# EXHIBIT A

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 2 of 45
Case 2:08-cv-00893-RTH-PJH Document 182-1 Filed 02/08/12 Page 1 of 44 PageID #:
6746

**PRE-TRIAL ORDER ATTACHMENT 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

|  |  |  |
|---|---|---|
| ——————————————— )  |  |  |
| **UNITED STATES OF AMERICA and** ) |  |  |
| **STATE OF LOUISIANA,** ) |  |  |
| ) | **Civil Action No. 2:08-cv-893** | |
| **Plaintiffs,** ) |  |  |
| ) | **Judge Richard T. Haik, Sr.** | |
| **v.** ) |  |  |
| ) | **Mag. Judge Patrick J. Hanna** | |
| **CITGO PETROLEUM CORPORATION,** ) |  |  |
| ) |  |  |
| **Defendant.** ) |  |  |
| ——————————————— ) |  |  |

**UNITED STATES' CITATIONS ON THE INTERPRETATION
AND APPLICATION OF THE PENALTY PROVISIONS
IN SECTION 311(b) OF THE CLEAN WATER ACT**

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 3 of 45
Case 2:08-cv-00993-RTH-PJH Document 182-1 Filed 02/08/12 Page 2 of 44 PageID #:
6747

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   Judicial Interpretation and Application of the Penalty Factors . . . . . . . . . . . . . . 1

          1.   Seriousness of the Violation or Violations . . . . . . . . . . . . . . . . . . . . . . 6

          2.   Economic Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

               a.   EPA's Interpretation of Economic Benefit . . . . . . . . . . . . . . . . 11
               b.   Consideration of Offsets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          3.   Degree of Culpability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          4.   Other Penalties for the Same Incident . . . . . . . . . . . . . . . . . . . . . . . . 17

          5.   History of Prior Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          6.   Nature, Extent, and Degree of Success of Any Efforts of
               the Violator to Minimize or Mitigate the Effects of the Discharge  . . . . .18

          7.   Economic Impact of the Penalty on the Violator . . . . . . . . . . . . . . . . . . 20

          8.   Other Matters as Justice May Require  . . . . . . . . . . . . . . . . . . . . . . . . 22

     B.   Judicial Standards for Negligence, Gross Negligence, and
          Willful Misconduct Under Section 311 of the Clean Water Act . . . . . . . . . . . . 22

          1.   The Interpretation of Negligence, Gross negligence, and
               Willful Misconduct Under the Clean Water Act . . . . . . . . . . . . . . . . . . 24

               a.   Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
               b.   Gross Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
               c.   Willful Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          2.   Louisiana Standards for Gross Negligence and Willful Misconduct . . . 30

          3.   Proving Gross Negligence and Willful Misconduct  . . . . . . . . . . . . . . . 34

III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

i

## **TABLE OF AUTHORITIES**

**CASES:**

*Ambrose v. New Orleans Police Dep't. Ambulance Serv.*,
    639 So. 2d 216 (La. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Arabie v. CITGO Petrol. Corp.*,
    49 So.3d 529 (La. App. 3d Cir. 10/27/10) (2010 WL 4226012) . . . . . . . . . . . . . . . . . . 24

*Atlantic States Legal Found. v. Tyson Foods, Inc.*,
    897 F.2d 1128 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 10

*Bayer Corp. v. British Airways, PLC*,
    210 F.3d 236 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*Brown v. Lee*,
    929 So. 2d 775 (La. Ct. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Cates v. Beauregard Electric Coop., Inc.*,
    316 So. 2d 907 (La. Ct. App. 1975), *aff'd*, 328 So. 2d 367 (La. 1976) . . . . . . . 32, 33, 34

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans*,
    891 F. Supp. 290 (E.D. La. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 34

*Harris v. Gardner*,
    216 F.3d 970 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Tug Ocean Prince, Inc.*,
    584 F.2d 1151 (2nd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 29, 30, 32, 35

*Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis*,
    2003 AMC 1681 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*Martinez v. Mukasey*,
    519 F.3d 532 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Occidental Chemical Corp. v. Elliott Turbomachinery* Co.,
    84 F.3d 172 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*,
    922 F.2d 220 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*PIRG v. Powell Duffryn Terminals, Inc.*,
    720 F. Supp. 1158 (D. N.J. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*PIRG v. Powell Duffryn Terminals, Inc.*,
    913 F.2d 64 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 22

*Pound v. Airosol Co., Inc.*,
    498 F.3d 1089 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 22

*Price v. Exxon Corp.*,
    664 So. 2d 1273 (La. Ct. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Resolution Trust Co. v. Diamond*,
    45 F.3d 665 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

*Rosenblath's, Inc. v. Baker Indus., Inc.*,
    634 So. 2d 969 (La. Ct. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Russello v. United States*,
    464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Saba v. Compagnie Nationale Air France*,
    78 F.3d 664 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 35

*Schultz v. State Farm Insurance Co.*,
    508 So. 2d 854 (La. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*,
    73 F.3d 546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 11

*State of New Jersey v. State of New York*,
    283 U.S. 336 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Vinzant*,
    7 So. 2d at 917 (La. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34

*Terrebonne v. Cheramie*,
    952 So. 2d 833 (La. Ct. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*The Houston Exploration Co. v. Halliburton Energy Services, Inc.*,
  269 F.3d 528 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*TRW Inc. v. Andrews*,
  534 U.S. 19, 31 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Tull v. United States*,
  481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 21

*United States v. Aluminum Co. of America*,
  824 F. Supp. 640 (E.D. Tex. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

*United States v. B&W Investment Properties*,
  38 F.3d 362 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Coastal States Crude Gathering Co.*,
  643 F.2d 1125 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 16

*United States v. Colonial Pipeline Co., Inc.*,
  242 F. Supp. 2d 1365 (N.D. Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Lexington-Fayette Urban County Government*,
  591 F.3d 484 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Gulf Park Water Co., Inc.*,
  972 F. Supp. 1056 (S.D. Miss. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16

*United States v. Gulf Park Water Co., Inc.*,
  14 F. Supp. 2d 854 (S.D. Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 7, 9, 11, 18, 21

*United States v. Hanousek*,
  176 F.3d 1116,  (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Marine Shale Processors*,
  81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Municipal Authority of Union Township*,
  150 F.3d 259 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12, 15, 21

*United States v. Ortiz*,
  427 F.3d 1278 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Scruggs*,
  No. G-06-776, 2009 WL 500608 (S.D. Tex. Feb. 26, 2009) . . . . . . . . . . . . . . . . . . . . . . . 5

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 7 of 45
Case 2:08-cv-00993-RTH-PJH Document 182-1 Filed 02/08/12 Page 6 of 44 PageID #:
6751

*United States v. Smithfield Foods, Inc.,*
    972 F. Supp. at 348 (E.D. Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13

*United States v. Smithfield Foods, Inc.,*
    191 F.3d 516 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 18

*United States v. Standard Oil Co.,*
    384 U.S. 224 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*United States v. Wong Kim Bo,*
    472 F.2d 720 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Water Quality Insurance Syndicate v. United States,*
    522 F. Supp. 2d 220 (D. D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 35

*Water Quality Insurance Syndicate v. United States,*
    632 F. Supp. 2d 108 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 29, 35

*Weber v. Trinity Meadows Raceway, Inc.,*
    No. 4:92-CV-267-Y, 1996 WL 477049 (N.D. Tex. June 20, 1996) . . . . . . . . . . . . . . . . 5

**STATUTES:**

26 U.S.C. § 9509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 9

33 U.S.C. § 1319(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. § 1319(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

33 U.S.C. § 1319(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

33 U.S.C. § 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 6, 15, 16, 18, 19, 23, 25

33 U.S.C. § 1321(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

33 U.S.C. § 1321(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 6, 8, 9, 16, 18, 20, 21, 30, 35

33 U.S.C. § 1321(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8, 9

33 U.S.C. § 1321(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 15-17, 22

33 U.S.C. § 1321(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1321(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 16, 19

33 U.S.C. § 1321(b)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 19

33 U.S.C. § 1321(b)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

33 U.S.C. § 1321(b)(7)(D) . . . . . . . . . . . . . . . 2, 4, 16, 17, 19, 22, 23, 25, 26, 27

33 U.S.C. § 1321(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 14, 23

33 U.S.C. § 1321(c)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

33 U.S.C. § 1321(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

33 U.S.C. 1321(j)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

33 U.S.C. § 1321(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1321(6)(B) (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 2702(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 2704(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33 U.S.C. § 2716(f)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

La. R.S. 9:2795 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

La. R.S. 9:2795(B)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

La. R.S. 9:2795(E)(2)(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**RULES AND REGULATIONS:**

40 C.F.R. § 19.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 22

40 C.F.R. § 110.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 112.8(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

