# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF LOUISIANA, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITGO PETROLEUM CORPORATION, | ) ) |
| Defendant. | ) ) |

Civil Action No. 2:08-cv-893

Judge Richard T. Haik, Sr.

Mag. Judge Patrick J. Hanna

# UNITED STATES' CLOSING ARGUMENT

# AND

# PENALTY DEMAND

# TABLE OF CONTENTS

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Penalty Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.     CITGO's violation of Section 311(b)(3) of the Clean Water Act
         was the result of CITGO's gross negligence and willful misconduct . . . . . . . . . 1

     B.     Plaintiffs' spill volume calculations are the only credible evidence on volume . . 5

     C.     CITGO's acts and omissions warrant a high penalty based on
         the eight penalty factors in Section 311(b)(8). . . . . . . . . . . . . . . . . . . . . . . . . 8

         1.     CITGO's oil spill was a very serious violation of the Clean Water Act . . 8

         2.     CITGO obtained $83 million in economic benefit by delaying
            and avoiding projects needed to prevent the spill. . . . . . . . . . . . . . . . . . 9

         3.     CITGO's poor spill response during the first two days of the spill
            gave rise to the large-scale spill response effort that ensued. . . . . . . . . 11

         4.     Penalty factors 3, 4, 5, 7, and 8 also support a high penalty in this case . 13

III.   Penalty Demand for Violation of Section 311(b)(3) of the Clean Water Act . . . . . . . . 13

IV.   Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# I.   Introduction

CITGO's multi-million gallon oil spill was entirely preventable had CITGO properly

designed, operated, and maintained its Wastewater Treatment Plant ("WWTP") at the Lake

Charles Refinery.  But CITGO put profits above compliance with the law, protection of the

environment, and the safety of its own workers, repeatedly ignoring recommendations and

requests for additional storage and treatment capacity.  And CITGO *failed to do anything* to

remove the millions of gallons of waste oil accumulating in its wastewater and stormwater surge

tanks for at least five years before the spill.  CITGO's gross negligence and willful misconduct

caused one of the largest and most serious oil spills in the history of the United States.

In light of CITGO's gross negligence and willful misconduct, the huge volume of oil

spilled, the atrocious response during the first two days of the spill (e.g., instructing staff "not to

call the Coast Guard" when oil was pouring into the Indian Marais and allowing the West Ditch

dam to overflow oil all night long), and consideration of the other statutory penalty factors, the

Court should impose a penalty of at least $247 million.  CITGO's offer to pay a penalty of $5.85

million is woefully inadequate in light of its conduct and the fact it is a multi-billion dollar

company that made $1.8 billion dollars in net income in the year of the spill: approximately $5

million a day.  In addition, CITGO should be ordered to perform the requested injunctive relief.[1]

# II.   Penalty Argument

**A.   CITGO's violation of Section 311(b)(3) of the Clean Water Act was the result of CITGO's gross negligence and willful misconduct.**

CITGO has long known that its refinery wastewater includes 500 to 2,000 barrels of

waste oil every day.  Oily wastewater is regularly pumped directly to the wastewater tanks

---

[1]  The United States provided the Court with an extensive summary of the case law applying similar penalty factors and interpreting the gross negligence and willful misconduct terms under the Clean Water Act.  ECF Doc. 182-1, Pre-Trial Order at Attachment 1 (also attached hereto as Att. 1).  *See also* ECF Doc. 196, Pls' proposed findings of fact and conclusions of law.

without any treatment or oil removal during rain events, when the dry weather flow line is out of

service, and on other days as part of the refinery's operations.  Knowing this, knowing the tanks'

oil skimming system had been broken for approximately ten years, knowing the tank levels were

high and could not be brought down due to accumulated oil and sludge, and having been

repeatedly warned that its WWTP had inadequate storage capacity to handle a design storm

event and that the risk of overflow was "high," it was unconscionable for CITGO to have done

nothing to remove the floating oil layer from the tanks **during the five years** before the spill.[2/]

Given CITGO's actual knowledge of the risk of serious harm, this extreme neglect even

surpasses gross negligence; as Mr. Amendola testified, it is clearly reckless, which makes it also

willful misconduct.[3/]

> CITGO's own engineering expert, Dr. Tischler, confirmed CITGO's extreme lack of care

and recklessness when he testified that repair of the skimming system would have only cost

$18,000.  Although repairing the skimming system would not have prevented an oil spill from

occurring,[4/] as Dr. Tischler conceded on cross-examination, it would have greatly reduced the

volume of waste oil that spilled.  In a year when CITGO earned $1.8 billion in profits, P1071, it

is shocking that CITGO would not spend $18,000 to repair the skimming system that it knew had

---

[2/] CITGO's five years of failed operation and maintenance also violates its LPDES permit, which requires CITGO to "properly operate and maintain" its WWTP equipment "at all times" to prevent permit violations like the illegal discharge at issue in this case.  *See* P0426 at CIT0103611.  Permit compliance is mandatory at all times.

[3/] Gross negligence does not require intent or recklessness.  See Attachment 1 at 22-35 for discussion of the legal standards for gross negligence and willful misconduct under the Clean Water Act.

[4/] This is because (1) there is always oil floating in the tanks (typically hundreds of thousands of gallons) and (2) over 21 million gallons overflowed from the tanks and CITGO had neither enough tank storage nor enough secondary containment capacity to hold that volume.  *See* P0198, CITGO Rev. Not. to LDEQ at CIT0000007 (admitting the discharge of oily materials was at least 510,000 barrels (99,000 + 411,239), or 21.4 million gallons).  CITGO falsely reported to the Court that, "Importantly, CITGO *did* have adequate capacity to contain the spill."  ECF Doc. 182, Pre-Trial Order at 33.  The volume of the secondary containment berm undisputedly was, and still is, far less than 21 million gallons.  Thus, Dr. Tischler's argument that $18,000 was the least cost alternative for economic benefit is wrong.  Additional treatment and storage capacity and operational changes were needed.

been broken for years and was critical to the safe and proper operation of the WWTP.

Moreover, CITGO's corporate representative and engineer, Mr. Dunn, admitted that CITGO's failure to regularly monitor and remove the waste oil accumulating in the tanks was a "root cause" of the spill. *See* P0214 at CIT0047850. A reasonable refinery operation would monitor and remove the oil from the tanks on a continuous or at least weekly basis. Mr. Dunn and Ms. LeBlanc, CITGO's Environmental Department Manager for Waste and Water, admitted that neither they nor anyone else at CITGO made any efforts to remove the floating waste oil from the tanks for at least five years before the spill.[5] This was a complete and utter failure to do properly operate. It defies all common sense, is the epitome of gross negligence and, given CITGO's knowledge and awareness of the risks, is also clearly willful misconduct.[6]

CITGO also violated its own written standard operating procedures for years by not fixing the oil skimming system, not removing the oily sludge, and not operating the storage tanks at the 5.5 foot level. *See* P0234 at 1, section 2.0 (SOP-432-102). At the time of the spill, the tanks were at 17 feet with 4.6 million gallons of waste oil in them. This disregard of longstanding written procedures is strong evidence of gross negligence.[7]

---

[5] CITGO's WWTP Unit Supervisor from January 2000 to 2007, Curtis Miller, confirmed that the skimming system was already "abandoned . . . in place" when he arrived in 2000, and that no effort was made to fix it. Pls' Dep. Binder Ex. V, Miller Dep. at 46:24 - 47:16.

[6] CITGO's pre-trial and trial assertion that "[b]efore the spill, CITGO did not know that oil was accumulating in the tanks," ECF Doc. 182, Pre-Trial Order at 29, is a blatant falsehood that was thoroughly repudiated by the evidence. Mr. Dunn conceded CITGO had measured at least five feet of oil (millions of gallons) in the tanks the year before the spill, P0398 at 2, line 44, but did nothing to remove the oil. It was also shown that CITGO, and Mr. Dunn, had long known that it was inevitable and obvious that oil accumulated in the tanks. P0806, P0950 at 4; P0398 at lines 34-44; Pls' Dep. Binder Ex. P, Will Richards Dep. at 25. CITGO did not bother to measure again before the spill and had not bothered to measure or monitor the amount of oil accumulating in the tanks for the previous five years, even though *it only takes ten minutes* to measure the oil in a tank. *See, e.g.*, Richards Dep. at 185. Mr. Dunn agreed this failure to regularly monitor the accumulation of oil in the tanks was a complete failure to do the right thing.

[7] During the oil spill, CITGO also violated its requirement to sample the discharges from the tanks and all the drains flowing into the waterways. *Id.* at 7. By only sampling one time from one location, CITGO made it impossible to fully characterize the oily wastewater. Nonetheless, there was ample evidence that the wastewater did contain oil (that is how millions of gallons of waste oil got in the tanks) and did cause a sheen on the waterways.

Equally disturbing, CITGO's oil spill could have been prevented *entirely* if CITGO had built and properly operated adequate storage and treatment capacity at the WWTP. Mr. Dunn confirmed that **"Root Cause #1"** for the oil spill was CITGO's lack of adequate storage capacity. *See* P0214 at CIT0047849. CITGO "intentionally" underbuilt the WWTP in 1994, D-58 at CIT0200316, and still does not have adequate capacity today. Over 21 million gallons overflowed from the tanks, and CITGO's own witnesses testified that CITGO needed at least four wastewater tanks operating properly to prevent the spill on June 19, 2006. CITGO also needed additional treatment capacity equipment and numerous operational improvements.[8]

Ms. LeBlanc confirmed Mr. Amendola's opinion – and the documentary evidence – that CITGO has a long history of disregarding known risks concerning the inadequate capacity of its storage and treatment equipment at the WWTP. CITGO made high risk decisions to eliminate needed storage and treatment equipment for cost-cutting purposes, underbuilt the WWTP, failed to implement the design, repeatedly ignored recommendations and requests for more capacity, and continues to disregard the environmental violations and safety risks associated with using its secondary containment berm as part of its planned primary storage capacity.[9]

---

[8] Dr. Tischler agreed with Mr. Amendola that the rain on June 19 did not exceed CITGO's 25-year design storm level, or even a 10-year storm level. The 25-year storm level is 10.2 inches, and the 10-year storm level is 8.7 inches. The actual rainfall at the refinery was 8.3 inches.

[9] Key points are as follows:
- 1992: CITGO recommends 44 million gallons of tank capacity for the new WWTP (equivalent to at least four tanks), but CITGO ultimately builds two tanks in 1994.
- 1994: **CITGO eliminates the following needed equipment for "cost reduction" purposes** (P0423 at CIT0098350): one storage tank, two API separators, one DGF unit, one aeration tank, and a caustic neutralization unit. This cost-cutting saved **$35 million** in delayed and avoided costs.
- 1995: WWTP Unit Supervisor identifies inadequate storage capacity, lack of implementation of design, "major" operational problems, and "high" risk. P0444 at 1.
- 1996: WWTP Unit Supervisor makes written request for construction of third storage tank because of "inadequate tankage," P0511, and knowledge that "a large quantity of oil" is accumulating in tanks, P0806.
- 1998: ENSR, CITGO's wastewater engineering consultant, recommends third storage tank because inadequate capacity and identifies need to remove accumulating oil.
- 1999: **CITGO ignores recommendations and decides to use secondary containment berm as part of**

4

Finally, the numerous failures in the containment berm are more evidence of CITGO's reckless, irresponsible, and willful acts, sufficient in and of themselves to find gross negligence:

- CITGO had knowingly left the 16" firewater pipe open prior to the spill – a gaping breach in the containment system – with no means on site to close it;
- CITGO left the junction box unsealed for a year in contravention of design plans.

Also, drains, a gate, and pipe penetrations through the concrete portion of the berm leaked, and the earthen berm was not impermeable in contravention of the SPCC regulations. All of these failings simply add to the primary root causes of the spill to cumulatively amount to overwhelming evidence of gross negligence and willful misconduct.

## B. Plaintiffs' spill volume calculations are the only credible evidence on volume.

The only credible evidence of CITGO's total spill volume was provided by the Plaintiffs' oil spill science expert, Dr. Michel. Dr. Michel, a nationally renowned oil spill scientist, relied on widely recognized and accepted principles of oil spill fate and transport science to determine that 111,000 barrels of waste oil and 411,000 barrels of oily wastewater discharged from the

---

**planned primary storage capacity.** CITGO develops plan to pave the berm to make inevitable tank overflows cheaper to clean up. CITGO was aware that discharging waste oil and oily wastewater to the berm will cause environmental violations and pose numerous health and safety hazards.

- 2001: CITGO (including Mr. Dunn) and ENSR identify Intermediate Tank Farm drains as in disrepair and contributing flow to WWTP during storms, contrary to design plan. CITGO ignores problem until after 2006 spill and does not complete repair for 2-3 years.
- 2002: ENSR returns and recommends third tank and rejects use of berm as planned storage capacity. CITGO delays and does not build third tank until December 2007.
- 2006: ENSR reports (after the spill, in Dec. 2006) that CITGO still will not have enough storage capacity even with three tanks when a tank is out of service.
- 2007: ENSR recommends construction of a fourth storage tank and performance of a stormwater drainage area calibration study as essential to ensuring regulatory compliance, identifying the tank as **"critical in meeting all regulatory requirements under equipment maintenance conditions."** P0396 at CIT0246329, 318. CITGO disregards this advice, re-writes ENSR's recommendations, Pls' Dep. Binder Ex. W, Woodhull Dep. at 134-36, and instead decides to raise the berm height to try to contain the next inevitable tank overflow or diversion. This is after the disastrous 2006 spill, yet **CITGO essentially repeats the same terrible choice it made in 1999**.
- 2008: Despite already knowing it did not have enough storage capacity, especially during times when a tank is out of service for long-overdue maintenance and inspection work (another breach of duty), CITGO represents to the criminal court and the United States in its Environmental Compliance Plan that the third tank provides sufficient tank capacity for rain events and "redundant" tank storage capacity even when a tank is out of service for maintenance. *See* D-1022, ECP at 5, section A.2. In fact, CITGO was planning to use the berm as planned storage capacity during tank maintenance periods.

tanks, and that of that amount at least 76,800 barrels of waste oil and 259,000 barrels of oily

wastewater flowed into the waterways. *See* P1050-05 (Dr. Michel's summary volume table).

