# EXHIBIT C

Case No. 11-31117

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

UNITED STATES OF AMERICA, on behalf of Administrator of
Environmental Protection Agency,
Plaintiff - Appellant-Cross-Appellee

STATE OF LOUISIANA, on behalf of Louisiana Department of
Environmental Quality,
Plaintiff - Cross-Appellee

v.

CITGO PETROLEUM CORPORATION,
Defendant - Appellee-Cross-Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
_____

**PRINCIPAL BRIEF OF THE UNITED STATES**
_____

IGNACIA S. MORENO
Assistant Attorney General

JASON T. BARBEAU
SAMBHAV N. SANKAR
JOHN EMAD ARBAB
Attorneys, U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC  20044
(202) 514-4046

## CERTIFICATE OF INTERESTED PERSONS

In Case No. 11-31117, *United States of America et al. v. CITGO Petroleum Corp.*, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Parties:  United States of America (on behalf of the U.S. Environmental Protection Agency); State of Louisiana (on behalf of the Louisiana Department of Environmental Quality); CITGO Petroleum Corporation.

Counsel of parties:   John E. Arbab; Jason T. Barbeau; Brian C. Boyle; John C. Champion; Meredith A. Cunningham; Ann Beryl Hill; Craig Isenberg; Dwana C. King; Karen J. King; Edward C. Lewis; Michael K. Powell; Andrea M. Price; Edwin M. Quinones; Sambhav N. Sankar; Richard E. Sarver; Joseph W. Warren.

Other persons and entities:  Aaron P. Avila; Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C.; Jonathan R. Bourg; Fulbright & Jaworski, L.L.P.; Ignacia S. Moreno.

/s/John E. Arbab
counsel for the United States

- i -

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to 5th Cir. R. 28.2.3, the United States of America respectfully submits that oral argument would assist the Court in determining whether the civil penalty ordered by the district court should be vacated and remanded for further consideration, particularly in light of the lengthy trial record in this case.

/s/John E. Arbab
counsel for the United States

# TABLE OF CONTENTS

**Page**

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     Nature of the Case and Proceedings Below . . . . . . . . . . . . . . . . . . . . 3

       B.     Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       C.     Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             1.     Overview of CITGO's "massive" oil spill . . . . . . . . . . . . . . . 8

             2.     Impacts of CITGO's oil spill . . . . . . . . . . . . . . . . . . . . . . . . . 11

             3.     CITGO's acts and omissions resulting in the oil spill . . . . . . 15

                  a.     CITGO's prolonged failure to properly operate
                        and maintain the WWTP . . . . . . . . . . . . . . . . . . . . . . . 15

                  b.     CITGO's inadequate design and design
                        implementation at the WWTP . . . . . . . . . . . . . . . . . . 18

             4.     CITGO's acts and omissions in response to the oil spill . . . . 21

                  a.     CITGO failed to contain the spill . . . . . . . . . . . . . . . . . 21

                  b.     CITGO did not properly and fully inform
                        the Coast Guard about the true nature of the spill . . . . 23

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

- iii -

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

THE $6 MILLION CIVIL PENALTY SHOULD BE VACATED
AND REMANDED TO THE DISTRICT COURT FOR
FURTHER CONSIDERATION OF AN APPROPRIATE PENALTY . . . 28

A.   The Egregious Facts Of This Case, Including Many Of The
     District Court's Own Findings, Demonstrate That The Penalty
     Is Unreasonable And Inadequate, Even Accepting *Arguendo*
     The Court's Finding That This Massive Oil Spill Was The Result
     Of Ordinary Negligence On CITGO's Part. . . . . . . . . . . . . . . . . . . 29

     1.   The court's steeply discounted penalty is unreasonable
          and inadequate under penalty factors 1, 3, and 5 . . . . . . . . . . 30

          a.   Penalty factor 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

          b.   Penalty factor 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

          c.   Penalty factor 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     2.   The court's reliance on penalty factor 6 does not support
          its steeply discounted penalty . . . . . . . . . . . . . . . . . . . . . . . . . 34

     3.   The court erred as a matter of law respecting its
          interpretation and application of penalty factor 8  . . . . . . . . . 39

B.   The District Court Clearly Erred In Rejecting A Finding
     That This Massive Oil Spill Was The Result Of
     CITGO's Gross Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

     1.   The United States proved a compelling case
          of gross negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     2.   The court's rationale for rejecting a gross-negligence
          finding rests in part on a clearly erroneous factual
          finding and is otherwise entirely unpersuasive  . . . . . . . . . . . 48

- iv -

C.      The District Court's Discussion Of The Gross Negligence
        Standard Applicable To CWA Civil Penalty Determinations
        Creates Substantial Confusion As To Whether The Court
        Applied The Correct Standard In Rejecting A Finding Of
        Gross Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

D.      The District Court Erred In Failing To Apply The "Top-Down"
        Method Or A Discernible Alternative Method In Determining
        The Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

E.      The District Court Erred In Failing To Make Findings As To
        A Reasonable Approximation Of The Economic Benefit To
        CITGO Of Its Violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

F.      The District Court's Finding That 54,000 Barrels
        (2.27 Million Gallons) Of Oil Entered Navigable Waterways
        Is Incorrectly Low and Clearly Erroneous. . . . . . . . . . . . . . . . . . . . 58

        1.      The court's volume finding ignores undisputed evidence
                that an additional 3,418 barrels of waste oil entered
                waterways.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        2.      CITGO's estimate of the volume of oil that evaporated
                from waterways lacked a credible basis . . . . . . . . . . . . . . . . 60

        3.      The court's volume finding ignores undisputed evidence
                that an additional 259,000 barrels of oily wastewater
                entered waterways  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

- v -

# TABLE OF AUTHORITIES

**CASES:**                                                                **Page**

*Atlantic States Legal Found. v. Tyson Foods, Inc.*,
    897 F.2d 1128 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,53,55,58

*Bd. of Trustees v. Gabriel, Roeder, Smith & Co.*,
    529 F.3d 506 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*,
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,55

*Houston Exploration Co. v. Halliburton Energy Servs.*,
    269 F.3d 528 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Pound v. Airosol Co.*,
    498 F.3d 1089 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 26,41,54,58

*Resolution Trust Corp. v. Diamond*,
    45 F.3d 665 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Sierra Club v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,54,57

*Topalian v. Ehrman*,
    3 F.3d 931 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Tug Ocean Prince, Inc. v. United States*,
    584 F.2d 1151 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Tull v. United States*,
    481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,28,39

- vi -

**CASES (continued):**                                                                  **Page**

*United States v. Coastal States Crude Gathering Co.*,
    643 F.2d 1125 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6,7,28

*United States v. Gulf Park Water Co.*,
    14 F. Supp. 2d 854 (S.D. Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 40,54

*United States v. Lexington-Fayette Urban County Gov't*,
    591 F.3d 484 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48,49,53

*United States v. Mun. Auth. of Union Twp. (Dean Dairy)*,
    150 F.3d 259 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40,55,58

*United States v. Smithfield Foods, Inc.*,
    191 F.3d 516 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

*United States v. Yanez Sosa*,
    513 F.3d 194 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,47

*Water Quality Ins. Syndicate v. United States*,
    632 F. Supp. 2d 108 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . .  42

**STATUTES:**

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Clean Water Act ("CWA"):
    33 U.S.C. §1251 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3

    33 U.S.C. §1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    33 U.S.C. §1321(a)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

- vii -

**STATUTES (continued)** **Page**

33 U.S.C. §1321(b) (section 311(b)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

33 U.S.C. §1321(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

33 U.S.C. §1321(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 U.S.C. §1321(b)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,30-32

33 U.S.C. §1321(b)(7)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,51,52

33 U.S.C. §1321(b)(7)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

33 U.S.C. §1321(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . 8,31,33-35,39,55

33 U.S.C. §1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Oil Pollution Act ("OPA"):
Pub. L. No. 101-380, §4301, 104 Stat. 484, 533-37 (1990) . . . . . . . . . . . . 7
33 U.S.C. §2704(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**REGULATION:**

40 C.F.R. §19.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

**LEGISLATIVE HISTORY:**

S. Rep. No. 101-94, at 2-3 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722 . . . . 7

**MISCELLANEOUS:**

*Restatement (Third) of Torts (Physical and Emotional Harm)*
§2 cmt. a (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 212
(5th ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

- viii -

## JURISDICTION

The district court possessed jurisdiction under, *inter alia*, 33 U.S.C.

§1321(b)(7)(E) (action for imposition of civil penalty under Clean Water Act).  The

district court entered final judgment on September 29, 2011.  USCA5 10820.  The

United States timely filed a notice of appeal on November 23, 2011.  USCA5 10838.

CITGO Petroleum Corporation ("CITGO") timely filed a cross-appeal on

December 6, 2011.  USCA5 10844.  This Court's jurisdiction rests on 28 U.S.C.

§1291.

## STATEMENT OF ISSUES

The United States brought this action for imposition of a civil penalty and

injunctive relief against CITGO under the Clean Water Act ("CWA"), 33 U.S.C.

§1251 *et seq.*, arising from a June 2006 oil spill at CITGO's Lake Charles refinery in

Louisiana.  After a bench trial, the district court found that CITGO was "fully at fault"

for a "massive" oil spill – a "tragedy" that would have been prevented but for

CITGO's years of negligence.

The court issued injunctive relief against CITGO but ordered it to pay an

incongruously low penalty of only $6 million – an amount scarcely more than <u>one</u>

<u>day's</u> profit for CITGO ($5 million) at the time of the spill.  The issue presented is

whether the $6 million penalty should be vacated and remanded for further

- 1 -

consideration where:

A.  The egregious facts of this case, including many of the court's own findings, demonstrate that the penalty is inadequate, even accepting *arguendo* the court's finding that this massive oil spill was the result of ordinary negligence on CITGO's part;

B.  The court clearly erred in rejecting a finding that this massive oil spill was the result of CITGO's gross negligence;

C.  The court's discussion of the gross negligence standard applicable to CWA civil penalty determinations creates substantial confusion as to whether the court applied the correct standard in rejecting a finding of gross negligence;

D.  The court erred in failing to apply the "top-down" method or a discernible alternative method in determining the penalty;

E.  The court erred in failing to make findings as to a reasonable approximation of the economic benefit to CITGO of its violation; and

F.  The court's finding that 54,000 barrels (2.27 million gallons) of oil entered waterways is incorrectly low and clearly erroneous.

- 2 -

# STATEMENT OF THE CASE

## A. <u>Nature of the Case and Proceedings Below</u>

The United States brought this action seeking a civil penalty and injunctive relief against CITGO under the CWA, 33 U.S.C. §1251 *et seq.* The lawsuit arises out of CITGO's discharge of oil on June 19-20, 2006 from the Wastewater Treatment Plant ("WWTP") at its Lake Charles, Louisiana refinery into navigable waters of the United States.[1]

In a summary judgment ruling, the district court concluded that CITGO violated the CWA, holding: (i) CITGO discharged oil in violation of 33 U.S.C. §1321(b)(3), and thus was subject to a civil penalty; and (ii) CITGO's discharge also violated 33 U.S.C. §1311(a), and CITGO thus was subject to injunctive relief.[2] USCA5 1951-58. The court found the following facts undisputed. Two tanks at CITGO's Lake Charles refinery, known as Tanks 320 and 330, contained waste ("slop") oil, refinery process wastewater, and sludge on June 19, 2006. A heavy rain storm was forecast

---

[1]     The State of Louisiana, also a plaintiff below, sought penalties and costs against CITGO under state law. The district court awarded Louisiana $3 million.   USCA5 10837. Louisiana has not appealed.

[2]     As relevant here, 33 U.S.C. §1321(b)(3) prohibits "[t]he discharge of oil * * * into or upon the navigable waters of the United States, [or] adjoining shorelines * * * in such quantities as may be harmful." In general terms, 33 U.S.C. §1311(a) prohibits the discharge of any pollutant unless authorized by a permit. *See id.* §1342.

- 3 -

for, and occurred, in the Lake Charles area on June 19.  The two tanks overflowed on June 19, spilling oil into the Indian Marais and the Calcasieu River.  USCA5 1952-1953, 1955.

On September 29, 2011, after a two-week bench trial, the court issued the decision at issue here (styled "Judgment").  United States' Record Excerpts ("U.S.RE") Tab 3 (USCA5 10820-37).  The court found, *inter alia*, that CITGO caused a "massive" oil spill by negligently allowing 54,000 barrels of oil (2.27 million gallons[3]/) to discharge from the two storage tanks and a containment berm at the WWTP into the waterways.  USCA5 10820, 10825, 10828.

Notwithstanding the court's finding that the "massive" oil spill caused by CITGO's negligence here was "excessive" and "a tragedy" (USCA5 10822, 10825, 10834), the court imposed a civil penalty of only $6 million – an amount scarcely more than the $5 million profit CITGO was earning <u>every day</u> at the time of the spill.  *E.g.*, Exh. P1053-06 (CITGO generated net income of approximately $1.8 billion in 2006).  The court issued this penalty notwithstanding its further findings, *inter alia*, that:

---

[3]/     One barrel is 42 gallons.  33 U.S.C. §1321(a)(13).

- 4 -

- CITGO negligently "failed to properly maintain and operate its wastewater treatment facility [WWTP] *in violation of state law for five (5) years prior to the date of the spill*" (USCA5 10836) (emphasis added);

- The storm event was <u>less</u> than a "1 in 25 year/24 hour storm." Specifically: "[T]he storm event which led to the June 2006 spill was not a 1 in 25 year/24 hour storm, which the plant [WWTP] was supposedly designed to handle. *That is, as it was designed and running, the Citgo refinery was not capable of handling what it should have.*" (USCA5 10830-31) (emphasis added); and

- CITGO's spill had "a *huge negative effect* on the local area and the state" and "*significantly impacted*" the environment (USCA5 10827) (emphasis added).

