# United States Court of Appeals
#### FIFTH CIRCUIT
#### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

July 11, 2013

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

No. 13-30221, In Re: Deepwater Horizon
USDC No. 2:10-MD-2179
USDC No. 2:12-CV-968
USDC No. 2:12-CV-970

The court has granted the unopposed motion to supplement the record in this case with Document #4 from 2:10-MD-2179 and Document #101 from 2:10-CV-7777.

Sincerely,

LYLE W. CAYCE, Clerk

By: _Connie Brown_
Connie Brown, Deputy Clerk
504-310-7671

Mr. William W. Blevins
Mr. Andrew Baker Bloomer
Mr. Robert C. Mike Brock
Ms. Elizabeth Joan Cabraser
Mr. Jeffrey Bossert Clark Sr.
Mr. Timothy A. Duffy
Mr. Soren E. Gisleson
Mr. Richard Cartier Godfrey
Mr. Ethan Peter Keith Greene
Ms. Robin Lynn Greenwald
Mr. Don Keller Haycraft
Mr. Stephen Jay Herman
Mr. Samuel Issacharoff
Mr. James Peter Joseph I
Mr. James Andrew Langan
Ms. Elizabeth A. Larsen
Mr. Matthew Edward Lundy
Mr. Steven Andrew Myers
Mr. Joseph Darrell Palmer
Ms. Ellen K. Reisman
Mr. James Parkerson Roy

NO. 13-30221

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

In re DEEPWATER HORIZON –
APPEALS OF THE MEDICAL BENEFITS CLASS ACTION SETTLEMENT

MIKE STURDIVANT; PATRICIA STURDIVANT; SUSAN FORSYTH; JAMES
H. KIRBY, IV,
*Claimants-Appellants*,

MEDICAL BENEFITS SETTLEMENT CLASS,
*Plaintiff-Appellee*
v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY,
*Defendants-Appellees*,

On Appeal from the United States District Court
for the Eastern District of Louisiana, No. 2:10-md-02179-CJB-SS

APPELLANTS' MOTION TO SUPPLEMENT THE RECORD

Joseph Darrell Palmer
Law Offices of Darrell Palmer PC
603 N. Highway 101, Suite A
Solara Beach, CA 92075
Phone: (858) 792-5600
Fax: (866) 583-8115
*Attorney for Appellants Mike and Patricia
Sturdivant, Susan Forsyth, and James H.
Kirby IV*

## REQUEST TO SUPPLEMENT THE RECORD

Rule 10(e) of the Federal Rules of Appellate Procedure governs the correction and modification of the appellate record. This request is made pursuant to Fed. R. App. Proc. 10(e)(3). Counsel for the Appellees have consented to the supplement.

Appellants request the Court supplement into the Record on Appeal with one document associated with Case 2:10-md-02179 and one document associated with Case 2:10-cv-07777 within the U.S. District Court for the Eastern District of Louisiana. These documents are on the district court dockets; they were inadvertently missing from the Stipulated Record on Appeal filed with this court on April 8, 2013, and are relevant to the Appellants appeal.

| 10-md-02179 | Doc. 4 | Filed 8/11/10 | Pretrial Order #3 |
| 10-cv-07777 | Doc. 101 | Filed 8/31/12 | Objections To The Economic Settlement Agreement |

Appellants and their counsel respectfully request the Fifth Circuit Court of Appeals enter an Order allowing supplementation of the record in this appeal under Rule 10(e) of the Federal Rules of Appellate Procedure.

Dated: July 10, 2013          Respectfully submitted,
*/s/ Joseph Darrell Palmer*
Joseph Darrell Palmer
603 N. Highway 101, Suite A
Solana Beach, CA 92075
Telephone: (858) 792-5600 Fax: (866) 583-8115
darrell.palmer@palmerlegalteam.com
Attorney for Objector-Appellants Mike and
Patricia Sturdivant, Susan Forsyth and James H.
Kirby IV

## CERTIFICATE OF SERVICE

I certify that on July 10, 2013, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will provide notification of such filing to all parties. I further certify that the foregoing parties will be served via U.S Mail:

Robert Brock
Covington & Burling, LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

Timothy A. Duffy
Kirkland & Ellis, LLP
300 N. La Salle Street
Chicago, IL 60654

Dated: July 10, 2013          /s/ Joseph Darrell Palmer
                              Joseph Darrell Palmer

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This filing relates to: | Section: J |
| *Cases in Pleading Bundle B1, and VoO Charter Dispute Cases* | Honorable Carl J. Barbier |
| | Magistrate Judge Shushan |
| *Bon Secour Fisheries, Inc., et al. v. BP Exploration and Production, Inc., et al.,* | Date: November 8, 2012 |
| Civil Action No. 12-970 | Time: 8:30 a.m. |
| | Courtroom: C268 |
| Objections to Economic and Property Damages Settlement Agreement, | |
| Civil Action No. 10-7777 | |

**MEMORANDUM IN SUPPORT OF OBJECTIONS TO THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT BY OBJECTORS HUNTER ARMOUR AND JUDITH ARMOUR**

### TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii-v

Summary of Objection ................................................................................................. 1

I.    The Court Must Protect Absent Class Members and Give Special Scrutiny
to a Pre-Certification Settlement. ........................................................................ 4

II.    The Class Cannot Be Certified. ........................................................................... 5

    A.    The Class Representatives Do Not Satisfy Rule 23(a)(4) ...................... 5

        1.    Intra-Class Conflicts Preclude Certification. ............................ 6

        2.    *In re Aqua Dots* Precludes Class Certification. ....................... 9

        3.    The Upside-Down Class Representative Selection Precludes Class
Certification. ........................................................................... 10

    B.    A Class Action Is Not a Superior Means of Resolution When There
Was Already an Existing Claims Process ............................................. 11

III.    The Settlement Is Unfair. .................................................................................. 18

    A.    *Bluetooth* Precludes Settlement Approval. ......................................... 18

    B.    *Dennis v. Kellogg* Precludes Settlement Approval. .............................. 29

IV.    The Settlement Violates Rule 23(h). ................................................................. 29

CONCLUSION ............................................................................................................ 31

PROOF OF SERVICE ................................................................................................ 32

TABLE OF AUTHORITIES

*CASES:*

*Alfaro v. Commissioner*, 349 F.3d 225, 229 (5th Cir. 2003) ……………………………………22

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) ……………………………12, 13

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997)……………………………………6, 11, 12, 15, 18

*Baroni v. Bellsouth Telcomms, Inc.*, 2004 U.S. Dist. LEXIS 14403, (E.D. La. 2004)…………..13

*Beebe v. Pac. Realty Trust*, 99 F.R.D. 60 (D. Or. 1983) …………………………………………11

*Berger v. Compaq  Computer Corp.*, 257 F.3d 475 (5th Cir. 2001)…………………………………6

*Bevrotte v. Caesars Ent. Corp.*, 2011 U.S. Dist. LEXIS 114463 (E.D. La. Oct. 4, 2011)…………12

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*,
 532 U.S. 598 (2001)……………………………………………………………………..27

*Bublitz v. E.I. Dupont De Nemours & Co.*, 224 F. Supp. 2d 1234, 1239
 (S.D. Iowa 2002)……………………………………………………………………27

*Buettgen v. Harless*, 263 F.R.D. 378 (N.D. Tex. 2009) …………………………………………10

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ……………………………12, 13, 15, 17

*Charles v. Goodyear Tire & Rubber Co.*, 976 F. Supp. 321(D. N.J. 1997) ……………………25

*Childs v. United Life Ins. Co.*, No. 10-CV-23-PJC, 2012 U.S. Dist. LEXIS 70113
 (N.D. Okla. May 21, 2012)……………………………………………………………23

*Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004)……………………………………12

*Create-A-Card Inc., v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920,
 (N.D. Cal. Sept. 22, 2009) ……………………………………………………………25

*Daigle v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012)…………..15

*Dennis v. Kellogg*, No. 11-55674 (9th Cir. Jul. 13, 2012)……………………………………20, 29

*Georgine v. Amchem Prods.*, 83 F.3d 610 (3d Cir. 1996) ……………………………………11, 12, 17

*Gregory v. Finova Capital Corp.*, 442 F.3d 188 (4th Cir. 2006) ………………………………16

*Ibarra v. Texas Employment Comm'n*, 823 F.2d 873 (5th Cir. 1987) ...........................................4

*In re Aqua Dots Products Liability Litigation*, 654 F.3d 748
    (7th Cir. 2011) ...............................................................................2, 9, 10, 14, 18, 26

*In re Asbestos Litigation*, 134 F.3d 668 (5th Cir. 1999)...........................................................6

*In re Bluetooth Headset Products Liability Litigation.* 654 F.3d 935
    (9th Cir. 2011) ...............................................................3, 18-20, 22, 23-25, 28

*In re Cendant Corp. Prides Litig.*, 243 F.3d 722, (3d Cir. 2001)…………………………….27

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second
    Mortg. Litig.*, 418 F.3d 277 (3d Cir. 2005)…………………………………………21

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457
    (E.D. Tex. Jun. 30, 2005)...................................................................................24

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360 (E.D. La. 1997) .................12

*In re GMC Dex-Cool Prods Liab. Litig.*, 2006 U.S. Dist. LEXIS 74503
    (S.D. Ill. Sept. 27, 2006)...................................................................................12

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ...............21

*In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974) ..........................................................14, 18

*In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635,
    10 (N.D. Cal. Mar. 29, 2011).............................................................................25

*In re Katrina Canal Breaches Litig. v. Bd. of Comm'rs*, 628 F.3d 185 (5th Cir. 2010) ......4, 18, 24

*In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010) ..............................29, 30

*In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132 (S.D.N.Y. July 14, 2008)................10

*In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004).....................................................12

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) .........25-27

*In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418 (N.D. Cal. 2009) ............................25

*In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) .................................................29

*In re Vitamins Antitrust Class Actions*, 215 F.3d 26 (D.C. Cir. 2000) ...........................................6

*Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996) .......................................................21

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007)............................................7

*Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551 (5th Cir. 2011)...................................................11

*New Orleans Depot Servs. v. Dir.*, ---F.3d---, 2012 U.S. App.
LEXIS 15336, (5th Cir. July 25, 2012)...............................................................22

*Nguyen v. BMW of N. Am. LLC*, 2012 U.S. Dist. LEXIS 56018
(N.D. Cal. Apr. 20, 2012) .......................................................................................27

*O'Keefe v. Mercedes-Benz USA, L.L.C.*, 214 F.R.D. 266, 304-05 (E.D. Pa. 2003) ................25

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).....................................................................6, 18

*Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978)..............................................18

*Puerto Rico v. M/V Emily S*, 158 F.R.D. 9 (D.P.R. 1994)..............................................................11

*Reed v. Gen. Motors, Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)...................................4, 18, 19, 30

*Robertson v. Monsanto Co.*, 287 Fed. Appx. 354 (5th Cir. 2008) (*per curiam*) ....................13, 17

*Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004)............................................11

*Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003) ............................................................27

*Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006)...........................................13

*Strong v. BellSouth Telcoms.*, 137 F.3d 844 (5th Cir. 1998)..................................4, 18, 19, 21, 23

*Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 638-39 (5th Cir. 2012)................................6

*Univ. of Utah v. United States*, 2008 U.S. Dist. LEXIS 78185,(D. Utah Oct. 6, 2008)............16

*U.S. v. City of Miami, Fla.*, 614 F.2d 1322 (5th Cir. 1980), *modified on other
grounds*, 664 F.2d 435 (5th Cir. 1981) ......................................................................................4

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002).......................................................23

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991).............................19, 20, 23

*STATUTES:*

33 U.S.C. § 2704.................................................................................................................1

Fed. R. Civ. P. 23(b)(3) ....................................................................................................11

*OTHER AUTHORITIES:*

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(b)..................4, 18

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(c) .........................4

Department of Justice Office of Public Affairs, "Audit of Gulf Coast Claims
    Facility Results in $64 Million in Additional Payments" (Apr. 19, 2012)....................1

BDO Consulting, *Independent Evaluation of the Gulf Coast Claims Facility:
    Report of Findings & Observations to the Department of Justice* (June 5, 2012)............1

Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809 (2000)..................22

Eric A. Posner, "The Other Value of Life," *The New Republic* (Jul. 31, 2012).......................1

Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can be a
    Fair and Efficient Alternative to a Class Action*, 31 Rev. Litig. 617,
    635 (2012)........................................................................................................ 14-16

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004).........................25

George Talbot, "Ken Feinberg: 'The GCCF did what it said it would do'", (Apr. 21, 2012).......5

Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings &
    Observations to the U.S. Dept. of Justice (BDO Consulting, June 15, 2012)...............5

Norman Sabbey, Comment, *Rule 23: Categories of Subsection (b)*,
    10 B.C. Indus. & Com. L. Rev. 539 (1968-69) ...............................................15

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*,
    108 F.R.D. 237 (1985)........................................................................................19

Ronald E. Young, *Federal Rules of Civil Procedure: Rule 23, The Class
    Action Device and Its Utilization*, 22 U. Fla. L. Rev. 631 (1970).......................15

## Summary of Objection

As plaintiffs correctly state, "This class settlement is unique." Docket No. 7104 at 1. But it is unique in an unprecedented way that requires rejection of the settlement.

For well over a year before the settlement was announced, the BP defendants had established and administered a multi-billion dollar fund, the Gulf Coast Claims Facility ("GCCF"), administered by the most respected claims administrator in American history, Kenneth Feinberg. Moreover, on October 18, 2010, BP filed papers in this proceeding where they (1) conceded that they were a "Responsible Party" under the Oil Pollution Act, 33 U.S.C. § 2704, and (2) agreed to "pay all legitimate claims, regardless of the OPA statutory limit of liability," subject to a right of contribution. Docket No. 559. An audit commissioned by the Department of Justice found that the Feinberg GCCF issued $6.2 billion of claims while only underpaying this tremendous volume by only $64 million, barely 1%. *See* Eric A. Posner, "The Other Value of Life," *The New Republic* (Jul. 31, 2012) (praising Feinberg's efficiency and concluding "This is impressive, and suggests that Feinberg has much to be proud of"); BDO Consulting, *Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings & Observations to the Department of Justice* (June 5, 2012). And BP quickly moved to rectify the small number of underpayments. Department of Justice Office of Public Affairs, "Audit of Gulf Coast Claims Facility Results in $64 Million in Additional Payments" (Apr. 19, 2012). It is only with this background that putative class counsel has negotiated a settlement—that, by definition, can provide no more money than the unlimited funds BP had already promised.

