UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| Civ. No. 10-4536 | : | MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES' MOTION *IN LIMINE* TO PERMIT RELEVANT EVIDENCE CONCERNING BP P.L.C. AND OTHER BP AFFILIATES**

For the reasons set forth in this Motion *in Limine*, the United States requests a ruling that the Court will consider the actions and finances of BP Exploration and Production, Inc.'s ("BPXP's") corporate affiliates when evaluating each of the penalty factors, not just the "mitigation" factor. A ruling at this juncture will help streamline discovery and trial, as explained in the United States' brief on Case Management. It also will enable the Court to arrive at a civil penalty that justly punishes and deters future behavior.

BP[1] takes inconsistent positions on the relevance of the actions and finances of BP p.l.c. and its affiliates, depending solely on whether it suits its interests. Thus, in Phase I and Phase II, it glossed over any corporate forms and referred consistently to only the actions of "BP." BP has indicated it seeks to present evidence of BP's response actions, or efforts to mitigate the spill pursuant to one of the statutory penalty factors in Section 311(b)(8), even though those actions were not taken by BPXP, the liable party in this proceeding. But, BP contends that the scope and consideration of other statutory penalty factors should be limited to BPXP – specifically when

---

[1] BP means the BP Group which BP defines as "BP p.l.c. and its subsidiaries." Ex. #1 (BP Annual Report at 3, TREX-06033).

1

that limitation benefits BP, for example, as in the penalty factors "any history of prior violations" and "the economic impact of the penalty on the violator."

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████[2] BP operates BP p.l.c. and its subsidiaries as a group enterprise acting through business segments and strategic performance units ("SPUs"), of which BPXP plays only a small part. Thus it is not surprising that many BP Group entities were involved in the Macondo well both before and after the blowout and explosion on April 20, 2010. Consistent with how BP as a corporate group functions, the record in Phase I and Phase II does not distinguish the actions of BPXP, as opposed to any other BP corporate entity, even with respect to the Macondo well. Thus, for many of the penalty factors, such as culpability and seriousness, consideration cannot be limited to the conduct of BPXP. BP should not be allowed to engage in such inconsistent and self-serving use of the corporate structure.

The United States asks this Court to take into consideration the BP corporate family (BP p.l.c. and its affiliates) in fixing the civil penalty.[3] That is precisely what Judge Vance did in evaluating BP's criminal plea. *See* Ex. 69 (*United States v. BP Exploration and Production, Inc.*, No. 12-292, Reasons for Accepting Plea Agreement, Jan. 30, 2013, at 5-6). Rec. Doc. 65. To be clear, the United States does not at this time seek a ruling that any specific evidence should be admitted at trial, but rather, that evidence will not be excluded solely because it relates

---

[2] *See* Ex. 2 (Hayward Dep. 561:18-562:8).

[3] BP's own agreements acknowledge the use of affiliates to conduct operations at the well. "Affiliates" include any "corporation, company, limited liability company, partnership, or other legal entity that . . . (c) owns or controls a Party, or (d) is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party." *See* Ex. 3 (Macondo Operating Agreement, at 2, 20, Ex. 03457).

to another BP entity. Evidence would continue to be weighed under Rule 403 for undue delay or wasting of time, at an appropriate time and when the evidence is before it.[4]

## FACTUAL BACKGROUND

**A. BP Has Operated as an Integrated Group of Business Segments and Strategic Performance Units, Including BPXP**

While BPXP was the lease holder and registered operator with the Minerals Management Service ("MMS") for the Macondo Well, in actuality multiple BP entities were involved in the drilling and operation of the well. To consider only BPXP is to create a legal fiction for the purposes of assessing a penalty which is in direct conflict with the evidence. For example, BP Corporation North America Inc. was registered with MMS as the Areawide Guarantor for BPXP.[5] BP America Production Company ("BPAP") was the party that entered the drilling contract with Transocean for the Deepwater Horizon to drill the Macondo Well.[6] While the contract was with BPAP, the Deepwater Horizon was used not only to drill wells operated by BPXP, but BP America Inc. as well.[7] Further, it was BP America, Inc., and not BPXP that submitted the Oil Spill Response Plan relied upon in the Macondo well permit.[8] As explained below, employees of multiple BP entities, including BP p.l.c., were involved in decision-making regarding the Macondo well. ████████████████████████████████████████
████████████████████████

---

[4] The United States reserves its rights to makes any necessary arguments with respect to Anadarko, who has not yet advanced a position on this subject.

