# Exhibit 1



# Annual Report
# and Form 20-F
# 2010

bp.com/annualreport

# What's inside?

## 5    Business review

6    Chairman's letter
8    Board of directors
10   Group chief executive's letter
12   Progress in 2010
14   Group overview
34   Gulf of Mexico oil spill
40   Exploration and Production
55   Refining and Marketing
61   Other businesses and corporate
63   Liquidity and capital resources
68   Corporate responsibility
76   Research and technology
78   Regulation of the group's business
81   Certain definitions

## 83   Directors and senior management

84   Directors and senior management
87   Directors' interests

## 89   Corporate governance

90   Board performance report
105  Corporate governance practices
106  Code of ethics
106  Controls and procedures
107  Principal accountants' fees and services
108  Memorandum and Articles of Association

## 111  Directors' remuneration report

112  Part 1 Summary
114  Part 2 Executive directors' remuneration
120  Part 3 Non-executive directors' remuneration

## 123  Additional information for shareholders

124  Critical accounting policies
127  Property, plants and equipment
127  Share ownership
128  Major shareholders and related party transactions
129  Dividends
130  Legal proceedings
133  Relationships with suppliers and contractors
134  Share prices and listings
135  Material contracts
135  Exchange controls
135  Taxation
137  Documents on display
137  Purchases of equity securities by the issuer and affiliated purchasers
138  Fees and charges payable by a holder of ADSs
138  Fees and payments made by the Depositary to the issuer
139  Called-up share capital
139  Administration
139  Annual general meeting
140  Exhibits

## 141  Financial statements

142  Consolidated financial statements of the BP group
150  Notes on financial statements
228  Supplementary information on oil and natural gas (unaudited)
PC1  Parent company financial statements of BP p.l.c.



6033

Exhibit No.
Worldwide Court
Reporters, Inc.

# Miscellaneous terms

In this document, unless the context otherwise requires, the following terms shall have the meaning set out below.

**ADR**
American depositary receipt.

**ADS**
American depositary share.

**AGM**
Annual general meeting.

**Amoco**
The former Amoco Corporation and its subsidiaries.

**Annulus**
The space between two concentric objects, such as between the wellbore and casing of an oil well or between casing and tubing, where fluid can flow. It allows fluids, such as drilling mud, to circulate in the well.

**Atlantic Richfield**
Atlantic Richfield Company and its subsidiaries.

**Associate**
An entity, including an unincorporated entity such as a partnership, over which the group has significant influence and that is neither a subsidiary nor a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of an entity but is not control or joint control over those policies.

**Barrel**
42 US gallons.

**b/d**
barrels per day.

**boe**
barrels of oil equivalent.

**BP, BP group or the group**
BP p.l.c. and its subsidiaries.

**Burmah Castrol**
Burmah Castrol PLC and its subsidiaries.

**Cent or c**
One-hundredth of the US dollar.

**The company**
BP p.l.c.

**Dollar or $**
The US dollar.

**EU**
European Union.

**GAAP**
Generally accepted accounting practice.

**Gas**
Natural gas.

**GCRO**
Gulf Coast Restoration Organization.

**Hydrocarbons**
Crude oil and natural gas.

**IFRS**
International Financial Reporting Standards.

**Joint control**
Joint control is the contractually agreed sharing of control over an economic activity, and exists only when the strategic financial and operating decisions relating to the activity require the unanimous consent of the parties sharing control (the venturers).

**Joint venture**
A contractual arrangement whereby two or more parties undertake an economic activity that is subject to joint control.

**Jointly controlled asset**
A joint venture where the venturers jointly control, and often have a direct ownership interest in the assets of the venture. The assets are used to obtain benefits for the venturers. Each venturer may take a share of the output from the assets and each bears an agreed share of the expenses incurred.

**Jointly controlled entity**
A joint venture that involves the establishment of a corporation, partnership or other entity in which each venturer has an interest. A contractual arrangement between the venturers establishes joint control over the economic activity of the entity.

**Liquids**
Crude oil, condensate and natural gas liquids.

**LNG**
Liquefied natural gas.

**London Stock Exchange or LSE**
London Stock Exchange plc.

**LPG**
Liquefied petroleum gas.

**mb/d**
thousand barrels per day.

**mboe/d**
thousand barrels of oil equivalent per day.

**mmBtu**
million British thermal units.

**mmboe**
million barrels of oil equivalent.

**mmcf**
million cubic feet.

**mmcf/d**
million cubic feet per day.

**MW**
Megawatt.

**NGLs**
Natural gas liquids.

**OPEC**
Organization of Petroleum Exporting Countries.

**Ordinary shares**
Ordinary fully paid shares in BP p.l.c. of 25c each.

**Pence or p**
One-hundredth of a pound sterling.

**Pound, sterling or £**
The pound sterling.

**Preference shares**
Cumulative First Preference Shares and Cumulative Second Preference Shares in BP p.l.c. of £1 each.

**PSA**
A production-sharing agreement (PSA) is an arrangement through which an oil company bears the risks and costs of exploration, development and production. In return, if exploration is successful, the oil company receives entitlement to variable physical volumes of hydrocarbons, representing recovery of the costs incurred and a stipulated share of the production remaining after such cost recovery.

**SEC**
The United States Securities and Exchange Commission.

**Subsidiary**
An entity that is controlled by the BP group. Control is the power to govern the financial and operating policies of an entity so as to obtain the benefits from its activities.

**Tonne**
2,204.6 pounds.

**Trust**
Deepwater Horizon Oil Spill Trust.

**UK**
United Kingdom of Great Britain and Northern Ireland.

**US**
United States of America.

Business review

# Gulf of Mexico oil spill

### Incident summary

On 20 April 2010, following a well blowout in the Gulf of Mexico, an explosion and fire occurred on the semi-submersible rig Deepwater Horizon and on 22 April the vessel sank. Tragically, 11 people lost their lives and 17 others were injured. Hydrocarbons continued to flow from the reservoir and up through the casing and the blowout preventer (BOP) for 87 days, causing a very significant oil spill.

The Deepwater Horizon rig was operated by Transocean Holdings LLC and was drilling the Macondo exploration well. The well forms part of the Mississippi Canyon Block 252 (MC252) lease, in respect of which BP Exploration & Production Inc. was the named party and operator with a 65% working interest. The well was in a water depth of 5,000 feet and 43 nautical miles from shore.

BP tackled the leak at its source in multiple, parallel ways, which over time included: attempting to fit caps on the well, using containment systems to pipe oil to vessels on the surface, sealing the well through a static-kill procedure and drilling relief wells. BP recognized early in the incident that drilling relief wells constituted the ultimate means to seal and isolate the well permanently and stop the flow of oil and gas. Two relief wells were drilled, the first of which was started on 2 May; the second was started on 16 May as a contingency.

On 15 July, BP successfully shut in the Macondo well and then commenced a static-kill procedure. On 9 August, BP confirmed that the casing had been successfully sealed with cement. On 16 September, the first relief well intercepted the annulus of the Macondo well. After completing cementing operations on 19 September, BP, the federal government scientific team and the National Incident Commander concluded that the well-kill operations had successfully sealed the annulus.

BP then began the abandonment of the Macondo well, which included removing portions of the casing and setting cement plugs. This work was completed on 8 November. In parallel, operations to plug and abandon (P&A) the relief well that intercepted the Macondo well took place and were completed on 30 September. P&A of the second relief well is in progress and is expected to complete in early March 2011. All response activities at the Macondo site (with the exception of the final seabed survey and seismic sweep, which are scheduled to take place at the end of first quarter in 2011), were completed on 8 January with the recovery of the buoy and anchor system for the free-standing riser.

The group income statement for the year ended 31 December 2010 includes a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill. See Financial consequences on page 38 and Financial statements – Note 2 on page 158 for more details.

### Key statistics

|  | 2010 |
| --- | --- |
| Total pre-tax cost recognized in income statement ($ million) | 40,935 |
| Total cash flow expended (pre-tax) ($ million) | 17,658 |
| Total payments from $20-billion trust fund ($ million) | 3,023 |
| Total number of claimants to GCCF[a] | 468,869 |
| Number of people deployed (at peak) (approximately) | 48,000 |
| Number of active response vessels deployed during the response (approximately) | 6,500 |
| Barrels of oil collected or flared (approximately) | 827,000 |
| Barrels of oily liquid skimmed from surface of sea (approximately) | 828,000 |
| Barrels of oil removed through surface burns (UAC estimate) | 265,450 |

[a] Gulf Coast Claims Facility (GCCF)

### Gulf Coast Restoration Organization (GCRO)

Following the accident, BP established a separate organizational unit – the Gulf Coast Restoration Organization (GCRO) – to provide the necessary leadership and dedicated resources to facilitate BP's fulfilment of its clean-up responsibilities and to support the long-term effort to restore the Gulf coast. The GCRO addresses all aspects of the response, including: executing our ongoing clean-up operations and all associated remediation activities; coordinating with government officials; keeping the public informed; and implementing the $20-billion Deepwater Horizon Oil Spill Trust established to meet certain of our financial obligations. At the end of 2010, the GCRO had a permanent staff of 100 employees and about 5,900 contractors including the Gulf Coast incident management team. The majority of the clean-up, maintenance and monitoring is being carried out by contract staff. Since inception, many other BP staff and contractors have been, and will continue to be, temporarily seconded to assist the permanent team and to provide additional resources or specialist skills where required.

### Our response

BP immediately took responsibility for responding to the incident, taking steps to remedy the harm that the spill caused to the Gulf of Mexico, the Gulf coast environment, and the livelihoods of the people in the region. The US government formed a Unified Area Command (UAC) to link the organizations responding to the incident and provide a forum for those organizations to make co-ordinated decisions. If consensus could not be reached on a particular matter, the Federal On-Scene Coordinator (FOSC) made the final decision on response-related actions. BP's comprehensive response focused on three strategic fronts: stopping the flow of hydrocarbons at the source; working to capture, contain and remove oil offshore and near the shore; and cleaning and restoring impacted shorelines and beaches along the Gulf coast.

Initially BP mobilized a fleet of 30 vessels and over a million feet of protective boom. Thereafter the scale of activity grew rapidly, and at its peak included more than 6,500 vessels, more than 13 million feet of boom and almost 48,000 personnel.

BP also formed an investigation team charged with gathering the facts surrounding the accident, analysing available information to identify possible causes and making recommendations that would help prevent similar accidents in the future. The team concluded that no single action or inaction caused this accident. Rather, a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces came together to allow the accident. Multiple companies, work teams and circumstances were involved over time. See Internal investigation and report on page 37 for further information on the investigation and its findings.

# Directors and senior management

84   Directors and
     senior management

87   Directors' interests

Directors and senior management

# Directors and senior management

The following lists the company's directors and senior management as at 18 February 2011.

| Name | | Initially elected or appointed |
|---|---|---|
| C-H Svanberg | Chairman | Chairman since January 2010 |
| | | Director since September 2009 |
| R W Dudley | Executive Director (Group Chief Executive) | Group chief executive since October 2010 |
| | | Director since April 2009 |
| P M Anderson | Non-Executive Director | February 2010 |
| F L Bowman | Non-Executive Director | November 2010 |
| A Burgmans | Non-Executive Director | February 2004 |
| C B Carroll | Non-Executive Director | June 2007 |
| Sir William Castell | Non-Executive Director (Senior Independent Director) | July 2006 |
| I C Conn | Executive Director (Chief Executive, Refining and Marketing) | July 2004 |
| G David | Non-Executive Director | February 2008 |
| I E L Davis | Non-Executive Director | April 2010 |
| D J Flint | Non-Executive Director | January 2005 |
| Dr B E Grote | Executive Director (Chief Financial Officer) | August 2000 |
| Dr D S Julius | Non-Executive Director | November 2001 |
| B R Nelson | Non-Executive Director | November 2010 |
| F P Nhleko | Non-Executive Director | February 2011 |
| M Bly | Executive Vice President (Safety and Operational Risk) | October 2010 |
| R Bondy | Group General Counsel | May 2008 |
| S Bott | Executive Vice President (Human Resources) | March 2005 |
| Dr M C Daly | Executive Vice President (Exploration) | October 2010 |
| R Fryar | Executive Vice President (Production) | October 2010 |
| A Hopwood | Executive Vice President (Exploration and Production, Strategy and Integration) | October 2010 |
| B Looney | Executive Vice President (Developments) | October 2010 |
| H L McKay | Executive Vice President (Chairman and President of BP America Inc.) | June 2008 |
| S Westwell | Executive Vice President (Strategy and Integration) | January 2008 |

Mr C-H Svanberg was appointed chairman on 1 January 2010. Mr P M Anderson was appointed as a director on 1 February 2010 and Mr I E L Davis was appointed as a director on 2 April 2010. Mr E B Davis, Jr and Sir Ian Prosser retired as directors on 15 April 2010.

Mr A G Inglis resigned as a director on 31 October 2010. Dr A B Hayward resigned as group chief executive on 1 October 2010 and as a director on 30 November 2010. Mr R W Dudley became group chief executive on 1 October 2010. Mr B R Nelson and Mr F L Bowman were appointed as directors on 8 November 2010 and Mr F P Nhleko was appointed as a director on 1 February 2011.

At the company's 2010 annual general meeting (AGM), the following directors retired, offered themselves for election/re-election and were duly elected/re-elected: Mr P M Anderson, Mr A Burgmans, Mrs C B Carroll, Sir William Castell, Mr I C Conn, Mr G David, Mr I E L Davis, Mr R W Dudley, Mr D J Flint, Dr B E Grote, Dr A B Hayward, Mr A G Inglis, Dr D S Julius, and Mr C-H Svanberg.

Mr D J Flint and Dr D S Julius will retire at the conclusion of the company's 2011 AGM. All of the other directors will offer themselves for election/re-election at the company's 2011 AGM.

Dr H Schuster has been appointed as executive vice president, human resources, in succession to Mrs S Bott with effect from 1 March 2011.

David Jackson (58) was appointed company secretary in 2003. A solicitor, he is a director of BP Pension Trustees Limited.

## Directors

### C-H Svanberg
*Chairman of the chairman's and nomination committees and attends meetings of the remuneration committee*

Carl-Henric Svanberg (58) joined BP's board in September 2009 and became chairman of BP on 1 January 2010. From 2003 until December 2009, he was president and chief executive officer of Ericsson, also serving as the chairman of Sony Ericsson Mobile Communications AB. He continues to be a non-executive director of Ericsson.

