# Exhibit 48

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL No. 2179 |
| | * | Section: J |
| This Pleading applies to: | * * | Judge Barbier |
| *All Cases* | * * | Magistrate Judge Shushan |
| | * * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP's PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

Timothy A. Duffy, P.C.
R. Christopher Heck
James Sollee Buino
Elizabeth R. Sheyn
David R. Freedman
Vanessa Barsanti
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Telephone: 504-581-7979
Facsimile: 504-556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: 202-662-5985
Facsimile: 202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

June 21, 2013

# INTRODUCTION

## I. THE PARTIES AND THE NATURE OF THE PROCEEDINGS.

### A. The Parties.

#### 1. The BP Defendants.

1. BP Exploration & Production Inc. ("BPXP") is the BP entity that bid for, and was awarded the right to lease, Mississippi Canyon Block 252 ("MC252") in March 2008 and that was named a responsible party for the *Deepwater Horizon* oil spill by the U.S. government on April 28, 2010, under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701. Agreed Stipulations No. 96 (Rec. Doc. 5927); Statement of BP Exploration & Production Inc. Re Applicability of Limit of Liability Under Oil Pollution Act of 1990 (Rec. Doc. 559). BPXP originally leased 100% of the MC252 prospect leasehold from the United States, but through lease exchange agreements and assignments had reduced its leasehold interests to a 65% interest. Agreed Stipulations No. 100 (Rec. Doc. 5927); BP Parties' Answer to the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ("BP B1 Answer") ¶ 247 (Rec. Doc. 4130). BPXP is a Delaware corporation with its principal place of business in Texas. BP B1 Answer ¶ 210; BP Parties' Answer to the Morales Original Petition ¶ 7 (Rec. Doc. 1216). BPXP is the only BP defendant in the United States' civil case in this proceeding. Complaint of the United States of America (Civ. A. No. 2:10-cv-04536, Rec. Doc. 1).

2. BP America Production Company ("BPAP") (collectively with BPXP, "BP") was a party to the drilling contract concerning the use of the *Deepwater Horizon* to drill the Macondo well. Agreed Stipulations No. 98 (Rec. Doc. 5927); BP B1 Answer ¶ 211 (Rec. Doc. 4130). BP America Production Company is a Delaware corporation with its principal place of business in Texas. BP B1 Answer ¶ 211 (Rec. Doc. 4130).

3.    BPXP leased the MC252 block from the United States and designed the Macondo well, and BP selected and hired the contractors to execute the Macondo well plan.  BP B1 Answer ¶ 219 (Rec. Doc. 4130).

4.    BP America Inc., BP Company North America Inc., and BP Corporation North America Inc. are holding companies with no Gulf of Mexico operational assets.  BP p.l.c.'s Responses and Objections to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission at 69 (No. 37) (Dec. 8, 2010) ("BP p.l.c.'s Discovery Responses (Dec. 8, 2010)") (attached hereto as Ex. 1).[1]

5.    BP America Inc. is a Delaware corporation with its principal place of business in Texas; BP Company North America Inc. is a Delaware corporation with its principal place of business in Illinois; and BP Corporation North America Inc. is an Indiana corporation with its principal place of business in Texas.  BP's Answer to First Amended Complaint of the State of Veracruz ¶¶ 11-12 (Rec. Doc. 5339).

6.    BP Products North America Inc. is an entity primarily involved in "downstream" operations, including crude oil refineries and the transportation and marketing of refined products such as gasoline.  BP p.l.c.'s Discovery Responses at 69 (No. 37) (Dec. 8, 2010) (Ex. 1).  It is a Maryland corporation with its principal place of business in Illinois.  *Id*; The BP Parties' First Amended Answer to the First Amended Complaint of the State of Veracruz ¶ 13 (Rec. Doc. 8658-2).

7.    Each of the foregoing BP defendants is a direct or indirect wholly-owned subsidiary of BP p.l.c.  BP p.l.c. is a corporation organized under the laws of England and Wales

---

[1] "Ex." refers to documents contained in the Compendium of Exhibits to BP's Proposed Findings of Fact and Conclusions of Law (June 21, 2013), filed contemporaneously herewith.  The Compendium contains only documents that do not have a transcript, exhibit, or "Rec. Doc." citation.

condition."  *See also* Tr. 4694 (Newman) (regulations apply not only to operators, but to contractors as well, including with respect to well control).

48.     Section 250.401 requires that the operator or designated contractors "must take necessary precautions to keep wells under control at all times."

### B.     Consistent with Industry Practice and Federal Regulations, BP Hired Third-Party Contractors to Drill the Macondo Well.

