# Exhibit 69

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      NO: 12-292

BP EXPLORATION AND PRODUCTION, INC.         SECTION: R


**REASONS FOR ACCEPTING PLEA AGREEMENT**


**Legal Standard**

BP and the government entered their agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. That rule authorizes the government to enter into a plea agreement with a defendant in which the parties agree that a particular sentence is the appropriate disposition of the case.[1] A court can accept or reject such an agreement, but it cannot modify or rewrite it. Nor can it involve itself in plea negotiations.

In assessing whether to accept a Rule 11(c)(1)(C) plea, the Court must make an "individualized assessment of the plea agreement" based on the facts and circumstances specific to the case. To ensure that it constitutes a "reasonable disposition," the Court must take into account, among other things, "'the exigencies of plea bargaining from the government's point of

---

[1] Fed. R. Crim. P. 11(c)(1)(C); *see also United States v. BP Prods. N. Am., Inc.*, 610 F. Supp. 2d 655, 674-78 (S.D. Tex. 2009).

view,' including 'limited resources and uncertainty of result.'"[2]
A court may not reject a plea agreement proposed under Rule
11(c)(1)(C) based on broad policy grounds unrelated to the
conduct before the Court. Nor is it appropriate to reject a plea
agreement because the Court believes that the government should
have brought other charges or charged other people. These
decisions are up to the prosecutor.[3] Nevertheless, a district
court can properly reject a plea agreement if it believes the
defendant would receive too light a sentence.

In assessing the parties' agreement, the Court should
analyze the proposed plea agreement in light of 18 U.S.C. §§
3553, 3563, and 3572, which govern the imposition of sentences,
including fines and probation, in federal criminal cases.[4] Those
statutory provisions require that all federal criminal sentences
take into account a number of factors, including the nature and
circumstances of the offense and the history and characteristics
of the defendant; the need to reflect the seriousness of the
offense, promote respect for the law, and provide just
punishment; the need to afford specific and general deterrence to

---

[2] *BP Prods.*, 610 F. Supp. 2d at 674, 662 (quoting *United
States v. Bundy*, 359 F.Supp.2d 535, 538 (W.D. Va. 2005).

[3] *BP Prods.*, 610 F. Supp. 2d at 675.

[4] *See id.* at 727-28.

2

criminal conduct; and the need to protect the public.[5]
Discretionary conditions of probation must be reasonably related
to those same factors, and must "involve only such deprivations
of liberty or property as are reasonably necessary."[6] Fines,
meanwhile, must be imposed after consideration of the Section
3553 factors mentioned above, as well as additional factors such
as the defendant's ability to pay, the burden imposed on the
defendant, whether the defendant can pass on the expense of the
fine to consumers and, in the case of organizational defendants,
the size of the organization and any measures taken by it to
discipline responsible employees and to prevent a recurrence.[7]
*See* 18 U.S.C. § 3572(a).

Ultimately, taking all of these factors into consideration,
the Court must determine whether the proposed plea agreement is a
"reasonable disposition" given the available alternatives, the
risks presented by those alternatives, and the limits in what the
law allows.[8] Considering the specific facts and circumstances in
the record of this case, including the objections raised by some
of the victims, the Court finds the proposed plea agreement is a
reasonable disposition of this matter and the sentence it calls

---

[5] *See* 18 U.S.C. § 3553(a).

[6] 18 § 3563(b).

[7] 18 § 3572(a).

[8] *BP Prods*, 610 F. Supp. 2d at 730.

3

for does not undermine the statutory purposes of sentencing. The Court makes this determination for the following reasons.

**Seriousness of the Offence and History and Characteristics of the Defendant**

There is no question that BP has committed serious offenses. BP's conduct resulted in the tragic deaths of 11 individuals and caused enormous environmental damage from the discharge of oil into the Gulf of Mexico, which has had a disastrous impact on the Gulf Coast Region. To make matters worse, in the wake of the spill, BP obstructed a congressional investigation into the amount of oil it was spilling into the Gulf or Mexico from the *Macondo* well. The explosion on the *Deepwater Horizon* rig would never have occurred if BP's employees had properly supervised the negative pressure testing of the well, had not ignored multiple indications that the drill pipe was not secure, had not failed to respond to obvious signs of pressure on the drill pipe, had not failed to contact onshore engineers to alert them of problems, and had not negligently deemed the negative pressure test a success. Their negligence in failing to control the well caused the blowout to occur, which caused the explosion which killed 11 men. Their negligence also caused the discharge of harmful quantities of oil into the Gulf of Mexico on the seabed, in the water column, at the surface, and across hundreds of miles of

4

beaches and coastline in the states of Louisiana, Mississippi, Alabama, and Florida. The discharge of oil killed protected migratory birds including brown pelicans, laughing gulls, and northern gannets, among others. The *Deepwater Horizon* oil spill was the largest marine oil spill in the history of the United States and the petroleum industry.

