**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re:  Oil Spill by the Oil Rig
      "Deepwater Horizon" in the Gulf
      of Mexico, on April 20, 2010

This Pleading Relates To
- **10-4182** (*Alabama v. BP*)
- **10-4183** (*Alabama v. Transocean, et. al*)
- **13-2645** (*Alabama v. Anadarko & MOEX*)
- **13-2646** (*Alabama v. Transocean*)
- **13-2647** (*Alabama v. Halliburton*)
- **13-2813** (*Alabama v. BP*)

**MDL No. 2179**
**SECTION: J**

**JUDGE BARBIER**
**MAGISTRATE SHUSHAN**

**OPPOSED MOTION TO STRIKE EXPERT OPINIONS**
**–AND–**
**UNOPPOSED MOTION FOR ADDITIONAL BRIEFING PAGES**

The State of Alabama moves this Court to (1) strike James Oldham's declaration, either in its entirety or just Paragraphs 4-6 and 31-33, which offer improper expert opinions, *see* MDL 2179 Doc. 12345-2, and (2) grant Alabama 15 additional pages of briefing for good cause shown.  *See* MDL 2179 Doc. 12126 at 2 (granting Alabama the "right to seek additional pages").

BP attached Professor Oldham's declaration to its brief.  The Court should strike the declaration, either in part or in whole, because it violates Rule 702 by presenting retained-expert opinions on the pure question of law presented.  *See* Doc. 12345-1 at 13, 17 n.8, 19; 12345-2. The Court should grant Alabama 15 additional pages of briefing space to respond to (a) BP's use of Dr. Oldham's 15-page historical treatise and resulting opinions and (b) Transocean's 7-page argument that Alabama waived its right to a jury based on particular statements we made, and actions we took, with regard to Transocean's Limitation Trial.  *See* Doc. 12362.

None of the Defendants object to Alabama's request for 15 additional pages.  BP objects to Alabama's motion to strike; thus, a memorandum in support follows.  *See* Local Rule 7.4.

**MEMORANDUM IN SUPPORT OF ALABAMA'S MOTION TO STRIKE EXPERT OPINIONS AND MOTION FOR ADDITIONAL BRIEFING PAGES**

### BACKGROUND

1.    In its Briefing Schedule Order, the Court granted BP 25 pages for its opening brief; Alabama 25 pages to respond; and, BP 10 or 15 pages in reply.  *See* Doc. 12126.  The Court reserved the right to seek additional pages for Alabama's brief and BP's reply brief "if necessary to respond to issues raised by other parties." *Id.* at n.1, n.2.  The Court did not, however, reserve the right for BP to request an extension of its 25-page limit for its opening brief. *Id.*

2.    The question presented by these briefs is whether the Seventh Amendment entitles Alabama to a jury trial for its claims for OPA compensatory damages.  *Id.*  Whether the Seventh Amendment entitles a party to a jury is a pure question of law, not fact.  *See Luera v. M/V Alberta*, 635 F.3d 181, 186 (5th Cir. 2011).

3.    While we disagree with BP's analysis and conclusion, BP correctly identifies the test for determining whether the Seventh Amendment grants Alabama the right to a jury trial for its OPA economic damage claims:

> The Seventh Amendment 'requires a jury trial on the merits in those actions that are analogous to actions brought in 18th Century English law courts.' *Tull v. United States*, 481 U.S. 412, 417 (1987).  The Supreme Court applies a two-part test to determine whether an action is a suit at common law under the Seventh Amendment:
>
>> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.

> *Id.* at 417-18 (citations omitted).

Doc. 12345-1 at 19.

4.      To bolster its argument on this pure question of law, BP retained Professor James Oldham to, in his words, "*provide an expert opinion* regarding English legal history in connection with motion practice on whether the State of Alabama is entitled to a jury trial on the claims it has brought against BP." Doc. 12345-2 at 1 (emphasis added).

5.      Professor Oldham provided BP with a 15-page "Declaration," which contains a 2-page summary of his findings and conclusions, followed by an 11-page "**Opinions**" section that contains the Professor's review of 18th Century Admiralty and Common Law and his resulting conclusions. We attach the Professor's declaration to this motion. In it, we highlight Paragraphs 4-6 and 31-33, which contain Professor Oldham's expert opinions/conclusions on the legal question presented—*i.e.* whether Alabama's OPA economic damage claims are comparable/analogous to claims brought in the English Courts of Common Law, as opposed to the English Courts of Equity or Admiralty, in 1791. *See* Attachment A at 2-3, 15-16.

