## BP'S REQUEST FOR DISCRETIONARY REVIEW REGARDING CLAIM NO. 107397

Pursuant to Section 6.6 of the Economic and Property Damage Settlement Agreement ("Settlement Agreement"), BP respectfully files this Request for Discretionary Court Review. The Settlement Program awarded Claimant, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ total award), and the Appeals Panel affirmed. This award, however, was the direct result of the Settlement Program's improper treatment of condominium fees and assessments collected from Claimant's owners to pay for condominium expenses for the purpose of calculating Variable Profit. As a result, the Settlement Program generated an award amount that is at odds with the directives of the Settlement Agreement, economic reality, and the Claims Administrator's own policies.

## EXPLANATION OF BP'S POSITION

The Settlement Agreement's Business Economic Loss ("BEL") Framework seeks to identify post-Spill declines in economic performance that might be fairly attributable to the Spill. The BEL Framework "compares the *actual profit of a business* during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." Settlement Agreement, Ex. 4C at 1 (emphasis added). It does so by comparing Variable Profit -- defined as revenue minus corresponding variable expenses -- earned in defined Benchmark and Compensation periods before and after the Spill. As the Settlement Program has recognized in its policies, not all money received by a claimant is "revenue" for the purposes of calculating Variable Profit. *See* Policy 328 - Version 2 - Business Economic Loss Claims: Non-Revenue Items of Entities.

Here, Claimant is a condominium association that does not operate like a traditional business. Claimant does not sell goods or services. Instead, Claimant effectively serves as a

1



PLAINTIFF'S EXHIBIT 3

vehicle to collect and pass-through the collective fees and expenses of the condominium owners for a variety of purposes, such as building maintenance and upkeep, community property and amenities, and services for the association members. Even Claimant did not consider the assessments that it received from its members to be taxable income, as those amounts were not included in taxable income Claimant reported to the IRS. *See* 2008 Tax Return; 2009 Tax Return; 2010 Tax Return.

The Settlement Program nevertheless included three types of payments from its members as revenue. Claimant received payments from its condominium-owning members as reimbursements for the condominium association's "insurance" account and "loan origination costs" account, which are both fixed expenses. Claimant labeled these reimbursements as "insurance assessments" and line of credit assessments" in its financial data. As is typical of condominium developments, the association maintains an insurance policy covering the structure and exterior of the buildings, and any common property elements (pools, clubhouses, etc.), and the individual unit owners pay the association for their share of this expense. Claimant simply collects these fees from the condominium owners and then uses the money to pay the insurance policy. Likewise, the association must obtain a line of credit and individual unit owners pay for their share of this expense. Treating these pure pass through amounts as "revenue" to calculate "actual profit" of the condominium association ignores the reality of the association and its function. Similarly, the "elevator and parking lot assessment" payments Claimant received from the condominium owners were used to pay for the maintenance of the building and common facilities.

Under the Settlement Agreement, these reimbursement payments for each condominium owner's share of these common expenses do not qualify as operating revenue for purposes of

2

determining compensation, as they are internal to the condominium association itself and thus could not constitute the "actual profit of a business." Settlement Agreement, Ex. 4C at 1.

In erroneously treating these pass-through reimbursements as "revenue," the Claims Administrator disregarded his own policy implementing the Settlement, which expressly recognizes that "reimbursed expenses . . . are not typically earned as revenue under the normal course of operations in an arm's length transaction" and therefore "shall not typically be treated as 'revenue' for purposes of the various calculations to be performed under the terms of the Settlement Agreement with regard to entities asserting BEL claims." Policy 328 - Version 2 - Business Economic Loss Claims: Non-Revenue Items of Entities.

For the foregoing reasons, BP respectfully requests that the Court vacate the award to Claimant and remand the claim to the Settlement Program with instructions to re-evaluate the claim in accordance with the terms of the Settlement Agreement.