IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL NO.   2179 |
| | * | SECTION J |
| This document relates to all actions. | * * | HONORABLE CARL J. BARBIER |
| | * | |
| | * * | MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970 |
| | | SECTION J |
| Plaintiffs, | * * | |
| v. | * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production, Inc.; BP America Production Company; BP P.L.C., | * * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants | | |

# Declaration of Daniel J. Balhoff

On February 18, 2014, the Court ordered the undersigned to "file a declaration setting forth any factual information in his possession relevant to the issues raised in BP's Motion for a Preliminary Injunction Suspending the Second Distribution of the Seafood Compensation Program." Docket No. 12359. Many of the oral and written communications that I received throughout the development of the Seafood Compensation Program ("SCP") were confidential, and I assume that the Court does not intend for me to produce these confidential communications. That said, this Declaration summarizes the development and implementation of certain aspects of the SCP. I understand that the parties may contest the relevance or materiality of the statements herein, and I take no position concerning those legal issues (which are better left to the Court).

On March 8, 2012, the Court appointed John W. Perry, Jr. as the Court-Designated Neutral "to preside over the proposed settlement of the seafood program," which constitutes part of a larger proposed class settlement in this matter.  Docket No. 5998.  Mr. Perry and I are partners in the firm of Perry, Atkinson, Balhoff, Mengis & Burns, L.L.C.  I have worked closely with Mr. Perry since 1990.  Mr. Perry asked me to assist him in discharging his duties as the Court-Designated Neutral.  I have worked with Mr. Perry in similar capacities several times before.

When I began the project, I was given an "Agreement-in-Principle" ("AIP").  The AIP stated that the parties had agreed that BP would pay $2.3 billion (subject to certain credits) to compensate the economic loss claims for Commercial Fishermen, Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners.  I was not involved in the drafting of the AIP or the decision that BP would pay $2.3 billion.

Over the next two months, I attended meetings in New Orleans and Baton Rouge on an almost daily basis, with additional substantial time spent in telephone conferences.  During the course of my investigation, I was informed that Watts Guerra Craft LLP represented approximately 44,000 deckhands.  At least in part to respond to this, we attempted to craft a category for recovery for claimants who had no documentation of lost earnings and who could not produce a sworn statement from their employers.  This eventually was incorporated in the SCP as a category entitled "Claimants Without Tax Information or Pay Period Earnings Documentation Who Submit a Claimant Sworn Written Statement, Sponsor Sworn Written Statement(s) And Attorney Sworn Written Statement (if applicable) To Establish Earnings."  This category was known as Category III, and I anticipated that most of the Watts Guerra Craft LLP clients would fall within this category.  Of course, to the extent that Watts Guerra Craft LLP clients could satisfy more stringent levels of proof, they potentially could participate in other facets of the SCP.  For deckhands, these included Category I ("Individual Claimants With Tax Information or Pay Period Earnings Documentation for 2009") and Category II ("Individual Claimants Without Tax Information or Pay Period Earnings Documentation Who Submit a Claimant Sworn Written Statement and Employer Sworn Written Statement to Establish Earnings").  Furthermore, none of these categories was restricted to Watts Guerra Craft LLP clients.  To the extent clients of any firm other than Watts Guerra Craft LLP satisfied the appropriate levels of proof, those clients could be compensated under Categories I, II, or III.

After our investigation, Mr. Perry and I submitted the SCP to the Court. Rec. Doc. 6430-22.  The SCP contained detailed calculations concerning how much individual claimants would receive in a first distribution.  The SCP estimated that this first distribution would result in an aggregate payout of more than $1.9 billion.  SCP at p.3.  The SCP also anticipated that a balance would remain after the first distribution.  The SCP provided that the Court-Appointed Neutral would recommend an appropriate allocation of the second distribution:

> The Seafood Compensation Program is estimated to result in prompt claims

> payments totaling more than $1.9 billion representing approximately 83% of the $2.3 billion Seafood Compensation Program Amount. After applying the terms of the Deepwater Horizon Economic And Property Damages Settlement Agreement (including determining the Seafood Compensation Program Amount) and paying the eligible Seafood Compensation Program claims, the Claims Administrator shall determine the amount of funds, if any, constituting the remaining Seafood Compensation Program Amount. In the event there are Seafood Compensation Program Amount funds remaining, such funds will be distributed to claimants that received compensation from the Seafood Compensation Program. The balance will be distributed to each Claimant in proportion to the Claimant's gross compensation expressed as a share of the gross compensation paid by the Claims Administrator to all claimants under the Seafood Compensation Program. Gross compensation reflects compensation paid by the Claims Administrator prior to deduction for Seafood Spill-Related Payments. If, however, the Court-Appointed Neutral determines that a distribution other than purely proportional would be more appropriate in light of the information available at the time of the second distribution, he may recommend to the Court that the second distribution be reallocated in an alternative fashion. Any such reallocation will be subject to court approval.

SCP at p.3.

On January 31, 2013, the Court appointed Mr. Perry and myself as joint Court-Designated Neutrals for this purpose, and Randi S. Ellis as Deputy Court-Designated Neutral.

The SCP set forth the compensation calculation for Category III Claimants (discussed above) at page 84:

> The **Claims Administrator** shall receive and process claims under Category III as required to allow for Claimants and/or the **Claims Administrator** to supplement the claim or acquire any additional necessary information or documentation. No Category III claim shall be paid until after the **Bar Date**. After the **Bar Date** for Category III claims, the **Claims Administrator** shall determine whether each Claimant who timely submitted a Category III claim is eligible and qualified to receive compensation. If the **Claims Administrator** determines that a Claimant is eligible and qualified to receive compensation for a Category III claim, the Claimant shall receive a lump-sum payment of $5,000. If the total aggregate amount of Category III compensation claims for all claimants who have timely submitted eligible and qualifying Category III claims exceeds the **Aggregate Compensation Amount for Category III**, then Category III Claimants will be subject to a pro rata reduction in compensation. If the **Aggregate Compensation Amount for Category III** is not exhausted, then any remaining amount within

> the **Aggregate Compensation Amount for Category III** shall be distributed as part of the balance described in the "General Framework and Overview of Seafood Compensation Program Distribution" Section of the Seafood Compensation Program.

The above refers to an "Aggregate Compensation Amount." Mr. Perry and I designed the SCP to allot no more than $50 million of the first distribution to Category III Claimants: "**Category III Aggregate Compensation Amount:** $50 million is the Aggregate Compensation Amount available to pay Category III claims." SCP at p.66.

Although the Category III Claimants were entitled to (at most) an aggregate of $50 million in the first distribution, Category III Claimants are entitled to participate in the second distribution (i.e., the distribution of any funds that are available after the first distribution):

> All claimants who receive compensation under the Seafood Compensation Program are entitled to a share of the distribution of the balance whether or not their individual claims have been characterized as "lump sum" or a similar term, and whether or not they are members of Categories II and III of the Seafood Crew Compensation Plan (each of which provides for an Aggregate Compensation Amount, which shall not apply as a limitation to a Claimant's entitlement to a share of the balance to be distributed).

SCP at p.3 n.4.

Thus, at the inception of the SCP, it was theoretically possible that Category III Claimants would receive a cumulative aggregate amount exceeding $50 million after the first and second distributions had concluded.

I do not anticipate that the Neutrals will recommend that Category III Claimants receive more than a purely proportional share of the funds available for the second distribution.

_/s/ Daniel J. Balhoff_
Daniel J. Balhoff

February 21, 2014