UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section: J |
| | : | |
| This Document Applies to: | : | The Hon. Carl J. Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | The Hon. Sally Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |
| | : | |

REPLY OF THE SPECIAL MASTER
TO RESPONSES, OBJECTIONS, AND MOTIONS FILED BY THE SHOW CAUSE PARTIES

COMES NOW Special Master Louis J. Freeh, pursuant to the Court's Order of

September 6, 2013 ("Order"), to file this reply to the responses, objections and motions

filed by Lionel Sutton, Christine Reitano, Jon Andry, Glen Lerner, The Andry Law Firm and

Andry Lerner LLC (collectively the "show cause parties"), as well as interested party Gilbert

Andry, in response to the Special Master's Report of September 6, 2013 ("Report").

Not a single objection raised by the show cause parties changes in any way the

validity of the Report's findings.  Sutton's fiduciary violations — aided and abetted by

Lerner, Jon Andry and Gilbert Andry — caused tangible harm to the integrity of the

Deepwater Horizon Court Supervised Settlement Program ("CSSP") and the Deepwater

Horizon Economic & Real Property Claims Center ("DHECC").  Sutton's failure to disclose

his concealed financial interest deprived the DHECC of his loyalty as a fiduciary.  The Court

should adopt the Report and fashion appropriate remedies to address the misconduct of

the show cause parties.

## A. *Background*

After the Special Master filed the Report, the Court entered the Order directing the show cause parties to show cause why the Court should not adopt the findings and recommendations of the Special Master to: (a) disallow The Andry Law Firm's CSSP claim under the unclean hands doctrine; and (b) disqualify attorneys Sutton, Reitano, Lerner, and Andry, as well as any associated law firms, from representing CSSP claimants (or collecting fees from such claimants) under the unclean hands doctrine.  Order at 3.  Pursuant to Rule 53(f), the Court stated that the show cause parties, as well as any other interested party, may file responses or any objection or motion concerning the Report.  *Id.* at 3-4.

Pursuant to the Court's Orders, the Special Master has provided extensive discovery to the show cause parties from the investigative record developed during the Special Master's investigation, including sworn testimony taken from four show cause parties.

The show cause parties have filed numerous briefs in response to the Report.  The Special Master has distilled the issues raised in these various papers, and has addressed these issues in this consolidated reply.  A chart summarizing the issues raised by the show cause parties, and where in this reply these issues have been addressed by the Special Master, is attached as Exhibit A.

## B. *Procedural Issues Raised by the Show Cause Parties*

1.   Standard of Proof.

Rule 53(f)(3) requires the Court to "decide *de novo* all objections to findings of fact made or recommended by a master," unless the parties, with the court's approval, stipulate otherwise.  Fed. R. Civ. P. 53(f)(3).  No stipulation exists in this matter.

Courts may rely upon the Special Master's record in resolving objections under Rule 53(f).  *See In re Vioxx Prods. Liab. Litig. v. Merck & Co.*, 2013 U.S. App. LEXIS 2664, at *6-7 (5th Cir. Feb. 7, 2013)(per curiam)(non-precedential).  For example, in *PIC Group, Inc. v. LandCoast Insulation, Inc.*, 2011 U.S. Dist. LEXIS 73342, at *2-3 (S.D. Miss. July 7, 2011), the court appointed a special master to review the defendant's discovery compliance and make recommendations on the plaintiff's sanctions motion regarding the defendant's data loss.  On the day the special master traveled to the defendant's office to collect electronic data, the defendant's manager ran a software program to wipe information from his computer despite knowing that the special master was arriving that day for data collection.

The manager claimed the program was not run for any improper purpose, but the special master found the manager's claim lacked credibility.  *Id.* at *14.  The defendant objected to this characterization.  Reviewing the special master's finding, the court affirmed the special master's credibility determination and found the manager's testimony "unpersuasive" based on the special master's investigative record.  *Id.* at *17.

A court also may receive additional evidence if needed in the review process.  *See* Fed. R. Civ. P. 53(f)(1).  For example, in *In re Intel Corp. Microprocessor Antitrust Litig.*, 2012 U.S. Dist. LEXIS 141137, at *8-9 (D. Del. Sept. 28, 2012), the court ordered an additional hearing to review evidence on a key credibility finding by the special master concerning the plaintiffs' class certification motion.  The parties filed briefs with the special master, and he held a three-day hearing.  At the conclusion of the proceedings, the special master issued his report recommending denial of the class certification motion.  Plaintiffs filed objections.

Under Rule 53(f)(3), the court made a *de novo* review of the special master's findings.  The special master's key finding concerned the credibility of the plaintiffs' expert

witness.  In reviewing this finding, the court stated that, while it could rely on the special master's record alone, making a credibility finding under those particular facts was difficult solely on a "paper record."  *Id.* at *8.  The court thus held an evidentiary hearing to observe directly the expert's testimony and make a creditability finding.  *See id.*

No issue similar to that from *In re Intel* is presented here, where the parties have not answered several of the Report's credibility findings.  For example, the Report reviewed statements Jon Andry made to Michael Juneau on June 17, 2013, which are demonstrably false.[1]  At that time, Andry said Sutton "had no financial interest of any kind in any claim" of Casey Thonn ("Thonn").[2]  In his filings, Andry states a finding that he made false statements is "contradicted by the full record," yet he cites no specific evidence.[3]  Such a general claim does not raise serious issue with the Report's well-supported credibility finding.

Similarly, the Report highlighted false statements by Lerner concerning the Thonn referral.[4]  Lerner said the Report improperly identified his statement as false, yet Lerner himself admits elsewhere in his brief that the Thonn claim was referred by Reitano, not Sutton as Lerner had testified.[5]  No credibility issue is raised here.

     2.    <u>Notice and Opportunity to Be Heard</u>.

Rule 53(f)(1) states that, "[i]n acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions."  Fed. R. Civ. P. 53(f)(1).  Explaining a 2003 amendment to Rule 53, the Advisory Committee Notes state that "the requirement that the court must afford an opportunity to be heard can be satisfied by taking written submissions when the court acts on the report without taking live testimony."

While the Fifth Circuit has not addressed the issue, courts have held consistent with the Advisory Committee Notes that an evidentiary hearing is not required by Rule 53(f). *See Disney Enters. v. Stephen Slesinger, Inc.*, 499 F. App'x 707, 708 (9th Cir. 2012) (non-precedential)("The rules only require that a district court give the parties 'notice and an opportunity to be heard' . . . which 'does not require an oral or evidentiary hearing on the issue."). The primary case cited by the show cause parties in support of an evidentiary hearing, *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982), was decided before the 2003 amendment to Rule 53, which modified the rule "extensively to reflect changing practices in using masters" and eliminated language requiring a hearing before adoption of a special master's report. *See* Fed. R. Civ. P. 53 Advisory Committee Notes (2003 Amendment).

Here, the Court left to the Special Master discretion in how to take and gather evidence, recognizing that the "appointment will not involve traditional special master roles involving mediation, discovery, fact finding, or substantive law." Order of July 2, 2013 at 2. In satisfying the Order's mandates, the Special Master conducted extensive interviews, elicited sworn testimony, conducted computer forensic work, issued subpoenas for documents and data, and examined numerous other records. This investigative effort has produced a lengthy record that has been provided to the show cause parties. The show cause parties have supplemented the record with their own evidence and affidavits.

The show cause parties further cite a series of cases concerning special masters appointed under the National Vaccine Injury Compensation Program (collectively "the *Vaccine Cases*") to support the view that an evidentiary hearing is required. *See David v. Sec'y of Health & Human Servs.*, 94 Fed. Cl. 53, 65-66 (2010); *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 776-77, 781-82 (2006).

Unlike in the *Vaccine Cases*, where the master was to decide cases on a set record but instead gathered external evidence without notice to the parties, the Court here directed the Special Master to "[p]erform an independent *external investigation*" into defined issues at the CSSP.  Order of July 2, 2013 at 1-2 (emphasis added).  The show cause parties gave testimony under oath, with their counsel present for the questioning.  The parties have the investigative record, and have made filings based on a review of that record and the gathering of their own evidence.  No further hearing is required.

    3.    <u>The District Court's Use of the Special Master's Report</u>.

The show cause parties state that the Special Master's Report is inadmissible hearsay, thus limiting the use the Court may make of the Report in its review under Rule 53.  The cases cited, however, concern whether an investigative report may be submitted as substantive evidence at a trial, not whether a district court conducting a *de novo* review under Rule 53 can receive and review a special master's underlying report.

In *In re September 11 Litigation*, 621 F. Supp. 2d 131 (S.D.N.Y. 2009), surviving family members of airplane victims of the September 11 attack sought to introduce the 9/11 Commission's report on the attacks.  The court held that such a report, resulting from a government-authorized investigation, can be admitted as substantive trial evidence as a public record under Federal Rule of Evidence 803(8), but only if certain factors establishing trustworthiness and reliability are met.  621 F. Supp. 2d at 153-55.  This procedure is inapposite here, as the 9/11 Commission's report was not prepared under Rule 53, and the court was not reviewing the report to determine if it should adopt, affirm, modify, wholly or partly reject or reverse, or resubmit to a special master under Rule 53(f)(1).

In any event, the trustworthiness required under Rule 803(8)(B) is met here. Starting within weeks of the events relevant to the Report, the Special Master conducted a thorough and fair investigation staffed by experienced professionals who have examined similar issues in the past.  The Special Master took the sworn testimony of several persons, including four of the show cause parties.  While the show cause parties have raised claims of alleged bias, the Court has rejected those claims and the Special Master has made all appropriate disclosures.  These elements satisfy the requirements of Rule 803(8)(B).  *See, e.g., Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1306-08 (5th Cir. 1991).

    4.    <u>Jurisdiction Issues Concerning the Show Cause Parties</u>.

