UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | : | MDL No. 2179 |
| *"DEEPWATER HORIZON"* in the | : | |
| GULF OF MEXICO, on APRIL 20, 2010 | : | SECTION:  J |
| | : | |
| This document relates to: | : | JUDGE BARBIER |
| | : | |
| No. 12-970 | : | MAG. JUDGE SHUSHAN |

**MEMORANDUM IN SUPPORT OF MOTION TO PROTECT AND PRESERVE
CLAIMANT CONFIDENTIALITY AND TO ENFORCE THE ORDERS OF THE COURT**

**[Filed Under Seal]**

Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class, by and through undersigned Co-Lead Class Counsel, respectfully submit the following memorandum in support of their motion to protect and preserve Claimant confidentiality and the independence of the Settlement Program:

**MAY IT PLEASE THE COURT:**

Both the Settlement Agreement and the Court's Order regarding implementation expressly and unambiguously dictate that:

> BP and Class Counsel shall ***not*** have access to any individual Claim File for a Claim that is being processed and has not yet been resolved in the Settlement Program, except if the Claim File is needed by BP, a Claimant, or their counsel, to prosecute or defend an Appeal.[1]

As acknowledged by BP Counsel, the purpose of this language is clear: "to ensure that there would be no interference with the Settlement Program's evaluation of a claim while it is in process."[2]

---

[1] *See* ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573] ¶9, *and* SETTLEMENT AGREEMENT, SECTION 4.4.14, (emphasis supplied).

[2] LETTER FROM BP COUNSEL DAN CANTOR (March 11, 2013), p.2.

Nevertheless, (to a large extent unbeknownst to Class Counsel, and otherwise over Class Counsel's strong and repeated objections), BP has accessed confidential Claim-specific pre-Determination information and data in various different ways since the commencement of the Program. This access must stop.

### Negotiating History, Settlement Agreement Terms and Court Orders Limiting Access and Protecting Confidentiality

Throughout the negotiation process, it was clearly understood and agreed at all times by the Parties that:

- The Claimant would have an absolute right to see exactly how his or her claim had been calculated and/or otherwise evaluated by the Program, and what the calculation, evaluation and/or denial was based upon.

- BP would have no right to access the individual claim file information, participate in, or otherwise influence the processing or evaluation of a claim before there was a formal Eligibility Notice.

- After there was a formal Eligibility Notice or Denial, both BP and Class Counsel (as well as the Claimant) would have access, in BP's case, *to the extent that* an appeal could be taken or defended, and, in Class Counsel's case, so that a Class Member could obtain assistance from Class Counsel in making or defending an appeal.

These principles were memorialized in Sections 4.4.14, 6.1.2.1.1 and 6.8 of the Settlement Agreement. Notably, Section 4.4.14 explicitly prevents BP from accessing any individual Claim File prior to a formal determination.[3]

---

[3] *See* SETTLEMENT AGREEMENT, SECTION 4.4.14; s*ee also,* SECTION 6.1.2.1.1 ("*Within 30 days of issuance of notice in writing to the Claimant of a final determination of a Claim* by the Settlement Program, a Claimant may request in writing reconsideration…. The Settlement Program shall provide access to the Claimant and the BP Parties of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination") (emphasis supplied); SECTION 6.8 ("*Immediately upon issuance of final written notice from the Claims Administrator of a determination of a Claim,* the Settlement Program shall provide BP, Lead Class Counsel, Claimant and Claimant's counsel (if Claimant is represented) with electronic access to the full record of the Claim at issue") (emphasis supplied); *see also,* SECTION 4.4.14 ("The Claimant may request and receive reasonable access to his, her, or its Settlement Program and/or Transition Process Claim File and supporting information, *but only after issuance of a Final Determination of the Claim….*") (emphasis supplied) [*Note* that this was subsequently clarified by the Claims Administrator and the Parties to limit the Claimant's access only to the Program's internal work product, in accordance with Section 6.1.2.1.1, and as discussed more fully *infra* herein].

