UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | * | |
| GULF OF MEXICO, on | * | SECTION J |
| APRIL 20, 2010 | * | |
| | * | JUDGE BARBIER |
| **THIS PLEADING APPLIES TO:** | * | MAG. JUDGE SHUSHAN |
| No. 12-311 | * | |
| | * | **JURY TRIAL DEMANDED** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF CAMERON INTERNATIONAL CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS CLAIMS
<u>FOR BREACH OF CONTRACT, INDEMNITY, AND DEFENSE EXPENSES</u>**

1152473v1

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

I.      THE LIBERTY INSURANCE POLICY ....................................................................3

II.     THE BP/TRANSOCEAN/CAMERON LITIGATION ...............................................5

III.    LIBERTY REFUSES TO PAY CAMERON'S CLAIM .............................................6

ARGUMENT ..........................................................................................................................7

I.      LIBERTY'S "OTHER INSURANCE" DEFENSE SHOULD BE REJECTED AS
        A MATTER OF LAW. ...............................................................................................8

        A.      Cameron Did Not Have Any "Other Insurance" That "Applies" To
                Cameron's Loss When It Settled With BP. .....................................................8

                1.      The Court Has Held That Cameron's Interpretation Favoring
                        Coverage Is Reasonable And That Interpretation Must Be
                        Accepted Under Texas Law. ................................................................8

                2.      Discovery Has Conclusively Established That Liberty Was Not
                        Entitled To Deny Cameron Insurance When Transocean Refused
                        To Indemnify Cameron. .....................................................................11

        B.      "Other Insurance" Does Not Include Non-Insurance Contractual
                Indemnities Such As The Purported Transocean Indemnity. .............................14

II.     LIBERTY'S IMPAIRMENT-OF-SUBROGATION DEFENSE SHOULD BE
        REJECTED AS A MATTER OF LAW ....................................................................16

        A.      Liberty Does Not Have Any Subrogation Rights Because It Wrongfully
                Denied Insurance To Cameron. ......................................................................17

        B.      Cameron and BP Expressly Preserved In The BP-Cameron Settlement
                Any Subrogation Rights That Liberty Might Have Had. ....................................19

III.    THE LIBERTY POLICY COVERS CAMERON'S MDL DEFENSE EXPENSES ........21

CONCLUSION......................................................................................................................23

1152473v1

## INTRODUCTION

This case is about Liberty's refusal to honor its insurance obligations and pay the losses that Cameron suffered as a result of the Macondo Well blowout.

On December 15, 2011, Cameron incurred a loss under its insurance policies when, with the Court's assistance, it settled a multi-billion-dollar claim by BP and others for $250 million (the "BP-Cameron Settlement").  All of Cameron's insurers resolved Cameron's insurance claim, but not Liberty.  Instead, Liberty offered two excuses for its refusal to pay. There is no genuine dispute as to any material fact as to either.  Accordingly, Cameron should be granted summary judgment on its Breach of Contract, Indemnity, and Defense Expenses claims.

*First*, Liberty claims that Cameron had "other insurance"—in the form of a disputed contractual indemnity from Transocean—that Liberty says Cameron had to exhaust before Liberty's coverage obligations were triggered.  This argument fails as a matter of law. After thorough briefing and oral argument, this Court denied Liberty's motion for judgment on the pleadings, holding that Liberty's "Other Insurance" clause is susceptible to "two reasonable interpretations"—one of which affords coverage to Cameron because "Transocean's refusal to provide indemnity would mean that there is no 'other insurance' that 'applies' to Cameron's loss." (Order & Reasons at 20, Aug. 16, 2012, Dkt. 7129.)  A straightforward application of established Texas law required, and still requires, the Court to adopt Cameron's interpretation as a matter of law.  *See, e.g.*, *id.* ("Given these alternatives, the Court adopts [Cameron's interpretation], favoring coverage, for purposes of deciding this motion."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("[I]f a contract of insurance is susceptible of more than one reasonable interpretation, [a court] must resolve the uncertainty by adopting the construction that most favors the insured.").

Discovery has not altered the Court's conclusion that Cameron's interpretation is reasonable.  Quite the contrary.  Discovery has confirmed that Liberty's interpretation is unreasonable and was never intended by Liberty or Cameron.  Liberty's underwriters candidly testified, among other things, that when Liberty sold Cameron the policy they expected Liberty to pay claims where, as here, a potential indemnitor like Transocean denied responsibility.  Discovery also has demonstrated that "other insurance" as used in Liberty's policy does not include non-insurance contractual indemnities such as the Transocean indemnity.

*Second*, Liberty asserts that Cameron breached the policy by allegedly extinguishing Liberty's subrogation rights in its settlement with BP.  Liberty, however, had already lost those rights as a matter of law through its own wrongful denial of liability for any settlement with BP.  Before the settlement was reached, based on its "Other Insurance" argument, Liberty told Cameron in no uncertain terms that it would not pay, no matter what.  Under Texas law, Liberty was not entitled to refuse to pay Cameron's claim for the BP-Cameron Settlement while, at the same time, requiring Cameron to protect Liberty's rights in that settlement.  Once Liberty denied liability, it had no rights under the policy and Cameron was entitled to resolve its potentially devastating litigation with BP without regard to Liberty's purported subrogation rights.

Liberty's argument fails for another independent reason:  In their settlement agreement, Cameron and BP expressly preserved any subrogation rights Liberty might have had.  The plain language of the agreement states that Cameron did not release Liberty's rights to subrogation against BP, Transocean, or any other parties.  Nonetheless, Liberty asks the Court to ignore clear provisions in the settlement expressly preserving Liberty's rights, provisions that were added specifically to preclude the very argument Liberty is making now.  No basis exists to

do so, especially because the only parties to the settlement (BP and Cameron) have confirmed that Liberty's subrogation rights were preserved.

