UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 2179 <br> SECTION J |
| | * | |
| **THIS PLEADING APPLIES TO:** <br> No. 12-311 | * * | JUDGE BARBIER <br> MAG. JUDGE SHUSHAN |
| | * | |
| | * | **JURY TRIAL DEMANDED** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF CAMERON INTERNATIONAL CORPORATION'S
STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF
CONTRACT, INDEMNITY, AND DEFENSE EXPENSES**

Plaintiff Cameron International Corporation ("Cameron") respectfully submits this statement of uncontested material facts in support of its motion for partial summary judgment:

1. Cameron purchased an excess casualty insurance policy from Liberty Insurance Underwriters, Inc. ("Liberty") for the policy period from July 1, 2009 through July 1, 2010 ("Liberty Policy" or "Policy"). (*See* Liberty Policy Decl. Item 2 (Ex. 2).)[1]

2. Liberty charged Cameron a premium of $210,000 for the Liberty Policy. (Liberty Policy Decl. Item 3 (Ex. 2).)

3. The Liberty Policy provides $50 million in limits above $100 million in "Underlying Insurance," defined as the First Underlying Insurance Policy with $25 million limits

---

[1] Citations to "Ex. __" are to the exhibits annexed to Cameron's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Claims for Breach of Contract, Indemnity, and Defense Expenses. For the Court's convenience, Exhibit 1 contains an index of exhibits.

issued by Illinois National Insurance Company and Other Underlying Insurance Excess of First Underlying Insurance Policy with $75 million limits issued by "Various Companies." (*See* Liberty Policy Decl. Item 5, Art. I (Ex. 2.)  That "Underlying Insurance," in turn, was excess of a $3 million "fronting policy" for which Cameron was responsible.

4. The Liberty Policy was one layer of a "tower" of ten excess casualty insurance policies purchased by Cameron for the 2009-2010 policy year. (*See* Insurance Tower Diagram (Ex. 6).)  In total, Cameron acquired $500 million in excess casualty coverage. (*Id.*)  The first underlying excess insurance policy in that tower was issued by Illinois National Insurance Company ("INIC Policy"). (*See* INIC Policy (Ex. 9).)

5. Liberty drafted the Liberty Policy using its standard terms and conditions for excess casualty insurance as set forth on Liberty Form 0101-XS (Ed. 03-00). (*See* Morris Dep. at 38 (Ex. 3); Mandel Dep. at 41-42 (Ex. 4); Form 0101-XS (Ed. 03-00) (Ex. 5).)  Liberty did not negotiate those terms and conditions, and did not do so with Cameron. (*See* Morris Dep. at 54 ("[T]his is the form that everybody gets."); Mandel Dep. at 45-47 (testifying that Liberty "never" agrees to modify the terms and conditions and "never" did so with Cameron).)

6. Liberty agreed to provide Cameron $50 million in coverage if Cameron suffered a "loss" in excess of $103 million, the limits of Cameron's underlying insurance. (*See* Liberty Policy Decl., Art. I, Decl. Items 4-5 (Ex. 2).)  Liberty also agreed to "promptly pay on [Cameron's] behalf the amount of 'loss' covered under this policy." (*Id.* Art. V(H).)

7. On April 20, 2010, during the Policy period, a blowout of the Macondo Well occurred, causing an explosion and fire aboard the *Deepwater Horizon*. These events gave rise to

hundreds of lawsuits, naming Cameron, Transocean, BP and others as defendants and third-party defendants. The lawsuits were consolidated in multi-district litigation.

8. On April 23, 2010, Cameron provided notice to Liberty that it incurred potential liability arising from the Macondo Well blowout. (Liberty's Resp. to Req. for Admis. No. 1, Apr. 8, 2013 (Ex. 12).)

9. On August 10, 2010, Cameron requested that Transocean Ltd. and all subsidiaries and affiliates ("Transocean") indemnify Cameron under both "knock-for-knock" and pollution indemnity provisions contained within contracts between Cameron and predecessors to Transocean relating to the sale of the blowout preventer used on the *Deepwater Horizon*.

10. Although Transocean agreed to honor its "knock-for-knock" indemnity agreements, it denied owing any indemnity to Cameron for pollution liabilities.

11. Cameron sued Transocean. Transocean, in turn, sued Cameron for damages arising from its pollution-related liabilities, indemnity and contribution. Transocean and BP both opposed Cameron's attempts to obtain indemnity for pollution liabilities from Transocean. (*See* Answer to Verified Compl. for Exoneration, Claims, Countercls., and Cross-cls. of Cameron Int'l Corp., Apr. 20, 2011, Dkt 412 (Case No. 10-2771); Transocean's Rule 14(c) Third-Party Compl., Feb. 18, 2011, Dkt. No. 1320; Transocean's Rule 13 Cross-cls./Countercls., Apr. 20, 2011, Dkt. 2068.)

