Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4

 5
    In Re:  OIL SPILL BY THE OIL RIG
 6  "DEEPWATER HORIZON" IN THE GULF
    OF MEXICO, ON APRIL 20th, 2010        MDL NO. 2179
 7

 8
    Applies to:
 9  12-311, Cameron Int'l Corp. v.
    Liberty Ins. Underwriters, Inc.,
10  a/k/a Liberty Int'l Underwriters

11  _____

12
            VIDEOTAPED DEPOSITION OF DENISE MORRIS
13               SAN FRANCISCO, California
                   Thursday, June 20, 2013
14

15

16

17

18

19

20

21

22

23  Reported by:

24  LESLIE ROCKWOOD, RPR, CSR 3462

25  Job No. 62770
```

EXHIBIT 3

Page 38

```
 1   policy, there is also a clause F labeled "Other
 2   Insurance."
 3           Do you see that?
 4       A.  Yes.
 5       Q.  Is it fair to say that the Liberty policy that
 6   was issued to Cameron included verbatim the other
 7   insurance provision that was part of Liberty's standard
 8   terms and conditions?
 9       A.  Yes.
10       Q.  I have a few questions about Engel Exhibit 7,
11   which are the -- which is the form --
12       A.  Okay.
13       Q.  -- of the Liberty -- of the excess liability
14   policy.
15           Who drafted Engel Exhibit 7?
16       A.  I have no clue.
17       Q.  Do you know when it would have been drafted?
18       A.  Well, we came -- this -- the entire policy, no,
19   I don't know.  We began, the company, in -- I think it
20   was May of 1999 using this policy form.
21       Q.  So is it the case that at all times since the
22   inception of Liberty Insurance Underwriters, Liberty has
23   used Engel Exhibit 7 as its standard terms and
24   conditions?
25       A.  Yes.
```

Page 52

1          MR. KORN:  I'll -- I'll restate that.
2     Q.   Can you give me an example of how Liberty would
3  typically use the other insurance provision?
4     A.   Well, when you're underwriting an account, if
5  there's somebody else that -- you know, for instance, if
6  you had a property owner and you want to make sure that
7  they're requesting additional insured status and
8  limits -- you know, certain underlying limits for
9  somebody leasing their premises, because if there was
10 something -- an exposure that arose due to the tenant's
11 liabilities, then you would want to make sure that there
12 was other insurance that would apply first.
13    Q.   And is that the intent of the other insurance
14 provision in the Liberty policy?
15    A.   I think it's the intent in anybody's policy.
16    Q.   Do you think that there's anything unique to --
17 to the other insurance provision that Liberty uses in
18 its policies compared to other insurance provisions used
19 in -- by other insurers?
20    A.   Oh, absolutely.  I, you know, probably have
21 never seen two that read exactly the same way.
22    Q.   So if you could just direct your attention to
23 Exhibit 7, Engle Exhibit 7.  That's the form policy --
24    A.   Yes.
25    Q.   -- that Liberty uses.

1    A.   Okay.
2    Q.   And focus again on page 5, the other insurance
3  provision.  I just want to walk through it with you.
4         The first sentence says, quote, "If other
5  insurance applies to a loss that is also covered by this
6  policy, this policy will apply excess of such other
7  insurance."
8         Do you see that?
9    A.   Yes.
10   Q.   What is the intent of that sentence?
11   A.   Well, that there's -- there's insurance that
12 applies to the loss.  The same -- that's covered by our
13 policy but is also covered by another policy, we intend
14 to sit excess to that insurance.
15   Q.   Is this -- is the term "other insurance" as
16 used in this sentence intended to pick up contractual
17 indemnities, or is it --
18   A.   Well, it --
19   Q.   -- intended --
20   A.   -- does when you look at the definition as
21 other insurance includes.
22   Q.   I -- I understand the reference that you're
23 making to the words.  But I'm wondering that -- as to
24 whether when you, as the underwriter, were underwriting
25 policies for Liberty, did you have contractual

Page 54

1   indemnities in mind when referring to other insurance in
2   this provision, or were you focused on actual other
3   insurance policies issued by other insurers?
4           MR. MARTIN:  Object to the form.
5           THE WITNESS:  I wouldn't say that it's -- it's
6   an active part of the underwriting process.
7   BY MR. KORN:
8       Q.  Why not?
9       A.  It's just so many -- so many different things
10  come into play on the underwriting side that, you know,
11  we -- we're not looking at the policy form and saying,
12  you know, on each and every thing is, "Well, how would
13  this apply to this insured?"  Or "How would this apply
14  to this insured?"
15          Because, again, we don't interpret coverage.
16  You know, this is the form we drafted for use for LIU.
17  And this is the form that everybody gets.
18      Q.  If someone had asked you whether other
19  insurance, as used in this provision, included
20  contractual indemnities before this dispute emerged,
21  would you say that it did, or would you --
22      A.  I wouldn't have answered that question, because
23  I would tell them, "I'm not a claims person."
24      Q.  Do you refer the brokers or insureds to the
25  claims people --

Page 56

