Page 1

1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF LOUISIANA

4    --------------------------------------X

5    In re: OIL SPILL BY THE OIL RIG

6    "DEEPWATER HORIZON" IN THE

7    GULF OF MEXICO, ON APRIL 20, 2010

8

9    Applies to:

10   12-311, Cameron Int'l Corp. v. Liberty

11   Ins. Underwriters, Inc., a/k/a Liberty

12   Int'l Underwriters
     --------------------------------------X

13

14

15          VIDEOTAPED DEPOSITION OF ALAN MANDEL

16                 New York, New York

17                September 12, 2013

18

19

20

21

22

23

24   Reported by:
     Bonnie Pruszynski, RMR
25   JOB NO. 65662

EXHIBIT

4

1                    A. Mandel

2        Q      And who did you hear that from?

3        A      That was from probably Jeff

4    Roberts.

5        Q      Why would an "other insurance"

6    clause be a basis to decline to pay any money

7    to Cameron?

8        A      I couldn't even tell you.  I'm not

9    familiar with the "other insurance" clause.

10       Q      When you underwrote the policy to

11   Cameron, you didn't have an expectation that

12   the "other insurance" clause could be used by

13   Liberty as a basis to decline to pay Cameron

14   any money?

15       A      Never.

16       Q      How did you prepare for today's

17   deposition?

18       A      I had a phone conversation, I think

19   it was one or two times, with Judy Barrasso,

20   and yesterday I met with Robert.

21       Q      When were your conversations with

22   Ms. Barrasso?

23       A      I couldn't tell you the dates.  You

24   would have to ask Judy.

25       Q      It was a long time ago?

Page 40

1                    A. Mandel

2        Q       Engel Exhibit 7 is a copy of the

3    form policy that Liberty uses when it issues

4    insurance to insureds; correct?

5        A       Correct, sir.   Correct.

6        Q       Do you see in the lower left-hand

7    copy -- withdrawn.

8                Do you see in the lower left-hand

9    corner of each page the document has a

10   notation that says 0101-XS (Ed. 03-00)?

11       A       Yes, I do.

12       Q       Do you know what that means?

13       A       Normally, in an insurance company,

14   that's the endorsement, is the 0101-XS, and

15   normally the -- of any insurance company, the

16   edition date is when it was actually approved

17   and put into use to send to, you know,

18   producers.

19       Q       If you look back to the Liberty

20   policy, which is the previous document I

21   showed you, and you turn to the last four

22   pages, where it has the terms and conditions

23   for the excess liability policy --

24       A       Are you talking about the policy?

25       Q       At the -- the last -- so, if you

1               A. Mandel

2     look in the lower right-hand corner, there is

3     a number that is referred to as a Bates

4     number.  If you go to LIU 01498, please, and

5     let me know when you are there.

6         A     Okay.

7         Q     Am I correct that the terms and

8     conditions of the Liberty excess liability

9     policy also have the same notation in the

10    lower left-hand corner as the standard terms

11    and conditions that are in Engel Exhibit 7

12    that we just looked at?

13        A     Yes.

14        Q     Is it fair to say that when you

15    issued the Liberty policy to Cameron, you

16    used the standard terms and conditions that

17    Liberty uses with all of its insureds?

18        A     It varies by risk, but -- a lot of

19    the standard conditions, yes, are in there.

20        Q     It's a good clarification.  Let me

21    ask it a different way.

22              Is it fair to say that when you

23    issued the Liberty policy to Cameron, you

24    used the standard terms and conditions that

25    Liberty uses with all of its insured to whom

Page 42

1                    A. Mandel

2    it issues excess liability policies?

3        A     Yes, but to an extent.   There could

4    be an additional endorsement on -- depending

5    on the risk or exposure or something.

6        Q     That would be -- those additional

7    endorsements would be in addition to the

8    excess liability policy terms and conditions

9    that are in this four-page document?

10       A     It would be -- it could be an

11   additional endorsement.   Case in point, like

12   professional liability exclusion.

13       Q     Does Liberty use standard

14   endorsement language for each of the insureds

15   when it provides an endorsement?

16       A     I -- I really don't know.

17       Q     Is it fair to say that the four

18   pages that contain the excess liability

19   policy terms and conditions that were issued

20   to Cameron are the same terms and conditions

21   that Liberty uses when it issues excess

22   liability -- its excess liability policy to

23   insureds?

