Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA
 3    ------------------------------------X
      In Re:  OIL SPILL BY THE OIL RIG
 4    "DEEPWATER HORIZON" IN THE GULF OF
      MEXICO, ON APRIL 20, 2010,
 5
 6    Applies to:
 7    12-311, Cameron Int'l Corp. v. Liberty
      Ins. Underwriters, Inc., a/k/a Liberty
 8    Int'l Underwriters
 9
      ------------------------------------X
10
11
12          VIDEO DEPOSITION OF JAMES ENGEL
13                 New York, New York
14                    May 29, 2013
15
16
17
18
19
20
21    Reported by:
22    Rebecca Schaumloffel, RPR, CLR
23    Job No.   61441
24
25
```

EXHIBIT 20

1        J. ENGEL

2    A.    Yes.

3    Q.    Has Liberty ever taken the
4 position, to your knowledge, that other
5 insurance existed, as that term is defined in
6 the form policy, where the source of the
7 other insurance has denied payment to the
8 insured?

9    A.    Not that I can recall exactly as
10 you laid out the question. There have been
11 circumstances where you see the definition of
12 other insurance includes self insurance.
13 Where Liberty has taken the position that
14 self insurance applies first, SIR would apply
15 first. Of course, that happens often.

16    Q.    Let me try my question with a
17 little bit more precision. Has Liberty ever
18 taken the position that other insurance, as
19 that term is defined in the form policy,
20 existed where the other insurance issued is a
21 contractual indemnity and the party that
22 supposedly owes the indemnity has denied
23 payment to the insured?

24    A.    Not that I can recall. Again,
25 remember, that oil patch operates with

1   J. ENGEL
2   indemnifications all around, all the way up
3   through the chain of companies that it
4   operated in oil. So it is a unique industry.
5       Q.   Has Liberty ever taken the
6   position with any other insured that the
7   potential that a contractual indemnity might
8   be applicable means its policy hasn't
9   attached pursuant to the other insurance
10  clause?
11      A.   I think that's the question that
12  you just asked, worded a little differently.
13  So I would say I don't recall any situations.
14          MR. KORN:  Let me mark as Engel
15      Exhibit 8 a two-page E-mail bearing
16      the Bates numbers LIU 10184 to '85.
17          (Whereupon, Engel Exhibit 8, LIU
18      10184 to '85 was marked for
19      identification as of this date by the
20      Reporter.)
21      Q.   Please take a minute and let me
22  know when you have had a chance to review
23  this E-mail.
24      A.   Okay.
25      Q.   Is this an E-mail that you sent

Page 203

1       J. ENGEL
2  numbers CIC 0005127 through '29. Please take
3  a moment to review the letter that's marked
4  as Exhibit 11 and let me know when you are
5  ready.
6       A.    Okay. So I have read it.
7       Q.    Okay. Do you see the first
8  sentence -- well, let me first ask, can you
9  please identify this document for the record?
10      A.    It's a letter dated November 7,
11 2011, from Paul Koepff, our coverage counsel,
12 to Brad Eastman, deputy general counsel of
13 Cameron Corporation.
14      Q.    Was this letter sent on behalf of
15 Liberty Insurance Underwriters, Inc.?
16      A.    Yes.
17      Q.    That's the same entity as Liberty
18 International or LIU that we have been
19 referring to throughout the course of
20 the day?
21      A.    Yes.
22      Q.    Did you authorize the
23 transmission of this letter to Mr. Eastman?
24      A.    Yes.
25      Q.    Did you review it in draft form?

```
 1                    J. ENGEL
 2      A.    Yes.
 3      Q.    Did you approve its contents?
 4      A.    Yes.
 5      Q.    This letter was sent over a month
 6   prior to the time when Cameron and BP entered
 7   into their settlement agreement, correct?
 8      A.    That's correct.
 9      Q.    Did Liberty, in this letter,
10   decline to offer its policy limits to Cameron
11   at this time?
12      A.    Yes, that's evident on the middle
13   of page 2.
14      Q.    Thank you.  Could you turn to
15   page 3.
16      A.    Um-hum.
17      Q.    The first full paragraph in the
18   second sentence, Mr. Koepff wrote, quote,
19   "LIU believes that until a Court determines
20   that Cameron is not entitled to contractual
21   indemnity, the LIU policy is excess of
22   Cameron's contractual rights to be
23   indemnified by Transocean."  Closed quote.
