1

2  UNITED STATES DISTRICT COURT

   EASTERN DISTRICT OF LOUISIANA

3  ---------------------------------------X

   In Re:  OIL SPILL BY THE OIL RIG

4  "DEEPWATER HORIZON" IN THE GULF OF

   MEXICO, ON APRIL 20, 2010,

5

6  Applies to:

7  12-311, Cameron Int'l Corp. v. Liberty

   Ins. Underwriters, Inc., a/k/a Liberty

8  Int'l Underwriters

9

   ---------------------------------------X

10

11

12      VIDEO DEPOSITION OF MAUREEN MARTIN

13           New York, New York

14             June 25, 2013

15

16

17

18

19

20

21  Reported by:

22  Rebecca Schaumloffel, RPR, CLR

23  Job No: 62301

24

25

EXHIBIT

26

1                    M. MARTIN

2    you have that in front of you?

3         A.    I do.

4         Q.    Do you recognize this document?

5         A.    I do.

6         Q.    What is it?

7         A.    This is an E-mail from

8    Mitch Auslander providing an update from the

9    E-mail that we have just discussed, which

10   was, I guess, the prior exhibit.  In this

11   E-mail, he updates to indicate the Cameron

12   board met earlier that morning and approved

13   the proposed settlement and Cameron is now

14   seeking consent from its insurers.

15        Q.    Did Chartis respond to Cameron's

16   request for consent to the Settlement

17   Agreement?

18        A.    My recollection is, I am

19   confident we would have responded.  I am sure

20   that there is an E-mail indicating what our

21   response would be.

22        Q.    Did Chartis, in fact, consent to

23   Cameron's settlement with BP?

24        A.    Without looking or reviewing the

25   E-mail response, I believe we consented, but

1          M. MARTIN

2     we did have some concerns and some terms that

3     we would have provisioned our consent on.

4          Q.    Did Chartis ultimately fund

5     Cameron's settlement with BP?

6          A.    Ultimately, we funded a portion

7     of Cameron's settlement with BP.

8          Q.    Did Chartis agree to waive its

9     subrogation rights in connection with

10    Cameron's settlement with BP?

11         A.    Ultimately, we had a side -- we

12    negotiated a side agreement with Cameron in

13    which we agreed to, among other terms, waive

14    our subrogation rights.

15         Q.    Why did Chartis agree to waive

16    its subrogation rights?

17         A.    Chartis agreed to waive its

18    subrogation rights for a couple of reasons.

19    One, in our estimation, and I think I

20    testified to this previously, we were of the

21    opinion that the settlement amount was a good

22    result.  Just financially, in terms of

23    financial contribution, this was a good

24    result compared and contrasted to the

25    potential exposure that Cameron faced should

1                         M. MARTIN

2     it not settle.

3                 Number two, in our estimation and

4     valuation, we felt that the settlement amount

5     that was put at stake also, I guess,

6     represented or took into account the

7     valuation of those -- giving up subrogation

8     rights as well.  That that was reflected in

9     the amount of the ultimate settlement.

10                Third, we felt that, or as

11    described to us, Cameron would not -- Cameron

12    would not be able to resolve the case unless

13    the subrogation right issue was resolved with

14    BP.  That became very, very clear as the

15    ultimate negotiations concluded.

16        Q.    Was the consent to Cameron's

17    settlement with BP granted on behalf of both

18    the Illinois National and the Cat excess

19    policies?

20        A.    Yes.  When we would have been

21    responding to Cameron's request, it would

22    have been related to both of our policies

23    that were at stake.

24        Q.    Were subrogation rights waived

25    under both of those policies as well?

Page 61

M. MARTIN

1
2       Q.      Even though the other insurance
3    provision of the Liberty policy would have
4    been incorporated into the Cat excess policy,
5    did you consider it a legitimate basis to
6    deny coverage to Cameron for the BP
7    settlement?
8                MS. BARRASSO:  Note my objection
9        to the form.
10       A.      In our reading -- we did not read
11    it the same way.
12       Q.      Why not?  Withdrawn.
13                Miss Martin, did you mean that
14    you did not read the other insurance
15    provision the same way that Liberty did?
16       A.      We did not interpret it the
17    same -- in the same way that Liberty
18    interpreted this provision.
19       Q.      And why not?
20       A.      In looking at the relevant
21    clause, the other insurance includes any type
22    of self insurance indemnification or other
23    mechanism by which an insured arranges for
24    funding of legal liabilities.  We did not
25    read that as allowing contractual

Page 62

1                    M. MARTIN

2    indemnification to serve as other insurance

3    in this context.

4        Q.    At the time of Cameron's BP -- at

5    the time of -- withdrawn.

6              At the time of Cameron's

7    settlement with BP, did you have an

8    understanding as to the status of Cameron's

9    claim for indemnity against TransOcean?

10       A.    My understanding is it was as yet

11   unresolved.

12       Q.    Did you believe that that claim

13   for indemnity qualified as other insurance

14   under Liberty's other insurance provision?

15             MS. BARRASSO:  I will object to

16        the form, and you are calling for a

17        conclusion.

18       A.    Again, we did not, as I said

19   before, we did not read this language the

20   same way that Liberty interpreted it.

21       Q.    What did you understand that

22   language to mean?

23       A.    In reading this language, I think

24   the best way to answer your question is by

25   route of an example.  It would appear, in my

Page 71

M. MARTIN

1

2     interpretation of its other insurance

3     clause."

4          A.     Yes.

5          Q.     What were you referring to there?

6          A.     Basically, in that sentence, what

7     we are getting to is the restrictive is

8     underlying clause that we had discussed

9     earlier.

10         Q.     Which meant that the Cat excess

11    policy incorporated the Liberty policy's

12    other insurance provision?

13         A.     That's correct.

14         Q.     And why didn't AIG take the same

15    position as Liberty with respect to its other

16    insurance provision?

17         A.     Again, I apologize if I sound

18    very repetitive, but we did not read that

19    language the same -- in the same manner that

20    Liberty did.

21         Q.     Moving down a couple of lines

22    again, do you see the sentence that says, "In

23    the context of this particular loss and the

24    opportunity to settle with BP, the actions of

25    your clients are an unreasonable and

Page 72

M. MARTIN

1
2    prejudicial impediment to settlement."

3        A.    Yes.

4        Q.    Did you believe that Liberty's

5    actions were unreasonable?

6        A.    If we did not believe -- if we

7    did not believe it was reasonable, we

8    wouldn't have written this sentence the way

9    we did.  We believed it was an unreasonable

10   position.

11       Q.    And the last sentence of the

12   letter, do you see where it says, "If this

13   settlement is not concluded due to the

14   actions, omissions, or positions of one or

15   more of your clients, our clients reserve the

16   right to seek recovery of all financial

17   losses and damages incurred as a result

18   thereof"?

19       A.    Yes, I see that sentence.

20       Q.    And why did -- why did AIG

21   reserve its rights?

22       A.    At the time that this letter was

23   written, we were quite concerned that this

24   settlement opportunity was going to fall

25   apart, so we felt we needed to write