1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2


3     ****************************************************************

4
      IN RE: OIL SPILL BY THE
5     OIL RIG *DEEPWATER HORIZON*
      IN THE GULF OF MEXICO ON
6     APRIL 20, 2010
                              CIVIL ACTION NO. 10-MD-2179 "J"
7                             NEW ORLEANS, LOUISIANA
                              WEDNESDAY, FEBRUARY 26, 2014, A.M.
8


9
      ****************************************************************
10
      BON SECOUR FISHERIES, INC.,
11    ET AL

12    V                       CIVIL ACTION NO. 12-970 "J"
                              NEW ORLEANS, LOUISIANA
13                            WEDNESDAY, FEBRUARY 26, 2014, A.M.

14
      BP EXPLORATION & PRODUCTION,
15    INC., ET AL

16    ****************************************************************

17    BP EXPLORATION & PRODUCTION,
      INC., ET AL
18
      V                       CIVIL ACTION NO. 13-6674 "J"
19                            NEW ORLEANS, LOUISIANA
                              WEDNESDAY, FEBRUARY 26, 2014, A.M.
20

21    WATTS, ET AL

22    ****************************************************************

23
              TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING AND
24                    MOTION HEARING PROCEEDINGS
              HEARD BEFORE THE HONORABLE CARL J. BARBIER
25                  UNITED STATES DISTRICT JUDGE

                          **OFFICIAL TRANSCRIPT**

```
 1    APPEARANCES:

 2

 3    FOR BP AMERICA INC.,
      BP AMERICA PRODUCTION
      COMPANY, BP COMPANY
 4    NORTH AMERICA INC.,
      BP CORPORATION NORTH
 5    AMERICA INC.,
      BP EXPLORATION &
 6    PRODUCTION INC.,
      BP HOLDINGS NORTH
 7    AMERICA LIMITED,
      BP PRODUCTS NORTH
 8    AMERICA INC.:            LISKOW & LEWIS
                               BY:  DON K. HAYCRAFT, ESQUIRE
 9                             ONE SHELL SQUARE
                               701 POYDRAS STREET
10                             SUITE 5000
                               NEW ORLEANS, LA 70139
11

12
                               WILLIAMS & CONNOLLY
13                             BY:  KEVIN M. DOWNEY, ESQUIRE
                                    MARGARET A. KEELEY, ESQUIRE
14                             725 12TH ST., N. W.
                               WASHINGTON, DC 20005
15

16
      FOR BON SECOUR
17    FISHERIES, INC.:         IRWIN FRITCHIE URQUHART & MOORE
                               BY:  JAMES B. IRWIN, V, ESQUIRE
18                                  DOUGLAS J. MOORE, ESQUIRE
                               400 POYDRAS STREET, SUITE 2700
19                             NEW ORLEANS, LA 70130

20

21    FOR WATTS GUERRA, LLP:   GAINSBURGH BENJAMIN DAVID
                               MEUNIER & WARSHAUER
22                             BY:  GERALD E. MEUNIER, ESQUIRE
                               ENERGY CENTRE
23                             1100 POYDRAS STREET, SUITE 2800
                               NEW ORLEANS, LA 70163
24

25

                        OFFICIAL TRANSCRIPT
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE PLAINTIFFS'
      LIAISON COUNSEL:              HERMAN HERMAN & KATZ
 4                                  BY:  STEPHEN J. HERMAN, ESQUIRE
                                    820 O'KEEFE AVENUE
 5                                  NEW ORLEANS, LA  70113

 6

 7    ALSO PRESENT:                 THE HONORABLE SALLY SHUSHAN
                                    PATRICK JUNEAU
 8

 9

10    OFFICIAL COURT REPORTER:      CATHY PEPPER, CRR, RMR, CCR
                                    CERTIFIED REALTIME REPORTER
11                                  REGISTERED MERIT REPORTER
                                    500 POYDRAS STREET, ROOM HB406
12                                  NEW ORLEANS, LA 70130
                                    (504) 589-7779
13                                  Cathy_Pepper@laed.uscourts.gov

14

15    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.

16

17

18

19

20

21

22

23

24

25
```

**OFFICIAL TRANSCRIPT**

1             **P-R-O-C-E-E-D-I-N-G-S**

2         M O R N I N G    S E S S I O N

3        WEDNESDAY, FEBRUARY 26, 2014

4         (COURT CALLED TO ORDER)

5

6

7      THE DEPUTY CLERK:  All rise.

09:42:12  8      THE COURT:  Let's call the *Deepwater Horizon* matter.

09:42:17  9      THE DEPUTY CLERK:  Multi-District Number 10-2179,

09:42:22 10 *In re:  Oil spill by the oil rig Deepwater Horizon in the Gulf*

09:42:27 11 *of Mexico on April 20, 2010*; Civil Action Number 12-970,

09:42:33 12 *Bon Seacor Fisheries, Incorporated, et al. versus BP*

09:42:37 13 *Exploration & Production, Inc., et al.*; Civil Action

09:42:42 14 Number 13-6674, *BP Exploration & Production, Inc., et al.*

09:42:47 15 *versus Watts, et al.*

09:42:51 16      THE COURT:  All right.  We have related motions here.

09:42:57 17 One is, of course, BP's motion for a preliminary injunction to

09:43:01 18 suspend the second distribution of the Seafood Compensation

09:43:06 19 Program.  That's Record Document Number 2 in the case

09:43:10 20 identified as 13-6674, which is BP, etc. versus Mikal Watts,

09:43:16 21 et al.

09:43:16 22      Then there's BP's motion for relief from judgment

09:43:21 23 pursuant to Rule 60(b)(3), which is Record Document 11994 in

09:43:28 24 the MDL 10-2179, the master docket, of course, that really

09:43:34 25 relates to 12-970, the Bon Secour class action.

09:43:44  1            Then there is a related motion, but separate

09:43:49  2    motion, by Mikal Watts, from Watts Guerra, to stay the

09:43:58  3    proceedings in 13-6674.  That is Record Document 12171, which

09:44:15  4    is filed in the MDL master docket.

09:44:18  5            I think it makes sense, seems like to me, unless

09:44:22  6    somebody has a different opinion, to take up the Mikal Watts

09:44:27  7    motion to stay first.

09:44:28  8            Let's do that.  Who is going to argue?

09:44:34  9    Mr. Meunier, you're going to argue that?

09:44:38 10            MR. MEUNIER:  Yes, Your Honor.

09:44:38 11            THE COURT:  Who is going to argue that on this side?

09:44:40 12            MR. DOWNEY:  Kevin Downey, Williams & Connolly.

09:44:42 13            THE COURT:  Okay.  Go ahead, Mr. Meunier.

09:45:09 14            MR. MEUNIER:  May it please the Court.  Jerry Meunier,

09:45:15 15    of Gainsburgh Benjamin, appearing for Mikal Watts and Watts

09:45:19 16    Guerra, L.L.C.  We'll collectively refer to them as the "Watts

09:45:23 17    defendants."

09:45:23 18            Your Honor, more than 50 years ago, the

09:45:29 19    Fifth Circuit articulated the policy rationale which supports a

09:45:36 20    district judge's discretionary authority to stay a civil case

09:45:41 21    pending the progress of a parallel overlapping criminal matter.

09:45:46 22            The case was *Campbell v. Eastland*, where store

09:45:51 23    owners had brought a civil tax refund case against the IRS,

09:45:55 24    even as the U.S. Attorney's Office was investigating the

09:45:58 25    potential crime of their nonpayment of taxes.

**OFFICIAL TRANSCRIPT**

09:46:01 1          On appeal from the trial judge's decision to let

09:46:06 2     the civil case discovery proceed, over the U.S. Attorney's

09:46:11 3     objections, the Fifth Circuit found that this was error and

09:46:17 4     that the case should have been stayed; stayed, I should add,

09:46:23 5     even though no formal indictment had been issued in that

09:46:26 6     criminal investigation.

09:46:29 7          Why?  Well, fast forward those 50-plus years to

09:46:35 8     this MDL, and to the case of *Southeast Recovery v. BP*, in which

09:46:44 9     Magistrate Judge Wilkinson granted the Government's request to

09:46:48 10    stay that breach of contract case so as not to interfere with a

09:46:55 11    parallel overlapping criminal investigation, again, at a stage

09:47:00 12    prior to any formal indictment.

09:47:03 13         Quoting directly from the Fifth Circuit opinion

09:47:10 14    in *Campbell*, Judge Wilkinson reminded us of the fundamental

09:47:17 15    purpose that is served by your authority to stay a civil case

09:47:21 16    in these circumstances.  "When civil and criminal proceedings

09:47:26 17    are in parallel, the judicial discretion and procedural

09:47:30 18    flexibility available to a district judge should be used to

09:47:32 19    prevent the rules and policies applicable to one suit from

09:47:36 20    doing violence to those pertaining to the other."

09:47:42 21         Judge, it is this inevitable, inherit and

09:47:46 22    entirely predictable tension which brings us here today seeking

09:47:50 23    a stay of BP's civil case against our clients, a case which

09:47:55 24    requires the maximum disclosure of relevant information to sort

09:48:00 25    out claims and defenses, even as an overlapping active criminal

**OFFICIAL TRANSCRIPT**

09:48:05 1   investigation proceeds in which Constitutional safeguards

09:48:09 2   against disclosure must be respected.

09:48:12 3           So the question is not, as BP suggests, whether

09:48:20 4   parallel criminal and civil matters are routine or not, whether

09:48:25 5   they are usual or not; the question when this occurs is whether

09:48:32 6   the rules and practices of the one case, here, for example, the

09:48:37 7   pretrial and discovery rules applicable to BP's civil suit, are

09:48:42 8   likely to disrupt, contradict, or, in the language of the

09:48:45 9   Fifth Circuit, "do violence to the far different rules and

09:48:49 10  policies applying in the parallel criminal matter."

09:48:53 11          If, as here, the requisite special circumstances

09:48:57 12  of this conflict are demonstrated, then the exercise of

09:49:02 13  Your Honor's inherent case management authority to stay the

09:49:05 14  civil case is not only warranted, but it is consistent with

09:49:10 15  fundamental and well settled judicial policy in this Court and

09:49:15 16  in this Circuit.

09:49:20 17          Now, both sides agree that the courts in this

09:49:22 18  jurisdiction apply a six-factor test.

09:49:24 19          THE COURT:  Let me ask you this.

09:49:26 20          MR. MEUNIER:  Yes, Your Honor.

09:49:27 21          THE COURT:  I don't think there is any question that

09:49:31 22  there is almost exact overlap of the issues --

09:49:31 23          MR. MEUNIER:  Yes, Your Honor.

09:49:34 24          THE COURT:  -- in this case and in the criminal case.

09:49:34 25          MR. MEUNIER:  Yes, sir.

**OFFICIAL TRANSCRIPT**

09:49:36 1    THE COURT:  It seems to me the most significant factor

09:49:41 2  here is, you know, the status of the criminal investigation and

09:49:46 3  the likelihood that Mr. Watts is going to be indicted.

09:49:53 4    Obviously, I don't expect that you're totally

09:49:59 5  privy to the Government's investigation, but what can you or

09:50:03 6  Mr. Watts' criminal attorney tell us about the status of

09:50:06 7  things?

09:50:08 8    MR. MEUNIER:  Well, Your Honor, Mr. Robert McDuff, who,

09:50:12 9  as you know, executed an affidavit which is in the record, is

09:50:15 10  in court today and is available to answer any specific

09:50:20 11  questions you may have, within the parameters of what he's able

09:50:23 12  to disclose, of course.

09:50:24 13    But I did today want to provide an update to the

09:50:28 14  affidavit to this extent:  The investigation is ongoing and

09:50:34 15  active.  As you know, the file materials that were seized from

09:50:40 16  Mr. Watts' office by the Government remain in Government

09:50:42 17  custody.

09:50:43 18    THE COURT:  There was an execution of search warrants,

09:50:45 19  multiple search warrants, as I recall --

09:50:45 20    MR. MEUNIER:  Yes.

09:50:47 21    THE COURT:  -- which became a matter of public record

09:50:51 22  in the news media last -- was it February?

09:50:55 23    MR. MEUNIER:  February of last year, yes, sir.

09:50:56 24    THE COURT:  -- February of last year.

09:50:58 25    MR. MEUNIER:  Yes.  So that material remains in

**OFFICIAL TRANSCRIPT**

09:51:00 1    government custody.

09:51:02 2              We are now advised that, even though at the time

09:51:05 3    he executed his affidavit in mid-January this year, Mr. McDuff

09:51:10 4    believed that the Government decision whether or not to indict

09:51:15 5    a number of individuals, including Mr. Watts, could be expected

09:51:18 6    by mid-March -- he said within two months -- he has spoken most

09:51:27 7    recently with the U.S. Attorney's office and is advised that

09:51:29 8    the decision is now to be made closer to June of this year.

09:51:33 9              So what we can tell the Court is that in about

09:51:39 10   June of this year we expect the Government to make its

09:51:41 11   decision, but the investigation is currently active.

09:51:44 12        THE COURT:  All right.

09:51:44 13        MR. MEUNIER:  So, Your Honor --

09:51:45 14        THE COURT:  There is an active grand jury

09:51:48 15   investigation, right?

09:51:49 16        MR. MEUNIER:  There is an active criminal

09:51:52 17   investigation.  Beyond that, I don't know that I know

09:51:55 18   specifics.

09:51:55 19        THE COURT:  Okay.

09:51:56 20        MR. MEUNIER:  Would the Court then want to skip over my

09:52:01 21   well articulated discussion of factor one and go to factor two?

09:52:07 22              I think --

09:52:07 23        THE COURT:  Well, I think you just talked about factor

09:52:09 24   two, didn't you?

09:52:11 25        MR. MEUNIER:  Well, I did, but I want to --

09:52:13 1          THE COURT:  Go ahead.

09:52:14 2          MR. MEUNIER:  -- I want to say a bit more about factor

09:52:17 3     two.

09:52:18 4          THE COURT:  No, go ahead.

09:52:18 5          MR. MEUNIER:  So I want to give thanks for all of the

09:52:27 6     slides on factor one, but I do believe you are correct, Judge.

09:52:28 7          THE COURT:  They were very compelling.

09:52:31 8          MR. MEUNIER:  They were very compelling.

09:52:31 9          I do believe you're correct, Judge, that in this

09:52:33 10    case it's difficult to ignore the fact that there is an

09:52:39 11    overlap, if not identical substance, as to the civil and

09:52:39 12    criminal matters.

09:52:41 13          So factor two, which is the status of the

09:52:43 14    criminal case.  Judge, in this regard, I want to begin -- we

09:52:46 15    want to begin by acknowledging two reported decisions by

09:52:51 16    Your Honor which have not been discussed in the briefs.

09:52:55 17          These were decisions in which you denied motions

09:52:59 18    to stay, giving important consideration to the lack of a formal

09:53:05 19    criminal indictment.

09:53:07 20          In neither case, of course, did you hold that a

09:53:11 21    stay cannot be granted in the absence of an indictment; and,

09:53:15 22    perhaps most importantly, the specific facts of those cases are

09:53:19 23    clearly distinguishable from those of record here.

09:53:21 24          In the 2008 case of *Lebouef v. Global X-Ray*,

09:53:27 25    which is reported at 2008 Westlaw 23972, the plaintiff filed a

**OFFICIAL TRANSCRIPT**

09:53:33  1    civil action for alleged sexual assault by the defendant and

09:53:36  2    also brought criminal charges against him.  However, at the

09:53:41  3    time he moved to stay the civil case, the defendant was, quote,

09:53:46  4    "unaware of the status of the criminal case."

09:53:49  5              Moreover, not only had he not been indicted, but

09:53:52  6    he provided the Court with, quote, "no indication whether he

09:53:55  7    ever will be indicted."

09:53:58  8              Most notably, the defendant actually indicated in

09:54:00  9    that case for the record that, quote, "at the present time, he

09:54:05 10    has no intention of invoking his Fifth Amendment rights."

09:54:10 11              Those facts are clearly distinguishable from the

09:54:13 12    facts in this case.

09:54:13 13              In the 2011 case of *Lodge v. Boyd*, the plaintiff

09:54:18 14    filed a case of alleged sexual molestation by the defendant,

09:54:22 15    both in this court and in Mississippi state court, but the

09:54:25 16    parties disputed whether a criminal investigation or proceeding

09:54:28 17    even existed.

09:54:31 18              In fact, you found that the defendant, quote,

09:54:33 19    "presents no reliable evidence of an actual criminal proceeding

09:54:36 20    against him."  Thus, you concluded, there was, quote, "no

09:54:40 21    competent evidence before the Court as to the alleged ongoing

09:54:44 22    criminal investigation."

09:54:46 23              In fact, as you noted in Footnote 2 of that

09:54:49 24    opinion, the affidavit of the plaintiff, the victim -- the

09:54:53 25    alleged victim stated that he was, quote, "aware of no past or

09:54:57 1  current criminal proceeding arising from his allegations

09:55:01 2  against the defendant."

09:55:02 3          Now, when these facts -- or, more accurately,

09:55:09 4  these factual deficits are the facts that inform a district

09:55:16 5  judge's consideration of factor two, it is not surprising to us

09:55:18 6  that the lack of a formal indictment weighs in the

09:55:21 7  determination in a significant way.

09:55:23 8          But we submit that is not the case here.  It is a

09:55:26 9  matter of record here, as we said, that federal agents seized

09:55:30 10 file material from Mr. Watts' office last year because they are

09:55:34 11 investigating the legitimacy of his claims of representing

09:55:37 12 numerous clients in the *Deepwater Horizon* litigation.

09:55:42 13         It is a matter of record here that Mr. Watts has

09:55:44 14 retained counsel, Mr. Robert McDuff, to defend him in

09:55:48 15 connection with that very criminal investigation.

09:55:49 16         It is a matter of record here, based on

09:55:52 17 Mr. McDuff's unchallenged affidavit, that -- and I'm quoting

09:55:56 18 from the affidavit in the record as Document 12171-2 -- it's a

09:55:59 19 matter of record that "there is a real, appreciable and

09:56:05 20 nonspeculative prospect of the indictment of any number of

09:56:08 21 individuals, including Mr. Watts."

09:56:11 22         It is a matter of record here that Mr. McDuff

09:56:14 23 would advise Mikal Watts to invoke his Constitutional privilege

09:56:19 24 and decline to testify in response to discovery in the civil

09:56:22 25 matter, which relates to the same activities as the pending

**OFFICIAL TRANSCRIPT**

09:56:26 1    criminal investigation.

09:56:27 2            It is a matter of record here that Mr. McDuff

09:56:30 3    would further advise Mikal Watts that any testimony by him in

09:56:33 4    the civil matter would likely reveal strategies and defenses

09:56:37 5    that are important and could be utilized in defending the

09:56:41 6    criminal case.

09:56:42 7            Now, without bothering to cite the Court to those

09:56:47 8    cases of *Lebouef* and *Lodge,* what BP has briefed you on are some

09:56:54 9    cases outside of the Fifth Circuit.  We have discussed those in

09:56:56 10   our brief.  None of those cases, none, stand for the

09:56:59 11   proposition that a formal indictment *vel non* is dispositive of

09:57:04 12   factor two.

09:57:05 13           Factor two is the status of the criminal case.

09:57:07 14   Part of that analysis is indictment, yes or no.

09:57:10 15           But BP also makes the statement in its brief

09:57:14 16   that, "This case bears a strong similarity to *SEC v. First*

09:57:19 17   *Financial Group of Texas*," because they want to suggest to you

09:57:22 18   that, you know, the Fifth Circuit frowns on some blanket

09:57:26 19   Fifth Circuit assessment -- or assertion of privilege in

09:57:29 20   advance of actual discovery, and they cite that case.

09:57:33 21           Now, in that case, the SEC, in a civil action,

09:57:39 22   was proceeding as the Department of Justice was involved with

09:57:43 23   federal grand jury proceedings.  Both federal agencies were

09:57:50 24   simultaneously bringing civil and criminal matters into play

09:57:54 25   against a corporation for fraudulent student loan practices.

**OFFICIAL TRANSCRIPT**

09:57:58  1              Without so much as filing a motion for a stay of

09:58:03  2    the SEC case, without so much as seeking a protective order in

09:58:09  3    advance against discovery by the SEC, and without so much as

09:58:14  4    even objecting to information that was being sought by the SEC

09:58:17  5    in the civil case, the defendant corporate officials simply let

09:58:22  6    discovery proceed, sat on their hands and said, we're not

09:58:25  7    responding to anything, no matter what, based on a blanket

09:58:29  8    Fifth Circuit privilege.

09:58:30  9              The district court found them to be in contempt

09:58:34 10    and entered the injunctive relieve that was sought by the SEC.

09:58:40 11    The Fifth Circuit affirmed and said, look, you have not made

09:58:42 12    any record below regarding your Fifth Amendment right, and how

09:58:44 13    is a district judge or us supposed to address the specific

09:58:49 14    applicability of the Fifth Amendment.

09:58:55 15              Your Honor, that Mr. McDuff will, not may, but

09:58:59 16    will advise Mikal Watts to assert his Fifth Amendment right in

09:59:06 17    response to civil case discovery, failing a stay while the

09:59:07 18    criminal matter proceeds, is not to say that should that

09:59:12 19    eventuate, should a stay not be given, that this Court will be

09:59:16 20    deprived of a question-specific assertion of the Fifth

09:59:23 21    Amendment privilege.

09:59:24 22              Indeed, we can be confident that if civil case

09:59:28 23    discovery and the criminal investigation are allowed to proceed

09:59:31 24    in tandem and together, Mr. Watts, in counsel with Mr. McDuff,

09:59:36 25    will make specifically the kind of question-specific record

09:59:39 1   that this Court and the Fifth Circuit would need to determine

09:59:42 2   the applicability of the Fifth Amendment.

09:59:45 3           But that scenario, which was only allowed

09:59:49 4   improperly, we suggest, to happen in the *SEC* case because the

09:59:53 5   defendant never even sought a stay or a protective order before

10:00:00 6   discovery commenced, is precisely what you have the authority

10:00:04 7   to avoid, given the inevitable clash between civil case

10:00:09 8   discovery and the Fifth Amendment.

10:00:11 9           The defendant's argument that we can only present

10:00:13 10  a motion to stay after civil case discovery commences is both

10:00:18 11  illogical, impractical and is nowhere asserted, nowhere

10:00:23 12  asserted as a rule in the jurisprudence.

10:00:25 13          In fact, in *Shell Offshore v. Courtney*, where

10:00:29 14  Judge Berrigan applied the six-factor test to stay for one year

10:00:35 15  all civil case discovery in order to allow a preindictment,

10:00:39 16  preindictment in the criminal grand jury proceeding to take

10:00:45 17  precedence, she acknowledged the Fifth Circuit's caution

10:00:47 18  against the blanket assertion of a Fifth Amendment privilege in

10:00:53 19  that *SEC* case, but she correctly noted that, in advance of

10:00:55 20  discovery, it was the, quote, "real and appreciable risk,"

10:01:00 21  close quote, of self-incrimination which warranted the stay.

10:01:05 22          So, all I wanted to bring to the Court's

10:01:09 23  attention was a full and candid exposition of the cases where

10:01:15 24  you have gone into this second factor and been troubled by the

10:01:19 25  lack of an indictment, and point out to you that this is a far

10:01:22  1    different case factually, number one.

10:01:25  2              Also, point out to you how it is not, certainly,

10:01:28  3    in any Fifth Circuit law, that you can never bring a motion to

10:01:33  4    stay and implicate the Fifth Amendment until discovery is

10:01:40  5    underway.

10:01:40  6              So, in sum, Judge, we think that the status of

10:01:41  7    the criminal case under the recent case law in this Court

10:01:45  8    weighs in favor of the stay.  We know from recent

10:01:48  9    jurisprudence, including the *Waste Management* case which we've

10:01:52 10    cited in our brief, that the fact that formal criminal charges

10:01:54 11    have not been filed does not militate against the granting of a

10:01:54 12    stay.

10:01:59 13              We know that a stay is favored when a defendant

10:02:03 14    can demonstrate that the parallel criminal investigation is

10:02:09 15    active rather than speculative.

10:02:09 16              We know that the prospect of one or more

10:02:10 17    indictments here is real, appreciable and nonspeculative

10:02:14 18    pursuant to the unchallenged affidavit of Mr. McDuff.

10:02:17 19          THE COURT:  All right.  Mr. Meunier, I would like to

10:02:19 20    stop you right there, and let me hear from Mr. Downey, okay.

10:02:19 21          MR. MEUNIER:  Pardon me?

10:02:23 22          THE COURT:  Let me hear from Mr. Downey.  I've read the

10:02:25 23    briefs, and I'm familiar with the other arguments that you

10:02:28 24    make, okay.

10:02:30 25          MR. MEUNIER:  All right.  Thank you.

**OFFICIAL TRANSCRIPT**

10:02:30 1          THE COURT:  All right.

10:02:39 2          MR. DOWNEY:  Good morning, Your Honor.

10:02:39 3          THE COURT:  Good morning.

10:02:39 4          MR. DOWNEY:  Kevin Downey on behalf of the BP parties

10:02:43 5   in the BP, et al. v. Watts, et al. action.

10:02:49 6               On this motion, Your Honor, I would say three

10:02:51 7   things.

10:02:51 8               First, as the discussion with Mr. Meunier just

10:02:55 9   made clear, we don't know when an indictment will be returned.

10:02:59 10  I accept Mr. Meunier's representation that Mr. McDuff has been

10:03:03 11  told that the Department of Justice expects to return an

10:03:08 12  indictment or make a decision on the return of indictment in

10:03:10 13  June.

10:03:11 14              As is evident from the record in this case, that

10:03:14 15  is a different date than we have heard previously; and, the

10:03:19 16  length of any stay that would be implicated, even before a

10:03:22 17  decision is made on indictment, much less during the pendency

10:03:26 18  of the criminal case, is of uncertain length, potentially years

10:03:30 19  if that stay is extended throughout the life of the criminal

10:03:34 20  case.

10:03:34 21              As well, Your Honor, to my knowledge, we do not

10:03:38 22  have of record any direct representation from the Government on

10:03:42 23  that matter, again, except Mr. McDuff's representation that

10:03:48 24  that's what he's been told.

10:03:48 25              THE COURT:  You're not likely to get that, I can tell

**OFFICIAL TRANSCRIPT**

10:03:50 1    you.

10:03:51 2             MR. DOWNEY:  Well --

10:03:51 3             THE COURT:  You're not likely to get that.

10:03:51 4             MR. DOWNEY:  Yes, Your Honor.  Although --

10:03:54 5             THE COURT:  It's very rare.  I mean, occasionally they

10:03:57 6    do, but that's very rare.  The Government is not going to come

10:03:59 7    in and involve itself.

10:04:02 8             MR. DOWNEY:  Fair enough, Your Honor.

10:04:03 9             THE COURT:  That's not going to happen.

10:04:04 10            MR. DOWNEY:  But under the concept of imminence, we're

10:04:08 11   at this point several months away from even a decision on

10:04:11 12   indictment.  If an indictment were imminent, and the Department

10:04:14 13   intended to return it, there might be an indication from the

10:04:17 14   Department --

10:04:17 15            THE COURT:  Depends on how you define "imminent."

10:04:21 16            MR. DOWNEY:  Fair enough.

10:04:22 17                 To my mind, where there is an issue at stake of

10:04:25 18   the distribution of a substantial amount of assets or the

10:04:27 19   retention of a substantial amount of assets pursuant to a stay,

10:04:33 20   there are substantial interests at stake, and June is not

10:04:37 21   imminent.

10:04:38 22            THE COURT:  Okay.

10:04:39 23            MR. DOWNEY:  Let me say second, Your Honor, that the

10:04:42 24   interests at stake in the MDL 2179 matter are enormous.  I

10:04:49 25   don't think I need to rehearse that in great detail for the

**OFFICIAL TRANSCRIPT**

10:04:52 1   Court; but, I will say, as to the motion that's coming up next,

10:04:57 2   it's obvious that there will be at some point some result on

10:05:00 3   BP's request for a preliminary injunction.

10:05:03 4            One way or another, and as to one party or

10:05:06 5   another, or potentially as to both parties, the granting of a

10:05:11 6   stay or the denial of a stay is going to have a substantial

10:05:14 7   impact.

10:05:14 8            I'll let claimants speak for themselves in that

10:05:17 9   regard, but certainly you can expect that claimants would say

10:05:21 10  that a lengthy delay would prejudice their interests.

10:05:23 11           But as for BP, the distribution of assets at this

10:05:27 12  point in time, or a denial, even in part, of the request that

10:05:32 13  BP makes, would lead to assets being in the hands of claimants

10:05:38 14  with ready capacity to distribute it and a presumption that it

10:05:43 15  would be done.

10:05:43 16           THE COURT:  That argument seems to be relevant to the

10:05:45 17  next motion, not to this motion.

10:05:45 18           MR. DOWNEY:  Well, Your Honor --

10:05:47 19           THE COURT:  The next motion that you're going to argue,

10:05:49 20  the motion for preliminary injunction.

10:05:51 21           MR. DOWNEY:  Well, Your Honor, I only mention it in

10:05:54 22  connection with the equities for this reason.  If, in fact, the

10:05:56 23  Court were to deny BP's motion, and then a stay was entered

10:06:01 24  here, the result of that would be that the money would be

10:06:04 25  distributed.

**OFFICIAL TRANSCRIPT**

10:06:04  1          The time period during which there has been

10:06:08  2     distribution and dissipation has an effect on the parties.

10:06:11  3     Obviously, the opposite result would have a substantial effect

10:06:15  4     on the claimants, and I would suggest that is affected by this

10:06:18  5     decision.

10:06:21  6          Third, Your Honor, I just want to respond to a

10:06:26  7     few matters that Mr. Meunier raised about the overlap between

10:06:31  8     the two matters.

10:06:32  9          I acknowledge, of course, that Mr. Watts has

10:06:35 10     rights under the Fifth Amendment, and that those are implicated

10:06:38 11     by this decision.

10:06:39 12          I think the Court has to weigh that over a

10:06:42 13     substantial delay in the progress of the massive MDL

10:06:46 14     proceeding, where I think a decision or series of decisions on

10:06:49 15     the case will have enormous impacts throughout the course of

10:06:54 16     the litigation because assets will, again, either be

10:06:58 17     distributed or will remain with the program pursuant to a stay.

10:07:03 18          Last, Your Honor, let me just mention the posture

10:07:08 19     we're in, because I think it is important to the consideration

10:07:11 20     of the motion.

10:07:12 21          The Government is not here asking for an

10:07:15 22     indictment.  Mr. McDuff -- or for a stay, rather.  Mr. McDuff

10:07:21 23     has obviously been in contact with them, and he conveys the

10:07:24 24     representations that the Department has made as to timing; but,

10:07:26 25     the Government has not saw fit to come to the Court and seek a

10:07:29 1    stay to protect its interests.

10:07:33 2            It is the case, as Mr. Meunier says, that in the

10:07:36 3    rare case, there can be a stay requested by a defendant or a

10:07:42 4    putative defendant in a criminal matter in an accompanying

10:07:46 5    civil case, but that is very rare, Your Honor.  When the

10:07:50 6    interests at stake in the MDL are so substantial, I would

10:07:54 7    suggest that it would be an inappropriate remedy.

10:07:59 8            THE COURT:  All right.  Thank you very much.

10:08:03 9            MR. DOWNEY:  Thank you, Your Honor.

10:08:03 10           THE COURT:  Thank you.

10:08:06 11           Okay.  I don't need any more argument,

10:08:08 12   Mr. Meunier.

10:08:09 13           I'm going to grant Mr. Watts' motion to stay the

10:08:12 14   civil case, which is 13-6674, for the following reasons:

10:08:24 15           It's patently obvious, if I consider the factors,

10:08:41 16   that there are sufficient special circumstances involved here

10:08:44 17   that warrant this stay.

10:08:46 18           The first factor is the extent to which the

10:08:49 19   issues in the criminal case overlap with those presented in

10:08:51 20   this civil case.  As I said, it's virtually or exactly

10:08:56 21   identical.  It's precise overlap in the issues raised -- in

10:09:02 22   fact, in BP's lawsuit against Mr. Watts, they cite as a basis

10:09:09 23   for it the ongoing criminal investigation and the raid, the

10:09:19 24   execution of multiple search warrants on his offices in

10:09:22 25   San Antonio.

**OFFICIAL TRANSCRIPT**

10:09:25  1        It's clear that there is an ongoing and active

10:09:30  2    criminal investigation into Mr. Watts and his handling or

10:09:37  3    representation of numerous claimants in MDL 2179, and

10:09:50  4    allegations involving whether many of those clients are perhaps

10:10:00  5    fictitious or not properly identified, whatever.

10:10:03  6        There are multiple issues, but it's clear that

10:10:06  7    there is an active, ongoing criminal investigation involving

10:10:11  8    Mr. Watts and perhaps others, and I think there is sufficient

10:10:16  9    evidence in front of me that there is a likelihood, I would say

10:10:23 10    a strong likelihood that there will be indictments returned, if

10:10:27 11    not in the next two months, probably in the next several

10:10:31 12    months.

10:10:31 13        I think that's sufficient to weigh against any

10:10:38 14    possible prejudice to BP in this delay this will cause.  It's

10:10:48 15    not going to be an indefinite stay.  What I'm going to do is to

10:10:54 16    require that Mr. Watts' attorneys -- the parties, actually, all

10:11:01 17    the parties can submit to the Court -- I'm going to ask that a

10:11:07 18    report be made to the Court on the status of the criminal

10:11:09 19    investigation in four months, 120 days.  We'll reevaluate the

10:11:21 20    situation at that time.

10:11:22 21        I think, considering those factors and all the

10:11:26 22    other factors, that the Court will exercise its discretion in

10:11:33 23    that regard.

10:11:39 24        Okay.  Let's take the other motion.

10:12:05 25        Mr. Downey.

**OFFICIAL TRANSCRIPT**

10:12:06  1    MR. DOWNEY:  Your Honor, this motion was brought by BP
10:12:11  2  in the Watts case, and there is an accompanying motion in the
10:12:14  3  MDL under Rule 60(b) for an order that has comparable relief.
10:12:21  4    THE COURT:  Even though I never asked for formal
10:12:23  5  briefing on the Rule 60 motion, it occurred to me when I read
10:12:27  6  it that it exactly, again, at this point at least, asks for the
10:12:33  7  same relief.
10:12:35  8    In the Rule 60 motion, you're asking to stay or
10:12:40  9  enjoin the second distribution, and for discovery, of course.
10:12:46 10  Then, in the motion for preliminary injunction, you're asking
10:12:52 11  for similar relief -- well, you're asking to stay or enjoin the
10:13:00 12  second distribution, right?
10:13:02 13    MR. DOWNEY:  That's right, Your Honor.  That's right.
10:13:03 14  The relief sought is effectively identical.
10:13:06 15    THE COURT:  Right.  In fact, when I read the briefs, it
10:13:09 16  was copy and paste, both sides.  I mean, it's essentially the
10:13:12 17  same briefing.
10:13:13 18    MR. DOWNEY:  Right.  I think the relief requested is
10:13:15 19  identical.
10:13:16 20    The 60(b) motion, when Your Honor considers it,
10:13:18 21  will involve, obviously, some issues related to Rule 60(b) that
10:13:23 22  will have to be considered, but I think, for purposes of today,
10:13:26 23  I agree with the Court it's identical relief.
10:13:30 24    THE COURT:  Okay.  Go ahead.
10:13:31 25    MR. DOWNEY:  Your Honor, on this motion, BP is asking

**OFFICIAL TRANSCRIPT**

10:13:35 1   to preliminarily enjoin the second distribution of funds under

10:13:40 2   the Seafood Compensation Program pending either a determination

10:13:44 3   at trial in the Watts matter or under Rule 60(b)(3) of the

10:13:50 4   amount of damage caused by Mr. Watts' fraud.

10:13:54 5            Obviously, the request is unusual, but it results

10:13:58 6   from unusual, if not unique circumstances.  That is, as the

10:14:03 7   Court knows from the papers, that one of the plaintiffs'

10:14:06 8   lawyers and a member of the Plaintiffs' Steering Committee in

10:14:10 9   MDL 2179 appears to have invented clients for purposes of

10:14:15 10  gaining a position on the Plaintiffs' Steering Committee and

10:14:19 11  joining in the benefits of the Common Benefit Fund.

10:14:22 12           Obviously, as the Court knows, we're not asking

10:14:24 13  at this time for ultimate relief, and we're not seeking a

10:14:30 14  determination that we are either entitled to damages from the

10:14:33 15  class or we're entitled to a modification of the judgment as a

10:14:36 16  final matter; but, if the remedy that we're requesting is not

10:14:41 17  entered at this time, BP submits to Your Honor that funds will

10:14:46 18  be distributed --

10:14:47 19           THE COURT:  What is the specific remedy that you're

10:14:50 20  asking for right now?

10:14:52 21           MR. DOWNEY:  We're asking for a stay of the

10:14:54 22  distribution, second distribution.

10:14:56 23           THE COURT:  Of the entire second distribution?

10:14:58 24           MR. DOWNEY:  At this stage, yes.

10:15:00 25           THE COURT:  I guess my questions about that to you are,

10:15:04 1    first of all -- I don't know to the extent that you're aware of

10:15:09 2    this or not, but I got the sense that partly you all are

10:15:18 3    operating under the impression that the second distribution is

10:15:23 4    imminent, so to speak.

10:15:28 5            I inquired of the Claims Administrator as to the

10:15:34 6    status of the first distribution, and I've got some information

10:15:38 7    here that I think is relevant.

10:15:44 8            Mr. Juneau is here.  If I state this wrong, he

10:15:57 9    can correct me, but this came from his office.

10:16:06 10           This is current through Monday, the 24th,

10:16:13 11   2/24/14.  The Seafood Program has paid out a total of

10:16:22 12   $1,074,534,594 to eligible claimants.  Of course, the claims

10:16:31 13   filing deadline has long passed, and we can't continue to get

10:16:36 14   claims in this program, so there is a total number of claims in

10:16:39 15   the Program of 24,609.

10:16:45 16           The Program has completely processed -- that

10:16:50 17   doesn't mean paid this number of claims, they've processed -- a

10:16:56 18   lot of claims were denied, of course; some were paid, some were

10:16:57 19   denied -- they've completed the processing of 21,871 Seafood

10:17:01 20   claims, which is about 89 percent of the total claims have been

10:17:04 21   processed.

