# Exhibit 5

To United States' Opposition to BPXP's Motion in Limine to Exclude (1)
Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents



JANUARY 2007

# THE REPORT OF
## THE BP U.S. REFINERIES INDEPENDENT SAFETY REVIEW PANEL



Suttles

EXHIBIT NO.

2430

**TREX-02430**

BP-HZN-2179MDL01022710



*The Panel's charter directs it to make a thorough, independent, and credible assessment of the effectiveness of BP's corporate oversight of safety management systems at its five U.S. refineries and its corporate safety culture. The charter further directs the Panel to produce a report examining and recommending needed improvements to BP's corporate safety oversight, corporate safety culture, and corporate and site safety management systems.*

# EXECUTIVE SUMMARY

## Background of the Panel's Review

On March 23, 2005, the BP Texas City refinery experienced one of the most serious U.S. workplace disasters of the past two decades, resulting in 15 deaths, more than 170 injuries, and significant economic losses. The U.S. Chemical Safety and Hazard Investigation Board (CSB), an independent federal agency charged with investigating industrial chemical accidents, promptly began an accident investigation that is ongoing.

On August 17, 2005, the CSB issued an urgent safety recommendation to the BP Global Executive Board of Directors that it commission an independent panel to assess and report on the effectiveness of BP North America's corporate oversight of safety management systems at its refineries and its corporate safety culture. In making its urgent recommendation, the CSB noted that the BP Texas City refinery had experienced two other fatal safety incidents in 2004, a major process-related hydrogen fire on July 28, 2005, and another serious incident on August 10, 2005. Based on these incidents and the results of the first few months of its preliminary investigation, the CSB cited serious concerns about:

- the effectiveness of the safety management system at the BP Texas City refinery,
- the effectiveness of BP North America's corporate safety oversight of its refining facilities, and
- a corporate safety culture that may have tolerated serious and longstanding deviations from good safety practice.

BP embraced the urgent recommendation of the CSB to form an independent panel. In a press release issued on August 17, 2005, the company noted that the Texas City explosion was the worst tragedy in BP's recent history and that it would "do everything possible to ensure nothing like it happens again." The company also said it would act promptly to deal with the independent panel's recommendations.

On October 24, 2005, BP announced the formation of the BP U.S. Refineries Independent Safety Review Panel. Former Secretary of State James A. Baker, III chairs the Panel, which includes the following additional members:

- Retired Admiral Frank L. "Skip" Bowman, President and Chief Executive Officer of the Nuclear Energy Institute;
- Glenn Erwin, who monitors refinery safety nationwide for the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union;
- Slade Gorton, former U.S. Senator from Washington State and member of the 9/11 Commission;

BP-HZN-2179MDL01022719

*Effectiveness of BP's corporate process safety management system.* BP has an aspirational goal and expectation of "no accidents, no harm to people, and no damage to the environment," and is developing programs and practices aimed at addressing process risks. These programs and practices include the development of new standards, engineering technical practices, and other internal guidance, as well as the dedication of substantial resources. Despite these positive changes, the Panel's examination indicates that BP's corporate process safety management system does not effectively translate corporate expectations into measurable criteria for management of process risk or define the appropriate role of qualitative and quantitative risk management criteria.

The findings above, together with other information that the Panel obtained during its examination, lead the Panel to conclude that material deficiencies in process safety performance exist at BP's five U.S. refineries. Some of these deficiencies are common among multiple refineries, and some of the deficiencies appear to relate to legacy systems in effect prior to BP's acquisition of the refineries.

BP appears to have established a relatively effective personal safety management system by embedding personal safety aspirations and expectations within the U.S. refining workforce. However, BP has not effectively implemented its corporate-level aspirational guidelines and expectations relating to process risk. Therefore, the Panel found that BP has not implemented an integrated, comprehensive, and effective process safety management system for its five U.S. refineries.

*Panel observations relating to process safety management practices.* The Panel observed several positive notable practices or, in the case of BP's process safety minimum expectation program, an excellent process safety management practice. The notable practices relate to creation of an engineering authority at each refinery and several other refinery-specific programs that are described in more detail in Section VI.8.

## Performance Evaluation, Corrective Action, and Corporate Oversight

Maintaining and improving a process safety management system requires the periodic evaluation of performance and the correction of identified deficiencies. As discussed more fully in Section VI.C, significant deficiencies existed in BP's site and corporate systems for measuring process safety performance, investigating incidents and near misses, auditing system performance, addressing previously identified process safety-related action items, and ensuring sufficient management and board oversight. Many of the process safety deficiencies are not new but were identifiable to BP based upon lessons from previous process safety incidents, including process incidents that occurred at BP's facility in Grangemouth, Scotland in 2000.

*Measuring process safety performance.* BP primarily used injury rates to measure process safety performance at its U.S. refineries before the Texas City accident. Although BP was not alone in this practice, BP's reliance on injury rates significantly hindered its perception of process risk. BP tracked some metrics relevant to process safety at its U.S. refineries. Apparently, however, BP did not understand or accept what this data indicated about the risk of a major accident or the overall performance of its process safety management systems. As a result, BP's corporate safety management system for its U.S. refineries does not effectively measure and monitor process safety performance.

The process safety performance metrics that BP uses are evolving. BP now monitors at the corporate level several leading and lagging process safety metrics. BP also is working with external experts to review process safety performance indicators across the company and the industry.

*Incident and near miss investigations.* BP acknowledges the importance of incident and near miss investigations, and it employs multiple methods at different levels of the organization to distribute information regarding incidents and lessons learned. Although BP is improving aspects of its incident and near miss investigation process, BP has not instituted effective root cause analysis procedures to identify systemic causal factors that may contribute to future accidents. When true root or system causes are not identified, corrective actions may address immediate or superficial causes, but not likely the true root causes. The Panel also believes that BP has an incomplete picture of process safety performance at its U.S. refineries because BP's process safety management system likely results in underreporting of incidents and near misses.

BP-HZN-2179MDL01022725

*Process safety audits.* The Panel found that BP has not implemented an effective process safety audit system for its U.S. refineries based on the Panel's concerns about auditor qualifications, audit scope, reliance on internal auditors, and the limited review of audit findings.

The Panel also is concerned that the principal focus of the audits was on compliance and verifying that required management systems were in place to satisfy legal requirements. It does not appear, however, that BP used the audits to ensure that the management systems were delivering the desired safety performance or to assess a site's performance against industry best practices. BP is in the process of changing how it conducts audits of safety and operations management systems, including process safety audits.

*Timely correction of identified process safety deficiencies.* BP expends significant efforts to identify deficiencies and to correct many identified deficiencies, which BP often does promptly. BP, however, has sometimes failed to address promptly and track to completion process safety deficiencies identified during hazard assessments, audits, inspections, and incident investigations. The Panel's review, for example, found repeat audit findings at BP's U.S. refineries, suggesting that true root causes were not being identified and corrected. This problem was especially apparent with overdue mechanical integrity inspection and testing. Although BP regularly conducts various assessments, reviews, and audits within the company, the follow through after these reviews has fallen short repeatedly. This failure to follow through compromises the effectiveness of even the best audit program or incident investigation.

In addition, BP does not take full advantage of opportunities to improve process operations at its U.S. refineries and its process safety management systems. BP does not effectively use the results of its operating experiences, process hazard analyses, audits, near misses, or accident investigations to improve process operations and process safety management systems.

*Corporate oversight.* BP acknowledges the importance of ensuring that the company-wide safety management system functions as intended. The company's system for assuring process safety performance uses a bottom-up reporting system that originates with each business unit such as a refinery. As information is reported up, however, data is aggregated. By the time information is formally reported at the Refining and Marketing segment level, for example, refinery-specific performance data is no longer presented separately.

