# Exhibit 11

To United States' Opposition to BPXP's Motion in Limine to Exclude (1)
Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents



BP Exploration (Alaska) Inc.
900 East Benson Boulevard
P.O. Box 196612
Anchorage, Alaska 99519-6612
(907) 561-5111

October 3, 2000

Ms. Jeanne Pascal
Northwest District Debarment Counsel
U.S. Environmental Protection Agency (Region X)
1200 Sixth Avenue
Seattle, WA 98101

Re: Compliance Agreement

Dear Ms. Pascal,

I am enclosing four originals of the Compliance Agreement between your Agency and BP Exploration (Alaska) Inc. (BPXA) that we have been negotiating over the last few months. I have signed each of these and am forwarding them to you so that you can execute them and then forward them to the Debarring Official in Washington, D.C. I look forward to receiving an executed copy in due course.

During the period of our negotiation of the Agreement BPXA's procedure for the tracking and reporting of environmental violations, nonconformances and near misses has been modified slightly from that described in the document reviewed and approved by you. The procedure is described in detail in Exhibit No. 3 and is discussed in Paragraph 23 of the Agreement. The new procedure no longer includes the explanatory flowchart stated in the Agreement; you will see that it now provides for reports of any such incidents to be made to HSE professionals or legal counsel in addition to a supervisor or to the HotLine, as required in the earlier version of the procedure.

Also during the period of our negotiations, the takeover of ARCO by BP Amoco plc, BPXA's parent company, has required some changes to be made to the titles of posts in the BPXA management structure. As a consequence, some alterations have been made in the list of post titles, shown in Exhibit No. 4, whose occupants must execute the Declaration and those, shown in Exhibit 7, who receive copies of the Agreement.

I trust that these minor changes will not cause you any inconvenience or concern. Carol Dinkins or I will be pleased to discuss them with you if you feel this is necessary.

On behalf of BPXA I would like to thank you for the open and helpful way in which you have conducted the negotiation of this Agreement with us. We are confident of our ability to meet fully the conditions of the Agreement and to avoid ever again being in the position in which we found ourselves at the conclusion of the United States' investigation of the Endicott Island waste disposals.

Sincerely,

*Chris J. Phillips*

Dr. C. J. Phillips
Vice President

UNITED STATES OF AMERICA

BEFORE THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

THE OFFICE OF GRANTS AND DEBARMENT, SUSPENSION

AND DEBARMENT DIVISION AT SEATTLE WASHINGTON

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THE COMPLIANCE AGREEMENT OF | ) | COMPLIANCE AGREEMENT |
| | ) | |
| BP EXPLORATION (ALASKA) INC. | ) | EPA CASE NUMBER |
| | ) | 99-0139-00 |

## COMPLIANCE AGREEMENT

### INTRODUCTION

This Compliance Agreement (Compliance Agreement or Agreement) is entered into between the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (EPA), OFFICE OF GRANTS AND DEBARMENT, and BP EXPLORATION (ALASKA) INC. (BPXA, Respondent or the Company). BPXA was incorporated in the State of Delaware and is a wholly-owned subsidiary of The Standard Oil Company, an Ohio corporation. Standard Oil is a company in the BP Amoco group of companies. Although this Agreement is between BPXA and EPA, BPXA agreed pursuant to its Plea Agreement with the Government (which is hereby incorporated by reference) to implement and maintain the Environmental Management System (EMS) described in the Plea Agreement at its own and also at designated Business Units, which are owned, managed or operated by BP Exploration & Oil, Atlantic Richfield Company and/or Amoco Production Company. This EMS is the centerpiece of BPXA's revised corporate attitude applicable to all facilities of the above Business Units that are engaged in the exploration, drilling and/or production of oil, both onshore and offshore, in the United States. This Agreement is composed of an Introduction, Background Overview, the Preamble, the body of the Agreement, and all exhibits attached hereto and is proposed in resolution of this matter.

### BACKGROUND OVERVIEW

**INTRODUCTION**

BPXA's corporate headquarters are at 900 East Benson Boulevard, Anchorage, Alaska. The Company currently is and, at the time of the events related to the cause for suspension and/or debarment, was involved in the business of exploring for, producing and transporting crude oil for sale to both government and public customers; BPXA operates oil drilling and production facilities on the North Slope of Alaska.

Doyon Drilling, Inc. (Doyon) currently is and, at the time of the events related to the cause for suspension and/or debarment was, an independent contractor to BPXA. Doyon is a wholly-owned subsidiary of Doyon Limited, an Alaska Native Corporation created pursuant to the Alaska Native Claims Settlement Act passed by the U.S. Congress in 1971. Doyon owns and operates a number of drilling rigs on the North Slope, including Rig 15, which is the rig at issue herein.

The events giving rise to the cause for suspension and/or debarment occurred at Rig 15 on Endicott Island between 1993 and 1995. BPXA's management became aware of the underlying events in August 1995 and took action related to them on September 5, 1995 after initiating an internal investigation.

## A. Endicott Field Development

Discovered in 1978 and developed between 1985 and 1987, Endicott is the world's first continuously-producing offshore Arctic oil field. The field is located about two and a half miles off Alaska's northern shore in the Beaufort Sea and about ten miles to the east of the Prudhoe Bay Field. Drilling, production and accommodation facilities are located on two man-made gravel islands; a man-made gravel causeway links them together and to the shore.

Because of its remoteness, Endicott's 45-acre Main Production Island (MPI) was built as a self-contained community. It can house about 150 people and has its own processing and living facilities, life support systems, medical facility, fire fighting equipment, and warehouse and shop facilities for environmental spill prevention and response efforts. The MPI is designed to accommodate up to 70 wellheads spaced ten feet apart, plus the necessary production and support facilities. There are five basic well configurations on the MPI arranged in two rows of wellheads. They include production, gas lift, gas injection, and water injection wells, and one Cretaceous disposal well, P-18.

Endicott's second man-made island is called the Satellite Drilling Island (SDI); it is approximately 10 acres in area and located some 3 miles south of the MPI. Oil and gas from production wells on the SDI are combined in manifold facilities and transported to processing facilities on the MPI through an inter-island pipeline, which is suspended above ground on steel vertical supports along the causeway and the road. At the MPI, oil, water and gas are separated at production facilities. From the outlet of the facilities, oil is then shipped down the 26-mile common carrier sales pipeline to Pump Station No. 1, where it enters the Trans Alaska Pipeline System (the Pipeline). The separated gas and produced water, supplemented by seawater, are injected into the subsurface oil reservoir to help maintain its pressure and enhance recovery efficiency. In the event of a failure of the water flood injection system, or if the produced water and other waste water is unsuitable for injection, the produced water may be injected into the Cretaceous formation through well P-18, which is permitted by the State of Alaska.



## B.  Rig 15: General Description

Doyon's Rig 15 was and is the drilling facility at Endicott, and was constructed especially to operate at Endicott.  Currently not in use, it is owned by Doyon and is a moveable rig that consists of the derrick (the bottom 20 feet of which is contained within windwalls to protect the workers and equipment from harsh Arctic weather conditions) and support facilities such as the generators that power the rig, mud pits, shale shakers and, since 1991, a rockwasher to clean cuttings, along with the shed in which the drill pipe was cleaned and is stored.  The rig is a self-contained facility and operations therein cannot easily be observed from the outside.[1]

When Rig 15 is located on the MPI, it is approximately 200 yards from BPXA offices.  When Rig 15 is located on the SDI, it is approximately three miles from the BPXA offices.  As a result, activities in and around the rig while it is operating can only be monitored by BPXA if a BPXA representative is physically present on the rig 24 hours a day, and if he is continuously moving from place to place on the rig and into the attached rockwasher facility discussed below.

The rockwasher on Rig 15 was developed by BPXA and ARCO for Doyon rigs to meet the companies' overall goal of eliminating surface discharges on the North Slope.  It is a mobile waste processing unit that receives and cleans, to a standard established by the Alaska Department of Environmental Conservation (ADEC), the larger cuttings generated in the drilling process for use as gravel in roads and pads.  Use of the rockwasher reduces the need for gravel quarrying operations in the North Slope tundra.  The rockwasher was designed specifically for use on Doyon rigs.  Although it was initially used at another Doyon rig (Rig 9), it was moved to Rig 15 at Endicott in the Fall of 1991.

---

[1] "Doyon Rig 15" is a self-propelled, cantilevered, two module set of equipment for drilling oil wells on the land under Arctic conditions.  The modules consist of a base, which is 45 feet wide by 116 feet long and weighs 2.7 million pounds, and support facilities, which are 50 feet wide by 96 feet long weighing 1.5 million pounds.  When the modules have been assembled, the top of the derrick in which the drill pipe is held is some 215 feet above ground level.

The derrick has a 1 million pound hoisting capacity and the rig generators are capable of generating 4,215,000 watts of electrical power.  Approximately 750 barrels of mud fluids for drilling use can be stored in tankage contained in the modules.  Two 1600 horsepower pumps provide the capacity to pump this fluid.  The rig is capable of drilling wells with a depth of approximately four miles.



During the time period relevant to this investigation, the rockwasher was attached to Rig 15 at the drill cuttings outfall, positioned between the pipe storage shed and the elevator to the mud room. The larger cuttings were transported to the rockwasher by an auger. At that time there was no direct access to the rockwasher from the rig, and the only way to enter the rockwasher was from the outside. Thus, people on the rig could not see the activities in the rockwasher without actually going outdoors from the rig and then entering the separate rockwasher unit.

