# Exhibit 12

To United States' Opposition to BPXP's Motion in Limine to Exclude (1)
Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents

ROBERT C. BUNDY
United States Attorney
DEBORAH M. SMITH
Deputy Chief
Environmental Crimes Section
TIMOTHY M. BURGESS
Assistant United States Attorney
SCOTT ELTRINGHAM
Trial Attorney
Environmental Crimes Section
JAMES OESTERLE
Special Assistant United States Attorney
Federal Building & U.S. Courthouse
Room 253
222 W. 7th Avenue, #9
Anchorage, AK 99513-7567
(907) 271-5071

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>BP EXPLORATION<br>(ALASKA) INC. )<br><br>Defendant. ) | No. *A 99-0141 CR (JKS)*<br><br><br>PLEA AGREEMENT |

## I.    INTRODUCTION

A. This document contains the complete plea agreement (Agreement) between the

United States of America (Government) and Defendant BP EXPLORATION (ALASKA) INC.

**PLEA AGREEMENT**
**Page 1**

PSC-MDL2179085800

TREX-22394

(BPXA), a Delaware corporation doing business in Alaska. Other than this Agreement, no other agreement, understanding, promise or condition exists between the parties.

B. The parties expressly agree and acknowledge that this Agreement is entered into and controlled by Fed. R. Crim. P. 11(e)(1)(C) and 11(e)(2). The Government and the Defendant understand and agree that: (a) if the Court accepts this Agreement, the Court is bound by the terms of the Agreement, and (b) if the Court does not accept this Agreement, either party may withdraw from the Agreement and the Defendant may withdraw its plea of guilty.

C. This Agreement does not limit the rights of any party to provide the Court or the United States Probation Office (Probation Office) with a full description of the Defendant's conduct, correct inaccuracies at any time, or speak at the time of sentencing consistent with the recommended provisions set forth in the Agreement. The parties agree to allocute at sentencing in favor of the joint recommendation regarding the appropriate sentence, as set forth in this Agreement.

D. This Agreement is limited to the United States Attorney's Office for the District of Alaska (United States Attorney's Office) and the Environmental Crimes Section of the Department of Justice, and does not bind other sections or divisions of the Department of Justice or any other federal, state or local prosecutive or regulatory authority.

E. The Defendant agrees that it has been fully advised of its statutory and Constitutional rights, that it has been informed of the charges and allegations against it and the possible penalties, and that it understands them. The Defendant further agrees that it understands that by

**PLEA AGREEMENT**
**Page 2**

PSC-MDL2179085801

CJP

entering a plea of guilty as set forth below, it will be waiving certain statutory and Constitutional rights to which it is otherwise entitled.

F. The Government and the Defendant agree that Chapter 8 of the Federal Sentencing Guidelines Manual governs this case with regard to any payment of restitution, community service, and probation, consistent with the nature of this Rule 11(e)(1)(C) Agreement; however, pursuant to U.S.S.G. § 8C2.1, Chapter 8 of the Federal Sentencing Guidelines Manual does not apply to the determination of an appropriate fine.

G. The Defendant understands and agrees that this Agreement does not confer any immunity on the Defendant or any of its officers, employees or directors for making false statements to the Government or giving untruthful testimony under an oath at any judicial proceeding, nor does this Agreement provide use immunity or derivative use immunity to the Defendant or any of its officers, employees or directors for any statements.

II. <u>THE AGREEMENT</u>

A. The Defendant agrees to:

1. Waive indictment and plead guilty to an Information charging it with one felony count of knowingly failing to immediately report the release into the environment of a hazardous substance, in violation of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Title 42, United States Code, Section 9603(a).

2. Acknowledge responsibility for the acts and omissions constituting the crime alleged in the Information and constituting the factual basis for its plea of guilty, which facts are set forth below in Section VI of this Agreement.

**PLEA AGREEMENT**
**Page 3**

PSC-MDL2179085802

CJP

3. Have its representative, an officer of BPXA, employed by and duly authorized by the Defendant's Board of Directors and with authority to speak for the Defendant, appear and enter the guilty plea and also appear for imposition of sentence.

4. Provide to the Government and the Court written evidence, in the form of a notarized resolution of its Board of Directors with both notary and corporate seals, certifying that the Defendant is authorized to waive its right to Indictment, to plead guilty to the Information in this case and to enter into and comply with all provisions of this Agreement. The resolution shall further certify that the President or Chief Executive Officer or his or her designee is authorized to take these actions and that all corporate formalities, including but not limited to approval by Defendant's directors, required for such authorization have been observed.

5. Forfeit its right to appeal any lawful sentence imposed in conformity with the provisions of this Rule 11(e)(1)(C) Agreement. The parties agree not to make any public statement regarding this Agreement or the Information, other than as required by law, prior to the filing of the Information.

6. Pay a fine of $500,000 as specified in paragraph IV.A of this Agreement.

7. Be placed on organizational probation for a probationary period of five years as specified in paragraph IV.C of this Agreement.

8. Provide full and complete cooperation to the United States in its continuing investigation of possible violations of federal law by any of the Defendant's employees, contractors, or agents as specified below. It is understood and agreed that the Government is not

**PLEA AGREEMENT**
**Page 4**

CJP

seeking and the Defendant is not agreeing to disclose legal or strategic advice or legal expertise

rendered.  The Defendant agrees to do the following:

a.      Provide all reports of interviews prepared or conducted by its counsel

(including in-house and outside counsel and criminal defense counsel) and

its agents, and all notes of interviews containing factual information

regarding possible violations of federal criminal environmental law

relating to the disposal of hazardous waste at Endicott Island, Alaska, from

1992 to 1995.  Portions of the reports of interviews which include

counsel's mental impressions, opinions of counsel and advice of counsel

may be redacted.  The Defendant will advise the Government of any

interviews that were not reduced to writing and have the interviewer

generate a report of interview based on his/her recollection.  In entering

into this agreement, the Defendant understands that there may be a need to

seek clarification of any report from its author by any appropriate means

and to seek the testimony of any participant in any interview.  The

Government will only call an attorney for the Defendant as a witness in

the event the Government determines in its sole discretion that securing

adequate testimony through other witnesses, such as investigators, is not

practicable or effective;

b.      Provide all documents and portions thereof containing statements,

including factual summaries, digests and/or chronologies prepared by its

PLEA AGREEMENT
Page 5

*CJP*

agents, employees or counsel regarding the subject matter defined in subparagraph 8(a);

c.    Provide all relevant written factual information concerning the complete results of all internal and external investigations of these matters;

d.    Provide full access to the Defendant's factual and technical experts, consultants and vendors and copies of all factual records and reports produced by same, or factual portions thereof, including those prepared for or at the direction of counsel.  The Government will restrict any of its questioning, interviews or testimony of these individuals to factual information and documents;

e.    Provide an updated and consolidated index for all documents produced pursuant to subparagraphs 8(a) through 8(d) of this Agreement and the subpoenas issued during the Government's investigation of BPXA;

f.    Provide an updated and consolidated privilege log for all documents withheld from production pursuant to subparagraphs 8(a) through 8(d) of this Agreement and the subpoenas issued during the Government's investigation of BPXA under a claim of privilege, with an indication of which documents (or portions thereof) are not being provided and the justification.  As part of the consolidated privilege log, or in a separate document, the Defendant will identify and enumerate all documents being withheld in part, or in their entirety, under a claim of the joint defense

