# Exhibit 29

To United States' Opposition to BPXP's Motion in Limine to Exclude (1) Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3
    IN RE:  OIL SPILL             MDL NO. 2179
 4  BY THE OIL RIG
    "DEEPWATER HORIZON"           SECTION:  J
 5  IN THE GULF OF
    MEXICO, ON APRIL              JUDGE BARBIER
 6  20, 2010                      MAG. JUDGE SHUSHAN
```

**Volume 1**

Deposition of **KEVIN DENNIS LACY**, P.O. Box 7888, The Woodlands, Texas 77387, taken in the Pan American Life Center, Mardi Gras Room, 11th Floor, 601 Poydras Street, New Orleans, Louisiana 70130, reported on Wednesday, June 1st, 2011.

1  drilling and completions or in the SPU as a
2  whole?
3       A.    So what my intent would have
4  been is to continue to mature and define a --
5  let's call it holistic approach for OMS for
6  D&C, which would include personal safety and
7  process safety into the organization, that
8  may not have been a single defined role, but
9  it would have been a clearly defined system.
10      Q.    And the reason for that would be
11 to bring all of that into focus, if you will,
12 for the entire drilling and completions
13 framework.
14      A.    That would be the goal, yes,
15 sir.
16      Q.    You're familiar with the Baker
17 report from the Texas City disaster?
18      A.    Yes, very familiar.
19      Q.    Okay.  And Mr. Baker's report,
20 one of his findings was that process safety
21 was lacking at BP, correct?
22      MS. KARIS:
23           Object to form.
24      THE WITNESS:
25           That was one of the conclusions

```
 1   in the Baker report, yes, sir.
 2   EXAMINATION BY MR. DART:
 3        Q.   And your goal, as you just
 4   described it, your trying to integrate
 5   process safety with HSSE would be to fulfill
 6   Mr. Baker's recommendation to incorporate
 7   process safety and actually inculcate it
 8   within the operating system of drilling and
 9   completions in the Gulf of Mexico, correct?
10        A.   My efforts were guided by
11   everything from the conclusions of the Baker
12   report as it related to BP.  The OMS efforts,
13   as I read and understood them, and then my
14   previous experience of developing OEMS and
15   OEMS for drilling completions in Chevron,
16   that was what I was -- those backgrounds or
17   understanding was what I was attempting to
18   do, yes, sir.
19        Q.   Those were your landmarks, your
20   guideposts?
21        A.   That's correct.
22        Q.   And had you stayed on at BP, you
23   would have tried to succeed at that goal of
24   integrating process safety into drilling and
25   completions; correct?
```

```
 1            UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3
     IN RE:  OIL SPILL          MDL NO. 2179
 4   BY THE OIL RIG
     "DEEPWATER HORIZON"        SECTION:  J
 5   IN THE GULF OF
     MEXICO, ON APRIL           JUDGE BARBIER
 6   20, 2010                   MAG. JUDGE SHUSHAN

 7

 8

 9
```

16                     **VOLUME 2**

17

18       Deposition of **KEVIN DENNIS LACY**, P.O.

19   Box 7888, The Woodlands, Texas 77387, taken

20   in the Pan American Life Center, Mardi Gras

21   Room, 11th Floor, 601 Poydras Street, New

22   Orleans, Louisiana 70130, reported on

23   Thursday, June 2nd, 2011.

24

25

```
 1    and completions, did you ever sacrifice
 2    safety for cost?
 3          A.    No, I did not.
 4          Q.    Did anyone in BP's management
 5    ever tell you to choose cost over safety in
 6    2009?
 7          A.    Not explicitly.
 8          Q.    Did you ever direct anyone in
 9    your leadership team or your engineering
10    teams to choose riskier activities at the
11    sacrifice of safety?
12          A.    No, absolutely not.
13          Q.    And to your knowledge, did your
14    leadership team practice engineering in a way
15    that chose safety over costs?
16          A.    I had full confidence in my
17    engineer -- in my D&C organization that they
18    were doing proper well design and proper risk
19    assessment commensurate with the risks that
20    we had at the time up until my departure.
21          Q.    And that would include any
22    decisions that were made on the Macondo well
23    up until your departure; correct?
24          A.    Those would have, of course,
25    included anything that -- that happened prior
```

1              I object to form.
2         THE WITNESS:
3              I would -- I would agree with
4    that statement.
5    EXAMINATION BY MR. WATTS:
6         Q.   When you -- and Harry Thierens
7    had that same reputation, didn't he?
8         A.   Harry had an exceptional
9    reputation, yes.
10        Q.   And when the safety leadership
11   for Gulf of Mexico's drilling and completion
12   is wiped out through a transfer or through a
13   job elimination, does that send a message to
14   the people that used to work under those
15   people about priorities?
16        MS. KARIS:
17             Object to form.
18        THE WITNESS:
19             It could send a number of
20   messages, yes.
21   EXAMINATION BY MR. WATTS:
22        Q.   Well, and in terms of these
23   message that could be sent, one message that
24   had happened in 2008 and 2009 is that you
25   received management directives from Andy

