# Exhibit 39

To United States' Opposition to BPXP's Motion in Limine to Exclude (1) Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents

Case 2:10-md-02179-CJB-DPC   Document 12460-40   Filed 03/06/14   Page 2 of 7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE: OIL SPILL by the OIL RIG<br>"DEEPWATER HORIZON" in the<br>GULF OF MEXICO,<br>on APRIL 20, 2010<br><br>Applies to:<br><br>ALL CASES and<br>2:10-cv-02771 | MDL No. 2179<br><br>Section: J<br><br>The Honorable Judge Barbier<br>Mag. Judge Shushan |

## REBUTTAL EXPERT REPORT OF DR. FREDERICK "GENE" BECK
## ON WELL DESIGN, CONTROL, DRILLING, AND MONITORING



8141

Exhibit No. _____

Worldwide Court Reporters, Inc.

TREX-08141

**CONFIDENTIAL**

**REBUTTAL EXPERT REPORT OF DR. FREDERICK "GENE" BECK**

## I.  Executive Summary.

My opinions and conclusions in regard to the Macondo well blowout are thoroughly discussed in my October 17, 2011 Opening Report. I have reviewed the expert reports submitted by the other parties involved in this matter and ascertained that the opinions expressed by the other parties' experts most often agree with and support my own opinions, which have not changed. I disagree with certain experts who present opinions that run contrary to my own (a group comprised mostly of experts retained by BP and Weatherford) and find their suggestions unsubstantiated. This rebuttal report addresses the other parties' expert reports and summarizes my key findings.

With the exception of certain experts retained by BP, the experts involved in this matter are in agreement that BP held and exercised ultimate responsibility for the Macondo well. In exercising that responsibility, BP repeatedly prioritized cost and time over safety in disregard of BP's express "safety first" policy, and more consistent with BP's "every dollar counts" mantra. Risk-increasing decisions made by BP to save time and money include, for example, BP's decision to disregard Halliburton's recommendation of placing at least 21 centralizers on the final production casing to avoid the risk of channeling and to use only 6 centralizers instead. In another example, BP decided to disregard Halliburton's recommendation of conducting at least one full bottoms up circulation prior to pumping the cement so that debris and gelling mud would be removed from the well so as to reduce the risk of cement contamination and channeling. And as operations on the well were concluding, BP proceeded with a displacement procedure and simultaneous operations that undermined the rig crew's and mudlogger's ability to accurately monitor the well for signs of a kick.

In prioritizing cost and time ahead of safety, as other experts have recognized, BP violated several MMS regulations. One of the experts retained by BP attempts to paint a different picture by, for example, (1) suggesting that the MMS regulations did not require BP to meet top of cement requirements for the uppermost hydrocarbon zone (the M57B zone) because that zone may not have been "producible" from a royalty standpoint, even though the zone presented a significant safety risk; and (2) suggesting that the MMS regulations did not require BP to conduct a negative pressure test during its temporary abandonment procedure because the regulations do not use the term "negative pressure test"

**6**

CONFIDENTIAL

expressly, even though the regulations clearly require that the well be tested to ensure that it is under control at all times. The same BP expert further suggests that, despite evidence establishing otherwise, BP must have maintained a safe drilling margin simply because the MMS did not issue an INC (incident of non-compliance) to BP during the course of drilling. These suggestions by BP's expert disregard safety concerns.

The other parties' experts appear to uniformly agree with my conclusion that BP and Transocean recklessly explained away the results of the negative pressure test and caused the blowout by significantly underbalancing the well despite the failed negative pressure test. At the time it conducted the negative pressure test, BP was well-aware that it had designed and drilled a high-risk well. Given its multiple risk-increasing decisions in regard to well design and operations, BP should have been on high-alert and exercising extreme caution when conducting the negative pressure test. Instead, BP's conduct was at the other extreme when, in part based upon explanations provided by Transocean, it recklessly explained away indications that the well was leaking. In my opinion, BP's reckless disregard of the test results was motivated by its desire to move forward with its temporary abandonment of the well without incurring additional cost or expending additional time to ensure well integrity and control.

