# Exhibit 41

To United States' Opposition to BPXP's Motion in Limine to Exclude (1) Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents



# Deepwater Horizon
# Accident Investigation Report

September 8, 2010

BP-HZN-BLY00000001

On April 18, 2010, at approximately 00:30 hours, the rig started running the 9 7/8 in. x 7 in. long string. At approximately 20:58 hours the same day, the Halliburton in-house cementing engineer sent an email to several BP and Halliburton personnel that contained partial lab test results, a new OptiCem™ modeling report (using seven inline centralizers) and Halliburton's recommended cementing procedure for the Macondo well cement job. The OptiCem™ model predicted a "severe" gas flow potential, driven mainly by the possibility of cement and spacer fluid channeling above a 13.97 ppg interval. OptiCem™ software considers only the formation pressure and not the fluid content, net pay thickness or permeability of an interval when computing gas flow potential.

The 13.97 ppg interval at 18,200 ft. was included in the OptiCem™ model report as the reservoir zone. The investigation team was unable to clarify why this pressure (13.97 ppg) was used in the model since available log data measured the main reservoir pressure to be 12.6 ppg at the equivalent depth. Use of the higher pressure would tend to increase the predicted gas flow potential.

The same OptiCem™ report refers to a 14.01 ppg zone at 17,700 ft. (which, in fact, should be 14.1 ppg: the actual pressure measured using the GeoTap® logging-while-drilling tool). However, the report does not include a prediction of gas flow potential for this zone. In fact, this zone would not be expected to present a possibility of gas flow or hydrocarbon ingress, since the BP subsurface team for the Macondo well assigned this interval a value of zero net pay. This was because they found the thin sand layers in the interval to be below log resolution, and that attempts to obtain fluid samples were unsuccessful. The interpretation of fluid content was deemed uncertain, but it was probably water (brine).

The cement job implemented on April 19, 2010, was performed according to the April 18, 2010, recommended procedure.

### Analysis—Cement Channeling and Casing Centralization

The investigation team could not determine why the variety of input parameters was used or changed for the different OptiCem™ modeling runs. Wellbore survey data was available after the well reached total depth on April 9, 2010. Open hole caliper data was collected on April 10–11, 2010. In the opinion of the investigation team, once the wellbore survey data and the open hole caliper data were available (with the program calculating standoff above the top centralizers), both sets of data should have been used for all modeling runs to accurately determine the requirements for cement channeling prevention. The model run on April 18, 2010, was the most accurate prediction of cement channeling.

The investigation team determined through interviews that the decision to ship 15 additional centralizers was made as a result of the OptiCem™ modeling on April 15, 2010. In the investigation team's opinion, when concerns arose over what were thought to be incorrect centralizers, the BP Macondo well team did not follow a documented management of change (MOC) process and therefore did not identify that they were in fact the correct centralizers. When the decision was made to proceed without the additional centralizers, the BP Macondo well team did not ask for the OptiCem™ model to be re-run.

The decision not to use 21 centralizers increased the possibility of channeling above the main hydrocarbon zones, but it likely did not contribute to the cement's failure to isolate the main hydrocarbon zones or to the failure of the shoe track cement.

## 2.5 Lost Circulation and Equivalent Circulating Density

Severe losses occurred near the bottom of the production section of the wellbore while drilling. The ECD was recorded as high as 14.8 ppg prior to the losses. To control the losses, the mud density was reduced, and a lost circulation pill was placed in the bottom of the wellbore. This solved the lost circulation problems. After wireline logging, a cleanout trip verified that the wellbore was in good condition. No problems with the wellbore were encountered on the cleanout trip, and lost circulation did not recur.

Halliburton's OptiCem™ cement placement modeling indicated that the ECD would slightly exceed the fracture gradient toward the end of the job. This could have resulted in losses during cement placement. Lost circulation material (Halliburton WellLife™ 734) was added to the cement slurry as a precaution to prevent losses.

### Analysis—Lost Circulation and ECD

The well was modeled using the minimum fracture gradient value. OptiCem™ modeling indicated that if the ECD exceeded the minimum fracture gradient value and then losses occurred, those losses would occur during the end of cement placement and would have little impact on the isolation of the main pay sands. Analysis showed that no more than 3 bbls of fluid were lost during cement placement from the time that the bottom wiper plug landed to the time the top wiper plug landed. The investigation team concludes that this issue did not contribute to the accident.

## 2.6 Planning For Temporary Abandonment

The BP Macondo well team prepared a detailed decision tree for the temporary abandonment of the well. The decision tree outlined steps to confirm the top of cement (TOC); this was consistent with Minerals Management Services (MMS) regulations (*Casing and Cementing Requirements, 30 CFR Section 250, 428*). This approach was based on the evaluation of lift pressure and full returns during cement placement.

