# Exhibit 53

To United States' Opposition to BPXP's Motion in Limine to Exclude (1)
Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Docket No. 08-893 |
| | * | |
| Plaintiff, | * | |
| | * | |
| VS | * | March 25, 2011 |
| | * | |
| CITGO PETROLEUM CORPORATION, | * | |
| | * | |
| Defendant. | * | Lafayette, Louisiana |

*****************************************************************

VOLUME V

REPORTER'S OFFICIAL TRANSCRIPT OF THE
TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD T. HAIK,
UNITED STATES DISTRICT JUDGE.
*****************************************************************

APPEARANCES:

For the United States:            Jason Barbeau
                                  David Askman
                                  Joseph Warren

For the State of Louisiana:       Dwana King


For CITGO Petroleum:              Richard Sarver
                                  Craig Isenberg
                                  Edward Lewis




REPORTED BY:   Mary Thompson, RMR, FCRR
               800 Lafayette Street, Ste. 3105
               Lafayette, Louisiana  70501

               (337)593-5222

I

I N D E X

PAGE NO.

GOVERNMENT WITNESSES:

Robert Harris:

    Direct Examination Continuing................  1148

    Cross-Examination..........................  1235

    Redirect Examination.......................  1295


Gary Amendola

    Direct Examination.........................  1309

1308

1    THE COURT:  Is that a course you take, industrial
2    wastewater engineering?
3    THE WITNESS:  Sir, my degree is in environmental
4    engineering, which was essentially a chemical engineering
5    program at the time I took it back in 1969.
6    THE COURT:  Okay.  Industrial wastewater
7    engineering and what else?
8    THE WITNESS:  Wastewater treatment.
9    MR. SARVER:  And, Your Honor, to move it along
10   we'll stipulate that Mr. Amendola is an expert in industrial
11   wastewater engineering --
12   THE WITNESS:  And treatment.
13   MR. SARVER:  -- and treatment.
14   THE COURT:  Okay.
15   MR. BARBEAU:  Again, just briefly, Mr. Amendola is
16   here to talk about gross negligence, the prior violations,
17   penalty factor, the basis for the economic benefit factor,
18   and then injunctive relief, the things needed to prevent
19   future violations.
20   THE COURT:  All right.
21   MR. BARBEAU:  And I would like to just help
22   Mr. Amendola introduce himself to the Court.
23   THE COURT:  Do we have a CV?
24   MR. BARBEAU:  Yes.  It is Plaintiff Exhibit
25   1059-07.

```
 1            MR. BARBEAU:  Let's look at the next page, please.
 2    MR. BARBEAU:  (CONTINUING)
 3        Q.    This is Root Cause No. 3.  What has CITGO
 4    identified as Root Cause No. 3 of the spill?
 5        A.    As we'll also discuss a little bit later, the water
 6    contains a considerable amount of suspended particulates,
 7    suspended solids or sludge, and when the water gets into
 8    these very large tanks -- the tanks are over 200 feet in
 9    diameter -- the material has a chance to settle out.  In
10    CITGO's case here, they were not removing the sludge from the
11    tank, either, and that filled up a considerable volume of the
12    tank as we'll show.
13            MR. BARBEAU:  Let's go back to the slides, please.
14            And the next one.
15    MR. BARBEAU:  (CONTINUING)
16        Q.    You're also addressing the prior violations penalty
17    factor.  Have you assessed CITGO's history of prior
18    violations?
19        A.    Yes.  We started in 1994 when this new treatment
20    system was started, and evaluated each of their monthly
21    discharge monitoring reports.
22            THE COURT:  Do you have an objection?
23            MR. SARVER:  I do.  I object.  This is irrelevant.
24    The violations at issue in this case are violations by
25    discharging oil on two days.  This is a discussion of
```

1316

1    violating the NPDES or LPDES permit for parameters other than

2    oil.  It has nothing to do with this case.

