# Exhibit 55

To United States' Opposition to BPXP's Motion in Limine to Exclude (1)
Additional Evidence of Culpability and (2) Evidence Relating to Prior Incidents

```
               UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF LOUISIANA
               LAFAYETTE-OPELOUSAS DIVISION

UNITED STATES OF AMERICA,          *     Docket No. 08-893
                                   *
                  Plaintiff,       *
                                   *
VS                                 *     March 25, 2011
                                   *
CITGO PETROLEUM CORPORATION,       *
                                   *
                  Defendant.       *     Lafayette, Louisiana

*************************************************************
                        VOLUME V

        REPORTER'S OFFICIAL TRANSCRIPT OF THE
                  TRIAL PROCEEDINGS
        BEFORE THE HONORABLE RICHARD T. HAIK,
            UNITED STATES DISTRICT JUDGE.
*************************************************************


APPEARANCES:


For the United States:              Jason Barbeau
                                    David Askman
                                    Joseph Warren

For the State of Louisiana:         Dwana King


For CITGO Petroleum:                Richard Sarver
                                    Craig Isenberg
                                    Edward Lewis




REPORTED BY:   Mary Thompson, RMR, FCRR
               800 Lafayette Street, Ste. 3105
               Lafayette, Louisiana  70501

               (337)593-5222
```

I

I N D E X

PAGE NO.

GOVERNMENT WITNESSES:

Robert Harris:

    Direct Examination Continuing................   1148

    Cross-Examination...........................   1235

    Redirect Examination........................   1295

Gary Amendola

    Direct Examination..........................   1309

1    taking on the risk of investing in the company, wants a rate

2    of return.  It's typically higher than the debt rate.

3            So what the WACC does, it weights the two based on

4    the company's capital that it has.  So there's a debt rate

5    and an equity rate, and it arrives at one weighed average

6    cost of capital or WACC rate.

7    Q.   Can you explain how this weighting works?

8    A.   Um...

9    Q.   Let me move ahead.  CITGO is a privately held

10   company.  How does CITGO raise equity capital from investors?

11   A.   It does it through retained earnings.  Those

12   retained earnings, and the earnings and profits of the

13   company -- what CITGO's doing, that's not CITGO's money.

14   That's CITGO's parent's, or the owner of CITGO, money.  In

15   this case PDVSA -- P-D-V-S-A are the initials.  That's

16   PDVSA's money.  And what PDVSA is choosing to do, it's

17   reinvesting those funds in the company if they are using

18   retained earnings to operate for cash flow.

19           And PDVSA would expect the same rate that an

20   outside investor would expect to invest in the company, much

21   like a mutual if you are getting dividends.  A lot of times

22   you can choose to reinvest those dividends.  You expect a

23   return on those dividends you usually invest.  Well, PDVSA

24   expects a return on the retained earnings that they're

25   choosing to reinvest in the company.

1    Q.   How do you know that CITGO used retained earnings

2    to make capital investments in capital projects?

3    A.   Well, as I mentioned earlier, I went to

4    Ms. Sivinski's deposition, and she addressed that at her

5    deposition.  And it goes back to where we were saying that

6    CITGO has determined the total piece of their pie, how much

7    are we going to spend on capital projects.

8         And what she said is that the criteria that they

9    look at to determine that amount is what's the earnings and

10   profits and what's the cash flow going to be for the coming

11   year.  And that's where we determine our capital budget from.

12   So it's obvious to me that they are using internally

13   generated funds to pay for their capital projects -- or at

14   least pay for part of them.

15   Q.   How did you determine CITGO's weighted average cost

16   of capital in this case?

17   A.   Well, as we mentioned, CITGO is a privately held

18   company, so there's a couple of ways you can do the WACC rate

19   if it's a privately held company.  I chose to do what's known

20   as a pure play method.  What that does is it takes publicly

21   traded companies and computes their WACC rates, and uses that

22   as an approximation for CITGO's, or the privately held

23   company, WACC.

24   Q.   And in this case, based upon your analysis, what's

25   the WACC rate that you decided to apply for CITGO?

