UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  Oil Spill by the Oil Rig                :          MDL NO.  2179
        "Deepwater Horizon" in the Gulf     :
        of Mexico, on April 20, 2010          :          SECTION:   J
                                                      :
        This Document Relates to:              :          JUDGE BARBIER
                                                      :
        *Civ. No.* 10-4536                         :          MAG. JUDGE SHUSHAN

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**UNITED STATES' OPPOSITION TO MOTION *IN LIMINE* OF DEFENDANT
ANADARKO PETROLEUM CORPORATION TO EXCLUDE ALL EVIDENCE
REGARDING ANADARKO'S CULPABILITY**

*Table of Contents*

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................. 7

    I.   The CWA Requires the Court's Consideration of  Evidence Concerning Anadarko's
       Involvement with the Macondo Well in Fixing a Civil Penalty ........................................... 7

  II.  Degree of Culpability" in Section 311(b)(8) is Not Limited to Negligence. ...................... 9

    A.  The  Statutory Language Does Not Support Anadarko's Position ................................... 9

    B.  Anadarko's Position is Inconsistent with the Legislative History of
       Section 311(b)(8) ......................................................................................................... 11

    C.  The Relevant Case Law Does Not Support Anadarko's Position ................................... 12

 III.  Any Other Matters that Justice May Require .................................................................. 15

CONCLUSION ............................................................................................................. 15

## Table of Authorities

**Cases**

*Am. River Trans. Co. v. Kavo Kaliakra SS*, 148 F.3d 446 (5th Cir. 1998) ................................. 13

*Barber v. Thomas*, 130 S. Ct. 2499 (2010)……………………………………………………14

*Braud v. Painter*, 730 F. Supp. 1 (M.D. La. 1990) ...................................................................... 13

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) .............................. 9

*Continental Ins. Co. v. Sabine Towing Co.*, 117 F.2d 694 (5th Cir. 1941).................................... 13

*E. River Steamship Corp. v. Transamerica*, 476 U.S. 858 (1986)................................................ 13

*Gele v.Wilson*, 616 F.2d 146 (5th Cir. 1980) ............................................................................... 13

*In re: Omega Protein*, 548 F. 3d 361 (5th Cir. 2008) ................................................................... 13

*In re: Pepperell Assocs.*, CWA Appeal Nos. 99-1 and 99-2, 9 E.A.D. 83, 2000 WL 576426 (EAB May 10, 2000)................................................................................................................... 14

*In re: Phoenix Constr. Servs., Inc.*, CWA Appeal No. 02-07, 11 E.A.D. 379, 2004 WL 1059751 (EAB April 15, 2004) ............................................................................................................. 15

*Inter-Cities Navig.Corp. v. United States*, 608 F.2d 1079 (5th Cir. 1979) ................................... 13

*Johnson v. Prudential Ins. Co. of Am.*, Civil Action No. H-06-0130, 2008 WL 901526 (S.D. Tex. Mar. 31, 2008)....................................................................................................... 10

*McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994)...................................................................... 13

*Otal Invs. Ltd. v. M/V Clary*, 494 F. 3d 40 (2d Cir. 2007)........................................................... 13

*Russello v. United States*, 464 U.S. 16 (1983) ............................................................................... 9

*Safety Nat. Cas. Corp. v. Certain Underwriters At Lloyd's, London*, 587 F. 3d 714 (5th Cir. 2009) ...................................................................................................... 9

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546 (5th Cir. 1996).......... 15

*Tedford v. Benchmark Ins. Co.*, No. 01-10995, 2002 WL 1860276 (June 17, 2002) (per curiam)............................................................................................................................. 10

*Tull v. United States*, 481 U.S. 412 (1987) ................................................................................... 15

*United States v. Adderly*, 529 F.2d 1178 (5th Cir. 1976).............................................................. 14

*United States v. Citgo Petroleum Corp.*, 723 F.3d 547 (5th Cir. 2013) .......................... 1, 2, 9, 15

*United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir. 1981) ........... 8, 12

*United States v. Hanousek*, 176 F.3d 1116 (9th Cir. 1999) ........................................... 9

*United States v. Kay*, 359 F.3d 738 (5th Cir. 2004) ................................................. 11

*United States v. Marathon Pipeline*, 589 F.2d 1305 (7th Cir. 1978) ............................... 12, 13

*United States v. M/V Big Sam*, 681 F.2d 432 (5th Cir. 1982) ....................................... 13

*United States v. Pruett*, 681 F.3d 232 (5th Cir. 2012) ............................................ 9, 10

*United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978) .................................... 13

*United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259 (3d Cir. 1998) ......................... 14

*Werner v. Upjohn Co.*, 628 F.2d 848 (4th Cir. 1980) ............................................... 10

**Statutes**

33 U.S.C. § 1251 et seq. ............................................................................ 1

33 U.S.C. § 1319(c)(1) ............................................................................. 9

33 U.S.C. § 1321(b)(3) ............................................................................. 9

33 U.S.C. § 1321(b)(7) ........................................................................... 8, 9

33 U.S.C. § 1321(b)(7)(D) .......................................................................... 9

33 U.S.C. § 1321(b)(8) ...................................................................... passim

**Legislative History**

136 Cong. Rec. S11, 536-48 (daily ed. Aug. 2, 1990) .............................................. 12

H.R. Rep. No. 101-653 (1990) (Conf. Rep.), reprinted in 1990 U.S.C.C.A.N. 779 .................... 11

