# Exhibit 18

To United States' Opposition to Motion *In Limine* of Defendant Anadarko Petroleum Corporation to Exclude All Evidence Regarding Anadarko's Culpability

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL       )    MDL NO. 2179
     by the OIL RIG,         )
 4   DEEPWATER HORIZON in    )    SECTION "J"
     the GULF OF MEXICO,     )
 5   April 20, 2010          )    JUDGE BARBIER
                             )
 6                           )    MAG. JUDGE
                             )    SHUSHAN
 7
```

                       *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                      VOLUME 1
                       *  *  *  *  *  *  *  *  *  *  *  *  *

                Deposition of **ROBERT BODEK**,
     taken at Pan-American Building, 601 Poydras
     Street, 11th Floor, New Orleans, Louisiana,
     70130, on the 11th of April, 2011.

     **APPEARANCES:**

     Mr. Mikal C. Watts
     **WATTS, GUERRA, CRAFT, LLP**
     Four Dominion Drive, Building Three
     Suite 100
     San Antonio, Texas 78257
     Phone:  210-447-0500   Fax:  210-447-0501

                  APPEARING FOR THE
                  PLAINTIFFS' STEERING COMMITTEE

```
 1              VIDEOGRAPHER:
 2                    This is the videotaped
 3   deposition of Robert Bodek.  This
 4   deposition is being held today at 601
 5   Poydras Street in New Orleans, Louisiana,
 6   on April the 11th, 2011.  The time
 7   indicated on the video screen is 8:32.
 8   This deposition is being taken in the
 9   matter of the Oil Spill by the DEEPWATER
10   HORIZON in the Gulf of Mexico on April
11   20th, 2010, taken in the United States
12   District Court, Eastern District of
13   Louisiana.
14                    ROBERT BODEK,
15   having been first duly sworn, testified as
16   follows:
17                    EXAMINATION
18   BY MR. WATTS:
19        Q.   What is your name?
20        A.   My name is Robert Joseph Bodek
21   Jr.
22        Q.   You go by Bobby?
23        A.   I do, sir.
24        Q.   Okay.  I'm Mikal Watts.  I go by
25   Mikal.  I'm a lawyer from San Antonio,
```

1   negotiator that negotiated the -- the
2   Macondo deal with partners.  Mike is also
3   one of my best friends.
4       Q.   Now -- and again, best friends
5   talk like this.  I don't -- I don't need
6   the apologies for this or that.  It's just
7   e-mail banter back and forth, and that's
8   cool.
9             Let me take you to the next
10  one, Tab 25.  March 8th.  This is Bates
11  Page Number 5606.
12            Are you with me?
13      A.   Yep.
14      Q.   Page 2.  You write an e-mail on
15  March the 8th at 11:09 p.m. forward Macondo
16  kick.
17      A.   What -- what's the -- I'm sorry.
18  What tab am I on?  What --
19      Q.   You're on Tab 25.
20      A.   Okay.
21      Q.   Second page of it.  At the top
22  you say, Subsurface meeting at 7:00 a.m.
23  tomorrow.  Currently shut-in.  Took a kick
24  at 13,250.
25           Are you with me?

```
 1          A.    Yes.
 2          Q.    All right.  On March the 8th,
 3    there was a significant kick taken on the
 4    Macondo 252#1 drilling well, right?
 5               MR. MONICO:
 6                    Objection.
 7          A.    I'm not sure what you mean by
 8    significant.
 9          Q.    You had to shut in the well?
10          A.    We shut in the well on any kick.
11          Q.    This kick was significant enough
12    that you were kind of deputized to do a
13    full analysis as to why it happened so that
14    we could create a communication plan of
15    lessons learned.
16                    Do you recall this?
17               MR. FIELDS:
18                    Objection, form.
19          A.    Yes, sir.
20          Q.    All right.  The kick takes place
21    at 13,250.  It occurred on March the 7th or
22    March the 8th, or do you recall?
23          A.    It was -- it was March 8th.  It
24    was -- it was late in the evening at
25    9:30'ish on March 8th.
```

