# Exhibit 29

To United States' Opposition to Motion *In Limine* of Defendant Anadarko
Petroleum Corporation to Exclude All Evidence Regarding Anadarko's Culpability

**MACONDO PROSPECT**
**WELL PARTICIPATION AGREEMENT**
**DEEPWATER GULF OF MEXICO**

This Well Participation Agreement (this "Agreement") dated effective as of October 1, 2009 ("Effective Date"), is made by and between **BP Exploration & Production Inc.,** a Delaware corporation ("BP"), **Anadarko Petroleum Corporation,** a Delaware corporation ("APC"), and **Kerr-McGee Oil & Gas Corporation**, a Delaware corporation ("KMG").

## RECITALS

A.    BP is the current owner or holder of an undivided sixty five percent (65%) Record Title Interest in lease OCS-G 32306, Mississippi Canyon Block 252, Deepwater Gulf of Mexico, U.S.A. (the "Macondo Prospect Area"), further described in Exhibit A.

B.    APC owns an undivided twenty five (25%) working interest in the Macondo Prospect Area following execution of the Lease Exchange Agreement (as hereinafter defined) and a subsequent assignment from its Affiliate Anadarko E&P Company, LP ("AEP") of AEP's Record Title Interest in the Macondo Prospect Area.

C.    APC intends to participate in the Initial Exploratory Well (as hereafter defined) as set forth in this Agreement.

D.    BP and KMG are owners of that certain production Platform A (ID# 24130 1), located in Viosca Knoll Block 989 (the "Pompano Platform").

E.    In consideration of the mutual promises set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, BP, APC and KMG agree to be bound by the terms of this Agreement.

## AGREEMENT

1.    **DEFINITIONS, INTERPRETATION AND EXHIBITS**

    1.1    **Definitions.**   Capitalized terms defined in the Macondo Operating Agreement (as hereafter defined) and not otherwise defined or modified in this Agreement have the meanings defined in the Macondo Operating Agreement. Additionally, the following words and phrases shall have the following meanings:



EXHIBIT # *1943*

WIT: *Bryan*

Page 1 of 11

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

*L75533*

ANA-MDL-000030613

"AFE" means the Well Plan and Authorization for Expenditure attached as Exhibit B.

"Affiliate" means any legal entity which controls, is controlled by, or is under common control with, another legal entity. An entity is deemed to "control" another if it owns directly or indirectly at least fifty percent (50%) of either of the following:

(A)     The shares entitled to vote at a general election of directors of such other entity.

(B)     The voting interest in such other entity if such entity does not have either shares or directors.

"Agreement" means this Well Participation Agreement, including the Recitals and all Exhibits.

"Commenced Drilling Operations" means the start of actual drilling operations.

"Exhibit" means a document referred to in Section 1.3.

"IEW" or "Initial Exploratory Well" means the well currently being drilled by Operator on the Macondo Prospect Area in which APC will participate under the terms of this Agreement. "IEW" and "Initial Exploratory Well" include Substitute Well(s), as defined in the Macondo Operating Agreement, for the IEW. The interest in the IEW assigned to APC consists of all tangible personal property in the well, including the tubular and wellhead costs as set forth in the AFE.

"Lease" or "Macondo Lease" means the oil and gas lease identified on Exhibit A, sometimes referred to herein as the Macondo Prospect Area.

"Lease Exchange Agreement" means the Lease Exchange Agreement dated effective October 1, 2009, wherein BP assigned to APC and AEP a combined undivided twenty five percent (25%) of 8/8ths Record Title Interest in the Macondo Lease pursuant to the terms and conditions therein.

"Macondo Operating Agreement" or "Macondo OA" means that certain operating agreement dated effective October 1, 2009, by and between BP and MOEX Offshore 2007 LLC, attached hereto as Exhibit C.

"Objective Depth" means the first of the following to occur: (a) 19,561' TVD SS; (b) a depth sufficient to encounter the first in-situ occurrence of the foraminfera Roblus L. or its stratigraphic equivalent, as encountered at 24,220' MD in the MC 696 OCS-G 16641 #1 well; or (c) an onset of

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030614

pressure beyond 18,561' TVD SS that requires a new casing string to continue drilling.

"Operator" means BP.

"Party" means BP, APC or KMG, as applicable, and "Parties" means all of them.

"Person" means an individual, corporation, company, state, statutory corporation, government entity or any other legal entity.

"Pompano OA" means that certain operating agreement dated effective May 1, 1988, among BP Exploration Inc. (predecessor-in-interest to BP), KMG (an indirect wholly owned subsidiary of APC) and Kerr-McGee Federal Limited Partnership I-1981, as amended, covering and affecting the following Federal offshore leases: (i) OCS-G 6898 (Viosca Knoll Block 989); (ii) OCG-G 6899 (Viosca Knoll Block 990); (iii) OCS-G 7923 (Mississippi Canyon Block 27); (iv) OCS-G 9771 (Mississippi Canyon Block 28); and (v) OCS-G 6894 (Mississippi Canyon Block 72).

"Record Title Interest" means, as to all depths, with respect to any federal OCS oil & gas lease, the undivided, fractional or percentage share of all right, title, and interest in such lease granted to the original lessee (or lessees) by the MMS, including, without limitation, an equal undivided fractional or percentage share of the operating rights in such lease.

"APC's Working Interest Share" means APC's working interest ownership in the Macondo Prospect Area of twenty five percent (25%) of 8/8ths.

"TVD" means Total Vertical Depth.

"Well Costs" means all costs to drill, evaluate, and abandon the IEW.

1.2  **Incorporation of Provisions from the Macondo OA**.  The Macondo OA is incorporated herein by reference, except as specifically modified in this Agreement.

1.3  **Exhibits**.  All of the Exhibits that are attached to the body of this Agreement are an integral part of, and are incorporated by reference into, this Agreement, including:

(A)  Exhibit A – Lease Description

(B)  Exhibit B – Well Plan and Authorization for Expenditure

(C)  Exhibit C – Macondo Operating Agreement

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030615

(D)     Exhibit D – Form of AMI Assignment

(E)     Exhibit E – Tax Partnership Provisions

1.4     **Conflicts and Enforceability.**  If there is a conflict or inconsistency between a provision of this Agreement and that of any Exhibit, the provision of this Agreement will prevail, except insofar as this Agreement has become ineffective by its own terms.

1.5     **Interpretation.** Unless the context expressly requires otherwise, all of the following apply to the interpretation of this Agreement:

(A)     The plural and singular words each include the other.

(B)     The masculine, feminine and neuter genders each include the others.

(C)     The word "or" is not exclusive.

(D)     The word "includes" and "including" shall be construed to mean "including without limitation to the generality."

(E)     The headings in this Agreement are included for convenience and do not affect the construction or interpretation of any provision of, or the rights or obligations of a Party under, this Agreement.

(F)     References to "Sections" shall unless the context provides otherwise be references to sections of this Agreement.

2.     **EFFECTIVE DATE AND TERM.**  This Agreement is effective as of the Effective Date and will terminate upon rig release from the IEW or its Substitute Well.

3.     **INITIAL EXPLORATORY WELL (IEW)**

3.1     **Commencement.**  BP commenced Drilling Operations for the IEW on October 6, 2009, utilizing the Transocean Marianas Rig.  Due to the facts and circumstances surrounding the damages sustained by the Marianas Rig as a result of Hurricane Ida, BP plans to utilize the Transocean Horizon Rig to resume drilling operations of the IEW and will drill the IEW to the Objective Depth subject to the terms of this Agreement. Such resumption of drilling operations of the IEW is expected to occur on or before April 1, 2010, which will be immediately following BP's contemplated plug and abandonment operations at Viosca Knoll 914 which will follow the the conclusion of BP's current well operations at Mississippi Canyon 727.

