# Exhibit 30

To United States' Opposition to Motion *In Limine* of Defendant Anadarko
Petroleum Corporation to Exclude All Evidence Regarding Anadarko's Culpability

# CIVIL PENALTY POLICY
# FOR SECTION 311(b)(3) AND SECTION 311(j)
# OF THE CLEAN WATER ACT

**Office of Enforcement and Compliance Assurance**
**August 1998**

# TABLE OF CONTENTS

I.  INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
   A.  Purpose and Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
   B.  Statutory Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
   C.  Choice of Forum  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

II.  ADMINISTRATIVE PENALTY PLEADING GUIDANCE . . . . . . . . . . . . . . . . . . . . . .  4

III.  MINIMUM SETTLEMENT PENALTY CALCULATION . . . . . . . . . . . . . . . . . . . . . .  5
   A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
   B.  Preliminary Gravity Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
      1.  Section 311(j) -- SPCC and FRP Violations . . . . . . . . . . . . . . . . . . . . . . . . .  7
         STEP 1:  Seriousness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
         STEP 2:  Culpability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
         STEP 3:  Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
         STEP 4:  History of Prior Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2.  Section 311(b)(3) -- Discharge Violations . . . . . . . . . . . . . . . . . . . . . . . . . 11
         STEP 1:  Seriousness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
         STEP 2:  Culpability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
         STEP 3:  Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         STEP 4:  History of Prior Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   C.  Adjustments to Gravity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      1.  Other Penalty for Same Incident  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      2.  Other Matters as Justice May Require  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      3.  Economic Impact of Penalty on Violator  . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   D.  Economic Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   E.  Adjustment for Gross Negligence or Willful Misconduct . . . . . . . . . . . . . . . . . . 16
   F.  Additional Reductions for Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      1.  Litigation Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
         a.  Appropriate and Inappropriate "Litigation Considerations" . . . . . . . 16
         b.  Factoring Litigation Considerations Into Penalty Calculation  . . . . . 18
         c.  Approval of Litigation Considerations . . . . . . . . . . . . . . . . . . . . . . . 18
      2.  Supplemental Environmental Projects  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1

## I. INTRODUCTION AND BACKGROUND

The Oil Pollution Act of 1990 ("OPA"), part of which amended Section 311 of the Clean Water Act ("Act" or "CWA"), became law shortly after the Exxon Valdez spilled over 11 million gallons of oil into Alaska's Prince William Sound. The Oil Pollution Act provided EPA with new authorities to enforce Section 311(b)(3) and Section 311(j) of the CWA, 33 U.S.C. §§1321(b)(3) and (j). Section 311(b)(3) prohibits the discharge of threshold amounts of oil or hazardous substances to navigable waters of the United States. To reduce the likelihood of a mishap, regulations issued under Section 311(j) (published at 40 C.F.R. Part 112) require facilities that store oil in significant amounts to prepare spill prevention plans and to adopt certain measures to keep accidental releases from reaching navigable waters. Certain types of facilities that pose a greater risk of release must also develop plans to respond promptly to clean up any spills that do occur.

Sections 311(b)(6) and (7) of the CWA, 33 U.S.C. §§1321(b)(6) and (7), authorize civil penalties for violation of any of these requirements. The penalty monies are deposited in the Oil Spill Liability Trust Fund, administered by the U.S. Coast Guard, and are used to help cover any spill cleanup costs incurred by the government. Civil penalties reduce the likelihood of a spill by providing an incentive to the violator and to other members of the regulated community to comply with the Act's requirements, help replenish funds that are used to clean up the environment, and provide a level playing field for businesses that meet their obligations under the law.

### A. Purpose and Scope

This civil penalty policy is provided for the use of EPA litigation teams in establishing appropriate penalties in settlement of civil administrative and judicial actions for violations of Sections 311(b)(3) and 311(j) of the Clean Water Act. It does not apply to criminal cases that may be brought for violations of Section 311 of the Act, nor to the civil enforcement of response orders issued under Section 311(c) or (e) of the Act, 33 U.S.C. §1321(c) or (e). This policy sets forth how the Agency expects to exercise its enforcement discretion in determining the minimum civil penalty settlement for violations of Section 311(b)(3) and (j) of the Clean Water Act, and states the Agency's views as to the proper allocation of enforcement resources by clarifying the minimum penalty amount that EPA may accept in settlement of a case. This policy also provides general guidelines on administrative civil penalty pleading practices under Sections 311(b) and (j) of the Clean Water Act.

This policy is intended as guidance, and is not final agency action. It does not create any rights, duties, obligations, or defenses, implied or otherwise, in any third parties. It does not affect the right of any respondent or defendant to decline to settle a case in favor of litigating liability or the proposed penalty amount, and it does not bind judges or presiding officers in their assessments of penalties. Upon concurrence by the Water Enforcement Division in ORE, this policy may be waived on a case-by-case basis.

2

This policy shall be implemented no later than thirty days after its issuance.  It applies to all Section 311(b)(3) and (j) actions filed after its implementation.  It also applies to all cases that are pending when it is implemented, but in which the government and the respondent or defendant have not yet reached agreement in principle on the amount of the civil penalty.

