**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to: 10-4536. | * * * * * * * * | Honorable CARL J. BARBIER |
| | | Magistrate Judge SHUSHAN |

---

**BP EXPLORATION & PRODUCTION INC.'S MEMORANDUM IN OPPOSITION**
**TO THE MOTION OF THE UNITED STATES TO LIMIT EVIDENCE**
**ABOUT THE "SERIOUSNESS" FACTOR**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000

Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 662-5985

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION.................................................................................................1

ARGUMENT.......................................................................................................2

I.    The Court Must "Consider The Seriousness Of The Violation," Not Simply Find That The Spill Exceeded An Unspecified Threshold Of Seriousness...................2

    A.    The Court's Obligation To "Consider The Seriousness Of The Violation" Requires It To Consider *The Extent To Which* The Spill Harmed The Environment, The Economy, And Human Health.............................5

    B.    Evidence Of Environmental Recovery Occurring For Any Reason Is Necessarily Relevant To The Seriousness Inquiry, And Deliberate Cleanup Efforts Are Also Relevant To Assessing The "Efforts Of The Violator To Minimize Or Mitigate The Effects Of The Discharge."......................7

    C.    BPXP Is Not Estopped From Challenging The Degree Of Seriousness Of The Spill.....................................................................................8

II.    BPXP Is Entitled To Appropriately Tailored Discovery To Prove That On A Per-Barrel Basis, The Spill Was Not As Serious As The United States Asserts...........9

    A.    No Trial Phases Conducted To Date Have Focused On The Effects Of The Spill, And BPXP's Agreement To Settle Certain Litigation Proves Nothing. ...............................................................................10

    B.    BPXP's Access To Certain NRD Evidence Does Not Support The Argument That Further NRD Discovery Should Be Cut Off.  As To Remaining Evidence, Privilege Issues Should Be Resolved In The Ordinary Course.................................................................................11

    C.    Conducting The Penalty Phase With Normal Pretrial Discovery And Evidentiary Presentations Need Not Negatively Impact The NRD Process. ...............................................................................13

III.    The United States' Fallback Proposal Is Plainly Unlawful. ........................................14

CONCLUSION .................................................................................................15

APPENDIX A — FACTOR-BY-FACTOR ANALYSIS OF CWA SECTION 311(b)(8) ................................................................................ A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlantic States Legal Found. Inc. v. Universal Tool & Stamping Co.,*
786 F. Supp. 743 (N.D. Ind. 1992).................................................................. 7

*Beck v. Prupis,*
529 U.S. 494 (2000) ........................................................................................ 1

*Diamond Roofing Co. v. OSHRC,*
528 F.2d 645 (5th Cir. 1976)......................................................................... 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,*
956 F. Supp. 588 (D.S.C. 1997), *vacated on other grounds,*
149 F.3d 303 (4th Cir. 1998), *rev'd*, 528 U.S. 167 (2000)........................... 5

*Hawaii's Thousand Friends v. Honolulu,*
821 F. Supp. 1368 (D. Haw. 1993) .............................................................. 5, 6

*Herbert v. Lando,*
441 U.S. 153 (1979) ...................................................................................... 15

*Hickman v. Taylor,*
329 U.S. 495 (1947) ...................................................................................... 10

*In re Crist,*
632 F.2d 1226 (5th Cir. 1980)......................................................................... 1

*In re Deepwater Horizon,*
--- F.3d ---, 2014 WL 700065 (5th Cir. Feb. 24, 2014)........................... 2, 8, 14, 15

*In re Flugence,*
738 F.3d 126 (5th Cir. 2013)........................................................................... 8

*In re Mike Fuel Oil Corp.,*
CWA-III-149, 1997 WL 1098078 (E.P.A. Mar. 27, 1997) ............................. 7

*K Mart Corp. v. Cartier, Inc.,*
486 U.S. 281 (1988) ........................................................................................ 2

*People v. So. Pac. Transp. Co.,*
No. Civ. 92117, 1993 WL 816066 (E.D. Cal. Sept. 2, 1993) ....................... 14

*Thibodeaux v. Grasso Prod. Mgmt. Inc.,*
370 F.3d 486 (5th Cir. 2004)........................................................................... 9

*Trinity Marine Nashville, Inc. v. OSHRC,*
275 F.3d 423 (5th Cir. 2001)......................................................................... 15

*United States v. Avatar Holdings,*
No. 93-281, 1996 WL 479533 (M.D. Fla. Aug. 20, 1996) .......................... 5, 7

ii

*United States v. CITGO Petroleum Corp.*,
2:08-CV-00893, 2010 WL 1754167, (W.D. La. Apr. 29, 2010) ............................................. 13

*United States v. CITGO Petroleum Corp.*,
2011 WL 10723934 (W.D. La. Sept. 29, 2011),
*vacated on other grounds*, 723 F.3d 547 (5th Cir. 2013) .................................................... 3

*United States v. CITGO Petroleum Corp.*,
723 F.3d 547 (5th Cir. 2013) ................................................................................................ 1

*United States v. Clark*,
577 F.3d 273 (5th Cir. 2009) ................................................................................................ 3

*United States v. Egan Marine Corp.*,
No. 08-3160, 2011 WL 8144393 (N.D. Ill. Oct. 13, 2011) ...................................................... 8

*United States v. Gulf Park Water Co.*,
14 F. Supp. 2d 854 (S.D. Miss. 1998) ................................................................................. 5

*United States v. Pierce*,
17 F.3d 146 (6th Cir. 1994) .................................................................................................. 3

