# Exhibit 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE – OPELOUSAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF LOUISIANA, | * * * | CIVIL ACTION NO. 2:08-cv-00893-RTH-PJH |
| Plaintiffs, | * * | JUDGE HAIK |
| V. | * * | MAGISTRATE HANNA |
| CITGO PETROLEUM CORPORATION | * * | |
| Defendant. | * | |

## CITGO PETROLEUM CORPORATION'S POST-TRIAL MEMORANDUM

Respectfully Submitted,

*/s/ Richard E. Sarver*
Richard E. Sarver, T.A., 23558
Craig Isenberg, 29603
Meredith A. Cunningham, 26465
BARRASSO USDIN KUPPERMAN
 FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, LA 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701

Edward Lewis, Texas State Bar No. 00786058
Federal I.D. No. 19169 (S.D. Tex.)
Brian C. Boyle, Texas State Bar No. 24045543
Federal I.D. No. 611130 (S.D. Tex.)
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

*Attorneys for Defendant CITGO Petroleum Corporation*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PLAINTIFFS FAILED TO PROVE GROSS NEGLIGENCE ....................................... 2

TOTAL VOLUME OF OIL DISCHARGED................................................................... 5

ANALYSIS OF PENALTY FACTORS ........................................................................... 6

INJUNCTIVE RELIEF..................................................................................................... 13

STATE OF LOUISIANA'S CLAIMS............................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*,
    244 F. Supp. 2d 41 (N.D.N.Y. 2003) ............................................................................... 6

*Hawaii's Thousand Friends v. City & County of Honolulu*,
    821 F. Supp. 1368 (D. Haw.1993) ................................................................................... 6

*Sierra Club v. El Paso Gold Mines, Inc.*,
    No. 01-2163, 2003 WL 25265873 (D. Colo. Feb. 10, 2003) .......................................... 9

*U.S. v. Allegheny Ludlum Corp.*,
    366 F.3d 164 (3d Cir. 2004) ............................................................................................ 9

*U.S. v. Conagra, Inc.*,
    No. 96-123, 1997 WL 33545777 (D. Idaho Dec. 31, 1997) ........................................... 9

*U.S. v. WCI Steel, Inc.*,
    72 F. Supp. 2d 810 (N.D. Ohio 1999) ............................................................................. 9

*Water Quality Ins. Syndicate v. U.S.*,
    632 F. Supp. 2d 108 (D. Mass. 2009) ............................................................................. 2

**Other Authorities**

33 U.S.C. § 1319 .................................................................................................................... 6

33 U.S.C. § 1321(b)(11) ........................................................................................................ 6

La. R.S. 30:2025(E)(1)(a) .................................................................................................... 15

CITGO has admitted fault for the June 2006 oil spill and has done everything in its power to make things right. It pled guilty to a criminal misdemeanor of negligence, paid a $13 million fine and incurred $7 million to comply with an Environmental Compliance Plan ("ECP") required by the same government agency now seeking massive penalties and many millions of dollars in needless injunctive relief. It completed construction of the $15 million tank that was nearly complete when the spill occurred. CITGO suffered economic harm from the spill, incurring enormous clean-up and legal costs and paying over $30 million in legal settlements, primarily for business interruption claims of local plants. It will compensate for any damage to natural resources through a separate process. No additional punishment would further the objectives of the Clean Water Act ("CWA") or provide more incentives to prevent a reoccurrence of the spill. In addition, Plaintiffs utterly failed to prove that CITGO acted with gross negligence either in conduct leading to the spill or in its response. As a result, a per-day penalty would produce a fair result. If the violation lasted two days, as Plaintiffs have said, then the maximum penalty would be $65,000. While that is not a large penalty by itself, it is appropriate given the penalties already incurred by CITGO. If the Court were to use a per-barrel calculation, however, the most it should award is 10% of the statutory maximum, or $110 per barrel, for a total of $5.94 million.[1]

Plaintiffs also failed to present sufficient evidence to prove that the injunctive relief they request is necessary or even related to the causes of the spill underlying this action. If the Court is inclined to award injunctive relief, however, we propose that it order the construction of a fourth aeration tank. Although Plaintiffs did not request this tank, it is the one piece of

---

[1] *See* CITGO's Proposed Findings of Fact and Conclusions of Law at 48-49 (noting that courts typically award penalties that are a small fraction of what the U.S. seeks here in cases involving allegations of far worse conduct, prolonged histories of environmental violations, and releases of more harmful chemicals that caused greater harm to the environment.)

equipment that current wastewater treatment unit ("WWTU") supervisor, Renee Atkins, says may provide additional help in meeting permit requirements.

