# EXHIBIT 11

LEXISNEXIS® FILE & SERVE
36926983
E-SERVICE
Apr  7 2011
8:37PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Cases | : | JUDGE BARBIER |
| ……………………………………………... | : | MAGISTRATE JUDGE SHUSHAN |

## BP EXPLORATION & PRODUCTION INC.'S FIRST SET OF
## DISCOVERY REQUESTS TO THE UNITED STATES OF AMERICA

Pursuant to Federal Rules of Civil Procedure 26, 33 and 34, BP Exploration & Production Inc. propounds the following requests for production of documents, interrogatories, and requests for admission to the United States of America to be responded to within 30 days of service.  BP Exploration & Production Inc. requests that all documents and electronically stored information responsive to the following discovery requests be produced at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654.

## REQUESTS FOR PRODUCTION

### I.       Macondo Specific Document Requests

1.       All documents referring or relating to the MC252 Well created on or after January 1, 2008.

2.       All documents referring or relating to any application for the MC252 Well filed by BP.

3.       All documents referring or relating to the Bureau of Ocean Energy Management's ("BOEM") evaluation, approval or disapproval of any submission for the MC252 Well filed by BP.

4.      All documents referring or relating to any health, safety or environment issues on board Transocean's *Deepwater Horizon* rig.

5.      All documents referring or relating to any inspection or audit of Transocean's *Deepwater Horizon* rig.

6.      All documents referring or relating to any inspection or audit of the blowout preventer utilized in Transocean's *Deepwater Horizon* rig.

7.      All documents referring or relating to any certification of the blowout preventer utilized on Transocean's *Deepwater Horizon* rig.


## II.      BOEM Procedures and Guidelines

8.      Documents sufficient to identify any person at the BOEM who received, reviewed, analyzed, evaluated, approved or disapproved of BP's submissions to BOEM related or referring to the MC252 Well, Transocean's *Deepwater Horizon* rig or Oil Spill Response Planning in the Gulf of Mexico, including but not limited to organization charts.

9.      All documents relating or referring to the education, training, experience, qualification, and evaluation of any person at the BOEM who received, reviewed, analyzed, evaluated, approved or disapproved of BP's submissions to BOEM related or referring to the MC252 Well or Transocean's *Deepwater Horizon* rig.

10.      All documents relating or referring to BOEM guidelines, procedures, policies or practices for the evaluation of submissions related to deepwater wells in the Gulf of Mexico.

11.      All documents relating or referring to BOEM guidelines, procedures, policies, practices or evaluations related to well control and safety training programs of deepwater well operations in the Gulf of Mexico from January 1, 2008 up until April 20, 2010.

### III.    BOEM Incident and Safety Data

12.    A complete, unredacted native copy of the BOEM corporate database (TIMS) maintained by the Technical Data Management Section (TDMS), including all underlying tables and documents linked in the database.

13.    All documents that track, refer or relate to the relationships between companies conducting Outer Continental Shelf operations in the Gulf of Mexico, including the effect of mergers, acquisitions and name changes on those companies.

14.    All district safety incident reports filed by each operator in the Gulf of Mexico with the BOEM.

15.    All safety and environmental management systems filed by each operator in the Gulf of Mexico with the BOEM.

16.    All documents constituting, referring or relating to BOEM safety index calculations and underlying data for each operator in the Gulf of Mexico.

17.    All documents constituting, referring or relating to BOEM statistics tracked in the OCS Performance Measure Program and underlying data for each operator in the Gulf of Mexico.

18.    All documents identifying, reflecting or relating to recipients of, or candidates considered for, the BOEM Safety Award for Excellence in the Gulf of Mexico, and all underlying documents or data supporting or relating to those selections or considerations.

19.    All BOEM documents or data constituting, reflecting or referring to annual production by operator, by well, and by total associated well depth, for operations in the Gulf of Mexico.

### IV.        Drilling Policies, Procedures, and Guidelines

20.     All documents referring or relating to the preparation, review or approval of Exploration Plans for the MC252 Well.

21.     All documents referring or relating to the preparation, review or approval of BP's Oil Spill Response Plans for the Gulf of Mexico region, including but not limited to BP's Oil Spill Response Plan in effect at the time of the Incident.

22.     All documents referring or relating to reviews, studies or assessments required by the National Environmental Policy Act or by regulations or practices to implement that Act in connection with exploration of the MC252 Well.

23.     All documents referring or relating to the application and requirements of the Oil Pollution Act of 1990 or any other federal law, or any regulations or practices to implement that Act or any such law, in determining the adequacy of an oil spill response plan.

24.     All documents that constitute, contain, describe or refer to any guideline, policy or practice for use in determining the adequacy of the conduct or actions of a Responsible Party in connection with the requirements of the Oil Pollution Act of 1990 related to the response to an incident for which that Act creates legal obligations.

25.     All documents referring or relating to the preparation, review or approval of Area Contingency Plans for areas affected by the Incident that either were in effect on April 20, 2010, or that were prepared and implemented at any time after April 20, 2010.

26.     All documents referring or relating to the preparation for an oil spill response by the Area Committees in the areas affected by the Incident.

27.     All documents relating or referring to the use of a long string, liner, or liner with a tie back production casing in deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other

filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

28.    All documents relating or referring to the use of a lock down sleeve in deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

29.    All documents relating or referring to the use of barriers in deepwater wells in the Gulf of Mexico, such as but not limited to surface cement plugs, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

30.    All documents relating or referring to the design and use of spacers for deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

31.    All documents relating or referring to temporary abandonment procedures for deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

32.     All documents relating or referring to positive or negative pressure tests for deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

33.     All documents relating or referring to cementing procedures for deepwater wells, including the design, testing and execution of foamed cement, in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

34.     All documents relating or referring to the use of centralizers in deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

35.     All documents relating or referring to the use (or decision not to use) a cement evaluation tool, including a cement bond log, in deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

36.     All documents relating or referring to tubular or casing design for deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

37.     All documents relating or referring to gas flow potential in deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries or analyses.

38.     All documents relating or referring to drilling fluids in deepwater wells, on or off-rig, in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries or analyses.

39.     All documents relating or referring to responding to well control events for deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries or analyses.

40.     All documents relating or referring to blowout preventers for deepwater wells in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or

external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries or analyses.

41.     All databases containing information relating or referring to deepwater well operations in the Gulf of Mexico, including but not limited to the Weekly Activity Report (WAR) database, the Application for Permit to Drill (APD) database, and the Application for Permit to Modify (APM) database, as well as any database reflecting owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses.

### V.     Requests Related To Other MDL 2179 Parties

42.     All documents relating or referring to any inspection or audit of Transocean's rigs utilized in the Gulf of Mexico from 2008 through today.

43.     All documents relating or referring to any inspection, audit or certification of blowout preventers utilized on Transocean's rigs in the Gulf of Mexico created on or after January 1, 2008.

44.     All documents relating or referring to any citations, warnings, notices, Incidents of Noncompliance ("INCs"), admonishments or violations issued to Transocean related to its operations or training of personnel in the Gulf of Mexico created on or after January 1, 2008.

