# EXHIBIT 12

LEXISNEXIS® FILE & SERVE
37258289
E-SERVICE
Apr 26 2011
6:04PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Cases …………………………………………... | : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

**BP EXPLORATION & PRODUCTION INC.'S SECOND SET OF**
**DISCOVERY REQUESTS TO THE UNITED STATES OF AMERICA**

Pursuant to Federal Rules of Civil Procedure 26, 33 and 34, BP Exploration & Production Inc. propounds the following requests for production of documents, interrogatories, and requests for admission to the United States of America to be responded to within 30 days of service. BP Exploration & Production Inc. requests that all documents and electronically stored information responsive to the following discovery requests be produced at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654.

**REQUESTS FOR PRODUCTION**

179. All documents referring or relating to the Joint Investigation conducted by the United States Coast Guard and the Bureau of Ocean Energy Management, Regulation and Enforcement into the causes of the Incident.

180. To the extent not required by other requests, all documents referring or relating to any investigation conducted by the United States Government regarding the cause or causes of the Incident.

181. All documents referring or relating to witness statements or interviews regarding the Incident, conducted by the United States Government in connection with any investigation into the causes of the Incident.

182.    All communications, documents, and drafts related to the preparation and publication of the "Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking and Loss of Eleven Crew Members Aboard the MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON* In the GULF OF MEXICO: April 20-22, 2010, Volume I" and Appendices by the United States Coast Guard.

183.    All documents referring or relating to the United States Coast Guard "Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking and Loss of Eleven Crew Members Aboard the MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON* In the GULF OF MEXICO: April 20-22, 2010, Volume I" and Appendices.

184.    All documents referring or relating to the oversight of foreign-flagged Mobile Offshore Drilling Units (MODUs), including but not limited to MODUs flagged under the Republic of the Marshall Islands.

185.    All documents referring or relating to any United States regulation, requirement, policy or guidance concerning safety, firefighting, or emergency preparedness drills aboard MODUs.

186.    All documents referring or relating to any United States regulation, requirement, policy or guidance concerning the command structure aboard MODUs.

187.    All documents exchanged between and communications between the United States and any person working on behalf of the Republic of the Marshall Islands referring or relating to the *Deepwater Horizon*, the MC252 Well, and the Incident.

188.    All documents exchanged between and communications between the United States and any person working on behalf of the International Maritime Organization referring or

relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after January 1, 2010.

189.   All documents referring or relating to any United States regulation, requirement, policy or guidance concerning annual Certificate of Compliance (COC) examinations.

190.   All documents referring or relating to annual Certificate of Compliance (COC) examinations of the *Deepwater Horizon* conducted by the United States Coast Guard.   All documents referring or relating to any administrative decision-making which has taken place or which is taking place relating to the determination of the rate or volume of oil discharged from the Macondo Well.

191.   All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to predictions, estimates, or measurements of the impacts of the discharge from the MC252 Well or Response Activities on biota, including but not limited to marine plant life, other plant life, fish, plankton, benthic life forms, marine mammals, birds, bacteria, microorganisms, or intertidal fauna, or referring or relating to efforts to predict, estimate or measure those impacts, including, but not limited to, data collected as part of Response Activities.

192.   All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to predictions, estimates, or measurements of the impacts of the discharge from the MC252 Well or Response Activities on physical environments on the land, in water, or in special environments such as wetlands, salt or brackish marshes, or that contain, describe, or

3

refer to efforts to predict, estimate or measure those impacts, including, but not limited to, data collected as part of Response Activities

193.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to predictions, estimates, or measurements of the impacts of the discharge from the MC252 Well or Response Activities on features of the environment considered human amenities (including but not limited to beaches, water frontages, fish traps or ponds, parks or reserves) or on man-made assets (including but not limited to bridges, causeways, boats, boat launches, docks, ports or weirs), or that contain, describe, or refer to efforts to predict, estimate or measure those impacts, including, but not limited to, data collected as part of Response Activities.

194.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to predictions, estimates or measurements of the impacts of the discharge from the MC252 Well or Response Activities on ambient air quality or water quality in any body of water, or that contain, describe, or refer to efforts to predict, estimate or measure those impacts, including, but not limited to, data collected as part of Response Activities.

195.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to predictions, estimates, or measurements of the impacts of decisions, conduct, acts or omissions of any federal agency or officer of the Unified States on efforts to avoid or mitigate the impacts of the discharge from the MC252 Well on biota, physical environments, human amenities, man-made assets, ambient air quality, or water quality, or that

contain, describe, or refer to efforts to predict, estimate or measure those impacts, including, but not limited to, data collected as part of Response Activities.

196.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to estimates of the number of animals found dead, alive or oiled to any extent during the Response Activities, including, but not limited to, Unusual Mortality Event ("UME") data.

197.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to estimates of the number of animals rescued, transported or rehabilitated during the Response Activities, including, but not limited to, data collected as part of Response Activities

198.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to plans or efforts to rescue, transport or rehabilitate wildlife in connection with the Response Activities.

199.    All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine the effectiveness of efforts to rescue, transport or rehabilitate wildlife in connection with the Response Activities, including, but not limited to, data collected as part of Response Activities

200.     All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to standards, guidelines, metrics, or to proposed standards, guidelines or metrics, to assess, measure or determine possible or predicted counterproductive or harmful effects of efforts to rescue, transport or rehabilitate wildlife in connection with the Response Activities, including, but not limited to, data collected as part of Response Activities

201.     All documents, other than documents created in connection with the Deepwater Horizon Natural Resource Damages Assessment conducted pursuant to the Oil Pollution Act, referring or relating to the effectiveness or lack of effectiveness of efforts to rescue, transport or rehabilitate wildlife in connection with the Response Activities, including, but not limited to, data collected as part of Response Activities

202.     All documents that constitute, contain, describe or refer to any guideline, policy or practice of the United States Government for use in determining the amount of civil penalties assessed under Section 311 of the Clean Water Act in connection with an oil spill.

203.     All documents that constitute, contain, describe or refer to any guideline, policy or practice for use in determining when and how the United States Government may invoke the Executive Privilege or the Deliberative Process Privilege in civil litigation.

204.     All documents identified in responses to the Interrogatories set forth below.


**INTERROGATORIES**

22.     Please identify every United States officer, employee or other person associated with the United States, including consultants and agents, who participated in any way in any firefighting efforts in response to the Incident on Transocean's *Deepwater Horizon* rig.

23.     Please identify each person who assisted, advised or represented the United States or the Unified Command in connection with any firefighting efforts in response to the Incident on Transocean's *Deepwater Horizon* rig, who was not an officer or enlisted person in the United States Coast Guard.

24.     State the number of barrels and gallons of oil and every other material (identifying each such material) discharged from the MC252 Well into the Gulf of Mexico as a result of the Incident, and your method(s) for calculating or otherwise determining that number, and identify each document on which your answer is based or that supports your answer.

25.     Identify any administrative decision-making which has taken place or which you expect to take place relating to the determination of the rate or volume of oil discharged from the MC252 Well, and for each such decision making state the decision that was reached.

26.     Explain fully how the estimated flow rate values and flow volumes for the discharge from the MC252 Well and the uncertainty to be assigned to those values and volumes, contained in the report dated March 10, 2011 and entitled "Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill," were prepared.  Identify all documents that refer or relate to that report, including but not limited to all appendices and peer review documents and documents that disagree with the contents of the report or its method of preparation, and identify all persons who participated in the preparation, review or approval of that report or its contents.

27.     State whether that report identified in Interrogatory No. 24 presents the opinion of the United States Government about the estimated flow rate values and flow volumes for the discharge from the MC252 Well and the uncertainty to be assigned to those values and volumes.

28.     Identify each person whom you may call as an expert witness in this matter, including each and every person whom you may call as either a retained or a non-retained expert (such as a current employee, agent or independent contractor), and, for each person identified, state:  (a) the subject matter on which the expert is expected to testify; (b) the substance of the facts and opinions to which the expert is expected to testify; and (c) a summary of the grounds for each opinion.

## REQUESTS FOR ADMISSION

### I.      Environmental Documents and Assessments

115.    Admit that the United States Government prepared an environmental impact statement under the National Environmental Policy Act that applied to the leasing of Mississippi Canyon Block 252.

116.    Admit that the environmental impact statement prepared by the United States Government with respect to the leasing of Mississippi Canyon Block 252 complied with the National Environmental Policy Act.

117.    Admit that the United States Government prepared a multisale environmental impact statement under the National Environmental Policy Act that applied to the leasing of Mississippi Canyon Block 252.

118.    Admit that the multisale environmental impact statement prepared by the United States Government with respect to the leasing of Mississippi Canyon Block 252 complied with the National Environmental Policy Act.

