Case 2:10-md-02179-CJB-DPC    Document 12466-2    Filed 03/07/14    Page 1 of 19

LE CAUX *against* EDEN. Wednesday, 7th Feb. 1781. An action will not lie at common law for false imprisonment, where the imprisonment was merely in consequence of taking a ship as prize, although the ship has been acquitted.

[Referred to, *Mayor of London* v. *Cox*, 1867, L. R. 2 H. L. 262. Commented on, *The Sylph*, 1867, L. R. 2 A. & E. 28. Referred to, *Sullivan* v. *Spencer*, 1872, Ir. R. 6 C. L. 177.]

The defendant was captain of a letter of marque called the "Enterprize," and, being on a cruize, fell in with, and took as a prize, a trader called the "Bee," belonging to Jersey, of which one Fainton was captain, Robine, supercargo, and Le Caux, (the present plaintiff), second mate. They, with others belonging to the "Bee," were removed into the "Enterprize," and brought to England; and the Court of Admiralty restored the ship and cargo, and condemned the captor, in costs and damages. After this, Fainton, Robine, and Le Caux, brought separate actions of trespass and false imprisonment, against Eden; to which he pleaded the general issue; and they all stood in the paper of causes to be tried before Lord Mansfield, at the sittings after Michaelmas term, 20 Geo. 3, *Fainton* v. *Eden*, and *Robine* v. *Eden*, by special juries, and *Le Caux* v. *Eden*, by a common jury. *Fainton* v. *Eden* came on first, on Friday, the 17th of December, 1779. The counsel for the plaintiff pressed, that the jury might be directed to assess damages upon a case to be made, subject to the opinion of the Court. Lord Mansfield said, he thought the action a new attempt, which, if it succeeded, would destroy the British Navy. If an action at law should lie, by the owners, and every man on board a ship [595] taken as prize, against the captor, and every man on board his ship, no man would dare to take a ship. He thought a doubt made, and the pendency of such a question, especially if large damages were given, would have very bad effects, and obstruct the necessary operations of the sea service; and, being clearly of opinion, that no such action had ever been sustained; that he himself had frequently ruled that such an action would not lie; and that, upon principles of law, convenience, and sound policy, and also upon the authority of precedents, such an action could not be maintained, he refused to direct the jury to make a case,

---

on that occasion, stated the principle to be what I have just mentioned, and said there had been many nonsuits for want of producing the original journals of the House of Commons. But the Court denied the rule to be as he stated it, and mentioned several instances where copies of matters, not of record, are admissible; as copies of court-rolls, of parish-registers, &c. and Lord [594] Mansfield expressly said, that copies of the journals are evidence [† 122], and that he particularly remembered their being admitted on a trial at Bar, in a cause in which he was leading counsel for *The late Sir Watkin Williams Wynne*, against *Middleton, the Sheriff of Denbighshire*, on an action for a false return. That Mr. Onslow, then Speaker of the House of Commons, made a point with his Lordship, that the copies should be offered in evidence, though nothing would have been so easy in that case as to produce the original journals. The Court added, that the reason ab inconvenienti, for holding it not necessary to produce records, applied, with still greater force, to such public books as the transfer books of the East India Company: for the utmost confusion would arise, if they could be transported to any the most distant part of the kingdom, whenever their contents should be thought material on the trial of a cause. The rule granted was, to shew cause why copies of those entries in the transfer books, which the party meant to make use of, as relative to the matter in dispute, should not be taken, and read in evidence at the trial; the rule to be served both on the solicitor for the Company, and the opposite party [F 2].

The correct principle, therefore, seems to be as laid down by Lord Holt, in a case of *Lynche* v. *Clerke*, viz. "That, wherever an original is of a public nature, and would be evidence if produced, an immediate sworn copy thereof will be evidence." 3 Salk. 154.

---

[† 122] Vide *Jones* v. *Randall*, B. R. H. 14 Geo. 3, Cowp. 17.
[F 2] So, examined copies of the bank books are evidence of possession, transfer, &c. of stock. *Marsh* v. *Colnet*, 2 Esp. 665. *Bretton* v. *Cope*, Peake, N. P. Rep. 30.

Case 2:10-md-02179-CJB-DPC   Document 12466-2   Filed 03/07/14   Page 2 of 19

or find a special verdict. The plaintiff might move for a new trial; the jury might find a special verdict, if they chose so to do; but he advised them to find for the defendant; which they did. *Robine* v. *Eden* stood next in the paper, and came on immediately after; when the counsel for the plaintiff combated the opinion Lord Mansfield had given in the former cause with great warmth, and earnestly pressed the jury to find for the plaintiff. Lord Mansfield adhered to his former direction, which the jury followed, and found for the defendant. *Le Caux* v. *Eden* stood lower in the paper, and did not come on till Wednesday, the 22d of December. Lord Mansfield, understanding that the counsel for the plaintiff persisted strongly that the action lay, and, instead of moving for a new trial, meant to tender a bill of exceptions, told them, he would consent to a special verdict. He mentioned his opinion to the jury, and said, as to that point, it was agreed by both parties, that they should find a special verdict: therefore they were to assess damages, supposing the action to lie. The jury, who had heard what had passed in the other two causes, had probably formed a judgment of their own, and they found for the defendant. They were again told, it was agreed they should find a special verdict, and assess damages for the plaintiff, and they were sent back. At last, with great reluctance, they found one shilling damages.

The special verdict stated as follows:

"On the 29th of October, 1778, the plaintiff was the second mate on board a certain ship or vessel called the 'Bee,' of which Fainton was then master, and, as such mate, the plaintiff on that day was proceeding on a certain voyage, in the said ship, from certain parts beyond the sea, to wit, from the harbour of Paspibiac, in the bay of Châleurs, on the coast of Canada, to the island of Jersey. The defen-[596]-dant was, on the same day, captain or commander of a certain ship of war, or letter of marque, called the 'Enterprize,' and was then cruizing on the high seas, and, on the same day, attacked, and, after examining all the papers, and documents, relating to, or in anywise respecting, the said ship the 'Bee,' her owners, cargo, and destination, seized the said ship the 'Bee,' as a prize, and caused the plaintiff to be removed, together with others of the men, out of her, to and on board the 'Enterprize,' and kept and continued him on board thereof, until her arrival in England. A suit was thereupon commenced, in His Majesty's High Court of Admiralty of England, by John Fiott, who claimed the said ship, called the 'Bee,' and all the goods, wares, and merchandizes, therein laden at the time of her being so taken and seized, and, on the 4th of March, 1779, the Right Worshipful Sir James Marriot, &c. condemned the defendant, the captor, in costs and damages, and referred the same to the register of the same Court, taking to his assistance two merchants, who were to make their report thereon. The register afterwards made his report as follows:"

(The report, which was set forth in hæc verba, contained allowances under different articles, viz. for the passage of passengers, for the sailors' wages from the time of the capture till their arrival in Jersey; for their expences in the intermediate time; a particular sum to two of them who had been carried to France, and detained as prisoners, at so much per month during their stay there; for the captain's expences; for sundry ship's materials missing; for repairs to the ship; for Robine's expences; for the loss of part, and damage done to the rest, of the cargo, and the diminution in the produce, by the loss of the market; for demurrage; for interest on two bills of exchange; for insurance on the ship, freight, and remaining part of the cargo, from England to Jersey; for commission on the value of the ship and cargo; and for the expence of the reference).

"The said ship called the 'Bee,' hath been restored to the said John Fiott."

This case,—(together with rules which had been obtained for new trials, in the two other causes, on the ground of misdirection,)—was twice argued: once in last Michaelmas term, on Tuesday, the 14th of Nov. by Cowper, for the plaintiff, and Lawrence for the defendant; and again, this day, by Dunning, for the plaintiff, and Lee, for the defendant.

