IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179  SECTION: J |
| This document relates to all actions. | * * * * * * | HONORABLE CARL J. BARBIER  MAGISTRATE JUDGE SHUSHAN |

**MEMORANDUM IN SUPPORT OF MOTION TO MODIFY
THE JANUARY 17, 2014 REPORT OF SPECIAL MASTER FREEH**

After initial reports of serious misconduct within the Court-Supervised Settlement Program ("CSSP"), the Court appointed Special Master Louis Freeh pursuant to Federal Rule of Civil Procedure 53 to conduct an independent, external investigation of the misconduct, and to recommend controls and policies to ensure the integrity of the CSSP, as well as business process procedures designed to fairly and efficiently adjudicate claims.[1]

As part of his duties, Special Master Freeh has filed two reports with the Court. The first report presented the results of the Special Master's investigation into the facts of the misconduct, but did not include recommendations to improve the defects in the CSSP's control environment.[2] The second report detailed further misconduct within the CSSP and made four recommendations to strengthen the internal controls of the settlement program.[3]

---

[1] Order, July 2, 2013, Rec. Doc. 10564; Order, Sept. 6, 2013, Rec. Doc. 11288.

[2] Sep. 6, 2013 Report of Special Master Louis J. Freeh at 89, Rec. Doc. 11287.

[3] Jan. 17, 2014 Report of Special Master Louis J. Freeh, Rec. Doc. 12174.

BP agrees with the recommendations of the Special Master—however, based on the available evidence, further remedial action is necessary and should be ordered by this Court. BP, therefore, respectfully objects to the Second Report of Special Master Freeh to the extent that it is incomplete, and requests that the Court direct additional steps to be taken by the CSSP.

## BACKGROUND

The Court gave Special Master Freeh three mandates when he was initially appointed pursuant to Rule 53: (1) to perform the independent investigation relating to Lionel Sutton's resignation, (2) to find facts "as to any other possible ethical violations or other misconduct within the CSSP," and (3) to "examin[e] and evaluat[e] the internal compliance program and anti-corruption controls within the CSSP, and mak[e] any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP."[4] The Special Master was instructed to submit a "formal report" if requested by the Court.[5]

Special Master Freeh submitted a written report to the Court on September 6, 2013, ("First Report"), addressing the first and second mandates.[6] The First Report found conflicts of interest and corruption at senior levels of the CSSP and concluded that the conduct of two of the settlement program's in-house counsel "may have violated the federal criminal statutes regarding fraud, money laundering, conspiracy or perjury."[7] The First Report also "raise[d] serious questions" about the policies and procedures used by the settlement program in evaluating claims

---

[4]  Order, July 2, 2013, Rec. Doc. 10564.

[5]  *Id.*

[6]  First Report, Rec. Doc. 11287, at 89; Order, Sept. 6, 2013, Rec. Doc. 11288.

[7]  First Report, Rec. Doc. 11287, at 2.

2

for fraud.[8]  In light of the problems identified, BP responded to the First Report by requesting that the Court temporarily suspend the payment of claims until the Special Master could recommend and implement necessary reforms.[9]

The Court responded to the First Report by instructing Special Master Freeh to continue his work, and detailed additional duties.  The Court directed Special Master Freeh to "recommend, design, and test enhanced internal compliance, anti-corruption, anti-fraud and conflicts of interest policies and procedures," and to "recommend any additional business process procedures designed to promptly and fairly adjudicate claims in an efficient manner."[10]  The second appointment order also required the Special Master to report to the Court and to the parties every thirty days.[11]

On January 17, 2014, Special Master Freeh issued his Second Report.  This report described conduct by senior CSSP officials at a New Orleans "bar," which had been awarded half a million dollars from the CSSP, that was "inconsistent with development of a proper ethical tone" and "create[d] risks for an office entrusted to administer a multi-billion dollar settlement fund."[12]  Special Master Freeh also described how the former CSSP Appeals Coordinator e-mailed confidential information regarding an active appeal to a family member who worked at a law firm representing the claimant, in violation of the Court's confidentiality order and the

---

[8]   *Id.* at 58.

[9]   BP Response to the Report of Special Master Freeh, Sept. 23, 2013, Rec. Doc. 11471.

