IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico On April 20, 2010 | * * * * | MDL 2179 |
| | * * | JUDGE BARBIER |
| **This filing relates to:** | * * * | SECTION J |
| **Matter of Chamroeun Duong** | * * * | MAGISTRATE JUDGE WILKINSON |
| (Including Civil Action No. 12-970) | * * | MAG DIV. 2 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*\* \* \* \* \* \* \* \* \* \* \* \* \*

## PETITION FOR WRIT OF REVIEW; PETITION FOR WRIT OF MANDAMUS; or, PETITION FOR TRIAL DE NOVO

Pursuant to Rule 18 of the Rules Governing the Third Party Claims Dispute

Resolution Process, the Cao Law Firm requests judicial review de novo of the ruling of

1

the Third Party Claim Dispute Adjudicator in connection with the above captioned matter.  In the alternative, the Cao Law Firm requests under the Due Process Clause of the Fifth Amendment to the United States Constitution for a Writ of Mandamus requiring the Claims Administrator, Patrick Juneau, to institute a system of review and/or appeal of the court-annexed dispute resolution process; or, in the alternative, the Cao Law Firm, under the Due Process Clause of the Fifth Amendment to the United States Constitution respectfully requests a trial de novo.

## I.   STATEMENT OF FACTS

Mr. Chamroeun Duong is a resident of Plaquemines Parish and, at all times pertinent hereto, was the owner of a 38ft. shrimping vessel, the "Miss Jennie D".  <u>Exhibit A, Affidavit of Chamroeun Duong</u>.  Mr. Duong's principal source of income was his shrimping business.  The BP Oil Spill of April 20, 2010, therefore, devastated his livelihood.  Shortly after the oil spill, Mr. Duong, like hundreds of other commercial fishermen, were hunted and hounded by plaintiff's firms.  These firms carried out highly questionable practices to trick simple immigrant fishermen into signing a retainer contract.

Mr. Duong did not want the assistance of any law firm in connection with his seafood claim at the onset of the oil spill.  When the Gulf Coast Claims Facility (GCCF) was established through a negotiated agreement between the White House and BP to resolve economic loss claims of individuals and businesses, Mr. Duong struggled through the procedure himself and filed his own claims.

Besides seafood related loss of income claims, the GCCF also evaluated subsistence claims, but not Vessel of Opportunity (VoO) claims.  All VoO claims were

being handled by private attorneys filing suit on behalf of individual claimants in federal court on a contingency fee basis.  Hearing that those who participated in the VoO program could be eligible for compensation, Mr. Duong singed a VoO Contingency Fee Retainer Agreement with the Cao Law Firm on August 11, 2011.  <u>Exhibit B, Retainer of Cao Law Firm</u>.  VoO litigation was very complex, and the language in the Master Charter Agreement between BP and the individual or business who signed the agreement was much more favorable to those who were hired than those who were not hired.  After carrying out extensive research and conducting many interviews with Asian fishermen, the Cao Law Firm decided that to best protect the interest of Asian fishermen who were not hired under the VoO Program was to file a race discrimination complaint with the EEOC and a separate suit in federal court.  Mr. Duong was not hired; therefore, he served as one of the Plaintiffs alleging race discrimination in a lawsuit filed by the Cao Law Firm for those Asians who were not hired to work in the VoO Program.  <u>Exhibit C, copy of VoO racediscrimination lawsuit</u>.  Based on information and belief, this was the only lawsuit of its kind filed on behalf of minorities discriminated by BP under the VoO Program.  Subsequently, the Court issued a stay on the lawsuit as all oil spill related litigation got consolidated under the Multidistrict Litigation (MDL) against BP.

      On, or about, March of 2012, a friend of Mr. Duong, through conversation, asked him whether he had signed a "short form against Transocean" because the "deadline was approaching".  Mr. Duong was then informed by his friend that WWG would file a "short form" for him, so Mr. Duong went to WWG on March 22, 2012 with the intent of a only filing a Short Form Joinder against Transocean.

When he arrived at WWG, he was greeted by a female assistant by the name of "Binh Nguyen" who discussed with him WWG's contract. She then enquired about Mr. Duong's VoO claim, to which he responded that the Cao Law Firm was representing him. Ms. Nguyen, whether deceptively or not, told Mr. Duong that WWG could not file a Short Form Joiner in federal court for him unless he discharged the Cao Law Firm from his VoO claim. Based on her representation, Mr. Duong terminated his agreement with the Cao Law Firm after the firm had expended extensive resources in the representation of his claim.

