# Exhibit G

M01-40918
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO.  2179 SECTION: J JUDGE BARBIER MAG. JUDGE SHUSHAN |

# CONFIDENTIAL

## WorldwideVIEW ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Admiral Thad William Allen
## VOLUME 1

SEPTEMBER 24, 2012

# COPY



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    place on..." the 17th of May.  Do you see that?

2        A.  I do.

3        Q.  Is this the kind of interaction you were

4    hoping for, between BP and the Government

5    Scientists?

6        A.  Yeah.

7        Q.  That is, a reach-out to -- to obtain

8    information about a -- a -- a technique like top

9    kill?

10       A.  This is the type of discussion I expect

11   would happen, yes.

12       Q.  All right.

13           (Discussion off the record.)

14               MR. BROCK:  Do you know where the

15   document is that establishes that --

16           (Discussion off the record.)

17               MR. BROCK:  Okay.

18       Q.  All right.  Turn to No. 25 now.

19               MR. FROST:  That's what we're on

20   now.

21       Q.  (By Mr. Brock) 26.  I'm sorry.

22               MR. FROST:  26?

23               MR. BROCK:  Yeah, 26, and this is

24   Exhibit 9132.

25           (Exhibit No. 9132 marked.)

 1          Q.  (By Mr. Brock) Now, do you see the first
 2     page of this is from Kate Baker to Bill Kirton,
 3     and others, of May 18, 2010?
 4          A.  I do.
 5          Q.  All right.  And do you see, included in
 6     the "To" line, are Representatives of nasa.gov,
 7     sandia.gov, Lawrence Livermore National
 8     Laboratory?  Do you see those names?
 9          A.  I do.
10          Q.  Okay.  So this E-mail is going to
11     Representatives of BP, as well as Representatives
12     of Government.  Correct?
13          A.  (Reviewing document.) I don't know if I
14     see BP on here.
15          Q.  Well, I -- I just happen to know that
16     Bill Kirton works for BP.  I guess that's --
17          A.  Oh.
18          Q.  -- how I know that.  You see
19     Representatives of Government there, correct?
20          A.  I do.
21          Q.  Okay.
22          A.  Yes.
23          Q.  And then, if you look over to "Summary
24     points from the Kill the Well" Pap -- "on Paper
25     Discussion," do you see that there are a number

01-42041
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# CMDR. RICHARD FERRELL BRANNON
### VOLUME 1

JANUARY 07, 2013

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1          A.   (Reviewing document.)

 2               Okay.

 3          Q.   (By Mr. Lundy) All right.  Have you had a

 4     chance to look at it?

 5          A.   (Nodding.)

 6          Q.   Let's start with the second page of this

 7     E-mail chain.  It's -- it's from Doshi or Doshi,

 8     Rupen or Rupen Doshi.  Do you see that?

 9          A.   Yes.

10          Q.   Dated May 27, 2010.  And the Top Kill was

11     attempted on May 26 and 27th, correct?

12          A.   Yeah.  It was over three days.

13          Q.   Or 28 -- it went through the 28th?

14          A.   Yes.

15          Q.   Okay.  That's correct, 26 through the

16     28th, somewhere?

17          A.   Somewhere in there, yes, sir.

18          Q.   All right.  And this -- this E-mail from

19     Doshi is dated May 27th, right?

20          A.   Yes.

21          Q.   Okay.  Look at the -- the list of

22     individuals who received the E-mail and tell me

23     if you're on this list.

24          A.   (Reviewing document.)

25               I do not see my name on there.
```

1          Q.   Do you see anyone from the Coast Guard on

2     here?

3          A.   I do not.

4          Q.   And the importance -- the subject matter

5     is "Data Files from BP's Top Kill," correct?

6          A.   Yes.

7          Q.   All right.  And it says:  "Importance:

8     High," correct?

9          A.   Yes.

10         Q.   And then it says:  "Gentleman, just want

11    to make it clear that NO ONE" -- and "NO ONE" is

12    in caps and bolded, right?

13         A.   Yes.

14         Q.   -- "is to get the data files from the Top

15    Kill method that is being pumped from yesterday

16    or today except for Paul Toom's Group," correct?

17         A.   That's correct.

18         Q.   And then it says:  "This order comes

19    directly from Bill Kirton and Charles Holt,"

20    correct?

21         A.   Yes.

22         Q.   Okay.  Then if you turn to the -- back to

23    the first page, you see where there's an E-mail

24    from Tooms to Rupen, Jace Larrison, and Mark

25    Mazzella, correct?

01-42080
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Secretary of Energy
# Dr. Steven Chu

**VOLUME 1**
JANUARY 24, 2013

# *COPY*



Systems Technology for the Litigation World

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    the momentum kill, was it your understanding

2    that BP was telling you that the modeling

3    suggested that momentum kill would work if

4    there was a flow rate of 5,000 barrels per

05:09    5    day, but not if there was a flow rate as high

6    as 15,000 barrels per day?

7        MR. CERNICH:  Object to form.

8        A.    I don't recall saying it will

9    work if it's this and it will not work if

05:09    10    it's that.  I think at that time, in the

11    May -- mid May time frame BP was saying we

12    believe this is -- will work and -- and

13    would -- but it was -- I don't recall

14    specifically talking about at what flow level

05:09    15    it would or would not work, but they made

16    a -- a case, a -- they tried to argue,

17    compellingly, that it would work.

18        Q.    (BY MR. BROCK)  I apologize for

19    this.  Let me get you to turn to Exhibit --

05:10    20    to Tab 41, which is Exhibit 9132.

21        A.    Tab 41.  Yes.

22        Q.    All right.  And do you see that

23    this is a note dated May 18th, 2010, from

24    Kate Baker to Bill Kirton and -- and a number

05:10    25    of other folks there?

305

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    And there are representatives of |
| 3 | Sandia Labs also included on this e-mail, |
| 4 | correct? |
| 05:10  5 | A.    Yes. |
| 6 | Q.    And if you look at the second |
| 7 | page of this document, please, there is a |
| 8 | list of folks that are present at the review |
| 9 | and then there are a few summary points that |
| 05:11  10 | come after that; do you see that? |
| 11 | A.    Let me look.  I see a list of |
| 12 | names, summary points.  Yes, there are a few |
| 13 | summary points. |
| 14 | Q.    All right.  Do you see in point |
| 05:11  15 | 2 the document says, modeling -- Modeling |
| 16 | indicates that a dynamic kill can be achieved |
| 17 | for a well flowing oil at a rate of 5,000 |
| 18 | stock tank barrels per day if the pressure |
| 19 | and most of the flowing wellbore is above the |
| 05:11  20 | bubble point; do you see that? |
| 21 | A.    I do. |
| 22 | Q.    And then do you see in the next |
| 23 | bullet point that it states, "Modeling |
| 24 | indicates that a dynamic kill cannot be |
| 05:11  25 | successfully executed if the oil flow rate is |

01-41705
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          )          MDL NO.  2179
"DEEPWATER HORIZON" in the               )
GULF OF MEXICO,  on                      )          SECTION: J
APRIL 20, 2010                           )
                                         )          JUDGE BARBIER
                                         )
                                         )          MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Albert Jeremiah "Bud" Decoste
## VOLUME 1

DECEMBER 5, 2012

# *COPY*



Systems Technology for the Litigation World

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1           (Exhibit No. 10473 marked.)

2      Q.  (By Mr. Orr) In the -- I'm looking at the

3   second E-mail the page, it's an E-mail dated May

4   27, 2010, from Rupen Doshi of BP, to various

5   people.  Do you recognize any of the recipients

6   as having Schlumberger E-mail addresses?

7      A.  Yes.  There's one here --

8      Q.  And --

9      A.  -- P. Flores.

10      Q.  Okay.  And who is P. Flores?

11      A.  I actually don't know.

12      Q.  Okay.  The first paragraph in that E-mail

13   says:  Gentle -- "Gentlemen," -- "Gentlemen,

14           "Just want to make it clear that NO ONE

15   is to get the data files from the Top Kill method

16   that is being pumped from yesterday or today

17   except for Paul Toom's Group.  This order comes

18   directly from Bill Kirton and Charles Holt.  Any

19   requests for this data has to go to Paul Tooms."

20           And then there's some more statements in

21   there.  At the bottom it says:  "Schlumberger:

22           "In case you are used for pumping cement

23   off the Q4000, the same data sharing restrictions

24   are valid for you as well."

25           Are you familiar with this E-mail?

01-41294
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG
"DEEPWATER HORIZON" in the
GULF OF MEXICO, on
APRIL 20, 2010

)
)
)
)
)
)
)

MDL NO. 2179

SECTION: J

JUDGE BARBIER

MAG. JUDGE SHUSHAN

## CONFIDENTIAL

### WorldwideVIEW ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Charles Holt
## VOLUME 1

NOVEMBER 28, 2012

# COPY



Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services
800 - 745 - 1101**

