Page 1

1        IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
2              IN AND FOR MIAMI-DADE COUNTY, FLORIDA
3

    STERBCOW LAW GROUP, LLC,      *
4   a Foreign Limited Liability   *
    Company and MELANCON | RIMES, *
5   LLC, a Foreign Limited        *
    Liability Company,            *
6                                 *
        Plaintiffs,               *
7                                 * CASE NO. 13-039679-CA-01
        v.                        *
8                                 *
    THE DOWNS LAW GROUP, P.A.,    *
9   a Florida Corporation,        *
    CRAIG T. DOWNS, individually, *
10  JEREMY FRIEDMAN, individually,*
    and DANIEL PEREZ,             *
11  individually,                 *
                                  *
12      Defendants.               *
                                  *
13  -----------------------------*
14  The Deposition of:
15                    AMLED PÉREZ
16  was held at the offices of Verbatim Reporting Puerto
17  Rico, LLC, 151 del Parque Street, Suite 1, San Juan,
18  Puerto Rico, on Thursday, February 13, 2014, at
19  9:01 a.m.
20
21
22
23
24  Reported by:  Shawn D. Weber
25                Registered Professional Reporter

Page 2

```
1   APPEARANCES:
2
3   COUNSEL FOR PLAINTIFFS
4   THE McKEE LAW GROUP, LLC
     17150 Royal Palm Boulevard, Suite 1
5   Weston, Florida 33327
     BY:  ROBERT J. McKEE, ESQ.
6       954.888.9877
        rmcKee@TheMcKeeLawGroup.com
7
8
9   COUNSEL FOR DEFENDANTS

10  THE DOWNS LAW GROUP, P.A.
     (Appearing Telephonically)
10  3250 Mary Street, Suite 307
11
12  Coconut Grove, Florida 33133
13  BY:  JEREMY D. FRIEDMAN, ESQ.
14      jfriedman@downslawgroup.com
15
16
17
18  NOTARY PUBLIC
19
20  ROSANNA RIVERA-SÁNCHEZ
21
22
23
24  ALSO PRESENT:  MARX STERBCOW, ESQ.
25          DANIEL PÉREZ, ESQ.
```

Page 3

```
1               I N D E X
2
3   DEPONENT                 PAGE
4   AMLED PÉREZ
5     Examination by Mr. McKee      9
6     Examination by Mr. Friedman   112
7     Examination by Mr. McKee      182
8     Examination by Ms. Friedman   223
9
10
11
12
13  VIDEO DISK 1              5
14  VIDEO DISK 2             37
15  VIDEO DISK 3             62
16  VIDEO DISK 4             104
17  VIDEO DISK 5             149
18  VIDEO DISK 6             182
19
20
21
22
23
24
25
```

Page 4

```
1               E X H I B I T S
2
    (PÉREZ)      DESCRIPTION         MARKED
3
4   Exhibit 1  Eleventh Judicial Circuit, Miami-    35
              Dade County, Florida Court Order
5             dated 2/12/14
6
    Exhibit 2  Composite of Gmail Correspondence   40
7             (2) Manila Folders
8
    Exhibit 3  The Down Law Group BP Packet        45
9
10  Exhibit 4  Declaration Under Penalty of        54
              Perjury - Case Information Sheet
11
12  Exhibit 5  Amled Pérez/Daniel Pérez E-mails    69
              Re: Translation of Paragraph
13
14  Exhibit 6  Marx Sterbcow/Jeremy Friedman       98
              E-mails Re: Sample Joint
15            Participation & Association
              Counsel Contract
16
17  Exhibit 7  Daniel Pérez/Craig Downs            219
              Amled Pérez/Daniel Pérez E-mails
18            Re: Translation - Subject: Letter
19
20
21
22
23
24
25
```

Page 5

```
1   SAN JUAN, PUERTO RICO; THURSDAY, FEBRUARY 13, 2014
2       P R O C E E D I N G S
3       THE VIDEOGRAPHER:  Good morning.
4       We are now on the record.
5       My name is Nelson D'Freitas with
6   Veritext.
7       Today's date is February 13, 2014,
8   and the time is 9:01.
9       The deposition is being held at
10  Verbatim Reporting located in San Juan,
11  Puerto Rico.
12      The caption of this case Sterbcow
13  Law Group, LLC v. The Downs Law Group,
14  P.A. in the Circuit Court of the 11th
15  Judicial Circuit in and for Miami-Dade
16  County, Florida.
17      The name of the witness is
18  Amled Pérez.
19      At this time, the attorneys will
20  identify themselves and the parties they
21  represent after which we will swear in
22  the witness, and we can proceed.
23      MR. McKEE:  Robert McKee on behalf
24  of the two plaintiffs.
25      MR. FRIEDMAN:  Jeremy Friedman on
```

2 (Pages 2 - 5)

Page 6

1  behalf of Downs Law Group, Craig Downs,
2  Daniel Pérez and Jeremy Friedman.
3       MR. McKEE:  Also present is
4  Marx Sterbcow, one of the
5  representatives of plaintiffs, and
6  Daniel Pérez, also.
7       MR. PÉREZ:  As was mentioned.
8       MR. McKEE:  Did you want to put
9  something on the record before we start?
10      MR. FRIEDMAN:  Well, after this, I
11  guess, attempt to swear in the witness,
12  I will.
13      MR. McKEE:  Let's go ahead and
14  swear in the witness.
15      MS. RIVERA:  My name is
16  Rosanna Rivera.  I am an attorney and
17  notary public for the Commonwealth of
18  Puerto Rico.
19      I will administer the oaths for
20  this deposition.
21      Please state your name for the
22  record.
23      THE VIDEOGRAPHER:  Nelson
24  D'Freitas.
25

Page 7

1       (Whereupon, the videographer is duly
2       sworn by the notary public.)
3       MS. RIVERA:  Thank you.
4       Please state your name for the
5       record.
6       THE REPORTER:  Shawn Weber.
7       (Whereupon, the court reporter is
8       duly sworn by the notary public.)
9       MS. RIVERA:  Thank you.
10      MR. FRIEDMAN:  The first swearing
11  in, who was she swearing in?
12      MR. McKEE:  Videographer.
13      MR. FRIEDMAN:  Okay.
14      MR. McKEE:  Second was court
15  reporter, and now she's going to do the
16  witness.
17      MR. FRIEDMAN:  Okay.
18      MR. RIVERA:  Please state your name
19  for the record.
20      THE DEPONENT:  Amled Pérez.
21      (Whereupon, the deponent is duly
22      sworn by the notary public.)
23      MR. RIVERA:  Thank you.
24      May I be excused?
25      MR. McKEE:  Let's see what counsel

Page 8

1  has to say on the phone.
2       MR. FRIEDMAN:  All right.
3  Mr. Court Reporter, are we on the record
4  now?
5       THE REPORTER:  Yes, we are.
6       MR. FRIEDMAN:  I'm just going to
7  make an objection to the entirety of the
8  deposition being a sworn deposition
9  based on the fact that it's not sworn
10  pursuant to Florida law.
11      We had advised Mr. McKee in writing
12  on two separate occasions that he needed
13  to have a commissioner appointed from
14  Florida or bring his own Florida court
15  reporter.  He did not do that,
16  apparently, and so we object to the
17  deposition being as a sworn deposition,
18  and that it will, essentially, be more
19  in the form of an unsworn statement, but
20  we don't have an objection to going
21  forward with those circumstances.
22      MR. McKEE:  Okay.  Let's proceed.
23
24
25

Page 9

1  Whereupon,
2       --------------
3       AMLED PÉREZ,
4       --------------
5  having been duly sworn by the notary public,
6  was examined and testified, as follows:
7       EXAMINATION
8  BY MR. McKEE:
9       Q   Could you tell us your full name, again, and
10  address?
11      A   Amled Pérez, and my address is 16 Baldorioty
12  Street, Yauco, Puerto Rico 00698.
13      Q   Have you ever had your deposition actually
14  taken of you before?
15      A   No.
16      Q   Because I know you're also a lawyer, this
17  may be redundant, but I think it's important that we
18  state on the record that the goal here is a written
19  document.
20      I'm going to ask you questions, as will other
21  counsel probably.  If you don't understand what I'm
22  asking you, if it's confusing, if it's compound, you
23  know all the things that you can object about, if that
24  makes you pause as to what you understand I'm asking
25  you, please let me know.

3 (Pages 6 - 9)

1    A   Okay.
2    Q   I will try to have short questions so that
3  we're not -- with you anticipating and jumping on top of
4  me so that the court reporter is having to listen to the
5  two of us.  I'll do the same with answers the best I
6  can.
7        Oftentimes, in normal communications, we
8  anticipate an answer, but here we need a written clear
9  record.  Even though we have a videographer here taping
10 this, it's still the verbal record; okay?
11   A   Yes.
12   Q   I don't want you guessing.  Approximations
13 are different from guessing in my mind and I think under
14 the rules.  So if you're approximating, let me know so
15 that we know an approximation on dates or whatever.
16       If you need a break, please say so.  We'll finish
17 the questioning and answer, and unless you have an
18 illness that requires you to jump up and leave -- I have
19 many inflammatory bowel patients, for example, clients
20 that need that.  So if you have no problem, then let's
21 just finish the question and answer before we take a
22 break, but that's fine at your discretion; okay?
23   A   Uh-huh.
24   Q   And then as you know, it has to be verbal
25 answers.  We all mess up on that one.

1        Could you tell us a little bit about your formal
2  education, college and thereafter?
3    A   I went to law school at the University of
4  Puerto Rico, and I did an LLM, maritime law at
5  Tulane University.
6    Q   Did you receive any awards during either
7  college or law school?
8    A   No.
9    Q   Did you ever clerk for lawyers before you
10 became a lawyer?
11   A   While I was waiting for the results of the
12 Puerto Rican Bar, yes.
13   Q   Who was that?
14   A   Jessica Rodríguez.
15   Q   And that was here in Puerto Rico?
16   A   Yes.
17   Q   Did there come a time that you went over to
18 the mainland, the United States?
19   A   For ...
20   Q   For work.
21   A   No.  I was already there when I worked for
22 Downs.
23   Q   When did you first go to the United States
24 to do any work relating to law?
25   A   I started working for Downs in July, but I

1  was already in the US.
2    Q   And was it a work reason that you were in
3  the US?
4    A   I'm sorry?
5    Q   Was it for a work purpose that you were in
6  the US already?
7    A   I was studying at Tulane.  I was finishing
8  my LLM.
9    Q   All right.  Could you explain how you got to
10 know The Downs Law Group was looking for some help?
11   A   At Tulane, it's a career website, something
12 like that.
13   Q   And that July, of what year was that?
14   A   2013.
15   Q   Do you remember who it was from The Downs
16 Law Group that you actually had first contact with?
17   A   With Daniel Pérez.
18   Q   And that would be the same gentleman that's
19 here in the room today?
20   A   Yes.
21   Q   At what point were you hired to do anything
22 on behalf of The Downs Law Group?
23   A   To the best that I can remember, I worked in
24 July, 20 something -- I think it was 25th -- meeting
25 some clients.

1    Q   All right.  Were these English language
2  speaking clients or Spanish language speaking clients?
3    A   Both.
4    Q   Meaning they spoke both languages or --
5    A   No.
6    Q   -- some of each?
7    A   I spoke to Spanish speaking clients and to
8  English speaking clients.
9    Q   Before we get into that aspect, what I'd
10 like to really get an understanding for is were you
11 hired at that time as an employee, to your
12 understanding, of The Downs Law Group, or were you
13 something other than an employee?
14       MR. FRIEDMAN:  Object to form.
15 BY MR. McKEE:
16   Q   You can answer.
17   A   As an employee of The Downs Law Group.
18   Q   Did they give you a firm employee handbook
19 or anything like that?
20   A   No.
21   Q   Did they supply you with an office?
22   A   I was sent to work from New Orleans.
23   Q   In what offices?
24   A   In Sterbcow Law Group's office.
25   Q   And who sent you to work there by The Downs

Page 14

1   Law Group?
2       A   Who sent me to work ...
3       Q   At that location.  In other words, how did
4   you know that you were supposed to work there?
5       A   When I was interviewed, I was told that
6   there was no official office, like the firm was based
7   out of Miami, but they needed to get to Spanish speaking
8   clients.
9       Q   Okay.
10      A   So I was going to be working off
11  New Orleans.  So my boss, Craig Downs, yeah, would be
12  the one that told me to work there.
13      Q   Was any explanation given to you as to why
14  you're working at the Sterbcow Law Offices?
15      A   No.  I was just given the address, and I
16  would work from there.  That's it.
17      Q   Did Downs Law Group supply you with a
18  computer at that site?
19      A   Later on.  Not when I -- not in July.
20      Q   When you say "later on," when did they
21  finally supply you with a computer?
22      A   I can't remember the date.
23      Q   Was it close to the end of your time working
24  with them or some other time?
25      A   I got a computer at first that did not work

Page 15

1   correctly, so I cannot -- I got two different computers
2   at two different times.
3       Q   Okay.
4       A   So at first was at the beginning, and then I
5   got a second one closer to the end of my period working.
6       Q   Were they supplied by The Downs Law Group,
7   or did you have to go out and buy them yourself?
8       A   No.  They were supplied by Downs Law Group.
9       Q   Did you receive a W-2 from Downs?
10      A   Yes.
11          MR. FRIEDMAN:  I'm sorry.  I did
12      not hear the answer to that.
13          THE DEPONENT:  Yes, yes.
14          MR. FRIEDMAN:  Okay.
15  BY MR. McKEE:
16      Q   And your paycheck was based on what time
17  frame?
18      A   I don't understand the question.
19      Q   Weekly, every two weeks, monthly?
20      A   I would send my hours through e-mail every
21  week, and I would get paid every two weeks.
22      Q   Were you provided business cards?
23      A   I had Danny's cards that I would give
24  clients so they could contact the office or Daniel
25  Pérez.

Page 16

1       Q   During this time you were working with Downs
2   Group, were you a licensed lawyer?
3       A   Not in New Orleans.
4       Q   In Puerto Rico?
5       A   Yes.
6       Q   When you worked in New Orleans, were you
7   accompanied by a Florida lawyer from the Downs Group at
8   client meetings discussing the various legal and factual
9   matters with these clients?
10      A   Can you repeat the question?
11      Q   Sure.
12          In the time that you were working in New Orleans,
13  was there a Florida lawyer supervising you there?
14      A   Not present.
15      Q   Was there a New Orleans lawyer present
16  there?
17      A   I would conduct most of the meetings in that
18  office with the client.
19      Q   But within the law firm of Sterbcow, his law
20  firm?
21      A   Yeah, it's like a separate conference room,
22  yes.
23      Q   And in those client meetings, would you
24  discuss the facts of each client with them?
25      A   Yes.

Page 17

1       Q   Are you aware of whether or not an
2   unlicensed lawyer from another non-US place has to have
3   supervision from a licensed lawyer when they're dealing
4   with clients?
5           MR. FRIEDMAN:  Object to form.
6           THE DEPONENT:  I'm sorry?
7   BY MR. McKEE:
8       Q   He objected to form.
9           If you understand the question, you can answer.
10      A   You're asking if I know if a licensed
11  attorney has to have a licensed attorney in that
12  jurisdiction in order to get facts from clients?
13      Q   Let me rephrase the question.  Not quite.
14  I'll try and make it more simple.
15          At the time when you were working with The Downs
16  Group in New Orleans, you were not licensed in the State
17  of Florida?
18      A   No.
19      Q   You were not licensed in any state in the
20  United States?
21      A   No.
22      Q   So were you made aware by The Downs Law
23  Group that the only way you could deal with advice would
24  be with supervision from a legally licensed lawyer from
25  the United States being present there; did they ever

5 (Pages 14 - 17)

1 tell you that?
2      A   I don't remember that being discussed,
3 because the paperwork that I had was filling out blanks
4 about information from each client.
5      Q   Would you agree that if that was indeed the
6 case, what I've just indicated to you, with you working
7 in the offices of Mr. Sterbcow, then that would have
8 satisfied that requirement?
9          MR. FRIEDMAN:  Object to form.
10         Calls for a legal conclusion and
11      outside the scope of this witness'
12      knowledge, and lack of foundation.
13         THE DEPONENT:  I don't know.
14 BY MR. McKEE:
15      Q   Assuming what I said is true, did you
16 believe that you had sufficient supervision available to
17 you there at the Sterbcow Law Offices with Mr. Sterbcow
18 available?
19         MR. FRIEDMAN:  Object to form.
20         THE DEPONENT:  Whenever a client
21      had any doubts about something, I would
22      e-mail Danny, and maybe a few occasions
23      when they had questions about other
24      unrelated stuff, I did consult with
25      Mr. Sterbcow, yes.

1 BY MR. McKEE:
2      Q   And during most of these client meetings
3 that you were involved in -- and these were BP
4 potential clients, right?
5      A   Yes.
6      Q   With most of those meetings, would you agree
7 that no lawyer from Florida was accompanying you during
8 those meetings?
9      A   There were a few times when Danny was at the
10 office with me when he went to New Orleans.
11      Q   But were most meetings without a Florida
12 lawyer?
13      A   Most meetings it was just me.
14      Q   At the Sterbcow Law Offices?
15      A   Yes.
16      Q   And also, sometimes outside of the office?
17      A   Yes.
18      Q   Did you have an understanding as to whether
19 Mr. Sterbcow's law firm was involved with The Downs firm
20 in representing these BP clients?
21      A   I have no knowledge of what contracts are
22 between them, you know, existing between them.
23      Q   But when he were there, did you have an
24 appreciation that Mr. Sterbcow and his law firm and
25 Mr. Melancon's law firm were involved with The Downs

1 Group?
2          MR. FRIEDMAN:  Objection as to
3      form.
4          THE DEPONENT:  To some level, yes,
5      but I have no knowledge of what their
6      business arrangements are.
7 BY MR. McKEE:
8      Q   Did anyone from The Downs Law Group indicate
9 that without their local involvement, you couldn't do
10 what you're doing for them, because it would have been
11 against Bar rules?
12      A   No.
13      Q   Could you describe what you understood to be
14 the make-up of lawyers of The Downs Law Group during
15 this time frame when you working there?
16      A   I don't understand.
17      Q   Who's there, who's a partner, who's an
18 associate on a lawyer level?
19      A   I have only talked to Danny, and I know that
20 he's an associate attorney there dealing with the BP Oil
21 Spill claims.  I mostly spoke to case coordinators.
22 There are a lot of those, and I would also be
23 supervised, and I would report back to Craig Downs.
24      Q   Did you ever meet Mr. Friedman?
25      A   No.

1      Q   Did you ever speak to him?
2      A   Not until recently.
3      Q   Meaning after you left employment there?
4      A   Yes.
5      Q   We'll discuss that a little later.
6      I'd like to get a better understanding for the BP
7 clients you were working with.  Were they mainly those
8 seeking medical benefits?
9      A   Yes, most of them.
10      Q   Were some of them also economic claimants?
11      A   Very few.
12      Q   Of the ones that were dealing with medical
13 benefits, did any of them have issues where they needed
14 to have some medical treatment diagnosis care?
15      A   Yes.
16      Q   Were most of them Mexican?
17      A   No.
18      Q   What was the segmentation of the types of
19 clients that you were signing up?
20      A   Americans, Hondurans, a few Mexicans.  Most
21 of them were American, I think.  I don't know.  This is
22 an approximation.
23      Q   That's fine.
24      As part of your discussions with them, were you
25 also informing them that they needed to get that kind of

1  medical care, treatment and diagnosis to fit within the
2  settlement parameters?
3      A   They would be examined.  I was not advising
4  them on getting medical treatment, or I was not
5  prescribing them to do anything.  I would fill out
6  papers, and they would need to get examined in order to
7  see if they could file a claim or not.
8      Q   And was that examination to occur through
9  one medical group?
10     A   That was my only role, filling out papers,
11 and I would forward all of this.  Other than that, I
12 would not be able to tell you who was checking them out
13 or ...
14     Q   Up to today, did you know that Louisiana
15 lawyers are permitted by their Bar rules to pay for the
16 medical care of their clients?
17         MR. FRIEDMAN:  Object.  I'm sorry,
18     you're asking her -- well, I didn't
19     catch the first part of the question.
20         Are you asking her if either that's
21     the rule, or are you asking her if she
22     knows that?
23         MR. McKEE:  I'll restate it.
24 BY MR. McKEE:
25     Q   Are you aware of whether or not the

1  Louisiana Bar allows Louisiana lawyers to pay for
2  medical care of their clients?
3      A   I'm not licensed in Louisiana.
4      Q   Did you know in Florida, Florida lawyers are
5  not allowed to do that?
6          MR. FRIEDMAN:  Object to form.
7      Foundation.
8  BY MR. McKEE:
9      Q   Did you know?
10     A   I have heard about this, but this is not my
11 -- you know, I'm not licensed in either state, so ...
12     Q   What I'm really trying to get at is whether
13 the Downs lawyers informed you of the distinction
14 between who can and who can't pay for certain aspects of
15 medical care or analysis, evaluation?
16     A   No.  I would think that would be out of the
17 scope of my employment.
18     Q   Are you aware that the Florida Bar has
19 provided written opinions that so long as a Florida
20 lawyer is in a joint venture with a Louisiana lawyer,
21 the Florida lawyer can pay for the medical care?
22         MR. FRIEDMAN:  Object to form.
23     Foundation.
24 BY MR. McKEE:
25     Q   Have you ever seen anything like that?

1      A   No.
2      Q   When working with The Downs Legal Group on
3  the BP cases, I'd like to get a feeling for the type of
4  documents you were handling with those clients; okay?
5      A   What I required --
6      Q   Yes.
7      A   -- or what was required?
8      A   A license or passport, any sort of government
9  issued ID with a picture, if they had check stubs or
10 their W-2 that stated for what contractor they worked
11 while they were cleaning, and I think that's it.
12     Q   At the time you were handling these
13 prospective clients, were you also signing them up on a
14 contingent fee agreement?
15     A   Yes.
16     Q   Were you explaining what the contingent fee
17 agreement meant?
18     A   Yes.
19     Q   Do you know whether or not a non-licensed US
20 lawyer, meaning you don't a US license, can do that
21 without direct supervision from the law firm?
22     A   No.
23     Q   But of course, if you are in the presence of
24 a Louisiana lawyer, do you know whether that makes it
25 okay?

1          MR. FRIEDMAN:  Object to form.
2      Foundation and calls for a legal
3      conclusion.
4          THE DEPONENT:  Again, I'm not aware
5      of either Louisiana or the differences
6      between Louisiana and Florida law.
7  BY MR. McKEE:
8      Q   And neither did anyone from Downs Group
9  inform you about those requirements?
10     A   No.
11     Q   Would you say the vast majority of the times
12 that you met with clients and actually had them sign,
13 most of those times no Florida lawyer was present?
14     A   Yes.
15     Q   Were there any variations in the type of
16 contingent fee agreement that these clients were
17 signing, meaning the language in those agreements?
18     A   Some were in Spanish, some were in English.
19         MR. FRIEDMAN:  Object to form.
20     Foundation.
21 BY MR. McKEE:
22     Q   Your answer was, some were in English, some
23 were in Spanish?
24     A   Yes.
25     Q   Did a Spanish speaking person have to sign

1  both, English and Spanish?
2      A   No.  I would explain the contract to each
3  person.
4      Q   All right.  And during the time that you
5  were signing up these clients, were you always using the
6  same contingent fee agreement, whether it be in English
7  or Spanish?
8      A   Was I using the same ...
9      Q   Agreement, meaning the same meanings of the
10  paragraphs, throughout that time frame.
11      A   From when I first started working, it was
12  slightly different.  There were ones when we were --
13  when I first started working, I was advised to use the
14  new ones.  The ones that were already printed were no
15  longer good, because they didn't explain as well.  A
16  paragraph was too short.
17      Q   In the sign-up process, by the time you've
18  started working there in July of 2013, had the Downs
19  Group signed many clients already?
20          MR. FRIEDMAN:  Object to form.
21  BY MR. McKEE:
22      Q   If you know.
23      A   Yes.
24      Q   Did have you access to those documents in
25  New Orleans?

1      A   The documents of all the signed clients
2  already?
3      Q   Yes.
4      A   No.
5      Q   The contracts you were using in July of
6  2013, do you remember, approximately, how many clients
7  you signed in the time you were working there?
8      A   Around 70.
9      Q   And do you remember whether or not the
10  contracts for those clients included a paragraph, I
11  think it was number 8, that mentioned that Marx Sterbcow
12  and Mr. Melancon would be involved as co-counsel in
13  those cases?
14      A   I believe, yeah, their names were mentioned
15  in the contract, yes.
16      Q   Have you seen any contracts that pre-dated
17  that time frame or any other document that would
18  describe the content of those contracts that indicated
19  that Sterbcow or Melancon were also in those contingent
20  fee agreements that pre-dated your time?
21      A   I can only tell you about the clients that I
22  dealt with, the contracts that I had in my hand.
23      Q   With the ones you dealt with, every single
24  one of them, was Sterbcow and Melancon listed in the
25  body of that contract, the contingent fee contract, as

1  co-counsel?
2      A   They mentioned that they were involved in
3  this.  I don't remember the exact phrasing of the
4  contract.  If you have it available.
5      Q   Do you remember the following language of
6  paragraph B, quote, "Craig Downs, Esq. will be the
7  attorneys primarily responsible for this matter.
8  Additionally, Marx Sterbcow, Esq. and Jason Melancon
9  Esq. will assist with this matter"?
10      A   Yes.
11      Q   In those contracts, did you see anything
12  that limited what Sterbcow or Melancon would be doing in
13  these cases?
14      A   No.
15      Q   Do you remember seeing anything directed to
16  the clients that this contract was used with that
17  indicated to them that there would be a limited role for
18  Sterbcow and Melancon?
19      A   No.
20      You said in this contract?
21      Q   In these contracts.
22      A   Okay.  That listed exactly what they were
23  doing or what the functions were, no.
24      Q   And outside of this contract, other than the
25  end of this relationship that is causing this litigation

1  in the first place, during the pendency of the work as
2  attorneys where Melancon, Sterbcow, Downs were working
3  for these clients, did you see anything that went to the
4  clients that said the role to the clients, the role of
5  Sterbcow and Melancon is limited?
6      A   You want to know if they told clients that
7  the scope of the two plaintiffs is limited in a
8  communication to clients before the pendency of this
9  claim?
10      Q   Yes.
11      A   No.
12      Q   Of the 70 or so clients that you signed up
13  under this contract that contains Sterbcow and Melancon
14  in its body, were those all named plaintiffs in the
15  appeal?
16      A   I don't know.
17      Q   Do you remember how many were named in the
18  appeal?
19      A   To my knowledge, this appeal happened before
20  I started working, so I do not know which were part of
21  the appeal and which were not.
22      Q   And so that we're clear, after the appeal
23  was dismissed, you're still signing up clients that
24  included Sterbcow and Melancon in the contingent fee
25  agreement?

Page 30

```
 1      A   When was the appeal finished?
 2          MR. McKEE:  As I sit here -- do you
 3      remember the date?
 4          MR. STERBCOW:  I don't.
 5   BY MR. McKEE:
 6      Q   I don't remember, and unfortunately, I can't
 7      tell you, but the appeal was over when you started,
 8      right?
 9      A   If you could tell me when the appeal was
10      finished.  I mean, I started working in July of 2013.
11      If the appeal was finished before that, then yes.
12      Q   We'll find out so I can follow up on that.
13          What I'm getting at, if the appeal was over, and
14      defendants perspective that the work of Sterbcow and
15      Melancon was only for the appeal, Downs was still
16      signing up clients on their contingent fee agreement
17      that included Sterbcow and Melancon, right?
18      A   Yes.
19      Q   Did you ever see a contingent fee agreement
20      that included the names of any other lawyers or law
21      firms for the BP clients other than Sterbcow and
22      Melancon?
23      A   No.
24      Q   Did you have any awareness, either through
25      oral communications or written communications, as to a
```

Page 31

```
 1      role of Levin Papantonio in the Downs work?
 2      A   No.
 3      Q   Did you know that Levin Papantonio, actually
 4      Mr. Papantonio himself is a member of the plaintiffs'
 5      steering committee of the BP class action?
 6      A   No.
 7      Q   Did you read or learn any information that
 8      indicated that the appeals of these medical benefits
 9      clients was dismissed because Downs cut a deal with the
10      PSC, the plaintiffs' steering committee?
11      A   It was never discussed.  I would never
12      discuss this appeal when I was working.  I was just
13      filling out the papers, and I had nothing to do with
14      this appeal.  I was not even working there.
15      Q   I understand.  I was just wondering if
16      during the pendency of the time you were there, you had
17      learned anything about the role of Levin Papantonio?
18      A   I had never heard this name before.
19      Q   Had you ever heard of Stuart Grossman?
20      A   No.
21      Q   Irvin González?
22      A   No.
23      Q   Do you recognize those as names of the
24      plaintiffs' steering committee?
25      A   No.  I don't know what the steering
```

Page 32

```
 1      committee is.
 2      Q   Did you ever see a communication written to
 3      these medical benefits clients that indicated why Downs
 4      was dismissing their appeal?
 5      A   It's, again, the appeal.  I was not even
 6      working there.  I mean, if I was working there, I had
 7      nothing to do with the appeal or any communications
 8      regarding the appeal.
 9      Q   And really, I'm not wondering if you were
10      involved in it, I'm wondering if you ever saw or read
11      anything while employed there?
12      A   No, not that I remember and not that I have
13      available or anything.
14      Q   And I'm sure the answer is the same, but I
15      have to ask them to make sure, because this is my only
16      chance to do this with you.
17          Did you see anything or learn orally of anything
18      as to information to the clients, whether The Downs Law
19      Group ever sought approval from a medical class benefits
20      client to dismiss their appeal, since it would have an
21      effect on their remuneration eventually?
22      A   I only dealt with medical claims clearance
23      that came to the office, and I don't know which ones
24      were or were not part of this appeal or even when it
25      happened.
```

Page 33

```
 1      Q   Did you see any information, learn of any
 2      information as to why The Downs Law Group eliminated
 3      Sterbcow and Melancon from their joint venture case
 4      and whether or not that related to them giving a percentage
 5      to other lawyers that might be with the plaintiffs'
 6      steering committee?
 7          MR. FRIEDMAN:  Object to form.
 8          THE DEPONENT:  What is the
 9      question, again?
10   BY MR. McKEE:
11      Q   Whether or not you saw any information that
12      indicated that the elimination of Melancon and Sterbcow
13      was so that additional fee percentage was available to
14      give to plaintiffs' steering committee members?
15          MR. FRIEDMAN:  Object to form.
16          THE DEPONENT:  Again, plaintiffs'
17      steering committee, this is regarding
18      the appeal again, right?
19   BY MR. McKEE:
20      Q   No.  It's relating to the dismissal, the
21      unilateral dismissal of Sterbcow and Melancon by their
22      joint venture partners instead of by their clients.
23          MR. FRIEDMAN:  Object to form.
24   BY MR. McKEE:
25      Q   And so I'm wondering if you saw anything
```

9 (Pages 30 - 33)

1  that indicated Downs did this because they needed to
2  find some percentage to give to plaintiffs' steering
3  committee members?
4      MR. FRIEDMAN:  Object to form.
5      THE DEPONENT:  I have never read or
6  heard any communication saying that the
7  breaking of this relationship between
8  the two law firms or attorneys was
9  because they needed any percentage to do
10  anything with this appeal that you're
11  mentioning again.
12  BY MR. McKEE:
13      Q   Did you see any document that went to
14  clients from the Downs Group that disclosed the joint
15  venture agreement with Sterbcow and Melancon other than
16  the contingent fee contract?
17      MR. FRIEDMAN:  Object to form.
18  Foundation.
19      THE DEPONENT:  If the clients were
20  informed by Downs about what?
21  BY MR. McKEE:
22      Q   Whether there was a joint venture between
23  Downs and Sterbcow and Melancon?
24      A   No.  I don't think that was detailed to the
25  clients, no.

1      MR. McKEE:  As part of today, we
2  subpoenaed certain documents, and we had
3  the good fortune of having a hearing on
4  whether or not these documents can be
5  produced, literally yesterday morning.
6  I did bring the order along.
7  Matter of fact, I'll make it an
8  Exhibit Number 1, the order from
9  yesterday's hearing, just so that you
10  have it available to you.  Take a look
11  at it if you'd like.
12      (Pérez Exhibit No. 1 marked for
13      identification.)
14      MR. McKEE:  And this is in relation
15  to the subpoena for this deposition and
16  documents, and so I want to make sure
17  you don't give me anything that the
18  judge said I'm not yet allowed to have.
19      And what I'm going to do is go
20  through the duces tecum, and what I'm
21  going ask you to do -- what we can do,
22  we can do this off the video record once
23  we start this process.
24      What I want to do is to have you
25  pull out from the documents you've

1  brought and put aside the things I'm not
2  allowed to get from you today; okay?
3      THE DEPONENT:  Okay.
4      MR. FRIEDMAN:  Bob, I'd like to go
5  off the record for a second, because
6  what I'd like to do is to make sure that
7  she does not produce any records that
8  the judge did not allow you to have.
9      I want to give Danny the
10  opportunity to see what she has brought,
11  and then I can discuss it with him so I
12  can make any objection to her or an
13  objection for the record.
14      MR. McKEE:  I have no problem with
15  that.  Let's go off the record, and I'd
16  like you to give the package of
17  documents that you brought in relation
18  to the subpoena to Mr. Pérez.
19      I'd like Mr. Pérez to remain in the
20  room, and we will not be looking at what
21  he's looking at.  But I'd like that to
22  happen here, and then Mr. Pérez can have
23  his phone call with his -- yeah, keep
24  the money out of there -- and we'll do
25  that ask you've asked.

1      Let's go off the video record, off
2  the written record, and Mr. Pérez can
3  review these documents.
4      THE VIDEOGRAPHER:  Going off the
5  record.  The time is 9:40.
6      (Recess.)
7      THE VIDEOGRAPHER:  We're back on
8  the record.
9      Tape number 2.  Time is 10:03.  On
10  the record.
11      MR. FRIEDMAN:  We have no objection
12  to producing any of the documents in
13  accordance with the court order with the
14  exception of one, which is a list of the
15  clients that includes confidential,
16  personal information that the judge
17  sustained the objection for, number 13.
18      MR. McKEE:  So what we'll do is
19  we'll mark -- no.  I'm going to let the
20  witness keep it, if that's okay with you
21  guys?
22      MR. PÉREZ:  There's two.  There's
23  that, and there's an e-mail.
24      MR. McKEE:  Maybe you could show
25  her which ones you're talking about, and

1  we'll make sure we're clear.
2       MR. PÉREZ: Yeah, it's in the
3  e-mails that cut off in different --
4  it's towards the end.  It's to the end.
5       THE DEPONENT: I couldn't print
6  very well.
7       MR. PÉREZ: I know.
8       THE DEPONENT: I tried.
9       MR. PÉREZ: No, at the end.  It's a
10  big stack of e-mails.
11       THE DEPONENT: This.
12       MR. PÉREZ: All right.
13       Yeah, it's this one.
14       MR. McKEE: And just so I'm clear,
15  as to that one, which is e-mails, what
16  in it is contrary to the rulings of the
17  Court?
18       MR. FRIEDMAN: Well, Danny had said
19  that it's a list of clients.  It
20  includes their confidential, personal
21  information, and that was specifically
22  excluded from -- where the judge
23  sustained our objection to that.
24       MR. McKEE: Since it's a multipage
25  document, is there any part of it that

1  doesn't do that?
2       MR. PÉREZ: I'll have to look at
3  that.
4       MR. McKEE: If you could look at
5  that, and let's make sure I get anything
6  I'm allowed to have.
7       MR. PÉREZ: This one for sure.
8       MR. STERBCOW: Just black out the
9  confidential info.
10       MR. McKEE: We can just cut it off.
11       MR. PÉREZ: No.  The entire thing
12  is the list.
13       MR. McKEE: Because I can't read
14  the print, but I see it's just a page
15  after page of listing.  I'm okay with
16  that.
17       MR. PÉREZ: Yeah, it's just this
18  list, the phone numbers.
19       MR. McKEE: Yeah.
20       MR. PÉREZ: The medical conditions.
21       MR. McKEE: I'm okay with that, not
22  a problem.
23       We'll just give those back to
24  Ms. Pérez, and she can hold those
25  separately.  And then we'll mark as a

1  composite exhibit the documents that are
2  being produced pursuant to the subpoena
3  and over which there is no current
4  objection.
5       So that will be composite Exhibit
6  Number 2.  And we'll let the court
7  reporter do that on the outside of the
8  Manila folder there.  It's two manila
9  folders.
10       And on a break, I'm going to leaf
11  through those, but if you want to mark
12  that, and then we'll move on with the
13  questioning.
14       (Pérez Exhibit No. 2 marked for
15  identification.)
16       MR. FRIEDMAN: Did you mark as an
17  exhibit to the deposition a retainer
18  agreement from Downs?
19       MR. McKEE: Not yet.  I'm about to,
20  though.
21       MR. FRIEDMAN: Okay.
22       MR. McKEE: Number 1 is the order
23  from yesterday.  Number 2 is this
24  composite exhibit.
25       MR. FRIEDMAN: Okay.

1       MR. McKEE: What you just asked is
2  where I'm kind of heading next after I
3  do a little cleanup on some of the
4  things I asked previously.
5  BY MR. McKEE:
6    Q   Back to the employment with Downs, ma'am.
7  Do you know whether they provided you with E & O
8  insurance?
9    A   E & O, no.
10    Q   No, they did not, or you don't know?
11    A   No, no insurance.
12    Q   During the times when you were meeting with
13  clients in the Sterbcow offices, did you ever have a
14  client meet you with Mr. Sterbcow present?
15    A   Yes.
16    Q   Did you indicate to that client that he's
17  also working on the case?
18    A   I told him -- we were at his office so that
19  the client arrived before I got there, and Marx welcomed
20  them, and yes, we conducted the meeting with him.
21    Q   With Mr. Sterbcow?
22    A   Yes.
23    Q   And so the indication to that client
24  whenever that happened is Mr. Sterbcow is participating
25  in the case?

11 (Pages 38 - 41)

Page 42

1      A   I don't remember what exactly had -- I told
2   the client.
3      Q   Certainly when they were signing the
4   retainer agreement, they were signing something that had
5   Mr. Sterbcow listed in it?
6      A   Yes, I did explain that we were -- this is
7   the office where we're at, because they would see all
8   the wall with and everything, and they wouldn't see
9   Downs Law Group. I was assuring them that, "You can
10  meet me here, and I'm in New Orleans, not in Miami."
11     Q   Right.
12     A   You know, also, in Miami.
13     Q   Did you go through there retainer agreement
14  with them, the contingent agreement?
15     A   Yes.
16     Q   That paragraph 8 that contains Marx
17  Sterbcow, Esq. and Jason Melancon, Esq., were you
18  letting the client know that you're talking about them
19  as lawyers, but their law firms are involved?
20     A   I didn't go that deep into explaining stuff
21  to the clients.
22     Q   Just like in that very same paragraph, it's
23  not Downs Law Group, it's Craig Downs, Esq. that's
24  listed, right?
25     A   Yes.

Page 43

1         MR. McKEE: You still there? We
2      had a weird sound on the phone.
3         MR. FRIEDMAN: Yes.
4         MR. McKEE: Okay.
5   BY MR. McKEE:
6      Q   Did there ever come a time that you asked
7   anyone from The Downs Law Group to change the
8   contingency fee agreements to make sure to remove the
9   reference to the individual clients, Jason Melancon and
10  Marx Sterbcow, to their actual law firm names?
11     A   Marx asked me to tell Danny, when I spoke to
12  him, if we could change the names that were listed in
13  the agreement, yes.
14     Q   And did you do that, did you tell Danny
15  that?
16     A   I told him that Marx was concerned about
17  that, yes. I informed him.
18     Q   And did anything get done about that?
19     A   I was just told to inform him. I did inform
20  him.
21     Q   But in a response, did there come a new
22  contingency fee agreement that had the law firm names
23  listed?
24     A   I don't recall exactly at what time that I
25  tell him about this concern in what would be the next

Page 44

1   amended retainer agreement that was sent to me.
2      Q   Did one ever come with the law firm names in
3   it, as opposed to --
4      A   As far as I know, that was not changed, no,
5   from what I can remember of the last retainer I saw.
6      Q   Did there come a notice from The Downs Law
7   Group to the clients that there was an error in these
8   contracts, because they're required under Florida Bar
9   regulations to list the law firms?
10        MR. FRIEDMAN: Object to form.
11  Foundation.
12        THE DEPONENT: Not that I'm aware
13     of. I didn't give communications out to
14     the clients. I only signed them up.
15  BY MR. McKEE:
16     Q   Are you aware of any Florida Bar rule that
17  requires the law firm name, as opposed to the lawyers
18  from the law firms, in the contracts?
19     A   I'm not aware of any Florida Bar rules.
20        MR. McKEE: I'd like to mark as the
21     next Exhibit 3 -- I'm just going to mark
22     a little number 3 down on the bottom of
23     the page. Actually, I'll put it on the
24     back so then we can track it -- of the
25     front page. That way we don't have to

Page 45

1      tie up the court reporter's hands.
2         (Pérez Exhibit No. 3 marked for
3      identification.)
4         MR. McKEE: It's a composite
5      exhibit, and I'd like you to explain to
6      me what this appears to be.
7         THE DEPONENT: Yes.
8         MR. FRIEDMAN: Can you please
9      describe what you're giving to the
10     witness?
11        MR. McKEE: Yeah, I am. It seems
12     to be -- and that's why I wanted her to
13     describe it, but I'll do it for you.
14        It seems to be a sign-up package
15     from The Downs Law Group.
16        MR. FRIEDMAN: All right.
17        MR. McKEE: But I'll let the
18     witness describe what this packet,
19     Exhibit 3 is.
20        THE DEPONENT: Yes. It is an
21     English retainer agreement for clean-up
22     worker.
23  BY MR. McKEE:
24     Q   And the name of the clean-up worker, as
25  indicated, is?

12 (Pages 42 - 45)

Page 46

1      A   Lorraine Clark.
2      Q   And the date of this document packet on the
3   fourth page in is what?
4      A   11/12/13.
5      Q   So that's November 12, 2013?
6      A   I believe so.  I sometimes change them.
7      Q   I'm just wondering, because I don't know in
8   Puerto Rico whether you put the month first or the date
9   first?
10     A   Yeah, that changes, and sometimes the
11  clients have different dates.
12     Q   Right.
13         So is there anything in this document that you
14  can find an approximate date of when it was being
15  executed?
16         MR. FRIEDMAN:  I'm sorry.  Did the
17     witness say that this is dated
18     November 12, 2013?
19         MR. McKEE:  It actually says
20     11/12/13.
21         THE DEPONENT:  It's supposed to be
22     11/12/13.
23         MR. McKEE:  I'm trying to find out
24     whether that's month first or day first.
25         MR. FRIEDMAN:  It's either

Page 47

1      November 2013 or December 2013?
2          MR. McKEE:  Yeah, we're trying to
3      figure that out.
4          MR. FRIEDMAN:  What's the name on
5      that packet, if you could please tell
6      me?
7          THE DEPONENT:  Lorraine Clark.
8          MR. FRIEDMAN:  Okay.
9          THE DEPONENT:  The rest of it is
10     filled out by her.
11  BY MR. McKEE:
12     Q   And is there a retainer agreement there, a
13  contingency fee agreement that's signed by the client?
14     A   Yes.
15     Q   And is that dated?
16     A   No.
17     Q   Does it have a paragraph 8 in it that
18  includes Sterbcow and Melancon?
19     A   It says "Craig Downs, Esq. will be the
20  attorneys, primary lead responsible for this matter.
21  Additionally, Marx Sterbcow, Esq. and Jason Melancon,
22  Esq. will assist with this matter.
23     Q   And with the assumption that I'm telling you
24  that the appeal was over on June 25, 2013, that's when
25  it was dismissed, this would be a time frame months

Page 48

1   after that time frame, right?
2      A   Yes.
3      Q   Also, that paragraph is interestingly
4   worded, but was it the Downs firm that supplied this
5   language of this retainer agreement to you?
6          MR. FRIEDMAN:  Object to form.
7          THE DEPONENT:  Yes.
8   BY MR. McKEE:
9      Q   It didn't come from Sterbcow, did it?
10     A   No.  I received the retainer agreements from
11  Downs.
12     Q   I'm intrigued by that English language,
13  "Craig Downs, Esq. will be the attorneys primarily
14  responsible."
15         As you explained that to the client, you were
16  saying that The Downs Law Firm was going to be primarily
17  so, because Craig Downs is only one person, right?
18     A   Maybe it was a typo.
19     Q   One way or the other?
20     A   Yes.
21     Q   The implication was that they were hiring
22  The Downs Law Firm when they signed this, right?
23         MR. FRIEDMAN:  Object to form.
24     Foundation.
25

Page 49

1   BY MR. McKEE:
2      Q   When you were dealing with the clients, were
3   they retaining The Downs Law Firm that was also
4   including the law firms where Sterbcow and Melancon were
5   working?
6          MR. FRIEDMAN:  Objection to form.
7      Foundation.
8          THE DEPONENT:  They were signing up
9      with Downs Law Group, and the contract
10     says Craig Downs would be the primary
11     responsible for this matter.
12  BY MR. McKEE:
13     Q   Well, it actually says "will be the
14  attorneys primarily responsible," right?
15     A   Yes, that's what it says.
16     Q   Now, when the client came into the office at
17  the Sterbcow firm, they would then be directed by the
18  Sterbcow personnel where they would be able to meet with
19  you, right?
20     A   I'm sorry?
21     Q   Was there a receptionist?
22     A   No, there was no receptionist.
23     Q   So when that client was coming there, how
24  was that appointment set up?
25     A   I would give them a time to meet me, and I

13 (Pages 46 - 49)

Page 50

1  would be there at that time.
2      Q    And would you be meeting them in the
3  reception area or in an office?
4      A    It's a conference room in the back.
5      Q    Did you ever see a payment to Sterbcow for
6  rent?
7      A    No, I didn't see payment.
8      Q    And then is this packet -- describe what
9  this packet is.  Is it everything that you would show
10 that perspective client, or was there anything else?
11     A    Is it everything that I would what?
12     Q    Show the perspective client, or was there
13 more documentation you'd work with?
14     A    No.  It's a complete packet.
15     Q    And just to be clear, at that time, were you
16 a notary for either Louisiana or the State of Florida?
17     A    No.
18     Q    And when you'd sit there with the client
19 with this packet, would you go page by page, typically?
20     A    Sometimes.  Sometimes they could come in the
21 office already with it signed.
22     Q    I notice one of the last ones is a
23 termination letter that says "If you are previously
24 signed with an attorney for any BP related case and you
25 wish to termination" -- that's the way it's written --

Page 51

1  "termination your relationship with that attorney, thus
2  retaining The Downs Law Group, please fill out the
3  information below."
4      Do you remember that document?
5      A    Yes.
6      Q    When the conversation with the clients first
7  started, were you informed by Downs that you needed to
8  verify that you couldn't talk with them if they were
9  currently represented by a lawyer?
10     A    We would ask them if they were involved in
11 the BP Oil Spill claim and if they were interested in
12 claiming.  If they told me that they were represented by
13 an attorney, I would no longer contact them.  I would
14 list it as ...
15     Q    Did any of them say they had a lawyer?
16     A    Yeah, sometimes when they would come to the
17 office, they would say they had not spoken to their
18 attorney for months, and they were unsatisfied.
19     Q    And so as the first step before any further
20 communication, was this termination letter filled out by
21 the client and then sent to the lawyer before you spoke
22 further with them?
23     MR. FRIEDMAN:  Object to form.
24     THE DEPONENT:  Was this signed
25     before I spoke to --

Page 52

1  BY MR. McKEE:
2      Q    Signed and delivered to the other lawyer.
3      A    No.
4      Q    And then in certain of these documents, at
5  the end of them, there are places for signatures as a
6  declaration under penalty of perjury as I'm showing you
7  at the last page there.
8      A    Yeah.
9      Q    Is there a reason why this document has no
10 dates in it on any of the pages that have signatures?
11     A    The client sometimes would post the date,
12 sometimes they wouldn't.
13     Q    And with this document, however the client
14 then gave it to you, that would be sent in some
15 mechanism to the Miami offices of The Downs Law Group?
16     A    Yes.
17     Q    These documents were not given to the
18 Sterbcow Law Office as they were signed?
19     A    No.
20     Q    That processing and the document movement
21 all went to the Downs Law Group?
22     A    Yes, I would store them sometimes at the
23 office, but they were always sent.
24     Q    Was there a notary at that office to
25 notarize signatures?

Page 53

1      A    No.
2      Q    Did Downs supply a notary at the office when
3  the signature was being applied by the client?
4      A    In New Orleans?
5      Q    In New Orleans.
6      A    No.
7      Q    Are you aware of whether a notary must be
8  present to notarize a document under Florida law?
9      A    I'm not aware of Florida law.
10     Q    Do you see this limited power of attorney
11 signed by the client?
12     A    Yes.
13     Q    You see it's not notarized, right?
14     A    It's signed by the client.
15     Q    But is it notarized?
16     A    No.
17     Q    Do you know whether this got notarized now
18 at the Downs office, subsequently?
19     A    I'm not sure.
20     Q    Do you see these HIPAA release forms with
21 the client's signature?
22     A    This what?
23     Q    These medical release forms.
24     A    Uh-huh.
25     Q    Do you see a notary section there?

14 (Pages 50 - 53)

1    A   Yes.
2    Q   Do you know whether these got notarized in
3  Miami without the signer present?
4    A   I have no knowledge.
5    Q   Do you see this authorization for legal
6  documents signed by the client?
7    A   Yes.
8    Q   Do you see that it also has a notary
9  section?
10    A   Yes.
11    Q   Do you see it's unsigned by the notary?
12    A   Yes.
13    Q   Do you know whether it went to Miami and got
14  notarized in Miami?
15    A   I have no knowledge.
16       MR. McKEE:  As the next exhibit,
17       composite number 4, is a similar packet.
18       It appears to be in Spanish, but I want
19       to kind of go through the same process
20       about that document.
21       (Pérez Exhibit No. 4 marked for
22       identification.)
23  BY MR. McKEE:
24    Q   It starts with a page that says "Declaration
25  Under Penalty of Perjury" and then in Spanish

1  "Declaración Bajo Pena de Perjurio." Pardon my Spanish.
2       And tell me what that package of documents is.
3    A   It's Spanish.  It's a Spanish medical claim.
4    Q   Does it also contain the retainer agreement?
5  And I'm not sure whether it does.  I'm just asking.
6    A   Yes.
7    Q   Is there a paragraph 8 and who's identified
8  as counsel for the plaintiff/claimant here?
9    A   "Craig T. Downs is the lawyer principally
10  responsible for this matter.  Also, Marx Sterbcow, Esq.
11  and Jason Melancon will help with this matter" in
12  Spanish.
13    Q   Were you the one that actually translated
14  the English version of the retainer agreement for use,
15  or was it already existing when you got there?
16    A   It was already existing.
17    Q   And the date of this particular client
18  sign-up -- can we find one, first of all?
19    A   October 27, 2013.
20    Q   Again, assuming the appeal was dismissed in
21  June of 2013, this is a couple months later, right?
22    A   Yes.
23    Q   And if I could borrow it for just a second
24  for a couple more questions?
25       Again, with a Spanish speaking person, would you

1  go through these pages one by one to help him check off
2  various symptoms he might be having?
3    A   Yeah.
4    Q   And again, this document, wherever there's a
5  signature of the client is undated; do you see that?
6    A   Yes.
7    Q   Were you given any instruction not to have
8  them date these by The Downs Group?
9    A   Not that I recall.
10    Q   And again, this document, which is the
11  Spanish language retainer agreement, is signed by the
12  client, right?
13    A   Yeah.
14    Q   Is the signature of the lawyer there?
15    A   No.
16    Q   It was also missing in the prior one; did
17  you notice that?
18       Showing it to the witness.
19       It's also missing on that one, too, right?
20    A   Yes.
21    Q   Of course, you weren't authorized to sign
22  these contracts on behalf of Downs, because you're not a
23  licensed lawyer in Florida or Louisiana, right?
24    A   No.
25    Q   Meaning I was correct?

1    A   I am not licensed in either state, and I was
2  not authorized to sign those.
3    Q   Did anyone from The Downs Law Firm come to
4  Louisiana while these clients were signing to execute
5  this at the time the client was executing it?
6    A   A notary to execute the documents, no.
7    Q   No.  A lawyer to actually sign up at the
8  same time.  I think you mentioned that Mr. Pérez was
9  sometimes there for client meetings?
10    A   Yes.
11    Q   Did he sign engagement agreements that were
12  signed by the clients?
13    A   No.
14    Q   And as a matter of fact, on these contracts,
15  it doesn't even identify the law firm that the lawyer or
16  abogado is from on the signature line, does it?
17    A   No.
18    Q   Again, with Mr. Estrada, Carlos A. Estrada,
19  on The Downs Law Group letterhead of authorization for
20  release of protected health information, it has a notary
21  line, right?
22    A   Yes.
23    Q   Is it executed by a notary on this document?
24    A   No.
25    Q   Actually, in all the sign-ups you did, was

15 (Pages 54 - 57)

Page 58

1  there ever a notary present to notarize these signatures
2  when they were being made?
3      A  No.
4      Q  Have you ever seen whether or not a notary
5  did sign these documents?
6      A  No.
7      Q  Do you know whether any of the documents
8  that were supposed to have been notarized were forwarded
9  to any third party in making the claim, for example, to
10  the Deep Water Horizon claims facility?
11      A  I only know the documents that got signed
12  with me were forwarded.
13      Q  Did The Downs Law Group ever explain to you
14  why they were sending you documents for client signature
15  with notary, yet they weren't supplying the notary?
16      A  No.
17      Q  Were there times that Mr. Sterbcow made
18  referrals of clients to The Downs Law Group that you
19  handed that sign up?
20      A  That I signed up, no.  He referred a client,
21  but I believe his claim was not completed or filed or
22  anything.
23      Q  But my point being, there were times when
24  Sterbcow or Melancon would actually send clients for
25  sign up?

Page 59

1      A  I have never had any contact with
2  Mr. Melancon.
3      Q  Okay.
4      A  But Mr. Sterbcow referred a client that kind
5  of e-mailed or something.
6      Q  Okay.  That happened?
7      A  Yes.
8      Q  Did you ever become aware of how many
9  medical benefits clients The Downs Law Group, as primary
10  counsel, were actually representing by the time you were
11  there working there?
12      A  No.
13      Q  Did you ever have discussions with anyone at
14  The Downs Law Group as far as on whose behalf the appeal
15  was made?
16      A  No, I never spoke to anyone about this
17  appeal.
18      Q  Do you know whether The Downs Law Group,
19  regardless of who they named in the appeal, were
20  actually doing it for the benefit of all of their
21  medical benefits clients?
22      A  Can you repeat the question?
23      Q  Sure.
24      Regardless of who was actually named as a
25  plaintiff in the appeal, do you know whether The Downs

Page 60

1  Law Group intended that work, that effort, to be for the
2  benefit of all of their medical benefits clients?
3      MR. FRIEDMAN:  Object to form.
4  Foundation.
5      THE DEPONENT:  Are we talking still
6  about the appeal?
7  BY MR. McKEE:
8      Q  Yes.
9      A  I have no knowledge about the appeal.
10      Q  Did you ever see any correspondence directed
11  to the BP clients who had retainer agreements that
12  included Melancon and Sterbcow in them where Downs
13  informed them that there was a dispute between the law
14  firms?
15      A  Any retainer agreements that said that?
16      Q  No.
17      On the clients who you know, because of the time
18  frame you were there, that the Sterbcow and the Melancon
19  names were in their retainer agreements, did you ever
20  see anything going out to those clients by way of
21  correspondence that informed those clients that the two
22  law firms -- the three law firms were having a dispute?
23      A  A client showed a paper saying that there
24  was no longer a relationship and got a new contract.
25      Q  Before we even get to that point, and I know

Page 61

1  what you're talking about, but I'm wondering before some
2  notice was given by Downs to clients that Sterbcow and
3  Melancon were no longer involved, I'm wondering if they
4  wrote to the client saying there was a dispute between
5  the two law firms, as is required by the Florida Bar?
6      MR. FRIEDMAN:  Object to form,
7  foundation.
8      THE DEPONENT:  As far as I know,
9  that's the notice that was mailed to
10  this particular client.
11  BY MR. McKEE:
12      Q  And did that notice include a statement to
13  the clients that they had an option to choose which
14  lawyers they wanted to use in further representation?
15      A  I do not recall what the communication he
16  received said.
17      MR. McKEE:  I'd like to take about
18  a five-minute break to go through the
19  correspondence file here.  So let's go
20  off the record.
21      You can stretch your legs, whatever
22  want to do, clear your head.
23      I'm going to go through these
24  documents before moving on.
25      THE VIDEOGRAPHER:  Going off the

16 (Pages 58 - 61)

1    record.  The time is 10:33.
2         (Recess.)
3         THE VIDEOGRAPHER:  We are back on
4    the record.
5         Tape number 3.  The time is 10:53.
6    On the record.
7    BY MR. McKEE:
8         Q    I've had a chance to go through the
9    composite exhibit of documents produced pursuant to the
10   subpoena, and I have a few questions on some of them.
11        There's one dated February 11, 2014.  It's from
12   you to Daniel Pérez, and it has a little emblem.  That
13   means there's an attached document called "Affidavit
14   Amled."
15        A    Yes.
16        Q    Are you producing that document?
17        A    Did I produce it?  No.
18        Q    Are you willing to?
19        A    Yes.
20        Q    That's on your computer?
21        A    Yes.
22        Q    Do you know the basic content of what that
23   affidavit says?
24        A    Yes, it said that I was a former employee of
25   Downs Law Group, that I have the e-mail address

1    amledperez@gmail.com, that I never authorized anyone
2    else other than myself to access that e-mail account and
3    that I -- yeah, that's basically it.
4         Q    And are you aware of any evidence to suggest
5    anyone else has accessed your e-mail account?
6         A    I have checked the logs and everything, so
7    no, I don't have any notice of recent somebody getting
8    in my account, no.
9         Q    Is there any evidence of somebody, not
10   recently?
11        A    I can only see the last few weeks on the
12   log, yes.
13        Q    And of course -- well, maybe not of course.
14   Are you aware there's a way to actually track
15   whether your account has been accessed from another
16   location?
17        A    Yes.
18        Q    Through your carrier?
19        A    Yes.
20        Q    And did you find any -- have you tried that
21   method to see if anyone accessed your e-mail accounts?
22        A    No.  I accessed my e-mail account from
23   several places.
24        Q    Was that affidavit the only affidavit sought
25   from you by lawyers from The Downs Group prior to your

1    deposition?
2         A    No.  I was sent one before, and I changed it
3    and sent the second one, the most recent one.
4         Q    And is that version available on your
5    computer?
6         A    Yes.
7         Q    And are you willing to produce that?
8         A    Yes.
9         Q    There's a document -- an e-mail from
10   November 26, 2013.  When did you leave the firm,
11   approximately?
12        A    November.
13        Q    Late, mid, early?
14        A    Late.
15        Q    It says -- it's from you to Daniel Pérez.
16        "Hi.  I'm sending all the documents I have,
17   because I have been asked for a few that maybe did not
18   make it."
19        What documents were you talking about, if you
20   know?
21        A    Copies of social security cards, license.
22   There were all that I had.
23        Q    So it's client information?
24        A    Yes, personal client information.
25        Q    On November 15, there's an e-mail to

1    Daniel Pérez, and actually says "Dear Craig and Danny."
2    Craig would be Craig Downs?
3         A    Yes.
4         Q    And it's asking them to see the attached
5    letter.  "Thank you for everything."
6         Is that your e-mail where you attached your
7    resignation letter?
8         A    Yes.
9         Q    And it also indicates "16-K of Amled BP
10   signed clients."  Do you know what that refers to?
11        A    Yeah, it's a list of the clients I signed up
12   while I was working there.
13        Q    Does that list have anything more than the
14   name of the client?
15        A    No, just the name of the client and when I
16   sent the packet.
17        Q    And would all of those clients have been
18   signed up on the contingency fee agreement that had the
19   Sterbcow and Melancon reference in paragraph 8?
20        A    Yes.
21        Q    Is that still in your computer?
22        A    What?
23        Q    That document, the Amled BP signed clients?
24        A    Yes, I think so, yes.
25        Q    Is that one of the documents that you

17 (Pages 62 - 65)

Page 66

1  produced today that we pulled aside, or was that a
2  different document?
3      A   No.  It was just a document that I made with
4  the name and last name of the person and when I sent it,
5  either if it was in the mail or if I left it with
6  someone else or somebody picked it up at the office or
7  Danny took it to Miami with him.
8      Q   And would that likely show approximately 70
9  clients that you signed up?
10     A   Yeah.
11     Q   Here's one from October 31, 2013, and it's
12 to you from Daniel Pérez.  And the two sentences say
13 "Let me know when I need to send you more.  I want to
14 avoid you having to make copies of packets in NOLA,"
15 NOLA being an abbreviation for New Orleans, Louisiana,
16 right?
17     A   Yes.
18     Q   And what packets were those?
19     A   I believe that was because I printed
20 packets, and that was like more expensive than it would
21 have been to print than if they sent it in the mail to
22 me.
23     Q   When you say "packets," you're talking about
24 client sign-up packets?
25     A   Sign-up packets, yes.

Page 67

1      Q   And those are similar to Exhibits 3 and 4?
2      A   I believe so, yes.
3      Q   Still had the contract that had, the
4  Sterbcow and Melancon, since we see that these are dated
5  in that very time frame and even after that time frame?
6      A   Yeah, I believe so.
7      Q   Did there come a time that you were sent a
8  new contract that didn't have Melancon and Sterbcow's
9  names in them?
10     A   I don't remember.
11     Q   Do you recall ever signing up a BP client
12 that didn't have a contingency fee agreement with
13 Sterbcow and Melancon in it as a disclosed lawyer?
14     A   Isn't that the same question as before?
15     Q   Maybe.
16         But what I'm trying to make sure is, are you
17 aware of any time that you signed up a client that
18 didn't have their names in it?
19     A   Not that I recall.  I don't remember what --
20 the last clients I signed up, what their contract stated
21 exactly.
22     Q   And what I'm getting at, did you get any
23 direction from The Downs Law Firm of "This type of
24 client, you'll put on this agreement that doesn't have
25 Sterbcow and Melancon in it"?

Page 68

1      A   No.
2      Q   "This type of client, you'll use a different
3  one"?
4      A   No.
5      Q   You didn't have two different types of
6  contracts?
7      A   We had separate contracts for economic
8  claims for zone workers, which I believe I never -- and
9  maybe I filled out one, but it was economic, medical
10 zone workers.  That was it, I think.
11     Q   Do you know whether any of those contingency
12 fee type contracts had Melancon, Sterbcow in them?  And
13 I don't need you to guess.  Do you have a recollection
14 of it is all I'm looking for.
15     A   I so rarely worked with those that I
16 wouldn't feel comfortable saying "yes" or "no."
17     Q   Let me do it a different way.
18         Were there times that you actually signed up an
19 economic class client?
20     A   Yes.
21     Q   Did you use a different retainer agreement?
22     A   The client that I can remember, he was both
23 a clean-up worker, and he might have an economic claim,
24 so I believe I had him sign both just in case.
25     Q   Both ...

Page 69

1      A   Both the economic and medical claims form.
2      Q   Do you happen to have an economic claim
3  contingency fee contract in your computer?
4      A   No.
5      Q   I have an e-mail dated October 22, 2013 from
6  Daniel Pérez to you asking you if you want your cell
7  phone added to the business cards.  Is that around the
8  first time you're getting a business card from The Downs
9  Group?
10     A   In my name, yes.  I only had Daniel Pérez'
11 business card.
12         MR. McKEE:  I'm going mark this one
13     separately as Exhibit 5, and it's dated
14     October 22, 2013.
15         (Pérez Exhibit No. 5 marked for
16         identification.)
17         MR. McKEE:  And it's from Daniel
18     Pérez to you, and it says "Can you
19     please translate the paragraph below?
20     Thanks."  And then has a chain of
21     e-mails.
22         MR. FRIEDMAN:  Wait, Bob.
23         Is this the exhibit that you
24     attached to your motion -- in your
25     response to our motion for protective

18 (Pages 66 - 69)

Page 70

1     order?
2           MR. McKEE:  Interestingly, it's
3     part of it.
4           MR. FRIEDMAN:  Well, pose your
5     question.  I want to make an objection
6     to this.
7     BY MR. McKEE:
8           Q    It says "From Jeremy D. Friedman to Craig
9     Down, Subject: Letter."
10          "I think along with the amended retainer for
11    those clients from July to the present, we should do a
12    letter to all of the clients stating something like
13    this."  And then it doesn't have the "something like
14    this" in this e-mail stream.
15          And it says "Thank you," continuing, "something
16    like that.  Sure, it is self-serving, but it can't hurt,
17    and we do have an obligation to keep the clients
18    advised."
19          THE DEPONENT:  I think it was --
20          MR. FRIEDMAN:  Wait.  Let me make
21    my objection.
22          I'm going to object to based on
23    attorney-client privilege.
24          MR. McKEE:  You already lost that
25    issue yesterday, but --

Page 71

1           MR. FRIEDMAN:  No, I didn't.  I
2     lost the issue as to whether she could
3     produce the document.  She did not rule
4     on whether that particular e-mail was
5     subject to privilege.  I'm maintaining
6     the privilege.  She can produce it to
7     you, and you can questions.  We'll see
8     what judge says on it.
9           MR. McKEE:  Fair enough.  You're
10    just preserving your objection.  I
11    understand.
12    BY MR. McKEE:
13          Q    And then there's a Spanish language partial
14    translation here, right?
15          A    Yeah, I think it printed on letter paper, as
16    opposed to legal paper, because it's cut off.
17          Q    Prior to producing this, did anyone from The
18    Downs Group review these documents?
19          A    Review?
20          Q    Yes, with you or separately from you?
21    Because I'm intrigued that the very Spanish language
22    portion is cut off right where it talks about
23    "terminating my clients."
24          A    No, no.  I printed this from my home
25    yesterday.  It was a lot of printing, so I was not

Page 72

1     paying attention.  I tried very hard.
2           Q    Nonetheless, this is where you're being
3     asked to translate an English language version of
4     something that's to go to the clients?
5           A    Yes.
6           Q    And in the portion from Jeremy Friedman,
7     he's talking about an amended retainer for those clients
8     from July to present, and the date is October 22, 2013.
9           Did you ever see the amended retainer?
10          A    I'm trying to think.  I don't remember if
11    that was sent to me or to clients.
12          Q    Was the gist of this, as you understood it,
13    that Jeremy from The Downs Law Group was going to have
14    the clients that were signed up from July till October
15    on a new retainer agreement that eliminated Sterbcow and
16    Melancon?
17          MR. FRIEDMAN:  Object to form.
18          THE DEPONENT:  Yes, because their
19    relationship was over.
20    BY MR. McKEE:
21          Q    Well, from your interpretation, when was the
22    relationship over?
23          A    I don't know when, if he's saying that the
24    e-mail says that they're informing the clients that the
25    relationship is no longer ongoing.

Page 73

1           Q    Did you see anything from any client that
2     terminated the engagement of Melancon or Sterbcow coming
3     from the client?
4           A    Coming from the client?
5           Q    Where they were terminating those lawyers?
6           A    No.  Clients wouldn't send me papers.
7           Q    Did you see, hear, learn of any evidence to
8     suggest that any clients were firing or discharging
9     Sterbcow?
10          A    Not to my knowledge.
11          Q    Or Melancon?
12          A    Not to my knowledge.
13          Q    Did you see anything from The Downs Group
14    that asked permission or sought input from Sterbcow or
15    Melancon about this letter that was going to go to the
16    clients?
17          A    I have no knowledge of their communications.
18          Q    Which would also mean then, of course, you
19    have not seen any such evidence?
20          A    Of any communications between Sterbcow
21    and ...
22          Q    Downs?
23          A    ... and Downs about?
24          Q    About this letter that was going to go out
25    to the clients?

19 (Pages 70 - 73)

1    A   Talking about this letter, no.
2    Q   And again, you don't know Florida Bar rules
3  as to whether they're required to confer before sending
4  such a communication to the lawyers?
5    A   No.
6    Q   Did you ever have any communication with
7  Mr. Friedman about his comment about the letter being
8  self-serving?
9    A   No.
10    Q   Did you have an understanding of what you
11  think he meant by that?
12    A   I only translated the paragraphs.
13    Q   The letter translation indicates that it was
14  going to be in the best interest not to continue with
15  the appeal, essentially.
16    Did the law firm ever describe to the clients in
17  writing that you ever saw why it's in their best
18  interests?
19    A   Not that I ever saw.
20    Q   Do you know whether that letter actually
21  went out to clients?
22    A   My translation?
23    Q   Or the English version or both.
24    A   I believe it did.
25    Q   And what makes you think that it did?

1    A   Some of the clients have called and said
2  they received a letter, and they wanted to know if they
3  could meet with me, so I have told them I'm no longer
4  working with the firm.
5    Q   Do you have an understanding of whether this
6  letter went to any client that was signed up before July
7  of 2013?
8    A   I did not ask them when they were signed up
9  when I spoke to them.
10    Q   There's an e-mail from September 26, 2013
11  that asks you, by Daniel Pérez, "Can you please
12  translate this letter into Spanish?"  And it has like a
13  zip item.
14    MR. FRIEDMAN:  Same objection.
15    Attorney-client privilege.
16    MR. McKEE:  I haven't asked her
17    anything yet, so let me finish the
18    question.
19  BY MR. McKEE:
20    Q   That says "client update letter."  Do you
21  have that client update letter?
22    A   Is it in the back?
23    MR. FRIEDMAN:  Are you referring to
24    Exhibit 5 still or a new exhibit?
25    MR. McKEE:  New exhibit, a

1  composite exhibit of her correspondence,
2  to which there was no prior objection.
3    MR. FRIEDMAN:  Okay.  I thought you
4  were referring, again, to Exhibit 5.
5    I have no objection to this new
6  exhibit that you're talking about.
7    MR. McKEE:  Okay.
8  BY MR. McKEE:
9    Q   In this September 19, 2013 letter, do you
10  see any reference to the dismissal of the appeal that
11  the Sterbcow and Melancon lawyers were working on, which
12  had occurred several months before?
13    A   They're talking about the appeal that was
14  still on while I was working?
15    Q   Right, not the one that Sterbcow and
16  Melancon were working on.
17    A   They're different, yes.
18    Q   Is there any reference in this client update
19  letter to Sterbcow and Melancon not doing any further
20  work for these plaintiffs?
21    A   No.
22    Q   And that's a letter dated September 19,
23  2013, right?
24    A   Yeah.
25    Q   Do you know whether it went out to clients?

1    A   I'm not sure if that was on the blog.
2    Q   Did Downs have a blog?
3    A   Yes.
4    Q   Did you read the blog from time to time?
5    A   I sometimes translated things.
6    Q   Did you ever see anything on the blog that
7  indicated a discontinuation of lawyer work for the BP
8  clients that were with an engagement agreement,
9  contingency fee agreement that included Sterbcow and
10  Melancon?
11    A   I haven't accessed the blog in quite awhile.
12    Q   Do you recall ever seeing anything like
13  that?
14    A   No.
15    Q   Was there more than one blog?
16    A   More than one blog post that I translated?
17    Q   Yes.
18    A   It was like a new -- something about the
19  effects of -- medical effects of the spill on clients
20  and -- not on clients, on people and the nature and all
21  of that.
22    Q   And it references in one of these e-mails
23  blog 2, blog 3, blog 4?
24    A   Yeah.
25    Q   Were you interpreting those for Spanish?

Page 78

1      A   Yeah, it's the effects of the chemicals that
2   were sprayed to contain the spill and mostly reports
3   that were from other articles that were, you know, just
4   to inform the clients about how dangerous the spill was.
5      Q   I see references in these e-mails of
6   prospective clients who were indicating they did have
7   counseling?
8      A   Yes.
9      Q   But they still wanted to come see you; do
10  you remember that?
11     A   Can I see it?
12     Q   Yeah, I'm going to show you several of them,
13  actually.  One is relating to the name of Martínez.
14  Another is Octavio Alcantara.  Another is Luis
15  Hernández.
16     A   Uh-huh.
17     Q   Were those clients signed up by The Downs
18  Law Firm?
19     A   Can I read the e-mail?
20     Q   Yes.
21     A   It appears to say that I just called them,
22  and I was informed that they had another lawyer.
23     Q   And the question is, do you know whether The
24  Downs Group actually signed them before they discharge
25  -- well, first of all, signed them, signed them up as

Page 79

1   clients?
2      A   I don't know about these particular clients,
3   but I would call them.  If they say that they have
4   another lawyer, I would inform and would put in, you
5   know, my information to not contact them, because they
6   were already represented.
7      Q   Were there times that you found that they
8   had been represented, and they had to use that form to
9   terminate their prior lawyer?
10     A   Yes.
11     Q   But were you having that meeting with them,
12  going through all the details of their illness, the
13  engagement agreement and whatnot before that was sent to
14  the other lawyer?
15     A   I would fill out their symptoms and if they
16  wanted to discharge their previous firm.  Sometimes they
17  didn't even know what the name of the other firm was, so
18  I would just send this to Florida.
19     I don't know if the claim process -- we would
20  wait for them to give us all the information.  I mean, I
21  only signed that and sent it to Florida.
22     Q   But did you have them sign the retainer
23  agreement and then rely on The Downs Group to move from
24  there?
25     A   Yes.

Page 80

1      Q   I have one dated Wednesday, August 28, 2013
2   from Danny Pérez to Shannon Simpson.  Do you know who
3   that is?
4      A   No.
5      Q   And you were copied on this e-mail, and it's
6   from Daniel Pérez, and part of the paragraph says,
7   quote, "On another note, please remember to send me the
8   list of patients that have gone to see you, which
9   patient reports you have already given me/faxed me and
10  which reports are yet to be written."
11     Do you know anything about that topic?
12     A   I believe those were the medical reports
13  that I picked up in New Orleans and forwarded to Downs.
14     Q   Do you know whether Shannon Simpson worked
15  for a medical doctor there?
16     A   No, I don't know who Shannon was.
17     Q   Was the typical way you'd send these sign-up
18  packets through UPS?
19     A   Sometimes they would be UPS.  Sometimes I
20  would hold them until Danny came to New Orleans, or
21  there was an attorney or a case coordinator that picked
22  up one once.  It varied.
23     Q   Do you remember a client, Isidoro Batista?
24     A   Yes.
25     Q   Is that a client that you signed up?

Page 81

1      A   Yes.
2      Q   Was he already retained by another law firm
3   at that time?
4      A   Does the e-mail say that?
5      Q   It says, specifically, "I signed up Isidoro
6   Batista this morning.  I attached the retainer agreement
7   of his previous firm so you can see the charges that
8   they say they're entitled to regardless of the
9   settlement."
10     A   Yes.
11     Q   Did Mr. Batista discharge that firm before
12  he was signed up?
13     A   He had previously spoke -- talked to me, and
14  he said that he had signed with another firm, was
15  not happy with it, and he said that he could not go with
16  another attorney, because his retainer agreement said
17  that he would have to pay.
18     I consulted that, and we said, "Let's check what
19  it says that they're going to charge him."  So I just
20  put it all together and sent it.
21     Q   Did you suggest to the folks down at Downs
22  in Miami that maybe the clients should ask their
23  previous attorney for their papers before sending the
24  termination letter?
25     MR. FRIEDMAN:  Object to form.

Page 82

1      THE DEPONENT:  Does the e-mail say
2   that?
3   BY MR. McKEE:
4      Q    Yes.
5      A    Yes.
6      Q    And you wrote to Danny, "I think the
7   termination letter should not have the logo of the firm,
8   because it looks like we are interfering with the
9   contract existing with the other law firms."
10      Did you ever get a response giving you guidance
11   from the Downs firm on what really needed to be
12   happening here?
13      A    It was a long time ago.  I think we spoke
14   about it on the phone, but it was not -- it was not
15   important.
16      Q    Did they ever give you any written guidance
17   that says "Here's what you need to do, Amled.  When
18   someone says they have another lawyer, tell them if they
19   discharge that lawyer, you'll be happy to talk to them,
20   otherwise, you can't talk to them."  Did they ever give
21   you that instruction?
22      A    If the clients were unhappy, they would fill
23   out the termination contract, and we would take care of
24   calling the firm and asking for papers, anything like
25   that.

Page 83

1      Q    But by then, they had already signed the
2   contingency agreement with The Downs firm?
3      A    Yeah, it was all in the same packet.
4      Q    And actually, some of the instruction that
5   you received on dealing with these respective clients
6   from Craig Downs were things like, quote, "I'm sure you
7   are persuasive.  Remember, we are sales people as
8   attorneys selling our position.  So we need to use
9   tactics to get people to commit to what they are saying
10   they will do"?
11      A    Yes.
12      Q    And that was from an e-mail of August 15,
13   2013.
14      A    That's because clients were not showing up
15   to appointments.
16      Q    Now, these e-mails that I'm reading that are
17   part of the exhibit that you produced under subpoena,
18   these were all done in regard to your employment with
19   Downs for the BP case, correct?
20      A    Yes.
21      Q    They were done in the ordinary scope of your
22   employment there?
23      A    Yes.
24      Q    And they were written by you or someone from
25   the Downs firm, such as the ones we've been reading?

Page 84

1      A    Yes.
2      Q    At or about the time of the date on the
3   document, of the e-mail document?
4      A    Yes.
5      Q    And everyone that was writing in those
6   e-mails between The Downs firm and yourself were persons
7   with knowledge of the content of those documents, right?
8      A    I believe so.
9      MR. FRIEDMAN:  Object to form.
10   BY MR. McKEE:
11      Q    And you kept these in the ordinary course
12   and scope of your employment with Downs, right?
13      A    Yes.
14      Q    And that would apply to every e-mail in that
15   which you've produced to me today, correct --
16      MR. FRIEDMAN:  Object to form.
17   BY MR. McKEE:
18      Q    -- that's between you and any member of The
19   Downs firm?
20      A    You're asking if the e-mails are between me
21   and the members of Downs Law Group?
22      Q    The ones that are between you and members of
23   The Downs Law Firm, would that all, what we just went
24   through on the business records exception to hearsay
25   rule --

Page 85

1      MR. FRIEDMAN:  Object to form.
2   BY MR. McKEE:
3      Q    -- would all of those answers apply to every
4   one of those e-mails?
5      MR. FRIEDMAN:  Same objection.
6      THE DEPONENT:  I am not
7   understanding your question.
8   BY MR. McKEE:
9      Q    I just went through a series of questions
10   about whether they were done before the scope of your
11   employment at or about the time --
12      A    Yes.
13      Q    -- that they were written.
14      A    Yes.
15      Q    And we've gone through a string of e-mails
16   here that were between you and Daniel Pérez.  Were those
17   all done under those circumstances that we just went
18   through?
19      A    Yes.
20      MR. FRIEDMAN:  Same objection.
21   BY MR. McKEE:
22      Q    As part of doing the sign-ups, did you
23   actually keep a copy of the sign-up packages in
24   New Orleans, or were they always sent down to Miami?
25      A    They were always sent to Miami or picked up

22 (Pages 82 - 85)

Page 86

by someone.
Q To go down to Miami?
A Yeah.
Q If a client -- well, first of all, where did most of the clients you signed up live?
A New Orleans.
Q Are you aware of whether a Florida lawyer can sign up a client in another state without co-counsel from the other state?
A I'm not aware about Florida law.
MR. FRIEDMAN: Object to form. Foundation.
THE DEPONENT: Florida law, I have no clue about Florida law.
BY MR. McKEE:
Q Did The Downs firm ever give you any guidance whether you needed to have a Louisiana lawyer present to discuss legal issues with Louisiana clients?
MR. FRIEDMAN: Same objection.
THE DEPONENT: I don't remember.
BY MR. McKEE:
Q Did The Downs Group ever give you any guidance as to whether, when dealing with Louisiana residents, that The Downs firm cannot be practicing law in the State of Louisiana without a Louisiana lawyer

Page 87

present?
MR. FRIEDMAN: Object to form. Foundation.
BY MR. McKEE:
Q Did they ever give you that guidance?
A Not that I recall.
Q Were you describing to these Louisiana residents what sorts of things the law firms were going to do on their behalf?
A You mean what the process would be?
Q Yes.
A Yes.
Q Did you describe to them what kind of allegations they would likely be making?
A No.
Q Was there ever a time when the clients that you signed where Mr. Pérez was with them, where he gave them what you thought to be legal advice about their cases in Louisiana?
A The papers that we signed when we were together, it was all about the symptoms that the clients felt either at the time of the spill or still to that date.
Q It also included powers of attorney?
A Yeah.

Page 88

Q It included authorizations to legally release their medical records, right?
A Yes.
Q And if Mr. Sterbcow or Mr. Melancon were not participants as lawyers, joint venture lawyers in that matter, did you see anyone else from Louisiana that was there to make sure that the Florida lawyer was not practicing law in Louisiana without a Louisiana lawyer involved?
MR. FRIEDMAN: Object to form. Foundation.
THE DEPONENT: I'm not aware of any other lawyer.
BY MR. McKEE:
Q In our request to produce what we propounded on Downs and the individual lawyers that are defendants here, we asked for, quote, "any and all communications, e-mails and correspondence to clients acknowledging the role of Plaintiffs, Sterbcow Law Group, LLC and/or Melancon Rimes in the BP Oil Spill cases."
The individual defendants said "none."
Were there communications, e-mails or correspondence that acknowledged the role of Sterbcow Law Group or Melancon Rimes in the BP Oil Spill case that was sent to clients, to your knowledge?

Page 89

A Can you repeat the question?
Q Sure.
Were there any communications, e-mails or correspondence to clients that acknowledged the role of Sterbcow Law Group and/or Melancon Rimes in the BP Oil Spill cases, to your knowledge?
A I know that they speak about the relationship, but I cannot attest to the content of what involvement they talk about.
Q Right, but there were such communications that acknowledged the role of those lawyers from those law firms?
A I believe so.
Q Was there any communication to clients which conveyed the message that Sterbcow Law Group and Melancon Rimes are no longer going to be their counsel?
A Yeah, there was no longer a relationship between both firms.
Q So an answer "none" would be false in your perspective?
MR. FRIEDMAN: Object to form.
THE DEPONENT: I don't want to answer that.
BY MR. McKEE:
Q Well, you know such communications occurred,

1  right, in writing?

2  A   Yes.

3  Q   Were there e-mails or other written

4  communications between members of the Downs Law Group

5  regarding the elimination of the Plaintiffs, Sterbcow

6  Law Group and Melancon Rimes, from the BP Oil Spill

7  representation?

8  MR. FRIEDMAN:  Object to form.

9  BY MR. McKEE:

10  Q   And I think we saw one with Jeremy and ...

11  A   Yes.

12  Q   Yes, there were such communications?

13  MR. FRIEDMAN:  Object to form, and

14  mischaracterizes prior testimony,

15  description of the exhibit.

16  BY MR. McKEE:

17  Q   Yes?

18  A   Yes.

19  Q   Because an attorney-client privilege

20  objection was raised, I'm not going to ask you about the

21  content of what I'm about to ask, just whether certain

22  things happened.

23  MR. FRIEDMAN:  Since the court

24  ordered that that can be produced, you

25  can ask her about the content of it.

1  I'm preserving my objection to

2  attorney-client privilege, and we'll

3  deal with that with the Court.

4  MR. McKEE:  All right.  I didn't

5  finish my question yet.

6  I'm asking about valuation, so

7  that's where I'm heading here.

8  MR. FRIEDMAN:  Valuation?

9  MR. McKEE:  Yeah, I'm asking about

10  number 7 in the request to produce.

11  MR. FRIEDMAN:  Okay.  But that was

12  overruled, so there is no attorney --

13  I'm sorry, was that one that she

14  sustained?

15  MR. McKEE:  Yes.

16  MR. FRIEDMAN:  That's work product.

17  There was no attorney-client privilege

18  objection to that.

19  MR. McKEE:  Well, work product as

20  to my clients would have to be in

21  relation to their litigation.

22  What I'm talking about is whether

23  or not when you divulge something to a

24  third party, whether there can ever be a

25  privilege.

1  So what I'm asking is whether this

2  witness knows whether OPA presentments

3  GCCF demands, BP demands ever went out

4  to third parties such as the DHCC,

5  GCCF or BP, third parties, if she knows.

6  And I'm not asking about content.

7  MR. FRIEDMAN:  The thing is, that

8  the Court ordered that no documents in

9  relation to the very question that

10  you're asking her can be produced based

11  on the objection based on work product.

12  And so the question really is

13  then -- is that can she still testify as

14  to issues that might violate the work

15  product privilege, which we've asserted

16  as part of our motion for protective

17  order, and the Court never actually

18  ruled on her testimony.

19  So at this point, all I can do is

20  preserve the objection, and she can

21  answer however she wants to answer.

22  MR. McKEE:  Sure.  And I'm not

23  asking for content of what those

24  documents might be.  I'm only asking

25  whether the witness knows, and she may

1  not, whether such documents were

2  propounded to third parties such as BP,

3  GCCF or the DHCC claims facility.

4  MR. FRIEDMAN:  My objection is

5  preserved and noted, so she can answer

6  the question.

7  MR. McKEE:  Okay.

8  THE DEPONENT:  You want to know if

9  what documents, the papers I filled out?

10  BY MR. McKEE:

11  Q   No.  Whether the amount of the claim of a

12  given client ever went to a third party?

13  A   I don't know.

14  Q   See, a lot to ask about nothing.

15  Did you ever see the agreement, written agreement

16  regarding the relationship between the Sterbcow Law

17  Firm, the Melancon Law Firm and The Downs Law Firm as it

18  relates to the BP matter, did you ever see it?

19  A   A signed contract?

20  Q   Signed or unsigned.

21  A   Not that I recall right now.

22  Q   Do you know of anything that Sterbcow's firm

23  or Melancon's firm failed to do in regard to their work

24  in this project?

25  A   Something that Sterbcow or Melancon ...

1    Q   Melancon failed to do under what they were
2  supposed to do in representing these clients?
3    A   I have no knowledge.
4       MR. FRIEDMAN:  Object to form.
5    Foundation.
6       THE DEPONENT:  I have no knowledge
7    of the business relationship.
8  BY MR. McKEE:
9    Q   On the contracts that have Sterbcow or
10  Melancon in them, do you know whether Downs ever
11  provided them a copy of that retainer agreement in
12  compliance with Florida Bar regulations on joint
13  representation?
14       THE DEPONENT:  I'm not aware.
15       MR. FRIEDMAN:  Object to form.
16    Foundation.
17  BY MR. McKEE:
18    Q   Are you aware of them ever providing
19  contracts that were signed by clients that included
20  Sterbcow and Melancon in the body of the contract,
21  whether it's required by the Bar or not?
22    A   Of them providing signed contracts to
23  Sterbcow or Melancon, I'm not aware.
24    Q   And certainly, you were never asked to do
25  so?

1    A   No.
2    Q   Is it true that to certain of the BP
3  claimant contingent fee clients, that Downs wrote to
4  certain clients telling them that Sterbcow and Melancon
5  were no longer their lawyers?
6    A   Isn't that the same question?
7       MR. FRIEDMAN:  Object to form.
8    Foundation.
9  BY MR. McKEE:
10    Q   It's stated differently.
11    A   Your question is?
12    Q   Whether you know whether Downs sent a letter
13  to certain clients, BP clients, that told those clients
14  that Sterbcow and Melancon were no longer their lawyers?
15    A   It said that the relationship between them
16  was over.
17    Q   Did you have any concern when that letter
18  was being drafted that that might be tortious
19  interference?
20       MR. FRIEDMAN:  Objection to form.
21    Foundation.  Calls for legal conclusion.
22  BY MR. McKEE:
23    Q   Kind of like what you're telling Danny in
24  that e-mail about whether contacting these clients
25  without discharging their other lawyer first could be

1  interference.
2       MR. FRIEDMAN:  Same objection.  And
3    also, compound question.
4  BY MR. McKEE:
5    Q   Did have you that feeling?
6       MR. FRIEDMAN:  Same objection.
7       THE DEPONENT:  You're asking me if
8    I had a feeling ...
9  BY MR. McKEE:
10    Q   That the letter that was going to go out to
11  the clients that said there was no longer going to be
12  representation by Sterbcow and Melancon, did you
13  consider whether that might be interfering with Sterbcow
14  or Melancon's rights with those clients?
15       MR. FRIEDMAN:  Object to form.
16    Foundation.
17  BY MR. McKEE:
18    Q   And if you didn't, you didn't, but I'm
19  wondering if you did.
20    A   I know my employers informed me that there
21  was a lease agreement, and they were informing clients
22  according to that, to that position.  They were no
23  longer together.  That's what they wanted to inform the
24  clients.
25    Q   Were they telling them that there's no

1  longer a lease agreement or no longer representation of
2  the lawyers?
3    A   There was no longer a representation.
4    Q   Right.
5       And when that letter was going out, did you think
6  that maybe someone should inform Sterbcow and
7  Melancon --
8       MR. FRIEDMAN:  Object to form.
9  BY MR. McKEE:
10    Q   -- before it went out to clients?
11    A   I thought that they would speak about it
12  among them.
13    Q   Did anyone from Downs talk to you about why
14  they were sending this letter?
15    A   About why?
16    Q   Yes.
17    A   To inform clients.
18    Q   What?
19    A   That there was no longer a relationship
20  between them.
21    Q   And did Downs ever describe to you, a
22  Puerto Rican lawyer, why that relationship was ending?
23    A   They were saying they were having a
24  disagreement about what the compensation should be.
25    Q   Did that disagreement matter get disclosed

1  to the clients in writing, to your knowledge?
2      A   Not that I know of.
3      Q   I know what your answer is going to be, but
4  I have to ask it.  Did anyone from Downs inform you what
5  the Florida Bar requires to be sent to clients, as
6  opposed to the letter they were sending?
7      A   No.
8      MR. McKEE:  Did you ever see this
9      e-mail from Marx Sterbcow to Jeremy
10     Friedman about the sample joint
11     participation and association counsel
12     contract?  Which I'll mark as the next
13     exhibit.  I think it's 6.
14     (Pérez Exhibit No. 6 marked for
15     identification.)
16     MR. McKEE:  It's dated August 24,
17     2012.  And it reads as follows.  And
18     this is from Jeremy to Marx, actually.
19     Actually, no.  The first part is
20     August 24, 2012 at 3:53 p.m. is Jeremy
21     to Marx.
22     It says "Hey, Marx, please let this
23     confirm our discussion that your firm
24     and possibly Jason's firm and/or Jason
25     has agreed to act as local counsel for

1      our clients in the in re: oil spill
2      class action matter pending in the
3      Eastern District of Louisiana."
4  BY MR. McKEE:
5      Q   Did you ever know that that communication
6  occurred?
7      A   Not that I was shown, no.
8      Q   And the matter pending in the Eastern
9  District of Louisiana was the class action, right?
10     A   I don't know the time of the appeal, so ...
11     Q   Well, there's no appeal in the Eastern
12  District of Louisiana, that's the Fifth Circuit?
13  Do you know?
14     MR. FRIEDMAN:  Object to form.
15     Foundation.
16     THE DEPONENT:  Yes.
17  BY MR. McKEE:
18     Q   Nonetheless, this letter says "for the
19  clients in the matter pending in the Eastern District of
20  Louisiana."  It goes on to say, quote, "I will be
21  getting an agreement shortly, however, the basic
22  terms will be that your firm will file the initial
23  objections once we provide them to you on or before
24  August 31, 2012, file a motion for pro hac vice that we
25  will provide to you to allow me to appear in the case,

1  assist in the final presentation of the court of the
2  objections on November 8, 2012 and possibly assist in
3  the presentation of argument as to entitlement to
4  attorneys' fees at a hearing, if necessary."
5      In exchange for this, we have agreed that you
6  will get 10 percent of the attorneys' fees awarded to us
7  by the Court and/or received from any third party."
8      Were you aware of those terms?
9      A   I have heard since, but I did not receive
10  this e-mail or anything like that.
11     Q   Have you ever seen any writing that
12  indicated that it related to any other cases other than
13  those that were in Eastern District of Louisiana ever?
14     A   I never paid that much attention to Eastern
15  District or -- I only worked in BP Oil Spill mostly
16  clean-up worker.
17     Q   And just so we're clear, on that same
18  document, a couple hours later, it says "From Marx.
19  Confirmed, Jeremy, Jason and his firm, along with mine,
20  will act as local counsel."
21     Do you see that?
22     A   Yes.
23     Q   Do you know of anything to suggest that
24  Jeremy and his firm and -- excuse me, Jason and his firm
25  and Marx and his firm did not act as local counsel?  Do

1  you know of anything that says they didn't?
2      A   Any paper that says they didn't, I have no
3  knowledge.
4      Q   And just so we're clear, on August 26, 2012,
5  9:58 p.m., in an e-mail to Jeremy from Jason, you see
6  Jason says, "I agree to the provisions.  I'm likely
7  leaving first thing tomorrow morning.  Jason."
8      A   Yes.
9      Q   In all of your discussions with folks from
10  The Downs Law Group, did any of them ever describe to
11  you a failure of performance pursuant to the agreement
12  between the three law firms by Sterbcow or Melancon?
13     A   You want to know if I was ever informed by
14  anyone in Downs Law Group about ...
15     Q   That Sterbcow and his firm or Melancon and
16  his firm did not perform as required under their
17  agreement?
18     A   They told me they worked in the appeal.
19     Q   They worked on the appeal?
20     A   Yeah.
21     Q   And Downs got it dismissed, right?
22     A   Yeah.
23     Q   Was there anything indicating they didn't do
24  their job right?
25     A   I have no knowledge.

Page 102

1    Q   So you haven't seen anything?
2    A   That they have told -- you asked if they
3  told me that they had not performed.
4    Q   Right.
5    A   No.  They told me that their work was
6  limited to that period of time.  That's what they've
7  told me.
8    Q   And did they say they didn't do it right,
9  didn't do it well, didn't do it competently?
10   A   I can't remember.
11   Q   Do you have any knowledge from your own self
12 whether these gentlemen, their law firms were not living
13 up to the agreement to represent these clients?
14       MR. FRIEDMAN:  Object to form.
15       Foundation.
16       THE DEPONENT:  I have no knowledge
17       that they did not perform.
18 BY MR. McKEE:
19   Q   And in that letter you translated into
20 Spanish, what Downs was telling the clients they were
21 sending the letter to was that these entities, Sterbcow
22 Law Group and Melancon Rimes were no longer acting on
23 their behalf, right?
24   A   Yes.
25   Q   They didn't use Marx Sterbcow's name or

Page 103

1  Jason Melancon's name, they used the law firm names,
2  right?
3    A   Yeah, if that's what it says.
4    Q   I'm just trying to make that
5  distinguishment, because they're making some
6  distinguishment that they only used the lawyers' names
7  in the contracts and not their law firms.  When they
8  sent the letter to the clients, they actually used their
9  law firm names, right?
10       MR. FRIEDMAN:  Objection to form to
11       the five questions that you just asked
12       simultaneously in one.
13       THE DEPONENT:  What was the
14       question?
15 BY MR. McKEE:
16   Q   I'll make it the one question.
17       In the letter that went out to clients that were
18 with Marx Sterbcow and Jason Melancon, the letter that
19 went out to those clients actually said that the law
20 firms that those two lawyers are in were no longer
21 representing them, right?
22   A   I can only -- the papers that I would have
23 signed every day had their names, personally, not the
24 firms, but what I translated there, I'm not sure if
25 that's exactly what went out to the client in paper.

Page 104

1    Q   Did that which went out to the clients in
2  paper come from New Orleans or from Miami?
3    A   The ...
4    Q   The letter to the clients.
5    A   From Miami.
6        MR. McKEE:  We're running out of
7        tape, and I'm almost done.  So let's
8        change the tape so the cross-examination
9        can go uninhibited.
10       THE VIDEOGRAPHER:  We are going off
11       the record.  The time is 11:54.
12       (Recess.)
13       THE VIDEOGRAPHER:  We are back on
14       the record.
15       Tape number 4.  The time is 11:59.
16       On the record.
17 BY MR. McKEE:
18   Q   When Downs had that letter sent out to the
19 clients with whom there was a contract that included
20 Sterbcow and Melancon, do you know whether they also
21 subsequently informed those clients they still owed
22 Sterbcow and Melancon a fee?
23       MR. FRIEDMAN:  Object to form.
24       Foundation.
25       THE DEPONENT:  I'm not aware of

Page 105

1  communications after that.
2  BY MR. McKEE:
3    Q   You never saw such a communication?
4    A   Telling clients that the ...
5    Q   They still owed a fee.
6    A   No.
7    Q   And so that the question is clear, did you
8  sign a communication in writing to clients in the BP
9  matter that they still owed a fee to Sterbcow and
10 Melancon?
11   A   No.
12   Q   Do you know whether any of the clients were
13 sent to a medical facility in Louisiana by Downs?
14   A   To the place where I picked up the medical
15 records.
16   Q   Do you remember what that place was called?
17   A   I remember where it was.
18   Q   Where was it?
19   A   Past my house on Esplenit (phonetic) Street
20 or Avenue or something like that.
21   Q   And do you know what the clients did when
22 they got there?
23   A   This is like an industrial medicine thing.
24 I would advise them -- I've never been there.  I've
25 never seen the process, but I would advise them that

27 (Pages 102 - 105)

1  they would get checked for all of the different
2  conditions that would apply for the claim to see if they
3  presented the symptoms that would allow them to claim
4  for medical benefits.
5     Q   When the clients went there, were the
6  clients paid for that?
7     A   No.
8     Q   Who was paying for them?
9     A   It would be paid on a contingent basis just
10 like the retainer.
11    Q   Who would be paid on a contingent basis?
12    A   The people that were performing the exams.
13    Q   So their payment was contingent upon the
14 plaintiff actually receiving money?
15    A   Yes.
16    Q   Did anyone from Downs tell you whether
17 that's allowable under Florida law?
18    A   No.
19    Q   Was it The Downs firm that instructed you to
20 send them to that facility?
21    A   I didn't send them.  I just told them that
22 at some point, an appointment would be made for them to
23 go there and get checked out.
24    Q   And who made that appointment?
25    A   Case coordinators in Florida.

1     Q   At The Downs firm?
2     A   Yes.
3     Q   Do you know whether any of the clients that
4  you signed up actually received a settlement payment?
5     A   I have no knowledge.  As far as I know,
6  nobody -- the medical claims have not been paid.
7     Q   And this is my last area of inquiry.
8  Hopefully it's short for your sake of mind.
9        When you were being asked to translate the letter
10 that was to be sent out to the clients that was
11 indicating that Sterbcow and Melancon were no longer
12 going to be representing them, were you concerned that
13 doing that might not be the correct thing legally to do?
14       MR. FRIEDMAN:  Object to form.
15    Foundation.
16       THE DEPONENT:  For me to translate
17    it?
18 BY MR. McKEE:
19    Q   No.  For that letter from the Downs firm to
20 go to those clients without other things happening.
21       MR. FRIEDMAN:  Same objection.
22       THE DEPONENT:  That would be me
23    thinking as an attorney, and I was only
24    performing as a law clerk intake so
25    I ...

1  BY MR. McKEE:
2     Q   Yeah, but you are a Puerto Rican attorney,
3  and you were at that time?
4     A   Yes.
5     Q   As a matter of fact, you almost passed the
6  New York Bar requirements?
7     A   I passed.
8     Q   And so at that time, you had enough
9  knowledge to know -- and I'm wondering if you thought
10 this shouldn't happen?
11       MR. FRIEDMAN:  Object to form.
12       THE DEPONENT:  I had no knowledge
13    if they have -- if they had
14    communications between them, you know,
15    discussing if they were going to later
16    inform clients together or if anything
17    would happen after I translated this.
18 BY MR. McKEE:
19    Q   Did there come a point in time where you
20 learned, no, there wasn't a communication, and Sterbcow
21 and Melancon were fairly upset about it?
22    A   Yes.
23       MR. FRIEDMAN:  Object to form.
24 BY MR. McKEE:
25    Q   At that point, did you start getting

1  concerned for yourself about what went on here?
2        MR. FRIEDMAN:  Object to form.
3        THE DEPONENT:  Yes.
4  BY MR. McKEE:
5     Q   And as a lawyer and upstanding woman, did
6  you say, "I'm not getting involved in these sorts of
7  actions, I don't want to have a part of this"?
8        MR. FRIEDMAN:  Object to form.
9  BY MR. McKEE:
10    Q   Did you say that to yourself?
11    A   I had already decided I was resigning,
12 because I wanted to come home.
13    Q   But you're not the type of person who would
14 help someone do something that's wrong, right?
15       MR. FRIEDMAN:  Object to form.
16       MR. McKEE:  Why are you laughing?
17    I think that's a pretty serious
18    question.
19       MR. FRIEDMAN:  I think these
20    questions are ridiculous, but go ahead,
21    keep going.
22       MR. McKEE:  A jury might not.
23 BY MR. McKEE:
24    Q   Do you think you're the type of person that
25 does things that you know are wrong?

28 (Pages 106 - 109)

Page 110

1      A    No.
2          MR. FRIEDMAN:  Object to form.
3  BY MR. McKEE:
4      Q    And you're the type of person who would
5  stand up to prevent things that are wrong, right?
6          MR. FRIEDMAN:  Object to form.
7  BY MR. McKEE:
8      Q    Right, that's why you're a lawyer, right?
9      A    Yes.
10         MR. FRIEDMAN:  Same objection.
11         MR. McKEE:  I have no further
12  questions.  Thank you.
13         Your witness.
14         MR. FRIEDMAN:  I'm sorry.  I didn't
15  hear the witness' last answer to that.
16         THE DEPONENT:  That I don't do
17  things that are wrong.
18         MR. FRIEDMAN:  Perfect.
19         Just before we begin, it's 12:00
20  your time.  This is kind of directed to
21  everyone there, particularly, the court
22  reporter and the videographer.  Did you
23  want to take a break for lunch?
24         MR. PÉREZ:  It depends how long.  I
25  mean, it depends how long you're going

Page 111

1  to take.  If it's not going to take that
2  long, I suggest we ride it out, but
3  that's up to you guys.
4          MR. McKEE:  I'm with counsel.  If
5  you think you're going to be awhile,
6  let's take lunch.  If you think it's
7  going to be brief, meaning a half hour
8  or less, let's wrap it up.
9          MR. FRIEDMAN:  I don't know.  It
10  could be longer than a half hour.  I
11  don't think it's going to be that long,
12  but I guess it depends on her answers.
13         MR. McKEE:  I'll leave it to the
14  witness, your choice.
15         THE DEPONENT:  Let's keep going.  I
16  really want to be done.
17         MR. McKEE:  I don't blame you.
18  Okay.  We're going to keep going.
19         MR. FRIEDMAN:  All right.  Let's
20  take a break, and Dan give me a call in
21  just a second.
22         MR. PÉREZ:  All right.
23         THE VIDEOGRAPHER:  Going off the
24  record.  The time is 12:07.
25         (Recess.)

Page 112

1          THE VIDEOGRAPHER:  We are back on
2  the record.
3          The time is 12:14.  Tape number 4.
4  On the record.
5          MR. McKEE:  We're on.
6              EXAMINATION
7  BY MR. FRIEDMAN:
8      Q    Ms. Pérez, my name is Jeremy Friedman, and I
9  represent The Downs Law Group ...
10     A    Yes.
11     Q    ... Danny Pérez, Craig Downs and myself,
12  Jeremy Friedman, in regards to a case entitled the
13  Sterbcow Law Group, LLC and Melancon Rimes, LLC v. the
14  defendants.
15         Are you familiar with this case at all?
16     A    Yes.
17     Q    I'm going to ask you a few questions today
18  concerning some of your testimony and some of your
19  knowledge as to this case.  And if you can't hear me,
20  because I'm over the phone, please tell me, and I will
21  attempt to rephrase my question.
22     A    Okay.  Thank you.
23     Q    Now, Ms. Pérez, are you here pursuant to a
24  subpoena today?
25     A    Yes.

Page 113

1      Q    And were you ever served with a subpoena,
2  personally served?
3      A    Yes.
4      Q    And in what way were you personally served?
5      A    They called my mother's pharmacy and asked
6  to talk to me.
7      Q    Who is "they"?
8      A    The process server.
9      Q    So the process server called your mother's
10  pharmacy, and what's the name of that pharmacy?
11     A    Farmacia Menay.
12     Q    And where is that located?
13     A    In Yauco, Puerto Rico.
14     Q    Do you know why the process server would be,
15  I guess, contacting your mother's pharmacy for that?
16     A    I would think they Googled the street
17  address and found -- because that's the only way I could
18  figure it out.
19     Q    And then did they ever personally serve you
20  with a subpoena?
21     A    Yes.
22     Q    And when did they do that?
23     A    When?
24     Q    Yes.
25     A    On February 5.

29 (Pages 110 - 113)

Page 114

1    Q   So that was less than 30 days ago?
2    A   Yes.
3    Q   And where were you when they personally
4  served you?
5    A   When they served me in Caguas, Puerto Rico.
6    Q   And did they serve you with a Florida
7  subpoena or a subpoena from a court in Puerto Rico?
8    A   It says "In the Circuit Court of the
9  Eleventh Judicial District in and for Miami-Dade County,
10  Florida.
11    Q   And was that the only subpoena you were
12  served with?
13    A   Yes.
14    Q   Now, after you got that subpoena, did you
15  speak to anybody from either Mr. McKee's office or
16  Mr. Sterbcow or his office or Mr. Melancon or his
17  office?
18    A   Yes.  Not Mr. Melancon.
19    Q   And who did you speak to?
20    A   I spoke to Mr. Sterbcow and then to
21  Mr. McKee.
22    Q   And when did you first speak to Mr. Sterbcow
23  about this subpoena?
24    A   When -- do you want a date?  I ...
25    Q   Or approximately.

Page 115

1    A   I know that when -- I don't know that they
2  -- and I don't remember, approximately.  This seems like
3  forever.
4    Q   But if they served you on February 5, it was
5  sometime after February 5?
6    A   Yes.
7    Q   And do you know how long after February 5
8  they served you?
9    A   No.  They served me on February 5.
10    You want to know when I talked to Mr. Sterbcow
11  about --
12    Q   Yes, yes.
13    A   -- the subpoena?
14    Q   How long after they served you did you speak
15  with Mr. Sterbcow?
16    A   A few days later, I think.
17    Q   Prior to being served on February 5, did you
18  ever waive service of process?
19    A   Yes.
20    Q   And when did you do that?
21    A   I sent a fax to Mr. McKee after he called
22  me, and he said that he just wanted to, you know, talk
23  to me about my role in the BP case.  So he said that
24  this would be just quick, and I said it was okay if you
25  know, they were coming to Puerto Rico and the time was

Page 116

1  right.
2    Q   Now, this happened before February 5,
3  correct?
4    A   Yes.
5    Q   Do you know if it happened -- or do you know
6  what the date of that fax was?
7    A   I don't remember.
8    Q   Do you still have a copy of the fax?
9    A   I think I do at home, yes.
10    Q   Did it happen in January or February?
11    A   I could find out, but I don't have it here.
12    Q   Did you speak with Mr. McKee on the phone
13  about your testimony here today?
14    MR. McKEE:  Well, that would be
15  impossible, since it's before today.
16    Objection to form.
17  BY MR. FRIEDMAN:
18    Q   Go ahead.
19    A   I'm trying to find out, because I told Danny
20  about sending this.  I informed Danny on February 3 that
21  I had waived process.
22    Q   This was on February 1?
23    A   On February 3.
24    Q   Oh, February 3, okay.
25    A   Yes.

Page 117

1    Q   So prior to February 3, had you waived
2  process, or did you waive it on that day?
3    A   I think it was the day before, but I would
4  have to -- I have the copy at home.
5    Q   So if Mr. McKee said that you had waived
6  process on January 29, would that be incorrect?
7    A   I hadn't spoken ...
8    MR. McKEE:  Form.
9    THE DEPONENT:  ... to him before I
10  sent the paper waiving process.
11  BY MR. FRIEDMAN:
12    Q   Now, in any of your communications with
13  Mr. McKee prior to this deposition, did you discuss your
14  testimony at all?
15    MR. McKEE:  Objection to form.
16    THE DEPONENT:  No, no.  He said he
17  wanted to ask me about the role that
18  I've had in the BP case.
19  BY MR. FRIEDMAN:
20    Q   Did he ask anything else besides your role
21  in the BP case, if you can remember?
22    A   I have such a headache.  I don't recall.
23  I'm so sorry.
24    Q   Did you provide any documents to Mr. McKee
25  or Mr. Sterbcow in regards to the subpoena prior to

30 (Pages 114 - 117)

Page 118

1    today?
2        A    No.
3        Q    Now, did you have any communications with
4    Mr. Sterbcow in regards to the subpoena prior to today?
5        A    Not regarding the subpoena.  I had talked to
6    him, but for other reasons.
7        Q    Did you have any communications with
8    Mr. Sterbcow about the allegations in the Complaint
9    prior to today?
10       A    He did tell me about it, yes.
11       Q    And when did you have this conversation?
12       A    When?
13       Q    Yeah.
14       A    I think after the claim was filed.
15       Q    So this was after their Complaint was filed?
16       A    I believe so.
17       Q    This would have been sometime in
18    January 2014?
19       A    Yes.
20       Q    Now, why were you having a discussion with
21    him in January of 2014?
22       A    It was just I was performing other sort of
23    work for him, and it was just about the fact that this
24    claim was ongoing and such.
25       Q    Did he talk about any of the specifics of

Page 119

1    the claim?
2        A    Not that I recall, no.
3        Q    Did he state or make any statements to you
4    as to their position in this case?
5        A    Yes.
6        Q    I'm sorry, yes or no?
7        A    Yes.
8        Q    What did he tell you?
9        A    Well, the same that was contained on the
10    claim, that he was working pursuant to, you know, to
11    like a joint representation ...
12       Q    Anything else?
13       A    ... between the two firms.
14       Q    Anything else?
15       A    Let me think.
16           Yeah, he had asked for my address and asked if I
17    would be available for being subpoenaed to just talk
18    about what I did on a day-to-day basis, the same thing.
19       Q    And this conversation you said occurred
20    sometime in January of 2014, correct?
21       A    Yeah, I think so.
22       Q    Now, in response to his request for your
23    address, what did you say, if anything?
24       A    I had given him my address prior to that for
25    payment for the other work that I had been doing.  I did

Page 120

1    give him my address, but if that's what you're asking, I
2    did not waive process in that conversation or did I ever
3    inform I had waived process there.
4        Q    Did you ever tell Mr. Sterbcow in that
5    conversation that you were agreeing to accept service of
6    process and no need to serve a subpoena?
7        A    I said I was available for a deposition if
8    it came to it, but I did not inform him of that.
9        Q    Did you talk about this case in any other
10    way with Mr. Sterbcow in that conversation or any other
11    conversation prior to today's deposition?
12       A    Not that I -- since the claim has been
13    filed, I mean, we would talk in the office, you know,
14    normally about, you know, day-to-day work, but ...
15       Q    But actually, my question, and I apologize
16    if I wasn't clear, did you talk about anything related
17    to the claim that they had filed prior to today other
18    than what you testified to?
19       A    I think that that's about it.
20       Q    Have you ever spoken with Mr. Jason
21    Melancon?
22       A    No, never.
23       Q    Have you ever seen Mr. Melancon?
24       A    No.
25       Q    Did you ever see Mr. Melancon in the office

Page 121

1    of Mr. Sterbcow at any time that you were working there?
2        A    No.
3        Q    And I'm assuming you never spoke on the
4    phone with Mr. Melancon?
5        A    I called him, I think, once when I was going
6    to work, but no, I did not receive a response.
7        Q    Did you ever write any letters to
8    Mr. Melancon?
9        A    No.
10       Q    Did you ever send any e-mails to
11    Mr. Melancon?
12       A    No.
13       Q    Did you ever see Mr. Melancon's name or law
14    firm's name on any communications between yourself and
15    any third party?
16       A    No.
17       Q    Now, you testified that you are a licensed
18    attorney in Puerto Rico, correct?
19       A    Yes.
20       Q    And you are currently -- or you passed the
21    Bar in New York; is that correct?
22       A    Yes.
23       Q    Are you a member of the New York Bar at this
24    time?
25       A    No.

31 (Pages 118 - 121)

Page 122

1    Q   Now, when you were retained by The Downs Law
2  Firm to work for them, were you retained as an attorney
3  licensed in Puerto Rico?
4    A   No.
5    Q   Were you retained in any way to provide any
6  type of legal advice to any clients?
7    A   No.
8    Q   Were you retained as an attorney in any form
9  by Downs Law Group?
10    A   No.  As a part-time law clerk.
11    Q   At any point during the time that you were
12  working for Downs, were you requested to give legal
13  advice to any client?
14      MR. McKEE:  Objection to form.
15      THE DEPONENT:  Not that I recall.
16      By "legal advice," you mean other
17      than telling the clients what the
18      results of this claim would be and
19      explaining the appeal that was holding
20      all of that?  Because that I did do.
21  BY MR. FRIEDMAN:
22    Q   Let's get into that.
23      When you said you talked about the appeal, when
24  did you explain to them all of that?
25    A   That there was an appeal going on that was

Page 123

1  holding up the process of paying out the claims.
2    Q   Anything else?
3    A   That once that time came when the appeal was
4  dismissed, the effective date would hit, and they would
5  receive their money, hopefully.
6    Q   Now, these conversations that you had, did
7  they occur -- when did they occur?  Did they occur at
8  the time that you signed them up first?
9    A   Sometimes I would explain all of this
10  before, because they knew the people were not getting
11  paid still, so they would ask.  If not, if they didn't
12  ask, then they would fill out the information, and then
13  I would explain it to them.
14    Q   So you would basically explain to them the
15  current status of the litigation; is that fair to say?
16    A   Yes.
17    Q   At any point in time, did you advise the
18  clients whether they had a viable claim or not?
19    A   No, I wouldn't know.
20    Q   At any point in time, did you advise any of
21  the clients as to whether they should file a claim or
22  whether they should simply forget about it?
23    A   No.  I would only ask very specifically if
24  they had any symptoms, because if they didn't have any
25  symptoms, then it didn't make sense to file a medical

Page 124

1  claim.
2    Q   Now, was this question part of like kind of
3  a group of questions on a checklist that you had from
4  Downs Law Group?
5    A   Yes.
6    Q   Now, you began working for Downs Law Group
7  in July of 2013; is that correct?
8    A   Yes.
9    Q   And you were, I guess, put in the offices of
10  Sterbcow Law Group, correct?
11    A   Yes.
12    Q   Did you sign up any clients at that
13  location?
14    A   Yes.
15    Q   Now, did you have a desk at that location?
16    A   I worked at -- there's a conference -- like
17  a conference table, longer table that I would meet
18  clients on all the time.
19    Q   I'm sorry.
20    A   On a conference kind of place.  There was a
21  desk, but I always met clients at a long table like the
22  one that we're sitting on right now.
23    Q   Did you have a computer there when you first
24  started?
25    A   When I first started, no.

Page 125

1    Q   Did you ever use any computer that was owned
2  by the Sterbcow Law Group?
3    A   Sometimes to print.
4    Q   I'm sorry to print things?
5    A   Sometimes to print, yes.
6    Q   And which computer would that be?
7    A   There were two other computers.  I think I
8  used both at some point.
9    Q   Were those in the offices of Mr. Sterbcow or
10  somewhere else located outside of his personal office?
11    A   Inside.
12    Q   And what were some of the type of things
13  that you would print from his office?
14    A   Sometimes the clients wanted a copy of --
15  very few clients wanted a copy of their -- the contract
16  that they were signing or the UPS labels to send the
17  information back to Miami or -- yeah, that kind of
18  thing.
19    Q   So you would access the UPS website in order
20  to mail things back to Downs Law Group, correct?
21    A   Yes.
22    Q   Did you ever use Mr. Sterbcow's computer to
23  access anything else?
24    A   Yes, the UPS label was sometimes sent by one
25  of the case coordinators to my e-mail account.

32 (Pages 122 - 125)

Page 126

1     Q   Did you ever access your e-mail on
2  Mr. Sterbcow's computer?
3     A   Yes.
4     Q   How many times?
5     A   I can't make -- I don't know.
6     Q   I mean, more than three?
7     A   I think about three, basically, not too
8  many.
9     Q   And when did you first access -- use his
10  computer to access your e-mail?
11    A   I don't know.
12    Q   I mean, would it have been when you first
13  started working for Downs?
14    A   The first packets I sent Danny, and maybe in
15  the next few months after I started working, not at
16  first.
17    Q   And you said you believe you used his
18  computer to access your e-mail around three times, is
19  that correct, possibly more?
20    A   Yes.
21    Q   What e-mail account did you put into his
22  computer to access it?
23    A   Can you repeat the question?
24    Q   Sure.
25       You said you accessed your e-mail on his computer

Page 127

1  at least three times, correct?
2     A   Yes, amled.pérez@gmail.com.
3     Q   Did you have to put a password in at that
4  time in order to access your e-mail?
5     A   Yes.
6     Q   Now, you were asked a few questions by
7  Mr. McKee concerning inquiry into your e-mail; do you
8  recall that?
9     A   Yes.
10    Q   And I believe you testified that you were
11  able to review the last couple of weeks to see if there
12  was any access from another computer, correct?
13    A   Yes.
14    Q   Did you ever engage in the process of
15  determining which computers your e-mail allowed access
16  from prior to the last couple of weeks?
17    A   I sometimes do it like once in awhile but,
18  no, not until recently.
19    Q   When you said "recently," what do you mean,
20  the last two or three weeks?
21    A   Yes.
22    Q   Now, you were asked some questions direct
23  concerning meeting with Downs Law Group clients; do you
24  recall that?
25    A   Yes.

Page 128

1     Q   And you would meet with them in the offices
2  of Marx Sterbcow, correct?
3     A   Yes.
4     Q   And do you know, did Downs Law Group ever
5  pay Mr. Sterbcow to rent his offices during that time
6  frame?
7     A   That I know of, that -- you want -- I
8  wouldn't know.
9     Q   So you don't know either way?
10    A   If he got paid or if he was supposed to be
11  paid?
12    Q   Correct.
13       Well, actually, those are two different
14  questions.  Let me ask it separately.
15       Do you know if Marx Sterbcow asked to be paid for
16  the uses of his office while during the time that you
17  were there?
18    A   He asked Danny.
19    Q   I'm sorry?
20    A   He asked Danny one of the times that Danny
21  was present at the office.
22    Q   And what did he say, specifically; do you
23  recall?
24    A   That he would ask Santa.
25    Q   When you say, "ask Santa," what was he

Page 129

1  asking Danny to do, to pay him so Downs could use his
2  office?
3     A   He asked Danny if he had heard anything
4  about the payment for use of the office, and Danny said
5  he would ask Santa and e-mail her about it.
6     Q   So based on that, was it your understanding
7  that Mr. Sterbcow either agreed with Downs Law Group or
8  at a minimum, expected payment for the use of the
9  offices?
10       MR. McKEE:  Objection to form.
11       THE DEPONENT:  What was the
12    question?
13  BY MR. FRIEDMAN:
14    Q   Sure.
15       Was it your understanding, based on what you just
16  testified to, that Mr. Sterbcow either had an agreement
17  for payment with Downs Law Group for use of the offices
18  or that he expected payment for it?
19       MR. McKEE:  Form.
20       THE DEPONENT:  Yes, he expected
21    payment, yes.
22  BY MR. FRIEDMAN:
23    Q   And do you know whether or not he was
24  actually paid, either on a monthly basis or in some
25  manner, for the use of his offices?

33 (Pages 126 - 129)

1          MR. McKEE:  Objection to form.
2          THE DEPONENT:  I believe he wasn't.
3   BY MR. FRIEDMAN:
4     Q   I'm sorry?
5     A   I believe he wasn't.
6     Q   He was or he was not?
7     A   He was not, because he asked for it.
8     Q   So your testimony is you don't think he was
9   actually ever paid anything for the use of his offices?
10    A   At that point when he asked for payment, he
11  told Danny that he had not received payment.
12    Q   And so my next question is, do you recall
13  when he asked to receive payment?
14    A   Danny went to the office maybe in October.
15  I don't recall.
16    Q   So by October, your testimony is that
17  Mr. Sterbcow had not been paid anything for the use of
18  his office; is that correct?
19    A   I don't know if he was not paid anything,
20  but at the moment, he asked, because he said he had not
21  received a check.
22    Q   When you were there, were there any other
23  tenants using Mr. Sterbcow's office?
24    A   No.
25    Q   To your knowledge, did Mr. Sterbcow ever

1   turn any tenants away because the offices were occupied
2   by Downs?
3     A   His office?
4     Q   Yes.
5     A   I have no knowledge.
6     Q   Did you see any tenants being turned away or
7   potential tenants being turned away as a result of Downs
8   Law Group being there?
9     A   No, not that I saw.
10    Q   Did Mr. Sterbcow ever advise you that he
11  would have a tenant there if Downs Law Group hadn't been
12  there?
13    A   No.
14    Q   Now, how many hours a week would you say you
15  would use Mr. Sterbcow's office?
16    A   On a regular week, around 25, 30, 30
17  something.
18    Q   So did you ever -- and this was, you're
19  saying, a regular week, what, from Monday through Friday
20  or Monday through Sunday?
21    A   Yeah, like on a normal week when clients
22  would show up.  There were times when I worked less than
23  that, because clients would not come to the office and I
24  would just leave, or there were times when they wanted
25  to meet me, and I would work more than that.

1     Q   Was there ever a time that you were working
2   70 hours in a week?
3     A   In a week, no.
4     Q   How about 60 hours?
5     A   It may have seemed like it.  I would have to
6   check the time that I charged.
7     Q   So you have a record of how often you were
8   there?
9     A   Most of the time when I was working, I
10  worked from the office, yes.  I sometimes worked from
11  home as well.
12    Q   So I just want to make sure that the record
13  is clear.
14        My question was, how many times were you actually
15  in Marx' office, as opposed to just working over all,
16  whether it be at home or somewhere else?
17    A   In a week?
18    Q   Yes.
19    A   Around 30 something hours.
20    Q   This would be in Marx' office?
21    A   Well, maybe less.
22    Q   Well, about how many hours a week were you
23  submitting to Downs Law Group to be paid on?
24    A   The most that I would charge would be around
25  30 something hours.

1     Q   And then would that include your work not
2   only in his office, but also sometimes at home or ...
3     A   Yes.
4     Q   ... somewhere else?
5     A   Yes.
6     Q   At any time, did you actually work in his
7   office for 70 hours in a particular week?
8     A   I think a total was of that, but for two
9   weeks, like more than normal, because I worked weekends,
10  too.  I remember a specific week where it was a lot and
11  I was a lot in the office, but I don't remember hours.
12  It was a resulting period of more than normal, but for
13  two weeks.
14    Q   So this was over a two-week period?
15    A   Yes, because I remember Santa asking me
16  about how I worked so many hours in that period.
17    Q   All right.  And then any hours that you
18  worked at Mr. Sterbcow's office or anywhere, that would
19  have been taken down and provided to Downs Law Group,
20  correct?
21    A   Yes.
22    Q   Now, when you were signing up clients, who
23  was normally in a room when a client would come in?
24    A   Usually, it was me and the client.
25    Q   Now, did Mr. Sterbcow ever attend any of

34 (Pages 130 - 133)

Page 134

1  those meetings?
2      A   He was sometimes introduced to the clients
3  as they walked in, and he was at the office.
4      Q   When you say "introduced," what would he say
5  to them?
6      A   I would say this was his office to explain
7  why we're a firm from Florida and we're in New Orleans,
8  and he would just say hi and talk to them, you know,
9  just in general.  Maybe he spoke about the symptoms and
10  the experience of some of the clients when they arrived,
11  yes.
12      Q   Now, how often would you say he did this?
13      A   A few times.
14      Q   But like twice?
15      A   Probably more than twice.
16      Q   More than five times?
17      A   No.  I would say just about that.
18      Q   So from the clients that at least you were
19  there, he had done this some frame between two and five
20  times; is that fair to say?
21      A   That he talked about their claims, their
22  symptoms and such, yes.
23      Q   As far as the time that he would actually
24  speak to the clients and come in on a meeting, how many
25  times would you say that was?

Page 135

1      A   If the clients arrived early and I was not
2  there, he would greet them.
3      Q   How about, I'm talking about now the time
4  that you are there and speaking with the client at that
5  table that you described.  How many times would you say
6  that he participated in a conversation?
7      A   About three or so.  I really would like to
8  not give a number, because I don't recall.
9      Q   But would you say it was more than five?
10      A   That he talked to the clients in the office
11  while I was signing them up?
12      Q   Yes.
13      A   No.
14      Q   I'm sorry.  I can't see there.  Are you
15  thinking about the answer?
16          MR. McKEE:  She said no.
17          THE DEPONENT:  I said no.  Sorry.
18  BY MR. FRIEDMAN:
19      Q   About how many times would you say, just so
20  it's clear, because maybe the phone knocked out, while
21  you were in the office signing up the client, how many
22  times did Mr. Sterbcow participate in that?
23      A   I wouldn't say more than three.  He was just
24  introduced to a few more than that.
25      Q   Did Mr. Sterbcow ever go over any of the

Page 136

1  sign-up packet that you described earlier in the
2  deposition with these clients?
3      A   With the clients, no.
4      Q   Did he ever discuss his agreement with Downs
5  Law Group, if any, with the clients?
6      A   Not that I recall.
7      Q   Did he ever discuss any retainer agreements
8  with the clients?
9      A   Not that I remember, no.
10      Q   Did he ever give any legal advice to the
11  clients?
12          MR. McKEE:  Objection to form.
13  Terms undefined.
14          THE DEPONENT:  I'm sorry?
15          MR. McKEE:  Terms undefined, legal
16  advice.
17  BY MR. FRIEDMAN:
18      Q   Amled, he's just preserving his objection
19  for the record, and so I'll repeat the question.
20      Did he ever provide any legal advice to any of
21  the clients that you were signing up in his office?
22      A   He advised the client that I asked him about
23  a medical situation, medical malpractice situation that
24  a client might have had.
25      Q   Now, that was part of those three clients

Page 137

1  that we talked about earlier?
2      A   Yeah.
3      Q   Anything else?
4      A   Not that I recall.
5      Q   Now, did Jason Melancon ever meet any of the
6  clients with you?
7      A   No.
8      Q   Did he ever sign up any of the clients with
9  you?
10      A   No.
11      Q   To your knowledge, did he discuss with the
12  clients any type of retainer agreement with them?
13      A   No.
14      Q   To your knowledge, did Mr. Melancon ever
15  give them any legal advice?
16      A   Not that I know about.
17      Q   To your knowledge, did Mr. Melancon ever
18  speak to any of the clients?
19      A   Not in my presence, not that I know about,
20  no.
21      Q   Now, you testified that you worked there
22  through November of 2013; is that correct?
23      A   Yes.
24      Q   And during that time frame, at some point,
25  did you ever leave the offices of Sterbcow Law Group?

35 (Pages 134 - 137)

Page 138

1     A   Yes.
2     Q   And do you know what date, specifically, you
3   left the offices?
4     A   In October, but that's ...
5     Q   Do you know what day in October it was?
6     A   Not right now, no, but -- no.
7     Q   All right.  Well, were you ever asked by
8   Downs Law Group to remove any of your belongings from
9   the office?
10    A   Yes.
11    Q   And who asked you to do that?
12    A   Danny.
13    Q   And did he tell you why you needed to remove
14  your belongings?
15    A   Because they were having a disagreement.
16    Q   And did you end up taking all of your stuff
17  out of there?
18    A   Yes.
19    Q   Did you leave behind any documents that you
20  prepared or received from Downs Law Group?
21    A   Not to my knowledge.
22    Q   You had a computer, eventually, I believe
23  you testified to, correct?
24    A   Yes.
25    Q   And who gave that to you?

Page 139

1     A   Danny's girlfriend.
2     Q   And was that used for work purposes on
3   behalf of Downs Law Group?
4     A   I used it very few times, but yes, only
5   for ...
6     Q   Did you ever use a computer for Downs Law
7   Group or on behalf of Downs Law Group other than the
8   three times we discussed with Mr. Sterbcow's computer or
9   the computer you received from Danny's girlfriend?
10    A   I would use my computer, because we were
11  having trouble just with the laptop itself.
12    Q   Now, in that computer, did you ever access
13  any documents prepared by Downs Law Group?
14    A   Yes.
15    Q   Did you ever access the Citrix server of
16  Downs Law Group?
17    A   I was never able to access it successfully.
18  I tried, but no.
19    Q   And when you left, did you take your
20  computer with you?
21    A   Yes.
22    Q   Was there any computer equipment that you're
23  aware of that was left behind in Mr. Sterbcow's office?
24    A   No.
25    Q   Now, after you left the offices, where did

Page 140

1   you go?
2     A   My house.
3     Q   Did you continue working for Downs Law
4   Group?
5     A   Yes.
6     Q   Do you recall how long you worked for Downs
7   Law Group after you left the Sterbcow Law Offices?
8     A   A few more weeks.
9     Q   And did you go to another office at that
10  point?
11    A   No.  I was looking for an office, but I
12  couldn't find one.
13    Q   Between the time that you left the offices
14  and the time that you left the employ at Downs Law
15  Group, did you have any communications with
16  Marx Sterbcow?
17    A   Yes.
18    Q   What did you discuss?
19    A   Just when clients would go to the office and
20  ask about me.  So he would give them my phone number or
21  let me know if they were there so that I would call
22  them.
23    Q   So clients would actually come to his office
24  after Downs Law Group left; is that correct?
25    A   Yes.

Page 141

1     Q   And what happened with those clients?
2     A   I would meet them outside, you know, in
3   public places.
4     Q   And you said you spoke on the phone with
5   Mr. Sterbcow about this?
6     A   Yes.
7     Q   Did these clients leave any documents with
8   Mr. Sterbcow, to your knowledge?
9     A   Not that I know about.
10    Q   Well, at any point, did these clients ever
11  advise you that they had left documents intended for
12  Downs Law Group with Mr. Sterbcow?
13    A   No.
14    Q   Was there any client that you can recall
15  that had said that she or he was trying to forward a
16  retainer agreement and we claim that we never got it?
17    A   That they were sending it themselves, yes.
18    Q   And was this after you left the offices of
19  Sterbcow Law Firm?
20    A   Yes.
21    Q   And who was that client?
22    A   I don't remember.
23    Q   Do you remember the circumstances about
24  that?
25    A   It was many times that they sent the papers,

36 (Pages 138 - 141)

Page 142

1  and then they would call me and fight with me about them
2  not getting an answer, or they complained about having
3  to sign papers twice or something like that. So it was
4  a lot, many people that I ...
5      Q   Well, did any of these clients actually
6  advise you that they sent the sign-up papers or
7  personally delivered the sign-up papers to
8  Mr. Sterbcow's offices after the law offices of Downs
9  had left?
10     A   No, not that I have talked to.
11     Q   Was there anyone who advised you that they
12  had spoken with Mr. Sterbcow subsequent to The Downs Law
13  Group leaving their offices?
14     A   I believe the same ones that would go there
15  and wouldn't find me.
16     Q   So it's clear, clients would actually go to
17  Mr. Sterbcow's office looking for you?
18     A   Yeah, because sometimes they were -- you
19  know, they knew that I was at that office, and they knew
20  that they were going to talk to someone Spanish speaking
21  or someone like that. So they wouldn't know my name or
22  anything, but they went looking for me, yes.
23     Q   In your discussions with Mr. Sterbcow about
24  this, did he ever advise you that there were some papers
25  you needed to pick up?

Page 143

1      A   Not that I recall.
2      Q   Going back to your client sign-ups, when you
3  were at Mr. Sterbcow's office and doing this, did
4  Mr. Sterbcow ever execute, to your knowledge, any of the
5  client retainer agreements?
6      A   Execute what?
7      Q   Any of the client retainer agreements.
8      A   No. You mean execute like sign?
9      Q   Yes.
10     A   No.
11     Q   Did he ever sign any documents on behalf of
12  Sterbcow Law Group in relation to this case that you're
13  aware of?
14     A   BP related Sterbcow Law Group documents?
15     Q   Right.
16     A   Not that I'm aware of.
17     Q   To your knowledge, did Mr. Melancon ever
18  sign any of the client retainer agreements?
19     A   No, I have never seen Mr. Melancon.
20     Q   Did you ever send any of the client retainer
21  agreements to Mr. Melancon's office so he could sign
22  them?
23     A   No.
24     Q   And you never saw Mr. Melancon in the
25  Sterbcow Law Group office, correct?

Page 144

1      A   No.
2      Q   "No," that's correct?
3      A   That's correct, I never saw him.
4      Q   And once the clients signed up with The
5  Downs Law Group, what did you do with those retainer
6  agreements?
7      A   I would sometimes store them and wait for
8  the UPS label, and sometimes Danny would pick them up.
9  It depended on the situation.
10     Q   So is it fair to say that any client sign-up
11  that you did, you would send them off to Downs Law
12  Group, or Downs Law Group would pick them up personally?
13     A   Yes.
14     Q   And at any time in that, say, period of time
15  when you were waiting for them to pick them up or mail
16  them out, to your knowledge, did Mr. Sterbcow or
17  Mr. Melancon ever sign any of those agreements?
18     A   No.
19     Q   Did they ever ask you to sign any of those
20  agreements?
21     A   No.
22     Q   To your knowledge, did they ever travel to
23  Miami to sign any of those agreements?
24     A   I have no knowledge.
25     Q   And did you ever go to Mr. Melancon's office

Page 145

1  at any time for him to sign those agreements?
2      A   No.
3      Q   You were shown the retainer agreement by
4  Mr. McKee as part of your deposition; do you recall
5  that?
6      A   Yes.
7      Q   If you could just take a look at that, I
8  think it might be Exhibit 4.
9      A   Yes.
10     Q   And that's the retainer agreement between
11  Downs Law Group, and I guess, one of the clients that
12  he's gotten ahold of, correct?
13         MR. McKEE: Form.
14         THE DEPONENT: Yes.
15  BY MR. FRIEDMAN:
16     Q   Now, is there any space there for
17  Mr. Sterbcow or Mr. Melancon to sign the agreements?
18     A   It says "abogado," as in attorney?
19     Q   Yeah.
20     A   Yeah, but no name. It just says "client"
21  and "attorney."
22     Q   So there would be a space if Mr. Sterbcow or
23  Mr. Melancon wanted to sign one of those agreements,
24  they could have signed it as attorney, correct?
25         MR. McKEE: Objection to form.

37 (Pages 142 - 145)

Page 146

1      THE DEPONENT:  Yes.
2  BY MR. FRIEDMAN:
3      Q   Does the agreement point out or at any time
4  did it state what fee percentage, if any, the Sterbcow
5  Law Group or Melancon Rimes, LLC would be entitled to?
6      MR. McKEE:  Objection to form.
7      THE DEPONENT:  No.
8  BY MR. FRIEDMAN:
9      Q   Does the fee agreement at any time state
10  what Mr. Sterbcow personally would be entitled to or
11  Mr. Melancon would personally be entitled to?
12      MR. McKEE:  Form.
13      THE DEPONENT:  No.
14  BY MR. FRIEDMAN:
15      Q   Now, you had testified earlier in your
16  direct examination that Mr. Sterbcow asked you to
17  actually change the individual's name and put his law
18  firm's name in there, correct?
19      A   He told me to tell Danny about it, yes.
20      Q   Did he tell you why that needed to be done?
21      A   Well, because of -- how do you say that?
22  Professional liability, like it was a difference between
23  his name personally and the name of his law firm.
24      Q   So he told you that he needed to distinguish
25  between himself personally and the law firm, correct?

Page 147

1      A   Yeah.
2      Q   Now, I believe you were asked this question,
3  but did you ever see an agreement, after he asked this
4  to be done, that changed it from him personally to the
5  Sterbcow Law Group?
6      A   No.
7      Q   And did you ever see an agreement where it
8  was changed from Jason Melancon personally to Melancon
9  Rimes, LLC?
10      A   Not that I recall.
11      Q   And do you know if Mr. Sterbcow or
12  Mr. Melancon ever followed up on their concern that
13  their law firms were not listed on the retainer
14  agreement?
15      A   I don't know if he communicated with Danny
16  or with Craig, no.  I have no knowledge.
17      Q   But as far as you saw after that, you never
18  saw any change made in that respect, correct?
19      A   No.
20      Q   You were asked about an agreement between
21  Downs Law Group and the Sterbcow Law Group concerning
22  BP, correct?
23      A   An agreement?
24      Q   Yeah.
25      A   Yes.

Page 148

1      Q   Did you ever see that agreement before
2  today?
3      A   This e-mail?
4      Q   No.  It would be an agreement that said
5  "joint venture agreement" or "co-counsel agreement."
6      MR. McKEE:  I didn't show it to
7  her.
8      MR. FRIEDMAN:  Okay.
9      MR. McKEE:  It's not an exhibit to
10  this depo.
11  BY MR. FRIEDMAN:
12      Q   Then let me rephrase the question.
13  Have you ever seen an agreement between
14  Marx Sterbcow or the offices of Sterbcow Law Group and
15  Downs Law Group in regards to any client or specific
16  client and BP?
17      A   An agreement between Downs and Sterbcow Law
18  Group's about specific clients?
19      Q   Yeah.
20      A   No.
21      Q   Have you seen any agreement between the two
22  parties?
23      A   Not that I recall.
24      MR. FRIEDMAN:  And to the
25  videographer or the court reporter, if

Page 149

1  we need to change the tape, tell me,
2  because obviously, I can't see that.
3      THE VIDEOGRAPHER:  Okay.  Can we go
4  off the record?
5      MR. FRIEDMAN:  Sure.
6      THE VIDEOGRAPHER:  We're going off
7  the record.  The time is 1:04.
8      (Recess.)
9      THE VIDEOGRAPHER:  We're on the
10  record.
11  Tape number 5.  The time is 1:08.
12  On the record.
13  BY MR. FRIEDMAN:
14      Q   Ms. Pérez, you testified -- you were asked
15  questions concerning the Exhibit Number 5; do you recall
16  that?
17      A   Yes.
18      Q   And because I'm not there, I just want to
19  confirm.  Can you just describe what Exhibit Number 5
20  is?
21      A   Just a second.
22  An e-mail.
23      Q   What does Exhibit Number 5 say in the top,
24  right-hand corner?
25      A   On the top right?

38 (Pages 146 - 149)

Page 150

1    Q   Yeah.
2    A   Https@mail.google.com.  That ...
3    Q   Actually, how about just below it to the
4  right?
5    A   Amled Pérez.
6    Q   Is that your e-mail address on that?
7    A   Yes.
8    Q   Do you see where it says below that "FW:
9  Letter"?
10    A   Yes.
11    Q   Do you know what that means?
12    A   Yes.
13    Q   What does that mean?
14    A   Forward.
15    Q   Did you ever forward this e-mail to
16  Mr. Sterbcow, Mr. Melancon or Mr. McKee?
17       MR. McKEE:  Form.
18       THE DEPONENT:  No.  That's the name
19    of the letter that I received.
20  BY MR. FRIEDMAN:
21    Q   At any time, did you ever provide this
22  e-mail to them?
23    A   No, not that I recall.
24    Q   Do you see at the bottom there where it says
25  "This e-mail is intended only to be read or used by the

Page 151

1  addressee"?
2    A   Yes.
3    Q   And that it says "If you're not the
4  addressee indicated in this message, that you should
5  destroy the message and notify the sender by reply
6  e-mail?
7    A   Yes.
8    Q   And then it says "confidentiality and/or
9  privilege are not waived or lost by reason of mistaken
10  delivery to you."  Do you see that?
11    A   Yes.
12    Q   Did either Mr. McKee, Mr. Melancon or
13  Mr. Sterbcow ever advise you you were in possession of
14  this e-mail?
15       MR. McKEE:  Form.
16  BY MR. FRIEDMAN:
17    Q   When I say "ever," I mean prior to today.
18       MR. McKEE:  Form.
19       THE DEPONENT:  Yes.
20  BY MR. FRIEDMAN:
21    Q   When did they tell you that?
22    A   The day before yesterday.
23    Q   So that goes into communications that you
24  had with them?
25    A   Yes.

Page 152

1    Q   So going back to that, what did you discuss
2  with regards to this e-mail?
3    A   I asked, because Danny informed me that this
4  was attached to a court document, and I asked how that
5  was there, and it was denied.
6    Q   So when you say "it was denied," what do you
7  mean?
8    A   That it was not used as part of any court
9  paper, and then after double checking, they said that it
10  was attached to a court motion or something.
11    Q   When you say "they," who are you referring
12  to?
13    A   Mr. McKee and Mr. Sterbcow.
14    Q   They were both on the phone with you at the
15  same time?
16    A   Yes.
17    Q   And you're saying that they first denied
18  that they ever actually attached that e-mail to a court
19  filing?
20    A   Yes.
21    Q   And Mr. Sterbcow -- who actually physically
22  said that it was not attached, Mr. Sterbcow or
23  Mr. McKee?
24    A   He asked Mr. McKee, and Mr. McKee said no.
25    Q   And this was two days ago, you said?

Page 153

1    A   About, yes.
2    Q   Well, was it more than five days ago?
3    A   No.
4    Q   Now, then you said that, they then said
5  something different about it?
6    A   Yeah, that it was attached to -- it was an
7  exhibit for the protective order.
8    Q   I'm sorry, what?
9    A   That it was filed as an opposition to a
10  protective order filed in Florida.
11    Q   Do you know when they actually filed this?
12    A   No.
13    Q   Do you know, was it filed prior to the court
14  order that was attached in Exhibit 1 to your deposition?
15    A   I have no knowledge when it was filed.
16    Q   Did they tell you why they were filing it?
17    A   No.
18    Q   Did they tell you how they got it?
19  I'm sorry?
20    A   No.
21    Q   Did you ask them how they got it?
22    A   Yes.
23    Q   And what did they say?
24    A   Nothing.
25    Q   They were just silent on the line?

39 (Pages 150 - 153)

1     A    We had some screaming, but not on their
2  side.
3     Q    I'm sorry, they were screaming at you, or
4  you were screaming at them?
5     A    I was screaming.
6     Q    Why were you screaming at them?
7     A    Because I was upset.
8     Q    And what, specifically, did you say to them
9  about this e-mail?
10     A    That I never authorized this to be filed in
11  court or used.
12     Q    Well, at the time that you said this, did
13  you know how they had gotten it?
14     A    It beats me.
15     Q    I'm sorry?
16     A    No.  I can only think that -- I don't know.
17     Q    Do you know if they accessed your e-mail at
18  any time?
19     A    I have no knowledge about that fact.
20     Q    But you never actually gave this e-mail to
21  them?
22     A    No, not -- no.
23     Q    And this e-mail, it's correct it includes a
24  disclaimer that says they should give it back if they
25  come into contact with it, because it's confidential,

1  correct?
2     A    Yes.
3     Q    Do you know if they ever gave it back to the
4  sender prior to filing it with the Court?
5     A    I have no knowledge.
6     Q    Do you know when they actually obtained this
7  e-mail?
8     A    I have no knowledge, no.
9     Q    After you were screaming at them, what did
10  they say in response to this?
11     A    Well, that -- how did get in the middle of
12  this?
13        That the other side had denied that there were
14  such communications and that it would have been a fraud
15  to the Court not to bring forward such communications if
16  they existed.
17     Q    Just so I'm clear, they told you that they
18  decided to file that with the Court based on the fact
19  that the defendants had denied of the existence of
20  communications?
21     A    They said it was a mistake in filing.
22     Q    They told you that it was an accident that
23  they filed it with the Court?
24     A    Yes.
25     Q    Did they tell you it was an accident that

1  they broke into your e-mail account?
2        MR. McKEE:  Form.  Motion to
3     strike.
4        THE DEPONENT:  No.
5  BY MR. FRIEDMAN:
6     Q    Did they tell you it was an accident to give
7  it to Downs Law Group once they received it based on
8  attorney-client privileged information?
9        MR. McKEE:  Objection to form.
10        THE DEPONENT:  No.
11  BY MR. FRIEDMAN:
12     Q    I'm just trying to find out the sequence of
13  events, because you first said they denied they ever did
14  it?
15     A    Yes.
16     Q    And then they changed their tune and said
17  that they did do it, correct?
18     A    Yes.
19     Q    They then told you why they did it, correct?
20     A    Yes.
21     Q    At what point did they tell you it was an
22  accident?
23     A    They said it was -- they said it was an
24  accident and that they were -- that's why I don't
25  understand.

1     Q    That what?
2     A    That's what I don't understand.  They said
3  it was filed by mistake and that it was -- that that was
4  what the motion was about, that that was filed, that
5  they were answering, because they knew that
6  communications did exist, but the fact that the letter
7  was filed was a mistake.
8     Q    But just so I understand it so we're clear,
9  they told you that it needed to be filed because of a
10  denial by the defendants, correct?
11     A    Yes.
12     Q    But they also said it was an accident that
13  it was filed?
14     A    Yes.
15     Q    So they told you both of those, correct?
16     A    Yes.
17     Q    Now, at what point in the conversation did
18  you ask them where did they get it or how did they get
19  it?
20     A    In the beginning.
21     Q    And you said that there was no response,
22  correct?
23     A    Yeah.
24     Q    So what was the next thing that was said
25  after you asked them, "Where did you get this?"

40 (Pages 154 - 157)

Page 158

1    A   I said, "How could this be filed in court?"
2    Q   And so they skipped the question of where
3  they got it and explained how it was filed or why it was
4  filed, correct?
5    A   Yes.
6    Q   Did you discuss any -- after that statement,
7  did you discuss at any time as to after that how they
8  got it?
9    A   No.  That's when I gave my sworn statement.
10   Q   But I'm still going back on account of the
11 telephone conversation.
12       Within that telephone conversation, was there
13 ever a time after they said that it was an accident that
14 you asked, once again, how did they get it?
15   A   Yes.
16   Q   What did they say that second time?
17   A   Nothing.
18   Q   I'm sorry, they said nothing?
19   A   Yeah.
20   Q   And what did you say in response to that?
21   A   Cried.
22   Q   You were crying on the phone with them?
23   A   Yes.
24   Q   Why were you crying?
25   A   Because this reflects poorly on me.

Page 159

1    Q   Why do you think it reflects poorly on you
2  that they took one of your e-mails?
3        MR. McKEE:  Form.
4        THE DEPONENT:  Because if something
5    that was supposed to be kept by me is
6    filed in court in a proceeding that it's
7    against the person that I'm working for,
8    it obviously reflects badly on me that
9    it is filed against my employer, whose
10   confidentiality I'm bound to.
11 BY MR. FRIEDMAN:
12   Q   Just so I understand it, you believe that it
13 would reflect bad on you, because a confidential e-mail
14 was disclosed in court by the plaintiffs and/or
15 plaintiffs' counsel, correct?
16       MR. McKEE:  Form.
17       THE DEPONENT:  Yes.
18 BY MR. FRIEDMAN:
19   Q   And what did they say to you while you were
20 crying about this?
21   A   That I was required to give it as per the
22 subpoena.
23   Q   They told you that you were required to give
24 it to them per the subpoena.  Was this before court
25 order?

Page 160

1    A   No.  That was after the court order, that it
2  was included in what I was supposed to hand in.
3    Q   Did you have a discussion with them after
4  the Court made an order concerning what you had to
5  produce?
6    A   He just told me that the deposition was
7  still going on, was still set up for today.
8    Q   And did you discuss this particular issue
9  with them after the court order came out?
10   A   After since yesterday?
11   Q   Yes.
12   A   I spoke to Mr. Sterbcow, yes.
13   Q   And what did he tell you the second time?
14   A   He said that this would be just, you know,
15 going through the papers that I had to give as per the
16 subpoena, just ...
17   Q   Did he bring up the issue at all that you
18 were crying about the day before?
19   A   Yes.
20   Q   And what did he say?
21   A   That he was not happy about that, that he
22 did not know that this would be filed.
23   Q   And did Mr. Sterbcow tell you in that second
24 conversation how he got it?
25   A   No.

Page 161

1    Q   Did you ask him?
2    A   It was already used.  No.
3    Q   I'm sorry?
4    A   No.
5    Q   Sitting here today, did either Mr. Sterbcow
6  or Mr. McKee ever tell you how they were able to access
7  an e-mail of yours?
8        MR. McKEE:  Form.
9        THE DEPONENT:  I can make my -- I
10   can think about it, but not that they
11   have told me.
12 BY MR. FRIEDMAN:
13   Q   How do you believe they accessed your
14 e-mail?
15   A   I have no knowledge that they have.
16       MR. McKEE:  Form.
17       THE DEPONENT:  I checked, and I --
18   I checked the e-mails that I had printed
19   when I was out of the office already,
20   but still in New Orleans.  I printed out
21   other documents that were personal, you
22   know, sent from Downs, like my check
23   stubs, and I have tried to make sense of
24   it, but I ...
25

41 (Pages 158 - 161)

1  BY MR. FRIEDMAN:
2      Q   I believe you testified that you have a
3  belief as to how they may have gotten it, correct?
4      A   It just doesn't make sense to me.  That's a
5  possibility.
6      Q   So what's your belief as to how they may
7  have gotten it?
8          MR. McKEE:  Objection to form.
9          THE DEPONENT:  I don't know.  I
10         don't know.
11 BY MR. FRIEDMAN:
12     Q   Do you believe you might have sent it to
13 them?
14     A   I did not forward it to them, no.
15     Q   Do you have any belief as to whether they
16 were able to access your e-mail from a computer in
17 Mr. Sterbcow's office?
18         MR. McKEE:  Form.
19         THE DEPONENT:  I have no knowledge
20         of this.  I dropped off other papers at
21         his office, but I do not know.
22 BY MR. FRIEDMAN:
23     Q   You recall earlier that we discussed that
24 you actually used Mr. Sterbcow's computer?
25     A   Yes.

1      Q   And you actually accessed your e-mail from
2  his computer, correct?
3      A   Yes.
4      Q   Do you know if the password was ever saved
5  on his computer?
6      A   I have no knowledge.
7      Q   Have you changed your password to your
8  e-mail since you found out about this issue?
9      A   Not in the last few days, no.  I changed it,
10 I believe, when I moved back to Puerto Rico.
11     Q   Now, have you seen this Exhibit 5 before
12 today?
13     A   What was filed in court?
14     Q   Correct.
15     A   It is here, around somewhere.
16     Q   But have you seen it before today?
17     A   I have seen the e-mail.  It's the same --
18 it's basically the same that I printed.
19     Q   And did you see that there was a
20 communication between myself and Craig Downs as part of
21 this e-mail?
22     A   Yeah, that's what I was supposed to
23 translate.
24     Q   Did you understand that that was a
25 confidential communication?

1      A   Yes.
2      Q   And did you also see that there was a
3  privilege notice at the bottom?
4      A   Yes.
5      Q   Now, do you know when Mr. Melancon first was
6  making a claim against Downs Law Group?
7      A   Did I know when what?
8      Q   When Mr. Melancon was first making a claim
9  against Downs Law Group?
10     A   When he filed it or -- I don't understand
11 the question.
12     Q   That he filed it, when he was first making a
13 claim or asserting a claim against them.
14     A   No.
15     Q   Do you know when he was first claiming that
16 they weren't complying with an agreement?
17     A   When -- what is the question, again?
18     Q   Do you know if Mr. Melancon -- or do you
19 know when Mr. Melancon was first claiming compliance --
20 or lack of compliance with any agreement by Downs Law
21 Group?
22     A   When I first was asked to get out of the
23 office, right?
24     Q   And this letter is dated October 22, 2013,
25 correct?

1      A   Yes.
2      Q   And were you asked to do this translation
3  after you had left the office?
4      A   Yes, I believe so.
5      Q   So Downs Law Group was not working or was
6  not occupying the office of Sterbcow Law Group at the
7  time that this translation request was made, correct?
8      A   If I was -- I'm sorry, I'm just hungry.
9  Your question was?
10     Q   Sure.
11         Downs Law Group was not using the offices of
12 Sterbcow Law Group at the time that this request for
13 translation was being made, correct?
14     A   Yes.
15     Q   Where were you when you received this
16 e-mail?
17     A   At my house.
18     Q   So if you were at your house and Downs Law
19 Group was no longer at the offices, do you have any idea
20 how Mr. McKee could have filed this or obtained this
21 document?
22     A   As I said, I performed other jobs for
23 Mr. Sterbcow, and I did drop off papers at his office,
24 but ...
25     Q   Would this have been one of the papers you

42 (Pages 162 - 165)

Page 166

1   dropped off?
2      A   I dropped a lot of papers regarding other
3   research that I did for him, but I don't know if I
4   accidentally did it.  I ...
5      Q   Well, this letter, this doesn't have
6   anything to do with any research from Mr. Sterbcow,
7   correct?
8      A   I know, yes.  The papers that I did have, I
9   printed off my -- of my home, and that's why I don't
10  feel comfortable saying for sure that my e-mail account
11  was hacked or anything like that, because again, this
12  just reflects poorly on me, because maybe it was my
13  mistake.
14     Q   Sitting here today, do you know, though, if
15  you ever personally gave them this document?
16     A   No.
17     Q   Did you ever go to their offices after
18  October 22?
19     A   Yes.
20     Q   How many times?
21     A   Maybe once or twice.
22     Q   When was that?
23     A   I don't know.
24     Q   Was it in November 2013?
25     A   I left in December, so I -- yeah, it could

Page 167

1   have only been in November.
2      Q   Were you still working for Downs Law Group
3   at the time that you went back to the offices?
4      A   Yes.
5      Q   What was the reason that you went back to
6   the offices?
7      A   To drop off papers that I had from
8   Mr. Sterbcow.
9      Q   You were doing work for Mr. Sterbcow while
10  you were working for Downs Law Group?
11     A   I had done research, legal research for
12  Mr. Sterbcow back in August and September.
13     Q   And what type of legal research did you do?
14     A   I did title insurance companies and such.
15     Q   Do you know why Mr. Sterbcow was having
16  someone working for Downs Law Group do legal research
17  for him on title insurance companies?
18     A   Because I was there.
19     Q   Did he ever advise anybody from Downs Law
20  Group that he was going to use you for his own, I guess,
21  personal purposes?
22     A   No.  He was not -- I mean, I was not working
23  -- I was not charging Downs Law Group for work that I
24  did for Mr. Sterbcow.
25     Q   I understand.  I understand.

Page 168

1      But you were working for Downs Law Group at the
2   time that he asked you to do this, correct?
3      A   Yes, because I was only working part-time.
4      Q   Did he pay you separately?
5      A   I'm sorry?
6      Q   Did he pay you separately?
7      A   Yes.
8      Q   And you said earlier that he had your
9   address already, correct?
10     A   Yes.
11     Q   And did he have your address in September of
12  2013?
13     A   In September, no, he did not.
14     Q   When did he first have your address?
15     A   I don't remember, but not by them, because I
16  was working there, and I lived in New Orleans.  So he
17  only needed my address to forward payment.
18     Q   But you did work for him in August of -- in
19  September of 2013, correct?
20     A   Yes.
21     Q   And when did he send payment to you?
22     A   When he was reimbursed.  I believe it was
23  December or January.
24     Q   Well, did he actually pay you --
25     A   Yes.

Page 169

1      Q   -- wait, let me finish -- after he filed a
2   lawsuit against us?
3      A   What was the date of the ...
4      Q   Let's say the beginning of January or the
5   end of December -- actually, the end of December 2013.
6      A   That the claim started?
7      Q   That the Complaint was filed.
8      A   Well, yes, then.
9      Q   So he paid you after he had filed a lawsuit
10  against Downs Law Group, correct?
11     A   Yes, because he would pay me when he was
12  reimbursed.
13     Q   Reimbursed by whom?
14     A   By his clients.
15     Q   And at the time that he reimbursed you --
16  well, how many times did he pay you?
17     A   Once.
18     Q   At the time that he told you about the
19  payment, he also discussed this lawsuit with you?
20     A   Discussed like -- yeah, we had talked about
21  it, yes.
22     Q   So did he know at that time that you were
23  going to be a witness at the time that he paid you four
24  months later?
25     A   No.

43 (Pages 166 - 169)

Page 170

1    Q   How do you know that?
2    A   That I was going to be a witness?
3    Q   No. Let me repeat the question.
4    Did you know that you were going to be a witness
5    in this case at the time that he paid you four months
6    after you did the job?
7    A   I don't know.
8    Q   Going back to the October 22 e-mail, did you
9    have any communications in this regard or related to
10   this Exhibit 5 with myself, Jeremy Friedman?
11   A   Yeah -- did I talk to you about this, no.
12   Q   At any time in 2013, did you have any
13   discussions with me whatsoever about anything?
14   A   No.
15   Q   Did you even know where I was?
16   A   No.
17   Q   Let me try this, prior to the subpoena?
18   A   Yes, I did not know.
19   Q   So yes would answer that question, but you
20   had never met me in person, correct?
21   A   I had never met you in person or spoken to
22   you.
23   Q   You were asked some questions about the
24   information that was sent by myself to Craig Downs; do
25   you recall that?

Page 171

1    A   That was sent?
2    Q   Yes, in that exhibit.
3    A   Yes.
4    Q   And in the exhibit to the deposition, does
5    it actually have the body of the e-mail?
6    A   Yes.
7    Q   So I'd like you to take a look at -- I guess
8    it would be the second page.
9    A   The one that's complete?
10   Q   See where it says "I think along with"?
11   A   "Along with the amended retainer"?
12   Q   Yes, do you see that?
13   A   Yes.
14   Q   Now, does the exhibit you're looking at,
15   does it have the next paragraph that starts out "as an
16   update to your case"?
17   A   No.
18   Q   What happened to that?
19   A   The one that I -- one that I printed, I
20   guess it got cut when I printed it.
21   Q   Well, did Mr. McKee produce Exhibit 5 today?
22   MR. McKEE:  That's from her papers,
23   sir.
24   THE DEPONENT:  The papers that I
25   brought, it seems like I was supposed to

Page 172

1    print it on legal paper or something,
2    and it got cut off.
3    MR. FRIEDMAN:  Danny, can you go
4    ahead -- did you bring with you
5    Exhibit C to their ...
6    MR. PÉREZ:  Yeah, I did.
7    MR. FRIEDMAN:  ... motion.
8    MR. PÉREZ:  Yeah.
9    MR. FRIEDMAN:  And what's the first
10   page of that?
11   MR. PÉREZ:  It's 1 of 4. The first
12   page is from me to her saying "Amled,
13   can you please translate the paragraph
14   below?"
15   The second page starts with "I
16   think" and ends with the signature of
17   the Downs Law Group.
18   The third page starts with
19   "confidentiality and privilege notice,"
20   and the bottom ends with "if you find
21   one of those executive offices, let me
22   know."
23   MR. FRIEDMAN:  Okay.
24   MR. PÉREZ:  And the fourth page
25   just starts with my name and ends with

Page 173

1    quoted text in it.
2    MR. FRIEDMAN:  If you could provide
3    that to the witness, first.  If
4    Mr. McKee wants to take a look at that,
5    he can ahead of time.
6    MR. McKEE:  I know it well.
7    THE DEPONENT:  Yeah, I have it.
8    BY MR. FRIEDMAN:
9    Q   Now, is this the e-mail that Mr. Sterbcow
10   said that it was accidentally filed?
11   A   Yes, the one that was marked that was in
12   court, yes.
13   Q   And did the e-mail that was accidentally
14   filed, did that have the paragraph that starts, "I think
15   on the second page as an update"?
16   A   Yes.
17   MR. McKEE:  Form. Objection.
18   BY MR. FRIEDMAN:
19   Q   Yes?
20   A   Yes.
21   Q   Did you understand at the time that you
22   received this that this was attorney-client privilege?
23   MR. McKEE:  Objection to form.
24   THE DEPONENT:  I don't think so,
25   because you were not communicating with

44 (Pages 170 - 173)

Page 174

1 the client, right? I didn't see it like
2 that.
3 BY MR. FRIEDMAN:
4    Q   Well, did you ever speak to Mr. Sterbcow
5 about any privilege concerning these documents?
6    A   No.
7    Q   Did he ever discuss in either of your phone
8 conversations about any type of legal privilege
9 involving these documents?
10    A   He said that that was being discussed in the
11 hearing, if these documents that I was going to provide
12 were privileged.
13    Q   And why did he bring that up?
14    A   I'm sorry?
15    Q   Why did he bring that up?
16    A   I don't understand.
17    Q   How did that come up in a conversation, the
18 issue of privilege and this particular document?
19    A   Well, he was telling me if I was supposed to
20 come to a deposition and said that there was a hearing
21 regarding confidentiality, regarding privilege, and
22 there was supposed to be a protective order so that I
23 wouldn't have to provide any documents.
24    Q   Now, did Mr. McKee ever discuss whether this
25 particular exhibit -- or e-mail, excuse me, was

Page 175

1 privileged?
2    A   He said he believed it wasn't.
3    Q   Well, how did it come up between you and
4 Mr. McKee's conversation about the issue of privilege?
5    A   When I asked him about this paper that he
6 had filed.
7    Q   And his response to that was he could do
8 that, because it's not privileged?
9       MR. McKEE:  Form.
10       THE DEPONENT:  He said that it
11    wasn't supposed to be confidential,
12    because it was in regards to a
13    relationship between two firms, and I
14    was translating something that was about
15    one firm, leaving the others out.
16 BY MR. FRIEDMAN:
17    Q   And in this regard, he never advised you how
18 he got that, correct?
19    A   No.
20    Q   And when you asked him, he remained silent,
21 correct?
22       MR. McKEE:  Form.  She just said
23    she didn't ask.
24 BY MR. FRIEDMAN:
25    Q   We'll go back then.

Page 176

1    Q   Ms. Pérez, isn't it true that you asked Mr. McKee
2 over the phone where he got this document?
3    A   Yes.
4    Q   And what was his response?
5    A   Nothing.  He just said that I was supposed
6 to -- that was required per the subpoena.
7    Q   But he didn't tell you how he got it,
8 correct?
9    A   No.
10       MR. FRIEDMAN:  One moment.
11 BY MR. FRIEDMAN:
12    Q   While you were working in the offices of
13 Sterbcow Law Group for Downs Law Group, did you ever
14 have any discussions with Mr. Sterbcow about any
15 attorneys' fees?
16    A   Attorneys' fees between me and him or
17 between him and Downs?
18    Q   Attorneys' fees via Downs Law Group?
19    A   Probably when we talked about -- when he
20 asked for the rent payment.
21    Q   You were asked by counsel on direct in
22 regards to a payment to the steering committee.  Do you
23 recall being asked that?
24    A   Yes.
25    Q   Have you ever heard Mr. Pérez or Mr. Downs

Page 177

1 ever reference any payment to the plaintiffs' steering
2 committee?
3    A   No.
4    Q   Have you ever seen any documents that would
5 demonstrate that?
6    A   No.
7    Q   Ms. Pérez, are you aware if Mr. McKee or
8 Mr. Sterbcow or Mr. Melancon has obtained any other of
9 your e-mails --
10       MR. McKEE:  Objection.  Form.
11 BY MR. FRIEDMAN:
12    Q   -- outside of this depo or prior to this
13 deposition?
14    A   Not to my knowledge.
15    Q   When you had these two conversations with
16 them, one yesterday and one a couple days ago, did they
17 ever advise you that they had any other documents of
18 yours in their possession?
19    A   No.
20    Q   Did they tell you what they were going to do
21 with Exhibit Number 5?
22    A   Prior to filing that, no.
23    Q   How about after they filed it?
24    A   No.  I mean, I thought you were asking me if
25 they asked if they could file that.  No, no.

45 (Pages 174 - 177)

Page 178

1      Q    After they filed it, did they tell you what
2   they were going to do with it at this point?
3      A    No.
4          MR. FRIEDMAN: All right. Let's
5   just take a quick break and see if I
6   have anything else, I might not, and
7   then we'll pick it up in about like one
8   minute.
9          MR. McKEE: Well, we ought to talk
10  about the witness needs lunch. She said
11  she has a headache and she's starving,
12  and I have questions.
13         MR. FRIEDMAN: How long do you have
14  questions for, do you think?
15         MR. McKEE: At least 20 minutes.
16         MR. FRIEDMAN: All right. It's
17  doubtful -- I'll have a discussion
18  quickly with Danny briefly about this.
19  I probably do not have any more, maybe,
20  but let me talk to him real quick. And
21  then why don't we just come back briefly
22  back on the record, and then I can close
23  out, and then we can decide whether she
24  wants to continue or take a break at
25  that time.

Page 179

1          MR. McKEE: We'll let her decide.
2          MR. FRIEDMAN: Yes.
3          THE VIDEOGRAPHER: We're going off
4   the record. The time is 1:46.
5          (Recess.)
6          THE VIDEOGRAPHER: We're back on
7   the record. The time is 1:58.
8          MR. FRIEDMAN: Ms. Pérez, at this
9   time, I have no further questions.
10         Now, you had said before we left
11  that you may want to either continue on
12  with Mr. McKee, he has about 20 minutes
13  or so, or take lunch. It's up to you.
14         MR. McKEE: Actually, it's
15  different than that. I'm getting too
16  old to be going past 2:00 in the
17  afternoon for lunch. I had a very light
18  breakfast. I'm going to take lunch, but
19  in light of the testimony I've heard,
20  over the lunch break, I highly recommend
21  that the witness brings legal counsel.
22         We're going to take lunch.
23         MR. FRIEDMAN: Let me just say for
24  the record that it sounds to me like
25  Mr. McKee is threatening the witness,

Page 180

1   and I don't know what that means.
2          MR. McKEE: I'm not allowed to give
3   her advice about invoking Fifth
4   Amendment. That's what I'm saying. She
5   need counsel here, because that's where
6   I'm going after lunch. Thank you.
7   That's not threatening. That's giving
8   some sage advice.
9          MR. FRIEDMAN: Did we get that on
10  the record?
11         MR. McKEE: I hope so.
12         THE REPORTER: Yes.
13         THE VIDEOGRAPHER: Yes.
14         MR. FRIEDMAN: All right. Good.
15  So we are taking --
16         MR. McKEE: We're going to take an
17  hour for lunch.
18         MR. FRIEDMAN: -- a break. How
19  long do you need for lunch?
20         MR. McKEE: I need to eat lunch, an
21  hour.
22         MR. FRIEDMAN: Okay. Amled, I
23  guess it's 2:00 now.
24         THE DEPONENT: Yeah.
25         MR. FRIEDMAN: So I guess you'll be

Page 181

1   back at 3:00?
2          THE DEPONENT: Yes.
3          MR. FRIEDMAN: Can you just go off
4   the record for a second?
5          MR. McKEE: No.
6          MR. FRIEDMAN: Okay. Say what you
7   want to say.
8          MR. McKEE: No, we're not going off
9   the record, unless it's for something
10  not related to this case.
11         MR. FRIEDMAN: I'm not on the
12  record anymore.
13         MR. McKEE: It has to be agreed by
14  counsel. You know the rules, sir.
15         What do you want to say if it's not
16  about this case?
17         MR. FRIEDMAN: It has nothing to do
18  with the case. We're off the record,
19  unless you have something else to say.
20         MR. McKEE: If it's not about this
21  case, we can go off record.
22         MR. FRIEDMAN: Yeah, wonderful.
23         THE VIDEOGRAPHER: Off the record.
24         (Recess.)
25         THE VIDEOGRAPHER: We are back on

46 (Pages 178 - 181)

Page 182

1    the record.
2          Tape number 6.  The time is 3:14.
3    On the record.
4          EXAMINATION
5    BY MR. McKEE:
6       Q   Ma'am, after being subpoenaed in this
7    matter, did you have any conversations with any lawyers
8    from the Downs Group?
9       A   Yes.
10      Q   With whom?
11      A   With Danny and with Mr. Friedman.
12      Q   On separate calls or jointly or both?
13      A   Both.
14      Q   How many times?
15          MR. FRIEDMAN:  One question.  When
16      you say "both," are you saying -- I
17      think you should clarify what she means
18      by "both."
19          THE DEPONENT:  Both with Danny only
20      and with Friedman and Danny jointly.
21   BY MR. McKEE:
22      Q   How many times did they contact you to
23   discuss matters about your subpoena?
24      A   Three or four times.
25      Q   And when Mr. Pérez arrived here yesterday on

Page 183

1    the plane from Miami, did he meet with you yesterday?
2       A   No.
3       Q   Have you ever gone over the documents that
4    you're going to be producing today with any of the
5    lawyers from the Downs firm?
6       A   Gone over?
7       Q   Meaning what you're going to produce, what
8    you're not going to produce, so on and so forth.
9       A   If I asked them if I could produce?  I asked
10   if something was covered by privilege, and I was told
11   that that was what the hearing was going to be about
12   yesterday.
13      Q   And did you talk to any of them from the
14   Downs firm between the time that the hearing was over
15   and last night?
16      A   Yes.
17      Q   Who did you talk to?
18      A   To Daniel Pérez.
19      Q   What did you talk about?
20      A   He said that the hearing went very well,
21   that the motion -- that this deposition was still up,
22   was still up for today at 9:00 a.m.
23      Q   He told you that motion went very well when
24   the very documents he was seeking to have protected by
25   court order were denied?

Page 184

1          MR. FRIEDMAN:  Object to form.
2    BY MR. McKEE:
3       Q   Is that what he told you?
4       A   He told me the hearing went very well.
5       Q   Did he show you a copy of that order?
6       A   No.  I just talked to him on the phone.
7       Q   Did he read you the order?
8       A   No.
9       Q   Approximately, when was your last day
10   working for the Downs firm as an employee?
11      A   November.  My resignation is in one of
12   those.
13      Q   One of the exhibits?
14      A   Yeah.
15      Q   And that would reflect time that was your
16   last day?
17      A   It was not my last day, per se, but when I
18   informed that I would no longer be working from a
19   different date forward.
20      Q   After you had left employment, did they owe
21   you money?
22      A   Yes.
23      Q   How much did they owe you?
24      A   About $5,000.
25      Q   Have they paid you yet?

Page 185

1       A   No, because I was going to get paid once the
2    claims started to be paid to clients.
3       Q   Well, let me get this straight.
4          Would it be accurate to state that that payment
5    that was owed to you was not for your hourly rate?
6       A   It was as a bonus.
7       Q   A bonus.
8          What was the bonus amount?
9       A   $75 per client signed.
10      Q   So they were paying you money to sign
11   clients?
12      A   It was as a performance -- like a
13   performance boost or something like that.
14      Q   In Florida, we call that running cases.
15          Did they ever explain to you whether that's legal
16   in Florida?
17          MR. FRIEDMAN:  Object to form.
18          Foundation.
19          THE DEPONENT:  No.
20   BY MR. McKEE:
21      Q   So for every client you brought in and got
22   them to sign, you were paid an additional $75 or were to
23   be paid?
24      A   Yeah.
25      Q   And were there times that you signed them up

47 (Pages 182 - 185)

Page 186

1  and actually did get paid?
2     A   No.
3     Q   So they owed you for every client you signed
4  up?
5     A   Yes, until they got significant monies.
6  That's what the timing to get paid would be.
7     Q   Do you have that in any kind of written or
8  contractual form?
9     A   We had an e-mail conversation, but that's on
10  my -- on the Downs Law Group server.
11     Q   But you're saying you don't have that group
12  of e-mails?
13     A   I believe I printed it, but since that was
14  not, you know, something that I would -- that was
15  required for this, I did not bring it.
16     Q   Well, the key thing is whether you have it
17  still?
18     A   Yes.
19     Q   Do you know whether The Downs Group was
20  paying others $75 apiece to sign up clients?
21     A   I was told everybody works in a performance
22  based, you know ...
23     Q   So does that mean it was your understanding
24  they had other people out there signing up clients for
25  $75 apiece?

Page 187

1     A   I don't know the amount.  That was just when
2  I first got interviewed in the beginning.
3     Q   But was that your understanding that others were
4  out there being paid a dollar amount for each client
5  that they signed up?
6     A   That would be paid in the end when the whole
7  matter was over.
8     Q   Meaning they'd be sharing in a fee earned
9  from the case?
10         MR. FRIEDMAN:  Object to form.
11         THE DEPONENT:  I don't know.
12  BY MR. McKEE:
13     Q   Well, have you ever heard of charging a
14  client a cost of having signed them up?
15     A   No.
16     Q   So if you were getting paid, it would have
17  to be coming out of someone's fee, right?
18         MR. FRIEDMAN:  Object to form.
19         Foundation.
20  BY MR. McKEE:
21     Q   And that would be sharing a fee with a
22  non-lawyer, right?
23     A   Yes, I guess, yes.
24     Q   Now, coming here today, they still owe you
25  money, right?

Page 188

1     A   Yes.
2     Q   They -- when I say "they," The Downs Group
3  still owes you money?
4     A   Yes.
5     Q   They've called you multiple times?
6     A   Yes.
7     Q   Did they ever suggest to you that they may
8  sue you?
9     A   No.
10     Q   Did they ever intimate that had you given
11  those documents to plaintiffs at any time, it would have
12  been a breach of your employment agreement?
13         MR. FRIEDMAN:  Object to form.
14         THE DEPONENT:  I'm trying to
15     remember each part of the call.  I think
16     it might have been said at some point.
17  BY MR. McKEE:
18     Q   Do you remember on or about November 12,
19  2013 dropping off Exhibits 3, 4 and 5 to Mr. Sterbcow at
20  his office?
21     A   I dropped off papers that I had to run to
22  him.
23     Q   And are you saying it did not include
24  Exhibits 3, 4 and 5?
25     A   I did not knowingly give papers.

Page 189

1     Q   That's my point, because there's been some
2  intimations made here, and I want to make sure the
3  record is here clear, especially with a lawyer under
4  oath.
5     A   Yeah.
6     Q   So is it possible that on that date, on or
7  about that date, in the papers you delivered to his
8  office, it included Exhibits 3, 4 and 5?
9         MR. FRIEDMAN:  Object to form.
10         Move to strike the whole question based
11     on the question that said "That's my
12     point."
13  BY MR. McKEE:
14     Q   You can answer.
15     A   I gave a big pile of papers, and I do think
16  it is possible.
17     Q   So that we're really clear, you don't have a
18  scintilla of evidence that anyone from either the
19  Sterbcow Law Firm or the Melancon Law Firm or the McKee
20  Law Group ever even attempted to access your private
21  e-mails?
22     A   No.
23         MR. FRIEDMAN:  Object to form.
24  BY MR. McKEE:
25     Q   Or your company e-mails?

48 (Pages 186 - 189)

Page 190

1    A   My --
2    Q   The ones at Downs.
3    A   On the same ...
4    Q   Right.
5    A   No.
6    Q   Did you give your pass codes to
7    Mr. Sterbcow?
8    A   No.
9    Q   To Mr. Melancon?
10   A   Never met him.
11   Q   To McKee, me?
12   A   No.
13   Q   Did you give your private pass codes to any
14   other person such that they could access your accounts?
15   A   Not for -- no.
16   Q   And of course, are you aware that a request
17   for production was delivered with service of process to
18   the Defendant Downs, individuals and the company that
19   asked for any and all e-mails or other written
20   communications between members of the Downs Law Group
21   regarding eliminating Plaintiffs Sterbcow Law Group, LLC
22   and/or Melancon Rimes, LLC from involvement in BP client
23   representation and that in the middle of January,
24   January 14, they responded, "none"; are you aware of
25   that?

Page 191

1        MR. FRIEDMAN:  Object to form.
2        THE DEPONENT:  Yeah.
3    BY MR. McKEE:
4    Q   That would have been a misrepresentation to
5    us, wouldn't it have?
6        MR. FRIEDMAN:  Wait, I didn't hear.
7    Did you answer the question?
8        THE DEPONENT:  Yes.
9        MR. FRIEDMAN:  What was your
10   answer?
11       THE DEPONENT:  Yes.
12       MR. FRIEDMAN:  That you're aware of
13   that request for production?
14       THE DEPONENT:  That he informed me,
15   yes.
16   BY MR. McKEE:
17   Q   And in light of what you know with
18   Exhibit 5, that document itself would have been one that
19   required disclosure?
20   A   Yes.
21       MR. FRIEDMAN:  Object to form.
22   Foundation.
23   BY MR. McKEE:
24   Q   And then at that time, the Sterbcow firm and
25   Melancon's firm were still counsel for these plaintiffs,

Page 192

1    right?
2        MR. FRIEDMAN:  Object to form.
3    Foundation.
4    BY MR. McKEE:
5    Q   The ones that they're going to send the
6    letter to is to tell them that those lawyers are no
7    longer going to be representing them, right?
8        MR. FRIEDMAN:  Object to form.
9    Please don't answer the question.
10   Besides, you just keep repeating
11   yourself or changing the question each
12   time.
13       MR. McKEE:  Sir, you can object to
14   form.
15       MR. FRIEDMAN:  Have you asked her
16   to answer the question, the first one?
17       MR. McKEE:  Motion to strike.  I
18   withdrew the question.  I moved on to
19   another question, because you objected.
20       MR. FRIEDMAN:  You withdrew the
21   question?
22       MR. McKEE:  You objected, and I
23   rephrased the question.  Thank you very
24   much.  I want an answer to my question.
25   So what was my last question?

Page 193

1        MR. FRIEDMAN:  So now, you're
2    withdrawing the question?  Just so the
3    record is clear, you withdrew that
4    question as to whether or not they were
5    still representing them at the time.
6    Go ahead.
7        MR. McKEE:  Court Reporter, could
8    you please read the last question before
9    all of that?
10       (The court reporter read the question
11   commencing at page 192, line 5.)
12   BY MR. McKEE:
13   Q   And now that we're on a video deposition,
14   I'd like to make sure the question is real clear; okay?
15   A   Yeah.
16   Q   At that time, with that document that you
17   were translating into Spanish ...
18   A   Yes.
19   Q   ... that document actually was going to be
20   addressed to the clients that Sterbcow and Melancon
21   represented, right?
22   A   Yes.
23       MR. FRIEDMAN:  Object to form.
24   Foundation.
25

49 (Pages 190 - 193)

Page 194

1  BY MR. McKEE:
2      Q   Now, you were asked some questions by
3  counsel for Downs, the defendant himself as well, about
4  your perspective on what was going on here in this
5  litigation.  You thought they were lying to Sterbcow,
6  didn't you?
7      A   About?
8      Q   About this lawsuit, the allegations in it?
9      A   Which?
10     Q   Did you think that The Downs Group was lying
11  about certain of the allegations that Sterbcow made in
12  his Complaint against him?
13         MR. FRIEDMAN:  Object to form.
14         THE DEPONENT:  Can I see which are
15     you talking about?
16  BY MR. McKEE:
17     Q   Well, let's make sure we're clear.  You
18  wrote e-mails to Mr. Sterbcow back in November and
19  December and January, didn't you?
20     A   Yes.
21     Q   About this case, didn't you?
22     A   Yes.
23     Q   About your perspective on what was being
24  said by the Downs Group, right?
25     A   He sent me an e-mail with the claim or

Page 195

1  whatever, FYI, e-mails that I have since deleted,
2  because he asked me to.
3      Q   Well, let's get to that.
4         In one of your e-mails, did you state to him
5  "These Downs people really don't care too much to lie
6  about those new contracts, do they?  And my favorite
7  part is they want to discount money paid for renting
8  your office.  Ha, ha, ha, better look for all those
9  checks lost in the mail."
10        Do you remember writing that e-mail?
11     A   Yes, because he said that he had not been
12  paid.
13     Q   And the new contract, what new contracts
14  were you talking about?
15     A   Contracts that he said that he drafted
16  that were sent to clients.
17     Q   The once that eliminated my clients,
18  Sterbcow, Melancon, as counsel for them?
19        MR. FRIEDMAN:  Object to form.
20     Foundation.
21        THE DEPONENT:  Yeah, the ones that
22     he's asking about in the claim.
23  BY MR. McKEE:
24     Q   And you said, "The Downs people really don't
25  care too much to lie about these new contracts, do

Page 196

1  they?"  Do you remember saying that?
2      A   Yes.
3      Q   And was that your feeling as you were
4  reviewing what they were responding to the Complaint?
5      A   Talking to him in a colloquial manner.
6      Q   And was there anything about that thought as
7  I just read it to you that you'd like to retract,
8  because it wasn't true?
9      A   I just thought that it was -- in the claim,
10  that it was curious that it said that in the case, that
11  something would be -- that there would be some
12  compensation, that the checks paid, that he said to me
13  that were never paid should be retract -- should be
14  reduced from that amount.
15     Q   At Downs?
16     A   It seemed funny to me, because when I was
17  looking for offices, I was told that was like $400.  So
18  if that he's claiming is a lot more, it seemed funny to
19  me that they would want to reduce that amount.
20     Q   And about "Better look for all those checks
21  lost in the mail" --
22     A   Yeah, because he said he never received
23  anything.
24     Q   And have you seen anything, even with
25  talking prior to coming to this deposition with

Page 197

1  Mr. Friedman and Mr. Pérez, to show that they actually
2  ever paid once rent, have you seen anything?
3      A   No.  I know that Santa said that she would
4  mail -- as she told Danny, she would mail a check.
5      Q   And have you seen anything to indicate a
6  check was mailed?
7      A   No.
8      Q   Let's talk a little bit about the law office
9  and what you were doing at the Sterbcow Law Office.
10        Was there a sign on a window, on a board, on a
11  bulletin board, on anything that said "These offices
12  are also the Downs Law Firm offices"?
13     A   No.
14     Q   Was there a business card that identified
15  that address as a Downs business address ...
16     A   With the --
17     Q   ... or Sterbcow?
18     A   -- 826, no.
19     Q   Was there letterhead that ever indicated
20  that was a Downs office?
21     A   No.
22     Q   So for all intents and purposes, you were
23  working out of the Sterbcow offices for this litigation
24  sign up?
25     A   Yes.

50 (Pages 194 - 197)

1    Q    So every client that came in, or entering a
2    building, had Sterbcow's name on it?
3    A    An office.
4    Q    An office.
5    A    Yes.
6    Q    It didn't have anything to do with Downs on
7    the offices, did it?
8    A    No.
9    Q    And you didn't have a business card for most
10   of the time to even give a client?
11   A    No. I was using Danny's.
12   Q    Okay. Indicating that a Florida lawyer is
13   somebody you were working with?
14   A    Yes, they would ask if I was like his
15   assistant or something.
16   Q    And then you met Louisiana residents at
17   those offices in Louisiana to sign up for a Florida
18   lawyer?
19   A    Yes.
20   Q    And two Louisiana lawyers?
21   A    And ...
22   Q    Two Louisiana lawyers who were named in the
23   contracts, right?
24        MR. FRIEDMAN: Object to form.
25        THE DEPONENT: What's the question?

1        And ...
2    BY MR. McKEE:
3    Q    When you were meeting with Louisiana
4    residents in this Louisiana law office, they were
5    meeting at an office of one of the lawyers who was
6    identified in their contracts?
7    A    Yes, I would tell them where we were and
8    explain.
9    Q    So it was made clear that you're in law
10   offices of someone who's working with us on these cases?
11   A    I would tell them that, "This is
12   Marx Sterbcow's office. This is who we're talking about
13   here."
14   Q    And when you say "here," you're talking
15   about in the retainer agreement?
16   A    Yes, so that they would know they're not
17   talking about some far away company, just to ...
18   Q    Make it local?
19   A    So that they would know that they could
20   contact me there.
21   Q    And that this law firm was involved in their
22   project?
23   A    Yeah, but I would never advise them to -- I
24   would never give out Marx' phone, for example, you know.
25   Q    Sure.

1    A    They would just come to the office and talk
2    to me, and if they had any questions, they had the Downs
3    Law Group business card with Danny's personal phone
4    number.
5    Q    But you were making it clear, especially
6    when you related to the contingent fee agreement, that
7    Sterbcow's firm was involved in this?
8    A    Yes.
9    Q    And then the clients signed their documents,
10   filled out their documents, primarily for most of the
11   time you were working with Downs, in the Sterbcow
12   office?
13   A    Yes.
14   Q    And from time to time, you used the Sterbcow
15   computers?
16   A    Yes.
17   Q    As a matter of fact, many of the clients you
18   were dealing with spoke Spanish as their primary
19   language?
20   A    Yeah, many of them.
21   Q    And Mr. Sterbcow doesn't speak Spanish?
22   A    No.
23   Q    So it wouldn't make sense for them to deal
24   with Mr. Sterbcow, would it?
25   A    No.

1        MR. FRIEDMAN: Object to form.
2    BY MR. McKEE:
3    Q    As matter of fact, when you were asked
4    questions about how much time was spent or how many
5    clients spent time with Mr. Sterbcow, how many clients
6    spent time with Mr. Pérez?
7    A    The ones that we would make appointments for
8    when he visited New Orleans.
9    Q    Was it more than 10?
10   A    Probably. Not in one day, but in one visit.
11   The first day I went there, we saw a lot of them.
12   Q    How many did Jeremy Friedman talk to that
13   you're aware of?
14   A    I was waiting for -- none that I have
15   knowledge.
16   Q    How about Mr. Craig Downs, the head of the
17   firm, to your knowledge?
18   A    That he signed up?
19   Q    Yeah, over in Louisiana.
20   A    None when I was there, at least.
21   Q    So Mr. Sterbcow actually saw more BP clients
22   than the head of the firm, the Downs firm --
23   A    Saw them pass by?
24   Q    -- by far.
25        No. Saw them for purposes of signing them up,

Page 202

1  right?
2        MR. FRIEDMAN:  Object to form.
3        I didn't hear the question.  Did
4    you say that Mr. Sterbcow saw more
5    clients than the entire Downs firm?
6        MR. McKEE:  No, I didn't.
7  BY MR. McKEE:
8    Q   My question was, so Mr. Sterbcow in the
9  process of signing up Louisiana clients --
10    A   Yes.
11    Q   -- saw more BP clients than Mr. Downs, who
12  was the lead lawyer pursuant to the contract, right?
13    A   When you say "saw" ...
14    Q   Saw at the offices, signed them up?
15    A   I would sign them up.
16    Q   I know.
17    And my point is, Mr. Downs didn't sign any of
18  them up, correct?
19    A   If that's the question, then yes, Sterbcow
20  had more than Downs.
21        MR. FRIEDMAN:  And let me just
22    clarify that.
23    When you say "Downs," you mean
24  Craig Downs, correct.
25        THE DEPONENT:  Yes.

Page 203

1        MR. McKEE:  Yes.
2        THE DEPONENT:  Yes, Mr. Downs.
3        MR. FRIEDMAN:  Okay.
4  BY MR. McKEE:
5    Q   Now, did the Downs Law Firm have any
6  separate offices in Louisiana?
7    A   Not that I know of.
8    Q   Do you know whether any of its lawyers are
9  licensed to practice in Louisiana?
10    A   No.  I think they're licensed in Florida.
11    Q   Matter of fact, from time to time, did
12  Mr. Sterbcow give you some business supplies to assist
13  you with your work with the sign up of clients?
14    A   Yes, paper clips and such.
15    Q   Office supplies necessary to continue
16  working with those BP clients?
17    A   Yeah, pens and that, yeah.
18    Q   And the deliveries of documents proceeded
19  from the Sterbcow Law Offices down to Miami, Florida,
20  right?
21    A   The what?
22    Q   The documents that were used to sign up
23  folks proceeded from his offices down to the Downs law
24  offices?
25    A   The signed documents already, yeah, we would

Page 204

1  store them there and then -- I'm sorry, send them.
2    Q   And I think I understood you to say that
3  after you were told by the Downs folks to move out of
4  Mr. Sterbcow's offices, you continued to work for Downs
5  for awhile?
6    A   For a few weeks, yes.
7    Q   Did they tell you to stop using the
8  contracts that had Sterbcow and Melancon in them, or
9  were you still using those?
10    A   They sent -- Danny asked me to use new
11  packets, but I don't recall what -- that's on the
12  e-mails.
13    Q   Do you know whether those new packets
14  deleted Melancon and Sterbcow?
15    A   I don't remember.  I would have to see the
16  attachment.  Actually, they were not attached.  They
17  were mailed.
18    Q   What do you mean by that?  I don't
19  understand.
20    A   That I received a box with new so I wouldn't
21  have to print stuff.  I got marketing materials and
22  packets.
23    Q   Was that after the letter that went to the
24  BP clients that informed those particular clients that
25  Sterbcow and Melancon would no longer be representing

Page 205

1  them?
2        MR. FRIEDMAN:  Object to form.
3        THE DEPONENT:  I have no knowledge,
4    because I don't know when that was sent,
5    and I don't remember the date when I
6    received the package.
7  BY MR. McKEE:
8    Q   You're now a trained lawyer, including an
9  LLM and licensure with the State of New York, right?
10    A   I'm not licensed in the State of New York
11  yet.
12    Q   Passed the Bar, though?
13    A   Yes.
14    Q   Were you required to take courses in what
15  involves attorney-client privilege during your law
16  school?
17    A   Yes.
18    Q   Perhaps you can educate me.
19    When joint venture lawyers, meaning they're
20  representing the same clients for the same purpose, and
21  one of them sends a letter to the clients, do you think
22  that's attorney-client privilege against the other law
23  firm, the joint venture?
24        MR. FRIEDMAN:  I'm going to object
25    to form as lack of foundation, nor has

52 (Pages 202 - 205)

Page 206

1    the witness been called as an expert
2    witness in the area.
3  BY MR. McKEE:
4    Q  Based on what you learned in your training.
5        MR. FRIEDMAN:  Same question -- or
6  excuse me, same objection.
7        THE DEPONENT:  If sending -- I'm
8  sorry?
9  BY MR. McKEE:
10    Q  If one of the joint venturers ...
11    A  Yeah.
12    Q  ... prior to a termination of the engagement
13  by the client of any of the joint venturers, if one of
14  the joint venturers sends a correspondence about the
15  litigation and what's going on in the litigation, is it
16  your understanding that's privileged against the other
17  joint venture partners?
18    A  In Puerto Rico, you would have to inform the
19  other client and such, but I'm not aware of that in
20  Florida or in Louisiana.
21    Q  But in Puerto Rico, that would not be
22  privileged, that's something they'd have to tell the
23  other law firm about, right?
24    A  Yeah, they would have to tell the other
25  attorney.

Page 207

1    Q  So as you were reviewing this document,
2  Exhibit 5, did you see that as being privileged as it
3  relates to Sterbcow and Melancon?
4        MR. FRIEDMAN:  Object to form.
5        THE DEPONENT:  I didn't think about
6  it.  I was just translating.
7  BY MR. McKEE:
8    Q  But in retrospect, looking today at it,
9  would it be something you think would be confidential
10  such that joint venturer Sterbcow and Melancon would not
11  be allowed to see this document?
12        MR. FRIEDMAN:  Object to form.
13        THE DEPONENT:  No.
14  BY MR. McKEE:
15    Q  Similarly, with engagement agreements and
16  sign up packages that include Melancon and Sterbcow in
17  its body as representative counsel, you wouldn't think
18  that that's privileged against them, would you?
19        MR. FRIEDMAN:  I object to form.
20  And well outside the scope of this
21  witness' knowledge, but go ahead.
22        THE DEPONENT:  What was the
23  question, again?
24  BY MR. McKEE:
25    Q  Well, I'm just trying -- assuming that these

Page 208

1  documents, Exhibits 3, 4 and 5 were in some of the
2  materials you gave to Mr. Sterbcow before this case,
3  this lawsuit, ever even started ...
4    A  Yeah.
5    Q  ... at that time, you knew that they had a
6  joint representation agreement with the clients, right?
7        MR. FRIEDMAN:  Object to form,
8  foundation.
9  BY MR. McKEE:
10    Q  Because they're on the contracts you're
11  signing every day?
12    A  I'm not aware of the business arrangements
13  that they privately have.
14    Q  No.  But you saw every time you signed up a
15  client that Sterbcow and Melancon are listed as counsel
16  representing these clients, too, right?
17        MR. FRIEDMAN:  Are you saying that
18  the individuals at Sterbcow Law Group
19  and Melancon Rimes?
20        MR. McKEE:  Motion to strike.
21        MR. FRIEDMAN:  Because you're using
22  them interchangeably.
23        MR. McKEE:  Motion to strike.
24  Improper objection.
25        MR. FRIEDMAN:  Are you saying

Page 209

1  individually or not, because you keep
2  referring to the contract that says
3  their names are on it when you know very
4  well the plaintiffs' names are on the
5  contract?
6  BY MR. McKEE:
7    Q  You knew that Attorney Sterbcow and Attorney
8  Melancon were representing the same clients as Downs
9  under these engagement agreements that you were signing
10  with clients, right?
11        MR. FRIEDMAN:  Object to form.
12  Calls for a legal conclusion.
13        THE DEPONENT:  In the contracts, it
14  says that they are going to assist in
15  this matter.
16  BY MR. McKEE:
17    Q  And it lists them as esquire, meaning
18  lawyers, right?
19    A  Yes.
20    Q  And so when more than one lawyer is
21  representing the same client on the same matters, are
22  you aware of any reason to think that documents that
23  pertain to that engagement are privileged, such that one
24  group of lawyers isn't allowed to see it?  Are you aware
25  of any such --

53 (Pages 206 - 209)

Page 210

1        MR. FRIEDMAN:  Object to the form.
2    BY MR. McKEE:
3        Q    Are you aware of any such circumstance that
4    would put you on notice of that?
5        MR. FRIEDMAN:  Same objection.
6        THE DEPONENT:  I'm so confused with
7    it.
8        Am I aware of ...
9    BY MR. McKEE:
10       Q    Of anything that you learned in the law that
11   says when lawyers from different law firms are
12   representing the same clients, that one law firm is not
13   allowed to see what the other law firm is doing on
14   behalf of that client?
15       A    I guess it would have to do with what they
16   said in their arrangements together that they would each
17   do, right?
18       Q    Do you understand that the contract to
19   represent these clients is between the lawyers and the
20   clients?
21       MR. FRIEDMAN:  Object to form.
22       THE DEPONENT:  The contracts
23       between the two firms are between ...
24   BY MR. McKEE:
25       Q    The three firms are with individual clients?

Page 211

1        MR. FRIEDMAN:  Object to form.
2    Foundation.  Assuming facts not in
3    evidence.
4        THE DEPONENT:  I don't know what
5        the ...
6    BY MR. McKEE:
7        Q    Well, let's look at the engagement agreement
8    in one of the exhibits, Exhibit 4.  You went over
9    these --
10       A    Yeah.
11       Q    -- these sign-up sheets with every client
12   that you work with, right?
13       A    Yes.
14       Q    And you went through the engagement
15   agreements, right?
16       A    Yes.
17       Q    And in it, did you go over paragraph 8?
18       A    Yes.
19       Q    And so when you were going over that
20   paragraph 8 with these clients, were you making it clear
21   to them that Craig Downs, Marx Sterbcow and
22   Jason Melancon were the lawyers working their case for
23   them?
24       MR. FRIEDMAN:  Object to form.
25       THE DEPONENT:  It says that

Page 212

1    Craig Downs is the principal lawyer
2    responsible for this matter so they
3    would understand -- I mean, from what I
4    would tell them, it was that the person
5    that would be in court in this matter in
6    Florida would be the Florida attorney,
7        Mr. Downs, and that Marx Sterbcow, Esq.
8        and Jason would help in this matter.
9    BY MR. McKEE:
10       Q    Well, that's intriguing.  It sounds like
11   practice of law, because is that -- what does that
12   paragraph actually say?
13       MR. FRIEDMAN:  Object to form.
14       Move to strike.  Comment.
15       THE DEPONENT:  You want me to
16       translate the ...
17   BY MR. McKEE:
18       Q    Yeah, or take the one in English.  Let's
19   look at the one in English so that we can all understand
20   it.
21       First of all, were any of these cases going to be
22   tried in Florida?
23       MR. FRIEDMAN:  Object to form.
24       Foundation.
25       THE DEPONENT:  I don't know.

Page 213

1    BY MR. McKEE:
2        Q    They're all in Louisiana, aren't they?
3        A    For economic claims in ...
4        Q    Are you aware of any --
5        A    ... Florida.
6        Q    Were you aware of any filing by Downs in a
7    Florida state court?
8        A    No, I did not check.
9        Q    What does paragraph 8 exactly say about what
10   lawyers are representing them?
11       A    It says "Craig Downs will be the attorneys
12   primarily responsible for this matter.  Additionally,
13   Marx Sterbcow, Esq. and Jason Melancon will assist with
14   this matter."
15       Q    And were they assisting as lawyers?
16       A    It says esquire, but you know, I guess they
17   would assist.  That's what it says.
18       Q    What were you explaining to the clients, was
19   that all about?
20       A    I would say that Mr. Craig Downs was the
21   owner of Downs Law Group, that he was going to be the
22   one directly dealing with this matter and that we were
23   in the offices of Mr. Marx Sterbcow and Mr. Jason had an
24   office in Baton Rouge and that they were involved,
25   but ...

54 (Pages 210 - 213)

Page 214

1    Q   Did you ever explain to a client whether
2  Mr. Downs had acquired any evidence to actually support
3  their cases?
4    A   Did I ever what?
5    Q   Inform clients the degree to which Mr. Downs
6  had acquired any evidence relating to their cases to
7  support their cases in causation?
8       MR. FRIEDMAN:  Objection.
9    Attorney-client privilege.
10      THE DEPONENT:  How do you mean
11   "acquire evidence"?
12 BY MR. McKEE:
13   Q   Well, on the clients that signed this
14 contract that included Sterbcow and Melancon ...
15   A   Yes.
16   Q   ... had you ever told any clients about what
17 degree of evidence Mr. Downs had acquired to help them
18 with their case?
19   A   What is required, you mean like --
20   Q   No.  For example --
21   A   -- taking them to the doctor and stuff?
22   Q   No.  For example, what were they exposed to
23 in the oil?  Did they do any testing to ascertain what
24 was in the oil where that client was located?
25   A   No.  They would do -- I don't know which --

Page 215

1  exactly which medical exams were performed on the
2  clients.
3       MR. FRIEDMAN:  I'm going to object
4    based on the Court's order.
5       This is work product.  It gets into
6    work product as to these particular
7    claims.  The judge has already excluded
8    any information, these documents.
9       There has been no ruling as to
10   testimony, but we're maintaining the
11   objection as to work product.
12      MR. McKEE:  Well, that's fine.  You
13   know perfectly well you guys never
14   fingerprinted any oil in the Gulf of
15   Mexico, so I'm wondering if she told any
16   clients about that.
17      MR. FRIEDMAN:  Would all be
18   attorney-client privilege.
19      MR. McKEE:  Not to my clients.  I'm
20   talking about the ones that they're on
21   the same form.
22      MR. FRIEDMAN:  Yes.  You understand
23   our position is that your clients are
24   not and were not co-counsel in the
25   matter in which you're saying they are.

Page 216

1    So, therefore, particularly, you're
2    asking her after July of 2013.  So, yes,
3    that would be attorney-client privilege.
4  BY MR. McKEE:
5    Q   Are you aware of any such evidence that they
6  disclosed to the clients?
7    A   If they had gone to the water, that's what
8  you mean?
9    Q   Whether they had done any sampling to be
10 able to prove proximate cause in their cases?
11      MR. FRIEDMAN:  Objection.  Work
12   product.
13      THE DEPONENT:  No.  I have no
14   knowledge of this.
15 BY MR. McKEE:
16   Q   Were you telling these clients who were
17 signing up that Mr. Downs was going to try their cases
18 in Florida?
19      MR. FRIEDMAN:  Objection.
20   Attorney-client privilege.
21 BY MR. McKEE:
22   Q   And I'm talking about the ones that had
23 Sterbcow and Melancon in the sign-up package.
24      MR. FRIEDMAN:  Same objection.  I
25   don't even know that what means.

Page 217

1  BY MR. McKEE:
2    Q   Did you tell any of them that their cases
3  would be tried in Florida?
4    A   I think it's probable.
5    Q   That's fair.  I'm not saying --
6    A   The economic ones, I -- the ones that wanted
7  to be economic claimants, I did know that those claims
8  were not stopped by the same appeal, that that process
9  was not the same.
10   Q   Did you know that those economic claimants
11 that you were signing up had already had their cases
12 settled by the class action in Louisiana federal court?
13   A   No.
14   Q   But you think you might have told some of
15 those folks that their cases would be tried in Florida?
16   A   No.  I mean, these clients, I explained
17 these papers to them just to be sure that they were
18 understanding, but they would fill out papers without
19 explanations if I would let them.
20   Q   Did any of them ask the question, "Why am I
21 hiring a Florida lawyer when my case is in New Orleans?"
22   A   No.
23      MR. FRIEDMAN:  Objection.  Attorney
24   client-privilege.
25

55 (Pages 214 - 217)

Page 218

BY MR. McKEE:

1
2   Q   Did you see anything that was provided to
3   the clients that indicated how a Florida lawyer could
4   represent them without Louisiana co-counsel?
5   A   No, not that I saw anything was provided to
6   the clients like that.
7   Q   With your training and your knowledge,
8   contingent fee contracts, whether it be Puerto Rican or
9   us right now, do you believe that if there was
10  malpractice committed in these cases, that had
11  engagement agreements, contingent fee engagements that
12  included Downs, Sterbcow and Melancon, that they're all
13  on the hook for malpractice?
14       MR. FRIEDMAN: Object to form.
15  Foundation.
16       THE DEPONENT: I would think if
17       three attorneys are working together,
18       yes, that each person would be on the
19       hook for ...
20  BY MR. McKEE:
21  Q   And that's based on your training in your
22  field as a lawyer, right?
23  A   Yes.
24       MR. McKEE: That's all I have,
25       ma'am. Thank you.

Page 219

1       THE DEPONENT: Thank you.
2       MR. FRIEDMAN: We need to take a
3       break. I may have just a brief
4       followup.
5       MR. McKEE: Off the record.
6       THE VIDEOGRAPHER: Going off the
7       record. The time is 3:52.
8       (Recess.)
9       THE VIDEOGRAPHER: We're back on
10      the record.
11  BY MR. McKEE:
12  Q   In cross-examination, was this a document
13  handed to you by defense counsel?
14  A   Yes.
15  Q   And is that the full four-page portion of
16  Exhibit 5?
17  A   Yes.
18       MR. McKEE: We'll mark that as
19       Exhibit 7.
20       (Pérez Exhibit No. 7 marked for
21       identification.)
22       MR. FRIEDMAN: And note my
23       objection on the record. This is a
24       document that Mr. McKee illegally filed
25       with the Court in Miami-Dade County. We

Page 220

1   objected to actually putting it as an
2   exhibit to avoid any further disclosure
3   of attorney-client privilege.
4       Mr. McKee has insisted over our
5   object that it be made part of this
6   deposition as well, and so we'll deal
7   with it with the Court when necessary.
8       MR. McKEE: Well, since you've made
9   a nice, long speaking objection, I'll
10  counter your objection that it should
11  have been produced by defendants in
12  their January 14 production. Instead,
13  the answer was "none." That clearly was
14  a misrepresentation by you, by all of
15  your co-counsel and by The Downs Law
16  Firm. You lied, and you got caught.
17  That's what the document is being marked
18  for.
19       MR. FRIEDMAN: I'm sorry, we lied
20  and we got caught, really?
21       MR. McKEE: Yes, yes.
22       MR. FRIEDMAN: These are documents
23  that --
24       MR. McKEE: I haven't finished my
25  objection. Thank you.

Page 221

1       MR. FRIEDMAN: These are documents
2   that Marx apologized, apparently,
3   according to the witness, but that you
4   shouldn't have filed in the first place?
5       MR. McKEE: Sir, you guys are
6   liars, and you got caught. And so we're
7   going to show that to the Court in our
8   motion to strike your pleadings for
9   fraud. So that's where we're heading.
10      MR. FRIEDMAN: Okay. But listen,
11  go ahead.
12      MR. McKEE: So it's marked as
13  Exhibit 7.
14      Oh, by the way, are you denying that
15      you guys wrote this?
16      MR. FRIEDMAN: Of course not. Of
17  course we wrote it. It's
18  attorney-client privilege.
19      MR. McKEE: We've got folks under
20  are oath here.
21  BY MR. McKEE:
22  Q   Ma'am, is this an authentic document that
23  indicates e-mails between yourself, Danny Pérez and
24  Jeremy Friedman?
25  A   Between myself and Daniel Pérez, yes.

56 (Pages 218 - 221)

Page 222

1    Q   And it also has attached to it, it's a
2  string correspondence between Jeremy Friedman and
3  Craig Downs relating to the same document, right?
4    A   Yes.
5    Q   And if they said there were no such
6  documents in answers to request for production, that
7  wouldn't have been true, right?
8    A   No.
9    Q   No, it would not have been true?
10   A   No.  It would -- unless they didn't have it.
11   Q   Well, they wrote it, right?
12   A   Yeah.
13   Q   And do they have a computer bank that stores
14  their documents, like a certain system that has pass
15  code and whatnot to get into it?
16   A   Yeah.
17      MR. McKEE:  I have nothing else.
18  Oh, hold it.
19      MR. FRIEDMAN:  What was your answer
20      what the pass codes are?
21  BY MR. McKEE:
22   Q   Oh, and by the way, did Mr. Sterbcow tell
23  you that it couldn't be filed ever?
24   A   No.  He told me that I should produce it as
25  part of the subpoena that I had this morning.

Page 223

1    Q   And if he did receive it from the documents
2  that you gave to him in late November, you were still an
3  employee of Downs at that time, right?
4    A   Yes.
5      MR. McKEE:  Nothing else.  Thank
6  you.
7      MR. FRIEDMAN:  All right.  Just a
8  couple follow-ups, Ms. Pérez.
9         EXAMINATION
10  BY MR. FRIEDMAN:
11   Q   In the redirect by Mr. McKee, you were asked
12  about some communication or additional communication
13  that you've had with Marx Sterbcow in January after this
14  lawsuit was filed; do you recall that?
15   A   Yes.
16   Q   And I'm a little confused as to one of the
17  things that you said concerning, I guess, e-mails going
18  back and forth between the two of you?
19   A   Uh-huh.
20   Q   Did you have any written e-mail
21  communication with Mr. Sterbcow in January 2014?
22   A   That I have available, no.
23   Q   No, but did you actually write any e-mails
24  between the two of you?
25   A   Yes.

Page 224

1    Q   And why were you writing e-mails back and
2  forth?
3    A   I was performing some other work for him and
4  legal research, again, and just communication in
5  general.
6    Q   So did Mr. Sterbcow ask you questions about
7  this case?
8    A   He sent me, I think, what was the claim
9  filed.
10   Q   Sorry.  Mr. Sterbcow actually sent you the
11  Complaint?
12   A   I don't remember if it was the Complaint
13  itself or the Blog 360.  You know, just showing ...
14   Q   Are you talking about the statements made by
15  Mr. McKee and Mr. Sterbcow and Mr. Melancon against our
16  law firm?
17   A   Just the page, you know, the website, where
18  it was so I could see it, but it was not -- it didn't
19  say it was him.  It said it was an author, a person that
20  worked for that blog.
21   Q   You weren't working for us at the time,
22  correct?
23   A   No.
24   Q   So Marx was sending these statements
25  directly to you, is that what you're saying?

Page 225

1    A   Yes.
2    Q   Hold on one second.
3      Did he tell you why he was actually doing this?
4    A   Sending me messages or ...
5    Q   I'm sorry?
6    A   Sending me messages or sending me --
7    Q   Well, did he tell you why he would be
8  sending you statements that were made to Florida, the
9  website Florida 360 by him and Mr. McKee?  Did he tell
10  you why he would be doing this?
11      MR. McKEE:  Objection to form.
12      THE DEPONENT:  He didn't tell me it
13      was by him and Mr. McKee.  He sent me
14      the -- I guess just for me to see it,
15      FYI.
16  BY MR. FRIEDMAN:
17   Q   But why would you need to see a link, were
18  you a witness in this case at that time?
19   A   No.
20   Q   Well, for what reason would you need to see
21  this?  You were no longer working for us, correct?
22   A   Yes.
23   Q   You were working for him at that point,
24  correct?
25   A   Yes.

57 (Pages 222 - 225)

Page 226

```
1       Q   So why did he send this to you, did he ever
2   tell you?
3           MR. McKEE: Form.
4           THE DEPONENT: No. It was just
5       FYI. For your information I guess it
6       said.
7   BY MR. FRIEDMAN:
8       Q   Just FYI, he didn't give any reason why you
9   would need this information?
10      A   Not that I recall in that message, no.
11      Q   And what did you respond to him after he
12  sent this just for your general information?
13      A   I probably made a few stupid jokes.
14      Q   I'm sorry?
15      A   I probably made the joke that Mr. McKee
16  read.
17      Q   I'm sorry. I didn't hear you. One more
18  time.
19      A   I probably said the joke that Mr. McKee
20  read.
21      Q   You said the joke that you said. What was
22  the joke again?
23      A   It was regarding the allegation that -- it
24  was regarding the -- that it said in case that there is
25  some compensation that needs to be paid, the lease
```

Page 227

```
1   amount that was paid to Mr. Sterbcow should be taken off
2   of that, should be deducted from that. I just thought
3   it was funny that in such a huge claim, a small amount
4   like that would be asked to be deducted.
5       Q   So you thought it was funny that Downs Law
6   Group would want to deduct any monies they paid to him
7   in rent from any amounts that he claims are due; is that
8   fair to say?
9       A   Yeah, because for what he's alleging is a
10  pretty huge amount. You know, if there was, in fact, a
11  representation and a 10 percent.
12      Q   So the two of you were joking about the rent
13  Downs had to pay them; is that correct?
14          MR. McKEE: Form.
15          THE DEPONENT: I thought it was
16      funny that it was asked that if there
17      was some compensation to be paid, that
18      the rent should be deducted from that,
19      because I thought it was a small amount.
20  BY MR. FRIEDMAN:
21      Q   Now, did you -- I believe you also testified
22  that Marx asked you to delete e-mails, correct?
23      A   Yes, he said they contained confidential
24  information from the research that I had conducted for
25  him recently.
```

Page 228

```
1       Q   But why did you have to delete them?
2       A   Because he said they contained confidential
3   information, you know, about the cases that were
4   ongoing.
5       Q   Did any of the e-mails that were deleted,
6   did they relate to this case at all?
7       A   Other than the one that you just read, I
8   can't -- I don't remember. I don't think so.
9       Q   So Marx actually asked you to delete the one
10  you just read?
11          MR. McKEE: Objection to form.
12          THE DEPONENT: I think he asked me
13      to erase any confidential information
14      from his clients in the most recent
15      research that I did for him, and I just
16      looked up the last ones, I think. That
17      was the -- that included the last
18      communications I had with him.
19  BY MR. FRIEDMAN:
20      Q   But did Marx ever ask you to delete any
21  e-mail that related to his pending lawsuit?
22      A   Not specifically like that, no.
23      Q   In regards to -- or at the time that he was
24  asking you about deducting the rent money ...
25      A   Yeah.
```

Page 229

```
1       Q   ... did he have any response to the joke
2   that you made?
3       A   I don't remember, sorry.
4       Q   As of January 2014, had you reviewed the
5   Complaint that Mr. Sterbcow's law firm and
6   Mr. Melancon's law firm filed against Downs Law Group,
7   Craig Downs, Danny Pérez and myself, Jeremy Friedman?
8       A   Yes.
9       Q   You had reviewed it?
10      A   I saw it, yes.
11      Q   At that time, had you reviewed -- well, wait
12  a minute. How did you get a copy of the Complaint?
13      A   Oh, no, not a copy. I mean, I think I saw
14  it online.
15      Q   You saw it online?
16      A   Right.
17      Q   How did you see it online?
18      A   I believe I saw it -- I don't even remember
19  which exactly was the paper that he sent me.
20      Q   Did Mr. Sterbcow post his Complaint on some
21  website?
22      A   No, no, no. I only -- I saw the blog, the
23  Law 360 thing online, and I saw the allegations made
24  where this deduction was asked. I don't know if that
25  was the Complaint or it was an answer by Downs.
```

58 (Pages 226 - 229)

1    Q   Did Mr. Sterbcow or Mr. McKee send you the
2  Complaint at any time?
3    A   Mr. McKee didn't send me anything, but from
4  what I can remember, what I have corresponded with
5  Mr. Sterbcow, I know I saw that allegation in one
6  document that had already been filed, but I don't know
7  if it was the Complaint or it was an answer to
8  something.
9    Q   You saw which allegation?
10   A   Asking the Court, requesting the Court that
11 if there was, in fact, some compensation to be paid,
12 that the money from this lease agreement as alleged by
13 Downs be deducted from the amount to be paid to
14 Mr. Sterbcow and Mr. Melancon.
15   Q   And this was a document that you received
16 from Marx Sterbcow, correct?
17   A   Yes.
18   Q   And did you ever discuss it with him further
19 other than him saying "just for your information"?
20   A   I know I said something, and he said he
21 didn't understand my comment, and that's when I said the
22 joke.
23   Q   Do you have any of these e-mails still?
24   A   No.  I would have brought it today.
25   Q   But you wrote these through your Gmail

1  account?
2    A   Yes.
3    Q   Do you know what Mr. Sterbcow's e-mail
4  address is that was used for those communications?
5    A   I guess it's Sterbcow Law Group.
6    Q   That's it?
7    A   Yeah, like marx@sterbcowlawgroup or
8  something like that.  I think it's his work ...
9    Q   It was through a work e-mail address,
10 correct?
11   A   Yeah, I believe so.
12   Q   Were there any other statements that
13 Mr. Sterbcow made to you or sent to you about this
14 lawsuit in January of 2014?
15   A   Not that I recall.  You said "sent" or
16 "said."
17   Q   Either sent to you by Mr. Sterbcow or said
18 to you over the phone in January 2014.
19   A   Yeah, I mean ...
20   Q   But other than what we've discussed at this
21 deposition today.
22   A   No.  That's -- yeah.
23   Q   Nothing else?
24   A   Yeah, I think the calls that -- we've
25 already discussed those calls before.

1    Q   Do you have a full understanding of what's
2  been alleged in the Complaint against the defendants?
3    A   You want me to list that?
4    Q   Well, do you have a full understanding of?
5    A   I believe I do.
6    Q   How did you gain that understanding?
7    A   Well, from what I have read.
8    Q   You said that you read -- that was that one
9  document that you read from Marx, correct?
10   A   But in the Blog 360, they do kind of like an
11 overview of what's alleged by -- it says a Florida
12 attorney sued over joint agreement, and there are other
13 news online as well.
14   Q   So you believe that you got a full
15 understanding of the case based on reading the Law 360
16 article?
17   A   No.  I don't mean to understand all the
18 parts.  I know what is being alleged, what is part of
19 the Complaint, I guess, the allegations that are part of
20 it.
21   Q   Are you aware of any of the defenses filed
22 by Downs Law Group or any individuals?
23   A   What I have talked about with Danny and ...
24   Q   Well, yes, beyond the issue with the rent,
25 are you aware of any other defenses?

1    A   Other than the rent, that there was no
2  contract, no joint agreement or something like that.
3    Q   And you got this from the Law 360 article?
4    A   No.  I have talked to Danny, and I know
5  that, because he's told me that this is what's being
6  alleged, that --
7    Q   So you, basically, got some things from Marx
8  and some things from Danny as to this lawsuit; is that
9  fair to say?
10   A   Yeah, and online.
11   Q   And online?
12   A   Yeah.
13      MR. FRIEDMAN:  That's all I have.
14      MR. McKEE:  No further questions.
15      You do have a right to read, or you
16   can waive that right.
17      THE DEPONENT:  A right to what?
18      MR. McKEE:  Read it and verify it's
19   accuracy of transcription or correctness
20   of answers.
21      THE DEPONENT:  I waive it.
22      MR. McKEE:  Great.
23      THE VIDEOGRAPHER:  This completes
24   Ms. Amled Pérez' deposition on
25   February 13, 2014.  The time is 4:12.

Page 234

1        We are going off the record.
2            (Whereupon, at 4:12 p.m. the
3        deposition is adjourned.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1            REPORTER'S CERTIFICATE
2        I, SHAWN D. WEBER, Registered Professional
3 Reporter with the National Court Reporters Association, do
4 hereby certify that the foregoing is a true and correct
5 transcript of the proceedings had in the within-entitled and
6 numbered cause on the date hereinbefore set forth; and I do
7 further certify that the foregoing transcript has been
8 prepared under my direction.
9
10
11
12
13    _____
      SHAWN D. WEBER
14
15
16
17
18
19
20
21
22
23
24
25

Page 235

1        CERTIFICATE OF NOTARY PUBLIC
2        I, ROSANNA RIVERA-SÁNCHEZ, Notary Public duly
3 commissioned and qualified in and for the Commonwealth of
4 Puerto Rico,
5        DO HEREBY CERTIFY that the videographer, court
6 reporter, and deponent were duly sworn before the
7 commencement of the taking of the deponent's testimony.
8        IN WITNESS WHEREOF I sign these presents and
9 affix my notarial seal in San Juan, Puerto Rico, this
10 _____ day of _____, 2014.
11
12
13
14
15
16
17    _____
      Notary Public
18
19
20
21
22
23
24
25

60 (Pages 234 - 236)

| & |
| --- |
| **&** 4:15 41:7,9 |

| 0 |
| --- |
| **00698** 9:12 |
| **01** 1:7 |

| 1 |
| --- |
| **1** 1:17 2:4 3:13 4:4 35:8,12 40:22 116:22 153:14 172:11 |
| **10** 100:6 201:9 227:11 |
| **104** 3:16 |
| **10:03** 37:9 |
| **10:33** 62:1 |
| **10:53** 62:5 |
| **11** 62:11 |
| **11/12/13** 46:4,20,22 |
| **112** 3:6 |
| **11:54** 104:11 |
| **11:59** 104:15 |
| **11th** 5:14 |
| **12** 46:5,18 188:18 |
| **12:07** 111:24 |
| **12:14** 112:3 |
| **13** 1:18 5:1,7 37:17 233:25 |
| **13-039679** 1:7 |
| **14** 190:24 220:12 |
| **149** 3:17 |
| **15** 64:25 83:12 |
| **151** 1:17 |
| **16** 9:11 65:9 |
| **17150** 2:4 |
| **182** 3:7,18 |
| **19** 76:9,22 |
| **192** 193:11 |
| **1:04** 149:7 |
| **1:08** 149:11 |
| **1:46** 179:4 |
| **1:58** 179:7 |

| 2 |
| --- |
| **2** 3:14 4:6,7 15:9 24:10 37:9 40:6,14 40:23 77:23 |
| **2/12/14** 4:5 |
| **20** 12:24 178:15 179:12 |
| **2012** 98:17,20 99:24 100:2 101:4 |
| **2013** 12:14 26:18 27:6 30:10 46:5,18 47:1,24 55:19,21 64:10 66:11 69:5,14 72:8 75:7,10 76:9 76:23 80:1 83:13 124:7 137:22 164:24 166:24 168:12,19 169:5 170:12 188:19 216:2 |
| **2014** 1:18 5:1,7 62:11 118:18,21 119:20 223:21 229:4 231:14,18 233:25 235:10 |
| **219** 4:17 |
| **22** 69:5,14 72:8 164:24 166:18 170:8 |
| **223** 3:8 |
| **24** 98:16,20 |
| **25** 47:24 131:16 |
| **25th** 12:24 |
| **26** 64:10 75:10 101:4 |
| **27** 55:19 |
| **28** 80:1 |
| **29** 117:6 |
| **2:00** 179:16 180:23 |

| 3 |
| --- |
| **3** 3:15 4:8 44:21,22 45:2,19 62:5 67:1 77:23 116:20,23,24 117:1 189:8 208:1 |
| **30** 114:1 131:16,16 132:19,25 |
| **307** 2:11 |
| **31** 66:11 99:24 |
| **3250** 2:11 |
| **33133** 2:12 |
| **33327** 2:5 |
| **35** 4:4 |
| **360** 224:13 225:9 229:23 232:10,15 233:3 |
| **37** 3:14 |
| **3:00** 181:1 |
| **3:14** 182:2 |
| **3:52** 219:7 |
| **3:53** 98:20 |

| 4 |
| --- |
| **4** 3:16 4:10 54:17,21 67:1 77:23 104:15 112:3 145:8 172:11 188:19,24 189:8 208:1 211:8 |
| **40** 4:6 |
| **400** 196:17 |
| **45** 4:8 |
| **4:12** 233:25 234:2 |

| 5 |
| --- |
| **5** 3:13,17 4:12 69:13 69:15 75:24 76:4 113:25 115:4,5,7,9 115:17 116:2 149:11,15,19,23 163:11 170:10 171:21 177:21 188:19,24 189:8 191:18 193:11 207:2 208:1 219:16 |
| **5,000** 184:24 |
| **54** 4:10 |

| 6 |
| --- |
| **6** 3:18 4:14 98:13,14 182:2 |

| 60 132:4 |
| --- |
| **62** 3:15 |
| **69** 4:12 |

| 7 |
| --- |
| **7** 4:17 91:10 219:19 219:20 221:13 |
| **70** 27:8 29:12 66:8 132:2 133:7 |
| **75** 185:9,22 186:20 186:25 |

| 8 |
| --- |
| **8** 27:11 42:16 47:17 55:7 65:19 100:2 211:17,20 213:9 |
| **826** 197:18 |

| 9 |
| --- |
| **9** 3:5 |
| **954.888.9877** 2:6 |
| **98** 4:14 |
| **9:00** 183:22 |
| **9:40** 37:5 |
| **9:58** 101:5 |

| a |
| --- |
| **a.m.** 1:19 183:22 |
| **abbreviation** 66:15 |
| **able** 22:12 49:18 127:11 139:17 161:6 162:16 216:10 |
| **abogado** 57:16 145:18 |
| **accept** 120:5 |
| **access** 26:24 63:2 125:19,23 126:1,9 126:10,18,22 127:4 127:12,15 139:12 139:15,17 161:6 162:16 189:20 190:14 |
| **accessed** 63:5,15,21 63:22 77:11 126:25 154:17 161:13 163:1 |

**accident** 155:22,25
 156:6,22,24 157:12
 158:13
**accidentally** 166:4
 173:10,13
**accompanied** 16:7
**accompanying** 19:7
**account** 63:2,5,8,15
 63:22 125:25
 126:21 156:1
 158:10 166:10
 231:1
**accounts** 63:21
 190:14
**accuracy** 233:19
**accurate** 185:4
**acknowledged**
 88:23 89:4,11
**acknowledging**
 88:18
**acquire** 214:11
**acquired** 214:2,6,17
**act** 98:25 100:20,25
**acting** 102:22
**action** 31:5 99:2,9
 217:12
**actions** 109:7
**actual** 43:10
**added** 69:7
**additional** 33:13
 185:22 223:12
**additionally** 28:8
 47:21 213:12
**address** 9:10,11
 14:15 62:25 113:17
 119:16,23,24 120:1
 150:6 168:9,11,14
 168:17 197:15,15
 231:4,9
**addressed** 193:20
**addressee** 151:1,4
**adjourned** 234:3
**administer** 6:19
**advice** 17:23 87:18
 122:6,13,16 136:10

136:16,20 137:15
 180:3,8
**advise** 105:24,25
 123:17,20 131:10
 141:11 142:6,24
 151:13 167:19
 177:17 199:23
**advised** 8:11 26:13
 70:18 136:22
 142:11 175:17
**advising** 22:3
**affidavit** 62:13,23
 63:24,24
**affix** 235:9
**afternoon** 179:17
**ago** 82:13 114:1
 152:25 153:2
 177:16
**agree** 18:5 19:6
 101:6
**agreed** 98:25 100:5
 129:7 181:13
**agreeing** 120:5
**agreement** 24:14,17
 25:16 26:6,9 29:25
 30:16,19 34:15
 40:18 42:4,13,14
 43:13,22 44:1 45:21
 47:12,13 48:5 55:4
 55:14 56:11 65:18
 67:12,24 68:21
 72:15 77:8,9 79:13
 79:23 81:6,16 83:2
 93:15,15 94:11
 96:21 97:1 99:21
 101:11,17 102:13
 129:16 136:4
 137:12 141:16
 145:3,10 146:3,9
 147:3,7,14,20,23
 148:1,4,5,5,13,17,21
 164:16,20 188:12
 199:15 200:6 208:6
 211:7 230:12
 232:12 233:2

**agreements** 25:17
 27:20 43:8 48:10
 57:11 60:11,15,19
 136:7 143:5,7,18,21
 144:6,17,20,23
 145:1,17,23 207:15
 209:9 211:15
 218:11
**ahead** 6:13 109:20
 116:18 172:4 173:5
 193:6 207:21
 221:11
**ahold** 145:12
**alcantara** 78:14
**allegation** 226:23
 230:5,9
**allegations** 87:14
 118:8 194:8,11
 229:23 232:19
**alleged** 230:12
 232:2,11,18 233:6
**alleging** 227:9
**allow** 36:8 99:25
 106:3
**allowable** 106:17
**allowed** 23:5 35:18
 36:2 39:6 127:15
 180:2 207:11
 209:24 210:13
**allows** 23:1
**amended** 44:1 70:10
 72:7,9 171:11
**amendment** 180:4
**american** 21:21
**americans** 21:20
**amled** 1:15 3:4 4:12
 4:17 5:18 7:20 9:3
 9:11 62:14 65:9,23
 82:17 136:18 150:5
 172:12 180:22
 233:24
**amled.pérez** 127:2
**amledperez** 63:1
**amount** 93:11 185:8
 187:1,4 196:14,19

227:1,3,10,19
 230:13
**amounts** 227:7
**analysis** 23:15
**answer** 10:8,17,21
 13:16 15:12 17:9
 25:22 32:14 89:19
 89:23 92:21,21 93:5
 98:3 110:15 135:15
 142:2 170:19
 189:14 191:7,10
 192:9,16,24 220:13
 222:19 229:25
 230:7
**answering** 157:5
**answers** 10:5,25
 85:3 111:12 222:6
 233:20
**anticipate** 10:8
**anticipating** 10:3
**anybody** 114:15
 167:19
**anymore** 181:12
**apiece** 186:20,25
**apologize** 120:15
**apologized** 221:2
**apparently** 8:16
 221:2
**appeal** 29:15,18,19
 29:21,22 30:1,7,9
 30:11,13,15 31:12
 31:14 32:4,5,7,8,20
 32:24 33:18 34:10
 47:24 55:20 59:14
 59:17,19,25 60:6,9
 74:15 76:10,13
 99:10,11 101:18,19
 122:19,23,25 123:3
 217:8
**appeals** 31:8
**appear** 99:25
**appearances** 2:1
**appearing** 2:10
**appears** 45:6 54:18
 78:21

**applied** 53:3
**apply** 84:14 85:3
  106:2
**appointed** 8:13
**appointment** 49:24
  106:22,24
**appointments** 83:15
  201:7
**appreciation** 19:24
**approval** 32:19
**approximate** 46:14
**approximately** 27:6
  64:11 66:8 114:25
  115:2 184:9
**approximating**
  10:14
**approximation**
  10:15 21:22
**approximations**
  10:12
**area** 50:3 107:7
  206:2
**argument** 100:3
**arrangements** 20:6
  208:12 210:16
**arrived** 41:19
  134:10 135:1
  182:25
**article** 232:16 233:3
**articles** 78:3
**ascertain** 214:23
**aside** 36:1 66:1
**asked** 36:25 41:1,4
  43:6,11 64:17 72:3
  73:14 75:16 88:17
  94:24 102:2 103:11
  107:9 113:5 119:16
  119:16 127:6,22
  128:15,18,20 129:3
  130:7,10,13,20
  136:22 138:7,11
  146:16 147:2,3,20
  149:14 152:3,4,24
  157:25 158:14
  164:22 165:2 168:2

170:23 175:5,20
  176:1,20,21,23
  177:25 183:9,9
  190:19 192:15
  194:2 195:2 201:3
  204:10 223:11
  227:4,16,22 228:9
  228:12 229:24
**asking** 9:22,24
  17:10 22:18,20,21
  55:5 65:4 69:6
  82:24 84:20 91:6,9
  92:1,6,10,23,24
  96:7 120:1 129:1
  133:15 177:24
  195:22 216:2
  228:24 230:10
**asks** 75:11
**aspect** 13:9
**aspects** 23:14
**asserted** 92:15
**asserting** 164:13
**assist** 28:9 47:22
  100:1,2 203:12
  209:14 213:13,17
**assistant** 198:15
**assisting** 213:15
**associate** 20:18,20
**association** 4:15
  98:11 236:3
**assuming** 18:15
  55:20 121:3 207:25
  211:2
**assumption** 47:23
**assuring** 42:9
**attached** 62:13 65:4
  65:6 69:24 81:6
  152:4,10,18,22
  153:6,14 204:16
  222:1
**attachment** 204:16
**attempt** 6:11 112:21
**attempted** 189:20
**attend** 133:25

**attention** 72:1
  100:14
**attest** 89:8
**attorney** 6:16 17:11
  17:11 20:20 50:24
  51:1,13,18 53:10
  70:23 75:15 80:21
  81:16,23 87:24
  90:19 91:2,12,17
  107:23 108:2
  121:18 122:2,8
  145:18,21,24 156:8
  173:22 205:15,22
  206:25 209:7,7
  212:6 214:9 215:18
  216:3,20 217:23
  220:3 221:18
  232:12
**attorneys** 5:19 28:7
  29:2 34:8 47:20
  48:13 49:14 83:8
  100:4,6 176:15,16
  176:18 213:11
  218:17
**august** 80:1 83:12
  98:16,20 99:24
  101:4 167:12
  168:18
**authentic** 221:22
**author** 224:19
**authorization** 54:5
  57:19
**authorizations** 88:1
**authorized** 56:21
  57:2 63:1 154:10
**available** 18:16,18
  28:4 32:13 33:13
  35:10 64:4 119:17
  120:7 223:22
**avenue** 105:20
**avoid** 66:14 220:2
**awarded** 100:6
**awards** 11:6
**aware** 17:1,22 22:25
  23:18 25:4 44:12,16

44:19 53:7,9 59:8
  63:4,14 67:17 86:7
  86:10 88:12 94:14
  94:18,23 100:8
  104:25 139:23
  143:13,16 177:7
  190:16,24 191:12
  201:13 206:19
  208:12 209:22,24
  210:3,8 213:4,6
  216:5 232:21,25
**awareness** 30:24
**awhile** 77:11 111:5
  127:17 204:5

**b**

**b** 4:1 28:6
**back** 20:23 37:7
  39:23 41:6 44:24
  50:4 62:3 75:22
  104:13 112:1
  125:17,20 143:2
  152:1 154:24 155:3
  158:10 163:10
  167:3,5,12 170:8
  175:25 178:21,22
  179:6 181:1,25
  194:18 219:9
  223:18 224:1
**bad** 159:13
**badly** 159:8
**bajo** 55:1
**baldorioty** 9:11
**bank** 222:13
**bar** 11:12 20:11
  22:15 23:1,18 44:8
  44:16,19 61:5 74:2
  94:12,21 98:5 108:6
  121:21,23 205:12
**based** 8:9 14:6
  15:16 70:22 92:10
  92:11 129:6,15
  155:18 156:7
  186:22 189:10
  206:4 215:4 218:21

232:15
**basic**  62:22 99:21
**basically**  63:3
  123:14 126:7
  163:18 233:7
**basis**  106:9,11
  119:18 129:24
**batista**  80:23 81:6
  81:11
**baton**  213:24
**beats**  154:14
**began**  124:6
**beginning**  15:4
  157:20 169:4 187:2
**behalf**  5:23 6:1
  12:22 56:22 59:14
  87:9 102:23 139:3,7
  143:11 210:14
**belief**  162:3,6,15
**believe**  18:16 27:14
  46:6 58:21 66:19
  67:2,6 68:8,24
  74:24 80:12 84:8
  89:13 118:16
  126:17 127:10
  130:2,5 138:22
  142:14 147:2
  159:12 161:13
  162:2,12 163:10
  165:4 168:22
  186:13 218:9
  227:21 229:18
  231:11 232:5,14
**believed**  175:2
**belongings**  138:8,14
**benefit**  59:20 60:2
**benefits**  21:8,13
  31:8 32:3,19 59:9
  59:21 60:2 106:4
**best**  10:5 12:23
  74:14,17
**better**  21:6 195:8
  196:20
**beyond**  232:24

**big**  38:10 189:15
**bit**  11:1 197:8
**black**  39:8
**blame**  111:17
**blanks**  18:3
**blog**  77:1,2,4,6,11
  77:15,16,23,23,23
  224:13,20 229:22
  232:10
**board**  197:10,11
**bob**  36:4 69:22
**body**  27:25 29:14
  94:20 171:5 207:17
**bonus**  185:6,7,8
**boost**  185:13
**borrow**  55:23
**boss**  14:11
**bottom**  44:22
  150:24 164:3
  172:20
**boulevard**  2:4
**bound**  159:10
**bowel**  10:19
**box**  204:20
**bp**  4:8 19:3,20 20:20
  21:6 24:3 30:21
  31:5 50:24 51:11
  60:11 65:9,23 67:11
  77:7 83:19 88:20,24
  89:5 90:6 92:3,5
  93:2,18 95:2,13
  100:15 105:8
  115:23 117:18,21
  143:14 147:22
  148:16 190:22
  201:21 202:11
  203:16 204:24
**breach**  188:12
**break**  10:16,22
  40:10 61:18 110:23
  111:20 178:5,24
  179:20 180:18
  219:3
**breakfast**  179:18

**breaking**  34:7
**brief**  111:7 219:3
**briefly**  178:18,21
**bring**  8:14 35:6
  155:15 160:17
  172:4 174:13,15
  186:15
**brings**  179:21
**broke**  156:1
**brought**  36:1,10,17
  171:25 185:21
  230:24
**building**  198:2
**bulleting**  197:11
**business**  15:22 20:6
  69:7,8,11 84:24
  94:7 197:14,15
  198:9 200:3 203:12
  208:12
**buy**  15:7

**c**

**c**  5:2 172:5
**ca**  1:7
**caguas**  114:5
**call**  36:23 79:3
  111:20 140:21
  142:1 185:14
  188:15
**called**  62:13 75:1
  78:21 105:16 113:5
  113:9 115:21 121:5
  188:5 206:1
**calling**  82:24
**calls**  18:10 25:2
  95:21 182:12
  209:12 231:24,25
**caption**  5:12
**card**  69:8,11 197:14
  198:9 200:3
**cards**  15:22,23
  64:21 69:7
**care**  21:14 22:1,16
  23:2,15,21 82:23
  195:5,25

**career**  12:11
**carlos**  57:18
**carrier**  63:18
**case**  1:7 4:10 5:12
  18:6 20:21 41:17,25
  50:24 68:24 80:21
  83:19 88:24 99:25
  106:25 112:12,15
  112:19 115:23
  117:18,21 119:4
  120:9 125:25
  143:12 170:5
  171:16 181:10,16
  181:18,21 187:9
  194:21 196:10
  208:2 211:22
  214:18 217:21
  224:7 225:18
  226:24 228:6
  232:15
**cases**  24:3 27:13
  28:13 87:19 88:20
  89:6 100:12 185:14
  199:10 212:21
  214:3,6,7 216:10,17
  217:2,11,15 218:10
  228:3
**catch**  22:19
**caught**  220:16,20
  221:6
**causation**  214:7
**cause**  216:10 236:6
**causing**  28:25
**cell**  69:6
**certain**  23:14 35:2
  52:4 90:21 95:2,4
  95:13 194:11
  222:14
**certainly**  42:3 94:24
**certificate**  235:1
  236:1
**certify**  235:5 236:4
  236:7
**chain**  69:20

**chance** 32:16 62:8
**change** 43:7,12 46:6
　104:8 146:17
　147:18 149:1
**changed** 44:4 64:2
　147:4,8 156:16
　163:7,9
**changes** 46:10
**changing** 192:11
**charge** 81:19 132:24
**charged** 132:6
**charges** 81:7
**charging** 167:23
　187:13
**check** 24:9 56:1
　81:18 130:21 132:6
　161:22 197:4,6
　213:8
**checked** 63:6 106:1
　106:23 161:17,18
**checking** 22:12
　152:9
**checklist** 124:3
**checks** 195:9 196:12
　196:20
**chemicals** 78:1
**choice** 111:14
**choose** 61:13
**circuit** 1:1,1 4:4
　5:14,15 99:12 114:8
**circumstance** 210:3
**circumstances** 8:21
　85:17 141:23
**citrix** 139:15
**claim** 22:7 29:9
　51:11 55:3 58:9,21
　68:23 69:2 79:19
　93:11 106:2,3
　118:14,24 119:1,10
　120:12,17 122:18
　123:18,21 124:1
　141:16 164:6,8,13
　164:13 169:6
　194:25 195:22
　196:9 224:8 227:3

**claimant** 55:8 95:3
**claimants** 21:10
　217:7,10
**claiming** 51:12
　164:15,19 196:18
**claims** 20:21 32:22
　58:10 68:8 69:1
　93:3 107:6 123:1
　134:21 185:2 213:3
　215:7 217:7 227:7
**clarify** 182:17
　202:22
**clark** 46:1 47:7
**class** 31:5 32:19
　68:19 99:2,9 217:12
**clean** 45:21,24 68:23
　100:16
**cleaning** 24:11
**cleanup** 41:3
**clear** 10:8 29:22
　38:1,14 50:15 61:22
　100:17 101:4 105:7
　120:16 132:13
　135:20 142:16
　155:17 157:8 189:3
　189:17 193:3,14
　194:17 199:9 200:5
　211:20
**clearance** 32:22
**clearly** 220:13
**clerk** 11:9 107:24
　122:10
**client** 16:8,18,23,24
　18:4,20 19:2 32:20
　41:14,16,19,23 42:2
　42:18 47:13 48:15
　49:16,23 50:10,12
　50:18 51:21 52:11
　52:13 53:3,11,14
　54:6 55:17 56:5,12
　57:5,9 58:14,20
　59:4 60:23 61:4,10
　64:23,24 65:14,15
　66:24 67:11,17,24
　68:2,19,22 70:23

73:1,3,4 75:6,15,20
75:21 76:18 80:23
80:25 86:4,8 90:19
91:2,17 93:12
103:25 122:13
133:23,24 135:4,21
136:22,24 141:14
141:21 143:2,5,7,18
143:20 144:10
145:20 148:15,16
156:8 173:22 174:1
185:9,21 186:3
187:4,14 190:22
198:1,10 205:15,22
206:13,19 208:15
209:21 210:14
211:11 214:1,9,24
215:18 216:3,20
217:24 220:3
221:18
**client's** 53:21
**clients** 10:19 12:25
　13:2,2,7,8 14:8
　15:24 16:9 17:4,12
　19:4,20 21:7,19
　22:16 23:2 24:4,13
　25:12,16 26:5,19
　27:1,6,10,21 28:16
　29:3,4,4,6,8,12,23
　30:16,21 31:9 32:3
　32:18 33:22 34:14
　34:19,25 37:15
　38:19 41:13 42:21
　43:9 44:7,14 46:11
　49:2 51:6 57:4,12
　58:18,24 59:9,21
　60:2,11,17,20,21
　61:2,13 65:10,11,17
　65:23 66:9 67:20
　70:11,12,17 71:23
　72:4,7,11,14,24
　73:6,8,16,25 74:16
　74:21 75:1 76:25
　77:8,19,20 78:4,6
　78:17 79:1,2 81:22

82:22 83:5,14 86:5
86:18 87:16,21
88:18,25 89:4,14
91:20 94:2,19 95:3
95:4,13,13,13,24
96:11,14,21,24
97:10,17 98:1,5
99:1,19 102:13,20
103:8,17,19 104:1,4
104:19,21 105:4,8
105:12,21 106:5,6
107:3,10,20 108:16
122:6,17 123:18,21
124:12,18,21
125:14,15 127:23
131:21,23 133:22
134:2,10,18,24
135:1,10 136:2,3,5
136:8,11,21,25
137:6,8,12,18
140:19,23 141:1,7
141:10 142:5,16
144:4 145:11
148:18 169:14
185:2,11 186:20,24
193:20 195:16,17
200:9,17 201:5,5,21
202:5,9,11 203:13
203:16 204:24,24
205:20,21 208:6,16
209:8,10 210:12,19
210:20,25 211:20
213:18 214:5,13,16
215:2,16,19,23
216:6,16 217:16
218:3,6 228:14
**clips** 203:14
**close** 14:23 178:22
**closer** 15:5
**clue** 86:14
**coconut** 2:12
**code** 222:15
**codes** 190:6,13
　222:20

college  11:2,7
colloquial  196:5
come  11:17 43:6,21
  44:2,6 48:9 50:20
  51:16 57:3 67:7
  78:9 104:2 108:19
  109:12 131:23
  133:23 134:24
  140:23 154:25
  174:17,20 175:3
  178:21 200:1
comfortable  68:16
  166:10
coming  49:23 73:2,4
  115:25 187:17,24
  196:25
commencement
  235:7
commencing  193:11
comment  74:7
  212:14 230:21
commissioned  235:3
commissioner  8:13
commit  83:9
committed  218:10
committee  31:5,10
  31:24 32:1 33:6,14
  33:17 34:3 176:22
  177:2
commonwealth  6:17
  235:3
communicated
  147:15
communicating
  173:25
communication
  29:8 32:2 34:6
  51:20 61:15 74:4,6
  89:14 99:5 105:3,8
  108:20 163:20,25
  223:12,12,21 224:4
communications
  10:7 30:25,25 32:7
  44:13 73:17,20
  88:17,22 89:3,10,25

90:4,12 105:1
108:14 117:12
118:3,7 121:14
140:15 151:23
155:14,15,20 157:6
170:9 190:20
228:18 231:4
companies  167:14
  167:17
company  1:4,5
  189:25 190:18
  199:17
compensation  97:24
  196:12 226:25
  227:17 230:11
competently  102:9
complained  142:2
complaint  118:8,15
  169:7 194:12 196:4
  224:11,12 229:5,12
  229:20,25 230:2,7
  232:2,19
complete  50:14
  171:9
completed  58:21
completes  233:23
compliance  94:12
  164:19,20
complying  164:16
composite  4:6 40:1
  40:5,24 45:4 54:17
  62:9 76:1
compound  9:22
  96:3
computer  14:18,21
  14:25 62:20 64:5
  65:21 69:3 124:23
  125:1,6,22 126:2,10
  126:18,22,25
  127:12 138:22
  139:6,8,9,10,12,20
  139:22 162:16,24
  163:2,5 222:13
computers  15:1
  125:7 127:15

200:15
concern  43:25 95:17
  147:12
concerned  43:16
  107:12 109:1
concerning  112:18
  127:7,23 147:21
  149:15 160:4 174:5
  223:17
conclusion  18:10
  25:3 95:21 209:12
conditions  39:20
  106:2
conduct  16:17
conducted  41:20
  227:24
confer  74:3
conference  16:21
  50:4 124:16,17,20
confidential  37:15
  38:20 39:9 154:25
  159:13 163:25
  175:11 207:9
  227:23 228:2,13
confidentiality
  151:8 159:10
  172:19 174:21
confirm  98:23
  149:19
confirmed  100:19
confused  210:6
  223:16
confusing  9:22
consider  96:13
consult  18:24
consulted  81:18
contact  12:16 15:24
  51:13 59:1 79:5
  154:25 182:22
  199:20
contacting  95:24
  113:15
contain  55:4 78:2
contained  119:9
  227:23 228:2

contains  29:13
  42:16
content  27:18 62:22
  84:7 89:8 90:21,25
  92:6,23
contingency  43:8,22
  47:13 65:18 67:12
  68:11 69:3 77:9
  83:2
contingent  24:14,16
  25:16 26:6 27:19,25
  29:24 30:16,19
  34:16 42:14 95:3
  106:9,11,13 200:6
  218:8,11
continue  74:14
  140:3 178:24
  179:11 203:15
continued  204:4
continuing  70:15
contract  4:15 26:2
  27:15,25,25 28:4,16
  28:20,24 29:13
  34:16 49:9 60:24
  67:3,8,20 69:3 82:9
  82:23 93:19 94:20
  98:12 104:19
  125:15 195:13
  202:12 209:2,5
  210:18 214:14
  233:2
contractor  24:10
contracts  19:21 27:5
  27:10,16,18,22
  28:11,21 44:8,18
  56:22 57:14 68:6,7
  68:12 94:9,19,22
  103:7 195:6,13,15
  195:25 198:23
  199:6 204:8 208:10
  209:13 210:22
  218:8
contractual  186:8
contrary  38:16

**conversation** 51:6
118:11 119:19
120:2,5,10,11 135:6
157:17 158:11,12
160:24 174:17
175:4 186:9
**conversations** 123:6
174:8 177:15 182:7
**conveyed** 89:15
**coordinator** 80:21
**coordinators** 20:21
106:25 125:25
**copied** 80:5
**copies** 64:21 66:14
**copy** 85:23 94:11
116:8 117:4 125:14
125:15 184:5
229:12,13
**corner** 149:24
**corporation** 1:9
**correct** 56:25 83:19
84:15 107:13 116:3
119:20 121:18,21
124:7,10 125:20
126:19 127:1,12
128:2,12 130:18
133:20 137:22
138:23 140:24
143:25 144:2,3
145:12,24 146:18
146:25 147:18,22
154:23 155:1
156:17,19 157:10
157:15,22 158:4
159:15 162:3 163:2
163:14 164:25
165:7,13 166:7
168:2,9,19 169:10
170:20 175:18,21
176:8 202:18,24
224:22 225:21,24
227:13,22 230:16
231:10 232:9 236:4
**correctly** 15:1

**correctness** 233:19
**corresponded** 230:4
**correspondence** 4:6
60:10,21 61:19 76:1
88:18,23 89:4
206:14 222:2
**cost** 187:14
**counsel** 2:3,8 4:15
7:25 9:21 27:12
28:1 55:8 59:10
86:8 89:16 98:11,25
100:20,25 111:4
148:5 159:15
176:21 179:21
180:5 181:14
191:25 194:3
195:18 207:17
208:15 215:24
218:4 219:13
220:15
**counseling** 78:7
**counter** 220:10
**county** 1:2 4:4 5:16
114:9 219:25
**couple** 55:21,24
100:18 127:11,16
177:16 223:8
**course** 24:23 56:21
63:13,13 73:18
84:11 190:16
221:16,17
**courses** 205:14
**court** 1:1 4:4 5:14
7:7,14 8:3,14 10:4
37:13 38:17 40:6
45:1 90:23 91:3
92:8,17 100:1,7
110:21 114:7,8
148:25 152:4,8,10
152:18 153:13
154:11 155:4,15,18
155:23 158:1 159:6
159:14,24 160:1,4,9
163:13 173:12
183:25 193:7,10

212:5 213:7 217:12
219:25 220:7 221:7
230:10,10 235:5
236:3
**court's** 215:4
**covered** 183:10
**craig** 1:9 4:17 6:1
14:11 20:23 28:6
42:23 47:19 48:13
48:17 49:10 55:9
65:1,2,2 70:8 83:6
112:11 147:16
163:20 170:24
201:16 202:24
211:21 212:1
213:11,20 222:3
229:7
**cried** 158:21
**cross** 104:8 219:12
**crying** 158:22,24
159:20 160:18
**curious** 196:10
**current** 40:3 123:15
**currently** 51:9
121:20
**cut** 31:9 38:3 39:10
71:16,22 171:20
172:2

---

**d**

**d** 1:24 2:13 3:1 5:2
70:8 236:2,13
**d'freitas** 5:5 6:24
**dade** 1:2 4:4 5:15
114:9 219:25
**dan** 111:20
**dangerous** 78:4
**daniel** 1:10 2:25
4:12,17,17 6:2,6
12:17 15:24 62:12
64:15 65:1 66:12
69:6,10,17 75:11
80:6 85:16 183:18
221:25

**danny** 18:22 19:9
20:19 36:9 38:18
43:11,14 65:1 66:7
80:2,20 82:6 95:23
112:11 116:19,20
126:14 128:18,20
128:20 129:1,3,4
130:11,14 138:12
144:8 146:19
147:15 152:3 172:3
178:18 182:11,19
182:20 197:4
204:10 221:23
229:7 232:23 233:4
233:8
**danny's** 15:23 139:1
139:9 198:11 200:3
**date** 5:7 14:22 30:3
46:2,8,14 52:11
55:17 56:8 72:8
84:2 87:23 114:24
116:6 123:4 138:2
169:3 184:19 189:6
189:7 205:5 236:6
**dated** 4:5 27:16,20
46:17 47:15 62:11
67:4 69:5,13 76:22
80:1 98:16 164:24
**dates** 10:15 46:11
52:10
**day** 46:24 103:23
117:2,3 119:18,18
120:14,14 138:5
151:22 160:18
184:9,16,17 201:10
201:11 208:11
235:10
**days** 114:1 115:16
152:25 153:2 163:9
177:16
**de** 55:1
**deal** 17:23 31:9 91:3
200:23 220:6
**dealing** 17:3 20:20
21:12 49:2 83:5

86:23 200:18
213:22
**dealt** 27:22,23 32:22
**dear** 65:1
**december** 47:1
166:25 168:23
169:5,5 194:19
**decide** 178:23 179:1
**decided** 109:11
155:18
**declaración** 55:1
**declaration** 4:10
52:6 54:24
**deduct** 227:6
**deducted** 227:2,4,18
230:13
**deducting** 228:24
**deduction** 229:24
**deep** 42:20 58:10
**defendant** 190:18
194:3
**defendants** 1:12 2:8
30:14 88:16,21
112:14 155:19
157:10 220:11
232:2
**defense** 219:13
**defenses** 232:21,25
**degree** 214:5,17
**del** 1:17
**delete** 227:22 228:1
228:9,20
**deleted** 195:1
204:14 228:5
**delivered** 52:2 142:7
189:7 190:17
**deliveries** 203:18
**delivery** 151:10
**demands** 92:3,3
**demonstrate** 177:5
**denial** 157:10
**denied** 152:5,6,17
155:13,19 156:13
183:25

**denying** 221:14
**depended** 144:9
**depends** 110:24,25
111:12
**depo** 148:10 177:12
**deponent** 3:3 7:20
7:21 15:13 17:6
18:13,20 20:4 25:4
33:8,16 34:5,19
36:3 38:5,8,11
44:12 45:7,20 46:21
47:7,9 48:7 49:8
51:24 60:5 61:8
70:19 72:18 82:1
85:6 86:13,20 88:12
89:22 93:8 94:6,14
96:7 99:16 102:16
103:13 104:25
107:16,22 108:12
109:3 110:16
111:15 117:9,16
122:15 129:11,20
130:2 135:17
136:14 145:14
146:1,7,13 150:18
151:19 156:4,10
159:4,17 161:9,17
162:9,19 171:24
173:7,24 175:10
180:24 181:2
182:19 185:19
187:11 188:14
191:2,8,11,14
194:14 195:21
198:25 202:25
203:2 205:3 206:7
207:5,13,22 209:13
210:6,22 211:4,25
212:15,25 214:10
216:13 218:16
219:1 225:12 226:4
227:15 228:12
233:17,21 235:6
**deponent's** 235:7

**deposition** 1:14 5:9
6:20 8:8,8,17,17
9:13 35:15 40:17
64:1 117:13 120:7
120:11 136:2 145:4
153:14 160:6 171:4
174:20 177:13
183:21 193:13
196:25 220:6
231:21 233:24
234:3
**describe** 20:13
27:18 45:9,13,18
50:8 74:16 87:13
97:21 101:10
149:19
**described** 135:5
136:1
**describing** 87:7
**description** 4:2
90:15
**desk** 124:15,21
**destroy** 151:5
**detailed** 34:24
**details** 79:12
**determining** 127:15
**dhcc** 92:4 93:3
**diagnosis** 21:14 22:1
**difference** 146:22
**differences** 25:5
**different** 10:13 15:1
15:2 26:12 38:3
46:11 66:2 68:2,5
68:17,21 76:17
106:1 128:13 153:5
179:15 184:19
210:11
**differently** 95:10
**direct** 24:21 127:22
146:16 176:21
**directed** 28:15
49:17 60:10 110:20
**direction** 67:23
236:8

**directly** 213:22
224:25
**disagreement** 97:24
97:25 138:15
**discharge** 78:24
79:16 81:11 82:19
**discharging** 73:8
95:25
**disclaimer** 154:24
**disclosed** 34:14
67:13 97:25 159:14
216:6
**disclosure** 191:19
220:2
**discontinuation**
77:7
**discount** 195:7
**discretion** 10:22
**discuss** 16:24 21:5
31:12 36:11 86:18
117:13 136:4,7
137:11 140:18
152:1 158:6,7 160:8
174:7,24 182:23
230:18
**discussed** 18:2
31:11 139:8 162:23
169:19,20 174:10
231:20,25
**discussing** 16:8
108:15
**discussion** 98:23
118:20 160:3
178:17
**discussions** 21:24
59:13 101:9 142:23
170:13 176:14
**disk** 3:13,14,15,16
3:17,18
**dismiss** 32:20
**dismissal** 33:20,21
76:10
**dismissed** 29:23
31:9 47:25 55:20
101:21 123:4

**dismissing** 32:4
**dispute** 60:13,22
  61:4
**distinction** 23:13
**distinguish** 146:24
**distinguishment**
  103:5,6
**district** 99:3,9,12,19
  100:13,15 114:9
**divulge** 91:23
**doctor** 80:15 214:21
**document** 9:19
  27:17 34:13 38:25
  46:2,13 51:4 52:9
  52:13,20 53:8 54:20
  56:4,10 57:23 62:13
  62:16 64:9 65:23
  66:2,3 71:3 84:3,3
  100:18 152:4
  165:21 166:15
  174:18 176:2
  191:18 193:16,19
  207:1,11 219:12,24
  220:17 221:22
  222:3 230:6,15
  232:9
**documentation**
  50:13
**documents** 24:4
  26:24 27:1 35:2,4
  35:16,25 36:17 37:3
  37:12 40:1 52:4,17
  54:6 55:2 57:6 58:5
  58:7,11,14 61:24
  62:9 64:16,19 65:25
  71:18 84:7 92:8,24
  93:1,9 117:24
  138:19 139:13
  141:7,11 143:11,14
  161:21 174:5,9,11
  174:23 177:4,17
  183:3,24 188:11
  200:9,10 203:18,22
  203:25 208:1
  209:22 215:8

220:22 221:1 222:6
  222:14 223:1
**doing** 20:10 28:12
  28:23 59:20 76:19
  85:22 107:13
  119:25 143:3 167:9
  197:9 210:13 225:3
  225:10
**dollar** 187:4
**double** 152:9
**doubtful** 178:17
**doubts** 18:21
**downs** 1:8,9 2:9
  4:17 5:13 6:1,1
  11:22,25 12:10,15
  12:22 13:12,17,25
  14:11,17 15:6,8,9
  16:1,7 17:15,22
  19:19,25 20:8,14,23
  23:13 24:2 25:8
  26:18 28:6 29:2
  30:15 31:1,9 32:3
  32:18 33:2 34:1,14
  34:20,23 40:18 41:6
  42:9,23,23 43:7
  44:6 45:15 47:19
  48:4,11,13,16,17,22
  49:3,9,10 51:2,7
  52:15,21 53:2,18
  55:9 56:8,22 57:3
  57:19 58:13,18 59:9
  59:14,18,25 60:12
  61:2 62:25 63:25
  65:2 67:23 69:8
  71:18 72:13 73:13
  73:22,23 77:2 78:17
  78:24 79:23 80:13
  81:21 82:11 83:2,6
  83:19,25 84:6,12,19
  84:21,23 86:16,22
  86:24 88:16 90:4
  93:17 94:10 95:3,12
  97:13,21 98:4
  101:10,14,21
  102:20 104:18

105:13 106:16,19
  107:1,19 112:9,11
  122:1,9,12 124:4,6
  125:20 126:13
  127:23 128:4 129:1
  129:7,17 131:2,7,11
  132:23 133:19
  136:4 138:8,20
  139:3,6,7,13,16
  140:3,6,14,24
  141:12 142:8,12
  144:5,11,12 145:11
  147:21 148:15,17
  156:7 161:22
  163:20 164:6,9,20
  165:5,11,18 167:2
  167:10,16,19,23
  168:1 169:10
  170:24 172:17
  176:13,17,18,25
  182:8 183:5,14
  184:10 186:10,19
  188:2 190:2,18,20
  194:3,10,24 195:5
  195:24 196:15
  197:12,15,20 198:6
  200:2,11 201:16,22
  202:5,11,17,20,23
  202:24 203:2,5,23
  204:3,4 209:8
  211:21 212:1,7
  213:6,11,20,21
  214:2,5,17 216:17
  218:12 220:15
  222:3 223:3 227:5
  227:13 229:6,7,25
  230:13 232:22
**downslawgroup.c...**
  2:14
**drafted** 95:18
  195:15
**drop** 165:23 167:7
**dropped** 162:20
  166:1,2 188:21

**dropping** 188:19
**duces** 35:20
**due** 227:7
**duly** 7:1,8,21 9:5
  235:2,6

**e**

**e** 3:1 4:1,12,14,17
  5:2,2 15:20 18:22
  37:23 38:3,10,15
  41:7,9 59:5 62:25
  63:2,5,21,22 64:9
  64:25 65:6 69:5,21
  70:14 71:4 72:24
  75:10 77:22 78:5,19
  80:5 81:4 82:1
  83:12,16 84:3,6,14
  84:20 85:4,15 88:18
  88:22 89:3 90:3
  95:24 98:9 100:10
  101:5 121:10
  125:25 126:1,10,18
  126:21,25 127:4,7
  127:15 129:5 148:3
  149:22 150:6,15,22
  150:25 151:6,14
  152:2,18 154:9,17
  154:20,23 155:7
  156:1 159:2,13
  161:7,14,18 162:16
  163:1,8,17,21
  165:16 166:10
  170:8 171:5 173:9
  173:13 174:25
  177:9 186:9,12
  189:21,25 190:19
  194:18,25 195:1,4
  195:10 204:12
  221:23 223:17,20
  223:23 224:1
  227:22 228:5,21
  230:23 231:3,9
**earlier** 136:1 137:1
  146:15 162:23
  168:8

early  64:13 135:1
earned  187:8
eastern  99:3,8,11,19
  100:13,14
eat  180:20
economic  21:10
  68:7,9,19,23 69:1,2
  213:3 217:6,7,10
educate  205:18
education  11:2
effect  32:21
effective  123:4
effects  77:19,19 78:1
effort  60:1
either  11:6 22:20
  23:11 25:5 30:24
  46:25 50:16 57:1
  66:5 87:22 114:15
  128:9 129:7,16,24
  151:12 161:5 174:7
  179:11 189:18
  231:17
eleventh  1:1 4:4
  114:9
eliminated  33:2
  72:15 195:17
eliminating  190:21
elimination  33:12
  90:5
emblem  62:12
employ  140:14
employed  32:11
employee  13:11,13
  13:17,18 62:24
  184:10 223:3
employer  159:9
employers  96:20
employment  21:3
  23:17 41:6 83:18,22
  84:12 85:11 184:20
  188:12
ends  172:16,20,25
engage  127:14
engagement  57:11
  73:2 77:8 79:13

206:12 207:15
  209:9,23 211:7,14
  218:11
engagements  218:11
english  13:1,8 25:18
  25:22 26:1,6 45:21
  48:12 55:14 72:3
  74:23 212:18,19
entering  198:1
entire  39:11 202:5
entirety  8:7
entities  102:21
entitled  81:8 112:12
  146:5,10,11 236:5
entitlement  100:3
equipment  139:22
erase  228:13
error  44:7
especially  189:3
  200:5
esplenit  105:19
esq  2:5,13,24,25
  28:6,8,9 42:17,17
  42:23 47:19,21,22
  48:13 55:10 212:7
  213:13
esquire  209:17
  213:16
essentially  8:18
  74:15
estrada  57:18,18
evaluation  23:15
events  156:13
eventually  32:21
  138:22
everybody  186:21
evidence  63:4,9 73:7
  73:19 189:18 211:3
  214:2,6,11,17 216:5
exact  28:3
exactly  28:22 42:1
  43:24 67:21 103:25
  213:9 215:1 229:19
examination  3:5,6,7
  3:8 9:7 22:8 104:8

112:6 146:16 182:4
  219:12 223:9
examined  9:6 22:3,6
example  10:19 58:9
  199:24 214:20,22
exams  106:12 215:1
exception  37:14
  84:24
exchange  100:5
excluded  38:22
  215:7
excuse  100:24
  174:25 206:6
excused  7:24
execute  57:4,6 143:4
  143:6,8
executed  46:15
  57:23
executing  57:5
executive  172:21
exhibit  4:4,6,8,10,12
  4:14,17 35:8,12
  40:1,5,14,17,24
  44:21 45:2,5,19
  54:16,21 62:9 69:13
  69:15,23 75:24,24
  75:25 76:1,4,6
  83:17 90:15 98:13
  98:14 145:8 148:9
  149:15,19,23 153:7
  153:14 163:11
  170:10 171:2,4,14
  171:21 172:5
  174:25 177:21
  191:18 207:2 211:8
  219:16,19,20 220:2
  221:13
exhibits  67:1 184:13
  188:19,24 189:8
  208:1 211:8
exist  157:6
existed  155:16
existence  155:19
existing  19:22 55:15
  55:16 82:9

expected  129:8,18
  129:20
expensive  66:20
experience  134:10
expert  206:1
explain  12:9 26:2,15
  42:6 45:5 58:13
  122:24 123:9,13,14
  134:6 185:15 199:8
  214:1
explained  48:15
  158:3 217:16
explaining  24:16
  42:20 122:19
  213:18
explanation  14:13
explanations  217:19
exposed  214:22

f

facility  58:10 93:3
  105:13 106:20
fact  8:9 35:7 57:14
  108:5 118:23
  154:19 155:18
  157:6 200:17 201:3
  203:11 227:10
  230:11
facts  16:24 17:12
  211:2
factual  16:8
failed  93:23 94:1
failure  101:11
fair  71:9 123:15
  134:20 144:10
  217:5 227:8 233:9
fairly  108:21
false  89:19
familiar  112:15
far  44:4 59:14 61:8
  107:5 134:23
  147:17 199:17
  201:24
farmacia  113:11

**favorite**  195:6
**fax**  115:21 116:6,8
**faxed**  80:9
**february**  1:18 5:1,7
  62:11 113:25 115:4
  115:5,7,9,17 116:2
  116:10,20,22,23,24
  117:1 233:25
**federal**  217:12
**fee**  24:14,16 25:16
  26:6 27:20,25 29:24
  30:16,19 33:13
  34:16 43:8,22 47:13
  65:18 67:12 68:12
  69:3 77:9 95:3
  104:22 105:5,9
  146:4,9 187:8,17,21
  200:6 218:8,11
**feel**  68:16 166:10
**feeling**  24:3 96:5,8
  196:3
**fees**  100:4,6 176:15
  176:16,18
**felt**  87:22
**field**  218:22
**fifth**  99:12 180:3
**fight**  142:1
**figure**  47:3 113:18
**file**  22:7 61:19 99:22
  99:24 123:21,25
  155:18 177:25
**filed**  58:21 118:14
  118:15 120:13,17
  153:9,10,11,13,15
  154:10 155:23
  157:3,4,7,9,13
  158:1,3,4 159:6,9
  160:22 163:13
  164:10,12 165:20
  169:1,7,9 173:10,14
  175:6 177:23 178:1
  219:24 221:4
  222:23 223:14
  224:9 229:6 230:6
  232:21

**filing**  152:19 153:16
  155:4,21 177:22
  213:6
**fill**  22:5 51:2 79:15
  82:22 123:12
  217:18
**filled**  47:10 51:20
  68:9 93:9 200:10
**filling**  18:3 22:10
  31:13
**final**  100:1
**finally**  14:21
**find**  30:12 34:2
  46:14,23 55:18
  63:20 116:11,19
  140:12 142:15
  156:12 172:20
**fine**  10:22 21:23
  215:12
**fingerprinted**
  215:14
**finish**  10:16,21
  75:17 91:5 169:1
**finished**  30:1,10,11
  220:24
**finishing**  12:7
**firing**  73:8
**firm**  13:18 14:6
  16:19,20 19:19,19
  19:24,25 24:21
  43:10,22 44:2,17
  48:4,16,22 49:3,17
  57:3,15 64:10 67:23
  74:16 75:4 78:18
  79:16,17 81:2,7,11
  81:14 82:7,11,24
  83:2,25 84:6,19,23
  86:16,24 93:17,17
  93:17,22,23 98:23
  98:24 99:22 100:19
  100:24,24,25
  101:15,16 103:1,9
  106:19 107:1,19
  122:2 134:7 141:19
  146:23,25 175:15

**filing**  183:5,14 184:10
  189:19,19 191:24
  191:25 197:12
  199:21 200:7
  201:17,22,22 202:5
  203:5 205:23
  206:23 210:12,13
  220:16 224:16
  229:5,6
**firm's**  121:14
  146:18
**firms**  30:21 34:8
  42:19 44:9,18 49:4
  60:14,22,22 61:5
  82:9 87:8 89:12,18
  101:12 102:12
  103:7,20,24 119:13
  147:13 175:13
  210:11,23,25
**first**  7:10 11:23
  12:16 14:25 15:4
  22:19 26:11,13 29:1
  46:8,9,24,24 51:6
  51:19 55:18 69:8
  78:25 86:4 95:25
  98:19 101:7 114:22
  123:8 124:23,25
  126:9,12,14,16
  152:17 156:13
  164:5,8,12,15,19,22
  168:14 172:9,11
  173:3 187:2 192:16
  201:11 212:21
  221:4
**fit**  22:1
**five**  61:18 103:11
  134:16,19 135:9
  153:2
**florida**  1:2,9 2:5,12
  4:4 5:16 8:10,14,14
  16:7,13 17:17 19:7
  19:11 23:4,4,18,19
  23:21 25:6,13 44:8
  44:16,19 50:16 53:8
  53:9 56:23 61:5

**filing**  74:2 79:18,21 86:7
  86:10,13,14 88:7
  94:12 98:5 106:17
  106:25 114:6,10
  134:7 153:10
  185:14,16 198:12
  198:17 203:10,19
  206:20 212:6,6,22
  213:5,7 216:18
  217:3,15,21 218:3
  225:8,9 232:11
**folder**  40:8
**folders**  4:7 40:9
**folks**  81:21 101:9
  203:23 204:3
  217:15 221:19
**follow**  30:12 223:8
**followed**  147:12
**following**  28:5
**follows**  9:6 98:17
**followup**  219:4
**foregoing**  236:4,7
**foreign**  1:4,5
**forever**  115:3
**forget**  123:22
**form**  8:19 13:14
  17:5,8 18:9,19 20:3
  23:6,22 25:1,19
  26:20 33:7,15,23
  34:4,17 44:10 48:6
  48:23 49:6 51:23
  60:3 61:6 69:1
  72:17 79:8 81:25
  84:9,16 85:1 86:11
  87:2 88:10 89:21
  90:8,13 94:4,15
  95:7,20 96:15 97:8
  99:14 102:14
  103:10 104:23
  107:14 108:11,23
  109:2,8,15 110:2,6
  116:16 117:8,15
  122:8,14 129:10,19
  130:1 136:12
  145:13,25 146:6,12

150:17 151:15,18
156:2,9 159:3,16
161:8,16 162:8,18
173:17,23 175:9,22
177:10 184:1
185:17 186:8
187:10,18 188:13
189:9,23 191:1,21
192:2,8,14 193:23
194:13 195:19
198:24 201:1 202:2
205:2,25 207:4,12
207:19 208:7
209:11 210:1,21
211:1,24 212:13,23
215:21 218:14
225:11 226:3
227:14 228:11
**formal** 11:1
**former** 62:24
**forms** 53:20,23
**forth** 183:8 223:18
224:2 236:6
**fortune** 35:3
**forward** 8:21 22:11
141:15 150:14,15
155:15 162:14
168:17 184:19
**forwarded** 58:8,12
80:13
**found** 79:7 113:17
163:8
**foundation** 18:12
23:7,23 25:2,20
34:18 44:11 48:24
49:7 60:4 61:7
86:12 87:3 88:11
94:5,16 95:8,21
96:16 99:15 102:15
104:24 107:15
185:18 187:19
191:22 192:3
193:24 195:20
205:25 208:8 211:2
212:24 218:15

**four** 169:23 170:5
182:24 219:15
**fourth** 46:3 172:24
**frame** 15:17 20:15
26:10 27:17 47:25
48:1 60:18 67:5,5
128:6 134:19
137:24
**fraud** 155:14 221:9
**friday** 131:19
**friedman** 1:10 2:13
3:6,8 4:14 5:25,25
6:2,10 7:10,13,17
8:2,6 13:14 15:11
15:14 17:5 18:9,19
20:2,24 22:17 23:6
23:22 25:1,19 26:20
33:7,15,23 34:4,17
36:4 37:11 38:18
40:16,21,25 43:3
44:10 45:8,16 46:16
46:25 47:4,8 48:6
48:23 49:6 51:23
60:3 61:6 69:22
70:4,8,20 71:1 72:6
72:17 74:7 75:14,23
76:3 81:25 84:9,16
85:1,5,20 86:11,19
87:2 88:10 89:21
90:8,13,23 91:8,11
91:16 92:7 93:4
94:4,15 95:7,20
96:2,6,15 97:8
98:10 99:14 102:14
103:10 104:23
107:14,21 108:11
108:23 109:2,8,15
109:19 110:2,6,10
110:14,18 111:9,19
112:7,8,12 116:17
117:11,19 122:21
129:13,22 130:3
135:18 136:17
145:15 146:2,8,14
148:8,11,24 149:5

149:13 150:20
151:16,20 156:5,11
159:11,18 161:12
162:1,11,22 170:10
172:3,7,9,23 173:2
173:8,18 174:3
175:16,24 176:10
176:11 177:11
178:4,13,16 179:2,8
179:23 180:9,14,18
180:22,25 181:3,6
181:11,17,22
182:11,15,20 184:1
185:17 187:10,18
188:13 189:9,23
191:1,6,9,12,21
192:2,8,15,20 193:1
193:23 194:13
195:19 197:1
198:24 201:1,12
202:2,21 203:3
205:2,24 206:5
207:4,12,19 208:7
208:17,21,25
209:11 210:1,5,21
211:1,24 212:13,23
214:8 215:3,17,22
216:11,19,24
217:23 218:14
219:2,22 220:19,22
221:1,10,16,24
222:2,19 223:7,10
225:16 226:7
227:20 228:19
229:7 233:13
**front** 44:25
**full** 9:9 219:15
232:1,4,14
**functions** 28:23
**funny** 196:16,18
227:3,5,16
**further** 51:19,22
61:14 76:19 110:11
179:9 220:2 230:18
233:14 236:7

**fw** 150:8
**fyi** 195:1 225:15
226:5,8

**g**

**g** 5:2
**gain** 232:6
**gccf** 92:3,5 93:3
**general** 134:9 224:5
226:12
**gentleman** 12:18
**gentlemen** 102:12
**getting** 22:4 30:13
63:7 67:22 69:8
99:21 108:25 109:6
123:10 142:2
179:15 187:16
**girlfriend** 139:1,9
**gist** 72:12
**give** 13:18 15:23
33:14 34:2 35:17
36:9,16 39:23 44:13
49:25 79:20 82:16
82:20 86:16,22 87:5
111:20 120:1
122:12 135:8
136:10 137:15
140:20 154:24
156:6 159:21,23
160:15 180:2
188:25 190:6,13
198:10 199:24
203:12 226:8
**given** 14:13,15
52:17 56:7 61:2
80:9 93:12 119:24
188:10
**giving** 33:4 45:9
82:10 180:7
**gmail** 4:6 230:25
**gmail.com** 63:1
**gmail.com.** 127:2
**go** 6:13 11:23 15:7
35:19 36:4,15 37:1
42:13,20 50:19

54:19 56:1 61:18,19
61:23 62:8 72:4
73:24 81:15 86:2
96:10 104:9 106:23
107:20 109:20
116:18 135:25
140:1,9,19 142:14
142:16 144:25
149:3 166:17 172:3
175:25 181:3,21
193:6 207:21
211:17 221:11
**goal**   9:18
**goes**   99:20 151:23
**going**   7:15 8:6,20
9:20 14:10 35:19,21
37:4,19 40:10 44:21
48:16 60:20 61:23
61:25 69:12 70:22
72:13 73:15,24
74:14 78:12 79:12
81:19 87:8 89:16
90:20 96:10,11 97:5
98:3 104:10 107:12
108:15 109:21
110:25 111:1,5,7,11
111:15,18,18,23
112:17 121:5
122:25 142:20
143:2 149:6 152:1
158:10 160:7,15
167:20 169:23
170:2,4,8 174:11
177:20 178:2 179:3
179:16,18,22 180:6
180:16 181:8 183:4
183:7,8,11 185:1
192:5,7 193:19
194:4 205:24
206:15 209:14
211:19 212:21
213:21 215:3
216:17 219:6 221:7
223:17 234:1

**gonzález**   31:21
**good**   5:3 26:15 35:3
180:14
**googled**   113:16
**gotten**   145:12
154:13 162:3,7
**government**   24:8
**great**   233:22
**greet**   135:2
**grossman**   31:19
**group**   1:3,8 2:4,9
4:8 5:13,13 6:1
12:10,16,22 13:12
13:17 14:1,17 15:6
15:8 16:2,7 17:16
17:23 20:1,8,14
22:9 24:2 25:8
26:19 32:19 33:2
34:14 42:9,23 43:7
44:7 45:15 49:9
51:2 52:15,21 56:8
57:19 58:13,18 59:9
59:14,18 60:1 62:25
63:25 69:9 71:18
72:13 73:13 78:24
79:23 84:21 86:22
88:19,24 89:5,15
90:4,6 101:10,14
102:22 112:9,13
122:9 124:3,4,6,10
125:2,20 127:23
128:4 129:7,17
131:8,11 132:23
133:19 136:5
137:25 138:8,20
139:3,7,7,13,16
140:4,7,15,24
141:12 142:13
143:12,14,25 144:5
144:12,12 145:11
146:5 147:5,21,21
148:14,15 156:7
164:6,9,21 165:5,6
165:11,12,19 167:2
167:10,16,20,23

168:1 169:10
172:17 176:13,13
176:18 182:8
186:10,11,19 188:2
189:20 190:20,21
194:10,24 200:3
208:18 209:24
213:21 227:6 229:6
231:5 232:22
**group's**   13:24
148:18
**grove**   2:12
**guess**   6:11 68:13
111:12 113:15
124:9 145:11
167:20 171:7,20
180:23,25 187:23
210:15 213:16
223:17 225:14
226:5 231:5 232:19
**guessing**   10:12,13
**guidance**   82:10,16
86:17,23 87:5
**gulf**   215:14
**guys**   37:21 111:3
215:13 221:5,15

**h**

**h**   4:1
**ha**   195:8,8,8
**hac**   99:24
**hacked**   166:11
**half**   111:7,10
**hand**   27:22 149:24
160:2
**handbook**   13:18
**handed**   58:19
219:13
**handling**   24:4,12
**hands**   45:1
**happen**   36:22 69:2
108:10,17 116:10
**happened**   29:19
32:25 41:24 59:6
90:22 116:2,5 141:1

171:18
**happening**   82:12
107:20
**happy**   81:15 82:19
160:21
**hard**   72:1
**head**   61:22 201:16
201:22
**headache**   117:22
178:11
**heading**   41:2 91:7
221:9
**health**   57:20
**hear**   15:12 73:7
110:15 112:19
191:6 202:3 226:17
**heard**   23:10 31:18
31:19 34:6 100:9
129:3 176:25
179:19 187:13
**hearing**   35:3,9
100:4 174:11,20
183:11,14,20 184:4
**hearsay**   84:24
**held**   1:16 5:9
**help**   12:10 55:11
56:1 109:14 212:8
214:17
**hereinbefore**   236:6
**hernández**   78:15
**hey**   98:22
**hi**   64:16 134:8
**highly**   179:20
**hipaa**   53:20
**hired**   12:21 13:11
**hiring**   48:21 217:21
**hit**   123:4
**hold**   39:24 80:20
222:18 225:2
**holding**   122:19
123:1
**home**   71:24 109:12
116:9 117:4 132:11
132:16 133:2 166:9

**hondurans** 21:20
**hook** 218:13,19
**hope** 180:11
**hopefully** 107:8
  123:5
**horizon** 58:10
**hour** 111:7,10
  180:17,21
**hourly** 185:5
**hours** 15:20 100:18
  131:14 132:2,4,19
  132:22,25 133:7,11
  133:16,17
**house** 105:19 140:2
  165:17,18
**https** 150:2
**huge** 227:3,10
**huh** 10:23 53:24
  78:16 223:19
**hungry** 165:8
**hurt** 70:16

**i**

**idea** 165:19
**identification** 35:13
  40:15 45:3 54:22
  69:16 98:15 219:21
**identified** 55:7
  197:14 199:6
**identify** 5:20 57:15
**illegally** 219:24
**illness** 10:18 79:12
**implication** 48:21
**important** 9:17
  82:15
**impossible** 116:15
**improper** 208:24
**include** 61:12 133:1
  188:23 207:16
**included** 27:10
  29:24 30:17,20
  60:12 77:9 87:24
  88:1 94:19 104:19
  160:2 189:8 214:14
  218:12 228:17

**includes** 37:15
  38:20 47:18 154:23
**including** 49:4
  205:8
**incorrect** 117:6
**indicate** 20:8 41:16
  197:5
**indicated** 18:6 27:18
  28:17 31:8 32:3
  33:12 34:1 45:25
  77:7 100:12 151:4
  197:19 218:3
**indicates** 65:9 74:13
  221:23
**indicating** 78:6
  101:23 107:11
  198:12
**indication** 41:23
**individual** 43:9
  88:16,21 210:25
**individual's** 146:17
**individually** 1:9,10
  1:11 209:1
**individuals** 190:18
  208:18 232:22
**industrial** 105:23
**inflammatory** 10:19
**info** 39:9
**inform** 25:9 43:19
  43:19 78:4 79:4
  96:23 97:6,17 98:4
  108:16 120:3,8
  206:18 214:5
**information** 4:10
  18:4 31:7 32:18
  33:1,2,11 37:16
  38:21 51:3 57:20
  64:23,24 79:5,20
  123:12 125:17
  156:8 170:24 215:8
  226:5,9,12 227:24
  228:3,13 230:19
**informed** 23:13
  34:20 43:17 51:7
  60:13,21 78:22

96:20 101:13
  104:21 116:20
  152:3 184:18
  191:14 204:24
**informing** 21:25
  72:24 96:21
**initial** 99:22
**input** 73:14
**inquiry** 107:7 127:7
**inside** 125:11
**insisted** 220:4
**instructed** 106:19
**instruction** 56:7
  82:21 83:4
**insurance** 41:8,11
  167:14,17
**intake** 107:24
**intended** 60:1
  141:11 150:25
**intents** 197:22
**interchangeably**
  208:22
**interest** 74:14
**interested** 51:11
**interestingly** 48:3
  70:2
**interests** 74:18
**interference** 95:19
  96:1
**interfering** 82:8
  96:13
**interpretation** 72:21
**interpreting** 77:25
**interviewed** 14:5
  187:2
**intimate** 188:10
**intimations** 189:2
**intrigued** 48:12
  71:21
**intriguing** 212:10
**introduced** 134:2,4
  135:24
**invoking** 180:3
**involved** 19:3,19,25
  27:12 28:2 32:10

42:19 51:10 61:3
  88:9 109:6 199:21
  200:7 213:24
**involvement** 20:9
  89:9 190:22
**involves** 205:15
**involving** 174:9
**irvin** 31:21
**isidoro** 80:23 81:5
**issue** 70:25 71:2
  160:8,17 163:8
  174:18 175:4
  232:24
**issued** 24:9
**issues** 21:13 86:18
  92:14
**item** 75:13

**j**

**j** 2:5
**january** 116:10
  117:6 118:18,21
  119:20 168:23
  169:4 190:23,24
  194:19 220:12
  223:13,21 229:4
  231:14,18
**jason** 28:8 42:17
  43:9 47:21 55:11
  98:24 100:19,24
  101:5,6,7 103:1,18
  120:20 137:5 147:8
  211:22 212:8
  213:13,23
**jason's** 98:24
**jeremy** 1:10 2:13
  4:14 5:25 6:2 70:8
  72:6,13 90:10 98:9
  98:18,20 100:19,24
  101:5 112:8,12
  170:10 201:12
  221:24 222:2 229:7
**jessica** 11:14
**jfriedman** 2:14

**job**   101:24 170:6
**jobs**   165:22
**joint**   4:14 23:20
33:3,22 34:14,22
88:5 94:12 98:10
119:11 148:5
205:19,23 206:10
206:13,14,17
207:10 208:6
232:12 233:2
**jointly**   182:12,20
**joke**   226:15,19,21
226:22 229:1
230:22
**jokes**   226:13
**joking**   227:12
**juan**   1:17 5:1,10
235:9
**judge**   35:18 36:8
37:16 38:22 71:8
215:7
**judicial**   1:1 4:4 5:15
114:9
**july**   11:25 12:13,24
14:19 26:18 27:5
30:10 70:11 72:8,14
75:6 124:7 216:2
**jump**   10:18
**jumping**   10:3
**june**   47:24 55:21
**jurisdiction**   17:12
**jury**   109:22

**k**

**k**   65:9
**keep**   36:23 37:20
70:17 85:23 109:21
111:15,18 192:10
209:1
**kept**   84:11 159:5
**key**   186:16
**kind**   21:25 41:2
54:19 59:4 87:13
95:23 110:20 124:2
124:20 125:17

186:7 232:10
**knew**   123:10 142:19
142:19 157:5 208:5
209:7
**knocked**   135:20
**know**   9:16,23,25
10:14,15,24 12:10
14:4 17:10 18:13
19:22 20:19 21:21
22:14 23:4,9,11
24:19,24 26:22 29:6
29:16,20 31:3,25
32:23 38:7 41:7,10
42:12,18 44:4 46:7
53:17 54:2,13 58:7
58:11 59:18,25
60:17,25 61:8 62:22
64:20 65:10 66:13
68:11 72:23 74:2,20
75:2 76:25 78:3,23
79:2,5,17,19 80:2
80:11,14,16 89:7,25
93:8,13,22 94:10
95:12 96:20 98:2,3
99:5,10,13 100:23
101:1,13 104:20
105:12,21 107:3,5
108:9,14 109:25
111:9 113:14 115:1
115:1,7,10,22,25
116:5,5 119:10
120:13,14 123:19
126:5,11 128:4,7,8
128:9,15 129:23
130:19 134:8
137:16,19 138:2,5
140:21 141:2,9
142:19,21 147:11
147:15 150:11
153:11,13 154:13
154:16,17 155:3,6
160:14,22 161:22
162:9,10,21 163:4
164:5,7,15,18,19
166:3,8,14,23

167:15 169:22
170:1,4,7,15,18
172:22 173:6 180:1
181:14 186:14,19
186:22 187:1,11
191:17 197:3
199:16,19,24
202:16 203:7,8
204:13 205:4 209:3
211:4 212:25
213:16 214:25
215:13 216:25
217:7,10 224:13,17
227:10 228:3
229:24 230:5,6,20
231:3 232:18 233:4
**knowingly**   188:25
**knowledge**   18:12
19:21 20:5 29:19
54:4,15 60:9 73:10
73:12,17 84:7 88:25
89:6 94:3,6 98:1
101:3,25 102:11,16
107:5 108:9,12
112:19 130:25
131:5 137:11,14,17
138:21 141:8 143:4
143:17 144:16,22
144:24 147:16
153:15 154:19
155:5,8 161:15
162:19 163:6
177:14 201:15,17
205:3 207:21
216:14 218:7
**knows**   22:22 92:2,5
92:25

**l**

**label**   125:24 144:8
**labels**   125:16
**lack**   18:12 164:20
205:25
**language**   13:1,2
25:17 28:5 48:5,12

56:11 71:13,21 72:3
200:19
**languages**   13:4
**laptop**   139:11
**late**   64:13,14 223:2
**laughing**   109:16
**law**   1:3,8 2:4,9 4:8
5:13,13 6:1 8:10
11:3,4,7,24 12:10
12:16,22 13:12,17
13:24 14:1,14,17
15:6,8 16:19,19
17:22 18:17 19:14
19:19,24,25 20:8,14
24:21 25:6 30:20
32:18 33:2 34:8
42:9,19,23 43:7,10
43:22 44:2,6,9,17
44:18 45:15 48:16
48:22 49:3,4,9 51:2
52:15,18,21 53:8,9
57:3,15,19 58:13,18
59:9,14,18 60:1,13
60:22,22 61:5 62:25
67:23 72:13 74:16
78:18 81:2 82:9
84:21,23 86:10,13
86:14,24 87:8 88:8
88:19,24 89:5,12,15
90:4,6 93:16,17,17
101:10,12,14
102:12,22 103:1,7,9
103:19 106:17
107:24 112:9,13
121:13 122:1,9,10
124:4,6,10 125:2,20
127:23 128:4 129:7
129:17 131:8,11
132:23 133:19
136:5 137:25 138:8
138:20 139:3,6,7,13
139:16 140:3,7,7,13
140:24 141:12,19
142:8,12 143:12,14
143:25 144:5,11,12

145:11 146:5,17,23
146:25 147:5,13,21
147:21 148:14,15
148:17 156:7 164:6
164:9,20 165:5,6,11
165:12,18 167:2,10
167:16,19,23 168:1
169:10 172:17
176:13,13,18
186:10 189:19,19
189:20 190:20,21
197:8,9,12 199:4,9
199:21 200:3 203:5
203:19,23 205:15
205:22 206:23
208:18 210:10,11
210:12,13 212:11
213:21 220:15
224:16 227:5 229:5
229:6,6,23 231:5
232:15,22 233:3
**lawsuit**  169:2,9,19
194:8 208:3 223:14
228:21 231:14
233:8
**lawyer**  9:16 11:10
16:2,7,13,15 17:2,3
17:24 19:7,12 20:18
23:20,20,21 24:20
24:24 25:13 51:9,15
51:21 52:2 55:9
56:14,23 57:7,15
67:13 77:7 78:22
79:4,9,14 82:18,19
86:7,17,25 88:7,8
88:13 95:25 97:22
109:5 110:8 187:22
189:3 198:12,18
202:12 205:8
209:20 212:1
217:21 218:3,22
**lawyers**  11:9 20:14
22:15 23:1,4,13
30:20 33:5 42:19
44:17 61:14 63:25

73:5 74:4 76:11
88:5,5,16 89:11
95:5,14 97:2 103:6
103:20 182:7 183:5
192:6 198:20,22
199:5 203:8 205:19
209:18,24 210:11
210:19 211:22
213:10,15
**lead**  47:20 202:12
**leaf**  40:10
**learn**  31:7 32:17
33:1 73:7
**learned**  31:17
108:20 206:4
210:10
**lease**  96:21 97:1
226:25 230:12
**leave**  10:18 64:10
111:13 131:24
137:25 138:19
141:7
**leaving**  101:7
142:13 175:15
**left**  21:3 66:5 138:3
139:19,23,25 140:7
140:13,14,24
141:11,18 142:9
165:3 166:25
179:10 184:20
**legal**  16:8 18:10
24:2 25:2 54:5
71:16 86:18 87:18
95:21 122:6,12,16
136:10,15,20
137:15 167:11,13
167:16 172:1 174:8
179:21 185:15
209:12 224:4
**legally**  17:24 88:1
107:13
**legs**  61:21
**letter**  4:18 50:23
51:20 65:5,7 70:9
70:12 71:15 73:15

73:24 74:1,7,13,20
75:2,6,12,20,21
76:9,19,22 81:24
82:7 95:12,17 96:10
97:5,14 98:6 99:18
102:19,21 103:8,17
103:18 104:4,18
107:9,19 150:9,19
157:6 164:24 166:5
192:6 204:23
205:21
**letterhead**  57:19
197:19
**letters**  121:7
**letting**  42:18
**level**  20:4,18
**levin**  31:1,3,17
**liability**  1:4,5
146:22
**liars**  221:6
**license**  24:8,20
64:21
**licensed**  16:2 17:3
17:10,11,16,19,24
23:3,11 24:19 56:23
57:1 121:17 122:3
203:9,10 205:10
**licensure**  205:9
**lie**  195:5,25
**lied**  220:16,19
**light**  179:17,19
191:17
**limited**  1:4,5 28:12
28:17 29:5,7 53:10
102:6
**line**  57:16,21 153:25
193:11
**link**  225:17
**list**  37:14 38:19
39:12,18 44:9 51:14
65:11,13 80:8 232:3
**listed**  27:24 28:22
42:5,24 43:12,23
147:13 208:15

**listen**  10:4 221:10
**listing**  39:15
**lists**  209:17
**literally**  35:5
**litigation**  28:25
91:21 123:15 194:5
197:23 206:15,15
**little**  11:1 21:5 41:3
44:22 62:12 197:8
223:16
**live**  86:5
**lived**  168:16
**living**  102:12
**llc**  1:3,5,17 2:4 5:13
88:19 112:13,13
146:5 147:9 190:21
190:22
**llm**  11:4 12:8 205:9
**local**  20:9 98:25
100:20,25 199:18
**located**  5:10 113:12
125:10 214:24
**location**  14:3 63:16
124:13,15
**log**  63:12
**logo**  82:7
**logs**  63:6
**long**  23:19 82:13
110:24,25 111:2,11
115:7,14 124:21
140:6 178:13
180:19 220:9
**longer**  26:15 51:13
60:24 61:3 72:25
75:3 89:16,17 95:5
95:14 96:11,23 97:1
97:1,3,19 102:22
103:20 107:11
111:10 124:17
165:19 184:18
192:7 204:25
225:21
**look**  35:10 39:2,4
145:7 171:7 173:4
195:8 196:20 211:7

212:19
**looked** 228:16
**looking** 12:10 36:20
36:21 68:14 140:11
142:17,22 171:14
196:17 207:8
**looks** 82:8
**lorraine** 46:1 47:7
**lost** 70:24 71:2
151:9 195:9 196:21
**lot** 20:22 71:25
93:14 133:10,11
142:4 166:2 196:18
201:11
**louisiana** 22:14 23:1
23:1,3,20 24:24
25:5,6 50:16 56:23
57:4 66:15 86:17,18
86:23,25,25 87:7,19
88:6,8,8 99:3,9,12
99:20 100:13
105:13 198:16,17
198:20,22 199:3,4
201:19 202:9 203:6
203:9 206:20 213:2
217:12 218:4
**luis** 78:14
**lunch** 110:23 111:6
178:10 179:13,17
179:18,20,22 180:6
180:17,19,20
**lying** 194:5,10

**m**

**ma'am** 41:6 182:6
218:25 221:22
**mail** 15:20 18:22
37:23 62:25 63:2,5
63:21,22 64:9,25
65:6 66:5,21 69:5
70:14 71:4 72:24
75:10 78:19 80:5
81:4 82:1 83:12
84:3,14 95:24 98:9
100:10 101:5

125:20,25 126:1,10
126:18,21,25 127:4
127:7,15 129:5
144:15 148:3
149:22 150:6,15,22
150:25 151:6,14
152:2,18 154:9,17
154:20,23 155:7
156:1 159:13 161:7
161:14 162:16
163:1,8,17,21
165:16 166:10
170:8 171:5 173:9
173:13 174:25
186:9 194:25 195:9
195:10 196:21
197:4,4 223:20
228:21 231:3,9
**mail.google.com.**
150:2
**mailed** 59:5 61:9
197:6 204:17
**mails** 4:12,14,17
38:3,10,15 69:21
77:22 78:5 83:16
84:6,20 85:4,15
88:18,22 89:3 90:3
121:10 159:2
161:18 177:9
186:12 189:21,25
190:19 194:18
195:1,4 204:12
221:23 223:17,23
224:1 227:22 228:5
230:23
**mainland** 11:18
**maintaining** 71:5
215:10
**majority** 25:11
**making** 58:9 87:14
103:5 164:6,8,12
200:5 211:20
**malpractice** 136:23
218:10,13

**manila** 4:7 40:8,8
**manner** 129:25
196:5
**maritime** 11:4
**mark** 37:19 39:25
40:11,16 44:20,21
69:12 98:12 219:18
**marked** 4:2 35:12
40:14 45:2 54:21
69:15 98:14 173:11
219:20 220:17
221:12
**marketing** 204:21
**martínez** 78:13
**marx** 2:24 4:14 6:4
27:11 28:8 41:19
42:16 43:10,11,16
47:21 55:10 98:9,18
98:21,22 100:18,25
102:25 103:18
128:2,15 132:15,20
140:16 148:14
199:12,24 211:21
212:7 213:13,23
221:2 223:13
224:24 227:22
228:9,20 230:16
231:7 232:9 233:7
**mary** 2:11
**materials** 204:21
208:2
**matter** 28:7,9 35:7
47:20,22 49:11
55:10,11 57:14 88:6
93:18 97:25 99:2,8
99:19 105:9 108:5
182:7 187:7 200:17
201:3 203:11
209:15 212:2,5,8
213:12,14,22
215:25
**matters** 16:9 182:23
209:21
**mckee** 2:4,5 3:5,7
5:23,23 6:3,8,13

7:12,14,25 8:11,22
9:8 13:15 15:15
17:7 18:14 19:1
20:7 22:23,24 23:8
23:24 25:7,21 26:21
30:2,5 33:10,19,24
34:12,21 35:1,14
36:14 37:18,24
38:14,24 39:4,10,13
39:19,21 40:19,22
41:1,5 43:1,4,5
44:15,20 45:4,11,17
45:23 46:19,23 47:2
47:11 48:8 49:1,12
52:1 54:16,23 60:7
61:11,17 62:7 69:12
69:17 70:2,7,24
71:9,12 72:20 75:16
75:19,25 76:7,8
82:3 84:10,17 85:2
85:8,21 86:15,21
87:4 88:14 89:24
90:9,16 91:4,9,15
91:19 92:22 93:7,10
94:8,17 95:9,22
96:4,9,17 97:9 98:8
98:16 99:4,17
102:18 103:15
104:6,17 105:2
107:18 108:1,18,24
109:4,9,16,22,23
110:3,7,11 111:4,13
111:17 112:5
114:21 115:21
116:12,14 117:5,8
117:13,15,24
122:14 127:7
129:10,19 130:1
135:16 136:12,15
145:4,13,25 146:6
146:12 148:6,9
150:16,17 151:12
151:15,18 152:13
152:23,24,24 156:2
156:9 159:3,16

161:6,8,16 162:8,18
165:20 171:21,22
173:4,6,17,23
174:24 175:9,22
176:1 177:7,10
178:9,15 179:1,12
179:14,25 180:2,11
180:16,20 181:5,8
181:13,20 182:5,21
184:2 185:20
187:12,20 188:17
189:13,19,24
190:11 191:3,16,23
192:4,13,17,22
193:7,12 194:1,16
195:23 199:2 201:2
202:6,7 203:1,4
205:7 206:3,9 207:7
207:14,24 208:9,20
208:23 209:6,16
210:2,9,24 211:6
212:9,17 213:1
214:12 215:12,19
216:4,15,21 217:1
218:1,20,24 219:5
219:11,18,24 220:4
220:8,21,24 221:5
221:12,19,21
222:17,21 223:5,11
224:15 225:9,11,13
226:3,15,19 227:14
228:11 230:1,3
233:14,18,22
**mckee's** 114:15
175:4
**mean** 30:10 32:6
73:18 79:20 87:10
110:25 120:13
122:16 126:6,12
127:19 143:8
150:13 151:17
152:7 167:22
177:24 186:23
202:23 204:18
212:3 214:10,19

216:8 217:16
229:13 231:19
232:17
**meaning** 13:4 21:3
24:20 25:17 26:9
56:25 111:7 183:7
187:8 205:19
209:17
**meanings** 26:9
**means** 62:13 150:11
180:1 182:17
216:25
**meant** 24:17 74:11
**mechanism** 52:15
**medical** 21:8,12,14
22:1,4,9,16 23:2,15
23:21 31:8 32:3,19
32:22 39:20 53:23
55:3 59:9,21 60:2
68:9 69:1 77:19
80:12,15 88:2
105:13,14 106:4
107:6 123:25
136:23,23 215:1
**medicine** 105:23
**meet** 20:24 41:14
42:10 49:18,25 75:3
124:17 128:1
131:25 137:5 141:2
183:1
**meeting** 12:24 41:12
41:20 50:2 79:11
127:23 134:24
199:3,5
**meetings** 16:8,17,23
19:2,6,8,11,13 57:9
134:1
**melancon** 1:4 27:12
27:19,24 28:8,12,18
29:2,5,13,24 30:15
30:17,22 33:3,12,21
34:15,23 42:17 43:9
47:18,21 49:4 55:11
58:24 59:2 60:12,18
61:3 65:19 67:4,8

67:13,25 68:12
72:16 73:2,11,15
76:11,16,19 77:10
88:4,20,24 89:5,16
90:6 93:17,25 94:1
94:10,20,23 95:4,14
96:12 97:7 101:12
101:15 102:22
103:18 104:20,22
105:10 107:11
108:21 112:13
114:16,18 120:21
120:23,25 121:4,8
121:11 137:5,14,17
143:17,19,24
144:17 145:17,23
146:5,11 147:8,8,12
150:16 151:12
164:5,8,18,19 177:8
189:19 190:9,22
193:20 195:18
204:8,14,25 207:3
207:10,16 208:15
208:19 209:8
211:22 213:13
214:14 216:23
218:12 224:15
230:14
**melancon's** 19:25
93:23 96:14 103:1
121:13 143:21
144:25 191:25
229:6
**member** 31:4 84:18
121:23
**members** 33:14 34:3
84:21,22 90:4
190:20
**menay** 113:11
**mentioned** 6:7
27:11,14 28:2 57:8
**mentioning** 34:11
**mess** 10:25
**message** 89:15
151:4,5 226:10

**messages** 225:4,6
**met** 25:12 124:21
170:20,21 190:10
198:16
**method** 63:21
**mexican** 21:16
**mexicans** 21:20
**mexico** 215:15
**miami** 1:2 4:4 5:15
14:7 42:10,12 52:15
54:3,13,14 66:7
81:22 85:24,25 86:2
104:2,5 114:9
125:17 144:23
183:1 203:19
219:25
**mid** 64:13
**middle** 155:11
190:23
**mind** 10:13 107:8
**mine** 100:19
**minimum** 129:8
**minute** 61:18 178:8
229:12
**minutes** 178:15
179:12
**mischaracterizes**
90:14
**misrepresentation**
191:4 220:14
**missing** 56:16,19
**mistake** 155:21
157:3,7 166:13
**mistaken** 151:9
**moment** 130:20
176:10
**monday** 131:19,20
**money** 36:24 106:14
123:5 184:21
185:10 187:25
188:3 195:7 228:24
230:12
**monies** 186:5 227:6
**month** 46:8,24

**monthly** 15:19
129:24
**months** 47:25 51:18
55:21 76:12 126:15
169:24 170:5
**morning** 5:3 35:5
81:6 101:7 222:25
**mother's** 113:5,9,15
**motion** 69:24,25
92:16 99:24 152:10
156:2 157:4 172:7
183:21,23 192:17
208:20,23 221:8
**move** 40:12 79:23
189:10 204:3
212:14
**moved** 163:10
192:18
**movement** 52:20
**moving** 61:24
**multipage** 38:24
**multiple** 188:5

**n**

**n** 3:1 5:2
**name** 5:5,17 6:15,21
7:4,18 9:9 31:18
44:17 45:24 47:4
65:14,15 66:4,4
69:10 78:13 79:17
102:25 103:1 112:8
113:10 121:13,14
142:21 145:20
146:17,18,23,23
150:18 172:25
198:2
**named** 29:14,17
59:19,24 198:22
**names** 27:14 30:20
31:23 43:10,12,22
44:2 60:19 67:9,18
103:1,6,9,23 209:3
209:4
**national** 236:3

**nature** 77:20
**necessary** 100:4
203:15 220:7
**need** 10:8,16,20
22:6 66:13 68:13
82:17 83:8 120:6
149:1 180:5,19,20
219:2 225:17,20
226:9
**needed** 8:12 14:7
21:13,25 34:1,9
51:7 82:11 86:17
138:13 142:25
146:20,24 157:9
168:17
**needs** 178:10 226:25
**neither** 25:8
**nelson** 5:5 6:23
**never** 31:11,11,18
34:5 59:1,16 63:1
68:8 92:17 94:24
100:14 105:3,24,25
120:22 121:3
139:17 141:16
143:19,24 144:3
147:17 154:10,20
170:20,21 175:17
190:10 196:13,22
199:23,24 215:13
**new** 13:22 14:11
16:3,6,12,15 17:16
19:10 26:14,25
42:10 43:21 53:4,5
60:24 66:15 67:8
72:15 75:24,25 76:5
77:18 80:13,20
85:24 86:6 104:2
108:6 121:21,23
134:7 161:20
168:16 195:6,13,13
195:25 201:8
204:10,13,20 205:9
205:10 217:21
**news** 232:13

**nice** 220:9
**night** 183:15
**nola** 66:14,15
**non** 17:2 24:19
187:22
**normal** 10:7 131:21
133:9,12
**normally** 120:14
133:23
**notarial** 235:9
**notarize** 52:25 53:8
58:1
**notarized** 53:13,15
53:17 54:2,14 58:8
**notary** 2:18 6:17 7:2
7:8,22 9:5 50:16
52:24 53:2,7,25
54:8,11 57:6,20,23
58:1,4,15,15 235:1
235:2,17
**note** 80:7 219:22
**noted** 93:5
**notice** 44:6 50:22
56:17 61:2,9,12
63:7 164:3 172:19
210:4
**notify** 151:5
**november** 46:5,18
47:1 64:10,12,25
100:2 137:22
166:24 167:1
184:11 188:18
194:18 223:2
**number** 27:11 35:8
37:9,17 40:6,22,23
44:22 54:17 62:5
91:10 104:15 112:3
135:8 140:20
149:11,15,19,23
177:21 182:2 200:4
**numbered** 236:6
**numbers** 39:18

**o**

**o** 5:2 41:7,9
**oath** 189:4 221:20
**oaths** 6:19
**object** 8:16 9:23
13:14 17:5 18:9,19
22:17 23:6,22 25:1
25:19 26:20 33:7,15
33:23 34:4,17 44:10
48:6,23 51:23 60:3
61:6 70:22 72:17
81:25 84:9,16 85:1
86:11 87:2 88:10
89:21 90:8,13 94:4
94:15 95:7 96:15
97:8 99:14 102:14
104:23 107:14
108:11,23 109:2,8
109:15 110:2,6
184:1 185:17
187:10,18 188:13
189:9,23 191:1,21
192:2,8,13 193:23
194:13 195:19
198:24 201:1 202:2
205:2,24 207:4,12
207:19 208:7
209:11 210:1,21
211:1,24 212:13,23
215:3 218:14 220:5
**objected** 17:8
192:19,22 220:1
**objection** 8:7,20
20:2 36:12,13 37:11
37:17 38:23 40:4
49:6 70:5,21 71:10
75:14 76:2,5 85:5
85:20 86:19 90:20
91:1,18 92:11,20
93:4 95:20 96:2,6
103:10 107:21
110:10 116:16
117:15 122:14
129:10 130:1

136:12,18 145:25
146:6 156:9 162:8
173:17,23 177:10
206:6 208:24 210:5
214:8 215:11
216:11,19,24
217:23 219:23
220:9,10,25 225:11
228:11
**objections** 99:23
100:2
**obligation** 70:17
**obtained** 155:6
165:20 177:8
**obviously** 149:2
159:8
**occasions** 8:12
18:22
**occupied** 131:1
**occupying** 165:6
**occur** 22:8 123:7,7,7
**occurred** 76:12
89:25 99:6 119:19
**octavio** 78:14
**october** 55:19 66:11
69:5,14 72:8,14
130:14,16 138:4,5
164:24 166:18
170:8
**office** 13:21,24 14:6
15:24 16:18 19:10
19:16 32:23 41:18
42:7 49:16 50:3,21
51:17 52:18,23,24
53:2,18 66:6 114:15
114:16,17 120:13
120:25 125:10,13
128:16,21 129:2,4
130:14,18,23 131:3
131:15,23 132:10
132:15,20 133:2,7
133:11,18 134:3,6
135:10,21 136:21
138:9 139:23 140:9
140:11,19,23

142:17,19 143:3,21
143:25 144:25
161:19 162:17,21
164:23 165:3,6,23
188:20 189:8 195:8
197:8,9,20 198:3,4
199:4,5,12 200:1,12
203:15 213:24
**offices** 1:16 13:23
14:14 18:7,17 19:14
41:13 52:15 124:9
125:9 128:1,5 129:9
129:17,25 130:9
131:1 137:25 138:3
139:25 140:7,13
141:18 142:8,8,13
148:14 165:11,19
166:17 167:3,6
172:21 176:12
196:17 197:11,12
197:23 198:7,17
199:10 202:14
203:6,19,23,24
204:4 213:23
**official** 14:6
**oftentimes** 10:7
**oh** 116:24 221:14
222:18,22 229:13
**oil** 20:20 51:11
88:20,24 89:5 90:6
99:1 100:15 214:23
214:24 215:14
**okay** 7:13,17 8:22
10:1,10,22 14:9
15:3,14 24:4,25
28:22 36:2,3 37:20
39:15,21 40:21,25
43:4 47:8 59:3,6
76:3,7 91:11 93:7
111:18 112:22
115:24 116:24
148:8 149:3 172:23
180:22 181:6
193:14 198:12
203:3 221:10

**old** 179:16
**once** 35:22 80:22
99:23 121:5 123:3
127:17 144:4 156:7
158:14 166:21
169:17 185:1
195:17 197:2
**ones** 21:12 26:12,14
26:14 27:23 32:23
37:25 50:22 83:25
84:22 142:14 190:2
192:5 195:21 201:7
215:20 216:22
217:6,6 228:16
**ongoing** 72:25
118:24 228:4
**online** 229:14,15,17
229:23 232:13
233:10,11
**opa** 92:2
**opinions** 23:19
**opportunity** 36:10
**opposed** 44:3,17
71:16 98:6 132:15
**opposition** 153:9
**option** 61:13
**oral** 30:25
**orally** 32:17
**order** 4:4 17:12 22:6
35:6,8 37:13 40:22
70:1 92:17 125:19
127:4 153:7,10,14
159:25 160:1,4,9
174:22 183:25
184:5,7 215:4
**ordered** 90:24 92:8
**ordinary** 83:21
84:11
**orleans** 13:22 14:11
16:3,6,12,15 17:16
19:10 26:25 42:10
53:4,5 66:15 80:13
80:20 85:24 86:6
104:2 134:7 161:20
168:16 201:8

217:21
**ought** 178:9
**outside** 18:11 19:16
28:24 40:7 125:10
141:2 177:12
207:20
**overruled** 91:12
**overview** 232:11
**owe** 184:20,23
187:24
**owed** 104:21 105:5
105:9 185:5 186:3
**owes** 188:3
**owned** 125:1
**owner** 213:21

|   p   |
|-------|

**p** 5:2
**p.a.** 1:8 2:9 5:14
**p.m.** 98:20 101:5
234:2
**package** 36:16
45:14 55:2 205:6
216:23
**packages** 85:23
207:16
**packet** 4:8 45:18
46:2 47:5 50:8,9,14
50:19 54:17 65:16
83:3 136:1
**packets** 66:14,18,20
66:23,24,25 80:18
126:14 204:11,13
204:22
**page** 3:3 39:14,15
44:23,25 46:3 50:19
50:19 52:7 54:24
171:8 172:10,12,15
172:18,24 173:15
193:11 219:15
224:17
**pages** 52:10 56:1
**paid** 15:21 100:14
106:6,9,11 107:6
123:11 128:10,11

128:15 129:24
130:9,17,19 132:23
169:9,23 170:5
184:25 185:1,2,22
185:23 186:1,6
187:4,6,16 195:7,12
196:12,13 197:2
226:25 227:1,6,17
230:11,13
**palm**  2:4
**papantonio**  31:1,3,4
31:17
**paper**  60:23 71:15
71:16 101:2 103:25
104:2 117:10 152:9
172:1 175:5 203:14
229:19
**papers**  22:6,10
31:13 73:6 81:23
82:24 87:20 93:9
103:22 141:25
142:3,6,7,24 160:15
162:20 165:23,25
166:2,8 167:7
171:22,24 188:21
188:25 189:7,15
217:17,18
**paperwork**  18:3
**paragraph**  4:12
26:16 27:10 28:6
42:16,22 47:17 48:3
55:7 65:19 69:19
80:6 171:15 172:13
173:14 211:17,20
212:12 213:9
**paragraphs**  26:10
74:12
**parameters**  22:2
**pardon**  55:1
**parque**  1:17
**part**  21:24 22:19
29:20 32:24 35:1
38:25 70:3 80:6
83:17 85:22 92:16
98:19 109:7 122:10

124:2 136:25 145:4
152:8 163:20 168:3
188:15 195:7 220:5
222:25 232:18,19
**partial**  71:13
**participants**  88:5
**participate**  135:22
**participated**  135:6
**participating**  41:24
**participation**  4:15
98:11
**particular**  55:17
61:10 71:4 79:2
133:7 160:8 174:18
174:25 204:24
215:6
**particularly**  110:21
216:1
**parties**  5:20 92:4,5
93:2 148:22
**partner**  20:17
**partners**  33:22
206:17
**parts**  232:18
**party**  58:9 91:24
93:12 100:7 121:15
**pass**  190:6,13
201:23 222:14,20
**passed**  108:5,7
121:20 205:12
**passport**  24:8
**password**  127:3
163:4,7
**patient**  80:9
**patients**  10:19 80:8
**pause**  9:24
**pay**  22:15 23:1,14
23:21 81:17 128:5
129:1 168:4,6,24
169:11,16 227:13
**paycheck**  15:16
**paying**  72:1 106:8
123:1 185:10
186:20

**payment**  50:5,7
106:13 107:4
119:25 129:4,8,17
129:18,21 130:10
130:11,13 168:17
168:21 169:19
176:20,22 177:1
185:4
**pena**  55:1
**penalty**  4:10 52:6
54:25
**pendency**  29:1,8
31:16
**pending**  99:2,8,19
228:21
**pens**  203:17
**people**  77:20 83:7,9
106:12 123:10
142:4 186:24 195:5
195:24
**percent**  100:6
227:11
**percentage**  33:4,13
34:2,9 146:4
**perez**  1:10
**perfect**  110:18
**perfectly**  215:13
**perform**  101:16
102:17
**performance**  101:11
185:12,13 186:21
**performed**  102:3
165:22 215:1
**performing**  106:12
107:24 118:22
224:3
**period**  15:5 102:6
133:12,14,16
144:14
**perjurio**  55:1
**perjury**  4:10 52:6
54:25
**permission**  73:14
**permitted**  22:15

**person**  25:25 26:3
48:17 55:25 66:4
109:13,24 110:4
159:7 170:20,21
190:14 212:4
218:18 224:19
**personal**  37:16
38:20 64:24 125:10
161:21 167:21
200:3
**personally**  103:23
113:2,4,19 114:3
142:7 144:12
146:10,11,23,25
147:4,8 166:15
**personnel**  49:18
**persons**  84:6
**perspective**  30:14
50:10,12 89:20
194:4,23
**persuasive**  83:7
**pertain**  209:23
**pharmacy**  113:5,10
113:10,15
**phone**  8:1 36:23
39:18 43:2 69:7
82:14 112:20
116:12 121:4
135:20 140:20
141:4 152:14
158:22 174:7 176:2
184:6 199:24 200:3
231:18
**phonetic**  105:19
**phrasing**  28:3
**physically**  152:21
**pick**  142:25 144:8
144:12,15 178:7
**picked**  66:6 80:13
80:21 85:25 105:14
**picture**  24:9
**pile**  189:15
**place**  17:2 29:1
105:14,16 124:20
221:4

**places**  52:5 63:23
  141:3
**plaintiff**  55:8 59:25
  106:14
**plaintiffs**  1:6 2:3
  5:24 6:5 29:7,14
  31:4,10,24 33:5,14
  33:16 34:2 76:20
  88:19 90:5 159:14
  159:15 177:1
  188:11 190:21
  191:25 209:4
**plane**  183:1
**pleadings**  221:8
**please**  6:21 7:4,18
  9:25 10:16 45:8
  47:5 51:2 69:19
  75:11 80:7 98:22
  112:20 172:13
  192:9 193:8
**point**  12:21 58:23
  60:25 92:19 106:22
  108:19,25 122:11
  123:17,20 125:8
  130:10 137:24
  140:10 141:10
  146:3 156:21
  157:17 178:2
  188:16 189:1,12
  202:17 225:23
**poorly**  158:25 159:1
  166:12
**portion**  71:22 72:6
  219:15
**pose**  70:4
**position**  83:8 96:22
  119:4 215:23
**possession**  151:13
  177:18
**possibility**  162:5
**possible**  189:6,16
**possibly**  98:24 100:2
  126:19
**post**  52:11 77:16
  229:20

**potential**  19:4 131:7
**power**  53:10
**powers**  87:24
**practice**  203:9
  212:11
**practicing**  86:24
  88:8
**pre**  27:16,20
**prepared**  138:20
  139:13 236:8
**prescribing**  22:5
**presence**  24:23
  137:19
**present**  2:24 6:3
  16:14,15 17:25
  25:13 41:14 53:8
  54:3 58:1 70:11
  72:8 86:18 87:1
  128:21
**presentation**  100:1
  100:3
**presented**  106:3
**presentments**  92:2
**presents**  235:8
**preserve**  92:20
**preserved**  93:5
**preserving**  71:10
  91:1 136:18
**pretty**  109:17
  227:10
**prevent**  110:5
**previous**  79:16 81:7
  81:23
**previously**  41:4
  50:23 81:13
**primarily**  28:7
  48:13,16 49:14
  200:10 213:12
**primary**  47:20
  49:10 59:9 200:18
**principal**  212:1
**principally**  55:9
**print**  38:5 39:14
  66:21 125:3,4,5,13
  172:1 204:21

**printed**  26:14 66:19
  71:15,24 161:18,20
  163:18 166:9
  171:19,20 186:13
**printing**  71:25
**prior**  56:16 63:25
  71:17 76:2 79:9
  90:14 115:17 117:1
  117:13,25 118:4,9
  119:24 120:11,17
  127:16 151:17
  153:13 155:4
  170:17 177:12,22
  196:25 206:12
**private**  189:20
  190:13
**privately**  208:13
**privilege**  70:23 71:5
  71:6 75:15 90:19
  91:2,17,25 92:15
  151:9 164:3 172:19
  173:22 174:5,8,18
  174:21 175:4
  183:10 205:15,22
  214:9 215:18 216:3
  216:20 217:24
  220:3 221:18
**privileged**  156:8
  174:12 175:1,8
  206:16,22 207:2,18
  209:23
**pro**  99:24
**probable**  217:4
**probably**  9:21
  134:15 176:19
  178:19 201:10
  226:13,15,19
**problem**  10:20
  36:14 39:22
**proceed**  5:22 8:22
**proceeded**  203:18
  203:23
**proceeding**  159:6
**proceedings**  236:5

**process**  26:17 35:23
  54:19 79:19 87:10
  105:25 113:8,9,14
  115:18 116:21
  117:2,6,10 120:2,3
  120:6 123:1 127:14
  190:17 202:9 217:8
**processing**  52:20
**produce**  36:7 62:17
  64:7 71:3,6 88:15
  91:10 160:5 171:21
  183:7,8,9 222:24
**produced**  35:5 40:2
  62:9 66:1 83:17
  84:15 90:24 92:10
  220:11
**producing**  37:12
  62:16 71:17 183:4
**product**  91:16,19
  92:11,15 215:5,6,11
  216:12
**production**  190:17
  191:13 220:12
  222:6
**professional**  1:25
  146:22 236:2
**project**  93:24
  199:22
**propounded**  88:15
  93:2
**prospective**  24:13
  78:6
**protected**  57:20
  183:24
**protective**  69:25
  92:16 153:7,10
  174:22
**prove**  216:10
**provide**  99:23,25
  117:24 122:5
  136:20 150:21
  173:2 174:11,23
**provided**  15:22
  23:19 41:7 94:11
  133:19 218:2,5

**providing** 94:18,22
**provisions** 101:6
**proximate** 216:10
**psc** 31:10
**public** 2:18 6:17 7:2
7:8,22 9:5 141:3
235:1,2,17
**puerto** 1:16,18 5:1
5:11 6:18 9:12 11:4
11:12,15 16:4 46:8
97:22 108:2 113:13
114:5,7 115:25
121:18 122:3
163:10 206:18,21
218:8 235:4,9
**pull** 35:25
**pulled** 66:1
**purpose** 12:5 205:20
**purposes** 139:2
167:21 197:22
201:25
**pursuant** 8:10 40:2
62:9 101:11 112:23
119:10 202:12
**put** 6:8 36:1 44:23
46:8 67:24 79:4
81:20 124:9 126:21
127:3 146:17 210:4
**putting** 220:1
**pérez** 1:15 2:25 3:4
4:2,12,12,17,17,17
5:18 6:2,6,7 7:20
9:3,11 12:17 15:25
35:12 36:18,19,22
37:2,22 38:2,7,9,12
39:2,7,11,17,20,24
40:14 45:2 54:21
57:8 62:12 64:15
65:1 66:12 69:6,10
69:15,18 75:11 80:2
80:6 85:16 87:17
98:14 110:24
111:22 112:8,11,23
149:14 150:5 172:6
172:8,11,24 176:1

176:25 177:7 179:8
182:25 183:18
197:1 201:6 219:20
221:23,25 223:8
229:7 233:24

**q**

**qualified** 235:3
**question** 10:21
15:18 16:10 17:9,13
22:19 33:9 59:22
67:14 70:5 75:18
78:23 85:7 89:1
91:5 92:9,12 93:6
95:6,11 96:3 103:14
103:16 105:7
109:18 112:21
120:15 124:2
126:23 129:12
130:12 132:14
136:19 147:2
148:12 158:2
164:11,17 165:9
170:3,19 182:15
189:10,11 191:7
192:9,11,16,18,19
192:21,23,24,25
193:2,4,8,10,14
198:25 202:3,8,19
206:5 207:23
217:20
**questioning** 10:17
40:13
**questions** 9:20 10:2
18:23 55:24 62:10
71:7 85:9 103:11
109:20 110:12
112:17 124:3 127:6
127:22 128:14
149:15 170:23
178:12,14 179:9
194:2 200:2 201:4
224:6 233:14
**quick** 115:24 178:5
178:20

**quickly** 178:18
**quite** 17:13 77:11
**quote** 28:6 80:7 83:6
88:17 99:20
**quoted** 173:1

**r**

**r** 5:2
**raised** 90:20
**rarely** 68:15
**rate** 185:5
**read** 31:7 32:10 34:5
39:13 77:4 78:19
150:25 184:7 193:8
193:10 196:7
226:16,20 228:7,10
232:7,8,9 233:15,18
**reading** 83:16,25
232:15
**reads** 98:17
**real** 178:20 193:14
**really** 13:10 23:12
32:9 82:11 92:12
111:16 135:7
189:17 195:5,24
220:20
**reason** 12:2 52:9
151:9 167:5 209:22
225:20 226:8
**reasons** 118:6
**recall** 43:24 56:9
61:15 67:11,19
77:12 87:6 93:21
117:22 119:2
122:15 127:8,24
128:23 130:12,15
135:8 136:6 137:4
140:6 141:14 143:1
145:4 147:10
148:23 149:15
150:23 162:23
170:25 176:23
204:11 223:14
226:10 231:15

**receive** 11:6 15:9
100:9 121:6 123:5
130:13 223:1
**received** 48:10
61:16 75:2 83:5
100:7 107:4 130:11
130:21 138:20
139:9 150:19 156:7
165:15 173:22
196:22 204:20
205:6 230:15
**receiving** 106:14
**reception** 50:3
**receptionist** 49:21
49:22
**recess** 37:6 62:2
104:12 111:25
149:8 179:5 181:24
219:8
**recognize** 31:23
**recollection** 68:13
**recommend** 179:20
**record** 5:4 6:9,22
7:5,19 8:3 9:18 10:9
10:10 35:22 36:5,13
36:15 37:1,2,5,8,10
61:20 62:1,4,6
104:11,14,16
111:24 112:2,4
132:7,12 136:19
149:4,7,10,12
178:22 179:4,7,24
180:10 181:4,9,12
181:18,21,23 182:1
182:3 189:3 193:3
219:5,7,10,23 234:1
**records** 36:7 84:24
88:2 105:15
**redirect** 223:11
**reduce** 196:19
**reduced** 196:14
**redundant** 9:17
**reference** 43:9
65:19 76:10,18
177:1

**references** 77:22
78:5
**referrals** 58:18
**referred** 58:20 59:4
**referring** 75:23 76:4
152:11 209:2
**refers** 65:10
**reflect** 159:13
184:15
**reflects** 158:25
159:1,8 166:12
**regard** 83:18 93:23
170:9 175:17
**regarding** 32:8
33:17 90:5 93:16
118:5 166:2 174:21
174:21 190:21
226:23,24
**regardless** 59:19,24
81:8
**regards** 112:12
117:25 118:4
148:15 152:2
175:12 176:22
228:23
**registered** 1:25
236:2
**regular** 131:16,19
**regulations** 44:9
94:12
**reimbursed** 168:22
169:12,13,15
**relate** 228:6
**related** 33:4 50:24
100:12 120:16
143:14 170:9
181:10 200:6
228:21
**relates** 93:18 207:3
**relating** 11:24 33:20
78:13 214:6 222:3
**relation** 35:14 36:17
91:21 92:9 143:12
**relationship** 28:25
34:7 51:1 60:24

72:19,22,25 89:8,17
93:16 94:7 95:15
97:19,22 175:13
**release** 53:20,23
57:20 88:2
**rely** 79:23
**remain** 36:19
**remained** 175:20
**remember** 12:15,23
14:22 18:2 27:6,9
28:3,5,15 29:17
30:3,6 32:12 42:1
44:5 51:4 67:10,19
68:22 72:10 78:10
80:7,23 83:7 86:20
102:10 105:16,17
115:2 116:7 117:21
133:10,11,15 136:9
141:22,23 168:15
188:15,18 195:10
196:1 204:15 205:5
224:12 228:8 229:3
229:18 230:4
**remove** 43:8 138:8
138:13
**remuneration** 32:21
**rent** 50:6 128:5
176:20 197:2 227:7
227:12,18 228:24
232:24 233:1
**renting** 195:7
**repeat** 16:10 59:22
89:1 126:23 136:19
170:3
**repeating** 192:10
**rephrase** 17:13
112:21 148:12
**rephrased** 192:23
**reply** 151:5
**report** 20:23
**reported** 1:24
**reporter** 1:25 7:6,7
7:15 8:3,5,15 10:4
40:7 110:22 148:25
180:12 193:7,10

235:6 236:3
**reporter's** 45:1
236:1
**reporters** 236:3
**reporting** 1:16 5:10
**reports** 78:2 80:9,10
80:12
**represent** 5:21
102:13 112:9
210:19 218:4
**representation**
61:14 90:7 94:13
96:12 97:1,3 119:11
190:23 208:6
227:11
**representative**
207:17
**representatives** 6:5
**represented** 51:9,12
79:6,8 193:21
**representing** 19:20
59:10 94:2 103:21
107:12 192:7 193:5
204:25 205:20
208:16 209:8,21
210:12 213:10
**request** 88:15 91:10
119:22 165:7,12
190:16 191:13
222:6
**requested** 122:12
**requesting** 230:10
**required** 24:5,7 44:8
61:5 74:3 94:21
101:16 159:21,23
176:6 186:15
191:19 205:14
214:19
**requirement** 18:8
**requirements** 25:9
108:6
**requires** 10:18
44:17 98:5
**research** 166:3,6
167:11,11,13,16

224:4 227:24
228:15
**residents** 86:24 87:8
198:16 199:4
**resignation** 65:7
184:11
**resigning** 109:11
**respect** 147:18
**respective** 83:5
**respond** 226:11
**responded** 190:24
**responding** 196:4
**response** 43:21
69:25 82:10 119:22
121:6 155:10
157:21 158:20
175:7 176:4 229:1
**responsible** 28:7
47:20 48:14 49:11
49:14 55:10 212:2
213:12
**rest** 47:9
**restate** 22:23
**result** 131:7
**resulting** 133:12
**results** 11:11 122:18
**retained** 81:2 122:1
122:2,5,8
**retainer** 40:17 42:4
42:13 44:1,5 45:21
47:12 48:5,10 55:4
55:14 56:11 60:11
60:15,19 68:21
70:10 72:7,9,15
79:22 81:6,16 94:11
106:10 136:7
137:12 141:16
143:5,7,18,20 144:5
145:3,10 147:13
171:11 199:15
**retaining** 49:3 51:2
**retract** 196:7,13
**retrospect** 207:8
**review** 37:3 71:18
71:19 127:11

**reviewed** 229:4,9,11
**reviewing** 196:4
　207:1
**rican** 11:12 97:22
　108:2 218:8
**rico** 1:17,18 5:1,11
　6:18 9:12 11:4,15
　16:4 46:8 113:13
　114:5,7 115:25
　121:18 122:3
　163:10 206:18,21
　235:4,9
**ride** 111:2
**ridiculous** 109:20
**right** 8:2 12:9 13:1
　19:4 26:4 30:8,17
　33:18 38:12 42:11
　42:24 45:16 46:12
　48:1,17,22 49:14,19
　53:13 55:21 56:12
　56:19,23 57:21
　66:16 71:14,22
　76:15,23 84:7,12
　88:2 89:10 90:1
　91:4 93:21 97:4
　99:9,12 101:21,24
　102:4,8,23 103:2,9
　103:21 109:14
　110:5,8,8 111:19,22
　116:1 124:22
　133:17 138:6,7
　143:15 149:24,25
　150:4 164:23 174:1
　178:4,16 180:14
　187:17,22,25 190:4
　192:1,7 193:21
　194:24 198:23
　202:1,12 203:20
　205:9 206:23 208:6
　208:16 209:10,18
　210:17 211:12,15
　218:9,22 222:3,7,11
　223:3,7 229:16
　233:15,16,17

**rights** 96:14
**rimes** 1:4 88:20,24
　89:5,16 90:6 102:22
　112:13 146:5 147:9
　190:22 208:19
**rivera** 2:20 6:15,16
　7:3,9,18,23 235:2
**rmckee** 2:6
**robert** 2:5 5:23
**rodríguez** 11:14
**role** 22:10 28:17
　29:4,4 31:1,17
　88:19,23 89:4,11
　115:23 117:17,20
**room** 12:19 16:21
　36:20 50:4 133:23
**rosanna** 2:20 6:16
　235:2
**rouge** 213:24
**royal** 2:4
**rule** 22:21 44:16
　71:3 84:25
**ruled** 92:18
**rules** 10:14 20:11
　22:15 44:19 74:2
　181:14
**ruling** 215:9
**rulings** 38:16
**run** 188:21
**running** 104:6
　185:14

―――――――― **s** ――――――――

**s** 4:1 5:2
**sage** 180:8
**sake** 107:8
**sales** 83:7
**sample** 4:14 98:10
**sampling** 216:9
**san** 1:17 5:1,10
　235:9
**santa** 128:24,25
　129:5 133:15 197:3
**satisfied** 18:8

**saved** 163:4
**saw** 32:10 33:11,25
　44:5 74:17,19 90:10
　105:3 131:9 143:24
　144:3 147:17,18
　201:11,21,23,25
　202:4,11,13,14
　208:14 218:5
　229:10,13,15,18,22
　229:23 230:5,9
**saying** 34:6 48:16
　60:23 61:4 68:16
　72:23 83:9 97:23
　131:19 152:17
　166:10 172:12
　180:4 182:16
　186:11 188:23
　196:1 208:17,25
　215:25 217:5
　224:25 230:19
**says** 46:19 47:19
　49:10,13,15 50:23
　54:24 62:23 64:15
　65:1 69:18 70:8,15
　71:8 72:24 75:20
　80:6 81:5,19 82:17
　82:18 98:22 99:18
　100:18 101:1,2,6
　103:3 114:8 145:18
　145:20 150:8,24
　151:3,8 154:24
　171:10 209:2,14
　210:11 211:25
　213:11,16,17
　232:11
**school** 11:3,7 205:16
**scintilla** 189:18
**scope** 18:11 23:17
　29:7 83:21 84:12
　85:10 207:20
**screaming** 154:1,3,4
　154:5,6 155:9
**se** 184:17
**seal** 235:9

**second** 7:14 15:5
　36:5 55:23 64:3
　111:21 149:21
　158:16 160:13,23
　171:8 172:15
　173:15 181:4 225:2
**section** 53:25 54:9
**security** 64:21
**see** 7:25 22:7 28:11
　29:3 30:19 32:2,17
　33:1 34:13 36:10
　39:14 42:7,8 50:5,7
　53:10,13,20,25 54:5
　54:8,11 56:5 60:10
　60:20 63:11,21 65:4
　67:4 71:7 72:9 73:1
　73:7,13 76:10 77:6
　78:5,9,11 80:8 81:7
　88:6 93:14,15,18
　98:8 100:21 101:5
　106:2 120:25
　121:13 127:11
　131:6 135:14 147:3
　147:7 148:1 149:2
　150:8,24 151:10
　163:19 164:2
　171:10,12 174:1
　178:5 194:14
　204:15 207:2,11
　209:24 210:13
　218:2 224:18
　225:14,17,20
　229:17
**seeing** 28:15 77:12
**seeking** 21:8 183:24
**seen** 23:25 27:16
　58:4 73:19 100:11
　102:1 105:25
　120:23 143:19
　148:13,21 163:11
　163:16,17 177:4
　196:24 197:2,5
**segmentation** 21:18
**self** 70:16 74:8
　102:11

selling  83:8
send  15:20 58:24
    66:13 73:6 79:18
    80:7,17 106:20,21
    121:10 125:16
    143:20 144:11
    168:21 192:5 204:1
    226:1 230:1,3
sender  151:5 155:4
sending  58:14 64:16
    74:3 81:23 97:14
    98:6 102:21 116:20
    141:17 206:7
    224:24 225:4,6,6,8
sends  205:21 206:14
sense  123:25 161:23
    162:4 200:23
sent  13:22,25 14:2
    44:1 51:21 52:14,23
    64:2,3 65:16 66:4
    66:21 67:7 72:11
    79:13,21 81:20
    85:24,25 88:25
    95:12 98:5 103:8
    104:18 105:13
    107:10 115:21
    117:10 125:24
    126:14 141:25
    142:6 161:22
    162:12 170:24
    171:1 194:25
    195:16 204:10
    205:4 224:8,10
    225:13 226:12
    229:19 231:13,15
    231:17
sentences  66:12
separate  8:12 16:21
    68:7 182:12 203:6
separately  39:25
    69:13 71:20 128:14
    168:4,6
september  75:10
    76:9,22 167:12
    168:11,13,19

sequence  156:12
series  85:9
serious  109:17
serve  113:19 114:6
    120:6
served  113:1,2,4
    114:4,5,12 115:4,8
    115:9,14,17
server  113:8,9,14
    139:15 186:10
service  115:18 120:5
    190:17
serving  70:16 74:8
set  49:24 160:7
    236:6
settled  217:12
settlement  22:2 81:9
    107:4
shannon  80:2,14,16
sharing  187:8,21
shawn  1:24 7:6
    236:2,13
sheet  4:10
sheets  211:11
short  10:2 26:16
    107:8
shortly  99:21
show  37:24 50:9,12
    66:8 78:12 131:22
    148:6 184:5 197:1
    221:7
showed  60:23
showing  52:6 56:18
    83:14 224:13
shown  99:7 145:3
side  154:2 155:13
sign  25:12,25 26:17
    45:14 55:18 56:21
    57:2,7,11,25 58:5
    58:19,25 66:24,25
    68:24 79:22 80:17
    85:22,23 86:8 105:8
    124:12 136:1 137:8
    142:3,6,7 143:2,8
    143:11,18,21

144:10,17,19,23
    145:1,17,23 185:10
    185:22 186:20
    197:10,24 198:17
    202:15,17 203:13
    203:22 207:16
    211:11 216:23
    235:8
signature  53:3,21
    56:5,14 57:16 58:14
    172:16
signatures  52:5,10
    52:25 58:1
signed  26:19 27:1,7
    29:12 44:14 47:13
    48:22 50:21,24
    51:24 52:2,18 53:11
    53:14 54:6 56:11
    57:12 58:11,20
    65:10,11,18,23 66:9
    67:17,20 68:18
    72:14 75:6,8 78:17
    78:24,25,25 79:21
    80:25 81:5,12,14
    83:1 86:5 87:17,20
    93:19,20 94:19,22
    103:23 107:4 123:8
    144:4 145:24 185:9
    185:25 186:3 187:5
    187:14 200:9
    201:18 202:14
    203:25 208:14
    214:13
signer  54:3
significant  186:5
signing  21:19 24:13
    25:17 26:5 29:23
    30:16 42:3,4 49:8
    57:4 67:11 125:16
    133:22 135:11,21
    136:21 186:24
    201:25 202:9
    208:11 209:9
    216:17 217:11

silent  153:25 175:20
similar  54:17 67:1
similarly  207:15
simple  17:14
simply  123:22
simpson  80:2,14
simultaneously
    103:12
single  27:23
sir  171:23 181:14
    192:13 221:5
sit  30:2 50:18
site  14:18
sitting  124:22 161:5
    166:14
situation  136:23,23
    144:9
skipped  158:2
slightly  26:12
small  227:3,19
social  64:21
somebody  63:7,9
    66:6 198:13
someone's  187:17
sorry  12:4 15:11
    17:6 22:17 46:16
    49:20 91:13 110:14
    117:23 119:6
    124:19 125:4
    128:19 130:4
    135:14,17 136:14
    153:8,19 154:3,15
    158:18 161:3 165:8
    168:5 174:14 204:1
    206:8 220:19
    224:10 225:5
    226:14,17 229:3
sort  24:8 118:22
sorts  87:8 109:6
sought  32:19 63:24
    73:14
sound  43:2
sounds  179:24
    212:10

**space** 145:16,22
**spanish** 13:2,7 14:7
  25:18,23,25 26:1,7
  54:18,25 55:1,3,3
  55:12,25 56:11
  71:13,21 75:12
  77:25 102:20
  142:20 193:17
  200:18,21
**speak** 21:1 89:7
  97:11 114:15,19,22
  115:14 116:12
  134:24 137:18
  174:4 200:21
**speaking** 13:2,2,7,8
  14:7 25:25 55:25
  135:4 142:20 220:9
**specific** 133:10
  148:15,18
**specifically** 38:21
  81:5 123:23 128:22
  138:2 154:8 228:22
**specifics** 118:25
**spent** 201:4,5,6
**spill** 20:21 51:11
  77:19 78:2,4 87:22
  88:20,24 89:6 90:6
  99:1 100:15
**spoke** 13:4,7 20:21
  43:11 51:21,25
  59:16 75:9 81:13
  82:13 114:20 121:3
  134:9 141:4 160:12
  200:18
**spoken** 51:17 117:7
  120:20 142:12
  170:21
**sprayed** 78:2
**stack** 38:10
**stand** 110:5
**start** 6:9 35:23
  108:25
**started** 11:25 26:11
  26:13,18 29:20 30:7
  30:10 51:7 124:24

124:25 126:13,15
  169:6 185:2 208:3
**starts** 54:24 171:15
  172:15,18,25
  173:14
**starving** 178:11
**state** 6:21 7:4,18
  9:18 17:16,19 23:11
  50:16 57:1 86:8,9
  86:25 119:3 146:4,9
  185:4 195:4 205:9
  205:10 213:7
**stated** 24:10 67:20
  95:10
**statement** 8:19
  61:12 158:6,9
**statements** 119:3
  224:14,24 225:8
  231:12
**states** 11:18,23
  17:20,25
**stating** 70:12
**status** 123:15
**steering** 31:5,10,24
  31:25 33:6,14,17
  34:2 176:22 177:1
**step** 51:19
**sterbcow** 1:3 2:24
  4:14 5:12 6:4 13:24
  14:14 16:19 18:7,17
  18:17,25 19:14,24
  27:11,19,24 28:8,12
  28:18 29:2,5,13,24
  30:4,14,17,21 33:3
  33:12,21 34:15,23
  39:8 41:13,14,21,24
  42:5,17 43:10 47:18
  47:21 48:9 49:4,17
  49:18 50:5 52:18
  55:10 58:17,24 59:4
  60:12,18 61:2 65:19
  67:4,13,25 68:12
  72:15 73:2,9,14,20
  76:11,15,19 77:9
  88:4,19,23 89:5,15

90:5 93:16,25 94:9
  94:20,23 95:4,14
  96:12,13 97:6 98:9
  101:12,15 102:21
  103:18 104:20,22
  105:9 107:11
  108:20 112:13
  114:16,20,22
  115:10,15 117:25
  118:4,8 120:4,10
  121:1 124:10 125:2
  125:9 128:2,5,15
  129:7,16 130:17,25
  131:10 133:25
  135:22,25 137:25
  140:7,16 141:5,8,12
  141:19 142:12,23
  143:4,12,14,25
  144:16 145:17,22
  146:4,10,16 147:5
  147:11,21 148:14
  148:14,17 150:16
  151:13 152:13,21
  152:22 160:12,23
  161:5 165:6,12,23
  166:6 167:8,9,12,15
  167:24 173:9 174:4
  176:13,14 177:8
  188:19 189:19
  190:7,21 191:24
  193:20 194:5,11,18
  195:18 197:9,17,23
  200:11,14,21,24
  201:5,21 202:4,8,19
  203:12,19 204:8,14
  204:25 207:3,10,16
  208:2,15,18 209:7
  211:21 212:7
  213:13,23 214:14
  216:23 218:12
  222:22 223:13,21
  224:6,10,15 227:1
  229:20 230:1,5,14
  230:16 231:5,13,17

**sterbcow's** 19:19
  67:8 93:22 102:25
  125:22 126:2
  130:23 131:15
  133:18 139:8,23
  142:8,17 143:3
  162:17,24 198:2
  199:12 200:7 204:4
  229:5 231:3
**sterbcowlawgroup**
  231:7
**stop** 204:7
**stopped** 217:8
**store** 52:22 144:7
  204:1
**stores** 222:13
**straight** 185:3
**stream** 70:14
**street** 1:17 2:11 9:12
  105:19 113:16
**stretch** 61:21
**strike** 156:3 189:10
  192:17 208:20,23
  212:14 221:8
**string** 85:15 222:2
**stuart** 31:19
**stubs** 24:9 161:23
**studying** 12:7
**stuff** 18:24 42:20
  138:16 204:21
  214:21
**stupid** 226:13
**subject** 4:18 70:9
  71:5
**submitting** 132:23
**subpoena** 35:15
  36:18 40:2 62:10
  83:17 112:24 113:1
  113:20 114:7,7,11
  114:14,23 115:13
  117:25 118:4,5
  120:6 159:22,24
  160:16 170:17
  176:6 182:23
  222:25

subpoenaed  35:2
  119:17 182:6
subsequent  142:12
subsequently  53:18
  104:21
successfully  139:17
sue  188:8
sued  232:12
sufficient  18:16
suggest  63:4 73:8
  81:21 100:23 111:2
  188:7
suite  1:17 2:4,11
sunday  131:20
supervised  20:23
supervising  16:13
supervision  17:3,24
  18:16 24:21
supplied  15:6,8 48:4
supplies  203:12,15
supply  13:21 14:17
  14:21 53:2
supplying  58:15
support  214:2,7
supposed  14:4 46:21
  58:8 94:2 128:10
  159:5 160:2 163:22
  171:25 174:19,22
  175:11 176:5
sure  16:11 32:14,15
  35:16 36:6 38:1
  39:5,7 43:8 53:19
  55:5 59:23 67:16
  70:16 77:1 83:6
  88:7 89:2 92:22
  103:24 126:24
  129:14 132:12
  149:5 165:10
  166:10 189:2
  193:14 194:17
  199:25 217:17
sustained  37:17
  38:23 91:14
swear  5:21 6:11,14

swearing  7:10,11
sworn  7:2,8,22 8:8,9
  8:17 9:5 158:9
  235:6
symptoms  56:2
  79:15 87:21 106:3
  123:24,25 134:9,22
system  222:14
sánchez  2:20 235:2

**t**

t  1:9 4:1 55:9
table  124:17,17,21
  135:5
tactics  83:9
take  10:21 35:10
  61:17 82:23 110:23
  111:1,1,6,20 139:19
  145:7 171:7 173:4
  178:5,24 179:13,18
  179:22 180:16
  205:14 212:18
  219:2
taken  9:14 133:19
  227:1
talk  51:8 82:19,20
  89:9 97:13 113:6
  115:22 118:25
  119:17 120:9,13,16
  134:8 142:20
  170:11 178:9,20
  183:13,17,19 197:8
  200:1 201:12
talked  20:19 81:13
  115:10 118:5
  122:23 134:21
  135:10 137:1
  142:10 169:20
  176:19 184:6
  232:23 233:4
talking  37:25 42:18
  60:5 61:1 64:19
  66:23 72:7 74:1
  76:6,13 91:22 135:3
  194:15 195:14

196:5,25 199:12,14
  199:17 215:20
  216:22 224:14
talks  71:22
tape  37:9 62:5 104:7
  104:8,15 112:3
  149:1,11 182:2
taping  10:9
tecum  35:20
telephone  158:11,12
telephonically  2:10
tell  9:9 11:1 18:1
  22:12 27:21 30:7,9
  43:11,14,25 47:5
  55:2 82:18 106:16
  112:20 118:10
  119:8 120:4 138:13
  146:19,20 149:1
  151:21 153:16,18
  155:25 156:6,21
  160:13,23 161:6
  176:7 177:20 178:1
  192:6 199:7,11
  204:7 206:22,24
  212:4 217:2 222:22
  225:3,7,9,12 226:2
telling  47:23 95:4,23
  96:25 102:20 105:4
  122:17 174:19
  216:16
tenant  131:11
tenants  130:23
  131:1,6,7
terminate  79:9
terminated  73:2
terminating  71:23
  73:5
termination  50:23
  50:25 51:1,20 81:24
  82:7,23 206:12
terms  99:22 100:8
  136:13,15
testified  9:6 120:18
  121:17 127:10
  129:16 137:21

138:23 146:15
  149:14 162:2
  227:21
testify  92:13
testimony  90:14
  92:18 112:18
  116:13 117:14
  130:8,16 179:19
  215:10 235:7
testing  214:23
text  173:1
thank  7:3,9,23 65:5
  70:15 110:12
  112:22 180:6
  192:23 218:25
  219:1 220:25 223:5
thanks  69:20
themckeelawgrou...
  2:6
thing  39:11 92:7
  101:7 105:23
  107:13 119:18
  125:18 157:24
  186:16 229:23
things  9:23 36:1
  41:4 77:5 83:6 87:8
  90:22 107:20
  109:25 110:5,17
  125:4,12,20 223:17
  233:7,8
think  9:17 10:13
  12:24 21:21 23:16
  24:11 27:11 34:24
  57:8 65:24 68:10
  70:10,19 71:15
  72:10 74:11,25 82:6
  82:13 90:10 97:5
  98:13 109:17,19,24
  111:5,6,11 113:16
  115:16 116:9 117:3
  118:14 119:15,21
  120:19 121:5 125:7
  126:7 130:8 133:8
  145:8 154:16 159:1
  161:10 171:10

172:16 173:14,24
178:14 182:17
188:15 189:15
194:10 203:10
204:2 205:21 207:5
207:9,17 209:22
217:4,14 218:16
224:8 228:8,12,16
229:13 231:8,24
**thinking** 107:23
135:15
**third** 58:9 91:24
92:4,5 93:2,12
100:7 121:15
172:18
**thought** 76:3 87:18
97:11 108:9 177:24
194:5 196:6,9 227:2
227:5,15,19
**threatening** 179:25
180:7
**three** 60:22 101:12
126:6,7,18 127:1,20
135:7,23 136:25
139:8 182:24
210:25 218:17
**thursday** 1:18 5:1
**tie** 45:1
**till** 72:14
**time** 5:8,19 11:17
13:11 14:23,24
15:16 16:1,12 17:15
20:15 24:12 26:4,10
26:17 27:7,17,20
31:16 37:5,9 43:6
43:24 47:25 48:1
49:25 50:1,15 57:5
57:8 59:10 60:17
62:1,5 67:5,5,7,17
69:8 77:4,4 81:3
82:13 84:2 85:11
87:16,22 99:10
102:6 104:11,15
108:3,8,19 110:20
111:24 112:3

115:25 121:1,24
122:10,11 123:3,8
123:17,20 124:18
127:4 128:5,16
132:1,6,9 133:6
134:23 135:3
137:24 140:13,14
144:14,14 145:1
146:3,9 149:7,11
150:21 152:15
154:12,18 158:7,13
158:16 160:13
165:7,12 167:3
168:2,3 169:15,18
169:22,23 170:5,12
173:5,21 178:25
179:4,7,9 182:2
183:14 184:15
188:11 191:24
192:12 193:5,16
198:10 200:11,14
200:14 201:4,5,6
203:11,11 208:5,14
219:7 223:3 224:21
225:18 226:18
228:23 229:11
230:2 233:25
**times** 15:2 19:9
25:11,13 41:12
58:17,23 68:18 79:7
126:4,18 127:1
128:20 131:22,24
132:14 134:13,16
134:20,25 135:5,19
135:22 139:4,8
141:25 166:20
169:16 182:14,22
182:24 185:25
188:5
**timing** 186:6
**title** 167:14,17
**today** 12:19 22:14
35:1 36:2 66:1
84:15 112:17,24
116:13,15 118:1,4,9

120:17 148:2
151:17 160:7 161:5
163:12,16 166:14
171:21 183:4,22
187:24 207:8
230:24 231:21
**today's** 5:7 120:11
**told** 14:5,12 29:6
41:18 42:1 43:16,19
51:12 75:3 95:13
101:18 102:2,3,5,7
106:21 116:19
130:11 146:19,24
155:17,22 156:19
157:9,15 159:23
160:6 161:11
169:18 183:10,23
184:3,4 186:21
196:17 197:4 204:3
214:16 215:15
217:14 222:24
233:5
**tomorrow** 101:7
**top** 10:3 149:23,25
**topic** 80:11
**tortious** 95:18
**total** 133:8
**track** 44:24 63:14
**trained** 205:8
**training** 206:4 218:7
218:21
**transcript** 236:5,7
**transcription**
233:19
**translate** 69:19 72:3
75:12 107:9,16
163:23 172:13
212:16
**translated** 55:13
74:12 77:5,16
102:19 103:24
108:17
**translating** 175:14
193:17 207:6

**translation** 4:12,18
71:14 74:13,22
165:2,7,13
**travel** 144:22
**treatment** 21:14
22:1,4
**tried** 38:8 63:20
72:1 139:18 161:23
212:22 217:3,15
**trouble** 139:11
**true** 18:15 95:2
176:1 196:8 222:7,9
236:4
**try** 10:2 17:14
170:17 216:17
**trying** 23:12 46:23
47:2 67:16 72:10
103:4 116:19
141:15 156:12
188:14 207:25
**tulane** 11:5 12:7,11
**tune** 156:16
**turn** 131:1
**turned** 131:6,7
**twice** 134:14,15
142:3 166:21
**two** 5:24 8:12 10:5
15:1,2,19,21 29:7
34:8 37:22 40:8
60:21 61:5 66:12
68:5 103:20 119:13
125:7 127:20
128:13 133:8,13,14
134:19 148:21
152:25 175:13
177:15 198:20,22
210:23 223:18,24
227:12
**type** 24:3 25:15
67:23 68:2,12
109:13,24 110:4
122:6 125:12
137:12 167:13
174:8

**types** 21:18 68:5
**typical** 80:17
**typically** 50:19
**typo** 48:18

**u**

**uh** 10:23 53:24
  78:16 223:19
**undated** 56:5
**undefined** 136:13
  136:15
**understand** 9:21,24
  15:18 17:9 20:16
  31:15 71:11 156:25
  157:2,8 159:12
  163:24 164:10
  167:25,25 173:21
  174:16 204:19
  210:18 212:3,19
  215:22 230:21
  232:17
**understanding**
  13:10,12 19:18 21:6
  74:10 75:5 85:7
  129:6,15 186:23
  187:3 206:16
  217:18 232:1,4,6,15
**understood** 20:13
  72:12 204:2
**unfortunately** 30:6
**unhappy** 82:22
**unilateral** 33:21
**uninhibited** 104:9
**united** 11:18,23
  17:20,25
**university** 11:3,5
**unlicensed** 17:2
**unrelated** 18:24
**unsatisfied** 51:18
**unsigned** 54:11
  93:20
**unsworn** 8:19
**update** 75:20,21
  76:18 171:16
  173:15

**ups** 57:25 80:18,19
  85:22 125:16,19,24
  143:2 144:8 223:8
**upset** 108:21 154:7
**upstanding** 109:5
**use** 26:13 55:14
  61:14 68:2,21 79:8
  83:8 102:25 125:1
  125:22 126:9 129:1
  129:4,8,17,25 130:9
  130:17 131:15
  139:6,10 167:20
  204:10
**uses** 128:16
**usually** 133:24

**v**

**v** 1:7 5:13 112:13
**valuation** 91:6,8
**variations** 25:15
**varied** 80:22
**various** 16:8 56:2
**vast** 25:11
**venture** 23:20 33:3
  33:22 34:15,22 88:5
  148:5 205:19,23
  206:17
**venturer** 207:10
**venturers** 206:10,13
  206:14
**verbal** 10:10,24
**verbatim** 1:16 5:10
**verify** 51:8 233:18
**veritext** 5:6
**version** 55:14 64:4
  72:3 74:23
**viable** 123:18
**vice** 99:24
**video** 3:13,14,15,16
  3:17,18 35:22 37:1
  193:13
**videographer** 5:3
  6:23 7:1,12 10:9
  37:4,7 61:25 62:3
  104:10,13 110:22

111:23 112:1
148:25 149:3,6,9
179:3,6 180:13
181:23,25 219:6,9
233:23 235:5
**violate** 92:14
**visit** 201:10
**visited** 201:8

**w**

**w** 15:9 24:10
**wait** 69:22 70:20
  79:20 144:7 169:1
  191:6 229:11
**waiting** 11:11
  144:15 201:14
**waive** 115:18 117:2
  120:2 233:16,21
**waived** 116:21
  117:1,5 120:3 151:9
**waiving** 117:10
**walked** 134:3
**wall** 42:8
**want** 6:8 10:12 29:6
  35:16,24 36:9 40:11
  54:18 61:22 66:13
  69:6 70:5 89:22
  93:8 101:13 109:7
  110:23 111:16
  114:24 115:10
  128:7 132:12
  149:18 179:11
  181:7,15 189:2
  192:24 195:7
  196:19 212:15
  227:6 232:3
**wanted** 45:12 61:14
  75:2 78:9 79:16
  96:23 109:12
  115:22 117:17
  125:14,15 131:24
  145:23 217:6
**wants** 92:21 173:4
  178:24

**water** 58:10 216:7
**way** 17:23 44:25
  48:19 50:25 60:20
  63:14 68:17 80:17
  113:4,17 120:10
  122:5 128:9 221:14
  222:22
**we've** 83:25 85:15
  92:15 221:19
  231:20,24
**weber** 1:24 7:6
  236:2,13
**website** 12:11
  125:19 224:17
  225:9 229:21
**wednesday** 80:1
**week** 15:21 131:14
  131:16,19,21 132:2
  132:3,17,22 133:7
  133:10,14
**weekends** 133:9
**weekly** 15:19
**weeks** 15:19,21
  63:11 127:11,16,20
  133:9,13 140:8
  204:6
**weird** 43:2
**welcomed** 41:19
**went** 11:3,17 19:10
  29:3 34:13 52:21
  54:13 74:21 75:6
  76:25 84:23 85:9,17
  92:3 93:12 97:10
  103:17,19,25 104:1
  106:5 109:1 130:14
  142:22 167:3,5
  183:20,23 184:4
  201:11 204:23
  211:8,14
**weston** 2:5
**whatnot** 79:13
  222:15
**whatsoever** 170:13
**whereof** 235:8

| | | x | york 108:6 121:21 |
|---|---|---|---|
| | | | 121:23 205:9,10 |

**willing** 62:18 64:7
**window** 197:10
**wish** 50:25
**withdrawing** 193:2
**withdrew** 192:18,20
  193:3
**witness** 5:17,22 6:11
  6:14 7:16 18:11
  37:20 45:10,18
  46:17 56:18 92:2,25
  110:13,15 111:14
  169:23 170:2,4
  173:3 178:10
  179:21,25 206:1,2
  207:21 221:3
  225:18 235:8
**woman** 109:5
**wonderful** 181:22
**wondering** 31:15
  32:9,10 33:25 46:7
  61:1,3 96:19 108:9
  215:15
**worded** 48:4
**words** 14:3
**work** 11:20,24 12:2
  12:5 13:22,25 14:2
  14:4,12,16,25 29:1
  30:14 31:1 50:13
  60:1 76:20 77:7
  91:16,19 92:11,14
  93:23 102:5 118:23
  119:25 120:14
  121:6 122:2 131:25
  133:1,6 139:2 167:9
  167:23 168:18
  203:13 204:4
  211:12 215:5,6,11
  216:11 224:3 231:8
  231:9
**worked** 11:21 12:23
  16:6 24:10 68:15
  80:14 100:15
  101:18,19 124:16
  131:22 132:10,10
  133:9,16,18 137:21

140:6 224:20
**worker** 45:22,24
  68:23 100:16
**workers** 68:8,10
**working** 11:25
  14:10,14,23 15:5
  16:1,12 17:15 18:6
  20:15 21:7 24:2
  26:11,13,18 27:7
  29:2,20 30:10 31:12
  31:14 32:6,6 41:17
  49:5 59:11 65:12
  75:4 76:11,14,16
  119:10 121:1
  122:12 124:6
  126:13,15 132:1,9
  132:15 140:3 159:7
  165:5 167:2,10,16
  167:22 168:1,3,16
  176:12 184:10,18
  197:23 198:13
  199:10 200:11
  203:16 211:22
  218:17 224:21
  225:21,23
**works** 186:21
**wrap** 111:8
**write** 121:7 223:23
**writing** 8:11 74:17
  84:5 90:1 98:1
  100:11 105:8
  195:10 224:1
**written** 9:18 10:8
  23:19 30:25 32:2
  37:2 50:25 80:10
  82:16 83:24 85:13
  90:3 93:15 186:7
  190:19 223:20
**wrong** 109:14,25
  110:5,17
**wrote** 61:4 82:6 95:3
  194:18 221:15,17
  222:11 230:25

**x** 3:1 4:1

**y**

**yauco** 9:12 113:13
**yeah** 14:11 16:21
  27:14 36:23 38:2,13
  39:17,19 45:11
  46:10 47:2 51:16
  52:8 56:3,13 63:3
  65:11 66:10 67:6
  71:15 76:24 77:24
  78:1,12 83:3 86:3
  87:25 89:17 91:9
  101:20,22 103:3
  108:2 118:13
  119:16,21 125:17
  131:21 137:2
  142:18 145:19,20
  147:1,24 148:19
  150:1 153:6 157:23
  158:19 163:22
  166:25 169:20
  170:11 172:6,8
  173:7 180:24
  181:22 184:14
  185:24 189:5 191:2
  193:15 195:21
  196:22 199:23
  200:20 201:19
  203:17,17,25
  206:11,24 208:4
  211:10 212:18
  222:12,16 227:9
  228:25 231:7,11,19
  231:22,24 233:10
  233:12
**year** 12:13
**yesterday** 35:5
  40:23 70:25 71:25
  151:22 160:10
  177:16 182:25
  183:1,12
**yesterday's** 35:9

**z**

**zip** 75:13
**zone** 68:8,10