# Exhibit 1

**TO UNITED STATES' REPLY TO BPXP'S OPPOSITION TO MOTION IN LIMINE TO PERMIT RELEVANT EVIDENCE CONCERNING BP P.L.C. AND ITS AFFILIATES**

# Annual Report and Form 20-F 2012

bp.com/annualreport

## Building a stronger, safer BP

# BP in 2012

The group made good progress this year. We worked to enhance safety and risk management. We continued to meet our commitments in the Gulf of Mexico. We sold assets and reduced complexity. And we focused investment on areas where we see higher margins. Over the following pages, we report on the actions taken to build a stronger, safer BP.

2 Information about this report

3 Business review: Group overview

4 BP at a glance
8 Chairman's letter
10 Group chief executive's letter
12 Energy outlook
15 Our business model
20 Our strategy
22 Our performance
28 Our key performance indicators
30 Our management of risk
32 Cautionary statement

33 Business review: BP in more depth

34 Financial review
38 Risk factors
46 Safety
51 Environmental and social responsibility
55 Employees
57 Technology
59 Gulf of Mexico oil spill
63 Upstream
72 Downstream
80 TNK-BP
82 Other businesses and corporate
84 Oil and gas disclosures for the group
90 Liquidity and capital resources
94 Regulation of the group's business
98 Certain definitions

101 Corporate governance

102 Governance overview
104 Board of directors
109 Executive team
112 How the board works
114 Board effectiveness
116 Shareholder engagement
117 Risk in BP
120 Audit committee
122 Safety, ethics and environment assurance committee
124 Gulf of Mexico committee
125 Nomination committee
126 Chairman's committee
126 UK Corporate Governance Code compliance
127 Directors' remuneration report
147 Regulatory information

153 Shareholder information

154 Called-up share capital
154 Share prices and listings
155 Dividends
155 UK foreign exchange controls on dividends
155 Shareholder taxation information
157 Major shareholders
158 Purchases of equity securities by the issuer and affiliated purchasers
158 Fees and charges payable by ADSs holders
159 Fees and payments made by the Depositary to the issuer
159 Documents on display
159 Administration
159 Annual general meeting

161 Additional disclosures

162 Legal proceedings
171 Critical accounting policies
174 Relationships with suppliers and contractors
174 Material contracts
175 Related-party transactions
175 Exhibits

177 Financial statements

178 Statement of directors' responsibilities
179 Consolidated financial statements of the BP group
186 Notes on financial statements
263 Supplementary information on oil and natural gas (unaudited)
PC1 Parent company financial statements of BP p.l.c.

20F Cross reference to Form 20-F

# Information about this report

**Cautionary statement**
This document should be read in conjunction with the cautionary statement on page 32.

**Frequent abbreviations**

ADR
American depositary receipt.

ADS
American depositary share.

Barrel (bbl)
159 litres, 42 US gallons.

b/d
Barrels per day.

boe
Barrels of oil equivalent.

GAAP
Generally accepted accounting practice.

Gas
Natural gas.

Hydrocarbons
Crude oil and natural gas.

IFRS
International Financial Reporting Standards.

Liquids
Crude oil, condensate and natural gas liquids.

LNG
Liquefied natural gas.

LPG
Liquefied petroleum gas.

mb/d
Thousand barrels per day.

mboe/d
Thousand barrels of oil equivalent per day.

mmboe
Million barrels of oil equivalent.

mmBtu
Million British thermal units.

MW
Megawatt.

NGLs
Natural gas liquids.

PSA
Production-sharing agreement.

RC
Replacement cost.

SEC
The United States Securities and Exchange Commission.

Tonne
2,204.6 pounds.

**Certain definitions**
For definitions of certain financial and contractual terms see pages 98-99.

**Key performance indicators**
Definitions for our group KPIs are provided on pages 28-29.

This document constitutes the Annual Report and Accounts in accordance with UK requirements and the Annual Report on Form 20-F in accordance with the US Securities Exchange Act of 1934, for BP p.l.c. for the year ended 31 December 2012. A cross reference to Form 20-F requirements is on page 20F.

This document contains the Directors' Report, including the Business Review and Management Report, on pages 3-126 and 147-175, and 178. The Directors' Remuneration Report is on pages 127-145. The consolidated financial statements of the group are on pages 177-286 and the corresponding reports of the auditor are on pages 179-181. The parent company financial statements of BP p.l.c. and corresponding auditor's report are on pages PC2-PC11 and page PC1 respectively.

The statement of directors' responsibilities, the independent auditor's report on the annual report and accounts to the members of BP p.l.c. and the parent company financial statements of BP p.l.c. and corresponding auditor's report do not form part of BP's Annual Report on Form 20-F as filed with the SEC.

*BP Annual Report and Form 20-F 2012* and *BP Summary Review 2012* may be downloaded from *bp.com/annualreport*. No material on the BP website, other than the items identified as *BP Annual Report and Form 20-F 2012* or *BP Summary Review 2012*, forms any part of those documents.

BP p.l.c. is the parent company of the BP group of companies. The company was incorporated in 1909 in England and Wales and changed its name to BP p.l.c. in 2001. Where we refer to the company, we mean BP p.l.c. Unless otherwise stated, the text does not distinguish between the activities and operations of the parent company and those of its subsidiaries, and information in this document reflects 100% of the assets and operations of the company and its subsidiaries that were consolidated at the date or for the periods indicated, including minority interests. BP's primary share listing is the London Stock Exchange. Ordinary shares are also traded on the Frankfurt Stock Exchange in Germany and, in the US, the company's securities are traded on the New York Stock Exchange in the form of ADSs (see page 154 for more details).

The term 'shareholder' in this report means, unless the context otherwise requires, investors in the equity capital of BP p.l.c., both direct and indirect. As BP shares, in the form of ADSs, are listed on the New York Stock Exchange (NYSE), an Annual Report on Form 20-F is filed with the US Securities and Exchange Commission (SEC). Ordinary shares are ordinary fully paid shares in BP p.l.c. of 25 cents each. Preference shares are cumulative first preference shares and cumulative second preference shares in BP p.l.c. of £1 each.

Trade marks of the BP group appear throughout this Annual Report and Form 20-F in italics. They include:

*ampm*
*Aral*
*ARCO*
*BP*
*BP Ultimate*
*Castrol*
*Castrol CRB*
*Castrol EDGE*
*Castrol Magnatec*
*Designer Water*
*Field of the Future*
*LoSal*
*Project 20K*
*Pushing Reservoir Limits*
*Veba Combi-Cracking (VCC)*

EcoBoost is a trade mark of Ford Motor Company.
SkyMine is a trade mark of Skyonic Corporation.
Permasense is a trade mark of Permasense Limited.

Registered office and our worldwide headquarters:

BP p.l.c.
1 St James's Square
London SW1Y 4PD
UK
Tel +44 (0)20 7496 4000

Our agent in the US:

BP America Inc.
501 Westlake Park Boulevard
Houston, Texas 77079
US
Tel +1 281 366 2000

Registered in England and Wales No. 102498.
Stock exchange symbol 'BP'.

# Additional disclosures

162 Legal proceedings

171 Critical accounting policies

174 Relationships with suppliers and contractors

174 Material contracts

175 Related-party transactions

175 Exhibits

Additional disclosures   161
BP Annual Report and Form 20-F 2012

# Legal proceedings

## Proceedings relating to the Deepwater Horizon oil spill

BP p.l.c., BP Exploration & Production Inc. (BPXP) and various other BP entities (collectively referred to as BP) are among the companies named as defendants in approximately 750 civil lawsuits resulting from the 20 April 2010 explosions and fire on the semi-submersible rig Deepwater Horizon and resulting oil spill (the Incident) and further actions are likely to be brought. BPXP is lease operator of Mississippi Canyon, Block 252 in the Gulf of Mexico (Macondo), where the Deepwater Horizon was deployed at the time of the Incident. The other working interest owners at the time of the Incident were Anadarko Petroleum Company (Anadarko) and MOEX Offshore 2007 LLC (MOEX). The Deepwater Horizon, which was owned and operated by certain affiliates of Transocean Ltd. (Transocean), sank on 22 April 2010. The pending lawsuits and/or claims arising from the Incident have generally been brought in US federal and state courts. Plaintiffs include individuals, corporations, insurers, and governmental entities and many of the lawsuits purport to be class actions. The lawsuits assert, among others, claims for personal injury in connection with the Incident itself and the response to it, wrongful death, commercial and economic injury, breach of contract and violations of statutes. The lawsuits seek various remedies including compensation to injured workers and families of deceased workers, recovery for commercial losses and property damage, compensation for personal injuries and medical monitoring, claims for environmental damage, remediation costs, claims for unpaid wages, injunctive and declaratory relief, treble damages and punitive damages. Purported classes of claimants include residents of the states of Louisiana, Mississippi, Alabama, Florida, Texas, Tennessee, Kentucky, Georgia and South Carolina; property owners and rental agents, fishermen and persons dependent on the fishing industry, charter boat owners and deck hands, marina owners, gasoline distributors, shipping interests, restaurant and hotel owners, cruise lines and others who are property and/or business owners alleged to have suffered economic loss; and response workers and residents claiming injuries due to exposure to the components of oil and/or chemical dispersants. Among other claims arising from the spill response efforts, lawsuits have been filed claiming that additional payments are due by BP under certain Master Vessel Charter Agreements entered into in the course of the Vessels of Opportunity Program implemented as part of the response to the Incident. Purported class action and individual lawsuits have also been filed in US state and federal courts, as well as one suit in Canada, against BP entities and/or various current and former officers and directors alleging, among other things, shareholder derivative claims, securities fraud claims, violations of the Employee Retirement Income Security Act (ERISA) and contractual and quasi-contractual claims related to the cancellation of the dividend on 16 June 2010. In August 2010, many of the lawsuits pending in federal court were consolidated by the Federal Judicial Panel on Multi-district Litigation into two multi-district litigation proceedings, one in federal court in Houston for the securities, derivative, ERISA and dividend cases and another in federal court in New Orleans for the remaining cases.

