# Exhibit 2

**TO UNITED STATES' REPLY TO BPXP'S OPPOSITION TO MOTION IN LIMINE TO PERMIT RELEVANT EVIDENCE CONCERNING BP P.L.C. AND ITS AFFILIATES**

Annual Report
and Form 20-F
2011

bp.com/annualreport





Building a stronger, safer BP

Additional information for shareholders

## Legal proceedings

### Proceedings relating to the Deepwater Horizon oil spill

BP p.l.c., BP Exploration & Production Inc. (BP E&P) and various other BP entities (collectively referred to as BP) are among the companies named as defendants in approximately 600 private civil lawsuits resulting from the 20 April 2010 explosions and fire on the semi-submersible rig Deepwater Horizon and resulting oil spill (the Incident) and further actions are likely to be brought. BP E&P is lease operator of Mississippi Canyon, Block 252 in the Gulf of Mexico (Macondo), where the Deepwater Horizon was deployed at the time of the Incident. The other working interest owners at the time of the Incident were Anadarko Petroleum Company (Anadarko) and MOEX Offshore 2007 LLC (MOEX). The Deepwater Horizon, which was owned and operated by certain affiliates of Transocean Ltd. (Transocean), sank on 22 April 2010. The pending lawsuits and/or claims arising from the Incident have been brought in US federal and state courts. Plaintiffs include individuals, corporations, insurers, and governmental entities and many of the lawsuits purport to be class actions. The lawsuits assert, among others, claims for personal injury in connection with the Incident itself and the response to it, wrongful death, commercial and economic injury, breach of contract and violations of statutes. The lawsuits seek various remedies including compensation to injured workers and families of deceased workers, recovery for commercial losses and property damage, claims for environmental damage, remediation costs, claims for unpaid wages, injunctive and declaratory relief, treble damages and punitive damages. Purported classes of claimants include residents of the states of Louisiana, Mississippi, Alabama, Florida, Texas, Tennessee, Kentucky, Georgia and South Carolina, property owners and rental agents, fishermen and persons dependent on the fishing industry, charter boat owners and deck hands, marine owners, gasoline distributors, shipping interests, restaurant and hotel owners, cruise lines and others who are property and/or business owners alleged to have suffered economic loss. Among other claims arising from the oil response efforts, lawsuits have been filed claiming that additional payments are due by BP under certain Master Vessel Charter Agreements entered into in the course of the Vessels of Opportunity Program implemented as part of the response to the Incident.

Shareholder derivative lawsuits related to the Incident have also been filed in US federal and state courts against various current and former officers and directors of BP alleging, among other things, breach of fiduciary duty, gross mismanagement, abuse of control and waste of corporate assets. On 15 September 2011, the judge in the federal multi-district litigation proceeding in Houston granted BP's motion to dismiss the consolidated shareholder derivative litigation pending there on the grounds that the courts of England are the appropriate forum for the litigation. On 8 December 2011, a final judgment was entered dismissing the shareholder derivative case, and on 3 January 2012, one of the derivative plaintiffs filed a notice of appeal to the US Court of Appeals for the Fifth Circuit.

On 13 February 2012, the judge in the federal multi-district litigation proceeding in Houston issued two decisions on the defendants' motions to dismiss the two consolidated securities fraud complaints filed on behalf of purported classes of BP ordinary shareholders and ADS holders. In those decisions the court dismissed all of the claims of the ordinary shareholders, dismissed the claims of the lead class of ADS holders against most of the individual defendants while holding that a subset of the claims against two individual defendants and the corporate defendants could proceed, and dismissed all of the claims of a smaller purported subclass with leave to re-plead in 20 days.

Purported class action lawsuits have been filed in US federal courts against BP entities and various current and former officers and directors alleging, among other things, securities fraud claims, violations of the Employee Retirement Income Security Act (ERISA) and contractual and quasi-contractual claims related to the cancellation of the dividend on 16 June 2010. In addition, BP has been named in several lawsuits alleging claims under the Racketeer-Influenced and Corrupt Organizations Act (RICO). In August 2010, many of the lawsuits pending in federal court were consolidated by the Federal Judicial Panel on Multidistrict Litigation into two multi-district litigation proceedings, one in federal court in Houston for the securities, derivative, ERISA and dividend cases and another in federal court in New Orleans for the remaining cases.

On 1 June 2010, the US Department of Justice (DoJ) announced that it is conducting an investigation into the Incident encompassing possible violations of US civil or criminal laws. The types of enforcement action that might be pursued and the nature of the remedies that might be sought will depend on the judgement and discretion of the prosecutors and regulatory authorities and their assessment as to whether BP has violated any applicable laws and its culpability following their investigations. Such enforcement actions could include criminal proceedings against BP and/or employees of the group. Prosecutors have broad discretion in identifying what, if any, charges to pursue, but such charges could include, among others, criminal environmental, criminal securities, manslaughter and obstruction-related offences. The United States filed a civil complaint in the multi-district litigation proceeding in New Orleans against BP E&P and others on 15 December 2010 (DoJ Action). The complaint seeks a declaration of liability under the Oil Pollution Act of 1990 (OPA 90) and civil penalties under the Clean Water Act and sets forth a purported reservation of rights on behalf of the US to amend the complaint or file additional complaints seeking various remedies under various US federal laws and statutes. On 8 December 2011, the US brought a motion for partial summary judgment seeking, among other things, an order finding that BP, Transocean, and Anadarko are strictly liable for a civil penalty under Section 311(b)(7)(A) of the Clean Water Act. This motion remains pending.

On 18 February 2011, Transocean filed a third-party complaint against BP, the US government, and other corporations involved in the Incident, naming those entities as formal parties in its Limitation of Liability action pending in federal court in New Orleans.

On 4 April 2011, BP initiated contractual out-of-court dispute resolution proceedings against Anadarko and MOEX, claiming that they have breached the parties' contract by failing to reimburse BP for their working-interest share of Incident-related costs. On 19 April 2011, Anadarko filed a cross-claim against BP, alleging gross negligence and 15 other counts under state and federal laws. Anadarko sought a declaration that it was excused from its contractual obligation to pay Incident-related costs. Anadarko also sought damages from alleged economic losses and contribution or indemnity for claims filed against it by other parties. On 20 May 2011, BP and MOEX announced a settlement agreement of all claims between them, including a cross-claim brought by MOEX on 19 April 2011 similar to the Anadarko claim. Under the settlement agreement, MOEX has paid BP $1.065 billion, which BP has applied towards the $20-billion Trust and has also agreed to transfer all of its 10% interest in the MC252 lease to BP. On 17 October 2011, BP and Anadarko announced that they had reached a final agreement to settle all claims between the companies related to the Incident, including mutual releases of all claims between BP and Anadarko that are subject to the contractual out-of-court dispute resolution proceedings or the federal multi-district litigation proceeding in New Orleans. Under the settlement agreement, Anadarko has paid BP $4 billion, which BP has applied towards the $20-billion Trust, and has also agreed to transfer all of its 25% interest in the MC252 lease to BP. The settlement agreement also grants Anadarko the opportunity for a 12.5% participation in certain future recoveries from third parties and certain insurance proceeds in the event that such recoveries and proceeds exceed $1.5 billion in aggregate. Any such payments to Anadarko are capped at a total of $1 billion. BP has agreed to indemnify Anadarko and MOEX for certain claims arising from the Incident (excluding civil, criminal or administrative fines and penalties, claims for punitive damages, and certain other claims). The settlement agreements with Anadarko and MOEX are not an admission of liability by any party regarding the Incident.

