# Exhibit 7

**TO UNITED STATES' REPLY TO BPXP'S OPPOSITION TO MOTION IN LIMINE TO PERMIT RELEVANT EVIDENCE CONCERNING BP P.L.C. AND ITS AFFILIATES**

# Annual Report and Form 20-F 2010

bp.com/annualreport



# What's inside?

## 5 Business review
- 6 Chairman's letter
- 8 Board of directors
- 10 Group chief executive's letter
- 12 Progress in 2010
- 14 Group overview
- 34 Gulf of Mexico oil spill
- 40 Exploration and Production
- 55 Refining and Marketing
- 61 Other businesses and corporate
- 63 Liquidity and capital resources
- 68 Corporate responsibility
- 76 Research and technology
- 78 Regulation of the group's business
- 81 Certain definitions

## 83 Directors and senior management
- 84 Directors and senior management
- 87 Directors' interests

## 89 Corporate governance
- 90 Board performance report
- 105 Corporate governance practices
- 106 Code of ethics
- 106 Controls and procedures
- 107 Principal accountants' fees and services
- 108 Memorandum and Articles of Association

## 111 Directors' remuneration report
- 112 Part 1 Summary
- 114 Part 2 Executive directors' remuneration
- 120 Part 3 Non-executive directors' remuneration

## 123 Additional information for shareholders
- 124 Critical accounting policies
- 127 Property, plants and equipment
- 127 Share ownership
- 128 Major shareholders and related party transactions
- 129 Dividends
- 130 Legal proceedings
- 133 Relationships with suppliers and contractors
- 134 Share prices and listings
- 135 Material contracts
- 135 Exchange controls
- 135 Taxation
- 137 Documents on display
- 137 Purchases of equity securities by the issuer and affiliated purchasers
- 138 Fees and charges payable by a holder of ADSs
- 138 Fees and payments made by the Depositary to the issuer
- 139 Called-up share capital
- 139 Administration
- 139 Annual general meeting
- 140 Exhibits

## 141 Financial statements
- 142 Consolidated financial statements of the BP group
- 150 Notes on financial statements
- 228 Supplementary information on oil and natural gas (unaudited)
- PC1 Parent company financial statements of BP p.l.c.


6033
Exhibit No. _____
Worldwide Court Reporters, Inc.

TREX-06033

Business review

*Rig process safety*
- Require hazard and operability reviews of the surface gas and drilling fluid systems for all BP-owned and BP-contracted drilling rigs.
- Include in the hazard and operability reviews a study of all surface system hydrocarbon vents, reviewing suitability of location and design.

*Blowout preventer design and assurance*
- Establish minimum levels of redundancy and reliability for BP's BOP systems. Require drilling contractors to implement an auditable risk management process to ensure that their BOP systems are operated above these minimum levels.
- Strengthen BP's minimum requirements for drilling contractors' BOP testing, including emergency systems.
- Strengthen BP's minimum requirements for drilling contractors' BOP maintenance management systems.
- Define BP's minimum requirements for drilling contractors' management of changes for subsea BOPs.
- Develop a clear plan for remotely operated vehicle intervention as part of the emergency BOP operations in each of BP's operating regions, including all emergency options for shearing pipe and sealing the wellbore.
- Require drilling contractors to implement a qualification process to verify that shearing performance capability of blind shear rams is compatible with the inherent variations in wall thickness, material strength and toughness of the rig drill pipe inventory.
- Include testing and verification of these BOP recommendations in the rig audit process.

**National Commission report**
BP has co-operated fully with the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (National Commission), which released the full report of its investigation on 11 January 2011. The National Commission acknowledged the complexities and risks inherent to deepwater energy exploration and production; it also concluded that neither industry nor government was fully prepared to assess or manage those risks. The National Commission identified certain missteps and oversights by individuals at BP, Transocean and Halliburton that led to the blowout and concluded that its root cause involved systemic management failures in the industry. These management issues, the National Commission found, extended beyond BP to contractors that serve the entire industry. This included BP's failure to adequately address risks created by late changes to well design and procedures, inadequate testing of the Macondo cement slurry by BP and Halliburton, inadequate communication between BP, Halliburton and Transocean, inadequate communication between Transocean and its crew, and inadequate decision-making processes at the Macondo well. The National Commission also found regulatory failures to be a contributing factor to the Macondo tragedy, in particular the lack of administrative resources and technical expertise at the Minerals Management Service.

