**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by | * | **MDL NO. 2179** |
| the Oil Rig "Deepwater Horizon" | * | |
| in the Gulf of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| This document relates to: | * | |
| All Cases and No. 12-970 | * | **Honorable CARL J. BARBIER** |
| | * | |
| | * | **Magistrate Judge SHUSHAN** |
| | * | |

**BP'S OPPOSITION TO**
**MOTION TO PROTECT AND PRESERVE CLAIMANT CONFIDENTIALITY**
**AND TO ENFORCE THE ORDERS OF THE COURT**

Class Counsel's motion is baseless.  The Settlement Agreement grants BP access, at all times, to "Claims-related data transferred to or generated in the Settlement Program."  The Claims Administrator confirmed BP's right to this data in a formal policy.  And Class Counsel, as early as 2012, agreed that the Settlement Agreement authorized BP to receive this data.  More than a year ago, in other words, Class Counsel agreed that BP had the very right that it now seeks to curtail.  Not only do Class Counsel ignore their own agreement, they omit any mention of the Claims Administrator's formal policy and fail to cite the Settlement Agreement provision in full.

Despite the fact that the Settlement Agreement guaranteed BP's access to the data, Class Counsel now seek to cut off that access, upon which BP relies to enforce its rights.  At the same time, Class Counsel adopts the pose of drawing attention to the "troubling" fact that BP provided the Freeh Group with a list of potentially fraudulent claims.  But, Special Master Freeh was clearly entitled to receive data pursuant to this Court's Order.

As we explain in greater detail below, Class Counsel's motion should be denied.

I.      **The Settlement Agreement Provides BP Access to Settlement Program Data.**

        The Settlement Agreement grants both BP and Class Counsel access to Settlement

Program data.  The Agreement draws a distinction between "Claims-related data," to which BP

and Class Counsel have access at all times, and "Claim Files" (i.e, the work product created by

the CSSP), to which they have access only after processing of a claim is complete.

        A.      **Section 4.4.14 of the Settlement Agreement Provides Access to "Claims-Related Data."**

        Section 4.4.14 of the Settlement Agreement expressly provides for access to "Claims-

related data" received and created by the CSSP.  It provides for access to that data at all times

and provides for access to "Claim Files" once processing of a claim is complete:

> ***BP and Class Counsel shall have access to all Claim Files and Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose*** including, without limitation, the operation of BP's separate OPA facility, prosecuting and defending appeals, reviewing and auditing the Settlement Program, reporting financial results, and pursuing indemnification, contribution, subrogation, insurance and other claims from third parties.  ***However, BP and Class Counsel shall not have access to any Claim Files for Claims that are being processed*** and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal.[1]

Class Counsel inexplicably quote the second sentence, but omit the first.[2]

        Class Counsel in the past have speculated that § 4.4.14 must contain a drafting error.[3]

They do not repeat that assertion here, and for good reason.  The negotiating history and

subsequent actions of the parties and the Claims Administrator make clear that all parties

---

[1]     Settlement Agreement § 4.4.14 (emphasis added); *see also* Order Regarding Settlement Implementation ¶ 9 (May 22, 2012) [Rec. Doc. 6573].

[2]     Pls.' Mem. at 1, 3.

[3]     *See, e.g.*, Pls.' Mem. Ex. 2, Herman E-mail to Cantor at 1 (Feb. 13, 2013) ("I am not sure that there was a conscious and material intent to not repeat 'Claims-Related Data' along with Claims Files in the second sentence.").

understood the distinction between the "Claims-related data," which is available to the parties in the interests of transparency, and the CSSP's working evaluation of that data (the "Claim Files"), which is restricted until the CSSP has made a determination.  The fact that the Settlement Agreement restricts pre-determination access to "Claim Files" but permits full and unfettered access to "Claims-related data" reflects a negotiated, purposeful agreement reached by the parties.[4]  Further, the use of different language in the two sentences shows that the parties intended a different meaning.  *See, e.g.*, *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 246 (3d Cir. 2008) (observing that the use of different language to address the same or similar issues in a contract "strongly implies that a different meaning was intended"); *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156-57 (10th Cir. 2007) (same).  Thus, § 4.4.14 only restricts access to "Claim Files" and only during the limited time that a claim is "being processed."

