UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | : | MDL No. 2179 |
| *"DEEPWATER HORIZON"* in the | : | |
| GULF OF MEXICO, on APRIL 20, 2010 | : | SECTION:  J |
| | : | |
| This document relates to: | : | JUDGE BARBIER |
| | : | |
| No. 12-970 | : | MAG. JUDGE SHUSHAN |

_____

**REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO PROTECT AND PRESERVE
CLAIMANT CONFIDENTIALITY AND TO ENFORCE THE ORDERS OF THE COURT**

It is undisputed that the Parties specifically discussed, negotiated, intended, and agreed

that "no party should have the ability to interfere with the Settlement Program's evaluation of a

claim while the evaluation is in process."[1] BP completely ignores this uncontroverted fact in its

Opposition, and, instead, attempts to argue that, although no access to the Claims Files "was

agreed to by the parties to ensure that there would be no interference with the Settlement

Program's evaluation of a claim while it is in process,"[2] Class Counsel supposedly intended and

agreed that BP would be allowed to extract and utilize all of that very same information in a

different format.   Apparently, BP now contends that a "Claim File" is limited to only the

Program's internal "work papers" – despite the fact that "Claim" is defined under the Settlement

Agreement as "any demand or request for compensation, together with any properly completed

form and accompanying required documentation, *submitted by a Claimant* to the Settlement

Program."[3]  Clearly, BP's position is unsupported by the record.

---

[1] DECLARATION OF BP COUNSEL DAN CANTOR, ¶3.

[2] LETTER FROM BP COUNSEL DAN CANTOR (March 11, 2013), p.2.

[3] SETTLEMENT AGREEMENT, Section 38.19 (emphasis supplied); s*ee also* ORDER RE CONFIDENTIALITY OF CLAIMS INFORMATION (June 29, 2012) [Doc 6822] ¶2; *see also, e.g.,* SETTLEMENT AGREEMENT, Section 4.4.1 ("The Parties shall jointly request that the Court issue an order directing that all claims-related information files and data previously submitted to the GCCF and/or that has been submitted to the Transition Process shall be transferred to the Settlement Program").

**BP's Exhibits Unequivocally Support Class Counsel's Recollection of the Discussions that Occurred During the Summer of 2012.**

BP submits three e-mail communications from the Summer of 2012 with its Opposition.

BP Exhibit 2 is a series of e-mails regarding the agenda for a June 26, 2012 Meeting. The e-mail from Co-Lead Counsel raising data access issues refers to:

> Access of *claimants* to any potential alleged GCCF "*fraud investigation*" information that might be provided to the Program[4]

This is entirely consistent with Class Counsel's recollection that those discussions centered on "the extent to which *Claimants* would be provided with access to information regarding their Claims from the Program"; in particular, "providing a Claimant with … information regarding the basis upon which he or she might be investigated for possible fraud."[5]

BP Exhibit 3 is a series of e-mails following the June 26th Meeting between and among BP, Class Counsel, and the Program's IT Specialist, Chris Reade.  Notably – and contrary to BP's contention that there was some "agreement" by Class Counsel that BP would have access to Claimant-specific pre-Determination data – both Co-Lead Class Counsel echoed the clear and express language of the Settlement Agreement (and Court Order) that: BP "shall *not* have access to any individual Claim File for a Claim that is being processed and has not yet been resolved in the Settlement Program."[6]  First, Mr. Roy asks:

> **Why will ANY data be disclosed from a claim file to BP or class counsel until after an offer is made.  That's how I thought it was left after today's meeting with the Administrator.**[7]

---

[4] BP EXHIBIT 2 (emphasis supplied).  The only other reference to data access issues in BP Exhibit 2 is: "Potential Access by BO [sic] and Class Counsel to status / processing / evaluation of initial '*test cases*'" (emphasis supplied).

[5] MEMO IN SUPPORT OF MOTION, p.4.  *See also, e.g.,* MEMO TO CLAIMS ADMINISTRATOR (March 22, 2013) p.2; HERMAN E-MAIL TO JUNEAU (Oct. 24, 2013).

[6] SETTLEMENT AGREEMENT, Section 4.4.14 (emphasis supplied); ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573] ¶9 (emphasis supplied).

