1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF LOUISIANA

4   --------------------------------------X

5   In re: OIL SPILL BY THE OIL RIG

6   "DEEPWATER HORIZON" IN THE

7   GULF OF MEXICO, ON APRIL 20, 2010

8

9   Applies to:

10   12-311, Cameron Int'l Corp. v. Liberty

11   Ins. Underwriters, Inc., a/k/a Liberty

12   Int'l Underwriters
     --------------------------------------X

13

14

15         VIDEOTAPED DEPOSITION OF ALAN MANDEL

16                  New York, New York

17                  September 12, 2013

18

19

20

21

22

23

24   Reported by:
     Bonnie Pruszynski, RMR
25   JOB NO. 65662

**Exhibit C**

```
 1                    A. Mandel
 2      Q      Do you do this -- withdrawn.
 3             Do you prepare an account summary
 4   like this for every insurance policy --
 5      A      Yes.
 6      Q      -- you issue?
 7      A      Yes, I do.
 8      Q      This was the account summary for
 9   the 2009-2010 policy year; right?
10      A      Yes.
11      Q      Was that a renewal for Liberty?
12      A      I believe so, yes.
13      Q      Do you recall the first year in
14   which Liberty issued an insurance policy to
15   Cameron for excess liability insurance?
16      A      I believe it was '06-'07.  I
17   believe July.
18      Q      Do you have an understanding as to
19   how Cameron came to talk to Liberty about the
20   possibility of issuing an excess insurance
21   policy in the first instance?
22      A      How did it start?  You want me
23   to --
24      Q      I'm -- my -- withdrawn.
25             My question to you, sir, is:  Do
```

1                    A. Mandel

2   you know who first approached Liberty for

3   purposes of issuing an insurance policy?

4       A       Probably Rusty Lee might have

5   called the office.

6       Q       Had you known Rusty Lee prior to

7   working on the Cameron matter?

8       A       No.

9       Q       What type of business does Liberty

10  view Cameron to be for purposes of risk

11  assessment?

12      A       As risk assessment, it's a

13  hazardous class of business, from both the

14  operation and their pollution -- possible,

15  you know, pollution.

16      Q       Why did Liberty decide, starting in

17  2006, to start issuing insurance policies to

18  Cameron?

19      A       Because we thought the insured had

20  excellent controls to handle their insurance

21  and their agreements, because there were a

22  lot of -- we had meetings.  The first meeting

23  was with Tony Black, who was the risk

24  manager, and he basically told us about the

25  insured's operation, that there were many

1                      A. Mandel

2  controls that they had in place to alleviate

3  our concerns about if something would happen

4  catastrophic, which it did, obviously.

5            I was advised that there were

6  certificates and a dedicated insurance

7  department, hold harmless agreements,

8  indemnification clauses.  Because I

9  point-blank had asked him what happens if a

10  catastrophic -- something happens, you know,

11  that could destroy the ocean and pollution.

12            So, he basically -- and he gave me

13  all the protection to alleviate my concerns

14  on the account.

15     Q    Was it based upon those discussions

16  with Mr. Black and Marsh that you at Liberty

17  decided to issue insurance to Cameron in the

18  first instance and then renew year after

19  year?

20     A    Well, we quoted the account the

21  first year, '06-'07, if we were on the

22  account that year, so we -- after all those

23  concerns, you know, was taken care of, from

24  our underwriting standpoint, and then

25  basically we did renew the account every

1                    A. Mandel

2    year, including after the loss, we still

3    renewed the account, although we cut our

4    limit back.

5         Q      Was it your understanding when you

6    sold the Liberty policy to Cameron that

7    Cameron obtained indemnity agreements in all

8    of its customer contracts?

9         A      Correct.

10        Q      So, every time that Cameron sold

11   equipment to a customer, it was your

12   understanding that Cameron had obtained

13   contractual indemnity?

14        A      Well, not understanding.  I was

15   told by Tony that there was contractual

16   agreements, indemnification agreements.  He

17   had a dedicated insurance department, with

18   both contract wording and language, and I

19   believe they had about 20 employees or so, 20

20   to 24.  I'm not exactly sure, but I think it

21   was over 20.

22        Q      And that was the case every time

23   that Cameron sold a piece of equipment to a

24   customer, that it had an indemnity agreement

25   from the customer?

1                    A. Mandel

2      A     Well, there was indemnity and

3   warranty.  The equipment couldn't be altered.

4   It was a certain warranty after a certain

5   period of time.  There was no responsibility

6   of Cameron if something happened.

7      Q     Was it your -- withdrawn.

8            And those indemnity agreements

9   would cover blowouts?

10     A     It would probably cover almost -- a

11  majority of their product line of equipment.

12     Q     Was it your expectation when you

13  sold Cameron insurance that Cameron's losses

14  would always be covered by its customer

15  indemnity agreements?

16     A     I was under the assumption, yes.

17     Q     Was it your expectation when you

18  sold Cameron insurance that Cameron would

19  always look first to its customer indemnity

20  agreements to cover its losses?

21     A     Yes.

22     Q     Was it also your expectation when

23  you sold Cameron insurance that Liberty would

24  provide coverage and pay Cameron's losses if

25  Cameron's customers refused to provide that

1                    A. Mandel

2    indemnity?

