UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SUSHAN |
| **THIS DOCUMENT APPLIES TO:**<br>No. 12-00311 | * * | **JURY TRIAL DEMANDED** |

**LIBERTY INTERNATIONAL UNDERWRITERS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING CAMERON'S FORFEITURE OF COVERAGE**

This coverage dispute between Cameron International Corporation ("Cameron") and Liberty International Underwriters, Inc. ("Liberty") arises from the *Deepwater Horizon* incident and Cameron's related settlement with BP. Cameron contends that Liberty was obligated to pay the $50 million Policy limits to fund Cameron's settlement with BP and is liable for that amount and more for failing to do so. As shown below, Liberty owes no obligation under the Policy. As Cameron repeatedly argued to this Court, Cameron had valid and enforceable indemnity rights against Transocean as a matter of law which it transferred over Liberty's objections when it settled with BP. Cameron's transfer of valid and enforceable indemnity rights without Liberty's consent impaired Liberty's subrogation rights to Liberty's prejudice *and* breached the policy's requirement that Cameron not unilaterally "assume any obligation", extinguishing coverage under the Liberty Policy. Liberty's Motion for Partial Summary Judgment should be granted.

# I.   BACKGROUND

## A.   Liberty's Insurance Policy

Liberty issued to Cameron an excess insurance policy, no. LQ1-B71-198583-046, which was in effect from July 1, 2009 to July 1, 2010 ("the Policy").[1]   The Policy is a part of Cameron's insurance tower and provides $50 million in limits for covered "loss" above $103 million in underlying coverage, subject to all Policy terms, conditions, and exclusions.

The first underlying policy to which the Policy generally follows form[2] mandates that Cameron do nothing to impair any subrogation rights that Liberty may have:

> **VI.    CONDITIONS [FIRST UNDERLYING POLICY][3]** . . .
>
> O.    Transfer of Rights of Recovery
>
> > If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us.  The Insured must do nothing after loss to impair these rights and must help us enforce them.

The Policy also mandates as a condition of coverage that Cameron not unilaterally assume obligations:

> **V.    CONDITIONS** . . .
>
> E.    Notice of Occurrence . . .

---

[1]    *See* Liberty Excess Policy, attached as Ex. A.

[2]    The Policy provides:

Except for any definitions, terms, conditions and exclusions of this Policy, the coverage provided by this policy is subject to the terms and conditions of the First Underlying Policy.

*Id.* at LIU01498.

[3]    *See* Illinois National Ins. Co. Policy, attached as Ex. B, at § VI, ¶ O.

804687_3

4. The Insureds will not, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.[4]

As shown below, Cameron had indemnity rights against Transocean encompassing its liability to BP which Cameron released in the BP settlement. Release of these valuable rights breached both the Policy's Transfer of Rights and assumption of obligations provisions.

## B.   Transocean's Agreements to Indemnify Cameron

Transocean had agreed in writing to indemnify Cameron for the very liability it paid BP to settle. Transocean's indemnity obligation arises through separate agreements providing a clear line of demarcation for risk allocation to the parties, as is common in the offshore drilling industry. First, the Drilling Contract between Transocean and BP governing construction, operation, and use of the *Deepwater Horizon* contains pertinent risk allocation provisions. As this Court has observed, "[t]he Drilling Contract reflects that [BP and Transocean] attempted to allocate risk ahead of time, ostensibly in the hope that some degree of certainty may be brought to the risks inherent in that undertaking".[5] The Drilling Contract obligates BP to fully indemnify Transocean for compensatory damages from subsurface pollution claims arising from the use of the *Deepwater Horizon* to drill wells, even if a claim is the result of Transocean's strict liability, negligence, or gross negligence.[6] Significantly, BP agreed to indemnify Transocean for such claims "without regard to whether the claim against [Transocean] is the result of an indemnification agreement with a third party."[7]

---

[4]   Ex. A, at LIU 01501.

[5]   *See* Order and Reasons, Rec. Doc. No. 5446, at p. 16.

[6]   *See* Drilling Contract, attached as Ex. C, at Art. 24.2.

[7]   *See id.* at Art. 25.1.

804687_3

In the subsequent contracts between Transocean and Cameron governing (a) Cameron's sale of BOP equipment for the Deepwater Horizon as specified in the Drilling Contract and (b) any subsequent work on the BOP equipment, Transocean directly undertook indemnity obligations in Cameron's favor.  Specifically, (1) the written Terms and Conditions for the sale of the Deepwater Horizon BOP equipment from Cameron to Transocean and (2) the Master Service Agreement ("MSA") between Transocean and Cameron governing work on the equipment both obligate Transocean to indemnify Cameron for certain pollution losses, to the extent a customer or supplier owed Transocean indemnity:

### Purchase Order's Terms & Conditions:[8]

In the event that Purchaser [Transocean] is entitled to indemnity *under any contract* with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control.  *Purchaser [Transocean] will provide Seller [Cameron] with the benefit of such indemnity to the fullest extent possible.*

### Transocean-Cameron Master Services Agreement:[9]

Transocean agrees that *if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution,* loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, *Transocean will provide Contractor [Cameron] with the benefit of such indemnity to the fullest extent possible.*

When Transocean agreed to provide Cameron the benefit of Transocean's indemnity contracts with its customers, Transocean had already executed such an indemnity contract with its customer BP -- the Drilling Contract.  As Cameron has explained, "When the Drilling Contract was signed, BP and Transocean surely anticipated that Transocean would give a

---

[8]  *See* Purchase Order Terms and Conditions ("Terms and Conditions"), attached as Ex. D, at ¶ 18 (emphasis added).

