# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED
MAR 20 2014
WILLIAM W. BLEVINS
CLERK

United States Court of Appeals
Fifth Circuit
**FILED**
February 24, 2014
Lyle W. Cayce
Clerk

No. 12-30012

D.C. Docket No. 2:10-CV-1758
D.C. Docket No. 2:10-MD-2179

IN RE: DEEPWATER HORIZON

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before JONES, BARKSDALE, and SOUTHWICK, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that appellants pay to appellees the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE:  18 MAR 2014

A True Copy       18 MAR 2014
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit
By:
Deputy

New Orleans, Louisiana

____ Fee _____
____ Process _____
_X__ Dktd _____
____ CtRmDep _____
____ Doc. No. _____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 12-30012

_____

IN RE: DEEPWATER HORIZON

_____

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 24, 2014

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Eastern District of Louisiana

_____

Before JONES, BARKSDALE and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Eleven Louisiana coastal parishes (the "Parishes") filed suits against BP and other defendants ("Appellees")[1] involved in the DEEPWATER HORIZON oil spill to recover penalties under The Louisiana Wildlife Protection Statute ("Wildlife Statute") for the pollution-related loss of aquatic life and wildlife. La. R.S. 56:40.1.[2] Suits filed originally in state court were removed to federal

---

[1] The Parishes filed suit against BP Exploration & Production, Inc.; BP Products North America, Inc.; BP America Production Company; and BP p.l.c. (collectively "BP"); Transocean Ltd.; Transocean Offshore; Transocean Deepwater; and Transocean Holdings (collectively "Transocean"); Halliburton Energy Services, Inc. and its related entities (collectively "Halliburton"); M-I, LLC; Cameron International Corp.; Weatherford U.S., L.P.; Anadarko Petroleum Corporation Co. and Anadarko E & P Company LP (collectively "Anadarko"); MOEX Offshore 2007 LLC and MOEX USA Corp. (collectively "MOEX"); Mitsui Oil Exploration Co., Ltd. ("MOECO").

On June 18, 2012, the district court entered a Consent Decree in MDL No. 2179 between the United States and MOEX defendants. Among other things, the Consent Decree provided for the payment of civil penalties to the State of Louisiana, conditioned on the State timely providing a Release to MOEX. The State timely provided the Release. Accordingly, the district court dismissed the Parishes' claims against MOEX.

[2] La. R.S. 56:40.1 *et seq.* authorizes civil penalties against any "person who . . . through the violation of any other state or federal law or regulation, kills or injures any fish, wild birds,

No. 12-30012

court, which denied the Parishes' motions to remand and then dismissed all of the Parishes' claims as preempted by federal law. Both decisions are challenged in the Parishes' appeal. We concur with the district court that the state law claims were removable pursuant to the jurisdictional provision of the Outer Continental Shelf Lands Act ("OCSLA"). We also affirm their dismissal as preempted by federal law.

## BACKGROUND

The Macondo well, which was being drilled by the mobile offshore drilling rig DEEPWATER HORIZON, experienced a catastrophic blowout and explosion in April 2010 and caused hydrocarbon, mineral, and other contaminant pollution all along the shores and estuaries of the Gulf Coast states, inflicting billions of dollars in property and environmental damage and spawning a litigation frenzy. Among the thousands of cases transferred for consolidated management by the Judicial Panel on Multidistrict Litigation to the Eastern District of Louisiana were the Parishes' lawsuits, some of which had been removed from state court. The district court handled cases filed by government entities, like the Parishes, in various groups according to their common issues. Considering first the remand motions filed by three of these Parishes, the court upheld its removal jurisdiction notwithstanding that the cases alleged only penalties accruing under state law for pollution damage that occurred in state waters or along the coastline.[3] The court predicated federal court jurisdiction on 43 U.S.C. § 1349(b)(1)(A). *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010 (In re: Oil Spill)*, 747 F. Supp. 2d 704,

---

wild quadrupeds, and other wildlife and aquatic life."

[3]   At least three Parishes filed motions to remand (St. Bernard, Terrebonne, Plaquemines), and the court's pertinent order was issued on October 6, 2010. The docket sheets are somewhat ambiguous about which Parishes are included in the ruling and order, but all have appealed the refusal to remand.

No. 12-30012

708-09 (E.D. La. 2010).   Next, considering various defendants' Motions to Dismiss the "B1" pleading bundle cases, filed for private or "non-governmental economic loss and property damages," the district court held that admiralty jurisdiction was present because the alleged tort occurred upon navigable waters and disrupted maritime commerce, and the operations of the DEEPWATER HORIZON, the vessel, bore a substantial relationship to maritime activity. *In re: Oil Spill*, 808 F. Supp. 2d 943, 951 (E.D. La. 2011).   The district court also held that state law was preempted by maritime law.   *Id.* at 953-55.   In a subsequent order concerning the "C" pleading bundle cases, brought by the states of Alabama and Louisiana, the court drew from its decision concerning the "B1" pleading bundle to hold that the states' wildlife actions are preempted by federal law.   *See In re: Oil Spill*, MDL No. 2179, 2011 WL 5520295, at *3, 8 (E.D. La. Nov. 14, 2011).   Finally, when considering the Local Government Entity Master Complaint and certain other cases within pleading bundle "C," the district court held, *inter alia*, that because the Parishes only asserted state law claims, which the district court already deemed preempted, the cases failed to state claims upon which relief could be granted and must be dismissed. *In re: Oil Spill*, 835 F. Supp. 2d 175, 179-80 (E.D. La. 2011).

