No. 13-30315 Cons. w/ 13-30329

actions to modify the agreement to which the parties had agreed and which the district court had approved and adopted in its consent decree.

A party seeking to modify the substance of a district court's consent decree bears a heavy burden of establishing that revision of the decree is justified. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). In *Rufo*, the Supreme Court explained that,

> [a]lthough . . . a district court should exercise flexibility in considering requests for modification of a[] . . . consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.

*Id.*[5] Further, the Court said that, "[a] party seeking modification of a consent decree may meet its initial burden by showing either a *significant* change either in factual conditions or in law." *Id.* at 384 (emphasis added). "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385 (citing *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298-99 (D.C. Cir. 1988), and *Ruiz v. Lynaugh*, 811 F.2d 856, 862-63 (5th Cir. 1987)). But, "[i]f it is clear that a party anticipated changing conditions that would make

---

[5] *Rufo* articulated these principles in the context of institutional-reform consent decrees. *See id.* However, the same principles apply to all consent decrees. *See, e.g., Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd.*, 45 F.3d 582, 586 (1st Cir. 1995) ("While *Rufo* was a case involving institutional reform, we do not read it as being confined in principle to such cases.").

No. 13-30315 Cons. w/ 13-30329

performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.*

BP has failed to demonstrate that there has been a significant change either in circumstances or in the law since it entered into—and, in fact, affirmatively sought adoption of—the consent decree approving and incorporating the settlement agreement. As the record reflects, BP was fully aware that it would be required to pay claims by firms in the construction, agriculture, and professional-services industries that were supported by these businesses' cash-basis accounting data and yet, nevertheless, BP agreed to the settlement and actively sought the district court's approval of the eventual consent decree. Accordingly, it is this court's clear duty to affirm the district court's judgment rejecting BP's attempts to force the Administrator to modify the consent decree and the parties' settlement simply because it is no longer convenient for BP to live with the terms to which it agreed.

## C.

In its appeals to this court, BP conveniently forgets that it sought to have the Administrator modify the settlement agreement's formula for calculating business economic loss by adding the detailed provisions that it proposed in Tab 1, attached to its January 2013 memorandum. Now, BP argues, belied by its attempt to have the Administrator modify the settlement decree, that the parties intended all along to require the Administrator to convert each claimant's cash-basis data to accrual-basis data by restating revenue in the month in which it was earned and matching it to the expenses that generated it, regardless of

50

No. 13-30315 Cons. w/ 13-30329

when the expenses were incurred.  The words of the district court's consent decree, and the settlement agreement approved therein, however, do not support BP's proposed interpretation.

In reviewing a district court's consent decree, our primary rule of interpretation is the "four corners" doctrine, under which the decree is construed according to its terms, not on the basis of "what might satisfy the purpose of one of the parties to it." *See United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).  In addition, certain "aids to construction" commonly employed in construing contracts may be referenced. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1972).  "Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *Id.*  In so doing, we must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with our own conception of its purpose. *See Armour*, 402 U.S. at 681-82.  A consent decree is the product of negotiation between the parties and embodies a compromise struck among various factors, including the parties' competing goals and the time, expense, and risk of litigation. *See id.* at 681.  In this way, "the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Id.* at 681-82.[6]  By consenting to a decree, the parties have

---

[6] In this regard, the majority does what *Armour* directs us not to do, *viz.*, the majority defines the "purpose" of the settlement agreement from outside sources and then uses that "purpose" to interpret the consent decree.  Nothing within the four corners of the consent decree indicates that the overriding purpose of the agreement, as the majority assumes, was

51

No. 13-30315 Cons. w/ 13-30329

waived their rights under the Due Process Clause to litigate the issues raised by a complaint. *Id.* at 682. A court should not later modify the decree by interposing terms not agreed to by the parties or not included in the language of the decree. *See id.*; *see also United States v. Atl. Ref. Co.*, 360 U.S. 19, 23 (1959); *Hughes v. United States*, 342 U.S. 353, 357 (1952).

Exhibit 4C of the settlement and consent decree, which is the pertinent subject of these appeals, details the compensation framework for business economic loss.[7] By its terms, the framework "compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." R. 4277. The framework includes two steps. Step one, which is at issue here, "[c]ompensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period" and "reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period." R. 4277. Step two, which is not at issue in these appeals, is intended to "[c]ompensate[] claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period." R. 4277.

_____

to perfectly match revenue to the expenses that generated it. *See Ante*, at 21.

[7] "The Settlement recognizes six categories of damage: (1) specified types of economic loss for businesses and individuals, (2) specified types of real property damage (coastal, wetlands, and real property sales damage), (3) Vessel of Opportunity Charter Payment, (4) Vessel Physical Damage, (5) Subsistence Damage, and (6) the Seafood Compensation Program." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 903 (E.D. La. 2012). Categories of damage other than business economic loss are not at issue in these appeals.

No. 13-30315 Cons. w/ 13-30329

With regard to step one, the Compensation Period is "selected by the claimant and may include three or more consecutive months between May and December 2010" (in other words, several months shortly after the oil spill began). R. 4277. The "Benchmark Period" is "the pre-[spill] period which claimant chooses as the baseline for measuring its historical financial performance"; for the Benchmark Period, "the claimant can select among the following . . . [p]eriods: 2009; the average of 2008–2009; or the average of 2007–2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes." R. 4277. Variable Profit is then defined as follows:

> **Variable Profit**: This is calculated for both the Benchmark Period and the Compensation Period as follows:
>
> 1.   Sum the monthly revenue over the period.
>
> 2.   Subtract the corresponding variable expenses from revenue over the same time period.

R. 4277. Having defined the relevant terms, the settlement finally prescribes "Step 1 Compensation" as follows: "Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period." R. 4277.

The majority states, and I agree, that the settlement permits a business-economic-loss claimant to select a comparison interval as short as three months (or as long as eight months). That is, claimants may choose income from any three consecutive months between May and December of 2010 to compare with income in a Benchmark Period of the same three to eight months in 2009, the average of 2008–2009, or the average of 2007–2009. This flexibility to choose a

53

No. 13-30315 Cons. w/ 13-30329

shorter comparison interval allows a claimant to take advantage of the natural variability in revenue over the course of a given year. Claimants may choose a three-month period in which their income was particularly bad in 2010, or particularly good in the Benchmark Period, and exclude from the calculation other months in which their 2010 income might have actually been quite good. The text of the settlement illustrates this feature (and others involving the settlement's causation framework) with three examples as follows:

Scenario 1:

    1)    Claimant selected the months of May–July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008–2009 and 2007–2009;

    2)    In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008–2009 or 2007–2009 as the Benchmark years—whichever provides the highest compensation.

Scenario 2:

    1)    Claimant selected the months of October–December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008–2009;

    2)    In determining compensation, Claimant could select the months of May–September 2010 as compared to the months of May–September in either 2009 or 2008–2009—whichever provides the highest compensation.

Scenario 3:

No. 13-30315 Cons. w/ 13-30329

1) Claimant selected the months of June–August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009. In addition, Claimant selected the months of August–October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007–2009;

2) In determining compensation, Claimant could select the months of May–December 2010 as compared to the months of May–December in either 2009 or 2007–2009—whichever provides the highest compensation.

