# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION J |
| This document relates to: All Cases and No. 12-970 | Honorable CARL J. BARBIER |
| | Magistrate Judge SHUSHAN |

## BP'S PROPOSAL FOR MATCHING AND MEMORANDUM IN SUPPORT OF PERMANENT INJUNCTION RELATED TO BEL CLAIMS

With a considerable measure of skepticism, the BEL Panel asked why it would be that parties who agree that matching is appropriate for accrual-basis claims would find it inappropriate for cash-basis claims. And so the Panel remanded for further proceedings to determine whether the parties did, in fact, agree to treat cash-basis claims in a way that the Panel called "economically meaningless." *In re Deepwater Horizon*, 732 F.3d 326, 338 (5th Cir. 2013) [hereinafter BEL Decision]. The evidence establishes, we submit, that the parties agreed: (1) to compensate only those persons and entities who suffered actual economic injury (*i.e.*, damages) as a result of the Oil Spill;[1] (2) to employ a "lost profits" analysis to determine actual economic loss; and (3) to calculate lost profits using an "accrual-style framework" that properly matches monthly "revenues" and "corresponding variable expenses." *Id*. at 337-38 (suggesting that "the term 'corresponding variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C" and stating that "only matching provides a realistic chance of achieving

---

[1] The BEL Panel said: "[I]t remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of *damages*. In interpreting a settlement, surely some weight has to be given to what *damages* recoverable in civil litigation actually are." 732 F.3d at 339 (emphases added).

the ostensible goal of the settlement of compensating claimants for real losses"); *see* BP's Mem. Re BEL Remand, Nov. 18, 2013, (Doc. No. 11863).

It does not require a complicated order to implement "matching" and an "accrual-style framework" for all claims and thereby to ensure the awards made by the Settlement Program compensate actual damages. Attached as Exhibit 1 is a proposed order that consists of seven elements:

> 1.      The Claims Administrator and Settlement Program shall process and pay all Business Economic Loss ("BEL") claims – whether new claims, claims for which final determination notices and payments were suspended pursuant to the Preliminary Injunction, or claims in the Claims Appeal Process – in such a way as to:

>> (a)  Determine proper monthly "revenues" and "corresponding variable expenses" related to those revenues consistent with an accrual-style framework, obtaining and using objective and reliable sources of information as necessary to make this determination in an informed manner, as authorized by Exhibit 4A of the Settlement Agreement.

>> (b)  Screen all BEL claims for failure to record monthly revenues and corresponding variable expenses accurately, using a proper accrual framework and triggers consistent with those identified in the Declaration of Patrick Juneau, Oct. 25, 2013 (Doc. No. 11741), and the Declarations of Hal Sider, Oct. 9, 2013 (Doc. No. 11726-8) and Nov. 7, 2013 (Doc. No. 11819-3).

>> (c)  Employ a definition of "revenues" that treats as revenues those enhancements of an entity's net assets which derive from earnings activities constituting its principal and ongoing business operations.

>> (d)  Attribute monthly "revenues" in a manner consistent with economic reality based on those business operations that generate earnings.

>> (e)  Employ a definition of "corresponding variable expenses" that treats as such expenses those actual or expected reductions in net assets that have occurred or will occur as a result of the entity's principal and ongoing business operations and, for

2

any given month, were incurred to generate the revenues properly attributed to that month.

   (f)  Take into account all factual information known and reasonably available to the Settlement Program regarding "revenue" and "corresponding variable expenses," including subsequently corrected financial data, so as to achieve results consistent with economic reality in the calculation of lost profits.

   (g)  Calculate BEL lost profits under Exhibit 4 of the Settlement Agreement using monthly "revenues" and "corresponding variable expenses," determined in accordance with this order, so as to reflect actual economic loss during the selected Compensation Period.

This proposed order follows from the BEL Decision, once it is applied to all claims, whether based on accrual-basis, cash-basis or some other form of accounting records.  Implicit or explicit in the BEL Decision are the following principles that should guide the Settlement Program in "matching" revenue and expenses for the Benchmark and Compensation periods:

   1.   *Lost Profits*.  The objective of the Settlement Agreement – and of the claims review process – is to compensate actual economic loss, specifically lost profits.  Thus, the BEL Panel spoke of matching as the only realistic method for "compensating claimants for real losses."  BEL Decision at 338.[2]  Conversely, the flaw in comparing cash-in with cash-out is that

---

[2]   *See id.* at 333 ("correlation gives business decision-makers a real-time view of *the net economic value* of a transaction in the period"); 336 ("subtracting temporally-related revenues and expenses recorded by cash-basis claimants would not result in numbers that could fairly be said to represent *actual economic losses or lost 'variable profits'*"); 337 (matching "expenses to be subtracted" by requiring that the expenses be "those that 'correspond' to the revenue earned . . . . seems amply supported by the language of Exhibit 4C and much more *consistent with general accounting and economic norms*"); 338 ("only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for *real losses*"); 339 ("[T]he interpretation urged by the Administrator is completely disconnected from *any reasonable understanding of calculation of damages*."); 339 ("[T]he agreement contains not only the terms 'corresponding' and 'variable,' but extensive documentation requirements which would allow claims administration accountants to process claims *in accordance with economic reality*."); 346-47 (Southwick, J., concurring) ("I agree to remand with instructions to reconsider the interpretation of Exhibit 4C for unmatched claims in light of the necessity of revenue and

it is often "economically meaningless," for it compensates "artificial losses that appear only from the timing of cash flows," not "real economic losses." *Id.* Thus, the polestar for the Settlement Program in all the decision making connected with the claims review process is to measure actual lost profits.

2.    *Accrual-Style Framework.* The BEL Decision did not find that the parties adopted a particular set of accounting rules. But it said that "cash accounting does not inherently recognize relationships between cash flows and their underlying transactions" and, therefore, does not ensure measurement of actual lost profits. *Id.* at 337. The BEL Panel spoke of "an accrual-style framework," in contrast, as one that measures actual lost profits by recognizing the relationship (*i.e.*, "match") between revenues earned in a particular period and the expenses that generated those revenues. Indeed, many claims that purport to use accrual accounting are not properly matched when one carefully examines the claimant's P&Ls.[3] Thus, the court's reference to "an accrual-style framework" rather than particular accounting rules reflects its view that more important than the application of any particular accounting method is the measurement of actual economic losses.

---

expense matching *to realistic measurement of economic loss.*"); *see also* Order and Reasons Granting Final Approval of Settlement, Dec. 21, 2012, at 10 (Doc. No. 8138) (Exhibits 4A-4E constitute a framework "derived from recognized and accepted methodologies applied in evaluating *business economic loss claims*"). (Emphases added).

[3]    Alexander Decl. ¶ 14 (Doc. No. 11726-5) ("The CSSP Accountants need the knowledge of a claimant's accounting basis to implement appropriate procedures to discover and correct matching and other errors in claims." (citing Appendices 1 and 2 to the declaration)); Gaspardo Decl. ¶¶ 6-18 (Doc. No. 11726-7) (describing "a list of 73 examples of BEL claim files . . . reviewed in which the claimant purported to submit 'accrual basis' financial information, but the monthly revenues and expenses recorded in the P&Ls submitted by the claimant exhibit strong indicia of not being 'sufficiently matched'"); Sider Decl. ¶¶ 31-34 (Doc. No. 11726-8) ("claims identified by claimants as relying on accrual basis financial statements suffer from problems relating to improper and insufficient matching of monthly revenue to corresponding variable expenses that are comparable to those observed among BEL claims taken as a whole").

4

3.     *Revenues and Expenses*.  Employing an accrual-style framework has three components.

The first is a definition of "revenue," which are enhancements to a business entity's net assets that derive from those earnings activities constituting its principal and ongoing business operations.  *Id.* at 333 (citing Statement of Financial Accounting Concepts ("SFAC") No. 6 and distinguishing "revenue" from receipt of payment).[4]

The second is a definition of "expenses," which are those actual (or expected) outflows of net assets that have occurred (or will occur) as a result of the entity's principal and ongoing business operations.  *Id.* at 333 & n.4 (citing SFAC No. 6, ¶¶ 146-47).[5]

The third component, applicable both to revenue and expenses, is one of temporality.  Revenues are recognized in (or attributed to) the month when the business earns and becomes entitled to receive them, not when payment is received.  It is necessary to estimate reliably when revenue was earned in order to ensure that the Variable Profit calculation results in a calculation of losses that reflect economic reality.  To that end, rules for revenue attribution are important and will assist the Settlement Program in ensuring that claimants with like losses receive like

---

[4]     *See also* SFAC No. 6 ¶ 78 (FASB 1985); Alexander Decl. ¶ 8 (Doc. No. 8963-36); Dietrich Decl. ¶¶ 15-16, 18 (Doc. No. 8963-37); Fishkind Decl. ¶ 18 (Doc. No. 8964-8); Weil Decl. ll. 138-48 (Doc. No. 8963-47); Brief of Amici Curiae Accounting Professors in Support of Appellants at 8, *In re: Deepwater Horizon*, Case No. 13-30315 (5th Cir. May 10, 2013) (Document 00512243426).

[5]     *See also* Alexander Decl. ¶ 9 (Doc. No. 8963-36); Dietrich Decl. ¶¶ 15, 17-18 (Doc. No. 8963-37); Fishkind Decl. ¶ 19 (Doc. No. 8964-8); Weil Decl. ll. 150-57 (Doc. No. 8963-47) Brief of Amici Curiae Accounting Professors, *supra* note 4, at 8.

compensation. Such rules should be based on objective indicators that correspond to true asset enhancement and, thus, to the timing of when revenue is earned.[6]

Similarly, because variable expenses must be traced to the revenues they generated, expenses are recognized in (or attributed to) the same month as those revenues for purposes of calculating Variable Profit, not necessarily to the month in which a cash payment was made. "This correlation" between revenues and expenses, the Fifth Circuit said, gives "a real-time view of the net economic value of a transaction in the period most relevant to its overall economic significance." BEL Decision, 732 F.3d at 333 (citing SFAC No. 6, ¶ 140). To the extent that variable expenses attributable to multiple months are recorded in a single month, they should be attributed and matched to the months in which the revenue to which those expenses actually relate was earned. What the Fifth Circuit called this "correlation" between revenues and expenses is what Exhibit 4C of the Settlement Agreement refers to as "corresponding variable expenses." *Id*. at 337 (explaining that such expenses "reasonably could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenues earned").[7] It is these corresponding variable expenses that must be identified and subtracted from revenue in order to properly calculate Variable Profit.

4.    *Accurate and Complete Information*.  The Settlement Agreement does not require claimants to submit their financial records other than as they are kept in the ordinary course of business.  Nor need claimants match revenues and expenses themselves, and this proposal does not suggest otherwise.  Rather, as the BEL Panel noted, Exhibit 4A of the Settlement Agreement

---

[6]    Asset enhancing activities are the work a business does or the costs it incurs that give rise to the right to receive cash or other consideration.  Revenue attribution rules can be organized by industry, because businesses in the same industry typically have similar earnings cycles.

