# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| | * | JUDGE BARBIER |
| Applies To: | * | |
| All Cases and 12-970 | * | MAG. JUDGE SHUSHAN |

## ORDER
### [Amending and Clarifying the Court's Order of Nov. 15, 2013 (Rec. Doc. 11857), Denying BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims]

Before the Court is BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims [Rec. Doc. 11819], as well as the Court's Order of November 15, 2013 [Rec. Doc. 11857], which denied BP's motion. The Court hereby amends its November 15, 2013 Order to provide its reasons for denying BP's motion, which are set forth below.

### Background

On October 2, 2013, in Docket No. 13-30315, a panel of the Fifth Circuit remanded to this Court for taking of additional evidence and reconsideration of what it found to be certain ambiguous provisions of the Settlement Agreement dealing with Business Economic Loss ("BEL") claims. The Fifth Circuit also directed this Court to issue a "narrowly tailored" preliminary injunction pending its deliberate reconsideration of the BEL issue. In response, on October 3, 2013, this Court issued an interim order staying certain BEL claims, and invited the parties to submit proposals for a formal preliminary injunction order. On October 18, 2013, the Court issued a preliminary injunction order enjoining the Claims Administrator from paying or processing certain BEL claims pending

1

resolution of the remand proceedings.  [Rec. Doc. 11697]  Despite the Court's October 18, 2013

Order confirming that "the issue of how causation is determined was not before the Fifth Circuit in

the recent BEL appeal" and "Exhibit 4B of the Settlement Agreement is not before the undersigned

on remand,"[1] BP nevertheless filed a Motion to Amend Scheduling Order re BEL Remand and

Preliminary Injunction Relating to BEL Claims on November 7, 2013, requesting the Court to

consider evidence regarding the "causal-nexus issue" and to amend the preliminary injunction to

enjoin the Claims Administrator and the Settlement Program from paying any BEL claim unless the

Claims Administrator has determined an "actual causal connection" between a claimant's loss and

the Oil Spill.  [Rec. Doc. 11819 and 11819-1 at 2]  Class Counsel filed an opposition, followed by

a reply by BP and a sur-reply by Class Counsel.  The Court issued a short order denying BP's

attempt to inject the issue of causation into the pending remand proceedings.  [Rec. Doc. 11857]

Although the BEL issue is presently unresolved and pending before this Court following remand

from the Fifth Circuit, BP has now filed a Notice of Appeal [Rec. Doc. 11879] seeking an

"emergency appeal" to the Fifth Circuit, and asking that this new appeal be consolidated with the

pending BEL appeal in Docket No. 13-30315.  At the same time, BP has made another document

dump into the record of this case, without leave of court and apparently without consulting with

opposing counsel.  [Rec. Doc. 11876]

　　　　While the Court has previously stated that the issue of causation is not before it on remand,

certain of BP's assertions in its motion and supporting memoranda should be addressed.  In its filing,

BP accuses the Claims Administrator of "rewrit[ing]" and "systematically disregard[ing]" the

Settlement Agreement's class definition and "misreading Exhibit 4B" by paying claimants "for losses

---

[1]  The Court repeated these statements when it issued the Scheduling Order Regarding the BEL Remand on
October 25, 2013.  [Rec. Doc. 11735 at 1 n.1]

that a reasonable observer might conclude were not in any way related to the Oil Spill." [Rec. Doc. 11819-1 at 1-2, 11-12]  Indeed, in what is, frankly, a startling reversal of its prior submissions and statements to this Court, BP asserts that "when the Administrator is confronted with evidence that the loss is not traceable to the Spill, Exhibit 4B does not tell him to ignore that evidence." [Rec. Doc. 11819-1 at 18-19]  BP's new position, however, is at odds with the Settlement Agreement's language and BP's prior statements and submissions regarding the proper interpretation and implementation of Exhibit 4B.  Moreover, BP's accusations against Mr. Juneau and the Settlement Program are unwarranted.  With respect to the issue of alternative causation, Mr. Juneau and the Settlement Program have acted in accordance with the terms of the Settlement Agreement and the Claim Administrator's October 10, 2012 formal policy announcement [Rec. Doc. 9089-1, Ex. A-5], which policy was enacted *with the specific guidance* and *confirmation of BP* and later confirmed by the Court.

BP argues that the Settlement Agreement and Rule 23 require that only claims that are "traceable to the oil spill" be paid.  Of course, the whole point of the class settlement was to resolve claims of persons who allege they have suffered economic losses attributable to the oil spill. But, in a class settlement, the parties agreed on an objective and specific method of proving whether or not a loss was caused by the oil spill.  In the context of a class-wide settlement program, involving claims by tens of thousands of claimants, it would be infeasible to expect or require every claimant to prove actual, or factual, causation.  Doing so would require thousands of individual trials of causation, defeating the whole purpose and intent of a class settlement.[2]

---

[2] On a related note, the Oil Pollution Act of 1990 ("OPA") would apply to most, if not all, of these claims were they to be litigated, yet there is a dearth of jurisprudence interpreting causation under that Act.  OPA broadened the scope of persons able to recover economic losses resulting from an oil spill, in part by removing the "physical injury" bright line that exists under general maritime law.  [*See* Order of August 26, 2011, Rec. Doc. 3830 at 19-21, 32-33] This Court

3

Instead,  pursuant to terms of the Settlement Agreement, BP and Class Counsel agreed that whether a claimant experienced an injury "due to or resulting from" the Oil Spill would be determined by a specific and stipulated method of proof, i.e., the objective criteria set forth in the Causation Framework contained in Exhibit 4B.[3]  For certain types of businesses located in certain areas, the parties agreed that there would be no causation requirement; losses for those businesses were presumed to be caused by the oil spill.[4]  For other businesses, the causation requirements vary depending upon the geographic zone (A thru D) and depending upon the ability to demonstrate a particular "V" , modified "V", or "U" curve as evidence of a decline and recovery in revenue during a specified period immediately following the oil spill. A claimant must meet these causation requirements in order to have a viable claim.

### BP's Previous Statements and Admissions re Causation Requirements

On several occasions BP confirmed the Parties' mutual intent and understanding that alternative causes of a claimant's alleged damages *would not* be analyzed separately by the Claims Administrator.  For example, in its August 13, 2012 Memorandum in Support of its Motion for Final Settlement Approval, BP quoted its expert, Holly Sharp, who stated:

> once a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected

---

previously commented that OPA causation may lie somewhere between traditional "proximate cause" and simple "but for" causation.  [*Id.* at 33]  The parties' negotiations occurred in the context of this uncertainty in the law.  As explained in the next paragraph, the Settlement Agreement reflects the parties' decision to resolve this issue through compromise, rather than litigation.

[3] Specifically, Section 5.3.2.3 sets forth the "Causation Requirements For Business Economic Loss Claims" as follows: "Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon Incident. The causation requirements for such Claims are set forth in Exhibit 4B."

[4] For example, Exhibit 4B(I)(4) provides, "If you are in Zone A or Zone B, and you meet the 'Tourism Definition,' you are not required to provide any evidence of causation."

4

compensation period are presumed to be caused by the spill, *with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*

[*See* Rec. Doc. 7114-1 at 33 (emphasis added)]  Moreover, after the Program's accountants began reviewing and evaluating actual claims in September of 2012, the Claims Administrator's Office approached both Parties (BP and Class Counsel) to clarify whether the Parties truly intended that the Program would apply only the purely objective formulae of Exhibits 4B and 4C to determine whether and how much a claimant could recover.   On September 25, 2012, the Claims Administrator's Office set forth the following query in an email sent to both Parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not?  Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of all losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?

