## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL 2179** |
|     "Deepwater Horizon" in the Gulf | * | |
|     of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| | * | **JUDGE BARBIER** |
| **Applies To:** | * | |
| | * | **MAG. JUDGE SHUSHAN** |
| **All Cases and 12-970** | | |

### ORDER & REASONS
### [Responding to Remand of Business Economic Loss Issues]

Before the Court are certain issues remanded from the Fifth Circuit Court of Appeals regarding Business Economic Loss claims under the Economic and Property Damages Settlement Agreement ("Settlement" or "Settlement Agreement"). The Court first addresses issues concerning the calculation of "Variable Profit" under the compensation framework contained in Exhibit 4C to the Settlement. The Court will then address issues relating to causation under the Settlement.

### I. Calculating "Variable Profit" for Business Economic Loss Claims

On October 2, 2013, in Docket No. 13-30315, a panel of the Fifth Circuit remanded to this Court for taking of additional evidence and reconsideration of what it found to be certain ambiguous provisions of the Settlement Agreement dealing with Business Economic Loss ("BEL") claims. *In re Deepwater Horizon*, 732 F.3d 326, 339 (5th Cir. 2013). The Fifth Circuit also directed this Court to issue a "narrowly tailored" preliminary injunction pending a deliberate reconsideration of the BEL issue. *Id.* at 345-46. In response, on October 3, 2013, this Court issued an interim order staying certain BEL claims, and invited the parties to submit proposals for a formal preliminary injunction order. [Rec. Doc. 11566] On October 18, 2013, the Court issued a preliminary injunction

order enjoining the Claims Administrator from paying or processing certain BEL claims pending resolution of the remand proceedings.  [Rec. Doc. 11697]  The next week, the Court issued a scheduling order regarding the BEL remand.  [Rec. Doc. 11735]  The Court subsequently amended the preliminary injunction order following a *per curiam* order from the Fifth Circuit on December 2, 2013.[1]

The BEL issue was remanded to this Court for the following purposes:  (1) to develop a more complete factual record regarding the meaning of Exhibit 4C and make relevant findings; (2) to have the Claims Administrator assure the Court that he is not converting accrual-basis accounting records into cash-basis accounting for evaluation of claims; and (3) to explain why this Court interpreted the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring matching of cash-basis claims.  *In re Deepwater Horizon*, 732 F.3d at 339.  Part I of the majority opinion authored by Judge Clement, joined by the concurring opinion of Judge Southwick, was concerned that if, based on the manner in which a claimant maintained its financial records, this so-called "matching" of revenues and expenses inherently occurred for certain claimants but not for others, then similarly situated claimants would be treated differently.  Moreover, the result might be that some claimants receive compensation without having sustained an actual loss.

In responding to the remand instructions, the Court has determined that the Claims Administrator is not converting accrual basis accounting records to cash basis records when claims are being evaluated.[2]

Next, in order to develop a more complete factual record regarding the meaning of Exhibit

---

[1]  The December 2, 2013 *per curiam* Order and the issues related to it are discussed in the next section of this Order and Reasons.

[2]  [*See* Declarations of Patrick A. Juneau, Claims Administrator, Rec. Docs. 11566 and 11741]

4C, the Court ordered the parties to submit any additional factual evidence that purports to show whether the parties discussed, prior to the time the Settlement Agreement was executed,[3] the intended meaning of Exhibit 4C (i.e., whether or not Exhibit 4C requires that revenues and expenses be matched for all claims, or only some claims).   Class Counsel filed its submission on November 6, 2013, including a number of declarations and other documentary evidence.  [Rec. Doc. 11804] Counsel for BP filed its submission on November 7, 2013, also including various declarations and other evidence.  [Rec. Doc. 11818]  The parties were also allowed to submit rebuttal evidence [Rec. Docs. 11833, 11836] and then written briefs setting forth their respective arguments on the BEL matching issue [Rec. Docs. 11862, 11863].

After reviewing the supplemental factual evidence, the Court concludes that there were no specific discussions as to the intended meaning of the language in Exhibit 4C prior to the execution of the Settlement Agreement.  However, it is clear the parties did discuss and were in agreement that similarly situated claimants must be treated alike,[4] and that in order to achieve a class settlement agreement, it was necessary that there be a transparent, objective methodology adopted to determine lost profits.   In contrast, there was never any discussion or suggestion that the calculation or determination of compensation for lost profits would be based simply on how financial data was maintained by a claimant, or would depend on whether a claimant kept its accounting records on a cash or accrual basis.

The issue of whether Exhibit 4C required "matching" of expenses and revenues first came

---

[3]  Judge Clement's opinion states: "We have not discovered whether, before the agreement was signed, the parties discussed the divergent effects of cash- and accrual-accounting records on the Exhibit 4C formula."  *In re Deepwater Horizon*, 732 F.3d at 339.

[4]In fact, one of the biggest criticisms of the former Gulf Coast Claims Facility was that it often treated similarly situated claimants differently.

3

to the Court's attention when BP asked the Court to review and reverse the Claims Administrator's January 15, 2013 policy decision interpreting certain portions of the Economic and Property Damage Settlement Agreement. On March 5, 2013, the Court issued an Order affirming the January 15 policy announcement. [Rec. Doc. 8812]

The Fifth Circuit's third directive was for the undersigned to explain why this Court interpreted Exhibit 4C in such a way that leads to matching for accrual-based claims and not for cash-basis claims. Accordingly, the Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it applies to the calculation of "Variable Profit" for Business Economic Loss Claims.

After fully reviewing the additional materials submitted by the parties and the definition of "Variable Profit," the Court reverses its earlier ruling and the Claims Administrator's interpretation as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims Administration. That decision states "the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were **recorded** at the time." (January 15, 2013 memorandum at p. 2)(emphasis added). The Claims Administrator has therefore determined that it is the time of recordation of revenues and expenses that controls the calculation of a loss.

Looking strictly at the settlement agreement methodology to be used in calculating Variable Profit, Exhibit 4C provides:

1. Sum the monthly revenue over the period.

2. Subtract ***corresponding*** variable expenses from revenue over the same period.

[Settlement, Exhibit 4C p.2, Rec. Doc. 6430-10 (emphasis added)] The Court finds that the word

4

"corresponding" must be given a meaning in this context.  Clearly, the word corresponding does not mean merely recorded revenue and expenses as the Claims Administrator has decided.  Rather, "corresponding" variable expenses is interpreted to mean "related" to or "accompanying" variable expenses.  *See Merriam-Webster*, 2013.  Thus, the Court finds that the provision for subtracting corresponding variable expenses requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses are recorded.[5]

In reaching this conclusion, the Court has read the provisions of the disputed section and given meaning to all of its terms.  To do otherwise would be to read out of the provision the word "corresponding."

Accordingly, the matter is remanded to the Claims Administrator,  Patrick A. Juneau, with instructions to adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses.[6]

As a final note, Court points out that the Fifth Circuit's October 2, 2013 opinion affirmed the conclusion that "comparable" in Exhibit 4C means the same calendar months in the Benchmark and Compensation Periods, not months in which similar activities took place.  *In re Deepwater Horizon*, 732 F.3d at 339-40.  The opinion added that requiring matching would likely resolve some of the issues BP claimed resulted from this interpretation of the word.  Accordingly, outside of what

---

[5]Ordinarily, such "matching" will occur naturally when a claimant maintains its accounting records on an accrual basis.  There may, however, be specific instances when accrual accounting records do not accurately match expenses to revenues, and the Court leaves it to the Claims Administrator to make such determinations.

[6]The parties have already provided their respective proposals for matching to the Claims Administrator and the Court. [Rec. Docs. 11885, 11886]  They have also had an opportunity to file comments on each other's proposal. [Rec. Docs. 11898, 11900]

239 of 838

is required to develop the protocol or policy described above, the Claims Administrator need not consider whether the activity that occurred in the Benchmark Period was similar to that which occurred in the Compensation Period (or vice versa).

## II.  Causation Under the Economic Settlement

### A.  Procedural History

On December 21, 2012, this Court issued a final judgment certifying a settlement class and approving the Economic Settlement.  [Rec. Docs.  8138, 8139]  Appeals were taken from that decision and are pending before the Fifth Circuit in docket number 13-30095.  For clarity, this Order and Reasons will refer to that panel as the "Certification Panel."  The Certification Panel is different from the Fifth Circuit panel in docket number 13-30315 that considered the issues above regarding the calculation of Variable Profit in Exhibit 4C.  For clarity, this Order and Reasons will refer to the Fifth Circuit panel in docket number 13-30315 as "the BEL Panel."

As mentioned, following the BEL Panel's remand on October 2, 2013, this Court issued a preliminary injunction order wherein the Court set forth, among other things, its understanding of the scope of remand; *viz.*, that remand was limited to how "variable profit" should be calculated under Exhibit 4C ("Compensation Framework for Business Economic Loss Claims") to the Settlement and that issues concerning the causation requirements under Exhibit 4B ("Causation Requirements for Business Economic Loss Claims") were outside the scope of remand.  [Rec. Doc. 11697]  The Court repeated this understanding in its scheduling order of October 25, 2013.  [Rec. Doc. 11735]  BP subsequently filed a motion to amend the preliminary injunction and scheduling orders, specifically requesting that the Court:

(1) amend the scheduling order on remand to permit BP to submit evidence and

> argument regarding the payment of claims for losses not causally connected to the
> Oil spill and (2) modify the preliminary injunction to include the following
> provision:   "The Claims Administrator and Settlement Program are further
> ENJOINED from paying any business economic loss claim unless they first
> determine that the claimant is a member of the class, including that the claimant is
> within the economic class definition and has suffered loss of income, earnings or
> profits as a result of the Deepwater Horizon Incident."

[Rec. Doc. 11819-1 at 20]  Class Counsel opposed this motion, BP replied, and Class Counsel sur-

replied.  [Rec. Docs. 11826, 11838, 11848]  On November 15, this Court summarily denied BP's

motion to amend.  [Rec. Doc. 11857]  On November 20, BP proffered a response to Class Counsel's

sur-reply.  [Rec. Doc. 11876]  The next day, BP appealed the denial of its motion to amend.  [Rec.

Doc. 11879]  On November 22, this Court amended its November 15 ruling to provide its reasons

for denying BP's motion.

