**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

4.      The revised P&Ls (as required) will be analyzed under the Start-Up Construction Methodology as
follows:

   a.    Allocation based on claimant's Fiscal Year End:

      i.     For each year measured using the claimant's fiscal year (e.g., January 2010 – December
             2010; January 2011 – December 2011; and January 2012 to December 2012, as provided),
             each month's variable expenses as a percentage of that period's total variable expenses will
             be computed.  If the claimant's fiscal year-end is different than the tax year, the tax year will
             be utilized as the basis for computing the variable expense percentage.

      ii.    Annual revenue for each fiscal year will be reallocated to individual months by multiplying
             total annual revenue by each month's percentage of total variable expenses (as computed in
             accord with i. above).

   b.    Benchmark Period (May 2011 to April 2012 or May 2010 to April 2011 if projections are
         utilized):

      i.     For the Benchmark Period (May 2011 through April 2012, or May 2010 to April 2011 if
             projections are utilized) each month's variable expenses as a percentage of the annual total
             variable expenses will be computed.

      ii.    Annual revenue will be reallocated to individual months by multiplying total annual
             revenue by each month's percentage of total variable expenses (as computed at i. above).

   c.    Compensation Period (May 2010-April 2011):

      i.     Each month's variable expenses for the year May 2010 to April 2011 as a percentage of total
             variable expenses for the year will be computed.

      ii.    Total revenue for the year May 2010 to April 2011 will be reallocated to individual months
             by multiplying total revenue by each month's percentage of total variable expenses (as
             computed at i. above).

5.      The P&Ls, restated in accord with Step 4 above, are utilized as the input for calculating
compensation under Exhibit 7 of the Settlement Agreement.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

6.   Calculate Expected Revenue and Expected Costs

   i.   Expected Revenue and Costs shall equal either:

      a.   The actual revenue and expenses as set forth in the restated P&Ls calculated in accord with Step 4 above for the Benchmark Period; or

      b.   Revenue and expenses reported on financial projections for the Start-Up Business. The use of such projections would be dependent on satisfying the requirements of Exhibit 7: that the projections were prepared prior to the spill and used to seek the extension of  credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family investors with business lending experience.

   ii.   Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections.

7.   Calculate Actual Profit/Loss

   i.   Actual Profit/Loss generated over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues as set forth in the restated P&Ls calculated in accord with Step 4 above and (ii) the claimant's Actual Variable Costs as set forth in the restated P&Ls calculated in accord with Step 4 above.

8.   Compensation will be computed under Exhibit 7 of the existing Settlement Agreement as follows:

      a.   Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated over the Compensation Period.
      b.   Apply the agreed-upon RTP adjustment.
      c.   Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

**Start-Up Agriculture & Educational Institution Methodology**

The methodology outlined below – "the Start-Up Agriculture and Educational Institution Methodology" – deviates from the methodologies described previously.  The primary difference relates to the time period the claimant may utilize.  Exhibit 7 permits a business to select an optimum period of 3 months up to 12 months.  Under the Start-Up Agriculture and Educational Institution Methodology the entire 12 month period will be utilized.

1.    The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.    If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue to the appropriate month.

3.    If adjustments made in accord with 2. above result in revised P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 7 using such P&Ls.

4.    If adjustments made in accord with 2. above result in revised P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed under the Start-Up Agriculture & Educational Institutions Methodology as follows:

    i.    Benchmark Period Variable Margin will be 'computed' based on the contemporaneous P&Ls provided by the claimant (as adjusted in accord with Step 2 above), for the period May 2011 to April 2012 (or May 2010 to April 2011 if projections are utilized) ("Expected Revenue")

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

ii.   Benchmark Period revenue is compared to the annual Variable Profit for the Compensation Period – May 2010 to April 2011 ("Actual Revenue").  This represents Total Lost Variable Profit.

iii.   Total Lost Variable Profit is multiplied by the Risk Transfer Premium ("RTP") to derive total compensation (less any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable).

**Educational Institutions Methodology**

Claimants deemed to be "Educational Institutions" will follow the same methodology as that set out above for Agriculture claimants, but results will not be evaluated using annual results from May to April of any given year.  Instead, the CSSP Accounting Vendors will assess the business to identify the unique "academic year" (e.g., "August to July").  The academic year will be utilized to evaluate annual results.

## BEL Claims  - Matching of Revenues and Expenses

### ATTACHMENT G – Start-Up Businesses Methodology

**Start-Up Professional Services Methodology**

1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  An evaluation of the claimant's fee arrangements for all cases/engagements (i.e., time & materials, fixed fee, contingent fee, or a combination thereof) will be performed based on discussions and an assessment of additional records requested from the claimant.  Such additional records will be consistent with those outlined in the Professional Services Methodology (Attachment E).  It should be noted that information requested may include records either prior to and/or after the Benchmark and Compensation Periods (i.e., prior to 2010 or after 2012).

3.  If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue or expenses to the appropriate month.

4.  If adjustments made in accord with 3. above result in revised P&Ls that are deemed sufficiently matched, the claim will be processed under the methodology set forth in Exhibit 7.  However, if revenue has been restated in accord with 3. above a causation analysis will be re-performed (if causation is not presumed).  If causation is satisfied, the revised P&Ls are utilized as the input for calculating compensation under the Settlement Agreement.

5.  If adjustments made in accord with 3. above do not resolve matching issues, the P&Ls will be revised, as set forth below, restating both revenue and expenses.

## BEL Claims  - Matching of Revenues and Expenses

## ATTACHMENT G – Start-Up Businesses Methodology

For those claimants who submit P&Ls which are deemed not "sufficiently matched", the P&Ls will be adjusted to allocate revenue on a straight line basis over the period of the case/engagement, <u>unless</u> the claimant can submit appropriate, reliable and complete records that permit an alternative allocation of revenue based on when activity generating the revenue occurred.  In professional services companies this would correspond to periods when work on the matter/engagement was actually performed.  Alternative information that the claimant may elect to present to demonstrate when effort was expended/hours were worked may include:

- Time and billing records maintained in the ordinary course of business that detail time worked by month by case/engagement is considered to be the most accurate and complete source of information.

- Other case/engagement records may provide sufficient information to 'reconstruct' when hours were worked in generating the revenue earned: calendars, engagement letters, court filings, case summaries, trial dockets, court and deposition appearances, expert report submissions, project deliverables, transaction closure dates, contract execution dates, court approvals, and payment schedules and receipt.

**Revenue**

Allocate Revenue on a straight line basis over the duration of the case/litigation

1.     If the claimant elects not to submit additional documentation, or provides documentation that, in the judgment of the Claims Administrator, does not permit the CSSP Accounting Vendors to reasonably estimate and verify the level of work effort in a given month, revenue will be reallocated to each month on a straight line basis over the duration of the matter.

2.     A matter will be considered to have commenced from the date of execution of an engagement letter or other indicia of the commencement of the undertaking, through the date that a matter has been settled, or a final project deliverable has been submitted and payment has been received,

G14

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

unless other information indicates an alternative date.  Other information could include, for example: evidence that work was commenced prior to the execution of an engagement letter or other indicia of the  commencement of the undertaking, post-trial filings, appeals, a further negotiation of the amount ultimately paid, or presentations after issuance of a final report. Information must be provided by claimants to permit the CSSP Accounting Vendors to verify the commencement and completion date of cases/engagements.

3.      In determining revenue generated for each matter, consideration will be given to the nature of the case/engagement, but in all instances will be net of any reimbursable expenses.  Revenue from time & material and fixed fee arrangements will be determined based on the engagement letter or other description of the nature and scope of the undertaking, and invoice records.  For contingent fee arrangements, revenue will be based on the amount paid to the claimant as of the date the Claims Administrator analyzes the claim.  For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

4.      For each case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) the revenue allocated to each month will equal revenue (determined in accord with 3 above) divided by the number of months that the case/engagement was worked on (as determined in accord with 2 above).

5.      Where revenue has been amended, a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).


Allocate Revenue based on Available Information

        The claimant will have the option to submit documentation to the Claims Administrator if it believes such records can more accurately estimate the level of work/hours incurred in a given month, thereby permitting revenue to be reallocated based on such effort, rather than a straight line basis.  The

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

CSSP Accounting Vendors will assess such records and determine whether, in their professional judgment, such records are adequate and complete enough to reasonably estimate and verify the level of work effort performed in a given month as it relates to each specific case/engagement.  If it is determined that such records permit a reasonable estimate of when effort/hours were incurred, revenue will be reallocated based on such efforts.  However, if not deemed sufficient to reasonably estimate and verify when effort was expended/hours were worked, the CSSP Accounting Vendors will revert to reallocating revenue to each month on a straight line basis over the duration of the matter.

In considering what additional information a claimant may elect to submit to identify when effort was expended/hours were worked, the CSSP Accounting Vendors anticipate that this will most likely include time and billing records maintained by a claimant in the ordinary course of business.  In the absence of such records, other information may be utilized to estimate or 'reconstruct' when effort/time was incurred.  Such information may include, but not be limited to, calendars, engagement letters, court filings, case summaries, court and deposition appearances, expert report submissions, transaction close dates, contract execution dates, project deliverables, court approvals, court/trial dates, and payment schedules and receipt.  The approach that will be followed is detailed below:

1.    Information will be requested from the claimant that details the nature of the fee arrangements for all cases/engagements commenced and/or closed during the Benchmark and Compensation Periods.  The information requested will be consistent with the set out in Attachment E – Professional Services Methodology.  Given that cases/engagements may have commenced prior to the Compensation Period or were ongoing or closed after the Benchmark Period, information required from claimants may extend prior to the Compensation Period and subsequent to the Benchmark Period.

2.    Revenue will be allocated to each month of the Benchmark Period (May 2011 to April 2012) and Compensation Period (May 2010 to April 2011) based on when work was actually performed.

G16

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

3.    To identify when hours were worked the following steps will be performed:

    a.    A detailed inventory of all engagements performed by the claimant will be obtained, separated by the nature of the fee arrangement.

    b.    The CSSP Accounting Vendors will, through inquiries of the claimant, and an evaluation of submitted documentation, determine if contemporaneous time and billing records were maintained by the claimant in sufficient detail to determine and verify when effort was expended/hours were worked on individual cases/engagements, or if practical a grouping of cases/engagements that had similar characteristics (e.g., commencement and completion date, revenue generated and paid).  If deemed sufficient, time and billing records will be utilized.

    c.    If time and billing records were not maintained by the claimant in sufficient detail to determine when effort was expended/hours were worked, the CSSP Accounting Vendor will consider the adequacy and completeness of other information provided and determine if sufficient to estimate and verify when effort was expended/time was worked, and will allocate revenue on such basis.

