**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

In considering options to resolve professional services claims that are not sufficiently matched, <u>a deviation from the existing methodology set forth in Exhibit 4C was deemed necessary</u>, [Class Counsel agree that this Proposed Framework completely re-writes the Settlement Agreement.[26]] due to the nature of a professional services firm's business and how this translates into calculating compensation that reflects economic reality.  The methodology requires adjustments to a claimant's contemporaneous P&Ls if they are deemed not to be 'sufficiently matched.'  After making such adjustments, the restated P&Ls are utilized in calculating compensation applying a methodology consistent with Exhibit 4C of the Settlement Agreement.  The approach outlined below does not alter the structure as to how compensation is calculated but does, if matching issues are identified, amend the P&Ls utilized in such calculations. [The Proposal appears to look at every single dollar of revenue and expense, rather than just the specific matching issues that are described below.]

The majority of professional services claims presented to the program to date have not maintained books and records on an accrual basis, but rather have been prepared predominantly on a modified cash basis.  As such, the timing of revenue recognized on the claimant's P&Ls may not correlate with the timing of activities performed to earn such revenue - e.g., advance payments or retainers may be received; progress or milestone invoices may be issued for fixed price contracts; and contingent fees may be paid, for example, on the successful outcome of a litigation matter or costs savings realized from a consulting engagement.  Recording revenue when cash is received in payment of such invoices can, therefore, result in considerable timing differences in the months that sales are recorded relative to when work was performed. [This is essentially BP's "comparable months" argument, which was expressly rejected by the BEL Panel.[27]] Similarly, expenses may also fluctuate.  For example, contract

---

[26] During the meeting with the Program Accountants on February 20, 2014, Mr. Ted Martens, from PwC conceded that this Proposed Framework is something new, which is neither found in nor circumscribed by Exhibit 4C.

[27] BEL OPINION, p.25 (732 F.3d at 340); *see also,* ORDER AND REASONS [Doc 12055] pp.5-6.

## **BEL Claims – Matching of Revenues and Expenses**

## **ATTACHMENT E – Professional Services Methodology**

personnel (e.g., contract attorneys or paralegal personnel) may be hired to assist during periods of significant activity but invoices may be issued and paid several months later.  Further, experts may be appointed and paid an advance retainer, with a final invoice being issued and paid subsequent to them concluding their services.  To effectively negate these 'matching' impacts an understanding of the fee arrangements, the hours/activity incurred by professional staff to perform the services, the duration of such activity, and how these activities compare to the timing of payments to or by the claimant is required.  [As set forth in the Memo to the Claims Administrator dated February 27, 2014, this is inconsistent with the BEL Opinion's discussion of the Exhibit 4A Documentation provisions, including Judge Clement's observation that "the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months.*"[28]  The Settlement Program should not require pre-Benchmark Year or post-2010 or other documents (many of which are privileged and confidential) beyond the Exhibit 4A requirements and inconsistent with Sections 4.3.7 and 4.3.8.  Moreover, where accrual-based or other matched claims were submitted, the Proposed Framework would un-match revenues from expenses.  Expenses and revenue would be moved to months during which no work was performed.  In the context of (at the very least) attorney contingency fees, Mr. Mertens admitted that the Proposed Policy is outside the Exhibit 4C Framework, but is not based upon any accepted method or practice of accounting.[29]]

---

[28] BEL OPINION, p.24 (732 F.3d at 340) (emphasis supplied).

[29] *See also, generally,* CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; BRIEF OF *AMICI CURIAE* CERTIFIED PUBLIC ACCOUNTING SOCIETIES, No.13-30315 (June 24, 2013); FASB CONCEPTS STATEMENT 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraph 83(b); Con 6, Page 35, Footnote 56 references Concepts Statement 5 (Par. 83 and Footnote 50); SECURITIES AND EXCHANGE COMMISSION STAFF ACCOUNTING BULLETIN NO. 104 ("SAB 104"), Pages 10 and 1; KIESO, WEYGANDT & WARFIELD, *Intermediate Accounting* (14th Ed.), at p.60; DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13-14.

E2

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

The Professional Services Methodology shall be applied to adjust a claimant's contemporaneous P&Ls that have been deemed not to be "sufficiently matched."  Claimants that submit P&Ls that are deemed "sufficiently matched" will be processed under the methodology set forth in Exhibit 4C of the Settlement Agreement, utilizing the contemporaneous P&Ls.  Those claimants that submit P&Ls that are deemed not "sufficiently matched" will have the P&Ls adjusted to allocate revenue on a straight line basis over the period of the case/engagement, [Mr. Mertens admitted during the meeting with Program Accountants on February 20, 2014 that this is outside of the Exhibit 4C Framework, and, in the case of contingency fees (at least), is not supported by any accepted method of accounting] <u>unless</u> the claimant can submit appropriate, reliable and complete records that permit an alternative allocation of revenue based on when activity generating the revenue occurred.  In professional services companies, this would correspond to periods when actual work  on the matter/engagement was performed.  Alternative information that the claimant may elect to present to demonstrate when effort was expended/hours were worked may include:

- Time and billing records maintained in the ordinary course of business that detail time worked by month by case/engagement are considered to be the most accurate and complete source of information.
- Other case/engagement records may provide sufficient information to 'reconstruct' when effort was expended/hours were worked in generating the revenue earned, such as: calendars, engagement letters, court filings, case summaries, trial dockets, court and deposition appearances, expert report submissions, project deliverables, transaction closure dates, contract execution dates, court approvals, and payment schedules and receipts.

It is expected that professional services claimants with time & material fee arrangements may maintain time and billing records in order to generate and support invoices presented to clients.  It is recognized that some claimants retained under a fixed or contingent fee arrangement may or may not maintain detailed time records.

E3

## **BEL Claims – Matching of Revenues and Expenses**

### **ATTACHMENT E – Professional Services Methodology**

Variable expenses will be allocated to each month of the Benchmark Period and the Compensation Period based on that month's percentage of total annual revenue.

The Professional Services Methodology does not apply to a professional services claimant that meets the definition of a Start-Up Business, Failed Business or Failed Start-Up Business.

**Professional Services Methodology**

1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, [see above] and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  If the CSSP Accounting Vendor identifies an error(s) [see above][30] in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue or expenses to the appropriate month.

3.  If adjustments made in accord with 2. above result in revised P&Ls that are deemed sufficiently matched, the claim will be processed under the methodology set forth in Exhibit 4C.  However, if revenue has been restated in accord with 2. above, a causation analysis will be re-performed (if causation is not presumed).  If causation is presumed  or satisfied, the P&Ls (adjusted for errors)

---

[30] "Errors" will be defined as accounting transactions that have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles [see above]; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.  In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors, if the entries were made in good faith with the best available information at the time. [see above]

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

are utilized as the input for calculating compensation under Exhibit 4C of the Settlement

Agreement:

- o Step 1 of the compensation calculation is determined as the difference between Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is selected by the claimant to include three or more consecutive months between May and December 2010.

- o Step 2 of the compensation calculation is based on the claimant's growth in revenue in January through April of 2010 relative to the claimant-selected Benchmark Period.  The claimant may select a six-consecutive month period between May to December, unless the claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months in 2010 shall be used for Step 2.

4. If adjustments made in accord with 2. above do not resolve matching issues, the P&Ls will be revised, as set forth below, re-allocating both revenue and expenses.


**Adjustments to Revenue**


**Allocate Revenue on a straight line basis over the duration of the case/engagement**

1. If the claimant elects not to submit additional documentation, or provides documentation that, in the judgment of the Claims Administrator, does not permit the CSSP Accounting Vendors to reasonably estimate or verify the level of effort expended/hours worked in a given month, revenue will be reallocated to each month on a straight line basis over the duration of the matter. [This is not supported by Settlement Agreement;  it is not compelled by, or even consistent with, BEL Opinion.]

