has been implemented.   In effect, BP argues that Exhibit 4B cannot be interpreted to exclude a requirement of causation because the certification panel held that requirement to be a feature of the class definition.   BP argues, then, that even if the class were properly certified under Article III based upon this definition, a settlement that abandons such a requirement, or at least a settlement later interpreted and implemented as not including such a requirement, was simultaneously approved.  This, according to BP, reanimates Article III, Rule 23, and Rules Enabling Act issues put to rest by the certification panel.   We disagree with the premise of abandonment and therefore we never reach the applicability of these fundamental issues to the questions that remain before us.[1]  Neither the Settlement Agreement's terms nor its implementation ignore causation.   Instead, the parties explicitly contracted that traceability between the defendant's conduct and a claimant's injury would be satisfied at the proof stage, that is, in the submission of a claim, by a certification on the document that the claimant was injured by the *Deepwater Horizon* disaster.  We explain.

The parties agreed to a form that BEL claimants would submit to make a claim.   The introductory section of the form states: "The **Business Economic Loss Claim** is for businesses . . . that assert economic loss *due to the spill*." (Italics added). The end of the form requires the claimant "certify and declare under penalty of perjury" that all of the information in the claim form is "true and accurate to the best of my knowledge."   The claimant further attests "I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy

---

[1] We observe that the difficulties that BP points out as to causation are outgrowths of the definition of the class and the terms of the Settlement Agreement that were sustained by the Certification panel.  We do not perceive any basis for saying Article III, Rule 23, and the Rules Enabling Act are violated at the claims processing stage that has not already been addressed by the prior panel.

available by law . . . and that suspicious claims will be forwarded . . . for possible investigation and prosecution." Every claim BP argues suffers from some causal-nexus infirmity should have with it an attestation from the claimant or an attorney that the economic loss was caused by the spill.

In light of our reading of the Settlement Agreement, claim form, letter briefing, and the voluminous record in this appeal, we conclude the Settlement Agreement does not require a claimant to submit *evidence* that the claim arose as a result of the oil spill. Each claimant does attest, though, under penalty of perjury, that the claim in fact was due to the *Deepwater Horizon* disaster. The attestation, of course, applies to all assertions on the claims form, including the financial figures and other details. Suspicious forms would be subject to investigation. These requirements are not as protective of BP's present concerns as might have been achievable, but they are the protections that were accepted by the parties and approved by the district court. It was a contractual concession by BP to limit the issue of factual causation in the processing of claims. Causation, or in Rule 23 terms, traceability, was not abandoned but it was certainly subordinated.

There is nothing fundamentally unreasonable about what BP accepted but now wishes it had not.[2] One event during negotiations in the fall of 2012 suggests reasons for just requiring a certification. The claims administrator, in working through how the proposed claims processing would apply in specific situations, submitted a hypothetical to BP and others. It posited three accountants being partners in a small firm located in a relevant geographic region. One of the three partners takes medical leave in the period immediately following the disaster, thus reducing profits in that period

---

[2] Though the approach may have been reasonable, that fact does not make it legally valid. As we have already held, though, the Certification panel precedentially resolved validity.

because that partner is not performing services for the firm. At least some of the firm's loss, then, would have resulted from the absence of the partner during his medical leave. BP responded that such a claim should be paid. We raise this not for the purpose of analyzing an issue we conclude is not relevant to our decision, namely, whether BP is estopped from its current arguments. Instead, we mention it in order to identify the practical problem mass processing of claims such as these presents, a problem that supports the logic of the terms of the Settlement Agreement. These are business loss claims. Why businesses fail or, why one year is less or more profitable than another, are questions often rigorously analyzed by highly-paid consultants, who may still reach mistaken conclusions. There may be multiple causes for a loss. As with the hypothetical accountants, all of the loss may be attributable to the missing partner, or some of the loss may be traceable to the *Deepwater Horizon* disaster. The difficulties of a claimant's providing evidentiary support and the claims administrator's investigating the existence and degree of nexus between the loss and the disaster in the Gulf could be overwhelming. The inherent limitations in mass claims processing may have suggested substituting certification for evidence, just as proof of loss substituted for proof of causation. Because the Settlement Agreement at least requires a formal assertion of the causal nexus, we conclude that what the certification panel relied upon in approving the class definition and Settlement Agreement remained in place during the processing of claims.

The dissent concludes we require too little as to causation. We see the extent of our colleague's disagreement to be as follows. All of us accept that the class definition and Settlement Agreement require that membership in the class be based on harm from BP's conduct, as the Certification Panel previously held. We also agree that the provision in Exhibit 4B that disclaims the need

for evidence of causation is at least generally applicable. We part analytical ways when identifying the role of the claims administrator regarding suspicious or implausible claims. The dissent would require the claims administrator to "ensure that claims are not paid that are not plausibly traceable to the spill," thus placing the onus on the claims administrator to ensure that implausible claims are adequately scrutinized such that those lacking a causal nexus are rejected.

We do not agree that we should order the claims administrator to perform that gatekeeping function. There is no language in the Settlement Agreement nor in BP's briefing, supplemental submissions, or emergency motions, about a procedure to be followed when an attestation of a nexus seems at odds with the specifics of the claim. Far from proposing a specific procedure or even guidelines for crafting one, the entirety of BP's requested relief, exemplified in its Renewed Motion for Injunction, is "a permanent injunction barring the [claims administrator] from issuing or paying awards to claimants whose alleged injuries are not traceable to the spill." BP identifies its desired relief but does not identify a part of the Settlement Agreement that in any way suggests that each submitted claim would be examined as to whether it satisfies a traceability requirement.

Relevant to this concern is that BP did not object in this appeal to a decision made in October 2012 that the claims administrator was not to look at potential alternative causes for claimants' losses. Though we are reluctant to say that all claims must be accepted no matter how clear the absence of the required nexus may be, no one has concerned itself in this appeal with the when, by whom, and how of analyzing such suspicious claims after they are submitted. It seems to us that absent any specific provision in the Settlement Agreement, and no one suggests there is one, such concerns are to be addressed

in the usual course of processing individual claims.  The Settlement Agreement contained many compromises.  One of them was to provide in only a limited way for connecting the claim to the cause. The claims administrator, parties, and district court can resolve real examples of implausible claims as they resolve other questions that arise in the handling of specific claims.

We affirm the district court's December 24, 2013, order interpreting the Settlement Agreement.  An injunction has been in place preventing payment of BEL claims pending the resolution of all of these issues.  Between the certification panel's decision of January 10 and ours today, all issues presented to this panel have been resolved.  On the other hand, petitions for rehearing *en banc* of the certification panel's decision on which we have relied have been filed.  We can anticipate that our decision might not persuade all parties either.  We conclude that the injunction should be dissolved, but the injunction remains in place until the mandate of the court is issued.

The December 24, 2013, ruling of the district court is AFFIRMED.  The injunction prohibiting payment of the relevant claims is VACATED.

JAMES L. DENNIS, Circuit Judge, concurring in part and concurring in the judgment:

The Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, imposes strict liability on those responsible for oil spills "into or upon the navigable waters or adjoining shorelines" of the United States. *Id*. § 2702. It provides for recovery of removal costs and of six categories of damages that "result from" such incidents, including damages for "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." *Id*. § 2702(b)(2)(E).

The oil spill from BP's Macondo oil well and Deepwater Horizon drilling rig into the Gulf of Mexico, which continued from April 20 to July 15, 2010, caused damages in all of the six OPA categories. Following the unprecedented spill that affected thousands of businesses across the Gulf Coast and surrounding regions, it seemed apparent that BP's liability for business economic loss (*viz.*, "loss of profits or impairment of earning capacity") could be enormous. However, the full scope of § 2702(b)(2)(E) liability, which is defined as affording recompense for business economic loss "due to" property and environmental damage that "result[s] from" a covered oil spill, had not yet been, and still has not been, judicially construed. Furthermore, the scope of such liability was, and still is, subject to intense scholarly debate.[1]

For these and other reasons, BP and the economic-loss claimants entered a settlement agreement adopting clearer definitions and formulas for the

---

[1] *See* John C. P. Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill*, 30 MISS. C. L. REV. 335 (2011); David W. Robertson, *The Oil Pollution Act's Provisions on Damages for Economic Loss*, 30 MISS. C. L. REV. 157 (2011); John C. P. Goldberg, *OPA and Economic Loss: A Reply to Professor Robertson*, 30 MISS. C. L. REV. 203 (2011); David W. Robertson, *OPA and Economic Loss: A Response to Professor Goldberg*, 30 MISS. C. L. REV. 217 (2011).

payment of such claims.  At their request, the district court approved the settlement agreement as a class-action settlement in its consent decree.

Within days of the district court's judgment, however, BP brought this litigation, which has evolved into BP asking the courts to interpret the settlement agreement and consent decree to require certain economic-loss claimants to prove, with trial-type evidence, that their losses were caused by the oil spill, regardless of whether they have met the definitions and formulas provided by the settlement agreement and consent decree.  The district court rejected BP's demands, and BP appealed.  The majority of this panel, first, addressing an issue of how damages should be calculated, vacated the district court's judgment and remanded with instructions to determine whether the claims administrator was converting claimants' accrual-method accounting data into cash-method data.  Second, addressing whether claimants must satisfy causation requirements external to the settlement agreement's text, the majority of this panel ordered the district court to "expeditiously craft" a "narrowly-tailored injunction" that would allow "those who experienced actual injury traceable to loss from the Deepwater Horizon accident to continue to receive recovery but those who did not do not receive their payments" pending further decision of the court.  *In re Deepwater Horizon*, 732 F.3d 326, 345-46 (5th Cir. 2013) (Clement, J.).  I dissented from the panel majority's vacatur and remand because, in my view, BP's action was an unwarranted attempt to change the terms of the settlement agreement and the district court's judgment rejecting that attempt should have been affirmed.  *Id.* at 361 (Dennis, J., concurring in part and dissenting in part).

