**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

- A sale recorded in December 2012 for crops produced during the "crop season" running from April 2012 to September 2012 will be allocated on a straight line basis over the 6 months April 2012 to September 2012.

- A sale recorded in February 2011 related to crops produced during the "crop season" running from April 2010 to September 2010 will be allocated on a straight line basis over the 6 months April 2010 to September 2010.

iv. CSSP Accounting Vendors will obtain support from the claimant with regard to the "crop season" dates, but will exercise professional judgment in determine the appropriate months to allocate revenue to. For example:

- If work in preparing a field for planting commences on April 30, 2011, May 2011 will most likely be the first month to which revenue is allocated.

- If the crop was harvested on November 3, 2012, October 2012 will most likely be the last date to which revenue is allocated.

v. Where a crop season crosses a claimant's Fiscal Year, or sales of crops are made in Fiscal Years subsequent to that in which the "crop season" resided, claimants may be required to provide additional years of P&L data

vi. On completion of steps i. through v. above, revenue will be allocated for each Fiscal Year included in the Benchmark and Compensation Periods (2010, 2011 and 2012).

vii. As a consequence of revenue being restated or allocated, a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 7 of the Settlement Agreement. For claimant's required to satisfy the customer mix test, the allocation of revenue per step iii. above will require that the identity of individual purchases of crop be tracked with the allocation of revenue.

b. Allocation of variable expenses:

i. An analysis of variable expenses, considered significant in the professional judgment of CSSP Accounting Vendors, recorded in any Fiscal Year will be performed to determine if they relate to that year's "crop season" or whether they represented bulk purchases held in inventory for

H12

## BEL Claims - Matching of Revenues and Expenses

### ATTACHMENT H – Start-Up Businesses Methodology

future "crop seasons."  If variable expenses pertain to multiple "crop seasons" the expense will be allocated to each individual "crop season."

ii.   Remaining variable expenses during each Fiscal Year included in the Benchmark Period and the Compensation Period will be allocated to individual months based on that month's allocated revenue as a percentage of total revenue for the same Fiscal Year period.  This approach results in a consistent variable profit margin for each month of any given Fiscal Year.  The calculation is as follows:

- Monthly corresponding variable expenses for each Fiscal Year included in the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses for each Fiscal Year and total allocated revenue for the same Fiscal Year.  This will yield a separate variable expense percentage for each Fiscal Year included in the Benchmark Period.

- This variable expense percentage (specific for each individual Fiscal Year included in the Benchmark Period) is applied to the specific monthly allocated revenue amounts in the Benchmark Period to calculate the corresponding variable expenses for each month.

- Monthly corresponding variable expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for each Fiscal Year included in the Compensation Period and total revenue for the same Fiscal Year.

- This variable expense percentage is applied to the specific monthly revenue amounts in each Fiscal Year included in the Compensation Period to calculate the corresponding variable expenses for each month.

5.   The P&Ls, restated and allocated in accord with Step 4 above, are utilized as the input for calculating compensation under Exhibit 7 of the Settlement Agreement.

6.   Calculate Expected Revenue and Expected Costs

   a.   Expected Revenue and Costs shall equal either:

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

    i.    The actual revenue and expenses as set forth in the restated and/or allocated P&Ls calculated in accord with Step 4 above for the Benchmark Period (i.e., May 2011 to April 2012); or

    ii.    Revenue and expenses reported on financial projections for the Start-Up Business for the period May 2010 to April 2011.  The use of such projections would be dependent on satisfying the requirements of Exhibit 7 of the Settlement Agreement: that the projections were prepared prior to the spill and used to seek the extension of credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family investors with business lending experience.

  b.  Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections.

7.    Calculate Actual Profit/Loss

  a.  Actual Profit/Loss results over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues (from May 2010 to April 2011) as set forth in the restated and/or allocated P&Ls calculated in accord with Step 4 above and (ii) the claimant's Actual Variable Costs (from May 2010 to April 2011) as set forth in the restated and/or allocated P&Ls calculated in accord with Step 4 above.

8.    Compensation will be computed under Exhibit 7 of the Settlement Agreement as follows:

  a.  Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated during the Compensation Period.

  b.  Apply the agreed-upon RTP adjustment.

  c.  Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable.

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

**Educational Institutions Methodology**

      The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement but does amend the P&Ls utilized in such calculations.  The calculations of both Step 1 and Step 2 compensation will be consistent with that prescribed by Exhibit 7 of the Settlement Agreement.

1.    The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.    An evaluation of the claimant's tuition arrangements (i.e., payments for annual tuition, an individual semester, or trimesters) will be performed to understand the time period for which student tuition fees apply.  In addition, the method of payment (i.e., advanced payment in full, or a monthly/quarter tuition payment(s)) will be confirmed with the claimant and / or third parties, receipt and analysis of supporting documentation.

3.    If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to restate revenue or expenses.

4.    If adjustments made in accord with 3. above result in restated P&Ls that are deemed sufficiently matched, the claim will be processed under the methodology set forth in Exhibit 7 of the Settlement Agreement.  However, if revenue has been restated in accord with 3. above a causation analysis will be re-performed (if causation is not presumed).  If causation is satisfied, the restated P&Ls are utilized as the input for calculating compensation under the Settlement Agreement.

5.    If adjustments made in accord with 3. above do not resolve matching issues, the P&Ls will be revised, as set forth below, allocating both revenue and expenses.

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

a.  Allocation of revenue:

    i.  Revenue recorded on the claimant's contemporaneous P&Ls will be analyzed to determine the months covered by the tuition fees paid.  This will require some additional information (e.g., reports from student admission records, tuition sub-ledger, student enrollment information, student fee accounts) in order to break out the recorded revenue into the various categories of payment types(e.g., annual enrollment, semester, trimesters) and identify the time period covered by the tuition period..

    ii.  Based on the analysis performed at i. above, monthly revenue will be allocated on a straight line basis to those months covered by the tuition .  For example:

- A payment made in July 2010 for the academic year running from September 2010 to June 2011 will be allocated on a straight line basis over the 10 months September 2010 to June 2011.

- A payment made in September 2011 for a semester that runs from September 2011 through December 2011, will be allocated on a straight line basis over the 4 month period September 2011 to December 2011.

    iii.  CSSP Accounting Vendors will obtain support from the claimant with regard to the academic year or semester dates, but will exercise professional judgment in determine the appropriate months to allocate revenue to.  For example:

- If a term commences on August 30, 2010, September 2010 will most likely be the first month to which revenue is allocated.

- If a term ends on June 3, 2011, May 2011 will most likely be the last date to which revenue is allocated.

    iv.  On completion of steps i. through iii. above, revenue will be allocated for each calendar year that forms part of the Benchmark and Compensation Period (2010, 2011, and 2012).

    v.  As a consequence of revenue being restated or allocated, a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 7 of the Settlement Agreement.  For claimant's required to satisfy the

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

customer mix test, the allocation of revenue per step ii. above will require that the identity of individual students be tracked with the allocation of revenue.

b. Allocation of variable expenses:

i. Variable expenses during each Fiscal Year that forms part of the Benchmark Period and the Compensation Period (e.g., 2010, 2011 and 2012 if the claimant maintains their Fiscal Year on a calendar year) will be allocated to individual months based on that month's allocated revenue as a percentage of total revenue for each Fiscal Year.  This approach results in a consistent variable profit margin for each month of any given Fiscal Year.  The calculation is as follows:

- Monthly corresponding variable expenses for each Fiscal Year of the Benchmark Period (e.g., 2011 and 2012 if the claimant maintains their Fiscal Year on a calendar year) will be calculated based on the percentage relationship between the sum of all variable expenses for each Fiscal Year and total revenue for the same annual period.  This will yield a separate variable expense percentage for each Fiscal Year that forms part of the Benchmark Period.

- This variable expense percentage (specific for each individual Fiscal Year that forms part of the Benchmark Period) is applied to the specific monthly revenue amounts in the Benchmark Period to calculate the corresponding variable expenses for each month.

- Monthly corresponding variable expenses during each Fiscal Year that comprises part of the Compensation Period (i.e., 2010 and 2011 if the claimant maintains their Fiscal Year on a calendar year) will be calculated based on the percentage relationship between the sum of all variable expenses for each Fiscal Year and total revenue for the same Fiscal Year.

- This variable expense percentage is applied to the specific monthly revenue amounts in the Compensation Period to calculate the corresponding variable expenses for each month.

H17

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

6.     The P&Ls, restated in accord with Step 5 above, are utilized as the input for calculating compensation under Exhibit 7 of the Settlement Agreement.

7.     Calculate Expected Revenue and Expected Costs

   a.   Expected Revenue and Costs shall equal either:

      i.   The actual revenue and expenses as set forth in the restated and/or allocated P&Ls calculated in accord with Step 5 above for the Benchmark Period (i.e., May 2011 to April 2012); or

      ii.  Revenue and expenses reported on financial projections for the Start-Up Business for the period May 2010 to April 2011.  The use of such projections would be dependent on satisfying the requirements of Exhibit 7 of the Settlement Agreement: that the projections were prepared prior to the spill and used to seek the extension of credit or financing to the Start-Up Business, from a financial institution, other entity in the primary business of lending or investing money, or non-family investors with business lending experience.

   b.   Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections.

8.     Calculate Actual Profit/Loss

   a.   Actual Profit/Loss results over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues (from May 2010 to April 2011) as set forth in the restated and/or allocated P&Ls calculated in accord with Step 5 above and (ii) the claimant's Actual Variable Costs (from May 2010 to April 2011) as set forth in the restated and/or allocated P&Ls calculated in accord with Step 4 above.

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

9.   Compensation will be computed under Exhibit 7 of the Settlement Agreement as follows:

   a.   Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated during the Compensation Period.

   b.   Apply the agreed-upon RTP adjustment.

   c.   Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable.

**Start-Up Professional Services Methodology**

1.   The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.

2.   An evaluation of the claimant's fee arrangements for all cases/engagements (i.e., time & materials, fixed fee, contingent fee, or a combination thereof) will be performed based on discussions and an assessment of additional records requested from the claimant.  Such additional records will be consistent with those outlined in the Professional Services Methodology (Attachment F).  It should be noted that information requested may include records either prior to and/or after the Benchmark and Compensation Periods (i.e., prior to 2010 or after 2012).

3.   If the CSSP Accounting Vendor identifies an error(s) in how the claimant has accounted for either revenue or variable expenses, correcting entries will be made to the P&Ls to restate revenue or expenses..

4.   If adjustments made in accord with 3. above result in restated P&Ls that are deemed sufficiently matched, the claim will be processed under the methodology set forth in Exhibit 7 of the Settlement Agreement.  However, if revenue has been restated in accord with 3. above a causation analysis will

H19

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

be re-performed (if causation is not presumed).  If causation is satisfied, the restated P&Ls are utilized as the input for calculating compensation under the Settlement Agreement.

