# MEMORANDUM

**To:** Patrick A. Juneau
    Claims Administrator

**From:** Class Counsel

**Re:** Final BEL Policy for "Matching" Revenue and Expenses
    *Policy Keeper No. 495 (dated 3/13/2014)*

**Date:** March 19, 2014

        The final Policy Announcement dated March 13, 2014 for the Matching of Revenue and Expenses in Business Economic Loss (BEL) Claims exceeds the authority of the Claims Administrator and the Court to approve, interpret and implement the Economic & Property Damages Settlement Agreement.  The Claims Administrator is to "faithfully implement and administer the Settlement, according to its terms."[1]  The Court, having approved the Settlement,[2] should enforce the agreement as bargained for, and not modify any of its substantive provisions.[3,4]  While Class Counsel respectfully incorporate, adopt, and reserve all objections, comments and suggestions previously submitted,[5] this Memo is intended to address the fundamental and material ways in which the Policy departs from the Settlement Agreement, even as interpreted by the U.S. Fifth Circuit,[6] and the District Court upon remand.[7]

---

[1] SETTLEMENT AGREEMENT, Section 4.3.1.

[2] *See* In re Deepwater Horizon, 910 F.Supp.2d 891 (E.D.La. 2012), *aff'd,* 739 F.3d 790 (5th Cir. 2014).

[3] *See, e.g.,* Evans v. Jeff D., 475 U.S. 717, 726, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986) ("the power to approve or reject a settlement negotiated by the parties before the trial does not authorize the court to require the parties to accept a settlement to which they have not agreed"); Klier v. Elf Atochem, 658 F.3d 468, 475-476 (5th Cir. 2011) ("Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement . . . once approved its terms must be followed by the court and the parties alike. … The terms of the settlement agreement are always to be given controlling effect").

[4] In this particular case, moreover, the Economic & Property Damages Settlement Agreement stands as an independent settlement and trust, separate and apart from the requirements or effects of Rule 23. *See generally,* SETTLEMENT AGREEMENT, Section 4 (establishing the *Deepwater Horizon* Court Supervised Settlement Program, a Transition Program, and a Process for Making Claims); Section 5.12 (establishment of a Settlement Trust); Section 21.2 (severability clause); Section 21.3 (processing of submitted Claims even in the absence of final approval); Section 26.1 (regarding the binding effect of the Agreement on the Parties); and Exhibit 26 (Individual Release); HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶¶ 5-7.

[5] *See generally* CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 9, 2013) [Doc 11728-1]; CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 18, 2013) [Doc 11728-4]; MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-7]; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862]; CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES [Doc 11885]; CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS [Doc 11898]; MEMO TO CLAIMS ADMINISTRATOR (Feb. 27, 2014); CLASS COUNSEL COMMENTS, OBJECTIONS AND SUGGESTIONS (Feb. 27, 2014); *see also,* Class Counsel's Comments, Objections and Suggestions to the final March 13th Policy submitted contemporaneously herewith.

[6] The "BEL OPINION" is the decision in Appeal No. 13-30315, dated  Oct. 2, 2013, and reported as In re Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013).

[7] *See* ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] pp.1-6.

Indeed, BP Counsel repeatedly agreed during the Administrative Panel Meeting that the Fifth Circuit directed the Claims Administrator to use Accrual Basis financials,[8] and the Claims Administrator and Program Accountants have admitted that the Agricultural, Educational and Professional Services Frameworks materially depart from the Compensation analysis agreed and approved in Exhibit 4C.[9]

The Claims Administrator and the Court should:

I.      Limit the Matching Triggers and Policies to *Cash Basis* Claims, allowing Accrual Basis Claims to be submitted, processed and paid under the established methodologies;

II.     Achieve matching, where required, through the re-allocation of *Expenses only,* without averaging, smoothing, re-allocating or otherwise moving Revenues that were properly recorded in accordance with an accepted Cash, Accrual, Percentage-of-Completion, or other accepted Accounting Methodology; and

III.    Utilize the Annual Variable Margin Methodology for *all* un-matched Claims, without resorting to different Construction, Agricultural, Educational or Professional Services Frameworks which were never negotiated nor agreed to, and are in many ways inconsistent with the Settlement Agreement.

In the alternative, the Claims Administrator and the Court should, at the very least:

a.      Limit the matching generally – and any Revenue adjustments in particular – to the specific transaction or transactions which 'triggered' or caused the Claim to be "un-matched", rather than re-calculating the entire Claim;  and

b.      Not re-visit Causation under Exhibit 4B where Contemporaneous P&Ls objectively indicate a loss caused by the Spill.

---

[8] During the Administrative Panel Meeting on March 12, 2014, when the issue of Accrual Claims was first raised, BP Counsel indicated that the "problem" was that some Claimants called their Claims "Accrual" when they really were not – indicating that Accrual Claims that really were in fact supported by Accrual-basis P&Ls would not require further matching.  Later in the meeting, BP Counsel expressly stated that: "The Court requires accrual-based accounting." And, again, several minutes later: "We were instructed by the Fifth Circuit to use accrual-style accounting." - BP Counsel, Wendy Bloom, March 12, 2014.

[9] The Claims Administrator specifically conceded that "a deviation from the existing methodology set forth in Exhibit 4C was deemed necessary" for Agricultural, Educational and Professional Services Claims. *See* ATTACHMENT D and ATTACHMENT E to Proposed Policy No. 495 (Feb. 12, 2014). During the meeting with the Program Accountants on February 20, 2014, Mr. John Petzold from PwC further acknowledged that the proposed Agriculture and Educational Frameworks were not based on the Settlement Agreement, but rather, constituted a new methodology.  Similarly, Mr. Ted Martens from PwC acknowledged that the Professional Services Framework was not based on the Settlement Agreement (nor any accepted Accounting Methodology), but rather, constituted a new methodology.

## Accrual Claims Require No Further Matching

The BEL Panel specifically states, at least seven times, that Accrual Claims are already "sufficiently matched" or otherwise "required" under the Settlement Agreement:

- "BP acknowledged that many claims presented data that '*sufficiently* *match*' revenue and expenses. This is because they apply the *accrual* accounting recognition and matching principles BP advances here as a matter of their ordinary record-keeping";[10]

- "Regardless of whether Exhibit 4C requires matching when it has not been undertaken in the ordinary course of record-keeping, it cannot be said to permit ignoring *sufficiently* *matched* data from *accrual-basis* claimants";[11]

- "As to *accrual-basis* claimants, matching is '*required*' in the sense that claimants are not permitted to present statements which contain inconsistent methodologies. This means that if a claimant's records are already matched, it must submit them in that form");[12]

- "the agreement cannot be read to permit ignoring '*sufficiently*-*matched*' revenue and expenses from *accrual-basis* claimants";[13]

- "At least as to claims presented on an *accrual-basis,* not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly *insisted* *on* *it*";[14]

- "We remand because the district court did not acknowledge the *requirement* of matching that is foundational for *accrual-basis* claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims";[15]

- "Part I of the panel opinion identifies the crucial question for remand: should matching be required for **all** claims when it is clearly *required* for many?"[16]

Echoing the Court's thinking, BP Counsel expressly acknowledged and agreed during the Administrative Panel Meeting that:

- "The Court requires accrual-based accounting"; and

- "We were instructed by the Fifth Circuit to use accrual-style accounting."[17]

---

[10] BEL OPINION, p.12 (732 F.3d at 334) (emphasis supplied).

[11] BEL OPINION, p.15 (732 F.3d at 335) (some emphasis added).

[12] BEL OPINION, p.16 fn.5 (732 F.3d at 336 n.5) (emphasis supplied).

[13] BEL OPINION, p.18 (732 F.3d at 337) (emphasis supplied).

[14] BEL OPINION, p.20 (732 F.3d at 338) (emphasis supplied).

[15] BEL OPINION, p.24 (732 F.3d at 339) (emphasis supplied).

[16] BEL OPINION, p.38 (732 F.3d at 346) (Southwick, J., concurring) (some emphasis added).

[17] Statements by BP Counsel Wendy Bloom during Administrative Panel Meeting, March 12, 2014.

Indeed, the entire basis of the BEL Opinion was that, because Accrual Claims are generally matched, and because the Parties presumably intended that all Class Members be treated the same, then Cash Claims should also generally be matched in the way that Accrual Claims are.[18]

This same logic was adopted by Judge Barbier upon remand: "it is clear that the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[19]

While Class Counsel respectfully disagree that the original interpretation and application of Exhibit 4C resulted in anything to the contrary,[20] there is no basis to alter the existing matching in Accrual Claims, which the BEL Opinion indicates BP "insisted upon" and repeatedly describes as both "sufficient" and "required".

## Matching Should be Accomplished Through the Re-Allocation of Expenses Only

The basis of the BEL Panel's decision – upon which Judge Barbier's December 24th Order is also based – is that the term "corresponding variable expenses" within part 2 of the Variable Profit definition:

> could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated. In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract *corresponding* expenses over the same [Benchmark or Compensation] time period.[21]

Clearly, the line item to be adjusted is Expense – not revenue.

---

[18] *See, e.g.,* BEL OPINION, p.19 (732 F.3d at 337) ("Because cash accounting does not inherently recognize the relationships between cash flows and their underlying transactions, the term 'corresponding variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C"); BEL OPINION, p.21 (732 F.3d at 338) ("The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims?"); BEL OPINION, p.38 (732 F.3d at 346) (Southwick, J., concurring) ("Part I of the panel opinion identifies the crucial question for remand:  should matching be required for *all* claims when it is clearly required for many?").

[19] ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] p.3.

[20] The underlying assumption to BP's argument is that two hypothetical businesses suffering identical losses but keeping their books differently would be treated differently under the Settlement Agreement.  However, the reality is that similar businesses of a similar size and nature typically keep their books under similar accounting methodologies.  Class Counsel are not aware of the hypothetical "two jet ski rental shops just down the beach from each other" that kept their books differently and were therefore treated in materially different ways.  Class Counsel believe that most jet ski rental shops of the same size and nature will tend to keep their books in the same or similar ways.  Indeed, BP's complaints focus on certain groups of businesses – *e.g.* construction, agriculture, professional services – who *all* keep their books under similar cash-basis methodologies.  The Settlement, moreover, treats all Class Members similarly by applying the same common, objective and transparent frameworks to all businesses, based on their Contemporaneous business records. Finally, BP's argument (and, frankly, the Claims Administrator's initial P&L Policy) ignores the fact that the Settlement Program should maximize the Compensation Amount of each and both of the hypothetical Claimants under Section 4.3.8. *See, e.g.,* OPPOSITION TO BP MOTION FOR RECONSIDERATION (Feb. 18, 2013) [Doc 8963-54] p.28; HERMAN DECLARATION (Nov. 12, 2013) [Doc 11833-1] ¶8.

[21] BEL OPINION, p.18 (732 F.3d at 337) (emphasis in original).

Not only does the BEL Panel never expressly discuss the re-allocation of revenue in the context of matching, but the only explicit reference to revenue in the BEL Opinion specifically *rejects* the proposition that uneven "cash flows" should be re-allocated or smoothed:

> BP's primary concern seems to be the *uneven cash flows* of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed.[22]

Nor is the re-allocation of properly recorded revenue supported by accepted Accounting Principles.

Paragraph 83(a) of FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, states that revenue and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenue is realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. FASB Codification, §605-10-25-1.[23] The Construction, Agriculture, Education and Professional Services Frameworks violate this principle by revising the Contemporaneous Profit & Loss Statements to recognize revenue in periods well before they could be recognized under any known accounting standard.

As noted by the Louisiana and Alabama Societies of Certified Public Accountants, appearing as *amici curiae*:

> BP's decision to embrace monthly-internal financial statements, prepared in the ordinary course of business, was made with the undisputed understanding that in preparing such statements most claimants use either the cash basis, income tax basis, modified accrual, or contractual basis of accounting (and not GAAP). The brief submitted by the academic amici never mentions this uncomfortable fact and completely ignores the terms of the Settlement Agreement. The Professors simply recite pages of GAAP concepts that are not recognized by the Settlement Agreement and are utilized by large multi-national companies, such as BP, in producing financial statements reviewed by regulators.
>
> But in the real world, where the thousands of CPA amici here practice, most companies throughout the Gulf Coast Region keep their monthly accounting records on perfectly acceptable and well-recognized bases other than GAAP (which are referred to in authoritative accounting literature as "other comprehensive bases of accounting") and are widely used alternatives to the numerous and often complex accounting

---

[22] BEL OPINION, p.25 (732 F.3d at 340); *see also* ORDER AND REASONS [Doc 12055] pp.5-6.

