UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | * | |
| GULF OF MEXICO, on | * | SECTION J |
| APRIL 20, 2010 | * | |
| | * | JUDGE BARBIER |
| | * | |
| | * | MAG. JUDGE SUSHAN |
| **THIS DOCUMENT APPLIES TO:** | * | |
| No. 12-00311 | * | **JURY TRIAL DEMANDED** |

**LIBERTY INSURANCE UNDERWRITERS, INC.'S
OPPOSITION TO PLAINTIFF CAMERON INTERNATIONAL, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.  INTRODUCTION

Cameron International Corporation ("Cameron") seeks a summary judgment declaring Liberty Insurance Underwriters, Inc. ("Liberty") is obligated to pay its Excess Liability Policy's ("Policy") $50 million limits to partially fund Cameron's settlement with BP and certain defense costs incurred defending the underlying litigation.  But, Liberty owes neither obligation under its Policy as explained below, and this motion should be denied.  First, as Cameron has repeatedly argued to this Court and does not deny here, Cameron had valid and enforceable indemnity rights against Transocean.  Cameron's transfer of its valid and enforceable indemnity rights to BP over Liberty's objections impaired Liberty's subrogation rights to Liberty's prejudice.  Under Texas law, Cameron breached the Policy and extinguished coverage.  Cameron's argument that Liberty waived its rights first is meritless.  At the time Liberty's obligation to indemnify arose when Cameron settled, Cameron already had agreed to transfer away its indemnity rights.  Moreover, Liberty never unconditionally denied liability or otherwise waived its subrogation rights.

1

Second, Liberty's reasonable interpretation of the Policy's Other Insurance Condition (hereinafter "OIC") is the only reasonable logical interpretation under the facts here where Cameron transferred away its indemnity rights.  In contrast, applying Cameron's interpretation here where Liberty lost its subrogation rights unfairly changes the net amount Liberty is required to pay under the Policy, an unreasonable result.  In any event, the sophisticated insured exception to the *contra proferentum* doctrine applies to allow the Court to interpret the OIC in favor of Liberty.  Further, Liberty had no obligation under the Policy to either pay or reimburse defense costs and therefore did not breach the Policy.  Finally, material issues of fact exist and preclude summary judgment.

## II.  STATEMENT OF FACTS

The Court is well acquainted with the background facts as they have been stated multiple times, most recently in Liberty's three pending motions for partial summary judgment, document numbers 12050-1, 12578-1 and 12580-1.

## III.   ARGUMENT AND AUTHORITIES

**A.     Liberty Owes No Coverage Because Cameron Breached The Policy By Impairing Liberty's Subrogation Rights, Extinguishing Coverage**

**1.     Cameron impaired Liberty's subrogation rights by transferring Cameron's rights of indemnity against Transocean.**

As a condition precedent to coverage under the Policy, Cameron agreed to do nothing after loss to impair Liberty's subrogation rights.[1]  Under Texas law, "[w]hen the insurer seeks to recover through contractual subrogation, it 'stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defense held by the third

---

[1]   Exhibit1, Illinois National Ins. Policy, Form 80517 at p. 16.

party against the insured.'"[2]   Since subrogation is derivative in nature and predicated upon the theory that an insurer becomes entitled and succeeds to the right of an insured, the insured must have a legally enforceable right against a third party in order to give rise to any right of the insurer against such third party by way of subrogation.[3]

But, Cameron agreed not to ever pursue its rights of indemnity against Transocean (indemnity which Cameron does not deny was valid) in paragraph 4.3 of the BP-Cameron Settlement Agreement and more importantly transferred and assigned those indemnity rights to BP in paragraph 4.5.  Paragraphs 4.3 and 4.5 states:

> 4.3 Cameron, on behalf of itself, the Cameron Releasing Parties, the Consenting Cameron Insurers, and any and all insurers, reinsurers, indemnitors, subrogees, or assignees of any Cameron Releasing Parties or Consenting Cameron Insurers, agrees not to pursue, demand, litigate, or otherwise seek any Claims for contribution, subrogation, indemnity, or Claims arising under any other theory of recovery, including Claims for fines, penalties, sanctions or punitive or exemplary damages, arising out of or related to the *Deepwater Horizon* Incident that any of them have, ever had, hereafter may have, or have acquired or may hereafter acquire against any Third Party, including against Transocean under the Transocean Contracts and against any insurer of Transocean (acting in its capacity as such); provided that the scope of this paragraph does not include any rights to insurance coverage that the Cameron Releasing Parties may have under the Cameron Policies. Cameron represents and warrants that it is authorized by the Consenting Cameron Insurers to enter into this paragraph on their behalf. Without limiting the remedies for any portion of this Agreement, the Parties agree that the BP Released Parties may enforce specific performance of this Paragraph.

> 4.5 To the fullest extent allowed by law, Cameron hereby assigns all right, title, and interest to all Claims that the Cameron Releasing Parties have asserted or could assert against any Third parties, including any indemnification claims against Transocean under the Transocean Contracts and further including Claims for fines, penalties, sanctions or punitive or exemplary damages, arising out of or relating to the *Deepwater Horizon* Incident (the "Cameron Third Party Claims") to BPXP, and BPXP accepts all right, title, and interest to all Cameron Third

---

[2]   *Millis Development& Construction v. America First Lloyd's Ins. Co.,* 809 F.Supp. 616, 635 (S.D. Tex. 2011), citing *Mid–Continent Ins. Co. v. Liberty Mut. Ins. Co.,* 236 S.W.3d 765, 774 (Tex.2007).

[3]   *American Zurich Ins. Co. v. Barker Roofing, L.P.*, 387 S.W.3d 54, 61 (Tex.App.–Amarillo 2012, no pet.).

