UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * * | MDL NO. 2179 SECTION J JUDGE BARBIER MAG. JUDGE SUSHAN |
| **THIS DOCUMENT APPLIES TO:** **No. 12-311** | * * | **JURY TRIAL DEMANDED** |

**LIBERTY INSURANCE UNDERWRITERS, INC.'S
OPPOSITION TO PLAINTIFF CAMERON INTERNATIONAL, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 6

| | |
|---|---|
| Christopher W. Martin | Judy Y. Barrasso, 2814 |
| Federal I.D. 13515 | Celeste, Coco-Ewing, 25002 |
| Robert G. Dees | BARRASSO USDIN KUPPERMAN |
| Federal I.D. 13899 | FREEMAN & SARVER, L.L.C. |
| 808 Travis, Suite 2000 | 909 Poydras Street, 24th Floor |
| Houston, Texas 77002 | New Orleans, Louisiana  70112 |
| 713-632-1700 (Telephone) | 504.589.9700 (Telephone) |
| 713-222-0101 (Facsimile) | 504.589.9701 (Facsimile) |

Attorneys for Liberty Insurance Underwriters, Inc.

# James A. Robertson, CPCU, ARM
## 1/16/2014

### Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF LOUISIANA
 3
 4
    IN RE: OIL SPILL by the OIL   MDL NO. 2179
 5  RIG "DEEPWATER HORIZON" in the SECTION J
    GULF OF MEXICO, on            JUDGE BARBIER
 6  APRIL 20, 2010                MAG. JUDGE
                                  SHUSHAN
 7
 8      Videotaped Deposition of JAMES A.
    ROBERTSON, CPCU, ARM, 881 Dover Drive, Suite
 9  360, Newport Beach, California 92663, taken in
    the offices of Stone, Pigman, Walther,
10  Wittmann, 546 Carondelet Street, New Orleans,
    Louisiana 70130, on Thursday, the 16th day of
11  January 2014, commencing at 9:31 a.m. and
    concluding at 3:14 p.m.
12
13
    APPEARANCES:
14
    WILLKIE FARR & GALLAGHER
15  (BY: JEFFREY B. KORN)
    787 Seventh Street
16  New York, New York  10019-6099
    (ATTORNEYS FOR CAMERON INTERNATIONAL
17  CORPORATION, PLAINTIFF)
18
    STONE PIGMAN WALTHER WITTMANN
19  (BY: CARMELITE M. BERTAUT)
    546 Carondelet Street
20  New Orleans, LA 70130-3588
    (ATTORNEYS FOR CAMERON INTERNATIONAL
21  CORPORATION, PLAINTIFF)
22
23
24
25
```

### Page 2

```
 1  APPEARANCES, CTD:
 2    BARRASSO, USDIN, KUPPERMAN,
      FREEMAN & SARVER
 3    (BY: JUDY Y. BARRASSO)
      909 Poydras Street, 24th Floor
 4    New Orleans, Louisiana 70112
      (ATTORNEYS FOR LIBERTY INSURANCE
 5    UNDERWRITERS, DEFENDANTS)
 6
    Also Present:
 7    Mathew Hodgkins, Videographer
    Reported by:
 8    TARA W. WILSON
      Certified Court Reporter
 9
10
```

### Page 3

```
 1               I N D E X
 2
 3
 4                                    PAGE
 5  SUIT CAPTION............................ 1
 6  APPEARANCES........................... 1, 2
 7  STIPULATION............................. 4
 8
 9  EXAMINATION INDEX
10  BY MR. KORN............................. 6
11
12  EXHIBIT INDEX
13  EXHIBIT 164 (EXPERT REPORT OF JAMES A.
14  ROBERTSON, CPCU, ARM)................... 6
```

### Page 4

