UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
|     "DEEPWATER HORIZON" in the | * | |
|     GULF OF MEXICO, on | * | SECTION J |
|     APRIL 20, 2010 | * | |
| | * | JUDGE BARBIER |
| | * | MAG. JUDGE SUSHAN |
| **THIS DOCUMENT APPLIES TO:** | * | |
| No. 12-311 | * | **JURY TRIAL DEMANDED** |

**LIBERTY INSURANCE UNDERWRITERS, INC.'S
OPPOSITION TO PLAINTIFF CAMERON INTERNATIONAL, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 12

Christopher W. Martin
Federal I.D. 13515
Robert G. Dees
Federal I.D. 13899
808 Travis, Suite 2000
Houston, Texas 77002
713-632-1700 (Telephone)
713-222-0101 (Facsimile)

Judy Y. Barrasso, 2814
Celeste, Coco-Ewing, 25002
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
504.589.9700 (Telephone)
504.589.9701 (Facsimile)

Attorneys for Liberty Insurance Underwriters, Inc.

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    EASTERN DISTRICT OF LOUISIANA
 4    ----------------------------------------X
 5    In re: OIL SPILL BY THE OIL RIG
 6    "DEEPWATER HORIZON" IN THE
 7    GULF OF MEXICO, ON APRIL 20, 2010
 8
 9    Applies to:
10    12-311, Cameron Int'l Corp. v. Liberty
11    Ins. Underwriters, Inc., a/k/a Liberty
12    Int'l Underwriters
      ----------------------------------------X
13
14
15        VIDEOTAPED DEPOSITION OF ALAN MANDEL
16                 New York, New York
17                 September 12, 2013
18
19
20
21
22
23
24    Reported by:
      Bonnie Pruszynski, RMR
25    JOB NO. 65662
```

Page 2

```
 7           September 12, 2013
 8           9:30 a.m.

12      Videotaped deposition of ALAN
13 MANDEL, held at the offices of Willkie Farr &
14 Gallagher, 787 Seventh Avenue, New York, New
15 York, before Bonnie Pruszynski, a Registered
16 Professional Reporter, Registered Merit
17 Reporter, Certified LiveNote Reporter and
18 Notary Public of the State of New York.
```

Page 3

```
 2 A P P E A R A N C E S:
 3 WILLKIE FARR & GALLAGHER
 4 Attorneys for Cameron
 5     787 Seventh Avenue
 6     New York, New York 10019
 7 BY: JEFFREY KORN, ESQ.
 8     JAMES CAPUTO, ESQ.
 9     and
10 STONE PIGMAN WALTHER WITTMANN
11     546 Carondelet Street
12     New Orleans, Louisiana 70130
13 BY: CARMELITE BERTAUT, ESQ.
14
15
16 MARTIN DISIERE JEFFERSON & WISDOM
17 Attorneys for Liberty
18     808 Travis
19     Houston, Texas 77002
20 BY: ROBERT DEES, ESQ.
21
22
23 Also present: Dale Swindel, CLVS
```

Page 4

```
 1          A. Mandel
 2      THE VIDEOGRAPHER:  This is the
 3 start of media labeled number one of the
 4 videotape deposition of Alan Mandel in
 5 the matter In Re: Oil Spill by the Oil
 6 Rig "Deepwater Horizon" in the Gulf of
 7 Mexico on April 20, 2010.
 8      This deposition is being held at
 9 787 Seventh Avenue, New York, New York,
10 on September 12, 2013, at approximately
11 9:29 a.m.
12      My name is Dale Swindell from TSG
13 Reporting, Incorporated, and I am the
14 certified legal video specialist.  The
15 court reporter is Bonnie Pruszynski in
16 association with TSG Reporting.
17      Will counsel please introduce
18 yourselves.
19      MR. KORN:  This is Jeffrey Korn of
20 Willkie Farr & Gallagher, counsel for
21 Cameron International Corporation, and
22 with me is James Caputo of my firm, and
23 Carmelite Bertaut of Stone Pigman.
24      MR. DEES:  Robert Dees for the
25 defendants, Liberty.
```

Page 5

