UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG          "DEEPWATER HORIZON" in the          GULF OF MEXICO, on          APRIL 20, 2010 | * * * * * * | MDL NO. 2179    SECTION J    JUDGE BARBIER |
| | * | MAG. JUDGE SUSHAN |
| **THIS DOCUMENT APPLIES TO:** | * | |
| No. 12-311 | * | **JURY TRIAL DEMANDED** |

### DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S RESPONSE TO CAMERON INTERNATIONAL CORPORATION'S STATEMENT OF UNCONTESTED MATERIAL FACTS AND OBJECTIONS TO EXHIBITS

Defendant Liberty Insurance Underwriters, Inc. ("LIUI" or "Liberty") submits this response to Plaintiff Cameron International Corporation's ("Cameron") Statement of Uncontested Material Facts in Support of its Motion for Partial Summary Judgment on its Claim for Breach of Contract, Indemnity and Defense Expenses. [Doc. No. 12440-2].

1.  Cameron purchased an excess casualty insurance policy from Liberty Insurance Underwriters, Inc. ("Liberty") for the policy period from July 1, 2009 through July 1, 2010 ("Liberty Policy" or "Policy").  (*See* Liberty Policy Decl. Item 2 (Ex. 2).)

    **RESPONSE:** Denied as written.  Liberty admits that it issued excess liability insurance policy no. LQ1-B71-198583-046 to Cameron, which was in effect from July 1, 2009 to July 1, 2010 ("Policy" or "Liberty Policy").

2.  Liberty charged Cameron a premium of $210,000 for the Liberty Policy.  (Liberty Policy Decl. Item 3 (Ex. 2).)

    **RESPONSE:** Denied as written.  Liberty admits that the Policy's Declarations state that the total annual premium was $210,000.

1

3. The Liberty Policy provides $50 million in limits above $100 million in "Underlying Insurance," defined as the First Underlying Insurance Policy with $25 million limits issued by Illinois National Insurance Company and Other Underlying Insurance Excess of First Underlying Insurance Policy with $75 million limits issued by "Various Companies." (*See* Liberty Policy Decl. Item 5, Art. I (Ex. 2).) That "Underlying Insurance," in turn, was excess of a $3 million "fronting policy" for which Cameron was responsible.

**RESPONSE:** Denied as written. Liberty admits that the Liberty Policy provided $50 million in coverage excess of $103 million in underlying coverage, subject to all terms and conditions of the Liberty Policy. Liberty further avers that the Liberty Policy's unique "Other Insurance" condition made it excess of applicable "self-insurance, indemnification or other mechanism by which [Cameron] arranges for funding of legal liabilities."

4. The Liberty Policy was one layer of a "tower" of ten excess casualty insurance policies purchased by Cameron for the 2009-2010 policy year. (*See* Insurance Tower Diagram (Ex. 6).) In total, Cameron acquired $500 million in excess casualty coverage. (*Id.*) The first underlying excess insurance policy in that tower was issued by Illinois National Insurance Company ("INIC Policy"). (*See* INIC Policy (Ex. 9).)

**RESPONSE:** Denied as written. Liberty admits that the Liberty Policy provided $50 million in coverage excess of $103 million in underlying coverage, subject to all terms and conditions of the Liberty Policy. Liberty further admits that the First Underlying Insurance Policy was issued by Illinois National Insurance Company.

5. Liberty drafted the Liberty Policy using its standard terms and conditions for excess casualty insurance as set forth on Liberty Form 0101-XS (Ed. 03-00). (*See* Morris Dep. at 38 (Ex. 3); Mandel Dep. at 41-42 (Ex. 4); Form 0101-XS (Ed. 03-00) (Ex. 5).) Liberty did not negotiate those terms and conditions, and did not do so with Cameron. (*See* Morris Dep. at 54 ("[T]his is the form that everybody gets."); Mandel Dep. at 45-47 (testifying that Liberty "never" agrees to modify the terms and conditions and "never" did so with Cameron).)

