UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010 | )   MDL NO. 2179 )   )   SECTION: J )   )   JUDGE BARBIER )   MAG. JUDGE SHUSHAN |
| **This Document Relates to:** **2:10-cv-02454, 2:10-cv-01768** | )   )   ) |
| | )   **MEMORANDUM IN SUPPORT OF** )   **MOTION FOR PARTIAL SUMMARY** )   **JUDGMENT ON COUNT 7 OF** )   **AMENDED COMPLAINT** |

## INTRODUCTION

Pursuant to Fed. R. Civ. Proc. 56(a) and Local Rule 56.1, the Center for Biological

Diversity (the "Center"), plaintiff in *Center for Biological Diversity v. BP America, et al.*, 2:10-

cv-02454 and 2:10-cv-01768, respectfully submits its Memorandum in Support of Motion for

Partial Summary Judgment on Count 7 of the Amended Complaint.  There is no material dispute

that Defendants BP Exploration & Production, Inc., BP America, Inc., and BP America

Production Company (collectively, "BP") released more than the reportable quantities of certain

hazardous substances, and are therefore liable for violations of the Emergency Planning and

Community Right-to-Know Act, commonly referred to as "EPCRA," 42 U.S.C. § 11001 *et seq*.

Specifically, Defendants are the owners or operators of a facility from which reportable

quantities of benzene, toluene, and xylene were released.[1]  Under 42 U.S.C. § 11004, Defendants

were required to immediately notify local and state emergency responders for the areas likely

affected by these releases.  Defendants were thereafter required to submit written followup

---

[1] The Center presently moves only with respect to these three hazardous substances.  The Center reserves the right to seek reporting of numerous other released hazardous substances through further motion or at trial.

1

emergency notice to the same, outlining the actions taken to respond to and contain the release, any known or anticipated acute or chronic health risks associated with the release, and what medical attention to seek for those individuals exposed to the release. Defendants have not completed these statutory duties and are therefore in violation of EPCRA, 42 U.S.C. 11004(b). Accordingly, the Center requests that the Court enter partial summary judgment declaring Defendants liable for violations of EPCRA.

## FACTUAL BACKGROUND

The following material facts are not in dispute. BP is a lessee of Block 252, Mississippi Canyon ("MC252"). Statement of Material Fact ("SMF") ¶ 1. MC252 is located approximately 50 miles from the Mississippi Delta, within the United States' Exclusive Economic Zone. *Id*. at ¶¶ 3-4. An exploratory well, the "Macondo Well," was constructed at MC252. *Id*. at ¶ 2. BP is the owner of the Macondo Well. *Id*. at ¶ 7. The Macondo Well is a stationary structure located on a single site. *Id*. at ¶¶ 5-6. On April 20, 2010, a blowout of the Macondo Well occurred. *Id*. at ¶ 10. On April 22, 2010, the MODU *DEEPWATER HORIZON*, which was responsible for drilling the Macondo Well, sank into the ocean, breaking the riser pipe that had run from the Macondo Well to the *DEEPWATER HORIZON*. *Id*. at ¶ 11. Oil thereafter flowed continuously from the Macondo Well and into the ocean and environment for a period of 86 days. *Id*. at ¶¶ 12-14. Oil from the Macondo Well reached the shoreline of the United States. *Id*. at ¶ 13. BP's position is that 2.45 mmSTB (million stock tank barrels) of oil were released from the Macondo Well into the environment during this 86-day period,[2] excluding any oil that was collected by

---

[2] For purposes of this motion only, the Center does not dispute that a minimum of 2.45 mmSTB of oil were released.

BP. *Id*. at ¶ 22.  One stock barrel at 60 degrees Fahrenheit is the equivalent of 42 gallons.  *Id*. at ¶ 29.

Prior to the blowout, on or about April 20, 2010, BP injected at least 450 gallons of a "spacer" fluid into the Macondo Well.  *Id*. at ¶ 16.  This amount was nearly twice the quantity used in standard industry practice, and was added to the well so that BP could avoid the hazardous waste reporting and disposal requirements under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*.  *Id*.

