# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL by the OIL RIG     )    MDL NO. 2179
"DEEPWATER HORIZON" in the GULF )    SECTION: J
OF MEXICO on APRIL 20, 2010     )
                                   )    JUDGE BARBIER
**This Document Relates to:**       )    MAG. JUDGE SHUSHAN
**ALL CASES IN PLEADING BUNDLE D1** )
                                   )
                                   )

---

### <u>Declaration of Daniel C. Snyder in Response to Motions to Dismiss</u>

I, Daniel C. Snyder, hereby declare that:

1.      I am over 21 years of age.  I am an associate with the Law Offices of Charles M. Tebbutt, P.C., located at 451 Blair Blvd., Eugene, OR 97402.  I am a member in good standing with the Oregon State Bar, OSB # 105127.  My firm represents the Center for Biological Diversity, one of the D1 Plaintiffs, in *Center for Biological Diversity v. BP America, Inc., et al.,* 2:10-cv-01768 and 2:10-cv-02454.

2.      On March 23, 2011, I searched Transocean's public website for a listing of all corporate directors and officers.  The specific URL I visited was "http://www.deepwater.com/fw/main/Our-Management-7.html".  Attached hereto as Exhibit A is a true and correct copy of the webpage as of the date of my visit.  At the time of my visit, the following individuals were identified as executive officers and senior managers of Transocean, Ltd.: John Briscoe, Vice President and Controller, Keelan I. Adamson, Vice President of Engineering and Technical Support, Eric B. Brown, Executive Vice President, Legal and Administration, and Terry B. Bonno, Vice President, Marketing.

3.     On March 23, 2011, I searched the Louisiana Secretary of State's corporations database, available online at "http://www.sos.louisiana.gov/tabid/819/Default.aspx". Attached hereto as Exhibit B, pp. 1-4, are true and correct copies of the publicly-available corporate information I retrieved from the database for "Transocean Offshore USA, Inc." and "Transocean Offshore Ventures, Inc." On March 23, 2011, I utilized Westlaw's Corporate & Business Records tool to search the Texas Secretary of State's Business Filings database. Attached hereto as Exhibit A, pp. 5-16, are true and correct copies of the publicly-available corporate information I retrieved from the database for "Transocean Enterprises, Inc.," "Transocean Offshore Deepwater Drilling, Inc.," and "Transocean Offshore Ventures, Inc."

4.     On March 10, 2011, I searched the United States Securities and Exchange Commission's Electronic Data-Gathering, Analysis, and Retrieval system ("EDGAR") for information related to Transocean Ltd. Attached hereto as Exhibit C are true and correct copies of the relevant excerpts from Transocean Ltd.'s Form 10-Q filing for the period ending March 31, 2010, and Transocean Ltd.'s 2010 Form 10-K filing.

5.     On March 28, 2011, I obtained a copy of BP's Regional Oil Spill Response Plan for the Gulf of Mexico from the New Orleans.com website. The specific URL I visited was: "http://www.neworleans.com/images/media/BP_Regional_OSRP_Redactedv2.pdf." Attached hereto as Exhibit D is a true and correct copy of the relevant excerpts from BP's plan.

6.     On March 28, 2011, I accessed the CBS News website and viewed an article entitled, "BP May Re-Tap Reservoir, Citing 'Lots of Oil.'" The URL I visited was "http://www.cbsnews.com/stories/2010/08/06/national/main6749005.shtml". The article is dated August 6, 2010, and quotes BP Chief Operating Officer Doug Suttles as stating that "[t]here's lots of oil and gas here," making reference to the MC #252 Macondo lease. He is also quoted as

saying that "[w]e're going to have to think about what to do with that at some point." A true and correct copy of the web page I viewed is attached hereto as Exhibit E.

7.      On March 28, 2011, I viewed video from an underwater submersible that was purportedly recorded during BP's removal of approximately 3,500 feet of drill pipe from the Macondo Well on August 22, 2010. The video shows pollutants being discharged from the Macondo Well during the procedure. The URL that I used to access the video was "http://www.youtube.com/watch?v=_L9UX7e0hY4&feature=related".

8.      On March 28, 2011, I viewed video from an underwater submersible, Enterprise ROV 1, that was allegedly recorded during BP's removal of approximately 3,500 feet of drill pipe from the Macondo Well on August 23, 2010. The video shows pollutants being discharged from the Macondo Well during the procedure. The URL that I used to access the video was "http://www.youtube.com/watch?v=p_mGLDE1YnU".

9.      On March 28, 2011, I accessed a July 15, 2010 article by Kristen Hays entitled "BP says test shuts off oil leak from Gulf well." The URL I visited was "http://www.reuters.com/article/2010/07/15/us-oil-spill-idUSTRE65O5TA20100715". The article quotes BP Chief Operating Officer Doug Suttles as stating that the initial tests from the stacking cap were "a great sight but its far from the finish line." The article also states that the U.S. Coast Guard described the containment cap as "at best a temporary fix to the leak while BP finishes two relief wells that it is drilling that are intended to intersect the blown-out well and permanently seal it next month." A true and correct copy of the article is attached as Exhibit F.

10.     On March 28, 2011, I accessed a July 15, 2010 Press Release from National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill,

DECLARATION OF DANIEL C. SNYDER                                                    3 / 5

www.restorethegulf.gov.  A true and correct copy of that press release is attached hereto as Exhibit G.

11.     On March 28, 2011, I accessed the transcripts from a July 19, 2010 press conference with National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit H.

12.     On March 28, 2011, I accessed the transcripts from a July 20, 2010 press conference with National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit I.

13.     On March 28, 2011, I accessed the transcripts from a August 9, 2010 press conference with National Incident Commander Admiral Thad Allen on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit J.

14.     On March 28, 2011, I accessed a July 18, 2010 letter from National Incident Commander Admiral Thad Allen to Bob Dudley, BP's Chief Managing Director, on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the transcript is attached hereto as Exhibit K.

15.     On March 28, 2011, I accessed the Summary Report for Fate and Effects of Remnant Oil in the Beach Environment, a February 10, 2011 report completed by the Operational Science Advisory Team (OSAT-2).  This report is available on the U.S. Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy of the relevant excerpts of the report is attached hereto as Exhibit L.