70 Fed. Reg. 50326 (Aug. 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 9 of 45
Case 2:08-cv-00993-RTH-PJH Document 182-1 Filed 02/08/12 Page 8 of 44 PageID #:
6753

**OTHER SOURCES:**

Pub. L. 101-380 § 4301
     104 Stat. 484, 536-37 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

EPA, *Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean
     Water Act* (August 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Restatement (Third) of Torts § 2 Recklessness (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

Senate Hrg. 101-265, Three Recent Oil Spills Before the S. Comm. of
     Environment and Public Works, 101st Cong. 265 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 21

Senate Rep. No. 101-94 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722 . . . . . . . . . . . . . . . . . . 3, 4

W. Page Keaton, *et al.*, *Prosser and Keaton on the Law of Torts* § 34 (5th ed. 1984) . . . . . 26, 28

# I.   INTRODUCTION

In accordance with the Court's Pre-Trial Order instructions, the United States respectfully submits the following supplemental page-specific citations to relevant jurisprudence on the interpretation of the penalty provisions in Section 311(b) of the Clean Water Act, including the statutory penalty factors and the statutory terms "gross negligence" and "willful misconduct."  CITGO's liability for violation of Section 311(b)(3) was established by the Court in the order granting the United States' first motion for partial summary judgment.  ECF Doc. 79, Sum. J. Order at 6.  The amount of the penalty remains to be determined after trial.  The size of the penalty is within the discretion of the Court, based on the volume of the oil discharged, consideration of the penalty factors listed in Section 311(b)(8), and whether the spill involved gross negligence or willful misconduct.  At trial, the United States intends to prove that CITGO's violation was the result of gross negligence or willful misconduct, or both.

No court has determined a judicial penalty under Section 311(b) of the Clean Water Act since the gross negligence and volume-based penalty provisions were enacted in 1990.  To assist the Court's evaluation of an appropriate penalty under Section 311(b), the first section below (II.A) provides page-specific citations to relevant jurisprudence on the interpretation and application of the statutory penalty factors.  The second section (II.B) provides page-specific citations to relevant jurisprudence on the standards for negligence, gross negligence, and willful misconduct to be applied in this case.

# II.   DISCUSSION

## A.   Judicial Interpretation and Application of the Penalty Factors

A civil penalty is mandatory when it has been established that a defendant violated

1

Section 311(b)(3) of the Clean Water Act ("CWA" or "Act"). *See* 33 U.S.C. § 1321(b)(7)(A) and (D) (stating violators "shall be subject to a civil penalty"); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990) (holding that the "shall be subject to a civil penalty" language in Section 309(d) of the Clean Water Act mandates a penalty); *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 858 (S.D. Miss. 1998) (same).

If the defendant is *merely* strictly liable, the Court is authorized to set the penalty in an amount up to $1,100 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(A). If the violation results from "gross negligence or willful misconduct," however, the Court is authorized to set the penalty in an amount up to $4,300 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(D).[1] Before 1990, this section of the Clean Water Act only provided a penalty up to $50,000 based on strict liability or up to $250,000 in the case of "willful negligence or willful misconduct." 33 U.S.C. § 1321(6)(B) (1990). In 1990, in response to the *Exxon Valdez* oil spill, Congress (in passing the Oil Pollution Act ("OPA")) amended Section 311 of the Clean Water Act to increase the deterrent value of Clean Water Act penalties. Congress strengthened Section 311's penalty provisions by authorizing penalties to be based on the number of barrels discharged, a volume-based system not found in other environmental statutes, and reduced the standard for the highest penalties from one that required willfulness to one that required only gross negligence *or* willful misconduct. *See* Pub. L. 101-380, § 4301, 104 Stat. 484, 536-37 (1990); *compare* 33 U.S.C. § 1321(6)(B) (1990) *with* 33 U.S.C. § 1321(b)(7)(A), (D) (1991). Congress thus increased the penalties, made the volume of the spill the central factor, lowered the standard for imposing the

---

[1] Effective March 16, 2004, the civil penalty amounts under Section 311(b)(7)(A) and (D) were increased to $1,100 (strict liability) and $4,300 (gross negligence or willful misconduct) per barrel discharged, respectively, by the Civil Monetary Penalty Inflation Adjustment Rule. *See* 40 C.F.R. § 19.4.

Case 2:10-md-02179-CJB-DPC   Document 12347-2   Filed 02/14/14   Page 12 of 45
Case 2:03-cv-00093-RTH-PJH   Document 182   Filed 02/08/12   Page 11 of 44   PageID #:
6756

highest penalties, and envisioned that spills resulting from gross negligence or willful
misconduct warrant greater penalties than other spills.

Section 311(b)(8) of the Act lists eight penalty factors that the Court "shall consider" in
determining the penalty.  33 U.S.C. § 1321(b)(8).  The penalty factors are (1) "the seriousness of
the violation or violations," (2) "the economic benefit to the violator, if any, resulting from the
violation," (3) "the degree of culpability involved," (4) "any other penalty for the same
incident," (5) "any history of prior violations," (6) "the nature, extent, and degree of success of
any efforts of the violator to minimize or mitigate the effects of the discharge," (7) "the
economic impact of the penalty on the violator," and (8) "any other matters as justice may
require."  *Id.*

These penalty factors should be assessed in light of the purpose of the Clean Water Act.
The purpose of the Clean Water Act "is to protect human health, welfare, and the environment,
to eliminate the discharge of all pollutants to waters of the United States, and to restore the
chemical, physical, and biological integrity of the Nation's waters."  *United States v. Aluminum
Co. of America*, 824 F. Supp. 640, 645 (E.D. Tex. 1993).  In enacting Section 311(b) of the Act,
Congress made the "unequivocal declaration," *United States v. Coastal States Crude Gathering
Co.*, 643 F.2d 1125, 1127 (5th Cir. 1981), that "it is the policy of the United States that there
should be *no* discharges of oil or hazardous substances into or upon the navigable waters of the
United States [or] adjoining shorelines," 33 U.S.C. § 1321(b)(1) (emphasis added).  This
discharge prohibition is fundamental because "any spill, no matter how quickly we respond to it
or how well we contain it, is going to harm the environment.  Consequently, preventing oil spills
is more important than containing and cleaning them up quickly."  S. Rep. No. 101-94, at 2-3

3

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 13 of 45
Case 2:03-cv-00093-RTH-PJH Document 182-1 Filed 02/08/13 Page 12 of 44 PageID #:
6757

(1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 724.

Clean Water Act penalties are to punish and deter. *Tull v. United States*, 481 U.S. 412, 422-24 (1987). As the Fifth Circuit succinctly put it, the statutory purpose of Section 311 is "to achieve the result of clean water as well as to deter conduct causing spills." *Coastal States*, 643 F.2d at 1128. The punitive and deterrent value of Section 311(b)(7)(A) civil penalties is central to achieving the policies and purposes of the Clean Water Act: the threat of significant civil penalties creates a strong incentive for industry to take precautions to prevent oil spills. The heightened civil penalties in Section 311(b)(7)(D) discourage gross negligence and willful misconduct by increasing penalty exposure.[2]

Clean Water Act enforcement "is designed to be simple, speedy and straightforward." *United States v. Gulf Park Water Co., Inc.*, 972 F. Supp. 1056, 1059 (S.D. Miss. 1997). Courts within the Fifth Circuit have repeatedly employed a "top-down" approach to determine the appropriate amount of civil penalties for violation of environmental protection laws. Under the top-down approach, courts "begin by calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1337 (5th Cir. 1996).[3] "[P]enalties assessed by judges should be

---

[2] Pursuant to Section 311(s) of the CWA, 33 U.S.C. § 1321(s), penalties recovered by the United States for actions under Section 311 do not go to the general Treasury but instead are deposited in the "Oil Spill Liability Trust Fund" established under 26 U.S.C. § 9509, *inter alia*, to fund cleanups of future discharges of oil and to compensate victims of oil spills.

[3] For this proposition, the Fifth Circuit favorably cited *Tyson Foods, Inc.*, 897 F.2d at 1142 ("If [the court] chooses not to impose the maximum, it must reduce the fine in accordance with the [CWA penalty] factors . . . .") and *United States v. B&W Investment Properties*, 38 F.3d 362, 368 (7th Cir. 1994) ("In considering fines under the [Clean Air] Act, courts generally presume that the maximum penalty should be imposed."). *See also Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1095 (10th Cir. 2007) (quoting *Marine Shale* and *B&W Investment* in support of the top-down penalty approach used by the district court).

District courts in the Fifth Circuit use the top-down approach outlined in *Marine Shale. See,*

4

sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle." *Tull*, 481 U.S. at 425 (quoting 123 Cong. Rec. 39190-91 (1977)).