5,500 barrels of waste oil evaporated from the containment berm and polluted the surrounding

air and endangered workers. The volumes of oily wastewater are not disputed by CITGO.

On the other hand, as Dr. Michel explained, CITGO's reported waste oil spill volume

numbers are works of fiction, unsupported by the evidence, and indeed contrary to the facts and

applicable science. Looking first to the volume of waste oil that reached waterways, CITGO has

absolutely no support or basis for its under-reported volume of 53,000 barrels. Dr. Ogle,

CITGO's purported volume expert who has never worked on an oil spill and has no expertise in

oil spill fate and transport, conceded that the single CITGO document he relied on provides **no**

**support** for CITGO's evaporation volumes, an essential part of the volume calculation. *See* D-

198 (CITGO's official spill volume table). Not one of the reported evaporation volumes – in

pounds or barrels – on CITGO's final volume table matches *any* of the accompanying

calculations. Ogle further admitted that CITGO could not provide him with any documentation

to support the volumes reported by CITGO.[10]

Ogle's criticism of Dr. Michel's use of NOAA's oil weathering model, ADIOS2, is

unfounded. Though a widely used and generally accepted model in the oil spill science field,

Ogle has never even used ADIOS2 and has no basis for his opinion.[11] He could not counter the

---

[10] The CITGO employee (Evans) who supposedly calculated the evaporation volumes in Exhibit D-198 could not be
located and was not called as a witness. His qualifications – if any – to do expert oil spill evaporation calculations
are completely unknown, and his numbers are nothing more than untraceable and unfounded speculation. Dr.
Michel is the only scientist to calculate the evaporation volumes. Undisputed testimony established that neither the
Coast Guard nor NOAA calculated the total spill volume or the total volume of oil that evaporated.

[11] At the same time, Ogle assumed that CITGO used a different model that was described in an article that was
referenced in Exhibit D-198. Ogle conceded that the model purportedly used by CITGO is used primarily for pure
compounds, not complex mixtures like oil (with thousands of compounds), and, as described in the article, uses a
"somewhat simplistic approach" and is intended "primarily as a screening tool." He did not identify any error rate or

60% evaporation of the oil in the river that was calculated by (1) Dr. Michel and (2) NOAA's spill response scientist (P0181), and (3) advocated by CITGO's expert, Dr. Slocomb, during his testimony in CITGO's prior, property-damage trial before this Court.[12] Essentially, even though he cannot critically evaluate the data, Ogle simply assumes that the numbers provided to him by CITGO are correct and therefore concludes that Dr. Michel must be wrong. Ogle's opinion is the epitome of junk science; it carries no weight and should be rejected.

In addition to CITGO's incorrect evaporation numbers, CITGO's reported volume of 53,000 barrels of waste oil reaching the waterways ignores other known fates of the oil, including 3,400 barrels left stranded on the shoreline. It is too low and contrary to the facts.[13]

As for the total volume of waste oil discharged from the tanks, although CITGO has long deceived the public and the courts, it is now indisputable that CITGO's reported 99,595 barrels is under-reported. That volume is based on the measurement in the berm at 3:00 p.m. on June 19 – 10 hours into the spill. It does not account for all the oil that had already flowed into the waterways, evaporated, soaked into the soil inside and outside the berm, or was pumped to an adjacent area for recovery before then.[14] Therefore, the total spill volume had to be more than

---

validation information for this model.

[12] See the re-direct examination of Dr. Michel on March 22, 2011 (discussing Dr. Slocomb's prior testimony where he and CITGO promoted 60% evaporation for the oil in the river based on the ADIOS2 model).

[13] Ogle, like CITGO, based the 53,000 barrels only on the amount recovered from the river (which CITGO improperly rounded down by over 1,000 barrels) and the baseless, artificially low evaporation amount. Ogle and CITGO ignore the undisputed other fates of the oil in the river, including entrainment of oil in the water column, deposition of oil into the sediments in the estuary, the existence of unrecovered sheens, and the stranding of oil on the shoreline. The stranding alone accounts for **another 3,400 barrels** of unrecovered oil in the river, a figure that was endorsed by CITGO's NRD expert, see P0245 at NOAA-089752, and that remained undisputed after Dr. Michel's testimony. See P1050-05 (Dr. Michel's volume table identifying these fates).

[14] CITGO misrepresented basic facts when it told the Court that the oily wastewater and waste oil "remained in the containment area for thirteen hours." ECF Doc. 182, Pre-Trial Order at 47. Ogle appeared to ignore the record evidence and adopt CITGO's position without critical review. CITGO's and Ogle's position, however, was proven false at trial through multiple eye-witness accounts of CITGO staff seeing black oil flowing down the roaring Indian Marais upon the early observations of the waterway; audio files of eye witnesses describing "crude" in the Indian

99,595 barrels.  Dr. Michel reasonably calculated a total spill volume of 111,000 barrels.

Finally, CITGO agrees the oil that evaporated from the berm is relevant to the penalty.[15]

## C.    CITGO's acts and omissions warrant a high penalty based on the 8 penalty factors.
### 1.    CITGO's oil spill was a very serious violation of the Clean Water Act.

The huge volume of oil spilled in this case establishes the seriousness of this violation

and warrants the statutory maximum for this penalty factor.  *See* Attachment 1 at 6-9.

Environmental harm is only one part of the "seriousness" factor, but CITGO's oil spill also

posed serious potential environmental and socio-economic harms and in fact caused serious

harms.  CITGO's oil spill contaminated the waterways, adjoining shorelines, the air, and land,

endangered health, closed the waterways, destroyed marsh, and killed fish and wildlife.[16]

---

Marais at 8:00 a.m. (three hours into the spill) (P0869) and shore-to-shore "recoverable" amounts of oil sheen (which indicates the presence of recoverable amounts of oil) across the entire river and continuing down river as far as could be seen at 11 a.m. (six hours into the spill) (P0873).  Mr. Dunn confirmed on cross examination that oil flowed from the tanks to the Indian Marais through multiple pathways, including the firewater line (which was open even before the spill began), the drains on the south and west sides of the berm, breaches in the berm walls, and direct projectile discharge from the top of the tanks through the air into the Indian Marais.  *See* P0214 at CIT0047853.  *See also* Ethan Johnson video deposition; P0204; P0206; P0215; P0217.  In addition, CITGO used pumps to move oily wastewater and waste oil from the berm to an adjacent containment area beginning on the morning of June 19.  Will Richards Dep. at 53.  Finally, CITGO's reliance on depositions of Coast Guard investigators taken three years after the event was proven to be unsound given that none of the investigators arrived until days after the spill and had not observed the spill as it occurred.  CITGO's focus on those depositions over the contemporaneous records and eye-witness accounts of its own employees and own internal investigation is spurious.

[15] CITGO and CITGO's financial expert, Mr. Finch, considered the amount of oil that evaporated from the berm as part of CITGO's lost oil revenues, thereby acknowledging the relevance of the evaporation volume from the berm.  But CITGO's reported volume that evaporated from the berm, 17,000 barrels, is greatly exaggerated and ignores the undisputed fact that evaporation from the berm would be lower than evaporation from the river because the volume of oil in the berm was contained in a limited area and was 1.5 feet thick, which limits the surface area available for evaporation.  The oil in the river, in contrast, was spread thinly over miles of the river and more oil was able to evaporate much more quickly.  As explained by Dr. Michel, the greatest evaporation occurred in the river (29,000 bbls) and the least occurred in the berm (5,500 bbls).  *See* P1050-05 (Dr. Michel's summary table).

[16] For example:
- Approximately **150 miles of shoreline were oiled**, including beaches, residential and industrial waterfront, and 94 miles of sensitive marsh habitat.  *See, e.g.*, P0252.
- Waterways that were oiled included the Indian Marais, the Calcasieu River and Ship Channel, Prien Lake, Moss Lake, the Intracoastal Waterway, and Calcasieu Lake.
- CITGO's waste oil contained **benzene**, a known human carcinogen, as well as many other hazardous compounds that threatened human health.  *See* P0747, MSDS.  Workers and spill responders were exposed to elevated levels of benzene and were not given respiratory protection during the first days of the spill.
- The oil spill forced the **closure of the Ship Channel** for 10 days and limited use of the waterway and

CITGO's expert, Dr. Slocomb, agreed with or did not dispute Dr. Michel's testimony on many of the major identified harms.  CITGO at trial acknowledged this was a serious spill.

> **2.      CITGO obtained $83 million in economic benefit by delaying and avoiding projects needed to prevent the spill.**

The penalty assessed by the Court must recoup the economic benefit that CITGO gained through non-compliance with the law and which gave CITGO an advantage vis-a-vis its competitors.  *See* Attachment 1 at 9-16.  The Plaintiffs' financial expert, Robert Harris, calculated this benefit to be at least $83 million using the common "avoided cost" method that he has applied (and that the courts accepted) in other cases.  *See, e.g., United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 348 (E.D. Va. 1997).  Mr. Harris explained that, when CITGO delayed investment in pollution control projects, it gained an economic benefit because it was able to divert capital from pollution-control projects, which generate no economic return, to strategic projects, which improve profitability.  CITGO's own internal document, in fact, confirms that CITGO "intentionally limited the capability" of the WWTP because of the "high capital cost involved" and because the project had "no monetary payback."  D-58 at 5.  Indeed, at the time that CITGO was cutting funding for the WWTP, its long-term plan called for substantial investments in strategic projects, including a hydrotreater project at the refinery that

---

navigation for a total of 24 days.  P1050-08.  At the height of the closures, 100 square miles of waterway were impacted, including the Intracoastal Waterway.

•        **Marsh habitat was destroyed**; it will take years for marsh habitat to fully recover.  Although Dr. Slocomb assumed all marsh habitat has fully recovered, he admitted he did not have field data to support his assumption.  Dr. Slocomb acknowledged that the state and federal Trustees' most recent assessment of shoreline injury identifies *permanent loss* of shoreline as part of the injuries to the marsh.

•        Numerous eye-witness accounts documented that fish, crabs, shrimp, and other aquatic life were killed by CITGO's oil spill.  Dr. Michel, the Trustees, and Dr. Slocomb **all agree that fish and other aquatic life were killed by CITGO's oil.**  Dr. Slocomb acknowledged that the current estimate of aquatic life killed is in the range of hundreds of thousands of fish and millions of benthic organisms.

•        A comprehensive bird survey was not conducted, but at least 50 birds were observed oiled.  Dr. Slocomb opined that a reasonable mortality estimate is **300 birds killed**.

9

was projected to boost profits by \$100 million per year. *See, e.g.*, P0998 at 3.[17]

      In calculating CITGO's economic benefit, Mr. Harris applied a rate of 10.04%, which reasonably approximates CITGO's weighted average costs of capital ("WACC").[18] CITGO's financial expert, Charles Finch, agrees that CITGO has equity capital, but asserts that CITGO would have funded pollution control projects using only borrowed capital. This assertion, however, was contradicted by CITGO's own employees – namely, Mr. Robert Kent, who is the head of CITGO's refining operations in North America, and Ms. Kresha Sivinski, who oversees the capital budgeting process. Mr. Kent testified that CITGO did not borrow capital to build pollution control projects, but rather relied upon income from operations.[19] The Court should, therefore, calculate CITGO's economic benefit using Mr. Harris's WACC rate, which reflects the full opportunity cost of capital raised from lenders and its parent company, PDVSA.[20]

      It was undisputed that CITGO needed four storage tanks to prevent the spill, but CITGO only had two tanks. Mr. Amendola also explained that additional treatment equipment was needed to prevent the spill. *See* P1059-08 (list of economic benefit items). Most of the equipment was needed since 1994, but eliminated by CITGO to cut costs. P0423 at

---

[17] CITGO also admits that, "as everybody understands, capital money spent on non-return projects reduces the amount of money that could be spent elsewhere on higher return and more needed projects and repairs." D-58 at 1.

[18] Mr. Harris explained that CITGO raises capital for pollution controls by borrowing capital from lenders ("debt capital") and by retaining earnings that belong to CITGO's Venezuelan owner, PDVSA ("equity capital"). He further explained that the WACC is the minimum rate of return that CITGO must earn to continue raising capital from these two sources.

[19] Similarly, Ms. Sivinski stated in her deposition that CITGO funds capital projects using cash flow and earnings.

[20] The Court should also reject Mr. Finch's assertion that Mr. Harris has improperly calculated CITGO's WACC. Mr. Harris explained that he calculated CITGO's WACC using the "pure play" method, which is a well-accepted method for calculating the WACC of a private company. Mr. Harris noted that his rate of 10.04% was conservative when compared to **CITGO's internal rate of 15%**, which CITGO uses in calculating the economic benefit of strategic projects. P0641 at 27. Finally, Mr. Harris' rate of 10.04% was well below the "hurdle rate" that CITGO established for strategic projects in its capital budgets from 2002 to 2008 – all of which use a rate of 30% or greater.

CIT0098350.  Mr. Dunn attributed the failure to remove sludge to cost-cutting as well.  P0214.[21]

Unable to challenge Mr. Harris' economic benefit calculation, CITGO asserts that various post-spill expenses should be an offset to economic benefit.  The Court should reject the concept of post-spill offsets for the legal and policy reasons previously explained by the United States in its pre-trial brief.  Attachment 1 at 13-16.  The purported offsets are not costs that would have prevented the spill and therefore are not part of the calculation.  To the extent the Court considers post-spill cleanup, it should not be done as part of the economic benefit analysis but rather in the response-effort penalty factor discussed in the next section.[22]  If the Court does consider post-spill expenses in the economic benefit factor, the facts showed that CITGO has already received $97 million in insurance recoveries and plans to recover more.  Accordingly, the Court should not reduce the economic benefit based on an any post-spill cost argument.