Despite these findings, the court concluded that "[g]iven the totality of the circumstances, * * * a per barrel violation rate of $111.00 is reasonable, for a total penalty of **$6,000,000**." USCA5 10829. The court found that, although "the evidence presented at trial clearly supports a finding of negligence," CITGO's "actions or inactions" did not "rise to the level of gross negligence or willful misconduct." USCA5 10821.

The court noted that, given its no-gross-negligence finding, it could impose a civil penalty of "up to" $1,100 per barrel. USCA5 10829. The court found the total volume of oil that entered navigable waterways as a result of CITGO's negligence was "in the range of fifty-four [thousand] (54,000) barrels." USCA5 10828. Multiplying 54,000 barrels by a penalty of $111/barrel, the court arrived at a penalty of $6 million.

- 5 -

*Id.*

The court acknowledged that $111/barrel is only 10% of the maximum per-barrel penalty (absent a finding of gross negligence). *Id.* Nonetheless, the court found a $6 million penalty "reasonable," explaining (*id.*):

> The Court believes this amount represents the seriousness of the violation, combined with Citgo's actions to mitigate the damages and the ultimate impact of the spill, which could have been much worse under the circumstances.

The court also stated that it "considered the injunctive relief outlined" in its decision "in determining an appropriate penalty." *Id.* As injunctive relief, the court ordered CITGO, *inter alia*, to construct an additional storage tank and install other needed equipment at the WWTP. USCA5 10829-34, 10837.

The United States' appeal and CITGO's cross-appeal followed. The government challenges only the court's civil penalty.

**B.    <u>Statutory Background</u>**

Under the CWA, "it is the policy of the United States that there should be *no discharges of oil* or hazardous substances into or upon the navigable waters of the United States [or] adjoining shorelines * * * ." 33 U.S.C. §1321(b)(1) (emphasis added). This is an "unequivocal declaration" of federal policy. *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir. 1981).

- 6 -

CWA Section 311(b), 33 U.S.C. §1321(b), has long provided for civil penalties to serve the purposes of punishment and deterrence. *See Coastal States*, 643 F.2d at 1127-28; *Tull v. United States*, 481 U.S. 412, 422-23 (1987) (similar CWA penalty provision). In 1990, Congress amended and strengthened CWA Section 311(b)'s civil penalty provisions through the Oil Pollution Act ("OPA"), Pub. L. No. 101-380, §4301, 104 Stat. 484, 533-37 (1990). The Senate Report emphasized: "[A]ny oil spill, no matter how quickly we respond to it or how well we contain it, is going to harm the environment. Consequently, preventing oil spills is more important than containing and cleaning them up quickly." S. Rep. No. 101-94, at 2-3 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722, 724.

As amended, CWA Section 311(b) authorizes a civil penalty for an oil spill on a per-barrel basis. A defendant is subject to a penalty "in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil * * * discharged." 33 U.S.C. §1321(b)(7)(A). This is a strict-liability provision; that is, negligence is not a prerequisite for the imposition of a penalty of up to $1,100/barrel. *Coastal States*, 643 F.2d at 1127 ("absolute liability standard" for assessment of penalty). At the time of CITGO's oil spill, the inflation-adjusted penalty under §1321(b)(7)(A) was $1,100/barrel. 40 C.F.R. §19.4.

The maximum per-barrel penalty a court may impose increases if the violation was "the result of gross negligence or willful misconduct." 33 U.S.C. §1321(b)(7)(D). In such a case, the defendant "shall be subject to a civil penalty of * * * not more than $3,000 per barrel of oil * * * discharged." *Id.* At the time of CITGO's oil spill, the inflation-adjusted penalty under §1321(b)(7)(D) was $4,300/barrel. 40 C.F.R. §19.4.

As amended, CWA Section 311(b) provides eight factors that a district court must consider in determining the amount of a civil penalty:

> [T]he court * * * shall consider [1] the seriousness of the violation or violations, [2] the economic benefit to the violator, if any, resulting from the violation, [3] the degree of culpability involved, [4] any other penalty for the same incident, [5] any history of prior violations, [6] the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, [7] the economic impact of the penalty on the violator, and [8] any other matters as justice may require.

33 U.S.C. §1321(b)(8) (bracketed material added).

## C.   Statement of Facts

### 1.   Overview of CITGO's "massive" oil spill

CITGO's Lake Charles refinery, located in Calcasieu Parish, Louisiana, is one of the largest in the United States. USCA5 10820, 10826. The WWTP at the refinery receives waste streams produced from refining operations throughout this large complex. U.S.RE Tab 4 (Exh. P0058:photo showing WWTP in middle and refinery

- 8 -

above); Tab 5 (Exh. P0214 at CIT0047866:flow diagram).  Storage tanks are necessary at the WWTP for several reasons, including: (a) the treatment system does not have sufficient capacity to treat all wastewater flow during rain events and (b) equipment in the treatment system periodically must be taken out of service for maintenance and repairs.    USCA5 9245:13-18 (Amendola); Exh. P0214 at CIT0047857.

When it constructed the WWTP in the early 1990s, CITGO chose to mix – rather than segregate – its oily refinery process wastewater with its contaminated stormwater runoff before pumping these materials to the WWTP.  Thus, the WWTP must be capable of treating the refinery's process wastewater <u>and</u> contaminated stormwater during rain events, before discharging the treated effluent into the Calcasieu River pursuant to CITGO's CWA permit.  *See* USCA5 9245:13-18, 9250, 9260:25-9261:10, 9302:12-17 (Amendola);  USCA5 9867:24-9871:12 (CITGO engineer Dunn);  USCA5 3106-07 (CITGO expert Dr. Tischler).

The WTTP was ostensibly designed to be capable of handling stormwater runoff in a volume equal to a 1-in-25-year/24-hour rain storm, which in Lake Charles is 10.3 inches of rain in a day.  USCA5 9250-51, 9277-79 (Amendola).  The certified amount of rain for the Lake Charles refinery on June 19, 2006 was 8.3 inches.  USCA5 9876:9-20 (CITGO engineer Dunn).  As the district court found, at the time

- 9 -

of the June 19 storm event, "*as it was designed and running, the Citgo refinery was not capable of handling what it should have*."  USCA5 10830-31 (emphasis added).  *See* Exh. P0192 at DOJ-002351 (Sunday, June 18, 2006 local newspaper forecast for heavy rain on Monday, June 19, 2006).

The "massive" oil spill in this case (USCA5 10825) began at about 4:45 a.m. on June 19.  The inflow of oily refinery process wastewater and stormwater that CITGO pumped into the WWTP's two 10 million gallon storage tanks, Tanks 320 and 330, pushed the floating roof on each tank above large vents located at the 43-foot level.  As a result, the contents of the tanks discharged from near the top of the tanks.  U.S.RE Tab 4 (Exh. P0058:photo showing oil staining on tanks); Exh. P0198 at CIT0006; USCA5 8056-68 (Dr. Michel); Exh. D1050 at CIT0093228.

Approximately 111,000 barrels (4.7 million gallons) of waste ("slop") oil discharged from the storage tanks during the first three hours of the spill, followed by 411,000 barrels (17.2 million gallons) of a mixture of oily wastewater and sludge during the next nine hours.  USCA5 7948-50, 8056:5-10 (Dr. Michel); Exh. P0198 at CIT0006-0007 (CITGO report to LDEQ noting spill duration and volumes); USCA5 10574:4-10575:12 (CITGO expert Dr. Ogle agreeing over 100,000 barrels of slop oil spilled from tanks).

- 10 -

Nearly all of the more than 21 million gallons of oily wastes that discharged from the two storage tanks initially fell into an open-air containment berm at the WWTP.  The containment berm  – which became a 10-acre lake of oil (USCA5 9830:17-19) – was too small to contain the spill.  USCA5 8118:8-24, 9342:6-10 9664:17-24, 10376:8-20.  Moreover, the berm itself was a sieve.  As the district court summarized during trial: "[T]hat oil got out [of the berm] every way, shape, form, and style.  It went over and under and around and through."  USCA5 8082:10-12.

Approximately two-thirds of the discharged oily wastes flowed into navigable waters of the United States, including the adjacent Indian Marais and the nearby Calcasieu River.  USCA 1952-53, 10820.  Although the district court found that 54,000 barrels entered navigable waters, the United States demonstrated that at least 76,800 barrels (3.23 million gallons) of waste ("slop") oil did so.  USCA5 7949, 8137-71 (Dr. Michel); Exh. P1050-05 (summary table).  CITGO's own records showed that an additional 259,000 barrels (nearly 11 million gallons) of oily wastewater also did so.  USCA5 7949, 8160:8-8161:11 (Dr. Michel); Exh. P0198 at CIT0007 (CITGO report to LDEQ).

## 2. Impacts of CITGO's oil spill

CITGO's waste oil, oily wastewater, and sludge polluted the Calcasieu Estuary and damaged the environment and economy.  The spill contaminated over 150 miles

- 11 -

of shoreline in the Calcasieu Estuary, including beaches, residential and industrial waterfront, and sensitive marsh habitat. USCA5 7954-56 (Dr. Michel), 10024 (CITGO expert Dr. Slocomb agreeing 154 miles of shoreline oiled); U.S.RE Tab 4 (Exhs. P0027, P0052, P0077:photos of various types of oiled areas).

It was undisputed that the majority of the oiled shoreline – 94 miles – was sensitive marsh habitat. USCA5 7956:17-7957:21 (Dr. Michel); *e.g.*, U.S.RE Tab 4 (Exhs. P0064, P0171: photos of oiled marsh areas). CITGO conceded that oil spread throughout the estuary. USCA5 8029:21-8030:2. It was undisputed that concentrated oil remained in the marsh and beneath the surface of the shoreline even after the surface appeared cleaned up. *E.g.*, U.S.RE Tab 4 (Exh. P0007:photo of pooled oil on beach); USCA5 7959:1-16 (Dr. Michel describing photo); Exh. P1066 (December 2006 final shoreline clean-up approval forms noting oil sheening still present when shoreline disturbed).

CITGO's oil spill damaged and destroyed marsh habitat and killed birds, fish, and other aquatic life. USCA5 7953-54 (Dr. Michel). While the district court found these natural resources were "affected" (USCA5 10823), the undisputed facts reveal much more. Marsh plants were coated in oil and died. USCA5 7956, 7960:25-7961:20, 7965:6-12 (Dr. Michel); USCA5 10048:19-21 (CITGO expert Dr. Slocomb); *e.g.*, U.S.RE Tab 4 (Exh. P0006: photo of dying marsh grass). CITGO's waste oil

- 12 -

also contained high levels of polynuclear aromatic hydrocarbons, or PAHs, which are toxic and persistent in the environment.  USCA5 7950:21-7951:10, 7975 (Dr. Michel).  Numerous eye witness accounts documented that fish, crabs, shrimp, and other aquatic life were killed by CITGO's spill.  USCA5 7991-95, 7997-99 (Dr. Michel discussing evidence).

CITGO's own expert agreed that numerous types of aquatic life were killed by CITGO's oil spill. USCA5 10025:7-9, 10030:21-10032:25 (Dr. Slocomb). CITGO's expert acknowledged that the Natural Resources Trustees (a joint state-federal team) had developed a working mortality estimate in the range of hundreds of thousands of dead fish.  USCA5 10035-36.  *See* USCA5 7984:18-7985:2, 7988:10-7990:25 (Dr. Michel discussing modeling results).  While the district court found that "several birds were oiled and killed" (USCA5 10823), the parties' experts agreed that 300 birds killed by the spill is a reasonable estimate.  USCA5 7978:10-7979:25 (Dr. Michel); USCA5 10062:2-15 (Dr. Slocomb).

CITGO's oil spill also caused significant economic impacts.  The spill forced the closure of the Calcasieu Ship Channel, which provides access to the Intracoastal Waterway and serves the Port of Lake Charles, the 11th largest seaport in the United States.  USCA5 8001:3-4 (Dr. Michel); USCA5 328.  It was uncontested that the Calcasieu Ship Channel was blocked for 10 days, USCA5 8003-04, a significant

- 13 -

amount of time to close a major navigation channel. USCA5 7999:23-8001:6 (Dr. Michel). *Cf.* USCA5 10823 (court finding navigation was shut down for "several days"). It was undisputed that use of the ship channel was restricted for a total of 24 days. USCA5 8003-04 (Dr. Michel); Exh. P1050-08 (summary of closures and restrictions). It was undisputed that recreational activities on the waterways were restricted, resulting in over 10,000 lost recreational trips. USCA5 8011:23-8012:4 (Dr. Michel); USCA5 10063:11-16 (Dr. Slocomb).

CITGO's oil spill and the closures it caused also injured residents and businesses located along the waterways. For example, it was undisputed that stopping navigation delayed numerous vessels, directly impacting commerce. USCA5 8006-10 (Dr. Michel); Exh. P1050-10 (summary of daily vessel delays); Exh. P0260 at USCG005463-005467 (Coast Guard summary of impacts to industrial operations along river). The U.S. Strategic Petroleum Reserve was tapped to make up for the loss of vessel access to oil refining operations along the Calcasieu River. USCA5 294 (U.S. Dept. of Energy, "Energy Assurance Daily" (July 6, 2006)). CITGO's insurers have paid approximately $29 million for demurrage, business interruption losses, and property damage claims. Exh. P0739 (CITGO's insurance summary table).

- 14 -

### 3. CITGO's acts and omissions resulting in the oil spill

The district court found that CITGO could have "prevented this tragedy" but for its negligence. USCA5 10822. That is an understatement. The facts proved by the government are egregious and demonstrate the magnitude of CITGO's irresponsibility.

### a. CITGO's prolonged failure to properly operate and maintain the WWTP

According to CITGO's own investigation, CITGO's prolonged failure to remove oil and sludge from the two storage tanks at the WWTP were "root" causes of the June 2006 spill. Exh. P0214 at CIT0047850-0047851. *See* USCA5 9242:22-9246:12 (Amendola); USCA5 9833:16-9834:1 (CITGO lead spill investigator Dunn confirming causes listed in Exh. P0214).