The settlement may make some class members better off—but, as many class members have objected, it also makes many class members worse off than they would have been with the

existing Feinberg GCCF process. Class counsel has replaced the GCCF with a much more burdensome claims process that will likely reduce BP's agreed-upon liability—and for this class counsel has surrendered any claim for punitive damages against BP, though there is no question that the defendants, with a market capitalization of $133 billion, have the ability to pay any such punitive damages. These intra-class conflicts require separate representation; the class cannot be certified under Rule 23(a)(4).

The $600 million class counsel seeks—and the $75 million they have already received—is thus untenable. It is based on what the class receives in the settlement, but that calculation does not include the figure of what the class has surrendered—rights to compensation for "all legitimate claims, regardless of the OPA statutory limit of liability" under the lauded Feinberg GCCF. So class counsel becomes unimaginably wealthy; BP is relieved of the risk of punitive damages; and the class gets nothing that they wouldn't have had before. Indeed, unpaid class members were further hurt (and BP benefited) when BP stopped Feinberg GCCF payments to transition to the class settlement formulas. Rule 23(a)(4) certification is thus unavailable for a second reason: class representatives have agreed to a settlement that does nothing more than what BP was already doing, and their decision to put the interests of class counsel and BP ahead of the absent class members they are supposed to represent proves their inadequacy. *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748 (7th Cir. 2011).

The class cannot be certified for a third reason: because there was already a GCCF claims process, a class action is not superior to the pre-existing claims process, and thus cannot be certified under Rule 23(b)(3), which requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Even if the class could be certified, the settlement cannot be approved as fair. The abusive $600 million request—together with an unprecedented $75 million advance—demonstrates all three signs of impermissible collusion identified by the Ninth Circuit in *In re Bluetooth Headset Products Liability Litigation.* 654 F.3d 935 (9th Cir. 2011). The fees are wildly disproportionate to the marginal benefit of the settlement (which, as mentioned above, is negative for many class members) over the Feinberg GCCF. But class counsel has also negotiated a "clear sailing" provision prohibiting BP from challenging the fees at the expense of the class. Moreover, even if the court were to cure these problems, the reduction in the excessive award would unfairly revert back to the defendant. Such a settlement structure means that class counsel has put their interests ahead of the class, and such self-dealing precludes settlement approval.

There is a second independent reason the settlement cannot be considered fair. BP has the right to appeal awards in the class action claims process. The awards to the class are therefore entirely indeterminate and subjective. Neither class members nor the court can evaluate in advance what they will be paid. This precludes approval as a matter of law.

Finally, the parties have committed multiple violations of Rule 23(h), by agreeing to a payment to class counsel before the class has had an opportunity to object to the settlement, and by failing to justify their proposed fee award before the objection deadline.

For these reasons, Hunter and Judith Armour object to the settlement and the proposed $600 million in fees. Their address is 6200 Siquenza Drive, Pensacola, Florida 32507. Their phone number is (850) 492-3474. The proof of their class membership can be found in their attached declarations and exhibits. In addition to the law and arguments herein, the Armours join

and adopt the objections filed by any other objectors, including the evidence and exhibits in support of those objections, to the extent those objections are not inconsistent with the Armours' arguments.

## I.    The Court Must Protect Absent Class Members and Give Special Scrutiny to a Pre-Certification Settlement.

This Court has a "duty under Rule 23 of the Federal Rules of Civil Procedure to protect absent class members and to police class action proceedings." *Strong v. BellSouth Telecommunications, Inc.,* 137 F.3d 844, 849 (5th Cir. 1998); *Ibarra v. Texas Employment Comm'n,* 823 F.2d 873, 878 (5th Cir. 1987); *U.S. v. City of Miami, Fla.,* 614 F.2d 1322, 1330-31 (5th Cir. 1980), *modified on other grounds,* 664 F.2d 435 (5th Cir. 1981).

"[T]he burden is on the settlement proponents to persuade the court that the agreement is fair, reasonable, and adequate for the absent class members who are to be bound by the settlement." *In re Katrina Canal Breaches Litig. v. Bd. of Comm'rs,* 628 F.3d 185, 196 (5th Cir. 2010); *accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(c). The settling parties have failed to meet that burden.

The settling parties refer to the *Reed* factors of *Reed v. Gen. Motors, Corp.,* 703 F.2d 170, 172 (5th Cir. 1983). But they fail to mention that the *Reed* factors are only a starting point and are not sufficient for settlement approval by themselves. *E.g., Katrina Canal Breaches,* 628 F.3d at 195 ("Without quarreling with the district court's findings [regarding the *Reed* factors], we nevertheless conclude that this settlement is not fair, reasonable, and adequate under Rule 23(e)").

## II.  The Class Cannot Be Certified.

Long before the settlement was negotiated, BP had already promised and provided a highly effective and highly lauded claims process that provided rapid compensation to class members. The GCCF, which was created in the immediate aftermath of an unprecedented environmental catastrophe, "was among the largest claims processing facilities in U.S. history." Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings & Observations to the U.S. Dept. of Justice (BDO Consulting, June 15, 2012) at 56. Despite facing momentous challenges and public criticism, the GCCF paid out a total of over $6.2 billion to over 220,000 individual and business claimants during the one-and-a-half-years of the program's existence. *Id.* at 59; see also George Talbot, "Ken Feinberg: 'The GCCF did what it said it would do'", (Apr. 21, 2012), (interview with Feinberg in which Feinberg describes the GCCF as "a very speedy, efficient way to get money out, in light of an unprecedented environmental disaster").

Because the settlement eliminates this process without ensuring that every class member is made at least as well off by the elimination of the GCCF, intra-class conflicts constitutionally preclude class certification in the absence of separate class representation for each of the affected subgroups. Moreover, the existence of the claims process means that the settlement is negotiated for the $600 million benefit of the attorneys, rather than for the class, which further precludes certification Rule 23(a)(4) and Rule 23(b)(3).

### A.  The Class Representatives Do Not Satisfy Rule 23(a)(4)

As the settling parties concede, settlement approval and the U.S. Constitution require a finding of adequacy of class representatives under Rule 23(a)(4). The Rule 23 adequacy inquiry is intended to uncover "conflicts of interest between the named plaintiffs and the class they seek

to represent." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001) (*quoting Amchem Prods. v. Windsor*, 521 U.S. 591, 625, (1997)). The settling parties cannot meet this constitutional requirement.

### 1.    Intra-Class Conflicts Preclude Certification.

A "district court has a duty under Fed. R. Civ. P. 23(e) to ensure that [a settlement] is fair, adequate, and reasonable and is not the product of collusion between the parties. Thus Rule 23(e) provides a check against settlement dynamics that may 'lead the negotiating parties— even those with the best intentions—to give insufficient weight to the interests of at least some class members.'" *In re Vitamins Antitrust Class Actions,* 215 F.3d 26, 30 (D.C. Cir. 2000). Unfortunately, insufficient weight was given to multiple groups of class members.[1] This precludes certification as a matter of law. As Judge Smith noted in dissent in *In re Asbestos Litigation,* class "representative must possess the same interest and suffer the same injury as the class members and must be aligned in interest such that no conflicts exist between the representative and any discrete subclasses within the broader class he purports to represent. *Amchem* demands a structural assurance of fair and adequate representation for the diverse groups and individuals affected." 134 F.3d 668, 677 (5th Cir. 1999). That dissent was vindicated when the Supreme Court reversed the Fifth Circuit for just this reason in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). This Court should not repeat the error, and must deny class certification.

---

[1] In the Fifth Circuit, any class member has the right to object to the unfairness of the settlement to any class member. *Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 638-39 (5th Cir. 2012) ("Any class member has standing to object to a class settlement").

First, some class members have been geographically reclassified to receive less compensation than they would have received under the Feinberg GCCF; other class members are victimized by a change in compensation formulas. Thus, next-door neighbors who suffered identical losses could receive wildly different compensation if one submitted a Feinberg GCCF claim form successfully in 2011 and another failed to navigate the claims process until after this settlement dissolved the Feinberg GCCF and replaced it with a different zone map. To the extent the settlement pays newer claims less than what they would have been paid under the Feinberg GCCF, it makes those class members worse off. That some class members can be said to benefit just shows the intra-class wealth transfer and conflict that precludes a finding of that a single set of class representatives can represent a single class. It is clear that many class members would be better off if the settlement had not been negotiated for the benefit of other class members. An opt out does not solve this problem, because the settlement has taken away the option of accessing the Feinberg GCCF. A clearer intra-class conflict is harder to imagine.

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007), is precisely on point. There, the Fifth Circuit refused certification because the class representatives sought "injunctive relief that would dissolve the EDS Stock Fund; the Fund cannot be partially shut down for the litigating Plaintiffs and remain open for absent class members who desire this investment option." *Id.* at 315. This case is *worse* than *Langbecker*, because this Court permitted exactly the injunctive relief *in the middle* of the case that *Langbecker* said was not permissible at *final judgment*: eliminating a fund option—here the highly effective Feinberg GCCF—that some class members would prefer.

Plaintiffs' claim that "class members and their negotiators were not competing with each other maximize [sic] their respective shares of a pre-limited fund" (Docket No. 7104 at 44) beggars belief. If that were true, there would be no need to renegotiate the geographic zones or the compensation formulas of the Feinberg GCCF. The parties could start with the Feinberg GCCF baseline, and negotiate upward from there to create compensation for the released punitive damages claims. Instead, the class counsel sold out several swaths of the class, likely in anticipation of the hundreds of millions of dollars of attorneys' fees that, while technically not negotiated at the same time, were not a surprise to any of the participants when they were requested separately.

Second, class members who planned to file claims in the spring of 2012 were unfairly victimized by being unable to do so in the transition period when the Feinberg GCCF was shut down. These class members deserve separate representation, but failed to get it. This intra-class conflict, where some class members were penalized for the benefit of other class members, precludes class certification.

Third, the settlement establishes a set of bonus payments for residents of Louisiana that the rest of the class is not eligible for. A lightly oiled wetland property just inside the Louisiana border is eligible for gigantic windfalls, but someone just a few miles west or east but outside of Louisiana will receive tens of thousands of dollars less even if they suffered much worse oiling by the objective SCAT measure. *See* Settlement Exhibit 12A at ¶ 1.E (only Louisiana residents eligible for Wetland Real Property Claims); *id.* at ¶ 1.D (SCAT rating of "lightly oiled" creates eligibility for "Compensation Category A"); *id.* at ¶ 2.C.vi.a *and* ¶ 2.C.ix.a (compensation of $25,000/acre with minimum of one acre). This cannot be justified by Louisiana state law: this

Court has already ruled that federal law preempts any state-law remedies for the spill, and the class complaint explicitly disclaimed any state-law claims. Thus class members outside of Louisiana require separate representation that does not have the plain conflicts with Louisiana wetland property owners.[2]

### 2.    *In re Aqua Dots* Precludes Class Certification.

Judge Easterbrook's opinion in *In re Aqua Dots* is also precisely on point. 654 F.3d 748 (7th Cir. 2011). The defendant toy manufacturer had agreed to provide refunds to class members before the litigation began. The Seventh Circuit affirmed a refusal by the district court to certify a class: because the class action sought relief that the defendant was already providing, the only purpose of the class action was wasteful litigation to generate fees for the class counsel at the expense of the class. This precluded a finding of Rule 23(a)(4) adequacy, because it demonstrated that the class representatives did not have the best interests of the class at heart. "A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests." 654 F.3d at 752.

The same is true here, except, once again, the case at bar presents a *worse* scenario than *In re Aqua Dots*: BP *had* a highly effective compensation program in the form of the Feinberg GCCF, but the class representatives here eliminated it to rationalize a class action settlement

---

[2] It is worth noting that plaintiffs elide this issue in their brief: they incompletely claim that "Compensation schemes for Wetlands Real Property are based on whether parcels were directly affected with oil," Docket No. 7104 at 13, without mentioning that heavily oiled wetlands in Mississippi, Alabama, Florida, and Texas are ineligible for Wetlands Real Property compensation.

where their attorneys would collect hundreds of millions of dollars of fees. This scenario precluded class representative Rule 23(a)(4) adequacy in *Aqua Dots*, and it does so here, too.

### 3. The Upside-Down Class Representative Selection Precludes Class Certification.

The "unique" nature of this case trumpeted by the settling parties demonstrates why it is inappropriate to certify as a class action. First, there was a Plaintiffs' Steering Committee; then there were settlement negotiations; and only then did the PSC select class representatives to ratify a *fait accompli*. But a look at the class complaint show numerous geographically dispersed class representatives who have nothing in common, and likely have never met, yet seek to represent a single class. How could they possibly be organized enough to do so? *Buettgen v. Harless*, 263 F.R.D. 378 (N.D. Tex. 2009), is directly on point. There, as here, the group of class representatives "fail[ed] to present evidence that the group have ever communicated in a meaningful way." Thus, class certification was not possible. If "named plaintiffs are not [talking] to each other, then it is unlikely that they can oversee their counsel independently." Andrew Trask, "Adequacy and Commitment: *Buettgen v. Harless*," McGuire Woods (Sep. 7, 2010). When a group like this set of class representatives is "not cohesive, then it is likely that it was put together by plaintiffs' counsel" to meet litigation objectives, thus "implying that the counsel controlled the plaintiffs." *Id.* When this happens, it makes a mockery of the class action process, and Rule 23(a)(4) adequacy cannot be satisfied: the "willing pawn of counsel" cannot be appointed class representative, because they cannot meaningfully supervise class counsel when they have been handpicked to rubber-stamp class counsel's decisions. *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 135-36 (S.D.N.Y. July 14, 2008).

**B.      A Class Action Is Not a Superior Means of Resolution When There Was Already an Existing Claims Process.**

In addition to manifesting a predominance of common issues and satisfying each Rule 23(a) prerequisite, a valid (b)(3) certification requires demonstrating that the class action device "is superior to other available methods for fairly and efficiently adjudicating the controversy." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting Fed. R. Civ. P. 23(b)(3)). "A class action is 'superior' for purposes of Rule 23(b)(3)  when it is clearly better than, 'and not just as good as, other available methods for handling the controversy.' *Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 15-16 (D.P.R. 1994) (quoting *Beebe v. Pac. Realty Trust*, 99 F.R.D. 60, 73 (D. Or. 1983)). As with all the rule 23 prerequisites, it is the party seeking certification who bears the burden of proof on the question of superiority. *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004). Aside from the solitary concern of trial management, which may be allayed through settlement, the other strictures of Rule 23(b)(3) superiority, "designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620. *See also Georgine v. Amchem Prods.*, 83 F.3d 610, 617 ("the 23(b)(3) requirements protect the same interests in fairness and efficiency as the 23(a) requirements"). For several independent reasons the settling parties cannot make the necessary demonstration of superiority in the case at bar: (1) The claims in this case are of positive, not negative value; (2) Individual issues predominate which cry out for decentralized control of litigation; and perhaps most importantly (3) BP's voluntary and governmentally overseen Gulf Coast Claims Facility is an equally effective remedial measure that undercuts the superiority of the class action mechanism here.