[5] *See* Ex. 4 (BP Answer Louisiana ¶38, Rec. Doc. 4907).

[6] *See* Ex. 5 (Stipulations No. 98, Rec. Doc. 5927).

[7] For example, the Deepwater Horizon was under pressure to get to the Nile well, which was operated not by BPXP but by BP America, Inc. See Ex. 6 (BP-HZN-2179MDL00246420); Ex. 7 (O'Bryan TR 9294:3-11); Ex. 8 (TREX 119E); Ex. 9 (TREX 20001 p.71).

[8] *See* Ex. 10 (TREX 768 p. 7-1).



Although BPXP is the lessee and operator, BP's SPU for the Gulf of Mexico functionally drilled and operated the Macondo well.

1. BP p.l.c. and its Affiliates Have Directed and Controlled BPXP

That multiple entities were involved in the well is unsurprising as BP is organized globally, by function, into business segments and SPUs.[10] BP p.l.c. is included within, sets standards for, and provides management for the "BP Group" – which describes the entirety of BP's operations.[11] "BP" or "BP Group" is defined by the company as "BP p.l.c. and its subsidiaries" which are entities "controlled by the BP Group" including "the power to govern the financial and operating policies" of the subsidiaries.[12]

While BP has a relatively large number of subsidiaries,[13] its operations are driven by a comparatively simple parallel structure of two business segments that are further divided into SPUs for actually operating these assets, the Upstream Segment (formerly Exploration and Production) and the Downstream Segment.[14] The operation of these business units is

---

[9] Ex. 11 (October 24, 2012 BP Response to EPA p. 39).

[10] *See* Ex. 12 (McKay TR 537:16-22).

[11] *See* Ex. 13 (Armstrong Dep. 25:18-27:22).

[12] *See* Ex. 1 (BP Annual Report for 2010 at 3, TREX 06033); Ex. 2 (Hayward Dep. 864:11-866:1).

[13] *See* Ex. 14 (BP Annual Report for 2012, at 255); At the time of the Macondo blowout, BP p.l.c. owned BP Holdings North America, which owned BP America Inc., which owned BP Corporation North America Inc., which owned BP Company North America Inc., which owned BP America Production Company, which owned BPXP. Thus, BP p.l.c. and the other listed corporations are affiliates of BPXP. Ex. 15 (Jan. 2, 2014 Letter).

[14] The Upstream segment (formally known as Exploration and Production "E&P") is responsible for oil and natural gas exploration, field development and production, midstream transportation, storage and

demonstrated by the involvement in the Macondo well of Andy Inglis, the Chief Executive of BP's global Exploration and Production business segment. At the time of the explosion, Mr. Inglis was an executive member of the BP p.l.c. board, a member of the Group Operations Risk Committee ("GORC"), an employee of BP p.l.c., and was directly involved in the management and operation of BPXP.[15] Mr. Inglis made decisions affecting the Macondo well including signing off on contracts regarding the Deepwater Horizon rig and on financial decisions regarding the well.[16] His involvement in this process meant he was directly informed of and responsible for key risks associated with drilling the well. Indeed, even during drilling operations Mr. Inglis was aware of risks that were occurring.[17]

That BP operated through its business units is further demonstrated by the fact that BP's employees, including high level executives, could not identify their precise corporate employer. Doug Suttles was the Chief Operating Officer ("COO") for the global BP Exploration and Production segment, and reported directly to Andy Inglis.[18] However, Mr. Suttles could not

---

processing. BPXP is part of the BP's Upstream segment. *See* Ex. 14 (BP Annual Report 2012, at 15, 18-19). The BP E&P Executive Office was run out of the United Kingdom, with a registered office for BP p.l.c. on St. James Square, in London, England. *See, e.g.* Ex. 16 (TREX 2248.1). Both E&P and the Gulf of Mexico SPU fall within and under the BP p.l.c. Board of Directors, with a "Direct reporting relationship" from Mr. Dupree, the Leader of the GoM SPU, to Mr. Inglis, the CEO of E&P, to Tony Hayward, the CEO of p.l.c., to the p.l.c Board of Directors, to the Safety, Ethics and Environment Assurance Committee (SEEAC). *See* Ex. 17 (TREX 2557).