### R W Dudley

Robert Dudley (55) joined the Amoco Corporation in 1979 for whom he worked until its merger with BP in 1998. Following a variety of posts in the US, the UK, the South China Sea and Moscow, in 2001 he became group vice president responsible for BP's upstream businesses in Russia, the Caspian Region, Angola, Algeria and Egypt. From 2003 to 2008, he was president and chief executive officer of TNK-BP in Moscow. He was appointed an executive director in April 2009 with responsibility for the broad oversight of the company's activities in the Americas and Asia. Between 23 June and 30 September 2010, he served as the president and chief executive officer of BP's Gulf Coast Restoration Organization in the US. On 1 October 2010 he succeeded Dr Hayward as group chief executive of BP p.l.c.

### P M Anderson
*Member of the chairman's, safety, ethics and environment assurance and Gulf of Mexico committees*

Paul Anderson (65) was appointed a non-executive director of BP on 1 February 2010. He is a non-executive director of BAE Systems PLC and of Spectra Energy Corp. He was formerly chief executive at Duke Energy where he also served as chairman of the board. Having previously been chief executive officer and managing director of BHP Limited and then BHP Billiton Limited and BHP Billiton Plc, he rejoined these latter boards in 2006 as a non-executive director, retiring on 31 January 2010. Previously he served as a non-executive director on numerous boards in the US and Australia.

### F L Bowman
*Member of the chairman's and safety, ethics and environment assurance committees*

Frank Bowman (66) joined BP's board on 8 November 2010. He served for over 38 years in the United States Navy, during which time he served as commander of the nuclear submarine *USS City of Corpus Christi* and commander of the submarine tender *USS Holland*, director of political-military affairs on the joint staff and chief of naval personnel. He was director of the naval nuclear propulsion programme in the Department of Navy and Department of Energy. After retiring from the Navy as an admiral, he became president and chief executive officer of the Nuclear Energy Institute. He served on the BP Independent Safety Review Panel. He is president of Strategic Decisions, LLC and a director of Morgan Stanley Mutual Funds.

### A Burgmans, KBE
*Member of the chairman's, remuneration and safety, ethics and environment assurance committees*

Antony Burgmans (64) joined BP's board in 2004. He was appointed to the board of Unilever in 1991. In 1999, he became chairman of Unilever NV and vice chairman of Unilever PLC. In 2005, he became non-executive chairman of Unilever PLC and Unilever NV, retiring from these appointments in 2007. He is also a member of the supervisory boards of Akzo Nobel N.V., Aegon N.V. and SHV Holdings N.V.

### C B Carroll
*Member of the chairman's and safety, ethics and environment assurance committees*

Cynthia Carroll (54) joined BP's board in 2007. She started her career at Amoco and in 1989 she joined Alcan, where in 2002 she was appointed president and chief executive officer of Alcan's primary metals group and an officer of Alcan, Inc. She was appointed as chief executive of Anglo American plc, the global mining group, in 2007. She is also a director of De Beers s.a. and Anglo Platinum Ltd.

### Sir William Castell, LVO
*Member of the chairman's, Gulf of Mexico and nomination committees and chairman of the safety, ethics and environment assurance committee*

Sir William (63) joined BP's board in 2006 and is the senior independent director. From 1990 to 2004, he was chief executive of Amersham plc and subsequently president and chief executive officer of GE Healthcare. He was appointed as a vice chairman of the board of GE in 2004, stepping down from this post in 2006 when he became chairman of the Wellcome Trust. He remains a non-executive director of GE.

### I C Conn

Iain Conn (48) joined BP in 1986. Following a variety of roles in oil trading, commercial refining, retail and commercial marketing operations, and exploration and production, in 2000 he became group vice president of BP's refining and marketing business. From 2002 to 2004, he was chief executive of petrochemicals. He was appointed group executive officer with a range of regional and functional responsibilities and an executive director in 2004. He was appointed chief executive of Refining and Marketing in 2007. He is a non-executive director and senior independent director of Rolls-Royce Group plc and chairman of The Advisory Board of Imperial College Business School.

### G David
*Member of the chairman's, audit, Gulf of Mexico and remuneration committees*

George David (68) joined BP's board in February 2008. He spent his career with United Technologies Corporation (UTC), as its chief executive between 1994 and 2008 and chairman from 1997 until his retirement in December 2009. He is a former director of Citigroup, Inc.

### I E L Davis
*Member of the chairman's, audit, nomination and remuneration committees and chairman of the Gulf of Mexico committee*

Ian Davis (59) joined BP's board on 2 April 2010. He spent his early career at Bowater, moving to McKinsey & Company in 1979. He was managing partner of McKinsey's practice in the UK and Ireland from 1996 to 2003. In 2003, he was appointed as chairman and worldwide managing director of McKinsey, serving in this capacity until 2009. He retired as senior partner of McKinsey & Company in July 2010.

### D J Flint, CBE
*Member of the chairman's and nomination committees and chairman of the audit committee*

Douglas Flint (55) joined BP's board in 2005. He trained as a chartered accountant and was made a partner at KPMG in 1988. In 1995, he was appointed group finance director of HSBC Holdings plc and in 2009 his role was broadened to chief financial officer, executive director, risk and regulation. He was appointed chairman of HSBC with effect from 3 December 2010. He was chairman of the Financial Reporting Council's review of the Turnbull Guidance on Internal Control. Between 2001 and 2004, he served on the Accounting Standards Board and the Standards Advisory Council of the International Accounting Standards Board. He will retire from the BP board at the conclusion of the 2011 AGM.

Directors and senior management

## Dr B E Grote

Byron Grote (62) joined BP in 1987 following the acquisition of the Standard Oil Company of Ohio, where he had worked since 1979. He became group treasurer in 1992 and in 1994 regional chief executive in Latin America. In 1999, he was appointed an executive vice president of Exploration and Production, and chief executive of chemicals in 2000. He was appointed an executive director of BP in 2000 and chief financial officer in 2002. He is a non-executive director of Unilever NV and Unilever PLC.

## Dr D S Julius, CBE
*Member of the chairman's and nomination committees and chairman of the remuneration committee*

DeAnne Julius (61) joined BP's board in 2001. She began her career as a project economist with the World Bank in Washington. From 1986 until 1997, she held a succession of posts, including chief economist at British Airways and Royal Dutch Shell Group. From 1997 to 2001, she was a full-time member of the Monetary Policy Committee of the Bank of England. She is chairman of the Royal Institute of International Affairs and a non-executive director of Roche Holdings SA and Jones Lang LaSalle, Inc. She will retire from the BP board at the conclusion of the 2011 AGM.

## B R Nelson
*Member of the chairman's and audit committees*

Brendan Nelson (61) joined BP's board on 8 November 2010. He is a chartered accountant and was admitted as a partner of KPMG in London in 1984. He served as a member of the UK Board of KPMG from 2000 to 2006 following which he was appointed vice chairman until his retirement in 2010. In KPMG International he held a number of senior positions including global chairman, banking and global chairman, financial services. He is a non-executive director of The Royal Bank of Scotland Group plc where he is chairman of the Group Audit Committee.

## F P Nhleko
*Member of the chairman's and audit committees*

Phuthuma Nhleko (50) joined BP's board on 1 February 2011. He began his career as a civil engineer in the United States and as a project manager for infrastructure developments in Southern Africa. Following this, he became a senior executive of the Standard Corporate and Merchant Bank in South Africa. He later held a succession of directorships before joining MTN Group, a pan-African and Middle Eastern telephony group, as group president and chief executive officer in 2002. He will step down as group chief executive of MTN Group at the end of March 2011 to become vice-chairman of the MTN Group and chairman of MTN International.

## Senior management
### M Bly

Mark Bly (51) joined BP in 1984. Following various engineering and commercial leadership assignments he held business unit leader posts in Alaska and the North Sea and was strategic performance unit leader for BP's North America Gas business. In 2007, he became group vice president, Exploration and Production and a member of the exploration and production operating committee. In 2008, he became group head of safety and operations and in October 2010 he was appointed executive vice president of safety and operational risk.

### R Bondy

Rupert Bondy (49) joined BP as group general counsel in 2008. In 1989, he joined US law firm Morrison & Foerster, working in San Francisco and London. From 1994 to 1995, he worked for UK law firm Lovells in London. In 1995, he joined SmithKline Beecham as senior counsel for mergers and acquisitions and other corporate matters. He subsequently held positions of increasing responsibility and, following the merger of SmithKline Beecham and GlaxoWellcome, he was appointed senior vice president and general counsel of GlaxoSmithKline in 2001.

### S Bott

Sally Bott (61) joined BP in 2005 as an executive vice president responsible for global human resources. She joined Citibank in 1970 and was in the economics department and the finance function before joining human resources. She was appointed human resources vice president in 1979. In 1994, she joined Barclays De Zoete Wedd, an investment bank, as head of human resources and in 1997 became group human resources director of Barclays plc. From 2000 to early 2005, she was managing director of Marsh and McLennan and head of global human resources at Marsh Inc. In 2008, she was elected as a non-executive director of UBS AG. She will retire as BP's group human resources director at the end of April 2011.

### Dr M C Daly

Mike Daly (57) joined BP in 1986 as a technical specialist in structural geology, subsequently joining BP's global basin analysis group. After a series of exploration business and functional roles in South America, the North Sea and new business development, in 2000 he became president of BP's Middle East and South Asia businesses. In 2006, he was appointed BP's head of exploration and new business development and in October 2010 he was appointed executive vice president, exploration.

### B Fryar

Bob Fryar (47) joined Amoco Production Company in 1985, serving in a variety of engineering and management positions in the onshore US and deepwater Gulf of Mexico. In 2003, he was appointed vice president of operations performance unit for BP Trinidad and later, in 2009, he became chief executive officer for BP Angola. In October 2010, he was appointed executive vice president, production.

### A Hopwood

Andy Hopwood (53) joined BP in 1980 as a petroleum engineer. Following a series of operational roles and roles in corporate planning and exploration and production planning, in 1999, he was appointed business unit leader in Azerbaijan, returning to London in 2001 as the upstream chief of staff. In 2004, he became strategic performance unit leader for BP's North America Gas business returning to London in 2009 as head of portfolio and technology for BP's upstream businesses. In October 2010, he was appointed executive vice president of exploration and production, strategy and integration.

## B Looney

Bernard Looney (40) joined BP in 1991 as a drilling engineer, working in a variety of roles in the North Sea, Vietnam and the Gulf of Mexico and later in the exploration and technology group. In 2005, he became senior vice president for BP Alaska, before moving to be head of the group CEO's executive office. He was appointed vice president for Norway and infrastructure in 2008 and then, in 2009, he became managing director of BP's North Sea business. In October 2010, he was appointed executive vice president, developments.

## H L McKay

Lamar McKay (52) was appointed chairman and president of BP America, Inc. in 2009. He joined Amoco Production Company as a petroleum engineer in 1980. He held a variety of roles before becoming group vice president for Russia and Kazakhstan in 2003, also being appointed to the board of TNK-BP in 2004. In 2007, he was appointed senior group vice president of BP and executive vice president of BP America. In early 2008, he became executive vice president of BP p.l.c. special projects, focusing on Russia, subsequently joining the group executive management team. In October 2010, in addition to his current duties, he was appointed president and chief executive officer of the Gulf Coast Restoration Organization.

## Dr H Schuster

Helmut Schuster (50) joined BP in 1989. He held a number of roles working in most parts of refining, marketing, trading and gas and power in the UK, UK and Continental Europe. In 2007 he became vice president, human resources for Refining and Marketing in BP and in 2010 he added corporate and functions to his portfolio. In February 2011 it was announced that he was appointed group human resources director and a member of BP's executive team in succession to Sally Bott with effect from 1 March 2011.

## S Westwell

Steve Westwell (52) was appointed in the manufacturing and supply division of BP Southern Africa in 1988. Following various retail positions in the UK and the US, he was appointed head of retail and a member of the board of BP Southern Africa Pty. In 2003, he became president and chief executive officer of BP Solar, and in 2004, group vice president of natural gas liquids, power, solar and renewables. In 2005, he was appointed group vice president of Alternative Energy. He joined the executive team in 2008 and is executive vice president, strategy and integration.

## Directors' interests

| Current directors | At 31 Dec 2010 | At 1 Jan 2010 | Change from 31 Dec 2010 to 24 Feb 2011 |
|---|---|---|---|
| C-H Svanberg | 925,000 | – | – |
| R W Dudley | 280,799[a] | 276,846[a] | – |
| A Burgmans | 10,156 | 10,156 | – |
| C B Carroll | 10,500[a] | 10,500[a] | – |
| Sir William Castell | 82,500 | 82,500 | – |
| I C Conn | 339,637[b] | 293,216[b] | 77,916 |
| G David | 159,000[a] | 39,000[a] | – |
| D J Flint | 15,000 | 15,000 | – |
| Dr B E Grote | 1,372,643[c] | 1,291,643[c] | – |
| Dr D S Julius | 15,000 | 15,000 | – |

| Directors leaving the board | At resignation/ retirement | At 1 Jan 2010 |
|---|---|---|
| E B Davis, Jr | 77,238[d] | 76,497[d] |
| Dr A B Hayward | 677,488[e] | 535,383 |
| A G Inglis | 309,823[f][g] | 259,163[f] |
| Sir Ian Prosser | 16,301[h] | 16,301 |

| Directors joining the board | At 31 Dec 2010 | On appointment | Change from 31 Dec 2010 to 24 Feb 2011 |
|---|---|---|---|
| P M Anderson | 6,000[i] | 6,000[i] | – |
| F L Bowman | 2,520[a][j] | 2,520[a][j] | 4,800 |
| I E L Davis | 10,000 | 10,000[k] | – |
| B R Nelson | – | –[l] | – |
| F P Nhleko | – | –[m] | – |

[a] Held as ADSs.
[b] Includes 48,024 shares held as ADSs at 31 December 2010 and 47,320 shares held as ADSs at 1 January 2010.
[c] Held as ADSs, except for 94 shares held as ordinary shares.
[d] On retirement at 15 April 2010.
[e] On resignation at 30 November 2010.
[f] Includes 34,962 shares held as ADSs.
[g] On resignation at 31 October 2010.
[h] On retirement at 15 April 2010.
[i] On appointment at 1 February 2010.
[j] On appointment at 8 November 2010.
[k] On appointment at 2 April 2010.
[l] On appointment at 8 November 2010.
[m] On appointment at 1 February 2011.

The above figures indicate and include all the beneficial and non-beneficial interests of each director of the company in shares of the company (or calculated equivalents) that have been disclosed to the company under the Disclosure and Transparency Rules as at the applicable dates.

Executive directors are also deemed to have an interest in such shares of the company held from time to time by the BP Employee Share Ownership Plan (No.2) to facilitate the operation of the company's option schemes.

No director has any interest in the preference shares or debentures of the company or in the shares or loan stock of any subsidiary company.