49.     On March 19, 2008, BPXP acquired a lease from the United States of 5,760 acres of property on the Outer Continental Shelf comprising Mississippi Canyon Block 252 ("MC252 lease").  The ten-year lease started on June 1, 2008.  Agreed Stipulations No. 96 (Rec. Doc. 5927).  As the lessee, BPXP was the operating rights owner and the operator.  Tr. 512-513 (L. McKay).  BPXP assigned minority working interests in the MC252 lease to Anadarko Petroleum Corporation and Anadarko E&P Company LP (collectively, "Anadarko") and MOEX Offshore 2007 (a wholly-owned subsidiary of MOEX USA Corporation, which is in turn a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd.) (collectively, "MOEX").  Agreed Stipulations No. 100 (Rec. Doc. 5927); TREX 001243.

50.     In its role as operator, BP was primarily responsible for designing the Macondo well, including engineering decisions regarding the well design.  Tr. 510 (McKay); Tr. 8583-84 (Guide).

51.     Consistent with industry practice, BP relied on a variety of different contractors to implement and construct the Macondo well design, including Transocean, Halliburton, M-I, Oceaneering, Weatherford, and Dril-Quip.  Tr. 8584-86 (Guide) ("[O]nce the well is designed … the drilling engineering team and all the third-party contractors come together with myself.  And then … they basically implement the plan step-by-step together."); Tr. 1921 (R. Sepulvado) ("We worked as a team drilling the well. The Transocean guys, third-party people, you know, we

Transocean with shearing capacity calculations for the *Deepwater Horizon* BOP during its operation.  TREX 040008 at 15, 18; Tr. 9096-97 (Shanks); TREX 007713; TREX 003951 at 5; Boughton Dep. 19; Turlak Dep. 386-88; Whitby Dep. 295-96, 521; Erwin Dep. 93; Hay 1 Dep. 59-60; TREX 001199 at 1; D. McWhorter Dep. 183-84.

241.    Throughout the operational history of the *Deepwater Horizon,* upon Transocean's request, Cameron would perform certain modifications and maintenance of the *Deepwater Horizon* BOP, including converting the lower variable bore ram to a test ram and equipping the lower annular with a 5,000-psi rated stripping element.  D. McWhorter Dep. 537-38; Hay 1 Dep. 406-07; Keeton Dep. 349-50; Stringfellow Dep. 466-67; Whitby Dep. 505.  In addition, Cameron issued engineering bulletins, product advisories, and product alerts relating to the *Deepwater Horizon* BOP.  TREX 004304 at Appendix H.

242.    Cameron considered the *Deepwater Horizon* BOP to meet "[i]ndustry [s]tandards," to be a "fine product," and to be the "best available and safest technology."  D. McWhorter Dep. 575; Coronado Dep. 478.

243.    No Cameron personnel were on board the *Deepwater Horizon* on April 20, 2010. Agreed Stipulations No. 103 (Rec. Doc. 5927); TREX 003695.

## 2.    M-I Swaco.

244.    M-I, LLC and BPXP entered into the Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services, effective February 1, 2009, that governed M-I, LLC's scope of work on the Macondo well.  Agreed Stipulations No. 161 (Rec. Doc. 5927); TREX 002804.

245.    BP contracted with M-I to provide specialized drilling mud and mud engineering services on the *Deepwater Horizon*, which included mud material, equipment, and personnel. TREX 002804; TREX 004248 at 18.

2329.  Transocean's training requirements for Masters and key rig personnel were appropriate and industry standard.  Tr. 9436 (Mitchell); D4950.1; TREX 003750; TREX 005474; TREX 007563; TREX 040011 at 26.

2330.  Captain Kuchta never received the major emergency management training required by Transocean, nor did he have well-control certification, nor had he been assessed competent as a Person-In-Charge.  Tr. 9436 (Mitchell); D4950.1; TREX 003750; TREX 005474; TREX 007563; TREX 040011 at 26; Wolfe Dep. 196.

2331.  Captain Kuchta's lack of training contributed to the Incident.  Tr. 9436 (Mitchell); TREX 040011 at 26-28.

2332.  Jimmy Harrell's OIM license issued by the Republic of the Marshall Islands permitted him to serve as an OIM only aboard non-self-propelled MODUs and did not permit him to legally serve as OIM aboard the self-propelled *Deepwater Horizon*.  Tr. 9444-47 (Mitchell); TREX 044013 at 14; D4954; TREX 040011 at 23-25, 28.

## X.  BP PROMPTLY INVESTIGATED AND ACCURATELY REPORTED ON THE CAUSES OF THE INCIDENT.

### A.  The Methodology of BP's Internal Investigation.

#### 1.  The Structure and Scope of the Investigation.

2333.  Within 24 hours of the Incident, BP initiated a non-privileged investigation of the Incident.  TREX 000001 at 13; Tr. 486-87 (Bea).

2334.  Mark Bly, BP's Group Head of Safety and Operations, was assigned to lead the investigation team, which was conducted independently from BP's teams managing the ongoing Incident response and regular operations.  TREX 000001 at 13.

2335.   BP believed it was important to get a quick and accurate understanding of the immediate causes of the Incident as soon as possible, so the immediate task the investigation team had was to understand what caused the Incident.  Tr. 488 (Bea).