Furthermore, the record shows that, although not the BP entity charged in this case, the BP family of companies has a history of deficient safety management. In 2009, BP Products North America, Inc. pleaded guilty to a felony violation the Clean Air Act as a result of an explosion at its Texas City refinery that killed 15 people and injured scores of others. BP admitted that it knowingly violated a requirement that it have written procedures to maintain the integrity of its process equipment and knowingly failed to warn contractors in the vicinity of the known hazards in its operations. The Court in that case noted that BP had been fined by OSHA for similar violations at other refineries before the Texas City incident. Two years before the Texas City incident, BP Exploration Alaska, another company under the BP umbrella, was convicted of a Clean Water Act violation arising out of a 2006 pipeline spill in Prudhoe Bay, Alaska. BP Exploration Alaska was also convicted in 2000 under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for failing to timely

report hazardous dumping by one of its contractors on the North Slope of Alaska. Besides these environmental crimes, another BP company settled charges of price manipulation in 2007 and paid $300 million in civil and criminal penalties.

Given the severity of BP's conduct in this case and its staggering consequences, as well as the criminal history of the BP corporate family, it is apparent to the Court that an acceptable sentence must impose severe fines and conduct remedies. The BP entities have paid fines in the millions of dollars and have been put on probation before. If past is prologue, only a sentence several orders of magnitude more severe than any previously imposed on any BP company will be sufficient to achieve adequate deterrence and protect the public from future misconduct by BP. Having said that, the Court nevertheless finds that, examined in their totality, the charges brought by the government and the sentence agreed to by the parties appear reasonably calculated to accomplish these statutory objectives of sentencing, particularly considering the risks of the alternatives.

First, the government's charges reasonably reflect the severity of the offense conduct. The government has charged BP with 11 felony counts of manslaughter, two environmental offenses, and one felony obstruction count. Prosecutions of corporations for manslaughter are unusual and BP is pleading

guilty and accepting responsibility for causing 11 deaths. The
Clean Water Act and Migratory Bird Treaty Act counts reflect the
damage to the environment, wildlife, and natural resources. The
felony obstruction count includes BP's post-spill misconduct. The
charges to which BP is pleading guilty expose it to, not only
substantial fines, but also collateral consequences in other
litigation, as well as suspension or debarment from government
contracts, including new leases for oil and gas exploration.

Next, the amount of the fine and other monetary payments are
reasonable in light of the litigation risks, the fines imposed in
comparable cases, the focus on remedying the type of
environmental harm caused, and in light of other financial
consequences to BP as a result of the *Deepwater Horizon* incident.

**First, there is a risk of a significantly lower fine if the plea
agreement is rejected.**

As noted, BP has agreed to pay $4 billion: $1.256 billion in
criminal fines and $2.744 billion in other payments. It is very
important to the Court's decision that there is a significant
risk that absent a plea agreement, the government would be unable
to recover more than $8.19 *million* dollars in fines from BP.[9]

---

[9] *BP Products*, 610 F. Supp. 2d at 729 (S.D. Tex. 2009)("The
court must also take into account the exigencies of plea
bargaining from the government's perspective, including ... risks
that absent the plea, the government would not be able to prevail
or would only obtain a $500,000 fine.").

This follows because, without an agreement, in order to recover fines of the magnitude the parties have agreed to here, the government would have to prove the applicability of the Alternative Fines Act. That Act permits the court to impose a fine of the greater of twice the gross gain or loss caused by the offense.