6.      BP cites Professor Oldham's declaration as authority five times in its 25-page brief. *See* Doc. 12345-1 at 13, 17 n.8, 19.

### ARGUMENT: MOTION TO STRIKE EXPERT OPINIONS

7.      In his own words, Professor Oldham was hired by BP "to provide an expert opinion" regarding the pure legal question of Alabama's constitutional right to a jury trial. Attachment A at 1. But Rule 702 allows expert opinions to assist the Court "understand the evidence or determine a fact in issue," not to answer a question of law. Questions of law are the sole province of the Court.

8.      Furthermore, even if Professor Oldham's opinions were proper under the rules (and they're not), attaching a declaration of expert opinions to a brief ensures that Alabama has no ability to subject those expert opinions to cross-examination.

9.     Accordingly, the Court could properly strike the *entire* declaration as an improper expert report under Rule 702. We consider that result our secondary request for relief.

10.     As our primary request, we ask for the lesser remedy of striking only the cited paragraphs that contain Professor Oldham's opinions/conclusions on the legal question presented—leaving the remaining historical treatise.  We do so because an understanding of English law in 1791 is important to the Court's decision, and we expect that viewing BP's use of Professor Oldham's research in light of Alabama's gap-filling response will benefit the Court.

11.     That said, it is critical to strike Professor Oldham's *conclusions/opinions*—one way or another.  If the Court fails to strike Professor Oldham's conclusions/opinions from the record, Alabama feels certain that BP will improperly cite them as proving the ultimate legal question, in this Court and in those to come.

12.     Finally, in its order striking Professor Oldham's declaration, Alabama requests the Court additionally order that BP not be allowed to attach another expert affidavit, declaration, report, etcetera to its reply brief.  If BP wishes to include additional facts and/or opinions in its reply, they should be in the body of BP's brief.

## ARGUMENT: MOTION FOR ADDITIONAL PAGES

13.     The Court's scheduling order reserves to Alabama the right to seek additional pages "[i]f necessary to respond to issues raised by other parties."  Doc. 12126 at 2, n.1. Alabama seeks a total of 15 additional pages under this provision and for good cause shown to respond to (a) BP's 15-page expert declaration/treatise and (b) TO's argument that Alabama took particular actions during the Limitation Proceedings that waived our constitutional right to a jury in later proceedings.

14.     Because no Defendant objects to this request, we will be brief.  By attaching a 15-page treatise on the question presented to its 25-page brief, and citing the declaration five times,

BP effectively extended its opening brief from the approved 25 pages to 40 pages. It would be fundamentally unfair for BP to have 40 pages in opening and 10+ pages in reply, while Alabama is capped at 25 pages total, especially when it is *Alabama's* constitutional right that's at stake. (We note that this 15 pages for 15 pages fairness argument does not account for the additional arguments contained in the TO and HESI briefs, which we will address within the presently requested 15 pages).

15. Alabama understands that *having* 40 pages to respond does not mean that Alabama must *use* 40 pages to respond. Alabama respects the Court's time and will attempt to keep its responsive brief as concise as possible, while still adequately addressing all of the issues raised in the Defendants' briefs and attachments.

## CONCLUSION

The Court should grant the following requests for relief:

1.      Strike Paragraphs 4-6 and 31-33 of James Oldham's declaration, or strike the declaration in its entirety, and order that BP cannot file or attach additional expert declarations/reports on the jury trial issue; and,

2.      Grant Alabama an additional 15 pages for its brief.


Respectfully Submitted,


LUTHER J. STRANGE
*Attorney General*

 /s/ Corey L. Maze
COREY L. MAZE
*Special Deputy Attorney General*

WINFIELD J. SINCLAIR
*Assistant Attorney General*

Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130

Phone: (334) 242-7300
Fax:    (334) 242-4891
Email:  cmaze@ago.state.al.us

Attorneys for the State of Alabama

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on **February 20, 2014**.