The show cause parties have stated that the Court lacks jurisdiction over them because they are not "parties" to the case and have not been served with process.

Rule 53(e) provides that a special master "must file the report and promptly serve a copy on each party, unless the court orders otherwise."  Fed. R. Civ. P. 53(e).  Rule 53(f)(1) provides that parties must be given an opportunity to be heard by the court.  Fed. R. Civ. P. 53(f)(1).  On September 6, 2013, the Report (Doc. No. 11287) and Order (Doc. No.  11288) were filed with the Court and served by the electronic notification system utilized by the Court's Order in the Deepwater Horizon multi-district litigation.  Some of the show cause parties promptly raised issues about their notice of the Report and Order.  On September 16, 2013, Lerner sought an extension of time to respond to the Court's Order.  On September 18, 2013, Reitano and Jon Andry sought similar extensions.  On September 19, 2013, the Court entered the first extension of the response time for the show cause parties.  Ultimately, the Court extended the response date to January 17, 2014.

Moreover, Jon Andry, Glen Lerner, Gilbert Andry, The Andry Law Firm and Andry Lerner had all filed pleadings with the Court in July 2013, before issuance of the Report, asking the Court to take action concerning the CSSP claims review process.  These parties thus purposefully availed themselves of the Court's jurisdiction.

The show cause parties cite *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902 (5th Cir. 1995) and *De Manez v. Bridgestone Firestone North American Tire, LLC*, 533 F.3d 578 (7th Cir. 2008) to support the argument that they are not properly before the Court.  In *De Manez,* the court found it could impose sanctions pursuant to its inherent power, but found that "[i]n order to be adequate, the Supreme Court has held, a person is entitled to notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections."  *De Manez*, 533 F.3d at 592.  In *McGuire*, the Fifth Circuit said that when "the district court had not issued a show cause or similar order or process that would have put [the non-party] on notice that sanctions were being considered against him personally," the court should have served on that person a document, "such as a summons, notice, writ, or order" to acquire personal jurisdiction.  *McGuire*, 48 F.3d at 907; *see also Waffenschmidt v. Mackay*, 763 F.2d 711, 718 (5th Cir. 1985) (subjecting non-parties to a show cause order and giving them an opportunity to contest that order).

Here, the Court has ongoing oversight and supervision over the CSSP and thus has subject matter jurisdiction over the CSSP, satisfying the requirement for a "case" or "controversy."  As described in Sections D.2 and D.3 of this brief, the Court has jurisdiction to impose sanctions on non-parties for misconduct during the course of litigation as part of

its inherent authority.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *De Manez*, 533 F.3d at 592; *Waffenschmidt*, 763 F.2d at 718.

The show cause parties have had actual notice of the proceedings since September 6, 2013, and have been granted several extensions to respond to the Order.  No allegation of prejudice for lack of formal service has been raised.  Even if the Court were to require personal service of its Order in addition to its issuance on the public docket, the Court may appropriately allow for an extended period of time for service before it issues sanctions. *See Duarte v. Michelin N. Am. Inc.*, 2013 U.S. Dist. LEXIS 73862, at *17-18 (S.D. Tex. May 3, 2013) (allowing extended period of time for service where there was no prejudice to the party being served); *McGuire*, 48 F.3d at 907 (disallowing sanctions only because, at the "time sanctions were rendered" against the sanctioned party, he had not yet "been served with any document that would satisfy the requirement of formal process.").

Lerner and Reitano raised the service issue.  On February 14, 2014, Lerner's counsel agreed to accept service of the Special Master's Report and the Court's Order to Show Cause without prejudice to any jurisdictional or process claims raised.  The Special Master has requested service upon Reitano by the U.S. Marshals of the Report and the Court's Order to Show Cause, after Reitano's counsel said she would not accept service on behalf of Reitano. A return will be filed on the docket when service is executed.

The objections to service should be overruled.

**C.** ***Responses to the Show Cause Parties' Objections***

1.    <u>Overview</u>.

Sutton concealed from the DHECC the financial interests he had with Jon Andry and Glen Lerner, in violation of the DHECC Code of Conduct that required staff to "take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality" concerning his official duties as part of the CSSP.  Sutton further concealed his interest in a DHECC claim for his company, despite a prohibition in the DHECC Code of Conduct against such an interest by staff members.

Sutton's concealed interests breached the fiduciary obligation Sutton owed to the DHECC by placing Sutton's personal financial interests at odds with his professional obligations, thus drawing into question his impartiality.  A conflict of interest exists even if no other unethical or improper act results, and such a conflict creates an appearance of impropriety that can undermine confidence placed in the fiduciary.  *United States v. Carbo*, 572 F.3d 112, 116 (3d Cir. 2009); *United States v. Kemp*, 500 F.3d 257, 283 (3d Cir. 2007).

Glen Lerner, Jon Andry and Gilbert Andry bear responsibility for this fiduciary breach as well, because one who knowingly participates in the breach of a fiduciary's duty also is liable to the beneficiaries of the trust relationship.  *See Taita Chem. Co. v. Westlake Styrene*, 351 F.3d 663, 670 (5th Cir. 2003).  These men knew of Sutton's obligations yet participated in the breach and later concealed their actions.

When stripped of rhetoric and bluster, not a single objection of the show cause parties withstands scrutiny.  Sutton's breach — aided and abetted by Jon Andry and Lerner — caused tangible harm to the integrity of the DHECC program.  Sutton's failure to disclose his concealed financial interest deprived the CSSP of his loyalty as a fiduciary, and "raises

the specter of secretive, self-interested action." *See, e.g., United States v. Woodward*, 149 F.3d 46, 63 (1st Cir. 1998).  The harm from such a fiduciary breach is well-recognized in criminal and civil law, particularly among persons entrusted with performing a public function such as is carried out by the CSSP.  *See, e.g., United States v. Sawyer*, 85 F.3d 713, 728 (1st Cir. 1996) (when a fiduciary conceals financial interest, "the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's potential motivation behind an official act").

The show cause parties state that a preliminary review of Sutton's actions in June 2013 found no explicit *quid pro quo* agreement among the show cause parties.  The Special Master's Report, however, followed a full investigation that amply documented Sutton's multiple breaches of his fiduciary obligations.  Moreover, *quid pro quo* deals rarely are explicit.  *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) (explicit *quid pro quo* not required); *Woodward*, 149 F.3d at 62-63 (fact finder can reasonably infer defendant "knew what the deal was – that the gratuities would continue as long as he voted favorably to [payor's] interests – and that he intended to be influenced by the gratuities").

The Report must be viewed in its totality, rather than isolating the evidence in bits and pieces, so as to consider the collective inferences to be drawn from the record as a whole.  *See United States v. Ayala,* 887 F.2d 62, 67 (5th Cir. 1989).  As the Fifth Circuit has advised, "circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."  *Id.*

2.      Objection:  CSSP Program Safeguards Made Claim Fraud Impossible.

The show cause parties state that Sutton could not have influenced any of the show cause party claims because the CSSP process is based on a mathematical formula that is not subject to manipulation, and is a multi-layered process with significant procedural safeguards.  The show cause parties state these program characteristics minimize the harm that could have been caused by Sutton's conflicts of interest.

Neither levels of review nor the "mathematical" nature of portions of the claims process are a substitute for the protections intended by the Code of Conduct and the obligation of staff members to abide by the Code's provisions.  The Settlement Agreement directs the Claims Administrator to "engage in supervision and oversight activities designed to ensure the implementation and integrity of the overall Settlement Program." Settlement Agreement at ¶ 4.3.10.  Among those controls are conflicts of interest and recusal policies intended to keep the personal financial interests of CSSP staff from raising any suggestion of conflict between the CSSP's fiduciary function and the individual's own financial benefit.  Sutton breached these important controls.

Moreover, as the Special Master's Report and subsequent work have made clear, the CSSP's control environment at the time of Sutton's employment contained vulnerabilities. The Thonn claim itself had fundamental deficiencies that were not detected by several layers of CSSP review.[6]  The assertion that the "mathematical" claims process could not have produced a flawed result is wrong and not relevant to the misconduct at issue.

3.      Objection:  Sutton was Required to Support Counsel and Claimants.

The show cause parties state that the Settlement Agreement required Sutton to provide assistance and information to claimants, and that part of a lawyer's duty to a client

involves pressing a claim for favorable resolution.  The settlement process, they note, is intended to be transparent and non-adversarial, and they cite to instances where CSSP staff have provided information to claimants and counsel about claim status.

This position relies on an isolated reading of one provision of the Settlement Agreement without considering other equally important parts of the document and the fiduciary obligations of CSSP staff.  The Settlement Agreement provides that:

> The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

Settlement Agreement at ¶ 4.3.7.  Nothing requires this support to be provided by Sutton himself.  The Andry Lerner law firm had a designated DHECC staff member (not Sutton) to answer questions about claim status.[7]  The DHECC also provides an internet-based portal to provide claim status information.[8]  Questions also could be directed to other DHECC staff members who did not labor under a conflict of interest with the Andry Lerner firm.

Sutton was to have had no role in the claims involving Andry or Lerner.  His participation in claims important to those men raised the specter of self-interested decision making.  The objection should be overruled.

    4.    <u>Objection:  Sutton Received Approval for his Outside Financial Interests</u>.