Page | 2

This provision from the Settlement Agreement was expressly adopted and confirmed by Court Order, which dictates that:

> BP and Class Counsel shall ***not*** have access to any individual Claim File for a Claim that is being processed and has not yet been resolved in the Settlement Program, except if the Claim File is needed by BP, a Claimant, or their counsel, to prosecute or defend an Appeal.[4]

The parties also agreed that the Claims Information would remain "confidential" under Pre-Trial Order No. 13, as memorialized in the Court's May 22nd Order regarding settlement implementation,[5] and as set forth more fully in the Court's Confidentiality Order of June 29, 2012:

> All Claims Information shall be kept confidential and shall not be disclosed except as allowed by this Order or subsequent Order of the Court…[6]

This Confidentiality Order further confirmed that the access of BP and Class Counsel would be limited to such confidential information "as provided in the Settlement Agreement and any Order

---

[4] ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573] ¶9 (emphasis supplied).

[5] ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573] ¶4.

[6] ORDER REGARDING THE CONFIDENTIALITY OF CLAIMS INFORMATION (June 29, 2012) [Doc 6822] ¶4. "Claims Information" is defined broadly under Paragraph 2 of the Confidentiality Order as:

> Claims Information. Pursuant to Paragraph 18 of the Court's March 8, 2012 First Amended Order Creating Transition Process (Rec. doc. 5995) and Paragraph 3 of the Court's May 22, 2012 Order Regarding Settlement Implementation (Rec. doc. 6573), all claim files and claims-related materials and data submitted to the Gulf Coast Claims Facility (the "GCCF") and in the Transition Process have been transferred to the Claims Administrator. Paragraph 4 of the Order Regarding Settlement Implementation directs that all such Claims Case 2:10-md-02179-CJB-SS Document 6822 Filed 06/29/12 Page 1 of 7.

> Information is deemed "confidential" under Pre-Trial Order No. 13 (Rec. doc. 641). In addition, the Claims Administrator will receive and will generate claim files and claims-related materials and data relating to claims submitted to the Claims Administrator under the Economic and Property Damages Settlement Agreement that contain personal identifying information and other private information regarding claimants that warrant protection from disclosure.

> This Order refers to all such GCCF, Transition Process and Economic and Property Damages Settlement Agreement claim files and claims-related materials and data collectively as "Claims Information."

of this Court (including previously entered Orders in connection with the Settlement Agreement)."[7]

## Summer 2012 Discussions

During the summer of 2012, Co-Lead Class Counsel participated in meetings and/or calls with BP Counsel, Mr. Juneau, Mr. Welker, Brown Greer, and Judge Shushan to discuss the extent to which *Claimants* would be provided with access to information regarding their Claims from the Program.

In particular, a concern was raised by the Claims Administrator with respect to the potential ramifications of providing a Claimant with too much information regarding the basis upon which he or she might be investigated for possible fraud. Class Counsel took the position that Claimants were entitled under Section 4.3.7 to know exactly what the issue was, and to have an opportunity to correct, explain, supplement and/or clarify the documentation or other information in question. However, the Claims Administrator decided that, as a general policy, the Claimant would simply be informed that his or her claim was being suspended for documentation review, and the investigation would proceed to conclusion, at which time the claim would either be cleared to go forward or denied – in which case the Claimant would be informed that his or her claim was being denied for suspected "fraud", but not necessarily why.

In addition, the Program sought clarification regarding the extent to which Claimants would be provided with access to other parts of his or her Claim File, including particularly pre-Determination draft, preliminary or otherwise incomplete work product of the Program Accountants and/or other Program Vendors, prior to a formal Eligibility Determination or Denial. Looking at Section 4.4.14, Section 6.1.2.1.1 and Section 6.8 together, the Parties

---

[7] ORDER REGARDING THE CONFIDENTIALITY OF CLAIMS INFORMATION (June 29, 2012) [Doc 6822] ¶6.

clarified that Claimants should always have access to the documents and other information the Claimants themselves had previously submitted to the GCCF and/or the Settlement Program, but would not be able to access or review the "forms, calculations and worksheets relied upon by the Settlement Program" until there was a formal Eligibility Determination or Denial.

Co-Lead Class Counsel do not recall any discussions, much less any "agreement", that BP would be provided with Claimant-specific information prior to a formal Eligibility Determination or Denial.