Cameron also moves for summary judgment on its claim that Liberty was required to pay Cameron's expenses defending the Macondo litigation.  The undisputed facts have established that Cameron's defense expenses are covered by the first underlying policy that Liberty expressly incorporated into its policy terms.  Because Liberty's excess policy disavows only its duty to defend, but not its obligation to indemnify defense expenses, Liberty must pay those expenses—as confirmed in discovery by Liberty's own witnesses.

## STATEMENT OF FACTS

## I.     THE LIBERTY INSURANCE POLICY

Cameron purchased excess casualty insurance from Liberty for the period from July 1, 2009 to July 1, 2010 (the "Liberty Policy" or "Policy").  (Liberty Policy Decl. Item 2 (Ex. 2); Cameron's Statement of Undisputed Material Facts ("SOF") ¶ 1.)[1]  Under the Policy, Liberty agreed to provide $50 million in coverage if Cameron suffered a "loss" in excess of $103 million.  (Liberty Policy Art. I, Decl. Items 4-5; SOF ¶ 6.)  If Cameron incurred such a loss, Liberty promised to "promptly pay on [Cameron's] behalf the amount of 'loss' covered under this policy."  (Liberty Policy Art. V(H); SOF ¶ 6.)

The Liberty Policy was drafted by Liberty using its standard terms and conditions, as set forth on Liberty Form 0101-XS (Ed. 03-00).  (Morris Dep. at 38 (Ex. 3); Mandel Dep. at 40-42 (Ex. 4); Form 0101-XS (Ed. 03-00) (Ex. 5); SOF ¶ 5.)  Liberty did not negotiate those terms and conditions, and did not do so with Cameron.  (Mandel Dep. at 45-47 (Ex. 4) (testifying

---

[1]     All exhibits cited as "Ex. __" refer to exhibits attached hereto.  For the Court's convenience, attached as Exhibit 1 is an index of exhibits.

that Liberty "never" agreed to modify the terms of its excess liability policy and "never" did so with Cameron); Morris Dep. at 54 (Ex. 3) ("[T]his is the form that everybody gets."); SOF ¶ 5.)

The Liberty Policy was one layer in a "tower" of excess casualty insurance. (Insurance Tower Diagram (Ex. 6); SOF ¶ 4.)   The Policy expressly applied "excess of the Underlying Insurance," which included only the policies issued by Illinois National Insurance Co. ("INIC"), ACE American Insurance Co., and XL Insurance Company Ltd.  (Liberty Policy Art. I, Decl. Items 4-5 (Ex. 2); Insurance Tower Diagram (Ex. 6); SOF ¶ 4.)

Liberty charged Cameron a premium of $210,000, or $4,200 per million dollars, for its layer of coverage.  (Liberty Policy Decl. Items 3, 5 (Ex. 2); SOF ¶ 2.)  Had Liberty's attachment point been higher, moving Liberty further away from the risk of paying a claim, Liberty's premium would have been lower.  (Mandel Dep. at 116 (Ex. 4).)

The Liberty Policy contained an "Other Insurance" clause.  That provision states: "If other insurance applies to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance."  (Liberty Policy Art. V(F) (Ex 2).)  "Other insurance" under this clause "includes any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities."  (*Id.*)  However, when Liberty sold the policy, its underwriter understood that, if the source of potential indemnity refused to pay Cameron's loss, it would be Liberty's responsibility to pay.  (Mandel Dep. at 104 (Ex. 4) ("Q: And if [the indemnitor] didn't pay that loss, then it would be Liberty's responsibility, because it issued an insurance policy, to pay that loss, correct?  A: Correct.").)  The "Other Insurance" clause was "never" intended by Liberty to leave Cameron without coverage for its losses.  (*Id.* at 31.)

The Liberty Policy is a "follow form" policy that is subject to the same "terms and conditions" as the underlying INIC Policy unless they are expressly altered by the Liberty Policy.

(Liberty Policy Art. I (Ex. 2); SOF ¶ 34.)  The INIC Policy states that "Defense Expenses will be in addition to the applicable Limits of Insurance of this policy."  (INIC Policy End. 29 ¶ 2 § IV(H) (Ex. 9); SOF ¶ 35.)   Nothing in the Liberty Policy derogates from this express contractual commitment.  (*See* Liberty Policy (Ex. 2); SOF ¶ 36.)

## II.      THE BP/TRANSOCEAN/CAMERON LITIGATION

On April 20, 2010, a blowout of the Macondo Well occurred, causing a catastrophic explosion and fire aboard the DEEPWATER HORIZON.  (SOF ¶ 7.)  These events gave rise to hundreds of lawsuits, naming Cameron, Transocean, BP and others as defendants and third-party defendants.  (*Id.*)  BP also sued Cameron, seeking to hold Cameron responsible because it had supplied the blowout preventer used on the DEEPWATER HORIZON.  (BP's Third-Party Compl. Against Cameron, Apr. 20, 2011, Dkt. 2065.)

Following the Macondo Well blowout, Cameron sought indemnity from Transocean under their contractual agreements.  (SOF ¶ 9.)  Those agreements contained an indemnification provision pursuant to which, "if Transocean is entitled to indemnity under any contract with its customers" for pollution liability, Transocean would provide Cameron "with the benefit of such indemnity to the fullest extent possible."  (MSA Am. No. 1 ¶ 15 at LIU07210 (Ex. 10); *see* Purchase Order ¶ 18 at LIU12017 (Ex. 11.)