12. In October 2011, Cameron began settlement negotiations with BP. (Eastman Dep. at 119 (Ex. 31).)

13. When Cameron began settlement negotiations with BP, and through the time Cameron settled with BP, Cameron was receiving and since has received no money from

- 4 -

Transocean (or BP) for pollution-related liabilities under the indemnity terms of Cameron's contracts with Transocean. (*See* Liberty's Resp. to Req. for Admis. Nos. 15-16, Apr. 8, 2013 (Ex. 12).)

14. BP denies owing any indemnity to Transocean for pollution liabilities. (Transocean Ltd, Form 10-K, filed Feb. 27, 2014, at 116 (Ex. 32).)

15. BP's obligations to Transocean for pollution liability have not been resolved. (Order and Reasons, dated Jan. 26, 2012, at 29 (Dkt. 5446).)

16. To date, BP has, in fact, provided no indemnity to Transocean for pollution liabilities. (Transocean Ltd, Form 10-K, filed Feb. 27, 2014, at 116 (Ex. 32).)

17. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*See* Nov. 7, 2011 letter from P. Koepff (Ex. 16).)

18. On December 12, 2011, with the assistance of Magistrate Judge Shushan as mediator, Cameron and BP reached a tentative settlement of nearly all of Cameron's Macondo-related liability in exchange for a $250 million payment. (*See* Dec. 12, 2011 email from M. Auslander (Ex. 17).)

19. Over the next three days, all of Cameron's insurers except Liberty consented to the proposed settlement.

20. ████████████████████████████████████████████ (*See* Dec. 13, 2011 letter from P. Koepff (Ex. 19); Dec. 14, 2011 letter from P. Koepff (Ex. 18).)

21. ████████████████████████████████████████████████████████████████ (*See* Dec. 14, 2011 letter from P. Koepff (Ex. 18).)

1152480v1

- 5 -

22. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ (*See* Dec. 13, 2011 letter from P. Koepff (Ex. 19); *see also* Dec. 14, 2011 letter from P. Koepff (Ex. 18).)

23. On December 15, 2011, Cameron entered into the Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify with BP Exploration & Production, Inc. and BP Corporation North America Inc ("BP-Cameron Settlement"). (Ex. 21.)

24. BP and Cameron agreed in the BP-Cameron Settlement that "[n]otwithstanding any other provision of this Agreement, . . . Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc." (*See* BP-Cameron Settlement ¶ 4.4 (Ex. 21).) BP and Cameron also agreed that Cameron would be required, through settlement or judgment, to obtain in any litigation with Liberty a waiver of Liberty's subrogation rights "against the BP Released Parties or Third Parties, including Transocean." (*Id.* ¶ 4.6.) In light of these provisions, on June 13, 2013, BP stated to the Court: "[T]he plain language of the BP-Cameron Settlement states that Cameron has not released Liberty's rights to subrogate and assert the same claims that Cameron could have asserted itself against BP, Transocean, and any other parties before entering into the BP-Cameron Settlement. Those subrogation rights were not extinguished or impaired under the BP-Cameron Settlement by release, assignment to BP, or otherwise." (BP Mot. to Quash 8-9, June 13, 2013, Dkt. 10388; *see also* Eastman Dep. at 105, 140-41 (Ex. 31).)

25. When it issued the Liberty Policy to Cameron, Liberty did not consider the "Other Insurance" provision as a basis to refuse to pay Cameron under the Liberty Policy. (*See* Mandel Dep. at 31 (Ex. 4) ("Q: When you underwrote the policy to Cameron, you didn't

have an expectation that the 'other insurance' clause could be used by Liberty as a basis to decline to pay Cameron any money?  A: Never.").)

26. Liberty did not intend Cameron to be without insurance under the Liberty Policy for losses resulting from blowouts based on its "Other Insurance" provision where the potential source of other insurance had refused to pay and denied liability.  (*See* Mandel Dep. at 104 (Ex. 4) ("Q: And if [third parties with whom Cameron had contractual indemnities] didn't pay that loss, then it would be Liberty's responsibility, because it issued an insurance policy, to pay that loss; correct?  A: Correct."); *see also id.* at 31 (underwriter of the Liberty Policy testifying that he "never" expected Liberty could use the "other insurance" clause as a basis to decline to pay Cameron); *id.* at 108-09 (underwriter of the Liberty Policy testifying that Cameron's contractual indemnities did not have anything "at all" to do with the "other insurance" provision when Liberty sold the Liberty Policy); *id.* at 174 (underwriter of the Liberty Policy testifying that it was his understanding that, if a contractual indemnitor did not pay, Liberty would be responsible under its policy).