```
 1      Q.  Did -- in response to that email, did you have
 2   a conversation with Mr. Engel?
 3      A.  I probably did.  I think I was in New York a
 4   couple weeks after that email, and I -- I talked to Jim
 5   when I was there about, you know, how he was viewing the
 6   clause.
 7      Q.  And do you recall what you told him?
 8      A.  I didn't tell him anything.  I just -- I asked
 9   him about the email to -- to give me, you know, a little
10   more insight onto his decision.
11      Q.  And what did he say?
12      A.  He clarified that he felt that indemnification
13   included any -- any contractual indemnities.
14      Q.  And did you agree with what he said?
15      A.  I didn't disagree with it.  It was his
16   interpretation, and he's the claims person.
17      Q.  Other than listen to his interpretation, did
18   you respond in any way to what he said?
19      A.  No.  Other than I was made aware -- when I had
20   asked Alan Mandel for a copy of his account summary that
21   he had made on it, that Alan had zeroed in on the
22   indemnity agreements in his account summary in his
23   assessment of the risk.
24      Q.  Had you ever -- prior to your conversation with
25   Mr. Engel, had you ever heard of the interpretation he
```

1  espoused from any other claims personnel?
2      A.  No.
3      Q.  Mr. Engel's interpretations provision to
4  include contractual indemnities was the first time you
5  had heard that interpretation; right?
6      A.  Yes.
7      Q.  Have you ever had any conversation with any
8  claims personnel when they took a contrary view?  That
9  is, that the other insurance definition did not include
10  contractual indemnities?
11      A.  No.
12      Q.  Would you have considered such a view to be
13  reasonable?
14      A.  Would I have considered what?
15      Q.  Would you have considered a view that the
16  definition of "other insurance" did not include
17  contractual indemnities to be a reasonable view to hold?
18          MR. MARTIN:  Object to the form.
19          THE WITNESS:  I suppose an argument could be
20  made either way.  But again, I'm not the one that
21  interprets coverage.
22  BY MR. KORN:
23      Q.  Let's go back to the provision itself.
24          Again, the first sentence says, "If other
25  insurance applies to a loss that is also covered by this

Page 92

1  contractual indemnities are indemnifications.
2      Q.  Okay.  So which -- which words in the other
3  insurance provision would cause you to think that it was
4  a question that should have been asked by Cameron or
5  Marsh that it would be Liberty's position that until a
6  Court determines that Cameron is not entitled to
7  indemnity from Transocean, there is other insurance, and
8  there is no coverage from liberty?
9          MR. MARTIN:  Object to the form.
10         THE WITNESS:  I'm -- I'm not the attorney.  I'm
11 not the attorney, and I'm not the claims department,
12 so --
13 BY MR. KORN:
14     Q.  That -- that's -- that's their decision?
15 That's what they're responsible for doing?  And if they
16 take that position, that's their business, not yours?
17     A.  Correct.
18     Q.  When this policy was issued to Cameron, it was
19 part of the tower; correct?
20     A.  Yes, I'm assuming.
21     Q.  Okay.  Is it fair to say that the implication
22 of the claims department's interpretation of the other
23 insurance provision is that for purposes of the
24 Deepwater Horizon incident, there is a $50 million gap
25 in the insurance tower?

Page 93