24       A     Yes.

25       Q     When you sold the policy to

Page 44

```
 1                    A. Mandel

 2    see numbers here.

 3        Q      It's faded.  It's the form policy

 4    that is --

 5        A      Oh, ours.  Okay, okay.  I have it

 6    in front of me, okay.

 7               MR. DEES:  No, no.

 8        A      This one.  Okay.

 9        Q      Keep that in front of you, please.

10        A      Okay.

11        Q      Also keep the Liberty policy in

12    front of you as well.

13        A      Okay.

14        Q      We are going to have that, too.

15               Are you familiar with the Liberty

16    policy Form 0101-XS (Ed. 03-00) that is Engel

17    Exhibit 7?

18        A      Is that -- that's this one?

19        Q      Yes.

20        A      Yes.

21        Q      What is it?

22        A      This is -- this is the actual

23    insurance contract, an insuring agreement,

24    how the defense is handled, just like any

25    insurance agreement in casualty, with
```

Page 45

1                    A. Mandel

2     parties, the definitions and conditions.

3         Q       And is this the standard form that

4     Liberty uses?

5         A       Liberty uses this on every excess

6     umbrella, not lead umbrella, first umbrella.

7         Q       So, for every excess umbrella,

8     these are the standard terms and conditions

9     that Liberty uses with all insureds; correct?

10        A       In this contract, yes.

11        Q       Have you ever negotiated the

12    language of any of the provisions in this

13    excess liability policy form with an insured?

14        A       Never.

15        Q       Did you ever agree to change the

16    language contained in Liberty's policy form

17    for excess liability policies with any

18    insured?

19        A       Never.

20        Q       If you could keep that document in

21    front of you, and now look to --

22        A       The Engel document?

23        Q       Yes.

24        A       This one?

25        Q       Yes.

```
 1                    A. Mandel

 2      A     Okay.

 3      Q     Keep that in front of you, and also

 4   turn to the excess liability policy terms of

 5   the Liberty policy that was issued to

 6   Cameron.  That is the last one.

 7      A     On the actual policy, you want.

 8      Q     Yes.

 9      A     Okay, it's right here.

10      Q     Correct.

11            And if you could turn to the terms

12   and conditions that match the standard terms

13   and conditions, which are the last four

14   pages.

15      A     Okay.

16      Q     So, if you could stay on page

17   LIU 01498 with me.

18      A     Okay.

19      Q     And you said just a moment ago that

20   you never negotiated or changed the terms and

21   conditions that are in this policy; right?

22      A     No.

23      Q     No, you never did that?

24      A     I have no authority.  We don't do

25   that.  So, I couldn't -- I can't assist you.
```

1                    A. Mandel

2    I don't do it.

3        Q      Were there any provisions in the

4    Liberty policy that was issued to Cameron

5    where the language was negotiated with

6    Cameron?

7        A      Never.

8        Q      And that's because Liberty required

9    Cameron to accept its standard terms and

10   conditions; correct?

11       A      Well, we made an offer to Cameron,

12   which is the policy that we use.

13       Q      In other words, Liberty required

14   Cameron to accept its standard terms and

15   conditions if it wished to purchase insurance

16   from Liberty?

17       A      Correct.

18       Q      Okay.  You can put that document

19   aside.

20              I'm going to hand you what has been

21   previously marked as Engel Exhibit 4.

22              MR. KORN:  You don't have these

23       memorized?

24              MR. DEES:  Actually, I do.

25              MR. DEES:  It's a much better copy

Page 50

1             A. Mandel

2             Were you the primary employee at

3    Liberty that was responsible for selling to

4    Cameron the Liberty insurance policy?

5         A    Yes, I guess you could say

6    "primary."

7         Q    Did you sell to Cameron an

8    insurance policy that did not provide

9    coverage for blowouts?

10        A    No.

11        Q    You understand that Cameron's

12   business, among other things, was to provide

13   blowout preventers to customers; correct?

14        A    Yes, I did.

15        Q    So, one of its biggest risks that

16   it would face would be a blowout; correct?