24   Did I read that right?
25      A.    Yes.
```

Case 2:10-md-02179-CJB-DPC   Document 12440-22   Filed 03/03/14   Page 6 of 10

Page 220

1            J. ENGEL

2     Q.    If you can turn to the third page
3  of the exhibit, which is the first page of
4  the letter from Mr. Koepff.  It starts off by
5  saying "On behalf of Liberty International
6  Underwriters, LIU."  This makes is pretty
7  clear it is on behalf of LIU, right?
8     A.    Yes.
9     Q.    In Mr. Koepff's letter, he wrote
10 that "LIU is not in a position to object to
11 the settlement amount of $250 million,"
12 right?
13    A.    That's correct.
14    Q.    And so LIU did not object to the
15 settlement amount itself, correct?
16    A.    That's correct.  We weren't in a
17 position to do so because our policy had not
18 attached.  We were no more in a position to
19 do that than any of the other higher level
20 excess insurers whose policies had also not
21 attached.
22    Q.    If you follow along a little bit
23 later in the paragraph, Mr. Koepff wrote
24 "Moreover as previously expressed to Cameron
25 by letter dated November 7, 2011, LIU

1        J. ENGEL
2   declines to offer any amounts under its
3   policy because the LIU policy has the
4   following other insurance provision" and then
5   it reproduces the provision.
6        Do you see that?
7    A.   I see that.
8    Q.   Is it fair to surmise from this
9   that Liberty refused to offer any amounts
10  under its policy because its policy didn't
11  attach?
12   A.   That's what this letter of
13  December 12th says, yes.
14   Q.   I believe it is December 13th?
15   A.   Sorry, December 13th.
16   Q.   This is in response to
17  Mr. Auslander's E-mail writing from
18  Mr. Eastman's E-mail account of
19  December 12th --
20   A.   That's correct.
21   Q.   -- of 2011?
22        So Cameron told Liberty that a
23  tentative settlement agreement had been
24  reached for $250 million, right?
25   A.   Right.

1                    J. ENGEL

2       Q.    Liberty did not object to the
3    amount of the settlement, right?
4       A.    For reasons that I stated, yes.
5       Q.    But Liberty said it would not
6    offer any amounts under its policies because
7    of the other insurance provision, right?
8       A.    That's correct.
9       Q.    So fair to say by December 13,
10   2011, Liberty had decided not to make payment
11   to Cameron under the Liberty policy for the
12   BP settlement, correct?
13      A.    That's correct.
14      Q.    Okay. If you can turn to page 2
15   of the letter, the last page of the document.
16   In the second full paragraph in the middle it
17   says, quote "Right now, there may be no
18   determination that Cameron is not entitled to
19   indemnity from Transocean for pollution
20   damages." Do you see that?
21      A.    I do.
22      Q.    It continues, quote, "Without
23   such a decision by the Court, it is LIU's
24   position that the LIU policy is excess of
25   that indemnity." Close quote.

1            J. ENGEL
2  would it get the benefit of the other
3  insurance provision that you have described
4  today for purposes of the attachment point?
5       A.    Well, I think so.  But I would
6  want to review the language more
7  specifically.  But it's possible.  But again,
8  I will repeat that I know that some of the
9  insurers up above did not have that clause in
10 their policies.
11      Q.    And if they did have -- granted
12 that you would like to review the provision,
13 but if Chubb had a restricted as underlying
14 provision that worked the way restricted as
15 underlying provisions generally work, would
16 it be fair to say that the Liberty position
17 was not unique in the tower?
18           MR. MARTIN:  Object to form.
19      A.    Again, you are asking me a
20 hypothetical question.  I would really like
21 to see the entirety of that contract.
22      Q.    All right.  Getting back to the
23 diagram, by virtue of your interpretation of
24 the other insurance provision, the Liberty
25 International policy did not attach at

Page 263

1                    J. ENGEL
2    $100 million as reflected in this tower,
3    correct?
4         A.    That's correct.
5         Q.    It attached somewhere higher than
6    that, right?
7         A.    May not have attached at all.
8         Q.    So it's outside of the -- so it
9    might have not been attached to the
10   $500 million?
11        A.    Might not have.
12        Q.    Is that because the Transocean
13   indemnity was potentially unlimited?
14        A.    It was.  And you also have to
15   understand that this tower applies to more
16   risk other than what was covered by the
17   indemnities, because there were risks that
18   Cameron had that weren't covered by the
19   indemnities.
20             MR. KORN:  I will mark as Engel
21        Exhibit 18, an E-mail dated
22        January 26, 2012, bearing Bates number
23        CIC 0008725 through '27.
24             (Whereupon, Engel Exhibit 18,
25        CIC 0008725 through '27 was marked for