10:17:08 22           There are an additional 2,096 Seafood claims in a

10:17:14 23   separate group, where they have been essentially processed, but

10:17:18 24   they are awaiting final resolution.  You know, people have to

10:17:21 25   decide whether to accept or appeal or whatever.  There are

10:17:28  1    2,096 in that category, and that makes up 8.5 percent of the

10:17:32  2    total claims submitted.

10:17:35  3             Then finally, there are 642 claims, or

10:17:41  4    2.6 percent of the total claims, which are still awaiting

10:17:47  5    review and processing, so those haven't completed even the

10:17:52  6    processing or review.

10:17:54  7             They also tell me that they anticipate that they

10:18:01  8    will have processed 97 percent of open Seafood claims by the

10:18:06  9    middle of the summer of 2014, and that at that point they

10:18:13 10    estimate there would be a remaining 3 percent that may be

10:18:17 11    subject to further investigation, special investigations, and

10:18:23 12    the resolution of which, of course, no one can say when or if

10:18:27 13    or how long that would take.

10:18:29 14             The point being, that there is nothing imminent

10:18:31 15    going to happen, first of all.  There is no distribution that's

10:18:33 16    going to happen this month or next month, it appears.  As you

10:18:42 17    are aware, we can't have a second distribution until the first

10:18:46 18    distribution is completed, first of all.

10:18:49 19             Secondly, Mr. Balhoff -- where is Mr. Balhoff?

10:18:58 20    There he is, way in the back -- Mr. Balhoff has not yet

10:18:59 21    submitted his proposed allocation formula for the second

10:19:02 22    distribution, which has to occur.

10:19:10 23             I don't think it's necessary for him to know the

10:19:13 24    amount of the funds that will be remaining for him to give us

10:19:16 25    that; but, nonetheless, he has to give us his proposed

1   allocation formula.

2         Then, obviously, we would have to give the

3   parties an opportunity to comment on whatever proposal I

4   receive from Mr. Balhoff and Mr. Perry.

5         Then, finally, nothing will occur unless and

6   until I order and approve the second distribution.

7         So the only point I'm trying to make, Mr. Downey,

8   is there is nothing going to happen this month, next month,

9   there is nothing imminent there, that it's going to be into the

10  summer or beyond, and there is a lot to happen before we get to

11  a second distribution.

12        So I guess the question I have is, why do we need

13  to enjoin anything at this time?

14      MR. DOWNEY:  Well, I guess, let me react to a few

15  statements.

16        If Your Honor is suggesting we take the

17  injunction motion up later because there is no distribution, so

18  the issues don't need to be considered at this time, no

19  distribution planned, imminently, I think -- I'll have to

20  confer with the client, but I understand that request.

21        I don't know, I don't have perfect visibility, I

22  don't know to what extent BP has perfect visibility into the

23  precise date of the second distribution --

24      THE COURT:  Well, I don't think anybody has that.  I

25  don't have that right now.

**OFFICIAL TRANSCRIPT**

10:20:50 1          My point is, it's not going to occur for several

10:20:55 2     months.  That kind of relates to the first motion we argued

10:21:04 3     today, too, because it looks like the timing is going to be

10:21:06 4     such that we may know what the Government's decision is in the

10:21:10 5     criminal case before there is even an opportunity for the

10:21:13 6     second distribution to occur, just the way this timing is

10:21:16 7     working out, it seems to me.

10:21:18 8          So, anyway, go ahead.  I just wanted to let that

10:21:25 9     information be put on record.

10:21:28 10          MR. DOWNEY:  Well, to the extent what Your Honor has

10:21:33 11     just said would suggest that, in fact, there isn't imminence,

10:21:36 12     and that we should take these issues up at another time, that's

10:21:39 13     fine.

10:21:40 14          If you want to hear the motion now --

10:21:41 15          THE COURT:  Well, let's go ahead and hear it, and we'll

10:21:44 16     decide how to act on it, but I thought it was relevant for

10:21:47 17     everyone to know that.

10:21:49 18          MR. DOWNEY:  Thank you, Your Honor.

10:21:51 19          THE COURT:  Go ahead.

10:21:52 20          MR. DOWNEY:  Let me divide what I have to say today

10:21:57 21     into three parts for Your Honor's consideration.  I'm sure

10:22:01 22     there are other questions Your Honor may have, but let me focus

10:22:04 23     on these three because they just seemed to me most prominent

10:22:09 24     within the briefing.

10:22:09 25          The first question is:  Has BP done enough to

**OFFICIAL TRANSCRIPT**

10:22:12 1    show that Mr. Watts has committed a fraud; is the record

10:22:16 2    sufficient to that end at this point?

10:22:18 3                The second question, which is addressed

10:22:22 4    extensively in the class defendants' opposition, is:  Were the

10:22:28 5    representations material, or were they immaterial; was it

10:22:32 6    trivial in the scheme of the negotiations, or was it

10:22:35 7    significant?

10:22:37 8                Third, there is a great deal of discussion of

10:22:38 9    reliance or whether reliance was justifiable.  I want to touch

10:22:43 10   on that now, and, perhaps, if I have some time in rebuttal,

10:22:48 11   respond to whatever Mr. Irwin says.

10:22:50 12               First, let me spend a moment on the fraud and the

10:22:53 13   falsity of the statements because I think, in particular,

10:22:56 14   whenever the Court considers this motion and reaches a decision

10:23:01 15   on it, it's now clear, since the Court has decided the motion

10:23:05 16   on the stay, that we have the record that we will have at the

10:23:10 17   time that decision is rendered.

10:23:12 18               Without repeating what is in our brief as to the

10:23:16 19   details of what's occurred, it's obvious that within this MDL,

10:23:23 20   within MDL 2179, within this consolidated matter, there have

10:23:29 21   been numerous filings which were false and misleading.

10:23:35 22               Several thousands, tens of thousands of

10:23:36 23   individuals were represented to be parties and to be clients of

10:23:40 24   Mr. Watts, and the record overwhelmingly demonstrates that they

10:23:45 25   were not.

**OFFICIAL TRANSCRIPT**

10:23:45  1          Most relevant to consideration of our 60(b)

10:23:51  2   motion is that these representations were specifically made in

10:23:55  3   connection with the settlement agreement, which was then

10:23:57  4   approved by the Court's approval order.

10:24:01  5          In the settlement agreement, as the Court knows,

10:24:05  6   although this is not -- the details of this are not of public

10:24:09  7   record, the opt-out letter was filed, and that opt-out letter

10:24:13  8   specifically identified the number of clients who Mr. Watts was

10:24:18  9   purporting to represent.

10:24:20 10          His application for membership on the

10:24:24 11   Plaintiffs' Steering Committee represented that he was the

10:24:27 12   attorney for over 40,000 plaintiffs in MDL 2179.

10:24:33 13          Your Honor, at various times, that number would

10:24:36 14   have represented different percentages of the total number of

10:24:40 15   claimants in MDL 2179, but I don't need to tell the Court that

10:24:45 16   that was a substantial number of claimants in a case which

10:24:49 17   there were a substantial number of claimants, ranging between a

10:24:52 18   third of the claimants, at some points higher, and perhaps at

10:24:57 19   one point a quarter of the claimants.

10:24:59 20          In response to these allegations and response to

10:25:03 21   these facts, what do the parties say?

10:25:06 22          Well, class counsel says it has no information or

10:25:09 23   belief as to Mr. Watts' conduct, which, for present purposes,

10:25:15 24   is the record, but the class defendants suggest to the Court

10:25:21 25   that the explanation for Mr. Watts' conduct might be mistake or

**OFFICIAL TRANSCRIPT**

neglect, as opposed to an intentional fraud.

So has BP done enough to overcome that suggestion and the argument that that's the appropriate inference from what the Court has before it?

Even at this stage of the proceedings, Your Honor, the record disproves that, for at least two reasons.

First, I think that the Court, for purposes of this injunction, should treat the record as if Mr. Watts, in response to the motion and response to the complaint, has asserted his rights under the Fifth Amendment.

BP is deprived at this time and at later times until the stay is lifted of any opportunity to examine Mr. Watts because he's indicating that his rights under the Fifth Amendment are implicated and preclude him from discussing these matters in response to discovery requests and questions from counsel in depositions.

From that assertion of the Fifth Amendment, Your Honor, the cases are legion that BP is entitled to a negative inference of fraud against Mr. Watts.  That has been decided in this Court, in the Fifth Circuit, and elsewhere over and over and over again.  The allegations are clearly set forth in BP's papers here, and they are unrebutted as to whether or not there was a fraud.

Now, the question that I think class defendants

10:26:48 1   pose in connection with this is, well, why should that

10:26:51 2   inference be attributed to anyone other than to Mr. Watts at

10:26:51 3   this stage.

10:26:55 4        I'd like to say, first, I'm not sure that's

10:26:57 5   necessary; but, assuming that it is necessary, it was the case

10:27:00 6   at the time that Mr. Watts made most of these representations

10:27:05 7   that he was a member of the Plaintiffs' Steering Committee, and

10:27:08 8   that was certainly true at the time of the negotiations that

10:27:10 9   are the factual focus of both parties in connection with this

10:27:14 10  case.

10:27:15 11       He was acting on behalf of claimants, he was

10:27:19 12  negotiating on behalf of the class, and his fraud induced, in

10:27:25 13  part, part of the payment that was agreed to by BP in the class

10:27:31 14  settlement.

10:27:34 15       As noted, he had a strong motive to make false

10:27:37 16  representations.  I think the Court understands that for

10:27:40 17  attorneys who are selected to be members of the

10:27:42 18  Plaintiffs' Steering Committee here, participation in the

10:27:46 19  Common Benefit Fund was ultimately granted, and that presents a

10:27:51 20  strong financial motive for the fraud.

10:27:52 21       I would say finally, Your Honor, and most

10:27:55 22  importantly, there is nothing in the record which demonstrates

10:28:00 23  that this is anything other than what BP says it is.  So at

10:28:06 24  this point, Your Honor, I think that BP has overwhelmingly

10:28:09 25  demonstrated that Mr. Watts committed a fraud.

**OFFICIAL TRANSCRIPT**

10:28:11  1                Now, Your Honor, I'm reaching a subject on

10:28:15  2     materiality that does implicate Pretrial Order Number 38, which

10:28:19  3     requires that the parties keep settlement negotiations

10:28:24  4     confidential amongst the parties and the Court, so I don't know

10:28:29  5     how the Court wants to handle that.

10:28:32  6                THE COURT:  Well, my view is, since you all have raised

10:28:36  7     the issue -- this is not using settlement negotiations to prove

10:28:44  8     a claim, it's raising the issues relating to alleged conduct in

10:28:58  9     terms of the settlement negotiations and motivations and so

10:29:04 10     forth -- seems to me that that stuff is relevant; and, you

10:29:10 11     know, as far as I'm concerned, if it's relevant, it's not

10:29:12 12     confidential.  Unless it's somehow otherwise privileged, I

10:29:17 13     think it's fair game --

10:29:19 14                MR. DOWNEY:  Well, that was my --

10:29:20 15                THE COURT:  -- by both sides.

10:29:21 16                MR. DOWNEY:  That is the restriction, the only

10:29:22 17     restriction, but the PSC was a party to the Order, as well.

10:29:31 18                MR. IRWIN:  Your Honor, we have no objection.

10:29:33 19                THE COURT:  Okay, good.

10:29:39 20                MR. DOWNEY:  There's a substantial discussion, as you

10:29:42 21     would expect, in the submission of the class defendants as to

10:29:44 22     why the representations of Mr. Watts that I've just talked

10:29:47 23     about didn't matter for purposes of achieving the class

10:29:51 24     settlement here, how in the scheme of the negotiations they

10:29:54 25     were trivial.

                                **OFFICIAL TRANSCRIPT**

So let me start first by explaining the two ways that I think the Court can look at this to understand that, in fact, the representations were quite material and had a substantial impact on the amount of money that was agreed to as part of the settlement, the $2.3 billion capped Seafood Fund.

First, and this is discussed extensively in the papers, the conduct had an overall impact on the dynamics of the negotiations and undoubtedly led to a different result than would have occurred had there been no fraud. I'll enumerate those circumstances for the Court in a moment.

But second, in terms of quantification, although we can't get a perfect picture into the value of these claims from the discussions between the parties, we can get a very substantial picture into where the parties were.

I'll explain what the difficulties were and why it's not a full picture, but I think, nevertheless, consideration of where the parties were on these issues at the time they entered the Seafood Fund negotiations will provide the Court a good window on numbers.

First, Your Honor, let me talk about the impact on the overall circumstances.

It's worth remembering what Mr. Watts was saying. He was saying he represented 40,000 claimants damaged as a result of the spill. They were plaintiffs in the MDL suit on whose behalf he had filed complaints consistent with Rule 11 or

10:31:35  1    short-form joinders consistent with Rule 11.

10:31:39  2             Obviously, there is the individual value of those

10:31:42  3    40,000 cases.  That would be an appropriate part of any

10:31:46  4    analysis, and I'll talk about that in a moment; but, there is

10:31:49  5    another factor, Your Honor, which is that he was presenting an

10:31:51  6    enormous number of claimants and an enormous number of

10:31:58  7    claimants for which, as the Holstein declaration that we've

10:32:01  8    submitted details, there was a risk of punitive damages, and

10:32:05  9    punitive damages across potentially several matters.

10:32:08 10             When the time came to settle the case, the Watts

10:32:14 11    claimants were incredibly -- when the time came to settle the

10:32:20 12    case, the Watts claimants were a prominent focus of the

10:32:24 13    discussions.  They were in virtually every aspect of the

10:32:27 14    discussions set forth in the record.

10:32:29 15             One side presented a number, BP, saying we will

10:32:33 16    only settle at this number if the Watts claimants are included.

10:32:37 17    The PSC said, here is a counterproposal; we will not include

10:32:41 18    the Watts claimants within that number.

10:32:44 19             Now, the frame of these negotiations was that

10:32:48 20    they occurred, as I think the Court knows, in a very short

10:32:51 21    period of time, between February 23rd and 25th.

10:32:57 22             As Mr. Godfrey details in his declaration, there

10:33:01 23    was specific discussion of Watts associated with particular

10:33:04 24    moves in the numbers, where BP increased its offer and included

10:33:10 25    as one of the conditions for moving the number that the

10:33:14 1   individual Watts claimants had to be included.

10:33:17 2           There were countermoves by the PSC, where they

10:33:19 3   conceded on numbers but still required that the Watts claimants

10:33:24 4   be excluded.

10:33:26 5           At the end of the day, there is not much dispute

10:33:29 6   between the parties that the Watts claimants were included in

10:33:32 7   the discussions.  Mr. Rice's declaration acknowledges that, and

10:33:36 8   even acknowledges that he made a statement to Magistrate

10:33:40 9   Judge Shushan to that effect.

10:33:47 10          So what does that mean in terms of how the Court

10:33:49 11  would ultimately go about valuing this?

10:33:50 12          Well, I would ask the Court to consider the issue

10:33:52 13  in the context of a discussion in one of the cases that we've

10:33:55 14  cited, the *Rhone-Poulenc* case from the 7th Circuit.  That's not

10:33:59 15  a Rule 60(b) cause or a fraud case, but it's a Rule 23 case.

10:34:05 16          There, the court analyzed what is the impact of

10:34:07 17  having a large number of claimants in a class action, even if

10:34:11 18  those claimants don't have claims which are particularly

10:34:14 19  meritorious.

10:34:16 20          There, the court said, well, there are thousands

10:34:18 21  and thousands and thousands of claimants.  Cases have been

10:34:22 22  tried.  What we know from those cases being tried is the

10:34:26 23  success rate of those claims is very *de minimis*.  The court

10:34:31 24  posited that it was probably one out of 13 cases.

10:34:34 25          The court said if those claims were evaluated

**OFFICIAL TRANSCRIPT**

10:34:37  1    individually by a defendant in a class action lawsuit, the

10:34:41  2    defendant would say, well, in aggregate, the damages might add

10:34:44  3    up to $125 million; but, when aggregated together and a value

10:34:50  4    was attributed to them, the defendant would look at it as a

10:34:53  5    value of $25 billion.

10:34:57  6                There is an aspect of that to the Watts claims

10:34:58  7    here.  I'm going to discuss the individual value of those

10:35:01  8    claims and how the parties looked at it, but I don't think the

10:35:04  9    Court, in making the decision, can put aside the context of the

10:35:08 10    large number of claimants and the effect they would have on any

10:35:11 11    party's consideration of the issue.

10:35:14 12                I think that's true, also, Your Honor, when we

10:35:16 13    get to the 60(b) motion.  It's often difficult for a court to

10:35:20 14    say, well, a fraud had a precise consequence in a case; but,

10:35:26 15    nevertheless, the fact that it didn't have a precise

10:35:29 16    consequence that can be identified, we nevertheless should take

10:35:32 17    some action to remedy it, not because the party that's been

10:35:38 18    injured can't prove the precise number, but, rather, because

10:35:42 19    it's difficult for that party to prove it, but you know that

10:35:45 20    it's there --

10:35:46 21         THE COURT:  Let me ask you this:  What this is

10:35:54 22    fundamentally about is that your client, BP, is arguing and

10:36:01 23    saying that, we would not have paid as much for the Seafood

10:36:12 24    Program, the 2.3 billion, if we had known Mr. Watts' claims

10:36:17 25    were, perhaps, in large number, fictitious, nonexistent or

10:36:20  1    whatever the case, right?

10:36:20  2         MR. DOWNEY:  That's right.

10:36:22  3         THE COURT:  That's what you're saying.

10:36:23  4              So, certainly, during these negotiations, BP and

10:36:29  5    its parties who were negotiating, the lawyers who were

10:36:32  6    negotiating on its behalf, had to have its own internal

10:36:36  7    valuation of these claims.

10:36:38  8              What value did BP put on the Watts claims as a

10:36:44  9    whole or individually during the negotiations?

10:36:47 10         MR. DOWNEY:  Well, I don't want to get into any --

10:36:49 11         THE COURT:  Oh, no, I want you to get into that.  I'm

10:36:51 12    asking that.

10:36:51 13         MR. DOWNEY:  Yes, but --

10:36:51 14         THE COURT:  I know you don't want to get into that, but

10:36:54 15    I want to get into that.

10:36:55 16         MR. DOWNEY:  Well, I think you can tell, Your Honor, to

10:36:57 17    some extent, from what occurred and was said in the

10:37:00 18    negotiations on valuation.

10:37:01 19         THE COURT:  Well, give me a number.

10:37:03 20         MR. DOWNEY:  Well, let me show you a slide to that

10:37:06 21    effect of where BP was.

10:37:07 22         THE COURT:  No, no, give me a number.  Give me a

10:37:08 23    number, if you can, first.  I'm not cutting you off, I'll let

10:37:10 24    you proceed, but that's the fundamental issue for me because

10:37:13 25    it's not how somebody else was looking at these claims, it's

**OFFICIAL TRANSCRIPT**

10:37:17  1
10:37:20  2
10:37:22  3
10:37:25  4
10:37:35  5
10:37:39  6
10:37:42  7
10:37:47  8
10:37:51  9
10:37:56 10
10:38:01 11
10:38:07 12
10:38:10 13
10:38:13 14
10:38:15 15
10:38:20 16
10:38:25 17
10:38:30 18
10:38:35 19
10:38:41 20
10:38:47 21
10:38:53 22
10:39:00 23
10:39:04 24
10:39:10 25

how BP was looking at these claims that's the real issue here,
it seems to me.

          If you're saying, we would have paid less if we
had known what we know now, what was the number, how much did
you value these claims -- because we all know, I mean, there
were -- I don't think anybody, anybody involved in this case,
really thought that Mr. Watts ever had 40-something thousand
claimants or that he had 40,000 valid claimants.

          There was public reports about that back to 2011.
There were issues.  It goes back to when he filed his claims
starting with the GCCF, under Mr. Feinberg, where they knocked
out thousands of his claims saying they were either incomplete,
they didn't have documentation, they didn't have proper
Social Security numbers, whatever.

          Everybody is aware of that.  I know BP was aware
of that because there was a letter written by the Goodwin
Procter law firm, representing the GCCF and Mr. Feinberg, to BP
specifically laying all this out in 2011, and then there were
media reports about all of that.

          So what I'm trying to understand is what value,
knowing whatever BP knew at the time about Mr. Watts' claims,
and, also, the fact that I think both sides concede that all,
or, if not all, certainly the vast majority, of his claimants
fell within Category III, that is, they were Seafood crew
deckhands, crew members who were undocumented, who had no proof

10:39:18 1   of employment, much less proof of earnings, and they would have

10:39:22 2   to rely on their own affidavit or something.

10:39:25 3               In other words, I'm just trying to understand how

10:39:30 4   was BP valuing these claims at that time.  I understand your

10:39:35 5   argument about the sheer number and how that could have

10:39:39 6   affected things, but what value did BP place on these claims

10:39:43 7   between February 23rd and February 25th when this was coming

10:39:47 8   together.

10:39:48 9               MR. DOWNEY:  Well, let me tell you the beginning of

10:39:49 10  that process, Your Honor, which obviously changes --

10:39:49 11              THE COURT:  Can you tell me what the value was first?

10:39:52 12              MR. DOWNEY:  Well, BP offered --

10:39:53 13              THE COURT:  Did you have a value?

10:39:54 14              MR. DOWNEY:  I don't have a specific value in part

10:39:57 15  because I don't want to reveal anything privileged.

10:40:00 16              THE COURT:  Well, wait a minute, wait a minute.  It

10:40:04 17  seems to me you can't come to court and say, we were defrauded,

10:40:09 18  and we wouldn't have paid as much if we had known then what we

10:40:15 19  know now, and then stand here and say, we don't want to reveal

10:40:18 20  what we were thinking at the time.  You can't have it both

10:40:22 21  ways.

10:40:22 22              So tell me, if you can, what BP's thinking was,

10:40:27 23  what their valuation was, what their analysis was of the Watts

10:40:32 24  claims during the negotiations, if you can tell me that.

10:40:35 25              MR. DOWNEY:  I can't tell you anything privileged, but

10:40:36  1    I can tell you what is nonprivileged.

10:40:40  2         THE COURT:  You know, if you want me to act on this

10:40:44  3    motion, it seems like I've got to have information.  I can't

10:40:47  4    just take a generalized statement that "we would have paid

10:40:50  5    less."  That's not good enough.

10:40:52  6         MR. DOWNEY:  Well, let me react to the various parts of

10:40:55  7    what Your Honor has said in part.

10:40:59  8              I don't have privileged information to reveal.

10:41:02  9    We're asking the Court to infer a value from the course of the

10:41:08 10    negotiations, which I understand the Court's comments, but

10:41:12 11    that's my response.

10:41:13 12         THE COURT:  Other than what I can infer from what we

10:41:20 13    know exists, the documents that have been filed here and the

10:41:28 14    declarations that have been filed, you have no other data,

10:41:34 15    documents, evidence, information to offer to the Court that I

10:41:41 16    can get some idea of the value BP placed on these claims during

10:41:46 17    the negotiations?

10:41:47 18         MR. DOWNEY:  No.  We'll rely on the record that we've

10:41:51 19    submitted, Your Honor, for purposes of making the decision.

10:41:51 20         THE COURT:  Okay.

10:41:53 21         MR. DOWNEY:  But let me say one thing in terms of, I

10:41:57 22    think, how to consider the issue of how much the damage is,

10:42:02 23    which, in part, relates to the question Your Honor is asking.

10:42:06 24              I think the question is really how much damage

10:42:08 25    was caused by the fraud, not fully what one party or the other

**OFFICIAL TRANSCRIPT**

10:42:13  1   valued these things at internally.

10:42:15  2         But the best numbers I can give you, Your Honor,

10:42:18  3   are the numbers that were exchanged when the parties were

10:42:23  4   discussing these things as a discrete category, discussing the

10:42:27  5   Watts claimants as a discrete category.

10:42:29  6         One of the difficulties --

10:42:29  7         THE COURT:  What were those numbers?

10:42:31  8         MR. DOWNEY:  Well, I'll show them to Your Honor.

10:42:34  9         So this was on February 20th, so this was

10:42:37 10   essentially the last discussion that was key to the Watts

10:42:41 11   claimants before the dedicated Seafood Fund negotiations began

10:42:46 12   on the 23rd.

10:42:48 13         THE COURT:  As I understand and I recall -- although I

10:42:49 14   wasn't in the room during the negotiations, Judge Shushan was,

10:42:54 15   and I certainly would get general reports as to progress that

10:43:03 16   was being made or not made -- my understanding is that up until

10:43:09 17   around that time, February 20th or thereabouts, the parties

10:43:14 18   were discussing a framework for these individual Seafood crew

10:43:24 19   member claims that would be similar or identical to the

10:43:27 20   individual economic loss claims, right?

10:43:31 21         MR. DOWNEY:  That's right, Your Honor.

10:43:31 22         THE COURT:  In other words, there would be a framework,

10:43:33 23   and it would say, if you fit into this category, this is how

10:43:37 24   your compensation would be calculated --

10:43:39 25         MR. DOWNEY:  That's correct.

10:43:40 1          THE COURT:  -- right?

10:43:42 2          MR. DOWNEY:  Those are the February 20th numbers.

10:43:44 3          THE COURT:  Right, I understand.

10:43:46 4               Around that time, progress apparently wasn't

10:43:49 5     being made, where you had a trial coming up.  My

10:43:55 6     understanding -- again, this is in the declarations and all

10:43:58 7     that have been submitted to the Court and other information

10:44:01 8     that was provided to the Court contemporaneously -- was that BP

10:44:07 9     at some point right about then came and suggested a different

10:44:12 10    approach, that is, instead of trying to figure out on a

10:44:20 11    case-by-case, claim-by-claim type of framework at this point

10:44:22 12    for the Seafood Program we're talking about, we will change the

10:44:28 13    focus.  Instead, we're going to talk about a guaranteed/capped

10:44:37 14    Seafood Fund, the focus of which the negotiations now became

10:44:41 15    total amount for that fund and who would be included.  Am I

10:44:44 16    right about that?

10:44:45 17         MR. DOWNEY:  I think that's described by Mr. Rice and

10:44:48 18    Mr. Godfrey in the record here.

10:44:50 19         THE COURT:  Right, right.

10:44:55 20              So, in the end, the focus became on what total

10:45:01 21    amount of money needed to be in this fund to fully or fairly

10:45:07 22    compensate the entire Gulf of Mexico, basically, for the

10:45:11 23    Seafood industry, right?

10:45:12 24         MR. DOWNEY:  Well, I think it was to compromise the

10:45:15 25    claims that would be included as part of that --

                      **OFFICIAL TRANSCRIPT**

10:45:15 1       THE COURT:  Right, right.

10:45:17 2       MR. DOWNEY:  -- particularized fund, as opposed to

10:45:19 3  under the IEL framework or under the BEL framework.

10:45:24 4       THE COURT:  Right.

10:45:24 5           So, as I understand, the $2.3 billion number --

10:45:33 6  it focused, again, not on individual claims, but it focused on

10:45:39 7  what is the revenue from the catch or landings in the

10:45:45 8  Gulf of Mexico in the timeframe prior to the spill.

10:45:49 9           I think the number that I recall was something on

10:45:51 10 the order of 475 million, 425 million.  400-and-something

10:45:57 11 million dollars was the total average annual revenue for the

10:46:03 12 entire Gulf of Mexico fisheries at that time, right?

10:46:08 13          The total number agreed to became five times

10:46:12 14 that, which came out to almost exactly $2.3 billion, right?

10:46:20 15      MR. DOWNEY:  Right in both respects.  I think -- if I

10:46:23 16 can just say what I think the record is --

10:46:26 17      THE COURT:  Well, the point I'm making is, my

10:46:28 18 understanding, in the end, when the number was finally agreed

10:46:31 19 to, you all weren't focusing any longer on individual claims in

10:46:34 20 terms of trying to calculate the value of those claims; you all

10:46:37 21 were focusing on what does it take for BP to compensate the

10:46:44 22 entire Gulf fishing industry.

10:46:49 23          It came out to five times, roughly five times the

10:46:54 24 gross revenue, not net revenue or profit, but the gross

10:46:59 25 revenue.  That's the way it was presented to the Court, too,

**OFFICIAL TRANSCRIPT**

1    during the fairness hearing, as I recall.

2         MR. DOWNEY:  There's no question that the industry

3    revenues were a basis for the presentation of the fairness of

4    the settlement in the Rule 23 hearing, and there is no question

5    that there were objections as part of the Rule 23 process on

6    fairness grounds, and that defense was asserted.

7              There is also no question, although I'm not

8    clear, Your Honor, how much --

9         THE COURT:  Objections not by BP; by others, you mean?

10        MR. DOWNEY:  No, by objectors to the settlement,

11   including the State of Louisiana and others.

12        THE COURT:  Okay.

13        MR. DOWNEY:  It's also true, Your Honor, that during

14   the course of the negotiations, the metric of how does this

15   appear relative to revenues was a subject of discussion and, in

16   a certain sense, a way for the parties to have a conversation

17   around it.

18        THE COURT:  Particularly, that was the focus those last

19   two or three days, as I recall the settlement negotiations,

20   February 23rd through 25th.

21             The 25th is when both sides signed off on the

22   2.3 billion.  BP put up 2.3 billion; class counsel said, we'll

23   take it, and the Watts claims are part of it.

24             No doubt, BP continually needed the Watts claims

25   wrapped up in that, right?  Not just the Watts claims, but all

10:48:19 1    the individual crew member claims, right?

10:48:22 2         MR. DOWNEY:  That's right.

10:48:24 3         THE COURT:  Go ahead, Mr. Downey.

10:48:25 4         MR. DOWNEY:  But let me just react to some of what

10:48:29 5    Your Honor has said.

10:48:31 6              First of all, Your Honor has said some things

10:48:32 7    from your own recollection that are beyond my knowledge, but I

10:48:35 8    accept them as how the Court has described the process.

10:48:37 9              I want to distinguish, though, between, I think,

10:48:40 10   the inference the Court is drawing from that and its

10:48:43 11   significance to how --

10:48:44 12        THE COURT:  I haven't drawn any inferences yet.  I'm

10:48:46 13   just trying to understand the facts.

10:48:48 14        MR. DOWNEY:  I think the right way to view the value of

10:48:51 15   the Watts claims within that $2.3 billion -- or I might say,

10:48:56 16   Your Honor, the potential value of those claims within the

10:48:59 17   $2.3 billion, as we're here on a preliminary injunction --

10:49:02 18   Your Honor is, as far as I know, correct that there has been no

10:49:09 19   discussion of the fund as a separate mechanism to settle the

10:49:14 20   claims until the period that Your Honor identified between the

10:49:17 21   20th and the 25th.

10:49:20 22             It's also consistent with the record that there

10:49:22 23   was a discussion about how to settle claims within the

10:49:27 24   individual economic loss framework that was not successful for

10:49:31 25   purposes of resolving those claims.

**OFFICIAL TRANSCRIPT**

10:49:33  1          THE COURT:  Right.

10:49:33  2          MR. DOWNEY:  I think where the parties were at that

10:49:35  3     time, Your Honor, does say something about how they valued the

10:49:39  4     claims on both sides, so let me just take Your Honor through

10:49:43  5     those valuations.

10:49:46  6          THE COURT:  Go ahead.

10:49:47  7          MR. DOWNEY:  First of all, Mr. Rice's declaration sets

10:49:50  8     forth where BP was.  I don't agree with it in full, but it's

10:49:55  9     not material for purposes of the discussion this morning.

10:49:58 10          Mr. Rice said in paragraph 11 of his declaration

10:50:02 11     in this matter, "In mid-February 2012, BP's position was that,

10:50:06 12     even upon providing sworn declarations from themselves and

10:50:10 13     either a former employer or a sponsor, the final compensation

10:50:14 14     to each such claimant should be capped at a maximum of $3,000,"

10:50:19 15     which was not acceptable, of course, to the PSC, which is what

10:50:23 16     made this offer --

10:50:26 17          THE COURT:  This is Mr. Rice's -- who, of course,

10:50:29 18     represented the PSC -- his declaration as to what BP's position

10:50:34 19     was at that time, right?

10:50:36 20          MR. DOWNEY:  Right.  I think he is describing the time

10:50:39 21     frame that Your Honor was referring to when there were

10:50:41 22     discussions about resolving these matters within the context of

10:50:44 23     the individual economic loss framework.

10:50:46 24          THE COURT:  I think that's right.

10:50:48 25          MR. DOWNEY:  What I'm going to show Your Honor now is

**OFFICIAL TRANSCRIPT**

10:50:51 1     obviously a maximum number, what would it mean for the Watts

10:50:55 2     claimants if each of them recovered.

10:50:57 3             It's certainly the case, and Your Honor alludes

10:50:58 4     to this, that they wouldn't recover in full, that there would

10:51:04 5     be claimants who would be disqualified because their claims

10:51:06 6     couldn't be processed because of documentation or for some

10:51:10 7     other reason; but, nevertheless, the maximums established at

10:51:15 8     that point would have led to these results for both crew and

10:51:18 9     for the Watts claimants.

10:51:19 10            For total crew, at a $3,000 per claim valuation,

10:51:26 11     the total value of the claims, if a maximum valuation were

10:51:31 12     used, is $146 million.

10:51:35 13            As I think the Court knows, most of those

10:51:37 14     claimants were Watts claimants, so, again, if there were a

10:51:40 15     maximum recovery under the individual economic loss formulas

10:51:45 16     under the proposal that was then existing, the maximum amount

10:51:48 17     that could have been recovered was $128 million.  That was BP's

10:51:54 18     position, in essence, at the outset of the Seafood Fund

10:51:59 19     negotiations.

10:52:00 20            At least as far as the record reflects here, the

10:52:05 21     last proposal countering that was made by the PSC also on

10:52:10 22     February 20th.  That's set forth in this document, which is

10:52:15 23     Exhibit 1 to the Bloom declaration.

10:52:18 24            This is rather buried in the document, so I

10:52:21 25     wanted to highlight it for the Court.  This is at page 35 of

**OFFICIAL TRANSCRIPT**

10:52:25  1    the document that's attached as Exhibit 1, which is the

10:52:29  2    framework for individual economic loss claims that was proposed

10:52:32  3    by BP and then responded to in redline by the PSC.

10:52:38  4            As Your Honor --

10:52:40  5        THE COURT:  It wasn't called Category III then because

10:52:43  6    that's part of the later allocation program, but this is

10:52:47  7    essentially what became Category III.

10:52:50  8        MR. DOWNEY:  Well, in part, it became Category III.

10:52:52  9    The parties neither had that terminology nor fully that concept

10:52:55 10    because there hadn't been agreement on any aspect of

10:52:58 11    documentation requirements.  That was all after the agreement

10:53:00 12    in principle.

10:53:01 13            So this was the PSC's response, their last

10:53:03 14    position.  PSC demanded for crew claimants, including the Watts

10:53:10 15    claimants, $12,500 per claimant, with an RTP of one, leading

10:53:15 16    effectively to a potential recovery on a per-claimant basis of

10:53:20 17    $25,000 per claimant.

10:53:21 18            Now, if the same math is done with the total

10:53:24 19    number of crew claimants, the potential recovery on a maximum

10:53:29 20    basis would be $1.2 billion.  For the Watts crew members, it

10:53:34 21    would be $1.1 billion.

10:53:36 22        THE COURT:  But you're not standing here today

10:53:38 23    suggesting that BP thought it was paying 1.1 billion for Watts

10:53:45 24    claims when it offered 2.3 billion?

10:53:49 25        MR. DOWNEY:  I'm not saying that, Your Honor, based on

**OFFICIAL TRANSCRIPT**

10:53:49  1    this --

10:53:49  2          THE COURT:  Okay.

10:53:52  3          MR. DOWNEY:  -- nor am I even saying at this time that

10:53:54  4    there wasn't an expectation of some deduction of this number,

10:53:57  5    which is, I think, clear from the record that we submitted.

10:53:59  6          Nevertheless, Your Honor, it does reflect that at

10:54:03  7    the start of the negotiations, where the parties were with

10:54:05  8    regard to the Watts claimants was BP was at 132

10:54:11  9    million potential maximum recover, or 128 million, depending on

10:54:15 10    how you do the numbers, and the PSC was at $1.1 billion.

10:54:20 11          So the notion that a smaller number was really

10:54:24 12    how the parties perceived this, I think, is not accurate.

10:54:29 13          THE COURT:  Well, okay.  I understand what you're

10:54:32 14    saying.

10:54:33 15          MR. DOWNEY:  I would say as well, Your Honor, that this

10:54:37 16    precedes all of the discussions that are described in the

10:54:40 17    record, and which I think Your Honor is familiar with, the

10:54:43 18    movement in numbers, where there are the discussions

10:54:46 19    specifically about the Watts claimants.

10:54:47 20          Those are substantial.  In the last 24 hours of

10:54:49 21    these negotiations, the size of the Seafood Fund increases, by

10:54:56 22    agreement between the parties, from BP's offer, first

10:55:01 23    $500 million, and then $200 million.  There's no dispute the

10:55:05 24    Watts claimants are discussed as part of that.

10:55:05 25          THE COURT:  I'm sure that wasn't the only discussion at

OFFICIAL TRANSCRIPT

10:55:08 1   that time, right?

10:55:12 2       MR. DOWNEY:  No, it wasn't.

10:55:12 3       THE COURT:  That wasn't the only thing that was being

10:55:11 4   discussed.

10:55:13 5       Let me ask you this:  Assuming everything you say

10:55:18 6   is right, Mr. Downey, and I agree with that, why would we have

10:55:22 7   to stay or enjoin the entire program, the entire second

10:55:28 8   distribution, to protect BP's potential recovery?

10:55:41 9       You have to admit, it's going to be nowhere near

10:55:44 10  $1-point-something billion, so it seems to me that, even if

10:55:52 11  everything you say is right and I agree with you, there has got

10:55:54 12  to be some much smaller percentage of that, that would be a

10:56:00 13  reasonable number to, if you want to say, hold back or put in

10:56:04 14  reserves or something until all of this other stuff is

10:56:07 15  resolved.

10:56:07 16      MR. DOWNEY:  There will be an ultimate determination,

10:56:09 17  obviously, in the case as to what the amount of -- the

09:55:59 18  effect of --

10:56:13 19      THE COURT:  Yes, but the problem is, I don't want to

10:56:15 20  hold up everybody else in the entire program until we can sort

10:56:21 21  out your case against Mr. Watts.  That's the problem that I see

10:56:27 22  right now, for me.