The Panel's examination indicates that BP's executive management either did not receive refinery-specific information that suggested process safety deficiencies at some of the U.S. refineries or did not effectively respond to the information that it did receive. According to annual reports on health, safety, security, and environmental assurance that BP management provided to the Environment and Ethics Assurance Committee of BP's Board of Directors for 1999 through 2005, management was monitoring process safety matters, including plant and operational integrity issues. The reports identify safety and integrity management risks that various levels of the organization confronted and describe management actions proposed to address and mitigate those risks. From 2001 to 2003, for example, BP developed and implemented standards for process safety and major accident risk assessments and increased monitoring and reporting of action item closure, sharing of lessons learned, overdue planned inspections, and losses of containment. The reports and other documents that the Panel examined indicate, however, that issues persisted relating to assurance of effective implementation of BP's policies and expectations relating to safety and integrity management.

For these reasons, the Panel believes that BP's process safety management system was not effective in evaluating whether the steps that BP took were actually improving the company's process safety performance. The Panel found that neither BP's executive management nor its refining line management has ensured the implementation of an integrated, comprehensive, and effective process safety system.

BP's Board of Directors has been monitoring process safety performance of BP's operations based on information that BP's corporate management presented to it. A substantial gulf appears to have existed, however, between the actual performance of BP's process safety management systems and the company's perception of that performance. Although BP's executive and refining line management was responsible for ensuring the implementation of an integrated, comprehensive, and effective process safety management system, BP's Board has not ensured, as a best practice, that management did so. In reviewing the conduct of the Board, the Panel is guided by its chartered purpose to examine and recommend any needed improvements. In the Panel's judgment, this purpose does not call for an examination of legal compliance, but calls for excellence. It is in this context and in the context of best practices that the Panel believes that BP's Board can and should do more to improve its oversight of process safety at BP's five U.S. refineries.

BP-HZN-2179MDL01022726

# III. OVERVIEW OF PROCESS SAFETY, PERSONAL SAFETY, AND CORPORATE SAFETY CULTURE

Under its charter, the Panel is charged to examine and to recommend any needed improvements to the corporate safety culture within BP's U.S. refineries, including the degree to which

- corporate officials exercise appropriate leadership to promote adherence to safety management systems;
- process safety is effectively incorporated into management decision-making at all levels;
- employees at all levels are empowered to promote improved process safety; and
- process safety programs receive adequate resources and are appropriately positioned within organizational structures.

As discussed in Section I, in its assessment the Panel has focused on *process* safety, rather than *personal* safety. The Panel believes that its charter and the CSB's August 2005 urgent recommendation require this focus. In order to understand the significance of the Panel's focus on process safety, rather than personal safety, the Panel elaborates in this section on some of the key distinctions between the two concepts.

## A. Comparison of Process Safety and Personal Safety

**Types of risk.**   In the context of refining operations, "process safety" refers to the prevention and mitigation of unintentional releases of potentially dangerous materials or energy from the refining process.[1] Process safety management involves a particular type of risk management—identifying and controlling the hazards arising from refining processes, such as the prevention of leaks, spills, equipment malfunctions, over-pressures, excessive temperatures, corrosion, metal fatigue, and other similar conditions.[2] Process safety programs focus on, among other things, the design and engineering of facilities; hazard assessments; management of change; inspection, testing, and maintenance of equipment; effective alarms; effective process control; procedures; training of personnel; and human factors.[3]

Process safety management is critical in refining operations because process accidents can have catastrophic effects and result in multiple fatalities and substantial economic, property, and environmental damage. Process hazards at a refinery can give rise to accidents that affect both workers inside the refinery and members of the public who reside nearby.

Typically, process safety risks arise from complex systems with a large number of control measures referred to as hard or soft controls. Hard controls are physical elements within the facility, such as barriers, alarms, and improved system design. Soft controls are internal procedures and best practices, such as standards, operating procedures, training, administrative controls, supervisory oversight, and the experience and knowledge of frontline operators.[4] Generally speaking, process safety relates to the quantity, quality, and variety of controls or protective features that protect people, the environment, and property from process hazards.[5]

On the other hand, "personal safety," which is sometimes referred to as occupational safety, focuses on hazards that are more directly related to individual workers. Typically, personal safety programs address risks of various types of physical injuries, including slips, falls, struck-by incidents, physical strains, electrocution, and auto incidents. Such accidents are usually associated with a hazard that is close to workers. Protection against a personal safety hazard is both relatively simple and, for the most part, at least nominally under the control of the potentially affected worker. Personal safety protections or controls against these types of hazards tend to be fairly simple in nature and limited in number. For example, personal safety controls place a heavy emphasis on training individual workers to recognize hazards, installing personal protective guards on dangerous machinery, and providing personal protective equipment to workers.

The literature[6] suggests, and the Panel believes, that the underlying or "root" causes of the large majority of personal and process accidents are deficiencies in the systems that a facility uses to prevent these two classes of accidents. The literature also suggests, and the Panel believes, that the presence of an effective personal safety management system does not ensure the presence of an effective process safety management system. As discussed elsewhere in this report, BP's personal injury rates were not predictive of process safety performance at BP's five U.S. refineries.

BP-HZN-2179MDL01022754

# VI. FINDINGS

## A. Corporate Safety Culture

A positive safety culture is important for good process safety performance. Absent a healthy safety culture, even the best safety management systems will be largely ineffective in ensuring and sustaining excellent process safety performance. In 2003, the Conference Board studied best practices in corporate safety and health among major corporations, analyzing how leading companies develop safety cultures. While this study focused on management and management practices, the Conference Board's 2003 report indicates that one of the key themes emerging from the study

> was that management practices alone are not sufficient to achieve outstanding safety performance; *all* of a company's workers must be engaged and involved. Ultimately, achieving excellence is about empowering all workers—management, supervisors, employees, and even contractors—to make safety and health practices truly work.[1]

The report also provides that "[c]ompanies have found that if safety and health values are not consistently (and constantly) shared at all levels of management and among *all* employees, any gains that result from declaring safety and health excellence a 'priority' are likely to be short-lived."[2]

Through BP's investigation of the March 2005 Texas City accident, it appears to the Panel that BP has come to appreciate the importance of cultural factors in promoting good process safety performance.[3] It also appears that BP now understands that a positive safety culture is a critical driver of process safety performance.

The Panel makes five fundamental observations about BP's corporate safety culture with respect to BP's U.S. refineries. First, BP has not provided effective process safety leadership. BP has not adequately established process safety as a core value across all its five U.S. refineries. While BP has an aspirational goal of "no accidents, no harm to people," BP has not provided effective leadership in making certain its management and U.S. refining workforce understand what is expected of them regarding process safety performance. BP has emphasized personal safety in recent years and has achieved significant improvement in personal safety performance, but BP did not emphasize process safety. BP mistakenly interpreted improving personal injury rates as an indication of acceptable process safety performance at its U.S. refineries. BP's reliance on this data, combined with an inadequate process safety understanding, created a false sense of confidence that BP was properly addressing process safety risks. The Panel further found that process safety leadership appeared to have suffered as a result of high turnover of refinery plant managers.

Second, at some of its U.S. refineries BP has not established a positive, trusting, and open environment with effective lines of communication between management and the workforce, including employee representatives. Creating trust within the organization at all levels is key to establishing an environment in which safety critical information can be shared among the workforce and with management with confidence that the information will be used primarily for one purpose—to improve safety conditions and performance.

Third, BP has not always ensured that it identified and provided the resources required for strong process safety performance at its U.S. refineries, including both financial and human resources. Despite having numerous staff at different levels of the organization that support process safety, BP does not have a designated, high-ranking leader for process safety dedicated to its refining business. While the Panel did not develop or identify sufficient information to conclude whether BP ever intentionally withheld resources on any safety-related assets or projects for budgetary or cost reasons, the Panel believes that the company did not always ensure that adequate resources were effectively allocated to support or sustain a high level of process safety performance. In addition, BP's corporate management mandated numerous company-wide initiatives that apply to the U.S. refineries and that, while well intentioned, have overloaded personnel at BP's U.S. refineries. This "initiative overload" may have undermined process safety performance. In addition, operations and maintenance personnel in BP's five U.S. refineries sometimes work high rates of overtime, and this could impact their ability to perform their jobs safely and increase process safety risk.