The significance of the rockwasher to this investigation is that its design allows, through one of its tanks, access to the intake of an injection pump employed to inject used mud and smaller cuttings into the outer annuli of permitted annular injection wells. The tank functions as a hopper. On a standard drilling rig, with no rockwasher, drilling mud is pumped down the well that is being drilled; there is no other means of communication between the surface and the subsurface. The mud pumping takes place in full view of those operating the rig; the characteristics of the mud are subject to regular inspection and test. However, on a rig equipped with a rockwasher, an alternative access to the subsurface is available through which mud and cuttings are routed without the direct surveillance of the rig personnel. Annular injection into wells other than the one being drilled involve the need to freeze protect the outer annulus of the well being used for injection, at the end of the injection operation.

## C. Relationship between BPXA, Shared Services Drilling and Doyon

Since development drilling began at Endicott in 1985-1987, Doyon, as an independent contractor, has supplied and operated the main drilling rig on the Island. Initially, BPXA's Drilling Department supervised drilling; the Department was independent of the Endicott development and production units. BPXA's Drilling Department was located in Anchorage and was headed by a manager who reported directly to the senior vice president of BPXA. The BPXA Drilling Department provided drilling services to all BPXA units. In 1991, the BPXA Drilling Department merged with ARCO's Drilling Department to form Shared Services Drilling (SSD), which provides drilling services to both companies for fields east of the Kuparuk field. The individuals who work for SSD are "seconded" (placed on temporary assignment) from both BPXA and ARCO or, are independently employed contract staff. SSD staff are managed independently from the personnel who staff the production facilities at Endicott.

In the BPXA management structure during 1993-1995, producing fields were referred to as "Assets." Supporting units such as SSD were (and continue to be) referred to as "service" units. New wells at Endicott were designed to specifications defined by SSD drilling engineers and drilled to subsurface locations identified by Endicott reservoir engineers, Asset personnel who work in Anchorage. The drilling was done by Doyon under a contract with the service unit, SSD, which provided the same support services for both BPXA and ARCO. Only after operational completion were the wells turned over to Endicott Asset production personnel for use.

At the time of the events underlying the conviction, both the Endicott Asset and SSD were supported by a central Health, Safety, and Environmental (HSE) organization. Based in Anchorage, the Environmental and Regulatory Affairs Department (aka the Anchorage Environmental Department) tracked and interpreted agency guidelines, laws and regulations, and advised HSE

counterparts at both Endicott Island and SSD concerning Company environmental compliance strategy and policy. Endicott's HSE group reported to the Endicott field managers, and provided environmental advice regarding non-drilling activities at Endicott. However, at that time, Endicott HSE's responsibility was limited to accepting and managing the disposal of any waste tendered to the Asset by the rig contractor personnel, after Doyon properly handled the waste.

At the time of the events underlying the conviction, SSD's HSE group addressed environmental issues arising from drilling activities. The SSD HSE group reported to SSD in Anchorage, and its performance was evaluated by SSD (often in coordination with the Anchorage Environmental Department).

When the Anchorage Environmental Department believed that regulatory requirements and procedures allowed for alternative compliance approaches, its advice to the Endicott Asset and to SSD HSE personnel might consist of identifying several acceptable alternatives. When there were several lawful methods of handling used oil, as an example, it was generally left to the contractor or Endicott waste generator to decide which alternative was more operationally appropriate. HSE personnel at Endicott and SSD were available for consultation about waste handling to contractors or Endicott waste generators.

At the time of the underlying events, BPXA had made environmental compliance a line responsibility, not an environmental staff responsibility. The waste generators (e.g. Doyon) performing "line" functions as drilling contractors were required to handle their own waste. After Doyon, as generator of the waste, identified and properly managed it (i.e., put it into a container, labeled it, segregated it and accumulated it in accordance with the Resource Conservation and Recovery Act (RCRA)) custody of the waste was transferred to the Endicott Asset. Doyon was instructed by SSD's HSE personnel to call Endicott's Asset HSE group when disposal of wastes generated by Doyon that were not usable on the rig was necessary (e.g., chemicals, paints, thinners and solvents).

In 1993, SSD created a North Slope drilling contractor HSE coordinator position. This position was required to be filled by representatives of the drilling contractors on the North Slope, including Doyon, and the incumbent was available to advise Doyon about all environmental issues.

**D. The SSD Company Representative**

Doyon's rig supervisors are known as "toolpushers." BPXA interfaces with them on a day-to-day basis through the Company Representative (aka "company man") at Endicott Island. The Company Representative is appointed by the appropriate SSD Drilling Superintendent and is responsible for ensuring that wells are drilled in accordance with the well plans developed by the SSD drilling engineers and in accordance with the requirements of the Asset's reservoir engineers. He also is responsible for the logistics of getting all necessary material and equipment to the well on time and for keeping "town" (SSD in Anchorage) and the local field management, who are part of the Endicott Asset, informed of the status and progress of the drilling operation.

The Company Representative is employed by, or contracted to, SSD and not by the Endicott Asset management. Therefore, although he is responsible for keeping the Endicott Field Manager

informed of rig operations and issues, the Company Representative reports to SSD and not to the Endicott Field Manager or to the Endicott Asset Manager. He is not responsible for managing operations on the rig itself, nor for the rig's waste management. Waste management was Doyon's responsibility under its contract with BPXA.

## E. Handling of Rig Wastes

The contracts between SSD and Doyon at the time relevant to this action required Doyon, as an independent contractor, to be responsible for handling discharges and/or wastes generated by operation of the rig. Doyon contracts expressly required Doyon to comply with all environmental laws, rules and regulations.

## F. BPXA's Waste Handling Policy

Drilling wastes include drilling muds, cuttings, and produced water, as well as many other types of wastes. These types of wastes had previously been disposed of in reserve pits onshore or on the sea ice during the winter, pursuant to a National Pollutant Discharge Elimination System (NPDES) permit at Endicott. In 1989, BP America instructed all of its operations to implement a waste minimization plan. Accordingly, BPXA began to modify its waste handling procedures, utilizing various means to minimize the volume of waste generated on the North Slope. In 1991, BPXA closed the reserve pits onshore, chose not to renew Endicott's NPDES permit to dispose of drilling wastes, and worked to minimize waste volumes by finding alternatives for use or disposal.

At Endicott, these efforts included, but were not limited to: (1) using the rockwasher to separate and wash cuttings for use in place of gravel in road and pad maintenance; (2) injecting mud and drilling wastes from a well being drilled into the annuli of previously drilled wells; (3) burning used oil in Black Gold Heaters; and (4) replacing new products used for freeze protection with used oils and Stoddard solvents, which meant they did not become wastes. In addition, after October 1992, BPXA began to recycle its used oils into the Pipeline.

## G. Well Drilling Procedure

When a well is being constructed, or "drilled," the rig initially drills a hole several thousand feet deep from the surface towards the underground oil reservoir (in which is the subsurface location the well is to penetrate). This hole is then protected with a steel pipe called the "surface casing" which provides support and is cemented into place. Then, a narrower hole is drilled for several thousand additional feet below the bottom of the surface casing. A second steel pipe called the "intermediate casing" is then placed in the hole to protect the newly drilled section and is extended to the surface. The lower portion of the intermediate casing, is cemented into place. A third, narrower hole is then drilled, below the intermediate casing, through the oil-bearing rock of the reservoir. A short additional length of casing called the "production liner" is cemented into place from just above the bottom of the intermediate casing to the bottom of the drilled interval. A final

pipe called the "tubing" is then run into the hole which extends from the surface to just above perforations, subsequently made in the liner, which allow oil to enter the well from the reservoir rocks. The tubing is held firmly in place inside the liner with a "packer."

The space between the production tubing and the intermediate casing is the "inner annulus;" the space between the intermediate and outer casings is known as the "outer annulus." As discussed below, fluids from the rockwasher were injected into the outer annuli of some wells and forced into voids and pore spaces in the permeable rock below the surface well casing at depths from 2700 to 4500 feet below the surface. The injected fluids then could move laterally or vertically downwards away from the well; upward movement was prevented by the presence of impermeable layers of rock just above the bottom of the well casing. Injection into the rock through the inner annulus or well tubing is impossible because the inner annulus and well tubing are sealed and do not come into contact with the rock.

## H. Waste Minimization Efforts

### 1.   Annular Injection

By regulation of the Alaska Oil and Gas Conservation Commission (AOGCC) the outer annuli of oil and gas wells can be used for injection of muds, fine cuttings and other RCRA-exempt waste from a nearby well which is being drilled, provided that the volume of materials injected into each well is limited to the waste produced from the drilling of a single new well and that a suitable formation to receive the injection is available. This activity, known as annular injection, has been an accepted practice at Endicott since its initial development. EPA and the AOGCC consider annular injection "incidental" to the drilling of a well and, therefore, exempt it from the provisions of the Underground Injection Control (UIC) program.

The AOGCC authorized annular injection in each permit to drill a well at Endicott. Until 1995, a second "Wastewater" permit was required for each well under Alaska's water quality legislation administered by ADEC for annular injection. In July 1995, the AOGCC assumed full responsibility for administering the disposal of drilling waste by annular injection and the State no longer requires a separate wastewater permit from ADEC for annular injection.