**PLEA AGREEMENT**
**Page 6**

*CJP*

privilege or the common interest privilege and provide a general description of each document and its origin, without disclosure of the identity of the members of any joint defense privilege. The Defendant will further provide the United States with a general description including the number, length and type of documents withheld on the basis of the joint defense privilege;

g.   The Defendant, and all counsels and consultants for the Defendant, shall withdraw from all joint defense agreements and all common interest agreements regarding the subject matter of this Agreement upon signing of this Agreement and shall immediately sever all such contractual agreements. The Defendant, and all counsels and consultants for the Defendant, agree not to enter any joint defense agreements or common interest agreements regarding the subject matter of this Agreement after the signing of this Agreement. The Defendant shall not produce information or notes of interviews without the consent of all parties to the interview if such interview is protected by a common interest agreement or joint defense privilege;

h.   During the period of probation, and at all reasonable times and with reasonable prior notice by the Government as practicable, provide full access to its facilities, records, and employees including: (1) access to, and production and authentication of, all records regarding the subject matter

**PLEA AGREEMENT**
**Page 7**

PSC-MDL2179085806

*CJP*

defined in subparagraph 8(a); and (2) access to its officers and employees
for the purposes of service of process, interviews, or arrest;

i.    Make its employees available in the United States to participate in judicial
proceedings, and the Defendant will make all reasonable efforts to ensure
that its officers, employees, consultants, attorneys, vendors and experts
cooperate with the investigation and disclose all information about their
activities and those of others relating to the subject matter set forth in
subparagraph 8(a), including advising them that: (1) they are encouraged
to cooperate, including by agreeing to provide information to the
Government, being interviewed by Government agents or attorneys, and
testifying in official proceedings; and (2) the Defendant will grant liberal
leave and pay reasonable transportation expenses to facilitate their
cooperation with the Government.

9. In providing the factual information and factual documents identified in
paragraph 8, and factual portions thereof, the Defendant and all its counsel affirmatively waive
any attorney-client privilege or attorney work product doctrine that may apply to this information
and documents.  The Defendant and all its counsel agree that the United States may make any
direct or indirect use, including release to third parties, of any information and documents
provided under this Agreement, except that in the event the United States proposes to release
confidential business information to any third party, the Defendant shall be provided prior notice
and a reasonable opportunity to seek an appropriate protective order or other judicial relief.  The

**PLEA AGREEMENT**
**Page 8**

CJP

Defendant shall provide to the United States an index of materials which it defines as confidential business information. The Defendant will not assert against the United States that any of the factual information or documents provided under this agreement remain subject to the attorney-client privilege or remain protected by the work product doctrine. The Government agrees not to argue that the fact that the Defendant has produced factual information and documents under this Agreement entitles the United States to attorney advice, legal strategy or legal opinions otherwise subject to the attorney-client privilege or the work product doctrine. The parties understand and agree that the United States may request additional documents from the Defendant as authorized by law. However, waivers required under this paragraph are not intended as general waivers of the attorney-client or work product privileges and apply only to the obligations defined in subparagraphs 8(a) through 8(i) of this Agreement, the subpoenaed documents, and information, interviews and documents voluntarily provided to date.

10. The Defendant agrees to develop, implement and maintain a Nationwide Environmental Management System (EMS) at BP Amoco Group facilities which are engaged in the exploration, drilling and/or production of oil, both onshore and offshore, in the United States of America and its territories, as described below. The EMS will be implemented and maintained at the following BP Amoco Group Business Units, which are owned, managed or operated by BPXA, BP Exploration & Oil, and/or Amoco Production Company. First, within Alaska, the participating Business Units will include Alaska Exploration, Central North Slope, Eastern North Slope, and Western North Slope. Second, within the contiguous United States, the participating Business Units will include Western U.S. Gas and MidContinent-Gulf Coast.

**PLEA AGREEMENT**
**Page 9**

*CJP*

Third, offshore the contiguous United States, the participating Business Units will include Gulf of Mexico-Deepwater Development, Gulf of Mexico-Deepwater Production, Gulf of Mexico-Exploration, and Gulf of Mexico-Shelf. The EMS will be consistent with the best environmental practices in order to effectively protect workers, the public and the environment, and to comply with all statutory and regulatory requirements. Under the EMS, policies and procedures will be implemented which are designed to ensure that the environmental performances of contractors and on-site service organizations, such as BPXA Shared Services Drilling, are adequately supervised. The Defendant agrees to assume all costs for the development, implementation and maintenance of the EMS during the period of probation, which will amount to approximately $15 million. Since BPXA's report of the illegal conduct to EPA in September 1995, approximately $5 million has been spent to implement the present environmental management system on Endicott Island and in Alaska.

        a.    BP America Inc., a Delaware corporation and Defendant's parent corporation, has agreed to (1) guarantee the availability of the funding necessary to develop, implement, maintain and monitor the EMS as described in this agreement and Attachment 1, (2) guarantee the performance of BPXA and BP Exploration & Oil in accord with this Agreement and Attachment 1, and (3) cooperate fully in the development, implementation, maintenance and monitoring of the EMS, as described in this Agreement and Attachment 1.

        b.    BP Amoco Corporation, an Indiana corporation and a parent corporation of Amoco Production Company, has agreed to (1) guarantee the performance of Amoco Production Company in accord with this Agreement and Attachment 1, and (2) cooperate

**PLEA AGREEMENT**
**Page 10**

PSC-MDL2179085809

CJP

fully in the development, implementation, and maintenance of the EMS as described in this Agreement and Attachment 1.

c.  The Defendant, and each of the corporations which manage, own or operate each of the individual Business Units, including BP Exploration & Oil and Amoco Production Co., shall agree and guarantee that the respective obligations to be assumed under paragraphs 10 through 12 and Attachment 1 attach to the assets or facilities subject to the EMS and shall pass to any successor-in-interest to each corporation, and shall be extended to any new Business Unit or new division engaged in the exploration, drilling and/or production of oil, provided that the assets or facilities of such Business Unit or new division are wholly owned, managed or operated by or affiliated with the Defendant, each of the aforesaid corporations or an affiliated corporation of them.

d.  BP Amoco p.l.c., an English corporation and the controlling corporation of the BP Amoco Group of companies, including BPXA, BP Exploration & Oil and Amoco Production Co., (BP Amoco) may from time to time merge with or acquire companies or assets during the term of this Agreement. The Defendant acknowledges and agrees that it is one of the objectives of paragraphs 10 and 11 of this Agreement to establish a uniform EMS in all new assets or facilities acquired by BP Amoco wholly or partly engaged in the exploration, drilling and/or production of oil and within the United States of America and its territories during the term of this Agreement. Should BP Amoco merge with or acquire additional assets or facilities during the term of this Agreement which are wholly or partly engaged in the exploration, drilling and/or production of oil and within the United States of America and its

**PLEA AGREEMENT**
**Page 11**

PSC-MDL2179085810

territories, then the Defendant shall immediately identify those new assets or new facilities which are engaged in the exploration, drilling and/or production of oil within the United States of America and its territories and shall fund, develop, implement and maintain the EMS described in Attachment 1 of the Agreement for those assets or facilities, in accordance with the provisions and limitations of paragraphs 10 through 12 and Attachment 1, provided that the acquired assets are, after the acquisition, operated or wholly or partially owned corporations controlled by BP Amoco or its successor-in-interest. Board resolutions of the corporate parents of any corporations owning such assets or facilities, and guarantee letters, similar in form and content to those delivered by the corporations presently owning such assets or facilities of the Business Units listed in Attachment 1 of the Plea Agreement, shall be delivered by the Defendant to the United States Attorney's Office for the District of Alaska and the United States Probation Office within thirty (30) days of the formal completion of such acquisition.

    e.  The Defendant agrees to provide the United States Attorney's Office for the District of Alaska and the United States Probation Office with immediate notice of any name change, business reorganization, sale or purchase of assets, divestiture of assets, or similar action affecting the Business Units subject to this Agreement or Defendant's performance of this Agreement. The Defendant shall not through a change of name, business reorganization, sale or purchase of assets, divestiture of assets, or similar action, seek to avoid the obligations and conditions set forth in this Agreement.