```
 1   Inglis and others that thou shalt cut costs?
 2   That happened?
 3          A.     Yes.
 4          Q.     That's a fact?
 5          A.     There were directives from Neil
 6   Shaw, which also were taken from Andy Inglis,
 7   yes.
 8          Q.     And from the time that you got
 9   there -- we had already gone through these
10   documents -- in 2008, you-all spent less
11   money than you did in 2007, but increased
12   production?
13          A.     That's correct.
14          Q.     In 2009, you spent less money
15   than you did in 2008, and dramatically
16   increased production?
17          MS. KARIS:
18                 Object to form.
19          THE WITNESS:
20                 We saved against plan.  I don't
21   know the absolute amounts.  The spin could
22   have been up because of more rigs.  But your
23   conclusion was, we calculated that we saved
24   somewhere between 250 and $350 million on the
25   2009 program.
```

```
 1    achieve that.
 2    EXAMINATION BY MR. WATTS:
 3         Q.    Sure.  But I want to talk about
 4    BP's boardroom.
 5         A.    Yes, sir.
 6         Q.    What caused your six-second
 7    pause in the words, "not explicitly"?
 8         MS. KARIS:
 9               Object to form.
10         THE WITNESS:
11               I was never given a directive
12    to -- to cut corners or to deliver something
13    not safely.  But there was tremendous
14    pressure on cost.
15    EXAMINATION BY MR. WATTS:
16         Q.    All right.  And let's visit
17    about that for a second.
18               That tremendous pressure on cost
19    was a tremendous pressure to reduce costs,
20    right?
21         A.    That's correct.
22         Q.    That tremendous pressure on cost
23    reduction existed in 2008 while you were at
24    BP?
25         MS. KARIS:
```

```
 1                  Object to form.
 2          THE WITNESS:
 3               In -- in all years, but it was
 4   particularly acute in the latter part of 2008
 5   and first half of 2009.
 6   EXAMINATION BY MR. WATTS:
 7       Q.   And it continued through the
 8   second half of 2009 and the planning for
 9   2010, that there were going to be further
10   cost reductions?
11          MS. KARIS:
12                  Object for form.
13          THE WITNESS:
14               They -- I believe I -- I stated
15   earlier, the initial business plans, as is
16   often the case, were sent back for revisions
17   and further reductions.
18   EXAMINATION BY MR. WATTS:
19       Q.   And when you say "further
20   reductions," that meant greater cost
21   reductions?
22       A.   Yeah.
23          MS. KARIS:
24                  Object to form.
25          THE WITNESS:
```

```
 1  efforts with Harry Thierens, the head of
 2  HSS&E mysteriously leaves the company as
 3  well, if you take a quarter off on process
 4  safety, can that lead to accidents?
 5          MS. KARIS:
 6                Object to form.
 7          THE WITNESS:
 8                Any relaxation or distraction
 9  could potentially lead to a significant
10  incident.
11  EXAMINATION BY MR. WATTS:
12       Q.    Can mixed messages sent by
13  company management lead to disaster?
14          MS. KARIS:
15                Object to form.
16          THE WITNESS:
17                There are examples where
18  employees have been distracted, I would say.
19  There were a number of examples in Texas City
20  along the lines of what you described.
21  EXAMINATION BY MR. WATTS:
22       Q.    You know, you mentioned Texas
23  City.
24                Do you know what a carbon copy
25  is?
```

```
 1        A.     Carbon copy?
 2        Q.     Yes.
 3        A.     Well, it's the old kind, yes.
 4        Q.     Do you remember in your speech,
 5   the lessons learns are the same ones we saw
 6   in Piper Alpha, the same ones we saw in Texas
 7   City?
 8        A.     That's correct.
 9        Q.     The process safety failures that
10   you've read about in the Presidential
11   Commission report and the Bly Report, do they
12   read like a carbon copy to what we saw after
13   Texas City in 2005?
14        MS. KARIS:
15             Object to form.
16        THE WITNESS:
17             The presentation that I made
18   indicated that there were common elements in
19   terms of all major disasters, and I believe
20   that Macondo classified as a major disaster
21   and shared common elements, which included,
22   and I believe, as we said earlier, were part
23   of the Bly statement that basic mistakes were
24   made.  There was problems with assurance.
25   There were problems with identifying
```

```
 1   potential dangerous situations, and some
 2   equipment failures and/or responses were
 3   ineffective.
 4       EXAMINATION BY MR. WATTS:
 5              Q.    And all that happened at a time
 6   that you knew, at least at the time that you
 7   left, that there was incredible management
 8   pressure on cost production while we needed
 9   to increase production?
10           MS. KARIS:
11                    Object to form.
12           THE WITNESS:
13                    I can only -- I can only state
14   that during my time there in -- there was --
15   and I will use the term, in my personal
16   opinion, incredible pressure on reducing
17   costs.
18           MR. WATTS:
19                    Okay.  Let's take a break and
20   change the tape.  I'm almost done.
21           THE VIDEOGRAPHER:
22                    Going off the record, the time
23   now is 5:27.
24                    (Whereupon, a brief recess was
25   taken.)
```