BP's failure to correctly acknowledge the results of the safety critical negative pressure test led to the blowout. Nevertheless, even though BP and its experts acknowledge that BP did in fact misinterpret the results of the negative pressure test, certain experts retained by BP attempt to shift some blame for the blowout to Halliburton's cement work and Sperry's mudlogging operations. I disagree with BP's experts on both fronts.

The experts who attempt to criticize Halliburton's primary cement work offer drastically different opinions, none of which establish that Halliburton likely caused the primary cement job to fail. In my opinion, BP, not Halliburton, caused any problems that existed in regard to the performance of the cement downhole. BP and BP alone decided, for example, to (1) inadequately centralize the well, (2) leave relatively light weight drilling mud in the rathole, (3) adopt a long string production casing, (4) forego a full bottoms up circulation prior to cementing, and (5) not wait at least 24 hours on the cement. Each of these decisions, individually and together, increased the risk that the cement job would fail. BP's failure to convert the float collar without damaging it added to that risk, making it even more likely that there would be problems with the cementing process.

7

CONFIDENTIAL

contractors are not expected to assume operator risk. The well operator stands to make millions (or billions) above and beyond its investment in the well if the drilling operation proves successful. Contractors, in contrast, are compensated pursuant to their written contracts with the well operator, regardless of whether the well proves to be profitable. The risk/reward equation is simple: the well operator holds the right to the potential upside (the biggest reward), making it possible from a financial standpoint for the operator to assume liability for the reservoir (the biggest risk). Because the contractors do not share in the biggest reward, it makes no sense from a financial standpoint for a contractor to share in the biggest risk. As a result, a contractor, such as Halliburton or Sperry, customarily would not agree to perform any work for or on behalf of a well operator such as BP if by making that agreement the contractor was assuming liability for the reservoir. The indemnity clause of the HAL/BP Agreement reflects and is consistent with this industry custom.[12]

In sum, any suggestion that Halliburton ultimately controlled the cement job cannot be reconciled with industry custom, BP's written practices, testimony by BP's witnesses, the HAL/BP Agreement, MMS regulations, or the fact that BP freely ignored Halliburton's advice on more than one occasion. Any suggestion that Sperry held or exercised ultimate control over any aspect of drilling and completion operations would be flawed for the same reasons. BP, as well operator, controlled and directed all operations on the Macondo well.

> **B.    In exercising control over the design and operation of the Macondo well, BP repeatedly prioritized cost and time over safety.**

My Opening Report discussed BP's Drilling and Well Operations Practice (DWOP) and associated Engineering Technical Practices (ETPs), which together provide a written framework for designing and conducting drilling operations.[13] BP's DWOP recognizes many of the industry standard "Good Drilling Practices" and dictates that BP wells should be "designed, drilled, and completed to high and consistent standards" and in compliance "with all relevant laws and regulations."[14] As explained by BP's expert

---

[12] Depo. Ex. 6320 at BP-HZN-MBI-00022184-88 (HAL/BP Agreement, § 19).

[13] Depo. Ex. 6121 at BP-HZN-BLY00034512 (DWOP § 1.2).

[14] Depo. Ex. 6121 at BP-HZN-BLY00034512 (DWOP § 1.2).

Morris Burch, "BP considers the DWOP to be critical to conforming to [BP's safety management system] and achieving BP's goals of no accidents, no harm to people and no damage to the environment."[15]

Significantly, BP states in DWOP § 2.3 that when planning and undertaking drilling and well operations, safety concerns should be prioritized "in order of importance" as Personnel, Environment, The Installation, Reservoir Integrity, and Well Delivery.[16] BP's written practices thus state that safety (personnel, environment) should be prioritized first and time to production (well delivery) should be prioritized last.