As a contingency, the BP Macondo well team decided to position a logging crew and tools on the rig to run a cement evaluation log if fluid losses occurred during cement placement. To facilitate running the cement evaluation log as deeply as possible, the cement job was designed so that cement would not be placed above the top wiper plug.

On the Macondo well, 1,000 ft. of cement above the uppermost hydrocarbon-bearing sand would have placed the cement inside the previous casing string, potentially creating a trapped annulus and causing problems with annular pressure build-up (APB). BP's policy discourages creating a trapped annulus on subsea wells, unless it is required for zonal isolation. The BP Macondo well team decided to place the TOC 500 ft. above the uppermost hydrocarbon-bearing sand, per MMS regulations.

Under *Section 5* of BP's *Engineering Technical Practice (ETP), GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*, if less than 1,000 ft. of cement above a distinct permeable zone is planned, then TOC must be determined by a "proven cement evaluation technique" such as a cement evaluation log. In addition, the plan must include 100 ft. of centralized pipe to be placed above any distinct permeable zone.

The information available to the BP well site leader and the Halliburton rig-based cement operator indicated that cement placement was performed as planned with lift pressure and no observed fluid losses. This post-job information was discussed during the morning operations telephone call involving personnel from BP and its Macondo well contractors. The BP Macondo well team decided not to run a cement evaluation log prior to temporary abandonment, reportedly reflecting consensus among the various parties on the call. The investigation team has not seen evidence of a documented review and risk assessment with respect to well condition and duration of suspension, regarding the annulus cement barriers.

**Analysis—Planning for Temporary Abandonment**
In the investigation team's opinion, evaluating lift pressure and lost returns did not constitute a "proven cement evaluation technique" per *Section 5* of the *ETP GP 10-60*. This section does not specify when a proven cement evaluation technique shall be employed, but typically a cement evaluation log would be run during the completion phase of the well.

By not conducting a formal risk assessment of the annulus cement barriers per the *ETP* recommendation, it is the investigation team's view that the BP Macondo well team did not fully conform to the intent of *ETP GP 10-60*. Such a risk assessment might have enabled the BP Macondo well team to identify further mitigation options to address risks such as the possibility of channeling; this may have included running a cement evaluation log.

## 2.7 Cement Design, Oversight, Communication and Evaluation

The investigation team considered the overarching organizational, decision-making and contractor management aspects of the Macondo well cement design and placement. This part of the analysis describes the investigation team's factual findings and conclusions.

An overview of BP and Halliburton collaboration on the Macondo well follows:

- As the well operator, BP provided to Halliburton well data such as fracture gradient, open hole caliper measurements, well survey measurements, downhole temperatures and pore pressure. BP also provided casing design information and planned mud densities.
- As the cementing advisor and product and equipment provider, Halliburton used this data to design a cement job that was intended to deliver zonal isolation for the well. The design included the types of cement slurry, spacer types, necessary quantities of cement and spacers, pump schedule and horsepower requirements. The Halliburton in-house cementing engineer was co-located with the BP Macondo well team.

## 4.4 Total Lifetime Cost

Materials and rig time costs of the long string are higher than the initial cost of a liner. Eventually, when the liner is tied back, its costs exceed those of the long string. The greater mechanical integrity risk of the liner and the tieback were factored into the lifetime cost analysis of using a long string versus using a liner.

**Analysis—Design Decision (Long String versus Liner)**
The investigation team determined that using a 9 7/8 in. x 7 in. long string production casing was an acceptable decision and provided a sound basis of design. As discussed in *3.3 Production Casing and Components* of this analysis, the production casing and components met all required design conditions. (Refer to *Appendix N.*) Industry data in Mississippi Canyon Block 252 area also indicates that approximately 57% of the wells used long strings while approximately 36% used liners or liners with tiebacks. (Refer to *Appendix O. Industry Comparison Data on Long String Casing and Casing Liners in the Macondo Well Area.*)

# 5 Conclusions

## 5.1 Cement Design

Based on CSI Technologies' lab results and analysis, the investigation team concluded that the nitrified foam cement slurry used in the Macondo well probably would have experienced nitrogen breakout, nitrogen migration and incorrect cement density, which would explain the failure to achieve zonal isolation of hydrocarbons. Nitrogen breakout and migration would have also contaminated the shoe track cement and may have caused the shoe track cement barrier to fail.