3              MR. BARBEAU:  We can get into this really quickly

4    with the witness, but these are all issues that go to the

5    inadequate storage and treatment capacity.  They are linked

6    hand-in-hand and they can't be separated.

7              THE COURT:  Why are they linked hand-in-hand with

8    the oil problem?

9              THE WITNESS:  Well, Your Honor, the treatment

10   facility is designed to handle a certain flow rate.  They've

11   constructed these very large tanks to contain the water.  It

12   is like filling up a bathtub with --

13             THE COURT:  I understand.  I've been here for a

14   week, man.  I know what they did and didn't do.

15             THE WITNESS:  Okay.  Well, the outlet of the

16   bathtub is very small, and they can only process water so

17   fast.  And during this storm event, they also had a series of

18   NPDES or LPDES permit violations because they overloaded

19   their treatment plant in an effort to get water out of the

20   system.  There is an imbalance in the way they have designed

21   this thing that the stormwater has to be handled at a certain

22   rate, so part of the problem is every time it rains, they're

23   under stress with their treatment system.  And if you go

24   through -- and we will -- a lot of the NPDES violations are

25   related to the lack of stormwater capacity.

1317

```
 1            So they are related very definitely.  It's a
 2    fundamental aspect of this case.
 3            MR. SARVER:  Your Honor, we have no objection if
 4    the witness and the government have any evidence of the prior
 5    discharge of oil from the facility.  That's what this case is
 6    about.  They don't have that evidence, and they want to try
 7    to pile on with evidence that is irrelevant.
 8            THE COURT:  I'm going to sustain that objection.
 9            MR. BARBEAU:  Your Honor, the --
10            THE COURT:  I'm going to sustain the objection.
11    You can proffer it tomorrow or Sunday or, you know, whenever
12    we can get the court reporter to come in.
13            MR. BARBEAU:  All right.
14            THE COURT:  I'm going to sustain that objection.
15    I'm concerned about the oil.
16            MR. BARBEAU:  Okay.  We do object.  It does go to
17    one of the penalty factors, and we'll make a proffer.
18            THE COURT:  No problem.
19    MR. BARBEAU:  (CONTINUING)
20        Q.   What is the -- do you have another opinion here
21    about the discharges from the facility?
22        A.   Yeah.  The last bullet on the slide, it goes to the
23    injunctive relief that I'm recommending to the Court.
24            One is they install adequate water storage capacity
25    to contain a storm, the 25-year designed storm, in tanks.
```

1376

1     with on that day.  So it just goes to show that there is not

2     enough capacity there.

3          Q.   And --

4               THE COURT:  So this would be a little preventative

5     maintenance for the injunctive relief?

6               THE WITNESS:  Well, we're getting there.  Yeah.

7     MR. BARBEAU:  (CONTINUING)

8          Q.   These discharges of the untreated oily wastewater,

9     did that include the hazardous waste sludge as well?

10         A.   Yes.  The untreated water includes the oil.  It

11    includes the solids that are hazardous waste when settled out

12    of the wastewater.

13         Q.   Does that also include -- does CITGO identify it as

14    including the characteristic hazardous waste for benzene?

15         A.   Yes.  The benzene waste code under RCRA is D018.

16    And if a concentration is greater than 0.05 milligrams per

17    liter, it's considered a hazardous waste.  And I'm sure you

18    heard a lot about benzene already.

19               And in this case, the wastewater on June 19th -- I

20    believe there was a measurement of 5 milligrams per liter of

21    benzene at one point in the water, and that's 10 times over

22    the standard.

23         Q.   And so these would be recognized as violations of

24    another sort when they discharge into --

25         A.    Under RCRA these would be unpermitted discharges.

1377

1      MR. SARVER:  Objection, Your Honor.  There are no

2  RCRA violations in this lawsuit, and he's stating a legal

3  conclusion in any event.

4      THE COURT:  Sustained.

5      MR. BARBEAU:  These are prior violations that we're

6  addressing.