1    A.   I used a rate of 10.04 percent.

2    Q.   Now, how do you know that 10.04 percent reasonably

3 approximates CITGO's weighed average cost of capital?

4    A.   I actually think it's a pretty conservative

5 estimate.  As we mentioned, in the capital budgeting process

6 there is an approval.  You know, when CITGO's refinery units

7 are going to submit a project for approval, there is an

8 approval package that has to be completed by that person to

9 give to the person that's going to make the decision on the

10 project to approve it or not.

11    And whereas I used a 10.04 percent -- they do a --

12 CITGO -- part of that approval package is an economic benefit

13 analysis much like the one that I did in my analysis.  And

14 when CITGO does that analysis, they use a rate of 15 percent

15 for a rate of return.  I used a rate of 10.04 percent.

16    Q.   If you can take a look at Tab 10 of your notebook,

17 you'll find Plaintiff Exhibit Number 641.

18    MR. WARREN:  Why don't we pull it up on the screen,

19 too.

20 MR. WARREN:  (CONTINUING)

21    Q.   Do you recognize this document?

22    A.   Yes.  This is kind of the guidelines -- I mentioned

23 the approval package -- that they have to put together.  This

24 is for every capital project over $25,000 that the company is

25 going to do.  There is an approval package.  These are the

 1    round numbers.

 2          THE COURT:  Okay.  Do you know what kind of a

 3    criminal fine they paid in this matter?

 4          THE WITNESS:  I believe they paid about a

 5    $13 million criminal penalty.

 6    MR. WARREN:  (CONTINUING)

 7       Q.   Let's turn to the part of your opinion regarding

 8    the economic impact issue.  In this case we're talking about

 9    the economic impact of a penalty upon CITGO.  Have you

10    formulated an opinion as to how a penalty might impact CITGO,

11    it's ability to pay a penalty?

12       A.   I have.

13       Q.   What is your opinion?

14       A.   I believe that CITGO, along with its parent

15    company, could pay a penalty between $500 million and a

16    billion dollars.

17          THE COURT:  Do you object to that?

18          MR. ISENBERG:  Well, I have an objection to

19    Mr. Harris referring to the parent company and what their

20    ability to pay is.  The parent company is not a defendant in

21    this case and is not liable for any penalty that may be

22    assessed against CITGO.

23          THE COURT:  I understand how it works.  So that's

24    an objection -- is that an objection?

25          MR. ISENBERG:  It's an objection to the relevance

1    of the parent company's finances.

2              THE COURT:   Overruled.

3              I'm sure you're going to ask him about CITGO alone.

4              MR. ISENBERG:  Yes, Your Honor.

5              THE COURT:  Okay.

6    MR. WARREN:   (CONTINUING)

7         Q.   If you could, look at Tab 21 of your notebook.  And

8    I believe this is Plaintiff Exhibit Number 1053-06.

9         A.   Okay.

10        Q.   What is this document showing us?

11        A.   This is an attachment to my report discussing

12   certain financial information about CITGO.

13             But what we start with -- really the second page,

14   cash flow from operations, is where we're going back.  And we

15   actually looked at the net income for CITGO from 1994

16   forward.  I'm showing in my analysis the last four completed

17   fiscal years and then as of June 30th.

18             But what I'm trying to get is an historical

19   perspective on CITGO, its operations, what kind of cash is it

20   generating on an annual basis, and what kind of income.  Just

21   how strong of a company is this.

22             And you can see from this, their net income -- for

23   instance, in '06, I think that may be the highest income -- I

24   think it is -- that we've seen in that 16-year period of

25   roughly $1.8 billion.  Then you can see the cash flow that

1    the company is generating.  The cash flow was actually higher

2    in '07, but it's a billion dollars of cash flow.  So what

3    this is telling me is historically CITGO is a very profitable

4    company.

5            And we'll go ahead and address out at '09.  You

6    know, it has dropped off in 2009 and -- well, 2010 is better

7    than 2009, the latest information I had, and I did receive a

8    September 30th financial statement -- or at least a balance

9    sheet and income statement after the date of my report.  The

10   company at that time was still in a loss position for the

11   year, so the last year and a half to year and three-quarters

12   of financial information I had, they were in a loss position

13   for that time period.