**Other Authorities**

Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the CWA, EPA Office of
      Enforcement and Compliance Assurance, Aug. 1998 ............................................ 14

American Heritage Dictionary of the English Language (4th ed. 2009) ............................. 10

Black's Law Dictionary (6th ed. 1990) ........................................................... 10

Black's Law Dictionary (9th ed. 2010)..........................................................................10

Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/..........10

Oxford English Dictionary (2d ed. 1989) ...................................................................10

*Table of Exhibits*

| Exh. # | Description |
|---|---|
| 1 | Excerpts from the Macondo Joint Operating Agreement ("JOA") (TREX-01243) |
| 2 | BP Daily Operations Report – Partners (Completion) (TREX-01252) |
| 3 | Assignment of Record Title Interest and Designation of Operator filed with MMS (Ex. 1944) |
| 4 | Excerpts of Deposition of Darrell Hollek, dated June 22, 2011 |
| 5 | Authorization for Expenditure Approved December 17, 2010 (Ex. 1919) |
| 6 | Excerpts of Deposition of Michael Beirne, dated June 27, 2011 |
| 7 | Second Supplemental Authorization for Expenditure Approved March 30, 2010 (Ex. 1921) |
| 8 | Excerpts of Deposition of Stuart Strife, dated October 5, 2011 |
| 9 | Proposal to set Production Casing Authorization for Expenditure Approved April 15, 2010 (Ex. 1922) |
| 10 | Email from Michael Beirne to members of BP Macondo Well Team, dated April 14, 2010 (TREX-02855) |
| 11 | Email from Dawn Peyton, dated November 30, 2009, forwarding pre-RCT and post-RCT Macondo Economics (Ex. 2692) |
| 12 | Email chain from Darrell Hollek, dated December 2, 2009, Re: Macondo (Ex. 2693) |
| 13 | Email chain from Darrell Hollek, dated December 17, 2009. Fw: Macondo Economics (Ex. 2694) |
| 14 | Email chain from Chuck Meloy, dated December 17, 2009, Re: Macondo economics (Ex. 2695) |
| 15 | Macondo well plan updates (TREX-02624, TREX-02627, TREX-02628, and TREX-02629) |
| 16 | Excerpts of Deposition of Robert Quitzau, dated May 25-26, 2011 |
| 17 | Excerpts of Deposition of Kirk Wardlaw, dated June 9, 2011 |

18     Excerpts of Deposition of Robert Bodek, dated April 11, 2011

19     Email chain from Paul Chandler, dated March 24, 2010, FW: Macondo Casing
      Plan & Pore Pressure Update (TREX-01218)

20     Email chain from Derek Folger, dated March 24, 2010, Re: Macondo (TREX-
      02655)

21     Email chain from Derek Folger, dated April 6, 2010, Re: Macondo Update
      (TREX-62517)

22     Email chain from Alan O'Donnell, dated April 9, 2010, Re: Macondo TD
      Reached (TREX-02635)

23     Meeting invite from Tim Trautman, dated April 12, 2010, FW: Macondo (TREX-
      01592)

24     Email from APC's Paul Chandler to BP's Robert Bodek, dated April 12, 2010
      (TREX-01593)

25     Email chain from Nick Huch, dated April 14, 2010, Re: Macondo TD & Draft
      Sub. Op. AFE (TREX-01256)

26     Email chain from Nick Huch to Michael Beirne, dated April 20, 2010, Re:
      Macondo TA Letter Agreement to T&A the MC 252 # 1 Well (TREX-01931)

27     Email chain from Byron J. McDonald, Re: rig blew up last nite in gulf (ANA-
      MDL-000015551 – 000015553)

28     Email chain from Alan O'Donnell, dated April 14, 2010, Re: Macondo (Ex. 2985)

29     Macondo Prospect Well Participation Agreement, Deepwater Gulf of Mexico
      (TREX-01943)

30     EPA's Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean
      Water Act (Office of Enforcement and Compliance Assurance, August 1998)

## INTRODUCTION

The Court has held Anadarko strictly liable under the Clean Water Act, 33 U.S.C. 1251 *et seq.*, ("CWA"), because it was an admitted owner of the Macondo Well at the time of the blowout.  The CWA now directs that the Court "shall consider" each of the eight statutory penalty factors in CWA Section 311(b)(8), 33 U.S.C. § 1321(b)(8), including the degree of culpability.  It is critical that the Court consider evidence of Anadarko's culpability:  the Fifth Circuit recently remanded a district court penalty assessment under Section 311(b)(8) for failure to set forth a rationale for each penalty factor.[1]  The penalty factor of "degree of culpability" in a strict liability framework is not limited to negligence and Anadarko's effort to preclude evidence concerning its conduct related to the Macondo Well is unavailing.

No party has presented evidence at trial of Anadarko's involvement because the Court's dismissals of the negligence claims were based solely on the pleadings, and because Anadarko was severed from Phase I.[2]  The only factual evidence on the record as to Anadarko's involvement in the Well is the limited statement of facts in the briefing of the Motions for Summary Judgment.[3]  Anadarko urges the Court to hold – without precedent under Section 311(b)(8) – that the phrase "degree of culpability" as a matter of law should be interpreted to be limited to the elements of maritime negligence.  In doing so, Anadarko relies almost exclusively on case law from negligence-based liability schemes.  At the same time, Anadarko freely presents a one-sided portrait of its involvement at Macondo, describing itself as a "non-operating

---

[1] See United States v. CITGO, 723 F.3d 547, 553 and 554 (5th Cir. 2013) (remanded for, among other things, failure to set forth analysis of economic benefit).