```
 1         Q.    March 8th.  You were at 13,250.
 2   You were in the -- which casing
 3   hole-section?
 4         A.    This was -- we -- we were to
 5   set -- we were planning on setting
 6   13-5/8-inch casing.
 7         Q.    Okay.  So you're in the
 8   13-5/8-inch casing section, you sustain a
 9   kick, and you got stuck, right?
10         A.    That is correct.
11         Q.    If you go to Bates page -- I
12   mean, I'm sorry, Tab Number 91, Bates
13   Page 876825.
14         A.    876825.
15         Q.    First page of Tab 91.  You write
16   an e-mail.
17               Greg, is there a time data
18   run 1,000?  Seems to me that looking at 900
19   and 1100 that it should be the 13-5/8
20   hole-section where we took a kick and got
21   stuck?
22         A.    Uh-huh.
23         Q.    Are you with me?
24         A.    Yes, sir.
25         Q.    Okay.  You are referring, at a
```

```
 1    later point in time, to the kick that
 2    occurred late in the evening on March the
 3    8th of 2010, with the 13-5/8-inch casing,
 4    right?
 5              MR. MONICO:
 6                   Objection to form.
 7         A.   Yes.
 8         Q.   All right.  On March the 8th,
 9    you were on land.  You were not on the
10    vessel; is that right?
11         A.   Yes, sir.
12         Q.   I want to talk to you about the
13    lessons learned from the March 8th kick.
14    If you could, go to Tab 29, please, sir.
15    Bates Number 39111.  And I'm going to start
16    at the bottom so you don't even have to
17    read it.  We'll do it together.  The bottom
18    is the first e-mail.
19                   You sent an e-mail at 8:15
20    to Graham Vinson who you call Pinky?
21         A.   Yes, sir.
22         Q.   Graham Vinson, what role does
23    Graham play in BP relative to you?
24         A.   Graham is my team leader.
25         Q.   Your team leader of the Tiger
```

1   have been populated.  A BAT sonic folder
2   may not have been populated.  I can't
3   remember -- I can't recall all the
4   specifics right now, what was entirely in
5   that -- in that directory.  But that gives
6   you an idea of some of the -- some of
7   the -- some of the pieces of data that --
8   that partners would have had access to.  If
9   they just simply had an Internet
10  connection, they could log onto a site.
11  The WellSpace didn't require a specific --
12  download a specific app in a computer.  It
13  was simply an HTML web based SharePoint
14  site.  So those are the two core pieces.
15              In addition to that, you
16  know, I would have telephone conversations
17  and e-mail transmittal back and forth
18  between partners and various individuals
19  that -- at the partner -- at the partners.
20       Q.    And how frequently -- the
21  WellSpace folders, how frequently were
22  those updated?
23       A.    It depends on the nature of the
24  data.  For instance, a geological -- I'm
25  sorry.  A detail report will be generated

1   such is a person new to the group, can you
2   please add them.  And I will do so
3   accordingly.  And I'm sure you've seen a
4   couple of e-mails like that.
5        Q.   Right.  And of this group of
6   people, were there some that you dealt with
7   fairly frequently?
8        A.   There's a couple that I recall
9   having dealt with.  John Kamm was my first
10  contact.
11       Q.   Uh-huh.
12       A.   He was the -- he was a
13  counterpart to myself.  He was the
14  operations geologist.  He was my -- the
15  first person I contacted to get the wheels
16  moving as far as getting partners setup
17  with -- with data transmission.  Paul
18  Chandler is a geologist, so I spoke with
19  him about subsurface issues.  And Josh
20  Nichols was the -- was the drilling
21  engineer.
22            So much like my role at BP,
23  I'm a liaison between the drillers and the
24  subsurface.  It was that way with Anadarko,
25  that I dealt with Paul Chandler in the

1   subsurface and Mr. Nichols and the -- on
2   the engineer standpoint.  So I would field
3   questions from -- to both anyway.
4        Q.   So they would call you up from
5   time to time with questions?
6        A.   Yes, ma'am.  Or send me an
7   e-mail.
8        Q.   Uh-huh.  Did you have any sense
9   how often they were looking at the
10  information up on WellSpace and INSITE?
11       A.   My best -- I don't know for
12  sure.  My best indicator would be when I
13  received an e-mail in reference to
14  something that I -- that I had recently
15  posted.  I can't -- I cannot say for sure
16  how often each one of these individuals may
17  or may not have access to data.
18       Q.   Were they generally aware of
19  when things were going well at the well and
20  when there were problems at the well?
21            MS. KUCHLER:
22                 Object to the form.
23            MR. FIELDS:
24                 Objection to form.
25       A.   I -- I don't -- I don't know.