3.2     **Operating Agreement and Well Participation.**  Notwithstanding the fact that BP commenced drilling operations on the IEW at its sole risk and expense on October 6, 2009 without APC's participation and prior to APC

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030616

owning an interest in the Macondo Lease, and such operations are ongoing as of the date of execution of this Agreement:

(a) BP and APC agree to continue the drilling of the IEW as follows: APC shall execute and deliver to BP a copy of Exhibit B, the Macondo Well Plan and Authorization for Expenditure, simultaneous with its execution of this Agreement, signifying APC's agreement to participate in the drilling of the IEW and any and all operations in connection with the drilling of the IEW effective October 1, 2009, subject to Section 4 below, and otherwise in accordance with and subject to the provisions of the Macondo OA; and

(b) BP and APC deem that BP's delivery of the Macondo Well Plan and Authorization for Expenditure to APC and APC's execution and delivery thereof to BP is in compliance with the Macondo OA.

BP represents that, as of the date of this Agreement, there are no pending, current, or accrued obligations (other than those that may have occurred in the ordinary course of the planning and drilling of the IEW) pursuant to any agreement regarding the drilling of wells, installation or construction of facilities/platforms, or any other capital expenditure exceeding $100,000 for which BP would be responsible, except as set forth in the AFE.

3.3     The Parties agree that any Development Plan proposed by either APC or BP pursuant to the Macondo OA shall provide for processing and handling of all production from the Macondo Prospect Area via a subsea tieback to the Pompano Platform; provided that BP determines it is safely, technically, and economically feasible to do so. In the event BP determines that it is not safely, technically, and economically feasible to tie-back Macondo Prospect Area production to the Pompano Platform, then any Development Plan proposed by BP that provides for a subsea tieback of Macondo Prospect Area production to any other BP owned and/or operated offshore facility shall require approval by both BP and APC. Further, BP and KMG agree that, pursuant to Article 13 of the Pompano OA, they each hereby consent and approve the construction, installation and operation of Facilities, equipment, pipelines, risers and umbilicals (and any modifications to the Pompano Platform in connection therewith) for use in connection with processing and handling of all production from the Macondo Prospect Area.

## 4.     COST-BEARING INTEREST:

4.1     Pursuant to this Agreement, APC shall pay thirty-three and one-third percent (33.33%) of the Well Costs for the IEW to the Objective Depth as set forth in the AFE, and any Substitute Well therefore, if any, agreed to under the Macondo OA. This obligation shall apply only until the earlier of: (a) the IEW Objective Depth has been drilled and evaluated as set forth in the AFE, (b) if applicable, the IEW has been plugged and abandoned, or (c)

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030617

the cumulative Well Costs for the IEW and any agreed-upon Substitute Well, if any, reaches one hundred and ten percent (110%) of the amount set forth in the AFE, excluding overhead (as "overhead" is defined in the COPAS provisions for the Macondo OA); provided that: (i) Section 4.1(b) shall only apply following the expiration of the applicable period for proposing Substitute Well(s) under the Macondo OA, and (ii) an Election by either Party not to participate in a Substitute Well(s) shall be governed by the applicable provisions of Article 16 of the Macondo OA. The AFE includes the estimated costs to drill, evaluate, and abandon the well. Upon the earlier to occur of subsections (a), (b) and (c) above, APC shall only be obligated to pay APC's Working Interest Share of any further operations conducted pursuant to the Macondo OA. APC will execute BP's AFE contemporaneously with the execution of this Agreement. BP shall invoice APC its applicable share of the Well Costs incurred as of the date of execution, in accordance with this Agreement, and APC shall pay the same in accordance with this Agreement and the Macondo OA. Thereafter, BP will invoice APC on a monthly basis as provided in the Macondo OA. BP uses an SAP-based accounting system that cannot automatically track and bill out vendor invoices at different cost interests. Therefore, when an operation reaches the point in which the cost interest should change as provided in the Section 4.1 above, the estimated well cost as reflected in BP's DIMS (Drilling rig cost estimator) at that point will be used as the mechanism for a cost interest change in BP's accounting system. Accordingly, any vendor invoices processed thereafter will be billed to APC at APC's Working Interest Share in accordance with Section 4.1.

4.2 In determining the above-referenced threshold for expenditures, the costs and expenses of the IEW and, if applicable, the agreed-to Substitute Well(s) shall be considered cumulatively. For example, if the Parties expend one hundred percent (100%) of the amount set forth in the AFE in Well Costs on the IEW before abandoning it and then agree to drill a Substitute Well, then, subject to subsections (a), (b) and (c) of Section 4.1, APC's obligation to pay thirty-three and one-third percent (33.33%) of the Well Costs on the Substitute Well shall terminate after ten percent (10%) of the amount set forth in the AFE has been expended in the Substitute Well, with APC paying APC's Working Interest Share thereafter.

5. **LEASE EXCHANGE AGREEMENT AND MACONDO OPERATING AGREEMENT:** Prior to the execution of this Agreement, BP and APC executed the Lease Exchange Agreement and delivered the respective Assignments as defined therein, and APC adopted, ratified, and executed the Macondo Operating Agreement. If there is any conflict between the terms of this Agreement and the Lease Exchange Agreement, the terms of this Agreement shall prevail. If there is any conflict between the terms of this Agreement and the Macondo OA, the terms of this Agreement shall prevail.

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030618

6.      **AREA OF MUTUAL INTEREST:**  The Parties agree to establish an area of mutual interest ("AMI"), effective as of the Effective Date until December 31, 2011, as follows:

6.1     **AMI Area.**  Mississippi Canyon, Blocks 208, 209, and 253.

6.2     **AMI Percentage.**      BP      75.00%
                                APC     25.00%

6.3     **AMI Terms.**  Should either Party ("Acquiring Party") by reason of a farm-in agreement or by purchase from third parties or through purchase pursuant to an OCS lease sale, or by any other means (other than as a result of a merger, reorganization or other Affiliate transfer, as well as transfers between BP and APC, or the acquisition of all or substantially all of a third party's assets located in the Gulf of Mexico) acquire an interest in leasehold record title, leasehold operating rights, production, reserves, facilities, or any other interest within the AMI Area as defined in Section 6.1 herein, then the Acquiring Party shall, within thirty (30) days after such acquisition, give written notice of such acquisition including a description of the right, title, and interest, and all terms and conditions relating thereto or equivalent terms for a non-cash or exchange transaction (other than as excluded above) to the other Party hereto ("Non-Acquiring Party") including   the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash). The Non-Acquiring Party shall have the option for a period of thirty (30) days after such notice is received to elect in writing to the Acquiring Party to acquire its pro rata share of the Acquiring Party's interest.  Such pro rata share shall be equal to each Party's applicable AMI Percentage, as defined in Section 6.2 herein, multiplied by the interest acquired by the Acquiring Party.  Should the Non-Acquiring Party elect to acquire its pro rata share of the Acquiring Party's interest as aforesaid, then within thirty (30) days after its election to acquire its share, it shall reimburse the Acquiring Party for the pro rata share of the costs attributable to the interest and shall assume its respective pro rata share of the Acquiring Party's rights and obligations, if any, attributable to such interest. The Acquiring Party shall assign to the Non-Acquiring Party its proportionate share of the interest to be assigned contemporaneously with the aforementioned reimbursement.  Said assignment shall be in the same form and content in all material respects as the Form of AMI Assignment attached hereto as Exhibit D, modified only insofar as is necessary to reflect the percentage and location of the interest assigned. Any interests acquired by the Non-Acquiring Party pursuant to this Section 6 shall be subject to an operating agreement that designates BP as operator and is otherwise identical in all material respects to the Macondo Operating Agreement, modified only insofar as is necessary to reflect the percentage

ANA-MDL-000030619

and location of the interest assigned; provided, however, if such interest is subject to a pre-existing operating agreement with a third party, the pre-existing operating agreement shall govern such interest. Failure to respond in writing within the time period specified above is deemed to be an election not to participate in such acquisition. Subject to a pre-existing operating agreement with a third party, if any, BP shall be designated Operator of any interest BP acquires pursuant to this AMI provision, In such case, APC will execute the requisite documentation required by the MMS within thirty (30) days of receipt of such documents from BP.