### B.  Statutory Authorities

OPA increased penalties for violations of Section 311 of the Clean Water Act.  In administrative cases, Section 311(b)(6) of the Act, as amended, 33 U.S.C. §1321(b)(6), authorizes EPA to assess Class I or Class II administrative penalties for the violation of Section 311(b)(3) or Section 311(j).  A Class I penalty may be assessed in an amount of up to $10,000 per violation, not to exceed $25,000.  For the reasons provided in earlier Agency guidance interpreting a predecessor provision of the Clean Water Act, for liability purposes each violation should also be tabulated on a daily basis.[1]  A Class II penalty may be assessed in an amount of up to $10,000 per day of violation, not to exceed $125,000. These and all other statutory provisions cited in this policy have been increased by ten percent, for events occurring after January 30, 1997, by the Debt Collection Improvement Act of 1996 (DCIA)[2] and its implementing regulations published at 40 C.F.R. Part 19.  Future across-the-board inflation adjustments under the DCIA are to be published not less often than every four years.

OPA also established new judicial sanctions.  A person who violates Section 311(b)(3) of the Act is subject to a civil penalty of up to $25,000 per day of violation, or up to $1,000 per barrel of oil or per unit of reportable quantity of CWA-listed hazardous substance discharged.  In instances of gross negligence or willful misconduct, these penalties increase to a $100,000 minimum and a maximum of $3,000 per barrel or unit of reportable quantity discharged.  EPA interprets this to mean that in the judicial forum the government may elect whether per day or volumetric penalties may apply according to how it pleads its case, or plead both approaches in the alternative.[3]  The law also provides that a person subject to regulations implementing the spill

---

[1] The Class I "per violation" language was borrowed from the Class I approach in Section 309(g) of the Act.  *See* H.R. Rep. No. 653, 101st Cong., 2d Sess. 153 (August 1, 1990)(Conference Committee Report on H.R. 1465).  We adopt here the rule and reasoning provided in 1987 guidance interpreting Section 309(g).  *See* "Guidance on the Effect of Clean Water Act Amendment Civil Penalty Assessment Language," OW/OECM, August 28, 1987 (published in the CWA Compliance/Enforcement Compendium, 1997 ed., at III.B.8).

[2] 31 U.S.C. 3701 note; Publ. L. 104-134, 110 Stat. 1321 (1996).  *See* 61 Fed. Reg. 69,359 (December 31, 1996)(includes *erratum* that Section 311(b)(7)(B) spill penalty has been adjusted from $25,000 per day to $11,000 per day, instead of $27,500 per day) and 62 Fed. Reg. 13514-17 (March 20, 1997) (Correcting *errata* in December 31, 1996, publication as a technical correction; maintaining the January 30, 1997, effective date in all cases).

[3] This is based on the plain meaning of the disjunctive statutory language, which does not limit a penalty request, and Senator Lieberman's statement in debate during consideration of OPA that, "It was my intent in writing the penalty provisions of my legislation, which have been substantially adopted in this bill that, in the event of a spill, the Government apply the penalty provisions in a manner which will punish the violator and deter and

3

prevention and response program of Section 311(j) of the Act may be assessed civil penalties of up to $25,000 per day of violation.  These statutory penalties have also been increased by ten percent for events occurring after January 30, 1997.

Pursuant to Section 311(b)(8) of the Act, 33 U.S.C. §1321(b)(8), a Section 311 civil penalty assessment is based on the following factors:

- ❗ The seriousness of the violation or violations;
- ❗ The degree of culpability involved;
- ❗ The nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge;
- ❗ Any history of prior violations;
- ❗ Any other penalty for the same incident;
- ❗ Any other matters as justice may require;
- ❗ The economic impact of the penalty on the violator; and
- ❗ The economic benefit to the violator, if any, resulting from the violation.

If negotiations break down and a case is litigated, the judge or presiding officer must consider these elements to determine the amount of any civil penalty. Agency negotiators themselves are not explicitly required to use the Section 311(b)(8) assessment factors.  But since settlement negotiations are always conducted in the shadow of the courtroom, this policy uses each statutory factor (as well as other necessary, but extrinsic, considerations) to guide the Agency bottom-line settlement position and to allow it to be coordinated with any subsequent litigating position.  Because failed penalty negotiations often lead directly to litigation, the enforcement team should establish and keep an accurate record of each of these factors.

Four of the statutory factors (seriousness, culpability, mitigation efforts, history of violations) relate to the severity of the violator's actions, and form the gravity component of the calculation.  The next three factors (other penalties incurred, other matters as justice may require, and economic impact on the violator) are broad considerations that may lead to case-by-case adjustments of the gravity component based on specific circumstances.  Calculating the gravity component is described in Sections III. B and C, below.  The violator's economic benefit is added to the gravity component to form the base penalty amount.

In limited circumstances, for settlement purposes only, the bottom line settlement amounts may be further adjusted based on litigation considerations, and based on Supplemental Environmental Projects (SEP's).  These are not mentioned in the statute, and therefore are not relevant to a judge or presiding officer deciding any contested proceeding.

---

prevent future violations.  Large civil penalties . . . are also especially important because, in certain cases, the liability of the spiller for cleanup costs under Federal law is limited by the provisions of this bill; aggressive penalties may need to compensate for this limited liability." 135 Cong. Rec. S11,545 (daily ed. August 2, 1990)(statement of Sen. Lieberman).

4

In all cases, however, EPA is limited in settlement and litigation to seeking no more than the violator's statutory maximum civil penalty liability.  If a particular application of this policy results in a settlement figure greater than the available statutory maximum, subject to choice of forum concerns (see I.C below) the settlement bottom line must be reduced to conform to statutory limitations.  All civil penalties paid pursuant to Section 311 of the Act, whether imposed administratively or judicially, are to be deposited in the Oil Spill Liability Trust Fund.[4]  This fund is administered by the National Pollution Funds Center of the Coast Guard pursuant to Department of Transportation delegations and Section 7 of Presidential Executive Order 12777 (October 18, 1991).