*United States v. Place*,
693 F.3d 219 (1st Cir. 2012) ................................................................................................ 3

*United States v. Procter & Gamble Co.*,
356 U.S. 677 (1958) ............................................................................................................ 10

*United States v. Rayo-Valdez*,
302 F.3d 314 (5th Cir. 2002) ................................................................................................ 4

*United States v. Smithfield Foods, Inc.*,
972 F. Supp. 338 (E.D. Va. 1997) ...................................................................................... 5, 9

*United States v. Williams*,
553 U.S. 285 (2008) ............................................................................................................ 2

**Statutes**

33 U.S.C. § 1321(b)(7) ......................................................................................................... 1, 4

33 U.S.C. § 1321(b)(7)(D) .................................................................................................... 4

33 U.S.C. § 1321(b)(8) ..................................................................................................... 4, 7, 8, 9

33 U.S.C. § 1321(b)(8)[1] ............................................................................................... *passim*

33 U.S.C. § 1321(b)(8)[6] .................................................................................................... 8

33 U.S.C. § 1321(b)(8)[8] .................................................................................................... 9

**Rules & Regulations**

40 C.F.R. § 300.323 ............................................................................................................. 2

Fed. R. Civ. P. 26(b) ................................................................................................. 13

Fed. R. Civ. P. 26(b)(1)............................................................................................. 15

Fed. R. Evid. 408 ...................................................................................................... 11

**Other Authorities**

Jonathan L. Ramseur,
   *Deepwater Horizon, The Fate of the Oil*,
   Congressional Research Service R41531 (2010) ...................................................... 6

Operational Science Advisory Team,
   Summary Report for Sub-Sea and Sub-Surface Oil and
   Dispersant Detection: Sampling and Monitoring 2 (Dec. 17, 2010), *available at*
   http://www.restorethegulf.gov/sites/
   default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf.) ........................... 6

Steve Lehmann, NOAA,
   *Research Teams Find Oil on Bottom of Gulf*, USAToday.com (Oct. 25, 2010)........................ 6

The National Research Council,
   *Oil in the Sea III:  Inputs, Fates, and Effects* 191 (2003) ........................................ 6

U.S. Fish & Wildlife Service,
   *Deepwater Horizon Bird Impact Data from DOI-ERDC NRDA Database
   12 May 2011*,
   http://www.fws.gov/home/dhoilspill/pdfs/Bird%20Data%20Species%20Spreadsheet%200512
   2011.pdf.................................................................................................................... 6

## INTRODUCTION

The Clean Water Act is clear:  in imposing a penalty for a violation of 33 U.S.C. § 1321(b)(7), this Court must consider, among other factors, "the seriousness of the violation," *id.* § 1321(b)(8).   Notwithstanding this clear statutory instruction, the United States has filed a motion *in limine* that asks the Court to take the extraordinary step of precluding BPXP from taking discovery or presenting evidence at trial about this statutory factor.  In what is surely among the largest and most complex civil penalties cases ever filed, the U.S. essentially asks BPXP to go to trial with a blindfold strapped over its eyes and one hand tied behind its back.

The most fundamental legal error underpinning the U.S.'s motion is its attempt to convert a broad-ranging penalty "factor" that the Court must "consider" into a binary, yes/no element that the U.S. either establishes or fails to establish.  According to the government, once the spill exceeds some — conveniently unspecified — trip wire-like threshold of "seriousness," any additional evidence concerning the violation's seriousness becomes unnecessarily duplicative. Making matters worse, the U.S. argues that it can use the number of barrels spilled to prove the seriousness of the violation, notwithstanding the fact that the number of barrels spilled independently drives the calculation of the penalty, which is assessed on a per-barrel basis.  *See* 33 U.S.C. § 1321(b)(7).   This constitutes impermissible double counting and renders key statutory terms superfluous.  *Beck v. Prupis*, 529 U.S. 494, 506 (2000) (noting the "longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous."); *In re Crist*, 632 F.2d 1226, 1233 n.11 (5th Cir. 1980) (Fifth Circuit's leading case applying the canon).

The government's approach is not only legally flawed but contrary to all reason.  The Section 1321(b)(8) factors each run along a continuum and are made part of an overall equitable balancing.  *See* Appendix A (breaking down each of the factors); *see also United States v. CITGO Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013).   None of the other Section 1321(b)(8) factors admit of a binary, yes/no application.  This explains why the government has not filed parallel motions *in limine* seeking to argue, for instance, that the "history of prior

violations" factor (Section 1321(b)(8)[5]) is a yes/no inquiry that asks simply whether prior violations exist and not what, precisely, the violations were, their relevance to the new violation under consideration, or *how serious* such violations were.   Again, principles of statutory construction dictate that the seriousness factor must be understood in the context of the other Section 1321(b)(8) factors.  *In re Deepwater Horizon*, --- F.3d ---, 2014 WL 700065, at *10 (5th Cir. 2014) ("words grouped in a list should be given related meaning"); *United States v. Williams*, 553 U.S. 285, 294 (2008) (this *noscitur a sociis* canon "counsels that a word is given more precise content by the neighboring words with which it is associated").   The word "seriousness" cannot be construed in a vacuum.   "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

For these reasons and others described below, BPXP must be permitted to conduct the robust discovery that befits a case of this magnitude, and it must be permitted to put on an equally robust evidentiary defense at trial.  If the U.S. truly believes that "the Court already has more definitive evidence to make this determination under the Clean Water Act than is required," USA Br. 1, BPXP has no objection to the U.S. limiting *the government's own* evidentiary presentation to materials in the record.  BPXP's defense however, may not be so circumscribed.  Any admissions in government documents bearing on the seriousness factor must be brought to light.  Due process requires a full airing of this critical penalty factor.