## PLAINTIFFS FAILED TO PROVE GROSS NEGLIGENCE

There is consensus authority that gross negligence involves conduct that is reckless or carried out with conscious disregard of a known risk. One court recently described it as "such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness."[2] The evidence does not support that finding here.

**Original Design of Wastewater Plant.** In 1994, CITGO built a state-of-the-art WWTU for $148.5 million. Jerry Dunn, the project engineer for the design and construction of the unit, testified that it was built to meet all permit limits and prevent any discharge to the river. CITGO did not under-build the WWTU. The opposite is true. Most refineries only seek to hold water from a 10-year storm and often only in open ponds or containment areas. CITGO's consultants did a detailed hydrology study to determine the required capacity to handle storm water during a 25-year-24-hour storm. CITGO then built tanks to hold this capacity even though it is a conservative design not required by any statute, regulation or permit requirement.

While the unit experienced operational hiccups in its early stages, CITGO continually addressed WWTU issues, taking actions to improve operations and capacity, including paving the containment area. In fact, CITGO was building a third storm water tank in June 2006 to respond to refinery expansions that would lead to increased flows to the WWTU. CITGO began building the tank in June 2004 after submitting a funding request earlier that year. CITGO agrees that the tank should have been completed by June 2005, but the delays – caused by a schedule miscalculation and contractor problems – were not a product of any misconduct. When

---

[2] See *Water Quality Ins. Syndicate v. U.S.*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009); for discussion of the legal standard, see CITGO's Pretrial Proposed Findings of Fact and Conclusions of Law at 39-42.

2

the problems arose, CITGO responded by working overtime and changing contractors. Moreover, no regulation or permit provision required the third tank, and it was close to completion when the spill occurred.

**Causes of the Spill.**  While CITGO admitted its mistakes led to the oil spill, there was no evidence that gross negligence caused the spill. The spill would not have occurred if not for an exceptionally heavy rainfall that, for three hours, was a 1 in 50 year rain event. The Coast Guard estimated 11 inches of rain (D-820 at 40803), which exceeds the 25-year-24-hour standard. Of course, there would have been no oil spill if not for the oil accumulation in the tanks, but the evidence showed that refinery management did not know how much oil had accumulated in the tanks and would have had every incentive to remove the oil had they known. Moreover, the WWTU supervisor at the time testified that, based on his knowledge of how the unit operated, he did not believe there was a large accumulation of oil in the tanks.[3] CITGO was aware of the tanks' high water levels; however, it believed that this was due to solids, and it had a plan in place to begin removing them within weeks of the spill.

Even with the high levels in the tanks, the refinery expected that the dike area surrounding the tanks would effectively contain any materials that escaped the tanks. The potential risk was not believed to be a release to navigable waterways, but rather a release to the dike area. No one anticipated that the underground junction box – installed during construction of the third storm water tank – would act as a bathtub drain, allowing the oil to escape to the Indian Marais and Calcasieu River. Absent construction of the third storm water tank, there

---

[3] Curtis Miller Dep. at 149:10-18 ("I didn't think I had that much oil in the tanks because of what my experience had been from day one getting in there and, you know, looking at the tanks levels and what I contribute to be dirt, sand, you know, and some oil. It's not, you know, because of the way the system is by no way I thought it was that much oil in there."). Miller believed he was removing oil each time he pumped liquids from the tanks after a rainfall. *See id.* at 192:18-193:5 ("[E]ach time that tank goes up and I have to pump when I'm pumping storm into 310 I'm pulling oil and water and everything and anything coming through there that's fluid.").

3

would have been no junction box. And CITGO would not have had to temporarily replace the concrete section of the dike with an earthen floor and berm, which acted as the "soil pipe" providing the means of escape for the oil. In sum, the oil spill resulted from a combination of oversights and mistakes – and an extraordinary rainfall – but not from gross negligence.