45.     All documents relating or referring to any citations, warnings, notices, INCs, admonishments or violations issued to Halliburton related to its operations or training of personnel in the Gulf of Mexico created on or after January 1, 2008.

## VI.        Communications and General Requests

46.     All documents requested by, or produced in response to, requests for production and interrogatories served on the United States Government by Plaintiffs or any other party in MDL No. 2179.

47.     All documents exchanged between and communications between the United States and any member, committee, employee, staff member or other person working on behalf of the United States Congress referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after January 1, 2010.

48.     All documents exchanged between and communications between the United States and any person working in the Executive Office of the President of the United States relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after January 1, 2010.

49.     All documents exchanged between and communications between the United States and any member, employee, staff member or other person working on behalf of the National Academy of Engineering or National Research Counsel referring or relating to the *Deepwater Horizon* Incident or  the MC252 Well created on or after April 20, 2010.

50.     All documents exchanged between and communications between the BOEM and any member, employee, staff member or other person working on behalf of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010.

51.     All documents exchanged between and communications between the United States and any member, employee, staff member or other person working on behalf of the Chemical Safety Board referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010.

9

52.     All documents exchanged between and communications between the United States and any member of the media or press referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010.

53.     All documents exchanged between and communications between the United States and any member, employee, staff member or other person working on behalf of Det Norske Veritas referring or relating the *Deepwater Horizon* Incident or the MC252 Well Prospect created on or after April 20, 2010.

54.     All documents exchanged between and communications between the United States and any other party in MDL No. 2179 referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010.

55.     All documents referring or relating to the "Macondo:  The Gulf Oil Disaster – Chief Counsel's Report" from the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling released in 2011.

56.     All documents referring or relating to any report, presentation, conference, meeting or public statement from the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, including the final report, "Deep Water:  The Gulf Oil Disaster and the Future of Offshore Drilling," released on January 11, 2011.

57.     All documents referring or relating to BP's "Deepwater Horizon:   Accident Investigation Report" dated September 8, 2010.

58.     All documents constituting, referring or relating to any working papers or reports created by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling or its staff.

59.     All documents constituting, referring or relating to any research reports submitted by any Person to the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling or its staff.

60.     All documents constituting, referring or relating to Freedom of Information Act requests that have sought records related to the response to the Incident.

61.     All documents produced by the United States under the Freedom of Information Act related to the Incident, the response to the Incident, BP's conduct in connection with the Incident, or any of the Response Activities, including but not limited to controlled in situ burning, skimmers, chemical dispersants, boom and berms.

62.     All documents provided to and other communications sent or received by the United States, the U.S. Congress, the Chemical Safety Board, the Marine Board of Investigation, the Incident Specific Preparedness Review, the National Commission on the Deepwater Horizon Oil Spill, or any other entity or proceeding related to the Incident or response to the Incident.


**VII.        Emergency Response, Firefighting and Rescue Efforts**

63.     All documents referring or relating to the United States' response to the explosion and fire on Transocean's *Deepwater Horizon* rig between the time of the explosion and the sinking of the *Deepwater Horizon* rig.

64.     All documents referring or relating to firefighting efforts in response to the explosion and fire on Transocean's *Deepwater Horizon* rig.

65.     All documents referring or relating to the rescue efforts and operations in response to the explosion and fire on Transocean's *Deepwater Horizon* rig.

66.     All documents referring or relating to training for emergency maritime response, firefighting or disaster response related to oil rigs in the Gulf of Mexico.

## VIII.        Closing the Wellhead

67.     All documents referring or relating to the effort to actuate the *Deepwater Horizon* blowout preventer on or after April 20, 2010, including any analysis of the position of the *Deepwater Horizon* blowout preventer components.

68.     All documents referring or relating to the decision to approve or reject any procedure considered or submitted as part of the effort to cap, seal or collect hydrocarbons from the MC252 Well.

69.     All documents referring or relating to any analysis, study, inspection or evaluation of a potential method to cap, seal or collect hydrocarbons from the MC252 Well, including any post-method analysis.

70.     All documents referring or relating to participation in or review of any peer reviews, Kill Well On Paper sessions, Hazard Identification Studies, or Hazard and Operability Studies for a potential method to cap, seal or collect hydrocarbons from the MC252 Well.

71.     All documents referring or relating to presentations or reports made by anyone from BP to the United States regarding potential methods to cap, seal, contain or collect hydrocarbons from the MC252 Well and the United States' response to such presentations or reports, including any post-method analysis.

72.     All documents referring or relating to presentations or reports made by anyone from third parties to the United States regarding potential methods to cap, seal, contain or collect hydrocarbons from the MC252 Well and the United States' response to such presentations or reports.

73.     All documents referring or relating to any communications between the United States and any employee or officer of BP on or after April 20, 2010 related to the MC252 well or the Response Activities.

74.     All documents referring or relating to the decision whether or not to proceed with the blowout preventer on blowout preventer option following the top kill attempt.

75.     All documents referring or relating to the decision whether or not to allow BP to install and/or shut the Capping Stack, including any analysis, studies, or testing protocol for the effect of the Capping Stack on the MC252 Well.

76.     All documents referring or relating to the monitoring, analysis, study, or evaluation of well integrity for the MC252 Well, including but not limited to documents regarding the decisions to terminate or prolong the well integrity testing on or after July 15, 2010.

77.     All documents referring or relating to communications by and among U.S. Secretary of Energy Steven Chu, the Science Advisors, and/or members of the National Laboratories regarding efforts to cap, seal or collect hydrocarbons from the MC252 Well.

## IX.     Recovery and Disposal of the Discharge

78.     All documents referring or relating to the efforts to contain, collect, or capture the flow of hydrocarbons from the MC252 Well.

79.     All documents referring or relating to the amount of hydrocarbons collected, contained or captured from the MC252 Well.

## X.        Estimates or Measurements of the Discharge

80.     All communications and documents, including underlying data, related to the flow rate or volume of oil or the oil budget for the MC252 Well following April 20, 2010, by or between individuals working for the United States.

81.     All documents related to any efforts to determine the volume of oil spilled or the flow rate of oil spilled from the MC252 Well following April 20, 2010, including but not limited to calculations of volumes of oil spilled and the flow rate at which oil was spilled from the MC252 Well, by any agency of the United States, including the Flow Rate Technical Group.

82.     All communications, documents, and drafts related to the preparation and publication of the document entitled "Oil Budget Calculator, Deepwater Horizon, Technical Documentation," by the Federal Interagency Solutions Group, Oil Budget Calculator Science and Engineering Team.

83.     All documents referring or relating to the actual or potential impact of different flow rates on the effort to contain or collect hydrocarbons from the MC252 Well, including any decision to order additional or redundant collection capacity.

84.     All documents referring or relating to the actual or potential impact of flow rate on the effort to cap or seal the MC252 Well.

85.     All documents referring or relating to predictions, estimates or measurements of the amounts of oil or any other substance discharged from the wellhead of the MC252 Well.