119.    Admit that the United States Government conducted an environmental assessment under the National Environmental Policy Act with respect the leasing of Mississippi Canyon Block 252.

120.    Admit that the environmental assessment conducted by the United States Government with respect to the leasing of Mississippi Canyon Block 252 complied with the National Environmental Policy Act.

## II.        Planning

121.    Admit that the United States Government received BP's Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009.

122.    Admit that the United States Government evaluated BP's Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009.

123.    Admit that the United States Government approved BP's Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009.

124.    Admit that the United States Government's approval of BP's Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009, was made in accordance with 33 U.S.C. § 1321(j).

125.    Admit that BP's Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009, was in compliance with all United States Government standards for response capabilities to address a worst case discharge.

126.    Admit that federal regulations provided an approved method for BP to use in determining the effective daily recovery capacity of skimming response capability for purposes of its Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009.

127.    Admit that federal regulations provided an approved method for BP to use in stating the effective daily recovery capacity of skimming response capability for purposes of its Gulf of Mexico Regional Oil Spill Response Plan, dated June 2009.

128.    Admit that the method provided in federal regulations for stating the effective daily recovery capacities of skimming capability does not fully predict, estimate or determine the efficiency with which skimming systems can recover oil in any specific incident.

129.    Admit that, as of the date of the Incident, the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident did not contain a worst case discharge scenario.

130.    Admit that, as of the date of the Incident, the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident did not identify all environmentally sensitive areas for protection in the event of an oil spill.

131.    Admit that during the Response Activities the Unified Command identified environmentally sensitive areas for protection that were not identified in the One Gulf Plan or the Area Contingency Plans for areas affected by the Incident.

132.    Admit that, owing to the omission of each environmentally sensitive area for protection in the event of an oil spill from the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident, the Unified Command undertook protection strategies or actions different than those contained in the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident.

133.    Admit that omissions in the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident with respect to identifying environmentally sensitive areas led to impacts from the Incident different than would have occurred if the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident had identified each environmentally sensitive area affected by the Incident.

134.    Admit that, as of the date of the Incident, the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident did not state priorities for action with respect to all environmentally sensitive areas for protection in the event of an oil spill.

135.    Admit that the Unified Command determined during the Response Activities that the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident did not state priorities for action with respect to all environmentally sensitive areas for protection in the event of an oil spill.

136.    Admit that, owing to the omission of priorities for action for all environmentally sensitive areas for protection in the event of an oil spill, the Unified Command undertook protection strategies or actions different than those contained in the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident.

137.    Admit that omissions in the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident with respect to prioritizing environmentally sensitive areas led to impacts from the Incident different than would have occurred if the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident had stated priorities for action with respect to each environmentally sensitive area affected by the Incident.

138.    Admit that omissions in the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident with respect to identifying protection strategies led to impacts from the Incident different than would have occurred if the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident had identified the protection strategies actually employed in the Response Activities by the Unified Command.

139.    Admit that omissions in the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident with respect identifying oil-spill response resources led to impacts

from the Incident different than would have occurred if the One Gulf Plan and the Area Contingency Plans for areas affected by the Incident had identified the oil-spill response resources actually employed in the Response Activities by the Unified Command.

### III.       Firefighting

140.    Admit that the United States Coast Guard participated in the efforts of the vessels attempting to fight the fire aboard the *Deepwater Horizon*.

141.    Admit that the United States Coast Guard coordinated the efforts of the vessels attempting to fight the fire aboard the *Deepwater Horizon*.

142.    Admit that the United States Coast Guard communicated with the vessels attempting to fight the fire aboard the *Deepwater Horizon*.

143.    Admit that the United States Coast Guard was asked to provide assistance in firefighting efforts in connection with the Incident.

144.    Admit that the Federal On-Scene Coordinators have jurisdiction over marine firefighting.

145.    Admit that the Commanding Officer of the United States Coast Guard Cutter *ZEPHYR*, assumed Federal On-Scene Coordinator duties for the Incident on April 21, 2010.

146.    Admit that the marine firefighting efforts related to the Incident lacked direction and coordination.

147.    Admit that the marine firefighting efforts related to the Incident paid insufficient attention to the risks of excess water destabilizing the *Deepwater Horizon*.

148.    Admit that the United States Coast Guard did not designate a fire marshal in connection with the Incident.

149.    Admit that the United States Coast Guard did not contact any Transocean employees to discuss the direction and/or coordination of the firefighting efforts in connection with the Incident.

150.    Admit that application of foam is more effective in firefighting to control burning hydrocarbons than water.

151.    Admit that United States Coast Guard regulations identify risks in spraying water in marine firefighting efforts.

152.    Admit that United States Coast Guard regulations incorporate by reference specific guidance concerning marine vessel fires, and that such guidance specifically addresses vessel stability in the context of a marine vessel fire.

153.    Admit that once the United States Coast Guard Cutter *Zephyr* arrived on the scene of the Incident, it assumed command and control of all operations.

154.    Admit that the United States Coast Guard was concerned about the stability of the *Deepwater Horizon* during the firefighting efforts.

155.    Admit that personnel aboard M/V *Max Chouest* asked the United States Coast Guard Cutter *Zephyr* to have fire vessels redirect water to the columns of the Deepwater Horizon.

### IV.        The Unified Command

156.    Admit that the United States Government directed the Unified Command Response Activities.

157.    Admit that an Officer of the United States Coast Guard provided signature approval for the Response Activities listed in Incident Action Plans.

158.    Admit that the United States Government approved the Response Activities listed in Incident Action Plans signed by an Officer of the United States Coast Guard.

159.    Admit that, under the National Contingency Plan, the Federal On-Scene Coordinator exercised final authority to direct the actions undertaken in the Unified Command Response Activities.

160.    Admit that, in their capacity as Federal On-Scene Coordinators, the Federal On-Scene Coordinators that served during the Response Activities acted on behalf of the President.

161.    Admit that the United States Government exercised final authority to direct the actions undertaken in Unified Command Response Activities.

162.    Admit that the United States Government had the authority to disapprove and to prevent implementation of any Unified Command Response Activities proposed by BP.

163.    Admit that the United States Government had the authority to require BP to undertake any Response Activity.

164.    Admit that the United States Government exercised final authority to determine the information that would be released to the public by the Unified Command during the Response Activities.

165.    Admit that the United States Government approved the release of all information released to the public from the Unified Command during the Response Activities.

166.    Admit that the United States Government approved the release of all information released from the Unified Command's Joint Information Center during the Response Activities.

167.    Admit that BP worked cooperatively with the United States Government in the Unified Command.

14

168.   Admit that BP performed all Response Activities it was directed to perform by the Unified Command.

169.   Admit that BP performed all Response Activities it was directed to perform by the Unified States.

170.   Admit that the Unified Command approved each of the Response Activities performed by BP, either before or after each such Response Activity was undertaken.

171.   Admit that the United States approved all Response Activities performed by BP.

172.   Admit that BP placed no limits on funding for Response Activities that prevented the Unified Command from performing Response Activities that the Unified Command determined were necessary to respond to the discharge from the MC252 Well following the Incident.

173.   Admit that the Unified Command had the resources necessary to respond to the discharge from the MC252 Well following the Incident.

174.   Admit that the Unified Command had the financial resources necessary to respond to the discharge from the MC252 Well following the Incident.

175.   Admit that the Unified Command had enough United States Government personnel and United States Government contractor personnel to participate in the Response Activities it determined were necessary to respond to the discharge from the MC252 Well following the Incident.

176.   Admit that, in May 2010, the President called for the tripling of federal resources to respond to the discharge from the MC252 Well following the Incident.

177.    Admit that the attempt to triple federal resources as called for by the President in May 2010 negatively impacted the Unified Command's ability to respond to the discharge from the MC252 Well following the Incident.

178.    Admit that United States Coast Guard officials believed that the tripling of federal resources called for by the President in May 2010 limited the Coast Guard's ability to respond to the Incident and to conduct its other missions following the Incident.

179.    Admit that United States Coast Guard officials believed that the tripling of federal resources called for by the President in May 2010 limited the Coast Guard's ability to conduct missions other than responding to the discharge from the MC252 Well.

180.    Admit that the Governor of Louisiana refused to provide the United States Coast Guard with the location of an oiled marsh where the Governor was physically located when the Governor publicly complained about the adequacy of the response to the Incident.

181.    Admit that the United States Government rejected offers from foreign countries and foreign companies of assistance in the form of response equipment and vessels to respond to the Incident.

**V.      Chemical Dispersants**

182.    Admit that Admiral Thad Allen stated on or about August 2, 2010, that he was satisfied with the use of dispersants to mitigate the impact of the discharge from the MC252 Well.

183.    Admit that dispersants were used to respond to the discharge from the MC252 Well only when dispersants were needed.