[597] The substance of the arguments of the counsel, on both occasions, was as follows:

For the plaintiff.—1. It was proved by the plaintiff, that the defendant took him by force, from a situation in which he was following his lawful employment. Prima facie, this was, unquestionably, a trespass and assault. Nor will the mere circumstance

Case 2:10-md-02179-CJB-DPC   Document 12466-2   Filed 03/07/14   Page 3 of 19

of its having happened at sea, make any difference; for actions are, every day, brought, and supported, for trespasses and assaults at sea. The defendant, therefore, must now insist, as he did at the trial, that he is not liable to this action, because the ship was taken as prize; and this, although it has been decided, by the sentence of the Court of Admiralty, that she was not lawful prize, and that he was not entitled to take her. The ground of the defence must be, that on principles of policy, or adjudged cases, there is either no civil remedy for the assault and imprisonment of a person taken on board a ship seized as prize, or, if there is, that the proper and exclusive tribunal for giving redress, is the Court of Admiralty, and that the plaintiff either has received, or may receive, a compensation there. The supposed reason of policy against the action, is the inconvenience to the naval service, if a captain, and all the officers and sailors, of a ship of war, were exposed to similar actions, at the suit of every sailor and passenger on board every ship seized by them as prize. This argument may, perhaps, be fit to be addressed to the Legislature, but cannot operate here. It is a well known maxim, that, for every injury, there must be a remedy. It will hardly be contended, that an action will not lie for wanton acts of cruelty and violence, exercised on the occasion of taking a ship as prize; and, if it will lie in any case, how is the line to be drawn? Besides, the argument of policy, such as it is, does not apply in the present instance; because this defendant is captain of a letter of marque, who acts voluntarily, for his own private profit, and that of his owners; not, as officers in the Navy, under public compulsive authority. As to the other ground, that, if there is a remedy, it must not be sought in a Court of Common Law, but in the Court of Admiralty, the inconvenience will be just as great before that judicature, for the same multiplicity of suits may arise there. This inconvenience, however, is, in a great measure, imaginary, since actions will seldom be advised, or brought, unless where there has been a [598] real and material injury, and substantial damages are likely to be recovered. But, how is the exclusive jurisdiction of the Admiralty Court to be supported? and does it not rather seem that they have no conusance of the subject-matter of this action? There cannot be produced an instance where they have taken upon them to assess damages for assaults, imprisonment, or any injury done to the person. In the case of *Rous* v. *Hassard* (a), the action was trespass for taking the ship, not for the imprisonment of any of the crew. So, in the present case, the allowance has only been for the loss of the voyage, damage to the cargo, loss of time, expences, and wages; not for being forced on board another ship, exposed, perhaps, to the dangers of war, or unhealthy climates, &c. Indeed, how can the Admiralty Court attempt to estimate those personal sufferings, and assess a compensation for them, without the intervention of a jury, in whom that discretionary jurisdiction is, by the law of England, peculiarly vested? Had the ship been condemned as lawful prize, perhaps the sentence would have been a bar to this action, because, in that case, it would have appeared, from the sentence, that the defendant, in taking the ship, of which the imprisonment of the men is a necessary consequence, had done nothing but what he had an authority for, by his letter of marque. But, as the case is, he is to be considered as being in the same situation with a sheriff's officer, who arrests one man, upon process against another. Of the costs and damages actually assessed by the Admiralty Court in this case, there is no part allowed to this plaintiff, nor is there any method by which he could compel a distribution, or the payment of any share or proportion to him. Is it not absurd to suppose, that, in any case, in a suit instituted by the owner of a vessel to recover her from the captor, together with his damages for the detention, the Court of Admiralty should investigate and apportion the damage sustained by every individual in the ship, from the imprisonment?—2. If we were to suppose the exclusive jurisdiction of the Admiralty to exist, still, as the plaintiff has shewn a primâ facie trespass, the special matter of the capture as prize, ought to have been pleaded by the defendant, in order to oust the jurisdiction of this Court, and it cannot be taken advantage of on the general issue.

The counsel for the defendant,—1. Stated this to be a case where nothing had been done but what was barely necessary for the purpose of bringing the vessel into port, in [599] order that the regular enquiry might be made, whether she was, or was not, lawful prize. They did not deny that the taking was a trespass, for which there was a remedy, but they insisted, that it was so circumstanced as not to be conusable any

---

(a) Vide infra, p. 602.

where but in the Court of Admiralty. What might be the case if the captors were guilty of wanton abuse, and unnecessary severity, as nothing of that sort had happened here, there was no occasion to enquire;—(though Lee said, he did not at all admit, that, even in such a case, an action at common law would lie.)—Compensation is due, if any injury has been suffered, but, as the original question was, "prize or no prize," both that and all the necessary consequences of the capture as prize, belonged solely to the jurisdiction of the Admiralty Court, and could only be enquired into there. It is as much a trespass to take a man's ship, as to take his person: now, when goods, supposed to be enemy's goods, are found on board a neutral vessel, the goods only are liable to capture [☞ 1], yet, as it is necessary to secure the vessel in order to bring the goods into harbour for condemnation, the owner cannot maintain an action for taking the ship, although the goods should be proved to be neutral, but the Admiralty Court, in such a case, would allow damages for the detention of the ship [☞ 2]. By parity of reason, why should they not for the detention of the person? To separate the question of "prize or no prize," and that concerning the incidental damages, would be to divide, between two different jurisdictions, the same entire transaction. There are many authorities which establish the position, that, where the original or principal matter is not conusable at common law, neither are the consequences; 13 Co. 53. Cro. El. 685. Carth. 398. 2 Keb. 360. 1 Lev. 243. 2 Lev. 25. Molloy, lib. 1, c. 4, § 32, p. 731, *Livingston* v. *Mackenzie*, at Guildhall, before Lord Mansfield, 10 Geo. 3.—(Lee cited that case from a note of his own.)— As questions concerning prizes chiefly arise between foreigners and British subjects, it is highly expedient that they should be decided according to a law, not municipal and peculiar to this country, but generally known and adopted. In almost all the treaties between us and foreign states, it is stipulated, either expressly, or by implication, that all matters relative to prizes shall be determined in the Admiralty Court. There is, for instance, an express article to that effect, in the Treaty of 1699, between Great Britain and Den-[600]-mark, (Art. 35). Another advantage arising from the jurisdiction of the Admiralty Court is the expedition of the decision; for by the rules of that Court a clause can hardly last beyond a month. If foreigners were obliged to sue at common law, they could very rarely remain in England, with their witnesses, the necessary time for the final determination of their cause. But the great convenience is, that all parties concerned may join in one libel, whereas, if the action at law could be supported, the costs alone of the numberless suits to which every individual among the captors would be exposed, would, independent of damages, be sufficient to deter every man of common prudence from entering into the service. It would certainly, with regard to privateers, and letters of marque, have the effect of a prohibition. It may be true that this plaintiff was not a party to the suit in the Admiralty, but he might have been, or any of the persons interested might have sued on behalf of himself and all the rest. An instance of a libel of that sort may be found in the printed appeals, in the year 1764, in the case of the ship "Le Vigilant." Though, perhaps, no direct case can be mentioned of an assessment of damages in the Admiralty Court, eo nomine, for the personal injury of imprisonment, yet the 6th and 7th standing interrogatories exhibited in order to ascertain the damages are so general, that any sort of personal injury might be stated in answering them. In the 4th Institute, 134, it is laid down, that the Admiralty has jurisdiction over "contracts, pleas, and quereles, upon the sea," which last expression seems to include personal trespasses; and the same doctrine seems to be recognized in 1 Roll. Rep. 250, and 3 Blackst. 106, 107.— 2. With regard to the plea, the facts which come out, upon the plaintiff's own case, shew, that this is not a trespass at common law, and, therefore, the general issue is sufficient; the plaintiff has failed in proving his case, and ought to have submitted to a nonsuit.

Lord Mansfield did not go into the argument at large, but adhered to the opinion he had so repeatedly and peremptorily given at Nisi Prius; and probably thought it more decent to leave the discussion of it to the other Judges.

Willes, Justice.—Under all the circumstances of this case, as stated in the special verdict, I am of opinion, that the action is not maintainable. I may perhaps go upon narrower ground than the rest of the Court, but the rule I would lay down is, that, where the injury is the necessary [601] and natural consequence of the capture, the

---

[☞ 1] *Salucci* v. *Johnson*, B. R. H. 25 Geo. 3.    [☞ 2] Ibid.

Court of Admiralty has the sole and exclusive jurisdiction. The cases cited go to establish that principle. I must decide upon the facts as found by the verdict, which are merely, that the ship was seized as prize by the defendant, and that he caused the plaintiff, together with others of the crew, to be removed from thence into his own ship, and kept him there till their arrival in England. Nothing appears to have been done which could have been avoided, consistent with the seizing the ship as prize. I will not say there may not be cases where this Court would have a concurrent jurisdiction; if, for instance, personal ill-treatment should be used, not the necessary effect of the capture. Suppose the ship were condemned as lawful prize, but that some of the crew had been used with unnecessary cruelty; I do not know whether, in such a case, the Admiralty would take conuzance of the injury, though it is very remarkable, that no action at law has ever been brought. However, that difficulty does not arise here. It is said, there is no jury, in the Admiralty Court, to assess damages for a personal injury, but I see no reason why that Court should not judge of such injuries, as well as of those which affect property. They have an adequate method of ascertaining the damages, by reference to the register, who may call in the assistance of assessors. There is nothing in the supposed difficulty of apportioning the damages. Why may not £100 be assessed to one man, and 1s. to another? There has been such an apportionment in this very case. If there is a remedy in the Admiralty Court, that is sufficient; and it is certainly a great advantage, that the parties, there, can all join in one libel. It would be of the most dangerous consequence to the sea-service if such an action as this could be maintained.

Ashhurst, Justice.—The circumstance of no action having ever been brought is almost decisive, that it has been the general apprehension, that no such action will lie; for the occasions, in time of war, have been innumerable. The inconvenience of entertaining such causes would be intolerable; because every individual in the captured ship might bring a separate action against every man in the crew of the vessel making the capture. The case in 1 Levinz goes on good and solid grounds. It is unnecessary to go into all possible cases, or to say how it would be, if unnecessary personal [602] cruelty were exercised; but where the Admiralty Court has jurisdiction of the original matter, it ought also to have jurisdiction of every thing necessarily incidental.