[10]  Order, Sept. 6, 2013, Rec. Doc. 11288.  Special Master Freeh was also directed to "assist the Claims Administrator in the implementation" of the recommended changes.  *Id.*

[11]  *Id.*

[12]  Second Report, Rec. Doc. 12174, at 4-5.

3

CSSP's conflicts of interest policy.[13]  In addition to these factual findings, the Second Report made the following four recommendations:

> 1. The Special Master recommends that the CAO should continue to educate its staff on the high ethical expectations concerning confidential information, conflicts of interest and recusal. . . .
>
> 2. The Special Master recommends that the CAO should develop appropriate staff positions dedicated to fielding claim status questions. . . .
>
> 3. The Special Master recommends that the CAO should develop an appropriate communication policy, including requiring usage of official email. . . .
>
> 4. The Special Master recommends that the CAO should involve the Fraud, Waste and Abuse Coordinator at the start and at each phase of investigations.[14]

Pursuant to Rule 53, BP moved for the production of certain evidence relied on by Special Master Freeh for his recommendations.[15] This Court denied BP's request for documents, concluding that "BP has not demonstrated a compelling reason for production of any of the documents sought in its motion, while the Special Master has presented compelling reasons why they should not be produced."[16]  BP now moves to modify the Special Master's Second Report to include additional recommendations based on the evidence known to BP.

---

[13]  *Id.* at 2-4.

[14]  *Id.* at 6-7.

[15]  BP Motion to Order Production of Certain Documents by Special Master Freeh and to Set Schedule ("BP Motion"), Jan. 29, 2014, Rec. Doc. 12254.

[16]  Order, Feb. 28, 2014, Rec. Doc. 12436.

# ARGUMENT

Federal Rule of Civil Procedure 53 permits a court, acting on a special master's report, to "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions."[17] The Court must provide the parties an opportunity to make "objections," or submit "a motion to adopt or modify" a special master's report.[18] The parties' responses must be filed within 21 days after the report's issuance.[19] The court decides *de novo* all objections to findings of fact and conclusions of law made by a master.[20]

Special Master Freeh recognized the extent of the problems in the CSSP. "[T]he prior CSSP business processes did not sufficiently protect and safeguard the CSSP function. Significant redesign efforts costing millions of dollars have been required."[21] Indeed, Special Master Freeh found that CSSP staff "fought efforts to engage in vendor oversight, and serious vendor issues concerning workflow techniques, claim processing, and process integrity were unremediated."[22]

---

[17] Fed. R. Civ. P. 53(f)(1).

[18] *Id.*

[19] Fed. R. Civ. P. 53(f)(2). Judge Shushan's order setting the briefing schedule for BP's discovery motion suspended this 21-day clock until resolution of that motion, which occurred on February 28, 2014. *See* Order, Jan. 31, 2014, Rec. Doc. 12269; Order, Feb. 28, 2014, Rec. Doc. 12436. Thus, the parties have until March 7, 2014 to respond to the Special Master's report, because fourteen days accrued between the time the Second Report was filed (January 17, 2014) and Judge Shushan's order (January 31, 2014), leaving seven days remaining to file after the Court's order (February 28, 2014).

[20] Fed. R. Civ. P. 53(f)(3)-(4).

[21] Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties ("Freeh Reply"), Feb. 21, 2014, Rec. Doc. 12393, at 29.

[22] *Id.*

BP agrees that the four recommendations made by Special Master Freeh on January 17, 2014, are necessary and should be adopted. Special Master Freeh's recommendations address ethical controls and training, communications with claimants to avoid conflicts of interest, and the role of the CSSP's Fraud, Waste, and Abuse Coordinator.[23] However, additional changes are required to remediate the problems in the CSSP that arguably fall within the scope of the Special Master's mandate. BP recognizes that the Special Master's work is ongoing, and that the Special Master may make additional reports, written or oral. In the interim, however, BP moves the Court to direct additional steps to remedy the CSSP deficiencies.[24]

## RECOMMENDATIONS

Based on the information available to BP, the following recommendations are a necessary starting point to ensure the integrity of the CSSP and establish business process procedures to adequately adjudicate claims. BP proffers that the evidence collected by Special Master Freeh would support the recommendations made herein.[25] These recommendations should be adopted by the Court and executed by the Claims Administrator.

---

[23] Second Report, Rec. Doc. 12174, at 6-7.