Ms. Nguyen then asked Mr. Duong about his GCCF seafood compensation claim and to which he responded that he wanted to continue representing himself in that claim. He thus initialed "No" at privision 2 of WWG's contract. <u>Exhibit D, WWG's contract with Chamroeun Duong</u>. After signing the contract, Mr. Duong did not hear from WWG again.

At the beginning of 2012, there were news that the Plaintiff's Steering Committee and BP reached a comprehensive agreement to settle all economic, seafood, and VoO claims. The Deepwater Horizon Economic & Property Claims Center (DHECC) was established to compensate eligible claims pursuant to the terms of the agreement. The center's main purpose was to resolve those claims previously handled by the GCCG, along with VoO claims, under one comprehensive program. The Loss of Income Compensation Program for commercial fishermen under the GCCF was to be paid under the Seafood Compensation Program of the DHECC. Further, any compensation received by commercial fishermen under the GCCF would be subtracted from the final settlement with the DHECC. Thus, they were basically one and the same program except for the

different formulation used by the DHECC to arrive at an eligibility amount.  The DHECC, however, was not up and running until June of 2012.

As explained by Mr. Duong in his affidavit, approximately three months after he retained WWG he went to the firm on May 18, 2012, to terminate his contract because he was not at all happy with their services.  He was again greeted by Ms. Binh Nguyen, the assistant who was responsible for his case.  After telling her that he wanted to discharge WWG, Ms. Nguyen quickly went and told Mr. Waltzer who came out of his office and tried to convince Mr. Duong to stay with them.  Mr. Waltzer then into Ms. Nguyen's office and brought out a Summary Sheet which was done without Mr. Duong's knowledge and consent.  Mr. Waltzer told Mr. Duong that WWG could get him $216,427.00 for his seafood loss of income claim if he were to sign with WWG.  <u>Exhibit E, WWG's Summary Sheet</u>.  After signing the Summary Sheet simply to acknowledge that he was explained the content of the Summary Sheet, Mr. Duong proceeded to discharge WWG.  <u>Exhibit F, Mr. Duong's Termination Letter to WWG</u>.

On July 26, 2012, Mr. Duong returned to the Cao Law Firm.  Not only did he requested that the Cao Law Firm resume the representation of his VoO claim, but he also retained the Cao Law Firm for the representation of his loss of income claim under the Seafood Compensation Program of the DHECC.  <u>Exhibit G, Cao Law Firm's Loss of Income Retainer</u>.  This was the first time that Mr. Duong had retained any firm to represent him in his seafood claims.  The Cao Law Firm continues to represent Mr. Duong for all of his claims till this very day and had filed all claims for him that enabled him to receive substantial compensation from DHECC.  <u>Exhibit H, DHECC's Claimant Details; Exhibit I, Seafood Compensation Vessel Owner Claim Form and Eligibility</u>

5

Notice; Exhibit J, Seafood Compensation Boat Captain Claim Form and Eligibility Notice; Exhibit K, VOO Claim Form and Eligibility Notice.

Subsequent to its termination, WWG asserted a lien against Mr. Duong's VoO and Seafood Compensation claims. The fee dispute was transferred to the Third Party Dispute Resolution Process without the explicit consent of all parties involved. The disputed was arbitrated and decision was issued on, or about, February 25, 2014. Exhibit L, Final Decision of Third Party Dispute Resolution Process.

## II.   LAW AND ARGUMENT

**A) The court-annexed Third Party Dispute Resolution Process violates the Claimant's Procedural Due Process under the Fifth Amendment to the U.S. Constitution.**

The most fundamental question here is whether this Honorable Court has the power to impose this court-annexed arbitration process under the DHECC. For a federal court to have jurisdiction on a matter, the parties must be diverse, or there is an issue concerning federal law. In this situation, the parties to the arbitration process are not diverse, and the issues being arbitrated are not issues concerning federal law, but rather state contract law, and state codes of professional conduct.

With that being said, the first question that must be addressed is whether the arbitration process implemented by the Claims Administrator in the Third Party Dispute Resolution Program is a contractual binding program subject to the Federal Arbitration Act (FAA), or a non-binding court-annexed program. This distinction is succinctly provide by Amy J. Schmitz in her article, "Nonconsensual + Nonbinding = Nonsensical? Reconsidering Court-Connected Arbitration Programs". 10 CDZJCR 587. As described by Ms. Schmitz, court-annexed arbitration is premised on a court order or judicial

6

mandate, and the court order requires the parties to participate in the proceeding, without the parties' consent.