```
 1            Q.      Did you participate in any peer

 2      reviews?

 3            A.      Yes, sir, I did.

 4            Q.      As it pertains to the BOP on

08:41 5      BOP?

 6            A.      Yes, sir.

 7            Q.      Okay.  Now, let's keep talking

 8      about the people you talked to to get ready

 9      for this deposition, today.

08:41 10           A.      Okay.

 11            Q.      You've talked to me about

 12      Mr. Frazelle and Mr. Kidd as it pertains to

 13      the BOP on BOP.  Who else did you talk to?

 14            A.      Then I -- I talked with

08:41 15      Mr. Kirton, Bill Kirton.  I talked with Adam

 16      Ballard, I talked with Phil Patillo, I talked

 17      with Tom Knox.  As I sit here, that's who I

 18      recall that I visited with, yes, sir.

 19            Q.      Okay.  And what did you speak

08:41 20      with Mr. Kirton about?

 21            A.      The conversation with Mr. Kirton

 22      was -- was about a -- a presentation that

 23      took place in the late May time frame around

 24      the top kill effort and his recollection of

08:42 25      that presentation and conversation.
```

         1          Q.     And what presentation are you --

         2   are you speaking of?

         3          A.     This was a presentation that

         4   was -- that was given to the BP and Unified

08:42    5   Command that was summarizing the -- the top

         6   kill effort, as I recall.

         7          Q.     Do you remember who presented

         8   the presentation?

         9          A.     That presentation, Mr. Kirton

08:42   10   did the majority of the presenting, as I

        11   recall.

        12          Q.     What do you recall about --

        13   well, what information did Mr. Kirton provide

        14   you in your conversations with him as it

08:42   15   pertains to that presentation?

        16          A.     Confirming participants that

        17   were in the room and in the -- the content,

        18   confirming the content of the -- the

        19   conversation.

08:43   20          Q.     Can you give me any more details

        21   than what you generally described about it

        22   was a presentation of the top kill as to the

        23   precise details of the presentation that was

        24   given that you talked to Mr. Kirton about?

08:43   25          A.     I don't recall the exact

1    and the operational efforts for the

2    Enterprise, DEN being the Discoverer

3    Enterprise.

4         Q.     Okay.  Did your role change from

09:46  5    April 28th with this document to the

6    conclusion of the top kill in the end of May?

7         A.     Yes, it did.

8         Q.     Okay.  And can you walk me

9    through that change?

09:46 10         A.     As I recall, I had returned from

11    Robert, Louisiana.  I was over there for a

12    week or so, and I initially got involved here

13    with -- with the top kill, and then there was

14    a period of time where I was involved with

09:47 15    the BOP on BOP effort, and as the top kill

16    was gaining momentum, I became the ops

17    manager for the -- the top kill effort on and

18    around the mid part of May time frame.

19         Q.     Okay.  Okay.  So what are your

09:47 20    responsibilities as the ops manager in mid

21    May for the top kill?

22         A.     We had taken the -- we, Mark

23    Patteson, still had the top kill, and Bill

24    Kirton had taken the engineering component of

09:47 25    the top kill, the preparation, and I had

1    taken the operations component, which is

2    operationalizing the engineering plans for

3    the top kill.

4         Q.    Okay.  So you would take -- you

09:48  5    were responsible for taking the engineering

6    plans and then overseeing the actual

7    operation of the top kill in accordance with

8    those plans; is that fair?

9         A.    Yes, sir, that's fair.

09:48  10        Q.    Were you involved with the -- so

11    you were involved with the workup of the top

12    kill, correct?

13         MR. CASEY:  Objection to form.

14         A.    I was -- I was in various

09:48  15    reviews of the top kill plans, including

16    HAZ -- HAZIDs and peer assists for the top

17    kill, yes.

18         Q.    (BY MR. BARR)  Okay.  And were

19    you based in Houston, doing the work for the

09:48  20    top kill?

21         A.    I was in Houston at the time.

22         Q.    And Houston is where the source

23    control effort was directed from, correct?

24         A.    That's correct.

09:48  25        Q.    Now, would you agree with me

1          MR. DRAKE:  Same objections.

2          A.     I can only recall the

3     conversations that I was in and the reviews I

4     was in, and one of the conversations that we

11:44  5     had recently was -- was -- that I had was

6     with Mr. Kirton to confirm who was in the

7     room and what was reviewed, and it -- in that

8     conversation, the limitations of the top kill

9     were identified.

11:44 10          MR. BARR:  The mike keeps falling off.

11          MR. CASEY:  That silky tie.

12          Q.     (BY MR. BARR)  Do you know who

13     was in those meetings --

14          MR. DRAKE:  Objection; form.

11:44 15          Q.     (BY MR. BARR)  -- that you just

16     referenced?

17          MR. DRAKE:  Objection; form.  Which

18     meetings?

19          MR. BARR:  The ones he's talking about.

11:44 20          Q.     (BY MR. BARR)  Yeah, and for

21     the -- we'll -- for the record -- well, no,

22     you can --

23          MR. CASEY:  Go on.  Go ahead.

24          MR. BARR:  The witness is looking at a

11:45 25     notebook that has -- there are some