BP has had discussions with the DoJ regarding possible settlements of the claims by the DoJ, other federal agencies and certain States, in whole or in part, and remains open to further discussions but there are a number of significant issues and considerable uncertainty as to whether any agreement could ultimately be reached.

On 25 February 2013, the first phase of a Trial of Liability, Limitation, Exoneration and Fault Allocation commenced in the federal multi-district litigation proceeding in New Orleans. For further information, see page 164 below.

In addition, BP has been named in several lawsuits alleging claims under the Racketeer-Influenced and Corrupt Organizations Act (RICO). On 15 July 2011, the judge granted BP's motion to dismiss a master complaint raising RICO claims against BP. The court's order dismissed the claims of the plaintiffs in four RICO cases encompassed by the master complaint.

On 26 August 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss a master complaint raising claims for economic loss by private plaintiffs, dismissing plaintiffs' state law claims and limiting the types of maritime law claims plaintiffs may pursue, but also held that certain classes of claimants may seek punitive damages under general maritime law. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of the master complaint to those individual complaints. On 30 September 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss a master complaint asserting personal injury claims on behalf of persons exposed to crude oil or chemical dispersants, dismissing plaintiffs' state law claims, claims by seamen for punitive damages, claims for medical monitoring damages by asymptomatic plaintiffs, claims for battery and nuisance under maritime law, and claims alleging negligence per se. As with his other rulings on motions to dismiss master complaints, the judge did not lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of the master complaint to those individual complaints.

Shareholder derivative lawsuits related to the Incident have been filed in US federal and state courts against various current and former officers and directors of BP alleging, among other things, breach of fiduciary duty, gross mismanagement, abuse of control and waste of corporate assets. On 15 September 2011, the judge in the federal multi-district litigation proceeding in Houston (MDL 2185) granted BP's motion to dismiss the consolidated shareholder derivative litigation pending there on the grounds that the courts of England are the appropriate forum for the litigation. On 8 December 2011, a final judgment was entered dismissing the shareholder derivative case and, on 3 January 2012, one of the derivative plaintiffs filed a notice of appeal to the US Court of Appeals for the Fifth Circuit. On 16 January 2013, the Court of Appeals affirmed dismissal of the action. The plaintiffs in the two remaining state-court actions, which are pending in Texas and Louisiana, have agreed to be bound by the outcome of the federal case.

On 13 February 2012, the judge in the federal multi-district litigation proceeding in Houston issued two decisions on the defendants' motions to dismiss the two consolidated securities fraud complaints filed on behalf of purported classes of BP ordinary shareholders and ADS holders. In those decisions the court dismissed all of the claims of the ordinary shareholders, dismissed the claims of the lead class of ADS holders against most of the individual defendants while holding that a subset of the claims against two individual defendants and the corporate defendants could proceed, and dismissed all of the claims of a smaller purported subclass with leave to re-plead in 20 days. On 2 April 2012, plaintiffs in the lead class and subclass filed an amended consolidated complaint with claims based on (1) the 12 alleged misstatements that the court held were actionable in its February 2012 order on BP's motion to dismiss the earlier complaints; and (2) 13 alleged misstatements concerning BP's operating management system that the judge either rejected with leave to re-plead or did not address in his February decisions. On 2 May 2012, defendants moved to dismiss the claims based on the 13 statements in the amended complaint that the judge did not already rule are actionable. On 6 February 2013, the judge granted in part this motion to dismiss, rejecting plaintiffs' claims based on 10 of the 17 statements at issue in the motion and also dismissing all claims against Andrew Inglis. On 5 March 2013, the court announced that a trial date has been scheduled for 25 August 2014.

In April and May 2012, six new cases (three of which were consolidated into one action) were filed in state and federal courts by one or more state, county or municipal pension funds against BP entities and several current and former officers and directors seeking damages for alleged losses those funds suffered because of their purchases of BP ordinary shares and, in two cases, ADSs. The funds assert various state law and federal law claims. All of the cases have been transferred to the judge in the federal multi-district litigation proceeding in Houston. In May and June, plaintiffs in the two cases that were filed in state court moved to send those cases back to state court, which was denied on 3 October 2012. On 4 January 2013, the judge denied a motion to certify that decision for immediate appeal. On 21 December 2012, defendants filed motions to dismiss these cases. From July 2012 to January 2013, nine additional cases were filed in Texas state and federal courts (four of which were consolidated into one action) by pension or investment funds against BP entities and current and former officers, asserting Texas state law claims and seeking damages for alleged losses that those funds suffered because of their purchases of BP ordinary shares. All of the cases have been transferred to federal court in Houston, and it is anticipated that they will be handled by the same judge presiding over the multi-district litigation proceeding.

On 20 July 2012, a BP entity received an amended statement of claim for an action in Alberta, Canada, filed by three plaintiffs seeking to assert claims under Canadian law against BP on behalf of a class of Canadian residents who allegedly suffered losses because of their purchase of BP ordinary shares and ADSs. This case was dismissed on jurisdictional grounds on 14 November 2012. On 15 November 2012, one of the plaintiffs re-filed a statement of claim against BP in Ontario, Canada, seeking to assert the same claims under Canadian law against BP on behalf of a class of Canadian residents. BP informed the Ontario court that it intends to contest jurisdiction, and a hearing on this issue has been scheduled for 23-24 September 2013.

On 5 July 2012, the judge in the federal multi-district litigation proceeding in Houston (MDL 2185) issued a decision granting the defendants' motions to dismiss, for lack of personal jurisdiction, the lawsuit against BP p.l.c. for cancelling its dividend payment in June 2010. On 10 August 2012, the plaintiffs filed an amended complaint, which BP moved to dismiss on 9 October 2012.

On 30 March 2012, the judge in the federal multi-district litigation proceeding in Houston (MDL 2185) issued a decision granting the defendants' motions to dismiss the ERISA case related to BP share funds in several employee benefit savings plans. On 11 April 2012, plaintiffs requested leave to file an amended complaint, which was denied on 27 August 2012. Final judgment dismissing the case was entered on 4 September 2012 and, on 25 September 2012, plaintiffs filed a notice of appeal to the US Court of Appeals for the Fifth Circuit.

On 1 June 2010, the US Department of Justice (DoJ) announced that it was conducting an investigation into the Incident encompassing possible violations of US civil or criminal laws. The DoJ announced on 7 March 2011 that it had created a unified task force of federal agencies, led by the DoJ Criminal Division, to investigate the Incident. Other US federal agencies still may commence investigations relating to the Incident. The SEC and DoJ also investigated potential securities law violations, including potential securities fraud claims, alleged to have arisen in relation to the Incident. On 15 November 2012, BP announced that it reached agreement with the US government, subject to court approval, to resolve all federal criminal charges and all claims by the SEC against BP arising from the Deepwater Horizon accident, oil spill and response.

On 29 January 2013, the US District Court for the Eastern District of Louisiana accepted BP's pleas regarding the federal criminal charges, and BP was sentenced in connection with the criminal plea agreement. BP pleaded guilty to 11 felony counts of Misconduct or Neglect of Ships Officers relating to the loss of 11 lives; one misdemeanour count under the Clean Water Act; one misdemeanour count under the Migratory Bird Treaty Act; and one felony count of obstruction of Congress. The final judgment and order of the US District Court is provided as Exhibit 99.1 to this *Annual Report and Form 20-F 2012*.

Pursuant to that sentence, BP will pay $4 billion, including $1.256 billion in criminal fines, in instalments over a period of five years. Under the terms of the criminal plea agreement, a total of $2.394 billion will be paid to the National Fish & Wildlife Foundation (NFWF) over a period of five years. In addition, $350 million will be paid to the National Academy of Sciences (NAS) over a period of five years. The court also ordered, as previously agreed with the US government, that BP serve a term of five years' probation. Pursuant to the terms of the plea agreement, the court also ordered certain equitable relief, including additional actions, enforceable by the court, to further enhance the safety of drilling operations in the Gulf of Mexico. These requirements relate to BP's risk management processes, such as third-party auditing and verification, BP's Oil Spill Response Plan, training, and well control equipment and processes such as blowout preventers and cementing. BP has also agreed to maintain a real-time drilling operations monitoring centre in Houston or another appropriate location. In addition, BP will undertake several initiatives with academia and regulators to develop new technologies related to deepwater drilling safety. The resolution also provides for the appointment of two monitors, both with terms of four years. A process safety monitor will review, evaluate and provide recommendations for the improvement of BP's process safety and risk management procedures including, but not limited to, BP's risk review of processes concerning deepwater drilling in the Gulf of Mexico. An ethics monitor will review and provide recommendations for the improvement of BP's code of conduct and its implementation and enforcement. BP has also agreed to hire an independent third-party auditor who will review and report to the probation officer, the DoJ and BP regarding BP's implementation of key terms of the proposed settlement, including procedures and systems related to safety and environmental management, operational oversight, and oil spill response training and drills. Under the plea agreement, BP has also agreed to co-operate in ongoing criminal actions and investigations, including prosecutions of four former employees who have been separately charged.