On 20 April 2011, Transocean filed claims in its Limitation of Liability action alleging that BP had breached BP America Production Company's contract with Transocean Holdings LLC by BP not agreeing to indemnify Transocean against liability related to the Incident and by not paying certain invoices. Transocean also asserted claims against BP under state law, maritime law, and OPA 90 for contribution. On 1 November 2011, Transocean filed a motion for partial summary judgment on certain claims filed in the Limitation Action and the DoJ Action between BP and Transocean. Transocean's motion sought an order which would bar BP's

contribution claims against Transocean and require BP to defend and indemnify Transocean against all pollution claims, including those resulting from any gross negligence, and from civil fines and penalties sought by the government. On 7 December 2011, BP filed a cross-motion for summary judgment seeking an order that BP is not required to indemnify Transocean for any civil fines and penalties sought by the government or for punitive damages.

On 26 January 2012, the judge ruled on BP's and Transocean's indemnity motions, holding that BP is required to indemnify Transocean for third-party claims for compensatory damages resulting from pollution originating beneath the surface of the water, regardless of whether the claim results from Transocean's strict liability, negligence, or gross negligence. The court, however, ruled that BP does not owe Transocean indemnity for such claims to the extent Transocean is held liable for punitive damages or for civil penalties under the Clean Water Act, or if Transocean acted with intentional or wilful misconduct in excess of gross negligence. The court further held that BP's obligation to defend Transocean for third-party claims does not require BP to fund Transocean's defence of third-party claims at this time, nor does it include Transocean's expenses in proving its right to indemnity. The court deferred a final ruling on the question of whether Transocean breached its drilling contract with BP so as to invalidate the contract's indemnity clause.

On 22 February 2012, the judge ruled on motions filed in the DoJ Action by the US, Anadarko, and Transocean seeking early rulings regarding the liability of BP, Anadarko, and Transocean under OPA 90 and the Clean Water Act, but limited the order to addressing the discharge of hydrocarbons occurring under the surface of the water. Regarding OPA 90, the judge held that BP and Anadarko are responsible parties under OPA 90 with regard to the subsurface discharge. The judge ruled that BP and Anadarko have joint and several liability under OPA 90 for removal costs and damages for such discharge, but did not rule on whether such liability under OPA 90 is unlimited. While the judge held that Transocean is not a responsible party under OPA 90 for subsurface discharge, the judge left open the question of whether Transocean may be liable under OPA 90 for removal costs for such discharge as the owner/operator of the Deepwater Horizon. Regarding the Clean Water Act, the judge held that the subsurface discharge was from the Macondo well, rather than from the Deepwater Horizon, and that BP and Anadarko are liable for civil penalties under Section 311 of the Clean Water Act as owners of the well. The judge left open the question of whether Transocean may be liable under the Clean Water Act as an operator of the Macondo well.

On 20 April 2011, Halliburton Energy Services, Inc. (Halliburton), filed claims in Transocean's Limitation of Liability action seeking indemnification from BP for claims brought against Halliburton in that action, and Cameron International Corporation (Cameron) asserted claims against BP for contribution under state law, maritime law, and OPA 90, as well as for contribution on the basis of comparative fault. Halliburton also asserted a claim for negligence, gross negligence and wilful misconduct against BP and others. On 19 April 2011, Halliburton filed a separate lawsuit in Texas state court seeking indemnification from BP E&P for certain tort and pollution-related liabilities resulting from the Incident. On 3 May 2011, BP E&P removed Halliburton's case to federal court, and on 9 August 2011, the action was transferred to the federal multi-district litigation proceedings pending in New Orleans.

Subsequently, on 30 November 2011, Halliburton filed a motion for summary judgment in the federal multi-district litigation proceedings pending in New Orleans. Halliburton's motion seeks an order stating that Halliburton is entitled to full and complete indemnity, including payment of defence costs, from BP for claims related to the Incident and denying BP's claims seeking contribution against Halliburton. On 21 December 2011, BP filed a cross-motion for partial summary judgment seeking an order that BP has no contractual obligation to indemnify Halliburton for fines, penalties, or punitive damages resulting from the Incident.

On 31 January 2012, the judge ruled on BP's and Halliburton's indemnity motions, holding that BP is required to indemnify Halliburton for third-party claims for compensatory damages resulting from pollution that did not originate from property or equipment of Halliburton located above the surface of the land or water, regardless of whether the claims result from Halliburton's gross negligence. The court, however, ruled that BP does not owe Halliburton indemnity to the extent that Halliburton is held liable for punitive damages or for civil penalties under the Clean Water Act. The court further held that BP's obligation to defend Halliburton for third-party claims does not require BP to fund Halliburton's defence of third-party claims at this time, nor does it include Halliburton's expenses in proving its right to indemnity. The court deferred ruling on whether BP is required to indemnify Halliburton for any penalties or fines under the Outer Continental Shelf Lands Act. It also deferred ruling on whether Halliburton acted so as to invalidate the indemnity by breaching its contract with BP, by committing fraud, or by committing another act that materially increased the risk to BP or prejudiced the rights of BP as an indemnitor.

On 1 September 2011, Halliburton filed an additional lawsuit against BP in Texas state court. Its complaint alleges that BP did not identify the existence of a purported hydrocarbon zone at the Macondo well to Halliburton in connection with Halliburton's cement work performed before the Incident and that BP has concealed the existence of this purported hydrocarbon zone following the Incident. Halliburton claims that the alleged failure to identify this information has harmed its business ventures and reputation and resulted in lost profits and other damages. On 16 September 2011, BP removed the action to federal court, where it was stayed pending a decision by the Judicial Panel on Multidistrict Litigation on transfer of the action to the multi-district litigation proceeding in New Orleans. On 1 September 2011, Halliburton also moved to amend its claims in Transocean's Limitation of Liability action to add claims for fraud based on similar factual allegations to those included in its 1 September 2011 lawsuit against BP in Texas state court. On 11 October 2011, the magistrate judge in the federal multi-district litigation proceeding in New Orleans denied Halliburton's motion to amend its claims, and Halliburton's motion to review the order was denied by the judge on 19 December 2011.