The National Commission's report made a number of recommendations in nine distinct areas for addressing the causes and consequences of the spill, including principally the following: improving the safety of offshore operations by enhancing the government's role and by establishing an industry-run, private-sector oversight entity; safeguarding the environment by increasing support for environmental science and regulatory review related to Outer Continental Shelf oil and gas activities; strengthening spill response planning and capacity; advancing well-containment capabilities by increasing government expertise and requiring enhanced containment plans by operators; dedicating funding by the US Congress to Gulf restoration; ensuring financial responsibility by raising the \$75-million liability cap for offshore facility accidents; promoting Congressional awareness of the risks of offshore drilling; and developing expertise and research programmes devoted to exploration and spill containment in the Arctic.

Given the emerging consensus that the Gulf of Mexico accident was the result of multiple causes involving multiple parties, we support the National Commission's efforts to strengthen industry-wide safety practices. We are committed to working with government officials and other operators and contractors to identify and implement operational and regulatory changes that will enhance safety practices throughout the oil and gas industry. Even prior to the conclusion of the National Commission's investigation, BP instituted changes designed to further strengthen safety and risk management. These changes include the creation of an enhanced Safety and Operational Risk function, reporting directly to group chief executive Bob Dudley, that maintains an independent view of the implementation of internal and external requirements and of safety and operational risks.

On 17 February 2011, the Commission's Chief Counsel published a separate report on his investigation about the causes of the incident. The Chief Counsel's investigation concluded that the blowout resulted from a series of engineering and management mistakes by the companies involved in the incident, including BP, Halliburton and Transocean.

**Consequences of the accident for BP and its shareholders**
Financial consequences
The group income statement for 2010 includes a pre-tax charge of \$40.9 billion in relation to the Gulf of Mexico oil spill. This comprises costs incurred up to 31 December 2010, estimated obligations for future costs that can be estimated reliably at this time, and rights and obligations relating to the trust fund, described below.

Costs incurred during the year mainly related to oil spill response activities, which included the drilling of relief wells and other subsea interventions, surface response activities including numerous vessels, and shoreline response involving deployment of boom and beach cleaning activities.

Under US law BP is required to compensate individuals, businesses, government entities and others who have been impacted by the oil spill. Individual and business claims are administered by the GCCF, which is separate from BP. BP has established a trust fund of \$20 billion to be funded over the period to the fourth quarter of 2013, which is available to satisfy legitimate individual and business claims administered by the GCCF, state and local government claims resolved by BP, final judgments and settlements, state and local response costs, and natural resource damages and related costs arising as a consequence of the Gulf of Mexico oil spill. In 2010, BP contributed \$5 billion to the fund, and further quarterly contributions of \$1.25 billion are to be made during the period 2011 to 2013. The income statement charge for 2010 includes \$20 billion in relation to the trust fund, adjusted to take account of the time value of money. The establishment of the trust fund does not represent a cap or floor on BP's liabilities and BP does not admit to a liability of this amount.

BP has provided for all liabilities that can be estimated reliably at this time, including fines and penalties under the Clean Water Act (CWA). The total amounts that will ultimately be paid by BP in relation to all obligations relating to the incident are subject to significant uncertainty.

BP considers that it is not possible to estimate reliably any obligation in relation to natural resource damages claims under the OPA 90, litigation and fines and penalties except for those in relation to the CWA. These items are therefore contingent liabilities.

BP holds a 65% interest in the Macondo well, with the remaining 35% held by two joint venture partners. While BP believes and will assert that it has a contractual right to recover the partners' shares of the costs incurred, no recovery amounts have been recognized in the financial statements.

For a full understanding of the impacts and uncertainties relating to the Gulf of Mexico oil spill refer to Financial statements – Note 2 on page 158, Note 37 on page 199 and Note 44 on page 218. See also Risk factors on page 27 and Proceedings and investigations relating to the Gulf of Mexico oil spill on pages 130-131.