**B.      The Parties Agreed That the Settlement Agreement Provides Access to "Claims-Related Data."**

Not only does § 4.4.14 expressly authorize BP's access, this access was reconfirmed at a Claims Administration Panel meeting on June 26, 2012 (attended by Magistrate Judge Shushan, Claims Administrator Patrick Juneau, CSSP General Counsel Christine Reitano, James Roy, Steve Herman[5] (by telephone) and others).  At this meeting, the parties discussed the implementation of § 4.4.14.[6]  Orran Brown of BrownGreer illustrated a detailed grid concerning

---

[4]    Ex. 1, Declaration of Daniel A. Cantor ("Cantor Decl.") ¶¶ 3-4.

[5]    Cantor Decl. ¶ 5; *see also* Ex. 2, Herman E-mail to Reitano at 1 (June 24, 2012) (co-Lead Class Counsel Steve Herman proposed adding to the meeting agenda the issues of data access and the confidentiality of claims information).

[6]    Cantor Decl. ¶ 6.  Class Counsel argue that the June 2012 meeting was intended only to address "the extent to which *Claimants* would be provided with access to information

data access.  Class Counsel, BP, and the CSSP all agreed that (i) both parties enjoyed access to "Claims-related data" at all times, but that (ii) CSSP work papers, referred to in the Settlement Agreement as the "Claim File," would only be available once the CSSP issued a determination on a given claim.[7]  The parties affirmed this understanding in a follow-up teleconference on July 2, 2012.[8]  Accordingly, the CSSP provided BP with Claims-related data.[9]

### C.    The Claims Administrator Issues a Formal Policy Providing Access to "Claims-Related Data."

In February 2013, in response to a query from Class Counsel, the CSSP's in-house counsel, Christine Reitano, confirmed in writing that the CSSP "met with BP and Class Counsel in July [2012] and mapped out the options for the scope and timing of access," agreeing that "Claimants, Class Counsel and BP have full access to the claims file and claims information, except for the Claims Administrator's calculations, at any time."[10]  "That is how [data access] was set it [sic] up and how it has been administered it [sic] since," she said.[11]  Ms. Reitano also

---

regarding their Claims from the Program."  Pls.' Mem. at 4.  The record demonstrates, however, that the meeting also addressed—and resolved—BP's access to the data.

[7]   Cantor Decl. ¶ 6; Pls.' Mem., Ex. 3, Cantor Letter to Juneau and Reitano at 3 (Mar. 11, 2013).

[8]   Cantor Decl. ¶¶ 7-8; *see also* Ex. 3, Cantor E-mail to Herman, Roy, Reitano, and Odom at 1 (June 28, 2012) (arranging call to confirm the parties' understanding of the issue in response to questions raised by Class Counsel in a series of e-mails after the Claims Administration Panel meeting).  Class Counsel's claim that any agreement on this issue "was and is expressly revoked" is unavailing.  Pls.' Mem. at 7.  The parties were merely confirming what the Settlement Agreement plainly provides.

[9]   Cantor Decl. ¶ 9; Ex. 4, Reade E-mail to Lawson at 2 (July 17, 2012); Strunk E-mail to Reade and Lawson at 1 (July 17, 2012) (explaining that Excel downloads were intended as "a temporary measure" until BP had the ability to gather the information from the portal itself.).

[10]   Pls.' Mem. Ex. 1, Reitano E-mail to Rice at 2-3 (Feb. 12, 2013).