[7] BP EXHIBIT 3 (emphasis supplied).

Later, Mr. Herman expresses the same understanding:

> …what I think this is intended to refer to is the disclosure (to BP, Class Counsel and the Claimant) of individual Claims Information *after* the Determination by the Program as to that Claim, (not a ruling of the Court). As I have indicated separately, and as Jim has indicated below, **I don't think there are any data points that BP is allowed to have from in-process Claims. They (and Class Counsel) are only allowed to have general aggregate nonclaimant-specific data, until there is a Determination by the Program.**[8]

BP Exhibit 4 is an e-mail string from July 2012 apparently evidencing some transfer of data from BrownGreer to BP.[9]  The communications are limited solely to BP and Program representatives.  Class Counsel are not included or copied on the communications.

**The Agenda Item Notes from the Secret Meetings between BP and BrownGreer Appear to Confirm that Someone at Brown Greer Believed that BP was Not Entitled to get Claimant-Specific Data Prior to a Formal Determination**

The Agenda Item Notes from August 13, 2013 for the secret meetings between BP and BrownGreer reflect the following with respect to Individual Economic Loss NAICS Codes:

> BG: we confirmed that we are displaying this data field only for claims that have received an Eligibility or Denial Notice. This is correct and in line with the current policy on what data we are authorized to transfer. Any claims that were previously displaying this data field without having received an Eligibility or Denial Notice have been updated to hide this information until we issue such a Notice.[10]

BP effectively concedes that Class Counsel were neither invited nor aware of these secret meetings; that BP controlled the agenda for these meetings; that they occurred for months before they were "approved" by Ms. Reitano; and that Claimant-specific information was discussed, outside the presence of either Class Counsel or Claimant's own attorney.[11]

---

[8] BP EXHIBIT 3 (emphasis supplied).

[9] Notably, BP's back-door access to pre-Determination data since the start of the Settlement Program belies BP's repeated assertions before the U.S. Fifth Circuit that it did not understand the nature or magnitude of potentially affected claims until the end of 2012 or beginning of 2013.

[10] AGENDA ITEMS FOR BP-BROWNGREER WEEKLY DATA CALLS, at pdf p.47.

[11] In addition to the issues referenced in Class Counsel's original MEMORANDUM IN SUPPORT (at pp.9-10), these minutes also reflect, for example: **(i)** documents and spreadsheet referenced throughout the Minutes that were not provided to Class Counsel; **(ii)** *ex parte* discussions regarding specific Claimants and Claims; **(iii)** addition and management of fields at BP's request; **(iv)** apparent removal of "matching appeals" filed by BP from the number of

**BP Refuses to Answer Questions About Whether Confidential Claimant-Specific Data May Have Been Sold, Pooled or Otherwise Shared with Third Parties**

On February 26, 2014, as a follow-up to an IT "workstream" call in which the data analytics company SAS was discussed, Class Counsel wrote to BP requesting information about confidential Claimant-specific data that may have been shared by BP with SAS or other firms:

> Has BP provided Claimant-specific information to SAS and/or any other accounting, investigation or data analytics contractor, sub-contractor, vendor or consultant?
>
> If so, what measures, if any, has BP taken to ensure that such vendors or consultants comply with the Protective Orders and do not, in any way, share, sell or otherwise pool Claimant-specific information with or to others, either directly or indirectly?

To the best of Class Counsel's recollection and belief, BP has never provided a response to this request.

**Class Counsel Never Contended that there Was a "Drafting Error"**

As reflected in BP Exhibit 3, Class Counsel always believed that BP was entitled to "general aggregate nonclaimant-specific data".

When this issue arose, BP Counsel attempted to draw some distinction between the term "Claims-related data" utilized in the fourth sentence of Section 4.4.14 and the term "Claim Files" which is utilized in the last sentence of Section 4.4.14.