3        A       Could you say that one more time?

4        Q       Was it your expectation when you

5    sold Cameron insurance that Liberty would

6    provide coverage and pay Cameron's losses if

7    Cameron's customers refused to provide

8    indemnity?

9        A       That was never talked -- I can't --

10   I can't form an opinion on that.  I don't

11   know.

12       Q       If Cameron had indemnity agreements

13   with all of its customers and was supposed to

14   look to those customers first for coverage,

15   at what point would Liberty ever have to pay

16   a loss to Cameron?

17       A       I'm not sure.

18       Q       Was it your understanding, when you

19   sold Cameron insurance, that Cameron would be

20   required to sue its customers for indemnity

21   and lose before Liberty would pay anything

22   under the policy?

23       A       I don't -- I don't know.

24       Q       Was it your understanding when you

25   sold Cameron insurance that the Liberty

```
 1                    A. Mandel

 2   policy would not attach unless and until a

 3   court determines that Cameron is not entitled

 4   to contractual indemnity?

 5             MR. DEES:  Object to the form of

 6        the question.

 7             You can answer.

 8        A    That, I am not sure either.

 9        Q    Let's go back to Exhibit 47, which

10   is the account summary.  If you could look at

11   the second page of the summary, please, sir.

12             This discussion describes exposure

13   and controls; right?

14        A    Correct.

15        Q    And midway down, it says:  "The

16   insured limits or caps their liability on

17   their products sold, as if a client had a

18   problem with a valve that was not installed

19   to the right standards which caused a massive

20   oil spill, our insured could not stay in

21   business if the claim caused millions of

22   dollar of damage to the ocean.  Thus, large

23   amount of capital spending would be needed to

24   clean up the spill."

25             What did you mean when you wrote
```

1                    A. Mandel

2    that?

3        A      What did I mean?

4        Q      Um-hum.

5        A      That basically I had asked Tony,

6    the risk manager, and Rusty Lee, why would I

7    want to write this account, as the

8    catastrophic exposure -- if one of the valves

9    or something doesn't work properly, it can

10   cause a massive oil spill or something.  You

11   know, why would I want to get involved in

12   this?  It's just too -- there is not enough

13   money in this account and the exposures are

14   tremendous.

15           So, basically to alleviate my

16   concern, Tony had mentioned that there was --

17   they were going to -- they were capping their

18   liabilities, that yes, they would -- you

19   know, it would go into their policy surplus,

20   that they couldn't afford a catastrophic

21   exposure like that.  So they said they do cap

22   their liabilities with the clients who they

23   sign.  So, he alleviated my concerns.

24       Q      And that would be by indemnity

25   agreement or --

1                    A. Mandel

2       A       Indemnity agreement, warranties,

3    certificates of insurance, hold harmless,

4    et cetera, or -- you know, on that.  So I

5    took Tony's word.  He's a risk manager, I

6    believe 20 years.  Otherwise, I wouldn't -- I

7    wouldn't have written the account at all.

8    Too hazardous.

9       Q       And those agreements that would cap

10   liabilities were with Cameron's customers;

11   right?

12      A       The insurance department of Cameron

13   I believe had the agreements.  What I was

14   told, there is certain people in their

15   departments -- I think they have a contract

16   department.  They have all certain -- some

17   organization.

18      Q       But the agreements themselves were

19   between Cameron and its customers; right?

20      A       I believe so, yes.

21      Q       You would agree that if one of

22   those customers -- withdrawn.

23              Is it -- withdraw.

24              So, Cameron had indemnity

25   agreements with customers; right?

1                    A. Mandel

2       A      That's what Tony Black told me.

3       Q      And that was your understanding

4   when you issued the policies to Cameron;

5   right?

6       A      That was the only reason I had

7   issued the policy, to write the account.

8       Q      And so as a result, if Cameron

9   incurred a loss, it would look first to the

10  customer to satisfy its loss; right?

11      A      Correct.  What I was advised.

12      Q      And if the customer did not agree

13  to pay the loss under the customer contracts,

14  Liberty would be responsible for that loss,

15  correct?

16      A      That is a claim issue, so I can't

17  give you -- I can't give you a valid opinion.

18  I just don't know.

19      Q      So, if Cameron had suffered a loss

20  in connection with a blowout for which you

21  sold Cameron an insurance policy, and the

22  customer with whom Cameron had an

23  indemnifying agreement refused to pay, you

24  don't know whether Cameron had insurance?

25      A      I don't know how that would work,

```
 1                    A. Mandel
 2   contractual indemnities for purposes of
 3   assessing their impact on the "other
 4   insurance" provision; correct?
 5       A     Correct.
 6       Q     Is there another provision in the
 7   Liberty policy that would render relevant the
 8   contractual indemnities?
 9       A     No idea.
10       Q     What relevance to Cameron's risk
11   did the contractual indemnities that you
12   discussed with Mr. Black and Mr. Lee have?
13       A     Tremendous impact.  Wouldn't touch
14   this account with a ten-foot poll.  Not on
15   the exposure, and the catastrophic exposure
16   especially.
17       Q     And that's because you had the
18   understanding that the customers of Cameron
19   that owed Cameron indemnity would pay the
20   losses that Cameron suffered.
21       A     Well, there was a cap -- Tony Black
22   told me there was a -- they capped the --
23   their exposure in their contracts that they
24   could be held liable, Cameron.
25       Q     And it was based upon the
```