[9]  *See* Master Service Agreement, attached as Ex. E, at CAM_CIV_0017234 (emphasis added).

804687_3

pollution indemnity to its suppliers, following the time-honored practice of allocating pollution risk back to the operator."[10]

## C.   The Blowout and Cameron's Indemnity Demand

On April 20, 2010, a blowout of the Macondo well occurred, causing an explosion and fire aboard the Deepwater *Horizon* and leading to hundreds of lawsuits naming Cameron, Transocean, BP and other defendants.  Considering their potential exposure, both Transocean and Cameron vigorously sought to enforce their valuable indemnity rights throughout the litigation.

Cameron demanded that Transocean defend and indemnify it against the *Deepwater Horizon* claims based on the parties' contracts.[11]  Transocean denied the tender in part, but nevertheless tendered Cameron's claim to BP.[12]  Transocean also promised to "of course, pass onto Cameron any indemnity it is able to obtain (and pass) from BP."[13]

Cameron assured Liberty that it expected to be fully indemnified for any liability.  Only days after the spill, Cameron told Liberty, "[I]n our industry it is normal practice for equipment manufacturers and service providers to seek indemnification for pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowouts or loss of well control."[14]  Cameron also repeatedly represented in public filings after the spill that it had limited its liability, if any, through its indemnity agreements:

---

[10]   Reply, Rec. Doc. No. 4865, at p. 8.

[11]   *See* CIC0001734, attached as Ex. F; B. Eastman Depo., attached as Ex. G, at 211:11 to 212:9.

[12]   *See* CIC 15156, attached as Ex. H; Ex. G (B. Eastman Depo.), at 214:16 to 216:10.

[13]   *See* CIC0014934, attached as Ex. I; Ex. G (B. Eastman Depo.), at 209:19 to 211:5.

[14]   CIC0000246-48, attached as Ex. J; T. Black Depo., attached as Ex. K, at 177:17 to 183:8.

> The applicable contracts between Cameron and Transocean entities . . . provide that in the event Transocean is entitled to indemnity under any contract with its customers or suppliers for pollution or other damages associated with blowout or loss of well control, Transocean will provide Cameron with the benefit of such indemnity to the fullest extent possible.  Transocean has publicly stated that it has a full pollution indemnity from BP, although BP has so far declined to acknowledge any obligation under the indemnity.[15]

Cameron likewise told underwriters considering whether to renew its policies that it "d[id] not believe [it had] any liability" and "if there was found to be any liability, Cameron is expecting to be fully indemnified and defended by the parties[.]"[16]

Cameron promised to vigorously pursue its indemnities if necessary, and to tap into insurance only as a last resort: "If it is ultimately determined that the Company bears some responsibility, and therefore liability, for the costs and damages caused by this event, we will rely on our contractual indemnity rights and then, if and to the extent necessary and available, on our insurance coverage."[17]

## D.    Cameron's Motion for Summary Judgment on Indemnity

Both Cameron and Transocean ultimately turned to this Court to enforce their indemnity rights. Transocean moved for summary judgment on its indemnity claim against BP based on the Drilling Contract on November 3, 2011.[18]  Five days later, Cameron moved for summary judgment against Transocean, claiming the parties' contracts obligated Transocean, as a matter of law, to:

---

[15]   March 31, 2011 10-Q, attached as Ex. L, at p. 15; *see also* June 30, 2011 10-Q, attached as Ex. M, at p. 14.

[16]   MARSH 001903, attached as Ex. N.

[17]   Ex. L (3/31/11 10-Q), at p. 17; *see also* Ex. M (6/30/11 10-Q), at p. 14; Ex. G (B. Eastman Depo., at 190:5 to 193:17 (discussing Cameron's "three-pronged" strategy to contest liability, then look to contractual indemnities, then look to insurance).

[18]   *See* Rec. Doc. No. 4477.

(a) Hold Cameron harmless from all the pending claims asserted in these consolidated proceedings;

(b) Undertake the defense of Cameron against all of these claims; and

(c) Reimburse Cameron for all attorneys' fees and expenses incurred in defense of the covered claims.[19]

In support of its Motion, Cameron presented persuasive arguments that Transocean owed Cameron valuable and valid indemnification.[20]   Cameron argued that the indemnification provisions should be enforced as written because parties in the offshore drilling industry use such provisions to "'evaluate [their] risk exposure and obtain appropriate insurance (or elect to self-insure).'"[21]  As Cameron explained: "If not enforced as written, indemnity provisions will not 'enable' either party to measure the risk exposures it will absorb or insure."[22]  Cameron set out a two-prong test for the Court's determination of Transocean's indemnity obligations.  Under this test, Transocean owed Cameron indemnity because:

(i)    Transocean is "entitled to indemnity from BP under the Drilling Contract"; and

(ii)   Transocean is therefore obligated to provide Cameron with "the benefit of such indemnity to the fullest extent possible".[23]

On November 15, 2011, this Court issued its decision concerning BP's "additional insured" status under Transocean's insurance policies, in which the Court interpreted the very provisions of the Drilling Contract upon which Transocean relied to support its indemnification

---

[19]    *See* Rec. Doc. No. 4524.