## STANDARD OF REVIEW

"The district court's denial of the motion to remand, the propriety of removal under the various governing statutes, and the existence of subject-matter jurisdiction here are all interrelated questions of law subject to *de novo* review."   *Oviedo v. Hallbauer*, 655 F.3d 419, 422 (5th Cir. 2011) (emphasis added).   Further, "[w]e review the district court's grant of summary judgment on preemption grounds *de novo*."   *O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 757 (5th Cir. 2007).

3

No. 12-30012

## DISCUSSION

### I.   Removal Jurisdiction

The Appellees principally rely on OCSLA's broad jurisdictional grant in petitioning for federal court removal jurisdiction.[4]  Defendants may generally remove a case from state court if the federal court would have had original jurisdiction over it.  28 U.S.C. § 1441(a).  The defendants bear the burden of establishing the basis for removal, and operative facts and pleadings are evaluated at the time of removal. *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 163, 118 S. Ct. 523, 529 (1997).   The pertinent provision, OCSLA § 23(b)(1), states:

> . . . the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . . .

The Fifth Circuit has interpreted this language as straightforward and broad.  *See Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.,* 87 F.3d 150, 154 (5th Cir. 1996); *EP Operating Ltd. P'ship v. Placid Oil Co.,* 26 F.3d 563, 569 (5th Cir. 1994) ("[A] broad reading of the jurisdictional grant of section 1349 is supported by the expansive substantive reach of the OCSLA.").  Moreover, because jurisdiction is invested in the district courts by this statute, "[a] plaintiff does not need to expressly invoke OCSLA in order for it to apply." *Barker v. Hercules Offshore, Inc.,* 713 F.3d 208, 213 (5th Cir. 2013).  Courts typically assess

---

[4] Appellees' reliance on 28 U.S.C. § 1331 "arising under" jurisdiction is unpersuasive because no claim based on federal law appeared on the face of the Parishes' well-pled complaints. *McKnight v. Dresser, Inc.,* 676 F.3d 426, 430 (5th Cir. 2012).  Further, we need not decide (a) whether the Parishes, whose recovery is "in the name of the State, and who will share proceeds of any statutory recovery with the State," are nonetheless "citizens" for diversity purposes; or (b) whether the fact that the State, if the real party in interest, is a plaintiff means that it cannot raise an Eleventh Amendment bar to removal.

4

jurisdiction under this provision in terms of whether (1) the activities that caused the injury constituted an "operation" "conducted on the outer Continental Shelf" that involved the exploration and production of minerals, and (2) the case "arises out of, or in connection with" the operation. *See, e.g., EP Operating Ltd. P'ship*, 26 F.3d at 568-69. As the district court noted, the fact that the oil spill occurred because of the Appellees' "operations" in exploring for and producing oil on the Outer Continental Shelf ("OCS") cannot be contested.

The Parishes do not concede, however, that, under the second half of the inquiry, their statutory wildlife claims arose out of or in connection with the oil production operation. Following the migration of contaminants from the well, the injury to wildlife and aquatic life was wholly situated in state territorial waters and on land. The statutory wildlife claims, they assert, have no effect on the "efficient exploitation of resources from the OCS," nor do they "threaten the total recovery of federally-owned resources." *Id.* at 570. "Mere connection" to activities on the OCS, in other words, is insufficient to meet the jurisdictional test.

This argument, however, cannot be squared with applicable Fifth Circuit law or the facts before us. Even though one can hypothesize a "mere connection" between the cause of action and the OCS operation too remote to establish federal jurisdiction, this court deems § 1349 to require only a "but-for" connection. *See, e.g., Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350 (5th Cir. 1999) (applying the "but-for" test and finding § 1349 jurisdiction where a worker on a stationary drilling platform in the OCS was injured); *Tenn. Gas Pipeline*, 87 F.3d at 155 (using "but-for" test to find jurisdiction when a boat collided with a platform, even though the accident was argued to be a "navigational" error and the mineral operation in question did nothing to cause the accident); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988) (applying OCSLA to a personal injury suit when a platform worker was injured

No. 12-30012

because a rope broke and caused him to fall to the deck of an adjacent transport vessel). The but-for test does not include a purposive element as the Parishes advocate. It is undeniable that "the oil and other contaminants would not have entered into the State of Louisiana's territorial waters 'but for' [Appellees'] drilling and exploration operation." *In re: Oil Spill*, 747 F. Supp. 2d at 708. This is not, in short, a challenging case for asserting original federal jurisdiction, and therefore removal jurisdiction, under OCSLA.