R. 4283. Consequently, if this court were to interpret the settlement agreement to require the Administrator to convert each claimant's cash-method data into accrual-method data showing monthly revenue as earned matched with the expenses that generated it regardless of when the revenue and expenses were recorded on the claimant's books, we necessarily would be violating *Armour*'s four-corners rule: BP's proposed conversion and matching requirements, which would require the Administrator to restate the months in which claimants recorded their revenue and expenses, are not contained within the four corners of the decree and settlement. And, for the reasons already stated, we, in effect, would be modifying the terms of the consent decree without BP having satisfied its burden of showing a significant change in circumstances or law justifying that modification. Such a modification of the settlement decree would conflict with the clear examples in the settlement agreement and would require the Administrator go outside and perhaps far beyond the Compensation and Benchmark Periods selected by the claimant to trace the generative expenses to match with revenue earned in those periods. Further, even if such a

55

No. 13-30315 Cons. w/ 13-30329

reconstruction of the claimant's business history were possible, it would likely differ markedly from the cash-method claimant's records kept in 2009 and the first quarter of 2010 when the claimant had no inkling that an oil spill affecting his business would occur on April 20, 2010. The effect of our so interpreting the settlement agreement could be devastating to many claimants who are unable to translate or reconstruct their cash-basis data into revenue matched to the expenses that generated it under BP's proposed conversion and ultra matching requirements. Moreover, forced conversion of all cash-basis data into accrual-basis data would discriminate against the remaining cash-basis claimants by either thwarting their claims entirely or treating their claims less favorably than the cash-basis claims already resolved.

The plain wording of the settlement agreement read as a whole and with all of its supporting documents permits claimants to support their business-economic-loss claims using their own business records and does not require that these records be kept in any particular form. In fact, BP, jointly with class counsel, told the district court that "[t]he documents required to support Business Economic loss claims . . . are the documents that businesses either keep in the ordinary course or that may readily be prepared from a business's books and records." R. 8558 (jointly proposed findings of fact and conclusions of law filed in the district court by BP and class counsel in support of final approval); *see also In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 904 (E.D. La. 2012) (same) (final-approval order); CPA Societies' Amicus Br. at 1-14. This is the way the district court interpreted the settlement agreement and consent decree in its March 5, 2013 order upholding the Administrator's rejection of BP's attempt to modify the

56

No. 13-30315 Cons. w/ 13-30329

parties' agreement or change the Administrator's interpretation of it. R. 12550 ("[T]he documentation provisions contained within Exhibit 4A make it clear that the Program's analysis is to be based on revenue and expenses during the relevant periods chosen by the claimant, *as reflected in historical business records*. . . . Exhibit 4A does not require that accounting occur on an 'accrual' basis, as opposed to a 'cash' basis.") (emphasis added).   In other words, a claimant may support its claim with data recorded using cash-basis accounting if it has consistently used that method in the ordinary course of its business.[8] Further, the claimant may use records kept using accrual-basis accounting if that is what it has consistently applied in the ordinary course of its business. Likewise, the settlement does not instruct the Administrator to refrain from accepting and relying on claims supported by a claimant's own business records, whether cash basis or accrual basis, so long as the claimant's books have been consistently kept on the same method and in the ordinary course of business. Most important, the settlement nowhere instructs the Administrator to restate or convert a claimant's claim submitted using cash-basis accounting data into accrual-basis accounting data, showing revenue only in the months in which it was earned, and matching the monthly earned revenue with the expenses that generated it, regardless of when the expenses were made or incurred.[9] Simply

---

[8] For that matter, the federal government accepts, for tax purposes, submissions supported using a business's data recorded using cash-basis accounting so long as such accounting has consistently been used in the ordinary course of business.  *See* 26 U.S.C. § 446(a) ("Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.").

[9] The April 18, 2012 version of the settlement contained a requirement that accounting professionals seeking reimbursement for their services certify that they submitted their reimbursement request "in compliance with generally accepted accounting principles" ("GAAP"), a requirement which was subsequently removed from the May, 2 2012 version that

57

No. 13-30315 Cons. w/ 13-30329

stated, none of the terms, conditions, and qualifications that BP proposes and argues for are stated or contained within the four corners of the consent decree and settlement agreement.

For these reasons, I respectfully conclude that the majority has unintentionally fallen into legal error by not recognizing that the four-corners rule of *Armour* and other teachings by the Supreme Court require that the district court's consent decree containing the settlement agreement be interpreted as written; that this appellate court may not add to or subtract from the district court's consent decree; that likewise we must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with our own conception of its purpose; and that the district court's interpretation of its own consent decree was correct and should be affirmed. *See Armour*, 402 U.S. at 682; *see also United States v. Atl. Ref. Co.*, 360 U.S. 19, 23 (1959); *Hughes v. United States*, 342 U.S. 353, 357 (1952); *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 912 F.2d 819, 825 (5th Cir. 1990) ("Nor are courts at liberty to redraft the obligations commanded by the decree absent consent of the parties.").

## II.

I respectfully disagree with the majority's reversal of the district court's decision and its remand of the case to the district court to determine whether the Administrator has been converting claims submitted with accrual-method accounting data into cash-method supported claims and processing them on that basis. The majority itself concedes that this scenario is "unlikely" and that BP

_____

was approved by the district court. *Compare* R. 2445 (April 18, 2012 version), *with* R. 3955 (May 2, 2012 version). BP knew how to insist that claims abide by GAAP but failed to do so, suggesting that it understood that claims could be submitted based on documents prepared using cash-method accounting. *See* CPA Societies' Amicus Br. at 6.

58

No. 13-30315 Cons. w/ 13-30329

has not explicitly asserted this. *Ante*, at 15. That BP has not so argued in these appeals makes the majority's *sua sponte* raising of the issue highly irregular and contrary to our normal rule of addressing on appeal only the issues raised and argued by the appellant. Furthermore, careful inspection of the record in this case demonstrates that the majority's intuited scenario is not just unlikely; the record demonstrates that it is plainly not the case.

Neither BP nor class counsel has ever questioned whether the Administrator was properly applying Exhibit 4C's compensation requirements to use claimants' accrual-method accounting data to calculate and pay business-economic-loss claims. On December 5, 2012, BP expressed concern to the Administrator that he was overcompensating claimants by using their cash-method data in his calculations. On December 11, 2012, BP sent a follow-up email to the Administrator's special counsel asking, if financial data submitted by a claimant does not accurately assign revenue to the months in which it was earned, what steps would the Administrator take to obtain financial data that accurately reflect the earning of revenue by month. R. 18372. On December 16, 2012, class counsel responded by asking the Administrator to issue a policy statement providing that, "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." R. 18381. On January 8 or 9, 2013, BP demanded that the Administrator revise his interpretation of the Exhibit 4C formula so as to require him to convert the books of *all* claimants using cash-basis accounting to accrual-basis accounting or to modify the formula to do so for construction, farming, and professional-services firms using cash-method accounting. The Administrator's refusal to do so and his January 15, 2013 policy

No. 13-30315 Cons. w/ 13-30329

statement, stating that he "will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time" and that he lacked authority to change the settlement agreement by carving out exceptions for certain categories of claimants, led directly to BP's appeal to the district court to reverse the Administrator's decision. Thus, nothing in the communications between the parties and the Administrator indicates that their dispute involved the conversion of accrual-based accounting data to cash-based accounting data. The district court affirmed the decision of the Administrator rejecting BP's demand that the Administrator either (a) interpret the settlement agreement to require the conversion of all claimants' cash-method accounting data to a particular kind of accrual-method data prior to calculating the claimants' business economic loss or (b) modify the settlement agreement in that way with respect to construction, farming, professional-services claims based on cash-method accounting data.

Consequently, the majority's notion that Administrator has ever converted any claimant's accrual-method accounting data to cash-method data has no support in the record or the briefs in this case. The majority's precipitous reversal of the district court's judgment and remand for unnecessary proceedings is erroneous and quite unfortunate for everyone concerned in this case.

## III.

### A.

I now turn to the discussion in the majority opinion of so-called "fictitious" claims (part II of the opinion), which is now supported by the vote of one judge. Like Judge Southwick, I do not join this section of the opinion and I respectfully dissent from it as well. These appeals arise from a dispute regarding BP's

60

No. 13-30315 Cons. w/ 13-30329

proposed modification or reinterpretation of the settlement agreement's text; a separate appeal addressing the district court's certification of this class action and acceptance of the settlement agreement has been docketed and calendared for oral argument on November 4, 2013 before a different panel of judges. *See In re Deepwater Horizon Appeals of the Economic and Property Damage Class Action Settlement*, No. 12-31155 (5th Cir. filed Nov. 19, 2012). The parties have not argued those certification and acceptance issues to this panel, and we may not properly decide them or pronounce upon them.