[7]    *See also* Alexander Decl. ¶ 13-14 (Doc. No. 8963-36); Dietrich Decl. ¶ 19 (Doc. No. 8963-37); Sider Decl. ¶¶ 44-47 (Doc. No. 8963-46); Polinsky Decl. ¶ 6 (Doc. No. 8963-44).

creates "extensive documentation requirements which would allow claims administration accountants to process claims in accordance with economic reality." *Id.* at 339. The mandatory nature of those requirements – "[i]n order to be eligible for compensation, a business claimant ***must*** provide" certain categories of documents, Settlement Agreement Ex. 4A, Apr. 18, 2012 (Doc. No. 6276-8) (emphasis added) – should ensure that the Settlement Program has a solid base of financial information.

But Exhibit 4A recognizes that the required documentation may not be complete, or may raise questions. And so, in addition to requiring the submission of certain records at the outset, Exhibit 4A also authorizes the Claims Administrator to call for additional documentation, if necessary, to understand the underlying earnings activities in the Benchmark and Compensation Periods. In other words, consistent with the goal the Settlement Agreement to "compensat[e] claimants for real losses," BEL Decision, 732 F.3d at 338, the Settlement Program is empowered – indeed, is required – to seek additional information where such additional information is necessary to implement the compensation framework properly. If, subsequent to the creation of P&Ls and other documents submitted in support of a claim, additional information comes to light that gives a more accurate and complete picture of the underlying economic activities, the Settlement Program should take this information into account. In short, the Settlement Program should not only scrutinize claims submissions for errors and irregularities, but also request and examine additional source documents from the claimant (as well as other available information) in order to apply rigorously the three principles discussed above.

In sum, the BEL Decision describes the necessary components of a claims-review process that recognizes the importance of "matching." The components include, at a basic level, the definitions of "revenues" and "expenses," both of which recognize the importance of

identifying the underlying economic activities, not simply tracking the flow of cash. Recognition of the underlying transaction, in turn, inherently involves identification of the timing of the transaction – *i.e.*, when did the business engage in the activities that earned revenue and when did it incur the expenses for the business operations that gave rise to that revenue? This correlation between particular revenues and particular expenses is the essence of "matching," which is captured in the settlement's requirement that the claims-review process identify "corresponding variable expenses."

A process that in this manner (i) defines revenues and expenses, (ii) attributes them to the correct month, and (iii) correlates variable expenses to the revenues generated by those expenses will measure economic performance in a meaningful way. Where from an economic perspective there are "lost profits," this approach accurately determines that loss, and where from a legal perspective there are "damages," this approach accurately quantifies them. Thus, Judge Southwick spoke of "the *necessity* of revenue and expense matching to realistic measurement of economic loss." *Id*. at 346-47 (emphasis added).

Nothing about this "matching" proposal will seem foreign, or out of the ordinary, to the sophisticated accountants working with the Settlement Program.[8] It would be strange to think that an accrual-style framework, designed to process claims "in accordance with economic reality," would be foreign to them. *Id.* at 339. The BEL Panel certainly saw nothing out of the ordinary in expecting the Settlement Program to do so, noting that the documentation required by Exhibit 4A "presumably would allow accountants fairly, if at times imperfectly, to 'match' revenues and expenses if such were required." *Id.* at 337. As one potential method of

---

[8]   *See* Finch Suppl. Decl. ¶¶ 27-37 (Doc. No. 8963-39); Weil Decl. ll. 374-389 (Doc. No. 8963-47).

105 of 838

implementing BP's Proposed Injunction, BP offers a set of guidelines for the Claims

Administrator's consideration. *See* Exhibit 2 hereto.

For the reasons discussed in BP's Memorandum Re BEL Remand, the Court should find

that the only interpretation of the Settlement Agreement that makes sense is one that matches

revenue and expenses. And for the reasons set forth in this memorandum, the Court should enter

an order or permanent injunction in the form attached as Exhibit 1 to implement that

interpretation of the Agreement.

November 21, 2013

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td><em>/s/ Kevin M. Downey</em></td></tr>
<tr><td>James J. Neath</td><td>Kevin M. Downey</td></tr>
<tr><td>Mark Holstein</td><td>F. Lane Heard III</td></tr>
<tr><td>BP AMERICA INC.</td><td>WILLIAMS & CONNOLLY LLP</td></tr>
<tr><td>501 Westlake Park Boulevard</td><td>725 Twelfth Street, N.W.</td></tr>
<tr><td>Houston, TX 77079</td><td>Washington, D.C. 20005</td></tr>
<tr><td>Telephone: (281) 366-2000</td><td>Telephone: (202) 434-5000</td></tr>
<tr><td>Telefax: (312) 862-2200</td><td>Telefax: (202) 434-5029</td></tr>
</table>

| | |
|---|---|
| Daniel A. Cantor | ___/s/ Don K. Haycraft___ |
| Andrew T. Karron | S. Gene Fendler (Bar #05510) |
| ARNOLD & PORTER LLP | Don K. Haycraft (Bar #14361) |
| 555 Twelfth Street, NW | R. Keith Jarrett (Bar #16984) |
| Washington, DC 20004 | LISKOW & LEWIS |
| Telephone: (202) 942-5000 | 701 Poydras Street, Suite 5000 |
| Telefax: (202) 942-5999 | New Orleans, Louisiana 70139 |
| | Telephone: (504) 581-7979 |
| Robert C. "Mike" Brock | Telefax: (504) 556-4108 |
| COVINGTON & BURLING LLP | |
| 1201 Pennsylvania Avenue, NW | Richard C. Godfrey, P.C. |
| Washington, DC 20004 | J. Andrew Langan, P.C. |
| Telephone: (202) 662-5985 | David J. Zott, P.C. |
| Telefax: (202) 662-6291 | Jeffrey J. Zeiger |
| | Wendy L. Bloom |
| Jeffrey Lennard | KIRKLAND & ELLIS LLP |
| Keith Moskowitz | 300 North LaSalle Street |
| DENTONS US LLP | Chicago, IL 60654 |
| 233 South Wacker Drive | Telephone: (312) 862-2000 |
| Suite 7800 | Telefax: (312) 862-2200 |
| Chicago, IL 60606 | |
| Telephone: (312) 876-8000 | Jeffrey Bossert Clark |
| Telefax: (312) 876-7934 | Steven A. Myers |
| | KIRKLAND & ELLIS LLP |
| **OF COUNSEL** | 655 Fifteenth Street, N.W. |
| | Washington, D.C. 20005 |
| | Telephone: (202) 879-5000 |
| | Telefax: (202) 879-5200 |

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.**
**AND BP AMERICA PRODUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of November, 2013.

/s/ Don K. Haycraft
Don K. Haycraft

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | * | SECTION J |
| This document relates to: All Cases and No. 12-970 | * * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |

## [PROPOSED] PERMANENT INJUNCTION RELATED TO BEL CLAIMS

In view of the United States Court of Appeals for the Fifth Circuit's decision in *In re: Deepwater Horizon,* No. 13-30315 (consolidated with 13-30329), dated October 2, 2013, the undersigned entered an order to suspend the issuance of any final determination notices or any payments on certain Business Economic Loss ("BEL") claims.  Doc. No. 11566. The Order was issued as an immediate and interim measure until the Court was able to confer with and receive input from the parties in order to confect a "narrowly tailored" preliminary injunction order as instructed by the Fifth Circuit.

Thereafter, on October 18, 2013, upon further consideration of the Fifth Circuit's decision, and after consultation with the Parties and the Claims Administrator, the Court entered a Preliminary Injunction Related to BEL Claims.  Doc. No. 11697.

Now, upon consideration of the evidentiary declarations and legal memoranda submitted by the parties, and after consultation with them, the Claims Administrator, and the Special Masters, the Court hereby orders as follows:

1.      The Claims Administrator and Settlement Program shall process and pay all Business Economic Loss ("BEL") claims – whether new claims, claims for which final

determination notices and payments were suspended pursuant to the Preliminary Injunction, or claims in the Claims Appeal Process – in such a way as to:

a.      Determine proper monthly "revenues" and "corresponding variable expenses" related to those revenues consistent with an accrual-style framework, obtaining and using objective and reliable sources of information as necessary to make this determination in an informed manner, as authorized by Exhibit 4A of the Settlement Agreement.

b.      Screen all BEL claims for failure to record monthly revenues and corresponding variable expenses accurately, using a proper accrual framework and triggers consistent with those identified in the Declaration of Patrick Juneau, Oct. 25, 2013 (Doc. No. 11741), and the Declarations of Hal Sider, Oct. 9, 2013 (Doc. No. 11726-8) and Nov. 7, 2013 (Doc. No. 11819-3).

c.      Employ a definition of "revenues" that treats as revenues those enhancements of an entity's net assets which derive from earnings activities constituting its principal and ongoing business operations.

d.      Attribute monthly "revenues" in a manner consistent with economic reality based on those business operations that generate earnings.

e.      Employ a definition of "corresponding variable expenses" that treats as such expenses those actual or expected reductions in net assets that have occurred or will occur as a result of the entity's principal and ongoing business operations and, for any given month, were incurred to generate the revenues properly attributed to that month.

f.      Take into account all factual information known and reasonably available to the Settlement Program regarding "revenue" and "corresponding variable expenses" including

subsequently corrected financial data, so as to achieve results consistent with economic reality in the calculation of lost profits.

    g.  Calculate BEL lost profits under Exhibit 4 of the Settlement Agreement using monthly "revenues" and "corresponding variable expenses," determined in accordance with this order, so as to reflect actual economic loss during the selected Compensation Period.

   2.  This Order does not affect claims submitted to the Settlement Program for: (i) Seafood Program Compensation, (ii) IEL other than those IEL claims identified in paragraph 3 of the Order dated October 18, 2013, Doc. No. 11697; (iii) Subsistence, (iv) VoO Charter Payments, (v) Vessel Physical Damage, (vi) Coastal Real Property Damage, (vii) Wetlands Real Property Damage, or (viii) Real Property Sales Damage. Such categories of claims are to be processed, and determinations, decisions and payments are to be made, in the normal course of the Program's operation.

   New Orleans, Louisiana, this _____ day of _____, 2013.