> I will give a hypothetical situation to try to illustrate the question we are asking:

> Hypo:  A small accounting corporation / firm is located in Zone B.  They meet the "V-shaped curve" causation test.  The explanation for the drop in revenue is that one of the three partners went out on medical leave right around the time of the spill.  Their work output and corresponding income, thus went down by about a third.  The income went back up 6 months later when the missing partner returned from medical leave.  Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?

[Rec. Doc. 9089-1, Ex. A-2]  BP's attorneys unambiguously confirmed BP's position that the claimant in the posed hypothetical would be entitled to full recovery.  A letter from Mark Holstein (Managing Counsel, Litigation for BP America, Inc.) dated September 28, 2012, stated:

> If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

5

Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant's firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-financial data indicates that the decline was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.

[Rec. Doc. 9089-1, Ex. A-4, p.2-3] Relying on this response, the Claims Administrator issued a

Policy Announcement on October 10, 2012, which stated in part:

### 2. No Analysis of Alternative Causes of Economic Losses.

The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

[Rec. Doc. 9089-1, Ex. A-5, p. 2-3] BP did not object to this Policy Announcement, and on

December 12, 2012, the Parties appeared before the Court and directly confirmed their agreement

with the Claims Administrator's Policy Announcement. That confirmation was memorialized in an

email from the undersigned to the Parties on the same date.[5] [Rec. Doc. 9089-1, Ex. A-6]

---

[5] The Court's email to the Parties on December 12, 2012 stated: "Counsel for BP and the PSC agree with the Claims Administrator's objective analysis of causation with respect to his evaluation of economic damages Claims, as previously set forth by Mr. Juneau in paragraph 2 of his October 10, 2012 policy announcement." [Rec. Doc. 9089-1, Ex.

6

During the Final Fairness Hearing before this Court on November 8, 2012, Richard Godfrey,

the lead attorney and negotiator for BP, in advocating for the approval of the settlement, made the

following comments regarding the causation requirements:

> We have presumed causation in Zone A. We've presumed causation. It's irrebuttable. You know as well as I do, Your Honor, how many people come in and think they have got a claim damage for economic loss; but, when the facts come out, they had a bad year because they lost their key manager, they had a bad year because the street was being repaired in front of them, whatever reason.
>
> We're presuming causation for whole sections of the settlement class depending on where you reside and the nature of your business. Our experts say, the joint experts, it exceeds the *Reed* factor."

[Rec. Doc. 7892 at 68]

BP's understanding of Exhibit 4B and its link to the Class Definition was again confirmed

when the Parties appeared before the Fifth Circuit Court of Appeals in Case No. 13-30315 on July

8, 2013. During the oral argument, when asked about causation, Ted Olson on behalf of BP stated:

> This is a settlement, and with respect to the causation issue, that is not the issue that is before this court. . . . *The settlement agreement with respect to 4B as to causation provided a mechanism which allowed someone to come through the door to be then entitled to prove the amount of actual lost profits.* It was a compromise, which every settlement agreement is, with respect to causation issues. . . .

[*See* Unofficial Transcript of Hearing before U.S. Fifth Circuit Court of Appeals in Case No.

13-30315 at 11, Rec. Doc. 11826-2 (emphasis added)]

## The Fifth Circuit Recognized That BP's Appeal Was About Loss Measurement, Not Causation

The issue before the Fifth Circuit on appeal was how economic loss is measured under the

provisions of Exhibit 4C. The primary question was whether there is a requirement that "variable

---

A-6]

7

expenses" be matched to the revenues produced by those expenses, in order to calculate "variable profit." Part I of the majority opinion by Judge Clement,[6] joined by Judge Southwick, was concerned that if, based on the manner in which the claimant maintained his or her financial records, this so-called "matching" inherently occurred for certain claims but not for others, then similarly-situated claimants would be treated differently and, moreover, some claimants might receive compensation without having an actual loss. While the calculation or measurement of economic loss is measured under Exhibit 4C, the separate causation requirements for BEL claimants are set forth in Exhibit 4B, discussed above. All BEL claimants must meet these requirements in order to be eligible for compensation.

However, the issue of how causation is determined under Exhibit 4B was not before the Fifth Circuit in the recent BEL appeal. This is evident from the following passages from the majority and concurring opinions.

In the Fifth Circuit opinion, Judge Clement states:

BP did agree that alternative causes of losses were irrelevant if the financial figures supported that a loss occurred. The false positives BP criticizes *now* are based on loss calculations produced under the district court's cash-in, cash-out approach. . . . [T]he issue is whether it is permissible to allow the often economically meaningless temporal coinciding of cash received and paid to determine the value of a claim.

Slip op. at 21 (emphasis added). Judge Southwick also recognizes that causation was agreed to by the parties:

If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation. Improper measurement of losses under Exhibit 4C might compensate claimants without actual losses. . . . Even so, the parties

---

[6]There are three separate opinions, including the partial majority opinion by Judge Clement, the concurring opinion by Judge Southwick, and the dissenting opinion by Judge Dennis. For purposes of the remand, the parties and the Court agreed that Judge Southwick's concurring opinion is controlling.

8

> agreed by Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred to claimants during the proper time period.  The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation.

*Id.* at 37-38.  Judge Southwick further points out that "[n]o one on appeal is challenging Exhibit 4B."

*Id.* at 39.  Finally, Judge Southwick distinguishes causation from the measurement of a claimant's loss and makes clear the purpose of the remand to this Court:

> Part I of the panel opinion identifies the crucial question for remand: Should matching be required for *all* claims when it is clearly required for many?  I agree to remand with instructions to reconsider the interpretation of Exhibit 4C for unmatched claims in light of the necessity of revenue and expense matching to realistic measurement of economic loss.

*Id.* at 38.

"Causation" was before the Fifth Circuit only in the very narrow sense that an improper calculation under Exhibit 4*C* might result in a claimant who suffered no loss receiving compensation.  Per Judge Southwick:

> Improper measurement of losses under Exhibit 4C might compensate claimants without actual losses.  That potential raises the causation question in the sense that a party who suffered no loss regardless of cause certainly did not have a loss caused by the oil spill.

*Id.* at 37.

Accordingly, the Court reiterates that, as the record reflects (and despite BP's recent filings), Exhibit 4B and the issue of causation was not before the Fifth Circuit in Docket No. 13-30315 and is not before the undersigned on remand.  Rather, what is before the Court is the measurement of a claimant's loss under Exhibit 4C.

9

### Certification Under Rule 23 Was Not an Issue on This Appeal

Part II of Judge Clement's panel opinion was not joined by either of the other two panelists. That part of the opinion, which discusses requirements for Article III standing and certification under Rule 23, is therefore not controlling as to the issues before this Court on remand.  The questions of class certification and the approval of the settlement are the subjects of a separate pending appeal before a different panel of the Fifth Circuit (5th Cir. Dkt. no. 13-30095).  It is unclear to the undersigned what standing BP has to raise arguments against class certification or the fairness of the class settlement.   BP was a party to the settlement, helped to draft the Settlement Agreement, did not object to or appeal either class certification or approval of the settlement, and in fact strenuously advocated for approval of the settlement.  Notably, the Settlement Agreement itself requires the parties to the Agreement, including BP, to "support the final approval and implementation of this Agreement and  defend it against objections, appeal or collateral attack." [Settlement Agreement § 17.1, p.81, Rec. Doc. 6430-1]  Nonetheless, and despite being only an appellee,  BP has made written and oral arguments against its own Settlement Agreement.

### Conclusion

BP accuses the Claims Administrator of "rewriting" and "systematically disregarding" the Settlement Agreement.   To the contrary, when it talks about causation, if anyone is attempting to rewrite or disregard the unambiguous terms of the Settlement Agreement, it is counsel for BP.