> On December 2, 2013, a divided BEL Panel issued a *per curiam* decision stating:
>
> The district court's refusal to consider causation, upon presentation of that issue by
> the appellant, contravenes the direction in the concurring opinion to "allow the
> parties on remand to give [the causation issue] the attention it deserves."   The panel
> opinion and concurrence, read together, invited the parties to present arguments with
> respect to causation, Rule 23, the Rules Enabling Act, and Article III standing on
> remand. . . .
>
> . . . the issue of causation is again remanded for expeditious consideration and
> resolution in crafting "[a] stay tailored so that those who experienced actual injury
> traceable to loss from the Deepwater Horizon accident continue to receive recovery
> but those who did not do not receive their payments until this case is fully heard and
> decided through the judicial process," including by any other panel of this court that
> resolves these issues."

[BEL Panel 12/2/13 Slip. Op. at 3, Rec. Doc. 11977 (citations omitted, bracketed alterations in

original)]  Judge Dennis dissented, but did note that he "agree[d] with the majority, however, that

its remand order should not be construed to interfere or conflict with the judgment of any other panel

of this court that addresses or resolves this issues."  [*Id.* at 5 (Dennis, J., dissenting)]

7

This Court subsequently ordered the Claims Administrator to suspend the issuance of final determination notices and payments of BEL claims pending resolution of the BEL issues that are the subject of the pending remand. [Rec. Doc. 11928] The Court now addresses the issues regarding causation.[7]

## B. Contractual Provisions, the October 10, 2012 Policy Announcement, and the Parties' Arguments

Section 1 of the Settlement, entitled "Class Definition," states:

. . . If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, unless the person or entity is excluded under Section 2:

. . . [Sections 1.1 and 1.2 provide the geographic descriptions of the class] . . .

1.3.     Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.   The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

. . .

1.3.1.2.        Economic Damage Category. Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the Deepwater Horizon Incident, subject to certain Exclusions. (Exhibits 16-19)

[Rec. Doc. 6430-1 (emphasis omitted)] Section 2 then excludes certain individuals and entities from the class.[8] Furthermore, Section 3 lists claims that are not recognized under the Settlement and are

---

[7] Class Counsel sought and received leave to file a supplemental submission [Rec. Doc. 12017], which the Court has considered along with the previous filings on the causation issue. [11819, 11826, 11838, 11848, 11876]

[8] For example, commercial banks, casinos, insurance entities, the oil and gas industry, and defense contractors are excluded under Section 2.

8

reserved to class members.[9]

Exhibit 4B, referenced above in Section 1.3.1, is entitled "Causation Requirements for Businesses Economic Loss Claims." A footnote to Exhibit 4B reads:

> This Causation Requirements for Business Economic Loss Claims does not apply to (i) Start-up Businesses; (ii) Failed Businesses; (iii) Entities, Individuals or Claims not included within the Economic Class definition; and (iv) Claims covered under the Seafood Program.

[Rec. Doc. 6430-9 at 1 n.1] Exhibit 4B is divided into three parts: (I) "Business Claimants for Which There is No Causation Requirement," (II) "Causation Requirement for Zone B and Zone C," and (III) "Causation Requirements for Zone D." Part I lists the entities that, because of their geographic proximity to the Gulf and/or the type of business they conduct, "are not required to provide any evidence of causation."[10] Part II states, "If you are not entitled to a presumption as set forth in (I) above and you are located in Zone B or Zone C then you must satisfy the requirements of one of the following sections A-E below." The five requirements are (A) "V-Shaped Revenue Pattern," (B) "Modified V-Shaped Revenue Pattern," (C) Decline-Only Revenue Pattern" (D) "Proof of Spill-Related Cancellations," (E) "Causation Proxy Claimant." Part III applies to Zone D claimants and requires them to meet one of six tests, five of which are similar to the tests in Part II.

On October 10, 2012, after receiving input from BP and Class Counsel, the Claims Administrator issued the following policy announcement:

**2. No Analysis of Alternative Causes of Economic Losses.**
The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out

---

[9] For example, bodily injury claims, moratoria losses, and claims relating to menhaden (or "pogy") fishing are reserved under Section 3.

[10] For example, (I)(4) states, "If you are in Zone A or Zone B, and you meet the "Tourism Definition," you are not required to provide any evidence of causation."

9

specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. ***The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement.*** The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, ***without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement.*** Further, the Claims Administrator ***will not evaluate potential alternative causes*** of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

[Rec. Doc. 8963-71 (emphasis added)]  In other words, with respect to business economic loss claims,[11] so long as a claim satisfied one of the tests set forth in Exhibit 4B to the Settlement (and assuming the claimant met the geographic requirements and the claimant or claim was not excluded under Section 2 or Section 3), the Claims Administrator would deem the claim eligible for payment without any further inquiry into whether or not the loss was factually caused by the oil spill. BP never appealed from or otherwise sought this Court's review of the October 10, 2012 policy announcement.  This is in contrast to the Claims Administrator's January 15, 2013 policy announcement regarding the calculation of variable profit for BEL claims under Exhibit 4*C*, which, as detailed in the previous discussion, BP promptly appealed to this Court and then to the Fifth Circuit BEL panel.  Indeed, as reflected in the policy announcement and as discussed below and in the Appendix, BP advanced the very position adopted by the Claims Administrator in the October

---

[11] The Claims Administrator's policy statement concerns individual economic loss claims, as well as business economic loss claims.  However, because the parties focus their briefing on business claims, the Court will similarly focus its attention on business claims.

12, 2012 policy announcement.

Nevertheless, BP now asserts that "the [Claims] Administrator has adopted a policy or practice that rewrites the class definition and authorizes the payment of claims that lack a causal nexus to the Oil Spill." [Rec. Doc. 11819-1 at 4 (numbers omitted)]   BP argues that Section 1.3.1.2 of the class definition  (quoted above) requires that a loss be "as a result of" the oil spill, and establishes a factual causation requirement for all claims that is separate from and independent of any criteria found in Exhibit 4B.  According to BP, "the Administrator must determine first whether a claimant is a member of the class"—i.e., the Claims Administrator must determine, among other things, whether a claimed loss is due to the oil spill—"before considering the damage categories and applying Exhibit 4B." [*Id.* at 17]   BP cites the footnote to Exhibit 4B (quoted above) as supporting its position that Exhibit 4B and the class definition are separate.  BP concludes that when the Claims Administrator is presented with evidence that the claimed loss is not traceable to the oil spill, Exhibit 4B does not permit him to ignore that evidence.  [*Id.* at 19]

Class Counsel counters that BP should be judicially estopped from making this argument, because it previously and repeatedly took a contradictory position that this Court accepted when it certified the settlement class and approved the Settlement Agreement.  Class Counsel also asserts that the language of the Settlement does not support BP's interpretation; instead, the Settlement reflects the parties' agreement that the objective criteria in Exhibit 4B would determine whether a loss was "as a result of" the oil spill.  Class Counsel contends that Section 1.3.1.2, relied upon by BP, is prefaced and modified by Sections 1.3 and 1.3.1 (quoted above).  These Sections state that Section 1.3.1.2 is merely a "summar[y]" of the Economic Damage Category, which is "fully

11

described in the attached Exhibits 1A-15."[12]  Thus, Class Counsel interprets the Settlement as incorporating Exhibit 4B into the class definition.

As to Class Counsel's judicial estoppel argument, BP replies that its prior statements concerned only Exhibit 4B, not class membership, and therefore are not inconsistent.  Arguing in the alternative, BP contends that Class Counsel's interpretation of the Settlement creates issues respecting Article III standing, Rule 23, and the Rules Enabling Act, as outlined in Part II of the BEL Panel's October 2, 2013 decision.[13]  BP argues that such issues may not be waived; therefore, judicial estoppel cannot be used to avoid the defects that exist under Class Counsel's interpretation. Class Counsel responds that there are no Article III, Rule 23, or Rules Enabling Act defects, but further adds that if such defects are present, they cannot be used to re-write the terms of a contractual agreement.

## C.    Judicial Estoppel

The Court agrees that judicial estoppel bars BP from advancing its current interpretation of the Settlement Agreeement.  "Judicial estoppel is an equitable doctrine that prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same

---

[12]  Class Counsel finds further support for their interpretation in Sections 5.3.2.1 and 5.3.2.3:

5.3.2.1.  Overview. The frameworks setting forth the documentation requirements governing Business Economic Loss Claims, and the standards for evaluating such Claims and determining compensation for such Claims, are set forth in Exhibits 4A-7 to the Agreement.
. . .
5.3.2.3.  Causation Requirements For Business Economic Loss Claims Generally.  Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon Incident. ***The causation requirements for such Claims are set forth in Exhibit 4B.***

[Rec. Doc. 6430-1 (emphasis omitted and supplied)]

[13]  Although BP mentions the Rules Enabling Act in its motion to amend, it omits reference to the Rules Enabling Act in its reply brief.  It is not clear if BP has abandoned entirely its argument under the Rules Enabling Act, or merely concedes that it can be judicially estopped from asserting an argument under Rules Enabling Act.

12

or some earlier proceeding." *In re Paige*, 610 F.3d 865, 876 (5th Cir. 2010) (quotations and citations omitted). The Fifth Circuit recognizes three particular requirements for judicial estoppel: (1) the current position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the change in position must not have been inadvertent. *Id.* Whether to invoke judicial estoppel is left to the discretion of the court. *In re Flugence*, No. 13-30073, 2013 WL 6244758 at *2 (5th Cir. Nov. 22, 2013).

      1.    <u>BP's Prior Statements to the Court</u>

On August 13, 2013, BP filed a motion for final approval of the Settlement. BP's supporting memorandum stated:

> Businesses in certain geographic zones and industries, such as seafood processing, will not be required to provide documentation demonstrating causation, while businesses in other zones will be required to submit varying degrees of evidence of causation. . . .

> Many businesses will benefit from causation presumptions. *See* Sharp Decl. (Ex. 18) ¶ 14 ("Having causation presumed for many business claimants[] benefits those claimants because they are not required to provide any evidence of causation."). As Dr. Fishkind explains, the zones and industry definitions governing causation presumptions are economically reasonable, as they benefit the claimants most likely to have been affected by the spill. . . . Conversely, requiring proof of causation in other industries and geographic zones is reasonable because there is a less direct connection between these areas and the spill. . . .

> For those claimants required to prove causation, however, the tests are reasonable. *See* Landry Decl. (Ex. 13) ¶ 38 (describing the causation tests as "consistent with . . . economic reality"). Indeed, in many ways the causation principles are remarkably favorable to claimants. *See, e.g.*, Sharp Decl. (Ex. 18) ¶ 17 ("*[O]nce a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period <u>are presumed to be caused by the spill, with no analysis</u> required to determine whether the declines might have been due, at least in part, to other causes*.") In contrast, in litigation, a "detailed analysis of the reasons for the revenue and/or variable profit declines is undertaken because it is part of the plaintiff's burden of proof."