Utilizing Time and Billing records to reallocate revenue

1.    Any billing records submitted will be analyzed for each engagement.  Hours recorded by personnel for each individual case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) will be compared to the timing of revenue recognized.  Total revenue generated from each case will be considered net of reimbursable expenses.  Total revenue generated from each case/engagement will be reallocated to each month based on the percentage of hours charged in that month relative to the total case/engagement hours.

2.    Based upon the content and format of the time and billing records received, additional analysis may be performed including but not limited to comparison of pre-spill and post-spill:  monthly

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

hours worked in assessing lost hours, if any; billing rates per engagement/case in assessing higher/lower rates, if any; changes in the overall variable profit margin between periods, if any; utilization mix of professional staff (including owners/partners); lines and/or types of services/engagements worked on; and length of the project and value of settlements reached .

3.    For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

4.    Where revenue has been amended a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

Utilizing Engagement Records to reallocate revenue

1.    It is expected that claimants who operate under a time & materials fee arrangement will maintain time and billing records in order to create and support the invoices to their clients.  Accordingly, it is assumed that the methodology set out below will most likely apply to fixed fee and contingent fee arrangements, or a combination of the two.  It should be noted that if a firm has a variety of fee arrangements including some performed on a time & materials basis, for which it maintained time and billing records, the revenue may (based on the judgment of the CSSP Accounting Vendors) be bifurcated, and different records will be applied to identify when hours were worked.

2.    If the claimant elects to submit documentation that the CSSP Accounting Vendors deem sufficient to estimate and verify the effort expended/hours worked incurred in any given month, cases/engagements performed under a fixed fee or contingent fee arrangement will be evaluated utilizing other engagement documentation, as follows:

    i.   Fixed and contingent fee cases/engagements worked during the Benchmark Period and the Compensation Period

        •   Identify the commencement and completion date for each case/engagement, including the date revenue was recorded and/or cash was received

G18

**<u>BEL Claims  - Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT G – Start-Up Businesses Methodology</u>**

- In the case of a legal matter, conduct an examination of available legal and non-legal documents (e.g., pleadings and other court records, discovery requests, depositions and/or court  documents, due diligence commencement dates, transaction closure dates, submission of contract drafts, lawyer's calendars etc.) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month.  This process will be performed in consultation with the claimant.

  - Based on the duration of the legal matter, combined with the timing of significant events, an estimate of the percentage of the total work effort on the case will be assigned to each month.

  - Revenue will be reallocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort incurred on the case.

- For other professional services claimants (not law firms), conduct an examination of available documentation (e.g., budgets, project reports, draft and final deliverables, calendars, time and billing records, progress and status reports, meetings/presentations and other key milestone events) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month.  This process will be performed in consultation with the claimant.

  - Based on the duration of the engagement, combined with the timing of significant events/milestones, an estimate of the percentage of the total effort incurred on the engagement will be assigned to each month.

  - Revenue will be reallocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort incurred on the engagement.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

3.      For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

4.      Where revenue has been amended a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).


Variable Expenses

1.      It is expected that the records maintained by some claimants may not separately identify variable expenses, as defined in Exhibit 4D of the Settlement Agreement, to specific cases/engagements.

2.      Where revenue is allocated on a straight line basis over the duration of a case/engagement, due to the claimant electing not to submit additional documentation, or where there was a lack of sufficient information to reliably estimate and verify when hours were worked/effort was expended, variable expenses incurred during the Benchmark Period (May 2011 to April 2012 or May 2010 to April 2011 if projections are used) and Compensation Period (May 2010 to April 2011) will be allocated to individual months based on that month's revenue as a percentage of total revenue for the same 12- month period.  This approach results in a consistent variable profit margin for each month of any given year (May to April).  The calculation is as follows:

- Monthly Corresponding Variable Expenses during the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses year May 2011 to April 2012 and total revenue for the same period.

- This variable expense percentage is applied to the specific monthly revenue amounts in the Benchmark Period to calculate the Corresponding Variable Expenses for each month.

- Monthly Corresponding Variable Expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for the 12-month period May 2010 to April 2011 and total revenue for the same period.

G20

## **BEL Claims  - Matching of Revenues and Expenses**

### **ATTACHMENT G – Start-Up Businesses Methodology**

- This variable expense percentage is applied to the specific monthly revenue amounts in the Compensation Period to calculate the Corresponding Variable Expenses for each month.

3. Where revenue has been reallocated on a basis other than the straight line basis, variable expenses incurred during the Benchmark and Compensation Periods will be allocated to individual months based on the total effort expended/hours worked, estimated using the same information utilized in reallocating revenue.

Compensation Calculation

1. The revised P&Ls resulting from the reallocation of revenue and variable expenses are utilized as the input for calculating compensation under Exhibit 7 of the Settlement Agreement:

2. Calculate Expected Revenue and Expected Costs

   i. Expected Revenue and Expected Costs shall equal either:

      a. The Actual Revenue and Actual Costs as set forth in the restated P&Ls for the Benchmark Period; or

      b. Revenue and expenses reported on financial projections for the Start-Up Business. The use of such projections would be dependent on satisfying the requirements of Exhibit 7: that the projections were used to seek the extension of credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family provider investors with business lending experience.

   ii. Claimant's Expected Profit/Loss for the compensation period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both expected revenue and expected costs must both be based on qualifying projections.

G21

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

3.      Calculate Actual Profit/Loss

     i.      Actual profit/loss generated over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues as set forth in the restated P&Ls and (ii) the claimant's Actual Variable Costs as set forth in the restated P&Ls, for the Compensation Period.

4.      Compensation will be computed under Exhibit 7 of the existing Settlement Agreement as follows:

     1.   Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated over the Compensation Period.
     2.   Apply the agreed-upon RTP adjustment.
     3.   Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, and/or from any VoO Settlement Payment Offsetor VoO Earned Income Offset, where applicable.

5.      As noted above in 'Utilizing Time and Billing records,' if this data is available and used to reallocate revenues, the additional analysis described below may be performed at this step in order to identify and quantify the various components of the compensation calculation.  This analysis may include consideration of compensation resulting from a decrease/increase in hours, a decrease/increase in rates/awards and an increase/decrease in variable profit margin. Depending upon the level of detail provided, these components may be further analyzed to identify compensation amounts associated with changes in utilization/mix of professional staff as well as changes in types of services/engagements/cases worked on.

**BP's RESPONSE TO CSSP POLICY ANNOUNCEMENT REGARDING POLICY 495:**
**"BUSINESS ECONOMIC LOSS CLAIMS:**
**MATCHING OF REVENUES AND EXPENSES"**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     OVERALL PRINCIPLES AND CONCEPTS ...................................................... 2
        A.      Claims Administrator's General Principles ............................................. 2
        B.      Error Correction ..................................................................................... 4
        C.      Application of Accounting Principles...................................................... 5
        D.      Revenue and Corresponding Variable Expenses ..................................... 6
                1.      Revenue ....................................................................................... 6
                2.      Corresponding Variable Expenses ............................................... 7
        E.      Use of May through April Annual Estimation Period ............................. 8
        F.      Determination of Sufficient Matching and Exercise of Professional
                Judgment .............................................................................................. 10
                1.      In General .................................................................................. 10
                2.      Scope of the Seven Juneau Declaration Criteria......................... 11
                3.      Timing of Application of the  Juneau Declaration Criteria ......... 12

III.    MATCHING METHODOLOGIES...................................................................... 13
        A.      Annual Variable Margin Methodology.................................................. 13
        B.      Construction Methodology ................................................................... 14
                1.      Variable Expenses ..................................................................... 14
                2.      Percentage of Completion or Completed Contract Bases of Preparation ....... 15
                3.      Two-Step Estimation Process ..................................................... 15
                4.      Language About Benchmark Periods Incorrectly Suggesting
                        Inconsistency with the Settlement Agreement Should Be Clarified.............. 16
                5.      Use of Completed Contract Method ............................................ 17
                6.      Application of Customer Mix Test .............................................. 17
        C.      Agriculture and Educational Institutions Methodology......................... 18
                1.      Agriculture Methodology – Consistency with Settlement Language ............ 18
                2.      Agriculture Methodology – Bulk Purchases................................ 19
                3.      Education Methodology.............................................................. 20
        D.      Professional Services Methodology....................................................... 21
                1.      Reliability of Documentation Requirements for Alternative Efforts
                        Based Methodology ................................................................... 21
                2.      Valuation of Work-in-Progress for Contingent Matters ............... 21

IV.     EVALUATION OF EXHIBIT 4B REQUIREMENTS ......................................... 22
        A.      In General............................................................................................. 22
        B.      Customer Mix Test ............................................................................... 23

V.      OTHER TOPICS ............................................................................................... 24
        A.      NAICS Codes....................................................................................... 24
        B.      Failed Businesses ................................................................................. 25
        C.      Start-up Businesses .............................................................................. 27

BP respectfully submits its comments in response to the CSSP's Policy Announcement entitled "Policy 495:  Business Economic Loss Claims:  Matching of Revenue and Expenses" (hereinafter "the BEL Policy").

# I.    INTRODUCTION

As an initial matter, BP acknowledges the diligent and extensive effort by the Accounting Vendors that is reflected in the BEL Policy.  It is apparent that the CSSP and its Accounting Vendors have sought to develop a good faith, comprehensive program to implement the Fifth Circuit's directions to measure Variable Profit under the BEL Framework in a manner that reflects economic reality and results in a realistic measurement of economic loss.  There are, however, some adjustments that should be made in response to several issues that are apparent in the Policy.[1]  Certain aspects of the BEL Policy may result in a failure to achieve a realistic measure of economic loss, and some of the language used suggests departures from the requirements of the Settlement Agreement language, whereas no such departures are necessary to implement the Fifth Circuit's mandate.

The BEL Policy acknowledges the requirement that BEL claims determinations must comply with the Fifth Circuit's October 2, 2013 decision ("Fifth Circuit BEL Ruling"), including the requirement that the CSSP must obtain sufficient claimant financial information to properly identify and match monthly revenues and corresponding variable expenses to achieve a realistic measurement of economic loss.  The standards outlined by the Fifth Circuit must remain the overarching context within which the BEL Policy is adopted and implemented.  This means that final claim determinations must reflect economic reality and the use of an accrual style framework to achieve a realistic measure of actual economic loss.  If this goal is not achieved, it will lead to further disputes and appeals of individual claims, which is not in the interest of any of the parties.