2. An evaluation of the claimant's fee arrangements for all cases/engagements (i.e., time & materials, fixed fee, contingent fee, or a combination thereof) will be performed based on discussions and an assessment of additional records requested from the claimant.   Information will be requested that includes, at a minimum, the client, case/engagement name, commencement date, completion date, revenue generated, and the fee arrangement (time &

### BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT E – Professional Services Methodology

materials, fixed fee, contingent fee or a combination thereof).  Given that cases/engagements may have commenced prior to the Benchmark Period or were ongoing or closed after the Compensation Period, information required from claimants may extend prior to the Benchmark Period and subsequent to the Compensation Period.  Information must be provided by claimants to permit the CSSP Accounting Vendors to verify the commencement and completion date of cases/engagements. [As set forth in the Memo to the Claims Administrator dated February 27, 2014, this is inconsistent with the BEL Opinion's discussion of the Exhibit 4A Documentation provisions, including Judge Clement's observation that "the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months.*"[31] The documentation required to perform even the straight line re-allocation of revenue will be so burdensome for many Claimants that submission of a documented claim will be impossible.  Consider the example of even a mid-sized law firm or accounting firm.  The firm would likely have hundreds or even thousands of bills every month with potentially multiple matters on each bill.  To perform the allocation, each matter would have to be segregated and given an engagement start date.  Every dollar paid to the firm for every matter would then be reallocated based on the duration of the engagement.  The only Claimants able to perform such a task would be those with relatively few fees collected in a given period.  Application of the policy should be (at most) limited to those firms that actually receive the types of fees driving the methodology (*e.g.,* lump sum retainers, contingent fees, etc.), and only to those fees.  But the Settlement Program

---

[31] BEL OPINION, p.24 (732 F.3d at 340) (emphasis supplied).

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

should not require pre-Benchmark Year or post-2010 or other documents (many of which are privileged and confidential) beyond the Exhibit 4A requirements and inconsistent with Sections 4.3.7 and 4.3.8.]

3.     A matter will be considered to have commenced from the date of execution of an engagement letter or other indicia of commencement of the undertaking, through the date that a matter has been settled, or a final project deliverable has been submitted, and payment has been received, unless other information indicates an alternative date.  Other information could include, for example: evidence that work was commenced prior to the execution of an engagement letter or prior to other indicia of commencement of the undertaking, post-trial filings, appeals, a further negotiation of the amount ultimately paid, or presentations after issuance of a final report.

4.     In determining revenue generated for each matter, consideration will be given to the nature of the case/engagement, but in all instances will be net of any reimbursable expenses.  Revenue from time & material and fixed fee arrangements will be determined based on the engagement letter or other indicia of the nature and scope of work and invoice records.  For contingent fee arrangements, revenue will be based on the amount paid to the claimant as of the date the Claims Administrator analyzes the claim.  For contingent cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

5.     For each case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) the revenue allocated to each month will equal revenue (determined in accord with 4 above) divided by the number of months that the case/engagement was worked on (as determined in accord with 3 above).

6.     Where revenue has been restated, a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the revenue pattern test per the Settlement Agreement.  [For the reasons stated in the Memo to the Claims Administrator dated

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

February 27, 2014, and above, any re-allocation of revenue for Exhibit 4C Compensation purposes should not result in any alteration or re-vising of the Causation analysis under Exhibit 4B.]

Allocate Revenue based on Available Information

The claimant will have the option to submit documentation to the Claims Administrator if it believes such records can more accurately estimate the level of work/hours incurred in a given month, thereby permitting revenue to be reallocated based on such effort, rather than a straight line basis.  The CSSP Accounting Vendors will assess such records and determine whether, in their judgment, such records are sufficiently adequate and complete to permit a reasonable estimation and verification of the level of effort expended/hours worked in a given month as it relates to each specific case/engagement.  If it is determined that such records permit a reasonable estimate of when effort was expended/hours were worked, revenue will be reallocated based on such efforts.  However, if not deemed sufficient to reasonably estimate when effort was expended/hours were worked, the CSSP Accounting Vendors will revert to reallocating revenue to each month on a straight line basis over the duration of the matter.

In considering what additional information a claimant may elect to submit to identify when effort was expended /hours were worked, the CSSP Accounting Vendors anticipates that this will most likely include time and billing records maintained by a claimant in the ordinary course of business.  In the absence of such records, other information may be utilized to estimate or 'reconstruct' when effort was expended/hours were worked.  Such information may include, but not be limited to, calendars, engagement letters, court filings, case summaries, court and deposition appearances, expert report submissions, transaction close dates, contract execution dates, project deliverables, court approvals, court/trial dates, and payment schedules and receipts.  The approach that will be followed is detailed below:

1.     An evaluation of the claimant's fee arrangements for all cases/engagements (i.e., time & materials, fixed fee, contingent fee, or a combination thereof) will be performed based on discussions with the

E8

### BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT E – Professional Services Methodology

claimant and an assessment of additional records requested from the claimant.   Information will be requested that includes, at a minimum, the client, case/engagement name, commencement date, completion date, revenue generated, and the fee arrangement (time & materials, fixed fee, contingent fee or a combination thereof).  Given that cases/engagements may have commenced prior to the Benchmark Period or were ongoing or closed after the Compensation Period, information required from claimants may extend prior to the Benchmark Period and subsequent to the Compensation Period.

2.   Revenue will be allocated to each month of the Benchmark Period (considered to run from May to April 2009/10; the average of 2008/09-2009/10; or the average of 2007/8-2009/10) and Compensation Period based on when work was actually performed.

3.   To identify when effort was expended/hours were worked the following steps will be performed:

   a.   A detailed inventory of all engagements performed by the claimant will be obtained, and separated by the nature of the fee arrangement.

   b.   The CSSP Accounting Vendors will, through inquiries of the claimant, and an evaluation of submitted documentation, determine if contemporaneous time and billing records were maintained by the claimant in sufficient detail to determine when effort was expensed/hours were worked on individual cases/engagements, or if practical a grouping of cases/engagements that had similar characteristics (e.g., commencement and completion date, or revenue generated and paid).  If deemed sufficient, time and billing records will be utilized.

   c.   If time and billing records were not maintained by the claimant in sufficient detail to determine and verify when effort was expended/hours were worked, the CSSP Accounting Vendor will consider the adequacy and completeness of other information provided and determine if sufficient to estimate and verify when effort was expended/hours were worked and allocate revenue on such basis.

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT E – Professional Services Methodology

Utilizing Time and Billing records to reallocate revenue

1.    Any billing records submitted will be analyzed for each engagement.  Hours recorded by personnel for each individual case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) will be compared to the timing of revenue recognized.  Total revenue generated from each case will be considered net of reimbursable expenses.  Total revenue generated from each case/engagement will be reallocated to each month based on the percentage of hours charged in that month relative to the total case/engagement hours.  An illustration of steps 1 and 2  is provided below:

**Illustrative example**

Provided below is an example that illustrates for one case/engagement how revenue will be reallocated based on the hours charged in a given month relative to total case/engagement hours.
The case/engagement commenced in January 2009 and work ceased in May 2010.  Total hours incurred on the case/engagement is 2,000.  Total revenue recorded was $500,000 that was paid in September 2010.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| Hours per Billing Records [A] | 100 | 50 | 10 | 10 | 225 | 45 | 45 | 0 | 100 | 350 | 50 | 50 |
| Percentage of Total Hours Billed [B = A/2000] | 5% | 3% | 1% | 1% | 11% | 2% | 2% | 0% | 5% | 18% | 3% | 3% |
| Revenue (As submitted by Claimant) | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - |
| Revenue (As restated) [B*$500,000] | $ 25,000 | $ 12,500 | $ 2,500 | $ 2,500 | $ 56,250 | $ 11,250 | $ 11,250 | $  - | $ 25,000 | $ 87,500 | $ 12,500 | $ 12,500 |
| **2010** | | | | | | | | | | | | |
| Hours per Billing Records [A] | 50 | 50 | 75 | 350 | 440 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percentage of Total Hours Billed [B = A/2000] | 3% | 3% | 4% | 18% | 22% | 0% | 0% | 0% | 0% | | | |
| Revenue (As submitted by Claimant) | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $ 500,000 | $  - | $  - | $  - |
| Revenue (As restated) [B*$500,000] | $ 12,500 | $ 12,500 | $ 18,750 | $ 87,500 | $ 110,000 | $  - | $  - | $  - | $  - | $  - | $  - | $  - |

Based upon the content and format of the time and billing records received, additional analysis may be performed including but not limited to comparison of pre-spill and post-spill:  monthly hours worked in assessing lost hours, if any; billing rates per engagement/case in assessing higher/lower rates, if any; changes in the overall variable profit margin between periods, if any; utilization mix of professional staff (including owners/partners); lines and/or types of services/engagements worked on; and length of project and value of settlements reached.