Next, after the district court issued an injunction, BP filed an "emergency motion" in this court seeking to have this panel order the district court to expand the injunction's scope.  BP's Mot. (Doc. No. 195, filed Nov. 21,

2013).  A majority of this panel remanded to the district court and ordered it to give further "expeditious consideration" in the first instance to the "issue of causation" and to revise the injunction as found needed.  *In re Deepwater Horizon*, No. 13-30315 (5th Cir. filed Dec. 2, 2013).  I dissented from the panel's remand and order because I thought the district court had acted correctly and I agreed with the reasons it had assigned; moreover, I stated that BP's belated attempt to raise the issue of causation of damages under the OPA clearly did not survive BP's entering voluntarily into the settlement agreement and consent decree and failing to raise the causation issue in the initial proceedings in the district court and appeal.  *Id.* (Dennis, J., dissenting).

After this second remand, the district court, first, granted BP certain partial relief it sought regarding the court's interpretation of the settlement agreement's provisions for calculating damages and ordered the claims administrator to adopt and implement a policy for matching revenue and corresponding variable expenses when calculating business-economic-loss claims.  Second, the district court held that the settlement agreement would be interpreted as written without any judicial gloss.  Third, the district court held that BP was judicially estopped from pursuing its causation arguments because those arguments contradicted numerous representations BP had made to the district court and this circuit court regarding how the settlement agreement should be interpreted and implemented.  The district court explained, essentially, that BP had long maintained that the settlement agreement's definitions and formulas were the sole relevant provisions for processing claims, and such statements on BP's part clearly contradicted BP's new arguments that claimants must also prove causation with supporting evidence.  And the district court rejected BP's arguments under Article III, Rule 23, and the Rules Enabling Act.  *In re: Oil Spill by the Oil Rig "Deepwater*

*Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 10-MD-2179 (E.D. La. filed Dec. 24, 2013).

BP has now lodged another appeal and motion with this panel, seeking to have this court, not the district court, "permanently enjoin" the claims administrator from processing claims from claimants who have not proven with trial-type evidence that their "alleged injuries" are "traceable to the Deepwater Horizon oil spill." BP's Mot. (Doc. No. 231, filed Dec. 30, 2013).

Although I continue to adhere to the views I expressed previously in this case, I now join Judge Southwick in affirming the district court's December 24, 2013 order interpreting the settlement agreement as written and declining to add, by judicial gloss, any additional requirements, procedures, or other provisions not contained in the text of the settlement agreement and consent decree and its attached exhibits. I agree with Judge Southwick that BP's renewed motion for an injunction should be denied and that no injunction against the payment of business-economic-loss claims shall continue. I also agree that we are bound by the certification panel's Article III, Rule 23, and Rules Enabling Act rulings in its January 10, 2014 opinion and decision. Accordingly, for these reasons, I concur in the above-described conclusions reached by Judge Southwick and in the judgment he has written for the majority of this panel.

EDITH BROWN CLEMENT, Circuit Judge, dissenting.

A majority of this panel (1) affirms the district court's December 24, 2013 order, (2) denies BP's motion for a permanent injunction against the issuance or payment of awards to claimants whose injuries are not traceable to the Deepwater Horizon oil spill, and (3) holds that this panel is bound by the certification panel's rulings on Article III, Rule 23, and the Rules Enabling Act.[1] I respectfully dissent.

The judicial power of federal courts extends only to cases and controversies. There are but three irreducible constitutional requirements: an injury in fact, a causal connection between the injury and the conduct complained of, and that the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Despite the modern development of class actions under our law, the extent of our judicial power remains unchanged. It extends only to cases and controversies—redressable injuries with a causal connection. *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

The Deepwater Horizon tragedy took eleven lives and caused great damage to our environment and region. Cases and controversies abounded. In light of this, the parties sought to negotiate a settlement agreement that would resolve these issues on an enormous, class-wide basis, one of the largest settlements in history. This was a settlement that would compensate claimants for "[l]oss of income, earnings or profits . . . as a result of the" spill. Settlement Agreement § 1.3.1.2. The agreement was signed and the class was certified on December 21, 2012, with the support of the parties.

---

[1] Judge Dennis "concur[s] in the above-described conclusions reached by Judge Southwick and in the judgment he has written for the majority of this panel." While this opinion refers to Judge Southwick's opinion as speaking for the "majority," it is worth noting that little of his analysis and reasoning carries the support of two panel members.

Two subsequent decisions of the Claims Administrator brought the parties into conflict. One was the Policy Statement endorsed by the district court in an order of March 5, 2013, that established the accounting methodology to be used to measure payments for Business Economic Loss claims under Exhibit 4C of the Settlement Agreement. The other was a Policy Statement that was issued on October 10, 2012, and adopted by the district court on April 9, 2013, that laid out a position on "Causation Requirements" in Exhibit 4B. It stated:

> The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement.

On October 2, 2013, a majority of our panel agreed that Exhibit 4C required matching of revenues and expenses, and remanded to the district court with the additional instruction to consider the issue of causation if raised by the parties. *In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013) ("*Deepwater Horizon I*"). On remand, the district court declined to address the causation issues, and after a renewed motion to our panel, we remanded again on December 2, 2013, with instructions to consider the causation issues BP raised.

On December 24, 2013, the district court issued an order requiring the Claims Administrator to match revenue and expenses as directed by our October 2 opinion and subsequent order of December 2. This resolved the first dispute raised by the Claims Administrator's Policy Statement, and no party has appealed this issue.

The district court also addressed the second disputed issue in an order that analyzed the causation issues we directed the court to consider. It held that BP was judicially estopped from arguing that individuals and entities whose injuries were not fairly traceable to the oil spill should not be able to recover. BP responded with an additional motion asking this court to put in place a permanent injunction to ensure that the Claims Administrator considers causation before paying out claims.

Meanwhile, another panel of this court heard challenges to the certification of the class action in this case and released an opinion on January 10, 2014, upholding the district court's certification of the Settlement Agreement.[2] The majority of that panel found no issue with upholding the certification of the Settlement Agreement, because the agreement as written "explicitly limits claims to those based on '[l]oss of income, earnings or profits suffered by Natural Persons or Entities *as a result of* the DEEPWATER HORIZON INCIDENT,' . . . . As contemplated by the Class Definition, therefore, the class contains only persons and entities that possess Article III standing." *In re Deepwater Horizon*, 739 F.3d 790, 803 (5th Cir. 2014) ("*Deepwater Horizon II*").

The certification panel declined to address the Claims Administrator's interpretation of the Settlement Agreement, leaving that issue for our panel's consideration in light of our retention of jurisdiction. As the certification panel stated, "[t]he evidentiary standard to be applied by the Claims Administrator . . . is a question of interpreting the Settlement Agreement and applying it to

---

[2] While the decision of the certification panel is binding under our circuit's rule of orderliness, that opinion was careful to limit its holding to the class certification and settlement approval context. In addition, it was arguably premature for that panel to rule on the certification issue before ours had issued a final ruling on the proper interpretation of the Settlement Agreement. Much of the confusion, delay, and additional briefing in these cases could have been avoided if the cases had been consolidated into one panel.

each individual claim, and we are not called upon to address those issues in this appeal." *Id.* at 808. The opinion further acknowledged:

> The parties now vigorously dispute how this evidentiary framework was intended to work. For its part, BP has argued in its subsequent submissions to the *Deepwater Horizon I* panel that "the Claims Administrator must make a threshold determination whether the claimant has suffered loss as a result of the spill" and that under footnote 1 of Exhibit 4B this "threshold determination must be made *before* applying the causation criteria outlined in Exhibit 4B." The named plaintiffs hold a different view.

*Id.* at 807–08.

While the certification panel majority does not address what occurred after class certification, Judge Garza's dissent traces the ostensible elimination of the causation requirement to the Policy Statement of the Claims Administrator. That interpretation stated that the program would "compensate . . . claimants . . . *without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill.*" *Id.* at 823 (Garza, J., dissenting). This reading "effectively eliminated" the language requiring causation. *Id.* at 823 n.5.

The majority adopts the view that the agreement as written does not eliminate causation or traceability, but "subordinate[s]" it. Specifically, Judge Southwick agrees with the certification panel that causation was contemplated by the Settlement Agreement. He points to the Business Economic Loss claim form informing claimants that, "[t]he Business Economic Loss Claim is for businesses . . . that assert economic loss due to the spill." Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Purple Form) 1. Nine pages later, the form requires the claimant to certify under penalty of perjury "that the information provided in this Claim Form is true and accurate to the best of my knowledge." *Id.* at 9. "Every claim BP

argues suffers from some causal-nexus infirmity should have with it an attestation from the claimant or an attorney that the economic loss was caused by the spill." To the majority, this attestation satisfies any concerns about causation.

The form certainly provides further evidence that causation was a critical part of the Settlement Agreement. The difficulty is that the interpretation and implementation of the agreement eliminated this requirement when the Exhibit 4B Policy Statement informed claimants that they would be compensated whether or not their injuries "resulted . . . from a cause other than the Deepwater Horizon oil spill." These decisions and pronouncements may not have been relevant for the certification panel majority, which declined to analyze issues that arose from the interpretation and implementation of the settlement after its approval by the district court, but they are crucial in assessing "whether the implementation of the Settlement Agreement is defective." This interpretation that submitting forms that lack colorable causation was acceptable under the agreement was relied upon by attorneys, who urged uninjured plaintiffs to file claims "[i]f the numbers work." BP Br. 77, Doc. 00512230427 (May 5, 2013) (citing R.16719). These attorneys were not urging perjury: they were merely interpreting the agreement in light of the Claims Administrator's interpretation that was upheld by the district court. How can they be pursued for false statements for relying on these legally binding pronouncements, much less an individual, unrepresented claimant who lacks even this level of legal sophistication? This Policy Statement effectively eliminated the need for a claimant to allege injury traceable to BP's conduct, and therefore raises once again the Constitutional concerns that the majority claims were "put to rest by the certification panel."