5.  If adjustments made in accord with 3. above do not resolve matching issues, the P&Ls will be revised, as set forth below, allocating both revenue and expenses.

For those claimants who submit P&Ls which are deemed not "sufficiently matched", the P&Ls will be adjusted to allocate revenue on a straight line basis over the period of the case/engagement, underline the claimant can submit appropriate, reliable and complete records that permit an alternative allocation of revenue based on when activity generating the revenue occurred.  In professional services companies this would correspond to periods when work on the matter/engagement was actually performed.  Alternative information that the claimant may elect to present to demonstrate when effort was expended/hours were worked may include:

- Time and billing records maintained in the ordinary course of business that detail time worked by month by case/engagement is considered to be the most accurate and complete source of information.

- Other case/engagement records may provide sufficient information to 'reconstruct' when hours were worked in generating the revenue earned: calendars, engagement letters, court filings, case summaries, trial dockets, court and deposition appearances, expert report submissions, project deliverables, transaction closure dates, contract execution dates, court approvals, and payment schedules and receipts.

**Revenue**

Allocate Revenue on a straight line basis over the duration of the case/litigation

1.  If the claimant elects not to submit additional documentation, or provides documentation that, in the judgment of the Claims Administrator, does not permit the CSSP Accounting Vendors to reasonably estimate and verify the level of work effort in a given month, revenue will be allocated to each month on a straight line basis over the duration of the matter.

H20

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

2.    A matter will be considered to have commenced from the date of execution of an engagement letter or other indicia of the commencement of the undertaking, through the date that a matter has been settled, or a final project deliverable has been submitted and payment has been received, unless other information indicates an alternative date.  Other information could include, for example: evidence that work was commenced prior to the execution of an engagement letter or other indicia of the  commencement of the undertaking, post-trial filings, appeals, a further negotiation of the amount ultimately paid, or presentations after issuance of a final report.  Information must be provided by claimants to permit the CSSP Accounting Vendors to verify the commencement and completion date of cases/engagements.

3.    In determining revenue generated for each matter, consideration will be given to the nature of the case/engagement, but in all instances will be net of any reimbursable expenses.  Revenue from time & material and fixed fee arrangements will be determined based on the engagement letter or other description of the nature and scope of the undertaking, and invoice records.  For contingent fee arrangements, revenue will be based on the amount paid to the claimant as of the date the CSSP Accounting Vendors analyze the claim.  For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no revenue or variable expenses will be recognized within the claimant calculation for such cases.

4.    For each case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) the revenue allocated to each month will equal revenue (determined in accord with 3 above) divided by the number of months that the case/engagement was worked on (as determined in accord with 2 above).

5.    Where revenue has been restated and/or allocated, a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

H21

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H − Start-Up Businesses Methodology**

Allocate Revenue based on Available Information

The claimant will have the option to submit documentation to the Claims Administrator if it believes such records can more accurately estimate the level of work/hours incurred in a given month, thereby permitting revenue to be allocated based on such effort, rather than a straight line basis.  The CSSP Accounting Vendors will assess such records and determine whether, in their professional judgment, such records are adequate and complete enough to reasonably estimate and verify the level of work effort performed in a given month as it relates to each specific case/engagement.  If it is determined that such records permit a reasonable estimate of when effort was expended/hours were worked, revenue will be allocated based on such efforts.  However, if not deemed sufficient to reasonably estimate and verify when effort was expended/hours were worked, the CSSP Accounting Vendors will revert to allocating revenue to each month on a straight line basis over the duration of the matter.

In considering what additional information a claimant may elect to submit to identify when effort was expended/hours were worked, the CSSP Accounting Vendors anticipate that this will most likely include time and billing records maintained by a claimant in the ordinary course of business.  In the absence of such records, other information may be utilized to estimate or 'reconstruct' when effort was expended/hours were worked..  Such information may include, but not be limited to, calendars, engagement letters, court filings, case summaries, court and deposition appearances, expert report submissions, transaction close dates, contract execution dates, project deliverables, court approvals, court/trial dates, and payment schedules and receipts.  The approach that will be followed is detailed below:

1.    Information will be requested from the claimant that details the nature of the fee arrangements for all cases/engagements commenced and/or closed during the Benchmark and Compensation Periods.  The information requested will be consistent with the items set out in Attachment E – Professional Services Methodology.  Given that cases/engagements may have commenced prior to

## BEL Claims - Matching of Revenues and Expenses

### ATTACHMENT H – Start-Up Businesses Methodology

the Compensation Period or were ongoing or closed after the Benchmark Period, information required from claimants may extend prior to the Compensation Period and subsequent to the Benchmark Period.

2.   Revenue will be allocated to each month of the Benchmark Period (May 2011 to April 2012) and Compensation Period (May 2010 to April 2011) based on when work was actually performed.

3.   To identify when hours were worked the following steps will be performed:

   a.   A detailed inventory of all engagements performed by the claimant will be obtained, separated by the nature of the fee arrangement.

   b.   The CSSP Accounting Vendors will, through inquiries of the claimant, and an evaluation of submitted documentation, determine if contemporaneous time and billing records were maintained by the claimant in sufficient detail to determine and verify when effort was expended/hours were worked on individual cases/engagements, or if practical a grouping of cases/engagements that had similar characteristics (e.g., commencement and completion date, revenue earned and paid).  If deemed sufficient, time and billing records will be utilized.

   c.   If time and billing records were not maintained by the claimant in sufficient detail to determine when effort was expended/hours were worked, the CSSP Accounting Vendor will consider the adequacy and completeness of other information provided and determine if sufficient to estimate and verify when effort was expended/time was worked, and will allocate revenue on such basis.

Utilizing Time and Billing records to reallocate revenue

1.   Any billing records submitted will be analyzed for each engagement.  Hours recorded by personnel for each individual case/engagement (or a subset thereof if, in the professional judgment of the CSSP Accounting Vendor, some projects are deemed immaterial to the compensation calculation) will be compared to the timing of revenue recognized.  Total revenue earned from each case will be considered net of reimbursable expenses.  Total revenue earned from each case/engagement will be

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

allocated to each month based on the percentage of hours charged in that month relative to the total case/engagement hours.

2.  Based upon the content and format of the time and billing records received, additional analysis may be performed including but not limited to comparison of pre-spill and post-spill:  monthly hours worked in assessing lost hours, if any; billing rates per engagement/case in assessing higher/lower rates, if any; changes in the overall variable profit margin between periods, if any; utilization mix of professional staff (including owners/partners); lines and/or types of services/engagements worked on; and length of the project and value of settlements reached.

3.  For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no revenue nor variable expenses will be recognized within the claimant calculation for such cases.

4.  Where revenue has been restated and/or allocated a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

Utilizing Engagement Records to allocate revenue

1.  It is expected that claimants who operate under a time & materials fee arrangement will maintain time and billing records in order to create and support the invoices to their clients.  Accordingly, it is assumed that the methodology set out below will most likely apply to fixed fee and contingent fee arrangements, or a combination of the two.  It should be noted that if a firm has a variety of fee arrangements including some performed on a time & materials basis, for which it maintained time and billing records, the revenue may (based on the professional judgment of the CSSP Accounting Vendors) be bifurcated, and different records will be applied to identify when hours were worked.

H24

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

2.  If the claimant elects to submit documentation that the CSSP Accounting Vendors deem sufficient to estimate and verify the effort expended/hours worked in any given month, cases/engagements performed under a fixed fee or contingent fee arrangement will be evaluated utilizing other engagement documentation, as follows:

   a.  Fixed and contingent fee cases/engagements worked during the Benchmark Period and the Compensation Period

      i.  Identify the commencement and completion date for each case/engagement, including the date revenue was recorded and/or cash was received

      ii. In the case of a legal matter, conduct an examination of available legal and non-legal documents (e.g., pleadings and other court records, discovery requests, depositions and/or court documents, due diligence commencement dates, transaction closure dates, submission of contract drafts, lawyer's calendars etc.) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month.  This process will be performed in consultation with the claimant.

         • Based on the duration of the legal matter, combined with the timing of significant events, an estimate of the percentage of the total work effort on the case will be assigned to each month.

         • Revenue will be allocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort expended on the case.

   b.  For other professional services claimants (not law firms), conduct an examination of available documentation (e.g., budgets, project reports, draft and final deliverables, calendars, time and billing records, progress and status reports, meetings/presentations and other key milestone events) to establish proof of work/timing of effort in order to estimate the revenue that should be attributed to a given month.  This process will be performed in consultation with the claimant.

      i.  Based on the duration of the engagement, combined with the timing of significant events/milestones, an estimate of the percentage of the total effort incurred on the engagement will be assigned to each month.

H25

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

    ii.      Revenue will be allocated to each month by multiplying the total contingent fee or fixed fee by that month's percentage of the total effort expended on the engagement.

3.      For contingent fee cases that remain open/unsettled as of the date the claim is being evaluated, no revenue or variable expenses will be recognized within the claimant calculation for such cases.

4.      Where revenue has been restated and/or allocated a causation analysis will be re-performed to confirm that the claimant meets the revenue pattern test per the Settlement Agreement (if causation is not presumed).

Variable Expenses

1.      It is expected that the records maintained by some claimants may not separately identify variable expenses, as defined in Exhibit 4D of the Settlement Agreement, to specific cases/engagements.

2.      Where revenue is allocated on a straight line basis over the duration of a case/engagement, due to the claimant electing not to submit additional documentation, or where there was a lack of sufficient information to reliably estimate and verify when hours were worked/effort was expended, variable expenses incurred during the Benchmark Period (May 2011 to April 2012 or May 2010 to April 2011 if projections are used) and Compensation Period (May 2010 to April 2011) will be allocated to individual months based on that month's revenue as a percentage of total revenue for each individual Fiscal Year that forms part of the Benchmark or Compensation Periods (e.g., 2010, 2011 and 2012if the claimant maintains their Fiscal Year on a calendar year).  This approach results in a consistent variable profit margin for each month of any given Fiscal Year.  The calculation is as follows:

    a.      Monthly corresponding variable expenses during the Benchmark Period will be calculated for each Fiscal Year that forms part of the Benchmark Period based on the percentage relationship between the sum of all variable expenses for each Fiscal Year or May 2010 to April 2011 if projections are utilized, and total revenue for the same Fiscal Year.

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

 b. This variable expense percentage is applied to the specific monthly revenue amounts in each Fiscal Year in the Benchmark Period to calculate the corresponding variable expenses for each Fiscal Year.

 c. Monthly corresponding variable expenses during the Compensation Period will be calculated for each Fiscal year that forms part of the Compensation Period based on the percentage relationship between the sum of all variable expenses for each Fiscal Year and total revenue for the same Fiscal Year.

 d. This variable expense percentage is applied to the specific monthly revenue amounts in each Fiscal Year in the Compensation Period to calculate the corresponding variable expenses for each month.