[23] The Securities & Exchange Commission follows this concept of revenue recognition. *See* Codification of STAFF ACCOUNTING BULLETINS TOPIC 13: REVENUE RECOGNITION, found at http://www.sec.gov/interps/account/sabcodet13.htm.

requirements prescribed by GAAP. These recognized bases of accounting other than GAAP include:

- ° cash basis (including modified cash basis)
- ° regulatory basis
- ° tax basis
- ° contractual basis
- ° modified accrual basis

The cash basis and tax basis methods are the most prevalent.[24]

Section 446(a) of the Internal Revenue Code, which articulates a general rule for methods of accounting, states that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Simply put, revenue recognition is based on the accounting method used by a business.[25]

Nevertheless, and in any event, there is no GAAP, Accrual or other accounting standard which allows – much less requires – a company to recognize or record revenue *before* (or after) it is 'earned' based on 'revenue attribution criteria' or past or future 'business activities'.

As verified by Dr. Mark Kohlbeck:

Recognition of revenue and expenses under the accrual-basis of accounting (GAAP) is based on the revenue recognition principle and the expense recognition principle. The revenue recognition principle requires the revenue to be both earned and realizable to be recognized (Concepts Statement No, 5, ¶83)

* * *

Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession.[26]

CPA Allen Carroll further confirms that:

GAAP recognition rules and 'matching' most often apply to expense recognition not revenue recognition….

---

[24] Brief of Amici Curiae Certified Public Accounting Societies in Support of Appellees, No.13-30315 (June 24, 2013), at pp.4-5 [Fifth Cir. Doc. 00512285581, at 11-12]; *citing*, Panzeca Declaration (Feb. 18, 2013) [Doc 8963-85], ¶14 [R.15968]; *see also*, Supplemental Declaration of W. Allen Carroll (Oct. 24, 2013) [Doc. 11740-1].

[25] Brief of Amici Curiae, at p.5 [Fifth Cir. Doc. 00512285581, at 12].

[26] Declaration of Dr. Mark Kohlbeck, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10, (emphasis supplied); *see also*, Panzeca Declaration (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; Declaration of Allen Carroll (Jan. 16, 2013) [Doc 8963-77], p.2; Asher Declaration (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; Stutes Declaration (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; Supplemental Carroll Declaration (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14.

[A] proposal to move revenue to match expenses is backwards and violates the very concept referred to as matching in BP's out of date textbook....

The matching approach that BP advocates is not matching in any sense recognized in the accounting world, but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses.[27]

Based on the Settlement Agreement, the BEL Opinion, and accepted Accounting Principles, any required matching should be accomplished by a re-allocation of Variable Expenses alone, and not by any re-allocation of properly recorded revenues.

## All BEL Claims that Are Not "Sufficiently Matched" Should be Matched under the Annual Variable Margin Methodology

The Court's decision on remand was based largely on the finding that "the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[28]

Indeed, the Settlement Agreement itself dictates that that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."[29]

As noted, the Claims Administrator and Program Accountants concede that the proposed new Agricultural and Educational Frameworks depart from the Exhibit 4C analysis,[30] and that the proposed new Professional Services Framework not only departs from the Exhibit 4C analysis,[31] but also departs from any standard or accepted accounting methodology.[32]

---

[27] SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14.

[28] ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] p.3.

[29] SETTLEMENT AGREEMENT, Section 4.4.7.

[30] The Claims Administrator specifically concedes that "a deviation from the existing methodology set forth in Exhibit 4C was deemed necessary." See ATTACHMENT D to Proposed Policy No. 495 (Feb. 12, 2014). During the meeting with the Program Accountants on February 20, 2014, Mr. John Petzold from PwC further acknowledged that the proposed Agriculture / Educational Framework was not based on the Settlement Agreement, but was a new methodology, which, when using only one benchmark year, effectively eliminates the "Step Two" Calculation to which the BEL Claimant is entitled under Exhibit 4C.

[31] The Claims Administrator specifically concedes that "deviation from the existing methodology set forth in Exhibit 4C was deemed necessary." See ATTACHMENT E to Proposed Policy No. 495 (Feb. 12, 2014). This was further confirmed by Ted Martens from PwC during the meeting with Program Accountants on February 20, 2014.

[32] During the meeting with the Program Accountants on February 20, 2014, Mr. Ted Martens from PwC acknowledged that the 'straight line averaging' approach to revenue (or expenses) cannot be found in any accepted accounting methodology with respect to (at least) a contingent fee situation, where a fee is not earned unless and until a judgment or settlement is paid. See also, generally, CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; BRIEF OF AMICI CURIAE CERTIFIED PUBLIC ACCOUNTING SOCIETIES, No.13-30315 (June 24, 2013); FASB CONCEPTS STATEMENT 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraph 83(b); Con 6, Page 35, Footnote 56 references Concepts Statement 5 (Par. 83 and Footnote 50); SECURITIES AND EXCHANGE COMMISSION STAFF ACCOUNTING BULLETIN No. 104 (SAB 104), Pages 10 and 1; KIESO, WEYGANDT & WARFIELD, Intermediate Accounting (14th Ed.), at p.60; DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13-14.

It appears that the development of these new frameworks (as well as the new Construction Framework) was motivated by a desire to achieve some vague, subjective and undefined notion of "economic reality".

Clearly, there is no indication or directive from the BEL Panel that either the Claims Administrator or the Court would tear up the Agreement, start from scratch, and develop a completely new methodology that would attempt to "achieve a realistic measure of economic loss."

The BEL Panel was simply weighing the two proffered interpretations of the term "corresponding" as used in Exhibit 4C, and concluded that, *as between the two,* BP's proffered interpretation was *more* in line with "economic reality".

Upon remand, the Court agreed that the word "corresponding" within the definition of "Variable Profit" should be interpreted to suggest the type of matching of expenses to revenue that one would typically find in accrual-based accounting profit & loss statements.

*However,* this does not in any way suggest or imply that the entire 4C Compensation Framework should be tossed out the window in favor of some new and unspecified standard of "realistic measure of economic loss" – particularly in cases where such methodologies would violate accepted accounting principles.

Class Counsel respectfully submit that the Claims Administrator does not have the authority to abandon the negotiated terms of the Settlement Agreement, and could ensure sufficient matching for all industry groups using the basic Average Variable Margin Methodology.

This approach is supported by not only the absence of industry-based alternative frameworks within Exhibit 4C for BEL Claims,[33] but is also required by Section 4.4.7, which dictates that that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."

### Where Only One or Several Discreet Transactions 'Trigger' or Cause the Claim to be "Un-Matched" the Program Should Simply Re-Allocate that Revenue and/or Expense, Rather Than Completely Changing the Contemporaneous P&Ls and Re-Calculating the Entire Claim

The matching required under the BEL Opinion generally – and any Revenue adjustments in particular[34] – should be limited, where possible, to the specific transaction or transactions which 'triggered' or caused the Claim to be "un-matched".

For example, where one 'spike' in recorded revenue or other anomaly causes a Claim to be "un-matched" under the Claims Administrator's criteria for Identification of Unmatched Claims, the Program should simply re-allocate the expense and/or revenue associated with that 'spike' or other anomaly, rather than deconstructing the Contemporaneous P&Ls and Re-Calculating the entire Claim.

---

[33] *See also, e.g.,* MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1] pp.6-7; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862] p.9.

[34] Class Counsel, of course, disagree with any re-allocation of revenue.

The BEL Opinion itself rejects either an increased burden on the Claimant to produce significant additional documentation and other information or a forensic analysis of each Claim by the Settlement Program:

- The documents identified in Exhibit 4A "presumably would allow accountants _fairly, if at times imperfectly,_ to 'match' revenues and expenses if such were required."[35]

- "the difference is between what claimants had to present … and what the Administrator was thereafter to do"[36]

- "the Benchmark and Compensation periods were referring to months of the same name, _without any complex analysis of what type of business activities took place within those months._"[37]

The additional documents, records, information and complex analyses called for under the new Construction, Agricultural, Educational and Professional Services Frameworks are not what was contemplated under Section 4.3.7, Exhibit 4A or Exhibit 4C of the Settlement Agreement – even as interpreted by the BEL Panel.

## The Program Should Not Alter or Revisit the Causation Test under Exhibit 4B

Even assuming _arguendo_ that some 'smoothing' or other re-allocation of revenue should occur for Exhibit 4C purposes,[38] there is absolutely no basis under the Settlement Agreement or the BEL Opinion to thereafter re-visit the issue of Causation under Exhibit 4B.

The entire basis of the BEL Opinion – as well as the District Court's decision on remand – centered on the "Variable Profit" definition and specifically the interpretation of "corresponding variable expenses" in Exhibit 4C.[39]

The Causation Test found in Exhibit 4B is a pure revenue test, which has nothing to do with expenses. The terms "Variable Profit" and "variable expenses" are found nowhere in the Exhibit 4B Framework.

Judge Southwick specifically noted in the original BEL Opinion that: "**No one on appeal is challenging Exhibit 4B.**"[40]

---

[35] BEL OPINION, p.20 (732 F.3d at 337) (emphasis supplied).

[36] BEL OPINION, p.20 (732 F.3d at 337).

[37] BEL OPINION, p.24 (732 F.3d at 340) (emphasis supplied).

[38] Class Counsel, of course, disagree with any re-allocation of revenue.

[39] _See_ BEL OPINION, pp.9-10, 16-24 (732 F.3d at 332, 336-339); ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] pp.4-5.

[40] BEL OPINION, p.39 (732 F.3d at 347) (Southwick, J., concurring); _see also,_ BEL OPINION, p.37 (732 F.3d at 346) (Southwick, J., concurring) (does not join in Part II of Judge Clement's opinion, because it implies "an invalidity to the Settlement Agreement's _causation framework,_ **which no one challenges**") (emphasis supplied). _See also_ In re Deepwater Horizon, No. 13-30315, 2014 WL 841313 (5th Cir. March 3, 2014) (affirming District Court's interpretation and application of the BEL Causation test under Exhibit 4B).

Moreover, and as reflected by the ADDENDUM TO CAUSATION REQUIREMENTS FOR BUSINESS ECONOMIC LOSS CLAIMS AND COMPENSATION FRAMEWORK FOR BUSINESS ECONOMIC LOSS CLAIMS, the two tests are not only separate and distinct, but the Claimant is expressly permitted to use *different months* for the Causation Test than for the Compensation analysis.

The three Scenarios included as examples within this ADDENDUM further reflect that the Causation Test under Exhibit 4B would be applied first.

It likely goes without saying that, in the ordinary course of human events, B comes before C.

On November 2, 2013, Class Counsel asked BP to provide "any and all support for the proposition stated in Footnote 1 of BP's November 1st Letter that the Compensation Framework in Exhibit 4C would be applied *before* the Causation Test under Exhibit 4B"?[41]   To the best of Class Counsel's knowledge and recollection, BP did not respond.  Nor are Class Counsel aware of any discussions, written communications or other evidence that the Parties intended or agreed that the Compensation Framework would be applied first.[42]

Under the original BEL Opinion, and particularly the District Court's Order of December 24, 2013 – which has now been affirmed with respect to causation by the BEL Panel on appeal[43] – there is absolutely no basis to alter or re-visit the Exhibit 4B Causation analysis based on adjustments to "corresponding variable *expenses*" under Exhibit 4C.

## Additional Comments, Objections and Suggestions

Class Counsel respectfully incorporate by reference all previous submissions,[44] as well as the additional comments, objections and suggestions contained within the attached "red-line" to the Claims Administrator's March 13, 2014 Policy No. 495, submitted contemporaneously herewith.

Enclosures
cc: Counsel for BP

---

[41] E-Mail from Herman to BP Counsel George Brown, et al (Nov. 2, 2013).