Party Claims.  To the extent that assignment of any Cameron Third Party Claims is deemed invalid by a court or arbitration panel of competent jurisdiction, Cameron agrees on behalf of the Cameron Releasing Parties to release, and covenants not so sue for, each and every such Cameron Third Party Claim for which the assignment had been deemed invalid.

After consistently declaring it must waive all its indemnity rights to settle (including in the complaint here), Cameron now argues it magically preserved Liberty's subrogation rights while still transferring all its rights, isolating paragraph 4.4.  Cameron's argument rings hollow and cannot withstand scrutiny.   Although paragraph 4.4 purports to preserve Liberty's subrogation rights, Cameron has transferred the basis for any subrogated rights to BP in Paragraph 4.5, including all of Cameron's rights against Transocean.  As a consequence, if upon payment, Liberty tried to assert the contractual right of indemnity Cameron had against Transocean, Liberty could no longer assert that subrogation claim because it has been transferred to BP by Cameron.[4]  If otherwise, surely Cameron, who continued to discuss settlement with Liberty into January 2012, would have advised Liberty of the opportunity to pay and pursue subrogation rights.  It never did.

### 2.    Prior to Cameron's settlement with BP, Liberty had valuable, valid subrogation rights against Transocean which were derivative of Cameron's indemnity rights.

"Under Texas law, contractual subrogation rights are created between parties by agreement or contract granting the right to pursue reimbursement from a third party in exchange for payment of a loss."[5] Liberty's contractual subrogation rights are explicitly set forth in the underlying Illinois National Policy:

### O.    Transfer of Rights of Recovery

---

[4] *See* Deposition of Paul Koepff, page 250, line 15 through page 254, line 18 attached as Exhibit 2.
[5]   *Millis Development & Const., Inc. v. America First Lloyd's Ins. Co.,* 809 F.Supp.2d 616, 635 (S.D.Tex. 2011), citing *Mid–Continent Ins. Co. v. Liberty Mut. Ins. Co.,* 236 S.W.3d 765, 774 (Tex.2007).

> If any Insured has rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them.[6]

Cameron previously argued to the Court that Transocean owed Cameron indemnity for claims, including claims for loss of hole or reservoir and pollution claims.[7]   In Cameron's Amended Complaint, Cameron admits it knew its insurers had valid subrogation rights that had to be waived in the settlement because BP likely was required to indemnify Cameron "because Transocean was entitled to look to BP under indemnification provisions in the contracts between those parties,"[8] and BP had responsibility for all pollution claims.[9]

### 3.    Liberty did not unconditionally deny liability, and therefore it did not waive its subrogation rights.

Desperately trying to avoid the known consequence of its decision to transfer its indemnity rights, Cameron argues Liberty waived its subrogation rights when Liberty "unconditionally denied liability for Cameron's settlement with BP based on its "Other Insurance" clause."   This contention is simply not true.   While Liberty did repeatedly inform Cameron of its coverage positions based on the OIC and objected to impairment of its subrogation right, and reserved its rights, it never denied coverage or unconditionally denied liability.[10]   To the contrary, Liberty repeatedly advised that once all underlying insurance and indemnities were exhausted, the Policy would attach and coverage would be afforded subject to

---

[6]   Exhibit 1 Illinois National Ins. Policy, Form 80517 at p. 16.
[7]   *See* Doc. 4524-1, Memorandum In Support Of Cameron International Corporation's Motion For Summary Judgment Denying All Claims Asserted By Transocean And Declaring Obligations Of Transocean To Indemnify And Defend Cameron.
[8]   *See* Doc. 6287, Amended Complaint at pages 12-13.
[9]   *Id.* at pages 10-13.
[10]   *See* Paul Koepff letters attached as Exhibits 3, 4 and 5.

the other terms, conditions and provisions of the Policy.  And, Liberty repeatedly requested to discuss its position regarding the BP settlement and its impact on coverage and offered to pay some amount.  But Cameron was unwilling to accept the amount offered.[11]   In short, Liberty never unconditionally denied liability and did not waive its subrogation rights.[12]   At minimum, a genuine issue of fact exists.

### 4.      Liberty did not repudiate the insurance contract, but Cameron did.

Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance.[13] It is conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract.[14] When one party repudiates a contract, the innocent party may treat the repudiation as a breach or continue to perform under the contract and await the time of the agreed-upon performance.[15]

Liberty never denied coverage and did not repudiate the insurance contract; instead, Liberty advised that the Policy had not yet attached and consistently objected to the non-financial settlement terms demanded by BP, which would impair its subrogation rights.[16] This is a crucial distinction because the Policy may have afforded coverage in the future once the underlying insurance and indemnities had been exhausted.

---

[11] *Id.*

[12] *See U.S. Fidelity and Guaranty Co. v. Cascio,* 723 S.W.2d 209, 210 (Tex.App.—Dallas 1986, no writ), citing *Ford v. State Farm Mutual Automobile Ins. Co.,* 550 S.W.2d 663, 666 (Tex. 1977).

[13] *Van Polen v. Wisch*, 23 S.W.3d 510, 516 (Tex.App.—Houston [1st Dist.] 2000, pet. denied).

[14] *In re Braddock,* 64 S.W.3d 581, 585 (Tex.App.—Texarkana 2001, no pet.).

[15] *Ingersoll–Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 211 (Tex.1999).

[16] Exhibit 3, November 7, 2011 Koepff letter; *see also* Exhibit 4, December 13, 2011 Koepff letter, and Exhibit 5, December 14, 2011 Koepff letter.