```
 1            S T I P U L A T I O N
 2
 3      It is stipulated and agreed by and between
 4  counsel for the parties hereto that the
 5  videotaped deposition of the aforementioned
 6  witness is hereby being taken for any purposes
 7  under the Federal Rules of Civil Procedure.
 8      The formalities of sealing, certification,
 9  and filing are specifically waived.  The
10  witness reserves the right to read and sign the
11  deposition.
12      That all objections, save those as to the
13  form of the question and the responsiveness of
14  the answer, are hereby reserved until such time
15  as this deposition, or any part thereof, may be
16  used or sought to be used in evidence.
17
18              * * * * * *
19
20      TARA W. WILSON, Certified Court Reporter,
21  State of Louisiana, officiated in administering
22  the oath to the witness.
```

# James A. Robertson, CPCU, ARM
## 1/16/2014

**Page 113**

1 interpretation of the "other insurance"
2 provision, Cameron must pay that judgment, even
3 though the contractual indemnitor has refused
4 to pay, right?
5    MS. BARRASSO:
6       Objection, asked and answered.
7    THE WITNESS:
8       I believe the way I've worded the
9 answer and the way you asked the question
10 before lunch, which the answer to which, I
11 believe, is going to be the same, is that under
12 those circumstances, there still has not been a
13 determination by which the carrier can actually
14 determine if the attachment point of its policy
15 has been reached.
16       And it is essential and the carrier
17 has an absolute right to require that the
18 attachment point of its policy be reached
19 before it has any obligation under the policy
20 or whether there's -- before there's any
21 coverage that attaches under the policy.
22 EXAMINATION BY MR. KORN:
23    Q.    And that means even though the party
24 who allegedly owes a contractual indemnity has
25 refused to pay it and is litigating that with

**Page 114**

1 Cameron, Cameron must pay the loss of a billion
2 dollars and Liberty is not responsible for it,
3 right?
4    MS. BARRASSO:
5       Objection. And also objection,
6 Liberty was never responsible for a billion
7 dollars.
8    MR. KORN:
9       It's a hypothetical.
10    THE WITNESS:
11       There, there --
12    MS. BARRASSO:
13       Well, object because that's not in
14 your hypothetical.
15    MR. KORN:
16       It was.
17    MS. BARRASSO:
18       If you want to restate it.
19    THE WITNESS:
20       Well, Liberty would only be
21 responsible for the limits of its policy in the
22 event that its policy attaches to the loss.
23 Your hypothetical has not yet included
24 circumstances that indicate that the attachment
25 point of the Liberty policy has been reached.

**Page 115**

1 Liberty is under no obligation to
2 presumptively make payments or, in anticipation
3 of any other event, make payments under the
4 policy. There are definite terms of the
5 Liberty policy that establish when it has an
6 obligation to pay. And this is a contract, and
7 the carrier is entitled to rely on the terms of
8 the contract for purposes of determining what,
9 what its, its obligations are.
10 EXAMINATION BY MR. KORN:
11    Q.    So the attachment -- and let me just
12 be clear. Under -- in your answer, the
13 attachment point has not been reached because a
14 court has not finally determined whether the
15 contractual indemnity is valid and applies to
16 the loss, right?
17    A.    That's right. The issue, in terms of
18 your hypothetical, is not whether Transocean
19 has refused to pay. The issue is whether
20 Transocean has an obligation to pay and will be
21 required to pay by a judgment from the -- from
22 the court.
23    Q.    As a result, when Cameron incurs a
24 loss under those circumstances, Liberty is not
25 paying that loss, right?

**Page 116**

1    A.    Liberty is only required to pay those
2 losses for which a claim has actually been
3 submitted and under circumstances where its
4 attachment point has already been reached. As
5 I said in the previous answer or one of the --
6 two answers ago, it doesn't have to make
7 payments in anticipation of some other unknown
8 event or some other unknown outcome.
9    Q.    And is that unknown event or unknown
10 outcome the final discrimination of the
11 Transocean indemnity?
12    A.    In this case, yes. It, I mean, could
13 be other circumstances, but.
14    Q.    Turn back to the Liberty policy,
15 which you can keep open.
16    A.    Okay.
17    Q.    Looking at the "other insurance"
18 clause, do you think that a reasonable insured
19 reading the terms of this "other insurance"
20 provision would have understood that when it
21 incurred a loss covered by this policy, that
22 Liberty would not pay that loss unless and
23 until a court ruled that a potential
24 contractual indemnity that might also apply to
25 that loss was invalid or unenforceable?

**(504) 833-3330**     **Curren-Landrieu, LLC**   FAX (504) 833-3355
**(800) 487-3376**      www.currenland.com    currenland@aol.com

James A. Robertson, CPCU, ARM
1/16/2014

### Page 121

1    Q. And where an indemnification
2 agreement has no cap and is unlimited, there is
3 no attachment point for the Liberty policy,
4 right?
5    A. Other than on a contingent basis in
6 the event that the other party is, number one,
7 ultimately unable to pay and, number two, that
8 Cameron or any other policyholder would be
9 required to pay in, in place of the other
10 party, then there's a contingent liability on
11 the failure of the indemnification that all of
12 the insurance would apply.
13    Q. Turn to page 13. And this is at the
14 bottom I'm going to focus you on. What point
15 were you trying to make about the BP
16 indemnity -- withdrawn.
17      What point were you trying to make
18 about BP at the bottom of page 13 over to 14?
19    A. The point I was making in that