```
 1          A. Mandel
 2      THE VIDEOGRAPHER:  Will the court
 3 reporter please swear in the witness?
 4      (Witness sworn.)
 5 ALAN MANDEL,
 6      called as a witness, having been first
 7      duly sworn, was examined and testified
 8      as follows:
 9 EXAMINATION
10 BY MR. KORN:
11   Q   Good morning, Mr. Mandel.  Could
12 you please state your full name for the jury.
13   A   Alan Mark Mandel.
14   Q   Where are you employed today?
15   A   I'm employed at Liberty
16 International Underwriters.
17   Q   What position do you hold at
18 Liberty International Underwriters?
19   A   Vice president underwriting.
20   Q   For how long have you worked at
21 Liberty International Underwriters?
22   A   This is my ninth year.
23   Q   To whom do you report currently?
24   A   John Russomanno.
25   Q   And for how long have you reported
```

Page 54

1    A. Mandel
2        THE WITNESS: Do I answer the
3    question?
4        MR. DEES: Yes.
5    A   Okay. So, the question is, did I
6    know --
7    Q   I can rephrase that.
8    A   Sure.
9    Q   Even though you didn't give any
10   consideration to the "other insurance" clause
11   when you sold the policy to Cameron, were you
12   not surprised -- why were you not surprised
13   that the claims people invoked the "other
14   insurance" clause to deny coverage to
15   Cameron?
16   A   Well, I don't know much about the
17   "other insurance" clause. I just know it's
18   in every insurance contract. It's just
19   basically underlying insurance comes into
20   play. That's all I know about it.
21       So, I really have no idea about the
22   "other insurance" clause. You know, I'm not
23   a claim person, so I -- I -- and I have never
24   been questioned on anything of "other
25   insurance" clause in 37 years in the

Page 55

1    A. Mandel
2    business, so I don't -- you know.
3    Q   Did you play any role in the
4    decision to deny insurance coverage to
5    Cameron?
6    A   I have never had any claim meeting
7    with anybody in LIU under this claim, with
8    the exception when we had -- the claim came
9    in, and I was instructed to make copies of
10   the account summary, the underlying policy,
11   and the -- the binder. The account summary,
12   the policy, and the underlying policy, the
13   three documents, that's all I was instructed
14   to do, and then that was it.
15   Q   Did you agree with the decision of
16   Liberty to deny coverage to Cameron?
17   A   I can't make an assumption or an
18   opinion, because I am not a claim person. I
19   don't have the background to do that.
20   Q   But you would agree that the
21   Deepwater Horizon blowout is the type of
22   incident that you would have assumed would be
23   covered by the Liberty policy that you sold
24   to Cameron; correct?
25   A   It would be covered, yes.

Page 56

1    A. Mandel
2        MR. KORN: Why don't we take a
3    break. Thank you.
4        THE VIDEOGRAPHER: The time is
5    10:30. We are going off the record.
6        (Recess taken.)
7        THE VIDEOGRAPHER: The time is
8    10:39. We are back on the record.
9    BY MR. KORN:
10   Q   Welcome back, Mr. Mandel.
11       I'm going to hand you a document
12   that was previously marked as Morris
13   Exhibit 47.
14       Please take a moment to review
15   Morris Exhibit 47, and let me know when you
16   are ready.
17   A   Okay.
18   Q   Do you recognize Morris Exhibit 47?
19   A   That's -- yes.
20   Q   What is it?
21   A   It's an account summary of the
22   account for the policy period 7/1/09 to
23   7/1/10.
24   Q   And that is the account summary for
25   the Liberty policy that we have been

Page 57

1    A. Mandel
2    discussing and that is the subject of this
3    lawsuit; right?
4    A   Yes.
5    Q   And if you look at the first page
6    of the exhibit, you e-mailed the account
7    summary to Denise Morris on May 5th, 2010;
8    correct?
9    A   Correct.
10   Q   Is this an e-mail that you sent in
11   the ordinary course of your business at
12   Liberty?
13   A   It appears, looking at it, yes.
14   Q   And the account summary that is
15   attached, is that a document that you
16   prepared in the ordinary course of your
17   business at Liberty?
18   A   Yes.