**RESPONSE:** Denied as written. Liberty objects to the cited deposition testimony of Alan Mandel and Denise Morris. These witnesses repeatedly testified that they are not claims personnel, and thus they lack any foundation to testify concerning application of the Liberty Policy to Cameron's loss. (*See* Mandel Dep. At 66 – 68, Exhibit 12). Moreover, Mandel and Morris *only* testified concerning their personal knowledge and experience and *not* as Liberty's corporate representatives.

Moreover, Liberty does negotiate terms and did so, when asked, by Cameron and others. (*See* R. Lee Dep. At 80, Exhibit 7) Liberty avers that Cameron is a multi-billion dollar company that employs its own risk management staff and retained Marsh USA, Inc. ("Marsh"), the world's largest insurance broker, to assist it in analyzing and negotiating its liability insurance tower. (*See* R. Lee Dep. At 13 – 25, Exhibit 7). Cameron unquestionably is a sophisticated insured and, with Marsh's help, was more than capable of evaluating the coverage Liberty offered.

6. Liberty agreed to provide Cameron $50 million in coverage if Cameron suffered a "loss" in excess of $103 million, the limits of Cameron's underlying insurance. (*See* Liberty Policy Decl., Art. I, Decl. Items 4-5 (Ex. 2).) Liberty also agreed to

3

"promptly pay on [Cameron's] behalf the amount of 'loss' covered under this policy." (*Id.* Art. V(H).)

**RESPONSE:** Denied as written. Liberty avers that the Liberty Policy itself, including *all* of its terms and conditions, is the best evidence of the coverage provided.

7. On April 20, 2010, during the Policy period, a blowout of the Macondo Well occurred, causing an explosion and fire aboard the *Deepwater Horizon*. These events gave rise to hundreds of lawsuits, naming Cameron, Transocean, BP and others as defendants and third-party defendants. The lawsuits were consolidated in multi-district litigation.

   **RESPONSE:** Admitted.

8. On April 23, 2010, Cameron provided notice to Liberty that it incurred potential liability arising from the Macondo Well blowout. (Liberty's Resp. to Req. for Admis. No. 1, Apr. 8, 2013 (Ex. 12).)

   **RESPONSE:** Denied as written. Liberty admits that on April 23, 2010 Cameron provided notice to Liberty of a loss arising from the Macondo Well blowout.

9. On August 10, 2010, Cameron requested that Transocean Ltd. and all subsidiaries and affiliates ("Transocean") indemnify Cameron under both "knock-for-knock" and pollution indemnity provisions contained within contracts between Cameron and predecessors to Transocean relating to the sale of the blowout preventer used on the *Deepwater Horizon*.

   **RESPONSE:** Denied as written. Liberty avers that the best evidence of Cameron's request is Cameron's August 10, 2010 letter to Transocean's Acting Co-General Counsel. *See* Exh. F to Liberty's Motion for Partial Summary Judgment Concerning

4

Cameron's Forfeiture of Coverage (Rec. Doc. No. 125807).

10. Although Transocean agreed to honor its "knock-for-knock" indemnity agreements, it denied owing any indemnity to Cameron for pollution liabilities.

**RESPONSE:** Denied as written. Liberty avers that Transocean initially denied Cameron's request to honor its "knock-for knock" indemnity agreement, but later changed its position. Liberty further avers that Transocean tendered Cameron's demand for pollution indemnity to BP. (*See* Exh. H to Liberty's Motion for Partial Summary Judgment Concerning Cameron's Forfeiture of Coverage, Rec. Doc. No. 125807). Transocean also promised Cameron that it would "of course, pass onto Cameron any indemnity it is able to obtain (and pass) from BP." (*See* Ex. I to Liberty's Motion for Partial Summary Judgment Concerning Cameron's Forfeiture of Coverage, Rec. Doc. No. 125807).