To attempt to stop the flow of oil coming from the Macondo Well during the spill, BP pumped heavy drilling muds through the Blowout Preventer choke and kill lines and into the Macondo Well.  *Id*. at ¶ 17.  The heavy drilling muds that were injected into the well contained ethylene glycol, caustic soda, ███████████  *Id*. at ¶¶ 18-19.  This process occurred between May 26-28, 2010.  *Id*. at ¶ 17.

The *Q4000* vessel collected oil being released directly from the Macondo Well on June 19, 2010. *Id*. at ¶ 20.  The oil that was collected was later analyzed by BP and found to contain, by weight in a monophasic fluid, 0.03%-0.06% benzene, 0.02% to 0.017% toluene, and 0.07% to 0.25% xylene.  *Id*. at ¶ 21.  The oil had an API gravity of 36.2 at 60 degrees Fahrenheit.  *Id*. at ¶ 25.  To determine the amount of benzene, toluene, and xylene released into the environment during the spill by weight, one must determine the relative density of the oil that was released from the Macondo Well.  This involves a simple mathematical formula, outlined in Plaintiff's SMF at ¶¶ 23-28.  Based on BP's position that 2.45 mmSTB were released from the Macondo Well during the spill, it is calculated that at least 2,525 lbs/day of benzene, 1,683 lbs/day of toluene, and 5,891 lbs/day of xylene were released during the 86-day spill.  *Id*. at ¶ 33.

BP did not notify any emergency responders about the release of benzene, toluene, and xylene from the Macondo Well, and has not submitted any followup emergency reports under EPCRA concerning these releases to emergency responders for areas likely to be impacted by the spill. *Id.* at ¶¶ 36-37. Members of the Center have searched for information concerning the specific types of chemicals contained in the oil released during the spill, but have not found that information because BP has not submitted any reports. *Id.* at ¶ 38. Members of the Center would make use of the information that should have been filed with emergency responders for a variety of purposes, such as evaluating their individual exposures to chemicals that may be present in the Gulf, or providing information to their primary care physicians for medical reasons. *Id.*

## LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), summary judgment should be granted whenever a movant shows "that there is no genuine issue as to any material fact[,]" such that the movant "is entitled to judgment as a matter of law." *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A moving party may satisfy its summary judgment burden by pointing to undisputed evidence in the record. *See Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003). In the face of such undisputed evidence, the nonmoving party may not rest upon the pleadings, but rather must

4

identify specific facts that establish a genuine issue for trial. *Celotex*, 477 U.S. at 324. Thus, while all reasonable inferences are drawn in favor of the nonmoving party, that party cannot defeat summary judgment by relying upon conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075.

## ARGUMENT

The Center respectfully requests that the Court find BP liable for violations under EPCRA and grant the Center's Motion for Partial Summary Judgment. There can be no genuine dispute that (1) the Center has constitutional standing to bring and maintain its EPCRA claim; and (2) that BP has violated and remains in violation of EPCRA's requirements.

## I.   THE CENTER HAS CONSTITUTIONAL STANDING TO MAINTAIN ITS CLAIM UNDER EPCRA.

For a non-profit such as the Center to have constitutional standing, it must show, *inter alia*, that its members would otherwise have standing to sue in their own right. *Hunt v. Wash. State Apple Advertising Comm'n.*, 432 U.S. 333, 343 (1977). For an individual to have standing, he or she must show that (1) he or she suffered an "injury in fact," (2) that is "fairly traceable" to the defendant's activity, and (3) that the individual's injuries are likely to be redressed by a favorable decision. *Save Our Community v. U.S. E.P.A.*, 971 F.2d 1155, 1160-61 (5th Cir. 1992) (internal citations omitted) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)). For informational statutes such as EPCRA, an injury-in-fact occurs whenever a "plaintiff fails to obtain information which must be publicly disclosed pursuant" to that statute. *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Center for Biological Diversity, Inc. v. BP America Production Co.*, 704 F.3d 413, 429-30 (5th Cir. 2013) (adopting reasoning in *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 703-06 (W.D. Ky. 2003) (denial of right to be informed of releases from defendant's facility afforded

plaintiff standing to assert EPCRA claim for failure to report release of chemicals)); *see also Atlantic States Legal Found. v. Buffalo Envelope Co.*, 823 F. Supp. 1065, 1071 (W.D. N.Y. 1993) (standing based on informational injury).