DECLARATION OF DANIEL C. SNYDER                                                    4 / 5

16.     On March 28, 2011, I accessed the July 19, 2010 transcript of the *Deepwater Horizon*

investigatory hearings before the Joint United States Coast Guard / Bureau of Ocean

Management, Regulation, and Enforcement.  The full transcript is available at:

"http://www.deepwaterinvestigation.com/external/content/document/3043/856483/1/7-19-

10.pdf".  A true and correct copy of the relevant excerpts of the transcripts is attached hereto as

Exhibit M.

17.     On March 28, 2011, I accessed BP's Responses to a June 14, 2010 Informational Request

from the Honorable Edward J. Markey and the Honorable Louis Capps, Concerning Activities

Related to Environmental and Worker Health Impacts.  BP's Response is available at:

"http://globalwarming.house.gov/files/LTTR/2010-07-23_ResponseTo2001-06-

14_MarkeyCappsLetter.pdf".  A true and correct copy of the BP Response is attached hereto as

Exhibit N.

18.     On March 28, 2011, I accessed an August 20, 2010 letter from National Incident

Commander Admiral Thad Allen to Bob Dudley, BP's Chief Managing Director, on the U.S.

Government's website concerning the oil spill, www.restorethegulf.gov.  A true and correct copy

of the transcript is attached hereto as Exhibit O.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

DATED THIS 29TH DAY OF MARCH, 2011

s/Daniel C. Snyder

Daniel C. Snyder, OSB #105127

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1

1          USCG/BOEM MARINE BOARD OF INVESTIGATION

          INTO THE MARINE CASUALTY, EXPLOSION, FIRE,

2               POLLUTION, AND SINKING

          OF MOBILE OFFSHORE DRILLING UNIT

3          DEEPWATER HORIZON, WITH LOSS OF LIFE

          IN THE GULF OF MEXICO 21-22 APRIL 2010

4               Monday, July 19, 2010


5


6          *   *   *   *   *   *   *


7

          The transcript of The Joint United

8     States Coast Guard/The Bureau of Ocean Energy

     Management, Regulation and Enforcement

9     Investigation of the above-entitled cause,

     before Dorothy N. Gros, a Certified Court

10     Reporter, authorized to administer oaths of

     witnesses pursuant to Section 961.1 of Title

11      13 of the Louisiana Revised Statutes of 1950,

     as amended, reported at the Radisson Hotel,

12      2150 Veterans Memorial Boulevard, Kenner,

     Louisiana, 70062, on Monday, July 19, 2010,

13      beginning at 8:00 a.m.


14


15


16


17


18


19

Exhibit M
Page 1

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt
Case 2:10-md-02179-CJB-SS   Document 13633-7   Filed 04/15/14   Page 8 of 58
Case 2:10-md-02179-CJB-SS   Document 1849-3   Filed 03/30/11   Page 82 of 134

2

```
1    APPEARANCES:
     MEMBERS OF THE BOARD:
2     CAPT HUNG M. NGUYEN, CO-CHAIR
     UNITED STATES COAST GUARD
3
     DAVID DYKES, CO-CHAIR
4     THE BUREAU OF OCEAN ENERGY MANAGEMENT,
     REGULATION AND ENFORCEMENT
5
     JASON MATHEWS
6     THE BUREAU OF OCEAN ENERGY MANAGEMENT,
     REGULATION AND ENFORCEMENT
7
     JOHN McCARROLL
8     THE BUREAU OF OCEAN ENERGY MANAGEMENT,
     REGULATION AND ENFORCEMENT
9
     ROSS WHEATLEY
10     UNITED STATES COAST GUARD

11     LTR ROBERT BUTTS, COURT RECORDER
     UNITED STATES COAST GUARD
12
     REPORTED BY:  DOROTHY N. GROS, CCR
13          CERTIFIED COURT REPORTER

14

15

16

17

18

19
```

Exhibit M
Page 2

1               I N D E X
                              PAGE
2        Caption. . . . . . . . . . . . . . . . . 1
         Appearances. . . . . . . . . . . . . . . 2
3         Certificate. . . . . . . . . . . . . . 364
         Examination of STEPHEN BERTONE:
4            BY MR. MATHEWS . . . . . . . 27, 95, 121
             BY MR. McCARROLL . . . . . . . . . .84
5            BY MR. WHEATLEY. . . . . . . . . . .86
             BY MR. LINSIN. . . . . . . . . . . 107
6            BY MR. KOHNKE. . . . . . . . . . . 115
             BY MS. KIRBY . . . . . . . . . . . 121
7            BY MR. JONES . . . . . . . . . . . 128
             BY MR. GORDON. . . . . . . . . . . 131
8            BY CAPT NGUYEN . . . . . . 164, 167, 227
             BY MR. DYKES . . . . . . . . . . . 167
9            BY MR. PENTON. . . . . . . . . . . 170
             BY MR. GODFREY . . . . . . . . . . 193
10       Examination of LANCE MOORE JOHN:
             BY MR. MATHEWS . . . . . . 236, 250, 262
11           BY MR. McCARROLL . . . . . . . .245, 251
             BY MR. DYKES . . . . . . . . . . . 249
12           BY MR. LINSIN. . . . . . . . .252, 265
             BY MS. KUCHLER . . . . . . . . . . 254
13           BY MR. CLEMENTS. . . . . . . . . . 258

14

15

16

17

18

19

Exhibit M
Page 3

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 10 of 58
Case 2:10-md-02179-CJB-SS Document 849-3-7 Filed 03/30/11 Page 64 of 38

4

1        EXAMINATION: (CONT'D)

2

3           BY MS. KARIS . . . . . . . . . . . 263

4        Examination of LEO LINDER:

5           BY MR. MATHEWS . . . . . . . . .268, 348

6           BY MR. McCARROLL . . . . . . .286, 350

7           BY MR. LINSIN. . . . . . . . .291, 359

8           BY MR. PENTON. . . . . . . . . . . 295

9           BY MR. DYKES . . . . . . . . . . . 309

10          BY MR. KOHNKE. . . . . . . . . . . 312

11          BY MS. KIRBY . . . . . . . . .315, 345

12          BY MR. GORDON. . . . . . . . .333, 356

13          BY MS. KARIS . . . . . . . . . . . 335

14          BY MR. GODWIN. . . . . . . . . . . 353

15

16

17

18

19

Exhibit M
Page 4

20      motorman, also fell in line and we ran towards

21      the standby generator.  As I was running to

22      the standby generator, I looked up at the

23      derrick where the crown should approximately

24      be and I could see nothing but flames way past

25      the crown.  I remember looking down at the

Exhibit M
Page 5

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 12 of 58
Case 2:10-md-02179-CJB-SS Document 849-3-7 Filed 03/30/11 Page 80 of 738

41

1     deck because it was very slick and I saw a

2     substance that had a consistency of snot.  I

3     can remember thinking to myself why is all

4     this snot on the deck.  It was approximately,

5     I would say, an inch to an inch and a half

6     thick.  As I made my way -- as we made our way

7     to the standby generator room, we had to come

8     pass right by the BOP house, which has a huge

9     door that's approximately, I'd say, 80, 90

10     feet tall and probably 50 foot wide that you

11     can actually look down into the moon pool.