No court has had occasion to determine a Section 311(b)(7) judicial penalty based on the penalty factors listed in Section 311(b)(8) of the Clean Water Act. Although the United States has filed and resolved numerous complaints for violations of Section 311(b) since the gross negligence and per-barrel-discharged penalty provisions were enacted in 1990, no court has assessed a judicial penalty because all prior defendants have resolved their alleged violations through negotiated consent decrees or other pre-trial mechanisms. Some guidance can be found, however, in case law under Section 309(d) of the Clean Water Act setting out penalty factors for violations of discharge permits. Five of the eight penalty factors in Section 311(b)(8) are analogous to factors in Section 309(d).[4] Still, the Court should be cognizant that oil spills generate unique pollution concerns that warrant unique application of the penalty factors listed in Section 311(b)(8). The Supreme Court has long recognized the uniformly "deleterious effect" of oil spilled into our nation's waters: "its presence in our rivers and harbors is both a menace to navigation and a pollutant." *United States v. Standard Oil Co.*, 384 U.S. 224, 226 (1966). In addition, Congress places particular emphasis on the volume of the discharge in Section 311(b) penalties.

_____

*e.g.*, *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 573 (5th Cir. 1996) (affirming district court's judgment using *Tyson Foods'* top-down penalty approach); *Gulf Park*, 14 F. Supp. 2d at 858 (reviewing Fifth Circuit practice and applying the top-down approach described in *Tyson Foods*); *Weber v. Trinity Meadows Raceway, Inc.*, No. 4:92-CV-267-Y, 1996 WL 477049 at *15 (N.D. Tex. June 20, 1996) (applying top-down approach); *United States v. Scruggs*, No. G-06-776, 2009 WL 500608 at *3 (S.D. Tex. Feb. 26, 2009) ("The Fifth Circuit endorsed the 'top-down' methodology for calculating the appropriate penalty.").

[4] CWA Section 309(d) includes Section 311(b)(8) penalty factors 1, 2, 5, 7, and 8 listed above.

It is the Court's task to interpret the meaning of the penalty factors in Section 311 of the Clean Water Act, which is a question of federal law. *See, e.g.*, *Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 671-72 (2nd Cir. 1995) (collecting cases and holding that a federal court's task of interpreting the meaning of undefined words in a federal statute "is, and always has been, a matter of federal law"); *Cedar Point*, 73 F.3d at 565-68 (interpreting the meaning of "pollutant" in Section 309 of the CWA). The following discussion is provided to assist the Court's consideration of the statutory penalty factors and determination of the appropriate penalty in this case.

### 1.    Seriousness of the Violation or Violations

Assessing the "seriousness of the violation" penalty factor should be a simple matter in the oil spill context because oil spilled into our nation's waters has long been recognized as a serious hazard wherever it occurs. The Second Circuit summarized the unique and serious concerns of oil spills in *In re Tug Ocean Prince, Inc.*:

> Dumping and accidental spilling of oil constitutes a major pollution threat to the water resources of the nation. It can destroy or limit marine life, ruin wild life habitats, kill birds, limit or destroy the recreational value of ocean beaches, lake shores and river stretches, contaminate water supplies and create fire hazards. Congress has repeatedly indicated its high regard for our water quality and, conversely, its disdain for its pollution.

584 F.2d 1151, 1161 (2nd Cir. 1978) (addressing Section 311(f) oil spill cost recovery action). In light of Congress' creation of a volume-based penalty system for Section 311(b) violations, the volume of oil discharged provides a straightforward basis to assess the seriousness of the violation. For example, CITGO's admitted discharge of millions of gallons of oil would be a clear and strong indicator of a serious violation of Section 311(b).

Courts have addressed the "seriousness of the violation" penalty factor in the context of

Section 309(d) violations of discharge permits. When determining penalties for permit violations, courts have considered the significance of the violation (viewed in terms of the relative importance of the provision violated and the degree of exceedance), the number of violations and duration of noncompliance, and actual or potential harm. *See, e.g.*, *Gulf Park*, 14 F. Supp. at 859. Looking at the topics identified in *Gulf Park*, the "significance of the violation," particularly the "relative importance of the provision violated," *id.*, is obvious in oil spill cases. Congress has declared that there should be "no discharges" of oil, 33 U.S.C. § 1321(b)(1); a major discharge of oil strikes at the heart of the Clean Water Act. Similarly, in light of Congress' emphasis on the volume discharged in the Section 311(b)(7) penalty provisions, the "degree of exceedance" part of the "significance of the violation" topic, *Gulf Park*, 14 F. Supp. 2d at 859, is plainly evidenced by the volume discharged.

The "number of violations" and "duration of noncompliance," *id.*, are self-explanatory. The number of violations, however, is more pertinent to Section 309 violations that are solely subject to a "per day of violation" liability scheme than to significant oil spills such as this one, in which civil penalty liability is more appropriately determined by the volume of the discharge.

Regarding "actual or potential harm," *Gulf Park*, 14 F. Supp. 2d at 859, proof of actual harm is not required (although it is abundantly evident in this case). Courts widely recognize that potential harm alone, even without proof of actual harm, is sufficient to warrant substantial penalties. Because harm can be difficult, or in some circumstances, impossible to document, "[t]he United States is not required to establish that environmental harm resulted from the defendants' discharges or that the public health has been impacted due to the discharges, in order for this Court to find the discharges 'serious.'" *Id.* at 860-61 (discussing multiple cases). *See*

*also United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 344 (E.D. Va. 1997) ("The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect."), *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999).  This reasoning is even more apt in the context of Section 311(b) oil spills because the statute prohibits discharges of oil in "quantities as may be harmful," 33 U.S.C. § 1321(b)(3), evidencing that the focus of this provision is on potential harm.[5]  Thus, proof of a "film" or "sheen" of oil, 40 C.F.R. § 110.3(b), on the water evidences a violation of Section 311(b)(3) and establishes potential harm.

The United States will also show that CITGO's spill produced serious actual harm.  In a spill where millions of gallons of oil flowed into the waterways of the Calcasieu Estuary, the presence of a large volume of oil in the waterways is more than proof of potential harm; it also evidences actual harm.  Oil does not belong in our nation's waterways, and polluting these waters with oil is an actual harm in and of itself.  *See Standard Oil Co.*, 384 U.S. at 226 (recognizing oil's "presence in our rivers and harbors is both a menace to navigation and a pollutant"); 33 U.S.C. 1321(b)(1) (declaring there should be "no discharges" of oil).  Actual harm can be seen in impacts on commerce and navigation due to the presence of oil in the waterway, such as restrictions or closures of rivers, lakes, and businesses along the waterway.  Actual harm can also be seen in oiled and killed aquatic life and terrestrial wildlife, in miles of oiled shoreline and habitat, in the presence of toxins remaining in the estuary, or in the human

---

[5] Section 311(b)(4) of the Act directs the President to determine by regulation those quantities of oil that may be harmful, and the regulations issued to fulfill this mandate provide that such quantities include, *inter alia*, the presence of a "film" or "sheen" of oil on the water.  40 C.F.R. § 110.3(b).

Case 2:10-cv-02479-CJB-DPC Document 123-7 Filed 02/04/14 Page 18 of 45
Case 2:08-cv-00093-RTH-PJH Document 182-1 Filed 02/06/12 Page 1 of 44 PageID #:
6762

health and other socio-economic impacts of a spill.  *See, e.g.*, *Ocean Prince*, 584 F.2d at 1161

(discussing impacts of oil spills).  Any of these impacts would further support a finding of actual

harm and a substantial penalty.

      Finally, in the CWA Section 309 penalty context, courts have rejected arguments from

polluters that violations are not serious because the receiving waters were already being polluted

by other sources.  *See, e.g., Gulf Park*, 14 F. Supp. 2d at 859-61 (collecting cases and holding

"the existence of other sources of pollution does not mitigate the potential harm caused by this

discharge").  The Supreme Court teaches, a "river is more than an amenity, it is a treasure."

*State of New Jersey v. State of New York*, 283 U.S. 336, 342 (1931) (Justice Holmes).  The case

law, Section 311(b)(1)'s express "no discharge" oil policy, and the Clean Water Act's overall

goal to *restore* the integrity of our nation's waters make it clear that under Section 311(b) the

pre-existing contamination in a river provides no basis for a court to reduce a penalty for a spill.

      **2.**     **Economic Benefit**

      In considering the violator's economic benefit resulting from the violation, the Court is to

assess the financial benefit CITGO accrued through its noncompliance.  *See, e.g.*, *United States

v. Smithfield Foods, Inc.*, 191 F.3d 516, 530 (4th Cir. 1999) (approximating CWA Section 309

violator's economic benefit to "disgorge[] any profits it attained through its non-compliance").