### 3.   CITGO's poor spill response during the first two days of the spill gave rise to the large-scale spill response effort that ensued.

During the first two days of the spill, CITGO failed to contain the spill, concealed the true nature and extent of the spill from the Coast Guard, endangered the health of its workers and spill responders, and inexcusably allowed the oil to spread uncontrollably.[23]  In light of the facts

---

[21] Contrary to CITGO's assertion, there is no statute of limitations on considering economic benefit.  It is a penalty factor, not a cause of action.  *See, e.g.*, *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1098-00 (10th Cir. 2007); *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 862-63 (S.D. Miss. 1998); *PIRG v. Powell Duffryn Term., Inc.*, 720 F. Supp. 1158, 1163 (D. N.J. 1989) (all considering long periods of economic benefit and prior violations).

[22] CITGO's novel request for a penalty reduction for the alleged $25 million in legal fees (mostly for other cases) that CITGO has incurred in fighting lawsuits is inappropriate for consideration under any penalty factor.  To allow it would distort the economic benefit of noncompliance factor into a mitigation tool for polluters, whereby the polluters that choose to hire more lawyers at higher rates are entitled to reduced penalties.  Nor is it reasonable to consider costs of third party settlements.  The $13 million criminal fine is already addressed in a separate penalty factor.

[23] The primary spill response facts include:
•  CITGO's construction of the plywood dam in the West Ditch on June 19 was a major spill response blunder.  Damming off a flowing waterway and then allowing the dam to overflow oil all night long is atrocious.  It is undisputed the dam was completed by 7:45 p.m., began to overflow by 10:00 p.m., and was left unattended and unrepaired all night.  P0207 at 4.  Testimony by Mr. Franklin, a professional emergency responder, that no reasonable responder would allow that plywood dam to overflow through the night, was uncontradicted.  The record

11

shown at trial, no mitigation credit should be given to CITGO for this sixth penalty factor

because of the atrocious spill response effort CITGO made during the first two days.  CITGO's

failure to do the right thing in the first days of the response greatly increased the impacts of the

spill and the massive scope of the cleanup effort that was subsequently needed.  If any credit is

given, it should not exceed 10% because CITGO had a duty to perform a satisfactory cleanup, its

efforts were adequate only after the Coast Guard arrived, and the Coast Guard greatly assisted in

---

shows that effective spill response efforts only began once the Coast Guard arrived and got CITGO organized.  CITGO's emphasis on the size and cost of the cleanup effort highlights the magnitude and seriousness of the spill.

• In notifications of the spill, CITGO misled the Coast Guard, downplayed the true nature of the catastrophic spill, and displayed a shocking lack of candor in a true emergency situation.  Not one witness testified that CITGO made adequate notice to the Coast Guard.  During the first two days of the spill, CITGO failed to tell the Coast Guard facts that were critical to determining the extent of response that would be necessary.  Crucial omitted facts included that two enormous tanks overflowed oil for hours, that the berm was nearly full and leaking into the waterway from multiple locations, and that CITGO feared overflowing or rupturing the berm.  Witnesses saw black oil in the Indian Marais at 8:00 a.m., but CITGO only reported sheen.  CITGO's incident commander was informed of a recoverable, shore-to-shore oil sheen in the river – he described it to management as "a pretty good oil spill," P0875 – but then reported only that the sheen had gotten worse and boom was being deployed (even though boom had been deployed hours earlier and had already proven ineffective).  (Although there was some mis-communication or misunderstanding about who called the Coast Guard with a sheen upate at 11:40 a.m. on June 19 (CITGO, not Conoco), CITGO's failure to provide adequate notice about the true nature of the spill contributed to the Coast Guard's response to that call.)

• By the afternoon of June 19, oil was observed pouring into the Indian Marais from the West Ditch.  P0206.  At this point, when CITGO certainly should have called the Coast Guard to notify them of this clear emergency condition, **CITGO's Incident Commander instructed CITGO staff to *not* call the Coast Guard.**  *See* P0882 (audio file at 6:04 p.m.)  CITGO's night Incident Commander described the event as "an **environmental disaster**," P0883 (audio file at 6:18 p.m.), and as **"an unbelievable oil flow getting away from us . . . . [I]t's big,"** P0889 (audio file at 10:29 p.m.)  CITGO did not call all night and into the next day, as oil continued to pour into the waterways.  This purposeful cover-up was a horrendous misstep that delayed the Coast Guard's response and exacerbated the effects of the spill.  Even the next day, CITGO still only mentioned sheen on its 12:15 call to the Coast Guard.  *See* P0300.  Mr. Dunn confirmed his investigation findings that CITGO's notice on June 20 was inadequate.  P0214 at CIT0047863.

• CITGO failed to protect its own workers and spill responders during the first days of the response.  *See, e.g.*, Pls' Dep. Binder Ex. D, Culpepper Dep. at 97-99.  It is undisputed that benzene monitoring was not conducted on the first day, even though people were working around – and in – the 10-acre lake of oil surrounding the tanks.  There is no dispute **workers and responders did not have respiratory protection** on the first day, much of the second day, and even on the third morning as described by workers and on radio calls.  It is undisputed that hazardous compounds were emitted into the air, including benzene.  Once benzene monitoring was conducted on subsequent days, CITGO detected elevated levels of benzene.  The action level for respiratory use is 0.5 ppm, and multiple readings were above 1 ppm and highs were 4.2 ppm.  These facts, along with the air modeling performed by Mr. Chinkin, establish that people were exposed to elevated levels of benzene and that CITGO endangered human health by its inadequate monitoring and control of the spill site.  Mr. Franklin testified that, given the abject failure to develop a site safety plan in light of the known and unknown hazards, he would have shut down the response immediately to protect people.  CITGO's lack of protective planning was a direct violation of CITGO's own policies and procedures regarding emergency response.  CITGO provided no testimony to justify its blatant disregard for its own policies and the safety of the emergency responders.

achieving the cleanup.  *See* Attachment 1 at 18-20 (discussing application of penalty factor).

4.       **Penalty factors 3, 4, 5, 7, and 8 also support a high penalty in this case.**[24]

## III.    Penalty Demand for Violation of Section 311(b)(3) of the Clean Water Act

Clean Water Act penalties are intended to punish and deter.  *Tull v. United States*, 481

U.S. 412, 422-24 (1987).  As demonstrated at trial, under CITGO's proposed per-day penalty

approach the penalty would be so low as to have no deterrent power.  And a per-day penalty

scheme is not even provided for in the gross negligence and willful misconduct provision of

Section 311(b)(7)(D).  Instead, the Court should determine the penalty based on the per-barrel

approach that Congress enacted in 1990 to strengthen the deterrent power of Section 311(b)

penalties.  For gross negligence or willful misconduct, the maximum possible penalty is $4,300

per barrel discharged, for strict liability, $1,100 per barrel discharged.  33 U.S.C.

---

[24]   .       **Factor 3 under CWA Section 311(b)(8):  CITGO's degree of culpability is extremely high.**  The maximum penalty is warranted for the culpability penalty factor for CITGO's gross negligence and willful misconduct.  *See* Section II.A above.  *See also* Attachment 1 at 16.
•       **Factor 4 - Other Penalties:  CITGO's payment of a criminal fine does not offset this penalty.**  The only penalty paid related to this spill is the $13 million criminal fine, and it does not directly offset the civil penalty.  *See* ECF Doc. 79, Sum. J. Order at 5; *see also* Attachment 1 at 17.  The amount of the criminal fine in the plea bargain was a compromise figure that did not address gross negligence, the Section 311(b)(8) penalty factors, or the volume-based penalty and should have little to no effect on the Court's determination of this penalty.
•       **Factor 5 - Prior Violations:  CITGO has a long history of illegal discharges due to its inadequate storage and treatment capacity at the WWTP.**  *See* Attachment 1 at 18.  The Plaintiffs only focused on violations since 1994 when the current WWTP was initiated.  CITGO has discharged untreated oily wastewater containing listed (F037 hazardous waste sludge) and characteristic (D018 benzene) hazardous wastes into the Surge Pond on at least five occasions from 1995 to 1997 and again in 2008.  These discharges, which totaled more than 30 million gallons were done expressly to avoid overflowing the wastewater tanks.  *See, e.g.*, P0789 at 1.  CITGO also has over 950 days of permit exceedances from the WWTP outfall, as self-reported on mandatory disclosures.  *See* P1070.
•       **Factor 7 - Economic Impact of the Penalty:  CITGO has the ability to pay a substantial penalty.**  Since the spill, CITGO has siphoned more than $4.5 billion in cash out of the company to PDVSA, its parent company in Venezuela, in the form of voluntary cash dividends.  *See* P1071 (dividend history).  CITGO's Lake Charles refinery is the fourth largest refinery in the United States, and CITGO is a multi-billion dollar company with tens of billions of dollars in revenues.  It cannot credibly seek to reduce the penalty amount based on any speculative economic impact of the penalty on CITGO.  The burden is on CITGO to show that "the impact of a penalty would be ruinous or otherwise disabling."  *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp.2d 854, 868 (S.D. Miss. 1998) (collecting cases).  CITGO and CITGO's financial expert, Mr. Finch, however, refused to state a penalty amount that CITGO could or could not pay.  Consistent with the case law, Mr. Harris recommended considering the vast financial assets of CITGO's parent company.  PDVSA is the fourth largest oil company in the world.  It is appropriate for the Court to consider the violator's parent company.  *See* Attachment 1 at 21 (collecting cases).
•       **Factor 8 - any other matter as justice may require:**  No additional considerations are warranted under the final penalty factor.  *See* Attachment 1 at 22 (collecting cases reversed for considering improper factors).

§ 1321(b)(7)(D), (b)(7)(A), 40 C.F.R. § 19.4.[25]

If the Court only considered the amount of waste oil that flowed into the waterways (at least 76,800 bbls) and the waste oil that polluted the surrounding air from within the containment berm (5,500 bbls) – i.e., the amount of waste oil released to the environment outside the berm (at least 82,300 bbls) – the maximum gross negligence penalty is $354 million and the maximum strict liability penalty is $90.5 million. The penalty must also address CITGO's dumping into the waterways of 259,000 barrels of oily wastewater, which is oil under the Act.[26]

In light of the facts established at trial, the Court would be fully justified in imposing a higher penalty, but **the United States requests that the Court issue a Section 311(b) Clean Water Act penalty in the amount of at least $247 million.** This amounts to $1,000 per barrel for at least the 82,300 barrels of waste oil that were released into the environment outside the containment berm multiplied by three for gross negligence and willful misconduct.[27] The amount is also roughly equivalent to three times CITGO's economic benefit of non-compliance.

---

[25] The United States believes that the Court should assess the penalty based on the total volume of oil that discharged from the tanks (111,000 bbls waste oil and 411,000 bbls oily wastewater) and then give any mitigation credit appropriate for the amount of oil that did not escape the secondary containment berm. *See* Attachment 1 at 19; ECF Doc. 115-1 (U.S. Mem. at 13-19) and 148 (Reply at 9-11). Providing secondary containment that is impervious to spills and is capable of holding the contents of the largest tank in the event of a tank rupture plus sufficient freeboard to hold anticipated rainfall is required by law. 40 CFR § 112.8(c)(2). CITGO has documented that it recovered 7,563 barrels of waste oil from the berm. P0221 at CITGO-LC0000476 (CITGO's oil recovery log). Another 21,000 barrels were recovered from the Indian Marais and inside and outside the berm on the first two days.

[26] As shown in the United States' second motion for partial summary judgment, all of the spilled material is "oil" as defined by Section 311(a)(1) of the Clean Water Act. *See* ECF Doc. 115-1 (U.S. Mem. at 3-11) and 148 (Reply at 7-8). EPA has publicly recognized for decades that oily wastewater is oil under the Act. *See* ECF Doc. 148 at 7-8. Only considering the amount of waste oil (at least 76,800 bbls) and oily wastewater (259,000 bbls) that reached the waterways and the waste oil that evaporated from within the containment berm (5,500 bbls) results in a maximum penalty of $1.46 billion (341,300 bbls) under the gross negligence provision and $375 million under the strict liability provision.

[27] It is also two times the strict liability maximum for the total volume of waste oil discharged from the tanks (111,000 bbls); less than one-half the strict liability maximum for the total amount of waste oil and oily wastewater that discharged from the tanks (522,000 bbls); and below the strict liability maximum for the minimum volume of waste oil (82,300 bbls) and oily wastewater (259,000 bbls) that was released into the environment outside the berm.

This penalty provides more than sufficient credit for any factor(s) for which the Court deems mitigation appropriate and still constitutes a penalty that fulfills the Court's duty to provide meaningful specific and general deterrence value for CITGO and other oil polluters.

## IV.    Injunctive Relief

The Court should order CITGO to perform the injunctive relief requested by the United States by the specified dates in order to prevent future violations of the Clean Water Act. CITGO's own witnesses conceded the continuing link between inadequate storage and treatment capacity. CITGO is still lacking in both storage and treatment capacity and therefore must ramp up its treatment flow during storms to try to avoid overflowing the oil from the wastewater tanks. That ramp up continues to lead to permit exceedances. Storage and treatment equipment needs are identified in P1072 (table).[28] In addition to the other requested injunctive relief, building these additional storage and treatment capacity units, most of which were recommended since 1994 but eliminated to cut costs, P0423 at CIT0098350, should better enable CITGO to operate safely and in compliance with the Clean Water Act during maintenance and rain events.

The Court should order CITGO to assess the extent of sediment contamination in the Indian Marais waterway resulting from the spill. CITGO has not done any sampling of the sediment in the Indian Marais below the water line to assess and remedy the effects of the spill.