CITGO has long known that it is critically important to regularly remove waste oil and other substances from the WWTP storage tanks to provide enough storage capacity during rain events. In 1997, a CITGO engineer warned: "Since the system is already marginal for stormwater capacity, it is imperative that excess oil and solids be removed so that this capacity can be used to store stormwater." Exh. P0950 at CIT0201212. Despite this knowledge, however, by the time of the June 2006 spill, CITGO had allowed over four million gallons of waste oil to accumulate in Tanks 320

- 15 -

and 330. *Compare* USCA5 7948:23-7949:2 (Dr. Michel reporting 111,000 barrels of waste oil spilled from tanks) *with* USCA5 10575:10-12 (CITGO expert agreeing more than 100,000 barrels of waste oil spilled from tanks).

The roof-mounted oil-skimming systems designed to remove floating oil from the storage tanks on a regular basis had not worked for approximately *ten years* prior to the spill. USCA5 9659:12-14 (CITGO expert Dr. Tischler recognizing oil skimming system had been broken for approximately ten years); Exh. P0950 at CIT0201212 (Jan. 1997 CITGO memorandum reporting tanks' skim oil systems are plugged and "do not work"); Exh. P0542 (Oct. 2000 CITGO e-mail reporting skimming pumps "have not been used in several years"); Plaintiffs' Depo. Binder Exh. V, Miller Depo. 46:24-47:16 (WWTP supervisor confirming that oil skimming system was already "abandoned . . . in place" when he arrived in 2000, and that no effort was made to fix it).

By 2000, CITGO had also discontinued use of alternative methods to remove floating waste oil, such as pumping out the tanks with a vacuum truck or portable pumps. USCA5 9846:5-19. It was thus undisputed that CITGO failed to remove floating waste oil accumulating in the tanks for *at least five years* before the spill.

As for sludge, CITGO failed to successfully remove the sludge from the tanks for five years before the spill, which consumed more of the limited tank capacity.

- 16 -

USCA5 9274-9275 (Amendola).  CITGO's investigation determined that sludge had not been removed to avoid incurring additional processing costs ("additional $2.5 MM per year") and also because CITGO's inadequate tank capacity made it "too risky" to take a tank out of service.  Exh. P0214 at CIT0047870; USCA5 9872:15-9874:19 (corporate representative Dunn confirming).  Consistent with the facts, the court found that the two storage tanks at the WWTP "were overloaded and should have been addressed prior to the spill."  USCA5 10822.

Moreover, CITGO violated its own written standard operating procedures ("SOP") by not emptying most of the contents of the storage tanks before rain storms.  As noted, the tanks have large vents near the top, at the 43-foot level.  CITGO's SOP called for the tanks to be drawn down to a low tank level of 5.5 feet prior to "any" rain event.  USCA5 9848:4-18 (corporate representative Dunn); Exh. P0234 §§2.2, 6.1.1 (SOP).

But prior to the rainstorm on June 19, 2006, the tanks were already at the 17-foot level, over three times the level specified in the SOP.  USCA5 9848:4-13 (Dunn).  CITGO had not operated the storage tanks at the specified low levels for years before the spill.  *E.g.*, USCA5 10464:11-19 (CITGO environmental department supervisor LeBlanc confirming); Plaintiffs' Depo. Binder Ex. V, Miller Depo. 12:9-10, 152:3-13 (WWTP supervisor stating he did not recall getting the tanks down to 5.5-foot level

- 17 -

during his tenure, which began in January 2000); USCA5 9849:2-4 (corporate representative Dunn describing the period as "a significant amount of time" before spill). Consistent with the evidence, the court found that CITGO inactions "violated its own standard operating procedures." USCA5 10822.

CITGO did not even regularly measure the amount of waste oil in the storage tanks, a *ten minute* job. USCA5 9835:14-19 (corporate representative Dunn confirming); Plaintiffs' Depo. Binder Exh. P, Richards Depo. 184-185 (describing minimal effort needed to take a measurement). CITGO's WWTP supervisor admitted that he did not take any measurements in the six and a half years he supervised the WWTP before the June 2006 spill. Plaintiffs' Depo. Binder Exh. V, Miller Depo. 149:6-9, 149:22-25. In 2005, a senior CITGO engineer did check for waste oil in Tank 330 and detected five feet of floating oil. USCA5 9259-60 (Amendola); Exh. P0398 at CIT04274202:42-44 (Richards interview memorandum). Even with this knowledge, CITGO did not remove the oil from the tanks.

### b.     CITGO's inadequate design and design implementation at the WWTP

CITGO's investigation confirmed that another "root" cause of the oil spill was the WWTP's lack of adequate capacity to handle contaminated stormwater in amounts the WWTP was supposed to be able to handle, and that CITGO had known this for

- 18 -

years prior to the spill: "The WWT Unit was incapable of containing the storm water from this event or a 25 year storm event. An engineering study completed in 2002 identified this deficiency." Exh. P0214 at CIT0047849; USCA5 9833:16-20 (CITGO lead investigator Dunn confirming); USCA5 9244 (Amendola).

CITGO's inadequate tank capacity dates back to the original design of the WWTP in the early 1990s. USCA5 9301:21-9303:25, 9343:8-9348:3 (Amendola describing design shortfalls). For example, CITGO's own documents showed CITGO staff requested 44 million gallons of storage in 1992 (equivalent to four storage tanks), but CITGO management decided to build for capacity of 25 million gallons (equivalent to only two tanks and use of part of the adjacent equalization tank). *Id.* By the time the WWTP became operational in May 1994, CITGO had removed the third and fourth storage tanks from the design to save money. *E.g.*, Exh. P0423 at CIT0098350 (1994 CITGO presentation listing $35 million in "wastewater equipment eliminated for cost reduction"). In short, CITGO actually needed four dedicated storage tanks at the WWTP, but built only two. USCA5 9299:10-17.

CITGO's own staff and consultants repeatedly warned management over many years before the June 2006 oil spill that the WWTP needed more storage tank capacity, but CITGO failed to act on that advice. For example, in October 1995,

- 19 -

CITGO's WWTP supervisor, Jeff Schweitzer, wrote a long letter to management identifying "major concerns." Exh. P0444. Schweitzer reported that there had already been "several near miss events in terms of exceeding the capacity of the stormwater tanks and one event when diversion to the Surge Pond was necessary,"[4] and that "[n]one of the events involved a rain event over 5 inches." *Id.* at CIT0137832 (also noting designed rain capacity is 10.25 inches).

At that point, the WWTP staff "estimated that under new, ideal conditions, the system would realistically only handle an 8-9 inch rain event." Exh. P0356 (Schweitzer June 2006 e-mail, recounting events). Schweitzer told CITGO management that the "potential for an overflow situation well short of the 25 year [design rain] event is high." Exh. P0444 at CIT0137832 (Oct. 1995 letter).

The following year, 1996, after more unauthorized discharges of oily wastewater and hazardous waste into the unpermitted Surge Pond, Schweitzer unambiguously reported the need for more capacity by making a written request for CITGO to "construct a new stormwater tank." Exh. P0511 at CIT0258843 (Oct. 31, 1996 Request for Design Change). This request stated: "[S]everal times it has been

---

[4] The "surge pond" is an unpermitted, unlined surface impoundment at the refinery. These illegal discharges contained oily wastewater and hazardous waste. USCA5 9305:13-9309:23 (Amendola discussing unpermitted discharges to surge pond of approximately 30 million gallons, not including 2006 spill).

necessary to divert wastewater to the refinery surge pond. These diversions were necessary because of inadequate tankage to contain additional flow as a result of large storm events." But CITGO still did not build additional storage capacity; thus, the inadequate two-tank storage system remained at the time of the June 2006 rain event.

### 4.    CITGO's acts and omissions in response to the oil spill

CITGO's investigation determined that its "initial response was not adequate for the event." Exh. P0214 at CIT0047859. The court found that CITGO's "initial response was lacking in that workers were not fully protected, the Coast Guard was not properly and fully informed, and the spill was not adequately contained." USCA5 10826. The court's findings, while accurate insofar as they go, do not adequately portray the wholesale inadequacy of CITGO's efforts to contain the spill during the critical first two days, June 19-20, 2006.

### a.    CITGO failed to contain the spill

The first CITGO responders to inspect the Indian Marais saw black oil flowing unimpeded down that fast-moving waterway around 8 a.m. on June 19. USCA5 8366-68, 8426:13-8427:12 (CITGO lead emergency responder Newman describing two-foot long "ribbons" of black oil moving down the "churning" Indian Marais). CITGO's efforts to use boom in the Indian Marais failed to stop the flow of waste oil and oily wastewater from the Marais into the Calcasieu River. Ethan Johnson, one of CITGO's

<div align="center">- 21 -</div>

lead spill responders, testified that he helped put several lines of boom at the mouth of the Indian Marais, but "[t]he sheen and the oil was breaking up and rolling underneath the boom itself." Plaintiffs' Depo. Binder Exh. K, Johnson Depo. 21:2-22:24.

By 11 a.m. on June 19, CITGO responders investigated the Calcasieu River at the mouth of the Indian Marais and confirmed the presence of recoverable amounts of oil flowing out of the Marais into the River. Steve Newman, CITGO's tactical chief and lead emergency responder, observed the oil from a boat and called CITGO's incident commander, Dick Reed, to report that there were "recoverable" amounts of oil in the river stating: "It is bank to bank. It's a sheen of oil across the river." Exhs. P0873-1, P0873 at 2-3 (audio file and transcript); USCA5 8378:12-8380:3 (Newman); USCA5 8027:19-8028:5 (identification of Exh. P0873 as 11:00 a.m. on June 19).

By the afternoon of June 19, oil was observed "pouring" into the Indian Marais from the "West Ditch" adjacent to the WWTP. Exh. P0206 at CIT0427433:11-12 (Mallet interview memorandum describing observations at 4:30 or 5:00 p.m.); Exh. P0247 at CIT0427341 (Gray interview memorandum describing Indian Marais as "full of oil" at 5 p.m. on June 19).

- 22 -

In response to this development, CITGO constructed a makeshift plywood dam at the north end of the "West Ditch," where the ditch connects to two 48-inch culverts that drop into the Indian Marais.  Exh. P0207 at CIT0037715  (CITGO investigation report).  The plywood dam was completed by 7:45 p.m. on June 19, but it began to overflow by 10:00 p.m., and was left unattended and unrepaired all night.  *Id.* (reporting West Ditch "was not inspected during the evening hours of June 19 until 7 am the following morning").  On the morning of June 20, the Indian Marais was "full" of oil.  Plaintiffs' Depo. Binder Ex. V, Miller Depo. 128:25-129:20.

On the night of June 20, Coast Guard pollution investigators were alerted to the oil spill situation on the Calcasieu River and witnessed a heavy layer of oil in multiple locations at and downriver from CITGO.  USCA5 8467-70, 8473:1-6 (Lt. Sevin); Exh. P0300 (Coast Guard investigator Chatagnier statement, describing chronology).  The Coast Guard's Acting Response Chief, Lt. Sevin, testified that CITGO's response effort at that time was "[m]inimal to none."  USCA5 8471:5-8; *see* USCA5 8470:8-15, 8471:9-21, 8473:7-15.

### b.     CITGO did not properly and fully inform the Coast Guard about the true nature of the spill

The court found that the Coast Guard "was not properly and fully informed" about the oil spill by CITGO.  USCA5 10826.  This mild statement, however, does not

- 23 -

do justice to what happened.  At 8:20 a.m. on June 19, CITGO simply reported to the Coast Guard "sheen on Indian Marais going to Calcasieu River."  *Compare* USCA5 8365-69, 8426:13-8427:12 (CITGO lead emergency responder describing two-foot long black oil ribbons churning in Indian Marais at 8 a.m.) *with* Exh. P0322 at EPA6R002572 (CITGO spill notification log reporting to Coast Guard at 8:20 a.m. that "sheen" was observed).

This report of a "sheen" failed to mention what CITGO already knew: that a huge amount of waste oil and oily wastewater had spilled from the tanks, that the tanks were still overflowing, and that concentrated oil was flowing down the Indian Marais into the river.  *E.g.*, USCA5 10406:8-10407:5 (CITGO lead spill response coordinator agreeing Coast Guard should have been informed of tanks overflowing and berm on verge of overflow).

Then, as discussed *supra* 22, CITGO's responders got out on the Calcasieu River and reported to CITGO's incident commander, Reed, at 11 a.m. that recoverable amounts of oil were spanning the river ("bank-to-bank" sheen in amounts that were "recoverable").  As an internal follow-up to that call, CITGO's security chief, Ben Talbot, called Reed and reiterated that "there's a pretty good spill on the water." Exhs. P0874-1, P0874 at 2:5-8 (audio file and transcript of call at 11:17 a.m. from Talbot to Reed); USCA5 8380:19-25 (discussing exhibit).

- 24 -

Instead of sharing that information with the Coast Guard, CITGO concealed the gravity of the situation by reporting to the Coast Guard at 11:40 a.m. merely that the "sheen" had "gotten worse" and that CITGO was deploying booms.  Exh. P0322 at EPA6R002573.  The booms, however, had already been deployed hours earlier and CITGO already knew the booms were ineffective.  And CITGO's lead emergency responder (Newman) had already told incident commander Reed on the 11 a.m. radio call that "We don't have enough booms to take care of this," with which Reed agreed. Exhs. P0873-1, P0873 at 2:11-13 (audio file and transcript).