First, as in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), "the most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case." *Id.* at 420 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) and citing *Amchem*, 521 U.S. at 617). "A negative value suit is one in which class members' claims would be uneconomical to litigate." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 411 n.1 (5th Cir. 2004) (internal quotation omitted). There can be no dispute here that the central economic and compensatory damages claims of this lawsuit are astronomical and present "ample incentive" for class members to proceed on an individual basis—indeed, the class action adds nothing here, because class members cannot recover unless they submit the same sort of detailed claims (and, in most instances, more detailed claims) with the assistance of counsel that they needed to before this settlement dissolved the Feinberg GCCF. *Bevrotte v. Caesars Ent. Corp.*, 2011 U.S. Dist. LEXIS 114463, at *16 (E.D. La. Oct. 4, 2011). *Accord Georgine v. Amchem Prods.*, 83 F.3d 610, 633 (3d Cir. 1996), *aff'd sub nom Amchem Prods. v. Windsor*, 521 U.S. 591 (1997); *In re GMC Dex-Cool Prods. Liab. Litig.*, 2006 U.S. Dist. LEXIS 74503, at *23-*25 (S.D. Ill. Sept. 27, 2006) (collecting cases). Even minor property infringement claims that do not arise out of a mass tort are not viewed as so insubstantial as to be characterized as negative value claims, notwithstanding the fact that some putative class members only owned small tracts of land. *Corley v. Entergy Corp.*, 220 F.R.D. 478, 490 (E.D. Tex. 2004)

Even for those class members with meager aggregate damages claims, the ability to seek punitive damages and/or attorneys' fees renders their claims of non-negative value. *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360, 375 (E.D. La. 1997) (citing *Castano*, 84 F.3d at 748). *Compare* Amended Complaint (Dkt. No. 6412) at 131-36 (seeking punitive

damages on all claims; Prayer for Relief (c) (punitive damages); Prayer for Relief (e) (attorneys' fees). Ultimately, *Castano*'s holding is dispositive: when damages are high and punitive damages are available, individual suits are feasible and a class action is not superior. 84 F.3d at 748.

Second, superiority is undermined by the predominance of individualized issues related to the calculation of damages. As explained by the Fifth Circuit, "[t]he greater number of individual issues, the less likely superiority can be established." *Castano*, 84 F.3d at 745 n.19. The "symbiotic relationship"[3] between predominance and superiority and the interplay therein undergirds "the general rule" that class action resolution is not superior for dealing with mass torts. *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006). Despite the plaintiffs' emphasis on the "single-source" nature of the Deepwater Horizon incident,[4] the general rule against class action resolution of mass torts holds true even when mass torts arise out of a single discrete incident. *Id.* at 602; *Robertson v. Monsanto Co.*, 287 Fed. Appx. 354, 362 (5th Cir. 2008) (*per curiam*) (reversing certification and finding no superiority where "issues of causation and damages are highly individualized" notwithstanding that "the alleged cause of the plaintiffs' injuries is a single incident."). Because putative class members have each suffered damages in unique and varied ways, geo-spatially and temporally distinct ways, there is no predominance of common issues and likewise no superiority of the class action procedure. It is only appropriate for individuals to control litigation of their own claims. The settlement requires them to continue to do so in any event, adding no judicial economy.

---

[3] *Baroni v. Bellsouth Telcomms, Inc.*, 2004 U.S. Dist. LEXIS 14403, at * 28 n.54 (E.D. La. 2004) (citing *Allison*).
[4] Plaintiffs' Motion for Final Approval (Dkt. No. 7104), at i, 23, 38, 51.

*Third*, the class action certification and settlement here is not a superior method of resolution here, in light of BP's acknowledgement of culpability and establishment of the Gulf Coast Claims Facility ["GCCF"] under the administration of Kenneth Feinberg and the oversight of the Federal government. Any marginal gains to absent plaintiffs under the terms of the proposed settlement as compared with the terms of the GCCF program are more than offset by the additional costs and expenses incurred during class settlement. "Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute." *In re Hotel Tel. Charges*, 500 F.2d 86, 91 (9th Cir. 1974); Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can be a Fair and Efficient Alternative to a Class Action*, 31 Rev. Litig. 617, 635 (2012) ("Class settlements, for instance, involve the extra expense of class counsel's fees."). *Cf. also In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests."). In deciding whether the class is benefitted by the certification and simultaneous settlement, the Court should compare its provisions against those of the pre-existing GCCF.

Both the Advisory Committee Notes to Rule 23, as well as the writings of Committee member Charles Alan Wright strongly support the proposition that non-judicial alternatives should be considered when inquiring into the superiority of a class action. Voigt, 31 Rev. Litig. at 625. Commentators at the time of the 1966 appending of (b)(3) agreed that the language required a class action to be superior to "any other form of settlement." *Id.* at 629 (citing Norman

Sabbey, Comment, *Rule 23: Categories of Subsection (b)*, 10 B.C. Indus. & Com. L. Rev. 539, 548-49 (1968-69); Ronald E. Young, *Federal Rules of Civil Procedure: Rule 23, The Class Action Device and Its Utilization*, 22 U. Fla. L. Rev. 631, 637 (1970)). "Over the past fifteen years, nine[5] federal district courts have addressed whether a class action may be compared to a refund program and have concluded that such a comparison is appropriate." Voigt, 31 Rev. Litig. at 630-31; *see also id.* at 632-36 (elucidating the errors of the three federal courts that have held that only comparisons with formal adjudicatory procedures are warranted). Although Professor Voigt mentions that both the Fourth and the Ninth Circuits have similarly implied that it is proper to compare class actions with extra-judicial remedies, *id.* at 631 n.54, he neglects to mention that the Supreme Court and Fifth Circuit have implied likewise.

Endorsing the precise remedial method employed by BP here, the *Amchem* Court wrote that "[t]he argument is sensibly made that a nationwide administrative regime would provide the most secure fair, and efficient means of compensating victims of asbestos exposure. 521 U.S. at 628-29. And even more efficiently, Congress did not even have to adopt such a solution (as they would with a judicially certified class) because BP instituted the program voluntarily, although not without government oversight. The Fifth Circuit has also concluded that non-judicial processes can be superior to the class action device. *Castano*, 84 F.3d at 747 n.24 ("The parties can also turn to mediation and arbitration to settle individual or aggregated claims.").

Quite simply, contrary to the plaintiffs' assertions,[6] a superior process does not require judicial intervention.[7] Voigt, 31 Rev. Litig. at 654-55. Voluntary remedial programs have been

___

[5] There are now ten with the inclusion of *Daigle v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012) (denying class certification, finding no superiority on the basis of Ford's voluntary safety recall).

[6] Plaintiffs' Motion for Final Approval (Dkt. No. 7104) at 48.

found superior for cases involving economic loss, property damage, personal injury, cases where aggregate class damages are of a large magnitude. *Id.* at 642-45 (citing cases). Alternative non-class action relief need not be identical to the class action settlement relief. *Cf. Gregory v. Finova Capital Corp.*, 442 F.3d 188, 190-92 (4th Cir. 2006) (holding that the class action was not superior to a bankruptcy proceeding, even though "the relief sought in the two action differed slightly.").[8]

All that is required is that the voluntary remedial program is "fair and efficient"; when it is, "a court must deny class certification." Voigt, 31 Rev. Litig. at 639. Whether a remedial program is "fair and efficient" depends on whether 1. It fully compensates plaintiffs for actual damages, *id.* at 646; 2. It includes an active campaign to notify plaintiffs of its existence, *id* at 646; 3. It does so in a timely fashion, "no longer than the time a class member would be

---

[7] Even assuming *arguendo* that plaintiffs are correct that some form of governmental structural protection or legitimacy is necessary, it was present here. State governments effectively lobbied and threatened litigation to improve the compensation formulas of the GCCF. The Department of Justice held an audit of the Feinberg GCCF, and negotiated compensation for perceived shortfalls. A government investigation alone is enough to preclude a finding of superiority. *See* Steven B. Malach & Robert E. Koosa, *Government Action and the Superiority Requirement: A Potential Bar to Private Class Action Lawsuits*, 18 Geo. J. Legal. Ethics 1419, 1424-26 (2005) (discussing cases in which courts denied class certification based in part on the existence of a governmental investigation); *Univ. of Utah v. United States*, 2008 U.S. Dist. LEXIS 78185, at *13-*22 (D. Utah Oct. 6, 2008) (administrative claims process precludes finding superiority of class action resolution).

[8] It is for this reason, that the six mostly insignificant distinctions that the plaintiffs note between the GCCF and the class settlement relief do not suffice to make the class settlement a superior method of adjudication. In fact, the differences do nothing but exacerabate the intra-class conflicts, discussed above. The plaintiffs' note that the settlement compensates some types of damage that were not being compensated by the GCCF, but fails to note that the marginal gains for some class members are offset by losses to others. The settlement effectuates little more than moving 600 million dollars that may have gone to GCCF claimants to line the pockets of class counsel.

reimbursed via a class action settlement" *id.* at 656; and 4. It conserves judicial resources. *Id.* at 659.

The GCCF program satisfies the standards of fairness and efficiency. It has been administered by the capable special master Kenneth Feinberg; as discussed above, a Department of Justice audit found only $64 million in underpayments in a universe of $6.2 billion of payments and overpayments. In the aggregate, these billions of dollars of payments to claimants evidences not only the level of compensation that has been provided, but the level of notice to potential plaintiffs. Claimant compensation has been provided in a prompt and timely manner. But even beyond the redress of full monetary compensation, BP has voluntarily acknowledged its responsibility in connection with the Deepwater Horizon incident and pledged to the Court to "pay all legitimate claims in an efficient and fair manner". *See* Statement of BP Exploration & Production Inc (Dkt. No. 559). Such an acknowledgment of liability further undermines a finding of class action superiority. *Robertson*, 287 Fed. Appx. at 362 (no superiority when "as far as the issue of liability is concerned, there is simply no gain to be had from using the class action form.")

It is improper to presume that without this certification and settlement there would be judicial meltdown. *Castano*, 84 F.3d at 747 n.24 ("There is reason to believe that even a mass tort...could be managed, without class certification, in a way that avoids judicial meltdown.") (citing *Georgine*). Here, there is no need for such conjecture even: the GCCF had served as an functioning voluntary settlement program for over a year.  In light of the alternate remedial procedure, there is "the very real possibility that the judicial crisis may fail to materialize." *Id.* at 747. And even if the plaintiffs' are correct that judicial economy would be served by a global

settlement, if there is one principle that can be gleaned from *Amchem* and *Ortiz*, it is that efficiency concerns cannot override due process concerns and make an otherwise untenable class a superior solution. To adopt, at this point, a class settlement is not a superior solution for putative class members. Although it surely is superior from the perspective of class *counsel*, fees are a class expense, not a benefit. *Hotel Tel. Charges*, 500 F.2d at 91; *Aqua Dots*, 654 F.3d at 751.

### III.   The Settlement Is Unfair.

Even if the intra-class conflicts, lack of representative adequacy, and lack of class action superiority could be ignored, and the class could be certified, the settlement cannot be approved as fair under Rule 23(e).

### A.   *Strong* and *Bluetooth* Preclude Settlement Approval.

While *Katrina* makes clear that the six *Reed* factors are not the sole reasons a settlement should be rejected as unfair, unreasonable or inadequate under Rule 23(e), the Fifth Circuit wisely did not attempt to catalog an exclusive list of what may constitute grounds for rejection. *Katrina*, 628 F.3d at 195; *accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(b) (a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case"). In analyzing the fairness of a proposed settlement under Rule 23(e), this Circuit, does however, command district courts to "always consider the possibility that an agreement reached by the class attorney is not in the best interest of the class," and beware of settlements which enrich class counsel to a greater degree than they do absent class members. *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-16 (5th Cir. 1978).

This consideration extends beyond the *Reed* factor requiring a finding of non-collusion and non-fraud. "Even when the district court finds the settlement agreement to be untainted by collusion, fraud, and other irregularities, the court must thoroughly review the attorneys' fees agreed to by the parties in the proposed settlement agreement." *Strong v. BellSouth Telcoms.*, 137 F.3d 844, 850 (5th Cir. 1998). *Accord* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985) (Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations."

The *Strong* court recognized that certain structural provisions designed to benefit class counsel can give rise to an inference of unfairness. *Id.* ("[W]hen fees are paid from the defendant's own funds, a conflict results from 'the danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.'" (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)). The Ninth Circuit agrees; it recently identified a non-exhaustive[9] list of three warning signs of a class action settlement that is inequitable as between class counsel and the class. *In re Bluetooth*

---

[9] Additional indications of a self-dealing settlement are present as well. Class counsel has arranged that they will be paid 480 million dollars even in event that final approval is not granted. Such a provision cannot be in the class' interest. Settlement Agreement, Exhibit 27, ¶ 4.d ("Fee Agreement") (Docket No. 6430-46). This provision serves only to divorce the interests of class counsel from the class. Moreover, class counsel entitled themselves to 75 million dollars before final approval is granted. Fee Agreement ¶ 4.a. A pre-pay provision of this nature is unheard of and both provisions violate Rule 23(h), which permits fees to be awarded to class counsel only upon notice to the class. *See* Section IV, below.

*Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). As in *Bluetooth*, each of these of these "multiple indicia" of unfairness are present in this pre-certification settlement.[10]

The first and second *Bluetooth* indicia of an unfair settlement are procedural: they are 1. the presence of a "clear-sailing" agreement, such that the defendant will not challenge the award of fees to plaintiffs' counsel, and 2. A segregated fee fund such that any dimunition in those fees reverts to the defendant rather than redounding to the class' benefit (i.e. the "kicker"). *Bluetooth*, 654 F.3d at 947. This proposed settlement includes both a clear-sailing agreement and a segregated fee fund. Fee Agreement ¶ 2 (clear-sailing agreement); ¶ 4 (segregated fee fund) (citing Settlement Agreement § 5.16).