[15] *See* Ex. 18 (BP Annual Reports 2009 (at 65-92)); Ex. 19 (TREX 7203). Mr. Inglis conducted weekly meetings with the senior executive management teams of BP's exploration and production business and issued orders to all Exploration and Production subsidiaries, including BPXP. *See* Ex. 20 (Inglis Dep. 580:2-11). For example, in July 2009, Mr. Inglis ordered a "segment wide safety stand-down . . ." *See* Ex. 21 (TREX 6312, BP-HZN-2179MDL01854244).

[16] Mr. Inglis signed the financial memorandum authorizing the expenditure of $139.5 million to drill the well. That memorandum noted, that "[t]he subsurface and drilling risks include a narrow pore-pressure and fracture gradient window, stuck pipe, gas kick and shallow depletion. . .." *See* Ex. 22 (TREX 6327 at BP-HZN-2179MDL00131246); Ex. 23 (TREX 6318); Ex.24 (Ex. 6316).

[17] On April 6, two weeks before the blowout, Mr. Inglis was told that "[w]e are currently taking serious [mud] losses which is a concern." Ex. 20 (Inglis Dep. 580:2-24); Ex. 25 (TREX-06321 at 1).

[18] See Ex. 26 (Suttles Dep. 22:23-23:3, 547:10-19, 550:23-551:9).

name the specific legal entity in which his position as COO was held. *Id.* Confusing matters further, Mr. Suttles thought his paycheck came from BP North America Inc. *Id.* Similarly, Neil Shaw could not say what BP entity he was employed by- even when he was head of the Gulf of Mexico SPU.[19]

BP p.l.c. was further involved in drilling operations because it controlled and monitored operations, performance, risk management and safety for the entire BP Group.[20] Indeed, one of the key roles of the BP p.l.c. board was and continues to be to identify and manage risk from all of Group's operations.[21] At the time of the incident, the BP p.l.c. board of directors was composed of 19 members: 9 non-executive and 10 executive directors.[22] In contrast, in 2010, the BPXP board of directors was composed of only three members.[23] As Lamar McKay, the Chairman and President of BP America Inc., explained, BPXP "is a subsidiary company that holds the Gulf of Mexico assets. It legally holds the leases in the Gulf of Mexico . . . the

---

[19] See Ex. 27 (Shaw Dep. 187:9-188:11).

[20] BP's seven executive committees set policy, make decisions, and oversee the management of risks and performance. These committees include (1) the Executive Team Meeting ("ETM") to manage strategic and commercial risks; (2) the GORC to manage health, safety, security and environment and operations integrity risks; (3) the Group Financial Risk Committee ("GFRC") to manage finance and trading risks; (4) the Group Disclosure Committee ("GDC") for financial reporting risk; (5) the Group People Committee ("GPC") for people risks; (6) the Resource Commitments Meeting ("RCM") for risks related to investment decisions; and (7) the Group Ethics and Compliance Committee ("GECC") for ethics and compliance risks. *See* Ex. 1 (BP Annual Report for 2010 at 92-96); Ex. 14 (BP Annual Report for 2012 at 117-118). *See e.g.,* Ex. 28 (Bly TR 883:20-887:16, 893:5-894:22); Ex. 2 (Hayward Dep. 183:3-194:21, 664:4-666:23)); Ex. 17 (TREX-02557 BP Organizational Chart); Ex. 29 (D-2670 BP Organizational Chart); Ex. 30 (D-2672 SEEAC Organizational Chart); Ex. 31 (D-2674 Executive Management Organizational Chart); Ex. 32 (D-2675 GORC Organizational Chart).

[21] From 2008 through 2010, the BP p.l.c. board held numerous meetings and acted on various matters including reports from its SEEAC, whose role was to identify and mitigate significant non-financial risks. *See* Exs. 18, 1 (BP Annual Report for 2009, at 65-80; BP Annual Report for 2010, at 84-107). During that time, SEEAC considered a wide range of matters including safety at multiple and varying BP operations, and GORC acted on a wide variety of safety and environmental incidents, including those reported in the quarterly Orange Books which summarized major incidents throughout the BP Group. *See* Ex. 33 (TREX 03822).

[22] *See* Ex. 18 (BP Annual Report and Accounts 2009 at 66).