Directors and senior management

# Corporate governance

90   Board performance report

105 Corporate governance practices

106 Code of ethics

106 Controls and procedures

107 Principal accountants' fees and services

108 Memorandum and Articles of Association

Corporate governance

Corporate governance

# Board performance report

Dear shareholder

The tragic loss of life on the Deepwater Horizon and subsequent events in the Gulf of Mexico dominated the work of the board over the year. The following report describes how your board addressed the immediate crisis while working to ensure a complex, global business continued to operate effectively.

I believe the board responded strongly during the crisis. Our first priority was to provide the guidance, resources and support required by our response teams in the Gulf of Mexico. We met as a full board on 25 occasions during the year. A dedicated Gulf of Mexico committee was formed to enable the board to respond quickly and appropriately as events unfolded. During the summer, the chairs of the committees and I met regularly to ensure work was co-ordinated and the right issues were being addressed in a timely way.

There remains much for the board to do. We are giving particular attention to the ways in which the company applies the many lessons learned, in particular in the process safety area, and meets its ongoing commitments in the US. We are also working with the executive team to ensure BP pursues a clear strategic direction that is well matched to future opportunities and challenges.

There has been significant change on the board. Five new non-executives have joined over the past 12 months and we have a new group chief executive. The board is a strong and united team with a breadth of experience that will serve the company well.

Events in the Gulf of Mexico represent a watershed for the company. In terms of the board, it is essential that we employ the most effective processes and governance mechanisms, and I am leading a review of the structures and tools that were in place during 2010. We will examine the results of our board and committee evaluations, which are described in this report. We will carefully consider the constructive feedback I have received from shareholders and others. Our goal is to be a board that not only responds to the issues of the past but that also anticipates the challenges of the future as BP's business changes and evolves to the demands of a global organization in the twenty-first century. I look forward to reporting to you on this in the future.

We are required to comply with the new UK Corporate Governance Code from next year. To ensure we meet standards of best practice we have already adopted the requirements of the new Code as the basis for assessing the BP board's performance, in addition to complying with the June 2008 Combined Code.

Finally, I want to emphasize the importance the board places on trust and transparency. It is right that we share our thoughts and actions with you, and we will use all appropriate channels of communication to provide timely and helpful information.

I would like to take this opportunity to thank all of my colleagues for their time commitment and support during the year.

**Carl-Henric Svanberg**
Chairman

## BP's governance framework

The BP board works within a clear framework described in its governance principles. These describe the board's role, how it operates, how it relates to executive management and the main tasks of its committees. These are available on the corporate governance page of our website. In all its work the board has to consider specific issues – including health, safety, the environment and BP's reputation. Put simply, the board needs to set the right tone from the top.

Our main areas of focus are:
- Active consideration of long-term strategy.
- Monitoring executive management and the performance of the company.
- Obtaining assurance that material risks to BP are identified and that systems of risk management and internal control are in place to manage such risks.
- Board and executive management succession.

We keep the board governance principles under regular review and we consider their effectiveness as part of the annual board evaluation.

## Board activities in 2010

Over the year, the board met 25 times as we responded both to events in the Gulf of Mexico and subsequently in the financial markets, meeting at least weekly as the crisis developed. The board had to organize its work to respond to the crisis while ensuring the other parts of the company continued to perform. During the summer we formed the Gulf of Mexico committee whose primary responsibility was the oversight of the Gulf Coast Restoration Organization and whose work is described further in this report.

With the exception of the two non-executive directors who joined the board in November, each non-executive director has visited the Gulf of Mexico at least once; the chairman and the chair of the safety, ethics and environment assurance committee (SEEAC) have made more frequent visits and the Gulf of Mexico committee held meetings in the US.

### Gulf of Mexico

The board identified seven priorities in its response to the crisis:

#### 1. Containment and clean-up of the spill

The board monitored the company's work in containing the spill and subsequently capping the well. The board received regular updates from BP management and was kept in daily contact as the company responded to the spill in cleaning the beaches and working with affected communities. Through the group chief executive, the board was kept appraised of the work of the Unified Command in the US. The board is still monitoring this work through the Gulf of Mexico committee (see below).

#### 2. Claims

The company's commitment to meet legitimate claims was agreed to and is being monitored by the board, who received updates on the number and quantum of claims paid by the company and the time taken to process claims received. The board approved the proposal to appoint Kenneth Feinberg to discharge the trust fund and agreed to the fund's terms and structure. Oversight of BP's activities with respect to the Gulf Coast Claims Facility, the Deepwater Horizon Oil Spill Trust and response to fines and penalties is part of the remit of the Gulf of Mexico committee and, going forward, the committee will maintain its monitoring of this area and report this back to the board.

The board also discussed and approved the settlement with the White House on the establishment of the trust fund, believing this would reinforce the company's stated commitment to honour all legitimate claims arising from the incident.

### 3 Liquidity

The events in the Gulf of Mexico, particularly the early inability to cap the well, had a major impact on the company's standing in the financial community and its ability to raise cash on historic terms after its credit rating was downgraded. This was closely monitored by the board so that prompt remedial action could be taken.

With the uncertainty in the financial markets and the establishment of the $20-billion trust fund, the board considered it necessary to review its dividend policy. Despite the company's strong underlying financial performance and asset position, the board believed that additional confidence was needed that the company could manage the uncertainty over the timing and extent of the costs and liabilities relating to the spill going forward. The board decided that in these circumstances it needed to take a prudent and conservative approach to the company's financial position. Accordingly it decided to cancel the first-quarter dividend and to announce that there would be no interim dividends in respect of the second and third quarters of 2010. The board indicated it would consider the resumption of dividend payments in 2011 at the time of the fourth quarter 2010 results, when the board expected it would have a clearer picture of the longer-term impact of the incident. On 1 February 2011, it was announced that quarterly dividend payments would recommence.

To further increase the company's available cash resources, the board significantly reduced the company's organic capital spending in 2010 and increased planned divestments to a target of $30 billion.

The board ensured that the market was kept fully informed of the company's position.

### 4 Investigation

Mark Bly – head of the Safety and Operations function – was asked by the then group chief executive to undertake an investigation aimed at analysing the chain of events surrounding the incident on the Deepwater Horizon and to make recommendations to enable the prevention of a similar accident. The investigation team was tasked to work independently from other BP spill response activities and separately from any investigation conducted by other companies or investigation teams.

The Deepwater Horizon Accident Investigation Report (BP's Investigation Report) was published in September and outlined eight key findings relating to the causes of the accident; for further detail, see Gulf of Mexico oil spill on page 34. The report did not identify any single action or inaction that caused the accident and concluded that a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces came together to allow the initiation and escalation of the accident. A series of 26 recommendations were developed to address each of the report's key findings and these have formed the basis of an action plan. The board tasked the group chief executive and senior management team to implement this action plan across BP and asked SEEAC to oversee this process.

The board is monitoring the hearings of other, non-BP investigations and will consider how the conclusions from these investigations fit within the framework of findings and actions arising from BP's own report.

### 5 Internal initiatives

Following the accident, a number of internal initiatives have been commenced by executive management, with frequent reporting back to the board including examining what can be learnt to further improve BP's risk processes and the company's oversight of contractors. A number of these initiatives are still ongoing and will conclude in the course of 2011.

As incoming chief executive, Bob Dudley announced that a new safety and risk division would be created (the Safety and Operational Risk Function) and that the Exploration and Production segment would be restructured from a single business into three functional divisions (Exploration, Developments and Production). Splitting the upstream business into separate functions is intended to foster the long-term development of specialist expertise and to reinforce accountability for risk management.

### 6 Reputation

During the crisis and afterwards, the board had extensive discussions about the reputational impact of the event, including how it might affect BP's licence to operate both in the US and elsewhere. This work continues to focus on BP's relationship with shareholders, governments, communities and indeed all those who come into contact with BP through its business operations.

The chairman, the chief executive, the chairman of SEEAC and senior management have been actively involved in discussions with shareholders and other groups in an endeavour to address concerns and to start to rebuild trust.

### 7 Strategy

The events in the Gulf of Mexico led the board to undertake a review of strategy. Led by the group chief executive and his team, the board attempted to address the key challenge of how to regain shareholder value and address core issues, including:

- Simplification (how to focus the company's operations across a wide geography).
- How the company could manage risk more tightly.
- How BP could focus on its core capabilities.
- The opportunity to reset the company's portfolio.

The board held three away-day discussions on strategy during the year; these were robust and explored a wide range of strategic options. The outcome of these deliberations on strategy was presented to the investor community on 1 February 2011. For detail of our strategy presentation, see Our strategy on page 19.

### Management and organizational changes

In late April the board and Tony Hayward agreed that he would step down as group chief executive on 1 October, to be succeeded by Bob Dudley, and would leave the company and the board at the end of November. This decision was made following a series of extensive discussions by the board as to what strategic focus BP as a company should have in the longer term and what leadership was best equipped to embark on this next phase.

Through the nomination committee, the board engaged external advisers who identified an external candidate and existing executive director, Bob Dudley, for the position of group chief executive. After interviews and detailed consideration it was concluded that Bob Dudley had the strong industry, operational and geopolitical experience required for the role and, as a result, was appointed as group chief executive. Bob Dudley has handed over his duties as head of the Gulf Coast Restoration Organization to Lamar McKay, president and chairman of BP America.

In September the board agreed with Andy Inglis, executive director and head of the upstream business, that in order to facilitate the new organizational structure, he would relinquish his role and step down from the board at the end of October – leaving the company at the end of 2010. The executive vice presidents heading the three new upstream divisions report directly to Bob Dudley and the board decided that on the basis of this reporting line it would not replace Andy Inglis's position as an upstream executive director on the board. From 1 November 2010, executive director membership of the board has been reduced to three.

### Other board activities in 2010

At the start of each year the board plans and agrees a forward agenda for its work and that of its committees so that it can balance its workload and achieve its tasks (namely, strategy, risk and the oversight of the company's performance and operation of the system of delegation). Our forward-planning process allows for urgent issues to be accommodated – and following the Gulf of Mexico incident, the focus of the board's activities shifted in response to the challenges and activities taking place.

This process also gives the board the ability to deal with pressing and ongoing business. These included a review of opportunities in Russia, the global economic outlook, the 2011 annual plan, group risks, Alternative Energy and BP's HR function. The board considered the group's statutory reports and the broader aspects of corporate reporting, received regular updates on the group's financial outlook and discussed the company's financial results.

The independent expert appointed to provide an objective assessment of the BP US Refineries Independent Safety Review Panel (Duane Wilson) made his annual presentation to the board. Further details on his activities are outlined in the report of the SEEAC below.

### The board and risk management

One of the tasks of the BP board is to ensure that the company is run effectively and that the material risks to the group are identified, understood and that the systems of risk management and internal control are in place to manage these risks.

Integral components in discharging this task are:
- Regular reviews of the material risks to the group and their recognition in the company's annual plan.
- Ensuring through the board's system of delegation that its approach to risk is adopted by the group chief executive (GCE) and that decisions are taken in accordance with this system.
- Maintaining through the board and its committees clear oversight of the system of internal control and risk management established and maintained by the group chief executive.

### The board's monitoring of risk

Each year the board reviews the key group risks and how they are managed as part of the annual group plan. The board decides which risks will be monitored by the board and which will be allocated to the committees with appropriate reporting to the board. A high-level work programme for the board and its committees is set on the basis of a forward agenda that reflects the board's core tasks and the key group risks.

Geopolitical and reputational risks are considered by the board. Reports are received from the committees to whom specific risk oversight has been allocated. The audit committee monitors the management of financial risk while the SEEAC monitors the management of non-financial risk. In addition, the Gulf of Mexico committee was formed in 2010 specifically to oversee the activities of the Gulf Coast Restoration Organization.

Under BP's governance framework, authority for the executive management of BP is delegated to the group chief executive (subject to defined limits and monitoring). Executive management has responsibility for the delivery of projects (for example, the development of upstream projects is managed by a specialist group known as the Global Projects Organization).

The board's committees review the reporting by business and function, which includes the safety and environmental performance of projects. The committees receive regular reports from the group compliance and ethics, the internal audit and the safety and operational risk functions. The audit reports highlight the key findings and management actions arising from that work.

As part of the board's risk oversight activities, the audit committee and SEEAC hold an annual joint meeting to assist the board in assessing the effectiveness of the company's internal control and risk management systems.

BP's general auditor (head of the internal audit function) reports on audit work on risk management activities across the group and attends meetings of both the audit committee and SEEAC. The general auditor and the group compliance and ethics officer have direct access to the chairs of both committees. Meetings are held both with and without the presence of management.

### BP governance framework



## BP's system of internal control

The board is responsible for maintaining a sound system of internal control and delegates the establishment and maintenance of this system to the group chief executive. Management systems, organizational structures, processes, standards and behaviours are all components of BP's system of internal control.

Management of risk and operational performance is one of the three elements of BP's system of internal control. Businesses identify, prioritize, manage, monitor and improve the management of risks on a day-to-day basis to equip them to deal with hazards and uncertainties. The key risks, and how they are managed, are reported up through the line in a consistent manner to enable business planning, appropriate intervention and ultimately board oversight.

This enables the identification of the most important risk management activities. Audit processes are designed to consider whether selected risk management activities are designed and operating effectively.

### Investments and operations

BP's operations and investments are conducted and reported in accordance with, and associated risks are thereby managed through, relevant standards and processes. These range from OMS (which is the structured set of processes designed to deliver safe, responsible and reliable operating activity), to group standards (which set out processes for major areas such as fraud and misconduct reporting), through to detailed administrative instructions.

BP has an established investment approvals and assurance process which provides a set of policies and procedures for all its investment decisions, including BP's decisions to invest in partner-operated or joint venture activities. These include a consistent set of economic assumptions used to evaluate projects (including oil and carbon pricing), together with an assessment of financial and non-financial risk, economic return and other factors that may be relevant. Potential investments must also be screened against BP's group-defined practice on environmental and social matters.

Material commitments (including those involving long-term commitments or which potentially involve reputational issues) are reviewed and endorsed by an executive-level committee – the Resource Commitments Meeting (RCM). The board is kept updated of the RCM activities through the circulation of RCM minutes in advance of each board meeting. The board annually considers a review of capital projects and their performance against investment criteria.