2336.   The BP IIT Report, published on September, 8, 2010, represented the full and complete reported findings of the BP investigative team into the facts and circumstances surrounding the Incident.  Tr. 903-04 (Bly); TREX 000001.

2337.   The intent of the investigation was to identify critical factors (events or conditions that, if eliminated, could have prevented the Incident or reduced its severity) and to examine potential causal or contributory factors at the immediate cause and system cause levels.  Tr. 912-13 (Bly); TREX 000001 at 13.  The BP IIT's findings and lessons were shared publicly, with a goal of preventing the recurrence of a similar incident.  Tr. 914, 1144 (Bly).

2338.   The BP IIT consisted of over 50 individuals who investigated the Incident for approximately five months, and was comprised of internal BP personnel as well as external consultants and experts, including personnel experienced in areas of safety, cementing, fluids, well control, drilling, BOP, process hazard analysis, subsea, failure mode testing, and operations. Tr. 1097, 1190 (Bly); Tr. 487-88 (Bea); TREX 000001.9.1.BP; D4307A.  Transocean's drilling expert Calvin Barnhill acknowledged that the organization and procedure of the BP investigation – putting more than 50 engineers and technicians on the team and allowing them to sort out what happened from an engineering and operational standpoint – was an appropriate way to conduct the investigation.  Tr. 5017 (Barnhill).

2339.   As part of its work, the BP IIT interviewed approximately 50 witnesses.  Tr. 1191 (Bly); D4307A; Tr. 487 (Bea).  The investigation team members took notes during these various interviews but did not record the conversations nor did they seek to take verbatim transcriptions

operational risk. TREX 045062; Tr. 386 (Bea). The S&O function provided both leadership and guidance on process safety issues, which evidenced BP's safety-mindedness. Tr. 385-86 (Bea).

2425. The S&O function was initially led by John Mogford, who was given an unlimited budget for this effort. Tr. 386 (Bea); Mogford Dep. 546-47. After John Mogford, the S&O function was led by Mark Bly. Tr. 387 (Bea).

2426. The S&O function accomplished its purpose through several means, including the development and maintenance of the OMS framework; the creation of an independent S&O audit function to monitor conformance with OMS; the use of the Orange Book process to track safety performance metrics (described more fully below); the development and provision of core capability training programs; and the provision of specific technical expertise and connection to industry best practice. TREX 045062.

2427. The S&O function conducted an audit to measure conformance with OMS, which was described as the difference between the practice actually being used by the operating unit and the practice required by the applicable BP standard. Tr. 1161-62 (Bly).

2428. The S&O audit teams included S&O employees and subject matter experts from outside S&O, depending on the operation being audited. Tr. 902 (Bly).

2429. BP also developed the Safety, Environment and Ethics Assurance Committee ("SEEAC") to provide oversight over safety. Tr. 384-85 (Bea). The SEEAC was a board level committee consisting of independent members of BP's Board. Tr. 385 (Bea). Its meetings were also attended by BP Group CEO Tony Hayward. Tr. 385 (Bea).

2430. As Professor Bea acknowledged, the SEEAC improved BP leadership's oversight over process safety. Tr. 384-85 (Bea).

2447.  Within BP, Ellis Armstrong led the effort to develop a means to track these indicators consistently across the company, resulting in the creation of the Orange Book in 2007.  Mogford Dep. 539-40; Armstrong Dep. 85.  The Orange Book, generated on a quarterly basis, compiled safety metrics relating to personal and process safety, including both leading and lagging indicators, from each of BP's business segments.  Tr. 1156-57 (Bly); Mogford Dep. 540; Flynn Dep. 48.

2448.  The Orange Book was reviewed by, among other entities, the GORC and the SEEAC.  Mogford Dep. 540-41; Armstrong Dep. 85.  Thus, the creation of the Orange Book and its distribution to top BP leadership informed BP's leadership of trends in the safety arena and enhanced their conversations aimed at improving safety performance.  Mogford Dep. 541; Tr. 1156-57 (Bly).

2449.  The safety performance metrics for the Exploration & Production segment, including the GoM SPU were reviewed by Andy Inglis, the Segment Chief Executive for Exploration & Production, Inglis' leadership team, the GORC, and the SEEAC.  Mogford Dep. 540-41; Tr. 1157 (Bly).

2450.  In addition to being reviewed by top company leadership, safety data were also reviewed by leadership within the GoM SPU at weekly operations meetings and at quarterly meetings attended by the SPU's Leadership Team and management.  Tr. 8109-10 (Shaw).

2451.  The GoM SPU tracked a comprehensive set of safety indicators in what was known as the Maroon Book.  Tr. 8027-28, 8109-10 (Shaw); Dupree Dep. 567-70.  The Maroon Book tracked both leading and lagging indicators for both personal and process safety in the GoM SPU, including BP assets and contractor-owned rigs.  Tr. 8109-10 (Shaw); TREX 045257_E11.1.1.BP.