But, the applicability of the Alternative Fines Act would not be a sure thing. The Alternative Fines Act may not be applied where its use would "unduly complicate or prolong the sentencing process."[10] If calculating an alternative fine would make sentencing unduly complex, the court would be required by law to resort to fines established by statutes for the specific offenses. In this case, those fines for all 14 offenses would be capped at a total of $8.19 million.[11]

Were BP to go to trial, the United States undoubtedly would face the argument that attempting to prove pecuniary loss or gain would trigger the complexity provision. This is no trivial argument as courts have utilized this provision to foreclose the

---

[10] 18 U.S.C. § 3571(d).

[11] The statutory maximum fines without application of alternative fine provision would be $500,000 for each manslaughter count for a maximum fine of $5.5 million; $25,000 per day of the violation for the Clean Water Act count for a maximum fine of $2.175 million, assuming the violation occurred for 87 days as stipulated by the parties; $15,000 for the Migratory Bird Treaty Act count; and $500,000 for the obstruction count.

use of the alternative fine provision in the past.[12] Courts are more likely to conclude that determining the amount of a fine under the Alternative Fines Act would unduly complicate or prolong the sentencing proceeding when there are multiple victims, the causation issues are disputed, or there are disputed future losses.[13] Were the Court to reject the plea agreement in

---

[12] For example, in *United States v. CITGO Petroleum Corp.*, No. C-06-563, 2012 WL 5421303, at *4-6 (S.D. Tex. Nov. 6, 2012) *recons. denied*, No. C-06-563, 2012 WL 6681891 (S.D. Tex. Dec. 20, 2012), the court held that Section 3571(d) would not be applied where, among other things, the court would essentially need to preside over a second trial to determine the gross loss or gain. In that case, an oil refinery operator and related entities were convicted after jury trial on felony counts of operating an oil water separator without proper emission control devices, in violation of Clear Water Act (CWA), and convicted after bench trial on misdemeanor counts of unlawfully taking migratory birds in violation of the Migratory Bird Treaty Act. The Court delayed sentencing to have the benefit of the Supreme Court's then-pending ruling in *Southern Union Co. v. United States*, --- U.S. ----, 132 S.Ct. 2344, 183 L.Ed.2d 318 (2012), which held that any fact that increases the amount of a criminal fine beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. In addition to *CITGO*, the court in *United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 147 (D.D.C. 2012) held, based on *Southern Union*, that in order for the court to impose an Alternative Fines Act fine, the Constitution requires that the jury find beyond a reasonable doubt that an amount constituted a "gross gain" or "gross loss" and that the amount was derived from the charged offenses. *See also, Southern Union,* 132 S.Ct. at 2370-71 (BREYER, J., dissenting)(noting that a consequence of the majority's holding is that Alternative Fines Act fines will need to be proved to a jury). Justice Breyer has also recognized the complexity of proving the loss in environmental cases. *Southern Union Co.*, 132 S. Ct. at 2344, 2370 (Breyer, J., dissenting) (discussing the potential impact of the Court's holding on Section 3571(d) and noting that in "an environmental pollution case, the jury may have particular difficulty assessing different estimates of resulting losses").

[13] *See BP Products*, 610 F. Supp. at 691.

9

this case, all three factors suggest that determining the gross
loss would unduly complicate or prolong sentencing. First,
proving the loss caused by BP's Clean Water Act violation could
involve hundreds of thousands of potential victims, and
quantification of the environmental harm would be subject to
intense disputes over causation that could prolong sentencing.
Additionally, calculating the pecuniary loss caused by the oil
spill would involve disputes over future losses, for example,
from latent impacts of the spill. Because of the complexity of
proving the gross loss caused by BP's crimes, there is a
significant risk that the Court would find that the Alternative
Fines Act can not apply. As I mentioned, this would mean that the
fines would be capped at just $8.19 million under applicable
default fine provisions. That amount is less than one percent
(0.65%) of the $1.256 billion fine BP has agreed to pay pursuant
to the plea agreement, and less than half a percent (0.205%) of
the total negotiated criminal recovery of $4 billion. The
uncertainty the government would face and the risk of this much
lower fine if the case went to trial counsels in favor of the
Court's accepting the plea agreement. Litigation risk is also
present because even if the Alternative Fines Act could be
applied, under recent Supreme Court authority, the government may
have to prove the alternative fine amount to a jury beyond a

reasonable doubt.[14] This is a much higher standard of proof than the one that applies in a sentencing proceeding before a judge.