    /s/ Corey L. Maze
COREY L. MAZE
*Special Deputy Attorney Genera*l

# Attachment A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179 SECTION J |
| This document relates to: | * * | Judge Barbier |
| Case Nos. 10-2771, 10-4182, 10-4183, 13-02645, 13-cv-02646, 13-cv-02647, 13-cv-02813 | * * * | Magistrate Judge Shushan |

---

## DECLARATION OF JAMES OLDHAM

1.     I, James Oldham, declare as follows:  I am the St. Thomas More Professor of Law and Legal History at the Georgetown University Law Center in Washington, D.C.  I have been retained by BP to provide an expert opinion regarding English legal history in connection with motion practice on whether the State of Alabama is entitled to a jury trial on the claims it has brought against BP.

### Questions Presented and Summary of Opinions

2.     This report supplies historical information on the jurisdictional scope of the English Court of Admiralty in the late eighteenth century in connection with ongoing litigation in the U.S. District Court for the Eastern District of Louisiana resulting from the oil spill from the "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010.  The particular inquiry concerns the right to jury trial.  This question has been raised in the suit against BP by the state of Alabama seeking damages under the Oil Pollution Act of 1990, including for lost tax revenues

1

and increased public expenditures due to the oil spill. Alabama has demanded a jury trial, claiming entitlement under the Seventh Amendment of the U.S. Constitution.

3.     I have been asked to look at two questions. First, whether and to what extent admiralty jurisdiction in late 18th century English law extended to injuries that occurred partly on land. Second, whether claims for lost tax revenues and increased public expenditures would be considered actions at common law in late 18th century English law.

4.     In sum, my conclusion is that English law in 1791 did not limit Admiralty jurisdiction to events occurring wholly on navigable waters. Instead, both court decisions and contemporary treatises recognized that Admiralty jurisdiction was not limited to events occurring wholly at sea but extended to consequential events occurring on land. For example, where a ship was taken as a prize at sea, and its crew brought actions for trespass, false imprisonment, or for recovery of goods that had been sold on the land, such actions were within admiralty jurisdiction. Indeed, even if the Admiralty Court held that the ship was not a proper prize, admiralty still had jurisdiction to decide cases resulting as a consequence of the taking of the ship.

5.     The English Admiralty Court decided a variety of cases, including those involving personal assaults on vessels. In this capacity, English judges sitting in Admiralty awarded damages for a range of injuries. English courts, both common law and admiralty, also recognized the benefits of admiralty jurisdiction, including in adjudicating cases involving a large number of parties.

6.     English common law courts of the late eighteenth century apparently did not conduct jury trials in which a government sued a private party for lost tax revenues resulting from injuries caused to a third party, or for increased public expenditures resulting from the actions of a private party. Nor do there appear to have been jury trials that were persuasively

2

analogous.  In general, cases involving complex financial accounts were customarily resolved in the Court of Chancery rather than by juries in the common law courts.

### Background and Qualifications

7.    I have researched and studied legal history, including English legal history, for approximately 35 years.  My research has included studying the circumstances under which a jury was available by English law and practice.

8.    I have written numerous books and articles regarding English legal history, including *Case Notes of Sir Soulden Lawrence 1787-1800*, Selden Society (London, 2013); *English Common Law in the Age of Mansfield*, Studies in Legal History, University of North Carolina Press (2004); *The Mansfield Manuscripts and the Growth of English Law in the Eighteenth Century*,  Studies in Legal History, The University of North Carolina Press, (2 vols. 1992); and  "Informal Lawmaking in England by the Twelve Judges in the Late Eighteenth and Early Nineteenth Centuries," 29 *Law and History Review* 181 (2011) ) (winner of the 2012 Sutherland Prize by the American Society for Legal History for the best published article in 2011 on English legal history).

9.    I have written books and articles specifically about the right to a jury trial in England before 1791, including *Trial By Jury: The Seventh Amendment and Anglo-American Special Juries*, New York University Press (2006); "On the Question of a Complexity Exception to the Seventh Amendment Guarantee of Trial by Jury," 71 *Ohio State Law Journal* 1031 (2010); and "The Seventh Amendment Right to Jury Trial:  Late Eighteenth-Century Practice Reconsidered," in Katherine O'Donovan and Gerry R. Rubin, eds., *Human Rights and Legal History: Essays in Honour of Brian Simpson*, Oxford University Press (2000).