The show cause parties state that Sutton disclosed his interests to CSSP staff.  Lerner states that Sutton told him that Patrick Juneau had cleared Sutton receiving a portion of the Thonn fee in recognition of his prior work on the file.  In his pleadings, Sutton states that David Odom, the then-CEO of the CAO, knew of the interest Sutton held in the Thonn case.[9]

Sutton said in his sworn testimony that he did not disclose the payment of the Thonn fee to Patrick Juneau or "anyone else" in the CAO.[10]  Odom told the Special Master he had no knowledge of Sutton's interest in the Thonn claim or any other claim.[11]  On June 25, 2013, Sutton told lawyers for The Andry Law Firm that it was "[c]ommon knowledge that you should not have financial interest in any case going before settlement," and that Sutton told Lerner "you can't send me the Thon [sic] referral fee – use for Crown."[12]

Lerner said Sutton "represented that he had disclosed [the referral fee] to Mr. Juneau."[13]  Lerner said this talk took place when Sutton referred the Thonn case to Lerner, which Sutton needed to do because "he had accepted a job at the claims administration office."  Lerner said Sutton "couldn't be working the case himself any more, that would be my assumption" because he was taking a position with the CSSP.[14]  Lerner recalled asking Sutton why Sutton was taking this job given the restrictions the job carried.[15]

Lerner's testimony concerning Sutton's alleged disclosure is contradicted by the record.  Thonn retained Andry Lerner on April 12, 2012 – six months before Sutton was hired at the DHECC in November 2012.[16]  Andry Lerner filed Thonn's claims on June 24, 2012 – four months before Sutton's hiring at the DHECC.[17]  Lerner's pleadings state "the timing and circumstances of the client referral demonstrate that Thonn was unconnected to Sutton's employment with the CAO."[18]  Sutton says the discussion focused not on a referral fee but on his request to be paid for "work his firm did in submitting Thonn's claims to the GCCF," which Sutton says was not prohibited by the CAO ethics rules.[19]

Other evidence further contradicts Lerner and shows that Lerner and Andry shared knowledge of the payment to Sutton.  For example, on December 14, 2012, six weeks after Sutton began working at the CAO, Lerner and Jon Andry exchanged emails about payment

to Sutton of the referral fee.[20]  Andry said Sutton had reached out to him about the Thonn referral fee.[21]  Andry told Lerner that the referral fee to Sutton should be paid from Lerner's disbursement.  Lerner told Andry, "We were going to pay [Thonn] but only once I'm paid,. [sic] Not paying out of my pocket."[22]  Andry told Lerner:  "you just got paid a disbursment [sic] . . . pay it out of that."[23]  The exchange neither shows any dispute between Lerner and Andry about paying Sutton nor makes any mention that Lerner understood payment of the fee had been approved.  Further, Jon Andry never mentioned elsewhere any understanding from Lerner that Sutton had said payment of the fee had been approved.

Lerner cites a July 9, 2013 email from Sutton to support his position about disclosure.  This email was sent almost three weeks after Sutton's resignation from the CSSP and two weeks after he told lawyers for Jon Andry that he had told Lerner "you can't send me the Thonn referral fee – use for Crown."[24]  In the email, Sutton wrote to Lerner:

> I just don't get it.  I don't even know the names of any of your other claimants.
> From what I heard, there was an anonymous call that I was referring cases to
> Jon while I was working at the claims office.  It wasn't even the Thonn case
> because I told Pat about that case before I started.  When this first came up I
> told Pat that the only case I sent was [T]honn before I started.  He told me
> that he already knew about Thonn because he remembered that I told him.[25]

This email, drafted as Sutton considered having to "sue to get to the bottom of this and clear my name,"[26] does not support Lerner's position.  Had the men had the discussion described in Lerner's testimony, there would have been no need for Sutton to spell out this alleged disclosure in writing to Lerner.  Moreover, elsewhere in the email string, Lerner said he understood Sutton had disclosed about "being a salaried member of Crown."[27]  Yet Lerner is silent about any "understanding" concerning Sutton's disclosure of the Thonn fee.

Lerner's testimony that Sutton said he disclosed receipt of the Thonn fee is contrary to the record and timing of events.  Lerner's objection should be overruled.

5.       Objection:  Private Lawyers Owe No Fiduciary Duty to the CSSP.

The show cause parties state that Andry and Lerner did not owe a fiduciary duty to

the CSSP, and thus were under no obligation to disclose their financial relationship with

Sutton.  The parties submit an affidavit from Professor Geoffrey C. Hazard, Jr. to support

their position.  The assumptions upon which Professor Hazard based his opinion, however,

were not accurate.

Professor Hazard found Jon Andry "had a right to assume that Sutton's request for

payment of the fee was in conformity with his ethical obligations."  Declaration of Geoffrey

C. Hazard, Jr., at ¶ 7(c) (Jan. 9, 2014).  Professor Hazard based his finding on an

understanding that "Lerner inquired of Sutton whether Lerner paying him was

appropriate, and Sutton told him that he had spoken with Juneau."  *Id*. at ¶ 20.  As discussed

above, this assumption is incorrect.  Professor Hazard also makes no mention of whether

his assumptions included knowing that Andry made false statements about his relationship

with Sutton, telling Michael Juneau at that time that Sutton "had no financial interest of any

kind in any claim" of Thonn.[28]

These facts are relevant because a breach of a fiduciary relationship is not limited

solely to the actions of the fiduciary.  Third parties who knowingly participate in the breach

of a fiduciary relationship may be held liable to the beneficiaries of the trust relationship.

*Malpiede v. Townson*, 780 A.2d 1075, 1096 n.74 (Del. 2001) (quoting *Gilbert v. El Paso Co.*,

490 A.2d 1050, 1057 (Del. Ch. 1984)).  Indeed, a third party can aid the breach of a

fiduciary obligation where the party knows of the existence of a fiduciary relationship and

knowingly participates in a breach of that duty.  *Gotham Partners, L.P. v. Hallwood Realty*

*Partners*, 817 A.2d 160, 172 (Del. 2002); *see also Taita Chem. Co. v. Westlake Styrene*, 351

F.3d 663, 670 (5th Cir. 2003) (applying *Malpiede* and *Gotham Partners* in dispute governed by Delaware law).[*]  The concept of aiding and abetting a fiduciary duty breach also is recognized in federal criminal law.  *See United States v. Milovanovic*, 678 F.3d 713, 728 (9th Cir. 2012) (en banc) (indictment sufficiently alleged aiding and abetting an honest services fraud violation where private citizens aided state contractors in breach of "an implicit fiduciary duty of trust"), *cert denied*, 133 S. Ct. 929 (2013).

Sutton had a fiduciary relationship with the CSSP.  He agreed when hired to avoid conflicts of interest and to "take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality" concerning his work with the CSSP.[29]  Sutton breached his obligations through his financial interests with Andry and Lerner.

Andry and Lerner "knowingly participated" in Sutton's breach.  "Knowing participation . . . requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."  *Malpiede*, 780 A.2d at 1097.  Andry and Lerner each knew of the financial restrictions that accompanied the fiduciary relationship that staff members had to the CSSP.

In a June 17, 2013 interview by Michael Juneau, Andry said Sutton and Reitano had no interest in any Andry Lerner claims.[30]  Andry told Juneau that, given the dynamics of his relationship with Sutton and Reitano, Andry made "a point to avoid situations that would compromise him in any way."[31]  Approximately six weeks later, Andry testified:

> I never thought [Reitano and Sutton] weren't entitled to the fee, but it was just talked to me or explained to me, I guess, by Lerner during the time that we talked about it that *it wasn't proper for them to receive a fee because they worked at the facility* – or she worked at the facility.

---

[*] A civil action for such a breach also requires a showing of some economic harm as a result of the breach.  *See Taita Chem. Co.*, 351 F.3d at 670.  The purpose of this discussion is not to state an independent cause of action, but rather to demonstrate that third parties can have responsibility for breaches of fiduciary obligations.

. . . .

> My understanding from Glen was that Tiger worked at the [CAO] facility and it was primarily from, when Christin[e] sent us the case, that if she sent us the case, then she can't work on it or get a fee.  And so I just presumed that Tiger was in the same position.  So if they couldn't receive a fee, I just assumed that they shouldn't receive a fee.  Excuse me, *I assumed that if they couldn't receive a fee, that we shouldn't pay them one.*[32]

Lerner testified that he also understood the limitations of Sutton's position:

> In fact, my whole conversation about the referral of this case . . . was probably a 15- to 30-second conversation in a Suburban with 'Tiger,' where we said, "Hey, now that I'm going to go work for the claims administration office, I have one case to refer.  And I want to refer the case to you guys."  I'm like, "Okay."  *My first thing was, well, first, I said, "Did you clear this with your boss?  Is this okay?"*

. . . .

> In fact, when [Sutton] told me that Christine took her job [at the CAO], I – the first thing I said to him, "Did you tell [Mr. Juneau]?", because even with him being her husband – I mean, yeah, with him being her husband, *the look of potential impropriety with he and I being partners in Crown*, I said, "Did you guys tell Mr. Juneau about our involvement?"[33]

Both Lerner and Andry knew Sutton could not have an interest in CSSP claims because of his fiduciary obligations, yet both Lerner and Andry knew Sutton was paid for the Thonn claim.  While Lerner claimed that Sutton told him that the referral fee had been approved, this claim is not credible, as explained at pages 14 to 15 of this brief.  There also is no evidence that Lerner ever told Andry about any alleged disclosure by Sutton of the Thonn payments.

For these reasons, the claim that Lerner and Andry did not breach an obligation to the CSSP is neither factually nor legally correct.  This objection should be overruled.

6.    Objection:  Sutton Provided Minimal Support on Andry Lerner Claims.

The show cause parties state that Sutton did not provide access to DHECC confidential information, and looked up only four of the almost 700 filed claims for the Andry Lerner firm.  The parties argue that no reasonable person would pay significant money in exchange for such limited information.

The evidence contradicts this objection.  First, Sutton looked up claims that were the most important to Jon Andry.  For example, on March 6, 2013, Jon Andry identified five claimants to Patrick Juneau that Andry said were "stuck."[34]  Included among these claimants was The Andry Law Firm, as well as Talen's Marine.  The claimants each had significant pending claims, with Talen's Marine filing claims for over $13 million and The Andry Law Firm filing a claim for more than $7 million.