### Eight Months into the Program, Class Counsel Discover that BP Has Pre-Determination Access to Claims Files

In February of 2013, Class Counsel were told that the "live feed" that was rumored to have existed under the GCCF was never "turned off" by Brown Greer, and that BP was being provided with access to pre-Determination Claim-specific data.

Class Counsel made an inquiry to the Claims Administrator, and, in a series of communications during February and March of 2013, reiterated their understanding that:

1. Claimants, absent exceptional circumstances, have full access to the claims file and claims information, except for the Program's work product, at any time.[8]

2. Claimants, as well as Class Counsel and BP, gain access to the Claims Administrator's calculations, including accountant workbooks, when the Program issues the first Eligibility or Denial Notice on a claim.[9]

3. BP and Class Counsel are entitled to general, aggregate, non-personal / non-confidential / non-claim-specific reports and other information about the filing and status of claims, at all times.

---

[8] Class Counsel respectfully noted that: "We believe the Claimant should always be provided with full access to all claims information, but understand the Claims Administrator's position regarding Program worksheets / calculations and investigations of potential fraud."

[9] As noted by Class Counsel at the time, BP would only actually be provided with access to the extent necessary to prosecute or defend an appeal.

4. BP does not get, (absent some exceptional circumstances), access to the claim-specific claim files, claim information, or Claims Administrator's calculations, until after the Program issues the first Eligibility or Denial Notice on the claim.

5. Class Counsel is not generally / automatically provided with access to the claim-specific claim files, claim information, or Claims Administrator's calculations, until after the Program issues the first Eligibility or Denial Notice on the claim; however, Class Counsel can communicate with the Program regarding specific claims information and issues where the Class Member (and/or the Class Member's Attorney and/or CPA) has requested the assistance of Class Counsel.[10]

Apparently, Brown Greer (and perhaps others) recalled that it was "agreed" during the Summer of 2012 that "Claimants, their lawyers and the Parties may see everything in the claimant's file except review worksheets and calculations at any time."[11]

Class Counsel reiterated that they did not recall any "agreement" that BP would have access to Claimant-specific information prior to a formal Eligibility Determination, and questioned whether they even had the authority to enter into an agreement that was contrary to the express terms of not only the Settlement Agreement, but also an Order of the Court.[12]

Finally, it is important to note that Class Counsel have consistently maintained that equal access is *not* the issue. Certainly, Class Counsel should have (and yet in many respects have not had) equal access to BP. But undersigned have always repeatedly emphasized that *neither* BP *nor* Class Counsel should have full access to Claimant-specific pre-Determination information.[13]

Because undersigned were immersed in the Phase One Trial, because BP had already started to unfairly and improperly attack the Claims Administrator in connection with the BEL

---

[10] *See generally,* HERMAN E-MAIL TO REITANO (Feb. 12, 2013); HERMAN E-MAIL TO CANTOR (Feb. 13, 2013); HERMAN E-MAIL TO REITANO (March 13, 2013); MEMO TO CLAIMS ADMINISTRATOR (March 22, 2013).

[11] Memo. from Brown Greer to Christine Reitano (Feb. 7, 2013).

[12] *See generally,* HERMAN E-MAIL TO REITANO (Feb. 12, 2013); HERMAN E-MAIL TO CANTOR (Feb. 13, 2013); HERMAN E-MAIL TO REITANO (March 13, 2013); MEMO TO CLAIMS ADMINISTRATOR (March 22, 2013).

[13] Of course, it must be noted that BP does not stand in the same relation to the Settlement Program as Class Counsel. Unlike BP, Class Counsel have a responsibility to attempt to assist Claimants (and/or their attorneys and/or CPAs) with questions, concerns or other issues associated with the processing of their Claims.

issues, and because it did not appear at that time that BP was using the information to attempt to influence the processing of claims, Class Counsel decided not to press the issue further at that time.

### Class Counsel Discover that BP Is Accessing the Program's IT System Nightly with "Bots" and Using Pre-Determination Data to Attempt to Influence the Processing of Claims

On or around October 2, 2013, Class Counsel learned that BP was using an electronic robot (or "bot") to "crawl" through the Program's IT system in order to extract Claim-specific data on a nightly basis.