Although Transocean honored other indemnity obligations, it denied that it had any obligation to Cameron for pollution liability.  (SOF ¶¶ 10-16)  Far from agreeing to indemnify Cameron, Transocean sued Cameron for damages, and both Transocean and BP opposed Cameron's attempts to obtain indemnity.  (Liberty's Resps. to Req. for Admis. Nos. 15-16, Apr. 8, 2013 (Ex. 12); Transocean's Opp'n to Cameron's Mot. for Summ. J., Nov. 30, 2011, Dkt. 4778; BP's Opp'n to Cameron's Mot. for Summ. J., Dec. 7, 2011, Dkt. 4828; SOF ¶ 11.)

### III.   LIBERTY REFUSES TO PAY CAMERON'S CLAIM

After vigorously defending the Oil Spill MDL for over a year, with billions of dollars at stake, Cameron determined that settlement was its best option.  Starting in October 2011, Cameron engaged in settlement discussions with BP.  (SOF ¶ 12.)  Cameron kept all of its insurers, including Liberty, apprised of the progress of negotiations and sought their input.  (*See* Nusum Dep. at 18 (Ex. 13); Sledge Dep. at 78-79 (Ex. 14); Lee Dep. at 171-72 (Ex. 15).)

On November 7, 2011, some eighteen months after Cameron first gave Liberty notice of its claim, Liberty told Cameron that it would not pay anything in connection with any settlement with BP.  (Nov. 7, 2011 letter from P. Koepff (Ex. 16); SOF ¶ 17.)  Citing its "Other Insurance" clause, Liberty denied that it had any obligation to Cameron "until a court determines that Cameron is not entitled to contractual indemnity."  (*Id.*)  Liberty took this position even though it knew that Transocean had denied any obligation to indemnify Cameron for pollution liability.  (Liberty's Resp. to Req. for Admis. No. 15, Apr. 8, 2013 (Ex. 12).)

On December 12, 2011, with the assistance of Magistrate Judge Shushan, Cameron reached a tentative agreement with BP to settle the case for $250 million.  (Dec. 12, 2011 email from M. Auslander (Ex. 17); SOF ¶ 18.)  Shortly thereafter, Cameron secured the approval of all of its insurers, except Liberty.  Although Liberty did not object to the reasonableness of the $250 million payment, and expressly waived its rights under the consent provisions of the Liberty Policy, it refused to pay.  (Dec. 14, 2011 letter from P. Koepff (Ex. 18); SOF ¶ 20, 21.)  Instead, Liberty repeated that "it would not offer any amounts under its policies [sic] because of the other insurance provision."  (Dec. 13, 2011 letter from P. Koepff (Ex. 19); *see also* Engel Dep. at 221-22 (Ex. 20).)

1152473v1

Even without Liberty's support, Cameron was able to move forward with the settlement based on all the other insurers' agreement to pay and waive their subrogation rights. However, because of Liberty's aggressive behavior, Cameron decided it would be prudent to negotiate a specific provision to preserve Liberty's rights, if any, which it did.  (BP-Cameron Settlement ¶ 4.4 (Ex. 21) ("Notwithstanding any other provision of this Agreement, . . . Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc.").)

On December 15, 2011, shortly before midnight, BP and Cameron signed the Settlement Agreement and agreed to pay $250 million to BP.  (*See* BP-Cameron Settlement (Ex. 21); SOF ¶ 23.)  Because Transocean had rejected Cameron's requests for pollution indemnity and challenged them in court, Cameron had no indemnity from Transocean at that time.  (SOF ¶ 13.)  Other than its own resources, Cameron could only resort to the tower of insurance, including the Liberty Policy, to pay its $250 million loss.  Liberty, however, did not pay.

## ARGUMENT

Under Texas law, insurance policies are contracts to be interpreted "according to settled rules of construction."  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008).  The "primary concern" in construing an insurance policy is to "effectuate the parties' intent as expressed."  *Don't Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 30 (Tex. 2008).  This requires the Court to read all parts of the contract together and to strive "to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative."  *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998).  Where the policy's terms are unambiguous, the terms are enforced according to their plain meaning.  *See Travelers Lloyds Ins. Co. v. Pac. Emp'rs Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010).  "However, if an ambiguity exists—*i.e.*, if the term is susceptible to two or more reasonable interpretations—

1152473v1

the term is interpreted in favor of coverage."   (Order & Reasons at 20, Aug. 16, 2012, Dkt. 7129.)  *See also Hudson Energy*, 811 S.W.2d at 555.

Applying these well-settled principles, Cameron is entitled to summary judgment on its claims for Breach of Contract, Indemnity, and Defense Expenses.

## I.  LIBERTY'S "OTHER INSURANCE" DEFENSE SHOULD BE REJECTED AS A MATTER OF LAW.

There is no dispute that Transocean denied owing any contractual indemnity to Cameron for pollution liability.  (Liberty's Resps. to Req. for Admis. Nos. 15-16, Apr. 8, 2013 (Ex. 12); Liberty's Answer & Affirmative Defenses ¶ 32, Mar. 29, 2012, Dkt. 6147; Transocean's Opp'n to Cameron's Mot. for Summ. J., Nov. 30, 2011, Dkt. 4778.)  When Cameron settled with BP, therefore, no money at all was coming from Transocean to pay Cameron's loss.

Nevertheless, Liberty maintains that coverage under the Liberty Policy is "excess" of "Cameron's indemnification rights against Transocean" pursuant to Liberty's "Other Insurance" clause.  (Liberty Supp. Interrog. Resp. No. 3, Feb. 25, 2013 (Ex. 22).)  But Liberty cannot establish, as it must to evade liability, that Cameron had "other insurance" that "applies" to its loss.  (Order & Reasons at 19, Aug. 16, 2012, Dkt. 7129 (holding that Liberty bears the burden of proof).)  Cameron had no "other insurance" at all—it had a *claim* for contractual indemnity that Transocean had refused to honor and was contesting in court.  Accordingly, as a matter of law, Cameron's "Other Insurance" defense must be rejected.