27. Liberty's "Other Insurance" clause has been used in all Liberty excess casualty policies in exactly the same form for over a decade before the Liberty Policy was issued.  (Liberty's Supp. Resp. to Interrogs. Nos. 11-12, Feb. 25, 2013 (Ex. 22); Morris Dep. at 38 (Ex. 3).)

28. Liberty is unable to identify any instance where Liberty has denied payment to an insured based on its "Other Insurance" provision.  (*See* Liberty's Supp. Resp. to Interrog. No. 18, Feb. 25, 2013 (Ex. 22).)

29. This is the first time that Liberty has taken the position that "other insurance" existed where "the party that supposedly owes the indemnity has denied payment to the insured." (Engel Dep. at 160-61 (Ex. 20).)

30. The indemnity provisions contained in Cameron's contracts with Transocean are contractual indemnities. (*See* Purchase Order ¶ 18 at LIU12017 (Ex. 11); Master Services Agreement Am. No. 1 ¶ 15 at LIU07210 (Ex. 10).)

31. No other insurer in Cameron's insurance tower objected to the BP-Cameron Settlement based on an "Other Insurance" provision.

32. Policies issued by Chubb Atlantic Indemnity Limited ("Chubb") and AIG Excess Liability Insurance International Limited ("AIG Excess") contained "Restrictive As Underlying Provisions."  (Chubb Policy Cond. 7 (Ex. 7) ("[I]f any **Underlying Policy(ies)** with limits of liability in excess of the underwriter of the **Followed Policy** but underlying to this Policy (the **Intervening Policy(ies)** contains warranties, terms, conditions, exclusions or limitations more restrictive than this Policy or the **Followed Policy**, . . . then this Policy shall be deemed to follow those more restrictive warranties, terms, conditions, exclusions or limitations of the **Intervening Policy(ies).**"); AIG Excess Policy § VI(J) (Ex. 8) (same).)

33. Chubb and AIG Excess agreed to consent and contribute to the BP-Cameron Settlement, and ██████████████████████████████████ (Dec. 14, 2011 letter from R. Bryan (Ex. 25); *see* Nusum Dep. at 27, 34-35 (Ex. 13); Martin Dep. at 46-47 (Ex. 26).)

34. "Except for any definitions, terms, conditions, and exclusions" of the Liberty Policy, the coverage provided by Liberty was "subject to the terms and conditions of the [INIC Policy]." (Liberty Policy Art. I, Decl. Item 5 (Ex. 2).)

35. The INIC policy states that "Defense Expenses will be in addition to the applicable Limits of Insurance of this policy." (INIC Policy End. 29 ¶ 2 § IV(H) (Ex. 9).)

36. The Liberty Policy makes no mention of Defense Expenses. (Liberty Policy (Ex. 2).)

37. Liberty has paid none of Cameron's defense expenses incurred in defending claims in the Oil Spill MDL.

38. All of Cameron's insurers, except for Liberty, resolved Cameron's insurance claim.

39. Cameron paid the $50 million that Liberty refused to contribute toward the BP-Cameron Settlement.

                                                Respectfully submitted,

Dated:  March 3, 2014        */s/ Phillip A. Wittmann*
                                          Phillip A. Wittmann, 13625
                                              pwittmann@stonepigman.com
                                          Carmelite M. Bertaut, 3054
                                              cbertaut@stonepigman.com

                                          STONE PIGMAN WALTHER WITTMANN L.L.C.
                                          546 Carondelet Street
                                          New Orleans, Louisiana  70130
                                          504-581-3200
                                          504-581-3361 (fax)

                                          WILLKIE FARR & GALLAGHER LLP
                                          Mitchell J. Auslander
                                          Jeffrey B. Korn
                                          787 Seventh Avenue
                                          New York, New York  10019
                                          (212) 728-8000
                                          (212) 728-8111

                                          *Attorneys for Cameron International Corporation*

1152480v1

- 9 -

**CERTIFICATE OF SERVICE**

        I hereby certify that the above and foregoing Plaintiff Cameron International Corporation's Statement of Uncontested Material Facts in Support of its Motion for Partial Summary Judgment on its Claim for Breach of Contract, Indemnity, and Defense Expenses been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of March, 2014.

                                                            */s/ Phillip A. Wittmann*