```
 1              MR. MARTIN:  Object to the form.
 2              THE WITNESS:  I'm -- our -- our claims
 3    department is suggesting that by their stance, yes.
 4    BY MR. KORN:
 5         Q.  Are you aware of any situations where Liberty
 6    invoked its other insurance provision where there was a
 7    dispute with the other insurer?
 8         A.  No.
 9         Q.  Are you aware of any instances in which Liberty
10    ever invoked the other insurance provision to allocate
11    responsibility for paying the insured?
12         A.  Not that I've ever heard of.
13         Q.  On a slightly -- completely different subject,
14    I have another question.
15              Do you have any ongoing -- are you going --
16    withdrawn.
17              Are you going to have any ongoing relationship
18    with LIU after your retirement goes into effect?
19         A.  I have personal relationships, but that's about
20    it.
21         Q.  There's not -- there's not going to be an
22    ongoing consulting arrangement or other --
23         A.  No.
24         Q.  -- professional relationship?
25         A.  I -- no.  I've told them that if they want a
```

1  addition to that $25 million limit.
2  BY MR. KORN:
3     Q.  So let's say defense costs are outside the
4  limits.  Once the indemnity has exhausted that
5  $25 million that you used in your example, do you go up
6  to the next layer, and assuming it follows form, then
7  that layer picks up the defense costs if they're outside
8  the limits until its indemnity is exhausted?
9     A.  When defense is outside of the limit?
10    Q.  Yes.
11    A.  No.  The excess people -- yes.  You would
12 follow form, the defense provision, unless you
13 specifically endorsed it.  But most excess players on
14 a -- on a large loss are going to want to get involved
15 as opposed to having a duty to get involved.  But if
16 their defense costs are outside the limit, then so are
17 ours.
18    Q.  And is that the case in the -- under the
19 standard terms and conditions of the Liberty policy
20 form?
21    A.  What?  Under our excess policy?
22    Q.  Yes.
23    A.  Yes.  We follow form.
24    Q.  So if we go back to Engel Exhibit 7, this is
25 the excess liability standard terms and conditions.

Page 124

1    A.   Yes.
2    Q.   And these -- this is -- these are the terms and
3    conditions that were used in the Cameron policy?
4    A.   Yes.
5    Q.   And under these terms and conditions, if
6    defense costs were outside limits in the underlying
7    layer, you follow form and would cover defense costs
8    once the -- your layer was hit?
9    A.   Yes.
10   Q.   Okay.  You can put that to the side.
11       MR. KORN:  I'm going to mark as Engel
12   Exhibit -- sorry.  Withdrawn.
13       I'm going to mark as Morris Exhibit 46 a
14   document bearing the Bates range LIU 0949 through 0952.
15           (Exhibit 46, Umbrella/Excess Casualty -
16            Premium Worksheet, 7/7/09, LIU 0949 - 52,
17            marked for identification.)
18   BY MR. KORN:
19   Q.   Ms. Morris, please let me know when you've had
20   a chance to review Exhibit 46.
21   A.   Okay.
22   Q.   What is Exhibit 46?
23   A.   It's not something I'm totally familiar with,
24   but it looks like it is a sheet that's given to the
25   assistants that gives them some information that they

```
 1              MR. MARTIN:  Object to the form.
 2              THE WITNESS:  No.  It doesn't say that the
 3     defense costs are under the Liberty form.  No, it
 4     doesn't say that.  It says they're outside the limit on
 5     the Illinois National policy.
 6     BY MR. KORN:
 7         Q.  And the Liberty policy follows form on the
 8     Illinois National policy; right?
 9         A.  It does follow form, but I think it's specific
10     in that it says, "We have the right but not the duty for
11     any claim or defense of any suit which in our opinion
12     may create liability on us for loss under this policy.
13     If we exercise such right to defend it, we'll do so at
14     our own expense."
15         Q.  Okay.  Let me take a step back, then.  Let's
16     assume that Mr. Mandel accurately described the lead
17     umbrella policy as outside -- as having defense costs
18     outside limits.  Are you with me?
19         A.  Yes.
20         Q.  Does that mean that based upon the Liberty
21     policy terms, the standard policy terms that we just
22     looked at, that the defense costs are outside limits for
23     the Liberty policy?
24         A.  If we've determined that it's a loss that is
25     covered by this policy, yes.
```