17        A    Yes.

18        Q    And you understand and understood

19   at the time that Cameron wished to purchase

20   insurance to cover the risk that might result

21   from a blowout; right?

22        A    Yes.

23        Q    Are you familiar with the Deepwater

24   Horizon disaster?

25        A    Not that close, but -- I'm not a

Page 55

1                    A. Mandel

2   business, so I don't -- you know.

3        Q      Did you play any role in the

4   decision to deny insurance coverage to

5   Cameron?

6        A      I have never had any claim meeting

7   with anybody in LIU under this claim, with

8   the exception when we had -- the claim came

9   in, and I was instructed to make copies of

10  the account summary, the underlying policy,

11  and the -- the binder.  The account summary,

12  the policy, and the underlying policy, the

13  three documents, that's all I was instructed

14  to do, and then that was it.

15       Q      Did you agree with the decision of

16  Liberty to deny coverage to Cameron?

17       A      I can't make an assumption or an

18  opinion, because I am not a claim person.  I

19  don't have the background to do that.

20       Q      But you would agree that the

21  Deepwater Horizon blowout is the type of

22  incident that you would have assumed would be

23  covered by the Liberty policy that you sold

24  to Cameron; correct?

25       A      It would be covered, yes.

Page 61

```
 1                    A. Mandel
 2   year, including after the loss, we still
 3   renewed the account, although we cut our
 4   limit back.
 5       Q      Was it your understanding when you
 6   sold the Liberty policy to Cameron that
 7   Cameron obtained indemnity agreements in all
 8   of its customer contracts?
 9       A      Correct.
10       Q      So, every time that Cameron sold
11   equipment to a customer, it was your
12   understanding that Cameron had obtained
13   contractual indemnity?
14       A      Well, not understanding.  I was
15   told by Tony that there was contractual
16   agreements, indemnification agreements.  He
17   had a dedicated insurance department, with
18   both contract wording and language, and I
19   believe they had about 20 employees or so, 20
20   to 24.  I'm not exactly sure, but I think it
21   was over 20.
22       Q      And that was the case every time
23   that Cameron sold a piece of equipment to a
24   customer, that it had an indemnity agreement
25   from the customer?
```

Page 62

                            A. Mandel

1

2      A     Well, there was indemnity and

3   warranty.  The equipment couldn't be altered.

4   It was a certain warranty after a certain

5   period of time.  There was no responsibility

6   of Cameron if something happened.

7      Q    Was it your -- withdrawn.

8            And those indemnity agreements

9   would cover blowouts?

10     A     It would probably cover almost -- a

11  majority of their product line of equipment.

12     Q    Was it your expectation when you

13  sold Cameron insurance that Cameron's losses

14  would always be covered by its customer

15  indemnity agreements?

16     A    I was under the assumption, yes.

17     Q    Was it your expectation when you

18  sold Cameron insurance that Cameron would

19  always look first to its customer indemnity

20  agreements to cover its losses?

21     A    Yes.

22     Q    Was it also your expectation when

23  you sold Cameron insurance that Liberty would

24  provide coverage and pay Cameron's losses if

25  Cameron's customers refused to provide that

Page 68

1            A. Mandel

2  no.

3     Q     Would you agree that Cameron faced

4  risk -- risks that might result from a

5  massive oil spill that could put Cameron out

6  of business?

7     A     It's a possibility, depending on

8  how large the company is and how much they

9  have -- and what their other assets are.

10  There is a very big possibility due to fines.

11     Q     That's what you wrote in your

12  account summary; right?

13     A     That's because that's what I was

14  told.

15     Q     If you can turn to page seven of

16  your account summary.

17            Are you with me, sir?

18     A     Yes, I am.

19     Q     What does page seven describe?

20     A     The lead umbrella, the carrier, the

21  limits, the term, the premium, the form,

22  occurrence versus claims made, and the --

23  their conditions of the lead umbrella.

24     Q     Do you see that in describing the

25  lead umbrella policy, there is a section of

Page 69

1                    A. Mandel

2    the form that says "defense"?

3        A    Yes.  It's outside the limit.

4        Q    What does that mean?

5        A    That defense could be -- go on

6    forever.  It's outside the limit versus in

7    the limit.  There are two options, either in

8    the limit or out of the limit.  On this

9    account, it's outside the limit.