10:56:30 23      MR. DOWNEY:  Well, Your Honor, I would only say this.

10:56:32 24  I think -- I certainly understand the Court's statement about

10:56:35 25  not wanting to hold the funds up.  I would say, where we stand

10:56:39  1   with regard to the Seafood claimants is, as with claimants in

10:56:44  2   other contexts, if the money is distributed, that's effectively

10:56:47  3   the final result.  It would be very difficult for BP to recoup

10:56:51  4   that money if there is a later determination that the fraud had

10:56:54  5   a more substantial impact than the Court perceives at this

10:57:01  6   time.  That's number one.

10:57:01  7           Number two, I would say I don't know at what

10:57:02  8   point a second distribution will be considered prudent by the

10:57:07  9   Court, at what number the Court would say, we'll just allow

10:57:11 10   these issues to be determined before there is a determination

10:57:17 11   on the Watts case brought by BP.

10:57:22 12           Third, I don't know what effect everything else

10:57:25 13   that happens in the world will have on a second distribution.

10:57:27 14   I know there are aspects of the Seafood Program that are the

10:57:34 15   subject of the Special Master's work with regard to this.  I

10:57:36 16   don't know what, if any, effect that will have on the second

10:57:39 17   distribution, but I certainly wouldn't want for BP at the end

10:57:43 18   of this process to be competing with others for the same pot of

10:57:47 19   funds because there is some legitimate claim on the part of one

10:57:52 20   or the other to those funds.

10:57:54 21           So I think there is good prudential reasons to do

10:57:57 22   it.  I acknowledge that I am not demonstrating to the Court

10:57:59 23   today that there is $1.3 billion of injury as we sit here.

10:58:07 24           THE COURT:  Or anything close to it, yes.

10:58:09 25           MR. DOWNEY:  Well, that I don't agree with, Your Honor.

**OFFICIAL TRANSCRIPT**

10:58:10  1    I think if you take the kind of formula that -- and analysis

10:58:14  2    that the *Rhone-Poulenc* case does, I think the multiples are

10:58:20  3    applied to the actual per-claimant offer, so I don't agree with

10:58:24  4    Your Honor that it's not close to a large number.

10:58:27  5            THE COURT:  Okay.

10:58:32  6            MR. DOWNEY:  I just want to react, also, to one thing

10:58:34  7    Your Honor said about others being aware that Mr. Watts did not

10:58:42  8    represent all the individuals that he purported to represent

10:58:44  9    because Your Honor is right that there was a *New York Times*

10:58:48  10   article on this subject in April 2011, of course.

10:58:51  11           Of course, BP did receive the letter that

10:58:54  12   Your Honor referenced from Mr. Pitofsky, who was representing

10:59:00  13   the GCCF.

10:59:01  14           But, Your Honor, I think it's important to look

10:59:05  15   at those events in a few ways.  First of all, while Mr. Watts

10:59:10  16   may not have been either successful in or even ultimately

10:59:13  17   represented clients that he presented in a settlement program

10:59:16  18   here, he did have these parties before the Court, and he was

10:59:20  19   representing, consistent with his obligations under Rule 11,

10:59:24  20   that they were parties in this litigation.

10:59:27  21           So, to be sure, there might be disputes with

10:59:31  22   individual claimants; there might be such disputes, given the

10:59:34  23   number, on a broader basis; but, the notion that almost all of

10:59:39  24   these claimants were invented as clients of his, because either

10:59:45  25   they were not people under any definition who could be within

**OFFICIAL TRANSCRIPT**

10:59:50 1   the class, because they had no relationship with Mr. Watts or

10:59:55 2   anyone related to him, they didn't work in the industry -- in

10:59:59 3   some cases the Social Security numbers that are used are for

11:00:04 4   people who are dead -- I don't think when people read either

11:00:08 5   that letter or that article, the reasonable inference from it

11:00:13 6   was these 44,000 claimants are either close to completely or

11:00:21 7   completely invented for purposes of pursuing a lawsuit.  So I

11:00:24 8   would say that's the overarching context in which these events

11:00:28 9   happened.

11:00:28 10          Second, Your Honor, as Your Honor says, there

11:00:31 11  were these prior incidents with Mr. Watts, but I would remind

11:00:35 12  the Court that there was reaction in this Court to those

11:00:40 13  events.

11:00:40 14          When Mr. Watts was quoted in the *New York Times*

11:00:45 15  article and learned of what the *New York Times* article would

11:00:48 16  say, he made a statement to the *New York Times* saying, there

11:00:52 17  have been some issues with respect to certain of these

11:00:55 18  claimants; I am working to correct them; in some instances, I

11:01:00 19  have made an error.

11:01:01 20          In the months following that, he filed dismissals

11:01:06 21  with regard to about 142 of the claimants, including, in at

11:01:10 22  least one instance, one of the people identified in the

11:01:13 23  *New York Times*.

11:01:13 24          So I accept what the Court says about a

11:01:16 25  perception in terms of full representation of these people, but

**OFFICIAL TRANSCRIPT**

11:01:20 1   I think the notion that they were wholly invented, I think is

11:01:23 2   not in any sense a red flag as a result of either the *New York*

11:01:32 3   *Times* article or the GCCF.

11:01:33 4   THE COURT:  Putting aside for the moment Mr. Watts'

11:01:37 5   conduct, what did BP do to investigate Mr. Watts' claims before

11:01:50 6   it agreed to include them in the settlement?

11:01:53 7   MR. DOWNEY:  Well, I'm not aware, Your Honor, of any

11:01:55 8   particular investigation that's part of the record, or I'm not

11:01:58 9   aware of it at all, related to Mr. Watts' claims.

11:02:03 10  THE COURT:  I mean, there was publicly available

11:02:06 11  information in the database, I believe, that Mr. Watts had

11:02:10 12  filed, as I recall, the same I'm going to call it

11:02:17 13  40,000-and-some-odd number of claims with short-form joinders

11:02:23 14  in this Court, correct?

11:02:25 15  MR. DOWNEY:  That's correct.

11:02:25 16  THE COURT:  As I recall, looking at a short-form

11:02:27 17  joinder, you have the name of the claimant, the address of the

11:02:29 18  claimant, some other identifying information, not the entire

11:02:32 19  Social Security number, but the last four digits of that

11:02:35 20  person's Social Security number.

11:02:36 21  MR. DOWNEY:  That's correct.

11:02:37 22  THE COURT:  I may have the names wrong, sorry.  It's

11:02:43 23  Miss Travis, I believe, right?  Is she the one who submitted

11:02:46 24  the declaration about later matching up Social Security

11:02:48 25  numbers?

**OFFICIAL TRANSCRIPT**

11:02:49  1        MR. DOWNEY:  Yes.

11:02:50  2        THE COURT:  She says that when BP got the -- what

11:02:55  3   Mr. Watts apparently did -- and why he did this, I have no

11:02:59  4   idea, but he had filed short-form joinders, and then later he

11:03:05  5   filed new claim forms directly with BP, correct?

11:03:11  6        MR. DOWNEY:  That's correct.

11:03:12  7        THE COURT:  For roughly the same 40,000 people,

11:03:16  8   42,000 people.

11:03:16  9        MR. DOWNEY:  That's right.

11:03:17 10        THE COURT:  In those claim forms he gave to BP, he gave

11:03:21 11   the full Social Security numbers.

11:03:22 12        MR. DOWNEY:  That's correct.

11:03:23 13        THE COURT:  She said that BP then had someone go

11:03:26 14   through and try to match the Social Security numbers to the

11:03:30 15   names and addresses and so forth to see if it matched up.

11:03:36 16        MR. DOWNEY:  That's correct.

11:03:36 17        THE COURT:  That's kind of what led to this motion.

11:03:38 18        MR. DOWNEY:  Right.

11:03:41 19        THE COURT:  I guess what I'm trying to understand, is

11:03:42 20   there any reason you couldn't have done the same thing the year

11:03:46 21   before?

11:03:46 22             You had all the short-form claim forms where

11:03:51 23   Mr. Watts claimed to be representing 40-something thousand

11:03:54 24   people.  Was there any effort at all by anybody to vet those

11:03:57 25   forms and vet that information and use it to try to see if

11:04:01  1    these were real people?

11:04:03  2         MR. DOWNEY:  Well, let me distinguish between the

11:04:05  3    information and the form for one moment, although it's really

11:04:08  4    not the most significant thing I have to say.

11:04:10  5         THE COURT:  I know one had, like I said, just the last

11:04:13  6    four digits of the Social Security number, the other had the

11:04:17  7    entire, but it has been represented to the Court that someone

11:04:21  8    could take the information, the identifying information on that

11:04:26  9    short-form joinder filed in 2011 with the Court, and take the

11:04:31 10    name, the address, and the last four digits, and go into

11:04:36 11    LexisNexis -- I don't know if I could do it, but somebody who

11:04:39 12    knows what they are doing with a computer could easily -- and

11:04:42 13    quickly figure out if there is a real person, a person by that

11:04:45 14    name, that address, with a Social Security number with those

11:04:48 15    last 4 digits.  I guess that's how they do it.

11:04:52 16         I'm just wondering if there was any reason BP

11:04:56 17    didn't do that?  If you're faced with 40,000 alleged claims

11:05:01 18    with some degree of suspicion about the numbers and validity,

11:05:05 19    why wasn't that done in 2011?

11:05:07 20         MR. DOWNEY:  Well, they didn't do it, Your Honor,

11:05:11 21    first.

11:05:11 22         Second --

11:05:11 23         THE COURT:  Again, none of that excuses what Mr. Watts

11:05:15 24    may have done, I'm not suggesting that, in representations to

11:05:18 25    the Court and so forth, but I'm just curious as to why that

11:05:22 1    wouldn't have been done.

11:05:24 2        MR. DOWNEY:  Second, Your Honor, I would say the

11:05:26 3    differences in the information are significant only in the

11:05:30 4    sense that, while defendant class presents a process for three

11:05:38 5    claimants as to how you could match Social Security numbers and

11:05:43 6    get to a determination of whether the person exists or not,

11:05:47 7    that process is different, very time intensive, even as it was,

11:05:52 8    frankly, with having the actual Social Security numbers.

11:05:54 9        But that's not the most important part,

11:05:56 10   Your Honor.  The most important point is that Mr. Watts was

11:06:01 11   before the Court with these claimants.  Of course, Your Honor

11:06:05 12   wouldn't engage in any due diligence associated with the --

11:06:06 13       THE COURT:  No, I can promise you, I'm not going to go

11:06:09 14   look at 40,000 --

11:06:09 15       MR. DOWNEY:  Of course not.

11:06:11 16       THE COURT:  -- but I'm not the one being asked to pay

11:06:13 17   all of this money, though.  It seems like you might want to do

11:06:16 18   that.

11:06:17 19       MR. DOWNEY:  But, Your Honor, let me say this.  Having

11:06:19 20   filed the claims, and having filed them in this Court, that

11:06:24 21   creates a special context, which I know from your comments

11:06:27 22   that, if it's proven to be true, the Court would be concerned

11:06:30 23   about.

11:06:31 24       But it's not just a representation to BP in a

11:06:34 25   contractual negotiation.  There has been a representation to

11:06:37 1    the Court, with the special protections that the Court has.

11:06:41 2    That's what I would say first, Your Honor.

11:06:43 3              Second, it's true that you can aggregate a lot of

11:06:46 4    these pieces and say, you know, now that you look back on it,

11:06:51 5    shouldn't BP have undertaken some action.

11:06:54 6              Well, first of all, as a legal matter, I don't

11:06:56 7    agree with that.  There is no duty to investigate where the

11:07:02 8    standard is justifiable reliance, as it is with respect to many

11:07:05 9    of the counts set forth in the complaint.

11:07:08 10             But beyond that, I would say, Your Honor, that

11:07:12 11   the kind of information conveyed in those communications,

11:07:17 12   either from the GCCF or the *New York Times*, is not of the kind

11:07:21 13   that's now been discovered.

11:07:25 14             Those are issues about disputes between Mr. Watts

11:07:27 15   and real claimants as to whether he represented them, which

11:07:32 16   would be common in some of these circumstances at a low level.

11:07:35 17   That's fundamentally somewhat of a different issue than the

11:07:39 18   issue of wholesale invention, which appears to be what has

11:07:43 19   occurred here, from the record.

11:07:45 20             So I understand Your Honor's point.  I've given

11:07:48 21   you an answer as to what the record is.  I don't think that the

11:07:52 22   fraud imposes an obligation on BP in cases which are filed in

11:07:58 23   front of the Court to investigate the veracity of a

11:08:05 24   representation by a well-regarded lawyer that this person is a

11:08:08 25   real person and I represent them.

**OFFICIAL TRANSCRIPT**

60

11:08:09  1        THE COURT:  All right.  I'm sorry, were you finished?

11:08:12  2        MR. DOWNEY:  No, Your Honor.  I would just say, where

11:08:15  3   we stand, as I suggested in connection with the motion to stay

11:08:21  4   Mr. Watts' case, I think where we stand is the Court obviously

11:08:25  5   has to make a decision at some point on the motion.

11:08:30  6        I just would emphasize again for the Court that a

11:08:32  7   decision in a direction that is adverse to BP here preordains

11:08:38  8   the result because the monies are distributed.

11:08:40  9        It's true that there would be some delay as to

11:08:45 10   payment to claimants if the Court enters the preliminary

11:08:50 11   injunction requested by BP, but whatever the appropriate amount

11:08:54 12   of that ultimately is determined to be will be distributed.

11:08:58 13        Of course, these are not claimants whose sole

11:09:02 14   compensation in connection with the program is going to be

11:09:04 15   limited to the second distribution.  So I would just urge the

11:09:09 16   Court to consider --

11:09:11 17        THE COURT:  But your real claim is against Mr. Watts.

11:09:18 18   If he defrauded you, your claim is against Mr. Watts.  You

11:09:23 19   certainly have rights of recovery against him if you can prove,

11:09:27 20   you know, what you've alleged in your lawsuit.

11:09:30 21        MR. DOWNEY:  I think that will be cold comfort with the

11:09:33 22   kind of damage that BP has suffered here, but we do have a

11:09:36 23   claim against Mr. Watts and can seek to recover.  But I

11:09:39 24   understand Your Honor's point.

11:09:40 25        But I think, in order to prevent the dissipation

**OFFICIAL TRANSCRIPT**

11:09:45  1    of the assets that are the only real means of recovery for BP,
11:09:49  2    the injunction is necessary.
11:09:50  3            THE COURT:  Okay.  Thank you very much, Mr. Downey.
11:09:53  4            MR. DOWNEY:  Thank you, Your Honor.
11:09:56  5            THE COURT:  Mr. Irwin.
11:10:00  6            MR. IRWIN:  Yes, thank you, Your Honor.  Jim Irwin and
11:10:04  7    my partner, Doug Moore, on behalf of the Class.
11:10:07  8            Your Honor, I almost had to pinch myself when I
11:10:16  9    heard the statement just a few moments ago that you don't have
11:10:22 10    to investigate a claim and that they didn't investigate these
11:10:27 11    claims.
11:10:28 12            I've been a defense lawyer for 40 years.  My job,
11:10:33 13    what clients pay me to do, is to investigate claims as much as
11:10:39 14    I can.
11:10:39 15            The claim can be brought by Russ Herman, from the
11:10:42 16    pinnacle of the Bar, and I'm going to do everything I can to
11:10:46 17    investigate that claim.  I'm going to do everything I can to
11:10:48 18    trash that claim.
11:10:49 19            It could be brought by a first-year lawyer.  The
11:10:52 20    client expects me, as a defense lawyer, to do that.
11:10:55 21            The notion that there is no duty to investigate
11:10:59 22    claims, whether they're 42,000 immigrant claims brought in a
11:11:04 23    mass tort setting against BP, or whether they're a death case
11:11:11 24    brought by a great plaintiff lawyer like Jerry Meunier, my job
11:11:16 25    is to investigate them.  Anybody's job is to investigate them.

**OFFICIAL TRANSCRIPT**

11:11:19  1          Yesterday afternoon, Your Honor, at about

11:11:22  2  4 o'clock, we got an affidavit, a declaration from Wendy Bloom,

11:11:31  3  17 hours before the hearing this morning.

11:11:32  4          So I went back, and I looked at some stuff.  On

11:11:42  5  December 17th, BP filed about 95 pages of papers that basically

11:11:47  6  overlap these issues:  The Rule 60 motion and brief, the

11:11:51  7  complaint and the injunction brief.  That amounted to 95 pages,

11:11:55  8  and it included four declarations.

11:11:59  9          A month later, with our thanks to the Court for

11:12:03 10  an extension over the holidays, the Class filed a 35-page

11:12:07 11  opposition, with eight exhibits, including two declarations.

11:12:14 12          One week after that, BP filed 15 more pages, with

11:12:18 13  two declarations, two supplemental declarations.  Then we

11:12:23 14  closed the record on January 31st with five more pages.

11:12:26 15          It was submitted to Your Honor with 150 pages,

11:12:32 16  eight declarations and four exhibits.  Your Honor then

11:12:35 17  scheduled a hearing on February 13th.  You issued the Order.

11:12:39 18  You said you did not require any additional submissions.  On

11:12:43 19  February 26th, we are here today.

11:12:47 20          Yesterday, at 4:00 p.m., what comes across the

11:12:50 21  wire but this declaration, so I decided I would take a look.  I

11:12:58 22  went to the Internet.  One of the first things I found was

11:13:02 23  another declaration of Wendy Bloom, which I know Your Honor is

11:13:06 24  familiar with.

11:13:06 25          The information I heard from the PSC is that

**OFFICIAL TRANSCRIPT**

11:13:12 1   Ms. Bloom was the point person for the Seafood negotiations,

11:13:16 2   which we had wondered all along why we had not seen a

11:13:21 3   declaration from her as part of this motion process from day

11:13:23 4   one on December 17, 2013.

11:13:26 5         But I did discover this affidavit -- or this

11:13:31 6   declaration filed with respect to the Bell claims.  I noticed

11:13:36 7   and took notice at paragraph four, where in paragraph four

11:13:48 8   Ms. Bloom says that BP was represented during these

11:13:51 9   negotiations by multiple law firms, significant class action

11:13:55 10  experience, complex litigation experience.  She specifically

11:13:59 11  mentioned the names of Mr. Godfrey and herself.

11:14:02 12        She said that BP had a team of experts from

11:14:06 13  multiple disciplines, including economics, finance, damages,

11:14:10 14  accounting, demographics.  She mentioned Mr. Seider of Lexecon,

11:14:18 15  an economist, and Mr. Gaspardo, a CPA and an MBA.

11:14:25 16        I wondered why that team hadn't taken the time to

11:14:29 17  look at these 42,000 short-form joinders that were filed in

11:14:33 18  June and July -- pardon me, April, May, June and July of 2011.

11:14:40 19        So we look at this affidavit yesterday, 17 and a

11:14:43 20  half hours ago, and we wonder, what's the purpose of this

11:14:47 21  affidavit?

11:14:50 22        Paragraph four, the only thing we could glean

11:14:54 23  from this affidavit is the statement that the PSC's demand for

11:15:00 24  deckhand and dockside worker claimants without earnings

11:15:04 25  documentation who submit individual, employer -- and I

11:15:07 1    underlined that word "employer" -- and sponsor sworn

11:15:12 2    statements, the demand was $12,500.

11:15:15 3              I asked myself, well, what does that have to do

11:15:17 4    with what we're talking about today?  Because those are not the

11:15:20 5    Watts deckhands.  The Watts deckhands specifically were the

11:15:23 6    people who did not have employer statements.  So why do we

11:15:28 7    even -- why do we go there?  What is that all about?

11:15:34 8              To be sure, I looked at Exhibit 10, which was the

11:15:38 9    Seafood settlement.  There is Category II in green, *People with*

11:15:47 10   *Employer Statements*.  Those are not the deckhands of Watts'

11:15:52 11   people.  Why is she putting that in the affidavit?

11:15:57 12             Then I look, here are the Watts people.  They're

11:16:03 13   Category III, as we all know, people who do not have an

11:16:07 14   employer statement.  They are the transient dock workers.  In

11:16:12 15   many cases, they probably didn't even have Social Security

11:16:14 16   numbers, that we'll get to.

11:16:15 17             Then, this morning, we're given this, which was

11:16:24 18   attached to that affidavit.  Again, you have to ask yourself,

11:16:32 19   what does this have to do with the Watts claims?  Because it

11:16:36 20   was Mr. Godfrey, as Your Honor knows from the opt-out letter on

11:16:40 21   April 14th, who handwrote in that the Watts claims were

11:16:44 22   Category III, and Category III are claims without employer

11:16:48 23   support.  They are simply sworn affidavits.

11:16:51 24             So we have here V, which is what Mr. Downey just

11:16:57 25   showed you, Category V, *Deckhands, Dockside Workers, Claimants*

*Without Earnings*.  Under B it says, "They will submit a sworn

statement of the employer."

So what did BP -- what value during -- now, this

is negotiations.

THE COURT:  I think, at the time of those negotiations,

my sense, from trying to put all of this together, is that --

well, first of all, there obviously was no such animal as

Category III because that was created by the Court neutrals.

MR. IRWIN:  Right.

THE COURT:  So they were just talking about different

types of claimants and different levels of proof that would be

required.

MR. IRWIN:  Yes, sir.

This actually more closely ended up as

Category II.  Category II were deckhands or crew members who

actually had an employer statement.

This ended up Category II, but what value did PSC

put on this?  On Category II claims, which is effectively what

this is, with an employer statement, they valued it at 3,000.

Now, what value did they put on claims without

even an employer statement, the question that Your Honor asked

that was not answered.  As far as I can tell, based on what

they did, as opposed to what they say, they put no value on it.

We'll get to it.

Finally, with response to Your Honor's question

**OFFICIAL TRANSCRIPT**

11:18:33  1   about what value did they put on it, and they say that's

11:18:38  2   privileged, I would suggest that when they use this testimony

11:18:43  3   that they're offering as a sword to try to prove fraud or

11:18:48  4   justifiable reliance or, in this case, materiality, that they

11:18:52  5   can't then hide behind that privilege.

11:18:55  6          So if they want to hide behind that privilege,

11:18:59  7   then the question is raised whether the exact same inference

11:19:02  8   should arise by hiding behind that privilege as they suggest a

11:19:08  9   Fifth Amendment inference should reside with respect to

11:19:11 10   Mr. Watts' taking of that amendment.

11:19:19 11          Your Honor, I know, is familiar with the elements

11:19:31 12   for a preliminary injunction.  We will focus in this

11:19:34 13   presentation on one and three, substantial likelihood of

11:19:39 14   success and the balance of the harms.

11:19:44 15          This is from Your Honor's case, the *Dixon*.  "It

11:19:48 16   is well known and established law in the Fifth Circuit that a

11:19:53 17   preliminary injunction is an extraordinary and drastic remedy,

11:19:57 18   and there is a heavy burden."

11:20:03 19          Let's look at what BP said to Your Honor in

11:20:07 20   November, I think, of 2012, at the fairness hearing.  They

11:20:12 21   talked about how the Gulf Coast industry, that BP had

11:20:19 22   guaranteed payments -- and I think Your Honor alluded to this

11:20:22 23   earlier -- nearly five times the annual revenue of the

11:20:27 24   Gulf Coast entire seafood industry, in a way to suggest to the

11:20:33 25   Court, and to the claimants that they were trying to get

**OFFICIAL TRANSCRIPT**

11:20:35 1    involved in this settlement eventually, that this was a

11:20:39 2    generous deal for them, they should sign up, join in.

11:20:43 3            They also said that a Court-appointed neutral

11:20:50 4    will ensure that all claimants will be made more than whole in

11:20:54 5    the first round distribution, and they said there would be a

11:20:57 6    generous payment from a second round distribution.

11:20:59 7            They hold this carrot out to people to sign up

11:21:03 8    for this program, you'll be generously compensated in the first

11:21:08 9    round, and they promise a second round.

11:21:11 10            The third thing they say there is the Program

11:21:14 11    must be viewed from the perspectives of pounds of seafood

11:21:18 12    produced, the price per pound and the ultimate revenues.

11:21:21 13            As Your Honor's questions suggested earlier, this

11:21:25 14    evaluation of 2.3 billion was based not on fisherman, but on

11:21:32 15    fish.

11:21:33 16            Finally, they say, "The agreement provides that

11:21:37 17    2.3 billion will be paid regardless of the fact that the total

11:21:42 18    claims submitted under the Program may be a lesser amount."  If

11:21:45 19    only one fisherman had shown up and filed an eligible claim for

11:21:51 20    this program, that one fisherman would have gotten

11:21:56 21    $2.3 billion.  That's the deal that BP made.  That makes this a

11:22:02 22    guarantee rather than a cap, ensuring that BP has no incentive

11:22:07 23    to minimize any plaintiff's claim.

11:22:10 24            This is what BP told these people before they

11:22:14 25    gave up their rights to sue for punitive damages.  This is what

11:22:18  1    they promised them.  They guaranteed them this.

11:22:21  2             As we wrote in our brief, Your Honor, when they

11:22:24  3    filed those 95 pages on December 17, 2013, the word "guarantee"

11:22:30  4    that they used repeatedly in touting this settlement to

11:22:33  5    Your Honor and to the class vaporized from those 95 pages.  The

11:22:40  6    only word that appeared was "cap."

11:22:43  7             THE COURT:  Let me ask you this, Mr. Irwin.

11:22:46  8             MR. IRWIN:  Yes, sir.

11:22:46  9             THE COURT:  Assuming that BP is able to prove fraud on

11:22:53 10    the part of Mr. Watts in the particulars that have been

11:22:58 11    alleged, and assuming that I accept that there was some

11:23:09 12    consideration -- certainly, BP had an interest in corralling as

11:23:16 13    many claims as they could, as any defendant would in agreeing

11:23:20 14    to a class settlement -- the concern they have and Mr. Downey

11:23:31 15    has expressed, and I guess I have the same concern, is that if

11:23:34 16    they prove these things, and they can convince the Court

11:23:38 17    ultimately that they somehow were defrauded into paying some

11:23:46 18    amount more than they otherwise would have paid or offered, how

11:23:51 19    should I deal with that at this point?

11:23:53 20             Because their concern is that, as Mr. Downey

11:23:58 21    said, if all the funds are dissipated, as a practical matter it

11:24:04 22    would be difficult, if not impossible, for them to recover

11:24:06 23    whatever amounts, if any, they might ultimately be entitled to

11:24:10 24    recover.

11:24:11 25             MR. IRWIN:  I'll answer it two ways.  I think the

11:24:15  1   *Raymark* case gives the answer that the proper -- and I'll talk

11:24:20  2   about it a little bit more -- the proper restitution is to go

11:24:23  3   after the people who committed the fraud.  I'll come back to

11:24:27  4   that in a minute.

11:24:28  5          But I think I'll also try to answer your other

11:24:32  6   question, and that is, how much money is really at risk here?

11:24:36  7   What is the issue about what kind of money the Court may choose

11:24:40  8   to set aside?

11:24:41  9          We hope you don't set aside any, Your Honor, but

11:24:45 10   I'm going to try to answer your question.

11:24:46 11          If we can go to slide 9.

11:24:48 12          This is when we're talking about materiality,

11:24:55 13   Your Honor.  This is not with the benefit of revisionist

11:24:58 14   hindsight.  This is what was going on back at the time, okay.

11:25:02 15          So back in the February timeframe, back when the

11:25:13 16   seafood neutral concluded there should be a $50 million cap on

11:25:18 17   the Watts deckhands -- which we'll get to, and I know

11:25:22 18   Your Honor knows --

11:25:23 19          THE COURT:  Well, actually, that's a 50 million cap on

11:25:26 20   the Cat III category --

11:25:26 21          MR. IRWIN:  Yes, sir.

11:25:31 22          THE COURT:  -- which we, I think, know most, if not

11:25:34 23   all, of Watts' claimants would have fallen into.  There could

11:25:41 24   potentially, I guess, have been some other claimants in that

11:25:44 25   category, too.

**OFFICIAL TRANSCRIPT**

11:25:48  1          MR. IRWIN:  Here is the math, Your Honor.  With the

11:25:48  2   50 million cap on the Cat III claimants without employer

11:25:52  3   statements, let's just assume that there were 40,000 of them

11:25:56  4   were Watts claimants, the 40,000 sort of miraculously made it

11:26:02  5   through.

11:26:02  6          We know that there was an internal cap of $5,000

11:26:06  7   per claimant.  That's the most any claimant could get under

11:26:09  8   Exhibit 10, under Mr. Balhoff's and Mr. Perry's program.  So if

11:26:18  9   actually 40,000 of them were found eligible, they would end up

11:26:22 10   getting only $1,250 apiece because there was not going to be

11:26:26 11   any more distributed than $50 million.

11:26:29 12          THE COURT:  As I understand, the way that was set up is

11:26:34 13   that there was a per-claimant cap -- we're talking about now

11:26:36 14   the Seafood Compensation Program put together by the

11:26:42 15   Court-appointed neutrals -- for Category III, say, the Watts

11:26:48 16   claimants at this point, type claimants -- per-claimant cap of

11:26:54 17   $5,000 per claimant, but then there was an aggregate cap of

11:26:58 18   50 million, so that if there were 40,000 -- or there were a

11:27:07 19   sufficient number of claimants who had claims that were

11:27:15 20   approved for $5,000 -- as I recall, no payments were made here

11:27:20 21   until all the claims were reviewed.  That's the first thing in

11:27:25 22   this.  There were no payments made --

11:27:27 23          MR. IRWIN:  They were the caboose.

11:27:29 24          THE COURT:  Right.  So there would have to be a

11:27:35 25   pro rata reduction if the claims, based on 5,000 per claimant,

**OFFICIAL TRANSCRIPT**

11:27:39  1    would exceed the $50 million.  That's how you came up with that

11:27:43  2    number?

11:27:43  3            MR. IRWIN:  Yes, sir, that's correct.

11:27:45  4            How we came up with the second number is, as

11:27:48  5    pointed out by Mr. Balhoff in his recent declaration, the

11:27:53  6    second distribution would be pro rata.  So 50 million of

11:28:00  7    1.1 billion -- 1.1 billion was the amount that was distributed

11:28:05  8    generally, as Your Honor reported earlier, in the first

11:28:08  9    distribution -- 50 million of that is a little over two

11:28:11 10    percent.

11:28:11 11            So if you take that exact same two percent, and

11:28:14 12    you apply it to the remaining balance of -- actually, pardon

11:28:21 13    me, it was 1.9 million that was predicted to be -- it was

11:28:25 14    predicted to be distributed in the first distribution, and

11:28:32 15    50 million of that is about two percent.  So this is where the

11:28:35 16    people's heads were at the time.  The second distribution would

11:28:38 17    have left over around 400 million, and two percent of

11:28:43 18    400 million comes to 10.5 million.

11:28:46 19            So if we go back to the February timeframe with

11:28:48 20    the $50 million aggregate cap and $5,000 internal cap on

11:28:57 21    Cat III people, you would come up with a total award for those

11:29:01 22    40,000 people of $60.5 million, and $1,513 per deckhand.  Those

11:29:09 23    are the numbers that were in people's heads back then about

11:29:12 24    what this distribution would be.

11:29:15 25            So that's my best effort to answer your question

**OFFICIAL TRANSCRIPT**

11:29:18  1   about the value of protecting that amount, which we

11:29:27  2   respectfully suggest BP has not established, but that would be

11:29:30  3   the answer to the question, we believe.

11:29:32  4          Now, I would like to come back and talk a little

11:29:34  5   bit about the *Raymark* case.  I know a little bit about it

11:29:38  6   because back in the day I used to represent them here in

11:29:41  7   federal court in the *Hannon* case against Mr. Martzell.

11:29:48  8          Raymark was also known as Raybestos-Manhattan,

11:29:51  9   Your Honor.  You may remember the name.  They made brake shoes.

11:29:56 10          So there was a collateral litigation involving

11:29:59 11   Raymark and brake shoes and tire workers --

11:30:02 12      THE COURT:  Was this asbestos litigation?

11:30:05 13      MR. IRWIN:  Yes, sir, it was.

11:30:06 14          BP cited this case with some of their papers, and

11:30:08 15   they pointed out correctly in those papers that what happened

11:30:11 16   in the case was that some of the plaintiff lawyers and some

11:30:17 17   doctors conspired to submit fraudulent medical reports in

11:30:22 18   support of bogus claims.

11:30:24 19          This was uncovered.  It was a Rule 60(b) process.

11:30:28 20   Raymark sought to get a restitution of the money back from the

11:30:39 21   lawyers and from the doctors who collaborated on this fraud.

11:30:42 22   It also sought to rescind the entire settlement.

11:30:50 23          Indeed, Raymark did prevail in getting a claim to

11:30:54 24   get restitution from the lawyers and from the doctors, but what

11:30:59 25   BP did not put in its brief, and what we put in our opposition,

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 11:31:03 1 | is that the Court said, but we're not going to let you rescind |
| 11:31:05 2 | this settlement; go after the bad guys, go after the people who |
| 11:31:11 3 | committed the fraud, go after the people who did whatever the |
| 11:31:14 4 | bad things that they did, but you're not going to punish the |
| 11:31:18 5 | rest of the class because of that. |
| 11:31:20 6 | They refused to rescind under Rule 60(b) or |
| 11:31:30 7 | reform the settlement agreement in any way that would affect |
| 11:31:33 8 | any distributions to the class. |
| 11:31:34 9 | If we can go back to where we were, please. |
| 11:31:42 10 | There we go. |
| 11:31:43 11 | That makes it a guarantee rather than a cap. |
| 11:31:48 12 | Your Honor, we think this is a very important |
| 11:31:51 13 | threshold question for the Court.  What is the burden of proof |
| 11:31:54 14 | here?  Is it a preponderance of the evidence, or is it clear |
| 11:32:00 15 | and convincing?  Our position is, either one, they have failed |
| 11:32:06 16 | miserably. |
| 11:32:07 17 | But the fact is, their burden in this situation |
| 11:32:09 18 | is clear and convincing.  That is because the only remedy that |
| 11:32:16 19 | they have here right now is under 60(b).  They are not entitled |
| 11:32:20 20 | to bring an independent action. |
| 11:32:23 21 | The reason is that the law in the Fifth Circuit |
| 11:32:28 22 | is clear.  If you are going to attempt to bring an independent, |
| 11:32:33 23 | freestanding action, like they've tried to do here with this |
| 11:32:37 24 | injunction case, you have to show under Rule 60(b) that you |
| 11:32:41 25 | have no other adequate remedy at law. |

**OFFICIAL TRANSCRIPT**

11:32:44 1          The case that is dispositive of this, Judge, is a

11:32:49 2     case that's called *Turner v. Pleasant*.  It came out of this

11:32:53 3     courthouse and went to the Fifth Circuit.  It comes out of the

11:32:57 4     unfortunate episode involving Judge Porteous.

11:33:01 5          The upshot of the case is, is that it was a

11:33:04 6     Jones Act case, I think, or a maritime case that was tried in

11:33:08 7     Judge Porteous' court.  The Court found in favor of the

11:33:14 8     defendant.

11:33:15 9          Then, some years later, long after the one-year

11:33:20 10    period in Rule 60(b), the impeachment process unfolded, and

11:33:27 11    evidence was revealed to the plaintiffs that there was some

11:33:30 12    possible favoritism between the judge and the defense lawyer,

11:33:34 13    so they then brought a completely free and independent action

11:33:38 14    seeking to set aside that defense judgment.

11:33:44 15         The Fifth Circuit in this case gave the rule that

11:33:52 16    truly was, Your Honor, the final word, the last word in the

11:33:55 17    case.

11:33:55 18         Here is the case, *Turner v. Pleasant*.  Here are

11:34:05 19    the five factors -- which Your Honor is familiar with, it's in

11:34:08 20    our brief -- about looking at whether or not you can bring --

11:34:11 21    you can bring a freestanding claim instead of a Rule 60(b)

11:34:15 22    claim to set aside a judgment.

11:34:18 23         The factors include their prior judgment, which

11:34:21 24    in equity and good conscience should not be enforced, but there

11:34:25 25    is a meritorious claim in the underlying case.

11:34:28  1          Then there is number five, that there is an

11:34:30  2     absence of an adequate remedy at law.

11:34:36  3          The adequate remedy at law here is Rule 60, not a

11:34:40  4     freestanding case.  It's Rule 60 in the existing MDL.

11:34:45  5          THE COURT:  What are you saying, that that could apply

11:34:47  6     if it's too late to file a Rule 60 motion, for example?

11:34:50  7          MR. IRWIN:  Yes.  You could bring a freestanding case,

11:34:52  8     an independent action, if you don't have a remedy at law.

11:34:56  9          The remedy at law is Rule 60, and under Rule 60,

11:34:59 10     you have to bring it within a year.  So if something crops

11:35:03 11     up --

11:35:03 12          THE COURT:  In this case, BP's Rule 60 motion was filed

11:35:06 13     right inside a year, as I recall.

11:35:09 14          MR. IRWIN:  Yes, sir, it was.

11:35:11 15          Here is what the Fifth Circuit says.  It's

11:35:13 16     literally the last word in the case, because this came up many

11:35:18 17     years later during the impeachment process.  "We are left with

11:35:24 18     the last element.  The Turners must allege that they have no

11:35:25 19     adequate remedy at law.  They do not.  The opportunity to file

11:35:30 20     a Rule 60(b) motion passed long ago."

11:35:34 21          So this is a Rule 60(b) proceeding in this case,

11:35:39 22     not a freestanding --

11:35:40 23          THE COURT:  Let me ask you, assuming that's correct, as

11:35:45 24     a practical matter, that they make the same allegations and

11:35:52 25     seek the same relief here, so what difference does that make?

                          **OFFICIAL TRANSCRIPT**

11:35:56  1          MR. IRWIN:  It's makes a difference in the burden of

11:35:59  2   proof.

11:35:59  3          The burden of proof under Rule 60, if you look at

11:36:01  4   the case at the bottom there, Your Honor, *Hesling v. CSX*

11:36:08  5   *Transport*, it's universal to all the Fifth Circuit cases, the

11:36:08  6   burden of proof is clear and convincing evidence; not a

11:36:12  7   preponderance of the evidence, it's clear and convincing.

11:36:17  8          So we can look at all of the other prescriptions

11:36:19  9   about Rule 60, about how it's carefully applied -- that may not

11:36:27 10   be the right word, but I think the Court knows what I'm

11:36:29 11   saying -- it's not overused, it's used to protect judgments,

11:36:33 12   protect the court, protect the parties, but the significance is

11:36:37 13   it's clearly and convincing.