BP-HZN-2179MDL01022792

The Panel's review indicates that experienced refinery workers are often reluctant to take supervisory positions, resulting in inexperienced supervisors. Consistent with the sentiment expressed during interviews, more than 20 percent of Whiting's maintenance/craft technicians, HSSE employees, and operators indicated their impression that sometimes there was insufficient staff in their work groups to perform their jobs safely. On the other hand, contractors' responses suggested that they were generally satisfied with the amount of staff in their work groups.

Many hourly workers interviewed at Texas City reported that understaffing had historically been a significant issue at that refinery, and many BP documents reflect this concern. Survey results demonstrate this perception, as reflected by 26 percent of employees in the nine process safety functional groups, as a whole, indicating that sometimes there was insufficient staff in their work groups to perform their jobs safely. For the six process safety functional groups highlighted throughout this report (i.e., operators, maintenance/craft technicians, HSSE employees, engineering professionals, operations management, and maintenance management), negative response rates ranged between 20 percent and 32 percent. On the other hand, contractors provided a low negative response rate of nine percent and a high positive response rate of 78 percent.

Many workers interviewed at Carson expressed concern about staffing at all levels of that refinery. Many management employees stated that their departments were understaffed, leaving them unable to keep up with the recent increase in paperwork, audits, and initiatives. Additionally, hourly employees interviewed said that their units were staffed adequately for normal operations but not for emergency procedures or upset conditions. Survey results provided a mixed message. Sixteen percent of employees in Carson's nine process safety functional groups indicated their belief that there was sometimes insufficient staff in their work groups to perform their jobs safely. Carson operators and maintenance/craft technicians provided the highest negative response rates of 21 percent and 20 percent, respectively. In contrast, contractors and employees in the other process safety functional groups tended to respond more positively.

Cherry Point's interviewees and survey respondents generally did not express concern about staffing problems at the refinery.

BP now appreciates the loss of its refining expertise and is taking meaningful steps to address it. The Refining Technology function, which once had as few as 35 people, currently has more than 150 and is still growing. BP is examining line management for its U.S. refineries to see where it needs strengthening, and many of the refineries are hiring at various levels, particularly operators and engineers.

## > U.S. refinery funding

Good process safety performance requires adequate resources, including funding for inspecting, testing, maintaining, and repairing or replacing equipment; resources for training and educating personnel; resources for keeping operating procedures up-to-date; and resources for implementing best or good industry practices. If a refinery is underresourced, maintenance may be deferred, inspections and testing may fall behind, old and obsolete equipment may not be replaced, and process risks will inevitably increase. The Panel does not believe that BP has always ensured that the resources required for strong process safety performance at its U.S. refineries were identified and provided.

The Texas City refinery illustrates this point. From 1992 to the 1998 merger with BP, Amoco consistently and significantly cut costs in the Texas City refinery.[23] Between 1992 and 1999, total maintenance spending fell 41 percent; from 1992 to 2000, total capital spending fell 84 percent.[24] Notwithstanding this sustained period of budget cutting, after the merger BP issued a company-wide challenge to each of the refineries to cut their budgets an additional 25 percent without jeopardizing the integrity of the facility. According to at least one senior manager, progress toward meeting that challenge to cut costs 25 percent became a milestone in each refinery plant manager's performance contract. Pursuant to that corporate challenge, Texas City continued to cut costs,[25] and some data indicate the refinery came close to meeting the 25 percent target.

BP-HZN-2179MDL01022815

In 2002, BP commissioned a report by A.T. Kearney to understand, among other things, "the historical facts which have led to the deterioration of the Texas City refinery performance."[25] The report noted the funding trends discussed above and connected the significant reductions in refinery spending with the corresponding deterioration in the refinery's integrity and reliability:[27]

- In the last ten years, maintenance budget allocation has been controlled essentially by a "top down" allocation of funds.[28]
- Budget cuts were imposed based on the previous year's spend, and did not take into account the specific needs of the refinery.[29]
- Prior to 2002, the refinery did not carry out a thorough, "bottom up" analysis of maintenance needs or challenge the budget allocation process.[30]
- Evidence from annual performance reports suggested that cost cutting was not carried out as a structured, managed, and measured process.[31]
- There was no application of best practice in order to reach the budget reductions without reducing the level of maintenance work.[32]

In October 2002, refining corporate management requested that from a budgetary perspective, Texas City "enter 'crisis mode.' . . . [while] not compromis[ing] the safety and environmental performance of our units."

Although BP began to increase funding for the U.S. refineries in 2002, and between 2002 and 2006 the budgets for the U.S. refineries increased every year, BP nonetheless continued to issue budgetary challenges. For example, in late 2004 BP issued a 25 percent regional capital budget challenge for the five U.S. refineries for 2005 seeking to reduce capital spending. Numerous interviews and documents reflect that Texas City continued to feel considerable budget pressure, and some at the refinery were critical of the refinery's senior leadership for not pushing harder for larger budgets.

Despite BP's increased funding for its U.S. refineries from 2002 onward, the Panel's impression is that BP did not act with sufficient urgency to make up for what had been many years of insufficient funding, and as a result, at least some of the refineries continued to be underinvested. The Panel does not mean to suggest that BP deliberately underinvested in the refineries and notes that it does not have sufficient data to quantify such an assessment. Moreover, during the course of the review, the Panel did not develop or identify sufficient information to conclude whether BP ever intentionally withheld resources on any safety-related assets or projects for budgetary or cost reasons. The Panel believes, however, that the company did not always ensure that adequate resources were effectively allocated to support or sustain a high level of process safety performance.

It is not clear to the Panel why the U.S. refineries did not receive greater funding. The Panel did not have access to specific refinery budget requests and allocations or other detailed documentation. As a result, the Panel could not attempt to ascertain whether and the extent to which refinery requests for funding that arguably impact process safety were reduced or rejected. As part of its business plan, each refinery requests capital for three different purposes: (1) license-to-operate (funding needed to be in legal compliance and otherwise remain open to operate); (2) sustainability (capital needed to maintain long-term operations); and (3) commercial (money for new opportunities, expansions, and so forth).

The Panel understands that BP examines each "bucket" differently: license-to-operate requests receive little push back; sustainability requests get reviewed by technical experts; and commercial requests are considered last and receive the heaviest scrutiny. According to various BP personnel, license-to-operate and sustainability requests typically receive full allocations, with the vast majority of the annual fluctuations in refinery spending falling on commercial requests. While BP does not have a "safety" component per se in its refinery budgets, the Group Vice President—Refining informed the Panel that he had not encountered a situation in which BP failed to provide a refinery with the necessary resources to address a known safety problem. Because that same executive also acknowledged to the Panel—as did some other members of BP management—that some of the U.S. refineries were underinvested in prior years, the question of "why" is raised. Did the refinery plant managers and their staff fail to see the need to spend more? Were they paring back on the amounts requested because they believed this was what their superiors wanted to see? Did they believe that they were more likely to be rewarded for meeting aggressive cost-cutting goals? The Panel was unable to answer these questions because of the BP "three bucket" budgeting approach, which makes it difficult to identify safety-

BP-HZN-2179MDL01022816

## INCORPORATION OF PROCESS SAFETY INTO MANAGEMENT DECISION-MAKING

In addition to a lack of a high-ranking process safety leader who can ensure that process safety is sufficiently considered in management decision-making, the Panel detected several issues with BP's approach to incorporating process safety into management decision-making. In the implementation of its business plans, BP establishes various goals and metrics for performance, including financial performance, operating performance, environmental performance, and personal safety performance. In this process, as discussed in Section IV and elsewhere in this report, BP relies to a large degree on its performance contract system to drive conduct in a manner consistent with its corporate goals. To a large degree, the BP system focuses on measurement and monitoring of performance results against these corporate objectives, established at the corporate level and cascaded through the BP organization using performance contracts. These performance contracts establish goals and metrics, and management at different levels of the organization monitors performance against the metrics to provide assurance that corporate objectives are being accomplished. The system also uses many goals and metrics, including financial results and production, that are capable of measurement and feedback in the short-term. For Refining, other metrics used include availability of refineries for operation and personal injury rates. The performance system has a decidedly short-term emphasis, with performance contracts typically focused on annual metrics and goals.