### 2.   Freeze Protection and the Use of Used Oils and Solvents

On the North Slope, the first 2,000 feet below the surface is permafrost which has a temperature less than 32°F. Aqueous fluids left in the inner or outer annuli of non-producing wells could freeze and damage the steel casing that lines the well. This poses a safety as well as an environmental hazard. By regulation, the AOGCC requires that freezable fluids in such wells be displaced with non-freezing fluids. This process is known as "freeze protection." Although AOGCC regulations do not specify what types of fluids should be used for freeze protection, the fluids used for this purpose typically are new product diesel or dead crude oil.

Since the early development of the field, Endicott wells have been freeze protected with new product diesel, dead crude, "Arctic pak" or occasionally with small quantities of used oils or petroleum-based solvents in the outer and inner annuli of wells.

After analyzing the issue and consulting with various officials at EPA, the Anchorage Environmental Department personnel concluded that two waste streams, used lubricating oil and used Stoddard solvent (marketed as Chevron 325 -- which is naphtha, a petroleum product), could be substituted for, or mixed with, new product diesel or processed crude for use as a freeze protectant in the annuli of non-producing wells. The Anchorage Environmental Department advised appropriate personnel (petroleum or production engineers and drilling contractors) that used oils and solvents could be substituted for new product diesel or dead crude oil for freeze protection. SSD, through its HSE officer told SSD personnel and drilling contractors: "DO use" used oil and solvent for freeze protection during annular injection.

## PREAMBLE

WHEREAS, at the time of the underlying incident, the Doyon Rig 15 toolpusher and/or "roustabout" (rig worker who handles equipment and supplies) directed personnel to take barrels of used material that had accumulated in the storage area at Rig 15 to the rockwasher unit. The Doyon toolpusher then directed Doyon employees to illegally inject the used materials into the outer well annulus rather than reuse them beneficially for freeze protection as was allowed under BPXA's permits. Since these used materials were improperly used under RCRA, they became RCRA wastes; and,

WHEREAS, from at least July 1993 until September 1994, and then again from January 1995 until late August or early September 1995, Doyon personnel injected various materials, along with muds and cuttings, into the outer annuli of wells at Rig 15; and,

WHEREAS, on or about January 17, 1995, Doyon injected approximately 23 barrels of waste oil and waste solvent;  and,

WHEREAS, a Doyon rockwasher worker asked to meet with BPXA's SSD personnel at BPXA's offices in Anchorage on August 31, 1995.  At that meeting, the rockwasher worker expressed his concerns about unauthorized disposal activities at Rig 15, and described what he had heard, seen and been told to do; and,

WHEREAS, prior to reporting the unauthorized release as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), BPXA immediately opened an internal investigation into this matter and five days after commencing its internal investigation, BPXA confirmed by September 5, 1995, that no hazardous wastes from Rig 15 had been tendered to Endicott's HSE department by Doyon for disposal between 1993 and  September 1995. Records from Endicott show that minimal amounts of hazardous waste were shipped from Endicott during 1993-1995. Since the reduced volume of waste was consistent with BPXA's waste minimization plan, BPXA's management did not notice this fact prior to the rockwasher's disclosure to BPXA; and,

WHEREAS, although BPXA learned about the January 17, 1995, release on August 31, 1995.  BPXA reported that release to the National Response Center (NRC) on September 13, 1995, which was  followed by written notice on October 6, 1995; and,

WHEREAS, on September 25, 1995, BPXA submitted its internal report entitled "Doyon Rig 15 Waste Disposal Investigation Report" to EPA and ADEC; and,

WHEREAS, during the months following the disclosure, BPXA took steps at Endicott to ensure that its waste management and disposal practices complied with federal and state law. On September 5, 1995, BPXA verbally instructed personnel at Rig 15 to cease all annular injection. Annular injection was allowed to resume later that day only after BPXA's Company Representative instructed the Rig crews that annular injection had to be done in compliance with the law. The Company Representative also instructed personnel at Rig 15 that the only materials suitable for annular injection were those allowed in the AOGCC Annular Injection Permit. Consequently freeze protection fluid injection was to be done only with new product diesel. On September 20, 1995, BPXA provided Rig 15 with new written instructions concerning annular injection practices, which Doyon posted at the rockwasher. BPXA ordered personnel on all other rigs across the Slope to suspend use of used oils and solvents for purposes of freeze protection; and,

WHEREAS, after this incident, BPXA acknowledged its responsibility in this matter and engaged in extensive revisions of the manner in which the Company does business internally and in particular with respect to its environmental programs, oversight, training, review and audits. These programs and changes are described fully in the Mitigation Section of this Agreement; and,

WHEREAS, following negotiations with the Environmental Crimes Section (ECS) of the Environment and Natural Resources Division of the Department of Justice (DOJ) and the United States Attorney for the District of Alaska, BPXA agreed to be charged pursuant to an Information filed in the United States District Court for the District of Alaska for violation of CERCLA. A copy of the Information is attached hereto as **EXHIBIT NO. 1.** The Information states that on August 31, 1995, BPXA learned about a January 17, 1995, release of hazardous substances at Rig 15 operating at Endicott Island, but did not immediately notify the NRC as required by law; and,

WHEREAS, BPXA pled guilty under CERCLA to the Information on September 23, 1999, and was convicted and sentenced on February 1, 2000, and paid a $500,000 criminal fine. In addition, BPXA paid a civil penalty of $6.5 million as part of a Consent Agreement with DOJ, and will spend $15 million to make changes in its operations and management systems to prevent recurrence of the underlying violations; and,

WHEREAS, as part of the Plea Agreement, BPXA agreed to implement a nationwide EMS as provided in the Plea Agreement and Attachment 1 (attached hereto as **EXHIBIT NO. 2**). BPXA will be on probation for five years; and,

WHEREAS, BPXA implemented a number of changes in its operations and management systems immediately following the underlying incident and will continue to make current and long term changes as necessary; and,

WHEREAS, the Parties agree that the above referenced Information could provide the basis for a suspension and BPXA's conviction could be a cause for BPXA's debarment under 40 CFR Part 32 or 48 CFR § 9.4 et seq; and,

WHEREAS, in furtherance of resolving this matter with EPA SDD and to demonstrate its good faith and intention to become and remain presently responsible, BPXA approached EPA SDD for entry into this Compliance Agreement prior to the entry of its plea and subsequent conviction and agreed to be bound by the terms and conditions herein; and,

WHEREAS, BPXA desires to make positive efforts to assure the integrity of its conduct and the conduct of its operations, and to assure EPA and the federal Government that BPXA does not pose a threat to the Government's procurement and assistance programs; and,

WHEREAS, BPXA has taken, and will continue to take, all necessary steps as identified by EPA SDD in this Agreement and BPXA's counsel during the term of this Agreement to become and remain presently responsible Government contractors, and to fully implement all terms and conditions herein; and,

WHEREAS, BPXA assures EPA SDD that none of its environmental staff will be supervised by or directly report to any Business Unit manager (environmental staff will be independent from and cannot be managed or terminated by production personnel), and, that BPXA will not retaliate against or discipline any employee, environmental or otherwise, who reports an incident to a regulatory agency prior to reporting the incident to BPXA; and,

WHEREAS, Respondent cooperated with the Government and with EPA SDD in the resolution of this matter; and,

WHEREAS, Respondent recognizes the seriousness of its improper activity, and has implemented, and will continue to implement changes and/or programs as necessary to remain in compliance with environmental laws and regulations; and,

WHEREAS, Respondent recognizes the importance of ethics, integrity and honesty in participating in governmental procurement and non-procurement programs as well as in fulfilling its environmental responsibilities, and affirmatively agrees it will not knowingly engage in prohibited practices, or in dishonest or unlawful environmental practices, activities, methods or behavior in the discharge of its current or future business; and,

WHEREAS, the Parties agree that the primary bases for the underlying Information were that BPXA did not properly supervise Doyon's waste handling activities, BPXA's HSE function did not have adequate resources to oversee contractors, BPXA's HSE organization was not properly coordinated, and BPXA's audits and audit protocols were insufficient; and,

WHEREAS, EPA believes, based on the information available to date, that the terms and conditions contemplated by this Compliance Agreement are adequate to protect the interests of the federal Government, and that further action against the Respondent is not warranted, and that BPXA's entry into this Compliance Agreement is sufficient to assure EPA that the conditions giving rise to the Information have been corrected, that the underlying criminal violations will not recur, and that Respondent has become and will remain presently responsible if Respondent fully complies with the terms and conditions hereunder; and,

WHEREAS, the Parties hereto have determined that it is in the interest of both Parties to enter into this Agreement so as to finally resolve all potential suspension, debarment and eligibility issues that pertain to Respondent and its corporate affiliates, directors, officers, and employees in regard to the underlying violations. The Parties agree that entry into this Agreement obviates the necessity of further EPA suspension and debarment action based on the underlying facts and violations; and,

WHEREAS, Respondent agrees to full, good faith cooperation with any EPA inspector, auditor or reviewer from the EPA SDD as well as with inspectors and auditors from other local, state or federal agencies who may have business with the Respondent regarding its operations, or with auditors or inspectors who may be authorized to conduct inspections or audits of Respondent's operations on behalf of any federal governmental agency or on behalf of the EPA SDD; and,

WHEREAS, Respondent understands that the terms and conditions of this Agreement are material inducements for the Government to enter into this Agreement, and that repeated violations of non-material provisions of this Agreement may cumulatively result in a material violation of the terms and conditions herein; and,