**PLEA AGREEMENT**
**Page 12**

PSC-MDL2179085811

*CJP*

           f.      This Agreement, together with all of the obligations and terms hereof, shall inure to the benefit of and shall bind assignees, successors-in-interest, or transferees of the Parties.

           g.      No change in ownership or corporate or other legal status including, but not limited to, any transfer of assets or property, shall alter BPXA's responsibilities under this Plea Agreement, except, however, in the event BPXA no longer has any ownership interest or operational control at a facility other than Endicott Island and Satellite Drilling Island, it may notify the Environmental Protection Agency in writing, providing supporting documentation of the transaction, and, thereafter, will no longer be obligated to perform the requirements of Section II.A, paragraphs 10 through 12, and Section IV.D, paragraph 3, of this Plea Agreement and Attachment 1 thereto at that facility. No later than 30 days prior to sale or transfer of ownership or operation of any Endicott Island or Satellite Drilling Island facility, BPXA shall give written notice of this Plea Agreement to each purchaser or successor-in-interest. Upon such sale or transfer, BPXA shall provide a copy of this Plea Agreement to each such purchaser or successor-in-interest. The sale or transfer of ownership or operation of any Endicott Island or Satellite Drilling Island facility will not relieve BPXA of its obligations regarding the Endicott Island and Satellite Drilling Island facility under this Plea Agreement. BPXA shall notify in writing the United States Department of Justice and the Environmental Protection Agency of such purchaser or successor-in-interest at least 30 days prior to any sale or transfer of any Endicott Island and/or Satellite Drilling Island facility.

**PLEA AGREEMENT**
**Page 13**

PSC-MDL2179085812

CJP

11. The Defendant agrees to ensure that the incentive bonus and shared savings programs offered to the employees, contractors, contractor employees and agents engaged in oil exploration, drilling and production at BP Amoco Group facilities in the United States and its territories do not encourage behavior which could result in operational risks or environmental harm. The improved incentive bonus programs and shared savings programs will be implemented and maintained at BP Amoco Group Business Units owned, managed or operated by BPXA, BP Exploration & Oil, and/or Amoco Production Company, as listed in paragraph 10. Waste minimization strategies adopted to avoid costs will not be rewarded unless those strategies are wholly consistent with all applicable statutes and regulations. All such incentive bonus and shared savings programs will be regularly evaluated to ensure that their existence does not cause additional environmental risks. Should any new assets or facilities be acquired by BP Amoco as described in subparagraphs 10(c) and (d), their incentive bonus and shared savings programs shall be subject to the same provisions as in this section.

12. The Defendant agrees to the appointment of a court-appointed monitor during the probationary period to monitor development, implementation and maintenance of the EMS and the design and supervision of the incentive bonus and shared savings programs. The Defendant agrees to assume all costs and expenses associated with the employment of the monitor.

B. In exchange for the Defendant's full and complete compliance with the terms of this Agreement, the Government acknowledges and agrees that:

**PLEA AGREEMENT**
**Page 14**

1. Following the Defendant's report of the criminal conduct to the Environmental Protection Agency, BPXA did the following: improved its waste management procedures at Endicott Island; enhanced its environmental training for BPXA employees and contractors; discontinued the practice of utilizing used solvents and used oil to protect the outer annuli of wells from freezing; commissioned a waste management audit on Endicott Island; conducted a North Slope-wide multi-media environmental compliance audit; qualified for certification pursuant to the International Organization for Standardization (ISO) Environmental Management Systems—Specification with Guidance for Use (also known as ISO 14001 certification); reorganized its Health, Safety and Environmental (HSE) sections within the business organization to increase corporate accountability for HSE functions and to ensure compliance with environmental statutes and regulations; and modified its incentive bonus program to ensure that employees did not have an incentive to cut costs at the expense of environmental compliance and safety.

2. During the Government's investigation, BPXA took the following steps to cooperate: provided a summary of its initial internal investigation, including notes of interviews; provided extensive documentation; provided unrestricted access to the facilities and drilling operations on Endicott Island, at Prudhoe Bay and to the BPXA Anchorage offices; provided unrestricted access to paper files and computer files on Endicott Island and in BPXA Anchorage offices; provided a document-by-document inventory of documents produced; provided access to expert witnesses; made employees stationed in foreign countries available to Government investigators, and paid for the employees' transportation to Anchorage. After a period of

**PLEA AGREEMENT**
**Page 15**

PSC-MDL2179085814

negotiation, BPXA provided additional notes of employee interviews taken by outside counsel

during the later stages of the internal investigation, and provided a limited waiver of the attorney-

client and work product privileges.

   3. In recognition of the corrective measures adopted by the Defendant subsequent

to the offense, the development, implementation and maintenance of the Nationwide

Environmental Management System, and certain steps taken to cooperate with the government's

investigation, the Government agrees to forego charging in an information or indictment criminal

violations of the Resource Conservation and Recovery Act, Title 42, United States Code, Section

6928(d)(2).

   4. The Government will not seek additional criminal prosecution in the District of

Alaska against the Defendant, or any other affiliated or related corporate entity, for

environmental criminal violations and general criminal violations (1) relating to waste disposal

and rig operations at Rig 15 from 1992 to 1995, or (2) based on any matters that were the subject

of the Government's criminal investigation involving the Defendant and were known to the

Government at the time of this Agreement. This Agreement does not limit the Government's

right to prosecute any offenses based on facts of which it was unaware as of the date of this

Agreement. The parties understand that this Agreement does not apply to any individuals,

including but not limited to present and former employees, officers, agents and contractors. The

parties further understand that this Agreement applies only to federal criminal charges and only

binds the United States Attorney's Office for the District of Alaska and the Department of Justice

Environmental Crimes Section. The Defendant has discussed this Agreement with its attorneys

**PLEA AGREEMENT**
**Page 16**

PSC-MDL2179085815

*CJP*

and understands that nothing contained in this Agreement is meant to limit the rights and authority of the United States to take further civil or administrative action against the Defendant or any affiliated or related corporation, including but not limited to, any listing and debarment proceedings to restrict rights and opportunities of the Defendant to contract with or receive assistance, loans and benefits from United States government agencies.

III.    PENALTIES

The maximum penalty for the count in the Information is a fine of $500,000 or twice the gross gain or loss resulting from the unlawful conduct, Title 18, United States Code, Section 3571; from one to five years probation; and a special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

IV.    RECOMMENDATIONS AS TO SENTENCE

Pursuant to Fed. R. Crim. P. 11(e)(1) and (2), the parties agree that the following sentence is appropriate and should be imposed in this case:

A.   The Defendant shall pay the maximum fine of $500,000. The fine will be paid on or before the date that the Court imposes sentence.

B.   The Defendant shall pay a special assessment of $400 to the Victim's Assistance Fund, pursuant to Title 18, United States Code, Section 3013(a)(2)(B), on or before the date that the Court imposes sentence.