BP's written practices, including the "safety first" directive of DWOP § 2.3, are only effective if followed. This was not the case on the Macondo well, where BP repeatedly failed to comply with its own standards and repeatedly prioritized time and money above safety concerns.[17] Take for example BP's decision to cancel the planned cement bond log.[18] Although a cement bond log would have confirmed that the top of cement met planned targets and determined whether channeling or other placement issues produced a result requiring remediation, BP canceled the planned cement bond log prior to temporary abandonment of the well. BP suggests that it was justified in its decision to cancel the planned test because Halliburton did not indicate a need to conduct a cement bond log.[19] I disagree. BP, not Halliburton, was ultimately in control of and responsible for testing the integrity of the cement. BP alone made the risk-increasing decision not to conduct a cement bond log in the interest of saving time and money, and in doing so failed to follow its "safety first" policy.

BP's failure to make safety its first priority in deciding whether to conduct a cement bond log was not an isolated incident. Rather, as discussed at length in my Opening Report, BP engaged in a pattern of conduct on the Macondo well whereby it repeatedly prioritized cost and time ahead of safety concerns. This pattern of conduct was consistent with BP's "every dollar counts" philosophy and rendered the Macondo well a

---

[15] Report of Morris Burch (BP), 10/17/2011 (hereinafter "Burch Report") at 22.

[16] Depo. Ex. 6121 at BP-HZN-BLY00034516 (DWOP § 2.3).

[17] Beck Report at 23-31.

[18] Beck Report at 87-88.

[19] Sabins Report (BP) at 78-80.

high-risk and dangerous well that was described by BP's own engineers as a "nightmare."[20]

BP's expert Dr. Kathleen Sutcliffe claims that BP did not incentivize cost savings at the expense of safety and that BP "demonstrated the attributes of a strong safety culture."[21] Similarly, BP's expert Mr. Burch opines that BP's risk-management processes and procedures "were appropriately applied during the planning and design of the Macondo well."[22] For the reasons discussed herein and throughout my Opening Report, I disagree. There is no question that BP engaged in a pattern of conduct that increased risk in the interest of saving time and money.

Other parties share my opinion. For example, the Chief Counsel's Report observes that on a drilling rig "time is money" and points to multiple specific decisions by BP "that increased risk at the Macondo well while potentially saving time."[23] Dr. Robert Bea and Dr. William Gale, experts retained by the Plaintiffs, similarly conclude that BP's behavior "resulted in increased risk in proportion to the amount of time and money saved" and cite to exemplary "key Macondo well decisions that increased risk but saved time and money."[24] And David Pritchard, another expert retained by the Plaintiffs, found that "[i]n the final week of the well, BP made ten (10) choices, which were designed to save rig time costing it $1,000,000 a day, and to save money in additional ways. These decisions, taken together, increased the risk of blowout."[25] Thus, I am far from alone in concluding that BP repeatedly increased risk by prioritizing time and money ahead of safety concerns.

---

[20] *See generally* Beck Report at 31-101; Depo. Ex. 126 at CON67.

[21] Expert Report of Kathleen M. Sutcliffe, Ph.D (BP) at 7, 82.

[22] Burch Report (BP) at vi; *see also* Burch Report (BP) at 36-44.

[23] CCR at 245-46 (citing Amendment 41 to Drilling Contract No. 980249; BP-HZN-BLY 125444; BP-HZN-MBI 126763; BP-HZN-MBI 225981; BP-HZN-MBI 269181; HAL_10648; Sims, interview, February 1, 2011; BP-HZN-CEC22433; and Guide Interview, January 19, 2011).

[24] Rule 26 Report on BP's Deepwater Horizon Macondo Blowout, Prepared by Dr. Robert G. Bea and Dr. William E. Gale, Jr., 8/26/2011 (hereinafter "Bea-Gale Report") (BP) at xx-xxi.

[25] Pritchard Report (Plaintiffs) at 17-18.