## 5.2 Cement Design, Oversight, Communication and Evaluation

The opinion of the investigation team regarding oversight, communication and evaluation was as follows:

- Communication between BP and Halliburton personnel involved in the cement job was not effective in relation to the challenges and associated risks with the slurry design (i.e., stability of the foamed cement) and placement.
- The BP Macondo well team did not provide effective quality assurance on Halliburton's technical services.
- The BP Macondo well team did not give BP zonal isolation experts the opportunity to perform sufficient quality assurance on the Halliburton and BP Macondo well team's cement design and procedures.
- The investigation team had no information as to the extent, if any, that Halliburton supervised or provided technical support to the Halliburton in-house cementing engineer on the Macondo well job. The investigation team was also unaware of any direct engagement between Halliburton supervisory personnel and the BP Macondo well team regarding the design of the Macondo well job.

BP-HZN-BLY00000077

## 5.3 Planning for Temporary Abandonment

In the investigation team's opinion, evaluating lift pressure and lost returns did not constitute a "proven cement evaluation technique" per Section 5 of ETP GP 10-60. Section 5 does not specify when a proven cement evaluation technique shall be employed, but typically a cement evaluation log would be run during the completion phase of the well.

By not conducting a formal risk assessment of the annulus cement barriers (per ETP GP 10-60 recommendations), it is the investigation team's view that the BP Macondo well team did not fully conform to the intent of the ETP. Such a risk assessment might have enabled the BP Macondo well team to identify further mitigation options to address risks such as the possibility of channeling; this may have included the running of a cement evaluation log.

## 5.4 Cement in the Shoe Track

Based on available evidence, hydrostatic pressure calculations, OLGA® well flow modeling and analysis of data from the Macondo well static kill on August 4, 2010, hydrocarbons entered the casing through the shoe track. Therefore, the shoe track cement and the float collar barriers must have failed to prevent this ingress. The investigation team has not established whether this failure was attributable to the design of the cement, contamination of the cement by the mud in the wellbore, commingling of the cement with nitrogen due to nitrogen breakout from the foam cement slurry, swapping of the shoe track cement with the mud in the rathole (bottom of the well) or some combination of these factors.

## 5.5 Overarching Conclusions

Improved engineering rigor, cement testing and communication of risk by Halliburton could have identified the low probability of the cement achieving zonal isolation.

Improved technical assurance, risk management and MOC by the BP Macondo well team could have raised awareness of the challenges of achieving zonal isolation and led to additional mitigation steps.

# 6 Recommendations

The investigation team has developed recommendations in response to the findings and conclusions presented in Section 5. Deepwater Horizon Accident Analyses. (Refer to Section 6. Investigation Recommendations of this report.) These recommendations comprise two categories: (1) those related to BP's Drilling and Well Operations Practice (DWOP) and its Operations Management System (OMS) implementation and (2) those related to BP's Contractor and Service Provider Oversight and Assurance.

# Analysis 5B. Hydrocarbons Entered the Well Undetected and Well Control Was Lost

## 1 Introduction

*Analysis 5A. Well Integrity Was Not Established or Failed* discussed three findings that are pertinent to this analysis:

- The annulus cement barrier did not isolate the hydrocarbons (Key Finding 1).
- The shoe track barriers did not isolate the hydrocarbons (Key Finding 2).
- The available evidence points to hydrocarbons having entered the casing through the shoe track.

*Analysis 5B.* provides details of how those findings relate to the subsequent operations on *Deepwater Horizon* as the integrity of the well was tested and how the influx entered and moved undetected up the wellbore into the riser, resulting in the catastrophic explosions, loss of life and loss of the rig.

To test the integrity of the well, the rig crew conducted a positive-pressure test on the casing, and then they conducted a negative-pressure test to confirm that the cement barrier and mechanical barriers were capable of withstanding an underbalanced condition. Abnormal pressures observed during the negative-pressure test were indicative of a failed or inconclusive test; however, the test was deemed successful.

Subsequent displacement of the well to seawater put the well in an underbalanced condition, allowing the well to flow. This flowing condition went unchecked until an estimated 8 minutes before the first explosion, after flow had become severe.

From analysis of the information available to the investigation team, flow indications started approximately 51 minutes before the blowout, although they were not detected until hydrocarbons from the reservoir had risen above the blowout preventer (BOP) and into the riser.

This analysis considers operational matters and the policies and procedures applicable to them. BP's *Drilling and Well Operations Practice* provides for the preparation of a well control interface/bridging document between BP and drilling contractors. At the time of the accident, BP and Transocean did not have a formal joint well control bridging document defining the well control activities for this well. The investigation team believes that Transocean's well control procedures had been considered to be in line with BP's expectations. This analysis references in particular the applicable Transocean well control procedures contained in the *Transocean Well Control Handbook*, a copy of which was provided to the investigation team. (Refer to *Appendix T. Comparison of Events with Relevant Transocean Well Control Policies, Practices and Procedures* for relevant excerpts.)