7      THE COURT:  No, he was addressing this violation.

8  He said this occurred here.

9      Didn't you say that?

10     THE WITNESS:  What?

11     THE COURT:  Never mind.

12     MR. BARBEAU:  We're referring to these discharges

13  into the surge pond as recognized violations.

14     THE COURT:  Okay.

15     MR. BARBEAU:  And we could look real quick -- so

16  it's not just us saying it, let's go to Exhibit P-436.

17     THE COURT:  Any objection to that document?

18     MR. SARVER:  No, Your Honor.

19     THE WITNESS:  I think it's already in there.

20     MR. BARBEAU:  Okay.  Let's look at Page 120810.

21  MR. BARBEAU:  (CONTINUING)

22     Q.  This is a CITGO report from 1998, and here they're

23  talking about the -- considering discharging directly to the

24  surge pond.  And do you see -- can you identify the

25  disadvantages that they recognize?

1    A.   Yes.   Apparently CITGO is under a consent order

2  with EPA, and that would violate that.

3           They cited it would violate RCRA, as we just talked

4  about.

5           And they also talked about it would reduce -- or

6  jeopardize their risk-based closure for the surge pond, which

7  is an ongoing activity, and it could require removal and

8  treatment of all sludge in the surge pond, and that's not

9  what they want to do.

10   Q.   That surge pond is the unpermitted surface

11 impoundment that we've been talking about?

12   A.   That's the large pond I pointed out in the aerial

13 photograph.

14   Q.   And CITGO and you recognize that as a RCRA

15 violation to dump in there the untreated wastewater?

16   A.   Yes.

17   Q.   All right.  Rather than go through each of those

18 diversions, did you total up roughly how many millions of

19 gallons of untreated oily wastewater that they discharged

20 into the surge pond for those diversions?

21   A.   I think for all the diversions total, not including

22 the June 2006 event, it was somewhere around 30 million

23 gallons.

24   Q.   All right.  And so when CITGO talks about not

25 having an event like this occur before the June 19th event,

1379

1   is part of the reason that they haven't had the overflow of

2   the tanks is because they were doing a different illegal

3   discharge somewhere else to avoid that?

4        A.   Yes.

5             THE COURT:   Sustained.   Strike it from the record.

6             MR. BARBEAU:   Can we look at Exhibit P-790.

7   MR. BARBEAU:   (CONTINUING)

8        Q.   Is this one of CITGO's reports about doing the

9   discharge into the surge pond?

10       A.   Yes, it is.

11       Q.   And do you see down on Line 1 it identifies the

12  waste code.   Can you tell us what D018 is and FO37?

13       A.   Yes.   As I testified a few minutes ago, D018 is the

14  waste code for benzene wastewater, and F037 is the waste code

15  for primary sludge from petroleum refinery wastewaters.

16            MR. SARVER:   Your Honor, we object.   It's a

17  different alleged violation.   It is long past the statute of

18  limitations.

19            THE COURT:   Were y'all cited on this?

20            MR. SARVER:   We certainly reported it to DEQ as

21  evidenced on the face of the document.