14       Q.    But from -- prior to 2006, in that period from 1994

15   to 2006, did CITGO ever have a year where it lost money?

16       A.    No.  The 2009 year out of that -- I'm going to say

17   it's 16 years, it may be more, 17.  During that time period

18   this is the first loss year that CITGO had.

19       Q.    And the amount of -- the gain in 2006 was what

20   amount?

21       A.    Gain or I'll call it net income --

22       Q.    Net income.

23       A.    -- was -- I'm going to call it 1.8 billion.

24       Q.    And net income in 2007?

25       A.    I'm going to round that to $1.6 million.

1    Q.   And it subsequently had a loss, is what you're

2    saying, in 2008?

3    A.   No.  It had a loss in 2009.  It had a roughly

4    $200 million loss.  That's a lot of money to you and I, but

5    for a company generating these kind of profits over the

6    years, it's not as significant as it would be to a much

7    smaller company.

8         THE COURT:  $200 million?

9         THE WITNESS:  Yes.  But I would point out during

10   that year, because of depreciation and those type of things,

11   they did at least cash flow, and had some money available for

12   capital improvements or debt service.

13   MR. WARREN:  (CONTINUING)

14   Q.   What were the company's revenues in that year that

15   it lost $200 million?

16   A.   I believe revenues in that year were around

17   $24 billion, if my memory is right.

18   Q.   So looking at the historical financial data of

19   CITGO, what do you conclude about its ability to pay?

20   A.   Well, I think you've got to look at -- you have to

21   consider the history and what -- and the significant cash

22   flows that have been generated over the years.  And, yeah,

23   they have lost some money in the last year and a half, but

24   overall this is a very strong company that has been

25   profitable for years.

1        THE COURT:  And the question is?

2        MR. WARREN:  Well, there --

3        THE COURT:  That wasn't the same question.  Repeat

4   your question.

5   MR. WARREN:  (CONTINUING)

6        Q.   My question is what -- how does your -- the

7   historical data that you looked at, how does it support your

8   opinion with regard to CITGO'S ability to pay a penalty?

9        THE COURT:  You said that.

10        What is your opinion as to what the civil penalty

11   should be?  That's the next question.  What they can pay --

12   not what it should be.  What is your opinion as to what they

13   can pay?  You've already said about them and the parent

14   company.  Do you have an opinion as to just them?

15        THE WITNESS:  It's hard to just look at just CITGO

16   because there has been --

17        THE COURT:  So your answer is, no, you don't have

18   an opinion?

19        THE WITNESS:  Ask your question one more time.

20        THE COURT:  Do you have an opinion as to what just

21   CITGO could pay as to a civil penalty?

22        THE WITNESS:  I have not done an analysis of just

23   CITGO.

24        THE COURT:  Fair enough.

25   MR. WARREN:  (CONTINUING)

1   projects that are winding down, and their future capital

2   improvements, instead of being at $450 million a year, are

3   going to drop down in the $250 million range.  I think that

4   was Mr. Kent.

5        So they're going to -- their capital requirements

6   are going to decline over the next year or two years that

7   they project out.

8   MR. WARREN:  (CONTINUING)

9        Q.   At the end of this quarter they had 406 --

10  $46 million in net cash flow?

11       A.   For that quarter they did, yes.

12       Q.   This is a page from the same document.  What does

13  this show us?

14       A.   This shows the liquidity, the amount of cash on

15  hand plus available credit that the company has at the

16  various dates across the bottom of the page.

17       Q.   So when you say cash on hand, this is money that

18  CITGO, without its parent, has available to deploy at its

19  discretion, correct?

20       A.   Not totally.  What they've got is, if you take

21  their cash that they have in the bank plus available credit

22  on lines of credit -- for instance, if you go to -- let's

23  just go to 6-30-2010.  They have $716 million there.  There

24  are liquidity requirements placed on them by creditors of

25  about $400 million.  So they've got $316 million actually

1  available that -- probably to use at their somewhat

2  discretion.