[2] See Rec. Docs. 3830, 4159, 4578, 4845, 4642 (Dismissal Orders); Rec. Doc. 5930 (Stipulated Order Regarding Anadarko Entities).

[3] Rec. Docs.  4836-2; 5113-3; 5216.

investor," a term devised solely for this litigation,[4] a portrait which, if Anadarko's Motion is granted, the United States will not be able to flesh out in any way.

Anadarko's Motion misconstrues the plain language of the statute and the straightforward application of the penalty factors to a strictly liable party, and ignores the legislative history of Section 311(b).  Indeed, Anadarko's Motion should be viewed with skepticism in light of its recent submission to the Court, where it identified as evidence relevant to the "other matters" penalty factor non-operating parties' customary dealings with operators in the industry – precisely the kind of evidence it seeks to bar the United States from presenting.  Anadarko's March 3, 2014 Submission, at 4.  At a minimum, the United States should be able to put into context any evidence that Anadarko seeks to introduce about industry practice with its own expert testimony and evidence of Anadarko's involvement at this Well.

"Culpability" in the Penalty Phase includes all gradations of culpability beginning with strict liability,[5] and merely equates with acts or omissions that are "blameworthy" or "meriting condemnation."  While it is undisputed that "culpability" can encompass negligence, gross negligence, or criminal behavior, that is not the issue presented here.  The issue in the Penalty Phase will be whether and to what extent Anadarko will receive a "deduction" from the statutory maximum penalty, based on culpability among other factors.  The United States simply does not need to prove negligence as part of the Penalty Phase of this litigation.

---

[4] By contrast, the Joint Operating Agreement (JOA) setting out the respective rights and obligations of BP, Anadarko and MOEX for the Macondo Prospect refers to Anadarko as a "participating party" (Ex. 1 at 9-10) or "non-operating party," (Id. at 14).  BP in its daily reports to Anadarko referred to it as a "partner," Ex. 2, and Anadarko is a "lessee" for purposes of MMS documentation. See, e.g., Ex. 3, at 10 (Designation of Operator Form).

[5] The Fifth Circuit has indicated that culpability can begin with strict liability and grow to higher degrees. See CITGO, 723 F.3d at 553 (negligence is a "higher degree of culpability than strict liability").

## FACTUAL BACKGROUND

The Court already has held that Anadarko was a co-owner of the Well with BP.[6] Acknowledging that CWA penalties "place a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same," the Court found that "Anadarko and BP were the ones directly engaged in the enterprise which caused the spill. They were the mineral lessees, they owned the well, and they stood to profit directly from the oil it produced. Thus, Congress intended that the cost of pollution would be borne by these parties."[7]

Additional evidence from Phase I discovery not presented or explained at trial will demonstrate how intimately Anadarko monitored the drilling of the Macondo Well; how it failed to take any precautions despite BP's notorious prior safety and environmental problems; and how it failed to make inquiries at critical junctures. For example, Anadarko approved a series of Authorizations for Expenditure ("AFEs") as costs mounted during the drilling of the Macondo Well. Even though those AFEs are part of the record supporting the US Motion for Summary Judgment, the significance of those multiple approvals has not been fully explained to the Court.[8]

---

[6] Order and Reasons [As to the United States', Transocean's, and Anadarko's Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA] (February 22, 2012) ("Summary Judgment Order"), Rec. Doc. 5809, at 2. Only once in its Motion *in Limine*, in a footnote, does Anadarko acknowledge that it is an admitted owner of the Macondo Well. Anadarko Memo., at 2, n.2.

[7] Summary Judgment Order, Rec. Doc. 5809, at 20.

[8] Approval of the first AFE also constituted approval of the Macondo Well design. See Ex. 5 (signed December 17, 2009); Ex. 6 (Deposition of Michael Beirne (June 27, 2011), at 217-18). Anadarko approved a supplemental AFE required because of cost overruns stemming from well control issues. Ex. 7 (signed March 30, 2010); Ex. 8 (Deposition of Stuart Strife (Oct. 5, 2011), at 134:05-135:04). The fourth AFE was for the purchase and installation of the production casing, casing hanger, cement, and lockdown sleeve. See Ex. 9 (signed AFE dated April15, 2010); Ex. 10 (April 14, 2010 email from Michael Beirne to members of BP's Macondo team, emphasizing that with regard to setting the production casing, "*We need to be sure we have co-owner [Anadarko and MOEX] approval prior to initiating this operation.*") (emphasis in original).

Anadarko performed a detailed economic assessment of the Macondo Well in October, 2009, and repeated it using higher costs after a hurricane damaged the initial rig, concluding the "economics did not change much and still look very strong."[9]  In contrast to its thorough financial assessment of the well, Anadarko's 30(b)(6) designee testified that APC failed to conduct *any* general due diligence into BP's safety record, Ex. 4 (Deposition of Darrell Hollek (June 22, 2011), at 134:17-22), and did not review BP's exploration plan or oil spill response plan.  Id. at 134:19-135:15.  Despite the fact that by 2009 BP had pled guilty to a number of criminal violations of environmental statutes, Anadarko steadfastly maintained the position that there were no internal Anadarko discussions regarding BP's past health, safety and environmental ("HSE") record as part of its decision-making process to partner with BP at Macondo.  Id. at 136:07-137:10.  Anadarko did not request or review any risk assessment or accident risk analysis from BP, stating that "we let the operator do the full risk assessment"  Id. at 137:11-138:01, and adding that reviewing such an assessment "takes a lot of time," and Anadarko trusts the operator to do a good job.  Id. at 138:02-11.  Anadarko's complacency concerning BP's drilling safety meant that it did not exercise rights that it had under the JOA.[10]

---

[9] Exs. 11-14 (email chains among APC employees in November-December 2009 discussing revised economics for Macondo).