```
 1    independently without reporting back to
 2    Tokyo?
 3                 MS. KUCHLER:
 4                       Object to the form.
 5         A.    I did not get that -- I did not
 6    get a sense of that.
 7         Q.    Okay.  One more person.  If you
 8    turn to Tab 11.  And Anadarko is adding a
 9    Mr. Bob Quitzau to the INSITE access list.
10                 Is this another person that
11    you communicated with?
12                 (Exhibit Number 1217 marked.)
13         A.    Yes, ma'am.
14         Q.    On behalf of Anadarko?
15         A.    Yes, ma'am.
16         Q.    And what was his background?
17                 MS. KUCHLER:
18                       Object to the form.
19         A.    I believe he was a drilling
20    engineer consultant.
21         Q.    Okay.  Associated with Anadarko
22    Petroleum, to the best of your knowledge?
23                 MS. KUCHLER:
24                       Object to the form.
25         A.    Yes, ma'am.
```

1      Q.    Okay.  Okay.  Let's look at
2  Tab 32.
3               Did you get the sense that
4  Anadarko was following progress at the well
5  with a certain level of technical
6  expertise?
7            (Exhibit Number 1218 marked.)
8            MS. KUCHLER:
9                 Object to the form.
10     Q.    Do you understand that question?
11     A.    Could -- could you restate that
12  for me, please?
13     Q.    Did they understand from a
14  technical perspective what was happening at
15  the well?
16           MS. KUCHLER:
17                Object to the form.
18     A.    I believe they did.
19     Q.    Okay.  And then this -- in this
20  e-mail from March 24th, Mr. Quitzau is
21  asking questions concerning the case
22  productive objectives with the 9-7/8-inch
23  casing.
24                What was happening at the
25  well at this point in time; do you recall?

```
 1    sands being approximately three-tenths of a
 2    pound per gallon overpressure when compared
 3    to -- compared to the modeled shale
 4    pressures.
 5         Q.    And the 11-7/8 section, is that
 6    a contingency liner?
 7         A.    Yes, ma'am.
 8         Q.    Okay.  And Mr. Quitzau is asking
 9    you what's going to happen with the rest of
10    the well, correct, 9-7/8-inch casing?
11              MS. KUCHLER:
12                   Object to the form.
13         A.    He is asking me a couple of
14    questions that pertain to what our planned
15    operations were -- are for subsequent
16    points in the well.
17         Q.    And he's asking you what the
18    total -- what -- what the casing will be
19    when you reach total depth, correct?
20         A.    Yes.
21         Q.    Do you remember having
22    discussions with Mr. Quitzau concerning
23    progress at the well and the use of
24    contingency liners and --
25         A.    Yes, I do.
```

**WITNESS' CERTIFICATE**

I, **ROBERT BODEK**, read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

---

**ROBERT BODEK**

GAUDET KAISER, L.L.C.
Board-Certified Court Reporters