7. **RELATIONSHIP OF THE PARTIES AND TAX PROVISIONS:** It is not the purpose or intention of this Agreement to create, and this Agreement shall not be construed as creating, a joint venture, mining partnership or other relationship whereby any Party will be held liable for the acts or omissions of any other Party, and the liabilities of each of the Parties hereto shall be several and not joint or collective. For Federal Income Tax purposes, however, each Party acknowledges that this Agreement creates a partnership for tax purposes between the Parties with respect to the Initial Exploratory Well which is subject to the application of all provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended (the Code), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. The Parties agree that they shall not elect out of partnership treatment and shall execute and file with the Internal Revenue Service and/or any state taxing authority, any returns or documents necessary to evidence or effectuate this election to be treated as a tax partnership with respect to the Initial Exploratory Well pursuant to all Federal and/or State laws and regulations. The tax partnership created hereunder shall be governed by the Tax Partnership Provisions attached hereto as Exhibit E.

8. **GENERAL PROVISIONS**

   8.1 **Notices.** All notices and communications required or permitted under this Agreement shall be made in accordance with the Macondo OA.

   8.2 **Public Announcements.** No Party shall issue a press release concerning this Agreement unless all Parties have approved the issuance and content of the press release.

   8.3 **Prior Agreements.** This Agreement and all Exhibits attached hereto comprise the complete and exclusive agreement between the Parties regarding the subject matter of this Agreement, and supersede all oral and written communications, negotiations, representations or agreements in relation to that subject matter made or entered into on or before the Effective Date.

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030620

8.4 **Waiver**. The failure by either Party to pursue remedies for breach of this Agreement does not constitute a waiver by that Party of any breach of this Agreement by the other Party or raise any defense against Claims for breach of this Agreement. The waiver or failure to require the performance of any covenant or obligation contained in this Agreement or to pursue remedies for breach of this Agreement does not waive a later breach of that covenant or obligation.

8.5 **Preparation**. Preparation of this Agreement has been an effort of the Parties and the resulting Agreement must not be construed more severely against one of the Parties than against the other.

8.6 **Severability**. Each provision of this Agreement is severable and if any provision is determined to be invalid, unenforceable or illegal under any existing or future law by a court, arbitrator of competent jurisdiction or by operation of any applicable law, such invalidity, unenforceability or illegality does not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

8.7 **Amendment**. No change to this Agreement is effective unless made in writing and signed by both Parties. Any contemplated assignment or reassignment under this Agreement will be in a form (i) mutually agreeable to all Parties, (ii) approvable by the Minerals Management Service, Gulf of Mexico Region, and (iii) warranted by, through and under each respective Party.

8.8 **Counterparts.** This Agreement may be executed in any number of duplicate counterparts, each of which will be deemed an original of this Agreement, and which together will constitute one and the same instrument; provided that neither Party will be bound to this Agreement unless and until both Parties have executed a duplicate counterpart.

8.9 **Survival**. Upon termination as defined in Section 2, the rights and obligations of the Parties with respect to the Macondo Prospect Area shall thereafter be governed by the Macondo OA. Notwithstanding the termination of this Agreement, Sections 6 and 7 shall survive, and all causes of action which arose prior to termination shall survive until, by their respective terms, they are no longer operative or are otherwise limited by an applicable statute of limitations.

8.10 **Binding Effect**. The terms and conditions of this Agreement shall be governed by the laws of **TEXAS** and shall be binding upon, and shall inure to the benefit of each Party and its respective successors and assigns, but may not be assigned without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030621

8.11 **Further Assurances**. Each of the Parties hereto shall execute, acknowledge and deliver to the other such further documents and take such other action, as may be necessary in order to carry out the purposes of this Agreement. Unless otherwise provided in this Agreement, the Parties agree to prepare and execute such documents within thirty (30) days of receipt of a written request for such documents from the other Party.

8.12 **Representation and Acknowledgement**. BP represents that it owns the record title interest in the Lease set forth in Exhibit A, the Lease is in full force and effect, and BP is in compliance with each of the material terms and conditions of the Lease.

8.13 **Dispute Resolution Procedure**. Any Dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in the Macondo OA.

**The remainder of this page is intentionally left blank.**

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030622

The Parties have executed this Agreement as evidenced by the following signatures of the authorized representatives of the Parties, but is effective for all purposes as of the Effective Date:

**BP Exploration & Production Inc.**

By: _____

Title: _ATTORNEY·IN·FACT_

Date: _12/17/09_

**Anadarko Petroleum Corporation**

By: _____

Title: _Agent and Attorney-in-Fact_

Date: _December 17, 2009_

**Kerr-McGee Oil & Gas Corporation**

By: _____

Title: _Attorney-in-Fact_

Date: _December 17, 2009_

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030623

### Exhibit A – Lease Description

Attached to and made a part of that certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration & Production Inc., Anadarko Petroleum Corporation, and Kerr-McGee Oil & Gas Corporation

### BP LEASE - MACONDO PROSPECT AREA

### Lease Description:

Federal OCS Oil & Gas Lease Serial number OCS-G 32306 dated June 1, 2008 between the United States of America and BP Exploration & Production Inc., covering all of Mississippi Canyon Block 252, OCS Official Protraction Diagram NH 16-10, containing approximately 5,760 acres as to all depths and bearing a royalty of 18.75%.

Page 1 of 1

ANA-MDL-000030624

Exhibit B – Well Plan and AFE
Attached to the Well Participation Agreement dated October 1, 2009, among BP Exploration Production Inc., Anadarko Petroleum Corp., and Kerr-McGee Oil Gas Corp.