### C.  Choice of Forum

The Agency enforcement team should apply this policy to determine whether to seek a penalty administratively or judicially.  If the bottom line requires higher penalties than can be achieved in an administrative proceeding, EPA should refer the case to the Department of Justice for judicial enforcement.  EPA staff may also choose to refer a Section 311 enforcement case for judicial action for other reasons, such as the need for injunctive relief.

In a case where a spill resulted from gross negligence or willful misconduct, Section 311(b)(7)(D) of the Act, 33 U.S.C. §1321(b)(7)(D), requires use of the judicial forum.  As amended by the DCIA, it provides for a minimum penalty of $100,000 for events occurring before January 31, 1997, or a minimum of $110,000 for events occurring on or after that date.

## II.  ADMINISTRATIVE PENALTY PLEADING GUIDANCE

In judicial cases, the United States does not request a specific proposed penalty, but instead paraphrases the Clean Water Act in reciting a request for a penalty "up to" the statutory maximum.  This is sometimes referred to as "notice pleading" for penalties.  By contrast, Agency administrative complaints under proposed 40 C.F.R. §22.14(a)(4) (63 Fed. Reg. 9464, 9469, 9485 [February 25, 1998]) either may include a form of notice pleading or use a specific penalty request.  (During their pendency, the proposed changes to 40 CFR Part 22 are to be used as procedural guidance for the administrative assessment of penalties under Section 311(g)(6) of the Clean Water Act.[5])  Although this section of the policy provides general guidelines on how EPA may select an appropriate penalty amount in an administrative complaint, it does not direct when an Agency litigation team should use penalty notice pleading and when it should plead for a sum certain.

---

[4] *See* Section 4304 of OPA (Pub.L. 101-380, tit. IV, §4304, 104 Stat. 484) and 26 U.S.C. §9509(b)(8).

[5] *See also* 63 Fed. Reg. 9478 (February 25, 1998)(addressing Class I, non-APA cases).

5

The Agency litigation team may elect to adapt the settlement methodology in Part III of this policy ("Minimum Settlement Penalty Calculation") to establish a definitive penalty request in an administrative complaint.  After reasonable examination of the relevant facts and circumstances (including any known defenses), the litigation team, when proposing a specified penalty in an administrative complaint, should in good faith make the most favorable factual assumptions, legal arguments, and judgments possible on behalf of the Agency.  As a practical matter, any specific penalty amount proposed in an administrative complaint, unless the complaint is subsequently amended, will be the maximum that the enforcement team may seek at hearing, and generally will provide a starting point for settlement negotiations.  Such an administrative penalty request therefore should be higher than the bottom line settlement amount determined under Part III of this policy.[6]  Although appropriate in settlement calculations, Part III.F, "Additional Reductions for Settlements," should not be applied in drafting a complaint penalty figure.

A proposed penalty should not be inconsistent with the statutory factors in Section 311(b)(8), because those factors would ultimately be the basis of the presiding officer's penalty assessment.  In any Class II complaint seeking a specific penalty, the Agency litigation team should also take into account the requirements of the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), P.L. 104-121 (1996), if the respondent qualifies as a small business under that statute.[7]  SBREFA by its terms does not apply to non-Administrative Procedure Act ("non-APA"), Class I cases.[8]   For a more extended discussion of SBREFA, *see* "Interim Guidance on Administrative and Civil Judicial Enforcement Following Recent Amendments to the Equal Access to Justice Act," ORE/OECA, May 28, 1996 ("SBREFA Guidance").

When SBREFA does not apply, the "Adjustments" in Part III should not normally be used in drafting a definitive complaint penalty figure.  These "Adjustments" are mitigating factors that are more appropriately asserted by the respondent, since at the outset of the case exculpatory or mitigating circumstances generally will be more accessible to the alleged violator than to the Agency.

## III.  MINIMUM SETTLEMENT PENALTY CALCULATION

---

[6] *See* "Distinctions Among Pleading, Negotiating and Litigating Civil Penalties for Enforcement Cases," OECM/OW, January 19, 1989 (published in the CWA Compliance/Enforcement Compendium, 1997 ed., at IV.C.17), for a detailed discussion of this issue.

[7] *See* 13 C.F.R.  §121.

[8] Sections 331 and 332 of SBREFA amend the Equal Access to Justice Act ("EAJA"), 28 U.S.C. §2412; 5 U.S.C. §504 and EAJA apply by their terms to APA proceedings only.  Consequently, SBREFA does not apply to Class I (non-APA) Section 311 complaints.

6

## A. Introduction

Before the filing of the complaint, the Agency litigation team must use the following guidelines to determine the minimum amount the Agency will accept in settlement for counts based on violations of Section 311(b)(3) or 311(j) of the Act, or receive a case-specific exemption from the Director of the Water Enforcement Division in ORE.  This amount, along with the appropriate Appendix worksheet and a supporting rationale, should be included in the enforcement-confidential portion of the case file.  After a complaint is filed, as the Agency receives more relevant information regarding liability and penalty issues, the litigation team should adjust its settlement figure accordingly, documenting the rationale for the changes.

*The bottom-line figure resulting from application of this Section 311 civil penalty settlement policy and the specific calculation that led to it are not public.  Each is privileged, enforcement-confidential information.  It is work product developed for negotiation purposes, and should not be shared with administrative judges, respondents or defendants, or the public.*[9] This policy itself, however, is public and not confidential.

In calculating the bottom-line settlement figure, the case development team should assume that all the allegations in the complaint will be successfully proven, except to the extent this policy specifically allows for the incorporation of litigation considerations into the penalty calculation. The subjective aspects of the various penalty factors should be applied conservatively in determining the settlement bottom line because that figure represents the minimum the Agency will accept in settlement, which may be less than the penalty amount that the litigation team considers otherwise ideally suited to the violation.