## <u>ARGUMENT</u>

## I.     **The Court Must "Consider The Seriousness Of The Violation," Not Simply Find That The Spill Exceeded An Unspecified Threshold Of Seriousness.**

The U.S. offers a proposed order featuring dozens of citations to establish a generic proposition no one disputes:  the *Deepwater Horizon* spill was serious.  In 2010, the spill was declared a spill of national significance ("SONS"), *see* 40 C.F.R. § 300.323, and even BPXP has asked this Court to find that 2.45 million barrels of oil escaped from the rig and its appurtenances into the environment.  But Section 1321(b)(8)[1] does not pose the binary question of whether a "spill of national significance" was or was not declared; instead, this first penalty factor demands

a broader inquiry into the spill's "seriousness."  Congress is fully aware of how to incorporate regulatory tests into statutes.  *United States v. Place*, 693 F.3d 219, 227 (1st Cir. 2012) ("Congress knows how to penalize regulatory violations when it wants to, but it did not do so here ….")  Section 1321(b)(8)[1] simply does not mirror the yes/no SONS designation.  A SONS designation is ***relevant***, but it is not and cannot become the end point of the seriousness inquiry.

Obviously, to concede that the spill was "serious" does not obviate the need for the Court to hear evidence as to ***how serious*** the spill was.  *Cf., e.g.*, *United States v. Clark*, 577 F.3d 273, 282 (5th Cir. 2009) ("While a primary method of judging the seriousness of an offense is by comparing it to other crimes, that ***does not mean that a mechanical test based upon the Guidelines must be used to label an offense 'serious' or 'not serious.'***  Rather, the Speedy Trial Act's requirement that courts must consider 'the seriousness of the offense' simply demands that the gravity of the crime be carefully considered ***as a factor*** . . . .") (quoting *United States v. Pierce*, 17 F.3d 146, 149 (6th Cir. 1994) (emphasis added)).  Seriousness is a calibrated scale.

For example, in the *CITGO* case, the largest prior Section 1321 penalty case brought by the U.S., the court found that "[i]t is undisputed that this spill was a serious violation that impacted several waterways, including the Indian Marais, the Calcasieu River and the Calcasieu Ship Channel."  *United States v. CITGO Petroleum Corp.*, No. 08-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011) (star pagination unavailable, at page 4 of Rec. Doc. 234), *vacated on other grounds*, 723 F.3d 547 (5th Cir. 2013).   And CITGO itself had acknowledged the seriousness of the spill in its own post-trial brief: "This was a serious spill."  Ex. 1 (CITGO Petroleum Corp.'s Post-Trial Memo. at 6 (Apr. 11, 2011)).  Yet both sides presented evidence on this factor after conducting discovery on it as well.  For example, CITGO presented testimony that it summarized as follows:

> John Slocomb, CITGO's environmental science expert, confirmed the effectiveness of CITGO's clean-up efforts. Dr. Slocomb testified that, based on toxicity and marsh recession studies performed jointly by CITGO and the NRDA trustees, and his more than 100 trips to the estuary to assess its recovery from the spill, the damage was minimal and had fully recovered long before trial.  By contrast, the government's expert, Dr. Michel, never visited the estuary and cited no toxicity studies in support of her opinion that the spill caused serious harm.

*Id.* The court discussed this evidence in its decision, and found that while the spill was indeed serious, "the testimony showed that the environmental impact was almost fully rectified by 2009, and the wildlife seems to be showing no adverse impacts from the spill." *CITGO Petroleum Corp.*, 2011 WL 10723934 (star pagination unavailable, at page 4 of Rec. Doc. 234).

In exercising its discretion under 33 U.S.C. § 1321(b)(7), the Court will need to assess a penalty between the statutory minimum of zero and the statutory maximum of $1,100 per barrel of oil discharged, or potentially higher if it concludes that the violation resulted from gross negligence or willful misconduct, *see* 33 U.S.C. § 1321(b)(7)(D) (inflation-adjusted). Thus, to survive appellate review, the Court cannot simply pluck a number from the ether; it must conduct a detailed review of the factors, as the Fifth Circuit has made clear. *See CITGO*, 723 F.3d at 553.

Moreover, whatever penalty the Court assesses will be imposed on a per-barrel basis, which means that the Court's ruling with respect to the total number of barrels spilled will independently be a major driver of any penalty assessed against BPXP. Yet the U.S. nonetheless argues that "the fact that the Macondo Oil Spill resulted in the discharge of millions of barrels of oil alone is a strong indicator of the seriousness of BP's and Anadarko's violation." USA Br. 3. As noted above, this line of reasoning contravenes the superfluousness canon. *See, e.g., United States v. Rayo-Valdez*, 302 F.3d 314, 318 (5th Cir. 2002) ("when interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous."). The barrels quantum has its own, self-sufficient impact on the penalty amount. The U.S. offers no authority for the proposition that a company involved in a high-volume spill should necessarily face a higher ***per-barrel*** penalty (indeed, doing so would effectively embody double-counting). Rather, as the authorities confirm, the seriousness factor that the Court must consider under 33 U.S.C. § 1321(b)(8) encompasses far more than just the number of barrels spilled.

The government's approach also makes no sense. The release of some quantum of oil into the drinking water source of a densely populated city is a more serious event than the release of the same quantum of oil far away from people's homes. The government's binary, yes/no approach to seriousness would inexplicably and inappropriately strip a Court sitting in equity

from distinguishing between such radically different situations.