**Response to the Spill.** CITGO's response to the oil spill was proactive, aggressive and effective. The Coast Guard did not arrive at the refinery until the evening of June 20, but CITGO had already promptly begun response activities and complied with its obligations to notify the Coast Guard and other appropriate government entities by then. Although a single report to the Coast Guard's National Response Center would have fulfilled CITGO's reporting obligations, CITGO made multiple NRC reports and called the local Coast Guard four times over the first two days of the spill to provide updates. While Plaintiffs claimed that CITGO should have provided additional information about the situation on the first day, Plaintiffs' own expert, Richard Franklin, agreed that there was no requirement to notify the Coast Guard about oil that was contained in the berm. Even so, CITGO's notifications were sufficient to prompt the LDEQ to inspect the refinery on June 19 (D-318 at 305), and prompted the Coast Guard to mistakenly visit Conoco Phillips the same day. When Dan Chapman, from LDEQ, went to the WWTU, he saw that the tanks had overflowed to the berm and some oil had reached the Marais, but that CITGO had deployed booms and hired Miller Environmental to control the spill. (*Id.*)

While some oil – a sheen and very sporadic two-foot black ribbons as described by Steve Newman – was released to the Marais and the River on the first day, CITGO believed it had contained the vast majority of the oil on its property. This is consistent with Chapman's observations and shows that CITGO's belief that the spill was under control was reasonable. Indeed, the evidence was undisputed that the source of the leak from the containment area was

4

not discovered until mid-morning on June 20. Newman testified that CITGO built a dam in the West Ditch in the afternoon of June 19, and that when he went home that evening he was confident the oil was contained. At that time, no one knew where the oil in the West Ditch was coming from, because the junction box was underground and, of course, the containment area was filled with water and oil. Once CITGO understood the source and magnitude of the spill, it spared no expense or resource to respond. The Coast Guard applauded the "rapid CITGO ramp up" (D-820 at 40805) and labeled the response a "resounding success" (D-1244).

## TOTAL VOLUME OF OIL DISCHARGED

The best estimate of the volume of oil released to navigable waterways is 54,000 barrels of oil to the Indian Marais, of which approximately 25,000 barrels reached the Calcasieu River. These figures are based on a direct measurement of the oil in the dike area at 3 p.m. on the first day of the event. Plaintiffs presented a calculation of 77,000 barrels to the Marais prepared by Dr. Michel based on an unreliable model with no known error rate and inputs that did not match reality. The government made much of the reports of oil escaping to the waterways before the 3 p.m. measurement, but the sum of the evidence showed that the unmeasured oil was limited to sheens and small ribbons of oil – an unquantifiable amount that was likely only a handful of barrels. Indeed, Dr. Michel could not quantify any amount of oil that left the dike before 3 p.m. And she admitted that the additional 12,000 barrels that she thinks were originally in the tanks could have been pumped out of the dike area or lost to evaporation. In either case, the oil would not have reached a waterway, which is necessary to be subject to penalty in this action.

Plaintiffs also incorrectly claim that the water released from the containment area should be treated as oil and included in a per-barrel penalty.[4] Plaintiffs point to a water sample of 337

---

[4] *See* CITGO's Proposed Findings of Fact and Conclusions of Law at 43-45; CITGO's Opp. to USA's 2d Motion Partial S.J. at 8-19.

5

ppm oil and grease. But this reading does not convert the sampled water into "oil" within the meaning of the CWA. Dr. Michel admitted she had no opinion on the toxicity of the water, and further admitted that if all 411,000 barrels of water had the same 337 ppm concentration of oil and grease, the total volume of oil would be approximately 160 barrels. Further, the State prosecuted its claim for the wastewater discharge under an administrative action that has been joined to this suit, and CITGO cannot be double penalized (or, now, triple penalized) for this discharge. 33 U.S.C. § 1319; 33 U.S.C. § 1321(b)(11). Moreover, Plaintiffs failed to show that any quantifiable amount of sludge was released to navigable waterways, and Dr. Michel admitted that she had no opinion on whether the sludge was toxic. Accordingly, there is no basis for including any sludge in the penalty assessment.