86.     All documents referring or relating to the physical or chemical properties of oil or any other substance discharged from the wellhead of the MC252 Well.

XI.      **Personal Injuries and Other Human Health Affects Attributed to Response Activities**

87.     All documents that constitute, refer or relate to medical, scientific or other reports, studies, data, or any other analysis or assessment of personal injuries, or any other physical, mental, or emotional injuries, illnesses, or claims, or death attributed to Response Activities, including but not limited to plans or proposals to review such reports, studies, data or other analyses or assessments.

88.     All documents referring or relating to medical, scientific, technical, or other reports, studies, predictions, estimates, data, or measurements, or any other analyses or assessments of acute or chronic human health effects (including injury, illness or death), toxicities, hazards, exposures, or risks, whether physical, mental, or emotional, related to, concerning, attributed to, based upon, or otherwise associated with, Response Activities, including but not limited to plans or proposals to study, predict, estimate, evaluate, assess, or measure any such effects, toxicities, hazards, exposures, or risks.


XII.      **Management or Control of Fishing Activities**

89.     All documents referring or relating to decisions, plans or proposals to close any area for commercial or recreational fishing as a result of or in connection with the Incident or Response Activities.

90.     All documents referring or relating to decisions, plans or proposals to open any area for commercial or recreational fishing that was closed as a result of or in connection with the Incident or Response Activities.

### XIII.         Shoreline Clean-Up

91.     All documents referring or relating to the role of any federal agency or federal officer or to the role of the Unified Command in shoreline assessment or clean-up activities, including but not limited to such activities pertaining to beaches or special environments such as wetlands and saltwater or brackish marshes.

92.     All documents referring or relating to plans or proposals to determine or to study shoreline oiling in connection with the Incident and Response Activities, including but not limited to documentation protocols, experimental assessment plans, or data quality assurance or data quality control activities related to such plans or proposals.

93.     All documents referring or relating to the use or proposed use of Quick Reaction Forces or other types of response teams organized by the Unified Command at the Houma Incident Command Post or at any other location in connection with Response Activities.

94.     All documents referring or relating to determinations or studies of shoreline oiling in connection with the Incident and Response Activities, including but not limited to documentation protocols, experimental assessment plans, or data quality assurance or data quality control activities related to such plans or proposals.

95.     All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of shoreline assessment or clean-up in connection with the Response Activities.

96.     All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted counterproductive or harmful effects of shoreline assessment or clean-up in connection with the Response Activities.

97.     All documents referring or relating to the effectiveness of shoreline assessment or clean-up in connection with the Response Activities.

98.     All documents referring or relating to counterproductive or harmful effects attributed to shoreline assessment or clean-up in Response Activities, including but not limited to any such effects on biota, physical environments, human amenities, man-made assets, ambient air quality, or water quality.

## XIV.     Boom

99.     All documents referring or relating to plans, proposals or decisions to procure or deploy boom in connection with the Response Activities.

100.     All documents referring or relating to plans, proposals or decisions to add to, alter or amend the booming protection strategies contained in, or that should have been contained in, the Area Contingency Plans for areas affected by the Incident.

101.     All documents referring or relating to plans, proposals or decisions to remove boom in connection with the Response Activities.

102.     All documents referring or relating to plans, proposals or decisions to locate boom in staging areas, to transport boom from one location to another, or to prohibit the relocation of boom, in connection with the Response Activities.

103.     All documents referring or relating to standards or guidelines to determine the physical qualities of boom, or to set performance standards for boom, used in connection with the Response Activities.

104.     All documents referring or relating to plans, proposals or decisions to inspect or test boom, or to estimate or determine the types or quantity of boom used, in connection with the Response Activities.

17

105.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of the use of boom in connection with the Response Activities.

106.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted counterproductive or harmful effects of the use of boom in connection with the Response Activities.

107.    All documents referring or relating to the effectiveness of the use of boom in connection with the Response Activities.

108.    All documents referring or relating to counterproductive or harmful effects of or attributed to the use of boom in Response Activities, including but not limited to any such effects on biota, physical environments, human amenities, man-made assets, ambient air quality, or water quality.


## XV.        Skimming

109.    All documents not contained in public rulemaking dockets of the U.S. Coast Guard or the U.S. Department of Interior referring or relating to the development of criteria or standards for the Effective Daily Recovery Capacity of skimmers or to changes or proposed changes in those criteria or standards.

110.    All documents referring or relating to the number, type or capabilities of skimming equipment or vessels obtained by BP for use in the response to the Incident, or to the adequacy of the skimming resources obtained by BP for use in the response to the Incident.

111.    All documents referring or relating to plans, proposals or decisions to procure or deploy skimming equipment or vessels in connection with the Response Activities, or to plans,

proposals or decisions to not use or to curtail use of skimming equipment or vessels in connection with the Response Activities.

112.    All documents referring or relating to plans, proposals or decisions to inspect or test skimming equipment or vessels or to test or evaluate procedures used in skimming in connection with the Response Activities.

113.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of skimming in connection with the Response Activities.

114.    All documents referring or relating to the effectiveness of skimming in connection with the Response Activities.


### XVI.        Controlled In-Situ Burning

115.    All documents referring or relating to plans, proposals or decisions to conduct controlled in-situ burning in connection with the Response Activities.

116.    All documents referring or relating to studies, assessments, data, or analyses of the use of controlled in-situ burning in connection with the Response Activities.

117.    All documents referring or relating to unpublished studies, assessments or analyses of the use of controlled in-situ burning in spill response activities in the Gulf of Mexico or the Gulf of Mexico basin.

118.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of controlled in situ burning, either in connection with the Response Activities or as a countermeasure to respond to any other spill.

119.    All documents referring or relating to the actual or possible impact of pre-clearance or clearance requirements for the use of controlled in-situ burning in connection with the Response Activities on the amount of oil or other discharged materials that reached the shoreline.

120.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted counterproductive or harmful effects of controlled in situ burning, either in connection with the Response Activities or as a countermeasure to respond to any other spill.

121.    All documents referring or relating to the effectiveness of the use of controlled in situ burning in connection with the Response Activities.

122.    All documents referring or relating to counterproductive or harmful effects of or attributed to the use of controlled in situ burning in Response Activities, including but not limited to any such effects on biota, human health or ambient air quality.

## XVII.        Chemical Dispersants

123.    All documents not contained in public rulemaking dockets of the U.S. Environmental Protection Agency referring or relating to the development of criteria or standards for the review, evaluation or analysis of chemical dispersant products as a countermeasure to respond to an oil spill, including but not limited to such products listed in Subpart J of the National Contingency Plan.

124.    All documents not contained in public rulemaking dockets of the U.S. Environmental Protection Agency referring or relating to the decision to include Corexit EC9527A and Corexit EC9500A in Subpart J of the National Contingency Plan.

125. All documents referring or relating to the effectiveness of Corexit EC9527A and Corexit EC9500A in surface or subsea applications, including but not limited to the effects of the use of those products in such applications on the location and fate of oil and the compounds contained in oil.