184.    Admit that dispersants were an essential tool in mitigating the impacts of the discharge from the MC252 Well.

16

185.    Admit that dispersants were an effective tool in preventing the discharge from the MC252 Well from reaching the Gulf of Mexico shoreline.

186.    Admit that dispersants increased the speed at which oil discharged from the MC252 Well degraded.

187.    Admit that the United States Government believes that application of dispersants at the wellhead to the discharge from the MC252 Well was a prudent and responsible Response Activity.

188.    Admit that the final decision to use dispersants as a Response Activity was made by the Federal On-Scene Coordinator, not BP.

189.    Admit that the volume of dispersants applied during Response Activities was reduced by 72 percent from peak levels in response to the United States Government's May 26, 2010 directive regarding dispersant use.

190.    Admit that use of dispersants is less environmentally harmful than allowing oil to migrate on the water surface into wetlands and coastal habitats.

191.    Admit that, following a United States Environmental Protection Agency denial to apply dispersants to the surface of the water in the Gulf of Mexico by air, United States Coast Guard Captain James Hanzalik stated that, if oil hit the beach because dispersants were not applied, the "responsibility needs to be placed squarely in the EPA's court."

192.    Admit that application of dispersants at the wellhead to the discharge from the MC252 Well reduced exposure to volatile organic compounds for persons on vessels engaged in Response Activities.

193.    Admit that application of dispersants to the surface of the water in the Gulf of Mexico reduced exposure to volatile organic compounds for persons on vessels engaged in Response Activities.

194.    Admit that BP and its contractors never violated United States Government directives regarding dispersant use during the Response Activities.

195.    Admit that, as of April 20, 2010, Corexit EC9500A and Corexit EC9527A were pre-approved by the United States Government for use in responding to an oil spill in the Gulf of Mexico.

196.    Admit that, in May 2010, the United States Government directed BP to identify an alternative to the dispersants being used in Response Activities.

197.    Admit that there existed no alternative to the dispersants being used in Response Activities that were listed on the United States Environmental Protection Agency's National Contingency Plan Product Schedule and available in sufficient quantities to replace Corexit EC9500A and Corexit EC9527A and that presented lower risks to human or other animal health than Corexit EC9500A and Corexit EC9527A.

198.    Admit that the United States Environmental Protection Agency's independent study of alternative dispersants confirmed that there existed no alternative to the dispersants being used in Response Activities that was less toxic and available in sufficient quantities.

199.    Admit that the Regional Response Plan for Region IV provided pre-approval for use of dispersants to respond to an oil spill.

200.    Admit that the Regional Response Plan for Region VI provided pre-approval for use of dispersants to respond to an oil spill.

18

201.    Admit that, for the period from on or about April 22, 2010 to on or about May 26, 2010, the United States Government approved the aerial application of dispersants as a Response Activity.

202.    Admit that, on or about May 26, 2010, the United States Government directed BP to eliminate the surface application of dispersants to the discharge from the MC252 Well.

203.    Admit that, on or about May 26, 2010, the United States Government began requiring written requests for authorization to apply dispersants by air to the surface of the water in the Gulf of Mexico.

204.    Admit that the United States Government approved the aerial application of a total of 15,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on May 28, 2010.

205.    Admit that a request was made to the United States Government for approval to apply a total of 19,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on May 29, 2010.

206.    Admit that the United States Government approved the aerial application of a total of 15,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on May 29, 2010.

207.    Admit that the United States Government approved the aerial application of a total of 19,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on May 30, 2010.

208.    Admit that the United States Government approved the aerial application of a total of 19,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on May 31, 2010.

209.    Admit that a request was made to the United States Government for approval to apply a total of 21,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 1, 2010.

210.    Admit that the United States Government did not approve the aerial application of any dispersants to the surface of the water in the Gulf of Mexico, to occur on June 1, 2010.

211.    Admit that a request was made to the United States Government for approval to apply a total of 21,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 2, 2010.

212.    Admit that the United States Government did not approve the aerial application of any dispersants to the surface of the water in the Gulf of Mexico, to occur on June 2, 2010.

213.    Admit that a request was made to the United States Government for approval to apply a total of 21,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 3, 2010.

214.    Admit that the United States Government approved the aerial application of a total of 2,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 3, 2010.

215.    Admit that a request was made to the United States Government for approval to apply a total of 22,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 4, 2010.

216.    Admit that the United States Government did not approve the aerial application of any dispersants to the surface of the water in the Gulf of Mexico, to occur on June 4, 2010.

217.    Admit that a request was made to the United States Government for approval to apply a total of 40,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 5, 2010.

218.    Admit that the United States Government approved the aerial application of a total of 125 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 5, 2010.

219.    Admit that the United States Government approved the aerial application of a total of 2,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 6, 2010.

220.    Admit that the United States Government approved the aerial application of a total of 4,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 7, 2010.

221.    Admit that a request was made to the United States Government for approval to apply a total of 104,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 8, 2010.

222.    Admit that the United States Government approved the aerial application of a total of 32,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 8, 2010.

223.    Admit that a request was made to the United States Government for approval to apply a total of 32,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 9, 2010.

224.    Admit that the United States Government did not approve the aerial application of any dispersants to the surface of the water in the Gulf of Mexico, to occur on June 9, 2010.

225.    Admit that a request was made to the United States Government for approval to apply a total of 32,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 10, 2010.

226.    Admit that the United States Government approved the aerial application of a total of 21,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 10, 2010.

227.    Admit that a request was made to the United States Government for approval to apply a total of 36,200 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 11, 2010.

228.    Admit that the United States Government approved the aerial application of a total of 15,700 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 11, 2010.

229.    Admit that a request was made to the United States Government for approval to apply a total of 58,160 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 12, 2010.

230.    Admit that the United States Government approved the aerial application of a total of 7,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 12, 2010.

231.    Admit that a request was made to the United States Government for approval to apply a total of 70,600 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 13, 2010.

232.    Admit that the United States Government approved the aerial application of a total of 36,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 13, 2010.

233.    Admit that a request was made to the United States Government for approval to apply a total of 59,800 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 14, 2010.

234.    Admit that the United States Government approved the aerial application of a total of 17,800 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 14, 2010.

235.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico on June 14, 2010, in comparison with the amount that the United States Government approved for such application on that date.

236.    Admit that a request was made to the United States Government for approval to apply a total of 46,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 15, 2010.

237.    Admit that the United States Government approved the aerial application of a total of 15,500 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 15, 2010.

238.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico on June 15, 2010, in comparison with the amount that the United States Government approved for such application on that date.

239.    Admit that a request was made to the United States Government for approval to apply a total of 46,700 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 16, 2010.

240.    Admit that the United States Government approved the aerial application of a total of 19,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 16, 2010.

241.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico on June 16, 2010, in comparison with the amount that the United States Government approved for such application on that date.

242.    Admit that a request was made to the United States Government for approval to apply a total of 44,800 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 17, 2010.

243.    Admit that the United States Government approved the aerial application of a total of 18,700 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 17, 2010.

244.    Admit that a request was made to the United States Government for approval to apply a total of 38,400 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 18, 2010.

245.    Admit that the United States Government approved the aerial application of a total of 19,200 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 18, 2010.

246.    Admit that a request was made to the United States Government for approval to apply a total of 28,700 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 19, 2010.

247.    Admit that the United States Government approved the aerial application of a total of 12,300 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 19, 2010.

248.    Admit that a request was made to the United States Government for approval to apply a total of 31,780 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 20, 2010.

249.    Admit that the United States Government approved the aerial application of a total of 15,500 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 20, 2010.

250.    Admit that a request was made to the United States Government for approval to apply a total of 33,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 21, 2010.

251.    Admit that the United States Government approved the aerial application of a total of 10,400 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 21, 2010.

252.    Admit that a request was made to the United States Government for approval to apply a total of 27,487 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 22, 2010.

253.    Admit that the United States Government approved the aerial application of a total of 10,487 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 22, 2010.

254.    Admit that a request was made to the United States Government for approval to apply a total of 11,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 23, 2010.

255.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 23, 2010.

256.    Admit that the United States Government approved the aerial application of a total of 22,400 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 24, 2010.

257.    Admit that a request was made to the United States Government for approval to apply a total of 42,600 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 25, 2010.

258.    Admit that the United States Government approved the aerial application of a total of 14,400 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 25, 2010.

259.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico on June 25, 2010, in comparison with the amount that the United States Government approved for such application on that date.

260.    Admit that a request was made to the United States Government for approval to apply a total of 74,200 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 26, 2010.

261.    Admit that the United States Government approved the aerial application of a total of 43,600 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 26, 2010.

262.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico on June 26, 2010, in comparison with the amount that the United States Government approved for such application on that date.