Buller, Justice.—"The question on this special verdict, as it was stated by Mr. Dunning, is a plain broad question; namely, whether an action at common law can be maintained for an imprisonment on a capture at sea as prize; and, as it is of general importance, I have taken all the pains I could to look into the books.

"There is no case in which it has ever been holden, that such an action would lie; and, if it could be maintained, there are, in every war, such frequent opportunities for it, that it must have happened in every day's practice, or some instances, at least, must have been in the memory of those who have had long experience in Westminster Hall; but there is not the smallest trace of such a determination, or even dictum, in any Court in England.

"An universal silence in Westminster Hall, on a subject which so frequently gives occasion for litigation, is a strong argument to prove that no such action can be sustained [† 125].

"But the case does not rest on negative usage only; for there are a current of authorities, from the time of Queen Elizabeth, to the present time, all of which agree, that the Admiralty has jurisdiction, not only of the question, 'prize or not prize,' but of all its consequences: and many of them agree, that the Admiralty has the sole and exclusive jurisdiction, and that the Courts of Common Law have no jurisdiction at all of such questions.

"The case most in point with the present is that of *Rous* v. *Hassard & è contra*, argued at the Cock-pit, on the 22d of March, 1749, and determined by Lord Chief Justice Lee, on the 2d of April, 1750.

"The circumstances of that case were these: Rous, having a letter of marque, on the 18th of December, 1741, seized a sloop called the 'South Kingstown,' or 'Paon,' as prize, and afterwards libelled against her as prize in the Admiralty Court in South Carolina. She was claimed by a third person, as French property, (the war then being with Spain,) and the Admiralty Court acquitted the ship and cargo. Then,

---

[† 125] Littl. § 108.   2 Ld. Raym. 944.

Case 2:10-md-02179-CJB-DPC    Document 12466-2    Filed 03/07/14    Page 6 of 19

an action of trespass was brought against Rous, in the Inferior Court of Common Pleas at Newport, in Rhode Island, for taking the sloop, to which he pleaded 'not guilty [1],' and [603] there was a verdict against him, with £8000 damages and costs. On an appeal and cross appeal to the Superior Court of Judicature at Newport, the verdict and judgment in the Inferior Court were confirmed. Then, there was an appeal and cross appeal to the Court of Equity there, which decreed against Rous, with £5000 damages and costs; and, afterwards, an appeal by both parties, to the King in Council. The reasons, in the printed case on the part of Rous, were, 1. That there was no evidence that the claimants were the true and sole owners of the sloop and cargo; 2. That, if the property had been sufficiently proved and established, no action of trespass could lie for the taking this sloop and cargo, because they were taken on the high seas as prize, and the Court of Admiralty had not only the sole jurisdiction to determine, whether prize or not, but likewise to determine, whether, upon all the circumstances of the case, the captor ought to pay or be paid costs, and how much, or whether there should be any costs paid at all; and no other Court can take conusance of that question; 3. That there was so probable a cause of seizure, that the Court of Admiralty ought to have given Rous his costs, though the ship and cargo were acquitted; 4. This reason respected the quantum of the damages.

"I have a note of this case, as it was cited by Lord Mansfield, in the case of *Livingston & Welch* v. *Mackenzie*, at the sittings in Middlesex, after Trinity term, 1770. His Lordship, after stating the facts and proceedings, said:

"'The great question was, whether an action of trespass would lie, for taking a ship as a prize. Lord Chief Justice Lee, having called in two civilians to his assistance, delivered the opinion of the Court, that, though, for taking a ship on the high seas, trespass would lie at common law, yet, when it was taken as a prize, though taken wrongfully, though it were acquitted, and though there were no colour for the taking, the Judge of the Admiralty was Judge of the damages and costs, as well as of the principal matter; and he laid it down as law, that, if such an action were brought in England, and the defendant pleaded "not guilty," the plaintiff could not recover.'

[604] "Unless the distinction which has been made between injuries to property, and injuries to the person, can be supported, such an authority, uncontradicted by any case, or dictum, repeatedly recognized at Nisi Prius, and strengthened by the negative usage of the Courts of Law, would, of itself, I think, be binding upon us now, and conclude against the plaintiff.

"But, if that case wanted support, there are many authorities which maintain the principle on which that determination is founded.

"The cases which are earliest in point of time, have decided, only, that the Court of Admiralty has a jurisdiction, and not that this Court has none; but they are founded on a principle, which, in other cases, has been extended to the exclusion of the jurisdiction of this Court.

"In 43 Eliz. it was resolved, 'That, if goods be taken by pirates at sea, though they are sold afterwards at land, yet the Admiralty has cognizance thereof, for that which is incident to the original matter, shall not take away the jurisdiction.'

"So it was said by the Court, in 1 Vent. 173, and it is added, 'That is law, though there were another resolution in *Bingley's case*.'

"In *Turner & Cary* v. *Nele*, T. 20 Car. 2, 1 Lev. 243, 1 Sid. 367 (*a*), one who had letters of marque, in the Dutch War, took an Ostender for a Dutch ship, and brought her into harbour, and libelled her as a prize, and there was a sentence that she was not a prize; and the Ostender libelled in the Admiralty against the captor, for damage sustained, by hurt the ship had received in port, and a prohibition was prayed, because the suit was for damage done in port, for which, it is said, an action lies at common law; but the prohibition was denied, as the original was a capture at sea, and the bringing her into port, in order to have her condemned as a prize, is but a consequence of it, 'and, not only the original, but the consequences, shall be tried there.'

---

[1] "Captain Rous, according to the course of pleading there, (saving to himself all advantages of giving any special matter in evidence,) pleaded to issue, that he was not guilty in manner and form as the plaintiffs had declared." Vide printed case for Rous.

(*a*) There called *Turner & Cary* v. *Smith*.

Case 2:10-md-02179-CJB-DPC   Document 12466-2   Filed 03/07/14   Page 7 of 19

"In *Ridley* v. *Egglesfield*, 23 Car. 2, 2 Lev. 25, an action was brought for suing in the Admiralty, against the Statutes of Ric. 2, & Hen. 4, and the declaration stated, that the [605] plaintiff libelled there for ship and goods, supposing them taken by pirates on the high sea, and of a coming afterwards to the defendant on the high sea, whereas he purchased them on the land. The goods were contraband, being going to the Dutch in time of war, and taken by a Scotch man of war, and, on a suit by the defendant, condemned in the Admiralty Court in Scotland, and sold to B. who bought them on land, and sold to the plaintiff, in England. All the Court agreed that the original cause, being of piracy, belonged to the Admiralty, and, though the goods were condemned in the Admiralty in Scotland, this did not alter the case as to the jurisdiction of the Court, but is pleadable in abatement in the Admiralty in England: but neither that, nor the sale on land, altered the jurisdiction, the original matter being piracy, which all comes in question again, and the sale at land is a matter consequential upon the piracy, and dependant upon it.

"In *Rex* v. *Broom*, B. R. H. 9 Will. 3, Carth. 398, the same point was resolved.

"And, in 10 Will. 3, in the case of *Brown & Another* v. *Franklyn*, Carth. 474, the Court not only pronounced affirmatively, for the jurisdiction of the Admiralty Court, agreeably to the former cases; but also, negatively, against the jurisdiction of the Courts of Common Law.

"In that case, there was a motion, for a prohibition to the Admiralty, suggesting, that trespass on the case, for conversion of goods, as also the trial of the property of any goods, belonged to the King, &c. and was not to be tried before the Admiral; that, nevertheless, the defendant, being the King's Proctor, had libelled against the plaintiffs, in the Admiralty, concerning the property of a certain ship called, &c. and her cargo, &c. whereas the ship was a wreck, in the East Indies, and not the property of the French King, or any of his subjects enemies of our King, but belonged to subjects of the King of Portugal, who was in amity with us, and that the goods came to the hands of the plaintiffs, on land, in the East Indies. There had been a sentence in the Admiralty Court, that all was prize, and, upon that sentence, this libel was founded, charging, that the goods had come to the hands of the plaintiffs, that they had embezzled them, and praying an account.

"It was insisted, for the prohibition, that it was unreasonable the plaintiffs should be concluded by the sentence upon the general libel (*a*), to which they were not parties, neither had they any notice thereof.

"The Court inclined that the plaintiffs ought to have an [606] opportunity to be heard, and to controvert the matter of fact, and, thereupon, a day was appointed to hear a civilian upon this question, viz. whether the plaintiffs, upon this libel depending against them in the Court of Admiralty, might controvert the property there, against the tenor of the first sentence?

"Afterwards, Dr. Lane, acquainted the Court, that an appeal might be received against such a general sentence for prize, and the appellants would be let in to controvert the right, and disprove the prize; and it appeared, that, in this case, the plaintiffs had appealed.

"Wherefore, and for that the Court apprehended, (as it was insisted upon, on the other side,) that 'prize or not prize' was a matter not triable at common law, but altogether appropriated to the jurisdiction of the Admiralty, the prohibition was denied.