[24] BP recognizes that the Special Master's written reports are not the only mechanism to remedy the deficiencies within the CSSP. Pursuant to the Settlement Agreement, the Court retains authority to oversee the CSSP. *See* Settlement Agreement §§ 4.3.1-2. BP also will continue to participate in the informal CSSP stakeholder processes, and will invoke its fiduciary and contractual rights as necessary to address fraud and fix weaknesses within the program.

[25] BP's ability to fully evaluate the Special Master's recommendations is limited by the Court's order denying discovery and denying BP's request to set "an appropriate schedule . . . to permit BP to make an appropriate filing." BP Motion, Rec. Doc. 12254; Order, Feb. 28, 2014, Rec. Doc. 12436. In addition, because BP has restricted visibility into the CSSP's operations and its current remediation efforts, it is possible that some of BP's additional recommendations may be in the process of being implemented.

**Remediation of the IT System to Prevent Fraud, Waste, and Abuse**

1.  *The Claims Administrator should ensure that the IT system preserves and retains complete information about individual claims, has a robust reporting mechanism, and allows for complete claims tracking.*

A report prepared by IBM and delivered to the Chief Information Officer of the CSSP demonstrates that the current IT system does not preserve a record of the processes used and information actions taken in the manual processing required for typical claims. For example, much of the information used to calculate and document BEL claims is performed in Microsoft Excel workbooks that are maintained by the CSSP vendors outside the IT system. Such supporting documentation should be uniformly linked to associated claims in one data management system.

Within the current system, Global Notes associated with individual claims have been deleted or altered. Moreover, the system does not permit the aggregation of an individual claimant's applications across claims types, which would facilitate review for duplicate claims or fraud. The IT system should maintain a complete record of all transactions or notes associated with a claim file, and any alterations or deletions should be tracked and archived. Moreover, such records must be maintained pursuant to this Court's document retention order.[26] An end-to-end claims management system would improve productivity, reduce error, provide additional transparency and help prevent fraud.

2.  *The Claims Administrator should reduce the current level of risk in the IT System so that it is free of fraud, waste and abuse.*

The current IT system suffers from a lack of software development rigor, and, according to IBM, is missing typical components including: process models, functional architecture diagrams, non-functional testing methods, and separation of duties. Currently, there is little to

---

[26]   *See* Order, March 11, 2013, Rec. Doc. 8867.

7

prevent IT System data analysts and developers from manually interacting with claims data. Pursuant to best practices, IT systems developers and operators should never directly interact with production data because they have the ability to change key information such as amounts and claim statuses. It is important that the Claims Administrator remediate this problem because the lack of separation of duties in the CSSP IT system allows bad actors not only to execute malicious actions, but also to hide these actions.

In addition to enforcing separation of duties, the Claims Administrator should limit and monitor user access to ensure that only necessary personnel have access to the claims processing system. In a report on the internal control environment of the CSSP, prepared by CliftonLarsonAllen LLP ("CLA") and delivered to the Chief Financial Officer of the CSSP, CLA noted that there were 443 out of approximately 3,000 users who had multiple user accounts with different permission rights and capabilities. Each user should only have one account and access rights should align with job responsibilities. IT System developers and operators should not have the user rights to alter or manipulate claimant submitted source data because changes to key information could impact the claim determination and claim statuses.

The operation of an appropriate IT system is crucial to the functioning of the CSSP. The CSSP has represented that it will take at least nine months to get a new system in place. Unless immediate steps are taken, however, a large number of claims may be processed before an appropriate system is in place.

> 3. ***The Claims Administrator should use automated data analytics to address fraud risks and enhance the claims process.***

By way of example, but not limitation, an automated claims monitoring and fraud screening system would standardize and bring consistency to the identification and escalation of potentially fraudulent claims for further investigation and help to reduce the potential for human

8

error and subjectivity.  For example, the current 'be on the look out' ('BOLO') list is not automated, but should be.  Similarly, claims could automatically be screened for indicia of heightened risk for fraud, including claims over certain dollar thresholds or certain types of claims from specific geographic areas, with such claims automatically referred for enhanced due diligence and closer scrutiny.  Failing to leverage technology to screen claims leaves claims processing open to human error.  For example, it is not reasonable to expect that human claims processors can effectively screen claims manually against the several hundred entities listed on the BOLO list.  Further, automated screening can efficiently address patterns in claims that might be missed by human review.  Such analytics could identify anomalies for further scrutiny before finalizing determinations and recognize patterns indicative of fraud.