The Third Party Dispute Resolution Process in the Matter of Chamroeun Duong is a court-annexed program as the program was implemented pursuant to an Order of this Court.  Although the intent of the Third Party Dispute Resolution Process is to efficiently and effectively resolve disputes between parties over various issues in connection with the DHECC, the process is fraught with constitutional challenges.  The U.S. Supreme Court has made it clear on many occasions with respect to nature of the arbitration process.  First and foremost, arbitration "is a matter of consent, not coercion." Volt v. Board of Trustees of Leland Standford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488.  Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must "give effect to the [parties'] contractual rights and expectations." Id.  The parties' "intentions control," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444, and the parties are "generally free to structure their arbitration agreements as they see fit," Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76.  They may agree to limit the issues arbitrated and may agree on rules under which an arbitration will proceed.  They may also specify with whom they choose to arbitrate their disputes.  See EEOC v. Waffle House, Inc., 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755.  Underscoring the consensual nature of private dispute resolution, the Supreme Court has held that parties are "generally free to structure their arbitration agreements as they see fit." Mastrobuono, Supra, at 57.  According to the Supreme Court, nothing in the Federal Arbitration Act authorizes a court to compel arbitration of

any issues, or by any parties, that are not already covered in the agreement. Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

In this case, The Third Party Dispute Resolution Process has violated all the rules governing the arbitration process in violation of the Due Process Clause of the Fifth Amendment and therefore cannot be binding and not subjected to the FAA. Not only are the parties compel to arbitrate, they have no saying on the rules of arbitration, they have no saying of the issues being arbitrated, and they have no saying on who should serve as the arbitrator. All this was decided by the DHECC Claims Administrator.

According to Ms. Schmitz, court-annexed arbitration must, in its very nature, be non-binding and generally provides for a trial de novo: "Court-connected mandated arbitration has raised constitutional and other concerns due to its involuntary nature. Courts have entertained challenges of mandatory programs on grounds that they violate federal and state jury trial, due process, court access, equal protection, and separation of powers rights. [FN82] From these challenges, arguments based on federal and state constitutional rights to a jury trial on legal causes of action have carried the most weight. [FN83] Furthermore, such state constitutional challenges may be stronger than such federal challenges due to the states' jury access provisions. [FN84] These challenges have produced a rule requiring that court-ordered arbitration of legal claims traditionally tried by a jury must be subject to trial de novo."

Justice Broussard Mosk of the California Supreme Court said it best in his concurring opinion in the case Lyons v. Wickhorst, 42 Cal.3d 911, 727 P.2d 1019, 231 Cal.Rptr. 738:

8

> Article I, section 16 of the California Constitution gives to all its citizens the inviolate right to trial by jury. This right has been long protected and cherished in our jurisprudence . . . [T]he compulsory arbitration proceeding cannot operate as a substitute for the constitutional guarantee of a jury trial. . . .

Id, pg. 923.

### B. The Adjudicator did not have the power to resolve contractual disputes between the Claimant, Chamroeun Duong, and WWG.

Even if this Honorable Court were to construe that this arbitration process is constitutional, contractual and binding pursuant to the FAA, Title 9 U.S.C. section 10(a) provides instances in which vacating an arbitration final ruling is warranted:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrator, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

At issue in this case is whether the arbitrator exceeded his or her powers in adjudicating this fee dispute. In this regard, the parties really do not know what powers the arbitrator is vested by the courts. This is all done pursuant to the rules imposed by the Court and/or the Claims Administrator. With that being said, this case involves more

9

than a simple fee dispute between two law firms. In a simple fee dispute between law firms representing, for example, a motor vehicle accident matter, the issue of contractual consent usually does not arise.

But this case is different, in adjudicating a fee split between two different law firms, the arbitrator must first rule on the issue of contractual consent in connection with the various claims of the Claimant. Here, the Claimant never consented to have his dispute with WWG be resolved through the Third Party Dispute Resolution Process. Whether the adjudicator has the plenary power is highly questionable, unless such power is given by the Claimant. Here, no such power was given. All parties were ordered to submit a Statement of Dispute and evidence to support their contentions. The arbitrator then ruled on all issues disputed irrelevant of whether or not authority was provided. The arbitrator, in essence, serves as judge and jury in all matters affecting the rights of others beyond the two disputing law firms.