```
 1    documents, as I understand it, that he
 2    selected from a set of documents that he
 3    reviewed that help him with time lines.
 4    We're going to mark the -- the binder as
 5    Exhibit 10512 and let him refer to it, if it
 6    helps him answer the question.
 7          MS. STRIPPOLI:  Counsel, are there
 8    copies for all the parties, the binder?
 9          MR. CASEY:  Do you want yours marked
10    or --
11          MR. BARR:  It doesn't matter to me.
12          THE WITNESS:  What do we want to do?
13          MR. CASEY:  You're good.  Do you want
14    me to put this on the cover?
15          MR. BARR:  Yeah, that's fine.
16          A.    Give me just a minute here so
17    that I can orient myself here with your --
18    with your question.
19          Q.    (BY MR. BARR)  Do you think
20    there is a memo in there that talks about
21    this meeting you were talking about that
22    discloses the 15,000?
23          A.    There is a communication that
24    I'm looking for, but I'm not finding right at
25    this time, and it's actually the -- the piece
```

11:45 (5)
11:45 (10)
11:45 (15)
11:46 (20)
11:46 (25)

1    is not in here, but it's the -- with the Kate

2    Baker.

3              Q.    I may actually have it.

4              A.    Yeah, it's a Kate Baker.

11:47   5              Q.    Go to Tab 64 in your notebook.

6              A.    Okay, that'll be great.

7              Q.    We'll mark this as Exhibit 8553.

8              MR. CASEY:  I'm sorry, the tab number

9    one more time?

11:47  10              MR. BARR:  Pardon?

11              MR. CASEY:  Can I have the tab number

12    one more time.

13              MR. BARR:  Oh, 64.

14              MR. CASEY:  63?

11:47  15              MR. BARR:  4.

16              MR. CASEY:  4.

17              MR. BARR:  Previously marked as

18    Exhibit 8553.

19              THE WITNESS:  All the way in the back.

11:47  20    Okay.

21              Q.    (BY MR. BARR)  Is that the memo

22    you're -- you're looking for?

23              A.    That's one of the memos, yes,

24    sir, and this is -- this is where the Kate

11:47  25    Baker and Bill Kirton, Kurt Mix --

1      Q.      Okay.

2      A.      -- and Ole Rygg reviewed with

3    the science team.

4      Q.      Well, let's -- let's -- let's

11:48  5    talk about that.

6      A.      Okay.

7      Q.      This is "Summary points from the

8    Kill the Well on Paper Discussion," right?

9      A.      That's what this says.

11:48  10      Q.      And this is 18 May, 2010, right?

11      A.      That's what it says.

12      Q.      And it's stamped "PRELIMINARY

13    DRAFT FOR DISCUSSION, NOT FOR ISSUE," right?

14      A.      That's what my copy has here,

11:48  15    yes.

16      Q.      So we have no idea if this got

17    disseminated any further than off somebody's

18    printer, right?

19      MR. DRAKE:  Objection; form.

11:48  20      A.      In this 64, no, sir, I don't

21    have any idea of where it went.

22      Q.      (BY MR. BARR)  I mean, you're

23    here as BP today.  Did BP distribute this

24    memo to Unified Command?

11:48  25      A.      Sir, I don't recall.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              Q.     It says, "Present at the
 2      review," Kate Baker.  Who does she work for?
 3              A.     BP.
 4              Q.     Bob Grace, who does he work for?
 5              A.     Bob Grace is a consultant that
 6      was helping us, well control consultant.
 7              Q.     For BP?
 8              A.     Working for BP.
 9              Q.     So was he a BP contractor?
10              A.     He was a BP contractor.
11              Q.     Bill Kirton, who does he work
12      for?
13              A.     BP.
14              Q.     Kurt Mix, who does he work for?
15              A.     Works for BP.
16              Q.     Ole Rygg, who does he work for?
17              A.     He was a consultant for --
18              Q.     Contracted for BP?
19              A.     Contract to help the effort.
20              Q.     Dan Wood, who does he work for?
21              A.     Sir, don't know.
22              Q.     Jack Bullman, it says "NASA," do
23      you know that?
24              A.     No, other than what it says
25      here.
```

Timestamps in left margin: 11:48 (line 5), 11:49 (line 10), 11:49 (line 15), 11:49 (line 20), 11:49 (line 25)

1    which is a role that I play on the IMT.

2              Followed by that I -- I went

3    over to Robert, Louisiana with a group of

4    folks and helped set up Unified Command in

02:11  5    Robert, Louisiana.  I was only there about a

6    week, and then I -- I came back, and when I

7    came back I was -- there was a team being

8    created around this BOP on BOP.  And work had

9    already been ongoing.  And so I initially

02:12  10   engaged in the BOP on BOP or the capping

11   stack team.  That --

12        Q.    When was this?

13        A.    That would have been the first

14   week of May.

02:12  15        Q.    Okay.  Sorry to interrupt.

16        A.    No, that's okay.  And then I

17   got -- got plucked into the top kill team,

18   and as an operations there was -- myself was

19   the operations manager for that, and Bill

02:12  20   Kirton was the engineering manager for that

21   effort.  The top kill.  And I remained as

22   part of the response.

23              As we went to containment I

24   actually was one of the leaders -- we had a

02:12  25   little bit lined out, and I was one of the

leaders that was overseeing the Discoverer

Enterprise and the flow back to the

Discoverer Enterprise and all the activities

with that.

02:13          Finally, I was -- when we --

when the well was -- was killed I spent some

time working as -- as an ops manager in some

of the fishing efforts inside of the Horizon

stack and the recovery of the stack to the --

02:13     to the Q, so...

        Q.    Do you -- did you have any other

job duties during the response effort than

those that you previously listed?

        A.    None -- those were the primary

02:13     job responsibilities.  Obviously, on any

given day one might be delegated to go do

something a little different than -- than in

that, but those were my primary job

responsibilities during the response.

02:13          Q.    Okay.  What does an operations

manager for top kill entail?

        A.    As we define the -- the tasks

between Bill and I -- Bill and I were both

working this top kill effort, and as we got

02:14     ourselves organized -- my background is

1    would be within his job duties?

2        A.    In this case he was -- yes, he

3    was asked to -- to limit the distribution --

4    to communicate limiting the distribution,

03:31   5    yes.

6        Q.    If you turn to the -- the

7    content of the e-mail, it says, Gentlemen,

8    Just want to make clear that NO ONE, which is

9    bold, "is to get the data files from the Top

03:31   10   Kill method that is being pumped from

11   yesterday or today except for Paul Toom's

12   group.  This order comes directly from Bill

13   Kirton and Charles Holt."

14            Did I read that correctly?

03:31   15       A.    You did read that correctly.

16       Q.    And then in bold it says, "Any

17   requests for this data has to go to Paul

18   Tooms," correct?

19       A.    That's correct.

03:31   20       Q.    On May 27th the well was still

21   flowing, correct?

22       A.    The well was still flowing at

23   that time.

24       Q.    And as a general principle would

03:32   25   you agree that the more information, the

1    Add Energy model?

2         MR. DRAKE:  Objection; form.

3         A.    I'm familiar with some of the

4    scenarios that were run with the Add Energy

03:50   5    model.

6         Q.    (BY MR. MAZE)  Do you understand

7    how the model works?

8         MR. DRAKE:  Objection; form.

9         A.    I have a general understanding

03:51  10    of -- of how the model works.  It's going

11    through and managing calculations of fluid or

12    gas that's being transported through a -- a

13    set of pipes of various sizes and dimensions

14    and -- and then estimations are made as a

03:51  15    result of that.

16         Q.    (BY MR. MAZE)  Okay.  Do you

17    know if the estimations of flow rate

18    contained within the OLGA model were shared

19    with Doug Suttles prior to the performance of

03:51  20    the top kill?

21         A.    I don't know the answer to that,

22    no.

23         Q.    Do you know if the estimates of

24    flow rate contained within the OLGA model

03:51  25    were shared with federal government employees

1    within the Unified Command prior to the

2    execution of the top kill?

3          MR. DRAKE:  Objection; scope.

4          A.    Yes, I believe, as I recall,

03:52  5    there was a review that -- that took place

6    with government, and I believe that Secretary

7    Salazar, as I recall, was there plus a number

8    of others.  This is via a conversation that I

9    had with Bill Kirton that took place there at

03:52  10   BP, and it was a review of the top kill.  And

11   in that review, there was discussion and what

12   I got from my conversation with Bill Kirton

13   around the flow rate considerations and

14   limitations of top kill.

03:52  15         Q.    (BY MR. MAZE)  What are the

16   specifics of that conversation with regard to

17   flow rate?

18         MR. CASEY:  Objection to form.

19         MR. DRAKE:  Same objection.

03:52  20         A.    Can you state that again?  When

21   you say "specifics," help me --

22         Q.    (BY MR. MAZE)  Yeah, I'm just

23   reading back your answer.  It was a review of

24   top kill in that review.  It was a discussion

03:53  25   and what I got from my conversation around

01-41295
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Charles Holt
## VOLUME 2

NOVEMBER 29, 2012

## *COPY*



Systems Technology for the Litigation World

Litigation Group ◆ Court Reporting ◆ Video Production ◆ Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1          MR. KRAUS:  Objection; form.