In its resolution with the SEC, BP has resolved the SEC's Deepwater Horizon-related claims against the company under Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 and the associated rules. BP has agreed to a civil penalty of $525 million, payable in three instalments over a period of three years, and has consented to the entry of an injunction prohibiting it from violating certain US securities laws and regulations. The SEC's claims are premised on oil flow rate estimates contained in three reports provided by BP to the SEC during a one-week period (on 29 and 30 April 2010 and 4 May 2010), within the first 14 days after the accident. BP's consent was incorporated in a final judgment and court order on 10 December 2012, and BP made its first payment of $175 million on 11 December 2012. BP's consent and the final judgment and order of the US District Court are provided as Exhibit 99.2 and Exhibit 99.3, respectively, to this *Annual Report and Form 20-F 2012*.

BP's November 2012 agreement with the US government does not resolve the DoJ's civil claims, such as claims for civil penalties under the Clean Water Act or claims for natural resource damages under the Oil Pollution Act of 1990 (OPA 90). Neither does it resolve the private securities claims pending in the multi-district litigation proceedings in Houston (MDL 2185).

On 28 November 2012, the US Environmental Protection Agency (EPA) notified BP that it had temporarily suspended BP p.l.c., BPXP and a number of other BP subsidiaries from participating in new federal contracts. As a result of the temporary suspension, the BP entities listed in the notice are ineligible to receive any US government contracts either through the award of a new contract, or the extension of the term of or renewal of an existing contract. The suspension does not affect existing contracts the company has with the US government, including those relating to current and ongoing drilling and production operations in the Gulf of Mexico.

The charges to which BPXP pleaded guilty included one misdemeanour count under the Clean Water Act that, by operation of law following the court's acceptance of BPXP's plea, triggers a statutory debarment, a so referred to as mandatory debarment, of the BPXP facility where the Clean Water Act violation occurred. On 1 February 2013, the EPA issued a notice that BPXP was mandatorily debarred at its Houston headquarters.

Mandatory debarment prevents a company from entering into new contracts or new leases with the US government that would be performed at the facility where the Clean Water Act violation occurred. A mandatory debarment does not affect any existing contracts or leases a company has with the US government and will remain in place until such time as the debarment is lifted through an agreement with the EPA.

With respect to the entities named in the temporary suspension, the temporary suspension may be maintained or the EPA may elect to issue a notice of proposed discretionary debarment to some or all of the named entities. Like suspension, a discretionary debarment would preclude BP entities listed in the notice from receiving new federal fuel contracts, as well as new oil and gas leases, although existing contracts and leases will continue. Discretionary debarment typically lasts three to five years and may be imposed for a longer period, unless it is resolved through an administrative agreement. To date, the EPA has not issued such notice of proposed discretionary debarment to any of the entities named in the temporary suspension.

While BP's discussions with the EPA have been taking place in parallel to the court proceedings on the criminal plea, the company's work toward reaching an administrative agreement with the EPA is a separate process, and it may take some time to resolve issues relating to such an agreement. BPXP's mandatory debarment applies following sentencing and is not an indication of any change in the status of discussions with the EPA. The process for resolving both mandatory and discretionary

debarment is essentially the same as for resolving the temporary suspension. BP continues to work with the EPA in preparing an administrative agreement that will resolve suspension and debarment issues. On 15 February 2013, BP filed an administrative challenge with the EPA seeking to lift the 28 November 2012 suspension of 22 BP entities and the 1 February 2013 statutory debarment of BPXP at its Houston headquarters. BP maintains that the EPA's actions do not reflect BP's present status as a responsible government contractor. The EPA will review the administrative record and determine whether to change its decision. Decisions reached by the EPA can be challenged in federal court.

The United States filed a civil complaint in the multi-district litigation proceeding in New Orleans against BPXP and others on 15 December 2010 (DoJ Action). The complaint seeks a declaration of liability under OPA 90 and civil penalties under the Clean Water Act and sets forth a purported reservation of rights on behalf of the US to amend the complaint or file additional complaints seeking various remedies under various US federal laws and statutes. See Financial statements – Note 2 on page 194.

A Trial of Liability, Limitation, Exoneration, and Fault Allocation was originally scheduled to begin in the federal multi-district litigation proceeding in New Orleans in February 2012. The court's pre-trial order issued 14 September 2011 provided for the trial to proceed in three phases and to include issues asserted in or relevant to the claims, counterclaims, cross-claims, third-party claims, and comparative fault defences raised in Transocean's Limitation of Liability Action (discussed below). Pursuant to an amended pre-trial order dated 30 May 2012, the first phase of the Trial of Liability, Limitation, Exoneration, and Fault Allocation commenced on 25 February 2013. The first trial phase will address issues arising out of the conduct of various parties allegedly relevant to the loss of well control at the Macondo well, the ensuing fire and explosion on the Deepwater Horizon on 20 April 2010, the sinking of the vessel on 22 April 2010 and the initiation of the release of oil from the Deepwater Horizon or the Macondo well during those time periods, including whether BP or any other party was grossly negligent. The second trial phase, which is projected to commence in September 2013, will address (i) "source control" issues pertaining to the conduct or inaction of BP, Transocean or other relevant parties regarding stopping the release of hydrocarbons stemming from the Incident from 22 April 2010 through approximately 19 September 2010, and (ii) "quantification of discharge" issues pertaining to the amount of oil actually released into the Gulf of Mexico as a result of the Incident from the time when these releases began until the Macondo well was capped on approximately 15 July 2010 and then permanently cemented shut on approximately 19 September 2010.

On 20 April 2011, BP filed claims against Cameron International Corporation (Cameron), Halliburton Energy Services, Inc. (Halliburton), and Transocean in the DoJ Action, seeking contribution for any assessments against BP under OPA 90 based on those entities' fault. On 20 June 2011, Cameron and Halliburton moved to dismiss BP's claims against them in the DoJ Action. BP's claim against Cameron has been resolved pursuant to settlement, but Halliburton's motion remains pending.

On 30 May 2011, Transocean filed claims against BP in the DoJ Action alleging that BP America Production Company had breached its contract with Transocean Holdings LLC by not agreeing to indemnify Transocean against liability related to the Incident. Transocean also asserted claims against BP under state law, maritime law and OPA 90 for contribution. On 20 June 2011, Cameron filed similar claims against BP in the DoJ Action.

On 6 December 2011, the United States brought a motion for partial summary judgment seeking, among other things, an order finding that BP, Transocean and Anadarko are strictly liable for a civil penalty under Section 311(b)(7)(A) of the Clean Water Act. On 22 February 2012, the judge ruled on motions filed in the DoJ Action by the United States, Anadarko, and Transocean seeking early rulings regarding the liability of BP, Anadarko and Transocean under OPA 90 and the Clean Water Act, but limited the order to addressing the discharge of hydrocarbons occurring under the surface of the water. Regarding OPA 90, the judge held that BP and Anadarko are responsible parties under OPA 90 with regard to the subsurface discharge. The judge ruled that BP and Anadarko have joint and several liability under OPA 90 for removal costs and damages for such discharge, but did not rule on whether such liability under OPA 90 is unlimited. While the judge held that Transocean is not a responsible party under OPA 90 for subsurface discharge, the judge left open the question of whether Transocean may be liable under OPA 90 for removal costs for such discharge as the owner/operator of the Deepwater Horizon. Regarding the Clean Water Act, the judge held that the subsurface discharge was from the Macondo well, rather than from the Deepwater Horizon, and that BP and Anadarko are liable for civil penalties under Section 311 of the Clean Water Act as owners of the well. The judge left open the question of whether Transocean may be liable under the Clean Water Act as an operator of the Macondo well. Anadarko, BP and the United States have each appealed the 22 February 2012 ruling to the US Court of Appeals for the Fifth Circuit, and the appeals have been consolidated. On 23 October 2012, Transocean filed a motion to dismiss the appeal as untimely and for lack of jurisdiction. On 5 February 2013, the appeals court denied Transocean's motion.

On 11 January 2013, BP filed a motion for partial summary judgment against the United States, seeking rulings that (1) BP collected at least 810,000 barrels from the broken riser, from the top of the blowout preventer and lower marine riser package, and from the choke and kill lines of the blowout preventer, all before these barrels reached the waters of the Gulf of Mexico, and (2) that these barrels may not be counted toward the maximum penalty potentially to be assessed against BP under Section 311 of the Clean Water Act, 33 U.S.C. § 1321. The court set a schedule under which briefing on BP's motion will be complete in February 2013. On 15 February 2013, BP and the United States reached a stipulation, entered by the court on 19 February 2013. The stipulation provides that 810,000 barrels of oil were collected without coming into contact with ambient Gulf waters and that those 810,000 barrels of oil are not to be used in calculating the statutory maximum penalty under the Clean Water Act.

On 1 March 2013, Transocean sought the MDL 2179 court's leave to supplement its pleadings to include an affirmative defence asserting that BP's representations regarding the flow rate at the Macondo well constituted an intervening and superseding cause of the oil spill for the majority of its duration. Transocean's defence claims that BP fraudulently misrepresented and concealed information regarding the flow rate at the Macondo well in late April and May 2010, as well as the likelihood of success of a top-kill approach to stopping the flow of hydrocarbons from the well, and thus prevented the implementation of alternative means of source control that Transocean asserts could have capped the well as early as May 2010. Also on 1 March 2013, Halliburton filed a motion for leave to amend its answers in MDL 2179 to assert a similar defence.