On 20 April 2011, BP asserted claims against Cameron, Halliburton, and Transocean in the Limitation of Liability action. BP's claims against Transocean include breach of contract, unseaworthiness of the Deepwater Horizon vessel, negligence (or gross negligence and/or gross fault as may be established at trial based upon the evidence), contribution and subrogation for costs (including those arising from litigation claims) resulting from the Incident, as well as a declaratory claim that Transocean is wholly or partly at fault for the Incident and responsible for its proportionate share of the costs and damages. BP asserted claims against Halliburton for fraud and fraudulent concealment based on Halliburton's misrepresentations to BP concerning, among other things, the stability testing on the foamed cement used at the Macondo well; for negligence (or, if established by the evidence at trial, gross negligence) based on Halliburton's performance of its professional services, including cementing and mud logging services; and for contribution and subrogation for amounts that BP has paid in responding to the Incident, as well as in OPA assessments and in payments to plaintiffs. BP filed a similar complaint in federal court in the Southern District of Texas, Houston Division, against Halliburton, and the action was transferred on 4 May 2011 to the federal multi-district litigation proceeding pending in New Orleans.

On 20 April 2011, BP filed claims against Cameron, Halliburton, and Transocean in the DoJ Action, seeking contribution for any assessments against BP under OPA 90 based on those entities' fault. On 20 June 2011, Cameron and Halliburton moved to dismiss BP's claims against them in the DoJ Action. BP's claim against Cameron has been resolved pursuant to settlement, but Halliburton's motion remains pending.

On 16 December 2011, BP and Cameron announced their agreement to settle all claims between the companies related to the Incident, including mutual releases of claims between BP and Cameron that are subject to the federal multi-district litigation proceeding in New Orleans. Under the settlement agreement, Cameron has paid BP $250 million in cash in January 2012, which BP has applied towards the $20-billion Trust. BP has agreed to indemnify Cameron for compensatory claims arising from the Incident, including claims brought relating to pollution damage or any damage to natural resources, but excluding civil, criminal or administrative fines and penalties, claims for punitive damages, and certain other claims.

On 20 May 2011, Dril-Quip, Inc. and M-I L.L.C. (M-I) filed claims against BP in Transocean's Limitation of Liability action, each claiming a right to contribution from BP for damages assessed against them as a result of the Incident, based on allegations of negligence. M-I also

Additional information for shareholders

claimed a right to indemnity for such damages based on its well services contracts with BP. On 20 June 2011, BP filed counter-complaints against those entities' fault in connection with the Incident and under OPA 90, and seeking declaratory judgment that Dril-Quip, Inc. and M-I caused or contributed to, and are responsible in whole or in part for damages incurred by BP in relation to, the Incident. On 20 January 2012, the court granted Dril-Quip, Inc.'s motion for summary judgment, dismissing with prejudice all claims asserted against Dril-Quip in the federal multi-district litigation proceeding in New Orleans.

On 21 January 2012, BP and M-I entered into an agreement settling all claims between the companies related to the Incident, including mutual releases of claims between BP and M-I that are subject to the federal multi-district litigation proceeding in New Orleans. Under the settlement agreement, M-I has agreed to indemnify BP for personal injury and death claims brought by M-I employees. BP has agreed to indemnify M-I for claims resulting from the Incident, but excluding certain claims.

On 30 May 2011, Transocean filed claims against BP in the DoJ Action alleging that BP America Production Company had breached its contract with Transocean Holdings LLC by not agreeing to indemnify Transocean against liability related to the Incident. Transocean also asserted claims against BP under state law, maritime law, and OPA 90 for contribution. On 20 June 2011, Cameron filed similar claims against BP in the DoJ Action.

On 26 August 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss a master complaint raising claims for economic loss by private plaintiffs, dismissing plaintiffs' state law claims and limiting the types of maritime law claims plaintiffs may pursue, but also held that certain classes of claimants may seek punitive damages under general maritime law. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of the master complaint to those individual complaints.

On 14 September 2011, the BOEMRE issued its report (BOEMRE Report) regarding the causes of the 20 April 2010 Macondo well blowout. The BOEMRE Report states that decisions by BP, Halliburton and Transocean increased the risk or failed to fully consider or mitigate the risk of a blowout on 20 April 2010. The BOEMRE Report also states that BP, and Transocean and Halliburton, violated certain regulations related to offshore drilling. In itself, the BOEMRE Report does not constitute the initiation of enforcement proceedings relating to any violation. On 12 October 2011, the U.S. Department of the Interior Bureau of Safety and Environmental Enforcement issued to BP E&P, Transocean, and Halliburton Notification of Incidents of Noncompliance (INCs). The notification issued to BP E&P is for a number of alleged regulatory violations concerning Macondo well operations. The Department of Interior has indicated that this list of violations may be supplemented as additional evidence is reviewed, and on 7 December 2011, the Bureau of Safety and Environmental Enforcement issued to BP E&P a second INC. This notification was issued to BP for five alleged violations related to drilling and abandonment operations at the Macondo well. BP has filed an administrative appeal with respect to the first and second INCs. BP has also filed a joint stay of proceedings with the Department of Interior with respect to the 12 October 2011 INCs and plans to file a joint stay regarding the 7 December 2011 INCs.

On 30 September 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss a master complaint asserting personal injury claims on behalf of persons exposed to crude oil or chemical dispersants, dismissing plaintiffs' state law claims, claims by seamen for punitive damages, claims for medical monitoring damages by asymptomatic plaintiffs, claims for battery and nuisance under maritime law, and claims alleging negligence per se. As with his other rulings on motions to dismiss master complaints, the judge did not lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of the master complaint to those individual complaints.

A Trial of Liability, Limitation, Exoneration, and Fault Allocation was originally scheduled to begin in the federal multi-district litigation proceeding in New Orleans in February 2012. The court's pre-trial order issued 14 September 2011 provided for the trial to proceed in three phases

and to include issues asserted in or relevant to the claims, counterclaims, cross-claims, third-party claims, and comparative fault defenses raised in Transocean's Limitation of Liability Action.

On 18 October 2011, Cameron filed a petition for writ of mandamus with US Court of Appeals for the Fifth Circuit seeking an order vacating the trial plan for the 27 February 2012 trial and requiring that all claims against Cameron in that proceeding be tried before a jury. On 26 December 2011, the Court of Appeals denied the application for mandamus.

The State of Alabama has filed a lawsuit seeking damages for alleged economic and environmental harms, including natural resource damages, civil penalties under state law, declaratory and injunctive relief, and punitive damages as a result of the Incident. The State of Louisiana has filed a lawsuit to declare various BP entities (as well as other entities) liable for removal costs and damages, including natural resource damages under federal and state law, to recover civil penalties, attorney's fees, and response costs under state law, and to recover for alleged negligence, nuisance, trespass, fraudulent concealment and negligent misrepresentation of material facts regarding safety procedures and BP's land or other defendants' ability to manage the oil spill, unjust enrichment from economic and other damages to the State of Louisiana and its citizens, and punitive damages. The Louisiana Department of Environmental Quality has issued an administrative order seeking environmental civil penalties and other relief under state law. On 23 September 2011, BP removed this matter to federal district court. Several local governments in the State of Louisiana have filed suits under state wildlife statutes seeking penalties for damage to wildlife as a result of the spill. On 10 December 2010, the Mississippi Department of Environmental Quality issued a Complaint and Notice of Violation alleging violations of several state environmental statutes.