[11]   *Id.* at 3; *see also* Ex. 5, BrownGreer Mem. at 5 (Feb. 7, 2013) ("We currently show BP and Class Counsel all Claims Information except detailed review data such as calculation

wrote that "BP has access to requested weekly reports containing specific data points" from the CSSP web portal and offered Class Counsel equal access, stating: "Class Counsel may wish to have access to these same reports, or may wish to specify other 'claim level' data they would like to receive, and we are happy to work with [them] to meet [their] needs."[12]

Later, at a March 2013 meeting, the Claims Administrator reminded Class Counsel that everyone had agreed in June 2012 to the ground rules for access to the claims-related data and announced the CSSP's intention to follow that agreement.[13]  Shortly thereafter, the Claims Administrator issued a memorandum setting forth the rules for access to the data—rules which reflected the past agreement and current practice.[14]

In a contemporaneous e-mail summarizing the meeting, an attorney representing plaintiffs wrote: "Pat [Juneau] and Orran [Brown] believe that this access policy was agreed to by the parties at a meeting held back in June.  Supposed to be a meeting where Jim [Roy] was present and Steve [Herman] was on the phone.  Claim to have discussed the relevant SA provisions and outlined all of the access on a whiteboard and parties agreed."[15]  This e-mail

---

information, denial reasons, or incompleteness reasons.  We reveal detailed review data to the claimant and to both Parties after we issue the first Eligibility Notice to a claimant.").

[12]  Ex. 6, Reitano E-mail to Herman, Roy, Holstein, and Moskowitz at 1(Feb. 7, 2013); *see also* Ex. 5, BrownGreer Mem. at 6 (Feb. 7, 2013) (offering to provide Class Counsel with access to the FTP site and weekly Excel downloads).

[13]  Cantor Decl. ¶ 10; Ex. 7, Holstein E-mail to Judge Shushan and Piantidosi at 4 (Jan. 7, 2014) ("[T]he parties presented positions on the issue, a panel meeting was conducted and the Claims Administrator declined to change the data access protocols he had established at the outset of the Settlement Program and to which he found Class Counsel had previously agreed.").

[14]  *See* Ex. 8, Juneau Mem. (March 19, 2013).

[15]  Pls.' Mem. Ex. 4, Creevy E-mail re: "BP – Data Access Meeting" at 2 (Mar. 12, 2013).

acknowledged that Class Counsel had requested access to the weekly Excel downloads and that "maybe info was sent to Steve/Jim" about the reports at an earlier time.[16]

In April 2013, the Claims Administrator issued CSSP Policy No. 378.  It states that, while the CSSP is reviewing a claim, BP and Class Counsel "*[s]hall have equal Access to Claim Reports and to the Claim Files and Claims Database on all Claimants and Claims*, but shall not have Access to Accountant Workbooks, Claim Review Details or Global Notes relating to a particular Claim or Claimant."[17]  Class Counsel never appealed this policy and now acknowledge that they "decided not to press the issue further at that time."[18]  Class Counsel's suggestion that claimants may have greater rights to claim-specific data is beside the point. Whatever rights claimants may have, the issue in the Motion is BP's rights and those are clear.

*     *     *

Class Counsel inexplicably turn a blind eye to the Settlement Agreement and Policy No. 378, and they conveniently ignore their own agreement to a policy of joint access to the claims-related data that has prevailed since the inception of the CSSP.  Not only does BP enjoy a right to obtain this data, but Class Counsel surely waived any right to claim otherwise.

## II.     BP Has Obtained Only the "Claims-Related Data" to Which It Is Entitled.

Equally spurious is Class Counsel's charge that BP has improperly obtained information by using robots ("bots") to mine the CSSP's IT system for information and by holding "secret meetings" with BrownGreer.  These charges are simply false.

---

[16]   *Id.*

[17]   Ex. 9, Policy No. 378 ¶ 2(b) (Apr. 9, 2013) (emphasis added).

[18]   Pls.' Mem. at 7.