Class Counsel simply commented that the undersigned was "not sure that there was a conscious and material intent to not repeat 'Claims-Related Data' along with Claims Files" in that last sentence – [but] "Nevertheless, and in any event" [it doesn't matter, because the] "Claims-Related Data" [to which BP is entitled] "refers to general, aggregate, non-personal, non-confidential information about the general nature and status of various types of claims, (access to

---

Program Appeals reported in the Status Reports; **(v)** inclusion by BrownGreer of "all text ever entered in global notes" for each individual Claim at BP's request; **(vi)** inclusion of "Reportable revenue" field for individual Claimants at BP's request. *See generally* AGENDA ITEMS FOR BP-BROWNGREER WEEKLY DATA CALLS.

which is not in dispute); it doesn't mean all of the specific information from individual Claims Files simply extracted into Excel spreadsheets."[12]

Apparently, BP now contends that a "Claim File" is limited to only the Program's internal "work papers".[13]

BP apparently wants the Court to believe that, although no access to the Claims Files "was agreed to by the parties to ensure that there would be no interference with the Settlement Program's evaluation of a claim while it is in process,"[14] Class Counsel nevertheless intended and agreed that BP would be allowed to extract and utilize all Claimant- and Claim-specific information and data in an Excel spreadsheet format.[15]

## BP Continues to Improperly Attempt to Influence the Investigation, Evaluation, Delay and Denial of Claims

BP effectively admits that it was attempting to influence the processing and payment (*i.e.* investigation, delay and denial) of at least 700 Claims – while pointing to the irrelevant fact that the Freeh Group is entitled to receive "confidential" information.  The issue is: The Program was intended and agreed to be *independent* and Court-supervised – *not* BP-supervised.

Plaintiffs respectfully submit herewith several recent communications with representatives of BP, the Freeh Group, and the Program, regarding BP's continuing efforts to directly and/or indirectly influence the investigation, evaluation, delay and denial of Claims.[16] To the best of Class Counsel's recollection and belief, BP has not responded.

---

[12] HERMAN E-MAIL TO CANTOR (Feb. 13, 2013).

[13] ***But*** *see:* SETTLEMENT AGREEMENT, Section 38.19 (defining "Claim" as "any demand or request for compensation, together with any properly completed form and accompanying required documentation, *submitted by a Claimant to the Settlement Program*") (emphasis supplied).

[14] LETTER FROM BP COUNSEL DAN CANTOR (March 11, 2013), p.2.

[15] As noted by Class Counsel at the time: "Of all the disingenuous nonsense I have heard out of BP in the last year, this might take the cake." *See* E-MAIL FROM HERMAN TO CANTOR (Nov. 10, 2013).

[16] *See* HERMAN E-MAIL TO WELKER ET AT RE POT "FRAUD" INVESTIGATIONS (Feb. 26, 2014); HERMAN E-MAILS WITH WELKER RE FRAUD CHECKLISTS (Feb. 28, 2014); HERMAN E-MAIL TO DIPPLE RE FRAUD CHECKLISTS (March 6, 2014); HERMAN E-MAIL RE "BOLO LIST" (March 7, 2014).

**Conclusion**

For the above and foregoing reasons, and for the reasons stated in Class Counsel's original Motion, Memorandum, and Exhibits, Plaintiffs respectfully request the Court to enforce the terms of the Settlement Agreement and its own Court Orders, to eliminate BP's access to confidential Claim-specific data, files and other information prior to a formal Eligibility Determination, and to order that all such confidential and unauthorized data be returned.

This 17th day of March, 2014.

Respectfully submitted,

<table>
<tr>
<td>

/s/   Stephen J. Herman

**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

</td>
<td>

/s/ James Parkerson Roy

**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*

</td>
</tr>
</table>

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Reply Brief and Exhibits will be served *via* E-Mail on Counsel for BP this 17th day of March, 2014.

/s/ James Parkerson Roy and Stephen J. Herman

## <u>Exhibits</u>

A.      Herman E-Mail to BP Counsel re Data Analytics (Feb. 26, 2014)

B.      Herman E-Mail to Welker and Piantidosi re Pot. "Fraud" Investigations (Feb. 26, 2014) with BP *New York Times* Ad re Seafood Program

C.      E-Mails between Herman and Welker re "Fraud Checklists" (Feb. 28, 2014)

D.      Herman E-Mail to BP Counsel re FWA (March 6, 2014)

E.      Herman E-Mail re "BOLO" List (March 7, 2014)