[20]    In connection with this Motion, Liberty adopts in their entirety Cameron's summary judgment motion, memorandum, reply, and all exhibits. *See* Rec. Doc. Nos. 4524 and 4865.

[21]    Rec. Doc. No. 4524-1, at pp. 1-2.

[22]    *Id.* at 19.

[23]    Rec. Doc. No. 4865, at p. 2.

7

claim.[24]   Considering the Drilling Contract's indemnity provisions (Arts. 24.1 and 24.2), the Court found that BP, and not Transocean, had assumed responsibility for subsurface pollution:

> BP, under the Drilling Contract, assumed responsibility for Macondo well oil release pollution liabilities. BP's assumption of pollution responsibility is found in Article 24.2, in which BP assumes pollution liabilities not assumed by Transocean in Article 24.1. Article 24.1 allocates to Transocean liabilities for pollution originating on or above the surface of the water. *The Deepwater Horizon Incident entailed a subsurface release; thus, Transocean did not assume pollution liabilities arising from the incident. Further, because Transocean did not assume these liabilities under Article 24.1 of the Drilling Contract, BP assumed them under Article 24.2's catchall provision*: responsibility for pollution arising out of or connected with operations under the contract and not assumed by Transocean in Article 24.1.[25]

This decision previewed the Court's likely ruling on Transocean's indemnity claims, which primarily rested on the same provisions. Consistent with its November decision, the Court held two months later that the Drilling Contract obligated BP to indemnify Transocean for third-party compensatory damage claims against Transocean related to sub-surface pollution, even if the claim is the result of Transocean's own strict liability, negligence, or gross negligence.[26] The Court found the parties intended the broad indemnity obligations contained in Article 25.1 of the Drilling Contract to be "fully incorporated" into Article 24.2, which concerned loss associated with sub-surface pollution.[27]

---

[24]   *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* MDL No. 2179, 2011 WL 5547259, at **22-23 (E.D. La. 2011) (Rec. Doc. No. 4588). The Court observed, "[U]nder Section II of the Policies, BP is an additional insured only for liabilities assumed by Transocean under the terms of the Drilling Contract. Thus, the Court must look to the terms of the Drilling Contract to determine the scope of coverage." *Id.* at *22.

[25]   *See id.* at *23 (emphasis added). Although this decision was appealed, the Court's interpretation of the Drilling Contract is not directly at issue.

[26]   Order and Reasons, Rec. Doc. No. 5446.

[27]   *Id.* at p. 10.

804687_3

**E.**    **Cameron's Settlement with BP and Withdrawal of its Motion**

Based on the Court's November 15, 2011 ruling, Liberty reasonably anticipated that the Court would apply the same analysis to Cameron and Transocean's pending contractual indemnification motions set for hearing on December 16, 2011 and grant Cameron's and Transocean's motions for indemnification from Transocean and BP, respectively.  Liberty communicated that belief to Cameron.[28]  But, instead of pursuing indemnification, just four days after telling the Court in its Reply Brief that "Cameron's interpretation of the clear and unambiguous language of the Transocean pollution indemnity obligation is the only reasonable interpretation presented",[29] Cameron suddenly attempted to force Liberty to accept a settlement that waived all contractual subrogation and indemnification rights, including Cameron's valuable indemnification rights against Transocean that Transocean "essentially had acknowledged".  Liberty flatly objected to the unilateral waiver of its subrogation rights, but Cameron settled anyway over Liberty's objection.   Cameron never presented Liberty with the opportunity to consider contributing to a settlement that did *not* require transfer of Cameron's indemnity rights; the transfer of these rights was at all times a condition of the deal as presented to LIU.

The final settlement obligated Cameron to pay BP $250 million and to transfer its subrogation and indemnification rights to BP.[30]  In exchange, BP agreed to indemnify Cameron for claims (except fines, penalties, sanctions, or exemplary damages) related to pollution from

---

[28]    *See, e.g.,* CIC 005127-29, attached as Ex. O

[29]    Reply, Rec. Doc. No. 4865.

[30]    Amended Complaint, Rec. Doc. No. 6287, at ¶ 46; Settlement Agreement, attached as Ex. F, at ¶ 4.3 (emphasis added).  Cameron also assigned the indemnity claim to BP.  Ex. P, at ¶ 4.5.

804687_3

the *Deepwater Horizon* incident. The settlement was funded in part by some of Cameron's other insurers and in part by Cameron itself.[31]

Cameron withdrew its Motion for Summary Judgment on the morning of the December 16, 2011 hearing, thus precluding any determination of Cameron's right to indemnification from Transocean.[32] But determining Cameron's right to indemnification from Transocean was critical to triggering coverage under the Policy pursuant to the Other Insurance Clause, and the Transfer of Rights Recovery provision.[33]

**F.**     **Cameron's Lawsuit Against Liberty and the Court's August 2012 Opinion**

On January 30, 2012, Cameron filed this lawsuit against Liberty, seeking recovery of the Liberty Excess Policy's $50 million limit, payment of defense costs, and penalties and attorney fees for Liberty's purported bad faith in not funding its settlement with BP.[34] On May 4, 2012, Liberty moved for judgment on the pleadings arguing, among other things, that Cameron's release of its indemnity rights in connection with the BP settlement impaired Liberty's right to subrogation, negating coverage.[35] Citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691 (Tex. 1994), the Court held that Liberty was not excused from coverage unless Cameron's breach of the Policy was material, *i.e.*, if Cameron "released legally valid and enforceable

---

[31]   Amended Complaint, Rec. Doc. No. 6287, at ¶¶ 58-59.