Undeterred by this reasoning, the Parishes raise additional but flawed arguments. First, their attempt to intertwine the Section 1349 jurisdictional inquiry with OCSLA's choice of law provision, 43 U.S.C. § 1333, fails because the provisions and the issues they raise are distinct. *See, e.g., Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 491-92 (5th Cir. 2002); *Recar*, 853 F.2d at 368-70. Federal courts may have jurisdiction to adjudicate a dispute under OCSLA, but they must then turn to the OCSLA choice of law provision to ascertain whether state, federal, or maritime law applies to a particular case. (Choice of law will be addressed in the next section of this opinion.) Any contrary implication in *Golden v. Omni Energy Servs. Corp.*, 242 Fed. App'x 965, 967 (5th Cir. 2007), is not precedential because the case was unpublished; we reference *Golden* here only because the Parishes erroneously relied on it.[5] Second, the Parishes contend that there is a situs requirement for OCSLA jurisdiction under the language of Section 1349. We disagree. Because federal jurisdiction exists for cases "arising out of, or in connection with" OCS operations, 43 U.S.C. § 1349, the statute precludes an artificial limit based on situs and the Parishes' formulation conflicts with this court's but-for test. *See cases cited supra.* Third,

---

[5] *Golden* has been criticized and is in any event factually distinguishable from this case, as the injury there originated in the land-based operation of the helicopter. *See, e.g.,* David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty & Maritime Law at the National Level & in the Fifth & Eleventh Circuits*, 33 Tul. Mar. L.J. 381, 464 (2009).

the Parishes misapprehend 28 U.S.C. § 1441(b) in urging that diversity of citizenship is necessary to support the removal of an OCSLA claim. The version of Section 1441(b) in effect at the time of the district court's ruling required instead that a federal basis for original jurisdiction exist (OCSLA) and that no defendant be a citizen of the forum state.[6] Because both of those preconditions were met here, removal jurisdiction existed.

## II.    Choice of Law

The more difficult question in this appeal is whether the Wildlife Statute's penalties can be applied against the Appellees. The Parishes' arguments are easily summarized. Both briefs submitted by the Parishes (authored on behalf of Orleans Parish, et al. and New Iberia Parish, et al.) acknowledge that the mobile offshore drilling unit DEEPWATER HORIZON is a vessel. *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498-99 (5th Cir. 2002), *overruled in part, on other grounds, by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc); *Offshore Co. v. Robison*, 266 F.2d 769, 776 (5th Cir. 1959). Both briefs assert that, for this reason, the OCSLA choice of law provisions cannot apply to their claims. ("Since, as the District Attorneys have consistently maintained, OCSLA situs is lacking, OCSLA cannot apply.") The Parishes thus foreswear any reliance on 43 U.S.C. § 1333(a)(2)(A), which

---

[6] Section 1441(b) was amended effective only for actions commenced after January 6, 2012. The Parishes' claims commenced prior to that date. The language of Section 1441(b) applicable to the Parishes' claims provides:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removeable without regard to the citizenship or residence of the parties. Any other such action shall be removeable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. § 1441(b).

borrows state law as surrogate federal law to regulate certain OCSLA activity.[7]
As Orleans Parish puts it, "[i]t is not the adoption of state law as federal
surrogate law that allows for penalties under Title 56, but the fact that the harm
to wildlife made subject of the District Attorneys' suit occurred exclusively
within Louisiana state waters, and Louisiana has the right to exercise its
traditional police power . . . by pursuing penalty claims under Louisiana state
law."[8]

While they purport to abjure the application of federal law, however, the
Parishes also rely on savings clauses in federal statutes that regulate water
pollution (Clean Water Act ("CWA")), 33 U.S.C. § 1321(o),[9] and oil pollution (Oil
Pollution Act ("OPA")), 33 U.S.C. § 2718(c), and preserve some state remedies.
Of course, if the in-state location of wildlife injury alone suffices to support
Louisiana's exercise of its police power, why resort to federal savings clauses?

The Parishes' inconsistent positions reveal a basic flaw. The question here
is not whether federal law plays a role in remediating the effects of the Macondo
well blowout, but how extensive the role is. The Parishes cannot prove
Appellees' responsibility, or respective shares of responsibility, for wildlife
injuries without alluding to the blowout's physical source, emissions from a well

---

[7] Of course, the Parishes cannot prevent the application of OCSLA as a litigation choice
any more than they could agree to a contract choice of law provision mandating admiralty law
in these circumstances. *Alleman v. Omni Energy Servs. Corp.*, 580 F.3d 280, 283 n.2
(5th Cir. 2009) ("parties cannot choose to be governed by maritime law when OCSLA applies").

[8] The crux of the Parishes' argument is this analogy: "If someone commits murder on
the navigable waters within the State of Louisiana, admiralty law might apply to any civil
claim arising from that death, but Louisiana would undoubtedly be able to prosecute the
murder under Louisiana law." It is a bad analogy because it assumes the murder was
committed in Louisiana waters, unlike the pollution that simply migrated into state waters.
It is also an inapt basis for considering federal preemption, a subject that demands close
textual analysis of case law and statutes.

[9] The district court referred to this provision by Section number of the Clean Water Act
(§ 311), rather than by the U.S.C. number (§ 1321).