Judge Clement begins her discussion by expressing concern regarding whether the plaintiff class members have "colorable legal claims" which she defines as an "[ability] to plead" the elements of a claim. *See ante*, at 26; *see also ante*, at 29 (stating that a claim is "colorable" if the plaintiff "can *allege* standing and the elements necessary to state a claim on which relief can be granted"). I do not understand what that concern has to do with this case. Here, the district court held, in an opinion to which Judge Clement makes no reference, that "the class representatives—*like all class members*—allege economic and/or property damage stemming directly from the *Deepwater Horizon* spill." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d at 915 (emphasis added). And the district court went on to say that, under the class definitions, "persons with marginal or potentially worthless claims . . . [are] excluded." *Id*. at 917; *see also id*. at 917 (stating that the "class in this case consists exclusively of individuals and businesses that have already suffered economic loss"). Nobody has appealed from this finding that the class members here allege losses stemming directly from BP's conduct. Judge Clement's dicta are divorced from the facts and issues in this case.

61

No. 13-30315 Cons. w/ 13-30329

Turning, very briefly, to Judge Clement's legal pronouncements, I must say that I respectfully disagree with her statement that a court cannot allow a single person lacking a "colorable claim" against a class-action defendant to recover compensation in a class-action settlement because to do so would "ignore[] the standing requirement of Article III and create[] a substantive right where none existed before." *Ante,* at 27-28. This analysis confuses the relevant legal principles, is not supported by any law from our circuit or others, and would cause our circuit to split with at least three of our sister circuits if it were binding. First, although Judge Clement leans heavily on a dissenting opinion in the Third Circuit's *Sullivan* case, that dissent was joined by only a single other judge and its analysis was squarely rejected by the seven-judge majority. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) (en banc); *see also Rodriguez v. Nat'l City Bank*, No. 11-8079, 2013 WL 4046385, at *4 (3d Cir. Aug. 12, 2013) (Jordan, J.) ("*Sullivan* instructed that assessing whether individual class members have viable claims is inappropriate in the context of reviewing a proposed settlement class."). Second, although Judge Clement cites a decades-old Seventh Circuit decision, *see ante*, at 28, a more recent decision from that circuit rejects her analysis in no uncertain terms:

> [The class-action defendant] argues that before certifying a class the district judge was required to determine which class members had suffered damages. But putting the cart before the horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification. It is true that injury is a prerequisite to standing. But as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied.

62

No. 13-30315 Cons. w/ 13-30329

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009). And third, the analysis also conflicts with the Second Circuit's. *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 243-44 (2d Cir. 2012).

And, for the reasons explained at length in *Sullivan*, requiring a district court to ensure that every class-action settlement beneficiary has a "colorable" cause of action against the defendant is unworkable in practice. Should the district court require that every settlement beneficiary file a separate complaint consisting of individual allegations and that BP file separate motions to dismiss each of the complaints? I do not think it wise to mandate such an unwieldy and expensive undertaking when the parties settled precisely to avoid that sort of costly litigation. *See* Fed. R. Civ. P. 1 (the civil procedure rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"). Nor do I see how it is required by existing law.[10]

Lastly, Judge Clement's theory rests on a false premise: the idea that every individual who benefits from a class-action settlement must or is deemed to have an independent cause of action against the class-action defendant. I do not think that is the case. In a simple non-class-action lawsuit between a single

---

[10] I certainly do not see how it is required by the law of standing. It is hornbook law that, "[i]n class action cases, the standing inquiry focuses on the class representatives. The class representatives must have individual standing in order to sue. . . . [T]he representative need not prove that each member of the class has standing." WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2:1 (5th ed.) (collecting cases in omitted footnotes); *see, e.g.*, *Kohen*, 571 F.3d at 676 ("It is true that injury is a prerequisite to standing. But as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) ("We do not require that each member of a class submit evidence of personal standing.").

63

No. 13-30315 Cons. w/ 13-30329

plaintiff and a single defendant, I am not aware of any rule that would prohibit the litigants from reaching a settlement in which the defendant agrees to make payment not to the plaintiff he has allegedly wronged but rather to, say, a favored charity instead. Should that happen, neither the law nor common sense presumes that the charity has an independent cause of action against the defendant. *See, e.g.*, *King v. Emp'rs Nat'l Ins. Co.*, 928 F.2d 1438, 1442 (5th Cir. 1991) (discussing third-party beneficiaries to settlement agreements). This basic principle seems no less applicable in the class-action context and to apply with no less force whether the settlement benefits a charity, one or more specifically enumerated individuals or entities, or a class of individuals or entities as defined by whatever characteristics the negotiating parties choose. *See id.* at 1442 ("In fact, there is no requirement that the third-party beneficiary even be specifically named in the contract."); *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) ("The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby."). In short, whether a settlement agreement arises in the class-action context or not, there seems to me no requirement that every beneficiary of the agreement have a "colorable" cause of action against the defendant.[11]

A fundamental flaw in Judge Clement's analysis is that it conflates and fails to distinguish between, on the one hand, the legal requirements for *certifying a class*, *see ante*, at 27-28 (arguing that courts act unlawfully "[b]y including claimants in the class definition that lack colorable claims"), and, on

---

[11] This is not to say that the parties here intended to benefit third parties lacking viable causes of action; rather, the point is that there is no legal reason to inquire into whether the settlement benefits persons lacking viable causes of action.

No. 13-30315 Cons. w/ 13-30329

the other hand, those for *approving and enforcing a settlement agreement* in the class-action context, *see ante*, at 31 (arguing that a class-action settlement "is unlawful" and cannot be approved if it grants compensation to businesses "that had not sustained losses"), assuming without explication that the former are coterminous with the latter. However, the distinction should not be elided: whether or not it is true that Rule 23 or another provision of law is violated by maintaining a class action including class members lacking "colorable" claims—one legal issue—it does not follow either way that the court's approval or enforcement of a settlement that benefits persons without "colorable" claims violates any law—a distinct legal issue. *See, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268-76 (2d Cir. 2006) (addressing separately the class certification and settlement approval issues); *cf. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) ("[The class-action defendant] argu[es] that the class for which certification is requested is fatally overbroad because it contains members who could not have been harmed by any post-merger price increases . . . . This [issue] is critical *for class certification purposes*.") (emphasis added). Without embracing either of Judge Clement's propositions, because neither are presented to this panel for decision, any discussion of them will not be furthered by conflating one for the other as she does here.

## B.

BP twice sought a preliminary injunction from the district court and was twice denied. Thereafter, BP sought both a stay pending appeal and a preliminary injunction from this court, which were also denied. I see no reason to reverse any of these decisions. The majority opinion, however, purports to reverse the district court's denial of a preliminary injunction and appears to

No. 13-30315 Cons. w/ 13-30329

"instruct the district court to expeditiously craft a narrowly-tailored injunction" that allows the claims of "those who experienced actual injury traceable to loss from the Deepwater Horizon accident" to proceed while staying the claims of "those who did not." *Ante*, at 35-36.  Because the majority opinion's instruction to the district court regarding the injunction appears to be based on Judge Clement's separate opinion concerning class-action law, that instruction does not appear to be based on a majority vote of this panel.  Moreover, for the same reasons I discussed in the foregoing sections of this opinion, this appellate court may not  modify the terms and conditions of the district court's consent decree or order the district court to do so; and this court cannot use material outside of the four corners of the consent decree to reinterpret that decree.  Consequently, it would be clear legal error for this court to assume that it has jurisdiction and authority to impose on the Administrator the requirement that, in addition to identifying a claimant as eligible and entitled to compensation for business economic loss under the consent decree encompassing the parties' settlement agreement, he must also find independently that the claimant is not one of "those who [did not] experience[] actual injury traceable to loss from the Deepwater Horizon accident" before paying the claim.  Such an injunction would be broader than the alleged purpose of the remand and tantamount to modifying the consent decree for the benefit of one of the parties, BP, without that party carrying its burden to show a change in circumstances or law that warrants changing the decree; or else to interpreting the consent decree based on material or purposes not stated within the four corners of the consent decree.