            _____
            Carl J. Barbier
            United States District Judge

# EXHIBIT 2

**[Proposed] Guidelines for Implementation of BEL Claims
Processing Consistent with Fifth Circuit BEL Opinion**

**November 21, 2013**

# **TABLE OF CONTENTS**

Page

I.      Introduction ........................................................................................................1

II.     Five Steps for Evaluating BEL Claims for Matching Issues ................................2

    A.      Perform an analytical review to assess whether errors or irregularities or matching type issues are present in the BEL claim submission. ........................... 2

    B.      Attribute revenue to the month in which the appropriate earnings metric occurred, based on the revenue attribution guidelines appropriate for the particular business under review. ................................................................ 4

    C.      Identify the corresponding variable expenses that relate to the revenue attributed to each month. ........................................................................ 4

    D.      Perform the BEL computations using the correct revenue and corresponding variable expense data. ........................................................ 5

    E.      Evaluate the preliminary BEL claim determination for consistency with economic reality. ................................................................................ 5

III.    Conceptual Framework for Determining Revenue and Corresponding Variable Expenses 6

    A.      Revenue Attribution ................................................................................ 6

        (1)     Short Earnings Cycle ................................................................ 7

        (2)     Long Earnings Cycles ................................................................ 10

            (a)     Project or Job Based Earnings Cycle ................................... 11

            (b)     Effort Based Earnings Cycle ............................................... 15

            (c)     Time Based Earnings Cycle ................................................ 19

            (d)     Market Presence ................................................................ 22

    B.      Identification of Corresponding Variable Expenses ................................... 22

    C.      Non-Revenue Items ................................................................................ 31

IV.     Appendix of Additional Examples ........................................................................34

i

## I.     Introduction

BP has developed a set of Proposed Guidelines for implementation of the Business Economic Loss (BEL) Framework (and other business economic loss frameworks, including Start-Up and Failed Businesses, collectively "BEL claims") in the wake of the Fifth Circuit's BEL Opinion.[1]  These Guidelines seek to provide specific guidance regarding processing of BEL claims that is consistent with (i) the language of the Settlement Agreement as (ii) interpreted in the BEL Opinion.

For claimants that establish a causal nexus to the spill,[2] the CSSP must determine Variable Profit in the pre-spill Benchmark Period and the post-spill Compensation Period by identifying for each period "the monthly revenue over the period" and subtracting therefrom the "corresponding variable expenses . . . over the same time period."  (Settlement Ex. 4C.)  The difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period is the Step 1 BEL compensation.

Measuring actual economic losses in a manner consistent with a traditional lost profits framework and that reflects economic reality is the starting point for a plan to properly implement the BEL Opinion.  BP's plan therefore uses this starting point as the overarching frame within which the other aspects of BEL implementation must fit.  Thus, BP's Proposed Guidelines focus on whether the end result is effective for achieving a traditional lost profits measure consistent with economic reality.

The Guidelines seek to implement an "accrual-style framework" that identifies monthly revenue and corresponding variable expense to calculate monthly variable profit in accord "with economic reality."[3]  As discussed further below, the Guidelines are based on FASB Concept Statement No. 6, cited by the Fifth Circuit, defining revenue as the enhancement of the business's assets based on earnings activities during the period, and focus on identification of revenue drivers which approximate these earnings.

Thus, BP has developed an approach that achieves a proper determination of revenues and corresponding variable expenses consistent with measuring actual economic losses, by using easy to apply concepts that are consistent with both the measurement of economic loss and widely accepted accounting practices.  In addition, we remain open to similar alternative proposals that achieve the end goal of reliably identifying monthly revenue and expenses and determining actual economic losses.

---

[1]   *See In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013) (hereafter "BEL Opinion").

[2]   The BEL Ruling also addresses causation, stating that if a claimant "has no colorable claim that the loss was caused by the spill, it also lacks standing and cannot state a claim."  *See* BEL Opinion, 732 F.3d 326, 340.  Thus, the class cannot include "members that had not sustained losses at all, or had sustained losses unrelated to the oil spill."  *Id.* at 343.  These Guidelines do not address the nexus and class membership issues that are addressed in BP's other court filings on those issues.

[3]   *Id.* at 337, 339.

1

We discuss below the key provisions of the BP Guidelines including the basic steps required for evaluation of BEL claims, the conceptual framework for revenue attribution and identification of corresponding variable expenses, and some of the procedural issues that should be considered in connection with a proper implementation of the BEL Opinion.

## II. Five Steps for Evaluating BEL Claims for Matching Issues

The proper processing of BEL claims consistent with the above principles can be done in a practical and efficient manner by the CSSP Accounting Vendors. There are several basic steps that should be followed to perform the Compensation calculation. This is not a process that must be mechanically followed in every instance, but a description of the logical steps in the process. The five basic steps are:

- Perform an analytical review to assess whether errors or irregularities or matching type issues are present in the BEL claim submission.

- Attribute revenue to the month in which the actual economic activity occurred, based on the revenue attribution guidelines appropriate for the particular business under review. Review for causation under Exhibit 4B.

- Identify the corresponding variable expenses that relate to the revenue attributed to each month.

- Perform the BEL computations using the correct revenue and corresponding variable expense data.

- Evaluate the preliminary BEL claim determination for consistency with economic reality.

These summary steps do not attempt to describe every task that the BEL claim reviewer will and must perform. The CSSP must, of course, detect irregularities, errors, fraud, and, in the first instance, determine whether a causal nexus to the Oil Spill exists.

### A. Perform an analytical review to assess whether errors or irregularities or matching type issues are present in the BEL claim submission.

After a BEL claim file has been received and initial processing[4] has occurred, it should be assigned to an appropriately trained professional accountant for evaluation of the claim. The first step that should be done by the professional accountant is an analytical review of the available information about the business. This analysis should be performed using data analysis and metrics that could be generated by using computer assisted techniques. The "Declaration Tab" of the financial data analysis model developed by the Accounting Vendors could also serve as a tool for developing initial data metrics for review.

---

[4] We do not address here the details of initial processing of claims, which should include appropriate inquiries along with error and fraud prevention and detection procedures.

A variety of metrics can be generated to help the professional accountant discern whether a matching problem may exist. *See, e.g.*, October 9, 2013 Declaration of Hal Sider (Doc. No. 11726-8) (identifying metrics); October 25, 2013 Declaration of Patrick Juneau ("Juneau Declaration") (Doc. No. 11741) (identifying seven criteria to be used for identifying matching issues); November 7, 2013 Declaration of Hal Sider (Doc. No. 11819-3) (proposing modest changes to the screens used by CSSP). The screens and triggers proposed by BP and by the CSSP to identify potential matching issues can be used as part of the initial analytical review. For example, identifying monthly revenue as a percentage of the annual revenue is a useful method for identifying recorded revenue spikes that should be flagged for further review. Negative variable profit margins or wide variation in profit margins also can serve as appropriate flags for further investigation. While the current tools developed by the Accounting Vendors should be quite useful to this effort, they are not the only data metrics that should be used. In addition, the Accounting Vendors should continually review and monitor the effectiveness of the data analysis tools they use and identify additional metrics that may prove useful.[5]

In addition to generating the data analysis and metrics, an analytical review can make use of charts and graphics to help review data over the Benchmark and Compensation Periods. For example, the Accounting Vendors can develop charts for each claim file with a graph of the monthly revenue and monthly variable profit margin percentage during the Benchmark and Compensation periods based on the claimant's data. Often, it is easy to see potential matching issues when viewed in the form of a graphical depiction.

The professional accountant must also make an effort to understand the claimant's business and review information in the claim file and/or readily available documents to help inform the review for matching issues. It would be helpful for the CSSP Accounting Vendors to organize the review teams around common business characteristics such as business type or size, and to have industry and other technical specialists available to review particular issues and common problems.

The professional accountant, along with more senior reviewers, should exercise their judgment about whether matching issues exist. For example, companies that sell products (as opposed to services) should have certain accounts related to inventory and costs of goods sold. The professional accountant reviewing the file should be attentive to whether the amounts recorded in the costs of goods sold account are reasonable in the context of the claimant's financial statements and are consistent with expectations for that particular business. Similarly, if the business is a franchise that pays a franchise fee that is a consistent percentage of total sales, then the reviewer should be alert for anomalies in the monthly expense for that line item. Again, computer assisted techniques can be used to help with a review of all line items in the P&L statements to identify matching issues.

As part of the review, the professional accountant should be taking standard steps such as comparing sales tax returns to monthly sales, and similar reconciliations of information from the annual tax returns and other information. Many of these steps can be assisted through data metrics provided by utilizing computer assisted techniques.

---

[5]  *See* Nov. 7, 2013 Sider Declaration (Doc. No. 11819-3) at ¶¶ 8-10.

The professional accountant reviewing the file should follow up on matching issues identified by contacting the claimant or claimant's accountant as required and making additional inquiries, seeking documents the CSSP is entitled to under Exhibit 4A, and performing any other research that may help with identification of the matching issue and the proper manner of fixing the issue.

Once appropriate information is obtained to help address any issues identified, the professional accountant can proceed with the evaluation of the BEL claim by following the additional steps below.

B.  **Attribute revenue to the month in which the appropriate earnings metric occurred, based on the revenue attribution guidelines appropriate for the particular business under review.**

The CSSP accountant reviewer should make a determination of the proper amount of revenue to be attributed to each month in the relevant Benchmark and Compensation Periods. Revenue attributed to a month can be determined based on metrics that correspond to the earnings activities of enhancing assets over time, which we explain further below.  *See* III.A, *infra*.  The specific metrics used to determine asset enhancement over time, and thus revenue attributed to a given month, will vary by industry.  However, in many instances the nature of asset enhancement and the basis for revenue attribution should be apparent from a review of the file.  In addition, if an erroneous entry was made to revenue in a particular month, and was corrected in a later month, then the steps to attribute revenue to the correct month often will be apparent to the accountant reviewer.  Or, if a cash receipt representing a deposit from a customer was recorded as revenue, instead of as an obligation of the business, then the accountant reviewer should take steps to make sure the final determination of revenue does not include the improperly recorded amount.

The causation requirement under Exhibit 4B should be evaluated once a final determination of proper revenue attribution has been completed.

We provide further explanation and examples below, and in the Appendix.

C.  **Identify the corresponding variable expenses that relate to the revenue attributed to each month.**

After revenue is properly attributed to each month, the accountant reviewer should make a determination about whether the corresponding variable expenses have been properly identified and attributed to the month when the related revenue was attributed.  The term "variable expenses" is defined in Exhibit 4C in the language describing the Variable Profits calculation, and in Exhibit 4D.

The phrase "corresponding variable expenses" means the Variable expenses that are related to the revenue attributed to the period under consideration.  *See* BEL Opinion at 18.  Only properly identified corresponding variable expenses should be used in computation of Variable Profit.  Expenses that are not "variable" as defined by the parties should not be included in the calculation of Variable Profit, and expenses that do not relate to revenue earned in the relevant month should not be used to calculate Variable Profit for that month.  Appropriate adjustments to

4

payroll expenses should also be made, in accordance with the agreed upon approach reflected in Exhibit 4C.

Often the accountant reviewer will be able to determine the nature of the matching issue based on the specific details presented by the particular claim under review. For example, a claimant may have made a correcting or "true up" entry in a single month that reflects activity over a several month period. By obtaining the details from the claim file or through follow up with the claimant, the professional accountant should be able to readily determine the proper treatment for those corresponding variable expenses and attribute them to the correct months. Other times, the accountant reviewer will have to make attributions of corresponding variable expenses based upon guidelines developed for businesses of that type or business model, as discussed further below.

We provide examples in the Appendix and below illustrating these observations.

D.     **Perform the BEL computations using the correct revenue and corresponding variable expense data.**

Once revenue is properly attributed to the correct months, and the corresponding variable expenses have been identified and attributed to the correct months, the CSSP accountant reviewer can calculate the amount of base compensation pursuant to Step One and Step Two of Exhibit 4C. This process can be automated, using computer assisted techniques, and can include the use of computational algorithms to identify the maximum amount of compensation the claimant may be entitled to, based upon the properly attributed revenues and corresponding variable expenses.