Frankly, it is surprising that the same counsel who represented BP during the settlement negotiations, participated in drafting the final Settlement Agreement, and then strenuously advocated for approval of the settlement before this Court, now come to this Court and the Fifth Circuit and contradict everything they have previously done or said on this issue.  Such actions are deeply

10

disappointing, especially considering that the Court has previously appreciated and complimented the excellent cooperation and professionalism exhibited by all counsel in this extremely complex and difficult litigation.  In any event, the undersigned is certain that causation is not an issue before this Court, and will not consider any pleadings requesting that it be made a subject of re-evaluation.

Accordingly, for these reasons, BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims [Rec. Doc. 11819] is DENIED.

This Court will continue to complete the pending remand proceedings as expeditiously as possible.

Signed in New Orleans, Louisiana, this 22nd day of November, 2013.

United States District Court

11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: **Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>This Document Relates to:<br><br>No. 12-970 | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SHUSHAN** |

## BP'S RESPONSE TO
## CLASS COUNSEL SUBMISSION OF
## PROPOSAL FOR MATCHING EXPENSES

The Court directed the parties to file proposals "designed to be responsive to the Fifth

Circuit's BEL decision,"[1] which requires that the Settlement Agreement be implemented so as to

ensure that the "means of showing loss [does not] become disconnected from economic

realities." *In re Deepwater Horizon*, 732 F.3d 326, 347 (5th Cir. 2013) (Southwick, J.,

concurring) ("BEL Decision"). The parties designed the compensation framework to that end,

for they required compensation to be based on lost profits.[2] Basing compensation on a

"matching" of cash-in and cash-out rather than a "matching" of revenues and expenses, the BEL

Panel said, would not determine actual economic injury and would not permit a calculation of

---

[1]  Scheduling Order Regarding BEL Matching Proposals at 1, Nov. 15, 2013 (Doc. No. 11861).

[2]  Had the Settlement Agreement been designed to compensate claimants who did not have actual economic injuries, it would not have passed muster under Rule 23 and Article III. *Id.* at 343 ("If the Administrator is interpreting the Settlement to include such claimants [i.e., "that had not sustained losses at all"], the Settlement is unlawful."); *id.* at 347 (Southwick, J., concurring) ("[T]o allow the means of showing loss to become disconnected from economic realities threatens to distort entry into the class and is a defect under Rule 23.").

lost profits. *Id.* at 336, 338. BP has therefore proposed (i) an "accrual-style framework" that (ii) properly matches monthly "revenues" and "corresponding variable expenses" for the purpose of (iii) conducting a "lost profits" analysis (iv) based on actual economic injury. That proposal is set forth in BP's proposed seven-point order.

What is striking about Class Counsel's Proposal is that it does not mention "actual economic injury" or "lost profits." Nor does it refer to what the BEL Panel called "any reasonable understanding of calculation of damages." *Id.* at 339. Class Counsel's Proposal does make a grudging concession to "some level of matching," but it is a concession for concession's sake. And it is a concession limited to cash-basis claims,[3] although BP has demonstrated that many accrual-basis claims also present matching problems and fail the Administrator's seven screening criteria.[4] The Proposal is not tethered to any principle, nor does it appear aimed at any target. That is, the elements of the Proposal (both as to Revenue Recognition and Expense Recognition) have nothing to do with (i) carrying out a lost profits analysis, (ii) ensuring that settlement awards compensate for actual losses, or (iii) paying like compensation to like claimants. And, for that reason, the Proposal is not a solution to the problem identified by the Fifth Circuit.

Consider first Class Counsel's Statement on Revenue Recognition.[5] If it is aiming at economic reality, it misses the mark in three fundamental ways:

---

[3]   Class Counsel Submission at 2, Nov. 21, 2013 (Doc. No. 11885) ("[S]ome level of matching in Cash Basis Claims is likely required . . . .").

[4]   *See* BP's Proposal for Matching at 4 & n.3, Nov. 21, 2013 (Doc. No. 11886).

[5]   Class Counsel Statement, Nov. 21, 2013 (Doc. No. 11885-2) (hereafter "CCS:RR").

2

1.      First, it misconstrues the Fifth Circuit's BEL Decision at a fundamental level. The BEL Decision talks at length about cash- and accrual-basis accounting, about matching of revenues and expenses, and about the measurement of actual economic injury.  That discussion occupies six pages of the BEL Decision, 732 F.3d at 333-39, under the headings, "Revenue and Expense Recognition Principles," "Accrual-Basis Claimants," and "Cash-Basis Claimants."  But the passage that Class Counsel quotes in its opening sentence – ostensibly about recognition of "revenues" – **has nothing to do with matching revenues and corresponding variable expenses**. CCS:RR at 1.  The quotation comes from the BEL Panel's holding regarding "'Comparable' Periods" language, which decided whether "comparable" refers to the same calendar months in both the Benchmark and Compensation period.  BEL Decision, 732 F.3d at 339-40.  Thus, Class Counsel sets off on the wrong foot: What they quote, they quote mistakenly.  That alone is telling.

But it is also telling what they do **not** quote, for in the immediately preceding sentence, the Panel said, "[W]e conclude that our holding as to cash and accrual-basis claimants will resolve some of the issues BP claims results from the district court's interpretation of 'comparable.'"  *Id*. at 340.  That is, the court considered the dispute about "comparable" months largely irrelevant as a practical matter, because proper matching of revenue and expenses would generally resolve the problem of compensating claimants who had not suffered any real economic injury.

2.      Second, Class Counsel miss the mark by focusing on the **accounting** principles that govern proper financial reporting, not the **economic** principles that are essential to determining actual economic injury and, specifically, lost profits.  Class Counsel assert that most Gulf Coast businesses keep their books on bases other than GAAP, that the IRS computes

3

taxable income based on the taxpayer's method of accounting, and that income properly recognized in one period should not be moved "'for financial reporting purposes.'"  CCS:RR at 2-4 (quoting Kohlbeck Decl.).  But the object of the Settlement Agreement is not to check whether businesses in the Gulf Coast Region maintain acceptable monthly accounting records, or to compute taxable income, or to implement a financial reporting system for claimants.  It is to determine lost profits.[6]

The BEL Decision states clearly that the Agreement must be read consistent with a basic understanding of *damages*: "[I]t remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of *damages*. In interpreting a settlement, surely some weight has to be given to what *damages* recoverable in civil litigation actually are."  BEL Decision, 732 F.3d at 339 (emphases added). The BEL Panel said – and Class Counsel have never disputed – that any determination of *damages*, including lost profits, must be based on a comparison of revenue and expenses (not cash inflow and outflow) for the Benchmark and Compensation Periods.  A lost profits analysis begins therefore with an attribution of revenue consistent with economic reality.[7]

3.       Third, Class Counsel resist offering a proposal that is responsive to the BEL Decision by refusing to use the Decision's terminology and refusing to follow its analytical approach, which focused on actual economic loss.  When the BEL Panel spoke of revenue and its proper recognition, it did not use the terms "move" or "smooth" at all, and yet Class Counsel uses those terms repeatedly (and pejoratively) to characterize the proper matching that is part of

---

[6]    *See, e.g.*, Godfrey Decl. ¶ 9, Nov. 7, 2013 (Doc. No. 11818-2); Bloom Decl. ¶ 13, Nov. 7, 2013 (Doc. No. 11818-1).

[7]    *See, e.g.*, Fishkind Decl. ¶ 8, Mar. 20, 2013 (Doc. No. 8964-8).