13

[Rec. Doc. 7114-1 at 31-33 (emphasis added)]  In further support of its motion for final approval,

BP filed multiple declarations by experts it had retained.  One of BP's experts, James Henley,

declared:

> The causation requirements of the BEL Framework appear more than reasonable.  For businesses in Zone A or in certain industries in Zones B and C or Primary Seafood Processors in Zone D, *there is a presumption of causation, which will inevitably include businesses that were not economically or financially affected by the DWH Spill*.  This alone is an unusually generous feature and atypical, in my experience, in economic loss cases.  For those businesses that do not qualify for a presumption of causation, there are *multiple tests* under which they can qualify and *establish causation*.  This variety of test options gives claimants *multiple ways to establish causation,* which appears to be more than fair.
>
> Moreover, the causation tests *reflect reasonable expectations about the economic harm* the DWH Spill could have caused to a business, and therefore *are appropriate tests for the purpose of establishing causation*.  The "V tests" require that a business demonstrate a loss after the DWH Spill and a subsequent recovery.  Based on my experience analyzing economic loss litigation cases, it is reasonable to expect a recovery at some point after a demonstrated loss where the circumstances claimed to have caused the loss have changed.  The tests reflect this reasonable expectation.  Moreover, the tests contain exceptions where it is reasonable to expect that other factors may have prevented a recovery, such as entrant of a new competitor or construction preventing customer access.

[Rec. Doc. 7114-11 at 18-19 (emphasis added)]  Dr. Henry Fishkind, another of BP's experts,

declared in support of the motion for final approval that:

> For many Claimants (including all industry types in Zone A, Primary Seafood Industry participants in all Zones, Secondary Seafood Industry and Charter Fishing participants in Zone A, B, and C, and Tourism participants in Zone B[)] economic losses incurred post-Spill in 2010 *are presumed to be due to the DWH Spill* and the Claimant need not provide evidence to establish causation.  This approach is consistent with economic principles, which would predict that the DWH Spill would most directly affect industries tied to the Gulf.  The available data reflect some decline in performance in these industries in the months after the DWH Spill.  Granting a presumption that losses experienced by such Claimants are spill-related benefits Claimants by simplifying the Settlement claims process to avoid costs associated with determining causation for Claimants in areas and industries most likely to have been directly affected by the DWH Spill.

14

> Claimants in industries and geographic areas that do not receive a presumption must establish causation by satisfying defined thresholds for establishing that their losses were spill-related, with different revenue threshold for Claimants in Zones B and C as compared to Zone D.
>
> [A]reas more distant from the coast and Claimants in industries other than Tourism, Charter Fishing, and Primary and Secondary Seafood fac[e] higher causation thresholds.
>
> The Settlement Agreement establishes a variety of **standardized mechanisms** that can be used by Claimants that do not receive a presumption **to establish that their losses are due to the DWH Spill**. These mechanisms are straightforward and transparent, facilitating the review of a claim as well as a Claimant's decision about whether to participate in the Settlement or to opt out and continue to the claim through litigation.
>
> Claimants can **establish that losses were spill-related** by showing that their revenue (i) fell at the time of the DWH Spill and (ii) later recovered after the DWH Spill ended and clean up efforts were (largely) complete [i.e., the "V-Shaped Revenue Pattern" test in Exhibit 4B]. These causation criteria are reasonable and economically appropriate, because revenue or earnings that fell due to the DWH Spill would be expected to rebound after the DWH Spill ended. Losses that continued after the DWH Spill ended are likely to be due to factors other than the DWH Spill. . . .

[Rec. Doc. 7114-5 at 21-22 (footnote omitted, emphasis added)]  During the Final Fairness Hearing before this Court on November 8, 2013, Richard Godfrey, the lead attorney and negotiator for BP, made the following comments regarding the causation requirements while advocating for the approval of the settlement:

> We have presumed causation in Zone A. We've presumed causation. **It's irrebuttable**. You know as well as I do, Your Honor, how many people come in and think they have got a claim damage for economic loss; **but, when the facts come out, they had a bad year because they lost their key manager**, **they had a bad year because the street was being repaired in front of them**, whatever reason.
>
> We're presuming causation for whole sections of the settlement class depending on where you reside and the nature of your business. Our experts say, the joint experts, it exceeds the *Reed* factor.

[Rec. Doc. 7892 at 68 (emphasis added)]  Following the Fairness Hearing, BP and Class Counsel

15

submitted *joint* proposed findings in support of final approval that stated:

> The Settlement reasonably requires that some business claimants demonstrate that their business was affected by the spill. In many other cases causation is presumed, which benefits class members. Where class members are required to prove causation, there are multiple reasonable options for doing so. *See* Settlement Agreement Ex. 4B . . . .
>
> . . . ***Where causation is presumed, the causation presumption applies to all losses established pursuant to the compensation methodology*** . . . .
>
> . . .
>
> Where causation is not presumed, the causation tests are reasonable and flexible; they use standardized and transparent approaches. The causation tests reflect rational expectations about the economic harm that the spill could have caused businesses.  The first option is the V-shaped revenue test, which requires proof of a downturn after the spill followed by a later upturn.  Claimants with a less severe V ("Modified V-Shaped Revenue Pattern") or whose business did not experience an upturn in 2011 ("Decline-Only Revenue Pattern") may still recover provided that they can provide certain reasonable additional information. . . .
>
> . . .
>
> ***Once the causation tests are satisfied, all revenue and variable profit declines during the Compensation Period are*** <u>***presumed***</u> ***to be caused entirely by the spill, with*** <u>***no***</u> ***analysis of whether such declines were also traceable to other factors unrelated to the spill.***

[Rec. Doc. 7945 at 36-39 (emphasis added)]  On December 12, 2012, the parties appeared before the Court and confirmed their agreement with the Claims Administrator's Policy Announcement on October 2, 2012 (quoted above).[14]

BP also has made similar statements to the Court-appointed and Court-supervised Claims Administrator and to the United States Court of Appeals for the Fifth Circuit.  These statements are

---

[14] This confirmation was memorialized in an e-mail from the undersigned to the parties on December 12, 2012 that stated, "Counsel for BP and the PSC agree with the Claims Administrator's objective analysis of causation with respect to his evaluation of economic damages Claims, as previously set forth by Mr. Juneau in paragraph 2 of his October 10, 2012 policy announcement." [Rec. Doc. 8963-75]

250 of 838

reproduced in Appendix A to this opinion.

2.     <u>Judicial Estoppel Analysis</u>

The above statements reflect BP's previous position in this litigation that, for purposes of the Economic Settlement, whether a loss occurred "as a result of" the Deepwater Horizon Incident is determined exclusively by Exhibit 4B. BP's current position is not only "clearly inconsistent" with its previous position, it directly contradicts what it has told this Court regarding causation. The November 8, 2012 Fairness Hearing, quoted above, is an excellent example. There BP's counsel explained that Exhibit 4B provides businesses in Zone A with an "irrebuttable" presumption that any economic loss during a certain post-spill time period were due to the oil spill, even if the actual cause of the loss was not spill related—such as the departure of a key manager or ongoing street repairs in front of the business. Under BP's current interpretation, however, the hypothetical Zone A business that lost its key manager would not be a class member and thus not entitled to compensation under the Settlement. If that is the case, then the causation presumption clearly was not "irrebuttable," as BP's counsel previously told the Court.[15] Furthermore, if the Claims Administrator must determine whether each claim is causally connected to the oil spill, as BP now claims, then one wonders whether a causation presumption serves any purpose at all. BP's current interpretation arguably makes the presumption—and perhaps the other causation tests in Exhibit 4B as well—superfluous.

---

[15] BP's current interpretation similarly contradicts its previous position respecting businesses that do not receive a causation presumption and instead must satisfy one of Exhibit 4B's tests. For example, BP's current position cannot be squared with its previous statement: "[O]nce a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period are ***presumed*** to be caused by the spill, ***with no analysis required to determine whether the declines might have been due, at least in part, to other causes***." [Rec. Doc. 7114-1 at 33 (emphasis added, quotations omitted); *see also* Letter of 9/28/12 from BP Counsel Mark Holstein to Claims Administrator, Rec. Doc. 8963-67 at 3 (reproduced in Appendix)]

Indeed, BP not only took the position that causation under the Settlement was determined exclusively through Exhibit 4B, it promoted Exhibit 4B as providing a benefit to claimants in that it was "more than reasonable," "more than fair," "objective," "transparent," "standardized," "economically appropriate," "consistent with . . . economic reality," and an "efficient" method of establishing causation.  Such attributes, BP claimed, were part of the reason the Settlement deserved Court approval under Rule 23.  This Court accepted BP's previous position when it certified the Settlement Class and approved the Settlement on December 21, 2012.[16]  [Rec. Docs. 8138, 8139] The Court further finds that BP's change of position was not inadvertent.

Accordingly, the Court holds that BP is judicially estopped from arguing (1) that Exhibit 4B is not the exclusive means of determining whether a business economic loss is "as a result of" of the Deepwater Horizon Incident for purposes of the Settlement, including the Class Definition; (2) or that the Settlement contains, implicitly or explicitly, a causation requirement other than Exhibit 4B; (3) or that satisfying Exhibit 4B does not establish under the Settlement an irrebuttable presumption that a business' economic loss was "as a result of" the Deepwater Horizon Incident; (4) or making similar arguments.  As a corollary to this ruling, the Court finds that whether a business economic loss is "as a result of" the Deepwater Horizon Incident for purposes of the Settlement is determined exclusively and conclusively by Exhibit 4B.

---

[16]  The Court also accepted BP's position on December 12, 2012, as noted above.