The consistent treatment in the BEL Policy of all claims by initially analyzing the claim and correcting errors, followed by the application of particularized methodologies for achieving a reasonable approximation of the matching of monthly revenues and variable expenses taking into account the earnings cycle of the claimant, and then followed by application of the Variable Profit calculations and Step One and Two Compensation under Exhibit 4C, along with a post-review evaluation of whether the outcome of the review yields a realistic estimate of losses, would be a reasonable approach to the requirements articulated in the Fifth Circuit BEL Ruling.

---

[1]   The issue of the causal-nexus requirement for class membership is currently pending before the Fifth Circuit. The resolution of that issue will have important implications for the processing of BEL claims.  However, BP does not address that issue in this response, but reserves its right to seek any appropriate modifications of this policy in response to the Fifth Circuit's resolution of the causal-nexus issue.

However, there are several significant questions and issues that must be addressed before the BEL Policy is finalized, in order to ensure that the BEL Policy is in compliance with the Fifth Circuit's requirements.  These issues include, among others:

- The scope and definition of errors and how they are identified and corrected;

- The lack of details concerning accounting principles, including the definitions of, and attribution rules concerning, revenue and corresponding variable expenses;

- The discretion granted to the Accounting Vendors to make decisions about whether a claimant's P&Ls are sufficiently matched, without any explanation of what standards will be used to exercise that judgment;

- Use of a May through April annual estimation period that risks interfering with the integrity of the fiscal year financial information;

- Unnecessary assertions of departures or the appearance of departures from the Settlement Agreement in the use of estimation methodologies; and

- The proper application of the requirements of Exhibit 4B when adjustments to revenue inputs have been made.

We address below these and certain other issues we have identified based on the language of the BEL Policy and the parties' meeting with the CSSP Accounting Vendors last week, and we offer some precise, constructive suggestions as to how the Policy could be improved to address each issue and more closely adhere to the Fifth Circuit's decision, as well as the Settlement Agreement.  BP specifically preserves and does not waive its right to address other issues that may arise or come to its attention with regard to the CSSP's interpretation or implementation of the BEL Policy.


## II.    OVERALL PRINCIPLES AND CONCEPTS

### A.    Claims Administrator's General Principles

In its previous submissions, BP articulated seven principles that should guide the Settlement Program in ensuring that awards to BEL claimants compensate actual economic damages.[2]  The CSSP should expressly adopt those principles in the BEL Policy.  The articulation in the BEL Policy of ten underlying principles is helpful for understanding the Claims Administrator's conceptual framework for crafting the BEL Policy, and several of those conclusions are consistent with BP's seven principles.  For example, we agree with principles Nos. 1-3, and No. 7, which are essential to achieving the proper implementation of the Fifth

---

[2]  See BP's November 21, 2013 Proposal for Matching and Memorandum in Support of Permanent Injunction Related to BEL Claims (Doc. No. 11886).

Circuit BEL Ruling.  We also agree with the observation in principle No. 8 that certain industries (construction, agriculture, education and professional services) have unique characteristics and should be the subject of particularized rules in order to achieve sufficient matching in a way that reasonably depicts economic reality for purposes of loss measurement.  However, as discussed further below, we do not agree that these are the only industries for which particularized rules are warranted.

We do not fully understand the purpose of principle No. 4, which seems to assert that correct matching of revenues and expenses is not achievable.  The assertion that proper matching cannot be achieved in a cost effective manner is inconsistent with BP's experience and review of thousands of claims files to date.  That experience establishes that it is possible to obtain the necessary records required to evaluate a claimant's monthly P&Ls and make the adjustments that would be appropriate under an accrual style framework in order to achieve a reasonable measure of actual economic losses.[3]  The necessary adjustments can be made efficiently, without unreasonable burden of time or resources.  Principle No. 4 should be eliminated or modified for the additional reason that it is not fully consistent with the Policy provisions requiring the correction of errors.

We are also concerned that the BEL Policy grants significant discretion to the Accounting Vendors to determine and correct errors (principle No. 5) while leaving some ambiguity as to what constitutes an error, and also grants discretion to determine whether a claim is deemed sufficiently matched without setting forth specific criteria (beyond the seven Juneau criteria used in identifying matching problems) that must be met before such a determination can be reached (principle Nos. 5, 10).  The issue of discretion in the exercise of professional judgment is discussed further below.  Nevertheless, BP believes that the Accounting Vendors can achieve the goal of realistic measurement of actual economic losses if the error correction process is done in a comprehensive manner and with appropriate supervision and quality control procedures in place.  Furthermore, the representations by the Accounting Vendors during the February 20, 2014 meeting would address various concerns of BP about the error correction process, and the BEL Policy should be updated to include those representations.[4]

Principle No. 6 reflects an assessment that the majority of claimants will be evaluated under the  Annual Variable Margin ("AVM") methodology, which is later described as being applicable to short cycle claimants.  We do not agree with the assertion that this methodology "is the most feasible methodology in the context of a class-wide settlement."  BP explained in its November 21, 2013 submission the most appropriate methods for evaluating short cycle claimants.  Nevertheless, BP does not object to the use of the AVM methodology, provided that the nature of the claimant's business fits this method, and that the other issues we raise herein are appropriately addressed.  In addition, the CSSP must take care to ensure that businesses that do not fit within the short cycle business model or that have unique characteristics impacting the

---

[3]  See Declaration of Brian Gaspardo, October 9, 2013.

[4]  For example, during the February 20, 2014 meeting with the CSSP Accounting Vendors, PwC confirmed that a well-documented record of all decisions, judgments, error corrections, communications with claimants, etc., would be created for every claim and will be available to the parties.  The BEL Policy should be updated to reflect this representation.

timing of revenue are not included in the AVM methodology and are handled in a manner that appropriately achieves a realistic measure of economic loss.  Principle No. 8 identifies several such businesses requiring a more "customized methodology," but there are other businesses that should be carefully considered for more customized treatment, such as real estate brokers and agents.

We agree with principle No. 9, and it reflects the authority granted to the CSSP under Exhibit 4A to obtain additional documents and/or information from the claimant necessary for a proper evaluation of the claim.

We discuss below our concerns about the lack of clarity in principle No. 10 around the standards to be used in the exercise of professional judgment by the Accounting Vendors.

### B.    Error Correction

In a footnote that first appears on page 3 of the BEL Policy, "Errors" are defined as: "accounting transactions that have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories."  The footnote further states that "accounting estimates now determined to be inaccurate will not be considered accounting errors, if the entries were made in good faith with the best available information at the time."

**Comments:** If implemented robustly and in good faith, the error correction process as used in the BEL Policy will be an important step toward meeting the requirements articulated by the Fifth Circuit.  BP is concerned, however, that the concept of "errors" could be viewed too narrowly—*e.g.*, resulting only in the correction of entries that are plainly mistaken, rather than more broadly viewing as errors any failure to use an accrual-style framework to reflect historical economic reality.  Furthermore, the Fifth Circuit requirement to achieve a realistic measure of economic loss dictates that corrective adjustments must be made to estimates that have been determined to be inaccurate or distortionary to the measurement of economic loss.[5]  The BEL claim evaluation effort is a retrospective review of the facts to calculate lost profits with the benefit of hindsight, not an evaluation of whether an original estimate was made in good faith or not.  Moreover, as discussed further below, errors should be corrected using the fiscal year information before any analysis of a May through April framework can be performed, because (1) year-end adjustments typically relate to prior months within the same fiscal year and (2) reconciling information to the tax returns can provide additional assurances that the fiscal year revenue and expenses are accurate.

---

[5]   See, e.g., Proposed Guidelines for Implementation of BEL Claims Processing Consistent with the Fifth Circuit BEL Opinion, Section III (Doc. No. 11886-2) at pp. 2, 4.

**Proposal:**  Update the BEL Policy to clarify expressly, as the Accounting Vendors confirmed during the February 20, 2014 meeting, that the definition of "Errors" includes the proper analysis and allocation of year-end true-up and other correcting or cumulative entries, including, but not limited to, adjustments for inventory and cost of goods sold, bad debt write offs, percentage of completion accounting, revenue and/or expense spikes not consistent with economic reality, and similar adjustments.  The BEL Policy should expressly clarify that error review and correction will include monthly revenue entries for AVM claims and/or monthly expense entries for Construction claims that are not consistent with widely accepted accounting concepts and with economic reality, as discussed in the Fifth Circuit's decision and BP's prior submissions.  The updated BEL Policy should make clear that estimates that are determined to have been inaccurate must be adjusted to reflect economic reality in order to comply with the Fifth Circuit ruling.  Also, the updated BEL Policy should explicitly recognize that errors must be corrected using the fiscal year information before any estimating methodologies using a May through April or other time frame can be utilized.

### C.    Application of Accounting Principles

In the definition of "Errors" that first appears in a footnote on page 3 of the BEL Policy, the concept of "mistake in application of accounting principles" is undefined.

**Comments:**  A claimant's error in applying "accounting principles" will be corrected by CSSP accountants, but the BEL Policy does not explain what basis of accounting will be used to determine whether an accounting principle has been misapplied.  This leaves a great deal of uncertainty concerning when and how errors will be identified and provides no information about the standard to be used for making correcting adjustments to the contemporaneous monthly P&Ls that are part of the inputs to the BEL claims determination process.  The Fifth Circuit BEL ruling requires the use of an accrual style framework for such rules.  During the February 20, 2014 meeting held by the Claims Administrator, the Accounting Vendors were asked about this issue; they explained that claim files would be reviewed carefully and if there were significant amounts reflecting approaches that do not reflect widely accepted and common accrual accounting practices, an appropriate review and adjustment would be made.[6]  This clarification should be expressly set forth in the BEL Policy.  Moreover, BP's November 21, 2013 submission, at Attachment 2, included detailed suggestions for the substantive approach to attribution of revenue and corresponding variable expenses that should be adopted consistent with widely accepted accounting concepts and with achieving a realistic measure of economic loss.[7]

---

[6]  Mr. Hacker of PwC explained that commonly understood accounting principles would be followed.  Mr. Martens, also of PwC, confirmed that there are a whole host of appropriate accounting principles that would be applicable to the evaluation of claims for errors in application of an accounting principle.  For example, Mr. Martens agreed that year-end adjustments to cost of sales, where the claimant had recorded its purchases as expenses each month, would need to be corrected and reallocated to the proper months, and he agreed that advance payments for future services incorrectly recorded as revenue should be adjusted.

[7]  See Proposed Guidelines for Implementation of BEL Claims Processing Consistent with the Fifth Circuit BEL Opinion, Section III (Doc. No. 11886-2).

The CSSP should also recognize that because the review of claims is a retrospective analysis with the goal of achieving a realistic measure of economic loss, corrections should also take account of subsequent events that make clear that original amounts recorded were not correct, in hindsight.  That is, the BEL Policy proposal's general rule against correcting estimates that later prove to be inaccurate ("accounting estimates now determined to be inaccurate will not be considered accounting errors, if the entries were made in good faith with the best available information at the time") is likely to result in measurements of revenue and variable expenses that deviate from economic reality and result in unrealistic damage estimates, contrary to the Fifth Circuit's ruling.