2.    For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

E10

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

3.      Where revenue has been restated, a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the revenue pattern test per the Settlement Agreement.  [For the reasons stated in the Memo to the Claims Administrator dated February 27, 2014, and above, any re-allocation of revenue for Exhibit 4C Compensation purposes should not result in any alteration or re-vising of the Causation analysis under Exhibit 4B.]

Utilizing Engagement Records to reallocate revenue

1.      It is expected that claimants who operate under a Time & Materials fee arrangement will maintain time and billing records in order to create and support the invoice to their client.  Accordingly, it is assumed that the methodology set out below will most likely apply to fixed fee and contingent fee arrangements, or a combination of the two.  It should be noted that if a firm has a variety of fee arrangements including some performed on a time & materials basis, for which it maintained time and billing records, the revenue may (based on the judgment of the CSSP Accounting Vendors) be bifurcated, and different records will be applied to identify when effort was expended/hours were worked.

2.      If the claimant elects to submit documentation that the CSSP Accounting Vendors deem sufficient to estimate and verify the effort expended/hours worked in any given month, cases/engagements performed under a fixed fee or contingent fee arrangement will be evaluated utilizing other engagement documentation, as follows:

   i.   Fixed and contingent fee cases/engagements worked during the Benchmark Period and the Compensation Period

   •   Identify the commencement and completion date for each case/engagement, including the date revenue was recorded and/or payment was received.

**<u>BEL Claims – Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT E – Professional Services Methodology</u>**

- In the case of a legal matter, conduct an examination of available legal and non-legal documents (e.g., pleadings and other court records, discovery requests, depositions and/or trial documents, due diligence commencement dates, transaction closure dates, submission of contract drafts, lawyer's calendars etc.) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month. This process will require consultation with the claimant.

    - Based on the duration of the legal matter, combined with the timing of significant events, an estimate of the percentage of the total work effort on the case will be assigned to each month.

    - Revenue will be reallocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort incurred on the case.

- For other professional services claimants (not law firms), conduct an examination of available documentation (e.g., budgets, project reports, draft and final deliverables, calendars, time and billing records, progress and status reports, meetings/presentations and other key milestone events) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month. This process will be performed in consultation with the claimant.

    - Based on the duration of the engagement, combined with the timing of significant events/milestones, an estimate of the percentage of the total effort incurred on the engagement will be assigned to each month.

    - Revenue will be reallocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort incurred on the engagement.

2.   For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

Variable Expenses

1.　　It is expected that the records maintained by some claimants will not separately identify variable expenses, as defined in Attachment A to the Settlement Agreement, by specific cases/engagements.

2.　　Where revenue is allocated on a straight line basis over the duration of a case/engagement, due to the claimant electing not to submit additional documentation, or where there was a lack of sufficient information to reliably estimate and verify when hours were worked/effort was expended, variable expenses incurred during the years May through April of the Benchmark Period and the Compensation Period will be allocated to individual months based on that month's revenue as a percentage of total revenue for the same 12- month period.  This approach results in a consistent variable profit margin for each month of any given year (May to April), but which may potentially differ from one year to the next.  The calculation is as follows:

- Monthly Corresponding Variable Expenses for each year of the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses for the three (3) respective 12-month periods, as provided, (e.g., May 2009 - April 2010; May 2008 - April 2009; May 2007 - April 2008) prior to the spill and total revenue for the same annual period.  This will yield a separate Variable Expense percentage for each year of the Benchmark Period.  [Under this Proposed Framework, revenue will be moved to non-Benchmark periods, but the "corresponding" expenses will not be moved to match that revenue.  The effect will be to incorrectly "match" expenses to false revenue.]

- This variable expense percentage (specific for each individual year of the Benchmark Period) is applied to the specific monthly revenue amounts in the Benchmark Period to calculate the Corresponding Variable Expenses for each month.

- Monthly Corresponding Variable Expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

the 12-month period following the date of the spill, (i.e., May 2010 – April 2011) and total revenue for the same period.

- This variable expense percentage is applied to the specific monthly revenue amounts in the Compensation Period to calculate the Corresponding Variable Expenses for each month.

3.  Where revenue has been reallocated on a basis other than the straight line basis, variable expenses incurred during the years May through April of the Benchmark Period and the Compensation Period will be allocated to individual months based on the total effort incurred, estimated using the same information utilized in reallocating revenue.

<u>Variable Margin</u>

1.  Variable Margin will be calculated for the Benchmark Period only (and utilized in the Step 2 compensation calculation) as follows:

   i.  Sum Variable Profit from May through December of the period selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

   ii.  Sum total revenue from May through December of the period selected by the claimant to be used for the Benchmark Period. (i.e. Optimal Benchmark Period).

   iii.  Calculate Variable Margin percent as Variable Profit calculated in (i) divided by total revenue calculated in (ii).

<u>Compensation Calculation</u>

1.  The revised P&Ls resulting from the reallocation of revenue and variable expenses are utilized as the input for calculating compensation under Exhibit 4C of the Settlement Agreement:

   o  Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT E – Professional Services Methodology**

selected by the claimant to include three or more consecutive months between May and December 2010.

- o  Step 2 of the compensation calculation is based on the claimant's growth in revenue in January through April of 2010 relative to the claimant-selected Benchmark Period. Claimant may select a six-consecutive month period between May to December, unless claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months shall be used for Step 2.

  - ▪  To compute the Claimant Specific Factor, the total revenue from January 2010 to April 2010 will be compared to:
    - •  Revenue for the period January 2009 to April 2009, where the Optimum Benchmark Period comprises 2009/10 P&Ls.
    - •  Average revenue for the periods January 2009 to April 2009 and January 2008 to April 2008, where the Optimum Benchmark Period comprises 2008/09 and 2009/10 P&Ls.
    - •  Average revenue for the periods January 2009 to April 2009, January 2008 to April 2008, and January 2007 to April 2007 where the Optimum Benchmark Period comprises 2007/08, 2008/09 and 2009/10 P&Ls.

2.  As noted above in 'Utilizing Time and Billing records,' if this data is available and used to reallocate revenues, an additional analysis described below may be performed at this step in order to identify and quantify the various components of the compensation calculation. These components can include compensation resulting from a decrease/increase in hours, a decrease/increase in rates/awards and an increase/decrease in variable profit margin. Depending upon the level of detail provided, these components may be further analyzed to

## **BEL Claims – Matching of Revenues and Expenses**

### **ATTACHMENT E – Professional Services Methodology**

identify compensation amounts associated with changes in utilization/mix of professional

staff as well as changes in types of services/engagements/cases worked on.

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT F – Failed Businesses and Failed Start-Up Businesses

Section I of the "Matching of Revenues and Expenses" policy, which addresses identification of "unmatched claims," does not apply to Failed Businesses or Failed Start-Up Businesses.  Exhibit 6 of the Settlement Agreement sets forth the Failed Business Compensation Framework that covers both Failed Businesses[32] and Failed Start-Up Businesses[33].  The causation documentation requirements and basis of computation as required in Exhibit 6 differ significantly from those of regular BEL claimants processed under Exhibit 4.  Some of the key differences in assessing causation, and computing losses, include:

- A Failed Business or Failed Start-Up Business is "excluded" from recovery under the Settlement Agreement if the claimant reports negative EBITDA (earnings before interest, income tax, depreciation, amortization and owner's compensation) for the  12 months prior to May 1, 2010.

- Compensation for a Failed Business applies a multiple (based on the claimant's industry and as specified in Exhibit 6) of the claimant's EBITDA for the 12 months prior to the spill.  This amount is subsequently adjusted for changes in account balances of assets and liabilities of the business between the date of the spill and the date of the balance sheet closest to the date the claim was filed.