The elements of standing do not end at certification, but continue to be vital throughout "the successive stages of litigation." *Lewis*, 518 U.S. at 358. Because this is a settlement class action, there are no successive stages of litigation: the certification stage and the proof stage have been combined. If someone is a member of the class, they recover. But while the certification panel analyzed the agreement as written, the subsequent implementation has expanded those who can recover even to those who cannot trace their injuries to BP's conduct. This agreement, as implemented, is using the powers of the federal courts to enforce obligations unrelated to actual cases or controversies.

Judge Southwick's opinion points out the challenge of proving causation when multiple causes are at stake by offering the hypothetical of an accounting firm that experienced economic loss after the disaster in part because one of its three partners took medical leave. It is admittedly difficult to isolate multiple causes, and that is not what Article III requires. Even in that example, an argument can be made that the disaster impacted part of the firm's losses. If so, these claimants can colorably assert injury due to the spill and are appropriate members of this class. A more fitting example here would be an accounting firm in Zone A where all three partners went on medical leave for several months after the disaster. The profits of their firm drop precipitously, but in no way due to the negligence of BP. Under Judge Southwick's reasoning, the Settlement Agreement requires BP to pay these losses as well so long as they sign a claim form. But these plaintiffs have no injury traceable to BP's actions, and would not have standing to maintain a suit individually under *Lujan*. Nonetheless, because of the majority's ruling here, these claimants will recover.

Perhaps recognizing that its ruling would lead to absurd results in at least a small number of cases, the majority states that the "[t]he claims

administrator, parties, and district court can resolve real examples of implausible claims as they resolve other questions that arise in the handling of specific claims." But I do not see how this statement provides any comfort in light of the district court's ruling that BP is judicially estopped from arguing causation. And the majority declines to rule one way or the other on judicial estoppel, which it inexplicably concludes is "an issue . . . not relevant to our decision." In the end, we are left with the majority's holding that the Claims Administrator does not need to perform the "gatekeeping function" of ensuring that claims are not paid that are not plausibly traceable to the spill. Claimants whose losses had absolutely nothing to do with Deepwater Horizon or BP's conduct will recover as a result of this ruling.

The number of claimants ultimately affected by this issue may well be small, but the constitutional principles are important because they assure the vigorous and fair resolution of disputes and respect the limitations on the power of the federal judiciary. I would reverse the district court's holding on judicial estoppel and permanently enjoin the Claims Administrator from paying awards to claimants whose injuries are not traceable to the Deepwater Horizon oil spill.

I respectfully dissent.

POLICY ANNOUNCEMENT

POLICY 495:  BUSINESS ECONOMIC LOSS CLAIMS:
MATCHING OF REVENUE AND EXPENSES

## Introduction

The District Court has instructed the Claims Administrator "to adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses."  (Rec. Doc. 12055, p. 37 of 43).

Based upon the U.S. 5th Circuit Court of Appeals' decision of October 2, 2013 and the District Court's Order & Reasons of December 24, 2013 on remand, the Claims Administrator understands that the following principles are to be applied in evaluating BEL claims under Exhibit 4C of the Settlement Agreement:

1.  The Settlement Agreement contemplates that loss calculations are to be based upon accounting records that sufficiently match revenues with expenses.

2.  The Settlement Agreement's "provision for subtracting corresponding variable expenses requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses were recorded." (Rec. Doc. 12055, p. 5 of 43).

3.  Some claimant-submitted contemporaneous accounting records inherently match revenues with expenses sufficiently for purposes of the Settlement Agreement. Others do not. (732 F. 3d at 334, 335).

4.  For those "unmatched claims," the claimant-submitted accounting records are to be adjusted "in light of the necessity of revenue and expense matching to realistic measurement of economic loss." (732 F. 3d at 346 – 347).

## Policy Development Process

In the process of developing this policy as directed by the Court, the Claims Administrator has conducted extensive consultations with the Court Supervised Settlement Program ("CSSP") Accounting Vendors (PricewaterhouseCoopers and Postlethwaite & Netterville) and has received significant input from both BP and Class Counsel.  The Claims Administrator's efforts in this regard have included:

- Both BP and Class Counsel made written submissions detailing the frameworks that they propose be implemented to accomplish the "matching" required by the Court.  These written submissions were reviewed in detail by the Claims Administrator and the CSSP Accounting Vendors.

- An extended Q&A session was conducted to allow the CSSP Accounting Vendors to gain a more complete understanding of the proposals submitted by both sides.  There were

1

numerous participants in this informational session, including BP, Class Counsel, accounting experts representing both parties, CSSP Accounting Vendors, the Claims Administrator and various members of the CAO staff.

- The CSSP Accounting Vendors conducted numerous independent working sessions over a period of approximately fourthree months.

- The Claims Administrator and the CSSP Accounting Vendors conducted several joint working sessions over a period of approximately threetwo months.

- An initial draft of this Policy was provided to both BP and Class Counsel, after which the Claims Administrator and the CSSP Accounting Vendors presented the Policy to BP, Class Counsel, and accounting experts representing both parties.;  An additional extended Q&A Session was conducted at that time.

- Both BP and Class Counsel made written submissions responding to the draft Policy. These written submissions were reviewed in detail by the Claims Administrator and the CSSP Accounting Vendors.  Revisions to the Policy were made based upon additional input from the parties and after further analysis by the CSSP Accounting Vendors.

- This final written policy has been adopted only after such thorough input, analysis, consideration and consultation.

## Underlying Issues / Principles

Based upon the CSSP's experience in reviewing claims and analyzing accounting records submitted to the CSSP since the inception of this settlement program and in light of the rulings and directives received from the Court, the Claims Administrator, in consultation with the CSSP Accounting Vendors, has arrived at the following conclusions relative to the "matching" issues at hand:

1. The claimant's method of accounting (cash vs. accrual vs. other) is not necessarily determinative of whether revenues and expenses are sufficiently "matched" as per the orders of the Court.

2. Different industries tend to present different issues and require different methodologies in terms of trying to achieve sufficient "matching."

3. In an effort to achieve sufficient "matching" in such a way that the accounting records may serve as a basis for "realistic measurement of economic loss," differing analyses are required depending upon the specifics of the particular business, including industry type and nature and duration of revenue or expense cycles.

4. It is not feasible in the context of a class-wide settlement involving thousands of different claims, with each claimant's financial information potentially spanning a

2

time period in excess of four years, to attempt to match specific expenses to specific revenues on an individual transaction by transaction basis. The time, effort and expense required under this approach would be prohibitive. Further, it is unlikely that such individualized matching of specific expenses to specific revenues would be possible based on information and documentation available to the claimants or the CSSP.

5. If a claimant's contemporaneous P&Ls submitted to the CAO are deemed to be 'sufficiently matched' based on an assessment by the CSSP Accounting Vendors, such P&Ls will be utilized in calculating compensation under the Settlement Agreement. In utilizing such contemporaneous P&Ls, corrections will be made for any accounting "errors" identified in the ordinary course, by the CSSP Accounting Vendors.[1]

6. It is the CSSP's considered assessment that, for the majority of claimants, sufficient "matching" of revenue and expenses will be best accomplished through an annual variable margin methodology which- totals variable expenses for each Fiscal Year[2] fiscal year ending April 30 and allocates them to each month on a pro-rata basis of monthly revenues for the same period. This approach reasonably accomplishes sufficient "matching" and is the most feasible methodology in the context of a class-wide settlement.

7. Depending on the specifics of a given business, it may be appropriate to make adjustments to the claimant's financials as to the timing of the recognition of either revenues or expenses or both.

8. The operating characteristics of certain businesses will not lend themselves to the application of an annual variable margin methodology. - The following industries in particular each warrant a customized methodology in order to achieve sufficient matching in a way that reasonably depicts economic reality for purposes of loss measurement: construction, agriculture, education and professional services.

---

[1] _____ "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made in good faith with the best available information at the time.

[2] A claimant's Fiscal Year is the twelve month period that the claimant uses for preparing it's annual financial statements and, in the majority of cases, for filing its annual tax return with the Internal Revenue Service. The fiscal year may or may not be the same as a calendar year. In the event that a claimant's Fiscal Year differs from the claimant's annual tax reporting period, the tax reporting period will typically be utilized.

3

9. In order to achieve sufficient "matching," adjustments to the claimant's contemporaneous accounting records are best made by the CSSP Accounting Vendors after appropriate inquiry and gathering of additional documents and/or information, if necessary, from the claimant.[3]

10. Consideration of whether revenues and expenses are sufficiently matched necessarily involves an element of professional judgment. The CSSP recognizes and reserves the right of the CSSP Accounting Vendors to exercise such professional judgment to achieve sufficient matching as ordered by the Court.[4]

**Statement of Policy**

The Claims Administrator thus adopts the following "policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses" as ordered by the Court.

## I.    **Identification of "unmatched claims."**

A.    The criteria to be used in identifying "unmatched claims," other than with respect to Failed Businesses, Failed Start-Up Businesses and Start-Up Businesses, will be the same as those set out in the Declaration of Patrick A. Juneau, Claims Administrator, dated October 25, 2013.