3. Where revenue has been allocated on a basis other than the straight line basis, variable expenses incurred during the Benchmark and Compensation Periods will be allocated to individual months based on the total effort expended/hours worked, estimated using the same information utilized in allocating revenue.

Compensation Calculation

1. The restated and/or allocated P&Ls resulting from the allocation of revenue and variable expenses are utilized as the input for calculating compensation under Exhibit 7 of the Settlement Agreement:

2. Calculate Expected Revenue and Expected Costs

 a. Expected Revenue and Expected Costs shall equal either:

  i. The Actual Revenue and Actual Costs as set forth in the restated and/or allocated P&Ls for the Benchmark Period (i.e., May 2011 to April 2012); or

  ii. Revenue and expenses reported on financial projections for the Start-Up Business for the period May 2010 to April 2011.  The use of such projections would be dependent on satisfying the requirements of Exhibit 7 of the Settlement Agreement: that the projections were used to seek the extension of credit or financing to the Start-Up Business, from a financial institution,

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

other entity in the primary business of lending or investing money, or non-family provider investors with business lending experience.

b. Claimant's Expected Profit/Loss for the compensation period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both expected revenue and expected costs must both be based on qualifying projections.

3. Calculate Actual Profit/Loss

   a. Actual profit/loss results over the Compensation Period will be calculated as the difference between (i) the claimant's Actual Revenues (from May 2010 to April 2011) as set forth in the restated and/or allocated P&Ls and (ii) the claimant's Actual Variable Costs (from May 2010 to April 2011) as set forth in the restated and/or allocated P&Ls.

4. Compensation will be computed under Exhibit 7 of the Settlement Agreement as follows:

   a. Calculate the claimant's base compensation loss as the difference between (i) the claimant's expected profit/loss and (ii) the claimant's actual profit/loss generated during the Compensation Period.

   b. Apply the agreed-upon RTP adjustment.

   c. Deduct any payments or credits received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, and/or from any VoO Settlement Payment Offset and/or VoO Earned Income Offset, where applicable.

5. As noted above in 'Utilizing Time and Billing records,' if this data is available and used to allocate revenues, the additional analysis described below may be performed at this step in order to identify and quantify the various components of the compensation calculation. This analysis may include consideration of compensation resulting from a decrease/increase in hours, a decrease/increase in rates/awards and an increase/decrease in variable profit margin. Depending upon the level of detail provided, these components may be further analyzed to identify compensation amounts

**BEL Claims - Matching of Revenues and Expenses**

**ATTACHMENT H – Start-Up Businesses Methodology**

associated with changes in utilization/mix of professional staff as well as changes in types of

services/engagements/cases worked on.

**BP'S RESPONSE TO FINAL POLICY ANNOUNCEMENT: POLICY 495: "BUSINESS ECONOMIC LOSS CLAIMS: MATCHING OF REVENUES AND EXPENSES"**

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    REVISIONS TO ERROR AND REVENUE/VARIABLE EXPENSE MISMATCHING
       CORRECTION PROCESS ....................................................................... 3

III.   REVISIONS TO NAICS CODE CATEGORIZATION – ATTACHMENT A ................. 5

IV.    REVISIONS TO CONSTRUCTION METHODOLOGY – ATTACHMENT C ............. 6

V.     REVISIONS TO AGRICULTURE METHODOLOGY – ATTACHMENT D ................ 9

VI.    REVISIONS TO EDUCATIONAL INSTITUTIONS METHODOLOGY –
       ATTACHMENT E ................................................................................ 10

VII.   REVISIONS TO PROFESSIONAL SERVICES METHODOLOGY – ATTACHMENT
       F ..................................................................................................... 11

VIII.  CONCLUSION ...................................................................................... 14

i

BP respectfully submits its supplemental comments in response to the CSSP's Final Policy Announcement entitled "Policy 495: Business Economic Loss Claims:  Matching of Revenue and Expenses" (hereinafter "Final BEL Policy Announcement").[1]

# I.   INTRODUCTION

BP has provided substantial written materials reflecting its views on the proper implementation of the BEL compensation framework, including its November 18, 2013 submission, November 21, 2013 proposals, various written correspondence with the Claims Administrator, and its most recent February 27, 2014 submission reflecting comments about the February 12, 2014 publication of Policy 495 concerning matching of revenues and expenses for BEL claims.  The Final BEL Policy Announcement uses a different approach to matching revenues and variable expenses than the approach advocated by BP, and omits many of the requested modifications proposed by BP.  However, with certain exceptions, the Final BEL Policy Announcement appears to reflect a comprehensive effort by the CSSP Accounting Vendors to create a permissible process for analyzing and processing BEL claims to achieve a realistic measure of economic loss consistent with the Fifth Circuit's prior ruling.

The Final BEL Policy Announcement includes important changes, revisions and clarifications that were made in response to the comments and input provided by Class Counsel and BP during the February 20, 2014 CSSP meeting and the parties' respective written submissions of February 27, 2014.  BP reserves its prior positions and fully incorporates by reference its prior objections, comments and recommendations on the proper implementation of matching of revenues and expenses.  In addition, BP's position is based on its understanding of the Final BEL Policy Announcement, as explained by the Accounting Vendors in the February 20, 2014 CSSP meeting and the recent March 12, 2014 panel meeting.  We explain in detail below BP's current understanding of key aspects of the policy.

Proper implementation of the Final BEL Policy Announcement will be critical to complying with the mandate of the Fifth Circuit and achieving the goals and express terms of the Settlement, particularly in light of the discretion that the policy reserves for the Accounting Vendors.  The professional judgment of the Accounting Vendors must be exercised robustly and transparently, without interference from the Claims Administrator's office, and the results of the exercise of such judgment must be tested for each claim against the overarching Fifth Circuit requirement that the process result in a realistic measure of economic loss that is consistent with economic reality.

Class Counsel and other PSC members continue to aggressively attack the Accounting Vendor's proposals by continuing to press arguments that have been rejected by the Fifth Circuit

---

[1]  The CSSP issued its Policy Announcement concerning BEL matching of revenues and expenses on February 12, 2014 ("Proposed BEL Policy").  After input from the parties, the CSSP issued a modified version of the policy on March 7, 2014.  On March 13, 2014 a final policy announcement was issued, reflecting further modifications after the panel meeting that occurred on March 12, 2014.  We use the term "Final BEL Policy Announcement " to reference the most recent version of the BEL matching policy received on March 13, 2014, but references to revisions are intended to reference both the March 7, 2014 changes and the March 13, 2014 changes.

699 of 838

and the District Court.  Class Counsel's written submissions have mischaracterized the Fifth Circuit's BEL Decision and the District Court's December 24, 2013 Order.  They have badgered the Accounting Vendors during recent meetings, attempting to get various professionals to agree with Class Counsel's misinterpretations of the Settlement and how the policy might operate. Class Counsel provide citations to year-old expert declarations that had been used to support the positions they took while defending the now-rejected January 15, 2013 BEL policy, which has now been found to be inconsistent with the Settlement Agreement.

For example, at the March 12 panel meeting, Class Counsel devoted substantial time to setting forth precisely the same positions that they raised in their November 21 submission – positions which are inconsistent with the BEL Panel's holding and which were rejected by the District Court's December 24 Order.  These positions should be seen for what they are: inappropriate attempts to litigate already decided matters and to upset and undermine the efforts to develop a workable solution for matching revenues and variable expenses and achieving a realistic measure of economic loss consistent with the requirements of the Settlement Agreement. At no time have Class Counsel made any attempt to propose an alternative set of revenue and variable expense matching procedures to comply with the Fifth Circuit Decision and District Court's Order.  Indeed, Class Counsel seem intent on attempting to reverse or block what the Fifth Circuit, the District Court and now the professional Accounting Vendors have all concluded by objecting to the Final BEL Policy Announcement and the manner in which it will be implemented.

We discuss below our understanding of key aspects of the Final BEL Policy Announcement and the modifications to the language that occurred since the issuance of the February 12, 2014 Proposed BEL Policy.  In particular, there were changes made to the description of the error and revenue/variable expense mismatching correction process that occurs upon the initial evaluation of BEL claims.  The error and revenue/variable expense mismatching correction process is a critical early step towards proper evaluation of BEL claims.  The attempt to define "error" and the revenue/variable expense mismatching correction process and the explanation of that process to the parties created some confusion among all the parties.  If our understanding below is inaccurate, or if the implementation of this process fails to match this understanding, then BP has substantial concerns about the sufficiency of the error and revenue/variable expense mismatching correction process that is intended to occur before a further determination about whether a claimant's records are deemed sufficiently matched or not.

In addition, the Final BEL Policy Announcement made changes to each of the specialized matching methodologies in response to the input from Class Counsel and BP.  We describe our understanding of the specialized methodologies for achieving an appropriate matching of revenues and variable expenses.  These methodologies continue to contain aspects that cause BP concern about proper implementation.  However, on balance, if properly implemented, the specialized methodologies for construction, agriculture, educational institutions and professional services are reasonable methods for adjusting the accounting records that are used as inputs to the BEL compensation framework, in order to achieve a realistic measurement of economic loss.

BP intends to monitor closely the claims determination process and assess its options based on a comparison of the results of BEL claims awards with the Fifth Circuit's requirement

2

of adoption of an accrual style framework to have sufficiently matched P&Ls that can be used as inputs in order to achieve a realistic measure of economic loss consistent with economic reality.

## II.   REVISIONS TO ERROR AND REVENUE/VARIABLE EXPENSE MISMATCHING CORRECTION PROCESS

If the error and revenue/variable expense mismatching correction process is implemented properly with appropriate oversight and quality assurance, then it can help achieve the goal of the Settlement to achieve a realistic measure of economic loss.  The Final BEL Policy Announcement attempted to clarify the error correction process by revising footnote 1, which now provides, in relevant part:

> *"'Errors' will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.  Recognizing that the Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls."*[2]

In addition, clarifying language was added at page 7, with the addition of the following modified sentences:

> *"Contemporaneous P&Ls submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify either an error (as previously defined)* **or a mismatch of revenue and variable expenses** *which can be explained and supported by appropriate documentation."*[3]

During the March 12, 2014 panel meeting, the CSSP Accounting Vendors confirmed that the error and revenue/variable expense mismatching correction process had not changed, despite the clarifying language, and that the explanations provided at the February 20, 2012 CSSP meeting remain accurate.[4]  BP therefore understands the policy as an attempt to correctly match revenues and expenses as a preliminary step to help achieve a realistic measure of historical economic performance.  As CSSP Accounting Vendors confirmed, proper matching requires investigation of "spikes" and other irregularities in the benchmark and compensation periods, including review of irregularities in monthly revenue for claims subject to the AVM

---

[2]  Final BEL Policy Announcement at 3, n.1.