[42] *See, e.g.,* GODFREY E-MAIL (Feb. 17, 2012) [Doc 8963-58] No.2 ("The Compensation Framework is not the "causation test," which determines eligibility to claim that there was a loss *caused by* the oil spill. Rather, *once the causation test has been satisfied* (or presumed, as in Zone A for example), the Compensation Framework is designed to determine the compensation amount for a post-spill loss") (some emphasis added); HOLSTEIN LETTER TO JUNEAU (re Alternative Causation) (Sept. 28, 2012) [Doc 8963-67] ("If a claimant has submitted the required documentation under the Business Economic Loss (BEL) Documentation Requirements (Ex. 4A), and these documents … establish that the claim satisfies the requirements of the BEL Causation Framework (Ex. 4B), *then* Claimant Compensation should be calculated pursuant to the provisions of the BEL Compensation Framework (Ex. 4C)") (emphasis supplied).

[43] *See* In re Deepwater Horizon, No. 13-30315, 2014 WL 841313 (5th Cir. March 3, 2014).

[44] *See generally* CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 9, 2013) [Doc 11728-1]; CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 18, 2013) [Doc 11728-4]; MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1]; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862]; CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES [Doc 11885]; CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS [Doc 11898]; MEMO TO CLAIMS ADMINISTRATOR (Feb. 27, 2014); CLASS COUNSEL COMMENTS, OBJECTIONS AND SUGGESTIONS (Feb. 27, 2014).

**POLICY ANNOUNCEMENT**

**POLICY 495:  BUSINESS ECONOMIC LOSS CLAIMS:
MATCHING OF REVENUE AND EXPENSES**

**[Class Counsel Comments, Objections and Suggestions – March 19, 2014] [1]**

<u>**Introduction**</u>

The District Court has instructed the Claims Administrator "to adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses."  (Rec. Doc. 12055, p. 37 of 43).

Based upon the U.S. 5th Circuit Court of Appeals' decision of October 2, 2013 and the District Court's Order & Reasons of December 24, 2013 on remand, the Claims Administrator understands that the following principles are to be applied in evaluating BEL claims under Exhibit 4C of the Settlement Agreement:

1. The Settlement Agreement contemplates that loss calculations are to be based upon accounting records that sufficiently match revenues with expenses.

2. The Settlement Agreement's "provision for subtracting corresponding variable expenses requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses were recorded." (Rec. Doc. 12055, p. 5 of 43).

   [The basis of the BEL Panel's decision, upon which Judge Barbier's December 24th Order is also based, is that the term "corresponding variable expenses" within part 2 of the Variable Profit definition "could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated.  In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract *corresponding* expenses over the same [Benchmark or Compensation] time period." BEL OPINION, p.18 (732 F.3d at 337) (emphasis in original).  This clearly indicates that the line item to be adjusted is expense – not revenue.[2]]

---

[1] Class Counsel are submitting contemporaneously herewith a Memorandum to the Claims Administrator dated March 19, 2014.  The over-arching objections set forth therein, as well as the general objections and other comments set forth by Class Counsel in response to the Underlying Issues / Principles contained herein are respectfully incorporated and asserted throughout this Policy.  The failure to object to any specific proposed term or provision should not be deemed a waiver of any objection to, nor agreement with, the Policy, Framework or sub-part in question.

[2] *See also* Part I(D) of the BEL OPINION, at p.25 (732 F.3d at 340), *and, generally* CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2].

444895
3/13/14 [Class Counsel's Comments, 3/19/2014]

3. Some claimant-submitted contemporaneous accounting records inherently match revenues with expenses sufficiently for purposes of the Settlement Agreement. Others do not. (732 F. 3d at 334, 335).

4. For those "unmatched claims," the claimant-submitted accounting records are to be adjusted "in light of the necessity of revenue and expense matching to realistic measurement of economic loss." (732 F. 3d at 346 – 347).

[As provided, to some extent, in the revised final policy *infra*, Claimants should be provided with the opportunity to submit Contemporaneous Accrual (or other "sufficiently matched") monthly P&Ls, to be evaluated in the manner that BEL Claims have historically been processed under Exhibit 4C.  Class Counsel respectfully suggest that the Policy, as written, appears to require significantly more source documents and scrutiny than is contemplated under the Settlement Agreement.]

## Policy Development Process

In the process of developing this policy as directed by the Court, the Claims Administrator has conducted extensive consultations with the Court Supervised Settlement Program ("CSSP") Accounting Vendors (PricewaterhouseCoopers and Postlethwaite & Netterville) and has received significant input from both BP and Class Counsel.  The Claims Administrator's efforts in this regard have included:

- Both BP and Class Counsel made written submissions detailing the frameworks that they propose be implemented to accomplish the "matching" required by the Court.  These written submissions were reviewed in detail by the Claims Administrator and the CSSP Accounting Vendors.

- An extended Q&A session was conducted to allow the CSSP Accounting Vendors to gain a more complete understanding of the proposals submitted by both sides.  There were numerous participants in this informational session, including BP, Class Counsel, accounting experts representing both parties, CSSP Accounting Vendors, the Claims Administrator and various members of the CAO staff.

- The CSSP Accounting Vendors conducted numerous independent working sessions over a period of approximately four months.

- The Claims Administrator and the CSSP Accounting Vendors conducted several joint working sessions over a period of approximately three months.

- An initial draft of this Policy was provided to both BP and Class Counsel, after which the Claims Administrator and the CSSP Accounting Vendors presented the Policy to BP, Class Counsel, and accounting experts representing both parties.  An additional extended Q&A Session was conducted at that time.

2

- Both BP and Class Counsel made written submissions responding to the draft Policy. These written submissions were reviewed in detail by the Claims Administrator and the CSSP Accounting Vendors. Revisions to the Policy were made based upon additional input from the parties and after further analysis by the CSSP Accounting Vendors.

- This final written policy has been adopted only after such thorough input, analysis, consideration and consultation.

## Underlying Issues / Principles

Based upon the CSSP's experience in reviewing claims and analyzing accounting records submitted to the CSSP since the inception of this settlement program and in light of the rulings and directives received from the Court, the Claims Administrator, in consultation with the CSSP Accounting Vendors, has arrived at the following conclusions relative to the "matching" issues at hand:

1. The claimant's method of accounting (cash vs. accrual vs. other) is not necessarily determinative of whether revenues and expenses are sufficiently "matched" as per the orders of the Court.

   [Class Counsel respectfully disagree. The entire basis of the BEL Opinion was that, because Accrual Claims are generally matched, and because the Parties presumably intended that all Class Members be treated the same, then Cash Claims should also generally be matched in the way that Accrual Claims are.[3] This same logic was adopted by Judge Barbier upon remand: "it is clear that the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[4] While Class Counsel respectfully disagree that the original interpretation and application of Exhibit 4C resulted in anything to the contrary,[5]

---

[3] *See generally* CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 9, 2013) [Doc 11728-1] pp.1-2; CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 18, 2013) [Doc 11728-4] pp.2-4; MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1] pp.5-6; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862] p.1; CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES [Doc 11885] pp.1-2; CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS [Doc 11898] pp.2-4.

[4] ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] p.3.

[5] The underlying assumption to BP's argument is that two hypothetical businesses suffering identical losses but keeping their books differently would be treated differently under the Settlement Agreement. However, the reality is that similar businesses of a similar size and nature typically keep their books under similar accounting methodologies. Class Counsel are not aware of the hypothetical "two jet ski rental shops just down the beach from each other" that kept their books differently and were therefore treated in materially different ways. Class Counsel believe that most jet ski rental shops of the same general size and nature will likely keep their books under the same or similar methodologies. Indeed, BP's complaints focus on certain groups of businesses – *e.g.* construction, agriculture, professional services – who *all* keep their books under similar cash-basis methodologies. The Settlement, moreover, treats all Class Members similarly by applying the same common, objective and transparent frameworks to all businesses, based on their Contemporaneous business records. Finally, BP's argument (and, frankly, the Claims Administrator's initial P&L Policy) ignores the fact that the Settlement Program should maximize the Compensation Amount of each and both of the hypothetical Claimants under Section 4.3.8. *See, e.g.,* OPPOSITION TO BP MOTION FOR RECONSIDERATION (Feb. 18, 2013) [Doc 8963-54] p.28; HERMAN DECLARATION (Nov. 12, 2013) [Doc 11833-1] ¶8.

3

there is no basis to alter the existing matching in accrual-basis claims, which the BEL Opinion indicates BP "insisted upon" and repeatedly describes as both "sufficient" and "required".[6]]

2.  Different industries tend to present different issues and require different methodologies in terms of trying to achieve sufficient "matching."

    [This may be true in the abstract, or as a matter of accounting generally, but there is nothing in the Settlement Agreement that would indicate that the Parties intended or agreed to apply multiple, fundamentally different compensation frameworks to BEL Claims based on the type of business or industry.  Indeed, Section 4.4.7 dictates that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."[7]]

3.  In an effort to achieve sufficient "matching" in such a way that the accounting records may serve as a basis for "realistic measurement of economic loss," differing analyses are required depending upon the specifics of the particular business, including industry type and nature and duration of revenue or expense cycles.

---

[6] *See* BEL OPINION, p.12 (732 F.3d at 334) ("BP acknowledged that many claims presented data that "*sufficiently match*" revenue and expenses. This is because they apply the *accrual* accounting recognition and matching principles BP advances here as a matter of their ordinary record-keeping") (emphasis supplied); BEL OPINION, p.15 (732 F.3d at 335) ("Regardless of whether Exhibit 4C requires matching when it has not been undertaken in the ordinary course of record-keeping, it cannot be said to permit ignoring *sufficiently matched* data from *accrual-basis* claimants") (emphasis supplied); BEL OPINION, p.16 fn.5 (732 F.3d at 336 n.5) ("As to *accrual-basis* claimants, matching is '*required*' in the sense that claimants are not permitted to present statements which contain inconsistent methodologies. This means that if a claimant's records are already matched, it must submit them in that form") (emphasis supplied); BEL OPINION, p.18 (732 F.3d at 337) ("the agreement cannot be read to permit ignoring '*sufficiently-matched*' revenue and expenses from *accrual-basis* claimants") (emphasis supplied); BEL OPINION, p.20 (732 F.3d at 338) ("At least as to claims presented on an *accrual-basis*, not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly *insisted on it*") (emphasis supplied); BEL OPINION, p.24 (732 F.3d at 339) ("We remand because the district court did not acknowledge the *requirement* of matching that is foundational for *accrual-basis* claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims") (emphasis supplied); BEL OPINION, p.38 (732 F.3d at 346) (Southwick, J., concurring) ("Part I of the panel opinion identifies the crucial question for remand:  should matching be required for *all* claims when it is clearly *required* for many?") (emphasis added).  *See also, e.g.,* BEL OPINION, p.19 (732 F.3d at 337) ("Because cash accounting does not inherently recognize the relationships between cash flows and their underlying transactions, the term 'corresponding variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C"); BEL OPINION, p.21 (732 F.3d at 338) ("The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims?").

[7] *See also, e.g.,* MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1] pp.6-7; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862] p.9.  *See also,* ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] p.3 ("it is clear that the parties did discuss and were in agreement that similarly situated claimants must be treated alike").

4

[Consistent with this observation, during the meeting with the Program Accountants on February 20, 2014, Mr. Charles Hacker from PwC indicated that, in developing Policy No. 495, the Program Accountants were attempting to achieve a "realistic measure of economic loss."  In addition to what is noted *supra,* there is no indication or directive from the BEL Panel that the Claims Administrator was to tear up the Agreement, start from scratch, and develop a completely new methodology that would attempt to "achieve a realistic measure of economic loss."  The BEL Panel was simply weighing the two proffered interpretations of the term "corresponding" as used in Exhibit 4C, and concluded that, *as between the two,* BP's proffered interpretation was *more* in line with "economic reality".  Upon remand, Judge Barbier agreed that the word "corresponding" within the definition of "Variable Profit" should be interpreted to suggest the type of matching of expenses to revenue that one would typically find in accrual-based accounting profit & loss statements.  *However,* this does not in any way suggest or imply that the entire 4C Compensation Framework should be tossed out the window in favor of some new and unspecified standard of "realistic measure of economic loss" – particularly in cases where such methodologies would violate accepted Accounting Methodologies.]

4.  It is not feasible in the context of a class-wide settlement involving thousands of different claims, with each claimant's financial information potentially spanning a time period in excess of four years, to attempt to match specific expenses to specific revenues on an individual transaction by transaction basis.  The time, effort and expense required under this approach would be prohibitive.  Further, it is unlikely that such individualized matching of specific expenses to specific revenues would be possible based on information and documentation available to the claimants or the CSSP.