Cameron, however, refused to protect Liberty's subrogation rights as required by the Policy, and manifested its intent to breach the Policy by consistently demanding from the first time settlement with BP was required that Liberty waive and release its subrogation rights.[17] Liberty repeatedly warned Cameron that the intentional relinquishment of its indemnity rights and Liberty's subrogation rights was a repudiation of the insurance contract.[18] Despite Liberty's objections, Cameron entered into the BP settlement wherein it transferred to BP its claims against Transocean, including those based on contractual indemnity.[19]  Cameron's intentional breach of the "Transfer of Rights of Recovery" provision was a repudiation of the Policy.

     **5.**     **Cameron's transfer of its valuable indemnity rights prejudiced Liberty.**

Cameron transfered its valuable indemnity rights to BP when it settled, thereby impairing Liberty's subrogation rights because thereafter Liberty no longer had the ability to pursue subrogation against Transocean. Impairment of those valuable indemnity rights and benefits prejudiced Liberty and under Texas law negates coverage.[20]  Therefore, Liberty owes no coverage to Cameron and its Motion should be denied.

**B.**     **Liberty Owes No Coverage Yet Because Under the OIC, the Policy is Excess to Indemnification.**

     **1.**     **Liberty's OIC Interpretation is the Only Reasonable and Practical Interpretation Based on the Facts Here.**

Although the Court stated in its Rule 12(c) decision there are two reasonable interpretations of OIC's term "applies": (1) other insurance might ***potentially*** apply to Cameron's

---

[17]  *See* Doc. 6287, Amended Complaint at page 14 ("As a condition of the settlement … BP insisted that Cameron's insurers waive any subrogation rights and that Cameron waive any indemnification rights it might have against Transocean.").

[18]  Exhibit 5, December 14, 2011 Koepff letter.

[19]  Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify, Provision 4.3.

[20]  *See Trumble Steel Erectors, Inc. v. Moss,* 304 Fed. Appx. 236, 239 (5th Cir. 2008) (recognizing under Texas law, "prejudice is the loss of a valuable right or benefit).

loss; or (2) other insurance **actually and presently** applies, the Court then did not consider the effect of those interpretation under the facts here.[21]   Considering the facts, the only reasonable interpretation is that the OIC means other insurance that might **potentially** apply.

### a. "Potentially Applies" is the Only Reasonable and Logical Interpretation Under the Facts Here.

On its face, the other insurance clause dispute appears to be about the **timing** of LIU's payment, *i.e.* whether the policy attaches upon Transocean's mere denial of its indemnity obligation or after Cameron's right to indemnity has been finally determined.   But on the facts here, Cameron's interpretation changes the **amount** that is owed under the LIU policy, leading to an absurd, unreasonable and unfair result.   To illustrate, following Cameron's interpretation, where there are two competing insurers, one of which has denied coverage, the otherwise excess insurer must pay the claim and then pursue subrogation rights against the other insurer.   Because the right of subrogation presumably ensures that the amount the insurer ultimately pays on the loss will not be more than contemplated under the policy, the difference in the interpretations typically  is one of timing.   But here, because Cameron bargained away the subrogation rights, leaving LIU without the ability to pay the claim and recover in subrogation, Cameron's interpretation changes much more than the timing of payment, it changes the net  **amount** LIU is required to pay under the policy. Cameron's interpretation, thus, is unreasonable under the facts here because it results in LIU paying more than bargained for under either interpretation of the other insurance clause.

---

[21] See, Order and Reasons, Doc. #7129, page 20.

The Sixth Circuit considered a similar circumstance in *Sherwin-Williams Co. v. Insurance Co. of the State of Pennsylvania* and flatly rejected the argument that the mere denial of other insurance triggers a policy even where the net amount owed was not impacted.[22]  There, the insured *Sherwin-Williams* had a "difference in conditions" policy ("ISOP") policy which provided coverage only to the extent a loss was not covered by or exceeded the limits of multiple primary policies.  The ISOP policy provided that "Coverage under this policy shall apply as primary insurance when a peril herein is not insured under a specific primary policy."  Sherwin-Williams filed claims against its primary policies and the ISOP policy, all of which denied coverage.  While suit was pending against the primary policy carriers, Sherwin-Williams sued ISOP.  Citing the policy language requiring that a peril be "not insured" for the ISOP policy to apply, ISOP contended the suit was premature because it was not yet clear whether the losses were insured by the primary policies.  ISOP argued that the language "not insured" meant the policy only applied after a denial of coverage *and* the insured had concluded all efforts to recover from the insurers.  The district court disagreed, stating the policy did not explain how the insured was to demonstrate that a claim was "not insured."

The Sixth Circuit reversed, holding the insured must assert and pursue its rights against the primary carriers before asserting a claim against ISOP.  The court explained: "an excess insurer's duty . . . does not attach until the insured *has tried and failed* to collect under his primary policies.[23]  The Sixth Circuit expressly rejected the argument that a mere denial is sufficient:

---

[22] *Sherwin-Williams Co. v. Insurance Co. of Pennsylvania,* 105 F.3d 258 (6th Cir. 1997).
[23] *Id.* at pages 262-263, *citing Rhone-Poulenc, Inc. v. International Ins. Co.,* 71 F.3d 1299, 1302 (7th Cir. 1995).

> As a practical matter, we cannot agree with the district court's rationale that once an insurance company has denied coverage, "there is no reason to expect the claim will ultimately be found to be insured."  Denial of an insurance claim by no means indicates a future successful judicial outcome for the insurer.[24]

The court concluded that until Sherwin-Williams pursued its claims **with all its legal resources** against the primary carriers and obtained a judicial determination as to whether there actually is or is not primary coverage, suit against ISOP was premature.[25]  The court enforced the ISOP policy conditions, although ISOP's right to pursue the primary policies had not been impaired, and ISOP presumably could have pursued the other insurance.