20 paragraph, especially in the last sentence on
21 page 13 that carries over to the top of page
22 14, based on what I said leading up to that, is
23 that, what often happens in agreements -- let's
24 just talk about a lease for a minute.
25      A lease will often have an

### Page 122

1 indemnification agreement or a hold harmless
2 agreement, it's usually called, where the
3 lessee is to hold harmless and indemnify the
4 lessor from any claims arising out of the
5 lessee's occupancy of the leased premises.
6      And then, as a means of proving the
7 financial capability of performing under the
8 indemnity agreement, the lessee is required to
9 provide a liability insurance policy that names
10 the lessee -- the lessor, rather, as an
11 additional insured under the policy. And this
12 policy is supposed to provide financial
13 protection to the lessor so that the lessor
14 doesn't have to rely on its own insurance that
15 it purchases for its own risks for loss.
16      BP -- in contrast with the normal
17 practices of both parties in contracts of
18 having their own insurance for their own
19 liabilities, BP takes the position that it
20 doesn't require liability insurance at all. If
21 it is required to indemnify another party, it
22 will indemnify that party out of its own
23 financial resources. It won't rely on some
24 financially inferior organization like an
25 insurance company to pay claims on BP's behalf.

### Page 123

1    Q. What basis do you have for that
2 understanding of BP's behavior?
3    A. There was a -- I've seen it in print
4 at least twice in publications quoting BP's --
5 I think it was the chairman, although it could
6 have been a risk management person -- that BP
7 does not purchase any insurance of any kind,
8 property or liability.
9    Q. When did BP's executives make that
10 statement?
11    A. That statement originally appeared
12 in, in print, I believe it was around 19 --
13 well, I think it's footnoted somewhere here in
14 the report. I want to say 1993, but I -- let
15 me see.
16      It's section H of the report. I
17 think it's actually quoted in section H. It
18 was quoted in articles that were published in
19 1995 and in 1998. I don't remember now,
20 because it's not exactly clear from the
21 footnote, who the individual was that made the
22 statements.
23    Q. Do you know whether BP still has that
24 practice today of not carrying insurance?
25    A. No. I don't know what their current

### Page 124

1 program is -- their current practices are.
2 However, it's my experience in working with
3 large companies that have sophisticated risk
4 management programs that once they embark on a
5 self-funding program like that, they seldom go
6 backwards or revert to prior practices of
7 spending millions of dollars on insurance.
8    Q. Do you know whether BP seeks
9 additional insured status in its contracts with
10 drilling contractors?
11    A. I suspect that depends on the nature
12 of the contracts and the nature of the risks
13 being transferred. And, and, you know, judging
14 from the statements by Mr. Moomjian and
15 articles that he has published, sometimes those
16 sorts of indemnification and other requirements
17 go both ways.
18      Sometimes the producer, BP, will
19 require indemnification for certain risks from
20 a drilling contractor. But I don't know what
21 BP's specific practices are. I only know about
22 the generic practices and the variation of such
23 practices that were written about by Mr.
24 Moomjian.
25    Q. Generally speaking, seeking

31 (Pages 121 to 124)

# James A. Robertson, CPCU, ARM
## 1/16/2014

173

1     REPORTER'S CERTIFICATE
2     This certification is valid only for a transcript accompanied by my original signature
3     and original required seal on this page.
4     I, TARA W. WILSON, Certified Court Reporter, in and for the State of Louisiana, as
5     the officer before whom this testimony was taken, do hereby certify that James A.
6     Robertson, CPCU, ARM, after having been duly sworn by me upon authority of R.S. 37:2554, did
7     testify as hereinbefore set forth in the foregoing 172 pages;
8     That this testimony was reported by me in the stenotype reporting method, was prepared
9     and transcribed by me or under my personal direction and supervision, and is a true and
10     correct transcript to the best of my ability and understanding;
11     That the transcript has been prepared in compliance with transcript format guidelines
12     required by statute or by rules of the Board, that I have acted in compliance with the
13     prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure
14     Article 1434 and in rules and advisory opinions of the Board;
15     That I am not related to counsel or to the parties herein, nor am I otherwise
16     interested in the outcome of this matter.
17
18

19     TARA W. WILSON, CCR
    Certified Court Reporter
20
21
22
23
24
25

44 (Page 173)

# Curren-Landrieu, L.L.C.
Digital Certificate of Authenticity
**Signed 1/31/2014 11:49:00 AM CST**

---

**Digital Certification by:**
Tara W. Wilson
Curren-Landrieu L.L.C.
Valid 11/21/2012 to 12/29/2025

**Document Certified:**
1/16/2014 9:30:00 AM
Oil Spill by the Oil Rig
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010
2179
James A. Robertson, CPCU, ARM
332mjb.ptx

**Certificate Issued by:**
Curren-Landrieu L.L.C.
Courtpages Incorporated
Valid 11/19/2012 to 12/30/2025

**Click Here to Download this Authentic Document**

**Digital Signature:**
4FBC7055F20B3E6B36F2AECB9C74CF10E7514AA6CC9CEEAB95BBF05976D7977B
61AE66B9474B538A94D6107F43B7AF1D046B8799BAEF94C2CDCB1D32E5B6536E

**Public Key Used to Validate the above Signature:**
0602000000A40000525341310002000001000100D35D6D44AA5F666E5A602B59200834ABB4888535BF6B
0F85D3A2698D7CF36138F6A9DC5555D84BBC958576F558798CFF3E64FE994450B11E45EBFE94409BB9D6