19   Q   I think you talked about this
20   earlier. The account summary is the document
21   that is prepared after the policy has been
22   issued, and after you go through the account
23   and type up your analysis of the account;
24   right?
25   A   Yes.

Page 66

A. Mandel
2  A   Indemnity agreement, warranties,
3  certificates of insurance, hold harmless,
4  et cetera, or -- you know, on that. So I
5  took Tony's word. He's a risk manager, I
6  believe 20 years. Otherwise, I wouldn't -- I
7  wouldn't have written the account at all.
8  Too hazardous.
9      Q   And those agreements that would cap
10 liabilities were with Cameron's customers;
11 right?
12     A   The insurance department of Cameron
13 I believe had the agreements. What I was
14 told, there is certain people in their
15 departments -- I think they have a contract
16 department. They have all certain -- some
17 organization.
18     Q   But the agreements themselves were
19 between Cameron and its customers; right?
20     A   I believe so, yes.
21     Q   You would agree that if one of
22 those customers -- withdrawn.
23         Is it -- withdraw.
24         So, Cameron had indemnity
25 agreements with customers; right?

Page 67

A. Mandel
2  A   That's what Tony Black told me.
3      Q   And that was your understanding
4  when you issued the policies to Cameron;
5  right?
6      A   That was the only reason I had
7  issued the policy, to write the account.
8      Q   And so as a result, if Cameron
9  incurred a loss, it would look first to the
10 customer to satisfy its loss; right?
11     A   Correct. What I was advised.
12     Q   And if the customer did not agree
13 to pay the loss under the customer contracts,
14 Liberty would be responsible for that loss,
15 correct?
16     A   That is a claim issue, so I can't
17 give you -- I can't give you a valid opinion.
18 I just don't know.
19     Q   So, if Cameron had suffered a loss
20 in connection with a blowout for which you
21 sold Cameron an insurance policy, and the
22 customer with whom Cameron had an
23 indemnifying agreement refused to pay, you
24 don't know whether Cameron had insurance?
25     A   I don't know how that would work,

Page 68

A. Mandel
2  no.
3      Q   Would you agree that Cameron faced
4  risk -- risks that might result from a
5  massive oil spill that could put Cameron out
6  of business?
7      A   It's a possibility, depending on
8  how large the company is and how much they
9  have -- and what their other assets are.
10 There is a very big possibility due to fines.
11     Q   That's what you wrote in your
12 account summary; right?
13     A   That's because that's what I was
14 told.
15     Q   If you can turn to page seven of
16 your account summary.
17         Are you with me, sir?
18     A   Yes, I am.
19     Q   What does page seven describe?
20     A   The lead umbrella, the carrier, the
21 limits, the term, the premium, the form,
22 occurrence versus claims made, and the --
23 their conditions of the lead umbrella.
24     Q   Do you see that in describing the
25 lead umbrella policy, there is a section of

Page 69

A. Mandel
2  the form that says "defense"?
3      A   Yes. It's outside the limit.
4      Q   What does that mean?
5      A   That defense could be -- go on
6  forever. It's outside the limit versus in
7  the limit. There are two options, either in
8  the limit or out of the limit. On this
9  account, it's outside the limit.
10        So, this could go on forever. It's
11 not indemnity. It's defense of the claim.
12     Q   So, for the Illinois National
13 Insurance policy that was issued Cameron for
14 the '09-2010 policy year, defense costs were
15 outside limit; correct?
16     A   Yes.
17     Q   And when defense costs are outside
18 limits, that means defense costs are covered
19 by the insurance policy; correct?
20     A   Yes.
21     Q   So, when you wrote this, it was
22 your understanding that defense costs were
23 covered by the Illinois National policy;
24 correct?
25     A   That's what I was advised.

## Page 82

         A. Mandel
1  
2  with pricing.
3      Q   Did the "other insurance" clause in
4  the Liberty policy impact the premium that
5  you charged to Cameron in any way?
6      A   Nothing. It has nothing to do with