11. Cameron sued Transocean. Transocean, in turn, sued Cameron for damages arising from its pollution-related liabilities, indemnity and contribution. Transocean and BP both opposed Cameron's attempts to obtain indemnity for pollution liabilities from Transocean. (*See* Answer to Verified Compl. for Exoneration, Claims, Countercls., and Cross-cls. of Cameron Int'l Corp., Apr. 20, 2011, Dkt 412 (Case No. 10-2771); Transocean's Rule 14(c) Third-Party Compl., Feb. 18, 2011, Dkt. No. 1320; Transocean's Rule 13 Cross-cls./Countercls., Apr. 20, 2011, Dkt. 2068.)

**RESPONSE:** Denied as written. Liberty avers that the cited pleadings themselves are their best evidence of their contents.

12. In October 2011, Cameron began settlement negotiations with BP. (Eastman Dep. at 119 (Ex. 31).)

5

**RESPONSE:** Denied as written. Liberty objects to the cited testimony of Brad Eastman as lacking any foundation, as Mr. Eastman testified that he did not know whether Cameron or BP originally initiated the settlement negotiations. (Eastman Depo., at 117-18.) In the cited page, Mr. Eastman testified only that he first told the insurers in October 2011 that Cameron was negotiating with BP. (See Cam. Ex. 31, at 119.)

13. When Cameron began settlement negotiations with BP, and through the time Cameron settled with BP, Cameron was receiving and since has received no money from Transocean (or BP) for pollution-related liabilities under the indemnity terms of Cameron's contracts with Transocean. (*See* Liberty's Resp. to Req. for Admis. Nos. 15-16, Apr. 8, 2013 (Ex. 12).)

    **RESPONSE:** Admitted. Liberty avers, however, that "Other Insurance" may apply to Cameron's loss under the Policy terms even if a demand for indemnification initially is refused.

14. BP denies owing any indemnity to Transocean for pollution liabilities. (Transocean Ltd, Form 10-K, filed Feb. 27, 2014, at 116 (Ex. 32).)

    **RESPONSE:** Denied as written. Liberty objects that Ex. 32 is hearsay, incomplete as only three pages are attached, and not properly authenticated. Moreover, according to this Court's January 26, 2012 opinion, "BP admits that the [Drilling] contract requires it to indemnify Transocean for pollution claims arising from Transocean's 'fault or negligence,' but denies that it owes indemnity for claims based on strict liability . . . or where Transocean acted with gross negligence." *In re Oil Spill by the Oil Rig Deepwater Horizon*, 841 F. Supp. 2d 988, 992 (E.D. La. 2012).

15. BP's obligations to Transocean for pollution liability have not been resolved. (Order and Reasons, dated Jan. 26, 2012, at 29 (Dkt. 5446).)

    **RESPONSE:** Denied as written. Liberty admits that on January 26, 2012 *all* issues raised in the parties' motions were not resolved. Nevertheless, the Court indisputably held that "BP is required to indemnify Transocean for compensatory damages asserted by third parties against Transocean related to pollution that did not originate on or above the surface of the water, even if the claim is the result of Transocean's strict liability (including OPA and unseaworthiness), negligence, or gross negligence." (*Id.* at 1009.) Cameron has offered no evidence concerning the present status of these issues.

16. To date, BP has, in fact, provided no indemnity to Transocean for pollution liabilities. (Transocean Ltd, Form 10-K, filed Feb. 27, 2014, at 116 (Ex. 32).)

    **RESPONSE:** Denied as written. Liberty objects that Ex. 32 is hearsay, incomplete as only three pages are attached, and not properly authenticated.

17. On November 7, 2011, for the first time, Liberty told Cameron that it would not provide any insurance to Cameron in connection with any settlement with BP based on its "Other Insurance" provision and the existence of Cameron's unresolved claim for contractual indemnity against Transocean. (*See* Nov. 7, 2011 letter from P. Koepff (Ex. 16).)