The Fifth Circuit has already determined that the Center has standing to bring this claim. *See Center for Biological Diversity, Inc. v. BP America Prod. Co.*, 704 F.3d at 429-32 (District Court's conclusion that Center lacked standing under EPCRA incorrect; order from the Court directing BP to file requisite EPCRA reports would redress Center's members' informational injury. The Court unambiguously found that "the Center has standing to assert its claim for relief based on defendants' alleged failure to comply with the reporting requirements of EPCRA[.]" *Id.* at 432; *see also* ECF No. 1984-2 – 1984-7 (previous standing declarations). This issue was not resubmitted to the District Court on remand, and it is therefore the law of the case that the Center has standing to maintain this suit. *See, e.g., U.S. v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) (discussing "mandate rule," which is a "specific application of the law of the case doctrine, prohibit[ing] a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court[.]").

Notwithstanding this holding from the Fifth Circuit, the Center has submitted further standing declarations in conjunction with the instant motion. *See* Declarations of Sondak, Craig, Scott, and Keats, filed herewith. These declarations further detail how the Center's members have searched for information about the specific contaminants they may have been exposed to during and after the oil spill, Ex. 10 at ¶ 8 (Sec. Decl. of Keats), Ex. 11 at ¶¶ 3, 7 (Sec. Decl. of Sondak), Ex. 12 at ¶¶ 4-6, 8 (Sec. Decl. of Scott), Ex. 13 at ¶¶ 3-5 (Sec. Decl. of Craig); their recent attempts to contact the Orleans Parish emergency response offices to obtain the reports required under EPCRA, Ex. 10 at ¶ 10, Ex. 12 at ¶ 9, Ex. 13 at ¶¶ 10-11; and why this

information is useful and how they would make use of it.  Ex. 10 at ¶¶ 5-7, 9, Ex. 11 at ¶¶ 5-6, Ex. 12 at ¶¶ 3, 8, Ex. 13 at ¶¶ 7-8.  This is far more than what is required to prove standing under EPCRA.

## II.   THERE IS NO DISPUTE THAT BP HAS VIOLATED AND CONTINUES TO VIOLATE EPCRA'S REPORTING REQUIREMENTS.

BP has violated and continues to violate the reporting requirements of EPCRA consequent to its failure to provide written, followup emergency notification to local emergency responders for the areas likely affected by the releases from the Macondo Well.  42 U.S.C. § 11004(c).  "The purpose of EPCRA [is] to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases."  *Huls America Inc. v. Browner*, 83 F.3d 445, 446 (D.C. Cir. 1996).  It is designed "to create incentives for safer behavior for those parties who possess the greatest knowledge about the risks associated with their wastes."  S. Rep. No. 848, 96th Cong., 2d Sess. 12-15, 31-34 (1980) (related CERCLA legislative history).  Along these lines, EPCRA requires owners and operators to "immediately" provide emergency notification to state and local emergency planning committees about the release of reportable quantities of hazardous substances.  42 U.S.C. § 11004(b).  "As soon as practicable" thereafter, the owners or operators are required to submit written, followup emergency notices that describe, *inter alia*: the chemical name or identity of the substance involved; an estimate of the quantity released into the environment; the time and duration of the release; the medium or media into which the release occurred; any known or anticipated acute or chronic health risks associated with the emergency, along with advice regarding medical attention for those exposed; proper precautions to take as a result of the release; and the name and phone number of the persons to be contacted for additional information.  42 U.S.C. § 11004(b)(2), (c).  EPCRA's citizen-suit provision vests the

Court with jurisdiction over civil actions against owners or operators who fail to submit followup written reports. 42 U.S.C. § 11046(a)(1)(A)(i).

To establish liability under EPCRA, a citizen-plaintiff must show that the defendant was both a "person" and an "owner or operator" of a "facility" from which the "release" of a "hazardous substance" occurred. 42 U.S.C. § 11004(a)(3). The release of the hazardous substance must be in amounts that exceed the "reportable quantity" for the substance – a quantity established by EPA regulation. 42 U.S.C. § 11004(a)(3)(a). Additionally, the release must be of the type that would require a notification under Section 103(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9603(a) ("CERCLA"). 42 U.S.C. § 11004(a). Finally, a plaintiff must show that the defendant failed to submit the followup emergency notification required by 42 U.S.C. § 11004(c). Liability must follow if each of these elements is met.