12     When I looked into that space, I saw nothing

13     but flames.  I could see no equipment

14     whatsoever.  It was solid flames.  When we

15     walked into the standby generator room, myself

16     and Mike Williams ran to the starting panel.

17     I flipped the switch from automatic to manual,

18     hit the reset button and the start button.

19     There was absolutely no turning over of the

Exhibit M
Page 6

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 13 of 58
Case 2:10-md-02179-CJB-SS Document 1849-3-7 Filed 03/30/11 Page 87 of 34

126

1      MR. LONDON:

2             No, you know it was Chris.

3      MS. KIRBY:

4             Feel free to correct me.

5      THE WITNESS:

6             I know it was Chris.

7      MR. LONDON:

8             He knows it was Chris and that's

9      during -- immediately after the

10      incident when you're talking about the

11      EDS?

12  BY MS. KIRBY:

13      Q.  Right after the incident you leave the

14  bridge, right?

15      A.  Correct.

16      Q.  And you go where?

17      A.  I was enroute to the standby generator

18  room.

19      Q.  And you see the snot, as you put it,

Exhibit M
Page 7

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (251 of 731) [08/10/2010 2:27:17 PM]

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC   Document 12673-7   Filed 04/15/14   Page 14 of 58
Case 2:10-md-02179-CJB-SS   Document 849-3-7   Filed 03/30/11   Page 83 of 73

20      where?

21          A.  On the deck.  It was approximately an

22   inch to and inch and a half thick.  It had a

23   kind of a whitish, milky look to it.

24          Q.  Was it on fire?

25          A.  Not in the path that I was going.

Exhibit M

Page 8

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1       Q.  Did you look around and see any --

2    what appeared to be any of it on fire

3    elsewhere?

4       A.  The only place that I looked as I came

5    out of the bridge was up to the derrick, of

6    course, because it was the biggest flame.

7    Then I noticed my feet slipping.  I looked

8    down at the deck and thought to myself what is

9    all this snot doing on the deck.  At that

10    point, I looked towards the moon pool and was

11    coming up to it and looked into the moon pool

12    itself.  I don't recall looking really

13    anywhere else other than the path that I was

14    on the derrick and the moon pool.

15       Q.  This substance that you were slipping

16    in, did you get any on your hands or anywhere

17    where you could feel it?

18       A.  No, ma'am.

19       Q.  Did it look like anything you'd seen

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (253 of 731) [08/10/2010 2:27:17 PM]

20     used on the rig before?

21         A.  No, ma'am.

22         Q.  Are you familiar with drilling mud,

23     obviously?

24         A.  I've seen it; I've touched it, but I'm

25     not familiar with all the different types and

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 17 of 58
Case 2:10-md-02179-CJB-SS Document 849-3 Filed 03/30/11 Page 9 1 of 38

1        such.

2           Q.  It didn't look like drilling mud?

3           A.  No, not the drilling mud that I'm used

4      to seeing, no.

5           Q.  What about spacer?

6           A.  I don't know what that is.

7           Q.  You don't know what it is.

8              MS. KIRBY:

9                    No further questions.  Thanks.

10             CAPT NGUYEN:

11                   Cameron?

12             MR. JONES:

13                   A couple of questions, Captain.

14             Good morning, Mr. Bertone.  My name is

15             David Jones and I represent Cameron.

16             Just a couple of quick questions for

17             you.

18                 E X A M I N A T I O N

19      BY MR. JONES:

Exhibit M
Page 11

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1          MR. FANNING:

2                    No questions.

3          CAPT NGUYEN:

4                    Mike Williams?

5          MR. PENTON:

6                    Just a couple, Captain.

7                    E X A M I N A T I O N

8     BY MR. PENTON:

9          Q.   Captain, I'm Ronnie Penton and I

10    represent Mike Williams.  I have a couple

11    questions for you.  How standard in the

12    industry, at least in your experience, is a

13    450 barrel spacer?

14         A.   I'd say, just from my experience, it's

15    not standard.

16         Q.   That's not standard industry

17    practice, is it?

18         A.   No.

19         Q.   Why is that?

Exhibit M
Page 12

20                  MR. EASON:

21                      Go on and answer the questions as

22          best you can.

23          MR. PENTON:

24                      Sure, if you can.

25          MR. EASON:

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 20 of 58
Case 2:10-md-02179-CJB-SS Document 849-3-7 Filed 03/30/11 Page 4 of 58

296

1                    If you can.

2                    THE WITNESS:

3                        Just as a rule of thumb, you need

4                        roughly 200 barrels is what we try to

5                    pump -- 200 to 180.  To make that

6                    distinction between the seawater and

7                    the synthetic fluid?

8        BY MR. PENTON:

9            Q.  Yes.

10           A.  Any more than that wouldn't be called

11       for.  It would be unmerited to make more of

12       it.

13           Q.  Maybe I missed it.  Who specified that

14       size of spacer?

15           A.  That size of spacer?

16           Q.  Yes.

17           A.  Ultimately it was vetted through BP so

18       they gave the go-ahead to use it.

19           Q.  It was vetted through BP, but did you

Exhibit M
Page 14

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC   Document 12673-7   Filed 04/15/14   Page 21 of 58
Case 2:10-md-02179-CJB-SS   Document 849-3-7   Filed 03/30/11   Page 93 of 34

20    or someone with your company recommend it?