Courts use economic benefit analysis to "recoup any benefits a violator gained by breaking the

law and which gave the violator an advantage vis-a-vis its competitors," thereby leveling the

economic playing field.  *United States v. Municipal Auth. of Union Township*, 150 F.3d 259, 267

(3rd Cir. 1998).  The point of the economic benefit factor is clear:  "Insuring that violators do not

reap economic benefit by failing to comply with the statutory mandate is of key importance if the

penalties are successfully to deter violations." *Tyson Foods*, 897 F.2d at 1141.

The violation in the CITGO oil spill case is the discharge of oil from the tanks to the waterway. CITGO has already admitted at a minimum that the violation resulted in substantial part from CITGO's years of failure to construct needed storage tank capacity and years of failure to remove the accumulation of oil from the tanks prior to the spill. ECF Doc. 79, Sum. J. Order, at 2 (quoting factual basis for criminal conviction). Accordingly, the Court's economic benefit analysis requires an approximation of the amount of money that CITGO gained from delaying and avoiding these and other costs that should have been incurred to maintain compliance and prevent the oil spill. To do this, the Court needs to assess the avoided and delayed costs of compliance and "determine how much money defendants made on the funds they did not spend for compliance." *Smithfield Foods*, 972 F. Supp. at 348-49, *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999). Money not spent on needed pollution control measures is fungible, and a violator can benefit from that money in a variety of ways. For example, when a company delays or avoids capital expenditures and operations-and-maintenance costs necessary for compliance, "the company is able to use those funds for other income-producing activities, such as investing that money in their own company." *Id.* A violating company and its parent company may also benefit by passing additional profits or dividends to the parent company.

The approximation method commonly used by the courts is the "cost avoided" method, "whereby economic benefit is measured by determining 'the avoided and/or delayed cost of compliance, . . . [using] the weighted average cost of capital (WACC) as a discount/interest rate.'" *Smithfield Foods*, 191 F.3d at 530 (describing this as "the common" method used)

10

(quoting *Smithfield Foods*, 972 F. Supp. at 349).[9]  The cost-avoided method is "a logical

method" that is "not in conflict with the CWA or basic economic principles."  *Id.* at 530

(upholding district court's use of the cost-avoided method and use of the WACC rate).  The

Court can also consider the extra income, or "wrongful profits," CITGO generated by continuing

to operate the refinery, and even expanding operations, in the face of inadequate wastewater

treatment and storage capacity.  *See, e.g.*, *Union Township*, 150 F.3d at 267 (discussing and

upholding wrongful profits analysis).

 Courts widely recognize that a "reasonable approximation of the economic benefit reaped

from the defendant's noncompliance is sufficient" to calculate a penalty under the Clean Water

Act.  *Gulf Park*, 14 F. Supp. 2d at 863; *see also Smithfield Foods*, 191 F.3d at 529 (quoting

"reasonable approximation" from CWA legislative history and collecting cases).  Moreover,

"[t]he determination of economic benefit does not require an elaborate evidentiary showing."

*Gulf Park*, 14 F. Supp. 2d at 863.

### a. EPA's Interpretation of Economic Benefit

 The Court should also consider EPA's interpretation of the meaning of the term

"economic benefit" in the statutes it administers.  *See, e.g.*, *Cedar Point*, 73 F.3d at 562 n.28

(citing to an EPA Federal Register entry and recognizing that EPA's "expertise in enforcing the

CWA is entitled to some deference").  EPA has interpreted the meaning of the economic benefit

factor in the notice and comment process and in policy statements.  In 2005, EPA published its

---

[9] The WACC rate is used to calculate the present value of the avoided or delayed costs. *Smithfield Foods*, 191 F.3d at 530 n.11.  The WACC "represents 'the average rate of return a company expects to make for its investors, in order to maintain its current level of investors and its current level of business operations.'"  *Id.* at 530-31 (quoting *Smithfield Foods*, 972 F. Supp. at 349 n.18).

notice of final agency action and its response to comments on how EPA "calculates the economic benefit that regulated entities obtain as a result of violating environmental requirements." 70 Fed. Reg. 50326 (Aug. 26, 2005). Consistent with the case law cited above, EPA stated that the economic benefit component seeks to "remove or neutralize the economic incentive to violate environmental regulations." *Id.* at 50329. "If these financial resources are not used for compliance, then they presumably are invested in projects with an expected financial return to the organization. This concept of alternative investment – that is, the amount the violator would normally expect to make by investing in something other than pollution control – is the basis for calculating the economic benefit of noncompliance." *Id.* This has been EPA's consistent interpretation of economic benefit for at least 20 years. *See, e.g.*, *Union Township*, 150 F.3d at 264 (quoting similar language from a 1990 EPA manual).

As EPA put it, a violator "may gain an economic benefit from either delaying and/or avoiding compliance costs." 70 Fed. Reg. 50329. For delayed compliance, the violator's economic benefit is "the difference between investing in pollution control and investing in other projects." *Id.* This is because "violators have the opportunity to invest their funds in projects other than those required to comply with environmental regulations." *Id.* For avoided compliance costs, the economic benefit is "the total avoided annual costs plus the return that could be expected on the funds that were used for projects other than pollution control." *Id.*

Also, after extensive notice and comment and peer review of its economic benefit model, EPA determined that use of the WACC rate is the most appropriate rate to calculate present value "because it better represents firms' total capital structures and their own typical business decision-making practices." *Id.* at 50337.

### b.    Consideration of Offsets

As a final point, it should be recognized that consideration of a violator's economic "benefit" does not call for a "cost-benefit" comparison of pre-spill financial benefits with post-spill costs.  In other words, contrary to what CITGO may argue, the post-spill costs to the violator, such as attorney fees and tort settlements, are not subtracted from the economic benefit of the cost-cutting conduct that caused the spill.  The economic benefit is to be calculated based on the avoided and delayed costs that should have been incurred to *prevent* the spill.  Post-spill costs play no role in that formula.  Moreover, comparing the financial benefits of the avoided and delayed costs and wrongful profits that a violator gained by not taking appropriate action to prevent an oil spill with all the expenses a violator incurs after an oil spill would frustrate the clear purpose of the economic benefit factor.

Violators should not be allowed to gain an economic advantage over their competitors by violating the law.  *Pound*, 498 F.3d at 1097; *PIRG v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 79 (3rd Cir. 1990) ("Violators should not be able to obtain an economic benefit vis-a-vis their competitors due to their non-compliance with environmental laws." (citations omitted)).  The economic benefit is enjoyed with each passing day prior to the spill because the violator does not spend the money needed to maintain compliance and prevent the spill.  The violator has the benefit of using the funds not spent on pollution control for other purposes, including making investments in its own profit-making operations or distributing extra profits to its parent company or shareholders.  *Smithfield Foods*, 972 F. Supp. at 349.  All of those benefits are obtained prior to the spill, and the benefit has already been realized by the time the spill occurs.  At the penalty stage, the Court needs to account for and disgorge those years of wrongful benefit

13

Case 2:08-cv-00093-RTH-PJH Document 182-1 Filed 02/06/15 Page 22 of 44 PageID #: 6767

that the violator enjoyed.

In addition to preventing violators from gaining a competitive advantage, the economic benefit factor is designed to remove all financial incentives to disregard the law. At the time they are deciding whether to incur the costs of preventing an oil spill, violators often know how much compliance will cost and decide to risk noncompliance precisely in order to avoid the costs of compliance. To eliminate the incentive to violate the law, the economic benefit factor looks at the time before the spill, when the violator is tempted to avoid incurring the costs of compliance, and ensures that, regardless of whether post-spill expenses turn out to be high or low, the money the violator set out to save is removed from the violator in the penalty-setting process.

Post-spill costs such as penalties, legal fees, cleanup costs, and third-party settlements thus are not relevant to the consideration of the economic benefit of noncompliance factor. The payment of penalties is expressly covered, not in the economic benefit factor, but in the Section 311(b)(8) "other penalties" penalty factor discussed below. Post-spill cleanup costs may be relevant to yet other penalty factors, as a reflection of the seriousness of the violation and the violator's efforts to minimize or mitigate the effects of the spill. Substantial third-party settlements reflect the seriousness of the violation and may help support a high penalty determination. A violator's legal fees are largely discretionary, do not relate to compliance in any meaningful way, and do not provide useful information in a penalty case. And, in many cases (as in this one), violators are reimbursed by insurers for these post-spill costs.

To consider post-spill costs as part of the economic benefit factor would allow a violator to mask the wrongful financial benefit it already enjoyed during the period of noncompliance – the value sought in the economic benefit factor – by using post-spill costs, such as discretionary

14

legal defense fees, to try to offset the penalty amount.  Such a result would be unjust and

contrary to the goals and purposes of the Clean Water Act in general and the economic benefit

penalty factor in particular.  EPA has addressed this exact issue in its published penalty policy

specifically addressing settlements of penalty cases for Section 311(b)(3) of the Clean Water

Act.  EPA, *Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean Water Act*,

at 16 (August 1998).[7]  EPA explains that, "[b]ecause Section 311(b)(3) establishes a 'no

discharge' standard for oil . . . , each person subject to this provision of law has an obligation to

make whatever investment is necessary to avoid prohibited discharges."  *Id.* at 16.  EPA states:

> Economic benefit is to be measured in the moment before the Section 311(b)(3)
> violation occurred, and *based solely on avoided costs that would have been*
> *incurred prior to the discharge.*  There should be no offset recognized under this
> factor for any economic losses the violator incurs as a result of the illegal
> discharge, such as the cost of lost product, or cleanup or response costs.