---

[28] For example,

•        A fourth storage tank is needed. Construction of a fourth stormwater tank is "critical in meeting all regulatory requirements under equipment maintenance conditions. . . . The addition of a new stormwater tank (266 ft diameter) would eliminate any storage, wastewater treatment, or air emission problems during a major storm event, or during equipment maintenance activities." P0396 at CIT0246329. This strong recommendation by the CITGO/ENSR project team has been ignored. *See* Woodhull Dep. at 86-87.

•        A stormwater drainage area calibration study is needed to help CITGO understand the current flow burdens for its storage and treatment capacity needs. *See* P0396 at CIT0246330. *See* Woodhull Dep. at 95-98 (agreeing study was recommended in 2007 and is needed).

•        A third DGF unit is needed because CITGO only has two and treatment capacity is bottlenecked when one is taken out of service.

•        Two additional API separators are needed; they are high maintenance units with frequent downtime. *See* Woodhull Dep. at 90-91 (agreeing at least one additional API separator is a good idea).

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

IGNACIA S. MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division


*/s/ Jason T. Barbeau*
JASON T. BARBEAU
Trial Attorney (D.C. Bar No. 468200)
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
(202) 616-8908 (telephone)
(202) 616-6584 (facsimile)
jason.barbeau@usdoj.gov

STEPHANIE A. FINLEY
United States Attorney

KAREN J. KING (#23508)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501-6832
Telephone: (337) 262-6618
Facsimile: (337) 262-6693
karen.king@usdoj.gov

OF COUNSEL:
Edwin M. Quinones
Office of Regional Counsel, Region 6
U.S. Environmental Protection Agency
1445 Ross Avenue
Dallas, Texas 75202-2733

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 11, 2011, a copy of the UNITED STATES' CLOSING ARGUMENT AND PENALTY DEMAND was filed and served through the Court's electronic case filing system.

*/s/ Jason T. Barbeau*

PRE-TRIAL ORDER ATTACHMENT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

_____
)
UNITED STATES OF AMERICA and )
STATE OF LOUISIANA, )
)           Civil Action No. 2:08-cv-893
Plaintiffs, )
)           Judge Richard T. Haik, Sr.
v. )
)           Mag. Judge Patrick J. Hanna
CITGO PETROLEUM CORPORATION, )
)
Defendant. )
_____)

## UNITED STATES' CITATIONS ON THE INTERPRETATION AND APPLICATION OF THE PENALTY PROVISIONS IN SECTION 311(b) OF THE CLEAN WATER ACT

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Judicial Interpretation and Application of the Penalty Factors . . . . . . . . . . . . . 1

            1.    Seriousness of the Violation or Violations . . . . . . . . . . . . . . . . . . . . . 6

            2.    Economic Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                  a.    EPA's Interpretation of Economic Benefit . . . . . . . . . . . . . . . . 11
                  b.    Consideration of Offsets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    Degree of Culpability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            4.    Other Penalties for the Same Incident . . . . . . . . . . . . . . . . . . . . . . . 17

            5.    History of Prior Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            6.    Nature, Extent, and Degree of Success of Any Efforts of
                  the Violator to Minimize or Mitigate the Effects of the Discharge  . . . . . 18

            7.    Economic Impact of the Penalty on the Violator . . . . . . . . . . . . . . . . . 20

            8.    Other Matters as Justice May Require  . . . . . . . . . . . . . . . . . . . . . . . 22

      B.    Judicial Standards for Negligence, Gross Negligence, and
            Willful Misconduct Under Section 311 of the Clean Water Act . . . . . . . . . . . . 22

            1.    The Interpretation of Negligence, Gross negligence, and
                  Willful Misconduct Under the Clean Water Act . . . . . . . . . . . . . . . . . . 24

                  a.    Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
                  b.    Gross Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                  c.    Willful Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            2.    Louisiana Standards for Gross Negligence and Willful Misconduct . . . 30

            3.    Proving Gross Negligence and Willful Misconduct  . . . . . . . . . . . . . . . 34

III.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

i

## <u>TABLE OF AUTHORITIES</u>

**CASES:**

*Ambrose v. New Orleans Police Dep't. Ambulance Serv.*,
    639 So. 2d 216 (La. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Arabie v. CITGO Petrol. Corp.*,
    49 So.3d 529 (La. App. 3d Cir. 10/27/10) (2010 WL 4226012) . . . . . . . . . . . . . . . . . . 24

*Atlantic States Legal Found. v. Tyson Foods, Inc.*,
    897 F.2d 1128 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 10

*Bayer Corp. v. British Airways, PLC*,
    210 F.3d 236 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*Brown v. Lee*,
    929 So. 2d 775 (La. Ct. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Cates v. Beauregard Electric Coop., Inc.*,
    316 So. 2d 907 (La. Ct. App. 1975), *aff'd*, 328 So. 2d 367 (La. 1976) . . . . . . 32, 33, 34

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans*,
    891 F. Supp. 290 (E.D. La. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 34

*Harris v. Gardner*,
    216 F.3d 970 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Tug Ocean Prince, Inc.*,
    584 F.2d 1151 (2nd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 29, 30, 32, 35

*Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis*,
    2003 AMC 1681 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*Martinez v. Mukasey*,
    519 F.3d 532 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Occidental Chemical Corp. v. Elliott Turbomachinery* Co.,
   84 F.3d 172 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*,
   922 F.2d 220 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*PIRG v. Powell Duffryn Terminals, Inc.*,
   720 F. Supp. 1158 (D. N.J. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*PIRG v. Powell Duffryn Terminals, Inc.*,
   913 F.2d 64 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 22

*Pound v. Airosol Co., Inc.*,
   498 F.3d 1089 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 22

*Price v. Exxon Corp.*,
   664 So. 2d 1273 (La. Ct. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Resolution Trust Co. v. Diamond*,
   45 F.3d 665 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

*Rosenblath's, Inc. v. Baker Indus., Inc.*,
   634 So. 2d 969 (La. Ct. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Russello v. United States*,
   464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Saba v. Compagnie Nationale Air France*,
   78 F.3d 664 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 35

*Schultz v. State Farm Insurance Co.*,
   508 So. 2d 854 (La. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*,
   73 F.3d 546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 11

*State of New Jersey v. State of New York*,
   283 U.S. 336 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Vinzant*,
   7 So. 2d at 917 (La. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34

*Terrebonne v. Cheramie*,
   952 So. 2d 833 (La. Ct. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iii

*The Houston Exploration Co. v. Halliburton Energy Services, Inc.*,
   269 F.3d 528 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*TRW Inc. v. Andrews*,
   534 U.S. 19, 31 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Tull v. United States*,
   481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 21

*United States v. Aluminum Co. of America*,
   824 F. Supp. 640 (E.D. Tex. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

*United States v. B&W Investment Properties*,
   38 F.3d 362 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Coastal States Crude Gathering Co.*,
   643 F.2d 1125 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 16

*United States v. Colonial Pipeline Co., Inc.*,
   242 F. Supp. 2d 1365 (N.D. Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Lexington-Fayette Urban County Government*,
   591 F.3d 484 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Gulf Park Water Co., Inc.*,
   972 F. Supp. 1056 (S.D. Miss. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16

*United States v. Gulf Park Water Co., Inc.*,
   14 F. Supp. 2d 854 (S.D. Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 7, 9, 11, 18, 21

*United States v. Hanousek*,
   176 F.3d 1116,  (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Marine Shale Processors*,
   81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Municipal Authority of Union Township*,
   150 F.3d 259 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12, 15, 21

*United States v. Ortiz*,
   427 F.3d 1278 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Scruggs*,
   No. G-06-776, 2009 WL 500608 (S.D. Tex. Feb. 26, 2009) . . . . . . . . . . . . . . . . . . . . 5

iv

*United States v. Smithfield Foods, Inc.*,
972 F. Supp. at 348 (E.D. Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13

*United States v. Smithfield Foods, Inc.*,
191 F.3d 516 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 18

*United States v. Standard Oil Co.*,
384 U.S. 224 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*United States v. Wong Kim Bo*,
472 F.2d 720 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Water Quality Insurance Syndicate v. United States*,
522 F. Supp. 2d 220 (D. D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 35

*Water Quality Insurance Syndicate v. United States*,
632 F. Supp. 2d 108 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 29, 35

*Weber v. Trinity Meadows Raceway, Inc.*,
No. 4:92-CV-267-Y, 1996 WL 477049 (N.D. Tex. June 20, 1996) . . . . . . . . . . . . . . . . 5

## STATUTES:

26 U.S.C. § 9509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 9

33 U.S.C. § 1319(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. § 1319(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

33 U.S.C. § 1319(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

33 U.S.C. § 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 6, 15, 16, 18, 19, 23, 25

33 U.S.C. § 1321(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

33 U.S.C. § 1321(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 6, 8, 9, 16, 18, 20, 21, 30, 35

33 U.S.C. § 1321(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8, 9

33 U.S.C. § 1321(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 15-17, 22

33 U.S.C. § 1321(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1321(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 16, 19

33 U.S.C. § 1321(b)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 19

33 U.S.C. § 1321(b)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

33 U.S.C. § 1321(b)(7)(D) . . . . . . . . . . . . . . . . . . . . 2, 4, 16, 17, 19, 22, 23, 25, 26, 27

33 U.S.C. § 1321(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 14, 23

33 U.S.C. § 1321(c)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

33 U.S.C. § 1321(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

33 U.S.C. 1321(j)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

33 U.S.C. § 1321(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1321(6)(B) (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 2702(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 2704(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33 U.S.C. § 2716(f)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

La. R.S. 9:2795 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

La. R.S. 9:2795(B)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

La. R.S. 9:2795(E)(2)(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## RULES AND REGULATIONS:

40 C.F.R. § 19.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 22

40 C.F.R. § 110.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 112.8(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

70 Fed. Reg. 50326 (Aug. 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**OTHER SOURCES:**

Pub. L. 101-380 § 4301
   104 Stat. 484, 536-37 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

EPA, *Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean
   Water Act* (August 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Restatement (Third) of Torts § 2 Recklessness (1999) . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

Senate Hrg. 101-265, Three Recent Oil Spills Before the S. Comm. of
   Environment and Public Works, 101st Cong. 265 (1989) . . . . . . . . . . . . . . . . . . . . . 21

Senate Rep. No. 101-94 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722 . . . . . . . . . . . . . . . . . . 3, 4

W. Page Keaton, *et al.*, *Prosser and Keaton on the Law of Torts* § 34 (5th ed. 1984) . . . . . 26, 28

# I.    INTRODUCTION

In accordance with the Court's Pre-Trial Order instructions, the United States respectfully submits the following supplemental page-specific citations to relevant jurisprudence on the interpretation of the penalty provisions in Section 311(b) of the Clean Water Act, including the statutory penalty factors and the statutory terms "gross negligence" and "willful misconduct."  CITGO's liability for violation of Section 311(b)(3) was established by the Court in the order granting the United States' first motion for partial summary judgment.  ECF Doc. 79, Sum. J. Order at 6.  The amount of the penalty remains to be determined after trial.  The size of the penalty is within the discretion of the Court, based on the volume of the oil discharged, consideration of the penalty factors listed in Section 311(b)(8), and whether the spill involved gross negligence or willful misconduct.  At trial, the United States intends to prove that CITGO's violation was the result of gross negligence or willful misconduct, or both.

No court has determined a judicial penalty under Section 311(b) of the Clean Water Act since the gross negligence and volume-based penalty provisions were enacted in 1990.  To assist the Court's evaluation of an appropriate penalty under Section 311(b), the first section below (II.A) provides page-specific citations to relevant jurisprudence on the interpretation and application of the statutory penalty factors.  The second section (II.B) provides page-specific citations to relevant jurisprudence on the standards for negligence, gross negligence, and willful misconduct to be applied in this case.

# II.    DISCUSSION

## A.    Judicial Interpretation and Application of the Penalty Factors

A civil penalty is mandatory when it has been established that a defendant violated

1

Section 311(b)(3) of the Clean Water Act ("CWA" or "Act"). *See* 33 U.S.C. § 1321(b)(7)(A) and (D) (stating violators "shall be subject to a civil penalty"); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990) (holding that the "shall be subject to a civil penalty" language in Section 309(d) of the Clean Water Act mandates a penalty); *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 858 (S.D. Miss. 1998) (same).

If the defendant is *merely* strictly liable, the Court is authorized to set the penalty in an amount up to $1,100 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(A). If the violation results from "gross negligence or willful misconduct," however, the Court is authorized to set the penalty in an amount up to $4,300 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(D).[1] Before 1990, this section of the Clean Water Act only provided a penalty up to $50,000 based on strict liability or up to $250,000 in the case of "willful negligence or willful misconduct." 33 U.S.C. § 1321(6)(B) (1990). In 1990, in response to the *Exxon Valdez* oil spill, Congress (in passing the Oil Pollution Act ("OPA")) amended Section 311 of the Clean Water Act to increase the deterrent value of Clean Water Act penalties. Congress strengthened Section 311's penalty provisions by authorizing penalties to be based on the number of barrels discharged, a volume-based system not found in other environmental statutes, and reduced the standard for the highest penalties from one that required willfulness to one that required only gross negligence *or* willful misconduct. *See* Pub. L. 101-380, § 4301, 104 Stat. 484, 536-37 (1990); *compare* 33 U.S.C. § 1321(6)(B) (1990) *with* 33 U.S.C. § 1321(b)(7)(A), (D) (1991). Congress thus increased the penalties, made the volume of the spill the central factor, lowered the standard for imposing the

---

[1] Effective March 16, 2004, the civil penalty amounts under Section 311(b)(7)(A) and (D) were increased to $1,100 (strict liability) and $4,300 (gross negligence or willful misconduct) per barrel discharged, respectively, by the Civil Monetary Penalty Inflation Adjustment Rule. *See* 40 C.F.R. § 19.4.

highest penalties, and envisioned that spills resulting from gross negligence or willful misconduct warrant greater penalties than other spills.