Oil continued to flow under the booms into the Calcasieu River throughout the spill's first day, June 19.  USCA5 8380:17-8381:5 (Newman).  Before 3 p.m. on June 19, CITGO was aware that oil had traveled at least a mile down the river and was still uncontained.  USCA5 8381:6-8382:6; Exh. P0969 (CITGO e-mail).   By 6:00 p.m., CITGO's incident commander Reed affirmatively instructed staff *not* to call the Coast Guard: "He [Dick Reed] told me *not to call Coast Guard* or National Response."  Exhs. P0882-1, P0882 at 2:21-22 (audio file and transcript of call to night incident commander Ross Turpin) (emphasis added); USCA5 8703:5-25 (identifying call as made at 6:04 p.m. on June 19)  The night incident commander, Ross Turpin, recognized the situation as "an environmental disaster we're dealing with," but still CITGO did not inform the Coast Guard of that "disaster."  Exhs. P0883-1, P0883 at

- 25 -

2:2, 5:13-14 (audio file and transcript of call at 6:18 p.m. on June 19).

Later on the night of June 19, Turpin described the situation as *"an unbelievable oil flow getting away from us . . . . and it's big,"* yet still CITGO did not alert the Coast Guard about such a spill.  Exhs. P0889-1, P0889 at 4:1-5 (audio file and transcript of call) (emphasis added); USCA5 8704:21-8705:16 (identifying call as made at 10:29 p.m.).  *See infra* 37-38 (discussing CITGO's subsequent continuing lack of candor toward Coast Guard).

## STANDARD OF REVIEW

A district court's civil penalty determination is reviewed for an abuse of discretion.  *See Pound v. Airosol Co.*, 498 F.3d 1089, 1094 (10th Cir. 2007); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 576 (5th Cir. 1996).  A district court abuses its discretion where its decision is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.  *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008).  A district court's legal interpretation of the statutory penalty factors is reviewed *de novo*.  *Pound*, 498 F.3d at 1094.

- 26 -

## SUMMARY OF ARGUMENT

The $6 million penalty should be vacated and the case remanded for further consideration of an appropriate penalty.  On the egregious facts of this case, it was an abuse of discretion for the district court, with virtually no explanation, to issue a per-barrel penalty that is only *10%* of the amount that could have been imposed on a strict-liability basis, and is an amount far below the economic benefit of the violation to CITGO – a critical issue the court erroneously failed to address in a meaningful way by declining to make findings as to a reasonable approximation of CITGO's economic benefit.

The penalty is particularly unreasonable given the court's own finding that CITGO was negligent – *i.e.*, where CITGO was *not* being assessed a penalty merely on the basis of strict liability – and that, but for CITGO's negligence, this environmental disaster would never have occurred.  Indeed, on this record, the court's finding of no gross negligence on CITGO's part is clearly erroneous; thus, CITGO was subject to a maximum penalty of $4,300/barrel, compared to which the court's $111/barrel penalty is only *2.6%*.  The penalty is also unreasonably low because the court clearly erred in determining the volume of the spill.

- 27 -

## ARGUMENT

### THE $6 MILLION CIVIL PENALTY SHOULD BE VACATED AND REMANDED TO THE DISTRICT COURT FOR FURTHER CONSIDERATION OF AN APPROPRIATE PENALTY

The $6 million penalty issued by the district court is a proverbial "slap on the wrist" for CITGO that undermines the purposes of civil penalties: punishment and deterrence. *See Tull*, 481 U.S. at 422-23; *Coastal States*, 643 F.2d at 1128. *See also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 185 (2000) (CWA civil penalties "do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations").

A $6 million penalty is scarcely more than the $5 million profit CITGO was earning <u>every day</u> at the time of the spill. *E.g.*, Exh. P1053-06 (CITGO generated net income of approximately $1.8 billion in 2006). A $6 million penalty is also not even *25%* of the $25.9 million in economic benefit that CITGO gained from delaying construction of just one of the two additional storage tanks the court confirmed were needed at the WWTP (USCA 5 10830-32; *see infra* 56).

The mere $6 million penalty also ignores the government's evidence that, in the aftermath of what the court correctly found was a "catastrophe" (USCA5 10834), CITGO since the spill has transferred over $4.5 *billion* in cash (voluntary dividend

- 28 -

payments) to its parent company in Venezuela, but still has <u>not yet</u> made the relatively modest expenditures needed to upgrade the WWTP to prevent another catastrophe from happening again.  USCA5 9157:20-9158:1; Exh. P1071 (dividend history).

More than five years <u>after</u> CITGO's debacle, the court found that "a situation such as the 2006 discharge is likely to happen again if some measures are not taken to improve the Citgo facility" (USCA5 10829), and specifically found that CITGO is not "currently operating with adequate capacity."  USCA5 10832.  Indeed, for that reason, the court issued injunctive relief against CITGO.  USCA5 10829-34.

On this record, the $6 million penalty should be vacated and remanded to the district court for further consideration of an appropriate penalty.

**A.    The Egregious Facts Of This Case, Including Many Of The District Court's Own Findings, Demonstrate That The Penalty Is Unreasonable And Inadequate, Even Accepting *Arguendo* The Court's Finding That This Massive Oil Spill Was The Result Of Ordinary Negligence On CITGO's Part.**

The $6 million penalty is based on the court's conclusion that, in the circumstances of this case, it was "reasonable" to impose a per-barrel penalty, $111/barrel, that is only *one-tenth* of the $1,100/barrel penalty the court could have imposed in light of its finding that CITGO was negligent but not grossly negligent. USCA5 10821, 10825, 10829.  As discussed in Section B below, this spill resulted from CITGO's gross negligence.  But even accepting *arguendo* the court's ordinary-

- 29 -

negligence finding, on this record it was unreasonable for the court to effectively grant CITGO a *90% reduction* in the penalty that could have been imposed on the basis of strict liability, *i.e.*, even if CITGO were without fault for this spill.   33 U.S.C. §1321(b)(7)(A).

### 1.   The court's steeply discounted penalty is unreasonable and inadequate under penalty factors 1, 3, and 5.

a. *Penalty factor 1*.  A court must consider "the seriousness of the violation or violations."   *Id.*   The court's $111/barrel penalty patently does not reflect "the seriousness of the violation."  USCA5 10829.  Indeed, it contradicts the court's own findings that the CITGO's oil spill was "massive" and "excessive" – a "tragedy" that had "a huge negative effect on the local area and the state," and "significantly impacted" the environment.  USCA5 10822, 10825, 10827, 10834.

The court's low $111/barrel penalty is also contrary to the evidence bearing on the seriousness of CITGO's oil spill.  As shown in greater detail *supra* 11-13, 25, at the time of the spill, CITGO itself accurately described the spill as an "environmental disaster."   This spill contaminated over 150 miles of shoreline in the Calcasieu Estuary, including beaches, residential and industrial waterfront, and sensitive marsh habitat.  The majority of the oiled shoreline – 94 miles – was undisputedly sensitive marsh habitat.  The Natural Resource Trustees developed a mortality estimate in the

- 30 -

range of hundreds of thousands of dead fish.  The parties' experts even agreed that 300 is a reasonable estimate of the number of birds killed by the spill.

The economic impact of the spill was also substantial.  *Supra* 13-14.  Among other things, the spill (i) forced the closure of the Calcasieu Ship Channel for 10 days and restricted use for 24 days, (ii) caused $29 million in damage to third parties; and (iii) interfered with significant (10,000 trips) recreational use of the affected waterways.

In short, the "seriousness of the violation" (penalty factor 1) supports a penalty toward the high end of the range ($1,100/barrel), not *90% below* the high end ($111/barrel).  The district court abused its discretion in concluding otherwise.

b.  *Penalty factor 3*.  Because 33 U.S.C. §1321(b)(7)(A) is a strict-liability penalty provision, CITGO could have been assessed a penalty up to $1,100/barrel even if no culpability had been proved.  However, a court must consider "the degree of culpability involved."  33 U.S.C. §1321(b)(8).  Here, the court found that "Citgo is fully at fault for the spill and resulting damages, but is not guilty of gross negligence or willful misconduct."  USCA5 10825.  Even assuming no gross negligence, the court's $111/barrel penalty is unreasonable given (i) the evidence bearing on the egregious nature of CITGO's acts and omissions, and (ii) the court's finding that CITGO was *negligent*, which is a heightened degree of culpability under

- 31 -

the strict liability penalty provision.  33 U.S.C. §1321(b)(7)(A).

As shown *supra* 9-10, on June 19, 2006, CITGO's WWTP could not handle the volume of contaminated storm water runoff produced by the 8.3 inches of rain that fell at the refinery that day – a rainfall amount well *within* the WWTP's ostensible capacity of 10.3 inches.  The court itself found: "*as it was designed and running, the Citgo refinery was not capable of handling what it should have*."  USCA5 10830-31 (emphasis added).  This was not a mere operating error on CITGO's part but rather a wholesale failure for years to run the WWTP in accordance with the facility's design.

As also shown *supra* 10, 15-16, floating waste oil that had been accumulating for *at least five years* spilled out of the vents near the top of the tanks.  The waste oil had been accumulating in the tanks for so long because CITGO never fixed the broken oil-skimming equipment mounted on the roofs of the tanks – skimming equipment that had been broken for approximately *ten years* at the time of this spill – and CITGO stopped using alternative means to remove the oil.

Moreover, although CITGO had known for years before the spill that it was critical to periodically remove oily wastes from the tanks to maintain their storage capacity, CITGO nevertheless had allowed over *4 million gallons* of waste oil to build up in the tanks before the June 2006 spill.  CITGO did not even bother to regularly

- 32 -

monitor the amount of waste oil in the tanks – even though it only takes *ten minutes* to measure the oil in a tank.  *See supra* 15-18.  To make matters worse, for over *ten years* prior to the spill, CITGO's technical staff and engineering consultants repeatedly warned management of the need for additional storage and treatment capacity at the WWTP, including specifically with regard to heavy rainfall events. *See supra* 19-21.  But CITGO refused to add capacity.

By the time of the June 2006 oil spill, after <u>twelve years of delay</u>, CITGO was finally in the process of building the third storage tank that had been removed from the design to save costs in 1994 and repeatedly requested since then.   USCA5 9330:16-21 (Amendola); Exh. P0423 at CIT0098350 (1994 CITGO presentation). But the third tank was not completed until December 2007, some 18 months after the June 2006 oil spill  (USCA5 10447:10-12) – a classic example of too little, too late.

In short, CITGO's "degree of culpability" for this tragedy (penalty factor 3) supports a penalty toward the high end of the range ($1,100/barrel), not *90% below* the high end ($111/barrel).  The court abused its discretion in concluding otherwise.

c. *Penalty factor 5*.  A court must consider "any history of prior violations." 33 U.S.C. §1321(b)(8).  Here, the court found that CITGO had a long history of prior CWA violations at the Lake Charles refinery: "Since 1994, the government has shown that Citgo discharged oily wastewater into the surge pond on at least six (6) occasions

- 33 -

* * *.  Further, the government has shown that Citgo has over nine hundred fifty (950) days of permit exceedances, as shown on mandatory disclosures."  USCA5 10825. That history of violations led the court to find: "[CITGO] does not appear to have recognized the importance of compliance, pollution control, environmental responsibility, and the overall duty imposed on businesses to operate safely."  USCA5 10826.

This history and the court's own findings plainly should have factored into the penalty determination.  However, the court ignored those findings in issuing its low $111/barrel penalty.  *See* USCA5 10829.  The court abused its discretion in doing so.

### 2. The court's reliance on penalty factor 6 does not support its steeply discounted penalty.

A court must consider "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge."  33 U.S.C. §1321(b)(8) (factor 6).  Here, the government proved that CITGO's response effort was woefully inadequate until the Coast Guard arrived on the scene, an arrival that CITGO delayed for two days by failing to inform the Coast Guard of the magnitude of the spill.  *See supra* 21-26.

The court found a $111/barrel penalty reasonable, in part, because CITGO took action "to mitigate the damages and the ultimate impact of the spill."  USCA5 10829.

- 34 -

While the court might be correct that the spill's impact "could have been worse" had CITGO done nothing (*id.*), the court's findings and the record show that the impact would have been far less severe if CITGO had mounted an effective response immediately and accurately notified the Coast Guard of the catastrophic nature of the spill.

The court itself found that "Citgo's initial response [to the spill] was lacking in that workers were not fully protected, the Coast Guard was not properly and fully informed, and the spill was not adequately contained."   USCA5 10826.   Those findings plainly demonstrate the unreasonableness of the court's low $111/barrel penalty based on "the nature, extent, and degree of success" of CITGO's efforts to minimize or mitigate the effects of this spill.   33 U.S.C. §1321(b)(8).   If anything, the court's own findings support a penalty substantially higher than $111/barrel.

The court found that "measures were taken by Citgo to minimize and mitigate the effects of the discharge promptly."   USCA5 10826.   That conclusion is substantially undermined by the court's other findings that (i) CITGO's "efforts were better organized and more effective once the Coast Guard became involved," and (ii) CITGO and its clean-up contractors "eventually" deployed over sixty miles of boom and other equipment.   USCA5 10826-27.   Moreover, the record demonstrates that CITGO's efforts in the critical two days after the spill were largely *unsuccessful*

- 35 -

– that is, had little "degree of success" under penalty factor 6.

As shown in greater detail *supra* 21-23, CITGO's response to the spill on June 19 and 20 was ineffective and incompetent. For example, CITGO spill-response personnel saw black oil flowing unimpeded down the Indian Marais around 8 a.m. on June 19, but their efforts to use booms to keep the oil from flowing from the Marais into the Calcasieu River failed. By 11:00 a.m., CITGO knew oil sheen was spreading across the river from bank to bank. By this point, it had to be clear to CITGO that the situation was beyond its ability to control. Yet CITGO blandly reported to the Coast Guard that the "sheen" had "gotten worse."

By the afternoon of June 19, CITGO personnel saw waste oil "pouring" into the Indian Marais from the West Ditch. CITGO's response was to build a makeshift plywood dam that was a total failure: the dam was completed by 7:45 p.m., but it began to overflow by 10:00 p.m. In a particularly glaring example of CITGO's spill-response ineptitude, the dam was inexplicably left unattended and unrepaired all night. *Supra* 23.