In conjunction, both provisions indicate that the class attorneys have negotiated to protect their fee award at the expense of potential class benefits. *See Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991) ("[A clear-sailing] clause by its very nature deprives the court of the advantages of the adversary process."); *Bluetooth*, 654 F.3d at 949 ("[T]he kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees"). At a minimum, these two clauses serve as warning signs of a self-serving settlement that badly needs justification: why was this negotiated in such a manner to make the class worse off? *Id.*

Oddly, despite this precedent condemning the practice, the plaintiffs tout the segregated fee fund as a virtue of the settlement's structure. Motion for Final Approval (Dkt. No. 7104) at 52. In doing so, they "disregard the economic reality that a settling defendant is concerned only

---

[10] Pre-certification settlements demand heightened scrutiny. "[W]here, as here, class counsel negotiates a settlement agreement before the class is even certified, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Dennis v. Kellogg Co.*, ---F.3d---, 2012 U.S. App. LEXIS 14385, at *9-*10 (9th Cir. July 13, 2012) (quoting *Bluetooth*, 654 F.3d at 947).

with its total liability." *Strong*, 137 F.3d at 849. "That the defendant will pay the attorneys' fees from its own funds likewise does not limit the court's obligation to review the reasonableness of the agreed-to fees." *Id. Accord In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("[P]rivate agreements to separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Johnson v. Comerica*, 83 F.3d 241, 246 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal.").[11]

Because this economic reality cannot be avoided, the separation of fee from class fund[12] only serves to exacerbate the conflict between attorney and client by creating the unattractive

---

[11] There is, unfortunately, one material difference when there is no common fund: the district court cannot rewrite the settlement agreement to ensure that the class gets a proportional share of the award. If the district court reduces the attorneys' fee request in any way, the money reverts to the defendants, rather than to the class. The design of this settlement suggests that plaintiffs' attorneys were putting their own interests ahead of those of the class claimants, another reason why Rule 23(a)(4) adequacy should not be found.

[12] Plaintiffs also laud the separate negotiation of fee and class fund. Motion for Final Approval at 52. However, such separation does nothing to allay any conflict unless "fee negotiations [are] postponed until the settlement has been judicially approved, not merely until the date the parties allege to have reached an agreement." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005) (quoting *GM Pick-Up*, 55 F.3d at 804). Here the consummation of the entire settlement agreement is expressly contingent on "the material term and condition precedent" of reaching an agreement on fees. Settlement Agreement § 14.1 (Dkt. No. 6430-1). As such, any notion that BP's reservation price for total liability somehow did not affect the negotiations of the settlement is false.

More generally, the settling parties are rational economic actors: even when the negotiations over fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the class reduces the amount the defendants are willing to pay class counsel. Because these future fee negotiations are not an unexpected surprise, the overhang of the future fee negotiations necessarily infects the earlier settlement negotiations. This is invariably at the expense of the class when there is a separate fund for fees, because both class counsel and the defendants have an incentive to leave extra "space" for that future negotiation in

consequence that any reduction in fees cannot redound to the class' benefit. A "kicker" arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is *no apparent reason* the class should not benefit from the excess allotted for fees." *Bluetooth,* 654 F.3d at 949 (emphasis added). The reversion of an oversized fee request to the defendant is *per se* self-dealing that makes the settlement inherently unfair under Rule 23(e).[13]

In addition, a "kicker" will likely have the additional self-serving effect of protecting class counsel by deterring scrutiny of the fee award. A court has less incentive to scrutinize a fee award, because the kicker combined with the clear sailing agreement means that any reversion will only go to the defendant that had already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"). Secondly, the kicker deters scrutiny of class counsel in another way: under current law, objectors are not entitled to fees unless they

---

a bifurcated negotiation that the parties do not need to have when it is simply negotiating for a single pot of money to go into a common fund. *Cf. Bluetooth*, 654 F.3d at 948-49 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair).

[13] There is no compelling basis for this court to avoid the counsel of the many persuasive cases that culminated in *Bluetooth*. The Fifth Circuit avoids creating a circuit split in the absence of persuasive reasons. *New Orleans Depot Servs. v. Dir.*, ---F.3d---, 2012 U.S. App. LEXIS 15336, at *18 n.6 (5th Cir. July 25, 2012) ("We are always chary to create a circuit split.") (quoting *Alfaro v. Commissioner*, 349 F.3d 225, 229 (5th Cir. 2003)).

provide a substantial benefit to the class. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002). But because a reduction of fees in a kicker settlement revert to the defendant, a good-faith objector seeking to benefit the class at large has no financial incentive to object to the fee arrangement.

Meanwhile the clear-sailing clause, by definition, prohibits the defendant from scrutinizing the fee award. The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Weinberger*, 925 F.2d at 518, 525; *Childs v. United Life Ins. Co.*, No. 10-CV-23-PJC, 2012 U.S. Dist. LEXIS 70113, at *13-14 & n.6 (N.D. Okla. May 21, 2012). It lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 948.

To repeat, the schematic design of the fee award has two consequences: to inflate the fee at the class's expense; and to reduce the court's incentive to carefully scrutinize the fee for unreasonableness, since any reductions benefits only the defendant. Any fee that a defendant agrees to pay directly to class counsel is an amount that it presumptively would have been willing to include as part of the payment to the class. "The court's review of the attorneys' fees component of a settlement agreement is thus an essential part of its role as guardian of the interests of class members." *Strong*, 137 F.3d at 850. Unless the settlement is modified such that any reduction in fees is used to augment class recovery rather than reverting to the defendant, it must be rejected as structurally unfair.

The third *Bluetooth* indicia of an unfair settlement is substantive and perhaps the most important of all. It is "when counsel receive a disproportionate distribution of the settlement"

relative to that benefit which they confer upon class members. *Bluetooth*, 654 F.3d at 947; *see also In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *23 n.5 (E.D. Tex. Jun. 30, 2005) ("Although it may be uncommon for courts to scrutinize a settlement based upon counsel receiving too much and plaintiff receiving too little, it is hardly unprecedented.") (collecting cases). A settlement occasions a comparison between the benefit conferred and class counsel's award. There is no question that the settlement authorizes attorneys' fees and costs of $600 million. Fee Agreement ¶ 2. The key issue lies in determining how to measure the benefit conferred in this case. The burden, of course, in proving the quantum of benefit lies with the proponents of the settlement. *Katrina*, 628 F.3d at 196. They must demonstrably show that the settlement "secures some adequate advantage for the class." *Id.* at 195.

Instead of making a legitimate showing of the benefit conferred, however, the plaintiffs rely in their Motion for Final Approval, at 52, on a $7.8 billion figure referenced but not questioned in the Report of Robert H. Klonoff (Dkt. No. 7101-5) at ¶ 94. Klonoff, in offering that valuation, in turn relied on the 2011 BP Annual Report and Form 20-F.[14] Methodologically relying on that figure suffers from at least two devastating errors: 1) It incorrectly presumes that the benefit to the class is the *projected cost* to the defendant; 2) It includes no offset for the benefit that BP would have conferred independently under the pre-settlement status quo ante, benefit for which the settlement is not a but-for cause.

---

[14] *available at*
http://www.bp.com/assets/bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/common_assets/bpin2011/downloads/BP_Annual_Report_and_Form_20F_2011.pdf.

BP's annual report states simply that "BP estimates the cost of the proposed settlement would be approximately $7.8 billion[15] (including the $2.3 billion commitment to help resolve economic loss claims related to the Gulf seafood industry)." Annual Report at 163. However, "the standard [under rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)). *Accord Charles v. Goodyear Tire & Rubber Co.*, 976 F. Supp. 321, 325 (D. N.J. 1997); *O'Keefe v. Mercedes-Benz USA, L.L.C.*, 214 F.R.D. 266, 304-05 (E.D. Pa. 2003).

This follows from a recognition that the "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*" (emphasis in original). *In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at * 3 (N.D. Cal. Sept. 22, 2009). *See also In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1998) (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37);  Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004) ("the fee awards should be based only on the benefits actually delivered.").

But there is a more fundamental problem with the $7.8 billion valuation. It wrongly credits class counsel for benefits which the settlement does not create, benefits that BP would have voluntarily issued to class members of its own accord under the GCCF program. The parties present no evidence supporting the idea BP would have terminated its pre-existing

---

[15] Moreover, Klonoff and BP both acknowledge that the actual figure could be significantly lower than $7.8 billion. Annual Report at 163, Klonoff Report ¶ 97. The guaranteed expenditures are well below Klonoff's "conservative estimate" of $5 billion.

remedial program in the absence of this settlement. On the contrary, the fact that payments were made to class members during the pendency of approval strongly suggests that the GCCF relief program would have continued just as before. Moreover, the parties make no attempt to calculate the marginal benefits which supposedly enhanced claim formulas (Plaintiffs Motion for Final Approval at 48-49) bestow upon the class. The value of the settlement is not the $7.8 billion that BP is spending, but the amount that the class will receive *that they would not have already received through the Feinberg GCCF had class action settlement negotiations fallen through.* That number is nowhere near $7.8 billion; the parties present no evidence that it is even greater than zero. While the value of punitive damages claims are certainly in dispute, there are certainly not entirely worthless.

As discussed above, sizable portions of this settlement are nearly-identical to the GCCF program, equating to "relief that duplicates a remedy that most [plaintiffs] already have received, and that remains available to all members of the putative class." *Aqua Dots*, 654 F.3d at 752. "A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests." *Id.*

*Prudential* is particularly instructive. 148 F.3d at 336-37. It is inappropriate to base a "fee calculation on 'the entire value of the settlement'," including those portions which the settling parties did not produce for the class. *Id.* To be eligible for fees, class counsel must be a "material factor" in the creation of benefits; that is, it had to have been "more than an initial impetus behind the creation of the benefit." *Id. Accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.13 Illustration 2 (2010). Otherwise, "[a]llowing private counsel to

receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiffs attorneys to minimize the costs of failure...by freeriding on the monitoring efforts of others." *Prudential*, 148 F.3d at 336-37. *See also In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 741 (3d Cir. 2001) ("[Defendant's] liability and consequent collectability had been conceded at the outset of the PRIDES controversy, and that fact should have been given major consideration by the District Court when setting Kirby's attorneys' fees.").

Here, it is blatantly apparent that class counsel and the proposed settlement are not the causal impetuses for a majority of the dollars that class members are likely to receive. *See Nguyen v. BMW of N. Am. LLC*, 2012 U.S. Dist. LEXIS 56018 (N.D. Cal. Apr. 20, 2012) (class counsel cannot take credit for voluntary remedial efforts of the defendant); *see also Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003) (expressing concern about "the incorporation in the agreement of promotion and complaint programs Boeing had already developed and implemented, with no obligation on the part of the Company to continue those programs in their present form or alternatively to substitute programs of the same efficacy.").[16] The court should

---

[16] *Cf. also Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001) ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change. Our precedents thus counsel against holding that the term "prevailing party" authorizes an award of attorney's fees without a corresponding alteration in the legal relationship of the parties."); *Bublitz v. E.I. Dupont De Nemours & Co.*, 224 F. Supp. 2d 1234, 1239 (S.D. Iowa 2002) ("The Court interprets the Supreme Court's recent decision in *Buckhannon Board and Care Home v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 149 L. Ed. 2d 855, 121 S. Ct. 1835 (2001), as abolishing the catalyst theory with respect to the common fund doctrine. It is true that the precise issue addressed by the Court in Buckhannon is whether the term 'prevailing party' includes a party who has prevailed under the catalyst theory. *Id.* at 610. This Court, however, holds that the broader import of that ruling is not limited to the term 'prevailing party.'") (citations omitted).

look to GCCF operation as a comparator, against which the actual benefit of the settlement can be judged. In this vein, the GCCF issued payments of $6.2 billion over a year and a half, with the anticipation that another $13.8 billion would be paid out over the life of the fund. A proper valuation of the benefit conferred by class counsel must accordingly deduct this amount from the payments made from the settlement fund to class members.

Because the parties have not attempted to make such a showing, the Armours are left only to conclude that the $600 million fee would be disproportionate when compared with the marginal gains to class members; indeed, we cannot even conclude that the settlement doesn't make the class as a whole worse off for the benefit of a minority of class members. A disproportionate fee award thus manifested completes *Bluetooth's* triumvirate of cautionary signals of an unfair, lawyer-driven settlement. As such, it is incumbent upon this Court to reject the settlement until it can pass 23(e) muster.

The Court can and should respond by reducing the fees to an amount proportionate to the *difference* between this settlement and what the class would have received under the GCCF. But if the Court were to do so here, the "kicker" will simply shift the remainder back into the pockets of the defendants—even though the defendants were willing to pay this money to settle the case. In effect, class counsel will have left hundreds of millions of dollars on the table in a futile effort to shield their own attorneys' fees from scrutiny. As the Ninth Circuit has said, "there is no apparent reason" for such a reversion to defendants in the presence of a clear sailing clause indicating the defendants' willingness to pay that money to the class instead. *Bluetooth*, 654 F.3d at 949. Such a reversion by itself would demonstrate an unfair breach of fiduciary duty than cannot be countenanced, and is independent reason to reject the settlement.

**B.**     *Dennis v. Kellogg* **Precludes Settlement Approval.**

There is a second independent reason the settlement cannot be considered fair. BP has the right to appeal awards in the class action claims process. Settlement § 6. The awards to the class are therefore entirely indeterminate and subjective, and require additional litigation (demonstrating another independent reason why this class action is not "superior" to the pre-existing *status quo*). Neither class members nor class members can evaluate in advance what or even when they will be paid. This precludes approval as a matter of law. As in *Dennis v. Kellogg*, No. 11-55674 (9th Cir. Jul. 13, 2012), "Class counsel and [BP] ask us for the impossible — a verdict before the trial. They essentially say, 'Just trust us. Uphold the settlement now, and we'll tell you what it is later.' ... The settlement provides no assurance" that class members will receive the just compensation that BP had already promised this Court on October 18, 2010. The fill-in-the-blanks approach is not permissible in a Rule 23 opt-out settlement; if the parties wish to have such an amorphous arrangement, it needs to be through a mass-action opt-in as in *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 463 (E.D. La. 2006), while leaving parties the opportunity to continue participating in a restored Feinberg GCCF.

**IV.     The Settlement Procedure Violates Rule 23(h).**

Under the plain language of Fed. R. Civ. Proc 23(h), notice of a motion for class counsel attorneys' fees must be "directed to class members in a reasonable manner." Thus, class counsel is required to submit its basis for attorneys' fees well before objections are due so that the class has a full and fair opportunity to address the claims made. *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010). Objections are due today, August 31, but the legal basis and evidence for the fee request has not yet been filed—even as class counsel has already cashed

enormous checks of tens of millions of dollars. This improper procedure makes approval impossible. "The plain text of the rule requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed." *Mercury Interactive*, 618 F.3d at 993. Class members have been "deprived of an adequate opportunity to object to the motion." *Id.*

*Mercury Interactive* requires either rejection of the fee request, or a full and fair opportunity to respond to the fee request; it will be reversible error if objectors are not permitted to respond. The improperly awarded $75 million—and any other improperly paid fees—must be returned until a true adversary hearing has occurred.