[23] *See* Ex. 34 (BPXP Annual Franchise Tax Report for 2010, filed with Delaware Secretary of State).

operating structure, the way you manage all the assets, is organized in businesses that don't perfectly match this legal entity structure. . . ."[24]

### 2. BP p.l.c. Managed and Funded the Response Action

The BP Group's involvement in the Macondo well continued after the blowout and explosion, since it directed, controlled, and funded the operation to stop the discharge of massive quantities of oil from the Macondo well. Immediately after the blowout, BP put Doug Suttles, the COO for BP's Exploration and Production segment, who reported directly to Mr. Inglis, in charge of the response.[25] On June 22, 2010, Tony Hayward, Chief Executive Officer for BP p.l.c., announced the formation of the Gulf Coast Restoration Organization ("GCRO") "to manage our long-term response to the Deepwater Horizon incident."[26] The GCRO was responsible for addressing "all aspects of the response, including executing our ongoing cleanup operations and all associated remediation activities; coordinating with government officials; keeping the public informed; and implementing the $20 billion Deepwater Horizon Oil Spill Trust established to meet certain of our financial obligations."[27] The BP Board of Directors also established a Gulf of Mexico Committee to oversee the work of the GCRO.[28]

BP p.l.c. and the BP Group also were the public face of BP after the explosion at Macondo. During its response to the incident and thereafter, BP p.l.c. repeatedly told the United States Congress, its investors, and the public that it would pay all legitimate claims, including

---

[24] *See* Ex. 12 (McKay TR 594:17-596:6).

[25] *See* Ex. 35 (Ex. 2410); Ex. 26 (Suttles Dep. 22:12-22); Mr. Suttles' text messages document his involvement in the response. *See* Ex. 36 (Suttles Text Messages, BP-HZN-2179MDL01453512-555).

[26] *See* Ex. 37 (Message from Tony Hayward, June 22, 2010, BP-HZN-2179MDL07721911-912).

[27] *See* Ex. 1 (BP Annual Report 2010 at 34).

[28] The Board monitored the company's work in containing the spill, received regular updates from BP management and was kept in daily contact as the company responded to the spill. *See* Ex. 38 (Gulf of Mexico Charter, July 9, 2010, BP-HZN-2179MDL02003229-30); Ex. 1 (BP Annual Report 2010 at 90, 101).

civil penalties resulting from the incident.[29] On June 17, 2010, then CEO Tony Hayward testified before Congress "I'm here today because I have a responsibility to the American people to do my best to explain what B.P. has done, is doing and will do in the future to response to this terrible accident. …"[30] Nowhere in his lengthy testimony did Hayward mention BPXP.

B. **BP Has Consistently Treated the BP Group as One Entity in This Litigation**

Mention of the entity "BPXP" is remarkably absent from the Phase I and Phase II trial and discovery.[31] Rather, BP consistently referred solely to "BP" throughout trial, without distinguishing entities.[32]

In its post-trial briefings BP is similarly opaque as to which BP entity is involved. For example, in its findings of fact, BPXP and BPAP are separately defined and then they are defined collectively as "BP."[33] BP, however, continues on to use the term "BP" to include BP p.l.c. and other BP affiliates so that it can take credit for any safety reforms and improvements performed within the entire company, and also for the Bly investigation. Claiming that "BP promptly investigated and accurately reported on the causes of the accident," BP points to Mark

---

[29] *See* Ex. 39 (Ex. 7369 BP-HZN-2179MDL01787719-21).

[30] *See* Ex. 40 (Ex. 6001, June 17, 2010 Verbatim Transcript, p. 26).

[31] In fact, an electronic search of the trial transcript for Phase I reveals that "BPXP" was mentioned only a few times. The United States found only four references to BPXP in Phase I testimony: (1) the Deputy Clerk read the case captions into the record; (2) Plaintiffs' counsel asked Mr. McKay whether he was CEO of BPXP and he responded no; (3) Counsel asked Mr. McKay whether the criminal plea agreement was entered by BPXP, and he confirmed it was; and (4) Counsel identified the contract for Gulf of Mexico SPU offshore well services was between BPXP and Halliburton Energy Services. Ex. 41 (Phase 1 TR 10:13-18, 594:20-596:6, 600:11-14, 1433:18-23).

[32] For example, when discussing actions by John Guide, the well site leader, and Tony Hayward, the CEO of BP p.l.c., both are touted as actions on behalf of "BP." This blurring of corporate lines held true throughout BP's questioning of Dr. Bea, even when discussing the Six Point Plan, and actions by BP p.l.c. board committees GORC and SEEAC. *See* Ex. 42 (Bea TR. 368-391, 415-421, 440-443, 476-478). In fact, employees repeatedly testified they worked for "BP". *See* Ex. 43 (Sepulveda TR 1958:16-1959:10); Ex. 44 (Guide TR 8574:14-17); From Phase II: Ex. 45 (Dupree TR 579:6-25); Ex.46 (Ballard TR 909:15-910:3); Ex. 47 (Mazzella TR 734:11-20).