### BP's system of internal control

**Elements include:**

**Board and executive governance of the group**
- Board governance principles, including executive limitations
- Board committees
- Executive committees
- Group plan and planning processes
- Financial framework

**The assignment of authority and responsibility**
- System of delegation

**Integrity and ethical values and legal compliance**
- Code of conduct
- Certification

**Management philosophy and operating style**
- Group strategy
- Organizational structure

**Competence framework**
- Leadership framework
- Learning and development



BP's system of internal control

Control environment · Management of risk and operational performance · Management of people and individual performance

**Risk management**
- Risk management system
- Group risk categories and group risks
- Operating Management System (OMS)
- Group standards
- Processes and practices

**Monitoring performance and the management of risk**
- Operating performance reviews
- Management information
- Group financial risk committee
- Group operations risk committee

**Clear lines of communication**
- Internal communications
- External communications

**Management of people**
- Performance objectives
- HR policies and procedures

**Employee concerns**
- OpenTalk
- Fraud and misconduct reporting standard

### Executive team and committees

The group chief executive and his senior team are supported by executive-level sub-committees, that are responsible for and monitor specific group risks: the group operations risk committee (GORC), the group financial risk committee (GFRC), the group people committee (GPC), the resources commitments meeting (RCM) and the group disclosure committee (GDC). These committees provide input and data to the risk management process by the executive, as do the group compliance and ethics function, the safety and operational risk audit function and the group's financial control team.

The GCE conducts regular performance reviews with the businesses and key functions to monitor performance and the management of risk and to intervene if necessary. People management is based on annual and long-term objectives, through which employees are directed towards delivering specific elements of the group plan within agreed boundaries.

BP has an annual certification process in which team leaders are asked to discuss with their teams and then submit a certificate regarding their and their team's understanding of and adherence to BP's code of conduct and the reporting of any breaches.

Corporate governance

Corporate governance

## Board and committee attendance

| | Board | | Audit committee | | SEEAC | | Remuneration committee | | Gulf of Mexico committee | | Nomination committee | | Chairman's committee | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | a | b | a | b | a | b | a | b | a | b | a | b | a | b |
| Carl-Henric Svanberg | 25 | 25 | | | | | | | | | 8c | 8 | 8c | 8 |
| Sir William Castell | 25 | 24 | | | 9c | 9 | | | 9 | 6 | 8 | 8 | 8 | 8 |
| Paul Anderson | 23 | 21 | | | 8 | 8 | | | 9 | 9 | | | 7 | 7 |
| Frank 'Skip' Bowman | 2 | 2 | | | 1 | 1 | | | | | | | 1 | 1 |
| Antony Burgmans | 25 | 19 | | | 9 | 8 | 6 | 6 | | | | | 8 | 7 |
| Cynthia Carroll | 25 | 19 | | | 9 | 7 | | | | | | | 8 | 6 |
| George David | 25 | 21 | 15 | 15 | | | 6 | 6 | 9 | 9 | | | 8 | 7 |
| Erroll Davis, Jr | 4 | 3 | 5 | 5 | 3 | 2 | | | | | | | 1 | 1 |
| Ian Davis | 22 | 21 | 10 | 9 | | | 4 | 3 | 9c | 9 | | | 7 | 7 |
| Douglas Flint | 25 | 25 | 15c | 14 | | | | | | | 6 | 6 | 8 | 7 |
| DeAnne Julius | 25 | 23 | | | | | 6c | 6 | | | 8 | 8 | 8c | 8 |
| Brendan Nelson | 2 | 2 | 1 | 1 | | | | | | | | | | |
| Sir Ian Prosser | 4 | 3 | 5 | 5 | | | 2 | 1 | | | 3 | 3 | 1 | 1 |
| **Executive directors:** | | | | | | | | | | | | | | |
| Bob Dudley | 25 | 25 | | | | | | | | | | | | |
| Iain Conn | 25 | 24 | | | | | | | | | | | | |
| Byron Grote | 25 | 25 | | | | | | | | | | | | |
| Tony Hayward | 24 | 23 | | | | | | | | | | | | |
| Andy Inglis | 23 | 23 | | | | | | | | | | | | |

[a] Total number of meetings the director was eligible to attend.
[b] Total number of meetings the director did attend.
[c] Committee chairman.

### Board meetings and attendance

As part of its forward agenda, the board normally plans to hold one of its meetings at the company's offices in Washington and at least one meeting at or near one of the company's operational locations (enabling the opportunity for board site visits). In 2010, the board held one meeting in Washington but due to the increased number of meetings and associated constraints on time, held the remainder of its meetings in London or via teleconference. A total of 25 board meetings were held during the year.

### Membership of the BP plc board

Throughout 2010 Carl-Henric Svanberg has led the board as chairman. Sir William Castell was appointed senior independent director in April 2010 following the retirement of Sir Ian Prosser at the AGM.

Neither the chairman nor the senior independent director is employed as executives of the group. The board maintains a succession plan for the chairman and senior independent director, in addition to the group chief executive and senior management.

During the year, there were a number of changes to the board:
- Sir Ian Prosser and Erroll Davis, Jr retired from the board at the AGM in April 2010.
- Two non-executive directors were appointed prior to the 2010 AGM: Paul Anderson in February 2010 and Ian Davis in April 2010.
- Dr Tony Hayward stepped down as group chief executive on 1 October 2010 and left the board on 30 November 2010.
- Andy Inglis stepped down as chief executive, Exploration and Production and as an executive director of the board at the end of October 2010.
- Two further non-executive directors were appointed on 8 November 2010, Frank 'Skip' Bowman and Brendan Nelson.

In addition, Phuthuma Nhleko joined the board as a non-executive director on 1 February 2011.

At the AGM in April 2011, Dr DeAnne Julius (chair of the remuneration committee) and Douglas Flint (chair of the audit committee) will retire from the board. Their committee chair roles will be assumed by Antony Burgmans (remuneration) and Brendan Nelson (audit).

The board is composed of the chairman, 11 non-executive directors and three executive directors. The board governance principles state that the number of directors should not normally exceed 16. The board has decided that it will maintain the current level of executive director membership on the board, with reporting of exploration and production activities that were previously represented by Andy Inglis now being undertaken by Bob Dudley.

The chairman's committee reviews the systems for senior executive development and determines the succession plan for the group chief executive, executive directors and other senior members of executive management.

The nomination committee identifies, evaluates and recommends candidates for appointment or reappointment as non-executive directors and keeps under review the mix of knowledge, skills and experience of the board necessary to ensure an orderly succession. Given the size of the BP board and the need to deliver a steady refreshment of board appointments, the committee has developed a longer term 'pipeline' of potential non-executive talent on which it expects to draw as the need for new appointments arises.

### Director appointment, tenure and elections

The chairman and non-executive directors of BP serve on the basis of letters of appointment. Non-executives ordinarily retire at the AGM following their 70th birthday. Executive directors have service contracts with the company, which are expressed to retire at a normal retirement age of 60 (subject to age discrimination).

Details of all payments to directors appear in the directors' remuneration report.

BP does not place a term limit on a director's service as the company proposes all its directors for annual re-election by shareholders (a practice we have followed since 2004). New board members are subject to election by shareholders at the first AGM following their appointment. The chairman and the nomination committee keep the tenure of directors under consideration as part of a continual review of board skills and balance.

## Indemnity and insurance

In accordance with BP's Articles of Association, directors are granted an indemnity from the company in respect of liabilities incurred as a result of their office, to the extent permitted by law. In respect of those liabilities for which directors may not be indemnified, the company maintained a directors' and officers' liability insurance policy throughout 2010. During the year, a review of the terms and scope of the policy was undertaken. The policy has been renewed for 2011. Although their defence costs may be met, neither the company's indemnity nor insurance provides cover in the event that the director is proved to have acted fraudulently or dishonestly. UK company law permits the company to advance costs to directors for their defence in investigations or legal actions.

## Time commitment and outside appointments for directors

Letters of appointment to the BP board do not set out fixed time commitments for board duties as the company believes that the time required by directors may change depending on business events (as was demonstrated during 2010). Membership of the board represents a significant time commitment and it is expected that directors will allocate sufficient time to the company to perform their duties effectively. The nomination committee keeps this under regular review.

BP permits executive directors to take up one external board appointment, subject to the agreement of the chairman and reported to the BP board. Fees received for an external appointment may be retained by the executive director and are reported in the directors' remuneration report.

Non-executive directors may serve on a number of outside boards, provided they continue to demonstrate their commitment to discharge their duties to BP effectively. The nomination committee keeps under review the nature of directors' other interests to ensure that the effectiveness of the board is not compromised. The committee may make recommendations to the board if it concludes that a directors' other commitments are inconsistent with those required by BP.

## Board independence

The governance principles require our non-executive directors to be independent in character and judgement and free from any business or other relationship that could materially interfere with the exercise of their judgement. The board has determined that those non-executive directors who served during 2010 fulfilled this requirement and were independent.

The board also satisfied itself that there is no compromise to the independence of, or existence of conflicts of interest for those directors who serve together as directors on the boards of outside entities or who have other appointments in outside entities. These issues are considered on a regular basis at board meetings.

## Board support and external advice

Support to the board and its committees is provided through the company secretary's office, which reports to the chairman. Within BP, the company secretary has no executive function and his appointment is determined by the nomination committee and his remuneration determined by the remuneration committee.

Under the BP board governance principles, any director is entitled to obtain independent, professional advice relating their own responsibilities and the affairs of BP. Directors are also expected to obtain independent advice where there is consideration of any matter in which a director may have an interest that could conflict with the interests of the company.

## Induction and board learning

All directors receive a full induction programme when they join the board, including a session on BP's system of governance and the legal duties of directors of a listed company. Non-executive directors receive a wider programme that covers the business of the group and is tailored according to a director's own background and the board committees on which they will serve. During the year we undertook induction programmes for our new non-executive directors, which in some cases are continuing. The programme covers BP's business, an overview of its functions, the company's strategic approach and financial framework and the group's approach to risk management. Each non-executive director had a separate induction session on the board committee(s) of which they are a member and all had a private session with the company's external auditor. In 2010 we also continued the induction programme for the chairman – including visits to BP operations around the world.

The events of the year resulted in the board concentrating on issues in the upstream business and in the US, with planned visits to other locations such as a joint venture petrochemicals plant in Asia and to BP's fuel and lubricants technology site, being postponed. The SEEAC visited the Texas City refinery in February. There is a full programme of visits for 2011. Non-executive directors are expected to participate in at least one site visit per year.

The programme of board learning events was amended following events in April to include detailed briefings on aspects of deepwater drilling and technology options for killing the well. The board also received verbal and written updates on legal and regulatory issues.

## Board evaluation

BP conducts an annual evaluation of the performance and effectiveness of the board and its committees. The evaluation of individual directors is undertaken by the chairman, with the chairman's own performance evaluated by the chairman's committee (led by the senior independent director).

By building on the results of the previous year's evaluation, the board tries to achieve a continuous cycle of evaluation, targeted actions arising from the review and performance improvement. Actions taken by the board during the year in response to the outcome of the 2009 review included the scheduling of more informal sessions outside board meetings to maximize the utility of the time available for the board and an active planning of committee and board succession to ensure appropriate cross membership between related committees.

With the evaluation of the board's performance being largely dominated by events in the Gulf of Mexico, it was felt that the 2010 evaluation needed to be undertaken in as robust and rigorous a manner as possible. The board decided to appoint an external facilitator (a different individual to the external facilitator who undertook the 2009 evaluation) to work with the company to undertake this year's review.

The evaluation of the board was undertaken through one-on-one interviews with each board member (with the exception of Frank Bowman and Brendan Nelson who joined the board late in the year). Evaluation of the board committees was managed through the use of online questionnaires.

Corporate governance

Corporate governance

The outcome of these evaluations is reported in the work of committees at the end of this report.

The results of this evaluation work were presented in meetings of the board and each of its committees in January 2011 during which there were discussions of the lessons learned as the board and its committees performed their responsibilities during the months of intense and unprecedented operational, reputational and legal challenges to BP following the 20 April 2010 incident.

The evaluation highlighted a number of strengths and identified the following areas for further development in the coming year:

- Conduct additional site visits and participate in detailed briefings on significant operating activities of the company, including upstream businesses.
- Review and, if necessary, revise the company's board governance principles.
- Clarify the board's role in the crisis planning process.
- Build on the strong working relationships within the board to continue and enhance good communication and cohesion.
- Co-ordinate and clarify external and stakeholder communications.
- Meet more often with senior managers below the level of executive directors as part of the board's management succession oversight function.
- Remain involved in strategic planning and related risk analyses.

### Communication
#### Shareholder engagement

Given the events of last year, communication with our shareholders has been particularly important. In addition to contact with our large and institutional investors, we have welcomed the communication we have had with our private shareholders – with many letters and emails coming through to the chairman, to the group chief executive and to other parts of the company. While these represent a diverse range of viewpoints, both positive and negative about the company, they have also enabled the board to be informed about the wider shareholder perception of events and the company's reaction to them.

During the incident and beyond, we attempted to keep our shareholders and the wider market informed of events and progress through various channels – including press releases, webcasts, teleconferences and meetings. The group chief executive, executive directors and senior management engaged with shareholders across a broad range of issues.

In parallel, the chairman met with investors in the US and UK on a one-to-one and group basis, as did other senior, non-executive directors. The views and reactions discussed with the company in these webinars and meetings provided valuable feedback and input into the board's thinking over the period of the crisis and our deliberations on strategy.

The company maintains a programme of engagement with a range of shareholders on issues relating to the group. Presentations given by the group to the investment community are available to download from the 'Investors' section of our website.

We held our annual meeting with our largest investors and the chairman and chairs of our main board committees in March 2010. Topics discussed at this session included the work of the board and its committees over the year, key challenges and the company's position on the shareholder resolution on oil sands. We find this meeting a useful way for investors to hear about the work of our committees and for our non-executive directors to engage in dialogue with investors. It is intended that a similar meeting will be held in March 2011.

The board gains independent feedback on the views of our institutional investors on the company, its performance and its investor relations programme through an annual investor audit which is undertaken by external advisors.

### AGM

We have strong participation at our AGM, with attendance usually exceeding a thousand people. With the size and geographic diversity of our shareholder base, we try to make the AGM accessible through the use of webcasting and advance voting – either online, by post or telephone. Votes on all matters (except procedural issues) are taken by a poll at our AGM – meaning that every vote cast, whether by proxy or made in person, is counted.

The chairs of the board committees and the chairman were present during the 2010 AGM. Board members met shareholders on an informal basis after the main business of the meeting.

Average voting levels at the 2010 AGM decreased slightly to 60%, compared to 61% in 2009. However, the number of webcast downloads for the 2010 AGM increased over 2009 levels. We make our webcast, speeches and presentations from the AGM available on the BP website after the event, together with the outcome of voting on the resolutions.

### International advisory board

In 2009, BP formed an international advisory board (IAB) whose purpose is to advise the chairman, chief executive and board of BP p.l.c. on strategic and geopolitical issues relating to the long-term development of the group. The IAB advises on:

- How global and regional trends in the areas of economics, politics and business might affect the development of BP's business in the long term.
- How the international business community and individual governments perceive BP's plans and programmes of activities.