2452.  Through Process Safety Scorecards, the GoM SPU also tracked process safety performance on a monthly basis, which included process safety performance for drilling operations.  Tr. 8062-63 (Shaw).

2453.  Between 2005 and 2010, BP developed new performance metrics.  In fact, BP led the industry in the development and use of process safety metrics.  Tr. 383-84 (Bea).  For example, BP led one of the key API committees aimed at developing new process safety performance metrics.  Tr. 383-84 (Bea).

2454.  BP continuously reviewed the basket of metrics it tracked to ensure those metrics were still helping BP understand emerging risks and driving improvement in safety performance. Flynn Dep. 121-22.  Professor Bea was complimentary of BP's efforts in this area.  Tr. 384 (Bea).

### B.      BP Had a Positive and Supportive Safety Culture.

#### 1.      Safety Was Always the First Priority.

##### a.      BP's Leadership Set the Tone from the Top.

2455.  BP's senior leadership understood that management must set the tone from the top on safety issues.  Tr. 1041, 1153 (Bly); Tr. 8028 (Shaw); Hayward Dep. 150-51.  For example, the GORC and the SEEAC set the tone from the top by reviewing and considering safety performance, including progress on the implementation of OMS.  Tr. 1153 (Bly).

2456.  Statements by BP's key leadership emphasized safety as BP's number one priority.  These statements demonstrate that BP was focusing on and improving its process safety.  Tr. 374-75, 379 (Bea); Tr. 1153 (Bly).

2457.  In external communications to shareholders, BP Group CEO Tony Hayward conveyed the importance of safety.  Tr. 377 (Bea).  Communications like these from Tony Hayward empowered those within the organization to place importance on safety.  Tr. 377 (Bea).

2458.    Andy Inglis, the CEO of Exploration and Production at the time of the Incident, likewise emphasized the importance of safety in his communications.  Tr. 377-79 (Bea).  For example, in an Exploration & Production telecom on April 2, 2010, Andy Inglis began his speech by starting with safety and emphasizing:  "The agenda in the upstream does not change: it is safety and it's people performance, and today I am going to start with safety … nothing changes in terms of safety being our number one priority."  TREX 048157.

2459.    According to Professor Bea, beginning meetings with discussions on safety, like Andy Inglis did, was characteristic of a safety-minded company.  Tr. 378 (Bea).  This emphasis on safety was also conveyed by the leadership in the GoM SPU.  Tr. 8028-29 (Shaw).  For example, when Neil Shaw started as the GoM SPU Leader in February 2008, he sent an e-mail to his leadership team encouraging everyone "to make safety their number 1 priority."  Tr. 8033 (Shaw); TREX 002398.1.2.BP.

2460.    Even after safety performance improved in the GoM SPU, Neil Shaw's message remained the same.  In a report to the GoM SPU employees on the Gulf of Mexico's 2008 safety performance, Neil Shaw wrote:  "This is, of course, a journey, one where there is always room for further improvement, and one where we can never become complacent.  The inherent risks of our business remain, and we must always continue to put safety as our number one priority in everything we do every day."  Tr. 8120-21 (Shaw); TREX 047145 at 1.  While Neil Shaw wanted to acknowledge the GoM SPU's achievements, he also wanted to ensure that the organization remained focused on safety and did not become complacent.  Tr. 8119-21 (Shaw).

2461.    BP management's communications regarding safety focused on both personal and process safety.  Tr. 8041-42, 8045 (Shaw); D4902.  For example, in Neil Shaw's 2008 SPU Update issued in May 2008, he closed his discussion with the following note: "Lets [*sic*]

continue to focus on what matters – continuously improving our personal and process safety, making this a great place to work with the best future in the GoM and delivery of our 2008 performance targets."  TREX 048143.1.3.BP; TREX 048143.3.3.BP.

2462.  Neil Shaw also set the tone at the top for safety through weekly operational meetings.  Tr. 8030 (Shaw).  At these meetings, Neil Shaw met with his leadership team, which included the Vice Presidents of Drilling & Completions, Exploration, Projects, and Human Resources.  Tr. 8030 (Shaw); Dupree Dep. 560.  The agenda at these weekly operational meetings always included safety as the first topic.  During these meetings, the leadership team reviewed every personal or process safety incident that happened in the previous week.  Tr. 8030 (Shaw); Dupree Dep. 560.

2463.  Likewise, the BP employees involved in Macondo well operations, including John Guide, Mark Hafle, Greg Walz, Brian Morel, and the Wellsite Leaders, were focused on safety as their number one priority and cared deeply about the people on the rigs.  Tr. 9248-49, 9386 (O'Bryan); Tr. 8594-95, 8778 (Guide); Tr. 2025-26 (R. Sepulvado); Tr. 8265-66 (Lambert).  BP's contractors working on the Macondo well also believed safety was a top priority.  Tr. 3620, 3672 (Keith); Tr. 8603 (Guide); Tr. 5605-06 (Young); Garrison Dep. 144-45; Winslow Dep. 406.