**The monetary penalties are objectively reasonable compared to previous criminal fines.**

The monetary penalty in this case not only dwarfs any fine ever paid by a BP entity, but it also far exceeds any other monetary penalty imposed in the history of the United States. BP's overall criminal monetary sanction – a total of $4 billion – is also more than three times larger than the value of the next-largest criminal resolution ever paid, which was $1.3 billion.[15] The value of BP's criminal resolution is also more than the three next-largest overall criminal resolutions combined. Further, the

---

[14] *Southern Union Co. v. United States*, --- U.S. ----, 132 S.Ct. 2344, 183 L.Ed.2d 318 (2012) (any fact that increases the amount of a criminal fine beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt).

[15] Among the top five largest criminal resolutions of all time, BP's is the only one to arise from an environmental incident. The next five highest overall criminal resolutions are: (1) Pfizer's 2009 $1.3 billion criminal resolution ($1.195 billion criminal fine; $105 million criminal forfeiture) with respect to off-label pharmaceutical marketing; (2) HSBC's 2012 $1.256 billion criminal forfeiture resolution with respect to violations of the Bank Secrecy Act, International Emergency Economic Powers Act and Trading with the Enemy Act; (3) GlaxoSmithKline's 2012 $1 billion criminal resolution ($955 million criminal fine; $45 million criminal forfeiture) with respect to off-label pharmaceutical marketing; (4) Abbott Laboratories' 2012 $700 million criminal resolution ($500 million criminal fine; $200 million forfeiture) for off-label pharmaceutical marketing; and (5) Eli Lilly's 2009 $615 million criminal resolution ($515 million criminal fine; $100 million forfeiture) for off-label pharmaceutical marketing.

11

fines in other environmental cases, including those with massive
environmental damage and loss of life, are lower by several
orders of magnitude than the BP package. In the criminal *Exxon
Valdez* oil spill case, there was a judgment that included a $150
million fine, all but $25 million of which the Court later
forgave in consideration of Exxon's cooperation in the clean-up.
BP's $1.15 billion Clean Water Act fine here is forty-six times
greater than the effective fine ultimately paid in The *Exxon
Valdez* case.[16] Moreover, considering the total $4 billion package
in the plea agreement, BP's payments here would be 160 times
greater than the $25 million fine actually paid in *Exxon Valdez*
and more than twenty-six times greater than the $150 million fine
that was initially imposed but was not actually paid by Exxon.
Likewise, in the Texas City Refinery disaster, a BP entity paid a
fine of $50 million where 15 people died and 170 others were
injured. The $4 billion in total payments here exceeds that
amount by a factor of 80.

The Court also takes note that BP is prohibited under the
agreement from seeking any tax benefit or receiving any reduction
in civil liability based on the payments made pursuant to this
agreement or referencing the payments in any public relations,
marketing, or advertising. These restrictions ensure that BP will

feel the full brunt of the $4 billion in penalties it is required
to pay.

Of course, the Court does not doubt that BP, one of the
world's biggest companies in terms of revenue and total value,[17]
could afford to pay more without going out of business. But this
does not render the agreed upon penalty of $4 billion, by far the
largest criminal penalty ever, unacceptable. The amount of fines
and other payments here amounts to just punishment compared to
previous fines and they will deter BP and other companies from
committing similar crimes in the future.

**The payments are targeted toward remedying the harm caused by the
oil spill.**

Not only is this the largest fine in history, but most of
the money paid, instead of going into the Federal Treasury, is
targeted toward mitigating and repairing the damage done by the
spill. The $1.15 billion Clean Water Act fine will be paid to the
Oil Spill Liability Trust Fund, pursuant to the plea agreement.
The RESTORE Act of 2012 directs 80 percent of BP's criminal Clean
Water Act fine to the Gulf Coast states to restore ecosystems and
rebuild local economies damaged by the *Deepwater Horizon* oil

---

[17] BP had revenues of about $375 billion in fiscal year 2011.
At the end of the first quarter of 2010, shortly before the Macondo
tragedy, BP's market cap (the total value of the issued shares of a
publicly traded company) was $178.7 billion; as of the end of
January 2013, BP's market cap was approximately at $140 billion.