3

10.     I have spent extended time in Edinburgh and London examining manuscript sources on English legal history at The National Register of Archives (Scotland), The National Archives (London) and the libraries of three Inns of Court    Lincoln's Inn, the Middle Temple, and the Inner Temple.  These sources were the foundational work for two of my books -- *Case Notes of Sir Soulden Lawrence 1787-1800*, and *The Mansfield Manuscripts and the Growth of English Law in the Eighteenth Century*.

11.     I teach seminars on English legal history and the history of the jury.  I am a long-term member of the Selden Society, the only learned society and publisher devoted entirely to English legal history.  Founded in 1887, the Society has published 128 annual volumes consisting of original source materials never before in print, together with extensive editorial essays.  In addition, I am a member of the American Society for Legal History, having served three terms on the Board of Directors.    From 2001-2012 I was a member of the Board of Editors of *Law and History Review*, and I was an editorial consultant to the Documentary History Project of the United States Supreme Court from 1986 until the Project's completion in 2007.  I have also been a co-author and Counsel of Record of three briefs *Amici Curiae* of Legal Historians addressing the historical scope and reach of the writ of *habeas corpus*, in *I.N.S. v. St. Cyr*, 533 U.S.289 (2001), *Rasul v. Bush* and *al Odah v. United States*, 542 U.S. 466 (2004), and *Boumediene v. United States*, 553 U.S. 723 (2008).

12.     Further information on my background and qualifications is set forth in my resume, which is attached to this Declaration.

**Materials Considered**

13.     In addition to my own books, the principal sources I consulted were Blackstone's Commentaries, Browne on Admiralty Jurisdiction, Bacon's Abridgement, Comyn's Digest, and

Justice's Dominion of the Sea. Full citations to these and other sources consulted are listed on an attachment to this report.

14. In addition, I relied on my decades of experience in researching English law pre-1791 and historical aspects of jury trial rights.

15. These materials are of the kind that I and other legal historians regularly rely upon in writing, teaching, and performing other work outside of litigation.

### Opinions

16. As described by William Blackstone, the proceedings of the Court of Admiralty "are according to the method of the civil law, like those of the ecclesiastical courts; upon which account it is usually held at the same place with the superior ecclesiastical courts, at doctors' commons in London."[1] This meant, among other things, that in conducting civil cases and prize cases, "this court proceeded without jury, in a method much conformed to the civil law."[2]

**The Scope of Admiralty Jurisdiction**

17. Relevant cases were collected, summarized and annotated in a number of leading treatises and abridgements. Three meriting mention were *A General Treatise of the Dominion of the Sea: and a Compleat Body of Sea-Laws*, by Alexander Justice (third edition 1710); *A Compendious View of the Civil Law, and of the Law of Admiralty*, by Arthur Browne (second edition, 1802, volume II, *Containing the View of the Admiralty Law*); and *A New Abridgement of the Law*, by Matthew Bacon (seventh edition, 1832). These and other sources recognized that

---

[1] W. Blackstone, *Commentaries on the Laws of England*, 4 vols., III: 69 (1768).

[2] Id. at IV: 265(1769). The Admiralty also had jurisdiction over crimes committed at sea, and in order not to subject the accused to trial and a possible death sentence by a single man, a statute was passed in the reign of Henry VIII establishing a jury trial procedure for the criminal cases. Id. at 265-266.

5

admiralty jurisdiction was not limited to events occurring wholly at sea. For example, Matthew

Bacon's *A New Abridgement of the Law* (seventh edition, 1832) contains a chapter titled *Of the*

*Court of Admiralty*. The second section of that chapter is titled, "To What Things Its Jurisdiction

Extends: And Herein of Such Matters As Arise, Partly on Sea, and Partly on Land." Citing

numerous case authorities, Bacon states:

> If the original cause arises upon the sea, and other matters happen upon the land depending thereupon, yet the trial shall be in the court of admiralty.
>
> As, if a man takes a thing upon the sea and brings it to the land, and afterwards carries it away, the suit for this shall be in the admiralty court, for this is a continued act.
>
> So, if goods are taken piratically out of a ship, and afterwards sold upon land, a suit may be commenced in this case in the admiralty court, against the vendee.
>
> So, if a ship be taken by pirates and carried to *Tunis*, and there sold, it being originally within the jurisdiction of the Admiral, it so continues, notwithstanding the sale afterwards upon the land.[3]

Bacon's conclusions are amply supported by the pre-1791 English cases he cites, which

regularly recognized admiralty jurisdiction over events partially occurring on land. This was

particularly true in prize cases.