Sutton's research focused on these key claims, as summarized in the chart of contacts and claim research attached as Exhibit B.[35]  For example, on March 6, 2013, Sutton looked up The Andry Law Firm claim in the DHECC database, and dispatched an email to CSSP staff about the claim's status.  That day, Sutton exchanged six text messages with Jon Andry, in addition to two phone calls made on March 5 with Gilbert Andry.  On March 7, 2013, Sutton looked up the Talen's Marine claim on the DHECC database while exchanging numerous text messages with Jon Andry.

Equally important are the actions of Sutton, Jon Andry, Gilbert Andry and Lerner on March 15, 2013.  That day, Jon Andry and Sutton exchanged a series of 35 text messages.  Gilbert Andry and Sutton had a cell phone call that morning.  Between these communications, Sutton checked the claims of four claimants represented by Andry Lerner (Motivation, Inc.; Talen's Marine; Vishnu Enterprises, Inc. and Casey Thonn).  Sutton also

checked the status of The Andry Law Firm's claim this same day.  Between the text messages and Andry-related claims research, Sutton sent Lerner emails about the status of Sutton's next payment from the Thonn claim.  In fact, Sutton told Lerner that "***Jon told me*** that he just disbursed so you won't get it for a few days."[36]

A reasonable trier of fact can readily conclude from these actions that Jon Andry tasked Sutton with reviewing claims of importance to Jon Andry in these messages.  The frequency of these communications, interspersed at the same time with inquiries about high-value Andry Lerner and The Andry Law Firm claims, and discussion of the money due to Sutton, make plain the reasonable inference — perhaps unspoken — that Jon Andry, Gilbert Andry and Glen Lerner had undue influence at the DHECC through Sutton.  *See United States v. Fierro,* 38 F.3d 761, 768 (5th Cir. 1994) (fact finder can make reasonable inferences of knowledge and guilt from the timing of telephone calls and the defendant's actions surrounding the calls).  The show cause parties' objection should be overruled.

7.    Objection:  Andry and Sutton Met to Discuss Unrelated Claims.

The show cause parties state that Jon Andry and Sutton met on March 7, 2013, and discussed only the Talen's Marine claim, not other claims of the show cause parties.  The record does not support this position.

Sutton and Andry contradict each other about the lunch discussion.  Sutton said the two men discussed the Talen's Marine claim.[37]  Andry said the discussion involved Andry Lerner's pending BP claims and concerned:

> Nothing more than what I would have told anybody, and that is, you know, whatever help you can give me, give me, I need to get my claims done. They are sitting there and they are kind of languishing, and I don't know what's going on, but, you know, if you could help me out, help me out.[38]

Andry said Sutton never got back to him with any information after the lunch.[39]

Records contradict the testimony of both Sutton and Andry, and indicate that the conversation at this lunch involved more than just the Talen's Marine claim.  On the morning of the lunch, Sutton sent an email about The Andry Law Firm claim to a DHECC staff member, followed by a series of text messages with Jon Andry.  *See* Exhibit B.  After the lunch, Sutton received a response to the email about The Andry Law Firm claim, and sent text messages to Jon Andry, called Gilbert Andry and also called Jon Andry.  After this activity, he conducted lookups in the DHECC system on Talen's Marine, and then sent further text messages to Jon Andry.  The calls and text messages contradict Andry's sworn testimony that Sutton never got back to him with any claim information after the lunch.[40]

The day after the lunch, Sutton emailed Lerner, noting that he had met with Jon Andry for lunch the day before and was "working with [Jon Andry] to get your [Talen's] claim pushed through as quick as possible."[41]  Later on March 8, Sutton wrote Lerner again, saying "Jon got paid on the Casey Thonn bp case last week so you can send me that."[42]

Andry said the lunch with Sutton happened "accidently" and without any "plan or arrangement,"[43] yet DHECC records show that Andry and Sutton exchanged 11 text messages the morning of the lunch.  *See* Exhibit B.  The two men had a cell phone conversation moments before lunch at 11:55 a.m.  *Id*.  A reasonable fact finder could conclude that Andry's statement that the lunch was "accidental" and without "plan or arrangement" was made to conceal the true nature of this meeting.

The false statements made by both men about their meeting support an inference of consciousness of wrongdoing about their activities.  *See United States v. Villarreal,* 324 F.3d 319, 325 (5th Cir. 2003) ("[A] defendant's exculpatory statements which are shown by other evidence to be false may give rise to an inference of consciousness of guilt.").  The

contacts between Andry and Sutton on March 7, 2013, coupled with Sutton's research on Andry's claims and the false statements, all support a finding of improper conduct.

       8.    <u>Objection:  Sutton Did Not Expedite The Andry Law Firm Claim</u>.

The parties state that The Andry Law Firm claim wrongfully had been placed on hold in December 2012, and that the contacts in March 2013 were to bring the claim back on track.  The parties also state that the DHECC staff addressing the claim did not find anything unusual about the claim's processing and said the claim had not been expedited.

On March 6, 2013, after a phone conversation with Gilbert Andry the day before, Sutton sent an email to his DHECC colleague, Mark Staley, a supervisor in the CSSP claims review process, inquiring about the status of The Andry Law Firm claim.  *See* Exhibit B.  Mr. Sutton wrote to Mr. Staley, asking to have Christopher Rinaldi, who was working on the claim, contact Sutton.[44]  After researching the claim on the DHECC database and engaging in further communications with Jon Andry and Gilbert Andry, Sutton resent his email to Staley on March 7, 2013, after not having received a response to the first email.[45]

On March 7, 2013, when Sutton returned from lunch with Jon Andry, he found a response to his email from Staley.  The words of the email speak to the impact of Sutton's outreach:  "[The Andry Law Firm] claim was in line to be processed.  I have asked Chris ***to go ahead and pull the claim down and process***.  I can keep you posted on the status if that is your preference."[46]  Sutton communicated with both Gilbert Andry and Jon Andry within hours of receiving this email.

Just four days later, Staley told Sutton, The Andry Law Firm "claim[ ] has been prepared and ***pushed*** to accountant Q/C review as of today.  If it comes back for any reason

I will let you know."[47]  The next morning at 8:22 a.m., Sutton thanked Staley for the update. At 8:35 a.m., Sutton sent two text messages to Gilbert Andry.

On March 20, 2013, two weeks after Sutton wrote to Staley about The Andry Law Firm claim, the DHECC issued a notice of eligibility for the claim for $7,648,722.34.

The show cause parties rely on an isolated statement by Rinaldi, who recalled that when he asked Staley if The Andry Law Firm claim should receive special treatment, Staley said to give the claim to a regular analyst on his team and "work it as you would any other claim."[48]  Yet Rinaldi also told investigators it was "unusual" and the first and only time he had ever heard directly regarding a particular claim from Staley, who was two levels above him at their firm.[49]  Rinaldi was not sure why Staley was taking such special interest in the Andry claim, which he called "uncommon."[50]  Staley also said it was out of the ordinary for Sutton to ask to speak to an accountant working a claim and that he could not recall another instance of that type of request.[51]

Rinaldi and his supervisors were not aware of the full facts, including Sutton's hidden financial interest and the extent of the outreach that Gilbert Andry and Jon Andry had made to Sutton in the days before Sutton's "unusual" inquiry about the claim. Moreover, even putting aside the nature of Sutton's outreach that resulted in the claim being "pushed" through processing and determined to be eligible for payment two weeks later, a breach of the fiduciary obligation occurs regardless of whether the concealed financial interest improperly influenced the fiduciary's actions.  *See United States v. Carbo*, 572 F.3d 112, 116 (3d Cir. 2009).  The show cause parties' objection should be denied.

9.     Objection:  Sutton Said Claims Could Not Be Prioritized.

The show cause parties state that a January 29, 2013 email, not mentioned in the Report, shows that Sutton advised Lerner he could not expedite claims.  The show cause parties state this email shows Sutton had no intention to act improperly.

Procedurally, the January 29, 2013 email on a private email account between Lerner and Sutton was not cited in the Report because it was not produced by Glen Lerner, despite a subpoena to Lerner calling for all of his email with Sutton.  Lerner produced over 1,800 pages of emails, but the January 29, 2013 email was not among that production or any other documents provided to the Special Master.  The Special Master had no ability to obtain such private email unless Lerner produced it pursuant to the subpoena.  Lerner's papers are silent on why he did not produce the email pursuant to the subpoena.

Substantively, the isolated email from January 2013 is inconsistent with the actions Sutton took in March 2013, when he took steps over several weeks to obtain further payment from the Thonn claim that he knew had been issued to Andry Lerner on February 28, 2013.  Sutton's intent is demonstrated in the important March 2013 time period.

The events of March 7, including the false exculpatory statements by Sutton and Jon Andry and the "unusual" nature of Sutton's outreach to the DHECC accounting staff that resulted in the claim being "pushed" through processing and made eligible for payment two weeks later, were explained above.  The day after Sutton's lunch with Andry, Sutton wrote to Lerner to report about the lunch and advise, "I am working with [Jon Andry] ***to get your [Talen's] claim pushed through as quick as possible***."[52]  Within an hour of writing this note, Sutton and Jon Andry spoke by cell phone.  A week later on March 15, 2013, Sutton pursued payment on the Thonn claim from Jon Andry and Glen Lerner at the same time he

was researching the claims by Talen's and The Andry Law Firm.  Sutton's concrete acts to "get your [Talen's] claim pushed through as quick as possible" while also getting paid on Thonn demonstrate the intent of the show cause parties.

A reasonable finder of fact could conclude from these actions, statements and communications that Sutton was seeking to push claims for the Andry Lerner firm, despite what he may have said to the contrary in one isolated email two months before his efforts. *See United States v. Thomas*, 627 F.3d 146, 154 (5th Cir. 2010) ("'Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof.'").

     10.    <u>Objection:  The Thonn Referral Fee Was Not Improper</u>.