More troubling, however, Class Counsel were advised that BP had provided a list of approximately 700 claims to the Program *via* the Freeh Group which BP contended deserved some type of heightened or additional scrutiny.

This is exactly the type of potential influence on the claims evaluation process that was expressly prohibited.[14]

These revelations spurred yet another series of communications with the Settlement Program in which Class Counsel reiterated that: **(i)** Co-Lead Class Counsel had no recollection of any "agreement" that BP could receive Claim-specific information prior to a formal Eligibility Determination; **(ii)** even assuming *arguendo* that such an "agreement" was made, Co-Lead Class Counsel likely did not have the authority to agree to something that was contrary to an express provision contained within not only the Settlement Agreement, but also an Order of the Court; and **(iii)** any "agreement" on the issue was and is expressly revoked.[15]

---

[14] *See also, e.g.,* HERMAN E-MAIL TO READE (with BETA VERSION OF FRAUD METRICS) (Oct. 18, 2013). **Class Counsel have repeatedly objected to the continuation of these "Work Stream Meetings" which are ostensibly for the purpose of addressing budgetary issues and improving efficiencies, but through which BP attempts to direct its influence over the determination and payment (*i.e.* delay, investigation, denial and non-payment) of claims.**

[15] *See* HERMAN E-MAIL TO JUNEAU (Oct. 24, 2013).

Class Counsel also noted that BP's access to *any* data (*i.e.* even aggregate and non-Claim-specific and/or post-Determination data) under Section 4.4.14 is limited to "legitimate" purposes, and certainly not for the bad faith breach of Section 9.1, Section 16.1 or Section 17.1 of the Settlement Agreement.[16]

BP argued that Section 4.4.14 only prohibited BP from accessing "Claims Files" prior to a formal Eligibility Determination, but did not prohibit BP from accessing or otherwise obtaining that very same "Claims-related data" in Excel or some other form.[17]  Class Counsel questioned the likelihood that anyone would have ever agreed to that, and further reiterated that:

- The Settlement Program was intended to be transparent in the sense that each *Claimant* would know (a) in advance, the Frameworks by which his/her claim would be processed; and (b) at the time of denial/determination, the basis upon which his/her claim had been calculated or denied. But no one ever expressed any significance or concern that confidential information contained within the Claims Files would be "*transparent*" to BP.

- The Agreement is clear: "BP and Class Counsel shall not have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal." Section 4.4.14.

- Class Counsel did not agree to this. "If someone believes we did, they are mistaken. We certainly don't agree to it now. And it is highly questionable that we even have the authority to agree to something contrary to the express terms of not only the Settlement Agreement but an Order of the Court."

- The legitimate and imminently reasonable basis to deny BP access to such data was acknowledged by BP Counsel himself:  To ensure that the Settlement Program would be *independent,* by "ensuring that there would be no interference with the Settlement Program's evaluation of a claim while it is in process."[18]

---

[16] *See* HERMAN E-MAIL TO JUNEAU (Oct. 24, 2013).

[17] *See* LETTER FROM BP COUNSEL DAN CANTOR (Nov. 9, 2013).

[18] HERMAN E-MAIL TO CANTOR (Nov. 11, 2013).

Class Counsel discussed their concerns with the Freeh Group, and understood that BP's access to pre-Determination Claim-specific data was being eliminated.

**Secret Meetings Between Brown Greer and BP**

During the Summer of 2012, the Claims Administrator was concerned that Counsel for BP were attempting to unduly influence Brown Greer, PwC and/or Postlethwaite employees regarding the ways in which Settlement Program Claims would be processed, and therefore directed that the Parties not engage in *ex parte* communications directly with the Program Vendors.

In January of 2014, Class Counsel learned that BP had nevertheless been meeting with Brown Greer on a weekly basis since (at least) the Fall of 2012 to discuss various data-related issues. Class Counsel were neither informed of these meetings nor invited to attend.

Indeed, neither the Claims Administrator nor his IT specialist, Chris Reade, had any knowledge of these meetings or calls prior to January 2014.  When Mr. Reade discovered that these calls were occurring, he attended the next one by phone and was troubled that individual Claims were being discussed, and terminated the call.  The collective written Agendas for these meetings and/or calls were obtained from Brown Greer and provided to Class Counsel, and the Claims Administrator directed that any further legitimate data issues should be addressed in the presence of Class Counsel.