### A.  Cameron Did Not Have Any "Other Insurance" That "Applies" To Cameron's Loss When It Settled With BP.

#### 1.  The Court Has Held That Cameron's Interpretation Favoring Coverage Is Reasonable And That Interpretation Must Be Accepted Under Texas Law.

This is not the first time the parties have asked the Court to interpret Liberty's "Other Insurance" clause.  Shortly after this case was filed, Liberty filed a motion for judgment

on the pleadings, arguing that the Liberty Policy's "Other Insurance" provision should be construed to mean that the Liberty Policy has not attached in light of Cameron's claim for potential contractual indemnification against Transocean.

In a 30-page opinion, the Court denied Liberty's motion. (Order & Reasons, Aug. 16, 2012, Dkt. 7129.) In that decision, the Court carefully analyzed Liberty's "Other Insurance" clause, which states: "If other insurance applies to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance." (Liberty Policy Art. V(F) (Ex. 2).) Because the "operative words" are "if" and "applies," the Court stated that "[t]he Liberty Policy is excess of the Transocean indemnity only *if* the Transocean indemnity *applies* to the loss." (Order & Reasons at 19, Aug. 16, 2012, Dkt. 7129 (emphasis in original).) The Liberty Policy, however, does not define "applies" and, thus, the Court sought to determine its meaning. (*Id.*)

After reviewing the relevant contract law principles, the Court held:

> There are two reasonable interpretations that could be given to "applies." It could mean that Liberty's coverage is excess of any "other insurance" that might *potentially* apply to Cameron's loss, despite the fact that (1) Transocean has denied that it owes Cameron indemnification and (2) the validity/scope of the indemnity clauses in the Cameron-Transocean Contracts has never been judicially determined. However, "applies" could also mean that Liberty's coverage attaches unless "other insurance" *actually and presently* applies. Under this interpretation, Transocean's refusal to provide indemnity would mean that there is no "other insurance" that "applies" to Cameron's loss.

(*Id.* at 20 (emphasis in original).)

This holding is dispositive. As the Court stated in its previous ruling, under long-settled Texas law, "if a contract of insurance is susceptible of more than one reasonable interpretation, [a court] must resolve the uncertainty by adopting the construction that most

- 9 -

favors the insured." *Hudson Energy*, 811 S.W.2d at 555.[2]  (*See also* Order & Reasons at 20, Aug. 16, 2012, Dkt. 7129.)  This fundamental doctrine applies with special force where, as in this case, an insurer seeks to use a policy provision to exclude or limit coverage.  *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987) (courts "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent").[3]

Here, the Court has held that the word "applies" is susceptible to "two reasonable interpretations"—one that results in coverage for Cameron, one that does not.  (Order & Reasons at 20, Aug. 16, 2012, Dkt. 7129.)   A straightforward application of established Texas law requires the Court to adopt Cameron's interpretation, under which "Transocean's refusal to provide indemnity would mean that there is no 'other insurance' that 'applies' to Cameron's loss." (*Id.*)  *See, e.g.*, *Hudson Energy*, 811 S.W.2d at 555; *Barnett*, 723 S.W.2d at 666-67.  Liberty's "Other Insurance" argument must therefore be rejected as a matter of law.

This result also makes sense.  Policyholders purchase insurance to receive payment for losses covered by the policy.  Where no payment is forthcoming from any other source, the insured should receive the insurance for which it paid.  Policyholders do not bear the risk that they will be left without any insurance just because the source of "other insurance" has refused to (or cannot) pay.  *See* 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 219:1 (3d ed. 2005 & Supp. 2013) (Ex. 23) ("'Other insurance' clauses govern the relationship

---

[2]   *See, e.g.*, *Evanston Ins. Co. v. Legacy of Life Inc.*, 370 S.W.3d 377, 380 (Tex. 2012); *Progressive Cty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003); *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997).

[3]   *See, e.g.*, *Houston Exploration v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 472 (Tex. Aug. 26, 2011); *Hudson Energy*, 811 S.W.2d at 555; *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001).

1152473v1

between insurers[;] they do not affect the right of the insured to recover under each concurrent policy.").  Indeed, the Texas Supreme Court has recognized that it would be "unconscionable" for insureds like Cameron to have less coverage as a result of an "other insurance" provision than if they "had been protected by only one of the policies."  *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 586 (Tex. 1969); *see also Rhone-Poulenc, Inc. v. Int'l Ins. Co.*, No. 94-C-3303, 1996 WL 328011, at *13 (N.D. Ill. June 11, 1996) ("[T]he only reasonable construction of [the 'other insurance' clause] is that it may be applied by [the insurer] as a shield against [the insured's] claim, but only if other carriers have acknowledged coverage" (emphasis added)).  That is exactly what Liberty seeks to do here.  Its "unconscionable" position should be rejected as a matter of law.

> **2.      Discovery Has Conclusively Established That Liberty Was Not Entitled To Deny Cameron Insurance When Transocean Refused To Indemnify Cameron.**

In the preceding section, Cameron demonstrated that Liberty's "Other Insurance" clause must be construed in favor of coverage under Texas law.  There is thus no need for the Court to consider extrinsic evidence of intent.  However, even if the Court were to consider intent, discovery in this case, including admissions of Liberty's underwriters, has conclusively established that no genuine dispute exists that Liberty's "Other Insurance" provision is inapplicable under the circumstances of this case.

As an initial matter, this is the first time that Liberty has taken the position that "other insurance" existed where "the party that supposedly owes the indemnity has denied payment to the insured."  (Engel Dep. at 160-61 (Ex. 20).)  This, despite the fact that Liberty's "Other Insurance" provision has been in all Liberty excess policies in this exact form since "late 1999 or early 2000."  (Liberty Supp. Interrog. Resp. No. 11, Feb. 25, 2013 (Ex. 22); *see also* Morris Dep. at 54 (Ex. 3), Mandel Dep. at 45 (Ex. 4).)