10               So, this could go on forever.  It's

11   not indemnity.  It's defense of the claim.

12       Q    So, for the Illinois National

13   Insurance policy that was issued Cameron for

14   the '09-2010 policy year, defense costs were

15   outside limit; correct?

16       A    Yes.

17       Q    And when defense costs are outside

18   limits, that means defense costs are covered

19   by the insurance policy; correct?

20       A    Yes.

21       Q    So, when you wrote this, it was

22   your understanding that defense costs were

23   covered by the Illinois National policy;

24   correct?

25       A    That's what I was advised.

1                    A. Mandel

2      Q     If you could turn back to what was

3   previously marked as Engel Exhibit 2, this

4   document.

5             I would like you to turn to

6   Endorsement 29, which is at the Bates number

7   001130, in the lower right-hand corner.

8      A     Zero zero --

9      Q     1130.

10     A     Okay.

11     Q     I would just like to direct you to

12   paragraph H under two on the first page.  Do

13   you see that?

14     A     "Defense expenses will be in

15   addition to the limit"?

16     Q     Yes.  It says:  "Defense expenses

17   will be in addition to the applicable limits

18   of insurance of this policy."

19             Do you see that?

20     A     Um-hum.

21     Q     That language makes clear that

22   defense expenses are covered by the Illinois

23   National policy; correct?

24     A     That's correct.

25     Q     If you look down a little bit

Page 82

1                    A. Mandel

2    with pricing.

3        Q      Did the "other insurance" clause in

4    the Liberty policy impact the premium that

5    you charged to Cameron in any way?

6        A      Nothing.  It has nothing to do with

7    it.

8        Q      Let's turn to the last page of the

9    Liberty policy.

10              Are you there, sir?

11       A      I'm there.  I'm sorry, I'm looking

12   at the page, and then you are looking at me.

13       Q      Clause F on the last page of Engel

14   Exhibit 3 contains the "other insurance"

15   provision; right?

16       A      Yes, it does.

17       Q      What is the purpose of the "other

18   insurance" clause as used in the -- in the

19   Liberty policy?

20       A      Well, not the Liberty policy, but

21   the only thing I know about the "other

22   insurance" clause is that it's other

23   insurance that could be somebody who has

24   self-insurance, and that would be -- in case

25   there is a claim, that would be first that

Page 83

```
 1                A. Mandel
 2   would be paid, and then we would come into
 3   play.
 4                They don't want to also pay -- a
 5   lot of times you wind up -- you know, you
 6   don't want to pay the same claim two times --
 7   you know, it could be there is no control on
 8   it.
 9                That's the only thing I know about
10   the "other insurance" clause.
11        Q    So, as far as you know, the purpose
12   of the "other insurance" clause is to prevent
13   the insured from collecting twice for the
14   same loss?
15        A    That's correct.  I never had an
16   example.  I really never seen it, you know,
17   in the history of working in insurance, so I
18   don't know about it.
19        Q    And your history goes back pretty
20   far, all the way back to 1977.
21        A    Thirty-seven years, yeah.
22        Q    Did you discuss with Cameron at any
23   time the "other insurance" clause?
24        A    Did I discuss with Cameron?  No, I
25   never had any contact with them, except at
```

```
 1                    A. Mandel
 2   with its customers; correct?
 3       A     Correct.
 4       Q     And it was on that basis that you
 5   underwrote this risk; correct?
 6       A     Correct.
 7       Q     Was it your expectation, when you
 8   underwrote that, the risk, that the third
 9   parties with whom Cameron had those
10   contractual indemnities would pay the loss
11   that Cameron incurs?
12       A     Yes.
13       Q     And if it didn't pay that loss,
14   then it would be Liberty's responsibility,
15   because it issued an insurance policy, to pay
16   that loss; correct?
17       A     Correct.
18       Q     If you could turn to the last page
19   of the document, please.
20             What does this page describe?
21       A     The conditions of our policy, the
22   endorsements, and the pro and cons, so if
23   somebody looks it over and wants to figure
24   what the exposure is.  With every pro,
25   there's always a con.  Like the glass is half
```

Page 108

1                      A. Mandel

2       A      No, I don't believe so.

3       Q      Is it fair to say that in the

4    broking -- rather -- withdrawn.