11:36:38 14          So that when we start talking about -- when we

11:36:40 15   start talking about their burden here, and they are asking for

11:36:44 16   a stay under Rule 62(b), and Your Honor is properly taking them

11:36:50 17   both up at the same time, whether it's an injunction under 65

11:36:54 18   or a stay under Rule 62(b), and a case out of our own court

11:36:59 19   right here -- oops, back -- Judge Morgan, and many other cases

11:37:07 20   just like this, points out that the analysis of a Rule 62(b)

11:37:14 21   stay is the same as the four-prong analysis in a Rule 65

11:37:21 22   injunction.

11:37:22 23          So this is what we wanted to focus the Court on,

11:37:26 24   and that is this, we think the two main issues are material

11:37:31 25   misrepresentation.  They've got to prove that a

                        **OFFICIAL TRANSCRIPT**

11:37:35 1    misrepresentation made by Mr. Watts, true or false, was

11:37:37 2    material to any decisions that they made and the actions they

11:37:42 3    took.

11:37:42 4              Then they have to show that they justifiably

11:37:46 5    relied on a material misrepresentation.  The trick is, and

11:37:52 6    because this is a Rule 60 motion, they've got to prove that by

11:37:56 7    clear and convincing evidence.

11:37:57 8              So, materiality.  The agreement in principle,

11:38:05 9    which was really what launched this settlement right before

11:38:08 10   Your Honor's trial, March 2, 2012, what's really critical here

11:38:14 11   is, is that the parties agree that the Seafood neutral will

11:38:18 12   develop this settlement program, but it's subject to the

11:38:23 13   approval of BP -- of all parties.  BP had to approve it.  That

11:38:31 14   was on March 2.

11:38:32 15             On April 14th, the opt-out letter was signed and

11:38:36 16   sent to Your Honor, four days before the settlement.  In that

11:38:44 17   opt-out letter, Mr. Godfrey signed his name to it.  That's his

11:38:48 18   handwriting.  Mr. Godfrey designated the Watts claims as

11:38:52 19   Category III.

11:38:56 20             On April 18, 2012, it became official.  Those

11:39:04 21   Category III claims, the Watts claims, which in Mr. Godfrey's

11:39:09 22   own handwriting he put in that bucket, amounted to a total of

11:39:12 23   2.17 percent of the entire settlement agreement.

11:39:22 24             They put in their brief that the need to achieve

11:39:27 25   global peace and get these Watts cases settled, was the, quote,

driving force, the driving force.  Well, one has to ask oneself -- judge them not by what they say, but by what they do, because they didn't act like this was the driving force.

Mr. Herman pointed out that the real crunch of the negotiations back then were the rich claims of the oyster holders and the shrimpers and the vessel owners.  I suspect Your Honor knows that, too.

Mr. Rice said -- and we've seen this earlier from the Bloom affidavit -- that they put a $3,000 value on Seafood crew with employer sworn statements, something that the Watts people were never going to be able to get and didn't get, and BP at the end of the day didn't require it because they put them in Category III, without an employer statement.

There is the bottom line slide that I showed Your Honor earlier.

Now, what does the defendant do?

Like I said at the beginning, I'm a defense lawyer.  My job is to investigate claims.  I guarantee you that's what the client expects me to do.

So, in April, May, June and July, a hundred thousand of these things roll in, including 42,000 for Mr. Watts.

You know, Your Honor, there is actually a lot of information in here.  A responsible defense lawyer is going to get to work on it or assign somebody to do it and get it going.

11:41:07 1          Let's look at the information here.  First of

11:41:09 2   all, you've got -- and we've redacted all of this, Your Honor,

11:41:12 3   for privacy reasons.  You've got the name of the person.

11:41:14 4   You've got an address.  You've got the last four digits -- and

11:41:20 5   this is a made-up number, 6789 -- of a Social Security number.

11:41:25 6          Some of these people, you had businesses.  Here

11:41:27 7   it says, "self-employed deckhand."

11:41:29 8          I tell you what else you've got, you've got the

11:41:32 9   name of the plaintiff lawyer.  So if something happens, and if

11:41:36 10  something comes up in the press, or if you have issues with

11:41:40 11  this, you've got the name of the plaintiff lawyer.

11:41:43 12         I know I've been -- many a time, a judge has said

11:41:46 13  to me or an opponent across the table, well, did you ever pick

11:41:49 14  up the phone and call Mr. Watts?  They could have done that at

11:41:53 15  some point in time.  Instead, they just relied on what the

11:42:02 16  *New York Times* attributed to Mr. Watts.

11:42:04 17         I'll tell you what else is on this, Judge.  There

11:42:08 18  is information about this particular claim having been filed

11:42:10 19  with the GCCF -- GCCF, yes -- and there is a claim number under

11:42:14 20  there that we've redacted out.

11:42:16 21         Well, we know that the GCCF was their program,

11:42:20 22  their people, they funded it.  All they had to do was pick up

11:42:23 23  that same phone and call the GCCF and say, you've got a claim

11:42:27 24  here, what's in that claim, have you done any work on it, do

11:42:32 25  you have a Social Security number, do you have any

**OFFICIAL TRANSCRIPT**

80

11:42:37  1    documentation supporting it?  It was at their fingertips to get
11:42:40  2    that information.
11:42:44  3              Here is what they could have done, and they
11:42:46  4    didn't do until Ms. Travis started looking at this in 2013 -- I
11:42:51  5    would be willing to bet she didn't look at it until after the
11:42:53  6    newspaper articles came out about the Secret Service raid in
11:42:57  7    February -- but here is all you needed to do.
11:43:03  8              You put the name, address in LexisNexis, and it
11:43:12  9    costs a grand total of $22 to do this, and this is what you
11:43:19 10    get.  You get a report.  This report will tell you the address
11:43:26 11    of this person, the name of this person, other residences where
11:43:31 12    this person has lived.  It will tell you neighbors.  It will
11:43:34 13    tell you family members.
11:43:35 14              It will give you information about employment,
11:43:39 15    prior employment, if it's available.  It will tell you about
11:43:41 16    this person's voting and political record, if they vote.  It
11:43:46 17    will tell you if they have hunting and fishing licenses.  It
11:43:48 18    will tell you about vehicle licenses.  It will tell you about
11:43:51 19    bankruptcies.
11:43:52 20              It will give you a lot of information on this
11:43:54 21    individual for the princely sum of $22.
11:43:59 22         THE COURT:  It matches the name and address to those
11:44:01 23    last four digits.  I imagine, obviously, you could have
11:44:06 24    multiple people with Social Security numbers with those last
11:44:09 25    four digits, but then it matches it up with the name, see if

11:44:11 1    it's the same name as on the form.

11:44:13 2           MR. IRWIN:  Yes, sir.

11:44:15 3           THE COURT:  Okay.

11:44:15 4           MR. IRWIN:  So, again -- this is not a real name --

11:44:18 5    Jennifer.  We've obviously just taken Jennifer's last four

11:44:23 6    digits of her Social Security number from the short-form

11:44:28 7    complaint, 6789.

11:44:29 8           From this accurate report from the LexisNexis

11:44:34 9    database that I just talked about that costs $22, you get the

11:44:38 10   first five, if you really want them, and there is your

11:44:44 11   Social Security number on Jennifer.

11:44:46 12          Then you can take that Social Security number and

11:44:51 13   stick it in another LexisNexis inquiry.  This one costs $6.

11:44:59 14   For $6, you can see who has that Social Security number, what

11:45:04 15   you now think is Jennifer's Social Security number.

11:45:09 16          You find out that it's not Jennifer at all, it's

11:45:12 17   Caesar, who doesn't live in Florida, but who lives in

11:45:16 18   Grand Rapids, Michigan, so you know you've got something that's

11:45:19 19   not matching up here.

11:45:20 20          I looked at three of them, and I attached three

11:45:22 21   of them to our brief under seal.  You can see actual names of

11:45:26 22   the actual short-form joinder people, you can see the names of

11:45:31 23   the people who actually had those Social Security numbers.  I

11:45:33 24   just looked at three.

11:45:41 25          So I say, pay no attention to what they say, pay

11:45:45 1    attention to what they did, or, most importantly, what they

11:45:49 2    didn't do.

11:45:50 3              Regardless of materiality, there still has to be

11:45:55 4    reliance.  There was a -- even if they didn't go to the

11:46:01 5    LexisNexis database, which Mr. Downey said they didn't do, back

11:46:05 6    in June and July of 2012 -- pardon me, '11, even if they didn't

11:46:13 7    take the time to do that, they couldn't help but notice that

11:46:15 8    out of those 42,000, they had at least 3,000 dummies.

11:46:22 9              The reason we know that is because we just did

11:46:24 10   the math on the 42,000 that Ms. Travis recited, where she said

11:46:30 11   41 percent of the claimants had -- I may get this backwards,

11:46:37 12   Judge, but I think 41 or 42 percent of the claimants -- they

11:46:41 13   were only able to identify 42 percent --

11:46:42 14        THE COURT:  They matched 40-something percent.

11:46:42 15        MR. IRWIN:  -- match 42 percent.

11:46:45 16             That left 59 percent.  Of that 59 percent, they

11:46:49 17   said 13 percent of that 59 percent had dummy numbers,

11:46:54 18   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.  You take that 13 percent, and that comes up to

11:47:02 19   3400 people.

11:47:02 20             I don't care what you do with those short-form

11:47:07 21   complaints.  You can't start flipping through more than four or

11:47:10 22   five of them when you start realizing, I've got a lot of

11:47:15 23   numbers here that are not are real, genuine Social Security

11:47:19 24   numbers.

11:47:19 25             Justifiable reliance.  I think about Ms. Bloom's

**OFFICIAL TRANSCRIPT**

11:47:23  1   affidavit and these teams of experts, teams and teams of them.

11:47:29  2          Here is the *New York Times* talking about Mr. Tim

11:47:34  3   Nguyen, who said, "I never signed up with anybody."  The

11:47:41  4   article goes on to say that, "That was Mr. Watts who purported

11:47:41  5   to represent you."  Here is Mr. Nguyen saying, "I didn't sign

11:47:45  6   up with him."

11:47:48  7          Here is another Vietnamese fisherman.  He said --

11:47:50  8   we don't know whether he was signed up by Mr. Watts or not

11:47:52  9   signed up by Mr. Watts or another lawyer, it's not indicated

11:47:55 10   here, but it certainly is alarming.  If I were a defense

11:48:00 11   lawyer, I would be alarmed by a report that here is a plaintiff

11:48:04 12   who said he was misled into signing up for a lawyer by a woman

11:48:08 13   who told him he was applying for medical assistance.  That

11:48:11 14   would worry the heck out of me.

11:48:13 15          Here is something else.  As Watts' claims were

11:48:20 16   being filtered down by the GCCF, he then filed 26,000 instead

11:48:26 17   of 42,000, and it was noted that virtually every submission

11:48:30 18   listed a deckhand with identical earnings.

11:48:33 19          Well, you know that's not true, or it's not

11:48:35 20   accurate.  Is it fraud?  I don't know if it's fraud, but I know

11:48:38 21   it's not accurate.

11:48:39 22          Then here at the end, 35 Watts clients made it

11:48:48 23   through the GCCF, and the GCCF cut checks.  Out of those 35,

11:48:54 24   11 of them said they weren't represented by him.  So we know

11:48:58 25   that at least out of that cohort, that practically a third

**OFFICIAL TRANSCRIPT**

said, he's not my lawyer.

So what I heard from this podium a little while ago is that, we're not going to pay any attention to that. That's nothing.  We're not going to worry about that, not going to look at those short-form complaints, not going to pick up the phone.

Here is the Goodwin Procter letter.  This is the letter of the lawyer who represented the GCCF.  In essence, it's BP's lawyer.  40,000 plaintiff profile forms were submitted by Watts to the GCCF.  There is a series of subtractions that I'll show you in the next slide.

We basically get down to what this lawyer says, after starting with 40,000, we could only verify a lone claimant, one.

This is what it looked like:  44,000 plaintiff profile forms, over 297 duplicates, 12,834 with no info, 25,000 incomplete.  That left 1377.  1375 were not Mr. Watts'. The two that were left, one of them was not signed by the plaintiff, which was required, and one was.

One out of 44,002 made it through.

THE COURT:  That's from the GCCF report to BP about the Watts claims?

MR. IRWIN:  Yes, sir.  That's the letter from Goodwin Procter.

Then, this is another case where I had to pinch

OFFICIAL TRANSCRIPT

11:50:40 1    myself, where BP's brief, their reply brief said, well, you

11:50:48 2    know, the PSC never flagged any of this for us.

11:50:54 3            Then we see this supplemental declaration, where

11:50:58 4    it's now time to blame Joe Rice.  I guess the next time, on my

11:51:06 5    next mass tort, I'll go to the plaintiff lawyers, and I'll say,

11:51:09 6    here, here is my inventory of all of your cases, would you

11:51:12 7    please evaluate them for me, all your claims.  You do all the

11:51:15 8    work; I'm not going to do it.

11:51:17 9            Because that's basically what they are saying

11:51:18 10   here is that Joe Rice, the Plaintiffs' Steering Committee,

11:51:22 11   should have done all the work to evaluate all these claims that

11:51:25 12   BP didn't see fit to take the time to do itself.

11:51:28 13           So I looked at this declaration, where

11:51:34 14   Mr. Godfrey says, "At no point during the negotiations at which

11:51:38 15   I was present did Mr. Rice state or suggest that Mr. Watts had

11:51:43 16   fictitious clients."

11:51:45 17           At no point did Mr. Rice ever flag that, but the

11:51:51 18   *New York Times* did, that at least 30 percent of theirs weren't

11:51:57 19   his.

11:51:58 20           Next, Mr. Godfrey says, "At no point did Mr. Rice

11:52:03 21   flag for me that Mr. Watts' clients had stolen identities or

11:52:08 22   false Social Security numbers."

11:52:11 23           Well, in fact, Watts himself submitted to them

11:52:15 24   short-form joinders with at least 3,000 false numbers, if they

11:52:22 25   had taken the time to look at them.

**OFFICIAL TRANSCRIPT**

11:52:23  1          Mr. Rice also didn't flag for Mr. Godfrey that
11:52:32  2  any of the Watts clients were dead, any of them were dead, did
11:52:36  3  not exist or that the clients themselves were fraudulent,
11:52:39  4  made-up or fictitious.
11:52:41  5          Well, the *New York Times* said, "Mr. Nguyen said,
11:52:45  6  'I didn't sign up with anybody.'"
11:52:47  7          Mr. Rice says -- Mr. Rice was supposed to flag, I
11:52:53  8  guess, for Mr. Godfrey -- that, "Watts did not, in fact,
11:52:58  9  represent roughly 40,000 or more clients, but instead some
11:53:02 10  significantly less."  So, shame on Joe Rice for not telling him
11:53:06 11  he represented less.
11:53:07 12          Well, Goodwin Procter told him he represented
11:53:11 13  only one out of 40,000, their own lawyer.
11:53:20 14          So Your Honor will have to consider balancing the
11:53:25 15  harm.  Yesterday, Doug and I went to the Internet and pulled up
11:53:33 16  BP's 2012 Annual Report.  In 2012, they were a $388 billion
11:53:47 17  business worldwide, 388 billion.
11:53:52 18          Then we pulled up this article from CNN dated
11:53:57 19  April 29, 2013.  This is a quote about a fisherman from
11:54:02 20  Yscloskey, an oysterman.  This is April of 2013.  He says,
11:54:11 21  "$300 worth of fuel, $100 worth of other expenses, and I have
11:54:15 22  to pay the deckhand.  I got $150 a day on a perfect day.  It
11:54:20 23  don't pay to go out."
11:54:24 24          There are pictures of the oyster reefs and all
11:54:29 25  the shrimpers retiring because they couldn't make a living

**OFFICIAL TRANSCRIPT**

11:54:32 1    anymore.

11:54:32 2              Well, Your Honor, BP stuck it to the

11:54:35 3    Mr. Barisiches of the Gulf of Mexico four years ago, and they

11:54:40 4    are trying -- they are coming back, and for good measure,

11:54:43 5    trying to do it again.

11:54:44 6              They promised to these people and they lured them

11:54:47 7    into this settlement with a promise of a second distribution.

11:54:50 8    Now, they won't even tell you how much they want to hold back

11:54:54 9    from this second distribution.  They want you to hold back

11:54:57 10   $1.2 billion from people who are innocent; innocent, innocent

11:55:03 11   people like Mr. Barisich, who works all day and gets 150 bucks.

11:55:12 12             So I think the balance is clear, Your Honor.  We

11:55:14 13   appreciate the opportunity to present this to you.  Thank you

11:55:18 14   for letting us make our case on this.  Knowing the fact that

11:55:21 15   the second distribution will be many, many months from now, we

11:55:24 16   ask that Your Honor deny this motion.  It is without merit.

11:55:29 17        THE COURT:  All right.  Thank you, Mr. Irwin.

11:55:31 18        MR. IRWIN:  Thank you.

11:55:31 19        THE COURT:  Mr. Downey, I'll give you about five

11:55:34 20   minutes, okay.

11:55:36 21        MR. DOWNEY:  Your Honor, let me comment on a few

11:55:38 22   aspects of Mr. Irwin's presentation.

11:55:41 23             First of all, and perhaps most importantly for

11:55:44 24   the Court's consideration, let's focus on the scope of damage.

11:55:47 25             Mr. Irwin presented to you a calculation which

**OFFICIAL TRANSCRIPT**

88

11:55:50 1    first assumed that the $50 million cap was in place at the time

11:55:54 2    of the negotiations; then, took the total number of claimants,

11:55:59 3    allocated those within the $50 million cap, and came up with

11:56:04 4    per-claimant calculations of a little more than a thousand

11:56:08 5    dollars per claimant.

11:56:10 6              But, of course, as the Court knows from

11:56:13 7    Mr. Balhoff's declaration, the $50 million cap did not exist at

11:56:19 8    the time of the negotiations and was the result of subsequent

11:56:21 9    discussions between Mr. Balhoff -- who was not even in place at

11:56:25 10   the time, but was, rather, contemplated by the agreement in

11:56:28 11   principle -- and the parties at a later time.

11:56:32 12             So what does that mean about what was happening

11:56:33 13   when this amount of money was decided on?  Well, take even the

11:56:38 14   assumed upon cap imposed per claimant under Mr. Balhoff's plan

11:56:45 15   of distribution, $5,000 per claimant.

11:56:48 16             So with that cap per claimant, which was

11:56:52 17   determined to be the appropriate maximum amount that any

11:56:55 18   claimant could receive within the context of the $2.3 billion

11:57:00 19   fund, that still suggests that the only reasonable perception

11:57:04 20   of the value of these claims would have been well in excess of

11:57:09 21   $200 million at the time.

11:57:10 22             So I think the effort of Mr. Irwin to minimize

11:57:15 23   the value of these claims by accepting caps which were later

11:57:19 24   imposed, at a time when Mr. Watts and others had no incentive

11:57:23 25   to make those caps higher because, of course, they didn't

**OFFICIAL TRANSCRIPT**

11:57:26 1  actually have these clients, and they had no motive in front of

11:57:30 2  Mr. Balhoff to insist on a higher cap -- in other words, those

11:57:34 3  caps were relative to other claimants, they weren't relevant to

11:57:38 4  BP; the amount of money that BP was going to pay had been set

11:57:41 5  as of March 2nd.

11:57:43 6          So I think the valuations, even on a per-cap

11:57:48 7  basis, Your Honor, demonstrate the scope of potential damage

11:57:50 8  here.  I think, to the extent that there was an aggregate cap

11:57:54 9  imposed later, it's not -- it shouldn't be a factor in

11:57:57 10 Your Honor's evaluation of how to value the claims as of the

11:58:02 11 time of the negotiations.  That's as to the scope of the

11:58:06 12 damage.

11:58:06 13         Now, as to the remedy, Mr. Irwin says, well, the

11:58:13 14 correct way to proceed here is pursuant to 60(b).  I agree with

11:58:16 15 Mr. Irwin in part.  It is an appropriate to proceed under

11:58:20 16 60(b), assuming that remedy is determined to be available by

11:58:23 17 the Court.

11:58:24 18         Mr. Irwin says this is significant to him because

11:58:26 19 the burden of proof imposed on BP is higher if it's a 60(b)

11:58:32 20 motion.  Well, Your Honor, I think that is to confuse a few

11:58:36 21 things.

11:58:37 22         I don't think there is any doubt here that

11:58:41 23 Mr. Watts committed a fraud.  I don't think there is any doubt

11:58:44 24 that he made false representations to the Court and to BP, and

11:58:50 25 that his claims were negotiated as part of the settlement of

11:58:54  1   the $2.3 billion fund.  The only argument that the parties are

11:58:57  2   really having is whether or not that resulted in a payment that

11:59:03  3   was -- of the size and scale that BP's motion is seeking.

11:59:08  4        So the notion that there is not clear and

11:59:10  5   convincing evidence of a fraud being committed is really

11:59:13  6   focused on the wrong issue.  Mr. Irwin is saying, well, there's

11:59:18  7   not a lot of damage because BP actually didn't rely on this as

11:59:23  8   much as I say; but, there is no question within the inquiry

11:59:25  9   that the Court will pose under 60(b) that there was a fraud on

11:59:28 10   the Court, and it had an effect on the procedures.

11:59:30 11        So while I recognize Mr. Irwin's point and don't

11:59:36 12   disagree with his point that we can proceed under 60(b), I

11:59:39 13   think it's not material to the issues before the Court for

11:59:42 14   decision today.

11:59:43 15        Next, Your Honor, let me just comment a bit on

11:59:48 16   Mr. Irwin's description of the negotiations and the

11:59:52 17   requirements of documentation at the time that the last offers

11:59:57 18   were exchanged between the parties because I do think that is

12:00:01 19   important to the Court's overall consideration of how to

12:00:05 20   perceive the amount of monies that should be withheld under any

12:00:08 21   injunction that is entered.

12:00:10 22        Mr. Irwin says at the time that the PSC conveyed

12:00:14 23   its offer -- or counteroffer back to BP on February 20th, the

12:00:21 24   documents reflect that, in fact, there was a requirement for

12:00:24 25   employer verification for the new category that had been

12:00:27 1    created within the IEL, which was referred to as Category V.

12:00:32 2            But if Your Honor studies that document, on the

12:00:35 3    second page of that document there is a description of what the

12:00:38 4    categories are.  On page 2 of the exhibit to the Bloom

12:00:41 5    definition, the word "employer verification" is struck out, so

12:00:47 6    the precise point on which Mr. Irwin hinges his argument is

12:00:52 7    contradicted by the very document that he's describing.

12:00:55 8            THE COURT:  I interpreted that document as indicating

12:01:02 9    that at that time BP's position was valuing that category, that

12:01:13 10   type of claimant as 3,000 per claimant, but BP would have

12:01:23 11   required this additional documentation from the employer and so

12:01:27 12   forth.

12:01:28 13           In response to that, the PSC was asking for

12:01:33 14   12,000 or whatever, and they were suggesting to eliminate that

12:01:44 15   employer verification.  The parties never reached an agreement

12:01:47 16   on that.

12:01:48 17           MR. DOWNEY:  That's right.

12:01:50 18           THE COURT:  That's how --

12:01:50 19           MR. DOWNEY:  Even at the time -- that's how I interpret

12:01:50 20   the document as well.

12:01:51 21           THE COURT:  Okay.

12:01:53 22           MR. DOWNEY:  Your Honor, the parties never reached

12:01:57 23   agreement on the documentation requirements when discussing the

12:02:03 24   $2.3 billion number.  It's not in the agreement in principle

12:02:05 25   announced March 2nd.

**OFFICIAL TRANSCRIPT**

That's the subject of subsequent discussions with Mr. Balhoff.  Those documentation requirements are ultimately decided by Mr. Balhoff as part of that process for inclusion in the Seafood program's evaluation of the claims.

Now, much of Mr. Irwin's presentation was devoted to the point of reliance.  I must say, he believes the fraud was so obvious that I find it somewhat surprising that other parties did not believe Mr. Watts was engaged in a fraud at the same time.

He attempts to exonerate the PSC's use of Mr. Watts' claimants in the negotiations by saying it wasn't Mr. Rice's duty, it's the duty of defense counsel.  But surely the PSC, who was dealing with Mr. Watts all the time, and was making representations about his clients for the purposes of securing this agreement, the record doesn't suggest they were doing it intentionally, but they were making representations which we now know to be false about the size of claims that Mr. Watts was actually presenting to the Court.

So it's not just BP who didn't look into these claims, it's people who were reliant on them in negotiating with BP for purposes of achieving a settlement agreement.

As well, I would say, Your Honor, I don't think, really, the process that Mr. Irwin describes that BP could have gone through is actually all that meaningful.

The fact of the matter is, the kinds of steps

OFFICIAL TRANSCRIPT

12:03:42  1   that Mr. Irwin describes were not gone through, but that

12:03:47  2   process is not nearly as simple as Mr. Irwin suggests.

12:03:52  3             First of all, I don't think there is anything in

12:03:54  4   the record which suggests that there has been a process by

12:03:57  5   which 3500 of these have been verified after a review of all of

12:04:02  6   them.

12:04:02  7             Second, the kind of documentation that Mr. Irwin

12:04:06  8   believes was available to BP just wasn't available to BP about

12:04:10  9   Mr. Watts.  Sure, short-form joinders were available; but,

12:04:15 10   beyond that, documentation that was in the possession of the

12:04:17 11   GCCF as to Mr. Watts' claimants does not appear to have

12:04:22 12   contained the kind of information that Mr. Irwin speculated

12:04:25 13   about.

12:04:26 14             The point of the Goodwin Procter letter was to

12:04:29 15   say to BP, Mr. Watts has not completed the GCCF process, so his

12:04:35 16   claims are not being processed to give rise to the kind of

12:04:38 17   documentation that Mr. Irwin is describing.

12:04:41 18             That made complete sense in the context of what

12:04:46 19   was occurring because Mr. Watts and other members of the PSC

12:04:49 20   were disparaging the GCCF and arguing that the superior forum

12:04:57 21   in which to have those claims adjudicated was this forum.

12:05:01 22   Therefore, the abandonment of the process and the abandonment

12:05:05 23   of claims to pursue them here does not in and of itself raise

12:05:10 24   any suspicion.

12:05:11 25             So I think the dramatization of what could have

**OFFICIAL TRANSCRIPT**

12:05:15  1   been done is, first of all, based on more documentation than BP

12:05:19  2   had; and, second, I think there's no evidence that indicates

12:05:23  3   what that process would have revealed had it been undertaken in

12:05:27  4   full.

12:05:28  5          As well, and I just want to emphasize to the

12:05:32  6   Court, the assurances of Mr. Watts and his taking actions

12:05:35  7   before this Court gave a lot of confidence, I'm sure, to all

12:05:41  8   the parties, but to BP as well.

12:05:42  9          So, Your Honor, unless you have more questions

12:05:49 10   with respect to the motion, we'll submit at this time.

12:05:52 11          THE COURT:  All right.  Thank you.

12:05:53 12          I believe I just heard Mr. Downey concede one

12:06:05 13   point, at least, that BP does have a remedy under Rule 60(b)

12:06:14 14   that is available.  They did timely file their Rule 60 motion.

12:06:19 15   So I don't quite understand the point of the so-called

12:06:23 16   independent action that we're dealing with here.

12:06:26 17          The relief that's sought by BP is the same under

12:06:35 18   either; it's basically to enjoin or stay the second

12:06:43 19   distribution of the Seafood program.

12:06:47 20          As I said at the outset, I really don't see a

12:06:57 21   need to enjoin anything at this point, if, for no other reason,

12:07:03 22   that there's no imminent danger of an irreparable harm because

12:07:14 23   there is no second distribution that will be made for at least

12:07:19 24   a number of months; and, it is completely in the control of the

12:07:26 25   Court, in that it has to go through the process that I

**OFFICIAL TRANSCRIPT**

described earlier, and I have to sign off on it before any second distribution will be made.

I will say this. The evidence that's been submitted to the Court in the way of declarations by the parties involved in these negotiations and other documentation, particularly the contemporaneous evidence, contemporaneous to the time of the settlement and shortly thereafter, convinces the Court that, even assuming BP ultimately will prevail on its fraud claims against Mr. Watts, that the potential damages recovery would not come close to a billion dollars or anywhere in that neighborhood.

BP has argued, I think it used the term somewhere in its briefing -- it emphasizes the number of clients that Mr. Watts alleged to have had, that is, 40-plus thousand. Certainly, that's a large number; however, while the number of claims in a case like this is certainly relevant, it's not necessarily the most important factor. It's what types of claims these are or were and what sort of value the parties assigned to these claims.

Of all the types of claims in the Seafood program, the Watts claims, the so-called Category III, what ended up being the Category III claims, obviously are the lowest possible value. These were persons who were undocumented, who alleged to have been employed as deckhands on fishing vessels. They had no tax returns, no employer wage

statements.  They were unable, largely, to obtain any
affidavits or any sort of verification of their employment from
their alleged employers.  So I don't see how anybody could have
put a high value on any of those claims.

Did BP want to corral them into the settlement?
Of course, they did, as any defendant would, to corral as many
claims as you can in a class settlement.

Did BP insist that the Seafood Program, the
guaranteed/capped Seafood Program of 2.3 billion, include all
of the individual crew member claims, including the Watts
claims?  Obviously, they did.  However, that doesn't tell us
much about the value that was assigned to or placed on these
claims.

There were several numbers thrown around here
today by both sides as to a potential way the Court could
approximate a value that could even arguably be relevant to
BP's claim here.

One thing I'm convinced of is that BP's argument
that somehow the Watts claims were the driving force in these
negotiations is clearly without basis; in fact, that they, at
best, were the tail wagging the dog, and maybe they were even
the flea on the tail wagging the dog.  They were significant in
numbers, but not significant in value, as far as I can tell.

Even though the Seafood Compensation Program was
created after the $2.3 billion fund was agreed to, it wasn't

12:12:33 1   long after, it was shortly thereafter when the Court appointed,

12:12:36 2   at the parties' request, a court neutral, Mr. Perry and his

12:12:42 3   partner, Mr. Balhoff, to allocate the 2.3 billion.

12:12:47 4            As part of that process, they were required to

12:12:53 5   place a value on the Watts claims, the Category III claims, and

12:12:59 6   the parties, including BP, as pointed out here today, had to

12:13:05 7   approve what they did.

12:13:07 8            It was through that process that the number

12:13:14 9   $50 million was arrived at.  Even assuming there would have

12:13:20 10  been the anticipated second distribution, pro rata

12:13:27 11  proportionate second distribution, that would have maximized

12:13:31 12  the aggregate recovery for those Category III claimants at

12:13:34 13  about $60 million.

12:13:41 14           So the decision that I have to make is, do I

12:13:47 15  grant BP any type of interim relief, and, if so, what amount?

12:13:54 16           I don't think I have to make that ultimate

12:13:56 17  decision today, other than to say I'm going to deny the motion

12:14:00 18  for preliminary injunction because I don't think it's

12:14:03 19  necessary, for all the reasons I just said.

12:14:06 20           Nothing is going to happen right now.  Anything

12:14:12 21  that does happen will have to come through the Court, get

12:14:17 22  approval of the Court, and an opportunity for both sides to

12:14:20 23  weigh in before I sign off on anything.

12:14:23 24           There will be an opportunity at that time for me

12:14:24 25  to give some thought, and, again, the parties will be able to

12:14:29  1    weigh in, as to whether I should stay any part of the second

12:14:39  2    distribution.  It certainly would only be a part that we could

12:14:44  3    possibly put in some sort of reserve fund until the rest of

12:14:50  4    this matter is resolved.

12:14:51  5            So, for today, I don't think BP's met its burden

12:15:02  6    on its motion for preliminary injunction for the reasons I've

12:15:05  7    just said, and I'm going to deny the motion for preliminary

12:15:07  8    injunction.

12:15:11  9            In terms of the Rule 60(b)(3) motion, I guess

12:15:17 10    what I'm doing is really deferring ruling on that at this point

12:15:20 11    because I don't think we have to rule on that right now.

12:15:27 12            Does anybody have any questions about the ruling

12:15:30 13    here?

12:15:31 14        MR. DOWNEY:  Your Honor, just a question, really, as to

12:15:35 15    procedure.

12:15:35 16        THE COURT:  Yes.

12:15:36 17        MR. DOWNEY:  Is there some point in the process where

12:15:38 18    the Court would like the parties to reinitiate the conversation

12:15:44 19    under 60(b) as to the amount of an appropriate stay?  When

12:15:49 20    would you want the parties to weigh in on that?

12:15:53 21        THE COURT:  You mean you all to try to agree to that?

12:15:55 22        MR. DOWNEY:  Well, I suppose.  I think it's unlikely we

12:15:59 23    could agree.

12:15:59 24        THE COURT:  That would be a good idea.  We can engage

12:16:01 25    in more settlement discussions, settlement discussions about

**OFFICIAL TRANSCRIPT**

12:16:05  1    the settlement.

12:16:06  2                   Actually, that would be a good idea.  It seems to

12:16:10  3    me that it might be a way that the parties could agree on some

12:16:14  4    resolution of this -- interim resolution, I guess.

12:16:20  5           MR. DOWNEY:  Yes.  But barring that, Your Honor, which,

12:16:23  6    obviously, we'll take under advisement, but barring that --

12:16:26  7           THE COURT:  I think the opportunity would be when the

12:16:32  8    second round distribution is imminent, so to speak, there will

12:16:38  9    be an opportunity for you to respond.

12:16:44  10                  First of all, nothing is going to happen until

12:16:45  11   the first round is completed, which, as I've said, won't be any

12:16:48  12   earlier than this summer, it seems like from information I

12:16:51  13   received from the Claims Administrator.

12:16:54  14                  Secondly, Mr. Balhoff and Mr. Perry will have to

12:16:59  15   submit their proposal to the Court.  Everyone will have a

12:17:02  16   chance to weigh in on that.  Before I sign off on anything,

12:17:05  17   you'll certainly have a chance to make any suggestions.

12:17:08  18          MR. DOWNEY:  So unless we receive some other direction

12:17:10  19   from the Court, we'll plan to comment on this issue at the time

12:17:13  20   of the neutrals' report.

12:17:16  21          THE COURT:  Anything from this side of the table?

12:17:17  22          MR. HERMAN:  Thank you, Your Honor.  Steve Herman for

12:17:20  23   the Class.

12:17:20  24                  I don't have any questions.  I just wanted to

12:17:22  25   make a brief comment about the confidentiality issue.

**OFFICIAL TRANSCRIPT**

12:17:25 1             We agree with the Court and, presumably, BP that

12:17:28 2  there doesn't really need to be confidentiality anymore over

12:17:33 3  ordinary settlement discussions, 408 type stuff.  I mean, that

12:17:35 4  seems to be blown open.

12:17:35 5           There's two small issues that --

12:17:37 6        THE COURT:  I think that's right.  The only caveat on

12:17:41 7  that is anything that's submitted or has been submitted that

12:17:45 8  has personal identifying information, obviously, it needs to be

12:17:49 9  redacted.

12:17:49 10        MR. HERMAN:  Yes, Your Honor, that was one point,

12:17:52 11  claimant-specific information.

12:17:53 12          The other point is that at some point during the

12:17:56 13  negotiations, my recollection is that either the United States

12:18:01 14  and/or the states provided information to the parties to help

12:18:06 15  them with the different things.  I think it was part of the

12:18:10 16  NRDA process and/or Department of Wildlife and Fisheries.

12:18:13 17         In any event, we agreed to keep Government

12:18:16 18  information confidential, and so I would suggest --

12:18:18 19       `THE COURT:  That's not relevant to this.

12:18:20 20        MR. HERMAN:  It's not relevant here, but that's just --

12:18:21 21        THE COURT:  I'm just talking about documents and

12:18:27 22  information that have been submitted and relied on by both

12:18:31 23  sides in conjunction with this hearing.

12:18:33 24        MR. HERMAN:  Yes, Your Honor.

12:18:33 25        THE COURT:  Does anybody have any questions about that?

**OFFICIAL TRANSCRIPT**

12:18:36  1          MR. DOWNEY:  No.

12:18:36  2               Your Honor, we'll assume that PTO 38 doesn't

12:18:39  3     apply to negotiations that have been discussed in the --

12:18:39  4          THE COURT:  Right.

12:18:44  5          MR. DOWNEY:  -- what's the subject of submission, and I

12:18:47  6     assume the Court is unsealing what's been submitted.

12:18:49  7          THE COURT:  That's correct.

12:18:53  8               I'll give you all a week to tell me if there is

12:18:56  9     anything in particular that should still be sealed for some

12:18:59 10     other reason, plaintiff-specific information or whatever.

12:19:05 11          MR. DOWNEY:  Yes, Your Honor.

12:19:05 12          MR. HERMAN:  Yes, Your Honor.

12:19:06 13          THE COURT:  Anything else?

12:19:07 14               All right, everyone.  Have a good day.

12:19:09 15          MR. DOWNEY:  Thank you, Your Honor.

12:19:11 16          THE COURT:  All rise.

         17               (WHEREUPON, at 12:19 p.m. the hearing was

         18     concluded, and the Court was in recess.)

         19                         *    *    *

         20

         21

         22

         23

         24

         25

                              **OFFICIAL TRANSCRIPT**

1                          REPORTER'S CERTIFICATE

2

3

4          I, Cathy Pepper, Certified Realtime Reporter, Registered

5     Merit Reporter, Certified Court Reporter of the State of

6     Louisiana, Official Court Reporter for the United States

7     District Court, Eastern District of Louisiana, do hereby

8     certify that the foregoing is a true and correct transcript to

9     the best of my ability and understanding from the record of the

10    proceedings in the above-entitled and numbered matter.