Without commenting specifically on the use of performance contracts, the Panel believes that this general approach of establishing performance metrics and targets to accomplish corporate objectives, including the use of annual metrics, is not unusual. The Panel believes, however, that process safety considerations, many of which have implications that extend well beyond one year, have not been considered adequately in BP's management decision-making process and the implementation system used to drive conduct, at least in the U.S. refining operations. Many decisions relating to process safety involve costs and benefits that are both long term in nature and sometimes difficult to measure. In making these decisions, how should management measure the benefits of expenditures intended to improve process safety performance, such as expenditures for training or additional testing of equipment? The costs, in terms of present dollars to be spent, can be determined or estimated with relative certainty; the benefits, in terms of an incremental reduction of process risk (*i.e.*, incremental reduction of likelihood of occurrence of a process incident), perhaps occurring over an indeterminate period, can often be very difficult to estimate. The benefit of some of these types of expenditures may not be known or realized for many years.

In addition, while BP promulgates broad, aspirational goals, it delegates substantial discretion to refinery plant managers without clearly defining process safety expectations or responsibilities. BP's framework lacks meaningful checks and balances, and while accountability is a core concept in BP's Management Framework for driving desired behavior, BP has not demonstrated that it has effectively held those with refinery line accountability responsible for process safety performance at its U.S. refineries.

### > Short-term focus

The Panel observes that BP directs a great deal of attention to short-term performance that is capable of quick measurement, analysis, and feedback (*e.g.*, profitability, production, environmental performance, and injury rates). BP provides clear expectations for performance in these areas, and can promptly ascertain how various decisions and events impact BP's performance. This focus is reflected in BP's reliance on performance contracts, which are the primary consideration in determining annual bonuses. The metrics and milestones contained in performance contracts have historically focused on short-term performance in areas such as profitability, production, environmental, and injury rates, all of which are measured in a relatively short (one year) period.

Assessments of process safety performance and capabilities, however, require metrics that differ from those used to assess performance in other areas and a management system that can measure performance against those metrics. The fact that a facility has not had a significant process safety incident for some time may say little about the true state of process safety at that site or the potential for a major process incident. Decisions and events impacting process safety or human capability may not have a discernible impact for many years. For example, a

BP-HZN-2179MDL01022823

decision to reduce spending on inspections, testing, or maintenance may have no apparent negative impact on process safety performance for a lengthy period. By the same token, increasing spending on inspections, testing, or maintenance may not lead to an ascertainable improvement in process safety performance in the short-term, as the lead times between the decision and the noticeable effect can be substantial. These long-term concepts such as process safety performance and human capabilities appear to be less well tracked, understood, and managed by BP's systems. BP management historically has neither particularly emphasized these items nor driven their results.

This observation finds a parallel in BP's own lessons from the Grangemouth incidents in 2000. Following the Grangemouth incidents, BP mobilized a task force to undertake a review of all operating units and functions at that refinery. One of the task force's findings was that BP was too focused on short-term cost reduction, and not focused enough on longer-term investment for the future. The task force also found that BP reinforced the short-term cost reduction focus through performance contract metrics, and the task force concluded that "HSSE was unofficially sacrificed to cost reductions, and cost pressures inhibited staff from asking the right questions; eventually staff stopped asking." It appears to the Panel that this problem also applied to the U.S. refineries.

## > Process safety expectations, responsibilities, and accountabilities

BP's Management Framework is based upon delegation and accountability through a chain of command that has numerous links. Through delegation, BP attempts to ensure that the most appropriate person is responsible for meeting expectations; through accountability, it attempts to ensure that each person in the chain of command has an interest in making certain that the responsible delegate performs the task.

In the broadest sense, BP's Board of Directors is accountable for ensuring process safety because it is ultimately accountable to BP's owners, the shareholders. BP's Board of Directors itself does not manage; instead, it delegates responsibility for all of BP's operations, including process safety in the U.S. refineries, to the Group Chief Executive. The Group Chief Executive himself does not manage BP's operations. While remaining accountable to the Board, he delegates responsibility to the Chief Executive, Refining and Marketing for all aspects of the refining business's performance. This series of delegations and commensurate accountability continues through two more levels until responsibility rests with the refinery plant managers. At each refinery, the plant manager is directly responsible for managing safety in the refinery and all management in the refining line above the plant manager remain accountable. The refinery plant manager then cascades responsibility down throughout the refinery while remaining accountable. The overarching principle is that responsibility is delegated downward until it reaches the most appropriate person. Each person in the chain of command continues to be accountable, but the person closest to the task is responsible for ensuring that expectations are met.

In theory, this framework appears to be logical and coherent. In practice, however, the Panel perceives four problems. First, BP has often been unclear about specific accountabilities and responsibilities, creating confusion and situations in which no one appears to have responsibility for decisions impacting process safety. Second, the BP framework relies on a chain of individual-to-individual interfaces with few independent checks or reviews so that any single dysfunctional relationship can create a break in the process safety system management chain. Third, BP has not provided clear process safety performance expectations to refinery line management, including refinery plant managers. Fourth, the Panel has seen little information suggesting that BP has held people accountable for process safety performance.

**Unclear responsibilities.** While BP appears to have been clear about the general concept of line accountability, it is apparent that responsibilities with respect to BP's refining organization have often been muddled. BP has a complex structure, and BP has frequently reorganized, created new positions, and shifted responsibilities between organizations. As a result, it has not always been clear with respect to process safety just who was responsible for what. Referring to Texas City, the Mogford Report observes:

> This large complex organization has many interfaces requiring clear accountabilities and good communication both
> horizontally and vertically throughout the organization. In reality, the Investigation Team found examples of a lack of

BP-HZN-2179MDL01022824

accountability, unclear roles and responsibilities, and poor communication with employees tending to work within silos. This, in turn, creates a confusion around some of the many interfaces.[35]

The Panel observed many instances of this lack of clarity. In the view of the Panel and within BP, the respective responsibilities and accountabilities of, and the inter-relationships among, the Safety and Operations function, the Group Technology function, and the Refining and Marketing HSSE and Technology organization (all of which are outside the refinery line organization) are not clear. At the refinery level, it is apparent that situations existed in which no one was clearly responsible for work that clearly impacts process safety (for example, the preparation of management of change analyses), and some refinery workers were uncertain how and where process safety management fit within the refinery's organization. While the BP Management Framework recognizes that accountabilities for process safety performance run with the line, BP must clarify the responsibilities of those in the line and of staff that supports the line to be successful in fostering good process safety performance.

**Absence of checks and reviews.**    At each link in the management chain, a BP manager or supervisor delegates responsibility to a person below, and the delegator satisfies his or her ongoing accountability by monitoring the delegatee's performance. BP's structure provides very few independent checks and reviews with respect to the functionality of this chain. As a practical matter, this framework depends heavily upon having healthy, productive relationships between the individuals at each and every link in this chain of command.

A problem can occur in this management framework if a breakdown in communication or understanding exists at any one of these interfaces. With respect to process safety, there are many potential reasons for such a breakdown, including

- the delegatee may not perceive a process hazard, the need to correct a process safety problem, or a process safety cultural weakness, and as a result, the delegator does not learn of the issue;
- the delegatee may believe that other goals, such as financial, production, or cost-cutting objectives, are more important to the delegator than process safety goals; and
- the delegator may not have sufficient understanding of the issues facing the delegatee, whether because of poor communication, lack of substantive knowledge, or otherwise.

Even a single dysfunctional relationship in the chain—whether between a supervisor and a superintendent, a refinery plant manager and the regional vice president, or the head of global refining and the Chief Executive, Refining and Marketing—can create a significant break in the management system for ensuring process safety performance.