WHEREAS, BPXA standard contract clauses require the Company's independent contractors to comply with all applicable federal, state and municipal laws relating to protection of human health, safety, natural resources or the environment, in addition to BPXA's own HSE policies and procedures. The contracts further require that the contractors report instances of non-compliance, promptly correct non-compliance and cooperate with governmental agency personnel. Under the contracts, HSE non-compliance by a contractor is subject to disciplinary action, including termination and BPXA agrees to more closely manage its contractors for compliance; and,

NOW, THEREFORE, EPA AND BPXA, in reliance upon the representations contained in this Agreement, which includes the Introduction, Background Overview, Preamble, Body of the Agreement and Exhibits, and in consideration of the mutual promises, covenants and obligations in this Agreement hereby agree to the following terms and conditions:

## AGREEMENT

## BPXA'S REVISED CORPORATE ATTITUDE AND MITIGATION MEASURES: BPXA'S COMMITMENT TO COMPLY WITH THE TERMS AND CONDITIONS OF THE PLEA AGREEMENT

1.       Pursuant to the Plea Agreement attached hereto as **EXHIBIT NO. 2,** BPXA has paid its fine of $500,000 and has been placed on probation for five years. As a condition of its probation, BPXA is required to establish and operate under the terms and conditions of a corporate EMS. The changes that have been made by BPXA to date in its environmental management and operations have been recognized by the ECS and the United States Attorney as constituting the basis for a suitable EMS for purposes of the Plea Agreement. These changes include BPXA's improvement of its waste management procedures at Endicott Island, enhancement of its environmental training for employees and contractors, discontinuation of the practice of utilizing used solvents and used oil to freeze protect the outer annuli, commission of an audit of waste management practices on Endicott Island by external independent auditors, as well as a North Slope wide multi-media environmental compliance audit, reorganization of its HSE Sections within the business organizations (including elevating the HSE Manager to a level equivalent to Vice President), and modification of its incentive bonus program to include penalties for failing to ensure full environmental compliance. BPXA is committed not only to compliance with the Plea Agreement, but also to expanding and improving upon its current EMS as described in the Plea Agreement.

11



2.     Rig 15 is currently idle and has been cold stacked at Endicott Island since February 1999.  Doyon entered a plea agreement and an agreement of deferred prosecution with the Department of Justice and the U.S. Attorney's Office, which included a commitment to implement an environmental compliance system.  BPXA entered into revised contracts with Doyon that clarified and strengthened the waste management and environmental compliance provisions under those contracts.

## BPXA'S EXCLUSION OF INDIVIDUALS

3.     The Company Representative who worked at Endicott on January 17, 1995, no longer works for BPXA, although he received additional environmental compliance training subsequent to the discovery of the events that led to the underlying offense.

## BPXA'S IMMEDIATE CORRECTIVE ACTIONS

4.     After BPXA was advised of the underlying problems by the Doyon employee, Endicott HSE staff provided additional training for Rig 15 personnel (including contract personnel), that focused on the purpose and use of the RCRA drum storage site, setting up and maintaining satellite accumulation areas, complying with spill containment requirements, and labeling.

5.     Endicott management initiated and participated in weekly Waste/Fluid Management meetings from October 1995 to February 1999, which addressed site-specific waste handling and disposal practices.  This also provided valuable input for the revision of Endicott's environmental and waste handling procedures as well as documentation and training.  Since drilling at Endicott has ceased, these meetings have been suspended until drilling resumes.  A mix of people participated in these meetings, including employees from the Alaska Petroleum Contractors' Vehicle Maintenance Shop, vacuum truck employees, and Rig 15 personnel who were actually involved in day-to-day fluids handling activities.

6.     On October 18, 1995, BPXA's Anchorage Environmental Department and SSD, with significant input from HSE and operational staff on the North Slope, issued a detailed guidance document to instruct all North Slope personnel in the proper use, recycling, or disposal of recovered or used materials.  The guidance document covers many different operations including drilling, cement jobs, freeze protection, and others; it also covers a wide variety of materials such as mud and cuttings, various waters, cement returns and various oil products including snowmelt and rainwater. The guidance document also includes information about appropriate disposition of wastes such as waste disposal in a Class II well, and reuse and disposal as hazardous or non-hazardous waste. Having set a goal to make the guidance document more practical to use, BPXA has continually revised it based on input from the field personnel using the guidance document.  Revision #3, known as "The Red Book," further defined the guidance document but also added flow diagrams and transfer, manifest and disposal forms.  Revision #4, jointly issued with ARCO, added further narrative training text and facility-specific matrices unique to the operations and disposal options of each facility.  BPXA posts significant changes and additions to "The Red Book" on the BPXA Intranet.

7.     BPXA implemented a waste management certification program and trained all relevant North Slope employees, including contract personnel.  Based on the RCRA model, BPXA

instituted the program to require that all personnel who generate, transport, or receive waste of any kind within the oil and gas lease area must be "certified" to do so. Like RCRA, the program uses manifests that require each member in the chain of waste management to verify the accuracy of the information and all signatories are certified. Individuals who attended the initial RCRA training program on or before April 1, 1996, were placed on a new certified generator list; only certified persons from that list could sign and certify manifests as waste generators. In current practice, environmental personnel provide Certified Waste Generator training and maintain an up-to-date list of approved generators, transporters and receivers. Receivers (operators of disposal facilities) must verify the generator and transporter as "certified" prior to accepting waste for disposal. This ensures that only trained personnel handle waste at any time. Standard operating procedures and the necessary forms, some of which are specific to individual facilities, are provided as part of the training and posted on the BPXA Intranet. BPXA and ARCO also created a 54-page training manual to be used in conjunction with classroom training or a self-study CD-ROM program. According to the SSD standard operating procedure for waste generator authorization, both the Company Representative and mud engineer are required to be certified generators.

8.     Following the underlying incident, BPXA (SSD) issued a revised Annulus Injection Standard Operating Procedure which covers the areas of roles and responsibilities, training, well selection criteria, permitting, injection procedures and reporting. In addition, BPXA revised and implemented new cementing procedures. These procedures have been and are distributed to all SSD personnel and contractors through the BPXA Intranet and Internet.

9.     In February 1996, within six months of the Rig 15 disclosures, BPXA commissioned extensive internal and external audits both of its operations on the North Slope and those of all of its contractors to ensure its compliance with waste management requirements, including RCRA and UIC for Class I/II Wells at all of its facilities. To ensure the integrity of the results, BPXA supplemented its internal audit staff with parent or sister company auditors from out-of-state, and with third-party consultants. Recognizing that employees were concerned about cooperating with the Government (due to the possible liability ramifications), BPXA's then President John Morgan encouraged all employees to help identify waste management problems and report violations, and indicated that BPXA would not retaliate or tolerate retaliation by employees or managers against other employees for providing information. Before the audit report was completed, BPXA voluntarily disclosed to EPA all potential violations noted in the report. No action was taken by any regulatory agency as a result of these disclosures.

10.     In response to the audit findings, BPXA immediately corrected those matters that could be immediately corrected at Endicott and tracked those that required a longer time frame to resolve. BPXA conducted a similarly detailed follow-up report at the other facilities on the North Slope. In addition, BPXA conducted thorough monthly audit follow-up inspections as part of its routine internal audit program. As of April 4, 1997, all of the problems identified in the audit report, other than long-term revisions to BPXA's waste management procedures and self-assessment processes, had been corrected.

11.     In November, 1997, BPXA retained Arthur D. Little, an experienced, independent environmental and management consultant, to conduct an extensive audit of all of its facilities, including the Anchorage office, with respect to all environmental media. The field work was completed in April 1998 and twelve final reports addressing different media at different facilities



were completed in June 1998. All instances of non-compliance were disclosed to governmental agencies by BPXA throughout the audit, and no action was taken by any regulatory agency with respect to those instances of non-compliance. BPXA's internal audit tracking system tracked all audit findings to ensure that those requiring a response were addressed. All issues at Endicott have been addressed.

12.     The ISO 14000 Series, a project of the International Organization for Standardization, is a collection of standards required of all members which was developed to assist organizations in achieving environmental and economic gains for the implementation of effective worldwide environmental management systems. ISO 14001 requires member companies to conform to compliance management systems criteria established by the ISO standard. All members are then required to submit to the scrutiny of a third-party auditor for certification of conformance. This series has been recognized and commended by EPA as unique because it can be objectively audited internally or by third parties. BPXA received ISO 14001 Certification on December 3, 1998 with the certificate covering the North Slope fields where BPXA functions directly as an operator at Prudhoe Bay, Western Operating Area, Endicott, Milne Point, Exploration, and the Anchorage support groups. As part of the continual improvement required to maintain certification under the standard, BPXA is subject to independent follow-up audits during the three-year period of certification. BPXA successfully passed the first of these follow-up audits conducted in March 1999. There were no "Major Non-Conformances" and only ten "Minor Non-Conformances" (compared to thirty-seven listed during the initial certification review). A second follow-up audit was conducted in March 2000; against stricter standards than in the previous year there were two "Major Non-Conformances" and seven "Minor Non-Conformances." The problems identified in this audit have been or are in the process of being corrected at this time. All of these documents are available to EPA SDD upon request.