C.   The Defendant shall be placed on organizational probation for a period of five years.

**PLEA AGREEMENT**
**Page 17**

*CJP*

D. In addition to the Court's standard conditions of probation and in addition to conditions that may be set by the Probation Office, the terms of probation shall include the following specific conditions:

1. The Defendant shall commit no further violations of environmental laws, regulations or permits of the United States, including those for which primary enforcement has been delegated to a state.

2. Any environmental violation voluntarily and timely reported to appropriate representatives of the United States Government by BPXA, as provided in its EMS and in accord with all the provisions of the 1991 Department of Justice voluntary disclosure policy (also known as "Factors in Decisions on Criminal Prosecutions for Environmental Violations in the Context of Significant Voluntary Compliance or Disclosure Efforts by the Violator"), shall not be considered by prosecutors to be a probation violation or to be subject to sanctions under this Agreement. The determination of whether the disclosure is timely and voluntarily reported shall be within the sole discretion of the Government. The Government's position on whether a subsequent violation is an appropriate basis for a probation violation does not bind the United States Probation Office or the Court. Nothing herein shall prohibit the United States from proceeding administratively, civilly, or criminally against BPXA for any alleged environmental violation.

3. The Defendant shall develop, implement and maintain a permanent Nationwide Environmental Management System, as described in paragraph 10 and Attachment 1, "BP Amoco Group Environmental Management System," which is incorporated by reference,

**PLEA AGREEMENT**
**Page 18**

PSC-MDL2179085817

*CJP*

at all BP Amoco Group Business Unit facilities engaged in the exploration, drilling and/or production of oil, both onshore and offshore, in the United States of America and its territories. Attachment 1 details the EMS objectives and required supervision, structure, training, audits, and reports to the Government and Court.  Paragraph 10 of this Agreement contains requirements relating to the acquisition of Business Units and such terms shall apply throughout this section.

    a.    The EMS at each such Business Unit facility will establish that: all environmental and related operational risks have been identified; such risks are being appropriately managed and potential risks are avoided; all federal, state and local environmental laws, regulations, and permit requirements are being adhered to; appropriate policies, programs and procedures are in place; organizational responsibilities are clearly defined, understood and implemented; Business Units', contractors' and on-site service organizations' environmental quality control assurance and verification systems are in place, as determined by appropriate self-policing and third-party audits; company operations, including contractor operations and on-site service provider operations, do not present actual risks to the environment.  The Defendant shall ensure that the environmental compliance program is diligently enforced by the officers and managers of the Defendant and the Business Units.

    b.    The Defendant shall be responsible for all costs associated with the development, implementation, maintenance and monitoring of the EMS.

**PLEA AGREEMENT**
**Page 19**

PSC-MDL2179085818

*CJP*

c.     As part of the EMS, the Defendant shall ensure that all BP Amoco Group Business Unit incentive bonus and shared savings programs, as described in paragraph 10 and Attachment 1, offered to employees, contractors, contractor employees, and agents engaged in the exploration, drilling and production of oil are designed to discourage behavior which could result in operational risks or environmental harm. All such incentive bonus and shared savings programs shall be regularly evaluated by the Defendant to ensure that their existence and terms do not cause environmental risks.

d.     During the period of probation, a court-appointed monitor shall monitor the development, implementation and maintenance of the EMS and the design and supervision of the incentive bonus and shared savings programs, in accord with Attachment 1. The court-appointed monitor will be approved by the Court, United States Attorney's Office, Probation Office, and Environmental Protection Agency. The Defendant will assume all costs and expenses associated with the employment and expenses of the monitor. The Defendant and the Business Units agree to provide the monitor, immediately upon request, with unrestricted access to all facilities, employees, documents and computers, relevant to monitoring of the EMS and to facilitate access to contractors and contractor employees. The Court, Probation Office and United States Attorney's Office will establish the reporting requirements. All reports and draft

PLEA AGREEMENT
Page 20

PSC-MDL2179085819

*CJP*

reports issued by the monitor will be delivered to the Court, Probation

Office and United States Attorney's Office prior to or simultaneously with

delivery to the Defendant.

## V.   ELEMENTS

The elements of the offense described in the Information, to which the Defendant agrees

to plead guilty, are as follows: (1) a hazardous substance; (2) in an amount equal to or greater

than the reportable quantity; (3) was released into the environment; (4) from a facility; and (5)

the Defendant, who was a person in charge of the facility; (6) failed to immediately notify the

appropriate agency of the United States as soon as the Defendant became aware of the release.

Title 42, United States Code, Section 9603(a).

## VI.   FACTUAL BASIS

The conduct described below constitutes a factual basis for the violations contained in the

Information.  The Defendant, a corporation, is criminally liable for the acts and omissions in this

instance of its employees.  The Defendant is a person in charge of the Endicott facility.

The parties stipulate that the following provides a factual and legal basis for the

Defendant's conviction of the crime charged in the Information.

Defendant BPXA conducts oil exploration, drilling, and production in Alaska.  BPXA is

the majority owner and operator of Endicott Island.  Endicott consists of two man-made islands

located in the Beaufort Sea off the North Slope of Alaska.  The islands were constructed in the

late 1980's to facilitate oil exploration and production.

**PLEA AGREEMENT**
**Page 21**

PSC-MDL2179085820

In the 1990's, BPXA employed one drilling rig on Endicott. The drilling rig was provided and operated by Doyon Drilling, Inc. (Doyon Drilling). Doyon Drilling was supervised by Shared Services Drilling, an on-site service organization that supervised and provided drilling services on the North Slope of Alaska. Shared Services Drilling was staffed with BPXA and contract employees, supervisors and managers. This rig had an attached unit called a rockwasher or rockwashing unit. The rockwasher was designed to process rock cuttings produced during the drilling process. In the rockwasher, the larger rock cuttings were separated and cleaned with water for subsequent use as a substitute for gravel on roads and pads. The remaining fine cuttings, spent drilling mud and the rinsate were disposed of by injection into the outer annuli of other wells.

When drilling a well, the Endicott rig drills a hole to a certain depth, then lowers a steel pipe called a surface casing into the hole and cements that casing in place. The rig then drills a second, smaller hole below the surface casing. A second casing is lowered and cemented into place. Next, an even smaller hole is drilled below the second casing and the production liner, a narrow steel pipe, is lowered into the hole and cemented into place. Finally, the steel production tubing is lowered into the well and secured inside the production liner. Oil and gas are brought to the surface through perforated holes in the production liner and then via the production tubing.

The space between the outer, surface casing and the second casing is called the outer annulus. The surface casing extends to a depth of between 2,700 feet and 4,500 feet. On most Endicott wells, fluids pumped down the outer annulus reach the 2,700 to 4,500 foot depth, then flow into the ground formation and are released into the environment.

**PLEA AGREEMENT**
**Page 22**

*CJP*

Over a period of several years, beginning approximately in early 1993 and lasting until approximately September 1995, Doyon Drilling, the contractor of BPXA, discharged waste oil and hazardous substances by injecting barrels of waste materials down the outer annuli of oil-producing wells at Endicott.  BPXA was one of Doyon Drilling's two clients, providing approximately 80% of the contractor's income.  BPXA did not require Doyon Drilling to have an internal environmental compliance program and BPXA provided limited specialized environmental training for Doyon Drilling employees.