Others in the industry may benefit from consideration of these recommendations as well. Full implementation of the recommendations would involve a long-term commitment and a prioritized action plan with due dates and accountabilities for each element of the plan, with each of the actions tracked to completion. Some of the recommendations are dependent on the cooperation of entities outside BP.

# *DWOP* and OMS Implementation

## 1 Procedures and Engineering Technical Practices

**1.1** Update and clarify current practices to ensure that a clear and comprehensive set of cementing guidelines and associated *Engineering Technical Practices (ETPs)* are available as controlled standards. The practices should include, as a minimum:

- Clearly defined mandatory practices.
- Recommended practices and operational guidance.
- Definitions of critical cement jobs.
- Description of the technical authority's (TA's) role in oversight and decision making.

**1.2** Review and update *ETP GP 10-10 Well Control*, clarifying requirements for subsea blowout preventer (BOP) configuration:

- Establish minimum requirements for ram types, numbers and capability.
- Establish minimum requirements for emergency well control activation systems.
- Conduct a gap assessment of the BP-operated and BP-contracted rig fleet and put corrective actions in place to assure conformance.

**1.3** Update the relevant technical practices to incorporate the following design requirements:

- *BPA-D-003 Tubular Design Manual*: Consider load conditions for negative-pressure tests in the casing design assessment for subsea wells.
- *DWOP*: Standardize the installation of the locking mechanism of the casing hanger seal assembly to the high-pressure housing for subsea wellheads.

**1.4** Review and update *ETP GP 10-45 Working with Pressure* to include negative-pressure testing; this practice should provide as a minimum:

- The purpose of the test.
- A definition of the barriers to be tested.
- Identification and evaluation of the consequences of failure.
- A contingency plan of action in the event that failures occur.
- A requirement for detailed procedures which should include as an example:
  - The configuration of test lines and correct valve positions.
  - All operational steps and decision points.
  - A description of the roles and accountabilities for the personnel involved.
  - Clearly defined success/failure criteria for the test.
  - Authorization instructions if results are outside the defined success criteria.
- Assurance that contractor procedures are consistent with *ETP GP 10-45*.

1.5 Clarify and strengthen standards for well control and well integrity incident reporting and investigation. Ensure that all incidents are rigorously investigated and that close out of corrective actions are completed effectively.

1.6 Propose to the American Petroleum Institute the development of a recommended practice for design and testing of foam cement slurries in high-pressure, high-temperature applications.

1.7 Review and assess the consistency, rigor and effectiveness of the current risk management and management of change (MOC) processes practiced by Drilling and Completions (D&C) by:

- Implementing an action plan to address areas that should be strengthened to conform with OMS expectations.
- Defining minimum requirements of D&C functional teams to deliver consistent and effective application of MOC and risk mitigation from planning through execution.
- Assessing high-consequence drilling activities as a priority, starting with the Gulf of Mexico Exploration and Appraisal drilling team.

## 2 Capability and Competency

2.1 Reassess and strengthen the current TA's role in the areas of cementing and zonal isolation. Ensure adequate TA coverage to support all the D&C global operations. As a minimum, a TA should:

- Review and approve all critical zonal isolation engineering plans and procedures.
- Provide assurance of contractors for all services related to zonal isolation engineering and technical services, including engineering competency, service quality and adherence to relevant standards.

2.2 Enhance D&C competency programs to deepen the capabilities of personnel in key operational and leadership positions and augment existing knowledge and proficiency in managing deepwater drilling and wells operations by:

- Defining the key roles to be included in the enhanced competency programs.
- Defining critical leadership and technical competencies.
- Creating a 'Deepwater Drilling Leadership Development Program.' The program would build proficiency and deepen capabilities through advanced training and the practical application of skills.
- Developing a certification process to assure and maintain proficiency. Conduct periodic assessments of competency that include testing of knowledge and demonstrations of the practical application of skills.

2.3 Develop an advanced deepwater well control training program that supplements current industry and regulatory training. Training outcomes would be the development of greater response capability and a deeper understanding of the unique well control conditions that exist in deepwater drilling. This program should:

- Embed lessons learned from *Deepwater Horizon* accident.
- Require mandatory attendance and successful completion of the program for all BP and drilling contractor staff who are directly involved in deepwater operations, specifically supervisory and engineering staff, both onshore and offshore.
- Where appropriate, seek opportunities to engage the broader drilling industry to widen and share learning.