22            THE COURT:   Was there a citation issued on this?

23            MR. BARBEAU:   I can't speak to that.

24            THE COURT:   Then I'm not letting it in.

25            MR. BARBEAU:   Well, again, this goes to the prior

1    violations, the history of violations.  We're not trying to
2    get a statute of limitations issue going here.  We're looking
3    at all history of relevant violations, and the reason that
4    they are doing this is because they don't have enough
5    capacity.
6              THE COURT:  He has already testified to that.
7              MR. BARBEAU:  Okay.
8              THE COURT:  How many times do we need to testify to
9    it?
10             MR. BARBEAU:  Can I just move all of these five
11   discharges into the record?
12             MR. SARVER:  Your Honor, we object to them, but if
13   it will move it along -- we object.  That's all.
14             THE COURT:  Okay.  I'll let them in for the
15   completeness of the record, and give it the appropriate
16   weight I think it deserves under the circumstances.
17             MR. BARBEAU:  Thank you, Your Honor.
18             Let's just show them real quick.  This is P-553,
19   please.
20             Let's skip that.  Go to P-540.
21   MR. BARBEAU:  (CONTINUING)
22        Q.   Is this one of the surge pond discharges?
23        A.   Yes.
24             MR. BARBEAU:  We move that into the record.
25             MR. SARVER:  What is the date on this, Mr. Barbeau?

```
1              MR. BARBEAU:  It is November 7, 1996.

2              MR. SARVER:  We object.  And one further basis for

3      the objection -- and I know you're not going to consider the

4      EPA penalty policy, but it has been admitted into evidence

5      for whatever you choose to do with it.  The EPA penalty

6      policy says you may consider if the respondent has a relevant

7      history of violation within the past five years.

8              MR. BARBEAU:  And that's a penalty policy and there

9      are numerous cases --

10             THE COURT:  I'm going to allow it in for

11     completeness of the record.  Put them all in right now.  Just

12     rattle them off and put them in.  If I decide I want to read

13     them later on, I'll do that.

14             MR. BARBEAU:  P-540 is the 1996.

15             P-787 is the 1995.

16             P-790 is 1996.

17             P-789 is another discharge for 1996.

18             P-788 is 1996.

19             P-433 is another discharge in 2007.

20             P-527 is from 2008.

21             And I would actually like to show that.  That is

22     post-construction of the third tank.

23             THE COURT:  All right.  Let's show that one.  Let's

24     see what that one is.

25             MR. BARBEAU:  P-527.
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

UNITED STATES OF AMERICA,      *    Docket No. 08-893
                                  *
             Plaintiff,    *
                                  *
VS                            *    March 28, 2011
                                  *
CITGO PETROLEUM CORPORATION,    *
                                  *
             Defendant.   *    Lafayette, Louisiana

*****************************************************************
VOLUME VI

REPORTER'S OFFICIAL TRANSCRIPT OF THE
TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD T. HAIK,
UNITED STATES DISTRICT JUDGE.
*****************************************************************

APPEARANCES:


For the United States:          Jason Barbeau
                                David Askman
                                Joseph Warren

For the State of Louisiana:    Ms. Dwana King


For CITGO Petroleum:           Richard Sarver
                                Craig Isenberg
                                Edward Lewis




REPORTED BY:   Mary Thompson, RMR, FCRR
                 800 Lafayette Street, Ste. 3105
                 Lafayette, Louisiana  70501

                 (337)593-5222

1464

I N D E X

I

PAGE NO.

GOVERNMENT WITNESSES:

Gary Amendola

    Cross-Examination.......................... 1465
    Redirect Examination....................... 1542

DEFENSE WITNESSES:

Mark Ploen:

    Direct Examination......................... 1602

    Cross-Examination.......................... 1650

    Redirect Examination....................... 1671

Lial Tischler:

    Direct Examination......................... 1678

    Cross-Examination.......................... 1802

```
 1    capacity here, yes.
 2            THE COURT:  I understand.
 3    MR. BARBEAU:  (CONTINUING)
 4        Q.   There was a question about discharging the oily
 5    wastewater into that dike area under these circumstances to
 6    avoid overflowing the tanks.  Do you recall that?
 7        A.   I do.
 8        Q.   And are there -- and there was a question about the
 9    benzene as far as an air -- Clean Air Act issue.  Do you
10    recall that?
11        A.   Yes.
12        Q.   Are there other benzene issues outside of the Clean
13    Air Act that we should be concerned about?
14        A.   Sure.  There is worker health and safety for one.
15    That's probably the most prominent one.
16            MR. SARVER:  Beyond the scope of his report,
17    Your Honor.
18            THE COURT:  Is that beyond the scope of his report?
19            MR. BARBEAU:  I think he identified multiple
20    concerns about discharging into --
21            THE COURT:  Did he specifically refer to that in
22    his report?
23            THE WITNESS:  I referred to benzene emissions.
24            MR. SARVER:  Your Honor, they had --
25            THE COURT:  So what's the question?
```

1560