3           THE COURT:  None of that is going to be used to pay

4  expenses, daily expenses, costs?

5           THE WITNESS:  They have money coming in on an

6  ongoing basis.  That's just at that point.  It's kind of like

7  a snapshot, right here this is what they have.  It will

8  fluctuate daily.

9  MR. WARREN:  (CONTINUING)

10      Q.   Now, in forming your opinion have you taken into

11 account dividend payments that CITGO has made?

12      A.   Yes.

13      Q.   And what have you concluded from those dividend

14 payments?

15      A.   I think I have a chart, but they pay their

16 dividends to PDVSA.  That is their owner.  And I think I have

17 a chart of those dividends.

18           MR. WARREN:  It's the last PowerPoint slide.

19 MR. WARREN:  (CONTINUING)

20      Q.   Is this --

21      A.   This is an analysis I did, and I mentioned earlier

22 that I went back to 1994 and scheduled the income.

23           But what this analysis was -- is really discussing

24 is the dividends that have been paid, and so -- the cash

25 dividends.

1          So what this tells me -- I did some averaging at

2    the bottom, but if you look at the total net income that we

3    have highlighted here for the 16 or 17 years -- 15 years,

4    you'll see they made, from 1994 to 2008 -- I actually did

5    this before I dropped the last number in -- was $7.6 million.

6          Skip over about four columns -- or three columns to

7    cash dividends that have been paid.  CITGO has basically

8    distributed not quite 100 percent of its net income over that

9    time period to its parent company.  That's significant to me.

10         THE COURT:  Cash dividends paid, that line is how

11   much in 2008, December 31, 2008, they paid to the parent

12   company, $1,330,000,000?

13         THE WITNESS:  That's correct.

14         THE COURT:  That's basically a cash dividend --

15   what it appears to be is the profit that the parent company

16   has made on this company?

17         THE WITNESS:  Right.  If you look at the last line

18   on the spreadsheet, your 10-year average, it's from 1-1-2000

19   to 12-31-09.  For that 10-year period they averaged earning

20   $665 million a year.  That's after-tax profit.

21         And you go over to the --

22         THE COURT:  That's including all the depreciation

23   on the equipment?

24         THE WITNESS:  Yes, sir.  That's taking just

25   straight net income on the financial statements.

1226

1    THE COURT:  But my question is, in 2008 they sent
2    over cash dividends of $1,330,000,000?
3    THE WITNESS:  That's correct.
4    THE COURT:  And nothing in 2009?
5    THE WITNESS:  To my knowledge they haven't paid any
6    dividends during the -- since the year '08.  I don't know
7    exactly what date they paid those.
8    MR. WARREN:  (CONTINUING)
9    Q.  In 2009 there is a column just to the right of
10   non-cash dividends paid.  What is that, Mr. Harris?
11   A.  There's various expenses that are paid -- PDVSA
12   expenses that are paid by CITGO, I believe, and they classify
13   those as non-cash dividends on their financial statements.
14   Q.  So 2009 was a year that the company had lost money,
15   had negative net income, correct?
16   A.  As I remember, it was around $200 million lost.
17   Q.  But they still paid $99 million in non-cash
18   dividend payments in that year?
19   A.  They did.
20   Q.  What are the total dividend payments that have been
21   paid since June of 2006?
22   A.  You'll see the highlighted box.  It's to the left
23   hand as you're looking at it.  They paid $4,700 -- it's both
24   boxes combined.  I'm sorry.  They paid $4,776,000,000 in
25   dividends since the year that the oil spill -- including the

1    year of the oil spill, but since that time.

2         Q.   You had stated at the outset of your opinion that

3    in your opinion that CITGO has the ability to pay from $500

4    million to a billion dollars when combined with PDVSA.  What

5    is the basis for your opinion that the Court should take into

6    account PDVSA in assessing CITGO's ability to pay?

7         A.   Well, I don't know that CITGO is going to claim an

8    inability to pay, but if they do, I think it's proper to look

9    at PDVSA as a source of funds for that.