[10] For example, the JOA permitted Anadarko to call meetings with the operator to discuss HSE matters and to request an HSE plan.  Ex. 1 (Excerpts from JOA, at Article 5.10 (the Operator is responsible for executing HSE obligations "with the support and cooperation of the Non-Operators") and at Exhibit "K" (detailing HSE duties and obligations).  The non-operating participating parties also can visit the rig during reasonable times.  Ex. 1 (Excerpts from JOA, at Article 7.3); Ex. 17 (Deposition of Kirk Wardlaw (June 9, 2011), at 150:06-11).

Anadarko received extensive information of the status of the drilling operations through its agreement with BP.[11]  There were no restrictions on Anadarko's use of these data and Anadarko had no concerns about it being off-limits in any way.[12]  Anadarko was aware of the March 8, 2010 kick that resulted in work stopping to fish out a stuck drillpipe and to sidetrack the area.[13]  Anadarko assigned a veteran drilling engineer, Robert Quitzau, to monitor the drilling at the well after the March 8 kick.  Ex. 16 (Quitzau Dep. at 50:08-24).  Quitzau especially looked at depths, mud weights, shoe tests, and operating summaries, and read all the daily operating reports.  Id. at 59:10-60:04; 99:07-100:03; 394-95; 578:03-17.  Quitzau emailed updates and detailed pore pressure/fracture gradient (PPFG) plots showing narrow drilling margins to the Anadarko Macondo team, including managers and executives, to compare the actual progress against the well plan.[14]  Internal emails reveal that Anadarko was aware of BP's drilling losses and kicks and problems with well control.[15]

---

[11] Anadarko received technical information from three sources:  (1) telephone conversations and emails with BP operations personnel such as Bobby Bodek, a BP operational geologist (Ex. 18 (Deposition of Robert Bodek (April 11-12, 2011), at 358:15-19; 364:05-365:07; 372:07-373:18; 375:08-25); Ex. 19 (providing pore pressure and casing plan update to Anadarko)); (2) WellSpace, which included daily operating reports, daily drilling reports, mudlogging reports, pore pressure/fracture gradient reports, and other documents (Ex. 16 (Deposition of Robert Quitzau (May 25-26, 2011), at 37:02-13)); and (3) InSite Anywhere, which provided real-time drilling and formation evaluation data (Id. at 140:24-141:05).

[12] Ex. 16 (Quitzau Dep. at 561:22-562:13; 563:23-564:15).  See also Ex. 17 (Wardlaw Dep. at 205:09-207:10).

[13] Ex. 18 (Bodek Dep. at 185:14-188:07); Ex. 16 (Quitzau Dep. at 50:17-24; 66:13-67:24; 578:12-24).
[14] Ex. 15 (PPFG plots provided to Anadarko); Ex. 16 (Quitzau Dep. at 114:07-115:19; 121-24; 334-35).

[15] To describe only two examples of many, in a March 24, 2010 email exchange, Derek Folger inquires of Quitzau, "What is BP up to at Macondo?  From this last plan update you emailed they were supposed to drill down to 17,000ft before setting the 11.75" liner.  Now their report shows they are pulling out of the hole at 15,100' to run liner.  What is going on at the well?"  Ex. 20 (emphasis added).  And, secondly, in an April 6, 2010 email exchange between Anadarko's Peter Botevyle and Derek Folger, in which Folger states there are still "well control issues" and they are losing "6.3 barrels of mud every 2 minutes," and Botevyle responds, "yikes, that sounds like a lot."  Ex. 21 (emphasis added).

Evidence of BP's difficulties in drilling the final segment of the Well was presented during the Phase I trial.[16]  Anadarko understood the technical issues,[17] but on April 12, 2010, after an internal meeting,[18] it contacted BP to inquire whether "BP has entertained the idea of drilling below our current TD [total depth]" and that Anadarko "would support this position if BP was in agreement . . . ." [19]  On April 13, 2010, BP emailed Anadarko that:

> Due to safety concerns and wellbore integrity issues, BP, as operator, has deemed the Macondo exploratory well as achieving Objective Depth at 18,360' MD. Having both loss zones, and comparatively over-pressured sands in the open hole provided for little to no margin to continue drilling.

Ex. 25.  Anadarko nonetheless continued to want to drill the Well deeper.  After another internal discussion with managers,[20] Anadarko provided its approval to conclude the drilling of the well on April 14, 2010, but added, "However, in the event BP concludes that it is safe and prudent to continue drilling to original Objective Depth Anadarko would not oppose [sic] BP doing so."  Ex. 25.   Thus, Anadarko on several occasions encouraged BP to drill deeper despite the risks.   After Anadarko approved the conclusion of drilling, Anadarko authorized the temporary abandonment of the well on April 20, 2010, Ex. 26, which included the cementing and negative pressure test.  Proposed

---

[16] Proposed Findings of Fact by the United States (June 21, 2013), Rec. Doc. 10460, at ¶¶ 71-72.