**bp**

## AUTHORIZATION FOR EXPENDITURE

X2-000X8

| | | |
|---|---|---|
| DATE PREPARED: | 26-Aug-2009 | FINANCIAL MEMO NO: | GoM-SPU-FM-2009-5 |
| OPERATOR: | BP | AFE NO: | X2-000X8 |
| LEASE/UNIT/FACILITY: | OCS-G-32306 | START DATE: | 1-Oct-2009 |
| LEASE/FAC FLAC ID: | Mississippi Canyon 252 | END DATE: | 20-Dec-2009 |
| WELL DESC/NAME/NO: | MC 252 #1 | SURFACE LOCATION: | X=1,202,803 Y=10,431,617 |
| WELL FLAC: | | BOTTOM HOLE LOC: | X=1,202,803 Y=10,431,617 |
| BUSINESS UNIT: | GoMX | PRPSD TOTAL DEPTH: | 19,561' TVD SS' |
| BP, ET. AL. WORKING INTEREST: | 75.000% | COUNTY/STATE: | Offshore - GoM / LA |
| JOINT OPRTG AGRMNT NO: | | OPERATING FIELD: | Macondo - Wildcat |
| SAP COST CENTER: | | HORIZON: (formation/prospect) | Miocene |

**PROJECT DESCRIPTION/COMMENTS**        Project Name: Macondo ( MC 252 #1 )

Authority is requested to fund the drilling and evaluation of the Macondo exploration well. The well will be drilled with the Transocean "Marianas " semi-submersible in 4,992' of water.  Six (6) strings of casing are planned to be run to reach TD.  Also included is a contingency expandable liner, risked at 50%  Abandonment costs are also included in this AFE.  The well is designed as a "keeper," and in the success case, the well will be temporary abandoned for future completion.  The well is estimated to require ~ 77 days and $96.1 M to drill and temporary abandon.  "Objective Depth shall be the first to occur of the following: (a) 19,561' TVD SS; (b) a depth sufficient to encounter the first in-situ occurrence of the foraminifera Robulus L, or its stratigraphic equivalent, as encountered at 24,220' MD in the MC 595 #1 well (OCS-G 16641), or (c) an onset of pressure beyond 19,561' TVD SS that requires a new casing string to continue drilling.

| Working Interest OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP, et. al. | 66.667% | 75.000% | $ 64,066,987 | |
| Anadarko | 33.333% ** | 25.000% | $ 32,033,013 | **Until Objective Depth or 110% of Total Costs described hereof, whichever occurs first |
| | | | $ | |
| | | | $ | |
| Total | 100% | Total 100% | Total Costs $ 96,100,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| INTANGIBLE | Rig MOB, prep, drill, evaluate, and abandonment costs | $ 87,457,000.00 | $ 87,457,000.00 |
| TANGIBLE | Tubular (36", 28", 22", 18", 16", 13-5/8", 11-7/8" conn. and wellhead costs | $ 8,643,000.00 | $ 8,643,000.00 |
| | TOTAL PROJECT COST | $ 96,100,000.00 | $ 96,100,000.00 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Mark Hafle | Drilling Engineer | mark.hafle@bp.com | 281-366-4237 |
| | Andreas M. Kraus | D&C Project Services Team Lead | andreas.m.kraus@bp.com | 281-366-4703 |

**PARTNER APPROVAL:**   YES ✓   NO ____   DATE 12/17/09

NOTICE TO NONOPERATOR: Costs shown are estimates only.  Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation.  Overhead will be charged in accordance with the Joint Operating Agreement.

COMPANY NAME / NONOPERATOR     Anadarko

PRINT NAME: _Stuart Strife_  TITLE _VP Exploration GOM_

SIGNATURE _____

**BP APPROVAL:**      PRINT NAME

Attorney-in-Fact       Kemper Howe       SIGNATURE _____   DATE

Page 1 of 3

ANA-MDL-000030625

Exhibit B - Continued



ANA-MDL-000030626

Exhibit B - Continued



Page 3 of 3

ANA-MDL-000030627

**Exhibit C – Macondo Prospect Operating Agreement**

Attached to and made a part of the certain Well Participation Agreement dated
Effective October 1, 2009, by and between BP Exploration & Production Inc.,
Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation

# MACONDO PROSPECT OPERATING AGREEMENT

ANA-MDL-000030628

**Exhibit D – Form of AMI Assignment**

Attached to and made a part of that certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration & Production Inc., Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation

# FORM OF AMI ASSIGNMENT

Macondo Prospect  (MC 252)
Exhibit "D" to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030629

U. S. Department of the Interior          OMB Control Number: 1010-0006
Minerals Management Service

OMB Approval Expires: March 31, 2007

| | Lease No. |
|---|---|

ASSIGNMENT   OF   RECORD   TITLE   INTEREST   IN
FEDERAL OCS OIL AND GAS LEASE

Lease Effective Date

New Lease No. (MMS Use Only)

Part A: Assignment

Legal description of land/area being assigned:

Assignor(s) does hereby sell, assign, transfer and convey unto Assignee(s) the following undivided right, title and interest:

Insert name and Company number of each Assignor and Assignee.

Assignor(s):                                                    Percentage Interest Conveyed

Assignee(s):                                                    Percentage Interest Received

The approval of this assignment is restricted to record title interest only.

☐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

For MMS Use only - Do Not Type Below This Line

This Assignment of Record Title Interest has been filed as of the date stamped on this document and hereby approved by the Minerals Management Service on the date below.

By_____
    Authorized Official for MMS                    Title                         Approval Date

Paperwork Reduction Act of 1995 (PRA) Statement: The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. The MMS uses the information to track ownership of leases in the Federal OCS. Responses are mandatory (43 U.S.C. 1334). Proprietary data are covered under 30 CFR 250.196. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of the this form to the Information Collection Clearance Officer, Mail Stop 4230, Minerals Management Service, 1849 C Street, NW, Washington, DC 20240.

MMS FORM MMS-150        (June 2006)                                    Page 1 of 2

ANA-MDL-000030630

Part B - Certification and Acceptance

1. Assignor(s) certifies it is the owner of the record title interest in the above-described lease that is hereby assigned to the Assignee(s)
   specified above.
2. DEBARMENT COMPLIANCE: Assignee shall comply with the Department of the Interior's nonprocurement debarment and
   suspension regulations as required by Subpart C of 43 CFR Part 42 and shall communicate the requirement to comply with these
   regulations to persons with whom it does business related to this record title interest assignment by including this term in its contracts and
   transactions.
3. EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION: Assignor(s) and Assignee(s)
   certify that they are in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations
   41 CFR 60-01 - Obligations of Contractors and Subcontractors; and 41 CFR 60-2 - Affirmative Action Programs. These requirements
   are for the purpose of preventing discrimination against persons on the basis of race, color, religion, sex, or national origin. These regulations have specific performance requirements.
4. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining
   to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on
   the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased
   lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR 256. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is subject to, and shall fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Minerals Management Service is governed by 30 CFR 256.

This Assignment of Record Title Interest will be made effective between the parties hereto as of _____, upon approval by the Minerals Management Service. United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which willl be deemed an original instrument, but all of which together shall constitute but one and the same instrument provided, however, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Minerals Management Service unless all counterparts are filed simultaneously.

I certify that the statements made herein by the undersigned are true, complete and correct to the best of my knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

ASSIGNOR                                      ASSIGNOR


By:_____                  By:_____
Name:                                        Name:
Title:                                       Title:

        Execution Date                               Execution Date

ASSIGNEE                                      ASSIGNEE


By:_____                  By:_____
Name:                                        Name:
Title:                                       Title:

        Execution Date                               Execution Date

ANA-MDL-000030631

MMS FORM MMS-150    (June 2006)    Page 2 of 2

Page 4 of 6

:ondo Prospect
bit D to Well Participation Agreement
APC/ KMG

ANA-MDL-000030632

### EXHIBIT "A"

### ATTACHED TO AND MADE A PART OF THAT CERTAIN
### ASSIGNMENT OF RECORD TITLE INTEREST
### IN FEDERAL OCS OIL & GAS LEASE FOR OCS-G XXXXX

**ASSIGNOR:**

**ASSIGNEE:**

To have and to hold the percentage of record title interest conveyed in Federal OCS Oil & Gas Lease OCS-G _____ covering _____ block _____ ("Assigned Lease") (and all appurtenant property, if any [in the case of Mississippi Canyon 252 into APC, including the wellbore and other personal property associated with the Mississippi Canyon Block 252 #1  OCS-G 32306 well (API #6081741169)]) unto the Assignee forever, subject to and in accordance with all the terms and provisions of the Assigned Lease and subject to the limitations, exceptions, reservations, and conditions set forth below.