In creating the gravity penalty methodologies provided below, EPA has taken into account the 1997 effects of the DCIA on its statutory civil penalty claims.  When further DCIA adjustments to Section 311 penalty authorities are published in the Federal Register, the dollar amounts provided below are deemed to be increased by the same inflation factor without need to republish this policy.[10]  EPA may, of course, republish this policy to clarify the newly adjusted settlement amounts.

## B. Preliminary Gravity Calculation

---

[9] In administrative cases, which are governed by 40 C.F.R. Part 22, the settlement figure is *not* subject to any disclosure requirements of 40 C.F.R. § 22.14(a).

[10] The revised figures apply to all actions filed after the DCIA regulatory effective date as well as all filed cases in which the government and the respondent or defendant have not yet reached an agreement in principle on the amount of the civil penalty.

7

Although the arithmetic methodology of the gravity components for violations of each Section 311 enforcement program is similar, the nature of violations of the 311(j) and 311(b)(3) programs are substantially different.  Consequently, this settlement policy provides separate discussion of gravity for each program.  Both of the methodologies begin with a "seriousness" figure and then provide additional, statutorily-based adjustment factors.  For both the Section 311(j) and 311(b)(3) programs, each adjustment factor calculation acts upon and replaces the immediately preceding calculation. The settlement methodologies, then, use an initial "seriousness" figure subject to a chain of sequentially applied adjustments.

### 1. *Section 311(j) -- Spill Prevention Control and Countermeasure (SPCC) and Facility Response Plan (FRP) Violations*

The gravity portion of the settlement penalty for violations of CWA Section 311(j) is to be determined by applying the following sequential steps.

**STEP 1:  SERIOUSNESS**

The seriousness of a 311(j) violation depends, in part, on the risk posed to the environment as a result of the violation.  Risk can encompass the extent of the violation, the likelihood of a spill, the sensitivity of the environment around the facility, and the duration of the violation.  The extent of the violation, which also contributes to the seriousness of the violation, depends on the storage capacity of the violator's facility, the existence and adequacy of secondary containment, the degree and nature of the violations of the relevant requirements, and the duration of the violation. The sensitivity of the environment can be characterized by considering the potential environmental impact from a worst case discharge at the facility.

**Step 1.a:**  Apply matrix.  Determine an initial figure from the following table.  Within each range, the Agency litigation team should exercise discretion, considering storage capacity and extent of noncompliance only, since other considerations are incorporated in later steps.

| Extent of Noncompliance | Storage Capacity of the Facility in gallons | | | |
| --- | --- | --- | --- | --- |
| | Less than 42,000 | 42,001 to 200,000 | 200,001 to 1 million | More than 1 million* |
| Minor Noncompliance: | $500 to $3,000 | $2,000 to $6,000 | $5,000 to $12,000 | $8,000 to $20,000 |
| Moderate Noncompliance: | $3,000 to $8,000 | $6,000 to $15,000 | $12,000 to $25,000 | $20,000 to $50,000 |
| Major Noncompliance: | $8,000 to $20,000 | $15,000 to $30,000 | $25,000 to $60,000 | Not less than $50,000 |

**8**

*\* This column also applies to all Facility Response Plan violators.*

Extent of Noncompliance:  Use the following criteria to determine extent of noncompliance:

      **!** *Minor Noncompliance*.  Cumulatively, the violations have only a minor impact on the ability of the  respondent to prevent or respond to worst case spills through the development and implementation of a plan.

      **!** *Moderate Noncompliance*.  Cumulatively, the violations have a significant impact on the ability of the respondent to prevent or respond to worst case spills through the development and implementation of a plan.

      **!** *Major Noncompliance*.  Cumulatively, the violations essentially undermine the ability of the respondent to prevent or respond to worst case spills through the development and implementation of a plan.

Examples in each category are provided below.  These examples are for purposes of illustration only.  The category actually used should be based on the criteria provided above, taking into consideration the specific facts of the case and the number of violations involved, even if that category is different than the one suggested by the list of examples below.

**SPCC VIOLATIONS**

Minor noncompliance: Failure to review plan after three years; failure to amend plan after minor facility change; failure to have amendment certified.

Moderate noncompliance: Plan not available during the normal 8-hour work day; inadequate or incomplete plan; inadequate or incomplete implementation of plan (but neither a complete lack of secondary containment, nor grossly inadequate secondary containment ); no plan, but adequate secondary containment; implementation of applicable state plan that does not reference SPCC or meet all SPCC requirements; failure to amend or implement amended plan after spill or any major facility change; failure to submit required information after a spill; failure to certify plan.

Major noncompliance: No SPCC plan and no secondary containment; failure to implement SPCC plan; inadequate or incomplete plan implementation resulting in (1) grossly inadequate or no secondary containment or (2) hazardous site conditions.

9

**FRP VIOLATIONS**

Minor noncompliance: Failure to maintain certificate of nonapplicability;  improper plan format; failure to provide copy of plan to local or State authority; no annual review of FRP to ensure consistency with the NCP/ ACP; failure to update or submit plan reflecting minor facility changes.

Moderate noncompliance: Submission of inadequate plan; submission of plan inconsistent with NCP/ACP; late submission of plan; failure to update or amend plan reflecting major facility changes; failure to amend or resubmit plan in response to RA notification; inadequate, incomplete, or late implementation of plan (without presenting a major risk); failure to develop or conduct a drill/exercise program.