### A. The Court's Obligation To "Consider The Seriousness Of The Violation" Requires It To Consider *The Extent To Which* The Spill Harmed The Environment, The Economy, And Human Health.

The U.S. asserts that the Court does not need to hear evidence of actual environmental harm because "all that is required to establish the seriousness of the Macondo Oil Spill is the risk of *potential* harm." USA Br. 3. But even if the U.S. wishes to dismiss "what harm can be established or still exists" as "completely irrelevant to the Penalty Phase," USA Br. 5, it has no authority for the proposition that BPXP should be precluded from adducing evidence challenging how great the potential harm asserted by the U.S. is. Stated differently, the U.S.'s choice to focus exclusively on potential harm does not remove its burden to demonstrate **how serious** that potential harm is. The seriousness criterion of 33 U.S.C. § 1321(b)(8)[1] requires the Court to consider not simply the number of barrels spilled, but rather factors including "(1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) ***the actual or potential harm to human health and the environment***." *Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368, 1383 (D. Haw. 1993) (emphasis added).[1]

Consistent with these instructions, courts routinely hear evidence concerning the environmental and other effects of an unlawful discharge:

- In *Smithfield Foods, Inc.*, 972 F. Supp. 338, the Court based its analysis upon the "credible testimony and evidence." *Id.* at 343. Recognizing that "a substantial reduction in the maximum statutory penalty is warranted where the violations caused minimal environmental damage," *id.* (quoting *United States v. Avatar Holdings*, No. 93-281, 1996 WL 479533, at *6 (M.D. Fla. Aug. 20, 1996)), the Court spent four pages of its opinion discussing evidence of the spill's environmental impact.

- In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 956 F. Supp. 588 (D.S.C. 1997), *vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998), *rev'd*, 528 U.S. 167 (2000), the Court recognized that the "presence or absence of environmental harm is relevant to the assessment of a Clean Water Act penalty." *Id.* at 602. The Court reviewed "[a]ll available data, including semi-annual acute and chronic toxicity tests performed by Laidlaw *over the last nine years*, a 1992 fish tissue study conducted by RMT, and a recent fish tissue study conducted by DHEC." *Id.* at 602-03 (emphasis added). The Court concluded that "Laidlaw's effluent, even with the permit exceedances it has experienced, has had no

---

[1] *Accord United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 859 (S.D. Miss. 1998); *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 343 (E.D. Va. 1997).

demonstrated adverse affect on the environment."  *Id.* at 603.

• In *Hawaii's Thousand Friends,* 821 F. Supp. 1368, the court faced conflicting data regarding whether violations caused environmental harm.  The Court held that "there is no evidence that the Honouliuli [plant's] discharge currently poses a threat to public health or the environment.  Therefore, the court will consider the lack of measurable material harm to be a significant mitigating factor in assessing penalties."  *Id.* at 1395-96.

The effort by the U.S. to limit the Court's inquiry is not surprising given that the **actual** environmental harm here was far less than the government lets on.  The U.S. has presented for judicial notice certain facts related to such harm.  Critically, however, those proposed facts do not even begin to tell the whole story.  The real and complete story has two main facets: (1) far less environmental impact than originally expected in 2010; followed by (2) robust recovery. For example, the U.S. did not inform the Court, among other key facts, that:

• extensive natural hydrocarbon seeps— by one government estimate — release about 140,000 tonnes per year of crude oil into the Gulf[2] and that because of these natural seeps, microbes have evolved to consume oil including oil discharged during the spill.[3]

• remarks by government employees indicate that "[t]he concept of a big slick of oil sinking to the bottom is kind of an anathema . . . [w]e have not found anything that we would consider actionable at 5,000 feet or 5 feet."[4]

• according to the government's own study, **after August 3, 2010**, no water sample exceeded toxicity benchmarks as a result of Macondo oil and no seafloor sediment exceeded toxicity benchmarks beyond 3 kilometers from the wellhead.[5]

• with the exception of a single piping plover carcass, no endangered or threatened bird species were collected following the spill, and that this single piping plover did not have visible oil on it.[6]

This is just the tip of the iceberg.  BPXP is entitled to discovery to develop the full record.

---

[2] The National Research Council, *Oil in the Sea III:  Inputs, Fates, and Effects* 191 (2003).

[3] Jonathan L. Ramseur, *Deepwater Horizon, The Fate of the Oil*, Congressional Research Service R41531, 15 (2010); Operational Science Advisory Team, Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection:  Sampling and Monitoring 2 (Dec. 17, 2010), *available at* http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf.).

[4] Steve Lehmann, NOAA, *Research Teams Find Oil on Bottom of Gulf*, USAToday.com (Oct. 25, 2010).

[5] Operational Science Advisory Team, *Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring* 2 (Dec. 17, 2010), *available at* http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf.

[6] U.S. Fish & Wildlife Service, *Deepwater Horizon Bird Impact Data from DOI-ERDC NRDA Database 12 May 2011*, http://www.fws.gov/home/dhoilspill/pdfs/Bird%20Data%20Species%20Spreadsheet%2005122011.pdf.