## ANALYSIS OF PENALTY FACTORS

**Seriousness of the Violation.** This was a serious spill, but because it did not cause "material environmental harm," this is a "significant mitigating factor."[5] The environmental impact was minimal and of short duration. Mark Ploen, CITGO's oil spill response expert and on-scene advisor to the incident commander at the spill, testified that the active clean-up of the Calcasieu estuary had been completed by mid-July, less than a month after the spill. John Slocomb, CITGO's environmental science expert, confirmed the effectiveness of CITGO's clean-up efforts. Dr. Slocomb testified that, based on toxicity and marsh recession studies performed jointly by CITGO and the NRDA trustees, and his more than 100 trips to the estuary to assess its recovery from the spill, the damage was minimal and had fully recovered long before trial. By contrast, the government's expert, Dr. Michel, never visited the estuary and cited no toxicity studies in support of her opinion that the spill caused serious harm.

---

[5] *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 244 F. Supp. 2d 41, 50 (N.D.N.Y. 2003); *Hawaii's Thousand Friends v. City & County of Honolulu*, 821 F. Supp. 1368, 1396-97 (D. Haw.1993).

Dr. Slocomb testified that the marsh shorelines were the areas most adversely impacted by the spill, but that more than half of the affected marsh had completely recovered by September 2006, and more than ninety percent of the marsh had fully recovered by October 2008. (*See* D-1267.) A study performed jointly by CITGO and the NRDA trustees showed that the CITGO spill caused no erosion of marshes in the estuary. Indeed, CITGO performed an emergency replanting of a 2.35-acre parcel of severely impacted marshland to prevent any such erosion, and Dr. Slocomb testified that this parcel had fully recovered by 2009. (*See* D-1267.)

Dr. Slocomb also testified that all of the toxicity testing done in this case showed that the oil did not have toxic effects on sediment or bivalves, and that the only toxicity testing done on a fish kill found near the time of the spill showed no contaminants at levels sufficient to cause acute or chronic toxicity. While forty-three birds were observed to be oiled, three of which died, 2,000 or more un-oiled and unharmed birds were observed in the spill area at the time, suggesting, according to Dr. Slocomb, that the oil did not pose a significant threat to birds. Nor did the spill reduce the overall biomass of shrimp, crabs, and fish in the estuary.

Plaintiffs also failed to prove that the oil spill overexposed anyone to the chemicals in the oil. As Fred Boelter, a certified industrial hygienist, and Angela Harris, a toxicologist, explained, all of the actual monitoring data at CITGO and in the community showed exposures below any health-based standards. Plaintiffs' experts, Lyle Chinkin and William Perry, failed to present any reliable contrary evidence. Chinkin simply used the wrong model. He admitted that the model had never been validated for his purpose and, not surprisingly, had never been used this way before. As such, it was perfectly predictable that his modeling results completely failed to match the real-world monitoring performed by CITGO's industrial hygiene teams. Other evidence confirmed that people were not put at risk for overexposures. Benzene exposure tests

7

on Coast Guard employees were normal; Ronny Lovett and Steve Newman testified that the odor and fumes from the oil were not strong on the first day and that they suffered no health effects; and Mike Monroe testified that, out of nearly 1700 clean-up workers, only 15 people made health reports to the Unified Command, none of which related to the odor or fumes from the oil. (D-884 (excerpts attached).)

While the harm caused by the spill was minimal, CITGO will be required to pay for any damage caused to the environment and lost recreational use through the Natural Resource Damages Assessment conducted in cooperation with state and federal agencies.  In fact, CITGO would have already paid for these damages, but the government has refused to go forward with the damage assessment while this litigation is pending.  CITGO has also paid many millions of dollars to local plants for business interruption losses.  (*E.g.*, D-1342, D-1346, D-1410-C, D-1534, D-1535.)

**No Economic Benefit.**  Plaintiffs must show an "economic benefit to the violator, if any, resulting from the violation."  Plaintiffs failed to do so.  In many CWA cases, the government seeks penalties based on a series of related violations and economic benefit is determined by the costs that would have been necessary to prevent the recurring violations.[6]  Here, Plaintiffs assert one violation occurring for two days – the oil spill and related wastewater discharge arising out of a single event. For Plaintiffs' theory to make sense, they would have had to prove that CITGO committed a violation by delaying projects plaintiffs' expert, Gary Amendola, testified were needed dating back to 1994.  But Plaintiffs failed to prove that any law, regulation or permit provision required the things advocated by Amendola at any time.  Nor did Amendola testify that all of the things he said CITGO should have done were necessary to prevent the violation in this case. Rather, he limited his opinion to things that were required to stop the

---

[6]   See CITGO's Proposed Findings of Fact and Conclusions of Law at 53.