126. All documents referring or relating to any potential lethal or sub-lethal effects of the use of Corexit EC9527A and Corexit EC9500A in surface or subsea applications, or to any other potential deleterious effects of the use of those products on biota or on human health when so applied, including but not limited to any such effects when those products are mixed with oil and other materials produced in an uncontrolled well blowout and with sea water.

127. All documents referring or relating to decisions to permit or to limit or to control the use of Corexit EC9527A and Corexit EC9500A, or to limit or control the quantities applied, in surface or subsea applications in the Response Activities.

128. All documents referring or relating to efforts to identify alternative dispersants to Corexit EC9527A and Corexit EC9500A during the Response Activities or to any decision to permit the continued use of the Corexit products.

129. All documents referring or relating to procedures or practices used in deciding when, where, how, and in what quantities to permit the use of Corexit EC9527A and Corexit EC9500 in surface or subsea applications in the Response Activities.

130. All documents referring or relating to any decisions to deny the use of Corexit EC9527A and Corexit EC9500 in surface or subsea applications in the Response Activities.

131. All documents referring or relating to the actual or possible consequences of daily or other specific pre-clearance or clearance requirements for the use of chemical dispersants in

connection with the Response Activities (either in subsea or surface applications, or both) on the amount of oil or other discharged materials that reached the shoreline or surface.

132.    All documents referring or relating to the actual or possible consequences of decisions to approve or deny application of Corexit EC9527A and Corexit EC9500 on the surface or subsea in connection with the Response Activities

133.    All documents referring or relating to the supply of, and logistics for procurement and deployment of Corexit EC9527A and Corexit EC9500A in connection with the Response Activities (either in subsea or surface applications, or both), including but not limited to such documents referring or relating to the sufficiency or insufficiency of the supply and commercial availability of those products or to the adequacy or inadequacy of the logistics for procurement and deployment of those products in connection with the Response Activities.

134.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of the use of chemical dispersants or to measure the fate of dispersed oil in connection with the Response Activities.

135.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted counterproductive or harmful effects of the use of chemical dispersants in connection with the Response Activities.

136.    All documents referring or relating to the effectiveness of, or benefits from, the use of chemical dispersants in connection with the Response Activities.

137.     Except to the extent requested by Request No. 126, all documents referring or relating to counterproductive or harmful effects of or attributed to the use of Corexit EC9527A and Corexit EC9500A in the Response Activities.

## XVIII.     Mississippi River Diversions

138.     All documents referring or relating to plans, proposals or decisions to increase or decrease rates of Mississippi River discharge between April 20, 2010 and September 15, 2010 at the Bayou Lamoque Diversion, the Davis Pond Diversion, the Violet Siphon, the Caernarvon Diversion, the Whites Ditch Siphon, the Naomi Siphon, the West Point A la Hache Siphon, and the Ostrica Lock in connection with the Response Activities.

139.     All documents referring or relating to the role of any federal agency or federal officer or to the role of the Unified Command in increasing or decreasing rates of Mississippi discharge between April 20, 2010 and September 15, 2010.

140.     All documents referring or relating to studies, assessments, data, or analyses of the use of Mississippi River discharges in spill response activities.

141.     All documents referring or relating to unpublished studies, assessments or analyses of the use of Mississippi River discharges in spill response activities in the Gulf of Mexico or the Gulf of Mexico basin.

142.     All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of the use of Mississippi River discharges in connection with the Response Activities.

143.     All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted

23

counterproductive or harmful effects of the use of Mississippi River discharges in connection with the Response Activities.

144.    All documents referring or relating to counterproductive or harmful effects of or attributed to Mississippi River discharges in connection with the Response Activities, including but not limited to any such effects on biota, physical environments, human amenities, man-made assets, ambient air quality, or water quality.


### XIX.        Waste Management

145.    All documents referring or relating to the role of any federal agency or federal officer or to the role of the Unified Command in developing directives on waste management in connection with the Response Activities.

146.    All documents referring or relating to studies, assessments, data, or analyses of waste management in connection with the Response Activities.

147.    All documents referring or relating to unpublished studies, assessments or analyses of waste management in connection with the Response Activities.


### XX.        Alternative Response Techniques

148.    All documents referring or relating to any other method, technology, art or procedure for use as a countermeasure to reduce or mitigate the impact of the discharge attributed to the Incident, other than those methods, technologies, arts or procedure contained in or referred to in BP's Oil Spill Response Plan for the Gulf of Mexico approved in 2009.

149.    All documents referring or relating to the use of berms in connection with the Response Activities.

150.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of the use of berms in connection with the Response Activities.

151.    All documents referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted counterproductive or harmful effects of the use of berms in connection with the Response Activities.

152.    All documents referring or relating to the effectiveness of the use of berms in connection with the Response Activities.

153.    All documents referring or relating to counterproductive or harmful effects of or attributed to the use of berms in the Response Activities, including but not limited to any such effects on biota, physical environments, human amenities, man-made assets, ambient air quality, or water quality.

### XXI.        Physical and Chemical Assessments, Sampling and Data Analysis

154.    All documents referring or relating to the planning, approval, execution, and demobilization of protocols for conducting sampling of air, water, sediments, released oil (including but not limited to oil and material discharged at the wellhead, oil mousse, tarballs, etc.) and waste in connection with the Incident and Response Activities.

155.    All documents referring or relating to objectives, standards, guidelines, metrics, protocols, analysis, reports, or to proposed standards, guidelines, metrics, protocols, analysis or reports, that refer to air sampling, including but not limited to public health protection monitoring and sampling and occupational health protection sampling and monitoring in connection with the Incident and Response Activities.

156.    All documents referring or relating to objectives, standards, guidelines, metrics, protocols, analysis, reports, or to proposed standards, guidelines, metrics, protocols, analysis or reports, that refer to water and sediment sampling conducted in connection with the Incident and Response Activities.

157.    All documents referring or relating to objectives, standards, guidelines, metrics, protocols, analysis, reports, or to proposed objectives, standards, guidelines, metrics, protocols, analysis or reports, referring to the sampling of oil and other material discharged from the MC252 Well.

158.    All documents referring or relating to objectives, standards, guidelines, metrics, or to proposed objectives, standards, guidelines or metrics, to assess, measure or determine possible harmful effects in seafood in connection with the Incident and Response Activities.

159.    All documents referring or relating to objectives, standards, guidelines, metrics, protocols, or to proposed objectives, standards, guidelines, metrics or protocols, to assess the quality and control of sample data in connection with the Incident and Response Activities.

160.    All documents referring or relating to objectives, standards, guidelines, metrics, or to proposed objectives, standards, guidelines or metrics, used in validation of data collected in connection with the Incident and Response Activities.

161.    All documents referring or relating to any other method, technology, equipment, art, remedial process, or procedure for use as a countermeasure to correct, reduce, or mitigate errors, anomalies, or other breaches of sampling standards, guidelines, metrics, or protocols related to sampling processes, sampling data, or sampling reporting and analysis in connection with the Incident or Response Activities.