263.    Admit that a request was made to the United States Government for approval to apply a total of 61,480 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on June 27, 2010.

264.    Admit that the United States Government approved the aerial application of a total of 10,880 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 27, 2010.

265.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico on June 27, 2010, in comparison with the amount that the United States Government approved for such application on that date.

266.    Admit that the United States Government approved the aerial application of a total of 5,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 28, 2010.

267.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 29, 2010.

268.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on June 30, 2010.

269.    Admit that the United States Government approved the aerial application of a total of 20,100 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 1, 2010.

270.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico, to occur on July 1, 2010, in comparison with the amount that the United States Government approved for such application on that date.

271.    Admit that a request was made to the United States Government for approval to apply a total of 64,800 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on July 2, 2010.

272.    Admit that the United States Government approved the aerial application of a total of 20,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 2, 2010.

273.    Admit that the United States Government's delay in approving the requested dispersant application limited the amount of dispersants that was applied by air to the surface of the water in the Gulf of Mexico, to occur on July 2, 2010, in comparison with the amount that the United States Government approved for such application on that date.

274. Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 3, 2010.

275. Admit that a request was made to the United States Government for approval to apply a total of 20,840 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on July 4, 2010.

276. Admit that the United States Government approved the aerial application of a total of 8,640 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 4, 2010.

277. Admit that a request was made to the United States Government for approval to apply a total of 16,700 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on July 5, 2010.

278. Admit that the United States Government approved the aerial application of a total of 6,700 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 5, 2010.

279. Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 6, 2010.

280. Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 7, 2010.

281.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 8, 2010.

282.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 9, 2010.

283.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 10, 2010.

284.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 11, 2010.

285.    Admit that a request was made to the United States Government for approval to apply a total of 10,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on July 12, 2010.

286.    Admit that the United States Government approved the aerial application of a total of 5,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 12, 2010.

287.    Admit that a request was made to the United States Government for approval to apply a total of 10,000 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on July 13, 2010.

288.    Admit that the United States Government approved the aerial application of a total of 5,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 13, 2010.

289.    Admit that the United States Government approved the aerial application of a total of 10,000 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 14, 2010.

290.    Admit that a request was made to the United States Government for approval to apply a total of 30,100 gallons of dispersants by air to the surface of the water in the Gulf of Mexico, to occur on July 15, 2010.

291.    Admit that the United States Government approved the aerial application of a total of 20,100 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 15, 2010.

292.    Admit that the United States Government approved the aerial application of a total of 375 gallons of dispersants to the surface of the water in the Gulf of Mexico, to occur on July 19, 2010.

293.    Admit that the United States Government approved the application of dispersants to the surface of the Gulf of Mexico by the M/V *International Peace* in order to evaluate dispersant effectiveness and health risks.

294.    Admit that, on or about May 15, 2010, the United States Government authorized the application of dispersants at the wellhead to the discharge from the MC252 Well.

295.    Admit that, on or about May 26, 2010, the United States Government directed BP to limit the application of dispersants at the wellhead to the discharge from the MC252 Well to a maximum of 15,000 gallons per day.

296.    Admit that the United States Government authorized BP to increase application of dispersants from 15,000 gallons to 23,000 gallons for June 4, 2010, at the wellhead to the discharge from the MC252 Well.

297.    Admit that, on June 19, 2010, the United States Government authorized BP to increase application of dispersants from 15,000 gallons to 21,600 gallons for 24 hours at the wellhead to the discharge from the MC252 Well.

298.    Admit that the United States Government authorized BP to apply more than 15,000 gallons of dispersants for July 11, 2010, at the wellhead to the discharge from the MC252 Well.

299.    Admit that the United States Government authorized BP to increase application of dispersants to twelve gallons per minute, or approximately 17,000 gallons, for July 12, 2010, at the wellhead to the discharge from the MC252 Well.

## VI.    Controlled In-Situ Burning

300.    Admit that the Regional Response Plan for Region IV provided pre-approval for controlled in-situ burning to respond to an oil spill.

301.    Admit that the Regional Response Plan for Region VI provided pre-approval for controlled in-situ burning to respond to an oil spill.

302.    Admit that the United States Government required smoke plume sampling before controlled in-situ burning could be used as a Response Activity.

303.    Admit that a member of the United States Coast Guard was present at all controlled in-situ burning operations conducted to respond to the discharge from the MC252 Well.

304.     Admit that the United States Government estimates that the amount of oil burned during controlled in-situ burning Response Activities was between 220,000 to 310,000 barrels of oil

305.     Admit that controlled in-situ burning operations conducted during Response Activities complied with federal regulations and applicable Regional Response Plans.

306.     Admit that controlled in-situ burning is an effective response tool to mitigate the impacts of an oil spill.

307.     Admit that United States Government conducted air sampling at the locations of controlled in-situ burning Response Activities.

308.     Admit that the United States Government determined that dioxins emitted during controlled in-situ burning Response Activities were below the United States Environmental Protection Agency's levels of concern.

## VII.        Other Response Methods and Impacts

309.     Admit that the *Deepwater Horizon* Incident and response did not cause hypoxia, or dead zones, in the Gulf of Mexico.

310.     Admit that the Unified Command mobilized more than 14 million feet of boom and deployed approximately 3.9 million feet of containment boom and approximately 9.7 million feet of sorbent boom.

311.     Admit that boom helped prevent some oil from reaching sensitive coastline ecosystems.

312.     Admit that BP completely followed the United States Government's direction regarding what types of boom to procure for use by the Unified Command.

313.    Admit that BP completely followed the United States Government's direction regarding where to stage or locate all boom in storage areas procured for use by the Unified Command prior to boom deployment.

314.    Admit that BP completely followed the United States Government's direction regarding where to deploy all boom that BP deployed under direction of the Unified Command.

315.    Admit that seafood testing has shown and continues to show that seafood from the Gulf taken since the Incident has been and is safe for human consumption.

316.    Admit that the Shoreline Cleanup Assessment Technique ("SCAT") process was used successfully to ensure a net environmental benefit from the Response Activities.

317.    Admit that the Fish and Wildlife Service advised the Incident Command on ways to mitigate the effects of the oil and response activities on wildlife.

318.    Admit that the Unified Command established protocols to minimize potential impacts on wildlife.

319.    Admit that the United States Government approved the waste management plans developed for and used during the response.

320.    Admit that the United States Government approved the vessel decontamination plans developed for and used during the response.

321.    Admit that the United States Government did not provide a general Jones Act waiver for the *Deepwater Horizon* Incident.

322.    Admit that the United States Government did not request alternative requirements for compliance with the National Environmental Policy Act in order to establish an interim rule to permit the relocation of equipment for use in the Response Activities until on or about July 6, 2010.

34

323.    Admit that the United States Government responded to the request for alternative National Environmental Policy Act requirements in connection with the Response Activities on or about July 12, 2010.

324.    Admit that the United States Government did not waive applicable Clean Water Act discharge standards for all available decanting equipment, which precluded the use of some skimmers and other Response Activities.

325.    Admit that the United States Government did modify Clean Water Act discharge standards to permit the testing and use of some spill response technologies.

## VIII.    Barrier Island Sand Berms

326.    Admit that, on May 11, 2010, the State of Louisiana applied for a permit to construct offshore barrier berms in order to respond to the Incident.

327.    Admit that, in May 2010, an interagency task force advised the National Incident Command that the State of Louisiana's proposed project to build offshore barrier berms would not be an effective spill-response measure.

328.    Admit that, on May 27, 2010, the United States Government issued a permit for the State of Louisiana to build six offshore barrier berms.

329.    Admit that the State of Louisiana has constructed offshore barrier berms that were authorized by the United States Government on or about May 27, 2010.

330.    Admit that the State of Louisiana is constructing offshore barrier berms that were authorized by the United States Government on or about May 27, 2010.

331.    Admit that the State of Louisiana's contractors have constructed offshore barrier berms that were authorized by the United States Government on or about May 27, 2010.

332.    Admit that the State of Louisiana's contractors are constructing offshore barrier berms that were authorized by the United States Government on or about May 27, 2010.

333.    Admit that BP did not apply to the United States Government for a permit to construct offshore barrier berms in the State of Louisiana as a Response Activity.

334.    Admit that BP did not request permission from the United States Government to construct offshore barrier berms in the State of Louisiana as a Response Activity.

335.    Admit that the National Incident Commander approved only one segment of Louisiana's offshore barrier berm project on May 27, 2010.

336.    Admit that on June 2, 2010, after a communication by or on behalf of the President, the National Incident Commander approved the remaining segments of Louisiana's offshore barrier berm project.

337.    Admit that the United States Government did not issue a permit for BP to build offshore barrier berms following the Incident.