"The next case, in order of time, was the case of *Key & Hubbard* v. *Pearse*, at the Cock-pit, in the time of Lord Wilmington, which was determined by Lord Chief Justice Lee, and whose judgment I have, in his own hand-writing, as follows:

"'At a committee of council, 31st January 1742, the declaration in prohibition is: Whereas the Statutes of Ric. 2, &c. prohibit the Admiralty to take jurisdiction of matters at land, and whereas Key and Hubbard are natives of Ireland, and are merchants, and were true owners of the ship called the "Canary Merchant," and the goods therein were theirs, and were possessed of the said ship, at the City of New-York, eastward of the city; nevertheless Pearse, commander of the King's ship, the "Hamburgh," within the body of the City of New-York, did seize, and take out of their possession, this "Canary Merchant."—It then sets forth the libel, wherein Captain Pearse libels, and sets forth the King's orders of the 11th of June, 1739, to seize Spanish vessels; also an order of council of the 10th of July, 1739, for reprisals;

---

(*a*) I.e. the first.

charging the taking this ship on the high seas, and that it belonged to the subjects of Spain, or persons inhabiting within the territories of the King of Spain.—Whereas, in truth, the ship was taken within the body of the City of New-York, and not on the sea, and whereas it did not belong to the King of Spain, or any of his subjects, but did belong to the plaintiffs.—And then it sets forth their plea, in the Admiralty, as to their title to the ship and goods, as sub-[607]-jects of Ireland, merchants, their being owners, and the seizure thereof at land, and also the seizing of a register, and Mediterranean pass, which the master had, and that they offered to verify this plea by affidavits, which are set forth.—Then charges, that the Admiralty refused to receive this plea; and all the proceedings contrary to the prohibition.

"'To this declaration, the defendant has demurred, and the causes of demurrer are,' &c.—[Here were set forth four causes of demurrer, but the fourth only was material.]—'4th Cause;—For that, "prize or not prize," and the matters in question, are only triable by the law of nations, in the Admiralty, and not by the law of this land.

"'The plaintiffs (protesting, &c.) have joined in demurrer.

"'This is a question on a seizure, made pursuant to the King's order for seizing Spanish ships, and the question in this cause was, whether this was lawful prize. As this is a question upon prize, I think the Common-Law Court had no right to prohibit. To prove it; in 1 Sid. 320, it is said by the Court, "Inasmuch as the matter is 'prize or not prize,' no prohibition shall go;" and, in Carth. 476. 10 Will. 3, per Cur. "Prize or not prize" is a matter not triable at common law, but altogether appropriated to the jurisdiction of the Admiralty. And that it is so appropriated, appears strongly from the several Acts of Parliament cited, (at the Bar,) in every one of which, where there is any notice taken of the legal proceedings in respect of prizes, they are noticed as in the Admiralty, and, in 6 Ann. c. 37, & 9 Ann. c. 27, it is plain the Legislature considered the jurisdiction to be in the same Court, viz. the Admiralty, whether the prize was taken on the sea, in a creek, an haven, or river. The true reason why the jurisdiction is appropriated to the Admiralty, is, that prizes are acquisitions juré belli, and jus belli is to be determined by the law of nations, and not the particular municipal law of any country. Nor have the counsel cited one instance, where a prohibition was ever granted in a cause of prize. The Solicitor-General cited Molloy, lib. 1, c. 2, s. 6, where that author says, that letters of reprisal may issue, not only by the jus gentium & civile, but by the ancient municipal law of this country; and he mentioned a writ in the Register, 129. But that is a writ grounded on the statute of Magna Carta, c. 30, which gives power to seize and detain the [608] persons and goods of alien merchants here, till satisfaction is made for injuries done to our merchants abroad. That by no means proves a general power in the Courts of Law, to exercise a jurisdiction in matters of prize; but only gives power to the Court of Chancery, to issue a writ for seizing and detaining, till satisfaction is made, in the case mentioned in the statute. Though, therefore, I do agree that the jurisdiction of a Court of Admiralty, generally, is limited to matters arising super altum mare, and is, in that respect, local, yet I do not take it to be so in case of prize; for the jurisdiction does not depend on the locality, but the nature of the question, which is such as is not to be tried by any rules of the common law, but by a more general law, which is the law of nations. It is argued, that the plaintiffs in prohibition, have, by their declaration, made a case which shews that the ship, which has been seized, cannot be prize, and that the defendant, by his demurrer, has confessed this. But, though it be true that a demurrer does confess facts well alledged, I think that will not intitle the plaintiffs to a prohibition; for, if the Common-Law Court has not a jurisdiction of the subject, no admission of parties can give it a jurisdiction. Besides, it is not confessed by the demurrer, that this ship did not belong to persons inhabiting within the territories or dominions of the King of Spain, for that is not alledged. Upon the whole, I am of opinion, that the Court of Common Law had no authority to intermeddle in this suit, (wherein the question appears to be, whether the ship was prize or not,) and that the Admiralty has the sole jurisdiction; and if this Inferior Court of Admiralty have done wrong in refusing the plea offered, or shall do wrong in any future determination, the proper remedy is by appeal.'

"The judgment of the Court of Law abroad, which was for the plaintiffs, was reversed [1].

---

[1] The course of the proceeding was this: Pearse having libelled in the

Case 2:10-md-02179-CJB-DPC   Document 12466-2   Filed 03/07/14   Page 9 of 19

"Then came the case of *Rous* v. *Hassard*, in 1750, which I have already stated, and which, as it was admitted [609] on the first argument of this case, has been followed by nonsuits and determinations, at Guildhall, which have never been objected to.

"And lastly, the case of *Vanderwoodst and Others* v. *Thompson*, tried before Mr. Justice Gould, on the 13th of May, 1780, at Guildhall, and afterwards brought before the Court of Common Pleas; which was as follows:

"'It was an action of trespass, against the defendant, for breaking and entering the plaintiff's ship, upon the high seas, and carrying away his money and goods: there was a second count, confining the trespass to the goods only. The defendant pleaded "not guilty."

"'On the trial, it was proved, that the defendant had letters of marque, under which he attacked and boarded the ship of the plaintiffs, which made some resistance; that he found tea, gin, cannon, and small arms, on board, and likewise some money, which was taken out of the ship, and carried away. That the defendant carried the ship to Newcastle, where the Custom-House officers seized her for having smuggled goods on board; and that she was afterwards condemned in the Exchequer. The sentence of condemnation was read. It was contended, for the plaintiff, that the capture was unlawful, because the defendant did not belong to the Custom-House; and he could not justify the seizure under the Hovering Act (a), as King's ships only can seize under such circumstances.

"'But Mr. Justice Gould held, that, as there was reason to suppose that the ship was a pirate, though the jury should be satisfied she was not really so, yet the action would not lie.

"'In Easter term last, there was a motion for a new trial, which, upon consideration, was denied by the Court.'

"Some of these cases go only to prove, that the Court of Admiralty has a jurisdiction on the question of 'prize or not prize,' and its consequences, and, therefore, this Court would not prohibit them from proceeding on such questions; and, that the Admiralty Court has such a jurisdiction is not now denied, on the part of the plaintiff. But others of the cases shew, not only that the Admiralty has a jurisdiction, but that this Court has none; and that, upon the general plea, of not guilty, no action can be maintained, where the question relates to prize.

"But, if there had been no such authorities, and the question had been now to be decided for the first time, there can [610] be no case in which that maxim 'quod inconveniens est non licitum est,' which is so often reiterated by Lord Coke, would deserve more attention.

"It is a very useful and a wise maxim, when applied to new or undecided points; and, in this case, the inconvenience would be intolerable, the convenience none, if such an action were sustained.

"The inconvenience would be so great, that no officer would venture to seize a ship as prize; for he must do it at the peril of his utter ruin, since, if he were mistaken, he would be liable to an infinite number of actions, the costs of which alone, supposing the damages to be universally as trivial as in the present case, no private man could discharge.

"The convenience would be none, because, by one suit in the Admiralty Court, each individual is intitled to recover a full recompence for the injury he may have sustained.

"The plaintiff is not, (as was contended by his counsel,) at the mercy of the owner, for he might institute a suit himself, or he might make himself personally a party in the suit commenced by the owner, or captor, and, in that suit, would be intitled to recover, not only for damage done to his cloaths or property, but for personal injuries to himself; some instances of which I have been favoured with from that Court.

---

Admiralty-Court at New-York, and the plea of Key and Hubbard having been refused, they obtained, from the Court of King's Bench of that province, a writ of prohibition, and having declared in prohibition, and Pearse having demurred, as above stated, the Court over-ruled the demurrer, upon which Pearse brought a writ of error before the governor and council. They affirmed the judgment, and then Pearse brought this appeal.

(a) 6 Geo. 1, c. 21, § 31.

And, in this case, the Admiralty have made allowance for the wages, provisions, and expences, of every man on board; which, for any thing that appears to the contrary on this record, is the measure of the real damages sustained.

"I agree with the counsel for the plaintiff, that, if it be clear upon principles, or judicial authorities, that an action may be maintained, the inconvenience will not avail; the Court must pronounce according to the law, as they find it, and Parliament alone can relieve.