### **Improvement of Risk Assessment and Audit Functions, Including Fraud Detection and Correct Claims Processing**

4. *The Claims Administrator should establish a robust independent internal audit function.*

An independent internal audit function is critical to ensure that claims are processed in accordance with the terms of the Settlement Agreement, free of undue influence, fraud, and other improprieties.  The internal audit function should be staffed by internal auditors with no operational responsibility in relation to the functions and/or departments audited, and appropriately experienced and qualified to conduct audits of a complex operation like the CSSP.  Special Master Freeh explained that the Casey Thonn claim exhibited "fraudulent characteristics" and was the subject of a CSSP file review, but that it "did not cause any further inquiry to

occur."[27]  The Special Master concluded that "[p]ayments to Mr. Thonn should have been put on hold, pending further inquiry."[28]

A robust internal audit function is critical to detecting claims fraud.  The CSSP's current internal quality control/quality assurance function is too limited in scope and ineffective in the manner it performs its work.  In its current review of the mathematical application of the claim calculation, it does not scrutinize the accuracy of the information submitted by the claimant.  The internal audit function should, amongst other things, test for fraudulent claims, as well as robustly testing the control framework to ensure accurate processing of claims and that controls in place detect and prevent fraud.

> 5. *The Claims Administrator should conduct regular risk assessments of the CSSP to identify fraud prevention internal control gaps and residual risks.*

The CSSP has adopted various policies without evaluating their potential for enhanced fraud risk.  For example, Policy 262 now allows self-certification by Seafood Compensation Plan claimants through Sworn Written Statements, and Policy 464 allows a derivative "summary" form of P&Ls to be submitted, with the original source material being required only at the discretion of the Claims Administrator.  These policy changes introduce heightened risks for fraud because they rely on self-certification or claimant-developed summary information rather than original source documents.

Periodic risk assessments would help limit fraud risks.  These assessments should include review of the implications for newly adopted claims settlement policies on the CSSP's fraud prevention program, such as for Policies 262 and 464.  Following such assessments, the Claims Administrator should then develop policies and procedures for applying mitigating controls such

---

[27] First Report, Rec. Doc. 11287, at 59, 87.

[28] *Id.* at 87.

as enhanced scrutiny and escalated due diligence to mitigate risk identified by the assessments, using a risk-based approach. All remediation efforts should be monitored for continued effectiveness and subjected to the robust auditing of the internal audit function. Failing to implement such periodic risk assessments may prevent the Claims Administrator from identifying likely fraud scenarios, leaving fraudulent claims or schemes undetected, and missing an opportunity to efficiently allocate resources to provide the most cost effective deterrent and detection capabilities.

>    **6.** ***The Claims Administrator should develop written standards and procedures for the handling of claims, including large, risky, suspicious, or otherwise atypical claims and circumstances.***

The Freeh Reports reveal numerous instances in which Claims Administrator or vendor personnel appear uncertain as to how to respond to atypical, potentially unethical, or otherwise questionable situations. For example, in response to Lionel Sutton's attempts to expedite certain claims, Special Master Freeh reports that one vendor employee told investigators that it was "unusual" and "uncommon" for a supervisor who was two levels above that employee to inquire about a particular claim, but there appears to have been no policy in place for responding to such an unusual request.[29] To remedy this lack of policy, the Claims Administrator should provide objective and standardized decision making criteria for:

- deciding how to handle "red flags" where potential fraud or suspicious activity has been identified;

- deciding when to require referral of a claim to a special investigations unit;

- deciding how to resolve discrepancies in data or documentation;

- deciding when to escalate indicia of fraud issues to more senior managers;

---

[29] Freeh Reply, Rec. Doc. 12393, at 23.

- deciding when to deny a claim based on "lack of credible evidence;" and

- deciding when to refer a claim to the DOJ or deny a claim without referral to the DOJ.