1. **Assuming that the power to resolved contractual dispute was given to the Adjudicator by the parties, the Adjudicator erred in finding that there was consent on the part of Mr. Duong to have WWG represent him in his seafood compensation claims.**

The most fundamental tenet regulating the interpretation of contracts is the determination of the common intent of the parties. The U.S. Fifth Circuit Court of Appeals, in <u>Walpold v. E. Eric Guirard & Associates</u>, 442 F.3d 269, 271 (5th Cir. 2006) held that any contingency fee agreements contracted in Louisiana must be interpreted under Louisiana law. According to Louisiana Civil Code article 1927, a "contract is formed by the consent of the parties established through offer and acceptance." The parties' intent is to be determined by the words of the contract when they are clear and explicit. <u>Sullivan v. State, Department of Transportation and Development</u>, 623 So. 2d

28, 30 (La. App. 1st Cir.), writ denied, 629 So. 2d 1179 (La. 1993).  When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.  Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So. 2d 466, 479, writ denied, (La. 1994).  However, when the terms of the agreement are unclear, ambiguous or will lead to absurd consequences, the court may go beyond the original agreement to determine the true intent of the parties.  Sullivan, 623 So. 2d at 30.  Doubtful provisions must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract.  LSA-C.C. art. 2053.  In case of doubt that cannot be resolved, a provision in a contract must be interpreted against the party who furnished its text.  LSA-C.C. art. 2056; Spohrer v. Spohrer, 610 So. 2d 849, 853 (La. App. 1st Cir. 1992).

      In the case at bar, there was clearly no consent on the part of Mr. Duong to have WWG represent him in his seafood compensation claims.  Exhibit A, Affidavit of Chamroeun Duong.  The most fundamental tenet regulating the interpretation of contracts is the determination of the common intent of the parties.  According to Louisiana Civil Code article 1927, a "contract is formed by the consent of the parties established through offer and acceptance."  The parties' intent is to be determined by the words of the contract when they are clear and explicit.  Sullivan v. State, Department of Transportation and Development, 623 So. 2d 28, 30 (La. App. 1st Cir.), writ denied, 629 So. 2d 1179 (La. 1993).  When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.  Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So. 2d 466, 479, *writ denied*, (La. 1994).  However, when the terms of the agreement are unclear, ambiguous or will lead to absurd

11

consequences, the court may go beyond the original agreement to determine the true intent of the parties. Sullivan, 623 So. 2d at 30. Doubtful provisions must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract. LSA-C.C. art. 2053. In case of doubt that cannot be resolved, a provision in a contract must be interpreted against the party who furnished its text. LSA-C.C. art. 2056; Spohrer v. Spohrer, 610 So. 2d 849, 853 (La. App. 1st Cir. 1992).

In the case at bar, there is clearly the lack of the meeting of the minds between the parties. Exhibit A, Affidavit of Chamroeun Duong. Mr. Duong singed a retainer with WWG with the simple intent of retaining the firm to file a Short Form Joinder against Transocean in federal court. Other former clients of WWG had the same understanding when they retained WWG to represent them. See Exhibit M, Contract of Sony Thuong and Affidavit of Hue Phan; and Exhibit N, Contract of Vui Van and Affidavit of Vui Van and Co Thi Nguyen.

WWG argues that the first provision of the contract anticipates its representation of Mr. Duong's loss of income claim under the Seafood Compensation Program of the DHECC. The first provision of the WWG's contract reads:

> 1.   I am hiring your firm to protect my interests in Court.
>
> I hire Waltzer & Wiygul Law Firm ("W&W") to be my attorney, to represent me and/or my business in all court proceedings relating to the Deepwater Horizon oil spill, including the proceedings before Judge Barbier in the Eastern District of Louisiana, Case No. MDL 2179.

This provision is ambiguous and confusing. What does the term *all court proceedings* mean? Does this include filing a seafood claim with the DHECC, though a

12

court supervised program, does not involve any court proceedings? If this is the interpretation, it would contradict the intent of the Claimants who choose not to have WWG representing them in their seafood related claims either under the GCCF or the DHECC. WWG's contract unequivocally states that GCCF claims were not included in the contract and that the Claimants shall proceed to handle seafood related claims under the GCCF on their own. As stated above, GCCF loss of income claims for commercial fishermen were transferred to and adjudicated by the DHECC under the Seafood Compensation Program. They are one and the same program except for the formulation of compensation. Money received under the GCCF by a claimant is deducted from the settlement with the DHECC. The deduction shows that the programs are interconnected.