2          MR. MAZE:  Objection; form.

3          A.     This -- this presentation

4    included a summary of the top kill, the fleet

01:20  5    that was going to be used for the top kill.

6    There is a summary here of the diagnostics,

7    objectives, and what we wanted to -- to get

8    out of that.

9               There is a slide here that

01:21  10   describes the communications and command and

11   how that system was going to work.  There is

12   a slide here that describes the subsea

13   layout.

14              There are two organization

01:21  15   charts for the offshore organization and the

16   onshore organization.  There is some -- a

17   data collection sheet for some of the -- the

18   high-level data to be collected.  Key

19   decisions that -- that would be taken during

01:21  20   the course.  And -- and then the top risks.

21              There is a couple of slides here

22   following that that identify pump schedule

23   and -- and pressures that had been calculated

24   and modeled.

01:21  25         Q.     (BY MR. DRAKE)  Using the

1    definition of flow rate that you've provided

2    to us this afternoon, sir, is this the

3    meeting where Secretary Salazar was informed

4    about the impact of various flow rates on top

01:22    5    kill?

6         MS. STRIPPOLI:  Objection; form.

7         MR. BARR:  Objection; form.

8         MR. KRAUS:  Objection; form.

9         MR. MAZE:  Objection; form.

01:22   10         A.    Yes, in -- in my preparation

11    for -- for deposition, I had a conversation

12    with Mr. Bill Kirton, who Mr. Bill Kirton was

13    presenting a bunch of this material, and the

14    flow rates and the impact of flow rates to

01:22   15    the top kill were discussed during this --

16    this review.

17         Q.    (BY MR. DRAKE)  And following

18    this review, did the Unified Command approve

19    proceeding with the top kill effort?

01:22   20         MR. KRAUS:  Objection; form.

21         MR. BARR:  Objection; form.

22         MS. STRIPPOLI:  Objection; form.

23         MR. MAZE:  Objection; form.

24         A.    Yes, the procedures for the top

01:22   25    kill effort were approved by Unified Command

1      say that or heard somebody say that?

2            MR. DRAKE:  Objection; form.

3            MS. STRIPPOLI:  Objection; form.

4            A.      The attendees identified here

01:42  5    would have indicated that Dr. McNutt was

6      there, and to my best recollection I remember

7      Dr. McNutt being in that -- that -- in the

8      room when that was reviewed.

9            Q.      (BY MR. BARR)  And you remember

01:42  10   somebody saying the dynamic kill will not

11     work if the well was flowing at more than

12     15,000 barrels a day?

13           MR. CASEY:  Objection to form.

14           MR. DRAKE:  Same objection.

01:42  15          A.      In my preparation for -- for the

16     deposition I talked with Bill Kirton, who

17     was -- who was presenting the majority of

18     this material, and confirmed that the flow

19     rates were included, including some posters

01:43  20   that were hanging on the wall that included

21     the flow rates that were talked to and

22     discussed during that 8:00 to 10:00 time

23     frame.

24           Q.      (BY MR. BARR)  Now, when you say

01:43  25   "the flow rates that were discussed" are you

1    talking about the assumptions that went into

2    the Add Energy models?

3              A.    This was -- this was a plot that

4    had potential flow rates and -- and

01:43  5    comparisons of the dynamic kill and -- and in

6    that conversation was that anything that --

7    above 15,000, that the dynamic or momentum

8    kill would not be as successful --

9              Q.    Okay.

01:43  10              A.    -- would not be successful.

11              Q.    So it's your testimony under

12    oath today that that information was provided

13    in that two-hour session?

14              MR. CASEY:  Objection to form.

01:43  15              A.    From my recollection sitting

16    here two and a half years later, yes, I

17    remember that conversation taking place.

18              Q.    (BY MR. BARR)  Well, if I

19    understood your testimony correctly, it's not

01:43  20    really your memory of it; it's from

21    Mr. Kirton's memory of it, based upon your

22    discussion with Mr. Kirton, correct?

23              MR. CASEY:  Objection to form.

24              MR. DRAKE:  Same objection.

01:44  25              A.    In preparation I visited with

575

 1    Mr. Kirton about that meeting, and being in

 2    attendance at that meeting, I recall seeing

 3    the plots that Mr. Kirton referenced.

 4        Q.    (BY MR. BARR)  Okay.  I'm just

01:44  5   trying to be -- you know, it's not a trick

 6    question.  I'm just trying to find out, is

 7    this your memory that this was said or is

 8    this Mr. Kirton's memory --

 9        MR. CASEY:  Objection --

01:44 10       Q.    (BY MR. BARR)  -- that this is

11    what was said?  That's all I want to know.

12        MR. CASEY:  Objection to form.

13        MR. DRAKE:  Objection to form.

14        A.    Mr. Kirton described the meeting

01:44 15   to me and reminded me in that conversation of

16    the posters that I remember seeing.

17        Q.    (BY MR. BARR)  Okay.  So it's

18    not --

19        A.    So it's coming from Mr. Kirton.

01:44 20   It's a conversation with Mr. Kirton.

21        Q.    (BY MR. BARR)  Okay.  So if this

22    was said to Dr. McNutt she should have known

23    about it, right?

24        MS. STRIPPOLI:  Objection; form.

01:44 25       MR. CASEY:  Objection to form.

01-40969
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Rear Admiral Mary Ellen Landry

**VOLUME 2**

OCTOBER 23,  2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group✦Court Reporting✦Video Production✦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1      Q.  What words do you recall?

2      A.  I recall -- I recall a phone

3  conversation, and he was basically telling me,

4  "We" -- you know, "We're not in the meetings.  I

5  feel like we should be in the meetings.  So I'm

6  going to go into the meeting."

7      Q.  I'm sure he did.

8      A.  And he did.

9      Q.  I'd ask you to look at Tab 36, which is

10  Exhibit 9164.  And this is an E-mail string right

11  in the middle of the top kill operation, dated

12  May 27th through May 28th.

13      A.  (Reviewing document.)

14      Q.  Okay?  And if you could start at the last

15  E-mail on the -- on the second page there, from

16  Rupen Doshi.  If you could just read into the

17  record the "Gentleman."

18      A.  "Gentleman,

19          "Just want to make clear that NO ONE is

20  to get the data files from the Top Kill method

21  that is being pumped from yesterday or today

22  except for Paul Toom's group.  This order comes

23  directly from Bill Kirton and Charles Holt."

24      Q.  Okay.  Any request for data is -- has to

25  go to Paul Tooms?

1     A.  That's correct.

2     Q.  Now, were you in -- there's a number of

3 folks down here -- I'm sorry.  Go -- go up one --

4 one E-mail.  Do you see that?  There's a list of

5 personnel that -- that can have access to the Top

6 Kill Analysis.

7              MS. KARIS:  Objection, form.

8 Foundation.

9     A.  "Mark has requested that the following

10 personnel have access to this data at the

11 completion of the kill for analysis."

12    Q.  (By Mr. Li) Yeah.  And there's a list of

13 people there.

14    A.  That's correct.

15    Q.  Are any of those people Coast Guard

16 personnel?

17    A.  I don't recognize any of the names.

18    Q.  Okay.  If you could go to the front page.

19 This is from Paul Tooms, right in the -- it's

20 like right below the first E-mail on the page.

21 Paul Tooms.

22          "Of course" your "guys" -- "you guys" are

23 "doing the job" -- I'm sorry.

24          "Of course you guys doing the job can get

25 the data, so list is approved."

01-41915
RM/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### WorldwideVIEW™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert Markham Patteson

## VOLUME 2

JANUARY 24, 2013

# COPY



Systems Technology for the Litigation World

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

10:17 1          MR. BENTSEN:

10:17 2                  Objection, form.

10:17 3          MR. BREEN:

10:17 4                  Objection, form.

10:17 5          A.      You'll have to be more specific with

10:17 6    the phrase "go forward."