On 4 April 2011, BP initiated contractual out-of-court dispute resolution proceedings against Anadarko and MOEX, claiming that they have breached the parties' contract by failing to reimburse BP for their working-interest share of Incident-related costs. On 19 April 2011, Anadarko filed a cross-claim against BP, alleging gross negligence and 15 other counts under state and federal laws. Anadarko sought a declaration that it was excused from its contractual obligation to pay Incident-related costs. Anadarko also sought damages from alleged economic losses and contribution or indemnity for claims filed against it by other parties. On 20 May 2011, BP and MOEX announced a settlement agreement of all claims between them, including a cross-claim brought by MOEX on 19 April 2011 similar to the Anadarko claim. Under the settlement agreement, MOEX has paid BP $1.065 billion, which BP has applied towards the $20-billion Trust, and has also agreed to transfer all of its 10% interest in the MC252 lease to BP. On 17 October 2011, BP and Anadarko announced that they had reached a final agreement to settle all claims between the companies related to the Incident, including mutual releases of all claims between BP and Anadarko that are subject to the contractual out-of-court dispute resolution proceedings or the federal multi-district litigation proceeding in New Orleans. Under the settlement agreement, Anadarko has paid BP $4 billion, which BP has applied towards the $20-billion Trust, and has also agreed to transfer all of its 25% interest in the MC252 lease to BP. The settlement agreement also grants Anadarko the opportunity for a 12.5% participation in certain future recoveries from third parties and certain insurance proceeds in the event that such recoveries and proceeds exceed $1.5 billion in aggregate. Any such payments to Anadarko are capped at a total of $1 billion. BP has agreed to indemnify Anadarko and MOEX for certain claims arising from the Incident (excluding civil, criminal or administrative fines and penalties, claims for punitive damages, and certain other claims). The settlement agreements with Anadarko and MOEX are not an admission of liability by any party regarding the Incident.

On 18 February 2011, Transocean filed a third-party complaint against BP, the US government, and other corporations involved in the Incident, naming those entities as formal parties in its Limitation of Liability action pending in federal court in New Orleans.

On 20 April 2011, Transocean filed claims in its Limitation of Liability action alleging that BP had breached BP America Production Company's contract with Transocean Holdings LLC by BP not agreeing to indemnify Transocean against liability related to the Incident and by not paying certain invoices. Transocean also asserted claims against BP under state law, maritime law, and OPA 90 for contribution. On 1 November 2011, Transocean filed a motion for partial summary judgment on certain claims filed in the Limitation Action and the DoJ Action between BP and Transocean. Transocean's motion sought an order that would bar BP's contribution claims against Transocean and require BP to defend and indemnify Transocean against all pollution claims, including those resulting from any gross negligence, and from civil fines and penalties sought by the government. On 7 December 2011, BP filed a cross-motion for summary judgment seeking an order that BP is not required to indemnify Transocean for any civil fines and penalties sought by the government or for punitive damages.

On 26 January 2012, the judge ruled on BP's and Transocean's indemnity motions, holding that BP is required to indemnify Transocean for third-party claims for compensatory damages resulting from pollution originating beneath the surface of the water, regardless of whether the claim results from Transocean's strict liability, negligence or gross negligence. The court, however, ruled that BP does not owe Transocean indemnity for such claims to the extent Transocean is held liable for punitive damages or for civil penalties under the Clean Water Act, or if Transocean acted with intentional or wilful misconduct in excess of gross negligence. The court further held that BP's obligation to defend Transocean for third-party claims does not require BP to fund Transocean's defence of third-party claims at this time, nor does it include Transocean's expenses in proving its right to indemnity. The court deferred a final ruling on the question of whether Transocean breached its drilling contract with BP so as to invalidate the contract's indemnity clause.

On 20 April 2011, Halliburton filed claims in Transocean's Limitation of Liability action seeking indemnification from BP for claims brought against Halliburton in that action, and Cameron asserted claims against BP for contribution under state law, maritime law and OPA 90, as well as for contribution on the basis of comparative fault. Halliburton also asserted a claim for negligence, gross negligence and wilful misconduct against BP and others. On 19 April 2011, Halliburton filed a separate lawsuit in Texas state court seeking indemnification from BPXP for certain tort and pollution-related liabilities resulting from the Incident. On 3 May 2011, BPXP removed Halliburton's case to federal court, and on 9 August 2011, the action was transferred to the federal multi-district litigation proceedings pending in New Orleans.

Subsequently, on 30 November 2011, Halliburton filed a motion for summary judgment in the federal multi-district litigation proceedings pending in New Orleans. Halliburton's motion sought an order stating that Halliburton is entitled to full and complete indemnity, including payment of defence costs, from BP for claims related to the Incident and denying BP's claims seeking contribution against Halliburton. On 21 December 2011, BP filed a cross-motion for partial summary judgment seeking an order that BP has no contractual obligation to indemnify Halliburton for fines, penalties or punitive damages resulting from the Incident.

On 31 January 2012, the judge ruled on BP's and Halliburton's indemnity motions, holding that BP is required to indemnify Halliburton for third-party claims for compensatory damages resulting from pollution that did not originate from property or equipment of Halliburton located above the surface of the land or water, regardless of whether the claims result from Halliburton's gross negligence. The court, however, ruled that BP does not owe Halliburton indemnity to the extent that Halliburton is held liable for punitive damages or for civil penalties under the Clean Water Act. The court further held that BP's obligation to defend Halliburton for third-party claims does not require BP to fund Halliburton's defence of third-party claims at this time, nor does it include Halliburton's expenses in proving its right to indemnity. The court deferred ruling on whether BP is required to indemnify Halliburton for any penalties or fines under the Outer Continental Shelf Lands Act. It also deferred ruling on whether Halliburton acted so as to invalidate the indemnity by breaching its contract with BP, by committing fraud, or by committing another act that materially increased the risk to BP or prejudiced the rights of BP as an indemnitor.

On 1 September 2011, Halliburton filed an additional lawsuit against BP in Texas state court. Its complaint alleges that BP did not identify the existence of a purported hydrocarbon zone at the Macondo well to Halliburton in connection with Halliburton's cement work performed before the Incident and that BP has concealed the existence of this purported hydrocarbon zone following the Incident. Halliburton claims that the alleged failure to identify this information has harmed its business ventures and reputation and resulted in lost profits and other damages. On 16 September 2011, BP removed the action to federal court, where it was stayed until it was transferred by the Judicial Panel on Multidistrict Litigation to the multi-district litigation proceeding in New Orleans. On 1 September 2011, Halliburton also moved to amend its claims in Transocean's Limitation of Liability action to add claims for fraud based on similar factual allegations to those included in its 1 September 2011 lawsuit against BP in Texas state court. On 11 October 2011, the magistrate judge in the federal multi-district litigation proceeding in New Orleans denied Halliburton's motion to amend its claims, and Halliburton's motion to review the order was denied by the judge on 19 December 2011.

On 20 April 2011, BP asserted claims against Cameron, Halliburton and Transocean in the Limitation of Liability action. BP's claims against Transocean include breach of contract, unseaworthiness of the Deepwater Horizon vessel, negligence (or gross negligence and/or gross fault as may be established at trial based upon the evidence), contribution and subrogation for costs (including those arising from litigation claims) resulting from the Incident, as well as a declaratory claim that Transocean is wholly or partly at fault for the Incident and responsible for its proportionate share of the costs and damages. BP asserted claims against Halliburton for fraud and fraudulent concealment based on Halliburton's misrepresentations to BP concerning, among other things, the stability testing on the foamed cement used at the Macondo well; for negligence (or, if established by the evidence at trial, gross negligence) based on Halliburton's performance of its professional services, including cementing and mud logging services; and for contribution and subrogation for amounts that BP has paid in responding to the Incident, as well as in OPA assessments and in payments to plaintiffs. BP filed a similar complaint in federal court in the Southern District of Texas, Houston Division, against Halliburton, and the action was transferred on 4 May 2011 to the federal multi-district litigation proceeding pending in New Orleans.

On 16 December 2011, BP and Cameron announced their agreement to settle all claims between the companies related to the Incident, including mutual releases of claims between BP and Cameron that are subject to the federal multi-district litigation proceeding in New Orleans. Under the settlement agreement, Cameron has paid BP $250 million in cash in January 2012, which BP has applied towards the $20-billion Trust. BP has agreed to indemnify Cameron for compensatory claims arising from the Incident, including claims brought relating to pollution damage or any damage to natural resources, but excluding civil, criminal or administrative fines and penalties, claims for punitive damages, and certain other claims.

On 20 May 2011, Dril-Quip, Inc. and M-I L.L.C. (M-I) filed claims against BP in Transocean's Limitation of Liability action, each claiming a right to contribution from BP for damages assessed against them as a result of the Incident, based on allegations of negligence. M-I also claimed a right to indemnity for such damages based on its well services contracts with BP. On 20 June 2011, BP filed counter-complaints against Dril-Quip, Inc. and M-I, asking for contribution and subrogation based on those entities' fault in connection with the Incident and under OPA 90, and seeking declaratory judgment that Dril-Quip, Inc. and M-I caused or contributed to, and are responsible in whole or in part for damages incurred by BP in relation to the Incident. On 20 January 2012, the court granted Dril-Quip, Inc.'s motion for summary judgment, dismissing with prejudice all claims asserted against Dril-Quip in the federal multi-district litigation proceeding in New Orleans.