On 14 November 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss the complaints filed by the States of Alabama and Louisiana. The judge's order dismissed the States' claims brought under state law, including claims for civil penalties and the State of Louisiana's request for a declaratory judgment under the Louisiana Oil Spill Prevention and Response Act, holding that those claims were pre-empted by federal law. It also dismissed the State of Louisiana's claims of nuisance and trespass under general maritime law. The judge's order further held that the States have stated claims for negligence and products liability under general maritime law, that the States have sufficiently alleged presentment of their claims under OPA 90, and that the States may seek punitive damages under general maritime law. On 9 December 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss a master complaint brought on behalf of local government entities. The judge's order dismissed plaintiffs' state law claims and limited the types of maritime law claims plaintiffs may pursue, but also held that the plaintiffs have sufficiently alleged presentment of their claims under OPA 90 and that certain local government entity claimants may seek punitive damages under general maritime law. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims or otherwise apply his dismissal of the master complaint to those individual complaints.

On 9 December 2011 and 28 December 2011, the judge in the federal multi-district litigation proceeding in New Orleans also granted BP's motions to dismiss complaints filed by the District Attorneys of 11 parishes in the State of Louisiana seeking penalties for damage to wildlife, holding that those claims are pre-empted by the Clean Water Act. Many of the parishes have filed notices of appeal to the U.S. Court of Appeals for the Fifth Circuit.

On 3 March 2012, BP announced a settlement with the Plaintiffs' Steering Committee (PSC) in the federal Multi-District Litigation proceedings pending in New Orleans (MDL 2179) to resolve the substantial majority of legitimate private economic loss and medical claims stemming from the Incident. The agreement in principle is subject to final written agreement and court approvals.

The proposed settlement is comprised of two separate agreements. The first of these resolves economic loss claims and the other resolves medical claims. The proposed agreement to resolve economic loss claims includes a $2.3 billion BP commitment to help resolve economic loss claims related to the Gulf seafood industry and a

fund to support continued advertising that promotes Gulf Coast tourism. It also resolves claims for additional payments under certain Master Vessel Charter Agreements entered into in the course of the Vessels of Opportunity Program implemented as part of the response to the Incident.

The proposed agreement to resolve medical claims involves payments based on a matrix for certain currently manifested physical conditions, as well as a 21-year medical consultation programme for qualifying class members. It also provides that class members claiming later-manifested physical conditions may pursue their claims through a mediation/litigation process. Consistent with its commitment to the Gulf, BP has also agreed to provide $105 million to improve the availability, scope and quality of healthcare in Gulf communities. This healthcare outreach programme would be available to all individuals in those communities, regardless of whether they are class members.

Each proposed agreement provides that class members would be compensated for their claims on a claims-made basis, according to agreed compensation protocols in separate court-supervised claims processes. The compensation protocols under the proposed economic loss settlement agreement include a risk transfer premium (RTP). The RTP is an agreed factor to be used in calculating certain types of damages, including potential future damages that are not currently known, relating to the Incident.

BP estimates the cost of the proposed settlement would be approximately $7.8 billion (including the $2.3 billion commitment to help resolve economic loss claims related to the Gulf seafood industry). While this is BP's reliable best estimate of the cost of the proposed settlement, it is possible that the actual cost could be higher or lower than this estimate depending on the outcomes of the court-supervised claims processes. In accordance with its normal procedures, BP will re-evaluate the assumptions underlying this estimate on a quarterly basis as more information, including the outcomes of the court-supervised claims processes, becomes available. (For more information, see Financial statements – Note 38.)

At this time, BP expects all settlements under these agreements to be paid from the Trust. Other costs to be paid from the Trust include state and local government claims, state and local response costs, natural resource damages and related claims, and final judgments and settlements. It is not possible at this time to determine whether the Trust will be sufficient to satisfy all of these claims as well as those under the proposed settlement. Should the Trust not be sufficient, payments under the proposed settlement would be made by BP directly.

The proposed economic loss settlement provides for a transition from the Gulf Coast Claims Facility (GCCF) to a new court-supervised claims programme, to administer payments made to qualifying class members. A court-supervised transitional claims process will be in operation while the infrastructure for the new settlement claims process is put in place. During this transitional period, the processing of claims that have been submitted to the GCCF will continue, and new claimants may submit their claims. BP has agreed not to wait for final approval of the economic loss settlement before claims are paid. The economic loss claims process will continue under court supervision before final approval of the settlement, first under the transitional claims process, and then through the settlement claims process established by the proposed economic loss settlement.

Under the proposed settlement, class members would release and dismiss their claims against BP. The proposed settlement also provides that, to the extent permitted by law, BP will assign to the PSC certain of its claims, rights and recoveries against Transocean and Halliburton for damages with protections such that Transocean and Halliburton cannot pass those damages through to BP.

The proposed settlement is subject to reaching definitive and fully-documented agreements within 45 days of 2 March 2012, and if those agreements are not reached, either party has the right to terminate the proposed settlement. Once definitive agreements have been reached, BP and the PSC will seek the court's preliminary approval of the settlement. Under US federal law, there is an established procedure for determining the fairness, reasonableness and adequacy of class action settlements. Pursuant to this procedure, and subject to the court granting preliminary approval of both agreements, there would be an extensive outreach programme to the public to explain settlement agreements and class members' rights, including the right to "opt out" of the classes, and the processes for making claims. The court would then conduct fairness hearings at which class members and various other parties would have an opportunity to be heard and present evidence and decide whether or not to approve each proposed settlement agreement. Should the number of class members opting out exceed an agreed and court-approved threshold, BP will have the right to terminate the proposed settlement.

The proposed settlement does not include claims made against BP by the DoJ or other federal agencies (including under the Clean Water Act and for Natural Resource Damages under the Oil Pollution Act) or by the states and local governments. Also excluded are certain other claims against BP, such as securities and shareholder claims pending in MDL 2185, and claims based solely on the deepwater drilling moratorium and/or the related permitting process.

The court has subsequently ordered that the first phase of the trial be adjourned. The court will schedule a status conference to discuss issues raised by the proposed settlement and to set a new trial date.