## A.    BP Obtained All Information Appropriately From the Settlement Program.

Class Counsel accuse BP of improperly "using an electronic robot (or 'bot') to 'crawl through the [Settlement] Program's IT system in order to extract Claim-specific data.'"[19]  BP rebutted this allegation when Class Counsel raised it with Magistrate Judge Shushan and Frank Piantidosi of the Freeh Group in December 2013 and January 2014.[20]  BP accesses CSSP data through the CSSP web portal, as authorized by the Settlement Agreement and Claims Administrator.[21]  Class Counsel's allegations are unsupported by any evidence.

The "bots" to which Class Counsel refers are actually "scripts" that BP and its retained experts use to help control their Internet Explorer web browsers when they access the CSSP web portal.[22]  A bot is a program that would reside on the CSSP's own computer system.  By contrast, scripts remain on the computers of BP and do not send any data to the CSSP's computers.  Scripts do nothing other than what an individual could do manually (pointing and clicking in a browser); they just operate faster.  The scripts in question submit web page queries for specified data that BP is authorized to receive under the Settlement Agreement, and they do not permit BP to obtain information not authorized by the Settlement Program.[23]

Class Counsel also accuse BP of using information procured with this technology to provide "a list of approximately 700 claims to the Program *via* the Freeh Group which BP

---

[19]  *Id.*

[20]  *See generally* Ex. 7, E-mails addressing allegations.

[21]  *Id.*, Holstein E-mail to Judge Shushan and Piantidosi at 4 (Jan. 7, 2014).

[22]  *Id.*

[23]  *Id.*  Importantly, these "scripts" are not impairing the functioning of the Settlement Program's IT system, as the CSSP's Chief Information Officer and the IBM Report confirmed.  Ex. 7, Welker E-mail to Robinson at 1 (Jan. 13, 2014); Pls.' Mem. Ex. 11, IBM Report at 4 (Feb. 6, 2014).

contended deserved some type of heightened or additional scrutiny."[24]  Class Counsel go on to

allege that BP's communications with the Freeh Group were an improper "potential influence on

the claims evaluation process."[25]  As established, BP only possessed data that it was entitled to

receive pursuant to the Settlement Agreement.  BP provided the referenced list to Special Master

Freeh in connection with his Court-authorized investigation.[26]  Surely, Class Counsel do not

suggest that Special Master Freeh was not entitled to receive claims-related data.  "The Court

and any special masters appointed by the Court, and the direct staff of the foregoing, shall have

access to all Claims Information."[27]  BP's response to Special Master Freeh's request did not

constitute misuse of Claims Information.  Rather, BP provided the Special Master data he was

entitled to.

**B.    BP Did Not Conduct "Secret Meetings" With BrownGreer.**

Class Counsel also allege that BP held "secret meetings" with BrownGreer,

PricewaterhouseCoopers, and/or Postlethwaite employees regarding the processing of claims.[28]

The meetings were not "secret," they were expressly approved by the CSSP and concerned

technical and data issues.

---

[24]  Pls.' Mem. at 7.

[25]  *Id.*

[26]  Cantor Decl. ¶ 15.

[27]  Order Regarding the Confidentiality of Claims Information of the Claims Administrator of
the Deepwater Horizon Economic and Property Damages Settlement Agreement at ¶ 5 [Rec.
Doc. 6822].

[28]  Pls.' Mem. at 9.

Prior to the Summer of 2012, the Claims Administrator permitted, and at times encouraged, the parties to communicate directly with Settlement Program vendors.[29]  At a June 26, 2012 Claims Administration Panel meeting, however, the Claims Administrator announced a new rule, effective in early July 2012, requiring the parties to obtain approval from the CSSP before contacting vendors and designating Ms. Reitano to address questions from BP and Class Counsel regarding permissible contacts.[30]

On various occasions, BP's Counsel, Mr. Cantor, contacted Ms. Reitano and received permission for IT professionals from BP and BrownGreer to communicate.[31]  In November 2012, BrownGreer requested weekly calls with BP's technical representatives, and Mr. Cantor sought confirmation from Ms. Reitano that the ongoing, telephonic meetings requested by the Claims Administration Vendor working for the Claims Administrator had in fact been authorized.  Mr. Cantor wrote in an e-mail to Ms. Reitano:  "I understand that the [BrownGreer] data folks suggested to BP data folks that it would make sense for them to have a weekly technical data call.  I assume that is ok but just wanted to confirm."[32]  Ms. Reitano confirmed that the ongoing meetings were authorized[33] on the same day, responding via e-mail "It's ok,

---

[29]   Cantor Decl. ¶ 11.