[32]   *See* Rec. Doc. No. 4941.

[33]   Liberty contends that its unique "Other Insurance" clause provides that Liberty's coverage obligation is excess to other insurance, including indemnification obligations owed Cameron. Ex. A, at LIU 01501.

[34]   *See* Original Complaint of Cameron International Corp., No. 12-311, Rec. Doc. No. 1; Amended Complaint of Cameron International Corp., Rec. Doc. No. 6287.

[35]   Rec. Doc. No. 6438. Liberty also contended that the Policy's "Other Insurance" condition made it excess of applicable indemnity. Because Cameron had not exhausted its indemnity rights, and instead had released them, the Policy was not triggered.

804687_3

indemnity claims against Transocean."[36]   Because Cameron withdrew its motion for summary judgment on the eve of settlement, the Court never determined whether Cameron's indemnity rights were valid and enforceable, and no party had asked the Court to do so in connection with Liberty's Motion.[37]   Lacking proof of the value of Cameron's indemnity rights, the Court found that Liberty was not entitled to judgment on the pleadings.[38]

In this Motion, Liberty asks the Court to answer the question it reserved in connection with Liberty's earlier motion.   Specifically, Liberty asks the Court to find that (1) Cameron's indemnity rights against Transocean were valid and enforceable; and (2) Cameron's unilateral release of these rights prejudiced Liberty and forfeited coverage.

## II.   ARGUMENT AND AUTHORITIES

### A.   The Court Has Held that Coverage Is Barred if Cameron Released Valid and Enforceable Indemnity Claims.

The First Underlying Policy to which the Policy follows form mandates that the Insured "do nothing after loss to impair" subrogation rights.[39]   Courts interpreting similar provisions have held that an insured's breach of its obligation by impairing on insurer's subrogation rights may extinguish coverage, if the insurer is prejudiced.[40]   Texas courts have held that prejudice is

---

[36]   Order and Reasons, Rec. Doc. No. 7129, at p. 25.

[37]   *See id.* at p. 26.

[38]   *See id.* at p. 26.

[39]   Ex. B, at p. 16.

[40]   *See, e.g., Tropic Pollo I Corp. v. Nat'l Specialty Ins. Co.,* 818 F. Supp. 2d 559, 563 (E.D.N.Y. 2011) (granting summary judgment for insurer finding that insured's impairment of insurer's subrogation rights barred recovery under policy); *Stamper v. Liberty Mut. Ins. Co.,* 897 So. 2d 142, 144 (La. App. 1 Cir. 2004) ("When an insured releases his debtor and thereby deprives the insurer of its subrogation right, the insurer is discharged to the degree of impairment from its liability under the policy."); *McNeill v. District-Realty Title Ins. Corp.,* 342 A.2d 55, 56 (D.C. 1975) ("[I]n depriving his insurer by settlement and release of its right of subrogation against a wrongdoer, the insured provides the insurer with a complete defense to an action on the policy."); *Foundation Reserve Ins. Co.,* 458 S.W.2d 214, 216 (Tex. Civ. App., 1970, no pet.);

11

the loss of a valuable right or benefit.[41]

This Court recognized this rule in deciding Liberty's prior Motion, holding that "*Hernandez* and its progeny of cases instruct that Liberty may be excused from its coverage obligation only if Cameron released legally valid and enforceable indemnity claims against Transocean."[42]   In *Hernandez*, the Texas Supreme Court explained that when one party commits a material breach of contract, the other party to the contract is excused from its obligation to perform.[43]   As an example of a material breach, the *Hernandez* court stated:

> [T]here may be instances when an insured's settlement without the insurer's consent prevents the insurer from receiving the anticipated benefit from the insurance contract; specifically, the settlement may extinguish a valuable subrogation right.[44]

As the Texas Supreme Court recently explained, a material breach occurs where the insured's unilateral action "significantly impair[s] the insurer's position."[45]   The Fifth Circuit recently applied this rule to a dispute involving an excess insurer in *Berkeley Regional Insurance Co. v. Philadelphia Indemnity Ins. Co.*, 690 F.3d 342, 349-50 (5th Cir. 2012).   The Court emphasized that excess insurers, like primary insurers, "have a contract with the insured and are entitled to rely on the same contract principles discussed above."[46]

---

see also 16 COUCH ON INS. § 224:136 (3d ed. 2011) ("As a general rule, an insured who deprives an insurer, by settlement and release, of its right of subrogation against a wrongdoer, thereby provides the insurer with a complete defense to an action on the policy[.]").

[41]   *See, e.g., Trumble Steel Erectors, Inc. v. Moss,* 304 Fed. Appx 236, 239 (5th Cir. 2008) (recognizing that under Texas law, "[p]rejudice is the loss of a valuable right or benefit").

[42]   Order & Reasons, Rec. Doc. No. 7129, at page 25 (discussing *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691 (Tex. 1994)).

[43]   *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d at 692.

[44]   *Berkeley,* 690 F.3d at 693.

[45]   *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 756 (Tex. 2013).

[46]   *Id.* at 349.   The specific policy provision at issue in *Berkeley* required the insured to provide the insurer prompt notice of lawsuits.