No. 12-30012

drilled in the OCS, or its human source, errors or omissions related to the DEEPWATER HORIZON'S production activity on the high seas above the OCS. The Parishes' pleadings expressly allege, *inter alia*, that Appellees caused the Macondo well oil spill and violated federal regulations in so doing.

Analysis of federal law thus inevitably precedes the Parishes' simplistic *lex loci delicti* theory. Federal law covers the disaster in two ways. First, pursuant to OCSLA, "[a]ll law applicable to the outer Continental Shelf is federal law," and all cases "involving events occurring on the Shelf [are] governed by federal law . . . ." *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-81, 101 S. Ct. 2870, 2876 (1981); *see* 43 U.S.C. § 1333(a)(1) ("The . . . laws . . . of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all . . . devices permanently or temporarily attached to the seabed . . . [for the purpose of resource exploitation].") Federal law governs injuries arising from activity on an OCSLA situs even if the injury occurs elsewhere. *See Alleman*, 580 F.3d at 286 (OCSLA applies to helicopter accident although victims fell into the sea after the helicopter crashed into an offshore platform). OCSLA allows the borrowing of state law as surrogate federal law only when state law is "not inconsistent with . . . other Federal laws and regulations . . . ." 43 U.S.C. § 1333(a)(2)(A). The borrowing provision does not apply here, however, either because, as the district court stated, the disaster is governed by maritime law or because the broader language of Section 1333(a)(1), which extends explicitly to devices temporarily attached to the OCS (as Section 1333(a)(2)(A) does not), clearly controls.[10] In sum, even if the Parishes had not attempted to waive reliance on OCSLA, the federal law articulated by

---

[10] This Court's "*PLT* test," which we have used to determine when state law may apply to an OCSLA activity, is a misfit for the present case. *See Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990). *PLT* may suit cases under Section 1331(a)(2), but it is hard to square with Section 1333(a)(1), where state law has no role.

No. 12-30012

OCSLA displaces state law. Further, as the Supreme Court has ruled, Section 1333(a) "supersede[s] the normal choice-of-law rules that the forum would apply." *Gulf Offshore*, 453 U.S. at 482 n.8, 101 S. Ct. at 2877 n.8.

Alternatively, maritime law applies here because the DEEPWATER HORIZON is a vessel. A strong argument exists for the proposition that the disaster occurred while the vessel was engaged in the maritime activity of conducting offshore drilling operations, and the disaster had a significant effect on maritime commerce. *Cf. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 *passim*, 115 S. Ct. 1043 *passim* (1995) (maritime law applies to damages where drill barge flooded underwater tunnel and buildings on river bank); *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986).

OSCLA Section 1333(a)(1) and admiralty law constitute alternative, not overlapping, regimes of federal law. *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 361, 89 S. Ct. 1835, 1840 (1969); *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 772-73 (5th Cir. 2006). For present purposes, however, the exact dichotomy is irrelevant as either regime includes the federal statutes regulating water pollution and oil pollution, to which we now turn.

## A. General Principles

The Federal Water Pollution Control Act (*aka* Clean Water Act, "CWA"), 33 U.S.C. § 1251-1376, and its implementing regulations comprehensively govern oil exploration and development on the OCS, including BP's conduct of the Macondo well operations pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. GMG290000. *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 164-66 (5th Cir. 2012). Under the regulations, states like Louisiana that might be affected by offshore pollutant discharges may offer comments before permits are issued, but they have no other

No. 12-30012

express regulatory role. *Id.* at 165. Nevertheless, the Parishes assert the right to pursue state law penalties against the Appellees for pollution that migrated from nearly fifty miles offshore. We will examine their arguments in detail but first explain further the pertinent background law.

Put in starkest terms, had the blowout occurred in Texas state waters and caused pollution in Louisiana, the Parishes' Louisiana law claims would be squarely foreclosed. Federal preemption of interstate water pollution claims has been a feature of United States law for over a hundred years. *See, e.g., Missouri v. Illinois*, 200 U.S. 496, 26 S. Ct. 268 (1906). Since 1987, the issue has been settled by the Supreme Court's decision in *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S. Ct. 805 (1987). In *Ouellette*, the Court resolved conflicting circuit court decisions on the question whether a state could enforce its laws against pollution that migrated into its environment from a neighboring state. *Compare Illinois v. City of Milwaukee*, 731 F.2d 403, 410-11 (7th Cir. 1984), *with Ouellette v. Int'l Paper Co.*, 776 F.2d 55, 55-56 (2d Cir. 1985). The Court explained that federal common law had, until 1971, governed "the use and misuse of interstate waters," and the Court reaffirmed the preemption of state law by federal common law articulated in *Illinois v. City of Milwaukee (Milwaukee I)*, 406 U.S. 91, 92 S. Ct. 1385 (1972). *Ouellette*, 479 U.S. at 487, 107 S. Ct. at 809. The Court described how the enactment of the federal CWA displaced federal common law with a complex scheme of cooperative federalism, delegating to states the authority to issue NPDES effluent discharge permits to point sources within their borders while retaining primary federal responsibility to eliminate water pollution. *Ouellette*, 479 U.S. at 488-91, 107 S. Ct. at 809-11. The Court then applied the standards of conflict preemption, concluding that the "CWA precludes a court from applying the law of an affected State against an out-of-state source." 479 U.S. at 494, 107 S. Ct. at 813. The Court stated:

No. 12-30012

> After examining the CWA as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the "full purposes and objectives of Congress."