66

No. 13-30315 Cons. w/ 13-30329

## CONCLUSION

For these reasons, I concur in the majority's affirmance of the district court's dismissal of BP's suit against the Administrator for failure to state a claim under Rule 12(b)(6) but I respectfully dissent from the majority opinion in all other respects.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| Applies to: | * | JUDGE BARBIER |
| | * | |
| 12-970 and All Cases | * | MAGISTRATE SHUSHAN |
| | * | |

## ORDER

In view of the ruling rendered by the Fifth Circuit panel on October 2, 2013 in case number 13-30315 consolidated with 13-30329, the Claims Administrator is ordered to immediately suspend the issuance of any final determination notices or any payments with respect to those BEL claims in which the Claims Administrator determines that the matching of revenues and expenses is an issue. The Section 6 claims appeals process (filing of notices, briefs, and panel decisions) for similar BEL claims will be placed on hold pending implementation of the Fifth Circuit decision. All other claims and appeals are to be processed and determinations, decisions, and payments made in the normal course of the Program's operation.

Further, in response to a question raised by the Fifth Circuit, the Court has confirmed with the Claims Administrator that claims based on an accrual accounting basis are not being converted to a cash accounting basis.[1]

---

[1] See attached declaration of Patrick A. Juneau, Claims Administrator dated October 3, 2013.

This order is issued only as an immediate and interim measure until the Court is able to confer with and receive input from the parties in order to confect an appropriate "narrowly tailored" preliminary injunction order as instructed by the Fifth Circuit. Staying the processing or payment of all BEL claims would be overly broad and unnecessary as applied to those claims for which matching of revenues and expenses is not an issue.

The parties are instructed to submit to the Court *in camera* a proposed draft for a narrowly tailored preliminary injunction order, together with a letter brief, not exceeding five pages, as to how the Court should proceed to implement the Fifth Circuit ruling. In addition, the parties shall submit proposed policy language for the Court's consideration. Such submissions shall be made not later than 3:00 p.m. on Wednesday, October 9, 2013.

The Court will hold a status conference in chambers with counsel for BP, Class Counsel, and the Claims Administrator on Friday, October 11, 2013 at 9:00 a.m.

Signed in New Orleans, Louisiana, this 3rd day of October, 2013.

_____
United States District Judge

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION "J"** |
| | * | |
| | * | |
| **This Document Relates To:** | * | **JUDGE BARBIER** |
| **12-970** | * | |
| | * | **MAGISTRATE SHUSHAN** |

## DECLARATION OF PATRICK A. JUNEAU, CLAIMS ADMINISTRATOR
### [Regarding Processing of BEL Claims]

Patrick A. Juneau, Claims Administrator of the Court Supervised Settlement Program ("CSSP"), does hereby affirm and attest to the following:

1.      The CSSP has adopted Policy 464, which addresses the permitted bases of accounting for submission of Business Economic Loss ("BEL") claims. This policy provides that a claimant who maintains accrual-basis financial records in the normal course of its business must submit such accrual-basis records and may not convert its records to cash-basis accounting for purposes of submitting a claim.

2.      When a BEL claimant submits accrual-basis financial records in support of its claim, the CSSP uses those accrual-basis records in the evaluation of the claim. The CSSP does not instead convert such records to a cash-basis. Nor does the CSSP ignore accrual-basis records when submitted and instead evaluate the claim from a cash-basis perspective. This is the manner in which the CSSP has handled BEL claims from the program's inception.

Signed in New Orleans, Louisiana, this _____ 3 rd _____ day of _ october _____, 2013.

PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

## FINAL POLICY ANNOUNCEMENT

## POLICY 464: BUSINESS ECONOMIC LOSS CLAIMS: REQUIREMENT OF MONTHLY AND ANNUAL PROFIT AND LOSS STATEMENTS

### I. Introduction.

Section 4 of Exhibit 4A to the Settlement Agreement requires Business Economic Loss ("BEL") claimants to submit monthly and annual profit and loss statements or alternative source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. To apply this requirement, the Claims Administrator previously adopted several policies:

1. **Policy 85:** *Business Economic Loss Claims: Profit and Loss Statements.* Addressed the requirement in Section 4 of Exhibit 4A that P&Ls "shall identify the dates on which they were created," and states that if a claimant has already submitted P&L statements that do not identify the dates on which they were created, the claimant may resubmit the P&L statements with the addition of the dates on which they were created or may provide a separate document identifying the dates on which the P&L statements were created.

2. **Policy 232:** *Profit and Loss Statements (P&Ls).* Addressed not requiring an annual P&L if 12 monthly P&Ls were provided, and not requiring a missing monthly P&L where 11 monthly P&Ls and an annual P&L had been provided.

3. **Policy 286:** *Creation of Monthly Profit and Loss Statements.* Addressed the requirement to submit P&Ls as kept in the regular course of business, creating P&Ls from contemporaneous source documents or submission of alternate source documents to the Claims Administrator. The language of this policy appeared in the 10/22/12 Alert Reminder Regarding Document Requirements for BEL Claims that was referred to in footnote 1 of the 3/5/13 memorandum to the Parties that became Policy 355 v.1, as explained below.

4. **Policy 355 v.0:** *Alternate Source Documents for Revenues and Expenses.* Addressed (a) monthly allocations of revenues/expenses; (b) monthly allocations of owner and officer payroll; and (c) the rule that BEL claimants were permitted to restate P&Ls from cash to accrual basis, but not from accrual to cash basis. This policy had a lengthy history. The Claims Administrator first announced this policy to the Parties by memorandum on 9/25/12. The Parties' responses on 9/28/12 led to a meeting of the Administrative Panel on 10/1/12, after which the Claims Administrator re-issued the policy, along with policies on other subjects, to the Parties by memorandum on 10/8/12. The Claims Administrator circulated on 4/2/13 an Excel Compendium of all policies that the Claims Administrator felt should be posted publicly. This policy bore Policy ID 259 in that Compendium. When the Claims Administrator placed this policy in the Policy Keeper software tracking application, it became Policy 355 v0 and was marked as superseded by Policy 355 v1.

1

5. **Policy 355 v1:** *Business Economic Loss Claims: Documentation Requirements.*
Combined Policies 286 and 355 v.0 and became the controlling policy on this subject.
Included (1) a reminder of the BEL documentation requirements described in the
10/22/12 Alert (from Policy 286); (2) described the creation by claimants of P&Ls from
alternate source documents; (3) stated that claimants were not merely to allocate revenues
and expenses evenly over 12 months; and (4) described the Claims Administrator's
review where P&Ls were not maintained by a claimant in the regular course of business.
The Claims Administrator announced this policy in a 3/5/13 memorandum to the Parties
and later made it Policy 355 v1 in the Policy Keeper application, marking it as
superseding Policy 355 v.0.

6. **Policy 355 v.0 (c):** *Restatement of Profit and Loss Statements.* The Claims
Administrator issued this policy in a 10/8/12 memorandum to the Parties and marked it as
Policy 355 v.0(c) in the Policy Keeper application.

The Claims Administrator announces this comprehensive policy regarding the treatment
of P&Ls under the Settlement Agreement. Henceforth the Claims Administrator will consider
this policy to be the governing policy on this subject. All capitalized terms used in this policy
that are defined in the Settlement Agreement shall have the meanings given to them in the
Settlement Agreement.