E.     **Evaluate the preliminary BEL claim determination for consistency with economic reality.**

The claims determination conducted by the initial accountant reviewer should be reviewed by a more senior professional with appropriate training and experience in the underlying issues raised by the claim before it becomes ready for final processing. This supervisory review should include an analytical review of appropriate metrics, a review of any significant determinations that were made concerning revenues and corresponding variable expenses, and a review of any red flags or special industry or other technical concerns that are common among businesses of that type, size, and geographic location. The level of attention and time spent on a review should be appropriately tailored to the size and complexity of the claim.

Divergence between BEL base offer amounts and losses suffered by claimants in the post-spill period are indicators of both matching problems and losses that fail to approximate economic reality. Therefore, claims with base offers that are materially larger than the losses in variable profits suffered by the claimant after the spill should be re-reviewed. The CSSP should compare Step 1 losses it determines with the loss in claimant's variable profits during the post-

5

spill period, and Step 1 offers that are materially in excess of this benchmark should be subject to a re-evaluation.[6]

The supervisory review also must include a final causation review under Exhibit 4B, using the correctly attributed revenue amounts, if there are any additional changes.

Once the supervising professional accountant has become satisfied that the revenues and corresponding variable expenses have been properly attributed and all issues resolved in a satisfactory manner, the claim determination can proceed for final processing.

## III.  Conceptual Framework for Determining Revenue and Corresponding Variable Expenses[7]

### A.   Revenue Attribution

As noted, the CSSP must develop rules for revenue attribution to specific months. The Guidelines propose that revenue attribution rules should be based on objective indicators that correspond to the asset enhancement process, and thus the timing of when revenue is earned.[8] The Guidelines refer to these indicators as "revenue drivers."[9] It is necessary to determine when revenue was earned in order to ensure that the Variable Profit calculation results in a calculation of losses that reflect economic reality. The focus on revenue drivers is also consistent with the definition of revenue used in the accounting literature, in particular SFAC No. 6. Thus, revenue drivers result in the measure of "asset enhancement" that is part of the basic definition of revenue.

The appropriate revenue drivers and revenue attribution rules vary by industry and firm, but are all based on widely understood economic and accounting concepts and practices. For

---

[6]  *See* October 9, 2013 Sider Declaration (Doc. No. 11726-8), ¶¶ 19-20, which states that "a useful method of identifying offers that rely on data that do not properly match monthly revenue and corresponding variable expenses is to identify claims for which the CSSP's base offer is unrealistically large relative to the decline in variable profits. . . . A BEL offer which implies that a claimant's 2010 variable profit in the absence of the spill would have been at least 25% greater than the claimant's variable profit in the Benchmark Period is defined here (and in my March 14 declaration) as a 'disproportionately large' offer. The existence of a disproportionately large offer is a strong indicator that the CSSP is compensating claimants for artificial losses due to reliance on financial data that do not properly match monthly revenue with corresponding variable expenses." Sider's economic logic and analysis has not been challenged by the PSC.

[7]  The CSSP Accounting Vendors must exercise judgment about the level of complexity and size of a claim and implement the suggested rules in a practical manner that does not add undue complexity to processing smaller claims. These Guidelines are written with a view towards the correct analysis of significant claims, and BP recognizes that some more expeditious procedures may be applied to less complex or smaller claims.

[8]  SFAC No. 6, which the Fifth Circuit cited in the BEL Opinion, *see* 732 F.3d at 333, defines revenues as "enhancements of assets of an entity" from "activities that constitute the entity's ongoing major or central operations." Asset enhancing activities are the work a business does or the costs it incurs that give rise to the right to receive cash or other consideration. Those asset enhancing activities that constitute the business's major or central operations are referred to in this document as the business's revenue drivers.

[9]  *See* Horngren, Charles T., Srikant, M. Datar, and George Foster, Cost Accounting: A Managerial Emphasis 11th Edition, at 62.

6

example, the rules for an entity in the construction business will be different from the rules for a restaurant, even though the overarching goals and principles are the same. At the same time, there are commonalities among businesses in different industries due to similar business models and earnings cycles which are discussed further below. Thus, for consistent application, the revenue attribution rules can be organized into general categories by grouping different types of businesses that have similar earnings cycles.

The Guidelines reflect common approaches for revenue attribution based on different earnings cycles. Accurate evaluation of asset enhancing activities within a particular period and attribution of revenue to particular months can be accomplished by identifying the claimant's type of business and the process by which revenue is generated, which we refer to as the claimant's earnings cycle.[10] An earnings cycle is the process a business engages in from the acquisition of basic inputs like employee labor and raw materials, through the activities that create the product or service, the selling of the product or service, and consequently the increase in the assets of the entity, ultimately resulting in the collection of cash. The Guidelines use the concept of earnings cycles as a method of grouping businesses with similar earnings activities for consistent treatment in accordance with measuring actual economic losses. There may be other acceptable approaches to grouping businesses for consistent treatment.

The actual collection of cash will often occur substantially after the earnings activity, but may also occur prior to the earnings activities (for example, an advance payment). Earnings cycles differ based on different business models, and in some cases, earnings cycles can vary across firms within an industry. At the same time, businesses in different industries can often have similar earnings cycles. It is possible to develop practical and workable rules for attributing revenue to months for businesses in a variety of industries by focusing on the business's earnings cycle. The following are several categories of business earnings cycles that could be used for organizing and identifying objective revenue drivers consistently across different categories of businesses. These categories are not intended to be exhaustive, but result in identification of revenue drivers that are consistent with basic accounting and economic concepts across industries:

### *(1)    Short Earnings Cycle*

For businesses with short earnings cycles, the asset enhancing activity that drives revenue and the delivery of the product or service takes place over a short period of time, often within one month.[11] Industries that typically have short earnings cycles include, but are not limited to, traditional manufacturers, retail, wholesale and distribution, healthcare, tourism and hospitality, and bars and restaurants. The revenue drivers for businesses with short earnings cycles are

---

[10]   *See* November 7, 2013 Declaration of John Davis ("KPMG Declaration") at ¶ 15. The KPMG Declaration helps demonstrate that the positions taken by BP are supported by widely understood and accepted accounting practices. The KPMG Declaration was removed from the record by Magistrate Shushan, (Doc. No. 11827), and BP intends to file its objections and a motion requesting the court to reverse that order. Nevertheless, the economic and accounting concepts that ground BP's proposed guidelines remain in place and the Guidelines reflect an approach that flows logically from the BEL Opinion.

[11]   *See* KPMG Declaration at ¶ 16.

generally when services are rendered or when goods are delivered, which often coincides with the point of sale.  As a result, monthly revenue attribution in these industries can often be based on daily cash register totals, shipping records, or similar indicators that the delivery of the product or service occurred.  The following are brief descriptions of the revenue attribution rules that would generally apply to several types of businesses with short earnings cycles.[12]  However, the CSSP Accounting Vendors should also exercise judgment about whether a particular business should be treated under the Short Earnings Cycle category or whether the facts and circumstances may warrant an alternate treatment in a specific case.

**Retail Businesses.**  Retail businesses offer goods and services for sale to customers and the revenue driver is the value exchanged at the point of sale or delivery of the asset.  For these businesses, the earnings cycle is generally relatively short, often completed within a few days and within a month's time.  Parts of the retail sector are highly cyclical and seasonal; for many retail stores, much of the year's revenue is generated in the one to two month period leading up to Christmas and the subsequent sales period that typically follows; other retailers may have revenue cycles that coincide with tourist cycles.

Because the major effort in retailing is contemporaneous with the revenue generating transactions, there are very limited special considerations that would distinguish the timing or measurement of revenue attribution by a retailer.  Revenue should be attributed to relevant months based on the amounts exchanged at the point of sale and delivery.  This is likely to closely correspond to the receipt of cash or a claim to cash (e.g., a check or credit card transaction).  Here, the timing of sales approximates the asset enhancement provided by the retailer—the product display and the transaction services provided by the retailer.

Customers may pay for their purchases either by cash or credit, but neither the form of payment nor the timing of the payment should impact the months to which the revenue is attributed – revenue is attributed at the point of sale, when services are provided or the goods delivered.  The CSSP should be able to identify the period to which revenue should be attributed as most retailers should maintain contemporaneous records in the form of daily sales reports or point of sales reports which summarize all sales activity transacted within the day or other defined period.

**Traditional Manufacturing**.  For businesses in the manufacturing industry, the revenue drivers are the manufacturing process and the materials, labor, and other direct and variable costs incurred in that process.  Traditional manufacturing includes businesses that acquire raw materials and other resources and engage in various on-going processes to produce goods for sale.  Revenue-earning activities involve producing the goods for eventual transfer to the customer.  Revenue for traditional manufacturers from the sale of goods should be attributed by the CSSP to the months when the goods were shipped to customers, which reflects the enhancement of an asset at that time.[13]

---

[12]   We do not intend to catalogue all businesses with short earnings cycles.  However, we generally would expect that businesses in the above-noted areas would be evaluated under this category.

[13]   The CSSP could attempt to attribute revenues from the sale of goods to the months the goods were produced but we believe this approach is not appropriate because linking sold goods to the month they were produced is

*(Cont'd on next page)*

123 of 838

**Example of a Short Cycle Business with a Revenue Matching Issue.**[14]

The revenue attribution rules for businesses with short earnings cycles are straightforward and the CSSP Accounting Vendors may find that there are fewer matching problems with this category of claimants with respect to revenue attribution. Nevertheless, short cycle claimants can have matching issues from improper recording of revenue. For example, the chart below shows a short cycle business that has negative revenue in December. This recorded spike would result in a review for matching based on the analytical review procedures that should be a part of every BEL claim evaluation. It also would be flagged by one of the seven criteria for screening identified in the Juneau Declaration.



Upon investigation, the claim reviewer accountant determines that the reason for the negative revenue was that a one-time correcting entry was made in December to correct an error that overstated revenue in November. To correct that for proper attribution of revenue, the claim

*(Cont'd from previous page)*

    burdensome and does not provide a significantly better measure of the asset enhancing activities of a manufacturing business in a given month.

[14]  All of the examples described herein are based on hypothetical data. For examples using actual data from claimant files, see the attached Appendix.

reviewer accountant would remove the negative revenue from December, and attribute it to November, in accordance with the information learned from the claimant's sales tax records. The following panel illustrates the original revenue pattern, and the correction.