4

an accrual-style framework designed to determine lost profits. When Class Counsel argue that "revenue should not typically be moved into or out of the relevant Benchmark and Compensation Periods," CCS:RR at 1, they assume that revenue has already been properly attributed to a particular period. But for claimants who keep their books on a cash basis, as well as many claimants who keep their books on a hybrid basis, the books do not attribute *revenue* to a month, but record *cash receipts*.[8] As the BEL Panel said, "cash accounting does not inherently recognize relationships between cash flows and their underlying transactions." BEL Decision, 732 F.3d at 337. An accrual-style framework based on concepts of revenue and expense rather than cash flows inherently considers such relationships. It begins by asking – from an economic perspective – when the underlying business activity took place that earned the revenue.[9]

For that reason, to attribute revenue is not to "move" something, but to assign it for the first time to the period in which the related earnings activities took place. The analysis done by the Settlement Program, after all, is retrospective. The Program's accountants are looking at the facts in hindsight, and they know both (i) the amount of revenue earned; and (ii) when the business's earnings activities took place. For purposes of determining lost profits, the question is (i) *to what period* is it appropriate to attribute the revenue (ii) in light of *when* the earnings activities occurred so that one can determine (iii) *whether* a loss of profits occurred.

---

[8]    Even accrual-basis claimants make errors that require proper attribution and may recognize revenue after the related earning activity because recognition awaited the removal of uncertainties. *See* Alexander Decl. ¶¶ 14-16, Mar. 20, 2013 (Doc. No. 8963-36); Gaspardo Decl. ¶¶ 4, 6-18, & Ex. A (Doc. No. 11726-7).

[9]    BEL Decision, 732 F.3d at 337 ("[C]ash accounting, by nature, ignores any significance that might be related to the timing of cash receipts and payments, beyond mere cash flow concerns."); *see also* Fishkind Decl. ¶ 11, Mar. 20, 2013 (Doc. No. 8964-8); Gaspardo Decl. ¶ 8, Oct. 23, 2013 (Doc. No. 11726-26).

5

This criticism is not to reject Class Counsel's Proposal in its entirety:

- We agree that the "Administrator has developed testing to identify claims where a matching issue may be present." Class Counsel Proposal: Expense Recognition at 1, Nov. 21, 2013 (Doc. No. 11885-1) (hereafter "CCP:ER"). He should perform that testing. He should also perform the additional screens (or tests) identified by BP that will make the screening more accurate. The undisputed record establishes that they will advance the goal of identifying claims that have not properly matched revenues and expenses.[10]

- We agree that for some claimants "the revenue recognition principles are the same in practice under both cash and accrual methods," i.e., lead to similar results. CCS:RR at 2.[11] But, of course, there are many claimants for which the principles are not the same in practice and do not lead to similar results, with the potential mismeasurement of lost profits from failing to match revenue and expense amounting to hundreds of millions of dollars.[12] The Fifth Circuit's BEL Decision requires the Court to address this, as it has done by asking for matching proposals.

- We agree, too, that "without the documentation to establish the dates on which services were rendered for each transaction, conversion of revenue to an 'accrual type" methodology would be inherently artificial . . . ." CCS:RR at 2. But neither the BEL Panel nor BP suggests that proper revenue attribution or matching be done without documentation to

---

[10]  *See, e.g.,* Juneau Decl., Oct. 25, 2013 (Doc. No. 11741); Sider Decl., Nov. 7, 2013 (Doc. No. 11825-3).

[11]  Class Counsel assert, without evidence, that this is true "[f]or the vast majority of claimants."

[12]  *See* Sider Decl., Feb. 18, 2013 (Doc. No. 8965-17); Supp. Sider Decl. ¶¶ 18-25, Mar. 14, 2013 (Doc. No. 8964-18).

6

support it in the first instance.[13]  Exhibit 4A empowers the Settlement Program to secure the needed information,[14] and it should do so.

- We agree that the use of Generally Accepted Accounting Principles "is not required under the Settlement Agreement."  CCS:RR  at 2.  The BEL Panel understood that what was required to determine actual economic injury was an "accrual-style framework," not the application of accounting principles that serve a purpose other than calculating damages.

- We agree, most importantly, that the objective is accurately assessing "economic reality."  *Id*.[15]

This final point of agreement in principle, however, highlights the parties' larger disagreement.  Class Counsel want the Administrator to implement the settlement as he did before the Fifth Circuit's opinion, and they only reluctantly concede that there should be "some level of matching."  They do not offer a cohesive, principled proposal, but present instead two "Statement[s]" that in large part continue to reject the very idea of matching.

The Statement on Revenue Recognition makes no clear proposal, unless it is that revenue should be recognized only if it meets four criteria that are merely accounting standards for contemporaneous financial reporting, *id*., not criteria that concern the calculation of damages or lost profits.  As a result, Class Counsel's proposal generally will not result in attribution of

---

[13]  *See, e.g.*, BP's Proposal for Matching Ex. 2, at 29, Nov. 21, 2013 (Doc. No. 11886-2).

[14]  Where the documentation does not exist, BP proposed ways to proceed.  *E.g.*, *id.* at 15-16.

[15]  When Class Counsel say that "[m]oving revenue creates a significant risk of distorting economic reality if recognition is not based on [GAAP], which is not required under the Settlement Agreement," they seem both to embrace and reject GAAP, but they unmistakably endorse the principle that compensation should be based on "economic reality."

7

revenue to the month in which it is earned and claimants will continue to receive offers based on time periods identified by reductions in cash flows, not reductions in profits.

The Statement on Expense Recognition pays lip service to the Settlement Agreement's requirement that "corresponding variable expenses" be matched to revenue for all claims, but then undermines the requirement by suggesting that only "***certain*** variable expenses be apportioned to correspond to revenue." CCP:ER at 1 (emphasis added). Class Counsel also say certain variable expenses should "typically" be matched and that other expenses "typically" should not, without citing any evidence to support the two categories. CCP:ER at 1-2. And they seek to create special rules that will continue to produce results inconsistent with economic reality. Regarding bad debts for example, Class Counsel again resort to financial reporting standards and propose that bad debts be recognized when deemed uncollectible. But bad debt expenses relate either to specific revenues that become uncollectible (and, therefore, should be matched to those revenues) or to a general reserve (and, therefore, should be matched pro rata to revenues). Regarding travel expenses, Class Counsel claim that these expenses are "inherently unrelated to the period in which the revenue item is recorded" and should not be matched. CCP:ER at 2. Yet the accounting standard approvingly quoted by Class Counsel one page earlier (and cited by the BEL Decision, 732 F.3d at 333), requires that at least certain travel expenses be treated as a variable cost and matched because "[t]he revenue and expense(s) are directly related to each other and require recognition at the same time." CCP:ER at 1 (quoting Statement of Fin. Accounting Concepts No. 6, Fin. Accounting Standards Bd., ¶ 146).[16] Thus, in their two short

---

[16]   *See also* Statement of Fin. Accounting Concepts No. 6, Fin. Accounting Standards Bd., ¶ 146 ("Other examples of expenses that may result from the same transaction and be directly related to sales revenues are ***transportation to customers***, sales commissions, and perhaps certain other selling costs." (emphasis added)).

8

statements, Class Counsel at one and the same time (i) state that the Settlement Agreement does not require GAAP accounting, (ii) cite GAAP as authoritative, and (iii) apply GAAP inconsistently.

What Class Counsel have offered is not a logical proposal for matching, but limited concessions that aim to maintain the status quo. Their proposal, in effect, is that the Court (i) consider as revenue whatever the claimant recorded at the time (whether based on cash-in or underlying earnings activity and whether correct or not) and (ii) match some expenses to recorded revenue, even where the expenses would be matched to revenue in the wrong period. This makes no sense on its face. And, tellingly, Class Counsel do not defend their proposal as a methodology that will accurately measure lost profits or treat like claimants in like manner. The courts have recognized that, for purposes of determining damages and as a matter of economic reality, one must look at when the earnings activities took place, not when income was received. This problem often arises when law firms or marriages involving a lawyer-spouse dissolve. In *Seale v. Sledge*, 430 So. 2d 1028 (La. Ct. App. 1983), at issue was the division of a law firm's revenue upon its dissolution. Taking a cash accounting perspective, certain members of the firm argued that "work in progress does not become an asset in terms of money until the work is completed and the fee is paid when a firm is on a cash basis." *Id.* at 1031. The Louisiana Court of Appeals rejected that view, holding that the value of a contingency fee can be considered an asset of the firm notwithstanding the fact that it had not yet been collected or is even certain to be earned. *Id.* (citing *Due v. Due*, 342 So. 2d 161, 166 n.5 (La. 1977).[17] In *Due*, the problem of

---

[17] The court in *Seale v. Sledge* held that the decision in *Donald v. Glazer,* 194 So.2d 176 (La. Ct. App. 1967), *writ refused*, 196 So.2d 533 (La. 1967), was in error when it said that accounts receivable from an accounting partnership handled on a cash basis were not considered as income or an asset until collected. *Seale*, 430 So. 2d at 1030-31.