18

## D. Article III, Rule 23, and the Rules Enabling Act ("the Article III Issues")

BP argues that paying claims that lack a factual causal nexus to the oil spill violates the standing requirement in Article III of the Constitution, as well as certain requirements under Federal Rule 23 and the Rules Enabling Act.[17]  BP further asserts that "[b]ecause standing is a constitutional and Rule 23 requirement, it cannot be waived.  The doctrine of judicial estoppel is just a variant of the doctrine of wavier, and is also inapplicable."  [Rec. Doc. 11868 at 2]

BP has raised Article III standing, Rule 23, and the Rules Enabling Act (sometimes collectively referred to as the "Article III Issues") as a means of supporting its new interpretation of the Settlement.  BP urged that the Claims Administrator's and Class Counsel's interpretation of the Settlement created issues with Article III, etc., which would be avoided under its interpretation. [*See, e.g.*, Rec. Doc. 11819-1 at 19]  As explained above and in the Appendix, however, until recently BP interpreted the Settlement in the same manner as the Claims Administrator and Class Counsel, and BP is judicially estopped from advancing a new interpretation of the Settlement. Consequently, it would appear that BP's position is that the Settlement is defective and that these defects cannot be waived.[18]

### 1. This Court's Jurisdiction to Consider the "Article III Issues"

Before engaging the Article III Issues, the Court pauses to note that it appears to lack the authority to consider them, notwithstanding the BEL Panel's invitation to the parties "to present arguments with respect to causation, Rule 23, the Rules Enabling Act, and Article III standing on

---

[17]  As noted above, BP may have abandoned its argument regarding the Rules Enabling Act.  *Supra* note 13.

[18]  Such a position would appear to conflict with BP's promises "to take all actions necessary to obtain final approval of this Agreement and entry of a Final Order and Judgment" and "to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack." [Settlement §§ 16.1, 17.1, Rec. Doc. 6430-1]

19

remand." [BEL Panel 12/2/13 Slip Op. at 3, Rec. Doc. 11977]  It is well established that a federal

district court and a federal appellate court should not attempt to assert jurisdiction over a case

simultaneously.  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  "The filing

of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court

of appeals and divests the district court of its control over those aspects of the case involved in the

appeal."  *Id.* (citations omitted); *accord Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298, 299

(5th Cir. 1984).  "[A]ctions taken by the district court in violation of this principle are null and

void."  16A Charles Alan Wright, et al., *Federal Practice and Procedure* § 3949.1 at 51-53 (4th ed.

2008) (footnote omitted).   "An appeal from a judgment that determines the whole action

accomplishes the broadest ouster of district court jurisdiction."  *Id.* at 63 (citing *Nicol*, 743 F.2d

299).

As mentioned above, this Court entered a final judgment on December 21, 2012 that certified

the Settlement Class and approved the Settlement.  Appeals from that judgment are pending before

the Certification Panel, not the BEL Panel.  Indeed, arguments regarding the Article III Issues were

made to the Certification Panel.  Consequently, this Court does not grasp how it may consider issues

that are before the Certification Panel.[19]  Any ruling by this Court on the Article III Issues would

appear to be null.

This view is consistent with Judge Dennis' statement on December 2, 2013:  "I agree with

---

[19]  *See also In re Deepwater Horizon*, 732 F.3d 326, 348, 358, 360 (5th Cir. Oct. 2, 2013) (Dennis, J.,
dissenting) (explaining that the only issues before the BEL panel concern the interpretation of the Settlement's
***compensation*** framework in Exhibit 4***C***; issues concerning class certification and acceptance of the Settlement are before
the Certification Panel); *id.* at 347-48 (Southwick, J., concurring) ("The question of loss measurement [under Exhibit
4***C***] is clearly before us. . . .  Part II of [Judge Clement's] opinion elaborates on a causation issue under Rule 23 . . . .
[C]ausation was addressed by the parties in Exhibit 4B . . . . No one on appeal is challenging Exhibit 4B . . . . Because
the Rule 23 problem BP raises is confined to the measurement of loss [ i.e., Exhibit 4***C***] and not to questions of standing
of claimants who cannot show their losses were caused by BP's actions, I would not at this time suggest there is a
fundamental Rule 23 defect . . . .").

the majority, however, that its remand order should not be construed to interfere or conflict with the judgment of any other panel of this court that addresses or resolves this issue." [BEL Panel 12/2/13 Slip Op. at 5 (Dennis, J., dissenting), Rec. Doc. 11977]  The BEL Panel majority appears to have expressed a similar notion when it stated, "[T]he issue of causation is again remanded for expeditious consideration and resolution in crafting '[a] stay . . . until this case is fully heard and decided through the judicial process,' **including by any other panel of this court that resolves these issues.**" [*Id.* at 3(emphasis added)]

Nevertheless, because it is not clear to this Court if the BEL Panel intended this Court to address the Article III Issues, and considering that this Court previously misinterpreted the BEL Panel's remand instructions, it will address the Article III Issues.[20]  Presumably, one Fifth Circuit panel or another will determine whether this Court had jurisdiction to do so.  The Court repeats, however, that it appears to lack jurisdiction over these issues.

2.     Regarding Part II of the BEL Panel's Decision and the "Article III Issues"

Turning, reluctantly, to the Article III Issues, one preliminary point should be made.  Part II of the October 2, 2013 BEL Panel opinion,[21] which addressed the Article III Issues (and upon which BP relies heavily), is not binding.  Part II was supported only by the authoring judge, Judge Clement.  Judge Southwick did not join Part II and Judge Dennis expressly dissented from it.[22]

---

[20]  The Court notes the confusion that has resulted from the unusual posture of two different appellate panels simultaneously considering overlapping issues.

[21]  *See In re Deepwater Horizon*, 732 F.3d at 340-44.

[22]  *See id* at 346 (Southwick, J., concurring) ("I do not join the broader Rule 23 analysis that appears in Part II); *id.* at 358 (Dennis, J., dissenting) ("Like Judge Southwick, I do not join [Part II] of the opinion and I respectfully dissent from it as well.").  While Judge Southwick did comment that Judge Clement's discussion was "logical," this was said in connection with the Exhibit 4C/variable profit calculation analysis, not Exhibit 4B.  *See id.* at 346 (Southwick, J., concurring) ("The discussion [in Part II] is logical in finding that constitutional infirmities would exist if certain corrections are not made to the interpretation of **Exhibit 4C**. There is, though, no briefing on the constitutional issues

21

Moving past this preliminary point, Part II of the BEL opinion reasons that a claimant who has suffered a loss, but has "no colorable claim" that the loss was caused by the spill, lacks constitutional standing "because it cannot allege a causal connection between its loss and the spill." *Id.* at 340 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).[23][24]   Such claims are outside federal subject matter jurisdiction, because they do not present a "case" or "controversy" under Article III.   According to Part II, a court that certifies a settlement class and approves a settlement that includes a "non-colorable" claim violates Article III and therefore acts *ultra vires*. *Id.* at 341-42.   Part II similarly concludes that allowing "non-colorable" claims to recover from the settlement fund creates a substantive right where none previously existed, and consequently violates the Rules Enabling Act, 28 U.S.C. § 2072(b) (stating the Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." ).

Part II relies heavily on the dissenting opinion (composed of two judges) from *Sullivan v.*

---

that are addressed.  I am concerned that those observations imply—though they may well not be intended to go that far—an invalidity to the Settlement Agreement's causation framework, which no one challenges.  I would not make the pronouncements that appear in Part II." (emphasis added)).

[23] Part II also discussed claimants who suffered no loss at all.  In light of this Court's resolution of the Variable Profit/Exhibit 4C issue, the Court assumes this is no longer an issue.

[24] It is worth mentioning here that neither BP nor Judge Southwick (when discussing Exhibit 4C) appear to agree that every single class member must have a "colorable" claim.  For example, BP states in its motion to amend that:

> If the class definition is interpreted to sweep within it *significant numbers* of businesses that did not suffer any loss resulting from the Oil Spill . . . the Settlement cannot survive review under Rule 23.

and

> The Article III and Rule 23 problems that result from the Administrator's actions are not that the agreed-to and approved class definition inadvertently results in *some small number of claims* who lack standing receiving awards.  The problem is that . . . the Administrator has opened membership in the class to an unlimited number of persons and businesses . . . .

[Rec. Doc. 11819-1 at 7, 14 (emphasis added)]  Judge Southwick noted, "[I]f the methods of computing losses do not, at least for a large number of claimants, determine in any reasonable fashion whether a financial loss actually occurred, there are significant Rule 23 problems in the incoherence of the calculation method."  *In re Deepwater Horizon*, 732 F.3d at 347 (Southwick, J., concurring).

*DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2010) (en banc).  However, the dissent's view was rejected by the seven-judge majority of the en banc *Sullivan* court.  The *Sullivan* majority explained that "[a]n analysis into the legal viability of asserted claims is properly considered through a motion to dismiss under Rule 12(b) or summary judgment pursuant to Rule 56, not as part of a Rule 23 certification process."  *Id.* at 305.[25]  The *Sullivan* majority continued:

> Were we to require district courts to ensure that . . . each class member has a "colorable legal claim," district courts would be obligated at the class certification stage to, *sua sponte*, conduct a thorough Rule 12(b)(6) analysis of every statutory and common-law claim to ensure that each plaintiff—including absent class members—possesses a valid cause of action or a "colorable claim" under the applicable federal or state substantive law.  Such an inquiry into the merits goes beyond the requirements of Rule 23, for Rule 23 does not require a district court to determine whether class members individually have a colorable claim—one that [in the words of the dissent] "appear[s] to be true, valid, or right."

*Id.* at 308.

Furthermore, imposing any causation requirement outside those found in Exhibit 4B frustrates the parties' attempt to settle, as opposed to litigate (repeatedly; perhaps thousands of times), the issue of causation.  This point is particularly important when considered with the fact that the Oil Pollution Act of 1990 ("OPA") , 33 U.S.C. § 2701, et seq., broadened the scope of persons able to recover economic losses resulting from an oil spill beyond the "physical injury" bright line that exists under general maritime law, yet the limits and contours of OPA causation are largely untested in the jurisprudence.  [*See* Order of August 26, 2011, 808 F. Supp. 2d 943, Rec. Doc. 3830 at 19-21, 32-33 (noting that OPA causation may lie somewhere between traditional "proximate cause" and simple "but for" causation)].  The parties negotiated in light of the uncertainty in the law,

---

[25] *See also id.* ("Put another way, a district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied."

23

and the Settlement represents their compromise on this matter. As recounted earlier, Exhibit 4B established objective and "economically appropriate" criteria for determining causation that could be efficiently administered. Yet, Part II apparently would require either this Court or the Claims Administrator to assess the viability of *each* claim—imposing an new, undefined, and subjective requirement as to whether each claim is "colorable." As the *Sullivan* majority recognized, "Even were a district court to properly ascertain the applicable law after conducting the choice-of-law inquiry, it would likely encounter unsettled legal questions, further undermining its ability to assess the viability of some class members' claims and increasing the costs of administration." *Sullivan*, 667 F.3d at 309.