**Proposal:**  The BEL Policy should be updated to explain in more detail which accounting principles will be used to evaluate whether revenue, expenses, and other transactions are erroneously recorded for purposes of the BEL claims review process.   This explanation should confirm that widely accepted and common accrual accounting concepts and practices, as well as the adherence to economic reality, would form the underlying basis for a careful review of claim files by professionals with appropriate training and supervision, as long as those concepts and practices are consistent with the overarching goal of achieving results that reflect economic reality and a realistic measurement of economic loss.  When available, retrospective data that reflect actual revenue earned and expenses incurred should be incorporated into the BEL analysis instead of simple reliance on contemporaneous estimates.  Further, the CSSP should adopt the substantive approaches included in BP's November 21, 2013 submission or develop and articulate its own specific rules.

### D.     Revenue and Corresponding Variable Expenses

In Underlying Principle No. 5, the BEL Policy states: "In utilizing such contemporaneous P&Ls, corrections will be made for any accounting 'errors' identified in the ordinary course, by the CSSP Accounting Vendors."  For each of the industry-specific methodologies described, beginning at Attachment B, the BEL Policy provides as step 2 that "[i]f the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue and variable expenses to the appropriate month."

### 1.     Revenue

**Comments:**  The BEL Policy does not clearly define "revenue" or the period to which revenue should be attributed when correcting errors in the claimants' P&Ls.  The Fifth Circuit BEL Ruling requires the use of an accrual style framework.   BP's November 21, 2013 submission, principle 1(c), explained that the BEL Policy should:

> "Employ a definition of 'revenues' that treats as revenues those enhancements of an entity's net assets which derive from earnings activities constituting its principal ongoing business operations."

6

The term "revenue" has the common and widely understood meaning that BP explained in its briefing before the District and Appellate Courts with respect to the BEL Policy.  But unless the BEL Policy follows that definition, certain inflows of cash or assets could improperly be treated as "revenue."  SFAC No. 6, which the Fifth Circuit cited in its BEL Opinion, *see* 732 F.3d at 333, defines revenues as "enhancements of assets of an entity" from "activities that constitute the entity's ongoing major or central operations."  Asset enhancing activities are the work a business does or the costs it incurs that give rise to the right to receive cash or other consideration.

BP's November 21, 2013 submission, principle 1(d), explained that the BEL Policy should:

> *"Attribute monthly 'revenues' in a manner consistent with economic reality based on those business operations that generate earnings."*

The BEL Policy does not clearly define the period to which revenue should be attributed when correcting errors in claimants' P&Ls.  The Fifth Circuit BEL ruling requires the use of an accrual style framework; however, the Policy does not describe on what basis the CSSP Accounting Vendors might attribute revenue.

Revenue must be attributed reliably in order to ensure that the Variable Profit calculation results in a calculation of losses that reflect economic reality.  To that end, rules for revenue attribution are important and will assist the Settlement Program in ensuring that claimants with like losses receive like compensation.  Revenue attribution rules should be based on objective indicators that reflect true asset enhancement, and correspond to the timing of when revenue is earned.

**Proposal:**  The CSSP should publish revenue attribution rules consistent with the adoption of an accrual style framework as required by the Fifth Circuit.  In its November 21, 2013 submission, Attachment 2, BP suggested rules for revenue attribution that would meet the criteria established by the Fifth Circuit.[8]  These rules should be adopted by the CSSP and included in the BEL Policy.  This is particularly important in order to provide consistent and similar treatment among claimants, and also to avoid departing from the mandate of the Settlement Agreement and the Fifth Circuit to reflect economic reality.

### 2.      Corresponding Variable Expenses

**Comments:** In its November 21, 2013 submission, principle 1(e), BP explained that the BEL Policy should:

> *"Employ a definition of 'corresponding variable expenses' that treats as such expenses those actual or expected reductions in net assets that have occurred or will occur as a*

---

[8]   See Proposed Guidelines for Implementation of BEL Claims Processing Consistent with the Fifth Circuit BEL Opinion, Section III (Doc. No. 11886-2).

*result of the entity's principal and ongoing business operations and, for any given month, were incurred to generate the revenues properly attributed to that month."*

As with "revenue," the term "expenses" is undefined in the Policy.  SFAC No. 6, which the Fifth Circuit cited in its BEL Opinion, *see* 732 F.3d at 333 & n.4, defines expenses as those actual (or expected) outflows of net assets that have occurred (or will occur) as a result of the entity's principal and ongoing business operations.

**Proposal**:  The CSSP should make explicit the definition of corresponding variable expenses that will be used for evaluation of BEL claims and correction of errors, and use the definition proposed by BP.

### E.        Use of May through April Annual Estimation Period

As currently written, the BEL Policy  utilizes a May through April annual estimation period both to determine variable profit margin and to reallocate variable expenses (in Attachments B and D) or revenues (in Attachment C) for monthly P&Ls insufficiently matched after any error corrections.  As explained both in the Policy statement and at the February 20 meeting, the CSSP wants to bifurcate the pre-Spill and post-Spill months when determining profit margins while also maintaining the integrity of a twelve month business cycle in correcting insufficiently matched monthly P&Ls.

**Comments:**  Certainly, because most firms use an annual accounting cycle, use of a twelve month period to estimate variable profit margin for attributing monthly revenue and variable expenses is critical for the realistic measurement of economic loss.  As the CSSP explained at the February 20 meeting, a sufficiently long period is necessary to accurately capture a full business cycle in evaluating variable profit percentage.[9]  The fundamental nature of improperly matched financial statements means that corresponding revenues and variable expenses may be separated by many months.  Use of an estimation period other than twelve months to estimate variable profit margins would likely separate related revenues and expenses or combine unrelated revenues and expenses.  More obviously, because most claimants utilize a twelve month fiscal year with a "hard close" only at the beginning and end of that twelve month period, any margin estimate must utilize that twelve month period to appropriately include the corrections and cumulative entries performed only at fiscal year-end.

The need to compare and match revenues and the corresponding variable expenses, however, creates some intellectual tension with the CSSP's selection of a May-April estimation period.  As the Policy recognizes in Attachment C, most construction companies conduct a "hard close" only at the end of their fiscal year.  That "hard close" issue described in Attachment C is not unique to construction firms, but is an important issue for those businesses which, for IRS

---

[9]    Mr. Hacker further explained, during the February 20, 2014 CSSP meeting, that if a period of less than twelve months were used for estimation purposes, there would be a great likelihood that the estimation of expenses would be skewed.

and other reporting requirements, are uniquely concerned about the completeness and accuracy of their twelve-month fiscal year financial statements.  The "hard close" is intended to ensure the twelve month fiscal year is supported by accurate balance sheets on both the period beginning and ending dates.  Subsequently, the revenues and expenses included in the fiscal year income statement are typically intended to be correct for that twelve-month period overall (though not for each specific month).

The parties recognized the importance and integrity of the fiscal year by requiring monthly financial data to be accompanied by tax returns for all claimants so that the aggregate monthly data could be reconciled to tax returns.  Designating a May through April period to measure variable profit margin, however, combines information from different fiscal years, and thus fails to properly match fiscal year-end adjustments with the twelve-month period generating the adjustment.  That is, any claimant without a May through April fiscal year would have activity from one fiscal year matched with activity from a different fiscal year, leading to distortions in the measurement of variable profit margins in both fiscal years.  As acknowledged in Attachment C, the twelve month fiscal year is more likely to be an accurate reflection of variable profit margin as well as total revenues and total variable expenses due to the "hard close."  Accordingly, while the pre- and post-Spill considerations outlined by CSSP are legitimate concerns, there are no accurate data to support use of a May through April reporting period.  Further, the inherent loss of accuracy makes this convention likely to distort economic reality by attempting to match unrelated financial results across fiscal years.

BP's intention and belief throughout this process has been that the Settlement Agreement should utilize underlying financial data which reflects economic reality, and should be applied in a way that produces a "realistic measurement of economic loss."  The twelve month fiscal year provides the more accurate reflection of variable profit margin due to the existence of a "hard close" at the beginning and end of the fiscal period, and helps to achieve the goal of matching revenues and variable expenses that correspond to that revenue rather than mixing activity across fiscal years.[10]

**Proposal:** Eliminate the use of the May-April estimation period.  Employ a fiscal year approach to evaluating margins and correcting matching, which creates a single standard and would reduce (but not eliminate) the interpretive tension around what should, and should not, be considered an error.  It would also be simpler to administer for many claimants that use a January to December fiscal year since claimant documentation has been submitted on this basis.  Therefore, replacing the May through April period with the claimant's fiscal year would improve the transparency, accuracy and simplicity of both the BEL Policy matching procedures and the application of Settlement Agreement Exhibit 4C and would more accurately comport with the Fifth Circuit's mandate to achieve economic reality.

---

[10]  The "hard close" process does not ensure accuracy, of course, and those adjustments must be scrutinized to ensure consistency with the objectives of the Settlement of achieving a realistic measure of economic loss.

**F.**     **Determination of Sufficient Matching and Exercise of Professional Judgment**

**1.**     **In General**

Under the terms of the BEL Policy, claims will be reviewed for sufficient matching using the professional judgment of the CSSP Accounting Vendors as well as the seven criteria listed in the Declaration of Patrick Juneau dated October 25, 2013 (the "Juneau Declaration criteria"). Thus, the BEL Policy allows the CSSP Accounting Vendors, using professional judgment, to determine that P&Ls submitted in support of a claim are not sufficiently matched, even if they pass the Juneau Declaration criteria. Claims that are deemed to be sufficiently matched proceed to be processed under the Settlement Agreement BEL Compensation Framework, using contemporaneous P&Ls that have been reviewed and corrected for errors. The accounting vendors' use of professional judgment is invoked in the following examples from the BEL Policy:

- Underlying Principle No. 10, page 3 ("Consideration of whether revenues and expenses are sufficiently matched necessarily involves an element of professional judgment. The CSSP recognizes and reserves the right of the CSSP Accounting Vendors to exercise such professional judgment to achieve sufficient matching as ordered by the Court.");

- Identification of Unmatched Claims, pages 4-5 ("Any claim, whether based on accrual or cash-basis records, that does not fall within one of the foregoing seven criteria shall be presumed to be 'sufficiently matched,' provided, however, that if in the professional judgment of the CSSP Accounting Vendors, a claimant's financial records contain other significant indicia that the claim may not be "sufficiently matched," the CSSP reserves the right to identify such claim for further matching analysis as set forth below.");

- Identification of Unmatched Claims, page 5 ("With respect to any claims where matching is determined to be an issue as set forth in this paragraph I.A. above, the CSSP Accounting Vendors will exercise their professional judgment to determine whether that claim is 'sufficiently matched' based upon the evaluation of the information submitted and available to them, including, when applicable, the nature and complexity of the industry or business in question, particularly with regard to claims based upon cash-basis accounting records.").