- Compensation for a Failed Start-Up Business is not directly dependent on P&Ls as in other BEL Claims categories but rather is focused on the assets and liabilities of the business as well as the business owner's annual earnings pre and post spill.

The above requirements consider the total EBITDA for the 12-month period prior to the spill, and are not dependent upon the results of any one or more individual months within that period, nor do they

---

[32] A Failed Business is an "entity that commenced operations prior to November 1, 2008, and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets."

[33] A Failed Start-Up Business is defined as "an entity that commenced operations on or after November 1, 2008, and, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets."

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT F – Failed Businesses and Failed Start-Up Businesses**

require a comparison of monthly variable profits between years.  The Failed Start-Up Business methodology computation is based solely on the balance sheet.  This significantly reduces any matching concerns that may exist on a claimant's P&Ls between months.

Matching concerns could arise from:

- a mismatch of revenue and expenses at the start and end of the 12 month period prior to the spill, and

- balance sheets utilized in the calculations being inaccurate due to revenue or expenses not being matched.  [The assets and liabilities on the balance sheet would not be impacted by a mismatch of revenue and expenses.  The equity section could possibly be impacted, but is not factored into the methodology.  Additionally, the Program looks at a balance sheet existing at the time of the claim, so a temporary mismatch of revenues and expenses would have been eliminated by this point.  Oftentimes, moreover, the balance sheets either reflect $0 assets & liabilities or are on the income tax returns.]

<u>Identification of "unmatched claims" and Methodology for adjusting P&Ls not sufficiently matched</u>

1.    The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors[34], and indicators of insufficient matching of revenue and variable

---

[34] "Errors" will be defined as accounting transactions that have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles [see above]; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.  In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors, if the entries were made in good faith with the best available information at the time. [see above]

F2

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT F – Failed Businesses and Failed Start-Up Businesses

expenses.  It should be recognized that it may be common to see unusual fluctuations in a business that is failing.

2. This matching analysis would not include the use of the Declaration Tool utilized for General BEL claimants as outlined in Section I of the "Matching of Revenues and Expenses" policy, for the reasons cited above.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

3. The CSSP Accounting Vendors' analysis will focus on potential matching issues that would impact the annual results for the year May 2009 to April 2010, as compared to those issues that may impact a given month(s) but have no impact on the annual results.  Further attention will be paid to potential matching issues that would impact balance sheets utilized for those months that impact the compensation calculation.

4. If no matching issues are identified that would impact the calculation, the claim will be analyzed and processed based on the information presented by the claimant.

5. If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue and/or expenses to the appropriate month.  Consideration will also be given to the impact that such error(s) have on the balance sheets utilized in the calculation.  If revenues are corrected/adjusted as a result of this analysis, causation will be re-performed to ascertain eligibility within the specific guidelines  outlined in Exhibit 6 of the Settlement Agreement.

6. The calculation of compensation for both Failed Businesses and Failed Start-Up Businesses will be consistent with that presently prescribed by Exhibit 6 of the Settlement Agreement.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

As with general BEL claimants, in considering options to resolve Start-Up Business[35] claims that have been deemed to be not sufficiently "matched," it was necessary to apply distinct methodologies dependent upon the business operations and activities of individual claimants.  Under the Start-Up Business Methodology described below, it is therefore necessary to classify claimants as operating as either a short earnings cycle business, construction claimant, agriculture or educational institution or a professional services entity. [For the reasons stated above, Class Counsel disagree.]  While the term "Start-Up Methodology" generally describes what is set out below, it should be noted that separate methods exist for Start-Up Business claimants that fall under each category.  Further, it was important to tailor each of the methodologies set forth in Attachments B through E to reflect the differences between a Start-Up Business and a general BEL claimant.

<u>Comparison of general BEL claimants to Start-Up Business claimants</u>

Exhibit 7 of the Settlement Agreement outlines the framework for Start-Up Business claims.  Under the Settlement Agreement, Start-Up Business compensation is calculated on a basis similar to that applicable to general BEL claims, in that it requires the selection of an optimal period of several months that compares variable profit between the Benchmark Period and the Compensation Period.  [To the extent applicable, Class Counsel respectfully adopt and incorporate all objections and suggestions outlined in the February 27th Memo and/or *supra* herein with respect to the proposed Start-Up Business Methodologies.]  The major exception between the two frameworks relates to a different Benchmark Period: For Start-Up Business claims the period is post spill (May 2011 to April 2012)[36], whereas general BELs consider pre-spill results on a calendar year (2009 only, an average of 2008/09, or an average of 2007/08/09).  For Start-Up Businesses both the Benchmark Period and the Compensation Period are

---

[35]  A "Start-up Business" is considered to be a claimant with less than 18 months of operating history at the time of the DWH Spill.

[36]  Where a claimant elects to utilize projections, the Benchmark Period utilized per Exhibit 7 is May 2010 to April 2011.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

post spill.  Other specific differences for Start-Up Businesses that impact the Start-Up Business Methodology include:

- Benchmark and Compensation Periods are not based on calendar years but on the year May to April.
- General BEL claims can utilize up to 8 months as their Optimum Benchmark Period for the purposes of the computation, whereas Start-Up Businesses have the option to utilize a 12 month period.
- The Settlement Agreement permits claimants to utilize projections as compared to actual financial results, in computing compensation, provided such projections were prepared prior to the spill and utilized by the claimant to obtain credit from a financial institution, other entity in the primary business of lending or investing money, or non-family private investors.

Effect of Differences on Start-Up Business Methodology

The period from May to April will continue to form the basis of analyzing information under the Start-Up Business Methodology.  The option to utilize a 3 to 12 month Optimum Benchmark Period will also continue to apply, the exception being under the Start-Up Agriculture and Educational Institutions Methodology that will require a 12 month period be utilized.

Under the Start-Up Business Methodology, projections may continue to be utilized provided that based upon an analysis by the CSSP Accounting Vendors, the projections appear to be sufficiently matched.  This can be assessed by obtaining an understanding and conducting a review of the assumptions underlying the projections.  It is noted, however, that projections normally have fewer expense line items than actual monthly P&Ls so mapping projection line items to actual P&Ls can be more complex resulting in variable expenses (as defined by Exhibit 4D of the Settlement Agreement) being difficult to identify.  Further, projections may often be prepared on an annual basis, or for a period

G2

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

of less than one year, thereby not permitting monthly revenue and expenses to be identified.  As such, professional judgment will be applied by CSSP Accounting Vendors in assessing whether projections contain adequate, complete and appropriate information necessary to compute compensation under the Start-Up Business Methodology.

Identification of claims not 'sufficiently matched'

The criteria set out in Section I.A. of the CSSP policy on Matching of Revenues and Expenses shall be applied to Start-Up Business claimants in order to determine whether the submitted financial records are not sufficiently matched.  However, executing that analysis differs for Start-Up Businesses as a consequence of different definitions of the Benchmark Period between the Start-Up Business and the general BEL frameworks.

The criteria for identifying potential matching issues for Start-Up Business claims will utilize the 7 criteria already in place for BEL claims in general.  It should, however, be noted that:

- the calculations under the 7 criteria will include the Benchmark Period that extends through April 2012.
- on the basis that the Compensation Period and the Benchmark Period run from May through April, rather than a calendar year, the computation included will be performed over a May-April "annual" period. "Annual" for the purposes of criteria #2, 5 and 7 is defined as May through April. The years 2007, 2008 and 2009 will not form part of the analysis, as by definition such periods do not comprise the Benchmark Period or the Compensation Period.
- Significant increases or fluctuations in revenues and/or expenses are more common in Start-Up Businesses as compared to more mature BEL businesses.  Triggers identified from the 7 criteria may therefore not relate to matching issues.  This will be addressed as part of the claimant outreach performed by the CSSP.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

Methodology for adjusting P&Ls not sufficiently matched

Claimants' contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors[37], and indicators of insufficient matching of revenue and variable expenses.  It is recognized that it may be common to see more frequent fluctuations in a business that is a start-up.