The process for identifying those claims whose submitted financial records fail to sufficiently match revenues with expenses shall be the following:

If the monthly profit and loss statements submitted by a claimant, restated adjusted by the CSSP Accounting Vendors for any identified errors, meet any one of the following criteria, then the claim shall be identified for a further matching analysis as described below:

---

[3] As per Exhibit 4A of the Settlement Agreement, claimants will be required to provide contemporaneous P&L statements that identify the dates on which they were created.  In addition to, but not in lieu of the contemporaneous P&Ls, The claimants may also elect to submit amended P&Ls that they believe are sufficiently matched.  Regardless of whether or not the claimant submits amended P&Ls, the CSSP Accounting Vendors will utilize contemporaneous P&Ls as a starting point for any claim.  The CSSP Accounting Vendors will require detailed information to understand and verify the changes made by claimants to achieve sufficiently matched P&Ls.  If a claimant cannot provide appropriate, reliable and complete records that support amendments made to the contemporaneous P&Ls, the CSSP Accounting Vendors will adopt one of the methodologies set forth in this Policy. consider only the contemporaneous P&Ls.

[4] The claimant's file will be appropriately and reasonably documented to reflect the basis for the exercise of professional judgment by the CSSP Accounting Vendors as to material matters in the identification and resolution of matching issues, the correction of identified errors, the resolution of ambiguities or inconsistencies in materials supplied by the claimant, the selection of the appropriate "Matching Methodology" to be utilized, and/or the allocation of revenue and/or expenses impacting the causation calculation under Exhibit 4B of the Settlement Agreement or having a significant impact on the compensation payable.

4

1.      negative total revenue- is recorded for any month included within the Benchmark Year(s), Compensation Year or 2011;

2.      total revenue recorded in any month included in the Benchmark Year(s), Compensation Year or 2011 exceeds 20% of the claimant's annual revenue for the year which includes that month;

3.      the monthly profit and loss statements or other documentation submitted shows that the claimant's business experienced a period of dormancy during the Benchmark Year(s), Compensation Year or 2011;

4.      total variable expenses when summed up are negative for any month within the Benchmark Year(s) or Compensation Year;

5.      total variable expenses for any month within the Benchmark Year(s) or Compensation Year exceed 25% of the claimant's annual variable expense for the year which includes that month;

6.      variable margin percentages when compared between any two months included within the Benchmark Year(s) and Compensation Year vary by more than 50 percentage points; or,

7.      in any given month within the Benchmark Year(s) or Compensation Year, the variance between that month's percentage of annual revenues as compared to that same month's percentage of annual variable expenses exceeds 8 percentage points.

Any claim, whether based on accrual, -or-cash or another -basis of accounting books and records, that does not fall within one of the foregoing seven criteria shall be presumed to be "sufficiently matched," provided:, however, that if in the professional judgment of the CSSP Accounting Vendors, a claimant's financial records contain other significant indicia that the claim may not be "sufficiently matched," the CSSP reserves the right to identify such claim for further matching analysis as set forth below.

With respect to any claims where matching is determined to be an issue as set forth in this paragraph I.A. above, the CSSP Accounting Vendors will exercise their professional judgment to determine whether that claim is "sufficiently matched" based upon the evaluation of the information submitted and available to them, including, when applicable, the nature and complexity of the industry or business in question, particularly with regard to claims based upon cash-basis accounting records.

For those claims determined *to* be sufficiently matched, the CSSP Accounting Vendors will utilize claimant-submitted accounting records (adjusted for any identified accounting errors) to calculate compensation as set forth in the Settlement Agreement.

444895
3/7/14

For those claims determined *not* to be sufficiently matched, the CSSP Accounting Vendors will adjust the claimant-submitted accounting records as outlined in paragraph II below in order to achieve sufficient matching as per the orders of the Court.

B.      As to Failed Businesses and Failed Start-Up Businesses and as to Start-Up Businesses, identification of "unmatched claims" will be determined as set out in Attachments G~~F~~ and H~~G~~ to this policy.

II.      **Adjustment of "unmatched claims . . . in light of the necessity of revenue and expense matching to realistic measurement of economic loss."**

For those claims determined under paragraph I above *not* to be sufficiently matched, the below methodologies will be utilized to achieve sufficient matching as per the orders of the Court.

A.      Determination of Applicable Methodology.

Claims will be assigned to an industry type for purposes of these methodologies using NAICS codes as outlined in **Attachment A**.  To the extent that in the professional judgment of the CSSP Accounting Vendors assignment to a methodology by such NAICS code is inappropriate based on that claimant's particular business activities, the CSSP reserves the right to revise the applicable methodology to achieve sufficient matching as ordered by the Court.  All claims submitted with P&Ls that are deemed not to be sufficiently matched, will be processed under one of the Methodologies set forth below.  Note: no claim will be processed under an individually tailored approach to resolve matching issues.

B.      ~~General~~ Annual Variable Margin Methodology for "Unmatched" Claims.

**See Attachment B**.

C.      Construction Claims.

**See Attachment C**.

D.      Agriculture ~~and Educational Institutions~~ Claims.

**See Attachment D**.

E.      Educational Institutions Claims.

**See Attachment E.**

F.      Professional Services Claims.

**See Attachment F~~E~~.**

6

G̲F̶.     Failed Businesses and Failed Start-Up Businesses.

      **See Attachment G̲F̶.**

H̲G̶.     Start-Up Businesses.

      **See Attachment H̲G̶.**

Under the above methodologies, the guiding principle has been to utilize the claimant's contemporaneous P&Ls where there is no indicia of a mismatch of revenue and expenses. Where matching issues have been identified the approach will be, ~~has been,~~ wherever possible, to amend the P&Ls utilized as inputs to the compensation calculation and, ~~but~~ to the extent possible calculate Step 1 and Step 2 compensation in accordance with the Settlement Agreement. ~~not alter the manner in which the calculation has been performed.~~

Contemporaneous P&Ls submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify either an error (as previously defined) or a mismatch of revenue and variable expenses which can be explained and supported by appropriate documentation.

As it relates to adjusting ~~amending~~ the inputs to better match revenue ~~income~~ with c̲C̶orresponding v̲v̶ariable e̲e̶xpenses, the methodologies ~~-~~ require the reallocation of revenue, expenses or both . ~~To bifurcate the performance of the business pre-spill and post-spill, the reallocation of revenue and/or expenses will be analyzed over a May to April time period~~ for both the Benchmark and Compensation Periods.

Claimants may be required to provide additional information under the methodologies outlined in the attachments.  This may include information prior to the Benchmark Period or subsequent to the Compensation Period (i.e., ~~,~~ w̲w̶here the claimant has adopted a Fiscal Year that differs from a calendar year).  ~~Further, claimants with assumed causation will be required to provide information for 2011 as a consequence of the methodologies requiring an analysis of the May through April time period.~~

444895
3/7/14

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK**

In developing a methodology to address claims that have been deemed not to be 'sufficiently matched,' several methodologies have been developed to address unique factors common to the manner in which certain industries operate and record their financial information:

- Annual Variable Margin Methodology (otherwise referred to as "Short Revenue Cycle") – Attachment B

- Construction – Attachment C

- Agriculture – Attachment D

- and Educational Institutions – Attachment ED

- Professional Services – Attachment FE

This document summarizes NAICS codes that will likely fall into each methodology.  However, it is important to note that a claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment opinion of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, sSome businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector.

In identifying those NAICS codes that would most likely fall into each methodology, there is a particular focus on the has been paid to those 'specialty' methodologies – Construction, Professional Services, and Agriculture, and & Educational Institutions – with all other NAICS codes defaulting to the Annual Variable Margin (Short Revenue Cycle) methodology.

Set out below is a summary of how the NAICS codes are presently assigned.

A1

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

# Construction[5]

236xxx - Construction of Buildings

| 2361XX | Residential Building Construction |
|--------|-----------------------------------|
| 2362XX | Nonresidential Building Construction |

237xxx - Heavy and Civil Engineering Construction

| 2371XX | Utility System Construction |
|--------|-----------------------------|
| 2372XX | Land Subdivision |
| 2373XX | Highway, Street, and Bridge Construction |
| 2379XX | Other Heavy and Civil Engineering Construction |

238xxx - Specialty Trade Contractors

| 2381XX | Foundation, Structure, and Building Exterior Contractors |
|--------|----------------------------------------------------------|
| 2382XX | Building Equipment Contractors |
| 2383XX | Building Finishing Contractors |
| 2389XX | Other Specialty Trade Contractors |

336xxx - Transportation Equipment Manufacturing

| 3361XX | Motor Vehicle Manufacturing |
|--------|------------------------------|
| 3362XX | Motor Vehicle Body and Trailer Manufacturing |
| 3363XX | Motor Vehicle Parts Manufacturing |
| 3364XX | Aerospace Product and Parts Manufacturing |
| 3365XX | Railroad Rolling Stock Manufacturing |
| 3366XX | Ship and Boat Building |
| 3369XX | Other Transportation Equipment Manufacturing |

321xxx - Wood Product Manufacturing

| 3211XX | Sawmills and Wood Preservation |
|--------|---------------------------------|
| 3212XX | Veneer, Plywood, and Engineered Wood Product Manufacturing |
| 3219XX | Other Wood Product Manufacturing |

---

[5] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology. As a result, sSome businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A2

## BEL Claims − Matching of Revenues and Expenses

## ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

# Agriculture and Educational Institutions[6]

111xxx − Crop Production

| | |
|---|---|
| 1111XX | Oilseed and Grain Farming |
| 1112XX | Vegetable and Melon Farming |
| 1113XX | Fruit and Tree Nut Farming |
| 1114XX | Greenhouse, Nursery, and Floriculture Production |
| 1119XX | Other Crop Farming |

## 112xxx – Animal Production

| | |
|---|---|
| 1121XX | Cattle Ranching and Farming |
| 1122XX | Hog and Pig Farming |
| 1123XX | Poultry and Egg Production |
| 1124XX | Sheep and Goat Farming |
| 1129XX | Other Animal Production |