[3]  *Id.* at 7 (emphasis added).

[4]  The representations made at the February 20, 2014 CSSP meeting concerning how the BEL matching policy would be implemented were identified in BP's February 27, 2014 written response to the BEL matching policy.

methodology and irregularities in monthly variable expenses for claims subject to the Construction methodology.  Failure to comprehensively identify such circumstances will result in BEL offers that do not realistically approximate losses in variable profits.

An important application of the error and revenue/variable expense mismatching correction process was discussed at the February 20, 2014 CSSP meeting.  Where a claimant that is in the business of providing services uses cash basis accounting, and records in April an advance payment from a customer for a service to be provided over the following six months, the CSSP Accounting Vendors would adjust the P&Ls to allocate the payment as revenue over that six-month period.  BP agrees with this approach, as represented by the Accounting Vendors at the February 20, 2014 meeting and confirmed at the March 12, 2014 panel meeting.[5]

If instead, in the above situation, the cash payment received and recorded in April was an advance payment for a major event (*e.g.*, a music festival) that was held in October, then the P&Ls would be adjusted to allocate that payment as revenue for the month of October, and the related variable expenses would also be allocated to the month of October.  Again, BP agrees with the Accounting Vendors that this would be the proper approach to adjusting the P&Ls during the error correction and revenue/variable expense matching process.  The adjustment of P&Ls by allocating revenue to the month when the underlying earnings activities occurred[6] is a necessary step in ensuring that Exhibit 4C is interpreted in a manner consistent with the use of an accrual style framework, as the Fifth Circuit explained in its BEL Decision.

In addition, the Final BEL Policy Announcement adjusted the description of the circumstances under which a prior estimate that becomes incorrect will be evaluated, by removing the reference to the "good faith" of the circumstances surrounding the recording of the original accounting estimate.  We understand, based upon the Panel meeting and the language of the Final BEL Policy Announcement, that the revised sentence means that insubstantial differences in estimates that were based on the best information available at the time will not be adjusted, but significant differences must be evaluated to determine if the original estimate was inconsistent with the original best available information, or that the difference between the estimate and the actual facts was so significant that it should be treated as an error or a mismatch of revenue and variable expenses.

The combination of correcting errors and fixing mismatches of revenue and variable expenses would be consistent with the Fifth Circuit's requirement that Exhibit 4C be interpreted to require that an accrual style framework be applied in a manner designed to achieve a realistic

---

[5]  Conversely, if this step is not properly implemented, then it is likely that the resulting evaluation of the claim will reflect a distortion of economic reality.  *See* Declaration of Professor J. Richard Dietrich attached hereto as Attachment A ("Dietrich Decl.") at ¶ 5.  This is particularly important for the Annual Variable Margin methodology, which uses monthly revenue as the basis for allocating variable expenses to achieve proper matching.  *Id.* at ¶ 6. The failure to ensure that revenue is in the correct months, when the earnings related activities occurred, followed by the attempted use of the AVM methodology, will lead to claim awards that reflect distortions from economic reality. *Id.*

[6]  Of course, if the earnings related activity occurred over a period of multiple months then the revenue should be allocated over the months when the earnings activities occurred.

4

measure of economic loss.[7]  As the Final BEL Policy Announcement recognizes, the initial processing of claims may not achieve the goal of having sufficiently matched P&Ls that can be used as inputs to the calculation of Exhibit 4C compensation, and the use of additional matching methodologies may be required.  The policy reserves substantial discretion to the professional judgment of the CSSP Accounting Vendors.  But such professional judgment must always be exercised to achieve a reasonable measurement of actual economic losses, in accordance with the Fifth Circuit's BEL Decision.  Failure to implement the policy in this manner would lead to significant economic distortions.[8]  BP is also relying on the policy's representations that the Accounting Vendors' exercise of that professional judgment, and the bases therefore, will be clearly and transparently documented in the claims file.[9]

If the CSSP Accounting Vendors are able to properly implement the approach to error and revenue/variable expense mismatching correction as reflected above, then BP does not object to the approach.  BP reserves its rights to evaluate the actual implementation of the policy and individual claim determinations and will continue to use the Fifth Circuit's overarching requirement of achieving a realistic measure of economic loss as the standard against which such determinations must be evaluated.

## III.   REVISIONS TO NAICS CODE CATEGORIZATION – ATTACHMENT A

The Final BEL Policy Announcement included numerous changes to "Attachment A" concerning which industry NAICS codes would be assigned to particular methodologies.  These changes appear to have been made largely to conform Attachment A to other changes in the BEL Policy.  The Final BEL Policy Announcement, at Attachment A, is structured so that any NAICS codes that were deleted, or not originally included, automatically default to the AVM methodology, which is referenced as the "short revenue cycle" methodology.  Because of the importance of the revenue allocation issue for the AVM methodology, discussed above, judgments about which NAICS codes are allocated to a specialized matching methodology and which default to the AVM methodology, remain a critical part of proper implementation.

The changes to this section continue to reflect that the Claims Administrator's office will exercise judgment to determine whether, based on the nature of its operations or earnings cycle, a particular business type or claimant should be treated under a specialized methodology,

---

[7]  *See In re Deepwater Horizon*, 732 F.3d 326, 347 (5th Cir. 2013).

[8]  *See, e.g.*, Dietrich Decl. at ¶ 5.

[9]  A critical part of proper implementation of the proposed policy is CSSP's commitment that the CSSP Accounting Vendors will utilize contemporaneous P&Ls in evaluating and documenting any claim.  CSSP must properly enforce the requirement that claimants provide "detailed information to understand and verify the changes made by claimants to achieve sufficiently matched P&Ls."  *See* Final BEL Policy Announcement at 4, n.3.  As CSSP appears to recognize, enabling claimants to resubmit financial statements raises significant fraud concerns.  BP intends to closely scrutinize resubmitted financial statements and supporting documentation and CSSP's compliance with the transparency principles in the amended policy.

regardless of its NAICS code, in order to achieve a realistic measure of economic loss.  BP assumes that the Claims Administrator's office can only exercise that judgment based upon the recommendations of the CSSP Accounting Vendors, and assumes that this will be the case.  This judgment is an important consideration that the CSSP Accounting Vendors must take seriously (and document appropriately) in order to avoid anomalies that result in a significant departure from economic reality.  It would be inappropriate for the Claims Administrator's office to disregard the considered professional judgment of the CSSP Accounting Vendors in this area, and/or to allow such anomalies to persist.

Real estate brokerage firms should be carefully evaluated for treatment under one of the specialized methodologies.  While there are a range of sizes and activities of real estate brokers, most operate by an approach that involves numerous activities performed over a period of time related to assisting sellers and buyers of real property.  These activities include advertising, obtaining listings, showing properties, holding open houses, telephone calls, and activities to raise the profile of the broker.  The closing of a real estate transaction reflects the culmination of that process.  BP suggests that most real estate brokers should be evaluated under the professional services methodology, under the Final BEL Policy Announcement.  Depending on the facts and circumstances, such as the volume and timing of such transactions, the failure to consider the timing of when the revenue generating effort occurred may lead to a mismatch of the recording of revenues and variable expenses and, if left unadjusted, the calculation of awards often will not reflect a realistic measure of actual economic losses.

## IV.    REVISIONS TO CONSTRUCTION METHODOLOGY – ATTACHMENT C

The Construction methodology was revised in the Final BEL Policy Announcement in response to various issues identified by Class Counsel as well as by BP.  In particular, the Construction methodology now uses Fiscal Year financial information, which helps maintain the integrity of the financial records related to the claimant's fiscal year.  The Final BEL Policy Announcement also clarifies that variable expenses in the claimant's Contemporaneous P&Ls will be analyzed to help ensure that errors are identified and properly corrected before the Construction methodology is applied.

Contrary to Class Counsel's criticisms, the Construction methodology is an approach to allocating revenues that can achieve a realistic measure of economic performance if properly implemented, and is consistent with the Settlement Agreement BEL framework.  As is the case with all of the specialized methodologies, the Construction methodology is applied after the CSSP Accounting Vendors have analyzed a claim, made appropriate corrections and adjustments, and made a further determination that the adjusted P&Ls are not deemed sufficiently matched.[10]  For P&Ls that are not sufficiently matched, the construction methodology provides a method for adjusting the accounting records that are used as inputs to the calculation of Variable Profits.  The Construction methodology accomplishes this by allocating the total fiscal year revenue to the months during that fiscal year, proportionately,

---

[10]  *See* Final BEL Policy Announcement at C2-3.

based on the amount of variable expenses incurred in each month.  The methodology is a reasonable approach to estimation, because it uses the variable expenses actually incurred as a method of estimating when the earnings activity actually occurred.[11]  This is an effective method of approximating what construction companies actually do and how they generate revenue.[12]  They work on construction of buildings and other structures and incur costs that often track the progress of the project.  By allocating revenues from the claimant's fiscal year in accordance with when the progress on the projects occurred, the methodology attempts to achieve a reasonable measurement of actual economic performance.

Class Counsel make a broad assertion that the approach to revenue allocation is not supported by accounting concepts, and they cite an array of expert declarations purportedly supporting that assertion.[13]  But Class Counsel's assertions miss the point entirely, and do not support any change in the Construction methodology.  Class Counsel claim that the Construction methodology is inappropriate because it does not match expenses to revenues.  But that is just wrong.   By getting the revenue into the correct months, and ensuring the variable expenses are in the correct months, revenues and variable expenses are properly matched.[14]  Moreover, by first adjusting the relevant inputs to the Exhibit 4C calculation, the Construction methodology can then proceed exactly as indicated by the Variable Profit calculation:  "1. Sum the monthly revenue over the period[ and] 2. Subtract the corresponding variable expenses from revenue over the same time period."[15]

Class Counsel also assert that the Construction methodology matches revenue to effort and claim that this would "often be contrary" to "accepted revenue recognition accounting principles."[16]  But this assertion is both wrong and irrelevant.[17]  As the Final BEL Policy Announcement recognizes, the CSSP Accounting Vendors are using contemporaneous accounting records as inputs to a process for estimating a realistic measure of actual historic economic loss.  In order to achieve that realistic measure, the Accounting Vendors must adjust and restate the inputs to achieve proper matching consistent with economic reality.  The Accounting Vendors first correct errors and mismatches between variable expenses and revenues.  The Construction methodology then restates the inputs concerning revenue (where the claimant's records are deemed **not** sufficiently matched) by allocating the fiscal year total revenue over the months in the fiscal year based upon an estimate of when the work was performed.  This makes economic sense and is consistent with how most construction companies that properly use accrual based accounting practices would measure revenues.[18]  Class Counsel provide no explanation for how the Construction methodology would be contrary to any

---

[11]  *See* Dietrich Decl. at ¶¶ 7-8.