    [Class Counsel strongly agree, and further suggest that this is supported by Judge Clement's BEL Opinion.[8]]

5.  If a claimant's contemporaneous P&Ls submitted to the CAO are deemed to be 'sufficiently matched' based on an assessment by the CSSP Accounting Vendors, such P&Ls will be utilized in calculating compensation under the Settlement Agreement.  In utilizing such contemporaneous P&Ls, corrections will be made for any accounting "errors" identified in the ordinary course, by the CSSP Accounting Vendors.[9]  [See comments in fn.9]

---

[8]  *See, e.g.,* BEL OPINION, p.20 (732 F.3d at 337) (the documents identified in Exhibit 4A "presumably would allow accountants *fairly, if at times imperfectly,* to 'match' revenues and expenses if such were required") (emphasis supplied); BEL OPINION, p.24 (732 F.3d at 340) ("the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis* of what type of business activities took place *within those months*") (emphasis supplied).

[9]  "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the

444895
3/13/14

6. It is the CSSP's considered assessment that, for the majority of claimants, sufficient "matching" of revenue and expenses will be best accomplished through an annual variable margin methodology which totals variable expenses for each Fiscal Year[10] and allocates them to each month on a pro-rata basis of monthly revenues for the same period. This approach reasonably accomplishes sufficient "matching" and is the most feasible methodology in the context of a class-wide settlement.

7. Depending on the specifics of a given business, it may be appropriate to make adjustments to the claimant's financials as to the timing of the recognition of either revenues or expenses or both.

[Class Counsel do not believe that either the Settlement Agreement or the BEL Opinion supports the averaging or 'smoothing' or other moving or re-allocation of revenue.[11] Parts I(B) and I(C) of the BEL Opinion – and Judge Barbier's decision on remand – all turn on the interpretation of "corresponding variable *expenses*".[12] The only part of the BEL Opinion that directly addresses revenue specifically <u>rejects</u> BP's argument that spikes in revenue (indeed "uneven *cash flows*") should

---

Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made using the best available information at the time. [The "errors" that are corrected must be clear, unambiguous and objective. Class Counsel believe that "mistakes in applying accounting principles" is too broad, and allows for too much subjectivity. The Claims Administrator has already developed a Policy for excluding certain items from the calculation of "revenue". While Class Counsel have disagreed with some of the Claims Administrator's decisions in this regard (*see* Memo dated Aug. 28, 2013), these "error" adjustments should be limited to (at most) the items specified in Policy No. 328. Additionally, Contemporaneous P&Ls should generally be accepted in light of Exhibit 4A, the liberal definition of "Contemporaneous" in Section 38.38, and the Claimant-friendly requirements of Sections 4.3.7 and 4.3.8; the BEL Opinion should not be a license or excuse to disregard the terms of the Settlement Agreement, to inject overly subjective determinations, or to conduct a forensic audit of each claim.]

[10] A claimant's Fiscal Year is the twelve month period that the claimant uses for preparing its annual financial statements and, in the majority of cases, for filing its annual tax return with the Internal Revenue Service. The fiscal year may or may not be the same as a calendar year. In the event that a claimant's Fiscal Year differs from the claimant's annual tax reporting period, the tax reporting period will typically be utilized.

[11] *See generally* Class Counsel *In Camera* Submission (Oct. 9, 2013) [Doc 11728-1] p.1; Memo to Claims Administrator (Oct. 23, 2013) [Doc 11728-1] pp.1-4; Class Counsel Brief on the BEL Remand Issue [Doc 11862] pp.1-2; Class Counsel Submission of Proposal for Matching Expenses [Doc 11885] pp.1-2; Class Counsel Statement: Revenue Recognition [Doc 11885-2] pp.1-4; Class Counsel Comments on BP "Matching" Proposals [Doc 11898] pp.2-4.

[12] *See* BEL Opinion, pp.9-10, 16-24 (732 F.3d at 332, 336-339); Order and Reasons (Dec. 24, 2013) [Doc 12055] pp.4-5.

6

be averaged, smoothed, or otherwise adjusted based upon "comparable" economic activities.[13]]

8.  The operating characteristics of certain businesses will not lend themselves to the application of an annual variable margin methodology.  The following industries in particular each warrant a customized methodology in order to achieve sufficient matching in a way that reasonably depicts economic reality for purposes of loss measurement: construction, agriculture, education and professional services.

[For the reasons *supra,* and as more fully set forth in Class Counsel's Memorandum to the Claims Administrator dated March 19, 2014, (as well as *infra* herein), Class Counsel disagree.]

9.  In order to achieve sufficient "matching," adjustments to the claimant's contemporaneous accounting records are best made by the CSSP Accounting Vendors after appropriate inquiry and gathering of additional documents and/or information, if necessary, from the claimant.[14]

[See Comments re No. 4 *supra,* (including fn.8 *supra*), and Comments in fn.14. Claimants should not be *required* to prepare or provide additional documentation that is not required under Exhibit 4A.  Further, and consistent with Section 4.3.7,

---

[13] BEL OPINION, p.25 (732 F.3d at 340) ("BP's primary concern seems to be the *uneven cash flows* of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed") (emphasis supplied); *see also,* ORDER AND REASONS [Doc 12055] pp.5-6.

[14] As per Exhibit 4A of the Settlement Agreement, claimants will be required to provide contemporaneous P&L statements that identify the dates on which they were created.  In addition to, but not in lieu of the contemporaneous P&Ls, claimants may also elect to submit amended P&Ls that they believe are sufficiently matched. [All Accrual-based P&Ls should be sufficient.] Regardless of whether or not the claimant submits amended P&Ls, the CSSP Accounting Vendors will utilize contemporaneous P&Ls as a starting point for any claim.  The CSSP Accounting Vendors will require detailed information to understand and verify the changes made by claimants to achieve sufficiently matched P&Ls.  If a claimant cannot provide appropriate, reliable and complete records that support amendments made to the contemporaneous P&Ls, the CSSP Accounting Vendors will - consider only the contemporaneous P&Ls. [The Claims Administrator refers to "contemporaneous" in a colloquial sense, and ignores the Settlement Agreement's broad and liberal definition of "Contemporaneous" in Section 38.38.  While the Claims Administrator has the discretion to request source documents for the P&Ls in some cases, this was clearly intended to be the exception, and not the rule. In addition, the Policy seems to call for "detailed information" that goes beyond the provisions of Exhibit 4A, as well as the letter and the spirit of both Section 4.3.7 and Section 4.3.8 of the Settlement Agreement, as well as the BEL Opinion itself: The documents identified in Exhibit 4A "presumably would allow accountants *fairly, if at times imperfectly,* to 'match' revenues and expenses if such were required…. [T]he difference is between what claimants had to present…and what the Administrator was thereafter to do…. [T]he Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months*" BEL OPINION, pp.20,24 (732 F.3d at 337,340) (emphasis supplied).]

444895
3/13/14

the Program Accountants should provide assistance to Claimants, and any additional burden resulting from the new matching Policy should be minimized]

10. It is the intent of this policy to ensure both causation determination and compensation determination are both based on sufficiently matched P&Ls.

[For the reasons set forth more fully in Class Counsel's Memorandum to the Claims Administrator dated March 19, 2014, we do not believe that either the Settlement Agreement nor the BEL Opinion would dictate that revenue be moved, averaged, 'smoothed' or otherwise re-allocated for "matching" purposes; nor, assuming any such revenue re-allocation *arguendo* for Exhibit 4C purposes, does either the Settlement Agreement or the BEL Opinion dictate any change, alteration or re-visiting of the Causation Test in Exhibit 4B. The Causation Test was clearly intended to be a completely separate and independent test from the Compensation analysis, allowing for the utilization of completely *different months*. The Causation Test is intended to be applied *first*. And the Causation Test is based on *revenue only,* and has nothing to do with "corresponding variable *expenses.*"]

11. Consideration of whether revenues and expenses are sufficiently matched necessarily involves an element of professional judgment. The CSSP recognizes and reserves the right of the CSSP Accounting Vendors to exercise such professional judgment to achieve sufficient matching as ordered by the Court.[15]

[Understood. But this should not give free license to set aside the terms of the Settlement Agreement, to inject unnecessary elements of subjectivity, to conduct a forensic audit of each claim, or to replace the Exhibit 4C Compensation Framework with a Program Accountant's individual sense of some other "realistic measure of economic loss".]

---

[15] The claimant's file will be appropriately and reasonably documented to reflect the basis for the exercise of professional judgment by the CSSP Accounting Vendors as to material matters in the identification and resolution of matching issues, the correction of identified errors, the resolution of ambiguities or inconsistencies in materials supplied by the claimant, the selection of the appropriate "Matching Methodology" to be utilized, and/or the allocation of revenue and/or expenses impacting the causation calculation under Exhibit 4B of the Settlement Agreement [For the reasons stated in Class Counsel's Memo to the Claims Administrator dated March 19, 204, any re-allocation of revenue for Exhibit 4C Compensation purposes should not result in any alteration or re-vising of the Causation analysis under Exhibit 4B; however, Class Counsel agree that if this is done, it should be explained by the Program Accountants] or having a significant impact on the compensation payable.

8

444895
3/13/14

**Statement of Policy**

The Claims Administrator thus adopts the following "policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses" as ordered by the Court.

**I.    Identification of "unmatched claims."**

A.    The criteria to be used in identifying "unmatched claims," other than with respect to Failed Businesses, Failed Start-Up Businesses and Start-Up Businesses, will be the same as those set out in the Declaration of Patrick A. Juneau, Claims Administrator, dated October 25, 2013.

[As has been briefed previously, and as set forth in Class Counsel's Memorandum to the Claims Administrator dated March 19, 2014, Class Counsel do not believe that any additional matching of expenses is necessary for Accrual Claims.]

The process for identifying those claims whose submitted financial records fail to sufficiently match revenues with expenses shall be the following:

If the monthly profit and loss statements submitted by a claimant, restated by the CSSP Accounting Vendors for any identified errors, meet any one of the following criteria, then the claim shall be identified for a further matching analysis as described below:

1.    negative total revenue is recorded for any month included within the Benchmark Year(s), Compensation Year or 2011;

2.    total revenue recorded in any month included in the Benchmark Year(s), Compensation Year or 2011 exceeds 20% of the claimant's annual revenue for the year which includes that month;

[We understand that when this criteria is triggered, the Program then examines the Claim to see whether there is an explanation other than some issue re "matching". Many tourism businesses are seasonal. The bunching of revenue is part of the naturally recurring business cycle, and has nothing to do with a failure to match expenses. To subject these businesses to a new matching policy would inappropriately disadvantage some of the businesses most clearly and directly affected by the Spill.]

3.    the monthly profit and loss statements or other documentation submitted shows that the claimant's business experienced a period of dormancy during the Benchmark Year(s), Compensation Year or 2011;

[As noted above, many tourism / seasonal businesses will experience a period of "dormancy";  this is generally not indicative of a "matching" issue.]

9

444895
3/13/14

4. total variable expenses when summed up are negative for any month within the Benchmark Year(s) or Compensation Year;

5. total variable expenses for any month within the Benchmark Year(s) or Compensation Year exceed 25% of the claimant's annual variable expense for the year which includes that month;

[See above]

6. variable margin percentages when compared between any two months included within the Benchmark Year(s) and Compensation Year vary by more than 50 percentage points; or,

7. in any given month within the Benchmark Year(s) or Compensation Year, the variance between that month's percentage of annual revenues as compared to that same month's percentage of annual variable expenses exceeds 8 percentage points.

[This threshold appears to be set up as some type of 'catch-all'. It is unnecessary. To the extent it is retained, it is too low.]

Any claim, whether based on accrual, cash or another basis of accounting books and records, that does not fall within one of the foregoing seven criteria shall be presumed to be "sufficiently matched," provided; however, that if in the professional judgment of the CSSP Accounting Vendors, a claimant's financial records contain other significant indicia that the claim may not be "sufficiently matched," the CSSP reserves the right to identify such claim for further matching analysis as set forth below.

[Again, Class Counsel do not believe that these triggers should be applied to Accrual Claims. Moreover, Class Counsel believe that the existing seven triggers (actually Nos.1-6) are more than adequate to catch any and all "un-sufficiently matched" claims. The Program Accountants should not be applying their professional judgment to require further matching of Claims that were not otherwise triggered.]