Under the facts here, where the right to pursue Other Insurance has been impaired and the net amount owed is impacted, application of the *Sherwin-Williams* reasoning is even more compelling here.  Accordingly, as in *Sherwin-Williams*, before the Policy here attaches, Cameron must first pursue with all its legal resources its indemnity claims against Transocean in order to obtain a judicial determination as to whether there is or is not indemnity coverage; a mere denial of indemnity by Transocean is not enough.

Liberty's expert, James Robertson, agrees, explaining that for coverage to attach pursuant to the OIC, Transocean cannot merely refuse to pay; it must be determined whether Transocean had an obligation to pay.[26]  But because Cameron transferred its rights away, Transocean's obligation to pay indemnity to Cameron never can be determined and enforced.  Thus, Cameron's interpretation requiring Liberty to pay and pursue the other insurer changes the net *amount* Liberty would be required to pay under the policy and results in Liberty paying more than it contracted for under the Policy, an unreasonable and unfair result.

---

[24] *Id.* at 263.
[25] *Id.*
[26] J. Robertson Depo. at 115:17 to 115:22, attached as Exhibit 6.

Additional reasons further compel the conclusion that the only reasonable interpretation is that other insurance possibly applies. For one, the "presently applies" interpretation would result in no legal duty by Cameron to ever seek enforcement of indemnification from Transocean. If Cameron chose to not seek enforcement of the indemnity provisions, no indemnification would ever "presently apply." The fallacy of this interpretation was explained by a Wisconsin federal court when analyzing a similar argument involving excess coverage. In *Manpower Inc. v. Insurance Co. of Pennsylvania*, the Court explained:

> Manpower argues the "to the extent of recovery" language means DIC [difference in conditions] coverage is available so long as the insured had not actually received payments under the local policy, whether or not the DIC policy is in fact broader than the local policy. Manpower then notes that it has not actually received more than $250,000 from AIG-Europe, and that therefor ISOP must cover the rest of the claim. I do not agree with Manpower's interpretation. Although the "to the extent of recovery" clause is not a model of clarity, it would be absurd to interpret it as meaning that DIC coverage is available whenever the insured has not obtained payment from the primary insurer. Such an interpretation would allow the insured to simply bypass the primary insurer altogether and file a claim directly under the DIC policy and then claim that coverage is owed under the DIC policy because there has been no recovery from the primary insurer. And this would defeat the whole point of DIC coverage, which is to provide coverage when coverage is not available under the primary policy.[27]

As *Manpower* explained, the "presently applies" interpretation allows Cameron unilaterally to choose not to enforce indemnity from Transocean, settle with BP, and then claim the Policy limits from Liberty arguing no indemnity "presently" applies," thereby defeating the whole point of the OIC under the facts here. It would be absurd to interpret the OIC as having that meaning and creating that result.

---

[27] *Manpower Inc. v. Insurance Co. of Pennsylvania*, 807 F.Supp.2d 806, 809 (E.D. Wis 2011).

This interpretation also leads to absurd unreasonable results, because a party like Cameron can decide to settle within weeks without ever demanding indemnity it is owed and without allowing time for a full analysis of indemnification rights between the parties. This is particularly possible where the potentially responsible entity (like Transocean and/or BP) has a business relationship with the insured (like Cameron) that the insured would like to maintain, so the insured does not seek to enforce its contractual indemnity.

Finally, Cameron's interpretation does not explain how the inclusion of the term "indemnification" in the OIC would impact the Policy if there is no requirement to determine if indemnification exists, or even submit a demand to enforce indemnification. Cameron instead merely argues that the term "indemnification" must be deleted from the provision, but, it is a canon of Texas contract construction that the Court must avoid construction of policy language that does not give all terms included in a policy meaning and effect.[28]

In short, the OIC's only reasonable interpretation under the facts here is that other insurance need only **potentially** apply to trigger OIC, meaning Liberty's Policy does not attach until Transocean's indemnification obligation under its contract with Cameron is finally determined, and that did not occur before Cameron waived Liberty's subrogation rights in its settlement with BP.

> **b. If the doctrine of *contra proferentem* is applied, then the sophisticated insured exception should also be applied.**

Alternatively, if as Cameron argues, the Court should still conclude the OIC has two reasonable interpretations, then the sophisticated insured exception to the rule of *contra proferentem* applies, which the Court did not previously consider. *Contra proferentem* is a

---

[28] *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987); *General American Indem. Co. v. Pepper,* 339 S.W.2d 660, 661 (Tex. 1960)*; National Security Life and Cas. Co. v. Davis,* 257 S.W.2d 943, 944 (Tex. 1953)*; see also First Nat. Bank v. Protective Life Ins. Co.*, 511 F.2d 731, 734 (5th Cir.1975).

contract interpretation device of last resort to be used only when all other methods of interpretation and construction prove unsatisfactory.[29]   But *contra proferentem* does not apply when "corporate insureds with bargaining power equal to the insurer participate in drafting the insurance coverage".[30]   As explained in *Vought,* "considering that Texas applies principles that are congruous with the sophisticated insureds exception, the court holds that Texas courts would apply the exception where the facts warrant."[31]   The facts here warrant application of the exception. [32]

### c.    Cameron *is* a Sophisticated Insured.

Substantial evidence establishes that Cameron, with the assistance of its broker Marsh USA, Inc. ("Marsh") one of the world's largest brokers had equal, if not greater bargaining power than Liberty.   Cameron, a multi-billion dollar company that employs its own risk management staff, retained Marsh to assist it in analyzing and negotiating their liability insurance tower.[33]   Marsh shopped around for potential insurers, specifying the coverage sought. Marsh and Cameron solicited and then met with Liberty to discuss and negotiate potential insurance, including the limits and other terms.   Every year, Marsh told Cameron to advise of any discrepancies in the coverage sought and obtained.   Cameron could have complained but

---

[29] *Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex.App-Austin 2003).