7  it.
8      Q   Let's turn to the last page of the
9  Liberty policy.
10         Are you there, sir?
11     A   I'm there. I'm sorry, I'm looking
12 at the page, and then you are looking at me.
13     Q   Clause F on the last page of Engel
14 Exhibit 3 contains the "other insurance"
15 provision; right?
16     A   Yes, it does.
17     Q   What is the purpose of the "other
18 insurance" clause as used in the -- in the
19 Liberty policy?
20     A   Well, not the Liberty policy, but
21 the only thing I know about the "other
22 insurance" clause is that it's other
23 insurance that could be somebody who has
24 self-insurance, and that would be -- in case
25 there is a claim, that would be first that

## Page 83

         A. Mandel
1  
2  would be paid, and then we would come into
3  play.
4         They don't want to also pay -- a
5  lot of times you wind up -- you know, you
6  don't want to pay the same claim two times --
7  you know, it could be there is no control on
8  it.
9         That's the only thing I know about
10 the "other insurance" clause.
11     Q   So, as far as you know, the purpose
12 of the "other insurance" clause is to prevent
13 the insured from collecting twice for the
14 same loss?
15     A   That's correct. I never had an
16 example. I really never seen it, you know,
17 in the history of working in insurance, so I
18 don't know about it.
19     Q   And your history goes back pretty
20 far, all the way back to 1977.
21     A   Thirty-seven years, yeah.
22     Q   Did you discuss with Cameron at any
23 time the "other insurance" clause?
24     A   Did I discuss with Cameron? No, I
25 never had any contact with them, except at

## Page 84

         A. Mandel
1  
2  the meeting, you know, the renewal meeting or
3  the business meeting.
4      Q   Did you discuss with Marsh at any
5  time the "other insurance" clause?
6      A   Never.
7      Q   Did you ever disclose to Cameron or
8  Marsh that Liberty might use the "other
9  insurance" clause as a basis to refuse to pay
10 coverage?
11     A   Never.
12     Q   If you could look at the first
13 sentence of the provision, it says: "If
14 other insurance applies to a loss that is
15 also covered by this policy, this policy will
16 apply excess of such other insurance."
17         Do you see that?
18     A   Yes.
19     Q   And it uses the word "apply" there;
20 right?
21     A   Yes.
22     Q   This provision doesn't say "may
23 apply" to a loss; correct?
24     A   Correct.
25     Q   And it doesn't say "potentially

## Page 85

         A. Mandel
1  
2  apply" to a loss; correct?
3      A   Correct.
4      Q   And is it fair to say that where
5  other insurance is not actually available to
6  pay Cameron's loss, this provision should not
7  excuse Liberty from paying?
8         MR. DEES: Object to form.
9         THE WITNESS: I can talk?
10        MR. DEES: Yes.
11     A   To tell you that, I cannot make an
12 opinion. I'm not a claim person, so I
13 couldn't tell you. I don't have the basis to
14 make an opinion on that. I don't know.
15     Q   When you sold this policy to
16 Cameron, is it fair to say that you did not
17 have an expectation that this provision could
18 be used to deny coverage to Cameron where it
19 was not receiving other insurance from a
20 different source for the same loss?
21     A   No idea.
22     Q   You did not have that understanding
23 when you sold this policy; right?
24     A   Correct. I knew nothing about the
25 "other insurance" clause. We have talked

| Page 90 | Page 91 |
|---|---|
| A. Mandel | A. Mandel |
| 2  A    It has nothing to do with it.<br>3  Q    That would be a false statement to<br>4  suggest that?<br>5  A    False, yeah.<br>6  Q    Would it be a false statement to<br>7  suggest that the "other insurance" provision<br>8  in a Liberty policy is a critical component<br>9  in underwriting policies?<br>10 A    False.<br>11 Q    Do you think that it is fair to an<br>12 insured to be required to go to court and<br>13 obtain a judgment that it is not entitled to<br>14 contractual indemnity before the coverage<br>15 that you sold to Cameron is provided under<br>16 the Liberty policy?<br>17     MR. DEES: Object to form.