    **RESPONSE:** Denied. On November 7, 2011, Liberty admits that it sent a coverage position letter to Cameron, which is itself the best evidence of its contents. As stated in this letter, Liberty responded to a request from Cameron that (1) LIU consent, and/or waive any objections to non-financial terms of a hypothetical future settlement with BP, and (2) agree to pay its $50 million limits in the future "should Cameron need such[.]" Liberty informed Cameron that "until a court determines that Cameron is not entitled to

contractual indemnity, Liberty's position was that the LIU policy is excess of Cameron's contractual right to be indemnified by Transocean." Liberty further stated that "LIU has no obligation to indemnify unless both underlying limits and Transocean's contractual indemnity to Cameron have been exhausted. At present time, such exhaustion has not happened." Liberty reserved its rights under the Policy, at law, and in equity.

18. On December 12, 2011, with the assistance of Magistrate Judge Shushan as mediator, Cameron and BP reached a tentative settlement of nearly all of Cameron's Macondo- related liability in exchange for a $250 million payment. (*See* Dec. 12, 2011 email from M. Auslander (Ex. 17).)

**RESPONSE**: Denied as written. Liberty objects to the Mitch Auslander e-mail included in Ex. 17. The statements contained in this e-mail are hearsay at minimum and, in some instances, hearsay within hearsay. Furthermore, Cameron's submission of this e-mail, containing statements of its trial counsel, potentially violates Rule 3.7 of the Louisiana Rules of Professional Conduct, which precludes an attorney from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness. Liberty also objects to Cameron's characterization of Magistrate Judge Shushan's role in the Cameron/BP settlement negotiations. Finally, Liberty avers that the draft settlement agreement between Cameron and BP attached as Ex. 17 is the best evidence of its terms and conditions.

19. Over the next three days, all of Cameron's insurers except Liberty consented to the proposed settlement.

**RESPONSE**: Denied as written. As reflected in its December 13, 2011 letter, Liberty advised Cameron that it was "not in a position to object to the settlement amount of

8

$250M" but it "continue[d] to object to the . . . non-financial terms[.]"  (*See* Exhibit 4) Liberty admits that some of Cameron's insurers agreed to contribute some portion of their policy proceeds at issue to partially fund Cameron's settlement with BP.

20. Liberty did not object to the amount of the settlement.  (*See* Dec. 13, 2011 letter from P. Koepff (Ex. 19); Dec. 14, 2011 letter from P. Koepff (Ex. 18).)

    **RESPONSE**:  Denied as written.  As reflected in its December 13, 2011 letter, which is the best evidence of its contents, Liberty advised Cameron that it was "not in a position to object to the settlement amount of $250M" but it "continue[d] to object to the . . . non-financial terms[.]"  (*See* Exhibit 4)

21. Liberty waived its rights to rely on the consent provisions of the Liberty Policy.  (*See* Dec. 14, 2011 letter from P. Koepff (Ex. 18).)

    **RESPONSE**: Denied as written.  Liberty admits that it advised Cameron that if Cameron decided to settle with BP, it would not assert that the *amount* of the settlement violated the Policy's consent provision.  Liberty continued to object to the proposed "non-financial terms," however, and did not agree that Cameron could assume an obligation to waive its indemnity claim.

22. On December 13 and 14, 2011, Liberty repeated its position that it would not provide any insurance to Cameron in connection with any settlement with BP based on its "Other Insurance" provision.  (*See* Dec. 13, 2011 letter from P. Koepff (Ex. 19).); *see also* Dec. 14, 2011 letter from P. Koepff (Ex. 18).)

    **RESPONSE**: Denied as written.  Liberty avers that it continued to advise Cameron of its coverage position on December 13 and 14, 2011 and did not deny coverage.  Liberty offered to "negotiate a resolution of this dispute with Cameron" through counsel-to-

9

counsel discussions and "welcome[d] the opportunity to discuss" its position with Cameron. (See Exhibits 4 and 5)

23. On December 15, 2011, Cameron entered into the Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify with BP Exploration & Production, Inc. and BP Corporation North America Inc ("BP-Cameron Settlement"). (Ex. 21.)