*1.     BP is a "person" within the meaning of EPCRA.*

The BP defendants are corporations organized under the laws of the state of Delaware. SMF at ¶ 41. Under EPCRA, "person" means "any…corporation." 42 U.S.C. § 11049(7). As such, the BP defendants are "persons" within the meaning of EPCRA.

*2.     BP was the "Owner" and "Operator" of the Macondo Well.*

EPCRA requires that the "owner or operator" of a facility provide emergency notification about the release of reportable quantities of hazardous substances from their facility. 42 U.S.C. § 11004(a)(1). BP has admitted that it was the owner of the Macondo Well. SMF at ¶ 1 (BP is a lessee of Block 252, Mississippi Canyon); *id*. at ¶ 8 (BP is the owner of the Macondo Well). BP was also the operator of the well from at least April 20 to July 15, 2010. *Id*. at ¶ 9. For purposes of summary judgment, the Court need only find that BP was either an "owner" or "operator" of

8

the Macondo Well.  42 U.S.C. § 11046(1)(A) (liability under EPCRA's citizen suit provisions runs to "owner or operator").

3.      *The Macondo Well is a "Facility" Within the Meaning of EPCRA.*

EPCRA defines a "facility" as "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person[.]"  42 U.S.C. § 11049(4).  The Macondo Well is a stationary structure located on a single site within the territorial jurisdiction of the United States and is owned and operated by BP.  SMF at ¶¶ 2-9.  It is therefore a "facility" as that term is defined in EPCRA.

4.      *The 86-day Oil Spill Constitutes a "Release" under EPCRA.*

A "release" subject to EPCRA is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, or disposing into the environment…of any hazardous chemical, extremely hazardous substance, or toxic chemical."  42 U.S.C. § 11049(8).  As used in the definition of "release," the "environment" includes "water[.]"  42 U.S.C. § 11049(2).  Based on these definitions, the 86-day oil spill from the Macondo Well into the Gulf of Mexico is a "release" subject to EPCRA.

5.      *Benzene, Toluene, and Xylene are "Hazardous Substances" with "Reportable Quantities" subject to EPCRA.*

EPCRA requires owners or operators to report the release of a reportable quantity of a "hazardous substance," so long EPA has established a reportable quantity for that substance under CERLA § 102(a).  42 U.S.C. § 11004(3)(a).  That provision of CERCLA requires the Administrator of the EPA to promulgate regulations designating hazardous substances and their reportable quantities.  42 U.S.C. § 9602(a).  EPA has promulgated regulations, found at 40 C.F.R. § 302.4, which identify hazardous substances subject to CERCLA and EPCRA, along

with their reportable quantities.  The chemicals subject to this Motion for Partial Summary Judgment[3] are identified in those regulations as "hazardous substances" with reportable quantities: benzene is a "hazardous substance" with a reportable quantity of 10 pounds/day; toluene is a "hazardous substance" with a reportable quantity of 1000 pounds/day; and xylene is a "hazardous substance" with a reportable quantity of 100 pounds/day.  *Id*. at Table 302.4.

6.     *Benzene, Toluene, and Xylene were Released from the Macondo Well in Amounts that Exceeded their Reportable Quantities.*

Benzene, toluene, and xylene were released in amounts that far exceeded their reportable quantities each day of the 86-day spill.  According to BP's own oil sampling data and simple mathematical calculations about the amount of oil discharged from the Macondo Well, at least 2,525 lbs. of benzene (RQ 10 lbs/day), 1,683 lbs. of toluene (RQ 1000 lbs/day), and 5,891 lbs. of xylene (RQ 100 lbs/day) were released each day during the spill.  SMF at ¶¶ 21-33.  These amounts far exceed the reportable quantities for these hazardous substances established by EPA at 40 C.F.R. § 302.4.