21        A.   Recommend it?  Like I said before, the

22    idea to use an LCM spacer had been kicked

23    around before in the same circumstance when we

24    had LCM spacers left on -- not spacers, pills.

25    And I remember having a conversation with

Exhibit M
Page 15

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 22 of 58
Case 2:10-md-02179-CJB-SS Document 849-3-7 Filed 03/30/11 Page 96 of 38

297

1      Murray Sepulvado about what we could do with

2      it.  But that was very early on in the hitch.

3      As the hitch progressed and got more -- we got

4      closer to the point, we started asking

5      questions whether or not we could do this to

6      BP.  And that's how it came to be.

7         Q.  Well, when you say, "what we could do

8      with it," what do you mean?

9         A.  Use it as a spacer.

10         Q.  Why was it of such a great amount to

11      begin with?

12         A.  Because there were two different

13      pills, roughly 180 barrels a piece.

14         Q.  So you put them together?

15         A.  Yes.

16         Q.  And I appreciate your answer, but

17      maybe it was a poorly formed questions, but

18      who made that decision?

19         A.  The decision was made by BP to use it.

Exhibit M
Page 16

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC   Document 12673-7   Filed 04/15/14   Page 23 of 58
Case 2:10-md-02179-CJB-SS   Document 849-3-7   Filed 03/30/11   Page 7 of 34

20          Q.  Did you recommend it or someone from

21     your company recommend it?

22          A.  Again, I broached the subject with

23     him.  It wasn't an idea that I came up with

24     so, I mean, it was an idea that was just in

25     the air and we talked about.

Exhibit M
Page 17

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (594 of 731) [08/10/2010 2:27:20 PM]

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 24 of 58
Case 2:10-md-02179-CJB-SS Document 849-3-7 Filed 03/30/11 Page 98 of 130
298

1          Q.   Well, was it a joint idea between

2      yourself and BP?

3              MR. EASON:

4                      Captain, at this point, I'd object.

5              He's answered this question three times

6              and at this point --

7              MR. PENTON:

8                      I haven't gotten an answer,

9              Captain.  I'm trying to work with the

10              witness to get an answer on if it was a

11              joint effort on behalf of this witness,

12              as well as BP, or were the other

13              parties involved in that process.

14              CAPT NGUYEN:

15                      He can answer that, but I think you

16              stated your question so he can answer

17              that question, please.

18              THE WITNESS:

19                      Is it a joint decision like did I

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (595 of 731) [08/10/2010 2:27:20 PM]

20          have a say in it?

21      BY MR. PENTON:

22          Q.  Yes.

23          A.  Or M-I SWACO had a say in it.

24      Ultimately, that decision was BP's decision.

25          Q.  Ultimately it was their decision?

Exhibit M
Page 19

Case 2:10-md-02179-CJB-DPC Document 13963-7 Filed 04/15/14 Page 26 of 52

1    A.  Yes.

2    Q.  But you were involved in that

3  decision?

4    A.  Yes.

5    Q.  Now, why is such a large pill not

6  recommended or not normally used?

7    MR. EASON:

8         Let me object --

9    MR. PENTON:

10        I'm sorry.  I can't hear your

11        objection.  I'm sorry.

12    MR. EASON:

13        Ronnie, you used the word

14        "recommended" in that question.  I'd

15        just object to that use.

16  BY MR. PENTON:

17    Q.  You testified that such a large volume

18  of spacer is not standard industry practice.

19  And so I'm asking, I guess the question is why

Exhibit M
Page 20

20      is it not the standard industry practice such

21      a large pill?

22          A.  Well the pill, depending on the size,

23      a large pill would do the same job as a

24      smaller pill.  So why make a 400 barrel pill

25      if you don't have the fluid already ready, as

Exhibit M
Page 21

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 13263-7 Filed 04/15/14 Page 28 of 58
Case 2:10-md-02179-CJB-SS Document 13263-7 Filed 08/30/11 Page 9 of 34

300

1    opposed to just taking the 200 barrel pill.

2    But we had these two fluids already made.

3        Q.  So was it more driven by the idea that

4    you already had that made up and you used it?

5        A.  Well, I didn't but --

6        Q.  I understand.

7        A.  I understand.  But yes, we had the

8    product there and BP wanted to use it.

9        Q.  Tell me, if you know, what types of

10   difficulties or complications may be visited

11   on the well conditions with such a large pill,

12   if you know.

13       A.  If I know?

14       MR. SCAFF:

15            Objection, Captain.  This witness

16       is not here to testify as an expert and

17       I believe he's asking him to speculate

18       as to wellbore conditions and it's

19       beyond his personal knowledge.

Exhibit M
Page 22

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 29 of 58
Case 2:10-md-02179-CJB-SS Document 1549-3 Filed 03/30/11 Page 103 of 134

20          MR. PENTON:

21                    And, Captain, if he knows.  He's

22          the drilling fluid specialist.  That's

23          what this is, drilling fluid, if he

24          knows.

25                    MR. SCAFF:

Exhibit M
Page 23

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (600 of 731) [08/10/2010 2:27:20 PM]

301

1                    It's used at the surface --

2           CAPT NGUYEN:

3                    Yes, sir.  I agree with the M-I

4           SWACO adviser.

5    BY MR. PENTON:

6      Q.  Do you know -- I'll try to rephrase

7    and get by that, okay?  Do you know if this

8    450 barrel spacer caused complications in the

9    well condition that they were dealing with

10    that evening?

11          MR. SCAFF:

12                   Again, Captain, that calls for an

13          expert opinion.  It's beyond the scope

14          of Mr. Lindner's personal knowledge and

15          what he's here to testify to under

16          oath.

17          MR. PENTON:

18                   I believe the witness could say

19          that.  I mean, he's the one involved in

Exhibit M
Page 24

20          this.  I don't know who else I can ask

21          that question to.

22          MR. EASON:

23                    He's here as a fact witness,

24          Captain.

25          MR. PENTON:

1          MR. PENTON:

2                    That's all I have, sir.  Thank you.

3          MR: DYKES:

4                    I've got a couple of follow-up

5          questions.

6                    E X A M I N A T I O N

7          BY MR. DYKES:

8          Q.  You had a 450 barrel loss circulation

9     material pill that you had combined out of two

10    separate pills.  So take an average, if you

11    have two, you have two 225 barrel pills,

12    originally?