*Id.* (emphasis added).  Thus, EPA recognizes that post-spill expenses should not be included in

determining the economic benefit, which is focused on expenditures needed to prevent the spill

and remain in compliance with the law.  This is consistent with the general principle that "[t]he

fact that the violator has also penalized itself by failing to implement cost-effective methods that

would have put it into compliance . . . and thereby save it money is certainly no basis to mitigate

its penalty."  *Union Township*, 150 F.3d at 266.

Considering post-spill costs such as cleanup costs in the economic benefit factor is also

inappropriate because the violator has an independent duty to clean up its oil spill.  33 U.S.C.

§ 1321(c)(5)(A) (statutory obligation to "respond immediately to a discharge").  Failure to

comply with a cleanup order is a separate violation of Section 311 and subjects the violator to

---

[7] Available at epa.gov/compliance/resources/policies/civil/cwa/311pen.pdf.

another penalty up to three times the actual costs incurred by the United States. 33 U.S.C. § 1321(b)(7)(B). Thus, spending money to clean up an oil spill is a necessary action to avoid violating another law after the Section 311(b) violation has occurred. Moreover, oil polluters are liable under the Oil Pollution Act to pay the oil spill response costs and damages. *See* 33 U.S.C. § 2702(a). So if CITGO had not performed the cleanup work, the Coast Guard would have done so, and CITGO would now be liable for those costs as well.

Furthermore, post-spills costs are the direct result of the violator's unlawful conduct and the scope of the costs is largely dependent on the violator's post-spill conduct. For example, the violator may fail to properly notify response agencies, the violator may fail to adequately respond to the initial spill, or the violator may needlessly expand or prolong subsequent litigation. These post-spill failings and acts of the violator can lead to greatly increased spill response costs, damages, settlement costs, and legal fees. Ultimately, no matter how imaginative a violator gets in compiling post-spill costs, the fact remains that the violator already enjoyed the economic benefit of noncompliance prior to the spill.

### 3. Degree of Culpability

Section 311(b)(7) imposes strict liability for violation of Section 311(b)(3). *Coastal States*, 643 F.2d at 1127. *Gulf Park*, 972 F. Supp. at 1059 (holding "compliance with the CWA is a matter of strict liability"). As such, significant penalties are warranted even in the absence of culpable conduct. If the degree of culpability rises to the level of gross negligence or willful misconduct, the court has discretion to nearly quadruple the strict liability penalty up to $4,300 per barrel discharged. 33 U.S.C. § 1321(b)(7)(D); 40 C.F.R. § 19.4. The Court's assessment of culpability should address CITGO's acts and omissions that led to the discharge from the tanks.

As noted above and outlined in the accompanying Pre-Trial Order, the United States intends to prove that this spill resulted from CITGO's gross negligence or willful misconduct, or both.

### 4. Other Penalties for the Same Incident

The Court has already set out its basic approach to "other penalties" in ruling on the United States' first motion for partial summary judgment. The Court held:

> Plaintiffs' claim for a civil penalty is *clearly* not barred by CITGO's payment of its criminal fine, as the Clean Water Act specifically provides for both civil *and* criminal fines/penalties. Additionally, the plea agreement signed by CITGO reads, "Furthermore, this Plea Agreement does not provide or promise any waiver of any civil or administrative actions, sanctions, or penalties that may apply."

ECF Doc. 79, Sum. J. Order at 5 (internal citations omitted). The Court further held that "other penalties for the same incident are taken into consideration on the front end – in determining the amount of the fine – and not on the back end as an offset to the civil penalty imposed." *Id.*

The amount of a criminal fine in a *plea bargain* is, by its nature, a compromise figure. CITGO's fine only resolved its independent criminal liability and should have little influence on the determination of the appropriate amount of the civil penalty. CITGO's criminal fine was necessarily limited by the governing provisions of the criminal code and was not based on the civil penalty factors that the Court is required to consider in this case or the per-barrel penalty approach that Congress created for civil violations of Section 311(b)(3). Nor did the criminal case redress the gross negligence that is at issue in this case. The criminal negligence violations listed in Section 309(c)(1) of the Clean Water Act only provide causes of action for plain negligence, whereas the civil penalty provision in Section 311(b)(7)(D) authorizes the Court to nearly quadruple the per-barrel civil penalty in the case of gross negligence or willful misconduct. CITGO's culpability and the seriousness of the violation, in combination with the

17

other factors, will compel a finding that a substantial Section 311(b) civil penalty is needed to provide adequate deterrence and punishment for this extremely serious and preventable spill.

### 5. History of Prior Violations

The Court is to consider any history of prior violations. As the plain language "any" indicates, the Court may consider a defendant's violations from any time period. *See, e.g.*, *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1163 (D. N.J. 1989) (considering defendant's history of violations over 11 years in CWA Section 309 penalty action), *aff'd in relevant part*, 913 F.2d 64 (3rd Cir. 1990); *Gulf Park*, 14 F. Supp. 2d at 864 (considering violations over 12 years in CWA Section 309 penalty action). At a minimum, the Court can consider all types of violations that relate to violations of the Clean Water Act, including discharge permit violations, oil spills, deficiencies in spill prevention and control measures, and related air and hazardous waste releases. When considering wastewater discharge permit violations, courts have long recognized that a violation of a monthly permit limit "constitutes a violation of every day of that month." *United States v. Aluminum Co. of America*, 824 F. Supp. 640, 650 (E.D. Tex. 1993) (collecting cases). *See also Smithfield Foods*, 191 F.3d at 527-28 (same, collecting cases). In other words, each violation of a monthly permit limit amounts to approximately 30 days of violations. CITGO has a long history of violations that merits consideration at trial.

### 6. The Nature, Extent, and Degree of Success of Any Efforts of the Violator to Minimize or Mitigate the Effects of the Discharge

Violators have an independent statutory obligation to "respond immediately to a discharge," 33 U.S.C. § 1321(c)(5)(A), and thereby minimize or mitigate the effects of a discharge. Failure to comply with a cleanup order is a separate violation of Section 311 and

18

subjects the violator to another penalty up to three times the actual costs incurred.  33 U.S.C. § 1321(b)(7)(B).  In light of a violator's independent duty to clean up its oil spill, violators are expected to make prompt and satisfactory efforts to minimize or mitigate the effects of a discharge.  Accordingly, mitigation of the penalty should be considered only if the violator's response efforts and results were beyond satisfactory.  Furthermore, the size of the spill helps inform the level of response needed: big spills typically require substantial spill response efforts.

If the Court is considering mitigating the penalty to take account of the amount of oil that discharged from the tanks but was recovered from within the berm (i.e., the amount of oil that did not escape the breached secondary containment), that consideration should be counter-balanced with a recognition that a failed secondary containment berm is evidence of a violation of another provision of the Clean Water Act.[9]  Section 311 and its implementing regulations *mandate* that adequate secondary containment for CITGO's tanks be maintained at all times.  40 C.F.R. § 112.8(c)(2).  The regulations – promulgated under Section 311(j)(1)(C) of the CWA – require that the secondary containment berm be, *inter alia*, "impervious" and capable of holding the entire capacity of the largest tank in the containment area plus sufficient freeboard for anticipated rain.  40 C.F.R. § 112.8(c)(2).  Thus, CITGO's incentive for having reliable

---

[9] As a matter of law, the definition of "discharge" in Section 311(a)(2) and the plain language of the penalty provisions in Section 311(b)(7)(A) and (D) require that the maximum potential penalty be determined by the total volume discharged from CITGO's tanks, not on any lesser amount that escaped CITGO's failed secondary containment berm.  *See United States v. Colonial Pipeline Co., Inc.*, 242 F. Supp. 2d 1365, 1376-77 (N.D. Ga. 2002) (holding Section 311(b)(7) penalty is based on the "entire amount of oil or hazardous substance released into the environment").  The discharge of oil into a leaking, partially bare-earth, open-air containment berm, from which hundreds of thousands of gallons of oil dispersed into the surrounding air and underlying soil, certainly is a release into the environment.  It is a separate, fact-based issue as to whether a court should allow some mitigation credit for oil recovered from within a failed berm.

19

secondary containment is that it had a pre-existing legal duty to maintain its secondary containment berm and prevent the multiple breaches that occurred.