Section 311(b)(8) of the Act lists eight penalty factors that the Court "shall consider" in determining the penalty. 33 U.S.C. § 1321(b)(8). The penalty factors are (1) "the seriousness of the violation or violations," (2) "the economic benefit to the violator, if any, resulting from the violation," (3) "the degree of culpability involved," (4) "any other penalty for the same incident," (5) "any history of prior violations," (6) "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge," (7) "the economic impact of the penalty on the violator," and (8) "any other matters as justice may require." *Id.*

These penalty factors should be assessed in light of the purpose of the Clean Water Act. The purpose of the Clean Water Act "is to protect human health, welfare, and the environment, to eliminate the discharge of all pollutants to waters of the United States, and to restore the chemical, physical, and biological integrity of the Nation's waters." *United States v. Aluminum Co. of America*, 824 F. Supp. 640, 645 (E.D. Tex. 1993). In enacting Section 311(b) of the Act, Congress made the "unequivocal declaration," *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir. 1981), that "it is the policy of the United States that there should be *no* discharges of oil or hazardous substances into or upon the navigable waters of the United States [or] adjoining shorelines," 33 U.S.C. § 1321(b)(1) (emphasis added). This discharge prohibition is fundamental because "any spill, no matter how quickly we respond to it or how well we contain it, is going to harm the environment. Consequently, preventing oil spills is more important than containing and cleaning them up quickly." S. Rep. No. 101-94, at 2-3

3

(1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 724.

Clean Water Act penalties are to punish and deter. *Tull v. United States*, 481 U.S. 412, 422-24 (1987). As the Fifth Circuit succinctly put it, the statutory purpose of Section 311 is "to achieve the result of clean water as well as to deter conduct causing spills." *Coastal States*, 643 F.2d at 1128. The punitive and deterrent value of Section 311(b)(7)(A) civil penalties is central to achieving the policies and purposes of the Clean Water Act: the threat of significant civil penalties creates a strong incentive for industry to take precautions to prevent oil spills. The heightened civil penalties in Section 311(b)(7)(D) discourage gross negligence and willful misconduct by increasing penalty exposure.[2/]

Clean Water Act enforcement "is designed to be simple, speedy and straightforward." *United States v. Gulf Park Water Co., Inc.*, 972 F. Supp. 1056, 1059 (S.D. Miss. 1997). Courts within the Fifth Circuit have repeatedly employed a "top-down" approach to determine the appropriate amount of civil penalties for violation of environmental protection laws. Under the top-down approach, courts "begin by calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1337 (5th Cir. 1996).[3/] "[P]enalties assessed by judges should be

---

[2/] Pursuant to Section 311(s) of the CWA, 33 U.S.C. § 1321(s), penalties recovered by the United States for actions under Section 311 do not go to the general Treasury but instead are deposited in the "Oil Spill Liability Trust Fund" established under 26 U.S.C. § 9509, *inter alia*, to fund cleanups of future discharges of oil and to compensate victims of oil spills.

[3/] For this proposition, the Fifth Circuit favorably cited *Tyson Foods, Inc.*, 897 F.2d at 1142 ("If [the court] chooses not to impose the maximum, it must reduce the fine in accordance with the [CWA penalty] factors . . . .") and *United States v. B&W Investment Properties*, 38 F.3d 362, 368 (7th Cir. 1994) ("In considering fines under the [Clean Air] Act, courts generally presume that the maximum penalty should be imposed."). *See also Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1095 (10th Cir. 2007) (quoting *Marine Shale* and *B&W Investment* in support of the top-down penalty approach used by the district court).
District courts in the Fifth Circuit use the top-down approach outlined in *Marine Shale. See,*

sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle." *Tull*, 481 U.S. at 425 (quoting 123 Cong. Rec. 39190-91 (1977)).

No court has had occasion to determine a Section 311(b)(7) judicial penalty based on the penalty factors listed in Section 311(b)(8) of the Clean Water Act.  Although the United States has filed and resolved numerous complaints for violations of Section 311(b) since the gross negligence and per-barrel-discharged penalty provisions were enacted in 1990, no court has assessed a judicial penalty because all prior defendants have resolved their alleged violations through negotiated consent decrees or other pre-trial mechanisms.  Some guidance can be found, however, in case law under Section 309(d) of the Clean Water Act setting out penalty factors for violations of discharge permits.  Five of the eight penalty factors in Section 311(b)(8) are analogous to factors in Section 309(d).[4]  Still, the Court should be cognizant that oil spills generate unique pollution concerns that warrant unique application of the penalty factors listed in Section 311(b)(8).  The Supreme Court has long recognized the uniformly "deleterious effect" of oil spilled into our nation's waters: "its presence in our rivers and harbors is both a menace to navigation and a pollutant."  *United States v. Standard Oil Co.*, 384 U.S. 224, 226 (1966).  In addition, Congress places particular emphasis on the volume of the discharge in Section 311(b) penalties.

---

*e.g.*, *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 573 (5th Cir. 1996) (affirming district court's judgment using *Tyson Foods'* top-down penalty approach); *Gulf Park*, 14 F. Supp. 2d at 858 (reviewing Fifth Circuit practice and applying the top-down approach described in *Tyson Foods*); *Weber v. Trinity Meadows Raceway, Inc.*, No. 4:92-CV-267-Y, 1996 WL 477049 at *15 (N.D. Tex. June 20, 1996) (applying top-down approach); *United States v. Scruggs*, No. G-06-776, 2009 WL 500608 at *3 (S.D. Tex. Feb. 26, 2009) ("The Fifth Circuit endorsed the 'top-down' methodology for calculating the appropriate penalty.").

[4] CWA Section 309(d) includes Section 311(b)(8) penalty factors 1, 2, 5, 7, and 8 listed above.

5

It is the Court's task to interpret the meaning of the penalty factors in Section 311 of the Clean Water Act, which is a question of federal law. *See, e.g.*, *Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 671-72 (2nd Cir. 1995) (collecting cases and holding that a federal court's task of interpreting the meaning of undefined words in a federal statute "is, and always has been, a matter of federal law"); *Cedar Point*, 73 F.3d at 565-68 (interpreting the meaning of "pollutant" in Section 309 of the CWA). The following discussion is provided to assist the Court's consideration of the statutory penalty factors and determination of the appropriate penalty in this case.

1. **Seriousness of the Violation or Violations**

Assessing the "seriousness of the violation" penalty factor should be a simple matter in the oil spill context because oil spilled into our nation's waters has long been recognized as a serious hazard wherever it occurs. The Second Circuit summarized the unique and serious concerns of oil spills in *In re Tug Ocean Prince, Inc.*:

> Dumping and accidental spilling of oil constitutes a major pollution threat to the water resources of the nation. It can destroy or limit marine life, ruin wild life habitats, kill birds, limit or destroy the recreational value of ocean beaches, lake shores and river stretches, contaminate water supplies and create fire hazards. Congress has repeatedly indicated its high regard for our water quality and, conversely, its disdain for its pollution.

584 F.2d 1151, 1161 (2nd Cir. 1978) (addressing Section 311(f) oil spill cost recovery action). In light of Congress' creation of a volume-based penalty system for Section 311(b) violations, the volume of oil discharged provides a straightforward basis to assess the seriousness of the violation. For example, CITGO's admitted discharge of millions of gallons of oil would be a clear and strong indicator of a serious violation of Section 311(b).

Courts have addressed the "seriousness of the violation" penalty factor in the context of

6

Section 309(d) violations of discharge permits.  When determining penalties for permit violations, courts have considered the significance of the violation (viewed in terms of the relative importance of the provision violated and the degree of exceedance), the number of violations and duration of noncompliance, and actual or potential harm.  *See, e.g.*, *Gulf Park*, 14 F. Supp. at 859.  Looking at the topics identified in *Gulf Park*, the "significance of the violation," particularly the "relative importance of the provision violated," *id.*, is obvious in oil spill cases.  Congress has declared that there should be "no discharges" of oil, 33 U.S.C. § 1321(b)(1); a major discharge of oil strikes at the heart of the Clean Water Act.  Similarly, in light of Congress' emphasis on the volume discharged in the Section 311(b)(7) penalty provisions, the "degree of exceedance" part of the "significance of the violation" topic, *Gulf Park*, 14 F. Supp. 2d at 859, is plainly evidenced by the volume discharged.

The "number of violations" and "duration of noncompliance," *id*., are self-explanatory.  The number of violations, however, is more pertinent to Section 309 violations that are solely subject to a "per day of violation" liability scheme than to significant oil spills such as this one, in which civil penalty liability is more appropriately determined by the volume of the discharge.

Regarding "actual or potential harm," *Gulf Park*, 14 F. Supp. 2d at 859, proof of actual harm is not required (although it is abundantly evident in this case).  Courts widely recognize that potential harm alone, even without proof of actual harm, is sufficient to warrant substantial penalties.  Because harm can be difficult, or in some circumstances, impossible to document, "[t]he United States is not required to establish that environmental harm resulted from the defendants' discharges or that the public health has been impacted due to the discharges, in order for this Court to find the discharges 'serious.'"  *Id.* at 860-61 (discussing multiple cases).  *See*

*also United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 344 (E.D. Va. 1997) ("The court may justifiably impose a significant penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect."), *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999). This reasoning is even more apt in the context of Section 311(b) oil spills because the statute prohibits discharges of oil in "quantities as may be harmful," 33 U.S.C. § 1321(b)(3), evidencing that the focus of this provision is on potential harm.[5] Thus, proof of a "film" or "sheen" of oil, 40 C.F.R. § 110.3(b), on the water evidences a violation of Section 311(b)(3) and establishes potential harm.

The United States will also show that CITGO's spill produced serious actual harm. In a spill where millions of gallons of oil flowed into the waterways of the Calcasieu Estuary, the presence of a large volume of oil in the waterways is more than proof of potential harm; it also evidences actual harm. Oil does not belong in our nation's waterways, and polluting these waters with oil is an actual harm in and of itself. *See Standard Oil Co.*, 384 U.S. at 226 (recognizing oil's "presence in our rivers and harbors is both a menace to navigation and a pollutant"); 33 U.S.C. 1321(b)(1) (declaring there should be "no discharges" of oil). Actual harm can be seen in impacts on commerce and navigation due to the presence of oil in the waterway, such as restrictions or closures of rivers, lakes, and businesses along the waterway. Actual harm can also be seen in oiled and killed aquatic life and terrestrial wildlife, in miles of oiled shoreline and habitat, in the presence of toxins remaining in the estuary, or in the human

---

[5] Section 311(b)(4) of the Act directs the President to determine by regulation those quantities of oil that may be harmful, and the regulations issued to fulfill this mandate provide that such quantities include, *inter alia*, the presence of a "film" or "sheen" of oil on the water. 40 C.F.R. § 110.3(b).

health and other socio-economic impacts of a spill. *See, e.g.*, *Ocean Prince*, 584 F.2d at 1161 (discussing impacts of oil spills). Any of these impacts would further support a finding of actual harm and a substantial penalty.

Finally, in the CWA Section 309 penalty context, courts have rejected arguments from polluters that violations are not serious because the receiving waters were already being polluted by other sources. *See, e.g., Gulf Park*, 14 F. Supp. 2d at 859-61 (collecting cases and holding "the existence of other sources of pollution does not mitigate the potential harm caused by this discharge"). The Supreme Court teaches, a "river is more than an amenity, it is a treasure." *State of New Jersey v. State of New York*, 283 U.S. 336, 342 (1931) (Justice Holmes). The case law, Section 311(b)(1)'s express "no discharge" oil policy, and the Clean Water Act's overall goal to *restore* the integrity of our nation's waters make it clear that under Section 311(b) the pre-existing contamination in a river provides no basis for a court to reduce a penalty for a spill.

2. **Economic Benefit**

In considering the violator's economic benefit resulting from the violation, the Court is to assess the financial benefit CITGO accrued through its noncompliance. *See, e.g.*, *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 530 (4th Cir. 1999) (approximating CWA Section 309 violator's economic benefit to "disgorge[] any profits it attained through its non-compliance"). Courts use economic benefit analysis to "recoup any benefits a violator gained by breaking the law and which gave the violator an advantage vis-a-vis its competitors," thereby leveling the economic playing field. *United States v. Municipal Auth. of Union Township*, 150 F.3d 259, 267 (3rd Cir. 1998). The point of the economic benefit factor is clear: "Insuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the

9

penalties are successfully to deter violations." *Tyson Foods*, 897 F.2d at 1141.

The violation in the CITGO oil spill case is the discharge of oil from the tanks to the waterway. CITGO has already admitted at a minimum that the violation resulted in substantial part from CITGO's years of failure to construct needed storage tank capacity and years of failure to remove the accumulation of oil from the tanks prior to the spill. ECF Doc. 79, Sum. J. Order, at 2 (quoting factual basis for criminal conviction). Accordingly, the Court's economic benefit analysis requires an approximation of the amount of money that CITGO gained from delaying and avoiding these and other costs that should have been incurred to maintain compliance and prevent the oil spill. To do this, the Court needs to assess the avoided and delayed costs of compliance and "determine how much money defendants made on the funds they did not spend for compliance." *Smithfield Foods*, 972 F. Supp. at 348-49, *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999). Money not spent on needed pollution control measures is fungible, and a violator can benefit from that money in a variety of ways. For example, when a company delays or avoids capital expenditures and operations-and-maintenance costs necessary for compliance, "the company is able to use those funds for other income-producing activities, such as investing that money in their own company." *Id.* A violating company and its parent company may also benefit by passing additional profits or dividends to the parent company.