CITGO's effort to contain the spill during the critical June 19-20 time-frame – such as it was – featured a complete lack of candor vis-a-vis the Coast Guard. Put in terms of penalty factor 6, the "nature [and] extent" of CITGO's efforts to minimize or mitigate the effects of this oil spill should have been – but manifestly were not –

- 36 -

premised on forthright provision of accurate information to the Coast Guard.

As shown, on the morning of June 19, CITGO innocuously advised the Coast Guard that there was a "sheen" in the Indian Marais – not that CITGO's responders had observed black oil in the Marais.  Later that morning, CITGO knew the tanks were still overflowing and that there was already a "pretty good spill" on the Calcasieu River, but merely advised the Coast Guard that the "sheen" had "gotten worse," and that CITGO was deploying booms – which had been deployed hours earlier and had not stopped the flow of oil into the river.  *Supra* 24-25.

Later on the night of June 19, night incident commander Turpin described the situation as *"an unbelievable oil flow getting away from us . . . . and it's big,"* yet CITGO still did not alert the Coast Guard of the severity of the situation.  To the contrary, by 6:00 p.m., day incident commander Reed had already inexplicably and unjustifiably instructed CITGO staff *not* to call the Coast Guard.  *Supra* 25-26.

When CITGO called the Coast Guard around noon on June 20, it still misrepresented the true nature of its environmental disaster by providing only a "sheen" update. Exh. P0300 (Coast Guard investigator Chatagnier statement: CITGO referred to "sheen sighting from 19JUN06" and reported only that "a small amount of sheen had escaped from their boom at Indian Marais").  Even CITGO's investigation determined that CITGO "did not provide an adequate update" to the

- 37 -

Coast Guard on the afternoon of June 20.  Exh. P0214 at CIT0047863.

Even after the Coast Guard arrived at the refinery on the night of June 20, CITGO still was not forthcoming about the nature and extent of the spill.  USCA5 8471:25-8472:4 (Acting Response Chief Lt. Sevin); USCA5 8551-53 (Lt. Commander Mills).  Due to CITGO's recalcitrance, and the lack of visibility at night, the true nature of the spill was not fully revealed to the Coast Guard until the morning of the third day, June 21.  USCA5 8469-70, 8473:1-6, 8475:24-8476:16 (Lt. Sevin); USCA5 8551:4-20 (Lt. Commander Mills).

CITGO's lack of candor about the unfolding events delayed the Coast Guard's response and exacerbated the negative effects of the oil spill.  As Lieutenant Commander Mills, the Executive Officer of the Coast Guard's Lake Charles Unit, testified, the Coast Guard had technical expertise and equipment that could have and would have been deployed on the first day:

> Q:    Commander, if you had been aware of the situation at CITGO's refinery on the morning of June 19th with the tanks overflowing and secondary containment full, would you have mobilized the Gulf Strike Team at that time?
>
> A:    Immediately.

USCA5 8560:2-6.

- 38 -

This copious evidence of CITGO's poor initial response efforts and utter lack of candor toward the Coast Guard supports a penalty toward the high end of the range ($1,100/barrel), not *90% below* the high end ($111/barrel). The court abused its discretion in concluding otherwise.

### 3.     The court erred as a matter of law respecting its interpretation and application of penalty factor 8.

Penalty factor 8 requires a court to consider "any other matters as justice may require." 33 U.S.C. §1321(b)(8). Applying that factor here, the court agreed with CITGO that it should consider the company's "positive impact and role in the community in calculating the penalty assessed." USCA5 10827. The court found that "[t]he Lake Charles Refinery is one of the largest in the nation and its existence has a positive economic impact on the state of Louisiana." *Id.* The court's reliance on this rationale was legal error.

We are unaware of authority for the proposition that a court may reduce a civil penalty because the CWA violator operates a large facility that benefits the economy. Indeed, such an interpretation of penalty factor 8 turns the purposes of CWA penalties – punishment and deterrence – on their head. *Tull*, 481 U.S. at 422-23; *see supra* at 7. To achieve deterrence, a civil penalty "must be high enough so that the discharger cannot 'write it off' as an acceptable environmental trade-off for doing business."

- 39 -

*United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 869 (S.D. Miss. 1998) (quotation marks omitted); *see United States v. Mun. Auth. of Union Twp. (Dean Dairy)*, 150 F.3d 259, 263-64 (3d Cir. 1998).  Reducing civil penalties for large facilities, simply because they are large, unfairly treats large entities more leniently than smaller ones and makes it easier for large facilities to "write off" penalties as an acceptable cost of doing business.

The court committed another legal error, apparently under penalty factor 8.  The court stated (without further explanation) that, in arriving at a $111/barrel penalty, it "considered the injunctive relief" it was issuing.  USCA5 10829.  Evidently, the court reduced the per-barrel penalty by an unspecified amount based in part on the cost to CITGO of the injunctive relief ordered by the court.  *See also* USCA5 10837 (explaining that court "considered this cost [*i.e.*, the cost of injunctive relief ordered] in assessing the State penalty").

Nothing in the CWA, however, authorizes a court to reduce a civil penalty by some percentage of the cost to the violator of the injunctive relief ordered.  Viewed from the standpoint of punishment and deterrence, if anything, the greater the cost of the injunctive relief, the higher the penalty should be.  Costly injunctive relief generally indicates significant economic benefit to, and serious misconduct by, the violator.  Simply put, injunctive relief and civil penalties are two separate kinds of

- 40 -

remedies under the CWA.

It makes no sense to interpret the "as justice may require" penalty factor as permitting reduction of a penalty based on the cost of injunctive relief – costs the defendant should have incurred to prevent an oil spill from happening in the first place. As the Sixth Circuit explained in a similar context: "In most [CWA] cases, the more serious the violation, the more that penalty money could be used for remediation [*i.e.*, used by the defendant to come into compliance]. If Congress thought a violator's money would be better spent that way, Congress would hardly have provided for civil penalties." *United States v. Lexington-Fayette Urban County Gov't*, 591 F.3d 484, 487 (6th Cir. 2010).

Appellate courts reverse and remand civil penalties where the district court considered improper rationales under this penalty factor. This Court should do the same here. *See Pound*, 498 F.3d at 1096-97; *Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990).

### B.    The District Court Clearly Erred In Rejecting A Finding That This Massive Oil Spill Was The Result Of CITGO's Gross Negligence.

If the court had made a gross negligence finding, CITGO would have been subject to a penalty of up to $4,300/barrel. *See supra* at 8. The court's $111/barrel penalty is a mere *2.6%* of the penalty that could have been imposed in a case of gross

- 41 -

negligence.  The court's no-gross-negligence finding here is clearly erroneous.  *See Houston Exploration Co. v. Halliburton Energy Servs.*, 269 F.3d 528, 531 (5th Cir. 2001) (clearly erroneous standard of review).

"Negligence is a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances.  A greater degree of care is required when the circumstances present a greater apparent risk. Negligence is 'gross' when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care." *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) (case involving OPA, 33 U.S.C. §2704(c)(1)).  Similarly, the *Restatement (Third) of Torts* explains that, "[t]aken at face value, this term [gross negligence] simply means negligence that is especially bad." *Restatement (Third) of Torts (Physical and Emotional Harm)* §2 cmt. a (2010).  *Accord* W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* 212 (5th ed. 1984) ("[M]ost courts consider that 'gross negligence' * * * differs from ordinary negligence only in degree, and not in kind.").  Thus, for the purposes of the CWA, gross negligence requires objective proof of a departure from the standard of care beyond what would constitute ordinary negligence.

- 42 -

1.      **The United States proved a compelling case of gross negligence.**

A plethora of evidence establishes that CITGO was grossly negligent.

Consider, for example:

- CITGO knew that to cut costs, "the design of the WWTP was intentionally limited in capability," Exh. P0503 at CIT200303 (1997 CITGO presentation), and that the design capacity provided "no 'fat' in storage volume," Exh. P0561 at CIT137750 (CITGO PowerPoint).

- Nonetheless, CITGO allowed sludge and floating waste oil to accumulate in the storage tanks for *at least five years* before this spill. The waste oil had been accumulating in the tanks for years because CITGO never bothered to fix the tanks' broken oil-skimming equipment – equipment that had been broken for approximately *ten years* at the time of this spill. *Supra* 16-17.

- CITGO's own engineering expert, Dr. Tischler, testified that it would have cost CITGO *only $18,000* to replace the pumps for the broken oil-skimming equipment, which would have greatly reduced the volume of floating waste oil that spilled from the tanks. USCA5 9659:4-21.

But that is just the tip of the iceberg. For instance, CITGO's own corporate representative, Jerry Dunn, agreed that CITGO's failure to monitor the accumulation of oil in the tanks was a "*complete failure* to do the right thing." USCA5 9835:14-9836:2 (emphasis added). CITGO did not dispute trial testimony that a reasonable refinery operator would monitor and remove the oil from the storage tanks on a *continuous or at least weekly basis.* USCA5 9257:2-6, 9260:20-24, 9367:5-8 (Amendola). But CITGO did not monitor and remove the oil on anything remotely

- 43 -

like a continuous or weekly basis; rather, it did not monitor on any periodic basis whatsoever, and allowed the oil to accumulate for years.

Despite having known for years that, to maintain the tanks' storage capacity, it was critical to periodically remove oily wastes from the tanks, CITGO allowed over *4 million gallons* of waste oil to build up in the tanks before the June 2006 spill, and did not even monitor the amount of waste oil in the tanks – even though it only takes *ten minutes* to measure the oil in a tank.   *Supra* 15-18.  Testimony established that allowing this huge volume of waste oil build-up "took away valuable storage capacity that [CITGO] *sorely needed at the time of the spill*."  USCA5 9275:19-21 (Amendola) (emphasis added).

Contrary to its own written SOP, CITGO did not empty most of the contents of the storage tanks to a tank level of 5.5 feet prior to the June 19 rain storm, instead maintaining the tanks at the 17-foot level, *over three times* the level specified in the SOP.  In fact, CITGO had not operated the storage tanks at the specified low levels for years before the spill.  *Supra* 17-18.  This was not a case of CITGO occasionally making small deviations from its SOP – rather, CITGO chronically failed to follow its SOP.

Before the spill, CITGO also expanded its refinery operations and increased wastewater flows to the WWTP <u>without</u> first increasing its wastewater treatment and

- 44 -

storage capacity. USCA5 9338:25-9339:13 (Amendola); Exh. P0421 at CIT0093250, 0093253 (Jan. 2004 CITGO/ENSR report addendum listing recent and upcoming refinery expansions). This further diminished the WWTP's already-inadequate storage capacity. Even a CITGO engineering expert admitted at trial it was "unreasonable" that CITGO operated new production units before providing more treatment capacity at the WWTP. USCA5 9717:11-9718:3 (Dr. Tischler).

In addition to these drastic operational failures, CITGO had known for over *ten years* prior to the spill that its WWTP design lacked adequate storage and treatment capacity. For at least a decade, CITGO's technical staff and engineering consultants repeatedly had expressed concern and recommended additional storage and treatment capacity specifically with regard to heavy rainfall events. *Supra* 19-21. But CITGO refused to add capacity in order to save money.

CITGO also had long known that the risk of overflow was high. *See id.* For example, in 1995, the year after the WWTP was built, Jeff Schweitzer, CITGO's WWTP supervisor in the 1990s, reported to management that the "potential for an overflow situation well short of the 25 year [design rain] event is high." Exh. P0444 at CIT0137832 (Oct. 1995 interoffice letter). Again in 1997, a CITGO project team reiterated that the risk of such an overflow is "high." Exh. P0400 at CIT0064567 (1997 study request).

- 45 -

CITGO's knowledge of the risk of harm increased over time because CITGO's technical staff, engineers, and consultants repeatedly identified the lack of adequate wastewater treatment and storage capacity at the WWTP and requested additional capacity.  For example,

• In 1997, CITGO internally acknowledged the WWTP has "little or no extra room to handle major refinery upsets or a heavy rainfall." Exh. P0503 at CIT0200303 (1997 CITGO presentation);

• In 1998 CITGO and its consultants recognized that additional tank storage was needed.   USCA5 10398:17-21, 10422:16-10423:11, 10444:22-10445:15 (CITGO environmental department supervisor LeBlanc confirming); and

• In 2002, CITGO's project team and consultant again recommended additional storage capacity.  USCA5 10447:6-12 (LeBlanc).

Despite all these warnings, CITGO still did not build any additional storage tank capacity.

As further evidence of CITGO's knowledge of its inadequate wastewater storage and treatment capacity and the high risk of overflow: the government showed that at least five times before the 2006 spill and again in 2008, CITGO made multiple unauthorized diversionary discharges of tens of millions of gallons of untreated oily wastewater and hazardous wastes into an unlined, unpermitted surface impoundment – the "Surge Pond" – to avoid overflowing the tanks.  USCA5 9305:13-9309:23 (Amendola); USCA5 10408:19-23, 10419-20 (CITGO environmental department

- 46 -

supervisor LeBlanc confirming CITGO's five discharges to surface impoundment before the 2006 spill were to avoid overflowing tanks and discharges of untreated oily wastewater included hazardous waste). *See also supra* 20-21.

Despite this overwhelming record, the court found "no gross negligence" on CITGO's part. USCA5 10822. As shown, that finding is clearly erroneous because it is "without substantial evidence to support it" and the court "misinterpreted the effect of the evidence." *Bd. of Trustees v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008). Accordingly, the court's $111/barrel penalty represents an abuse of discretion because it rests on a clearly erroneous assessment of the evidence bearing on gross negligence. *Yanez Sosa*, 513 F.3d at 200.