**V.      The Court Must Ensure Compliance With Rule 23(e)(3)**

Under Fed. R. Civ. Proc. 23(e)(3), the "parties seeking approval [of a settlement] must file a statement identifying any agreement made in connection with the proposal." But though class counsel has thousands of clients, many of whom have individually settled with BP, no such Rule 23(e)(3) statement has been filed identifying these separate agreements; Rule 23(e)(3) is not even mentioned in the briefs. There are three separate reasons why the Court, or better yet a neutral special master it appoints, must scrutinize these agreements *in camera* if not provide them to a committee of objectors for true adversary review. First, the Court has an obligation under the *Reed* factors to ensure that there was not a side-deal providing favorable treatment for Class Counsel's individual clients in exchange for shorting the benefits to class members without attorneys on the Plaintiffs' Steering Committee. The fairness of what the class members are receiving can be directly compared to what class counsel has negotiated for their own portfolio of clients. Second, even if there was no chance of explicit collusion, a good test for whether what

the settlement provides class members is truly fair is to see whether Class Counsel has been willing to accept the terms of the deal for their own clients that they wish to impose on absent class members, or whether attorneys in the Plaintiffs' Steering Committee have individually negotiated more favorable terms over the life of the Feinberg GCCF than what this settlement provides. Third, given the potential conflicts of interest, it is entirely possible that the parties are engaging in additional violations of Rule 23(h): BP could be agreeing to expedite settlements with the PSC relative to non-PSC attorneys for non-class members so that the PSC attorneys could collect fees quicker from their own portfolios of clients, thus funding their ability to wrest the claims process away from the Feinberg GCCF. There might be any number of irregularities, but we will not know until the parties comply with Rule 23(e)(3) and the appropriate level of independent scrutiny is given. The failure to do so would be reversible error.

## CONCLUSION

For the foregoing reasons, the class cannot be certified, and the settlement cannot be approved.

Dated: August 31, 2012

Respectfully submitted,

By:  _____/s/ Christopher A. Bandas_____

Christopher A. Bandas
State Bar No. 00787637
Southern Bar No. 17509
BANDAS LAW FIRM, P.C.
500 North Shoreline Blvd., Suite 1020
Corpus Christi, Texas 78401-0353
(361) 698-5200 Telephone
(361) 698-5222 Facsimile

Counsel for Objectors
Hunter Armour and Judith Armour

## PROOF OF SERVICE

I hereby certify that on the 31st day of August 2012 a true and correct copy of the above and foregoing was served on the following as indicated below as well as all counsel of record via the Court's CM/ECF system.

Via U.S. Mail & CM-RRR
James Parkerson Roy
Attn: Deepwater Horizon E&PD Settlement
Domengeaux Wright Roy & Edwards
555 Jefferson St., Ste. 500
P.O. Box 3668
Lafayette, LA 70501
Economic & Property Damages Lead Class
Counsel

Via U.S. Mail & CM-RRR
Richard C. Godfrey, P.C.
Attn: Deepwater Horizon E&PD Settlement
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Defendants' Counsel

Via CM-ECF Filing
Clerk of Court
United States District Court for the
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Executed on August 31, 2012.

           /s/ Christopher A. Bandas
           Christopher A. Bandas
           Tx. State Bar No. 00787637
           Tx. Southern Bar No. 17509
           BANDAS LAW FIRM, P.C.
           500 North Shoreline Blvd., Suite 1020
           Corpus Christi, Texas 78401-0353
           (361) 698-5200 Telephone
           (361) 698-5222 Facsimile

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This filing relates to: | Section: J |
| *Cases in Pleading Bundle B1, and VoO Charter Dispute Cases* | Honorable Carl J. Barbier |
| | Magistrate Judge Shushan |
| *Bon Secour Fisheries, Inc., et al. v.* *BP Exploration and Production, Inc., et al.,* | Date:      November 8, 2012 |
| Civil Action No. 12-970 | Time:      8:30 a.m. |
| | Courtroom:   C268 |
| Objections to Economic and Property Damages Settlement Agreement, | |
| Civil Action No. 10-7777 | |

**Declaration in support of Objections to the Economic and Property Damages Settlement Agreement by Objector Hunter T. Armour**

Now comes Hunter T. Armour, and states the following under oath and under penalty of perjury in support of his objection.

1. My name is Hunter T. Armour. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

2. My GCCF Claimant Number is 1049770.

3. My address is 6200 Siquenza Drive, Pensacola, Florida 32507.

4. I earn money running fishing charters in the Big Lagoon and the mouth of Pensacola Pass, and my business was damaged by the Deepwater Horizon spill; I suffered numerous cancellations between May and October 2010 and have in addition lost business as the result of the oil spill. I have not yet been compensated for these damages.

5. I am licensed by the state of Florida as a charter captain; a true and correct copy of that license is attached as Exhibit 1.

6. I am licensed by the United States Coast Guard as well; a true and correct copy of that license is attached as Exhibit 2.

7. I pay business taxes to Escambia County, Florida, to permit me to run my business as a charter captain. A true and correct copy of a receipt for that tax is attached as Exhibit 3.

8. A true and correct copy of my Florida vessel registration is attached as Exhibit 4.

9. In 2007, my business had $14,665 net profit. A true and correct copy of my 2007 Schedule C is attached as Exhibit 5.

10. In 2008, my business had $11,676 net profit. A true and correct copy of my 2008 Schedule C is attached as Exhibit 6.

11. In 2009, my business had $13,015 net profit. A true and correct copy of my 2009 Schedule C is attached as Exhibit 7.

12. In 2010, my business had only $8,347 net profit because of the effect of the Deepwater Horizon spill. A true and correct copy of my 2010 Schedule C is attached as Exhibit 8.

13. Along with my wife, Judith Armour, I co-owned the waterfront property at 6200 Siguenza Drive at the time of the Deepwater Horizon spill. A true and correct copy of my property taxes for 2010 is attached as Exhibit 9.

14. We suffered coastal property damage because of the Deepwater Horizon spill from oil washing up from the intercoastal waterway. A true and correct copy of my Green Form is attached as Exhibit 10.

15. On information and belief, my property is wetland property.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on August 31, 2012, in PENSACOLA _____, FL__.

Hunter T. Armour

1049770



**EXHIBIT**

1

1049770-



STATE OF FLORIDA
RECREATIONAL LICENSE
C-ICT# 897-984-467

PRIVILEGE(S) PURCHASED:
1Y CHARTER CAPTAIN - 4 OR MORE   $201.50
VALID FOR: 07/28/2010 - 07/31/2011

TOTAL: $201.50

ALL SALES FINAL

1049770-

SERIAL NUMBER
1184929

DEPT. OF HOMELAND SECURITY U.S. COAST GUARD CG 2849 (REV. 6-04)

# UNITED STATES COAST GUARD

ISSUE NUMBER 5

# U.S. MERCHANT MARINE OFFICER

*This is to certify that*

**\*\*\* HUNTER THOMAS ARMOUR \*\*\***

*having been duly examined and found competent, is hereby licensed to serve*

*for the term of five years from the date hereof, as:*

MASTER OF STEAM OR MOTOR VESSELS OF NOT MORE THAN 100 GROSS REGISTERED TONS
(DOMESTIC TONNAGE) UPON NEAR COASTAL WATERS FOR DOMESTIC VOYAGES ONLY. THE
HOLDER OF THIS LICENSE MEETS THE STCW 95 REGULATIONS WITHOUT FURTHER
ENDORSEMENT

*Given under my hand this* 21st *day of* March *2007*

LINK, CAPT, USCG
MANAGING OFFICER, NATIONAL MARITIME CENTER

ISSUED AT: KEARNEYSVILLE, WV
EXPIRATION DATE: MARCH 20 2012

EXHIBIT

2

1049770



LOCAL BUSINESS TAX RECEIPT
ESCAMBIA COUNTY, FL

THIS BUSINESS TAX RECEIPT EXPIRES

September 30, 2011

HOLDER IS HEREBY AUTHORIZED TO ENGAGE IN
THE BUSINESS, PROFESSION, OR OCCUPATION OF

CHARTER CAPTAIN
6200 SIGUENZA DR

HUNTER ARMOUR CHARTER
6200 SIGUENZA DR
PENSACOLA FL 32507

THE ISSUANCE OF THIS RECEIPT
DOES NOT ENSURE COMPETENCY

PAID-8903620 0001-0001 185 09/15/2010 26 25

JANET HOLLEY CFC
Tax Collector

2010 - 2011

ACCT
NO.        655537       GROUP
                        TYPE    047116    TOTAL    26 25

This business tax receipt is in addition to and not in lieu of any other license
required by law or municipal ordinance and is subject to regulations
of zoning, health, contractor licensing, and other lawful authority.

OWNER ARMOUR HUNTER

**EXHIBIT**

3

1049770-

# FLORIDA VESSEL REGISTRATION

FL/DO #  FL7896MC     DECAL  15019260     Expires  Midnight Sat 12/31/2010     COAGY 9 / 1

| | | | | | |
|---|---|---|---|---|---|
| YR/MK | 2003/EXH | BODY | VS | | |
| HIN | EKH521970203 | | | HULL | EKH521970203 |
| HULL | FBGLSS | | | TITLE | 87282284 |
| USE | CM CHRTR | PROPUL | OUTBRD | FUEL | GAS |
| DL/FEID | A656338514510 | TYPE | OPEN | LENGTH | 19' |
| Date Issued | 12/7/2009 | | | | |

HUNTER THOMAS ARMOUR
6200 SIGUENZA DR
PENSACOLA, FL 32507-8627

| | Reg Tax | | | Cash Code | 100 |
|---|---|---|---|---|---|
| | Int Reg | | | Tax Months | 12 |
| | County Fee | 33.25 | | Back Tax Mos | |
| | Mail Fee | | | Credit Class | |
| | Sales Tax | 2.75 | | Credit Months | |
| | Voluntary Fee | | | | |
| | Grand Total | 36.00 | | | |

## IMPORTANT INFORMATION

1  Your registration must be updated to your new address within 30 days of, changing
   Registration renewals are the responsibility of the registrant and shall occur during
   the 30-day period prior to the expiration date shown on this registration  Renewal
2  notices are provided as a courtesy and are not required for renewal purposes

EXHIBIT
4

1049770-

| SCHEDULE C | **Profit or Loss From Business** | OMB No. 1545-0074 |
|---|---|---|
| (Form 1040) | (Sole Proprietorship) | **2007** |
| Department of the Treasury | ▶ Partnerships, joint ventures, etc., must file Form 1065 or 1065-B | Attachment |
| Internal Revenue Service   (99) | ▶ Attach to Form 1040, 1040NR, or 1041   ▶ See Instructions for Schedule C (Form 1040) | Sequence No. 09 |

**Name of proprietor**  Hunter T Armour

**Social security number (SSN)**  ▇▇▇▇▇▇▇

**A** Principal business or profession, including product or service (see page C-2 of the instructions)
Inland fishing guide

**B** Enter code from pages C-8, 9, & 10  ▶ 114110

**C** Business name. If no separate business name, leave blank.
Hunter T Armour

**D** Employer ID number (EIN), if any

**E** Business address (including suite or room no.)  ▶
City, town or post office, state, and ZIP code

**F** Accounting method  (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify)  ▶

**G** Did you "materially participate" in the operation of this business during 2007? If "No," see page C-3 for limit on losses   [X] Yes  [ ] No

**H** If you started or acquired this business during 2007, check here  ▶ [ ]

### Part I  Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. Caution. If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see page C-3 and check here  ▶ [ ] | 1 | 21,920 |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 21,920 |
| 4 | Cost of goods sold (from line 42 on page 2) | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 | 5 | 21,920 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see page C-3) | 6 | |
| 7 | Gross income. Add lines 5 and 6  ▶ | 7 | 21,920 |

### Part II  Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | | 18 | Office expense | 18 | |
| 9 | Car and truck expenses (see page C-4) | 9 | | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see page C-5) | | |
| 11 | Contract labor (see page C-4) | 11 | | a | Vehicles, machinery, and equipment | 20a | |
| 12 | Depletion | 12 | | b | Other business property | 20b | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see page C-4) | 13 | | 21 | Repairs and maintenance | 21 | 800 |
| | | | | 22 | Supplies (not included in Part III) | 22 | 180 |
| | | | | 23 | Taxes and licenses | 23 | 431 |
| | | | | 24 | Travel, meals, and entertainment | | |
| 14 | Employee benefit programs (other than on line 19) | 14 | | a | Travel | 24a | |
| 15 | Insurance (other than health) | 15 | 1,071 | b | Deductible meals and entertainment (see page C-6) | 24b | |
| 16 | Interest | | | 25 | Utilities | 25 | |
| a | Mortgage (paid to banks, etc.) | 16a | | 26 | Wages (less employment credits) | 26 | |
| b | Other | 16b | | 27 | Other expenses (from line 48 on page 2) | 27 | 4,473 |
| 17 | Legal and professional services | 17 | 300 | | | | |

| | | | |
|---|---|---|---|
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27 in columns  ▶ | 28 | 7,255 |
| 29 | Tentative profit (loss). Subtract line 28 from line 7 | 29 | 14,665 |
| 30 | Expenses for business use of your home. Attach Form 8829 | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (statutory employees, see page C-7). Estates and trusts, enter on Form 1041, line 3 | 31 | 14,665 |
| | • If a loss, you must go to line 32. | | |

**32** If you have a loss, check the box that describes your investment in this activity (see page C-7).
• If you checked 32a, enter the loss on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (statutory employees, see page C-7). Estates and trusts, enter on Form 1041, line 3
• If you checked 32b, you must attach Form 6198. Your loss may be limited.

32a [ ] All investment is at risk.
32b [ ] Some investment is not at risk.