[33] *See* Ex. 48 (BP's Proposed Findings of Fact and Legal Conclusions "BP Proposed FOF," Rec. Doc. No. 10467, ¶ 1 and ¶ 2 respectively).

Bly, "BP's Group Head of Safety and Operations" as heading the investigation.[34] Mr. Bly, of course, was a member of the executive team of BP p.l.c.[35] Much of BP's findings of fact can only be read to include BP p.l.c. or other affiliates. BP touts its safety culture, claiming that "BP's senior leadership understood that management must set the tone from the top on safety issues," citing testimony by BP p.l.c. employees Bly and Hayward, and Inglis.[36] References to BPXP in BP's Phase I Finding of Fact are extremely limited, referencing only its ownership of the Macondo lease and contract with M-I for Gulf of Mexico SPU offshore well services.[37] In BP's proposed legal conclusions, however, the broad use of "BP" ends: only BPXP acknowledges that it is the responsible party under the Oil Pollution Act.[38]

Just as BP's presentation of evidence at trial precludes the Court and the parties from deciphering the precise involvement of BPXP, as opposed to any other BP entity, so did BP's responses to discovery. In fact, BP consistently refused to produce documents or respond to interrogatories regarding corporate identity or structure. Despite interrogatories requesting that individuals involved in the Macondo well be identified by employer, BP identified individuals as "employees or corporate representatives of any BP Defendant," "employees of an affiliate of the BP Group," "BP Employees" or employees associated with the "BP Parties."[39] BP also refused

---

[34] *Id.,* Ex. 48 (BP Proposed FOF, ¶ 2333-2334).

[35] Ex. 49 (Bly Dep. 14:23-18:6).

[36] *See* Ex. 48 (BP Proposed FOF, Section XI.B.1.a, ¶ 2455-2463). Including references to BP PLC board activities from GORC and SEEAC. ¶ 2429, 2447-2449.

[37] *Id.*, Ex. 48 (BP Proposed FOF,¶ 49 and ¶ 244).

[38] *See, e.g., id.,* Ex. 48 (BP Proposed FOF, Sections XIV.A (¶¶ 2691-2697) and XV (¶¶ 2702-2705).

[39] Employer identification was only provided for corporate officer titles. *See* Ex. 50 (BP Defendants Responses to Plaintiffs Omnibus Requests Interrogatory 2 and RFP 8); Ex. 51 (Fourth Supplement); Ex. 52 (BP Parties Responses to PSC Interrogatories 4, 5, 10, 13-14, 16-19, 25, 28). BP was requested to identify individuals with information regarding both their employer and position. *See* Ex. 53 (PSC Definition of "identify"). The BP Parties objected that they would only identify employers where "the context reasonably requires." *See* Ex. 54 (BP Objections). Moreover, these requests were served on the

to produce personnel files which presumably would have contained such information.[40]  Making matters worse, many deponents, even corporate representatives under Rule 30(b)(6) did not or could not identify the BP entity that employed them.[41]

BP's refusal to provide information on corporate entities went beyond just identifying employers.  BP refused to produce *as irrelevant* organization charts for the different BP affiliates, stating instead, it would only produce charts showing the engineering and operations personnel assigned to the Gulf of Mexico SPU in 2009 and 2010.[42]  These charts do not identify the different corporate entities involved, because, as explained above, the SPU is a business segment designation organized by BP p.l.c.[43]  Even when information on corporate entities has been produced in discovery, the information has been conflicting.  For example, in its criminal plea factual allocution, BP states that "BP had two Well Site Leaders on the Deepwater Horizon, who were BP's employees, agents, and highest–ranking representatives on the rig," where BP is defined to solely include BPXP.[44]  However, in discovery, BP stated that Well Site Leader Robert Kaluza was employed by BPAP, not BPXP.[45]  Even witnesses who at trial testified they worked for "BP," provided conflicting answers in depositions.[46]  Moreover, multiple witnesses

---

various BP entity defendants individually, but BP choose to respond jointly on behalf of BPXP, BPAP, and BP America Inc.  See Ex. 55  (BP Response).

[40] *See* Ex. 56 (RFP 18).