The IAB is chaired by our previous chairman, Peter Sutherland. Other members of the BP IAB are Kofi Annan, Josh Bolten, Dr Ernesto Zedillo, President Romano Prodi and Lord Patten of Barnes. Dr Javier Solana will join the IAB in 2011. Bob Dudley and Carl-Henric Svanberg attend the IAB meetings.

The IAB will normally meet in person twice a year, but members also provide advice and counsel to the chairman, the group chief executive and the board of BP p.l.c. when needed (including during events in the Gulf of Mexico). In 2010, the IAB met once (as one meeting was cancelled due to travel disruption following the volcanic ash cloud).

# Committee Reports

## Audit committee report

The audit committee's agenda in 2010, like that of the board, was significantly shaped by the tragic events in the Gulf of Mexico. These required the committee to focus additional attention and go in greater depth into matters concerning BP's response to the incident, in particular in this committee regarding the financial consequences. Considerable time and effort was spent reviewing and challenging BP's assessment of the likely cost of its immediate and longer-term financial responsibilities and the adequacy of disclosure both around these financial consequences and the related contingencies which were unable to be expressed financially at each reporting date. We also critically reviewed the control aspects surrounding the deployment of BP's financial and physical resources in responding to the incident and, at the height of the crisis, critically examined the group's liquidity and funding position.

While all of these matters were also covered by the board in full session, and many were independently covered from a different perspective by the newly formed Gulf of Mexico committee, the audit committee was extensively engaged in the detailed review of the financial reporting aspects of the incident and the company's response. It was also important that the committee maintained its regular oversight with respect to internal controls and financial integrity across the remainder of the company's activities and consequentially, as reported below, we held a number of extra meetings to ensure our originally planned agenda could be fulfilled in addition to the heightened workload arising from the Gulf of Mexico incident.

I regret that this will be both my first and last audit committee report, as I am stepping down from the board following my appointment as chairman of HSBC Holdings plc. This has been a very challenging year and I want to express my sincere thanks to the members of the audit committee and those who have contributed to satisfying our enquiries for having worked together so effectively. I am certain this will continue under Brendan Nelson's leadership.

**Douglas Flint**
Chair of the Audit Committee

### Committee members

Douglas Flint – committee chair (from 15 April 2010)
George David
Ian Davis (appointed 2 April 2010)
Brendan Nelson (appointed 8 November 2010)
Phuthuma Nhleko (appointed 1 February 2011)

Members who left during the year

Sir Ian Prosser – previously chair of the committee (retired 15 April 2010)
Erroll Davis, Jr (retired 15 April 2010)

The audit committee is composed of independent, non-executive directors selected to provide a wide range of financial, international and commercial expertise appropriate to fulfil the committee's duties.

Douglas Flint is group chairman (formerly chief financial officer and executive director, risk and regulation) of HSBC Holdings plc and a former member of the Accounting Standards Board and the Standards Advisory Council of the International Accounting Standards Board. The board is satisfied that he is the audit committee member with recent and relevant financial experience as outlined in the UK Corporate Governance Code and the June 2008 Combined Code.

The board also determined that the audit committee meets the independence criteria provisions of Rule 10A-3 of the US Securities Exchange Act of 1934 and that Mr Flint may be regarded as an audit committee financial expert as defined in Item 16A of Form 20-F.

Douglas Flint became chair of the audit committee upon the retirement of Sir Ian Prosser from the board in April 2010. As noted above, following his appointment as chairman of HSBC Holdings plc, he will retire from the BP board at the AGM in April 2011. Brendan Nelson will become chair of the audit committee from this time. Upon Mr Flint's retirement, Mr Nelson will become the audit committee financial expert as defined in Item 16A of Form 20-F.

The board considered Mr Nelson's extensive skills and experience made him the ideal candidate to succeed Douglas Flint. Mr Nelson served as a member of the UK Board of KPMG from 2000 to 2006 following which he was appointed vice chairman until his retirement in 2010. In KPMG International he held a number of senior positions including global chairman, banking and global chairman, financial services. Subsequent to retiring from KPMG he was appointed a non-executive director of The Royal Bank of Scotland Group plc where he is chairman of the Group Audit Committee.

## Committee role and structure

The role and responsibilities of the audit committee are set out in the Appendix of BP's board governance principles and available on our website. We keep these under review and test their effectiveness in our annual evaluation of the audit committee.

The committee met 15 times in 2010: this was a significant increase over the previous year with additional time being needed to cover the financial and control aspects of the incident in the Gulf of Mexico. As it does each year, the committee held a joint meeting with the safety, ethics and environment assurance committee (SEEAC) in January to review the general auditor's report on internal control and risk management systems for 2010.

Each meeting of the committee is attended by the group chief financial officer, the deputy chief financial officer, the group controller, the general auditor (head of internal audit) and the chief accounting officer. The lead partner of our external auditors (Ernst & Young) is also present.

The committee also holds separate private sessions during the year with the external auditor and the general auditor – these sessions are without the presence of executive management.

The board is kept updated and informed of the audit committee's activities and any issues arising through verbal reports at its meetings from the committee chair and the circulation of the committee's minutes.

## Committee processes

### Information and advice

Information and reports for the committee are received directly from accountable functional and business managers and from relevant external sources. In addition, like our board and other committees, the audit committee can access independent advice and counsel when needed on an unrestricted basis. During 2010, external specialist legal advice was provided to the committee by Sullivan & Cromwell LLP, Freshfields Bruckhaus Deringer LLP and Kirkland and Ellis LLP and financial advice was provided by KPMG and Morgan Stanley. As part of its annual evaluation, the committee reviews the adequacy of reliable and timely information from management that enables it to fulfil its responsibilities. The 2010 evaluation indicated that members recognized the openness and transparent nature of the materials and presentations provided by management.

### Training and visits

Responding to events in the Gulf of Mexico, there was increased focus on accounting policy applicable to the circumstances arising from the incident and the committee received briefings on the relevant accounting policy applications, particularly provisioning and related disclosure. Other technical updates the committee received included developments in financial reporting, in oil and gas reserves disclosure and in relation to taxation changes.

Induction programmes tailored around their roles on the audit committee were prepared for the two new members who joined during the year. These included sessions on tax, treasury, our trading operations, accounting, financial authorities and the structure of BP's finance function. Both had separate, private sessions with the external and internal auditors. During 2011, we will undertake an audit committee induction programme for Phuthuma Nhleko.

The audit committee held one of its regular meetings at BP's UK trading operations and combined this with a visit to the trading floors which provided the opportunity to meet and put questions to employees. Members of the committee also visited the Gulf of Mexico.

Corporate governance

Corporate governance

## Committee activities

### Gulf of Mexico

The committee considered critically the financial reporting arising from the incident in the Gulf of Mexico, including the impact on the company's liquidity, provisions and contingencies, risk factor disclosure, the associated accounting treatment arising from events and the approval of market announcements. It has also received reports from the general auditor and the group controller on the status of financial controls in the new Gulf Coast Restoration Organization.

### Financial reporting

The group's quarterly financial reports, the 2009 Annual Report and Accounts, the Annual Review and the 20-F were reviewed by the committee before recommending their publication to the board. In undertaking this review, the committee discussed with management how they had applied critical accounting policies and judgements to these documents, including key assumptions regarding provisions (such as for the Gulf of Mexico spill response, litigation, environmental remediation and decommissioning), contingencies and impairment testing. Further details on impairment reviews are included in the Financial statements – Note 5 on page 164 and Note 11 on page 173. Each year, the committee also reviews the company's disclosures relating to oil and gas reserves.

### Monitoring business risk

The committee operates a regular cycle of review of risk, control and assurance from BP's businesses and supporting functions. During the year, the committee undertook a controls review of the US Midwest fuels value chain and received an update on risk, governance and controls activities relating to TNK-BP. The latter included the reports on the system of internal control, TNK-BP's quarterly financial reporting procedures and certain tax matters. Functional reviews were held of information technology and services, procurement, integrated supply and trading and BP's business service centres.

Other areas of review by the committee included the central case planning assumptions for oil and gas prices and refining margins that are utilized in the group's investment appraisal process as well as impairment reviews, a review of the delivery of major projects and the risk management and investment strategy relating to pensions and retirement benefits.

During the year the chief financial officer reported on the work of the group financial risk committee – this is an executive-level committee that provides assurance to the executive on the management of BP's financial risk.

### Internal control, audit and risk management

The forward agenda for the audit committee contains standing items on internal control – these include the quarterly internal audit findings report, an evaluation of internal controls, and an annual assessment of BP's enterprise level controls.

An important input into the board's review of the company's system of risk management and internal control is the annual joint meeting between the audit committee and the SEEAC. This takes place at the start of each year to review the general auditor's report on internal control and risk management systems for the previous year. The general auditor reviews his team's findings and management's actions to remedy significant issues identified in that work. His report also includes information on the results of audit work undertaken by the safety and operational risk audit team and reviews by the group's financial control team.

### External auditors

In 2010, the committee held two scheduled meetings with the external auditors without management being present. These sessions, without the presence of executive management, offered an opportunity for direct feedback and dialogue between both the committee and the auditors. In addition, the chair of the audit committee meets privately with the external auditors before each audit committee.

Performance of the external auditors is evaluated by the audit committee each year, with particular emphasis on their independence, objectivity and viability. The committee reviews the composition of the audit team annually and meets the relevant partners when undertaking business or function reviews. Additionally, the committee has the opportunity to assess specific technical capabilities in the audit firm when addressing specialist topics, for example this year in impairment testing and liquidity reviews.

We maintain auditor independence through limiting non-audit services to tax and audit-related work that fall within defined categories. A new lead audit partner is appointed every five years and other senior audit staff are rotated every seven years. No partners or senior staff from Ernst & Young who are connected with the BP audit may transfer to the group.

Non-audit work by Ernst & Young is subject to the audit committee's pre-approval policy. Non-audit work undertaken by Ernst & Young and by other accountancy firms is regularly monitored by the committee.

Fees paid to the external auditor for the year were $55 million, of which 14.5% was for non-audit work (see Financial statements – Note 17 on page 176). After four years of reductions, the fees and services provided by Ernst & Young for audit and non-audit work increased slightly in 2010 due to additional work required consequent upon the Gulf of Mexico incident.

The audit committee considers both the fee structure and the audit engagement terms and monitors progress during the year. It has recommended to the board that the reappointment of Ernst & Young as the company's external auditors be proposed to shareholders at the 2011 AGM.

### Internal audit

Progress of internal audit against the annual schedule of audits is monitored on a quarterly basis, and the committee looks at the key findings and tracking of any material actions that are overdue or have been rescheduled. A programme of work by internal audit is proposed each year for the committee's approval and in reviewing this, the committee looks at whether it believes key risks facing the company have been appropriately addressed. The programme in 2010 was supplemented considerably by additional work related to risks and controls consequent upon the Gulf of Mexico incident. The programme for 2011 also reflects an enhanced risk environment and was approved by the committee in January 2011.

The general auditor met privately with the committee once during the year, without the presence of executive management or the external auditors. He also meets as necessary with the committee chair between meetings.

Each year the committee reviews internal audit's staff resources in both number and expertise to seek assurance that they are sufficient to fulfil its role. The committee was also satisfied that internal audit had appropriate access to information and that management was committed in the provision of that information. The committee also seeks the views of the external auditors on the effectiveness and quality of internal audit.

### Other activities

Through quarterly updates by the group compliance and ethics officer and general auditor, the committee monitors fraud, misconduct and non-compliance with the BP code of conduct and remedial actions undertaken as a result. The annual certification report which is signed by the group chief executive is also reviewed by the committee.

Financial issues and concerns that have been flagged through the company's employee concerns programme OpenTalk, are reviewed by the committee – which tracks trends in both the case type and time taken to close out queries and reports.

### Committee evaluation

The audit committee examines its performance and effectiveness on an annual basis. In 2010, the committee used an internally designed questionnaire administered by external consultants. It looked at key areas, including the clarity of its role and responsibilities, the balance of skills among its members and the effectiveness of reporting its work to the board. The review concluded inter alia that it had been effective and was satisfied with the extent of training it received but would seek to make time for more. Overall the committee considered it had the right composition in terms of expertise and resource to undertake its activities effectively.

## Safety, ethics and environment assurance committee report

The tragic incident in the Gulf of Mexico, and the extensive activities that were undertaken in response, required and received the full attention of the whole board. It was agreed, early on, that SEEAC should focus its efforts with respect to the incident upon monitoring the pace and effectiveness of the company's group wide response to the recommendations of BP's Investigation Report (further information on the report is on page 91). The Gulf of Mexico committee, of which I am a member, was established as a separate committee to monitor the ongoing restoration activities in the Gulf of Mexico. This enabled the SEEAC to retain its focus on the key non-financial risks within its previously planned agenda for the year, as you will read in the report below.

Nonetheless, I and my SEEAC colleagues made a number of visits to the Gulf of Mexico to gain first-hand assurance of the activities to cap the Macondo well and remediate the impact of the oil spill. I believe the combined response of all those involved was outstanding but we all remained deeply saddened that the incident had occurred and that 11 lives had been lost. Our forward focus on the recommendations of BP's Investigation Report is intended to provide board-level assurance that such an incident could not recur.

I believe the committee is well resourced to fulfil its tasks and this has been further strengthened by the recent appointment of Frank 'Skip' Bowman to the board. Frank Bowman had served on the BP US Refineries Independent Safety Review Panel and brings to SEEAC his extensive safety experience from his time as head of the US Nuclear Navy.

**Sir William Castell**
Chair of the Safety Ethics and Environment Assurance Committee

### Committee members
Sir William Castell – committee chair
Paul Anderson (appointed 2 February 2010)
Frank 'Skip' Bowman (appointed 8 November 2010)
Antony Burgmans
Cynthia Carroll

Members who left during the year
Erroll Davis, Jr (retired 15 April 2010)

### Committee role and structure
The role of the SEEAC is to look at the processes adopted by BP's executive management to identify and mitigate significant non-financial risk, including monitoring process safety management, and receive assurance that they are appropriate in design and effective in implementation. The full list of the tasks and responsibilities of the SEEAC is available on our website

The committee met nine times in 2010. The increased number of meetings held in 2010 primarily reflected the committee's work in reviewing the company's actions in response to BP's Investigation Report. These meetings also provided input for the board's review of that report and established an ongoing monitoring process for SEEAC. One meeting early each year is held jointly with the audit committee to review BP's internal control and risk management systems and to discuss the forward programme of the internal audit function. In January 2011 this meeting was extended to enhance the focus on the integrated approach of audit work including that of the safety and operational risk audit function.