### b.      BP's Leadership in the GoM SPU Engaged Contractors to Support the Message that Safety Was a Top Priority.

2464.  BP leadership within the GoM SPU, and within Drilling & Completions, held Leadership Engagement sessions.  During these sessions, BP leadership, both offshore and onshore, would meet with the contractor's leadership to discuss safety issues.  Tr. 8620-21 (Guide); Tr. 441-42 (Bea); TREX 047414; TREX 008093.  Contractor employees from the rigs, such as the Offshore Installation Manager, the senior toolpusher, the toolpusher and the driller,

should be entered into evidence to the extent such testimony has not already been admitted by the Court.

## XIV.   BPXP'S LIABILITY UNDER THE OIL POLLUTION ACT OF 1990.

2691.   The PSC (on behalf of private plaintiffs), the United States, Alabama, and Louisiana brought claims against BPXP for strict liability under OPA.  Rec. Doc. 1128 ¶¶ 678-690; Civ. A. No. 2:10-cv-04536, Rec. Doc. 1 ¶¶ 77-91; Rec. Doc. 1872 ¶¶ 205-19; Rec. Doc. 2031 ¶¶ 153-67, 195-221.  This section evaluates BPXP's liability under OPA.

### A.    BPXP Has Acknowledged Its Responsibilities under OPA.

2692.   BPXP has acknowledged it is a "Responsible Party" under OPA.  *See, e.g.*, Rec. Doc. 559 at 1 ("Under the Oil Pollution Act of 1990, BP Exploration & Production Inc. is one of the several 'Responsible Parties' in connection with the Incident and the resulting oil spill."). Under OPA, a "Responsible Party" includes "[i]n the case of an offshore facility …, the lessee or permittee of the area in which the facility is located" 33 U.S.C. § 2701(32)(C).  An "offshore facility" includes a facility located in the navigable waters of the United States, 33 U.S.C. § 2701(22), and a "facility," in turn, includes equipment that can be used to explore or drilling for oil, 33 U.S.C. § 2701(9).   Under OPA, a mobile offshore drilling unit ("MODU") "means a vessel (other than a self-elevating lift vessel) capable of use as an offshore facility."  33 U.S.C. § 2701(18).   Therefore, because the *Deepwater Horizon* MODU was located at Mississippi Canyon Block 252 ("MC252"), and BPXP is the lessee of MC252, BPXP is a Responsible Party under OPA.  *See also* Rec. Doc. 5809 at 7 ("When the MODU is being used as an offshore facility – *i.e.*, when the MODU is 'exploring for, drilling for, producing, [etc.] ... oil' 'in, on, or under ... navigable waters' – then the responsible party is the lessee (the responsible party for an

offshore facility."). BPXP accepted its designation as a Responsible Party on May 3, 2010. Letter from J. Dupree to T. Morrison (May 3, 2010) (attached hereto as Ex. 8).[17]

2693. As a Responsible Party, BPXP is liable for removal costs and damages as defined in OPA. 33 U.S.C. § 2702(a)-(b). BPXP has the right to seek contribution from other parties. Rec. Doc. 3830 at 21 ("Claimants present their claims to the Responsible Party, who pays the claims and is then allowed to seek contribution from other allegedly liable parties."), citing 33 U.S.C. §§ 2709, 2710, 2713.

2694. BPXP has been fulfilling its obligations under OPA by paying claims for removal costs and damages caused by the spill. *E.g.*, TREX 45393 at BP-HZN-2179MDL04968018; Rec. Doc. 6430; Rec. Doc. 6427.

### B.      BPXP Agreed to Waive the Cap on OPA Damages.

2695. Subject to certain statutory exceptions, OPA places a cap on a Responsible Party's liability. 33 U.S.C. §§ 2704(a)-(b); Rec. Doc. 925 at 1.

2696. On October 18, 2010, BPXP filed with the Court a statement providing that BPXP "has chosen to waive the statutory limitation on liability under OPA" without making any admission regarding BPXP's conduct and specifically denying that BPXP had been grossly negligent. Rec. Doc. 559 at 1-2.

2697. In accord with this statement, the Court ordered that BPXP and its affiliates were barred from raising the OPA cap on liability as defense in this litigation. Rec. Doc. 925 at 2.

---

[17]   BPAP cannot be liable under OPA as the relevant provisions of OPA define a responsible party as the "lessee or permittee of the area in which the facility is located." 33 U.S.C. § 2701(32)(C). The record is undisputed that BPXP was the lessee of the area, and BPAP was not. Similarly, although BPAP was a party to the Drilling Contract, it was not a "person owning, operating, or demise chartering" the *Deepwater Horizon* MODU. 33 U.S.C. § 2701(32)(A).