spill. The $100 million fine for violation of the Migratory Bird
treaty act is required by statute and the plea agreement to be
used by the Department of the Interior to carry out wetlands
conservation and restoration projects located in Gulf Coast
states or otherwise designed to benefit migratory bird species
and other wildlife and habitat affected by the *Macondo* Oil
Spill.[18] The $2.394 billion to be paid to the National Fish and
Wildlife Foundation as a special condition of probation will be
apportioned to the affected Gulf Coast states to remedy harm and
eliminate or reduce the risk of future harm to Gulf Coast natural
resources. Half of this $2.394 billion will be used to conduct
projects in Alabama, Florida, Mississippi, and Texas.  The other
half will be used to create and restore barrier islands off the
coast of Louisiana and/or to implement river diversion projects
for the purpose of restoring the coastal habitat of the state.

Under the agreement, BP is to pay $350 million to the
National Academy of Sciences for the purposes of Oil Spill
prevention and response in the Gulf of Mexico. The National
Academy of Sciences is required to use the funds to advance
scientific and technical understanding to improve the safety of
offshore oil drilling, production and transportation in the Gulf
of Mexico.

---

[18]  16 U.S.C. §§ 703, 707, 4406(b); 18 U.S.C. § 3571(d).

14

Of course, the Court realizes that the fines and other penalties provided by the plea agreement can do nothing to restore the lives of the 11 men who were killed. But in the payment to the National Academy of Sciences, the agreement at least directs money towards preventing similar tragedies in the future. That the bulk of the payments to be made under the plea agreement are directed toward restoring the Gulf Coast and preventing future disasters, contributes to the reasonableness of the plea agreement.

**The $4 billion penalties should be considered in light of BP's other related payments, obligations, and liabilities.**

In finding the amounts involved here reasonable, the Court has considered other expenditures and financial commitments that BP has made in connection with the *Deepwater Horizon* incident.[19] Before reaching the proposed plea agreement, BP spent $24.2 billion in responding to the *Deepwater Horizon* incident through the third quarter of 2012. The $24.2 billion includes costs for spill response activities; payments for individual, business, and government claims; costs for environmental impact assessment,[20]

---

[19] *See, e.g., BP Prods.*, 610 F. Supp. 2d at 677-78, 729 (doing the same).

[20] BP has spent or reimbursed the federal and state natural resource trustees over $600 million spent investigating the potential natural resource damages resulting from the *Deepwater Horizon* incident and oil spill.

environmental restoration,[21] and research activities[22]; and

funding for restoring local industries.[23] BP estimates that total

---

[21]   In 2011, BP voluntarily set aside up to $1 billion to be
used for NRD early restoration projects pursuant to an agreement
with the federal and state natural resource trustees.

[22] In 2010, BP and the Gulf of Mexico Alliance, which
includes the States of Alabama, Florida, Louisiana, Mississippi,
and Texas, announced detailed plans for the implementation of
BP's $500 million Gulf of Mexico Research Initiative (GoMRI).
While the details of the GoMRI were being developed, BP awarded a
series of fast-track grants to five research groups, totaling $40
million, to study the impact of the oil spill, and its associated
response, on the marine and shoreline environment of the Gulf of
Mexico. Through September 30, 2012, a total of $179 million in
grants for research efforts has been awarded. Under the Plea
Agreement, BP will "continue to fulfill its commitment to fund
[GoMRI] . . . at the level established by the Master Research
Agreement . . . between BP and the Gulf of Mexico Alliance."
(Exhibit B ¶ 33; *see also* Plea Agreement ¶ 4(c)(viii).).

[23] In 2010, BP provided $87 million in grants to Alabama,
Florida, Louisiana, and Mississippi for tourism promotion and
provided another $52 million for behavioral health funding. BP
made additional commitments of $174 million over three years to
promote tourism, to help the states monitor seafood safety, and
to promote Gulf seafood within the four affected states, of which
$132 million has been funded against those commitments through
September 30, 2012.
    In 2010, BP also established a $100 million Rig Worker
Assistance Fund through the Baton Rouge Area Foundation (the
"Foundation") to support unemployed rig workers experiencing
economic hardship as a result of the moratorium on deepwater
drilling that had been imposed by the federal government at the
time. In 2011, the Foundation awarded $5.8 million to an expanded
pool of applicants, after awarding $5.6 million to nearly 350 rig
workers in 2010.
    With less than 2,000 applicants seeking funds, the
Foundation granted $18 million of the BP contribution to
community-based organizations through its Future for the Gulf
Fund. At the end of 2011, the Foundation was assessing additional
funding requests from organizations assisting those impacted by
the spill, and said it hoped to complete the distribution of the
BP contribution by the end of 2012.

amount paid out will eventually reach $42 billion, including the criminal fines in this case. This amount includes the $525 million that BP will pay as a civil penalty as part of a settlement agreement with the Securities and Exchange Commission.