18.     Similarly, in *Comyn's Digest*, third edition (1792) the following examples are

given of Admiralty jurisdiction:

> The common jurisdiction of the admiralty is limited to things done *super altum mare*; but in matters of prize, the jurisdiction depends not on locality, but on the subject, which is governed by the *jus belli*, and not by the rules of the common law, and belongs exclusively (with all its consequences) to the admiralty. . . .
>
> And, therefore , if a sentence be there for a ship, or goods as prize, a prohibition does not go upon a suggestion, that it was not prize, or that it was acquired upon land.[4] . . .
>
> Yet if the libel be founded upon one single continued act, which was principally upon the sea, tho' part was upon land, a prohibition will not go: as, if the mast of a ship be taken upon the sea, tho' it be afterwards brought to shore. . . .

---

[3] Bacon, Seventh Edition, at II: 499.

[4] John Comyns, *A Digest of the Laws of England*, 3rd edition, 6 vols. (1792), I:386

6

> Yet, where the admiral has conusance of the principal, he shall have jurisdiction of the incident: as, if goods taken by pirates are sold upon land, there may be a libel against the vendee in the admiralty.[5]

**Prize Cases**

19.     Much of the English admiralty litigation of the late eighteenth century involved the capture by English privateers of enemy ships and the determination by the Admiralty whether such ships were to be condemned as prize.  It was firmly established in the English courts that prize questions fell under the exclusive jurisdiction of the Court of Admiralty.

20.     The leading common law case was *Le Caux v. Eden*,[6] decided in 1781 in the Court of King's Bench.  That case involved the capture by the English ship *Enterprise* of a trading ship called the *Bee*.  The captain and two officers were taken onboard the *Enterprise* and brought to England.  The Admiralty, however, determined that the ship *Bee* was not a proper prize, and the ship was restored to its owner, along with its cargo. Thereafter the captain and the two officers each brought an action for trespass and false imprisonment in the Court of King's Bench against Eden, the captain of the *Enterprise*.  The Court of King's Bench was the dominant common law court where cases were heard by juries.  Lord Mansfield, the Chief Justice of the Court of King's Bench from 1756-1788, presided over most of the jury trials.  In 1781, three related cases, collectively reported in the name of one of the plaintiffs as (*Le Caux*), moved from the trial court to the full Court of King's Bench for formal argument. [7]

_____

[5] Id. at I: 396, citing cases.

[6] 2 Doug. 594 (1781).

[7] In England in the late eighteenth century, each of the three common law courts (King's Bench, Common Pleas, and Exchequer) conducted civil jury trials.  By mid-century, the Court of King's Bench had become the leader of the three courts, a status that sharply increased during Lord Mansfield's time as chief justice.  When a question of law arose during a jury trial, the usual procedure was to take the jury verdict, but by agreement of counsel, to

7

21.     After argument, the decision of the full Court of King's Bench was that all prize questions, including the legitimacy of characterizing the captured ship as prize, belonged to the Admiralty.  Within this broad holding, three additional propositions were established:  (1) That the Admiralty's exclusive jurisdiction was not wholly limited to events at sea (or within the ebb and flow of the tide in coastal waterways); rather it extended to consequential events on land; (2) as long as the original taking of the prize was at sea, the Admiralty's exclusive jurisdiction continued, even after the Court of Admiralty determined that the taking was unjustified; and (3) that damages could be assessed by the Court of Admiralty in a prize adjudication.

22.     In the judges' opinions, Justice Willes, who described himself as perhaps going on narrower ground than the rest of the court, said that "where the injury is the necessary and natural consequence of the capture, the Court of Admiralty has the sole and exclusive jurisdiction." [8]  Justice Ashhurst agreed    "where the Admiralty court has jurisdiction of the original matter, it ought also to have jurisdiction of everything necessarily incidental." [9]  Justice Buller concurred, and he prepared an extensive opinion reviewing numerous prior authorities. Lord Mansfield endorsed Buller's opinion in its entirety, and stated:  "[There is] no doubt but for a battery at sea, [or] imprisonment on taking a ship, trespass lies, but if the taking be as Prize, the foundation of the whole depends first on the question Prize or no Prize.  There [it is] admitted

---

make it subject to the opinion of the full four-judge court (one of the four would have been the trial judge, customarily the chief justice).  The case would then be argued to the full court during the next law term following the jury trial.