The show cause parties state that referral fees such as that paid to Sutton on the Thonn claim are appropriate, and Louisiana courts are lenient on the timing and manner for disclosing such fees to a client.  The show cause parties also state that the Special Master's interview confuses an attorney referral agreement with a client retainer agreement, as supported by the affidavit of Andry Lerner attorney Christina Mancuso.

The Special Master leaves for the state bars of Louisiana and Nevada to determine whether any professional responsibility rules have been violated by any of the show cause parties, and whether the disclosure of a referral fee to Thonn satisfies the ethical expectations of the bar.  What is important in terms of determining the show cause parties' objections is the unusual and concealed nature of the Thonn referral fee.

For example, the employee at Andry Lerner who handled case intake and tracked referral agreements said the Thonn claim was the only file she was aware of at the firm that did not have a written referral agreement in the file.[53]

Further, Mancuso stated in her affidavit that her discussions with Reitano concerned an attorney client contract, not an attorney referral agreement.  Mancuso stated she never discussed an attorney referral agreement with Reitano, contrary to her Special Master interview.  But Mancuso sent an attorney referral agreement dated May 8, 2012 to Reitano – almost six weeks after Reitano started working at the CSSP and a month after Thonn signed his attorney client contract with Andry Lerner.[54]  Mancuso explains that she sent the referral agreement to Reitano "after contacting Jonathan Andry."[55]

The proposed referral agreement sent by Mancuso to Reitano weeks after Reitano began working at the CSSP included a 50-50 split between Andry and Reitano of the attorney's fees recovered, while the Andry Lerner employee who tracked referral agreements said the Andry Lerner firm normally used a 60-40 split for referrals.[56] Mancuso does not explain what Andry said about the referral agreement or how she would have known to use a 50-50 split in the agreement rather than the standard 60-40 split. Mancuso's affidavit also does not explain how Sutton ultimately came to receive over $40,000 in referral fees — a 50-50 split of the attorney's fees received by Andry Lerner.

The key is that Andry Lerner continued to communicate with Reitano about referral fees after she joined the CSSP, that the Thonn referral fee was extraordinary in a number of ways at the firm — and that ultimately the referral fee was paid to Sutton.  No further finding on this issue is required to support the Report's conclusions about this referral fee.

11.   Objection:  Romeo Papa Was Permitted to Make a Claim.

Sutton states that nothing in the Settlement Agreement prohibited a business in which he had an ownership interest from filing a claim.

Sutton is reading in isolation the Settlement Agreement and his obligations as a CSSP employee.  The Settlement Agreement directs the Claims Administrator to "engage in supervision and oversight activities designed to ensure the implementation and integrity of the overall Settlement Program."  Settlement Agreement at ¶ 4.3.10.  Among the controls enacted to satisfy this fiduciary obligation are policies concerning conflicts of interest and recusal, which required Sutton to affirm that he had not submitted a CSSP claim and to notify the Claims Administrator in writing if such a claim were to be filed.[57]  Sutton agreed that he did not have and would not have "any personal interest" in the CSSP process.[58]

Sutton held a 50 percent ownership interest in Romeo Papa when it filed its CSSP claim.  Romeo Papa submitted a moratorium claim in late 2012, at the time Sutton was working on the DHECC's moratorium policy.  Sutton contacted his fellow principals at Romeo Papa to advise them that these claims might begin to be paid out and that Romeo Papa should submit one.[59]  The firm's CFO also recalled receiving personal assistance from Sutton during the claim submission process.[60]  DHECC and cell phone records corroborate the CFO's recollection.[61]

Sutton breached his disclosure obligations for his own benefit, and tangibly assisted the Romeo Papa claim through the CSSP process.  Nothing in the Settlement Agreement permitted this misconduct.  The objection should be overruled.

12.    Objection:  Crown Payments to Sutton Were Unrelated to the CSSP.

The show cause parties state that the payments from Crown made as a monthly "allowance" to Sutton were unrelated to the CSSP, and thus had no relevance to Sutton's position at the program.  Sutton stated that he orally disclosed his involvement with Crown

to Patrick Juneau, and that "everyone" knew of the connection because of the Crown office signage at Sutton's law office, which was on the same floor as the CSSP.

The CSSP policies required staff to take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality with respect to the performance of staff members' official duties. Sutton admitted he never disclosed to Patrick Juneau or the CSSP staff that Lerner, whose law firm had claims pending before the CSSP, was a Crown partner and the company's financier.[62] Sutton said he did not disclose his relationship with Lerner in Crown because he did not believe there to be any conflict of interest.[63] But it was not for Sutton to determine himself whether a conflict existed.

The appearance of a CSSP employee sharing a business relationship with an attorney pursuing millions in CSSP claims is a conflict of interest in itself. Sutton violated the CSSP conflict of interest policy by not disclosing his Crown relationship with Lerner.

13.  Objection:  Reitano was Performing Important Work with Brown Greer.

Reitano stated she was a valued, hardworking, and faithful employee at CSSP, who served as the "funnel" through which "ALL communication regarding the Economic Settlement Program, its vendors, policies, procedures, rules, FAQ's, etc, must be directed."[64] Reitano stated she had an appropriate management relationship with CSSP vendor Brown Greer, and denied any resistance to implementing appropriate new controls.

While Reitano may dispute the value of certain reforms suggested by CSSP staff, the record shows that she worked to advocate in favor of Brown Greer when other CSSP staff sought to evaluate certain Brown Greer business processes. Reitano and her husband were strong supporters of the Brown Greer firm, which is perhaps best summarized by a

handwritten note retrieved from Sutton's office that stated: "What a great opportunity for BG to have BP to pay for them to improve their system."[65]

Since the Report, the CSSP has engaged a number of professionals to review existing business processes that had been the subject of discussion with Reitano when she was with the program.  These reviews make clear that the prior CSSP business processes did not sufficiently protect and safeguard the CSSP function.  Significant redesign efforts costing millions of dollars have been required.

To be sure, lapses in vendor oversight do not rise to the same level as conflicts of interest exhibited by some former CSSP employees.  Yet Reitano fought efforts to engage in vendor oversight, and serious vendor issues concerning workflow techniques, claim processing, and process integrity were unremediated.  Her objections should be overruled.

14.    Objection:  Reitano Properly Referred Sutton to a DHECC Vendor.

Reitano denied that her discussions with CSSP vendor Garden City Group about a potential job for her husband Sutton before he joined the CSSP were improper.  Reitano said she understood the CSSP conflicts of interest policy and her ethical obligations.

Reitano stated that she did not understand how "recommending" her husband for a position with an existing CSSP vendor could present a conflict of interest.  Such advocacy for a position for a family member with an entity doing business with the CSSP, however, presents a clear conflict and use of Reitano's position for her family's personal gain.  That the conversation happened over friendly dinners does not make it any less of a conflict. The unspoken pressure on a vendor in such situations is plain, as the vendor's president recognized when he said he felt like Reitano's request put him in a difficult position because Reitano was his client and he did not want to be rude to her husband.[66]

The conflict inherent in such activity is well recognized.  For example, federal civil service laws make it a conflict for a federal employee to seek jobs for close relatives from federal contractors to avoid this unspoken pressure.  *See* 5 U.S.C. § 2302(b)(7); 5 C.F.R. § 2635.702(a).  Such protections "foster public confidence in the integrity of federal officials." *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 5 (D.D.C. 2004).

The qualifications and familiarity with the vendor of Reitano's husband provide no safe haven for her action.  Reitano's objections should be rejected.

15.   Objection:  Contact with David Duval Was Appropriate.

The show cause parties state that Jon Andry's communications with DHECC Appeals Coordinator David Duval were not improper, and consisted only of routine inquiries about claim status and the appeals process.  Responding to inquiries from attorneys was part of Duval's job, the show cause parties stated.

Only when The Andry Law Firm's claim was held up on appeal did Andry pursue a relationship with Duval — a relationship that consisted of regular emails, work and personal cell phone calls, and two lunches paid for by Andry at the Palace Café, which included a discussion of Andry's claims.  Specifically, on March 20, 2013, the DHECC issued an eligibility notice for The Andry Law Firm's claim, but the claim was not paid because BP appealed on April 10, 2013.  On April 25, 2013, The Andry Law Firm responded by arguing that BP's appeal must be denied based on the Court's April 24, 2013 order.

It was only when the Firm's claim was appealed that Andry began regularly contacting Duval.  Starting April 25, 2013, Andry contacted Duval by email, work phone, and cell phone with questions and comments concerning the appeal.  He emailed Duval requesting help with a different Andry Lerner claim that had been stalled; and he provided

Duval and his CAO assistant with two free meals at a local restaurant, where they discussed general CAO processes and the specific claims that Andry had asked Duval about in previous emails.[67]  According to Duval, his relationship with Andry "took on a life of its own," even though Duval was not an appropriate CAO contact for all of Andry's inquiries.[68]

When this conduct is viewed with the complete record, Andry's relationship with Duval created at least the appearance of a conflict of interest.  *Cf. United States v. Kemp*, 500 F.3d 257, 283 (3d Cir. 2007) ("One reason why federal and state law mandates disclosure of conflicts of interest . . . is that it is often difficult or impossible to know for sure whether a public official has acted on a conflict of interest.").  The objection should be overruled.

16.  <u>Objection:  The Andry Law Firm and Andry Lerner Are Distinct Entities</u>.

The show cause parties state that the Special Master's Report conflates The Andry Law Firm and Andry Lerner.  The parties state that The Andry Law Firm should not be held accountable for the alleged actions of another entity over which it had no control.  The parties cite *Austa La Vista, LLC v. Mariner's Pointe Interval Owners Association,* 173 S.W.3d 786, 794 (Tenn. Ct. App. 2005), to support this position.  But the *Austa La Vista, LLC* case, which involved two unrelated entities that owned the same piece of property at different points in time, is not applicable to the facts here where two closely-held entities with overlapping membership are involved in the misconduct.