Even just the limited information contained within the formal written Agendas reveals several causes for concern.  Just taking a few examples:

- "Weekly Data Call Approval by Dan" (11/20/12).  We understand that "Dan" refers to BP Counsel, Dan Cantor.  Assuming that is correct, why is Brown Greer looking to BP Counsel with respect to the approval of the weekly calls?

- On 3/5/13, BP appears to be requesting the name of the Claiming Entity, in addition to the unique Claimant ID. Why does BP want or need to know the names of persons or entities that are making claims? To attempt to bully or intimidate such businesses into withdrawing their claims? To publish Emeril-type ads about their businesses in the *New York Times*?

- On 3/19/13, BP appears to be requesting the Accountant or Accounting Firm to whom the specific Claim has been assigned. Why did BP want or need to know that information? So that it could communicate with the Program Accountants directly and try to influence the way that they were processing the Claim?

- On 6/4/13, BP appears to be requesting a "preliminary" weekly notice of the specific Claims that have been referred for a Moratoria Loss Review. What was BP going to do with that information?

- On 6/19/13, BP appears to be requesting to be told which specific Claims have gone into the Document Investigation Process. What was BP going to do with that information? [19]

While BP claims that former Program employee Christine Reitano "approved" of these Brown Greer – BP calls *via* e-mail in November of 2012: **(i)** these meetings apparently occurred for at least two months before they were approved; **(ii)** such approval would have been limited to an attempt to resolve potential discrepancies between the Program's formal Reports and BP's own numbers; **(iii)** it is only reasonable to assume that such discussions ventured into issues beyond what is reflected in the formal written Agendas; and **(iv)** it is inevitable that conversations regarding even the post-Determination aspects of individual Claims would result in some level of post-Determination denials, holds, adjustments or other reconsideration – and would likely affect the way in which other Claims would be processed and/or evaluated in the future.

---

[19] *See* AGENDA ITEMS FOR BP-BROWNGREER WEEKLY DATA CALLS, at pdf pp.5, 13, 14, 26, 29.

Finally, and even assuming *arguendo* that there was no attempt by BP to improperly utilize confidential information or to directly or indirectly influence the processing of Claims, the mere appearance of impropriety and/or potential for abuse is clear.

### The IBM Report

On February 20, 2014, Class Counsel were provided with an IBM Report dated February 6, 2014, which confirms BP's virtually unlimited access to Claim-specific pre-Determination data. The Report seems focused on equal access – which, again, is *not* the issue – and notes that BP is provided with electronic back-up files and have enhanced abilities to monitor appeals that are not available to Class Counsel.[20]

### THE COURT SHOULD PROTECT THE INDEPENDENCE OF THE SETTLEMENT PROGRAM AND THE CONFIDENTIALITY OF CLAIM AND CLAIMANT-SPECIFIC INFORMATION

The Parties promised, and the Court approved, an *independent* Settlement Program, implemented and administered by an independent Claims Administrator and Trustee, with independent Vendors, subject to the supervision and direction of the Court.[21] One of the keys to

---

[20] The IBM Report indicates that the Claims Administrators' Office offered to make electronic back-ups available to Class Counsel in October of 2013. This may be correct. But Class Counsel have been consistently and repeatedly attempting since October of 2013 to have BP's access to Claim-specific pre-Determination data terminated, (*not* to obtain additional Claim-specific information for Class Counsel).

With respect to the discrepancy in the access to Settlement Program Appeals information, Class Counsel understand that individual Claimants (and/or their counsel), as opposed to Class Counsel, would be "initiating" and/or "participating" in the appeals process. However, Class Counsel are frequently called upon to assist individual Claimants with their Settlement Program Appeals, and should be provided with the same access to information as BP.

[21] *See generally,* SETTLEMENT AGREEMENT, SECTIONS 4.3.1, 4.3.2, 4.3.4, 4.3.5, 4.3.10, 4.4.7, 5.12.1, 5.12.1.2, 6.1.2.2.5, 6.4, 6.6, 18.1.

maintaining this independence was to prevent BP from having access to Claim-specific files, data or other information prior to a formal Eligibility Determination.[22]

BP has, in various different ways, and armed with full and unfettered access to confidential Claim-specific pre-Determination information, repeatedly and continuously attempted to exert its influence and control over the Settlement Program, its Vendors, its staff, and the claims administration process.