It is therefore unsurprising that no one—not Liberty, not Cameron, not anyone—had any expectation or intent that Liberty could take this unprecedented position when the Liberty Policy was issued.  Alan Mandel, the Liberty underwriter who sold Cameron the Liberty Policy, testified that Liberty understood that "Cameron wished to purchase insurance to cover the risk that might result from a blowout."  (Mandel Dep. at 50 (Ex. 4); *see also id.* at 55, 156-57.)  Mr. Mandel also understood that Cameron sought to obtain indemnity in all customer contracts for that risk.  (*Id.* at 61-62.)  But if those customers refused to honor a contractual indemnity, Liberty understood it was its responsibility to pay Cameron's losses; Cameron was not to be left without coverage.  (*Id.* at 104, 110-11, 174.)  As Mr. Mandel testified:

> Q:  Was it your expectation, when you underwrote [Cameron's] risk, that the third parties with whom Cameron had those contractual indemnities would pay the loss that Cameron incurs?
>
> A:  Yes.
>
> Q:  And if [they] didn't pay that loss, then it would be Liberty's responsibility, because it issued an insurance policy, to pay that loss; correct?
>
> A:  Correct.

(*Id.* at 104; *see also id.* at 110-11, 174.)  Mr. Mandel's testimony as the seller of the Liberty Policy removes any doubt that the Policy was intended to respond where, as here, the indemnitor (Transocean) denied any obligation to pay.

Mr. Mandel's testimony also demonstrates that Liberty's position on Cameron's claim is entirely contrived.  He candidly testified that Cameron's contractual indemnities did not have anything "at all" to do with the "other insurance" provision when Liberty sold the Liberty Policy to Cameron.  (Mandel Dep. at 108-09 (Ex. 4).)  And it was certainly not viewed by Liberty's underwriters as a possible excuse for Liberty to evade liability.  (*See id.* at 31

- 12 -

(testifying that he "never" expected Liberty could use the "other insurance" clause as a basis to decline to pay Cameron); Rogin Dep. at 31, 34 (Ex. 27).)

To the contrary, Mr. Mandel testified that the "Other Insurance" clause was intended to avoid a situation where different insurers would "pay the same claim two times." (Mandel Dep. at 83 (Ex. 4).)  That understanding—unlike the post-hoc interpretation espoused by Liberty after this dispute arose—is completely consistent with industry usage.  *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206 (5th Cir. 1996) (other insurance clauses "avoid an insured's temptation or fraud of over-insuring . . . property or inflicting self-injury").  It is also consistent with how Liberty's own affiliates have handled claims under analogous circumstances where the source of other insurance has refused to pay.  *See* Compl. at 9, *Liberty Int'l Underwriters Canada* v. *Scottsdale Ins. Co.*, Civ. A. No. 1:12-cv-04934 (D.N.J. Aug. 6, 2012) ("As a result of Scottsdale's denial, LIU was <u>forced</u> to front all defense and indemnity payments relating to the underlying action.") (emphasis added) (Ex. 28).

Liberty's position, by contrast, has left an unintended $50 million gap in Cameron's insurance tower.  According to Liberty's Chief Claims Officer, James Engel, the Liberty Policy did not attach at $103 million, and "may not have attached at all," by virtue of its "Other Insurance" interpretation.  (Engel Dep. at 262-63 (Ex. 20); *see also* Morris Dep. at 92-93 (Ex. 3).)  Because Cameron typically seeks to obtain contractual indemnity when it sells blowout preventers—its principal business—Liberty's interpretation effectively renders the Liberty Policy illusory for blowouts—the very risk that Cameron sought to insure.  (*See* Mandel Dep. at 50, 61-62, 156-57 (Ex. 4); Morris Dep. at 92-93 (Ex. 3).)  If Liberty were to have its way, either the "other insurer" (Transocean) would pay, and let Liberty off the hook, or Liberty would not be required to pay because a court might one day conclude following potentially ruinous litigation

- 13 -

that the indemnitor, who Liberty argues is an "other insurer," was obligated to pay.  But Liberty did not sell, and Cameron did not buy (and would not have bought), such "heads I win, tails you lose" insurance.

The premium Liberty charged Cameron further demonstrates that Liberty's coverage was intended to attach after Cameron's claim payout exceeded $103 million, not $103 million plus some inchoate right to recover on an indemnity from Transocean.  According to Liberty's underwriter, he charged a premium consistent with Liberty's place in Cameron's tower.  (*See* Mandel Dep. at 114-15 (Ex. 4).)  Had Liberty's attachment point been higher than $103 million, Liberty would have charged less.  (*Id.* at 116 ("Q: Is there any basis to charge the same $4,200 for higher layers of coverage under Liberty's pricing policies?  A: Probably not.").)

The uncontroverted evidence is that neither party intended the "Other Insurance" clause to permit Liberty to evade its obligation to pay a covered loss when the source of the "other insurance" was not paying.  Liberty's own underwriter—the person who sold Cameron the Liberty Policy—conceded as much.  Given the undisputed facts, Liberty cannot carry its burden to establish its "Other Insurance" defense and Cameron is entitled to summary judgment.  (Order & Reasons at 19, Aug. 16, 2012, Dkt. 2179 (Liberty bears the burden of proof).)

### B.   "Other Insurance" Does Not Include Non-Insurance Contractual Indemnities Such As The Purported Transocean Indemnity.

Liberty's "Other Insurance" interpretation fails as a matter of law for another independent reason:  Transocean's purported contractual indemnity is not "other insurance."