5               Is it fair to say that in the

6    underwriting file, there is no reference to

7    any discussion that was had about the "other

8    insurance" clause with anyone from Cameron or

9    Marsh?

10      A      No.  I never was involved in

11   anything on the "other insurance" clause.

12   Nothing was ever questioned about it, in my

13   history of insurance.

14      Q      When you discussed with Mr. Black

15   and Mr. Lee the contractual indemnities, did

16   that have anything to do with the "other

17   insurance" provision?

18      A      Not at all.  I never knew anything

19   about the "other insurance" provision, the

20   other insurance.  It was never discussed.  I

21   have never discussed it with anybody in

22   insurance ever.  No one has ever brought

23   anything to my attention about the "other

24   insurance" clause.

25      Q      You weren't discussing Cameron's

```
1                    A. Mandel

2    contractual indemnities for purposes of

3    assessing their impact on the "other

4    insurance" provision; correct?

5        A      Correct.

6        Q      Is there another provision in the

7    Liberty policy that would render relevant the

8    contractual indemnities?

9        A      No idea.

10       Q      What relevance to Cameron's risk

11   did the contractual indemnities that you

12   discussed with Mr. Black and Mr. Lee have?

13       A      Tremendous impact.  Wouldn't touch

14   this account with a ten-foot poll.  Not on

15   the exposure, and the catastrophic exposure

16   especially.

17       Q      And that's because you had the

18   understanding that the customers of Cameron

19   that owed Cameron indemnity would pay the

20   losses that Cameron suffered.

21       A      Well, there was a cap -- Tony Black

22   told me there was a -- they capped the --

23   their exposure in their contracts that they

24   could be held liable, Cameron.

25       Q      And it was based upon the
```

1                    A. Mandel

2   understanding that they would actually pay,

3   that you agreed to write the risk; correct?

4        A     I believe so.  I don't have the

5   actual agreements.

6        Q     When you issued the policy to

7   Cameron, did you think that if those

8   customers refused to pay, Cameron had an

9   obligation to go sue them before Liberty

10  would pay a loss that Cameron suffered under

11  the policy?

12       A     I have no idea.

13       Q     Have you ever heard of any

14  insurance company ever requiring that as a

15  condition to coverage?

16       A     Not really, but you never know.  I

17  really can't say.  It could be, but I didn't

18  read anything about it.  I really don't know.

19       Q     So, in your more than 30 years of

20  experience, that has never happened, to

21  you -- to your knowledge?

22       A     Not to me.  Not to me personally.

23       Q     When you sold Cameron the insurance

24  policy and charged it a premium, you knew

25  that there would be circumstances that

1                    A. Mandel

2    Liberty might have to pay Cameron's losses;

3    correct?

4        A    Yes.  Yes.

5        Q    What were the circumstances.

6        A    Something maybe that didn't fall

7    outside -- I don't know.  It could be a --

8    had to be some kind of catastrophic claim.

9    Maybe something happened such as what

10   happened here.  I don't really know.

11       Q    In other words, you did not sell

12   Cameron an insurance policy that you

13   considered to be completely illusory; right?

14            MR. DEES:  Objection to the form of

15       the question.

16       A    I don't understand your question.

17       Q    Let's go back to this document,

18   Exhibit 145.  It's the tower that has the

19   premiums filled in.  I think we talked about

20   this earlier.

21            Would you describe the tower of

22   insurance that Cameron purchased for this

23   policy year as a follow-form tower?

24       A    It would be a follow-form tower,

25   correct, subject to the terms and conditions

```
1                    A. Mandel
2    Cameron if its attachment point was at
3    $500 million as opposed to $100 million?
4         A     I'm sorry, can you --
5         Q     Would you agree that Liberty would
6    have charged a lot less per million to
7    Cameron if Liberty's attachment point was at
8    $500 million as opposed to $100 million?
9         A     Well, I -- we probably would pass
10   on the account, due to the exposure is so
11   large compared to the premium so small.  It
12   may not make sense for us, to get to a
13   minimum premium, when I can do a minimum
14   premium on another class of business which
15   could be more profitable to the insurance
16   company.
17        Q     So, you might not have underwritten
18   this policy at all --
19        A     We might --
20        Q     -- because you wouldn't have been
21   able to charge enough money at a higher layer
22   to justify the liability?
23        A     Right.  In other words, the 2,000 a
24   mill, we may say for a class of this
25   business, we would need at least $5,000 per
```

1                    A. Mandel

2    mill.  It just doesn't make sense from an

3    underwriting standpoint, because after all,

4    our business is to be profitable.