11

12

13

14                              *s/Cathy Pepper*
                              _____

15                              Cathy Pepper, CRR, RMR, CCR
                              Certified Realtime Reporter
16                              Registered Merit Reporter
                              Official Court Reporter
17                              United States District Court
                              Cathy_Pepper@laed.uscourts.gov
18

19

20

21

22

23

24

25

                            **OFFICIAL TRANSCRIPT**

## $

**$1,074,534,594** [1] - 25:12
**$1,250** [1] - 70:10
**$1,513** [1] - 71:22
**$100** [1] - 86:21
**$12,500** [2] - 49:15, 64:2
**$125** [1] - 37:3
**$128** [1] - 48:17
**$146** [1] - 48:12
**$150** [1] - 86:22
**$200** [2] - 50:23, 88:21
**$22** [3] - 80:9, 80:21, 81:9
**$25** [1] - 37:5
**$25,000** [1] - 49:17
**$3,000** [3] - 47:14, 48:10, 78:9
**$300** [1] - 86:21
**$388** [1] - 86:16
**$5,000** [5] - 70:6, 70:17, 70:20, 71:20, 88:15
**$50** [8] - 69:16, 70:11, 71:1, 71:20, 88:1, 88:3, 88:7, 97:9
**$500** [1] - 50:23
**$6** [1] - 81:13
**$60** [1] - 97:13

## '

**'11** [1] - 82:6

## 0

**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** [1] - 82:18

## 1

**1** [2] - 48:23, 49:1
**1-point-something** [1] - 51:10
**1.1** [5] - 49:21, 49:23, 50:10, 71:7
**1.2** [1] - 49:20, 87:10
**1.3** [1] - 52:23
**1.9** [1] - 71:13
**10** [2] - 64:8, 70:8
**10-2179** [2] - 4:9, 4:24
**10-MD-2179** [1] - 1:6
**10.5** [1] - 71:18
**11** [5] - 34:25, 35:1, 47:10, 53:19, 83:24

**1100** [1] - 2:23
**11994** [1] - 4:23
**12,000** [1] - 91:14
**12,834** [1] - 84:16
**12-970** [3] - 1:12, 4:11, 4:25
**120** [1] - 22:19
**12171** [1] - 5:3
**12171-2** [1] - 12:18
**128** [1] - 50:9
**12:19** [1] - 101:17
**12TH** [1] - 2:14
**13** [3] - 36:24, 82:17, 82:18
**13-6674** [5] - 1:18, 4:14, 4:20, 5:3, 21:14
**132** [1] - 50:8
**1375** [1] - 84:17
**1377** [1] - 84:17
**13th** [1] - 62:17
**142** [1] - 54:21
**14th** [2] - 64:21, 77:15
**15** [1] - 62:12
**150** [2] - 62:15, 87:11
**17** [4] - 62:3, 63:4, 63:19, 68:3
**17th** [1] - 62:5
**18** [1] - 77:20

## 2

**2** [5] - 4:19, 11:23, 77:10, 77:14, 91:4
**2,096** [2] - 25:22, 26:1
**2.17** [1] - 77:23
**2.3** [18] - 34:5, 37:24, 44:5, 44:14, 45:22, 46:15, 46:17, 49:24, 67:14, 67:17, 67:21, 88:18, 90:1, 91:24, 96:9, 96:25, 97:3
**2.6** [1] - 26:4
**2/24/14** [1] - 25:11
**20** [2] - 1:6, 4:11
**20005** [1] - 2:14
**2008** [2] - 10:24, 10:25
**2010** [2] - 1:6, 4:11
**2011** [7] - 11:13, 39:9, 39:18, 53:10, 57:9, 57:19, 63:18
**2012** [7] - 47:11, 66:20, 77:10, 77:20, 82:6, 86:16
**2013** [5] - 63:4, 68:3, 80:4, 86:19, 86:20
**2014** [5] - 1:7, 1:13, 1:19, 4:3, 26:9
**20th** [6] - 42:9, 42:17,

43:2, 46:21, 48:22, 90:23
**21,871** [1] - 25:19
**2179** [6] - 18:24, 22:3, 24:9, 29:20, 30:12, 30:15
**23** [3] - 36:15, 45:4, 45:5
**23972** [1] - 10:25
**23rd** [4] - 35:21, 40:7, 42:12, 45:20
**24** [1] - 50:20
**24,609** [1] - 25:15
**24th** [1] - 25:10
**25,000** [1] - 84:17
**25th** [5] - 35:21, 40:7, 45:20, 45:21, 46:21
**26** [4] - 1:7, 1:13, 1:19, 4:3
**26,000** [1] - 83:16
**26th** [1] - 62:19
**2700** [1] - 2:18
**2800** [1] - 2:23
**29** [1] - 86:19
**297** [1] - 84:16
**2nd** [2] - 89:5, 91:25

## 3

**3** [1] - 26:10
**3,000** [4] - 65:19, 82:8, 85:24, 91:10
**30** [1] - 85:18
**31st** [1] - 62:14
**3400** [1] - 82:19
**35** [3] - 48:25, 83:22, 83:23
**35-page** [1] - 62:10
**3500** [1] - 93:5
**38** [2] - 33:2, 101:2
**388** [1] - 86:17

## 4

**4** [2] - 57:15, 62:2
**40** [1] - 61:12
**40,000** [16] - 30:12, 34:23, 35:3, 39:8, 56:7, 57:17, 58:14, 70:3, 70:4, 70:9, 70:18, 71:22, 84:9, 84:13, 86:9, 86:13
**40,000-and-some-odd** [1] - 55:13
**40-plus** [1] - 95:14
**40-something** [3] - 39:7, 56:23, 82:14
**400** [3] - 2:18, 71:17,

71:18
**400-and-something** [1] - 44:10
**408** [1] - 100:3
**41** [2] - 82:11, 82:12
**42** [3] - 82:12, 82:13, 82:15
**42,000** [7] - 56:8, 61:22, 63:17, 78:21, 82:8, 82:10, 83:17
**425** [1] - 44:10
**44,000** [2] - 54:6, 84:15
**44,002** [1] - 84:20
**475** [1] - 44:10
**4:00** [1] - 62:20

## 5

**5,000** [1] - 70:25
**50** [7] - 5:18, 69:19, 70:2, 70:18, 71:6, 71:9, 71:15
**50-plus** [1] - 6:7
**500** [1] - 3:11
**5000** [1] - 2:10
**504** [1] - 3:12
**589-7779** [1] - 3:12
**59** [3] - 82:16, 82:17

## 6

**6** [1] - 81:14
**60** [13] - 23:5, 23:8, 62:6, 75:3, 75:4, 75:6, 75:9, 75:12, 76:3, 76:9, 77:6, 94:14
**60(b** [19] - 23:3, 23:20, 23:21, 30:1, 36:15, 37:13, 72:19, 73:6, 73:24, 74:10, 74:21, 75:20, 75:21, 89:16, 89:19, 90:9, 90:12, 94:13, 98:19
**60(b)** [2] - 73:19, 89:14
**60(b)(3** [3] - 4:23, 24:3, 98:9
**60.5** [1] - 71:22
**62(b** [3] - 76:16, 76:18, 76:20
**642** [1] - 26:3
**65** [2] - 76:17, 76:21
**6789** [2] - 79:5, 81:7

## 7

**701** [1] - 2:9
**70113** [1] - 3:5
**70130** [2] - 2:19, 3:12
**70139** [1] - 2:10
**70163** [1] - 2:23
**725** [1] - 2:14
**7th** [1] - 36:14

## 8

**8.5** [1] - 26:1
**820** [1] - 3:4
**89** [1] - 25:20

## 9

**9** [1] - 69:11
**95** [4] - 62:5, 62:7, 68:3, 68:5
**97** [1] - 26:8

## A

**A.M** [3] - 1:7, 1:13, 1:19
**abandonment** [2] - 93:22
**ability** [1] - 102:9
**able** [5] - 8:11, 68:9, 78:11, 82:13, 97:25
**above-entitled** [1] - 102:10
**absence** [2] - 10:21, 75:2
**accept** [5] - 17:10, 25:25, 46:8, 54:24, 68:11
**acceptable** [1] - 47:15
**accepting** [1] - 88:23
**accompanying** [2] - 21:4, 23:2
**accounting** [1] - 63:14
**accurate** [4] - 50:12, 81:8, 83:20, 83:21
**accurately** [1] - 12:3
**achieve** [1] - 77:24
**achieving** [2] - 33:23, 92:21
**acknowledge** [2] - 20:9, 52:22
**acknowledged** [1] - 15:17
**acknowledges** [2] - 36:7, 36:8
**acknowledging** [1] -

10:15
**Act** [1] - 74:6
**act** [3] - 28:16, 41:2, 78:3
**acting** [1] - 32:11
**Action** [2] - 4:11, 4:13
**action** [14] - 4:25, 11:1, 13:21, 17:5, 36:17, 37:1, 37:17, 59:5, 63:9, 73:20, 73:23, 74:13, 75:8, 94:16
**ACTION** [3] - 1:6, 1:12, 1:18
**actions** [2] - 77:2, 94:6
**active** [8] - 6:25, 8:15, 9:11, 9:14, 9:16, 16:15, 22:1, 22:7
**activities** [1] - 12:25
**actual** [6] - 11:19, 13:20, 53:3, 58:8, 81:21, 81:22
**add** [2] - 6:4, 37:2
**additional** [3] - 25:22, 62:18, 91:11
**address** [8] - 14:13, 55:17, 57:10, 57:14, 79:4, 80:8, 80:10, 80:22
**addressed** [1] - 29:3
**addresses** [1] - 56:15
**adequate** [4] - 73:25, 75:2, 75:3, 75:19
**adjudicated** [1] - 93:21
**Administrator** [2] - 25:5, 99:13
**admit** [1] - 51:9
**advance** [3] - 13:20, 14:3, 15:19
**adverse** [1] - 60:7
**advise** [3] - 12:23, 13:3, 14:16
**advised** [2] - 9:2, 9:7
**advisement** [1] - 99:6
**affect** [1] - 73:7
**affected** [2] - 20:4, 40:6
**affidavit** [17] - 8:9, 8:14, 9:3, 11:24, 12:17, 12:18, 16:18, 40:2, 62:2, 63:5, 63:19, 63:21, 63:23, 64:11, 64:18, 78:9, 83:1
**affidavits** [2] - 64:23, 96:2
**affirmed** [1] - 14:11
**afternoon** [1] - 62:1

**agencies** [1] - 13:23
**agents** [1] - 12:9
**aggregate** [6] - 37:2, 59:3, 70:17, 71:20, 89:8, 97:12
**aggregated** [1] - 37:3
**ago** [5] - 5:18, 61:9, 63:20, 75:20, 84:3, 87:3
**agree** [14] - 7:17, 23:23, 47:8, 51:6, 51:11, 52:25, 53:3, 59:7, 77:11, 89:14, 98:21, 98:23, 99:3, 100:1
**agreed** [7] - 32:13, 34:4, 44:13, 44:18, 55:6, 96:25, 100:17
**agreeing** [1] - 68:13
**agreement** [15] - 30:3, 30:5, 49:10, 49:11, 50:22, 67:16, 73:7, 77:8, 77:23, 88:10, 91:15, 91:23, 91:24, 92:15, 92:21
**ahead** [9] - 5:13, 10:1, 10:4, 23:24, 28:8, 28:15, 28:19, 46:3, 47:6
**al** [7] - 4:12, 4:13, 4:14, 4:15, 4:21, 17:5
**AL** [4] - 1:11, 1:15, 1:17, 1:21
**alarmed** [1] - 83:11
**alarming** [1] - 83:10
**allegations** [5] - 12:1, 22:4, 30:20, 31:22, 75:24
**allege** [1] - 75:18
**alleged** [11] - 11:1, 11:14, 11:21, 11:25, 33:8, 57:17, 60:20, 68:11, 95:14, 95:24, 96:3
**allocate** [1] - 97:3
**allocated** [1] - 88:3
**allocation** [3] - 26:21, 27:1, 49:6
**allow** [2] - 15:15, 52:9
**allowed** [2] - 14:23, 15:3
**alluded** [1] - 66:22
**alludes** [1] - 48:3
**almost** [4] - 7:22, 44:14, 53:23, 61:8
**ALSO** [1] - 3:7
**Amendment** [14] - 11:10, 14:12, 14:14, 14:16, 14:21, 15:2,

15:8, 15:18, 16:4, 20:10, 31:11, 31:15, 31:18, 66:9
**amendment** [1] - 66:10
**AMERICA** [6] - 2:2, 2:3, 2:4, 2:5, 2:7, 2:8
**amount** [20] - 18:18, 18:19, 24:4, 26:24, 34:4, 43:15, 43:21, 48:16, 51:17, 60:11, 67:18, 68:18, 71:7, 72:1, 88:13, 88:17, 89:4, 90:20, 97:15, 98:19
**amounted** [2] - 62:7, 77:22
**amounts** [1] - 68:23
**analysis** [6] - 13:14, 35:4, 40:23, 53:1, 76:20, 76:21
**analyzed** [1] - 36:16
**AND** [1] - 1:23
**animal** [1] - 65:7
**announced** [1] - 91:25
**annual** [2] - 44:11, 66:23
**Annual** [1] - 86:16
**answer** [8] - 8:10, 59:21, 68:25, 69:1, 69:5, 69:10, 71:25, 72:3
**answered** [1] - 65:22
**anticipate** [1] - 26:7
**anticipated** [1] - 97:10
**Antonio** [1] - 21:25
**anyway** [1] - 28:8
**apiece** [1] - 70:10
**appeal** [2] - 6:1, 25:25
**appear** [2] - 45:15, 93:11
**APPEARANCES** [2] - 2:1, 3:1
**appeared** [1] - 68:6
**appearing** [1] - 5:15
**applicability** [2] - 14:14, 15:2
**applicable** [2] - 6:19, 7:7
**application** [1] - 30:10
**applied** [3] - 15:14, 53:3, 76:9
**apply** [4] - 7:18, 71:12, 75:5, 101:3
**applying** [2] - 7:10, 83:13
**appointed** [3] - 67:3, 70:15, 97:1
**appreciable** [3] - 12:19, 15:20, 16:17

**appreciate** [1] - 87:13
**approach** [1] - 43:10
**appropriate** [6] - 31:3, 35:3, 60:11, 88:17, 89:15, 98:19
**approval** [3] - 30:4, 77:13, 97:22
**approve** [2] - 27:6, 77:13, 97:7
**approved** [2] - 30:4, 70:20
**approximate** [1] - 96:16
**APRIL** [1] - 1:6
**April** [9] - 4:11, 53:10, 63:18, 64:21, 77:15, 77:20, 78:20, 86:19, 86:20
**arguably** [1] - 96:16
**argue** [4] - 5:8, 5:9, 5:11, 19:19
**argued** [2] - 28:2, 95:12
**arguing** [2] - 37:22, 93:20
**argument** [8] - 15:9, 19:16, 21:11, 31:3, 40:5, 90:1, 91:6, 96:18
**arguments** [1] - 16:23
**arise** [1] - 66:8
**arising** [1] - 12:1
**arrived** [1] - 97:9
**article** [7] - 53:10, 54:5, 54:15, 55:3, 83:4, 86:18
**articles** [1] - 80:6
**articulated** [2] - 5:19, 9:21
**asbestos** [1] - 72:12
**aside** [5] - 37:9, 55:4, 69:8, 69:9, 74:14, 74:22
**aspect** [3] - 35:13, 37:6, 49:10
**aspects** [2] - 52:14, 87:22
**assault** [1] - 11:1
**assert** [1] - 14:16
**asserted** [4] - 15:11, 15:12, 31:11, 45:6
**assertion** [4] - 13:19, 14:20, 15:18, 31:18
**assessment** [1] - 13:19
**assets** [5] - 18:18, 18:19, 19:11, 19:13, 20:16, 61:1
**assign** [1] - 78:25
**assigned** [2] - 95:19,

96:12
**assistance** [1] - 83:13
**associated** [2] - 35:23, 58:12
**assume** [3] - 70:3, 101:2, 101:6
**assumed** [2] - 88:1, 88:14
**assuming** [8] - 32:5, 51:5, 68:9, 68:11, 75:23, 89:16, 95:8, 97:9
**assurances** [1] - 94:6
**attached** [3] - 49:1, 64:18, 81:20
**attempt** [1] - 73:22
**attempts** [1] - 92:10
**attention** [4] - 15:23, 81:25, 82:1, 84:3
**attorney** [2] - 8:6, 30:12
**Attorney's** [3] - 5:24, 6:2, 9:7
**attorneys** [2] - 22:16, 32:17
**attributed** [3] - 32:2, 37:4, 79:16
**authority** [4] - 5:20, 6:15, 7:13, 15:6
**available** [9] - 6:18, 8:10, 55:10, 80:15, 89:16, 93:8, 93:9, 94:14
**AVENUE** [1] - 3:4
**average** [1] - 44:11
**avoid** [1] - 15:7
**awaiting** [2] - 25:24, 26:4
**award** [1] - 71:21
**aware** [8] - 11:25, 25:1, 26:17, 39:15, 53:7, 55:7, 55:9

---

## B

**backwards** [1] - 82:11
**bad** [2] - 73:2, 73:4
**balance** [3] - 66:14, 71:12, 87:12
**balancing** [1] - 86:14
**balhoff** [1] - 92:2, 92:3, 99:14
**Balhoff** [8] - 26:19, 26:20, 27:4, 71:5, 88:9, 89:2, 97:3
**balhoff's** [3] - 70:8, 88:7, 88:14
**bankruptcies** [1] - 80:19

**Bar** [1] - 61:16
**BARBIER** [1] - 1:24
**Barisich** [1] - 87:11
**Barisiches** [1] - 87:3
**barring** [2] - 99:5, 99:6
**based** [7] - 12:16,
14:7, 49:25, 65:22,
67:14, 70:25, 94:1
**basis** [7] - 21:22, 45:3,
49:16, 49:20, 53:23,
89:7, 96:20
**bears** [1] - 13:16
**became** [7] - 8:21,
43:14, 43:20, 44:13,
49:7, 49:8, 77:20
**BEFORE** [1] - 1:24
**began** [1] - 42:11
**begin** [2] - 10:14,
10:15
**beginning** [2] - 40:9,
78:17
**behalf** [6] - 17:4,
32:11, 32:12, 34:25,
38:6, 61:7
**behind** [3] - 66:5,
66:6, 66:8
**BEL** [1] - 44:3
**belief** [1] - 30:23
**believes** [2] - 92:6,
93:8
**Bell** [1] - 63:6
**below** [1] - 14:12
**Benefit** [2] - 24:11,
32:19
**benefit** [1] - 69:13
**benefits** [1] - 24:11
**BENJAMIN** [1] - 2:21
**Benjamin** [1] - 5:15
**Berrigan** [1] - 15:14
**best** [4] - 42:2, 71:25,
96:21, 102:9
**bet** [1] - 80:5
**between** [15] - 15:7,
20:7, 30:17, 34:13,
35:21, 36:6, 40:7,
46:9, 46:20, 50:22,
57:2, 59:14, 74:12,
88:9, 90:18
**beyond** [5] - 9:17,
27:10, 46:7, 59:10,
93:10
**billion** [31] - 34:5,
37:5, 37:24, 44:5,
44:14, 45:22, 46:15,
46:17, 49:20, 49:21,
49:23, 49:24, 50:10,
51:10, 52:23, 67:14,
67:17, 67:21, 71:7,
86:16, 86:17, 87:10,
88:18, 90:1, 91:24,

95:10, 96:9, 96:25,
97:3
**bit** [5] - 10:2, 69:2,
72:5, 90:15
**blame** [1] - 85:4
**blanket** [3] - 13:18,
14:7, 15:18
**bloom** [2] - 63:1, 63:8
**Bloom** [5] - 48:23,
62:2, 62:23, 78:9,
91:4
**bloom's** [1] - 82:25
**blown** [1] - 100:4
**bogus** [1] - 72:18
**BON** [2] - 1:10, 2:16
**Bon** [2] - 4:12, 4:25
**bothering** [1] - 13:7
**bottom** [2] - 76:4,
78:14
**Boyd** [1] - 11:13
**BP** [118] - 1:14, 1:17,
2:2, 2:3, 2:3, 2:4,
2:5, 2:6, 2:7, 4:12,
4:14, 4:20, 6:8, 7:3,
13:8, 13:15, 17:4,
17:5, 19:11, 19:13,
22:14, 23:1, 23:25,
24:17, 27:22, 28:25,
31:2, 31:12, 31:19,
32:13, 32:23, 32:24,
35:15, 35:24, 37:22,
38:4, 38:8, 38:21,
39:1, 39:15, 39:17,
39:21, 40:4, 40:6,
40:12, 41:16, 43:8,
44:21, 45:9, 45:22,
45:24, 47:8, 49:3,
49:23, 50:8, 52:3,
52:11, 52:17, 53:11,
55:5, 56:2, 56:5,
56:10, 56:13, 57:16,
58:24, 59:5, 59:22,
60:7, 60:11, 60:22,
61:1, 61:23, 62:5,
62:12, 63:8, 63:12,
65:3, 66:19, 66:21,
67:21, 67:22, 67:24,
68:9, 68:12, 72:2,
72:14, 72:25, 77:13,
78:12, 84:21, 85:12,
87:2, 89:4, 89:19,
89:24, 90:7, 90:23,
91:10, 92:19, 92:21,
92:23, 93:8, 93:15,
94:1, 94:8, 94:13,
94:17, 95:8, 95:12,
96:5, 96:8, 97:6,
97:15, 100:1
**BP's** [23] - 4:17, 4:22,
6:23, 7:7, 19:3,

19:23, 21:22, 31:23,
40:22, 47:11, 47:18,
48:17, 50:22, 51:8,
75:12, 84:9, 85:1,
86:16, 90:3, 91:9,
96:17, 96:18, 98:5
**brake** [2] - 72:9, 72:11
**breach** [1] - 6:10
**brief** [14] - 13:10,
13:15, 16:10, 29:18,
62:6, 62:7, 68:2,
72:25, 74:20, 77:24,
81:21, 85:1, 99:25
**briefed** [1] - 13:8
**briefing** [4] - 23:5,
23:17, 28:24, 95:13
**briefs** [3] - 10:16,
16:23, 23:15
**bring** [8] - 15:22, 16:3,
73:20, 73:22, 74:20,
74:21, 75:7, 75:10
**bringing** [1] - 13:24
**brings** [1] - 6:22
**broader** [1] - 53:23
**brought** [9] - 5:23,
11:2, 23:1, 52:11,
61:15, 61:19, 61:22,
61:24, 74:13
**bucket** [1] - 77:22
**bucks** [1] - 87:11
**burden** [9] - 66:18,
73:13, 73:17, 76:1,
76:3, 76:6, 76:15,
89:19, 98:5
**buried** [1] - 48:24
**business** [1] - 86:17
**businesses** [1] - 79:6
**BY** [8] - 1:4, 2:8, 2:13,
2:17, 2:22, 3:4, 3:14,
3:15

# C

**caboose** [1] - 70:23
**Caesar** [1] - 81:17
**calculate** [1] - 44:20
**calculated** [1] - 42:24
**calculation** [1] - 87:25
**calculations** [1] - 88:4
**CALLED** [1] - 4:4
**Campbell** [2] - 5:22,
6:14
**candid** [1] - 15:23
**cannot** [1] - 10:21
**cap** [20] - 67:22, 68:6,
69:16, 69:19, 70:2,
70:6, 70:13, 70:16,
70:17, 71:20, 73:11,
88:1, 88:3, 88:7,

88:14, 88:16, 89:2,
89:6, 89:8
**capacity** [1] - 19:14
**capped** [2] - 34:5,
47:14
**caps** [3] - 88:23,
88:25, 89:3
**care** [1] - 82:20
**carefully** [1] - 76:9
**CARL** [1] - 1:24
**carrot** [1] - 67:7
**case** [104] - 4:19, 5:20,
5:22, 5:23, 6:2, 6:4,
6:8, 6:10, 6:15, 6:23,
7:6, 7:13, 7:14, 7:24,
10:10, 10:14, 10:20,
10:24, 11:3, 11:4,
11:9, 11:12, 11:13,
11:14, 12:8, 13:6,
13:13, 13:16, 13:20,
13:21, 14:2, 14:5,
14:17, 14:22, 15:4,
15:7, 15:10, 15:15,
15:19, 16:1, 16:7,
16:9, 17:14, 17:18,
17:20, 20:15, 21:2,
21:3, 21:5, 21:14,
21:19, 21:20, 23:2,
28:5, 30:16, 32:5,
32:10, 35:10, 35:12,
36:14, 36:15, 37:14,
38:1, 39:6, 43:11,
48:3, 51:17, 51:21,
52:11, 53:2, 60:4,
61:23, 66:4, 66:15,
69:1, 72:5, 72:7,
72:14, 72:16, 73:24,
74:1, 74:2, 74:5,
74:6, 74:15, 74:17,
74:18, 74:25, 75:4,
75:7, 75:12, 75:16,
75:21, 76:4, 76:18,
82:25, 87:14, 95:16
**case-by-case** [1] -
43:11
**cases** [18] - 10:22,
13:8, 13:9, 13:10,
15:23, 31:19, 35:3,
36:13, 36:21, 36:22,
36:24, 54:3, 59:22,
64:15, 76:5, 76:19,
77:25, 85:6
**Cat** [3] - 69:20, 70:2,
71:21
**catch** [1] - 44:7
**categories** [1] - 91:4
**Category** [23] - 39:24,
49:5, 49:7, 49:8,
64:9, 64:13, 64:22,
64:25, 65:8, 65:15,

88:14, 88:16, 89:2,
89:6, 89:8
**capacity** [1] - 19:14
**capped** [2] - 34:5,
47:14

65:17, 65:18, 70:15,
77:19, 77:21, 78:13,
91:1, 95:21, 95:22,
97:5, 97:12
**category** [8] - 26:1,
42:4, 42:5, 42:23,
69:20, 69:25, 90:25,
91:9
**Cathy** [2] - 102:4,
102:15
**CATHY** [1] - 3:10
**Cathy_Pepper@laed
.uscourts.gov** [1] -
102:17
**cathy_Pepper@laed.
uscourts.gov** [1] -
3:13
**caused** [2] - 24:4,
41:25
**caution** [1] - 15:17
**caveat** [1] - 100:6
**CCR** [2] - 3:10, 102:15
**CENTRE** [1] - 2:22
**certain** [2] - 45:16,
54:17
**certainly** [16] - 16:2,
19:9, 32:8, 38:4,
39:23, 42:15, 48:3,
51:24, 52:17, 60:19,
68:12, 83:10, 95:15,
95:16, 98:2, 99:17
**CERTIFICATE** [1] -
102:1
**CERTIFIED** [1] - 3:10
**Certified** [3] - 102:4,
102:5, 102:15
**certify** [1] - 102:8
**chance** [2] - 99:16,
99:17
**change** [1] - 43:12
**changes** [1] - 40:10
**charges** [2] - 11:2,
16:10
**checks** [1] - 83:23
**choose** [1] - 69:7
**Circuit** [20] - 5:19, 6:3,
6:13, 7:9, 7:16, 13:9,
13:18, 13:19, 14:8,
14:11, 15:1, 16:3,
31:21, 36:14, 66:16,
73:21, 74:3, 74:15,
75:15, 76:5
**Circuit's** [1] - 15:17
**circumstances** [7] -
6:16, 7:11, 21:16,
24:6, 34:10, 34:21,
59:16
**cite** [3] - 13:7, 13:20,
21:22
**cited** [3] - 16:10,

36:14, 72:14
**CIVIL** [3] - 1:6, 1:12,
1:18
**civil** [25] - 5:20, 5:23,
6:2, 6:15, 6:16, 6:23,
7:4, 7:7, 7:14, 10:11,
11:1, 11:3, 12:24,
13:4, 13:21, 13:24,
14:5, 14:17, 14:22,
15:7, 15:10, 15:15,
21:5, 21:14, 21:20
**Civil** [2] - 4:11, 4:13
**claim** [26] - 33:8,
43:11, 48:10, 52:19,
56:5, 56:10, 56:22,
60:17, 60:18, 60:23,
61:10, 61:15, 61:17,
61:18, 67:19, 67:23,
72:23, 74:21, 74:22,
74:25, 79:18, 79:19,
79:23, 79:24, 96:17
**claim-by-claim** [1] -
43:11
**claimant** [23] - 47:14,
49:15, 49:16, 49:17,
53:3, 55:17, 55:18,
70:7, 70:13, 70:16,
70:17, 70:25, 84:14,
88:4, 88:5, 88:14,
88:15, 88:16, 88:18,
91:10, 100:11
**claimant-specific** [1] -
100:11
**claimants** [72] - 19:8,
19:9, 19:13, 20:4,
22:3, 25:12, 30:15,
30:16, 30:17, 30:18,
30:19, 32:11, 34:23,
35:6, 35:7, 35:11,
35:12, 35:16, 35:18,
36:1, 36:3, 36:6,
36:17, 36:18, 36:21,
37:10, 39:8, 39:23,
42:5, 42:11, 48:2,
48:5, 48:9, 48:14,
49:14, 49:15, 49:19,
50:8, 50:19, 50:24,
52:1, 53:22, 53:24,
54:6, 54:18, 54:21,
58:5, 58:11, 59:15,
60:10, 60:13, 63:24,
65:11, 66:25, 67:4,
69:23, 69:24, 70:2,
70:4, 70:16, 70:19,
82:11, 82:12, 88:2,
89:3, 92:11, 93:11,
97:12
**Claimants** [1] - 64:25
**claimed** [1] - 56:23
**Claims** [2] - 25:5,

99:13
**claims** [108] - 6:25,
12:11, 25:12, 25:14,
25:17, 25:18, 25:20,
25:22, 26:2, 26:3,
26:4, 26:8, 34:12,
36:18, 36:23, 36:25,
37:6, 37:8, 37:24,
38:7, 38:8, 38:25,
39:1, 39:5, 39:10,
39:12, 39:21, 40:4,
40:6, 40:24, 41:16,
42:19, 42:20, 43:25,
44:6, 44:19, 44:20,
45:23, 45:24, 45:25,
46:1, 46:15, 46:16,
46:20, 46:23, 46:25,
47:4, 48:5, 48:11,
49:2, 49:24, 55:5,
55:9, 55:13, 57:17,
58:20, 61:11, 61:13,
61:22, 63:6, 64:19,
64:21, 64:22, 65:18,
65:20, 67:18, 68:13,
70:19, 70:21, 70:25,
72:18, 77:18, 77:21,
78:5, 78:18, 83:15,
84:22, 85:7, 85:11,
88:20, 88:23, 89:10,
89:25, 92:4, 92:17,
92:20, 93:16, 93:21,
93:23, 95:9, 95:16,
95:18, 95:19, 95:20,
95:21, 95:22, 96:4,
96:7, 96:10, 96:11,
96:13, 96:19, 97:5
**clash** [1] - 15:7
**Class** [3] - 61:7,
62:10, 99:23
**class** [21] - 4:25,
24:15, 29:4, 30:22,
30:24, 31:25, 32:12,
32:13, 33:21, 33:23,
36:17, 37:1, 45:22,
54:1, 58:4, 63:9,
68:5, 68:14, 73:5,
73:8, 96:7
**clear** [14] - 17:9, 22:1,
22:6, 29:15, 45:8,
50:5, 73:14, 73:18,
73:22, 76:6, 76:7,
77:7, 87:12, 90:4
**clearly** [5] - 10:23,
11:11, 31:22, 76:13,
96:20
**CLERK** [2] - 4:7, 4:9
**client** [4] - 27:20,
37:22, 61:20, 78:19
**clients** [18] - 6:23,
12:12, 22:4, 24:9,

29:23, 30:8, 53:17,
53:24, 61:13, 83:22,
85:16, 85:21, 86:2,
86:3, 86:9, 89:1,
92:14, 95:13
**close** [5] - 15:21,
52:24, 53:4, 54:6,
95:10
**closed** [1] - 62:14
**closely** [1] - 65:14
**closer** [1] - 9:8
**CNN** [1] - 86:18
**Coast** [2] - 66:21,
66:24
**cohort** [1] - 83:25
**cold** [1] - 60:21
**collaborated** [1] -
72:21
**collateral** [1] - 72:10
**collectively** [1] - 5:16
**comfort** [1] - 60:17
**coming** [4] - 19:1,
40:7, 43:5, 87:4
**commenced** [1] - 15:6
**commences** [1] -
15:10
**comment** [5] - 27:3,
87:21, 90:15, 99:19,
99:25
**comments** [2] - 41:10,
58:21
**committed** [6] - 29:1,
32:25, 69:3, 73:3,
89:23, 90:5
**Committee** [6] - 24:8,
24:10, 30:11, 32:7,
32:18, 85:10
**common** [1] - 59:16
**Common** [2] - 24:11,
32:19
**communications** [1] -
59:11
**COMPANY** [2] - 2:3
**comparable** [1] - 23:3
**compelling** [2] - 10:7,
10:8
**compensate** [2] -
43:22, 44:21
**compensated** [1] -
67:8
**Compensation** [4] -
4:18, 24:2, 70:14,
96:24
**compensation** [3] -
42:24, 47:13, 60:14
**competent** [1] - 14:11
**competing** [1] - 52:18
**complaint** [4] - 31:10,
59:9, 62:7, 81:7
**complaints** [3] -

34:25, 82:21, 84:5
**complete** [1] - 93:18
**completed** [5] - 25:19,
26:5, 26:18, 93:15,
99:11
**completely** [5] -
25:16, 54:6, 54:7,
74:13, 94:24
**complex** [1] - 63:10
**compromise** [1] -
43:24
**computer** - 57:12
**COMPUTER** [1] - 3:15
**concede** [2] - 39:22,
94:12
**conceded** [1] - 36:3
**concept** [2] - 18:10,
49:9
**concern** [3] - 68:14,
68:15, 68:20
**concerned** [2] - 33:11,
58:22
**concluded** [3] - 11:20,
69:16, 101:18
**conditions** [1] - 35:25
**conduct** [5] - 30:23,
30:25, 33:8, 34:7,
55:5
**confer** [1] - 27:20
**confidence** [1] - 94:7
**confident** [1] - 14:22
**confidential** [3] - 33:4,
33:12, 100:18
**confidentiality** [2] -
99:25, 100:2
**conflict** [1] - 7:12
**confuse** [1] - 89:20
**conjunction** [1] -
100:23
**connection** [7] -
12:15, 19:22, 30:3,
32:1, 32:9, 60:3,
60:14
**Connolly** [1] - 5:12
**CONNOLLY** [1] - 2:12
**conscience** [1] -
74:24
**consequence** [2] -
37:14, 37:16
**consider** [5] - 21:15,
36:12, 41:22, 60:16,
86:14
**consideration** [10] -
10:18, 12:5, 20:19,
28:21, 30:1, 34:17,
37:11, 68:12, 87:24,
90:19
**considered** [3] -
23:22, 27:18, 52:8
**considering** [1] -

22:21
**considers** [2] - 23:20,
29:14
**consistent** [5] - 7:14,
34:25, 35:1, 46:22,
53:19
**consolidated** [1] -
29:20
**conspired** [1] - 72:17
**Constitutional** [2] -
7:1, 12:23
**contact** [1] - 20:23
**contained** [1] - 93:12
**contemplated** [1] -
88:10
**contemporaneous** [2]
- 95:6
**contemporaneously**
[1] - 43:8
**contempt** [1] - 14:9
**context** [7] - 36:13,
37:9, 47:22, 54:8,
58:21, 88:18, 93:19
**contexts** [1] - 52:2
**continually** [1] - 45:24
**continue** [1] - 25:13
**CONTINUED** [1] - 3:1
**contract** [1] - 6:10
**contractual** [1] - 58:25
**contradict** [1] - 7:8
**contradicted** [1] -
91:7
**control** [1] - 94:24
**conversation** [2] -
45:16, 98:18
**conveyed** [2] - 59:11,
90:22
**conveys** [1] - 20:23
**convince** [1] - 68:16
**convinced** [1] - 96:18
**convinces** [1] - 95:7
**convincing** [7] -
73:15, 73:18, 76:6,
76:7, 76:13, 77:7,
90:5
**copy** [1] - 23:16
**corporate** [1] - 14:5
**CORPORATION** [1] -
2:4
**corporation** [1] -
13:25
**corral** [2] - 96:5, 96:6
**corralling** [1] - 68:12
**correct** [18] - 10:6,
10:9, 25:9, 42:25,
46:18, 54:18, 55:14,
55:15, 55:21, 56:5,
56:6, 56:12, 56:16,
71:3, 75:23, 89:14,
101:7, 102:8

**correctly** [2] - 15:19, 72:15

**costs** [3] - 80:9, 81:9, 81:13

**counsel** [6] - 12:14, 14:24, 30:22, 31:17, 45:22, 92:12

**COUNSEL** [1] - 3:3

**countering** [1] - 48:21

**countermoves** [1] - 36:2

**counteroffer** [1] - 90:23

**counterproposal** [1] - 35:17

**counts** [1] - 59:9

**course** [22] - 4:17, 4:24, 8:12, 10:20, 20:9, 20:15, 23:9, 25:12, 25:18, 26:12, 41:9, 45:14, 47:15, 47:17, 53:10, 53:11, 58:11, 58:15, 60:13, 88:6, 88:25, 96:6

**court** [15] - 8:10, 11:15, 14:9, 36:16, 36:20, 36:23, 36:25, 37:13, 40:17, 72:7, 74:7, 76:12, 76:18, 97:2

**COURT** [139] - 1:1, 3:10, 4:4, 4:8, 4:16, 5:11, 5:13, 7:19, 7:21, 7:24, 8:1, 8:18, 8:21, 8:24, 9:12, 9:14, 9:19, 9:23, 10:1, 10:4, 10:7, 16:19, 16:22, 17:1, 17:3, 17:25, 18:3, 18:5, 18:9, 18:15, 18:22, 19:16, 19:19, 21:8, 21:10, 23:4, 23:15, 23:24, 24:19, 24:23, 24:25, 27:24, 28:15, 28:19, 33:6, 33:15, 33:19, 37:21, 38:3, 38:11, 38:14, 38:19, 38:22, 40:11, 40:13, 40:16, 41:2, 41:12, 41:20, 42:7, 42:13, 42:22, 43:1, 43:3, 43:19, 44:1, 44:4, 44:17, 45:9, 45:12, 45:18, 46:3, 46:12, 47:1, 47:6, 47:17, 47:24, 49:5, 49:22, 50:2, 50:13, 50:25, 51:3, 51:19, 52:24, 53:5, 55:4, 55:10, 55:16, 55:22,

56:2, 56:7, 56:10, 56:13, 56:17, 56:19, 57:5, 57:23, 58:13, 58:16, 60:1, 60:17, 61:3, 61:5, 65:5, 65:10, 68:7, 68:9, 69:19, 69:22, 70:12, 70:24, 72:12, 75:5, 75:12, 75:23, 80:22, 81:3, 82:14, 84:21, 87:17, 87:19, 91:8, 91:18, 91:21, 94:11, 98:16, 98:21, 98:24, 99:7, 99:21, 100:6, 100:19, 100:21, 100:25, 101:4, 101:7, 101:13, 101:16