**Lack of process safety expectations.**    Under BP's Management Framework, the refinery plant manager is accountable for all aspects of the refinery's operations with the exception of those encompassed by the centralized group functions, such as Tax and Accounting. While the refinery plant manager has many direct reports to whom accountabilities may be further delegated, BP regards the refinery plant manager as the person responsible for the refinery's financial, operational, environmental, and safety performance. While those in the line above the refinery remain accountable for all aspects of the refinery's performance, including safety, BP's management framework is clear that refinery corporate management satisfies its responsibility by monitoring performance, not by supervising the operations of the refineries.

BP recognizes that in this organizational framework, the refinery plant manager has a tremendous amount of discretion in running the business. Some people at BP refer to this as an "empowerment ethos."[36] As Browne has described, "we want them to be entrepreneurs, not bureaucrats doing exactly what they are told from above."[37]

On a day-to-day level, the refinery plant manager makes countless decisions relating to or affecting process safety. Particularly in the short-term, many of these decisions often involve balancing of various other refinery objectives and goals, such as production, profitability, cost reduction, and scheduling. While BP provides plant managers with reasonably clear guidance and direction with respect to financial,

BP-HZN-2179MDL01022825

**2004 Internal Audit.**   An internal audit report relating to 2004 but issued in August 2005 discussed noncompliance with BP's standards on health, safety, and environmental matters. Among other things, this report noted that

> [t]here have been senior management interventions, especially in the [Refining and Marketing] segment, to address this compliance issue leading to focus teams undertaking unannounced spot checks ("Monitoring Events") on assets to assess compliance in specific areas including control of work, driving safety and the 8 golden rules. The findings of the Monitoring Events have been directly communicated to the relevant Segment [Group Vice-President] but it is as yet unclear what sustained impact is achieved.

> Overall the issue identified in the 2003 summary paper does not appear to have materially improved during 2004 despite the increased attention by Senior Management. Whilst this is disappointing it is not unexpected due to the scale of the organisation and past experiences of attempts to fundamentally alter behavioural safety issues.

**Prior BP process safety management audits.**   BP's own process safety audits also indicate that BP was not ensuring timely compliance with various internal process safety standards and programs at its U.S. refineries. Set forth below for each of BP's U.S. refineries are examples of findings from those internal audit reports in the area of inspections, testing, and/or maintenance.

### Carson (2005)
- 134 pressure relief valves were past due inspection, which was a significant reduction since the 2002 compliance review.
- 46 pressure vessels were past due date for internal inspection, and 120 pressure vessels were past due for wall-thickness measurements.
- Out of a random sampling of ten turbines, only one had a record of being tested for overspeed trip.

### Cherry Point (2005)
- Critical alarms were not generally tested, except at the hydrocracker unit. While the review found that a plan existed to implement such a testing program over a period of up to five years, the audit team advised that it considered this could be accomplished sooner.
- Management statistics for steam turbine overspeed trip testing were not readily apparent. According to the compliance report, this information is produced on a regular basis for assurance at other BP refineries.

### Texas City (2004)
- There was below 100 percent compliance with testing of on stream and turnaround critical instruments, overspeed trips on rotating equipment, and relief valves, as well as with inspection of piping, pressure vessels, and storage tanks.
- Many procedures for testing of critical instruments and emergency shut-down systems were out of date and some were missing.
- Interval-based inspections and risk-based inspection tasks were not integrated into one inspection management system for execution and tracking.

### Toledo (2004)
- 54 pressure safety valves were overdue for testing.
- Inspections of ten relief valves were being postponed without documented technical justification or risk assessment.
- 77 items of preventive maintenance were overdue by six months or more.
- Original equipment manufacturer manuals for certain critical alarms could not be produced.

BP-HZN-2179MDL01022876

> **Inadequate process safety knowledge and competency is a theme common to other panel findings**

The Panel also believes that deficiencies relating to process risk knowledge and competence in BP's U.S. refining organization are likely contributing causal factors for other findings elsewhere in this report. For example,

- Instances of a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process safety risks existed at each of BP's U.S. refineries.
- BP has not adequately established process safety as a core value across its five U.S. refineries.
- BP mistakenly used improving personal safety performance (*i.e.*, personal injury rates) as an indication of acceptable process safety performance at its five U.S. refineries; BP's reliance on this data and inadequate process safety understanding created a false sense of confidence that it was properly addressing process safety risks at those refineries.
- BP's investigation system has not instituted effective root cause analysis procedures to identify systemic causal factors.
- BP's process safety management system likely results in under reporting of incidents and near misses at BP's U.S. refineries.

As discussed elsewhere in this report, the Panel believes that the effects of widespread deficiencies in process safety training and education have manifested themselves in a number of ways at BP's U.S. refineries.

> **Steps BP has taken to date**

In recognition of the need to better determine the qualifications and competencies required of its workforce, including its U.S. refining workforce, BP has established in its Safety and Operations functional group a new position titled Vice-President of Organization Capability. BP has advised that the responsibilities of this position include developing plans to identify the skills and capabilities that are required for different work groups within the BP organization, including the U.S. refineries; assessing the capabilities of the workforce; and addressing any gaps or deficiencies in skills and capabilities through, among other things, training and development programs. BP has also advised that

- its Safety and Operations functional group is developing Group-wide training programs for leaders, including first level leaders (supervisors), superintendents, and operators;
- the training programs being developed for leaders include new training protocols and standards on safety across the Group;
- Refining has instituted an operations superintendent training program;
- its human resources function is developing Group-wide training programs for all managers and supervisors; and
- its Safety and Operations functional group is developing a set of standardized principles and expectations for board operator training.

In addition, the Panel understands that BP has taken or has begun to take a number of actions at Texas City relating to training and skill development. For example, BP has advised that at Texas City, it has instituted leadership development and other training programs involving a projected 300,000 training hours per year and has implemented enhanced training programs for all employees, including orientation for new hires, start-up and distillation training, and education on safety and environmental compliance, operations, and operator competency. For a brief listing of measures that BP has undertaken or announced since March 2005, including measures relating to training, see "BP Post-Texas City Measures" in Appendix F.

BP-HZN-2179MDL01022898

## C. Performance Evaluation, Corrective Action, and Corporate Oversight

In order to maintain and improve the effectiveness of a complex management system, such as a process safety management system, management must periodically evaluate the system's performance and address any identified deficiencies or opportunities for improvement. Continual improvement, which the total quality management concept of Plan-Do-Check-Act contemplates, represents a fundamental objective of management systems generally and safety management systems specifically.[1] As noted in the ANSI Z10 standard, an organization should evaluate its system's performance "through monitoring, measurement, assessment, incident investigations, and audits."[2] Upon identifying deficiencies within the system, the organization should then take corrective actions.[3]

An organization also should establish and implement a process for management to review the overall effectiveness of its safety management systems and make needed improvements. In a complex organization with multiple levels of management and with safety management systems having a site-specific element, some level of oversight at the corporate level (*i.e.*, above the operating business units) is required to evaluate the overall effectiveness of the corporate management system. Such a corporate-level review should take place at least annually and culminate in any improvements necessary to ensure the continued suitability, adequacy, and effectiveness of the systems.[4] This corporate oversight of the overall performance of the management systems provides the primary means by which an organization's leaders can assure themselves that the system is functioning as intended and that the organization is achieving its established performance goals.

These evaluations represent an essential element of BP's Plan-Perform-Measure-and-Improve cycle, which in turn serves as a fundamental element of the continuous improvement contemplated by BP's health and safety management system.[5] In this part of the Panel's report, the Panel will review the extent to which BP has implemented this continuous improvement cycle, with a particular focus on the "Measure-and-Improve" portion of the cycle.

**BP's record.**   BP has a mixed record of evaluating process safety performance, taking corrective actions, and implementing an effective continual improvement cycle. The Panel's review indicates that significant deficiencies existed in BP's site and corporate systems for measuring, monitoring, and evaluating process safety performance; investigating prior incidents and near misses; auditing system performance and compliance with applicable standards; and addressing previously identified process safety-related action items in a timely and thorough manner. Based on these deficiencies, the Panel believes that BP has not effectively implemented the Measure-and-Improve elements of its own system for continuous improvement of process safety management.