13.     BPXA created the "Environmental Compliance Contractor Mentorship Program" (the Program) in October 1998 due to its heavy reliance on contractors. The purpose of the Program is to create a dedicated team to proactively assist contractors in reviewing and revising their environmental compliance programs so that they have the training and knowledge to comply with applicable environmental requirements, and so that they operate within BPXA's Operational Integrity Assurance System and ISO 14001 requirements. The program also provides BPXA with more direct knowledge of its contractors' environmental compliance procedures. As a first step, the Program conducted a North Slope-wide survey to obtain the contractors' input in carrying out the Program. Future steps include defining the Program elements, testing these elements with a pilot group of contractors, and soliciting contractor participants.

14.     BPXA reorganized its HSE function in order to increase the strength, visibility and independence of its HSE Manager and his Department. The HSE Manager reports directly to the BPXA President; his post is at the same organizational level (equivalent to a Vice President) as those of the Business Unit Leaders. The Environmental Manager is a new position that reports directly to the HSE Manager, and a new position of Compliance Assurance and Continual Improvement Manager reports to the HSE manager. New reporting relationships have been defined to ensure efficient communication between Anchorage-based HSE staff and their colleagues on the North Slope. Anchorage-based environmental staff are members of the HSE Department and report to the Environmental Manager. Field-based environmental staff, including the North Slope Environmental



Advisor, and North Slope Environmental Technicians, report through HSE Business Account Managers (who are not production personnel) to the Environmental Manager.

15. Mr. Ross Klie is currently BPXA's HSE Manager. He reports directly to BPXA's President and he is the senior Company official responsible for managing the environmental and health and safety functions of BPXA. The HSE Manager has been, and will continue to be, directly available to all Company personnel for receipt of communications and/or information regarding environmental problems and/or potential regulatory or compliance issues at BPXA, and his telephone number is posted and is on the Intranet. He carries a pager. The HSE Manager's availability for this purpose is in addition to the Company's usual methods for receiving reports from its employees.

16. BPXA implemented its "Gainshare" annual bonus program in 1992 to offer monetary incentives for employees to improve their performance in many areas that would lead to better business and HSE results. From its inception, Gainshare rewarded employees at all levels for achieving environmental and safety objectives established by the Company. In 1997, BPXA modified the Gainshare program to significantly reduce potential payout to any employees who fail to report environmental and safety violations and it made these changes applicable to the 1998 calendar year. This was done in recognition of the Government's expressed concern about timely reporting of environmental infractions as well as in recognition of the results of a BPXA audit of North Slope compliance and reporting issues conducted in 1996 which suggested that the previous Gainshare structure may have been misperceived by some employees as an inducement not to report violations.

## BPXA'S REVISED LONG TERM ENVIRONMENTAL POLICIES AND PROCEDURES

17. In response to the discovery of the unlawful activities at Endicott Island, BPXA instituted a number of new, long-term policies and procedures Company-wide in order to prevent such activities in the future. As discussed in greater detail below, BPXA enhanced its environmental training and specifically focused on hazardous waste handling. BPXA adopted a corporate environmental policy, reorganized its HSE function, issued comprehensive procedures for disposal and reuse of used materials, instituted an environmental compliance mentorship program for contractors, improved its Gainshare incentive program, and qualified for ISO 14001 certifications.

18. The BPXA HSE Policy, issued in 1998 by BPXA President Richard C. Campbell and reissued in 1999, requires all BPXA employees to commit to BPXA's HSE policies and sets expectations for all BPXA personnel. These expectations include meeting or exceeding regulatory requirements, involving employees in improving HSE performance, working to ensure adherence to the requirement that contractors maintain HSE compliance, continually improving pollution prevention programs, setting annual HSE objectives and auditing results, and allocating adequate HSE resources to achieve and maintain compliance. The BPXA HSE Policy is regularly communicated to employees and contractors using a variety of media, including training, videos, posters displayed throughout the facilities, meetings, discussions, and email, as well as through the BPXA Intranet-based EMS, which is accessible by all BPXA personnel and contractors working at BPXA facilities.



19.    The EMS also includes a component called "Environmental and Legal Requirements" under which each Business Unit develops, approves, communicates, and improves Operational Controls for all potential significant environmental aspects of each Business Unit's operations.  Under this component persons called "technical authorities" prepare a controlled document called an Environmental Compliance Matrix (Matrix).  The Matrix identifies applicable environmental laws, regulations and other requirements that are necessary for each Business Unit to achieve compliance.  Technical authorities are members of the Anchorage-based Environmental Department.  The technical authorities identify, interpret and clarify emerging regulatory and Company environmental requirements for all Business Units.  Field management personnel integrate emerging requirements into operational controls.  Consistent with the EMS Document Control Procedure, the Matrix is periodically updated to reflect new and revised state and federal statutes and regulations, as well as other requirements that are applicable to BPXA's operations.  The specific compliance Matrix for each field describes the roles and organizational responsibilities for each specific position to carry out all environmental compliance obligations, including required reporting to regulatory agencies.

20.    BPXA communicates its environmental information in part through tiered committees that are designed to achieve upward and downward communication of environmental issues and concerns to all employees, on-site service providers, and contractors.  Examples of such tiered committees include Employee HSE Committees, Field and North Slope Contractor HSE Forums, and Business Unit HSE Meetings and the Alaska Leadership Team.  This latter Team, which defines the Company's regional policies for Alaska, is headed by the BPXA President and includes Business Units Leaders, the Business Unit Resource Manager, the Vice President of Government and Public Affairs, and the HSE Manager.  BPXA uses the personal face-to-face communication generated by these various committees, meetings, and forums to effectively transmit, receive, and address environmental issues and concerns and discuss those concerns comprehensively by representatives of all Business Units.  The BPXA culture fosters and supports open access to managers at all levels, regardless of chain of command.

21.    In addition to the methods listed above, BPXA communicates environmental information through a variety of Business Unit-specific means.  Each work site in the field conducts monthly HSE meetings and daily environmental HSE talks.  Contractors meet with their Contract Accountable Managers at least annually, and more frequently for contractors performing environmentally-sensitive work, to discuss the results of HSE performance self-assessments, including of its contractors.  Other internal Business Unit mechanisms include Environmental Bulletins, HSE Committee Bulletins, Monthly Field Communications, the Alaska Leadership Team and staff meetings, the monthly HSE Forum, the pre-job hazards analysis, and field performance reports.

22.    In conformity with the goals and requirements of this Agreement, BPXA will continue to implement and improve its enhanced EMS, as provided in Attachment 1 to the Plea Agreement.  Funding for BPXA's continued implementation of the EMS is guaranteed as provided in documents also attached to the Plea Agreement.  Further development and implementation of BPXA's  EMS will be in accordance with the provisions of the Plea Agreement and Attachment 1 thereto.  BPXA's EMS includes, among other things, the following elements:  a corporate policy on environmental compliance and on protection of the environment which is continually updated as necessary; the Matrix (updated as necessary) for all Business Units, which specifies environmental



standards and other requirements; a general policy requirement that all BPXA operational activities must achieve environmental compliance; a defined management structure that ensures appropriate involvement, accountability and quick resolution of issues by employees at all levels; a clear delineation of reporting responsibilities and related job functions with respect to carrying out environmental duties; a training program for managers, environmental personnel and all other employees charged with environmental responsibilities using process-related training techniques to document work procedures to ensure compliance; a facility-level assessment and corrective action process; procedures for emergencies and shut downs; processes to accommodate changes in equipment and technology; and the Corporate Compliance Committee, which meets monthly and includes Business Unit Leaders, managers who report directly to the Alaska Leadership Team, and an outside environmental consultant.

23.     Effective January 1, 1998, BPXA and contract employees who were (or will be) assigned or contracted to do a project or activity on the North Slope were required by BPXA to attend the North Slope Training Cooperative (NSTC) Unescorted Program prior to working on any assignment at the North Slope.  No one can have access to the North Slope fields without an escort or without having been trained.  The training curriculum includes verbal and written information on how to report a potential HSE non-compliance incident.  Attendance was recorded on a roster maintained by BPXA prior to October 1, 1998 and after that date attendance was recorded and maintained by one of three third-party providers.  Upon completion of the training, each attendee receives an NSTC training documentation card which must be carried by the attendees at all times to confirm that (s)he received the requisite training.  Additional information on how to report a potential HSE non-compliance incident is also discussed in the Alaska Safety Handbook and the North Slope Environmental Handbook which are distributed to each attendee who attends and completes the NSTC Unescorted Program.  Both Handbooks provide phone numbers and information for employees on what to do and who to contact at his/her respective field location to report an environmental incident, emergency or potential HSE non-compliance event.  Pursuant to the Company's Environmental Noncompliance/Nonconformance Tracking and Reporting Procedure (BPXA Reporting Procedure), reporting of such events can be made through several means of communication including, by telephone to a 24 hour manned number or in person.  Senior and mid-level managers, also, are notified.  The BPXA Reporting Procedure (and explanatory flowchart) is attached hereto as **EXHIBIT NO. 3**.  Each of the BPXA field locations and the Anchorage headquarters has an active HSE Committee of employees with whose members HSE concerns can be raised.  "Near miss/feedback" reporting boxes are located in areas where employees can deposit anonymous reports and not be seen (e.g. employee bathrooms).