The injected barrels contained a variety of wastes, including waste paint thinner, waste paint, waste oil, waste glycol, and waste solvents.  Many of the waste materials placed into the rockwasher tanks and injected into the outer annuli were hazardous wastes under the Resource Conservation and Recovery Act (RCRA), including ignitable wastes, lead-contaminated oil and lead-contaminated solvents.  Some of the wastes injected contained chemical constituents found in specific halogenated and non-halogenated solvents identified by the Environmental Protection Agency as hazardous when spent and disposed, also known as F-listed wastes pursuant to RCRA. The chemical constituents included methylene chloride, toluene, xylene, benzene and ethyl benzene.

Workers in the rockwasher unit complained to Doyon Drilling managers about the severity of the fumes released during injection of the waste.  Some rockwasher workers wore respirators to protect them from the fumes.

The injection of the waste solvents and waste oil, as well as wastes containing chemical constituents such as methylene chloride, naphthalene, toluene, benzene, xylene, and ethyl

**PLEA AGREEMENT**
**Page 23**

PSC-MDL2179085822

*CJP*

benzene constituted disposal, although the practice was concealed as "freeze protection." Those

wastes were not used to freeze protect Endicott wells that had just been drilled. Instead, new

diesel oil and dead crude oil were legitimately used when freeze protection was needed. Doyon

Drilling managers reported that they believed this disposal practice was known and endorsed by

BPXA supervisors on Endicott Island and within Shared Services Drilling. Those BPXA

supervisors deny this.

On approximately January 16, 1995, 23 barrels of waste oil and waste solvent were

delivered to the rockwasher at the drilling rig for injection. A rockwasher worker refused to

pump the chemicals into the rockwasher tank and inject them into the well. He told the Doyon

Drilling forklift driver and the rig supervisor that he refused. A Doyon Drilling supervisor

instructed that the 23 barrels be injected and the barrels were injected the following day. The

Doyon Drilling supervisor reported that he discussed the disposal practice and the rockwasher

worker's complaints about the illegal nature of the disposal with two BPXA supervisors prior to

injection on January 17. BPXA supervisors deny this.

On approximately January 17, 1995, a sample was taken of the 23 barrel mixture prior to

injection and was later tested by the EPA. According to the subsequent laboratory analysis, the

sample was ignitable and contained chemical constituents found in specific listed halogenated

and non-halogenated solvents identified by EPA as hazardous when spent and disposed. Some

of the particular constituents included methylene chloride, naphthalene, toluene, benzene, xylene,

ethyl benzene, 1,2,4-trimethylbenzene and 1,3,5-trimethylbenzene.

**PLEA AGREEMENT**
**Page 24**

PSC-MDL2179085823

*CJP*

On August 31, 1995, the Doyon Drilling rockwasher worker reported to BPXA Shared Services Drilling managers the illegal disposal of hazardous waste over a three-year period, including the January 17, 1995, injection of 23 barrels of waste oil and waste solvents. He also reported his belief that BPXA supervisors were notified of the January 17 injection and approved of the injection as freeze protection. BPXA personnel deny approving the improper injection of hazardous waste. Following the August 31 notice, BPXA managers did not immediately report the release of hazardous substances as required by law.

An internal investigation conducted by BPXA was completed by September 5 and supported the rockwasher worker's report. Specifically, BPXA managers determined that no RCRA waste had been shipped from Rig 15 for several years, unlike at similar rigs on the North Slope of Alaska. No report of the January 17, 1995, release of hazardous substances was made to any United States agency until September 13, 1995. On September 13, 1995, BPXA provided oral notification to the National Response Center and other federal and state agencies, regarding the release of hazardous substances into the annuli of wells at Endicott Island.

BPXA acknowledges that from January 1993 through September 1995, it exercised inadequate oversight and supervision of the Health, Safety and Environmental (HSE) functions of BPXA's Shared Services Drilling and Doyon Drilling; that inadequate audits and audit protocols of BPXA HSE functions were in place; that inadequate resources were dedicated to ensuring appropriate environmental planning, oversight and self-policing; and there was

//

//

**PLEA AGREEMENT**
**Page 25**

PSC-MDL2179085824

inadequate coordination within the BPXA business organizations on HSE matters.

Dated this 23rd day of September, 1999.

FOR THE UNITED STATES:

ROBERT C. BUNDY
UNITED STATES ATTORNEY

DEBORAH M. SMITH
DEPUTY CHIEF
ENVIRONMENTAL CRIMES SECTION
U.S. DEPARTMENT OF JUSTICE

TIMOTHY M. BURGESS
ASSISTANT U.S. ATTORNEY

SCOTT ELTRINGHAM
TRIAL ATTORNEY
ENVIRONMENTAL CRIMES SECTION

JAMES OESTERLE
SPECIAL ASSISTANT U.S ATTORNEY

FOR BPXA:

CHRIS J. PHILLIPS
VICE PRESIDENT
BP EXPLORATION (ALASKA) INC.

CAROL E. DINKINS
VINSON & ELKINS
COUNSEL FOR BP EXPLORATION
   (ALASKA) INC.

DAVID B. BUKEY
BUKEY & BENTLEY
COUNSEL FOR BP EXPLORATION
   (ALASKA) INC.

JEFFREY M. FELDMAN
FELDMAN & ORLANSKY
COUNSEL FOR BP EXPLORATION
   (ALASKA) INC.

PLEA AGREEMENT
Page 26

PSC-MDL2179085825

## BP EXPLORATION (ALASKA) INC.
## ACTION OF THE BOARD OF DIRECTORS WITHOUT A MEETING

The undersigned being all of the Directors of BP Exploration (Alaska) Inc., a Delaware corporation (the "Corporation"), hereby take the following action and adopt the following resolution in writing and without a meeting pursuant to Section 141(f) of the General Corporation Law of Delaware:

RESOLVED, that the President  and his designees are, and each of them is, hereby authorized

- to waive the Corporation's right to Indictment;

- to waive the Corporation's right to trial;

- to plead guilty to an Information charging the Corporation with one count of  federal criminal violation of the Comprehensive Environmental Response, Compensation,  and Liability Act, Title 42, United States Code, Section 9603(a), in connection with the Corporation's activities at Endicott Island, Alaska;

- to enter into a Plea Agreement in connection with this Information;

- to appear in Court as necessary to take any of these actions;

- to fully develop, implement and maintain  the Environmental Management System, as described in Attachment 1 of the Plea Agreement;

- to fully fund the development, implementation and maintenance of the  Environmental Management System, as described in and attached to the Plea Agreement;

- to fully comply with all probationary conditions imposed by the Plea Agreement, United States District Court or probation office;

and to take such further action and execute such documents and agreements as may be necessary or advisable to plead guilty to the aforesaid Information and enter into the Plea Agreement, including payment of related fines and penalties as approved and substantially presented in this meeting. All corporate formalities necessary for these actions have been observed.

IN WITNESS WHEREOF, the undersigned have executed this instrument as of the 2nd day of September, 1999.

R. C. Campbell

J. E. Golden

V. W. Holt

PSC-MDL2179085827

## CERTIFICATION

I, James D. Decker, Assistant Corporate Secretary of BP EXPLORATION (ALASKA) INC. (the "Corporation"), hereby certify for and on behalf of the Corporation that attached hereto is a true and complete copy of a resolution adopted by the Corporation's Board of Directors without a meeting, and that said resolution has not been modified or revoked and remains in full force and effect on this date hereof.

DATED this *15th* day of September, 1999.

James. D. Decker
Assistant Secretary

Sworn to and subscribed before me this
15th day of September, 1999.