2.4 Establish BP's in-house expertise in the areas of subsea BOPs and BOP control systems through the creation of a central expert team, including a defined segment engineering technical authority (SETA) role to provide independent assurance of the integrity of drilling contractors' BOPs and BOP control systems. A formalized set of authorities and accountabilities for the SETA role should be defined.

2.5 Request that the International Association of Drilling Contractors review and consider the need to develop a program for formal subsea engineering certification of personnel who are responsible for the maintenance and modification of deepwater BOPs and control systems.

## 3 Audit and Verification

3.1 Strengthen BP's rig audit process to improve the closure and verification of audit findings and actions across BP-owned and BP-contracted drilling rigs.

## 4 Process Safety Performance Management

4.1 Establish D&C leading and lagging indicators for well integrity, well control and rig safety critical equipment, to include but not be limited to:

- Dispensations from *DWOP*.
- Loss of containment (e.g., activation of BOP in response to a well control incident).
- Overdue scheduled critical maintenance on BOP systems.

4.2 Require drilling contractors to implement an auditable integrity monitoring system to continuously assess and improve the integrity performance of well control equipment against a set of established leading and lagging indicators.

BP-HZN-BLY00000184

# Contractor and Service Provider Oversight and Assurance

## 5 Cementing Services Assurance

**5.1** Conduct an immediate review of the quality of the services provided by all cementing service providers. Confirm that adequate oversight and controls are in place within the service provider's organization and BP regarding:

- Compliance with applicable service provider, BP and industry standards.
- Competency of engineering and supervisory personnel.
- Effective identification, communication and mitigation of risk associated with providers' services.

## 6 Well Control Practices

**6.1** Assess and confirm that essential well control and well monitoring practices, such as well monitoring and shut-in procedures, are clearly defined and rigorously applied on all BP-owned and BP-contracted offshore rigs (consider extending to selected onshore rigs such as those for high-pressure, high-temperature, extended reach drilling [ERD] and sour service applications). These practices should be:

- Defined and codified as BP minimum standards for demonstrated practice and proficiency.
- Formally bridged into contractor rig site well control policies and procedures, with a self-verification and reporting process.
- Reinforced by regular audit by BP well site leaders.

## 7 Rig Process Safety

**7.1** Require hazard and operability (HAZOP) reviews of the surface gas and drilling fluid systems for all BP-owned and BP-contracted drilling rigs. Include a HAZOP review as an explicit check for rig acceptance and rig audit. Phase 1 should address offshore rigs. Phase 2 should address selected onshore rigs such as those for high-pressure, high-temperature, ERD and sour services applications.

**7.2** Include in the HAZOP reviews a study of all surface system hydrocarbon vents, reviewing suitability of location and design.

## 8 BOP Design and Assurance

8.1 Establish minimum levels of redundancy and reliability for BP's BOP systems. Require drilling contractors to implement an auditable risk management process to ensure that their BOP systems are operated above these minimum levels.

8.2 Strengthen BP's minimum requirements for drilling contractors' BOP testing, including emergency systems. Require drilling contractors to:

- Demonstrate that their testing protocols meet or exceed BP's minimum requirements.
- Perform self-audits and report conformance with their own protocols.

8.3 Strengthen BP's minimum requirements for drilling contractors' BOP maintenance management systems. Require drilling contractors to:

- Demonstrate that their maintenance management systems meet or exceed BP's minimum requirements.
- Perform self-audits and report results to confirm conformance with their own management systems.

8.4 Define BP's minimum requirements for drilling contractors' MOCs for subsea BOPs. Require drilling contractors to:

- Demonstrate that their MOC systems meet or exceed BP's minimum requirements.
- Perform self-audits and report results to confirm conformance with their own MOC processes.

8.5 Develop a clear plan for ROV intervention (independent of the rig-based ROV) as part of the emergency BOP operations in each of BP's operating regions, including all emergency options for shearing pipe and sealing the wellbore.

8.6 Require drilling contractors to implement a qualification process to verify that shearing performance capability of BSRs is compatible with the inherent variations in wall thickness, material strength and toughness of the rig drill pipe inventory.

8.7 Include testing and verification of conformance with *Recommendations 8.1* through *8.6* in the rig audit process.

BP-HZN-BLY00000186

Although the investigation team has taken a broad approach to making recommendations within the intent of its *Terms of Reference*, the team believes that as the findings in this report are considered and discussed, they may give rise to broader systemic responses or recommendations associated with possible broader industry issues. These issues might include industry working practices; training and competency assessment; and interfaces among operators, drilling contractors and service providers.