```
 1      MR. BARBEAU:  (CONTINUING)
 2          Q.   I'm trying to drill into the different types of
 3      benzene-related issues.  For example, is there an RCRA issue
 4      with benzene?
 5          A.   Sure.  Yes, there is.
 6          Q.   What is that?
 7              MR. SARVER:  Your Honor, this is beyond the scope
 8      of his report.
 9              THE COURT:  Pull up the report.  Let's see it.
10      Show it to me in your report.  And I'm -- you already had a
11      benzene expert.
12              MR. BARBEAU:  I'm trying to hit the regulatory
13      issues, not the health exposures.
14              THE COURT:  Have they been charged with a
15      regulatory environmental --
16              MR. BARBEAU:  Again, we're looking into injunctive
17      relief concerns about letting the stuff go into the open air.
18              THE COURT:  Well, show me his report.
19              MR. BARBEAU:  Okay.
20              THE COURT:  I tell you what, I'm going to let him
21      testify because it will take less time to do it.  I'll let it
22      go to the weight of the evidence.  He is not a benzene
23      expert, although I understand his expertise.
24              THE WITNESS:  In respect to Mr. Barbeau's question
25      about benzene and RCRA, the wastewaters that contain more
```

1    than a half-milligram per liter or part-per-million of

2    benzene are classified as hazardous waste DO18.  And the

3    concern is that if you release the wastewaters into the open

4    environment, the benzene is a very volatile substance and

5    will evaporate.

6              THE COURT:  We've heard that 15 times already.

7              MR. BARBEAU:  All right.

8              THE COURT:  Did that happen -- do they have benzene

9    in the Indian Marais now because of what you think may be in

10   the sediment on the bottom?

11             THE WITNESS:  No.  I think the benzene has all

12   evaporated.  There are other compounds.

13   MR. BARBEAU:  (CONTINUING)

14   Q.   We talked about that on Friday as far as the air

15   emissions that they were detecting?

16   A.   Sure.

17   Q.   Okay.  As far as the -- so when they have to take a

18   tank out of service for this inspection, we learned today

19   that it was approximately six months -- or it's not quite

20   complete, but it's about six months.  Is that a length of

21   time that would warrant having additional capacity during

22   those periods?

23   A.   I believe so.

24   Q.   How many more tanks do they have to take out of

25   service to complete their required API tank inspections?

1756

1      A.   I just don't know.  And I should qualify that I did

2   get a copy of the more recent permit application that was

3   filed in 2008.  I did not review it in detail, but I did go

4   through it.  I'd forgotten that.

5      Q.   Do you recall seeing any mention of a notification

6   that the secondary containment will be used as a surface

7   impoundment?

8      A.   I simply don't recall.

9      Q.   And you're aware that using the surge pond --

10  discharging into the surge pond is a -- gives rise to

11  environmental concerns under RCRA and the Clean Water Act?

12  Are you aware of that?

13     A.   I don't think it -- I don't know about the Clean

14  Water Act.  I know that there are issues related to RCRA if

15  they put a hazardous waste in it.

16     Q.   Would it also be bypassing treatment under the

17  permit and discharging that material into the surge pond?

18     A.   Well, it wouldn't be bypassing treatment if it were

19  put in the surge pond and worked back through the treatment

20  plant.  It does not bypass.  It doesn't go to -- you know,

21  they are basically using it as storage.  That wouldn't be a

22  bypass.

23     Q.   Well, sure it does.  Chemicals are being

24  volatilized into the air before treatment.

25     A.   That's under a different regulation.  That's under

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

UNITED STATES OF AMERICA,          *      Docket No. 08-893
                                   *
               Plaintiff,          *
                                   *
VS                                 *      March 31, 2011
                                   *