10        Many times when there is an inability to pay

11   raised, we look at transactions between the parent company

12   and the subsidiary and whether there are arm's-length

13   transactions, the dollar amount of them, the timing of the

14   transactions, and those sorts of things.  Was there a

15   business purpose to the transaction.  Did the company receive

16   anything of value in return.

17        So one of the first places we look is the

18   dividends, and to me dividends -- this raises a red flag in

19   my mind that we distributed dividends equal to our net

20   income, we're basically taking all the money out.

21        And so that's the reason I did the analysis.

22        Q.   When you attended Mr. Kent's deposition, he also

23   discussed a loan that CITGO made to PDVSA.  Can you describe

24   that to the Court?

25        A.   In 2007 CITGO made a billion-dollar loan to PDVSA.

1    That money was loaned -- and I may get the percentages wrong,

2    but I'm close -- at about a 3.8 percent interest rate.  In a

3    subsequent year it declined to, I think, around 1.4 percent.

4            So it was very favorable terms on the loan, and

5    what I would not consider to be an arm's length transaction.

6    CITGO was actually paying a higher rate for its debt to its

7    creditors when it loaned its money to CITGO, so it caused

8    financial harm to CITGO.

9        Q.    Now, you mentioned that CITGO refinanced recently,

10   and that Mr. Kent discussed that refinance in his deposition.

11       A.    He did.

12       Q.    And what did the -- he say the creditors said with

13   regard to this $1 billion loan?

14       A.    The creditors had some problems with the remaining

15   balance.  I can't remember what the balance was on that note,

16   but they -- the creditors, in effect, said we're not going to

17   loan you the money unless PDVSA is going to pay their money

18   back first.

19       Q.    So they insisted that PDVSA return the money if

20   they were going to give additional money to CITGO?

21       A.    That's correct.

22       Q.    Would that indicate that the creditors had a view

23   about whether this payment was an arm's length transaction or

24   not -- or this loan was an arm's length transaction?

25            THE COURT:  He can't tell you what the creditors

```
 1    believed.  Bring them in.
 2              MR. WARREN:  Very good, Your Honor.
 3              THE COURT:  That's not fair.
 4              MR. ISENBERG:  That was my objection.
 5              THE COURT:  No problem.  Sustained.
 6              MR. WARREN:  Can I go back to Slide 4, please,
 7    PowerPoint Slide 4.
 8    MR. WARREN:  (CONTINUING)
 9         Q.   In some of these years was the net -- amount of the
10    dividend payment in excess of the discretionary payment -- I
11    mean in excess of net income?
12         A.   It was.  And if you go to the bottom line, I did it
13    for the 10 years.  And you can see for the last 10 years they
14    have averaged more in dividend payments than they have in net
15    income.
16         Q.   What does that tell you as an expert in financial
17    accounting about the relationship between PDVSA and its
18    parent -- PDVSA and CITGO?
19         A.   I'm not sure what it tells me about the
20    relationship between them, but I think that's extremely
21    unusual that they are distributing really more than they are
22    making in money to their parent company.  Dividends are
23    normally a --
24              THE COURT:  Well, you can't give them more than you
25    have.  So what they had was they had that depreciation stuff
```

1    in there that they got tax breaks on, but it didn't affect

2    the cash they had on balance?

3            THE WITNESS:  That's true in part.  It matters

4    where they were going into that time period, too.  How much

5    cash did you have on hand at 1-1-2000, because you are eating

6    through that as you do it.  So -- and you could be borrowing

7    money, too.  They may have had to borrow the money.  I can't

8    tell you where the money came from.  I just know they paid

9    out more than they made.

10           MR. WARREN:  Can I have Document 628, please.

11           THE COURT:  They could have made more money the

12   years before and didn't pay that out as dividends and had an

13   excess at the beginning of that next year?

14           THE WITNESS:  Right.

15           THE COURT:  Okay.

16   MR. WARREN:  (CONTINUING)

17       Q.   This is a capital budget guideline that we were

18   looking at at the very outset of your testimony, and what I

19   want you to focus on is that paragraph right there

20   (indicating) which makes a reference to a very high dividend

21   requirement in 2003.  Can you explain what that is about?