[17] On April 9, 2010, Quitzau was asked whether he thought BP could drill deeper.  Quitzau advised Anadarko that "[BP] clearly cannot tolerate any well control incident based on their recent mud losses" and that "[i]f there is any risk of seeing a pressure gradient increase below the pay sand, it would be wise to case the future completion zone now."  Ex. 22; Ex. 16 (Quitzau Dep. at 182:04-183:19).

[18] On April 12, 2010, a number of Macondo team members met to "discuss our options for possible drilling deeper beyond our current [Total Depth] for the Macondo well."  Ex. 23.

[19] Ex. 24 (April 12, 2010 email from APC geologist Paul Chandler to BP's Bobby Bodek).

[20] Ex. 4 (Hollek Dep. at 196:15-22); Ex. 28.

6

Findings of Fact by the United States (June 21, 2013), Rec. Doc. 10460, at ¶¶ 77-79, 144-166.

In depositions, Anadarko rationalized its failure to conduct any general due diligence by pointing to the number of wells BP had drilled without a similar catastrophe.  Ex. 4 (Hollek Dep. at 55:11-23; 225:21-226:25).  However, on April 21, 2010, as the burning *Deepwater Horizon* was listing on the sea, an Anadarko manager emailed a revealing message to his colleague:  "I tell you, BP is up S___t creek; between the Texas City Refinery fire, the Alaska pipeline leak, Thunderhorse almost sinking – not sure I would partner with them any more."  Ex. 27.

As co-owner and co-lessee at Macondo, and as partner with BP elsewhere in the Gulf of Mexico,[21] Anadarko had a unique relationship with BP.  Relative to other citizens of the Gulf States, Anadarko – as BP's co-owner and drilling partner, and as a member of the "polluting enterprise," –does have some "degree of culpability" through its conduct in connection with Macondo. [22]  Given the CWA mandate to consider each penalty factor, nothing should preclude the ordinary review of the evidence of Anadarko's involvement at Macondo.

## **ARGUMENT**

### I.    **The CWA Requires the Court's Consideration of  Evidence Concerning Anadarko's Involvement with the Macondo Well in Fixing a Civil Penalty.**

A meaningful civil penalty for Anadarko, a co-owner of the Macondo Well, is appropriate and consistent with the statutory scheme of CWA § 311(b).  A key purpose of civil

---

[21] For example, BP and Kerr-McGee (an Anadarko subsidiary) co-owned the Pompano facility, located near Macondo.  Ex. 29 (Well Participation Agreement).  See also Ex. 4 (Hollek Dep. at 55:14-19 (citing "long relationship" between Anadarko and BP)).

[22] The United States recognizes that Anadarko's participation is not on a par with BPs' and has stipulated that it will not pursue claims that Anadarko was an operator or person-in-charge of the Macondo Well. See, e.g., Stipulated Order Regarding Anadarko Entities, Rec. Doc. 5930 (Feb. 29, 2012), ¶¶ 1-2.

penalty provisions in strict liability statutes like the CWA is to protect the public and regulate potentially dangerous or harmful activities, by ensuring that *every actor* involved with the activity, no matter how large or small, has a concrete incentive to minimize the potential harm at issue.[23]  This Court has concluded, based on the legislative history and case law, that the civil penalty under Section 311(b)(7) has multiple goals, but the primary objectives are to punish and deter future pollution.[24]  The role of the district court in assessing a CWA penalty is to weigh the evidence regarding the specific conduct of the liable party, a role that is incompatible with broadly excluding evidence of the liable party's involvement with the illegal discharge. Assessing a significant civil penalty against all of the owners – including those who turned over day-to-day operations and control to another party but possessed drilling expertise and knowledge of the drilling activities – will create additional safety incentives and deter future oil spills.  The Court's observations are consistent with the language of the CWA which mandates that a liable party *shall* be subject to a civil penalty, Section 311(b)(7), and further requires that the Court *shall* consider each of eight statutory penalty factors.  Section 311(b)(8).

---

[23] *See, e.g.*, United States v. Coastal States Crude Gathering Co., 643 F.2d 1125, 1128 (5th Cir. 1981) (under earlier version of Section 311(b)(8), held that shifting of  the burden from the public to the violator—even when the discharge was caused by a wholly unrelated third party—was a valid exercise of congressional power and reasonably related to the purposes of the statutory scheme).

[24] January 26, 2012 Order and Reasons as to Transocean and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity, Rec. Doc. 5446, at 20.  In its ruling regarding BP's indemnity of Transocean, this Court observed that:

> [A]ssessing a CWA penalty requires a Court to consider factors such as the seriousness of the violation, the defendant's culpability, and the economic impact the penalty will have on the defendant.  *See* 33 U.S.C §1321(b)(8).  Thus, the penalty becomes somewhat "tailored" to the specific defendant and situation; an amount appropriate for one defendant might be ineffective (or grossly excessive) for another.

Id. at 21.

**II.      "Degree of Culpability" in Section 311(b)(8) is Not Limited to Negligence.**

The Fifth Circuit has indicated that culpability includes strict liability and increases

through higher degrees of culpability.  See CITGO, 723 F.3d at 553 (negligence is a "higher

degree of culpability than strict liability").  The Court can readily hear and weigh evidence

concerning Anadarko's involvement with the Macondo Well without disturbing its prior rulings

that Anadarko was not negligent or at fault for the blowout under maritime negligence law.  As

shown below, there is no basis to restrict the interpretation of "degree of culpability" to be

coextensive with tort-based claims under admiralty law or other kinds of negligence under state

or federal law.