#### Assignment Subject to Prior Contracts
The record title interest conveyed in the Assigned Lease is subject to Assignee's assumption of the express and implied terms and conditions of the Assigned Lease and the following agreement(s), collectively the "Agreements":
1. That certain Lease Exchange Agreement dated October 1, 2009, by and between BP Exploration and Production Inc., Anadarko E&P Company LP and Anadarko Petroleum Corporation.
2. That certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration and Production Inc., Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation.
3. **Applicable OA**

Should any terms of this Assignment conflict with the terms of the Agreements listed above, the terms of the Agreements shall control.

#### Limited Warranty of Title

Page 5 of 6

Macondo Prospect
Exhibit D to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030633

The Assignment is delivered and accepted:

(a) without warranty of title or any other type of warranty (express or implied); except as to claims by persons claiming the same property, or any part thereof, by, through or under the assigning party, but not otherwise, but with full subrogation and substitution in and to all actions in warranty; and

(b) free and clear of any overriding royalties, production payments, mortgages, pledges or other burdens, liens or encumbrances on production (including but not limited to dedications of production, production handling agreements, and/or processing agreements) other than the lessor's royalty; and

(c) subject to approval by the MMS.

### Binding Effect

This Assignment and the rights, titles, interests, and obligations assigned, reserved, excepted, or retained in this Assignment, shall inure to the benefit of, and shall be binding upon, the successors and assigns of the Assignor and Assignee. The covenants, obligations and agreements contained in this Assignment shall be construed as covenants running with the land and the Assigned Lease.

Page 6 of 6

Macondo Prospect
Exhibit D to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030634

**Exhibit D – Form of AMI Assignment**

Attached to and made a part of that certain Well Participation Agreement dated
effective October 1, 2009, by and between BP Exploration & Production Inc.,
Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation

# FORM OF AMI ASSIGNMENT

Page 1 of 6

Macondo Prospect (MC 252)
Exhibit "D" to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030635

U. S. Department of the Interior      OMB Control Number: 1010-0006
Minerals Management Service

OMB Approval Expires: March 31, 2007

ASSIGNMENT   OF   RECORD   TITLE   INTEREST   IN
FEDERAL OCS OIL AND GAS LEASE

Lease No. _____

Lease Effective Date _____

New Lease No. (MMS Use Only) _____

Part A: Assignment

~~Legal description of land/area being assigned:~~

Assignor(s) does hereby sell, assign, transfer and convey unto Assignee(s) the following undivided right, title and interest:

Insert name and Company number of each Assignor and Assignee.

Assignor(s):                                          Percentage Interest Conveyed

Assignee(s):                                          Percentage Interest Received

The approval of this assignment is restricted to record title interest only.

⊐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

For MMS Use only - Do Not Type Below This Line

This Assignment of Record Title Interest has been filed as of the date stamped on this document and hereby approved by the Minerals Management Service on the date below.

By_____
      Authorized Official for MMS                    Title                              Approval Date

Paperwork Reduction Act of 1995 (PRA) Statement: The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. The MMS uses the information to track ownership of leases in the Federal OCS. Responses are mandatory (43 U.S.C. 1334). Proprietary data are covered under 30 CFR 250.196. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of the this form to the Information Collection Clearance Officer, Mail Stop 4230, Minerals Management Service, 1849 C Street, NW, Washington, DC 20240.

MMS FORM MMS-150      (June 2006)

Page 1 of 2

ANA-MDL-000030636

Part B - Certification and Acceptance

1. Assignor(s) certifies it is the owner of the record title interest in the above-described lease that is hereby assigned to the Assignee(s)
   specified above.
2. DEBARMENT COMPLIANCE: Assignee shall comply with the Department of the Interior's nonprocurement debarment and
   suspension regulations as required by Subpart C of 43 CFR Part 42 and shall communicate the requirement to comply with these
   regulations to persons with whom it does business related to this record title interest assignment by including this term in its contracts and
   transactions.
3. EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION: Assignor(s) and Assignee(s)
   certify that they are in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at
   41 CFR 60-01 - Obligations of Contractors and Subcontractors; and 41 CFR 60-2 - Affirmative Action Programs. These requirements
   are for the purpose of preventing discrimination against persons on the basis of race, color, religion, sex, or national origin. These regulations have specific performance requirements.
4. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining
   to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on
   the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased
   lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR 256. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is subject to, and shall fully comply with, all applicable regulations now or ~~to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the~~ Minerals Management Service is governed by 30 CFR 256.

This Assignment of Record Title Interest will be made effective between the parties hereto as of _____, upon approval by the Minerals Management Service, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together shall constitute but one and the same instrument provided, however, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Minerals Management Service unless all counterparts are filed simultaneously.

I certify that the statements made herein by the undersigned are true, complete and correct to the best of my knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

ASSIGNOR                                          ASSIGNOR


By:_____                      By:_____
Name:                                            Name:
Title:                                           Title:

      Execution Date                                   Execution Date

ASSIGNEE                                          ASSIGNEE


By:_____                      By:_____
Name:                                            Name:
Title:                                           Title:

      Execution Date                                   Execution Date

ANA-MDL-000030637

MMS FORM MMS-150    (June 2006)    Page 2 of 2

Page 4 of 6

:ondo Prospect
bit D to Well Participation Agreement
APC/ KMG

ANA-MDL-000030638

EXHIBIT "A"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN
ASSIGNMENT OF RECORD TITLE INTEREST
IN FEDERAL OCS OIL & GAS LEASE FOR OCS-G XXXXX**

**ASSIGNOR:**

**ASSIGNEE:**

To have and to hold the percentage of record title interest conveyed in Federal OCS Oil & Gas Lease OCS-G _____ covering _____ block _____ ("Assigned Lease") (and all appurtenant property, if any [in the case of Mississippi Canyon 252 into APC, including the wellbore and other personal property associated with the Mississippi Canyon Block 252 #1 OCS-G 32306 well (API #6081741169)]) unto the Assignee forever, subject to and in accordance with all the terms and provisions of the Assigned Lease and subject to the limitations, exceptions, reservations, and conditions set forth below.

<u>Assignment Subject to Prior Contracts</u>
The record title interest conveyed in the Assigned Lease is subject to Assignee's assumption of the express and implied terms and conditions of the Assigned Lease and the following agreement(s), collectively the "Agreements":
1. That certain Lease Exchange Agreement dated October 1, 2009, by and between BP Exploration and Production Inc., Anadarko E&P Company LP and Anadarko Petroleum Corporation.
2. That certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration and Production Inc., Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation.
3. **Applicable OA**

Should any terms of this Assignment conflict with the terms of the Agreements listed above, the terms of the Agreements shall control.

<u>Limited Warranty of Title</u>

Page 5 of 6

Macondo Prospect
Exhibit D to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030639

The Assignment is delivered and accepted:

(a) without warranty of title or any other type of warranty (express or implied); except as to claims by persons claiming the same property, or any part thereof, by, through or under the assigning party, but not otherwise, but with full subrogation and substitution in and to all actions in warranty; and

(b) free and clear of any overriding royalties, production payments, mortgages, pledges or other burdens, liens or encumbrances on production (including but not limited to dedications of production, production handling agreements, and/or processing agreements) other than the lessor's royalty; and

(c) subject to approval by the MMS.