Major noncompliance: Failure to submit FRP; substantial failure to implement FRP; inadequate or incomplete plan implementation resulting in major risk of significant and substantial harm to the environment; failure to maintain current proof of equipment and personnel available to respond to a worst case discharge; intentional or knowing violations.

Because spill response plan requirements established under Section 311(j)(5) and 40 C.F.R. §112.20 assume the existence of a facility posing a significant risk of harm, penalties for any facility that is subject to the facility response plan requirements should be read under the "more than 1 million gallons" column on the right, regardless of the facility's actual storage capacity.

**Step 1.b:** Adjust the amount determined from the matrix to reflect the potential environmental impact of a worst case discharge.  Choose the most serious applicable category:

❗ *Major impact.* A discharge would likely have a significant effect on human health, an actual or potential drinking water supply, a sensitive ecosystem, or wildlife (especially endangered species), due to factors such as proximity to water or adequacy of containment.  Upward adjustment of 25% to 50%.

❗ *Moderate impact.* A discharge would likely have a significant affect on navigable waters (other than a drinking water supply), adjoining shorelines, or vegetation (other than a sensitive ecosystem) due to factors such as proximity to water or adequacy of containment.  Upward adjustment of up to 25%.

❗ *Minor impact.* No adjustment.

10

**Step 1.c:** Adjust the amount from **STEP 1.b** to account for the duration of the violation. Determine the number of months that the violation continued. For each month, add one half of one percent to the amount from Step 1.b (e.g., if the violation continued for 32 months, increase the amount from the previous step by 16%), up to 30% maximum.

**STEP 2: CULPABILITY**

Consider the degree to which the respondent should have been able to prevent the violation, considering the sophistication of the respondent and the resources and information available to it, and any history of regulatory staff explaining to the respondent its legal obligations or notifying the respondent of violations. Depending upon the degree of culpability, the litigation team may increase the amount from **STEP 1** by as much as 75%.

**STEP 3: MITIGATION**

Section 311(b)(8) requires that in assessing a penalty the judge or presiding officer must consider the "nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge." Though a violation of SPCC regulations increases the threat of a discharge rather than actually causing a discharge, this factor can be taken into account in 311(j) cases by considering how quickly the violator comes into compliance, thereby mitigating the threat of a discharge. The litigation team should use the following guidelines:

    **!** If the violator qualifies for application of EPA's "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations Policy" (60 Fed. Reg. 66706, December 22, 1995) ("Audit Policy"), the terms of that policy apply.

    **!** When the violator comes into compliance before being notified of its violation by regulatory staff orally or in writing, reduce the amount from **STEP 2** by up to 25%.

    **!** When the violator, after notification of its violation, comes into compliance within a reasonable time period not to exceed six months: No adjustment.

This is a downward adjustment only because any failure to come into compliance promptly after being informed of the violation is accounted for in **STEP 2** (Culpability).

**STEP 4: HISTORY OF PRIOR VIOLATIONS**

Adjust the amount from **STEP 3** if the respondent has a relevant history of violations within the past five years. Consider violations of SPCC and facility response plan regulations, discharges in violation of Section 311(b)(3), and any violation of an environmental statute that relates to the respondent's ability to prevent or mitigate a discharge in violation of Section 311(b)(3). Related violations, for example, could include certain operation and maintenance

11

violations that indicate a respondent's inattention to pollution control requirements.  Relevant violations at any other facility under common ownership or control should be considered under this Step.

Violations include admitted violations (such as discharge monitoring reports or other required self-reporting), adjudicated violations, findings of violations by EPA or other agencies that have not been withdrawn or overturned by a reviewing authority, and cases that were settled by consent and involved the payment of a penalty (whether or not liability was admitted).  If there is a history of such violations, the litigation team may increase the **STEP 3** amount by up to 100%, depending on the frequency and severity of such past violations.

### 2. Section 311(b)(3) -- Discharge Violations

**STEP 1:  SERIOUSNESS**

The *potential* environmental impact of a discharge, the amount of the hazardous substance or oil involved, and (in certain circumstances) the duration of the discharge are critical factors in determining the seriousness of a violation of Section 311(b)(3) of the Act.  Potential  harm is distinct from actual harm because mitigation efforts can reduce the actual harm.  Mitigation efforts are considered in **STEP 3** below; this initial Step considers only risk factors.

**Alternative A:** To determine the seriousness component of the penalty when potential environmental impact and quantity discharged are the most significant elements of the Section 311(b)(3) violation, select an amount within the appropriate cell in the following table.

| Potential Impact | Quantity Discharged (Barrels/RQ)[11] | | | | |
|---|---|---|---|---|---|
| | Less than 5 | 5 to 19 | 20 to 79 | 80 to 125 | More than 125 |
| Minor Impact: | $400 to $2,000 | $1,000 to $6,000 | $5,000 to $12,000 | $9,000 to $20,000 | $100 to $250 per bbl/RQ |
| Moderate Impact: | $2,000 to $7,000 | $6,000 to $12,000 | $10,000 to $25,000 | $16,000 to $45,000 | $250 to $500 per bbl/RQ |
| Major Impact: | $7,000 to $12,000 | $12,000 to $30,000 | $18,000 to $55,000 | $45,000 to $90,000 | $500 to $1000 per bbl/RQ |

---

[11] *See* Section 311(b)(7)(A) of the Act, 33 U.S.C. §1321(b)(7)(A).

12

Quantity:  Use the entire quantity discharged in violation of Section 311(b)(3), determined in accordance with any applicable Agency guidance or interpretation.  The quantity of oil is measured by the number of barrels (one barrel equals 42 gallons).  The quantity of hazardous substances is measured in reportable quantities (RQ), which are listed for each substance in 40 C.F.R. Part 117.