**B.    Evidence Of Environmental Recovery Occurring For Any Reason Is Necessarily Relevant To The Seriousness Inquiry, And Deliberate Cleanup Efforts Are Also Relevant To Assessing The "Efforts Of The Violator To Minimize Or Mitigate The Effects Of The Discharge."**

The government blithely dismisses as irrelevant whether harm "still exists on the day the CWA penalty case is tried."  USA Br. 5.  Because the Court is bound to consider the violation's seriousness, however, it is similarly bound to consider anything that renders the violation less serious.  For instance, any natural factors that made Macondo oil biodegrade faster than other crude oil, the depth and location of the spill, the pressure conditions where the oil was discharged, the water temperatures operative in the Gulf of Mexico, the abundant presence of natural microorganisms long adapted to consuming the natural seeps that are prevalent in the Gulf — in short, anything tending to show the resilience of the impacted ecosystem.  *See, e.g., Avatar Holdings*, 1996 WL 479533, at *6 (recognizing that "[a] substantial reduction in the maximum statutory penalty is warranted where the violations caused minimal environmental damage"); *Atl. States Legal Found. Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743, 747 (N.D. Ind. 1992) ("Notwithstanding the sheer number of violations by the defendant, the court finds there has been minimal environmental damage as a result of the violations.").

Similarly, as part of any such seriousness analysis, the Court should consider any mitigation that successfully remedied or averted environmental or economic harm.  *See, e.g., CITGO Petroleum Corp.*, 2011 WL 10723934 ("testimony showed that the environmental impact was almost f[u]lly rectified by 2009, and the wildlife seems to be showing no adverse impacts from the spill").  Indeed, reinforcing these conclusions, the statute also instructs the Court to consider "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge." 33 U.S.C. § 1321(b)(8).  *See, e.g., CITGO*, 2011 WL 10723934 (noting that "measures were taken by Citgo to minimize and mitigate the effects of the discharge promptly" and that "[a]lthough the environment was significantly impacted, the evidence shows that it has made a good recovery over the following years"); *In re Mike Fuel Oil Corp.*, CWA-III-149, 1997 WL 1098078 (E.P.A. Mar. 27, 1997) ("Respondent made some efforts to mitigate the effects of the discharge and that ***there was some limited***

7

*success to those efforts*") (emphasis added); *United States v. Egan Marine Corp.*, No. 08-3160, 2011 WL 8144393, at *7 (N.D. Ill. Oct. 13, 2011) (defendant "complied with its legal obligations to aid in the cleanup, which cuts in favor of" a lower penalty).[7]

In this case, BPXP has spent more than $14 billion on response and clean-up in connection with the *Deepwater Horizon* Incident, including extensive efforts to prevent oil from reaching the shoreline habitats and to restore any environmental harm. *See* BPXP's Proposed Stipulated Facts Concerning its Efforts to Minimize and Mitigate the Effects of the *Deepwater Horizon* Spill. In the most basic terms, BPXP's effective efforts at mitigation reduced the seriousness of the spill. Depriving BPXP of that defense is contrary to the CWA and due process.

Evidence of recovery of any kind in the Gulf is clearly relevant under the seriousness factor. Limiting BPXP's ability to introduce such evidence would dramatically prejudice its rights to put on a competent defense and destroy the incentives for a company involved in a large-scale spill to seek to limit the environmental impacts of the spill.

## C.    BPXP Is Not Estopped From Challenging The Degree Of Seriousness Of The Spill.

The U.S. argues that "BP should be estopped from arguing that the Macondo Oil Spill did not have a serious impact on the environment, human health, and private parties' economics because of statements by BP and facts included in Appendix A." USA Br. 8. For judicial estoppel to operate, however, the U.S. would need to demonstrate, among other things, that BPXP was asserting "a legal position that is plainly inconsistent with a prior position." *In re Flugence*, 738 F.3d 126, 129 (5th Cir. 2013). Nowhere does the government cite BPXP construing Section 1321(b)(8) inconsistently. Moreover, BPXP's concession that the spill was serious says nothing about where on the continuum of seriousness the spill fell. The central question for the purposes of Section 1321(b)(8) is not whether the spill was serious, but rather

---

[7] Anticipating a government response, factor 6 concerning "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge," 33 U.S.C. § 1321(b)(8)[6] is not rendered superfluous by BPXP's straightforward interpretation of the statute. The first factor on seriousness inherently has to include an analysis of the seriousness of remaining harm whereas the sixth factor clearly requires analysis of efforts at mitigation (otherwise tending to reduce the penalty award) *even if they are not successful*.

*how serious* it was.  Thus, in the *CITGO* case, where the defendant had acknowledged that the spill was serious, it was not precluded from seeking discovery or presenting evidence on this issue, and the U.S. did not even argue for such an estoppel.

This is common sense — none of the factors in Section 1321(b)(8) are mechanistic on/off switches and the clear intention of Congress is to require a holistic facts-and-circumstances analysis of all issues bearing on the penalty.  The first factor on seriousness is known by the company it keeps — *i.e.,* its relation to the other seven factors.  *See, e.g., Thibodeaux v. Grasso Prod. Mgmt. Inc.*, 370 F.3d 486, 491 (5th Cir. 2004) (*noscitur a sociis* canon looks for "the unifying thread" connecting the words or phrases in a statutory list).  The "unifying thread" of Section 1321(b)(8) that makes this especially apparent is the last factor, which notes that courts must consider "any other matters as justice may require."  33 U.S.C. § 1321(b)(8)[8].  The purpose of Section 1321(b)(8) is to force a full and fair analysis of all relevant factors bearing on the appropriate penalty to impose and thus embodies an instruction about how to interpret Section 1321(b)(8) as a whole.

## II.    BPXP Is Entitled To Appropriately Tailored Discovery To Prove That On A Per-Barrel Basis, The Spill Was Not As Serious As The United States Asserts.