8

overflow of the tanks into containment – which by itself is not a violation of any law or regulation and certainly not the CWA. Plaintiffs' expert, Franklin, admitted that CITGO was not required even to report a release of oil to containment. Thus, there is no evidentiary basis to find that CITGO obtained any economic benefit "resulting from the violation" or from not doing things necessary to prevent a CWA violation.

Moreover, under the CWA, "economic benefit" means the least costly means of complying with the law.[7] Robert Harris, Plaintiffs' expert on economic benefit, agreed that this is the right method but admitted that he did not know whether he had used it. In fact, Plaintiffs presented no evidence that the Amendola projects were needed in 1994 to prevent an oil spill in 2006. By assuming this, Plaintiffs maximize the calculation, taking advantage of many years of compounded interest, but ignoring the legally and economically correct methodology. Under the least cost scenario testified to by Lial Tischler – preventing oil accumulation and pouring a one-piece junction box, or sealing the box, at a total cost of less than $25,000 – the economic benefit (*i.e.* the delay from 2005 to 2007 of incurring those costs) comes to $719. (D-1846.)

In addition, the law precludes economic benefit calculations that go back more than five years before filing of the lawsuit, in this case 2003.[8] This results in a significant reduction, even using Plaintiffs' inflated discount rate of 10%. (D-1851.) CITGO also presented alternative scenarios that accepted some or all of Amendola's recommendations but applied CITGO's actual debt rate for the periods at issue, accurately reflecting CITGO's cost of capital. (D-1847-1850.) Plaintiffs' use of a 10% rate is based on the cost of capital of three public companies.[9] This is an

---

[7] *U.S. v. Allegheny Ludlum Corp.*, 366 F.3d 164, 185 (3d Cir. 2004); *U.S. v. WCI Steel, Inc.*, 72 F. Supp. 2d 810 (N.D. Ohio 1999).

[8] *See U.S. v. Conagra, Inc.*, No. 96-123, 1997 WL 33545777, at *24-25 (D. Idaho Dec. 31, 1997); *Sierra Club v. El Paso Gold Mines, Inc.*, No. 01-2163, 2003 WL 25265873, at *7 (D. Colo. Feb. 10, 2003).

[9] *See Allegheny*, 366 F.3d at 181 (government's calculation of WACC using S&P bonds was improper as "a more accurate calculation could easily have been achieved by using figures specific to [the defendant's] bonds.").

9

unreliable rate because, as Charles Finch, the only economist to testify, explained, it is a well-settled economic principle that private companies like CITGO, which do not sell stock to raise capital, do not have comparable capital costs to public companies. Harris admitted that his methodology had no known error rate and that even a small difference in the interest rate could lead to a large difference in the calculation.

Finally, Plaintiffs failed to account for the economic detriment to CITGO directly resulting from the "violation." The evidence establishes that CITGO incurred more than $136 million in expenses relating to the spill, including clean-up costs, a $13 million criminal penalty, and legal settlements and expenses. (D-1855.) Insurance reimbursed CITGO for a substantial amount of expenses, but the evidence showed that unreimbursed expenses exceeded $29 million after tax effects and future valuing. (D-1853.) This is in addition to $1.9 million of unrecovered oil that was not covered by insurance. Moreover, CITGO's insurance costs increased substantially following this insurance claim. (D-1854.) In short, the economic detriment far outweighed any economic benefit and provides a strong disincentive for CITGO to have a spill like this one happen again.

**Degree of Culpability.**  For the same reasons that CITGO was not grossly negligent, this penalty factor does not favor a large penalty.

**Other Penalties for Same Incident.**  CITGO has already paid a $13 million criminal fine, $7 million in improvements to the WWTU to comply with and exceed the ECP, and reimbursed the Coast Guard and the State of Louisiana $2 million and $27,000, respectively, for response costs. CITGO will also pay Trustees for the costs of assessment and damages to natural resources through NRDA and any amounts awarded to the State of Louisiana in this case.