162.    All documents that constitute, contain, describe or refer to reports, studies, data, or any other analysis or assessment of sampling, sampling data, sample reporting, or sample analysis in connection with the Incident and Response Activities.

## XXII.        Command and Control of the Incident Response

163.    All documents referring or relating to the selection of one or more platforms to establish a Common Operating Picture for the Response Activities, including but not limited to the Geographic Information System-based Environmental Response Management Application ("ERMA") system.

164.    All documents referring or relating to assessments of the effectiveness or lack of effectiveness of the ERMA system or any other system used to obtain and disseminate information for the planning, operations and command functions of the Unified Command (other than systems used for the public information function of the Unified Command) in connection with the Response Activities.

165.    All documents that contain, describe, refer to, or specify the roles of the National Incident Commander and the Incident Commanders who were officers of the U.S. Coast Guard or personnel of the Environmental Protection Agency or the Department of Interior in the planning, operations, or approval processes used in the Response Activities, or in the direction of the Response Activities, including but not limited to the differences in the roles of those officers in comparison to, or in relation to, the roles of BP, employees or officers of the Executive Branch of the federal government not included in the Unified Command organization, or employees or officers of any State or local government.

166.    All documents referring or relating to BP's preparedness for response to the Incident.

27

167.    All documents referring or relating to BP's implementation of its Gulf of Mexico Oil Spill Response Plan.

168.    All documents referring or relating to the level of effort by BP in connection with the Response Activities or to the sufficiency of BP's support of the Response Activities or that evaluate or comment in any way on BP's participation in the Response Activities.

169.    All documents in which officers or ranks of the U.S. Coast Guard comment upon, describe or refer to the impacts of decisions, acts or omissions by leadership, staff or employees of other federal agencies on any operation undertaken in connection with the response to the Incident, including but not limited to such decisions on the effectiveness of such operations or on the effectiveness of the response to the Incident.

170.    All documents in which any staff or employees of any federal agency or function other than the U.S. Coast Guard comment upon, describe or refer to the impacts of the decisions, acts or omissions of officers or ranks of the U.S. Coast Guard on any operation undertaken in connection with the response to the Incident, including but not limited to such decisions on the effectiveness of such operations or on the effectiveness of the Response Activities.

171.    All documents referring or relating to the level of effort by state and local governments or their officers or employees in connection with the Response Activities, or to the sufficiency of the support of the Response Activities by, or that evaluate or comment in any way on participation in the Response Activities by, those governments, officers or employees.

172.    All documents referring or relating to any actual or potential negative or counterproductive effects on any operation undertaken in connection with the response to the Incident, or on the effectiveness of the Response Activities, caused by or attributed to the

28

conduct, acts or omissions of any Member of the U.S. Congress, any staff of the U.S. Congress, or any federal or state elected or appointed official or employee.

### XXIII.        Requests Related to the Government's Claims and Evidence

173.    All documents mentioned or referenced in any pleading, motion or brief filed by the United States in this action.

174.    All documents relating to the allegations in the United States' Complaint.

175.    All documents that you may use or seek to introduce into evidence at any trial or hearing in this action.

176.    All documents that relate to any expert testimony or opinions, or have been considered by any expert witness that may testify on your behalf at any trial or hearing in this action.

177.    All documents which relate to the anticipated testimony of any person that you may call as a witness at any trial, hearing or deposition in this matter.

178.    All documents identified in the responses to the Interrogatories set forth below.

### INTERROGATORIES

1.    Please identify every United States officer, employee or other person associated with United States, including consultants and agents, who participated in any review, evaluation, approval or disapproval of any submission by BP related to the MC252 Well and state that person's involvement with the MC252 Well.

2.    Please identify every United States officer, employee or other person associated with the United States, including consultants and agents, who participated in any review, inspection, evaluation, approval or disapproval of any submission related to or referring to

Transocean's *Deepwater Horizon* rig and state that person's involvement with Transocean's *Deepwater Horizon* rig.

3.      State whether the Application for Permit to Drill for the MC252 Well and subsequent amendments approved by the United States in 2009 and 2010 complied with federal law and regulation.  If the answer is in the negative, (a) identify each respect in which the Application for Permit to Drill for the MC252 Well and subsequent amendments approved by the United States in 2009 and 2010 did not comply with federal law or regulation, and (b) identify each document upon which the response is based.

4.      Identify with particularity any alleged variations or deviations in the casing strings installed in the MC252 Well as compared to the casing string designs approved by the United States in 2009 and 2010.

5.      Identify and describe in detail (including name and location of the well, leaseholder, operator and spud date) each deepwater well in the Gulf of Mexico that utilized a long string production casing design that the United States Government approved.

6.      Identify and describe in detail (including name and location of the well, leaseholder, operator and spud date) each deepwater well in the Gulf of Mexico that utilized a liner or liner with a tie back production casing design that the United States Government approved.

7.      Identify and describe in detail (including name and location of the well, leaseholder, operator and spud date) each deepwater well in the Gulf of Mexico that involved a temporary abandonment procedure and provide all steps in such temporary abandonment procedure approved by the United States Government.

8.      Please identify every United States officer, employee or other person associated with United States, including consultants and agents, who participated in any way in any effort to predict, estimate or measure the amount of discharge from the wellhead of the MC252 Well, or in any effort to predict, estimate, characterize or measure the physical or chemical properties of any substance contained in the discharge from the MC252 Well.

9.      Please identify each person who was not a full-time employee of the United States when contacted and was contacted to assist, advise or represent the United States or the Unified Command in connection with efforts to contain the flow from the wellhead of the MC252 Well, to participate in any way in the response to the Incident, or to provide scientific or other advice related to the Incident or the response to the Incident.

10.     For each person identified in the response to Interrogatory No. 9, state the intended role or function of that person in the participation in the response to the Incident or in providing scientific or other advice.

11.     Please identify each person who assisted, advised or represented the United States or the Unified Command in connection with efforts to contain the flow from the wellhead of the MC252 Well, participated in any way in the response to the Incident, or provided scientific or other advice related to the Incident or the response to the Incident, who was not an officer or enlisted person in the U.S. Coast Guard.

12.     For each person identified in the response to Interrogatory No. 11, state the role or function of that person in the participation in the response or in providing scientific or other advice.

13.     Please identify every United States officer, employee or other person associated with United States, including consultants and agents, who participated in any way in decisions or

plans to approve, disapprove, limit, control or review the use of chemical dispersants in connection with the Response Activities.

14.     Please identify each person who assisted, advised or represented the United States or the Unified Command in connection the decision whether or not to proceed with the blowout preventer on blowout preventer option following the top kill attempt.

15.     Please identify each person who participated in discussions or provided advice to the United States regarding the decision whether or not to allow BP to install and, subsequently, shut the Capping Stack.

16.     State whether the BP Gulf of Mexico Oil Spill Response Plan approved by the United States in 2009 complied with federal law and regulation.  If the answer is in the negative, (a) state each respect in which the BP Gulf of Mexico Oil Spill Response Plan approved by the United States in 2009 did not comply with federal law or regulation, and (b) identify each document upon which your negative answer is based.