338.    Admit that, on or about June 4, 2010, the Unified Command informed BP that the construction of the berms by the State of Louisiana was a removal action and that the expense of the construction was an appropriate removal cost under the Oil Pollution Act of 1990.

## IX.        Vessels of Opportunity

339.    Admit that the National Contingency Plan does not call for a program similar to the Vessels of Opportunity program.

340.    Admit that the Regional Response Plan for Region IV does not call for a program similar to the Vessels of Opportunity program.

341.    Admit that the Regional Response Plan for Region VI does not call for a program similar to the Vessels of Opportunity program.

342.    Admit that, at the time of the Incident, neither the One Gulf Plan nor the Area Contingency Plans for the areas affected by the Incident called for a program similar to the Vessels of Opportunity program.

36

## X.        Post-Incident Well Control and Closure

343.    Admit that representatives of the United States Government were stationed in the Houston Incident Command Post during the Response.

344.    Admit that representatives of the United States Government attended daily planning meetings held at the Houston Incident Command Post during the Response.

345.    Admit that representatives of the United States Government attended daily operations meetings held at the Houston Incident Command Post during the Response.

346.    Admit that representatives of the United States Government attended Science Team meetings held at the Houston Incident Command Post during the Response.

347.    Admit that representatives of the United States Government were never denied admittance to a meeting held at the Houston Incident Command Post during the Response.

348.    Admit that BP never refused a request from a representative of the United States Government to share data or information regarding the condition of the MC252 Well.

349.    Admit that BP never refused a request from a representative of the United States Government to collect data or information regarding the condition of the MC252 Well.

350.    Admit that BP never refused a request from a representative of the United States Government to collect data or information regarding the condition of the MC252 Well unless the request interfered with ongoing operations.

351.    Admit that the members of the Government Science Teams did not hold formal positions under the Unified Command System.

352.    Admit that representatives of the United States Government participated in the development of procedures to seal the MC252 Well.

353.    Admit that representatives of the United States Government participated in the development of procedures to contain hydrocarbons flowing from the MC252 Well.

354.    Admit that representatives of the United States Government were informed of every potential procedure for sealing the MC252 Well other than those provided by members of the public included in the Alternative Response Tool Evaluation System.

355.    Admit that representatives of the United States Government had access to the same information about every potential procedure suggested for sealing the MC252 Well provided to BP.

356.    Admit that representatives of the United States Government were informed of every procedure utilized to seal the MC252 Well.

357.    Admit that representatives of the United States Government were informed of every potential procedure for containing the discharge from the MC252 Well other than those provided by members of the public included in the Alternative Response Tool Evaluation System.

358.    Admit that representatives of the United States Government had access to the same information about every potential procedure suggested for containing the discharge from the MC252 Well provided to BP.

359.    Admit that representatives of the United States Government were informed of every procedure utilized to contain the discharge from the MC252 Well.

360.    Admit that representatives of the United States Government stationed in Houston approved every procedure utilized to seal the MC252 Well.

361.    Admit that representatives of the United States Government stationed in Houston approved every procedure utilized to contain the discharge from the MC252 Well.

362.    Admit that representatives of the United States Government stationed at the Unified Area Command approved every procedure utilized to seal the MC252 Well.

363.    Admit that representatives of the United States Government stationed at the Unified Area Command approved every procedure utilized to contain hydrocarbons flowing from the MC 252 Well.

364.    Admit that representatives of the United States Government participated in the development of some or all of the procedures related to the use of BOP intervention to contain the discharge from the MC252 Well.

365.    Admit that representatives of the United States Government reviewed the procedures related to the use of BOP intervention to contain the discharge from the MC252 Well.

366.    Admit that representatives of the United States Government approved the procedures related to the use of BOP intervention to contain the discharge from the MC252 Well.

367.    Admit that representatives of the United States Government participated in the development of some or all of the procedures related to the use of a cofferdam to contain the discharge from the MC252 Well.

368.    Admit that representatives of the United States Government reviewed the procedures related to the use of a cofferdam to contain the discharge from the MC252 Well.

369.    Admit that representatives of the United States Government approved the procedures related to the use of a cofferdam to contain the discharge from the MC252 Well.

370.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used to collect the discharge from the MC252 Well via the Riser Insertion Tube Tool.

371.    Admit that representatives of the United States Government reviewed the procedures used to collect the discharge from the MC252 Well via the Riser Insertion Tube Tool.

372.    Admit that representatives of the United States Government approved the procedures used to collect the discharge from the MC252 Well via the Riser Insertion Tube Tool.

373.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used for the top kill operation on the MC252 Well.

374.    Admit that representatives of the United States Government reviewed the procedures used for the top kill operation on the MC252 Well.

375.    Admit that representatives of the United States Government approved the procedures used for the top kill operation on the MC252 Well.

376.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used for the junk shot operation on the MC252 Well.

377.    Admit that representatives of the United States Government reviewed the procedures used for the junk shot operation on the MC252 Well.

378.    Admit that representatives of the United States Government approved the procedures used for the junk shot operation on the MC252 Well.

379.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used to collect the discharge from the MC252 Well via a top hat.

380.    Admit that representatives of the United States Government reviewed the procedures used to collect the discharge from the MC252 Well via a top hat.

381.    Admit that representatives of the United States Government approved the procedures used to collect the discharge from the MC252 Well via a top hat.

382.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used to collect the discharge from the MC252 Well via the *Q4000*.

383.    Admit that representatives of the United States Government reviewed the procedures used to collect the discharge from the MC252 Well via the *Q4000*.

384.    Admit that representatives of the United States Government approved the procedures used to collect the discharge from the MC252 Well via the *Q4000*.

385.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used to collect the discharge from the MC252 Well via the *Helix Producer*.

386.    Admit that representatives of the United States Government reviewed the procedures used to collect the discharge from the MC252 Well via the *Helix Producer*.

387.    Admit that representatives of the United States Government approved the procedures used to collect the discharge from the MC252 Well via the *Helix Producer*.

388.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used to collect the discharge from the MC252 Well via free standing riser systems.

389.    Admit that representatives of the United States Government reviewed the procedures used to collect the discharge from the MC252 Well via free standing riser systems.

390.    Admit that representatives of the United States Government approved the procedures used to collect the discharge from the MC252 Well via free standing riser systems.

41

391.    Admit that representatives of the United States Government participated in the development of some or all of the procedures regarding the installation and use of a Capping Stack on the MC252 Well.

392.    Admit that representatives of the United States Government reviewed the procedures regarding the installation and use of a Capping Stack on the MC252 Well.

393.    Admit that representatives of the United States Government approved the procedures regarding the installation and use of a Capping Stack on the MC252 Well.

394.    Admit that the installation of the Capping Stack was delayed at the request of the Government Science Team.

395.    Admit that representatives of the United States Government participated in the development of some or all of the procedures used to test the well integrity of the MC252 Well following the installation and closure of the Capping Stack.

396.    Admit that representatives of the United States Government reviewed the procedures used to test the well integrity of the MC252 Well following the installation and closure of the Capping Stack.

397.    Admit that representatives of the United States Government approved the procedures used to test the well integrity of the MC252 Well following the installation and closure of the Capping Stack.

398.    Admit that some representatives of the United States Government took the position that the Capping Stack should be re-opened on or after July 15, 2010.

399.    Admit that representatives of the United States Government received BP's Applications for Permit to Drill both relief wells.

400.   Admit that representatives of the United States Government reviewed BP's Applications for Permit to Drill both relief wells.

401.   Admit that representatives of the United States Government approved BP's Applications for Permit to Drill both relief wells.

402.   Admit that, on or before May 31, 2010, representatives of the United States Government agreed that one possible explanation for the failure of the top kill operation was that the rupture discs in the casing of the MC252 Well had failed during the Incident.

403.   Admit that representatives of the United States Government were concerned about the integrity of the MC252 Well during the course of the Response.

404.   Admit that, on or before May 31, 2010, representatives of the United States Government agreed with the decision to abandon the blowout preventer on blowout preventer option.

405.   Admit that, on or before May 31, 2010, representatives of the United States Government agreed with the decision to abandon the blowout preventer on blowout preventer option based on the Government Science Team's analysis of the MC252 Well.

406.   Admit that, on or before May 31, 2010, representatives of the United States Government agreed with the decision to abandon the blowout preventer on blowout preventer option based on analysis of the MC252 Well conducted by both BP and the Government Science Team.

## XI.      Flow Rate

407.   Admit that scientifically reliable estimates of the flow rate for the discharge from the MC252 Well require analysis of the physical condition of and flow through the *Deepwater Horizon* blowout preventer.

408.    Admit that scientifically reliable estimates of the flow rate for the discharge from the MC252 Well require analysis of the physical condition of and flow through the Riser.