"But no such principle, or authority, has been produced at the Bar. The authorities are the other way, and so, also, is the principle; for the principle is, that the question 'prize or not prize,' and the consequences of it, are conusable solely in the Admiralty Court; the true reason of which is, that prizes are acquisitions jure belli, and the jus belli is to be determined by the law of nations, and not by the particular municipal law of any country.

**[611]** "The counsel for the plaintiff have endeavoured to distinguish the present case from the case of an action brought immediately after the seizure of the ship, because there has been a sentence of acquittal in the Admiralty Court, which is conclusive, that the ship was not lawful prize.

"Of that I will take more particular notice presently; but I will first examine more minutely what is the ground of the decision, at the Cockpit, in *Rous v. Hassard*, as that may afford an answer to the objection made, that, at all events, the matter should have been specially pleaded; which was an objection, that, for a long time, had great weight in my mind.

"The ground of that decision was, that the capture, as prize, was not a trespass at common law; for Lord Chief Justice Lee said, that, on not guilty, the plaintiff could not recover in England.

"But if, as insisted for the plaintiff, the capture had been, primâ facie, a trespass at common law, it would have been incumbent on the defendant to have pleaded specially, that he seized the ship as prize, and what was the cause, or ground, of seizure.

"This shews, that the Courts have not a concurrent jurisdiction, for, if that were the case, the special matter must have been pleaded.

"The case before Mr. Justice Gould was upon a plea of not guilty, and founded upon the same principle.

"It is true, that none of the cases which I have mentioned, were founded on injuries to the person, but were all for damage done to the ship, or to the cargo, or goods on board. But that, I think, makes no difference, for the question must be the same in an action of false imprisonment, as it is in an action of trespass for taking away the goods, or the ship; and the party injured is as much entitled to a satisfaction, in the one case, as in the other, in the Admiralty Court. But, if there be any difference, that difference will operate in favour of the defendant, for a confinement under a capture is distinguishable from the common case of a false imprisonment.

"In the case of a capture, there is no distinct substantive act of imprisonment. It is only a necessary and unavoidable consequence of the capture. The captors do not mean to confine the captured longer than they are forced to do so, for **[612]** the purpose of securing their supposed prize. They cannot throw them all overboard, and they cannot secure the ship and cargo, without imposing some restraint on the men; but the moment they get to a shore, they are as willing to get rid of the men, as the men themselves can be to go.

"It was admitted, on the first argument, that the question 'prize or not prize,' is a question solely and exclusively to be determined in the Admiralty Court. But then it was contended, that, after a sentence in that Court declaring the ship to be no prize, an action might be maintained.

"But, in such actions as the present, the principal question must be, 'prize or not prize;' for, if the ship be a lawful prize, it is not a false imprisonment; and that is a question which we cannot decide.

"The question of 'prize or not prize,' must still arise, notwithstanding the acquittal in the Admiralty, though it is true that the sentence in that Court is conclusive on the question. But it is evidence of a thing which this Court cannot enquire into; and that is the ground of the decision in 2 Lev. 25, for, though there had been a sentence of condemnation in that case, and the goods were afterwards sold on land, yet the Court refused to grant a prohibition, because the original cause, being of

Case 2:10-md-02179-CJB-DPC   Document 12466-2   Filed 03/07/14   Page 11 of 19

piracy, must all come in question again, and they held that the sentence did not alter the case.

"In the case in Carth. 474, and the later cases which I have mentioned in which there had been sentences of acquittal, the question of prize was as much at rest as it could be in the present case; but, notwithstanding that, the Courts have always said, that the subsequent matter was not triable at common law, but altogether appropriated to the sole jurisdiction of the Admiralty. Besides this, if the original taking be not a trespass conusable at common law, the sentence of the Admiralty Court cannot give a jurisdiction to this Court, which it had not before.

"That sentence does not alter the nature of the original taking. It was still a seizure as prize; which the common law does not take notice of, as a trespass; and the sentence cannot make that a trespass, which was not so at the time when the fact was committed.

"Upon the whole, as the plaintiff has had, or may have, a remedy elsewhere, as there is no case in which it has ever been holden, that such an action can be maintained, and it would be attended with great mischief and inconvenience if it [613] could be maintained, and, as there are several authorities which say, the action will not lie, I am of opinion that there must be judgment for the defendant."

Lord Mansfield declared his assent to every thing Buller, Justice, had said.

Judgment for the defendant.

The two rules for new trials were afterwards discharged, no writ of error having been brought in this case [1].

---

[1] The foundation and nature of the prize jurisdiction in the Court of Admiralty, having been explained by Lord Mansfield, in a very elaborate argument, when he delivered the opinion of the Court in the case of *Lindo* v. *Rodney and Another*, and the subject being connected with this case of *Le Caux* v. *Eden*, I have inserted what his Lordship said on that occasion, in this place, though the decision was posterior, in point of time, to the period to which, for the present, I mean to confine these reports.

In Michaelmas term, 22 Geo. 3, the rule to shew cause, why there should not be a prohibition, had been granted; and, in Hilary term, 22 Geo. 3, (on Friday, the 25th, and Saturday, the 26th, of January,) the case was argued at the Bar, by Dr. Wynne, King's Advocate, Dr. Scott, the Attorney-General, and Dunning, against,— and Wilson, Wood, Pigott, Erskine, and S. Heywood, in support of, the application.

On Monday, the 4th of February, Lord Mansfield delivered the opinion of the Court, as follows:

Lord Mansfield.—"Many persons, in the same case, under the same circumstances, upon the same ground, have severally applied for a prohibition, to stop the Judge of the Admiralty from proceeding upon a monition, issued in the usual form, in order to the condemnation of goods, wares, merchandizes, arms, stores, and ammunition, taken and seized, by His Majesty's land and sea forces, under the command of Admiral Rodney and General Vaughan, at the island of St. Eustatius, and its dependencies, upon the surrender of the said island of St. Eustatius, and its dependencies, on or about the 3d of February last; and citing all persons to shew cause, why they should not be pronounced to have belonged, at the time of the capture and seizure, to our enemies, and as goods of enemies, or otherwise liable to confiscation, be adjudged, and condemned, as good and lawful prize.

"Elias Lindo claims part of these goods, as belonging to him, a British subject, and, as to them, prays a prohibition; and, by his suggestion, among other things, he avers;

"That Sir George Rodney and General Vaughan, upon the 3d of February, in a hostile manner, seized upon, and took possession of, the island of St. Eustatius, with every thing whatsoever therein being, (open hostilities then subsisting between the King and the States,) and that the goods claimed were taken upon land, in the said island of St. Eustatius.

"The ground upon which the prohibition is prayed, is; that the goods were taken upon land, which appears upon the face of the monition, and is averred by the suggestion.

"The only question then is, whether the goods being taken on land, though in consequence of a surrender to ships at sea, excludes the only prize jurisdiction known in this kingdom?

K. B. XXVIII.—13

"This question naturally leads to an enquiry into the nature of this jurisdiction, exercised by the Judge of the Admiralty, exclusively of every other judicature of every kind, except upon appeal.

"Upon the motion being made, I directed, in Court, a search to be made into the books of the Admiralty, especially during the reign of Queen Elizabeth: I also got a search made myself. And one of the registers informed us, in Court, during the argument, that there are no Prize-Act books farther back than 1643; no sentences farther back than 1648.

"The register has not been able to search farther back than 1690. The prior records are in confusion, illegible; and no index.

"It appears that this jurisdiction in matters of prize, (whether it be coeval with the Court of Admiralty, or, which is much more probable, of a later institution, beyond the time of memory,) though exercised by the same person, is quite distinct.

[614] "He is appointed Judge of the Admiralty by a commission under the Great Seal, which enumerates particularly, as well as generally, every object of his jurisdiction; but not a word of prize.

"To constitute that authority, or to call it forth, in every war, a commission under the Great Seal issues to the Lord High Admiral, to will and require the Court of Admiralty, and the lieutenant and Judge of the said Court, his surrogate or surrogates, and they are hereby authorized and required, to proceed upon all and all manner of captures, seizures, prizes, and reprisals, of all ships and goods, that are, or shall be, taken; and to hear and determine, according to the course of the Admiralty, and the law of nations.

"A warrant issues to the Judge accordingly.

"The monition, and other proceedings, are in his name, with all his titles of office, rank, and degree; adding, emphatically, as the authority under which he acts, the following words; 'And also to hear and determine all and all manner of causes, and complaints, as to ships and goods seized and taken as prize, specially constituted and appointed.'

"The Court of Admiralty is called the Instance Court; the other the Prize Court.

"The manner of proceeding is totally different.

"The whole system of litigation and jurisprudence in the Prize Court, is peculiar to itself: it is no more like the Court of Admiralty, than it is to any Court in Westminster-Hall.

"From 8 Eliz. c. 5, it appears, that, in civil and marine causes, there were many appeals, which the statute restrains to one to the King in Chancery, to be finally decided by Delegates. But prize is not a civil and marine cause; and the appeal lies to commissioners, consisting of the Privy Council.