Standards and procedures should be established on a risk-based approach to set a threshold for claim value above which a second review by a completely separate team would be automatically required (thus implementing a "dual key" approach to high dollar value claims). In addition, for claims in excess of a minimum threshold or that exhibit any fraud indicators, the Claims Administrator should establish an objective policy to obtain official tax records from the IRS prior to the payment of the claim. In addition, policies and controls should be established in connection with the use of Sworn Written Statements to prevent against, fraudulent, inaccurate or otherwise inappropriate use of such statements in the claims process. Such a process is necessary to ensure that "[s]uspicious forms" are "subject to investigation," as the Fifth Circuit recognized is necessary to allow for the identification of "implausible claims."[30] Further, all communications between claims personnel and their direct and indirect supervisors should be recorded in the claims file. Such a policy will create an auditable record of claims decisions and influences on such decisions, and will also deter improper attempts to exercise undue influence over claims personnel.

7. *The Claims Administrator should ensure that the development of CSSP policies is free from undue influence, unbiased, and in accordance with the terms of the Settlement Agreement.*

The Claims Administrator is charged with developing policies to implement the terms of the Settlement Agreement. As discussed in the First Report, Sutton was responsible for drafting a policy providing guidance to claims analysts regarding when a BEL claim should be denied on

---

[30] *See In re: Deepwater Horizon*, No. 13-30315, slip op. at 11, 14 (5th Cir. Mar. 3, 2014).

damages deemed a result of the 2010 United States government moratorium on deep sea drilling in the Gulf, as opposed to the Deepwater Horizon oil spill.[31]  At the same time, he was assisting his Romeo Papa LLC business partner submit such a claim.[32]

To avoid undue influence or bias in the policy development process, the policy making process should be subject to appropriate controls to establish transparency and prevent fraud. Furthermore, each new policy should be properly tested, consistently applied and monitored for effectiveness.  A quality assurance process should be documented and performed.  Policy changes should be assessed to determine the change's impact on error and fraud prevention.

### Improvements to the Management and Control Environment

**8.    *The Claims Administrator should improve the overall control environment by implementing a recognized internal control framework, such as the Committee of Sponsoring Organizations Framework ("COSO Framework").***

Special Master Freeh noted that "the CSSP's control environment at the time of Sutton's employment contained vulnerabilities."[33]  Such vulnerabilities were exploited by Sutton and others, to the detriment of the CSSP.  Adopting a recognized internal control structure and corresponding controls would ensure the integrity of the CSSP and ensure that the objective of accurately processing claims is achieved.  Internal controls also ensure accountability and adherence to the policies and procedures and promote an ethical environment.

The CSSP is a multi-billion dollar entity and it should utilize controls consistent with such an organization.  The COSO Framework — a widely recognized internal control framework used by over 90% of all companies — describes the requirements for an effective internal control

---

[31]  *See* First Report, Rec. Doc. 11287, at 65-66.

[32]  *Id.* at 62-66.

[33]  Freeh Reply, Rec. Doc. 12393, at 12.

structure.  The COSO Framework enables organizations to effectively and efficiently develop policies, procedures and controls that adapt to changing business and operation environments, mitigate risks to acceptable levels, and support sound decision making and governance of the organization.

The Claims Administrator should perform a comprehensive review of all CSSP internal controls at an entity or enterprise level as well as claims processing level, identify gaps in the existing controls environment and develop appropriate controls.  Claims processing may need to be put on hold (in whole or in part) until such time as appropriate controls are put in place.

9. ***The Claims Administrator Should Effectively Publicize its Non-Retaliatory Reporting Hotlines.***

The Claims Administrator's recently-adopted Code of Conduct refers to "Various Fraud Hotlines," but no phone numbers are included in the Code.  No guidance is provided within the Code for reporting if a wrongdoer is at a senior level.  A recently promulgated vendor code also contains a reference to fraud hotlines, but similarly does not provide the actual numbers to call.  It is not clear whether the Claims Administrator or vendors publicize these reporting hotlines nor whether they emphasize a commitment to responding to reporting on a non-retaliatory basis beyond promulgation of the codes themselves.  Procedures to protect the identity of complainants and to protect them from retaliation must be clearly articulated, well-publicized within the respective organizations, and adhered to.  These procedures should explain who receives reporting tips (preferably a third party), how that person will maintain anonymity, and what steps the responsible parties will use to protect identities as complaints are investigated.  Employees and others should feel comfortable making inquiries or reports without losing their jobs, which requires additional action beyond the adoption of a code that simply states that

anonymous reporting is allowed.  Management should actively encourage employees to report fraud and misconduct and protect them from adverse consequences when they do so.