      The US Fifth Circuit Court of Appeals is very explicit in its handling of ambiguities in a written contract—any ambiguity must be construed against the party who furnished its text.[1] <u>Wampold</u>, <u>supra</u>. In this case it must be construed against WWG. If this Honorable Court were to look the conduct of the parties before and after the formation of the contract, it clearly sees that Mr. Duong did not want WWG to represent him in connection to any seafood loss of income claim under the GCCF or the DHECC. Further, as stated above, Mr. Duong ended its agreement with WWG a couple of months before the DHECC became operational.

---

[1] In <u>Wampold v. E. Eric Guirard & Associates</u>, 442 F.3d 269 (5th Cir. 2006), a case that have analogous set of facts as this case, the Fifth Circuit Court of Appeals, ruled that the phrase "gross proceeds of recovery" in a standard contingency fee contract does not encompass future, post-judgment monthly benefits.

But WWG contends that Mr. Duong signed the Summary Sheet which authorized the firm to expend the cost to evaluate his claim.  This contention is false and misleading a statement on the Summary Sheet reads: "I have reviewed this sheet, which provides as ESTIMATE of what offer I may receive, as well as my options, with Waltzer, Wiygul & Garside".  Below this statement, two other provisions allow Mr. Duong to choose to have either WWG submit a claim on his behalf, or to opt out.  He chose neither, for he did not initial any of the provisions.  This clearly shows that he did not want WWG to not represent him in his Seafood Compensation Claim with the DHECC.  There is no ambiguity here.  Based on the language of the Summary Statement, and corroborated by Mr. Duong and other former clients of WWG through their affidavits, the signing the document only acknowledges that a Summary Sheet provided and explained and does not imply anything else.  Mr. Duong's signing of the Summary Sheet does not at all insinuate that an agreement has been reached to allow WWG to file a claim on his behalf.  If he did, why would he then proceed to terminate WWG seconds after?  The insinuation is absurd and contradicts the actions of Mr. Duong after he signed the Summary Sheet.  As a matter of fact, by signing and **not** choosing the provision that would allow WWG to file a claim on his behalf, Mr. Duong again reiterated that he did not want WWG's involvement in his seafood claim.  This action, along with his choosing "No" in article 2 of the alleged original contract, corroborated Mr. Duong's argument.

2. **The Adjudicator erred in finding that WWG performed substantial amount of work that led to Mr. Duong's awards.**

If WWG is to have any interest in Mr. Vui's claims at all, it would only be in connection with any money that WWG had gotten for him under the VoO Compensation Program.  It is disputed, however, whether the VoO amount of $5,700.00 received for

14

Mr. Duong's vessel was through the work of WWG.  Pursuant to the Louisiana Rules of Professional Conduct, WWG would only be entitled to a percentage of the $5,700.00 if it has provided meaningful legal services to Mr. Duong.  As Mr. Duong's Claimant Details from the DHECC clearly shows, all activities related to Mr. Duongs claims were all performed by the Cao Law Firm after WWG's services had been terminated.  These activities are clearly shown in the Claimant Details Document, and the claim forms and eligibility notices attached hereto.  For the Adjudicator to find that WWG performed the substantial amount of work in connection with Mr. Duong's case is clearly contrary to the facts of this case.

### III.    RELIEF REQUESTED

The Cao Law Firm therefore requests that this Honorable Court vacate the Final Decision of the Adjudicator and review this fee dispute de novo.  The Cao Law Firm also requests that a stay be issued to the Administrator ordering him to not disperse any funds held in trust until these issues are resolved.

Respectfully Submitted,

S:// Anh "Joseph" Cao
Cao Law Firm
2439 Manhattan Blvd., Ste. 302
Harvey, Louisiana 70058
Tel: 504-367-5001
Email: acao@loyno.edu

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court of the Eastern District of Louisiana by using the CM/ECF System, which will send notice in accordance with the procedures established in MDL 2179, on this 10th day of March, 2014.

S:// Anh "Joseph" Cao
Cao Law Firm
2439 Manhattan Blvd., Ste. 302
Harvey, Louisiana 70058
Tel: 504-367-5001
Email: acao@loyno.edu