10:17 7    EXAMINATION BY MR. MAZE:

10:17 8          Q.      Okay.  I'm going to show you what

10:17 9    was marked as Tab 93 on the PSC exhibits

10:17 10   yesterday.  And these do not have a previous

10:17 11   exhibit sticker, so I'm going to mark them with a

10:17 12   new sticker, No. 11412.

10:17 13                 This is an e-mail from Mark Mazzella

10:17 14   to Bill Kirton with you copied.  I'm going to

10:17 15   hand you a copy and counsel a copy.

10:18 16                 This was sent on Monday, May

10:18 17   the 10th of 2010.  The subject is "Version 10

10:18 18   Kill Planning Procedures."  The body of the --

10:18 19   this e-mail says, "FYI - these procedures have

10:18 20   been approved by Mark P and endorsed by me for

10:18 21   planning.  If you have any questions, please feel

10:18 22   free to contact me directly.  Regards, Mark

10:18 23   Mazzella."

10:18 24                 Did I at least read the body of the

10:18 25   e-mail correctly?

10:18  1        A.      Yes, you did.

10:18  2        Q.      And you would be Mark P, correct?  I

10:18  3   mean, you're -- you're copied on the e-mail, you

10:18  4   don't know any other Mark P that would refer to,

10:18  5   do you?

10:18  6        MR. BREEN:

10:18  7             Objection, form.

10:18  8        A.      I do not.

10:18  9   EXAMINATION BY MR. MAZE:

10:18 10        Q.      Okay.  If you'll turn the page, it's

10:18 11   the attachment, and it's entitled "Planning

10:18 12   Procedure For Junk Shot, Bullhead, and Momentum

10:18 13   Top Kills Horizon BOP."

10:18 14             And I'll give you a -- just a few

10:18 15   moments just to flip through it.  You don't have

10:19 16   to read the whole thing because I'm not going to

10:19 17   ask you any specific questions about it, but if

10:19 18   you want to just refresh your recollection as to

10:19 19   what this is about.

10:19 20        A.      (Witness reading.)

10:20 21        Q.      Okay.

10:20 22        A.      Sorry.

10:20 23        Q.      Sure, go ahead.

10:20 24        A.      (Witness reading.)

10:21 25             Okay.

10:21 1          Q.     Okay.  Having looked at this, is it

10:21 2     fair to say that you approved the procedures

10:21 3     for -- I'm just going to read straight from the

10:21 4     document -- the junk shot procedure, the kill

10:21 5     procedure, the momentum kill procedure, the

10:21 6     cementing procedure, with such details as the

10:21 7     type of pills to be used as bridging materials,

10:21 8     the pressure in which the fluids would be pumped,

10:21 9     the type of fluids that would be pumped?  Is that

10:21 10    fair?

10:21 11         MR. BREEN:

10:21 12              Objection, form.

10:21 13         MR. BENTSEN:

10:21 14              Objection, form.

10:21 15         A.     Looking at the -- the date of

10:22 16    May 4th, looking at the -- the nature of this

10:22 17    procedure, this appears to me to be a very

10:22 18    early -- very early high-level procedure rather

10:22 19    than a detailed operational procedure that was

10:22 20    the procedure actually later approved by BP

10:22 21    personnel and the Unified Command to -- to

10:22 22    actually execute.

10:22 23              So I read this e-mail as a agreement

10:22 24    on a -- on the principals, the high-level

10:22 25    principals, but I would not characterize this as

10:22  1       the detailed operational procedure by looking at

10:22  2       what I'm just seeing today.

10:22  3       EXAMINATION BY MR. MAZE:

10:22  4            Q.    But at least as of May the 4th,

10:22  5       you're the one approving the at least early-level

10:22  6       procedures, correct?

10:22  7            MR. BREEN:

10:22  8                  Objection, form.

10:22  9            A.    Those are Mark Mazzella's comments,

10:23 10       meaning that we talked about it.

10:23 11       EXAMINATION BY MR. MAZE:

10:23 12            Q.    Is it accurate or not accurate to

10:23 13       say that you approved the procedure that was

10:23 14       attached to that e-mail?

10:23 15            MR. BREEN:

10:23 16                  Objection, form.

10:23 17            MR. BENTSEN:

10:23 18                  Form.

10:23 19            A.    I don't remember a -- there -- there

10:23 20       was no formal approval process at this stage that

10:23 21       I remember, and I see no approval signature and

10:23 22       that type of thing.

10:23 23       EXAMINATION BY MR. MAZE:

10:23 24            Q.    So let me go back to my original

10:23 25       point -- or original question.  How does it make

01-41070
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )    MDL NO.  2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO, on    )    SECTION: J
APRIL 20, 2010    )
    )    JUDGE BARBIER
    )
    )    MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW* ™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert Quitzau
## VOLUME 1

NOVEMBER 1, 2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

```
1              Did you interact with any of the other
2      teams that are listed here, any -- any of the
3      other groups?
4          A.  (Reviewing document.)
5              I don't see any names of persons that I
6      interacted with.  I might have -- I might have
7      had some discussions with Mitch Quinn, but I --
8      I'm not sure about that.
9          Q.  Okay.  Who is Mitch Quinn?
10         A.  He's "BOP Pod Change Out."
11         Q.  Okay.
12         A.  I just -- I remember the name, but -- but
13     other than that, I don't see any oth -- other
14     names that ring a bell.
15         Q.  Okay.  What about up the reporting
16     structure, did you interact with any of the
17     people listed above Mr. Fowler and Mr. Sharadin?
18         A.  I was in -- had some interactions with
19     John Sixt, Eric Beyer, Gary Wulf, Bill Kirton,
20     Charlie Holt, and George Gray.
21         Q.  Okay.  What -- can -- I -- I know this is
22     a broad question, and I'll -- I'll clarify it,
23     but what types of interactions did you have with
24     those folks?
25                  MS. WILMS:  Object to form.
```

 1          A.   It's a very broad question.   Bill Kirton

 2     and I knew each other from previous career

 3     crossing.   Charlie Holt asked me to do some work,

 4     and George Gray asked me to do some work.   John

 5     Sixt, I spoke to about junk shot and subsea

 6     efforts.   That's about the extent of it.

 7          Q.   (By Mr. Leopold) Okay.   One -- we're done

 8     with that exhibit.   Let's turn to one more,

 9     Tab 101.

10          (Exhibit No. 9932 marked.)

11          Q.   (By Mr. Leopold) Okay.   And let's mark

12     this as the next exhibit.

13          A.   Got it.

14          Q.   Okay.   What exhibit is that, Mr. Quitzau?

15          A.   9932.

16          Q.   Thank you.   And I placed in front of you

17     an E-mail from Robert Sanders to David Sims,

18     dated July 26th, 2010.   And attached to -- to

19     this E-mail is a document with -- with some

20     additional org charts.   And I'd like you to turn

21     to Bates Page 859118.