On 21 January 2012, BP and M-I entered into an agreement settling all claims between the companies related to the Incident, including mutual releases of claims between BP and M-I that are subject to the federal multi-district litigation proceeding in New Orleans. Under the settlement agreement, M-I has agreed to indemnify BP for personal injury and death claims brought by M-I employees. BP has agreed to indemnify M-I for claims resulting from the Incident, but excluding certain claims.

On 14 September 2011, the US Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) issued a report (BOEMRE Report) regarding the causes of the 20 April 2010 Macondo well blowout. The BOEMRE Report states that decisions by BP, Halliburton and Transocean increased the risk or failed to fully consider or mitigate the risk of a blowout on 20 April 2010. The BOEMRE Report also states that BP, Transocean and Halliburton violated certain regulations related to offshore drilling. In itself, the BOEMRE Report does not constitute the initiation of enforcement proceedings relating to any violation. On 12 October 2011, the U.S. Department of the Interior Bureau of Safety and Environmental Enforcement issued to BPXP, Transocean, and Halliburton Notification of Incidents of Noncompliance (INCs). The notification issued to BPXP is for a number of alleged regulatory violations concerning Macondo well operations. The Department of Interior has indicated that this list of violations may be supplemented as additional evidence is reviewed, and on 7 December 2011, the Bureau of Safety and Environmental Enforcement issued to BPXP a second INC. This notification was issued to BP for five alleged violations related to drilling and abandonment operations at the Macondo well. BP has filed an administrative appeal with respect to the first and second INCs. BP has filed a joint stay of proceedings with the Department of Interior with respect to both INCs.

On 18 October 2011, Cameron filed a petition for writ of mandamus with US Court of Appeals for the Fifth Circuit seeking an order vacating the trial plan for the 27 February 2012 trial and requiring that all claims against Cameron in that proceeding be tried before a jury. On 26 December 2011, the Court of Appeals denied the application for mandamus.

The State of Alabama has filed a lawsuit seeking damages for alleged economic and environmental harms, including natural resource damages, civil penalties under state law, declaratory and injunctive relief, and punitive damages as a result of the Incident. The State of Louisiana has filed a lawsuit to declare various BP entities (as well as other entities) liable for removal costs and damages, including natural resource damages under federal and state law, to recover civil penalties, attorney's fees, and response costs under state law, and to recover for alleged negligence, nuisance, trespass, fraudulent concealment and negligent misrepresentation of material facts regarding safety procedures and BP's (and other defendants') ability to manage the oil spill, unjust enrichment from economic and other damages to the State of Louisiana and its citizens, and punitive damages. The Louisiana Department of Environmental Quality has issued an administrative order seeking environmental civil penalties and other relief under state law. On 23 September 2011, BP removed this matter to federal district court, and it has been consolidated with the multi-district proceedings in New Orleans.

District Attorneys of 11 parishes in the State of Louisiana have filed suits under state wildlife statutes seeking penalties for damage to wildlife as a result of the spill. On 10 December 2010, the Mississippi Department of Environmental Quality issued a Complaint and Notice of Violation alleging violations of several state environmental statutes.

On 14 November 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss the complaints filed by the States of Alabama and Louisiana. The judge's order dismissed the States' claims brought under state law, including claims for civil penalties and the State of Louisiana's request for a declaratory judgment under the Louisiana Oil Spill Prevention and Response Act, holding that those claims were pre-empted by federal law. It also dismissed the State of Louisiana's claims of nuisance and trespass under general maritime law. The judge's order further held that the States have stated claims for negligence and products liability under general maritime law, that the States have sufficiently alleged presentment of their claims under OPA 90, and that the States may seek punitive damages under general maritime law. On 9 December 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss a master complaint brought on behalf of local government entities. The judge's order dismissed plaintiffs' state law claims and limited the types of maritime law claims plaintiffs may pursue, but also held that the plaintiffs have sufficiently alleged presentment of their claims under OPA 90 and that certain local government entity claimants may seek punitive damages under general maritime law. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of the master complaint to those individual complaints.

In January 2013, the States of Alabama, Mississippi and Florida formally presented their claims to BP under OPA 90 for alleged losses including economic losses and property damage as a result of the Gulf of Mexico oil spill. BP is evaluating these claims. The State of Louisiana has also asserted similar claims. The amounts claimed, certain of which include punitive damages or other multipliers, are very substantial. However, BP considers the methodologies used to calculate these claims to be seriously flawed, not supported by the legislation and to substantially overstate the claims. Claims have also been presented by various local governments which are substantial in aggregate and more claims are expected to be presented. The amounts alleged in the presentments for State and Local government claims total over $34 billion. BP will defend vigorously against these claims if adjudicated at trial.

On 9 December 2011 and 28 December 2011, the judge in the federal multi-district litigation proceeding in New Orleans also granted BP's motions to dismiss complaints filed by the District Attorneys of 11 parishes in the State of Louisiana seeking penalties for damage to wildlife, holding that those claims are pre-empted by the Clean Water Act. All 11 of the District Attorneys of parishes in the State of Louisiana have now filed notices of appeal. The State of Alabama's attempt to intervene into the case has been denied. Since May 2012, amicus briefs have been filed in those appeals by the States of Alabama, Louisiana, and Mississippi. The appeal is now fully briefed and was scheduled for oral argument on 5 March 2013.

On 3 March 2012, BP announced an agreement in principle with the Plaintiffs' Steering Committee (PSC) in the federal multi-district litigation proceedings pending in the federal district court in New Orleans (MDL 2179) to settle the substantial majority of legitimate private economic and property damages claims and exposure-based medical claims stemming from the Incident. On 18 April 2012, BP and the PSC filed with that court the Economic and Property Damages Settlement Agreement and the Medical Benefits Class Action Settlement Agreement.

The Economic and Property Damages Settlement resolves certain economic and property damage claims, and the Medical Benefits Class Action Settlement resolves medical claims by response workers and certain Gulf Coast residents. The Economic and Property Damages Settlement includes a $2.3-billion BP commitment to help resolve economic loss claims related to the Gulf seafood industry and a $57-million fund to support continued advertising that promotes Gulf Coast tourism. It also resolves property damage in certain areas along the Gulf Coast, as well as claims for additional payments under certain Master Vessel Charter Agreements entered into in the course of the Vessels of Opportunity Program implemented as part of the response to the Incident. The Economic and Property Damages Settlement does not include claims made against BP by the DoJ or other federal agencies (including under the Clean Water Act and for Natural Resource Damages under the Oil Pollution Act) or by the states and local governments. Also excluded are certain other claims against BP, such as securities and shareholder claims pending in MDL 2185, and claims based solely on the deepwater drilling moratorium and/or the related permitting process.

The Medical Benefits Class Action Settlement involves payments to qualifying class members based on a matrix for certain Specified Physical Conditions, as well as a 21-year Periodic Medical Consultation Programme for qualifying class members. Although claims will not be paid until the agreement's Effective Date – *i.e.*, the final approval of the Medical Benefits Class Action Settlement and resolution of all appeals – class members are permitted to file claim forms in advance of the Effective Date to facilitate administration of the Medical Benefits Class Action Settlement upon the Effective Date. It also provides that class members claiming Later-Manifested Physical Conditions may pursue their claims through a mediation/litigation process, but waive, among other things, the right to seek punitive damages. Consistent with its commitment to the Gulf, BP has also agreed as part of the Medical Benefits Class Action Settlement to provide $105 million to the Gulf Region Health Outreach Program to improve the availability, scope and quality of healthcare in certain Gulf Coast communities. This healthcare outreach programme will be available to, and is intended to benefit, class members and other individuals in those communities.

Each agreement provides that class members will be compensated for their claims on a claims-made basis, according to agreed compensation protocols in separate court-supervised claims processes. The compensation protocols under the Economic and Property Damages Settlement provide for the payment of class members' economic losses and property damages. In addition many economic and property damages class members will receive payments based on negotiated risk transfer premiums (RTPs), which are multiplication factors designed, in part, to compensate claimants for potential future damages that are not currently known, relating to the Incident. The Economic and Property Damages Settlement and the Medical Benefits Class Action Settlement are not an admission of liability by BP. The settlements are uncapped except for economic loss claims related to the Gulf seafood industry under the Economic and Property Damages Settlement and the $105 million to be provided to the Gulf Region Health Outreach Program under the Medical Benefits Class Action Settlement.

As part of its monitoring of payments made by the court-supervised claims processes operated by the Deepwater Horizon Court Supervised Settlement Program (DHCSSP) for the Economic and Property Damages Settlement, BP identified multiple business economic loss claim determinations that appeared to result from an interpretation of the Economic and Property Damages Settlement Agreement by that settlement's claims administrator that BP believes was incorrect. This interpretation produced a higher number and value of awards than the interpretation BP assumed in making the initial estimate. Pursuant to the mechanisms in the Economic and Property Damages Settlement Agreement, the claims administrator sought clarification from the court on this matter and on 30 January 2013, the court initially upheld the claims administrator's interpretation of the agreement. On 6 February 2013, the court reconsidered and vacated its ruling of 30 January 2013 and stayed the processing of certain types of business economic loss claims. The court lifted the stay on 28 February 2013. Other business economic loss claims have continued to be paid at a higher average amount than previously assumed by BP in determining its initial estimate of the total cost. On 5 March 2013, the court affirmed the claims administrator's interpretation of the agreement and rejected BP's position as it relates to business economic loss claims. BP strongly disagrees with the ruling of 5 March 2013 and the current implementation of the agreement by the claims administrator. BP intends to pursue all available legal options, including rights of appeal, to challenge this ruling.