On 15 September 2010, three Mexican states bordering the Gulf of Mexico (Veracruz, Quintana Roo, and Tamaulipas) filed lawsuits in federal court in Texas against several BP entities. These lawsuits allege that the Incident harmed their tourism, fishing, and commercial shipping industries (resulting in, among other things, diminished tax revenue), damaged natural resources and the environment, and caused the states to incur expenses in preparing a response to the Incident. On 9 December 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted in part BP's motion to dismiss the three Mexican states' complaints, dismissing their claims under OPA 90 and for nuisance and negligence per se, and preserving their claims for negligence and gross negligence only to the extent there has been a physical injury to a proprietary interest of the states. On 5 April 2011, the State of Yucatan submitted a claim to the GCCF alleging potential damage to its natural resources and environment, and seeking to recover the cost of assessing the alleged damage. BP anticipates further claims from the Mexican federal government.

Citizens groups have also filed either lawsuits or notices of intent to file lawsuits seeking civil penalties and injunctive relief under the Clean Water Act and other environmental statutes. On 16 June 2011, the judge in the federal multi-district litigation proceeding in New Orleans granted BP's motion to dismiss a master complaint raising claims for injunctive relief under various federal environmental statutes brought by various citizens groups and others. The judge did not, however, lift an earlier stay on the underlying individual complaints raising those claims for injunctive relief or otherwise apply his dismissal of the master complaint to those individual complaints. In addition, a different set of environmental groups filed a motion to reconsider dismissal of their Endangered Species Act claims on 14 July 2011. That motion remains pending. On 31 January 2012, the court, on motion by the Center for Biological Diversity, entered final judgment on the basis of the 16 June 2011 order with respect to two actions brought against BP by that plaintiff. On 2 February 2012, the Center for Biological Diversity filed a notice of appeal of both actions.

On 15 July 2011, the judge granted BP's motion to dismiss a master complaint raising RICO claims against BP. The court's order dismissed the claims of the plaintiffs in four RICO cases encompassed by the master complaint.

The DoJ announced on 7 March 2011 that it created a unified task force of federal agencies, led by the DoJ Criminal Division, to investigate the Incident. Other US federal agencies may commence investigations relating to the Incident. The SEC and DoJ are investigating securities matters arising in relation to the Incident.

On 21 April 2011, BP entered a framework agreement with natural resource trustees for the US and five Gulf coast states, providing for up to $1 billion to be spent on early restoration projects to address natural resource injuries resulting from the Incident. Funding for these projects will come from the $20-billion Trust fund.

BP's potential liabilities resulting from threatened, pending and potential future claims, lawsuits and enforcement actions relating to the Incident, together with the potential cost of implementing remedies sought in the various proceedings, cannot be fully estimated at this time but they have had and are expected to have a material adverse impact on the group's business, competitive position, cash flows, prospects,

Additional information for shareholders

liquidity, shareholder returns and/or implementation of its strategic agenda, particularly in the US. These potential liabilities may continue to have a material adverse effect on the group's results and financial condition. *See Financial statements – Note 2 on pages 190-194 for information regarding the financial impact of the Incident.*

**Investigations and reports relating to the Deepwater Horizon oil spill**

BP is subject to a number of investigations related to the incident by numerous agencies of the US government. The related published reports are available on the websites of the agencies and commissions referred to below.

On 11 January 2011, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (National Commission), established by President Obama, published its report on the causes of the Incident and its recommendations for policy and regulatory changes for offshore drilling. On 17 February 2011, the National Commission's Chief Counsel published a separate report on his investigation that provides additional information regarding the causes of the Incident.

In a report dated 20 March 2011, with an Addendum dated 30 April 2011, the Joint Investigation Team (JIT) for the Marine Board of Investigation established by the US Coast Guard and Bureau of Ocean Energy Management (BOEMRE) issued the Final Report of the Forensic Examination of the Deepwater Horizon Blowout Preventer (BOP) prepared by Det Norske Veritas (BOP Report). The BOP Report concludes that the position of the drill pipe against the blind shear rams prevented the BOP from functioning as intended. Subsequently, BP helped to sponsor additional BOP testing conducted by Det Norske Veritas under court auspices, which concluded on 21 June 2011. BP continues to review the BOP Report and is in the process of evaluating the data obtained from the additional testing.

On 22 April 2011, the US Coast Guard issued its report (Maritime Report) focused upon the maritime aspects of the Incident. The Maritime Report criticizes Transocean's maintenance operations and safety culture, while also criticizing the Republic of the Marshall Islands – the flag state responsible for certifying Transocean's Deepwater Horizon vessel.

The US Chemical Safety and Hazard Investigation Board (CSB) is also conducting an investigation of the Incident that is focused on the explosions and fire, and not the resulting oil spill or response efforts. The CSB is expected to issue a single investigation report in 2012 that will seek to identify the alleged root cause(s) of the Incident, and recommend improvements to BP and industry practices and to regulatory programmes to prevent recurrence and mitigate potential consequences.

Also, at the request of the Department of the Interior, the National Academy of Engineering/National Research Council established a Committee (Committee) to examine the performance of the technologies and practices involved in the probable causes of the Incident and to identify and recommend technologies, practices, standards and other measures to avoid similar future events. On 17 November 2010, the Committee publicly released its interim report setting forth the Committee's preliminary findings and observations on various actions and decisions including well design, cementing operations, well monitoring, and well control actions. The interim report also considers management, oversight, and regulation of offshore operations. On 14 December 2011, the Committee published its final report, including findings and recommendations. A second, unrelated National Academies Committee will be looking at the methodologies available for assessing oil impacts on ecosystem services in the Gulf of Mexico, with a final report expected in late 2012 or early 2013, and a third National Academies Committee will be studying methods for assessing the effectiveness of safety and environmental management systems (SEMS) established by offshore oil and gas operators.

On 10 March 2011, the Flow Rate Technical Group (FRTG), Department of the Interior, issued its final report titled "Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill." The report provides a summary of the strengths and limitations of the different methods used by the US government to estimate the flow rate and a range of estimates from 13,000 b/d to over 100,000 b/d. The report concludes that the most accurate estimate was 53,000 b/d just prior to shut in, with an uncertainty on that value of ±10% based on FRTG collective experience and judgement, and, based on modelling, the flow on day one of the Incident was 62,000 b/d.

On 18 March 2011, the US Coast Guard ISPR team released its final report capturing lessons learned from the incident as well as making recommendations on how to improve future oil spill response and recovery efforts.

Additionally, since April 2010, BP representatives have testified multiple times before the US Congress regarding the Incident. BP has provided documents and written information in response to requests from Members, committees and subcommittees of the US Congress.

**Other legal proceedings**

The US Federal Energy Regulatory Commission (FERC) and the US Commodity Futures Trading Commission (CFTC) are currently investigating several BP entities regarding trading in the next-day natural gas market at Houston Ship Channel during September, October and November 2008. The FERC Office of Enforcement staff notified BP on 12 November 2010 of their preliminary conclusions relating to alleged market manipulation in violation of 18 C.F.R. Sec. 1c.1. On 30 November 2010, CFTC Enforcement staff also provided BP with a notice of intent to recommend charges based on the same conduct alleging that BP engaged in attempted market manipulation in violation of Section 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act. On 23 December 2010, BP submitted responses to the FERC and CFTC November 2010 notices providing a detailed response that it did not engage in any inappropriate or unlawful activity. On 28 July 2011, the FERC staff issued a Notice of Alleged Violations stating that it had preliminarily determined that several BP entities fraudulently traded physical natural gas in the Houston Ship Channel and Katy markets and trading points to increase the value of their financial swing spread positions. Other investigations into BP's trading activities continue to be conducted from time to time.