[30]   *Id.*; Ex. 10, Reitano E-mail to Roy, Herman, Holstein, Moskowitz, and Cantor at 1 (June 27, 2012) ("Mr. Juneau has asked me to re-iterate, that the point of contact in the Administrator's Office is myself.").

[31]   Cantor Decl. ¶ 12.

[32]   Ex. 11, Cantor E-mail to Reitano at 1 (Nov. 16, 2012); Cantor Decl. ¶ 13.

[33]   Class Counsel's suggestion that BrownGreer looked to Mr. Cantor for approval of their request to have weekly meetings with BP's technical representatives, *see* Pls.' Mem. at 9, is not true.  Cantor Decl. ¶ 14.  As discussed above, the meetings were approved by CSSP General Counsel.  It appears that Class Counsel may have misconstrued a notation on an agenda.  That notation merely indicated that BP's counsel had approved BP's participation. *Id.*

thanks for confirming, Dan."[34]  BP's meetings were no "secret."  Instead, they were expressly approved by the CSSP.

As the meeting agendas demonstrate, the meetings concerned technical and data issues— they did not constitute an improper attempt to obtain information or influence claims processing.[35]  Class Counsel quote selectively from the agendas and speculate.  But the full text of the agendas—which are attached as Exhibit 14 to Class Counsel's memo in support of their motion—demonstrate that the meetings concerned matters of technical and procedural routine, not the merits of claims evaluation.  Read in context, the excerpts Class Counsel cite are not to the contrary:

- *November 20, 2012*: Class Counsel point to the line "Weekly Data Call Approval By Dan" and ask why BrownGreer would "look[] to BP Counsel with respect to the approval of the weekly calls?"[36]  Mr. Cantor did not "approve" the meetings at issue, but obtained approval from the CSSP and authorized the BP data team to participate in the meetings in light of that approval.[37]  The agenda reflects this fact.[38]

- *March 5, 2013*: Class Counsel suggest that "BP appears to be requesting the name of the Claiming Entity, in addition to the unique Claimant ID."[39]  But the agenda shows that BrownGreer and BP identified a data issue regarding claimants' names generally—names were missing from

---

[34]  Ex. 11, Reitano E-mail to Cantor at 1 (Nov. 16, 2012); Cantor Decl. ¶ 14.

[35]  *See* Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions.

[36]  Pls.' Mem. at 9.

[37]  Cantor Decl. ¶ 14.

[38]  Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions, 11/20/12 Notes.

[39]  Pls.' Mem. at 10.

previously populated spreadsheet fields, even though they were visible on the CSSP web portal.[40]

- *March 19, 2013*: Class Counsel suggest that BP's request for a field displaying "Accountant or Accounting Firm" data indicates that BP wished to "communicate with the Program Accountants directly . . . to influence the way that they were processing the claim."[41] This is speculation unsupported by any evidence that BP did so.

- *June 4, 2013*: Class Counsel suggest that BP improperly requested "a 'preliminary' weekly notice of the specific Claims . . . referred for a Moratoria Loss Review."[42]  Class Counsel fail to disclose that BP made its request to the Claims Administrator's Office,[43] and that the Claims Administrator communicated BP's request to Class Counsel, who were given an opportunity to respond before any action was taken.[44]

- *June 19, 2013*: Class Counsel suggest that BP improperly asked "to be told which specific Claims have gone into the Document Investigation Process."[45]  Again, Class Counsel fail to disclose that BP made the request through formal channels.  BrownGreer sought approval from the Claims Administrator before acting on the request[46] and the Claims Administrator gave Class Counsel an opportunity to comment.[47]

---

[40] Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions, 3/5/13 Notes.