804687_3

The "material breach" rule articulated in *Hernandez* is a basic principle of contract law, applied by many courts nationwide.[47]  The rule ensures that a party will not be held to a contract where it has been deprived of essential contract rights for which it bargained.[48]

This well established rule applies here to bar coverage.  Cameron did, in fact, extinguish Liberty's valuable contractual subrogation rights, and significantly impaired Liberty's position, by releasing its indemnity rights[49] and withdrawing its pending indemnity claim contemporaneously with its settlement with BP.

**B.**    **Cameron Had Valid and Enforceable Indemnity Rights Against Transocean**

As Cameron has argued, "[a]s a matter of law, the risk allocation provisions of the Terms and Conditions governing the BOP purchase and the MSA should be enforced as written".[50]

**1.**    **Maritime Law Governs the Drilling Contract and Cameron's Agreements**

Liberty and Cameron agree that maritime law governs the Drilling Contract and the Cameron-Transocean Agreements.[51]  A maritime contract containing an indemnity agreement should be read as a whole and its words given their plain meaning unless the provision is

---

[47]    *See, e.g., Brown v. Grimes*, 120 Cal. Rptr. 3d 893, 902-05 (Cal. Ct. App. 2011) (attorney's breach of oral promise to compensate investigator was material and discharged another attorney from any further obligations under fee-sharing agreement); *Psychiatric Solutions of Va., Inc. v. Finnerty*, 676 S.E.2d 358, 364-68 (Va. Ct. App. 2009) (medical provider's material breach of provider agreement discharged state agency from any obligation to reimburse provider for services rendered to Medicaid patients); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981).

[48]    *See* RESTATEMENT (SECOND) OF CONTRACTS § 237, cmt. b ("The rule is based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party.").

[49]    *See* Ex. P, at ¶ 4.5.

[50]    Rec. Doc. No. 4865, at p. 17.

[51]    *See* Rec. Doc. No. 4524-1 at pp. 17-20; *Breaux v. Halliburton Energy Services, Inc.*, 562 F.3d 358, 364 (5th Cir. 2009).

13

ambiguous.[52]  Disagreement as to the meaning of a contract does not make it ambiguous, nor

does uncertainty or lack of clarity in the language chosen by the parties.[53]  Under maritime law, a

"court should construe an indemnity clause to cover all losses which reasonably appear to have

been within the parties' contemplation".[54]  And, this Court has observed that, "the determination

as to whether defense or indemnification is due must be made at the outset of the litigation by

reference solely to the relevant pleadings and pertinent contractual provisions.[55]  Cameron

recognized the importance of enforcement of risk allocation provisions to the offshore drilling

industry, stating:

> These principles calling for enforcement of risk allocation provisions in
> accordance with the unconditional language of the indemnity provisions are of
> vital importance to companies involved in offshore drilling.  *Risk Allocation* 1,
> p. 20.  If not enforced as written, indemnity provisions will not "enable" either
> party "to measure the risk exposures it will absorb or insure."  Transocean clearly
> agrees that contractual indemnity agreements should be enforced as written.  *See*
> Doc. 4477-2.[56]

## 2.     Transocean's Indemnity Obligation to Cameron

With its Motion for Summary Judgment, Cameron filed a substantial legal memorandum

arguing that the indemnification provisions should be enforced as written.[57]  As Cameron pointed

out, "[T]here are two contractual sources of indemnity obligations that Transocean undertook

---

[52] Rec. Doc. No. 5446 at pp. 5-6; Rec. Doc. No. 4524-1 at 17-19; *Breaux,* 562 F.3d at 955.

[53] *Id.*

[54] Rec. Doc. No. 4524-1; *Breaux,* 562 F.3d at 364 (quoting *Foreman v. Exxon Corp.* 770 F.2d 490, 496 (5th Cir. 1985)); *Corbett v. Diamond M Drilling Co.,* 654 F.2d 329, 333 (5th Cir. 1981).

[55] Order and Reasons, Rec. Doc. No. 5446; *In re TT Boat Corp.,* No. 98-0494, 1999 WL 1442054 at *6 (E.D. La. 1999) (citations and quotations omitted); *In Re Torch, Inc.,* No. 94-2300, 1996 WL 185765 *9 (E.D. La. 1996) (citations and quotations omitted).

[56] Rec. Doc. No. 4424-1, at p. 19.

[57] Rec. Doc. No. 4524-1.

804687_3

directly in favor of Cameron. The first source is the written 'Terms and Conditions' for two BOP equipment purchase orders for specified equipment to be installed in the Deepwater Horizon, SOF ¶ 6, Exhs. 2, 34. The second is the written MSA between Cameron and Transocean."[58] As Cameron explained, both the Purchase Order and MSA obligate Transocean to provide Cameron with the benefit of the "indemnity" of any customer contract related to pollution liability.[59] Specifically, the final subparagraph of the Purchase Orders' Terms and Conditions provide that:

> Transocean agrees that *if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution*, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, *Transocean will provide Contractor [Cameron] with the benefit of such indemnity to the fullest extent possible.*[60]

Likewise, the MSA contained a practically identical provision in Amendment No. 1, Paragraph 15B:

> Transocean agrees that *if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution*, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, *Transocean will provide Contractor [Cameron] with the benefit of such indemnity to the fullest extent possible.*[61]

The Court should apply Cameron's own two-prong test and rule that Transocean owes Cameron indemnity because:

(i)    Transocean is "entitled to indemnity from BP under the Drilling Contract"; and

---

[58]    *Id.* at p. 4.