479 U.S. at 493, 107 S. Ct. at 812 (citation omitted).

Among its reasons, the Court noted that factors such as the impact of discharges on a waterway, the types of effluents, and the schedule for compliance may vary widely among sources. Point source states may require stricter controls than the federal government. Complex policy, scientific, and technological decisions are required. Lawsuits based on affected states' common law of nuisance would upset this "balance of public and private interests." 479 U.S. at 494, 107 S. Ct. at 813. Such suits could "effectively override both the permit requirements and the policy choices made by the source State." 479 U.S. at 495, 107 S. Ct. at 813. The efficiency and predictability of the permit system would be undermined, to the disadvantage of private regulated entities. Chaotic confrontations among states could erupt over conflicting standards imposed on a single point source. In sum,

> It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure.

479 U.S. at 497, 107 S. Ct. at 814.

Notably, *Ouellette* also confronted and rejected the contention that two provisions of the CWA, which preserved a State's right to regulate its waters and an injured party's right to seek relief under "any statute or common law," authorized the nuisance suit under the affected state's law rather than that of the point source state. According to the Court, neither savings clause, carefully read, would stand for so broad a proposition. 479 U.S. at 492-93, 107 S. Ct. at 812. The citizen suit savings clause was preceded by the qualifier,

No. 12-30012

"[n]othing in this section," while the states' authority was saved for regulation only of their own waters. *Id.*

*Ouellette*'s interpretation of preemption under the CWA has not been superseded by any later Supreme Court decision nor, as we shall see, by statute. Indeed, its principles were affirmed by the Court in *Arkansas v. Oklahoma*, 503 U.S. 91, 100, 112 S. Ct. 1046, 1053-54 (1992).

Because the CWA was inadequate to provide complete remedies for the Valdez, Alaska oil spill catastrophe, Congress passed the Oil Pollution Act ("OPA") in 1990. 33 U.S.C. §§ 2701-62. Congress intended that the OPA would "build[] upon section 311 of the Clean Water Act [§ 1321] to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution." S. Rep. No. 101-94, at 9 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 730. The OPA prescribes a supplemental, comprehensive federal plan for handling oil spill responses, allocating responsibility among participants and prescribing reimbursement for cleanup costs and injuries to third parties. The remedial efforts for the Macondo well blowout occurred under the auspices of both the CWA, 33 U.S.C. § 1321(b)(1) (the CWA applies to oil discharges in connection with activities above the OCS), and the OPA, 33 U.S.C. § 2701(32)(C) (extending the OPA to offshore facilities above the OCS).

Both the CWA and the OPA contain provisions that save state law causes of action, including penalty claims, under certain circumstances. The CWA clause involved in this case is 33 U.S.C. § 1321(o), which states in pertinent part:

> (o) Obligation for damages unaffected, local authority not preempted; existing Federal authority not modified or affected
>
> (1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator . . . or offshore facility to any person or agency under any provision of law for damages to any publicly owned

13

No. 12-30012

or privately owned property resulting from a discharge of any oil or hazardous substance . . ..

(2)  Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State, or with respect to any removal activities related to such discharge.

(3) Nothing in this section shall be construed . . . to affect any State or local law not in conflict with this section.

(Emphasis added).

The OPA's provision is differently worded:

Section 2718(a).  Relationship to Other Law
(a)     Preservation of State authorities; Solid Waste Disposal Act

Nothing in this Act . . . shall–

(1)     affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A)     the discharge of oil or other pollution by oil within such State; or
(B)     any removal activities in connection with such a discharge;  or

(2)     affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law.

. . . .

(c)  Additional requirements and liabilities; penalties

14

No. 12-30012

> Nothing in this Act . . . shall in any way affect, or
> be construed to affect, the authority of the United
> States or . . . any State or political subdivision thereof—
>
> > (1)   to impose additional liability or
> > additional requirements; or
> >
> > (2)   to impose, or to determine the
> > amount of, any fine or penalty
> > (whether criminal or civil in nature)
> > for any violation of law;
>
> relating to the discharge . . . of oil.

33 U.S.C. § 2718(a), (c) (emphasis added).

## B.    Application of General Principles

The Parishes make two basic arguments. First, they assert that their historic police powers to deter oil pollution in their waters and protect their aquatic life and wildlife are preserved notwithstanding the application of federal law. Second, they assert that both above-cited federal savings clauses expressly protect their ability to levy Wildlife Statute fines. Each argument must be carefully considered.

## 1. Does *Ouellette* control?

The Parishes' first proposition depends on whether the states maintained historic police powers to apply their local law to interstate water pollution even if the pollution originated outside the state. The Supreme Court's discussion of the issue in *Milwaukee I* contradicts the Parishes' position. 406 U.S. at 105-06, 92 S. Ct. at 1393-94. A federal common law of nuisance, not the competing laws of each affected jurisdiction, was applied to interstate water pollution cases from an early period. 406 U.S. at 106-07, 92 S. Ct. at 1394-95. This is not to say the states were deprived of rights and remedies in such cases, but only that they had to rely on the common body of federal law to do so. The claim by the states (and

No. 12-30012

their localities) to apply their historic police power in these situations is therefore dubious.