## II. Policy Statement.

### A. General Requirement.

In support of a BEL claim, Section 4 of Exhibit 4A of the Settlement Agreement
Framework requires claimants to submit, for the claimed Benchmark Period, 2010 and, if
applicable, 2011, either (1) monthly and annual profit and loss statements or (2) alternate source
documents establishing monthly revenues and expenses. A claim without complete monthly
P&Ls and an annual P&L for an applicable period shall be considered incomplete and such
claimants shall be required to provide them or explain why they cannot provide them in an
explanation that the Claims Administrator considers to be reasonably reliable. Claimants are not
permitted merely to allocate revenues or expenses equally over a twelve month period. Rather,
claimants are required to submit sufficient documentation to establish actual monthly revenues
and expenses as required by the Settlement Agreement.

### B. Creation Date of P&Ls.

The Claims Administrator will require verification of the dates on which a claimant's
profit and loss statements were created. That verification may be verbal or in writing. The
Claims Administrator may, in his discretion, request source documents for profit and loss
statements. If there is a discrepancy between amounts reflected in a tax return and comparable
items reflected in a profit and loss statement for the same period, the Claims Administrator may
request the claimant to provide additional information or documentation.

## C. Accounting Method for P&Ls: General Rule.

A BEL claimant is required to submit the monthly and annual profit and loss statements that were maintained in the regular course of the claimant's business, using the accounting method used in compiling such statements in the regular course of the claimant's business.

## D. Restatement of P&Ls Using Different Accounting Method: General Rule.

The Claims Administrator has adopted this general rule regarding the circumstances in which a claimant submitting monthly and annual P&Ls in support of a BEL claim may restate such statements to alter the accounting method by which they were prepared in the regular course of the claimant's business:

1. Cash to Accrual Restatement Permitted: If the claimant's profit and loss statements for a relevant period were prepared on a cash basis, the claimant is permitted to restate such statements on an accrual basis.

2. Accrual to Cash Restatement Not Permitted: If the claimant's profit and loss statements for a relevant period were prepared on an accrual basis, the claimant is not permitted to restate such statements on a cash basis.

This general rule is subject to the specific provisions of the remainder of this policy.

## E. Claimants With P&Ls Based on Different Accounting Methods.

The Claims Administrator will observe the following guidelines in connection with P&Ls based on different accounting methods:

### 1. Claimant Submits Cash Basis P&Ls Only:

(a) Accrual Basis Claimants: If the available information establishes that the claimant's regular accounting method for the applicable period was accrual basis, the Claims Administrator will typically not use the cash basis P&Ls for any purpose. The claim will typically be considered incomplete and the claimant must submit accrual basis P&Ls.

(b) Cash Basis Claimants: If the available information establishes that the claimant's regular accounting method for the applicable period was cash basis, the Claims Administrator will typically use the cash basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim.

### 2. Claimant Submits Accrual Basis P&Ls Only: The Claims Administrator typically will use the accrual basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim, regardless of whether the claimant's regular accounting method for the applicable period was cash basis or accrual basis.

3

426479

### 3. Claimant Submits Both Cash Basis and Accrual Basis P&Ls:

(a) Selection of P&Ls for Use in Review: If the claimant submits both cash basis P&Ls and accrual basis P&Ls, the Claims Administrator typically will not use the cash basis P&Ls for any purpose. Instead, the Claims Administrator typically will use the accrual basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim.

(b) No Mixing of P&Ls with Different Accounting Methods: The Claims Administrator will not mix cash basis P&Ls for some months with accrual based P&Ls for other months for any purpose. Instead, the Claims Administrator will use only cash basis P&Ls or accrual basis P&Ls consistently across all months of the applicable Benchmark Period and Compensation Periods.

(c) Same P&Ls for Causation and Compensation: For claimants in Zones B, C or D that must establish Causation, the Claims Administrator will use the same set of P&Ls (cash or accrual, but not both) in determining the monthly revenue amounts to perform the Revenue Pattern Causation Tests and in performing the Compensation calculation.

## F. Claimants That Cannot Submit P&Ls Maintained in the Regular Course of Business.

### 1. Claimants Subject to This Subsection of This Policy.

Subsection II.F of this policy applies to BEL claimants that: (1) did not maintain monthly and/or annual profit and loss statements in the regular course of their business, prepared at or near the time of the events recorded; or (2) did maintain such statements but after diligent efforts cannot locate or re-produce them to submit in support of a BEL claim.

### 2. Duty of Claimants to Create P&Ls.

A claimant subject to Subsection II.F may create such monthly statements based on contemporaneous alternate source documents (which may include, but are not limited to, invoices supporting revenues, invoices or bills supporting expenses, purchase orders, bills of lading, contracts, leases, bank statements, schedules, check registers, canceled checks, sales journals, credit card statements, etc.). To the extent that claimants are not in possession of such supporting documentation, they are encouraged to seek and obtain such documentation from relevant third parties. If the claimant engages an accountant to create these P&Ls, such accounting expenses may be submitted for reimbursement pursuant to the terms of the Claimant Accounting Support provisions in Section 4.4.13 of the Settlement Agreement. The Claims Administrator may allow a particular claimant to create such monthly P&Ls in "summary" form, provided the submission contains data regarding all revenue and expenses in sufficient detail to allow the Claims Administrator properly to apply the terms of the Settlement Agreement to that specific claim. The Claims Administrator reserves the right to require submission of all or parts

426479

4

of the underlying source documentation to verify the accuracy of any P&Ls that are created.

## 3. **Claimants That Cannot Create P&Ls.**

If creating monthly and/or annual P&Ls would result in an undue burden to a claimant subject to Subsection II.F despite the availability of the Claimant Accounting Support reimbursement, the claimant may be allowed to submit the contemporaneous alternate source documentation to the Claims Administrator. The Claims Administrator's Accountant Reviewers will determine whether, in the Claims Administrator's discretion, it is appropriate to assist the claimant with devising P&Ls sufficient to permit the Claims Administrator to conduct the causation and compensation evaluations required on the claim. In evaluating whether creating monthly and/or annual P&Ls would result in an undue burden to the claimant, the Claims Administrator will consider the following factors:

(a) The claimants eligible for treatment under this Section II.F.3 ("Eligible Claimants") typically will be *pro se* claimants.

(b) Accounting firms, tax preparers, attorneys, consultants, and other professional services typically will not be Eligible Claimants.

(c) Eligible Claimants typically are those that report income on a Form 1040 Tax Return with a Schedule C or E that includes documentation of expenses.

(d) Eligible Claimants typically are those with annual revenues less than $50,000 in each year included in the Causation and Compensation calculations (*i.e.*, the claimed Benchmark Period, 2010, and 2011, if applicable). The Claims Administrator's Accountant Reviewers may pro-rate this dollar threshold to account for partial years.

(e) Eligible Claimants typically are those that report income on Federal tax returns that were self-prepared. Claimants with tax returns prepared by an accountant typically will not be eligible for treatment under this Section II.F.3.

(f) Eligible Claimants typically will not have presented any support documentation generated with the assistance of accounting software (*e.g.*, claimants who have submitted quarterly or annual financials generated with the use of accounting software would typically not be eligible).

(g) Eligible Claimants will be able to provide support for actual revenues. If the claimant requires "Customer Mix" data to satisfy Causation, the claimant typically will not be eligible for treatment under this Section II.F.3.

## 4. **Review of Claims From Claimants Subject to Subsection II.F.**

In the review of BEL claims submitted by claimants subject to Subsection II.F, the Claims Administrator reserves the right to determine an appropriate level of supporting and/or explanatory documentation and information for the circumstances of a given claim. It is

426479

5

anticipated that in such instances for those claims involving very small dollar amounts, a lesser level of detail may be required than may be required for larger or more complicated claims. The Claims Administrator's Accountant Reviewers will use their professional judgment in determining the appropriate level of detail required to resolve questions presented by a particular claim. In determining the level of detail required, the Claims Administrator may take into account such factors as the nature, size and complexity of the business and the historical patterns of revenues and expenses.

## G. Gaps in Information.

(a) If a BEL claimant has submitted 12 monthly P&Ls for an applicable period but is unable to produce an annual P&L statement, an annual P&L is not required and the claim shall not be considered incomplete for that reason. Instead, the Claims Administrator will create the annual P&L as necessary based upon the total revenues and expenses in the 12 monthly P&Ls.