**Example 1.2**
**Short Earnings Cycle Claimant with Misreported Revenue**

- Negative revenue in December. Claimant indicates to CSSP that this is caused by a correction to revenue that was originally recorded in November.
- CSSP asks claimant to produce documentation to resolve the error problem such as: sales tax returns, sales records.
- Based on sales tax records, CSSP corrects the error.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | |
| Uncorrected Revenue | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 135 | (25) | 1,000 |
| % of Annual | 5% | 6% | 8% | 8% | 8% | 11% | 14% | 13% | 10% | 8% | 14% | -3% | 100% |
| Variable Expenses | 25 | 25 | 40 | 45 | 45 | 60 | 60 | 55 | 50 | 35 | 35 | 25 | 500 |
| | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | |
| Revenue from Sales Tax Return | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Corrected Revenue | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| % of Annual | 5% | 6% | 8% | 8% | 8% | 11% | 14% | 13% | 10% | 8% | 6% | 5% | 100% |
| Variable Expenses | 25 | 25 | 40 | 45 | 45 | 60 | 60 | 55 | 50 | 35 | 35 | 25 | 500 |

### (2)  Long Earnings Cycles

In contrast to short earnings cycle business models, a variety of other industries have long earnings cycles in which asset enhancement occurs over several periods and therefore asset enhancement is not well approximated by focusing on the delivery of the product or services. This includes industries such as construction, agriculture and professional services, including law firms, among others.

As mentioned above, SFAC No. 6, which the Fifth Circuit cited in its opinion, defines revenues as "enhancements of assets of an entity" from "activities that constitute the entity's ongoing major or central operations." As noted above, asset enhancing activities are the work a business does or the costs it incurs that give rise to the ultimate right to receive and collect cash or other consideration. The SFAC No. 6 definition provides a foundation for accounting in industries in which multiple time periods are required for producing products and services. For example, under percentage of completion accounting, which is widely used in construction and related industries which involve long-term projects, revenue in a given time is attributed based on the percentage of a project that is completed in that given time period.

Attribution of revenue from a longer-term project or service to a single point in time would be inconsistent with economic reality because it deviates from the basic principle that asset enhancement in "long-cycle" or long earnings process industries occurs over time. Just as receipt of cash does not identify when revenue was earned and so fails to reflect economic reality, attribution of revenue from a longer-term construction project to a single date would fail to reflect economic reality; so too would attribution of revenue to a single date for farms and professional services firms which likewise have long earnings cycles or processes.[15]

---

[15]  *See* Richard Dietrich Declaration (Doc. No. 8964-5) ¶¶ 12, 26, 28; Roman Weil Declaration (Doc. No. 8964-5) at lines 202-236.

These principles apply across all firms characterized by a "long cycle" earning process. However, because the nature of the production process varies across industries and firms, the revenue drivers applied to approximate the asset enhancement process over time varies across firms and industries. In these types of businesses, asset enhancement (and thus revenue earned) occurs over an extended period. The following are subcategories of approaches for identifying revenue drivers based on particular characteristics of earnings cycles that are common to many businesses with long earnings cycles:

      *(a)     Project or Job Based Earnings Cycle*

Job or project based revenue generating activities are generally based on arrangements with customers to produce an asset (e.g., construction of an office building, shopping complex, hotel) over several periods.[16] Asset enhancement for these businesses can be determined using revenue drivers that measure the progress made towards completion. Compensation for such activity is generally based on specific contract arrangements such as the completion of the asset; however, value is created throughout the creation or building process. The primary revenue driver is the progress or percentage-of-completion achieved. This can be measured by the current direct costs incurred relative to the total estimated cost (input method) or the units of completion relative to the total units required (output method).

For example, consider a construction contractor that had a $30,000 contract that had a cost of $20,000 and spanned three months from July through September 2010. In July 2010 the contractor incurred $10,000 in costs. Dividing $10,000 by the total cost of $20,000 yields a percentage-of-completion factor of 50%. This means the CSSP should attribute 50% of the total revenue of $30,000 from the project to July 2010, or $15,000. In August and September 2010, the contractor incurred costs of $5,000 each month. The CSSP should attribute $7,500 as revenue in each August and September; 25% of the $30,000 contract value each month. The timing of the receipt of $30,000 does not impact the attribution of revenues. The CSSP should ensure that the total amount of revenue measured for each project is attributed to each month in direct proportion to the relative amount of direct costs of material and labor used or other measure of progress toward completion during that month on that project.

---

[16] *See* KPMG Declaration at ¶ 17.

11

**Example of Project-Based Earnings Cycle Claimant with Revenue Matching Issue**

The following chart illustrates a claimant, such as a construction company, that should be evaluated using the percentage of completion approach appropriate for a project-based earnings cycle. The chart shows the reported monthly revenue over a one-year period, including a revenue spike of over 30% in the month of September. A spike of this size should come to the attention of the reviewing accountant and be reviewed in more detail for matching issues. It would also be flagged by at least one of the seven criteria in the Juneau Declaration.



The claim reviewer accountant would make inquiries by reviewing the file or contacting the claimant. Assume that the claimant provides information to show that the recorded September revenue spike relates to a cash payment from a customer at the completion of a six month project. The claim reviewer accountant should ask the claimant for documentation, pursuant to Exhibit 4A, reflecting the usual and customary documents that a business of this type would have, and use that documentation to determine the percentage of completion of the project for each month. The following chart illustrates the original revenue pattern and the corrected revenue pattern. The example assumes that the claimant provided information to show that the project progressed 10% during April, 20% during May through August, and the final 10% in September.

12

**Example 2.2**
**Long Earnings Cycle Claimant with Revenue Spike**
**Project / Job-Based Earnings Cycle**
**Matching Implementation Based on Claimant-Provided Information**

- Spike in revenue in September due to $250 cash payment from customer upon completion of long-term project resulting in $300 total revenue for the month.
- CSSP asks claimant to produce documentation to resolve the matching problem such as: job-level expense reports, progress-completion reports, etc.
- Based on documents provided by the claimant, CSSP determines the percent of completion for the project by month over the life of the project (April-September).
- Matching problem is resolved by attributing the revenue for the project by month based on the percent of completion.

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | | |
| Revenue | | 75 | 60 | 65 | 50 | 55 | 65 | 70 | 55 | 300 | 70 | 75 | 60 | 1,000 |
| % of Annual | | 8% | 6% | 7% | 5% | 6% | 7% | 7% | 6% | 30% | 7% | 8% | 6% | 100% |
| Variable Expenses | | 40 | 30 | 35 | 40 | 45 | 50 | 55 | 45 | 50 | 40 | 35 | 35 | 500 |
| | | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | | |
| Revenue from Long-Term Project | A | | | | | | 250 | | | | | | | |
| Percent of Completion for Project | B | | | | 10% | 20% | 20% | 20% | 20% | 10% | | | | |
| Matching Correction | C=A*B | | | | 25 | 50 | 50 | 50 | 50 | 25 | | | | 250 |
| All Other Revenue | D | 75 | 60 | 65 | 50 | 55 | 65 | 70 | 55 | 50 | 70 | 75 | 60 | 750 |
| Corrected Revenue | E=C+D | 75 | 60 | 65 | 75 | 105 | 115 | 120 | 105 | 75 | 70 | 75 | 60 | 1,000 |
| Variable Expenses | F | 40 | 30 | 35 | 40 | 45 | 50 | 55 | 45 | 50 | 40 | 35 | 35 | 500 |

The following line graph illustrates the difference in revenue patterns from the original submission to the final determination containing properly attributed revenue.



If the claimant is unable to provide documentation sufficient to reasonably calculate the percentage of completion for the projects over the relevant months, then the CSSP could

13

consider a solution in appropriate cases of attributing the annual revenue ratably over the months in proportion to the variable expenses incurred. The following panel and chart illustrate the effects of that solution:

**Example 2.4**
**Long Earnings Cycle Claimant with Revenue Spike**
**Project / Job-Based Earnings Cycle**
**Matching Implementation Based on Monthly Variable Expenses**

- Spike in revenue in September due to cash payment from customer upon completion of long-term project.
- CSSP asks claimant to produce documentation to resolve the matching problem such as: job-level expense reports, progress-completion reports, etc.
- Claimant is unable to provide documentation sufficient to correct the spike and attribute it by month. CSSP verifies that reported variable expenses are reliable and consistent with economic reality.
- CSSP implements matching by taking annual revenue and attributing it by month based on monthly share of variable expenses.

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | | |
| Revenue | | 75 | 60 | 65 | 50 | 55 | 65 | 70 | 55 | 300 | 70 | 75 | 60 | 1,000 |
| % of Annual | | 8% | 6% | 7% | 5% | 6% | 7% | 7% | 6% | 30% | 7% | 8% | 6% | 100% |
| | | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | | |
| Variable Expenses | A | 40 | 30 | 35 | 40 | 45 | 50 | 55 | 45 | 50 | 40 | 35 | 35 | 500 |
| % of Annual | B=A/Annual | 8% | 6% | 7% | 8% | 9% | 10% | 11% | 9% | 10% | 8% | 7% | 7% | 100% |
| Annual Revenue | C | | | | | | 1,000 | | | | | | | |
| Corrected Revenue | D=B*C | 80 | 60 | 70 | 80 | 90 | 100 | 110 | 90 | 100 | 80 | 70 | 70 | 1,000 |



Example 2.5
Long Earnings Cycle Claimant with Revenue Spike
Project / Job-Based Earnings Cycle
Matching Implementation Based on Monthly Variable Expenses

Spike in revenue in September caused by cash payment at completion of six-month project. Spike is corrected by attributing annual revenue by share of monthly variable expenses.

14

<blockquote>(b)     <em>Effort Based Earnings Cycle</em></blockquote>

Asset enhancement in several other industries can be determined by the entity's efforts, which these Guidelines describe as an "effort based" earnings cycle. For these businesses, revenue drivers are based on the amount of effort expended by the employees of the entity, or other similar measure.[17] Revenue should be attributed by identifying objective and reliable data related to the effort expended and apportioning that revenue to the months when the effort was expended. Many professional service businesses fall into this category, including law firms. Law firms are discussed in more detail below followed by an illustration of a matching issue for an hours-based professional services firm and another example for a contingent fee law firm that is unable to provide hours-based documentation.

### Professional Services – Law Firms

The revenue driver for law firms is the amount of effort expended on its matters by the professionals working at the firm. For example, law firms provide legal advice and services to clients and commonly are compensated under two alternative methods. Some law firms are paid by their clients for services rendered, often on an hourly rate basis. Other law firms engage in client work on a contingent basis, and are paid when an event occurs such as when a final judgment is entered in favor of the client, or a settlement is reached. The precise arrangements will vary among law firms of different sizes and practice specialties. For many law firms that bill clients for hours worked, revenue relating to specific periods can be identified by the amount billed and ultimately collected for legal effort provided in a specific month.

For contingent fee law firms, the amount of revenue to be obtained on a matter may have been uncertain during the Benchmark and Compensation Periods, but may in fact be known as of the date the claim is being reviewed by the CSSP. Therefore, the total amount of revenue collected on many or most contingent fee matters can be determined.[18]

To attribute revenue, the CSSP should identify the most objective measure of the total effort expended by the attorneys and other professionals during each month, which usually should be the amount of total hours spent by the attorneys and other professionals. Revenue should be attributed to months for law firms based on the firm's total effort during those months as indicated in billings sent to clients.