9

valuation arose in a divorce, where the wife argued that the community property included the value of the husband's work on an unresolved, contingency-fee case. The Supreme Court of Louisiana held that there was "no merit to the defendant's argument that, somehow by reason of technical characterization, no economic value should be attributed to an attorney's interest in a contingent fee contract until the successful prosecution of the claim entitles him to actual compensation for his services." *Id*. at 165 (also noting that "[t]he valuation of these interests in pending contracts have arisen, for example, in suits by former law partners for a division of the assets following dissolution of the partnership"). Courts elsewhere have taken the same economic-realist view.[18] Like the BEL Decision, these cases reflect the law's pragmatic view that, in matters of valuation and damages, economic reality trumps formal accounting rules, particularly cash accounting.

## Conclusion

For the foregoing reasons, BP requests that the Court enter the Proposed Order that was submitted along with BP's Proposal for Matching. Only BP's Proposed Order does what the Fifth Circuit requires. Class Counsel's Proposal, in contrast, seeks to maintain the status quo prior to the Court of Appeals decision, and ignores the requirement that the Settlement Program conform to economic reality by determining and awarding compensation only for lost profits.

---

[18]  *See also Bader v. Cox*, 701 S.W. 2d 677, 682 (Tex. App. 1985) (holding that "we cannot agree with [the] contention that because the partnership operated on a cash-basis accounting system and because the value of the contingent-fee files at the time of decedent's death is not readily or easily ascertainable, the files are not assets of the partnership"); *Gottlieb v. Greco*, 298 A.D. 2d 300, 301 (N.Y. App. Div. 2002) ("[P]ending contingency fee cases of a dissolved law partnership are assets subject to distribution to be valued as of the date of dissolution . . . .").

210 of 838

November 26, 2013

Respectfully submitted,

  /s/ Kevin M. Downey

James J. Neath  
Mark Holstein  
BP AMERICA INC.  
501 Westlake Park Boulevard  
Houston, TX  77079  
Telephone:  (281) 366-2000  
Telefax:  (312) 862-2200

Kevin M. Downey  
F. Lane Heard III  
WILLIAMS & CONNOLLY LLP  
725 Twelfth Street, N.W.  
Washington, D.C. 20005  
Telephone:  (202) 434-5000  
Telefax:  (202) 434-5029

Daniel A. Cantor  
Andrew T. Karron  
ARNOLD & PORTER LLP  
555 Twelfth Street, NW  
Washington, DC 20004  
Telephone:  (202) 942-5000  
Telefax:  (202) 942-5999

  /s/ Don K. Haycraft

S. Gene Fendler (Bar #05510)

Don K. Haycraft (Bar #14361)  
R. Keith Jarrett (Bar #16984)  
LISKOW & LEWIS  
701 Poydras Street, Suite 5000  
New Orleans, Louisiana 70139  
Telephone:  (504) 581-7979  
Telefax:  (504) 556-4108

Robert C. "Mike" Brock  
COVINGTON & BURLING LLP  
1201 Pennsylvania Avenue, NW  
Washington, DC 20004  
Telephone:  (202) 662-5985  
Telefax:  (202) 662-6291

Richard C. Godfrey, P.C.  
J. Andrew Langan, P.C.  
David J. Zott, P.C.  
Jeffrey J. Zeiger  
Wendy L. Bloom  
KIRKLAND & ELLIS LLP  
300 North LaSalle Street  
Chicago, IL 60654  
Telephone:  (312) 862-2000  
Telefax:  (312) 862-2200

Jeffrey Lennard  
Keith Moskowitz  
DENTONS US LLP  
233 South Wacker Drive  
Suite 7800  
Chicago, IL  60606  
Telephone:  (312) 876-8000  
Telefax:  (312) 876-7934

**OF COUNSEL**

Jeffrey Bossert Clark  
Steven A. Myers  
KIRKLAND & ELLIS LLP  
655 Fifteenth Street, N.W.  
Washington, D.C. 20005  
Telephone:  (202) 879-5000  
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.  
AND BP AMERICA PRODUCTION COMPANY**

11

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 26th day of November, 2013.

/s/ Don K. Haycraft
Don K. Haycraft

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

<table>
<tr><td>

In re:  Oil Spill by the Oil Rig
       "Deepwater Horizon" in the Gulf
       of Mexico, on April 20, 2010

**This Document Relates to:**

       **No. 12-970**

</td><td>

**MDL No. 2179**

**SECTION: J**

**JUDGE BARBIER**

**MAGISTRATE SHUSHAN**

</td></tr>
</table>

## CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS

Eligible Business Economic Loss (BEL) Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following comments in response to the Court's Order of November 15, 2013 [Doc 11861], as a supplement to Class Counsel's submissions on Expense Recognition [Doc 11885-1] and Revenue Recognition [Doc 11885-2], and in response to BP's Proposal [Doc 11886]:[1]

MAY IT PLEASE THE COURT:

BP's 65-page "Proposed Guidelines for Implementation of BEL Claims Processing Consistent with Fifth Circuit BEL Opinion" continues to pretend that the Fifth Circuit ordered the District Court and the Claims Administrator to match expenses to revenues.  To the contrary, Judge Southwick, joined by Judge Clement, simply instructed the Court to "enter a narrowly tailored and potentially brief stay"[2] while the Court determined, on remand, whether the Parties had intended to match expenses to revenue,[3] (which they didn't).[4]

---

[1] Class Counsel respectfully incorporate the preface to their CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES (Nov. 21, 2013) [Doc 11885], at pp.1-2.

[2] In re: Deepwater Horizon, 732 F.3d 326, 346 (5th Cir. 2013) (Southwick, J., concurring).

[3] Deepwater Horizon, 732 F.3d at 346 ("we are vacating and remanding for *further consideration* of the interpretation of Exhibit 4C") (Southwick, J., concurring) (emphasis supplied).

[4] *See generally,* CLASS COUNSEL BRIEF [Doc 11862]; *citing,* CLASS SUBMISSION [Doc 11804], *and,* CLASS REPLY [Doc 11833].

Even assuming *arguendo* that the Fifth Circuit suggested that <u>*expenses*</u> should be moved into or out of the relevant Benchmark and Compensation Periods to better match the recorded revenues in Cash Basis Claims, (i) the Court expressly rejected the notion that recorded *revenues* should be moved into or out of the relevant Benchmark and Compensation Periods,[5] and (ii) Judge Clement's entire opinion was premised on the assumption that Accrual Claims would already be sufficiently matched:

> Because cash accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term "corresponding variable expenses" reasonably could imply an accrual-style framework inherent in Exhibit 4C....
>
> At least as to claims presented on an accrual-basis, not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly insisted on it....
>
> The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims? ....
>
> We remand because the district court did not acknowledge the requirement of matching that is foundational for accrual-basis claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims.[6]

Similarly, Judge Southwick concurs that:

> Part I of the panel opinion identifies the crucial question for remand: should matching be required for *all* claims when it is clearly required for many?[7]

BP's current suggestion that the type of matching typically found in Accrual Basis Claims is (allegedly) <u>***not***</u> what Exhibit 4C "requires" belies the entire logic behind the Fifth Circuit's decision. (The truth, as noted in BP Counsel's letter of September 28, 2012,[8] is that the

---

[5] *See* Part I(D) of the BEL Decision. <u>Deepwater Horizon</u>, 732 F.3d at 339-340.
[6] <u>Deepwater Horizon</u>, 732 F.3d at 337, 338 and 339.
[7] <u>Deepwater Horizon</u>, 732 F.3d at 346 (Southwick, J., concurring).
[8] DOC 8963-68.