Moreover, the delays that would result from having to engage in a claim-by-claim analysis of whether each claim is "fairly traceable" to the oil spill—whether done by the parties in attempting to create a class definition that contains only "colorable" claims, by the Court in attempting to evaluate the Class and the Settlement as part of the certification/approval process, or by the Claims Administrator in administering the Settlement—are the very delays that the Settlement, indeed all class settlements, are intended to avoid. *See Amchem*, 521 U.S. 591, 620 (1997) ("Settlement is relevant to a class certification . . . . Confronted with a request for settlement-only class certification, a district court deed not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." (citation omitted)). Again, the frameworks in Exhibit 4B provide an efficient and "economically appropriate" method of determining causation. Requiring each claim to not only meet Exhibit 4B but also show factual causation, even if only "colorable," would bring the claims administration process to a virtual standstill, depriving the Class of the bargained-for efficiency it was promised. The *Sullivan* majority expressed similar concerns

24

and added that such a requirement would likely prevent certification of any settlement class:

> [W]ere we to mandate that a class include only those alleging "colorable" claims, we would effectively rule out the ability of a defendant to achieve "global peace" by obtaining releases from all those who might wish to assert claims, meritorious or not. ***We need not take judicial notice of the fact that plaintiffs with non-viable claims do nonetheless commence legal action***. . . . The parties entered a mutual agreement and sought certification of a settlement class with the aim of avoiding countless individual suits in diverse jurisdictions.

> . . .

> Our dissenting colleagues disparage the concept of "global peace" as if it were an impermissible objective in using the class action device.  From a practical standpoint, however, achieving global peace is a valid, and valuable, incentive to class action settlements.   Settlements avoid future litigation with all potential plaintiffs—meritorious or not.  If the dissent's position were adopted, there would be no settlements, collusive or otherwise.  ***First of all, litigating whether a claim is "colorable" and defending who is in and who is not in the class would be an endless process, preventing the parties from seriously getting to, and engaging in, settlement negotiations.  And, as discussed above, the "individualized" nature of the task would doom the class certification process from the outset.***  Second, since releases would necessarily be limited to the qualifying class members, those ultimately excluded would no doubt go right back into court to continue to assert their claims.  No defendants would consider settling under this framework, for they could never be assured that they have extinguished every claim from every potential plaintiff.

> As applied here, the objectors' approach would subject De Beers to numerous individual suits brought by claimants excluded from the class, undermining the strong presumption in favor of voluntary settlement agreements, which we have explicitly recognized with approval.  ***This presumption is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.***  By contrast, requiring a class to assert uniform or identical questions of law or fact and to preemptively demonstrate their legal viability would seriously undermine the possibility for settling any large, multi district class action.

*Id.* at 310-11 (quotations and citations omitted; emphasis added);[26]  *see also id.* at 337 (Scirica, J.,

---

[26] This quote by the *Sullivan* majority also responds the Part II's statement, "There is no need to secure peace with whom one is not war.  Total lack of consideration for non-recoverable claims would call into question the validity of the Settlement Agreement."  *In re Deepwater Horizon*, 732 F.3d at 344.

concurring) (" Consequently, individual 12(b)(6) inquiries for settlement class certification could present serious difficulties in administration and greatly increase costs and fees, and may deplete rather than increase the recovery of even successful plaintiffs.").

On a related note, it is questionable whether even the dissent in *Sullivan* would agree with what Part II proposes. *Sullivan* concerned a nation-wide antitrust settlement class that was composed of two subclasses: those who had purchased diamonds directly from the defendant and those who had indirectly purchased the defendant's diamonds. However, many States' laws did not recognize the indirect purchasers' cause of action. As noted above, the *Sullivan* majority criticized an approach that would require the examination of each claim in the class for viability. The dissent responded that its approach would require no such analysis:

> I advocate a procedure essentially identical to the one that occurred here: A district court is approached with a class complaint requesting relief under a variety of state statutes. ***Because of differences among those statutes, it is clear that some class members are entirely without a cognizable claim***. Objectors bring those issues to the district court's attention. Because such variances ... are so significant as to defeat commonality and predominance even in a settlement class certification, the district court should deny certification.

*Id.* at 346 (Jordan, J., dissenting) (citation and quotations omitted; emphasis added). The dissent then stated, "Note that the court in this hypothetical has neither performed a Rule 12(b)(6) inquiry, ***nor conducted an individualized assessment of claims***." *Id.* (Jordan, J., dissenting). The dissent further acknowledges that a court, when considering whether to certify a class, need not "engage in 'an intensive cataloguing of each class member's claim." *Id.* (Jordan, J., dissenting).

In the eyes of the *Sullivan* dissent then, claims could be easily segregated into "colorable" and "non-colorable" based on the law of the State that applied to each. Unlike the situation in *Sullivan* (as viewed by the dissent), this case does not involve one group of claimants asserting a

claim under State X's law, which recognizes the claim, and another group asserting a nearly identical claim under State Y's law, which does not recognize the claim. Here, to determine which claims are "not colorable" would require "an individualized assessment of claims" and "an intensive cataloguing of each class member's claim"—something that even the dissenting opinion in *Sullivan* did not support.

Turning to the argument that permitting a non-colorable claim to recover under the Settlement would violate the Rules Enabling Act by creating a substantive right where none existed, there is no such violation in this instance because this is a settlement. The point of a settlement is to avoid having a court determine the merits of an issue. As explained by the *Sullivan* majority:

> [A]pproval of a settlement under Rule 23 merely recognizes the parties' voluntary compromise of their rights and does not itself affect their substantive state law rights.
>
> . . .
>
> Thus, a district court's certification of a settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms *without engaging in any substantive adjudication of the underlying causes of action*. In the absence of a finding that plaintiffs are actually entitled to relief under substantive state law, we reiterate that a court does not "abridge, enlarge, or modify any substantive right" by approving a voluntarily-entered class settlement agreement.
>
> . . .
>
> The dissent concludes that approving class certification here endorses the enlargement of substantive rights because had some class members brought these claims individually in state court, they would "be immediately shown the exit." This is incorrect, for the state court would not automatically dismiss them without a motion from De Beers. More significantly, nothing would prevent De Beers from settling those claims in lieu of moving to dismiss them, and doing so in that scenario would not be an enlargement of substantive rights.

*Id.* at 302-13 & n.43 (citations omitted). Notably, the last paragraph bears striking similarity to comments BP's counsel made during oral argument before the Fifth Circuit BEL Panel:

> Judge Clement:  I'm talking about the example that Administrator Juneau sent out for comments, where if there's an accounting firm of three members, one is hospitalized for several months, of course they lose money. . . .
>
> . . .
>
> Judge Clement:  They couldn't bring suit against you anyway if it wasn't caused by –
>
> BP Counsel:  They could bring suit. They'd have to prove causation. They could bring – they could.  And this is a compromise of tens of thousands of claims.

[Unofficial Transcript pp. 10-14, Rec. Doc. 11826-2].

Moving to another point, the Court does not believe that the concerns raised in Part II of the BEL Panel's decision are actually jurisdictional issues. "In class action cases, the standing inquiry focuses on the class representatives."  1 William B. Rubenstein, et al., *Newberg on Class Actions* § 2:1, at 58 (5th ed. 2011) (footnote omitted).  While the class representative herself must have standing, "the representative need not prove that each member of the class has standing."  *Id.* at 59 (footnote omitted).  Instead, "[w]hether a plaintiff with standing will be permitted to present not only her own individual claims but also those of a class is not properly a question of standing doctrine but of ***class action law***"; i.e., the criteria found in Rule 23(a) and (b).  *Id.* § 2:1 at 59 (emphasis added).[27] Of course, Rule 23 issues are unquestionably before the Certification Panel, not this Court

---

[27] *See also* 13A Charles Alan Wright, *Federal Practice and Procedure* §3531.9.6, at 942 (3d ed. 2008) ("So long as the named class representatives fulfill the requirements of effective representation imposed by Civil Rule 23, the functional needs of the adversary system are satisfied.  The difficulty in identifying which members of the class have been injured should not of itself make judicial action inappropriate, so long as there is an otherwise satisfactory showing of class injury, causation, and prospective remedial benefit.  ***If adjudication is to be denied it might better be as a matter of class action doctrine than Article III concepts of standing.***" (emphasis added)); *id.* § 3531, at 6, 23 (The standing concept "has been very much tied to litigation asserting the illegality of governmental action"; i.e., public law.  "The fascination of complex standing doctrine and the concern to observe constitutional limits on the judicial power occasionally lead courts to invoke public law concepts to resolve concern that are better addressed through private-law concepts. . . .  The difficulty arises when these questions of private right are considered through the distinctive public-law doctrines of standing.  It would be better to rely directly on cause-of-action, real-party-in-interest, capacity, intervention, and like concepts."); *Bond v. United States*, 131 S. Ct. 2355, 2362 (2011) ("Still, the question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion.").

or the BEL Panel.

The view that the standing inquiry focuses on the class representative, not absent class members, is supported by the purpose of the standing doctrine: to ensure that parties have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . . ." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Absent class members, as the name suggests, are not the ones before the court presenting the issues for judicial determination; this is performed by the class representative. Thus, there is no need for absent class members to establish their "adverseness." Once the class representative meets the standing threshold, the purpose of the doctrine is fulfilled. Requiring wave upon wave of absent class members to establish standing does not make the case any more adverse nor the issues to be decided any sharper. Such a practice, as far as Article III standing is concerned, would be merely redundant. Additionally, requiring absent class members to establish their standing would be contrary to a fundamental purpose of the class action device:

> Indeed, if class members other than the named plaintiffs were required to submit evidence of their standing, then the core function of class actions, wherein named plaintiffs represent a passive group of class members, would be significantly compromised. Some courts have suggested in dicta that passive class members must have standing, but they have mentioned this only briefly and without considering the consequences of such a rule.

---

Part II of the BEL Panel's decision rejected the argument that standing focuses on the class representative, not the absent class members. The opinion cites *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612 (1997), which it described as "referring to a class issue of uninjured plaintiffs as concerning 'standing,' even when some of the named plaintiffs in the case had actual injuries." *In re Deepwater Horizon*, 732 F.3d at 340 n.6. Of course, *Amchem* did not reach any Article III issues, making any comments on the matter dicta. *See Amchem*, 521 U.S. at 612. Additionally, some of the class representatives alleged no injury from the their exposure to asbestos. *See id.* at 603. Therefore, it would layer speculation upon dicta to assume the *Amchem* Court would look anywhere other than the class representatives if it engaged in a standing analysis.