**Comments:** It is unclear what standards will be used to evaluate whether a claimant's P&Ls are sufficiently matched (beyond the seven Juneau Declaration criteria) so that the claim will be evaluated and compensation determined. We believe that some basic clarity is important. The BEL claims determination process should be reasonably transparent to the parties so that it is clear to the claimant, the PSC, and BP exactly what steps were taken and which judgments were made. The BEL Policy must ensure that claims that continue to reflect improper accounting or unusual patterns will not be processed for payment until appropriate adjustments are made.

**Proposal:** The CSSP Accounting Vendors should provide a detailed explanation and guidance concerning how their "professional judgment" would be exercised under a variety of scenarios. In addition, the Policy should clarify that each claim determination will include

10

complete documentation of the steps taken and the judgments and calculations made by the Accounting Vendors or any other CSSP personnel such that a reviewer could fully understand and reproduce the results.[11]  The BEL Policy should articulate how this documentation process is to be communicated both to claimants and BP, and the parties should have the opportunity to comment on the CSSP's proposed approach.  There should also be a process in place to review claims determinations to evaluate whether matching issues continue to exist, or whether an initial claim determination is not in fact a realistic measure of economic loss, prior to making that claim determination final and available to the parties.

For example, as a further check on the discretion and judgment used by CSSP Accounting Vendors, the Policy should establish a standard post-matching claim review for each offer to determine whether the result of the matching process yields a realistic measure of economic loss.  This can be accomplished by an evaluation of a variety of metrics, including BP's prior proposal to compare the claimant's "but for" May-December 2010 variable profit implied by the BEL offer compared to the claimant's average May-December variable profit in the benchmark period.  Offers that imply that the claimant's "but for" variable profit would have been more than 25% higher than that in the benchmark period would necessitate a further modification of the proposed matching methodology for the claim.

### 2.      Scope of the Seven Juneau Declaration Criteria

The BEL Policy at page 4 describes the application of the seven Juneau Declaration criteria to be used for screening claims to determine whether the claimant's monthly P&Ls are sufficiently matched.

**Comments:**  The Juneau Declaration criteria  are appropriate; however, they leave potential remaining gaps that could allow the processing of claims containing errors and irregular patterns.  In its November 21 submission, BP explained in its principle 1(b) that the BEL Policy should:

> *"Screen all BEL claims for failure to record monthly revenues and corresponding variable expenses accurately, using a proper accrual framework and triggers consistent with those identified in the Declaration of Patrick Juneau, Oct. 25, 2013 (Doc. No. 11741), and the Declarations of Hal Sider, Oct. 9, 2013 (Doc. No. 11726-8) and Nov. 7, 2013 (Doc. No. 11819-3)."*

The BEL Policy adopts the  Juneau Declaration criteria, which are consistent, in part, with BP's submission and are appropriate.  However, the Juneau Declaration criteria leave potential remaining gaps that could allow the processing of claims containing errors and irregular patterns.

---

[11]   PwC confirmed during the February 20, 2014 CSSP meeting that this procedure would be part of the claims review process, and that all decisions and calculations will be well documented.

For example, the proposed metrics identified in the Sider declarations include factors—such as the presence of negative variable profits in a month, and the presence of line item expenses for a given month that appear to reflect expenses for multiple periods concentrated in a single month—which are not reflected in the Juneau Declaration criteria, but which are indicative of a lack of proper matching.  Additionally, the proposed Sider metrics set a threshold for identifying revenue or expense "spikes" of 17% for a given month, below the levels of 20% and 25%, respectively, proposed in the Policy.

**Proposal:**   BP proposes that the CSSP incorporate three additional metrics for identifying matching issues previously proposed into its claims review process, two of which are based on line-item expenses already captured in CSSP's claims review process:  (i) claimants with material negative variable expense line items; (ii) claimants with material bad debt expense spike; and (iii) claimants with material negative variable profit in a given month.

**Negative Variable Expense Line Items:**  Negative line item expenses typically reflect adjustments or corrections to entries in prior periods. Entries of this type thus imply that expenses are misreported for at least two months—the month with the negative line item and one or more prior months.  Application of this proposed criterion would be focused on significant variations by limiting it to variable cost line items that account for 5% or more of a claimant's total variable expenses across Benchmark and Compensation Years.    Line-item information is captured in CSSP's BEL workbooks and is readily available to CSSP for analysis.

**Bad Debt Expense Spikes:**   Bad debt expenses typically reflect a "true up" entry reported at year end (or at other potentially irregular intervals) and thus often indicate the presence of matching problems.  Bad debt expenses account for revenue reported in prior months that was not paid to the firm, and that the firm no longer expects to receive. Bad debt expenses signal potential matching problems because they reflect overstated expenses in one period and overstated revenue in others.  Consistent with BP's prior submission, BP proposes the use of a metric that identifies only claims with material bad debt expenses, defined as those in which (i) one month accounts for 50% or more of the claimant's annual bad debt expenses and (ii) annual bad debt expense exceeds 1% of the claimant's annual revenue.

**Negative Variable Profit:**  The presence of negative variable profit in a month can indicate potential matching problems. Because firms typically do not operate when (correctly measured) variable expenses exceed revenue, the presence of negative variable profit in a given month can indicate errors in reporting of revenue and/or corresponding variable expenses in prior periods. The proposed additional criterion would identify claims in which a claimant reports negative variable profits in a month exceeding 1% of the claimant's annual revenue.

### 3.    Timing of Application of the  Juneau Declaration Criteria

The BEL Policy is ambiguous concerning whether errors are reviewed and corrected before or after the Juneau Declaration criteria are applied, or both.

**Comments:**  The BEL Policy does not explain, for example, if the Juneau criteria are re-applied following the correction of accounting errors for circumstances in which the original P&Ls passed the Juneau criteria.  *See* page 5 ("For those claims determined *to* be sufficiently matched, the CSSP Accounting Vendors will utilize claimant-submitted accounting records (adjusted for any identified accounting errors) to calculate compensation as set forth in the Settlement Agreement."), page B1 (For unmatched claims, the BEL Policy requires, e.g., that "[t]he claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses."), page B2 ("If [those adjustments] result in revised P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 4C using such P&Ls.").  In addition, the CSSP's initial implementation of the Juneau Declaration  criteria indicated that the criteria were applied only to the claimant's Compensation and Benchmark Periods.  However, because determination of the benchmark years depends on the results of the matching process, it is essential to apply the seven criteria analysis to all years of available data provided by the claimant.

**Proposal:**  Amend the BEL Policy to clearly state that the Juneau Declaration criteria will be applied at multiple stages in the process, including as the final step.


# III.   MATCHING METHODOLOGIES

## A.   Annual Variable Margin Methodology

The Annual Variable Margin ("AVM") methodology uses an annual measurement period of May through April for the purpose of estimating and allocating corresponding variable expenses to monthly revenue over the same period.  We understand that the rationale for using a May through April estimation period was to be responsive to potential concerns about the use of a fiscal year annual estimation period—namely, that it might result in the economic performance of variable profits during the pre-spill 2010 months of January through April affecting the determination of variable profits in the post-spill months of May through December 2010, by making those post-spill variable profit estimates higher than they would otherwise be.  The BEL Policy therefore creates an artificial year for estimation purposes, running from May through April.  See, for example, Attachment B ("Annual Variable Margin Methodology"):

- Benchmark Period:  The time period over which revenues and variable expenses will be compared is May through April, thereby bifurcating the result of operations pre-spill from those post-spill.  (Page B2.)

- Compensation Period:  Monthly Corresponding Variable Expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for the 12-month period following the date of spill (i.e., May 2010 through April 2011) and total revenue for the same period.  (Page B3.)

**Comments:**  There were views expressed during the February 20, 2014 meeting that use of a May through April annual estimation period might introduce additional concerns that would

not be present if the BEL Policy adhered to a fiscal year basis.  There are benefits to using the fiscal year, including the ability to reconcile aggregate monthly P&Ls to contemporaneous and reliable evidence such as federal tax returns, and the fact that year-end adjustments typically relate back to months during the fiscal year.  Indeed, the Construction methodology (discussed further below) recognizes that it is necessary and correct for revenue to be reallocated to months using a fiscal year due to the widespread use of year-end revenue "true-up" adjustments.  The CSSP's concern that a fiscal year approach would mix pre-spill and post-spill economic performance is mitigated by the fact that revenues from the pre-spill months are not being changed other than for corrections.  Thus, the AVM methodology would not mix post-spill and pre-spill revenue in 2010.

      **Proposal:**  The CSSP should eliminate the use of the May through April period.  Considering the balance between the choice of the May through April estimation period and a fiscal year estimation period, in our view, as discussed in II.D. above, that balance strongly favors the use of a fiscal year for estimation purposes.  The use of a fiscal year allows for better assurance that aggregate revenues and expenses are accurate, because they can be reconciled to reliable contemporaneous records such as federal tax returns.  In addition, year-end adjusting entries, true-ups, and corrections typically reflect and relate to economic activity that has already occurred, and consequently require allocations over the months in the fiscal year.

### B.    Construction Methodology

#### 1.    Variable Expenses

      The Construction methodology, when applicable, allocates revenue to the appropriate months based on the relationship between monthly variable expenses and annual variable expenses over a twelve month estimation period.  This approach can be a reasonable method of estimating the economic performance over the estimation period and achieving a realistic measure of economic loss.  An important assumption in this methodology is that monthly variable expenses are accurate, after correction for errors.[12]  There are unique issues posed by the record keeping practices of many construction claimants that may result in irregular and economically unreliable patterns of recording payments to subcontractors, or the recording of bulk purchases of materials when purchased but prior to those materials being used.

      **Comments:**  Variable expenses used for matching may be inaccurate due to the patterns of payment and recording used by construction claimants in their monthly records, which may not accurately reflect the expenses actually incurred in each month, but instead may reflect payment in one month for expenses (such as subcontractor payments) incurred for materials or services delivered over a several month period.  Because the monthly variable expenses form the basis for allocation of revenues over the estimation period, careful diligence is necessary to find and correct anomalies in the recording of the variable expenses.  It will be important for the

---

[12]   Mr. Keenan of PwC explained at the February 20, 2014 CSSP meeting that spikes in variable expenses would be carefully reviewed to determine whether an error existed.