Claimants that submit P&Ls that are deemed "sufficiently matched" will be processed under the methodology outlined in Exhibit 7 of the Settlement Agreement, utilizing the contemporaneous P&Ls. Those claimants that submit P&Ls which are not deemed "sufficiently matched" will have the P&Ls adjusted to allocate revenue and expenses to those periods when the activity generating the revenue was incurred.  This will be accomplished by assigning and analyzing claims under the following methodologies:

- Start-Up Short Earnings Cycle Annual Variable Margin Methodology
- Start-Up Construction Methodology
- Start-Up Agriculture & Educational Institution Methodology
- Start-Up Professional Services Methodology

These are described in more detail below.

---

[37] "Errors" will be defined as accounting transactions that have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.  In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors, if the entries were made in good faith with the best available information at the time.

## BEL Claims  - Matching of Revenues and Expenses

## ATTACHMENT G – Start-Up Businesses Methodology

**Start-Up Short Earnings Cycle Annual Variable Margin Methodology**

The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement, but does require amendment of  the P&Ls utilized in such calculations. The calculations of compensation will be consistent with that prescribed by Exhibit 7 of the Settlement Agreement.

1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for revenue and/or expenses, correcting entries will be made to the P&Ls to assign revenue and expenses to the appropriate month.  Where revenue has been amended, a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the revenue pattern test per the Settlement Agreement.

3.  If adjustments made in accord with 2. above result in revised P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 7 using such P&Ls.

4.  If adjustments made in accord with 2. above result in revised P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed to calculate the "Corresponding Variable Expenses," calculated as follows:

    a.  Benchmark Period (May 2011 to April 2012 or May 2010 to April 2011 if projections are utilized):

        •  Monthly Corresponding Variable Expenses during the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses

G5

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

for the 12-month period May 2011 to April 2012 (May 2010 to April 2011 if projections are utilized) to total revenue for the same period.

- This variable expense percentage is applied to the specific monthly revenue amounts in the Benchmark Period to calculate the Corresponding Variable Expenses for each month.

b. Compensation Period (April 2010 to May 2011):

- Monthly Corresponding Variable Expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for the 12-month period May 2010 – April 2011 to total revenue for the same period.
- This variable expense percentage is applied to the specific monthly revenue amounts in the Compensation Period to calculate the Corresponding Variable Expenses for each month.

5.   Calculate Expected Revenue & Expected Costs

   i.   Expected Revenue and Expenses shall equal either:

   a. The actual revenue and expenses as set forth in the restated P&Ls calculated at Step 4 above for the Benchmark Period; or

   b. Revenue and expenses reported on financial projections for the Start-Up Business. The use of such projections would be dependent on satisfying the requirements of Exhibit 7: that the projections were prepared prior to the spill and used to seek the extension of credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family private investors with business lending experience.

   ii.  Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected

Revenue and Expected Costs must both be based on qualifying projections.

6.      Calculate Actual Revenue and Actual Costs

   i.      Actual profit/loss generated over the Compensation Period will be calculated as the difference

        between (i) the claimant's Actual Revenues as set forth in the restated P&Ls calculated at Step

        4 above and (ii) the claimant's Actual Variable costs as set forth in the restated P&Ls

        calculated at Step 4 above, both for the Compensation Period.

7.      Compensation will be computed under Exhibit 7 of the existing Settlement Agreement as follows:

   a.   Calculate the claimant's Base Compensation Loss as the difference between (i) the
        claimant's Expected Profit/Loss and (ii) the claimant's Actual Profit/Loss generated over
        the Compensation Period.
   b.   Apply the agreed-upon RTP adjustment.
   c.   Deduct any payments or credits received by the claimant from BP or the GCCF pursuant
        to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO
        Earned Income Offset, where applicable.

**Start-Up Construction Methodology**

The approach outlined below, does not alter the structure as to how compensation is calculated

under the Settlement Agreement, but does amend the P&Ls utilized in such calculations.  The calculation

of compensation will be consistent with that prescribed by Exhibit 7 of the Settlement Agreement.

The restatement of the P&Ls to more accurately match revenue and expenses involves a multi-

step process.  The initial step requires an analysis of the financial results of the claimant based on its fiscal

year (i.e., its annual financial reporting date).  Analyzing P&Ls for the 12 months that comprise a

claimant's fiscal year typically yields a more accurate and compete record of the results of operations for

the 12 months then ended, as in the CSSP Accounting Vendors' experience there is typically a 'true-up' or

'hard close' performed at the end of the year.  Annual revenues will be reallocated to each month of the

fiscal year, based on that month's percentage of variable expenses to annual variable expenses.

G7

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

A further adjustment is necessary to restate the P&Ls on a May to April period in both the Benchmark and Compensation Periods, thereby remaining consistent with the approach set forth in Exhibit 7 of the Settlement Agreement.  This is achieved by reallocating variable profit / revenues to each month, based on each month's percentage of variable expenses to annual variable expenses measured over each May to April time period.

As a consequence of restating monthly revenue based on a month's variable expenses as a percentage of annual variable expenses, the revenue recorded on the restated P&Ls can no longer be attributed to individual customers.  Accordingly, the restated P&Ls could not be utilized for the purpose of determining causation for any claimant required to satisfy a Customer Mix Test.  Under the Start-Up Construction Methodology, any claimant required to satisfy a Customer Mix Test to demonstrate causation will utilize the contemporaneous P&Ls for the causation assessment, but will utilize the restated P&Ls for computing compensation.[38]

1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for revenue and/or variable expenses, correcting entries will be made to the P&Ls to assign revenue and/or variable expenses to the appropriate month.

3.  If adjustments made in accord with 2. above result in revised P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 7 using such P&Ls.

---

[38]  This procedure would supersede, for construction companies only, Policy 464 as it relates to the requirement to utilize the same P&Ls for determining causation and calculating compensation.

**<u>BEL Claims  - Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT G – Start-Up Businesses Methodology</u>**

4.    The revised P&Ls (as required) will be analyzed under the Start-Up Construction Methodology as follows:

   a.   Allocation based on claimant's Fiscal Year End:

   i.     For each year measured using the claimant's fiscal year (e.g., January 2010 – December 2010; January 2011 – December 2011; and January 2012 to December 2012, as provided), each month's variable expenses as a percentage of that period's total variable expenses will be computed.  If the claimant's fiscal year-end is different than the tax year, the tax year will be utilized as the basis for computing the variable expense percentage.

   ii.    Annual revenue for each fiscal year will be reallocated to individual months by multiplying total annual revenue by each month's percentage of total variable expenses (as computed in accord with i. above).

   b.   Benchmark Period (May 2011 to April 2012 or May 2010 to April 2011 if projections are utilized):

   i.     For the Benchmark Period (May 2011 through April 2012, or May 2010 to April 2011 if projections are utilized) each month's variable expenses as a percentage of the annual total variable expenses will be computed.

   ii.    Annual revenue will be reallocated to individual months by multiplying total annual revenue by each month's percentage of total variable expenses (as computed at i. above).

   c.   Compensation Period (May 2010-April 2011):

   i.     Each month's variable expenses for the year May 2010 to April 2011 as a percentage of total variable expenses for the year will be computed.

   ii.    Total revenue for the year May 2010 to April 2011 will be reallocated to individual months by multiplying total revenue by each month's percentage of total variable expenses (as computed at i. above).

5.    The P&Ls, restated in accord with Step 4 above, are utilized as the input for calculating compensation under Exhibit 7 of the Settlement Agreement.