## 113xxx – Forestry & Logging

| | |
|---|---|
| 1131XX | Timber Tract Operations |
| 1132XX | Forest Nurseries and Gathering of Forest Products |
| 1133XX | Logging |

115xxx – Support Activities for Agriculture and Forestry

| | |
|---|---|
| 1151XX | Support Activities for Crop Production |
| 1152XX | Support Activities for Animal Production |
| 1153XX | Support Activities for Forestry |

## 611xxx – Educational Services

| | |
|---|---|
| 6111XX | Elementary and Secondary Schools |
| 6112XX | Junior Colleges |
| 6113XX | Colleges, Universities, and Professional Schools |
| 6114XX | Business Schools and Computer and Management Training |
| 6115XX | Technical and Trade Schools |
| 6116XX | Other Schools and Instruction |

---

[6] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, sSome businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A3

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK**

| 6117XX | Educational Support Services |
| --- | --- |

A4

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK**

# Educational Institutions[7]

**611xxx – Educational Services**

| | |
|---|---|
| 6111XX | Elementary and Secondary Schools |
| 6112XX | Junior Colleges |
| 6113XX | Colleges, Universities, and Professional Schools |
| 6114XX | Business Schools and Computer and Management Training |
| 6115XX | Technical and Trade Schools |
| 6116XX | Other Schools and Instruction |
| 6117XX | Educational Support Services |

---

[7] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, sSome businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A5

## BEL Claims − Matching of Revenues and Expenses

### ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

## Professional Services[8]

561xxx - Administrative and Support and Waste Management and Remediation Services

| | |
|---|---|
| 5611XX | Office Administrative Services |
| 5612XX | Facilities Support Services |
| 5613XX | Employment Services |
| 5614XX | Business Support Services |
| 5615XX | Travel Arrangement and Reservation Services |
| 5616XX | Investigation and Security Services |
| 5617XX | Services to Buildings and Dwellings |
| 5619XX | Other Support Services |

541xxx - Professional, Scientific, and Technical Services

| | |
|---|---|
| 5411XX | Legal Services |
| 5412XX | Accounting, Tax Preparation, Bookkeeping, and Payroll Services |
| 5413XX | Architectural, Engineering, and Related Services |
| 5414XX | Specialized Design Services |
| 5415XX | Computer Systems Design and Related Services |
| 5416XX | Management, Scientific, and Technical Consulting Services |
| 5417XX | Scientific Research and Development Services |
| 5418XX | Advertising, Public Relations, and Related Services |
| 5419XX | Other Professional, Scientific, and Technical Services |

922xxx - Justice, Public Order, and Safety Activities

| | |
|---|---|
| 9221XX | Justice, Public Order, and Safety Activities |

---

[8] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, sSome businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A6

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

The methodology outlined below – "the Annual Variable Margin Methodology" - shall be applied to adjust a claimant's contemporaneous P&Ls that have been deemed not to be "sufficiently matched." This methodology will not apply to claims whose submitted P&L's have been deemed "sufficiently matched," which claims will be processed under the methodology set forth in Exhibit 4C of the Settlement Agreement, utilizing the contemporaneous P&Ls. This methodology will not apply to claimants in the construction, agriculture or educational industries, nor will it apply to professional services firms, for which tailored methodologies have been developed. Furthermore, this methodology does not apply to claimants who meet the definition of a Start-Up Business, Failed Business or Failed Start-up Business.

The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement but does, if matching issues are identified, amend the P&Ls utilized in such calculations. The calculations of both Step 1 and 2 compensation will be consistent with that prescribed by Exhibit 4C of the Settlement Agreement.

**Annual Variable Margin Methodology**

1.  The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses. Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.  If the CSSP Accounting Vendors identify an error(s)[9] in how the claimant has accounted for revenue or expenses, correcting entries will be made to the P&Ls to restate ~~assign~~ revenue and expenses to

---

[9] "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the Settlement Agreement does not mandate that the P&Ls be

B1

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

the appropriate month.  Where revenue has been restated a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the ~~R~~revenue ~~p~~Pattern ~~t~~Test per Exhibit 4B of the Settlement Agreement.

3.  If adjustments made in accord with 2. above result in restated ~~revised~~ P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 4C of the Settlement Agreement using such P&Ls.

4.  If adjustments made in accord with 2. above result in restated ~~revised~~ P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed to calculate the "Corresponding ~~v~~Variable ~~e~~Expenses," calculated as follows:

   a.  Benchmark Period[10]:

   • ~~The time period over which revenues and variable expenses will be compared is May to April, thereby bifurcating the result of operations pre-spill from those post-spill.[11]~~

   • Monthly ~~c~~Corresponding ~~v~~Variable ~~e~~Expenses for each Fiscal Year included in the ~~year of the~~ Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses for the three (3) respective Fiscal Years ~~12-month periods (i. e.,  May 2009 – April 2010; May 2008 – April 2009; May 2007 – April 2008,~~ (as provided)~~)~~ prior to the spill and total revenue for the same Fiscal Year~~annual period~~.  This will yield a separate ~~v~~Variable ~~e~~Expense percentage for each Fiscal Year ~~year~~ included in ~~of~~ the Benchmark Period.

--------------------------------------------------------------

based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made in good faith with the best available information at the time.

[10]  Benchmark Period for the purpose of calculating the annual variable margin expense percentage could be either 2009~~May 2009 to April 2010~~; the average of ~~the two periods May~~ 2008 and 2009~~to April 2009 and May 2009 to April 2010~~; or the average of ~~the three periods May~~ 2007, 2008 and 2009 ~~to April 2008, May 2008 to April 2009 and May 2009 to April 2010~~

[11]  ~~With respect to claimants for whom causation is presumed under the Settlement Agreement, this methodology will require claimants to produce 2011 financial records.~~

B2

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

- This Vvariable Eexpense percentage (specific for each individual Fiscal yYear included in ofthe Benchmark Period) is applied to the specific monthly revenue amounts in each Fiscal Year included in the Benchmark Period to calculate the cCorresponding vVariable eExpenses for each month.

b. Compensation Period:

- Monthly cCorresponding vVariable eExpenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for those Fiscal Years included in the Compensation Periodthe 12-month period following the date of spill, (i.e., May 2010 – April 2011), and total revenue for the same period.

- Where the claimant's Fiscal Year is not on a calendar year basis, this will result in a separate vVariable eExpense percentages for months covered for by each Fiscal Year included in Compensation Period.

- This variable expense percentage is applied to the specific monthly revenue amounts in each the Fiscal Year included in the Compensation Period to calculate the cCorresponding vVariable eExpenses for each month.

c. Variable Margin – (Calculated for the Benchmark Period only for Step 2 compensation calculation):

  i. Sum Variable Profit from May through December of the periods selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

  ii. Sum total revenue from May through December of the periods selected by the claimant to be used for the Benchmark Period. (i.e. Optimal Benchmark Period).

  iii. Calculate Variable Margin percent as Variable Profit calculated in (i) divided by total revenue calculated in (ii).

B3

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

5.   The P&Ls, ~~re~~allocated ~~stated~~ for the ~~c~~Corresponding ~~v~~Variable ~~e~~Expenses calculated in Step 4 above, are utilized as the input for calculating compensation under Exhibit 4C of the Settlement Agreement:

  o   Step 1 of the compensation calculation is determined as the difference in Variable Profit between the ~~2010~~ Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is selected by the claimant to include three or more consecutive months between May 2010 and December 2010.

  o   Step 2 of the compensation calculation is based on the claimant's growth in revenue in January 2010 through April of 2010 relative to the same months of the claimant-selected Benchmark Period.  The claimant may select a six-consecutive month period between May 2010 to December 2010, unless the claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months shall be used for Step 2:

    ▪   To compute the Claimant Specific Factor, the total revenue from January 2010 to April 2010 will be compared to January to April revenue of the Optimum Benchmark Period (i.e., 2009, average of 2008/2009, or average of 2007/2008/2009).~~:~~

      • ~~Revenue for the period January 2009 to April 2009, where the Optimum Benchmark Period comprises 2009/10 P&Ls.~~

      • ~~Average revenue for the periods January 2009 to April 2009 and January 2008 to April 2008, where the Optimum Benchmark Period comprises 2008/09 and 2009/10 P&Ls.~~

B4

**<u>BEL Claims – Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT B - "Annual Variable Margin Methodology"</u>**

- ~~Average revenue for the periods January 2009 to April 2009, January 2008 to April 2008, and January 2007 to April 2007 where the Optimum Benchmark Period comprises 2007/08, 2008/09 and 2009/10 P&Ls.~~

B5

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

**Illustrative Example - Annual Variable Margin Methodology**

Assume that the claimant has adopted a calendar year Fiscal Year and has an Optimal Benchmark Period of May through December select months in of 2008 and 20092008/09 (the average of 2008/2009).