[12]  *See id.*

[13]  *See* Class Counsel's February 27, 2014 submission at C1, n.17.

[14]  *See* Dietrich Decl. at ¶¶ 9-10.

[15]  *See* Exh. 4C at 2.

[16]  Class Counsel's February 27, 2014 submission at C1.

[17]  *See* Dietrich Decl. at ¶ 9.

[18]  *See id.*

accounting principle, or why that would matter to the estimation of economic performance and calculation of lost Variable Profit.

Class Counsel's use of the Kohlbeck declaration is inapt.[19]  Kohlbeck simply says that if revenue was properly recorded it would be wrong to move it to another period in order to smooth revenues for financial reporting.[20]  But that is a simple truism that does not address the Construction methodology's goal of matching revenue and corresponding variable expenses to achieve a realistic measurement of economic loss.[21]  The Construction methodology applies when the records of the claimant are deemed **not** sufficiently matched.  Kohlbeck's assertion does not purport to address much less opine on that situation, so it is of no relevance to the exercise that is done by the Accounting Vendors to analyze and adjust the accounting records that in their professional judgment have errors and are insufficiently matched before a realistic measure of economic loss can be achieved.[22]

Class Counsel also provide references to other expert declarations they submitted in January and February of 2013 in support of the arguments they made in defense of the Claims Administrator's prior matching policy.  But the January 2013 BEL policy, and Class Counsel's objections to it, were soundly rejected by the Fifth Circuit's BEL Decision, which was based on a record that included those declarations.  None of those prior experts' *2013* declarations, by definition, can provide commentary on the Final BEL Policy Announcement developed by the CSSP Accounting Vendors and issued in *2014*.  And neither Class Counsel nor any of those prior expert declarations have offered any constructive suggestions or alternatives to the Construction methodology, beyond the repetition of general objections that have been repeatedly rejected by the Fifth Circuit, the District Court and the accounting professional participants who developed the Final BEL Policy Announcement.[23]

The Final BEL Policy Announcement does not indicate how construction claims based on financial data reported using the completed contract method of accounting would be handled under the Construction methodology.  As noted in BP's February 27, 2014 written response, such claimants' records require careful scrutiny to determine how best to achieve a realistic measure of economic performance, since often the underlying earnings activities may occur over an extended time period, while the revenues and variable expenses may be recorded in a single month when the project is completed.[24]  Failure to evaluate such claims appropriately will lead to results that reflect a distortion of economic reality.

BP does not object, with the reservations expressed previously concerning the use of the completed contract method, to use of the Construction methodology assuming it is properly

---

[19] *See* Class Counsel's February 27, 2014 submission at C1, n.17.

[20] *Id.*

[21] *See* Dietrich Decl. at ¶¶ 3, 10.

[22] *See, e.g., id.*

[23] *See also id.* at ¶ 10 (explaining that these references are irrelevant to the key question of whether the estimation technique is reasonable).

[24] *See, e.g., id.* at ¶ 7, n.4.

8

implemented as reflected in the Final BEL Policy Announcement, and as represented to the parties during the February 27, 2014 CSSP meeting and the March 12, 2014 panel meeting, and the claims determinations are consistent with economic reality.

## V.   REVISIONS TO AGRICULTURE METHODOLOGY – ATTACHMENT D

The Final BEL Policy Announcement reflects significant changes to the Agriculture methodology that were made in response to input from Class Counsel and BP.  The Agriculture methodology recognizes that the nature of the agriculture production process and business model results in significant timing differences between when earnings activities occur and when cash is received or expended and recorded in the accounting records, and thus requires an allocation of both revenue and variable expenses to particular months in order to match revenue with variable expenses in a way that reflects economic reality.[25]  The Agriculture methodology identifies the revenue that is related to particular crops and allocates it on a "straight line basis" to the months during which the crops were planted, grown, and harvested:  the "crop season."  This approach is reasonable given the nature of the business.[26]  In addition, the Agriculture methodology identifies the variable expenses associated with the crop growing activities and allocates those expenses based on a constant percentage calculated by comparing the total expenses to the total revenues for the fiscal year.

Similar to all of the specialized matching methodologies, the Agriculture methodology will be applied to claims after the Accounting Vendors analyze the claim and make corrections and after a determination is made by those professionals that a claimant's P&Ls are deemed ***not*** sufficiently matched.  The methodology results in adjusting the P&Ls used as inputs to the calculations made under Exhibit 4C of the Settlement.  Once the monthly revenues and corresponding variable expenses have been correctly placed into the proper months, the steps required by Exhibit 4C can be implemented:  "1. Sum the monthly revenue over the period[ and] 2. Subtract the corresponding variable expenses from revenue over the same time period."[27]  The claimant continues to have the choice of which Benchmark Period to use and which three to eight-month period during 2010 to select as the claimant's Compensation Period.  Step One and Step Two Compensation are calculated as indicated by Exhibit 4C.

During the March 12, 2014 panel meeting, Class Counsel continued to press its overall objections to matching, which, as indicated above, have been rejected by the Fifth Circuit and also the District Court.  In addition, a PSC lawyer repeatedly hectored the Accounting Vendors to accept his characterization of the Agriculture methodology as "eliminating the variability and optionality" provided to claimants under the agreement.  The Accounting Vendors did not agree with the PSC's improper interpretation and characterization of the agreement.  Class Counsel are wrong again.  Class Counsel's argument appears to be nothing more than an observation that if proper matching did not occur, the claimants would get higher awards based on cherry-picking

---

[25]   *See* Final BEL Policy Announcement at D1.

[26]   *See, e.g.*, Dietrich Decl. at ¶ 12.

[27]   Exh. 4C at 2.

9

months with inaccurate financial data, which would necessarily lead to estimates of lost variable profits that are inconsistent with economic reality.  Of course, that argument cannot justify a failure to take steps to achieve proper matching.  The Accounting Vendors developed a methodology for achieving a realistic measure of actual economic loss, at the direction of the Claims Administrator and the District Court.  That methodology operates as described above, adjusting inputs so that the revenues and variable expenses are in the correct months before the calculations required by Exhibit 4C can be performed.  The reduction in the variability due to discontinued use of prior incorrect financial data is fully consistent with the Fifth Circuit's Decision.

BP does not object to use of the Agriculture methodology assuming it is properly implemented as reflected in the Final BEL Policy Announcement, including the overarching requirement that the policy must be implemented in a manner such that actual claims determinations achieve a realistic measure of economic loss that is consistent with economic reality.[28]

## VI.   REVISIONS TO EDUCATIONAL INSTITUTIONS METHODOLOGY – ATTACHMENT E

The Final BEL Policy Announcement reflects significant changes to the Educational Institutions methodology that were made in response to input from Class Counsel and BP.  The Educational Institutions methodology recognizes that the nature of educational institutions' business results in significant timing differences between when tuition is billed, received and recorded, and when the earnings activities of delivering educational services actually occur. Thus this methodology requires an allocation of both revenue and variable expenses to particular months in order to "better achieve sufficient matching of revenue and expenses" in a way that reflects economic reality.[29]   The Educational Institutions methodology identifies the tuition revenue that is related to particular academic periods and allocates it on a "straight line basis" to the months during which the academic services were performed for that tuition.  This approach is reasonable given the nature of the business.[30]  In addition, the Educational Institutions methodology identifies the variable expenses associated with the academic services activities and allocates those expenses proportionately to the monthly revenue over the fiscal year periods.[31]

Similar to all of the specialized matching methodologies, the Educational Institutions methodology will be applied to claims after the Accounting Vendors analyze the claim and make

---

[28]  BP's position and this written submission is limited to BP's comments on the Final BEL Policy Announcement and does not reflect considerations relating to the causation and class membership requirements articulated in the Fifth Circuit's March 3, 2014 decision.  For example, it does not address the situation where agriculture claimants have lower profits that are the result of variation in government grants or subsidies that are unrelated to the oil spill, and the Claims Administrator and the Court's responsibilities to investigate Claims Forms submitted under penalty of perjury.

[29]  Final BEL Policy Announcement at E1.

[30]  *See* Dietrich Decl. at ¶¶ 13-14.

[31]  *See* Final BEL Policy Announcement at E4.

corrections and after a determination is made by those professionals that a claimant's P&Ls are deemed **not** sufficiently matched.  The methodology results in adjusting the P&Ls used as inputs to the calculations made under Exhibit 4C of the Settlement.  Once the monthly revenue and corresponding variable expenses have been correctly placed into the proper months, the steps required by Exhibit 4C can be implemented: "1. Sum the monthly revenue over the period[ and] 2. Subtract the corresponding variable expenses from revenue over the same time period."[32]  The claimant continues to have the choice of which Benchmark Period to use and which three to eight-month period during 2010 to select as the claimant's Compensation Period.  Step One and Step Two Compensation are calculated as indicated by Exhibit 4C.

BP does not object to use of the Educational Institutions methodology assuming it is properly implemented as reflected in the Final BEL Policy Announcement, including the overarching requirement that the policy must be implemented in a manner such that actual claims determinations achieve a realistic measure of economic loss that is consistent with economic reality.[33]

## VII.   REVISIONS TO PROFESSIONAL SERVICES METHODOLOGY – ATTACHMENT F

The Final BEL Policy Announcement reflects important clarifications and changes to the Professional Services methodology made in response to input from Class Counsel and BP.  The Professional Services methodology explains that most of the professional services claimants' books and records submitted to the CSSP have not been maintained on an accrual basis, but have been prepared predominantly on a modified cash basis.  The methodology also explains that such claimants' P&Ls can reflect important timing differences between when work was performed and when revenue was recorded.[34]  Thus this methodology requires an allocation of both revenue and variable expenses to particular months in order to achieve sufficient matching of revenue and expenses in a way that reflects economic reality.[35]  The Professional Services methodology identifies the revenue that is related to particular engagements and allocates it on a "straight line basis" to the months during which the engagements were performed for that revenue, or allocates revenue based on more particularized information showing the actual effort performed each month, when reliable and accurate records are provided.  This approach is reasonable given the nature of professional services businesses, assuming the methodology is properly implemented.[36]  In addition, the Professional Services methodology identifies the variable expenses associated

---

[32]  Exh. 4C at 2.

[33]  BP's position and this written submission is limited to BP's comments on the Final BEL Policy Announcement and does not reflect considerations relating to the causation and class membership requirements articulated in the Fifth Circuit's March 3, 2014 decision.  For example, it does not address the situation where Educational Institutions have lower profits that are the results of government grants or contributions that are unrelated to the oil spill, and the Claims Administrator and the Court's responsibilities to investigate Claims Forms submitted under penalty of perjury.

[34]  *See* Final BEL Policy Announcement at F1.

[35]  *See id*.