With respect to any claims where matching is determined to be an issue as set forth in this paragraph I.A. above, the CSSP Accounting Vendors will exercise their professional judgment to determine whether that claim is "sufficiently matched" based upon the evaluation of the information submitted and available to them, including, when applicable, the nature and complexity of the industry or business in question, particularly with regard to claims based upon cash-basis accounting records.

For those claims determined *to* be sufficiently matched, the CSSP Accounting Vendors will utilize claimant-submitted accounting records (adjusted for any identified accounting errors) to calculate compensation as set forth in the Settlement Agreement.

For those claims determined *not* to be sufficiently matched, the CSSP Accounting Vendors will adjust the claimant-submitted accounting records as outlined in paragraph II below in order to achieve sufficient matching as per the orders of the Court.

B.     As to Failed Businesses and Failed Start-Up Businesses and as to Start-Up Businesses, identification of "unmatched claims" will be determined as set out in Attachments G and H to this policy.

**II.     Adjustment of "unmatched claims . . . in light of the necessity of revenue and expense matching to realistic measurement of economic loss."**

For those claims determined under paragraph I above *not* to be sufficiently matched, the below methodologies will be utilized to achieve sufficient matching as per the orders of the Court.

A.     Determination of Applicable Methodology.

Claims will be assigned to an industry type for purposes of these methodologies using NAICS codes as outlined in **Attachment A**.  To the extent that in the professional judgment of the CSSP Accounting Vendors assignment to a methodology by such NAICS code is inappropriate based on that claimant's particular business activities, the CSSP reserves the right to revise the applicable methodology to achieve sufficient matching as ordered by the Court.  All claims submitted with P&Ls that are deemed not to be sufficiently matched, will be processed under one of the Methodologies set forth below.  Note: no claim will be processed under an individually tailored approach to resolve matching issues.

[As set forth more fully in Class Counsel's Memo of March 19, 2014, Exhibit 4C – as written, as interpreted by both the BEL Panel and Judge Barbier, and under the provisions of Section 4.4.7 – must be applied as the single Framework / Policy for all BEL Claims.]

B.     Annual Variable Margin Methodology for "Unmatched" Claims.

**See Attachment B**.

C.     Construction Claims.

**See Attachment C**.   [should be calculated under Attachment B]

D.     Agriculture Claims.

**See Attachment D.**   [should be calculated under Attachment B]

E.     Educational Institutions Claims.

**See Attachment E.**   [should be calculated under Attachment B]

444895
3/13/14

F.     Professional Services Claims.

See Attachment F.   [should be calculated under Attachment B]

G.     Failed Businesses and Failed Start-Up Businesses.

See Attachment G.   [all Failed Business and Failed Start-Up Businesses should
be calculated under the single general methodology]

H.     Start-Up Businesses.

See Attachment H.   [all Start-Up Businesses should be calculated
under the single general methodology]

Under the above methodologies, the guiding principle has been to utilize the claimant's contemporaneous P&Ls where there is no indicia of a mismatch of revenue and expenses. Where matching issues have been identified the approach will be, wherever possible, to amend the P&Ls utilized as inputs to the compensation calculation and to the extent possible calculate Step 1 and Step 2 compensation in accordance with the Settlement Agreement.

Contemporaneous P&Ls submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify either an error (as previously defined) or a mismatch of revenue and variable expenses which can be explained and supported by appropriate documentation.  If matching issues remain after such restatements, revenue and/or variable expenses[16] will be allocated as per one of the methodologies set forth in Attachments B through H.

As it relates to adjusting the inputs to better match revenue with corresponding variable expenses, the methodologies require the reallocation of revenue, expenses or both for both the Benchmark and Compensation Periods. [Properly recorded revenue should not be re-allocated to accomplish "matching", but should only be adjusted in the case of a clear, objective and unambiguous error.]   In the Attachments to this Policy, references to "variable expenses" include "variable payroll expenses," as computed under Exhibit 4C of the Settlement Agreement. In identifying the two months between May 2010 and December 2010 with the lowest Total Payroll Expense, the CSSP Accounting Vendors will utilize the contemporaneous P&Ls after any restatement for errors (as previously defined) and/or a mismatch of revenue and payroll expenses which can be explained and supported by appropriate documentation, but prior to any allocation of revenue and/or variable expenses under the methodologies set forth in the Attachments B through H (excluding G).

Claimants may be required to provide additional information under the methodologies outlined in the attachments.  This may include information prior to the Benchmark Period or subsequent to the Compensation Period (i.e., where the claimant has adopted a Fiscal Year that differs from a calendar year).  [As set forth more fully *supra*, (and as previously and otherwise

---

[16] In the case of a Failed Business of Failed Start-Up Business any identified allocation will include all expenses that fall within EBITDA, as defined in Exhibit 6 of the Settlement Agreement.

12

briefed), the BEL Opinion itself belies the notion that Claimants should be *required* to submit additional (and in many cases burdensome) documentation and other information.[17] Claimants should be give the *choice* to submit additional Contemporaneous P&Ls, documents or other information, in the hopes of having the Claim processed more efficiently and/or maximized under Section 4.3.8.  However, Claimants should not be *required* to prepare or provide additional documentation and/or information that is not required under Exhibit 4A.  Further, consistent with Section 4.3.7, the Program Accountants should provide assistance to Claimants, and any additional burden resulting from the new matching Policy should be minimized.]

---

[17] *See* BEL OPINION, p.20 (732 F.3d at 337) ("the difference is between what claimants had to present … and what the Administrator was thereafter to do"); *see also* BEL OPINION, p.20 (732 F.3d at 337) (the documents identified in Exhibit 4A "presumably would allow accountants *fairly, if at times imperfectly,* to 'match' revenues and expenses if such were required") (emphasis supplied); BEL OPINION, p.24 (732 F.3d at 340) ("the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months*") (emphasis supplied).

444895
3/13/14

**<u>BEL Claims – Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK</u>**

In developing a methodology to address claims that have been deemed not to be 'sufficiently matched,' several methodologies have been developed to address unique factors common to the manner in which certain industries operate and record their financial information:

- Annual Variable Margin Methodology (otherwise referred to as "Short Revenue Cycle") – Attachment B

- Construction – Attachment C

- Agriculture – Attachment D

- Educational Institutions – Attachment E

- Professional Services – Attachment F

This document summarizes NAICS codes that will likely fall into each methodology.  <u>However, it is important to note that a claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector.</u>

In identifying those NAICS codes that would most likely fall into each methodology, there is a particular focus on the 'specialty' methodologies – Construction, Professional Services, Agriculture, and Educational Institutions – with all other NAICS codes defaulting to the Annual Variable Margin (Short Revenue Cycle) methodology.

Set out below is a summary of how the NAICS codes are presently assigned.

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

# Construction[18]

**236xxx - Construction of Buildings**

| 2361XX | Residential Building Construction |
|--------|-----------------------------------|
| 2362XX | Nonresidential Building Construction |

**237xxx - Heavy and Civil Engineering Construction**

| 2371XX | Utility System Construction |
|--------|----------------------------|
| 2372XX | Land Subdivision |
| 2373XX | Highway, Street, and Bridge Construction |
| 2379XX | Other Heavy and Civil Engineering Construction |

**238xxx - Specialty Trade Contractors**

| 2381XX | Foundation, Structure, and Building Exterior Contractors |
|--------|--------------------------------------------------------|
| 2382XX | Building Equipment Contractors |
| 2383XX | Building Finishing Contractors |
| 2389XX | Other Specialty Trade Contractors |

**336xxx - Transportation Equipment Manufacturing**

| 3361XX | Motor Vehicle Manufacturing |
|--------|----------------------------|
| 3362XX | Motor Vehicle Body and Trailer Manufacturing |
| 3363XX | Motor Vehicle Parts Manufacturing |
| 3364XX | Aerospace Product and Parts Manufacturing |
| 3365XX | Railroad Rolling Stock Manufacturing |
| 3366XX | Ship and Boat Building |
| 3369XX | Other Transportation Equipment Manufacturing |

[These 336xxx NAICS Codes relate to Manufacturing, and would not be expected to have the same type of matching issues that might arguably be found re traditional Construction.]

---

[18] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology. As a result, some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A2

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK**

321xxx - Wood Product Manufacturing

| 3211XX | Sawmills and Wood Preservation |
|--------|--------------------------------|
| 3212XX | Veneer, Plywood, and Engineered Wood Product Manufacturing |
| 3219XX | Other Wood Product Manufacturing |

[These 321xxx NAICS Codes relate to Manufacturing, and would not be expected to have the same type of arguable matching issues that might arguably be found re traditional Construction.]

# Agriculture[19]

111xxx – Crop Production

| 1111XX | Oilseed and Grain Farming |
|--------|---------------------------|
| 1112XX | Vegetable and Melon Farming |
| 1113XX | Fruit and Tree Nut Farming |
| 1114XX | Greenhouse, Nursery, and Floriculture Production |
| 1119XX | Other Crop Farming |

115xxx – Support Activities for Agriculture

| 1151XX | Support Activities for Crop Production |
|--------|----------------------------------------|

[These 1151xx NAICS Codes include retail establishments like seed and supply stores, which do not have the matching issues that might arguably be found in the traditional farming business.]

---

[19] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology. As a result, some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

## Educational Institutions[20]

**611xxx – Educational Services**

| | |
|---|---|
| 6111XX | Elementary and Secondary Schools |
| 6112XX | Junior Colleges |
| 6113XX | Colleges, Universities, and Professional Schools |
| 6114XX | Business Schools and Computer and Management Training |
| 6115XX | Technical and Trade Schools |
| 6116XX | Other Schools and Instruction |
| 6117XX | Educational Support Services |

---

[20] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A4

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT A - NAICS CODES ASSIGNED TO MATCHING FRAMEWORK

## Professional Services[21]

**541xxx - Professional, Scientific, and Technical Services**

| | |
|---|---|
| 5411XX | Legal Services |
| 5412XX | Accounting, Tax Preparation, Bookkeeping, and Payroll Services |
| 5413XX | Architectural, Engineering, and Related Services |
| 5414XX | Specialized Design Services |
| 5415XX | Computer Systems Design and Related Services |
| 5416XX | Management, Scientific, and Technical Consulting Services |
| 5417XX | Scientific Research and Development Services |
| 5418XX | Advertising, Public Relations, and Related Services |
| 5419XX | Other Professional, Scientific, and Technical Services |

[5413XX (Architectural, Engineering and Related Services) are going to include engineers that are part of the Construction industry;  5419XX (Other Professional, Scientific and Technical Services) is too broad.]

---

[21] A claimant with a given NAICS code will not automatically be assigned to a given methodology by virtue of the NAICS code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology.  As a result, some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector

A5

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - Annual Variable Margin Methodology**

The methodology outlined below – "the Annual Variable Margin Methodology" - shall be applied to adjust a claimant's contemporaneous P&Ls that have been deemed not to be "sufficiently matched." This methodology will not apply to claimants who's submitted P&Ls have been deemed "sufficiently matched," which claims will be processed under the methodology set forth in Exhibit 4C of the Settlement Agreement, utilizing the contemporaneous P&Ls.  This methodology will not apply to claimants in the construction, agriculture or educational industries, nor will it apply to professional services firms, for which tailored methodologies have been developed. [As set forth in Class Counsel's Memorandum to the Claims Administrator dated March 19, 2014 and further above, this Annual Variable Margin Methodology should apply to all "un-matched" Cash Basis (or other "insufficiently matched") Claims.]  [Assuming *arguendo,* in the alternative, that specialized frameworks or methodologies are provided to some BEL Claimants, they should be made available to all BEL Claimants who might choose to attempt to utilize such framework or methodology to maximize his or her claim, per Section 4.4.7 and Section 4.3.8.] Furthermore, this methodology does not apply to claimants who meet the definition of a Start-Up Business, Failed Business or Failed Start-up Business.

The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement but does, if matching issues are identified, amend the P&Ls utilized in such calculations.  The calculations of both Step 1 and 2 compensation will be consistent with that prescribed by Exhibit 4C of the Settlement Agreement.

**Annual Variable Margin Methodology**

1. The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant.  [See comments above. Should be consistent with Exhibit 4A, the definition of Contemporaneous, and the Claimant-friendly provisions of Sections 4.3.7 and 4.3.8, as well as the directive to apply the BEL Framework consistently to all BEL Claimants under Section 4.4.7.  Subjective determinations or an undefined standard of "realistic

B1

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - Annual Variable Margin Methodology**

measure economic loss" should not be a substitute for Exhibit 4C.  There should not be a forensic audit of each claim.]