[30] *Vought Insurance Industries, Inc. v. Falvey Cargo Underwriting, Ltd.,* 729 F.Supp.2d 814, 823 (N.D. Tex June 25, 2010).

[31] *Id.* at 825.

[32] This Court discussed the sophisticated insured exception at length on page 12 of its November 15, 2011 *BP v. Ranger Insurance* opinion (2011 WL 5547259) where it cited *Vought Insurance Industries, Inc. v. Falvey Cargo Underwriting, Ltd.,* 729 F.Supp.2d 814 (N.D. Tex June 25, 2010). There is a pending certified question from the Fifth Circuit to the Texas Supreme Court related to the *BP-Ranger Insurance* litigation that seeks an explanation of the scope of the sophisticated insured exception under Texas law.  *See In Re Deepwater Horizon*, 728 F.3d 491 (5th Cir. Aug. 29, 2013).

[33] *See* R. Lee Depo at 13:1 to 25:20, attached as Ex. 7; *See* Client Service Agreement between Marsh and Cameron attached as Ex. 8.

never did.  Cameron's sophistication is also evidenced by its use of a complicated "fronted" insurance policy as part of its insurance tower to self-insure its first three million dollars in liability per occurrence,[34] a type of self-insurance mentioned in *Vought* as an example of a sophisticated insured.[35]

Cameron's argument that they were unaware of terms or terms were hidden is simply not believable.  Cameron's director of risk management Tony Black testified about the Policy Cameron received from Liberty.[36]  This is the testimony of a sophisticated insured that had equal bargaining power and negotiated the terms of the Policy to obtain exactly what it wanted; not an insured that was forced to sign a contract of adhesion and now should be protected from the language of its own contract.  Indeed, some terms in the Policy were negotiated and changed.[37] There is no evidence Cameron asked for a term that was not then negotiated.

Considering the evidence, the sophisticated insured exception applies and the Court should construe the Policy in favor of Liberty.  Alternatively, as in *Vought*, a fact issue exists.

### 2.        The Other Insurance Condition is not "Unconscionable".

Cameron alleges Liberty's interpretation of the OIC is "unconscionable" because it would result in Cameron having "less coverage as a result of an 'other insurance' provision than if it 'had been protected by only one of the policies."   Liberty never denied coverage to Cameron, rather, it merely advised that the Policy did not attach until Cameron's right to

---

[34]*See* T. Black Depo at 96:19 to 100:05, attached as Ex. 9.  A fronted policy allows an insured to retain the liability, but use the insurer's financial reserves to meet certain financial regulations necessary to retain that amount of liability.

[35] *See Vought Insurance Industries, Inc. v. Falvey Cargo Underwriting, Ltd.,* 729 F.Supp.2d 814, 826 (N.D.Tex. 2010).

[36] *See* T. Black Depo at 59:24 – 60:17, attached as Exhibit 9.

[37] *See* the deposition of Rusty Lee, page 80, attached as Exhibit 7.

indemnification was resolved.[38]  If Cameron's indemnity rights were determined to be valid and

enforceable, it was fully covered for its potential liability.  If not, the Policy provided $50 million

in coverage subject to the terms and conditions of the Policy.  The OIC does not result in less

coverage, but rather permits Liberty to determine what indemnification exists before its Policy is

triggered.  This is consistent with Cameron's three-pronged approach to liability explained in its

March 31, 2011 and June 30, 2011 10-Q Disclosures:

> If it is ultimately determined that the Company bears some responsibility, and
> therefore liability, for the costs and damages caused by this event, we will rely on
> our contractual indemnity rights and then, if and to the extent necessary and
> available, on our insurance coverage.[39]

### 3.      "Other Insurance" *Does* Include the Transocean Indemnity Obligation.

Cameron argues the term "includes" cannot expand the definition of "other insurance" to

bring within its scope contractual indemnities.  However, the *Barnett v. Aetna* case cited by

Cameron actually rejects this argument and confirms the fundamental rule of contract

construction that each part of the contract should be given effect.[40]  In addition, the treatise cited

by Cameron groups retention, noninsurance transfers, and insurance together as risk-financing

techniques by which an insured arranges for funding of legal liabilities.[41]  Indemnification is

included within this group as either insurance or a non-insurance transfer.  An example of

contractual indemnities performing the same role as insurance is BP's decision to discontinue

---

[38] *See* November 7, 2011 and December 14, 2011 Paul Koepff letters to Cameron, attached as Exhibits 3 and 5.
[39] *See* March 31, 2011 10-Q, attached as Exhibit 10 at 13-15; June 30, 2011 10-Q, attached as Exhibit 11 at p. 14.
[40] *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987); *General American Indem. Co. v. Pepper*, 339 S.W.2d 660, 661 (Tex. 1960); *National Security Life and Cas. Co. v. Davis*, 257 S.W.2d 943, 944 (Tex. 1953); *see also First Nat. Bank v. Protective Life Ins. Co.*, 511 F.2d 731, 734 (5th Cir.1975) (Court must avoid construction of policy which does not give all portions of policy meaning and effect).
[41] *SEE* CAMERON EX. 24, C. LUTHARDT & E. WIENING, PROPERTY AND LIABILITY INSURANCE PRINCIPLES AT 10.12 (4TH ED. 2005).