<br>18 A    I can't -- I can't make an opinion<br>19 on that. I'm not a claim person, so my -- I<br>20 would be guessing. I have no idea.<br>21 Q    Do you agree with Liberty's<br>22 position in this case to deny coverage to<br>23 Cameron based upon the "other insurance"<br>24 provision?<br>25 A    To be perfectly honest, I have no | 2  idea. I have no background to know yes or<br>3  no. I'm not a claim person. I don't have<br>4  that background.<br>5  Q    Are you aware that -- withdrawn.<br>6      Do you know which customer of<br>7  Cameron's Liberty is relying on to say that<br>8  that customer was required to pay indemnity<br>9  to Cameron?<br>10 A    I really have no idea. I'm not --<br>11 I'm not aware of that. I don't know.<br>12 Q    Do you know on what basis Liberty<br>13 is relying on the "other insurance" provision<br>14 to deny coverage to Cameron?<br>15 A    I don't have -- I really don't<br>16 know -- I didn't -- I haven't had any<br>17 discussion with the claim department. It's a<br>18 totally -- to be honest with you, I<br>19 haven't -- I really don't know.<br>20 Q    When you issued the policy to<br>21 Cameron, would you have found it hard to<br>22 believe that Liberty would rely on the "other<br>23 insurance" provision to deny coverage to<br>24 Cameron?<br>25     MR. DEES: Object to the form of |

| Page 92 | Page 93 |
|---|---|
| A. Mandel | A. Mandel |
| 2  the question.<br>3  A    If it's in the contract, then I<br>4  guess it's correct, if there is -- the way<br>5  the wording is. I have no idea. If it's in<br>6  the contract, it's a contract. Nothing was<br>7  hidden. It's right in there.<br>8  Q    When you issued the policy to<br>9  Cameron, would you have found it hard to<br>10 believe that Liberty would rely on the "other<br>11 insurance" provision to refuse to pay<br>12 Cameron's losses for blowouts?<br>13     MR. DEES: Object to form.<br>14 A    That, I have no idea. I'm not a<br>15 claim person. I can't give you a basis of an<br>16 opinion. I really don't know. I would be<br>17 guessing.<br>18 Q    Have you ever discussed the Cameron<br>19 claim with Jim Engel?<br>20 A    I'm sorry, sir?<br>21 Q    Have you ever discussed the Cameron<br>22 claim with Jim Engel?<br>23 A    Only in passing once, when we had<br>24 the problems with the storm. I asked how<br>25 everything was going, and he said he was | 2  working on the Cameron case, and that was it.<br>3  Nothing -- he's never asked me for anything.<br>4  Q    Did you ever discuss the Cameron<br>5  claim with Jessica Rogin?<br>6  A    You want to know the truth? I<br>7  don't know who she is. I never met her, but<br>8  I know the name. I haven't, sir, to be<br>9  honest with you.<br>10 Q    In the nine years that you worked<br>11 at Liberty, has every excess umbrella policy<br>12 had this same "other insurance" provision?<br>13 A    Well, it's the same -- my opinion,<br>14 it's the same jacket. It's the same form<br>15 since 2000 -- the year 2000, so I would say<br>16 for my period, yes. I don't know about<br>17 before, if something changed it. I don't<br>18 know.<br>19 Q    And how many policies would you<br>20 estimate that you have underwritten while<br>21 working at Liberty?<br>22 A    By "underwritten," would you mean<br>23 by bound accounts, or just worked on accounts<br>24 and you don't get the order?<br>25 Q    Let's go with bound accounts. |

```
1                    A. Mandel

2                  C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                          : SS.

5    COUNTY OF NEW YORK    )

6

7

8           I, BONNIE PRUSZYNSKI, a Notary

9    Public with and for the State of New York,

10   do hereby certify:

11          That ALAN MANDEL, the witness

12   whose deposition is hereinbefore set forth,

13   was duly sworn by me and that such deposition

14   is a true record of the testimony given by

15   the witness.

16          I further certify that I am not related

17   to any of the parties to this action by

18   blood or marriage, and that I am in no way

19   interested in the outcome of this matter.

20          IN WITNESS WHEREOF, I have hereunto

21   set my hand this 17th of September, 2013.

22
                          Bonnie A Pruszynski
23                        _____

24                        Bonnie Pruszynski

25
```