**RESPONSE:** Denied as written. Liberty objects to the e-mail from Mitch Auslander included in Ex. 21. The statements contained in this e-mail are hearsay at minimum and, in some instances, hearsay within hearsay. Furthermore, Cameron's submission of this e-mail, containing statements of its trial counsel, potentially violates Rule 3.7 of the Louisiana Rules of Professional Conduct, which precludes an attorney from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness. Liberty avers that the Cameron/BP settlement is the best evidence of its contents and admits that the settlement is effective December 15, 2011 by its terms.

24. BP and Cameron agreed in the BP-Cameron Settlement that "[n]otwithstanding any other provision of this Agreement, Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc." (*See* BP-Cameron Settlement ¶ 4.4 (Ex. 21).) BP and Cameron also agreed that Cameron would be required, through settlement or judgment, to obtain in any litigation with Liberty a waiver of Liberty's subrogation rights "against the BP Released Parties or Third Parties, including Transocean." (*Id.* ¶ 4.6.) In light of these provisions, on June 13, 2013, BP stated to the Court: "[T]he plain language of the BP-Cameron Settlement states that Cameron has not released Liberty's rights to subrogate and assert the same claims that Cameron could

have asserted itself against BP, Transocean, and any other parties before entering into the BP-Cameron Settlement. Those subrogation rights were not extinguished or impaired under the BP-Cameron Settlement by release, assignment to BP, or otherwise." (BP Mot. to Quash 8-9, June 13, 2013, Dkt. 10388; *see also* Eastman Dep. at 105, 140-41 (Ex. 31).)

**RESPONSE:** Denied as written. Liberty avers that the Cameron/BP settlement document, in its *entirety*, is the best evidence of the terms and conditions of the parties' settlement. Liberty further objects to Cameron's reliance on post-execution, self-serving statements contained in BP's Motion to Quash as evidence. These documents are hearsay and are not relevant or admissible to interpret the settlement agreement, the terms of which are clear. The Court previously denied Liberty discovery concerning the Cameron/BP settlement finding no ambiguity. Rec. Doc. No. 10642.

25. When it issued the Liberty Policy to Cameron, Liberty did not consider the "Other Insurance" provision as a basis to refuse to pay Cameron under the Liberty Policy. (*See* Mandel Dep. at 31 (Ex. 4) ("Q: When you underwrote the policy to Cameron, you didn't have an expectation that the 'other insurance' clause could be used by Liberty as a basis to decline to pay Cameron any money?  A: Never.").)

**RESPONSE:** Denied as written. Liberty objects to Mr. Mandel's testimony cited by Cameron. Mr. Mandel repeatedly testified that he does not deal with claims, and thus he lacks any foundation to testify concerning application of the Liberty Policy to Cameron's loss. (*See* Mandel Dep. At pages 55, 66-68, 85, 90 and 92, Exhibit 12)  Moreover, Mandel *only* testified concerning his personal knowledge and experience and *not* as Liberty's corporate representatives. Finally, Liberty objects that this testimony is

11

irrelevant to interpret the clear Liberty Policy terms.

26. Liberty did not intend Cameron to be without insurance under the Liberty Policy for losses resulting from blowouts based on its "Other Insurance" provision where the potential source of other insurance had refused to pay and denied liability. (*See* Mandel Dep. at 104 (Ex. 4) ("Q: And if [third parties with whom Cameron had contractual indemnities] didn't pay that loss, then it would be Liberty's responsibility, because it issued an insurance policy, to pay that loss; correct? A: Correct."); *see also id.* at 31 (underwriter of the Liberty Policy testifying that he "never" expected Liberty could use the "other insurance" clause as a basis to decline to pay Cameron); *id.* at 108-09 (underwriter of the Liberty Policy testifying that Cameron's contractual indemnities did not have anything "at all" to do with the "other insurance" provision when Liberty sold the Liberty Policy); *id.* at 174 (underwriter of the Liberty Policy testifying that it was his understanding that, if a contractual indemnitor did not pay, Liberty would be responsible under its policy).