7.     *The Releases of Benzene, Toluene, and Xylene from the Macondo Well Required Notice Under CERCLA § 103(a).*

EPCRA requires the reporting of the release of reportable quantities of hazardous substances if such a release "requires notification under section 103(a)" of CERCLA.  42 U.S.C. § 11004(a)(3).  Pertinent here, CERCLA § 103(a) requires "any person in charge" of an "offshore facility" to report the release of reportable quantities of "hazardous substances" to the

---

[3] The Center alleges that release of numerous other hazardous substances also took place and reserves the right to seek relief with respect to those failures to report as well.  Those substances include: polynuclear aromatic hydrocarbons, ethylbenzene, arsenic, nickel, fluoranthene, naphthalene, methane, haloethers, halomethanes, copper, mercury, arsenic, and cadmium.

National Response Center as soon as that person obtains "knowledge" of the release, so long as the release is not "federally permitted."  42 U.S.C. § 9603(a).  Here, the releases of benzene, toluene, and xylene in reportable quantities from the Macondo Well required notice under CERCLA § 103(a) because (*a*) BP was a "person in charge" of the Macondo Well; (*b*) the Macondo Well is an "offshore facility;" (*c*) BP knew or should have known that the Macondo Well was releasing reportable quantities of benzene, toluene, and xylene; (*d*) the definition of "hazardous substance" under CERCLA includes benzene, toluene, and xylene; and (*e*) the releases were not federally permitted.

> A.     BP was a "Person in Charge" of the Macondo Well.

The term "person in charge" is not defined by CERCLA.[4]  Courts interpreting the phrase have focused on the degree of control that a party exerts at a facility (or, in this case, at an "offshore facility").  For instance, the Court in *Sierra Club, Inc. v. Tyson Foods, Inc.* found that a "person in charge" was a party that occupies "positions of responsibility and power" such that they can "make timely discovery of a release, direct the activities that result in the pollution, and have the capacity to prevent and abate the environmental damage."  299 F. Supp. 2d at 716 (citing *U.S. v. Carr*, 880 F.2d 1550, 1554 (2d Cir. 1989)).  In most cases, an owner or operator will be a "person in charge."  *Id*.  Here, BP was both the owner and operator of the Macondo Well during the spill.  SMF at ¶¶ 8-9.  BP also exercised substantial control over the Macondo Well during the spill, with its Houston headquarters being designated the Incident Command

---

[4] BP is a "person" under CERCLA.  42 U.S.C. § 9601(21) ("The term 'person' means a[]…corporation[.]"); SMF at ¶ 39.

Post for source control measures. *Id*. at ¶ 40. Based on these facts, BP was a "person in charge" of the Macondo Well.

> B.   The Macondo Well was an "Offshore Facility" under CERCLA.

CERCLA defines an offshore facility as "any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel." 42 U.S.C. § 9601(17). The Macondo Well is a "facility of any kind" located "under" the "navigable waters of the United States." SMF at ¶¶ 3-5. The Macondo Well is also a "facility of any kind" that is "subject to the jurisdiction of the United States[,]" as BP leased the MC252 site from the United States Minerals Management Service and it is located within the jurisdiction of the Untied States. *Id*. at ¶¶ 1, 3-5.

> C.   BP Had Knowledge of the Releases from the Macondo Well.

Under CERCLA, the duty to notify the National Response Center is triggered when a party obtains knowledge of a release of a hazardous substance in amounts that exceed that substance's reportable quantity. 42 U.S.C. § 9603(a). Knowledge under the statute may be actual or constructive. *Sierra Club, Inc*., 299 F. Supp. 2d at 707. Constructive knowledge arises when a "person in charge of a facility possessed knowledge of such circumstances as would ordinarily lead upon investigation, in the exercise of reasonable diligence which a prudent person ought to exercise, to a knowledge of a release of a reportable quantity of a hazardous substance." *Id*. (quoting *In the Matter of Thoro Products Co*., 1992 WL 143993, 1992 EPA ALJ LEXIS 523 (May 19, 1992)).