13         A.  I don't remember exactly what the pit

14    volumes were, but yes.

15         Q.  Somewhere in that ballpark?

16         A.  Somewhere in that ballpark.

17         Q.  Why didn't you only use one and just

18    dump the other one overboard?

19         A.  We couldn't dump overboard because of

Exhibit M
Page 26

20      the way BP -- well, and this is, I'm speaking

21      for BP.  This is my understanding of it.  That

22      according to the RECRA Act, they couldn't just

23      discharge something that hadn't been

24      circulated through the well, the wellhead --

25            Q.  The wellbore?

Exhibit M
Page 27

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (618 of 731) [08/10/2010 2:27:20 PM]

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1      A.  -- because it wouldn't be an exempt

2  waste.

3      Q.  So to be in compliance with the

4  National Pollution Discharge Elimination

5  System requirements, also known as the NPDES?

6      A.  I don't know that, plus I am not an

7  environmental lawyer, but I thought the RECRA

8  Act was different than the NPDES.  But it is

9  an environmental act from what I understand.

10      Q.  So the fluid has to come in contact

11  with the wellbore before it can be discharged

12  overboard.

13      A.  In order to be considered an exempted

14  waste, right.  And that, of course, it can't

15  be a synthetic fluid.  That's beyond the pale

16  but a water based -- if you're going to dump a

17  water based thing, you couldn't just build it

18  in your pit and dump it.

19      Q.  But you can build it in your pits,

Exhibit M
Page 28

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

20      pump it down the hole, take it right back up

21      the backside and dump it overboard?

22          A.  If you use it for something.

23          Q.  So even though common practice is 180

24      to 200 barrel spacer, we can combine this, an

25      uncommon practice, and pump it to get through

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (620 of 731) [08/10/2010 2:27:20 PM]

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

317

1          answered.

2          CAPT NGUYEN:

3                    I agree with M-I SWACO.

4      BY MS. KIRBY:

5          Q.  Did you hold yourself out as a

6      negative testing expert to Mr. Kaluza?

7          A.  Not at all.

8          Q.  Did he tell you why he was asking you

9      versus anyone else?

10         A.  No.

11         Q.  The two pills that you testified were

12     used, was one mixed on that day, April 20th?

13         A.  If I recall correctly, it was prior.

14     It was prior to -- it could have been earlier

15     that morning like 1 o'clock.

16         Q.  And the other one?

17         A.  Oh, you mean like mixed together --

18     those two pills mixed together?

19         Q.  No.  You had two pills, correct?  How

Exhibit M
Page 30

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (633 of 731) [08/10/2010 2:27:20 PM]

20      old was the one pill; how old was the other

21      pill?

22              A.   Both pills were mixed two weeks prior

23      to the event.

24              Q.   Was there any Form-A-Set material in

25      either of the pills?

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1          A.   Form-A-Set, yes.  One pill was Form-A-

2     Set; one was Form-A-Squeeze.

3          Q.   And was there any Form-A-Squeeze test?

4          A.   Yes.

5          Q.   There was.  Tell us, please, what the

6     purpose of Form-A-Squeeze is.

7          A.   Form-A-Squeeze -- it's a material that

8     compresses against the porous surface and

9     dewaters, leaving the plug.

10          Q.   So it's a loss -- what they call a --

11          A.   It's a loss circulation pill.

12          Q.   So when you start losing mud while

13     you're drilling and it's because your

14     formation is breaking down, you put the Form-

15     A-Squeeze in there so that it will essentially

16     fill up that spot and hold it tight; is that

17     right?

18          A.   That is what its purpose, yes.

19          Q.   So it hardens, in other words?

Exhibit M
Page 32

20          A.  It dewaters.  That means the water

21      phase gets shoved into the formation and the

22      Form-A-Squeeze material creates a plug so the

23      whole pill itself does not harden.

24          Q.  And Form-A-Set, what does it do?

25          A.  Form-A-Set does if you add what's

Exhibit M
Page 33

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (636 of 731) [08/10/2010 2:27:20 PM]

1    called an accelerant.  It causes the pill to

2    cross link, which was not added.

3        Q.  So the accelerant was not added?

4        A.  The accelerant was not added.

5        Q.  So you had a Form-A-Squeeze pill,

6    true?

7        A.  True.

8        Q.  Mixed two weeks earlier, correct?

9        A.  Yes.

10       Q.   And you had a Form-A-Set pill mixed

11   two weeks earlier, correct?

12       A.  Uh-huh (affirmative response).

13       Q.  And no one wanted to have to keep

14   either one of those pills, correct?

15       A.  Yes.

16       Q.  And who was it --

17       A.  Well, again --

18       Q.  Who was it that didn't want to keep

19   those pills?

Exhibit M
Page 34

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

20      A.   It's BP.

21      Q.   BP told you it did not want to keep

22   the pills?

23      A.   They didn't want to have to dispose of

24   them, yes.

25      Q.   If you didn't use the pills, you

Exhibit M
Page 35

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1    testified before that if you used them

2    downhole, then you could have an exemption as

3    drilling fluid, right?

4        A.  As an exempt waste, from what I

5    understand.

6        Q.  What if you hadn't used them that way,

7    what would have had -- what would the rig have

8    had to do --

9        A.  We would have had -- I wouldn't know

10   exactly where they would have to send it.  I

11   presume Newport does disposal so it would have

12   had to be disposed of.

13       Q.  Hazardous waste disposal, right?

14       A.  Yes.

15       Q.  When these pills are, either one or

16   both, when they're mixed, do they have a milky

17   fluid, milky white fluid look?

18       A.  A milky white fluid, but it looked

19   like a gray drilling fluid.

Exhibit M
Page 36

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (639 of 731) [08/10/2010 2:27:20 PM]

Case 2:10-md-02179-CJB-SS Document 1849-3 Filed 03/30/11 Page 17 of 34

20          Q.  Like a what?  A gray?

21          A.  Gray.

22          Q.  Have you ever heard anybody

23      characterize it as looking like snot?

24          A.  It wasn't quite snotty.

25          Q.  But it was close?

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

1        A.  It was thick.  It was thick, but it

2    was still fluid.

3        Q.  So it was very viscous?

4        A.  Yes.

5        Q.  And really the only reason for putting

6    those two pills down there was just to get rid

7    of them; is that your understanding?