Any acts or omissions by a violator that worsen the effects of the discharge also should be considered under this factor. Examples include a violator's failure to promptly and properly notify federal or state response authorities; failure to warn employees, neighbors, or responders of health hazards related to the spill; failure to protect the health and welfare of employees, neighbors, or responders; and inadequate or incomplete efforts to contain or control the discharge.

Finally, the plain language of the penalty factor, "efforts of the violator," indicates that the focus is on what the violator did to minimize or mitigate the effects of the discharge. Thus, a court should not give credit for cleanup results that are due to events beyond the control of the violator, such as the temperature, the tides, the weather, the inherent properties of the spilled oil, or the effectiveness of the Coast Guard's response efforts. For example, the fact that a significant amount of oil typically evaporates into the surrounding air due to ambient temperatures, tidal effects, river currents, or the chemical properties of the spilled oil does not reflect any effort of the violator to remove oil from the waterway. Indeed, the fact that spilled oil disperses into the surrounding air through evaporation changes, rather than mitigates, the effects of the discharge; the evaporation of surface oil transfers hazardous oil components from the water to the atmosphere and creates new air quality impacts such as inhalation exposure hazards to people and wildlife.

### 7. Economic Impact of the Penalty on the Violator

The Supreme Court in *Tull* held that a court "may also seek to deter future violations by

basing the penalty on its economic impact." 481 U.S. at 423. *See also Gulf Park*, 14 F. Supp. 2d at 859 n.3. A "civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business." *Powell Duffryn*, 720 F. Supp. at 1166; *Gulf Park*, 14 F. Supp. 2d at 869 (same). In strengthening the penalty provisions in Section 311(b) in 1990, Congress recognized that "what we need to do is raise the cost of carelessness and to emphasize prevention. One of the best ways to induce the oil industry to operate more safely, I believe, is to make sure that they pay heavily when there is a spill." S. Hrg. 101-265 at 155 (statement of Rep. Schneider). Otherwise, the violator and others will be tempted to roll the dice on the monetary tradeoffs between fulfilling their duty to prevent oil spills and paying to pollute.

That a penalty amount may be inadequate to achieve deterrence is of particular concern in cases involving a company with the financial resources of CITGO, as evidenced by the fact that CITGO has tens of billions of dollars in annual revenues and assets and has sent over 4.5 billion dollars in voluntary dividends to its large parent company in Venezuela since the oil spill.

Under this penalty factor, courts also consider the finances of the violator's parent company. *See, e.g.*, *Union Township*, 150 F.3d at 268 ("Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on the violator."). "If the subsidiary does not retain its revenues, . . . then its parent's financial resources are highly relevant." *Id.* at 268-69. *See also Powell Duffryn*, 720 F. Supp. at 1166 (considering defendant's relationship with its large international parent company and rejecting defendant's claim of economic impact of the penalty). Thus, under this factor, it is appropriate for a court to consider a violator's or its parent company's vast wealth, revenues, assets, or earning capacity.

8.      **Other matters as justice may require**

The scant case law on this penalty factor typically identifies matters that are not properly considered under this factor.  For example, in *Pound v. Airosol Co., Inc.*, the Tenth Circuit reversed the district court's Clean Air Act penalty determination in a citizen suit based in part on the district court's consideration of several improper factors, including the fact that the government did not join the citizen suit, requiring proof of an intentional violation, and the plaintiff's alleged competitive motivation in filing the suit.  498 F.3d 1089, 1096-97.  Similarly, in *Powell Duffryn*, the Third Circuit reversed the district judge's reduction from the statutory maximum CWA penalty because the district court based the reduction on the fact that the government did not join in the citizen suit or otherwise prosecute the violation.  913 F.2d at 69-70, 81.  Another improper factor would be the cost of injunctive relief because the need for injunctive relief and the associated costs are to be considered separately from the penalty determination.  *See, e.g.*, *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 487 (6th Cir. 2010) ("Rejecting a civil penalty as too high because of the greater seriousness of the violation, or because the penalty money could be used for remediation, is in tension with, rather than in accordance with, the statutory purpose behind civil penalties.").

**B.      Judicial Standards for Negligence, Gross Negligence, and Willful Misconduct Under Section 311 of the Clean Water Act**

The United States will prove at trial that CITGO's violation of Section 311(b)(3) of the Clean Water Act was the result of CITGO's gross negligence or willful misconduct, or both.  Under Section 311(b)(7)(D) of the Clean Water Act, the maximum penalty for a violation resulting from gross negligence or willful misconduct is an amount "not more than" $4,300 per barrel of oil discharged.  33 U.S.C. § 1321(b)(7)(D); 40 C.F.R. § 19.4.  In the related Clean

Water Act criminal action, CITGO already pleaded guilty to negligent discharges from the tanks based on CITGO's failure to construct needed storage tank capacity and its failure to properly operate and maintain the existing tanks. *See* ECF Doc. 79, Sum. J. Order at 2 (quoting admitted factual basis of the criminal plea). Thus, CITGO's negligence under the Clean Water Act is established. The only question that remains is whether CITGO's breach of duty amounts to gross negligence or willful misconduct. This section addresses the legal standards for assessing gross negligence and willful misconduct under Section 311 of the Clean Water Act.

As with the interpretation of the Section 311(b)(8) penalty factors discussed above, the Court should assess negligence, gross negligence, and willful misconduct in this Clean Water Act case based on a uniform, federal interpretation of those statutory terms rather than on the tort law of the state where the spill or gross negligence or willful misconduct occurred. *See Diamond*, 45 F.3d at 671-72 (holding that a federal court's task of interpreting the meaning of undefined words in a federal statute "is, and always has been, a matter of federal law").[9] Consistent federal interpretation is necessary and appropriate to ensure that the enforcement of this federal health and welfare statute is fair and predictable and not subjected to different, potentially conflicting outcomes based on state lines.

Although the Clean Water Act does not define negligence, gross negligence, or willful misconduct, and no cases have interpreted the meaning of gross negligence or willful misconduct specifically under Section 311(b)(7)(D), federal courts have interpreted the terms negligence, gross negligence, and willful misconduct as used in other provisions of the Act and the related

---

[9] In *Diamond*, the Second Circuit was called upon to interpret the meaning of the phrase "contract or lease" in a federal statute. Surveying Supreme Court precedent, the Court explained that the meaning of undefined words in a federal statute is discerned from "generally applicable, long-standing principles of law," rather than adherence to a particular state's interpretations. *Id.*

Oil Pollution Act of 1990.  The courts have developed consistent interpretations of these statutory terms in the context of federal enforcement of the Clean Water Act and OPA.

Were the Court, however, to look to Louisiana law on the meaning of the statutory terms negligence, gross negligence, and willful misconduct in the Clean Water Act, the Court's analysis and decision should be the same because Louisiana law on these terms is sufficiently similar to the federal interpretations.  Indeed, the Louisiana Court of Appeal (Third Circuit) recently held that CITGO's acts and omissions in the design and operation of the Wastewater Treatment Plant "clearly" supported a finding of gross negligence for this oil spill.  *Arabie v. CITGO Petrol. Corp.*, 49 So.3d 529, 558 (La. App. 3d Cir. 10/27/10) (upholding trial verdict for compensatory and punitive damages based on a finding of gross negligence).[10]

### 1.       The Interpretation of Negligence, Gross Negligence, and Willful Misconduct Under the Clean Water Act

#### a.       Negligence

A finding of negligence under the Clean Water Act requires objective proof of a failure to use such care as a reasonably prudent person would use under similar circumstances.

Construing the criminal negligence provision in Section 309(c) of the Clean Water Act, the Tenth Circuit held:  "In its ordinary usage, 'negligently' means a failure to exercise the degree of care that someone of ordinary prudence would have exercised in the same

---

[10] Applying the Texas gross negligence standard, which is more demanding than that of the Clean Water Act or Louisiana law, the Court held that CITGO "had knowledge and was constantly aware of the problems with the WWTU [Wastewater Treatment Unit] but made decisions and enforced policies regarding engineering and construction that resulted in the ultimate release of millions of gallons of toxic oil and wastewater into the Calcasieu waterways, causing injuries and damages to plaintiffs."  *Id.*  CITGO's appeal to the Louisiana Supreme Court is pending (writ app. granted Feb. 4, 2011).

circumstance." *United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (addressing discharge without a permit under Section 301); *see also id.* at 1282 ("Even though the CWA does not define the term 'negligently,' we can easily determine what the government must prove").[1] In *United States v. Hanousek*, also a criminal negligence case, the Ninth Circuit held that the "ordinary meaning of 'negligently' is a failure to use such care as a reasonably prudent and careful person would use under similar circumstances." 176 F.3d 1116, 1120 (9th Cir. 1999) (addressing discharge under CWA Section 311).