The approximation method commonly used by the courts is the "cost avoided" method, "whereby economic benefit is measured by determining 'the avoided and/or delayed cost of compliance, . . . [using] the weighted average cost of capital (WACC) as a discount/interest rate.'" *Smithfield Foods*, 191 F.3d at 530 (describing this as "the common" method used)

10

(quoting *Smithfield Foods*, 972 F. Supp. at 349).[g]  The cost-avoided method is "a logical method" that is "not in conflict with the CWA or basic economic principles."  *Id.* at 530 (upholding district court's use of the cost-avoided method and use of the WACC rate).  The Court can also consider the extra income, or "wrongful profits," CITGO generated by continuing to operate the refinery, and even expanding operations, in the face of inadequate wastewater treatment and storage capacity.  *See, e.g.*, *Union Township*, 150 F.3d at 267 (discussing and upholding wrongful profits analysis).

Courts widely recognize that a "reasonable approximation of the economic benefit reaped from the defendant's noncompliance is sufficient" to calculate a penalty under the Clean Water Act.  *Gulf Park*, 14 F. Supp. 2d at 863; *see also Smithfield Foods*, 191 F.3d at 529 (quoting "reasonable approximation" from CWA legislative history and collecting cases).  Moreover, "[t]he determination of economic benefit does not require an elaborate evidentiary showing."  *Gulf Park*, 14 F. Supp. 2d at 863.

### a.  EPA's Interpretation of Economic Benefit

The Court should also consider EPA's interpretation of the meaning of the term "economic benefit" in the statutes it administers.  *See, e.g.*, *Cedar Point*, 73 F.3d at 562 n.28 (citing to an EPA Federal Register entry and recognizing that EPA's "expertise in enforcing the CWA is entitled to some deference").  EPA has interpreted the meaning of the economic benefit factor in the notice and comment process and in policy statements.  In 2005, EPA published its

---

[g] The WACC rate is used to calculate the present value of the avoided or delayed costs. *Smithfield Foods*, 191 F.3d at 530 n.11.  The WACC "represents 'the average rate of return a company expects to make for its investors, in order to maintain its current level of investors and its current level of business operations.'"  *Id.* at 530-31 (quoting *Smithfield Foods*, 972 F. Supp. at 349 n.18).

notice of final agency action and its response to comments on how EPA "calculates the economic benefit that regulated entities obtain as a result of violating environmental requirements." 70 Fed. Reg. 50326 (Aug. 26, 2005). Consistent with the case law cited above, EPA stated that the economic benefit component seeks to "remove or neutralize the economic incentive to violate environmental regulations." *Id.* at 50329. "If these financial resources are not used for compliance, then they presumably are invested in projects with an expected financial return to the organization. This concept of alternative investment – that is, the amount the violator would normally expect to make by investing in something other than pollution control – is the basis for calculating the economic benefit of noncompliance." *Id.* This has been EPA's consistent interpretation of economic benefit for at least 20 years. *See, e.g.*, *Union Township*, 150 F.3d at 264 (quoting similar language from a 1990 EPA manual).

As EPA put it, a violator "may gain an economic benefit from either delaying and/or avoiding compliance costs." 70 Fed. Reg. 50329. For delayed compliance, the violator's economic benefit is "the difference between investing in pollution control and investing in other projects." *Id.* This is because "violators have the opportunity to invest their funds in projects other than those required to comply with environmental regulations." *Id.* For avoided compliance costs, the economic benefit is "the total avoided annual costs plus the return that could be expected on the funds that were used for projects other than pollution control." *Id.*

Also, after extensive notice and comment and peer review of its economic benefit model, EPA determined that use of the WACC rate is the most appropriate rate to calculate present value "because it better represents firms' total capital structures and their own typical business decision-making practices." *Id.* at 50337.

12

### b. Consideration of Offsets

As a final point, it should be recognized that consideration of a violator's economic "benefit" does not call for a "cost-benefit" comparison of pre-spill financial benefits with post-spill costs. In other words, contrary to what CITGO may argue, the post-spill costs to the violator, such as attorney fees and tort settlements, are not subtracted from the economic benefit of the cost-cutting conduct that caused the spill. The economic benefit is to be calculated based on the avoided and delayed costs that should have been incurred to *prevent* the spill. Post-spill costs play no role in that formula. Moreover, comparing the financial benefits of the avoided and delayed costs and wrongful profits that a violator gained by not taking appropriate action to prevent an oil spill with all the expenses a violator incurs after an oil spill would frustrate the clear purpose of the economic benefit factor.

Violators should not be allowed to gain an economic advantage over their competitors by violating the law. *Pound*, 498 F.3d at 1097; *PIRG v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 79 (3rd Cir. 1990) ("Violators should not be able to obtain an economic benefit vis-a-vis their competitors due to their non-compliance with environmental laws." (citations omitted)). The economic benefit is enjoyed with each passing day prior to the spill because the violator does not spend the money needed to maintain compliance and prevent the spill. The violator has the benefit of using the funds not spent on pollution control for other purposes, including making investments in its own profit-making operations or distributing extra profits to its parent company or shareholders. *Smithfield Foods*, 972 F. Supp. at 349. All of those benefits are obtained prior to the spill, and the benefit has already been realized by the time the spill occurs. At the penalty stage, the Court needs to account for and disgorge those years of wrongful benefit

that the violator enjoyed.

In addition to preventing violators from gaining a competitive advantage, the economic benefit factor is designed to remove all financial incentives to disregard the law. At the time they are deciding whether to incur the costs of preventing an oil spill, violators often know how much compliance will cost and decide to risk noncompliance precisely in order to avoid the costs of compliance. To eliminate the incentive to violate the law, the economic benefit factor looks at the time before the spill, when the violator is tempted to avoid incurring the costs of compliance, and ensures that, regardless of whether post-spill expenses turn out to be high or low, the money the violator set out to save is removed from the violator in the penalty-setting process.

Post-spill costs such as penalties, legal fees, cleanup costs, and third-party settlements thus are not relevant to the consideration of the economic benefit of noncompliance factor. The payment of penalties is expressly covered, not in the economic benefit factor, but in the Section 311(b)(8) "other penalties" penalty factor discussed below. Post-spill cleanup costs may be relevant to yet other penalty factors, as a reflection of the seriousness of the violation and the violator's efforts to minimize or mitigate the effects of the spill. Substantial third-party settlements reflect the seriousness of the violation and may help support a high penalty determination. A violator's legal fees are largely discretionary, do not relate to compliance in any meaningful way, and do not provide useful information in a penalty case. And, in many cases (as in this one), violators are reimbursed by insurers for these post-spill costs.

To consider post-spill costs as part of the economic benefit factor would allow a violator to mask the wrongful financial benefit it already enjoyed during the period of noncompliance – the value sought in the economic benefit factor – by using post-spill costs, such as discretionary

14

legal defense fees, to try to offset the penalty amount.  Such a result would be unjust and contrary to the goals and purposes of the Clean Water Act in general and the economic benefit penalty factor in particular.  EPA has addressed this exact issue in its published penalty policy specifically addressing settlements of penalty cases for Section 311(b)(3) of the Clean Water Act.  EPA, *Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean Water Act*, at 16 (August 1998).[7]  EPA explains that, "[b]ecause Section 311(b)(3) establishes a 'no discharge' standard for oil . . . , each person subject to this provision of law has an obligation to make whatever investment is necessary to avoid prohibited discharges."  *Id.* at 16.  EPA states:

> Economic benefit is to be measured in the moment before the Section 311(b)(3) violation occurred, and *based solely on avoided costs that would have been incurred prior to the discharge.*  There should be no offset recognized under this factor for any economic losses the violator incurs as a result of the illegal discharge, such as the cost of lost product, or cleanup or response costs.

*Id.* (emphasis added).  Thus, EPA recognizes that post-spill expenses should not be included in determining the economic benefit, which is focused on expenditures needed to prevent the spill and remain in compliance with the law.  This is consistent with the general principle that "[t]he fact that the violator has also penalized itself by failing to implement cost-effective methods that would have put it into compliance . . . and thereby save it money is certainly no basis to mitigate its penalty."  *Union Township*, 150 F.3d at 266.

Considering post-spill costs such as cleanup costs in the economic benefit factor is also inappropriate because the violator has an independent duty to clean up its oil spill.  33 U.S.C. § 1321(c)(5)(A) (statutory obligation to "respond immediately to a discharge").  Failure to comply with a cleanup order is a separate violation of Section 311 and subjects the violator to

---

[7] Available at epa.gov/compliance/resources/policies/civil/cwa/311pen.pdf.

another penalty up to three times the actual costs incurred by the United States. 33 U.S.C. § 1321(b)(7)(B). Thus, spending money to clean up an oil spill is a necessary action to avoid violating another law after the Section 311(b) violation has occurred. Moreover, oil polluters are liable under the Oil Pollution Act to pay the oil spill response costs and damages. *See* 33 U.S.C. § 2702(a). So if CITGO had not performed the cleanup work, the Coast Guard would have done so, and CITGO would now be liable for those costs as well.

Furthermore, post-spills costs are the direct result of the violator's unlawful conduct and the scope of the costs is largely dependent on the violator's post-spill conduct. For example, the violator may fail to properly notify response agencies, the violator may fail to adequately respond to the initial spill, or the violator may needlessly expand or prolong subsequent litigation. These post-spill failings and acts of the violator can lead to greatly increased spill response costs, damages, settlement costs, and legal fees. Ultimately, no matter how imaginative a violator gets in compiling post-spill costs, the fact remains that the violator already enjoyed the economic benefit of noncompliance prior to the spill.

### 3. Degree of Culpability

Section 311(b)(7) imposes strict liability for violation of Section 311(b)(3). *Coastal States*, 643 F.2d at 1127. *Gulf Park*, 972 F. Supp. at 1059 (holding "compliance with the CWA is a matter of strict liability"). As such, significant penalties are warranted even in the absence of culpable conduct. If the degree of culpability rises to the level of gross negligence or willful misconduct, the court has discretion to nearly quadruple the strict liability penalty up to $4,300 per barrel discharged. 33 U.S.C. § 1321(b)(7)(D); 40 C.F.R. § 19.4. The Court's assessment of culpability should address CITGO's acts and omissions that led to the discharge from the tanks.

As noted above and outlined in the accompanying Pre-Trial Order, the United States intends to prove that this spill resulted from CITGO's gross negligence or willful misconduct, or both.

### 4.     Other Penalties for the Same Incident

The Court has already set out its basic approach to "other penalties" in ruling on the United States' first motion for partial summary judgment.  The Court held:

> Plaintiffs' claim for a civil penalty is *clearly* not barred by CITGO's payment of its criminal fine, as the Clean Water Act specifically provides for both civil *and* criminal fines/penalties.  Additionally, the plea agreement signed by CITGO reads, "Furthermore, this Plea Agreement does not provide or promise any waiver of any civil or administrative actions, sanctions, or penalties that may apply."

ECF Doc. 79, Sum. J. Order at 5 (internal citations omitted).  The Court further held that "other penalties for the same incident are taken into consideration on the front end – in determining the amount of the fine – and not on the back end as an offset to the civil penalty imposed."  *Id.*

The amount of a criminal fine in a *plea bargain* is, by its nature, a compromise figure.  CITGO's fine only resolved its independent criminal liability and should have little influence on the determination of the appropriate amount of the civil penalty.  CITGO's criminal fine was necessarily limited by the governing provisions of the criminal code and was not based on the civil penalty factors that the Court is required to consider in this case or the per-barrel penalty approach that Congress created for civil violations of Section 311(b)(3).  Nor did the criminal case redress the gross negligence that is at issue in this case.  The criminal negligence violations listed in Section 309(c)(1) of the Clean Water Act only provide causes of action for plain negligence, whereas the civil penalty provision in Section 311(b)(7)(D) authorizes the Court to nearly quadruple the per-barrel civil penalty in the case of gross negligence or willful misconduct.  CITGO's culpability and the seriousness of the violation, in combination with the

other factors, will compel a finding that a substantial Section 311(b) civil penalty is needed to provide adequate deterrence and punishment for this extremely serious and preventable spill.

### 5. History of Prior Violations

The Court is to consider any history of prior violations. As the plain language "any" indicates, the Court may consider a defendant's violations from any time period. *See, e.g.*, *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1163 (D. N.J. 1989) (considering defendant's history of violations over 11 years in CWA Section 309 penalty action), *aff'd in relevant part*, 913 F.2d 64 (3rd Cir. 1990); *Gulf Park*, 14 F. Supp. 2d at 864 (considering violations over 12 years in CWA Section 309 penalty action). At a minimum, the Court can consider all types of violations that relate to violations of the Clean Water Act, including discharge permit violations, oil spills, deficiencies in spill prevention and control measures, and related air and hazardous waste releases. When considering wastewater discharge permit violations, courts have long recognized that a violation of a monthly permit limit "constitutes a violation of every day of that month." *United States v. Aluminum Co. of America*, 824 F. Supp. 640, 650 (E.D. Tex. 1993) (collecting cases). *See also Smithfield Foods*, 191 F.3d at 527-28 (same, collecting cases). In other words, each violation of a monthly permit limit amounts to approximately 30 days of violations. CITGO has a long history of violations that merits consideration at trial.

### 6. The Nature, Extent, and Degree of Success of Any Efforts of the Violator to Minimize or Mitigate the Effects of the Discharge

Violators have an independent statutory obligation to "respond immediately to a discharge," 33 U.S.C. § 1321(c)(5)(A), and thereby minimize or mitigate the effects of a discharge. Failure to comply with a cleanup order is a separate violation of Section 311 and

subjects the violator to another penalty up to three times the actual costs incurred. 33 U.S.C.

§ 1321(b)(7)(B). In light of a violator's independent duty to clean up its oil spill, violators are

expected to make prompt and satisfactory efforts to minimize or mitigate the effects of a

discharge. Accordingly, mitigation of the penalty should be considered only if the violator's

response efforts and results were beyond satisfactory. Furthermore, the size of the spill helps

inform the level of response needed: big spills typically require substantial spill response efforts.