The government demonstrated that CITGO's negligence in this case was especially bad and extreme, *i.e.*, was gross negligence. For at least ten years before the June 2006 oil spill, CITGO knew that, as designed and operating, the WWTP was an environmental disaster waiting to happen. To save money, however, CITGO chose not to rectify the WWTP's lack of adequate storage and treatment capacity – instead, essentially gambling that a heavy rainfall, even one within the ostensible design capacity, would not overwhelm the WWTP. This is the epitome of gross negligence, particularly given that, as the court itself pointed out, "[l]ike death and taxes, major storm events in Louisiana are a fact of life." USCA5 10834.

- 47 -

2.    **The court's rationale for rejecting a gross-negligence finding rests in part on a clearly erroneous factual finding and is otherwise entirely unpersuasive.**

In rejecting a finding of gross negligence, the court made a clearly erroneous factual finding: "[A]pproximately eleven (11) inches of rain fell in Lake Charles on the date of the spill. Had it not been for the excessive rain, it is unlikely that the tanks would have overfilled that day." USCA5 10822. The record demonstrates that 8.3 inches (not 11 inches) fell at the refinery on the date of the spill, June 19, 2006, an amount well <u>within</u> the ostensible capacity of the WWTP (10.3 inches). *Supra* 9-10. Indeed, on cross-examination, CITGO's own engineering expert, Dr. Tischler, confirmed that the rain on June 19 did not exceed CITGO's 25-year storm design level, nor did it even exceed a 10-year storm level. USCA5 9681-83.

The court's opinion highlights its error on this point. In addressing injunctive relief, the court correctly found: "[T]he storm event which led to the June 2006 spill was not a 1 in 25 year/24 hour storm, which the plant [WWTP] was supposedly designed to handle. That is, as it was designed and running, the Citgo refinery was not capable of handling what it should have." USCA5 10830-31.

The court's erroneous rainfall finding warrants vacatur and remand of the penalty. In *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996), this Court did just that when it found that one of two key factual findings made by the

- 48 -

district court was clearly erroneous and the Court was "unable to determine whether the error was harmless or to dispose of this case by reducing the amount of the fine on our own." *Id.* at 1339. Given the district court's emphasis of its erroneous rainfall finding in setting the civil penalty, that is the situation here too.

The court's remaining rationale for rejecting a gross negligence finding is entirely unpersuasive. The court found that "Citgo was working on a plan to remove the excess shortly before the spill and believed it had a dike area which would contain any overflow in the interim." USCA5 10822. Given the overwhelming record evidence of gross negligence, these facts are far too slender a reed upon which to rest a no-gross-negligence finding.

Moreover, the "plan" to which the court referred is simply an undated, one-page "Storm Tank Level Reduction Plan." Exh. D83. Notably, the plan specifies numerous contingencies restricting CITGO's ability to actually implement it; for instance, the plan lists many "[i]tems that need to be resolved prior to cleaning," including discontinuing use of two waste processing tanks and converting them to slop oil service. *Id.* Furthermore, CITGO's complete failure to remove the floating waste oil from the storage tanks – not for a few weeks or months – but for five years before the spill is outrageous conduct that cannot credibly be excused by an unexecuted plan.

Concerning the "dike area" to which the court referred, *i.e.*, the containment

- 49 -

berm at the WWTP (USCA5 10822): if CITGO actually believed the berm would "contain any overflow" pending implementation of its theoretical "plan," that belief was unreasonable.  In fact, the court correctly recognized that the containment berm was like a sieve, stating at trial: "[T]hat oil got out [of the berm] every way, shape, form, and style.  It went over and under and around and through."  USCA5 8082. CITGO knew or should have known that the berm was compromised in multiple places and thus would not "contain any overflow in the interim." USCA5 10822.  For example, at the time of the spill, the berm was compromised by an uncapped 16-inch open pipe ("firewater line") which was left open and flowing for 17 hours. Exh. P0214 at CIT0047852-53, 0047873.  In any case, CITGO had long known that the containment berm "is for spills and tank failures and should not be used as a designed feature for storage of excess material."  Exh. P0436 at CIT0120815 (Dec. 1998 CITGO memorandum).

In short, given the abundant evidence of gross negligence adduced by the government, CITGO's "plan" and its sieve-like containment berm plainly do not constitute substantial evidence supporting the court's no-gross-negligence finding.

- 50 -

**C.    The District Court's Discussion Of The Gross Negligence Standard Applicable To CWA Civil Penalty Determinations Creates Substantial Confusion As To Whether The Court Applied The Correct Standard In Rejecting A Finding Of Gross Negligence.**

A court may impose a heightened per-barrel civil penalty (up to $4,300/barrel here) if the violation was "the result of gross negligence *or* willful misconduct." 33 U.S.C. §1321(b)(7)(D) (emphasis added).    Thus, if the court here conflated gross negligence with willful misconduct in determining the amount of CITGO's civil penalty, then it committed legal error because the plain language of §1321(b)(7)(D) uses those terms in the disjunctive.   Conflating those terms would render one of them superfluous, which would be an improper statutory interpretation.   *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (if it can be prevented, "no clause, sentence, or word shall be superfluous").

The court's opinion creates substantial confusion as to whether the court committed such error.   The meaning of "gross negligence" and "willful misconduct" in the CWA is emphatically a matter of federal law, not the law of a particular state. A federal court's interpretation of undefined terms in a federal statute "is, and always has been, a matter of federal law."   *Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 671 (2d Cir. 1995).   As used in the CWA, the difference between "gross negligence" and "willful misconduct" is that "gross negligence" is a lesser standard that does not

- 51 -

require a finding of intent or recklessness, whereas "willful misconduct" does. *See supra* 42 (gross negligence) and *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1164 (2d Cir. 1978) (willful misconduct in CWA involves at least "a reckless disregard of the consequences").

Here, however, the court began its "gross negligence" analysis by stating: "[u]nder Louisiana law, gross negligence is willful, wanton, and reckless conduct that falls between intent to do wrong and ordinary negligence." USCA5 10821. That statement suggests the court erroneously applied state law and equated gross negligence with willful misconduct. On the other hand, the court elsewhere made findings couched in the disjunctive language of §1321(b)(7)(D), for example: "Although the Court finds the evidence presented at trial clearly supports a finding of negligence, it does not find that Citgo's actions or inaction rise to the level of gross negligence or willful misconduct." *Id.*

It is thus unclear whether the court applied the correct standard in rejecting a finding of gross negligence. That uncertainty impedes proper appellate review of the court's $111/barrel penalty. A remand would allow the district court to clarify the legal test it applied in ruling on the gross negligence issue, and to determine whether any error on that score requires redetermination of an appropriate penalty. On remand, the district court should proceed on the premise that the term "gross

- 52 -

negligence" in the CWA is not defined by Louisiana law, as the court seemed to believe.  USCA5 10821.

**D.    The District Court Erred In Failing To Apply The "Top-Down" Method Or A Discernible Alternative Method In Determining The Penalty.**

This Court has generally recognized the "top-down" method as an appropriate means for calculating a civil penalty.  *See Marine Shale Processors*, 81 F.3d at 1337. Here, however, the district court declined to apply that method for a legally erroneous reason and did not articulate a discernible alternative method in calculating the $6 million penalty.  This was legal error.

The "top-down" method involves "calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist."  *Id.*; *see Tyson Foods*, 897 F.2d at 1142.  Here, the government asked the district court to apply the "top-down" method, but it declined to do so, stating: "I'm not going to start from the maximum and then come down.  That's what they do in criminal cases.  This is not a criminal case."  USCA5 6406.  That ruling was error.

We are unaware of authority for the proposition that the "top-down" method cannot be used outside of criminal cases. The court's ruling is also inconsistent with *Marine Shale Processors*, where this Court referred favorably to the "top-down" method in a civil penalty case (*see* 81 F.3d at 1337), and with *Cedar Point Oil*, where

- 53 -

this Court upheld a district court's use of the "top-down" method to determine a civil penalty. *See* 73 F.3d at 573-76. *See also Gulf Park Water Co.*, 14 F. Supp. 2d 854 (applying "top-down" method in civil case).

Having erroneously rejected use of the "top-down" method, the court failed to articulate a discernible alternative method. One possibility could have been the "bottom-up" method, which involves determining "the economic benefit a violator gained by noncompliance" and then adjusting the penalty based on consideration of the other statutory factors. *Pound*, 498 F.3d at 1095. The court did not apply (and could not have applied) that method because the court erroneously declined to determine a reasonable approximation of the economic benefit gained by CITGO from its violations. USCA5 10824-25. *See infra* 55-58.

The court articulated no discernible alternative method and none can be gleaned from its opinion. The court's rationale was that it selected the $111/barrel penalty "[g]iven the totality of the circumstances." USCA5 10829. Absent a district court's explanation of its reasons for exercising its discretion in a particular way, it is difficult (if not impossible) for an appellate court to determine whether the lower court acted within its discretion. *See*, *e.g.*, *Topalian v. Ehrman*, 3 F.3d 931, 935 (5th Cir. 1993) (vacating and remanding award of attorney sanctions where district court's findings provided appellate court with an insufficient basis for review for an abuse of

discretion).  That is the situation here.  *See also Tyson Foods*, 897 F.2d at 1142 (remanding CWA penalty and requiring district court on remand to "clearly indicat[e] the weight it gives to each of the [penalty] factors in the statute and the factual findings that support its conclusions").

### E.    The District Court Erred In Failing To Make Findings As To A Reasonable Approximation Of The Economic Benefit To CITGO Of Its Violation.

A court must consider "the economic benefit to the violator, if any, resulting from the violation." 33 U.S.C. §1321(b)(8) (penalty factor 2).  *See Laidlaw*, 528 U.S. at 185.  This is a critical consideration in a penalty determination because "the goal of the economic benefit analysis is to prevent a violator from profiting from its wrongdoing."  *Dean Dairy*, 150 F.3d at 263.  *See Tyson Foods*, 897 F.2d at 1141 (remanding where "[t]here is no evidence that in determining penalty amounts the court examined the economic benefit to the violator").  This inquiry is necessary if the penalty scheme is to have credible deterrent effect.  *See id.*  Here, the court erred in its analysis of this penalty factor.

As shown *supra* 15-21, CITGO has long wanted to avoid spending money on the WWTP to the greatest extent possible.  The reason is clearly stated in a 1997 CITGO document: the WWTP construction project was "regulatory driven and had no monetary payback."  Exh. P0503 at CIT0200303.  In other words, because the

- 55 -

WWTP was not a profit-point for the Lake Charles refinery, CITGO delayed or avoided necessary expenditures at the WWTP, which resulted in the violation here – the June 2006 oil spill.

The economic benefit issue was fully developed at trial, and the court had ample evidence before it from which to decide the issue.  CITGO asserted that it reaped no economic benefit, but also presented multiple alternative economic benefit values, ranging from a high of $20.11 million to a low of $719.00.  Exhs. D1850, D1851.  In sharp contrast, the government presented evidence showing that CITGO gained nearly $83 million in economic benefit by delaying or avoiding construction and operation costs at the WWTP.  Exh. P1059-08 (Amendola summary cost table); USCA5 9109:12-9113:10 (Harris quantifying economic benefit for identified avoided/delayed costs); Exh. P1053-05 at 2 (Harris economic benefit summary table).

For instance, simply by *delaying* the construction of the third storage tank, the government's evidence showed CITGO saved $25.9 million.  Exh. P1053-05 at 2 (first line item).  As an example of *avoided* costs, CITGO itself reported that it avoided $2.5 million <u>per year</u> in costs for alternative disposal of biosludge by not removing the oily sludge from the tanks.  Exh. P0214 at CIT0047870; USCA5 9874:5-19 (corporate representative Dunn confirming).

- 56 -

The court expressly found that "the failure to complete projects which could have prevented the damage done by the spill in this case <u>did result in an economic benefit</u> to Citgo." USCA5 10824 (emphasis added). Indeed, the record indisputably shows that CITGO did not complete the projects for the very purpose of saving money. *E.g.*, USCA5 10831.

The court also found that "the amount of gain to Citgo was less than the $83 million argued by the government, but more than the $719.00 asserted by Citgo." USCA5 10825. The court, however, did *not* quantify approximately where along that huge spectrum CITGO's economic benefit falls, but nevertheless fixed the penalty at less than about *7%* of the economic-benefit figure proffered by the government.

The court erroneously declined to quantify the amount of CITGO's economic benefit on the ground that "[t]he exact number is almost impossible to determine." USCA5 10825. This Court has concluded that an exact number is not necessary; rather, a "reasonable approximation" of the economic benefit suffices. *Cedar Point Oil*, 73 F.3d at 576. *Accord United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 529 (4th Cir. 1999).

Plainly, a finding that CITGO's economic benefit was somewhere between $719.00 and $83,000,000 is not a reasonable approximation of that benefit. Nor does such a finding permit a court to determine whether its penalty is sufficient to achieve

- 57 -

deterrence. *See Dean Dairy*, 150 F.3d at 263-64; *Tyson Foods*, 897 F.2d at 1141. Such a finding also makes it difficult, if not impossible, for an appellate court to review the district court's exercise of its discretion. The need for appropriate deterrence is pressing here, where CITGO still had not built the necessary storage and treatment equipment five years <u>after</u> the spill. USCA5 10830-33.

A remand is necessary so that the district court can properly consider the record evidence on economic benefit, make findings on a reasonable approximation of that benefit, and determine the amount of an appropriate penalty in light of those findings. *See Pound*, 498 F.3d 1099-1100.

**F.    The District Court's Finding That 54,000 Barrels (2.27 Million Gallons) Of Oil Entered Navigable Waterways Is Incorrectly Low and Clearly Erroneous.**

As the court noted (USCA5 10828), the government calculated that 76,800 barrels of waste oil entered waterways, whereas CITGO asserted that 54,000 barrels of waste oil did so. Thus, 22,800 barrels, or approximately 960,000 gallons, were in dispute. If the government's figure is correct, then even at the court's unreasonably low $111/barrel penalty rate, the court should have penalized CITGO an <u>additional</u> $2,530,800.