For Paperwork Reduction Act Notice, see page C-8 of the instructions.   (HTA)

Schedule C (Form 1040) 2007

**EXHIBIT**
**5**

1049770

Schedule C (Form 1040) 2007          Hunter T Armour                                    Page **2**

**Part III    Cost of Goods Sold (see page C-7)**

| | | |
|---|---|---|
| 33 | Method(s) used to value closing inventory    a ☐ Cost    b ☐ Lower of cost or market    c ☐ Other (attach explanation) | |
| 34 | Was there any change in determining quantities, costs, or valuations between opening and closing inventory? If "Yes," attach explanation | ☐ Yes  ☐ No |
| 35 | Inventory at beginning of year  If different from last year's closing inventory, attach explanation | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use | 36 | |
| 37 | Cost of labor  Do not include any amounts paid to yourself | 37 | |
| 38 | Materials and supplies | 38 | |
| 39 | Other costs | 39 | |
| 40 | Add lines 35 through 39 | 40 | 0 |
| 41 | Inventory at end of year | 41 | |
| 42 | Cost of goods sold  Subtract line 41 from line 40  Enter the result here and on page 1, line 4 | 42 | 0 |

**Part IV    Information on Your Vehicle**  Complete this part only if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business  See the instructions for line 13 on page C-4 to find out if you must file Form 4562

43  When did you place your vehicle in service for business purposes? (month, day  year)  ▶ -------------------

44  Of the total number of miles you drove your vehicle during 2007, enter the number of miles you used your vehicle for

a  Business ------------------  b  Commuting (see instructions) ------------------  c  Other ------------------

45  Do you (or your spouse) have another vehicle available for personal use?                ☐ Yes  ☐ No

46  Was your vehicle available for personal use during off-duty hours?                        ☐ Yes  ☐ No

47 a  Do you have evidence to support your deduction?                                          ☐ Yes  ☐ No

   b  If "Yes," is the evidence written?                                                       ☐ Yes  ☐ No

**Part V    Other Expenses.** List below business expenses not included on lines 8–26 or line 30

| | |
|---|---|
| Gasoline and oil | 3,490 |
| Bait | 888 |
| Permits | 35 |
| Drug free testing | 60 |
| | |
| | |
| | |
| | |
| | |
| 48  Total other expenses  Enter here and on page 1, line 27          48 | 4,473 |

Schedule C (Form 1040) 2007

1049770

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service   (99)

# Profit or Loss From Business
(Sole Proprietorship)

▶ Partnerships, joint ventures, etc , generally must file Form 1065 or 1065-B
▶Attach to Form 1040, 1040NR, or 1041   ▶ See Instructions for Schedule C (Form 1040)

OMB No 1545-0074

**2008**

Attachment
Sequence No  **09**

| | |
|---|---|
| Name of proprietor  Hunter T Armour | Social security number (SSN) |

**A**  Principal business or profession, including product or service (see page C-3 of the instructions)
Inland fishing guide

**B**  Enter code from pages C-9, 10, & 11
▶  114110

**C**  Business name  If no separate business name, leave blank
Hunter T Armour

**D**  Employer ID number (EIN), if any

**E**  Business address (including suite or room no )  -------------------------------------------
City, town or post office, state, and ZIP code

**F**  Accounting method  (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ▶ ------------

**G**  Did you "materially participate" in the operation of this business during 2008? If "No," see page C-4 for limit on losses   [X] Yes   [ ] No

**H**  If you started or acquired this business during 2008, check here  ▶ [ ]

## Part I   Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales  Caution  See page C-4 and check the box if | | |
| | • This income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, or | | |
| | • You are a member of a qualified joint venture reporting only rental real estate income not subject to self-employment tax  Also see page C-4 for limit on losses  ▶ [ ] | **1** | 18,360 |
| 2 | Returns and allowances | **2** | |
| 3 | Subtract line 2 from line 1 | **3** | 18,360 |
| 4 | Cost of goods sold (from line 42 on page 2) | **4** | |
| 5 | **Gross profit**  Subtract line 4 from line 3 | **5** | 18,360 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see page C-4) | **6** | |
| 7 | **Gross income**  Add lines 5 and 6  ▶ | **7** | 18,360 |

## Part II   Expenses  Enter expenses for business use of your home **only** on line 30

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising | **8** | 75 | 18 | Office expense | **18** | |
| 9 | Car and truck expenses (see page C-5) | **9** | | 19 | Pension and profit-sharing plans | **19** | |
| 10 | Commissions and fees | **10** | | 20 | Rent or lease (see page C-6) | | |
| 11 | Contract labor (see page C-5) | **11** | | a | Vehicles, machinery, and equipment | **20a** | |
| 12 | Depletion | **12** | | b | Other business property | **20b** | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see page C-5) | **13** | | 21 | Repairs and maintenance | **21** | 375 |
| | | | | 22 | Supplies (not included in Part III) | **22** | 199 |
| | | | | 23 | Taxes and licenses | **23** | 480 |
| | | | | 24 | Travel, meals, and entertainment | | |
| 14 | Employee benefit programs (other than on line 19) | **14** | | a | Travel | **24a** | |
| 15 | Insurance (other than health) | **15** | 1,071 | b | Deductible meals and entertainment (see page C-7) | **24b** | |
| 16 | Interest | | | 25 | Utilities | **25** | |
| a | Mortgage (paid to banks, etc ) | **16a** | | 26 | Wages (less employment credits) | **26** | |
| b | Other | **16b** | | 27 | Other expenses (from line 48 on page 2) | **27** | 4,284 |
| 17 | Legal and professional services | **17** | 200 | | | | |

| | | | |
|---|---|---|---|
| 28 | Total expenses before expenses for business use of home  Add lines 8 through 27  ▶ | **28** | 6,684 |
| 29 | Tentative profit or (loss)  Subtract line 28 from line 7 | **29** | 11,676 |
| 30 | Expenses for business use of your home  Attach Form 8829 | **30** | |
| 31 | Net profit or (loss)  Subtract line 30 from line 29 | | |
| | • If a profit, enter on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (if you checked the box on line 1, see page C-7)  Estates and trusts, enter on Form 1041, line 3 | **31** | 11,676 |
| | • If a loss, you must go to line 32 | | |
| 32 | If you have a loss  check the box that describes your investment in this activity (see page C-8) | | |
| | • If you checked 32a, enter the loss on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (if you checked the box on line 1, see the line 31 instructions on page C-7) Estates and trusts, enter on Form 1041, line 3 | **32a** [ ] All investment is at risk | |
| | • If you checked 32b, you must attach Form 6198  Your loss may be limited | **32b** [ ] Some investment is not at risk | |

For Paperwork Reduction Act Notice, see page C-9 of the instructions
(HTA)

Schedule C (Form 1040) 2008

**EXHIBIT**
6

**1049770 -**

Schedule C (Form 1040) 2008          Hunter T Armour          Page **2**

**Part III   Cost of Goods Sold (see page C-8)**

| | |
|---|---|
| 33 | Method(s) used to value closing inventory    a ☐ Cost    b ☐ Lower of cost or market    c ☐ Other (attach explanation) |

34   Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If "Yes," attach explanation     ☐ Yes    ☐ No

| | | | |
|---|---|---|---|
| 35 | Inventory at beginning of year  If different from last year's closing inventory, attach explanation | **35** | |
| 36 | Purchases less cost of items withdrawn for personal use | **36** | |
| 37 | Cost of labor  Do not include any amounts paid to yourself | **37** | |
| 38 | Materials and supplies | **38** | |
| 39 | Other costs | **39** | |
| 40 | Add lines 35 through 39 | **40** | |
| 41 | Inventory at end of year | **41** | |
| 42 | Cost of goods sold  Subtract line 41 from line 40  Enter the result here and on page 1  line 4 | **42** | |

**Part IV   Information on Your Vehicle.** Complete this part **only** if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business  See the instructions for line 13 on page C-5 to find out if you must file Form 4562

43   When did you place your vehicle in service for business purposes? (month, day, year)  ▶  - - - - - - - - - - - - - - - - - - - -

44   Of the total number of miles you drove your vehicle during 2008, enter the number of miles you used your vehicle for

a   Business  - - - - - - - - - - - - - - -  b  Commuting (see instructions)  - - - - - - - - - - - - - - - - -  c  Other - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| 45 | Was your vehicle available for personal use during off-duty hours? | ☐ Yes | ☐ No |
| 46 | Do you (or your spouse) have another vehicle available for personal use? | ☐ Yes | ☐ No |
| 47 a | Do you have evidence to support your deduction? | ☐ Yes | ☐ No |
| b | If "Yes," is the evidence written? | ☐ Yes | ☐ No |

**Part V   Other Expenses**   List below business expenses not included on lines 8–26 or line 30

| | |
|---|---|
| Gasoline and oil | 3,468 |
| Bait | 756 |
| Drug free testing | 60 |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | |
| 48   Total other expenses  Enter here and on page 1, line 27    **48** | 4,284 |

Schedule C (Form 1040) 2008

1049770

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

**Profit or Loss From Business**
(Sole Proprietorship)

► Partnerships, joint ventures, etc., generally must file Form 1065 or 1065-B

► Attach to Form 1040, 1040NR, or 1041    ► See Instructions for Schedule C (Form 1040)

OMB No 1545-0074

**2009**

Attachment
Sequence No  09

Name of proprietor: Hunter T Armour

Social security number (SSN)

**A** Principal business or profession, including product or service (see page C-2 of the instructions)
Inland fishing guide

**B** Enter code from pages C-9, 10, & 11
► 114110

**C** Business name  If no separate business name, leave blank
Hunter T Armour

**D** Employer ID number (EIN), if any

**E** Business address (including suite or room no)  ►
City, town or post office, state, and ZIP code

**F** Accounting method   (1) [X] Cash    (2) [ ] Accrual    (3) [ ] Other (specify)  ►

**G** Did you "materially participate" in the operation of this business during 2009? If "No" see page C-3 for limit on losses    [X] Yes   [ ] No

**H** If you started or acquired this business during 2009, check here    ►  [ ]

## Part I   Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales  Caution  See page C-4 and check the box if <br> • This income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, or <br> • You are a member of a qualified joint venture reporting only rental real estate income not subject to self-employment tax  Also see page C-3 for limit on losses | ► [ ] | 1 | 19,445 |
| 2 | Returns and allowances | | 2 | |
| 3 | Subtract line 2 from line 1 | | 3 | 19,445 |
| 4 | Cost of goods sold (from line 42 on page 2) | | 4 | |
| 5 | Gross profit  Subtract line 4 from line 3 | | 5 | 19,445 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see page C-4) | | 6 | |
| 7 | Gross income  Add lines 5 and 6 | ► | 7 | 19,445 |

## Part II   Expenses. Enter expenses for business use of your home only on line 30

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | 75 | 18 | Office expense | 18 | |
| 9 | Car and truck expenses (see page C-4) | 9 | 550 | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see page C-6) | | |
| 11 | Contract labor (see page C-4) | 11 | | a | Vehicles, machinery, and equipment | 20a | |
| 12 | Depletion | 12 | | b | Other business property | 20b | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see page C-5) | 13 | | 21 | Repairs and maintenance | 21 | 434 |
| | | | | 22 | Supplies (not included in Part III) | 22 | 178 |
| | | | | 23 | Taxes and licenses | 23 | 315 |
| | | | | 24 | Travel, meals, and entertainment | | |
| 14 | Employee benefit programs (other than on line 19) | 14 | | a | Travel | 24a | |
| 15 | Insurance (other than health) | 15 | 926 | b | Deductible meals and entertainment (see page C-6) | 24b | |
| 16 | Interest | | | 25 | Utilities | 25 | |
| a | Mortgage (paid to banks, etc) | 16a | | 26 | Wages (less employment credits) | 26 | |
| b | Other | 16b | | 27 | Other expenses (from line 48 on page 2) | 27 | 3,752 |
| 17 | Legal and professional services | 17 | 200 | | | | |

| | | | |
|---|---|---|---|
| 28 | Total expenses before expenses for business use of home  Add lines 8 through 27 | ► 28 | 6,430 |
| 29 | Tentative profit or (loss)  Subtract line 28 from line 7 | 29 | 13,015 |
| 30 | Expenses for business use of your home  Attach Form 8829 | 30 | |
| 31 | Net profit or (loss)  Subtract line 30 from line 29 <br> • If a profit  enter on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (if you checked the box on line 1, see page C-7)  Estates and trusts, enter on Form 1041, line 3 <br> • If a loss, you must go to line 32 | 31 | 13,015 |
| 32 | If you have a loss, check the box that describes your investment in this activity (see page C-7) <br> • If you checked 32a, enter the loss on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (if you checked the box on line 1, see the line 31 instructions on page C-7)  Estates and trusts, enter on Form 1041, line 3 <br> • If you checked 32b, you must attach Form 6198  Your loss may be limited | 32a [ ] All investment is at risk <br> 32b [ ] Some investment is not at risk | |

For Paperwork Reduction Act Notice, see page C-9 of the instructions
(HTA)

Schedule C (Form 1040) 2009

**EXHIBIT**

tabler

7

Schedule C (Form 1040) 2009          Hunter T Armour          104 9770          Page 2

## Part III   Cost of Goods Sold (see page C-8)

| | | | |
|---|---|---|---|
| 33 | Method(s) used to value closing inventory   a ☐ Cost   b ☐ Lower of cost or market   c ☐ Other (attach explanation) | | |

34   Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If "Yes," attach explanation ........................................................ ☐ Yes   ☐ No

| | | | |
|---|---|---|---|
| 35 | Inventory at beginning of year  If different from last year's closing inventory  attach explanation | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use | 36 | |
| 37 | Cost of labor  Do not include any amounts paid to yourself | 37 | |
| 38 | Materials and supplies | 38 | |
| 39 | Other costs | 39 | |
| 40 | Add lines 35 through 39 | 40 | |
| 41 | Inventory at end of year | 41 | |
| 42 | Cost of goods sold  Subtract line 41 from line 40  Enter the result here and on page 1, line 4 | 42 | |

## Part IV   Information on Your Vehicle  Complete this part only if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business  See the instructions for line 13 on page C-5 to find out if you must file Form 4562

43   When did you place your vehicle in service for business purposes? (month  day, year)   ▶ ..............................

44   Of the total number of miles you drove your vehicle during 2009, enter the number of miles you used your vehicle for

a   Business ...................   b  Commuting (see instructions) ...................   c  Other ...................

45   Was your vehicle available for personal use during off-duty hours? ........................... ☐ Yes   ☐ No

46   Do you (or your spouse) have another vehicle available for personal use? ........................... ☐ Yes   ☐ No

47 a   Do you have evidence to support your deduction? ........................... ☐ Yes   ☐ No

b   If "Yes " is the evidence written? ........................... ☐ Yes   ☐ No

## Part V   Other Expenses  List below business expenses not included on lines 8–26 or line 30

| | |
|---|---|
| Gasoline and oil | 2,901 |
| Bait | 756 |
| Drug free testing | 60 |
| Permits | 35 |
| | |
| | |
| | |
| | |

| | | |
|---|---|---|
| 48 | Total other expenses  Enter here and on page 1, line 27 | 48 | 3,752 |

Schedule C (Form 1040) 2009

Case 2:10-md-02179-CJB-DPC   Document 12350   Filed 02/12/14   Page 57 of 74

To    Page 4 of 5    Case 2:10-cv-07777-CJB-SS   Document 101-1   Filed 08/31/12   Page 15 of 30
2012-08-24 15:39:02 (GMT)    18662617776  From: Lee Buxton

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

# Profit or Loss From Business
(Sole Proprietorship)

▶ Partnerships, joint ventures, etc., generally must file Form 1065 or 1065-B,
▶ Attach to Form 1040, 1040NR, or 1041.   ▶ See instructions for Schedule C (Form 1040).