[41] As noted Doug Suttles was the COO for BP E&P, but was not sure in what legal entity that position was held; nor was Neil Shaw.  *Supra* at 5-6.  Mr. Rich, to whom who the Macondo team reported, was BP's corporate representative on the "chain of command in connection with the Macondo Well"  He testified that he, as well as several others, were employed by "BP."  See Ex. 57 (Rich Dep. 16:18-17:2, 22:11-18, 36:23-38:3, 48:6-14, 118:7-119:13).

[42] *See* Ex. 58 (RFP 69); Ex. 59 (Omnibus RFP 9).

[43] *See* Ex. 60 (TREX 2515, 2516, 2517, 2518).

[44] Ex. 61 (TREX 52673, p. 14)

[45] *See* Ex. 62 (Answer to RFA 10).

[46] Wellsite Leader Ronald Sepulveda testified he worked for "BP," but in depositions he stated he worked for BP America.  *See* Ex. 43; Ex. 63 (Sepulveda Dep. 348:21-349:4).  John Guide – the Wells Team

who were involved in the Macondo well testified they were employed by BP America.[47] Yet, BP has represented that BP America Inc., is merely a holding company without any Gulf of Mexico Assets.[48] These answers, ███████████████████████████████████ makes some of BP's post trial contentions difficult to reconcile.[49]

## ARGUMENT

### Evidence Concerning BP's Affiliated Entities is Highly Relevant to a Number of Section 311(b)(8) Penalty Factors

The primary purpose of civil penalties is deterrence and retribution. *See,* Tull v. United States, 481 U.S. 412, 422 (1987). The penalty becomes "tailored" to the specific defendant and situation and therefore, even in the absence of fault, a civil penalty may be appropriate to deter future spills of oil because Congress intended a standard of conduct higher than mere economic efficiency. United States v. Atlantic Richfield Co., 429 F. Supp. 830, 838-837 (D.C. Pa. 1977). Accord, United States v. Coastal States Crude Gathering Co., 643 F. 2d 1125, 1128 (5th Cir. 1981) (purpose of the FWCPA and of [Section 311(b)] is to achieve the result of clean water as well as to deter conduct causing spills); In re Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010, 841 F. Supp. 2d 988, 1004 (E.D. La. 2010) (citing legislative history that civil penalties [under the CWA] should serve as incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills). If important evidence

---

Leader for the Deepwater Horizon- testified at trial he worked for "BP," in depositions he stated he worked BP America. *See* Ex. 44; Ex. 64 (Guide Dep. 430:10-13).

[47] Andrew Frazelle (Drillings and Completions Operations Manager), Kevin Lacy (former Vice President for Drillings and Completions for Gulf of Mexico SPU), David Sims (Operations Manager for Gulf of Mexico), and John Sprague (Drillings Engineer Manager for the Gulf of Mexico) all testified they believed they were employed by BP America or BP America Inc. *See* Ex. 65 (Frazelle Dep. 347:10-11); Ex. 66 (Lacy Dep. 306:6-15); Ex. 67 (Sims Dep. 309:5-10); Ex. 68 (Sprague Dep. 35:19-36:4).

[48] *See* Ex. 48 (BP Proposed FOF, ¶ 4).

[49] For example, in its post trial proposed findings of fact, BP contends that BPXP designed the Macondo Well. This is unsupported in light of the above testimony, and hard to understand if BPXP had no employees. *See* Ex. 48 (BP Proposed FOF,¶ 3. Ft. 20, ¶ 2772, 2774, 2778, 2790, 2881).

concerning BP p.l.c. and other BP affiliates is precluded from this litigation, it will not be possible to effectively deter BP's conduct and fix an appropriate civil penalty.

Courts have considered evidence regarding the parent company of the defendant as a matter of discretion in applying penalty factors under the Clean Water Act.  In <u>United States v. Municipal Authority of Union Township</u> ("Dean Dairy"), 150 F. 3d 259 (3rd Cir. 1998), following trial a district court issued a civil penalty of $4,031,000 for violations of the CWA, stating that it could look to the finances of the defendant's parent as part of its analysis.  On appeal, the Third Circuit affirmed, *inter alia,* that the assets of the defendant's parent corporation could be examined in determining the economic impact of the penalty on the violator.  The defendant contended that the district court erred in considering the financial condition of its parent because the parent corporation had not been sued, did not violate the CWA, and there was insufficient information to pierce the corporate veil.