In addition to the committee membership, each SEEAC meeting is attended by the group chief executive, the executive vice president for safety and operational risk (Mark Bly), the general auditor (head of internal audit) and the lead partner from our external auditors. Four times during the year the committee held private sessions for the committee members only (without the presence of executive management) after the main business of the meeting, to discuss any issues arising or matters on the minds of the committee membership. The committee also held a private session with the group compliance and ethics officer. Between meetings, discussions involving the committee chair and secretary, the external auditor's lead partner, the general auditor and executive management occur as appropriate.

### Committee processes
Information and advice
Information to the committee comes from both inside and outside the company. The business segments and regional organizations provide direct reports to the committee but there is also cross-business information on a group wide level from our functions, including the safety and operations risk function, internal audit, group compliance and ethics, group legal and HR. During the year, the main external input into the committee has been from Mr Duane Wilson, the Independent Expert (for further information, see the section on Independent Expert below). As for the board and other committees, SEEAC can access any other independent advice and counsel if it requires, on an unrestricted basis. During the year SEEAC members have received briefings from external retained counsel, primarily Kirkland and Ellis LLP.

Training and visits
The committee visited the Texas City refinery in March 2010 to see the progress made against the BP US Refineries Independent Safety Review Panel report. This followed up on their observations from their previous visit in September 2007 and the committee chairman's visit in April 2008. The committee was joined by four other directors and received an extensive update on process safety progress since the 2005 incident. Their observations were consistent with the reports received from the Independent Expert.

Planned visits to other sites during the year were cancelled to enable the committee to reorganize its schedule to focus upon issues arising from the Macondo incident. Each member of SEEAC visited operations in the Gulf of Mexico at least once during the year, with the SEEAC chair making a number of visits to the region and its command centres to observe first hand BP's response efforts and the progress of attempts to kill the well and mitigate the effects of the oil spill. A separate technical briefing was provided to the committee (and other board members) on exploration drilling by the relevant functional managers.

Induction programmes for the two new members of SEEAC were organized during the year and, in the case of Frank Bowman, is still ongoing in 2011.

### Committee activities
Safety and operations
Discussion on personal and process safety and operational risk and performance forms a large part of the committee's agenda. The committee receives regular reports from the safety and operational risk function, including the quarterly reports prepared for executive management on the group's HSE performance and operational integrity. In 2010, excluding meeting time specifically addressing the Gulf of Mexico incident, the SEEAC utilized 42% of its agenda on safety and operational risk matters including process safety. This small reduction, compared with the 51% recorded in 2009, reflected the committee's commitment to gaining assurance in other areas of its remit including crisis and continuity management, regulatory compliance, environmental monitoring, security and product quality risk.

Corporate governance

Corporate governance

The committee also examined quarterly audit reports from BP's internal audit and safety and operations functions which highlighted key findings and material actions arising from audits which had taken place at segment, functional and regional levels and tracked their close-out. Safety and environmental performance of projects was included within the reporting by segment and performance unit.

Activities from the executive-level group operations risk committee (GORC) are reported to the SEEAC by its chair at each meeting. The SEEAC received regular updates on the company's interaction with regulatory agencies, and the committee chairman received a briefing from legal counsel on the OSHA citations in respect of Texas City.

### Gulf of Mexico

The committee examined BP's Investigation Report and its recommendations before providing input for the board's review of the report prior to its publication. The committee noted that the BP investigation team had conducted its investigation independently from the teams managing regular operations and the ongoing response to the incident. The committee also reviewed, and reported to the board, management's early actions in response to lessons learned. The action plan that has been developed from the 26 recommendations of BP's Investigation Report will be tracked in its implementation by the committee, against agreed timelines and milestones. In monitoring progress against BP's Investigation Report's recommendations, the safety and operations audit function will provide SEEAC with quarterly tracking reports and reporting updates will be made by upstream's executive vice president Developments and by the group chief executive. The committee is also monitoring other, non-BP investigations to determine how the conclusions from these relate to the action plan and activities arising from BP's Investigation Report.

The committee will also keep under review the implementation of the new safety and operational risk organizational structure and the resourcing it requires to support the decision and intervention rights it has in all aspects of the group's technical and operational activities, including key investment decisions.

### Independent Expert

Duane Wilson was appointed in 2007 by the board as an Independent Expert to provide an objective assessment of BP's progress in implementing the recommendations of the BP US Refineries Independent Review Panel (aimed at improving process safety performance at BP's five US refineries).

During the year, Mr Wilson kept the committee updated on his workplan and the outcome of his visits to each of BP's five US refining sites. In March, he published his third annual report that assessed BP's progress against the 10 panel recommendations. In his report, which was published in full on BP's website, he concluded that the company had made significant improvements in response to all 10 recommendations but that much work remained to be done. Mr Wilson's fourth report will be published in full and available on our website in March 2011 and a summary of the third and fourth reports is provided in Safety on page 70.

### Regional and functional reports

The committee receives a report each year on the progress made in HSE at TNK-BP, noting however that formal oversight of the joint venture's HSE performance and policies is exercised by TNK-BP's own HSE committee. It was reported that TNK-BP continued to make significant progress in addressing the main safety, ethical and environmental challenges confronting it since its creation in 2003. Nonetheless, significant areas remain for improvement and the committee will continue to monitor progress regularly.

With joint venture operations in Iraq getting under way, the committee sought and received an update on the risks and management of security in Iraq.

### Other topics

During the year, the committee examined the company's crisis response and continuity management plans. It also reviewed the risk identification and company's proposed mitigations relating to hydrocarbon product quality.

Developments in the measurement of greenhouse gas emissions were considered by the committee in the context of regulatory compliance and as part of the company's tracking and disclosure processes.

### Committee evaluation

For its 2010 evaluation, the SEEAC used a questionnaire administered by external consultants to examine the committee's performance and effectiveness. The review looked at different areas, including the balance of skills and experience among its membership, quality and timeliness of information the committee receives, the level of challenge between committee members and management and how well the committee communicates its activities and findings to the board.

The committee concluded that it should endeavour to increase its site visits and training, noting that the particular circumstances of 2010 had reduced the opportunity for such activities except in relation to the Gulf of Mexico. It also believed that it could improve the prioritization of its agendas through more focused pre-read material. The committee considered its current membership provided a well-balanced resource and also noted the valuable contribution made by the Independent Expert.

## Gulf of Mexico committee report

Following the accident in the Gulf of Mexico a separate business organization was set up to manage the group's long-term response to the incident – the Gulf Coast Restoration Organization (GCRO). The board subsequently created the Gulf of Mexico committee in recognition of the scale of the long-term response and to oversee the activities of the GCRO, thereby freeing up more of the board's time to devote sufficient attention to the oversight and strategic direction of the group as a whole.

The committee has met with leaders and management of the GCRO on a frequent basis in 2010, in order to oversee their running of the organization and to cover each of the committees tasks listed below, with a particular focus on legal and claims-related matters.

I believe the committee has taken a rigorous approach to its work – maintaining a detailed view of the complex issues involved in the aftermath of the incident and providing an effective oversight role on behalf of the board for a number of important areas. This has been reflected in the frequency of meetings the committee has held since the committee was formed in the summer. As we move into the next phase of the company's response in the Gulf of Mexico, I expect the timetable for the committee to stabilize and, during the course of 2011, the committee will continue to review the frequency and structure of its meetings.

**Ian Davis**
Chair of the Gulf of Mexico Committee

### Committee members

Ian Davis – committee chair
Paul Anderson
Sir William Castell
George David

Membership of the Gulf of Mexico committee includes two of our US-based non-executive directors and chair of the SEEAC. Two members of the committee are also on the audit committee, which has helped inform discussions at the latter relating to the provision for incident-related costs.

Each meeting of the committee is attended by Lamar McKay, President of the GCRO, and by Jack Lynch, general counsel to the GCRO. Our chairman, group chief executive and group general counsel join the meeting whenever possible. Senior management from GCRO also attend meetings of the committee as appropriate. Support is provided to the committee by the company secretary's office.

### Committee role and structure

The purpose of the committee is to provide non-executive oversight of the GCRO, and to support efforts to rebuild trust in BP and BP's reputation in the US.

The work of the committee is fully integrated with the work of the board on reputation, safety, strategy and financial planning, and the board retains ownership of the group's response to the incident. The workings and conclusions of the committee are transparent to and discussed regularly with the board, who receive briefings on the committee's activities through the circulation of minutes, and through verbal reports that the committee chair provides at board meetings.

The committee undertakes the following tasks:
- Monitoring the remediation work to mitigate the effects of the oil spill in the waters of the Gulf of Mexico and on the affected shorelines.
- Overseeing a co-ordinated response programme with affected communities and states, and overseeing the approach for relationships with communities, states and the US government on issues relating to the incident.
- Overseeing the legal and communication strategy for litigation involving the company or its subsidiaries arising from the incident or its aftermath, including government claims for fines and penalties.
- Overseeing the strategy connected with claims, recognizing the independent nature of the connected Gulf Coast Claims Facility.

- Overseeing BP's activities and responsibilities with respect to the Gulf Coast Claims Facility and the Deepwater Horizon Oil Spill Trust.
- Overseeing the process for distribution of the goodwill fund for rig workers who have been impacted by the drilling moratorium imposed by the US government.
- Overseeing expenditures and investments that fall outside the established claims administration process, or any redirection of resources outside the normal course of business.
- Reviewing and monitoring management strategy and actions to restore the group's reputation in the US and supporting management in any activities aimed at that goal.

The committee also considers and reviews the GCRO's management of operational and strategic risks connected with the response to the incident. This includes priorities, mitigation plans, resources and the effectiveness of activities.

The committee met on nine occasions in 2010 after its formation in July 2010.

### Committee processes

#### Information and advice
The committee receives its information from the leadership of the GCRO. Legal briefings are regularly provided by the group and GCRO general counsels, who are joined on occasion by other internal and external legal counsel.

BP's internal audit function has conducted reviews of certain of GCRO's activities and processes, and these have been summarized for the committee's review. Primary monitoring of the management of financial risk is undertaken by the audit committee with monitoring of the management of safety (and other non-financial) risk by the SEEAC.

#### Training and visits
The high frequency of meetings since July 2010 has helped the committee to become effective in each of its tasks. Three of these meetings were held in the US and were of extended duration, providing the opportunity for the committee to meet members of the GCRO leadership team.

### Committee activities

The committee's activities have included the following:

#### Legal
Legal updates from the general counsel to the GCRO have formed a significant part of the committee's agenda, given the breadth and pace of activities. The committee has overseen the GCRO's integrated legal approach, which incorporates all government, civil and criminal investigations, the multi-district litigation, the Natural Resources Damages Assessment process, and legal aspects of the claims processes. The committee has also monitored engagement with other responsible parties, contractors and the other working interest owners in the Macondo well.

#### Claims
The committee has monitored the status of claims from individuals and businesses, which since late August have been administered by the Gulf Coast Claims Facility, and the status of claims from government entities, which continue to be administered by BP.

Assessments of potential future claims for provisioning purposes are reviewed by the audit committee.

#### Remediation
The committee has received reports on the progress of clean-up and remediation activities, and on the phased transition of activities from the Unified Area Command to BP's control. The committee has also been briefed on the results of independent studies of air, water and sediment samples in the Gulf of Mexico. Metrics will be provided to the committee through 2011 to enable remediation activities to be monitored relative to the plan.

### Reputation

The committee has monitored the political landscape and the views of the American people, in part from independent polling data relating to many aspects of BP's response to the incident. This has helped inform many of the committee's discussions, and the committee will continue to receive polling data on a regular basis in 2011.

### Other topics

The committee has received reports on the status of the $500-million Gulf of Mexico Research Initiative (GRI). Research grants will be administered by the GRI's independent research board, and the committee will receive periodic updates to monitor that the distribution of funds is in accordance with the principles of sound science.

The committee has reviewed the status of payments from the $100-million Rig Worker Assistance Fund (Fund). This fund is independently administered by the Baton Rouge Area Foundation, with BP having no right to direct payments from the Fund. The committee will receive periodic updates on the status of payments from the Fund.

### Committee evaluation

The committee has recently examined its performance and effectiveness. The committee concluded that meetings need not be as frequent in 2011. Meetings will be approximately monthly, with several meetings scheduled to take place in the US.

### Remuneration committee report

#### Committee members
Dr DeAnne Julius – committee chair
Antony Burgmans
George David
Ian Davis (appointed 2 April 2010)

#### Members who left during the year
Sir Ian Prosser (retired 15 April 2010)

#### Committee role and structure
The committee determines on behalf of the board the terms of engagement and remuneration of the group chief executive, the chairman and executive directors and to report on those to shareholders. The committee is independently advised.

The chairman of the board attends meetings of the committee. DeAnne Julius will retire as chair of the remuneration committee at the 2011 AGM, from which time Antony Burgmans will assume the committee chairmanship.

Further details on the committee's role, authority and activities during the year are set out in the directors' remuneration report, on page 111 which is the subject of a vote by shareholders at the 2011 AGM.

## Nomination and chairman's committee reports

I chair both the nomination and the chairman's committees. These committees have had fuller agendas in 2010 than in previous years as the events and challenges of the year unfolded. The work of the committees has been inevitably intertwined and for this reason I am writing here to introduce the reports which appear below.

During the year the non-executive directors have been engaged in ensuring the board remained focused on its tasks and organizing its time in an effective way. This has not only been through the formal work of the chairman's committee but also through very regular informal contact particularly during the height of the crisis.

Membership of the board has had to evolve over the year both to address the normal succession process and to address the issues with which the board has had to deal. The nomination committee has been actively involved in all of this.

**Carl-Henric Svanberg**
Chair of the Nomination and Chairman's Committees

### Nomination committee report
**Committee members**

Carl-Henric Svanberg – committee chair
Sir William Castell
Ian Davis (joined upon becoming chair of the Gulf of Mexico committee in August 2010)
Douglas Flint (joined upon becoming chair of the audit committee in April 2010)
Dr DeAnne Julius

Members who left during the year
Sir Ian Prosser (retired 15 April 2010)

The committee met eight times during 2010.

### Committee role and structure

The committee identifies, evaluates and recommends candidates for the appointment or re-appointment as directors and for the appointment as company secretary.

The committee keeps the mix of knowledge, skills and experience of the board under regular review (always in consultation with the chairman's committee) to ensure an orderly succession of directors. The outside directorships and broader commitments of the non-executive directors are also monitored by the nomination committee.

The committee consists of the chairman and the chairs of the main board committees.

### Committee activities

The committee reviewed the independence and roles of each of the directors prior to recommending them for re-election at the 2010 AGM.

After the appointment of Paul Anderson and Ian Davis before the 2010 AGM the committee kept under review the list of potential candidates for non-executive directors to meet the developing requirements of the company and the board.