The Court acknowledged that BPXP and its affiliates were not admitting anything about their conduct, and had specifically denied that they had engaged in gross negligence. *Id.* at 1-2.

### C.   OPA Liability for the Spill is Divisible.[18]

2698.   Although BPXP is liable under OPA, it is premature to assess whether BPXP is liable for the entirety of the spill. Instead, the doctrine of divisibility contemplates that where there are "volumetric, chronological, or other" bases for dividing liability among multiple causes, liability is appropriately divided. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 617-18 (2009) (quotation omitted); *see also, e.g.*, Rec. Doc. 4392, at 13-15; Rec. Doc. 5124, at 9-10. Moreover, "it is immaterial whether all or any [persons having contributed to the harm] are joined as defendants in the particular action. RESTATEMENT (SECOND) OF TORTS § 433A cmt. a (1965).

2699.   In the Phase II trial, BP intends to establish that there are reasonable bases for dividing liability among multiple causes of the spill. At this time, it would be inappropriate for the Court to hold on an incomplete record that any parties are jointly and severally liable for the entirety of the spill.

### D.   BPXP Has No Liability Under OPA for Injuries Not Proximately Caused by the Incident.[19]

2700.   OPA imposes liability for damages that "result from" and are "due to" a spill. *See* 33 U.S.C. § 2702(a), *id.* § 2702(b)(2)(B), *id.* § 2702(b)(2)(E). This language necessarily adopts a proximate cause standard. *Cf., e.g., Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock*

---

[18] BP is aware that the Court has previously declined to apply the divisibility doctrine, *see* Rec. Doc. 5809 at 12. BP submits these proposed conclusions to facilitate its appellate rights.

[19] BP is aware that the Court has previously declined to rule on the standard of causation under OPA, *see* Rec. Doc. 3830 at 32-33. BP submits these proposed conclusions to facilitate its appellate rights.

## XV.   BPXP'S LIABILITY UNDER THE CLEAN WATER ACT.

2702.   The United States has brought a claim against BPXP for fines under the Clean Water Act ("CWA").   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1.   The CWA provides that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged."   33 U.S.C. § 1321(b)(7)(A).

2703.   Where the violation "was the result of gross negligence or willful misconduct" of such person, the maximum per-barrel fine is tripled.   *See* 33 U.S.C. § 1321(b)(7)(D).

2704.   The Court has previously held, on summary judgment, that both BPXP[20] and Anadarko are liable for civil penalties under the CWA as an owner of the Macondo well, as it was the offshore facility from which oil was discharged.   *See* Rec. Doc. 5809 at 23-24.   Both BPXP and Anadarko have appealed this ruling to the United States Court of Appeals for the Fifth Circuit.   BPXP's interlocutory appeal from that ruling is currently pending before the Fifth Circuit, *see* 5th Cir. No. 12-30883, and BPXP offers the following discussion without prejudice to that appeal.

2705.   For the reasons described in this section, even if BPXP could be liable on the CWA, it is not subject to treble fines as it was neither grossly negligent nor engaged in willful misconduct.

---

[20]   BPAP was not sued by the federal government under the CWA, Civ. A. No. 2:10-cv-04536, Rec. Doc. 1, and cannot be liable under the CWA as it was not an "owner, operator, or person in charge of any vessel, onshore facility, or offshore facility."   33 U.S.C. § 1321(b)(7)(A).   *See* § I.A.1.  The federal government sued BPXP as the sole BP entity in its case.   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1.   Thus, all references in this § XV to "BP" refer only to BPXP unless otherwise indicated.

motion *in limine* to exclude evidence of maintenance, inspection, and repair and holding that such evidence is relevant to whether defendant exercised reasonable care).

2770.   BP followed or exceeded industry practices in designing and drilling the well, *see* § V, which is powerful evidence that BP's actions were not negligent.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2771.   BP received approval from the federal government agency charged with regulating offshore drilling for its drilling plan and temporary abandonment procedure.  *See* § V.D.7.d.  *See Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz,* 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2772.   BP hired the best-reupted and most experienced contractors to drill the Macondo well, including Transocean and Halliburton, further evidencing that BP exercised due care.  *See, e.g., S. Farm Bureau Cas. Ins. Co. v. McKenzie*, 252 F.2d 195, 200 (5th Cir. 1958) ("Having hired a competent contractor who enjoyed a good reputation in the community and was as 'good as any you can get,' [the defendant] had every reason to believe that the wiring had been installed in a safe and workmanlike manner."); *Green v. United States*, 418 F. App'x. 862, 869 (11th Cir. 2011) (affirming that one contractor "could rely on the opinion of the competent person" of another contractor who certified that a work space in a vessel was safe for hot work).[28]  *Cf. Bourg*, 578 F.2d at 1121-22 (holding that owner of offshore platform who hired an