Also included in BP's *Deepwater Horizon* liability is an uncapped settlement agreement in the civil litigation in MDL-2179. The settlement resolves economic loss claims and medical claims stemming from the *Deepwater* incident and oil spill. The final amount of the settlement is uncapped but BP estimates that the total cost will be approximately $7.8 billion and the actual cost may be higher.

The United States continues to prosecute civil claims against BP, with an initial trial set to begin in February. BP faces the prospect of billions of dollars in additional liability in the civil actions, with potential civil penalties under the Clean Water Act and liabilities related to the ongoing Natural Resource Damage Assessment. BP was also recently temporarily suspended from receiving U.S. government contracts.

The Court takes note of BP's significant expenses, mandatory and voluntary, stemming from the *Deepwater* oil spill because these other consequences, while distinct from the plea agreement, provide context for the $4 billion BP will pay under the plea agreement. They demonstrate that paying $4 billion dollars on

17

top of all of the other financial consequences is a consequential
penalty.

**The plea agreement includes conduct requirements to deter future
accidents and violations.**

Also a factor in the Court's acceptance of the plea
agreement is the agreement's inclusion of meaningful conduct
remedies. Some of the victims expressed concern that BP could
return to business as usual while on probation. But, the terms of
probation are designed to prevent this by making sure that BP's
conduct will be closely watched for compliance with the terms of
probation and for any violations of the law.

The agreement provides for a five year term of probation -
the longest period available under the law - and a litany of
stringent special conditions of probation. These conditions
address both the safety and risk management practices and the
ethical climate at BP. They require two government approved
monitors to be on board to come up with recommended improvements
on both the safety and ethics fronts and BP will have to follow
these recommendations. The monitors will make follow up
recommendations and report potential violations of law to the
Department of Justice and the Probation Officer.

BP is also required to conduct at least one Safety and
Environmental Management System audit at each of the platforms or

18

platform rigs it owns or has under contract during the probation
period. The audits will ensure that BP has implemented
comprehensive safety and environmental management programs as
required under federal regulations issued in 2011 in response to
the *Deepwater Horizon* Incident.

The plea agreement also requires BP to arrange for third
party or expert oversight of a variety of specific functions that
directly led to the *Macondo* explosion, including verification of
the testing and maintenance of its blowout preventers, and review
of all deepwater well cement designs and cement testing. The
agreement also requires BP's blowout preventers to meet certain
equipment requirements to make sure they are as effective as
current technology allows. BP is required to maintain a real-time
drilling operations monitoring center and submit annual summaries
of reportable incidents and correctional measures to the Bureau
of Safety and Environmental Enforcement. BP must adopt standards
of competence for its deepwater drilling operations supervisors
and train and test its personnel on these standards. The plea
agreement also calls for substantial measures to improve BP's
response to a future accident, including increased training of
crisis management and spill response teams and immediately
updating its spill response plan to incorporate best practices.

To ensure compliance with all of these terms of probation,
BP is required to hire a third party independent auditor,

approved by the Department of Justice, whose job it is to review
and report to the Probation Officer and the Department of Justice
on the defendant's compliance with conditions I have described.
Ultimately, there will be access to this Court to punish
probation violations.

BP is also obligated by the plea agreement to cooperate in
any ongoing criminal investigation by the government relating to
the Deepwater Horizon incident.

The monitors, auditors, and stringent reporting requirements
mean that BP's conduct and compliance will be closely watched.
Equally important is the detailed regime of technical safeguards
to improve BP's deepwater drilling safety practices and
technology. In sum, the non-monetary conditions of probation
reflect the seriousness of the offense and, along with the
monetary penalties, provide just punishment and a deterrent to
future accidents and misconduct.