[8] 2 Doug. at 600.

[9] Ibid.

8

Admiralty has exclusively the sole jurisdiction."[10]  Further, Mansfield said that the suit for damages in the Court of King's Bench was not permissible because "the fundamental cause [in Admiralty] draws after it everything else."[11]

23.    Even when it turned out that the captured ship was not a legitimate prize, the exclusive Admiralty jurisdiction continued. As Justice Buller stated, the restoration of the ship "does not alter the nature of the original taking.  It was still a seizure as prize; which the common law does not take notice of, as a trespass; and the sentence cannot make that a trespass, which was not so at the time when the fact was committed."[12]  Buller relied on prior authorities, including the following:

> In *Turner & Cary v. Nele, T.* 20 *Car.* 2. 1 *Lev.* 243. 1 *Sid.* 367, one who had letters of *marque* in the *Dutch* war, took an *Ostender* for an *Dutch* ship and brought her into harbour, and libelled her as a prize, and there *was a sentence that she was not a prize*; and the *Ostender* libelled in the Admiralty against the captor for damage sustained, *by hurt the ship had received in port*, and the prohibition was prayed, because the suit was for damage done in port, for which, it was said, an action lies at common law; but the prohibition was denied, as the original was a capture at sea, and the bringing her into port, in order to have her condemned as a prize, is but a consequence of it, '*and, not only the original*, *but the consequences, shall be tried there.* ' [13]

Finally, on the question of damages, Justice Willes stated the following:

> It is said, there is no jury, in the Admiralty Court, to assess damages for personal injury, but I see no reason that court should not judge of such injuries, as well as of those which affect property.  They have an adequate method of ascertaining the damages, by reference to the Register, who may call in the assistance of assessors.  There is nothing in the

---

[10] Lord Mansfield's opinion is not included in Douglas's printed report of the case.  It was written down by Justice Buller on the back sides of his copy of the pleadings.  Buller's notes survive at Lincoln's Inn Library, London, and are transcribed at J. Oldham, *The Mansfield Manuscripts and the Growth of English Law in the Eighteenth Century*, two vols. (1992), pp.I: 660-661.

[11] Ibid. at 661.

[12] 2 Doug. at 612.

[13] 2 Doug. at 604 (footnote omitted) (italics in the original).

supposed difficulty of apportioning the damages. Why may not £100 be assessed to one man, and 1 *s*. to another? There has been such an apportionment in this very case. If there is a remedy in the Admiralty Court, *that* is sufficient; and it is certainly a great advantage, that the parties, there, can all join in one libel. It would be of the most dangerous consequences to the sea-service if such an action as this could be maintained.[14]

24.     Lord Mansfield was of the same mind. He stated:

[It is] contended that Admiralty can't give damages for personal injury. [There is] no authority for that. The Judge of Admiralty made a point of it, had given damages for taking cloaths & for personal injuries   [it is] impossible he should not have that jurisdiction.[15]

25.     In 1782, a year after the Court of King's Bench decided the *Le Caux* case, another

case arose in which a group of plaintiffs applied to the Court of King's Bench for a writ of

prohibition to stop the Court of Admiralty from proceeding upon a monition to condemn "goods,

wares, merchandises, arms, stores and ammunition" that had been seized by land and sea forces

under the command of Admiral Rodney as a result of the capture and surrender of the island of

St. Eustatius. In that case, *Lindo v. Rodney*,[16] sought the prohibition on the ground that the goods

were seized upon land, so that the case should be tried at common law. Lord Mansfield stated

the question before the court as, "Whether the goods being taken on land, though in consequence

of the surrender to ships at sea, excludes the only prize jurisdiction known in this Kingdom?"[17]

He directed a search to be made into the books of the Admiralty, especially during the reign of

---

[14] 2 Doug. at 600.

[15] J. Oldham, *The Mansfield Manuscripts,* at I:661.

[16] 2 Doug. 613 (1782) n. [1].

[17] 2 Doug. at 613.