An entity is deemed to have constructive knowledge of the knowledge of its agents. *Metropolitan Wholesale Supply v. The M/V Royal Rainbow*, 12 F.3d 58, 62 (5th Cir. 1994). Where corporations have overlapping officers, the knowledge is imputed across the corporate bodies.  *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 270 & n.16 (5th Cir. 1981) ("Where the officers and agents of two corporations are identical,

each one is chargeable with notice of everything that comes to the knowledge of the common officers.").  The knowledge is imputed to both entities, if it is material to both, even if the officer gained the knowledge in the course of his duties for only one entity. *Wachovia Bank Nat'l Ass'n v. WL Homes, LLC*, 534 F. App'x 165, 169-70 (3rd Cir. 2013).

The doctrine of imputed knowledge has particular application here, where Andry Lerner and The Andry Law Firm are both two-member organizations with one common member, and where the improper contacts were made for the benefit of both organizations. Both partners in The Andry Law Firm made contact with Sutton at key times in March 2013 to press The Andry Law Firm's pending claim.  Jon Andry's knowledge of the influence held over Sutton resulting from payment of the Thonn fees may be imputed to Andry Lerner and The Andry Law Firm.  Coordination of communications among Sutton and Jon and Gilbert Andry in March 2013 provides further facts from which shared knowledge may be inferred. *See* Exhibit B; *United States v. Lopez*, 979 F.2d 1024, 1029 (5th Cir. 1992) (concert of action can indicate agreement, and surrounding circumstances can establish knowledge).

Accordingly, this objection should be overruled.

17.    Objection:  Gilbert Andry Should be Removed from the Report.

Gilbert Andry states that references to him in the Report should be stricken and his good name cleared from disparaging innuendo.

The Report and this reply accurately describe actions by Gilbert Andry.  Both individually and through the knowledge imputed to The Andry Law Firm, Gilbert Andry participated in the breach of Sutton's fiduciary duties in an effort to enhance Gilbert Andry's financial interests.  His motion and objections should be denied.

### D. *Legal Analysis*

1.   The Unclean Hands Doctrine Protects the Integrity of the Judicial Process.

The defendants present a number of arguments against application of the unclean

hands doctrine, including the argument that the doctrine applies only in equity as an

affirmative defense.  The Court has been granted expansive authority to administer the BP

economic claims settlement so as to protect the integrity of the settlement process and the

public interest in a program intended to remedy wide-spread harm.  The Court is

empowered to take necessary actions to preserve its powers and the integrity of the CSSP.

With the merger of law and equity, the doctrine of unclean hands has application to

a broad range of misconduct.  *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969)

("Although [appellant] is not seeking equitable relief the doctrine remains applicable,  since

it expresses a general principle equally suited to damage actions.").  The purpose of the

doctrine is to protect the public interest of citizens and guard the integrity of the courts.

*Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3rd Cir. 1959) ("Courts are concerned primarily with

their own integrity in the application of the clean hands maxim and even though not raised

by the parties the court will of its own motion apply it.").

While the unclean hands doctrine has been recognized as an affirmative defense, its

application is not limited to this context, and courts have even raised the doctrine on their

own upon observing sharp tactics in the course of litigation.  *See Gaudiosi,* 269 F.2d at 881;

*Richards v. Levy*, 40 A.D.2d 1055, 1056 (N.Y. App. Div. 1972) ("This maxim or doctrine is not

primarily a matter of defense . . .  it need not be pleaded as a defense . . . and, in fact, need

not be pleaded at all as the court may raise it *sua sponte*.").

     2.     <u>The Court's Inherent Powers Broadly Provide for Relief</u>.

Courts enjoy inherent power to sanction.  The particular form and amount of a sanction "is uniquely committed to the sound discretion of the imposing court," *Crowe v. Smith*, 151 F.3d 217, 240 (5th Cir. 1998), tempered by appropriate judicial restraint and discretion.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).  Courts hold inherent powers, including the authority to fashion an appropriate sanction for conduct that abuses the judicial process.  *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009).  A federal court may suspend or dismiss an attorney as an exercise of the court's inherent powers.  *RTC v. Bright*, 6 F.3d 336, 340 (5th Cir. 1993); *Howell v. State Bar of Tex.*, 843 F.2d 205, 206 (5th Cir. 1988) ("Since the early days of English common law, it has been widely recognized that courts possess the inherent power to regulate the conduct of attorneys who practice before them and to discipline or disbar such of those attorneys as are guilty of unprofessional conduct.").

     3.     <u>The Court's Inherent Power to Impose Sanctions Extends to Non-Parties</u>.

The show cause parties state the Court's inherent power to impose sanctions is limited to parties or attorneys who appear before the Court, and therefore does not extend to non-parties.  In support of this position, they cite two Eastern District of Louisiana cases: *Stanley v. Trinchard*, 2004 U.S. Dist. LEXIS 25777 (E.D. La. Dec. 9, 2004), and *In re Bank of Louisiana/Kenwin Shops, Inc.*, 1998 U.S. Dist. LEXIS 11680 (E.D. La. July 28, 1998).  Neither case establishes the show cause parties' position.

In *Stanley*, the court stated only that it is "unclear" in the Fifth Circuit "whether the inherent power to sanction discovery abuses extends to abuses committed by non-parties." 2004 U.S. Dist. LEXIS 25777, at *12 (citing *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*,

- 34 -

2 F.3d 1397, 1411 (5th Cir. 1993)).  While declining to impose sanctions on the specific facts of that case, the court framed the issue as one of judicial discretion.  In *Bank of Louisiana*, the court imposed a sanction on a non-party, requiring the posting of a security bond.  *See* 1998 U.S. Dist. LEXIS 11680, at *13-15 (citing *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 86 F.3d 464, 467-68 (5th Cir. 1996)).

As this district court recognized in *Bank of Louisiana*, the clear inference from the second *Natural Gas* case ("*Natural Gas II*") is that this district court has the inherent power to sanction non-parties so long as the sanction is "essential to preserve the authority of the court and . . . the least possible power adequate to the end proposed."  86 F.3d at 467 (holding that under the facts of the case, a monetary sanction for civil contempt and period of incarceration was not the least possible sanction adequate to the end proposed).  This reading of *Natural Gas II* accords with the Ninth Circuit's ruling in *Lockary v. Kayfetz* that sanctions could be imposed against an entity not a party, attorney or signatory to pleadings but which had orchestrated a frivolous lawsuit.  *See* 974 F.2d 1166, 1170 (9th Cir. 1992).

Both *Natural Gas II* and *Lockary* rely on *Chambers*, where the Court held that a federal court may "resort to its inherent power" to sanction bad-faith conduct, even where the conduct also is covered by a statutory sanctioning provision.  *Chambers*, 501 U.S. at 50. The Court warned that courts invoking this power "must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees."  *Id.*

Here, the Court complied with the mandates of due process, and acquired personal jurisdiction over the show cause parties for purposes of imposing sanctions, by issuing the show-cause order and allowing the subject parties an opportunity for response.  Left for

consideration is whether the recommended sanctions are narrowly tailored and related to the equity sought, as discussed at pages 39 to 41 of this brief.

Alternatively, even if *Natural Gas II* is not read to authorize the imposition of sanctions against non-parties under the Court's inherent power, cases from within and outside the Fifth Circuit offer persuasive support for this position. For example, the Fifth Circuit has approved broad judicial powers to remedy misconduct, including the enjoining of non-parties who knowingly aid and abet a party to breach an order. *Waffenschmidt v. Mackay*, 763 F.2d 711, 718 (5th Cir. 1985) (finding it foreseeable to the non-parties that they would be required to respond before the court); *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 566-68 (E.D. Mich. 1993) (to be subject to inherent sanction power, non-party must have a substantial interest in outcome of the litigation and have substantially participated in the proceedings in which he interfered).

Here, Andry Lerner was formed to bring claims to the CSSP, and the firm stated to the Court in July 2013 that Lerner and Jon Andry "have invested several million dollars in establishing and operating [their] BP oil spill claims practice."[69] Lerner and Andry came to the Court several times in 2013 before issuance of the Report, seeking relief from a stay on the firm's claims so that "return on their investment" could be realized.[70]

Lerner, Jon Andry and their firm purposefully came to the Court and the CSSP, seeking to prosecute claims and obtain financial benefits from this legal work. Sutton shared an interest that was contingent on the outcome of the claims filed by an Andry Lerner client. Their misconduct directly relates to these efforts. The Court exercising jurisdiction to consider imposition of sanctions on these men and the Andry Lerner law firm in this setting does not offend traditional notions of fair play and substantial justice.

Sutton and Reitano entered agreements in furtherance of the Court's Order appointing the Claims Administrator, agreeing to assist the Claims Administrator in carrying out the responsibilities of the CSSP pursuant to the Court's Orders.[71]  The services were to be performed "strictly in accordance with the Settlement Agreement, and otherwise in accordance with the Court's orders," all in compliance with legal and ethical obligations.[72]  Sutton and Reitano were compensated for their work at the CSSP from a trust administered by the Court.[73]  Sutton retained a 50 percent interest in the legal fee in the Thonn claim.  The Court properly can exercise jurisdiction in these circumstances.

The Andry Law Firm, comprised of Gilbert Andry and Jon Andry, was a CSSP claimant seeking an award of more than $7 million.  The Court has continuing and exclusive jurisdiction over Economic Class Members and the distribution of benefits to such members.  Such class members are deemed to have submitted irrevocably to the Court's exclusive jurisdiction for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement.  Bringing The Andry Law Firm before the Court under these facts is appropriate.

      4.    <u>Requirement of an Injury</u>.

Application of the unclean hands doctrine requires a showing of an injury to a protected interest.  *See Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) (stating that the unclean hands doctrine cannot apply unless the party raising it "can show that he has personally been injured" by the opposing party's conduct).