BP has also repeatedly, and in bad faith, violated its contractual requirements and responsibilities under Section 9.1,[23] Section 16.1,[24] and Section 17.1[25] of the Settlement Agreement – in court filings, in paid advertisements, on its websites, and in corporate statements to the press.

In some of these communications, BP has walked the line – and in the case of Emeril's has clearly crossed the line – in maintaining the confidentiality of Claim-specific information, as required by the Court's Confidentiality Orders.

---

[22] *See* SETTLEMENT AGREEMENT, Section 4.4.14. (*See also, e.g.,* Sections 6.1.2.1.1 and 6.8.)

[23] "Communications by or on behalf of the Parties and their respective Counsel regarding this Agreement with the public and media shall be made in good faith, shall be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of the Settlement, and the information contained in such communications shall be consistent with the content of the Notice approved by the Court." SETTLEMENT AGREEMENT, Section 9.1.

[24] "The Parties agree to take all actions necessary to obtain final approval of this Agreement and entry of a Final Order and Judgment, including the terms and provisions described in this Agreement…." SETTLEMENT AGREEMENT, Section 16.1.

[25] "The Parties agree to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack. Neither the Parties nor their Counsel, directly or indirectly, will encourage any person to object to the Economic and Property Damages Settlement." SETTLEMENT AGREEMENT, Section 17.1

BP is an oil company.[26]  It's not a professional claims administrator, information technology consultant, or law enforcement agency.  Mr. Juneau and his staff, the Freeh Group and its staff, IBM, HUB, McGladrey, CliftonAllenLarson, PriceWaterhouse, Postlewaite & Netterville, BrownGreer and Garden City do not need assistance from BP with the proper and efficient evaluation and determination of claims.

But even to the extent that BP's insights or suggestions could arguably be helpful to the process, any such benefit would, in Class Counsel's view, be clearly outweighed by the appearance of undue influence – and, in any event, is contrary to what was negotiated and expressly agreed to by the Parties, and ordered by the Court.

---

[26] BP is also, of course, the Responsible Party and primary Defendant in this litigation, which hardly comes to this process with clean hands, having plead guilty to 11 felony counts of seaman manslaughter (18 U.S.C. §1115), one felony count of lying to Congress (18 U.S.C. §1505), criminal violations of the Clean Water Act (33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3)), criminal violation of the Migratory Bird Treaty Act (16 U.S.C. §§ 703 & 707(a)), and one count of lying to its stockholders and the SEC (15 U.S.C. §78m). In addition, a BP Engineer was recently convicted by a jury of obstruction of justice for post-spill destruction of evidence.  Indeed, BP was on probation for previous felony convictions at the time the Macondo disaster occurred.

# Exhibits

1. Herman E-Mail to Reitano (Feb. 12, 2013)

2. Herman E-Mail to Cantor (Feb. 13, 2013)

3. Letter from BP Counsel Dan Cantor (March 11, 2013)

4. Herman E-Mail to Reitano (March 13, 2013)

5. Class Counsel Memo to Claims Administrator (March 22, 2013)

6. Herman E-Mail to Reade (Oct. 18, 2013)
    with Beta Version of Fraud Metrics

7. Herman E-Mail to Juneau (Oct. 24, 2013)

8. Letter from BP Counsel Dan Cantor (Nov. 9, 2013)

9. Herman E-Mail to Cantor (Nov. 11, 2013)

10. Agenda Items for Brown Greer Weekly Calls

11. IBM Report (Feb. 2014)

## Conclusion

For the above and foregoing reasons, Plaintiffs respectfully request the Court to enforce the terms of the Settlement Agreement and its own Court Orders, and to eliminate BP's access to confidential Claim-specific data, files and other information prior to a formal Eligibility Determination.

This 22nd day of February, 2014.


Respectfully submitted,


| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |


## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that the above and foregoing Memorandum will be served on BP Counsel via E-Mail this 22nd day of February, 2014.

/s/ James Parkerson Roy and Stephen J. Herman