The purported Transocean indemnity is a one-paragraph term in a contract between Cameron and Transocean.  (Purchase Order ¶ 18 (Ex. 11); MSA Am. No. 1 ¶ 15 (Ex. 10).)  It is not "insurance" in any sense of the word.  Nowhere in that one paragraph are any

1152473v1

of the definitions, conditions, exclusions and other terms that are typically found in insurance policies.  Nor is Transocean an "insurer" in the business of insuring risks.

It is well understood in the insurance industry that insurance and contractual indemnity are two different things.  According to one leading textbook, contractual indemnities are considered "non-insurance transfers," distinct from "insurance."  *See* C. LUTHARDT & E. WIENING, PROPERTY AND LIABILITY INSURANCE PRINCIPLES at 10.12 (4th ed. 2005) (Ex. 24).

No matter how expansive the definition of "other *insurance*" in the Liberty Policy, that term simply cannot mean "*non-insurance*" contractual indemnities.  For starters, the Liberty Policy states that "other insurance *includes* any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities." (Liberty Policy Art. V(F) (Ex. 2) (emphasis added).)  The term "includes" cannot expand the definition of "other insurance" to bring within its scope things that are not actually insurance.  *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987) ("Where specific and particular enumerations of persons or things . . . are followed by general words, the general words are not to be construed in their widest meaning or extent but are to be treated as limited and applying only to persons or things of the same kind or class as those expressly mentioned.") (citation omitted).  Rather, it provides a non-exhaustive list of the types of real *insurance* that qualify as "other insurance."

The Liberty employee most knowledgeable about the "Other Insurance" provision, Denise Morris, supports the conclusion that the Transocean indemnity is not "other insurance" within the meaning of the Liberty Policy.  (Liberty Supp. Interrog. Resp. No. 10, Feb. 25, 2013 (Ex. 22).)  She testified that she had never before even heard that Liberty's "Other Insurance" clause includes contractual indemnities.  (Morris Dep. at 56-57 (Ex. 3).)  Ms. Morris

also admitted that "an argument could be made either way" about whether the "definition of 'other insurance' did not include contractual indemnities."  (*Id.* at 57.)

The reasonableness of Cameron's interpretation of the "Other Insurance" provision is further demonstrated by the fact that another insurer in Cameron's excess tower who could have taken Liberty's position disagreed with it.  (*See* Dec. 14, 2011 letter from R. Bryan (Ex. 25).)  AIG Excess's policy incorporated the same terms and conditions, including the "Other Insurance" provision, as the Liberty Policy.  (*See* AIG Excess Policy § VI(J) (Ex. 8).)  AIG Excess, however, "did not read [Liberty's "Other Insurance" clause] as allowing contractual indemnification to serve as other insurance in this context."  (Martin Dep. at 61-62 (Ex. 26).) For that reason, AIG Excess, contrary to its own financial interests, declined to adopt Liberty's "unreasonable" position and instead honored its obligations to fund the BP Settlement.  (*Id.* at 71-72.)  Another of Cameron's insurers, Chubb Atlantic Indemnity Limited, also could have taken the same position as Liberty but did not.  (Chubb Policy Cond. 7 (Ex. 7).)

In short, Liberty's "Other Insurance" provision cannot reasonably be interpreted to bring "non-insurance" contractual indemnities within its scope.  And, even if the definition of "other insurance" were susceptible to two reasonable interpretations, the Court must adopt Cameron's interpretation under Texas law.

## II.   LIBERTY'S IMPAIRMENT-OF-SUBROGATION DEFENSE SHOULD BE REJECTED AS A MATTER OF LAW.

The other reason that Liberty has offered to justify its refusal to pay Cameron's loss is that Cameron supposedly "agreed, in breach of the Policy, to release its indemnity rights against Transocean" in the BP-Cameron Settlement.  (Liberty Supp. Interrog. Resp. No. 3, Feb. 25, 2013 (Ex. 22).)  According to Liberty, this release "impaired Liberty's subrogation rights," excusing its obligation to pay.  (Liberty Supp. Interrog. Resp. No. 3, Feb. 25, 2013 (Ex. 22).)

- 16 -

Liberty is wrong.  Cameron did not impair Liberty's subrogation rights because (i) Liberty lost those rights through its own wrongful denial of insurance to Cameron, and (ii) even if Liberty had any subrogation rights after its wrongful denial, Cameron and BP expressly and unambiguously preserved those rights in the BP-Cameron Settlement.  Indeed, Cameron and BP—the only parties to the agreement—have confirmed this was their agreement.

A.   **Liberty Does Not Have Any Subrogation Rights Because It Wrongfully Denied Insurance To Cameron.**

Liberty relies on the "Transfer of Rights of Recovery" provision that the Liberty Policy incorporates from the INIC Policy.  That provision states:

> If any Insured has rights to recover all or part of any payment *we have made* under this policy, those rights are transferred to us.  The Insured must do nothing after loss to impair these rights and must help us enforce them.

(INIC Policy § VI(O)(1) (emphasis added) (Ex. 9).)  Liberty never acquired subrogation rights under this provision because Liberty refused to pay.  Instead, Liberty consistently denied any liability for the BP-Cameron Settlement based on its "Other Insurance" position.

Liberty's unequivocal denial waived its subrogation rights under Texas law. Starting November 7, 2011, more than a month before Cameron settled with BP, Liberty told Cameron in no uncertain terms that it would not fund any settlement, under any circumstances, because of its "Other Insurance" provision.  (Nov. 7, 2011 letter from P. Koepff (Ex. 16); Roberts Dep. at 163-64 (Ex. 29); Engel Dep. at 204 (Ex. 20); Rogin Dep. at 99 (Ex. 27).)  For the next six weeks, Liberty never wavered from its position that it would "decline[] to offer any amounts under its policy because the LIU policy has the . . . Other Insurance provision."  (Dec. 13, 2011 letter from P. Koepff (Ex. 19); *see also* Engel Dep. at 220 (Ex. 20).)