5        Q      Well, here you got comfortable with

6    $4200 per million at $100 million; correct?

7        A      Correct.

8        Q      Would it be fair to say that if

9    Liberty were at a higher layer than -- if it

10   agreed to issue a policy to Cameron, it would

11   have charged less than $4200 per million?

12       A      We most likely would have, if

13   everything was lined up properly from an

14   underwriting standpoint.

15       Q      In your view, is there any basis to

16   justify charging Cameron $4,200 per

17   million --

18       A      The basis was from Tony Black.

19              MR. DEES:  Let him finish.

20       Q      I didn't quite finish my question.

21       A      Oh, I'm sorry.

22       Q      Let me try that again, because I

23   was going to ask a different question.

24       A      Okay.

25       Q      In your view, is there any basis to

```
 1                    A. Mandel
 2    justify charging Cameron $4,200 per million
 3    for coverage for liabilities in excess of
 4    $500 million?
 5        A     Is there a justice, you said?
 6        Q     In your view, is there any basis to
 7    justify charging Cameron $4,200 per million
 8    for coverage for liabilities that do not
 9    attach in excess of $500 million?
10        A     I'm not -- you are going to have
11    to -- I have a problem with your question.  I
12    don't --
13        Q     Well, $4,200 was the price per
14    million you charged at $100 million; right?
15        A     Right.  Right.
16        Q     And we established that if you
17    moved up the tower and still issued the
18    policy, you would have charged less per
19    million dollars; right?
20        A     That's true.  Correct.
21        Q     Is there any basis to charge the
22    same $4,200 for higher layers of coverage
23    under Liberty's pricing policies?
24        A     Probably not.
25        Q     You can put that document to the
```

Page 156

1                        A. Mandel

2        Q       Focusing on the first section of

3    the document, operations, you wrote in here

4    that Cameron is "the leading manufacturer of

5    oil and gas pressure control and separation

6    equipment," and then it lists a number of

7    different products that it sells; right?

8        A       Yes.

9        Q       So, you understood that Cameron was

10   a manufacturer that provided equipment for

11   the oil and gas industry; right?

12       A       Correct.

13       Q       And I think we talked about this

14   earlier.  You understood that Cameron faced

15   substantial exposures resulting from

16   potential blowouts; correct?

17       A       Yes.

18       Q       And in the exposure section on page

19   two of the document, you wrote that "a

20   massive oil spill could potentially put

21   Cameron out of business."

22       A       Correct.

23       Q       And one of the reasons that Cameron

24   went to insurers like Liberty is to protect

25   against the risk that it might be put out of

Page 157

1                    A. Mandel

2    business; correct?

3        A    Yes.

4        Q    And that was the understanding that

5    you had with Cameron when you sold Cameron

6    this policy; correct?

7        A    Say that one more time.

8        Q    And that was the understanding that

9    you had with Cameron when you sold Cameron

10   this policy; they would be buying insurance

11   from you to protect against the risk.

12       A    Correct.

13       Q    And that risk was that they could

14   potentially be put out of business by a

15   blowout.

16       A    Yes.

17       Q    A blowout like what happened with

18   the Deepwater Horizon; correct?

19       A    Well, we're talking mainly about

20   the pollution exposure of destroying the

21   ocean and -- than their product, not the --

22   you know, including, of course, the

23   malfunction of a product, the products that

24   they have, but mainly the pollution was the

25   big essential thing.

Page 174

1                    A. Mandel

2    were relevant because Cameron might need to

3    call upon the indemnitor to pay?

4        A      Yes, that is correct.

5        Q      And if they didn't pay, then

6    Liberty would have exposure under its policy;

7    correct?

8        A      I believe so, but you would have to

9    talk to the claim department, because -- you

10   know.

11       Q      That was your understanding at

12   least?

13       A      Yes.

14              (Continued on next page with

15       witness jurat.)

16

17

18

19

20

21

22

23

24

25