**Court** [108] - 5:14, 7:15, 9:9, 9:20, 11:6, 11:21, 13:7, 14:19, 15:1, 16:7, 19:1, 19:23, 20:12, 20:25, 22:17, 22:18, 22:22, 23:23, 24:7, 24:12, 29:14, 29:15, 30:5, 30:15, 30:24, 31:4, 31:8, 31:21, 32:16, 33:4, 33:5, 34:2, 34:10, 34:19, 35:20, 36:10, 36:12, 37:9, 41:9, 41:15, 43:7, 43:8, 44:25, 46:8, 46:10, 48:13, 48:25, 52:5, 52:9, 52:22, 53:18, 54:12, 54:24, 55:14, 57:7, 57:9, 57:25, 58:11, 58:20, 58:22, 59:1, 59:23, 60:4, 60:6, 60:10, 60:16, 62:9, 65:8, 66:25, 67:3, 68:16, 69:7, 70:15, 73:1, 73:13, 74:7, 76:10, 76:23, 88:6, 89:17, 89:24, 90:9, 90:10, 90:13, 92:18, 94:6, 94:7, 94:25, 95:4, 95:8, 96:15, 97:1, 97:21, 97:22, 98:18, 99:15, 99:19, 100:1, 101:6, 101:18, 102:5, 102:6, 102:7, 102:16, 102:17

**Court's** [6] - 15:22, 30:4, 41:10, 51:24, 87:24, 90:19

**Court-appointed** [2] - 67:3, 70:15

**courthouse** [1] - 74:3

**Courtney** [1] - 15:13

**courts** [1] - 7:17

**CPA** [1] - 63:15

**created** [3] - 65:8, 91:1, 96:25

**creates** [1] - 58:21

**crew** [12] - 39:24, 39:25, 42:18, 46:1, 48:8, 48:10, 49:14, 49:19, 49:20, 65:15, 78:10, 96:10

**crime** [1] - 5:25

**criminal** [40] - 5:21, 6:6, 6:11, 6:16, 6:25, 7:4, 7:10, 7:24, 8:2, 8:6, 9:16, 10:12, 10:14, 10:19, 11:2, 11:4, 11:16, 11:19, 11:22, 12:1, 12:15, 13:1, 13:6, 13:13, 13:24, 14:18, 14:23, 15:16, 16:7, 16:10, 16:14, 17:18, 17:19, 21:4, 21:19, 21:23, 22:2, 22:7, 22:18, 28:5

**critical** [1] - 77:10

**crops** [1] - 75:10

**CRR** [2] - 3:10, 102:15

**crunch** [1] - 78:4

**CSX** [1] - 76:4

**curious** [1] - 57:25

**current** [2] - 12:1, 25:10

**custody** [2] - 8:17, 9:1

**cut** [1] - 83:23

**cutting** [1] - 38:23

# D

**damage** [8] - 24:4, 41:22, 41:24, 60:22, 87:24, 89:7, 89:12, 90:7

**damaged** [1] - 34:23

**damages** [7] - 24:14, 35:8, 35:9, 37:2, 63:13, 67:25, 95:9

**danger** [1] - 94:22

**data** [1] - 41:14

**database** [3] - 55:11, 81:9, 82:5

**date** [2] - 17:15, 27:23

**dated** [1] - 86:18

**DAVID** [1] - 2:21

**days** [3] - 22:19, 45:19, 77:16

**DC** [1] - 2:14

**de** [1] - 36:23

**dead** [3] - 54:4, 86:2

**deadline** [1] - 25:13

**deal** [4] - 29:8, 67:2, 67:21, 68:19

**dealing** [2] - 92:13, 94:16

**death** [1] - 61:23

**December** [3] - 62:5, 63:4, 68:3

**decide** [2] - 25:25, 28:16

**decided** [5] - 29:15, 31:21, 62:21, 88:13, 92:3

**decision** [20] - 6:1, 9:4, 9:8, 9:11, 17:12, 17:17, 18:11, 20:5, 20:11, 20:14, 28:4, 29:14, 29:17, 37:9, 41:19, 60:5, 60:7, 90:14, 97:14, 97:17

**decisions** [4] - 10:15, 10:17, 20:14, 77:7

**deckhand** [5] - 63:24, 71:22, 79:7, 83:18, 86:22

**deckhands** [7] - 39:25, 64:5, 64:10, 65:15, 69:17, 95:24

**Deckhands** [1] - 64:25

**declaration** [17] - 35:7, 35:22, 36:7, 47:7, 47:10, 47:18, 48:23, 55:24, 62:2, 62:21, 62:23, 63:3, 63:6, 71:5, 85:3, 85:13, 88:7

**declarations** [9] - 41:14, 43:6, 47:12, 62:8, 62:11, 62:13, 62:16, 95:4

**decline** [1] - 12:24

**dedicated** [1] - 42:11

**deduction** [1] - 50:4

**Deepwater** [3] - 4:8, 4:10, 12:12

**DEEPWATER** [1] - 1:5

**defend** [1] - 12:14

**defendant** [19] - 11:1, 11:3, 11:8, 11:14, 11:18, 12:2, 14:5, 15:5, 16:13, 21:3, 21:4, 37:1, 37:2, 37:4, 58:4, 68:13, 74:8, 78:16, 96:6

**defendant's** [1] - 15:9

**defendants** [4] - 5:17, 30:24, 31:25, 33:21

**defendants'** [1] - 29:4

**defending** [1] - 13:5

**defense** [9] - 45:6, 61:12, 61:20, 74:12, 74:14, 78:17, 78:24, 83:10, 92:12

**defenses** [2] - 6:25, 13:4

**deferring** [1] - 98:10

**deficits** [1] - 12:4

**define** [1] - 18:15

**definition** [2] - 53:25, 91:5

**defrauded** [3] - 40:17, 60:18, 68:17

**degree** [1] - 57:18

**delay** [4] - 19:10, 20:13, 22:14, 60:9

**demand** [2] - 63:23, 64:2

**demanded** [1] - 49:14

**demographics** [1] - 63:14

**demonstrate** [2] - 16:14, 89:7

**demonstrated** [2] - 7:12, 32:25

**demonstrates** [2] - 29:24, 32:22

**demonstrating** [1] - 52:22

**denial** [2] - 19:6, 19:12

**denied** [3] - 10:17, 25:18, 25:19

**deny** [4] - 19:23, 87:16, 97:17, 98:7

**Department** [6] - 13:22, 17:11, 18:12, 18:14, 20:24, 100:16

**depositions** [1] - 31:17

**deprived** [2] - 14:20, 31:12

**DEPUTY** [2] - 4:7, 4:9

**described** [4] - 43:17, 46:8, 50:16, 95:1

**describes** [2] - 92:23, 93:1

**describing** [3] - 47:20, 91:7, 93:17

**description** [2] - 90:16, 91:3

**designated** [1] - 77:18

**detail** [1] - 18:25

**details** [4] - 29:19, 30:6, 35:8, 35:22

**determination** [7] - 12:7, 24:2, 24:14, 51:16, 52:4, 52:10, 58:6

**determine** [1] - 15:1

**determined** [4] -

52:10, 60:12, 88:17, 89:16
**develop** [1] - 77:12
**devoted** [1] - 92:5
**difference** [2] - 75:25, 76:1
**differences** [1] - 58:3
**different** [12] - 5:6, 7:9, 16:1, 17:15, 30:14, 34:8, 43:9, 58:7, 59:17, 65:10, 65:11, 100:15
**difficult** [5] - 10:10, 37:13, 37:19, 52:3, 68:22
**difficulties** [2] - 34:15, 42:6
**digits** [8] - 55:19, 57:6, 57:10, 57:15, 79:4, 80:23, 80:25, 81:6
**diligence** [1] - 58:12
**direct** [1] - 17:22
**direction** [2] - 60:7, 99:18
**directly** [2] - 6:13, 56:5
**disagree** [1] - 90:12
**disciplines** [1] - 63:13
**disclose** [1] - 8:12
**disclosure** [2] - 6:24, 7:2
**discover** [1] - 63:5
**discovered** [1] - 59:13
**discovery** [16] - 6:2, 7:7, 12:24, 13:20, 14:3, 14:6, 14:17, 14:23, 15:6, 15:8, 15:10, 15:15, 15:20, 16:4, 23:9, 31:16
**discrete** [2] - 42:4, 42:5
**discretion** [2] - 6:17, 22:22
**discretionary** [1] - 5:20
**discuss** [1] - 37:7
**discussed** [6] - 10:16, 13:9, 34:6, 50:24, 51:4, 101:3
**discussing** [5] - 31:15, 42:4, 42:18, 91:23
**discussion** [12] - 9:21, 17:8, 29:8, 33:20, 35:23, 36:13, 42:10, 45:15, 46:19, 46:23, 47:9, 50:25
**discussions** [12] - 34:13, 35:13, 35:14,

36:7, 47:22, 50:16, 50:18, 88:9, 92:1, 98:25, 100:3
**dismissals** [1] - 54:20
**disparaging** [1] - 93:20
**dispositive** [2] - 13:11, 74:1
**disproves** [1] - 31:6
**dispute** [2] - 36:5, 50:23
**disputed** [1] - 11:16
**disputes** [3] - 53:21, 53:22, 59:14
**disqualified** [1] - 48:5
**disrupt** [1] - 7:8
**dissipated** [1] - 68:21
**dissipation** [2] - 20:2, 60:25
**distinguish** [2] - 46:9, 57:2
**distinguishable** [2] - 10:23, 11:11
**distribute** [1] - 19:14
**distributed** [9] - 19:25, 20:17, 24:18, 52:2, 60:8, 60:12, 70:11, 71:7, 71:14
**distribution** [45] - 4:18, 18:18, 19:11, 20:2, 23:9, 23:12, 24:1, 24:22, 24:23, 25:3, 25:6, 26:15, 26:17, 26:18, 26:22, 27:6, 27:11, 27:17, 27:19, 27:23, 28:6, 51:8, 52:8, 52:13, 52:17, 60:15, 67:5, 67:6, 71:6, 71:9, 71:14, 71:16, 71:24, 87:7, 87:9, 87:15, 88:15, 94:19, 94:23, 95:2, 97:10, 97:11, 98:2, 99:8
**distributions** [1] - 73:8
**District** [4] - 4:9, 102:7, 102:17
**DISTRICT** [3] - 1:1, 1:1, 1:25
**district** [5] - 5:20, 6:18, 12:4, 14:9, 14:13
**divide** [1] - 28:20
**Dixon** [1] - 66:15
**dock** [1] - 64:14
**docket** [2] - 4:24, 5:4
**dockside** [1] - 63:24
**Dockside** [1] - 64:25
**doctors** [3] - 72:17,

72:21, 72:24
**document** [8] - 48:22, 48:24, 49:1, 91:2, 91:3, 91:7, 91:8, 91:20
**Document** [4] - 4:19, 4:23, 5:3, 12:18
**documentation** [14] - 39:13, 48:6, 49:11, 63:25, 80:1, 90:17, 91:11, 91:23, 92:2, 93:7, 93:10, 93:17, 94:1, 95:5
**documents** [4] - 41:13, 41:15, 90:24, 100:21
**dog** [2] - 96:21, 96:22
**dollars** [3] - 44:11, 88:5, 95:10
**DON** [1] - 2:8
**done** [13] - 19:15, 28:25, 31:2, 49:18, 56:20, 57:19, 57:24, 58:1, 79:14, 79:24, 80:3, 85:11, 94:1
**doubt** [3] - 45:24, 89:22, 89:23
**Doug** [2] - 61:7, 86:15
**DOUGLAS** [1] - 2:18
**down** [2] - 83:16, 84:12
**Downey** [15] - 5:12, 16:20, 16:22, 17:4, 22:25, 27:7, 46:3, 51:6, 61:3, 64:24, 68:14, 68:20, 82:5, 87:19, 94:12
**DOWNEY** [95] - 2:13, 5:12, 17:2, 17:4, 18:2, 18:4, 18:8, 18:10, 18:16, 18:23, 19:18, 19:21, 21:9, 23:1, 23:13, 23:18, 23:25, 24:21, 24:24, 27:14, 28:10, 28:18, 28:20, 33:14, 33:16, 33:20, 38:2, 38:10, 38:13, 38:16, 38:20, 40:9, 40:12, 40:14, 40:25, 41:6, 41:18, 41:21, 42:8, 42:21, 42:25, 43:2, 43:17, 43:24, 44:2, 44:15, 45:2, 45:10, 45:13, 46:2, 46:4, 46:14, 47:2, 47:7, 47:20, 47:25, 49:8, 49:25, 50:3, 50:15, 51:2, 51:16, 51:23, 52:25, 53:6, 55:7, 55:15,

55:21, 56:1, 56:6, 56:9, 56:12, 56:16, 56:18, 57:2, 57:20, 58:2, 58:15, 58:19, 60:2, 60:21, 61:4, 87:21, 91:17, 91:19, 91:22, 98:14, 98:17, 98:22, 99:5, 99:18, 101:1, 101:5, 101:11, 101:15
**dramatization** [1] - 93:25
**drastic** [1] - 66:17
**drawing** [1] - 46:10
**drawn** [1] - 46:12
**driving** [4] - 78:1, 78:3, 96:19
**due** [1] - 58:12
**dummies** [1] - 82:8
**dummy** [1] - 82:17
**duplicates** [1] - 84:16
**during** [14] - 17:7, 20:1, 38:4, 38:9, 40:24, 41:16, 42:14, 45:1, 45:13, 63:8, 65:3, 75:17, 85:14, 100:12
**duty** [4] - 59:7, 61:21, 92:12
**dynamics** [1] - 34:7

# E

**Earnings** [1] - 65:1
**earnings** [3] - 40:1, 63:24, 83:18
**easily** [1] - 57:12
**Eastern** [1] - 102:7
**EASTERN** [1] - 1:1
**eastland** [1] - 5:22
**economic** [5] - 42:20, 46:24, 47:23, 48:15, 49:2
**economics** [1] - 63:13
**economist** [1] - 63:15
**effect** [9] - 20:2, 20:3, 36:9, 37:10, 38:21, 51:18, 52:12, 52:16, 90:10
**effectively** [4] - 23:14, 49:16, 52:2, 65:18
**effort** [3] - 56:24, 71:25, 88:22
**eight** [2] - 62:11, 62:16
**either** [14] - 20:16, 24:2, 24:14, 39:12, 47:13, 53:16, 53:24, 54:4, 54:6, 55:2,

59:12, 73:15, 94:18, 100:13
**element** [1] - 75:18
**elements** [1] - 66:11
**eligible** [3] - 25:12, 67:19, 70:9
**eliminate** [1] - 91:14
**elsewhere** [1] - 31:21
**emphasize** [2] - 60:6, 94:5
**emphasizes** [1] - 95:13
**employed** [2] - 79:7, 95:24
**Employer** [1] - 64:10
**employer** [18] - 47:13, 63:25, 64:1, 64:6, 64:14, 64:22, 65:2, 65:16, 65:19, 65:21, 70:2, 78:10, 78:13, 90:25, 91:5, 91:11, 91:15, 95:25
**employers** [1] - 96:3
**employment** [4] - 40:1, 80:14, 80:15, 96:2
**end** [8] - 29:2, 36:5, 43:20, 44:18, 52:17, 70:9, 78:12, 83:22
**ended** [3] - 65:14, 65:17, 95:22
**ENERGY** [1] - 2:22
**enforced** [1] - 74:24
**engage** [2] - 58:12, 98:24
**engaged** [1] - 92:8
**enjoin** [7] - 23:9, 23:11, 24:1, 27:13, 51:7, 94:18, 94:21
**enormous** [4] - 18:24, 20:15, 35:6
**ensure** [1] - 67:4
**ensuring** [1] - 67:22
**entered** [5] - 14:10, 19:23, 24:17, 34:18, 90:21
**enters** [1] - 60:10
**entire** [12] - 24:23, 43:22, 44:12, 44:22, 51:7, 51:20, 55:18, 57:7, 66:24, 72:22, 77:23
**entirely** [1] - 6:22
**entitled** [6] - 24:14, 24:15, 31:19, 68:23, 73:19, 102:10
**enumerate** [1] - 34:9
**episode** [1] - 74:4
**equities** [1] - 19:22
**equity** [1] - 74:24

error [2] - 6:3, 54:19
ESQUIRE [7] - 2:8, 2:13, 2:13, 2:17, 2:18, 2:22, 3:4
essence [2] - 48:18, 84:8
essentially [4] - 23:16, 25:23, 42:10, 49:7
established [3] - 48:7, 66:16, 72:2
estimate [1] - 26:10
et [7] - 4:12, 4:13, 4:14, 4:15, 4:21, 17:5
ET [4] - 1:11, 1:15, 1:17, 1:21
etc [1] - 4:20
evaluate [2] - 85:7, 85:11
evaluated [1] - 36:25
evaluation [3] - 67:14, 89:10, 92:4
event [1] - 100:17
events [3] - 53:15, 54:8, 54:13
eventually [1] - 67:1
eventuate [1] - 14:19
evidence [11] - 11:19, 11:21, 22:9, 41:15, 73:14, 74:11, 76:6, 76:7, 77:7, 90:5, 94:2, 95:3, 95:6
evident [1] - 17:14
exact [3] - 7:22, 66:7, 71:11
exactly [3] - 21:20, 23:6, 44:14
examine [1] - 31:13
example [2] - 7:6, 75:6
exceed [1] - 71:1
except [1] - 17:23
excess [1] - 88:20
exchanged [2] - 42:3, 90:18
excluded [1] - 36:4
excuses [1] - 57:23
executed [2] - 8:9, 9:3
execution [2] - 8:18, 21:24
exercise [2] - 7:12, 22:22
exhibit [1] - 91:4
Exhibit [4] - 48:23, 49:1, 64:8, 70:8
exhibits [2] - 62:11, 62:16
exist [2] - 86:3, 88:7
existed [1] - 11:17
existing [2] - 48:16, 75:4

exists [2] - 41:13, 58:6
exonerate [1] - 92:10
expect [4] - 8:4, 9:10, 19:9, 33:21
expectation [1] - 50:4
expected [1] - 9:5
expects [3] - 17:11, 61:20, 78:19
expenses [1] - 86:21
experience [2] - 63:10
experts [2] - 63:12, 83:1
explain [2] - 34:15
explaining [1] - 34:1
explanation [1] - 30:25
EXPLORATION [3] - 1:14, 1:17, 2:5
Exploration [2] - 4:13, 4:14
exposition [1] - 15:23
expressed [1] - 68:15
extended [1] - 17:19
extension [1] - 62:10
extensively [2] - 29:4, 34:6
extent [7] - 8:14, 21:18, 25:1, 27:22, 28:10, 38:17, 89:8
extraordinary [1] - 66:17

## F

faced [1] - 57:17
fact [20] - 10:10, 11:18, 11:23, 15:13, 16:10, 19:22, 21:22, 23:15, 28:11, 34:3, 37:15, 39:22, 67:17, 73:17, 85:23, 86:8, 87:14, 90:24, 92:25, 96:20
factor [17] - 7:18, 8:1, 9:21, 9:23, 10:2, 10:6, 10:13, 12:5, 13:12, 13:13, 15:14, 15:24, 21:18, 35:5, 89:9, 95:17
factors [5] - 21:15, 22:21, 22:22, 74:19, 74:23
facts [7] - 10:22, 11:11, 11:12, 12:3, 12:4, 30:21, 46:13
factual [2] - 12:4, 32:9
factually [1] - 16:1
failed [1] - 73:15
failing [1] - 14:17

fair [3] - 18:8, 18:16, 33:13
fairly [1] - 43:21
fairness [4] - 45:1, 45:3, 45:6, 66:20
fallen [1] - 69:23
false [7] - 29:21, 32:15, 77:1, 85:22, 85:24, 89:24, 92:17
falsity [1] - 29:13
familiar [5] - 16:23, 50:17, 62:24, 66:11, 74:19
family [1] - 80:13
far [7] - 7:9, 15:25, 33:11, 46:18, 48:20, 65:22, 96:23
fast [1] - 6:7
favor [2] - 16:8, 74:7
favored [1] - 16:13
favoritism [1] - 74:12
February [18] - 8:22, 8:23, 8:24, 35:21, 40:7, 42:9, 42:17, 43:2, 45:20, 47:11, 48:22, 62:17, 62:19, 69:15, 71:19, 80:7, 90:23
FEBRUARY [4] - 1:7, 1:13, 1:19, 4:3
federal [4] - 12:9, 13:23, 72:7
Feinberg [2] - 39:11, 39:17
fell [1] - 39:24
few [6] - 20:7, 27:14, 53:15, 61:9, 87:21, 89:20
fictitious [4] - 22:5, 37:25, 85:16, 86:4
Fifth [33] - 5:19, 6:3, 6:13, 7:9, 11:10, 13:9, 13:18, 13:19, 14:8, 14:11, 14:12, 14:14, 14:16, 14:20, 15:1, 15:2, 15:8, 15:17, 15:18, 16:3, 16:4, 20:10, 31:11, 31:15, 31:18, 31:21, 66:9, 66:16, 73:21, 74:3, 74:15, 75:15, 76:5
figure [2] - 43:10, 57:13
file [5] - 8:15, 12:10, 75:6, 75:19, 94:14
filed [27] - 5:4, 10:25, 11:14, 16:11, 30:7, 34:25, 39:10, 41:13, 41:14, 54:20, 55:12,

56:4, 56:5, 57:9, 58:20, 59:22, 62:5, 62:10, 62:12, 63:6, 63:17, 67:19, 68:3, 75:12, 79:18, 83:16
filing [2] - 14:1, 25:13
filings [1] - 29:21
filtered [1] - 83:16
final [5] - 24:16, 25:24, 47:13, 52:3, 74:16
finally [6] - 26:3, 27:5, 32:21, 44:18, 65:25, 67:16
finance [1] - 63:13
financial [1] - 32:20
Financial [1] - 13:17
fine [1] - 28:13
fingertips [1] - 80:1
finished [1] - 60:1
firm [1] - 39:17
firms [1] - 63:9
first [42] - 5:7, 13:16, 17:8, 21:18, 25:1, 25:6, 26:15, 26:17, 26:18, 28:2, 28:25, 29:12, 31:8, 32:4, 34:1, 34:6, 34:20, 38:23, 40:11, 46:6, 47:7, 50:22, 53:15, 57:21, 59:2, 59:6, 61:19, 62:22, 65:7, 67:5, 67:8, 70:21, 71:8, 71:14, 79:1, 81:10, 87:23, 88:1, 93:3, 94:1, 99:10, 99:11
first-year [1] - 61:19
fish [1] - 67:15
Fisheries [4] - 4:12, 100:16
fisheries [1] - 44:12
FISHERIES [2] - 1:10, 2:17
fisherman [5] - 67:14, 67:19, 67:20, 83:7, 86:19
fishing [3] - 44:22, 80:17, 95:25
fit [3] - 20:25, 42:23, 85:12
five [10] - 44:13, 44:23, 62:14, 66:23, 74:19, 75:1, 81:10, 82:22, 87:19
flag [5] - 55:2, 85:17, 85:21, 86:1, 86:7
flagged [1] - 85:2
flea [1] - 96:22
flexibility [1] - 6:18
flipping [1] - 82:21

Florida [1] - 81:17
focus [10] - 28:22, 32:9, 35:12, 43:13, 43:14, 43:20, 45:18, 66:12, 76:23, 87:24
focused [2] - 44:6, 90:6
focusing [2] - 44:19, 44:21
following [2] - 21:14, 54:20
Footnote [1] - 11:23
FOR [4] - 2:2, 2:16, 2:21, 3:3
force [2] - 78:1, 78:3, 96:19
foregoing [1] - 102:8
form [15] - 35:1, 55:13, 55:16, 56:4, 56:22, 57:3, 57:9, 63:17, 81:1, 81:6, 81:22, 82:20, 84:5, 85:24, 93:9
formal [7] - 6:5, 6:12, 10:18, 12:6, 13:11, 16:10, 23:4
former [1] - 47:13
forms [6] - 56:5, 56:10, 56:22, 56:25, 84:9, 84:16
formula [3] - 26:21, 27:1, 53:1
formulas [1] - 48:15
forth [9] - 31:22, 33:10, 35:14, 47:8, 48:22, 56:15, 57:25, 59:9, 91:12
forum [2] - 93:20, 93:21
forward [1] - 6:7
four [17] - 22:19, 55:19, 57:6, 57:10, 62:8, 62:16, 63:7, 63:22, 76:21, 77:16, 79:4, 80:23, 80:25, 81:5, 82:21, 87:3
four-prong [1] - 76:21
frame [2] - 35:19, 47:21
framework [8] - 42:18, 42:22, 43:11, 44:3, 46:24, 47:23, 49:2
frankly [1] - 58:8
fraud [28] - 24:4, 29:1, 29:12, 31:1, 31:20, 31:24, 32:12, 32:20, 32:25, 34:9, 36:15, 37:14, 41:25, 52:4, 59:22, 66:3, 68:9, 69:3, 72:21, 73:3,

83:20, 89:23, 90:5,
90:9, 92:6, 92:8,
95:9
**fraudulent** [3] - 13:25,
72:17, 86:3
**free** [1] - 74:13
**freestanding** [5] -
73:23, 74:21, 75:4,
75:7, 75:22
**FRITCHIE** [1] - 2:17
**front** [3] - 22:9, 59:23,
89:1
**frowns** [1] - 13:18
**fuel** [1] - 86:21
**full** [7] - 15:23, 34:16,
47:8, 48:4, 54:25,
56:11, 94:4
**fully** [3] - 41:25, 43:21,
49:9
**Fund** [8] - 24:11,
32:19, 34:5, 34:18,
42:11, 43:14, 48:18,
50:21
**fund** [8] - 43:15,
43:21, 44:2, 46:19,
88:19, 90:1, 96:25,
98:3
**fundamental** [3] -
6:14, 7:15, 38:24
**fundamentally** [2] -
37:22, 59:17
**funded** [1] - 79:22
**funds** [7] - 24:1,
24:17, 26:24, 51:25,
52:19, 52:20, 68:21

## G

**gaining** [1] - 24:10
**Gainsburgh** [1] - 5:15
**GAINSBURGH** [1] -
2:21
**game** [1] - 33:13
**Gaspardo** [1] - 63:15
**GCCF** [18] - 39:11,
39:17, 53:13, 55:3,
59:12, 79:19, 79:21,
79:23, 83:16, 83:23,
84:8, 84:10, 84:21,
93:11, 93:15, 93:20
**general** [1] - 42:15
**generalized** [1] - 41:4
**generally** [1] - 71:8
**generous** [2] - 67:2,
67:6
**generously** [1] - 67:8
**genuine** [1] - 82:23
**GERALD** [1] - 2:22
**given** [5] - 14:19, 15:7,

---

53:22, 59:20, 64:17
**glean** [1] - 63:22
**global** [2] - 10:24,
77:25
**Godfrey** [10] - 35:22,
43:18, 63:11, 64:20,
77:17, 77:18, 85:14,
85:20, 86:1, 86:8
**Godfrey's** [1] - 77:21
**Goodwin** [5] - 39:16,
84:7, 84:23, 86:12,
93:14
**Government** [9] -
8:16, 9:4, 9:10,
17:22, 18:6, 20:21,
20:25, 100:17
**government** [1] - 9:1
**Government's** [3] -
6:9, 8:5, 28:4
**Grand** [1] - 81:18
**grand** [4] - 9:14,
13:23, 15:16, 80:9
**grant** [2] - 21:13,
97:15
**granted** [3] - 6:9,
10:21, 32:19
**granting** [2] - 16:11,
19:5
**great** [3] - 18:25, 29:8,
61:24
**green** [1] - 64:9
**gross** [2] - 44:24
**grounds** [1] - 45:6
**group** [1] - 25:23
**Group** [1] - 13:17
**guarantee** [4] - 67:22,
68:3, 73:11, 78:18
**guaranteed** [2] -
66:22, 68:1
**guaranteed/capped**
[2] - 43:13, 96:9
**GUERRA** [1] - 2:21
**Guerra** [2] - 5:2, 5:16
**guess** [11] - 24:25,
27:12, 27:14, 56:19,
57:15, 68:15, 69:24,
85:4, 86:8, 98:9,
99:4
**GULF** [1] - 1:5
**Gulf** [8] - 4:10, 43:22,
44:8, 44:12, 44:22,
66:21, 66:24, 87:3
**guys** [1] - 73:2

## H

**half** [1] - 63:20
**handle** [1] - 33:5
**handling** [1] - 22:2

---

**hands** [2] - 14:6,
19:13
**handwriting** [1] -
77:18, 77:22
**handwrote** [1] - 64:21
**Hannon** [1] - 72:7
**harm** [2] - 86:15,
94:22
**harms** [1] - 66:14
**HAYCRAFT** [1] - 2:8
**HB406** [1] - 3:11
**heads** [2] - 71:16,
71:23
**hear** [4] - 16:20,
16:22, 28:14, 28:15
**HEARD** [1] - 1:24
**heard** [5] - 17:15,
61:9, 62:25, 84:2,
94:12
**hearing** [7] - 45:1,
45:4, 62:3, 62:17,
66:20, 100:23,
101:17
**HEARING** [2] - 1:23,
1:24
**heavy** [1] - 66:18
**heck** [1] - 83:14
**help** [2] - 82:7, 100:14
**hereby** [1] - 102:7
**HERMAN** [8] - 3:3,
3:4, 99:22, 100:10,
100:20, 100:24,
101:12
**Herman** [3] - 61:15,
78:4, 99:22
**herself** [1] - 63:11
**Hesling** [1] - 76:4
**hide** [2] - 66:5, 66:6
**hiding** [1] - 66:8
**high** [1] - 96:4
**higher** [4] - 30:18,
88:25, 89:2, 89:19
**highlight** [1] - 48:25
**himself** [1] - 85:23
**hindsight** [1] - 69:14
**hinges** [1] - 91:6
**hold** [7] - 10:20,
51:13, 51:20, 51:25,
67:7, 87:8, 87:9
**holders** [1] - 78:6
**HOLDINGS** [1] - 2:6
**holidays** [1] - 62:10
**Holstein** [1] - 35:7
**Honor** [133] - 5:10,
5:18, 7:20, 7:23, 8:8,
9:13, 10:16, 14:15,
17:2, 17:6, 17:21,
18:4, 18:8, 18:23,
19:18, 19:21, 20:6,
20:18, 21:5, 21:9,

---

23:1, 23:13, 23:20,
23:25, 24:17, 27:16,
28:10, 28:18, 28:22,
30:13, 31:6, 31:19,
32:21, 32:24, 33:1,
33:18, 34:20, 35:5,
37:12, 38:16, 40:10,
41:7, 41:19, 41:23,
42:2, 42:8, 42:21,
45:8, 45:13, 46:5,
46:6, 46:16, 46:18,
46:20, 47:3, 47:4,
47:21, 47:25, 48:3,
49:4, 49:25, 50:6,
50:15, 50:17, 51:23,
52:25, 53:4, 53:7,
53:9, 53:12, 53:14,
54:10, 55:7, 57:20,
58:2, 58:10, 58:11,
58:19, 59:2, 59:10,
60:2, 61:4, 61:6,
61:8, 62:1, 62:15,
62:16, 62:23, 64:20,
65:21, 66:11, 66:19,
66:22, 68:2, 68:5,
69:9, 69:13, 69:18,
70:1, 71:8, 72:9,
73:12, 74:16, 74:19,
76:4, 76:16, 77:16,
78:7, 78:15, 78:23,
79:2, 86:14, 87:2,
87:12, 87:16, 87:21,
89:7, 89:20, 90:15,
91:2, 91:22, 92:22,
94:9, 98:14, 99:5,
99:22, 100:10,
100:24, 101:2,
101:11, 101:12,
101:15
**Honor's** [9] - 7:13,
28:21, 59:20, 60:24,
65:25, 66:15, 67:13,
77:10, 89:10
**HONORABLE** [2] -
1:24, 3:7
**hope** [1] - 69:9
**HORIZON** [1] - 1:5
**Horizon** [3] - 4:8, 4:10,
12:12
**hours** [3] - 50:20,
62:3, 63:20
**hundred** [1] - 78:20
**hunting** [1] - 80:17

## I

**idea** [4] - 41:16, 56:4,
98:24, 99:2
**identical** [7] - 10:11,
21:21, 23:14, 23:19,

---

23:23, 42:19, 83:18
**identified** [6] - 4:20,
22:5, 30:8, 37:16,
46:20, 54:22
**identify** [1] - 82:13
**identifying** [3] - 55:18,
57:8, 100:8
**identities** [1] - 85:21
**IEL** [2] - 44:3, 91:1
**ignore** [1] - 10:10
**II** [5] - 64:9, 65:15,
65:17, 65:18
**III** [19] - 39:24, 49:5,
49:7, 49:8, 64:13,
64:22, 65:8, 69:20,
70:2, 70:15, 71:21,
77:19, 77:21, 78:13,
95:21, 95:22, 97:5,
97:12
**illogical** [1] - 15:11
**imagine** [1] - 80:23
**immaterial** [1] - 29:5
**immigrant** [1] - 61:22
**imminence** [2] -
18:10, 28:11
**imminent** [8] - 18:12,
18:15, 18:21, 25:4,
26:14, 27:9, 94:22,
99:8
**imminently** [1] - 27:19
**impact** [6] - 19:7,
34:4, 34:7, 34:20,
36:16, 52:5
**impacts** [1] - 20:15
**impeachment** [2] -
74:10, 75:17
**implicate** [2] - 16:4,
33:2
**implicated** [3] - 17:16,
20:10, 31:15
**important** [7] - 10:18,
13:5, 20:19, 53:14,
58:9, 58:10, 73:12,
90:19, 95:17
**importantly** [4] -
10:22, 32:22, 82:1,
87:23
**imposed** [4] - 88:14,
88:24, 89:9, 89:19
**imposes** [1] - 59:22
**impossible** [1] - 68:22
**impractical** [1] - 15:11
**impression** [1] - 25:3
**improperly** [1] - 15:4
**IN** [2] - 1:4, 1:5
**inappropriate** [1] -
21:7
**Inc** [2] - 4:13, 4:14
**INC** [9] - 1:10, 1:15,
1:17, 2:2, 2:4, 2:5,

2:6, 2:8, 2:17
**incentive** [2] - 67:22, 88:24
**incidents** [1] - 54:11
**include** [4] - 35:17, 55:6, 74:23, 96:9
**included** [7] - 35:16, 35:24, 36:1, 36:6, 43:15, 43:25, 62:8
**including** [11] - 9:5, 12:21, 16:9, 45:11, 49:14, 54:21, 62:11, 63:13, 78:21, 96:10, 97:6
**inclusion** [1] - 92:3
**incomplete** [2] - 39:12, 84:17
**Incorporated** [1] - 4:12
**increased** [1] - 35:24
**increases** [1] - 50:21
**incredibly** [1] - 35:11
**incrimination** [1] - 15:21
**indeed** [2] - 14:22, 72:23
**indefinite** [1] - 22:15
**independent** [5] - 73:20, 73:22, 74:13, 75:8, 94:16
**indicated** [2] - 11:8, 83:9
**indicates** [1] - 94:2
**indicating** [2] - 31:14, 91:8
**indication** [2] - 11:6, 18:13
**indict** [1] - 9:4
**indicted** [3] - 8:3, 11:5, 11:7
**indictment** [16] - 6:5, 6:12, 10:19, 10:21, 12:6, 12:20, 13:11, 13:14, 15:25, 17:9, 17:12, 17:17, 18:12, 20:22
**indictments** [2] - 16:17, 22:10
**individual** [16] - 35:2, 36:1, 37:7, 42:18, 42:20, 44:6, 44:19, 46:1, 46:24, 47:23, 48:15, 49:2, 53:22, 63:25, 80:21, 96:10
**individually** [2] - 37:1, 38:9
**individuals** [4] - 9:5, 12:21, 29:23, 53:18
**induced** [1] - 32:12
**industry** [6] - 43:23,

44:22, 45:2, 54:2, 66:21, 66:24
**inevitable** [2] - 6:21, 15:7
**infer** [2] - 41:9, 41:12
**inference** [7] - 31:3, 31:20, 32:2, 46:10, 54:5, 66:7, 66:9
**inferences** [1] - 46:12
**info** [1] - 84:16
**inform** [1] - 12:4
**information** [32] - 6:24, 14:4, 25:6, 28:9, 30:22, 41:3, 41:8, 41:15, 43:7, 55:11, 55:18, 56:25, 57:3, 57:8, 58:3, 59:11, 62:25, 78:24, 79:1, 79:18, 80:2, 80:14, 80:20, 93:12, 99:12, 100:8, 100:11, 100:14, 100:18, 100:22, 101:10
**inherent** [1] - 7:13
**inherit** [1] - 6:21
**INJUNCTION** [1] - 1:23
**injunction** [19] - 4:17, 19:3, 19:20, 23:10, 27:17, 31:9, 46:17, 60:11, 61:2, 62:7, 66:12, 66:17, 73:24, 76:17, 76:22, 90:21, 97:18, 98:6, 98:8
**injunctive** [1] - 14:10
**injured** [1] - 37:18
**injury** [1] - 52:23
**innocent** [3] - 87:10
**inquired** [1] - 25:5
**inquiry** [2] - 81:13, 90:8
**inside** [1] - 75:13
**insist** [2] - 89:2, 96:8
**instance** [1] - 54:22
**instances** [1] - 54:18
**instead** [6] - 43:10, 43:13, 74:21, 79:15, 83:16, 86:9
**intended** [1] - 18:13
**intensive** [1] - 58:7
**intention** [1] - 11:10
**intentional** [1] - 31:1
**intentionally** [1] - 92:16
**interest** [1] - 68:12
**interests** [5] - 18:20, 18:24, 19:10, 21:1, 21:6
**interfere** [1] - 6:10