In addition, the Panel observes that many of the process safety deficiencies it identified during its review are not new to BP. Many of these same deficiencies were identifiable to BP based upon lessons from previous process safety incidents, including three major process incidents that occurred at BP's petrochemical complex in Grangemouth, Scotland in 2000. As a government report investigating the Grangemouth incidents noted,

> [i]nadequate performance measurement and audit systems, poor root cause analysis of incidents, and incorrect assumptions about performance based on lost time accident frequencies (DAFWCF—days away from work case frequencies) and a lack of key performance indicators for loss of containment incidents meant that the company did not adequately measure the major accident hazard potential.[6]

The Grangemouth review also "suggested major weaknesses . . . in monitoring, audit[,] and review."[7]

The Panel considers the similarities between the "lessons" from Grangemouth and the Texas City incident to be striking: a lack of leadership and accountability,[8] insufficient awareness of process safety,[9] inadequate performance measurement,[10] a safety program too focused on personal safety,[11] and a failure to complete corrective actions.[12] Although the incidents occurred five years apart at different sites in different

BP-HZN-2179MDL01022916

valves, and other safety-related equipment. Organizations may use active monitoring requirements as leading indicators to provide feedback on performance before an accident or incident occurs.[21]

As the term implies, leading indicators attempt to measure variables that are believed to be indicators or precursors of future safety performance so that the desired safety outcome (*i.e.*, no incidents) can be achieved. While useful in predicting future process safety performance, leading indicators are not absolutely predictive. For example, the percentage of equipment that is past due for inspection can be considered a process safety leading indicator because the metric relates to the physical condition of the facility as well as the effectiveness of oversight systems. However, even if equipment inspections are current, equipment failures can still occur.

**Using both leading and lagging indicators.**   Effective measuring and evaluation systems utilize both leading and lagging indicators. The UK HSE recently proposed using a system of "dual assurance" with both leading and lagging indicators.[22] The UK HSE believes that employing both sets of indicators will provide assurances on the effectiveness of a site's risk control systems.[23] Trends in these indicators may provide advance notice of problems.

## > BP's measurement of safety performance

BP recognizes the importance of performance indicators for all aspects of its business operations, including operational (Solomon availability benchmarks), financial (gross margin), and safety performance (primarily personal safety metrics such as recordable injury frequency). Expectation 13.1 of gHSEr, which relates to Element 13: *Assessment, Assurance and Improvement*, creates the expectation that the company will establish and communicate safety-related performance indicators throughout the organization.[24]

**Reliance on injury rates.**   Interviews with BP corporate-level managers make clear that BP relied principally on injury rates to monitor process safety performance at the U.S. refineries before the Texas City accident. As shown in Table 54, the performance metrics in three key reports from different levels of the corporation—refining operations, the Refining and Marketing segment, and the BP Group—also demonstrate this focus on injury rates.

### Table 54

**Tracking Metrics Contained in Key BP Refining and Group-Level
Health, Safety, Security and Environmental Reports**

| 2005 Refining HSSE Performance Report | 2005 Refining and Marketing Segment HSSE Report | 2005 BP Annual HSSE Report for the Environment and Ethics Assurance Committee of the Board of Directors |
|---|---|---|
| • Fatalities<br>• Days Away From Work Case Frequency (DAFWCF)<br>• Recordable Injury Frequency<br>• Total Vehicle Accident Rate<br>• Oil Spills > One Barrel<br>• Energy Intensity Index<br>• Greenhouse Gas Emissions<br>• Real Sustainable Reductions | • Workforce Fatalities<br>• Third-Party Fatalities<br>• Third-Party Fatalities with Material Influence<br>• DAFWCF<br>• Recordable Injury Frequency<br>• Action-Item Closure<br>• Spills > One Barrel<br>• Severe Spills<br>• Total Vehicle Accident Rate<br>• Serious Vehicle Accident Rate<br>• Health Map Completion | • Fatalities<br>• DAFWCF<br>• Recordable Injury Frequency<br>• Uncontrolled Releases<br>• Greenhouse Gas Emissions<br>• HSSE Fines and Penalties |

BP-HZN-2179MDL01022918

> Previous concerns about measuring process safety performance

The investigation of three process incidents that occurred at BP's petrochemical complex in Grangemouth, Scotland in 2000 identified concerns with BP's reliance on personal safety metrics and lack of effective process safety leading indicators. As part of its investigation into these incidents, the UK HSE found that the "BP Group & Complex Management did not detect and intervene early enough on deteriorating performance[.]"[40] Specifically, the agency concluded that BP did not "adequately measure the major accident potential" because of "[i]nadequate performance measurement[,] . . . incorrect assumptions about performance based on lost time accident frequencies [(days away from work case frequencies),] and a lack of key performance indicators."[41]

In its dialogue with the UK HSE after the incident, BP acknowledged the importance of key performance indicators:

> One of the key learnings to come from the Grangemouth incidents is for the annual assurance process to take a closer look at the precursor indicators of potential major incidents at a location. The use of occupational safety indicators such as "Days Away From Work Case Frequency" (DAFWCF) can obscure other factors, and provide a false sense of security if it indicates an overall improving trend . . . .

The Grangemouth incident was not the only time that BP acknowledged concerns about its HSSE measuring and monitoring programs. During BP Internal Audit's review of the 2003 gHSEr audits, the auditors found "[p]oor monitoring processes[.]" Specifically, the auditors found an "[i]nadequate process to allow leadership to derive confidence that the processes on which they rely operate effectively—limited monitoring of basic processes (for compliance and robustness), poor [management information,]" and "[p]rocesses not sufficiently integrated to ensure visibility and complete coverage[.]" BP's internal review of its 2004 gHSEr audits found related concerns: "It is apparent that a number of [Business Units] are still unaware that they have to monitor their own HSE management system."

**Limited use of leading indicators.**   In the same 2003 EEAC report in which BP proposed tracking loss of containment and overdue inspections, BP Group HSSE noted the limited use of leading indicators within the company generally: "All Segments routinely monitor HSSE performance, typically by recording and measuring lagging or output indicators." The report states that only "several Segments (notably [Exploration and Production] and Petrochemicals) are using input or leading indicators to monitor performance . . . ." The Panel notes that in the report, BP Group HSSE did not propose a comprehensive set of leading indicators or attribute any urgency to developing such a set.

An Internal Audit report in 2004 reached the same conclusion with respect to the Refining and Marketing segment:

> Performance monitoring, while improving, is overbalanced in favor of output measures, resulting in reactive as opposed to preventative [sic] interventions. The reactive pace and timing of management interventions puts the segment at risk of missing certain targets and may act to driving [sic] reporting underground.

In response to this finding, management for the segment agreed that "relying exclusively on output measures (lagging indicators) is not appropriate."

According to BP's investigation report of the Texas City incident, the Texas City refinery had "numerous measures for tracking various types of operational, environmental[,] and safety performance, but no clear focus on the leading indicators for the potential catastrophic or major incidents."[42] Similar concerns were expressed in the report to the EEAC for 2004, which was written after the Texas City incident. In discussing a 2004 review that Internal Audit conducted of the HSSE function, the report noted a gap:

> **Monitoring of decentralised functional activity to deliver the Functional Plan**—the HSSE [Management Information ("MI")] systems are established but there is limited transparency of how the wider organisation is delivering against the plan. . . . [T]here is a heavy focus by BP senior management on lagging indicators (*e.g.*, fatalities, [days away from work

BP-HZN-2179MDL01022926

> case frequency], [green house gas]) to the detriment of leading indicators (*e.g.*, [advanced safety auditing], training, safety audits).