24.     The enhancement of the BPXA HSE incident and potential HSE non-compliance reporting procedure described above was implemented in October 1999.  All employees and contractors are being trained in use of BPXA's anonymous hotline for safety and environmental concerns.  They will also be trained on the reporting process as well as on the Company's expectations for all employee and contract staff regarding the staff's important role in maintaining HSE compliance.  Given BPXA's explicit corporate policy requiring employees to report potential environmental non-compliance events or incidents, BPXA expects its employees and contractors to report all such incidents internally in addition to reporting to regulatory agencies if the employee chooses, so that the Company can address such events or incidents in accordance with corporate policy, subject to the provisions of Paragraph G8 herein.  However, under no condition will any



employee who reports to a regulatory agency before (s)he reports internally be disciplined, censured or punished therefor.

## ENVIRONMENTAL COMMITMENT

25.     All managers who supervise operations in which environmental compliance is part of their official duties, and those employees, whose principal job function relates to or involves environmental compliance and waste handling, and employees who are involved in any manner whatsoever in the solicitation, preparation, award, administration, execution, management or oversight of government contracts or assistance of any type as well as the supervisors of these categories of employees shall sign a declaration entitled "Declaration of Environmental Commitment" that is drafted in conformity with standard legal practice or with 28 U.S.C. § 1746. **EXHIBIT NO. 4** attached hereto contains a list of job titles that are subject to the requirements of this provision.  In addition, an unsigned copy of the Declaration is attached hereto as **EXHIBIT NO. 5**.  This Declaration states, among other things, that:

        a.     the signatory will not knowingly violate environmental law; and,

        b.     the signatory will not permit an environmental violation to continue for an unreasonable length of time after the violation becomes known to that person; and,

        c.     the signatory will immediately report any illegal or potentially illegal activity related to environmental practices in accordance with the BPXA Reporting Procedure as soon as reasonably practicable after the activity becomes known to him or her.  In no event will a reasonable time to report in compliance with this section exceed forty-eight hours, except that if a reportable event hereunder becomes known on a Friday, a weekend or holiday, the day to report will be forty-eight  hours later or the next available work day, whichever is longer.

26.     Copies of these declarations will be maintained alphabetically by year in a file at BPXA's headquarters and be subject to inspection or audit by EPA SDD, the State, or SDD's designee for review during the term of this Agreement.  The list of specific jobs, positions or categories of workers who must sign such declarations can be unilaterally changed by BPXA as necessary to achieve compliance with the terms of this Agreement.

27.     Any and all new managers and employees that come under the embrace of Paragraph 25, including but not limited to full time, part time or contract employees, shall sign such declaration within ten days of their promotion or employment with BPXA.

28.     Every year on the anniversary date of the effective date of this Agreement during its duration, all the original and any new signatories of the declaration as described in Paragraphs 25 and 27, respectively, shall sign an "Annual Declaration of Compliance." An unsigned copy of this declaration is attached hereto as **EXHIBIT NO. 6**.  This declaration states, inter alia, that the signatory had no knowledge of environmental violations during the preceding year that were not reported in conformity with this section, and the signatory shall be subject to prosecution for perjury for material untruthful statements.  All declarations will be maintained alphabetically by year in a file at BPXA's headquarters office and be subject to EPA and/or State inspection, audit or compliance review during the term of this Agreement.



## BPXA'S ENVIRONMENTAL COMPLIANCE ASSURANCE PROGRAMS

29.     Each year BPXA routinely conducts compliance audits by way of self audits by the entity of itself, internal audits by another entity within the Company, or audits by external auditors. These audits will continue during the term of this Agreement, and BPXA will make these available to SDD upon its request, subject to the terms and conditions described in Paragraph 30.  In addition, BPXA will conduct at least two internal audits of its compliance with environmental laws and regulations and with this Agreement during the term of this Agreement, the first of which will be completed within 18 months after the endorsement date of this Agreement, on or before  April 30, 2002; and the second of which will be completed within 36 months after the effective date of this Agreement, on or before October 31, 2003.  EPA agrees that it will not assert that its review of such audit documents will constitute a waiver of any privilege otherwise applicable to such audits  or any portion thereof, and further agrees that such review is subject to the terms and conditions of Paragraphs 38 and 39 (confidentiality, attorney work product, privilege and Confidential Business Information (CBI) claims).

30.     All final internal audit reports assessing BPXA's compliance with this Agreement and any internal audit(s) conducted during the duration of this Agreement of its facilities relating to environmental compliance, responsibility, integrity or ethical issues shall be maintained in BPXA's headquarters office and shall be subject to inspection by the EPA SDD upon request.  EPA agrees that it will not assert that its review of such audit documents will constitute a waiver of any privilege otherwise applicable to such audits or any portion thereof, and further agrees that such review is subject to the terms and conditions described in Paragraphs 38 and 39 (confidentiality, work product, privilege and CBI claims). EPA may use the documents for a lawful purpose, subject to the conditions specified in Paragraphs 38 and 39 (which are privileges or attorney work product).

31.     In the event that any of BPXA's internal audits identifies deficiencies in BPXA's compliance with this Agreement or with its environmental programs or processes, those deficiencies will be fully investigated and addressed.  If any of the identified deficiencies are mandatorily required under applicable environmental law to be reported to any regulatory authority or agency, BPXA's environmental staff will so report and copies of those reports will be maintained in a file in BPXA's Headquarters office.  For the term of this Agreement, such reports will be subject to inspection or review by EPA SDD subject to claims of confidentiality, attorney work product, privilege and CBI as described in Paragraphs 38 and 39.  The provisions of this Paragraph will not be construed by the EPA SDD as an entitlement for EPA to become involved in BPXA's management decisions; rather, these will allow the EPA SDD to ensure that the goals and commitments made by BPXA under this Agreement are being met and adequately addressed.

EPA SDD hereby agrees that during discretionary audits or reviews conducted pursuant to this agreement, it will: 1) conduct such audits or reviews during normal business hours; and 2) use its best efforts not to unduly disrupt Company operations during the review process; and 3) give Respondent at least twelve hours advance notice so arrangements can be made for adequate conference room space and staffing to assist in the orderly and efficient production of documents and to ensure that the appropriate staff will be available to answer questions by the review team.



Reviews for cause, i.e., where there may be reason to believe that there are material breaches to the Agreement, will not be announced and will occur as necessary within the sole discretion of EPA SDD.

32.     BPXA will continue to seek the advice of its environmental staff, outside consultant(s) and corporate and outside counsel as often as is necessary in order to achieve full compliance with applicable environmental, health and safety laws as well as with the terms and conditions of this Agreement. BPXA will also seek guidance from local, state and federal regulatory agencies when appropriate in order to fully comply with the terms and conditions herein. BPXA understands that EPA will answer questions that pertain to environmental laws and regulations and their interpretation within the scope of EPA's regulating authority.

33.     BPXA will continue its membership and active participation in a number of industry organizations to maximize opportunities to learn from the experiences of other members and to educate and inform others about the lessons learned by BPXA with respect to environmental compliance. These organizations currently include the Alaska Oil and Gas Association, Alaska Support Industry Alliance, The Nature Conservancy, HSE Round Table, American Petroleum Institute, Ground Water Protection Council, Air and Waste Management Association, and GreenStar, all of which function to provide their member companies with an effective means of communication regarding industry and/or environmental issues. In addition, many of these organizations have environmental suborganizations to provide information exchange and collective action to deal with environmental and regulatory issues. Through participation in these organizations at the executive, manager and line employee level, BPXA will help and assist other industry members to identify and effectively address the operational or systemic conditions that can lead to non-compliance. BPXA will also seek opportunities to participate in appropriate industry or agency sponsored activities (e.g., advisory groups) where the Company's experience would be useful in developing programs, policies or standards that deal with potential compliance problems.

## TRAINING

34.     All BPXA executives and senior managers whose job titles are listed on **EXHIBIT NO. 7** attached hereto will be required to read, understand, and comply with this Compliance Agreement. They in turn will be responsible for communicating the requirements of this Agreement to their respective staffs to ensure compliance with this Agreement, and will be responsible for their staff's compliance with the law and with this Agreement.

35.     In an effort to sensitize its employees to environmental concerns and in order to improve the environmental and technical capabilities and skills of its employees, BPXA will continue to implement a program of environmental education and training for hourly employees, managers, environmental managers and contractors. In general, to ensure that these employees maintain a high level of environmental awareness, training, and education, the program includes specific environmental media training, permit compliance training, and environmental awareness and compliance policy training. BPXA further agrees that detailed training on the substantive contents of this Agreement will be covered during the initial employee training for each new manager, or for any managers who are promoted or whose responsibilities change to make them subject to the terms and conditions of Paragraph 34. At the conclusion of training, each such employee will acknowledge his/her completion of the training sessions hereunder by way of a dated



sign-in sheet. BPXA will maintain all training acknowledgments and sign-in sheets by facility along with a copy of the training agenda and any training materials for each training session that occurs during the term of this Agreement at BPXA's Headquarters office. These records will be made available to EPA SDD upon request or during any inspection, audit or review under this Compliance Agreement.

## DISSEMINATION AND NON-REPRISAL POLICY

36.     BPXA specifically agrees that a copy of this Agreement will be distributed to all BPXA employees whose job classification is listed in **EXHIBIT NO. 4**, which includes all managers for whom environmental compliance is part of their official duties, those employees whose principal job function relates to environmental compliance, including all waste handlers and contractors who fall into this category, and those employees who are involved in the solicitation, preparation, award, administration, execution, management or oversight of government contracts or assistance of any type.