Notary Public in and for the State of Alaska
My Commission Expires: 2 / 12 / 01

PSC-MDL2179085828



**BP EXPLORATION**

Richard C. Campbell, MBE
President, Alaska

BP Exploration (Alaska) Inc.
900 East Benson Boulevard
P.O. Box 196612
Anchorage, Alaska 99519-6612
(907) 564-5422

September 14, 1999

Mr. C. J. Phillips
BP Exploration (Alaska) Inc.
Mail Stop LR 2-3

Dear Mr. Phillips,

Pursuant to the terms of the Board Resolution of BP Exploration (Alaska) Inc. dated September 2, 1999, I designate you as the corporate officer and my designee to carry out all required duties in connection with the execution and the submission to the United States District Court for the District of Alaska of the Plea Agreement between BP Exploration (Alaska) Inc., and the United States Department of Justice, resolving matters of criminal liability arising from the government's investigation into waste handling issues at the Endicott Island facility. You are authorized to waive indictment, waive trial, and enter a plea of guilty on behalf of BP Exploration (Alaska) Inc., pursuant to the terms of the Plea Agreement, and to do all things necessary, including appearing in Court on behalf of the company, to resolve this matter in accordance the terms of the Plea Agreement.

Sincerely

Richard C. Campbell

 

PSC-MDL2179085829

*CJf*

**ATTACHMENT 1**
**PLEA AGREEMENT**

**United States v. BP Exploration (Alaska) Inc.**
**District of Alaska**

## BP AMOCO GROUP
## ENVIRONMENTAL MANAGEMENT SYSTEM

### A. Objectives

BP Amoco Group will develop an Environmental Management System (EMS) for each Business Unit involved in the exploration, drilling and/or production of oil in the United States of America and its territories. Each EMS will be consistent with the best environmental practices in order to effectively protect workers, the public and the environment, and to comply with all statutory and regulatory requirements. Each EMS will also specify how the environmental performance of contractors and on-site service providers such as Shared Services Drilling in BP Exploration (Alaska) Inc. (BPXA), will be adequately supervised by BP Amoco Group in accord with the objectives and key elements described below. The term environment, as used in this document, includes the surroundings in which an organization operates, including land, water, air, flora, fauna, natural resources, humans, and their interrelation.

BP Amoco Group, as used in this document, means all BP Amoco p.l.c. companies, subsidiaries or affiliated business entities engaged wholly or partially in the exploration, drilling and/or production of oil in the United States of America and its territories. The EMS will be developed, implemented and maintained at all Business Units engaged wholly or partially in the exploration, drilling and/or production of oil in the United States and its territories, which BP Amoco Group manages, operates or in which it holds a controlling ownership interest. As of September 23, 1999, the BP Amoco Group consisted of BPXA, BP Exploration & Oil, and Amoco Production Company, which manage, operate or own a controlling interest in the Business Units listed below.

- 1 -

PSC-MDL2179085830



The EMS will be implemented and maintained at the following BP Amoco Group Business Units. First, within Alaska, the participating Business Units will include Alaska Exploration, Central North Slope, Eastern North Slope and Western North Slope. Second, within the contiguous United States, the participating Business Units will include Western U.S. Gas and MidContinent-Gulf Coast. Third, offshore the contiguous United States, the participating Business Units will include Gulf of Mexico-Deepwater Development, Gulf of Mexico-Deepwater Production, Gulf of Mexico-Exploration and Gulf of Mexico-Shelf.

BP Amoco Group will establish three Compliance Committees to evaluate the existing EMS at each relevant Business Unit (BU), prepare an improved EMS for each of these BUs in accord with the key elements and objectives described below, report to the Environmental Protection Agency, and implement the EMS at each BU in the manner described below. The Compliance Committees will also manage and oversee environmental requirements that fall outside the jurisdiction of any one BU and will ensure that cross-cutting environmental requirements are appropriately coordinated among BUs. The Compliance Committees will also ensure that procedures outlined within the environmental management systems are standardized whenever practical, so it will not be necessary for BP Amoco Group employees transferred from one BU to another to learn about many different procedures at their new locations. The three Compliance Committees will oversee all Alaska BUs, and the onshore and the offshore BUs of the contiguous United States which are engaged in the exploration, drilling and production of oil.

The key elements of each BU EMS will be derived from the following sources:

- BP Amoco p.l.c. and BP Amoco Group principles and requirements;

- The International Organization for Standardization (ISO) specification for environmental systems, "Environmental Management Systems - Specification with Guidance for Use," 1996, also known as ISO 14001 standard;

- U.S. Department of Justice Voluntary Disclosure Policy, "Factors in Decisions on Criminal Prosecutions for Environmental Violations in the Context of Significant Voluntary Disclosure Efforts by the Violators," 1991;

- 2 -

- U.S. Environmental Protection Agency's (EPA) "Incentives for Self-Policing:  Discovery, Disclosure, Correction and Prevention of Violations," 1995;

- EPA's "Implementation Guide for the Code of Environmental Principles," 1997;

- EPA's National Enforcement Investigations Center "Compliance-Focused Environmental Management System-Enforcement Agreement Guidance," 1997; and

- There will be enhanced emphasis on compliance assurance, pollution prevention and adequate contractor and on-site service provider supervision.

Each BU EMS will establish that:

- All environmental and related operational risks have been identified;

- Risks are being appropriately managed and potential risks are avoided;

- All federal, state and local environmental laws, regulations, and permit requirements are being adhered to;

- Appropriate policies, programs, and procedures are in place;

- Organizational responsibilities are clearly defined, understood, and implemented;

- Appropriate environmental control quality assurance, and verification systems are in place through appropriate self-policing and third-party audits of BP Amoco Group, contractor and on-site service provider operations;

- Company operations, including contractor operations and on-site service provider operations, do not present unreasonable actual risks to the environment.

- 3 -

PSC-MDL2179085832



Each BU EMS will be consistent with the following ISO 14001 principles:

- Line Management and Responsibility: BP Amoco Group BU line management will be directly responsible for protecting workers, the public and the environment.

- Clear Roles and Responsibilities: Clear and unambiguous lines of authority and responsibility for ensuring environmental protection will be established and maintained at all organizational levels, and additionally for contractors and on-site service providers.

- Competence Commensurate with Responsibilities: BP Amoco Group personnel will possess the experience, knowledge, skills, and abilities that are necessary to discharge their responsibilities.

- Balanced Priorities: BP Amoco Group will effectively allocate resources for environmental programs and operations. Protecting workers, the public and the environment will be a priority at the BP Amoco Group BUs whenever activities are planned and implemented.

- Identification of Environmental Hazards: Before any task is begun, BP Amoco Group BU management will evaluate the associated environmental hazards.

- Operational and Hazard Control: Requirements and standards for environmental performance will be established which, if properly implemented, will adequately ensure that workers, the public and the environment are protected from adverse consequences. BP Amoco Group will include administrative and engineering controls to prevent and mitigate environmental hazards and to achieve other environmental goals, for example, pollution prevention.

- Checking and Corrective Action: BP Amoco Group will routinely monitor its environmental performance, including its compliance with legal requirements and conformance to environmental management system requirements. BP Amoco Group will take actions as necessary to correct any problems identified and to prevent their recurrence.

- 4 -

PSC-MDL2179085833



> Continual Improvement: Top management will periodically evaluate the suitability, adequacy and effectiveness of the environmental management system and take actions as necessary to ensure its ongoing suitability, adequacy and effectiveness.

## B.  Environmental Management System Manual - Key Elements

Each BU EMS will cover, at a minimum, the following 12 key elements that will be described in an Environmental Management System Manual.