CITGO PETROLEUM CORPORATION,       *
                                   *
               Defendant.          *      Lafayette, Louisiana

*****************************************************************
                        VOLUME IX

        REPORTER'S OFFICIAL TRANSCRIPT OF THE
                  TRIAL PROCEEDINGS
        BEFORE THE HONORABLE RICHARD T. HAIK,
            UNITED STATES DISTRICT JUDGE.
*****************************************************************


APPEARANCES:


For the United States:             Jason Barbeau
                                   David Askman
                                   Joseph Warren

For the State of Louisiana:        Dwana King


For CITGO Petroleum:               Richard Sarver
                                   Craig Isenberg
                                   Edward Lewis




REPORTED BY:   Mary Thompson, RMR, FCRR
               800 Lafayette Street, Ste. 3105
               Lafayette, Louisiana  70501

               (337)593-5222

I

I N D E X

PAGE NO.


DEFENSE WITNESSES:


Diana LeBlanc:

    Direct Examination........................... 2434
    Cross-Examination........................... 2472
    Redirect Examination........................ 2534


Jennifer Wilkie:

    Voir Dire Examination....................... 2559
    Voir Dire Examination....................... 2562
    Direct Examination.......................... 2565
    Cross-Examination........................... 2586
    Redirect Examination........................ 2601


Russel Ogle:


    Voir Dire Examination.   ................... 2607

    Voir Dire Examination....................... 2609

    Direct Examination.......................... 2611

    Cross-Examination........................... 2643

    Redirect Examination........................ 2685




Charles Finch:


    Direct Examination.......................... 2700

1    MR. BARBEAU:  (CONTINUING)

2        Q.   This is Option 5.  It's talking about bypass,

3    quote, clean water, unquote, to the Indian Marais.  That

4    clean water in quotes, that's referring to the untreated

5    wastewater, right?

6        A.   Basically, yes.  Basically that clean water would

7    be the dry weather flow that accumulates in the Panama Canal,

8    which is your non-benzene wastewater, and also the stormwater

9    that's accumulated.

10       Q.   This kind of goes towards that first flush idea?

11       A.   Correct.

12       Q.   Do you see under the disadvantages it says:

13   Despite, quote, first flush there remains a good chance that

14   discharge will result in sheen on the river?

15       A.   Correct.

16            MR. BARBEAU:  Let's go to Page 120815.

17   MR. BARBEAU:  (CONTINUING)

18       Q.   This is talking about discharging to the surge

19   pond?

20       A.   No, this is the wrong page.

21            MR. BARBEAU:  I'm sorry, 120811.

22   MR. BARBEAU:  (CONTINUING)

23       Q.   And under the disadvantages we have the violation

24   of a consent order with EPA.  That's what we were talking

25   about earlier, right?

1      A.    Yes.

2      Q.    And a violation of RCRA to put this material into

3    the surge pond?

4      A.    Correct.

5      Q.    You were aware of that?

6      A.    Yes.

7      Q.    And then also the third point says:  Would

8    jeopardize use of risk-based closure for this facility and

9    require removal and treatment of all sludge.

10          What's that about?

11     A.    At the time they were evaluating having a

12   risk-based closure for the surge pond.  That has since been

13   determined to not be a viable option, and it's not included

14   in our current plans for closure.

15     Q.    At the time, though, what would that have allowed?

16     A.    We were going to install a subaqueous cap to a

17   material that was still included in the surge pond, and to

18   leave it in place.

19     Q.    This decision to pave the berm, part of the

20   decision was that it would be cheaper to clean up when you

21   had the eventual overflow or -- yeah, overflow; is that

22   right?

23     A.    That's correct.

24     Q.    Because instead of needing to dig up all the

25   contaminated soil, you could scrape it off the concrete, I