22       A.   Can you blow it back up?

23       Q.   Well, let's look at the full document.

24       A.   Yeah, I want to see exactly what we're looking at.

25            This is the 2003 capital budget guidelines, so this

1    is -- when they're doing their 2003 budget, they're in the

2    last quarter of 2002 looking ahead, they already know they

3    have substantial dividend requirements from PDVSA.  And so

4    that's affecting their decisions in their capital budgeting

5    process.

6         Q.   Now, in your professional experience, are dividends

7    normally a discretionary-type payment that a company makes?

8         A.   They are discretionary, and usually are --

9         THE COURT:  They are discretionary unless you have

10   a parent company that's telling you what they are going to

11   be, correct?

12        THE WITNESS:  Correct.

13        THE COURT:  I mean, everybody has a boss.

14   MR. WARREN:  (CONTINUING)

15        Q.   If you could, turn to Exhibit 651, please.

16        Do you recognize this document, Mr. Harris?

17        A.   Yes, I do.

18        Q.   And what do you recognize it to be?

19        A.   This is a document where it's -- what it's called

20   is a preliminary program execution plan where CITGO was

21   looking at selling some of its -- what they call non-core

22   assets.  And part of the reason they were looking to sell

23   those assets is because of the high dividends requirements

24   placed on them by PDVSA.

25        Q.   Turn to Page 2, please.  I think we have a blow-up

1    from this.

2              MR. WARREN:  Let's get this area blown up here

3    (indicating).

4    MR. WARREN:  (CONTINUING)

5         Q.   Can you explain what we're looking at here,

6    Mr. Harris?

7         A.   Yeah.  You can see that what it's discussing is the

8    Lake Charles refinery complex and a number of non-core

9    facilities.  They are looking at, once again, selling some

10   assets to raise capital.  And one of the reasons they were

11   raising capital is because of the high dividend requirements.

12   And the first item on the list they were considering selling

13   was the wastewater treatment facility that they built in

14   1994.

15             THE COURT:  I bet you they wish they'd sold it

16   before 2006.

17             MR. WARREN:  Can we move to admit this document,

18   please.

19             MR. ISENBERG:  No objection.

20             THE COURT:  Without objection.

21             That must mean they think it's not really important

22   if they don't have an objection.

23   MR. WARREN:  (CONTINUING)

24        Q.   What do you see as the significance of this

25   document, Mr. Harris?

1       A.   Well, they were looking to sell the -- at a point

2   in time when they needed to improve and expand the wastewater

3   facility, they were looking, as one of their alternatives to

4   raise money, to actually sell the facility.

5       Q.   And what might that say about the reasons to invest

6   additional capital in the wastewater treatment plant?

7       A.   I would say --

8            MR. ISENBERG:  Object to that.

9            THE COURT:  Sustained.  It's beyond his expertise.

10           MR. WARREN:  Can I have Exhibit 574.

11           I have about two minutes left here, Your Honor.

12  MR. WARREN:  (CONTINUING)

13       Q.   Can you identify this document?

14       A.   This is PDVSA's financial statements for the six

15  months ending June 30, 2009.

16       Q.   And what is the significance of this document?

17           THE COURT:  It's the parent company and they are

18  loaded.  Is that what it is?

19           THE WITNESS:  Correct.

20           THE COURT:  And you object to that because it's

21  irrelevant?

22           MR. ISENBERG:  I have one additional objection to

23  this document.  This is not the document Mr. Harris relied on

24  when he formed his opinions.