A.     The  Statutory Language Does Not Support Anadarko's Position:

The starting place for interpreting a statute is the language of the statute itself.[25]  Here,

Congress used the terms "negligence" and "gross negligence" elsewhere in the Clean Water

Act.[26]  "Where Congress includes particular language in one section of the statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and

purposefully in the disparate inclusion or exclusion."[27]  Under canons of statutory construction, it

---

[25] Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London, 587 F. 3d 714, 718, n.9 (5th Cir. 2009), citing Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).

[26] Section 309(c)(1) provides that any person who "negligently violates" various provisions of the CWA, including Section 311(b)(3), may be subject to criminal penalties and imprisonment.  33 U.S.C. § 1319(c)(1).  And, Section 311(b)(7)(D) provides that civil penalties may be trebled in any case in which a violation of Section 311(b)(3) was "the result of gross negligence or willful misconduct."  33 U.S.C. § 1321(b)(7)(D).

[27] Russello v. United States, 464 U.S. 16, 23 (1983); United States v. Pruett, 681 F.3d 232, 242 n.5 (5th Cir. 2012) (upholding jury instruction regarding simple negligence for oil discharge giving rise to criminal penalties under Section 309(c)(1)); United States v. Hanousek, 176 F.3d 1116, 1121 (9th Cir. 1999) (same).

must be assumed that, had Congress intended "negligence" to have been the baseline for the statutory penalty factor "degree of culpability," Congress simply would have so stated.

Moreover, while the meaning of "culpable" can include "breach of a legal duty," it need not be limited to that meaning.  See, e.g., Oxford English Dictionary 118 (2d ed. 1989) (deserving blame or censure, blameworthy); American Heritage Dictionary of the English Language 442 (4th ed. 2000) (deserving of blame or censure as being wrong, evil, improper, or injurious); Merriam-Webster Dictionary (online at http://www.merriam-webster.com/dictionary) ("meriting condemnation or blame especially as wrong or harmful").[28]  Anadarko selects the most restrictive phrase from one of many dictionary definitions to support its argument regarding the ordinary meaning of the term "culpability."  See Anadarko Memorandum in Support of Motion *in Limine* to Exclude all Evidence Regarding Anadarko's Culpability, Rec. Doc. 12343 ("Anadarko Memo." or "Memo.") at 8, citing Black's Law Dictionary 379 (6th ed. 1990).[29]

---

[28] "Blame" in turn is defined to mean "(1) an act of attributing fault; *an expression of disapproval*; (2) *responsibility for something wrong*" ("blame rested with all the defendants").  Black's Law Dictionary 193 (9th ed. 2009) (emphasis supplied).  Here, of course, as a liable owner of the Macondo Well, Anadarko shares CWA responsibility for the Macondo incident.

[29] Anadarko cites several cases that use the Black's Law Dictionary definition of "culpability" (Memo. at 8), but these decisions occur in other legal contexts and are not models of linguistic purity.  See, e.g. Werner v. Upjohn Co., 628 F.2d 848, 856-57 (4th Cir. 1980) (Fourth Circuit focused on the application of Fed. R. Evid. 407 in a product liability case involving both negligence and strict liability claims, using "negligence" and "culpability" synonymously, but then stated that "[s]trict liability…involves conduct which is *technically less blameworthy* than negligence") (emphasis added); Johnson v. Prudential Ins. Co. of Am., No. H-06-0130, 2008 WL 901526, at *8 (S.D. Tex. March 31, 2008) (In ERISA case considering factors for award of attorneys fees, held that "[c]ulpable conduct includes conduct that is *blameworthy, censurable, careless*, at fault, *or* involves the breach of a legal duty") (emphasis supplied); Tedford v. Benchmark Ins. Co., 45 Fed. App'x 318, 2002 WL 1860276, at *3 (5th Cir. 2002) (per curiam) (In ERISA case considering factors for award of attorneys fees, held that "culpability" and "bad faith" are similar, and may be synonymous, a finding with which the other cited ERISA cases disagree); United States v. Pruett, 681 F. 3d 232 (5th Cir. 2012) (case involves defendant's challenge to conviction of negligent violation of CWA under Section 309(c) and the term "culpability" does not appear).

In addition, the statutory penalty factor refers to "*the degree*" of culpability involved, plain language which signals that the term should be interpreted broadly to extend to all probative facts. Dictionary definitions of culpability can *include* negligence, gross negligence, and willful misconduct, but also extend more broadly to any conduct that is blameworthy, careless, injurious, or worthy of censure or condemnation – a much lesser standard than the legal definition of negligence. In a strict liability framework, culpability may commence with probative facts that are less than negligence and a CWA plaintiff need not prove that a *strictly* liable party is negligent in order to present evidence of its culpability.

B.    Anadarko's Position is Inconsistent with the Legislative History of Section 311(b)(8):

Although the plain language of the statute is clear, in the event the Court finds any ambiguity in the language of the penalty factor,[30] the legislative history supports a broad construction of the penalty factors. The penalty factors in Section 311(b)(8) – including the factor of "degree of culpability" – were added as part of the 1990 Oil Pollution Act's amendments to the CWA. Enacted largely in response to the Exxon-Valdez oil spill in Prince William Sound, Alaska, these amendments to the CWA *strengthened* the penalty provisions.[31] The overriding purpose of the amendments to the penalty provisions in Section 311 was to enhance the deterrent and punitive effects of the penalties available under the CWA in the face

---

[30] United States v. Kay, 359 F.3d 738, 743 (5th Cir. 2004) (where court concludes statute is ambiguous – i.e. susceptible to more than one reasonable interpretation – it may turn to legislative history).