**Binding Effect**

This Assignment and the rights, titles, interests, and obligations assigned, reserved, excepted, or retained in this Assignment, shall inure to the benefit of, and shall be binding upon, the successors and assigns of the Assignor and Assignee.   The covenants, obligations and agreements contained in this Assignment shall be construed as covenants running with the land and the Assigned Lease.

Page 6 of 6

Macondo Prospect
Exhibit D to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030640

## Exhibit "E" - Tax Partnership Provisions

**Attached to and made a part of that certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration & Production Inc., Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation.**

### TAX PARTNERSHIP PROVISIONS

1.      General Provisions

1.1      **Designation of Documents.**  This exhibit is referred to in, and is made a part of that certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration & Production Inc. ("BP"), Anadarko Petroleum Corporation("APC") and Kerr-McGee Oil & Gas Corporation ("KMG").  Such agreement (including all exhibits thereto, other than this exhibit) shall be hereinafter referred to as the "Agreement"; and this exhibit to the Agreement is hereinafter referred to as this "Exhibit".  Except as may be otherwise provided in this Exhibit, terms defined in the Agreement shall have the same meaning when used in this Exhibit as in the Agreement.

1.2      **Name of Partnership.**  The Parties hereby agree to name this tax partnership the Macondo Prospect Partnership.

1.3      **Relationship of Parties.**  The parties to this Agreement shall be hereinafter referred to singularly as the "Party" or collectively as the "Parties."  The Parties understand and agree that the arrangement and undertakings evidenced by the Agreement, taken together, result in a partnership for purposes of federal income taxation pursuant to subchapter K of Chapter 1 of subtitle A of the Internal Revenue Code of 1986, as amended, and for purposes of certain state income tax laws which incorporate or follow federal income tax principles as to tax partnerships.  Such partnership for tax purposes is hereinafter referred to as the "Tax partnership."  For every other purpose of the Agreement, however, and notwithstanding any other provisions of the Agreement, express or implied, to the contrary, the Parties understand and agree that their legal relationship to each other under applicable state law with respect to all property subject to the Agreement, is one of tenants-in-common, or undivided interest owners, or lessee-sublessees and not one of partnership; or undivided liabilities of the Parties shall be several and not joint or collective; and that each Party shall be solely responsible for its obligations under the Agreement.

1.4      **Priority of Provisions.**  In the event of a conflict or inconsistency, whether direct or indirect, actual or apparent, between the terms and conditions of this Exhibit and the terms and conditions of the Agreement or any other Exhibit or any part thereof, the terms and conditions of this Exhibit shall govern and control.

1.5      **Survivorship.**

1

ANA-MDL-000030641

(a)   Any termination of the Agreement shall not affect the continuing application of the Tax Partnership Provisions as necessary for the termination and liquidation of the Tax Partnership.

(b)   Any termination of the Agreement shall not affect the continuing application of the Tax Partnership Provisions as necessary to resolve all matters regarding federal and state income taxation of the Tax Partnership.

(c)   These Tax Partnership Provisions shall inure to the benefit of, and the binding upon, the Parties hereto and their successors and assigns.

1.6   **Term.** The effective date of the Tax Partnership shall be the closing date of the Agreement. The Tax Partnership shall continue in full force and effect from and after such date until termination.

2.   **Income Tax Compliance and Capital Accounts.**

2.1   **Tax Returns.** The Operator as the Tax Reporting Partner ("TRP") shall prepare and file all required federal and state partnership income tax returns. In preparing such returns, the TRP shall use its best efforts and in doing so shall incur no liability to any other Party with regard to such returns. Not less than thirty (30) days prior to the proposed filing date of any such tax return the TRP shall submit to each Party, at the addresses listed below, a copy of the return as proposed for review.

In the event of a change in Operator, the Party serving as TRP at the beginning of a given taxable year will continue as TRP with respect to all matters concerning that year. In the event of such change in Operator, the party serving as TRP shall promptly provide notice to the new Operator's tax department and provide such information as reasonably necessary to transition TRP responsibilities to the new Operator.

2.2   **Fair Market Value Capital Accounts.** The TRP shall establish and maintain fair market value (hereinafter referred to as "FMV") capital accounts and tax basis capital accounts for each Party. Upon request, the TRP shall submit to each party along with a copy of any proposed partnership income tax return an accounting of its respective FMV capital accounts as of the end of the tax return period.

2.3   **Information Requests.** Each Party agrees to furnish to the TRP no later than thirty (60) days before the return due date (including extensions) such information relating to the operations conducted under this Agreement as may be required for the proper preparation of such returns and capital accounts. Similarly, each Party agrees to furnish timely to the TRP, as requested, any information and data necessary for the preparation and/or filing of other required reports and notifications. As provided in Internal Code Section ("I.R.C.")

2

ANA-MDL-000030642

6050K(c), a Party transferring it interest must notify the TRP to allow compliance with I.R.C. § 6050K(a) (see also Sec. 8.1).

3. **TRP as Tax Matters Partner**

3.1    If the Partnership does not qualify for the "small partnership exception" from §§ 6221 *et seq.*, Subchapter C of Chapter 53 of Subtitle A (the "TEFRA rules") of the I.R.C., the TRP shall also be the Tax Matters Partner as defined in I.R.C. § 6231(a)(7) (the "TMP") and references to the TRP shall then include references to the TMP and *vice versa.* In the event of any change in the Operator, the Party serving as TRP at the beginning of a given taxable year shall continue as TRP with respect to all matters concerning such year. In the event of a change in the TRP, the party serving as TRP shall promptly provide notice to the new Operator's tax department and provide such information as reasonably necessary to transition TRP responsibilities to the new Operator. The TRP and other Parties shall use their best efforts to comply with responsibilities outlined in this section and in I.R.C. §§ 6222 through 6233, and § 6050K (including any Treasury Regulations promulgated thereunder) and in doing so shall incur no liability to any other Party. Notwithstanding the TRP's obligation to use its best efforts in the fulfillment of its responsibilities, the TRP shall not be required to incur any expenses for the preparation for, or pursuance of, administrative, or judicial proceedings, unless the Parties agree on a method for sharing such expenses.

3.2    **Information Request by the TRP.** The Parties shall furnish the TRP within two weeks from the receipt of the request with such information (including information specified in I.R.C. §§ 6230(e) and 6050K) as the TRP may reasonably request to comply with the requirements on furnishing information to the Internal Revenue Service.

3.3    **TRP Agreements with IRS.** The TRP shall not agree to any extension of the statute of limitations for making assessments on behalf of any other Party without first obtaining the written consent of that Party. The TRP shall not bind any other Party to a settlement agreement of tax matters without obtaining the written concurrence of any such Party.

Any other Party who enters into a settlement agreement with the Secretary of the Treasury with respect to any partnership items, as defined by I.R.C. § 6231(a)(3), shall notify the other Parties of such settlement agreement and its terms within ninety (90) days from the date of settlement.

3.4    **Inconsistent Treatment of Tax Partnership Item.** If any Party intends to file a notice of inconsistent treatment under I.R.C. § 6222(b), such Party shall, prior to the filing of such notice, notify the TRP of such intent and the manner in which the Party's intended treatment of a partnership item is (or may be) inconsistent with the treatment of a partnership item is (or may be) inconsistent with the treatment of that item by the Tax Partnership. Within one week of receipt, the TRP shall remit copies of such notification to other Parties to the Tax

3

ANA-MDL-000030643

Partnership. If an inconsistency notice is filed solely because of a party not having received a Schedule K-1 in time for the filing of its income tax return, the TRP need not be notified.