Potential Environmental Impact:  The environmental impact of a spill can be greatly reduced by intervening factors that are not attributable to the discharger, such as intervention by independent third parties or luck (wind, tides, weather, time of day, etc.).  These external factors should not affect the penalty amount.  This factor also should not be affected by any mitigation efforts, since they are considered separately in **STEP 3** below.  This factor should therefore be based on the *risk* to the environment caused by the spill, and not simply the actual harm it caused.  Appropriate considerations include the proximity of the facility to sensitive areas (such as inhabited areas, drinking water, wildlife habitat), and the nature of the water body or shoreline potentially affected or endangered, such as pristine habitat for endangered species, a drinking water source, or a highly polluted industrial waterway.  Use the following criteria to determine potential environmental impact:

> ! *Major Impact*.  The discharge posed a significant threat to human health, an actual or potential drinking water supply, a sensitive ecosystem, or wildlife (especially endangered species).

> ! *Moderate Impact*.  The discharge posed a significant threat to navigable waters (other than an actual or potential drinking water supply), adjoining shorelines, or vegetation (other than a sensitive ecosystem).

> ! *Minor Impact*.  All other discharges resulting in the entry of oil or a CWA hazardous substance into navigable waters or upon an adjoining shoreline in a reportable quantity.

**Alternative B:** If there is a reportable quantity of oil or a hazardous substance discharged to an adjoining shoreline or a navigable water of the United States,  the duration of the event may be a more significant measure of seriousness than the quantity discharged.  In such a case, the Agency litigation team should use the following criteria for this step, *but only if this leads to a higher amount than established by Alternative A:*

> ! *Major duration***.** There has been a continuous or intermittent discharge representing more than fourteen days of violation.  Not less than $100,000.

> ! *Moderate duration*. There has been a continuous or intermittent discharge representing at least four, but not more than fourteen, days of violation.  From $25,000 to $100,000.

13

!   *Minor duration.* There has been a continuous or intermittent discharge representing two or three days of violation.  From $3,000 to $25,000.

## STEP 2:  CULPABILITY

Adjust the dollar amount from **STEP 1** based on the degree of culpability, using the highest applicable criterion:

!  If gross negligence or willful misconduct were involved, triple the dollar  amount derived in **STEP 1.**

!  If gross negligence or willful misconduct were not involved, apply a sliding scale to increase the **STEP 1** amount by up to 50%, depending on the degree of culpability. Culpability in this circumstance can include either an act of commission, such as setting a valve in the wrong position, or by an act of omission, such as failing to check a pipeline for corrosion.

## STEP 3:  MITIGATION

Adjust the dollar amount from **STEP 2** based on the "nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge," using the following guidelines:

!  If the violator otherwise qualifies for the complete elimination of the gravity component under EPA's Audit Policy through a qualifying audit, and the discovered discharges: (a) are reported immediately pursuant to the requirements of Section 311(b)(5), 33 U.S.C. §1321(b)(5), and its implementing regulation, 40 C.F.R. 300.300; (b) are made subject to governmental corrective or preventive measures that are independently enforceable under applicable environmental law; (c) collectively result in minor impact as described in Alternative A of Step 1; and, (d) are not the result of gross negligence or willful misconduct, the gravity component shall be reduced to zero.[12]

---

[12] A Section 311(b) spill violator never can qualify for a 75% gravity component reduction under the Audit Policy since any discharge that is self-evident enough to be discovered in the ordinary course of business -- without a qualifying audit -- is already subject to the implicit monitoring and explicit reporting provisions of Section 311(b)(5) of the Act.  To treat such disclosures as voluntary would undermine the purposes of Section 311 of the Act.  There are several reasons why only certain minor, and no moderate or major,  spill violations under Section 311 are eligible for mitigation under the Policy.  The Audit Policy encourages the identification of violations that might not otherwise be discovered, whereas significant spills are likely to be found in the ordinary course of business or by third parties, even in the absence of auditing.  Second, the Policy provides an incentive to prevent violations before they occur, while spills by definition reflect a failure to prevent.  Third, penalties for spill violations are returned to the Oil Spill Liability Trust Fund to help cover response costs; failure to recover such penalties in some circumstances may unfairly shift the burden of Fund support to other parties.  Finally, Condition D.8 of the Policy itself excludes violations that result in "serious environmental harm."

14

      **!** If the violator has conducted the best and most prompt response possible (range depending on effort required), reduce at least 5% but not more than 40%.

      **!** If the violator has conducted an adequate response, make no adjustment.

      **!** If the violator has conducted an inadequate response, increase up to 25%.

      **!** If the violator has failed to respond, increase at least 25% but no more than 50%.

      Failure by the violator to properly notify the National Response Center also should be considered in this Step if the violator's inadequate notification or lack of notification adversely affected EPA's ability to respond effectively to the discharge or to direct the cleanup. In that case, the respondent's mitigation efforts should be classified as inadequate or worse. A failure to notify may be, independently, a criminal violation of Section 311(b)(5) of the Act, which is beyond the scope of this policy.

**STEP 4:  HISTORY OF PRIOR VIOLATIONS**

      Adjust the amount from **STEP 3** if the respondent has a relevant history of violations within the past five years. Consider violations of spill prevention and response regulations, discharges in violation of Section 311(b)(3), and any violation of an environmental statute that relates to the respondent's ability to prevent or mitigate a discharge in violation of Section 311(b)(3). Related violations, for example, could include certain operation and maintenance violations that indicate a respondent's inattention to pollution control requirements. Relevant violations at any other facility under common ownership or control should be considered under this Step.