Once it is understood that seriousness is a question of degree and that the U.S. cannot meet its evidentiary burden simply by declaring that the spill was "serious" as an abstract matter, its remaining arguments to try to hamstring BPXP's discovery and trial defense fail.

Indeed, the leading CWA cases — each of which at least involves a spill a full order of magnitude smaller in scale than this case — involved extensive testimony from fact and expert witnesses.  *See, e.g., CITGO,* 723 F.3d at 550 (court heard testimony from 23 witnesses during two-week bench trial on the issues of penalties, including seriousness, and injunctive relief); *Smithfield Foods,* 972 F. Supp. at 340, 346-49, 353-54 (parties presented testimony at trial from at least nine expert witnesses in a case in which the U.S. sought a penalty of $20 million); *Gulf Park Water Co.*, 14 F. Supp. 2d at 857, 861-63, 866 (parties presented testimony at trial from at least five expert witnesses in a case in which the district court calculated a maximum penalty of approximately $46 million and assessed a penalty of approximately $1.5 million).

The scope and scale of the U.S.'s civil penalties claim here is many times greater than any Clean Water Act case it has brought in the past. For example, the largest prior CWA penalty ever awarded after trial was $12.6 *million* awarded against Smithfield Foods in 1997. In contrast here, the U.S. has asserted statutory maximum penalties of substantially more than $12.6 *billion*, or more than a *thousand times* as much. If the Court is going to be asked to award unprecedented penalties in the billions, then BPXP's right to seek ample discovery and present its full defense is at its zenith as compared to prior CWA cases.

### A.     No Trial Phases Conducted To Date Have Focused On The Effects Of The Spill, And BPXP's Agreement To Settle Certain Litigation Proves Nothing.

The U.S. argues that "little or no new evidence is required on the 'seriousness of the violation penalty factor'" because "the Court already has more definitive evidence to make this determination under the Clean Water Act than is required." USA Br. 1. As the Court is aware, however, none of the trial phases that have occurred thus far have focused on the spill's seriousness. Rather, Phase One focused on "issues arising out of the conduct of various parties allegedly relevant to the loss of well control at the Macondo Well," Rec. Doc. 6592 at 2 (May 30, 2012), and the Quantification segment of Phase Two (the sole segment of Phase Two where the U.S. was a party) focused on "issues pertaining to the amount of oil actually released into the Gulf of Mexico as a result of the Incident." Rec. Doc. 6592 at 3. Thus, no trial proceedings thus far have focused on the spill's effects. While there may be some relevant information available in the public record, federal trials are not "carried on in the dark"; rather, "[t]he way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial." *Hickman v. Taylor*, 329 U.S. 495, 501 (1947); *accord, e.g.*, *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) ("Modern instruments of discovery …. together with pretrial procedures make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent."). BPXP is entitled in the struggle of the adversary process to test what the government's witnesses actually think and have said about the seriousness of the spill, not just what views or documents they have chosen to make public. BPXP should be able to put on live witnesses to testify about

10

seriousness and to cross-examine any U.S. witnesses on the same topic and *vice versa*.

The U.S. also wrongly argues that the seriousness of the spill may be inferred from "the fact that BP has agreed to compensate private parties for economic losses in an uncapped settlement."  USA Br. 5.  That argument fails at the outset because the Economic Loss and Property Damage Settlement Agreement makes clear that it is not "an admission of any liability or wrongdoing, or recognition of the validity of any allegation of fact or law made by the Plaintiffs, the Economic Class or by any Economic Class Member in this Action or in any other action or proceeding."  Settlement Agreement (Rec. Doc. 6430-1 (May 3, 2012)) § 12.1; *see also* Fed. R. Evid. 408 (stating that evidence of furnishing valuable consideration in compromising a claim is not admissible to prove the amount of a disputed claim).  These principles are axiomatic.  Parties can settle litigation even though they disagree about the strength of the plaintiffs' claims.  *See* Rec. Doc. 8138 (Order & Reasons Approving Economic Settlement) at 116 (Dec. 21, 2012) ("While these filings suggest that certain parties view the evidence differently from how BP does," the Settlement as written nonetheless comports with law).[8]

### B.     BPXP's Access To Certain NRD Evidence Does Not Support The Argument That Further NRD Discovery Should Be Cut Off.  As To Remaining Evidence, Privilege Issues Should Be Resolved In The Ordinary Course.

The U.S. argues that "BP already possesses terabytes of NRD Data through the cooperative NRD Assessment process."  USA Br. 10.  The U.S. does not explain how BPXP's *access* to certain NRD data logically means that BPXP *should be barred from obtaining* critical additional evidence regarding environmental harm and recovery that only the U.S. possesses.  The U.S. has data and evidence that may assist BPXP's defense and yet has offered no authority to support withholding such evidence from BPXP.   BPXP is entitled to hear from the

---

[8] To try to rebut this bedrock law barring the use of settlements to establish liability or the amount thereof, all the U.S. can offer, *see* USA Br. 6, is a purported concession in a brief that BP filed long before the relevant class action settlement was even entered into.  But in the motion in question, BP tellingly moved *to preclude* the consideration of certain prior settlements during the Phase One trial.  *See* Rec. Doc. 4813 (Dec. 5, 2011).  BP's position in that brief is thus entirely consistent with its reliance here on Rule 408 and on the text of the class action settlement agreement.  BP's reply brief simply argued that both of BP's opponents had conceded that the settlements BP sought to exclude were irrelevant to the Phase One trial (which should have sufficed to resolve the motion) and then noted that "*to the extent it is necessary for the Court to consider these facts*, BP suspects that this can be done via stipulation and/or judicial notice."  Rec. Doc. 4958 at 2-3 (Dec. 19, 2011) (emphasis added).  This is far from a concession.  It is manifestly unnecessary to consider settlement facts if doing so would violate Rule 408, as would be the case here where heightening BPXP's liability is the very purpose for which the U.S. points to the class action settlement.

government's witnesses, to see their documents, and examine them under oath — consistent with any ground rules established by this Court to promote an orderly and efficient trial presentation.