**History of Prior Violations.**  Plaintiffs failed to prove that CITGO's earlier regulatory or

enforcement history warrants any increase in penalties. In fact, in the 12 years of WWTU operations before the spill, CITGO had not released any significant quantity of oil, overflowed the tanks, or committed any violations similar to what occurred in June 2006. CITGO also complied with its wastewater discharge permits over 99% of the time for every single permit constituent – exceeding the compliance data from the best refinery wastewater plants used by EPA to set refinery permit limits. Further, the alleged violations of CITGO's LPDES permit discussed in the testimony of Plaintiffs' expert, Amendola, are irrelevant because they differ in character from the allegations here and many are remote in time. Specifically, the LPDES violations arise from discharges of water from the WWTU that contain elevated levels of various regulated contaminants, but none of these violations involved the discharge of floating oil or have anything to do with what led to the oil spill.

**Efforts to Minimize/Mitigate Effects of Discharge.** CITGO took prompt measures to mitigate the effects of the oil spill. Lt. Commander Kenneth Mills, who had significant oil spill response experience as a former Gulf Force Strike Team member, testified that CITGO's response had ramped up rapidly and was already very proactive when he arrived at first light on June 21. He noted that the speed with which CITGO implemented an ICS command and control structure was "impressive" and that CITGO spared no expense in its response, in contrast to other spills he has worked on where money spent on response is usually a point of contention for the responsible party. At the height of its response, CITGO had deployed 1675 people, more than 320,000 feet (60 miles) of hard boom, many more miles of sorbent boom, 68 vacuum trucks, 33 skimmers, 82 boats and additional clean-up equipment from around the United States and even international locations. CITGO hired two of the largest and most respected oil spill clean-up companies in the nation, NRC and MSRC, to work on the response, or the "fantasy football team" of oil spill

responders, as Mark Ploen testified. In support of these clean-up efforts, CITGO spent over $64 million. CITGO's clean-up measures were successful. The Intracoastal Waterway was reopened to commercial traffic 7 days after the initial closure and the Calcasieu River was reopened for all uses in 24 days. Ploen testified that active clean-up was finished within less than a month of the spill. In fact, according to the Coast Guard, the effectiveness of the response prevented 2/3 of the oil discharged from reaching the Calcasieu River. (*See* D-306.) CITGO also tried to make things right in the community. As Mike Monroe and Ronny Lovett testified, CITGO either paid for or cleaned homeowners' docks and made repairs to their property.

**Economic Impact Of Penalty On Violator.** While Plaintiffs sought to present evidence of CITGO's parent company's financial condition, the parent is not a defendant in this case and is not liable for any penalty. Moreover, Plaintiffs presented no evidence regarding CITGO's ability to pay a penalty independent of its parent and their expert witness, Robert Harris, admitted that he could not quantify the penalty that CITGO alone could afford. While CITGO paid large dividends to its parent in the years 2006-2008, dividends are the only way that the parent obtains a return on its investment, and they were mostly funded by one-time asset sales. Even after making those dividend payments, CITGO had $1.2 billion in working capital at the end of 2008. But in the last two years, the economic downturn has severely affected CITGO's financial condition. CITGO lost over $200 million in 2009 and, according to Bob Kent, lost approximately $15 million in 2010. As of September 30, 2010, the date of the last available financial statements at the time of trial, CITGO had working capital of just $63 million, meager for a company that relies heavily on cash and its line of credit to fund ordinary operations. CITGO did not pay any dividends in 2009 or 2010, and is operating under strict debt and liquidity requirements imposed by its creditors. In fact, CITGO is precluded by agreements with

its creditors from incurring any additional debt and has pledged all of its refineries as collateral. As Kent explained, in coming years, the capital CITGO has will go primarily to environmental and maintenance projects.

**Any Other Matters as Justice May Require**.  The Lake Charles refinery is one of the largest employers in Louisiana.  CITGO plays an important role in the local and State economies, employing 1200 full-time employees and hundreds of contract employees.  CITGO spends large sums in the State, pays taxes to the parish and to the State and is a major supplier of petroleum products to Louisiana businesses.  CITGO also supports many charitable causes, focusing on those who are unable to help themselves, such as donating $5 million after Hurricane Rita to a health center for the disadvantaged in Lake Charles.  CITGO prioritizes safety and environmental by making those the top two factors in employee bonuses.