17.     State separately (as to the waters of the Gulf of Mexico and the shoreline of the Gulf of Mexico) the amount of the "spill" that "remains in the waters of the Gulf of Mexico and upon the adjoining shorelines of the United States," as alleged in the Complaint, and identify each document upon which your answer is based or that supports your answer.

18.     Describe fully the role and authority of U.S. Secretary of Energy Steven Chu, his Science Advisors, and members of the National Laboratories within the Unified Command during the effort to cap, seal, estimate the volume of, or collect hydrocarbons from the MC252 Well.

19.     Identify each person you intend to call or may call as a witness in this matter and, for each person identified, state the subject of their expected testimony.

20.     Identify each person you have retained as an expert or consultant in this matter and, for each person identified, state: (a) the subject matter on which the expert is expected to testify; (b) the substance of the facts and opinions to which the expert is expected to testify; and (c) a summary of the grounds for each opinion.

21.     Identify each person who has or may have knowledge or information relating to the allegations in the United States' Complaint.  For each person identified, state the subject area of knowledge.

## <u>REQUESTS FOR ADMISSION</u>

**I.       BP's Permit Applications and the MC252 Well**

1.     Admit that the United States Government received BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230, dated February 2009.

2.     Admit that the United States Government evaluated BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230, dated February 2009.

3.     Admit that the United States Government approved BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230, dated February 2009.

4.     Admit that the United States Government's approval of BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230, dated February 2009, was made in accordance with 30 CFR 250.233(b)(1).

5.     Admit that the United States Government received BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230 Public Information, dated February 2009.

6.     Admit that the United States Government evaluated BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230 Public Information, dated February 2009.

7.      Admit that the United States Government approved BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230 Public Information, dated February 2009.

8.      Admit that the United States Government's approval of BP's Initial Exploration Plan Mississippi Canyon Block 252 OCS-G 3230 Public Information, dated February 2009, was made in accordance with 30 CFR 250.233(b)(1).

9.      Admit that the United States Government received BP's Notice of Intent for BP Exploration & Production Inc., NPDES OCS Permit No. GMG 290110, dated February 23, 2009.

10.     Admit that the United States Government evaluated BP's Notice of Intent for BP Exploration & Production Inc., NPDES OCS Permit No. GMG 290110, dated February 23, 2009.

11.     Admit that the United States Government approved BP's Notice of Intent for BP Exploration & Production Inc., NPDES OCS Permit No. GMG 290110, dated February 23, 2009.

12.     Admit that the United States Government received BP's Application for Permit to Drill a New Well (Form MMS 123A/123S), dated May 13, 2009.

13.     Admit that the United States Government evaluated BP's Application for Permit to Drill a New Well (Form MMS 123A/123S), dated May 13, 2009.

14.     Admit that the United States Government approved BP's Application for Permit to Drill a New Well (Form MMS 123A/123S), dated May 13, 2009.

15.     Admit that the United States Government's approval of BP's Application for Permit to Drill a New Well (Form MMS 123A/123S), dated May 13, 2009, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

16.     Admit that the United States Government received BP's Application for Revised New Well (Form MMS 123A/123S), dated September 28, 2009.

17.     Admit that the United States Government evaluated BP's Application for Revised New Well (Form MMS 123A/123S), dated September 28, 2009.

18.     Admit that the United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated September 28, 2009.

19.     Admit that the United States Government's approval of BP's Application for Revised New Well (Form MMS 123A/123S), dated September 28, 2009, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

20.     Admit that the United States Government received BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted September 29, 2009.

21.     Admit that the United States Government evaluated BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted September 29, 2009.

22.     Admit that the United States Government approved BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted September 29, 2009.

23.     Admit that the United States Government's approval of BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted September 29, 2009, was made pursuant to 30 CFR 250.403.

24.     Admit that the United States Government received BP's Application for Revised New Well (Form MMS 123A/123S), dated October 15, 2009.

25.     Admit that the United States Government evaluated BP's Application for Revised New Well (Form MMS 123A/123S), dated October 15, 2009.

35

26.     Admit that the United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated October 15, 2009.

27.     Admit that the United States Government's approval of BP's Application for Revised New Well (Form MMS 123A/123S), dated October 15, 2009, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

28.     Admit that the United States Government received BP's Form MMS-124, dated October 21, 2009.

29.     Admit that the United States Government evaluated BP's Form MMS-124, dated October 21, 2009.

30.     Admit that the United States Government approved BP's Form MMS-124, dated October 21, 2009.

31.     Admit that the United States Government's approval of BP's Form MMS-124, dated October 21, 2009, was made pursuant to 30 CFR 250.465.

32.     Admit that the United States Government received BP's Application for Revised New Well (Form MMS 123A/123S), dated October 29, 2009.

33.     Admit that the United States Government evaluated BP's Application for Revised New Well (Form MMS 123A/123S), dated October 29, 2009.

34.     Admit that the United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated October 29, 2009.

35.     Admit that the United States Government's approval of BP's Application for Revised New Well (Form MMS 123A/123S), dated October 29, 2009, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

36.     Admit that the United States Government received BP's Incident Report, dated November 30, 2009.

37.     Admit that the United States Government evaluated BP's Incident Report, dated November 30, 2009.

38.     Admit that the United States Government approved BP's Incident Report, dated November 30, 2009.

39.     Admit that the United States Government's approval of BP's Incident Report, dated November 30, 2009, was made pursuant to 30 CFR 250.190.

40.     Admit that the United States Government received BP's Incident Report, dated December 7, 2009.

41.     Admit that the United States Government evaluated BP's Incident Report, dated December 7, 2009.

42.     Admit that the United States Government approved BP's Incident Report, dated December 7, 2009.

43.     Admit that the United States Government's approval of BP's Incident Report, dated December 7, 2009, was made pursuant to 30 CFR 250.190.

44.     Admit that the United States Government received BP's Form MMS-124, dated December 28, 2009.

45.     Admit that the United States Government evaluated BP's Form MMS-124, dated December 28, 2009.

46.     Admit that the United States Government approved BP's Form MMS-124, dated December 28, 2009.

47.     Admit that the United States Government's approval of BP's Form MMS-124, dated December 28, 2009, was made pursuant to 30 CFR 250.465.

48.     Admit that the United States Government received BP Exploration & Production, Inc. Emergency Evacuation Plan, dated January, 2010.

49.     Admit that the United States Government evaluated BP Exploration & Production, Inc. Emergency Evacuation Plan, dated January, 2010.

50.     Admit that the United States Government approved BP Exploration & Production, Inc. Emergency Evacuation Plan, dated January, 2010.

51.     Admit that the United States Government received BP's Application for Revised New Well (Form MMS 123A/123S), dated January 12, 2010.

52.     Admit that the United States Government evaluated BP's Application for Revised New Well (Form MMS 123A/123S), dated January 12, 2010.

53.     Admit that the United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated January 12, 2010.

54.     Admit that the United States Government's approval of BP's Application for Revised New Well (Form MMS 123A/123S), dated January 12, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

55.     Admit that the United States Government received BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted January 28, 2009.