409.    Admit that scientifically reliable estimates of the flow rate for the discharge from the MC252 Well require analysis of the physical condition of and flow through the Capping Stack.

410.    Admit that during the Response Activities the United States Government received all data it requested from BP related to the flow rate for the discharge from the MC252 Well.

411.    Admit that, on or about April 24, 2010, the United States Government released an estimate of flow rate for the discharge from the MC252 Well.

412.    Admit that, on or about April 24, 2010, RADM Mary Landry requested that BP and the United States National Oceanic and Atmospheric Administration approve a 1,000 bbl/day estimate of the flow rate for the discharge from the MC252 Well.

413.    Admit that RADM Mary Landry approved the April 24, 2010 1,000 bbl/day estimate released by the Unified Command of flow rate for the discharge from the MC252 Well.

414.    Admit that, on April 24, 2010, RADM Mary Landry announced a 1,000 bbl/day estimate of the flow rate for the discharge from the MC252 Well.

415.    Admit that the United States Government approved the April 24, 2010 1,000 bbl/day estimate released by the Unified Command of the flow rate for the discharge from the MC252 Well.

416.    Admit that the Unified Command's April 24, 2010 1,000 bbl/day flow rate estimate could not have been released without RADM Mary Landry's approval.

417.    Admit that the Unified Command's April 24, 2010 Unified Command flow rate estimate could not have been released without the United States Government's approval.

44

418.    Admit that, on April 26, 2010, the United States Government released a 5,000 bbl/day estimate of the flow rate for the discharge from the MC252 Well.

419.    Admit that the April 26, 2010 5,000 bbl/day estimate of the flow rate for the discharge from the MC252 Well was prepared by the United States National Oceanic and Atmospheric Administration, and was sent to and received by Unified Command on April 26, 2010.

420.    Admit that, on April 28, 2010, RADM Mary Landry announced a 5,000 bbl/day estimate of the flow rate for the discharge from the MC252 Well.

421.    Admit that the April 28, 2010 5,000 bbl/day flow rate estimate could not have been released without RADM Mary Landry's approval.

422.    Admit that the April 28, 2010 5,000 bbl/day flow rate estimate could not have been released without the United States Government's approval.

423.    Admit that the United States Government publicly acknowledged that the 5,000 bbl/day estimate was very rough and imprecise.

424.    Admit that the United States Government publicly announced that the 5,000 bbl/day estimate did not constrain either the resources or tactics of the response efforts.

425.    Admit that the United States Government created a Flow Rate Technical Group to estimate the flow rate for the discharge from the MC252 Well.

426.    Admit that the United States Government created the Flow Rate Technical Group on or about May 19, 2010.

427.    Admit that, on May 27, 2010, the United States Government released an estimate that the flow rate for the discharge from the MC252 Well was between 12,000 and 19,000 bbl/day.

428.    Admit that, on June 10, 2010, the United States Government released an estimate that the flow for the discharge from the MC252 Well prior to the insertion of the RITT was between 25,000 and 30,000 bbl/day but could be as low as 20,000 bbl/day or as high as 40,000 bbl/day.

429.    Admit that, on June 15, 2010, the United States Government released an estimate that the flow rate for the discharge from the MC252 Well was between 35,000 and 60,000 bbl/day.

430.    Admit that, on August 2, 2010, the United States Government released an estimate that the flow rate for the discharge from the MC252 Well at the beginning of the discharge was 62,000 bbl/day and was 53,000 bbl/day immediately before the MC252 Well was capped on July 15, 2010.

431.    Admit that the United States Government has not done a formal uncertainty analysis on the August 2, 2010 estimates identified in Request for Admission No. 426.

432.    Admit that the United States Government had access to real-time collection rates from the RITT and LMRP Cap/Top Hat.

433.    Admit that the United States Government had access to average collection rates from the RITT and LMRP Cap/Top Hat.

434.    Admit that there is no generally accepted method for estimating the rate of a discharge from a subsurface well under the conditions present at the MC252 Well between April 22, 2010 and July 15, 2010.

435.    Admit that, before the riser kink was cut, the riser kink had eroded.

## XII.        Industrial Hygiene and Sampling

436.    Admit that, as of approximately April 28, 2010, the United States Government began monitoring air quality along the Gulf Coast in both Regions IV and VI in response to the discharge from the MC252 Well following the Incident.

437.    Admit that, beginning on approximately April 28, 2010, United States Government monitored for VOCs, SVOCs, $PM_{2.5}$ and $PM_{10}$ along the Gulf Coast in response to the discharge from the MC252 Well following the Incident.

438.    Admit that the United States Environmental Protection Agency reviewed the plan for BP's Community Air Sampling and Analysis Program.

439.    Admit that the United States Government approved the plan for BP's Community Air Sampling and Analysis Program.

440.    Admit that the data the United States Government received from the Community Air Sampling and Analysis Program did not reach detection limit levels.

441.    Admit that the United States Government approved the demobilization of the Community Air Sampling and Analysis Program, on September 4, 2010.

442.    Admit that the United States Government reviewed the plan for BP's Branch Area Perimeter Air Sampling Program.

443.    Admit that the United States Government approved the plan for BP's Branch Area Perimeter Air Sampling Program.

444.    Admit that the data the United States Government received from the Branch Area Perimeter Air Sampling Program did not reach detection limit levels.

445.    Admit that the United States Government reviewed all plans prepared by BP for the demobilization of the Branch Area Perimeter Air Sampling Program.

446.    Admit that the United States Government approved the demobilization of the Branch Area Perimeter Air Sampling Program, on October 8, 2010.

447.    Admit that the United States Government sampled emissions from sites where controlled in-situ burn Response Activities occurred between July 13, 2010 and July 16, 2010.

448.    Admit that the sampled emissions from sites where controlled in-situ burn Response Activities occurred were tested for the presence of polychlorinated dibenzodioxins and polychlorinated dibenzofurans ("dioxins and furans").

449.    Admit that the results of the United States' testing of emissions from sites where controlled in-situ burn Response Activities occurred showed levels of dioxins and furans equivalent or similar to ambient concentrations in United States urban areas.

450.    Admit that the United States Government conducted onshore air monitoring in the Gulf Coast following the Incident.

451.    Admit that the United States Government reported that the data from the onshore air monitoring in the Gulf Coast following the Incident indicated low or non-detectable levels of volatile organic compounds, to include benzene, toluene, ethylbenzene, xylenes, cyclohexane, ethyltoluene, heptanes, hexane, naphthalene, and trimethylbenzene.

452.    Admit that, based on air monitoring conducted from May 18, 2010 to June 6, 2010, the United States Government determined that levels of EGBE (2-butoxyethanol) and dipropylene glycol monobutyl ether "were well below those that are likely to cause health effects, and suggest that the use of dispersants on the oil spill would not have a significant impact on air quality on land."

453.    Admit that the United States Government has reopened all of the federal waters closed to fishing in response to the discharge from the MC252 Well following the Incident.

454.    Admit that there has been no recoverable oil documented in the area of the MC252 Well (Grid C19), since August 4, 2010.

455.    Admit that the sampling of fish, shrimp and other seafood for purposes of opening and closing commercial and recreational fisheries within federal waters, in response to the discharge from the MC252 Well following the Incident, was conducted by the United States Government and not BP.

456.    Admit that sampling of fish, shrimp and other seafood for purposes of opening and closing commercial and recreational fisheries, in response to the discharge from the MC252 Well following the Incident, was not conducted by BP.

457.    Admit that "[t]here is no question Gulf seafood coming to market is safe from oil or dispersant residue."

458.    Admit that, as of October 29, 2010, the "overwhelming majority" of the seafood tested following the Incident showed "no detectable residue," and "not one of the samples" showed a "residue level that would be harmful for humans."

459.    Admit that the United States Government received Red Algae samples collected from the RAT: Offshore Oil and Water Sampling Protocol.

460.    Admit that the United States Government collected samples of oil and oil debris (to include oily water, oil mousse, grease, weathered oil, tarballs) for oil fingerprinting purposes following the Incident.

461.    Admit that the United States Government received samples from "Top Kill" Mud Samples from each of the four vessels used in the Top Kill exercise.

462.    Admit that the United States Government observed the collection of Dynamic Kill (SOMB) Mud Samples following the Incident.

49

463.    Admit that the United States Government received samples from each of the three (SOMB) Mud storage tanks following the Incident.

464.    Admit that the United States Government observed the collection of oil from the MC252 Well on August 14 and 15, 2010.

465.    Admit that the United States Government received amber jars of sampled source oil following the Incident.

466.    Admit that the United States Government reported that oil and oil debris (to include tarballs, oil mousse, grease, weathered oil and other petroleum based products) sampled following the Incident did not exhibit hazardous characteristics.