"A thing being done upon the high sea, don't exclude the jurisdiction of the Courts of Common Law. For, seizing, stopping, or taking, a ship, upon the high sea, not as prize, an action will lie; but for taking, as prize, no action will lie. The nature of the question excludes, not the locality. This was explained in the case of *Le Caux* v. *Eden.*

"The end of a Prize Court is, to suspend the property till condemnation; to punish every sort of misbehaviour in the captors; to restore instantly, velis levatis, (as the books express it, and as I have often heard Dr. Paul quote,) if, upon the most summary examination, there don't appear a sufficient ground; to condemn finally, if the goods really are prize, against every body, giving every body a fair opportunity of being heard. A captor may, and must, force every person interested to defend, and every person interested may force him to proceed to condemn, without delay.

"These views cannot be answered in any Court of Westminster-Hall, and, therefore, the Courts of Westminster-Hall never have attempted to take cognizance of the question, 'prize or not prize;' not from the locality of being done at sea, as I have said, but from their incompetence to embrace the whole of the subject.

"As to plunder, or booty, in a mere continental land war, without the presence or intervention of any ships, or their crews, it never has been important enough to give rise to any question about it. It is often given to the soldiers upon the spot; or wrongfully taken by them, contrary to military discipline. If there is any dispute, it is regulated by the commander in chief. There is no instance, in history or law, ancient or modern, of any question before any legal judicature, ever having existed about it, in this kingdom. To contend that such plunder was within the rules and

jurisdiction of the Prize Court, might be opposed by the subject matter, the nature of the jurisdiction, the person to whom it is given, and the rules by which he is Judge. Therefore, the counsel have confined their argument to reprisals ashore, by a naval force; as least, I shall consider it as so confined, without entering into any question about booty, in a mere land war; as to which I have no light to go by, and it is not now necessary to be decided. Neque teneo, neque dicta refello.

"The question then is, whether such a capture ashore, by a fleet of ships, and the land and sea forces aboard, in consequence of a previous surrender of the place, is within the jurisdiction of the Court of Prize.

"Two general objections have been relied upon.

[615] "1. That, though it were given and immemorially exercised, yet it cannot subsist, because contrary to the Statutes of 13 and 15 Ric. 2, and 2 Hen. 4.

"2. If there is no objection from these statutes to the existence of such a jurisdiction, that it is not given by immemorial usage, or the true construction of the commission.

"As to the first, these statutes manifestly relate to the usurpations of the Instance Court of Admiralty, in causes civil and marine, to contracts, pleas, and quarrels, only triable at law. There is not a word in any of the statutes applicable to the Prize Court; there was no complaint of it; not a syllable of commissions to judge of prize.

"In the subsequent altercations, in the reign of James I. between the Admiralty and the Judges, there is not a word of prize: the Admiralty don't complain of prohibitions in prize; none had ever been granted; the Judges don't complain of encroachments in matter of prize.

"The view, purport, and tendency of the statutes, is to prevent the Admiralty from trying matters triable at law. The taking a ship upon the high sea is triable at law to repair the plaintiff in damages: but a taking on the high sea, as prize, is not triable at law to repair the plaintiff in damages. The nature of the ground of the action—prize or not prize—not only authorizes the Prize Court, but excludes the common law.

"These statutes don't exclude the common law in any case, and they confine the Admiralty by the locality of the thing done, which is the cause of action: it must be done upon the high sea.

"If done in ports, havens, or rivers, within the body of a county of the realm, the Admiralty is excluded. But the Prize Court has uniformly, without objection, tried all captures in ports, havens, &c. within the realm. It happens often. We all remember several cases. Ships, not knowing of hostilities, come in by mistake. Upon the declaration of war, or hostilities, all the ships of the enemy are detained in our ports, to be confiscated as the property of the enemy, if no reciprocal agreement is made. They can only be condemned in the Court of Prize.

"What is still more extensive, foreign ports, or harbours, are not the high sea, any more than the shore, but numberless captures made there, have been condemned as prize.

"I am of opinion, that these statutes have no view, or relation to the subject of prize: consequently there arises from them no objection.

"2. The second objection is, that the jurisdiction is not given.

"I will consider this objection in three points of view.

"1. Upon the words of the commission.

"2. Upon the reason of the thing.

"3. Upon authorities and usage.

"1. As to the first; the commission certainly has in view captures by ships. Hostilities are committed by ships and the men aboard, at sea, or ashore; a fight begins; the vanquished runs ashore; gets the goods out; is pursued ashore; and the goods are taken.

"A fort, or town, is taken by the force of ships at sea, and is ransomed; or plate, money, and valuable effects taken.

"The means this country has of annoying, and making reprisals upon an enemy, is by naval expeditions. There never was, there never will be, one, no, not a single ship, which has not a view to operations upon land, if occasion should offer. They are often the main view—Sir George Rooke, at Vigo—Admiral Vernon, at Porto Bello and Carthagena— Lord Anson, in the South Seas—Sir George Pocock, at the

Havannah—many last war to Martinico, Guadaloupe, and other places—Commodore Johnston the other day.

"In many old treaties, some of which I shall mention by and by, the usual stipulation is, that the subjects of the one prince shall do no injury or violence to the subjects of the other, by land or sea, or in fresh waters, or in port. It is not by accident, therefore, that the words of the commission are general—all manner of captures, seizures, prizes, and reprisals of all ships and goods. It don't say—upon the sea. It don't say—goods in the ship. 'Reprisals' is the most general word that can be used.

"In causes civil and marine, to give jurisdiction to the Court of Admiralty, the libel must allege the cause of suit to be done upon the high sea, and, therefore, if that had been the intention of the commission, or the rule of law, it would certainly have been so expressed in the commission.

[616] "2. The reason of the thing requires the words should be general.

"It is, as I have said, in the view of every ship, much more of every fleet, which sails to make reprisals, to act on shore. There is no place of note which can be attacked, where neutral or British subjects do not reside, or have property, or where the enemy may not colourably borrow their names.

"If it is not within the jurisdiction of the Prize Court, consider the consequence to the captors; to the claimants; and to the State.

"The captors are in a miserable condition indeed. The prize cannot be condemned. If granted, it cannot be shared. Every officer and sailor may be liable to actions without number. The taking cannot be disputed. To disprove the property, they can only have witnesses from abroad, who cannot be compelled to come. The grounds upon which the Prize Court condemns or acquits, cannot be read at law; and, in every action where the plaintiff recovers to the value of a farthing, the captor must pay the costs.

"Colourable claimants might easily ruin the captors, through their want of the means of defence.

"It would be equally mischievous to fair claimants. They could not have their property restored instantly, upon their own papers, books, and affidavits. They must make formal proof. And the owners or crew of a privateer all the while might be spending the effects.

"But to the State the consequences would be still more mischievous.

"No distinction can be made between British and neutrals. If the jurisdiction is null by the statutes, or never was given, it can no more be exercised in the case of a neutral, than in the case of a subject.

"By the law of nations, and treaties, every nation is answerable to the other for all injuries done, by sea or land, or in fresh waters, or in port. Mutual convenience, eternal principles of justice, the wisest regulations of policy, and the consent of nations, have established a system of procedure, a code of law, and a Court for the trial of prize. Every country sues in these Courts of the others, which are all governed by one and the same law, equally known to each. The claimant is not obliged to sue the captors for damages, and undergo all the delay and vexation to which he may think himself liable, if he sues by a form of litigation, of which he is totally ignorant, and subjects his property to the rules and authority of a municipal law, by which he is not bound.

"In short, every reason which created a Prize Court as to things taken upon the high seas, holds equally when they are thus taken at land. The original cause of taking is here at sea. The force which terrified the place into a surrender was at sea. If they had resisted, the force to subdue would have been from the sea.

"Mr. Piggott candidly said, it would be spinning very nicely, to contend, if the enemy left their ship, and got ashore with money, were followed upon land, and stripped of their money, that this would not be a sea capture. I agree with him, but I cannot distinguish that case from this. Both takings are literally upon land. In both the prey is, as it were, killed at sea, and taken upon land. Here the capture of the goods on land is the immediate consequence of the surrender at discretion to a sea force.

"Would a sum paid by capitulation upon land have made it a sea or a land prize?

"Cui bono should all this subtlety be spun, when the reason for a jurisdiction to judge a capture at sea, and such a capture at land, is exactly the same?

" 3. Authorities and immemorial usage.

"In 1498, a treaty, intitled Confirmatio Tractatûs contra spolia maritima, & pro deprædatoribus coercendis, between Henry VII. and Louis XII. confirming one before made with Charles VIII. (13 Hen. VII. Rymer, vol. 12, p. 690); and, in 1526, another between Henry VIII. and Francis I. (17 Hen. VIII. Rymer, vol. 14, p. 147).