> **10.    The Claims Administrator should establish a system of due diligence for hiring persons in positions of substantial authority.**

The CSSP has hired employees with personal or family connections to others within the organization.[34]  In addition, at least one individual was hired despite ethical concerns expressed by existing staff.[35]  There is no indication that the CSSP implemented any formal due diligence or background check on individuals interviewing for, or hired into, positions of substantial authority.  If in fact some due diligence was done, it appears not to have been documented or considered during the hiring process.  Even in the search for a CEO, the Claims Administrator has refused to provide any documentation showing analysis of the candidates or information about the selection process.

An overall system of due diligence should be established to systematically evaluate whether an individual who is a candidate for a position of substantial authority within the CSSP has engaged in illegal or unethical behavior in the past.  Due diligence may include review of a criminal history inquiry, current and prior employment history, as well as current and past associations with other organizations including, for example, investments, partnerships, joint ventures and service on boards of directors.  In addition, it is prudent to inquire of any relevant licensing authority (e.g., state or federal bars, certified public accountant, engineering, claims adjuster) to determine whether the candidate is in good standing with the licensing authority and whether there are outstanding complaints.  A standardized system is especially important for the review of applicants with personal or family connections to other employees of the CSSP.

---

[34]   *See* First Report, Rec. Doc. 11287, at 19.

[35]   *Id.*

**Development of Policies to Avoid Fraud, Undue Influence, and Error in the Claims Process**

> 11. *The Claims Administrator should develop and implement a more robust identity verification program to avoid fraud in the claims process.*

Currently, the CSSP fails to verify that the identity of individuals submitting claims and the individuals in whose name the claims are submitted are one and the same. To mitigate the risk of identity theft and related fraudulent claims, the Claims Administrator should adopt additional policies, including for example, requiring the submission of copies of government-issued photo identification and a second form of identification documentation (such as a utility or phone bill) upon initial registration of a claim. Alternatively, the CSSP could require claimants to provide one form of government-issued photo ID with the additional submission, with identity verification to be conducted using public databases to match multiple identifiers, such as name, address, date of birth and taxpayer identification number. A second form of ID (such as a utility or phone bill) could be required on a risk-based approach for those claims deemed to be of escalated risk for fraud or those claims that are escalated for investigation of potential fraud. By not confirming that the person or entity making a claim is the same as the person or entity in whose name a claim is being made, the CSSP leaves itself open to fraudulent claims made through identity theft, with the additional risk that it may not be able to identify the real perpetrator should a fraudulent scheme or claim later be discovered.

**Establishment of Metrics to Measure Vendor Performance.**

> 12. *The Claims Administrator should implement policies to ensure that the claims administration vendors are operating in a strong control environment and that processes are functioning as designed.*

Special Master Freeh has stated that Reitano "fought efforts to engage in vendor oversight, and serious vendor issues concerning workflow techniques, claim processing, and

process integrity were unremediated."[36] The Claims Administrator should hold senior management accountable for managing vendors and ensuring that they perform their duties in accordance with the terms of the Settlement Agreement, service agreement(s), vendor codes of conduct[37] and any other agreements, orders or directives of the CSSP and/or the Court. Moreover, the senior management of the CSSP should be held accountable for ensuring vendors perform the contracted tasks within established budgets. To accomplish these goals, the Claims Administrator should develop and implement policies regarding appropriate reporting lines of authority within and between the Claims Administrator and its vendors.

> **13.** ***The Claims Administrator should ensure an effective external process audit is regularly performed or require some form of systematic assurance (e.g., Service Organization Control (SOC) reports) that the vendors' control environment meets requirements and expectations.***

The vast majority of CSSP operations are outsourced to vendors. The Claims Administrator relies on those vendors' own attestation that their control environments are sufficient. The most recently promulgated "Vendor Code of Conduct" suggests that CAO officers will "conduct periodic meetings with Vendors [sic] Senior Staff to review issues and to monitor Vendor compliance with this Code," but there is no evidence of a formalized audit or reporting process. Vendor self-certification leaves open the risk of fraud, unethical conduct, or gaps in the control environment because there is no independent confirmation that appropriate controls are in place and operating effectively. Formalized reporting and auditing processes are

---

[36] Freeh Reply, Rec. Doc. 12393, at 29.