22          A.   Okay.

23          Q.   And it's a slide that says "Systems

24     Engineering."   Do you see that?

25          A.   Yes, I do.

```
 1          A.  I participated in some.  Whether I did on

 2     this specific one, I -- I can't recall.

 3          Q.  Did you interact with Kate Baker at all

 4     in your response work on the BP oil spill?

 5          A.  I'm sorry, I don't recall that name.

 6          Q.  Take a look at the names on this E-mail

 7     and tell me if you interacted with any of those

 8     folks.

 9          A.  (Reviewing document.)  Yes, I did.

10          Q.  Which ones?

11          A.  Bill Kirton, Jon Sprague.

12          Q.  Ole Rygg, yes?

13               MS. WILMS:  Give him a chance --

14          A.  Ole Rygg --

15               MS. WILMS:  -- to look at the names.

16          A.  Yes.  Ole Rygg.

17               MS. WILMS:  Sorry.

18          A.  Ku -- Kurt Mix.

19          Q.  (By Mr. Leopold) Okay.

20          A.  That's all.

21          Q.  Were -- in the Kill the Well on Paper

22     exercises that you participated in, were those

23     people present?

24          A.  I don't recall the Attendees of all of

25     the exercises.
```

```
 1        A.  I believe some of the top kill plans, you

 2   know, whether -- whether the disks were failed

 3   before or after the top kill, some of the top

 4   kill plans contemplated that they might fail, and

 5   that continuous mud pumping could be conducted

 6   to -- to mitigate any problems with the disks,

 7   assuming that the well were -- were killed on the

 8   top kill.

 9        Q.  (By Mr. Lemmon) Were there consequences

10   to the relief well if the burst disk had blown?

11              MS. WILMS:  Object to form.

12        A.  I don't know of any consequences to the

13   relief well if the disks had already blown.

14   That -- that's -- that's outside my area of

15   expertise.

16        Q.  (By Mr. Lemmon) What if they had blown

17   during the top kill?

18              MS. WILMS:  Object to form.

19        A.  As I -- as I just -- okay.  If they had

20   blown during the top kill --

21        Q.  (By Mr. Lemmon) Were there consequences

22   to the relief well?

23        A.  To the relief well?

24              MS. WILMS:  Object to form.

25        A.  Are you asking while the relief well was
```

```
                   UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL        )   MDL NO. 2179

BY THE OIL RIG           )

"DEEPWATER HORIZON" IN   )   SECTION "J"

THE GULF OF MEXICO, ON   )

APRIL 20, 2010           )   JUDGE BARBIER

                         )   MAG. JUDGE SHUSHAN
```

```
                   Deposition of 30(b)(6)

DEPOSITION OF STRESS ENGINEERING SERVICES, BY

AND THROUGH GEORGE RAY ROSS, JR., Ph.D.,

P.E., taken at Pan-American Building,

601 Poydras Street, 11th Floor, New Orleans,

Louisiana, 70130, on the 16th day of

November, 2012.
```

```
 1          A.     It was not within my scope of
 2   work to render an opinion.
 3          Q.     And, therefore, you have no such
 4   opinion?
 5          A.     Without -- without having all
 6   the information on that particular well, I
 7   don't have sufficient information to form an
 8   opinion.
 9          Q.     Now, subsequent to that, you did
10   get the information?
11          MS. DAVIS:  Object to form.
12          A.     What -- what do you mean by
13   that?
14          Q.     (BY MR. GONZALEZ)  As you sit
15   here today, you now have the information that
16   you would need to calculate whether it would
17   work or not?
18          A.     No, I do not.
19          Q.     You do not.
20          I'm going to show you a document
21   Bates-stamped number BP-HZN-2179MDL05648464,
22   consists of two pages.  The top page is from
23   Michael Chambers --
24          A.     Okay.
25          Q.     -- to Bill Kirton, dated
```

11:41
11:41
11:41
11:41
11:41
11:42

```
  1    May 20th, 2010.  And if you go further

  2    down -- you are -- you are actually

  3    referenced in all these e-mails.

  4         A.     Uh-huh.

11:42  5         Q.     Have you seen this document

  6    before?

  7         A.     No, I have not.

  8         THE REPORTER:  Do you need to mark it?

  9         Q.     (BY MR. GONZALEZ)  The second

11:42 10    page you actually wrote, so...

 11         A.     Yes.

 12         Q.     So the second page you certainly

 13    saw because you wrote it?

 14         A.     That is correct.

11:42 15         Q.     All right.  So we'll mark this

 16    as the next exhibit number.

 17         THE REPORTER:  9799.  And after that we

 18    move to 10500.

 19         MR. GONZALEZ:  Ready?

11:43 20         THE REPORTER:  Ready.

 21         Q.     (BY MR. GONZALEZ)  All right.

 22    We're going to start on the second page,

 23    5648465, and it's an e-mail from you, George

 24    Ross, dated Friday, May 14th, 2010, to

11:43 25    Michael Chambers and others.  Tell us who
```

1    upstream side of the BOP."  Again, "Pat Ellis

2    attended the test on behalf of BOP.  Best

3    regards, George."

4              Was this your attempt at

11:44  5    reporting that the testing was successful?

6         A.    Yes, reporting that day's event.

7         Q.    If you go to the paragraph above

8    this page over your e-mail --

9         A.    Uh-huh.

11:44  10        Q.    -- which to get the right date

11    we have to go to the first page, and it's

12    from Michael Chambers, dated May 15th, 2010,

13    to Bill Kirton and cc's others, including

14    Bernard Mullins and Pat Ellis.

11:44  15        A.    Okay.

16        Q.    The last paragraph states -- now

17    going to the second page -- We have the full

18    attention of Brinker's entire company and

19    their top people here in the office and their

11:45  20    CEO is in Houston all week as well.  If you

21    want a full 10,000 psi delta P sealing test

22    at Stress, we can perform one.  The Brinker

23    option is ready to deploy, ready to test,

24    ready to be reengineered, even on the deck,

11:45  25    and ready to either bridge for diversion only

01-41219
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Ole Rygg, Ph.D.
**VOLUME 1**

OCTOBER 3, 2012

# COPY



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1       A.   The May 18th meeting?

2       Q.   Yes.   That we were just --

3                 MR. MAZE:   Tab 6.

4       Q.   (By Mr. Lundy) Tab -- Tab 6, we were just

5   discussing.

6                 MR. SCHOEMAN:   This one.

7       Q.   (By Mr. Lundy) With the Kate Baker

8   E-mail.  And attached to it is the "Summary

9   points from the Kill...Well on Paper Discussion"

10   of May 18th, 2010.  And at the top of the -- the

11   discussion is -- it says:  "Present at...review:

12   Kate Baker, Bob Grace, Bill Kirton, Kurt Mix, Ole

13   Rygg, Dan Wood, Jack Bullman" from NASA, "Curtt

14   Ammerman."  And it lists:  "John Benner, Jon

15   Sprague, Charles Morrow, Scott Perfect, Jim

16   Redmond, Mike Stone, Derek Wapman, and Arun

17   Majumdar."

18                 THE COURT REPORTER:   Thanks.

19       Q.   (By Mr. Lundy) That part -- that meeting.

20       A.   In that meeting, I assume that that was

21   discussed because it's stated in the -- in the

22   Memo that -- that the dynamic kill cannot be

23   successfully executed if the flow rate is 15,000

24   standard barrels a day -- per day.

25            (Discussion off the record.)

1        MR. LUNDY:  All right.

2     Q.  (By Mr. Lundy) So that was dis -- so it

3  was discussed at that meeting?

4     A.  Yes, from the -- from the notes, it -- it

5  appears to be in here.

6     Q.  M-h'm.

7     A.  Discussed in the meeting.

8     Q.  All right.  Then did anyone ask you,

9  during your Presentation or after your

10 Presentation, where you actually discussed the

11 dynamic kill general principles and the modeling

12 results, what the flow rate of the well was?

13    A.  I cannot recall that I did.

14    Q.  Wouldn't that be a -- a critical piece of

15 information that the Group wanted to know in

16 order to determine whether or not the top kill

17 would be successful?

18        MS. O'CONNOR:  Objection to form.

19    A.  Probably, but I cannot recall that they

20 asked me specifically about that.

21    Q.  (By Mr. Lundy) Because the flow rate was

22 important in determining whether or not top kill

23 or other options would be successful, was anyone

24 at that meeting assigned the task of -- of trying

25 to model and estimate a defensible flow rate at

1          MR. DAVIS-DENNY:  Mr. Hartley

2    allowed us to have three minutes of his

3    time allowed to Transocean.

4          Thank you, Mr. Hartley, for allowing us

5    to use three minutes of your time.