BP initially estimated the cost of the Settlements, including claims administration costs, to be approximately $7.8 billion (including the $2.3-billion commitment to help resolve economic loss claims related to the Gulf seafood industry). During the third quarter 2012, BP increased its estimate of the cost of claims administration by $280 million, and during the fourth quarter by a further $400 million as described in Financial statements – Note 36 on pages 236-239 herein. Subsequently, management has continued to analyse the business economic loss claims in the period since 5 February 2013 to gain a better understanding of whether or not the number and average value of claims received and processed to date are predictive of future claims (and so would allow management to estimate the total cost of the Settlements reliably). Management has concluded based upon this analysis that it is not possible to determine whether this claims experience to date is, or is not, an appropriate basis for determining the total cost. Therefore, given the inherent uncertainty that exists as BP pursues all available legal options to challenge the recent ruling and the higher number of claims received and higher average claims payments than previously assumed by BP which may or may not continue, management has concluded that no reliable estimate can be made of any business economic loss claims not yet received or processed by the DHCSSP.

BP's current estimate of the total cost of those elements of the Settlements that can be estimated reliably, which excludes any future business economic loss claims not yet received or processed by the DHCSSP, is $7.7 billion. If BP is successful in its challenge to the court's ruling, the total estimated cost of the Settlements will, nevertheless, be significantly higher than the current estimate of $7.7 billion, because business economic loss claims not yet received or processed are not reflected in the current estimate and the average payments per claim determined so far are higher than anticipated. If BP is not successful in its challenge to the court's ruling, a further significant increase to the total estimated cost of the Settlements will be required. However, there can be no certainty as to how the dispute will ultimately be resolved or determined. To the extent that there are insufficient funds available in the Trust fund, payments under the PSC settlement will be made by BP directly and charged to the income statement.

Significant uncertainties exist in relation to the amount of claims that are to be paid and will become payable through the claims process. There is significant uncertainty in relation to the amounts that ultimately will be paid in relation to current claims, and the number, type and amounts payable for claims not yet reported. In addition, there is further uncertainty in relation to interpretations of the claims administrator regarding the protocols under the Economic and Property Damages Settlement and judicial interpretation of these protocols, and the outcomes of any further litigation including in relation to potential opt-outs from the settlement or otherwise. While BP has determined its current best estimate of the cost of those aspects of the Settlements that can be measured reliably, it is possible that the actual cost could be significantly higher than this estimate due to the uncertainties noted above. In addition, a provision will be re-established for remaining business economic loss claims and the estimate will increase as more information becomes available, the interpretation of the protocols is clarified and the claims process matures, enabling BP to estimate reliably the cost of these claims. For more information, see Financial statements – Note 36 on pages 236-239 of this report.

All class member settlements under these agreements are payable under the terms of the Trust. Other costs to be paid from the Trust include State and Local government claims, state and local response costs, natural resource damages and related claims, and final judgments and settlements. The Trust may not be sufficient to satisfy all of these claims including those under the settlement agreements. Should the Trust not be sufficient, payments under the settlement agreements would be made by BP directly.

The Economic and Property Damages Settlement provides for a transition from the Gulf Coast Claims Facility (GCCF) to a new court-supervised claims programme, to administer payments made to qualifying class members. A court-supervised transitional claims process was in operation while the infrastructure for the new settlement claims process was put in place. During this transitional period (now concluded), the processing of claims that have been submitted to the GCCF continued, and new claimants submitted their claims. BP agreed not to wait for final approval of the Economic and Property Damages Settlement to pay claims. The economic and property damages claims process is under court supervision through the settlement claims process established by the Economic and Property Damages Settlement.

Under the Economic and Property Damages Settlement, class members release and dismiss their claims against BP not expressly reserved by that agreement. The Economic and Property Damages Settlement also provides that, to the extent permitted by law, BP assigns to the PSC certain of its claims, rights and recoveries against Transocean and Halliburton for damages with protections such that Transocean and Halliburton cannot pass those damages through to BP. Under the Medical Benefits Class Action Settlement, class members release and dismiss their claims against BP covered by that settlement, except that class members do not release claims for Later-Manifested Physical Conditions.

On 2 May 2012, the court overseeing the federal multi-district litigation proceedings pending in New Orleans (MDL 2179) issued orders preliminarily and conditionally certifying the Economic and Property Damages Settlement Class and the Medical Benefits Settlement Class and preliminarily approving the proposed Economic and Property Damages Settlement and the proposed Medical Benefits Class Action Settlement. Under US federal law, there is an established procedure for determining the fairness, reasonableness and adequacy of class action settlements. Pursuant to this procedure, an extensive notice programme to the public was implemented to explain the settlement agreements and class members' rights, including the right to "opt out" of the classes, and the processes for making claims. The court set a deadline of 31 August 2012 (later extended to 7 September 2012) for class members objecting to the Economic and Property Damages Settlement and/or the Medical Benefits Class Action Settlement to file their objections with the court and a deadline of 1 October 2012 (later extended to 1 November 2012) for class members to opt out of the Economic and Property Damages Class and/or the Medical Benefits Settlement Class. The Deepwater Horizon Court Supervised Settlement Program (DHCSSP), the new claims facility operating under the frameworks established by the Economic and

Property Damages Settlement, commenced operation on 4 June 2012 under the oversight of Claims Administrator Patrick Juneau. The court conducted a fairness hearing on 8 November 2012 in which to consider, among other things, whether to grant final approval of the Economic and Property Damages Settlement and the Medical Benefits Class Action Settlement, whether to certify the classes for settlement purposes only, and the merits of any objections to the settlement agreements. At the fairness hearing, the parties and objecting class members presented arguments for and against the approval of each settlement agreement and the certification of each settlement class. On 21 November 2012, the parties to the settlement filed a list of 13,123 individuals and entities who had submitted timely requests to opt out of the Economic and Property Damages Settlement Class and 1,638 individuals who had submitted timely requests to opt out of the Medical Benefits Settlement Class. On 16 November 2012, the court extended the deadline from 5 November 2012 to 15 December 2012 for such excluded persons or entities to request revocation of their requests to opt out of the settlement. As a result of such revocations, the number of opt-outs for the Economic and Property Damages Settlement and the Medical Benefits Class Action Settlement is fewer than those reported figures.

Following the fairness hearing, both settlements were approved by the district court. The Economic and Property Damages Settlement was approved on 21 December 2012 in a final order and judgment, and the Medical Benefits Class Action Settlement was approved by the district court in a final order and judgment on 11 January 2013. Since 17 January 2013, eight groups of purported members of the Economic and Property Damages Settlement Class have filed notices of appeal to the US Court of Appeals for the Fifth Circuit of the final order and judgment approving the Economic and Property Damages Settlement. Two groups of purported members of the Medical Benefits Settlement Class have also appealed from the final order and judgment approving the Medical Benefits Class Action Settlement. Additionally, a coalition of fishing and community groups has appealed from an order of the district court denying it permission to intervene in the civil action serving as the vehicle for the Economic and Property Damages Settlement and further denying it permission to take discovery regarding the fairness of that settlement.

On 18 January 2013, a purported class action was filed in federal district court in New Orleans seeking relief for all persons alleging losses caused by the Incident who are excluded from or have opted out of the Economic and Property Damages Settlement. On 8 February 2013, the action was consolidated with MDL 2179.

On 11 July 2012, BP filed motions to dismiss several categories of claims in MDL 2179 that were not covered by the Economic and Property Damages Settlement. On 1 October 2012, the court granted BP's motion, dismissing (1) claims alleging a reduction in the value of real property caused by the oil spill or other contaminant where the property was not physically touched by the oil and the property was not sold; (2) claims by or on behalf of entities marketing BP-branded fuels that they have suffered damages, including loss of business, income, and profits, as a result of the loss of value to the 'BP' brand or name; and (3) claims by or on behalf of recreational fishermen, recreational divers, beachgoers, recreational boaters, and similar claimants, that they have suffered damages that include loss of enjoyment of life from the inability to use of the Gulf of Mexico for recreation and amusement purposes. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of those categories of claims to those individual complaints. This order was appealed to the US Court of Appeals for the Fifth Circuit, but the appeal was dismissed for want of prosecution on 28 January 2013. On 19 February 2013, the appeals court granted appellants' motion to reinstate the appeal, and BP moved to dismiss the appeal for lack of jurisdiction.

On 15 September 2010, three Mexican states bordering the Gulf of Mexico (Veracruz, Quintana Roo, and Tamaulipas) filed lawsuits in federal court in Texas against several BP entities. These lawsuits allege that the Incident harmed their tourism, fishing, and commercial shipping industries (resulting in, among other things, diminished tax revenue), damaged natural resources and the environment, and caused the states to incur expenses in preparing a response to the Incident. On 9 December 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss the three Mexican states' complaints, dismissing their claims under OPA 90 and for nuisance and negligence per se, and preserving their claims for negligence and gross negligence only to the extent there has been a physical injury to a proprietary interest of the states. The court in MDL 2179 has also set a schedule for targeted discovery and motions on the legal issue of whether the Mexican States of Quintana Roo, Tamaulipas, and Veracruz have a justiciable claim. BP, other defendants, and the three Mexican States filed cross-motions for summary judgment on 4 January 2013 on the issue of whether the Mexican States have a proprietary interest in the matters asserted in their complaints, and the motions remain pending. On 5 April 2011, the State of Yucatan submitted a claim to the GCCF alleging potential damage to its natural resources and environment, and seeking to recover the cost of assessing the alleged damage. BP anticipates further claims from the Mexican federal government.