On 23 March 2005, an explosion and fire occurred in the isomerization unit of BP Products North America's (BP Products) Texas City refinery as the unit was coming out of planned maintenance. Fifteen workers died in the incident and many others were injured. BP Products has resolved all civil injury claims arising from the March 2005 incident.

In March 2007, the US Chemical Safety and Hazard Investigation Board (CSB) issued a report on the incident. The report contained recommendations to the Texas City refinery and to the board of directors of BP. In May 2007, BP responded to the CSB's recommendations. BP and the CSB will continue to discuss BP's responses with the objective of the CSB's agreeing to close out its recommendations.

On 25 October 2007, the DoJ announced that it had entered into a criminal plea agreement with BP Products related to the March 2005 explosion and fire. On 4 February 2008, BP Products pleaded guilty, pursuant to the plea agreement, to one felony violation of the risk management planning regulations promulgated under the US Clean Air Act (CAA) and on 12 March 2009, the court accepted the plea agreement. In connection with the plea agreement, BP Products paid a $50-million criminal fine and was sentenced to three years' probation which is set to expire on 12 March 2012. Compliance with a 2005 US Occupational Safety and Health Administration (OSHA) settlement agreement (2005 Agreement) and a 2006 agreed order entered into by BP Products with the Texas Commission on Environmental Quality (TCEQ) are conditions of probation.

The Texas Office of Attorney General, on behalf of the Texas Commission on Environmental Quality (TCEQ), has filed a petition against BP Products asserting certain air emissions and reporting violations at the Texas City refinery from 2005 to 2010. BP Products settled this lawsuit by an Agreed Final Judgment entered by the court on 20 December 2011.

The Texas Attorney General filed a separate petition against BP Products asserting emissions violations relating to a 6 April 2010 flaring event. This lawsuit was also settled by the Agreed Final Judgment mentioned in the preceding paragraph. This emissions event is also the subject of a number of civil suits by many area workers and residents alleging personal injury and property damages and seeking substantial damages. In addition, this emissions event is the subject of a federal governmental investigation.

In September 2009, BP Products filed a petition to clarify specific required actions and deadlines under the 2005 Agreement with OSHA. That agreement resolved citations issued in connection with the March 2005 Texas City refinery explosion. OSHA denied BP Products' petition.

In October 2009 OSHA issued citations to the Texas City refinery seeking a total of $87.4 million in civil penalties for alleged violations of the 2005 Agreement and alleged process safety management violations.

A settlement agreement between BP Products and OSHA in August 2010 (2010 Agreement) resolved the petition filed by BP Products in September 2009 and the alleged violations of the 2005 Agreement. BP Products has paid a penalty of $50.6 million in that matter and agreed to perform certain abatement actions. Compliance with the 2010 Agreement (which is set to expire on 12 March 2012) is also a condition of probation due to the linkage between this 2010 Agreement and the 2005 Agreement.

On 6 May 2010, certain persons qualifying under the US Crime Victims' Rights Act as victims in relation to the Texas City plea agreement requested that the federal court revoke BP Products' probation based on alleged violations of the Court's conditions of probation. The alleged violations of probation relate to the alleged failure to comply with the 2005 Agreement.

The OSHA process safety management citations issued in October 2009 were not resolved by the August 2010 settlement agreement. The proposed penalties in that matter are $30.7 million. The matter is currently before the OSH Review Commission which has assigned an Administrative Law Judge for purposes of mediation. These citations do not allege violations of the 2005 Agreement.

A shareholder derivative action was filed against several current and former BP officers and directors based on alleged violations of the US Clean Air Act (CAA) and Occupational Safety and Health Administration (OSHA) regulations at the Texas City refinery subsequent to the March 2005 explosion and fire. An investigation by a special committee of BP's board into the shareholder allegations has been completed and the committee has recommended that the allegations do not warrant action by BP against the officers and directors. BP filed a motion to dismiss the shareholder derivative action and a plea to the jurisdiction. On 16 June 2011, the court granted BP's plea to the jurisdiction and dismissed the action in its entirety. The shareholder has appealed the dismissal and the appeal is pending.

In March and August 2006, oil leaked from oil transit pipelines operated by BP Exploration (Alaska) Inc. (BPXAI at the Prudhoe Bay unit on the North Slope of Alaska. Several legal proceedings resulted from these events. On 29 November 2007, BPXA entered into a criminal plea agreement with the DoJ relating to these leaks. BPXA's guilty plea, to a misdemeanour violation of the US Water Pollution Control Act, included a term of three years' probation. On 29 November 2009, a spill of approximately 360 barrels of crude oil and produced water was discovered beneath a line running from a well pad to the Lisburne Processing Center in Prudhoe Bay, Alaska. On 17 November 2010, the US Probation Officer filed a petition in federal district court to revoke BPXA's probation based on allegations that the Lisburne event was a criminal violation of state and federal law and therefore BPXA was in violation of its probation obligations. BPXA contested the petition at an evidentiary hearing that was completed on 7 December 2011 in U.S. District Court in Anchorage, Alaska. On 27 December 2011, the Court issued a decision and order finding that BPXA did not violate the terms of its probation, dismissing the government's petition and terminating BPXA's probation.

On 12 May 2008, a BP p.l.c. shareholder filed a consolidated complaint alleging violations of federal securities law on behalf of a putative class of BP p.l.c. shareholders against BP p.l.c., BPXA, BP America, and four officers of the companies, based on alleged misrepresentations concerning the integrity of the Prudhoe Bay pipeline before its shutdown on 6 August 2006. On 8 February 2010, the Ninth Circuit Court of Appeals accepted BP's appeal from a decision of the lower court granting in part and denying in part BP's motion to dismiss the lawsuit. On 29 June 2011, the Ninth Circuit ruled in BP's favour that the filing of a trust related agreement with the SEC containing contractual obligations on the part of BP was not a misrepresentation which violated federal securities laws. The BP p.l.c. shareholder has filed an amended complaint, in response to which BP filed a new motion to dismiss, which is pending. On 31 March 2009, the United States filed a complaint seeking civil penalties and damages relating to the events at Prudhoe Bay. The complaint also involved claims related to asbestos handling, allegations of non-compliance at multiple facilities for failure to comply with EPA's spill prevention plan regulations, and for non-compliance with US Department of Transportation orders and regulations. The parties settled the dispute and on 13 July 2011 the Court entered a Consent Agreement in which BPXA agreed to pay a $25-million penalty and to perform certain injunctive measures over the next three years with respect to pipeline inspection and maintenance. On 31 March 2009, the State of Alaska filed a complaint seeking civil penalties and damages relating to these events. The complaint alleges that the two releases and BPXA's corrosion management practices violated various statutory, contractual and common law duties to the State, resulting in penalty liability, damages for lost royalties and taxes, and liability for punitive damages. In December 2011, the State of Alaska and BPXA entered into a Dispute Resolution Agreement concerning this matter that will result in arbitration of the amount of the State's lost royalty income and payment by BPXA of the additional amount of $10 million on account of other claims in the complaint.