[41] Pls.' Mem. at 10.

[42] *Id.*

[43] *See* Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions, 6/12/13 Notes.

[44] S*ee* Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions, 7/25/13 Notes.

[45] Pls.' Mem. at 10.

[46] *See* Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions, 6/19/13 Notes.

[47] *See* Pls.' Mem. Ex. 10, Agenda Items for BrownGreer Calls With BP Regarding Data Questions 7/25/13 Notes.

"[I]t is only reasonable to assume," Class Counsel say, that discussions at the IT meetings "ventured into issues beyond what is reflected in the formal written Agendas."[48]  But whatever Class Counsel may speculate about BP, there is no reasonable basis to assume that BrownGreer would discuss unauthorized subjects—and, of course, Class Counsel offer no evidence that anyone did.

### III.    BP Has Not Violated the Settlement Agreement or Confidentiality Orders.

Class Counsel assert that BP has breached the Settlement Agreement (and possibly applicable confidentiality orders), but they do not say how.  Nor can they.

### A.    Class Counsel Have Waived Any Claim of Breach.

At two places in their brief, Class Counsel assert that BP violated Sections 9.1, 16.1, and 17.1 of the Settlement Agreement.[49]  At both points, Class Counsel make the assertion in a single sentence, without explanation, argument, or citation to case law.  The only support for the assertion is Class Counsel's own e-mail of complaint to the Claims Administrator, which also makes only general, unsupported allegations.[50]  The Court should deem these unsupported factual allegations waived.  *See Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453-54 (5th Cir. 2007) (holding that even if arguments are mentioned in a brief, they are waived if the party does not provide adequate legal and factual support); *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 183 n.24 (5th Cir. 2003) ("A litigant's failure to provide legal or factual analysis results in waiver.").[51]

---

[48]   Pls.' Mem. at 10.

[49]   *See* Pls.' Mem. at 8, 12.

[50]   Pls.' Mem. Ex. 7, Herman E-Mail to Juneau at 1 (Oct. 24, 2013).

[51]   In addition, BP objects to any attempt by Class Counsel to make and develop arguments relating to Sections 9.1, 16.1, and 17.1 for the first time only in reply.  *See Conway v. United*

**B.    BP's Court Filings and Other Communications Have Not Violated the Settlement Agreement or Confidentiality Orders.**

Class Counsel's memorandum asserts—also without explanation—that unspecified "court filings" violated Sections 9.1, 16.1, and 17.1.[52]  It is true enough that "[j]udges are not like pigs, hunting for truffles buried in briefs," *De la O v. Hous. Auth. of El Paso, Texas*, 417 F.3d 495, 501 (5th Cir. 2005) (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)), but no amount of hunting in Class Counsel's brief will turn up even a listing of the supposedly offending "court filings."[53]

There is nothing in the Settlement Agreement, of course, that prohibits BP (or Class Counsel) from filing motions and briefs to correct errors in its interpretation.[54]  The Agreement

---

*States*, 647 F.3d 228, 237 n.8 (5th Cir. 2011) ("Arguments raised for the first time in a reply brief are forfeited."); *see also Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008) ("[A]rguments cannot be raised for the first time in a reply brief.").

[52]   Pls.' Mem. at 12.

[53]   Although Class Counsel fail to name the "court filings" at issue, BP's actions have been consistent with the Settlement Agreement.  Section 9.1 requires the parties' communications regarding the Settlement Agreement to "be made in good faith," but BP's efforts to correct what it believes are misinterpretations of the Settlement Agreement and to address problems with the administration of claims do not demonstrate a lack of "good faith."  Section 16.1 requires the parties "to take all actions necessary to obtain final approval" of the Settlement Agreement.  BP took all actions necessary to obtain final approval of the Settlement—which the Court granted on December 21, 2012.  Order & Judgment [Rec. Doc. 8139].  Similarly, Section 17.1, obligates the parties "to support the final approval and implementation" of the Settlement and "defend it against objections, appeal, or collateral attack."  BP defended the Settlement against objections in its court filings.  *See* BP's Reply Mem. in Support of Mot. for Final Approval of the Settlement Agreement (Oct. 22, 2012) [Rec. Doc. 7731].  BP also argued before the Fifth Circuit that the Settlement Agreement, as properly interpreted, is fair, reasonable, and adequate.  *In re Deepwater Horizon*, No. 13-30095, Doc. No. 00512358457 at 27 (5th Cir. Aug. 30, 2013).