[59]    *Id.* at pp. 6-8.

[60]    Ex. D (emphasis added).

[61]    Ex. E (emphasis added).

804687_3

(ii)  Transocean is therefore obligated to provide Cameron with "the benefit of such indemnity to the fullest extent possible".[62]

**3.    The First Prong Is Satisfied**

The Court's January 26, 2012 ruling satisfied the first prong of Cameron's test, holding that BP owed Transocean full indemnity under the Drilling Contract.[63]  In so ruling, the Court interpreted Articles 24.2 and 25.1 of the Drilling Contract and confirmed Article 25.1 was fully incorporated into Article 24.2.[64]  This Court explained:

> Article 25.1 is itself a clear and unequivocal agreement to provide its broad indemnity coverage whenever the triggering phrase "shall protect..." appears. . . . The Drilling Contract reflects that they attempted to allocate risk ahead of time, ostensibly in the hopes that some degree of certainty may be brought to the risks inherent in that undertaking. . . .  BP is required to indemnify Transocean for compensatory damages asserted by third parties against Transocean related to pollution that did not originate on or above the surface of the water, even if the claim is the result of Transocean's strict liability, negligence, or gross negligence.[65]

Pursuant to this ruling, the Drilling Contract between BP and Transocean is "unquestionably a 'contract of Transocean Holdings' with a 'customer' under which Transocean is entitled to indemnity" for pollution or other damages associated with blowout or loss of well control within both the Purchase Order Terms and Conditions and MSA.[66]  As Cameron eloquently explained:

> This agreement should end the matter between Transocean and Cameron because their agreement provides that in the event that [Transocean] is entitled to indemnity from BP for pollution related claims, Transocean is obligated to provide Cameron with the benefit of such indemnity to the fullest extent possible.[67]

---

[62]  Rec. Doc. No. 4865, at p. 2.

[63]  *See* Order and Reasons, Rec. Doc. No. 5446.

[64]  *Id.* at p. 10.

[65]  *Id.*

[66]  Rec. Doc. No. 4524-1, at p. 8.

[67]  Rec. Doc. No. 4865, at p. 4.

16

804687_3

### 4.    The Second Prong Is Satisfied

The only question remaining to determine Transocean's indemnity obligation to Cameron is whether Transocean is "obligated to provide Cameron 'with the benefit of such indemnity to the fullest extent desired.'"[68]  The answer is yes.  As Cameron correctly declared in its Reply Brief, Transocean was obligated to indemnify Cameron and Transocean had essentially acknowledged as much.[69]  The pertinent provisions of the parties' contracts provide that if Transocean is entitled to indemnity "under any contract with its customers . . . with respect to pollution . . . or other damages associated with blowout or loss of well control <u>Transocean will provide Cameron "with the benefit of such indemnity to the fullest extent possible</u>", (emphasis supplied).  Acknowledging this clear contract language, Transocean agreed to "of course, pass onto Cameron any indemnity it is able to obtain (and pass) from BP."[70]

Cameron explained the meaning of the "provide the benefit" language in the pertinent agreement:

> Transocean's obligation in the Terms and Conditions and MSA to 'provide' Cameron with the 'benefit' of the Drilling Contract, indemnity means that Cameron 'shall be entitled' to receive directly from Transocean the 'indemnification and defense' prescribed in Sections 23 and 24 of the Drilling Contract, as defined in Section 25.1.[71]

Cameron's position is supported by the obvious fact that Transocean anticipated giving pollution indemnity to its suppliers.  At the time of the indemnity agreements with Cameron, Transocean had already executed its Drilling Contract with BP that included Articles 24.2 and

---

68      *Id.* at p. 2.
69      *Id.*
70      Ex. I.
71      Rec. Doc. No. 4524-1, at p. 16.

804687_3

25.1.[72]  Article 25.1 reinforces Transocean's indemnity protection by providing that Transocean is entitled to indemnification even if *"the claim against the indemnitee is the result of an indemnification agreement with a third party."*  Thus, at the time Transocean agreed to indemnify Cameron by providing it "with the benefit of such indemnity to the fullest extent possible", Transocean knew it had such indemnity from BP.  Thus, Article 25.1 of the Drilling Contract explicitly anticipated the Transocean indemnity agreements with Cameron and these agreements must therefore be interpreted together.[73]  And because the sophisticated contracting parties were aware of the existence of both contracts, and intended that they be read together, the language therein provides clear and unequivocal notice that Transocean would indemnify Cameron for Cameron's own negligence related to pollution costs through BP's obligation to indemnify Transocean for indemnity claims of others.  The Drilling Contract then provides ample support for the Transocean indemnity obligations related to pollution and loss of reservoir.

This risk allocation makes perfect sense.  As Cameron argued, BP's commitment to "assume full responsibility" for underwater pollution costs, and its commitment to hold Transocean harmless from contractual indemnity, make particular sense in connection with Transocean's commitment to "provide" Cameron with the "benefit" of the indemnity provisions of the Drilling Contract because BP had significant control over the design of the blowout preventer equipment and direct regulatory obligations with respect to use of that equipment to drill deepwater wells on the Outer Continental Shelf.[74]

---

[72]  Rec. Doc. No. 4524-1 at p. 8.

[73]  *Id.* at p. 15.

[74]  *Id.* at 13-15.

804687_3

The two-prong test set out by Cameron, thus, is plainly satisfied.  As a matter of law, Transocean owed indemnity obligations to Cameron for pollution liability and other damages associated with blowout or loss of well control, which included liability to BP.