Even assuming the Parishes have some residual police power to apply local law to this OCSLA-originated discharge, however, they must overcome federal preemption under the CWA. As the Supreme Court predicted in *Milwaukee I*, 406 U.S. at 107, 92 S. Ct. at 1395, Congress could and did supplant federal common law with an overarching regulatory framework to protect the nation's waters. To effectuate the full purposes of the regulations, *Ouellette* held that the states' ability to apply local law to out-of-state point sources of alleged water pollution was in conflict with the CWA. 479 U.S. at 494, 107 S. Ct. at 812-13.

The Parishes contend that *Ouellette* is distinguishable. First, it applies only to the CWA's permitting provision (33 U.S.C. § 1342), not to the oil discharge prohibition (33 U.S.C. § 1321(o)). Relatedly, the savings provisions that *Ouellette* found inapposite are different from the provisions the Parishes rely on. Second, since *Ouellette* considered only interstate water pollution, the decision has no bearing on discharges from the OCS. We find these distinctions unpersuasive.

The Supreme Court's subsequent interpretation of *Oullette* substantially undermines any cramped reading of the case. The Court reiterated *Ouellette*'s holding that "the Clean Water Act taken 'as a whole, its purposes and its history' pre-empted an action based on the law of the affected State and that the *only* state law applicable to an interstate discharge is 'the law of the State in which the point source is located.'" *Arkansas*, 503 U.S. at 100, 112 S. Ct. at 1053 (citing *Ouellette*, 479 U.S. at 493, 487, 107 S. Ct. at 812, 809) (emphasis added). This statement is not limited to the specific provisions of the CWA at issue in *Ouellette*; in fact, *Arkansas* refers to "interstate discharge" irrespective of type or permit status. The Fourth Circuit confirmed *Ouellette*'s reach by applying it to an interstate pollution dispute arising under the Clean Air Act. *North*

16

No. 12-30012

*Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306-07 (4th Cir. 2010). That court concluded, "[t]here is no question that the law of the states where emissions sources are located . . . applies in an interstate nuisance suit. The Supreme Court's decision in *Ouellette* is explicit: a 'court must apply the law of the State in which the point source is located.'" *Id.* at 306 (citation omitted).

Hoping to confine *Ouellette* to NPDES permitting cases and the specific savings provisions the Court considered, the Parishes contend that the Court's goal in *Ouellette* was to prevent disruption of the point-source effluent permitting system by redundant or conflicting state legal regimes. 33 U.S.C. § 1342. On the other hand, they contend, because the CWA essentially prohibits "discharges" of "oil or hazardous substances" into the nation's navigable waters and the waters of the OCS, 33 U.S.C. 1321(b), allowing all affected states to impose their laws on the illegal activity creates not conflict, but reinforcement of federal law.

The Court's opinion, however, resists such limitation. In the paragraph that introduces the Court's reasoning, *Ouellette* speaks plainly: "We hold that when a court considers a State-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the state in which the point source is located." 479 U.S. at 487, 107 S. Ct. at 809. There is no mincing about the precise preemptive provisions of the federal CWA. Later, the Court responds to the plaintiffs' allegations that the point source violated the terms of its NPDES permit by noting the availability of a citizen suit under the CWA in lieu of the law of the affected state. 479 U.S. at 498 n.18, 107 S. Ct. at 814 n. 18. A permit violation constitutes a "discharge" prohibited by Section 1321(b). 33 U.S.C. § 1321(a)(definition of "discharge"), (b)(3). The Court's logic must extend to oil discharges, which are illegal under the same provision. With respect to oil pollution originating from the OCS, *Ouellette* offers an analogous

No. 12-30012

answer: the affected parties can sue for the generous remedies, including for loss of wildlife, that the OPA offers.   OPA, 33 U.S.C. § 2702(b)(2)(D).

A weaker argument against *Ouellette* urges that it quelled disputes over the application of competing state laws to interstate water pollution but has no impact on the overlay of state laws on a federally controlled point source.   On the contrary, the federal responsibility for the OCS is clear.   The Macondo well site was developed under a plethora of federal regulations, including an NPDES permit. *See generally Gulf Restoration Network*, 683 F.3d at 165-66.   The federal government's interest is no different from that of point-source states, which aim to encourage economic development while preserving optimal environmental conditions for their citizens.   Allowing up to five states along the Gulf Coast to apply their individual laws to discharges arising on the Shelf would foster the legal chaos described by *Ouellette*.   That three Gulf coast states   submitted amicus briefs in this appeal, and all five Gulf Coast states filed suits[11] to recover damages based on particular state laws testifies to the problem.   Moreover, just as with entities operating in point-source states, if entities engaged in developing the OCS were subjected to a multiplicity of state laws in addition to federal regulations, they could be forced to adopt entirely different operational plans or in the worst case deterred by the redundancy and lack of regulatory clarity from even pursuing their OCS plans.   The reasons for avoiding redundant or conflicting legal regimes are equally potent whether the point source is located in a state or a federal enclave.