(b) If a BEL claimant has submitted 11 out of 12 monthly P&Ls for an applicable period and an annual P&L for that period, the missing 12th monthly P&L is not typically required and the claim shall not be considered incomplete for that reason. Instead, the Claims Administrator will calculate the missing month's revenue and expenses as the difference between the 11-month total and the annual total for the period.

## H. Fraudulent Claims.

This policy is subject to the processes followed by the Claims Administrator to detect and deny payment on fraudulent claims.

6


54408937
Oct 18 2013
05:27PM

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig        MDL NO. 2179
      "Deepwater Horizon" in the Gulf
      of Mexico, on April 20, 2010       SECTION J

Applies to:                     JUDGE BARBIER
All Cases and 12-970        MAGISTRATE JUDGE SHUSHAN

## Preliminary Injunction Related to BEL Claims

In view of the ruling rendered by the Fifth Circuit panel on October 2, 2013 in case no. 13-30315 consolidated with 13-30329, on October 3, 2013 the undersigned entered an order to suspend the issuance of any final determination notices or any payments on certain Business Economic Loss ("BEL") claims. Rec. doc. 11566. The Order was issued as an immediate and interim measure until the Court was able to confer with and receive input from the parties in order to confect a "narrowly tailored" preliminary injunction order as instructed by the Fifth Circuit.

The parties thereafter submitted *in camera* proposed preliminary injunctions, neither of which the Court found acceptable. The proposal by Class Counsel was under-inclusive and that submitted by BP was over-inclusive.[1] At the status conference held on October 11, 2013, the Court discussed

---

[1]For example, Class Counsel suggested that the injunction be limited only to claims based on cash accounting and only for certain industries. BP suggested that the processing of all BEL claims be enjoined and that new or additional criteria be added to the causation requirements of Exhibit 4B of the Settlement Agreement.

the various Fifth Circuit opinions[2] and the parties were instructed to submit revised proposed language for a "narrowly tailored" preliminary injunction "consistent with the Court's interpretation and instructions provided in chambers... ." Rec. doc. 11635.

Having received the revised proposed draft orders from both Class Counsel and BP, and finding that both continue to have the same deficiencies, the Court sets forth its understanding of the issues before this Court on remand.

The issue before the Fifth Circuit on appeal was how economic loss is measured under the provisions of Exhibit 4C. The primary question was whether there is a requirement that "variable expenses" be matched to the revenues produced by those expenses, in order to calculate "variable profit." This issue is often associated with claims based on cash basis accounting, but not exclusively so. Part I of the majority opinion by Judge Clement, joined by Judge Southwick, was concerned that if this so-called "matching" was required for certain claims but not for others, the result might be that some claimants would receive compensation without proof of actual loss.

While the calculation or measurement of economic loss is measured under Exhibit 4C, the separate causation requirements for BEL claimants are set forth in Exhibit 4B. All BEL claimants must meet these requirements in order to be eligible for compensation. Section 5.3.2.3 of the settlement provides for causation for BEL claims:

---

[2]There are three separate opinions, including the partial majority opinion by Judge Clement, the concurring opinion by Judge Southwick, and the dissenting opinion by Judge Dennis. For purposes of the remand, the parties and the Court agreed that Judge Southwick's concurring opinion is controlling.

Causation Requirements For Business Economic Loss Claims Generally.

Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon incident. The causation requirements for such Claims are set forth in Exhibit 4B.

There is no causation requirement for a number of itemized businesses as set forth in Exhibit 4B I. The causation requirements for Zone B and Zone C businesses are objective tests set forth in Exhibit 4B II, and for Zone D businesses in Exhibit 4B III. If claimants fall into Section I, evidence of causation is <u>not</u> required. As to Sections II and III, claimants who meet the objective criteria satisfy the requirement of causation.

However, the issue of how causation is determined was not before the Fifth Circuit in the recent BEL appeal. This is evident from the following passages from the majority and concurring opinions.

In the Fifth Circuit opinion, as to causation, Judge Clement states:

BP did agree that alternative causes of losses were irrelevant if the financial figures supported that a loss occurred.

Slip op. at 21. Judge Southwick also recognizes that causation was agreed to by the parties:

If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation. Improper measurement of losses under Exhibit 4C might compensate claimants without actual losses.
. . .

Even so, the parties agreed by Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred.
. . .

The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation.

3

Id. at 37-38.  Judge Southwick further points out that "[n]o one on appeal is challenging Exhibit 4B."

Id. at 39.  Finally, Judge Southwick distinguishes causation from the measurement of a claimant's

loss and makes clear the purpose of the remand to this Court:

> Part I of the panel opinion identifies the crucial question for remand:  Should
> matching be required for *all* claims when it is clearly required for many?  I agree to
> remand with instructions to reconsider the interpretation of Exhibit 4C for unmatched
> claims in light of the necessity of revenue and expense matching to realistic
> measurement of economic loss.

Id. at 38.

Thus, Exhibit 4B of the Settlement Agreement is not before the undersigned on remand.

Rather, what is before the Court is the measurement of a claimant's loss under Exhibit 4C.  That

being clear, the Court orders as follows:

Upon consideration of the decision of the United States Court of Appeals for the Fifth

Circuit's decision in *In re: Deepwater Horizon,* No. 13-30315, dated October 2, 2013, and after

consultation with the Parties and the Claims Administrator, the Court hereby orders as follows:

1.      The Claims Administrator and Settlement Program shall continue to process and pay all

Business Economic Loss ("BEL") claims[3] presented on the basis of "properly-matched accrual-basis

records,"[4] which are "claims supported by sufficiently-matched, accrual-basis accounting."[5]  As to

---

[3] For the purposes of this Order, the term "BEL claims" shall include claims for Business
Economic Loss, Failed Businesses and Start-up Businesses.
[4] *In re: Deepwater Horizon*, slip op., at 21.
[5] *Id.* at 18.

4

these claims, the Claims Appeal Process also shall proceed as set forth in Section 6 of the Settlement Agreement.

2.      The Claims Administrator shall continue the temporary suspension of the issuance of final determination notices and payments with respect to all other BEL claims unless the Claims Administrator determines that the matching of revenues and expenses is not an issue with respect to any such claim, regardless of whether the claim is supported by accrual or cash-basis accounting records.

3.      The Claims Administrator also shall suspend the issuance of final determination notices and payments with respect to Individual Economic Loss ("IEL") claims for which the claimant's economic loss claim is qualified solely upon his or her employer's satisfaction of the BEL requirements set out in Section II of Exhibit 4B of the Settlement Agreement, and the employer's claim also falls within paragraph 2 of this Order.  This temporary suspension of any such IEL claim shall remain in effect unless the Claims Administrator determines that the matching of revenues and expenses is not an issue as to the employer's BEL claim.

4.      As to BEL and IEL claims currently in the Claims Appeal Process, the Claims Administrator shall review such appeals to determine whether any party raised the matching of revenues and expenses as a basis for the appeal.  If the Claims Administrator determines that the matching of revenues and expenses was made a basis for the appeal, the Claims Appeal Process shall be temporarily suspended as to any such appeal.  As to all other such appeals, the Claims Appeal Process shall proceed to determination and payment.

---

5

5. Notwithstanding any provision in this Order, the deadlines set forth in the Settlement Agreement for filing a Notice of Appeal shall remain in place and such deadlines are <u>not</u> stayed by this Order. For any timely-filed appeal on a BEL or IEL claim after the date of this Order where a basis for the appeal is the matching of revenues and expenses, such an appeal first shall be reviewed by the Claims Administrator. If the Claims Administrator agrees that the claim presents an issue as to whether revenues and expenses are sufficiently matched, then the Claims Appeal Process as to that claim shall be temporarily suspended. Otherwise, the Claims Administrator shall permit the claim to proceed through the Claims Appeal Process to determination and payment.