The CSSP may find that for some law firms, particularly contingent fee law firms, hours-based records are unavailable. Under such circumstances, another objectively reasonable measure should be selected in order to identify the earnings activity, such as the time elapsed between the start and conclusion of a particular case. For example, for contingent fee law firms that may not have hourly records sufficient to objectively identify the firm's overall activity, the

---

[17] *See* KPMG Declaration at ¶ 18.

[18] There may be instances where contingent fee work was performed during 2010 for which a fee has not been collected, but for which the value of the effort can be reasonably estimated consistent with standard lost profits methods commonly used in litigation involving law firms as parties. *See Due v. Due*, 342 So. 2d 161, 166 n.5 (La. 1977).

revenue from such a matter could be reasonably attributed on an equal monthly basis over the time period during which the legal matter occurred, from inception to conclusion of the matter.

Law firms often receive payments in periods before or after the efforts to generate the revenue are expended.  Where payments are received in advance of work performance, such payments represent obligations or liabilities of the law firm and do not constitute asset enhancements until the services are performed that entitle the service firm to payment. Therefore, any cash received in advance on a matter should be attributed as revenue to the months in which effort was expended on the matter as measured by hours worked.  Where payments are received after the effort is expended, revenue should be attributed in the same way, based on the hours worked on a matter in a given month, or alternatively, as discussed above in appropriate instances.

Examples of circumstances that may impact the timing of the performance of the professional services, and therefore impact the period in which asset enhancement occurs include:

a) Seasonality of work (e.g., some law firms may reflect patterns aligned with tourist activities or vacation seasons) will impact when the service is performed during the year.

b) Contingency payments or payments based on the outcome of service engagements are received after services are rendered and after the outcome of the service is determined.  Although the outcome and therefore collectability of fees from contingent fee engagements cannot be determined with certainty until a successful result or outcome has been achieved, the CSSP will generally have the benefit of hindsight in determining whether the efforts in a period were productive of revenue.

c) Advance payments or retainers are received prior to services performed.  In this type of service arrangement, the client signs a professional service agreement and pays a specified retainer fee that is used to "bill against" as services are performed.  Any unused retainer is, as often required by law, refunded to the client.  In this type of arrangement, revenue is attributed to months based on when services are performed.

d) Revenue from specific or completed performance arrangements that are driven by milestones or accomplishment of multiple tasks should be attributed to the period of performance notwithstanding that the payments may not be billed until a defined milestone has been achieved.

**Example of Efforts Based Earnings Cycle Claim – Professional Services Firm with Matching Issues**

The following panel and chart illustrate an example of a professional service firm (CPA firm) that has a recorded revenue spike in May, reflecting revenue that is 21% of the annual revenue.  That recorded revenue spike should result in further review by the claim reviewer accountant for matching issues.  The revenue spike will also be flagged by one or more of the seven criteria in the Juneau Declaration.  Upon further inquiry, which should be required due to the identification of matching issues, the claim reviewer accountant learns that the recorded spike

is caused by cash payments from clients relating to increased activity during tax season. Professional service firms are often characterized by high margins (i.e., variable expenses are low relative to revenue earned).  In such firms, variable expenses may not provide a reliable basis for approximating the effort expended by the firm in generating revenue in a given period. However, information on hours worked by professionals in such firms provides a reliable gauge to a firm's effort over time and thus can serve as a reliable revenue driver in attributing revenue. The CPA firm provides its payroll records sufficient to indicate the hours worked each month. The panel below shows the original uncorrected monthly revenue and the corrected monthly revenue that is attributed based on the proportion of monthly hours to total hours for the year. The line graph that follows shows a graphical depiction of the same information.

**Example 3.1**
**Long Earnings Cycle Claimant with Revenue Spike**
**Effort Based Earnings Cycle / CPA Firm**

- Revenue spike in May exceeds 20% of annual revenue, which meets CSSP's proposed threshold.
- Claimant indicates that spike is caused by receipt of payment for services rendered during tax season. Claimant provides payroll documents indicating hours billed by month.
- CSSP uses the documentation provided by claimant to match revenue to appropriate months based on effort.

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | | |
| Uncorrected Total Revenue | | 80 | 70 | 70 | 80 | 210 | 80 | 60 | 70 | 60 | 70 | 70 | 80 | 1,000 |
| % of Annual | | 8% | 7% | 7% | 8% | 21% | 8% | 6% | 7% | 6% | 7% | 7% | 8% | 100% |
| Variable Expenses | | 5 | 10 | 15 | 10 | 10 | 25 | 30 | 5 | 10 | 15 | 5 | 10 | 150 |
| | | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | | |
| Hours Worked | | 680 | 720 | 810 | 790 | 640 | 600 | 580 | 540 | 620 | 640 | 680 | 700 | 8,000 |
| % of Annual | A | 9% | 9% | 10% | 10% | 8% | 8% | 7% | 7% | 8% | 8% | 9% | 9% | 100% |
| Annual Revenue | B | | | | | 1,000 | | | | | | | | |
| Corrected Total Revenue | C=A*B | 85 | 90 | 101 | 99 | 80 | 75 | 73 | 68 | 78 | 80 | 85 | 88 | 1,000 |
| Variable Expenses | D | 5 | 10 | 15 | 10 | 10 | 25 | 30 | 5 | 10 | 15 | 5 | 10 | 150 |



**Example 3.2**
**Long Earnings Cycle Claimant**
**Effort Based Earnings Cycle / CPA Firm**
**Matching Implementation Based on Claimant-Provided Documentation**

Revenue is corrected and attributed to correct months based on claimant-provided documentation on hours worked.

17

### Example of Efforts Based Earnings Cycle Claim – Contingent Fee Law Firm

The following panel and line graphs illustrate an example for a contingent fee law firm with matching issues. The example shows the firm had recorded large revenue spikes in May and September of 2008, and in February of 2009. These recorded revenue spikes exceed 20% of annual revenue and should lead the claim reviewer accountant to conduct a further inquiry for matching issues. Indeed, it would be a virtual necessity for the CSSP Accounting Vendor to review all contingent fee law firms for potential matching issues in light of the known business model and anticipated issues.

**Example 4.1**
**Long Earnings Cycle Claimant with Revenue Spikes**
**Effort Based Earnings Cycle / Law Firm**
**Matching Implementation Based on Length of Case**

- Revenue Spikes in May 2008, September 2008, and February 2009 due to resolution of large cases. These months exceed 20% of annual revenue, which meets CSSP threshold of 20%.
- Claimant is unable to provide information to document effort by project.
- Revenue from large case resolutions is attributed ratably over the period in which case was active.

| | | 2008 | | | | | | | | | | | | | 2009 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | ... | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual | Jan | Feb | ... |
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | | | | | | |
| Revenue Items | | | | | | | | | | | | | | | | | | |
| Large Case #1 (18 Months) | | | | | | | 200 | | | | | | | | 200 | | | |
| Large Case #2 (6 Months) | | | | | | | | | | | 250 | | | | 250 | | | |
| Large Case #3 (24 Months) | | | | | | | | | | | | | | | 0 | | 300 | |
| Other Revenue | | | 10 | 20 | 15 | 10 | 10 | 15 | 10 | 20 | 10 | 10 | 10 | 10 | 150 | | | |
| Uncorrected Total Revenue | | | 10 | 20 | 15 | 10 | 210 | 15 | 10 | 20 | 260 | 10 | 10 | 10 | 600 | | | |
| % of Annual | | | 2% | 3% | 3% | 2% | 35% | 3% | 2% | 3% | 43% | 2% | 2% | 2% | 100% | | | |
| Variable Expenses | | | 0 | 5 | 0 | 5 | 10 | 5 | 0 | 5 | 5 | 0 | 10 | 5 | 50 | | | |
| | | | | | | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | | | | | | |
| Revenue Items | | | | | | | | | | | | | | | | | | |
| Large Case #1 (18 Months) | | | | | | | | | | | | | | | | | | |
|   Revenue | A | | ... | | 200 | | | | | | | | | | | | | |
|   Duration (Months) | B | | ... | | 18 | | | | | | | | | | | | | |
|   Corrected Revenue | C=A/B | | ... | 11 | 11 | 11 | 11 | 11 | | | | | | | | | | |
| Large Case #2 (6 Months) | | | | | | | | | | | | | | | | | | |
|   Revenue | D | | | | | | | 250 | | | | | | | | | | |
|   Duration (Months) | E | | | | | | | 6 | | | | | | | | | | |
|   Corrected Revenue | F=D/E | | | | | | 42 | 42 | 42 | 42 | 42 | 42 | | | | | | |
| Large Case #3 (24 Months) | | | | | | | | | | | | | | | | | | |
|   Revenue | G | | ... | | | | | 300 | | | | | | | | | | |
|   Duration (Months) | H | | ... | | | | | 24 | | | | | | | | | | |
|   Corrected Revenue | I=G/H | | ... | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | | 13 | 13 | |
| Other Revenue | J | | 10 | 10 | 15 | 10 | 10 | 15 | 10 | 20 | 10 | 10 | 10 | 10 | 150 | | | |
| Corrected Total Revenue | K=C+F+I+J | | 34 | 44 | 39 | 75 | 75 | 69 | 64 | 74 | 64 | 23 | 23 | 23 | 606 | | | |
| % of Annual | | | 6% | 7% | 6% | 12% | 12% | 11% | 11% | 12% | 11% | 4% | 4% | 4% | 100% | | | |
| Variable Expenses | | | 0 | 5 | 0 | 5 | 10 | 5 | 0 | 5 | 5 | 0 | 10 | 5 | 50 | | | |

The above panel also shows what the claim reviewer accountant learned upon further inquiry. The contingent firm received a large payment in each of three different litigation matters in the three months showing revenue spikes. The claimant provided information about the duration of each case, but was unable to provide objective and reliable hours-based records reflecting the effort on the case. Thus, a reasonable alternative approach is reflected above. The revenue for each matter is attributed ratably over the duration of the case. In one matter, the duration was 18 months, in another, 6 months, and in the third, 24 months. After each revenue item is properly attributed across the months, the totals are recalculated and the correctly attributed monthly revenue amounts are shown.

18

The following line graph illustrates the original and corrected revenue from this example.



**Example 4.2**
**Long Earnings Cycle Claimant with Revenue Spikes**
**Effort Based Earnings Cycle / Law Firm**
**Matching Implementation Based on Length of Case**

Spikes in revenue due to resolution of large cases. Claimant is unable to provide information on hours worked. Revenue is attributed ratably over the life of the cases.

*(c)      Time Based Earnings Cycle*

For certain businesses, the passage of time is the critical element of the asset enhancement process that earns revenue for the business.[19]   For such businesses, asset enhancement over time can be estimated using time as a revenue driver.   Farms engaged in growing crops are an example of a business with a time based earnings cycle that would fall into this category.   The farm incurs costs and engages in activities involving preparing for and planting the crops, maintaining the crops and harvesting.   A key aspect of the enhancement in value from that activity is the successful growth of the crops over the growing season.   Thus, using the progress of time over the growing season as the revenue driver is appropriate for farms growing crops.   For such businesses, proceeds from sale of crops for a given crop year should be identified and attributed ratably over the growing season, based on the passage of time.

---

[19]   *See* KPMG Declaration at ¶ 19.