Parties were focused on the use of *contemporaneous* Monthly P&Ls – whether they were fully matched, partially matched, or not matched at all.)

BP's 65-page Proposed Guidelines also belies the finding of the Court of Appeals that the provisions of the Settlement Agreement "clearly indicate that the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months.*"[9]

Finally, BP's Proposed Guidelines to move or "smooth" or otherwise re-allocate recorded revenues into and out of the relevant Benchmark and Compensation Periods not only has no support under the Settlement Agreement,[10] but has absolutely no basis under Generally Accepted Accounting Principles (GAAP), other accepted Accrual Basis accounting methods, or any other recognized accounting standards.  In particular, Paragraph 83(a) of FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, states that revenue and gains are realized when products (goods or services), merchandise, or other assets *are exchanged for cash or claims to cash.*[11]  Revenue is realizable when related assets received or held are *readily convertible to known amounts of cash or claims to cash.* FASB Codification, §605-10-25-1.[12]  BP's proposal violates this principle by revising the contemporaneous profit and loss statements to recognize revenue in periods well before they could be recognized under any known accounting standard.  As verified by Dr. Mark Kohlbeck:

---

[9] Deepwater Horizon, 732 F.3d at 340 (emphasis supplied).
[10] *See generally,* CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862], pp.3-4, 8-9; *citing,* SETTLEMENT AGREEMENT, Exhibit 4C, p.2 [Doc 6276-10, at 3]; RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶15; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶13; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶¶9-10; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶5; RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶10-11; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶¶ 24, 26; WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶3.
[11] The Financial Accounting Standards Board (FASB) establishes the accrual-based Generally Accepted Accounting Principles referred to commonly as "GAAP".
[12] The Securities & Exchange Commission follows this concept of revenue recognition. *See* Codification of STAFF ACCOUNTING BULLETINS TOPIC 13: REVENUE RECOGNITION, found at http://www.sec.gov/interps/account/sabcodet13.htm.

Recognition of revenue and expenses under the accrual-basis of accounting (GAAP) is based on the revenue recognition principle and the expense recognition principle. The revenue recognition principle requires the revenue to be both earned and realizable to be recognized (Concepts Statement No, 5, ¶83)

\* \* \*

_Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession._[13]

As well as CPA Allen Carroll:

GAAP recognition rules and "matching" most often apply to expense recognition _not revenue recognition_….

_BP's proposal to move revenue to match expenses is backwards and violates the very concept referred to as matching_ in BP's out of date textbook….

_The matching approach that BP advocates is not matching in any sense recognized in the accounting world,_ but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses.[14]

For all of the reasons previously briefed, and based on all of the evidence previously submitted, BP's Proposed Guidelines are contrary to both the intent of the Parties and the BEL Decision. Yet even assuming _arguendo_ that either the parties intended or the Fifth Circuit directed that expenses and revenues be "matched" in all claims, the specific Proposed Guidelines submitted by BP are completely unworkable, subjective, inefficient, and contrary to established accounting principles.

---

[13] DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10, (emphasis supplied).

[14] SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14. _See also,_ FASB CONCEPT STATEMENT 5, Paragraphs 83(b) and 84(a); KIESO, WEYGANDT & WARFIELD, Intermediate Accounting (14th ed.), p.60; BRIEF OF _AMICI CURIAE_ CERTIFIED PUBLIC ACCOUNTING SOCIETIES IN SUPPORT OF APPELLEES, No.13-30315 (June 24, 2013), at pp.4-5 [Fifth Cir. Doc. 00512285581, at 11-12]; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 14, 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Oct. 24, 2013) [Doc. 11740-1].

**BP's Proposed Guidelines Exceed the Language and Spirit of the Documentation Provisions**

Addressing the argument that matching of expenses in Cash Basis claims was precluded by the Documentation provisions set forth in Exhibit 4A, which require claimants who prepared their financials on a Cash Basis to submit those Contemporaneous Cash Basis financials to the Settlement Program, the Court of Appeals comments that: "*The difference is between what claimants had to present* – either cash-basis or accrual-basis claims – *and what the Administrator thereafter was to do.*"[15]   Hence, it is clear that whatever further matching of expenses that the Claims Administrator might be called upon to make should be performed by the Settlement Program, utilizing the existing Documentation.

BP itself represented to the Court that the documents required under the Settlement Agreement would not create a material burden:

> [T]he "*documentation requirements for [Business Economic Loss] claims . . . are reasonable and provide flexibility that is favorable to claimants*" and "*will not unreasonably burden valid claimants.*" Henley Decl. (Ex. 10) ¶ 23; see also Fishkind Decl. (Ex. 4) ¶ 80 ("The documentation requirements needed to support a Claim are tailored to the methodology in the relevant Framework and generally *consist of the types of documents businesses keep in the normal course of their business.*"); Sharp Decl. (Ex. 18) ¶ 12 ("The required business documents are relevant to causation and damages analysis and are the types of *documents that businesses must keep in the ordinary course of business, or are readily prepared and produced from a business' books and records.*"); Richardson Decl. (Ex. 16) ¶ 47 ("Given that companies routinely have this information available, it is reasonable to request it as a part of the Frameworks and should in no way exert an undue burden upon a business.").[16]

The new Proposed Guidelines violate BP's representations to the Class and to the Court.

For Claimants who are now defined by BP as "Long Earning Cycle" Claimants, BP proposes to

---

[15] Deepwater Horizon, 732 F.3d at 338 (emphasis supplied).
[16] BP DEFENDANTS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], pp.31-32; *see also, e.g.,* BP PROPOSED TUTORIAL, p.4 [Doc 11826-1 at 5] ("*Documentation requirements designed to utilize reports and information generally available in the ordinary course of business*"); *see also,* p.15 [Doc 11826 at 16].

require documents which may or may not exist, that _precede_ the Benchmark Period, or were not generated until _after_ 2011. *Contrast with,* Exhibit 4A, ¶4 (requiring monthly and annual P&Ls or alternate source documents "for _the claimed Benchmark Period_, _2010_ and, _if applicable, 2011_" – which 2011 documents, where applicable, are only required for _Causation,_ not Compensation).[17] Under BP's Proposed Guidelines, professional service firms would have to submit billing records to show the hours worked on various matters; not only are Billing Records not included on the list of required documents, but in order to document 2007 revenues, the professional service firm would have to submit 2006 – and perhaps even earlier – records. Similarly, construction companies operating on a completed contract basis would have to produce job records from 2006 and earlier.

## No One Ever Contemplated or Agreed To a Forensic Audit of Each Claim

There is absolutely no basis to ask the Claims Administrator and Program Accountants to audit financial statements and request supporting source documentation, such as daily sales reports or shipping logs. As noted by Judge Clement, the Settlement Agreement clearly focuses on the Benchmark and Compensation Periods "_without any complex analysis of what type of business activities took place within those months_"[18] – and hence certainly without a complex analysis into what type of business activities took place *before* or *after* those periods.