29

*Id.* § 2:3, at 64-65 (footnote omitted).[28]  Instead, and as discussed, whether the claims of the absent class members may be represented by the proposed class representative are tested through the requirements of Rule 23, not Article III standing.[29]

The Court will not retread its Rule 23 analysis, which was undertaken a year ago and is being reviewed by the Certification Panel.  [Rec. Doc. 8138]  However, the Court will offer one new observation it has gained over the past several months.  As explained in Judge Scirica's concurring opinion in *Sullivan*, the Supreme Court's decisions in *Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibre board Corp.*, 527 U.S. 815 (1999) set down important standards for settlement classes.  *Sullivan*, 667 F.3d at 336 (Scirica, J., concurring).  Those cases made clear that, in the class settlement context,  Rule 23's requirements are intended to protect absent class members:  "[*Amchem* and *Ortiz* were] [g]rounded in equitable concepts of structural and procedural fairness for absent plaintiffs—competent and conflict-free representation, fair allocation of settlement, absence of collusion . . . ."  *Id.* at 334 (Scirica, J., concurring).  Thus, while a  proposed class settlement relieves a district court of having to consider issues such as manageability, "other inquiries assume heightened importance and heightened scrutiny because of the danger of conflicts of interest, collusion, and unfair allocation."  *Id.* at 335 (Scrica, J., concurring) (citing *Amchem*, 521 U.S. at 620).  "The principal danger of collusion lies in the prospect that class counsel, induced by defendants' offer of attorneys' fees, will 'trade away' the claims of some or all class members for

---

[28] This point similarly overlaps with and reinforces the Court's comments regarding the impracticability of requiring a claim-by-claim showing of "colorable" factual causation, and the detriments such a requirement would have on the certification process and/or claim administration.

[29] The *Sullivan* majority did not address Article III issues, at least not explicitly.  *Sullivan* instead addressed "statutory standing," as opposed to constitutional standing, and its implications on Rule 23 and the Rules Enabling Act. *See id.* at 307 n.35.  However, if this Court is correct that the concerns raised in Part II of the BEL Opinion are actually Rule 23 issues disguised as Article issues, then *Sullivan* becomes all the more relevant.

inadequate compensation. There is also the possibility that a settlement will not serve the interests of all of the class members, which may be in tension." *Id.* at 336-37 (Scrica, J., concurring). Similarly, the *Sullivan* majority explained that, when approving a class settlement, "trial judges bear the important responsibility of protecting absent class members," and must be "assur[ed] that the settlement represents adequate compensation for the release of the class claims." *Id.* at 319.

With this in mind, the Court highlights the fact that, outside of the Seafood Compensation Program, the Settlement is uncapped. Considering this, the Court does not perceive how including a claimant with a "non-colorable" claim—assuming such claims are included—prejudices class members with "colorable" claims. Inclusion of a non-colorable claim does not in this instance decrease the amount a "colorable" claim may recover; i.e., recovery by the "non-colorable" claim does not detract from the "colorable" claim's share of the Settlement Fund. *Cf. id.* at 337 n.7 (Scirica, J., concurring) ("Objectors speculate inclusion of non-repealer state law claims necessarily diminishes the settlement accrued to class members whom they contend have undisputedly valid claims. But they provided no support for their assertion. . . . [U]nlike in *Amchem*, objectors have not shown the inclusion of more claims was achieved by grossly underpaying some class members."). Furthermore, considering the entire BEL saga as it has played out over the past year, the Court is beyond convinced that Class Counsel has fairly and adequately represented the Class, including absent Class Members, and that the Settlement was not a product of collusion. These observations alleviate *Amchem*'s and *Ortiz*'s concerns about protecting absent class members. Instead, the only party that would appear to have anything to gain by having the class redefined, the class decertified, or the settlement rejected would be BP. However, in the context of a class settlement, Rule 23 is not concerned with protecting a non-absent defendant who actively engaged

31

in negotiating the terms of the Settlement.

Finally, assuming that each class member is required to establish standing by showing that it has a "colorable" claim—which Part II of the BEL Panel opinion defined as (1) a claim with "some possible validity" and (2) a claim where the plaintiff "can *allege* standing and the elements necessary to state a claim on which relief can be granted," *In re Deepwater Horizon,* 732 F.3d at 340, 342 (citations omitted, emphasis in original)—this standard is arguably met under the Settlement. As discussed earlier, Exhibit 4B provides a variety of tests for establishing that a loss was "as a result of" the oil spill for Settlement Purposes. Some of these tests require a claimant to show factual evidence that a loss was caused by the oil spill.[30] Claims that satisfy this test would certainly meet the "colorable" test. Rather, it seems the focus of Part II's and BP's concern is the "V-Shaped Revenue Pattern" test. Under that test, a claimant could establish causation by showing a certain percentage downturn in revenue over a three-month period following the oil spill in 2010, followed by a certain percentage increase in revenue over the same months in 2011. The amount of revenue decline and increase that a particular business must show depends on the geographic distance from the Gulf, with businesses further from the Gulf coast having to show a greater decline and increase than those located near the coast. It should also be mentioned here that some businesses, either because of where they are located or the nature of the business, are entitled to a causation presumption under the Settlement, and therefore need not provide any evidence of causation. Discussing both tests helps to explain the theories behind each. To do this, the Court returns again to the declaration of Dr. Henry Fishkind, BP's expert who supported approval of the

---

[30] For example, under the "Proof of Spill-Related Cancellations" test, a hotel owner may establish causation by showing written evidence of a "spill-related" reservation cancellation that she was unable to rebook. Another claimant may produce written evidence that a contract was cancelled "as the direct result of the spill" that it could not replace.

32

Settlement:

> In broad terms the coastal economy of the Gulf Coast Area is dominated by economic activities related to tourism (including seasonal residences and second homes), seafood, marine shipping, and energy production. These industries constitute the economic base ("Base" or "Basic Industries") of the Gulf Coast Area's economy. These Basic Industries are the driving economic force for the area's economy. Their addition of income and salaries to the area's economy then supports local industries that sell directly to the Basic Industries or sell goods and services to employees in the Basic Industries. Without the Basic Industries there would be very little economic activity beyond subsistence activity. This simplified economic model is rooted in the well accepted Economic Base theory.

> The seafood industry is a classic export Base Industry since it exports most of its products outside the local region, bringing in income which supports its production and its employees. The tourism industry along with the related seasonal residential and second home businesses are also export Base type activities, but instead of physically exporting a vacation at the beach, the customers have to physically come to the area to enjoy the experience. The end result is a far larger degree of physical development related to the tourism industry than to the seafood industry. Nevertheless, both are integral parts of the Gulf Coast Area's economic Base.

> The DWH Oil Spill had some direct implications for tourism and seafood industries with consequential effects on some businesses in related industries. The tourism and seafood industries are concentrated in the immediate coastal area. As distance from the coastal area increases, the composition of economic activity shifts, with tourism and seafood becoming less important drivers of economic activity.

> The Economic Damage Claim Frameworks explicitly incorporate these economic realities in the methodologies for compensating Class Members. . . .

. . .

> Businesses and individuals may suffer losses for a wide variety of reasons. ***Thus, it is necessary and economically appropriate to evaluate the likelihood that a Claimant's losses were due to the DWH Spill or to other unrelated factors.*** The standardized approaches established in the Settlement Agreement for determining the likelihood that a Claimant's losses were caused by the DWH Spill, including granting a presumption that certain Claimants' losses are spill-related, are clearly defined, reasonable and based on sound economic principles.

> For many Claimants (including all industry types in Zone A, Primary Seafood Industry participants in all Zones, Secondary Seafood Industry and Charter Fishing

33

participants in Zone A, B, and C, and Tourism participants in Zone B[)] economic losses incurred post-Spill in 2010 are presumed to be due to the DWH Spill and the Claimant need not provide evidence to establish causation. ***This approach is consistent with economic principles, which would predict that the DWH Spill would most directly affect industries tied to the Gulf. The available data reflect some decline in performance in these industries in the months after the DWH Spill.***

Claimants in industries and geographic areas that do not receive a presumption must establish causation by satisfying defined thresholds for establishing that their losses were spill-related, with different revenue threshold for Claimants in Zones B and C as compared to Zone D.

[A]reas more distant from the coast and Claimants in industries other than Tourism, Charter Fishing, and Primary and Secondary Seafood fac[e] higher causation thresholds.

. . .

Claimants can establish that losses were spill-related by showing that their revenue (i) fell at the time of the DWH Spill and (ii) later recovered after the DWH Spill ended and clean up efforts were (largely) complete. ***These causation criteria are reasonable and economically appropriate, because revenue or earnings that fell due to the DWH Spill would be expected to rebound after the DWH Spill ended. Losses that continued after the DWH Spill ended are likely to be due to factors other than the DWH Spill.*** The dates selected for the decline and recovery in revenues are supported by economic data regarding the performance of the Tourism and Seafood industries in the wake of the DWH Spill.

. . .

***The Frameworks for business and individual economic loss claims correctly recognize the combined role of both geography and industry in setting causation criteria.*** For example, firms in tourism industries – such as restaurants – serve both local patrons as well as tourists. In establishing causation criteria, the Frameworks correctly recognize that the mix of local customers and tourists for firms that qualify as "Tourism" businesses differs in different geographic areas. For example, local patrons are likely to account for a larger share of customers for restaurants in nonbeach areas. ***Thus, the specification of different causation thresholds in the Frameworks for Tourism businesses in different Zones, and the use of different causation thresholds for different types of business in the same Zone, is reasonable from an economic perspective.***

[Rec. Doc. 7114-5 at 14-15, 20-22 (footnotes omitted) (emphasis added)]

34

As Dr. Fishkind's description shows, a claim that satisfies the V-Shaped test arguably is a claim with "some possible validity" and/or a claim where the plaintiff "can allege standing and the elements necessary to state a claim on which relief can be granted," again, assuming this is actually required. In other words, "because revenue or earnings that fell due to the DWH Spill would be expected to rebound after the DWH Spill ended," whereas "losses that continued after the DWH Spill ended are likely due to factors other than the DWH Spill," a claim that met the requirements of the V-Shaped test would, under this economic analysis, likely be due to the oil spill. When the facts come out—which in and of itself is a monumental assumption considering the claims are not being tried—the loss may be due to some cause other than the oil spill, or it may be caused in part by the oil spill and in part by something else, or it may in fact be entirely caused by the oil spill. But to ascertain the truth of the matter would require some counter evidence beyond what the claimant was required to submit under the Settlement. Consequently, the issue becomes one of merit. Of course, Part II of the BEL Panel opinion readily concedes that "Class settlements certainly can encompass unmeritorious claims." *In re Deepwater Horizon*, 732 F.3d at 342. Consequently, the purported distinction between a "non-colorable" claim and a merely "unmeritorious" claim is unworkable in the context of this case. In any respect, this is a voluntary settlement; it is not a trial on the merits, or a summary judgment motion, or even a Rule 12 motion. Considering evidence beyond the criteria in Exhibit 4B essentially invites a mini-trial for each claim, precisely what the Settlement was designed to avoid.[31]