Accounting Vendors to review and request all relevant documentation to determine whether variable expenses are appropriately included in the months in which the materials, labor or services were used on construction projects (or manufacturing projects).

**Proposal:** The BEL Policy should be updated to clarify that variable expenses will be closely scrutinized and appropriate adjustments to variable expenses made before applying the Construction methodology.  It would be useful to include a specific example in the BEL Policy to make clear to the parties how the corrections and adjustments will be made.

## 2.  Percentage of Completion or Completed Contract Bases of Preparation

The first paragraph on page C2 provides:  "This methodology will not apply to claims whose submitted P&Ls were prepared under either a percentage of completion or completed contract basis of accounting that are deemed 'sufficiently matched,' which claims will be processed under the methodology set forth in Exhibit 4C, utilizing the contemporaneous P&Ls."

**Comments:**  This language is ambiguous as to its meaning and how it will be applied. First, no standard is articulated in the Construction methodology for determining whether monthly P&Ls prepared under a percentage of completion or completed contract basis should be "deemed sufficiently matched" such that no further evaluation is required.  During the February 20, 2014 CSSP meeting with the parties, the Accounting Vendors clarified that all construction claims would be reviewed and analyzed, even where the claimant purports to have prepared the monthly P&Ls under a percentage of completion or completed contract method.

**Proposal:**  The BEL Policy should be updated to clarify that all construction claims will be evaluated to determine whether sufficient matching of monthly P&Ls exists.

## 3.  Two-Step Estimation Process

The Construction methodology, at page C1, describes a multi-step process (1) analyzing the claimant's financial results and re-allocating revenue based on its fiscal year, and (2) restating P&Ls by further re-allocating revenue to a May through April period in both the Benchmark and Compensation Periods.  The BEL Policy explains that "[a]nalyzing P&Ls for the 12 months that comprise a claimant's fiscal year typically yields a more accurate and complete record of the results of operations for the 12 months then ended, as in the CSSP Accounting Vendor's experience there is typically a 'true up' or 'hard close' performed at the end of the year."  Thus, the first step uses the fiscal year as the estimation period to allocate revenue to months based on that month's percentage of variable expenses relative to the annual variable expenses.  The second step then performs an additional estimation methodology, using a May through April annual period to reallocate variable profit/revenues to each month using the same allocation technique used in step one.  The purpose of the second step is to respond to a concern that step one may have resulted in variable profit from the pre-spill period becoming mixed into the post spill variable profit calculation.

15

**Comments:** BP does not agree with the use of the two-step methodology. The two-step Construction methodology is unlikely to result in improved reliability relative to a one-step approach based on the claimant's fiscal year. We agree that review and estimation of the monthly revenues based on corrected and adjusted variable expenses using a fiscal year estimation period is essential for achieving more accurate estimations of monthly revenues. Fiscal year information can be evaluated by comparison to reliable contemporary records such as annual federal tax returns. In addition, the adjusting entries made at fiscal year-end tend to relate to the prior months during that same fiscal year. The BEL Policy appears to be trying to balance competing concerns about isolating post-spill and pre-spill economic performance and the need for accurate fiscal year analyses. We appreciate those concerns, but as discussed above, we believe the balance tends to favor use of the fiscal year approach. The proposed Construction methodology already recognizes that it is necessary (and correct) for revenue to be reallocated across months due to the widespread use of year-end revenue "true ups."

The use of the fiscal year estimation period also would reduce the documentation requirements faced by many claimants, recognizing that the use of the May through April year would require Construction claimants subject to the V-test to provide P&L data from January-April of 2012 and Construction claimants that wish to use 2007 as a benchmark year would need to provide P&L data from May-December of 2006. Claimants with a January-December fiscal year would face no new documentation requirements. Finally, as the BEL Policy acknowledges, the Construction methodology "is premised on the assumption that variable expenses of a construction claimant are more accurately recorded on monthly P&Ls than are revenues." Once corrected for any errors, these variable expenses will not be reallocated even under a fiscal year approach. Thus, any changes in variable expenses due to the DWH spill will be preserved in the claimant's financial records after the implementation of the Construction methodology.

**Proposal:** Eliminate the second step (restating P&Ls to a May through April period).

### 4.    Language About Benchmark Periods Incorrectly Suggesting Inconsistency with the Settlement Agreement Should Be Clarified.

Footnote 8 on page C4 defines "Benchmark Period" by reference to May through April periods that appear to be different from the Benchmark Years described in the BEL Compensation Framework.

**Comments:** The Benchmark Periods described in the footnote may appear to be inconsistent with the Settlement Agreement, Exhibit 4C, pp. 1-2, but they are not. As we understand the BEL Policy, the various annual periods described, such as the May through April Benchmark periods, are simply part of the estimation methodology and not a departure from the Settlement language. The BEL Policy's methodology does not actually change the Benchmark Period under Exhibit 4C; rather, it is using an annual estimation period for purposes of estimating and allocating monthly revenue to be used in the Benchmark and Compensation Periods contemplated by Exhibit 4C.

**Proposal:**  Update the BEL Policy to clarify that it does not change the "Benchmark Period" as provided in Exhibit 4C and that the references to annual estimation periods are part of the methodology for estimating and allocating monthly revenues, not a purported change to the Settlement, which would be beyond the CSSP's authority.   For example, the BEL Policy could refer to this as the "Variable Margin Estimation Period" to prevent confusion with the "Benchmark Period" terminology.

### 5.      Use of Completed Contract Method

One issue discussed at the February 20 meeting, but not specifically addressed in the BEL Policy, is the methodology for sufficiently matching claimants submitting monthly P&Ls prepared on a completed contract basis.

**Comment**:  BP does not agree that the completed contract method can be used to achieve proper matching consistent with economic reality.  Even if done correctly, a claimant using the completed contract method would accumulate project costs incurred over multiple months and report them as variable expenses (COGS) all in the single month when the project is completed (and all revenues would be reflected in that month as well, regardless of payment schedule). However, assuming a project occurring over multiple months, the economic activity is not reflected in the monthly P&Ls when work is performed, and the monthly P&Ls are unlikely to either reflect economic reality or result in a "realistic measurement of economic loss" when processed as described in Settlement Agreement Exhibit 4C.  In fact, financial reporting under the completed contract method perhaps more closely parallels a contingency law firm rather than a construction company that is able to reasonably estimate its costs and revenues and uses the percentage of completion method.

**Proposal:**  The BEL Policy should be updated to eliminate its acceptance of the completed contract method as a way to achieve sufficient matching of P&Ls.  For completed contract claimants, the CSSP should develop a better, more precise estimation approach for accurately reflecting earnings activities and properly calculating a "realistic measurement of economic loss."  This could be achieved by first attributing the variable expenses to the months where work was performed, and then following the Construction methodology.  Alternatively, the professional services methodology could be applied to construction claimants using the completed contract method.  Once the earnings activities are assigned to the proper months, revenues can be appropriately matched to that earnings activity.

### 6.      Application of Customer Mix Test

The final paragraph on page C2 describes difficulties in satisfying the Customer Mix Test.

**Comments:**  The assertion in this paragraph is inconsistent with economic logic and the requirements of Exhibit 4B.  If a claimant has records to satisfy the Customer Mix Test (which requires accurate revenue measured by month and customer), then that claimant should also be

able to provide records required for proper matching.  This issue is discussed in more detail in section IV.B. below.

**Proposal:**  The Customer Mix Test should not be allowed for claimants that do not have properly matched underlying source records.[13]  See section IV.B. below.

### C.      Agriculture and Educational Institutions Methodology

#### 1.      Agriculture Methodology – Consistency with Settlement Language

At pages D1 and D2, the BEL Policy variously states that it has "deviate[d]" from, and "amended," the Settlement Agreement by changing the analysis to an annual comparison of variable profit and using a May through April time period to do so.  The CSSP lacks authority to depart from the Settlement and should not do so, and no departures from the agreement are necessary to fulfill the Fifth Circuit's directive to calculate lost profits using an accrual-type framework in a manner consistent with economic reality.  We understand that the Agriculture and Educational Institutions ("AEI") methodology is an approach for estimating a realistic measure of economic loss for industries whose business models have unique characteristics.  The approach compares annual variable profit calculated over an estimation period of May 2010 to April 2011 with an optimal May through April Benchmark estimation year.  The methodology presumes implicitly that the optimal compensation would be the equivalent of the result of the AEI methodology.   The AEI methodology should be modified to ensure that it is entirely consistent with the Settlement Agreement, while preserving the BEL Policy's recognition of the unique matching issues that arise among claimants from these industries.[14]  We discuss the Agriculture methodology below in this section and the next one, followed by a discussion of Education.

**Comments:**  The BEL Policy correctly recognizes that certain businesses such as agriculture businesses have unique characteristics that must be taken into account in evaluating their economic performance and in attempting to use contemporaneous accounting records to obtain a realistic measure of economic loss.  BP's November 21, 2013 submission explained one possible approach to evaluating the growing of crops.  Under BP's proposed approach, crop year revenue would be identified and aggregated, then allocated ratably over the growing season.  The CSSP's Agriculture methodology takes a different approach to estimating revenue, but the use of a May to April estimation period for revenue likely would capture the crop year revenue from the sale of crops harvested at the end of the prior-year's growing season.

---

[13]   Notably, PwC explained at the February 20, 2014 CSSP meeting that there are very few claimants that attempt to use the customer mix test, and even fewer who pass the test.

[14]   PwC explained during the February 20, 2014 CSSP meeting that the majority of agriculture claimants are using cash-basis records and there are significant timing differences between when cash is received and when work is performed.

Similarly, BP proposed that variable expenses relating to the planting and growing of crops must be matched to the monthly revenue in a proportionate manner. The Agriculture methodology would capture variable expenses over the May to April estimation period and similarly allocate those expenses to the revenue. Under BP's proposed approach, once revenue and expenses are allocated to the months during the growing season, it is likely that many claimants would optimize their claim by choosing the entire growing season (or the portion that fell within May to December) as their Compensation Period. Under the Agriculture methodology, that optimization is presumed by using the entire annual measurement.

The Agriculture methodology should be modified to ensure that it does not in fact "deviate" from or "amend" the Settlement Agreement but does serve as a method of calculating a realistic measure of economic loss in the relevant period. This could be accomplished in several different ways:

- Adopt BP's proposal from its November 21, 2013 submission concerning Agriculture claimants. The BP proposal adheres more closely to the Settlement's purposes than does the Agriculture methodology by matching revenue and variable expense from the same crop year and limiting the compensation period to May to December.