**<u>BEL Claims  - Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT G – Start-Up Businesses Methodology</u>**

6.     Calculate Expected Revenue and Expected Costs

    i.     **Expected Revenue and Costs shall equal either:**

        a.     **The actual revenue and expenses as set forth in the restated P&Ls calculated in accord with Step 4 above for the Benchmark Period; or**

        b.     **Revenue and expenses reported on financial projections for the Start-Up Business. The use of such projections would be dependent on satisfying the requirements of Exhibit 7: that the projections were prepared prior to the spill and used to seek the extension of  credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family investors with business lending experience.**

    ii.     **Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections.**

7.     Calculate Actual Profit/Loss

    i.     **Actual Profit/Loss generated over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues as set forth in the restated P&Ls calculated in accord with Step 4 above and (ii) the claimant's Actual Variable Costs as set forth in the restated P&Ls calculated in accord with Step 4 above.**

8.     Compensation will be computed under Exhibit 7 of the existing Settlement Agreement as follows:

        a.     **Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated over the Compensation Period.**
        b.     **Apply the agreed-upon RTP adjustment.**
        c.     **Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable.**

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

**Start-Up Agriculture & Educational Institution Methodology**


The methodology outlined below – "the Start-Up Agriculture and Educational Institution Methodology" – deviates from the methodologies described previously.  The primary difference relates to the time period the claimant may utilize.  Exhibit 7 permits a business to select an optimum period of 3 months up to 12 months.  Under the Start-Up Agriculture and Educational Institution Methodology the entire 12 month period will be utilized.


1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue to the appropriate month.

3.  If adjustments made in accord with 2. above result in revised P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 7 using such P&Ls.

4.  If adjustments made in accord with 2. above result in revised P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed under the Start-Up Agriculture & Educational Institutions Methodology as follows:

    i.  Benchmark Period Variable Margin will be 'computed' based on the contemporaneous P&Ls provided by the claimant (as adjusted in accord with Step 2 above), for the period May 2011 to April 2012 (or May 2010 to April 2011 if projections are utilized) ("Expected Revenue")

G11

## BEL Claims  - Matching of Revenues and Expenses

### ATTACHMENT G – Start-Up Businesses Methodology

ii.  Benchmark Period revenue is compared to the annual Variable Profit for the Compensation Period – May 2010 to April 2011 ("Actual Revenue").  This represents Total Lost Variable Profit.

iii.  Total Lost Variable Profit is multiplied by the Risk Transfer Premium ("RTP") to derive total compensation (less any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable).

**Educational Institutions Methodology**

Claimants deemed to be "Educational Institutions" will follow the same methodology as that set out above for Agriculture claimants, but results will not be evaluated using annual results from May to April of any given year.  Instead, the CSSP Accounting Vendors will assess the business to identify the unique "academic year" (e.g., "August to July").  The academic year will be utilized to evaluate annual results.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

**Start-Up Professional Services Methodology**

1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  An evaluation of the claimant's fee arrangements for all cases/engagements (i.e., time & materials, fixed fee, contingent fee, or a combination thereof) will be performed based on discussions and an assessment of additional records requested from the claimant.  Such additional records will be consistent with those outlined in the Professional Services Methodology (Attachment E).  It should be noted that information requested may include records either prior to and/or after the Benchmark and Compensation Periods (i.e., prior to 2010 or after 2012).

3.  If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to assign revenue or expenses to the appropriate month.

4.  If adjustments made in accord with 3. above result in revised P&Ls that are deemed sufficiently matched, the claim will be processed under the methodology set forth in Exhibit 7.  However, if revenue has been restated in accord with 3. above a causation analysis will be re-performed (if causation is not presumed).  If causation is satisfied, the revised P&Ls are utilized as the input for calculating compensation under the Settlement Agreement.

5.  If adjustments made in accord with 3. above do not resolve matching issues, the P&Ls will be revised, as set forth below, restating both revenue and expenses.

**<u>BEL Claims  - Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT G – Start-Up Businesses Methodology</u>**

For those claimants who submit P&Ls which are deemed not "sufficiently matched", the P&Ls will be adjusted to allocate revenue on a straight line basis over the period of the case/engagement, <u>unless</u> the claimant can submit appropriate, reliable and complete records that permit an alternative allocation of revenue based on when activity generating the revenue occurred.  In professional services companies this would correspond to periods when work on the matter/engagement was actually performed.  Alternative information that the claimant may elect to present to demonstrate when effort was expended/hours were worked may include:

- Time and billing records maintained in the ordinary course of business that detail time worked by month by case/engagement is considered to be the most accurate and complete source of information.

- Other case/engagement records may provide sufficient information to 'reconstruct' when hours were worked in generating the revenue earned: calendars, engagement letters, court filings, case summaries, trial dockets, court and deposition appearances, expert report submissions, project deliverables, transaction closure dates, contract execution dates, court approvals, and payment schedules and receipt.

**Revenue**

<u>Allocate Revenue on a straight line basis over the duration of the case/litigation</u>

1. If the claimant elects not to submit additional documentation, or provides documentation that, in the judgment of the Claims Administrator, does not permit the CSSP Accounting Vendors to reasonably estimate and verify the level of work effort in a given month, revenue will be reallocated to each month on a straight line basis over the duration of the matter.

2. A matter will be considered to have commenced from the date of execution of an engagement letter or other indicia of the commencement of the undertaking, through the date that a matter has been settled, or a final project deliverable has been submitted and payment has been received,

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

unless other information indicates an alternative date.  Other information could include, for example: evidence that work was commenced prior to the execution of an engagement letter or other indicia of the  commencement of the undertaking, post-trial filings, appeals, a further negotiation of the amount ultimately paid, or presentations after issuance of a final report. Information must be provided by claimants to permit the CSSP Accounting Vendors to verify the commencement and completion date of cases/engagements.

3.      In determining revenue generated for each matter, consideration will be given to the nature of the case/engagement, but in all instances will be net of any reimbursable expenses.  Revenue from time & material and fixed fee arrangements will be determined based on the engagement letter or other description of the nature and scope of the undertaking, and invoice records.  For contingent fee arrangements, revenue will be based on the amount paid to the claimant as of the date the Claims Administrator analyzes the claim.  For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

4.      For each case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) the revenue allocated to each month will equal revenue (determined in accord with 3 above) divided by the number of months that the case/engagement was worked on (as determined in accord with 2 above).

5.      Where revenue has been amended, a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

Allocate Revenue based on Available Information

The claimant will have the option to submit documentation to the Claims Administrator if it believes such records can more accurately estimate the level of work/hours incurred in a given month, thereby permitting revenue to be reallocated based on such effort, rather than a straight line basis.  The

G15

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

CSSP Accounting Vendors will assess such records and determine whether, in their professional judgment, such records are adequate and complete enough to reasonably estimate and verify the level of work effort performed in a given month as it relates to each specific case/engagement.  If it is determined that such records permit a reasonable estimate of when effort/hours were incurred, revenue will be reallocated based on such efforts.  However, if not deemed sufficient to reasonably estimate and verify when effort was expended/hours were worked, the CSSP Accounting Vendors will revert to reallocating revenue to each month on a straight line basis over the duration of the matter.

In considering what additional information a claimant may elect to submit to identify when effort was expended/hours were worked, the CSSP Accounting Vendors anticipate that this will most likely include time and billing records maintained by a claimant in the ordinary course of business.  In the absence of such records, other information may be utilized to estimate or 'reconstruct' when effort/time was incurred.  Such information may include, but not be limited to, calendars, engagement letters, court filings, case summaries, court and deposition appearances, expert report submissions, transaction close dates, contract execution dates, project deliverables, court approvals, court/trial dates, and payment schedules and receipt.  The approach that will be followed is detailed below:

1.  Information will be requested from the claimant that details the nature of the fee arrangements for all cases/engagements commenced and/or closed during the Benchmark and Compensation Periods.  The information requested will be consistent with the set out in Attachment E – Professional Services Methodology.  Given that cases/engagements may have commenced prior to the Compensation Period or were ongoing or closed after the Benchmark Period, information required from claimants may extend prior to the Compensation Period and subsequent to the Benchmark Period.

2.  Revenue will be allocated to each month of the Benchmark Period (May 2011 to April 2012) and Compensation Period (May 2010 to April 2011) based on when work was actually performed.

G16

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

3.   To identify when hours were worked the following steps will be performed:

    a.   A detailed inventory of all engagements performed by the claimant will be obtained, separated by the nature of the fee arrangement.

    b.   The CSSP Accounting Vendors will, through inquiries of the claimant, and an evaluation of submitted documentation, determine if contemporaneous time and billing records were maintained by the claimant in sufficient detail to determine and verify when effort was expended/hours were worked on individual cases/engagements, or if practical a grouping of cases/engagements that had similar characteristics (e.g., commencement and completion date, revenue generated and paid).  If deemed sufficient, time and billing records will be utilized.

    c.   If time and billing records were not maintained by the claimant in sufficient detail to determine when effort was expended/hours were worked, the CSSP Accounting Vendor will consider the adequacy and completeness of other information provided and determine if sufficient to estimate and verify when effort was expended/time was worked, and will allocate revenue on such basis.