The contemporaneous P&Ls provided by the Claimant:

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 325 | 325 | 900 | 600 | 325 | 300 | 350 | 325 | 300 | 275 | 4,600 |
| Variable expenses | (150) | (125) | (125) | (300) | (125) | (275) | (150) | (150) | (225) | (150) | (175) | (125) | (2,075) |
| Variable expenses as a % of revenue | 55% | 42% | 38% | 92% | 14% | 46% | 46% | 50% | 64% | 46% | 58% | 45% | 45% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 300 | 325 | 350 | 350 | 500 | 800 | 350 | 275 | 275 | 350 | 325 | 300 | 4,500 |
| Variable expenses | (175) | (125) | (275) | (225) | (275) | (300) | (125) | (225) | (275) | (175) | (100) | (150) | (2,425) |
| Variable expenses as a % of revenue | 58% | 38% | 79% | 64% | 55% | 38% | 36% | 82% | 100% | 50% | 31% | 50% | 54% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (175) | (125) | (225) | (200) | (125) | (75) | (150) | (150) | (125) | (150) | (100) | (125) | (1,725) |
| Variable expenses as a % of revenue | 47% | 36% | 64% | 53% | 42% | 33% | 67% | 60% | 45% | 55% | 40% | 56% | 50% |

| 2011 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 250 | 275 | 250 | 275 | 300 | 325 | 300 | 300 | 325 | 350 | 350 | 375 | 3,675 |
| Variable expenses | (125) | (150) | (100) | (175) | (175) | (250) | (125) | (175) | (150) | (175) | (175) | (125) | (1,875) |
| Variable expenses as a % of revenue | 50% | 55% | 40% | 64% | 58% | 77% | 42% | 58% | 46% | 43% | 50% | 33% | 51% |

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 325 | 325 | 900 | 600 | 325 | 300 | 350 | 325 | 300 | 275 | 4,600 |
| Variable expenses | (150) | (125) | (125) | (300) | (125) | (275) | (150) | (150) | (225) | (150) | (175) | (125) | (2,075) |
| | 125 | 175 | 200 | 25 | 775 | 325 | 175 | 150 | 125 | 175 | 125 | 150 | 2,525 |
| Variable expenses as a % of revenue | 55% | 42% | 38% | 92% | 14% | 46% | 46% | 50% | 64% | 46% | 58% | 45% | 45% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 300 | 325 | 350 | 350 | 500 | 800 | 350 | 275 | 275 | 350 | 325 | 300 | 4,500 |
| Variable expenses | (175) | (125) | (275) | (225) | (275) | (300) | (125) | (225) | (275) | (175) | (100) | (150) | (2,425) |
| | 125 | 200 | 75 | 125 | 225 | 500 | 225 | 50 | 0 | 175 | 225 | 150 | 2,075 |
| Variable expenses as a % of revenue | 58% | 38% | 79% | 64% | 55% | 38% | 36% | 82% | 100% | 50% | 31% | 50% | 54% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (175) | (125) | (225) | (200) | (125) | (75) | (150) | (150) | (125) | (150) | (100) | (125) | (1,725) |
| | 200 | 225 | 125 | 175 | 175 | 150 | 75 | 100 | 150 | 125 | 150 | 100 | 1,750 |
| Variable expenses as a % of revenue | 47% | 36% | 64% | 53% | 42% | 33% | 67% | 60% | 45% | 55% | 40% | 56% | 50% |

B6

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

To calculate the cCorresponding vVariable eExpenses:

| | | Benchmark Revenue May 2008 - April 2009 | 4,700 |
|---|---|---|---|
| | | Benchmark Variable Expenses May 2008 - April 2009 | (2,175) |
| Benchmark Period: Revenue 2008 | 4,600 | Variable expenses as a % of revenue | 46% |
| Benchmark Period: Variable Expenses 2008 | (2,075) | | |
| Variable expenses as a % of revenue | 45% | Benchmark Revenue May 2009 - April 2010 | 4,625 |
| | | Benchmark Variable Expenses May 2009 - April 2010 | (2,350) |
| Benchmark Period: Revenue 2009 | 4,500 | Variable expenses as a % of revenue | 51% |
| Benchmark Period: Variable Expenses 2009 | (2,425) | | |
| Variable expenses as a % of revenue | 54% | | |
| | | Total Revenue May 2010-April 2011 | 3,075 |
| Compensation Period: Revenue 2010 | 3,475 | Total Variable Expenses May 2010-April 2011 | (1,550) |
| Compensation Period: Variable Expenses 2010 | (1,725) | Variable expenses as a % of Revenue | 50% |
| Variable expenses as a % of Revenue | 50% | | |

B7

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - "Annual Variable Margin Methodology"**

Applying the ~~ce~~corresponding ~~v~~variable expense~~s~~ percentages, the <u>variable expenses reported on the</u> P&Ls would be ~~reallocated~~ <u>stated</u> as follows:

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 325 | 325 | 900 | 600 | 325 | 300 | 350 | 325 | 300 | 275 | 4,600 |
| Variable expenses | (124) | (135) | (147) | (147) | (406) | (271) | (147) | (135) | (158) | (147) | (135) | (124) | (2,075) |
| Variable expenses as a % of revenue | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 300 | 325 | 350 | 350 | 500 | 800 | 350 | 275 | 275 | 350 | 325 | 300 | 4,500 |
| Variable expenses | (162) | (175) | (189) | (189) | (269) | (431) | (189) | (148) | (148) | (189) | (175) | (162) | (2,425) |
| Variable expenses as a % of revenue | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (186) | (174) | (174) | (186) | (149) | (112) | (112) | (124) | (137) | (137) | (124) | (112) | (1,725) |
| Variable expenses as a % of revenue | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 325 | 325 | 900 | 600 | 325 | 300 | 350 | 325 | 300 | 275 | 4,600 |
| Variable expenses | | | | | (416) | (278) | (150) | (139) | (162) | (150) | (139) | (127) | (2,129) |
| Variable expenses as a % of revenue | | | | | 46% | 46% | 46% | 46% | 46% | 46% | 46% | 46% | |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 300 | 325 | 350 | 350 | 500 | 800 | 350 | 275 | 275 | 350 | 325 | 300 | 4,500 |
| Variable expenses | (139) | (150) | (162) | (162) | (254) | (406) | (178) | (140) | (140) | (178) | (165) | (152) | (2,226) |
| Variable expenses as a % of revenue | 46% | 46% | 46% | 46% | 51% | 51% | 51% | 51% | 51% | 51% | 51% | 51% | |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (191) | (178) | (178) | (191) | (151) | (113) | (113) | (126) | (139) | (139) | (126) | (113) | (1,757) |
| Variable expenses as a % of revenue | 51% | 51% | 51% | 51% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |

| 2011 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 250 | 275 | 250 | 275 | | | | | | | | | |
| Variable expenses | (126) | (139) | (126) | (139) | | | | | | | | | |
| Variable expenses as a % of revenue | 50% | 50% | 50% | 50% | | | | | | | | | |

B8

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT B - "Annual Variable Margin Methodology"

Step 1 and Step 2 compensation would be computed as:

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Benchmark Period (Average 2008 & 2009)** | | | | | | | | | | | | | |
| Revenue | 288 | 313 | 338 | 338 | 700 | 700 | 338 | 288 | 313 | 338 | 313 | 288 | 4,550 |
| Variable expenses | (143) | (155) | (168) | (168) | (338) | (351) | (168) | (142) | (153) | (168) | (155) | (143) | (2,250) |
| Variable Profit | 145 | 157 | 170 | 170 | 362 | 349 | 170 | 146 | 159 | 170 | 157 | 145 | 2,300 |
| Variable Profit % | 50% | 50% | 50% | 50% | 52% | 50% | 50% | 51% | 51% | 50% | 50% | 50% | 51% |
| | | | | | | | | | | | | | |
| **Compensation Period (2010/11)** | | | | | | | | | | | | | |
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (186) | (174) | (174) | (186) | (149) | (112) | (112) | (124) | (137) | (137) | (124) | (112) | (1,725) |
| Variable Profit | 189 | 176 | 176 | 189 | 151 | 113 | 113 | 126 | 138 | 138 | 126 | 113 | 1,750 |
| Variable Profit % | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |

**Step 1**

Optimum Benchmark Period identified as May to Dec

| | |
|---|---|
| Total variable profit May to December (Benchmark) | 1,658 |
| Total variable profit May to December (Compensation) | 1,020 |
| Step 1 Compensation (pre-RTP) | 639 |

**Step 2**

Optimum Benchmark Period from May to December, 2008 and 2009

| | |
|---|---|
| Revenue Jan 2010 to April 2010 | 1,450 |
| Revenue Jan to April (average for 2008 & 2009) | 1,275 |
| Revenue increase/(decrease) | 175 |
| Revenue Increase/(decrease) Percentage | 14% |
| Claimant Specific Growth Factor | 10%  [Max of 10%, Min of -2%] |
| General Adjustment Factor | 2% |
| | |
| Optimum Benchmark Period Revenue (May to December, 2008 & 2009) | 3,275 |
| Incremental Revenue | 393 |
| Variable profit for benchmark period | 51% |
| Step 2 compensation (pre-RTP) | 199 |

B9

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT B - "Annual Variable Margin Methodology"

| | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Benchmark Period (Average 2008/09 and 2009/10)** | | | | | | | | | | | | | |
| Revenue | 700 | 700 | 338 | 288 | 313 | 338 | 313 | 288 | 338 | 338 | 350 | 363 | 4,663 |
| Variable expenses | (335) | (342) | (164) | (139) | (151) | (164) | (152) | (140) | (165) | (164) | (170) | (176) | (2,263) |
| Variable Profit | 365 | 358 | 173 | 148 | 162 | 173 | 161 | 148 | 173 | 173 | 180 | 186 | 2,400 |
| Variable Profit % | 52% | 51% | 51% | 52% | 52% | 51% | 51% | 51% | 51% | 51% | 51% | 51% | 51% |
| | | | | | | | | | | | | | |
| **Compensation Period (2010/11)** | | | | | | | | | | | | | |
| Revenue | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 250 | 275 | 250 | 275 | 3,075 |
| Variable expenses | (151) | (113) | (113) | (126) | (139) | (139) | (126) | (113) | (126) | (139) | (126) | (139) | (1,550) |
| Variable Profit | 149 | 112 | 112 | 124 | 136 | 136 | 124 | 112 | 124 | 136 | 124 | 136 | 1,525 |
| Variable Profit % | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |

**Step 1**
Optimum Benchmark Period identified as May to Dec

| | |
|---|---|
| Total variable profit May to December (Benchmark) | 1,687 |
| Total variable profit May to December (Compensation) | 1,004 |
| Step 1 Compensation (pre-RTP) | 683 |

**Step 2**
Optimum Benchmark Period from May to December, 2008 and 2009

| | | |
|---|---|---|
| Revenue Jan 2010 to April 2010 | 1,450 | |
| Revenue Jan to April (average for 2008 & 2009) | 1,275 | |
| Revenue increase/(decrease) | 175 | |
| Revenue Increase/(decrease) Percentage | 12% | |
| Claimant Specific Growth Factor | 10% | [Max of 10%, Min of -2%] |
| General Adjustment Factor | 2% | |
| | | |
| Revenue for the Benchmark Period (2008 & 2009) | 3,275 | |
| Incremental Revenue | 393 | |
| Variable profit for benchmark period | 52% | |
| Step 2 compensation (pre-RTP) | 202 | |

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT C - Construction Methodology

The methodology outlined below – "the Construction Methodology" – is a deviation from the Annual Variable Margin Methodology described in Attachment B.  This methodology is premised on the assumption that variable expenses of a construction claimant are more accurately recorded on monthly P&Ls than are revenues[12].  Percentage of completion accounting for revenue by a construction company is based on estimates that may only be updated at the end of reporting periods (e.g., at the Fiscal Year end) rather than a monthly basis.  As such, matching issues may arise when significant adjustments are recorded to reflect more accurate estimates at quarter and/or year ends.  The Construction Methodology calls, therefore, to reallocate revenues in order to best achieve sufficient matching of revenue and expenses.

The restatement of the P&Ls to more accurately match revenue and expenses involves a multi-step process.  The initial step requires an analysis of the financial results of the claimant based on its fiscal year (i.e., its annual financial reporting date).  Analyzing P&Ls for the 12 months that comprise a claimant's fiscal year typically yields a more accurate and compete record of the results of operations for the 12 months then ended, as in the CSSP Accounting Vendor's experience there is typically a 'true-up' or 'hard close' performed at the end of the year.  Annual revenues will be reallocated to each month of the fiscal year, based on that month's percentage of variable expenses to annual variable expenses.

A further adjustment is necessary to bifurcate the performance of the business pre-spill from that post-spill.  By basing the computation of compensation using P&Ls on a fiscal or calendar year basis, any decline in variable profit margin experienced by the claimant in the Compensation Period will be somewhat mitigated by any higher variable profit margin generated during the four month period January to April.  Accordingly, the P&Ls will be restated on a May to April period in both the Benchmark and Compensation Periods.  This is achieved by reallocating variable profit / revenues to each month,

---

[12] Prior to the application of this methodology, the CSSP Accounting Vendors will analyze the variable expenses to the extent necessary.

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

~~based on each month's percentage of variable expenses to annual variable expenses measured over each May to April time period.~~

This Construction Methodology shall be applied to adjust a construction claimant's contemporaneous P&Ls that have been deemed not to be "sufficiently matched."  This methodology will not apply to claims whose submitted ~~-~~P&Ls were prepared under either a percentage of completion or completed contract basis of accounting that are deemed (after applying the criteria set forth in Section I.A. of this Policy) "sufficiently matched," which claims will be processed under the methodology set forth in Exhibit 4C of the Settlement Agreement, utilizing the contemporaneous P&Ls.  This revised methodology does not apply to a construction claimant that meets the definition of a Start-Up Business, Failed Business or Failed Start-up Business.

The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement but does amend the P&Ls utilized in such calculations.  The calculations of both Step 1 and Step 2 compensation will be consistent with that prescribed by Exhibit 4C of the Settlement Agreement.

As a consequence of ~~restating~~ allocating ~~monthly~~ revenue based on that month's variable expenses as a percentage of annual variable expenses, the revenue recorded on the allocated ~~restated~~ P&Ls can no longer be attributed to individual customers.  Accordingly, the allocated ~~restated~~ P&Ls cannot be utilized for the purpose of determining causation for any claimant required to satisfy a Customer Mix Test, per Exhibit 4B of the Settlement Agreement.  Under the Construction Methodology, for any claimant required to satisfy a Customer Mix Test to demonstrate causation, the CSSP will utilize the contemporaneous P&Ls (restated for errors) for the Customer Mix Test element of the causation

C2

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

assessment, but will utilize the restated and reallocated stated P&Ls for assessing the Revenue Pattern

Test under Exhibit 4B of the Settlement Agreement, and in computing compensation.[13]

---

[13] This would supersede, for construction companies only, Policy 464 as it relates to the requirement to utilize the same P&Ls for determining causation and calculating compensation.  However, as per the "Addendum To Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims" while the "claimant is not required to use the same months in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B [of the Settlement Agreement] and determining compensation pursuant to Ex. 4C [of the Settlement Agreement]" the "same Benchmark Period year(s) are used for the purpose of determining both causation and compensation."   Accordingly, the claimant may elect which months to utilize to demonstrate causation under the customer mix test, but must utilize the same Benchmark years as those used to calculate compensation.

C3

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

**Construction Methodology**

1.   The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.   If the CSSP Accounting Vendor identifies an error(s)[14] in how the claimant has accounted for revenue or variable expenses, correcting entries will be made to the P&Ls to restate ~~assign~~ revenue and variable expenses to the appropriate month.  Where revenue has been restated a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 4B of the Settlement Agreement.

~~2.~~3.   If adjustments made in accord with 2. above result in restated ~~revised~~ P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 4C of the Settlement Agreement using such P&Ls.

~~3.~~4.   If adjustments made in accord with 2. above result in restated ~~revised~~ P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed under the Construction Methodology as follows:

  a.   Allocation based on Claimant's Fiscal Year-End[15]:

    i.   For each Fiscal ~~y~~Year included in the Benchmark and Compensation Periods ~~measured using the claimant's fiscal year (e.g., January 2011 – December 2011; January 2010~~

---

[14] "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying accounting principles; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made in good faith with the best available information at the time.

[15] A claimant's fiscal/tax year may require additional information/documentation that may extend prior to the Benchmark Period and subsequent to the Compensation Period.

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

December 2010; January 2009 – December 2009; January 2008 – December 2008; January 2007 – December 2007, as provided) (2007, 2008, 2009 and 2010 (as provided)) each month's variable expenses as a percentage of that Fiscal Year period's total variable expenses will be computed. If the claimant's fiscal year-end is different than the tax year, the tax year will be utilized as the basis for computing the variable expense percentage.

   ii.   Where the claimant's Fiscal Year is not on a calendar year basis, this will result in a separate Variable Profit percentage for each Fiscal Year included in Benchmark and Compensation Periods.

ii. iii.   Annual revenue for each f Fiscal y Year will be re allocated to individual months by multiplying total annual revenue by each month's percentage of total variable expenses (as computed in accord with i. above).

b.  Benchmark Period[16]: Allocation based on May to April Periods

   i.   For each separate period of the Benchmark Period (e.g., May 2009 – April 2010; May 2008 – April 2009; May 2007 – April 2008, as provided) each month's variable expenses as a percentage of that period's total variable expenses will be computed. The time period over which variable profit and variable expenses will be compared is May to April, thereby bifurcating the results of operations pre-spill from those post-spill.

   ii.   Annual revenue for each year will be reallocated to individual months by multiplying total annual revenue by each month's percentage of total variable expenses (as computed in accord with i. above).

c.  Compensation Period:

   i.   Each month's variable expenses for the period May 2010 to April 2011 as a percentage of total variable expenses for the period will be computed.

---

[16] Benchmark Period for the purpose of calculating the annual variable expense percentage could be either May 2009 to April 2010; the average of the two periods May 2008 to April 2009 and May 2009 to April 2010; or the average of the three periods May 2007 to April 2008, May 2008 to April 2009 and May 2009 to April 2010)

C5

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

ii.     ~~Total revenue for the period May 2010 to April 2011 will be reallocated to individual~~
~~months by multiplying total revenue by each month's percentage of total variable expenses~~
~~(as computed in accord with i. above).~~

~~d.~~b. Variable Margin – (Calculated for the Benchmark Period only for Step 2 compensation
calculation):

   i.     Sum Variable Profit from May through December of the periods selected by the claimant to
be used for the Benchmark Period (i.e. Optimal Benchmark Period).

   ii.    Sum total revenue from May through December of the periods selected by the claimant to
be used for the Benchmark Period~~ (i.e.~~, Optimal Benchmark Period).

   iii.   Calculate Variable Margin percent as Variable Profit calculated in (i) divided by total
revenue calculated in (ii).

As a consequence of allocating monthly revenue a causation assessment under Exhibit 4B
of the Settlement Agreement will be re-performed.  However, given that revenue is
allocated based on that month's variable expenses as a percentage of annual variable
expenses, the revenue recorded on the allocated P&Ls can no longer be attributed to
individual customers.  Accordingly, the allocated P&Ls cannot be utilized for the purpose of
determining causation for any claimant required to satisfy a Customer Mix Test, per Exhibit
4B of the Settlement Agreement.  Under the Construction Methodology, for any claimant
required to satisfy a Customer Mix Test to demonstrate causation, the CSSP will utilize the
contemporaneous P&Ls (restated for errors) for the Customer Mix Test element of the
causation assessment, but will utilize the restated and allocated P&Ls for assessing the
Revenue Pattern Test under Exhibit 4B of the Settlement Agreement, and in computing
compensation.

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

4.5.   ~~T~~he P&Ls, ~~re~~allocated ~~stated~~ for the Corresponding Revenues calculated in accord with Step 4 above, are utilized as the input for calculating compensation under Exhibit 4C of the Settlement Agreement:

- o   Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is selected by the claimant to include three or more consecutive months between May 2010 and December 2010.