[36]  *See* Dietrich Decl. at ¶¶ 15-16.

with the service activities and allocates those expenses proportionately to the monthly revenue over the fiscal year periods, or based on total effort expended, using the same information used to allocate revenue.[37]

Similar to all of the specialized matching methodologies, the Professional Services methodology will be applied to claims after the Accounting Vendors analyze the claim and make corrections and after a determination is made by those professionals that a claimant's P&Ls are deemed ***not*** sufficiently matched.  The methodology results in adjusting the P&Ls used as inputs to the calculations made under Exhibit 4C of the Settlement.  Once the monthly revenue and corresponding variable expenses have been correctly placed into the proper months, the steps required by Exhibit 4C can be implemented: "1. Sum the monthly revenue over the period[ and] 2. Subtract the corresponding variable expenses from revenue over the same time period."[38]  The claimant continues to have the choice of which Benchmark Period to use and which three to eight-month period during 2010 to select as the claimant's Compensation Period.  Step One and Step Two Compensation are calculated as indicated by Exhibit 4C.

Class Counsel continued to press their objections to the Professional Services methodology during the March 12, 2014 panel meeting through their continued assertion of arguments that have been rejected by the Fifth Circuit, the District Court, and the professional Accounting Vendors.  Class Counsel also claimed, in their redlined comments on the policy, that the CSSP Accounting Vendors "admitted" that the proposed policy is not based on any accepted method or practice of accounting.  Again, Class Counsel's descriptions of the Accounting Vendors' remarks are inaccurate.[39]  In addition, Class Counsel cited several prior expert declarations and other accounting literature in their redlined comments, and claimed during the March 12, 2014 panel meeting that their authorities were unrebutted.  But, Class Counsel's assertions are both wrong and irrelevant, for several reasons:

*First*, allocation methods, such as straight line allocation, are widely used in accrual accounting settings.[40]  Among other things, allocation methods are used to apportion the total amount of revenue collected or expense incurred from an economic activity that takes place over multiple accounting periods to each individual accounting period.[41]  The supposed admission elicited by Class Counsel at the February 27, 2014 CSSP meeting about "accepted accounting methods" did not address this point, and instead reflects a PSC member's efforts to get the Accounting Vendors to agree with his long and varied assertions about the methodology.

*Second*, the straight-line allocation method is intuitive, easily calculated, and often serves as a reasonable measure of economic activity.[42]  The straight-line allocation method often is used

---

[37]  *See* Final BEL Policy Announcement at F11-12.

[38]  *See* Exh. 4C at 2.

[39]  *See, e.g.*, Dietrich Decl. at ¶¶ 17-18.

[40]  *See id.* at ¶ 20.

[41]  *See id.*

[42]  *See id.* at ¶ 23.

in accrual-style frameworks for allocating both revenue and expense across accounting periods or other categories of economic activity.[43]

    *Third*, Class Counsel fail to recognize that the use of the straight line allocation approach occurs after the claimant's records have been deemed ***not*** sufficiently matched, based on the professional judgment of the Accounting Vendors.

    *Fourth*, Class Counsel's comments that the straight line approach cannot be found in any accepted accounting methodology for contingent fee situations, "where a fee is not earned unless and until a judgment or settlement is paid," appears to be an assertion about the application of GAAP rules in a financial reporting context.[44]  But the Final BEL Policy Announcement does not purport to be a guide for preparing financial statements in compliance with GAAP.  Instead, it reflects methodologies for using accounting records as inputs to the Exhibit 4C calculation process in a manner designed to achieve a realistic measure of economic loss based on historic performance.  Class Counsel have provided no supporting information to suggest that the use of a straight line approach to allocate contingent fee revenue would not be an appropriate method for achieving a realistic measure of economic loss.  Instead, in duplicative footnotes in Class Counsel's written response, they cite general materials on revenue recognition under GAAP, without proposing that GAAP apply or explaining how any part of that GAAP literature informs the task at hand of developing a process to achieve a realistic measure of economic loss.[45]

    *Documentation requirements.*  Class Counsel also claimed, at the March 12, 2014 panel meeting and in their prior responses, that the Professional Services methodology is too burdensome on claimants because they will not have the required documentation.  But, Class Counsel's position is unsupported, wrong and irrelevant.  The starting point for all claimants is the claimant's own records.  Where those records require further support, the Settlement provides ample authority for the Claims Administrator to seek further information.[46]  Under the Professional Services methodology, the CSSP Accounting Vendors will require additional information for claimants that in their professional judgment are deemed not sufficiently matched.  But the additional records sought are the usual and customary documents that a professional services business is likely to maintain, and indeed must maintain to comply with its normal record-keeping obligations.  These records constitute "source documents" for the P&Ls, which the CSSP is authorized to obtain.[47]  It is not a burden for a claimant seeking a substantial recovery to have to support its claim with underlying documentation.  And, as the Settlement Agreement makes clear, if a claimant lacks the required substantiating records, then the claimant cannot recover.[48]  That result is not unfair, as otherwise, the claimant would be seeking an award based upon gross and unreasonable guesswork at best, or fraud at worst, when making claims.

---

[43] *See id.*

[44] *See id.* at ¶ 18.

[45] *See id.* at ¶ 19.

[46] *See, e.g.*, Exh. 4A.

[47] *See* Exh. 4A at ¶ 4.

[48] *See* Exh. 4A at 1 ("In order to be eligible for compensation, a business claimant must provide [certain documentation].")

13

*Handling of Work-in-Progress for contingent fee enterprises*.  The Final BEL Policy Announcement did not modify the approach to evaluation of contingent fee arrangements where the contingency has not been resolved as of the date of the arrangement.  BP incorporates by reference its prior comments on this issue, and we continue to be concerned that the failure to closely scrutinize contingent fee law firm claimants that had contingent fee work during the Compensation and/or Benchmark Periods that remains unresolved may result in award determinations that do not comport with economic reality.  BP provided several examples of law firm claimants who have substantial contingent fee work relating to the Deepwater Horizon accident that the firms initiated starting in 2010 and which has led to substantial awards to their represented clients in subsequent years.  Awards to such law firm claimants that do not appropriately account for the likelihood of these contingent recoveries will be erroneous and inconsistent with economic reality.[49]  It would be appropriate for the CSSP Accounting Vendors instead to estimate the expected recoveries where feasible, and allocate the expected revenue and variable expenses to the period during which the work was performed.[50]  In the alternative, where the expected fee recovery cannot be estimated, the Accounting Vendors should ensure that the related variable expenses are deferred, consistent with an accrual style framework, and not treated as expenses until the contingent fee matter is resolved.

Except for the issues concerning contingent fee work-in-progress during the Compensation and Benchmark Periods that remain unliquidated as of the time of the claim evaluation, BP does not object to use of the Professional Services methodology assuming it is properly implemented as reflected in the Final BEL Policy Announcement, including the overarching requirement that the policy must be implemented in a manner such that actual claims determinations achieve a realistic measure of economic loss that is consistent with economic reality.[51]  As noted above, proper implementation requires appropriate scrutiny of the records offered by claimants attempting to use the effort-based allocation approach.  Further, appropriate scrutiny of open contingent fee work must be taken into account in computing economic losses in accordance with economic reality.

# VIII.  CONCLUSION

The successful evaluation and processing of BEL claims consistent with the Settlement Agreement and the realistic measurement of economic losses will depend on a good faith and proper implementation of the Final BEL Policy Announcement.  The professional Accounting Vendors must exercise their professional judgment in a manner consistent with economic reality,

---

[49]  *See Due v. Due*, 342 So. 2d 161, 166 n.5 (La. 1977) (rejecting attorney's assertion in a divorce case that an unresolved contingency fee case had no economic value).

[50]  *See* Dietrich Decl. at ¶ 27.

[51]  BP's position and this written submission is limited to the comments on the Final BEL Policy Announcement and does not reflect considerations relating to the causation and class membership requirements articulated in the Fifth Circuit's March 3, 2014 decision.  For example, it does not address the situation where contingent fee law firms have submitted claims forms signed under penalty of perjury while knowing that they have significant amounts of 2010 earnings resulting from open contingent fee arrangements and does not address the Claims Administrator and the Court's responsibilities to investigate such Claims Forms.

and must be allowed to operate without undue influence or interference.  In turn, the Accounting Vendors must ensure that their own personnel are properly trained and supervised, and that proper controls are in place so that their duties can be implemented in order to achieve the goals of the Settlement.  Ultimately, the proper implementation must be judged by an assessment of whether the individual claim determinations achieve and reflect a realistic measure of actual economic losses consistent with economic reality.

15

# ATTACHMENT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to all actions. | * * * * * | HONORABLE CARL J. BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * * * | Civil Action No. 12-970 |
| | | SECTION J |
| Plaintiffs, | * * | |
| v. | * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | * * | |

## DECLARATION OF PROFESSOR J. RICHARD DIETRICH

### March 19, 2014

## I.   INTRODUCTION

1.   I am a professor of accounting and served for 11 years as chair of the Department of Accounting and Management Information Systems in the Fisher College of Business at The Ohio State University.  Immediately prior to joining the faculty at Ohio State, I was the academic fellow in the Office of the Chief Accountant ("OCA") at the U.S. Securities and Exchange Commission ("SEC").  I also have held tenured appointments as a professor

1

of accounting at the University of Illinois at Urbana-Champaign and the University of Texas at Austin. I received a B.S. in physics, an M.S. in measurement and control, an M.S. in accounting, and a Ph.D. in industrial administration from Carnegie-Mellon University.

2.  I have been asked to comment on certain aspects of the revisions to the matching policy that was modified and issued in final form on March 13, 2014 ("Final BEL Policy"), with specific focus on alterations to the prior version of that policy (the Claims Administrator's February 12, 2014 proposed "Policy 495: Business Economic Loss Claims: Matching of Revenue and Expenses" ("Proposed BEL Policy")). I focus in particular on revisions made to the Proposed Policy that were included in a March 7, 2014 update ("Modified BEL Policy"). I have also been asked to comment on certain issues raised by Class Counsel at the March 12, 2004, CSSP panel meeting,  and Class Counsel's memorandum dated February 27, 2014 pertaining to the Proposed BEL Policy.

3.  The Final BEL Policy is intended as a protocol to adjust claimant-submitted financial records to achieve a "realistic measurement of economic loss." The Final BEL Policy provides that if, in analyzing and processing a claim, the CSSP Accounting Vendors identify an error or a mismatch of revenue and variable expenses which can be explained and supported by appropriate documentation, the CSSP Accounting Vendors will restate the financial records to correct errors or mismatched revenues and variable expenses.[1] After restating for identified errors and mismatched revenues and expenses which are explained and supported by appropriate documentation, the restated financial records, unless deemed to be "sufficiently matched," "are to be adjusted 'in light of the necessity of revenue and expense matching to achieve realistic measurement of economic loss.'"[2] To achieve matching, the Final BEL Policy states that, "[d]epending on the specifics of a

---

[1]  "Contemporaneous P&Ls submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify either an error (as previously defined) or a mismatch of revenue and variable expenses which can be explained and supported by appropriate documentation." Final BEL Policy, page 7.