2.     If the CSSP Accounting Vendors identify an error(s) [see fn][22] in how the claimant has accounted for revenue or expenses, correcting entries will be made to the P&Ls to restate revenue and expenses to the appropriate month.  Where revenue has been restated a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 4B of the Settlement Agreement.  [We understand this to be limited to revenue adjustments for clear, objective and unambiguous errors.  See *supra*.  For the reasons set forth more fully in Class Counsel's Memorandum to the Claims Administrator dated March 19, 2014, we do not believe that either the Settlement Agreement nor the BEL Opinion would dictate that revenue be moved, averaged, 'smoothed' or otherwise re-allocated for "matching" purposes;  nor, assuming any such revenue re-allocation *arguendo* for Exhibit 4C purposes, does either the Settlement Agreement or the BEL Opinion dictate any change, alteration or re-visiting of the Causation Test in Exhibit 4B.]

3.     If adjustments made in accord with 2. above result in restated P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 4C of the Settlement Agreement using such P&Ls.

4.     If adjustments made in accord with 2. above result in restated P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed to calculate the "Corresponding variable expenses," calculated as follows:

---

[22] "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made using the best available information at the time. [See Comments to fn.9, *supra*]

B2

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - Annual Variable Margin Methodology**

a.   Benchmark Period[23]:

    i.   Monthly corresponding variable expenses for each Fiscal Year included in the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses for the three (3) respective Fiscal Years , (as provided) prior to the spill and total revenue for the same Fiscal Year.  This will yield a separate variable expense percentage for each Fiscal Year included in the Benchmark Period.

    ii.   This Variable Expense percentage (specific for each individual Fiscal Year included in the Benchmark Period) is applied to the specific monthly revenue amounts in each Fiscal Year included in the Benchmark Period to calculate the corresponding variable expenses for each month.

---

[23]  Benchmark Period for the purpose of calculating the annual variable margin expense percentage could be either 2009; the average of 2008 and 2009; or the average of 2007, 2008 and 2009.

B3

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - Annual Variable Margin Methodology**

b.  Compensation Period:

   i.  Monthly corresponding variable expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for those Fiscal Years included in the Compensation Period and total revenue for the same period.  [The initial Draft Proposed Policy created a May 2010–April 2011 Year, on the basis that the inclusion of pre-Spill variable expenses / percentages / margins should be segregated from post-Spill variable expenses / percentages / margins.  While Class Counsel did not believe that Claimants should be *required* to provide P&Ls (and other associated documents and information) beyond the Compensation Period defined in Exhibit 4C, (nor prior to the Benchmark Years), Class Counsel suggested at the meeting with the Program Accountants on February 20, 2014, and again in the February 27, 2014 Memo to the Claims Administrator with Comments, Objections and Suggestions, that the eight-month May-December 2010 post-Spill period would provide an appropriate Average Variable Margin percentage for the Compensation Period, and that the Claimant should have the *choice* to utilize either: **(a)** the post-Spill eight-month May-December 2010 period; **(b)** Calendar Year 2010, **(c)** the May 2010 – April 2011 Year suggested by the Claims Administrator, or **(d)** the Claimant's own Fiscal Year.   Providing the Claimant with such a choice is consistent with the BEL Opinion's suggestion that the matching can be done "fairly, if at times imperfectly"[24];   the original structure of Exhibit 4C;  and Section 4.3.8, which expressly directs the Claims Administrator and Program Accountants to maximize the Claim.  This Final Policy now *requires* the Claimant to mix pre-Spill variable expenses / percentages / margins with post-Spill expenses / percentages / margins.]

   ii.  Where the claimant's Fiscal Year is not on a calendar year basis, this will result in a separate variable expense percentages for months covered by each Fiscal Year included in Compensation Period.

---

[24] BEL OPINION, p.20 (732 F.3d at 337).

B4

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT B - Annual Variable Margin Methodology**

      iii.    This variable expense percentage is applied to the specific monthly revenue amounts in each Fiscal Year included in the Compensation Period to calculate the corresponding variable expenses for each month.

  c.   Variable Margin – (Calculated for the Benchmark Period only for Step 2 compensation calculation):

      i.    Sum Variable Profit from May through December of the periods selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

      ii.    Sum total revenue from May through December of the periods selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

      iii.    Calculate Variable Margin percent as Variable Profit calculated in (i) divided by total revenue calculated in (ii).

5.    The P&Ls, allocated for the corresponding variable expenses calculated in Step 4 above, are utilized as the input for calculating compensation under Exhibit 4C of the Settlement Agreement:

  a.   Step 1 of the compensation calculation is determined as the difference in Variable Profit between the Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is selected by the claimant to include three or more consecutive months between May 2010 and December 2010.

  b.   Step 2 of the compensation calculation is based on the claimant's growth in revenue in January 2010 through April of 2010 relative to the same months of the claimant-selected Benchmark Period.  The claimant may select a six-consecutive month period between May 2010 to December 2010, unless the claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months shall be used for Step 2:

      i.    To compute the Claimant Specific Factor, the total revenue from January 2010 to April 2010 will be compared to January to April revenue of the Optimum Benchmark Period (i.e., 2009, average of 2008/2009, or average of 2007/2008/2009).

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT B - Annual Variable Margin Methodology

**Illustrative Example - Annual Variable Margin Methodology**

Assume that the claimant has adopted a calendar year Fiscal Year and has an Optimal Benchmark Period of May through December of 2008 and 2009

The contemporaneous P&Ls provided by the Claimant:

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 325 | 325 | 900 | 600 | 325 | 300 | 350 | 325 | 300 | 275 | 4,600 |
| Variable expenses | (150) | (125) | (125) | (300) | (125) | (275) | (150) | (150) | (225) | (150) | (175) | (125) | (2,075) |
| | 125 | 175 | 200 | 25 | 775 | 325 | 175 | 150 | 125 | 175 | 125 | 150 | 2,525 |
| Variable expenses as a % of revenue | 55% | 42% | 38% | 92% | 14% | 46% | 46% | 50% | 64% | 46% | 58% | 45% | 45% |
| **2009** | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
| Revenue | 300 | 325 | 350 | 350 | 500 | 800 | 350 | 275 | 275 | 350 | 325 | 300 | 4,500 |
| Variable expenses | (175) | (125) | (275) | (225) | (275) | (300) | (125) | (225) | (275) | (175) | (100) | (150) | (2,425) |
| | 125 | 200 | 75 | 125 | 225 | 500 | 225 | 50 | 0 | 175 | 225 | 150 | 2,075 |
| Variable expenses as a % of revenue | 58% | 38% | 79% | 64% | 55% | 38% | 36% | 82% | 100% | 50% | 31% | 50% | 54% |
| **2010** | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (175) | (125) | (225) | (200) | (125) | (75) | (150) | (150) | (125) | (150) | (100) | (125) | (1,725) |
| | 200 | 225 | 125 | 175 | 175 | 150 | 75 | 100 | 150 | 125 | 150 | 100 | 1,750 |
| Variable expenses as a % of revenue | 47% | 36% | 64% | 53% | 42% | 33% | 67% | 60% | 45% | 55% | 40% | 56% | 50% |

**To calculate the corresponding variable expenses:**

| | |
|---|---|
| Benchmark Period: Revenue 2008 | 4,600 |
| Benchmark Period: Variable Expenses 2008 | (2,075) |
| Variable expenses as a % of revenue | 45% |
| | |
| Benchmark Period: Revenue 2009 | 4,500 |
| Benchmark Period: Variable Expenses 2009 | (2,425) |
| Variable expenses as a % of revenue | 54% |
| | |
| Compensation Period: Revenue 2010 | 3,475 |
| Compensation Period: Variable Expenses 2010 | (1,725) |
| Variable expenses as a % of Revenue | 50% |

B6

## BEL Claims – Matching of Revenues and Expenses

## ATTACHMENT B - Annual Variable Margin Methodology

Applying the corresponding variable expense percentages, the variable expenses reported on the P&Ls would be allocated as follows:

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 325 | 325 | 900 | 600 | 325 | 300 | 350 | 325 | 300 | 275 | 4,600 |
| Variable expenses | (124) | (135) | (147) | (147) | (406) | (271) | (147) | (135) | (158) | (147) | (135) | (124) | (2,075) |
| Variable expenses as a % of revenue | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | 45% | |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 300 | 325 | 350 | 350 | 500 | 800 | 350 | 275 | 275 | 350 | 325 | 300 | 4,500 |
| Variable expenses | (162) | (175) | (189) | (189) | (269) | (431) | (189) | (148) | (148) | (189) | (175) | (162) | (2,425) |
| Variable expenses as a % of revenue | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% | |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (186) | (174) | (174) | (186) | (149) | (112) | (112) | (124) | (137) | (137) | (124) | (112) | (1,725) |
| Variable expenses as a % of revenue | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |

## Step 1 and Step 2 compensation would be computed as:

| Benchmark Period (Average 2008 & 2009) | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 288 | 313 | 338 | 338 | 700 | 700 | 338 | 288 | 313 | 338 | 313 | 288 | 4,550 |
| Variable expenses | (143) | (155) | (168) | (168) | (338) | (351) | (168) | (142) | (153) | (168) | (155) | (143) | (2,250) |
| Variable Profit | 145 | 157 | 170 | 170 | 362 | 349 | 170 | 146 | 159 | 170 | 157 | 145 | 2,300 |
| Variable Profit % | 50% | 50% | 50% | 50% | 52% | 50% | 50% | 51% | 51% | 50% | 50% | 50% | 51% |

| Compensation Period (2010/11) | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 350 | 350 | 375 | 300 | 225 | 225 | 250 | 275 | 275 | 250 | 225 | 3,475 |
| Variable expenses | (186) | (174) | (174) | (186) | (149) | (112) | (112) | (124) | (137) | (137) | (124) | (112) | (1,725) |
| Variable Profit | 189 | 176 | 176 | 189 | 151 | 113 | 113 | 126 | 138 | 138 | 126 | 113 | 1,750 |
| Variable Profit % | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |

**Step 1**

Optimum Benchmark Period identified as May to Dec

| | |
|---|---|
| Total variable profit May to December (Benchmark) | 1,658 |
| Total variable profit May to December (Compensation) | 1,020 |
| Step 1 Compensation (pre-RTP) | 639 |

**Step 2**

Optimum Benchmark Period from May to December, 2008 and 2009

| | |
|---|---|
| Revenue Jan 2010 to April 2010 | 1,450 |
| Revenue Jan to April (average for 2008 & 2009) | 1,275 |
| Revenue Increase/(decrease) | 175 |
| Revenue Increase/(decrease) Percentage | 14% |
| Claimant Specific Growth Factor | 10%  [Max of 10%, Min of -2%] |
| General Adjustment Factor | 2% |

| | |
|---|---|
| Optimum Benchmark Period Revenue (May to December, 2008 and 2009) | 3,275 |
| Incremental Revenue | 393 |
| Variable profit for benchmark period | 51% |
| Step 2 compensation (pre-RTP) | 199 |

B7

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT C - Construction Methodology

The methodology outlined below – "the Construction Methodology" – is a deviation from the Annual Variable Margin Methodology described in Attachment B.  [For the reasons stated in the Memo to the Claims Administrator dated March 19, 2014, Class Counsel disagree.  Construction Companies should be evaluated under the same general methodology.] This methodology is premised on the assumption that variable expenses of a construction claimant are more accurately recorded on monthly P&Ls than are revenues[25].  Percentage of completion accounting for revenue by a construction company is based on estimates that may only be updated at the end of reporting periods (e.g., at the Fiscal Year end) rather than a monthly basis. [But what if the Claimant accurately performs a percentage-of-completion analysis every month?  The Proposed Framework incorrectly assumes that all jobs have the same profit margin, so that properly matched P&Ls would be rejected.  Items such as production bonuses are going to cause more revenue allocated to the month of the production bonus.]    As such, matching issues may arise when significant adjustments are recorded to reflect more accurate estimates at quarter and/or year ends.  The Construction Methodology calls, therefore, to reallocate revenues in order to best achieve sufficient matching of revenue and expenses. [This reallocation of revenues does not match expenses to revenues;  it "matches" revenue to effort – which will often be contrary to accepted revenue recognition accounting principles.[26]]

This Construction Methodology shall be applied to adjust a construction claimant's contemporaneous P&Ls that have been deemed not to be "sufficiently matched."  This methodology will

---

[25] Prior to the application of this methodology, the CSSP Accounting Vendors will analyze the variable expenses to the extent necessary.