purchasing property and liability insurance in 1991 and, instead, enter into indemnity agreements with its vendors and service firms to protect them from catastrophic losses.[42]  This risk-financing technique was created because BP and other large oil companies are in as good as if not better financial position than most insurers and they are the only entities involved in in deep-sea well operations that would be able to financially absorb the risk exposure that exists.[43]  Cameron's position would have the Court completely disregard the customary risk-financing techniques used in the oil and gas industry and completely ignore or read out of the OIC the word "indemnification."  But the rules of construction for insurance contracts require interpretation that gives meaning to every word, and indemnification is the main risk-financing technique used by large oil companies.[44]

### 4.    If extrinsic evidence is considered, it favors Liberty, and raises fact issues preventing summary judgment.

Cameron says there is no need for the Court to consider extrinsic evidence to decide its motion, then devotes more than five pages to extrinsic evidence to argue Liberty didn't *intend* the Policy to be excess of contractual indemnification.  Extrinsic evidence is inadmissible to create an ambiguity.[45]  Nevertheless, each of Cameron's contentions can be controverted and create fact issues that prevent summary judgment.

---

[42] Exhibit 6, J. Robertson Depo. at 121:17 to 124:7: BP continued to be self-insured at the time of the *Deepwater Horizon* oil spill.  *See* Nathan Golia, *BP Faces Challenges Self-Managing Oil Spill Claims Process*, INSURANCE & TECHNOLOGY (July 28, 2010); http://insurancetech.com/claims/bp-faces-challenges-self-managing-oil-sp/226300147.

[43] Exhibit 6, J. Robertson Depo. at 121:17 to 124:7.

[44]*See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987); Exhibit 6, J. Robertson Depo. at 121:17 to 124:7.

[45] *Khoei v. Stonebridge Life Ins. Co.*, 2014 WL 585399 (S.D. Tex. Feb. 14, 2014); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir.1991).

Cameron argues the testimony of Liberty's underwriter Alan Mandel "removes any doubt" that the Policy was intended to respond if Transocean denied indemnity. However, Mandel's testimony is not an admission and is not conclusive on this issue. Mandel stated in his deposition he was not a claim person and he <u>could not</u> give an opinion about whether Liberty would be responsible for the loss if Transocean denied indemnity:

> Q.    So Cameron had indemnity agreements with its customers, right?
>
> A.    That's what Tony Black told me.
>
> Q.    And that was your understanding when you issued the policies to Cameron, right?
>
> A.    That was the only reason I had issued the policy, to write the account.
>
> Q.    And so as a result, if Cameron incurred a loss, it would look first to the customer to satisfy the loss; right?
>
> A.    That is a claim issue, so I can't give you – I can't give you a valid opinion. I just don't know.
>
> Q.    So, if Cameron had suffered a loss in connection with a blowout for which you sold Cameron an insurance policy, and the customer with whom Cameron had an indemnifying agreement refused to pay, you don't know whether Cameron had insurance.
>
> A.    ***I don't know how that would work, no.***[46] (emphasis added)
>
> ***
>
> Q.    And is it fair to say that where other insurance is not actually available to pay Cameron's loss, this provision [the other insurance condition] should not excuse Liberty from paying?
>
> A.    To tell you that, I cannot make an opinion. I'm not a claim person, so I couldn't tell you. I don't have the basis to make an opinion on that. ***I don't know***.[47] (emphasis added)
>
> ***

---

[46] Alan Mandel deposition, Exhibit 12, page 66, line 24 through page 68, line 2.
[47] *Id.* at p. 85, l. 4 through l. 14.

Q.      When you issued the policy to Cameron, would you have found it hard to believe that Liberty would rely on the "other insurance" provision to refuse to pay Cameron's losses for blowouts?

A.      That, I have no idea.  I'm not a claim person.  I can't give you a basis of an opinion.  I really don't know.  I would be guessing.[48]

Further, Mr. Mandel testified in his personal capacity, not as a corporate representative of Liberty, and said he had no basis to agree or disagree with Liberty's claim decision:

Q.      Did you agree with the decision of Liberty to deny coverage to Cameron?

A.      I can't make an assumption or an opinion, because I am not a claim person.  I have no background to do that.[49]

***

Q.      Do you agree with Liberty's position in this case to deny coverage to Cameron based upon the "other insurance" provision?

A.      To be perfectly honest, I have no idea.  I have no background to know yes or no.  I'm not a claim person.  I don't have that background.[50]

Clearly Mandel had "no idea" of Liberty's "intent" as to its coverage position on the OIC, and his testimony certainly does not "remove any doubt" about what Liberty's Policy was intended to do.

Cameron's argument that a different declaratory judgment action[51] involving a primary policy not governed by Texas law with potentially different language suggests that Liberty could have paid first here and pursued the indemnitor is similarly misplaced.  First, the argument is totally irrelevant here where Liberty never was provided the opportunity by Cameron to pay any amount and pursue its subrogation rights because from the outset of settlement discussions, Cameron insisted such rights must be waived.  The other complaint makes no mention of a

---

[48] *Id.* at p. 92, l. 8 through l. 17.
[49] *Id.* at p. 55, l. 15 through l. 19.
[50] *Id.* at p. 90, l. 21 through p. 91, l. 4.
[51] *See* Complaint, *Liberty Int'l Underwriters Canada v. Scottsdale Ins. Co., et al.,* Civ. A. No. 1:12-cv-04934 (D.N.J. Aug, 6, 2012), attached as Ex. 28 to Cameron's Motion.

waiver of subrogation right.[52]   More importantly, Liberty has never said that payment first and

pursuit of another insurer is never appropriate.   Rather, as James Engel explained, the availability

of that procedure depends upon state law and under Texas law which governs the policy here,

that procedure has been rejected.[53]   The other complaint does not involve Texas law and

therefore is inapposite and irrelevant.