**RESPONSE:** Denied as written. Liberty objects to Mr. Mandel's testimony cited by Cameron. Mr. Mandel repeatedly testified that he does not deal with claims, and thus he lacks any foundation to testify concerning application of the Liberty Policy to Cameron's loss. (*See* Mandel Dep. At pages 55, 66-68, 85, 90 and 92, Exhibit 12) Moreover, Mandel *only* testified concerning his personal knowledge and experience and *not* as Liberty's corporate representatives. Finally, Liberty objects that this testimony is irrelevant to interpret the clear Liberty Policy terms.

27. Liberty's "Other Insurance" clause has been used in all Liberty excess casualty policies in exactly the same form for over a decade before the Liberty Policy was issued.

(Liberty's Supp. Resp. to Interrogs. Nos. 11-12, Feb. 25, 2013 (Ex. 22); Morris Dep. at 38 (Ex. 3)).)

**RESPONSE:** Denied as written. Liberty admits that, upon information and belief, Liberty Policy form 0100-XS(03 00) was first used by Liberty in one or more insurance policies in late 1999 or early 2000.

28. Liberty is unable to identify any instance where Liberty has denied payment to an insured based on its "Other Insurance" provision. (*See* Liberty's Supp. Resp. to Interrog. No. 18, Feb. 25, 2013 (Ex. 22).)

**RESPONSE:** Denied as written. Liberty avers that it did not deny coverage to Cameron in this matter; the Policy is excess and had not attached. Liberty admits that it is unaware of any instance in which Liberty has denied coverage based on an identical Other Insurance provision. Liberty denies, however, that this information is relevant given the plain Liberty Policy terms and the unique facts presented in this matter, including that Cameron entered into a settlement in which it transferred its valuable indemnity claim without Liberty's consent.

29. This is the first time that Liberty has taken the position that "other insurance" existed where "the party that supposedly owes the indemnity has denied payment to the insured." (Engel Depo. at 160-61 (Ex. 20).)

**RESPONSE:** Denied as written. As established by Cameron's Exhibit 28, another Liberty affiliate took the position that Other Insurance existed where the other insurer had denied coverage under its policy. Further, Mr. Engel personally testified that he could not recall Liberty previously taking the position that "the potential that a contractual indemnity might be applicable means its policy hasn't attached pursuant to

13

the other insurance clause." Mr. Engel did not testify as Liberty's corporate representative. Liberty also denies that this information is relevant given the plain Liberty Policy terms and the unique facts presented in this matter, including that Cameron entered into a settlement in which it transferred its valuable indemnity claim without Liberty's consent, preventing Liberty from exercising its subrogation rights.

30. The indemnity provisions contained in Cameron's contracts with Transocean are contractual indemnities. (*See* Purchase Order ¶ 18 at LIU12017 (Ex. 11); Master Services Agreement Am. No. 1 ¶ 15 at LIU07210 (Ex. 10).)

    **RESPONSE:** Admitted.

31. No other insurer in Cameron's insurance tower objected to the BP-Cameron Settlement based on an "Other Insurance" provision.

    **RESPONSE:** Denied as written. Cameron has not offered any evidence supporting this statement, and the statement is irrelevant and inadmissible to interpret Liberty's policy

32. Policies issued by Chubb Atlantic Indemnity Limited ("Chubb") and AIG Excess Liability Insurance International Limited ("AIG Excess") contained "Restrictive As Underlying Provisions." (Chubb Policy Cond. 7 (Ex. 7) ("[I]f any **Underlying Policy(ies)** with limits of liability in excess of the underwriter of the **Followed Policy** but underlying to this Policy (the **Intervening Policy(ies)** contains warranties, terms, conditions, exclusions or limitations more restrictive than this Policy or the **Followed Policy**, then this Policy shall be deemed to follow those more restrictive warranties, terms, conditions, exclusions or limitations of the **Intervening Policy(ies)**."); AIG Excess Policy § VI(J) (Ex. 8) (same).)