Here, BP possessed actual and constructive knowledge that the discharge of oil from the Macondo Well during the blowout was releasing reportable quantities of benzene, toluene, and

xylene.  First, it is commonly known and accepted in the oil industry that crude oil contains quantities of benzene, toluene, and xylene.  SMF at ¶ 34.  Thus, once the blowout occurred, BP knew or should have known in the exercise of reasonable diligence that the uncontrolled release of oil from the Macondo Well was also releasing substantial and reportable quantities of these hazardous substances.  Second, *prior* to the blowout, BP had the oil from the Macondo Well sampled and analyzed as part of the process of developing and evaluating the Macondo Prospect. *Id*. at ¶ 41.  This sampling revealed or should have revealed the relative percentages of benzene, toluene, and xylene contained in the Macondo Well oil.  Third, after the blowout occurred, BP notified the National Response Center about releases of benzene caused by the burning of in-situ oil that had risen to the surface of the Gulf.  ECF No. 1819-1 at ¶ 6 (Declaration of Shahrzod Hanizavareh).  These burns were conducted on May 6-7, May 25-26, June 8, and June 13, 2010. *Id*. at Ex. A.  Thus, BP possessed actual knowledge that reportable quantities of benzene were contained in the oil being released by the spill by at least May 6, 2010.  BP obtained further actual knowledge that the Macondo Well was releasing reportable quantities of benzene, toluene, and xylene on June 19, 2010, the date that Schlumberger collected oil samples from oil discharging from the Macondo Well.  SMF at ¶ 21.

Additionally, BP obtained constructive knowledge that the uncontrolled discharge from the Macondo Well was releasing reportable quantities of, *inter alia*, benzene, toluene, and xylene as of the date it received the Center's pre-suit Notice of Intent to Sue, dated June 1, 2010.  *Id*. at ¶ 42.

Based on these facts, BP knew *before* the blowout occurred that an uncontrolled discharge from the Macondo Well would cause the release of reportable quantities of benzene, toluene, and xylene.  BP's actions post-April 20th further demonstrate that Defendants had actual

knowledge that the Macondo Well was releasing reportable quantities of hazardous substances.

      D.     Benzene, Toluene, and Xylene are "Hazardous Substances" under CERCLA.

CERCLA defines "hazardous substance" as "any element, compound, mixture, solution, or substance designated pursuant to Section 9602 of this title[.]"  42 U.S.C. § 9601(14).  It also defines that term by referring to substances designated as hazardous by other environmental statutes, including the Clean Water Act and the Solid Waste Disposal Act, 42 U.S.C. § 6921. *See* 42 U.S.C. § 9601(14)(A)-(F).  Benzene, toluene, and xylene have been designated "hazardous substances" by the EPA Administrator pursuant to CERCLA Section 302(a), 42 U.S.C. § 9602(a).  *See* 40 C.F.R. § 302.4 (identifying "hazardous substances").

However, CERCLA excludes certain substances from the definition of "hazardous substances" under the "petroleum exclusion."  The statute states, in pertinent part:

> "The term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph[.]"

42 U.S.C. § 9601(14).  Here, because benzene, toluene, and xylene are "otherwise specifically listed or designated as" hazardous substances under CERCLA § 102(a), they are not subject to the petroleum exclusion.  The plain language of the statute compels this result.

Despite this clear statutory language, BP will argue that the petroleum exclusion does apply, and that it therefore had no duty to report the releases of benzene, toluene, and xylene under CERCLA and, consequently, EPCRA.  BP will rely upon *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801 (9th Cir. 1989).  In that non-binding case, the Ninth Circuit held, in contravention of the plain statutory language, that the "petroleum exclusion" applies to "any fraction of crude oil which has been listed or designated as a hazardous substance" under CERCLA.  *Id.* at 804.  The Court believed that this construction gave full

14

meaning to the exclusion.  *Id.* at 805.  It reasoned that a contrary interpretation would make the exclusion a "nullity[,] because all crude oil, petroleum and petroleum fractions, unrefined or refined, would fall outside its ambit."  *Id.*

The statutory construction of the petroleum exclusion is a matter of first impression in this Circuit, and the Court should not follow the incorrect reasoning of *Wilshire Westwood Associates*.  The most elementary and cardinal rule of statutory construction is "that the words of a statute will be given their plain meaning absent ambiguity."  *Texas Food Indus. Ass'n v. U.S. Dep't of Agric.*, 81 F.3d 578, 582 (5th Cir. 1996).  The courts must presume "that a legislature says in a statute what it means and means in a statute what it says."  *Id.* (citing *U.S. v. Meeks*, 69 F.3d 742, 744 (5th Cir. 1995)).  As stated by the Fifth Circuit:

> "By any rules of statutory construction, courts are forbidden to tamper with the plain meaning of the words employed unless they are clearly ambiguous or nonsensical.  The concomitant rule of interpretation is that courts may not re-write inartfully but unambiguously drafted legislation in order to accomplish results perceived by the court to be the goals of such flawed legislation."