8            MR. EASON:

9                Objection.  If you know the answer

10            to the question.

11            THE WITNESS:

12                To my knowledge -- well, it filled

13            a function that we needed a spacer.  We

14            then had to build another one without

15            it.

16    BY MS. KIRBY:

17        Q.  Are these two materials, the Form-A-

18    Squeeze and the Form-A-Set, are they

19    specifically designed for application of

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (641 of 731) [08/10/2010 2:27:20 PM]

20      spacers?

21         A.  No.

22         Q.  But it was felt that this would be

23      alright in this instance?

24          MR. EASON

25              Let me object to the form as to who

Exhibit M
Page 39

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

362

1          the hearing for this afternoon and we

2          will restart tomorrow morning at 8:00.

3          Thank you.

4

5                    *   *   *   *   *   *

6     (Whereupon, the hearing was adjourned at 3:45

7     p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

Exhibit M
Page 40

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (723 of 731) [08/10/2010 2:27:21 PM]

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

363

1

2                  R E P O R T E R ' S   P A G E

3              I, DOROTHY N. GROS, Certified Court

4        Reporter in and for the State of Louisiana,

5        the officer, as defined in Rule 28 of the

6        Federal Rules of Civil Procedure and/or

7        Article 1434(B) of the Louisiana Code of Civil

8        Procedure, before who this sworn testimony was

9        taken, do hereby state on the Record:

10               That due to the interaction in the

11        spontaneous discourse of this proceeding,

12        dashes (--) have been used to indicate pauses,

13        changes in thought, and/or talk overs; that

14        same is the proper method for a Court

15        Reporter's transcription of proceeding, and

16        that the dashes (--) do not indicate that

17        words or phrases have been left out of this

18        transcript;

19               That any words and/or names which could

Exhibit M
Page 41

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (725 of 731) [08/10/2010 2:27:21 PM]

Case 2:10-md-02179-CJB-DPC   Document 13263-7   Filed 04/15/14   Page 48 of 58
Case 2:10-md-02179-CJB-SS   Document 1849-3   Filed 03/30/11   Page 22 of 34

20      not be verified through references material

21      have been denoted with the phrase

22      "(phonetic)".

23

24

25      _____

Exhibit M
Page 42

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (726 of 731) [08/10/2010 2:27:21 PM]

file:///d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 13263-7 Filed 04/15/14 Page 49 of 58
Case 2:10-md-02179-CJB-SS Document 3-9-3 Filed 08/30/11 Page 23 of 34

364

1              DOROTHY N. GROS, CCR

2

3                  C E R T I F I C A T E

4

5              I, Dorothy N. Gros, Certified Court

6        Reporter, in and for the State of Louisiana,

7        authorized by the laws of said State to

8        administer oaths and to take the depositions

9        of witnesses, hereby certify that the

10         foregoing matter was taken before me at the

11         time and place herein above stated; the matter

12         being reported by me and thereafter

13         transcribed under my supervision; that the

14         foregoing pages contain a true and correct

15         transcription of the matter as thus given to

16         the best of my ability and understanding.

17

18              I further certify that I am not of

19        counsel nor related to any of the parties to

Exhibit M
Page 43

20      this cause, and that I am in no wise

21      interested in the result of said cause.

22

23

24

25

Exhibit M
Page 44

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt

Case 2:10-md-02179-CJB-DPC Document 12673-7 Filed 04/15/14 Page 51 of 58
Case 2:10-md-02179-CJB-SS Document 1349-3 Filed 03/30/11 Page 25 of 34

365

1        _____

2                    DOROTHY N. GROS, CCR

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Exhibit M
Page 45

file:////d08ms-yeunoslb3/Unitshares/Hearing_records/Transcripts/Session_3_19-23Jul10/7-19-10.txt (729 of 731) [08/10/2010 2:27:21 PM]

**RESPONSE TO JUNE 14, 2010 INFORMATION REQUEST FROM THE HONORABLE
EDWARD J. MARKEY AND THE HONORABLE LOIS CAPPS CONCERNING
ACTIVITIES RELATED TO ENVIRONMENTAL AND WORKER HEALTH IMPACTS**

**JULY 23, 2010**

1.      **Please provide the coordinates for all ships used for sampling that have been funded
by BP as a part of the cleanup effort, including all independent contractors and
recruited locals, since April 20, 2010.  Please provide all data collected by these
ships, including but not limited to rotifer toxicity, dead or stranded wildlife,
methodology and associated data for monitoring or calculating the total volume of
oil leaked and oxygen concentration/sampling.**

BP appreciates the importance of providing reliable and timely information regarding
water quality and chemistry gathered in connection with the incident.  Much of the data
referred to in the request is already available on the BP website.[1]

Additional data from the Unified Command's water column sampling program
(conducted by the Environmental Protection Agency (EPA), the National Oceanic and
Atmospheric Administration (NOAA) and BP scientists on the *R/V Brooks McCall*, the
*R/V Ocean Veritas* and now the *R/V Ryan Chouest*) has recently been assembled,
including data from NOAA and the EPA, and this data is now posted on the BP website
consistent with the EPA monitoring directive and efforts to bring greater transparency to
the monitoring process.[2]  This information and the analytical data and sampling plans
from the other types of water, air, and sediment monitoring conducted by BP or its
contractors is available from the "Monitoring and Sampling Information" page of the BP
website.[3]  New or additional monitoring data from the continuing sampling programs will
similarly be released as they become available for posting.  Please note that these results
do not include data from samples collected by government agencies or other researchers
not directed by the company.  With regard to your request for ship locations, sampling
location information is included with analytical results where applicable.

Finally, although BP is not currently collecting data on dead or stranded wildlife, the
Unified Command has a program for reporting and collecting information at its website.[4]

---

[1]   *See* http://www.bp.com/sectiongenericarticle.do?categoryId=9033821&contentId=7062498.

[2]   *See* http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062604.

[3]   *See* http://www.bp.com/sectiongenericarticle.do?categoryId=9033821&contentId=7062498.

[4]   *See* http://www.deepwaterhorizonresponse.com/go/doctype/2931/55963.