Consistent with these cases, negligence under the Oil Pollution Act has been interpreted as "a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances." *Water Quality Insurance Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) *("WQIS(2009)")* (OPA cost recovery claim) (quoting *Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis*, 2003 AMC 1681, 1693 (2003)). The standard is an objective one based on what the reasonably careful person would do under similar circumstances.

**b.    Gross Negligence**

A finding of gross negligence under Section 311(b)(7)(D) of the Clean Water Act requires objective proof of a departure from the standard of care beyond that which would constitute ordinary negligence. "Taken at face value, [gross negligence] simply means negligence that is especially bad, that is 'gross.' Given this literal interpretation, gross negligence carries a meaning that is less than recklessness." Restatement (Third) of Torts § 2

---

[1] Section 309(c) of the Act criminalizes negligent violations under a variety of sections including Sections 301 and 311.

25

Recklessness, cmt. a (1999). Indeed, "most courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind." W. Page Keaton, *et al.*, *Prosser and Keaton on the Law of Torts* § 34, at 212 (5th ed. 1984).

Based on the plain language of Section 311(b)(7)(D), "gross negligence" and "willful misconduct" are two distinct terms that have different meanings. The use of two terms and the use of the disjunctive "or" that separates "gross negligence" from "willful misconduct" in Section 311(b)(7)(D) express clear congressional intent that the two terms have different meanings. *See Martinez v. Mukasey*, 519 F.3d 532, 543 (5th Cir. 2008) ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992))). Moreover, as discussed above, Congress added the term "gross negligence" to the statute in 1990, changing the text from "willful negligence or willful misconduct" to "gross negligence or willful misconduct." *See supra*, at 2. If Congress meant for the terms gross negligence and willful misconduct to have the same meaning, Congress would have simply cut the old term "willful negligence" and left "willful misconduct" standing alone. To interpret the two terms to mean the same thing would render superfluous one of the key terms of the Clean Water Act's penalty provision. Such a reading would be improper because "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations omitted).

The two terms also have distinct meanings in the related Oil Pollution Act of 1990, which

amended CWA Section 311(b)(7)(D) by adding, *inter alia*, the term "gross negligence." For example, OPA provides liability limits for a responsible party unless the oil spill was caused by, *inter alia*, the "gross negligence or willful misconduct of" the responsible party, 33 U.S.C. § 2704(c)(1). But OPA only allows a guarantor to assert a defense if the spill was caused by "the willful misconduct of the responsible party." 33 U.S.C. § 2716(f)(1)(C). "'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). That the OPA defense for guarantors includes only "willful misconduct" but not "gross negligence" demonstrates that Congress intended the two terms to have separate meanings. *See also Water Quality Insurance Syndicate v. United States*, 522 F. Supp. 2d 220, 228, 230 (D. D.C. 2007) *("WQIS(2007)")* (finding willful misconduct of responsible party in OPA Section 2716(f) claim and not discussing gross negligence); *WQIS(2009)*, 632 F. Supp. 2d at 112 (upholding finding of gross negligence under OPA Section 2704(c)(1) and not discussing willful misconduct).

Moreover, in *WQIS (2009)*, gross negligence was treated as follows:

> Negligence is a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances. A greater degree of care is required when the circumstances present a greater apparent risk. Negligence is "gross" when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care.

632 F. Supp. 2d at 112 (quoting *Kuroshima Shipping*, 2003 AMC at 1693 (2003)). Thus, a finding of gross negligence is to be based on a factual determination that the negligence is "gross" and does not require evidence of recklessness or willful misconduct. The amount of care

needed to prevent an oil spill must be assessed in light of the totality of the circumstances. *Id.* at 115. For example, "As the danger becomes greater, the actor is required to exercise caution commensurate with it." Keaton, *Prosser and Keaton on the Law of Torts* § 34, at 208-09.

Even apart from the plain language of the Clean Water Act and the Oil Pollution Act and related cases, it is well settled that gross negligence and willful misconduct are distinct legal terms of art that have separate meanings.[12] And courts "readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense." *Harris v. Gardner*, 216 F.3d 970, 973 (11th Cir. 2000). Gross negligence is found where acts or omissions deviate from an objective standard of care in some measure beyond ordinary negligence. *See, e.g.*, Keaton, *Prosser and Keaton on the Law of Torts* § 34, at 212 (reporting "most courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind."). Gross negligence is not reckless disregard of probable consequences, which is equivalent to willful misconduct. Restatement (Third) of Torts § 2 Recklessness, cmt. a (1999) (noting "gross negligence carries a meaning that is less than recklessness"); *see also Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667-68 (D.C. Cir. 1996) (discussing the "continuum that runs from simple negligence through gross negligence to intentional misconduct" and recognizing reckless disregard as equivalent to willful misconduct, both of which are different than gross negligence). Thus, gross negligence is more than ordinary negligence and different than willful misconduct. *See, e.g.*, *Bayer Corp. v. British Airways, PLC*, 210 F.3d 236, 239 (4th Cir. 2000) (holding, in spoilage of goods case under Warsaw Convention, that "[t]he cases have repeatedly held that negligence,

---

[12] Willful misconduct is discussed in detail in the next section.

even gross negligence, would not satisfy [the willful misconduct] standard.").

Most simply put, gross negligence is a departure from the standard of care beyond that which would constitute ordinary negligence. Gross negligence, as a heightened degree of ordinary negligence, is assessed based on the same objective reasonable person standard. *See, e.g.*, *WQIS(2009)*, 632 F. Supp. 2d at 112.

### c. Willful Misconduct

The Second Circuit Court of Appeals construed "willful misconduct" under Section 311(f) of the Clean Water Act (which authorizes oil spill cost recovery actions). The Second Circuit defined willful misconduct as follows:

> an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences. If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an implication of a reckless disregard of the probable consequences. The knowledge required for a finding of willful misconduct is that there must be either actual knowledge that the act, or failure to act, is necessary in order to avoid danger, or if there is no actual knowledge, then the probability of harm must be so great that failure to take the required action constitutes recklessness.

*Ocean Prince*, 584 F.2d at 1163 (internal citations omitted) (finding willful misconduct based on company's omissions that led to oil spill). In a recent OPA cost recovery case, the district court in *WQIS(2007)* applied *Ocean Prince's* willful misconduct and reckless disregard standard and found the responsible party's acts constituted reckless disregard and willful misconduct. *WQIS(2007)*, 522 F. Supp. 2d at 229-30.

Other federal courts applying federal law have also long recognized that willful misconduct represents a different standard than gross negligence. Addressing willful misconduct

in *Bayer Corp.*, the Fourth Circuit recognized that "[t]he cases have repeatedly held that negligence, even gross negligence, would not satisfy [the willful misconduct] standard." 210 F.3d at 239. Consistent with *Ocean Prince*, courts also recognize that reckless disregard is "equivalent to willful misconduct" and serves as "a proxy for willful misconduct's scienter requirement." *Saba*, 78 F.3d at 667; *id.* at 668 (holding reckless disregard "lies between gross negligence and intentional harm.").

In summary, the Clean Water Act and Oil Pollution Act cases and the other cases discussed above employ these commonly understood meanings of the terms negligence, gross negligence, and willful misconduct under federal law. The Court should interpret the statutory terms "gross negligence" and "willful misconduct" in Section 311(b) consistent with this case law to ensure fair and predictable enforcement that is not subject to different outcomes based on an individual state's tort law.

### 2. Louisiana Standards for Gross Negligence and Willful Misconduct

Even if the Court were to apply state law – which it should not for the reasons discussed in the previous section – the Court should come to the same conclusion on the meaning of the terms gross negligence and willful misconduct because Louisiana law is similar to the federal interpretations.

As an initial matter, *First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans* instructs that "gross negligence" and "willful misconduct" are not synonymous terms. 891 F. Supp. 290 (E.D. La. 1995). In *Hibernia*, the case centered on the meaning of "willful misconduct or gross negligence" in a contract clause. In upholding a jury finding of gross negligence, the Court noted that the "other standard," willful misconduct, "was not an issue" in

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 40 of 45
Case 2:08-cv-00993-RTH-PJH Document 182-1 Filed 02/06/12 Page 39 of 44 PageID #:
6784

the case. *Id.* at 293 n.7, 296 n.15. Thus, the Court readily recognized that the plaintiff could

meet its burden by proving either gross negligence or willful misconduct. *See also State v.

Vinzant*, 7 So. 2d at 917, 921-22 (La. 1942) (holding that gross negligence has a well understood

meaning that clearly is not synonymous with willful).