      If the Court is considering mitigating the penalty to take account of the amount of oil that

discharged from the tanks but was recovered from within the berm (i.e., the amount of oil that

did not escape the breached secondary containment), that consideration should be counter-

balanced with a recognition that a failed secondary containment berm is evidence of a violation

of another provision of the Clean Water Act.[9] Section 311 and its implementing regulations

*mandate* that adequate secondary containment for CITGO's tanks be maintained at all times. 40

C.F.R. § 112.8(c)(2). The regulations – promulgated under Section 311(j)(1)(C) of the CWA –

require that the secondary containment berm be, *inter alia*, "impervious" and capable of holding

the entire capacity of the largest tank in the containment area plus sufficient freeboard for

anticipated rain. 40 C.F.R. § 112.8(c)(2). Thus, CITGO's incentive for having reliable

---

[9] As a matter of law, the definition of "discharge" in Section 311(a)(2) and the plain language of the penalty provisions in Section 311(b)(7)(A) and (D) require that the maximum potential penalty be determined by the total volume discharged from CITGO's tanks, not on any lesser amount that escaped CITGO's failed secondary containment berm. *See United States v. Colonial Pipeline Co., Inc.*, 242 F. Supp. 2d 1365, 1376-77 (N.D. Ga. 2002) (holding Section 311(b)(7) penalty is based on the "entire amount of oil or hazardous substance released into the environment"). The discharge of oil into a leaking, partially bare-earth, open-air containment berm, from which hundreds of thousands of gallons of oil dispersed into the surrounding air and underlying soil, certainly is a release into the environment. It is a separate, fact-based issue as to whether a court should allow some mitigation credit for oil recovered from within a failed berm.

secondary containment is that it had a pre-existing legal duty to maintain its secondary containment berm and prevent the multiple breaches that occurred.

Any acts or omissions by a violator that worsen the effects of the discharge also should be considered under this factor. Examples include a violator's failure to promptly and properly notify federal or state response authorities; failure to warn employees, neighbors, or responders of health hazards related to the spill; failure to protect the health and welfare of employees, neighbors, or responders; and inadequate or incomplete efforts to contain or control the discharge.

Finally, the plain language of the penalty factor, "efforts of the violator," indicates that the focus is on what the violator did to minimize or mitigate the effects of the discharge. Thus, a court should not give credit for cleanup results that are due to events beyond the control of the violator, such as the temperature, the tides, the weather, the inherent properties of the spilled oil, or the effectiveness of the Coast Guard's response efforts. For example, the fact that a significant amount of oil typically evaporates into the surrounding air due to ambient temperatures, tidal effects, river currents, or the chemical properties of the spilled oil does not reflect any effort of the violator to remove oil from the waterway. Indeed, the fact that spilled oil disperses into the surrounding air through evaporation changes, rather than mitigates, the effects of the discharge; the evaporation of surface oil transfers hazardous oil components from the water to the atmosphere and creates new air quality impacts such as inhalation exposure hazards to people and wildlife.

## 7. Economic Impact of the Penalty on the Violator

The Supreme Court in *Tull* held that a court "may also seek to deter future violations by

basing the penalty on its economic impact."  481 U.S. at 423.  *See also Gulf Park*, 14 F. Supp. 2d at 859 n.3.  A "civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business."  *Powell Duffryn*, 720 F. Supp. at 1166; *Gulf Park*, 14 F. Supp. 2d at 869 (same).  In strengthening the penalty provisions in Section 311(b) in 1990, Congress recognized that "what we need to do is raise the cost of carelessness and to emphasize prevention.  One of the best ways to induce the oil industry to operate more safely, I believe, is to make sure that they pay heavily when there is a spill."  S. Hrg. 101-265 at 155 (statement of Rep. Schneider).  Otherwise, the violator and others will be tempted to roll the dice on the monetary tradeoffs between fulfilling their duty to prevent oil spills and paying to pollute.

That a penalty amount may be inadequate to achieve deterrence is of particular concern in cases involving a company with the financial resources of CITGO, as evidenced by the fact that CITGO has tens of billions of dollars in annual revenues and assets and has sent over 4.5 billion dollars in voluntary dividends to its large parent company in Venezuela since the oil spill.

Under this penalty factor, courts also consider the finances of the violator's parent company.  *See, e.g.*, *Union Township*, 150 F.3d at 268 ("Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on the violator.").  "If the subsidiary does not retain its revenues, . . . then its parent's financial resources are highly relevant."  *Id.* at 268-69.  *See also Powell Duffryn*, 720 F. Supp. at 1166 (considering defendant's relationship with its large international parent company and rejecting defendant's claim of economic impact of the penalty).  Thus, under this factor, it is appropriate for a court to consider a violator's or its parent company's vast wealth, revenues, assets, or earning capacity.

21

8. **Other matters as justice may require**

The scant case law on this penalty factor typically identifies matters that are not properly considered under this factor. For example, in *Pound v. Airosol Co., Inc.*, the Tenth Circuit reversed the district court's Clean Air Act penalty determination in a citizen suit based in part on the district court's consideration of several improper factors, including the fact that the government did not join the citizen suit, requiring proof of an intentional violation, and the plaintiff's alleged competitive motivation in filing the suit. 498 F.3d 1089, 1096-97. Similarly, in *Powell Duffryn*, the Third Circuit reversed the district judge's reduction from the statutory maximum CWA penalty because the district court based the reduction on the fact that the government did not join in the citizen suit or otherwise prosecute the violation. 913 F.2d at 69-70, 81. Another improper factor would be the cost of injunctive relief because the need for injunctive relief and the associated costs are to be considered separately from the penalty determination. *See, e.g.*, *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 487 (6th Cir. 2010) ("Rejecting a civil penalty as too high because of the greater seriousness of the violation, or because the penalty money could be used for remediation, is in tension with, rather than in accordance with, the statutory purpose behind civil penalties.").

B. **Judicial Standards for Negligence, Gross Negligence, and Willful Misconduct Under Section 311 of the Clean Water Act**

The United States will prove at trial that CITGO's violation of Section 311(b)(3) of the Clean Water Act was the result of CITGO's gross negligence or willful misconduct, or both. Under Section 311(b)(7)(D) of the Clean Water Act, the maximum penalty for a violation resulting from gross negligence or willful misconduct is an amount "not more than" $4,300 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(D); 40 C.F.R. § 19.4. In the related Clean

22

Water Act criminal action, CITGO already pleaded guilty to negligent discharges from the tanks based on CITGO's failure to construct needed storage tank capacity and its failure to properly operate and maintain the existing tanks. *See* ECF Doc. 79, Sum. J. Order at 2 (quoting admitted factual basis of the criminal plea). Thus, CITGO's negligence under the Clean Water Act is established. The only question that remains is whether CITGO's breach of duty amounts to gross negligence or willful misconduct. This section addresses the legal standards for assessing gross negligence and willful misconduct under Section 311 of the Clean Water Act.

As with the interpretation of the Section 311(b)(8) penalty factors discussed above, the Court should assess negligence, gross negligence, and willful misconduct in this Clean Water Act case based on a uniform, federal interpretation of those statutory terms rather than on the tort law of the state where the spill or gross negligence or willful misconduct occurred. *See Diamond*, 45 F.3d at 671-72 (holding that a federal court's task of interpreting the meaning of undefined words in a federal statute "is, and always has been, a matter of federal law").[9] Consistent federal interpretation is necessary and appropriate to ensure that the enforcement of this federal health and welfare statute is fair and predictable and not subjected to different, potentially conflicting outcomes based on state lines.

Although the Clean Water Act does not define negligence, gross negligence, or willful misconduct, and no cases have interpreted the meaning of gross negligence or willful misconduct specifically under Section 311(b)(7)(D), federal courts have interpreted the terms negligence, gross negligence, and willful misconduct as used in other provisions of the Act and the related

---

[9] In *Diamond*, the Second Circuit was called upon to interpret the meaning of the phrase "contract or lease" in a federal statute. Surveying Supreme Court precedent, the Court explained that the meaning of undefined words in a federal statute is discerned from "generally applicable, long-standing principles of law," rather than adherence to a particular state's interpretations. *Id.*

Oil Pollution Act of 1990. The courts have developed consistent interpretations of these statutory terms in the context of federal enforcement of the Clean Water Act and OPA.

Were the Court, however, to look to Louisiana law on the meaning of the statutory terms negligence, gross negligence, and willful misconduct in the Clean Water Act, the Court's analysis and decision should be the same because Louisiana law on these terms is sufficiently similar to the federal interpretations. Indeed, the Louisiana Court of Appeal (Third Circuit) recently held that CITGO's acts and omissions in the design and operation of the Wastewater Treatment Plant "clearly" supported a finding of gross negligence for this oil spill. *Arabie v. CITGO Petrol. Corp.*, 49 So.3d 529, 558 (La. App. 3d Cir. 10/27/10) (upholding trial verdict for compensatory and punitive damages based on a finding of gross negligence).[10]

### 1. The Interpretation of Negligence, Gross Negligence, and Willful Misconduct Under the Clean Water Act

#### a. Negligence

A finding of negligence under the Clean Water Act requires objective proof of a failure to use such care as a reasonably prudent person would use under similar circumstances.

Construing the criminal negligence provision in Section 309(c) of the Clean Water Act, the Tenth Circuit held: "In its ordinary usage, 'negligently' means a failure to exercise the degree of care that someone of ordinary prudence would have exercised in the same

---

[10] Applying the Texas gross negligence standard, which is more demanding than that of the Clean Water Act or Louisiana law, the Court held that CITGO "had knowledge and was constantly aware of the problems with the WWTU [Wastewater Treatment Unit] but made decisions and enforced policies regarding engineering and construction that resulted in the ultimate release of millions of gallons of toxic oil and wastewater into the Calcasieu waterways, causing injuries and damages to plaintiffs." *Id.* CITGO's appeal to the Louisiana Supreme Court is pending (writ app. granted Feb. 4, 2011).

circumstance." *United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (addressing discharge without a permit under Section 301); *see also id.* at 1282 ("Even though the CWA does not define the term 'negligently,' we can easily determine what the government must prove").[1/] In *United States v. Hanousek*, also a criminal negligence case, the Ninth Circuit held that the "ordinary meaning of 'negligently' is a failure to use such care as a reasonably prudent and careful person would use under similar circumstances." 176 F.3d 1116, 1120 (9th Cir. 1999) (addressing discharge under CWA Section 311).

Consistent with these cases, negligence under the Oil Pollution Act has been interpreted as "a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances." *Water Quality Insurance Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) *("WQIS(2009)")* (OPA cost recovery claim) (quoting *Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis*, 2003 AMC 1681, 1693 (2003)). The standard is an objective one based on what the reasonably careful person would do under similar circumstances.

**b. Gross Negligence**

A finding of gross negligence under Section 311(b)(7)(D) of the Clean Water Act requires objective proof of a departure from the standard of care beyond that which would constitute ordinary negligence. "Taken at face value, [gross negligence] simply means negligence that is especially bad, that is 'gross.' Given this literal interpretation, gross negligence carries a meaning that is less than recklessness." Restatement (Third) of Torts § 2

---

[1/] Section 309(c) of the Act criminalizes negligent violations under a variety of sections including Sections 301 and 311.

25

Recklessness, cmt. a (1999). Indeed, "most courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind." W. Page Keaton, *et al.*, *Prosser and Keaton on the Law of Torts* § 34, at 212 (5th ed. 1984).

Based on the plain language of Section 311(b)(7)(D), "gross negligence" and "willful misconduct" are two distinct terms that have different meanings. The use of two terms and the use of the disjunctive "or" that separates "gross negligence" from "willful misconduct" in Section 311(b)(7)(D) express clear congressional intent that the two terms have different meanings. *See Martinez v. Mukasey*, 519 F.3d 532, 543 (5th Cir. 2008) ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992))). Moreover, as discussed above, Congress added the term "gross negligence" to the statute in 1990, changing the text from "willful negligence or willful misconduct" to "gross negligence or willful misconduct." *See supra*, at 2. If Congress meant for the terms gross negligence and willful misconduct to have the same meaning, Congress would have simply cut the old term "willful negligence" and left "willful misconduct" standing alone. To interpret the two terms to mean the same thing would render superfluous one of the key terms of the Clean Water Act's penalty provision. Such a reading would be improper because "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations omitted).

The two terms also have distinct meanings in the related Oil Pollution Act of 1990, which

26

amended CWA Section 311(b)(7)(D) by adding, *inter alia*, the term "gross negligence."  For

example, OPA provides liability limits for a responsible party unless the oil spill was caused by,

*inter alia*, the "gross negligence or willful misconduct of" the responsible party, 33 U.S.C.

§ 2704(c)(1).  But OPA only allows a guarantor to assert a defense if the spill was caused by "the

willful misconduct of the responsible party."  33 U.S.C. § 2716(f)(1)(C).  "'Where Congress

includes particular language in one section of a statute but omits it in another section of the same

Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate

inclusion or exclusion.'"  *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United

States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).  That the OPA defense for

guarantors includes only "willful misconduct" but not "gross negligence" demonstrates that

Congress intended the two terms to have separate meanings.  *See also Water Quality Insurance

Syndicate v. United States*, 522 F. Supp. 2d 220, 228, 230 (D. D.C. 2007) *("WQIS(2007)")*

(finding willful misconduct of responsible party in OPA Section 2716(f) claim and not

discussing gross negligence); *WQIS(2009)*, 632 F. Supp. 2d at 112 (upholding finding of gross

negligence under OPA Section 2704(c)(1) and not discussing willful misconduct).

 Moreover, in *WQIS (2009)*, gross negligence was treated as follows:

> Negligence is a failure to exercise the degree of care, which a person of ordinary
> caution and prudence would exercise under the circumstances.  A greater degree
> of care is required when the circumstances present a greater apparent risk.
> Negligence is "gross" when there is an extreme departure from the care required
> under the circumstances or a failure to exercise even slight care.