The court found, in agreement with CITGO, that approximately 54,000 barrels of waste oil reached waterways. *Id.* Without explanation, the court found "the

method of calculation that arrived at this amount to be more reasonable and credible."

*Id.* However, the court's volume finding of 54,000 barrels is clearly erroneous.[5]

### 1. The court's volume finding ignores undisputed evidence that an additional 3,418 barrels of waste oil entered waterways.

Dr. Michel undisputedly established at trial that 3,418 barrels of waste oil that flowed into the Calcasieu River were left remaining on the shoreline after cleanup. USCA5 8147:6-8148:3; Exh. P1050-05 (Dr. Michel summary table). Dr. Michel's inclusion of this 3,418-barrels was based on CITGO's and the Natural Resources Trustees' agreement that field data supported a finding that "between 2910 to 3925 barrels of waste oil remains stranded on the shoreline as film and coat on the beaches, on the man-made structures, and on the marsh vegetation." USCA5 8148 (Dr. Michel discussing PowerPoint by ENTRIX, CITGO's natural resource injury consultant). Dr. Michel used the midpoint volume (3,418 barrels) of the agreed range. USCA5 8148:4-10.

By contrast, CITGO's asserted 54,000-barrel volume figure ignores stranded oil. At trial, CITGO was unable to dispute the volume of oil left stranded on the shoreline, as established by Dr. Michel. Indeed, CITGO's expert, Dr. Slocomb (of

---

[5]     We assume *arguendo* that CITGO's penalty in this case will be based on the volume of oil that entered the waterways.

- 59 -

ENTRIX), did not contest Dr. Michel's finding as to the volume of stranded oil.  The court's 54,000-barrel figure was therefore clearly erroneous.

### 2. CITGO's estimate of the volume of oil that evaporated from waterways lacked a credible basis.

An accurate volume figure must account for waste oil that evaporated from waterways after spilling into them.  Exhs. P0242, P1050-05.  Accordingly, the parties presented evaporation estimates at trial: 35,800 barrels (the government's figure) versus 17,000 barrels (CITGO's figure).  The difference is 18,800 barrels, and even at the court's unreasonably low $111/barrel penalty rate, the penalty could have been about $2 million <u>higher</u>.  The court clearly erred in accepting CITGO's figure.

The government's expert, Dr. Michel, was the only witness at trial who actually calculated the amount of oil that evaporated from waterways. USCA5 8137-60.  She determined that (i) the most evaporation occurred from the Calcasieu River (29,328 barrels), where the oil was able to spread thin over the largest surface area, and (ii) less evaporation occurred from the Indian Marais (6,502 barrels), where the oil was confined in a smaller area.   USCA5 8142:20-8143:15, 8324:19-8326:6; Exh. P1050-05 (summary table). *See* USCA5 8145:17-8146:6, 8153:5-24, 8154:19-8155:3.  Adding those figures gives a total evaporation from waterways of 35,830 barrels.

- 60 -

However, CITGO's asserted evaporation total of 17,000 barrels was based on testimony offered by an expert, Dr. Ogle, who did not actually perform evaporation calculations. USCA5 10590:24-10591:3. Instead, Dr. Ogle based his opinion on the alleged evaporation calculations of a CITGO employee, Luke Evans. USCA5 10561:6-10563:12. But Evans' qualifications to perform expert oil spill evaporation calculations (if any) are completely unknown because CITGO did not call Evans as a witness at trial, or otherwise put testimony from Evans before the court.

Moreover, Dr. Ogle never spoke with Evans (USCA5 10598:5-6) but simply assumed Evans' assumptions and results were correct. USCA5 10605:10-12 (assuming "both parties were doing their best to calculate those evaporation rates"). Worse yet, Dr. Ogle, who had no experience with oil spills (USCA5 10540:17-10541:3), was unable to meaningfully review Evans' calculations or offer a credible opinion as to their validity. Over the government's objection, the court allowed Dr. Ogle to testify on evaporation volumes. USCA5 10563:6-9, 10597:6-7.

CITGO's sole documentary evidence for its asserted evaporation volume of 17,000 barrels is a conclusory written statement by Evans as to the volume of evaporated oil, as shown on the cover page of CITGO's Exhibit D198. USCA5 10596:22-10597:5. However, Evans' evaporation calculations, as shown on the subsequent pages of Exhibit D198, do not remotely match the reported evaporation

- 61 -

volumes on the cover page of that exhibit.  Exh. D198; USCA5 10596:22-10597:1.

Indeed, CITGO's reported numbers – highest evaporation in the bermed area and

lowest in the river – are the *opposite* of what would happen based on oil chemistry and

the confined nature of the bermed area, as confirmed by the only oil spill scientist to

testify on the subject at trial, Dr. Michel.  USCA5 8161:14-8162:10, 8324:13-8326:6.

Even Dr. Ogle finally admitted on cross-examination that the evaporation totals

on CITGO's Exhibit D198 do not match up with Evans' accompanying calculations.

USCA5 10591:21-10597:5.  When pressed, Dr. Ogle further conceded that neither he

nor CITGO had any other documentation for CITGO's asserted evaporation figures.

USCA5 10597:10-22.

On this record, the court's 54,000-barrel volume figure, which rests in large part

on CITGO's completely unsubstantiated evaporation numbers and ignores basic

principles of oil-spill science, is clearly erroneous.

### 3. The court's volume finding ignores undisputed evidence that an additional 259,000 barrels of oily wastewater entered waterways.

In addition to CITGO's waste oil, CITGO's discharge of oily wastewater was

a significant component of the spill.  This untreated oily wastewater contained a

mixture of waste oil, hazardous wastes, and other pollutants from the refinery's

processes. USCA5 8110-16, 9250:2-21, 9251:11-22, 9307:8-22, 9342:6-10, 8110-16;

- 62 -

Exh. P0503 at CIT0200312.  The United States sought penalties for this component of the spill.  USCA5 7425.

However, in calculating a penalty, the court ignored the oily-wastewater component – notwithstanding the court's recognition that, according to Dr. Michel, 259,000 barrels of oily wastewater "flowed into the waterways." USCA5 10828.  The government's figure was derived directly from CITGO's official report to the Louisiana Department of Environmental Quality, and was not disputed at trial. USCA5 7949:7-11, 21-25 (Dr. Michel); Exh. P0198 at CIT007 (CITGO revised notification to LDEQ).  The court's unexplained failure to address this huge component of the spill further demonstrates that the court abused its discretion in determining that $6 million is a "reasonable" penalty.  USCA5 10829.

- 63 -

## CONCLUSION

The $6 million civil penalty should be vacated and the case remanded to the district court for further consideration of an appropriate penalty.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General

JASON T. BARBEAU
SAMBHAV N. SANKAR
/s/JOHN EMAD ARBAB
Attorneys, U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC  20044
(202) 514-4046
john.arbab@usdoj.gov

April 13, 2012
90-5-1-1-09112

- 64 -

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect X3 Times New Roman 14 point font.

2.    This brief contains 13,979 words according to Word Perfect X3, in compliance with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i).

3.    All required privacy redactions have been made to this brief.

4.    The electronic submission of this brief is an exact copy of the paper document.

5.    This brief has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/John E. Arbab
Attorney, Appellate Section
U.S. Department of Justice
Environment & Natural Res. Division
P.O. Box 7415
Washington, DC 20044
(202) 514-4046
john.arbab@usdoj.gov

- 65 -

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2012, I electronically filed the foregoing Principal Brief of the United States with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I also certify that the other participants in this appeal are Filing Users and that service will be accomplished by the appellate CM/ECF system.

<div style="margin-left:40%">

/s/John E. Arbab
Attorney, U.S. Department of Justice
Environment & Natural Res. Div.
Appellate Section
P.O. Box 7415
Washington, DC 20044
john.arbab@usdoj.gov

</div>

- 66 -

# ADDENDUM

33 U.S.C. § 1321 (excerpt)

# UNITED STATES CODE

## 2006 EDITION

### CONTAINING THE GENERAL AND PERMANENT LAWS OF THE UNITED STATES ENACTED THROUGH THE 109TH CONGRESS

(ending January 3, 2007, the last law of which was signed on January 15, 2007)

Prepared and published under authority of Title 2, U.S. Code, Section 285b, by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME TWENTY

### TITLE 31—MONEY AND FINANCE

TO

### TITLE 35—PATENTS

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 2008

ministrator. All such decisions shall be public. Upon receipt of such decision, the Administrator shall promptly implement the board's decision in accordance with the provisions of this chapter.

**(d) Report by alleged polluter**

In connection with any hearing called under this subsection, the board is authorized to require any person whose alleged activities result in discharges causing or contributing to pollution to file with it in such forms as it may prescribe, a report based on existing data, furnishing such information as may reasonably be required as to the character, kind, and quantity of such discharges and the use of facilities or other means to prevent or reduce such discharges by the person filing such a report. Such report shall be made under oath or otherwise, as the board may prescribe, and shall be filed with the board within such reasonable period as it may prescribe, unless additional time is granted by it. Upon a showing satisfactory to the board by the person filing such report that such report or portion thereof (other than effluent data), to which the Administrator has access under this section, if made public would divulge trade secrets or secret processes of such person, the board shall consider such report or portion thereof confidential for the purposes of section 1905 of title 18. If any person required to file any report under this paragraph shall fail to do so within the time fixed by the board for filing the same, and such failure shall continue for thirty days after notice of such default, such person shall forfeit to the United States the sum of $1,000 for each and every day of the continuance of such failure, which forfeiture shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States in the district court of the United States where such person has his principal office or in any district in which he does business. The Administrator may upon application therefor remit or mitigate any forfeiture provided for under this subsection.

**(e) Compensation of board members**

Board members, other than officers or employees of Federal, State, or local governments, shall be for each day (including travel-time) during which they are performing board business, entitled to receive compensation at a rate fixed by the Administrator but not in excess of the maximum rate of pay for grade GS–18, as provided in the General Schedule under section 5332 of title 5, and shall, notwithstanding the limitations of sections 5703 and 5704 of title 5, be fully reimbursed for travel, subsistence and related expenses.

**(f) Enforcement proceedings**

When any such recommendation adopted by the Administrator involves the institution of enforcement proceedings against any person to obtain the abatement of pollution subject to such recommendation, the Administrator shall institute such proceedings if he believes that the evidence warrants such proceedings. The district court of the United States shall consider and determine de novo all relevant issues, but shall receive in evidence the record of the proceedings

before the conference or hearing board. The court shall have jurisdiction to enter such judgment and orders enforcing such judgment as it deems appropriate or to remand such proceedings to the Administrator for such further action as it may direct.

(June 30, 1948, ch. 758, title III, §310, as added Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 860.)

REFERENCES IN OTHER LAWS TO GS–16, 17, OR 18 PAY RATES

References in laws to the rates of pay for GS–16, 17, or 18, or to maximum rates of pay under the General Schedule, to be considered references to rates payable under specified sections of Title 5, Government Organization and Employees, see section 529 [title I, §101(c)(1)] of Pub. L. 101–509, set out in a note under section 5376 of Title 5.

## § 1321. Oil and hazardous substance liability

**(a) Definitions**

For the purpose of this section, the term—

(1) "oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil;

(2) "discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping, but excludes (A) discharges in compliance with a permit under section 1342 of this title, (B) discharges resulting from circumstances identified and reviewed and made a part of the public record with respect to a permit issued or modified under section 1342 of this title, and subject to a condition in such permit,,[1] (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 1342 of this title, which are caused by events occurring within the scope of relevant operating or treatment systems, and (D) discharges incidental to mechanical removal authorized by the President under subsection (c) of this section;

(3) "vessel" means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel;

(4) "public vessel" means a vessel owned or bareboat-chartered and operated by the United States, or by a State or political subdivision thereof, or by a foreign nation, except when such vessel is engaged in commerce;

(5) "United States" means the States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Guam, American Samoa, the Virgin Islands, and the Trust Territory of the Pacific Islands;

(6) "owner or operator" means (A) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, and (B) in the case of an onshore facility, and an offshore facility, any person owning or operating such onshore facility or offshore facility, and (C) in the case of any abandoned offshore facility, the person who owned or operated such facility immediately prior to such abandonment;

---

[1] So in original.

**Add. 2**

(7) "person" includes an individual, firm, corporation, association, and a partnership;

(8) "remove" or "removal" refers to containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches;

(9) "contiguous zone" means the entire zone established or to be established by the United States under article 24 of the Convention on the Territorial Sea and the Contiguous Zone;

(10) "onshore facility" means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land;

(11) "offshore facility" means any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel;

(12) "act of God" means an act occasioned by an unanticipated grave natural disaster;

(13) "barrel" means 42 United States gallons at 60 degrees Fahrenheit;

(14) "hazardous substance" means any substance designated pursuant to subsection (b)(2) of this section;

(15) "inland oil barge" means a non-self-propelled vessel carrying oil in bulk as cargo and certificated to operate only in the inland waters of the United States, while operating in such waters;

(16) "inland waters of the United States" means those waters of the United States lying inside the baseline from which the territorial sea is measured and those waters outside such baseline which are a part of the Gulf Intracoastal Waterway;

(17) "otherwise subject to the jurisdiction of the United States" means subject to the jurisdiction of the United States by virtue of United States citizenship, United States vessel documentation or numbering, or as provided for by international agreement to which the United States is a party;

(18) "Area Committee" means an Area Committee established under subsection (j) of this section;

(19) "Area Contingency Plan" means an Area Contingency Plan prepared under subsection (j) of this section;

(20) "Coast Guard District Response Group" means a Coast Guard District Response Group established under subsection (j) of this section;

(21) "Federal On-Scene Coordinator" means a Federal On-Scene Coordinator designated in the National Contingency Plan;

(22) "National Contingency Plan" means the National Contingency Plan prepared and published under subsection (d) of this section;

(23) "National Response Unit" means the National Response Unit established under subsection (j) of this section;

(24) "worst case discharge" means—

(A) in the case of a vessel, a discharge in adverse weather conditions of its entire cargo; and

(B) in the case of an offshore facility or onshore facility, the largest foreseeable discharge in adverse weather conditions;

(25) "removal costs" means—

(A) the costs of removal of oil or a hazardous substance that are incurred after it is discharged; and

(B) in any case in which there is a substantial threat of a discharge of oil or a hazardous substance, the costs to prevent, minimize, or mitigate that threat; and

(26) "nontank vessel" means a self-propelled vessel that—

(A) is at least 400 gross tons as measured under section 14302 of title 46 or, for vessels not measured under that section, as measured under section 14502 of that title;

(B) is not a tank vessel;

(C) carries oil of any kind as fuel for main propulsion; and

(D) operates on the navigable waters of the United States, as defined in section 2101(17a) of that title.