OMB No. 1545-0074

**2010**

Attachment
Sequence No. **09**

Name of proprietor: Hunter T. Armour

Social security number (SSN)

A  Principal business or profession, including product or service (see instructions)
Inland fishing guide

B  Enter code from pages C-9, 10, & 11
▶  114110

C  Business name. If no separate business name, leave blank.
Hunter T. Armour

D  Employer ID number (EIN), if any

E  Business address (including suite or room no.)  ▶
City, town or post office, state, and ZIP code

F  Accounting method   (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify)  ▶

G  Did you "materially participate" in the operation of this business during 2010? If "No," see instructions for limit on losses   [X] Yes   [ ] No

H  If you started or acquired this business during 2010, check here   ▶ [ ]

## Part I  Income

| | | | |
|---|---|--:|--:|
| 1 | Gross receipts or sales. Caution. See instructions and check the box if: | | |
| | • This income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, or | | |
| | • You are a member of a qualified joint venture reporting only rental real estate income not subject to self-employment tax. Also see instructions for limit on losses. ▶ [ ] | 1 | 12,875 |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 12,875 |
| 4 | Cost of goods sold (from line 42 on page 2) | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 | 5 | 12,875 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | 6 | |
| 7 | Gross income. Add lines 5 and 6 | 7 | 12,875 |

## Part II  Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | | |
|---|---|--:|--:|---|---|--:|--:|
| 8 | Advertising | 8 | 75 | 18 | Office expense | 18 | |
| 9 | Car and truck expenses (see instructions) | 9 | 450 | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | | a | Vehicles, machinery, and equipment | 20a | |
| 12 | Depletion | 12 | | b | Other business property | 20b | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 21 | Repairs and maintenance | 21 | |
| | | | | 22 | Supplies (not included in Part III) | 22 | 117 |
| | | | | 23 | Taxes and licenses | 23 | 349 |
| 14 | Employee benefit programs (other than on line 19) | 14 | | 24 | Travel, meals, and entertainment: | | |
| | | | | a | Travel | 24a | |
| 15 | Insurance (other than health) | 15 | 604 | b | Deductible meals and entertainment (see instructions) | 24b | |
| 16 | Interest: | | | 25 | Utilities | 25 | |
| a | Mortgage (paid to banks etc.) | 16a | | 26 | Wages (less employment credits) | 26 | |
| b | Other | 16b | | 27 | Other expenses (from line 48 on page 2) | 27 | 2,733 |
| 17 | Legal and professional services | 17 | 200 | | | | |

| | | | |
|---|---|--:|--:|
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27 ▶ | 28 | 4,528 |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 | 29 | 8,347 |
| 30 | Expenses for business use of your home. Attach Form 8829 | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (if you checked the box on line 1, see instructions). Estates and trusts, enter on Form 1041, line 3. | 31 | 8,347 |
| | • If a loss, you must go to line 32. | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | • If you checked 32a, enter the loss on both Form 1040, line 12, and Schedule SE, line 2, or on Form 1040NR, line 13 (if you checked the box on line 1, see the line 31 instructions). Estates and trusts, enter on Form 1041, line 3. | 32a [ ] All investment is at risk. | |
| | • If you checked 32b, you must attach Form 6198. Your loss may be limited. | 32b [ ] Some investment is not at risk. | |

For Paperwork Reduction Act Notice, see your tax return instructions.
(HTA)

Schedule C (Form 1040) 2010

**EXHIBIT**
9

Case 2:10-md-02179-CJB-DPC   Document 12350   Filed 02/12/14   Page 58 of 74
Case 2:10-cv-07777-CJB-SS   Document 101-1   Filed 08/31/12   Page 16 of 30

To:   Page 5 of 5                    2012-08-24 15:39:02 (GMT)          18662617776  From: Lee Buxton

Schedule C (Form 1040) 2010          Hunter T. Armour                               Page 2

| Part III | Cost of Goods Sold (see instructions) |
|---|---|

**33** Method(s) used to
value closing inventory:   a ☐ Cost   b ☐ Lower of cost or market   c ☐ Other (attach explanation)

**34** Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If "Yes," attach explanation                                                           ☐ Yes   ☐ No

| | | | |
|---|---|---:|---|
| 35 | Inventory at beginning of year. If different from last year's closing inventory, attach explanation . . . | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use . . . . . . . . . . . . . . | 36 | |
| 37 | Cost of labor. Do not include any amounts paid to yourself . . . . . . . . . . . . | 37 | |
| 38 | Materials and supplies . . . . . . . . . . . . . . . . . . . . . . . . . | 38 | |
| 39 | Other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | |
| 40 | Add lines 35 through 39 . . . . . . . . . . . . . . . . . . . . . . . . | 40 | 0 |
| 41 | Inventory at end of year . . . . . . . . . . . . . . . . . . . . . . . . | 41 | |
| 42 | Cost of goods sold. Subtract line 41 from line 40. Enter the result here and on page 1, line 4 | 42 | 0 |

| Part IV | Information on Your Vehicle. Complete this part **only** if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file Form 4562. |
|---|---|

**43** When did you place your vehicle in service for business purposes? (month, day, year)   ►   3/6/2001 . . . . . .

**44** Of the total number of miles you drove your vehicle during 2010  enter the number of miles you used your vehicle for:

  **a** Business . . . . . . . . . 900  **b** Commuting (see instructions) . . . . . . . . . . . . . . . . .  **c** Other . . . . . . . . 11,100

**45** Was your vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . ☒ Yes   ☐ No

**46** Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . ☒ Yes   ☐ No

**47 a** Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . ☒ Yes   ☐ No

  **b** If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes   ☐ No

| Part V | Other Expenses. List below business expenses not included on lines 8–26 or line 30. |
|---|---|

| | |
|---|---:|
| Gasoline and oil | 2,121 |
| Bait | 552 |
| Drug free testing | 60 |
| | |
| | |
| | |
| | |
| | |
| | |
| 48 Total other expenses. Enter here and on page 1, line 27 . . . . . . . . . . . . 48 | 2,733 |

Schedule C (Form 1040) 2010

**JANET HOLLEY, CFC**
ESCAMBIA COUNTY TAX COLLECTOR   **2010 Real Estate**   NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | ESCROW CD | ASSESSED VALUE | MILLAGE CODE | PROPERTY REFERENCE NUMBER |
|---|---|---|---|---|
| 10-4494-000 | 162 | See Below | 06 | 263S32-1000-020-002 |

2010 Real Estate 0109287.0000

OFFICE
(850) 438-6500

6200 SIGUENZA DR
LT 20 BLK 2
SIGUENZA COVE PB 5 P 12
OR 2729 P 826

TTY
FOR THE
HEARING
IMPAIRED
(850) 472-0031

18mp - 08932E / 027630 1-64815 2B6109713
ARMOUR HUNTER T SR & JUDITH S
6200 SIGUENZA DR
PENSACOLA FL 32507-9627

### AD VALOREM TAXES

| TAXING AUTHORITY | MILLAGE RATE | ASSESSED VALUE | EXEMPTION AMOUNT | TAXABLE AMOUNT | TAXES LEVIED |
|---|---|---|---|---|---|
| COUNTY | 6.9755 | 144,682 | 50,000 | 94,682 | 660.45 |
| PUBLIC SCHOOLS | | | | | |
| By Local Board | 2.2290 | 144,682 | 25,000 | 119,682 | 266.77 |
| By State Law | 5.6310 | 144,682 | 25,000 | 119,682 | 673.93 |
| SHERIFF | 0.6850 | 144,682 | 50,000 | 94,682 | 64.86 |
| WATER MANAGEMENT | 0.0450 | 144,682 | 50,000 | 94,682 | 4.26 |

**Do Not Pay.  Your mortgage company has requested your bill.**

RETAIN THIS
PORTION
FOR
YOUR
RECORDS

ESCAMBIA COUNTY TAX COLLECTOR • P.O. BOX 1312 • PENSACOLA, FL 32591-1312

| | TOTAL MILLAGE | 15.5655 | AD VALOREM TAXES | 1670.27 |
|---|---|---|---|---|

### NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | RATE | AMOUNT |
|---|---|---|
| FIRE | | 75.00 |

PLEASE
PAY ONLY
ONE
AMOUNT
SHOWN IN
YELLOW
SHADED
AREA

QUESTIONS ON ITEMS IN THIS SECTION ONLY CALL (850) 595-4960

| | NON-AD VALOREM ASSESSMENTS | 75.00 |
|---|---|---|

| COMBINED TAXES AND ASSESSMENTS | 1745.27 | PAY ONLY ONE AMOUNT | See reverse side for important information |
|---|---|---|---|

AMOUNT
DUE
IF PAID
BY

| Nov 30 2010 | Dec 31 2010 | Jan 31 2011 | Feb 28 2011 | Mar 31 2011 | Apr 30 2011 |
|---|---|---|---|---|---|
| $ 1675.46 | $ 1692.91 | $ 1710.36 | $ 1727.82 | $ 1745.27 | $ 1797.63 |

**JANET HOLLEY, CFC**
ESCAMBIA COUNTY TAX COLLECTOR   **2010 Real Estate**   NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | ESCROW CD | ASSESSED VALUE | MILLAGE CODE | PROPERTY REFERENCE NUMBER |
|---|---|---|---|---|
| 10-4494-000 | 162 | See Above | 06 | 263S32-1000-020-002 |

2010 Real Estate 0109287.0000

6200 SIGUENZA DR
LT 20 BLK 2
SIGUENZA COVE PB 5 P 12
OR 2729 P 826

ARMOUR HUNTER T SR & JUDITH S
6200 SIGUENZA DR
PENSACOLA FL 32507-9627

**EXHIBIT**

tabbies

9

AMOUNT
DUE IF
PAID BY

PAY IN U.S. FUNDS TO ESCAMBIA COUNTY TAX COLLECTOR • P.O. BOX 1312 • PENSACOLA, FL 32591-1312     (850) 438-6500

RETURN WITH
PAYMENT

| Nov 30 2010 | Dec 31 2010 | Jan 31 2011 | Feb 28 2011 | Mar 31 2011 | Apr 30 2011 |
|---|---|---|---|---|---|
| $ 1675.46 | $ 1692.91 | $ 1710.36 | $ 1727.82 | $ 1745.27 | $ 1797.63 |

Property Ref No: 28-3S-32-1000-020-002

Location: 6200 SIGUENZA DR
LT 20 BLK 2
SIGUENZA COVE PB 5 P 12
OR 2729 P 826

The taxing authorities which levy property taxes against your property will soon hold PUBLIC HEARINGS to adopt budgets and tax rates for the next year.

The purpose of these PUBLIC HEARINGS is to receive opinions from the general public and to answer questions on the proposed tax change and budget PRIOR TO TAKING FINAL ACTION.

Each taxing authority may AMEND OR ALTER its proposals at the hearing.

S - 0029145 / 0073094 JKG113035
ARMOUR HUNTER T SR & JUDITH S
6200 SIGUENZA DR
PENSACOLA FL 32507-9627

## TAXING AUTHORITY TAX INFORMATION

| REAL ESTATE | LAST YEAR'S TAXABLE VALUE (2009) | YOUR FINAL TAX RATE AND TAXES LAST YEAR (2009) | | CURRENT TAXABLE VALUE (2010) | YOUR TAX RATE AND TAXES THIS YEAR IF NO BUDGET CHANGE IS MADE (2010) | | YOUR TAX RATE AND TAXES THIS YEAR IF PROPOSED BUDGET CHANGE IS MADE (2010) | |
|---|---|---|---|---|---|---|---|---|
| Taxing Authority | COLUMN 1 | COLUMN 2 | | COLUMN 3 | COLUMN 4 | | COLUMN 5 | |
| | | MILLAGE RATE | TAXES | | MILLAGE RATE | TAXES | MILLAGE RATE | TAXES |
| COUNTY | $90,879 | 6.975500 | $633.93 | $94,682 | 7.370600 | $697.86 | 6.975500 | $660.45 |
| SCHOOL BY STATE LAW | $115,879 | 5.612000 | $650.31 | $119,682 | 5.903200 | $706.51 | 5.631000 | $673.93 |
| SCHOOL BY LOCAL BOARD | $115,879 | 2.248000 | $260.50 | $119,682 | 2.364600 | $283.00 | 2.229000 | $266.77 |
| SHERIFF | $90,879 | 0.685000 | $62.25 | $94,682 | 0.726700 | $68.81 | 0.685000 | $64.86 |
| WATER MANAGEMENT | $90,879 | 0.045000 | $4.09 | $94,682 | 0.049200 | $4.66 | 0.045000 | $4.26 |
| TOTAL AD VALOREM PROPERTY TAXES | | | $1,611.08 | | | $1,760.84 | | $1,670.27 |

## PROPERTY APPRAISER VALUE INFORMATION

| | COUNTY | | PUBLIC SCHOOLS | | MUNICIPAL | | OTHER DISTRICTS | |
|---|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2009 | 2010 | 2009 | 2010 | 2009 | 2010 |
| MARKET VALUE | | | | | | | $390,950 | $290,494 |
| LESS APPLIED ASSESSMENT REDUCTIONS | | | | | | | | |
| Save Our Homes Cap | $250,071 | $145,812 | $250,071 | $145,812 | $0 | $0 | $250,071 | $145,812 |
| Non-Homestead Cap | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Agricultural Classification | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ASSESSED VALUE | $140,879 | $144,682 | $140,879 | $144,682 | $0 | $0 | $140,879 | $144,682 |
| LESS EXEMPTIONS | | | | | | | | |
| First Homestead | $50,000 | $50,000 | $25,000 | $25,000 | $0 | $0 | $50,000 | $50,000 |
| Add'l Homestead | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Senior Exemption | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Combat Veteran's | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Exemptions | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TAXABLE VALUE | $90,879 | $94,682 | $115,879 | $119,682 | $0 | $0 | $90,879 | $94,682 |

Who to contact if you have questions regarding this notice:

# SEPARATOR

# SHEET

## NEW DOUCMENT
## TO FOLLOW

**Form W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
## Identification Number and Certification

Give Form to the requester. Do not send to the IRS.

See Specific Instructions on page 2. | Print or type

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
- [ ] Individual/sole proprietor
- [ ] C Corporation
- [ ] S Corporation
- [ ] Partnership
- [ ] Trust/estate

- [ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

- [ ] Other (see instructions) ▶

- [ ] Exempt payee

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
[ ][ ][ ] - [ ][ ] - [ ][ ][ ][ ]

Employer identification number
[ ][ ] - [ ][ ][ ][ ][ ][ ]

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign Here | Signature of U.S. person ▶                          Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 12-2011)

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT COASTAL REAL PROPERTY CLAIM FORM (GREEN FORM)

Form ID: GREEN



HUNTER ARMOUR
6200 SIGUENZA DR
PENSACOLA, FL 32507

---

After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

---



EXHIBIT

10

# THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT COASTAL REAL PROPERTY CLAIM FORM (GREEN FORM)

To make a **Coastal Real Property Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Coastal Real Property Claim** is for individuals or businesses who prove that they owned or leased Residential Parcels, Commercial Parcels, Deeded Boat Slips or other types of Parcels, with an eligible County Land Use Designation and located within the Coastal Real Property Claim Zone Map during the time period April 20, 2010, to December 31, 2010.  In addition to recovering an amount based on the location of the Parcel or Boat Slip and the period of legal possession of the Parcel or Deeded Boat Slip by each claimant, a claimant may recover additional damages upon proving that physical damage occurred to Real or Personal Property located on the Parcel or Deeded Boat Slip in connection with the Spill or as a result of Spill response cleanup operations that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or a delegate thereof, with the exception of any damage claimed for intrusion of oil, dispersant, or other substances on to the claimant's Parcel(s) or Deeded Boat Slip(s).