The <u>Dean Dairy</u> appellate court rejected the defendant's contention, stating that it was not the parent, but the violator who was penalized.  The reference to the parent's financial statement only assured that the penalty would not be set at a level above the defendant's ability to pay.  The Court reasoned that "[i]f the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial resources are highly relevant.  Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on a violator, see <u>Universal Tool</u>, 786 F. Supp. at 753; <u>PIRG v. Powell Duffryn</u>, 720 F. Supp. 1158, 1166 (D.N.J. 1989, *reversed in part on other grounds*, 913 F. 2d 64 (3rd Cir. 1990), and we see nothing improper in the same action here." *Id*. at 268-269.[50]  Furthermore, the

---

[50] *See also* <u>Idaho Conservation League v. Atlanta Gold Corp.</u>, 879 F. Supp. 2d 1148, 1170 (D. Idaho 2012) ("Cases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of a parent's assets is one factor, among many, that is appropriate in a Clean Water Act case"); <u>Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.</u>, 1995 WL 461252 *19

appellate court recognized the district court appropriately "undertook a fact-specific assessment that examined the role of the parent in the operations of the subsidiary, particularly with regard to the issue of pollution of the nearby waters and actions that could have resolved it." *Id.*

In the instant case, BP p.l.c. has benefitted substantially from the revenue and profits derived from BPXP, and its other more than 2900 subsidiaries.[51] The finances of BP p.l.c. are audited and reported on a consolidated basis, and although discovery would provide more detail, the available information suggests that BP p.l.c. has gained significant profits from its Exploration and Production activities in the Gulf of Mexico.[52] Since BP p.l.c. has reaped the benefits of the revenue and profit from BPXP and other subsidiaries, it is only fair to consider BP p.l.c. when evaluating the economic impact of a civil penalty on BPXP.

Moreover, given that BPXP will ask this Court to consider the efforts of BP p.l.c. under the penalty factor, **"**the degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge," 33 U.S.C. § 1321(b)(8), justice also demands that the conduct of BP p.l.c. and other BP entities be considered consistently across the other penalty factors. Specifically, with respect to "any history of violations," evidence regarding major environmental violations and accidents at other BP affiliates should not be forclosed. BP has pled guilty to environmental crimes in the United States on several occasions prior to Macondo, including at its

---

(D.N.J.). In re Carroll Oil Company, 2002 WL 1773052 (E.P.A.); In re: new Waterbury, Ltd, 1994 WL 6153777 (E.P.A.).

[51] *See* Ex. 14 (BP Annual Report 2012, at 255).

[52] BP's consolidated financial statements do not breakout the revenues or profits derived exclusively from BPXP. Nonetheless, according to BP's 2009 Annual Report, in 2009, 387,000 barrels of oil per day were produced from deepwater fields in the Gulf of Mexico, 28% of the total oil produced that year by BP subsidiaries worldwide. *See* Ex. 1 (BP Annual Report 2010, at 146, 168-170); Ex. 14 (BP Annual Report 2012, at 179-182).

Texas City refinery, and at Prudhoe Bay in Alaska.[53] In fact, in its Phase I ruling, the Court expressly noted that the evidence of BP's prior felonies and violations may be admissible in the penalty or punitive damages phase.[54]

Although the United States has not yet concluded what evidence it intends to present at trial on the prior violations factor, at a minimum BP's promises and assurances following the explosion and oil spill at Macondo should not be heard in a vacuum.[55] Only by learning about BP's prior violations that gave rise to BP's prior felony convictions and other violations – and its repeated promises to reform after each one – can this Court fully address BP's conduct at Macondo. Thus, evidence should not be limited to violations by BPXP.

Other evidence regarding BP affiliates, including the evidence of prior violations, also may be relevant to "the degree of culpability involved." As set forth above, the Phase I and Phase II record does not permit evaluation of the culpability of BPXP in isolation, without consideration of its BP affiliates. At a minimum, the prior violations and crimes should have, and did, put all BP affiliates on notice that its reckless behavior and emphasis on cost-cutting could have disastrous consequences as it engaged in the inherently dangerous activity of

---

[53] *See, e.g.,* Ex. 69 (United States v. BPXP, Criminal Action No. 12-292, Rec. Doc. 65, Reasons for Accepting Plea Agreement, pps. 5-6).