It had been anticipated that DeAnne Julius would stand down at the 2011 AGM, however, in the autumn of 2010, Douglas Flint announced that he would stand down also at the 2011 AGM upon his appointment as chairman of HSBC. The committee had been keeping the skills of the board under review, and as a result Brendan Nelson and Frank 'Skip' Bowman joined the board in November 2010 and Phuthuma Nhleko in February 2011. External advisers were involved in all three appointments.

In keeping under review the breadth of board skills, the committee took into account not only the vacancies that were appearing on the board but also considered what was necessary to ensure the breadth of experience around the board table. In particular, they considered the requirements of the group's operations within the developing world. In all of their deliberations they were mindful of the contribution made by the IAB.

During the summer the committee worked closely with the chairman's committee on the succession of Bob Dudley as group chief executive. External advisers were used throughout this process.

The committee continues to focus on the evolution of the board as it moves to a new stage in its development.

For its 2010 evaluation, the nomination committee used a questionnaire to examine the committee's performance and effectiveness. The committee concluded that, overall, it had worked well during a challenging year and that the board had undergone substantial change, which had been supported effectively through the committee. The evaluation concluded that the goal for the committee was to move forward with a better rhythm to ensure board refreshment in terms of skills and diversity.

### Chairman's committee report
**Committee members**

Carl-Henric Svanberg – committee chair
Sir William Castell
Paul Anderson (appointed 2 February 2010)
Frank 'Skip' Bowman (appointed 8 November 2010)
Cynthia Carroll
George David
Ian Davis (appointed 2 April 2010)
Douglas Flint
Dr DeAnne Julius
Brendan Nelson (appointed 8 November 2010)
Phuthuma Nhleko (appointed 1 February 2011)

Members who left during the year
Erroll Davis, Jr (retired 15 April 2010)
Sir Ian Prosser (retired 15 April 2010)

The committee met eight times in 2010.

### Committee role and structure

The committee is comprised of the chairman and all the non-executive directors.

The main tasks of the committee are:
- Evaluating the performance and effectiveness of the group chief executive.
- Reviewing the structure and effectiveness of the business organization of BP.
- Reviewing the systems for senior executive development and determining the succession plan for the group chief executive, executive directors and other senior members of executive management.
- Determining any other matter that is appropriate to be considered by all of the non-executive directors.
- Opining on any matter referred to it by the chairman of any committee comprised solely of non-executive directors.

Corporate governance

Corporate governance

**Committee activities**

Early in 2010 the committee determined that Sir William Castell should take on the role of senior independent director upon the retirement of Sir Ian Prosser from the board at the 2010 Annual General Meeting.

Following the accident in the Gulf of Mexico, the committee kept under review the ability of BP's business organization to respond to the challenges that arose while ensuring there was continued focus on the effectiveness of the rest of its global business. This involved ensuring that the board was focusing on the right issues and organizing itself in an appropriate manner. Throughout the crisis in the Gulf of Mexico the committee has actively considered the company's relations with shareholders and others with whom it came into contact, particularly state and federal governments.

The committee evaluated the performance of the group chief executive in early 2010 and formally reviewed succession planning within the group in September 2010. The committee was central to discussions in the summer over the future of Tony Hayward as group chief executive and his replacement by Bob Dudley.

The committee reviews with Bob Dudley his proposals for the enhanced safety and operation function and his reorganization of the Exploration and Production segment on the departure of Andy Inglis. There was no formal evaluation of the chairman in early 2010 as he was only recently in post. His performance was evaluated in early 2011 as part of the overall evaluation of the board.

The committee reviewed the skills of the board and formed collective views of those needed to meet the challenges of the company for the future. The chairman's committee worked closely with the nomination committee in matters around executive and non-executive succession.

# Risk management and internal control review

In discharging its responsibility for the company's risk management and internal control systems under the UK Corporate Governance Code and the June 2008 Combined Code, the board, through its governance principles, requires the group chief executive to operate with a comprehensive system of controls and internal audit to identify and manage the risks that are material to BP. The governance principles are reviewed periodically by the board and are consistent with the requirements of the UK Corporate Governance Code, including principle C.2 (risk management and internal control) and the June 2008 Combined Code, including principle C.2 (internal control).

The board has an established process by which the effectiveness of the risk management and internal control systems are reviewed as required by provision C.2.1 of the UK Corporate Governance Code and the June 2008 Combined Code. This process enables the board and its committees to consider the systems of risk management and internal control being operated for managing significant risks, including strategic, safety and operational and compliance and control risks, throughout the year. The process does not extend to joint ventures or associates.

As part of this process, the board and the audit and safety, ethics and environment assurance committees requested, received and reviewed reports from executive management, including management of the business segments, divisions and functions, at their regular meetings.

In considering the systems, the board noted that such systems are designed to manage, rather than eliminate, the risk of failure to achieve business objectives and can only provide reasonable, and not absolute, assurance against material misstatement or loss.

During the year, the board through its committees, regularly reviewed with the general auditor and executive management processes whereby risks are identified, evaluated and managed. These processes were in place for the year under review, remain current at the date of this report and accord with the guidance on the UK Corporate Governance Code and the June 2008 Combined Code provided by the Financial Reporting Council. In December 2010, the board considered the group's significant risks within the context of the annual plan presented by the group chief executive.

A joint meeting of the audit and safety, ethics and environment assurance committees in January 2011 reviewed a report from the general auditor as part of the board's annual review of the risk management and internal control systems. The report described the annual summary of internal audit's consideration of elements of BP's systems of risk management and internal control over risks arising in the categories of strategic, safety and operational and compliance and control and considered the control environment that responds to risk. The report also highlighted the results of audit work conducted during the year and the remedial actions taken by management in response to significant failings and weaknesses identified.

During the year, these committees engaged with management, the general auditor and other monitoring and assurance providers (such as the group compliance and ethics officer, head of safety and operational risk and the external auditor) on a regular basis to monitor the management of risks. Significant incidents that occurred and management's response to them were considered by the appropriate committee and reported to the board.

As disclosed elsewhere in this *Annual Report and Form 20-F 2010*, material internal control aspects of the Gulf of Mexico spill are being dealt with through the establishment of the Gulf Coast Restoration Organization and the implementation of the recommendations of BP's Investigation Report and through the consideration of other reports and investigations, some of which are still in process.

The Gulf Coast Restoration Organization was set up to manage the company's response activities. This organization has created the framework designed to enable the company to manage the operations and transactions now arising from the incident; including clean-up and restoration costs, claims management and litigation.

In order to ensure that lessons learnt from the event are embedded into the controls in the Operating Management System of the company, the company is undertaking a significant exercise to implement the recommendations of the BP's Investigation Report, and consider other reports and investigations into the incident.

The board established an additional committee, the Gulf of Mexico committee, to engage with management on a regular basis to monitor the response to the Gulf of Mexico spill and the management of risks arising from the incident.

In the board's view, the information it received was sufficient to enable it to review the effectiveness of the company's risk management and internal control systems in accordance with the Internal Control Revised Guidance for Directors (Turnbull).

Subject to determining any additional appropriate actions arising from items still in process, the board is satisfied that, where significant failings or weaknesses in internal controls were identified during the year, appropriate remedial actions were taken or are being taken.

### UK Corporate Governance Code compliance

BP complied throughout 2010 with the provisions of the UK Corporate Governance Code, except in the following aspects:

B.3.2   Letters of appointment do not set out fixed time commitments since the schedule of board and committee meetings is subject to change according to the exigencies of the business. All directors are expected to demonstrate their commitment to the work of the board on an ongoing basis. This is reviewed by the nomination committee in recommending candidates for annual re-election.

D.2.2   The remuneration of the chairman is not set by the remuneration committee. Instead, the chairman's remuneration is reviewed by the remuneration committee, who makes a recommendation to the board as a whole for final approval, within the limits set by shareholders.

BP also complied with the June 2008 Combined Code, with the exception of A.4.4 (letters of appointment) and B.2.2 (remuneration of the chairman) for the same reasons as outlined above for the UK Corporate Governance Code.

## Corporate governance practices

In the US, BP ADSs are listed on the New York Stock Exchange (NYSE). The significant differences between BP's corporate governance practices as a UK company and those required by NYSE listing standards for US companies are listed as follows:

### Independence

BP has adopted a robust set of board governance principles, which reflect the UK Corporate Governance Code and its principles-based approach to corporate governance. As such, the way in which BP makes determinations of directors' independence differs from the NYSE rules.

BP's board governance principles require that all non-executive directors be determined by the board to be 'independent in character and judgement and free from any business or other relationship which could materially interfere with the exercise of their judgement'. The BP board has determined that, in its judgement, all of the non-executive directors are independent. In doing so, however, the board did not explicitly take into consideration the independence requirements outlined in the NYSE's listing standards.

### Committees

BP has a number of board committees that are broadly comparable in purpose and composition to those required by NYSE rules for domestic US companies. For instance, BP has a chairman's (rather than executive) committee, nomination (rather than nominating/corporate governance) committee and remuneration (rather than compensation) committee. BP also has an audit committee, which NYSE rules require for both US companies and foreign private issuers. These committees are composed solely of non-executive directors whom the board has determined to be independent, in the manner described above.

The BP board governance principles prescribe the composition, main tasks and requirements of each of the committees (see the board committee reports on pages 97-104). BP has not, therefore, adopted separate charters for each committee.

Under US securities law and the listing standards of the NYSE, BP is required to have an audit committee that satisfies the requirements of Rule 10A-3 under the Exchange Act and Section 303A.06 of the NYSE Listed Company Manual. BP's audit committee complies with these requirements. The BP audit committee does not have direct responsibility for the appointment, re-appointment or removal of the independent auditors – instead, it follows the UK Companies Act 2006 by making recommendations to the board on these matters for it to put forward for shareholder approval at the AGM.

One of the NYSE's additional requirements for the audit committee states that at least one member of the audit committee is to have 'accounting or related financial management expertise'. As reported in BP Annual Report on Form 20-F, the board determined that Douglas Flint possessed such expertise and also possesses the financial and audit committee experiences set forth in both the UK Corporate Governance Code and SEC rules (see Audit committee report on page 97). Upon Mr Flint's retirement in April 2011, Mr Nelson will become the audit committee financial expert as defined in Item 16A of Form 20-F.

### Shareholder approval of equity compensation plans

The NYSE rules for US companies require that shareholders must be given the opportunity to vote on all equity-compensation plans and material revisions to those plans. BP complies with UK requirements that are similar to the NYSE rules. The board, however, does not explicitly take into consideration the NYSE's detailed definition of what are considered 'material revisions'.

### Code of ethics

The NYSE rules require that US companies adopt and disclose a code of business conduct and ethics for directors, officers and employees. BP has adopted a code of conduct, which applies to all employees, and has board governance principles that address the conduct of directors. In addition BP has adopted a code of ethics for senior financial officers as required by the SEC. BP considers that these codes and policies address the matters specified in the NYSE rules for US companies.

Corporate governance

Corporate governance

# Code of ethics

The company has adopted a code of ethics for its group chief executive, chief financial officer, deputy chief financial officer, group controller, general auditors and chief accounting officer as required by the provisions of Section 406 of the Sarbanes-Oxley Act of 2002 and the rules issued by the SEC. There have been no waivers from the code of ethics relating to any officers.

In June 2005, BP published a code of conduct, which is applicable to all employees.

# Controls and procedures

**Evaluation of disclosure controls and procedures**

The company maintains 'disclosure controls and procedures', as such term is defined in Exchange Act Rule 13a-15(e), that are designed to ensure that information required to be disclosed in reports the company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to management, including the company's group chief executive and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

In designing and evaluating our disclosure controls and procedures, our management, including the group chief executive and chief financial officer, recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the company have been detected. Further, in the design and evaluation of our disclosure controls and procedures our management necessarily was required to apply its judgement in evaluating the cost-benefit relationship of possible controls and procedures. Also, we have investments in certain unconsolidated entities. As we do not control these entities, our disclosure controls and procedures with respect to such entities are necessarily substantially more limited than those we maintain with respect to our consolidated subsidiaries. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected. The company's disclosure controls and procedures have been designed to meet, and management believes that they meet, reasonable assurance standards.

The company's management, with the participation of the company's group chief executive and chief financial officer, has evaluated the effectiveness of the company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of the end of the period covered by this annual report. Based on that evaluation, the group chief executive and chief financial officer have concluded that the company's disclosure controls and procedures were effective at a reasonable assurance level.

**Management's report on internal control over financial reporting**

Management of BP is responsible for establishing and maintaining adequate internal control over financial reporting. BP's internal control over financial reporting is a process designed under the supervision of the principal executive and financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of BP's financial statements for external reporting purposes in accordance with IFRS.

As of the end of the 2010 fiscal year, management conducted an assessment of the effectiveness of internal control over financial reporting in accordance with the Internal Control Revised Guidance for Directors on the Combined Code (Turnbull). Based on this assessment, management has determined that BP's internal control over financial reporting as of 31 December 2010 was effective.

The company's internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets; provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS and that receipts and expenditures are being made only in accordance with authorizations of management and the directors of BP; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of BP's assets that could have a material effect on our financial statements. BP's internal control over financial reporting as of 31 December 2010 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report appearing on page 143 of this *Annual Report and Form 20-F 2010*.

### Changes in internal control over financial reporting
The material impact of the Gulf of Mexico oil spill on the financial results of the company presented challenges for the company's internal control over financial reporting. As discussed in the Business Review section, response operations following the incident were managed by the Unified Area Command (UAC) using, in some cases, processes and systems that the company did not determine or control. As parties outside of the company had final decision-making authority on response-related actions, the activities undertaken by the company and its sub-contractors, and the associated costs, were not wholly within the company's control. A high level of activity and expenditure was generated in a very short time with limited documentation around sourcing and commitments. In addition, the potential for breakdowns in process and controls is increased when company employees are focused on immediate response actions in an emergency situation and working in uncertain conditions.

As a result of the magnitude of this unprecedented event, and in order to separately disclose the financial impacts, new processes and related controls were established to identify and segregate costs, calculate accruals and estimate provisions for future costs. These included:
- Establishing unique invoice-processing procedures and related controls to ensure appropriate accounting for costs.
- Developing methodologies for estimating the various elements of accruals and provisions and instituting related controls to validate assumptions and ensure adequate management review.
- Creating period-end financial reporting processes and related controls, including management and analytical review.
- Hiring additional resources to process and account for the significant level of expenditure.

Although the new controls are consistent with the company's established framework, they represent changes that have materially affected, or are reasonably likely to materially affect, the company's internal control over financial reporting. Despite the impact of this event, as stated above, management has concluded that the company's disclosure controls and procedures and internal control over financial reporting were effective as of 31 December 2010.