---

[28]  *See also Schmitt v. Algiers Pub. Serv. Co.*, 69 So. 2d 754, 758 (La. Ct. App. 1954) (dismissing plaintiffs negligence claim where defendant showed that ramps at issue "had been designed by a most reputable firm of architects and had been constructed by one of the leading general contractors in this locality"); *Kaltenbrun v. City of Port Washington*, 457 N.W.2d 527, 530 (Wis. Ct. App. 1990) ("Accordingly, we conclude that an owner who has contracted with a reliable and qualified independent contractor to implement all safety precautions associated with the work has fulfilled its duty of reasonable care to those employees of the general contractor or those employed by subcontractors whom the general contractor has hired."); *Sandoval v. Ritz Developers, Inc.*, No. 03-4233, 2006 WL 91606, at *1 (D.S.D. Jan. 13, 2006) (denying plaintiff's

experienced independent contractor would not be liable even if the contractor performed the work negligently).

2773.  BP worked closely with its contractors and held regular meetings to provide information and improve safety, *see* § V.B., further confirming that BP had appropriate processes in place to drill safely.  *See, e.g., Dye v. Schwegmann Bros. Giant Supermarkets, Inc.*, 627 So. 2d 688, 693-94 (La. Ct. App. 1993) (reversing trial court's finding of defendant's negligence, citing the fact that defendant held "[w]eekly safety meetings" to discuss incidents and improve personnel plans in response thereto); *Allen v. John F. Beasley Constr. Co.*, 347 So. 2d 1185, 1186 (La. Ct. App. 1977) (finding that duty to provide a safe environment was not breached, citing evidence including company practice of holding safety meetings); *Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 346 (Tex. Ct. App. 2011) (affirming jury determination that company did not negligently operate facility, citing evidence of company's ongoing safety meetings, hazard communications program, safety policy communications, and availability of safety equipment); *Rawson v. Midsouth Rail Corp.*, 738 So. 2d 280, 287 (Miss. Ct. App. 1999) (finding no abuse of discretion denial of motion for new trial after verdict finding defendant non-negligent, citing in support of trial outcome fact that "safety meetings were held on a regular basis").[29]

---

motion for judgment as a matter of law in slip and fall case where defendant claimed it was not negligent because it hired "reputable and good" contractors to build motel sidewalk and complete landscaping).

[29]  *See also In re Ingram Barge Co.*, No. 05-4419, 2008 WL 906303, at *6 n.23 (E.D. La. Mar. 31, 2008) (noting that although defendant barge owner was non-negligent, defendant would nevertheless be benefited by having a "written [safety] plan" regarding hurricane preparedness as such a plan would help defendant "move further into the realm of 'reasonableness[]'"); *Webre v. Azalea Fleet, Inc.*, No. 03-1190, 2005 WL 711608, at *5 (E.D. La. Mar. 23, 2005) (granting defendant's motion for summary judgment in maritime wrongful death case, holding that "a rational trier of fact could not conclude that [the defendant] was negligent for failing to properly train[,]" and citing evidence that safety meetings were held).

2774.   During the temporary abandonment process, BP was told by Halliburton that cement was ready to be pumped, and it was pumped as planned by Halliburton.   *See* § V.I. Given Halliburton's experience and resources, BP's decision to rely on them to design and pump the slurry was appropriate and met the standard of care.   *See* §§ II.D; VI.C.   *S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2775.   BP conducted three separate types of well integrity testing: seal assembly testing, the positive pressure test, and the negative pressure test.   *See* § IV.A.2.   Only the positive pressure test was required under MMS regulations.   *See* § IV.A.2.b.   The fact that BP undertook well integrity testing beyond that required by regulation further supports that BP satisfied the standard of care in the temporary abandonment of the well.   *See, e.g., Dickerson*, 509 So. 2d at 815; *Caruso*, 598 So. 2d at 773-75; *Jennings*, 792 F. Supp. 2d at 4.

2776.   BP's negative pressure test was consistent with the industry standard of care and properly designed to determine whether the well had integrity.   *See* § V.J.5   Although the Wellsite Leaders ultimately agreed to a misinterpretation pressed by the Transocean toolpusher, *see* § V.J.5.h, the appropriate design of the negative pressure test shows that BP had in place proper procedures to test the integrity of the well*, see* § V.J.5.   *See, e.g., Dickerson*, 509 So. 2d at 815; *Caruso*, 598 So. 2d at 773-75; *Jennings*, 792 F. Supp. 2d at 4.