**Victims Objections**

In its November 11, 2012, order, the Court invited victims
of the *Deepwater* explosion and oil spill to submit written
statements about the plea and the agreed sentence. The Court has
received 29 statements from victims, including one survivor of
the rig explosion, family members of some of the men who were
killed by the explosion, individuals whose property was damaged

by the oil spill, and individuals and organizations who were
otherwise affected by the environmental damage caused by the
spill. The Court also invited victims to contact the U.S.
Attorney's Victim Witness Coordinator if they wished to be
reasonable heard at the January 29, 2013, hearing. The Court has
heard and considered their statements.

Some of the families of victims who died wrote and spoke
before the Court primarily to express the grief, anger, and
anguish they have experienced. A common theme was that no amount
of money can ever compensate for the loss of a son, a husband, a
father, or a brother. The letters I have received from family
members are truly gut-wrenching and the sadness and overwhelming
sense of loss expressed by the people I've heard from, like
nothing else, brings home the gravity of BP's conduct. One family
member described the loss of her husband as like having a hole in
her heart. The Court is very aware that nothing in the plea
agreement can plug the hole in the lives of the survivors created
by the loss of their loved ones. The hope is that the families of
the victims as well as others affected by the spill can take some
solace in the fact that the plea agreement holds BP responsible
for its crimes and takes serious steps to prevent incidents like
this disaster from happening again.

In addition, victims' families expressed a variety of more
specific concerns with the plea agreement. Some expressed anger

21

at BP's behavior immediately following the explosion and the
absence of contact from someone to personally accept BP's
responsibility and to offer an apology. Now do I think that BP
should have apologized personally to the families of these
victims? The answer is yes. I think that BP should have done that
out of basic humanity. But having said that, its failure to do so
is not a basis for me to reject the agreement, considering the
many things that are positive about it and that I have no power
to change it, only to accept or reject it.

Some of those affected by the *Deepwater* explosion and oil
spill expressed disapproval with the plea agreement for not
subjecting high level BP executives to jail time. Again, what is
before me is a plea agreement between the company and the
government. I have to examine the reasonableness of the agreement
and accept or reject it without modification. As I have
explained, the charges brought by the government adequately
reflect what BP is responsible for. The government has separately
indicted four employees of BP for their conduct in this incident.
Based on the information before me, I am not in a position to
know whether higher ups should have been charged. But in any
event, it's the job of the job of the prosecutors, not the court,
to decide whom to prosecute.

Other people have complained that the financial penalties
are not sufficiently punitive. The Court has already addressed

the sufficiency of the fines and other payments in light of all
the considerations that are relevant to determining whether to
accept the plea agreement.

Finally, let me address the specific requests of several
deceased victims' family members for restitution. Again, the
Court lacks the ability to provide for additional payments on top
of what has been agreed to, or to modify the plea agreement. But,
even if there were no plea agreement, and BP stood convicted
after trial, the Court would be very limited in any restitution
it could legally order. Restitution would not be available for
pain, suffering, grief, and anguish and is limited to out of
pocket financial losses. Restitution could not be ordered for any
financial loss but that of the deceased victims. While the Court
acknowledges the pain and loss suffered by parents and siblings
of the deceased victims, the law would not allow for payments to
these family members in this case, regardless of the existence of
the plea agreement.

Besides family members of the men killed, the Court has also
heard from several individuals and organizations that were
affected in various ways by the oil spill. Some of these people
have requested compensation for damages they suffered as a result
of the spill. None of the crimes that BP is pleading guilty to
would allow restitution to victims like fishermen for the types
of harm caused by the spill to the fishing industry. So even if I

23

rejected the agreement and BP were convicted at trial, I could
not order BP to pay money to fishermen. As I have discussed, the
court recognizes the severity of the environmental harm caused,
but also finds that the monetary payments and remedial actions
included in the plea agreement amount to a reasonable sentence
considering the risks and alternatives. Finally, I would also
like to point out that there were hundreds of thousands of people
affected by this disaster, and I have heard objections from only
a very small number. Without relying on this fact, the Court
believes that the relatively small number of complaints reflects
that many of those affected agree with the Court's belief that
the plea agreement should not be rejected.

      For all of these reasons, I accept the plea agreement.


      New Orleans, Louisiana, this 29th day of January, 2013.

_____
      SARAH S. VANCE
    UNITED STATES DISTRICT JUDGE