Queen Elizabeth, and he made a search himself.[18]  In the course of his opinion, he explained the substantial differences in procedure between the common law courts and the prize court, observing that if the prize court did not have jurisdiction,

> The captors are in a miserable condition indeed.  The prize cannot be condemned.  If granted, it cannot be shared.  Every officer and sailor may be liable to actions without number.  The taking cannot be disputed.  To disprove the property, they only have witnesses from abroad, who cannot be compelled to come.  The grounds upon which the prize court condemns or acquits, cannot be read at law; and, in every action where the plaintiff recovers to the value of a farthing, the captor must pay the costs.[19]

Thus, after an extended analysis, the court unanimously refused the prohibition.  Consequently the cause of action for the goods seized on land would have been determined by the Admiralty Court sitting without a jury.

26.     The issues resolved in the *Le Caux* and *Lindo* cases continued to be acknowledged in subsequent disputes.  Thus in *Smart v. Wolff*,[20]  where the question was whether the Admiralty Court had jurisdiction over a claim for freight brought by a neutral master against the captor who had taken the goods on his ship as prize, all of the judges agreed that the Admiralty had jurisdiction.   This was so even though the goods had been delivered "into the hands of the captors."[21]  Chief Justice Kenyon stated:

> The proposition then cannot be maintained, that, when the Court of Admiralty has parted with the possession, it is *functus officio* . . . because if that Court has no jurisdiction, no Court whatever can give relief.  While the goods remain in the warehouses of the Admiralty it is admitted that they may dispose of them according to the exigency of the

---

[18] It was discovered that the records went no farther back than the 1640s.  2 Doug. at 613.

[19] 2 Doug. at 615.  Id. at 344.

[20] 3 T.R. 323 (1789).

[21] Id. at 341.

case; the same rule holds in common law courts, when they are said to be in *custodia legis*: but when do they cease to be so?  Not when they are sent out of their *actual* custody.  The jurisdiction of that Court attaches in *rem*, and is not altered *by a change of hands*.[22]

Further, as Justice Buller observed:  "Every case that I know on the subject is a clear authority to show that questions of prize and their consequences are solely and exclusively of the Admiralty jurisdiction.  After the cases of *Lindo v. Rodney, Le Caux v. Eden*, and *Livingston v. McKenzie*,[23] it would be a waste of time to enter into reasons to show that this court has no jurisdiction over those subjects."[24]

### Determination of Damages and Other Aspects of Admiralty Jurisdiction

27.     Once admiralty jurisdiction attached, judges sitting in admiralty could determine damages for any type of harm, including those generally considered by juries in courts of law.  Moreover, similar to the judges in *Le Caux*, other decisions recognized the benefits of admiralty jurisdiction and characteristics such as the lack of a jury.  Civil cases that did not involve prize questions were heard by the Admiralty under what was termed instance jurisdiction, and as Arthur Browne observed in *A Compendious View*:

> If a wrong be done to the person civiliter upon the seas, though the case of Le Caux and Eden related to the prize court, yet . . . the reasoning therein appears to me to apply to the instance court, and to shew that in any such case redress may be had in the court of admiralty; the damages to be assessed by the registrar in the manner pointed out by that case.[25]

---

[22] Id.

[23] Described in a footnote to the *Smart v. Wolff* opinion, 3 T.R. at 333 n. (a).

[24] Id. at 344 (footnotes omitted).

[25] Browne at II: 85.

28.     Ordinarily in the "instance" cases there was concurrent jurisdiction in the common law courts, but questions persisted about whether the Admiralty jurisdiction was co-extensive with that of the common law courts, especially with regard to damages.  In the case of *The "Ruckers,"*[26] the plaintiff brought suit against the master of a ship on which he had been a passenger for assaulting him on the high seas during a passage from the West Indies to England. Counsel for the defendant objected that this case "was not a suit which the Court of Admiralty would entertain; that personal injuries were things of so vague and indefinite a nature, that they seemed scarcely to admit of evaluation, by any other mode, than the verdict of a jury; that they were matters peculiarly fit to be settled by a jury, as was said by Mr. Dunning, in the case of *Le Caux v. Eden* (2 Douglas 597)."[27]

29.     The Admiralty judge, Sir William Scott, considered the matter to be important and recessed the case in order to give the Registrar of the Admiralty time to look into the records of the court.  When the court reconvened, the Registrar reported that he had searched the records back as far as 1730, and that "many instances were to be found of proceedings on damage, on behalf of persons described as part of the ship's company, against officers or others belonging to the same ship; and several, against persons belonging to other ships," as well as other cases with the parties unspecified.  Thus, Sir William Scott ruled that, in light of the precedents, and the fact that the injury occurred on the high seas, it was a fit matter for redress in his court.[28]

30.     In *Dominion of the Sea*, Alexander Justice emphasized the procedural advantages of suits in Admiralty.  Thus, after describing a King's Bench decision involving a prayer for a

---

[26] 4 C. Rob. 73 (1801).