Injury is not limited solely to economic harm, and can also occur where a party's position in a case is prejudiced by another party's conduct.  *TQP Dev., LLC v. Merrill Lynch & Co.,* 2012 U.S. Dist. LEXIS 189696, at *23-24 (E.D. Tex. July 18, 2012) ("claims of unclean

hands have typically required the moving party to show prejudice to its case as part of the unclean hands analysis."); *Ott v. Goodpasture, Inc.*, 1996 U.S. Dist. LEXIS 19867, at *12 (N.D. Tex. Sept. 26, 1996) ("Inequitable conduct' resides in failure to disclose material information, or submission of false material information, with an intent to deceive.").

Here, the integrity of the CSSP's processes and procedures was prejudiced by the failure of Sutton to disclose his financial relationship with Andry and Lerner, while Sutton sought to assist these men on issues of importance to them.  The failure of the show cause parties to interact with the CSSP in an ethical manner has "affect[ed] the equitable relations between the parties."  Their conduct injured the integrity of the program, which is required to impartially process claims that have been filed.

　　　5.　　Relief is Not Barred by Res Judicata.

The Andry Law Firm has stated that any relief is barred by res judicata because its CSSP claim allegedly has already been adjudicated.  For res judicata to apply, there must be two suits where: (1) the parties are identical in each suit; (2) a court of competent jurisdiction has rendered a prior judgment in one of the suits; (3) the decision was a final judgment on the merits; and (4) the plaintiff raises the same cause of action in each suit.  *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547, 553 (5th Cir. 2011).

Res judicata is inapplicable here.  The Special Master has no legal relationship to any party to the CSSP program or litigation.  *See Taylor v Sturgell,* 553 U.S. 880 (2008) (setting forth standards for identifying relationships between parties that implicate preclusion). The Special Master had no role in determining any of the show cause parties' claims, and had no obligation under the Court's Orders to raise issues during the claims review process.

Further, a final judgment can be challenged for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party" under Rule 60(b)(3), which "reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity." *Plaut v. Spendthrift Farm,* 514 U.S. 211, 233-35 (1995) ("Rule 60(b), and the tradition that it embodies, would be relevant refutation of a claim that reopening a final judgment is always a denial of property without due process.").

6. <u>Sanctions to be Narrowly Tailored and Related to the Equity the Party Seeks</u>.

As noted above, the Court has the inherent power to sanction non-parties so long as the sanction is "essential to preserve the authority of the court and . . . the least possible power adequate to the end proposed." *Natural Gas II*, 86 F.3d at 467 (citing *Chambers*, 501 U.S. at 50). As with sanctions prescribed by statute and the Federal Rules of Civil Procedure, sanctions pursuant to inherent powers "must be potent enough to be efficacious, but . . . narrowly tailored to serve only their necessary function." *FDIC v. Conner*, 20 F.3d 1376, 1383 (5th Cir. 1994) (discussing sanctions pursuant to Fed. R. Civ. P. 37(b)(2) for a discovery order violation). A sanction pursuant to the Court's inherent power must be narrowly tailored to the specific conduct being sanctioned, but sufficiently potent to deter such conduct from reoccurring. *See Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002) (court's inherent power to sanction "is limited by its ultimate source — the court's need to orderly and expeditiously perform its duties").

Here, the Special Master identified various acts of misconduct by the show cause parties, including undisclosed financial relationships among former CSSP staff and those

pursuing CSSP claims, as well as other conflicted relationships.  This misconduct harmed the integrity of the CSSP, and created the appearance that certain members of the CSSP staff might compromise their fiduciary obligations.  The misconduct presented issues of whether the show cause parties held the integrity expected from participants in the CSSP. The Special Master thus recommended the Court consider disallowing CSSP claims by the show cause parties, and barring the parties from future participation in the program because of the integrity issues continued participation might bring.

The Special Master recognizes that sanctions imposed for the integrity issues raised by the conduct of the show cause parties must be narrowly tailored to the specific conduct being sanctioned while also sufficiently potent to deter such conduct from reoccurring. Collateral harm to employees and vendors of the show cause parties should be minimized, but the impact here is caused as a result of the show cause parties' own misconduct.

The Special Master twice proposed measures that could help ensure the integrity of Andry Lerner's future participation in the CSSP, such as having firm claimants provide the CSSP with releases for obtaining tax information to confirm tax forms submitted by the claimants.  Counsel for Andry Lerner and its partners did not agree to such measures, which were intended to ensure the integrity of claims from the firm, explaining that the measures would unfairly single out the Andry Lerner firm.  The Andry Lerner firm's conduct as detailed in the Report supports the position that further integrity measures are required to allow this firm to continue to engage in the CSSP.

The harm to the CSSP program, and resulting costs, should be further considered against the continued financial benefits that The Andry Law Firm and Andry Lerner seek to

obtain from the CSSP.  A sanction sufficiently potent to deter future misconduct by the show cause parties is a necessary part of this calculation.

> 7.   Requirement of a Hearing.

The show cause parties argue that imposing sanctions requires the Court to provide full due process protections, including but not limited to an evidentiary hearing.  The parties support this position with case law providing that a defendant must be afforded Constitutional protections prior to the Court imposing sanctions that are criminal in nature. *See Crowe v. Smith*, 151 F.3d 217, 226-27 (5th Cir. 1998).

Such punitive sanctions are simply not at issue here.  The sanctions recommended in this case do not involve fines or imprisonment.  *See Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831 (1988) ("[C]onclusions about the civil or criminal nature of a contempt sanction are properly drawn . . . from an examination of the character of the relief itself."); *Groppi v. Leslie*, 404 U.S. 496, 497 (1972) (involving petitioner's challenge to a legislative resolution that caused him to be confined in county jail for leading a group onto the legislature's floor while it was in session).  Rather, the sanctions here involve steps to improve CSSP integrity, restrictions on future participation in the CSSP program, and monetary sanctions.  Rule 53(f) provides sufficient procedural protection for the due process rights of the show cause parties.

> 8.   Interference with Contract Rights.

The show cause parties state that they have financial interests in legal fees from their representations of claimants and, in the case of The Andry Law Firm, a CSSP claim.  Reitano stated that she has a financial interest in future client representations before the CSSP.  The parties state they cannot be deprived of these interests without due process.

Whether Andry Lerner has the right to any fee for work it performed on CSSP claims is a matter between the firm and its clients.  The case relied upon by the firm, *Due v. Due*, 342 So. 2d 161 (La. 1977), provides no guidance for what remains of an attorney's interest in a contingent fee case where the attorney has been disqualified from pursuing a case before a tribunal because of improper conduct.  Nor does *Andirac v. Richardson*, 51 So. 1024, 1025 (La. 1910), which held that a contingent fee agreement is binding on a client *in the absence of fraud*.

Lerner and Reitano state that courts may not reduce a contingency fee contract unless a party petitions the court for such relief.  This concept, however, has no application to the court's authority to impose sanctions on non-parties for misconduct in the CSSP process.  Further, Louisiana law provides procedures for allocating a contingent fee where a client changes counsel.  *See Skannal v. Jones Odom Davis & Politz, L.L.P.*, 124 So. 3d 500 (La. Ct. App. 2013); La. Rules Prof. Conduct, Rule 1.5(a).

The show cause parties are not entitled to any relief on the basis of any alleged interference with their business interests.

      9.    Issues Concerning the Special Master.

The show cause parties have raised several arguments concerning the Special Master's investigation and the Report.  In general, these issues are concerned with how the Special Master conducted the investigation and reported the results.  The criticisms are misplaced for two main reasons.

First, the Special Master did not independently determine the manner of the external investigation.  The Court authorized the process, with the consent of BP and the PSC, in accordance with Rule 53.  The Court "instructed [the Special Master] to perform his

duties *independently* of BP, the PSC, and the CSSP."  Order of July 2, 2013 at 3 (emphasis

added).  The Special Master was "authorized to communicate *ex parte* with the Court and

the parties, *without notice*, as he deem[ed] necessary and appropriate for the performance

of his duties."  *Id.* (emphasis added).  The Court instructed and authorized the Special

Master to conduct the investigation without interference from any individuals or entities.

Second, the Court has given the show cause parties the opportunity to contest the

Special Master's Report.  With access to the relevant investigative record, the show cause

parties have had the opportunity to present the Court with their own interpretation of the

record and to supplement the record with additional facts.  Where the parties have

objected, the Court will conduct *de novo* review of the Special Master's findings.  This

process *is* the remedy to the problems that the show cause parties have with the findings

and recommendations produced using the Special Master's methodology.  *See* Fed. R. Civ. P.

53(f)(3)-(4) ("The court must decide de novo *all objections to findings of fact* made or

recommended by a master . . . .  The court must decide de novo *all objections to conclusions

of law* made or recommended by a master.") (emphasis added).

The following are specific issues raised by the show cause parties.  Consistent with

the reasons stated above, none of these arguments merits relief.

a.       *The Special Master Process Was Not Fair or Reasonable.*

The show cause parties state the Special Master's investigative process was not fair

or reasonable.  For example, they state the process was flawed because counsel was not

permitted to attend all interviews, and, when present, was not given unfettered access to

the witness for questioning.