"The insurer's right to subrogation is waived upon the insurer's unconditional denial of liability."  46A EDWARD K. ESPING, ET AL., TEXAS JUR. 3D *Insurance Contracts and*

- 17 -

*Coverage* § 1076 (Jan. 2014) (Ex. 30).  Indeed, it is well established that, "[w]here an insurer denies liability on a policy, it is estopped from thereafter claiming that it was released when the insured settled with the wrongdoer, or that the insured breached the policy's subrogation provision, by impairing its subrogation rights, or extinguishing its subrogation rights."  *See* 16 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 224.148 (3d ed. 2005 & Supp. 2013) (Ex. 23); *see also id.* § 224.152; *Scottsdale Ins. Co. v. Knox Park Constr. Co.*, 488 F.3d 680, 688 (5th Cir. 2007) ("It is difficult to see why an insurer should be allowed, on the one hand, to deny liability and thus, in the eyes of the insured, breach his contract and, at the same time, on the other hand, be allowed to insist that the insured honor all his contractual commitments.") (internal quotation marks and citation omitted).

This rule accords with well-settled principles of contract law.  Where one party tells the other it is not going to perform, that party's repudiation relieves the other party of any further obligation under the contract.  *See, e.g.*, *Jack v. State*, 694 S.W.2d 391, 398 (Tex. App. 1984) ("It is fundamental that when one party to a contract repudiates or commits a material breach of that contract, the other party is discharged or excused from his obligation.").

Here, Liberty unconditionally denied liability for Cameron's settlement with BP based on its "Other Insurance" clause.  Before the settlement was reached, it told Cameron it would not pay for that reason—no matter what.  Having told its insured "that the insurer is not concerned, and he is to go his way[,]" Liberty no longer was "allowed to insist that the insured honor all his contractual commitments."  *Stephens v. State Farm Mut. Auto. Ins. Co.*, 508 F.2d 1363, 1366 (5th Cir. 1975), *abrogated on other grounds*, *Holyfield v. Members Mut. Ins. Co.*, 572 S.W.2d 672 (Tex. 1978).  Liberty thus forfeited its subrogation rights as a matter of law.

Liberty cannot insist on the preservation of its subrogation rights while, in the same breath, telling Cameron that it will not pay even if those rights were preserved.  It would turn the law on its head and be manifestly unfair if an insurer could avoid the consequences of its unequivocal repudiation simply by continuing to assert the very rights that were waived by that repudiation.  That is particularly true in this case where Cameron was facing a multi-billion-dollar liability if it did not settle with BP.  Liberty should not be allowed to use that circumstance to avoid its contractual obligations.

**B.   Cameron and BP Expressly Preserved In The BP-Cameron Settlement Any Subrogation Rights That Liberty Might Have Had.**

Even though Liberty had waived its subrogation rights, Cameron anticipated that Liberty would still make this an issue.  To eliminate any doubts, Cameron and BP agreed expressly to preserve Liberty's subrogation rights by including the following provisions:

- "[N]otwithstanding any other provision of this Agreement, including paragraphs 4.2 and 4.3, Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc. . . ."  (BP-Cameron Settlement ¶ 4.4 (Ex. 21).)

- Cameron agreed that it would only settle insurance coverage claims for the settlement payment it made to BP (*i.e.*, against Liberty) "if the settlement includes an express waiver of any such Cameron Insurer's rights of contribution, subrogation, indemnity, and rights to bring Claims arising under any other theory of recovery . . . against the BP Released Parties or Third Parties, including Transocean . . . ."  (*Id.* ¶ 4.6 (emphasis added).)[4]

- The defined term "Consenting Cameron Insurers" specifically excludes Liberty from the scope of all releases and covenants not to pursue subrogation claims.  (*Id.* ¶ 2.14 & Ex. A (Ex. 21); *see also id.* ¶¶ 4.1, 4.2, 4.3.)

The BP-Cameron Settlement could not have been any clearer:   Liberty's subrogation rights, including its right to seek recovery from Transocean if it pays Cameron, were preserved.  BP, the only other party to the agreement, interprets it the same way:

---

[4]      In the same provision, Cameron also agreed to use its reasonable best efforts to obtain a judgment that Liberty "waived" its subrogation rights "against the BP Released Parties or Third Parties, including Transocean." (*Id.*)

> [T]he plain language of the BP-Cameron Settlement states that **Cameron has not released Liberty's rights to subrogate and assert the same claims that Cameron could have asserted itself against BP, Transocean, and any other parties before entering into the BP-Cameron Settlement.  Those subrogation rights were not extinguished or impaired under the BP-Cameron Settlement by release, assignment to BP, or otherwise.**  At the same time, the BP-Cameron Settlement protects BP against subrogation claims from Liberty by placing conditions on Cameron's pursuit of insurance against Liberty and requiring Cameron to indemnify BP and pay its defense costs if Liberty sues BP or third parties, including Transocean, who then seek recovery from BP.

(BP Mot. to Quash 8-9, June 13, 2013, Dkt. 10388 (emphasis added).)  (*See also* Order at 2, July 5, 2013, Dkt. 10642 (granting motion to quash "for the reasons presented by BP" that the settlement agreement is not ambiguous); Order, July 16, 2013, Dkt. 10760 (denying appeal).)

Both BP and Cameron therefore agree that their settlement agreement preserved Liberty's rights.  Liberty, a non-party to the agreement, cannot create ambiguity when the actual parties agree to its meaning.  As the Texas Supreme Court has explained:

> No principle of interpretation of contracts is more firmly established than that great, if not controlling, weight should be given by the court to the interpretation placed upon a contract of uncertain meaning by the parties themselves.  Courts rightfully assume that parties to a contract are in the best position to know what was intended by the language employed.  The court should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary.

*Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979).

This is not altered by paragraph 4.5 of the BP-Cameron Settlement, in which Liberty asserts that Cameron "assigned to BP or released" its indemnification claims against Transocean.  Paragraph 4.4 says quite clearly that, "notwithstanding any other provision of this Agreement" (which obviously includes paragraph 4.5), Cameron was not releasing Liberty's subrogation rights.  Cameron could not have impaired Liberty's subrogation rights *sub silentio* in one provision when there is a specific provision that expressly preserves those rights and

- 20 -

overrides all other provisions of the agreement.  To conclude otherwise would disregard the parties' expressed intent and would run afoul of the "basic principle of contract interpretation" that no terms should be interpreted as "meaningless or superfluous."  *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).

Cameron's approach to preserving Liberty's subrogation rights is well-accepted.  "Since a release may be structured so as to preserve an insurer's rights, the execution of a release in such a situation does not violate the policy, destroy the insurer's right to subrogation, nor constitute a defense to an action on the policy."  COUCH ON INSURANCE § 224:102 (Ex. 23).  Indeed, "the preferable manner for the discharge of the obligation of the insured not to prejudice the subrogation rights of the insurer [is to] include in the release to the third party a provision explicitly reserving the right of the insurer."  *Weinberg v. Transamerica Ins. Co.*, 465 N.E.2d 819, 822 (N.Y. 1984).  That is precisely what Cameron and BP did here.  (*See* BP-Cameron Settlement ¶¶ 4.4, 4.6 (Ex. 21); Eastman Dep. at 105, 135 (Ex. 31).)

In short, BP and Cameron agreed to preserve, and not extinguish, Liberty's subrogation rights.  Liberty, as a stranger to the agreement, has no basis to say otherwise.[5]

## III.    THE LIBERTY POLICY COVERS CAMERON'S MDL DEFENSE EXPENSES

The Liberty Policy provides that "[e]xcept for any definitions, terms, conditions and exclusions of this policy, the coverage provided by this policy is subject to the terms and conditions of the [INIC Underlying Policy]."  (Liberty Policy Art. I (Ex. 2).)  For purposes of

---

[5]    At the hearing on Liberty's motion for judgment on the pleadings, the Court raised the issue of whether it had to decide whether Transocean had indemnification obligations to Cameron.  The Court need not do so on this motion because (i) as shown in Point I.A, it does not matter whether Transocean owed indemnity; it only matters that Transocean was not honoring it; (ii) as shown in Point I.B, the Transocean indemnity was not "other insurance" as the term is used in the Liberty Policy, or the term is at least ambiguous; and (iii) as shown in Point II.A and B., Liberty either waived its subrogation rights or those rights are preserved.

determining whether defense expenses are covered, the Court must therefore look first to the terms of the INIC Policy and then to the terms of the Liberty Policy.

Here, the INIC Policy imposes two separate and independent obligations relating to the payment of Cameron's defense expenses.  First, the INIC Policy imposes "the right and duty to defend any Suit against the Insured that seeks damages . . . covered by this policy . . . ." (INIC Policy, End. 29 ¶ 3 § III(A) (Ex. 9).)  Second, the INIC Policy imposes a duty to pay "Defenses Expenses . . . in addition to the applicable Limits of Insurance of this policy."  (*Id.* End. 29 ¶ 2 § IV(H).)

The Liberty Policy states that Liberty does not have a duty to defend.  (Liberty Policy Art. III (Ex. 2).)  By contrast, nothing in the Liberty Policy alters Liberty's obligation to pay "Defense Expenses."  The Liberty Policy is silent on that subject.  Had Liberty intended to exclude coverage for Defense Expenses afforded by the INIC Policy, it was required to do so "in clear and unambiguous language," *Hudson Energy*, 811 S.W.2d at 555, just as it did for the duty to defend.

This interpretation was confirmed by Liberty's witnesses.  Jessica Rogin, head of Liberty's casualty claims department, admitted that Liberty's defense provisions do not address defense costs.  (Rogin Dep. at 136-38 (Ex. 27).)  Liberty's former head of underwriting, Denise Morris, explained that, if defense costs are outside limits (*i.e.*, in addition to the basic indemnity obligation) and covered by the underlying layer, then they would also be outside limits and covered by the Liberty Policy.  (Morris Dep. at 124 (Ex. 3) ("Q: And under these terms and conditions, if defense costs were outside limits in the underlying layer, you follow form and would cover defense costs once the – your layer was hit?  A: Yes."); *see also id.* at 123 ("But if their defense costs are outside the limit, then so are ours."), *id.* at 132 (same).)  As Mr. Mandel

testified, that is the case here—the INIC Policy covers defense expenses and they are "outside the limit" of insurance.  (Mandel Dep. at 69-70 (Ex. 4).)

At the very least, there are two reasonable interpretations of the INIC Policy and Liberty Policy defense obligation provisions.  Under these circumstances, Texas law requires that Cameron's interpretation be given effect.  *See Hudson Energy*, 811 S.W.2d at 555.

## CONCLUSION

For the reasons discussed above, Cameron's motion for partial summary judgment should be granted in its entirety.

*s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
        pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
        cbertaut@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

WILLKIE FARR & GALLAGHER LLP
Mitchell J. Auslander
Jeffrey B. Korn
787 Seventh Avenue
New York, New York  10019
 (212) 728-8000
mauslander@willkie.com

*Attorneys for Cameron International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff Cameron International Corporation's Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Its Claims for Breach of Contract, Indemnity, and Defense Expenses has been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of March, 2014.

*/s/ Phillip A. Wittmann*

- 23 -