**interim** [2] - 97:15, 99:4
**internal** [3] - 38:6, 70:6, 71:20
**internally** [1] - 42:1
**Internet** [2] - 62:22, 86:15
**interpret** [1] - 91:19
**interpreted** [1] - 91:8
**invented** [4] - 24:9, 53:24, 54:7, 55:1
**invention** [1] - 59:18
**inventory** [1] - 85:6
**investigate** [11] - 55:5, 59:7, 59:23, 61:10, 61:13, 61:17, 61:21, 61:25, 78:18
**investigating** [2] - 5:24, 12:11
**investigation** [21] - 6:6, 6:11, 7:1, 8:2, 8:5, 8:14, 9:11, 9:15, 9:17, 11:16, 11:22, 12:15, 13:1, 14:23, 16:14, 21:23, 22:2, 22:7, 22:19, 26:11, 55:8
**investigations** [1] - 26:11
**invoke** [1] - 12:23
**invoking** [1] - 11:10
**involve** [2] - 18:7, 23:21
**involved** [5] - 13:22, 21:16, 39:6, 67:1, 95:5
**involving** [4] - 22:4, 22:7, 72:10, 74:4
**irreparable** [1] - 94:22
**IRS** [1] - 5:23
**IRWIN** [21] - 2:17, 2:17, 33:18, 61:6, 65:9, 65:13, 68:8, 68:25, 69:21, 70:1, 70:23, 71:3, 72:13, 75:7, 75:14, 76:1, 81:2, 81:4, 82:15, 84:23, 87:18
**Irwin** [19] - 29:11, 61:5, 61:6, 68:7, 87:17, 87:25, 88:22, 89:13, 89:15, 89:18, 90:6, 90:22, 91:6, 92:23, 93:1, 93:2, 93:7, 93:12, 93:17
**Irwin's** [4] - 87:22, 90:11, 90:16, 92:5
**issue** [13] - 18:17, 33:7, 36:12, 37:11, 38:24, 39:1, 41:22,

59:17, 59:18, 69:7, 90:6, 99:19, 99:25
**issued** [2] - 6:5, 62:17
**issues** [18] - 7:22, 21:19, 21:21, 22:6, 23:21, 27:18, 28:12, 33:8, 34:17, 39:10, 52:10, 54:17, 59:14, 62:6, 76:24, 79:10, 90:13, 100:5
**itself** [3] - 18:7, 85:12, 93:23

## J

**JAMES** [1] - 2:17
**January** [2] - 9:3, 62:14
**Jennifer** [3] - 81:5, 81:11, 81:16
**Jennifer's** [2] - 81:5, 81:15
**Jerry** [2] - 5:14, 61:24
**Jim** [1] - 61:6
**job** [4] - 61:12, 61:24, 61:25, 78:18
**Joe** [3] - 85:4, 85:10, 86:10
**join** [1] - 67:2
**joinder** [3] - 55:17, 57:9, 81:22
**joinders** [6] - 35:1, 55:13, 56:4, 63:17, 85:24, 93:9
**joining** [1] - 24:11
**Jones** [1] - 74:6
**Judge** [14] - 6:9, 6:14, 10:6, 10:9, 15:14, 16:6, 36:9, 42:14, 74:1, 74:4, 74:7, 76:19, 79:17, 82:12
**judge** [7] - 6:18, 6:21, 10:14, 14:13, 74:12, 78:2, 79:12
**JUDGE** [1] - 1:25
**judge's** [5] - 5:20, 6:1, 12:5
**judgment** [5] - 4:22, 24:15, 74:14, 74:22, 74:23
**judgments** [1] - 76:11
**judicial** [2] - 6:17, 7:15
**July** [4] - 63:18, 78:20, 82:6
**June** [8] - 9:8, 9:10, 17:13, 18:20, 63:18, 78:20, 82:6
**Juneau** [1] - 25:8
**JUNEAU** [1] - 3:7

**jurisdiction** [1] - 7:18
**jurisprudence** [2] - 15:12, 16:9
**jury** [3] - 9:14, 13:23, 15:16
**Justice** [2] - 13:22, 17:11
**justifiable** [4] - 29:9, 59:8, 66:4, 82:25
**justifiably** [1] - 77:4

## K

**KATZ** [1] - 3:3
**KEELEY** [1] - 2:13
**keep** [2] - 33:3, 100:17
**Kevin** [2] - 5:12, 17:4
**KEVIN** [1] - 2:13
**key** [1] - 42:10
**kind** [11] - 14:25, 28:2, 53:1, 56:17, 59:11, 59:12, 60:22, 69:7, 93:7, 93:12, 93:16
**kinds** [1] - 92:25
**knocked** [1] - 39:11
**knowing** [2] - 39:21, 87:14
**knowledge** [2] - 17:21, 46:7
**known** [5] - 37:24, 39:4, 40:18, 66:16, 72:8
**knows** [11] - 24:7, 24:12, 30:5, 35:20, 48:13, 57:12, 64:20, 69:18, 76:10, 78:7, 88:6

## L

**L.L.C** [1] - 5:16
**LA** [5] - 2:10, 2:19, 2:23, 3:5, 3:12
**lack** [3] - 10:18, 12:6, 15:25
**landings** [1] - 44:7
**language** [1] - 7:8
**large** [5] - 36:17, 37:10, 37:25, 53:4, 95:15
**largely** [1] - 96:1
**last** [22] - 8:22, 8:23, 8:24, 12:10, 20:18, 42:10, 45:18, 48:21, 49:13, 50:20, 55:19, 57:5, 57:10, 57:15, 74:16, 75:16, 75:18, 79:4, 80:23, 80:24, 81:5, 90:17

**late** [1] - 75:6
**launched** [1] - 77:9
**law** [12] - 16:3, 16:7, 39:17, 63:9, 66:16, 73:21, 73:25, 75:2, 75:3, 75:8, 75:9, 75:19
**lawsuit** [4] - 21:22, 37:1, 54:7, 60:20
**lawyer** [18] - 59:24, 61:12, 61:19, 61:20, 61:24, 74:12, 78:18, 78:24, 79:9, 79:11, 83:9, 83:11, 83:12, 84:1, 84:8, 84:9, 84:12, 86:13
**lawyers** [6] - 24:8, 38:5, 72:16, 72:21, 72:24, 85:5
**laying** [1] - 39:18
**lead** [1] - 19:13
**leading** [1] - 49:15
**learned** [1] - 54:15
**least** [10] - 23:6, 31:6, 48:20, 54:22, 82:8, 83:25, 85:18, 85:24, 94:13, 94:23
**Lebouef** [2] - 10:24, 13:8
**led** [3] - 34:8, 48:8, 56:17
**left** [5] - 71:17, 75:17, 82:16, 84:17, 84:18
**legal** [1] - 59:6
**legion** [1] - 31:19
**legitimacy** [1] - 12:11
**legitimate** [1] - 52:19
**length** [2] - 17:16, 17:18
**lengthy** [1] - 19:10
**less** [6] - 17:17, 39:3, 40:1, 41:5, 86:10, 86:11
**lesser** [1] - 67:18
**letter** [12] - 30:7, 39:16, 53:11, 54:5, 64:20, 77:15, 77:17, 84:7, 84:8, 84:23, 93:14
**letting** [1] - 87:14
**level** [1] - 59:16
**levels** [1] - 65:11
**LEWIS** [1] - 2:8
**Lexecon** [1] - 63:14
**LexisNexis** [5] - 57:11, 80:8, 81:8, 81:13, 82:5
**LIAISON** [1] - 3:3
**licenses** [2] - 80:17, 80:18

**life** [1] - 17:19
**lifted** [1] - 31:13
**likelihood** [4] - 8:3, 22:9, 22:10, 66:13
**likely** [4] - 7:8, 13:4, 17:25, 18:3
**LIMITED** [1] - 2:7
**limited** [1] - 60:15
**line** [1] - 78:14
**LISKOW** [1] - 2:8
**listed** [1] - 83:18
**literally** [1] - 75:16
**litigation** [6] - 12:12, 20:16, 53:20, 63:10, 72:10, 72:12
**live** [1] - 81:17
**lived** [1] - 80:12
**lives** [1] - 81:17
**living** [1] - 86:25
**LLP** [1] - 2:21
**loan** [1] - 13:25
**Lodge** [2] - 11:13, 13:8
**lone** [1] - 84:13
**look** [18] - 14:11, 34:2, 37:4, 53:14, 58:14, 59:4, 62:21, 63:17, 63:19, 64:12, 66:19, 76:3, 76:8, 79:1, 80:5, 84:5, 85:25, 92:19
**looked** [7] - 37:8, 62:4, 64:8, 81:20, 81:24, 84:15, 85:13
**looking** [5] - 38:25, 39:1, 55:16, 74:20, 80:4
**looks** [1] - 28:3
**loss** [5] - 42:20, 46:24, 47:23, 48:15, 49:2
**Louisiana** [3] - 45:11, 102:6, 102:7
**LOUISIANA** [4] - 1:1, 1:7, 1:12, 1:19
**low** [1] - 59:16
**lowest** [1] - 95:23
**lured** [1] - 87:6

**M**

**made-up** [2] - 79:5, 86:4
**Magistrate** [2] - 6:9, 36:8
**main** [1] - 76:24
**majority** [1] - 39:23
**Management** [1] - 16:9
**management** [1] -

7:13
**Manhattan** [1] - 72:8
**March** [5] - 9:6, 77:10, 77:14, 89:5, 91:25
**MARGARET** [1] - 2:13
**maritime** [1] - 74:6
**Martzell** [1] - 72:7
**mass** [2] - 61:23, 85:5
**massive** [1] - 20:13
**master** [2] - 4:24, 5:4
**Master's** [1] - 52:15
**match** [3] - 56:14, 58:5, 82:15
**matched** [2] - 56:15, 82:14
**matches** [2] - 80:22, 80:25
**matching** [2] - 55:24, 81:19
**material** [9] - 8:25, 12:10, 29:5, 34:3, 47:9, 76:24, 77:2, 77:5, 90:13
**materiality** [5] - 33:2, 66:4, 69:12, 77:8, 82:3
**materials** [1] - 8:15
**math** [3] - 49:18, 70:1, 82:10
**matter** [28] - 4:8, 5:21, 7:10, 8:21, 12:9, 12:13, 12:16, 12:19, 12:22, 12:25, 13:2, 13:4, 14:7, 14:18, 17:23, 18:24, 21:4, 24:3, 24:16, 29:20, 33:23, 47:11, 59:6, 68:21, 75:24, 92:25, 98:4, 102:10
**matters** [8] - 7:4, 10:12, 13:24, 20:7, 20:8, 31:16, 35:9, 47:22
**maximized** [1] - 97:11
**maximum** [9] - 6:24, 47:14, 48:1, 48:11, 48:15, 48:16, 49:19, 50:9, 88:17
**maximums** [1] - 48:7
**MBA** [1] - 63:15
**McDuff** [11] - 8:8, 9:3, 12:14, 12:22, 13:2, 14:15, 14:24, 16:18, 17:10, 20:22
**McDuff's** [2] - 12:17, 17:23
**MDL** [15] - 4:24, 5:4, 6:8, 18:24, 20:13, 21:6, 22:3, 23:3, 24:9, 29:19, 29:20,

30:12, 30:15, 34:24, 75:4
**mean** [11] - 18:5, 23:16, 25:17, 36:10, 39:5, 45:9, 48:1, 55:10, 88:12, 98:21, 100:3
**meaningful** [1] - 92:24
**means** [1] - 61:1
**measure** [1] - 87:4
**MECHANICAL** [1] - 3:14
**mechanism** [1] - 46:19
**media** [2] - 8:22, 39:19
**medical** [2] - 72:17, 83:13
**member** [5] - 24:8, 32:7, 42:19, 46:1, 96:10
**members** [6] - 32:17, 39:25, 49:20, 65:15, 80:13, 93:19
**membership** [1] - 30:10
**mention** [2] - 19:21, 20:18
**mentioned** [2] - 63:11, 63:14
**Merit** [2] - 102:5, 102:16
**MERIT** [1] - 3:11
**merit** [1] - 87:16
**meritorious** [2] - 36:19, 74:25
**met** [1] - 98:5
**metric** [1] - 45:14
**MEUNIER** [20] - 2:21, 2:22, 5:10, 5:14, 7:20, 7:23, 7:25, 8:8, 8:20, 8:23, 8:25, 9:13, 9:16, 9:20, 9:25, 10:2, 10:5, 10:8, 16:21, 16:25
**Meunier** [9] - 5:9, 5:13, 5:14, 16:19, 17:8, 20:7, 21:2, 21:12, 61:24
**Meunier's** [1] - 17:10
**MEXICO** [1] - 1:5
**Mexico** [5] - 4:11, 43:22, 44:8, 44:12, 87:3
**Michigan** [1] - 81:18
**mid** [3] - 9:3, 9:6, 47:11
**mid-February** [1] - 47:11
**mid-January** [1] - 9:3
**mid-March** [1] - 9:6

**middle** [1] - 26:9
**might** [9] - 18:13, 30:25, 37:2, 46:15, 53:21, 53:22, 58:17, 68:23, 99:3
**Mikal** [7] - 4:20, 5:2, 5:6, 5:15, 12:23, 13:3, 14:16
**militate** [1] - 16:11
**million** [31] - 37:3, 44:10, 44:11, 48:12, 48:17, 50:9, 50:23, 69:16, 69:19, 70:2, 70:11, 70:18, 71:1, 71:6, 71:9, 71:13, 71:15, 71:17, 71:18, 71:20, 71:22, 88:1, 88:3, 88:7, 88:21, 97:9, 97:13
**mind** [1] - 18:17
**minimis** [1] - 36:23
**minimize** [2] - 67:23, 88:22
**minute** [3] - 40:16, 69:4
**minutes** [1] - 87:20
**miraculously** [1] - 70:4
**miserably** [1] - 73:16
**misleading** [1] - 29:21
**misled** [1] - 83:12
**misrepresentation** [3] - 76:25, 77:1, 77:5
**Miss** - 55:23
**Mississippi** [1] - 11:15
**mistake** [1] - 30:25
**modification** [1] - 24:15
**molestation** [1] - 11:14
**moment** [5] - 29:12, 34:10, 35:4, 55:4, 57:3
**moments** [1] - 61:9
**Monday** [1] - 25:10
**money** [11] - 19:24, 34:4, 43:21, 52:2, 52:4, 58:17, 69:6, 69:7, 72:20, 88:13, 89:4
**monies** [2] - 60:8, 90:20
**month** [5] - 26:16, 27:8, 62:9
**months** [9] - 9:6, 18:11, 22:11, 22:12, 22:19, 28:2, 54:20, 87:15, 94:24
**Moore** [1] - 61:7
**MOORE** [2] - 2:17,

2:18

**moreover** [1] - 11:5
**Morgan** [1] - 76:19
**morning** [5] - 17:2, 17:3, 47:9, 62:3, 64:17
**most** [17] - 8:1, 9:6, 10:22, 11:8, 28:23, 30:1, 32:6, 32:21, 48:13, 57:4, 58:9, 58:10, 69:22, 70:7, 82:1, 87:23, 95:17
**motion** [52] - 4:17, 4:22, 5:1, 5:2, 5:7, 14:1, 15:10, 16:3, 17:6, 19:1, 19:17, 19:19, 19:20, 19:23, 20:20, 21:13, 22:24, 23:1, 23:2, 23:5, 23:8, 23:10, 23:20, 23:25, 27:17, 28:2, 28:14, 29:14, 29:15, 30:2, 31:10, 37:13, 41:3, 56:17, 60:3, 60:5, 62:6, 63:3, 75:6, 75:12, 75:20, 77:6, 87:16, 89:20, 90:3, 94:10, 94:14, 97:17, 98:6, 98:7, 98:9
**MOTION** [1] - 1:24
**motions** [2] - 4:16, 10:17
**motivations** [1] - 33:9
**motive** [3] - 32:15, 32:20, 89:1
**moved** [1] - 11:3
**movement** [1] - 50:18
**moves** [1] - 35:24
**moving** [1] - 35:25
**MR** [136] - 5:10, 5:12, 5:14, 7:20, 7:23, 7:25, 8:8, 8:20, 8:23, 8:25, 9:13, 9:16, 9:20, 9:25, 10:2, 10:5, 10:8, 16:21, 16:25, 17:2, 17:4, 18:2, 18:4, 18:8, 18:10, 18:16, 18:23, 19:18, 19:21, 21:9, 23:1, 23:13, 23:18, 23:25, 24:21, 24:24, 27:14, 28:10, 28:18, 28:20, 33:14, 33:16, 33:18, 33:20, 38:2, 38:10, 38:13, 38:16, 38:20, 40:4, 40:12, 40:14, 40:25, 41:6, 41:18, 41:21, 42:8, 42:21, 42:25, 43:2,

43:17, 43:24, 44:2, 44:15, 45:2, 45:10, 45:13, 46:2, 46:4, 46:14, 47:2, 47:7, 47:20, 47:25, 49:8, 49:25, 50:3, 50:15, 51:2, 51:16, 51:23, 52:25, 53:6, 55:7, 55:15, 55:21, 56:1, 56:6, 56:9, 56:12, 56:16, 56:18, 57:2, 57:20, 58:2, 58:15, 59:19, 60:2, 60:21, 61:4, 61:6, 65:9, 65:13, 68:8, 68:25, 69:21, 70:1, 70:23, 71:3, 72:13, 75:7, 75:14, 76:1, 81:2, 81:4, 82:15, 84:23, 87:18, 87:21, 91:17, 91:19, 91:22, 98:14, 98:17, 98:22, 99:5, 99:18, 99:22, 100:10, 100:20, 100:24, 101:1, 101:5, 101:11, 101:12, 101:15
**multi** [1] - 4:9
**multi-District** [1] - 4:9
**multiple** [6] - 8:19, 21:24, 22:6, 63:9, 63:13, 80:24
**multiples** [1] - 53:2
**must** [4] - 7:2, 67:11, 75:18, 92:6

---

## N

**name** [14] - 55:17, 57:10, 57:14, 72:9, 77:17, 79:3, 79:9, 79:11, 80:8, 80:11, 80:22, 80:25, 81:1, 81:4
**names** [5] - 55:22, 56:15, 63:11, 81:21, 81:22
**near** [1] - 51:9
**nearly** [2] - 66:23, 93:2
**necessarily** [1] - 95:17
**necessary** [5] - 26:23, 32:5, 61:2, 97:19
**need** [9] - 15:1, 18:25, 21:11, 27:12, 27:18, 30:15, 77:24, 94:21, 100:2
**needed** [3] - 43:21, 45:24, 80:7

**needs** [1] - 100:8
**negative** [1] - 31:20
**neglect** [1] - 31:1
**negotiated** [1] - 89:25
**negotiating** [4] - 32:12, 38:5, 38:6, 92:20
**negotiation** [1] - 58:25
**negotiations** [38] - 29:6, 32:8, 33:3, 33:7, 33:9, 33:24, 34:8, 34:18, 35:19, 38:4, 38:9, 38:18, 40:24, 41:10, 41:17, 42:11, 42:14, 43:14, 45:14, 45:19, 48:19, 50:7, 50:21, 63:1, 63:9, 65:4, 65:5, 78:5, 85:14, 88:2, 88:8, 89:11, 90:16, 92:11, 95:5, 96:20, 100:13, 101:3
**neighborhood** [1] - 95:11
**neighbors** [1] - 80:12
**net** [1] - 44:24
**neutral** [4] - 67:3, 69:16, 77:11, 97:2
**neutrals** [2] - 65:8, 70:15
**neutrals'** [1] - 99:20
**never** [8] - 15:5, 16:3, 23:4, 78:11, 83:3, 85:2, 91:15, 91:22
**nevertheless** [5] - 34:16, 37:15, 37:16, 48:7, 50:6
**New** [11] - 53:9, 54:14, 54:15, 54:16, 54:23, 55:2, 59:12, 79:16, 83:2, 85:18, 86:5
**NEW** [8] - 1:7, 1:12, 1:19, 2:10, 2:19, 2:23, 3:5, 3:12
**new** [2] - 56:5, 90:25
**news** [1] - 8:22
**newspaper** [1] - 80:6
**next** [12] - 19:1, 19:17, 19:19, 22:11, 26:16, 27:8, 84:11, 85:4, 85:5, 85:20, 90:15
**Nguyen** [3] - 83:3, 83:5, 86:5
**NO** [3] - 1:6, 1:12, 1:18
**non** [1] - 13:11
**none** [3] - 13:10, 57:23
**nonetheless** [1] - 26:25
**nonexistent** [1] -

37:25
**nonpayment** [1] - 5:25
**nonprivileged** [1] - 41:1
**nonspeculative** [2] - 12:20, 16:17
**NORTH** [4] - 2:4, 2:4, 2:6, 2:7
**notably** [1] - 11:8
**noted** [4] - 11:23, 15:19, 32:15, 83:17
**nothing** [8] - 26:14, 27:5, 27:8, 27:9, 32:22, 84:4, 97:20, 99:10
**notice** [2] - 63:7, 82:7
**noticed** [1] - 63:6
**notion** [5] - 50:11, 53:23, 55:1, 61:21, 90:4
**November** [1] - 66:20
**nowhere** [3] - 15:11, 51:9
**NRDA** [1] - 100:16
**Number** [6] - 4:9, 4:11, 4:14, 4:19, 33:2, 52:7
**number** [45] - 9:5, 12:20, 16:1, 25:14, 25:17, 30:8, 30:13, 30:14, 30:16, 30:17, 35:6, 35:15, 35:16, 35:18, 35:25, 36:17, 37:10, 37:18, 37:25, 38:19, 38:22, 38:23, 39:4, 40:5, 44:5, 44:9, 44:13, 44:18, 48:1, 49:19, 50:4, 50:11, 51:13, 52:6, 52:9, 53:4, 53:23, 55:13, 55:19, 55:20, 57:6, 57:14, 70:19, 71:2, 71:4, 75:1, 79:5, 79:19, 79:25, 81:6, 81:11, 81:12, 81:14, 81:15, 88:2, 91:24, 94:24, 95:13, 95:15, 97:8
**numbered** [1] - 102:10
**numbers** [28] - 34:19, 35:24, 36:3, 39:14, 42:2, 42:3, 42:7, 43:2, 50:10, 50:18, 54:3, 55:25, 56:11, 56:14, 57:18, 58:5, 58:8, 64:16, 71:23, 80:24, 81:23, 82:17, 82:23, 82:24, 85:22, 85:24, 96:14, 96:23
**numerous** [3] - 12:12,

22:3, 29:21

---

## O

**o'clock** [1] - 62:2
**O'KEEFE** [1] - 3:4
**objecting** [1] - 14:4
**objection** [1] - 33:18
**objections** [3] - 6:3, 45:5, 45:9
**objectors** [1] - 45:10
**obligation** [1] - 59:22
**obligations** [1] - 53:19
**obtain** [1] - 96:1
**obvious** [4] - 19:2, 21:15, 29:19, 92:7
**obviously** [19] - 8:4, 20:3, 20:23, 23:21, 24:5, 24:12, 27:2, 35:2, 40:10, 48:1, 51:17, 60:4, 65:7, 80:23, 81:5, 95:22, 96:11, 99:6, 100:8
**occasionally** [1] - 18:5
**occur** [4] - 26:22, 27:5, 28:1, 28:6
**occurred** [6] - 23:5, 29:19, 34:9, 35:20, 38:17, 59:19
**occurring** [1] - 93:19
**occurs** [1] - 7:5
**OF** [3] - 1:1, 1:5, 1:23
**offer** [6] - 35:24, 41:15, 47:16, 50:22, 53:3, 90:23
**offered** [3] - 40:12, 49:24, 68:18
**offering** [1] - 66:3
**offers** [1] - 90:17
**Office** [1] - 5:24
**office** [4] - 8:16, 9:7, 12:10, 25:9
**offices** [1] - 21:24
**OFFICIAL** [1] - 3:10
**official** [1] - 77:20
**Official** [2] - 102:6, 102:16
**officials** [1] - 14:5
**Offshore** [1] - 15:13
**often** [1] - 37:13
**oil** [2] - 4:10
**OIL** [2] - 1:4, 1:5
**ON** [1] - 1:5
**ONE** [1] - 2:9
**one** [48] - 4:17, 6:19, 7:6, 9:21, 10:6, 15:14, 16:1, 16:16, 19:4, 24:7, 26:12,

30:19, 35:15, 35:25, 36:13, 36:24, 41:21, 41:25, 42:6, 49:15, 52:6, 52:19, 53:6, 54:22, 55:23, 57:3, 57:5, 58:16, 62:12, 62:22, 63:4, 66:13, 67:19, 67:20, 73:15, 74:9, 78:1, 81:13, 84:14, 84:18, 84:19, 84:20, 86:13, 94:12, 96:18, 100:10
**one-year** [1] - 74:9
**oneself** [1] - 78:2
**ongoing** [5] - 8:14, 11:21, 21:23, 22:1, 22:7
**oops** [1] - 76:19
**open** [2] - 26:8, 100:4
**operating** [1] - 25:3
**opinion** [3] - 5:6, 6:13, 11:24
**opponent** [1] - 79:13
**opportunity** [9] - 27:3, 28:5, 31:13, 75:19, 87:13, 97:22, 97:24, 99:7, 99:9
**opposed** [2] - 31:1, 44:2, 65:23
**opposite** [1] - 20:3
**opposition** [3] - 29:4, 62:11, 72:25
**opt** [5] - 30:7, 64:20, 77:15, 77:17
**opt-out** [5] - 30:7, 64:20, 77:15, 77:17
**order** [8] - 14:2, 15:5, 15:15, 23:3, 27:6, 30:4, 44:10, 60:25
**ORDER** [1] - 4:4
**Order** [3] - 33:2, 33:17, 62:17
**ordinary** [1] - 100:3
**ORLEANS** [8] - 1:7, 1:12, 1:19, 2:10, 2:19, 2:23, 3:5, 3:12
**otherwise** [2] - 33:12, 68:18
**outset** [2] - 48:18, 94:20
**outside** [1] - 13:9
**overall** [3] - 34:7, 34:21, 90:19
**overarching** [1] - 54:8
**overcome** [1] - 31:2
**overlap** [6] - 7:22, 10:11, 20:7, 21:19, 21:21, 62:6
**overlapping** [3] - 5:21, 6:11, 6:25

**overused** [1] - 76:11
**overwhelmingly** [2] - 29:24, 32:24
**own** [6] - 38:6, 40:2, 46:7, 76:18, 77:22, 86:13
**owners** [2] - 5:23, 78:6
**oyster** [1] - 78:5, 86:24
**oysterman** [1] - 86:20

## P

**p.m** [2] - 62:20, 101:17
**page** [3] - 48:25, 91:3, 91:4
**pages** [7] - 62:5, 62:7, 62:12, 62:14, 62:15, 68:3, 68:5
**paid** [9] - 25:11, 25:17, 25:18, 37:23, 39:3, 40:18, 41:4, 67:17, 68:18
**papers** [6] - 24:7, 31:23, 34:7, 62:5, 72:14, 72:15
**paragraph** [4] - 47:10, 63:7, 63:22
**parallel** [6] - 5:21, 6:11, 6:17, 7:4, 7:10, 16:14
**parameters** [1] - 8:11
**pardon** [4] - 16:21, 63:18, 71:12, 82:6
**part** [27] - 13:14, 19:12, 32:13, 34:5, 35:3, 40:14, 41:7, 41:23, 43:25, 45:5, 45:23, 49:6, 49:8, 50:24, 52:19, 55:8, 58:9, 63:3, 68:10, 89:15, 89:25, 92:3, 97:4, 98:1, 98:2, 100:15
**participation** [1] - 32:18
**particular** [5] - 29:13, 35:23, 55:8, 79:18, 101:9
**particularized** [1] - 44:2
**particularly** [3] - 36:18, 45:18, 95:6
**particulars** [1] - 68:10
**parties** [6] - 11:16, 17:4, 19:5, 20:2, 22:16, 22:17, 27:3, 29:23, 30:21, 32:9,

33:3, 33:4, 34:13, 34:14, 34:17, 36:6, 37:8, 38:5, 42:3, 42:17, 45:16, 47:2, 49:9, 50:7, 50:12, 50:22, 53:18, 53:20, 76:12, 77:11, 77:13, 88:11, 90:1, 90:18, 91:15, 91:22, 92:8, 94:8, 95:5, 95:18, 97:6, 97:25, 98:18, 98:20, 99:3, 100:14
**parties'** [1] - 97:2
**partly** [1] - 25:2
**partner** [2] - 61:7, 97:3
**parts** [2] - 28:21, 41:6
**party** [5] - 19:4, 33:17, 37:17, 37:19, 41:25
**party's** [1] - 37:11
**passed** [2] - 25:13, 75:20
**past** [1] - 11:25
**paste** [1] - 23:16
**patently** [1] - 21:15
**PATRICK** [1] - 3:7
**pay** [8] - 58:16, 61:13, 81:25, 84:3, 86:22, 86:23, 89:4
**paying** [2] - 49:23, 68:17
**payment** [4] - 32:13, 60:10, 67:6, 90:2
**payments** [3] - 66:22, 70:20, 70:22
**peace** [1] - 77:25
**pendency** [1] - 17:17
**pending** [3] - 5:21, 12:25, 24:2
**People** [1] - 64:9
**people** [32] - 25:24, 53:25, 54:4, 54:22, 54:25, 56:7, 56:8, 56:24, 57:1, 64:6, 64:11, 64:12, 64:13, 67:7, 67:24, 69:3, 71:21, 71:22, 73:2, 73:3, 78:11, 79:6, 79:22, 80:24, 81:22, 81:23, 82:19, 87:6, 87:10, 87:11, 92:20
**people's** [2] - 71:16, 71:23
**Pepper** [3] - 102:4, 102:14, 102:15
**PEPPER** [1] - 3:10
**per** [19] - 48:10, 49:15, 49:16, 49:17, 53:3, 67:12, 70:7, 70:13, 70:16, 70:17, 70:25, 71:22, 88:4, 88:5,

88:14, 88:15, 88:16, 89:6, 91:10
**per-cap** [1] - 89:6
**per-claimant** [5] - 49:16, 53:3, 70:13, 70:16, 88:4
**perceive** [1] - 90:20
**perceived** [1] - 50:12
**perceives** [1] - 52:5
**percent** [21] - 25:20, 26:1, 26:4, 26:8, 26:10, 71:10, 71:11, 71:15, 71:17, 77:23, 82:11, 82:12, 82:13, 82:14, 82:15, 82:16, 82:17, 82:18, 85:9
**percentage** [1] - 51:12
**percentages** [1] - 30:14
**perception** [2] - 54:25, 88:19
**perfect** [4] - 27:21, 27:22, 34:12, 86:22
**perhaps** [7] - 10:22, 22:4, 22:8, 29:10, 30:18, 37:25, 87:23
**period** [4] - 20:1, 35:21, 46:20, 74:10
**Perry** [2] - 27:4, 97:2, 99:14
**Perry's** [1] - 70:8
**person** [10] - 57:13, 58:6, 59:24, 59:25, 63:1, 79:3, 80:11, 80:12
**person's** [2] - 55:20, 80:16
**personal** [1] - 100:8
**persons** [1] - 95:23
**perspectives** [1] - 67:11
**pertaining** [1] - 6:20
**phone** [3] - 79:14, 79:23, 84:6
**pick** [3] - 79:13, 79:22, 84:5
**picture** [3] - 34:12, 34:14, 34:16
**pictures** [1] - 86:24
**pieces** [1] - 59:4
**pinch** [2] - 61:8, 84:25
**pinnacle** [1] - 61:16
**Pitofsky** [1] - 53:12
**place** [4] - 40:6, 88:1, 88:9, 97:5
**placed** [2] - 41:16, 96:12
**plaintiff** [13] - 10:25, 11:13, 11:24, 61:24, 72:16, 79:9, 79:11,

83:11, 84:9, 84:15, 84:19, 85:5, 101:10
**plaintiff's** [1] - 67:23
**plaintiff-specific** [1] - 101:10
**plaintiffs** [3] - 30:12, 34:24, 74:11
**Plaintiffs'** [6] - 24:8, 24:10, 30:11, 32:7, 32:18, 85:10
**PLAINTIFFS'** [1] - 3:3
**plaintiffs'** [1] - 24:7
**plan** [2] - 88:14, 99:19
**planned** [1] - 27:19
**play** [1] - 13:24
**pleasant** [2] - 74:2, 74:18
**podium** [1] - 84:2
**point** [42] - 15:25, 16:2, 18:11, 19:2, 19:12, 23:6, 26:9, 26:14, 27:7, 28:1, 29:2, 30:19, 32:24, 43:9, 43:11, 44:17, 48:8, 52:8, 58:10, 59:20, 60:5, 60:24, 63:1, 68:19, 70:16, 79:15, 85:14, 85:17, 85:20, 90:11, 90:12, 91:6, 92:6, 93:14, 94:13, 94:15, 94:21, 98:10, 98:17, 100:10, 100:12
**pointed** [4] - 71:5, 72:15, 78:4, 97:6
**points** [2] - 30:18, 76:20
**policies** [2] - 6:19, 7:10
**policy** [2] - 5:19, 7:15
**political** [1] - 80:16
**Porteous** [1] - 74:4
**Porteous'** [1] - 74:7
**pose** [2] - 32:1, 90:9
**posited** [1] - 36:24
**position** [7] - 24:10, 47:11, 47:18, 48:18, 49:14, 73:15, 91:9
**possession** [1] - 93:10
**possible** [3] - 22:14, 74:12, 95:23
**possibly** [1] - 98:3
**posture** [1] - 20:18
**pot** [1] - 52:18
**potential** [7] - 5:25, 46:16, 49:16, 49:19, 50:9, 51:8, 89:7, 95:9, 96:15
**potentially** [4] - 17:18,

19:5, 35:9, 69:24
**Poulenc** [2] - 36:14, 53:2
**pound** [1] - 67:12
**pounds** [1] - 67:11
**POYDRAS** [4] - 2:9, 2:18, 2:23, 3:11
**practical** [2] - 68:21, 75:24
**practically** [1] - 83:25
**practices** [2] - 7:6, 13:25
**precedence** [1] - 15:17
**precedes** [1] - 50:16
**precise** [6] - 21:21, 27:23, 37:14, 37:15, 37:18, 91:6
**precisely** [1] - 15:6
**preclude** [1] - 31:15
**predictable** [1] - 6:22
**predicted** [2] - 71:13, 71:14
**preindictment** [2] - 15:15, 15:16
**prejudice** [2] - 19:10, 22:14
**preliminarily** [1] - 24:1
**preliminary** [11] - 4:17, 19:3, 19:20, 23:10, 46:17, 60:10, 66:12, 66:17, 97:18, 98:6, 98:7
**PRELIMINARY** [1] - 1:23
**preordains** [1] - 60:7
**preponderance** [2] - 73:14, 76:7
**prescriptions** [1] - 76:8
**present** [5] - 11:9, 15:9, 30:23, 85:15, 87:13
**PRESENT** [1] - 3:7
**presentation** [4] - 45:3, 66:13, 87:22, 92:5
**presented** [5] - 21:19, 35:15, 44:25, 53:17, 87:25
**presenting** [2] - 35:5, 92:18
**presents** [3] - 11:19, 32:19, 58:4
**press** [1] - 79:10
**presumably** [1] - 100:1
**presumption** [1] - 19:14
**pretrial** [1] - 7:7

**Pretrial** [1] - 33:2
**prevail** [2] - 72:23, 95:8
**prevent** [2] - 6:19, 60:25
**previously** [1] - 17:15
**price** [1] - 67:12
**princely** [1] - 80:21
**principle** [4] - 49:12, 77:8, 88:11, 91:24
**privacy** [1] - 79:3
**privilege** [8] - 12:23, 13:19, 14:8, 14:21, 15:18, 66:5, 66:6, 66:8
**privileged** [5] - 33:12, 40:15, 40:25, 41:8, 66:2
**privy** [1] - 8:5
**pro** [3] - 70:25, 71:6, 97:10
**problem** [2] - 51:19, 51:21
**procedural** [1] - 6:17
**procedure** [1] - 98:15
**procedures** [1] - 90:10
**proceed** [7] - 6:2, 14:6, 14:23, 38:24, 89:14, 89:15, 90:12
**proceeding** [7] - 11:16, 11:19, 12:1, 13:22, 15:16, 20:14, 75:21
**proceedings** [5] - 5:3, 6:16, 13:23, 31:5, 102:10
**PROCEEDINGS** [3] - 1:24, 3:14, 4:1
**proceeds** [2] - 7:1, 14:18
**process** [22] - 40:10, 45:5, 46:8, 52:18, 58:4, 58:7, 63:3, 72:19, 74:10, 75:17, 92:3, 92:23, 93:2, 93:4, 93:15, 93:22, 94:3, 94:25, 97:4, 97:8, 98:17, 100:16
**processed** [7] - 25:16, 25:17, 25:21, 25:23, 26:8, 48:6, 93:16
**processing** [3] - 25:19, 26:5, 26:6
**Procter** [5] - 39:17, 84:7, 84:24, 86:12, 93:14
**produced** [1] - 67:12
**PRODUCED** [1] - 3:15
**PRODUCTION** [4] -

1:14, 1:17, 2:3, 2:6
**Production** [2] - 4:13, 4:14
**PRODUCTS** [1] - 2:7
**profile** [2] - 84:9, 84:16
**profit** [1] - 44:24
**program** [14] - 20:17, 25:14, 49:6, 51:7, 51:20, 53:17, 60:14, 67:8, 67:20, 70:8, 77:12, 79:21, 94:19, 95:21
**Program** [14] - 4:19, 24:2, 25:11, 25:15, 25:16, 37:24, 43:12, 52:14, 67:10, 67:18, 70:14, 96:8, 96:9, 96:24
**program's** [1] - 92:4
**progress** [4] - 5:21, 20:13, 42:15, 43:4
**prominent** [2] - 28:23, 35:12
**promise** [3] - 58:13, 67:9, 87:7
**promised** [2] - 68:1, 87:6
**prong** [1] - 76:21
**proof** [8] - 39:25, 40:1, 65:11, 73:13, 76:2, 76:3, 76:6, 89:19
**proper** [3] - 39:13, 69:1, 69:2
**properly** [2] - 22:5, 76:16
**proportionate** [1] - 97:11
**proposal** [4] - 27:3, 48:16, 48:21, 99:15
**proposed** [3] - 26:21, 26:25, 49:2
**proposition** [1] - 13:11
**prospect** [2] - 12:20, 16:16
**protect** [5] - 21:1, 51:8, 76:11, 76:12
**protecting** [1] - 72:1
**protections** [1] - 59:1
**protective** [2] - 14:2, 15:5
**prove** [9] - 33:7, 37:18, 37:19, 60:19, 66:3, 68:9, 68:16, 76:25, 77:6
**proven** [1] - 58:22
**provide** [2] - 8:13, 34:18
**provided** [3] - 11:6,