The Panel believes that relying exclusively or predominantly on lagging indicators to assess process safety performance is ill-advised. The Panel acknowledges, however, that such reliance may not be unusual in the refining or other process industries. The Panel understands that many organizations rely heavily on failure data to monitor performance.[43] As the Group Chief Executive noted, based upon BP's system and its track record in output metrics commonly used in the industry, BP believed it had a robust safety performance measurement system. BP's reliance on lagging, after-the-fact indicators of process safety performance rather than leading, predictive measures, however, impaired BP's ability to measure, monitor, and detect deteriorating or degraded process safety conditions and performance. This failure to use a set of effective performance metrics that includes leading indicators increased the likelihood that the organization would identify the need for improvements or additional control of risk only after something had gone wrong.[44]

**Visibility of process safety indicators.**   Although BP tracked some metrics relevant to process safety (*e.g.*, loss of containment and overdue inspections) at its five U.S. refineries before the Texas City incident, the Panel does not believe that BP used these metrics to drive performance. BP did not include these metrics in performance contracts, for example. The company's focus on injury rates hindered an appreciation of the importance of these process safety metrics. As mentioned above, Group HSSE informed the EEAC in 2003 that it would monitor the company's performance on loss of containment and overdue inspections. Group HSSE's annual report to the EEAC the following year, however, did not include any information on these metrics. In discussing personal safety, the report cited only injury rates (days away from work case frequency and recordable injury frequency). In the context of plant and equipment integrity, the report only included information on the number of integrity-related major incidents and high potential incidents in 2002 and 2003.

The manner in which data were collected and reported up the line may have made it harder for executive management to appreciate relevant trends at individual refineries. Refining and segment level management appear to have aggregated much of this data as it was reported up, thereby reducing its effectiveness as a performance indicator.

Even within BP's refining operations, it does not appear that people appreciated the significance of the loss of containment and overdue inspection data. BP's investigation report on the Texas City accident, for example, concluded that "[t]here was no obvious priority or management focus on [key performance indicators] for process safety."[45] Specifically, the refinery had "limited visibility" on process safety performance metrics such as loss of containment incidents, spills, hydrocarbon fires, and process excursions/upsets.[46] The trend of the few leading indicators available to the company also did not have sufficient visibility within the organization: "[w]hile a few leading indicators were measured within the [Texas City] HSSE function, site management was not focused on trend analysis of measures that were much more likely to deliver an accurate sense of process safety performance at the site."[47]

The Panel believes that this Texas City assessment also fairly describes BP management's use of process safety indicators. BP tracked some process safety metrics such as loss of containment and overdue inspections. Apparently, however, BP did not understand or accept what this data indicated about the risk of a major accident or the overall performance of BP's corporate process safety management system. Instead, improving trends in BP's occupational illness and injury rates contributed to a false sense of confidence. Before the Texas City accident, BP did not have a sense of urgency about process safety. This lack of urgency appears to have resulted to a large extent because the company was not effectively monitoring its process safety performance.

BP-HZN-2179MDL01022927

## BP'S PROCESS SAFETY AUDIT SYSTEM

### > Importance of compliance and site safety management system audits

An audit provides the most formalized means of assessing the performance of a process safety management system. Audits should evaluate the effectiveness of the site's safety management systems as well as assess the site's compliance with regulatory requirements and other applicable standards.[75] As part of such an assessment, the audit team should interview relevant site personnel, review representative records, and review on-site conditions.

In the United States, the OSHA process safety management standard mandates compliance audits against the requirements of the standard every three years.[76] OSHA also requires companies subject to the standard to "promptly determine and document an appropriate response to each of the findings of the compliance audit, and document that deficiencies have been corrected."[77]

### > BP's gHSEr and process safety management audit programs

BP's standards recognize the importance of compliance and site safety management system audits. Expectation 13.10 of gHSEr, under Element 13: *Assessment, Assurance and Improvement*, provides an expectation of annual self-assessment against the gHSEr expectations by each business unit, such as a refinery, and external audits at least every three years.[78] In the past, the HSSE and Technology Group for the Refining and Marketing segment managed these external gHSEr audits for BP's U.S. refineries. According to BP, the refineries use the audits to demonstrate compliance with applicable legal requirements as well as BP's HSSE expectations, including effective management of major risks, performance against agreed targets and objectives, and documented action plans for closure of all outstanding items from HSSE self/external assessments.[79]

The BP Group process safety/integrity management standard further emphasizes process safety compliance and system audits.[80] The standard lists refinery plant manager assurance, external regulatory/legislative audit requirements, independent audits, and ongoing local self-assessments of systems and procedures as part of the overall audit and assurance structure used to review the effectiveness of process safety/integrity management. BP Refining also required field verification that compliance audits had been undertaken and regulatory requirements met.

The Refining process safety community of practice coordinates process safety audits at each refinery every three years to meet these requirements and to satisfy OSHA's audit obligation. BP conducted its process safety audits using the BP Refining Process Safety/Integrity Management Audit Protocol that BP issued in January 2003. The audit protocol outlined the areas to be reviewed during an audit and was organized by both gHSEr element and process safety/integrity management standard element. The audit protocol contained specific areas of inquiry that the audit team must cover during the audit. For example, the audit protocol required that the audit team "[i]dentify administrative controls to promptly determine and document a response to each of the audit findings as well as documenting that deficiencies have been corrected."

BP's process safety audit teams historically have spent approximately 30 to 40 percent of their time identifying and understanding the process safety management system at the audited refinery site and approximately 60 to 70 percent of their time checking compliance in the field. The audit teams have spent most of their time during the audit talking with refinery personnel, such as operators, maintenance workers, contractors, pipe fitters, inspectors, and technicians, who have a direct influence on and interaction with refinery processes.

BP-HZN-2179MDL01022942

On the last day of the audit, the audit team presents its Priority 1 and Priority 2 findings to refinery management. Priority 1 findings include items that are believed to be out of compliance with legal or internal standards. The site is responsible for correcting Priority 1 findings. Priority 2 findings, which are less serious, are concerned with "moving the sites forward" and include ideas or suggestions to improve the process safety management system.

## > The effectiveness of BP's process safety management audit programs

BP considers audits as vital elements of the annual assurance process for HSSE performance. According to a Group executive, BP previously believed that its process safety auditing system was on the leading edge; however, this view has changed since the Texas City incident. BP's own investigation identified specific deficiencies in process safety audit scope:

> The Texas City site has been subject to several audits in recent years, but these audits focused on documented management systems and processes rather than actual practices, such as following operating procedures. The audits also appeared to ignore the history of previous incidents, process excursions, and near-misses. Verification and audit processes were inadequate to provide early warning of process safety risk.[81]

BP now acknowledges that its process safety audit system was inconsistent and did not "flag" the severity of the issues at Texas City. Similarly, BP acknowledges that its process safety audit process was "not clear enough" and "issues were not emerging with enough edge." Based upon its review, the Panel has reached similar conclusions. Specifically, the Panel identified concerns in auditor qualifications, audit scope, reliance on internal auditors, and limited review of audit findings.

**Training and qualifications of auditors.**   According to BP, the process safety advisor for the refining business was responsible for selecting process safety audit team members. In making these selections, the process safety advisor requested recommendations from the process safety community of practice for individuals with specific qualifications and expertise.

BP required at least ten years of experience for audit team members. The Panel notes, however, that this experience requirement appears to be operational or subject matter-related, not audit-related. Although the typical audit team had one or more team members who participated in previous audits, BP did not specifically require prior audit experience or training as an auditor. In addition, BP did not provide formal training on auditing or have an auditor apprentice program.

BP's own internal reviews of gHSEr audits acknowledged concerns about auditor qualifications: "there is no robust process in place in the Group to monitor or ensure minimum competency and/or experience levels for the audit team members." The same review further concluded that "[the Refining strategic performance unit suffers] from a lack of preplanning, with examples of people being drafted onto audits the week before fieldwork. No formal training for auditors is provided."

The Panel believes that the absence of formalized audit training for individuals participating in BP audits, including process safety reviews at the refineries, reduced the overall effectiveness of the BP audit program. Beyond having subject matter expertise, effective auditing requires a combination of prior auditing experience and special audit training.