37.     BPXA commits  and assures EPA SDD that there will be no reprisal or retaliation by BPXA or by any BPXA officer or manager or employee against any employee or party (including contractors and consultants) who report actual or potential violation(s) of environmental law to any regulatory authority, whether local, state or federal, including, but not limited to, EPA SDD, the U.S. Attorney or BPXA's managers or general counsel. Although BPXA prefers that employees report violations to BPXA first, BPXA recognizes that employees may choose to report first to any regulatory agency or to EPA under this Agreement and will take no action against an employee who takes this course of action.  BPXA commits to, and assures, EPA SDD that BPXA will take disciplinary action against any employee or manager who retaliates against any employee who uses the hotline number, the employee suggestion boxes, or who reports any actual or potential environmental violations to any local, state or federal regulatory authority in the course of his/her job, which includes reporting to a regulatory agency before reporting internally.  BPXA understands that retaliation against employee(s) for the reporting of instances of non-compliance with environmental laws and regulations or with the terms of this Agreement at any time (whether before or after BPXA is notified by the reporting employee) may be considered by SDD as a material breach of this Agreement which will be determined in accordance with the provisions of 40 CFR Part 32.  BPXA will to the best of its ability ensure that this policy is exercised in good faith and BPXA agrees to extend this policy of non-reprisal to part-time employees, consultants and contractors.  At the same time, EPA acknowledges that BPXA may, in good faith, discipline employees appropriately, regardless of whether or not they are whistleblowers, as long as the basis for the discipline is not the fact that they are whistleblowers, witnesses or potential witnesses against BPXA or its employees.  Instances of discipline against whistleblowers in which there is no written, documented history of performance problems by the employee (such as performance improvement reports that are initialed and dated by the employee) will constitute evidence of retaliation which will be rebuttable under this paragraph.

## DISCLOSURE POLICY, ACCESS AND COOPERATION

38.     The Respondent  hereunder agrees to keep and maintain all appropriate business records that are required by this Agreement, by regulation (including but not limited to EPA regulations), or by any federal contract or subcontract work or activity that falls within the ambit of

21



procurement or non-procurement assistance activities as stated in 40 CFR Part 32 during the duration of this Agreement. Under this Paragraph, Respondent agrees to allow inspectors, auditors or persons from or representing the EPA SDD conducting compliance reviews pursuant to Paragraphs G11 and G12 access to all appropriate and applicable business records at its facilities, to all compliance documentation under G13, and to audit documents under Paragraphs 29, 30, and 31 (including both internal and outside audits), unless such records or documents or portions thereof are confidential, or attorney client privileged or subject to the work product doctrine; provided that, any such assertion of privilege or protection shall be exercised narrowly and in good faith. This will include the right to audit and/or inspect any BPXA facility for compliance with environmental laws and with this Agreement.

39.     If any documents required to be maintained and produced or reviewed pursuant to this Agreement, including but not limited to business records under Paragraph 38, compliance documentation under G11, G12 and G13, or audit documents under Paragraphs 29, 30, and 31, contain confidential business information and/or proprietary information, such documents may be produced by BPXA through an agent who will physically produce a copy of the documents at the office of the SDD advocate for review. Such documents will be treated as confidential business information upon such claim by the Company (and subsequent determination by EPA under 40 CFR Part 2 that the information claimed is CBI) and the copy of the documents may be returned to BPXA at SDD's discretion. SDD agrees that it will not assert that its review of such document(s) will constitute a waiver of any privilege(s) otherwise applicable to such documents, any documents associated with the preparation of such document(s), or any portion thereof; except that in the event of a material breach of this Agreement, EPA SDD shall be entitled to keep and use a copy of such document(s) for official purposes. To the extent SDD is able (if legal action is taken thereon), SDD will maintain any internal audit report or document as confidential business information, if the document was claimed as confidential business information by Respondent and it was determined to be CBI by EPA pursuant to its regulations. Respondent shall in good faith cooperate with EPA SDD reviewers conducting inquiries related to its facilities and business and shall notify its employees in writing that it is Company policy to cooperate with regulatory officials and that the Company encourages its employees to answer all questions posed by EPA auditors and inspectors fully, truthfully and candidly.

40.     EPA SDD agrees that it is bound by the terms and conditions of this Agreement.

**CORPORATE RESPONSIBILITY COMMITMENT**

41.     BPXA commits to the EPA SDD to take all actions that are necessary during the duration of this Agreement, and to make changes to its operations as necessary to maintain compliance with this Agreement and to maintain the business integrity required of a Government contractor and participant. BPXA assures the EPA SDD that it will to the best of its abilities discharge all Government obligations ethically, appropriately and competently.

**STANDARD PROVISIONS:**

G1.     **Finality of Agreement (Revised).** This Agreement is the final agreement between the Parties pertaining to resolution of potential suspension and debarment of BPXA based upon the facts now known to the government. BPXA hereby waives all further notice and opportunity for



hearing to which it may otherwise be entitled in this matter and consents to proceed according to the terms of this Agreement.

G2. **Debarment Resolution.** In consideration of BPXA's compliance with all of the terms of this Agreement, EPA agrees not to suspend or debar BPXA or any of BPXA's affiliates, officers, directors or employees based upon the facts recited herein and any criminal conviction or civil judgment herein and any criminal conviction or civil judgment resulting therefrom.

G3. **Breach of Agreement/Survival of Cause for Debarment.** The Parties agree that these causes for debarment survive the execution of this Agreement and EPA may initiate additional suspension and/or debarment proceedings against BPXA on these grounds if there is a material breach of this Agreement. Any material breach of this Agreement may also be regarded as an independent cause for suspension or debarment; the Parties agree that repeated violations of non-material provisions of this Agreement may cumulatively become a material breach of this Agreement. EPA may, upon evidence that BPXA has committed a material breach of this Agreement, suspend or propose BPXA for debarment. EPA will promptly notify BPXA in writing of the suspension or proposed debarment. BPXA will have the right to contest the suspension or proposed debarment according to the procedures set forth in 40 CFR Part 32.

G4. **Limitation on Settlement (Revised).** This Agreement relates solely to suspension and/or debarment issues in conjunction with the circumstances recited herein and in no way waives any other criminal, civil, contractual or administrative remedy or right which the Government may have for the circumstances so described, nor does this Agreement restrict the authority, responsibility or legal duty of EPA to consider and institute suspension and/or debarment proceedings against BPXA if information is received that provides a cause for suspension and/or debarment independent of the circumstances recited or referenced herein. This Agreement does not prejudice or limit in any way the rights or ability of BPXA to contest any future suspension, proposed debarment or eligibility proceedings, or otherwise defend against any other actions by EPA or the United States.

G5. **Release of Liability.** By execution of this Agreement, BPXA releases and shall hold harmless the United States, its instrumentalities, agents, and employees, in their official and personal capacities, of any and all liability or claims arising out of or otherwise related to this case including all negotiations leading to this Agreement and all matters contained herein

G6. **Freedom of Information Act.** BPXA acknowledges that this Agreement and the Attachments hereto are subject to release by EPA in accordance with the provisions of the Freedom of Information Act, 5 U.S.C. § 552 et seq.

G7. **Obey All Laws (Deleted).**

G8. **Reporting Requirement (Substitute).** BPXA will disclose to the EPA SDD any significant violations of environmental law or regulations or federal procurement and non-procurement regulations or requirements pertaining to the present responsibility of the Company that occur at any of BPXA's facilities during the duration of this Agreement and will describe to EPA SDD any and all remedies that BPXA has implemented or will implement to address the non-compliance. Nothing in this Agreement precludes BPXA from requesting the benefits of the EPA's Voluntary Disclosure Policy and any subsequent interpretative policies for any future



disclosure, nor shall anything in this Agreement adversely affect EPA's consideration of same or application of the such policies.

G9. **Restructuring or Acquisition of New Businesses (Revised).** BPXA shall not, through a change of name, business reorganization, sale or purchase of assets, or similar action, seek to avoid the obligations and conditions set forth in this Agreement. If, during the period covered by this Agreement, BPXA acquires or gains control of any business concern that performs or may perform work on projects funded by Federal assistance or procurement programs, such company shall be subject to the terms and conditions of this Agreement, and EPA shall be notified of the name of such newly-acquired business concern, its address and the nature of its business within ten calendar days from consummation of the acquisition or control.

G10. **Successors and Sale of Assets.** The terms, conditions and obligations of this Agreement shall survive reorganization of BPXA's corporate structure and shall be fully binding upon any organization which is a successor in interest to substantially all of the assets or shares of BPXA or which is associated or affiliated with BPXA; provided, however, that this Agreement is not intended to restrict the lawful and legitimate sale of assets to a bona fide independent purchaser and would not bind such an asset purchaser.

G11. **On-Site Compliance Reviews.** During the period of this Agreement, EPA may review BPXA's compliance with the terms of this Agreement. Such review may include visits by EPA employees and EPA authorized representatives to BPXA's facility(ies), interviews with employees, and an inspection of the facility. BPXA agrees to reimburse the U.S. Treasury for the reasonable costs actually incurred in conducting such reviews during the term of this Agreement. The Parties agree that "cost" shall include reasonable expense for travel, transportation, lodging and meals, to the extent normally authorized under Federal rules governing Government travel, as such expenses are actually incurred by EPA personnel or its authorized agents in conducting site visits for the purpose of verifying compliance with this Agreement. Costs under this paragraph will not be an allowable cost under any Federal contract or assistance agreement that BPXA has with any Federal agency.