### Key Element 1
### Management Policies and Procedures

> BP Amoco Group's Environmental Policy.  The policy will clearly communicate BP Amoco Group's commitment to environmental performance, including compliance with all applicable federal, state and local environmental statutes, regulations, enforceable agreements, and permits (environmental requirements). The policy will also clearly communicate BP Amoco Group's commitment to pollution prevention and continual improvement of the environmental management systems.

> Site-Specific Environmental Policies and Standards

> > 1)   Compilation of general principles, policies, rules, and procedures for site-specific environmental practices.

> > 2)   Includes process for developing, approving, and communicating standard operating practices for activities having potentially adverse environmental or regulatory compliance impacts.

> > 3)   Clearly identifies organizational responsibilities for maintaining compliance with environmental requirements, including required reporting to regulatory agencies.

- 5 -

PSC-MDL2179085834



4)    Includes ongoing means of communicating environmental issues and information to all organization personnel, on-site service providers, and contractors, and for receiving and addressing their concerns.

5)    Establishes and describes processes to ensure sustained interaction with regulatory agencies, and within the organization (e.g., between the various divisions, contractors, on-site service providers and the environmental department) regarding compliance with environmental requirements.

## Key Element 2
### Organization, Personnel, and Oversight of EMS

- Describes organizationally, how the EMS is implemented and maintained.

- Includes organization charts that identify units, line management and other individuals having responsibility for compliance with environmental requirements.

- Identifies and defines duties, roles, responsibilities and authorities of key environmental program personnel in implementing and sustaining the EMS.

- Ensures that specified responsibilities and accountabilities are consistently reflected in system documentation.

- Describes process to conduct and document periodic needs assessments and ensure adequate resources are provided for environmental compliance, including staffing, funding, equipment and external support.

PSC-MDL2179085835

## Element 3
## Accountability and Responsibility

- Specifies accountability and responsibilities of BU management for environmental protection practices, compliance, required reporting to regulatory agencies and corrective actions implemented in their area(s) of responsibility.

- Specifies accountabilities and responsibilities of BU management to adequately supervise the compliance with environmental, safety and health requirements by BU contractors and on-site service providers.

- Describes potential consequences for departure from specified operating procedures, including liability for criminal/civil/administrative penalties imposed as a result of noncompliance with environmental requirements.

- Measures employee and manager performance in area of environmental performance. Environmental performance will be an important aspect of performance appraisal and promotion of those staff for whom such activities form part of their normal activities. Leading (input) measures of environmental performance will be used, such as the number of compliance audits performed, percentage of audit findings closed within 30, 60, 90 days, percentage of compliance awareness training completed, number of waste minimization opportunities identified, number of spill reduction opportunities identified, and number of employees participating on HSE committees.

- BU employee, contractor and on-site service provider incentive bonus programs and shared savings programs will reward positive environmental performance. There will be an emphasis on utilizing leading (input) metrics to measure performance. A loss or diminution of bonus pay, or shared savings or assessment of any financial penalty will not be based upon lagging (output) metrics, which may discourage the accurate reporting of non-compliance with environmental requirements. For example, the number of environmental violations, regulatory incursions or spills will not be used as a metric or target.

- 7 -

PSC-MDL2179085836

The targets and performance measurements will emphasize continual improvement and accurate reporting. For example, in addition to leading metrics described above, a year-on-year improvement in overall air or water emissions per unit of production could be rewarded.

Incentive bonus and shared savings programs for BU employees and for contractors or on-site providers will be designed to avoid encouraging behavior which could be anticipated to result in operational risks or environmental harm. Waste minimization strategies adopted to avoid costs will not be rewarded, unless those strategies are wholly consistent with all applicable statutes and regulations. All such programs will be regularly evaluated to ensure that their existence does not cause additional environmental risks; should modifications be required in order to preclude any identified risks then these will be made as soon as possible. The impact of employee decisions or actions taken to reduce the risk of high-potential environmental incidents will not be considered in the calculation of lifting costs and production levels for inclusion in bonus and shared savings programs. For example, the cost of remedial cementation during the drilling of a well (or of well repairs or well abandonment for environmental reasons) will not be considered in such calculations.

Describes process to measure and supervise contractor and on-site service provider environmental performance. On-site service provider and contractor self-inspections, training sessions, and other leading metrics described above will be used, in addition to information tracking spills and injuries. Results of this process will be used to take corrective action as needed.

Implements a process to ensure that contractor interface documents are implemented as written.

Establishes a process to ensure that contractors and on-site providers are accurately reporting spills, environmental incidents and other environmental performance data.

- 8 -

PSC-MDL2179085837



- Ensures the objectivity of contractor and on-site service providers personnel performing audits or other environmental performance self-assessments.

## Key Element 4
## Environmental Requirements

- Describes process for identifying, interpreting and effectively communicating environmental requirements to affected BU personnel, on-site service providers and contractors, and ensuring that BU activities conform to those requirements.

- Specifies procedures for prospectively identifying and obtaining information about changes and proposed changes in environmental requirements, and incorporating those changes into EMS.

## Key Element 5
## Assessment, Prevention, and Control

- Identifies an ongoing process for assessing operations, for the purposes of preventing and controlling releases, ensuring environmental protection, and maintaining compliance with statutory and regulatory requirements. This section will describe monitoring and measurements, as appropriate, to ensure sustained compliance. It shall also include identifying operations and waste streams and discharges or emissions which may be causing, or may lead to: (1) releases of hazardous waste or other pollutants to the environment, or (2) a threat to human health or the environment. Finally, the process shall include performing root-cause analysis of identified problems in order to develop remedies and prevent recurring issues.

- Describes process for identifying operations and activities which could result in adverse environmental impacts, threats to human health or safety, and/or noncompliance with environmental requirements, where documented standard operating practices need to be developed.

- 9 -

PSC-MDL2179085838



- Describes process for ensuring input of environmental requirements (and concerns) in planning, design, and operation of ongoing, new, and/or changing buildings, processes, equipment, maintenance activities and product.

- Describes a system for conducting and documenting routine, objective, self-inspections by department supervisors and trained staff of BU, contractors and on-site service providers, especially at locations identified by the process described above.

- Describes a system for conducting and documenting systematic, objective, periodic review of facility operations and practices related to meeting environmental requirements by qualified, independent auditors. Develops and implements a systematic audit approach that employs consistent methods, site selections, protocols and procedure, updated as the law and regulations require.

- Describes and demonstrates top management commitment to compliance auditing program.

- Ensures adequate resources provided for compliance auditing program and assigns responsibilities for the compliance auditing program; ensures pre-planning of systematic audits and coordination of audits.

- Describes process for ensuring the qualifications and objectivity of auditors.

- Describes process that ensures the results of audits are reported to BU top management.

- Describes process that ensures the results of audits are reported to relevant contractors and on-site providers.

- Describes compliance auditing program which includes quality assurance component whereby an independent objective, qualified third-party organization audits the BU compliance audit program, reporting directly to BU top management at least once every two years. The third-party audit will determine, among other issues, whether there

- 10 -



is adequate coordination among BUs and Compliance Committees and appropriate standardization of EMS procedures.

## Key Element 6
### Environmental Incident and Noncompliance Investigations

- Describes standard procedures and requirements for reporting of incidents that threaten human health or the environment and/or noncompliance with environmental requirements by BU, contractors and on-site service providers.

- Establishes procedures for investigation of potential violations or noncompliance with environmental requirements by BU, contractors and on-site service providers.