25           THE COURT:  It's not?

```
 1              MR. ISENBERG:  I don't believe so.
 2              THE WITNESS:  I actually had a financial statement
 3   that was written in Spanish that had been provided, and this
 4   is the English version of the same document.
 5              THE COURT:  Overruled, Señor.  Give me a break.
 6         Did you evaluate his to see what he -- if the
 7   translation was correct or incorrect?
 8              MR. ISENBERG:  We have not done that, Your Honor.
 9              THE COURT:  Okay.  It must not be very important to
10   you, then.
11              THE WITNESS:  It was an interesting discussion at
12   the deposition.
13              THE COURT:  Okay.  Well, that's -- we don't have to
14   spend a lot of time on that.  It's in.
15   MR. WARREN:  (CONTINUING)
16        Q.   This financial statement is dated the six-month
17   period ending June 30, 2009.  What was PDVSA's net income in
18   that year?
19        A.   Well, for the six months -- we're talking about the
20   six-month period, it was over $3 billion.
21              MR. WARREN:  And you have admitted this document,
22   Your Honor, 574?
23              THE COURT:  I have, over the objection of the
24   defense because it was in Spanish and it's irrelevant, but
25   that's overruled.
```

1          MR. WARREN:  At the same time at 575 we have a

2    PDVSA press release statement that gives some context to it.

3    We would like to move that into the record.

4          And I have no further questions at this time.

5          THE COURT:  Do you have an objection to that one?

6          MR. ISENBERG:  Relevance, Your Honor.

7          MR. WARREN:  Can we blow it up, please.

8          THE COURT:  I don't think that's awful -- I don't

9    think it hurts or helps one way or the other, to be very

10    honest.  For the completeness of the record I'll let it in

11    and give it the weight that I think it deserves, which is not

12    a big deal.

13          And you are done?

14          MR. WARREN:  I assume I might have some redirect,

15    but I'll sit down for the moment.

16          THE COURT:  We're going to take a short recess, a

17    10-minute recess, and we'll get back to it.

18                          (A recess was taken.)

19                          AFTER THE RECESS

20                          (Call to order of the court.)

21          MR. ISENBERG:  May I proceed, Your Honor.

22          THE COURT:  Sure.

23                          CROSS-EXAMINATION

24    BY MR. ISENBERG:

25      Q.   Good morning, Mr. Harris.  We've met numerous

1    And the next deal is how much money did the company make and

2    give out as dividends that they could have used for some of

3    these other projects, be they necessary or an ability to make

4    the company appear to be more profitable (sic).   And by that

5    I mean you've seen companies that, instead of doing the

6    things they need to do, they pay higher dividends and it ends

7    up wrecking the company.   Am I right?

8         THE WITNESS:   That's true.

9         THE COURT:   So they have to put a certain amount of

10   it back into the company to make it keep working, right?

11        THE WITNESS:   That's correct.

12        THE COURT:   And hopefully it's making money, and

13   hopefully the dividends that are being used -- that are being

14   given to the parent company in this instance is truly in

15   excess of what should be done to keep this business afloat

16   and doing well and doing everything they are supposed to be

17   doing, correct?

18        THE WITNESS:   That's exactly right.

19   MR. ISENBERG:   (CONTINUING)

20        Q.   Mr. Harris, let me ask one follow-up question to

21   what Judge Haik just asked you.

22        We're focused very much on 1994, because that's the

23   year when Mr. Amendola said that most of these projects

24   should have been done, right?

25        A.   That's correct.

1    unusual and frequent -- they might not qualify as

2    extraordinary, but they are definitely unusual.

3         Q.   I got outside my area of expertise.  I thought that

4    was the right term.

5              But the point is, these are not sales that

6    routinely occur in the ordinary course of business, right?

7         A.   I agree with that.

8         Q.   And just a few questions to wrap this up on ability

9    to pay.

10             I think this is clear, but if the Court were to

11   find that it's not appropriate to consider the owner in

12   determining CITGO's ability to pay, you have no opinion on

13   how much CITGO can afford to pay, right?

14        A.   That's correct.  I have not done a separate

15   analysis of CITGO as a stand-alone entity.

16        Q.   And is it also true that the parent company of

17   CITGO does not guarantee any of its debt?

18             THE COURT:  They sure took a lot of dividends.

19             MR. ISENBERG:  They took dividends, Judge.

20             THE COURT:  Even from the sale -- from the sale of

21   properties owned by CITGO.  They gathered in the benefits

22   (sic).

23             MR. ISENBERG:  I understand, Your Honor.

24             THE COURT:  Okay.

25   MR. ISENBERG:  (CONTINUING)