[31] OPA authorized penalties based on dollars per barrel rather than days of violation, and by reducing the standard for the highest penalties from requiring "willfulness" to a lesser standard of "gross negligence or willful misconduct." H.R. Rep. No. 101-653, at 152-154 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 779, 831-833.

of major oil spills.[32]  Adopting a restrictive interpretation of the "degree of culpability" penalty factor would be inconsistent with the overall intent of the OPA amendments.

C.     The Relevant Case Law Does Not Support Anadarko's Position:

The Fifth Circuit has held that the intent of Congress was to impose substantial CWA penalties on owners and operators even in the absence of fault.  See United States v. Coastal States Crude Gathering Co., 643 F.2d 1125, 1128 (5th Cir. 1981).  Here, Anadarko is much more culpable than, for example, the pipeline owner described in Coastal States against whom the court assessed a penalty equal to 20% of the statutory maximum.  There, the owner had built and maintained the pipeline in accordance with all applicable regulations and standard industry practices, and the discharge resulted solely from the acts of an unknown third party whose vessel struck the pipeline and caused the rupture.  In contrast, Anadarko, a sophisticated oil well owner and operator of other GOM wells who partnered with BP and was intimately familiar with the drilling of the Macondo Well, was in a unique position to encourage safer practices, and thus has a degree of culpability absent in Coastal States.

The Fifth Circuit followed the Seventh Circuit, which has long held that even where an owner is "without fault" a substantial penalty under the CWA can be merited.  In United States v. Marathon Pipeline, 589 F.2d 1305, 1307-08 (7th Cir. 1978), a defendant argued that, even though it was strictly liable, it was without fault and therefore at most a nominal penalty could be assessed against it.  The Seventh Circuit disagreed:

> In effect, Marathon would have us read into the statute a strict standard of liability for a nominal penalty and a negligence standard of liability for a substantial penalty. We do not believe the plain language of the statute supports different

---

[32] As Senator Lieberman stated, "it was my intent in writing the penalty provisions . . . [that] the Government apply the penalty provisions in a manner which will punish the violator and deter future violations."  136 Cong. Rec. S11, 536-48 (daily ed. Aug. 2, 1990).

> standards for a substantial as opposed to a nominal penalty . . . . [W]e believe the
> intent of Congress, as manifested in Section 1321 taken as a whole, is to impose a
> substantial civil penalty on owners or operators even in the absence of fault and
> that such an intent is well within the constitutional powers of Congress.[33]

Accord, United States v. Tex-Tow, Inc., 589 F. 2d 1310, 1313-1314 (7th Cir. 1978) (where

owner was without fault, the court refused to read third party defense or proximate cause

requirement into civil penalty provision).

 The cases to which Anadarko cites, see Memo. at 9-10, are based in other statutory

schemes, including insurance law, Section 1983 actions, and limitation of liability actions.  The

decisions do not occur in the context of strict liability and therefore, do not address the issue

presented in this case.[34]  It is not surprising to see courts using the broader term culpability

---

[33] In fact, Anadarko's discussion of these cases reveals its strained interpretation, see Anadarko Memo. at
11.  Anadarko fails to point out that the Marathon Pipeline court held that it was not necessary to prove
negligence to render the defendant subject to a substantial CWA penalty.

[34] See, e.g., Continental Ins. Co. v. Sabine Towing Co., 117 F.2d 694, 697 (5th Cir. 1941) (examination of
scope of provision regarding fault in insurance policy; no mention of culpability); Braud v. Painter, 730 F.
Supp. 1 (M.D. La. 1990) (Fourth Amendment case arising from allegation of excessive force; cited
language is from pendant Louisiana civil code; no mention of nor analysis of culpability); McDermott,
Inc. v. AmClyde, 511 U.S. 202, 207-208, 216-217 (1994) (issue was allocation of responsibility and
damages among tortfeasors and treatment of settlement; no statement that "culpability" can only equate to
"fault" but only passing reference to "relative culpability"); In re: Omega Protein, 548 F.3d 361, 370 (5th
Cir. 2008) (in limitation of  liability action under admiralty law, Fifth Circuit allocates fault and equates it
with negligence; cited reference to culpability does not state that term can only pertain to negligence but
rather that calibration of culpability is not precise); Gele v. Wilson, 616 F.2d 146, 148 (5th Cir. 1980)
(same; another limitation of liability allocation of fault with passing reference to "calibration of
culpability"); Otal Invs. Ltd. v. M/V Clary, 494 F.3d 40, 62-63 (2d Cir. 2007) (in limitation of liability
action to allocate fault, court considered whether degree of fault meant  relative causal contribution, or
relative culpability; no statement that culpability must equate with negligence).  Anadarko also contends
that the United States must show proximate cause, even in the Penalty Phase, citing Inter-Cities Navig.
Corp. v United States, 608 F.2d 1079, 1081 (5th Cir. 1979) (must show cause in maritime negligence
case; term culpability used interchangeably with fault but no discussion of strict liability); Am. River
Trans. Co. v. Kavo Kaliakra SS, 148 F.3d 446, 450 (5th Cir. 1998) (same).  The cases Anadarko cites fail
to demonstrate the Court should look to federal maritime law in defining culpability here, where the Court
is assessing a penalty pursuant to the CWA.  E. River Steamship Corp. v. Transamerica, 476 U.S. 858,
864 (1986) (holding that general maritime law applied "absent relevant statute").  In United States v. M/V
Big Sam, the Court looked to the language of the statute and the statute's purpose, not federal maritime
law, in resolving issues under the CWA.  681 F.2d 432 (5th Cir. 1982).