3.5     **Requests for Administrative Adjustment.**  No party shall file a request for an administrative adjustment of partnership items pursuant to I.R.C. § 6227 for any Tax Partnership taxable year without first notifying all other Parties. If all other Parties agree with the requested adjustment, the TRP shall file the request for administrative adjustment on behalf of the Tax Partnership. If unanimous consent is not obtained within thirty (30) days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Party, including the TRP, may file a request for administrative adjustment on its own behalf.

**Judicial Proceedings.**  Any Party intending to file a petition under I.R.C. §§ 6226, 6228, or any other I.R.C. section with respect to any partnership item, or other tax matters involving the Tax Partnership, shall notify the other Parties, prior to such filing, of the nature of the contemplated proceeding. In the case where the TRP is the Party intending to file such petition, such notice shall be given within a reasonable time to allow the other Parties to participate in the choosing of the forum in which such petition will be filed. If the Parties do not agree on the appropriate forum, then the appropriate forum shall be decided by majority vote. Each Party shall have a vote in accordance with its percentage interest in the Tax Partnership for the year under audit. If a majority cannot agree, the TRP shall choose the forum. If a Party intends to seek review of any court decision rendered as a result of such a proceeding, such party shall notify the other Parties prior to seeking such review.

4.     **Elections**

4.1     **General Elections.**  For both income tax return and capital account purposes, the Tax Partnership shall elect:

(a)     To deduct currently intangible drilling and development costs (hereinafter referred to as "IDC");

(b)     To use the maximum allowable accelerated tax method and the shortest permissible tax life for depreciation purposes;

(c)     To use the accrual method of accounting;

(d)     To report income on a calendar year basis;

(e)     To amortize organizational expense over a period of sixty (60) months under I.R.C. §709;

4

ANA-MDL-000030644

(f)    To expense research and experimental expenditures under I.R.C. §174;

(g)    To elect under I.R.C. §451 (a) and Treas. Reg. § 1.451-5 to include advance payments in income in the year properly accruable under the Partnership's method of accounting; and

(h)    Under I.R.C. §754 to adjust the basis of partnership property, with the adjustments provided in I.R.C. §734 for a distribution of property and in I.R.C. §743 for a transfer of a partnership interest. In case of a distribution of property, the TRP shall adjust all capital accounts to the extent required in Treas. Reg. §1.704-1(b)(2)(iv)(m). In the case of a transfer of a partnership interest, the acquiring Partner(s) shall separately establish and maintain its (their) tax basis capital account(s).

4.2    **Depletion.**  Solely for FMV capital account purposes depletion shall be calculated by using simulated cost depletion within the meaning of Treasury Regulation § 1.704-1(b)(2)(iv)(k)(2). The simulated cost depletion allowance shall be determined under the principles of I.R.C. § 612 and be based on the FMV capital account basis of each Lease. Solely for purposes of this calculation, remaining reserves shall be determined consistently by the TRP.

4.3    **Electing Out Under I.R.C. § 761(a).**  The TRP shall notify all Parties of an election to be excluded from the application of subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code within thirty (30) days of the proposed filing date for the federal partnership income tax return. Any Party objecting to said election must do so in writing not less than seven (7) days prior to the proposed filing date for the federal partnership income tax return. **After an election-out, to avoid an unintended impairment of the election-out: The Parties will avoid, without prior coordination, any operational changes which would terminate the qualification for the election-out status; all Parties will monitor the continuing qualification of the Partnership for the election-out status and will notify the other Parties if, in their opinion, a change in operations will jeopardize the election-out; and, all Parties will use, unless agreed to by them otherwise, the cumulative gas balancing method as described in Treas. Reg. §1.761-2(d)(2).**

4.4    **Other Elections or Consents.**  Any tax elections other than those referenced above must be approved by the affirmative vote of two (2) or more Parties owning a Majority Working Interest based upon post-Payout ownership. Such approval shall not be unreasonably withheld.

5.    **Capital Contributions and FMV Capital Accounts**
The provisions of this Sec. 5 and any other provisions of the Tax Partnership Provisions relating to the maintenance of the capital accounts are intended to comply with Treas. Reg. §1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulations.

5

ANA-MDL-000030645

5.1    **Capital Contributions.** The respective capital contributions of each party to the Tax partnership shall be (a) each Party's interest in the oil and gas leases committed to this Tax Partnership, and all properties associated with the leases, and (b) all amounts paid by each party in connection with the acquisition, exploration, development and operation of the leases, and all other costs characterized as contributions or expenses borne by such Party under this Tax Partnership. The contribution of the leases and any other properties committed to this Tax Partnership shall be made by each Party's agreement to hold legal title to its interest in such leases or any other properties as nominee for this Tax Partnership.

5.2    **FMV Capital Accounts.** The FMV capital accounts shall be increased and decreased as follows:

(a)    The FMV capital accounts shall be increased by: (i) the amount of money and the FMV of any property contributed by each Party, respectively, to the Tax Partnership (net of liabilities assumed by the Tax Partnership or to which the contributed property is subject); (ii) that Party's Section 6.1 allocated share of Tax Partnership income and gains, or items thereof; (iii) any basis increases required by I.R.C. § 1016(a)(20); and (iv) that Party's share of I.R.C. § 705(a)(1)(B) and (C) items.

(b)    The FMV capital accounts shall be decreased by: (i) the amount of money and the FMV of any property distributed to each Party, respectively, by the Tax Partnership (net of liabilities assumed by each Party or to which the distributed property is subject); (ii) that Party's Section 6.1 allocated share of Tax Partnership deductions and losses, or items thereof; (iii) any basis decreases required by I.R.C. § 1016(a)(20); and (iv) that Party's share of I.R.C. § 705(a)(2)(B) items and I.R.C. § 709 nondeductible and nonamortizable items.

"FMV" when it applies to property contributed by a Party to the Tax Partnership shall be assumed to equal the adjusted basis, as defined in I.R.C. § 1011, of that property unless the Parties agree otherwise as indicated below or in a separate written agreement.

| Party | Property Contributed | FMV |
|-------|---------------------|-----|
| BP | 65% working interest Mississippi Canyon Block 252 | US$260 million |
| APC | 25% working interest Mississippi Canyon Block 252 | US$100 million |

5.3    **FMV Capital Account Revaluation.** The FMV capital accounts will be revalued as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(*e*), upon the distribution of Tax Partnership property to a Party, and to reflect revaluation of partnership property according to Treas. Reg. § 1.704-1(b)(2)(iv)(f).

Macondo Prospect (MC 252)
Exhibt "E "to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030646

6.1 **FMV Capital Account Allocations.** Each item of income, gain, loss, or deduction shall be allocated to each Party as follows:

(a) Actual or deemed income from the sale, exchange distribution, or other disposition of production shall be allocated to the Party entitled to such production or the proceeds from the sale of such production. The amount of income from the sale and FMV of production taken in kind by the Parties are deemed to be identical; accordingly, such items may be omitted from the adjustments made to the Parties' FMV capital accounts.

(b) Exploration cost, IDC, and operating and maintenance cost shall be allocated to each Party in accordance with its respective contribution, or obligation to contribute, to such cost.

(c) Depreciation shall be allocated to each Party in accordance with its contribution, or obligation to contribute, to such cost.

(d) Simulated depletion shall be allocated to each Party in accordance with its FMV capital account adjusted basis in each oil and gas property.

(e) Loss or deemed loss upon the sale, exchange, distribution, abandonment, or other disposition of depreciable or depletable property, shall be allocated to the Parties in the ratio of their respective FMV capital account adjusted basis in the depreciable or depletable property to the total FMV capital account adjusted basis in the depreciable or depletable property.