      Violations include admitted violations (such as discharge monitoring reports or other required self-reporting), adjudicated violations, findings of violations by EPA or other agencies that have not been withdrawn or overturned by a reviewing authority, and cases that were settled by consent and involved the payment of a penalty (whether or not liability was admitted). If there is a history of such violations, the litigation team may increase the **STEP 3** amount by up to 100%, depending on the frequency and severity of such past violations.

---

      Further, since a purpose of the Audit Policy is prevention of harm to the environment, an audit-based discovery and reporting of a concluded Section 311 discharge must lead to prevention or correction of the uncovered problem to qualify for any civil penalty reduction. To this end, EPA may invoke other statutory provisions that may apply, such as Sections 309(a), 309(b), (b), 311(c) or 311(e) of the Act, or Section 7003(a) of RCRA, 42 U.S.C. §6973(a), since Section 311(b)(3) of the Act is not directly enforceable through injunctive relief.

15

## C. Adjustments to Gravity

### 1. *Other Penalty for Same Incident*

If the violator has already paid a penalty to a State or local government for a violation arising out of the same incident, the Agency litigation team may use the prior penalty to offset the statutorily available federal penalty by as much as may be appropriate, taking into account the similarities and dissimilarities of the different laws that are being enforced.

### 2. *Other Matters as Justice May Require*

The litigation team may use this factor to adjust the proposed penalty amount if there are other relevant factors not set forth above, other than litigation considerations, which are discussed below.  Litigation considerations should not be double counted here.  The Agency litigation team should document for the case file an explanation of the considerations that were used in applying this factor.

### 3. *Economic Impact of Penalty on Violator*

Although reliable information regarding the economic impact of the penalty on the violator is unlikely to be available to the Agency prior to issuance or filing of the complaint, the litigation team should take this factor into account to the degree known in establishing a preliminary bottom line penalty amount.  Absent reliable information to the contrary, the  litigation team should assume that the violator is viable, and that economic impact is minimal and not sufficient to cause a reduction to the proposed settlement.  In appropriate cases where known economic impact would otherwise be minimal, the litigation team may increase the penalty amount in order to ensure that there is a sufficient impact to specifically deter the violator from future violations.[13]

This factor should only be applied after analysis of copies of actual federal tax returns, audited financial statements, or financial information of comparable reliability.  If an adjustment is made for an inability to pay, the case development team shall fully document its decision in the case file.  The litigation team should also consult the SBREFA Guidance to determine if it may apply to this factor.

## D. Economic Benefit

Violators frequently obtain an economic benefit by avoiding or delaying necessary compliance costs, by obtaining an illegal profit, by obtaining a competitive advantage, or by a

---

[13] The Conference Committee's report on the Oil Pollution Act of 1990, H. Rep. 101-653, noted that "Civil penalties should serve primarily as an additional incentive to eliminate human error and thereby reduce the number and seriousness of oil spills."  At 154.

16

combination of these or other factors.  Calculate the economic benefit or savings accruing to the violator by the noncompliance, and add that amount to the gravity figure determined above.  The recapture of economic benefit prevents a violator of environmental laws from having any financial incentive to disregard its legal obligations.  The Agency litigation team should document in the case file how economic benefit is calculated.[14]

Because Section 311(b)(3) establishes a "no discharge" standard for oil or CWA listed hazardous substances in quantities that may be harmful, each person subject to this provision of law has an obligation to make whatever investment is necessary to avoid prohibited discharges.  To estimate economic benefit in a Section 311(b)(3) case, the litigation team should, to the extent possible, determine the violator's avoided prevention costs, which may include capital costs, operation and maintenance costs, and training costs.  Economic benefit is to be measured in the moment before the Section 311(b)(3) violation occurred, and based solely on avoided costs that would have been incurred prior to the discharge.  There should be no offset recognized under this factor for any economic losses the violator incurs as a result of the illegal discharge, such as the cost of lost product, or cleanup or response costs.  Cleanup and response costs  -- which are independent reasons for a violator to comply with the law -- are already recognized as potentially mitigating factors in **STEP 3**.

In Section 311(j) cases, Agency staff should fully recognize all delayed or avoided costs, such as failure to prepare or implement an SPCC plan under 40 C.F.R. §112.3(b), hire a certified engineer as required by 40 C.F.R. §112.3(d), or prepare and submit a facility response plan pursuant to 40 C.F.R. §112.20.

### E.  Adjustment for Gross Negligence or Willful Misconduct

If the complaint alleges gross negligence or willful misconduct and use of the policy to this point has led to an amount that is less than the statutory minimum, the penalty figure for the Section 311(b)(3) count must be revised here to the statutory minimum amount.  At the time of this writing, that is no less than $100,000 for events occurring before January 31, 1997, and no less than $110,000 for events occurring upon or after that date, pursuant to Section 311(b)(7)(D) of the Act, as amended by the DCIA.  This figure may be reduced by applying litigation

---

[14] The standard method for calculating the economic benefit resulting from a violator's delayed or avoided compliance is through the use of EPA's BEN model.  Please refer to the "BEN User's Manual" (Office of Enforcement, December 1993, or any subsequent revision) for specific information on the operation of BEN.  In some OPA cases, BEN may be inapplicable.  For example, a pipeline operator may have been able to avoid noncompliance by operating its lines at fifty percent capacity, but instead established a risk of noncompliance by operating its lines at a higher capacity in order to enjoy greater product throughput.  In this circumstance, a delayed or avoided cost analysis would be inappropriate.  In such a case, it is necessary to look at the profit obtained from the extra throughput.  Where the litigation team suspects that the violator is obtaining an economic benefit from an illegal profit or other, "non-BEN" means, the team should consult any developed guidance on these subjects or, in the absence of such guidance, consult with Headquarters for further advice.