The U.S. does not deny, of course, that it possesses substantial evidence regarding the extent of environmental harm (or lack thereof) resulting from the spill and the subsequent recovery. Over the last four years, the U.S. has been spent hundreds of millions of dollars (most of which has been funded by BP) investigating the extent of potential "harm to life throughout the Gulf" in order to "create a holistic view of the effects to the Gulf of Mexico ecosystem from the discharged oil" and to [in order to] "better understand and gauge the damage caused by the release of discharged oil into the Gulf of Mexico …in 2010." NOAA's Third Interim Partial Claim ("IPC 2014") at 19, 42, 62. The U.S. cannot keep this investigation secret while simultaneously asking the Court to accept their characterization of the harm as "gravely serious."

Revealingly, the U.S. next argues that some of what BPXP seeks is not discoverable. *See* USA Br. at 11 (noting that some documents might be protected from discovery as draft reports, by the deliberative process privilege, or by the attorney-client privilege). The U.S., however, identifies no case in which a court has shut down discovery *in toto* simply because **some** responsive documents may be protected from discovery. Indeed, in Phases One and Two, the parties endeavored to resolve as many discovery disputes as possible without judicial intervention, and where necessary the Court intervened to issue prompt, definitive rulings.[9] The Court has demonstrated that it is fully capable of resolving such disputes. While the resolution of the U.S.'s civil penalty claims may entail a "vast undertaking," USA Br. 8, some reasonable amount of refereeing discovery disputes is clearly appropriate in light of the vast penalties that the U.S. is seeking from BPXP. *See also infra* Section II.C. (collecting the authorities rejecting the argument that the government's NRDA activities can be shrouded in privilege).

---

[9] *See, e.g.*, Rec. Doc. 4364 (Oct. 19, 2011) (establishing deadlines and directives for U.S. productions); Rec. Doc. 5028 (Dec. 29, 2011) (compelling production of certain "Zantaz" documents); Rec. Doc. 6228 (Apr. 12, 2012) (establishing deadlines for producing documents initially withheld under deliberative process privilege); Rec. Doc. 6617 (June 5, 2012) (establishing deadlines for re-producing documents from DOE custodians).

**C.    Conducting The Penalty Phase With Normal Pretrial Discovery And Evidentiary Presentations Need Not Negatively Impact The NRD Process.**

The U.S. suggests that it is "not in the Court's or the Parties' interest for the Court to make factual findings now on a limited and premature record that will either bind the parties in later NRD litigation notwithstanding better information, or that will prove to be inaccurate after a full presentation of evidence in the NRD case."  USA Br. 9.

At the outset, the Court should understand that these risks are increased by the U.S.'s own discovery proposal:  the record developed in the CWA case need only be "limited and premature" if the Court accepts the U.S.'s invitation to conduct a trial without the benefit of the discovery procedures that are used in the courts to ensure a fully developed record for adversarial litigation.  Moreover, if the U.S. were truly concerned about the prospect of the CWA case interfering with the NRDA process, it had a simple choice:  defer the prosecution of its CWA penalties case until after such time as the compensatory NRDA process was complete.  The U.S. instead chose to prioritize its penalty claims, and so cannot now be heard to complain that its choice will require some appropriate discovery of NRDA custodians.  Instead, the whole aim of the Erdenberger declaration (Rec. Doc. 12373-7 (Feb. 20, 2014)) that the government proffers here is to complain about the pain it would feel from such a self-inflicted wound.  Finally, note that what the U.S. seeks to do is to try to freeze in time the information concerning how serious the spill was and avoid the development of new facts as additional studies are completed revealing that the environment is recovering and resilient.  To counterbalance the government's strategic sequencing, BPXP must be permitted to engage in full discovery into the seriousness factor and to mount a defense informed by such discovery at trial.

The U.S. further asserts that BPXP should be denied discovery regarding the ongoing NRD assessment because "BP's proposed discovery will burden the United States and require collection and processing by multiple agencies."  USA Br. 12.  What the U.S. ignores, however, is that evidence the government has in its possession as part of the NRDA process falls within Rule 26(b)'s grant of liberal discovery.  *See* Fed. R. Civ. P. 26(b); *see also United States v. CITGO Petroleum Corp.*, 2:08-CV-00893, 2010 WL 1754167, at *4 (W.D. La. Apr. 29, 2010)

13

(concluding that information the U.S. gathered in an NRDA regarding "the nature and extent [of] the environmental, natural resources, and/or fish/wildlife harm caused by the oil spill is relevant" to the U.S.'s claim for Clean Water Act Section 311 civil penalties, rejecting the U.S.'s arguments that such information is protected from discovery under the work product privilege, and compelling the U.S. to produce such non-privileged information), *aff'd* Order, Rec. Doc. 112 (June 8, 2010) (Ex. 2); *People v. So. Pac. Transp. Co.*, No. Civ. 92117, 1993 WL 816066 (E.D. Cal. Sept. 2, 1993) (rejecting California's arguments that information it collected in an NRDA is protected from discovery).  Further, BPXP is willing to agree to reasonable discovery limits; the government proposes only an absolute ban.