## INJUNCTIVE RELIEF

Plaintiffs failed to prove that the requested injunctive relief was warranted.  As part of the criminal plea, the United States required that CITGO comply with the ECP to prevent a spill like this from happening again. (D-1022.)  CITGO timely complied with the ECP, including weekly removal of oil from the tanks and maintaining the tanks at low levels.  In fact, the refinery now has a procedure in place to do on-line solids removal to keeps the tanks at low levels without having to take a tank completely out of service.  It is inequitable for the same Plaintiff that required the ECP to pile on additional injunctive measures, particularly when the evidence showed that the new relief sought is unnecessary to prevent future spills.  Plaintiffs have no right under the Act simply to choose projects they would like CITGO to do without any regard to whether they relate to the event underlying this enforcement action – especially where their only evidence to support this request came from the testimony of Gary Amendola, who has never operated or performed a capacity evaluation for a refinery WWTU.  Moreover, Plaintiffs failed

to present any evidence to support remediating the Marais. Dr. Jennifer Wilkie testified that based on testing already performed – and approved by the EPA – no remediation in the Marais is necessary.

Renee Atkins, chemical engineer and current supervisor of the WWTU, testified that some of Amendola's recommendations – such as consistently removing oil from the tanks and operating the tanks at their design levels – were sound ideas that have already been implemented. But she testified unequivocally that the additional items recommended by Amendola are wholly unnecessary. Atkins stated that she has the equipment and procedures currently in place to prevent any spills to navigable waterways and to meet the refinery's permit requirements. Plaintiffs contend, however, that CITGO's outside engineering consultant, ENSR, recommended that a fourth tank was necessary to assure compliance with all regulations. John Woodhull, who was in charge of ENSR's study, denied this and testified that ENSR never recommended that CITGO build a fourth tank. (John Woodhull Dep. at 79:17-80:1.) Woodhull stated that ENSR recommended "a series of options" to manage storm water flow to the WWTU. (*Id.* at 81:18-82:4.) One of those options was building a fourth tank, but it was not the only option recommended by ENSR. (*Id.* at 99:19-101:2.) Indeed, one of the options was the same option endorsed by the government in the ECP – adding diversion capabilities to send storm water to secondary containment in "an unusual event." (*Id.* at 85:3-7, 124:18-125:13.) He testified that while ENSR's goal was to contain storm water in tanks, this was "not a requirement or a regulatory requirement." (*Id.* at 21:16-23:17.) He further echoed the testimony of Atkins that CITGO has consistently operated the WWTU in an environmentally compliant manner while selectively taking equipment out of service to perform maintenance. (*Id.* at 92:23-93:19.)

Ultimately, Atkins said the one piece of equipment that might help the WWTU's ability

to meet the goal of 100% environmental compliance is a fourth aeration tank (not a storm water tank), which would allow the unit to better handle increased flows during a rain event. If the Court were to order any injunctive relief, it should order CITGO to build a fourth aeration tank within the next 24 months.[10]

## STATE OF LOUISIANA'S CLAIMS[11]

The State's claims overlap substantially with the United States' claim and double recoveries for the same discharge are barred by 33 U.S.C. §1319. The State can recover up to $32,500 per day for two days of violation for the wastewater release (although only if the Court excludes wastewater from the penalty calculation in the United States' claim), and it can recover for any interference with the waterways from the wastewater discharge. CITGO proposes that no more than a $500,000 penalty to the State would be appropriate.[12]

---

[10] While not part of the trial record, for the Court's information, CITGO believes that the cost of an aeration tank with a similar capacity to the three aeration tanks it currently uses would be approximately $5-6 million.

[11] CITGO incorporates by reference its arguments in its motion to dismiss for lack of subject matter jurisdiction, as the State's diligent prosecution of its claims arising out of the 2006 spill bars the federal government from seeking penalties for the same discharge under 33 U.S.C. § 1319 or 33 U.S.C. § 1321.

[12] *See* CITGO's proposed conclusions of law at 67-71 for a more detailed discussion of these claims. La. R.S. 30:2025 provides for a civil penalty "of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and a penalty of not more than [$32,500] for each day of violation. However, when any such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an additional penalty of not more than [$1,000,000]." La. R.S. 30:2025(E)(1)(a). It is undisputed that CITGO has already paid the state for the costs it incurred in the response. For the reasons discussed above, CITGO's conduct was neither intentional nor willful, and the spill did not cause irreparable or severe damage to the environment or endanger human health.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April, 2011, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

*/s/ Richard E. Sarver*