56.     Admit that the United States Government evaluated BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted January 28, 2009.

57.     Admit that the United States Government approved BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted January 28, 2009.

58.     Admit that the United States Government's approval of BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted January 28, 2009, was made pursuant to 30 CFR 250.403.

59.     Admit that the United States Government received BP's Application for Revised New Well (Form MMS 123A/123S), dated January 25, 2010.

60.     Admit that the United States Government evaluated BP's Application for Revised New Well (Form MMS 123A/123S), dated January 25, 2010.

61.     Admit that the United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated January 25, 2010.

62.     Admit that the United States Government's approval of BP's Application for Revised New Well (Form MMS 123A/123S), dated January 25, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

63.     Admit that the United States Government received BP's Application for Permit to Modify (Form MMS-124), dated March 10, 2010.

64.     Admit that the United States Government evaluated BP's Application for Permit to Modify (Form MMS-124), dated March 10, 2010.

65.     Admit that the United States Government approved BP's Application for Permit to Modify (Form MMS-124), dated March 10, 2010.

66.     Admit that the United States Government's approval of BP's Application for Permit to Modify (Form MMS-124), dated March 10, 2010, was made pursuant to 30 CFR 250.465.

67.     Admit that the United States Government received BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010.

68.     Admit that the United States Government evaluated BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010.

69.     Admit that the United States Government approved BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010.

70.     Admit that the United States Government's approval of BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

71.     Admit that the United States Government was aware that a kick had occurred at the Macondo Well on March 8, 2010 when it approved BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010.

72.     Admit that the United States Government considered the March 8, 2010 kick in approving BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010.

73.     Admit that the United States Government received BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 25, 2010.

74.     Admit that the United States Government evaluated BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 25, 2010.

75.     Admit that the United States Government approved BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 25, 2010.

76.     Admit that the United States Government's approval of BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 25, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

77.     Admit that the United States Government received BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 26, 2010.

78.     Admit that the United States Government evaluated BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 26, 2010.

79.     Admit that the United States Government approved BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 26, 2010.

80.     Admit that the United States Government's approval of BP's Application for Revised Bypass (Form MMS 123A/123S), dated March 26, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

81.     Admit that the United States Government received BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 14, 2010.

82.     Admit that the United States Government evaluated BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 14, 2010.

83.     Admit that the United States Government approved BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 14, 2010.

84.     Admit that the United States Government's approval of BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 14, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

85.     Admit that the United States Government received BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 15, 2010.

86.     Admit that the United States Government evaluated BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 15, 2010.

87.     Admit that the United States Government approved BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 15, 2010.

88.    Admit that the United States Government's approval of BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 15, 2010, was made pursuant to 30 CFR 250.410 and 30 CFR 250.418.

89.    Admit that the United States Government approved BP's use of the 9 7/8" x 7" long string casing for the Macondo well, as specified in BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 15, 2010.

90.    Admit that the United States Government received BP's Application for Permit to Modify (Form MMS-124), dated April 16, 2010.

91.    Admit that the United States Government evaluated BP's Application for Permit to Modify (Form MMS-124), dated April 16, 2010.

92.    Admit that the United States Government approved BP's Application for Permit to Modify (Form MMS-124), dated April 16, 2010.

93.    Admit that the United States Government's approval of BP's Application for Permit to Modify (Form MMS-124), dated April 16, 2010, was made pursuant to 30 CFR 250.465.

94.    Admit that the United States Government approved BP's plan to set a 300' cement plug from 8367' to 8067', as specified in BP's Application for Permit to Modify (Form MMS-124), dated April 16, 2010.

95.    Admit that the United States Government received BP's Application End of Operations Report (Form MMS 125), accepted April 21, 2010.

96.    Admit that the United States Government evaluated BP's Application End of Operations Report (Form MMS 125), accepted April 21, 2010.

97.     Admit that the United States Government approved BP's Application End of Operations Report (Form MMS 125), accepted April 21, 2010.

98.     Admit that the United States Government's approval of BP's Application End of Operations Report (Form MMS 125), accepted April 21, 2010, was made pursuant to 30 CFR 250.465.

## II.     General Requests to Admit

99.     Admit that the United States Government approves long string production casing designs for deepwater wells in the Gulf of Mexico.

100.    Admit that the United States Government has approved long string production casing designs for deepwater wells in the Gulf of Mexico.

101.    Admit that a long string production casing design is an acceptable design for deepwater wells in the Gulf of Mexico.

102.    Admit that a long string production casing design is an appropriate design for deepwater wells in the Gulf of Mexico.

103.    Admit that more than 20% of all deepwater well designs in the Gulf of Mexico and approved by the United States Government utilize a long string production casing design.

104.    Admit that more than 30% of all deepwater well designs in the Gulf of Mexico and approved by the United States Government utilize a long string production casing design.

105.    Admit that more than 40% of all deepwater well designs in the Gulf of Mexico and approved by the United States Government utilize a long string production casing design.

106.    Admit that more than 50% of all deepwater well designs in the Gulf of Mexico and approved by the United States Government utilize a long string production casing design.

107.    Admit that more than 60% of all deepwater well designs in the Gulf of Mexico and approved by the United States Government utilize a long string production casing design.

108.    Admit that the United States Government approves liner with a tie back production casing designs for deepwater wells in the Gulf of Mexico.

109.    Admit that a liner with a tie back production casing design is an acceptable design for deepwater wells in the Gulf of Mexico.

110.    Admit that a liner with a tie back production casing design is an appropriate design for deepwater wells in the Gulf of Mexico.

111.    Admit that the United States Government does not require a negative pressure test during temporary abandonment procedures.

112.    Admit that there are no regulations regulating negative pressure test during temporary abandonment procedures.

113.    Admit that there are no federal laws regulating negative pressure tests during temporary abandonment procedures.

114.    Admit that the United States Government does not have guidelines for interpreting negative pressure tests.


## DEFINITIONS AND INSTRUCTIONS

1.      "You," "your," and "yours," whether or not capitalized, shall mean the United States.

2.      "United States" shall mean the United States of America, including its departments, agencies, and instrumentalities, any employees, agents or assigns of these departments, agencies, and instrumentalities, and any person who possesses information or documents within the custody and control of these departments, agencies, and instrumentalities.

3.      "Person," whether or not capitalized, shall mean an individual as well as any entity including any proprietorship, partnership, corporation, firm, committee, government agency or subdivision or consultant, or any other organization.

4.      "BOEM" shall mean the Bureau of Ocean Energy Management Regulation and Enforcement (formally the Minerals Management Service) and all current or former employees, agents or representatives, or anyone acting or purporting to act for or on the BOEM's behalf for any purpose whatsoever.

5.      "Transocean" shall mean Transocean Ltd. and all of its affiliates and subsidiaries as well as all current or former employees, agents or representatives, or anyone acting or purporting to act for or on the Transocean's behalf for any purpose whatsoever.

6.      "BP" means BP Exploration & Production Inc. and all of its affiliates and subsidiaries.