467.    Admit that the United States Government received chemistry analysis provided in the form of electronic data deliverables from BP's On-Shore Surface Water Sampling Plan.

468.    Admit that the United States Government received chemistry analysis provided in the form of electronic data deliverables from BP's Near-Shore Water and Sediment Sampling and Analysis Plan.

469.    Admit that the United States Government approved the Submerged Oil Snare Sentinel Program, at the Houma Incident Command Post, and the Snare Sentinel Monitoring Procedures, at the Mobile Incident Command Post.

470.    Admit that the United States Government reviewed data from samples collected as a part of the Submerged Oil Snare Sentinel Program that exhibited no evidence of subsurface oil.

471.    Admit that the United States Government approved BP's Targeted Beach Sediment Sampling and Assessment Plan utilized at the Mobile Incident Command Center.

472.     Admit that the United States Government received chemistry analyses provided in the form of electronic data deliverables from BP's Targeted Beach Sediment Sampling and Assessment Plan.

473.     Admit that the United States Government drafted and conducted sampling under the Coastal Surface Water Sampling Program.

474.     Admit that the Coastal Surface Water Sampling Program did not produce any evidence that chemical levels exceeded human health benchmarks.

475.     Admit that the sampled liquid and solid waste materials collected pursuant to the Recovered Oil/Waste Management Plan, Houma Incident Command, and the Solid Waste Management Plan, Mobile Sector, did not exhibit hazardous characteristics, as reported by the United States Environmental Protection Agency.

476.     Admit that representatives of the United States Government reviewed all protocols that BP used to test for chemical exposures to workers engaged in Response Activities.

477.     Admit that representatives of the United States Government reviewed all sampling plans that BP used to test for chemical exposures to workers engaged in Response Activities.

478.     Admit that representatives of the United States Government reviewed all protocols that BP used to test levels of chemicals in the water following the Incident.

479.     Admit that representatives of the United States Government reviewed all sampling plans that BP used to test levels of chemicals in the water following the Incident.

480.     Admit that representatives of the United States Government approved all protocols that BP used to test for chemical exposures to workers engaged in Response Activities.

481.    Admit that representatives of the United States Government approved all sampling plans that BP used to test for chemical exposures to workers engaged in Response Activities.

482.    Admit that representatives of the United States Government approved all protocols that BP used to test levels of chemicals in water following the Incident.

483.    Admit that representatives of the United States Government approved all sampling plans that BP used to test levels of chemicals in water following the Incident.

484.    Admit that the United States Government conducted sampling to test for chemical exposures to workers engaged in Response Activities.

485.    Admit that United States Government agencies conducted sampling to test for chemical exposures to the general public following the Incident.

486.    Admit that the results of the United States Government's sampling following the Incident did not indicate any exceedances of United States Occupational Safety and Health Administration action levels for the chemicals of concern.

487.    Admit that the results of the United States Government's sampling following the Incident did not indicate any exceedances of United States Occupational Safety and Health Administration Permissible Exposure Limits for the chemicals of concern.

488.    Admit that no air sampling by the United States Government following the Incident has detected any hazardous chemical at levels of concern.

489.    Admit that BP monitored for the appropriate analytes in sampling for potential chemical exposures to workers engaged in Response Activities.

490.    Admit that the United States Government reviewed BP's training matrices for workers engaged in Response Activities.

491.    Admit that the United States Government approved BP's training matrices for workers engaged in Response Activities.

492.    Admit that BP incorporated all elements and revisions suggested by the United States Government related to BP's training matrices for workers engaged in Response Activities.

493.    Admit that BP's training programs for workers engaged in Response Activities complied with all United States Occupational Safety and Health Administration occupational safety standards.

494.    Admit that, with respect to workers engaged in Response Activities, BP complied with all United States Government standards regarding the availability, training, and use of personal protective equipment.

495.    Admit that BP implemented all precautions that representatives of the United States Occupational Safety and Health Administration stated were necessary to protect workers engaged in Response Activities from potential hazards associated with Response Activities.

496.    Admit that BP implemented any corrections to workplace conditions that representatives of the United States Occupational Safety and Health Administration identified as necessary to protect workers from hazards associated with Response Activities.

497.    Admit that the National Institute for Occupational Safety and Health's quantitative exposure assessment of decontamination centers and workers determined that airborne concentrations of measured contaminants, including 2-butoxyethanol and other glycol ethers, limonene, benzene, ethyl benzene, toluene, xylenes, total hydrocarbons, diesel exhaust, PAHs, and CO were all below Occupational Exposure Limits.

498.    Admit that the National Institute for Occupational Safety and Health determined that shore cleaning work sites had effective programs to manage potential occupational hazards of Response Activities.

499.    Admit that personal protective equipment to prevent dermal exposure to weathered crude oil during Response Activities was used at all work sites and was available to all workers.

500.    Admit that the National Institute for Occupational Safety and Health determined that the five Response Activity sites it visited had programs in place to reduce potential occupational hazards of wildlife cleaning work.

501.    Admit that the National Institute for Occupational Safety and Health determined in its review of the Vessels of Opportunity ("VOO") program that airborne concentrations of measured contaminants, including benzene, 2-butoxyethanol, and carbon monoxide, were all below Occupational Exposure Limits.

502.    Admit that the National Institute for Occupational Safety and Health determined in its review of the VOO program that health surveys obtained from Vessels of Opportunity program responders, captains, and deckhands noted health symptoms similar to those reported by workers engaged in Response Activities who had no exposures to oil, dispersants, or cleaning chemicals.

503.    Admit that the National Institute for Occupational Safety and Health measured Personal Breathing Zones during an oil skimming mission aboard the *M/V Queen Bee* on June 14-16, 2010, and determined that measurements were below Occupational Exposure Limits and that no workers reported acute health symptoms.

504.    Admit that the National Institute for Occupational Safety and Health measured Personal Breathing Zones during a dispersant mission aboard the *M/V International Peace* on June 21-16, 2010, and determined that measurements were below Occupational Exposure Limits.

### XIII.        Additional Requests for Admission

505.    Admit that, as of August 4, 2010, approximately 75 percent of the oil released from the MC252 Well had been recovered, burned, evaporated or biodegraded in the Gulf of Mexico.

506.    Admit that the *BP Deepwater Horizon Oil Budget: What Happened to the Gulf Oil?*, which was released by the United States Government on August 4, 2010, was not peer reviewed.

507.    Admit that the *BP Deepwater Horizon Oil Budget: What Happened to the Gulf Oil?*, which was released by the United States Government on August 4, 2010, and the *Oil Budget Calculator Technical Documentation*, which was released by the United States Government on November 23, 2010, were not intended to provide information about the impact of the discharge from the MC252 Well.

508.    Admit that the *BP Deepwater Horizon Oil Budget: What Happened to the Gulf Oil?*, which was released by the United States Government on August 4, 2010, and the *Oil Budget Calculator Technical Documentation*, which was released by the United States Government on November 23, 2010, did not account for biodegradation of the discharge from the MC252 Well.

509.    Admit that foreign-flagged MODUs are subject to the requirements of Title 33, Code of Federal Regulations (CFR), Subchapter N.

510.    Admit that the United States Coast Guard conducted annual Certificate of Compliance (COC) examinations of the *Deepwater Horizon*.

511.    Admit that annual Certificate of Compliance (COC) examinations do not provide a consistent level of information that may be of use during re-inspections by different inspectors.

512.    Admit that the annual Certificate of Compliance (COC) examination of the *Deepwater Horizon* that was conducted by the United States Coast Guard on or about July 29, 2009, indicated that the *Deepwater Horizon* was in satisfactory condition.

513.    Admit that the Emergency Evacuation Plan (EEP) established by BP for Mississippi Canyon Block 252, satisfied the requirements of 33 C.F.R. Part 146.210.

## DEFINITIONS AND INSTRUCTIONS

BPXP respectfully adopts and incorporates all Definitions and Instructions set forth in BP Exploration & Production Inc.'s First Set of Discovery Requests on the United States of America, served on all counsel on April 7, 2011.

Additionally, if your response to any of the following Requests for Admission would differ based upon a specific Area Contingency Plan, respond separately for each Area Contingency Plan subject to the request: 129-139.

Furthermore, these additional terms are defined as follows:

1.    "Administrative decision-making" shall have the same meaning as contained in the Brief of the United States Regarding the Plan for the February 2012 Liability Trial, filed April 13, 2011 [Doc. 1946].

2.    "Alternative Response Tool Evaluation System" shall mean a system to evaluate conventional and non-conventional response technologies proposed by members of the general public during the response to the discharge from the MC252 Well.

56

3.      "Analyte(s)" shall mean a substance or chemical constituent that is the subject of chemical analysis.