"They stipulate, that (before any ship goes out of port, the admiral, &c. shall take sufficient security from the owners, that the master and mariners shall keep the peace towards the subjects of the other prince; and shall do them no injury or violence by land or sea, or in fresh waters, or in any port. The mariners to take an oath, that, when they return with their ships, and spoils, if they take any, they will immediately inform the admiral, or his officers, of the port from which they sailed, of their plunder, (præda,) spoils, and goods, without whose decree and permission they shall not be suffered to convey them out of their ships, or to exchange, sell, or alien them. No body to purchase, &c. from them, before the admiral, &c. have declared them to be lawful prize and capture; but, if it shall be [617] found that the said plunder, (præda,) was taken away from the subjects, lands, kingdoms, or dominions, of either of the said Kings, the goods taken, with damages and interest, shall, without delay, be ordered to be restored to the persons who have been plundered, and the sentence to be against masters, partners, owners, and sureties.

"Either party aggrieved may appeal to the Supreme Council.

"These treaties demonstrate the jurisdiction of prize in the Admiralty and Commissioners of Appeal then, to have been pretty much as it is now. Ships of war are to give security to do no injury or violence by land or sea, or in fresh waters, or in any port. When they return with prize, they are to disclose it, if they have taken any thing by sea or land from the subjects of either prince. If they have taken from the subjects, lands, kingdoms, or dominions, of either, instant restitution to be made, with costs and damages. If taken from the subject, in the land of an enemy, to be restored. If taken from the land of either prince, though the goods of an enemy, to be restored: it is a breach and violation of his territory. A capture of Admiral Boscawen upon the land and shore of the King of Portugal occasioned much discussion.

"It manifestly appears from these treaties, that the jurisdiction equally extended to goods taken by ships or their crews on land and at sea. They shew too, that no property vests in any goods taken at sea or on land, by a ship or her crew, till a sentence of condemnation as good and lawful prize; which continues law to this day.

"In *Goss* v. *Withers*, 2 Burr. 694, it is said, 'that I had talked with Sir George Lee, who had examined the books of the Court of Admiralty, and informed me, that they held the property not changed so as to bar the owner, in favour of a vendee, or recaptor, till there had been a sentence of condemnation, and that, in the reign of Charles II. Sir Richard Floyd, (the father of the late Sir Nathaniel,) gave a solemn judgment upon the point, and decreed restitution of a ship retaken by a privateer, after she had been 14 weeks in the enemy's possession, because she had not been condemned. That another case, upon the same principle, against a vendee, is cited at the end of *Assievedo* v. *Cambridge*, in 1695, (Lucas, 79,) after a long possession, two sales, and several voyages.'

"In the reign of Queen Elizabeth, it is well known that a buccaneering war was carried on by private adventurers, and that, in the Spanish West Indies, considerable prize was taken on land.

"Dr. Wynne said, the commissions to fit out ships against the enemy, expressly authorize the persons to whom they are granted to take the enemy's goods by land as well as by sea.

"He cited one, by way of instance, in the 37th of Elizabeth, 1595, (Rymer, vol. 16, p. 2751). A commission to Robert Crosse, giving full power, in hostile manner, as well by land as sea, to invade, take, stay, and destroy, any ships or goods of the King of Spain, his subjects, or adherents.

"'And such ships, goods, jewels, bullion, or any other riches as they shall take in them, we do strictly charge and command you to see that they be safely preserved from spoil, and to be brought home in good order into our realm of England.'

"They were to seize goods by land and sea. All they seized they were to bring to England. No property vested till condemnation. They could only be condemned by the Prize Court of Admiralty. They, therefore, most certainly were so condemned, though the proceedings are lost.

"In the reign of Queen Elizabeth, and former reigns, many special commissions issued, to inquire into depredations by violators of treaties, and the law of nations, which are to be seen in Rymer. But the most ancient instrument shews a prize jurisdiction, either inherent, or by commission, in the admiral. It is a letter from Edward III. to the King of Portugal, (Rymer, vol. 6, p. 15,) and recites a complaint, that the admiral, before whom the goods were judicially demanded, determined, that they should not be restored, as having been taken in war.

"Since the reign of Queen Elizabeth no special commission appears to have issued; but the Judge of the Admiralty, either by virtue of an inherent power, or the King's commission, or both, has solely exercised the jurisdiction of prize.

"I will conclude with three propositions.

"1. That, so far back as particular cases can be traced, which is for a cen-[618]-tury, the Admiralty has judged of, and condemned, goods taken on land as prize, as well as goods taken on sea.

"2. That every common-law authority to be found on the subject, allows and supports the jurisdiction.

"3. That the Legislature has, in many Acts of Parliament, recognized and referred to it, as clear, certain, and undoubted.

"1. 15 April, 1692. The sentence of Sir Charles Hedges, Judge of the Admiralty Prize Court, on goods taken on the plunder of a town.

"'Captain Mann, commander of their Majesty's hired ships in the West Indies, goes on shore with several of his crew, and pillages and plunders the inhabitants of a town, then in the territories and dominions of the French King, and brings off, and carries on board his ship, a considerable quantity of goods, to the amount of £20,000, as is sworn by several witnesses, besides 30 negroes, worth £20 each. This pillage he keeps to himself, without making any distribution thereof to his followers, or crew. The mariners, thinking they had a right to a share thereof, have called him to an account in the Court of Prize, and the questions which are made, are:

"'1. Whether this Court has jurisdiction?
"'2. Whether the mariners have a right to a share?
"'3. What that share shall be?
"'1. As to the jurisdiction; which is twofold, the Court of Admiralty, and the Court of Prize.'

("Here there is a long argument to shew that it may belong to the Court of Admiralty, as incident to the military authority of the admiral, in time of war, upon descents, as well as at sea,—which is not material to be now stated.—He proceeds thus:)

"'But go to the second ground of jurisdiction in this case, that it is, (as it is,) before the Court of Prize, where, by the plain words of the patent under the Broad Seal of England, it is evident enough, that the Court has cognizance of prize goods taken from the French, as well by land as by sea. It is, therefore, very clear to me, that this Court has jurisdiction.'

"He then proceeds upon the other two questions, as to the shares, but that is not material.

"This was followed, very soon after, by the cause which gave rise to the motion for a prohibition in 1698 (*a*).

"1703. 'Vigo' captures under different circumstances. Many to this purport.

"'Adventure,' Trevor, captain. The Queen against the goods in a certain schedule annexed, taken from the enemy, at the port of St. Mary and St. Vigo, in the kingdom of Spain, and put on board the said ship, and there, or in the hands of the said Trevor, now, or lately, remaining, and against all persons in general.

"Much was undoubtedly taken on land, and all condemned.

"10 June, 1745, Peyta. Sentence of condemnation to the King. Several purses of money, and jewels, amounting to £30,000, and upwards, taken and seized as plunder, in the town of Peyta, being a town in the Spanish West indies, in the kingdom of Spain, from the enemies of the Crown of Great Britain, were rightly and duly taken by the officers and mariners of His Majesty's ships, (naming them, &c.).

"4 Feb. 1746. Plunder taken from the island of St. Bartholomew, and condemned

---

(*a*) *Brown* v. *Franklyn.*

in Antigua, viz. 170 negro and mulatto slaves, and divers other goods, wares, and merchandizes, seized and taken from the island of St. Bartholomew.

" 27 April, 1759, 'Savannah.' Taken by Sir Hyde Parker's fleet. Goods and effects, (specified,) taken in boats and craft, and on shore. Many claims and restitutions.

" 27 June, 1759. Plunder taken at Senegal.

" 28 March, 1763, Havannah. Upon another state of facts. The ship 'Tyger,' and the effects on board, surrendered by capitulation, with the town;—a treaty on land.

" These cases shew, that, for a hundred years, the jurisdiction has been professedly, notoriously, and quietly exercised; which leads to the second proposition, that this exercise does not rest on acquiescence only, but

" 2. That every common-law authority to be found on the subject, allows and supports the jurisdiction.

" *Brown & Burton* v. *Franklyn,* the King's Proctor, Scacc. H. 10 W. 3, Carth. 474. Brown & Burton, the masters of two ships belonging to the East India Company, took a French ship, and cargo, and money, upon land. They had no letters of marque. The King's Proctor, upon the [619] usual monition, got a sentence of condemnation of the whole, as perquisite of Admiralty, and then proceeded upon the ground of this sentence, against Brown & Burton, for an account.

" They moved for a prohibition, suggesting the Statutes of 13 and 15 Ric. 2, and 2 Hen. 4, and averring that the goods and merchandizes were taken upon land, in the East Indies, and that they were no parties to the sentence, never heard, and ought not to be bound.

" The last was an objection upon the eternal principles of natural justice, but immediately removed, when the nature of the proceeding in rem came to be explained.

" The ground which remained, was their being taken upon land. If the Court had no jurisdiction, the sentence was null and void, the subsequent proceeding was illegal, and must have been prohibited.

" But it was insisted, by the counsel against the prohibition, that prize or no prize was a matter not triable at common law, but altogether appropriated to the jurisdiction of the Admiralty.

" The Court concurred in this proposition, and, therefore, denied the prohibition.

" This is a judgment in point, and the attempts which have been made shew, that no ingenuity can distinguish it, and Lord Chief Baron Comyn draws a general conclusion and maxim of law from it :—' If a sentence be in the Admiralty, for a ship or goods, as prize, a prohibition does not go upon a suggestion, that it was not prize, or that it was acquired upon land (*a*).'