[37] A recently promulgated Vendor Code of Conduct states that responsibility for implementing vendor-level codes rests with the vendors themselves, with "oversight" by the Claims Administrator and the CAO's CEO, CCO and Director of Waste, Fraud, and Abuse and provides for "periodic meetings." It provides no specific lines of authority, no specific reporting requirements, no specific time table for "periodic" review, and no specific policies and procedures by which compliance will be assured.

17

therefore critical. An SOC report, for example, is a typical external audit requirement on due diligence, regulatory and internal audit checklists. These reports are standard for all public and private companies of any size that receive a financial statement audit and outsource a significant process or portion of their internal control environment to third parties. Requiring SOC reports would provide systematic assurance that the vendors' control environment meets expectations.

> **14.    *The Claims Administrator should use management tools to ensure that vendors meet qualitative and quantitative performance targets.***

The quality of claims processing as it relates to Business Economic Loss ("BEL") claims in particular is problematic. The results of testing and appeals indicate that existing controls fail to catch significant numbers of errors. The Claims Administrator should require vendors to meet Key Performance Indicators ("KPIs"). The failure to use KPIs has precluded the Claims Administrator from determining whether vendors operated efficiently or in compliance with the terms of their respective agreements. The Claims Administrator should not take cost, process duration times, and productivity estimates from the vendors at face value, and should instead set its own standards for vendors based on its analysis of productivity data. The Claims Administrator should take corrective action when performance targets are not achieved.

Moreover, vendors do not currently provide standardized, sufficiently detailed invoices that enable productivity assessment. They should be required to do so, and the Claims Administrator should adopt a financial reporting framework to identify and track the activities performed by each vendor in an effort to match productivity with costs billed to the program.

## CONCLUSION

BP respectfully requests that the Court adopt the January 17, 2014 Report of Special Master Freeh with the modifications herein, which are necessary to improve the controls and processes of the CSSP and remediate deficient systems and practices.

| | |
|---|---|
| March 7, 2014 | Respectfully submitted, |
| | |
| James J. Neath |   /s/ Kevin M. Downey |
| Mark Holstein | Kevin M. Downey |
| BP AMERICA INC. | F. Lane Heard III |
| 501 Westlake Park Boulevard | WILLIAMS & CONNOLLY LLP |
| Houston, TX  77079 | 725 Twelfth Street, N.W. |
| Telephone:  (281) 366-2000 | Washington, DC  20005 |
| Telefax:  (312) 862-2200 | Telephone:  (202) 434-5000 |
| | Telefax:  (202) 434-5029 |
| | |
| Daniel A. Cantor |   /s/ Don K. Haycraft |
| Andrew T. Karron | S. Gene Fendler (Bar #05510) |
| ARNOLD & PORTER LLP | Don K. Haycraft (Bar #14361) |
| 555 Twelfth Street, NW | R. Keith Jarrett (Bar #16984) |
| Washington, DC 20004 | LISKOW & LEWIS |
| Telephone:  (202) 942-5000 | 701 Poydras Street, Suite 5000 |
| Telefax:  (202) 942-5999 | New Orleans, Louisiana 70139 |
| | Telephone:  (504) 581-7979 |
| Robert C. "Mike" Brock | Telefax:  (504) 556-4108 |
| COVINGTON & BURLING LLP | |
| 1201 Pennsylvania Avenue, NW | Richard C. Godfrey, P.C. |
| Washington, DC 20004 | J. Andrew Langan, P.C. |
| Telephone:  (202) 662-5985 | Wendy L. Bloom |
| Telefax:  (202) 662-6291 | KIRKLAND & ELLIS LLP |
| | 300 North LaSalle Street |
| Jeffrey Lennard | Chicago, IL 60654 |
| Keith Moskowitz | Telephone:  (312) 862-2000 |
| DENTONS US LLP | Telefax:  (312) 862-2200 |
| 233 South Wacker Drive | |
| Suite 7800 | Jeffrey Bossert Clark |
| Chicago, IL  60606 | Dominic E. Draye |
| Telephone:  (312) 876-8000 | KIRKLAND & ELLIS LLP |
| Telefax:  (312) 876-7934 | 655 Fifteenth Street, N.W. |
| | Washington, D.C. 20005 |
| ***OF COUNSEL*** | Telephone:  (202) 879-5000 |
| | Telefax:  (202) 879-5200 |

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY***

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of March, 2014.

                                              /s/ Don K. Haycraft
                                              Don K. Haycraft