6          MR. HARTLEY:  My pleasure.

7          (Recess from 4:03 p.m. to 4:04 p.m.)

8          THE VIDEOGRAPHER:  All set?

9          The time is 4:04 p.m.  We're back on the

10   record, beginning Tape 8.

11       Q.  (By Mr. Davis-Denny) I'm going to hand

12   you Exhibit 9269, which is my Tab --

13          MS. SARGENT:  71.

14       Q.  (By Mr. Davis-Denny) -- 71.

15          (Discussion off the record.)

16       Q.  (By Mr. Davis-Denny) Sir, is this an

17   E-mail that you sent to BP's Bill Kirton on May

18   20th of 2010?

19       A.  Yes.

20       Q.  And, sir, does this E-mail have an

21   attachment to it that you prepared?

22       A.  Yes.

23       Q.  Okay.  Does this E-mail have the same

24   slide that you showed me earlier that

25   demonstrated that the top kill could not succeed

 1    at flow rates above 15,000 barrels a day?

 2              MR. SCHOEMAN:  It's right there.

 3    (Indicating.)

 4       A.  Yes.  That's the last page on the slide

 5    packet.

 6              MR. SCHOEMAN:  I'm sorry.  The

 7    transcript says at 10,000, but I think your

 8    question was at 15,000; is that right?

 9              MR. DAVIS-DENNY:  It was at 15,000.

10       Q.  (By Mr. Davis-Denny) Your -- your answer

11    wouldn't be any different, is that right, sir,

12    with 15,000 barrels per day?

13       A.  Yeah.  That's at 15,000, yes.

14              MR. DAVIS-DENNY:  Thank you.

15          I think that -- that's all I have.  Thank

16    you.

17              THE WITNESS:  Okay.

18              MR. DAVIS-DENNY:  Thank you,

19    Mr. Hartley.

20              THE VIDEOGRAPHER:  It's 4:05.  We're

21    off the record.

22          (Recess from 4:05 p.m. to 4:08 p.m.)

23              MR. HARTLEY:  I'm ready.

24              THE VIDEOGRAPHER:  The time is

25    4:08 p.m.  We're back on the record, beginning

1           UNITED STATES DISTRICT COURT

            EASTERN DISTRICT OF LOUISIANA

2

3   IN RE:  OIL SPILL          )      MDL NO. 2179

    BY THE OIL RIG             )

4   "DEEPWATER HORIZON" IN     )      SECTION "J"

    THE GULF OF MEXICO, ON     )

5   APRIL 20, 2010             )      JUDGE BARBIER

                               )      MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17            * * * * * * * * * * * * * * * * *

                        VOLUME 1

18            * * * * * * * * * * * * * * * * *

19

20

21        Oral and Videotaped Deposition of Henry

    Matthew Thierens, Individually and as a Corporate

22  Represenative, taken at Kirkland & Ellis International,

    30 St. Mary Axe, 22nd Floor, London EC3A 8AF, England,

23  United Kingdom, on the 9th day of June, 2011.

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    that.

 2                    MR. STERBCOW:  All right.  Take a break.

 3                    THE VIDEOGRAPHER:  Off the record at

 4    11:07 a.m.  Ending Tape 2.

 5            (Recess from 11:07 a.m. to 11:32 a.m.)

 6                    MR. STERBCOW:  We're ready.

 7                    MR. SAFER:  We're starting over here, in

 8    case you're interested.

 9            (Exhibit No. 6087 marked.)

10                    THE VIDEOGRAPHER:  On the record at

11    11:22 a.m., beginning Tape 3.

12        Q.   (By Mr. Sterbcow) All right.  I'm going to

13    show you another document, Mr. Thierens, but I'd like

14    you to keep the one that you just -- just keep that

15    right there for now if you would.  This one is marked

16    6087.

17                    THE COURT REPORTER:  Tab number?

18                    MR. STERBCOW:  And it is Tab 6.

19        Q.   (By Mr. Sterbcow) And it's Bates MDL00638722

20    through 00638738.  I'll give you that.

21                    MR. STERBCOW:  I'll hand these out.  For

22    the record, entitled, "Gulf of Mexico SPU, Gulf of

23    Mexico Developments BU, White Paper on D&C

24    Organizational Model," dated March 25th, '08, Author,

25    Bill Kirton, Reviewer, Harry Thierens, Approver, Kevin

**PURSUANT TO CONFIDENTIALITY ORDER**

 1   Lacy.

 2          Do you recognize this?

 3      A.   I -- I don't recall seeing this document.

 4      Q.   All right.  Do you have any idea why this

 5   document would have been generated?

 6      A.   I believe this would have been generated as

 7   a -- we -- we call these things white papers, draft

 8   proposals, there could have been another word for it.

 9   Without reading through it in detail, I don't know.  I

10   think it refers to aspirations to describe what could

11   be a centralized model.

12      Q.   Okay.  If you -- turn to Page 4 for me, and we

13   won't spend a lot of time on this.  And at the bottom

14   where it says Page 3 of 17, 4 of 17, et cetera?

15      A.   Which page, please?

16      Q.   Page 4.

17      A.   Page 4.

18      Q.   At the top it says:  "Introduction."

19      A.   Okay.

20      Q.   And I -- and I think you're -- you were

21   accurate in what you just said, "The paper will provide

22   insight as to how the new D&C Organization will

23   function as it manages all well planning and execution

24   activity as well as the major support functions within

25   the newly formed D&C Central Team."

**PURSUANT TO CONFIDENTIALITY ORDER**

1        So given that, it says:  "This organization is

2   based on a Central Team...that uses 4 major groups to

3   manage the entire life cycle of projects from

4   Exploration through Development.  All well planning and

5   execution activities are managed through the E&A

6   Operations, Projects, Engineering, and" the

7   "Atlantis/Thunder Horse & Production Operations.  HSSE,

8   Performance Management, Rig and Wells Services and

9   Technology are also managed within the D&C Central

10  Team."

11        Having said that, is this the White Paper that

12  would tell us what the -- as you say the aspirations

13  were for reorganization and centralization of Drilling

14  & Completions?

15     A.   I -- I think so.  I -- I -- without reading it

16  in absolute detail, I can't answer that accurately, but

17  I believe it's -- it -- it describes the aspirations

18  towards the centralized Team.

19     Q.   If you go to the next page, Page 5, it

20  describes the Leadership Team, names Kevin Lacy, Vice

21  President of Drilling & Completions, which was, in

22  fact, true, correct?

23     A.   Correct.

24     Q.   And then he has six direct reports.  You're

25  listed as the Wells Director first.  Do you recall

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              UNITED STATES  DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2
3   IN RE:  OIL SPILL        )      MDL NO. 2179
    BY THE OIL RIG           )
4   "DEEPWATER HORIZON" IN   )      SECTION "J"
    THE GULF OF MEXICO, ON   )
5   APRIL 20, 2010           )      JUDGE BARBIER
                             )      MAG. JUDGE SHUSHAN
6
7
8
9
10
11
12
13
14
15
16
17              * * * * * * * * * * * * * * * * *
                         VOLUME 1
18              * * * * * * * * * * * * * * * * *
19
20
21          Deposition of Paul Tooms, Individually and as
    a Corporate Representative, taken at Kirkland & Ellis
22  International, 30 St. Mary Axe, 22nd Floor, London EC3A
    8AF, England, United Kingdom, on the 16th of June,
23  2011.
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   flow of the well, and it would have been a strange

2   thing to do.

3       Q.   Of course.  Now, the top kill junk -- junk

4   shot, who was in charge of that?

5       A.   I can't recall exactly who was in charge of

6   it.  I can recall that I think Bill Kirton was involved

7   in it, and Mark Mazzella had an involvement.  There may

8   have been others.

9       Q.   Okay.

10      A.   There may have been somebody else actually in

11  charge.