On 18 October 2012, before a Federal District Court located in Mexico City, a class action complaint was filed against BPXP, BP America Production Company, and other companies affiliated with BP. The plaintiffs, consisting of fishermen and other groups, are seeking, among other things, compensatory damages for the class members who allegedly suffered economic losses, as well as an order requiring BP to remediate environmental damage resulting from the Incident and to provide funding for the preservation of the environment and to conduct environmental impact studies in the Gulf of Mexico for the next 10 years. Plaintiffs have not yet properly served the BP entities named as Defendants.

Citizens groups have also filed either lawsuits or notices of intent to file lawsuits seeking civil penalties and injunctive relief under the Clean Water Act and other environmental statutes. On 16 June 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted BP's motion to dismiss a master complaint raising claims for injunctive relief under various federal environmental statutes brought by various citizens groups and others. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims for injunctive relief or otherwise apply his dismissal of the master complaint to those individual complaints. In addition, a different set of environmental groups filed a motion to reconsider dismissal of their Endangered Species Act claims on 14 July 2011. That motion remains pending. On 31 January 2012, the court, on motion by the Center for Biological Diversity, entered final judgment on the basis of the 16 June 2011 order with respect to two actions brought against BP by that plaintiff. On 2 February 2012, the Center for Biological Diversity filed a notice of appeal of both actions. Following oral argument, the Court of Appeals ruled in BP's favour on 9 January 2013 in virtually all respects, though it remanded the Center for Biological Diversity's claim under the Emergency Planning and Community Right to Know Act to the district court. On 22 January 2013, the Center for Biological Diversity filed a Petition for Panel Rehearing in the Court of Appeals, which was denied on 4 February 2013.

On 1 March 2012, the court in MDL 2179 issued a partial final judgment dismissing with prejudice all claims by BP, Anadarko and MOEX for additional insured coverage under insurance policies issued to Transocean for the sub-surface pollution liabilities BP, Anadarko and MOEX have incurred and will incur with respect to the Macondo well oil release. BP filed a notice of appeal from the court's judgment to the US Court of Appeals for the Fifth Circuit and oral argument was conducted on 3 December 2012. On 1 March 2013, the appeals court reversed the district court's judgment, rejecting the district court's ruling that the insurance that BP is entitled to receive as an additional insured under the Transocean insurance policies at issue is limited to the scope of the indemnity in the drilling contract between BP and Transocean.

In addition, BP is aware that actions have been or may be brought under the Qui Tam (whistle-blower) provisions of the False Claims Act (FCA). On 17 December 2012, the court ordered unsealed one complaint that had been filed in the US District Court for the Eastern District of Louisiana by one individual under the FCA's Qui Tam provisions. The complaint alleged that BP and another defendant had made false reports and certifications of the amount of oil released into the Gulf of Mexico following the Incident. On 17 December 2012, the DoJ filed with the court a notice that the DoJ elected to decline to intervene in the action.

On 21 April 2011, BP announced an agreement with natural resource trustees for the US and five Gulf Coast states, providing for up to $1 billion to be spent on early restoration projects to address natural resource injuries resulting from the Incident. Funding for these projects will come from the $20-billion Trust fund.

A claim was commenced against BP by a group of claimants on 26 July 2012 in Ecuador. The majority of the claimants represent local NGOs. The claim alleges that through the Incident and BP's response to it, BP violated the "rights of nature". The claim is not monetary but rather seeks injunctive relief. Two previous claims on identical grounds were previously dismissed at an early stage by the Ecuadorian courts. On 3 December 2012, the Ecuadorian court of first instance dismissed the claim. On 7 December 2012, the claimants filed a timely notice of appeal to the Ecuadorian court of second instance. On 28 February 2013, the court affirmed the dismissal by the lower court.

BP's potential liabilities resulting from threatened, pending and potential future claims, lawsuits and enforcement actions relating to the Incident, together with the potential cost of implementing remedies sought in the various proceedings, cannot be fully estimated at this time but they have had and are expected to have a material adverse impact on the group's business, competitive position, cash flows, prospects, liquidity, shareholder returns and/or implementation of its strategic agenda, particularly in the US. These potential liabilities may continue to have a material adverse effect on the group's results and financial condition. See Financial statements – Note 2 on page 194 for information regarding the financial impact of the Incident.

## Pending investigations and reports relating to the Deepwater Horizon oil spill

The US Chemical Safety and Hazard Investigation Board (CSB) is conducting an investigation of the Incident that is focused on the explosions and fire, and not the resulting oil spill or response efforts. As part of this effort, on 24 July 2012, the CSB conducted a hearing at which it released its preliminary findings on, among other things, the use of safety indicators by industry (including BP and Transocean) and government regulators in offshore operations prior to the accident. The CSB found that BP and other offshore industry members have placed too great an emphasis on personal safety rather than process safety overall. The CSB has indicated that it plans to issue its final report in April 2013. The CSB will seek to recommend improvements to BP and industry practices and to regulatory programmes to prevent recurrence and mitigate potential consequences.

A Committee of the National Academy of Engineering/National Research Council is looking at the methodologies available for assessing spill impacts on ecosystem services in the Gulf of Mexico, with a final report expected in the first or second quarter of 2013.

## Other legal proceedings

The US Federal Energy Regulatory Commission (FERC) and the US Commodity Futures Trading Commission (CFTC) are currently investigating several BP entities regarding trading in the next-day natural gas market at Houston Ship Channel during September, October and November 2008. The FERC Office of Enforcement staff notified BP on 12 November 2010 of their preliminary conclusions relating to alleged market manipulation in violation of 18 C.F.R. Sec. 1c.1. On 30 November 2010, CFTC Enforcement staff also provided BP with a notice of intent to recommend charges based on the same conduct alleging that BP engaged in attempted market manipulation in violation of Section 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act. On 23 December 2010, BP submitted responses to the FERC and CFTC November 2010 notices providing a detailed response that it did not engage in any inappropriate or unlawful activity. On 28 July 2011, the FERC staff issued a Notice of Alleged Violations stating that it had preliminarily determined that several BP entities fraudulently traded physical natural gas in the Houston Ship Channel and Katy markets and trading points to increase the value of their financial swing spread positions. Other investigations into BP's trading activities continue to be conducted from time to time.

On 23 March 2005, an explosion and fire occurred at the Texas City refinery. Fifteen workers died in the incident and many others were injured. BP Products has resolved all civil injury claims and all civil and criminal governmental claims arising from the March 2005 incident.

In March 2007, the US Chemical Safety and Hazard Investigation Board (CSB) issued a report on the incident. The report contained recommendations to the Texas City refinery and to the board of directors of BP. To date, CSB has accepted as satisfactorily addressed the majority of BP's responses to its recommendations. BP and the CSB are continuing to discuss the remaining open recommendations with the objective of the CSB agreeing to accept these as satisfactorily addressed as well.

On 29 October 2009, the US Occupational Safety and Health Administration (OSHA) issued citations to the Texas City refinery related to the Process Safety Management (PSM) Standard. On 12 July 2012, OSHA and BP resolved 409 of the 439 citations. The agreement required that BP pay a civil penalty of $13,027,000 and that BP abate the alleged violations by 31 December 2012. BP completed these requirements and the agreement has terminated. The settlement excluded 30 citations for which BP and OSHA could not reach agreement. However, the parties agreed that BP's penalty liability will not exceed $1 million if those citations are resolved through litigation. Additional efforts will be made in the future to resolve these citations.

On 8 March 2010, OSHA issued 65 citations to BP Products and BP-Husky for alleged violations of the PSM Standard at the Toledo refinery, with penalties of approximately $3 million. These citations resulted from an inspection conducted pursuant to OSHA's Petroleum Refinery Process Safety Management National Emphasis Program. Both BP Products and BP-Husky contested the citations, and a trial of 42 citations was completed in June 2012 before an Administrative Law Judge from the OSH Review Commission. A decision is expected in mid-2013.

A flaring event occurred at the Texas City refinery in April and May 2010. This flaring event is the subject of civil lawsuit claims for personal injury and, in some cases, property damage by roughly 50,000 individuals. These lawsuit claims have been consolidated in a Texas multi-district litigation proceeding in Galveston, Texas. A trial of six selected plaintiffs is scheduled for trial in September 2013. Also, this flaring event, and other refinery emissions from December 2008 through 2010, is the subject of a purported class action, on behalf of some local residential property owners, filed in US federal district court in Galveston. The purported class plaintiffs claim that refinery emissions caused their residential properties to lose value. No class has been certified, and no trial date has been set. In addition, the flares involved in this event are the subject of a federal government enforcement action.