Approximately 200 lawsuits were filed in state and federal courts in Alaska seeking compensatory and punitive damages arising out of the Exxon Valdez oil spill in Prince William Sound in March 1989. Most of those suits named Exxon (now ExxonMobil), Alyeska Pipeline Service Company (Alyeska), which operates the oil terminal at Valdez, and the other oil companies that own Alyeska. Alyeska initially responded to the spill until the response was taken over by Exxon. BP owns a 46.9% interest (reduced during 2001 from 50% by a sale of 3.1% to Phillips) in Alyeska through a subsidiary of BP America Inc. and briefly indirectly owned a further 20% interest in Alyeska following BP's combination with Atlantic Richfield. Alyeska and its owners have settled all the claims against them under these lawsuits. Exxon has indicated that it may file a claim for contribution against Alyeska for a portion of the costs and damages that it has incurred. If any claims are asserted by Exxon that affect Alyeska and its owners, BP will defend the claims vigorously.

Since 1987, Atlantic Richfield Company (Atlantic Richfield), a subsidiary of BP, has been named as a co-defendant in numerous lawsuits brought in the US alleging injury to persons and property caused by lead pigment in paint. The majority of the lawsuits have been abandoned or dismissed against Atlantic Richfield. Atlantic Richfield is named in these lawsuits as alleged successor to International Smelting and Refining and another company that manufactured lead pigment during the period 1920-1946. Plaintiffs include individuals and governmental entities. Several of the lawsuits purport to be class actions. The lawsuits seek various remedies including compensation to lead-poisoned children, cost to find and remove lead paint from buildings, medical monitoring and screening programmes, public warning and education of lead hazards, reimbursement of government healthcare costs and special education for lead-poisoned citizens and punitive damages. No lawsuit against Atlantic Richfield has been settled nor has Atlantic Richfield been subject to a final adverse judgment in any proceeding. The amounts claimed and, if such suits were successful, the costs of implementing the remedies sought in the various cases could be substantial. While it is not possible to predict the outcome of these legal actions, Atlantic Richfield believes that it has valid defences. It intends to defend such actions vigorously and believes that the incurrence of liability is remote. Consequently, BP believes that the impact of these lawsuits on the group's results, financial position or liquidity will not be material.

On 8 March 2010, OSHA issued citations to BP's Toledo refinery alleging violations of the Process Safety Management Standard, with penalties of approximately $3 million. These citations resulted from an inspection conducted pursuant to OSHA's Petroleum Refinery Process Safety Management National Emphasis Program. BP Products has contested the citations, and the matter is currently scheduled for trial before the OSH Review Commission in June 2012.

In April 2009, Kenneth Abbott, as relator, filed a US False Claims Act lawsuit against BP, alleging that BP violated federal regulations, and made false statements in connection with its compliance with those regulations, by failing to have necessary documentation for the Atlantis subsea and other systems. BP is the operator and 56% interest owner of the Atlantis unit in production in the Gulf of Mexico. That complaint was unsealed in May 2010 and served on BP in June 2010. Abbott seeks damages measured by the value, net of royalties, of all past and future production from the Atlantis platform, trebled, plus penalties. In September 2010, Kenneth Abbott and Food & Water Watch filed an amended

Additional information for shareholders

complaint in the False Claims Act lawsuit seeking an injunction shutting down the Atlantis platform. The court denied BP's motion to dismiss the complaint in March 2011. Separately, also in March 2011, BOEMRE issued its investigation report of the Abbott Atlantis allegations, which concluded that Mr Abbott's allegations that Atlantis operations personnel lacked access to critical, engineer-approved drawings were without merit and that his allegations about false submissions by BP to BOEMRE were unfounded. Trial is scheduled to begin on 10 April 2012.

BP Products' US refineries are subject to a 2001 consent decree with the EPA that resolved alleged violations of the CAA, and implementation of the decree's requirements continues. A 2009 amendment to the decree resolves remaining alleged air violations at the Texas City refinery through the payment of a $12-million civil fine, a $6-million supplemental environmental project and enhanced CAA compliance measures estimated to cost approximately $150 million. The fine has been paid, and BP Products is implementing the other provisions.

On 30 September 2010, the EPA and BP Products lodged a civil consent decree with the federal court in Houston. Following a public comment period, the federal court approved the settlement on 30 December 2010. The decree resolves allegations of civil violations of the risk management planning regulations promulgated under the CAA that are alleged to have occurred in 2004 and 2005 at the Texas City refinery. BP Products has paid the $15-million civil penalty and the Texas City refinery is implementing requirements to enhance reporting to the EPA regarding employee training, equipment inspection and incident investigation.

Various environmental groups and the EPA have challenged certain aspects of the air permits issued by the Indiana Department of Environmental Management (IDEM) for upgrades to the Whiting refinery. In response to these challenges, the IDEM has reviewed the permits and responded formally to the EPA. BP is in discussions with the EPA, the IDEM and certain environmental groups over these and other CAA issues relating to the Whiting refinery. BP has also been in settlement discussions with EPA to resolve alleged CAA violations at the Toledo, Carson and Cherry Point refineries.

An application was brought in the English High Court on 1 February 2011 by Alfa Petroleum Holdings Limited and OGIP Ventures Limited against BP International Limited and BP Russian Investments Limited alleging breach of a Shareholders Agreement on the part of BP and seeking an interim injunction restraining BP from taking steps to conclude, implement or perform the transactions with Rosneft Oil Company, originally announced on 14 January 2011, relating to oil and gas exploration, production, refining and marketing in Russia (the Arctic Opportunity). Those transactions included the issue or transfer of shares between Rosneft Oil Company and any BP group company (pursuant to the Rosneft Share Swap Agreement). The court granted an interim order restraining BP from taking any further steps in relation to the Rosneft transactions pending an expedited UNCITRAL arbitration procedure in accordance with the Shareholders Agreement between the parties. The arbitration has commenced and the interim injunction was continued by the arbitration panel.

On 17 May 2011, BP announced that both the Rosneft Share Swap Agreement and the Arctic Opportunity, originally announced on 14 January 2011, had terminated. This termination was as a result of the deadline for the satisfaction of conditions precedent having expired following delays resulting from the interim orders referred to above. These interim orders did not address the question of whether or not BP breached the Shareholders Agreement. The arbitration proceedings, which are subject to strict confidentiality obligations, are ongoing.