[54]   Indeed, both the Fifth Circuit and this Court have adopted BP's arguments to reverse the CSSP's prior policy, which did not require matching of revenues and expenses under the business economic loss ("BEL") framework.  *See In re Deepwater Horizon*, 732 F.3d 326, 339 (5th Cir. 2013); Rec. Doc. 12055 at 1-6.

says just the opposite:  "Issues or disagreements that cannot be unanimously resolved" by a panel composed of the Claims Administrator and representatives of Class Counsel and BP "will be referred to the Court for resolution."[55]

Class Counsel are also mistaken that BP's "paid advertisements," "websites," and "corporate statements to the press" violate Sections 9.1, 16.1, and 17.1.[56]  No provision of the Settlement Agreement prohibits BP from commenting publicly about the Agreement or its interpretation and implementation.  Class Counsel are also free to comment publicly, and they have done so, criticizing BP relentlessly.  This speech—whether BP's or Class Counsel's—is constitutionally protected.  *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 377 (1997) ("[C]ommenting on matters of public concern" belongs among the "classic forms of speech that lie at the heart of the First Amendment."); *see also Connick v. Myers*, 461 U.S. 138, 154 (1983).  "Court orders aimed at preventing or forbidding speech 'are classic examples of prior restraints.'" *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493-94 (5th Cir. 2013) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

## IV.   Class Counsel Identify No Legitimate Basis for Cutting Off BP's Access to "Claims-Related Data."

Ultimately, Class Counsel fail to offer any good reason for reversing course and denying access to the claims-related data, as provided for in the Settlement Agreement and Policy No. 378, and as previously agreed by the parties.  Class Counsel assert that providing BP with objective data compromises the program's "independence," but do not explain why that is true and do not provide any example where that has happened.  Class Counsel also assert that the CSSP "do[es] not need assistance from BP with the proper and efficient evaluation and

---

[55]   Settlement Agreement § 4.3.4.

[56]   Pls.' Mem. at 12.

determination of claims."[57]  But the point of access is not to provide assistance but to ensure accountability through transparency.  Hiding data behind a wall of secrecy only undermines confidence in the integrity of the program and raises questions as to its independence.

Class Counsel concede that they and BP have equal access to Settlement Program data.[58] The February 2014 report prepared by IBM examined BP and Class Counsel's level of access to claims-related data through both the CSSP web portal and back-up files of the production claims database,[59] and it confirmed that the parties' level of access is equal.[60]  Equal access is fair access.  There is no reason or basis to change.

## CONCLUSION

For the foregoing reasons, Class Counsel's motion should be denied.

---

[57]   Pls.' Mem. at 11-12.

[58]   Pls.' Mem. at 6, 11.

[59]   Class Counsel concede that the Claims Administrator offered to make electronic back-up files available to Class Counsel in October 2013 (Pls.' Mem. at 11 n.20), and so their argument that "BP is provided with electronic back-up files and [has] enhanced abilities to monitor appeals that are not available to Class Counsel" (Pls.' Mem. at 11) is unavailing.

[60]   Pls.' Mem. Ex. 11, IBM Report at 4 (Feb. 6, 2014) ("BP and PSC users of the BG web portal are provided access to the same capabilities and information at the same point in time.").

March 11, 2014

Respectfully submitted,

    */s/ Kevin M. Downey*
Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029

Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

*OF COUNSEL*

    */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of March, 2014.

        */s/ Don. K. Haycraft*
        Don K. Haycraft