## C.      Cameron Has Acknowledged the Validity of its Indemnity Rights.

Now that Cameron has settled with BP, Cameron asks the Court to forget its prior positions taken in the Oil Spill MDL and to "downplay" the strength and validity of its indemnification rights.  This directly contradicts Cameron's own repeated statements to the public and Liberty following the spill that it expected to be "fully indemnified."[75]  Moreover, in Cameron's Amended Complaint, Cameron admits it knew that its insurers had valid subrogation rights that had to be waived in the settlement because there was "a distinct possibility" that BP was required to indemnify Cameron "because Transocean was entitled to look to BP under indemnification provisions in the contracts between those parties."[76]  Cameron's Amended Complaint contains a circular graph that explains why BP should be responsible for all pollution liability apportioned to Cameron, Transocean, and BP.[77]  Cameron's Amended Complaint concisely explains why BP is responsible for all pollution claims and why Cameron intentionally prejudiced Liberty's rights to enforce the indemnification provisions.[78]  Cameron is now caught in its own circle.

---

[75]    *See* Exs. J, L, M, & N.

[76]    Amended Complaint, Rec. Doc. No. 6287, at ¶ 42.

[77]    *Id.*

[78]    *Id.*

804687_3

To now refute its own arguments requires Cameron to explain why, in November and December 2011, it presented these exact same arguments to the exact same Court in support of the exact same relief Liberty now seeks. Cameron must claim that it knew it was wrong when it filed its motion, but consciously decided to represent to this Court that it strongly believed in its right to indemnification from BP and Transocean. But Cameron's Deputy General Counsel confirmed just the opposite, testifying that Cameron believed its indemnity rights were enforceable when Cameron moved for summary judgment.[79] The Court should hold Cameron to its prior position that the indemnities are valid.

**D.    Transocean Acknowledged the Validity of the Cameron-Transocean Indemnity Agreements.**

All relevant parties have acknowledged the validity of the Cameron-Transocean indemnity agreements, including Transocean.[80] As Cameron explained:

> [W]hen Cameron first demanded indemnity, Transocean did not respond that it had no obligation to Cameron. Instead, it made a demand on BP grounded in the indemnity provisions of the Drilling Contract. SJ Ex. 11 (Doc. 4524-17). By tendering Cameron's claim to BP and taking the position that the claim is "expressly covered by section 24.2, as amplified by section 25.1," SJ Ex. 11, Transocean essentially acknowledged that Cameron's interpretation of these contracts is correct.[81]

Transocean's August 19, 2010 letter to BP tendering Cameron's indemnity demand under the Drilling Contract corroborates Cameron's statements in the Reply Brief. In that letter, Transocean's Acting General Counsel persuasively argued:

---

[79]    Ex. G (B. Eastman Depo.), at 62:9 to 63:19.

[80]    Cameron's Amended Complaint disingenuously alleges that "Transocean has vigorously denied and continues to deny that it has any obligation to indemnify Cameron for pollution and related claims." Amended Complaint, Rec. Doc. No. 6287, at ¶ 37.

[81]    Rec. Doc. No. 4865, at p. 9.

804687_3

[S]ection 25.1 provides that the required undertaking of "full responsibility," protection, defense, and hold harmless of section 24.2 includes "any and all claims" and "demands...without limit," "and without regard to whether the claims against [Transocean] is the result of an indemnification agreement with a third party."

The Cameron demand for indemnity by Transocean for pollution-related indemnity is, therefore, a claim expressly covered by section 24.2, as amplified by section 25.1. Transocean therefore, demands that BP "protect...and hold harmless" Transocean from the Cameron demand by taking full responsibility for all costs and liability incurred by Cameron in connection with pollution claims against Cameron arising from the *Deepwater Horizon* casualty.[82]

Thus, both Cameron and Transocean understood and acknowledged that Cameron was entitled to full protection under the relevant agreements.

**E.    Cameron Transferred the Valid and Enforceable Indemnity Rights and Impaired Liberty's Subrogation Rights.**

In settling with BP, Cameron agreed to transfer its indemnity rights, thereby impairing Liberty's subrogation rights and negating coverage.[83] While the settlement agreement purports to reserve Liberty's right to subrogation,[84] this is hollow lip-service. Liberty, a subrogated insurer, can only stand in Cameron's shoes. Under settled Texas law, "[i]f the insured has no cause of action, there can be no subrogation."[85] Cameron undisputedly assigned to BP or released its "indemnification claims against Transocean under the Transocean Contracts."[86] Cameron *transferred* the very indemnification rights to which Liberty would have been

---

[82]    Ex. H.

[83]    Ex. P, at ¶¶ 4.3, 4.5.

[84]    *Id.* at ¶ 4.4.

[85]    *Mendez v. Allstate Prop. & Cas. Ins. Co.*, 231 S.W.3d 581, 585 (Tex. App. – Dallas 2007) (citing *Fishel's Fine Furn. v. Rice Food Market*, 474 S.W.2d 539, 541 (Tex. App. – Houston [1st Dist.] 1971, writ dism'd)); *see also* 1 INS. CLAIMS & DISPUTES § 3.7 (6th ed. 2013) ("An insurance company claiming a right through subrogation stands in the shoes of the insured and takes no rights other than those that the insured had; as a result, if the insured has released the wrongdoer, the release by operation of law will ordinarily destroy the insurer's right of subrogation.").