In sum, *Ouellette* forms a controlling backdrop for resolving claims caused by the blowout.   Federal law, the law of the point source, exclusively applies to the claims generated by the oil spill in any affected state or locality.

---

[11] The Local Government Entity Master Complaint alleges breach of tort duties under the laws of Florida, Alabama, Mississippi, Louisiana, and Texas.

No. 12-30012

## 2.   Effect of Savings Clauses

With *Ouellette* as the controlling law, there are no state remedies to "save." The OPA applies as the law of the OCSLA point source and, along with the CWA penalties, furnishes a comprehensive remedial regime for affected states' governmental and private claims.  Just because the Parishes are located in the most closely adjacent state, they fare no better than the "down-current" states of Texas, Mississippi, Alabama, and Florida.  The CWA and the OPA "savings" clauses preserve but do not create state law claims. *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 162, 40 S. Ct. 438, 441 (1920); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 224-25, 106 S. Ct. 2485, 2495 (1986) (Death on the High Seas Act savings clause only preserves state courts' jurisdiction to provide remedies for fatalities in state waters).[12]

Nevertheless, for additional reasons, each savings clause is powerless to "save" the Parishes' claims under the Wildlife Statute.  In general, the savings clauses must be read with particularity and, as *Ouellette* demonstrates, a savings clause does not disrupt the ordinary operation of conflict preemption. *See Ouellette*, 479 U.S. at 492-93, 107 S. Ct. at 812 (rejecting application of two savings provisions of the CWA); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869, 120 S. Ct. 1913, 1919 (2000).

### a. CWA § 1321(o)

Most closely on point in the CWA is Section 1321(o)(2), which provides that, "[n]othing in this Section shall [preempt any state or local] requirement or liability with respect to the discharge of oil . . . into any waters within such state . . . ."  The provision only saves state laws imposing liability or additional requirements with respect to the "discharge" of oil "into any waters within such

---

[12] We reject the assertion in Alabama's amicus brief that "effects jurisdiction" or the "objective territorial principle," theories associated only with international law, apply to the federal preemption issues here.

No. 12-30012

State."  The provision does not save a state's laws where the discharge did not occur "within" the state.  The Parishes contend that the term "discharge" should be read to include "any means by which oil enters state waters."  According to the statute, however, "discharge" "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping . . .."  33 U.S.C. § 1321(a)(2).  These gerunds connote active conduct or movement from a point source to a place within the state rather than the mere passive migration or floating of oil into state waters.  Contrary to the Parishes' view, the word "emitting" does not change this analysis.  "Emit" means to send out or release.  *Webster's Third New International Dictionary* 742 (3d ed. 1986).  The principle of *noscitur a sociis*, that words grouped in a list should be given related meaning, reinforces our interpretation because, taken in context with the other gerunds, "emitting" must take on an active cast.  *See Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 322-23, 97 S. Ct. 2307, 2313-14 (1977).[13]

The other subsections of Section 1321(o) afford no benefit to the Parishes.  Section 1321(o)(1) expressly saves damage claims, not penalties under the Wildlife Statute.  Section 1321(o)(3), a catch-all provision, saves state laws *not in conflict* with the section itself.  To construe the catch-all harmoniously with Section 1321(o)(2), which is limited to discharges within state waters, and avoid rendering the companion provision superfluous, the catch-all must be similarly limited.

### b.  Section 2718(c)

The Parishes place the most emphasis on this savings clause from the OPA.  The section states that "[n]othing in this Act [OPA] . . . shall in any way

---

[13] *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 93 S. Ct. 1590 (1973), does not support the Parishes' interpretation of Section 1321 as preserving state law regulation of oil pollution that originated outside state waters.  The spill in that case occurred adjacent to Florida's shore.

No. 12-30012

affect . . . the authority of the United States or any State [or locality] . . . to impose . . . any fine or penalty . . ." relating to an oil discharge. 33 U.S.C. § 2718(c). First, they assert, the OPA was enacted to supplement the older CWA apparatus for redressing the consequences of oil pollution. Second, the Parishes urge that the OPA, being specific with regard to oil pollution, controls over the more general requirements of the CWA, which applies to both illegal oil and hazardous substance discharges into navigable waters. Third, the exact language of Section 2718(c) differs critically from the CWA's Section 1321(o) because it lacks the narrowing reference to state waters. Finally, a construction of Section 2718(c) that limits its effect to discharges within state waters would allegedly render the OPA savings clause superfluous. Section 2718(c), from their standpoint, preserves "all state penalty provisions 'relating to' oil spills in any way, not just those originating in state waters." On balance, however, we conclude that the Parishes place more weight on this savings provision than it can bear.