6. The Claims Administrator is further ordered to provide to the Court and the Parties, within seven days of the date of this Order, a declaration outlining the criteria that the Claims Administrator's Office will use to determine whether: (a) a claim is "supported by sufficiently-matched, accrual-basis accounting," as set forth in paragraph 1 of this Order; and (b) the matching of revenues and expenses is or is not an issue with respect to a BEL and IEL claim that falls within paragraphs 2, 3, or 5 of this Order, regardless of whether the claim is supported by accrual or cash-basis accounting records.

7. This Order does not affect claims submitted to the Settlement Program for: (I) Seafood Program Compensation, (ii) IEL other than those IEL claims identified in paragraph 3 of this Order; (iii) Subsistence, (iv) VoO Charter Payments, (v) Vessel Physical Damage, (vi) Coastal Real Property Damage, (vii) Wetlands Real Property Damage, or (viii) Real Property Sales Damage. These claims and appeals are to be processed, and determinations, decisions and payments are to be made, in the normal course of the Program's operation.

6

8.      This Order will remain in effect until modified by this Court.


New Orleans, Louisiana, this 18th day of October, 2013.

**Carl J. Barbier**
**United States District Judge**

7



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

October 25, 2013

The Honorable Carl Barbier
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

     re: Declaration pursuant to Order of Court dates October 18, 2013

Dear Judge Barbier;

     Pursuant to the Order of the Court dated October 18, 2013, you will find enclosed the Claims Administrator's "Declaration."

Sincerely,

Patrick A. Juneau

CC:    Honorable Sally Shushan
       Special Master Louis Freeh
       Frank Piantidosi
       Richard Godfrey
       George Brown
       Mark Holstein
       James Roy
       Stephen Herman

935 Gravier St., Suite 1905 | New Orleans, LA 70112 | TEL 504.934.4999 | FAX 504.934.4998
www.deepwaterhorizoneconomicsettlement.com

86 of 838

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig                         MDL NO. 2179
        "Deepwater Horizon" in the Gulf
        of Mexico, on April 20, 2010                    SECTION J

Applies to:                                             JUDGE BARBIER
All Cases and 12-970                                    MAGISTRATE JUDGE SHUSHAN

DECLARATION OF PATRICK A. JUNEAU, CLAIMS ADMINISTRATOR

[Regarding Criteria for "Matching" for BEL Claims]

Patrick A. Juneau, Claims Administrator of the Court Supervised Settlement Program

("CSSP"), does hereby affirm and attest to the following:

1.      The Court in its Preliminary Injunction issued on October 18, 2013 directed the

Claims Administrator and CSSP as follows:

> The Claims Administrator is further ordered to provide to the
> Court and the Parties, within seven days of the date of this Order, a
> Declaration outlining the criteria that the Claims Administrator's
> Office will use to determine whether: (a) a claim is "supported by
> sufficiently-matched, accrual-basis accounting," as set forth in
> paragraph 1 of this Order; and (b) the matching of revenues and
> expenses is or is not an issue with respect to a BEL and IEL claim
> that falls within paragraphs 2, 3, or 5 of this Order, regardless of
> whether the claim is supported by accrual or cash-basis accounting
> records.

The Claims Administrator understands that the Court's injunction was issued in accordance with

the Fifth Circuit's opinion and directive in Case No. 13-30315 to enter a "narrowly tailored and

potentially brief stay to allow the purposes of the remand to be realized." Slip. Op. No. 13-30315

at 38.

2. In paragraph 1 of its Preliminary Injunction Order, the Court directed the CSSP to continue payment of "claims supported by sufficiently-matched, accrual-basis accounting." Doc. 11697 at ¶ 1. As set forth in my prior Declaration, when a claimant submits accrual-basis financial records in support of its BEL claim, the CSSP does not convert such records to a cash-basis. Doc. 11566 at ¶ 2[1]. The prior Declaration was submitted to address the Fifth Circuit's concern that, though unlikely, a cash-in cash-out interpretation may have been "applied to all claims, including those supported by accrual accounting." Slip. Op. No. 13-30315 at 15. The Fifth Circuit sought assurance that claims submitted with accrual-based financial statements continue to be processed using "the inherently matched revenue and expense figures." Id. at 15-16.

3. There is some dispute as to whether contemporaneously-maintained accrual basis accounting records are, in and of themselves, sufficient (due to their "inherently matched revenue and expense figures"), or whether instead such accrual-basis records must sometimes undergo further "matching". Because Exhibit 4C requires compensation to be calculated based upon monthly profit and loss statements, not annual statements, some "matching" issues still may be present even when a claimant submits contemporaneously-maintained accrual-based monthly financial statements. Accordingly, all BEL claims will be subject to an analysis under

---

[1] In response to the initial Declaration, BP identified 17 instances (of the 19,105 BEL claims processed to either eligibility or denial to date) in which the CSSP appears to have used cash-basis records to calculate claims under Exhibit 4C when accrual basis records also may have been available. An initial review of those 17 instances shows in general that: (a) in several instances, the accrual basis financial statements submitted by the claimants were mislabeled or incomplete; (b) some claimants appear to have changed their business accounting method; and/or (c) some claimants appear to have first submitted (with the GCCF) accrual records, then later submitted cash basis records to the CSSP (N.B. -- while claimants are permitted to convert cash-basis records to accrual basis for claims purposes, they are not permitted to do the converse, i.e., convert accrual basis to cash basis. See Policy No. 464 at II D). In instances when the award exceeded $25,000, however, any of these issues could be raised in the Claims Appeal Process and, in any case when the use of a cash-basis record was erroneous, the calculation could be corrected or reversed through the appeal process.

2

the criteria set forth in paragraph 4 of this Declaration, whether based upon accrual or cash-basis accounting records.

4.     After consultation with and upon the recommendation of the CSSP Accounting Vendors[2], the criteria set forth in this paragraph will be applied to identify BEL claims that may present an issue as to whether they are based on revenues and expenses that are "sufficiently-matched". If the monthly profit and loss statements submitted by a claimant meet any one of the following criteria, then the claim shall be identified for a further matching review as described in paragraph 6 of this Declaration:

> (1)     negative total revenue[3] is recorded for any month included within the Benchmark Year(s), Compensation Year or 2011;
>
> (2)     total revenue[3] recorded in any month included in the Benchmark Year(s), Compensation Year or 2011 exceeds 20% of the claimant's annual revenue for the year which includes that month;
>
> (3)     the monthly profit and loss statements or other documentation submitted shows that the claimant's business experienced a period of dormancy during the Benchmark Year(s), Compensation Year or 2011;
>
> (4)     total variable expenses when summed up are negative for any month within the Benchmark Year(s) or Compensation Year;
>
> (5)     total variable expenses for any month within the Benchmark Year(s) or Compensation Year exceed 25% of the claimant's annual variable expense for the year which includes that month;

---

[2] The Claims Administrator and the CSSP Accounting Vendors also have reviewed and considered the submissions of both the PSC and BP with regard to these issues.

[3] The use of "revenue" in this criteria does not imply that the CSSP takes any position on whether any restating of "revenue" is required by the Settlement Agreement, the Fifth Circuit's Opinion, or the concept of "sufficient matching". Rather, the use of "revenue" is intended only as a readily-available test factor to identify a claim that may require further "matching" review.

3

(6)     variable margin percentages when compared between any two months included within the Benchmark Year(s) and Compensation Year vary by more than 50 percentage points; or,

(7)     in any given month within the Benchmark Year(s) or Compensation Year, the variance between that month's percentage of annual revenues[3] as compared to that same month's percentage of annual variable expenses exceeds 8 percentage points.

Any claim, whether based on accrual or cash-basis records, that does not fall within one of the foregoing seven criteria shall be presumed to be "sufficiently matched", and proceed to determination and payment, provided, however, that if in the professional judgment of the CSSP Accounting Vendors, a claimant's financial records contain other significant indicia that the claim may not be "sufficiently matched," the CSSP reserves the right to identify such claim for further matching review as set forth in paragraph 6.