For example, assume a rice producer plants in March and harvests in late July through early September in 2010. Further assume that the entire 2010 crop was sold in three transactions, in August 2010, September 2010 and March 2011 for prices of $400,000, $300,000 and $350,000, respectively. The Compensation Period crop year revenue would be $1,050,000, consisting of sales of $400,000 and $300,000 during 2010 plus the March 2011 sale of $350,000. Assuming that 2009 is selected as the Benchmark Period and the entire crop was sold in two transactions – one in July 2009 for $500,000 and one in November 2009 for $900,000 – the Benchmark Period crop year revenue for 2009 would be $1,400,000, which is the value of the two sales transactions that occurred in 2009. The 2010 crop year revenue would be allocated ratably over the months of March through September (the growing season). Thus, each month from March through September would have $150,000 of revenue attributed to it for purposes of the Variable Profits calculation. If the growing season were identical during 2009, then the Benchmark Period crop year revenue would be allocated ratably to March through September of 2009. Thus, each month from March through September of 2009 would have $200,000 of revenue attributed to it for purposes of the BEL claim.

| REVENUE RECOGNITION FOR FARM (AGRICULTURE) CROPS GROWN MAR-SEPT; SOLD IN DIFFERENT MONTHS THROUGHOUT YEARS | | | | | | |
|---|---|---|---|---|---|---|
| MONTH | SALES (2009) | REVENUES (2009) | SALES (2010) | REVENUES (2010) | SALES (2011) | REVENUES (2011) |
| January | $0 | $0 | $0 | $0 | $0 | $0 |
| February | $0 | $0 | $0 | $0 | $0 | $0 |
| March | $0 | $200,000 | $0 | $150,000 | $350,000 | $0 |
| April | $0 | $200,000 | $0 | $150,000 | - | - |
| May | $0 | $200,000 | $0 | $150,000 | - | - |
| June | $0 | $200,000 | $0 | $150,000 | - | - |
| July | $500,000 | $200,000 | $0 | $150,000 | - | - |
| August | $0 | $200,000 | $400,000 | $150,000 | - | - |
| September | $0 | $200,000 | $300,000 | $150,000 | - | - |
| October | $0 | $0 | $0 | $0 | - | - |
| November | $900,000 | $0 | $0 | $0 | - | - |
| December | $0 | $0 | $0 | $0 | - | - |
| **Total** | $1,400,000 | $1,400,000 | $700,000 | $1,050,000* | $350,000 | $0 |

  *An additional sale of $350,000 from the 2010 crop occurred in March 2011, making total 2010 crop year revenue $1,050,000.

20

**Example of Time Based Earnings Cycle claimant with matching issue – growing of crops.**

The following illustrates an example of a farm that has a matching issue.  The panel below identifies the original revenue pattern and shows the result after the correct treatment is applied.

**Example 5.1**
**Farming / Time-Based Earnings Cycle**
**April - November 2009 Growing Season**

- The Variable Expenses are incurred and the crop is grown during 2009 Growing Season April - November 2009 (based on USDA Growing Season data).
- The sale of the harvested crop can occur well into the next calendar year.
- The Revenue for 2009 Crop Year  July 2009 - June 2010 (based on USDA Crop Year data) is matched to the corresponding 2009 Variable Expenses.
- Matched Revenue and Variable Expenses are ratably attributed to 2009 Growing Season months April 2009 - November 2009.

| Month | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | |
| 2009 Crop Year Revenue | | | | | | | | | | | | | |
| Received in 2009 | | | | | | | 0 | 0 | 0 | 0 | 1,200 | 100 | 2,500 |
| Received in 2010 | 50 | 1,150 | 0 | 0 | 0 | 0 | | | | | | | |
| | | | | | | | | | | | | | |
| 2009 Variable Expenses | 0 | 0 | 0 | 220 | 435 | 420 | 210 | 120 | 55 | 30 | 10 | 0 | 1,500 |
| | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | |
| Revenue | =1/8 * Annual | 0 | 0 | 0 | 313 | 313 | 313 | 313 | 313 | 313 | 313 | 313 | 0 | 2,500 |
| Variable Expenses | =1/8 * Annual | 0 | 0 | 0 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 0 | 1,500 |



Example 5.2
Farming / Time-Based Earnings Cycle
April - November 2009 Growing Season

Crop year revenue and growing season variable expenses are attributed ratably over the April-November growing season.

2009 Growing Season (Variable Expense)

2009 Crop Year (Revenue)

Revenue   Variable Expenses   Corrected Revenue   Corrected Variable Expenses

21

*(d)     Market Presence*

Market presence is a business earnings cycle in which revenue is generated by maintaining relevance and visibility within a particular market.[20]   The CSSP should evaluate certain claims and consider whether it would be appropriate to use the establishment and presence in a geographic area as the basis for driving revenue for these claimants.   For the purpose of the BEL claim calculation, the total revenue generated from the on-going presence in the market place should be attributed ratably to the months during the calendar year.

Many real estate brokerage firms might be evaluated under this category.   In addition, a real estate brokerage might be evaluated based on the fact that it is engaged in a continuous effort to develop real estate transaction opportunities.   These efforts are the earnings activities that generate revenue for the real estate brokerage.   Consequently, the revenue for real estate brokerage firms can be attributed over the period in which the firm engaged in the continuous effort.

## B.     Identification of Corresponding Variable Expenses

As noted above, the CSSP also needs to ensure that variable expenses that relate to the monthly revenue are identified and subtracted from that revenue for purposes of computing Variable Profit for each month.   To the extent that variable expenses attributable to several months are recorded in one month on a cumulative basis, to "true up" expenses over a longer reporting period, the CSSP should conduct sufficient analysis to match the variable expenses contained in that cumulative amount to the months in which the revenue to which those expenses actually relate was earned.[21]

There are numerous common issues that arise in the evaluation of corresponding variable expenses that occur in certain account categories across a variety of businesses.   These include matching problems involving inventory and costs of goods sold, recording of bad debt expense, and recording of bonuses or commissions, as illustrations.   The following are examples that show how these issues can be reviewed and corrected.

### *Inventory Example*

One common matching issue that appears in the claim files is the treatment of inventory and costs of goods sold.   Many businesses do not adjust their monthly financial statements to properly reflect costs of goods sold, in part because they have other methods of keeping track of their inventory and costs and may not need to make monthly adjustments to the financial statements in order to manage their inventory.   This can often result in matching issues where the claimant has recorded inventory adjustments or purchases in a single month that relate to goods that were sold over multiple months.

---

[20]   *See* KPMG Declaration at ¶ 20.

[21]   *See* KPMG Declaration at ¶ 21.

In the chart below, a short cycle claimant recorded a mid-year spike in variable expenses, in which the variable expenses in April are 26% of the annual variable expenses. This situation should cause the claim reviewer accountant to investigate further for matching issues. The item would also be flagged by at least one of the seven criteria in the Juneau Declaration.



23

Upon further investigation, the claim reviewer accountant determines that the line item expense labeled "materials" is the reason for the unusual variation. Upon a review of the claim file or further inquiries of the claimant, the claim reviewer accountant learns that the claimant had a bulk purchase of inventory during April that was sold over the following six months. The claimant then provides the usual and customary records from its inventory system and related purchase orders or other documents to show the purchase and the subsequent sales pattern for that inventory. The following chart illustrates the original expense pattern and the corrected pattern showing properly attributed corresponding variable expenses.

**Example 6.2**
**Short Earnings Cycle Claimant with Mid-Year Variable Expense Spike**
**Matching Implementation Based on Claimant-Provided Documentation**

- Spike in Variable Expenses in April due to line item marked as "Materials". Claimant indicates to CSSP that these spikes reflected bulk purchases of inventory that was sold over the following six months.
- CSSP asks claimant to produce documentation to resolve the matching problem such as: purchase orders, inventory records, sales records.
- Claimant provides purchase, sale, and inventory records which indicate that the spike in materials costs relates to bulk purchase of inventory at the beginning of the summer that was sold over the following six months (April-September).
- CSSP uses the documentation provided by claimant to match the materials costs to revenue in the appropriate months.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | |
| Revenue | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Variable Expense Line Items: | | | | | | | | | | | | | |
| Materials | 20 | 20 | 30 | 115 | 20 | 30 | 30 | 30 | 30 | 30 | 30 | 20 | 405 |
| Other Variable Expenses | 5 | 5 | 10 | 15 | 10 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 95 |
| Uncorrected Total Variable Expenses | 25 | 25 | 40 | 130 | 30 | 40 | 40 | 40 | 35 | 35 | 35 | 25 | 500 |
| | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | |
| Revenue | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Variable Expense Line Items: | | | | | | | | | | | | | |
| Materials | 20 | 20 | 30 | 115 | 20 | 30 | 30 | 30 | 30 | 30 | 30 | 20 | 405 |
| Materials Matching Correction | | | | (85) | 15 | 20 | 20 | 15 | 15 | | | | 0 |
| Other Variable Expenses | 5 | 5 | 10 | 15 | 10 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 95 |
| Corrected Total Variable Expenses | 25 | 25 | 40 | 45 | 45 | 60 | 60 | 55 | 50 | 35 | 35 | 25 | 500 |

24

The chart below shows a line graph of the properly attributed corresponding variable expenses as compared with the original claimant submission.



In some situations, the claimant may not have records sufficient to make a specific determination of when the inventory was actually sold, or it may be impractical or unduly burdensome to gather the required information. Under those circumstances, the CSSP may find it reasonable to use a method to approximate a proper attribution of the corresponding variable expenses. The charts below reflect such an approach by showing one method of attributing the annual total variable expenses and allocating them to each month based on the monthly share of annual revenue.

**Example 6.4**
**Short Earnings Cycle Claimant with Mid-Year Variable Expense Spike**
**Matching Implementation Based on Monthly Revenue**

- Spike in Variable Expenses in April due to line item marked as "Materials". Claimant indicates to CSSP that these spikes reflected bulk purchases of inventory that was sold over the following six months.
- CSSP asks claimant to produce documentation to resolve the matching problem such as: purchase orders, inventory records, sales records.
- Claimant is unable to provide documentation that is sufficient to match the materials costs to revenue and attribute them to the correct month. CSSP verifies that reported revenue is reliable and consistent with economic reality.
- CSSP implements matching by taking annual total variable expenses and allocating them by month based on the monthly share of annual revenue.

|  |  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Revenue |  | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Variable Expense Line Items: |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Materials |  | 20 | 20 | 30 | 115 | 20 | 30 | 30 | 30 | 30 | 30 | 30 | 20 | 405 |
| Other Variable Expenses |  | 5 | 5 | 10 | 15 | 10 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 95 |
| Uncorrected Total Variable Expenses |  | 25 | 25 | 40 | 130 | 30 | 40 | 40 | 40 | 35 | 35 | 35 | 25 | 500 |
| | | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Revenue | A | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| % of Annual | B | 5% | 6% | 8% | 8% | 8% | 11% | 14% | 13% | 10% | 8% | 6% | 5% | 100% |
| Annual Variable Expenses | C |  |  |  |  |  | 500 |  |  |  |  |  |  |  |
| Corrected Total Variable Expenses | D=B*C | 25 | 28 | 38 | 40 | 40 | 55 | 70 | 63 | 50 | 38 | 30 | 25 | 500 |



**Example 6.5**
**Short Earnings Cycle Claimant with Mid-Year Variable Expense Spike**
**Matching Implementation Based on Monthly Revenue**

Spike in materials costs in April cannot be corrected based on claimant-provided documentation. Annual variable costs are attributed by month based on monthly share of annual revenue.