If a claimant has such source documentation, the information is likely already reflected in the General Ledger. The only additional knowledge to be gained by obtaining this documentation would be to check that the Claimant's accounting system was functioning

---

[17] *See* Exhibit 4A, ¶4, p.2 fn.5 ("Claimants included in Sections II or III of the _Causation Requirements_ for Business Economic Loss Claims are required to submit 2011 monthly profit and loss statements or alternate source documents") (emphasis supplied).
[18] Deepwater Horizon, 732 F.3d at 340 (emphasis supplied).

properly, which is an auditing function – far afield from the contemplated process for mechanically, efficiently and objectively evaluating and processing claims.

For the Settlement Program personnel to obtain and review shipping records to recalculate or verify monthly revenue, it would be very time-intensive, and unlikely to produce results that would be materially different. Furthermore, the claimant would have to incur substantial additional accounting costs both to gather and review and explain this documentation on the front end and to confirm what the Settlement Program has calculated on the back end, in the event of any difference.

BP's Proposed Guidelines also fail to reasonably address the situation where a Claimant simply does not have sufficient source documentation to recalculate monthly revenue. For example, BP states that if the Job Schedule documentation is not available, then revenues will be allocated based on monthly expenses. However, there is no mention of what would happen if expenses were also not "properly recorded". The net result would lead to the complete smoothing of annual financial results, which would not account for a business' ebb and flow of activity during the course of a year. (Not to mention specifically and expressly rejected and opposed by BP in September of 2012.) It would merely divide the year into equal months and not reflect "economic reality".

BP's proposal also fails to address the process by which a claimant may prove that expenses are reported in the proper period. BP's entire proposal suggests that expenses are reported in the "wrong" period, which may not be the case. There are plenty of examples where a Claimant simply had a spike in expenses during a given month. BP's proposal does not account for that economic reality.

**BP's Proposed Guidelines Rely on Numerous Subjective Determinations**

BP's Proposed Guidelines inject a tremendous amount of subjectivity into the Claims evaluation process. BP is essentially asking the Program Accountants to decide how a Claimant's specific business transactions should have been handled, based on unknown and undefined (as well as inherently subjective) considerations not spelled out anywhere in the Settlement Agreement.

**BP's "Earnings Cycle" Proposals Are Not Recognized under GAAP**

It would be in violation of FASB guidance to recognize revenue using BP's Proposed Guidelines relating to BP's proposed "Earnings Cycles":

- Effort Based Earnings Cycle – BP proposes that a business falling under this category would recognize revenue before it is realizable and before it has been earned. Where an attorney with a contingent fee arrangement wins a case, but there is a time lag before the fee is actually received, the lump sum fee revenue would still be recognized as revenue all at once, not over the preceding periods.

- Time Based Earnings Cycle – BP proposes that a business would recognize revenue before it has been earned. Until a farmer harvests the crop and delivers the goods (or claims to the goods), that farmer has not earned any revenue.

- Market Presence Earnings Cycle – BP's proposal is completely illogical and absurd. A real estate agent cannot recognize revenue before a sale occurs. Until that point, the agent has no claim to any commission income, and it is thus not recognized. As any agent will tell you, plenty of deals never close.

**BP's Proposed Treatment of Bad Debt is Contrary to GAAP**

The BP Proposed Guidelines regarding Bad Debt are directly contrary to accepted accrual basis accounting rules. Under those well-defined principles, the impairment of receivables shall be recognized when, based on all available information, it is probable that a loss has been incurred based on past events and conditions existing on the date of the financial statements;

losses shall not be recognized before it is probable that they have been incurred.[19]  BP's proposal to revise recorded revenue is contrary to this principle and unworkable.  BP does not explain how the Settlement Program would account for revenue recorded in pre-Benchmark periods. Likewise, it is inappropriate from an accounting standpoint, and will frequently be impossible as a practical matter, (not to mention contrary to the Settlement Agreement), to reduce recorded 2010 revenues that were not "bad" when a Claim was properly submitted in 2012.  Once again, under the guise of developing an Accrual-style framework, BP proposes just the opposite.

**BP Proposes an Additional Inappropriate Matching "Trigger"**

BP tries to impose an additional step to identify a potential "matching issue".  As demonstrated in the examples in BP's Appendix, BP proposes that the Claims Administrator also compare the annual variable profit margin in 2010 to that of the Benchmark Period.  This is in direct violation of the Settlement Agreement.  The first four months of 2010 are pre-spill and should not be considered.  Additionally, some businesses were only damaged for a small period of time, which is why the three-consecutive-month loss window was negotiated and agreed-to by the Parties.

**BP's Proposed Guidelines Are Much More Complex (and Subjective) than BP Suggests**

BP greatly oversimplifies the calculations they are proposing.  BP implies in its supporting Memorandum that these proposed alternatives are so simple that anyone can calculate them.  However, that is often not the case.  In some circumstances, it would require heavy involvement with the Claimant's accountant to provide this information.  For example:

- BP's description of the "Effort Based Earnings Cycle" proposal leads the reader to believe that this is a simple calculation whereby you can take a person's bill rate multiplied by the number of hours to arrive at revenue for the month.  However, it fails to

---

[19] FASB Accounting Standards Codification 310-10-35-8.

take into consideration many likely scenarios, such as discounts to certain clients, any fixed fee arrangements, and any write-offs.  This would require a lot of adjustments and is likely something that only someone very knowledgeable about the financial records could perform.

- BP's description of its "Time Based Earnings Cycle" Proposal leaves major questions unanswered.  First, the proposed alternative does not consider any crops (*e.g.* lumber) that have a growing cycle greater than one year.  Second, it assumes that the period in which revenue is generated can only be the time from which a crop is planted to the time it is harvested.  There are a lot of other activities that take place throughout the year (*e.g.* soil preparation, business development/meetings, review of financial performance for the year).  BP does not address how those activities would be accounted for in its proposal.

### "Non-Revenue Items"

The Non-Revenue Items section is misleading and confusing.  First, it implies that the Settlement Program is currently including non-operating revenue items in the calculation, which is not the case.  Secondly, what is BP's proposal regarding capital assessments in the context of a Homeowners Association?  Is BP saying that capital assessments should be treated as operating income?

### Is A Claimant Potentially Required to "Correct" More Than Once?

In BP's last example, the "corrected" P&Ls have variable profit margins that differ by more than 50%.  Will the Claimant be free from further scrutiny after correcting their P&Ls?  Or will the Claimant be subject to a second matching test?  Where is the subjective line drawn in the process?

### The Davis/KPMG Declaration Is Not in Evidence

BP repeatedly refers to John Davis' "KPMG Declaration" – an unsolicited proffer that is beyond the scope of the Court's Scheduling Order and was stricken from the record.

This 26th day of November, 2013.


Respectfully submitted,


   /s/  Stephen J. Herman                   /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129      **James Parkerson Roy**, La. Bar No.11511
**HERMAN HERMAN & KATZ LLC**           **DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
820 O'Keefe Avenue                556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113        Lafayette, Louisiana 70501
Telephone: (504) 581-4892          Telephone: (337) 233-3033
Fax No. (504) 569-6024             Fax No. (337) 233-2796
E-Mail: sherman@hhklawfirm.com    E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*              *Co-Lead Class Counsel*


## ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400

deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Telefax: (305) 476-7444

E-Mail:  ervin@colson.com

### CERTIFICATE OF SERVICE

We Hereby Certify that the above and foregoing Comments will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 26th day of November, 2013.