Related to this point is the fact that the requirements for Article III standing (again, assuming

---

[31] For similar reasons, claims that receive a presumption would also appear to meet Part II's "colorable" test. Claims that satisfy the "Modified V" or "Decline-Only Revenue Pattern" would almost certainly pass the colorable test, as they must not only show a certain revenue decline but also some other evidence that would indicates factual causation.

that absent class members must show standing) vary with each successive stage of the litigation.
*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For example, at the pleading stage "general factual allegations of injury resulting from the defendant's conduct may suffice," while a motion for summary judgment requires the plaintiff to "set forth by affidavit or other evidence specific facts." *Id.* (quotations and citations omitted). Given that this is a class settlement and absent class members typically do not file a complaint setting forth general factual allegations, any standing requirement based on *Lujan* would have to be exceedingly light. Additionally, Courts should not perform a Rule 12(b)(6) inquiry of each class member's claim when conducting a Rule 23 inquiry. As *Sullivan* explained:

> [T]he dissent seems to require that class members show that they can state a valid claim for relief. But the Rule 23 inquiry does not, and should not, involve a Rule (12)(b)(6) inquiry. [In footnote] The dissent describes this requirement in varied ways: under their view, class members who, "according to the plain terms of controlling law have no claim at all", . . . have a claim "clearly lacking a colorable basis", or have a claim "nonexistent as a matter of substantive law", are barred from partaking in this class action settlement. The problem with this requirement, however, is that in order to separate class members possessing an "existent" legal claim from those possessing a "nonexistent" one, district courts would have to perform a Rule 12(b)(6) inquiry into each class member's claim.

667 F.3d at 308 & n.37. The Court does not understand how a claim that has satisfied Exhibit 4B's "economically reasonable" test, and therefore was "likely" caused by the oil spill, can still be shown to be "non-colorable" without violating *Lujan* and *Sullivan* or, for that matter, the terms of the Settlement.

For these reasons, the Court finds that the Settlement is not defective under Article III, Rule 23, or the Rules Enabling Act, nor was certification of the class improper. The Court reiterates its belief that it does not have jurisdiction to consider these issues.

36

### III. Conclusion

With respect to the calculation of Variable Profit under Exhibit 4C, the Court finds that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses are recorded. Accordingly, IT IS ORDERED that the matter is remanded to the Claims Administrator, Patrick A. Juneau, with instructions to adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses.

With respect to how causation is determined under the Settlement, the Court finds that BP is judicially estopped from arguing (1) that Exhibit 4B is not the exclusive means of determining whether a business economic loss is "as a result of" of the Deepwater Horizon Incident for purposes of the Settlement, including the Class Definition; (2) or that the Settlement contains, implicitly or explicitly, a causation requirement other than Exhibit 4B; (3) or that satisfying Exhibit 4B does not establish under the Settlement an irrebuttable presumption that a business' economic loss was "as a result of" the Deepwater Horizon Incident; (4) or making similar arguments. As a corollary to this ruling, the Court finds that whether a business economic loss is "as a result of" the Deepwater Horizon Incident for purposes of the Settlement is determined exclusively by Exhibit 4B. Furthermore, although the Court does not believe it has jurisdiction to consider these issues concerning Article III, Rule 23, and the Rules Enabling Act, the Court finds that the Settlement is not defective under Article III, Rule 23, or the Rules Enabling Act, nor was certification of the class improper.

The Court maintains the preliminary injunction as amended on December 5, 2013 [Rec.

Doc. 11928], pending further action by the Certification Panel or the BEL Panel of the Fifth Circuit.

Signed in New Orleans, Louisiana, this 24th day of December, 2013.

_____
United States District Judge

38

## APPENDIX

The Court's discussion of judicial estoppel referenced only comments by, on behalf, or adopted by BP that were made to this Court. Here the Court collects similar comments regarding causation under the Settlement that BP made to the Claims Administrator and the Fifth Circuit BEL Panel.

On May 8, 2012, BP submitted a powerpoint presentation to the Claims Administrator that stated:

> Qualifying businesses receive compensation for <u>all losses</u> regardless of actual facts and circumstances.
> – All Zone A businesses and others with presumptions.
> – All businesses qualifying using overall revenue trends.
> – All other businesses can claim specific losses of contracts or reservations.

[Rec. Doc. 11826-1 (emphasis in original)] On September 25, 2012, the Claims Administrator's Office approached both parties (BP and Class Counsel) to clarify whether they truly intended that the Program would apply only the purely objective formulae of Exhibits 4B and 4C to determine whether and how much a claimant could recover. The Claims Administrator's Office set forth the following query in an email sent to both Parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?

> I will give a hypothetical situation to try to illustrate the question we are asking:

> *Hypo:* A small accounting corporation / firm is located in Zone B. They meet the "V-shaped curve" causation test. The explanation for the drop in revenue is that one of the three partners went out on medical leave right around the time of the spill.

39

Their work output and corresponding income, thus went down by about a third. The income went back up 6 months later when the missing partner returned from medical leave. Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?

[Rec. Doc. 8963-66 (emphasis in original)] Mark Holstein, managing attorney for BP America Inc.,

responded in a letter dated September 28, 2012:

If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

*Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant's firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-financial data indicates that the decline was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.*

[ Rec. Doc. 8963-67 at 3 (emphasis added, footnote omitted)]. Relying on this response, the Claims

Administrator issued the October 10, 2012 policy announcement quoted above in the main opinion.

For ease of reference, that policy announcement is reproduced here

### 2. No Analysis of Alternative Causes of Economic Losses.

The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. *The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement.* The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, *without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation*

40

*requirements set out in the Settlement Agreement.* Further, the Claims Administrator *will not evaluate potential alternative causes* of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

[Rec. Doc. 8963-71 (emphasis added)]

On July 8, 2013, the parties appeared before the Fifth Circuit BEL Panel. BP counsel Ted Olson stated the following:

> Judge Clement: I have a question, sir. In your reply brief, you said the only issue in this appeal is the lost profits calculation and you were talking about how the variable profit is to be calculated . . . . My problem is I think the real issue in the case is causation and consideration. If you look at 4B, where is BP's consideration for agreeing to pay those claims without proving they were caused by the Oil Spill?

> BP Counsel: [T]his is a settlement, and with respect to the causation issue, that is not the issue that is before this court . . . [The] settlement agreement with respect to 4B as to causation provided a mechanism which allowed someone to come through the door, to be then entitled to prove the amount of actual lost profits. It was a compromise, which every settlement agreement is. With respect to causation issues, some businesses that are very close to the spill, the causation issue is waived entirely. With respect --

> Judge Clement: Right. I'm not talking about those. I'm talking about the example that Administrator Juneau sent out for comments, where if there's an accounting firm of three members, one is hospitalized for several months, of course they lose money. . . . Where is the legal connexity between a damage or an injury and the ability to make BP pay?

> BP Counsel: It was a part of a compromise, which there's going to be thousands – tens of thousands –

> Judge Clement: Where's the consideration?

> BP Counsel: The consideration is the consideration of the settlement class as a whole. But the causation issue is going to be different with respect to each particular claimant. Judgments were made with respect to compromises on a proof of causation . . .

> Judge Dennis: Well, your major consideration is no one can bring suit against you on the oil spill outside of this class action, which you have announced you have settled.

41

> BP Counsel:  Exactly, your honor.

> Judge Clement:  They couldn't bring suit against you anyway if it wasn't caused by –

> BP Counsel:  They could bring suit. They'd have to prove causation. They could bring – they could.  And this is a compromise of tens of thousands of claims. But the important thing, and the issue that were' talking about here, is, assuming causation, assuming that a claimant gets through the door and is now entitled to prove lost profits; we then come to what everyone agrees in this case. The Appellees say this on page 27 of their brief: This appeal presents a straight forward question of contract interpretation.

[Unofficial Transcript pp. 10-14, Rec. Doc. 11826-2]  All three opinions from the BEL Panel's October 2, 2013 decision reflect that causation under the Settlement is determined by Exhibit 4B, which, for purposes of the judicial estoppel analysis, is arguably another instance of a court accepting BP's prior position.  Judge Clement wrote:

> Under Exhibit 4B, causation is generally assumed if economic loss can properly be shown.  BP did agree that alternative causes of losses were irrelevant if the financial figures supported that a loss occurred.

*In re Deepwater Horizon*, 732 F.3d 326, 338 (5th Cir. 2013).  Judge Southwick wrote:

> If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation.  . . .  Even so, the parties agreed by Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred to claimants during the proper time period.

*Id.* at 346 (Southwick, J., concurring).  Judge Dennis wrote:

> Consequently, it would be clear legal error for this court to assume that it has jurisdiction and authority to impose on the Administrator the requirement that, *in addition to* identifying a claimant as eligible and entitled to compensation for business economic loss under the consent decree encompassing the parties' settlement agreement, *he must also find* independently that the claimant is not one of "those who [did not] experience[ ] actual injury traceable to loss from the Deepwater Horizon accident" before paying the claim.  *Such an injunction would be* broader than the alleged purpose of the remand and *tantamount to modifying the consent decree* for the benefit of one of the parties, BP, without that party carrying its burden to show a change in circumstances or law that warrants changing the

42

decree . . .

*Id.* at 361 (Dennis, J., dissenting) (emphasis added).

**POLICY ANNOUNCEMENT**

**POLICY 495:  BUSINESS ECONOMIC LOSS CLAIMS:
MATCHING OF REVENUE AND EXPENSES**

**Introduction**

The District Court has instructed the Claims Administrator "to adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses."  (Rec. Doc. 12055, p. 37 of 43).

Based upon the U.S. 5th Circuit Court of Appeals' decision of October 2, 2013 and the District Court's Order & Reasons of December 24, 2013 on remand, the Claims Administrator understands that the following principles are to be applied in evaluating BEL claims under Exhibit 4C of the Settlement Agreement:

1.  The Settlement Agreement contemplates that loss calculations are to be based upon accounting records that sufficiently match revenues with expenses.

2.  The Settlement Agreement's "provision for subtracting corresponding variable expenses requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses were recorded." (Rec. Doc. 12055, p. 5 of 43).