- Use a method to estimate annual revenue (such as crop year revenue) but then allocate that revenue to some or all of the months during the annual estimation period, based on when the earnings activity occurred. By allocating revenue and expenses to months using this method, the process of optimizing a three to eight-month period as required by Exhibit 4C could continue to be used, thereby ensuring consistency with the Settlement Agreement.

- Continue to use the approach proposed in the current draft of the BEL Policy, but allocate the resulting revenues and expenses to months (over either the relevant growing season or the entire year) and then use the three to eight-month periods as specified in Exhibit 4C to calculate the lost profit. Delete language suggesting a departure from the Settlement Agreement and clarify the language in the Policy to explain that the entire approach is an estimation technique used to implement the terms of the Settlement and achieve the goals outlined by the Fifth Circuit. This approach would ensure consistency with the Settlement Agreement.

**Proposal:** Choose one of the alternative suggestions outlined above. Delete references in the BEL Policy to purported deviations from, and amendments to, the Settlement Agreement, and make clear that the Agriculture methodology as revised is consistent with the text of the Agreement.

### 2. Agriculture Methodology – Bulk Purchases

The Agriculture Methodology does not specifically discuss claimants categorized as agricultural enterprises with bulk purchases.

19

**Comments:**   It is important for the costs of bulk purchases to be attributed to the proper fiscal year.  Otherwise, multiple years of harvest costs may be included in a single year, and incorrectly matched to a single harvest year.

**Proposal:**  Update the BEL Policy to clarify that the Accounting Vendors will identify bulk purchases and allocate them appropriately to the proper period, or to inventory.  Add the following sentence to footnote 10 at page D3:  "For claimants categorized as agricultural enterprises with bulk purchases, it is important to ensure that the costs of bulk purchases to be attributed to the proper fiscal year."

### 3.   Education Methodology

The BEL Policy at page D6, last paragraph provides:  "Claimants deemed 'Educational Institutions' will follow the same methodology as that set out above for Agriculture claimants, but results will not be evaluated using annual results from May through April of any given year. Instead, the CSSP Accounting Vendors will assess the business to identify the unique 'academic year' (e.g., 'August to July').  The academic year will be utilized to evaluate annual results." Like the Agriculture methodology, this methodology should be be modified to ensure that it is consistent with the requirements of Exhibit 4C.

**Comments:**   Our understanding of the Education methodology is that the academic year is to be used as the estimation period for identifying revenues and expenses in an effort to achieve a realistic measure of economic loss.[15]  Thus, the methodology can be modified to ensure that it does not deviate from the Settlement, and instead, merely adjusts the P&Ls used in the analysis to reflect economic reality.

In addition, questions were raised at the February 20, 2014 CSSP meeting concerning whether an approach of less than an academic year would be appropriate for estimating revenues and variable expenses.  We believe the full academic year is a more reliable indicator for measuring the economic performance during the year for those educational institutions that may qualify as BEL claimants.[16]

One method of allowing for a claim to be evaluated over a shorter time period would be to add an additional step of allocating the academic year revenues and variable expenses to each month over the twelve month period when the earnings activities took place.  Thereafter the Exhibit 4C process of using a three to eight-month period for Compensation can be adhered to.

---

[15]   We suggest that the Accounting Vendors consider whether the rationale for educational institutions also may be applicable to some other industries and business models.

[16]   Mr. Martens of PwC explained at the February 20, 2014 CSSP meeting that the most common aspect of educational institutions is that tuition payments are received in advance, at the beginning of an academic year, while the entity would earn the money over the ensuing year.  He explained that there are significant timing differences for this category of claimants.  Mr. Hacker explained that failure to make changes would result in inappropriate windfalls to these claimants.

20

**Proposal:**  Update the BEL Policy to clarify that it does not purport to amend the Settlement Agreement.  Add another step to allocate revenue and variable expenses over the twelve month period of earnings activities to individual months within that period.

### D.      Professional Services Methodology

#### 1.      Reliability of Documentation Requirements for Alternative Efforts Based Methodology

The professional services methodology attributes revenue to months over the period in which the revenue was earned, based on customary and standard documentation of the duration of the engagements that earned that revenue.  There is also an alternative method, described at Pages E6 through E10: "Allocate Revenue based on Available Information" section.  The alternative method gives a claimant the option to seek to provide additional records to establish the timing of effort expended on services and engagements for purposes of allocating revenue.  The alternative method would then attribute revenue to specific months based upon the amount of effort expended to earn the revenue in those months.

**Comments:**   The BEL Policy does not include sufficient guidance on how the CSSP Accounting Vendors will evaluate the reliability of earnings histories based on materials such as calendars, engagement letters, and case summaries.  The reliability of these materials for the proper attribution of revenue is ambiguous at best.  If the documentation requirements are not robust or are lax,  incomplete or inappropriate documentation will lead to generation of revenue spikes that could often result in unrealistic awards that do not comport with the Fifth Circuit's mandate that the analysis be consistent with economic reality.  Stringent documentation requirements are necessary to give claimants the appropriate incentive to accurately and fully document their claims.

**Proposal:**  Amend the BEL Policy to reflect that Professional Services claimants unable or unwilling to provide accurate contemporaneous time and billing records must use the "straight line basis" option.

#### 2.      Valuation of Work-in-Progress for Contingent Matters

The BEL Policy explains at page E5, paragraph 4:  "For contingent fee arrangements, revenue will be based on the amount paid to the claimant as of the date the Claims Administrator analyzes the claim.  For contingent cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases."

**Comments:**  This provision appears to deviate from the principle that revenue will be allocated on a straight-line basis over the duration of the engagement.   Claims submitted by contingent fee law firms with significant open matters that were in progress during 2010 should

be closely scrutinized to determine the facts and circumstances around such contingent matters.[17] In appropriate cases, the open matters should be valued using accepted valuation techniques and amounts distributed as revenue and corresponding variable expenses over the duration of the matter.  For example, there are many contingent fee law firms that have spent time on the DWH spill related litigation.  To the extent those firms have or intend to submit claims, there would be a distortion of economic reality if such claims were processed without taking the contingent recovery of fees into consideration.  If the value of work-in-progress ("WIP") is not considered in determining revenue, then expenses associated with that WIP should not be considered.[18]  This will require claimant to provide information allowing the Accounting Vendors to distinguish variable expenses associated with open contingent fee cases although financial statements will not track expenses on this basis.  However, this approach would still result in unrealistically inflated awards for claimants with a significant amount of contingent fee activity in late 2010 that remains open today.

      **Proposal:**  The BEL Policy should be updated to recognize that the value of WIP will be taken into account in allocating revenue for claimants with contingent matters that were in progress during 2010 or the benchmark period and remain open.  The valuation of such WIP should be done in accordance with commonly accepted practices and methods.  In instances where value is not assigned to WIP, the expenses related to that WIP should be treated as deferred because they are not appropriate expenses in an accrual style framework and should be disregarded.

## IV.     EVALUATION OF EXHIBIT 4B REQUIREMENTS

### A.     In General

      It is unclear in the BEL Policy whether and when the Exhibit 4B analysis will be applied for each of the methodologies.  The BEL Policy expressly indicates that Exhibit 4B analysis will be re-performed if adjustments are made to revenue under the Annual Variable Margin Methodology and the Professional Services Methodology, but it does not so indicate for the Construction methodology.  For example, page B2 of the BEL Policy indicates that where revenue has been restated, the Exhibit 4B causation analysis will be re-performed.  Yet no similar statement is made under the Construction methodology (see Attachment C).

---

[17]   For example, numerous law firms operating under contingent fee arrangements have submitted BEL claims and have received offers without taking into account the substantial amount of work those law firms are performing on DWH spill related litigation.  Claim 89943 is a Zone D law firm that received an offer of over $400,000 despite having represented over 400 BEL claimants who in turn have offers outstanding of over $60 million.  Claim 45933 is a Florida law firm that received an offer of nearly $700,000, and at the same time has represented at least 75 BEL claimants who have received offers totaling more than $4 million.  An Alabama law firm in Zone D (claim 120339) represented more than 60 BEL claimants yet received an offer of over $700,000.  And claim 115155 reflects a Zone C law firm that received an offer of over $1.1 million, while representing more than 35 BEL claimants who received offers of more than $3.5 million.

[18]   Mr. Martens of PwC made this observation during the February 20, 2014 CSSP meeting, explaining that it would be the proper approach in an accrual accounting system.

**Comments:** During the February 20, 2014 CSSP meeting with the parties, in response to questions, Mike Juneau clarified that the CSSP intended to use the final adjusted monthly revenue for purposes of evaluation of the Exhibit 4B requirements. This is the only reasonable and logical interpretation of Exhibit 4B. An alternative approach using monthly revenue that contained errors without further analysis or adjustment would allow errors and irregularities to persist without proper treatment. Such a result would be improper under the Settlement.

**Proposal:** Update the BEL Policy to clarify that the Exhibit 4B analysis must be performed using the final adjusted revenue that has been determined for each claim.

## B. Customer Mix Test

During our January 7, 2014 meeting with the CSSP Accountants we were asked for BP's views on the application of the customer mix test under Exhibit 4B in circumstances where revenue has been attributed using a formulaic approach rather than using the customer specific source documents. As noted below, such claims should be denied.

Claimants in Zones B, C, and D that cannot satisfy the V-Shaped Revenue Pattern[19] can use the Customer Mix Test as a step towards establishing Exhibit 4B requirements. A claimant satisfies the Customer Mix Test by showing that it had a 10% decline in the share of total revenue generated by non-local or Zone A-C customers in a three month period in 2010 compared to 2009. A claimant who is a class member (that is, one who satisfies the causal-nexus requirement as BP has outlined in its briefs in the District Court and the Fifth Circuit), can establish the Exhibit 4B requirements in several alternative manners after satisfying the Customer Mix Test.

To satisfy the Customer Mix Test, the 10% decline in share of total revenue from non-local or Zones A-C customers must be reflected in one of the following types of documents:

- Contemporaneously maintained records of payment such as customer credit card receipts

- Customer registration logs

- Documentation that lists customers by location and monthly sales associated with those customers (that are kept in the ordinary course of business)

- Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

---

[19] Claimants in Zones B and C can satisfy the V-Shaped Revenue Pattern by showing a 8.5% downturn in total revenue in 2010 from the benchmark period and 5% upturn in total revenue in 2011. Claimants in Zone D can satisfy the V-Shaped Revenue Pattern by showing a 15% downturn in total revenue in 2010 from the benchmark period and 10% upturn in total revenue in 2011.

**Comments:**  For certain claimants with insufficient records to attribute revenue to months using the general matching guidelines, the CSSP may use a formula to determine monthly revenue.  For example, revenue may be attributed to months based on the claimant's annual profit margin.  BP was asked how the CSSP should apply the Customer Mix Test to these claimants.  In particular, the issue appears to be what amounts to use for "total revenue" for the three month period in applying the 10% test in light of the fact that the actual amount earned in each of the three months has been estimated and not based on claimant specific documents, while the customer mix proof must be based on actual customer related documentation.