Utilizing Time and Billing records to reallocate revenue


1.   Any billing records submitted will be analyzed for each engagement.  Hours recorded by personnel for each individual case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) will be compared to the timing of revenue recognized.  Total revenue generated from each case will be considered net of reimbursable expenses.  Total revenue generated from each case/engagement will be reallocated to each month based on the percentage of hours charged in that month relative to the total case/engagement hours.

2.   Based upon the content and format of the time and billing records received, additional analysis may be performed including but not limited to comparison of pre-spill and post-spill:  monthly

G17

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

hours worked in assessing lost hours, if any; billing rates per engagement/case in assessing higher/lower rates, if any; changes in the overall variable profit margin between periods, if any; utilization mix of professional staff (including owners/partners); lines and/or types of services/engagements worked on; and length of the project and value of settlements reached .

3.      For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

4.      Where revenue has been amended a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

Utilizing Engagement Records to reallocate revenue

1.      It is expected that claimants who operate under a time & materials fee arrangement will maintain time and billing records in order to create and support the invoices to their clients.  Accordingly, it is assumed that the methodology set out below will most likely apply to fixed fee and contingent fee arrangements, or a combination of the two.  It should be noted that if a firm has a variety of fee arrangements including some performed on a time & materials basis, for which it maintained time and billing records, the revenue may (based on the judgment of the CSSP Accounting Vendors) be bifurcated, and different records will be applied to identify when hours were worked.

2.      If the claimant elects to submit documentation that the CSSP Accounting Vendors deem sufficient to estimate and verify the effort expended/hours worked incurred in any given month, cases/engagements performed under a fixed fee or contingent fee arrangement will be evaluated utilizing other engagement documentation, as follows:

  i.   Fixed and contingent fee cases/engagements worked during the Benchmark Period and the Compensation Period

•   Identify the commencement and completion date for each case/engagement, including the date revenue was recorded and/or cash was received

**<u>BEL Claims  - Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT G – Start-Up Businesses Methodology</u>**

- In the case of a legal matter, conduct an examination of available legal and non-legal documents (e.g., pleadings and other court records, discovery requests, depositions and/or court  documents, due diligence commencement dates, transaction closure dates, submission of contract drafts, lawyer's calendars etc.) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month.  This process will be performed in consultation with the claimant.

    - Based on the duration of the legal matter, combined with the timing of significant events, an estimate of the percentage of the total work effort on the case will be assigned to each month.

    - Revenue will be reallocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort incurred on the case.

- For other professional services claimants (not law firms), conduct an examination of available documentation (e.g., budgets, project reports, draft and final deliverables, calendars, time and billing records, progress and status reports, meetings/presentations and other key milestone events) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month.  This process will be performed in consultation with the claimant.

    - Based on the duration of the engagement, combined with the timing of significant events/milestones, an estimate of the percentage of the total effort incurred on the engagement will be assigned to each month.

    - Revenue will be reallocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort incurred on the engagement.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

3.      For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no value will be assigned to such cases.

4.      Where revenue has been amended a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

Variable Expenses

1.      It is expected that the records maintained by some claimants may not separately identify variable expenses, as defined in Exhibit 4D of the Settlement Agreement, to specific cases/engagements.

2.      Where revenue is allocated on a straight line basis over the duration of a case/engagement, due to the claimant electing not to submit additional documentation, or where there was a lack of sufficient information to reliably estimate and verify when hours were worked/effort was expended, variable expenses incurred during the Benchmark Period (May 2011 to April 2012 or May 2010 to April 2011 if projections are used) and Compensation Period (May 2010 to April 2011) will be allocated to individual months based on that month's revenue as a percentage of total revenue for the same 12- month period.  This approach results in a consistent variable profit margin for each month of any given year (May to April).  The calculation is as follows:

• Monthly Corresponding Variable Expenses during the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses year May 2011 to April 2012 and total revenue for the same period.

• This variable expense percentage is applied to the specific monthly revenue amounts in the Benchmark Period to calculate the Corresponding Variable Expenses for each month.

• Monthly Corresponding Variable Expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for the 12-month period May 2010 to April 2011 and total revenue for the same period.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

- This variable expense percentage is applied to the specific monthly revenue amounts in the Compensation Period to calculate the Corresponding Variable Expenses for each month.

3. Where revenue has been reallocated on a basis other than the straight line basis, variable expenses incurred during the Benchmark and Compensation Periods will be allocated to individual months based on the total effort expended/hours worked, estimated using the same information utilized in reallocating revenue.

Compensation Calculation

1. The revised P&Ls resulting from the reallocation of revenue and variable expenses are utilized as the input for calculating compensation under Exhibit 7 of the Settlement Agreement:

2. Calculate Expected Revenue and Expected Costs

   i. Expected Revenue and Expected Costs shall equal either:

      a. The Actual Revenue and Actual Costs as set forth in the restated P&Ls for the Benchmark Period; or

      b. Revenue and expenses reported on financial projections for the Start-Up Business. The use of such projections would be dependent on satisfying the requirements of Exhibit 7: that the projections were used to seek the extension of credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family provider investors with business lending experience.

   ii. Claimant's Expected Profit/Loss for the compensation period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both expected revenue and expected costs must both be based on qualifying projections.

**BEL Claims  - Matching of Revenues and Expenses**

**ATTACHMENT G – Start-Up Businesses Methodology**

3.     Calculate Actual Profit/Loss

    i.     Actual profit/loss generated over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues as set forth in the restated P&Ls and (ii) the claimant's Actual Variable Costs as set forth in the restated P&Ls, for the Compensation Period.

4.     Compensation will be computed under Exhibit 7 of the existing Settlement Agreement as follows:

    1.   Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated over the Compensation Period.
    2.   Apply the agreed-upon RTP adjustment.
    3.   Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, and/or from any VoO Settlement Payment Offsetor VoO Earned Income Offset, where applicable.

5.     As noted above in 'Utilizing Time and Billing records,' if this data is available and used to reallocate revenues, the additional analysis described below may be performed at this step in order to identify and quantify the various components of the compensation calculation.  This analysis may include consideration of compensation resulting from a decrease/increase in hours, a decrease/increase in rates/awards and an increase/decrease in variable profit margin. Depending upon the level of detail provided, these components may be further analyzed to identify compensation amounts associated with changes in utilization/mix of professional staff as well as changes in types of services/engagements/cases worked on.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 13-30315

_____

United States Court of Appeals
Fifth Circuit

**FILED**

March 3, 2014

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

--------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP PIPE LINE COMPANY,

Defendants - Appellants

--------------------------------------------------------------------------------

Consolidated with: 13-30329

IN RE: DEEPWATER HORIZON

--------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on

behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

> Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

> Defendants - Appellants

-------------------------------------------------------------------

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY

> Plaintiffs - Appellants

v.

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

> Intervenor Defendants - Appellees

DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT
PROGRAM; PATRICK A. JUNEAU, in his official capacity as Claims
Administrator of the Deepwater Horizon Court Supervised Settlement
Program administering the Deepwater Horizon Economic and Property
Damages Settlement Agreement, and in his official capacity as Trustee of the
Deepwater

> Defendants - Appellees

-------------------------------------------------------------------------------
Consolidated with 13-31220

IN RE:  DEEPWATER HORIZON
-------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

              Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP PIPE LINE COMPANY,

              Defendants - Appellants

-------------------------------------------------------------------------------

Consolidated with 13-31316

IN RE:  DEEPWATER HORIZON
-------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

              Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

        Defendants - Appellants

_____

Appeals from the United States District Court
for the Eastern District of Louisiana

_____

Before DENNIS, CLEMENT and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal concerns issues arising under a Settlement Agreement approved by the district court in December 2012. Relevant to us today is that the settlement provided a mechanism for presenting and processing claims for business losses caused by the April 2010 *Deepwater Horizon* disaster in the Gulf of Mexico. The district court made two rulings as directed by our October 2013 remand. One concerned an accounting question, which was resolved in a sufficiently satisfactory manner as not to be appealed by any party. The other ruling was that the Settlement Agreement did not require those submitting claims for certain business losses to provide evidence of causation. BP Exploration and Production, Inc. appeals that ruling and also argues that an injunction is required to stop payments on such claims. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal was originally briefed in May and June of 2013 and orally argued in July. BP's argument at that time concerned contract interpretation. Its appeal was from an order of the district court entered on March 5, 2013.