- o   Step 2 of the compensation calculation is based on the claimant's growth in revenue in January 2010 through April of 2010 relative to the same months in the claimant-selected Benchmark Period.  The claimant may select a six-consecutive month period between May 2010 to December 2010, unless the claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months shall be used for Step 2:

  - ▪   To compute the Claimant Specific Factor, the total revenue from January 2010 to April 2010 will be compared to January to April revenue of the Optimum Benchmark Period (i.e., 2009; average of 2008/2009; or average of 2007/2008/2009)~~:~~.

    - ●   ~~Revenue for the period January 2009 to April 2009, where the Optimum Benchmark Period comprises 2009/10 P&Ls.~~

    - ●   ~~Average revenue for the periods January 2009 to April 2009 and January 2008 to April 2008, where the Optimum Benchmark Period comprises 2008/09 and 2009/10 P&Ls.~~

C7

**<u>BEL Claims – Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT C - Construction Methodology</u>**

- ~~Average revenue for the periods January 2009 to April 2009, January 2008 to April 2008, and January 2007 to April 2007 where the Optimum Benchmark Period comprises 2007/08, 2008/09 and 2009/10 P&Ls.~~

C8

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT C - Construction Methodology

### Illustrative Example – Construction Claims

Assume that the claimant adopted a calendar year Fiscal Year and has an Optimal Benchmark Period of May through December select months in 2008 and 2009/09 (the average of 2008/2009).

The contemporaneous P&Ls provided by the claimant:

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 375 | 275 | 400 | 350 | 275 | 400 | 350 | 250 | 300 | 275 | 3,825 |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | (2,150) |
| Variable Profit | 100 | 150 | 225 | 75 | 275 | 125 | 100 | 225 | 100 | 75 | 100 | 125 | 1,675 |
| Variable Profit % | 36% | 50% | 60% | 27% | 69% | 36% | 36% | 56% | 29% | 30% | 33% | 45% | 44% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 250 | 350 | 425 | 325 | 450 | 325 | 400 | 325 | 175 | 500 | 300 | 4,200 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 175 | 100 | 50 | 175 | 125 | 325 | 175 | 150 | 25 | (25) | 375 | 125 | 1,775 |
| Variable Profit % | 47% | 40% | 14% | 41% | 38% | 72% | 54% | 38% | 8% | -14% | 75% | 42% | 42% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 325 | 250 | 400 | 350 | 275 | 175 | 300 | 175 | 325 | 400 | 150 | 225 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 100 | 50 | 125 | 100 | 150 | 75 | 175 | 0 | 25 | 225 | 25 | 75 | 1,125 |
| Variable Profit % | 31% | 20% | 31% | 29% | 55% | 43% | 58% | 0% | 8% | 56% | 17% | 33% | 34% |

| 2011 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 125 | 450 | 300 | 375 | 275 | 400 | 325 | 425 | 225 | 375 | 3,850 |
| Variable expenses | (150) | (125) | (175) | (200) | (200) | (275) | (150) | (200) | (175) | (175) | (200) | (150) | (2,175) |
| Variable Profit | 125 | 175 | (50) | 250 | 100 | 100 | 125 | 200 | 150 | 250 | 25 | 225 | 1,675 |
| Variable Profit % | 45% | 58% | -40% | 56% | 33% | 27% | 45% | 50% | 46% | 59% | 11% | 60% | 44% |

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 375 | 275 | 400 | 350 | 275 | 400 | 350 | 250 | 300 | 275 | 3,825 |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | (2,150) |
| Variable Profit | 100 | 150 | 225 | 75 | 275 | 125 | 100 | 225 | 100 | 75 | 100 | 125 | 1,675 |
| Variable Profit % | 36% | 50% | 60% | 27% | 69% | 36% | 36% | 56% | 29% | 30% | 33% | 45% | 44% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 250 | 350 | 425 | 325 | 450 | 325 | 400 | 325 | 175 | 500 | 300 | 4,200 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 175 | 100 | 50 | 175 | 125 | 325 | 175 | 150 | 25 | (25) | 375 | 125 | 1,775 |
| Variable Profit % | 47% | 40% | 14% | 41% | 38% | 72% | 54% | 38% | 8% | -14% | 75% | 42% | 42% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 325 | 250 | 400 | 350 | 275 | 175 | 300 | 175 | 325 | 400 | 150 | 225 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 100 | 50 | 125 | 100 | 150 | 75 | 175 | 0 | 25 | 225 | 25 | 75 | 1,125 |
| Variable Profit % | 31% | 20% | 31% | 29% | 55% | 43% | 58% | 0% | 8% | 56% | 17% | 33% | 34% |

C9

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT C - Construction Methodology

Allocate revenue based on the claimant's fiscal year (calendar year in this example):

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 311 | 267 | 267 | 356 | 222 | 400 | 311 | 311 | 445 | 311 | 356 | 267 | 3,825 |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | (2,150) |
| Variable Profit | 136 | 117 | 117 | 156 | 97 | 175 | 136 | 136 | 195 | 136 | 156 | 117 | 1,675 |
| Variable Profit % | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 346 | 260 | 520 | 433 | 346 | 216 | 260 | 433 | 520 | 346 | 216 | 303 | 4,200 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 146 | 110 | 220 | 183 | 146 | 91 | 110 | 183 | 220 | 146 | 91 | 128 | 1,775 |
| Variable Profit % | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 339 | 301 | 414 | 376 | 188 | 151 | 188 | 263 | 452 | 263 | 188 | 226 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 114 | 101 | 139 | 126 | 63 | 51 | 63 | 88 | 152 | 88 | 63 | 76 | 1,125 |
| Variable Profit % | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% |

| 2011 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 266 | 221 | 310 | 354 | 354 | 487 | 266 | 354 | 310 | 310 | 354 | 266 | 3,850 |
| Variable expenses | (150) | (125) | (175) | (200) | (200) | (275) | (150) | (200) | (175) | (175) | (200) | (150) | (2,175) |
| Variable Profit | 116 | 96 | 135 | 154 | 154 | 212 | 116 | 154 | 135 | 135 | 154 | 116 | 1,675 |
| Variable Profit % | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% |

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 311 | 267 | 267 | 356 | 222 | 400 | 311 | 311 | 445 | 311 | 356 | 267 | 3,825 |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | (2,150) |
| Variable Profit | 136 | 117 | 117 | 156 | 97 | 175 | 136 | 136 | 195 | 136 | 156 | 117 | 1,675 |
| Variable Profit % | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 346 | 260 | 520 | 433 | 346 | 216 | 260 | 433 | 520 | 346 | 216 | 303 | 4,200 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 146 | 110 | 220 | 183 | 146 | 91 | 110 | 183 | 220 | 146 | 91 | 128 | 1,775 |
| Variable Profit % | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 339 | 301 | 414 | 376 | 188 | 151 | 188 | 263 | 452 | 263 | 188 | 226 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 114 | 101 | 139 | 126 | 63 | 51 | 63 | 88 | 152 | 88 | 63 | 76 | 1,125 |
| Variable Profit % | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% |

C10

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT C - Construction Methodology

Allocation based on a May to April Period:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total variable expenses May 2008 to April 2009 | 2,375 | | | | | | | | | | | |
| Total variable expenses May 2009 to April 2010 | 2,475 | | | | | | | | | | | |
| Total variable expenses May 2010 to April 2011 | 1,925 | | | | | | | | | | | |

| Benchmark variable expenses | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Variable expenses as a percentage of total expenses - 2008 | 7% | 6% | 6% | 8% | 5% | 9% | 7% | 7% | 11% | 7% | 8% | 6% |
| Variable expenses as a percentage of total expenses - 2009 | 8% | 6% | 13% | 11% | 8% | 5% | 6% | 10% | 12% | 8% | 5% | 7% |
| Variable expenses as a percentage of total expenses - 2010 | 9% | 8% | 11% | 10% | 6% | 5% | 5% | 9% | 16% | 9% | 6% | 8% |
| Variable expenses as a percentage of total expenses - 2011 | 8% | 6% | 9% | 10% | 10% | 14% | 8% | 10% | 9% | 9% | 10% | 8% |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total revenue May 2008 to April 2009 | 4,183 | | | | | | | | | | | |
| Total revenue May 2009 to April 2010 | 4,072 | | | | | | | | | | | |
| Total revenue May 2010 to April 2011 | 3,070 | | | | | | | | | | | |

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 311 | 267 | 267 | 356 | 220 | 396 | 308 | 308 | 440 | 308 | 352 | 264 | |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | |
| Variable Profit | 136 | 117 | 117 | 156 | 95 | 171 | 133 | 133 | 190 | 133 | 152 | 114 | |
| Variable Profit % | 44% | 44% | 44% | 44% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 352 | 264 | 528 | 440 | 329 | 206 | 247 | 411 | 494 | 329 | 206 | 288 | 4,094 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 152 | 114 | 228 | 190 | 129 | 81 | 97 | 161 | 194 | 129 | 81 | 113 | 1,669 |
| Variable Profit % | 43% | 43% | 43% | 43% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 41% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 370 | 329 | 452 | 411 | 199 | 159 | 199 | 279 | 478 | 279 | 199 | 199 | 3,596 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 145 | 129 | 177 | 161 | 74 | 59 | 74 | 104 | 178 | 104 | 74 | 89 | 1,371 |
| Variable Profit % | 39% | 39% | 39% | 39% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 38% |

| 2011 | Jan | Feb | Mar | Apr | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 239 | 199 | 279 | 319 | | | | | | | | | |
| Variable expenses | (150) | (125) | (175) | (200) | | | | | | | | | |
| Variable Profit | 89 | 74 | 104 | 119 | | | | | | | | | |
| Variable Profit % | 37% | 37% | 37% | 37% | | | | | | | | | |

C11