[2]  Final BEL Policy, page 1, quoting the 5th Circuit Court of Appeals (732F. 3d at 346-347).

given business, it may be appropriate to make adjustments to the claimant's financials as to the timing of the recognition of either revenues or expenses or both."[3] The Final BEL Policy lays out several alternative methods to make these adjustments.  Collectively, these methods are intended to adjust a claimant's corrected accounting record inputs so as to sufficiently match revenue or variable expenses or both to the economic activity that gives rise to the revenue and corresponding variable expenses.

4.     Note that the Final BEL Policy recognizes that it may be necessary to adjust revenue or variable expenses or both, so that the revenue and variable expenses will be recorded in the same month as the underlying activity that gives rise to the revenue and variable expenses in order to reflect economic reality.  Several of the methodologies that I describe below explicitly consider the underlying economic activities and allocate revenues and variable expenses to reflect economic reality. (See sections B though E below for detailed descriptions of the Construction, Agriculture, Educational Institutions, and Professional Services Methodologies.)

## II.   ANALYSIS

### A.     Comments on Error and Revenue/Variable Expense Mismatching Correction

5.     I've read the Final BEL Policy including the Underlying Issues/Principles section and the Statement of Policy as they pertain to error and revenue/variable expense mismatching correction.  In my opinion, if properly implemented, the procedures described provide a reasonable technique to adjust accounting record inputs that can then be used to provide realistic measurements of economic loss. Realistic measurement of economic loss relies on appropriately recording in each month the revenues and variable expenses associated with the economic activities that occurred in the same month.  Claimant-submitted accounting records will not always capture the underlying economic activities that occur in the same month for at least two reasons.  One reason is that the claimant-submitted financial information may contain errors.  Errors are accounting transactions that were

_____

[3]     Final BEL Policy, page 3.

inappropriately recorded in the claimant's contemporaneous P&Ls under the basis of accounting used by the claimant.  A second reason is that the claimant-submitted financial information may mismatch revenue or variable expenses in months other than the month of the underlying economic activity that gives rise to the revenue and variable expenses.  This mismatching error may arise because either the revenue, the variable expenses, or both are not recorded in the month when the economic activity occurs.  For example, a company may record an advance payment from a customer that is received in June, for services that will be provided evenly during the months of July, August and September, as revenue in June.  In order to properly match revenue so as to reflect economic reality, the revenue must be restated to the months of July, August and September.  Variable expenses corresponding to the revenue also must be restated to those three months, unless the variable expenses already were recorded in those months.  If corrections of mismatched revenue, variable expenses, or both are not properly implemented, the resulting evaluation of the claim will reflect a distortion of economic reality.

6. The Annual Variable Margin Methodology does not explicitly identify the economic activities that give rise to revenues and variable expenses and instead assumes that monthly revenue reflects the underlying economic activities occurring in each month.  Provided that the CSSP Accounting Vendors exercise their professional judgment to achieve sufficient matching based on the operating characteristics of all claimants, and not just those that fall within certain industries, the CSSP Accounting Vendors can then determine whether the Annual Variable Margin Methodology or one of the other methodologies (Construction, Agriculture, Educational Institutions or Professional Services) is best designed to make adjustments that will reflect economic reality. As the example in paragraph 5 describes, the CSSP Accounting Vendors must assure that the revenue that is mis-recorded in June is restated so that it is matched to the months in which the underlying economic activity occurs.  Unless restated by the CSSP Accounting Vendors, or unless the claimant's accounting records are adjusted using one of the other methodologies (Construction, Agriculture, Educational Institutions or Professional Services), the claimant's restated financials will be distorted and the calculated loss will not provide a realistic measurement of economic loss.

4

### B. Comments on Construction Methodology

7.  I have read ATTACHMENT C, titled "Construction Methodology" including the revisions made between the February 12, 2014 and March 7, 2014 drafts.  In my opinion, if properly implemented, the Construction Methodology provides a reasonable technique to adjust accounting record inputs that can then be used to provide realistic measurements of economic loss if the contemporaneous P&Ls of a construction industry claimant are deemed not to be "sufficiently matched."[4]  Proper implementation requires the correction by the CSSP Accounting Vendors of errors identified in a claimant's financial statements.

8.  The Construction Methodology uses an accrual-style framework to "match" revenues and variable expenses, using monthly variable expenses as an estimate of each month's economic activities.  This is a reasonable revenue allocation approach because variable expenses recorded each month generally reflect the underlying economic (e.g., construction) activity occurring in the month which generates revenue for the firm. The Construction Methodology is based on the same concepts as the percentage-of-completion method that is widely used to calculate periodic revenue in the construction industry—both share the insight that allocating revenue based on expense incurred in a month provides a realistic measure of monthly economic performance.  The restated monthly revenue and adjusted monthly variable expenses that result from the Construction Methodology will reasonably approximate economic reality and therefore can be used as inputs to create a realistic measurement of economic loss.

9.  I have read Class Counsel's criticisms of the proposed Construction Methodology.  I find Class Counsel's criticism that the Construction Methodology "does not match expenses to revenues; it 'matches' revenue to effort – which will often be contrary to accepted revenue recognition accounting principles" to be misleading.  I agree that the Construction

---

[4]  I note that "sufficiently matched" P&Ls of claimants in the construction industry that use the completed contract method may not provide a reasonable basis on which to determine economic loss, especially if the claimants have relatively few construction projects and if the construction projects extend over multiple months. Even if monthly revenues are "sufficiently matched" with variable expenses, it is possible that both the revenue and variable expenses are reported in a month different than the month of the construction activities which gave rise to the revenue and variable expenses.  Thus, the reported revenue and variable expenses may be unhinged from monthly economic activity.  Under these conditions, the calculation of economic loss would lose its grounding based on the claimant's economic activities.

Methodology "matches" revenue to effort.  It does so in the same way that the percentage-of-completion method, discussed above, "matches" revenue to effort.  The name of the method itself—percentage-of-completion—is used to convey that revenue is based on the proportion of the project (that is, the effort) that is expended in the month.[5]  Thus the Construction Methodology is consistent with a well-recognized revenue recognition accounting principle.   As I describe further in section F below, the Construction Methodology is a direct application of a proportionate allocation method to allocate revenue; proportionate allocation methods are often used to allocate revenue in many settings.[6]

10.   I also have read the accompanying footnote 17 in Class Counsel's Redline of the Proposed Policy, which cites expert declarations submitted in January and February of 2013. Nothing in footnote 17 would help to inform consideration of whether the Construction Methodology provides a reasonable measure of economic loss.  The statements cited in footnote 17 are premised on the use of GAAP (generally accepted accounting principles) to prepare periodic financial reports on a contemporaneous basis and not the Settlement Agreement's goal of generating realistic estimates of economic loss.  Thus, the footnote contains irrelevant truisms (e.g., "Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period … is considered unacceptable for financial reporting purposes by the accounting profession") and irrelevant generalizations (e.g., "GAAP recognition rules and 'matching' *most often* apply to expense recognition not revenue recognition" [*emphasis added*]).  Notably, that assertion provides no support for what is intended by "most often."  There are many accrual accounting concepts that apply to both revenue and expenses and it would be inappropriate to characterize one or the other

---

[5]   In fact, provided that reasonably dependable estimates of the extent of progress toward completion and total expected contract revenues and contract costs can be made, GAAP requires the use of the percentage-of-completion method to determine revenue.  See ASC 605-35-25-57.

[6]   As described in section F below, proportionate allocation methods use an "allocation base" that is intended to reflect the economic relationship between the amount to be allocated (e.g., revenue, expense or manufacturing cost) and the measure of economic activity (e.g., effort, time or number of units produced).  In this report, I refer to proportionate allocation methods that use time as the allocation base as a "straight-line allocation method."

6

set of rules as more predominant.  The footnote also incorrectly asserts that "BP's proposal to move revenue to match expenses is backwards" and "[t]he matching approach that BP advocates is not matching in any sense recognized in the accounting world." As I noted above, the percentage of completion method uses expenses to estimate the percentage of a project that has been completed in order to "match" revenues to expenses under GAAP.  In other words, the Construction Methodology uses the same conceptual approach to allocate revenue to months as is used in the percentage of completion approach that is widely adopted in accounting.  It uses variable expenses as a proxy for effort and allocates revenue based on when the relative amount of effort on a construction project was incurred.

### C.   Comments on Agriculture Methodology

11.  I have read ATTACHMENT D, titled "Agriculture Methodology" including the revisions made between the February 12, 2014 and March 7, 2014 drafts.  In my opinion, if properly implemented, the Agriculture Methodology provides a reasonable and appropriate means for restating contemporaneous P&Ls for claimants in the agriculture industry when the submitted P&Ls are not deemed to be sufficiently matched.  Proper implementation requires the correction by CSSP Accounting Vendors of errors identified in a claimant's financial statements.

12.  The Agriculture Methodology explicitly considers the timing of the economic activities that give rise to revenues and expenses for agricultural claimants—here the "crop season"—and uses a straight-line method (i.e., a proportionate allocation method that uses time as the allocation base) to allocate revenue over the crop season.  As I discuss further in section F below, the straight-line method is widely accepted for allocating revenue in an accrual-style accounting framework.  This method of allocating revenue is particularly appropriate here because the underlying economic activity—e.g., growing crops—takes place over an entire growing season, rather than at one point in time.  In order to reflect economic reality in this type of setting, monthly P&Ls used to measure economic losses must record revenue and variable expenses proportionately over the growing season.[7]  The

---

[7]   Note that, in contrast to P&Ls that are prepared each month during the growing season that are not informed by the total amount of revenue and variable expenses that will obtain from the entire growing season,  here the

Agriculture Methodology uses a straight-line method to allocate revenue and variable expenses; the resulting restated amounts will provide reasonable approximations of economic loss that are consistent with economic reality.

### D.   Comments on Educational Institutions Methodology

13.   I have read ATTACHMENT E, titled "Educational Institutions Methodology" including the revisions made between the February 12, 2014 and March 7, 2014 drafts.  In my opinion, if properly implemented, the Educational Institutions Methodology provides a reasonable and appropriate means for restating an educational institution claimant's contemporaneous P&Ls when the submitted P&Ls are not deemed to be sufficiently matched. Proper implementation requires the correction by CSSP Accounting Vendors of errors identified in a claimant's financial statements.