[26] *See, e.g.,* DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10, ("Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession"); *see also,* PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶10 ("GAAP recognition rules and 'matching' most often apply to expense recognition not revenue recognition"), ¶13 ("BP's proposal to move revenue to match expenses is backwards and violates the very concept referred to as matching in BP's out of date textbook"), ¶14 ("The matching approach that BP advocates is not matching in any sense recognized in the accounting world, but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses").

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT C - Construction Methodology

not apply to claims whose submitted P&Ls were prepared under either a percentage of completion or completed contract basis of accounting that are deemed (after applying the criteria set forth in Section I.A. of this Policy) "sufficiently matched," which claims will be processed under the methodology set forth in Exhibit 4C of the Settlement Agreement, utilizing the contemporaneous P&Ls.  This revised methodology does not apply to a construction claimant that meets the definition of a Start-Up Business, Failed Business or Failed Start-up Business.

The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement but does amend the P&Ls utilized in such calculations.  The calculations of both Step 1 and Step 2 compensation will be consistent with that prescribed by Exhibit 4C of the Settlement Agreement.

As a consequence of allocating revenue based on that month's variable expenses as a percentage of annual variable expenses, the revenue recorded on the allocated P&Ls can no longer be attributed to individual customers.  Accordingly, the allocated P&Ls cannot be utilized for the purpose of determining causation for any claimant required to satisfy a Customer Mix Test, per Exhibit 4B of the Settlement Agreement.  Under the Construction Methodology, for any claimant required to satisfy a Customer Mix Test to demonstrate causation, the CSSP will utilize the contemporaneous P&Ls (restated for errors) for the Customer Mix Test element of the causation assessment, but will utilize the restated and allocated P&Ls for assessing the Revenue Pattern Test under Exhibit 4B of the Settlement Agreement, and in computing compensation.[27]

---

[27]  This would supersede, for construction companies only, Policy 464 as it relates to the requirement to utilize the same P&Ls for determining causation and calculating compensation.  However, as per the "Addendum To Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims" while the "claimant is not required to use the same months in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B [of the Settlement Agreement] and determining compensation pursuant to Ex. 4C [of the Settlement Agreement]" the "same Benchmark Period year(s) are used for the purpose of determining both causation and compensation."  Accordingly, the claimant may elect which months to utilize to demonstrate causation under the customer mix test, but must utilize the same Benchmark years as those used to calculate compensation.

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

[To the extent that Causation under the non-Customer Mix Tests (*e.g.* the V-Test) is being re-calculated under Exhibit 4B after re-allocation of revenues, Class Counsel object for the reasons stated in the Memo to the Claims Administrator dated March 19, 2014, and above.]

## Construction Methodology

1. The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors [see above], and indicators of insufficient matching of revenue and variable expenses. Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant. [see above]

2. If the CSSP Accounting Vendor identifies an error(s) [see above][28] in how the claimant has accounted for revenue or variable expenses, correcting entries will be made to the P&Ls to restate revenue and variable expenses to the appropriate month. Where revenue has been restated a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 4B of the Settlement Agreement.

3. If adjustments made in accord with 2. above result in restated P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 4C of the Settlement Agreement using such P&Ls.

4. If adjustments made in accord with 2. above result in restated P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed under the Construction Methodology as follows:

   a. Allocation based on Claimant's Fiscal Year-End[29]:

---

[28] "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made using the best available information at the time. [See Comments to fn.9]

[29] A claimant's fiscal/tax year may require additional information/documentation that may extend prior to the Benchmark Period and subsequent to the Compensation Period. [Exceeds Documentation provisions in Exhibit 4A]

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT C - Construction Methodology

i.  For each Fiscal Year included in the Benchmark and Compensation Periods (2007, 2008, 2009 and 2010 (as provided)) each month's variable expenses as a percentage of that Fiscal Year's total variable expenses will be computed.  [The initial Draft Proposed Policy created a May 2010 – April 2011 Year, on the basis that the inclusion of pre-Spill variable expenses / percentages / margins should be segregated from post-Spill expenses / percentages / margins.  While Class Counsel did not believe that Claimants should be *required* to provide P&Ls (and other associated documents and information) beyond the Compensation Period defined in Exhibit 4C, (nor prior to the Benchmark Years), Class Counsel suggested at the meeting with the Program Accountants on February 20, 2014, and again in the February 27, 2014 Memo to the Claims Administrator with Comments, Objections and Suggestions, that the eight-month May-December 2010 post-Spill period would provide an appropriate Average Variable Margin percentage for the Compensation Period, and that the Claimant should have the *choice* to utilize either: **(a)** the post-Spill eight-month May-December 2010 period; **(b)** Calendar Year 2010, **(c)** the May 2010 – April 2011 Year suggested by the Claims Administrator, or **(d)** the Claimant's own Fiscal Year.   Providing the Claimant with such a choice is consistent with the BEL Opinion's suggestion that the matching can be done "fairly, if at times imperfectly"[30];   the original structure of Exhibit 4C;  and Section 4.3.8, which expressly directs the Claims Administrator and Program Accountants to maximize the Claim. This Final Policy now *requires* the Claimant to mix pre-Spill variable expenses / percentages / margins with post-Spill expenses / percentages / margins.]

ii.  Where the claimant's Fiscal Year is not on a calendar year basis, this will result in a separate Variable Profit percentage for each Fiscal Year included in Benchmark and Compensation Periods.

iii.  Annual revenue for each Fiscal Year will be allocated to individual months by multiplying total annual revenue by each month's percentage of total variable expenses (as computed in accord with i. above).  [For the reasons stated in the Memorandum to the Claims

---

[30] BEL OPINION, p.20 (732 F.3d at 337).

C4

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

Administrator dated May 19, 2014, and *supra,* Class Counsel believe that revenue should only be adjusted in the case of a clear, objective and unambiguous error;  revenues should not otherwise be moved, averaged, re-allocated or 'smoothed'.]

b.   Variable Margin – (Calculated for the Benchmark Period only for Step 2 compensation calculation):

    i.   Sum Variable Profit from May through December of the periods selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

    ii.   Sum total revenue from May through December of the periods selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

    iii.   Calculate Variable Margin percent as Variable Profit calculated in (i) divided by total revenue calculated in (ii).

5.   As a consequence of allocating monthly revenue a causation assessment under Exhibit 4B of the Settlement Agreement will be re-performed.   [As set forth in Class Counsel's Memorandum of March 19, 2014, any re-allocation of revenue for Exhibit 4C Compensation purposes should not result in any alteration or re-vising of the Causation analysis under Exhibit 4B.] However, given that revenue is allocated based on that month's variable expenses as a percentage of annual variable expenses, the revenue recorded on the allocated P&Ls can no longer be attributed to individual customers.  Accordingly, the allocated P&Ls cannot be utilized for the purpose of determining causation for any claimant required to satisfy a Customer Mix Test, per Exhibit 4B of the Settlement Agreement.  Under the Construction Methodology, for any claimant required to satisfy a Customer Mix Test to demonstrate causation, the CSSP will utilize the contemporaneous P&Ls (restated for errors) for the Customer Mix Test element of the causation assessment, but will utilize the restated and allocated P&Ls for assessing the Revenue Pattern Test under Exhibit 4B of the Settlement Agreement, and in computing compensation.

6.   The P&Ls, allocated for the Corresponding Revenues calculated in accord with Step 4 above, are utilized as the input for calculating compensation under Exhibit 4C of the Settlement Agreement:

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT C - Construction Methodology

a.  Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is selected by the claimant to include three or more consecutive months between May 2010 and December 2010.

b.  Step 2 of the compensation calculation is based on the claimant's growth in revenue in January 2010 through April of 2010 relative to the same months in the claimant-selected Benchmark Period.  The claimant may select a six-consecutive month period between May 2010 to December 2010, unless the claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months shall be used for Step 2:

  i.  To compute the Claimant Specific Factor, the total revenue from January 2010 to April 2010 will be compared to January to April revenue of the Optimum Benchmark Period (i.e., 2009; average of 2008/2009; or average of 2007/2008/2009).

### Illustrative Example – Construction Claims

Assume that the claimant adopted a calendar year Fiscal Year and has an Optimal Benchmark Period of May through December 2008 and 2009.

The contemporaneous P&Ls provided by the claimant:

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 275 | 300 | 375 | 275 | 400 | 350 | 275 | 400 | 350 | 250 | 300 | 275 | 3,825 |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | (2,150) |
| Variable Profit | 100 | 150 | 225 | 75 | 275 | 125 | 100 | 225 | 100 | 75 | 100 | 125 | 1,675 |
| Variable Profit % | 36% | 50% | 60% | 27% | 69% | 36% | 36% | 56% | 29% | 30% | 33% | 45% | 44% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 375 | 250 | 350 | 425 | 325 | 450 | 325 | 400 | 325 | 175 | 500 | 300 | 4,200 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 175 | 100 | 50 | 175 | 125 | 325 | 175 | 150 | 25 | (25) | 375 | 125 | 1,775 |
| Variable Profit % | 47% | 40% | 14% | 41% | 38% | 72% | 54% | 38% | 8% | -14% | 75% | 42% | 42% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 325 | 250 | 400 | 350 | 275 | 175 | 300 | 175 | 325 | 400 | 150 | 225 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 100 | 50 | 125 | 100 | 150 | 75 | 175 | 0 | 25 | 225 | 25 | 75 | 1,125 |
| Variable Profit % | 31% | 20% | 31% | 29% | 55% | 43% | 58% | 0% | 8% | 56% | 17% | 33% | 34% |

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT C - Construction Methodology**

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT C - Construction Methodology

Allocate revenue based on the claimant's fiscal year (calendar year in this example):

| 2008 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 311 | 267 | 267 | 356 | 222 | 400 | 311 | 311 | 445 | 311 | 356 | 267 | 3,825 |
| Variable expenses | (175) | (150) | (150) | (200) | (125) | (225) | (175) | (175) | (250) | (175) | (200) | (150) | (2,150) |
| Variable Profit | 136 | 117 | 117 | 156 | 97 | 175 | 136 | 136 | 195 | 136 | 156 | 117 | 1,675 |
| Variable Profit % | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% |

| 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 346 | 260 | 520 | 433 | 346 | 216 | 260 | 433 | 520 | 346 | 216 | 303 | 4,200 |
| Variable expenses | (200) | (150) | (300) | (250) | (200) | (125) | (150) | (250) | (300) | (200) | (125) | (175) | (2,425) |
| Variable Profit | 146 | 110 | 220 | 183 | 146 | 91 | 110 | 183 | 220 | 146 | 91 | 128 | 1,775 |
| Variable Profit % | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% | 42% |

| 2010 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 339 | 301 | 414 | 376 | 188 | 151 | 188 | 263 | 452 | 263 | 188 | 226 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 114 | 101 | 139 | 126 | 63 | 51 | 63 | 88 | 152 | 88 | 63 | 76 | 1,125 |
| Variable Profit % | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% |

## Step 1 and Step 2 compensation is calculated as follows:

**Step 1 & Step 2 Compensation**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Benchmark Period (Average 2008 and 2009)** | | | | | | | | | | | | | |
| Revenue | 329 | 263 | 393 | 394 | 284 | 308 | 286 | 372 | 482 | 329 | 286 | 285 | 4,013 |
| Variable expenses | (188) | (150) | (225) | (225) | (163) | (175) | (163) | (213) | (275) | (188) | (163) | (163) | (2,288) |
| Variable Profit | 141 | 113 | 168 | 169 | 122 | 133 | 123 | 160 | 207 | 141 | 124 | 122 | 1,725 |
| Variable Profit % | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% |
| **Compensation Period (2010)** | | | | | | | | | | | | | |
| Revenue | 339 | 301 | 414 | 376 | 188 | 151 | 188 | 263 | 452 | 263 | 188 | 226 | 3,350 |
| Variable expenses | (225) | (200) | (275) | (250) | (125) | (100) | (125) | (175) | (300) | (175) | (125) | (150) | (2,225) |
| Variable Profit | 114 | 101 | 139 | 126 | 63 | 51 | 63 | 88 | 152 | 88 | 63 | 76 | 1,125 |
| Variable Profit % | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% | 34% |