Cameron also asserts AIG Excess ("AIG"), one of Cameron's other insurers, "contrary to

its own financial interests," declined to adopt Liberty's position and instead funded the BP

settlement.   Cameron's speculation about AIG's financial interests is unfounded,

unsubstantiated, and irrelevant.   Whether an excess insurer with its own financial interest agrees

or disagrees with another insurer's interpretation of its own policy is irrelevant to construction of

a policy.

---

[52] *Id.*

[53] *See* James Engel deposition, page 135 line 19 through page 136, line 6, attached as Exhibit 13.
Texas law has evolved over the last twenty years to all but require insurers to withhold payment on any settlement where coverage issues exist until after those coverage issues have been resolved if it wishes to avoid paying claims that are not covered.  In 2008, the Texas Supreme Court ruled in *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.,* 246 S.W.3d 42 (Tex. 2008) that, under Texas law, an insurer is not entitled to reimbursement if it pays a settlement without the insured's express written consent to reimburse the insurer if coverage is later determined not to exist.  In dissent, now Chief Justice Nathan Hecht stated:

> The Court encourages insurers, as it has in the past, to obtain prompt resolution of coverage
> disputes, but today's decision leaves them no alternative.  Now an insurer *must* litigate coverage
> before a liability claim is resolved, even if that means putting an insured in the undesirable
> position of having to fight liability and coverage at the same time, even if it means litigating the
> liability claim in a declaratory judgment action to determine coverage, and even if it means
> delaying resolution of the liability claim until coverage has been determined.  Otherwise, an
> insurer will be denied the right to litigate coverage altogether, which the Court surely cannot
> intend.[53]  *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.,*
> 246 S.W.3d 42, 55 (Tex. 2008)

### C.    Liberty Has No Duty to Defend Cameron or Indemnify Cameron for Defense Costs[54]

Cameron asserts that Liberty owes defense expenses in addition to the Policy limits. Liberty has previously moved for summary judgment on this issue and filed a memorandum in support and reply brief, which are adopted herein.[55]

As explained in Liberty's Motion, Liberty does not owe defense expenses.  The Policy distinguishes between a duty to defend and a duty to indemnify.  Cameron agrees that Liberty does not owe a duty to defend under the Policy:

**DEFENSE**

A.    We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

B.    We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss" under this Policy.  If we exercise such right, we will do so at our own expense.

C.    If the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are exhausted solely by payment of "loss," we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which, in our opinion, may give rise to a "loss" under this Policy.  Such investigation or defense shall be at our own expense.[56]

Where there is no duty to defend, the obligation to reimburse defense costs, if any, must be rooted in a Policy's indemnification obligation.[57]  Here, the Policy does not require Liberty to *indemnify* Cameron for its defense costs in the underlying MDL.  The Policy limits Liberty's indemnification obligation to covered "loss" defined as "those sums which [the insured is]

---

[54] *See* Liberty's Motion For Partial Summary Judgment, Dkt. No. 12050-1, pages 14-20.
[55] *Id.,* and Liberty's Reply Brief, Dkt. No. 12454.
[56] *See* Liberty Policy attached as Exhibit 14, page 01499.
[57] *Gabarick, supra.*

legally obligated to pay *as damages*, after making proper deductions for all recoveries and salvage[.]"[58]  Because defense costs are not "damages," these costs do not qualify as covered "loss" under the Policy definition.[59]  In contrast, where courts have held an insurer owed a duty to pay defense costs, the Policy specifically includes defense costs within the indemnification obligation.  For example, in *National Union Fire Ins. Co. of Pittsburgh, PA v. U.S. Liquids, Inc.,* No. 03-20542, 2004 WL 304084, at *6 (5th Cir. 2004) (unpublished), the insurance Policy expressly defined "loss" to include "defense costs," meaning "reasonable and necessary fees, costs, and expenses . . . resulting solely from the investigation, defense and appeal of a Claim against the Insureds[.]"[60]  The Liberty Policy indisputably contains no such language and should not be interpreted in a strained manner to expand the limited obligation Liberty undertook.

Ignoring the clear Policy language, Cameron claims Liberty must indemnify Cameron for its defense costs because the Policy follows form to the underlying policy issued by Illinois National Insurance Company ("the INIC Policy") and, according to Cameron, the INIC Policy requires indemnification of defense costs.  This argument fails for at least two reasons.  First, the Policy specifically states that "*[e]xcept for any definitions, terms, conditions and exclusions of this Policy*, the coverage provided by this Policy is subject to the terms and conditions of the

---

[58] *See* Exhibit 14 at 01499 (emphasis added).

[59] *See, e.g., Westchester Fire Ins. Co. v. Stewart & Stevenson Servs., Inc.*, 31 S.W. 3d 654, 659-60 (Tex. App. – Houston [1st Dist.] 2000, reh'g overruled) (insured's defense costs were not covered loss under excess Policy requiring insurer to pay "sums that the 'insured' must legally pay as damages").

[60] *See also Gabarick,* 650 F.3d 545 (5th Cir. 2011) (holding insurer owed duty to indemnify defense costs where Policy included coverage for "costs, charges and expenses reasonably incurred and paid by assured in defense against any liabilities"); *Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 988-89 (5th Cir. 1993) (Policy defining "ultimate net loss" to include "expenses for . . . lawyers . . . and for litigation, settlement, adjustment and investigation of claims and suits" required insurer to indemnify insured for defense costs); *Certain Underwriters at Lloyds v. Chicago Bridge & Iron Co.*, 406 S.W.3d 326, 337-38 (Tex. App. – Beaumont 2013) (same).