14

    **RESPONSE:** Denied as written. The policies are irrelevant and inadmissible to interpret the Liberty Policy. Liberty objects that other policies are irrelevant to interpret the coverage provided by the Liberty Policy. Liberty further avers that the Chubb and AIG Excess policies are the best evidence of their respective terms and conditions.

33. Chubb and AIG Excess agreed to consent and contribute to the BP-Cameron Settlement, and (Dec. 14, 2011 letter from R. Bryan (Ex. 25); *see* Nusum Dep. at 27, 34-35 (Ex. 13); Martin Dep. at 46-47 (Ex. 26).)

    **RESPONSE:** Denied as written. Liberty objects to Ex. 25, which is hearsay and is not properly authenticated. Liberty further objects to the testimony of other insurers' representatives as irrelevant and inadmissible to determine Liberty's obligations under the Liberty Policy. (Ex. 13 & 26). Subject to all objections, Liberty admits that AIG Excess agreed to contribute a discounted portion of the requested policy proceeds towards the BP-Cameron Settlement, as reflected in separate agreements with Cameron. Liberty also admits that Chubb agreed to consent and contribute a discounted amount to the BP-Cameron settlement.

34. "Except for any definitions, terms, conditions, and exclusions" of the Liberty Policy, the coverage provided by Liberty was "subject to the terms and conditions of the [INIC Policy]." (Liberty Policy Art. I, Decl. Item 5 (Ex. 2).)

    **RESPONSE:** Denied as written. Liberty avers that the Liberty Policy is the best evidence of its terms and conditions.

35. The INIC policy states that "Defense Expenses will be in addition to the applicable Limits of Insurance of this policy." (INIC Policy End. 29 ¶ 2 § IV(H) (Ex. 9).)

    **RESPONSE:** Denied as written. Liberty avers that the INIC Policy in its entirety is the

best evidence of the coverage provided. Unlike the Liberty Policy, the INIC Policy contained a duty to defend, which included a duty to pay defense expenses in addition to the policy limits.

36. The Liberty Policy makes no mention of Defense Expenses. (Liberty Policy (Ex. 2).)

    **RESPONSE**: Denied. As Cameron has acknowledged, the Liberty Policy disclaims a duty to defend, which by implication disclaims any duty to pay defense expenses as part of the duty to defend. (*See* Liberty Policy, Exhibit 14) Where there is no duty to defend, the obligation to reimburse defense costs, if any, must arise from the policy's indemnification obligation. The Liberty Policy clearly limits Liberty's indemnification obligation to covered "loss" defined as "those sums which [the insured] is obligated to pay *as damages*," which do not include defense costs. (*Id.* at 01499.)

37. Liberty has paid none of Cameron's defense expenses incurred in defending claims in the Oil Spill MDL.

    **RESPONSE**: Admitted.

38. All of Cameron's insurers, except for Liberty, resolved Cameron's insurance claim.

    **RESPONSE**: Denied as written. Liberty avers that the written agreements between Cameron and its other insurers are the best evidence of any resolution Cameron may have reached with these insurers.

39. Cameron paid the $50 million that Liberty refused to contribute toward the BP-Cameron Settlement.

    **RESPONSE:** Denied as written.

In addition to the Responses above, Liberty adopts as if reproduced here in their entirety its Statements of Uncontested Fact filed with its (1) Motion for Partial Summary Judgment

16

Concerning Cameron's Forfeiture of Coverage (Rec. Doc. No. 12580), and (2) Motion for Partial Summary Judgment Concerning Cameron International Corporation's Texas Insurance Code Claims (Rec. Doc. No. 12050).