*Grider v. Cavazos*, 911 F.2d 1158, 1162 (5th Cir. 1990).

Here, statutory construction of the "petroleum exclusion" begins and ends with the plain language chosen by Congress.  *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (if language is plain, sole function of the court is to enforce statute according to its terms).  The exclusion applies, by its own terms, to "petroleum, including crude oil or any fraction thereof[.]"  42 U.S.C. § 6901(14).  It does not apply, however, to "any fraction thereof ***which is not otherwise specifically listed or designated as a hazardous substance*** under subparagraphs (A) through (F) of this paragraph[.]"  *Id.* (emphasis added).  There is no ambiguity in these words.  If a "fraction" of petroleum or crude oil "is not otherwise specifically listed or designated as a hazardous substance," then it does not fall within CERCLA's definition of a "hazardous substance."

15

Conversely, if a "fraction" of petroleum or crude oil "*is [] otherwise specifically listed or designated as a hazardous substance*[,]" then that fraction is a reportable "hazardous substance." The Court need not go any further, for there simply is no other interpretation or accepted meaning of the cited language that would give rise to ambiguity. *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 518-19 (5th Cir. 2004) (ambiguity arises only if statutory language is capable of more than one reasonable interpretation or more than one accepted meaning).[5] Congress knew what words it was using when it drafted the statute, and the Court should ascribe to them their ordinary and plain meaning. *White v. Black*, 190 F.3d 366, 368 (5th Cir. 1999) (words in statute to be given their ordinary meaning).

The Ninth Circuit's flawed interpretation renders an entire sentence of the statute superfluous. In determining that the exclusion applied to all fractions of crude oil, regardless of

---

[5] Only after a court concludes that a statutory provision is ambiguous may it consult legislative history. *Carrieri*, 393 F.3d at 518-19. In *Wilshire Westwood Associates*, the Ninth Circuit never made a determination of whether the petroleum exclusion was ambiguous, finding its interpretation was based on the plain language of the statute. 881 F.2d at 804 ("Any other construction ignores the plain language of the statute and renders the petroleum exclusion a nullity"). It nonetheless consulted legislative history to evaluate whether its "plain meaning" interpretation was sound. *Id.* at 805-06. The court noted that there was a dearth of legislative history concerning this specific provision. *Id.* at 805. It was presented with legislative history showing that each time Congress defined the term "hazardous substance," it included the petroleum exclusion *and* its exception ("not otherwise specifically listed..."). *Id.* at 806. Nonetheless, the court did not find this persuasive, and instead relied upon *later* legislative history related to a different statute. *Id.* at 807-808 (discussing underground storage tanks and subsequent "SARA" amendments to Solid Waste Disposal Act). In any event, this Court should not look to the legislative history at all, for the text in question is unambiguous.

16

whether those fractions have been "otherwise specifically listed or designated" as a hazardous

substance, the *Wilshire Westwood Associates* Court essentially rewrote the statute to read as

follows:

> "The term [hazardous substance] does not include petroleum, including crude oil or any
> fraction thereof ~~which is not otherwise specifically listed or designated as a hazardous~~
> ~~substance under subparagraphs (A) through (F) of this paragraph~~, and the term does not
> include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas useable for
> fuel (or mixtures of natural gas and such synthetic gas)."

This construction is untenable.  "It is a cardinal principle of statutory construction that a statute

ought, upon the whole, to be construed that, if it can be prevented, no clause, sentence, or word

shall be superfluous, void, or insignificant." *In Re: Oil Spill by the Oil Rig DEEPWATER*

*HORIZION in Gulf of Mexico,* 844 F. Supp. 2d 746, 752 n. 8 (E.D. La. 2012) (internal quotations

omitted) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441 (2001)).  The Ninth

Circuit's holding in *Wilshire Westwood Associates* tramples upon this principle, making the

strike-through text above superfluous, void, and insignificant.  This Court should, therefore, not

follow the flawed reasoning of the case.