Exhibit N
Page 1

2.    **Has BP sampled air and water to monitor for the presence of ingredients of the dispersants Corexit 9500 and 9527?  If yes, what are the results of this sampling?  If not, why not?  Please provide all data relating to the air and monitoring data, including the date the sample was taken, coordinates of sampling location, sampling equipment used and the limit of detection.**

The EPA and BP are involved in monitoring the air and water around worksites and along the shoreline for dispersant components.  BP is working with the EPA to test air and water samples and track any potential effects of dispersants, and to ensure that protective measures are adequate. To the best of our knowledge, the samples taken so far have shown very low to non-detectable levels of dispersant ingredients. Monitoring data is posted at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062604 and http://www.epa.gov/bpspill/dispersants.html#bpdata.

BP in coordination with the Unified Area Command (UAC) is working closely with the Occupational Safety and Health Administration (OSHA) and the National Institute for Occupational Safety and Health (NIOSH) in conducting industrial hygiene monitoring of the response workers.  These monitoring results have shown that worker exposure levels to dispersant ingredients are usually below the detection level and when detected, significantly below occupational exposure limits.  We have provided below a link to BP's detailed industrial hygiene monitoring data and summaries of that data presented in a chart format.
http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062609.

In particular, the following monitoring studies have been performed:

Monitoring studies to test for the presence of 2-butoxy-1-ethanol, a component of Corexit EC9527A but not EC9500:

- Monitoring by BP in select industrial hygiene samples.  Results are posted on the BP web site at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062609.
- Monitoring by BP in coastal and near shore water and sediment.  Results and sampling locations are posted on the BP web site at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062586.
- Monitoring by the OSHA of worker air samples.  Results and work activities are posted on the OSHA web site at http://www.osha.gov/oilspills/index_sampling.html.
- Monitoring by the or EPA of shoreline air using mobile analytical methods.  Results are posted on the EPA web site at http://www.epa.gov/bpspill/taga.html.
- Monitoring by the EPA in shoreline water.   Results are posted on the EPA web site at http://www.epa.gov/bpspill/water.html#cumulative.

Monitoring studies to test for the presence of 1,2-propanediol (propylene glycol), a component of both Corexit EC9527A and EC9500:

- Monitoring by BP in coastal and near shore water and sediment. Results and sampling locations are posted on the BP web site at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062586.
- Monitoring by OSHA of worker air samples. Results and work activities are posted on the OSHA web site at http://www.osha.gov/oilspills/index_sampling.html.
- Monitoring by the EPA in shoreline water. Results are posted on the EPA web site at http://www.epa.gov/bpspill/water.html#cumulative.

Monitoring studies to test for the presence of 2-sulfo-butanedioic acid, 1,4-bis(2-ethylhexyl) ester (dioctyl sulfosuccinate), a component of both Corexit EC9527A and EC9500:

- Monitoring by the EPA in shoreline water. Results are posted on the EPA web site at http://www.epa.gov/bpspill/water.html#cumulative.

Monitoring studies have been performed to test for the presence of 1-(2-butoxy-1-methylethoxy)-2-propanol (dipropylene glycol monobutyl ether), a component of Corexit EC9500A:

- Monitoring by the EPA of shoreline air using mobile analytical methods. Results are posted on the EPA web site at http://www.epa.gov/bpspill/taga.html.

3. **It is my understanding that 30,000 gallons of drilling mud was used in the failed "top kill" procedure and much of that found its way out of the pipes and into the ocean. It is my understanding, for example, that in addition to the synthetic oils and other chemicals that are used to make drilling mud, that BP may have included as much as 30% ethylene glycol, which is a common antifreeze, to ensure that methane hydrates didn't form during the procedure. Ethylene glycol is also toxic. To understand the potential effect the drilling mud may be having on the marine ecosystem, please list all ingredients that made up the drilling mud used in the failed "top kill" procedure.**

The U.S. Coast Guard and the Minerals Management Service approved the top kill procedure, including the ingredients for the drilling mud. The ingredients used in the procedure were: fresh water (which, as used, contained a sodium chloride brine solution), caustic soda, DUOVIS (which consists of xantham gum and Glyoxal), ethylene glycol, and MI BAR (which consists of Barite and Crystalline Silica Quartz). The ethylene glycol used was a 30% solution, meaning that it was diluted with water at 30% concentration. That solution is what was added to the mud. BP used approximately 30,000 barrels of drilling mud in the top kill procedure.

4. **How much methanol has BP pumped into the ocean as a part of the mitigation efforts? Is BP continuing to use methanol to prevent the formation of hydrates? If**

Exhibit N
Page 3

so, how much methanol is currently being used and how is that figure determined?
If not, when did BP start and stop discharging methanol into the ocean?  Please
provide all measurements and data that pertain to methanol used in the mitigation
effort.

As of July 1, 2010, BP had pumped approximately 11,330 gallons of methanol in direct
connection to the operations at the wellhead.  BP is continuing to use methanol to
mitigate hydrate formation at a rate of about 2-8 gallons/minute, depending on the
mitigation operation.  While the test facility is in recovery mode, the methanol is returned
to the surface along with the captured oil and gas.  At this time, both the oil and
methanol are stored on the Enterprise.

The spreadsheet being produced at BP-HZN-CEC0079795 through BP-HZN-
CEC0079798 tracks the amount of methanol being pumped as part of the mitigation
effort.  As for total methanol used during the mitigation effort, which includes pumped
amounts and amounts used in other service, BP has used more than 168,000 gallons since
the start of the mitigation effort.

5.    **What are the methane concentration measurements for the area surrounding the
      leak site?  Please provide the date of measurement, sampling equipment used,
      coordinates for sample location, and limit of detection of the equipment.**

BP monitors the air quality on the vessels that operate at the leak site in order to protect
worker health and to help prevent potential fire hazards associated with exposure to
methane and other crude oil constituents.  The monitoring is conducted pursuant to the
Offshore Air Monitoring Strategy.

Fire and explosion hazards and controls are assessed using handheld or stationary direct
reading instruments with catalytic bead sensors for 0-100% Lower Explosive Limit
(LEL).  LEL sensors are not substance-specific.  These sensors measure methane and
other combustible gases present in the environment.  The limit of detection or resolution
for the LEL sensor is 1.0%.  Monitoring data for vessels located at the leak site is
available beginning on April 27, 2010.  As of June 28, 2010, the average LEL
concentration is 0.1% over an average of 16,239 measurements collected.