Under Louisiana statutes and case law, "the prevailing meaning" of gross negligence is

understood to involve acts and omissions that fall "somewhere in the range between ordinary

negligence and intentional conduct." *Rosenblath's, Inc. v. Baker Indus., Inc.*, 634 So. 2d 969,

972 (La. Ct. App. 1994) (affirming gross negligence ruling where security guard contractor

checked front door to a department store after alarm went off but failed to check the rear

entrance). Gross negligence has been described as "conduct which falls below that which is

expected of a reasonably careful person under like circumstances, or which is less than that

diligence which even careless men are accustomed to exercise." *Id.* at 973 (collecting Louisiana

cases and statutory definitions referring to "substantial deviation" and "gross deviation" from

reasonable conduct). *See also Ambrose v. New Orleans Police Dep't. Ambulance Serv.*, 639 So.

2d 216, 223 (La. 1994) (holding emergency medical personnel were not grossly negligent where

it took 20 minutes to get patient into an ambulance under difficult circumstances and describing

gross negligence as, among other things, "an extreme departure from ordinary care" and the

"want of that diligence which even careless men are accustomed to exercise"); *Hibernia*, 891 F.

Supp. at 294-295 (finding gross negligence based on "major" and "gross" deviations from

banking practices). Gross negligence is to be assessed by an objective standard and "requires no

intent." *Rosenblath's*, 634 So. 2d at 972; *id.* (stating "gross negligence involves conduct which

falls far short of knowledge to a substantial certainty of harmful consequences"). Conduct

31

includes "omissions as well as acts." *Schultz v. State Farm Insurance Co.*, 508 So. 2d 854, 857 (La. Ct. App. 1987). In other words, gross negligence under Louisiana law is found where the departure from the standard of care is beyond that which would constitute ordinary negligence.

A straightforward example of gross negligence from the Louisiana courts is *Brown v. Lee*, wherein the Louisiana Court of Appeals declared that it would be gross negligence for a man on a Mardi Gras float to throw a coconut to an acquaintance on the street during a parade. 929 So. 2d 775, 779 (La. Ct. App. 2006). The risk of harm was objectively evidenced by the float krewe's internal rule against throwing coconuts into the crowd. The court found such conduct demonstrated "'want of even slight care and diligence' that is the very definition of 'gross negligence.'" *Id.*

Similar to the Second Circuit Court of Appeal's definition of willful misconduct in the *Ocean Prince* CWA case discussed above, Louisiana courts have defined the term "willful" to mean "a conscious course of action, in which an action is knowingly taken or not taken, which would likely cause injury, with a conscious indifference to the consequences thereof." *Price v. Exxon Corp.*, 664 So. 2d 1273, 1281 (La. Ct. App. 1995) (finding "willful" failure to warn based on a "conscious indifference to the danger posed"). Similarly, in the often-cited case of *Cates v. Beauregard Electric Coop., Inc.*, the Louisiana court viewed the terms "willful," "wanton," and "reckless" as virtually synonymous and held them to mean "that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." 316 So. 2d 907, 916 (La. Ct. App.

1975), *aff'd*, 328 So. 2d 367 (La. 1976). *See also Terrebonne v. Cheramie*, 952 So. 2d 833, 836 (La. Ct. App. 2007) (same, addressing "willful" and citing *Cates*).

Finally, in contrast to federal law and Louisiana opinions like *Hibernia* and *Vinzant*, which drew a clear distinction between gross negligence on one hand and reckless and willful misconduct on the other, some state and federal opinions interpreting gross negligence under Louisiana law include an overlap between gross negligence and willful misconduct concepts. That is, Louisiana courts and federal cases interpreting Louisiana cases sometimes include willful misconduct concepts as part of the discussion of gross negligence, but this conflation often occurs when making a distinction between the two concepts is not determinative of the case at hand or in recognition that evidence of willful misconduct would also satisfy the gross negligence standard. For example, in *Rosenblath's*, the court held that gross negligence can include acts or omissions amounting to "'reckless disregard' *or* 'careless indifference,' and may involve a gross or substantial deviation from an expected or defined standard of care." 634 So. 2d at 973. *See also Occidental Chemical Corp. v. Elliott Turbomachinery* Co., 84 F.3d 172, 177 (5th Cir. 1996) (same, quoting *Rosenblath's*); *Ambrose*, 639 So. 2d at 223 (weighing the facts and deciding between negligence and a list of gross negligence concepts that also included some "willful" concepts); *The Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528, 531-32 (5th Cir. 2001) (holding conduct amounted to negligence at most and citing a laundry list of concepts for gross negligence that included additional "willful" concepts).[13]

---

[13] *Halliburton* is a particularly unhelpful case for discerning the boundary between gross negligence and willful misconduct in Louisiana law. In it, the Fifth Circuit cited *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220 (5th Cir. 1991), as the basis for including "willful, wanton and reckless conduct" in its discussion of gross negligence. *Halliburton*, 269 F.3d at 531, n.7. The *Orthopedic* opinion, in turn, relied on the Louisiana case

Case 2:10-md-02179-CJB-DPC Document 12347-2 Filed 02/14/14 Page 43 of 45
Case 2:08-cv-00093-RTH-PJH Document 162-1 Filed 07/08/11 Page 42 of 44 PageID #:
6787

But when the Louisiana legislature and courts need to specifically address willful
misconduct, they readily make the distinction between willful misconduct and gross negligence.
For example, in one of the frequently cited cases on gross negligence, the Louisiana Supreme
Court in *State v. Vinzant* held that the statutory terms "grossly negligent" and "grossly reckless"
had different meanings, and both were clearly distinct from "wilfully or wantonly."  7 So. 2d at
922.  *See also Hibernia*, 891 F. Supp. at 293 n.7, 296 n.15 (recognizing "gross negligence" and
"willful misconduct" involve different standards).  And in La. R.S. 9:2795, the Louisiana
legislature limits the liability of private landowners who allow use of their property for
recreational purposes except in cases of "willful or malicious" failure to warn, La. R.S.
9:2795(B)(1), but limits the liability of public parks except in cases of "intentional or grossly
negligent acts" by an employee, La. R.S. 9:2795(E)(2)(d).  The legislature's use of different
terms in the same statutory section indicates the legislature's understanding that gross negligence
differs from willful misconduct.

### 3. Proving Gross Negligence and Willful Misconduct

The burden of proof is a "preponderance of the evidence."  *Hibernia*, 891 F. Supp. at 293
(upholding gross negligence finding based on preponderance of the evidence); *Herman &
MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) (recognizing preponderance-of-the-evidence
standard is generally applicable in civil actions).

Gross negligence and willful misconduct are to be assessed based on the totality of the

---

of *Cates* (discussed above).  *Cates*, however, addressed, not gross negligence, but "wanton"
negligence, by which the Court meant willful or conscious indifference (what federal courts
would call willful misconduct).  *Cates*, 316 So. 2d at 916.  *Cates* thus distinguished gross
negligence from reckless and willful misconduct.

circumstances. *See, e.g.*, *WQIS(2009)*, 632 F. Supp. 2d at 115 (upholding finding of gross negligence upon consideration of "all of the circumstances"); *Ocean Prince*, 584 F.2d at 1164 (finding willful misconduct due to a "combination of factors which together indicate a probable consequence of damage resulting from several failures to act, and by continuing to fail to act in the face of that probability, that indicates a reckless disregard of the consequences"); *Saba*, 78 F.3d at 667 (holding the court can "consider a pattern of conduct even if no one action or omission by itself would" amount to willful misconduct). Accordingly, multiple acts or omissions can cumulatively amount to gross negligence or willful misconduct. *See, e.g.*, *Ocean Prince*, 584 F.2d at 1164 ("While any one of the faults of Red Star alone . . . may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the [CWA]."); *WQIS (2007)*, 522 F. Supp. 2d at 230 ("The Court in *Ocean Prince* made clear that its conclusion that there was willful misconduct was based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.'" (quoting *Ocean Prince*)).

## III. CONCLUSION

This Court will make the first known judicial determination of a penalty under Section 311(b) based on the listed penalty factors, the volumetric penalty provisions, and the gross negligence and willful misconduct standards. The cases discussed above provide a framework for the Court's consideration of the penalty factors and gross negligence and willful misconduct under Section 311(b) of the Clean Water Act.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

IGNACIA S. MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

_/s/ Jason T. Barbeau_
JASON T. BARBEAU
Trial Attorney (D.C. Bar No. 468200)
David F. Askman (Wyoming Bar No. 5-2683)
Joseph W.C. Warren (D.C. Bar No. 452913)
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044
(202) 616-8908 (telephone)
(202) 616-6584 (facsimile)
jason.barbeau@usdoj.gov

STEPHANIE A. FINLEY
United States Attorney

Of Counsel:                         KAREN J. KING (#23508)
Edwin M. Quinones                   Assistant United States Attorney
Office of Regional Counsel          800 Lafayette Street, Suite 2200
Region 6, U.S. EPA                  Lafayette, LA 70501-6832
1445 Ross Avenue                    (337) 262-6618 (telephone)
Dallas, TX 75202-2733               (337) 262-6693 (facsimile)
                                    karen.king@usdoj.gov