632 F. Supp. 2d at 112 (quoting *Kuroshima Shipping*, 2003 AMC at 1693 (2003)).  Thus, a

finding of gross negligence is to be based on a factual determination that the negligence is

"gross" and does not require evidence of recklessness or willful misconduct.  The amount of care

needed to prevent an oil spill must be assessed in light of the totality of the circumstances. *Id.* at 115. For example, "As the danger becomes greater, the actor is required to exercise caution commensurate with it." Keaton, *Prosser and Keaton on the Law of Torts* § 34, at 208-09.

Even apart from the plain language of the Clean Water Act and the Oil Pollution Act and related cases, it is well settled that gross negligence and willful misconduct are distinct legal terms of art that have separate meanings.[12] And courts "readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense." *Harris v. Gardner*, 216 F.3d 970, 973 (11th Cir. 2000). Gross negligence is found where acts or omissions deviate from an objective standard of care in some measure beyond ordinary negligence. *See, e.g.*, Keaton, *Prosser and Keaton on the Law of Torts* § 34, at 212 (reporting "most courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind."). Gross negligence is not reckless disregard of probable consequences, which is equivalent to willful misconduct. Restatement (Third) of Torts § 2 Recklessness, cmt. a (1999) (noting "gross negligence carries a meaning that is less than recklessness"); *see also Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667-68 (D.C. Cir. 1996) (discussing the "continuum that runs from simple negligence through gross negligence to intentional misconduct" and recognizing reckless disregard as equivalent to willful misconduct, both of which are different than gross negligence). Thus, gross negligence is more than ordinary negligence and different than willful misconduct. *See, e.g.*, *Bayer Corp. v. British Airways, PLC*, 210 F.3d 236, 239 (4th Cir. 2000) (holding, in spoilage of goods case under Warsaw Convention, that "[t]he cases have repeatedly held that negligence,

---

[12] Willful misconduct is discussed in detail in the next section.

even gross negligence, would not satisfy [the willful misconduct] standard.").

Most simply put, gross negligence is a departure from the standard of care beyond that which would constitute ordinary negligence. Gross negligence, as a heightened degree of ordinary negligence, is assessed based on the same objective reasonable person standard. *See, e.g.*, *WQIS(2009)*, 632 F. Supp. 2d at 112.

### c. Willful Misconduct

The Second Circuit Court of Appeals construed "willful misconduct" under Section 311(f) of the Clean Water Act (which authorizes oil spill cost recovery actions). The Second Circuit defined willful misconduct as follows:

> an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences. If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an implication of a reckless disregard of the probable consequences. The knowledge required for a finding of willful misconduct is that there must be either actual knowledge that the act, or failure to act, is necessary in order to avoid danger, or if there is no actual knowledge, then the probability of harm must be so great that failure to take the required action constitutes recklessness.

*Ocean Prince*, 584 F.2d at 1163 (internal citations omitted) (finding willful misconduct based on company's omissions that led to oil spill). In a recent OPA cost recovery case, the district court in *WQIS(2007)* applied *Ocean Prince's* willful misconduct and reckless disregard standard and found the responsible party's acts constituted reckless disregard and willful misconduct. *WQIS(2007)*, 522 F. Supp. 2d at 229-30.

Other federal courts applying federal law have also long recognized that willful misconduct represents a different standard than gross negligence. Addressing willful misconduct

in *Bayer Corp.*, the Fourth Circuit recognized that "[t]he cases have repeatedly held that negligence, even gross negligence, would not satisfy [the willful misconduct] standard." 210 F.3d at 239. Consistent with *Ocean Prince*, courts also recognize that reckless disregard is "equivalent to willful misconduct" and serves as "a proxy for willful misconduct's scienter requirement." *Saba*, 78 F.3d at 667; *id.* at 668 (holding reckless disregard "lies between gross negligence and intentional harm.").

In summary, the Clean Water Act and Oil Pollution Act cases and the other cases discussed above employ these commonly understood meanings of the terms negligence, gross negligence, and willful misconduct under federal law. The Court should interpret the statutory terms "gross negligence" and "willful misconduct" in Section 311(b) consistent with this case law to ensure fair and predictable enforcement that is not subject to different outcomes based on an individual state's tort law.

### 2. Louisiana Standards for Gross Negligence and Willful Misconduct

Even if the Court were to apply state law – which it should not for the reasons discussed in the previous section – the Court should come to the same conclusion on the meaning of the terms gross negligence and willful misconduct because Louisiana law is similar to the federal interpretations.

As an initial matter, *First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans* instructs that "gross negligence" and "willful misconduct" are not synonymous terms. 891 F. Supp. 290 (E.D. La. 1995). In *Hibernia*, the case centered on the meaning of "willful misconduct or gross negligence" in a contract clause. In upholding a jury finding of gross negligence, the Court noted that the "other standard," willful misconduct, "was not an issue" in

the case.  *Id.* at 293 n.7, 296 n.15.  Thus, the Court readily recognized that the plaintiff could

meet its burden by proving either gross negligence or willful misconduct.  *See also State v.*

*Vinzant*, 7 So. 2d at 917, 921-22 (La. 1942) (holding that gross negligence has a well understood

meaning that clearly is not synonymous with willful).

Under Louisiana statutes and case law, "the prevailing meaning" of gross negligence is

understood to involve acts and omissions that fall "somewhere in the range between ordinary

negligence and intentional conduct."  *Rosenblath's, Inc. v. Baker Indus., Inc.*, 634 So. 2d 969,

972 (La. Ct. App. 1994) (affirming gross negligence ruling where security guard contractor

checked front door to a department store after alarm went off but failed to check the rear

entrance).  Gross negligence has been described as "conduct which falls below that which is

expected of a reasonably careful person under like circumstances, or which is less than that

diligence which even careless men are accustomed to exercise."  *Id.* at 973 (collecting Louisiana

cases and statutory definitions referring to "substantial deviation" and "gross deviation" from

reasonable conduct).  *See also Ambrose v. New Orleans Police Dep't. Ambulance Serv.*, 639 So.

2d 216, 223 (La. 1994) (holding emergency medical personnel were not grossly negligent where

it took 20 minutes to get patient into an ambulance under difficult circumstances and describing

gross negligence as, among other things, "an extreme departure from ordinary care" and the

"want of that diligence which even careless men are accustomed to exercise"); *Hibernia*, 891 F.

Supp. at 294-295 (finding gross negligence based on "major" and "gross" deviations from

banking practices).  Gross negligence is to be assessed by an objective standard and "requires no

intent."  *Rosenblath's*, 634 So. 2d at 972; *id.* (stating "gross negligence involves conduct which

falls far short of knowledge to a substantial certainty of harmful consequences").  Conduct

31

includes "omissions as well as acts." *Schultz v. State Farm Insurance Co.*, 508 So. 2d 854, 857 (La. Ct. App. 1987). In other words, gross negligence under Louisiana law is found where the departure from the standard of care is beyond that which would constitute ordinary negligence.

A straightforward example of gross negligence from the Louisiana courts is *Brown v. Lee*, wherein the Louisiana Court of Appeals declared that it would be gross negligence for a man on a Mardi Gras float to throw a coconut to an acquaintance on the street during a parade. 929 So. 2d 775, 779 (La. Ct. App. 2006). The risk of harm was objectively evidenced by the float krewe's internal rule against throwing coconuts into the crowd. The court found such conduct demonstrated "'want of even slight care and diligence' that is the very definition of 'gross negligence.'" *Id.*

Similar to the Second Circuit Court of Appeal's definition of willful misconduct in the *Ocean Prince* CWA case discussed above, Louisiana courts have defined the term "willful" to mean "a conscious course of action, in which an action is knowingly taken or not taken, which would likely cause injury, with a conscious indifference to the consequences thereof." *Price v. Exxon Corp.*, 664 So. 2d 1273, 1281 (La. Ct. App. 1995) (finding "willful" failure to warn based on a "conscious indifference to the danger posed"). Similarly, in the often-cited case of *Cates v. Beauregard Electric Coop., Inc.*, the Louisiana court viewed the terms "willful," "wanton," and "reckless" as virtually synonymous and held them to mean "that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." 316 So. 2d 907, 916 (La. Ct. App.

1975), *aff'd*, 328 So. 2d 367 (La. 1976).  *See also Terrebonne v. Cheramie*, 952 So. 2d 833, 836 (La. Ct. App. 2007) (same, addressing "willful" and citing *Cates*).

Finally, in contrast to federal law and Louisiana opinions like *Hibernia* and *Vinzant*, which drew a clear distinction between gross negligence on one hand and reckless and willful misconduct on the other, some state and federal opinions interpreting gross negligence under Louisiana law include an overlap between gross negligence and willful misconduct concepts. That is, Louisiana courts and federal cases interpreting Louisiana cases sometimes include willful misconduct concepts as part of the discussion of gross negligence, but this conflation often occurs when making a distinction between the two concepts is not determinative of the case at hand or in recognition that evidence of willful misconduct would also satisfy the gross negligence standard.  For example, in *Rosenblath's*, the court held that gross negligence can include acts or omissions amounting to "'reckless disregard' *or* 'careless indifference,' and may involve a gross or substantial deviation from an expected or defined standard of care."  634 So. 2d at 973.  *See also Occidental Chemical Corp. v. Elliott Turbomachinery* Co., 84 F.3d 172, 177 (5th Cir. 1996) (same, quoting *Rosenblath's*); *Ambrose*, 639 So. 2d at 223 (weighing the facts and deciding between negligence and a list of gross negligence concepts that also included some "willful" concepts); *The Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528, 531-32 (5th Cir. 2001) (holding conduct amounted to negligence at most and citing a laundry list of concepts for gross negligence that included additional "willful" concepts).[13]

---

[13] *Halliburton* is a particularly unhelpful case for discerning the boundary between gross negligence and willful misconduct in Louisiana law.  In it, the Fifth Circuit cited *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220 (5th Cir. 1991), as the basis for including "willful, wanton and reckless conduct" in its discussion of gross negligence. *Halliburton*, 269 F.3d at 531, n.7.  The *Orthopedic* opinion, in turn, relied on the Louisiana case

33

But when the Louisiana legislature and courts need to specifically address willful misconduct, they readily make the distinction between willful misconduct and gross negligence. For example, in one of the frequently cited cases on gross negligence, the Louisiana Supreme Court in *State v. Vinzant* held that the statutory terms "grossly negligent" and "grossly reckless" had different meanings, and both were clearly distinct from "wilfully or wantonly." 7 So. 2d at 922. *See also Hibernia*, 891 F. Supp. at 293 n.7, 296 n.15 (recognizing "gross negligence" and "willful misconduct" involve different standards). And in La. R.S. 9:2795, the Louisiana legislature limits the liability of private landowners who allow use of their property for recreational purposes except in cases of "willful or malicious" failure to warn, La. R.S. 9:2795(B)(1), but limits the liability of public parks except in cases of "intentional or grossly negligent acts" by an employee, La. R.S. 9:2795(E)(2)(d). The legislature's use of different terms in the same statutory section indicates the legislature's understanding that gross negligence differs from willful misconduct.

### 3. Proving Gross Negligence and Willful Misconduct

The burden of proof is a "preponderance of the evidence." *Hibernia*, 891 F. Supp. at 293 (upholding gross negligence finding based on preponderance of the evidence); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) (recognizing preponderance-of-the-evidence standard is generally applicable in civil actions).

Gross negligence and willful misconduct are to be assessed based on the totality of the

---

of *Cates* (discussed above). *Cates*, however, addressed, not gross negligence, but "wanton" negligence, by which the Court meant willful or conscious indifference (what federal courts would call willful misconduct). *Cates*, 316 So. 2d at 916. *Cates* thus distinguished gross negligence from reckless and willful misconduct.

circumstances. *See, e.g.*, *WQIS(2009)*, 632 F. Supp. 2d at 115 (upholding finding of gross negligence upon consideration of "all of the circumstances"); *Ocean Prince*, 584 F.2d at 1164 (finding willful misconduct due to a "combination of factors which together indicate a probable consequence of damage resulting from several failures to act, and by continuing to fail to act in the face of that probability, that indicates a reckless disregard of the consequences"); *Saba*, 78 F.3d at 667 (holding the court can "consider a pattern of conduct even if no one action or omission by itself would" amount to willful misconduct). Accordingly, multiple acts or omissions can cumulatively amount to gross negligence or willful misconduct. *See, e.g.*, *Ocean Prince*, 584 F.2d at 1164 ("While any one of the faults of Red Star alone . . . may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the [CWA]."); *WQIS (2007)*, 522 F. Supp. 2d at 230 ("The Court in *Ocean Prince* made clear that its conclusion that there was willful misconduct was based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.'" (quoting *Ocean Prince*)).

### III. CONCLUSION

This Court will make the first known judicial determination of a penalty under Section 311(b) based on the listed penalty factors, the volumetric penalty provisions, and the gross negligence and willful misconduct standards. The cases discussed above provide a framework for the Court's consideration of the penalty factors and gross negligence and willful misconduct under Section 311(b) of the Clean Water Act.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

IGNACIA S. MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division


  /s/ Jason T. Barbeau
JASON T. BARBEAU
Trial Attorney (D.C. Bar No. 468200)
David F. Askman (Wyoming Bar No. 5-2683)
Joseph W.C. Warren (D.C. Bar No. 452913)
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044
(202) 616-8908 (telephone)
(202) 616-6584 (facsimile)
jason.barbeau@usdoj.gov

STEPHANIE A. FINLEY
United States Attorney

Of Counsel:                                                  KAREN J. KING (#23508)
Edwin M. Quinones                                   Assistant United States Attorney
Office of Regional Counsel                         800 Lafayette Street, Suite 2200
Region 6, U.S. EPA                                     Lafayette, LA 70501-6832
1445 Ross Avenue                                       (337) 262-6618 (telephone)
Dallas, TX 75202-2733                               (337) 262-6693 (facsimile)
                                                                   karen.king@usdoj.gov

36