**(b) Congressional declaration of policy against discharges of oil or hazardous substances; designation of hazardous substances; study of higher standard of care incentives and report to Congress; liability; penalties; civil actions: penalty limitations, separate offenses, jurisdiction, mitigation of damages and costs, recovery of removal costs, alternative remedies, and withholding clearance of vessels**

(1) The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. 1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C. 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C. 1801 et seq.]).

(2)(A) The Administrator shall develop, promulgate, and revise as may be appropriate, regulations designating as hazardous substances, other than oil as defined in this section, such elements and compounds which, when discharged in any quantity into or upon the navigable waters of the United States or adjoining shorelines or the waters of the contiguous zone or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. 1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C. 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C. 1801 et seq.]), present an imminent and substantial danger to the pub-

lic health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches.

(B) The Administrator shall within 18 months after the date of enactment of this paragraph, conduct a study and report to the Congress on methods, mechanisms, and procedures to create incentives to achieve a higher standard of care in all aspects of the management and movement of hazardous substances on the part of owners, operators, or persons in charge of onshore facilities, offshore facilities, or vessels. The Administrator shall include in such study (1) limits of liability, (2) liability for third party damages, (3) penalties and fees, (4) spill prevention plans, (5) current practices in the insurance and banking industries, and (6) whether the penalty enacted in subclause (bb) of clause (iii) of subparagraph (B) of subsection (b)(2) of section 311 of Public Law 92–500 should be enacted.

(3) The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. 1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C. 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C. 1801 et seq.]), in such quantities as may be harmful as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges into the waters of the contiguous zone or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act), where permitted under the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, 1973, and (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards.

(4) The President shall by regulation determine for the purposes of this section those quantities of oil and any hazardous substances the discharge of which may be harmful to the public health or welfare or the environment of the United States, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

(5) Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. The Federal agency shall immediately notify the appropriate State agency of any State which is, or may reasonably be ex-

pected to be, affected by the discharge of oil or a hazardous substance. Any such person (A) in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection, or (B) in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(ii) of this subsection and who is otherwise subject to the jurisdiction of the United States at the time of the discharge, or (C) in charge of an onshore facility or an offshore facility, who fails to notify immediately such agency of such discharge shall, upon conviction, be fined in accordance with title 18, or imprisoned for not more than 5 years, or both. Notification received pursuant to this paragraph shall not be used against any such natural person in any criminal case, except a prosecution for perjury or for giving a false statement.

(6) ADMINISTRATIVE PENALTIES.—

(A) VIOLATIONS.—Any owner, operator, or person in charge of any vessel, onshore facility, or offshore facility—

(i) from which oil or a hazardous substance is discharged in violation of paragraph (3), or

(ii) who fails or refuses to comply with any regulation issued under subsection (j) of this section to which that owner, operator, or person in charge is subject,

may be assessed a class I or class II civil penalty by the Secretary of the department in which the Coast Guard is operating or the Administrator.

(B) CLASSES OF PENALTIES.—

(i) CLASS I.—The amount of a class I civil penalty under subparagraph (A) may not exceed $10,000 per violation, except that the maximum amount of any class I civil penalty under this subparagraph shall not exceed $25,000. Before assessing a civil penalty under this clause, the Administrator or Secretary, as the case may be, shall give to the person to be assessed such penalty written notice of the Administrator's or Secretary's proposal to assess the penalty and the opportunity to request, within 30 days of the date the notice is received by such person, a hearing on the proposed penalty. Such hearing shall not be subject to section 554 or 556 of title 5, but shall provide a reasonable opportunity to be heard and to present evidence.

(ii) CLASS II.—The amount of a class II civil penalty under subparagraph (A) may not exceed $10,000 per day for each day during which the violation continues; except that the maximum amount of any class II civil penalty under this subparagraph shall not exceed $125,000. Except as otherwise provided in this subsection, a class II civil penalty shall be assessed and collected in the same manner, and subject to the same provisions, as in the case of civil penalties assessed and collected after notice and opportunity for a hearing on the record in accordance with section 554 of title 5. The Administrator and Secretary may issue rules for discovery procedures for hearings under this paragraph.

(C) RIGHTS OF INTERESTED PERSONS.—

(i) PUBLIC NOTICE.—Before issuing an order assessing a class II civil penalty under this

paragraph the Administrator or Secretary, as the case may be, shall provide public notice of and reasonable opportunity to comment on the proposed issuance of such order.

(ii) PRESENTATION OF EVIDENCE.—Any person who comments on a proposed assessment of a class II civil penalty under this paragraph shall be given notice of any hearing held under this paragraph and of the order assessing such penalty. In any hearing held under this paragraph, such person shall have a reasonable opportunity to be heard and to present evidence.

(iii) RIGHTS OF INTERESTED PERSONS TO A HEARING.—If no hearing is held under subparagraph (B) before issuance of an order assessing a class II civil penalty under this paragraph, any person who commented on the proposed assessment may petition, within 30 days after the issuance of such order, the Administrator or Secretary, as the case may be, to set aside such order and to provide a hearing on the penalty. If the evidence presented by the petitioner in support of the petition is material and was not considered in the issuance of the order, the Administrator or Secretary shall immediately set aside such order and provide a hearing in accordance with subparagraph (B)(ii). If the Administrator or Secretary denies a hearing under this clause, the Administrator or Secretary shall provide to the petitioner, and publish in the Federal Register, notice of and the reasons for such denial.

(D) FINALITY OF ORDER.—An order assessing a class II civil penalty under this paragraph shall become final 30 days after its issuance unless a petition for judicial review is filed under subparagraph (G) or a hearing is requested under subparagraph (C)(iii). If such a hearing is denied, such order shall become final 30 days after such denial.

(E) EFFECT OF ORDER.—Action taken by the Administrator or Secretary, as the case may be, under this paragraph shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation—

(i) with respect to which the Administrator or Secretary has commenced and is diligently prosecuting an action to assess a class II civil penalty under this paragraph, or

(ii) for which the Administrator or Secretary has issued a final order assessing a class II civil penalty not subject to further judicial review and the violator has paid a penalty assessed under this paragraph,

shall not be the subject of a civil penalty action under section 1319(d), 1319(g), or 1365 of this title or under paragraph (7).

(F) EFFECT OF ACTION ON COMPLIANCE.—No action by the Administrator or Secretary under this paragraph shall affect any person's obligation to comply with any section of this chapter.

(G) JUDICIAL REVIEW.—Any person against whom a civil penalty is assessed under this paragraph or who commented on the proposed assessment of such penalty in accordance with

subparagraph (C) may obtain review of such assessment—

(i) in the case of assessment of a class I civil penalty, in the United States District Court for the District of Columbia or in the district in which the violation is alleged to have occurred, or

(ii) in the case of assessment of a class II civil penalty, in United States Court of Appeals for the District of Columbia Circuit or for any other circuit in which such person resides or transacts business,

by filing a notice of appeal in such court within the 30-day period beginning on the date the civil penalty order is issued and by simultaneously sending a copy of such notice by certified mail to the Administrator or Secretary, as the case may be, and the Attorney General. The Administrator or Secretary shall promptly file in such court a certified copy of the record on which the order was issued. Such court shall not set aside or remand such order unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the Administrator's or Secretary's assessment of the penalty constitutes an abuse of discretion and shall not impose additional civil penalties for the same violation unless the Administrator's or Secretary's assessment of the penalty constitutes an abuse of discretion.

(H) COLLECTION.—If any person fails to pay an assessment of a civil penalty—

(i) after the assessment has become final, or

(ii) after a court in an action brought under subparagraph (G) has entered a final judgment in favor of the Administrator or Secretary, as the case may be,

the Administrator or Secretary shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount assessed (plus interest at currently prevailing rates from the date of the final order or the date of the final judgment, as the case may be). In such an action, the validity, amount, and appropriateness of such penalty shall not be subject to review. Any person who fails to pay on a timely basis the amount of an assessment of a civil penalty as described in the first sentence of this subparagraph shall be required to pay, in addition to such amount and interest, attorneys fees and costs for collection proceedings and a quarterly nonpayment penalty for each quarter during which such failure to pay persists. Such nonpayment penalty shall be in an amount equal to 20 percent of the aggregate amount of such person's penalties and nonpayment penalties which are unpaid as of the beginning of such quarter.

(I) SUBPOENAS.—The Administrator or Secretary, as the case may be, may issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, or documents in connection with hearings under this paragraph. In case of contumacy or refusal to obey a subpoena issued pursuant to this subparagraph and served upon any person, the district court of the United

States for any district in which such person is found, resides, or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the administrative law judge or to appear and produce documents before the administrative law judge, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(7) CIVIL PENALTY ACTION.—

(A) DISCHARGE, GENERALLY.—Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

(B) FAILURE TO REMOVE OR COMPLY.—Any person described in subparagraph (A) who, without sufficient cause—

(i) fails to properly carry out removal of the discharge under an order of the President pursuant to subsection (c) of this section; or

(ii) fails to comply with an order pursuant to subsection (e)(1)(B) of this section;

shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to 3 times the costs incurred by the Oil Spill Liability Trust Fund as a result of such failure.

(C) FAILURE TO COMPLY WITH REGULATION.—Any person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation.

(D) GROSS NEGLIGENCE.—In any case in which a violation of paragraph (3) was the result of gross negligence or willful misconduct of a person described in subparagraph (A), the person shall be subject to a civil penalty of not less than $100,000, and not more than $3,000 per barrel of oil or unit of reportable quantity of hazardous substance discharged.

(E) JURISDICTION.—An action to impose a civil penalty under this paragraph may be brought in the district court of the United States for the district in which the defendant is located, resides, or is doing business, and such court shall have jurisdiction to assess such penalty.

(F) LIMITATION.—A person is not liable for a civil penalty under this paragraph for a discharge if the person has been assessed a civil penalty under paragraph (6) for the discharge.

(8) DETERMINATION OF AMOUNT.—In determining the amount of a civil penalty under paragraphs (6) and (7), the Administrator, Secretary, or the court, as the case may be, shall consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

(9) MITIGATION OF DAMAGE.—In addition to establishing a penalty for the discharge of oil or a hazardous substance, the Administrator or the Secretary of the department in which the Coast Guard is operating may act to mitigate the damage to the public health or welfare caused by such discharge. The cost of such mitigation shall be deemed a cost incurred under subsection (c) of this section for the removal of such substance by the United States Government.

(10) RECOVERY OF REMOVAL COSTS.—Any costs of removal incurred in connection with a discharge excluded by subsection (a)(2)(C) of this section shall be recoverable from the owner or operator of the source of the discharge in an action brought under section 1319(b) of this title.

(11) LIMITATION.—Civil penalties shall not be assessed under both this section and section 1319 of this title for the same discharge.

(12) WITHHOLDING CLEARANCE.—If any owner, operator, or person in charge of a vessel is liable for a civil penalty under this subsection, or if reasonable cause exists to believe that the owner, operator, or person in charge may be subject to a civil penalty under this subsection, the Secretary of the Treasury, upon the request of the Secretary of the department in which the Coast Guard is operating or the Administrator, shall with respect to such vessel refuse or revoke—

(A) the clearance required by section 60105 of title 46; .

(B) a permit to proceed under section 4367 of the Revised Statutes of the United States (46 U.S.C. App. 313);[2] and

(C) a permit to depart required under section 1443[2] of title 19;

as applicable. Clearance or a permit refused or revoked under this paragraph may be granted upon the filing of a bond or other surety satisfactory to the Secretary of the department in which the Coast Guard is operating or the Administrator.

(c) Federal removal authority

(1) General removal requirement

(A) The President shall, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance—

(i) into or on the navigable waters;

(ii) on the adjoining shorelines to the navigable waters;

(iii) into or on the waters of the exclusive economic zone; or

(iv) that may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States.

(B) In carrying out this paragraph, the President may—

(i) remove or arrange for the removal of a discharge, and mitigate or prevent a substantial threat of a discharge, at any time;

---

[2] See References in Text note below.

## *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

April 16, 2012

Mr. John Emad Arbab
U.S. Department of Justice
Enviroment & Natural Resources Division
Appellate Section
P.O. Box 7415 - Ben Franklin Station
Washington, DC 20044

Mr. Jason Tyler Barbeau
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044-7611

      **USCA No. 11-31117,  USA, et al v. Citgo Petroleum**
                          **Corporation**
        USDC No. 2:08-CV-893

The following pertains to your brief electronically filed on april 13, 2012.

You must submit the seven paper copies of your brief required by 5TH CIR. R. 31.1 within 5 days of the date of this notice pursuant to 5th Cir. ECF Filing Standard E.1.

Failure to timely provide the appropriate number of copies will result in the dismissal of your appeal pursuant to 5th Cir. R. 42.3.

        Sincerely,

        LYLE W. CAYCE, Clerk

        *Sabrina B. Short*
        By:
        Sabrina B. Short, Deputy Clerk
        504-310-7817

cc:  Ms. Ann Beryl Hill
     Mr. Craig Isenberg
     Ms. Dwana Christy King
     Ms. Karen Julian King
     Mr. Edward C. Lewis
     Ms. Andrea Mahady Price
     Mr. Richard E. Sarver