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Coastal Real Property Claim Form (Green Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of the Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form. The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along. Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person. Section 7 of the Coastal Real Property Instructions Booklet lists all the Claimant Assistance Centers.

Provide the following information about the Natural Person or business that is making this Coastal Real Property Claim.

| 1. **Name of Natural Person or Business:** | Last Name or Full Name of Business<br>ARMOUR | First Name<br>HUNTER | Middle Initial |
|---|---|---|---|

| 2. **Social Security Number:**<br>*or*<br>**Individual Taxpayer Identification Number:**<br>*or*<br>**Employer Identification Number:** | SSN or TIN<br>⬛ ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛⬛<br><br>EIN<br>\|_\|_\| - \|_\|_\|_\|_\|_\|_\| |
|---|---|

3. **Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program.  Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

☒ GCCF Claimant Number:

| 1 | 0 | 4 | 9 | 7 | 7 | 0 |

OR

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your Initial Registration Form with the Deepwater Horizon Settlement Program.  If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

☒ Deepwater Horizon Settlement Program Claimant Number:

| 1 | 0 | 0 | 0 | 8 | 4 | 3 | 6 | 0 |

If you do not yet have a Claimant Number, leave this question blank.

---

If you are making a Coastal Real Property Claim for more than one Parcel or Deeded Boat Slip, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission.  Make one copy for each additional Parcel or Deeded Boat Slip.

| 1. At any time between **April 20, 2010, and December 31, 2010, did you own or lease an Eligible Parcel or Deeded Boat Slip within the Coastal Real Property Claim Zone?** To determine if your Parcel or Deeded Boat Slip is an Eligible Parcel located in the Coastal Real Property Claim Zone, see Section 3 of the Coastal Real Property Instructions Booklet. | ☒Yes   ☐No |
|---|---|

If you checked "Yes" for Question 1, continue.

If you checked "No" for Question 1, stop filling out this Claim Form.  If you disagree with the Coastal Real Property Claim Zone Map and think your Parcel or Deeded Boat Slip should be included as an Eligible Parcel or Deeded Boat Slip on the map, you may challenge the eligibility designation of your Parcel or Deeded Boat Slip.  To challenge the eligibility designation, detach and fill out the two-page Coastal Real Property Parcel Eligibility Challenge Form attached to the end of this Claim Form and submit it with the required documentation to support your challenge.

| 2. Identify the type of Property for which you are making your Coastal Real Property Claim. | ☒Residential/Commercial/Other Parcel<br>☐Deeded Boat Slip |
|---|---|

| 3. Provide the address of the Parcel or Deeded Boat Slip: | |
|---|---|

| Street 6200 SIGUENZA DR | | Unit |
|---|---|---|

| City PENSACOLA | State FL | Zip Code 32507 |
|---|---|---|

| Parish/County Escambia |
|---|

| Other Description: |
|---|

| 4. Provide the tax assessment identification number for your Parcel or Deeded Boat Slip: | 263S32-1000-020-002 |
|---|---|
| 5. Provide the Parcel identification number: | 2729 P 826 |
| 6. Are you making this claim as the owner of the Parcel or Deeded Boat Slip?<br>If you checked "No," go to Question 13. | ☒ Yes      ☐ No |

Case 2:10-cv-02771-CJB-SS Document 101-1 Filed 08/31/12 Page 24 of 30

| 7. | If you checked "Yes" for Question 6, provide the dates when you owned the Parcel or Deeded Boat Slip: | 07/12/1989 to: //<br>(Month/Day/Year) (Month/Day/Year)<br>☒ Check here if you currently own the Parcel or Deeded Boat Slip |
|---|---|---|
| 8. | If you are the owner of the Parcel or Deeded Boat Slip, did you lease the Parcel or Deeded Boat Slip to another party at any time between April 20, 2010, and December 31, 2010? | ☐ Yes          ☒ No |
| 9. | If you own(ed) the Parcel or Deeded Boat Slip, did you own it with another person other than your spouse? | ☐ Yes          ☒ No |
| 10. | If you checked "Yes" for Question 9, provide: | |
| (a) | Your percentage of ownership: | ____% |
| (b) | The full name(s) and ownership percentage of all other co-owners of the Parcel or Deeded Boat Slip, to the best of your ability: | |
| 11. | Did ownership of the Parcel or Deeded Boat Slip change during the period April 20, 2010, to December 31, 2010? | ☐ Yes          ☒ No<br>If "Yes," provide the sale or transfer date:<br><br>//<br>(Month/Day/Year) |
| 12. | If you checked "Yes" for Question 11, list all other known owners for the time period April 20, 2010, to December 31, 2010, to the best of your ability. | |
| 13. | Are you making this claim as the lessee of the Parcel or Deeded Boat Slip? | ☐ Yes          ☒ No |
| 14. | If you checked "Yes" for Question 13, provide the dates when you leased the Parcel or Deeded Boat Slip: | // to: //<br>(Month/Day/Year) (Month/Day/Year)<br>☐ Check here if you currently lease the Parcel or Deeded Boat Slip |
| 15. | Are you claiming that physical damage occurred to Real or Personal Property on your Parcel or Deeded Boat Slip as a result of the Spill or Spill response cleanup operations? Refer to Section 2 of the Coastal Real Property Instructions Booklet for examples of physical damage. If you are claiming that your Vessel/Boat was damaged by the Spill or cleanup response operations, check "No" and submit a Vessel Physical Damage Claim Form (Black Form). | ☒ Yes          ☐ No |

If you checked "Yes" for Question 15, continue.

If you checked "No" for Question 15, go to Section C.

| | (a) | Was the physical damage to your Real or Personal Property caused by the Spill or Spill response cleanup operations, including Vessels of Opportunity ("VoO")? | ☒ Spill<br><br>☐ Spill Response Cleanup Operations |
|---|---|---|---|

**(b)** If the physical damage to your Real or Personal Property was caused by Spill response cleanup operations, were those operations consistent with the National Contingency Plan, which can include VoO or operations specifically ordered by the Federal On-Scene Coordinator (FOSC) or his or her delegate?

☐ Yes   ☐ No   ☐ Do not Know

| 16. | Did you own the Real or Personal Property located on the Parcel or Deeded Boat Slip at the time it was physically damaged? | ☒ Yes | ☐ No |
|---|---|---|---|

If you answer "Yes" to Question 16, continue.

If you checked "No" for Question 16, go to Section C.

**17.** To the best of your ability, provide the following information about the Real or Personal Property that was physically damaged:

   **(a)**  the type of Real or Personal Property that was physically damaged;
   **(b)**  if Personal Property was physically damaged, the location of the Personal Property on your Parcel when the damage occurred;
   **(c)**  if Real Property was physically damaged, the location of the damage on the Parcel;
   **(d)**  a description of the physical damage to your Real or Personal Property;
   **(e)**  how the physical damage occurred; and
   **(f)**  what or who caused the physical damage.

   The portion of the property that is directly adjacent to the water as is described in this claim form received physical damage from oil washing up from the intercoastal waterway. ( See attached photos in claim file ). This occurrence was also reported to the D.E.P. on 07/03/2010. The phone call to the D.E.P. was taken by D.E.P. employee Danille

**18.** For any Real or Personal Property listed in Question 17, describe the condition of your Real or Personal Property before the physical damage occurred.

   The property was pristine water front property.

| 19. | Did you repair the physically damaged Real or Personal Property? | ☒ Yes | ☐ No |
|---|---|---|---|

If you checked "Yes" for Question 19, provide:

   **(a)**  the name, address, and telephone number of the individual or business that repaired your damaged Real or Personal Property;

   I cleaned up the property myself.

   **(b)**  the cost to repair your damaged Real or Personal Property; and

   **(c)**  a description of the repairs made to your Real or Personal Property.

   Physically removed oil from my property that was adjacent to the water. This constituted about 8-10 hours labor on my part.

| 20. | Did you replace the physically damaged Real or Personal Property? | ☐ Yes | ☒ No |
|---|---|---|---|

**If you checked "Yes" for Question 20:**

(a) Explain why the physically damaged Real or Personal Property had to be replaced, rather than repaired:

(b) Provide:

(1) the name, address and telephone number of the individual or business from which you obtained the replacement Real or Personal Property;

(2) the cost of the replacement Real or Personal Property;

(3) the date when the replacement was made; and

(4) a description of the replacement Real or Personal Property.

If you checked "Yes" for either Question 19 or 20, go to Section C. If you checked "No" for *both* Questions 19 and 20, continue.

| 21. Do you plan to repair the physically damaged Real or Personal Property? | ☐ Yes | ☒ No |
|---|---|---|

**If you checked "Yes" for Question 21, provide:**

(a) the name, address, and telephone number of the individual or business that has provided the estimate for future repairs;

(b) the estimate of the future cost to repair; and

(c) a description of the planned repairs.

| 22. Do you plan to replace the physically damaged Real or Personal Property? | ☐ Yes | ☒ No |
|---|---|---|

**If you checked "Yes" for Question 22:**

(a) Explain why your physically damaged Real or Personal Property has to be replaced, rather than repaired:

(b) Provide:

(1) the name, address and telephone number of the individual or business from which you plan to obtain the replacement Real or Personal Property;

(2) the estimated cost of the replacement Real or Personal Property; and

(3)   a description of the replacement Real or Personal Property.

**Check the box(es) below that apply to you for your Parcel or Deeded Boat Slip and provide the necessary information.**

☒     **1. I owned the Parcel or Deeded Boat Slip between April 20, 2010, and December 31, 2010, and (check only one box):**

     ☐     (a)  I did not lease my Parcel or Deeded Boat Slip to anyone for more than 60 days.

     ☐     (b)  I leased my Parcel or Deeded Boat Slip to someone for more than 60 days. (Provide the lessee information below.)

☐     **2. I leased the Parcel or Deeded Boat Slip from someone for at least 60 days between April 20, 2010, and December 31, 2010.**

     If you checked box 1(b) or (2), provide the following:

| | Name of Lessee(s)/Owner(s) | Dates of Lease |
|---|---|---|
| | | |

By signing this Claim Form, I declare and affirm under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct.

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Coastal Real Property Claim.  The list of required documents, and instructions for how to submit them, are in Section 4 of the Coastal Real Property Instructions Booklet.  If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

Nothing in the Settlement's **Compensation Framework for Coastal Real Property Claims** shall alter, expand, or reduce BP's obligations for cleanup, removal, spill response and remediation of real property under applicable federal, state, or local laws, regulations, orders, or agreements. By signing this Claim Form, I acknowledge that any right to require any cleanup or remediation of the parcel shall not lie with me, but solely with governmental authorities, and that the need for any cleanup or remediation, and the standards by which the need for or sufficiency of such remediation is decided, shall be determined by governmental regulators of the executive department in accordance with properly promulgated law, rules, regulations, orders or agreements. Such governmental regulators alone shall make such determinations, and I agree not to employ regulatory proceedings as a means to seek the redress of claims, which are extinguished pursuant to this Settlement. It is expressly agreed that this acknowledgement of continued potential responsibility for governmental compliance on the part of the BP (and all other parties released) shall not grant me any personal jurisdiction recourse with respect to the regulatory obligations of the released parties. In the event proceedings, formal or informal, occur before governmental authorities, I agree to cooperate fully with the released parties in addressing questions or concerns presented by such proceedings; I agree to provide full and free access to the Eligible Parcel in connection therewith, and will further cooperate with the released parties in undertaking and proposing by the released parties such remediation that the released parties deem most appropriate, desirable, and/or cost-effective in meeting regulatory requirements, irrespective of any personal claims, preferences, rights of use or similar considerations by me, it being understood that such personal claims and considerations fall within the scope of the claims released by me under the Settlement.

1. **If You Have Your Own Attorney.** Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

   ☐ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2. **If You Do Not Have Your Own Attorney.** If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check.  Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim.  **You have an obligation to notify the Claims Administrator if your address changes.**

   The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made. The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you. You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3. **Garnishments, Liens, and other Attachments.**  Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4. **W-9 Form Requirement.** All claimants must provide a W-9 Form.  To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| Signature: | /S/ Hunter T. Armour | Date: | 8/20/2012 (Month/Day/Year) |
|---|---|---|---|

The claimant must sign this Claim Form personally.  No one can sign on behalf of the claimant unless the claimant is a business or is deceased, a Minor, or Incompetent. If the claimant is a business, an authorized business representative may sign. If the claimant is deceased, a Minor, or Incompetent, an authorized Representative may sign.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| | Section: J |
| This filing relates to:<br>    *Cases in Pleading Bundle B1, and VoO*<br>    *Charter Dispute Cases* | Honorable Carl J. Barbier |
| | Magistrate Judge Shushan |
| *Bon Secour Fisheries, Inc., et al. v.*<br>*BP Exploration and Production, Inc., et al.,* | Date:      November 8, 2012<br>Time:      8:30 a.m.<br>Courtroom:  C268 |
|     Civil Action No. 12-970 | |
| Objections to Economic and Property Damages Settlement Agreement, | |
|     Civil Action No. 10-7777 | |

**Declaration in support of Objections to the Economic and Property
Damages Settlement Agreement by Objector Judith S. Armour**

Now comes Judith S. Armour, and states the following under oath and under penalty of perjury in support of her objection.

1. My name is Judith S. Armour. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

2. My GCCF Claimant Number is 1049770.

3. My address is 6200 Siquenza Drive, Pensacola, Florida 32507.

4. Along with my husband, Hunter T. Armour, I co-owned the waterfront property at 6200 Siguenza Drive at the time of the Deepwater Horizon spill. A true and correct copy of my property taxes for 2010 is attached to Hunter's declaration as Exhibit 9.

5. We suffered coastal property damage because of the Deepwater Horizon spill from oil washing up from the intercoastal waterway. A true and correct copy of my Green Form is attached to Hunter's declaration as Exhibit 10.

6. On information and belief, my property is wetland property.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on August 31, 2012, in Pensacola , Fl .

Judith S. Armour

1