[54] BP may state that the Court granted its motion in limine to exclude evidence of prior accidents or alleged misconduct in Phase I of the trial. But the Court also stated that "it may be that some of this evidence will become more relevant and admissible at a later phase, e.g., if and when the Court is required to consider the quantum of punitive damages or the assessment of CWA penalties." The Court made the same ruling with respect to evidence of prior adverse criminal, civil, and regulatory proceedings, stating that while this evidence was "excluded from Phase I of the trial. Again, it may be that some of this evidence will become more relevant and admissible at a later phase where the Court is required to assess punitive damages or CWA penalties." *See* Doc. 5634, Order and Reasons Regarding Motion in Limine to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil or Regulatory Proceedings, Feb. 6, 2012, at 5-6.

[55] The United States will address the relevance of prior violations more specifically in its briefing on that subject.

deepwater drilling. Thus, the violations of BP affiliates are highly relevant to the CWA Section 311(b)(8) penalty factor "degree of culpability."

Finally, the Court should exercise its broad discretion under the penalty factor "any other matters that justice may require" to recognize that actions of BP corporate entities beyond BPXP are relevant. The Supreme Court in *Tull* described the process of weighing the penalty factors as "highly discretionary." Tull v. United States, *supra,* 481 U.S. at 427. *Accord*, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 576 (5th Cir. 1996). The Fifth Circuit, along with others, has held repeatedly that the district court's determination of the amount of a penalty to be assessed is reviewed under the highly deferential abuse-of-discretion standard. *Id.*; United States v. CITGO Petroleum Corp., 723 F.3d 547, 551 (5th Cir. 2013).

Recognition that the conduct of BP affiliates is or may be relevant should streamline and simplify presentation of evidence regarding the economic impact of the penalty on BP, and the degree, extent and success of BP's efforts to mitigate the effects of the discharge. The Court can weigh the probative value of specific evidence against considerations of undue delay, waste of time, or the needless presentation of cumulative evidence at a later time, when the United States presents evidence pursuant to the schedule and pre-trial orders in this penalty phase.

## CONCLUSION

For the foregoing reasons, the United States requests a ruling that the Court will consider the actions and finances of BPXP's corporate affiliates when evaluating each of the penalty factors, and not limit its consideration to the actions and finances of BPXP. At a minimum, the Court should not preclude the discovery and presentation of relevant evidence concerning BP p.l.c. and its affiliates.

Respectfully submitted,

| | |
|---|---|
| BRIAN HAUCK | ROBERT G. DREHER |
| Deputy Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| PETER FROST | SARAH HIMMELHOCH |
| Directory, Torts Branch, Civil Division | Senior Litigation Counsel |
| Admiralty and Aviation | NANCY FLICKINGER |
| STEPHEN G. FLYNN | Senior Attorney |
| Assistant Director | RICHARD GLADSTEIN |
| SHARON SHUTLER | PATRICK CASEY |
| MALINDA LAWRENCE | Senior Counsel |
| LAURA MAYBERRY | A. NATHANIEL CHAKERES |
| Trial Attorneys | JUDY HARVEY |
| | RACHEL KING |
| | ERICA PENCAK |
| R. MICHAEL UNDERHILL, T.A. | ABIGAIL ANDRE |
| Attorney in Charge, West Coast Office | RACHEL HANKEY |
| Torts Branch, Civil Division | BRANDON ROBERS |
| U.S. Department of Justice | Trial Attorneys |
| 7-5395 Federal Bldg., Box 36028 | |
| 450 Golden Gate Avenue | |
| San Francisco, CA 94102-3463 | /s/ Steven O'Rourke |
| Telephone:  415-436-6648 | STEVEN O'ROURKE |
| Facsimile:  415-436-6632 | Senior Attorney |
| E-mail:  mike.underhill@usdoj.gov | Environmental Enforcement Section |
| | U.S. Department of Justice |
| | P.O. Box 7611 |
| | Washington, D.C. 20044 |
| | Telephone:  202-514-2779 |
| | Facsimile:   202-514-2583 |
| | E-mail:  steve.o'rourke@usdoj.gov |
| | KENNETH A. POLITE, JR. |
| | United States Attorney |
| | Eastern District of Louisiana |
| | SHARON D. SMITH |
| | Assistant United States Attorney |
| | Eastern District of Louisiana |
| | 650 Poydras Street, Suite 1600 |
| | New Orleans, LA  70130 |
| | Telephone:  (504) 680-3000 |
| | Facsimile:  (504) 680-3184 |
| | E-mail:  sharon.d.smith@usdoj.gov |

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  February 14, 2014.                                                         /s/  Steven O'Rourke

                                                                                 U.S. Department of Justice