# Principal accountants' fees and services

The audit committee has established policies and procedures for the engagement of the independent registered public accounting firm, Ernst & Young LLP, to render audit and certain assurance and tax services. The policies provide for pre-approval by the audit committee of specifically defined audit, audit-related, tax and other services that are not prohibited by regulatory or other professional requirements. Ernst & Young is engaged for these services when its expertise and experience of BP are important. Most of this work is of an audit nature. Tax services were awarded either through a full competitive tender process or following an assessment of the expertise of Ernst & Young relative to that of other potential service providers. These services are for a fixed term.

Under the policy, pre-approval is given for specific services within the following categories: advice on accounting, auditing and financial reporting matters; internal accounting and risk management control reviews (excluding any services relating to information systems design and implementation); non-statutory audit; project assurance and advice on business and accounting process improvement (excluding any services relating to information systems design and implementation relating to BP's financial statements or accounting records); due diligence in connection with acquisitions, disposals and joint ventures (excluding valuation or involvement in prospective financial information); income tax and indirect tax compliance and advisory services; and employee tax services (excluding tax services that could impair independence); provision of, or access to, Ernst & Young publications, workshops, seminars and other training materials; provision of reports from data gathered on non-financial policies and information; and assistance with understanding non-financial regulatory requirements. Additionally, any proposed service not included in the pre-approved services, must be approved in advance prior to commencement of the engagement. The audit committee has delegated to the chairman of the audit committee authority to approve permitted services provided that the chairman reports any decisions to the committee at its next scheduled meeting.

The audit committee evaluates the performance of the auditors each year. The audit fees payable to Ernst & Young are reviewed by the committee in the context of other global companies for cost effectiveness. The committee keeps under review the scope and results of audit work and the independence and objectivity of the auditors. External regulation and BP policy requires the auditors to rotate their lead audit partner every five years. *(See Financial statements – Note 17 on page 176 and Audit committee report on page 98 for details of audit fees.)*

Consolidated financial statements of the BP group

 www.bp.com/downloads/incomestatement

## Group income statement

| For the year ended 31 December | | | | $ million |
|---|---|---|---|---|
| | Note | 2010 | 2009 | 2008 |
| Sales and other operating revenues | 7 | 297,107 | 239,272 | 361,143 |
| Earnings from jointly controlled entities – after interest and tax | | 1,175 | 1,286 | 3,023 |
| Earnings from associates – after interest and tax | | 3,582 | 2,615 | 798 |
| Interest and other income | 8 | 681 | 792 | 736 |
| Gains on sale of businesses and fixed assets | 5 | 6,383 | 2,173 | 1,353 |
| Total revenues and other income | | 308,928 | 246,138 | 367,053 |
| Purchases | | 216,211 | 163,772 | 266,982 |
| Production and manufacturing expenses<sup>a</sup> | | 64,615 | 23,202 | 26,756 |
| Production and similar taxes | 9 | 5,244 | 3,752 | 8,953 |
| Depreciation, depletion and amortization | 10 | 11,164 | 12,106 | 10,985 |
| Impairment and losses on sale of businesses and fixed assets | 5 | 1,689 | 2,333 | 1,733 |
| Exploration expense | 16 | 843 | 1,116 | 882 |
| Distribution and administration expenses | 12 | 12,555 | 14,038 | 15,412 |
| Fair value (gain) loss on embedded derivatives | 34 | 309 | (607) | 111 |
| Profit (loss) before interest and taxation | | (3,702) | 26,426 | 35,239 |
| Finance costs<sup>a</sup> | 18 | 1,170 | 1,110 | 1,547 |
| Net finance expense (income) relating to pensions and other post-retirement benefits | 38 | (47) | 192 | (591) |
| Profit (loss) before taxation | | (4,825) | 25,124 | 34,283 |
| Taxation<sup>a</sup> | 19 | (1,501) | 8,365 | 12,617 |
| Profit (loss) for the year | | (3,324) | 16,759 | 21,666 |
| Attributable to | | | | |
| BP shareholders | | (3,719) | 16,578 | 21,157 |
| Minority interest | | 395 | 181 | 509 |
| | | (3,324) | 16,759 | 21,666 |
| Earnings per share – cents | | | | |
| Profit (loss) for the year attributable to BP shareholders | | | | |
| Basic | 21 | (19.81) | 88.49 | 112.59 |
| Diluted | 21 | (19.81) | 87.54 | 111.56 |

<sup>a</sup> See Note 2 for information on the impact of the Gulf of Mexico oil spill on the income statement line items

Notes on financial statements

 www.bp.com/downloads/segmentalanalysis

## 7. Segmental analysis continued

| | | | | | | $ million |
|---|---|---|---|---|---|---|
| | | | | | | 2010 |
| By business | Exploration and Production | Refining and Marketing | Other businesses and corporate | Gulf of Mexico oil spill response | Consolidation adjustment and eliminations | Total group |
| **Segment revenues** | | | | | | |
| Sales and other operating revenues | 66,266 | 266,751 | 3,328 | – | (39,238) | 297,107 |
| Less: sales between businesses | (37,049) | (1,358) | (831) | – | 39,238 | – |
| Third party sales and other operating revenues | 29,217 | 265,393 | 2,497 | – | – | 297,107 |
| Equity-accounted earnings | 3,979 | 755 | 23 | – | – | 4,757 |
| Interest revenues | 83 | 46 | 109 | – | – | 238 |
| **Segment results** | | | | | | |
| Replacement cost profit (loss) before interest and taxation | 30,886 | 5,555 | (1,516) | (40,858) | 447 | (5,486) |
| Inventory holding gains[b] | 84 | 1,684 | 16 | – | – | 1,784 |
| Profit (loss) before interest and taxation | 30,970 | 7,239 | (1,500) | (40,858) | 447 | (3,702) |
| Finance costs | | | | | | (1,170) |
| Net finance income relating to pensions and other post-retirement benefits | | | | | | 47 |
| Loss before taxation | | | | | | (4,825) |
| **Other income statement items** | | | | | | |
| Depreciation, depletion and amortization | 8,616 | 2,258 | 290 | – | – | 11,164 |
| Impairment losses | 1,259 | 144 | 113 | – | – | 1,516 |
| Impairment reversals | – | 141 | 7 | – | – | 148 |
| Fair value loss on embedded derivatives | 309 | – | – | – | – | 309 |
| Charges for provisions, net of write-back of unused provisions, including change in discount rate | 303 | 275 | 206 | 30,266 | – | 31,050 |
| **Segment assets** | | | | | | |
| Equity-accounted investments | 17,738 | 7,043 | 840 | – | – | 25,621 |
| Additions to non-current assets | 20,113 | 4,030 | 1,226 | – | – | 25,369 |
| Additions to other investments | | | | | | 20 |
| Element of acquisitions not related to non-current assets | | | | | | (401) |
| Additions to decommissioning asset | | | | | | (1,972) |
| Capital expenditure and acquisitions | 17,753 | 4,029 | 1,234 | – | – | 23,016 |

[b] Inventory holding gains and losses represent the difference between the cost of sales calculated using the average cost to BP of supplies acquired during the period and the cost of sales calculated on the first-in first-out (FIFO) method after adjusting for any changes in provisions where the net realizable value of the inventory is lower than its cost. Under the FIFO method, which we use for IFRS reporting, the cost of inventory charged to the income statement is based on its historic cost of purchase, or manufacture, rather than its replacement cost. In volatile energy markets, this can have a significant distorting effect on reported income. The amounts disclosed represent the difference between the charge (to the income statement) for inventory on a FIFO basis (after adjusting for any related movements in net realizable value provisions) and the charge that would have arisen if an average cost of supplies was used for the period. For this purpose, the average cost of supplies during the period is principally calculated on a monthly basis by dividing the total cost of inventory acquired in the period by the number of barrels acquired. The amounts disclosed are not separately reflected in the financial statements as a gain or loss. No adjustment is made in respect of the cost of inventories held as part of a trading position and certain other temporary inventory positions.

[AS] www.bp.com/downloads/segmentalanalysis

## 7. Segmental analysis continued

|  |  |  |  |  | $ million |
|---|---|---|---|---|---|
|  |  |  |  |  | 2009 |
| By business | Exploration and Production | Refining and Marketing | Other businesses and corporate | Consolidation adjustment and eliminations | Total group |
| **Segment revenues** |  |  |  |  |  |
| Sales and other operating revenues | 57,626 | 213,050 | 2,843 | (34,247) | 239,272 |
| Less: sales between businesses | (32,540) | (821) | (886) | 34,247 | – |
| Third party sales and other operating revenues | 25,086 | 212,229 | 1,957 | – | 239,272 |
| Equity-accounted earnings | 3,309 | 558 | 34 | – | 3,901 |
| Interest revenues | 98 | 32 | 95 | – | 225 |
| **Segment results** |  |  |  |  |  |
| Replacement cost profit (loss) before interest and taxation | 24,800 | 743 | (2,322) | (717) | 22,504 |
| Inventory holding gains[b] | 142 | 3,774 | 6 | – | 3,922 |
| Profit (loss) before interest and taxation | 24,942 | 4,517 | (2,316) | (717) | 26,426 |
| Finance costs |  |  |  |  | (1,110) |
| Net finance expense relating to pensions and other post-retirement benefits |  |  |  |  | (192) |
| Profit before taxation |  |  |  |  | 25,124 |
| **Other income statement items** |  |  |  |  |  |
| Depreciation, depletion and amortization | 9,557 | 2,236 | 313 | – | 12,106 |
| Impairment losses | 118 | 1,834 | 189 | – | 2,141 |
| Impairment reversals | 3 | – | 8 | – | 11 |
| Fair value (gain) loss on embedded derivatives | (664) | 57 | – | – | (607) |
| Charges for provisions, net of write-back of unused provisions, including change in discount rate | 307 | 756 | 488 | – | 1,551 |
| **Segment assets** |  |  |  |  |  |
| Equity-accounted investments | 20,289 | 6,882 | 1,088 | – | 28,259 |
| Additions to non-current assets | 15,855 | 4,083 | 1,297 | – | 21,235 |
| Additions to other investments |  |  |  |  | 19 |
| Element of acquisitions not related to non-current assets |  |  |  |  | (7) |
| Additions to decommissioning asset |  |  |  |  | (938) |
| Capital expenditure and acquisitions | 14,896 | 4,114 | 1,299 | – | 20,309 |

[b] Inventory holding gains and losses represent the difference between the cost of sales calculated using the average cost to BP of supplies acquired during the period and the cost of sales calculated on the first-in first-out (FIFO) method after adjusting for any changes in provisions where the net realizable value of the inventory is lower than its cost. Under the FIFO method, which we use for IFRS reporting, the cost of inventory charged to the income statement is based on its historic cost of purchase, or manufacture, rather than its replacement cost. In volatile energy markets, this can have a significant distorting effect on reported income. The amounts disclosed represent the difference between the charge (to the income statement) for inventory on a FIFO basis (after adjusting for any related movements in net realizable value provisions) and the charge that would have arisen if an average cost of supplies was used for the period. For this purpose, the average cost of supplies during the period is principally calculated on a monthly basis by dividing the total cost of inventory acquired in the period by the number of barrels acquired. The amounts disclosed are not separately reflected in the financial statements as a gain or loss. No adjustment is made in respect of the cost of inventories held as part of a trading position and certain other temporary inventory positions.

Financial statements

Notes on financial statements

 www.bp.com/downloads/segmentalanalysis

## 7. Segmental analysis continued

| | | | | | $ million |
| | | | | | 2008 |
| By business | Exploration and Production | Refining and Marketing | Other businesses and corporate | Consolidation adjustment and eliminations | Total group |
|---|---|---|---|---|---|
| **Segment revenues** | | | | | |
| Sales and other operating revenues | 86,170 | 320,039 | 4,634 | (49,700) | 361,143 |
| Less: sales between businesses | (45,931) | (1,918) | (1,851) | 49,700 | – |
| Third party sales and other operating revenues | 40,239 | 318,121 | 2,783 | – | 361,143 |
| Equity-accounted earnings | 3,565 | 131 | 125 | – | 3,821 |
| Interest revenues | 114 | 35 | 220 | – | 369 |
| **Segment results** | | | | | |
| Replacement cost profit (loss) before interest and taxation | 38,308 | 4,176 | (1,223) | 466 | 41,727 |
| Inventory holding losses[a] | (393) | (6,060) | (35) | – | (6,488) |
| Profit (loss) before interest and taxation | 37,915 | (1,884) | (1,258) | 466 | 35,239 |
| Finance costs | | | | | (1,547) |
| Net finance income relating to pensions and other post-retirement benefits | | | | | 591 |
| Profit before taxation | | | | | 34,283 |
| **Other income statement items** | | | | | |
| Depreciation, depletion and amortization | 8,440 | 2,208 | 337 | – | 10,985 |
| Impairment losses | 1,186 | 159 | 227 | – | 1,572 |
| Impairment reversals | 155 | – | – | – | 155 |
| Fair value (gain) loss on embedded derivatives | 163 | (57) | 5 | – | 111 |
| Charges for provisions, net of write-back of unused provisions | 573 | 479 | 657 | – | 1,709 |
| **Segment assets** | | | | | |
| Equity-accounted investments | 20,131 | 6,622 | 1,073 | – | 27,826 |
| Additions to non-current assets | 21,584 | 6,636 | 1,802 | – | 30,022 |
| Additions to other investments | | | | | 52 |
| Element of acquisitions not related to non-current assets | | | | | 11 |
| Additions to decommissioning asset | | | | | 615 |
| Capital expenditure and acquisitions | 22,227 | 6,634 | 1,839 | – | 30,700 |

[a] Inventory holding gains and losses represent the difference between the cost of sales calculated using the average cost to BP of supplies acquired during the period and the cost of sales calculated on the first-in first-out (FIFO) method after adjusting for any changes in provisions where the net realizable value of the inventory is lower than its cost. Under the FIFO method, which we use for IFRS reporting, the cost of inventory charged to the income statement is based on its historic cost of purchase, or manufacture, rather than its replacement cost. In volatile energy markets, this can have a significant distorting effect on reported income. The amounts disclosed represent the difference between the charge (to the income statement) for inventory on a FIFO basis (after adjusting for any related movements in net realizable value provisions) and the charge that would have arisen if an average cost of supplies was used for the period. For this purpose, the average cost of supplies during the period is principally calculated on a monthly basis by dividing the total cost of inventory acquired in the period by the number of barrels acquired. The amounts disclosed are not separately reflected in the financial statements as a gain or loss. No adjustment is made in respect of the cost of inventories held as part of a trading position and certain other temporary inventory positions.