2777.   BP also had the well monitored for kicks by Transocean and Halliburton, two contractors with extensive experience in deepwater drilling on whom BP was entitled to rely. *See* §§ II.C.1.; II.C.4; II.D.1.   *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2778.   Similarly, for well control BP appropriately relied on Transocean as a world-class driller to exercise proper well control, including through using the BOP.   *See* §§ II.C.1; II.C.4. *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

injury. To the contrary, BP's actions show that it sought to design and drill the well consistent with the established standards for successfully drilling and temporarily abandoning deepwater wells. BP had no reason to believe that by complying with government regulations and industry standards a blowout or other injury would result. *See generally* 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

2789. The parties opposing BP allege that its actions constitute negligence, gross negligence, and/or willful misconduct. The remainder of this subsection considers each of these specific actions in turn and concludes that BP satisfied the standard of care for each one (except for negligence relating to supervising the negative pressure test). For each action other than the negative pressure test, BP explains (i) why BP's conduct does not even constitute negligence, which necessarily means that it was not gross negligence or willful misconduct; and (ii) even if the action could be considered negligent, why it does not reach the higher thresholds for gross negligence or willful misconduct. Importantly, each of these actions must be considered in light of the many positive steps that BP took to drill safely have safe drilling as described in the preceding paragraphs of this subsection. *See Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog*, 1996 WL 720761, at \*2-4; *Whitley*, 538 S.E.2d at 300; *Milligan*, 754 P.2d at 1069. Moreover, many of these actions could not have legally caused the Incident. Therefore, such conduct, either considered individually or collectively, does not come anywhere close to reaching the high thresholds required for gross negligence or willful misconduct.

## 2.    BP Maintained a Strong Safety Culture.

2790. In the years before the Incident, BP made substantial investments to develop a range of initiatives to improve its safety, and the PSC's expert on safety, Dr. Bea, repeatedly agreed that these initiatives show BP's commitment to safety. *See* § XI. All of these demonstrate BP's focus on safety and that BP met and exceeded the standard of care for its

safety culture.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2791.  In its operations, BP emphasized safety through "Stop the Job" procedures to stop operations when safety issues arose; SOCs for people to identify work needing improvement; and Safety Standdowns after incidents for everyone to understand what happened and how to apply learnings.  The fact that all of these were in effect on the *Deepwater Horizon* and support that BP exercised reasonable care.  *See* §§ III.G; III.H.; XI.B; XI.C.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.[31]

2792.  BP never cut costs at the expense of safety in the GoM SPU in 2008 or 2009.  *See* § XI.B.4.  Furthermore, there is no evidence that any BP personnel involved with the Macondo well or *Deepwater Horizon* cut corners at the expense of safety.  *See* §§ XI.B.5.c; XI.B.5.d.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2793.  Based on this evidence, BP's safety culture met and exceeded the standard of care for an operator's safety culture.  This was reflected in BP's safety statistics and award from the MMS, showing that its safety practice were generally superior to those of its competitors.  *See* §§ XI.D; XI.E.  Therefore, BP's safety culture was not negligent.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2794.  Nor was BP's safety culture so deficient as to meet the high thresholds of gross negligence or willful misconduct.  BP's implementation of numerous new safety initiatives and

---

[31]  *Cf. George v. Nabors Offshore Corp.*, No. H-09-1884, 2011 WL 649988, at *3-4 (S.D. Tex. Feb. 10, 2011) (denying motion for summary judgment for defendant where plaintiff had authority to stop work when confronted with hazardous condition but opted not to exercise authority); *Petri v. Kestrel Oil & Gas Properties, L.P.*, 878 F. Supp. 2d 744, 761 (S.D. Tex. 2012) (denying plaintiffs' motion for summary judgment against oil and gas employer on issue of employer's gross negligence and citing in evidence that employer had established stop-work program and employee failed to exercise stop-work authority).

BP took a number of steps demonstrating reasonable care and effort to achieve a valid negative pressure test and that its conduct was not an extreme departure from the standard of care.

2881.   *First*, BP's Wellsite Leaders Kaluza and Vidrine questioned why the first negative pressure test had drill pipe pressure.  This shows that the BP WSLs were not indifferent to the results of the test or failing to exercise even slight care.  Instead, they were attempting to understand the indications observed and whether the test was successful.  *See* § V.J.5.d.

2882.   *Second*, it was Transocean personnel who convinced BP that the drill pipe pressure was not a concern.  Transocean's toolpusher advanced the concept of "annular compression" or "bladder effect" and argued that the first test was a good test.  *See* § V.J.5.d. The Transocean toolpusher and driller told the WSLs that they had witnessed this effect before, further indicating that it was not a concern.  *See* § V.J.5.d.

2883.   BP Wellsite Leader Vidrine fully discussed these results with the Transocean drill crew.  Indeed, Vidrine indicated that the drill crew began to laugh and make fun of him because of his persistence in questioning whether the first test was good.  *See* § V.J.5.d.  Ultimately, based on the theory advanced by the toolpusher, Vidrine reportedly concluded that the explanation was plausible.  *See* § V.J.5.d.

2884.   These discussions show that the erroneous explanation for the negative pressure test came from Transocean rather than BP.  Moreover, Vidrine did not blindly accept the explanation offered by Transocean's toolpusher and driller, but instead engaged in an extensive discussion.  Furthermore, the fact that both the toolpusher and driller advancing the "bladder effect" theory were experienced and well-regarded gave Vidrine a legitimate basis for believing their explanation.