[27] Id. at 74.

[28] Id.

writ of prohibition to stop a suit for mariners' wages in the Court of Admiralty,[29]  Justice

commented:

> This Decision I take to have been very Just, and not only consonant to the Customs of Merchants, but likewise to the Laws and known Customs of the Land.  For it being evident that if Mariners were oblig'd to sue for their Wages at Common-Law, where each must bring a separate Action, not one of 500 of 'em cou'd be able to bear the Charge; and if they were, what they wou'd be obliged to lose at home, together with the necessary Charges of a suit at Common Law, wou'd more than countervail any Sum that cou'd be due to them for the longest Voyage that can be made.  It has always been the Practice in this Nation to allow them to joyn in their Suit in the Court of Admiralty.[30]

The necessity for suits for wages to be brought in Admiralty was recognized early, as is

shown by the following passage from the classic 17th-century treatise by Charles Molloy, *De

Jure Maritimo et Navali: Or A Treatise of Affairs Maritime, and of Commerce*:

> [A]t the *Common Law*, they [mariners] cannot join, but must sue all distinct and apart for their Wages.
>> Yet in the Admiralty they may all join, and the Courts at *Westminster* will not grant a Prohibition.[31]

Arthur Browne, in *A Compendious View*, also pointed out the advantages in Admiralty of the

joinder of suits, speed of decision making, and the ship as security.[32]   He noted also that "actions

for damages done by assaulting the person, are extremely frequent in the instance Court of

Admiralty."[33]

---

[29] [Anon.], Michaelmas 1679, *Dominion of the Sea* at 430.   The court denied the writ, holding that, "tho' the Contract was upon the Land; yet they have Jurisdiction."

[30] Ibid. at 430-31.

[31] C. Molloy, *De Jure Maritimo et Navali*, 3d edition (1682).  The identical passage appears in the 7th edition of Molloy (1722) and in the 9th edition (1769).

[32] Browne at II: 85.

[33] Id. at 110.

Economic Loss

31.     I understand that among the claims asserted by the state of Alabama in its litigation involving the Deepwater Horizon are demands for the recovery of lost tax revenues and for increased public expenditures.  These claims, of course, address harm that was the consequence of the event at sea, the oil spill, and could be countenanced in admiralty.

32.     If, however, admiralty jurisdiction were not to apply, a question would be whether cases existed in England in 1791 comparable or analogous to the economic loss claims being advanced by Alabama.  Based upon my review of relevant sources and my knowledge of English legal history, the English case law of the late eighteenth century reveals nothing comparable or persuasively analogous.  Among the sources I examined were Blackstone's Commentaries, Holdsworth's History of English Law, Bacon's Abridgement, Comyn's Digest, Harrison's Digest, Moore's Digested Index, Burrow's Settlement Cases, and the standard printed reports of English common law cases from the late 18th century (see attached source list for complete titles).

33.     Although there are no analogous cases, as a general matter in the eighteenth century, cases involving complex financial accounts, such as demands for an accounting in bankruptcy proceedings or in partnership disputes, were customarily filed in the Court of Chancery and referred to Masters in Chancery rather than being lodged with juries in the common law courts.[34]  Similarly, I understand that Alabama's claims would necessitate the

---

[34] See J. Oldham, "On the Question of a Complexity Exception to the Seventh Amendment Guarantee of Trial by Jury," 71 *Ohio State Law Journal*, 1031, 1033-34 (2010).

evaluation of complex economic data, and thus in eighteenth century English law likely would have been decided by the Court of Chancery rather than a jury.


I declare under penalty of perjury that the foregoing analysis and opinions are true and correct to the best of my knowledge and belief.


February 14, 2014

<u>James Oldham</u>

16