The Court directed the Special Master to conduct an independent investigation into the allegations of misconduct involving the CSSP, including the authority to communicate *ex parte* with CSSP staff and vendors.  Other individuals interviewed were permitted to have counsel present during their interviews.  As for the show cause parties, an attorney was present during each of their interviews, and the attorney was given an unrestricted opportunity to ask additional questions at the end of the interview.  For example, the following exchange took place near the completion of Glen Lerner's interview:

| | |
|---|---|
| Special Master: | Mr. Lerner, that completes our questions.  I'll ask your counsel if they want to put anything on the record or clarify anything that you've said or whether you want to clarify anything that you've said? |
| Counsel: | Not at this time, no.[74] |

A similar exchange took place near the conclusion of Sutton's interview:

| | |
|---|---|
| Special Master: | Counsel, do you have anything you want to add to the record? |
| Counsel: | No. |
| Special Master: | Mr. Sutton, do you want to add anything? |
| Sutton: | No.[75] |

Similar exchanges happened at the Jon Andry and Reitano interviews.[76]  The claim that the investigative process was unfair and unreasonable has no merit.

     b.  *The Parties' Access to the Special Master's Records.*

The show cause parties objected to their access to the Special Master's investigative record.  Before the parties filed their objections, the Special Master provided fulsome discovery of the investigative record under direction of the Court.  Among other documents, the Special Master provided the parties:  (1) all documents used to support the

Report's factual findings; (2) unredacted transcripts of the interviews of each show cause party; (3) notes of interviews of persons associated with the show cause parties; (4) notes of interviews of relevant CSSP staff and vendors; (5) documents from the CAO's internal investigation; (6) phone records; and (7) relevant emails from the DHECC email archive. The parties had access to their own interviews and records. The arguments regarding access to the investigative record are without merit given the discovery provided to the show cause parties in advance of the deadline for filing objections.

> c.    *The Special Master Cherry Picked Evidence.*

The show cause parties state the Special Master's Report selectively disclosed facts and omitted exculpatory evidence. One party stated that the Report was a "character assassination." The parties highlighted alleged misconduct by other persons and entities that was not discussed in the Report.

The Special Master's investigative methods based on the Court's mandates were openly described in the Report. The supporting documentation for all findings and recommendations has been made available to the show cause parties. The parties have been given the opportunity to challenge those findings and recommendations. The Court will make a *de novo* review of all findings that have been objected to by the show cause parties. This process is fair and appropriate under Rule 53.

The show cause parties' suggestion that the Report should have discussed other evidence, generally focused on misconduct by others, is misplaced. Whether others also engaged in misconduct does not erase or minimize the show cause parties' own actions. Moreover, since issuance of the Report, the Special Master and the CSSP staff actively have

engaged in efforts to increase the *overall* ethical awareness and compliance of the CSSP program so as to enhance the overall integrity of the program.

        d.    *The Special Master's Review Was Advocacy Driven.*

The show cause parties state that the Special Master has exceeded the authority permissible under Rule 53 by advocating for certain positions on, for example, discovery motions and the recommendation for application of the unclean hands doctrine.

These claims are misplaced.  None of the authorities cited support the proposition that a special master cannot take positions on issues related to his duties.  For example, in *Cobell v. Norton,* the court concluded that it was improper for the monitor to have become "something like a party himself" not because such behavior was improper but because the court gave the monitor this power without the parties' consent.  *See* 334 F.3d 1128, 1142 (D.C. Cir. 2003) ("The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system.  When the parties consent to such an arrangement, we have no occasion to inject ourselves into their affairs."); *United States v. Microsoft Corp.,* 147 F.3d 935, 956 (D.C. Cir. 1998) (finding improper a nonconsensual referral of a motion to a special master).  In *Hofmann v. EMI Resorts, Inc.*, the court permitted the special master to engage in investigations and take positions on issues of fact and law.  689 F. Supp. 2d 1361, 1364 n.2, 1366-68, 1373 (S.D. Fla. 2010) (permitting special master, where appointed with consent of the parties and acting consistent with orders, to conduct investigation and respond to parties' objections).

The parties knew of the Special Master's appointment, and The Andry Law Firm and Andry Lerner sent correspondence to the Special Master within one day of his appointment to pledge cooperation in the investigation.[77]  Before issuance of the Report, the Special

Master called the show cause parties to appear for testimony, and issued subpoenas to several of the parties for production of documents. The Andry Law Firm filed an opposition to a Special Master subpoena. Yet none of the parties raised any issue with the Special Master's appointment until the filing of the Report. *See Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004) (courts should be "cautious and discriminating" in reviewing recusal motions, as a "thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will apply rather than disregard the law, could introduce a bias into adjudication.").[78]

The Special Master also has left for other authorities the issue of whether any of the show cause parties have violated any criminal law or any ethical obligation.

The show cause parties have stated that the defendants BP Exploration & Production Inc., BP America Production Company, and BP p.l.c.'s (collectively "BP") have improperly commented upon the Special Master's Report in filings and in public statements. Neither the Court nor the Special Master had any role in the commentary cited by the show cause parties. Any claim for relief by the show cause parties for the allegedly improper commentary is unrelated to the issue of review of the Special Master's findings under Rule 53, presently before the Court. This objection should be overruled.

In sum, the Special Master was appointed with the consent of the parties to conduct an investigation and make recommendations concerning allegations of misconduct at the CSSP. The Special Master has faithfully carried out the Court's mandates. He has operated within the confines of his appointment and has not exceeded the authority expressly granted. Any objection to the Special Master's process should be overruled.

**E.** *Conclusion*

For the reasons stated in the Report and this brief, and following a *de novo* review of all objections to findings or recommendations by the Special Master under Rule 53, the Court should adopt and affirm the Report and impose appropriate sanctions against Lionel Sutton, Christine Reitano, Jon Andry, Glen Lerner, Gilbert Andry, The Andry Law Firm, and Andry Lerner LLC.

Respectfully submitted,

_____/s/  Louis J. Freeh_____
Louis J. Freeh
Special Master

Dated:  February 21, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this ___21st___ day of _____February_____, 2014.


　　　　　　　　　　　　__/s/Louis J. Freeh_____
　　　　　　　　　　　　Louis J. Freeh

[1] Report at 33-34, 43-44; SM-01-363.  Note that all references in the endnotes are to the Special Master's September 6, 2013 Report ("Report"), the discovery provided by the Special Master to the show cause parties (indicated with the "SM" designation followed by numbers), or items filed on the Court's docket.  All items are available for the Court's review.  Some of the show cause parties received three sets of production documents, whereas Lerner and The Andry Law Firm received four sets of production documents.  Those parties should consult their fourth production for references herein to SM-03- and their third production for references to SM-02-.

[2] Report at 33-34, 43-44; SM-01-363.

[3] Jon Andry filing 12165 at 17 (Jan. 17, 2014).

[4] Report at 28; Lerner filing 11988 at 28 (Dec. 16, 2013).

[5] Lerner filing 11988 at 24 (Dec. 16, 2013).

[6] Special Master filing 12107 at 7-12 (Jan. 8, 2014).

[7] SM-03-45.

[8] SM-03-45.

[9] Sutton filing 12022 at 6-7 (Dec. 18, 2013).

[10] SM-02-69.

[11] SM-01-687.

[12] SM-01-446; SM-01-457.

[13] SM-02-453.

[14] SM-02-457.

[15] SM-02-457.

[16] Andry Lerner filing 12348-1 at 3 ¶ 7 (Feb. 14, 2014).

[17] *See* SM-01-248.

[18] Lerner filing 11988 at 24 (Dec, 16, 2013).

[19] Sutton filing 12339-1 at 4-5 (Feb. 14, 2014).

[20] SM-01-304.

[21] SM-01-304.

[22] SM-01-304.

[23] SM-01-304.

[24] SM-01-446; SM-01-457.

[25] Lerner filing 11988-23 at 3 (Dec. 16, 2013).

[26] Lerner filing 11988-23 at 3 (Dec. 16, 2013).

[27] Lerner filing 11988-23 at 2 (Dec. 16, 2013).

[28] Report at 33-34, 43-44; SM-01-363.

[29] SM-02-396.

[30] Report at 33-34, 43-44; SM-01-363.

[31] Report at 33-34, 43-44; SM-01-363.

[32] SM-02-652, 669 (emphasis added).

[33] SM-02-453-54, 477 (emphasis added).

[34] SM-02-675; SM-01-308.

[35] References in this memorandum to any phone, text, or email communications between the show cause parties from March 5 to March 16, 2013 are presented in detail on Exhibit B.

[36] SM-01-273.

[37] SM-02-27-28.

[38] SM-02-646.

[39] SM-02-647.

[40] SM-02-647.

[41] SM-01-261.

[42] SM-01-315.
[43] SM-02-644-45.
[44] SM-01-345.
[45] SM-01-347.
[46] SM-01-344 (emphasis added).
[47] SM-01-344 (emphasis added).
[48] SM-03-743.
[49] SM-03-89.
[50] SM-03-90.
[51] SM-03-96.
[52] SM-01-261.
[53] SM-03-45; Andry filing 12165-5 at 2 (Jan. 17, 2014).
[54] Andry filing 11666-1 at 2 ¶ 8 (Oct. 16, 2013).
[55] Andry filing 11666-1 at 2 ¶ 8 (Oct. 16, 2013).
[56] SM-03-45; Andry filing 12165-5 at 2 (Jan. 17, 2014).
[57] SM-02-393-96; SM-01-637.
[58] SM-02-393-96; SM-01-637.
[59] Report at 63-66.
[60] Report at 64-65.
[61] Report at 64-65.
[62] SM-02-37.
[63] SM-02-54-55.
[64] Reitano filing 11990 at 4 (Dec. 16, 2013).
[65] SM-03-404.
[66] SM-01-663.
[67] Report at 53-57.
[68] SM-03-73.
[69] Andry Lerner filing 10887-1 at 8 (July 29, 2013).
[70] Andry Lerner filing 10887-1 at 8 (July 29, 2013).
[71] SM-02-393-94; SM-02-889.
[72] SM-02-393-96; SM-02-890.
[73] SM-02-393-95; SM-02-890.
[74] SM-02-546.
[75] SM-02-217-18.
[76] SM-02-692-94; SM-02-858-59.
[77] Andry Lerner filing 10887-1 at 4 (July 29, 2013); Andry Lerner filing exhibit 10887-2 at 9 (July 29, 2013);  Special Master filing 11107 at Exhibit A (Aug. 23, 2013).
[78] Special Master filing 11720 (Oct. 23, 2013).