43:8, 100:14
**provides** [1] - 67:16
**providing** [1] - 47:12
**prudent** [1] - 52:8
**prudential** [1] - 52:21
**PSC** [16] - 33:17, 35:17, 36:2, 47:15, 47:18, 48:21, 49:3, 49:14, 50:10, 62:25, 65:17, 85:2, 90:22, 91:13, 92:13, 93:19
**PSC's** [3] - 49:13, 63:23, 92:10
**PTO** [1] - 101:2
**public** [3] - 8:21, 30:6, 39:9
**publicly** [1] - 55:10
**pulled** [2] - 86:15, 86:18
**punish** [1] - 73:4
**punitive** [4] - 35:8, 35:9, 67:25
**purported** [2] - 53:8, 83:4
**purporting** [1] - 30:9
**purpose** [2] - 6:15, 63:20
**purposes** [1] - 23:22, 24:9, 30:23, 31:8, 33:23, 41:19, 46:25, 47:9, 54:7, 92:14, 92:21
**pursuant** [5] - 4:23, 16:18, 18:19, 20:17, 89:14
**pursue** [1] - 93:23
**pursuing** [1] - 54:7
**put** [20] - 28:9, 37:9, 38:8, 45:22, 51:13, 65:6, 65:18, 65:20, 65:23, 66:1, 70:14, 72:25, 77:22, 77:24, 78:9, 78:12, 80:8, 96:4, 98:3
**putative** [1] - 21:4
**putting** [2] - 55:4, 64:11

## Q

**quantification** [1] - 34:11
**quarter** [1] - 30:19
**question-specific** [2] - 14:20, 14:25
**questions** [9] - 8:11, 24:25, 28:22, 31:16, 67:13, 94:9, 98:12, 99:24, 100:25

43:8, 100:14
**quickly** [1] - 57:13
**quite** [2] - 34:3, 94:15
**quote** [10] - 11:3, 11:6, 11:9, 11:18, 11:20, 11:25, 15:20, 15:21, 77:25, 86:19
**quoted** [1] - 54:14
**quoting** [2] - 6:13, 12:17

## R

**raid** [2] - 21:23, 80:6
**raise** [1] - 93:23
**raised** [4] - 20:7, 21:21, 33:6, 66:7
**raising** [1] - 33:8
**ranging** [1] - 30:17
**Rapids** [1] - 81:18
**rare** [4] - 18:5, 18:6, 21:3, 21:5
**rata** [3] - 70:25, 71:6, 97:10
**rate** [1] - 36:23
**rather** [7] - 16:15, 20:22, 37:18, 48:24, 67:22, 73:11, 88:10
**rationale** [1] - 5:19
**Ray** [1] - 10:24
**Raybestos** [1] - 72:8
**Raybestos-Manhattan** [1] - 72:8
**Raymark** [6] - 69:1, 72:5, 72:8, 72:11, 72:20, 72:23
**re** [1] - 4:10
**RE** [1] - 1:4
**reached** [2] - 91:15, 91:22
**reaches** [1] - 29:14
**reaching** [1] - 33:1
**react** [4] - 27:14, 41:6, 46:4, 53:6
**reaction** [1] - 54:12
**read** [4] - 16:22, 23:5, 23:15, 54:4
**ready** [1] - 19:14
**real** [13] - 12:19, 15:20, 16:17, 39:1, 57:1, 57:13, 59:15, 59:25, 60:17, 61:1, 78:4, 81:4, 82:23
**realizing** [1] - 82:22
**really** [16] - 4:24, 39:7, 41:24, 50:11, 57:3, 69:6, 77:9, 77:10, 81:10, 90:2, 90:5, 92:23, 94:20, 98:10, 98:14, 100:2

**Realtime** [2] - 102:4, 102:15
**REALTIME** [1] - 3:10
**reason** [8] - 19:22, 48:7, 56:20, 57:16, 73:21, 82:9, 94:21, 101:10
**reasonable** [3] - 51:13, 54:5, 88:19
**reasons** [6] - 21:14, 31:7, 52:21, 79:3, 97:19, 98:6
**rebuttal** [1] - 29:10
**receive** [4] - 27:4, 53:11, 88:18, 99:18
**received** [1] - 99:13
**recent** [3] - 16:7, 16:8, 71:5
**recently** [1] - 9:7
**recess** [1] - 101:18
**recited** [1] - 82:10
**recognize** [1] - 90:11
**recollection** [2] - 46:7, 100:13
**record** [40] - 8:9, 8:21, 10:23, 11:9, 12:9, 12:13, 12:16, 12:18, 12:19, 12:22, 13:2, 14:12, 14:25, 17:14, 17:22, 28:9, 29:1, 29:16, 29:24, 30:7, 30:24, 31:6, 31:9, 32:22, 35:14, 41:18, 43:18, 44:16, 46:22, 48:20, 50:5, 50:17, 55:8, 59:19, 59:21, 62:14, 80:16, 92:15, 93:4, 102:9
**Record** [3] - 4:19, 4:23, 5:3
**RECORDED** [1] - 3:14
**recoup** [1] - 52:3
**recover** [5] - 48:4, 50:9, 60:23, 68:22, 68:24
**recovered** [2] - 48:2, 48:17
**Recovery** [1] - 6:8
**recovery** [8] - 48:15, 49:16, 49:19, 51:8, 60:19, 61:1, 95:10, 97:12
**red** [1] - 55:2
**redacted** [3] - 79:2, 79:20, 100:9
**redline** [1] - 49:3
**reduction** [1] - 70:25
**reefs** [1] - 86:24
**reevaluate** [1] - 22:19
**refer** [1] - 5:16

**referenced** [1] - 53:12
**referred** [1] - 91:1
**referring** [1] - 47:21
**reflect** [2] - 50:6, 90:24
**reflects** [1] - 48:20
**reform** [1] - 73:7
**refund** [1] - 5:23
**refused** [1] - 73:6
**regard** [7] - 10:14, 19:9, 22:23, 50:8, 52:1, 52:15, 54:21
**regarded** [1] - 59:24
**regarding** [1] - 14:12
**regardless** [2] - 67:17, 82:3
**Registered** [1] - 102:4
**REGISTERED** [1] - 3:11
**registered** [1] - 102:16
**rehearse** [1] - 18:25
**reinitiate** [1] - 98:18
**related** [5] - 4:16, 5:1, 23:21, 54:2, 55:9
**relates** [4] - 4:25, 12:25, 28:2, 41:23
**relating** [1] - 33:8
**relationship** [1] - 54:1
**relative** [2] - 45:15, 89:3
**relevant** [12] - 6:24, 19:16, 25:7, 28:16, 30:1, 33:10, 33:11, 89:3, 95:16, 96:16, 100:19, 100:20
**reliable** [1] - 11:19
**reliance** [7] - 29:9, 59:8, 66:4, 82:4, 82:25, 92:6
**reliant** [1] - 92:20
**relied** [3] - 77:5, 79:15, 100:22
**relief** [11] - 4:22, 23:3, 23:7, 23:11, 23:14, 23:18, 23:23, 24:13, 75:25, 94:17, 97:15
**relieve** [1] - 14:10
**rely** [3] - 40:2, 41:18, 90:7
**remain** [2] - 8:16, 20:17
**remaining** [3] - 26:10, 26:24, 71:12
**remains** [1] - 8:25
**remedy** [15] - 21:7, 24:16, 24:19, 37:17, 66:17, 73:18, 73:25, 75:2, 75:3, 75:8, 75:9, 75:19, 89:13, 89:16, 94:13

**remember** [1] - 72:9
**remembering** [1] - 34:22
**remind** [1] - 54:11
**reminded** [1] - 6:14
**rendered** [1] - 29:17
**repeatedly** [1] - 68:4
**repeating** [1] - 29:18
**reply** [1] - 85:1
**Report** [1] - 86:16
**report** [7] - 22:18, 80:10, 81:8, 83:11, 84:21, 99:20
**reported** [3] - 10:15, 10:25, 71:8
**Reporter** [7] - 102:4, 102:5, 102:6, 102:15, 102:16, 102:16
**REPORTER** [3] - 3:10, 3:10, 3:11
**REPORTER'S** [1] - 102:1
**reports** [4] - 39:9, 39:19, 42:15, 72:17
**represent** [7] - 30:9, 53:8, 59:25, 72:6, 83:5, 86:9
**representation** [8] - 17:10, 17:22, 17:23, 22:3, 54:25, 58:24, 58:25, 59:24
**representations** [11] - 20:24, 29:5, 30:2, 32:6, 32:16, 33:22, 34:3, 57:24, 89:24, 92:14, 92:16
**represented** [13] - 29:23, 30:11, 30:14, 34:23, 47:18, 53:17, 57:7, 59:15, 63:8, 83:24, 84:8, 86:11, 86:12
**representing** [5] - 12:11, 39:17, 53:12, 53:19, 56:23
**request** [6] - 6:9, 19:3, 19:12, 24:5, 27:20, 97:2
**requested** [3] - 21:3, 23:18, 60:11
**requesting** [1] - 24:16
**requests** [1] - 31:16
**require** [3] - 22:16, 62:18, 78:12
**required** [6] - 36:3, 65:12, 84:19, 91:11, 97:4
**requirement** [1] - 90:24

**requirements** [4] - 49:11, 90:17, 91:23, 92:2
**requires** [2] - 6:24, 33:3
**requisite** [1] - 7:11
**rescind** [3] - 72:22, 73:1, 73:6
**reserve** [1] - 98:3
**reserves** [1] - 51:14
**reside** [1] - 66:9
**residences** [1] - 80:11
**resolution** [4] - 25:24, 26:12, 99:4
**resolved** [2] - 51:15, 98:4
**resolving** [2] - 46:25, 47:22
**respect** [5] - 54:17, 59:8, 63:6, 66:9, 94:10
**respected** [1] - 7:2
**respectfully** [1] - 72:2
**respects** [1] - 44:15
**respond** [3] - 20:6, 29:11, 99:9
**responded** [1] - 49:3
**responding** [1] - 14:7
**response** [11] - 12:24, 14:17, 30:20, 31:10, 31:16, 41:11, 49:13, 65:25, 91:13
**responsible** [1] - 78:24
**rest** [2] - 73:5, 98:3
**restitution** [3] - 69:2, 72:20, 72:24
**restriction** [2] - 33:16, 33:17
**result** [9] - 19:2, 19:24, 20:3, 34:8, 34:24, 52:3, 55:2, 60:8, 88:8
**resulted** [1] - 90:2
**results** [2] - 24:5, 48:8
**retained** [1] - 12:14
**retention** [1] - 18:19
**retiring** [1] - 86:25
**return** [3] - 17:11, 17:12, 18:13
**returned** [2] - 17:9, 22:10
**returns** [1] - 95:25
**reveal** [4] - 13:4, 40:15, 40:19, 41:8
**revealed** [2] - 74:11, 94:3
**revenue** [6] - 44:7, 44:11, 44:24, 44:25, 66:23

**revenues** [3] - 45:3, 45:15, 67:12
**review** [3] - 26:5, 26:6, 93:5
**reviewed** [1] - 70:21
**revisionist** [1] - 69:13
**Rhone** [2] - 36:14, 53:2
**Rhone-Poulenc** [2] - 36:14, 53:2
**Rice** [3] - 85:4, 85:10, 86:10
**rice** [9] - 43:17, 47:10, 78:8, 85:15, 85:17, 85:20, 86:1, 86:7
**rice's** [4] - 36:7, 47:7, 47:17, 92:12
**rich** [1] - 78:5
**RIG** [1] - 1:5
**rig** [1] - 4:10
**rights** [6] - 11:10, 20:10, 31:11, 31:14, 60:19, 67:25
**rise** [3] - 4:7, 93:16, 101:16
**risk** [3] - 15:20, 35:8, 69:6
**RMR** [2] - 3:10, 102:15
**Robert** [2] - 8:8, 12:14
**roll** [1] - 78:21
**ROOM** [1] - 3:11
**room** [1] - 42:14
**roughly** [3] - 44:23, 56:7, 86:9
**round** [6] - 67:5, 67:6, 67:9, 99:8, 99:11
**routine** [1] - 7:4
**RTP** [1] - 49:15
**Rule** [37] - 4:23, 23:3, 23:5, 23:8, 23:21, 24:3, 34:25, 35:1, 36:15, 45:4, 45:5, 53:19, 62:6, 72:19, 73:6, 73:24, 74:10, 74:21, 75:3, 75:4, 75:6, 75:9, 75:12, 75:20, 75:21, 76:3, 76:9, 76:16, 76:18, 76:20, 76:21, 77:6, 94:13, 94:14, 98:9
**rule** [3] - 15:12, 74:15, 98:11
**rules** [4] - 6:19, 7:6, 7:7, 7:9
**ruling** [2] - 98:10, 98:12
**Russ** [1] - 61:15

# S

s/Cathy [1] - 102:14
safeguards [1] - 7:1
SALLY [1] - 3:7
San [1] - 21:25
sat [1] - 14:6
saw [1] - 20:25
scale [1] - 90:3
scenario [1] - 15:3
scheduled [1] - 62:17
scheme [2] - 29:6, 33:24
scope [3] - 87:24, 89:7, 89:11
Seacor [1] - 4:12
seafood [3] - 66:24, 67:11, 69:16
Seafood [30] - 4:18, 24:2, 25:11, 25:19, 25:22, 26:8, 34:5, 34:18, 37:23, 39:24, 42:11, 42:18, 43:12, 43:14, 43:23, 48:18, 50:21, 52:1, 52:14, 63:1, 64:9, 70:14, 77:11, 78:9, 92:4, 94:19, 95:20, 96:8, 96:9, 96:24
seal [1] - 81:21
sealed [1] - 101:9
search [3] - 8:18, 8:19, 21:24
SEC [8] - 13:16, 13:21, 14:2, 14:3, 14:4, 14:10, 15:4, 15:19
second [44] - 4:18, 15:24, 18:23, 23:9, 23:12, 24:1, 24:22, 24:23, 25:3, 26:17, 26:21, 27:6, 27:11, 27:23, 28:6, 29:3, 34:11, 51:7, 52:8, 52:13, 52:16, 54:10, 57:22, 58:2, 59:3, 60:15, 67:6, 67:9, 71:4, 71:6, 71:16, 87:7, 87:9, 87:15, 91:3, 93:7, 94:2, 94:18, 94:23, 95:2, 97:10, 97:11, 98:1, 99:8
secondly [2] - 26:19, 99:14
Secour [1] - 4:25
SECOUR [2] - 1:10, 2:16
Secret [1] - 80:6
securing [1] - 92:15

Security [23] - 39:14, 54:3, 55:19, 55:20, 55:24, 56:11, 56:14, 57:6, 57:14, 58:5, 58:8, 64:15, 79:5, 79:25, 80:24, 81:6, 81:11, 81:12, 81:14, 81:15, 81:23, 82:23, 85:22
see [11] - 51:21, 56:15, 56:25, 80:25, 81:14, 81:21, 81:22, 85:3, 85:12, 94:20, 96:3
seek [3] - 20:25, 60:23, 75:25
seeking [5] - 6:22, 14:2, 24:13, 74:14, 90:3
Seider [1] - 63:14
seized [2] - 8:15, 12:9
selected [1] - 32:17
self [1] - 15:21, 79:7
self-employed [1] - 79:7
self-incrimination [1] - 15:21
sense [7] - 5:5, 25:2, 45:16, 55:2, 58:4, 65:6, 93:18
sent [1] - 77:16
separate [3] - 5:1, 25:23, 46:19
series [2] - 20:14, 84:10
served [1] - 6:15
Service [1] - 80:6
set [10] - 31:22, 35:14, 48:22, 59:9, 69:8, 69:9, 70:12, 74:14, 74:22, 89:4
sets [1] - 47:7
setting [1] - 61:23
settle [5] - 35:10, 35:11, 35:16, 46:19, 46:23
settled [2] - 7:15, 77:25
settlement [34] - 30:3, 30:5, 32:14, 33:3, 33:7, 33:9, 33:24, 34:5, 45:4, 45:10, 45:19, 53:17, 55:6, 64:9, 67:1, 68:4, 68:14, 72:22, 73:2, 73:7, 77:9, 77:12, 77:16, 77:23, 87:7, 89:25, 92:21, 95:7, 96:5, 96:7, 98:25, 99:1, 100:3

several [6] - 18:11, 22:11, 28:1, 29:22, 35:9, 96:14
sexual [2] - 11:1, 11:14
shame [1] - 86:10
sheer [1] - 40:5
Shell [1] - 15:13
SHELL [1] - 2:9
shoes [2] - 72:9, 72:11
short [14] - 31:1, 35:20, 55:13, 55:16, 56:4, 56:22, 57:9, 63:17, 81:6, 81:22, 82:20, 84:5, 85:24, 93:9
short-form [13] - 35:1, 55:13, 55:16, 56:4, 56:22, 57:9, 63:17, 81:6, 81:22, 82:20, 84:5, 85:24, 93:9
shortly [2] - 95:7, 97:1
show [7] - 29:1, 38:20, 42:8, 47:25, 73:24, 77:4, 84:11
showed [2] - 64:25, 78:14
shown [1] - 67:19
shrimpers [2] - 78:6, 86:25
SHUSHAN [1] - 3:7
Shushan [2] - 36:9, 42:14
side [3] - 5:11, 35:15, 99:21
sides [9] - 7:17, 23:16, 33:15, 39:22, 45:21, 47:4, 96:15, 97:22, 100:23
sign [7] - 67:2, 67:7, 83:5, 86:6, 95:1, 97:23, 99:16
signed [7] - 45:21, 77:15, 77:17, 83:3, 83:8, 83:9, 84:18
significance [2] - 46:11, 76:12
significant [9] - 8:1, 12:7, 29:7, 57:4, 58:3, 63:9, 89:18, 96:22, 96:23
significantly [1] - 86:10
signing [1] - 83:12
similar [2] - 23:11, 42:19
similarity [1] - 13:16
simple [1] - 93:2
simply [2] - 14:5, 64:23

simultaneously [1] - 13:24
sit [1] - 52:23
situation [2] - 22:20, 73:17
six [2] - 7:18, 15:14
six-factor [2] - 7:18, 15:14
size [3] - 50:21, 90:3, 92:17
skip [1] - 9:20
slide [4] - 38:20, 69:11, 78:14, 84:11
slides [1] - 10:6
small [1] - 100:5
smaller [2] - 50:11, 51:12
so-called [2] - 94:15, 95:21
Social [23] - 39:14, 54:3, 55:19, 55:20, 55:24, 56:11, 56:14, 57:6, 57:14, 58:5, 58:8, 64:15, 79:5, 79:25, 80:24, 81:6, 81:11, 81:12, 81:14, 81:15, 81:23, 82:23, 85:22
sole [1] - 60:13
someone [2] - 56:13, 57:7
somewhat [2] - 59:17, 92:7
somewhere [1] - 95:12
sorry [2] - 55:22, 60:1
sort [6] - 6:24, 51:20, 70:4, 95:18, 96:2, 98:3
sought [7] - 14:4, 14:10, 15:5, 23:14, 72:20, 72:22, 94:17
Southeast [1] - 6:8
Special [1] - 52:15
special [5] - 7:11, 21:16, 26:11, 58:21, 59:1
specific [10] - 8:10, 10:22, 14:13, 14:20, 14:25, 24:19, 35:23, 40:14, 100:11, 101:10
specifically [7] - 14:25, 30:2, 30:8, 39:18, 50:19, 63:10, 64:5
specifics [1] - 9:18
speculated [1] - 93:12
speculative [1] - 16:15

spend [1] - 29:12
spill [3] - 4:10, 34:24, 44:8
SPILL [1] - 1:4
spoken [1] - 9:6
sponsor [2] - 47:13, 64:1
SQUARE [1] - 2:9
ST [1] - 2:14
stage [4] - 6:11, 24:24, 31:5, 32:3
stake [4] - 18:17, 18:20, 18:24, 21:6
stand [5] - 13:10, 40:19, 51:25, 60:3, 60:4
standard [1] - 59:8
standing [1] - 49:22
start [6] - 34:1, 50:7, 76:14, 76:15, 82:21, 82:22
started [1] - 80:4
starting [2] - 39:11, 84:13
State [2] - 45:11, 102:5
state [3] - 11:15, 25:8, 85:15
statement [13] - 13:15, 36:8, 41:4, 51:24, 54:16, 61:9, 63:23, 64:14, 65:2, 65:16, 65:19, 65:21, 78:13
statements [7] - 27:15, 29:13, 64:2, 64:6, 70:3, 78:10, 96:1
Statements [1] - 64:10
STATES [2] - 1:1, 1:25
States [3] - 100:13, 102:6, 102:17
states [1] - 100:14
status [8] - 8:2, 8:6, 10:13, 11:4, 13:13, 16:6, 22:18, 25:6
stay [47] - 5:2, 5:7, 5:20, 6:10, 6:15, 6:23, 7:13, 10:18, 10:21, 11:3, 14:1, 14:17, 14:19, 15:5, 15:10, 15:14, 15:21, 16:4, 16:8, 16:12, 16:13, 17:16, 17:19, 18:19, 19:6, 19:23, 20:17, 20:22, 21:1, 21:3, 21:13, 21:17, 22:15, 23:8, 23:11, 24:21, 29:16, 31:13, 51:7, 60:3, 76:16,

76:18, 76:21, 94:18, 98:1, 98:19
**stayed** [2] - 6:4
**Steering** [6] - 24:8, 24:10, 30:11, 32:7, 32:18, 85:10
**STENOGRAPHY** [1] - 3:14
**STEPHEN** [1] - 3:4
**steps** [1] - 92:25
**Steve** [1] - 99:22
**stick** [1] - 81:13
**still** [5] - 26:4, 36:3, 82:3, 88:19, 101:9
**stolen** [1] - 85:21
**stop** [1] - 16:20
**store** [1] - 5:22
**strategies** [1] - 13:4
**STREET** [4] - 2:9, 2:18, 2:23, 3:11
**strong** [4] - 13:16, 22:10, 32:15, 32:20
**struck** [1] - 91:5
**stuck** [1] - 87:2
**student** [1] - 13:25
**studies** [1] - 91:2
**stuff** [4] - 33:10, 51:14, 62:4, 100:3
**subject** [8] - 26:11, 33:1, 45:15, 52:15, 53:10, 77:12, 92:1, 101:5
**submission** [3] - 33:21, 83:17, 101:5
**submissions** [1] - 62:18
**submit** [7] - 12:8, 22:17, 63:25, 65:1, 72:17, 94:10, 99:15
**submits** [1] - 24:17
**submitted** [16] - 26:2, 26:21, 35:8, 41:19, 43:7, 50:5, 55:23, 62:15, 67:18, 84:10, 85:23, 95:4, 100:7, 100:22, 101:6
**subsequent** [2] - 88:8, 92:1
**substance** [1] - 10:11
**substantial** [15] - 18:18, 18:19, 18:20, 19:6, 20:3, 20:13, 21:6, 30:16, 30:17, 33:20, 34:4, 34:14, 50:20, 52:5, 66:13
**subtractions** [1] - 84:11
**success** [2] - 36:23, 66:14
**successful** [2] -

46:24, 53:16
**sue** [1] - 67:25
**suffered** [1] - 60:22
**sufficient** [5] - 21:16, 22:8, 22:13, 29:2, 70:19
**suggest** [13] - 13:17, 15:4, 20:4, 21:7, 28:11, 30:24, 66:2, 66:8, 66:24, 72:2, 85:15, 92:15, 100:18
**suggested** [3] - 43:9, 60:3, 67:13
**suggesting** [4] - 27:16, 49:23, 57:24, 91:14
**suggestion** [1] - 31:2
**suggestions** [1] - 99:17
**suggests** [4] - 7:3, 88:19, 93:2, 93:4
**suit** [3] - 6:19, 7:7, 34:24
**SUITE** [3] - 2:10, 2:18, 2:23
**sum** [2] - 16:6, 80:21
**summer** [3] - 26:9, 27:10, 99:12
**superior** [1] - 93:20
**supplemental** [2] - 62:13, 85:3
**support** [2] - 64:23, 72:18
**supporting** [1] - 80:1
**supports** [1] - 5:19
**suppose** [1] - 98:22
**supposed** [2] - 14:13, 86:7
**surely** [1] - 92:12
**surprising** [2] - 12:5, 92:7
**suspect** [1] - 78:6
**suspend** [1] - 4:18
**suspicion** [2] - 57:18, 93:24
**sword** [1] - 66:3
**sworn** [5] - 47:12, 64:1, 64:23, 65:1, 78:10

**T**

**table** [2] - 79:13, 99:21
**tail** [2] - 96:21, 96:22
**tandem** [1] - 14:24
**tax** [2] - 5:23, 95:25
**taxes** [1] - 5:25
**team** [2] - 63:12, 63:16
**teams** [3] - 83:1

**tens** [1] - 29:22
**tension** [1] - 6:22
**term** [1] - 95:12
**terminology** [1] - 49:9
**terms** [7] - 33:9, 34:11, 36:10, 41:21, 44:20, 54:25, 98:9
**test** [2] - 7:18, 15:14
**testify** [1] - 12:24
**testimony** [2] - 13:3, 66:2
**Texas** [1] - 13:17
**THE** [143] - 1:4, 1:5, 1:24, 3:3, 3:7, 4:7, 4:8, 4:9, 4:16, 5:11, 5:13, 7:19, 7:21, 7:24, 8:1, 8:18, 8:21, 8:24, 9:12, 9:14, 9:19, 9:23, 10:1, 10:4, 10:7, 16:19, 16:22, 17:1, 17:3, 17:25, 18:3, 18:5, 18:9, 18:15, 18:22, 19:16, 19:19, 21:8, 21:10, 23:4, 23:15, 23:24, 24:19, 24:23, 24:25, 27:24, 28:15, 28:19, 33:6, 33:15, 33:19, 37:21, 38:3, 38:11, 38:14, 38:19, 38:22, 40:11, 40:13, 40:16, 41:2, 41:12, 41:20, 42:7, 42:13, 42:22, 43:1, 43:3, 43:19, 44:1, 44:4, 44:17, 45:9, 45:12, 45:18, 46:3, 46:12, 47:1, 47:6, 47:17, 47:24, 49:5, 49:22, 50:2, 50:13, 50:25, 51:3, 51:19, 52:24, 53:5, 55:4, 55:10, 55:16, 55:22, 56:2, 56:7, 56:10, 56:13, 56:17, 56:19, 57:5, 57:23, 58:13, 58:16, 60:1, 60:17, 61:3, 61:5, 65:5, 65:10, 68:7, 68:9, 69:19, 69:22, 70:12, 70:24, 72:12, 75:5, 75:12, 75:23, 80:22, 81:3, 82:14, 84:21, 87:17, 87:19, 91:8, 91:18, 91:21, 94:11, 98:16, 98:21, 98:24, 99:7, 99:21, 100:6, 100:19, 100:21, 100:25, 101:4, 101:7, 101:13,

101:16
**theirs** [1] - 85:18
**themselves** [3] - 19:8, 47:12, 86:3
**thereabouts** [1] - 42:17
**thereafter** [2] - 95:7, 97:1
**therefore** [1] - 93:22
**they've** [5] - 25:17, 25:19, 73:23, 76:25, 77:6
**thinking** [2] - 40:20, 40:22
**third** [6] - 20:6, 29:8, 30:18, 52:12, 67:10, 83:25
**thousand** [5] - 39:7, 56:23, 78:21, 88:4, 95:14
**thousands** [6] - 29:22, 36:20, 36:21, 39:12
**three** [7] - 17:6, 28:21, 28:23, 45:19, 58:4, 66:13, 81:20, 81:24
**threshold** [1] - 73:13
**throughout** [2] - 17:19, 20:15
**thrown** [1] - 96:14
**Tim** [1] - 83:2
**timeframe** [3] - 44:8, 69:15, 71:19
**timely** [1] - 94:14
**timing** [3] - 20:24, 28:3, 28:6
**tire** [1] - 72:11
**TO** [1] - 4:4
**today** [15] - 6:22, 8:10, 8:13, 23:22, 28:3, 28:20, 49:22, 52:23, 62:19, 64:4, 90:14, 96:15, 97:6, 97:17, 98:5
**together** [5] - 14:24, 37:3, 40:8, 65:6, 70:14
**took** [3] - 63:7, 77:3, 88:2
**tort** [2] - 61:23, 85:5
**total** [18] - 25:11, 25:14, 25:20, 26:2, 26:4, 30:14, 43:15, 43:20, 44:11, 44:13, 48:10, 48:11, 49:18, 67:17, 71:21, 77:22, 80:9, 88:2
**totally** [1] - 8:4
**touch** [1] - 29:9
**touting** [1] - 68:4
**transcript** [1] - 102:8

**TRANSCRIPT** [2] - 1:23, 3:14
**transient** [1] - 64:14
**Transport** [1] - 76:5
**trash** [1] - 61:18
**Travis** [3] - 55:23, 80:4, 82:10
**treat** [1] - 31:9
**trial** [4] - 6:1, 24:3, 43:5, 77:10
**trick** [1] - 77:5
**tried** [4] - 36:22, 73:23, 74:6
**trivial** [2] - 29:6, 33:25
**troubled** [1] - 15:24
**true** [9] - 32:8, 37:12, 45:13, 58:22, 59:3, 60:9, 77:1, 83:19, 102:8
**truly** [1] - 74:16
**try** [5] - 56:14, 56:25, 66:3, 69:5, 69:10, 98:21
**trying** [11] - 27:7, 39:20, 40:3, 43:10, 44:20, 46:13, 56:19, 65:6, 66:25, 87:4, 87:5
**Turner** [2] - 74:2, 74:18
**Turners** [1] - 75:18
**two** [26] - 9:6, 9:21, 9:24, 10:3, 10:13, 10:15, 12:5, 13:12, 13:13, 20:8, 22:11, 31:6, 34:1, 45:19, 52:7, 62:11, 62:13, 68:25, 71:9, 71:11, 71:15, 71:17, 76:24, 84:18, 100:5
**type** [5] - 43:11, 70:16, 91:10, 97:15, 100:3
**types** [3] - 65:11, 95:17, 95:20

**U**

**U.S** [3] - 5:24, 6:2, 9:7
**ultimate** [4] - 24:13, 51:16, 67:12, 97:16
**ultimately** [8] - 32:19, 36:11, 53:16, 60:12, 68:17, 68:23, 92:2, 95:8
**unable** [1] - 96:1
**unaware** [1] - 11:4
**uncertain** [1] - 17:18
**unchallenged** [2] - 12:17, 16:18

**uncovered** [1] - 72:19
**under** [39] - 16:7, 18:10, 20:10, 23:3, 24:1, 24:3, 25:3, 31:11, 31:14, 39:11, 44:3, 48:15, 48:16, 53:19, 53:25, 65:1, 67:18, 70:7, 70:8, 73:6, 73:19, 73:24, 75:9, 76:3, 76:16, 76:17, 76:18, 79:19, 81:21, 88:14, 89:15, 90:9, 90:12, 90:20, 94:13, 94:17, 98:19, 99:6
**underlined** [1] - 64:1
**underlying** [1] - 74:25
**undertaken** [2] - 59:5, 94:3
**underway** [1] - 16:5
**undocumented** [2] - 39:25, 95:24
**undoubtedly** [1] - 34:8
**unfolded** [1] - 74:10
**unfortunate** [1] - 74:4
**unique** [1] - 24:6
**UNITED** [2] - 1:1, 1:25
**United** [3] - 100:13, 102:6, 102:17
**universal** [1] - 76:5
**unless** [5] - 5:5, 27:5, 33:12, 94:9, 99:18
**unlikely** [1] - 98:22
**unrebutted** [1] - 31:23
**unsealing** [1] - 101:6
**unusual** [2] - 24:5, 24:6
**up** [47] - 5:6, 19:1, 26:1, 27:17, 28:12, 37:3, 42:16, 43:5, 45:22, 45:25, 51:20, 51:25, 55:24, 56:15, 65:14, 65:17, 67:2, 67:7, 67:19, 67:25, 70:9, 70:12, 71:1, 71:4, 71:21, 75:11, 75:16, 76:17, 79:5, 79:10, 79:14, 79:22, 80:25, 81:19, 82:18, 83:3, 83:6, 83:8, 83:9, 83:12, 84:5, 86:4, 86:6, 86:15, 86:18, 88:3, 95:22
**update** [1] - 8:13
**upshot** [1] - 74:5
**urge** [1] - 60:15
**URQUHART** [1] - 2:17
**usual** [1] - 7:5
**utilized** [1] - 13:5

**V**

**valid** [1] - 39:8
**validity** [1] - 57:18
**valuation** [5] - 38:7, 38:18, 40:23, 48:10, 48:11
**valuations** [2] - 47:5, 89:6
**value** [35] - 34:12, 35:2, 37:3, 37:5, 37:7, 38:8, 39:5, 39:20, 40:6, 40:11, 40:13, 40:14, 41:9, 41:16, 44:20, 46:14, 46:16, 48:11, 65:3, 65:17, 65:20, 65:23, 66:1, 72:1, 78:9, 88:20, 88:23, 89:10, 95:18, 95:23, 96:4, 96:12, 96:16, 96:23, 97:5
**valued** [3] - 42:1, 47:3, 65:19
**valuing** [3] - 36:11, 40:4, 91:9
**vaporized** [1] - 68:5
**various** [2] - 30:13, 41:6
**vast** [1] - 39:23
**vehicle** [1] - 80:18
**vel** [1] - 13:11
**veracity** [1] - 59:23
**verification** [4] - 90:25, 91:5, 91:15, 96:2
**verified** [1] - 93:5
**verify** [1] - 84:13
**versus** [3] - 4:12, 4:15, 4:20
**vessel** [1] - 78:6
**vessels** [1] - 95:25
**vet** [2] - 56:24, 56:25
**victim** [2] - 11:24, 11:25
**Vietnamese** [1] - 83:7
**view** [2] - 33:6, 46:14
**viewed** [1] - 67:11
**violence** [2] - 6:20, 7:9
**virtually** [3] - 21:20, 35:13, 83:17
**visibility** [2] - 27:21, 27:22
**vote** [1] - 80:16
**voting** [1] - 80:16

**W**

**wage** [1] - 95:25
**wagging** [2] - 96:21, 96:22
**wait** [2] - 40:16
**wants** [1] - 33:5
**warrant** [1] - 21:17
**warranted** [2] - 7:14, 15:21
**warrants** [3] - 8:18, 8:19, 21:24
**WARSHAUER** [1] - 2:21
**WASHINGTON** [1] - 2:14
**Waste** [1] - 16:9
**WATTS** [2] - 1:21, 2:21
**Watts** [119] - 4:15, 4:20, 5:2, 5:6, 5:15, 5:16, 8:3, 9:5, 12:13, 12:21, 12:23, 13:3, 14:16, 14:24, 17:5, 20:9, 21:22, 22:2, 22:8, 23:2, 24:3, 29:1, 29:24, 30:8, 31:9, 31:14, 31:20, 32:2, 32:6, 32:25, 33:22, 34:22, 35:10, 35:12, 35:16, 35:18, 35:23, 36:1, 36:3, 36:6, 37:6, 38:8, 39:7, 40:23, 42:5, 42:10, 45:23, 45:24, 45:25, 46:15, 48:1, 48:9, 48:14, 49:14, 49:20, 49:23, 50:8, 50:19, 50:24, 51:21, 52:11, 53:7, 53:15, 54:1, 54:11, 54:14, 55:11, 56:3, 56:23, 57:23, 58:10, 59:14, 60:17, 60:18, 60:23, 64:5, 64:12, 64:19, 64:21, 68:10, 69:17, 70:4, 70:15, 77:1, 77:18, 77:21, 77:25, 78:10, 78:22, 79:14, 79:16, 83:4, 83:8, 83:9, 83:22, 84:10, 84:22, 85:15, 85:23, 86:2, 86:8, 88:24, 89:23, 92:8, 92:13, 92:18, 93:9, 93:15, 93:19, 94:6, 95:9, 95:14, 95:21, 96:10, 96:19, 97:5
**Watts'** [22] - 8:6, 8:16,

12:10, 21:13, 22:16, 24:4, 30:23, 30:25, 37:24, 39:21, 55:4, 55:5, 55:9, 60:4, 64:10, 66:10, 69:23, 83:15, 84:17, 85:21, 92:11, 93:11
**ways** [4] - 34:1, 40:21, 53:15, 68:25
**WEDNESDAY** [4] - 1:7, 1:13, 1:19, 4:3
**week** [2] - 62:12, 101:8
**weigh** [6] - 20:12, 22:13, 97:23, 98:1, 98:20, 99:16
**weighs** [2] - 12:6, 16:8
**well-regarded** [1] - 59:24
**Wendy** [2] - 62:2, 62:23
**Westlaw** [1] - 10:25
**WHEREUPON** [1] - 101:17
**whole** [2] - 38:9, 67:4
**wholesale** [1] - 59:18
**wholly** [1] - 55:1
**Wildlife** [1] - 100:16
**Wilkinson** [2] - 6:9, 6:14
**Williams** [1] - 5:12
**WILLIAMS** [1] - 2:12
**willing** [1] - 80:5
**window** [1] - 34:19
**wire** [1] - 62:21
**withheld** [1] - 90:20
**woman** [1] - 83:12
**wonder** [1] - 63:20
**wondered** [2] - 63:2, 63:16
**wondering** [1] - 57:16
**word** [8] - 64:1, 68:3, 68:6, 74:16, 75:16, 76:10, 91:5
**words** [3] - 40:3, 42:22, 89:2
**worker** [1] - 63:24
**workers** [2] - 64:14, 72:11
**Workers** [1] - 64:25
**works** [1] - 87:11
**world** [1] - 52:13
**worldwide** [1] - 86:17
**worry** [2] - 83:14, 84:4
**worth** [3] - 34:22, 86:21
**wrapped** [1] - 45:25
**written** [1] - 39:16
**wrote** [1] - 68:2

**X**

**X-Ray** [1] - 10:24

**Y**

**year** [12] - 8:23, 8:24, 9:3, 9:8, 9:10, 12:10, 15:14, 56:20, 61:19, 74:9, 75:10, 75:13
**years** [7] - 5:18, 6:7, 17:18, 61:12, 74:9, 75:17, 87:3
**yesterday** [4] - 62:1, 62:20, 63:19, 86:15
**York** [11] - 53:9, 54:14, 54:15, 54:16, 54:23, 55:2, 59:12, 79:16, 83:2, 85:18, 86:5
**yourself** [1] - 64:18
**Yscloskey** [1] - 86:20