As discussed above, BP used a classification system to prioritize action based upon whether a finding represented a possible gap in compliance with applicable regulations or BP standards (Priority 1) or a lesser process safety practice weakness reflecting an opportunity for improvement in process safety performance (Priority 2). In the judgment of the Panel's technical consultants, several prior findings that BP's audit teams made during process safety reviews at Carson, Toledo, and Whiting were misclassified as lesser (Priority 2) items instead of as regulatory

BP-HZN-2179MDL01022943

compliance or BP policy (Priority 1) issues. These potential misclassifications suggest that the competence, experience, or independence of some audit team members may have been insufficient.

**Depth and breadth of audits.**   To conduct an effective process safety audit of a site, the size of the audit team and the length of the audit will vary depending upon the refinery being audited. The duration of an audit clearly affects the breadth and depth of the review. The shorter the audit, the less time there is to talk with employees and review relevant documents. Opening and closing conferences at the beginning and end of the audit further limit the time available for the actual conduct of audit procedures. Short audits are not necessarily inadequate, but they limit the depth of review of representative systems that the auditors can conduct before coming to their conclusions. Conducting a review of fewer systems increases the likelihood that the auditors will miss deficiencies or come away with an inaccurate picture of a management system's performance. In general, BP's process safety audits of the U.S. refineries typically have lasted one work week.

The size and complexity of the refinery being audited affects the duration of the audit and the size of the audit team. The Panel believes it would be very challenging to conduct a thorough review of a refinery's process safety compliance and management systems in one week with the size of the audit teams that BP used. For this reason, although BP's audits may have been sufficient to satisfy the audit obligation in the process safety management standard, the Panel is concerned that some of BP's audits were of insufficient duration to ensure the depth and breadth necessary to provide BP adequate assurance as to its overall process safety performance.

For example, the Panel's technical consultants believe that the factual circumstances and support for several of their findings at the Whiting and Toledo refineries existed during at least one prior BP process safety audit at those refineries but were not identified in the previous audit. This oversight raises questions regarding the level of detail or thoroughness of prior BP audits on those issues.

Based upon its understanding of the audit protocol, the Panel also notes that the principal focus of the audits was on compliance and verifying that required management systems were in place to satisfy the OSHA audit requirement. It does not appear that BP used the audits to ensure that management systems were delivering the desired level of safety performance or to assess a site's performance against industry best practices.

**Reliance on internal auditors.**   BP also relied almost exclusively on internal auditors. Although the auditors were external to the subject site, they almost always were BP employees. The Panel recognizes that benefits can be gleaned from using employees to audit other sites, such as promoting best practices and sharing lessons across facilities. This approach has limitations, however. BP's process safety audit teams generally did not benefit from external experiences or perspectives of audit team members because they relied primarily on a pre-existing, internalized view of "how things are done at BP." Despite the best efforts of the audit teams, the auditors frequently came to an audit with the BP view of process safety and integrity management. The Panel believes that this internalized view likely reduced the effectiveness of the audits because the auditors did not have perspectives beyond their own organization as to process safety performance.

BP now acknowledges the importance of external perspectives. The Chief Executive, Refining and Marketing, for example, believes that the business units should be open to an external review periodically because third-party audits offer a different level of assurance.

**Limited review of audit findings and corrective actions.**   The Panel has also observed what it believes was a fairly limited review of audit findings outside of the audited refinery. Under prior requirements for process safety audits, the audit team presents its findings to the local refinery upon the completion of an audit. The process safety advisor then drafts the process safety audit report. At a later date, typically two to three weeks after completion of the process safety audit, the process safety advisor distributes the final process safety audit report to the refinery manager, the local refinery process safety committee, the local process safety coordinator, and the local HSSE manager. From that point, BP provides little or no guidance about what should happen next. In practice, the refinery manager has had great latitude in how to manage the audited site's response to audit findings. It appears that little, if any, process safety audit information was provided to executive management, although executive management certainly could have requested that information. For example, the Chief Executive, Refining and

BP-HZN-2179MDL01022944

> BP's response to other major process safety incidents: lessons from Grangemouth

The Panel believes that BP's responses to other major process safety incidents provide an important insight into BP's effectiveness in correcting identified deficiencies. For this reason, the Panel considered BP's management of process safety at the U.S. refineries against the backdrop of three major process incidents that occurred at BP's petrochemical complex in Grangemouth, Scotland during a two-week period in 2000.[119]

The three incidents involved a power distribution failure (May 29, 2000), a medium pressure steam main rupture (June 7, 2000), and a fire in an operating unit (June 10, 2000).[120] No fatalities or serious injuries occurred, but the UK HSE considered that the absence of injury was only due to "good fortune."[121] The incidents received significant media coverage and caused public concern regarding BP's "operating competence and the ability to manage the site safely."[122]

The UK HSE and the Scottish Environment Protection Agency jointly investigated the incidents under the United Kingdom's Control of Major Accident Hazards regulations. Among their conclusions, the agencies noted that BP Group policies for health and safety management "set high expectations but these were not consistently achieved because of organisational and cultural reasons at the [c]omplex."[123]

BP conducted its own review, individually investigating each incident using the company's root cause investigation procedures. Following these investigations, BP convened a task force to undertake a wider review of all operating units and functions across the complex.[124] The task force's main investigation generated more than 800 prioritized recommendations.[125] A small core team of this task force also developed "key themes that were relevant complex-wide, and potentially had wider organisational implications for the Company."[126]

Based upon its review, the Panel considers the similarities between the lessons from Grangemouth and the events of the Texas City incident to be striking. As shown in the table below, the circumstances may be different, but the underlying issues are very much the same.

### Table 66

Comparisons of Selected Findings from Investigations of the Grangemouth and Texas City Incidents

| Issue | Grangemouth | Texas City |
|---|---|---|
| Leadership and Accountability | "Insufficient management attention and resources [were] given to maintaining and improving technical standards for process operations and enforcing adherence to standards, codes of practice, good engineering practice, company procedures and the HSE guidance."[127] | "Process safety, operations performance, and systematic risk reduction priorities had not been set and consistently reinforced by management."[128] |
| Understanding of process safety | "There was a need to build awareness and competencies in process safety and integrity management within senior leadership and the organization in order to develop a meaningful value conversation around cost [versus] safety. There was a lack of experience in some areas, and limited refresher training plans."[129] | "[The Texas City Refinery suffers from] an inability to see risks and, hence, toleration of a high level of risk. This is largely due to poor hazard/risk identification skills throughout management and the workforce, exacerbated by a poor understanding of process safety . . . . There was no ongoing training program in process hazards risk awareness and identification for either operators or supervisors/managers."[130] |

BP-HZN-2179MDL01022955

## RECOMMENDATION #8—PROCESS SAFETY AUDITING

**BP should establish and implement an effective system to audit the process safety performance at its U.S. refineries.**

#### Commentary

1. *"establish and implement an effective system to audit the process safety performance"*—In order to be effective, the audit system should, among other things,

(a) confirm not only that the appropriate process safety management system is in place, but also that actual refinery operations in the field and throughout the line management chain of command conform to the system;

(b) ensure a cross functional team of qualified and trained auditors, including auditors with substantial expertise in the various elements of process safety management, refining technology, maintenance, and operations;

(c) provide adequate time to conduct thorough audits, taking into consideration the size and complexity of the refinery being audited and the number of auditors involved;

(d) periodically use audit teams independent of BP for the process safety audits for each U.S. refinery;

(e) require (i) consultation between the refinery leadership team and the auditors on proposed remedial measures and appropriate deadlines for the completion of those measures and (ii) notification of executive management and refining line management above the refinery level if and when agreed deadlines are not met, as well as if and when any renegotiated extended deadlines are subsequently not met;

(f) provide for the timely verification of remedial measure completion by personnel independent of the audited refinery; and

(g) upgrade the current audit finding significance ranking system to ensure consistent evaluation and prioritization of the significance of findings.

BP-HZN-2179MDL01022988