G12. **Reviews Not Conducted on Site.** As an alternative to an on-site review of BPXA's compliance with the terms of this Agreement, EPA may, at its sole election, conduct a compliance review by mail in which instance BPXA shall provide documentation of its compliance with this Agreement including but not limited to copies of documentation maintained as required in this Agreement and such additional relevant documentation and/or certifications as may be requested by EPA.

G13. **Documentation.** BPXA shall maintain documentation sufficient to demonstrate its compliance with the requirements of this Agreement.

G14. **Notification Addresses.** All notifications or submissions from BPXA required under this Agreement will be mailed to the following addresses:

U.S. Environmental Protection Agency
Suspension and Debarment Division (3902-R)
401 M Street, SW
Washington, DC 20460

with a copy to:

US EPA
Jeanne A. Pascal, Northwest District Debarment Counsel
EPA Suspension and Debarment Division
1200 Sixth Avenue (SD-071)
Seattle, WA 98101

BPXA's contact, in addition to Ms. Pascal at the address above for matters involving this Compliance Agreement, shall be:

Mr. Douglas Smith
US EPA: OEA-095
1200 Sixth Avenue
Seattle, WA 98101

G15. **Endorsement by the Debarring Official.** This Agreement shall become effective only upon its acceptance by the Debarring Official, pursuant to 40 CFR Part 32, as evidenced by his dated endorsement affixed hereto.

G16. **Modification of the Agreement.** Modifications to this Agreement, if any, shall be in writing, signed on behalf of BPXA and by the EPA Debarring Official, or his designee.

G17. **Term of the Agreement.** This Agreement shall remain in force until January 31, 2005.

G18. **Certification as to Recited Facts.** By signature hereto, the individual executing this Agreement on behalf of BPXA certifies, personally and on behalf of the corporation, subject to the criminal penalties of 18 U.S.C. § 1001, that the facts recited herein and in the submissions to the Suspension and Debarment Division and exhibits affixed hereto are to the knowledge and belief of BPXA, complete and accurate.

**LIST OF EXHIBITS AND DELIVERABLES**

EXHIBIT NO. 1:  Information

EXHIBIT NO. 2:  Plea Agreement and Attachment 1

EXHIBIT NO. 3:  BPXA Reporting Procedure

EXHIBIT NO. 4:  Positions Requiring Execution of Declaration

EXHIBIT NO. 5:  Declaration of Environmental Commitment

EXHIBIT NO. 6:  Annual Declaration of Compliance

EXHIBIT NO. 7:  Distribution List for Compliance Agreement

First Internal Audit Report due April 30, 2002; and,

Second Internal Audit Report due October 31, 2003.

**SIGNATORIES:**

**FOR BP EXPLORATION (ALASKA) INC.:  RESPONDENT**


Chris J. Phillips                                    10/3/00
Chris J. Phillips                                    Date
Vice President, BP Exploration (Alaska) Inc.


**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**


                                                     10/12/00
Jeanne A. Pascal, Northwest District                 Date
Debarment Counsel



## ENDORSEMENT AND DETERMINATION

Having reviewed the terms of the above Compliance Agreement between the U.S. Environmental Protection Agency, and BP EXPLORATION (ALASKA) INC., I hereby approve the terms of said Agreement as the appropriate disposition of this matter.

_____     11/8/00
Robert F. Meunier, Esq.                            Date
Office of Grants and Debarment
Debarring Official

Houston:209019 v 14

27

EXHIBIT 1

ROBERT C. BUNDY
United States Attorney
DEBORAH M. SMITH
Deputy Chief
Environmental Crimes Section
TIMOTHY M. BURGESS
Assistant United States Attorney
SCOTT ELTRINGHAM
Trial Attorney
Environmental Crimes Section
JAMES OESTERLE
Special Assistant United States Attorney
Federal Building & U.S. Courthouse
Room 253
222 W. 7th Avenue, #9
Anchorage, AK 99513-7567
(907) 271-5071

FILED

SEP 2 3 1999

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By ————————— Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA )
                          )
        Plaintiff,        )     No. A99-0141 CR. (JKS)
                          )
    v.                    )
                          )
                          )     INFORMATION
BP EXPLORATION            )
    (ALASKA) INC.         )
                          )
        Defendant.        )
_____)

The United States Attorney charges that at all times relevant to this Information:

1.    Defendant BP EXPLORATION (ALASKA) INC. (BPXA) conducted oil

exploration, drilling, and production activities in Alaska. BPXA was the majority owner and

1

operator of Endicott Island.  Endicott consisted of two man-made gravel islands located in the

Beaufort Sea off the North Slope of Alaska.  The islands were constructed in the late 1980's to

facilitate oil exploration and production.  Endicott Island is a facility, pursuant to Title 42, United

States Code, Section 9601(9), which defines "facility" to include "any building, structure,

installation, equipment . . . [or] well."

     2.     BPXA was a person in charge of a facility pursuant to Title 42, United States

Code, Section 9601(21), which defines "person" to include a corporation.

     3.     BPXA contracted with Doyon Drilling, Inc. (Doyon Drilling) to provide drilling

services on Endicott Island, specifically to operate a drilling rig identified as Rig 15.

     4.     An oil-producing well is typically constructed using a series of concentric steel

pipes ("casing"), with the smaller inner casings extending deeper than the outer casings.  The

spaces between the various casings are called annuli.  The space between the outermost casing,

known as the surface casing, and the next innermost casing is called the outer annulus.  The

surface casing extends to a depth of between 2,700 feet and 4,500 feet.  On most Endicott wells,

fluids pumped down the outer annulus reach the 2,700 to 4,500 foot depth, then flow into the

ground formation and are released into the environment.

     5.     In late 1992, a processing facility known as a rockwasher was added to Rig 15.

The function of the rockwasher was to process rock cuttings and spent drilling muds used in the

well drilling process.  Some of the rock cuttings and spent drilling muds were injected into the

outer annuli, or the outermost spaces of oil-producing wells on Endicott Island, utilizing a

practice known as annular injection.

6.     Between early 1993 and lasting until approximately September 1995, Doyon Drilling discharged hazardous substances by injecting barrels of waste materials down the outer annuli of oil-producing wells at Endicott.   The injected barrels contained a variety of wastes, including waste paint thinner, waste paint and waste solvents.   The outer annuli of the oil-producing wells into which the waste materials were injected were not sealed.  The waste materials were released into the environment.

7.     On or about January 17, 1995, twenty-three 55-gallon barrels of hazardous substances were injected down the outer annuli of a well.  Prior to injection, a sample of the twenty-three barrel mixture was taken by a Doyon Drilling employee.  Later analysis by the Environmental Protection Agency revealed that the sample was ignitable and contained chemical constituents found in specific listed halogenated and non-halogenated solvents identified by the Environmental Protection Agency as hazardous when spent and disposed, also known as F-listed wastes.  Some of the particular constituents included methylene chloride, naphthalene, toluene, benzene, xylene, ethyl benzene, 1,2,4-trimethylbenzene and 1,3,5-trimethylbenzene.  The injected mixture constituted a hazardous substance as defined under the Comprehensive Environmental Response, Compensation, and Liability Act, Title 42, United States Code, Sections 9601(14)(C).

8.     The quantity of an ignitable hazardous substance which must be reported to the appropriate government agency when it is released into the environment is 100 pounds.  42 U.S.C. § 9602; 40 C.F.R. § 302.4 (Table).  This amount is referred to as the reportable quantity. The reportable quantity for F-listed solvent based hazardous wastes containing the constituents found in the sample is between 10 and 100 pounds.  42 U.S.C. § 9602; 40 C.F.R. § 302.4(Table).

3

9.      A release includes "any spilling, . . . pumping, pouring, emitting, discharging injecting, . . . dumping or disposing into the environment." 42 U.S.C. § 9601(22).  The environment includes "surface water, ground water, . . . land surface or subsurface strata, or ambient air within the United States." 42 U.S.C. § 9601(8).

10.      On August 31, 1995, a Doyon Drilling employee reported the illegal disposal of hazardous waste over a three-year period, including the January 17, 1995, injection of twenty-three barrels, to BPXA managers.

11.      The Comprehensive Environmental Response, Compensation, and Liability Act, Title 42, United States Code, Sections 9601 et seq., seeks to ensure immediate reporting of releases of hazardous substances to the environment in order to allow government regulators and investigators to immediately respond and minimize any environmental harm.  Immediate reporting also enables investigators to prevent the loss of evidence during the investigation.

12.      On or about August 31, 1995, within the District of Alaska, Defendant BP EXPLORATION (ALASKA) INC., knew of the release to the environment of a hazardous substance in an amount equal to or greater than the reportable quantity at the Endicott Island facility and the Defendant BP EXPLORATION (ALASKA) INC. failed to immediately notify

///

///

///

///

///

///

4

the appropriate agency of the United States as soon as the Defendant became aware of the

release, in violation of Title 42, United States Code, Section 9603(a).


DATED this _23_ day of September, 1999.


ROBERT C. BUNDY
United States Attorney


DEBORAH M. SMITH
Deputy Chief
Environmental Crimes Section


TIMOTHY M. BURGESS
Assistant United States Attorney


SCOTT ELTRINGHAM
Trial Attorney
Environmental Crimes Section


JAMES D. OESTERLE
Special Assistant U.S. Attorney


5