- Describes a system for development, tracking, and effectiveness verification of corrective and preventative actions taken by BU, contractors and on-site service providers.

- Implements process for contractor and on-site service provider employees to notify BU management without fear of reprisal regarding environmental compliance issues and concerns, for example, a phone hot-line.

- Each of these procedures shall specify self-testing of such procedures, where practicable.

## Key Element 7
### Environmental Training, Awareness, and Competence

- Identifies specific education and training required for BU personnel, contractors and on-site service providers, as well as process for documenting, evaluating and improving training provided.

- Describes program to ensure that BU employees, contractor employees and on-site service provider employees are aware of BU environmental

- 11 -

PSC-MDL2179085840



policies and procedures, environmental requirements, and each employee's responsibilities within the environmental management system.

- Describes program for ensuring that personnel responsible for meeting and maintaining compliance with environmental requirements are competent on the basis of appropriate education, training and/or experience.

- Describes process for tracking BU employee, contractor and on-site provider questions about interpretation of environmental regulations. Such system feedback will provide valuable insight regarding the effectiveness of training and clarity of environmental procedures.

### Key Element 8
### Planning for Environmental Matters

- Describes how environmental planning will be integrated into other plans developed by the organization, as appropriate (e.g., capital improvements, training, maintenance).

- Requires establishing written goals, objectives, and action plans by operating organizational units with environmental responsibilities, as appropriate, including those for contractor operations conducted at the facility and on-site service providers, and how specified actions will be tracked and progress reported.

### Key Element 9
### Maintenance of Records and Documentation

- Identifies the types of records developed in support of the EMS (including self-audits, third-party audits and reports, audit working papers, and correspondence, including emails, about audits), who maintains them and where, and protocols for responding to inquiries and requests for release of information.

- Specifies the data management systems for any internal waste tracking, environmental data, and hazardous waste determinations.

- 12 -

PSC-MDL2179085841



## Key Element 10
## Pollution Prevention Program

- Describes an internal program for preventing, reducing, recycling, reusing and minimizing waste and emissions, including procedures to encourage material substitutions consistent with environmental requirements. Also includes mechanisms for identifying candidate materials to be addressed by program and tracking progress.

## Key Element 11
## Continuing Program Evaluation and Improvement

- Describes program for periodic (at least annual) evaluation of the EMS, including incorporating the results of the assessment into program improvements, revisions to the manual, improved training and communicating findings and action plans to affected employees, on-site service providers and contractors.

- Describes program for periodic (at least every two years) third-party evaluation of the EMS including incorporation of the results of the assessment into program improvements, revisions to the manual and communicating findings and action plans to affected employees, on-site service providers and contractors.

## Key Element 12
## Public Involvement/Community Outreach

- Describes a program for ongoing community education and involvement in the environmental aspects of the organization's products, activities and services and to promote general environmental awareness.

- 13 -



## C.  Establishment of Corporate Compliance Committee and Chair

BP Amoco Group will appoint three Corporate Compliance Committees (Committees) to oversee the environmental performance of all relevant BUs in the United States.  Each Committee will have approximately 10 members, including environmental, engineering, drilling and operating personnel, BP Amoco Group corporate legal and environmental staff, and an independent, third-party consultant with expertise in designing environmental management systems. One committee will oversee all BUs involved in the exploration, drilling and production of oil onshore and offshore in Alaska; the second committee will oversee all BUs involved in the exploration, drilling and production of oil onshore in the contiguous United States and the third committee will oversee all BUs involved in the exploration, drilling and production located offshore the contiguous United States.  The members of the Alaska Corporate Compliance Committee, including the independent third-party environmental consultant, must be submitted for approval to the U.S. Attorney's Office for District of Alaska and EPA Region 10 within two months of the execution of the plea agreement.

Each Committee will appoint a chair of the Committee.  The chair's responsibility will be to ensure that the Committee meets all responsibilities and duties described below and to submit the reports and manuals described below to EPA Region 10 in a timely manner.

All costs related to the operation of Compliance Committees and the review, development, communication, audit and analysis of each BU Environmental Management System and Manual will be borne solely by BPXA, and guaranteed by BP America Inc.

## D.  Compliance Committee Responsibilities

1)      Existing Environmental Management System Evaluation

Each Committee will evaluate the current status of the environmental management system within each BU in order to:

- 14 -

PSC-MDL2179085843



- Compare the current BU environmental management systems to the EMS objectives and 12 key elements described above and determine what, if anything, is needed to meet these objectives and key elements;

- Identify strengths and weaknesses of the BU's current environmental management system;

- Evaluate the effectiveness of the current management system to effectively address the environmental issues and risks that the BU will face, now and in the future.

2)     Preparation of Improved BU Environmental Management System

Each Committee will prepare and finalize an Environmental Management System for each BU that includes the best practicable methods for tracking, documenting and implementing environmental requirements, and clear departmental accountability for environmental and operational compliance. The Committees will prepare an EMS Manual for each BU that is organized to clearly address each of the key elements described above. The Committees will determine the most effective format for delivery of the manuals, including a computerized format, and insure that the current version of each BU's manual is always available to all of that BU's employees, contractors and on-site service providers.

3)     Report to the Environmental Protection Agency About Endicott EMS

The Alaska Committee will complete its evaluation of the existing environmental management system on Endicott within 60 days following appointment and approval of the Committee membership. The first draft of the Environmental Management System Manual will be completed and submitted to EPA Region 10 for review within six months following the evaluation. EPA will review and comment upon the manual within 60 days. The Committee will finalize the manual after receipt of EPA comments and submit them within two months to EPA Region 10 for formal approval.

All elements of the Endicott EMS will be implemented within 24 months of the date the Endicott EMS Manual is formally approved. Within 18 months of the date that the Endicott EMS is fully implemented, the Alaska Committee will arrange

- 15 -

PSC-MDL2179085844

for, fund and complete an independent, third-party EMS compliance audit, the purpose and scope of which shall be to evaluate the Endicott EMS to ensure its continuing suitability, adequacy and effectiveness and to recommend any changes appropriate to achieve the objectives of the program. The third-party EMS system auditors will be certified by the American National Standards Institute-Registrar Accreditation Board or will have comparable credentials and experience in performing EMS audits. The independent auditors and the scope of the audit will be pre-approved by EPA Region 10 prior to beginning the audit. The initial report of the auditors will be submitted simultaneously to EPA Region 10 and BP Amoco Group, along with audit working papers and correspondence related to the audit, including e-mails.

4)  Report to the Environmental Protection Agency on EMSs Other than Endicott

The Committees will report to EPA Region 10 on the status of each BU EMS and whether it meets the objectives and key elements described above. A copy of each BU EMS Manual will also be submitted. The report and manual will be submitted to EPA Region 10 within two years of the execution of the plea agreement. EPA Region 10 will then forward the report and manual to the appropriate EPA Region.

5)  Coordinate and Standardize Environment Management Systems

The Committees will jointly manage and oversee environmental requirements that fall outside the jurisdiction of a specific BU or Committee and will ensure that cross-cutting environmental requirements are appropriately coordinated among BUs. The Committees will also ensure that procedures outlined within each BU environmental management system are standardized whenever practical, so it will not be necessary for BP Amoco Group employees transferred from one BU to another to learn many different procedures at each location. Each Committee will be required to arrange for an independent, objective, qualified third-party organization audit, to determine if adequate coordination and standardization has occurred. This audit result will be reported directly to top management of BP Amoco Group and will be conducted at least every two years.

- 16 -