interchangeably with fault or negligence when analyzing a negligence-based scheme of liability, but none of the cited cases – even in these wholly unrelated contexts – delineates the limits or boundaries of the phrase "degree of culpability" in the context of a strict liability case.[35]

Moreover, Anadarko's references to EPA penalty policies have limited value, because they are explicitly designed for use solely in settlement.[36]  The 1998 Section 311(b) penalty policy does not indicate that negligence or more is necessary in order to make an upward adjustment based on culpability.[37]  Anadarko's reliance on EPA's 1984 Policy is misplaced.[38]

---

[35] In an effort to link its reasoning to a strict liability framework, Anadarko resorts to citing a criminal case involving admission of evidence of prior bad conduct based on the defendant's defense of innocence.  See Anadarko Memo. at 11, citing United States v. Adderly, 529 F.2d 1178 (5th Cir. 1976).  Here, of course, Anadarko's liability is in a civil context.

Anadarko further argues, Memo. at 12-13, that any ambiguity in the term culpability must be construed against the government.  However, the traditional tools of statutory construction – text, structure, history and purpose – first must be applied before resorting to such a canon of construction.  Barber v. Thomas, 130 S. Ct. 2499, 2508-090 (2010) (rule of lenity).  These tools show that no ambiguity exists.  Moreover, Anadarko implies that there was a lack of fair notice that it might be prosecuted for civil penalties under the CWA Section 311(b)(7). Anadarko Memo. at 12-13.  Yet, the Well Participation Agreement clearly identified Anadarko as the owner of the well property.  Ex. 29 at 2.  CWA 311(b)(7) unambiguously provides that liability attaches to "owners" of the requisite facility.  And, the JOA carves out from BP's obligation to indemnify Anadarko liability for penalties.  Ex. 1 at Article 22.5.

[36] EPA's Civil Penalty Policy was not intended for use by courts in determining penalties at trial.  See Ex. 30 at 1, 4; United States v. Mun. Auth. of Union Twp., 150 F.3d 259, 267 (3d Cir. 1998).

[37] The EPA Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the CWA (1998) adjusts penalties upward for culpability, providing that "[c]ulpability in this circumstance can include either an act of commission, such as setting a valve in the wrong position, or by [sic] an act of omission, such as failing to check a pipeline for corrosion.  See also In Re: Pepperell Assocs., CWA Appeal Nos. 99-1 and 99-2, 9 E.A.D. 83, 2000 WL 576426 (EAB May 10, 2000) (agency appeals board upholding adjustment for culpability based company's incomplete efforts to understand the applicable regulations; lack of concern regarding applicability of the regulations; poor cooperative behavior during the oil spill and inadequate cleanup methods; and failure to communicate essential information concerning the spill resulting in a delay of the cleanup.)

[38] In an effort to show that EPA interprets "culpability" to mean negligence, Anadarko reaches back to a 1984 EPA Policy, A Framework for Statute-Specific Approaches to Penalty Assessments, that pre-dates OPA and the 1998 penalty policy.  See Anadarko Memo. at 11-12.  That 1984 document sets forth a general framework for EPA programs to use in developing their own, statute-specific penalty policy, and

14

III.     **Any Other Matters that Justice May Require.**

What facts fall within the final penalty factor is within the broad discretion of the district court and the court can consider whatever range of evidence it believes justice requires.  The court's assessment of a civil penalty is highly discretionary and reviewed under an abuse of discretion standard.[39]  The Fifth Circuit has endorsed admission of evidence under the final penalty factor.[40]  Even though the evidence of Anadarko's involvement with respect to the Macondo Well should be considered by the Court under the "culpability" penalty factor, if the Court should disagree, such evidence should be considered at a minimum under this final factor. Anadarko indicated in its March 3, 2014 Submission that it may present evidence as to industry customs regarding non-operators as relevant under the "other matters" factor, and, at a minimum, the United States should be permitted to counter that with its own expert and evidence of Anadarko's involvement at this well.

**CONCLUSION**

Anadarko's Motion *in Limine* to Exclude All Evidence and Argument Presented for the Purpose of Proving Anadarko's Culpability or Fault in the Phase III Trial should be denied.

---

may be considered where no statute-specific policy is in effect.  See In re Phoenix Constr. Servs., Inc., CWA Appeal No. 02-07, 11 E.A.D. 379, 394 & 394 n.37 (E.A.B. April 15, 2004).  Here, however, the 1984 policy is superseded by the 1998 policy, which provides statute-specific guidance for Section 311(b)(3) and Section 311(j) of the CWA.  Ex. 30.

[39] Tull v. United States, 481 U.S. 412, 427 (1987).  Accord, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 576 (5th Cir. 1996); CITGO, 723 F.3d at 551.

[40] CITGO, 723 F.3d at 553-54 (no clear error when district court considered that defendant was major employer in community).

DATED: March 6, 2014

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
SARAH HIMMELHOCH
MICHAEL MCNULTY
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
PATRICK CASEY
RICHARD GLADSTEIN
DANIEL S. SMITH
Senior Counsel
ABIGAIL ANDRE
A. NATHANIEL CHAKERES
ANNA CROSS
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:   202-514-2583
E-mail:  steve.o'rourke@usdoj.gov

KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

16

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  March 6, 2014.                                        /s/  Steven O'Rourke
                                                            U.S. Department of Justice