(f) Gain or deemed gain upon the sale, exchange, distribution, abandonment or other disposition of depreciable or depletable property shall be allocated to the Parties so that the FMV capital account balances of the Parties will most closely reflect their overall Working Interests under the Agreement.

(g) Costs or expenses of any other kind shall be allocated to each Party in accordance with its respective contribution, or obligation to contribute, to such costs or expenses.

(h) Any other item of income shall be allocated to the Parties in accordance with the manner in which such income is realized by each Party.

6.2 **Tax Returns and Tax Basis Capital Account Allocations:**

(a) Unless otherwise expressly provided herein the allocations of Tax Partnership items of income, gain, loss, or deduction for tax return and tax basis capital account purposes shall be the same as and follow the principles of those contained in Section 6.1 hereof. However, the Partnership's gain or loss on the taxable disposition of a Partnership property in excess of the gain or loss under Sec. 6.1, if any, is allocated to

7

Macondo Prospect (MC 252)
Exhibt "E "to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030647

the contributing Party to the extent of such Party's pre-contribution gain or loss.

(b)    The Parties recognize that under I.R.C. § 613A(c)(7)(D), any depletion allowance is to be computed separately by each Party. For this purpose, each Party's share of the adjusted basis of each oil and gas property shall be equal to its contribution to the adjusted tax basis of such property.

(c)    The Parties recognize that under I.R.C. § 613A(c)(7)(D), the computation of gain or loss on the taxable disposition of an oil or gas property is to be computed separately by each Party. For this purpose the portion of the total amount realized by the Tax Partnership that represents a recovery of simulated adjusted basis in an oil and gas property will be allocated to the Parties in the same ratio that simulated depletion is allocated to them under Section 6.1(d) hereof. Any additional amount realized will be allocated in accordance with the ratio of simulated gain allocation for such property under Section 6.1(f) hereof subject first, however, to the requirements set forth in Section 6.2(g) hereof.

(d)    Depreciation shall be allocated to each Party in accordance with its contribution to the adjusted basis of the depreciable asset.

(e)    Any recapture of depreciation, IDC, and any other item of deduction or credit shall, to the extent possible, be allocated among the Parties in accordance with their sharing of the depreciation, IDC, or other item of deduction or credit which is recaptured.

(f)    Any recapture of depletion shall be computed separately by each Party, in accordance with its depletion allowance computed pursuant to Section 6.2(b) hereof.

(g)    For Tax Partnership property that has a value in the FMV capital accounts which differs from the adjusted tax basis of such property, any tax items relating to such property will be allocated to the Parties in a manner which takes into account the variation between the adjusted basis of such property and its FMV capital account value in accordance with I.R.C. § 704(c). The Parties intend that the allocations described in this Section 6 constitute a "reasonable method" of allocating income, gain, loss and deduction under Treas. Reg. § 1.704-3(a)(1).

(h)    The income attributable to take-in-kind production will not be reflected on the tax return.

7.    **Termination and Liquidating Distributions**

8

ANA-MDL-000030648

7.1    **Termination of the Tax Partnership.**  Termination shall occur on the earlier of the events described in I.R.C. §§ 708(b)(1)(B) or 708(b)(1)(A).

(a)    Termination Under I.R.C. § 708(b)(1)(A).  Upon termination under I.R.C. § 708(b)(1)(A), the business of the Tax Partnership shall be wound-up and concluded, and the assets shall be distributed to the Parties as described in Sections 7.2 through 7.4 hereof by the end of such calendar year (or, if later, within ninety (90) days after the date of such termination)

(b)    Termination under I.R.C. §708(b)(1)(B).  Upon termination under I.R.C. § 708(b)(1)(B), the Tax Partnership will be deemed to contribute all of its assets and liabilities to a new partnership in exchange for an interest in the new partnership, the terms of which are identical to those contained in this Exhibit.   Immediately thereafter, the terminated partnership will be deemed to distribute the interests in the new partnership to the Parties in proportion to their respective interests in the terminated partnership. The capital accounts of the Parties shall carry over to the new partnership and the deemed contribution of assets and liabilities by the terminated partnership to the new partnership and the deemed liquidation of the terminated partnership shall be disregarded for purposes of maintaining each Party's FMV capital account.

7.2    **Reversion.**  First, all money representing unexpended contributions by any Party and any property where no interest has been earned in that property under the Agreement by any other Party shall be returned to the contributing Party.

7.3    **Balancing.**  Second, the TRP shall take the actions specified under this Section 7.3 in order to cause the ratio of the Parties' FMV capital accounts to reflect as closely as possible their Working Interests under the Agreement.  The ratio of a Party's FMV capital account is represented by a fraction, the numerator of which is the Party's FMV capital balance and the denominator of which is the sum of all Parties' FMV capital account balances.  Such actions are hereafter referred to as "balancing the FMV capital accounts," and when completed, the FMV capital accounts of the Parties shall be referred to as being "balanced."  The manner in which the FMV capital accounts of the Parties are to be balanced shall be as follows:

The FMV of all Tax partnership properties shall be determined and the gain or loss for each property which would have resulted if a sale thereof has occurred at such FMV shall be allocated in accordance with Section 6.1(e) and (f) hereof.  If thereafter, any Party has a negative FMV capital account balance, that is, a balance less than zero, such party shall contribute an amount of money to the Tax partnership sufficient to achieve a zero balance FMV capital account.  Any Party may contribute an amount of

9

ANA-MDL-000030649

money to the Tax Partnership to facilitate the balancing of the FMV capital accounts.

7.4    **Distribution.**   Third, after the FMV capital accounts have been adjusted pursuant to Section 7.3 above, all remaining Tax Partnership property shall be distributed to the Parties in accordance with the ratios of their FMV capital accounts balances.   This distribution may be accomplished by one of the following two methods:

(a)    If all Parties consent, selected Tax Partnership properties shall be distributed to one or more of the Parties; or

(b)    If (a) above does not apply, an undivided interest in each and every Tax Partnership property shall be distributed to the Parties.

7.5    **Fair Market Valuation.**   For purposes of Sections 7.3 and 7.4, the FMV of any Tax Partnership property shall be agreed to by all the Parties.   In the event that all of the Parties do not reach such an agreement, the TRP shall retain a nationally-recognized independent engineering firm to prepare an evaluation of the FMV of such property.

8.    **Transfers, Indemnification, and Correspondence**

8.1    **Transfers of Tax Partnership Interests.**   Transfers of Tax Partnership interests shall be governed by the Agreement.   A Party transferring its interest, or any part thereof shall notify the TRP in writing within two weeks of such transfer.

8.2    **Indemnification.**   This Agreement does not include any indemnification provisions to protect Parties against any harm caused by an I.R.C. § 708(b)(1)(B) termination.   If the Parties desire indemnification provisions, a separate indemnification agreement must be drafted and incorporated by reference to the Agreement and this Exhibit.

8.3    **Correspondence.**   All correspondence relating to the preparation and filing of the Tax Partnership's income tax returns and capital accounts shall be forwarded to:

| | |
|---|---|
| Anadarko Petroleum Corporation | BP Exploration & Production Inc. |
| Attn: Robbie Lewis | Attn: Ray Yackell, Sr Tax Accountant |
| Tax Department | BP Tax Department |
| P.O. Box 1330 | 501 Westlake Park Boulevard |
| Houston, TX 77251-1330 | Houston, TX 77079 |

10

Macondo Prospect (MC 252)
Exhibt "E "to Well Participation Agreement
BP/ APC/ KMG

ANA-MDL-000030650