17

considerations, if appropriate.  Cases involving gross negligence or willful misconduct should be pursued judicially.

## F.  Additional Reductions for Settlements

### 1.  *Litigation Considerations*

Some enforcement cases may have legal or evidentiary weaknesses, or equitable considerations, that make it likely that a judge or presiding officer would assess a penalty that is less than the bottom line calculated according to the above method.  In such circumstances the bottom line penalty amount may be reduced to reflect the government legal staff's best professional judgment as to what penalty a judge or presiding officer might assess.

#### a.  Appropriate and Inappropriate "Litigation Considerations"

While there is no universal list of appropriate litigation considerations, the following factors may be appropriate in evaluating whether the penalty settlement figure exceeds the penalty the Agency would likely obtain at trial:

1.  Known problems with the reliability or admissibility of the government's evidence proving liability or supporting a civil penalty.

2.  The credibility, reliability, and availability of witnesses.[15]

3.  The informed, expressed opinion of the judge assigned to the case (or person appointed by the judge to mediate the dispute), after evaluating the merits of the case.[16]

4.  The record of the judge assigned to the case in comparable or related cases.  In contrast, the reputation of the judge or the judge's general demeanor, without a specific penalty or legal statement on a similar case, is rarely sufficient as a litigation consideration.

5.  Statements by Federal, State or local regulators which the respondent credibly may argue led it to believe it was complying with the federal law under which EPA is seeking penalties.

---

[15] The availability of a witness can affect the settlement bottom line if the witness cannot be produced at trial; it does not relate to the inconvenience or expense of producing the witness at trial.

[16] This factor, except as provided below with respect to the record of the judge or other trier of fact, may not be applied in anticipation, or at the stage of initial filing, and should not be applied by taking at face value what a judge might say simply to encourage settlement.

18

6. A mix of troublesome facts and weak legal argument such that the Agency faces a significant risk of obtaining a negative decision of national significance.

Litigation considerations *do not* include:

1. The Agency's desire to minimize the resource investment in the case to ordinary or minor expense.

2. A generalized goal to avoid litigation or to avoid potentially precedential areas of the law.

3. A duplicative statement of elements included or assumed elsewhere in this policy, such as inability to pay, or other factors as justice may require, or no history of prior violations, or good faith efforts by the violator to minimize or mitigate the threatened or actual discharge.

4. Off-the-record statements by the judge that large penalties are not appropriate before the court has had a chance to evaluate the specific merits of the case.

5. The fact that the protected adjoining shoreline or water of the United States is already polluted or can assimilate additional pollution.

6. The simple failure of a regulatory agency to initiate a timely enforcement action.

### b.  Factoring Litigation Considerations Into Penalty Calculation

The steps in the penalty calculation method set forth above correspond to the statutory penalty factors set forth in 311(b)(8), which a judge or presiding officer must use in determining the penalty amount.  Whenever possible, litigation considerations should be incorporated into the bottom line penalty calculation by identifying the statutory penalty factor or factors that they affect, and adjusting the corresponding steps in the above calculation appropriately.

For example, if the litigation consideration is an evidentiary weakness pertaining to the degree of culpability, that step in the calculation should be adjusted to reflect the possible conclusions as to culpability a judge or presiding officer might reach at a hearing or trial. Similarly, if the litigation consideration is an evidentiary weakness as to the quantity spilled, or as to the potential environmental impact, the corresponding step in the calculation should reflect the possible conclusions a judge or presiding officer might reach after hearing the evidence.

Some litigation considerations may relate to issues that the penalty calculation method outlined above does not address at all, such as evidentiary or legal issues pertaining to establishing liability, or other factors that the litigation team has reason to believe will affect the judge's or presiding officer's decision.  In such a case it may be appropriate to adjust the overall penalty without reference to a specific penalty factor or step in the methodology provided above.

Although this policy allows an initial estimate of litigation considerations in order to develop a bottom-line settlement figure, reductions for litigation considerations are likely to be most useful after the Agency obtains an informed view, through discovery and settlement activities, of the weaknesses in its case and the presiding judge's view of the case.

The Agency litigation team should document in the case file the rationale for any adjustments made on account of litigation considerations.

### c.  Approval of Litigation Considerations

The Agency recognizes that the quantitative evaluation of litigation considerations often reflects subjective legal opinions.  Therefore, EPA Regions may reduce the preliminary penalty amount for litigation considerations for up to one-third of the net gravity amount (i.e., gravity as modified by the gravity adjustment factors) without Headquarters approval.  Of course, such a reduction must be fully explained and maintained in the case file.

### 2.  *Supplemental Environmental Projects*

The Interim Revised EPA Supplemental Environmental Projects Policy ("the 1995 SEP policy") applies to administrative and judicial settlements reached under Section 311(b)(3) and Section 311(j) of the Clean Water Act, and it, or any successor policy, is incorporated by reference into this policy.  The 1995 SEP policy qualifies a SEP as an action "which the defendant/respondent is **not otherwise legally required to perform.**" [Emphasis in original].

In a Section 311(b)(3) context, this means that spill cleanup activities are not eligible for SEP recognition, since the statutory scheme already recognizes the violator as having cleanup responsibility.  The development of an SPCC plan or installation of appropriate containment is not eligible for SEP recognition, since each is already required by regulation.  Measures taken to prevent additional discharges in violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), (when the government has made a concurrent unpermitted discharge claim under that provision) may qualify as a SEP if the injunctive relief is beyond the scope of equitable relief that the government may, after litigation, receive from a court pursuant to Section 301(a) of the Act.