Finally, if the Court deems it necessary in order for BPXP to be permitted discovery into the NRDA process, BPXP would be willing to stipulate that any CWA Section 1321(b)(7)-(8) penalty determination will have no preclusive effect in the NRDA process.  At that point, it should become especially clear that there are no significant governmental interests weighing against the discovery BPXP seeks as a matter of fundamental fairness.

## III.   The United States' Fallback Proposal Is Plainly Unlawful.

As a fallback position, the U.S. proposes that its and BPXP's experts be permitted to testify about the environmental impacts of the *Deepwater Horizon* spill, but only if they base their opinions upon published articles or data about the spill and documents already in the record.

BPXP is certainly aware that the "Court intends to impose limitations in the Penalty Phase on the number of experts and fact witnesses, both during discovery and at trial as well as time limitations on presentation of evidence at trial."  Rec. Doc. 12392 at 7 (Feb. 21, 2014). Indeed, the Court imposed such restrictions upon Phases One and Two.  *See* Rec. Doc. 8173 (Phase One) (amended PTO 54); Rec. Doc. 11087 (Aug. 22, 2013) (Phase Two).  Nonetheless, the U.S.'s proposal — which goes far beyond the limitations that this Court applied earlier, and far beyond any case that the U.S. has identified — is plainly unlawful.  To be clear, the U.S. is suggesting that no actual discovery take place, but rather that experts simply be permitted to opine about the effects of the spill based on any information that may happen to already be in the

14

public domain.  But under the Federal Rules, BPXP is entitled to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1); *Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[T]he deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials.").  The U.S. cites no authority that could possibly justify such an "informational freeze" that blocks basic discovery.  Simply asking experts to opine on their view of the seriousness of the *Deepwater Horizon* spill without the benefit of discovery cannot ensure the brand of healthy and informed adversarial litigation that the Federal Rules demand and which is particularly necessary in a landmark case of this magnitude.  The government should not be permitted to shield their fact witnesses from testimony and their custodial files from production.

* * * *

The arguments that the U.S. urges here must be rejected as a matter of law for the reasons given above and because if adopted, they would invite reversal on appeal.  Cutting off review of seriousness risks reversal of any penalty entered (and retrial of the penalty factors), especially since it denies fundamental due process to BPXP to mount its defense.  All prior case law supports a holistic and multi-dimensional interpretation of seriousness, not a binary one.  Hence, to interpret the seriousness inquiry as an on/off switch is unprecedented and would violate the fair notice principles enshrined in the Due Process Clause.  *See Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423, 430-32 (5th Cir. 2001) (fair notice is violated when a company is penalized based on a new legal interpretation contrary to prior legal interpretations); *see also Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976).[10]

## CONCLUSION

The United States' motion *in limine* to severely restrict both discovery taken on the seriousness factor and any ensuing evidence presented at trial is unlawful and must be denied.

---

[10] BPXP also wishes to make clear that it is reserving all of its rights under its broader tenth affirmative defense concerning the constitutionality of CWA Section 1321.  BPXP Answer, Rec. Doc. 1858 at 33-34 (Apr. 4, 2011).

March 6, 2014

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000

Respectfully submitted,

 /s/ Don K. Haycraft
Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 662-5985

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.**

## APPENDIX A — FACTOR-BY-FACTOR ANALYSIS OF CWA SECTION 311(b)(8)

> **Determination of amount.**— In determining the amount of a civil penalty under paragraphs (6) and (7), the Administrator, Secretary, or the court, as the case may be, shall consider **[1]** the seriousness of the violation or violations, **[2]** the economic benefit to the violator, if any, resulting from the violation, **[3]** the degree of culpability involved, **[4]** any other penalty for the same incident, **[5]** any history of prior violations, **[6]** the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, **[7]** the economic impact of the penalty on the violator, and **[8]** any other matters as justice may require.

33 U.S.C. § 1321(b)(8) (sub-numbering in bold brackets added).

**[1]** "the seriousness of the violation or violations" — this is the factor under analysis. S*ee* BP Exploration & Production Inc.'s Memorandum in Opposition to the Motion of the United States to Limit Evidence About the "Seriousness" Factor (brief above).

**[2]** "the economic benefit to the violator, if any, resulting from the violation" — of course, this requires analysis both of the nature of any economic benefit and its magnitude and does not stop at asking whether an economic benefit occurred or did not occur.

**[3]** "the degree of culpability involved" — of course, this requires analysis of how culpable a violator is and not simply whether culpability is present or absent.

**[4]** "any other penalty for the same incident" — of course, this requires analysis of the nature and magnitude of other penalties for the same incident, not simply whether there have been one or more other penalties imposed.

**[5]** "any history of prior violations" — of course, this permits an analysis of the nature, magnitude, and recency in time of prior violations, and is not focused on the binary of whether there were or were not prior violations.

**[6]** "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge" — of course, this requires a full-blown analysis of mitigation efforts and does not stop at asking whether mitigation was attempted or not in some respect.

**[7]** "the economic impact of the penalty on the violator" — of course, this requires a full and fair analysis of any type of economic impact stemming from a penalty set at a given quantum and imposed on the violator, and is not simply an unhelpful acknowledgment of the common-sense point that any penalty is going to have some economic impact on the violator.

**[8]** "any other matters as justice may require" — this catch-all provision reinforces the wide-ranging nature of the factors and negates reading any of them to be mere binary, on/off elements.

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 6th day of March, 2014.

/s/ Don K. Haycraft
Don K. Haycraft