7.      "Communication" shall mean any transmission of information by one or more persons to one or more persons by any means including, without limitation, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail, computer linkups, written memoranda, and face-to-face conversations; "communication" includes all documents and electronically stored information ("ESI") containing, summarizing, or memorializing any communication.

8.      "Document" or "documents" shall have the full meaning ascribed to it by Federal Rule of Civil Procedure 34(a) including ESI, and includes the original and any identical or non-identical copy, regardless of origin or location, of any writing or record of any type or description, including but not limited to all writings; records; contracts; agreements; communications (intra or inter-company); correspondence; memoranda; letters; facsimiles;

45

electronic mail (e-mail); minutes, recordings, transcripts, and summaries of meetings, or recordings of meetings, speeches, presentations, conversations, or telephone calls (whether recorded in writing, mechanically, or electronically); handwritten and typewritten notes of any kind; statements; reports; voice recordings; desk calendars; diaries; logs; drafts; studies; analyses; schedules; forecasts; surveys; invoices; receipts; computer data; computer printouts; financial statements; balance sheets; profit and loss statements; statements of earnings; statements of net worth; credit reports; statements of operations; audit reports; financial summaries; statements of lists of assets; work papers; pictures; photographs; drawings; computer cards; tapes; discs; printouts and records of all types; instruction manuals; policy manuals and statements; books; pamphlets; cancelled checks; check stubs; and every other device or medium by which information or intelligence of any type is transmitted, recorded, or preserved, or from which intelligence or information can be perceived.

9.      "Identify," whether or not capitalized, when used with respect to: (a) an individual, shall mean to provide the individual's full name, job title, and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and Bates number(s).

10.      "Including" or "includes," whether or not capitalized, shall mean "including but not limited to" or "including without limitation."

11.      "Relating to" or "related to," whether or not capitalized, when referring to any given subject matter, shall mean any document that constitutes, comprises, involves, contains,

embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

12.    "Complaint" shall mean the complaint filed by the United States of America on December 15, 2010, in civil action number 2:10-cv-04536 pending in the United States District Court for the Eastern District of Louisiana.

13.    "Submission," whether or not capitalized, shall mean any application, filing, or submission to the United States.

14.    "*Deepwater Horizon* Incident" and "Incident" shall mean the loss of control of the MC252 Well and the fire and explosion(s) on board, and resulting sinking of, Transocean's *Deepwater Horizon* rig, in addition to the resulting oil spill in the Gulf of Mexico.

15.    "MC252 Well" shall mean the exploratory well that was being drilled by the *Deepwater Horizon* in the Macondo prospect of Mississippi Canyon 252 in the outer continental shelf of the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

16.    "Blowout," whether or not capitalized, shall mean an uncontrolled release of well fluids.

17.    "Capping Stack," whether or not capitalized, shall mean the mechanical device installed onto the *Deepwater Horizon* blowout preventer on July 10, 2010, and subsequently used to shut in the MC252 Well on July 15, 2010.

18.    "*Deepwater Horizon* blowout preventer" shall mean the blowout preventer from Transocean's *Deepwater Horizon* rig that was installed on the MC252 Well.

19.    "Kick," whether or not capitalized, shall mean the intrusion of liquid or gas into the wellbore.

20.     "Well control incident," whether or not capitalized, shall mean any kick or blowout.

21.     "Area Contingency Plan" shall have the meaning given in 40 C.F.R. § 300.5.

22.     "Area Committee" shall have the meaning given in 40 C.F.R. § 300.5.

23.     "Response Activities," whether or not capitalized, shall mean any and all activities performed to respond to the release of oil and hydrocarbons from the MC252 Well following the Incident.

24.     "Common Operating Picture" shall mean a common awareness of information and data related to and among those involved in the Response Activities.

25.     "Unified Command" shall mean the structure, organization, and team established to oversee and manage the response to the release of oil and hydrocarbons from the MC252 Well following the Incident.

26.     "National Incident Commander" shall have the meaning given in 40 C.F.R. Part 300.

27.     "Incident Commander" shall mean the individuals within the Unified Command responsible for management of the Response Activities, including the development of strategies and tactics.

28.     "Incident Command Post" shall mean the locations of the on-scene command and management organizations responsible for the Response Activities.

29.     "National Laboratories" shall mean the U.S. National Laboratories and Technology Centers, whose employees assisted in the response to the oil spill.

30.     "Science Advisors" shall mean the team of scientists selected by U.S. Secretary of Energy Steven Chu to provide advice on, and review of, source control efforts during the

response to the oil spill from the MC252 Well, excluding scientists employed by the National Laboratories.

31.     The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

32.     Unless otherwise specified, respond to all requests for production by searching for documents created on or after April 20, 2005.

33.     Produce all documents in the order in which they appear in your files.  Documents that, in their original condition, are stapled, clipped, or otherwise fastened together shall be produced in this same condition.

34.     Produce all documents within your possession, custody, or control including all documents in the possession, custody, or control of any United States government employee, agent, representative, consultant, attorney, accountant, advisors, or other persons directly or indirectly connected with you or subject to your control, any government department, agency or any other government subdivision.

35.     If any responsive document has been lost, destroyed, removed from, or is no longer in your possession, custody, or control for any reason, please identify the document, its last known location, and the circumstances surrounding its loss, destruction, or removal.

36.     If you contend that any responsive document is protected from disclosure pursuant to any privilege or work-product doctrine, please specifically set forth the privilege being asserted and any factual or legal basis for its assertion.  Also set forth the date and title of the document, its subject matter generally, its author(s) and recipient(s), and its Bates number(s).

37.     Each paragraph is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular request.

38.     If no documents responsive to a particular request exist, or if such documents exist but are not in your possession, custody, or control, then your response to that request shall so state.

39.     Pursuant to the Federal Rules of Civil Procedure, these requests are continuing and you must revise or supplement your responses and production whenever new or additional responsive information becomes known.

Dated:  April 7, 2011                                   Respectfully submitted,

                                                        /s/ J. Andrew Langan, P.C.
                                                        Richard C. Godfrey, P.C.
                                                        J. Andrew Langan, P.C.
                                                        KIRKLAND & ELLIS LLP
                                                        300 North LaSalle Street
                                                        Chicago, Illinois  60654
                                                        Telephone: (312) 862-2000
                                                        Facsimile: (312) 862-2200

                                                        and

                                                        Don K. Haycraft (Bar # 14361)
                                                        R. Keith Jarrett (Bar #16984)
                                                        LISKOW & LEWIS
                                                        701 Poydras Street, Suite 5000
                                                        New Orleans, Louisiana 70139-5099
                                                        Telephone: (504) 581-7979
                                                        Facsimile: (504) 556-4108

                                                        and

                                                        Robert C. "Mike" Brock
                                                        Covington & Burling LLP
                                                        1201 Pennsylvania Avenue, NW
                                                        Washington, DC 20004-2401
                                                        Telephone: (202) 662-5985

                                                        *Attorneys for BP Exploration & Production
                                                        Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 7th day of April, 2011.

/s/ J. Andrew Langan, P.C.