4.      "Biodegradation" shall mean the chemical dissolution or breakdown of materials by bacteria or other biological means.

5.      "Branch Area Perimeter Air Sampling Program" shall mean the protocols established in connection with the Incident and Response Activities for (i) sampling background concentrations around certain branches conducting decontamination activities; and (ii) monitoring air quality during mitigation activities.

6.      "Coastal Surface Water Sampling Program" shall mean the United States Environmental Protection Agency drafted protocols for the sampling of the coastal waters for oil and dispersants, and monitoring impact on human health or aquatic life in connection with the Incident and Response Activities.

7.      "Community Air Sampling and Analysis Program" shall mean the protocols established in connection with the Incident and Response Activities for sampling air concentrations for the purpose of (i) compiling baseline data; (ii) monitoring air quality during Response Activities; and (iii) any additional monitoring in support of Response Activities.

8.      "Decontamination" shall mean the process by which oily material is removed from oil-affected equipment, vessels, and response personnel.

9.      "Detection limit levels" shall mean the air contaminant limit levels established by the United States Environmental Protection Agency and measured by using the United States Environmental Protection Agency Method Detection Limit procedure.

10.     "Dynamic Kill (SOMB) Mud Samples" shall mean the samples collected from the Halliburton/Baroid Mud Plant, in Port Fourchon, Louisiana, pursuant to the Procedure for Obtaining Dynamic Kill (SOMB) Mud.

11.     "Effective daily recovery" shall have the meaning given in 30 C.F.R. Part 254.

12.     "Environmentally sensitive areas" shall mean areas of the shore and waters that contain features (including, but not limited to, barrier islands, coastal wetlands, beaches, coral reefs, fish and bird nurseries, and estuaries) that are particularly sensitive to environmental disruption (such as but not limited to oiling), which are supposed to be identified and addressed in Area Contingency Plans pursuant to the National Contingency Plan.

13.     "Environmental impact statement" shall have the meaning given in 42 U.S.C. § 4332 and the rules and regulations promulgated thereunder, including 40 C.F.R. Part 1508.

14.     "Environmental assessment" shall have the meaning given in 42 U.S.C. § 4332 and the rules and regulations promulgated thereunder, including 40 C.F.R. Part 1508.

15.     "Flow Rate Technical Group" or "FRTG," shall mean the group established on May 19, 2010 by Admiral Thad Allen, National Incident Commander, for the purpose of estimating the rate of hydrocarbon flow from the MC252 Well.

16.     "General Jones Act waiver" shall mean a waiver issued by the United States Government declaring that the requirements of the Merchant Marine Act of 1920 (also known as the Jones Act) do not apply during an emergency situation.  For example, the Jones Act was waived by the Secretary of the Department of Homeland Security in 2005 during the United States Government's response to Hurricane Katrina to permit the participation of foreign vessels in the response.

17. "Government Science Team" shall mean any and all combinations of the individuals comprising the "National Laboratories" and "Science Advisors," as those terms were defined in BP's First Set of Discovery Requests to the United States of America.

18. "Joint Information Center" shall mean the organization or entity in Unified Command of the same name that coordinated all Unified Command press releases, statements to the press, or communications to the press.

19. "Levels of concern" shall mean an occupational exposure limit established by federal and state law, rule, or regulation.

20. "LMRP Cap" and "Top Hat" shall mean the mechanical device used to collect hydrocarbons from the top of the Lower Marine Riser Package up to the *Discover Enterprise* after the riser was cut off in June 2010.

21. "National Contingency Plan" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan as set forth in 40 C.F.R. Part 300.

22. "National Environmental Policy Act" shall mean the law codified at 42 U.S.C. § 4321 et seq.

23. "National Institute for Occupational Safety and Health" shall mean the entity established under Section 22 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 671.

24. "Near-Shore Water and Sediment Sampling and Analysis Plan" shall mean the protocols established in connection with the Incident and Response Activities to guide near shore water sampling along the coast of Mississippi, Alabama, and Florida in state waters.

25. "Occupational Exposure Limits" shall mean a generic term used to represent a pair of numbers consisting of (i) the agent concentration or intensity that is allowable (based on

health effects data); and (ii) the period over which one averages workplace concentrations to evaluate whether the measured concentrations are less than the allowable limit.

26.   "One Gulf Plan" shall mean the multi-area contingency plan that serves as the initial portion of the Area Contingency Plan for several Area Committees in the Gulf of Mexico.

27.   "On-Shore Surface Water Sampling Plan" shall mean the protocols originally titled "Surface Water Sampling Plan" established in connection with the Incident and Response Activities to (i) measure effectiveness of Response Activities; (ii) facilitate public health decisions; and (iii) provide baseline samples.

28.   "Personal Breathing Zone(s)" shall mean the area identified by the National Institute for Occupational Heath and the Department of Health and Human Services as close to a person's nose and mouth, within 30 cm (1 ft) of a person's nose and mouth, or simply representative of the person's exposure for the purpose of measuring atmospheric contaminants.

29.   "Permissible Exposure Limits" shall mean the regulatory limits established by the United States Occupational Safety and Health Administration on the amount or concentrations of a substance in the air as set forth in 29 C.F.R. Part 1910.

30.   "President" shall mean the elected official known as President of the United States during the time period relevant to the specific request.

31.   "RAT: Offshore Oil and Water Sampling Protocol" shall mean the protocols established in connection with the Incident and Response Activities for the collection of floating oil and water offshore.

32.   "Riser kink" shall mean the area of the riser immediately above the lower marine riser pack that was bent at an angle greater than 90 degrees.

33.     "RITT" shall mean the riser insertion tube tool used to siphon hydrocarbons from the end of the riser to the *Discover Enterprise* in May 2010.

34.     "Sediment and Water Column Sampling and Analysis Plan for Oil Fate Assessment" shall mean the protocols established in connection with the Incident and Response Activities for the sampling of submerged or entrained oil using water column fluorometry profiles, water quality measurements, chemical analysis, and toxicity studies.

35.     "Snare Sentinel Monitoring Procedure" shall mean the protocols established at the Mobile Incident Command Post to sample near shore and offshore waters for submerged and sunken oil in the water column through the use of polypropylene oleophilic absorbent materials (i.e., snare sentinels).

36.     "Submerged Oil Snare Sentinel Program" shall mean the protocols established at the Houma Incident Command Post to sample near shore and offshore waters for submerged and sunken oil in the water column through the use of passive monitoring devices made of polypropylene oleophilic absorbent materials (i.e., snare sentinels).

37.     "Targeted Beach Sediment Sampling and Assessment Plan" shall mean the protocols established at the Mobile Incident Command Post for the sampling of beach sediments identified by Shoreline Cleanup Assessment Technique (SCAT) teams as impacted by weathered oil in the states of Alabama, Florida and Mississippi.

38.      "Top Kill Mud Samples" shall mean the samples collected from the four vessels used in the Top Kill exercise pursuant to the Procedure for Obtaining "Top Kill" Mud Samples Sampling Analysis Plan.

39.     "United States Environmental Protection Agency's independent study of alternative dispersants" shall mean the United States Environmental Protection Agency's testing

of eight dispersant products on the NCP Product Schedule during the response.  The results of the United States Environmental Protection Agency's Phase I testing were released in reports dated June 30, 2010, and the results of Phase II testing were released in a report dated July 31, 2010.  An update to the toxicity testing was released in a report dated August 31, 2010.

40.     "United States Occupational Safety and Health Administrative occupational safety standards" shall mean the standards provided in 29 C.F.R. Part 1910.

41.     "Vessels of Opportunity program" shall mean the program through which BP contracted directly with Gulf Coast vessel owners under master vessel charter agreements for use of vessels in connection with Response Activities.

42.     "Weathered crude oil" shall mean deteriorated or disintegrated crude oil that has been exposed to the weathering action of the elements (e.g., oil mousse or tarballs).

43.     "Worst case discharge" shall have the meaning given in 33 U.S.C. § 1321(a)(24) and the rules and regulations promulgated thereunder, including 30 C.F.R. Part 254.


Dated:  April 26, 2011                          Respectfully submitted,

                                                /s/ J. Andrew Langan, P.C.
                                                Richard C. Godfrey, P.C.
                                                J. Andrew Langan, P.C.
                                                KIRKLAND & ELLIS LLP
                                                300 North LaSalle Street
                                                Chicago, Illinois  60654
                                                Telephone: (312) 862-2000
                                                Facsimile: (312) 862-2200

                                                and

                                                Don K. Haycraft (Bar # 14361)
                                                R. Keith Jarrett (Bar #16984)
                                                LISKOW & LEWIS
                                                701 Poydras Street, Suite 5000
                                                New Orleans, Louisiana 70139-5099

Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 26th day of April, 2011.

/s/ J. Andrew Langan, P.C.