" But, in 1742, there is a more solemn and more elaborate judgment, by Lord Chief Justice Lee, a very able, and a very strict common lawyer; viz. in *Key & Hubbard* v. *Vincent Pearse*, 31 January, 1742. I was counsel in it. It was argued, and could only be argued, as a mere question of law, just as if it had arisen in Westminster Hall, upon a capture in the river Thames, within the body of a county.

" The colonies take all the common and statute law of England, applicable to their situation and condition. The Courts of Law prohibited the Court of Admiralty, just as the Courts of Westminster Hall do here.

" I had a full note of it. But, luckily, Lord Chief Justice Lee having taken time to consider, he brought with him notes of the opinion he was to deliver, which notes we have in his own hand. I have also the report of the committee, and the order of counsel upon it.

" I will state to you the notes from which the Chief Justice gave his opinion, in his own hand."

(Here his Lordship read the opinion of Lee, Chief Justice, verbatim, as it is set forth supra, p. 606 to 608.)

" Nothing can be clearer than the principles laid down by him. The question, 'prize or no prize,' is the boundary line; and not the locality of land or sea, or port within the body of a county within the realm [F 1].

---

(*a*) Com. Dig. title Admiralty, (E 9).

[F 1] So in *Menetone* v. *Gibbons*, 3 T. R. 267, it was held, on the authority of this case, that the Admiralty Court has jurisdiction to proceed against a ship, and condemn

Case 2:10-md-02179-CJB-DPC   Document 12466-2   Filed 03/07/14   Page 18 of 19

"3. That the Legislature, in several Acts of Parliament, has recognized and referred to this jurisdiction over goods taken on land as prize.

"The Prize Act of the 17th (*b*) and 29th (*c*) of George II. contain a clause, that the Lords of the Admiralty shall grant a commission, at the request of the owner, to the captain of any ship, 'for attacking or taking, with such ship, or with the crew thereof, any place or fortress upon the land, or any ship or goods belonging to, or possessed by, &c.'

"The Statute of the 19th of George III.(*d*), meaning to express the same thing, has used more words to effectuate the grant of the property to privateers, but takes the jurisdiction for clear and certain.

"Subsequent acts follow this.

"Upon these authorities there can be no doubt. We, none of us, ever had any.

"If the question had been doubtful, arguments from utility and public convenience ought to have turned the scale. It could answer no good end, and must produce inextricable mischief, to captors, claimants, and the State, if goods taken upon land by ships, should not be within the prize jurisdiction.

"The merits are no part of this question. If the captors have done wrong, in substance, or in manner, the Judge of Admiralty, and, if he err, the Lords of Appeal, have full power to make ample repara-[620]-tion. They give satisfaction even to an enemy prisoner, who is illiberally plundered, or personally ill treated.

"As we are all clearly of the opinion I deliver, we ought not to contribute to the injustice and mischief which may be occasioned to many persons, from giving liberty to declare in prohibition, and the parties know, they are not finally barred by our judgment. They may apply for a prohibition to every Court in Westminster-Hall.

"Therefore, we are all of opinion, that the rule should be discharged."

No motion has been made for a prohibition, in any other Court; but an action, (viz. *Mitchell and Another* v. *Rodney and Another*,) in which the same question arises, was tried before Lord Mansfield, at the sittings after Hilary term, 22 Geo. 3, and a special verdict found, upon which judgment passed in B: R. for the defendants, in the ensuing term, without argument, the opinion of the Court being already known; and a writ of error upon that judgment is now depending in the House of Lords [† 126] [F 2].

---

her to be sold, upon an hypothecation bond, though made on land: and that it made no difference that the instrument was under seal; any more than, in the case of *Brymer* v. *Atkins*, (infrà, cit.) a recognizance entered into by the parties in a Vice-Admiralty Court, to abide the event of an appeal (which they held only to operate in that Court as a stipulation) was an objection to the jurisdiction given to the Court of Appeal.

(*b*) 17 Geo. 2, c. 34, § 2.     (*c*) 29 Geo. 2, c. 34, § 2.     (*d*) 19 Geo. 3, c. 67, § 2.

[† 126] On the 24th of November, 1783, the judgment of the Court below was affirmed.

[F 2] The Prize Court has not only exclusive jurisdiction of the question of prize or no prize, but also of the question who were the captors; and it has a right by its process to place the property captured in the hands of those parties whom it has decided to have an interest in the capture, as, in that instance, the Army and Navy jointly. And even if that Court misconstrues an Act of Parliament on a matter within its jurisdiction, a prohibition will not lie. *Lord Camden* v. *Home, in Error*, 4 T. R. 382. So, if the Prize Court decide goods to be enemies' property, and the ship in which they were taken to be neutral, and decree the former to the captors, and the latter to the claimant, it has an exclusive jurisdiction: also to decree what shall be paid to the latter, for the freight which he has lost. And it may proceed for that purpose against parties having the produce in their hands; notwithstanding the goods have been delivered to the captors, and the statute 19 G. 3, c. 67, s. 2, vests prize goods in them. *Smart* v. *Wolf*, 3 T. R. 323. In this and the preceding case, these of *Le Caux* v. *Eden*, and *Lindo* v. *Rodney*, are fully confirmed, and considered as fundamental decisions on this subject; which is also fully discussed and illustrated by the arguments and judgments there given. On the principle of these decisions also it is settled, that captors have an insurable interest; being "liable to be called to account in the Court of Admiralty, where they may be amerced in damages and costs," per Lord Kenyon, *Boehm* v. *Bell*, 8 T. R. 154. See also *Le Cras* v. *Hughes*, Marshall, Ins. 108. See also *Willis* v. *Commissioners of Appeal in Prize Causes*, 5 East, 22, and

LUXTON *against* ROBINSON. Friday, 9th February, 1781. In an action upon an agreement to deliver possession for certain considerations, subject to a forfeiture, on failure, by either party, the person who was to deliver possession cannot sue for the forfeiture, without shewing in his declaration a possessory title in himself.

Assumpsit, on an agreement, by which the defendant was to take, of the plaintiff, certain premises, known by the name, &c. and the goods and fixtures, which should appear to be the property of the plaintiff, by a fair appraisement, by two appraisers, or their umpire, or else to forfeit a deposit of five guineas, and, if either should fail in his part of the agreement, that he should pay £10 to the other, exclusive of the deposit; the defendant to take possession on a day specified. The plaintiff averred, that, on the day, he was ready and willing to deliver to the defendant the said premises, and such goods and fixtures as should appear to be the property of the plaintiff, at such appraisement as in the said agreement mentioned, yet the defendant did not then, nor at any other time, accept and take of the plaintiff, the said premises, but wholly refused so to do, by reason whereof he became liable to pay the said sum of £10, exclusive of the deposit. Special demurrer; for that it does not appear; 1. That the plaintiff had any interest in the said premises, at the time of making the agreement; nor, 2. That he ever requested the defendant to take the said premises, and such of the said goods, &c.; nor, 3. That the said goods and fixtures were ever appraised in any manner whatsoever.

In support of the declaration, it was said, that, when a party declares on a demise, there is no occasion to shew an interest; if the defendant means to call that in question, he ought to [621] plead nil habuit in tenementis, and then the plaintiff must shew a title in his replication. Besides, in this case, it was not necessary that the plaintiff should have an interest in the premises, for nothing was to be paid but for the goods and fixtures. As to the appraisement, it was enough to aver, that he was ready and willing. He could not have an actual appraisement without the concurrence of the defendant; for, from the nature of the contract, one appraiser must have been named by each.

Wood, for the plaintiff.—Runnington, for the defendant.

Buller, Justice.—This is not like a demise by deed. Here, the plaintiff was to deliver possession, and, therefore, he ought to have shewn, that he had a right so to do. With regard to the appraisement, if each was to appoint one, he should have shewn, that he had appointed one.

Wood had leave to amend, on payment of costs.

THE KING *against* THE INHABITANTS OF CORHAMPTON. Saturday, 20th Feb. 1781. When the title of the rate is—so much in the pound,—and the pauper's name is inserted in the rate, and also his yearly rent, though nothing is written against his name in the column of sums assessed, this is a sufficient rating for the purpose of gaining a settlement.

The Court of Quarter Sessions for the county of Surry, confirmed an order of two justices, for removing the wife and children of one Richard Goodiff, from the parish of Croydon, to the parish of Corhampton, subject to the opinion of this Court, on the following facts:

Richard Goodiff was originally settled at Corhampton. In 1769 he came to Croydon, and there rented a house at £4, 10s. per annum. On the 10th of June,

---

*Brymer* v. *Atkins*, 1 H. Bl. 164, to which the same observations apply. In the former of these cases it was decided, that the commissioners had power (upon their original jurisdiction independent of the Prize Acts) to charge the agent for the captor, with interest upon the proceeds, after a decree of restitution. In the latter it was held, that where a Prize Court is authorized, by statute, to give the full value of ship, &c. to the appellant, it is not bound to interpret those words by any definite measure, (as by the price at the port to which it was carried,) but has a discretionary power to declare the full value, and also to enforce payment of it from the sureties.

K. B. XXVIII.—13*