12      Q.   All right.  How about top kill well kill?

13      A.   So top kill was initially Mark Patterson and

14  then I think Harry Thierens got involved in that, too,

15  and others may have been involved.

16      Q.   Now, under the column which is entitled "Data

17  which would increase the probability of success," we

18  see pressure downstream of BOP.  And what they're

19  referring to, of course, we talked about this morning

20  and that is it would be extremely helpful to know the

21  flow out of the -- out of the leak in order to

22  ascertain the likelihood of success for a top kill well

23  kill; is that correct?

24      A.   Actually, what I -- what I wanted to -- to

25  measure that -- I think -- I think this is my document.

1    using, I think, two gauges, used -- took a variety of

2    pressures at different points in the BOP stack.

3        Q.   Okay.  And then during the -- the top kill

4    method, the top kill operation itself, you collected

5    additional data, correct?

6        A.   During top kill itself, we -- we -- we

7    recorded pressure data full-time, yes.

8        Q.   Can you -- I -- I'd like to direct you to

9    this -- this E-mail that's Tab 21.

10           MR. CERNICH:  And I'm going to mark this

11   as Exhibit 6195.

12           (Exhibit No. 6195 marked.)

13       Q.   (By Mr. Cernich) And this is an E-mail from

14   someone named Rupen Doshi, dated Thursday, May 27,

15   2010, to various -- various people, some people at BJ

16   Services, and then there's a copy to you, and it says:

17   "Gentleman, Just want to make it clear that NO ONE is

18   to get the data files from the Top Kill method that is

19   being pumped from yesterday or today except for Paul

20   Toom's group.  This order comes directly from Bill

21   Kirton and Charles Holt.  Any requests for this data

22   has to go to Paul Tooms."  And can you explain to me

23   why Mr. Rupen is -- is providing that instruction?

24           MS. KARIS:  Object to form.

25       A.   I -- I can explain to you why I think he's

**PURSUANT TO CONFIDENTIALITY ORDER**

1   providing that instruction, and you -- you may need to

2   ask Rupen Doshi or Bill Kirton and Charl -- Charlie

3   Holt.  But collecting data, even -- even something as

4   straightforward as pressure data, in 5,000 feet of

5   water isn't -- isn't actually straightforward.  There

6   can be various reasons why you actually have to add

7   corrections to the data, validate that the gauges are

8   reading correctly, and so on.

9          And so the -- the decision was made quite

10  clearly that what we wanted to do here was, because I

11  had the gauge experts in my Group, was that the whole

12  data would come through a single point to be validated

13  before it was reissued out, because if we had people on

14  the vessels that were pumping and -- and making

15  decisions, if they were to use unvalidated data, in

16  fact, uncorrected data, we could get ourselves in a --

17  in a bad place.

18      Q.   (By Mr. Cernich) So did you instruct Mister --

19  Mr. Rupen to -- to provide this -- this instruction?

20      A.   No.  Actually Bill Kirton instructed Rupen

21  to -- to do it this way.

22      Q.   And was this data eventually -- eventually

23  distributed outside of BP?

24      A.   If I recall correctly, and -- and certainly

25  during the top kill, the data was -- was provided live

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

   IN RE:  OIL SPILL        MDL NO. 2179
5  BY THE OIL RIG
   "DEEPWATER HORIZON"       SECTION:  J
6  IN THE GULF OF
   MEXICO, ON                JUDGE BARBIER
7  APRIL 20, 2010           MAG. JUDGE SHUSHAN

8

9



15

16              **VOLUME I**

17

18       (30)(b)96)Deposition of **Halliburton**,

19  through its designated representative,

20  **RICHARD FRANK VARGO**, and **RICHARD FRANK VARGO**

21  individually, 102 Kent Circle, Lafayette,

22  Louisiana 70508, taken in the Pan American

23  Life Center, Mardi Gras Room, 11th Floor, 601

24  Poydras Street, New Orleans, Louisiana 70130,

25  reported on Wednesday, March 30th, 2011.

```
 1    the days afterwards.  I know I was looking at
 2    everything I could find.
 3            Q.     Did you try to talk to
 4    Mr. Chaisson or Mr. Anderson or anyone else
 5    that was on the rig at the time the cement
 6    job was poured on the 19th and the early
 7    morning hours of the 20th?
 8            A.     I spoke to --
 9        MR. GODWIN:
10                Object to form.
11        THE WITNESS:
12                I spoke to our -- the members of
13    our team in the days afterwards, yes, sir.
14    EXAMINATION BY MR. THORNHILL:
15            Q.     This was before your
16    Presidential Commission report?
17            A.     Yes, that would have been before
18    the Presidential Commission.  I asked them
19    what information they had.  What had gone on.
20            Q.     Tell me which team members you
21    talked with, if you don't mind.
22            A.     I spoke with Paul Anderson, I
23    spoke with Nate Chaisson, I spoke with
24    Mr. Gagliano.  I spoke with Vince Tabler, I
25    spoke with Ryan Haire, Chris Haire.  Those
```

```
 1    are the people that were with the rig that I
 2    recall talking with.
 3          Q.    Did you take any notes from your
 4    discussions with those gentlemen,
 5    Mr. Gagliano, Anderson, Chaisson, Tabler or
 6    Haire?
 7          A.    In the days after, I did have a
 8    few notes that I took as far as writing down
 9    calculations, trying to understand what had
10    gone on.
11          Q.    Where are those notes?
12          A.    I provided them to counsel.
13          Q.    When did you provide them?
14          A.    When they asked me.  And I don't
15    recall when they asked me, but it's been
16    months ago.
17          Q.    Months ago?
18          A.    Yes, sir.
19          Q.    Were there any other records
20    made of your discussions with these gentlemen
21    we just mentioned?
22          A.    Not that I'm aware of.
23          Q.    Did you tape record those
24    conversations?
25          A.    No, I didn't tape record
```

1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2

3    IN RE:  OIL SPILL        )   MDL NO. 2179
     BY THE OIL RIG           )
4    "DEEPWATER HORIZON" IN )   SECTION "J"
     THE GULF OF MEXICO, ON )
5    APRIL 20, 2010           )   JUDGE BARBIER
                              )   MAG. JUDGE SHUSHAN
6

7

8

9

10

11

12

13

14

15

16

17              * * * * * * * * * * * * * * * *
                          VOLUME 2
18              * * * * * * * * * * * * * * * *

19

20

         Continuation of the deposition of Barbara
21   Jean Lowery-Yilmaz, taken at Pan-American
     Building, 601 Poydras Street, 11th Floor, New
22   Orleans, Louisiana, 70130, on the 27th day of
     July, 2011.

23

24

25


**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   over-ride without further damage to the BOP at
 2   100, 200, & 300,000" barrels "flow rate," the
 3   answer is:  "No.  Closing the shear rams at any
 4   of the above flow rates will probably cause them
 5   to wash out."
 6        Do you see that?
 7   A.  I see that's written on the page.
 8   Q.  All right.  And it goes on to say that --
 9   that:  "We have since spoken with Cameron and
10   others and offer the following," and then it
11   comes up with some ideas that might be used.
12        Do you see that?
13   A.  I see that on the page.
14   Q.  All right.  What I want to go to is the
15   individuals who were involved in this series of
16   E-mails are Curtis Jackson, Don Weisinger, Bill
17   Kirton, Ginny Stover, Jasper Naylor, Vern -- I
18   can't read backwards -- but do you know any of
19   the people in either the "To" or "Cc" line of
20   this document?
21   A.  I know Curtis Jackson.  I had known Don
22   Weisinger well -- at some point, early, early in
23   my career.  I know Bill Kirton.
24   Q.  Did any of these people ever work under
25   your Chain of Command, either directly,
```

**PURSUANT TO CONFIDENTIALITY ORDER**