In March and August 2006, oil leaked from oil transit pipelines operated by BP Exploration (Alaska) Inc. (BPXA) at the Prudhoe Bay unit on the North Slope of Alaska. On 12 May 2008, a BP p.l.c. shareholder filed a consolidated complaint alleging violations of federal securities law on behalf of a putative class of BP p.l.c. shareholders against BP p.l.c., BPXA, BP America, and four officers of the companies, based on alleged misrepresentations concerning the integrity of the Prudhoe Bay pipeline before its shutdown on 6 August 2006. On 8 February 2010, the Ninth Circuit Court of Appeals accepted BP's appeal from a decision of the lower court granting in part and denying in part BP's motion to dismiss the lawsuit. On 29 June 2011, the Ninth Circuit ruled in BP's favour that the filing of a trust-related agreement with the SEC containing contractual obligations on the part of BP was not a misrepresentation which violated federal securities laws. The BP p.l.c. shareholder filed an amended complaint, in response to which BP filed a new motion to dismiss, which was granted on 14 March 2012. The plaintiff has appealed the court's dismissal of the case, and the appeal is pending. On 31 March 2009, the State of Alaska filed a complaint seeking civil penalties and damages relating to these events. The complaint alleges that the two releases and BPXA's corrosion management practices violated various statutory, contractual and common law duties to the State, resulting in penalty liability, damages for lost royalties and taxes, and liability for punitive damages. In December 2011, the State of Alaska and BPXA entered into a Dispute Resolution Agreement concerning this matter that resulted in arbitration of the amount of the State's lost royalty income and payment by BPXA of the additional amount of $10 million on account of other

Additional disclosures

claims in the complaint. Evidentiary hearings in the arbitration occurred in May and June 2012, and an award was issued by the arbitration panel in November 2012 in the approximate amount of $245 million. BPXA's working interest share of that award is approximately $66 million. All amounts due to the State of Alaska in this matter were paid in November 2012.

Approximately 200 lawsuits were filed in state and federal courts in Alaska seeking compensatory and punitive damages arising out of the Exxon Valdez oil spill in Prince William Sound in March 1989. Most of those suits named Exxon (now ExxonMobil), Alyeska Pipeline Service Company (Alyeska), which operates the oil terminal at Valdez, and the other oil companies that own Alyeska. Alyeska initially responded to the spill until the response was taken over by Exxon. BP owns a 46.9% interest (reduced during 2001 from 50% by a sale of 3.1% to Phillips) in Alyeska through a subsidiary of BP America Inc. and briefly indirectly owned a further 20% interest in Alyeska following BP's combination with Atlantic Richfield. Alyeska and its owners have settled all the claims against them under these lawsuits. Exxon has indicated that it may file a claim for contribution against Alyeska for a portion of the costs and damages that it has incurred. If any claims are asserted by Exxon that affect Alyeska and its owners, BP will defend the claims vigorously.

Since 1987, Atlantic Richfield Company (Atlantic Richfield), a subsidiary of BP, has been named as a co-defendant in numerous lawsuits brought in the US alleging injury to persons and property caused by lead pigment in paint. The majority of the lawsuits have been abandoned or dismissed against Atlantic Richfield. Atlantic Richfield is named in these lawsuits as alleged successor to International Smelting and Refining and another company that manufactured lead pigment during the period 1920-1946. Plaintiffs include individuals and governmental entities. Several of the lawsuits purport to be class actions. The lawsuits seek various remedies including compensation to lead-poisoned children, cost to find and remove lead paint from buildings, medical monitoring and screening programmes, public warning and education of lead hazards, reimbursement of government healthcare costs and special education for lead-poisoned citizens and punitive damages. No lawsuit against Atlantic Richfield has been settled nor has Atlantic Richfield been subject to a final adverse judgment in any proceeding. The amounts claimed and, if such suits were successful, the costs of implementing the remedies sought in the various cases could be substantial. While it is not possible to predict the outcome of these legal actions, Atlantic Richfield believes that it has valid defences. It intends to defend such actions vigorously and believes that the incurrence of liability is remote. Consequently, BP believes that the impact of these lawsuits on the group's results, financial position or liquidity will not be material.

In April 2009, Kenneth Abbott, as relator, filed a US False Claims Act lawsuit against BP, alleging that BP violated federal regulations, and made false statements in connection with its compliance with those regulations, by failing to have necessary documentation for the Atlantis subsea and other systems. BP is the operator and 56% interest owner of the Atlantis unit in production in the Gulf of Mexico. That complaint was unsealed in May 2010 and served on BP in June 2010. Abbott seeks damages measured by the value, net of royalties, of all past and future production from the Atlantis platform, trebled, plus penalties. In September 2010, Kenneth Abbott and Food & Water Watch filed an amended complaint in the False Claims Act lawsuit seeking an injunction shutting down the Atlantis platform. The court denied BP's motion to dismiss the complaint in March 2011. Separately, also in March 2011, BOEMRE issued its investigation report of the Abbott Atlantis allegations, which concluded that Kenneth Abbott's allegations that Atlantis operations personnel lacked access to critical, engineer-approved drawings were without merit and that his allegations about false submissions by BP to BOEMRE were unfounded. Trial was scheduled to begin on 10 April 2012, but the trial date was vacated and not rescheduled pending consideration of the parties' summary judgment motions.

Various non-governmental organizations ("NGOs") and the EPA challenged certain aspects of the air permits issued by the Indiana Department of Environmental Management (IDEM) related to the Whiting refinery modernization project. BP has been in discussions with the EPA, the IDEM and certain environmental groups over these and other Clean Air Act (CAA) issues relating to the Whiting refinery. BP has also been in discussions with the EPA regarding alleged CAA violations at the Toledo, Carson and Cherry Point refineries.

On 23 May 2012, BP Products North America, Inc., the EPA, the Department of Justice (DoJ), the IDEM and the NGOs resolved objections to the air permit for the Whiting refinery modernization project and settled allegations of air emissions violations at the Whiting refinery. The settlement requires emission reduction projects with an estimated cost of approximately $400 million and the payment of a civil penalty of $8 million. The settlement was approved by the federal court on 8 November 2012. On 20 December 2012 IDEM issued the final, revised air permit for the modernization project that incorporates the relevant consent decree provisions.

An application was brought in the English High Court on 1 February 2011 by Alfa Petroleum Holdings Limited and OGIP Ventures Limited against BP International Limited and BP Russian Investments Limited alleging breach of a Shareholders Agreement on the part of BP and seeking an interim injunction restraining BP from taking steps to conclude, implement or perform the transactions with Rosneft Oil Company, originally announced on 14 January 2011, relating to oil and gas exploration, production, refining and marketing in Russia (the Arctic Opportunity). Those transactions included the issue or transfer of shares between Rosneft Oil Company and any BP group company (pursuant to the Rosneft Share Swap Agreement). The court granted an interim order restraining BP from taking any further steps in relation to the Arctic Opportunity pending an expedited UNCITRAL arbitration procedure in accordance with the Shareholders Agreement between the parties. The arbitration commenced and the interim injunction was continued by the arbitration panel. On 17 May 2011, BP announced that both the Rosneft Share Swap Agreement and the Arctic Opportunity, originally announced on 14 January 2011, had terminated. This termination was as a result of the deadline for the satisfaction of conditions precedent having expired following delays resulting from the interim orders referred to above. These interim orders did not address the question of whether or not BP breached the Shareholders Agreement. The arbitration proceedings, which addressed the allegation of breach by BP for late notification to TNK-BP shareholders Alfa, Access and Renova (AAR) of the Arctic Opportunity, was settled on 13 November 2012 as part of a settlement of all the outstanding disputes between BP and AAR.

Five minority shareholders of OAO TNK-BP Holding (TBH) filed two civil actions in Tyumen, Siberia, against BP Russian Investments Limited (BPRIL) and BP p.l.c. and against two of the BP nominated directors of TBH. These two actions sought to recover alleged losses to TBH of $13 billion and $2.7 billion respectively arising from the failure to involve TNK-BP in BP's proposed alliance with Rosneft. On 11 November 2011, the Tyumen Court dismissed both claims fully on their merits. The plaintiffs appealed both of these decisions to the Omsk Appellate court. On 26 January 2012, the Appellate court upheld the Tyumen Court's dismissal of the claim in relation to the BP nominated directors of TBH. The Omsk Appellate court subsequently upheld the Tyumen court of first instance's dismissal of the minority suits against BPRIL and BP p.l.c. The plaintiffs then appealed both of the Omsk Appellate court decisions to the cassation court of appeal in Tyumen. The cassation court upheld the dismissal of the claim against the BP nominated directors, and the case against the BP nominated directors is now resolved. However, the cassation court remitted the case against the BP companies back to the Tyumen Court of first instance for reconsideration. The plaintiffs amended their claim to reduce their damages to approximately $8.6 billion. On 27 July 2012 the Tyumen Court ruled in favour of the plaintiffs and awarded $3.0 billion in damages against the BP companies. BPRIL filed an appeal of the Tyumen Court's decision with the Omsk Appellate court. In addition, Rosneft and BP-nominated directors of TNK-BP Ltd. filed statements in support of the contention that the award is unjustified, and the plaintiffs' claims wholly without merit. On 25 October 2012 the Omsk Appellate court adjourned its hearing of the appeal until 9 November 2012 and subsequently until 14 December 2012. At that hearing the minority shareholder petitioned the court to withdraw the lawsuit. The court adjourned that hearing until 24 January 2013 upon the motion of Rosneft. At the hearing on 24 January 2013 the court acceded to the motion of the minority shareholder to withdraw the claim and ruled that the claim should be withdrawn. Rosneft has appealed this ruling to the Tyumen Court of Cassation on the basis that the claim should be dismissed on the merits.