Five minority shareholders of OAO TNK-BP Holding (TBH) have filed two civil actions in Tyumen, Siberia, against BP Russia Investments Limited and BP p.l.c. and against two of the BP nominated directors of TBH. These two actions sought to recover alleged losses to TBH of $13 billion and $2.7 billion respectively. On 11 November 2011, the Tyumen Court dismissed both claims fully on their merits. The shareholders appealed both of these decisions to the Omsk Appellate court. On 26 January 2012, the Appellate court upheld the Tyumen Court's dismissal of the claim in relation to the BP nominated directors of TBH. The Omsk Appellate court subsequently confirmed the Tyumen court of first instance's dismissal of the minority suits against BP Russia Investments Limited and BP p.l.c. BP believes the allegations made are wholly without merit. No losses have been incurred and BP believes the likelihood of the claims being ultimately successful is remote. Consequently no amounts have been provided and the claim is not disclosed as a contingent liability.

On 9 February 2011, Apache Canada Ltd (Apache) commenced an arbitration against BP Canada Energy. Apache alleges that various properties/sites in respect of which it acquired interests from BP Canada Energy pursuant to the parties' Purchase and Sale Agreement signed in July 2010 will require work to bring the properties/sites into compliance with applicable environmental laws, and Apache claims that the purchase price should be adjusted for its estimated possible costs. BP Canada Energy denies such costs will arise or require any adjustment to the purchase price. The parties have appointed the arbitrator, and currently the hearing on the merits is scheduled to commence during the second quarter of 2012.

On 24 January 2012, the Republic of Bolivia issued a press statement declaring its intent to nationalize Pan American Energy's interests in the Caipipendi Operations Contract. No formal nationalization process has yet commenced. Pan American Energy and its shareholders BP and Bridas intend to vigorously defend their legal interests under the Caipipendi Operations Contract and available Bilateral Investment Treaties.

## Relationships with suppliers and contractors

### Essential contracts
BP has contractual and other arrangements with numerous third parties in support of its business activities. This report does not contain information about any of these third parties as none of our arrangements with them are considered to be essential to the business of BP.

### Suppliers and contractors
Our processes are designed to enable us to choose suppliers carefully on merit, avoiding conflicts of interest and inappropriate gifts and entertainment. We expect suppliers to comply with legal requirements and we seek to do business with suppliers who act in line with BP's commitments to compliance and ethics, as outlined in our code of conduct. We engage with suppliers in a variety of ways, including performance review meetings to identify mutually advantageous ways to improve performance.

### Creditor payment policy and practice
Statutory regulations issued under the UK Companies Act 2006 require companies to make a statement of their policy and practice in respect of the payment of trade creditors. In view of the international nature of the group's operations there is no specific group-wide policy in respect of payments to suppliers. Relationships with suppliers are, however, governed by the group's policy commitment to long-term relationships founded on trust and mutual advantage. Within this overall policy, individual operating companies are responsible for agreeing terms and conditions for their business transactions and ensuring that suppliers are aware of the terms of payment.

## Share prices and listings

### Markets and market prices
The primary market for BP's ordinary shares is the London Stock Exchange (LSE). BP's ordinary shares are a constituent element of the Financial Times Stock Exchange 100 Index. BP's ordinary shares are also traded on the Frankfurt Stock Exchange in Germany.

Trading of BP's shares on the LSE is primarily through the use of the Stock Exchange Electronic Trading Service (SETS), introduced in 1997 for the largest companies in terms of market capitalization whose primary listing is the LSE. Under SETS, buy and sell orders at specific prices may be sent electronically to the exchange by any firm that is a member of the LSE, on behalf of a client or on behalf of itself acting as a principal. The orders are then anonymously displayed in the order book. When there is a match on a buy and a sell order, the trade is executed and automatically reported to the LSE. Trading is continuous from 8.00 a.m. to 4.30 p.m. UK time but, in the event of a 20% movement in the share price either way, the LSE may impose a temporary halt in the trading of that company's shares in the order book to allow the market to re-establish equilibrium. Dealings in ordinary shares may also take place between an investor and a market-maker, via a member firm, outside the electronic order book.

In the US, the company's securities are traded on the New York Stock Exchange (NYSE) in the form of ADSs, for which JPMorgan Chase Bank, N.A. is the depositary (the Depositary) and transfer agent. The Depositary's principal office is 1 Chase Manhattan Plaza, N.A., Floor 21, New York, NY 10005-1401, US. Each ADS represents six ordinary shares. ADSs are listed on the New York Stock Exchange. ADSs are evidenced by American depositary receipts (ADRs), which may be issued in either certificated or book entry form.

The following table sets forth for the periods indicated the highest and lowest middle market quotations for BP's ordinary shares and ADSs for the periods shown. These are derived from the highest and lowest sales prices as reported on the LSE and NYSE, respectively.

|  | Pence | | Dollars | |
|---|---|---|---|---|
|  | Ordinary shares | | American depositary shares[a] | |
|  | High | Low | High | Low |
| Year ended 31 December | | | | |
| 2007 | 640.00 | 504.50 | 79.77 | 58.62 |
| 2008 | 657.25 | 370.00 | 77.69 | 37.57 |
| 2009 | 613.40 | 400.00 | 60.00 | 33.71 |
| 2010 | 658.20 | 296.00 | 62.38 | 26.75 |
| 2011 | **514.90** | **361.25** | **49.50** | **33.63** |
| Year ended 31 December | | | | |
| 2010: First quarter | 640.10 | 555.00 | 62.38 | 52.00 |
| Second quarter | 658.20 | 296.00 | 60.96 | 26.75 |
| Third quarter | 438.25 | 312.65 | 41.59 | 28.79 |
| Fourth quarter | 479.00 | 418.25 | 44.83 | 39.58 |
| 2011: First quarter | **514.90** | **431.00** | **49.50** | **42.51** |
| Second quarter | **480.23** | **425.00** | **47.45** | **41.26** |
| Third quarter | **483.04** | **361.25** | **47.09** | **35.10** |
| Fourth quarter | **477.54** | **363.95** | **45.83** | **33.63** |
| 2012: First quarter (to 17 February) | **501.37** | **455.05** | **47.67** | **42.85** |
| Month of | | | | |
| September 2011 | 426.04 | 361.25 | 39.72 | 35.10 |
| October 2011 | 477.54 | 363.95 | 45.83 | 33.63 |
| November 2011 | 466.05 | 416.99 | 44.89 | 39.41 |
| December 2011 | 471.45 | 433.00 | 44.26 | 40.40 |
| January 2012 | 487.60 | 455.05 | 46.03 | 42.85 |
| February 2012 (to 17 February) | 501.37 | 473.05 | 47.67 | 45.23 |

[a] One ADS is equivalent to six 25 cent ordinary shares.