[86]    *Id.* at ¶ 4.5

21

subrogated.   Such indemnification rights unquestionably were valuable.   The release of those

valuable rights constitutes prejudice under Texas law.[87]   By extinguishing Liberty's valuable and

enforceable subrogation rights, Cameron "forfeits any claim for indemnity under the policy."[88]

That Liberty had not yet paid for Cameron's loss does not require a contrary conclusion.

In *Mendez*, 231 S.W.3d at 584-86, the court rejected the insured's argument that the insurer's

right to subrogation was conditioned on payment, and thus a non-paying insurer could not

complain about the insured's failure to preserve its subrogation rights.   This argument

"misconstrue[d] the plain meaning of the contract and the right to subrogation[,]" the court

found.[89]   Followed to its logical conclusion, the court explained, this argument would result in

absurdity:

> It is axiomatic that when [the insured] released his claims against [the third-party
> tortfeasor], there was no third-party claim for Allstate to pursue.   But under the
> analysis [the insured] urges we adopt, unless Allstate made a payment, [the
> insured] would be able to circumvent his contractual obligations despite his
> destruction of the rights he was charged to protect.   Such a strained construction is
> antithetical to the purpose of subrogation and leads to an absurd result.[90]

Because the insured's interpretation would "render the subrogation clause meaningless," the

court concluded, the policy did not require the insurer to make a payment before the insured was

obligated to protect its subrogation rights.[91]   Following *Mendez*, Liberty's non-payment of

---

[87]   See *Trumble Steel Erectors, Inc.,*304 Fed. Appx. at 239; *see also Rooster Petro., LLC, et al. v. Fairways Offshore Exploration, Inc.*, No. 12-1322, 2013 WL 6274375, at *6 (E.D. La. 2013) (Fallon, J.) (in determining whether breach is material, Texas courts consider factors including "the extent to which the injured party will be deprived of the benefit which he reasonable expected" and "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived").

[88]   *Foundation Reserve Ins. Co.*, 458 S.W.2d at 214, 216 (Tex. Civ. App., 1970, no pet.).

[89]   *Id.* at 584-85.

[90]   *Id.* at 585.

[91]   *Id.* at 586; *see also Tropic Pollo I Corp. v. Nat'l Specialty Ins. Co.*, 818 F. Supp. 2d 559, 562-63 (E.D.N.Y. 2011) ("[P]laintiff need not wait for defendant's actual subrogation rights to accrue, because the policy

804687_3

Cameron's claim is immaterial.  The Policy clearly placed Cameron on notice of its duty to preserve Liberty's future subrogation rights following loss.  Where Cameron already had extinguished those rights, it would strain logic to require Liberty nevertheless to make payment on Cameron's claim.

Cameron also forfeited coverage by assuming an obligation to transfer its indemnity rights without Liberty's consent.  The Policy precluded Cameron from "assum[ing] any obligation" without Liberty's consent."[92]  Liberty never consented to Cameron assuming an obligation to transfer its indemnity claim.  To the contrary, while Liberty agreed not to object to Cameron's agreeing to settle, Liberty expressly objected to "the non-economic aspects of the proposed settlement" clarifying that "such action will jeopardize any coverage which Cameron might otherwise have under the LIU policy."[93]  Cameron contends it had to transfer its indemnification rights to settle, suggesting the transfer is excusable.  Even if true, Cameron's transfer of those rights had implications under the Policy; Cameron cannot unilaterally alter those terms.  Because Cameron transferred its valuable indemnity right, in violation of the Policy, Cameron has forfeited its right to coverage.

### III.  CONCLUSION

Cameron's settlement with BP clearly prejudiced Liberty by extinguishing Liberty's valuable subrogation rights.  Cameron breached the Policy when it unilaterally settled with BP

---

terms place plaintiff on notice that there was a present duty to exercise due diligence.  It would make no sense to require an insurance company to pay a claim if its subrogation rights are already impaired."); 16 COUCH ON INS. § 224:136 (3d ed. 2011) ("[W]here an insured releases a tortfeasor *prior to the insurer's payment of a claim*, [and] the insurer's rights of subrogation are destroyed  in breach of policy provisions, the insured's recovery, claim, or action on the policy is thereby barred.") (emphasis added)..

[92]   Ex. A, at LIU 01501.

[93]   *See* Ex. O.

over Liberty's objection.  Because Cameron's breach was clearly material, under *Hernandez* and its progeny, Cameron forfeited coverage and Liberty has no duty to indemnify Cameron for its business decision to settle with BP.  As such, the Court should grant Liberty's motion and dismiss with prejudice Cameron's breach of contract and indemnity claims.

Respectfully submitted,


   */s/ Judy Y. Barrasso*
Judy Y. Barrasso, 2814
Celeste, Coco-Ewing, 25002
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana  70112
504-589-9700 (Telephone)
504-589-9701 (Facsimile)

And


Christopher W. Martin, Federal I.D. 13515
Gary L. Pate. Federal I.D. 29713
MARTIN, DISIERE, JEFFERSON
   & WISDOM, L.L.P.
808 Travis, Suite 1800
Houston, Texas 77002
713-632-1700 (Telephone)
713-222-0101 (Facsimile)

Counsel for Liberty International
   Underwriters, Inc.

804687_3

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion for Summary Judgment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of March 2014.

_/s/ Judy Y. Barrasso_

804687_3