To begin, the canon of construction that mandates application of a specific over a general statutory provision is not easily adapted to this statutory scheme. As all parties acknowledge, the CWA, the fountainhead of clean water regulation, contains the provisions that prohibit oil discharges and set penalties for illegal discharges. 33 U.S.C. § 1321(b)(3),(6) ("Administrative penalties"), (7) ("Civil penalty actions"), (f) ("Liability for actual costs of removal"). These provisions led the district court to declare the CWA's savings provision more specific than those in the OPA. The Parishes, in contrast, characterize Section 2718(c) as plainly more specific both because it resides in the OPA and it preserves state penalty actions. We do not, however, perceive the applicability of these provisions to be an either/or proposition. Instead, each requires interpretation within a statutory framework in which the OPA was designed to complement, not compete with the CWA. That the OPA was enacted more

21

No. 12-30012

recently than the CWA means little where there is no fundamental conflict with provisions of the CWA. The statutes, in other words, must be construed, as the district court noted, in *pari materia*.

Moving to the specific language of Section 2718(c), the provision more precisely states, "Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. § 183 *et seq*.), or § 9509 of Title 26, [shall affect] the authority of the United States or any State or political subdivision thereof . . .." Statutory construction begins with the language of the statute, *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, 130 S. Ct. 2149, 2156 (2010), and, in the absence of ambiguity, often ends there. Two features of this prefatory language are notable. The savings provision does not apply beyond the OPA itself and two other laws. Further, Congress did not refer to the CWA. Courts are not at liberty to expand the language chosen by Congress, and the omission here is telling. Thus, while Section 2718(c) saves from the OPA's diminution the ability of the United States or state entities to impose requirements relating to oil discharges, it does not save those powers from the effects of the CWA or any other non-identified federal law. Consistent with this conclusion, the Supreme Court in *Ouellette* held that a savings clause commencing with "nothing in this section" is by its terms limited to preemption caused by that section alone. *See* 479 U.S. at 493, 107 S. Ct. at 812 (such a clause "does not purport to preclude pre-emption of state law by other provisions of the Act"); *see also United States v. Locke*, 529 U.S. 89, 106, 120 S. Ct. 1135, 1146-47 (Section 2718 does not extend to subjects addressed in other Titles of the OPA or other acts).

Other principles of statutory construction are relevant because of the prefatory language here. If Section 2718(c) were interpreted, as the Parishes contend, to "supersede" the CWA and *Ouellette* by allowing all affected states to layer their unique penalty and regulatory laws on top of those governing this OCSLA blowout, the result would be an implied repeal of CWA preemption.

22

No. 12-30012

Implied repeals, however, are disfavored. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442, 107 S. Ct. 2494, 2497 (1987); *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1335 (5th Cir. 1994). Apart from omitting reference to waters within the state, however, there is no indication in Section 2718(c) or the OPA that Congress intended to repeal the point-source primacy ordained by the CWA. That the OPA in fact amended CWA Section 1321(o)(2) to add the phrase "or with respect to any removal activities related to such discharge" without also amending the immediately preceding phrase "into any waters within such State" signals Congressional intent not to modify this portion of the CWA. *See* OPA Sec. 4202, Pub. L. No. 101-380, 104 Stat. 484, 532 (codified as 33 U.S.C. § 1321(o)(2)). Courts cannot, without any textual warrant, expand the operation of Section 2718(c) to, in effect, modify the scope of preemption under the CWA.

It is also possible to understand why Section 2718(c) omits a reference to waters within the affected state. Simply, the provision saves remedies available to the United States as well as the states, rendering a geographic limitation to state waters meaningless. Viewed in light of Congress' presumed awareness of *Ouellette* when the OPA was passed, and Congress' failure to change the scope of CWA preemption despite its intent generally to broaden remedies against oil pollution, this omission cannot be controlling on the scope of this savings provision.

Nor does this construction deprive the savings provision of utility, as the Parishes assert. For any oil pollution whose point source is on the land or navigable waters within a state, Section 2718(c) authorizes the point source state and its political subdivisions to impose any additional liability, requirements, fines, and penalties. Preemption is limited to situations in which

23

the affected state is not the point source jurisdiction; affected states may still pursue relief based on the OPA and the CWA or the law of the point-source.[14]

Finally, we note that this interpretation does not diminish the incentives for compliance with the CWA or the OPA or the point source states' additional laws concerning oil pollution. The federal laws' extravagant penalties, fines, criminal liability, and damage exposure that may be imposed on entities associated with oil pollution, even in the absence of the layering of multiple affected states' laws, evidence a clear congressional policy of deterrence and retribution.[15]

## CONCLUSION

For the reasons stated above, the district court had removal jurisdiction over the Parishes' Wildlife Statute claims. Further, it correctly concluded that the claims are preempted by the CWA as interpreted in *Ouellette*, and that Congress did not reject that interpretation explicitly or by negative implication in the CWA or when it passed the OPA. The judgment of the court dismissing the Parishes' claims is **AFFIRMED**.

---

[14] The argument is also briefly made that the Parishes' Wildlife Statute claims are preserved by Section 2718(a)(1)(A), which allows any state or political subdivision thereof to impose additional liability or requirements with respect to "the discharge of oil or other pollution by oil within such State . . .." The Parishes would limit "within such State" to modifying "pollution by oil." This does not wash grammatically; the geographic limitation applies to both means of pollution.

[15] From this discussion, it is clear that we reject a Tenth Amendment argument on behalf of the Parishes and need not reach Appellees' contention that the OPA's proscription of certain duplicative damages preempts the Wildlife Statute claims.