5.     The Court's Order further requires the Claims Administrator to identify the criteria that will be applied to determine whether "the matching of revenues and expenses is or is not an issue with respect to a BEL and IEL claim that falls within paragraphs 2, 3 or 5" of the Court's October 18, 2013 Order, regardless of whether the claim is supported by accrual or cash basis accounting records. As to any such claims, after consultation with and upon the recommendation of the CSSP Accounting Vendors, the criteria set forth above in paragraph 4 also will be used to evaluate whether the matching of revenue and expenses is or is not an issue with respect to claims under paragraphs 2, 3 or 5 of the October 18, 2013 Order.

6.     With respect to any claims where matching is determined to be an issue as set forth in paragraph 5 of this Declaration, or where a claim has been identified for further matching review under paragraph 4 of this Declaration, the Accounting Vendors will exercise their professional judgment to determine whether that claim is "sufficiently matched" based upon

4

the review of the information submitted and available to them, including when applicable the nature and complexity of the industry or business in question, particularly with regard to claims based upon cash-basis accounting records. The Claims Administrator and the CSSP will submit any claims that are determined to be "sufficiently matched" to its quality review process. If, after the quality review process, the claim is confirmed to be "sufficiently matched", the claim will then proceed to determination and payment.

7.     Finally, it is the understanding of the Claims Administrator that, at present, it is anticipated that the remand process will be concluded by December 2, 2013. Accordingly, the Claims Administrator wishes to advise the Court that the application of the foregoing criteria set forth in this Declaration during this "remand" period likely will result in a relatively small number of BEL claims reaching the determination and eligibility stage of the process, given the level of detailed review that will be required to assess each BEL claim, and all of which may require additional resources. Nonetheless, the CSSP will proceed with the processing of all BEL claims consistent with this Declaration and all Orders of the Court.

Dated:  October 25, 2013

Patrick A. Juneau, Claims Administrator

5

E-SERVICE
54504099
Nov 05 2013
04:37PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig                         MDL NO. 2179
      "Deepwater Horizon" in the Gulf
      of Mexico, on April 20, 2010                  SECTION  J

Applies to:                                             JUDGE BARBIER
*All Cases and 12-970*                                  MAGISTRATE JUDGE SHUSHAN

## ORDER

[Clarifying Preliminary Injunction (Rec. Doc. 11697)
Regarding Claims Currently in the Appeals Process]

The Court issued a preliminary injunction on October 18, 2013.  Rec. Doc. 11697.  In order to clarify the order the Court amends the preliminary injunction as follows:

1.      In paragraph 4 of the preliminary injunction order, relative to BEL and IEL claims in the claims appeal process, the Court directed the Program to "review such appeals to determine whether any party raised the matching of revenues and expenses as a basis for appeal." If that issue is raised, the appeal process is to be suspended with regard to that claim.  If that issue is not raised, the claims appeal process with regard to that claim is to proceed to determination and payment.

2.      The procedure outlined above will be applied to any claim that as of October 18, 2013:  (a) had received a final determination notice; (b) had an award of a sufficient dollar amount such that it was eligible to be appealed; (c) had an appeal of the determination filed or the time period for filing an appeal had expired; and (d) for which payment had not yet been issued.  Such claims include those that were actually appealed and those for which no appeal was filed within the appeal period.  All such claims are considered to have been "currently in the Claims Appeal Process" as per paragraph 4 of the preliminary injunction.

3.      In determining "whether any party raised the matching of revenues and expenses as a basis for appeal" (the "matching issue"), the Claims Administrator and Settlement Program (the "Program") will apply the following criteria:

(a)      If no appeal was timely filed, the matching issue will be considered to have not been raised as a basis for appeal;

(b)      If an appeal was filed and briefs in the form of an Initial Proposal, Final Proposal or Request for Discretionary Court Review were filed, the Program will consider the matching issue to have been raised only if the issue was raised in any of those three submissions filed as of October 18, 2013;

(c)      If an appeal was filed and briefs in the form of an Initial Proposal, Final Proposal or Request for Discretionary Court Review were filed, the Program will not consider the matching issue to have been raised if it was not included in any of those three submissions filed as of October 18, 2013; and

(d)      If an appeal was filed but the claim had not yet reached the point where any briefs were filed, the Program will look to the Notice of Appeal to determine whether the matching issue was raised as a basis for appeal.

4.      The criteria outlined above will govern whether claims currently in the claims appeal process involve the matching issue.  No currently pending appeals will be subject to analysis under the separate and distinct criteria outlined in paragraph 4 of the Claims Administrator's Declaration of October 25, 2013 (Rec. doc. 11741).

5.   Claims for which an appeal is timely filed after October 18, 2013 shall be processed in accordance with paragraph 5 of the preliminary injunction.

New Orleans, Louisiana, this 5th day of November, 2013.

_____
CARL J. BARBIER
United States District Judge

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| This Document Applies To: | * | JUDGE BARBIER |
| | * | |
| *12-970* | * | MAG. JUDGE SHUSHAN |

## ORDER

Before the Court are BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims (Rec. Doc. 11819) and related filings (Rec. Docs. 11826, 11838, 11840, 11848).

As a preliminary matter, IT IS ORDERED that BP's Motion for Leave to File Reply Memorandum (Rec. Doc. 11838), BP's Motion to File Under Seal Attachment 1 to the Declaration of Allison B. Rumsey (Exhibit B) in Support of BP's Reply Memorandum (Rec. Doc. 11840), and Class Counsel's Motion for Leave to File Sur-Reply (Rec. Doc. 11848) are hereby GRANTED.

IT IS FURTHER ORDERED that BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims (Rec. Doc. 11819) is DENIED for the reasons previously stated in the Court's Preliminary Injunction Order of October 18, 2013 (Rec. Doc. 11697) and further for the reasons stated by Class Counsel.

New Orleans, Louisiana, this 15th day of November, 2013.

United States District Judge

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| This Document Applies To: | * | JUDGE BARBIER |
| | * | |
| *12-970* | * | MAG. JUDGE SHUSHAN |

### Scheduling Order Regarding BEL Matching Proposals

On November 8, 2013, the Court asked the Court-Designated Neutrals to coordinate with the parties to develop a Scheduling Order to control the submission of matching proposals regarding the BEL issue.  After considering input from the parties and the Court-Designated Neutrals, the Court adopts following schedule:

By 5:00 p.m. on November 21, 2013, the parties will file proposals for matching which are designed to be responsive to the Fifth Circuit's BEL decision.  The proposals should include any supporting argument and  may cite to evidence already filed in the record.  However, no additional or new evidence may be submitted.  The parties must copy the Court, the Claims Administrator, opposing counsel, and the Court-Appointed Neutrals.

By 5:00 p.m. on November 26, 2013, the parties will file memoranda (not exceeding 10 pages)  responding to their opponents' submissions.  The memoranda  may not include any new or additional evidence.  The parties must copy the Court, the Claims Administrator, opposing counsel, and the Court-Appointed Neutrals.

Following receipt of these submissions, the Court will take the matter under advisement, and will advise the parties if any further information is needed, or whether a hearing will be held.

It has also come to the Court's attention that one or more parties believe there is a December 2, 2013 deadline for this Court to complete its reconsideration of the BEL issue following remand from the Fifth Circuit. This belief appears to stem from language contained in a letter from the Fifth Circuit Clerk's Office dated October 3, 2013. [Rec. Doc. 11615].

The Court has confirmed with the Fifth Circuit Clerk's Office that the December 2 date is not a deadline for completing action on the remand in the District Court, but rather a date by which the Fifth Circuit Clerk's Office will inquire of the District Court Clerk as to the status of the remand proceedings. Nonetheless, this Court intends to resolve the pending remand issue as efficiently and expeditiously as possible.

New Orleans, Louisiana, this 15th day of November, 2013.

_____
United States District Judge

2