### *Bad Debt Example*

Another common matching problem can arise with the treatment of bad debt expense. Businesses may take a variety of approaches to recording bad debt expense in their financial records. For example, many businesses may wait until late in the year to determine which accounts are uncollectible and then make a large entry that covers bad debts for sales that occurred over several different periods. The proper treatment of bad debt expense can be handled in different ways depending on the facts and circumstances of the claimant. For example, if there are specific customers related to the bad debt that is being recorded, then the related expense can be attributed to the months when the original revenue was properly attributed. In other instances, if the claimant is making an estimate of its overall uncollectible accounts, then it may be appropriate to allocate the bad debt expense over the period when the related receivables were generated and the original revenue was properly attributed.

Below is a line graph illustrating a short cycle claimant with a recorded spike in variable expenses in December. Variable expenses in the example are 26% of the annual variable expenses. This should result in further inquiry by the claim reviewer accountant for matching issues. The amount would also be flagged by one or more of the seven screens in the Juneau Declaration.



27

Upon further review of the file, the reviewer accountant can see that the increase is due to a single entry for bad debt expense during December.  Through further review of the file or through inquiry of the claimant, the reviewer accountant learns that the bad debt expense is a one-time year-end entry that relates to sales over the prior several months.  The reviewer should inquire of the claimant about documents to help show the relationship of the bad debt expense to prior sales.  The following panel illustrates the original variable expenses patterns and the corrected variable expenses.  The correction is based upon an assumption that the claimant provided specific information to help allocate the bad debt expense to the periods when the related sales occurred.

**Example 7.2**
**Short Earnings Cycle Claimant with End of Year Variable Expense Spike**
**Matching Implementation Based on Claimant-Provided Documentation**

- Spike in Variable Expenses in December due to line item marked as "Bad Debt Expense".  This month constitutes 26% of annual variable expenses, which meets CSSP's proposed threshold of 25%.
- Claimant indicates to CSSP that it only calculates its bad debt expense at the end of the year and takes an adjustment at that time for the purposes of preparing its tax return.  The bad debt expense in December thus relates to revenue recorded in prior months that failed to materialize.
- CSSP asks claimant to produce documentation to resolve the matching problem such as: sales records, returns records, etc.
- CSSP uses the documentation provided by claimant to match the bad debt expenses to revenue in the appropriate months.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | |
| Revenue | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Variable Expense Line Items: | | | | | | | | | | | | | |
| Bad Debt Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 |
| Other Variable Expenses | 25 | 25 | 30 | 30 | 35 | 40 | 45 | 40 | 35 | 35 | 30 | 30 | 400 |
| Total Variable Expenses | 25 | 25 | 30 | 30 | 35 | 40 | 45 | 40 | 35 | 35 | 30 | 130 | 500 |
| % of Annual | 5% | 5% | 6% | 6% | 7% | 8% | 9% | 8% | 7% | 7% | 6% | 26% | 100% |
| | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | |
| Revenue | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Variable Expense Line Items: | | | | | | | | | | | | | |
| Bad Debt Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 |
| Bad Debt Expense Matching Correction | | 10 | 10 | | 15 | 20 | 15 | 5 | 20 | | 5 | (100) | 0 |
| Other Variable Expenses | 25 | 25 | 30 | 30 | 35 | 40 | 45 | 40 | 35 | 35 | 30 | 30 | 400 |
| Corrected Total Variable Expenses | 25 | 35 | 40 | 30 | 50 | 60 | 60 | 45 | 55 | 35 | 35 | 30 | 500 |

28

Below is a line graph that compares the variable expense attribution as originally submitted by the claimant with the corrected variable expense amounts:



**Example 7.3**
**Short Earnings Cycle Claimant with End of Year Variable Expense Spike**
**Matching Implementation Based on Claimant-Provided Documentation**

Spike in variable expenses in December caused by bad debt expense adjustment. Bad debt expenses are matched to revenue based on claimant-provided documentation.

In many instances the claimant may not be able to provide sufficient documentation to specifically allocate the bad debt expense to the months in which the related sales occurred. It may also be impractical or unduly burdensome to do so in some instances. In such cases, it would not be unreasonable for the CSSP to implement a matching solution by taking the annual total variable expenses and allocating them by month based on the monthly share of annual revenue. The following is a panel illustrating that treatment, followed by a line graph that shows the resulting variable expenses compared to the original submission.

29

**Example 7.4**
**Short Earnings Cycle Claimant with End of Year Variable Expense Spike**
**Matching Implementation Based on Monthly Revenue**

> - Spike in Variable Expenses in December due to line item marked as "Bad Debt Expense". This month constitutes 26% of annual variable expenses, which meets CSSP's threshold of 25%.
> - Claimant indicates to CSSP that it only calculates its bad debt expense at the end of the year and takes an adjustment at that time for the purposes of preparing its tax return. The bad debt expense in December thus relates to revenue recorded in prior months that failed to materialize.
> - Claimant is unable to provide documentation that is sufficient to match the bad debt expenses to revenue and attribute them to the correct month. CSSP verifies that reported revenue is reliable and consistent with economic reality.
> - CSSP implements matching by taking annual total variable expenses and attributing them by month based on the monthly share of annual revenue.

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Claimant-Submitted P&L Data Before Matching:* | | | | | | | | | | | | | | |
| Revenue | | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| Variable Expense Line Items: | | | | | | | | | | | | | | |
| Bad Debt Expense | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 |
| Other Variable Expenses | | 25 | 25 | 30 | 30 | 35 | 40 | 45 | 40 | 35 | 35 | 30 | 30 | 400 |
| Uncorrected Total Variable Expenses | | 25 | 25 | 30 | 30 | 35 | 40 | 45 | 40 | 35 | 35 | 30 | 130 | 500 |
| | | | | | | | | | | | | | | |
| *Claimant-Submitted P&L Data After Matching:* | | | | | | | | | | | | | | |
| Revenue | A | 50 | 55 | 75 | 80 | 80 | 110 | 140 | 125 | 100 | 75 | 60 | 50 | 1,000 |
| % of Annual | B | 5% | 6% | 8% | 8% | 8% | 11% | 14% | 13% | 10% | 8% | 6% | 5% | 100% |
| Annual Variable Expenses | C | | | | | | | 500 | | | | | | |
| Corrected Total Variable Expenses | D=B*C | 25 | 28 | 38 | 40 | 40 | 55 | 70 | 63 | 50 | 38 | 30 | 25 | 500 |



**Example 7.5**
**Short Earnings Cycle Claimant with End of Year Variable Expense Spike**
**Matching Implementation Based on Monthly Revenue**

> Spike in bad debt expenses in December cannot be corrected based on claimant-provided documentation. Annual variable costs are attributed by month based on monthly share of annual revenue.

Legend: Revenue · Uncorrected Total Variable Expenses · Corrected Total Variable Expenses

30

Corresponding variable expenses can be identified using the usual and customary information available based on the industry type and business model. Application of this general matching principle may require guidelines for matching based upon the particular industry or business model in which the BEL claimant operates. Below is a brief discussion for two industries with treatments that vary based on businesses that follow different earnings cycles.

*Construction*

A business in the construction industry using the percentage of completion method of revenue attribution should use the same direct costs that are used to estimate the percentage of completion of construction in progress when attributing corresponding variable expenses to the revenue earned during a particular month. Example 2 in the Appendix includes an illustration using actual claimant data.

*Agriculture - Crops*

An entity that grows crops should identify all of the variable costs associated with the planting and growing of the specific crop under review. These costs should be accumulated during the growing season and then allocated proportionately to the months in which the revenue was properly attributed. This treatment is illustrated by the example shown above in the revenue attribution discussion for farms. *Supra* at Part III.A.2.b. In addition, Example 3 in the Appendix includes an illustration using actual claims data.

C.      **Non-Revenue Items**

The revenue drivers for each claimant should be based on transactions and activities that are appropriate for the earnings cycle category for that business and central to the claimant's ongoing major operations. However, some organizations generate income from activities and transactions that are not integral to their normal business operations. For example, a retailer may generate income from interest earned on short-term and long-term investments in addition to income from its normal business of selling goods and merchandise to customers. In this case, the investment income reported by the retailer should be considered as non-operating income or "non-revenue" because the investment income is not closely connected or necessary to the retailer's core business operations.

Other transactions and activities that a business entity enters into may have an impact on the income statement but are not typically treated as revenues. The following are additional non-exhaustive examples of non-operating income or "non-revenue" for purposes of calculating the BEL claims under the Settlement Agreement:

31

| EXAMPLES OF ITEMS THAT MAY NOT BE REVENUE | |
|---|---|
| Insurance Proceeds | Grants for "For-Profit" Entities |
| Interest and Investment Income | Capital Contributions |
| Gains or Losses from Sales of Assets | Financing Arrangements |
| Reimbursed Expenses | Credit Adjusting Journal Entries to Expense Accounts |
| Capital Assessments | Payment from Suppliers for Returns |
| Intercompany Sales / Related Party Transactions | Litigation / Dispute Proceeds |
| Consignment Sales | |

a) **Insurance Proceeds** – Insurance proceeds are compensation paid to an entity under an insurance contract and do not represent payments arising from the earnings activity of a business entity. In addition, insurance recoveries are payments that represent recovery of a prior loss or claim that is intended to make the entity whole. Thus, any such proceeds necessarily reflect at most a zero economic effect, since the proper measurement of the economic impact of insurance recoveries would take into account the offsetting loss.

b) **Interest and Investment Income** – Interest income reflects interest earned on investments such as cash held in savings accounts, certificates of deposits, dividends and other investment related activities. Interest income typically is not generated through the entity's central business operations of selling goods and/or services and therefore should not be treated as operating revenue. Other entities, such as those engaged in the rental of real property, do not generate interest income from their core business activity, and consequently an ad hoc financing transaction that generates interest income should not result in treating that interest income as revenue.

c) **Gains or Losses from Sales of Assets** – The phrase "gains or losses from sales of assets" typically refers to transactions involving the sale of assets that are not part of the entity's central business operations of selling products and/or services. For example, this category does not include the routine sale of inventory. Proceeds from the sale of non-current assets are not the result of the entity's normal earnings activity and should not be treated as part of revenue.

d) **Reimbursed Expenses** – Reimbursed expenses are considered compensation for "passed-through" costs that a business incurs on behalf of its clients for convenience and/or practical business purposes (e.g. travel expenses, advances of customer obligations, permits and licenses, etc.). Customers will reimburse or pay back a business for such passed-through costs, and, therefore, those subsequent cash receipts are not revenues because they are not the

32