/s/ Stephen J. Herman and James Parkerson Roy

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 02, 2013

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

No. 13-30315    In Re: Deepwater Horizon
USDC No. 2:10-MD-2179
USDC No. 2:12-CV-970
USDC No. 2:12-CV-970
USDC No. 2:10-MD-2179
USDC No. 2:13-CV-492

Enclosed is an order entered in this case.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Connie Brown, Deputy Clerk
504-310-7671

Mr. William W. Blevins
Mr. Andrew Baker Bloomer
Mr. Robert C. Mike Brock
Mr. James Augustus Burton
Mr. David B. Byrne Jr.
Mr. Jeffrey Bossert Clark Sr.
Mr. Paul D. Clement
Mr. Timothy A. Duffy
Mr. Miguel Angel Estrada
Mr. S. Gene Fendler
Mr. Patrick Henry Fourroux
Mr. Soren E. Gisleson
Mr. Richard Cartier Godfrey
Mr. Christopher Martin Guidroz
Mr. Don Keller Haycraft
Mr. Stephen Jay Herman
Mr. Mark Holstein
Mr. James M. Hood III
Mr. Thomas George Hungar
Mr. Samuel Issacharoff
Mr. Andrew Tanner Karron
Mr. James Andrew Langan
Mr. Jeffrey Lennard

Mr. Scott Payne Martin
Mr. Corey L. Maze
Mr. Michael Cameron Moore
Mr. Steven Andrew Myers
Mr. Theodore B. Olson
Ms. Gina Marie Palermo
Mr. Robert L Redfearn
Mr. James Parkerson Roy
Mr. Richard C. Stanley
Mrs. Megan Kathleen Terrell
Ms. Jennifer L. Thornton
Ms. Terese Troxclair Wyly

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT
_____

No. 13-30315
_____

IN RE: DEEPWATER HORIZON

-------------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON SECOUR
FISHERIES, INCORPORATED; FORT MORGAN REALTY, INCORPORATED; LFBP
1, L.L.C., doing business as GW Fins; PANAMA CITY BEACH DOLPHIN TOURS &
MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.; WILLIAM SELLERS;
KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; JOHN TESVICH;
MICHAEL GUIDRY, on behalf of themselves and all others similarly situated; HENRY
HUTTO; BRAD FRILOUX; JERRY J. KEE,

          Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP PIPE LINE COMPANY,

          Defendants - Appellants

_____

No. 13-30329
_____

IN RE: DEEPWATER HORIZON

---------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON SECOUR
FISHERIES, INCORPORATED; FORT MORGAN REALTY, INCORPORATED; LFBP
1, L.L.C., doing business as GW Fins; PANAMA CITY BEACH DOLPHIN TOURS &
MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.; WILLIAM SELLERS;

KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; JOHN TESVICH;
MICHAEL GUIDRY, on behalf of themselves and all others similarly situated; HENRY
HUTTO; BRAD FRILOUX; JERRY J. KEE,

        Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

        Defendants - Appellants

--------------------------------------------------------------------

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY

        Plaintiffs - Appellants

v.

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON SECOUR
FISHERIES, INCORPORATED; FORT MORGAN REALTY, INCORPORATED; LFBP
1, L.L.C., doing business as GW Fins; PANAMA CITY BEACH DOLPHIN TOURS &
MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.; WILLIAM SELLERS;
KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; JOHN TESVICH;
MICHAEL GUIDRY, on behalf of themselves and all others similarly situated; HENRY
HUTTO; BRAD FRILOUX; JERRY J. KEE,

        Intervenor Defendants - Appellees

DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT PROGRAM;
PATRICK A. JUNEAU, in his official capacity as Claims Administrator of the Deepwater
Horizon Court Supervised Settlement Program administering the Deepwater Horizon
Economic and Property Damages Settlement Agreement, and in his official capacity as
Trustee of the Deepwater

        Defendants - Appellees

        _____

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans

_____

Before DENNIS, CLEMENT and SOUTHWICK, Circuit Judges.

PER CURIAM:

We have considered the appellant's emergency motion, the appellee's opposition and the district court's orders of October 18, November 15, and November 22, 2013, holding that causation was not an issue for consideration on remand.  The district court's refusal to consider causation, upon presentation of that issue by the appellant, contravenes the direction in the concurring opinion to "allow the parties on remand to give [the causation issue] the attention it deserves."  *In re Deepwater Horizon*, 732 F.3d 326, 346 (5th Cir. 2013).  The panel opinion and concurrence, read together, invited the parties to present arguments with respect to causation, Rule 23, the Rules Enabling Act, and Article III standing on remand.   *See id.*  This court's expressing its views through two different opinions may have created interpretive difficulties on the remand, but the district court erred by not considering the arguments on causation.

IT IS ORDERED that the issue of causation is again remanded for expeditious consideration and resolution in crafting "[a] stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process," including by any other panel of this court that resolves these issues.

IT IS FURTHER ORDERED that appellants' emergency motion to enforce this Court's October 2, 2013 judgment and to enjoin any further payments to the BEL claimants whose injuries are not traceable to the spill, i.e., who did not suffer economic loss or property damage because of the spill, pending final disposition of the related

appeals is carried with this appeal pending further action by the district court in tailoring a stay.

IT IS FURTHER ORDERED that appellants' motion for leave to file their emergency motion in excess of the page limitation is GRANTED.

IT IS FURTHER ORDERED that appellants' motion to file exhibits in support of their emergency motion under seal is GRANTED to the extent that the same exhibits are under seal in the district court.

IT IS FURTHER ORDERED that appellants' motion to consolidate their new notice of appeal filed November 21, 2013, which has been docketed under appeal no. 13-31220, with these appeals is GRANTED.

IT IS FURTHER ORDERED that appellees' motion to file their response to appellants' emergency motion for injunction in excess of the page limitation is GRANTED.

IT IS FURTHER ORDERED that appellants' motion to file their reply to the opposition to the emergency motion for injunction in excess of the page limitation is GRANTED.

JAMES L. DENNIS, Circuit Judge, dissenting:

I respectfully dissent for the reasons patiently and painstakingly assigned by the district court.  In my view, the issue of causation in fact of economic damages "resulting from" or "due to" the oil spill under the Oil Pollution Act of 1991, see 33 U.S.C. § 2702(b)(2), that BP belatedly seeks to raise in this court, clearly did not survive the parties' settlement agreement, the district court's consent decree, or BP's failure to properly raise the issue in its initial proceeding before the district court.  I agree with the majority, however, that its remand order should not be construed to interfere or conflict with the judgment of any other panel of this court that addresses or resolves this issue.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION "J"** |
| | * | |
| **This Document Applies To:** | * | **JUDGE BARBIER** |
| | * | |
| **No. 12-970** | * | **MAG. JUDGE SHUSHAN** |

## ORDER
### [Amending Preliminary Injunction Related to BEL Claims]

On October 18, 2013, following remand in Fifth Circuit case no. 13-30315 (the BEL appeal), this Court issued a preliminary injunction staying the payment of those BEL claims where the matching of expenses and revenues is an issue, but otherwise allowing the processing and payment of other BEL claims that are supported by properly matched accrual-basis accounting records. [Rec. Doc. 11697] On November 5, 2013, this Court amended and clarified the injunction with respect to the settlement program's appeal process. [Rec. Doc. 11790]

On December 2, 2013, the panel of the Fifth Circuit found that this Court "erred by not considering [BP's] arguments on causation." The panel remanded the issue of causation and ordered this Court to "craft[] '[a] stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process,' including by any other panel of this court that resolves these issues."[1]

Accordingly,

---

[1] December 2, 2013, slip op. at p.3

IT IS ORDERED that the Preliminary Injunction issued on October 18, 2013 [Rec. Doc. 11697], and amended on November 5, 2013 [Rec. Doc. 11790], is further amended as follows:

The Claims Administrator may continue to accept BEL claims and process said claims, but shall temporarily suspend the issuance of final determination notices and payments of BEL claims, pending resolution of the BEL issues that are the subject of the pending remand. This suspension shall also apply to claims currently in the claims appeal process.

Except as provided in this Order, the provisions of the Preliminary Injunction issued on October 18, 2013, and amended on November 5, 2013, remain in full force and effect unless and until modified by this Court.

New Orleans, Louisiana, this 5th day of December, 2013.

_____
United States District Judge

2