3.  Some claimant-submitted contemporaneous accounting records inherently match revenues with expenses sufficiently for purposes of the Settlement Agreement. Others do not. (732 F. 3d at 334, 335)

4.  For those "unmatched claims," the claimant-submitted accounting records are to be adjusted "in light of the necessity of revenue and expense matching to realistic measurement of economic loss." (732 F. 3d at 346 – 347).

**Policy Development Process**

In the process of developing this policy as directed by the Court, the Claims Administrator has conducted extensive consultations with the Court Supervised Settlement Program ("CSSP") Accounting Vendors (PricewaterhouseCoopers and Postlethwaite & Netterville) and has received significant input from both BP and Class Counsel.  The Claims Administrator's efforts in this regard have included:

- Both BP and Class Counsel made written submissions detailing the frameworks that they propose be implemented to accomplish the "matching" required by the Court.  These written submissions were reviewed in detail by the Claims Administrator and the CSSP Accounting Vendors.

- An extended Q&A session was conducted to allow the CSSP Accounting Vendors to gain a more complete understanding of the proposals submitted by both sides.  There were

1

numerous participants in this informational session, including BP, Class Counsel, accounting experts representing both parties, CSSP Accounting Vendors, the Claims Administrator and various members of the CAO staff.

- The CSSP Accounting Vendors conducted numerous independent working sessions over a period of approximately three months.

- The Claims Administrator and the CSSP Accounting Vendors conducted several joint working sessions over a period of approximately two months.

- This final written policy has been adopted only after such thorough input, analysis, consideration and consultation.

## <u>Underlying Issues / Principles</u>

Based upon the CSSP's experience in reviewing claims and analyzing accounting records submitted to the CSSP since the inception of this settlement program and in light of the rulings and directives received from the Court, the Claims Administrator, in consultation with the CSSP Accounting Vendors, has arrived at the following conclusions relative to the "matching" issues at hand:

1. The claimant's method of accounting (cash vs. accrual vs. other) is not necessarily determinative of whether revenues and expenses are sufficiently "matched" as per the orders of the Court.

2. Different industries tend to present different issues and require different methodologies in terms of trying to achieve sufficient "matching."

3. In an effort to achieve sufficient "matching" in such a way that the accounting records may serve as a basis for "realistic measurement of economic loss," differing analyses are required depending upon the specifics of the particular business, including industry type and nature and duration of revenue or expense cycles.

4. It is not feasible in the context of a class-wide settlement involving thousands of different claims, with each claimant's financial information potentially spanning a time period in excess of four years, to attempt to match specific expenses to specific revenues on an individual transaction by transaction basis. The time, effort and expense required under this approach would be prohibitive. Further, it is unlikely that such individualized matching of specific expenses to specific revenues would be possible based on information and documentation available to the claimants or the CSSP.

5. If a claimant's contemporaneous P&Ls submitted to the CAO are deemed to be 'sufficiently matched' based on an assessment by the CSSP Accounting Vendors, such P&Ls will be utilized in calculating compensation under the Settlement

444895
2/12/14

Agreement.  In utilizing such contemporaneous P&Ls, corrections will be made for any accounting "errors" identified in the ordinary course, by the CSSP Accounting Vendors.[1]

6.   It is the CSSP's considered assessment that, for the majority of claimants, sufficient "matching" of revenue and expenses will be best accomplished through an annual variable margin methodology which  totals variable expenses for each fiscal year ending April 30 and allocates them to each month on a pro-rata basis of monthly revenues for the same period. This approach reasonably accomplishes sufficient "matching" and is the most feasible methodology in the context of a class-wide settlement.

7.   Depending on the specifics of a given business, it may be appropriate to make adjustments to the claimant's financials as to the timing of the recognition of either revenues or expenses or both.

8.   The operating characteristics of certain businesses will not lend themselves to the application of an annual variable margin methodology.   The following industries in particular each warrant a customized methodology in order to achieve sufficient matching in a way that reasonably depicts economic reality for purposes of loss measurement: construction, agriculture, education and professional services.

9.   In order to achieve sufficient "matching," adjustments to the claimant's contemporaneous accounting records are best made by the CSSP Accounting Vendors after appropriate inquiry and gathering of additional documents and/or information, if necessary, from the claimant.

10.   Consideration of whether revenues and expenses are sufficiently matched necessarily involves an element of professional judgment.  The CSSP recognizes and reserves the right of the CSSP Accounting Vendors to exercise such professional judgment to achieve sufficient matching as ordered by the Court.

**Statement of Policy**

The Claims Administrator thus adopts the following "policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses" as ordered by the Court.

---

[1]       "Errors" will be defined as accounting transactions that have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.  In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors, if the entries were made in good faith with the best available information at the time.

3

## I.  Identification of "unmatched claims."

A.     The criteria to be used in identifying "unmatched claims," other than with respect to Failed Businesses, Failed Start-Up Businesses and Start-Up Businesses,  will be the same as those set out in the Declaration of Patrick A. Juneau, Claims Administrator, dated October 25, 2013.

The process for identifying those claims whose submitted financial records fail to sufficiently match revenues with expenses shall be the following:

If the monthly profit and loss statements submitted by a claimant, adjusted by the CSSP Accounting Vendors for any identified errors, meet any one of the following criteria, then the claim shall be identified for a further matching analysis as described below:

1.     negative total revenue  is recorded for any month included within the Benchmark Year(s), Compensation Year or 2011;

2.     total revenue recorded in any month included in the Benchmark Year(s), Compensation Year or 2011 exceeds 20% of the claimant's annual revenue for the year which includes that month;

3.     the monthly profit and loss statements or other documentation submitted shows that the claimant's business experienced a period of dormancy during the Benchmark Year(s), Compensation Year or 2011;

4.     total variable expenses when summed up are negative for any month within the Benchmark Year(s) or Compensation Year;

5.     total variable expenses for any month within the Benchmark Year(s) or Compensation Year exceed 25% of the claimant's annual variable expense for the year which includes that month;

6.     variable margin percentages when compared between any two months included within the Benchmark Year(s) and Compensation Year vary by more than 50 percentage points; or,

7.     in any given month within the Benchmark Year(s) or Compensation Year, the variance between that month's percentage of annual revenues as compared to that same month's percentage of annual variable expenses exceeds 8 percentage points.

Any claim, whether based on accrual or cash-basis records, that does not fall within one of the foregoing seven criteria shall be presumed to be "sufficiently matched," provided, however, that if in the professional judgment of the CSSP Accounting Vendors, a claimant's financial records contain other significant indicia that the claim may not be "sufficiently

444895
2/12/14

matched," the CSSP reserves the right to identify such claim for further matching analysis as set forth below.

With respect to any claims where matching is determined to be an issue as set forth in this paragraph I.A. above, the CSSP Accounting Vendors will exercise their professional judgment to determine whether that claim is "sufficiently matched" based upon the evaluation of the information submitted and available to them, including, when applicable, the nature and complexity of the industry or business in question, particularly with regard to claims based upon cash-basis accounting records.

For those claims determined *to* be sufficiently matched, the CSSP Accounting Vendors will utilize claimant-submitted accounting records (adjusted for any identified accounting errors) to calculate compensation as set forth in the Settlement Agreement.

For those claims determined *not* to be sufficiently matched, the CSSP Accounting Vendors will adjust the claimant-submitted accounting records as outlined in paragraph II below in order to achieve sufficient matching as per the orders of the Court.

B.      As to Failed Businesses and Failed Start-Up Businesses and as to Start-Up Businesses, identification of "unmatched claims" will be determined as set out in Attachments F and G to this policy.

## II.   **Adjustment of "unmatched claims . . . in light of the necessity of revenue and expense matching to realistic measurement of economic loss."**

For those claims determined under paragraph I above *not* to be sufficiently matched, the below methodologies will be utilized to achieve sufficient matching as per the orders of the Court.

A.      Determination of Applicable Methodology.

Claims will be assigned to an industry type for purposes of these methodologies using NAICS codes as outlined in **Attachment A**.  To the extent that in the professional judgment of the CSSP Accounting Vendors assignment to a methodology by such NAICS code is inappropriate based on that claimant's particular business activities, the CSSP reserves the right to revise the applicable methodology to achieve sufficient matching as ordered by the Court.

B.      General Annual Variable Margin Methodology for "Unmatched" Claims.

**See Attachment B**.

C.      Construction Claims.

**See Attachment C**.

444895
2/12/14

      D.      <u>Agriculture and Educational Institutions Claims.</u>

            **See Attachment D.**

      E.      <u>Professional Services Claims.</u>

            **See Attachment E.**

      F.      <u>Failed Businesses and Failed Start-Up Businesses.</u>

            **See Attachment F.**

      G.      <u>Start-Up Businesses.</u>

            **See Attachment G.**

Under the above methodologies, the guiding principle has been to utilize the claimant's contemporaneous P&Ls where there is no indicia of a mismatch of revenue and expenses. Where matching issues have been identified the approach has been, wherever possible, to amend the P&Ls utilized as inputs to the compensation calculation, but not alter the manner in which the calculation has been performed.

As it relates to amending the inputs to better match income with corresponding expenses, the methodologies require the reallocation of revenue, expenses or both. To bifurcate the performance of the business pre-spill and post-spill, the reallocation of revenue and/or expenses will be analyzed over a May to April time period for both the Benchmark and Compensation Periods.

Claimants may be required to provide additional information under the methodologies outlined in the attachments. This may include information prior to the Benchmark Period or subsequent to the Compensation Period. Further, claimants with assumed causation will be required to provide information for 2011 as a consequence of the methodologies requiring an analysis of the May through April time period.

444895
2/12/14

## BEL Claims – Matching of Revenues and Expenses
## ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

In developing a methodology to address claims that have been deemed not to be 'sufficiently matched,' several methodologies have been developed to address unique factors common to the manner in which certain industries operate and record their financial information:

- Annual Variable Margin Methodology (otherwise referred to as "Short Revenue Cycle") – Attachment B

- Construction – Attachment C

- Agriculture and Educational Institutions – Attachment D

- Professional Services – Attachment E

This document summarizes NAICS codes that will likely fall into each methodology. However, it is important to note that a claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the opinion of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology. Some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector.

In identifying those NAICS codes that would most likely fall into each methodology, focus has been paid to those 'specialty' methodologies – Construction, Professional Services and Agriculture & Educational Institutions – with all other NAICS codes defaulting to the Annual Variable Margin (Short Revenue Cycle) methodology.

Set out below is a summary of how the NAICS codes are presently assigned.

A1