The Customer Mix Test requires the claimant to produce contemporaneous documents to show that it suffered a 10% decline in the share of total revenue generated by non-local or Zones A-C customers during a three month period in 2010.  In most cases, documents sufficient to show a customer's residence and the amount of revenue generated from the customer will also be sufficient to accurately attribute total revenue on a monthly basis without use of a formula.  Claimants who keep records detailed enough to satisfy the Customer Mix Test are therefore also likely to keep records sufficient to attribute revenues to months without the need of formulas.  Therefore, the fact that a formula must be used to determine monthly revenues for a claimant strongly suggests the claimant does not have the documents necessary to satisfy the Customer Mix Test.

**Proposal:**  After consideration of the issue, it seems that the best answer is likely that these types of claims should be denied.  If the customer cannot establish the actual revenue for a particular month, the customer cannot demonstrate that 10%, or any other percentage, of the revenue was derived from out of zone customers.  In other words, the claimant cannot establish a core component of the calculation (actual total revenue), and therefore cannot avail itself of the customer mix test.  Presumably, the claimant also cannot satisfy causation under the other methods, and thus these claims should be denied.

The CSSP should carefully scrutinize claims from claimants whose limited documentation requires revenues to be attributed formulaically, while also maintaining they have sufficient documents to pass the Customer Mix Test.

# V.      OTHER TOPICS

## A.      NAICS Codes

The BEL Policy at page 5 provides:  "To the extent that in the professional judgment of the CSSP Accounting Vendors assignment to a methodology by such NAICS code is inappropriate based on that claimant's particular business activities, the CSSP reserves the right to revise the applicable methodology to achieve sufficient matching as ordered by the Court."

**Comments:**  BP agrees that the NAICS code alone is not necessarily indicative of the actual business activities of a claimant and that further review is often required in order to identify the proper matching treatment to be applied to a claim.  The specification of the appropriate matching methodology should be based on the nature of the claimant's business activity and revenue cycle, not on the NAICS code alone.

### B.     Failed Businesses

The BEL Policy explains that the claimant's P&Ls will be analyzed by the Accounting Vendors for errors and indicators of insufficient matching of revenues and variable expenses, yet makes it clear that the Juneau triggers will not apply to identify potential matching problems for failed businesses.  See page F2.  But, there is no explanation about what standards will be used to determine if a potential matching issue exists.  The BEL Policy indicates that the focus on matching issues would be for the annual period of May 2009 to April 2010, as opposed to issues that impact the correct month only: "[f]urther attention will be paid to potential matching issues that would impact balance sheets utilized for those months that impact the compensation calculation."  See page F3.  In addition, on January 7, 2014 the CSSP Accounting Vendors asked BP for its views on how BP's proposals should be applied to the failed business compensation framework.  More specifically, we were asked whether monthly revenue attribution was required in light of the fact that the failed business framework references an annual EBITDA concept.

**Comments:** Settlement Agreement Exhibit 6 provides the framework for dealing with claims submitted by failed businesses and failed start-up businesses.  The distinction between a failed business and failed start-up business determines which "causation" framework and compensation framework are used.  A 'failed business' is a business that commenced operations *prior to* November 1, 2008 and that shut down sometime between May 1, 2010 and December 31, 2011; a 'failed start-up business' is a business that commenced operations *after* November 1, 2008 and shut down sometime between May 1, 2010 and December 31, 2011.  Certain claimants are subject to specific causation requirements based upon a comparison of pre-spill and post-spill revenues or costs.  (See Exhibit 6, at 2.)

*Compensation for Failed Businesses*

Broadly speaking, the method for determining compensation for failed businesses is to determine the value of the business at the time of the spill, determine the liquidation value of the business, and compensate the claimant for the difference, subject to certain adjustments.

To determine the value of the business at the time of the spill, Exhibit 6 requires the CSSP to 1) sum the latest twelve months EBITDA for the business for the twelve month period prior to May 1, 2010, 2) identify the industry in which the claimant operates and determine, via a chart provided in the exhibit, an appropriate multiplier, and 3) multiply the twelve month EBITDA by the multiplier.

To determine the liquidation value of the business, the CSSP looks to either 1) a court-approved reorganization value, if applicable, or 2) sales proceeds from assets liquidated plus certified appraisal values of assets yet to be liquidated.  The liquidation value of the business is then adjusted to account for remaining creditor obligations reflecting pre-spill obligations discharged during bankruptcy, and to account for any amounts received by the claimant from BP or the GCCF.

Finally, to determine the award, the liquidation value of the business is subtracted from the starting value of the business, and the claimant receives the difference.

25

There are several observations that the BEL Policy needs to take into consideration. First, calculation of EBITDA (earnings before interest, taxes, depreciation, and amortization) requires a proper calculation of *earnings*, which in turn requires a proper calculation of revenues and expenses. Such revenues and expenses must be attributed to the proper months using an accrual style framework, and in a manner designed to achieve a realistic measure of economic loss. Second, since the twelve month period crosses a fiscal year in most cases, a complete analysis must be done of the fiscal period ending in 2009 and the fiscal period ending in 2010 in order to properly allocate revenues and expenses to the requisite months. The calculation of EBITDA for the twelve month period ending May 1, 2010 can be properly done only after the revenues and all expenses not excluded by EBITDA are properly attributed to the months over the two-fiscal-year time period. Third, the monthly revenue and expenses are important to the additional causation requirement in Exhibit 6 for certain claimants not entitled to a presumption.

**Proposal**: The BEL Policy should be updated to require proper attribution of monthly revenue and corresponding variable expenses during the year leading up to the spill, and for the remaining months during 2010. In order to properly "sum the latest twelve months" EBITDA, the Accounting Vendors and the CSSP should carefully evaluate when that income was actually earned—including whether it is properly included in the EBITDA calculation, or should be attributed to a different twelve-month period. This process requires the proper determination of revenue and corresponding variable expenses consistent with economic reality, as discussed in BP's prior submissions and herein.

Second, the BEL Policy should explain that the Accounting Vendors will determine "earnings" when calculating EBITDA, by including *all* expenses <u>Before Interest Taxes Depreciation and Amortization</u>, as the term EBITDA requires.

Third, the BEL Policy should make clear that additional activity between May 1, 2010 and the date of business failure will be reviewed to identify and correct for transactions that could further distort the goal of achieving a realistic measure of economic loss. For example, distributions to owners made after May 1, 2010 should be properly taken into account.

Fourth, the BEL Policy should explain that eligibility requirements will be evaluated *after* any adjustments are made to revenues, expenses, or other relevant inputs.

*Compensation for Failed Start-up Businesses*

**Comments**: The compensation calculation is different for failed start-up businesses.

First, the framework requires the CSSP to calculate the book value of equity as of May 1, 2010. In order to do so, the Accounting Vendors must ensure that monthly revenue is accurate in the preceding period from inception of the business until May 1, 2010. All expenses incurred from inception to May 1, 2010 must be deducted. Moreover, the Accounting Vendors must review in detail the accounting transactions and principles underlying the assets and liabilities in order to obtain a proper measure of the book value of equity as of May 1, 2010.

Second, the CSSP must decrease that number for any amounts distributed to equity holders subsequent to the spill and for the book value of assets remaining to be liquidated, and

for any payments from the GCCF or other proceeds, and to increase that number for any unpaid obligations the claimant owes to its creditors.

Finally, the claimant's award is adjusted based on any 'sweat equity' put into the business by the owner. Sweat equity seeks to measure the value added by the owner of the business to the business for work performed by the owner on behalf of the business.

In addition, certain failed start-up businesses must provide additional proof of causation by demonstrating certain percentage declines in post-spill revenue relative to projections. (See Exhibit 6, at 2.)

**Proposal**: The BEL Policy should be updated to reflect the reality that revenues and expenses from inception through fiscal year 2010 or the date of failure must be evaluated and adjusted to ensure that revenues and expenses are attributed to the months in a manner consistent with economic reality. The May 1, 2010 book value of equity cannot be properly measured without a correct analysis and attribution of revenues and expenses. Other inquiries should be made and additional transactions reviewed which might impact the integrity of the balance sheet and the calculation of the book value of equity.


C.    **Start-up Businesses**

During the meeting on January 7, 2014 with the CSSP Accounting Vendors, we were asked how our proposals should be applied to the start-up business compensation framework. As noted below, proper monthly revenue attribution is required in order to properly apply the causation tests for certain start-up claimants. In addition, the requirement that monthly revenues and variable costs be determined for Benchmark and Compensation Periods (though slightly different from typical BEL claims) should mean that the same principles we set forth in BP's November 21, 2013 proposal are applicable to the evaluation of start-up business claims.

**Comments**: Exhibit 7 provides the settlement provisions governing the treatment of start-up businesses. A start-up business is a claimant with less than eighteen months of operating history at the time of the spill. Broadly speaking, this framework compensates the business for the difference between expected profit after the spill (based on 2011 actual profit or a pre-spill forecast) and actual profit after the spill.

*Compensation Calculation*

The claimant is compensated for the difference between expected and actual profit over the compensation period (which is selected by the claimant to include three or more consecutive months between May 2010 and April 2011), subject to adjustments.

To calculate expected profit over the compensation period, the claimant can use the actual revenue earned and variable costs incurred during the benchmark period (the period between May 2011 and April 2012 corresponding to the compensation period months), or the claimant can rely on financial projections prepared prior to the spill and provided to and utilized by a financial institution or other lender. Exhibit 7 does not define "revenue." "Variable Costs"

is a defined term which requires such costs to be "determined in accordance with Business Compensation Framework Attachment A." That reference is to the list of fixed vs. variable expenses that is included in the agreement at Exhibit 4D.

To calculate actual profit or loss generated over the compensation period, the CSSP should determine the difference between the claimant's actual revenues and the claimant's actual variable costs. These numbers are to exclude any one-time non-operating income/expense.

Finally, to determine the award, the CSSP determines the difference between the expected and actual profit/loss generated over the compensation period, applies the agreed-upon RTP, and deducts payments received by the claimant from BP or the GCCF.

**Proposal**: Because the monthly profit or loss is a component of the calculation, the concepts for error correcting, including proper revenue and variable expense attribution should be applied to start-up claims. In addition, the cross reference to the BEL framework in the definition of Variable Costs suggests that corresponding variable expenses should be matched to the revenues in a manner consistent with the BEL Policy. Doing so is also consistent with the principles enunciated in the Fifth Circuit's October 2, 2014 BEL decision.