That order affirmed a Policy Statement issued by the claims administrator on January 15, 2013. BP asserted that the district court and claims administrator's interpretations of Exhibit 4C of the Settlement Agreement were erroneous because they did not require matching of revenues and expenses in claims processing. On October 2, 2013, this panel, writing three separate opinions, remanded with guidance to the district court for reconsidering the necessity of matching revenues and expenses when processing Business and Economic Loss ("BEL") claims. *See In re Deepwater Horizon*, 732 F.3d 326, 332-39 (5th Cir. 2013) ("*Deepwater Horizon I*").

Additionally, in a part of the opinion for the court that no other panel member joined, Judge Clement wrote on a separate but related issue. She determined that if the Settlement Agreement's causation evidentiary framework was interpreted not to require proof of a nexus between the *Deepwater Horizon* disaster and a claimant's damages, the Settlement Agreement would violate Article III, Federal Rule of Civil Procedure 23, and the Rules Enabling Act. *Id.* at 342-43. Because that issue had not been briefed or argued, Judge Southwick wrote that it was inappropriate to resolve it. *Id.* at 346 (Southwick, J. concurring). Nonetheless, he called the analysis "logical" and joined in requiring the district court to consider, on remand, the relevance of causation to the extent the parties argued the point. *Id.*

On remand, the district court, in three different orders spread over several weeks, indicated that it did not believe this court had required an evaluation of the causation issue. On December 2, 2013, we clarified that Judges Clement and Southwick had agreed in their separate October opinions that, if raised, the district court must consider the Article III and other causation arguments on remand. We acknowledged that our issuance of multiple "opinions may have created interpretive difficulties on the remand,

but the district court erred by not considering the arguments on causation." Yet again today, we each express ourselves individually. Two of us do at least say in tandem, clearly we trust, "affirm."

On December 24, the district court held that the Settlement Agreement requires matching of revenues and expenses. The court directed the claims administrator to implement that interpretation. As of that ruling, the entirety of BP's initial argument, namely, that the initial interpretations of Exhibit 4C were incorrect, was successful. Also at that point, though, the district court rejected BP's arguments with respect to the new issue of whether Article III, Rule 23, and the Rules Enabling Act permitted the parties to agree to a settlement that dealt with causation in this manner. To answer that second question, the district court analyzed the terms of the Settlement Agreement and an October 10, 2012, Policy Statement by the claims administrator to which BP had not objected. The district court concluded that the language of the Settlement Agreement did not require extrinsic inquiry into causation and that the Settlement Agreement had not violated Article III, Rule 23, or the Rules Enabling Act by eschewing the need for evidence of causation.

BP renewed its emergency motion for an injunction with this court on December 30, challenging only the district court's rejection of its causation arguments. No party appealed the district court's instruction to the claims administrator to implement the district court's interpretation of the Settlement Agreement with respect to matching.

While this panel has been addressing questions arising out of the claims administrator's interpretation of the Settlement Agreement, another panel considered the chronologically earlier question of the validity of the certification of the class by the district court on December 21, 2012, and the approval of the Settlement Agreement. In a January 10, 2014, decision, what

we will refer to as the "certification panel" determined the class certification and settlement approval did not contravene Article III, Rule 23, or the Rules Enabling Act. *See In re Deepwater Horizon*, 739 F.3d 790, 795 (5th Cir. 2014) (*Deepwater Horizon II*).

The certification panel declined to analyze issues arising from the interpretation and implementation of the settlement after its approval by the district court, but the panel held that all Article III, Rule 23, and Rules Enabling Act concerns were resolved at the class certification and settlement approval stage. *Id.* at 804. We directed letter briefing on the impact of that decision on the remaining issues before this panel for resolution. We now consider the issues that we conclude remain before us.

## DISCUSSION

Contract interpretation is a question of law we review *de novo*. *Waterfowl L.L.C. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006). BP argues that the district court erred in concluding that the Settlement Agreement's causation framework did not violate Article III, Federal Rule of Civil Procedure 23, and the Rules Enabling Act. Only part of this issue was resolved on January 10 by the certification panel when it concluded that the certification of a class and the approval of the Settlement Agreement were proper. What this panel now must decide is whether the implementation of the Settlement Agreement is defective.

BP contends that Section 1.3.1.2 of the class definition and footnote 1 of Exhibit 4B establish a requirement that claimants prove with evidence that they are proper class members. Section 1.3.1.2 states: "Economic Damage Category. Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the **DEEPWATER HORIZON INCIDENT**." Footnote

1 of Exhibit 4B states: "This Causation Requirements for Business Economic Loss Claims does not apply to . . . Entities, Individuals, or Claims not included within the Economic Class definition." We will discuss the referenced footnote later.

The class definition was relied upon by the certification panel when it concluded that the Settlement Agreement complied with Article III:

> Under the plain terms of the Class Definition, a "person or entity" is included "in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described" in Section 1.3.1 of the Class Definition. Of these "Damage Categories," the only category that BP has identified as giving rise to Article III difficulties is the "Economic Damage Category" under Section 1.3.1.2. This section of the Settlement Agreement, however, explicitly limits claims to those based on "[l]oss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT," subject to exclusions for participants in certain industries. As contemplated by the Class Definition, therefore, the class contains only persons and entities that possess Article III standing.

*Deepwater Horizon II*, 739 F.3d at 803 (footnotes omitted). The panel also determined that the class definition and the amended complaint satisfied the requirements of Rule 23 and the Rules Enabling Act. *Id.* at 804 & n.53.

The Settlement Agreement was approved in the same December 2012 district court order that certified the class. The certification panel's opinion notes that the terms of this settlement substitute for at least some of the contested factual development that occurs in cases that do not have simultaneous certification and settlement. *Id.* at 806-08. Despite the settlement, the individual claims still had to be processed. Thus, we now examine the methodology for presenting and processing those claims, as written in the Settlement Agreement and as interpreted by the claims administrator in the October 10, 2012, Policy Statement.

Causation for BEL claims is primarily addressed in Exhibit 4B to the Settlement Agreement.  It provides for the use of proof of loss as a substitute for proof of causation.  Exhibit 4B exempts claimants located within certain geographic regions and in certain industries from presenting any evidence of causation.  That exemption appears in a section under the heading "Business Claimants for Which There is No Causation Requirement."  It continues: "If you are a business in [geographic] Zone A, you are not required to provide any evidence of causation unless you fall into one of the exceptions agreed to by the parties, and listed in footnote (1)."  Claimants not within the exempt criteria must only meet one of a set of quantitative tests based on their revenue patterns during the pre- and post- *Deepwater Horizon* disaster periods.

BP seeks to override the explicit language disclaiming the need for evidence of causation by focusing on this footnote that appears in Exhibit 4B: "This Causation Requirements for Business Economic Loss Claims does not apply to . . . Entities, Individuals, or Claims not included within the Economic Class definition."  Wielding this footnote, BP seeks to dismantle the complex framework of exemptions, presumptions, and formulas that allow business claimants to submit evidence of their income and expenses before and after the BP-caused disaster.  BP, in essence, is arguing that only if a claimant can prove its injuries are traceable to BP's conduct will Exhibit 4B's forswearing of the need for proof of traceability to BP's conduct apply.  There likely is a more nuanced manner in which BP would characterize its argument, but this fairly captures its essence.  We reject the argument, of course.

We acknowledge, though, that BP is pointing out a possible inconsistency between what the certification panel says it found to satisfy Article III – namely, a requirement that class members be able to trace their claims to the defendant's conduct – and the way the Settlement Agreement is written and