14.   The Educational Institutions Methodology explicitly identifies the timing of tuition collected by an educational institution claimant and the time periods during which the educational institution claimant will deliver educational services to the student.  Because the delivery of educational services occurs over time, e.g., an academic semester or academic year, the Educational Institutions Methodology allocates tuition collected using straight-line allocation over the period in which the educational services are delivered.  As I discuss further in section F below, the straight-line allocation method is widely accepted for allocating revenue in an accrual-style accounting framework.  Straight-line allocation is appropriate in this setting because it reasonably reflects the underlying economic activity. Variable expenses will then be allocated based on revenue allocated to each month.  This allocation results in matching variable expenses with the revenue each month and both amounts will provide reasonable approximations of economic reality, which in turn will permit realistic measurement of economic loss.

---

total amount of revenue or variable expenses arising from the entire growing season is known.  Thus, it is possible to prepare a much more realistic measure of monthly economic performance after the growing season concludes.

E.   **Comments on Professional Services Methodology**

15.   I have read ATTACHMENT F, titled "Professional Services Methodology" including the revisions made between the February 12, 2014 and March 7, 2014 drafts.  I understand that the Professional Services Methodology will apply to claimants in the professional services industry if the claimant's contemporaneous P&Ls are not deemed to be "sufficiently matched."  Proper implementation requires the correction by CSSP Accounting Vendors of errors identified in a claimant's financial statements.

16.   The Professional Services Methodology includes several variations that address anticipated differences across claimants based on details of their economic activities and the extent to which they submit "appropriate, reliable and complete" records that permit an allocation of revenue based on the timing of activities that generate the revenue. The several alternatives provided utilize appropriate, reliable and complete records of economic activity if submitted, while accommodating claimants that do not submit appropriate, reliable and complete records in a manner that best matches revenues and expenses in the absence of such records.  Each of these variations incorporates either a proportionate or straight-line allocation method to restate revenue.  In my opinion, if properly implemented, these variations are designed to achieve as economically realistic matching of revenue and variable expenses as can reasonably be achieved.

17.   I have read Class Counsel's criticism of the proposed Professional Services Methodology that appears both in Class Counsel's February 27, 2014 memorandum and in ATTACHMENT E of Class Counsel's February 27, 2014 proposed Redline of the Proposed Policy.  Class Counsel asserts, in part, that the Professional Services Framework "departs from any standard or accepted accounting methodology." (See page 2 of the memorandum.)  For reasons that I described above and in section F below, I disagree.  The methods employed in the Professional Services Methodology are used in accrual-style frameworks and use information that is intended to estimate the underlying economic activity within the constraints of accurate, reliable and complete information that is available to the CSSP Accounting Vendors.

18.   I further note that Class Counsel's February 27, 2014 memorandum at footnote 7 asserts that one of the CSSP accountants "acknowledged that the 'straight-line averaging'

approach to revenue (or expenses) cannot be found in any accepted accounting methodology with respect to (at least) a contingent fee situation where a fee is not earned unless and until a judgment or settlement is paid." I've been told by counsel that this quote does not accurately describe what occurred at the February 27, 2014 meeting. Moreover, the way Class Counsel's sentence is worded implies that Class Counsel are making an argument about the application of GAAP to a contingent fee law firm in a financial reporting context. Class Counsel did not seem to recognize that in the context of adjusting accounting records to estimate a measure of economic performance, straight-line allocation is a widely accepted method of doing so, and that the Professional Services Methodology does not have the same objectives that might inform the preparation of GAAP-based financial statements. The Professional Services Methodology is adjusting accounting records to be used as inputs to the Settlement Exhibit 4C calculations, in order to achieve a realistic measure of economic loss.

19. Similarly, Class Counsel's February 27, 2014 proposed Redline of the Proposed Policy at footnote 29 cites a number of references that, in turn, refer to GAAP for financial reporting and not to accrual-style frameworks that can be used to create realistic measurements of economic loss. For example, footnote 29 cites common GAAP references to general revenue recognition principles. Class Counsel do not explain which aspects of these general revenue recognition rules they are advocating to be used for purposes of estimating a realistic measurement of economic losses. The general references to GAAP revenue recognition principles do not contradict the fact that proportionate or straight-line allocations are pervasive in accrual accounting, and frequently are used to allocate revenue. To the extent Class Counsel intend to argue that contingent fee revenue should not be allocated to the months when the fees were earned, but instead allocated to the single month when cash was received, that approach would be inconsistent with economic reality, and with the effort to achieve a realistic measurement of actual economic loss.

F.   **Proportionate Allocation Methods in Accrual Accounting**

20.   Allocation methods are used widely in accrual accounting settings.  The goal of allocation methods is to relate "revenues, expenses, gains and losses to periods to reflect an entity's performance during a period."[8]  Among other purposes, allocation methods are used to apportion the total amount of revenue collected or expense incurred from an economic activity that takes place over multiple accounting periods to each individual accounting period.

21.   For example, assume that a real estate rental company agrees to receive $12,000 in cash in exchange for office space that will be provided to a tenant during the next year.  In calculating its monthly revenue on an accrual basis, the real estate rental company would allocate the $12,000 of cash received as revenue to each of the twelve months covered by the agreement.

22.   In order to determine the monthly revenue, the real estate rental company must select an allocation approach that will allocate the total revenue received ($12,000 in this example) over the period of economic activity (one year in this example).  An intuitive allocation approach is to allocate revenue *equally* to each month of the year.  This approach is known as straight-line allocation.  The application of straight-line allocation is pervasive in accrual accounting.

23.   Straight-line allocation is intuitive, easily calculated, and often serves as a reasonable measure of the underlying economic activity.  It often is used in accrual-style frameworks for allocating both revenue and expense across accounting periods or other categories of economic activity.  In certain settings, the accrual accounting framework of GAAP also requires that revenue be allocated on a straight-line basis.

24.   Continuing the example, *regardless* of the timing of cash receipts, an economically realistic measure of the real estate rental company revenue is to record revenue each month on a straight-line basis, i.e., $1,000 each month over the term of the rental agreement. Note that each month's revenue is unaffected by the timing of payments by the tenant.  The

---

[8]   FASB Statement of Financial Accounting Concepts No. 6, *Elements of Financial Statements*, paragraph 145.

tenant could pay the entire $12,000 amount on the first day of the rental term, on the last day of the rental term, or according to any pattern agreed to by the real estate rental company and the tenant; the timing of cash receipts by the real estate rental company is irrelevant to the measurement of revenue by the real estate rental company. Instead, the timing of monthly revenue is based on the economics of the real estate rental agreement.

25. When revenue is apportioned equally to each month of the underlying economic activity, the straight-line approach implicitly relies on the passage of time as the "allocation base." In other settings, allocation of revenue, expense, or cost can use a different allocation base to create a meaningful economic measure. If other allocation bases are used, the allocation method may be referred to as a proportionate allocation method. Indeed, because of its intuitive appeal, its ability to allocate revenue, expense or costs in an economically sensible way and its ease of application, straight-line or proportionate allocation is a pervasive tool for accounting and financial calculations. As described above, it can be used to allocate revenue to multiple accounting periods.[9] Companies also sometimes use a straight-line method to allocate revenue for software and services.[10] Expenses often are allocated using a straight-line or proportionate allocation method. Examples include: allocation of the cost of depreciable assets over their useful lives and the allocation of the cost of other post-employment benefits. In manufacturing settings, manufacturing overhead costs often are allocated using proportionate allocation methods. Companies also sometimes allocate the cost of internal service centers using a proportionate allocation method. These are just a few examples of the widespread use of straight-line or proportionate allocation methods in accounting. For the same reasons that straight-line or proportionate allocations are widely used in other settings, their use is appropriate in the Construction, Agriculture, Educational Institutions, and Professional Services Methodologies to provide a realistic measurement of economic loss.

---

[9]   Note that GAAP requires that revenue be measured as described in the real estate rental example, unless "another systematic and rational allocation basis is more representative of the time pattern in which the leased property is physically employed." See ASC 840-20-25-2.

[10]   For example, Apple Inc.'s 2012 Form 10-K states: "Revenue allocated to such rights included with iOS devices and Apple TV is recognized on a straight-line basis over two years, and revenue allocated to such rights included with Mac is recognized on a straight-line basis over four years. (See page 49.)

12

### G.    Using Proportionate or Straight-Line Allocation to Measure Revenue Arising from Contingent Fee Arrangements

26.    Provided that the total amount of cash collected from a contingent fee arrangement can be determined ex-post, this total amount can be allocated as revenue using a proportionate or straight-line allocation to the appropriate periods of economic activity.[11]   Allocating revenue in this way will achieve a systematic and rational allocation that is representative of the underlying economic activity.  As with the Professional Services Methodology, if a claimant provides appropriate, reliable and complete records of monthly effort (or variable expenses that reflect effort), revenue can be allocated using the measure of effort (or variable expenses that reflect effort) as the allocation base.  Otherwise, the revenue can be allocated monthly using time as the allocation base, i.e., recording an equal amount of revenue each month over the time period that gave rise to the contingent fee collected.

27.    For on-going litigation where the amount of cash to be collected from a contingent fee arrangement is not yet determined, the amount of future cash to be received should be estimated and allocated to months within and beyond the fiscal year along with amounts expended to date and amounts expected to be expended in the future.[12]   This approach will provide a realistic measure of economic loss.  If it is not possible to estimate the amount of future cash to be received or the amounts to be expended in the future, the measurement of economic loss will be biased upward if, as is likely, the unresolved contingent fee arrangements will be those from 2010 rather than the benchmark period.  Regardless of whether variable expenses incurred to date pending determination of contingent fee revenue are included in the P&Ls or are deferred, the measurement of economic loss will be upward biased—i.e., the measured loss will exceed the economic loss actually incurred.  Thus, if estimated amounts of future cash to be received, or amounts expected to be

---

[11]    By ex-post, I mean that the uncertainty about the amount of the contingent fee has been resolved and that amount is available to the CSSP Accounting Vendors.  To the extent that the uncertainty resolves later than 2010, it may be appropriate to obtain subsequent information to facilitate an accurate measurement of a claimant's economic loss.

[12]    If monthly records of effort or variable expenses do not provide a reasonable allocation base, then time (in months) can be used as an allocation base.

727 of 838

expended in the future from on-going litigation cannot be reasonably estimated, the claim should be held pending resolution of uncertainty of the amount of fees to be received and amounts to be expended.  After the uncertainty is resolved, it will be possible to match revenues and variable expenses to the month in which the underlying economic activities that give rise to the revenues and variable expenses occurred.  In the absence of a reasonable estimate of the amount of future cash to be received and the future amounts to be expended because of the on-going litigation, any alternative almost certainly will create an upward bias in the measurement of economic loss.  Such a result is inconsistent with the goal of achieving a realistic measurement of expected loss and therefore would eviscerate the intent of the Settlement Agreement.

## III.   CONCLUSION

28.   I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.


Date:  March 19, 2014

J. Richard Dietrich

14