**Step 1**
Optimum Period identified as May to Dec

| | |
|---|---|
| Total variable profit May to December (Benchmark) | 1,133 |
| Total variable profit May to December (Compensation) | 645 |
| Step 1 Compensation (pre-RTP) | 488 |

**Step 2**
Optimum Period from May to December, 2008 and 2009

| | |
|---|---|
| Revenue Jan 2010 to April 2010 | 1,430 |
| Revenue Jan to April (average for 2008 & 2009) | 1,380 |
| Revenue increase/(decrease) | 51 |
| Revenue Increase/(decrease) Percentage | 4% |
| Claimant Specific Growth Factor | 4%  [Max of 10%, Min of -2%] |
| General Adjustment Factor | 2% |

| | |
|---|---|
| Average Revenue for the Benchmark Period (May-Dec 2008 & 2009) | 2,633 |
| Incremental Revenue | 149 |
| Average Variable profit for Benchmark Period (May-Dec 2008 & 2009) | 43% |
| Step 2 compensation (pre-RTP) | 64 |

C8

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT D – Agriculture Methodology

The methodology outlined below – "the Agriculture Methodology" – is a slight deviation from the methodologies described previously in Attachments B and C. [As stated in the Claims Administrator's Proposed Policy dated February 12, 2104, this Framework constitutes "a deviation from the existing methodology set forth in Exhibit 4C."[31]  It completely re-writes the Settlement Agreement with respect to ("insufficiently matched") Agricultural Claims.]  Given the specific characteristics of the agriculture industry, the Claims Administrator, in consultation with the CSSP Accounting Vendors, believes it necessary to allocate both revenue and variable expenses in order to achieve "revenue and expense matching to realistic measurement of economic loss" as directed by the Court. [As noted *supra*, the BEL Opinion resolved a discreet dispute about how the word "corresponding" which modifies "variable expenses" within the Variable Profit definition in Exhibit 4C was to be interpreted;  it is not a license to substitute the Exhibit 4C Compensation Framework with some subjective and undefined new test for "realistic measurement of economic loss".]  This will be accomplished by allocating revenue and expenses over the "crop season," defined to be the months from preparing the field for sowing seed through to the harvesting of the produce.

In considering options to resolve agriculture claims that are not sufficiently matched, the allocation of both revenue and variable expenses was deemed necessary, due to the nature of an agriculture business and how this translates into matching revenue with expenses in a way that reflects economic reality. [see above]  The majority of agriculture claims presented to the program to date have maintained books and records on a cash basis.  The timing of revenue can vary considerably from one year to the next influenced in large part by weather patterns impacting the timing of planting and harvesting, and commodity prices that influence the decision to either sell on harvesting or holding produce in storage for sale at a future date.  Recording revenue when cash is received for the produce can, therefore, result in considerable timing differences a) in the months that sales are recorded from one year to the next

---

[31] During the meeting with the Program Accountants on February 20, 2014, Mr. John Petzold from PwC further acknowledged that the proposed Agriculture Framework was not based on the Settlement Agreement, but is a new methodology, which, when using only one benchmark year, effectively eliminates the "Step Two" Calculation to which the BEL Claimant is entitled under Exhibit 4C.

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT D – Agriculture Methodology**

[this is essentially the "comparable months" argument which was expressly *rejected* by the BEL Panel[32]], and b) because of a mismatch of revenue as compared to the expenses incurred in planting, growing and harvesting such crops.  Similarly, expenses may also fluctuate based on the timing of planting and harvesting, as well as decisions to purchase materials in bulk to be used over a prolonged period of time. To effectively negate these impacts, matching the revenue and variable expenses during the period from field preparation, sowing of seed through harvesting was deemed to yield results that would most closely align to economic reality.  The methodology, in essence, allocates revenue and expenses to the time period over which the produce was created.

The approach outlined below does not alter the structure as to how compensation is calculated under the Settlement Agreement but does amend the P&Ls utilized in such calculations.  The calculations of both Step 1 and Step 2 compensation will be consistent with that prescribed by Exhibit 4C of the Settlement Agreement.

**Agriculture Methodology**

1.    The claimant's contemporaneous P&Ls will be analyzed by the CSSP Accounting Vendors for potential accounting errors, and indicators of insufficient matching of revenue and variable expenses.  Such analysis will require, if considered necessary, explanations and additional information and documentation from the claimant. [see comments above]

---

[32] BEL OPINION, p.25 (732 F.3d at 340) ("BP's primary concern seems to be the uneven cash flows of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed"); *see also,* ORDER AND REASONS [Doc 12055] pp.5-6.

D2

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT D – Agriculture Methodology**

2.    If the CSSP Accounting Vendor identifies an error(s) [see above][33] in how the claimant has accounted for revenue or variable expenses, correcting entries will be made to the P&Ls to restate revenue and variable expenses to the appropriate month.   Where revenue has been restated a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 4B of the Settlement Agreement. [see above]

3.    If adjustments made in accord with 2. above result in restated P&Ls that are deemed to be sufficiently matched, the claim will be processed and compensation calculated under the methodology set forth in Exhibit 4C of the Settlement Agreement using such P&Ls.

4.    If adjustments made in accord with 2. above result in restated P&Ls that are not deemed to be sufficiently matched, the claim will be analyzed under the Agriculture Methodology as follows:

   a.   Allocation of revenue:

      i.    An evaluation of the nature of the crops grown by the claimant during the Benchmark and Compensation Period will be performed to understand the type of crop(s) grown, and the "crop season" in each given Fiscal Year.  In addition, through discussions with the claimant and / or third parties, where considered necessary, a review of supporting documentation, the CSSP Accounting Vendors will understand whether produce from each "crop season" was sold shortly after harvesting, or held in storage for sale at a subsequent date.

      ii.   Revenue recorded on the claimant's contemporaneous P&Ls will be analyzed to determine the "crop seasons" to which it relates.  This will require the claimant to provide additional information (e.g., inventory records, yield reports, sales records) in order to break out the recorded revenue into the various "crop seasons" (e.g., allocated to each year, or different

---

[33] "Errors" will be defined as accounting transactions that have been identified in the ordinary course of processing to have been inappropriately recorded in the claimant's contemporaneous P&Ls and will include, but not be limited to: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories. Recognizing that the Settlement Agreement does not mandate that the P&Ls be based on GAAP or any particular basis of accounting, the CSSP will analyze the P&Ls under the basis (e.g., accrual, cash, modified cash, income tax, etc.) of accounting used by the claimant in the normal course of business and reflected in the contemporaneous P&Ls. In general, accounting estimates now determined to be inaccurate based on subsequent events will not be considered accounting errors if the entries were made using the best available information at the time. [See Comments to fn.9]

**<u>BEL Claims – Matching of Revenues and Expenses</u>**

**<u>ATTACHMENT D – Agriculture Methodology</u>**

"crop seasons" where multiple crop types were planted in any one year) and identify the time period of each "crop season." [Exceeds Documentation provisions of Exhibit 4A, and is inconsistent with the BEL Opinion, as well as Sections 4.3.7 and 4.4.7]

iii.   Based on the analysis performed at i. and ii. above, monthly revenue will be allocated on a straight line basis to those months of the "crop season." [Not only is this contrary to Exhibit 4C, but it is contrary to accepted Accounting Methodologies]   For example:

- A sale recorded in December 2009 for crops produced during the "crop season" running from April 2009 to September 2009 will be allocated on a straight line basis over the 6 months April 2009 to September 2009.

- A sale recorded in February 2010 related to crops produced during the "crop season" running from April 2009 to September 2009 will be allocated on a straight line basis over the 6 months April 2009 to September 2009.

iv.   CSSP Accounting Vendors will obtain support from the claimant with regard to the "crop season" dates, but will exercise professional judgment to determine the appropriate months to allocate revenue to.  For example:

- If work in preparing a field for planting commences on April 30, 2009, May 2009 will most likely be the first month to which revenue is allocated.

- If the crop was harvested on November 3, 2010, October 2010 will most likely be the last date to which revenue is allocated.

v.   Where a crop season crosses a claimant's Fiscal Year, or sales of crops are made in Fiscal Years subsequent to that in which the "crop season" resided, claimants may be required to provide additional years of P&L data. [Exceeds Documentation provisions of Exhibit 4A, and is inconsistent with the BEL Opinion, as well as Sections 4.3.7 and 4.4.7]

vi.   On completion of steps i. through v. above, revenue will be allocated for each Fiscal Year included in the Benchmark and Compensation Periods (2007, 2008, 2009 and 2010 (as provided)).

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT D – Agriculture Methodology**

vii.    As a consequence of revenue being restated or allocated, a causation analysis will be re-performed (if causation is not presumed) to confirm that the claimant meets the Revenue Pattern Test per Exhibit 4B of the Settlement Agreement. [As set forth in Class Counsel's Memorandum of March 19, 2014, any re-allocation of revenue for Exhibit 4C Compensation purposes should not result in any alteration or re-vising of the Causation analysis under Exhibit 4B.]  For claimants required to satisfy the customer mix test, the allocation of revenue per step iii. above will require that the identity of individual purchases of crop be tracked with the allocation of revenue.

b.   Allocation of variable expenses:

i.    An analysis of variable expenses, considered significant in the professional judgment of CSSP Accounting Vendors, recorded in any Fiscal Year will be performed to determine if they relate to that year's "crop season" or whether they represented bulk purchases held in inventory for future "crop seasons."  If variable expenses pertain to multiple "crop seasons" the expense will be restated to each individual "crop season."

ii.    Remaining variable expenses during each Fiscal Year included in the Benchmark Period and the Compensation Period will be allocated to individual months based on that month's allocated revenue as a percentage of total revenue for the same Fiscal Year period.  This approach results in a consistent variable profit margin for each month of any given Fiscal Year.  The calculation is as follows:

- Monthly corresponding variable expenses for each Fiscal Year included in the Benchmark Period will be calculated based on the percentage relationship between the sum of all variable expenses for each Fiscal Year and total allocated revenue for the same Fiscal Year.  This will yield a separate variable expense percentage for each Fiscal Year included in the Benchmark Period.

- This variable expense percentage (specific for each individual Fiscal Year included in the Benchmark Period) is applied to the specific monthly allocated revenue amounts in the Benchmark Period to calculate the corresponding variable expenses for each month.

D5

**BEL Claims – Matching of Revenues and Expenses**

**ATTACHMENT D – Agriculture Methodology**

- Monthly corresponding variable expenses during the Compensation Period will be calculated based on the percentage relationship between the sum of all variable expenses for each Fiscal Year included in the Compensation Period and total revenue for the same Fiscal Year.

- This variable expense percentage is applied to the specific monthly revenue amounts in each Fiscal Year included in the Compensation Period to calculate the corresponding variable expenses for each month.

   c.  Variable Margin – (Calculated for the Benchmark Period only for Step 2 compensation calculation):

      i.  Sum Variable Profit from May through December of the periods selected by the claimant to be used for the Benchmark Period (i.e. Optimal Benchmark Period).

     ii.  Sum total revenue from May through December of the periods selected by the claimant to be used for the Benchmark Period. (i.e. Optimal Benchmark Period).

    iii.  Calculate Variable Margin percent as Variable Profit calculated in (i) divided by total revenue calculated in (ii).

5.  The P&Ls, allocated for the Revenues and variable expenses calculated in accord with Step 4 above, are utilized as the input for calculating compensation under Exhibit 4C of the Settlement Agreement:

   a.  Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.  The Compensation Period is selected by the claimant to include three or more consecutive months between May 2010 and December 2010.

   b.  Step 2 of the compensation calculation is based on the claimant's growth in revenue in January 2010 through April of 2010 relative to the same months in the claimant-selected Benchmark Period.  The claimant may select a six-consecutive month period between May 2010 to December 2010, unless the claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months shall be used for Step 2:

## BEL Claims – Matching of Revenues and Expenses

### ATTACHMENT D – Agriculture Methodology

i.   To compute the Claimant Specific Factor, the total revenue from January 2010 to April 2010 will be compared to January to April revenue of the Optimum Benchmark Period (i.e., 2009; average of 2008/2009; or average of 2007/2008/2009).