[INIC Policy.]"[61]   Because the Policy contains its own definitions, terms and conditions disclaiming a duty to defend and limiting Liberty's indemnification obligation to one which does not include defense costs, the Policy's definitions, terms, conditions and exclusions govern and the Policy does not follow-form to the INIC Policy on the claim for attorney fees.[62]

Furthermore, even if the Court were to consider the INIC Policy to determine the scope of Liberty's indemnification obligation, which it should not, the INIC Policy does not require indemnification of Cameron's defense costs.[63]   Rather, its indemnification obligation only requires INIC to pay sums Cameron is legally obligated to pay as "damages."[64]   As discussed above, "damages" do not include attorney fees.   Moreover, the INIC Policy's definition of the term "Loss" likewise does not include attorney fees.   The INIC Policy provides, "[I]f the applicable Retained Limit is specifically designated in the Schedule of Retained Limits as including Defense Expenses, then Loss shall include such Defense Expenses."[65]   The Policy's Schedule of Retained Limits *does not* include a designation stating that defense expenses are included.[66]   Applying this plain language, defense expenses are not included with in the INIC Policy's definition of "Loss".   Thus, the INIC Policy's "Loss" definition, like Liberty's, does not include attorney fees.

---

[61] Exhibit 14 at 01498 (emphasis added).

[62] *See Westchester*, 31 S.W.3d at 660 (where excess Policy stated that its own terms applied if different from underlying Policy, excess Policy's definition of loss controlled, and court could not consider lower level Policy terms).

[63] The INIC Policy has a duty to defend obligation, which includes an obligation to provide counsel and pay expenses.   *See* INIC Policy, attached as Exhibit 1, at Endorsement 29, ¶ 3.   That provision is not applicable to the Liberty Policy which expressly disclaimed a duty to defend obligation.

[64] *See* Exhibit 1 at Insuring Agreement, ¶ I(A).

[65] *Id.* at Endorsement 29, at ¶ 10.

[66] *Id.* at Schedule of Retained Limits.

Stretching to support its defense costs claim, Cameron recently invented a purported third duty owed by liability insurers – a "separate covenant . . . to pay court costs and attorneys' fees" that is "separate and distinct" from the duties to defend and to indemnify.[67]  Citing the "Limits of Insurance" section of the INIC Policy, Cameron claims that INIC assumed a duty to pay "Defense Expenses" in addition to the policy limits.  The Policy is "silent" concerning this third duty, Cameron contends, and thus the Policy follows form to the INIC Policy and Liberty also owes defense expenses in addition to the policy limits.

Cameron is wrong for several reasons.  First, the Policy is not silent.  It expressly provides there is no obligation to pay beyond the Policy limits.  The Policy states that the most Liberty will pay for "loss resulting from a single occurrence is the Policy's $50 million limit.[68]  Thus, the INIC Policy provisions are not applicable.

Second, Cameron has not cited a single case in which an insurer owed defense expenses because of a "separate covenant" apart from the familiar duties to defend and indemnify.[69]  And the Fifth Circuit is clear that a liability insurer owes only these two duties: "Under Texas law, an insurer may have *two responsibilities* relating to coverage—the duty to defend and the duty to indemnify."[70]

Third, Cameron claims that this supposed third duty originates in Endorsement 29, which amends the INIC Policy's "Limits of Insurance" provisions.  Far from creating *new* obligations, the provision only clarifies the scope of INIC's duty to defend.   Under Endorsement 29, paragraph H, *if INIC owed a duty to defend Cameron*, "Defense Expenses [would] be in addition to the applicable Limits of Insurance of this policy."  Because the Policy "disclaims a duty to

---

[67] Rec. Doc. No. 12342, at p. 15.
[68] Exhibit 14 at pages 01483, 01498.
[69] *Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 989 (5th Cir. 1993) did not so hold and the statement Cameron relies on is dicta.
[70] *See Gilbane Building Co.*, 664 F.3d at 594 (emphasis added).

defend" and any obligation to pay outside its limit, Endorsement 29's terms related to INIC's defense obligation do not apply to Liberty.

Apart from the duty to defend obligation, which only INIC had, neither INIC nor any insurer following form to the INIC Policy was required to indemnify Cameron for defense expenses.[71]   For these reasons, Cameron cannot show that Liberty is liable under the Policy for its defense costs in the underlying MDL.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

/s/ *Christopher W. Martin*
Christopher W. Martin
Federal I.D. 13515
Robert G. Dees
Federal I.D. 13899
808 Travis, Suite 1800
Houston, Texas 77002
713-632-1700 (Telephone)
713-222-0101 (Facsimile)

Judy Y. Barrasso, 2814
Celeste, Coco-Ewing, 25002
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana  70112
504.589.9700 (Telephone)
504.589.9701 (Facsimile)

Counsel for Liberty Insurance Underwriters, Inc.

---

[71] *See, e.g., TIG Ins. Co. v. North Am. Van Lines, Inc.*, 170 S.W.3d 264, 270-71 (Tex. App. - Dallas 2005, no pet.) (umbrella insurer was not obligated to pay insured's defense costs, which were excluded from Policy's definition of "ultimate net loss").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Defendant Liberty Insurance Underwriters, Inc.'s Response to Plaintiff Cameron International Corporation's Statement of Uncontested Material Facts has been served on all Counsel by electronically uploading the same in accordance with Pretrial Order No. 12, on this 2nd day of April, 2014.

*/s/ Christopher W. Martin*_____
Christopher W. Martin

5395-0002
01110442