## OBJECTIONS TO EXHIBITS

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, Liberty objects to certain exhibits offered in support of Cameron's motion as follows:

**A.     Depositions of Denise Morris and Alan Mandel (Exs. 3 & 4)**

Liberty objects to Cameron's use of testimony from Liberty's underwriting personnel. These witnesses repeatedly testified that they are not *claims* personnel, and thus they lacked any knowledge concerning the Policy's application to a particular claim. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Furthermore, Cameron attempts to offer their testimony to establish *Liberty's* knowledge and intent, but these witnesses did not testify as Liberty's corporate representatives but rather only in their individual capacity. Finally, Liberty objects that this extrinsic evidence is irrelevant to interpret the clear Policy terms. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

**B.     Chubb and AIG Excess Policies (Exs. 7 & 8)**

Liberty objects that Cameron's other insurance policies are completely irrelevant and inadmissible to the limited issues raised in Cameron's motion, which interpretation and application of the Liberty Policy. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") & 403.

**C.     Depositions of Alexis Nusum and Maureen Martin (Exs. 13 & 26)**

Liberty objects that this extrinsic evidence, from representatives of Cameron's other

insurers, is irrelevant and inadmissible to the limited issues raised in Cameron's motion, which involve the interpretation and application of the Liberty Policy. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") & 403.

### D.     Mitch Auslander E-mails (Exs. 17 & 21)

Liberty objects to the use of e-mails from Mitch Auslander, Cameron's trial counsel. (Ex. 17 & 21). The statements contained in these e-mails are hearsay at minimum and, in some instances, hearsay within hearsay. *See* Fed. R. Evid. 801 & 802. Moreover, Cameron's submission of these e-mails potentially violates Rule 3.7 of the Louisiana Rules of Professional Conduct, which precludes an attorney from acting as an advocate at trial in which the lawyer is likely to be a necessary witness.

### E.     Rick Bryan letter (Ex. 25)

Liberty objects that this extrinsic evidence, from a representative of one of Cameron's other insurers, is irrelevant and inadmissible to the limited issues raised in Cameron's motion, which involve only the interpretation and application of the Liberty Policy. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") & 403. Liberty further objects that this letter is hearsay and not properly authenticated. *See* Fed. R. Evid. 801, 802, & 901.

### F.     New Jersey Complaint Filed in Unrelated Matter (Ex. 28)

Liberty objects that this extrinsic evidence of allegations in a different lawsuit between different parties involving a primary policy with different terms governed by different law and filed in a different jurisdiction is irrelevant and inadmissible to determine the limited issues raised in Cameron's motion, which involve the interpretation and application of the Liberty Policy. Fed. R. Evid. 402 & 403. The evidence is also irrelevant because Cameron never

offered Liberty the opportunity in this matter to pay and pursue other insurance; rather, it insisted at all times that any settlement include a transfer of its indemnity rights.  *See id.*

G. **Brad Eastman Depo. (Ex. 31)**

Liberty objects to Cameron's use of Brad Eastman's deposition to establish when settlement communications between Cameron and BP began.  Mr. Eastman testified that he lacked personal knowledge concerning the timing of the negotiations and thus his testimony on that point lacks the required foundation.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

H. **Partial Copy of Transocean's 10-K (Ex. 32)**

Liberty objects that this document is incomplete, hearsay, and not properly authenticated.  *See* Fed. R. Evid. 801, 802, & 901.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

Christopher W. Martin
Federal I.D. 13515
Robert G. Dees
Federal I.D. 13899
808 Travis, Suite 1800
Houston, Texas 77002
713-632-1700 (Telephone)
713-222-0101 (Facsimile)

Judy Y. Barrasso, 2814
Celeste, Coco-Ewing, 25002
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana  70112

            504.589.9700 (Telephone)
            504.589.9701 (Facsimile)

            Counsel for Liberty Insurance Underwriters, Inc.

## **CERTIFICATE OF SERVICE**

   I hereby certify that the above and foregoing Defendant Liberty Insurance Underwriters, Inc.'s Response to Plaintiff Cameron International Corporation's Statement of Uncontested Material Facts has been served on all Counsel by electronically uploading the same in accordance with Pretrial Order No. 12, on this 2nd day of April, 2014.

            */s/ Christopher W. Martin*_____
            Christopher W. Martin

5395-0002
01110826