Were this Court to decide that the petroleum exclusion does somehow exempt all

fractions of crude oil, even if they are "otherwise specifically listed or designated as a hazardous

substance," then it should find that the exclusion was vitiated by BP's addition of other

hazardous materials to the Macondo Well.  Where hazardous substances are added to crude oil or

its fractions through methods other than the refining process, then that oil unequivocally falls

outside of the petroleum exclusion.  *See, e.g., Franklin County Convention Facilities Auth. v.*

*Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001) (citing *U.S. v. Alcan*

*Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)).  Here, BP injected at least 454 barrels of

"spacer" fluid, containing additional hazardous wastes, into the well before the blowout to avoid

17

disposing of that fluid in a manner consistent with the Resource Conservation and Recovery Act, 42 U.S.C § 6901 *et seq*. SMF at ¶ 16. BP also injected 28,000 to 30,000 barrels of used drilling muds into the Blowout Preventer and into the Macondo Well between May 26-28. *Id*. at ¶¶ 17-19. These muds contained ethylene glycol and caustic soda, both hazardous substances. *Id*.; *see also* 40 C.F.R. § 302.4 (Chemical Abstract Service Registration Numbers or "CASRN" numbers 107-21-1 and 1310-73-2, respectively). ██████████████████████████████ ██████████████████████████████████████████ ██████████ 40 C.F.R. § 302.4 (CASRN 67-56-1). None of these additions were part of the "refining process" of the Macondo Well oil, and therefore vitiate any possible reliance upon CERCLA's "petroleum exclusion."

In summary, the benzene, toluene, and xylene released from the Macondo Well constitute "hazardous substances" under CERCLA because they are "otherwise specifically listed" as hazardous substances. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4. Even if they were excluded from the definition of "hazardous substance," the fact that BP added other hazardous substances into the Macondo Well unrelated to any refining process vitiates the exclusion's applicability.

E.     The Releases were Not "Federally Permitted."

A release that is "a federally permitted release" is not required to be reported under CERCLA § 103(a). 42 U.S.C. § 9603(a). The term "federally permitted release" is specifically defined by the statute as: discharges in compliance with Clean Water Act permits, 42 U.S.C. § 9601(10)(A), (D), (F), (J); discharges that were considered in issuing a Clean Water Act permit, 42 U.S.C. § 9601(10)(B); intermittent discharges from a point source identified in a Clean Water Act permit, 42 U.S.C. § 9601(10)(C); releases in compliance with a final permit issued under the Solid Waste Disposal Act, 42 U.S.C. § 9601(10)(E); underground injection of fluids authorized by federal programs, 42 U.S.C. § 9601(10)(G); emissions into the air subject to

a permit issued under the Clean Air Act, 42 U.S.C. § 9601(10)(H); and releases in compliance with permits issued under the Atomic Energy Act, 42 U.S.C. § 9601(10)(K). The releases from the Macondo Well do not fall under any of the permit programs identified in the definition of a "federally permitted release." As such, the releases were not "federally permitted."

8. *BP Has Not Submitted any Written, Followup Reports to Any State Emergency Response Commissions or Local Emergency Response Committees.*

As the Fifth Circuit noted over a year ago, BP had not, and still has not, notified any state emergency response commissions or local emergency response committees about the releases of benzene, toluene, and xylene from the Macondo Well, and has not submitted any follow-up written reports to those entities pursuant to 42 U.S.C. § 11004(c). SMF at ¶¶ 36-37; *Center for Biological Diversity, Inc.*, 704 F.3d at 429-30.

**CONCLUSION**

For the reasons articulated herein, there is no dispute of material fact that BP has violated the reporting requirements of EPCRA. The Court should find as a matter of law that the Center is entitled to summary judgment on Count VII of the amended complaint as to BP's failure to report the release of benzene, toluene, and xylene as required by 42 U.S.C. § 11004.

DATED this 15th Day of April, 2014.

Respectfully submitted,

s/Charles M. Tebbutt
Charles M. Tebbutt
Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Ph: 541-344-3505
E-mail: charlie.tebbuttlaw@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2014, I electronically served the foregoing on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing in accordance with the procedures established in MDL 2179.

s/ Charles M. Tebbutt
Charles M. Tebbutt
Law Offices of Charles M. Tebbutt, P.C.