6.    **Has BP been collecting monitoring data in accordance with OSHA standard
      1910.120(h)(1)(i) regarding employee exposure to hazardous concentrations of
      hazardous substances?  Please describe the methodology used to collect this data.
      What actions has BP taken in response to air quality measurements that exceeded
      the levels of concern or NIOSH recommended exposure limits?**

Monitoring for environmental and public health impacts is a joint effort among BP and
several governmental agencies (*i.e.,* OSHA, the EPA, the Centers for Disease Control
(CDC), NIOSH, and State Health Organizations (SHOs)).  Results are posted on BP's
website for daily air monitoring and sampling, water sampling, and health monitoring,
and the Unified Area Command updates results on the Deepwater Horizon Response

Exhibit N
Page 4

website for air quality monitoring and water and sediment testing. The EPA also monitors and posts on its website air quality and water monitoring results.

In response to your question about air quality monitoring in particular, BP conducts air monitoring in accordance with air monitoring plans that have been approved by the Unified Area Command and are in compliance with 29 C.F.R. § 1910.120(h)(1)(i). They are designed to ensure selection of proper engineering controls, work practices, and personal protective equipment so that workers are not exposed to hazardous-substance levels in excess of the Permissible Exposure Limits (PEL) set by OSHA, the Threshold Limit Values (TLV) set by the American Conference of Governmental Industrial Hygienists (ACGIH), and/or the Recommended Exposure Limits (RELs) set by NIOSH.

To ensure that safety measures, designed to protect the workforce, remain effective, BP as part of its industrial hygiene program has engaged approximately 100 industrial hygienists and technicians to monitor area and personal exposures at the offshore, near-shore, and beach work areas. The air monitoring strategy includes both the use of real-time measurements and personal samples to demonstrate that safety systems including respiratory protection usage remain effective.

In particular, the technicians are using direct-reading instruments to conduct real-time monitoring for lower explosive limits for chemicals, and they monitor for exceedances of safe occupational exposure thresholds for benzene, hydrogen sulfide, carbon monoxide, oxygen, and other volatile organic compounds. The technicians in the offshore source-control area also monitor for sulfur dioxide and particulate matter. This real-time monitoring allows personnel to respond quickly to prevent over-exposure, provide necessary respiratory protection, or take any additional precautions.

Site action levels are set for the airborne hazards referred to above, and when an air-monitoring technician confirms a consistent reading above these action levels, they immediately inform the appropriate personnel—the vessel captain, in the case of offshore operations, or the site officials, in the case of onshore or near-shore operations. Work is then restricted in that area to workers wearing appropriate respiratory protection or else they must leave the area of exposure. It should be noted that in the case of vessel workers working offshore, they must first undergo the vessel's respiratory protection program that includes training, medical certification, and appropriate fit-testing for the respirator(s) that may be utilized for specific activities.

In addition to the real-time monitoring described above, Organic Vapor Monitor (OVM) badges are used to assess any personnel exposures to benzene, ethyl benzene, toluene, xylene and total hydrocarbons. In offshore operations, OVM badges are placed on personnel identified as having the highest potential for exposure, and monitoring is conducted on workers who spend the most time on the deck each day. For onshore and near-shore operations, the objective is to sample 10% of the representative population. The number of samples taken is based on an analysis of similar exposure groups, which consist of workers having the same general exposure profile based on, for example, the similarities of the tasks they perform and the materials with which they work.

Exhibit N
Page 5

OVM badges are analyzed pursuant to OSHA-approved methodologies by a laboratory accredited by the American Industrial Hygiene Association. The laboratory results are reviewed by a certified industrial hygienist who investigates any exposures above OSHA PELs, ACGIH TLVs, or NIOSH RELs to determine whether the proper workplace controls were in place or whether they need to be modified.

To date, more than 9,000 personal samples have been taken of workers involved in source control activities, offshore and near-shore operations, beach cleanup, and other response activities. In the vast majority of cases, there have been no significant exposures to airborne concentrations of benzene, total hydrocarbons or dispersant chemicals of interest. In the small number of cases where exposure data was slightly above the applicable limit, the issue was investigated and has usually been attributable to an unusual, nonrecurring event (e.g., a marine vessel fuel or hydraulic leak).

As sample results are validated, personal exposure data are shared with OSHA, NIOSH, the CDC and the EPA. Sample results are also published on the BP website at http://www.bp.com/genericarticle.do?categoryId=9033821&contentId=7062609.

7. **There have been numerous reports of illness experienced by those responding to the BP spill, and given both the short-term and potential long-term health effects of exposure to oil, gas and dispersants, it may be important to monitor the health of these individuals well into the future. What procedures are you taking to maintain records of all BP workers, contractors and recruited local residents that are assisting in the cleanup of the oil spill? Do you maintain records of their contact information, dates that each individual worked, and how many hours were logged? Do you also maintain records of what type of cleanup activities each individual partook in and the type of personal protective equipment they were given (i.e. respirators, gloves, hazmat suits)?**

BP takes very seriously the health and safety of every individual involved in the response effort. BP provides identity badges for most of the workers assisting in the cleanup, and the computer system for the badges tracks contact information of the workers. The workers without badges include those who are assisting with the skimming efforts and BP's Vessels of Opportunity program, since badges are a means of security and those particular workers generally do not enter the Incident Command Post sites or staging areas.

All workers assisting in the effort, including those without identity badges, must undergo training, which covers, among other things, any hazards associated with their assignments. To complete the training, individuals must provide their contact information, which is kept in a database maintained by a BP contractor. In addition, individuals assisting in the response effort have the opportunity to provide contact and other personal information to NIOSH as part of its rostering study. BP and the Unified Area Command support the rostering study and the goal of identifying all workers, including volunteers, involved in all response and cleanup activities. The NIOSH

rostering effort should be useful for short-term and long-term response worker health studies.

Given the massive number of volunteers and contractors, BP does not currently maintain records specifying for each individual worker the actual number of hours worked, the specific tasks conducted, and the type of personal protective equipment used.  However, BP is cooperating with NIOSH in that agency's rostering program, described above, which will provide that information for the workers who agree to participate in the program.  It is our understanding that worker participation in the NIOSH rostering has been very good.

Exhibit N
Page 7