# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In re: | Oil Spill by the Oil Rig "Deepwater Horizon in the Gulf of Mexico," on April 20, 2010 | : : : : | MDL No. 2179 |
| | | | Section J |
| This Document Relates To: 2:10-cv-01768 & 2:10-cv-02454 | | : : : : : | District Judge Barbier Magistrate Judge Shushan |

**JOINT BRIEF IN SUPPORT OF BP EXPLORATION AND PRODUCTION INC.'S AND BP AMERICA INC.'S MOTION FOR SUMMARY JUDGMENT AND TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC.'S, MOTION FOR SUMMARY JUDGMENT**

Steven L. Roberts
Rachel Giesber Clingman
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas  77002

Kerry J. Miller (Bar # 24562)
FRILOT L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana  70163

Brad D. Brian
Daniel B. Levin
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071

***ATTORNEYS FOR TRANSOCEAN
OFFSHORE DEEPWATER DRILLING INC.***

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC  20004

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022

***ATTORNEYS FOR BP EXPLORATION
AND PRODUCTION INC. AND BP
AMERICA INC.***

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

BACKGROUND ..................................................................................................... 3

STANDARD OF REVIEW ..................................................................................... 7

ARGUMENT ........................................................................................................... 7

I.     **None Of The Substances Identified In CBD's Amended Complaint Are Subject to EPCRA Reporting Requirements. ................................................................. 7**

     A.    Crude Oil and Its Constituents Are Not CERCLA "Hazardous Substances" Subject to EPCRA Reporting. ........................................................................ 8

     B.    Drilling Mud and Produced Water Are Not Hazardous Substances. ................... 10

     C.    Methane Is Not a Hazardous Substance ................................................................. 11

     D.    Releases Associated with Dispersant Application Were Government-Authorized and Not Subject to EPCRA ................................................................................. 11

     E.    Several Anticipated CBD Claims Are Barred by Defective Notice. ................... 13

II.    **EPCRA Does Not Apply To The Claimed Sources Of The Challenged Releases..... 13**

     A.    The *Deepwater Horizon* Is Not an EPCRA Facility. ........................................... 13

     B.    Even if the *Deepwater Horizon* Were an EPCRA Facility at Which Oil Was Produced, Used, Or Stored ..................................................................................... 17

     C.    BP Cannot Be Liable for Releases from the *Deepwater Horizon*. ...................... 19

III.   **The Information Required In An EPCRA Section 304 Report Was Publicly Available, Mooting This Case. .............................................................................. 20**

     A.    BP Complied With Any Requirement To Provide The Immediate Notice. ......... 20

     B.    BP Continued To Supply Information On A Real-Time, Ongoing Basis Throughout the Response. ................................................................................... 21

IV.   **CBD Faces A Heightened Standing Burden At The Summary Judgment Stage And Its Current Showing Cannot Satisfy That Standard. .......................................... 23**

V.    **CBD's Sole Remaining Remedy Is Barred by Laches. ................................................. 24**

**CONCLUSION ........................................................................................................ 25**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arizona Christian School Tuition Org. v. Winn*,
   131 S. Ct. 1436 (2011) ................................................................................. 24

*Bosamia v. Comm'r*,
   661 F.3d 250 (5th Cir. 2011) ...................................................................... 16

*Bunger v. Hartman*,
   797 F. Supp. 968 (S.D. Fla. 1992) ............................................................. 10

*Cariddi v. Consol. Alum. Corp.*,
   478 F. Supp. 2d 150 (D. Mass. 2007) ........................................................ 10

*Castro v. Collecto, Inc.*,
   634 F.3d 779 (5th Cir. 2011) ...................................................................... 14

*Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
   704 F.3d 413 (5th Cir. 2013) ................................................ 1, 5, 6, 8, 23, 25

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001) .................................................................................... 15

*Clapper v. Amnesty Int'l, USA*,
   133 S. Ct. 1138 (2013) ............................................................................... 24

*Coastal Habitat Alliance v. Patterson*,
   601 F. Supp. 2d 868 (W.D. Tex. 2008) ..................................................... 24

*Diversified Servs., Inc. v. Simkins Indus., Inc.*,
   974 F. Supp. 1448 (S.D. Fla. 1997) ........................................................... 10

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .................................................................................... 25

*Envtl. Def. Fund, Inc. v. Alexander*,
   614 F.2d 474 (5th Cir. 1980) ...................................................................... 25

*Esso Standard Oil Co. v. Rodriguez-Perez*,
   No. Civ. 01–2012, 2004 WL 2238894 (D.P.R. Oct. 1, 2004) ................... 10

*Foster v. United States*,
   926 F. Supp. 199 (D.D.C. 1996) ............................................................... 10

*Hallstrom v. Tillamook County*,
   493 U.S. 20 (1989) .................................................................................. 8, 13

*In re Condor Ins. Ltd.*,
  601 F.3d 319 (5th Cir. 2010) ........................................................................ 15

*In re Deepwater Horizon*,
  --- F.3d ---, 2014 WL 700065 (5th Cir. Feb. 24, 2014) ......................................... 16

*In re Greenway*,
  71 F.3d 1177 (5th Cir. 1996) ........................................................................ 15

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995) ................................................................................. 19

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
  910 F.2d 167 (5th Cir. 1990) ......................................................................... 7

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................. 23

*Members of the Beede Site Grp. v. Fed. Home Loan, Mortg. Corp.*,
  No. 09-370-WES, 2013 WL 4778570 (D.N.H. Sept. 5, 2013) ................................. 10

*Niecko v. Emro Mktg. Co.*,
  769 F. Supp. 973 (E.D. Mich. 1991) ................................................................ 10

*Regions Hosp. v. Shalala*,
  522 U.S. 448 (1998) ................................................................................. 18

*Save Our Wetlands, Inc. v. Army Corps of Eng'rs*,
  549 F.2d 1021 (5th Cir. 1977) ...................................................................... 25

*Sierra Club Ohio Chapter v. Columbus*,
  282 F. Supp. 2d 756 (S.D. Ohio 2003) ............................................................ 13

*St. Bernard Citizens for Envtl. Quality v. Chalmette Refining, L.L.C.*,
  399 F. Supp. 2d 726 (E.D. La. 2005) ................................................................ 7

*Two Rivers Terminal, L.P. v. Chevron USA, Inc.*,
  96 F. Supp. 2d 432 (M.D. Pa. 2000) ............................................................... 10

*United States v. Transocean Deepwater Drilling Inc.*,
  936 F. Supp. 2d 818 (S.D. Tex. 2013) ............................................................. 16

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................................. 25

*Wilshire Westwood Assocs. v. Atl. Richfield Corp.*,
  881 F.2d 801(9th Cir. 1989) ..................................................................... 8, 10

## Statutes

33 U.S.C. § 1321 ..................................................................... 3, 9, 12, 13, 17

33 U.S.C. § 1321(a)(11)..................................................................................................... 18

33 U.S.C. § 1321(c)(2)(A) ............................................................................................ 3, 13

33 U.S.C. §§ 2701 ............................................................................................................. 9

33 U.S.C. § 2701(9) ........................................................................................................ 18

33 U.S.C. § 2701(18) ...................................................................................................... 16

42 U.S.C. § 7412(r)(2)(C) .............................................................................................. 16

42 U.S.C. § 9601(14) .................................................................................................... 2, 8

42 U.S.C. § 9601(14)(f) ................................................................................................ 2, 9

42 U.S.C. § 9603(a) .......................................................................................................... 6

42 U.S.C. § 11001 ...................................................................................................... 6, 16

42 U.S.C. § 11004 ................................................................................................. 1, 4, 12

42 U.S.C. § 11004(a) ........................................................................................................ 7

42 U.S.C. § 11004(a)(1) .................................................................................................... 2

42 U.S.C. § 11004(a)(3) ..................................................................................... 12, 18, 19

42 U.S.C. § 11004(b) ................................................................................................... 6, 20

42 U.S.C. § 11004(b)(1) .................................................................................................. 14

42 U.S.C. § 11004(b)(2) .................................................................................................... 7

42 U.S.C. § 11004(b)(2)(A) ............................................................................................ 21

42 U.S.C. § 11004(b)(2)(C) ............................................................................................ 21

42 U.S.C. § 11004(b)(2)(D) ............................................................................................ 21

42 U.S.C. § 11004(b)(2)(E) ............................................................................................ 21

42 U.S.C. § 11004(c) ........................................................................................................ 7

42 U.S.C. § 11042 ........................................................................................................... 12

42 U.S.C. § 11045(b)(1)(B) ............................................................................................ 12

42 U.S.C. § 11046 ....................................................................................................... 4, 13

42 U.S.C. § 11046(a)(1)(A) ................................................................................ 14

42 U.S.C. § 11046(d) ....................................................................................... 13

42 U.S.C. § 11049(4) ................................................................ 2, 3, 14, 15, 17, 19

42 U.S.C. §§ 11049(7) ..................................................................................... 12

49 U.S.C. § 30102(a)(6) ................................................................................... 15

## Regulatory Material

40 C.F.R. § 261.4(b)(5) ..................................................................................... 11

40 C.F.R. § 300.915(a)(7), (8) .......................................................................... 12

40 C.F.R. § 302.4 ............................................................................................... 6

40 C.F.R. § 355.41 ............................................................................................ 22

50 Fed. Reg. 13,456, 13,460 (Apr. 4, 1985) ................................................... 8, 9

Recycled Used Oil Management Standards,
    57 Fed. Reg. 41,566 (Sept. 10, 1992) ......................................................... 9

EPA, Superfund Reportable Quantities, What
    Substances Are Covered?, *available at* www.epa.gov/oerrpage/superfund/policy/release/rq/
    index.htm (last visited Apr. 3, 2014) .......................................................... 9

## Other Authorities

AMERICAN HERITAGE DICTIONARY OF THE
    ENGLISH LANGUAGE (4th ed. 2000) ............................................................ 15

H.R. Rep. No. 99-253 (1986),
    *reprinted in* 1986 U.S.C.C.A.N. 2835 ......................................................... 6

Jon S. Faletto, *Negotiating Resolution of
    Environmental Enforcement Actions*, 18 N. ILL. U. L. REV. 527 (1998) .......... 17

MERRIAM WEBSTER DICTIONARY
    (New ed. 2004) .......................................................................................... 14

OXFORD DICTIONARY (DK Ill. ed. 1998) ........................................................ 14

Timothy R. Gablehouse, *The Role of Local
    Communities in Chemical Accident Prevention and Preparedness*, 2010 J. INST. JUST. INT'L
    STUD. 13 (2010) ......................................................................................... 17

WEBSTER'S DICTIONARY (2d ed. 1988) .......................................................... 14

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2229 (2002)..................................... 14, 15

## INTRODUCTION

With one exception, the Fifth Circuit affirmed this Court's complete dismissal of each claim pursued by the Center for Biological Diversity ("CBD").  *Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 432 (5th Cir. 2013).  The only claim the Fifth Circuit did not reject involves CBD's claim for injunctive relief under Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11004.  But the Fifth Circuit never blessed CBD's EPCRA theory; the Court merely allowed the claim to survive a motion to dismiss, so it could be fully tested on remand.  With discovery now concluded and with the full briefing of all arguments by BP and Transocean soon to be complete, this Court need not close its eyes to the truth: CBD's EPCRA claim also fails.

The last time it confronted EPCRA, this Court dismissed CBD's claims because "data regarding the spill and its cleanup are easily accessible."  D1 Order at 8, Rec. Doc. 2784 (June 16, 2011).  What this Court found in 2011 was — and remains — true.  The information *is* publicly available.  Critically, the Fifth Circuit did not reject this Court's logic, but remanded only for this Court to find whether "the information required by EPCRA's reporting provisions may indeed be easily located from alternate sources," suggesting that such information would "moot" CBD's claims.  *CBD*, 704 F.3d at 430, 432.  The record now confirms that the claim is moot.  CBD advances its EPCRA claim despite the fact that, from the earliest days of the spill, extraordinary amounts of information have been available from BP and Transocean,[1] the National Incident Command, and others.  The additional information that Transocean agreed with the United States to provide to the public (which is addressed in Transocean's separate brief) only further moots this case.  Indeed, CBD continues to press its EPCRA claim even

---

[1] "BP" refers to the BP entities CBD sued: BP America Inc. and BP Exploration & Production Inc.  "Transocean" refers to Transocean Offshore Deepwater Drilling Inc.  CBD's complaint also names Transocean Ltd. and Transocean Inc., but those entities take the position that the Court lacks personal jurisdiction over them, and the Court has stayed all jurisdictional discovery and briefing with respect to that issue.  *See* Rec. Doc. 2274; *see also* Rec. Doc. 1225 (Transocean Ltd.'s motion to dismiss for lack of personal jurisdiction).  Transocean Ltd. and Transocean Inc. therefore do not make any appearances for purposes of this motion.  The D1 Master Complaint (Doc. 880) also named additional Transocean entities that are not named in CBD's complaint.

though the United States — which never pulls its punches in *Deepwater Horizon* litigation — has alleged no violations of EPCRA.  That point alone speaks volumes.

Besides this and other legal flaws in its argument, CBD's EPCRA claim for injunctive relief serves no legitimate purpose.  CBD waited nearly a year following the Fifth Circuit remand to take any action, and its claims should be barred by laches.  Although CBD now feigns urgency, its on-and-off persistence should be seen for what it is: a desperate effort to preserve any sort of claim so it can save face and perhaps recoup some of its legal fees or costs.  But make no mistake: anyone can locate the information CBD purports to seek armed only with Google.

Indeed, CBD's pointless EPCRA claims should be rejected on numerous grounds:

***First*,** EPCRA's definition of the "hazardous substances" — which it borrows from CERCLA — contains an explicit ***exclusion*** for petroleum and any component thereof.  42 U.S.C. § 9601(14)(f).   A similar exclusion applies to drilling muds and other materials used in deepwater-drilling operations.  Accordingly, oil (and its constituents) forming part of the release are not subject to EPCRA reporting, nor are methane gas or drilling muds.  And methane is not subject to EPCRA simply because it is not regulated as either a CERCLA "hazardous substance" or an EPCRA "extremely hazardous substance."

***Second,*** CBD has not specified which part of Section 304(a) it is proceeding under, but all of them require that any necessary notice that must be provided applies only to a "release [of a hazardous or extremely hazardous substance that] occurs ***from a <u>facility</u> at which a hazardous chemical is produced, used, or stored***."  *E.g.,* 42 U.S.C. § 11004(a)(1) (emphasis added).  But the *Deepwater Horizon* is not a "facility" at all, *see* 42 U.S.C. § 11049(4) (defining "facilities" as "stationary items," with the exception of motor vehicles, rolling stock, and aircraft, none of which fit the *Deepwater Horizon* vessel).  This dovetails with other indications in the structure of EPCRA that it applies only to releases inside one or more States, not those occurring on Shelf enclaves.  Nor, even if the *Deepwater Horizon* were a facility, was it a facility from which oil was "produced, used, or stored."  Instead, it is indisputable that the *Deepwater Horizon* was an exploratory drilling vessel (specifically, a mobile offshore drilling unit), not a production vessel.

And lastly, the natural Macondo reservoir is not a "facility" within the meaning of EPCRA.  *See* 42 U.S.C. 11049(4) (wherein all exemplar "facilit[ies]" are man-made "structures" or "items").[2]

**Third,** Section 304 reporting does not apply here because any alleged "releases" of certain other substances (in this case, chemical dispersants used to remediate the spill) were directed by the United States as part of the response.  It defies law and logic to label **government-directed clean-up efforts** as "releases" **caused by** owners and operators of covered facilities.  CBD cannot point to a single case in the history of EPCRA where **government-directed** efforts were subjected to EPCRA's reporting requirements.  Requiring regulated parties carrying out federal removal directives under Section 311(c)(2)(A) of the Clean Water Act, 33 U.S.C. § 1321(c)(2)(A), to report what the federal government is directing would make no sense.

**Finally**, CBD's claim is hopelessly moot.  Even if BP and Transocean were obligated to provide the information CBD purports to seek, this Court was entirely correct in 2011 that such information is publicly available.  BP, Transocean, and others, including the United States, have provided all the information required under EPCRA and much more to the entire world.

## BACKGROUND

### A.    Factual Background

The *Deepwater Horizon* was a drilling rig owned by Transocean and hired by BP to drill the Macondo well.  Shortly before 10 p.m. on April 20, 2010, there was a blowout, resulting in a fire and explosion.  The rig's Dynamic Positioning Officer activated the Global Maritime Distress Safety and System alert at 9:56 p.m., approximately six minutes after the first explosion.

---

[2] BP (but not Transocean) also contends that no discharge occurred from the Macondo well, since the failed blowout preventer and broken drill pipe are both appurtenances of the *Deepwater Horizon* and they were the only sources of releases to water.  At no point did the well rupture.  As even CBD is forced to admit, the rig and its appurtenances belonged to Transocean alone.  Amended Complaint ¶ 15 (Rec. Doc. 813) (filed Nov. 26, 2010) ("Am. Compl.").  As a matter of law, since the drilling contract assigned operational responsibilities to Transocean and not BP, BP cannot be held liable as the operator of the *Deepwater Horizon*, even if the vessel could be deemed a facility **or** a facility from which oil containing hazardous substances was produced, used, or stored — and the *Deepwater Horizon* is neither.  BP recognizes that this Court has previously held that oil was "discharged" from the Macondo well and not from the *Deepwater Horizon*.  *See* Order as to Cross-Motions for Summary Judgment Regarding CWA and OPA Liability, Rec. Doc. 5809 (Feb. 22, 2012).  But that Order is currently on appeal.  *See In re Deepwater Horizon*, No. 12-30883 (5th Cir.).  BP wishes to reserve its analogous argument here.

This notified the Coast Guard Center in New Orleans of the need for immediate action.  At approximately 10:06 p.m., the BP Shore Base Supervisor provided notice by phone of the accident to both the Coast Guard and to the BP Logistics Marine Operations Coordinator.

The fire and explosion destroyed and ultimately sank the rig on April 22, 2010.  Eleven men tragically lost their lives.  Hydrocarbons flowed until July 15, 2010, when the well was capped.  The U.S., through the Federal On-Scene Coordinator ("FOSC"), the Unified Command, and the National Incident Command, engaged in the largest environmental response in history.  BP and Transocean were in constant communication with the FOSC, the Unified Command, and participating state agencies. BP Statement of Undisputed Material Facts ("BP UMF") ¶ 11.

## B. **Procedural Background**

### 1. **CBD's Complaints**

From the beginning, CBD has misunderstood the law.  For instance, it notified BP by letter dated June 1, 2010 of its "immediate" intent to bring a citizen suit under the Clean Water Act ("CWA"), stating that if immediate suit was either "not filed or not allowed by the courts," CBD would also pursue a citizen suit under Section 326 of EPCRA, 42 U.S.C. § 11046, after expiration of the 60-day notice period.[3]  No fewer than three successive complaints later,[4] CBD had asserted five claims under the CWA, one under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the claim now at issue, *i.e.*, that BP and Transocean violated Section 304 of EPCRA, 42 U.S.C. § 11004, by failing to report releases of hazardous substances to state and local emergency planning committees.  CBD sought, *inter alia*, an order requiring BP and Transocean to submit Section 304 reports, daily penalties for each failure to report, and payment of CBD's costs.  *See* Am. Compl. at 20-21.

To manage the hundreds of cases (including over 100,000 short-form joinders) then

---

[3] CBD supplemented its notice letter on June 3, 2010, alleging a second CWA violation.

[4] The first complaint, filed June 18, 2010, alleged only violations of Section 306 of the CWA.  CBD amended this complaint on August 2, 2010 to add the EPCRA claim.  But this suit was filed too early — only 17 (and not 60) days after notice was sent.  As a result, CBD filed a nearly identical lawsuit on August 4, 2010, and amended that second complaint on November 26, 2010.  Here, we reference only the November 26, 2010 Amended Complaint ("Am. Compl.") (Doc. No. 813).  And that suit was filed too late — several weeks after the well had already been capped.

pending in the MDL, this Court placed both of CBD's actions in the D1 Bundle (PTO No. 11) (Rec. Doc 569).  The D1 Master Complaint was filed on December 15, 2010 (Rec. Doc. 880).

### 2.    This Court's Dismissal and the Fifth Circuit Affirmance and Remand

BP and Transocean moved to dismiss all of CBD's claims — and all claims in the D1 Master Complaint.  Constrained by tight page limitations to respond to CBD's barrage of claims under several complex environmental statutes, BP and Transocean sought dismissal of the EPCRA claim on a subset of its grounds.  *See* BP Defs.' Mot. to Dismiss D1 Bundle at 29-31, 40 (Feb. 28, 2011) (Rec. Doc. 1441-1); Transocean's Mot. to Dismiss D1 Complaint (Feb. 28, 2011) (Rec. Doc. 1407); *see also* BP's Lodged Answer, (Apr. 11, 2014) (Rec. Doc. 12667-1).

On June 16, 2011, the Court granted the motions to dismiss.  As to the EPCRA claim, the Court found that the D1 Plaintiffs lacked standing because even "[a]ssuming that the operations fifty miles out in the Gulf were subject to EPCRA,"[5] it was, at that juncture, "unclear how the data collected under EPCRA can remedy the injury alleged."  D1 Order at 8.  In particular, the Court concluded that since there was no ongoing release, and the EPCRA data were "easily accessible," injunctive relief would not redress the injury claimed.  *Id.*

On January 9, 2013, the Fifth Circuit affirmed this Court's dismissal of all of CBD's claims, save the EPCRA claim, which was remanded.  *CBD*, 704 F.3d at 432.  But the Circuit did not suggest that CBD had a valid EPCRA claim; rather, it concluded that the record on a motion to dismiss did not clearly demonstrate that all of the required information was readily accessible to the public.  *Id.* at 430.  The Fifth Circuit noted, however, that "[i]f the information required by EPCRA[] . . . may indeed be easily located from alternate sources, it may be that a further order from the district court would provide no meaningful relief."  *Id.*

### 3.    CBD's Delay on Remand

CBD waited ***eight months*** after the Fifth Circuit remand to take any action to pursue the injunction it claims is vital to its members.  At that point, it served, but neglected to file, a

---

[5] As Argument Section II below demonstrates, the Court was right to raise doubts about the applicability of EPCRA to a seagoing vessel, dozens of miles out into the open waters of the Gulf, engaged in Shelf exploration activities.

Motion to Lift Stay Under Pretrial Orders 11 & 25 and for Leave to Proceed Before Magistrate Judge.  After being alerted by BP's counsel, CBD filed the motion on December 11, 2013.  *See* Rec. Doc. 11953.  The motion claimed that the combination of PTO 11 and PTO 25 left CBD without a "framework within which to proceed."  *Id.* at 3.  But that does not explain why CBD did not alert the Court of its allegedly paralyzing confusion earlier.  In January, Magistrate Judge Shushan set the current briefing schedule.  *See* Rec. Doc. 12090.

**C.**     **Statutory Background**

Enacted in 1986, EPCRA serves two principal objectives: (1) to provide the public and first responders with information about hazardous chemicals present in their community; and (2) to establish emergency planning and notification requirements that would protect the public should any of those chemicals be released.  *See* H.R. Rep. No. 99-253 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2842.  To achieve these objectives, EPCRA imposes duties on regulators and on facility owners and operators.  Regulators must establish state emergency response commissions ("SERCs") and local emergency planning commissions ("LEPCs") to prepare and implement plans for responding to emergency releases.  *See* 42 U.S.C. § 11001.

EPCRA requires the owners and operators of regulated facilities to follow emergency notification procedures in the event of certain chemical releases.  In this regard, Section 304 effectively supplements Section 103(a) of CERCLA, which requires an owner or operator to notify the National Response Center ("NRC")[6] in the event of a release of a reportable quantity of a substance defined under CERCLA as "hazardous."  *See* 42 U.S.C. § 9603(a); *see also* 40 C.F.R. § 302.4.  Section 304 enhances this requirement in two ways.  **First,** Section 304 provides that such releases also must be reported to the community emergency coordinator for the LEPC for any area, and to the SERC of any State, likely to be affected by the release.  *See* 42 U.S.C. § 11004(b).  **Second,** EPCRA adds to the universe of substances subject to reporting "extremely hazardous" substances that have been identified by the EPA Administrator and listed as such in

---

[6] As the Fifth Circuit noted in affirming the dismissal of CBD's CERCLA claim, BP notified the NRC of the explosion and spill soon after they occurred, resulting in immediate government response actions.  704 F.3d at 428.

40 C.F.R. Part 355.  *See id.* § 11004(a).  In other words, and most importantly here, **Section 304 covers two, and only two, categories of materials**: "hazardous substances" as defined under CERCLA, and "extremely hazardous substances" as identified under EPCRA.

Section 304(b) sets forth the information required to be reported.  The initial notification, to be provided "immediately" after the release occurs, must include eight items of information "**to the extent known at the time of the notice** and so long as no delay in responding to the emergency results."  *Id.* § 11004(b)(2) (emphasis added).  These items are narrow and straightforward: (1) the chemical name; (2) whether the chemical is extremely hazardous; (3) estimate of the quantity released; (4) time and duration of the release; (5) media into which the release occurred; (6) any known or anticipated health risks and, where necessary, advice regarding medical attention for exposed individuals; (7) proper precautions; and (8) the name and telephone number of a contact person.  *See id.*  A written follow-up notice (or notices) must be submitted to the LEPC and SERC "as soon as practicable after a release."  The requirements for this second notice likewise are discrete: the notice must update the information in the initial notice (including regarding associated health risks and advice regarding medical attention), and describe measures taken to respond to and contain the release.  *Id.* § 11004(c).

## STANDARD OF REVIEW

Under Rule 56, the Court should grant summary judgment when satisfied "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [its] favor."  *St. Bernard Citizens for Envtl. Quality v. Chalmette Refining, L.L.C.*, 399 F. Supp. 2d 726, 730 (E.D. La. 2005) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990)).  Because CBD has failed to adduce any defensible basis to support its claim that BP or Transocean violated EPCRA, these motions should be granted.

## ARGUMENT

**I.     NONE OF THE SUBSTANCES IDENTIFIED IN CBD'S AMENDED COMPLAINT ARE SUBJECT TO EPCRA REPORTING REQUIREMENTS.**

CBD alleges that BP violated Section 304 of EPCRA by failing to report, or to report adequately, releases or discharges of five substances: **(1)** oil and natural gas, *see* Am. Compl

¶¶ 1-3, 10-11, 19, 22-23, 41, 44-46, 60, 67, 69, 74-75, 78, 81, 84; **(2)** "toxic" and "hazardous pollutants," and "hazardous substances" that are effectively constituents of crude oil, *see id.* ¶¶ 1, 3, 10-11, 19, 22-23, 60-62, 65, 67, 69, 74-75, 78, 81, 84, 89, 93; **(3)** drilling mud and "produced water," *see id.* ¶¶ 1, 11, 60, 62, 67, 69, 74-75, 78, 84; **(4)** methane, *see id.* ¶¶ 1, 3, 60, 65, 67, 74-75, 78, 81, 84; and **(5)** chemical dispersants, *see id.* ¶¶ 59, 60.  This Argument Section I explains why all five types of substances are simply not subject to the EPCRA Section 304 reporting requirements.  The ensuing Argument Sections provide additional arguments, but by the end of Argument Section I, there is already nothing left of CBD's case.

### A. Crude Oil and Its Constituents Are Not CERCLA "Hazardous Substances" Subject to EPCRA Reporting.[7]

CBD's has preserved ***only*** its ability to argue that crude oil and its constituents are "hazardous substances."[8]  As discussed above, CERCLA's release reporting requirements apply to "hazardous substances," defined under Section 101(14) by reference to other environmental statutes under which a given substance has been designated as "toxic" or "hazardous": Sections 311 and 307(a) of the CWA, Section 112 of the Clean Air Act, Section 3001 of the Resource Conservation and Recovery Act ("RCRA") and Section 7 of the Toxic Substances Control Act ("TSCA").  *See* 42 U.S.C. § 9601(14).  CBD's suit as to Macondo oil reporting fails right out of the gate because crude oil is ***excluded*** from the definition of "hazardous substance" — and, accordingly, from reporting under CERCLA Section 103(a) and EPCRA Section 304.  *See id.*

---

[7] The Fifth Circuit noted that Defendants had asserted CERCLA's petroleum exclusion, but declined to decide the issue, noting this Court had not addressed it below.  704 F.3d at 428 n.4.  That issue forms the most straightforward basis on which to resolve CBD's EPCRA claim.

[8] CBD makes no allegation in its Amended Complaint that BP or Transocean failed to report, or to report adequately, the release of an "extremely hazardous substance" under EPCRA Section 304(a).  Nor does such an allegation exist in its Notice Letters.  What's done is done.  CBD cannot go back now and retroactively amend its notice letter.  *See, e.g., Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989) ("compliance with the 60–day notice provision is a mandatory, not optional, condition precedent for suit").  Nor does the Amended Complaint allege any EPCRA violation based on discharge of any substances that might have been stored on the *Deepwater Horizon*.  In any event, the diesel in the *Deepwater Horizon* fuel tanks also falls under the petroleum exclusion.  *See, e.g., Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 810 (9th Cir. 1989) ("the petroleum exclusion in CERCLA does apply to unrefined and refined gasoline"); Final Rule, 50 Fed. Reg. 13,456, 13,460 (Apr. 4, 1985) ("EPA interprets the petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specifically listed or designated hazardous substance is present in such products.").

§ 9601(14)(f) (excluding "petroleum, including crude oil or any fraction thereof . . . and natural gas."). Instead, petroleum, and releases thereof, are addressed by the Oil Pollution Act, 33 U.S.C. §§ 2701, *et seq.*, and by amendments to Section 311 of the CWA, 33 U.S.C. § 1321. Additionally, CBD's own complaint makes clear it is not asserting the independent release of hazardous substances but is focused only on the "constituents" of oil. *See* Am. Compl. ¶ 3.

At its most basic level, then, CBD's claim is defective because it alleges that BP failed to make reports about an oil spill, but EPCRA does not require reporting of oil spills. CBD attempts to circumvent this threshold failure by including a laundry list of "toxic pollutants" said to be "present in the oil" (*Id.* ¶ 61) and/or "in the earth's crust" (*id.* ¶ 65), and alleging that BP should have reported these as standalone releases of hazardous substances. By CBD's own admission, however, each of these chemicals is a "***natural component***[] ***of crude oil***." *See* CBD Response to Request for Admission No. 2 (emphasis added).

Needless to say, this is not how EPCRA works. CBD's effort to make out an EPCRA claim fails because, consistent with the longstanding positions of both EPA and the courts, the petroleum exclusion covers more than just the oil in crude oil. For more than a quarter of a century, EPA has interpreted the petroleum exclusion to apply not only to the oil itself, but also to any hazardous substances that are ***naturally present*** in crude oil. *See* Final Rule, 50 Fed. Reg. 13,456, 13,460 (Apr. 4, 1985). This position was confirmed by EPA's General Counsel:

> [W]e interpret this provision to exclude from CERCLA response and liability crude oil and fractions of crude oil, including the hazardous substances, such as benzene, which are indigenous in those petroleum substances. Because these hazardous substances are found naturally in all crude oil and its fractions, they must be included in the term "petroleum," for that provision to have any meaning.

Mem., Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2), 1987 WL 123926 (July 31, 1987) (the "Blake Memorandum"); *see also* Recycled Used Oil Management Standards, 57 Fed. Reg. 41,566, 41,606 (Sept. 10, 1992); EPA, Superfund Reportable Quantities, What Substances Are Covered?, *available at* www.epa.gov/oerrpage/superfund/policy/release/rq/index.htm (last visited Apr. 3, 2014).

Consistent with EPA's views, courts have interpreted the so-called "petroleum exclusion"

'"to remove from the coverage of CERCLA those otherwise hazardous substances which are inherent in petroleum."'  *Cariddi v. Consol. Alum. Corp.*, 478 F. Supp. 2d 150, 154 (D. Mass. 2007) (quoting *Niecko v. Emro Mktg. Co.*, 769 F. Supp. 973, 981 (E.D. Mich. 1991)); *see also, e.g.*, *Esso Standard Oil Co. v. Rodriguez-Perez*, No. Civ. 01–2012, 2004 WL 2238894, at *10 (D.P.R. Oct. 1, 2004); *Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432, 443-44 (M.D. Pa. 2000).  Rather, it is only '"hazardous substances that are added to, or mixed with, a petroleum product during or after use"' that are removed from the exclusion.  *Bunger v. Hartman*, 797 F. Supp. 968, 972 (S.D. Fla. 1992) (quoting *Niecko*, 769 F. Supp. at 981).

Indeed, in *Wilshire*, the Ninth Circuit rejected CBD's approach of distinguishing oil from its constituents, finding instead that "whether or not these constituents are fractions of petroleum, to interpret the petroleum exclusion otherwise would render the exclusion meaningless since it would result in no petroleum products coming under the petroleum exclusion." 881 F.2d at 802.[9] Other courts have followed *Wilshire*.  *See, e.g.*, *Diversified Servs., Inc. v. Simkins Indus., Inc.*, 974 F. Supp. 1448, 1454 (S.D. Fla. 1997).[10]  Because the "pollutants" enumerated by CBD are inherent in the MC-252 oil, they are covered by the petroleum exclusion.

## B.   Drilling Mud and Produced Water Are Not Hazardous Substances.

CBD also argues that BP was required, under Section 304 of EPCRA, to file notifications with respect to discharges of "drilling mud[]" and "produced water" which BP allegedly "discharged" into the Gulf of Mexico both before the *Deepwater Horizon* accident and during the spill response.  Am. Compl. ¶¶ 1, 11, 60, 62, 67, 69, 74-75, 78, 84.  CBD is incorrect.

---

[9]  The *Wilshire* court also took judicial notice that benzene, toluene, xylene, ethylbenzene, and lead also are all indigenous components of crude oil.  881 F.2d at 803.

[10]  Although far from clear from the face of the Amended Complaint, CBD appears to allege in Paragraph 60 (and again in Paragraph 81) that such substances were discharged from an unspecified source other than the release of oil in connection with the spill.  In its responses to BP's discovery requests, CBD "admits that the substances  . . . are natural components of crude oil but not that crude oil was the only source of such substances."  CBD Response to Request for Admission No. 2.  But CBD has produced ***nothing*** showing that these "hazardous substances" were present from a source other than natural crude oil.  BP and Transocean bear no burden to disprove CBD's unsubstantiated hypotheses in order to invoke the petroleum exclusion.  *See Members of the Beede Site Grp. v. Fed. Home Loan, Mortg. Corp.*, No. 09-370-WES, 2013 WL 4778570, at *5 (D.N.H. Sept. 5, 2013) (declining to place the burden of proving the absence of hazardous substances on the party claiming the exclusion) (citing *Foster v. United States*, 926 F. Supp. 199, 205-06 (D.D.C. 1996)).

Drilling mud, cement and materials known as "spacers" used in deepwater drilling operations are not "hazardous substances" under any of the statutes referenced in CERCLA's definition of the term. To the contrary, CERCLA incorporates the definition of hazardous wastes under RCRA, and RCRA provides a straightforward *exclusion* for such materials: "Drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal energy" are not hazardous wastes. 40 C.F.R. § 261.4(b)(5).

Consistent with common sense, CERCLA's legislative history confirms that drilling muds and produced water are not "hazardous substances" under that statute:

> [A]ny substance or material for which regulation is specifically suspended by Act of Congress under [RCRA] is excluded from designation as a hazardous substance for the purpose of S. 1480 [the Senate version of CERCLA], notwithstanding the presence in such substance of any hazardous or toxic chemical. Thus drilling muds and brines, which will have been excluded from regulation, are not hazardous substances under S. 1480.

S. Rep. No. 96–848, 96th Cong., 2d Sess., at 28 (Jul. 11, 1980). *See also United States v. Iron Mtn. Mines, Inc.*, 812 F. Supp. 1528, 1560 (E.D. Cal. 1992) (noting that CERCLA defines terms "by reference to statutes defining the substances themselves," including RCRA). CBD's EPCRA claims as to drilling mud and produced water thus fail as a matter of law.

### C.  Methane Is Not a Hazardous Substance.

CBD also claims that methane was released (Am. Compl. ¶ 49 ("methane . . . has spewed from the gushing BP well")) and BP should have reported such discharges of methane under EPCRA (*id.* ¶¶ 1, 3, 60, 65, 67, 74-75, 78, 81, 84). But methane is not a "hazardous substance" under CERCLA. Indeed, EPA has determined that "naturally occurring methane gas found in or associated with petroleum deposits is a type of natural gas and is therefore exempted from CERCLA coverage." EPA, Office of Solid Waste and Emergency Response, Directive No. 9360.0-8, *CERCLA Removal Actions at Methane Release Sites*, at 1 (Jan. 23, 1986). EPCRA claims based on methane are thus utter non-starters.

### D.  Releases Associated with Dispersant Application Were Government-Authorized and Not Subject to EPCRA.

CBD also asserts that BP should have reported under EPCRA the releases of the dispersants used as part of the response. *See* Am. Compl. ¶¶ 49, 59, 60. But CBD does not

- 11 -

specify which dispersants are alleged to have contained "hazardous substances," much less how such substances required reporting under Section 304 of EPCRA. In fact, the only dispersants applied during the response — Corexit EC9527A and Corexit EC9500A — were, and remain, listed on the National Oil and Hazardous Substances Pollution Contingency Plan Product Schedule, a prerequisite of which is that manufacturers submit information about its toxicity and effectiveness for review and approval by EPA. *See* 40 C.F.R. § 300.915(a)(7), (8).

Even assuming, moreover, that such dispersants were "hazardous substances," CBD would still lose. Because the United States ordered the use of those dispersants, their use does not trigger a reporting requirement under EPCRA. The statute applies to private and not to government action. Nothing in EPCRA requires reporting of releases directed and deployed according to the rules and limitations put forth by the government. Indeed, the ***EPCRA definition of "persons" to which the statute applies excludes the United States***. *See* 42 U.S.C. §§ 11049(7) (defining "person" as "any individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or interstate body"), § 11041(a)(3) (EPCRA does not modify obligations or liabilities of "any person" under other federal law), § 11042 (providing trade secret protections regarding required EPCRA disclosures to "persons"), § 11045(b)(1)(B) (providing for penalties imposed on "persons" for violations of 42 U.S.C. § 11004 — EPCRA Section 304, the provision at issue here). *Cf.* CWA Section 311(a)(2)(D), 33 U.S.C. § 1321(a)(2)(D) (similarly defining Presidentially authorized "discharges" to be excluded from the CWA's key term "discharge"). In short, just like the CWA, EPCRA does not apply to the law enforcement and environmental remediation decisions of the federal government itself.

Indeed, as this Court has held, the United States — through the FOSC — and not BP, "exercised ***ultimate decision-making authority*** over response activities, ***including the use of dispersants***." *In re Oil Spill by Oil Rig Deepwater Horizon in the Gulf of Mexico*, MDL No. 21179, 2012 WL 5960192, at *9 (E.D. La. Nov. 28, 2012) (emphasis added); *see generally* 33 U.S.C. § 1321(c)(2)(A) ("The President shall direct ***all*** Federal, State, and ***private actions to***

*remove*" a substantial spill's discharges.) (emphasis added).  As the decision-maker, the United States "approved surface and subsea applications of Corexit on a daily basis.  These authorizations included limits on when, where, and in what quantities Corexit could be applied." *Id.*  CBD's effort to premise an EPCRA claim on the use of dispersants is forlorn.

> ### E.      Several Anticipated CBD Claims Are Barred by Defective Notice.

Finally, to the extent that CBD would expand its claims to include chemicals that did not appear in its notice letters, the lack of 60-day notice is fatal.  *See* 42 U.S.C. § 11046(d).  The Supreme Court has held that "compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook County*, 493 U.S. 20, 30 (1989) (RCRA citizen suit).  *See also Sierra Club Ohio Chapter v. Columbus*, 282 F. Supp. 2d 756, 763 (S.D. Ohio 2003) (dismissing EPCRA claim for lack of notice).

CBD's notice letters are silent on several substances that appear for the first time in subsequent documents.  Most glaringly, methanol makes its first appearance in CBD's Requests for Admission.  It appears neither in the notice letters, nor in the Amended Complaint.  Likewise, drilling mud and dispersants are nowhere in the notice letters, and their debut in the Amended Complaint does not satisfy the requirements of 42 U.S.C. § 11046(d).  These omissions not only require dismissal of any claims based upon them, but, to the extent CBD is attempting to press such claims, they also belie the assurance that "Plaintiff gave notice of the violations specified in this complaint."  Am. Compl. ¶ 6 (citing 42 U.S.C. § 11046(d)).

## II.     EPCRA DOES NOT APPLY TO THE CLAIMED SOURCES OF THE CHALLENGED RELEASES.

CBD also alleges that "BP [and presumably Transocean as well, which is made part of Count 7 of the Amended Complaint] failed to provide notice of the release of reportable quantities of hazardous substances associated with the discharge from the well and platform . . . ."  Am. Compl. ¶ 66; *accord* Notice Letter (June 1, 2010), at 4.  This argument fails because no qualifying discharge occurred, for several reasons.

> ### A.      The *Deepwater Horizon* Is Not an EPCRA Facility.

CBD has alleged an EPCRA claim against Transocean as the owner of the *Deepwater*

*Horizon*.  *See* Am. Compl. ¶¶ 15, 92-93.  CBD similarly alleges that BP was the operator of the rig.  *See id.* ¶ 14.  Plaintiff thus alleges that together the Defendants owned and operated "the Deepwater Horizon rig," and it purports to bring an EPCRA claim on the theory that the statute required BP and Transocean to give emergency notice after "[o]il and toxic pollutants . . . discharge[ed] from the Deepwater Horizon rig."  *Id.* ¶¶ 14-15, 17, 19, 93.  But fatal to CBD's theory, the *Deepwater Horizon* does not meet EPCRA's definition of a "facility."

By any measure, the statute does not extend to vessels.  The emergency notice requirements of EPCRA only apply to "the owner or operator ***of a facility***."  42 U.S.C. § 11004(b)(1) (emphasis added); *see id.* § 11004(c).  And EPCRA's citizen suit provision only authorizes a civil action against "[a]n owner or operator ***of a facility***."  *Id.* § 11046(a)(1)(A) (emphasis added).  "Facility" is a defined term:

> The term 'facility' means all buildings, equipment, structures, ***and <u>other</u> stationary items*** which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person).  For purposes of section 11004 of this title, the term includes motor vehicles, rolling stock, and aircraft.

42 U.S.C. § 11049(4) (emphasis added).

The *Deepwater Horizon* is not an "other stationary item."  "Stationary" is ordinarily understood to describe an object that is "not portable" or that is "fixed in a station, course, or mode."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2229 (2002).[11]  By contrast, the *Deepwater Horizon* is a "dynamically-positioned semi-submersible deepwater drilling vessel" that "was afloat upon the navigable waters of the Gulf of Mexico."  Rec. Doc. 3830 at 6.  "It employed a satellite global positioning device and complex thruster technology to stabilize itself," "was practically capable of maritime transportation, and thus is properly classified as a vessel."  *Id.*  In design, the *Deepwater Horizon* was meant to be moved; in practice, it was moved routinely.  It therefore cannot possibly qualify as an EPCRA "stationary item."

---

[11]  *See also* MERRIAM WEBSTER DICTIONARY 700 (New ed. 2004) ("unchanging in condition"); OXFORD DICTIONARY 811 (DK Ill. ed. 1998) ("not meant to be moved; not portable"); WEBSTER'S DICTIONARY 1133 (2d ed. 1988) ("[n]ot capable of being moved: [f]ixed"; "[u]nchanging").  Because EPCRA does not define the term "stationary," this ordinary meaning governs.  *See, e.g.*, *Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011).

This conclusion is only bolstered by the other "stationary items" that EPCRA identifies as "facil[ities]": "buildings," "equipment," and "structures." 42 U.S.C. § 11049(4). Each are permanently affixed to the land around them. The general term that follows them — "other stationary items" — must be construed to embrace only objects that are similarly fixed and immobile. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (under the canon of *ejusdem generis*, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."). It would thus contravene the plain intent of Congress to treat a vessel such as the *Deepwater Horizon* as a "stationary item."

To be sure, Congress did **deem** some specific types of mobile objects to be "facilities" for purposes of EPCRA's emergency reporting provision, but none of those statutory exceptions would cover the *Deepwater Horizon*. The statute provides that "motor vehicles,[12] rolling stock, and aircraft" are to be deemed "facil[ities]" for purposes of the emergency notice provision. 42 U.S.C. § 11049(4). Notably absent from this list, however, is any reference to **vessels** like the *Deepwater Horizon*, or any general term that could extend to vessels. Because Congress pointedly excluded vessels from the list of mobile objects that are deemed to be "facilities" for EPCRA's emergency notice provision, it would violate long-settled canons of construction to apply that provision to the *Deepwater Horizon*. *See, e.g.*, *In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010) ("Generally where there are enumerated exceptions additional exceptions are

---

[12] The term "motor vehicle" does not encompass vessels. The ordinary meaning of "motor vehicle" is "an automotive vehicle not operated on rails," and especially "one with rubber tires used on highways." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1476 (2002); *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1148 (4th ed. 2000) ("A self-propelled wheeled conveyance, such as a car or truck, that does not run on rails."); *cf.* 49 U.S.C. § 30102(a)(6) (defining "motor vehicle" to mean "a vehicle driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways"). The Fifth Circuit has previously relied on these definitions in holding that a statutory reference to "motor vehicle" does not encompass a vessel. *See In re Greenway*, 71 F.3d 1177, 1180 (5th Cir. 1996) (per curiam) ("[T]he plain and common meaning of the term 'motor vehicle' does not include motorboats."). What is more, it would render the statute redundant to construe "motor vehicle" to mean *any* vehicle capable of motive transportation, because then there would be no need for a separate reference to "aircraft." 42 U.S.C. § 11049(4).

not to be implied, in the absence of a contrary legislative intent.") (quotation marks omitted).[13]

This makes perfect sense given the area-specific focus of EPCRA.  EPCRA requires establishment of state emergency response commissions ("SERC") and local emergency planning commissions ("LEPC") to prepare and implement plans for responding to emergency releases.  *See* 42 U.S.C. § 11001.  That structure makes clear that EPCRA contemplates that it will be applied to areas falling within States and localities, even if certain releases have the prospect of impacting multiple States.  But that structure does not make sense as applied to the Outer Continental Shelf, an exclusive federal enclave.  *See In re Deepwater Horizon*, --- F.3d ---, 2014 WL 700065, at *9 (5th Cir. Feb. 24, 2014) ("The reasons for avoiding redundant or conflicting legal regimes are equally potent whether the point source is located in a state or a federal enclave.").  There is no specific SERC to notify and certainly no LEPC to notify.  *Compare also* 42 U.S.C. § 11002(c) (requiring notification to "the State emergency response commission for the State in which such facility is located") *with In re Deepwater Horizon*, 2014 WL 700065, at *9 (oil pollution here "originat[ed] from the OCS," not from inside a single State).

Interpreted as a whole, EPCRA comes into focus.  *See, e.g., Bosamia v. Comm'r*, 661 F.3d 250, 254 (5th Cir. 2011) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").  The reason EPCRA does not define a "vessel" as a "facility" — unlike OPA, which does so as to mobile offshore drilling units, *see* 33 U.S.C. § 2701(18) — is that EPCRA does not apply by its text to maritime activities.  This is also why

---

[13] Transocean also notes that there is no tension between the conclusion that that the rig is not a "facility" under EPCRA and Judge Rosenthal's holding that the rig was part of a "stationary source" under the Clean Air Act.  *See United States v. Transocean Deepwater Drilling Inc.*, 936 F. Supp. 2d 818, 832 (S.D. Tex. 2013).  The definition of "stationary source" in the Clean Air Act is materially different from EPCRA's definition of "facility."  It extends to "any buildings, structures, equipment, **installations** or substance emitting stationary activities" that meet four statutory criteria.  42 U.S.C. § 7412(r)(2)(C).  "Installations" is a term of art that is absent from EPCRA's definition of "facility."  Judge Rosenthal's "installation[]"-based reasoning thus has no bearing on whether the *Deepwater Horizon* is an EPCRA "facility."  In any event, that holding is not binding here and is now being reviewed by the Fifth Circuit.  *See* 5th Cir. Case No. 12-20243.  Transocean reserves all of its rights to maintain that appeal.

the only mobile "items" to which EPCRA applies are "motor vehicles, rolling stock, and aircraft." 42 U.S.C. § 11049(4). Indeed, the purpose of EPCRA was to avoid the problems encountered as to the notable chemical release in Bhopal, India, by notifying communities and first responders of the hazards associated with the storage, production, and use of hazardous chemicals. *See generally* Timothy R. Gablehouse, *The Role of Local Communities in Chemical Accident Prevention and Preparedness*, 2010 J. Inst. Just. Int'l Stud. 13 (2010). In the context of a spill far beyond state waters, there is no specific local community. Additionally, the petroleum exclusion dovetails with the purpose of the statute because oil is a well-understood substance, not an exotic chemical that first responders need extensive disclosure about in order to be able to respond without making a release worse. *See* Jon S. Faletto, *Negotiating Resolution of Environmental Enforcement Actions*, 18 N. Ill. U. L. Rev. 527, 544 (1998) ("first responders were physically affected by the TCE vapors and encountered problems caused by lack of information"). Additionally, note that CWA Section 311(b)(5), 33 U.S.C. § 1321(b)(5), provides that giving notification to the federal government automatically notifies affected States.

Finally, in an argument unique to Transocean, even if EPCRA applied to discharge of Macondo oil (as explained above, it does not, *see* Argument Section I), CBD does not allege that Transocean owned or operated the Macondo Well. *See* Rec. Doc. 813.[14]

## B.    Even if the *Deepwater Horizon* Were an EPCRA Facility, It Is Not an EPCRA Facility at Which Oil Was Produced, Used, Or Stored.

The *Deepwater Horizon* was not used to store oil. It also was not designed to produce oil from subsea reservoirs. Nor was Macondo oil used on the *Deepwater Horizon*. Instead, the *Deepwater Horizon* was indisputably a vessel used to explore for and drill wells to which production vessels can later return. *See* BP UMF ¶ 18. Indeed, as the Court well knows, the *Deepwater Horizon* was in the process of preparing the Macondo well for abandonment when

---

[14] CBD instead alleges that Transocean "owned" the *Deepwater Horizon*, Am. Compl. ¶ 17, which cannot qualify as a "facility" under EPCRA. If CBD had alleged Transocean was the "operator" of the Macondo well, it could not prevail at summary judgment because the Court has already found that whether Transocean is an operator of the well is a disputed fact issue not amenable to summary judgment. *See* Rec. Doc. 5809 at 23.

the explosion and ensuing spill occurred.  *Id.* at ¶ 19.

These indisputable facts therefore prevent the *Deepwater Horizon* from qualifying as a facility at which oil "is produced, used, or stored."  42 U.S.C. § 11004(a)(3).  Macondo oil was simply not "produced, used, or stored" at, on, or by the *Deepwater Horizon*.  CBD would apparently read those words out of the statute, but that is not permissible.  *See, e.g.*, *Regions Hosp. v. Shalala*, 522 U.S. 448, 467 (1998) ("It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word.").

Indeed, to see why the qualifying phrase "produced, used, or stored" serves as a key limit, compare two other statutes with which the Court has become familiar: OPA and the CWA.  OPA defines a "facility" as "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: ***exploring for***, ***drilling for***, producing, storing, handling, transferring, processing, or transporting oil."  33 U.S.C. § 2701(9) (emphasis added).  Two features of the OPA definition stand out: (1) exploration and drilling for oil are separate activities that a structure constituting a "facility" can perform for OPA purposes; and (2) those purposes, which the *Deepwater Horizon* fits, are separately listed from "producing, storing," etc. oil.  Together these features show that Congress knows how to include oil exploration and drilling in the definition of a "facility" when it wants to.  In EPCRA, by contrast, those functions were drawn ***outside*** the definition of a "facility."

And CWA Section 311(a)(11) defines an "offshore facility" not just differently from EPCRA in telling ways but the most broadly — "***any facility of any kind*** located in, on, or under, any of the navigable waters of the United States, ***and any facility of any kind*** which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel."  33 U.S.C. § 1321(a)(11) (emphasis added).  However fervently CBD might wish it, EPCRA does not define the facilities it covers as "any facility of any kind" regardless of its location.  EPCRA's definition of a "facility" is far more confined.

- 18 -

**C.**     **BP Cannot Be Liable for Releases from the *Deepwater Horizon*.**[15]

In an argument unique to BP, BP was neither the owner nor the operator of the "platform," *i.e.,* rig, Am. Compl. ¶ 66, and although BP partly owned the Macondo well, no oil entered the Gulf of Mexico directly from the well itself.[16]  CBD's allegations against BP fail for lack of a qualifying release that has the requisite statutory nexus to BP.

By its terms, EPCRA applies to a "release . . . from a facility at which a hazardous chemical is produced, used, or stored."  42 U.S.C. § 11004(a)(1)-(3).  *See also id.* § 11049(4) (defining a EPCRA facility narrowly, *see* Argument Section II.B. above).  Nothing in the definition extends to natural reservoirs like the Macondo well.  BP therefore cannot be liable as the owner of the Macondo well, even if this Court were to assume that a release came from the well itself, which BP disputes.  *See supra* n.2.

Additionally, BP was neither the owner nor the operator of the *Deepwater Horizon* rig.  Oil originated in the Macondo well, flowed through the *Deepwater Horizon* and its appurtenances and, from there, entered the Gulf of Mexico.  *See* BP UMF ¶¶ 5-7.  As CBD concedes, "Transocean . . . is the owner of the Deepwater Horizon rig."  Am. Compl. ¶ 15.  Importantly, maritime law "ordinarily treats an 'appurtenance' attached to a vessel in navigable waters as part of the vessel itself."  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 535 (1995).  Thus, the drill pipe (riser) that extended from the *Horizon*, as well as the blow-out preventer ("BOP") at the wellhead, are part of the *Deepwater Horizon* itself.  Per the terms of Plaintiff's Amended Complaint, therefore, BP cannot be liable under EPCRA for any reporting failures concerning oil released from the *Deepwater Horizon* and/or its appurtenances.  Plaintiff has introduced no evidence, for instance, that BP operated the *Deepwater Horizon* to extend BP's EPCRA liability to oil discharges from the rig.  Indeed, the

---

[15]   This subsection contains an argument that BP alone is making and that Transocean does not endorse, reserving all of its rights.  Both BP and Transocean agree that  CBD's case should fail based on Argument Section I alone.

[16]    In the context of Clean Water Act penalties, the Fifth Circuit is currently considering whether any discharges occurred from the Macondo well itself, of which BP is the partial owner.  *See In re: Deepwater Horizon*, No. 12-30883 (5th Cir. argued Dec. 4, 2013).  BP is indisputably not the owner of the *Deepwater Horizon* rig.

drilling contract to which BP and Transocean succeeded, assigns operation rights exclusively to Transocean. *See* BP UMF ¶ 20. BP cannot be deemed an operator of the rig unless CBD could show that BP somehow acted in regard to the *Deepwater Horizon* in derogation of the terms of the contract. No such facts exist.

## III.   THE INFORMATION REQUIRED IN AN EPCRA SECTION 304 REPORT WAS PUBLICLY AVAILABLE, MOOTING THIS CASE.

Even if CBD could once have asserted a valid EPCRA claim, the claim would now be moot. BP and Transocean have not only made the required information available to the entire world, but did so in a far more comprehensive and real-time manner than what the statute contemplates. CBD's citizen suit thus is hopelessly moot.

This Court need not ignore the context of this case. The "release" in question was unique in size, scale, intensity, and duration, occurring over 87 days, more than 40 miles offshore in the open water, with the source of the release located 5,000 feet below the surface. Responding to the spill required monitoring thousands of miles of shoreline, with constant changes in the trajectory of the oil based on weather and other factors. The response effort likewise was unprecedented, involving at its peak the mobilization of nearly 50,000 people and the coordination of approximately 6,500 vessels and dozens of aircraft. Over 1.3 million air, water and environmental samples were collected, and some 24,000 personal badges sampled. These factors combined to create a highly fluid situation, and yet BP, Transocean, and the federal government constantly updated the public, including publicly available websites. This fact — which is obviously true, as the Court has recognized — moots any possible EPCRA claim.

### A.    BP Complied With Any Requirement To Provide The Immediate Notice.

As discussed in Background Section C, Section 304(b) says that an owner or operator must provide in the initial notice eight pieces of information, but only "***to the extent known at the time of the notice*** and so long as no delay in responding to the emergency results." 42 U.S.C. § 11004(b)(emphasis added). BP complied with this when on April 21, 2010, it called the NRC to report the *Deepwater Horizon* accident as it was occurring, in real-time. *See* Incident Description, www.nrc.uscg.mil/reports/rwservlet?standard_web+inc_seq=937680 (Apr. 21,

2010).  This notification included the Section 304(b) items known to BP at the time:

- The chemical name or identity of any substance involved in the release (*see* 42 U.S.C. § 11004(b)(2)(A)), *i.e.*, "oil: crude."

- An estimate of the quantity of any such substance that was released into the environment (*see id.* § 11004(b)(2)(C)), *i.e.*, "unknown."[17]

- The time and duration of the release (*see id.* § 11004(b)(2)(D)), *i.e.*, "The incident occurred on 20-APR-10 at 22:00 local time."

- The medium or media into which the release occurred (*see id.* § 11004(b)(2)(E)), *i.e.*, "Gulf of Mexico."[18]

As the incident report indicates, even putting aside whether EPCRA applies to Shelf oil spills, the information reported by BP was promptly disseminated to numerous state entities.  *See id.*

### B.  BP Continued To Supply Information On A Real-Time, Ongoing Basis Throughout the Response.

After the sinking of the rig and throughout the ensuing response, BP continued to provide state and local entities, and the public, with comprehensive information about the spill, efforts to contain it and potential health effects.  Specifically, less than a week after the rig explosion, on April 23, 2010, BP established a dedicated website, www.deepwaterhorizonresponse.com, which provided: daily updates on containment measures undertaken (including, *e.g.*, the amount of dispersant applied and boom deployed); oily water recovered and the number of response personnel and vessels; the locations of response equipment staging areas; and telephone numbers for reporting spill-related information.  The website also featured maps showing the location and trajectory of the oil, as well as readily-identifiable links to the individual Gulf States' spill-related websites.  As the response continued, BP also made extensive spill related information available on its corporate website, bp.com.  This information included reports on the results of

---

[17]  BP notes that based on the extensive and groundbreaking expert analysis required as to flow rate issues, as well as other learning emerging from the quantification segment of the Phase 2 trial, the Court is well aware of the practical limits on the extent to which the flow rate was knowable while the spill was still unfolding.  Even now, scientists differ in how to approach this issue.  EPCRA does not and cannot be read to impose liability where compliance with some aspect of information disclosure is impossible.  No regulated party can disclose what it does not know.  (Transocean did not participate in the quantification segment and does not join this footnote.)

[18]  BP contacted the NRC later that same morning to explain that a "sheen" of oil was visible.  *See* www.nrc.uscg.mil/reports/rwservlet?standard_web+inc_seq=937721.

environmental sampling (*i.e.*, air, water and coastal) and health monitoring (*i.e.*, results of monitoring of response workers located offshore, near-shore and onshore), as well as the results themselves.  And on May 25, 2010, BP launched four informational websites designed to offer state-specific spill information for Alabama, Florida, Louisiana and Mississippi residents, businesses and elected officials.  *See also* BP UMF ¶¶ 32-44 (providing additional details on the categories and location of EPCRA-required information).

By July 2010, the National Incident Command announced a new federal website, www.restorethegulf.gov, as a "one stop repository for news, data and operational updates related to administration-wide efforts."  The site, still operational today, includes, in relevant part:

- A section on fact sheets describing, among other subjects, crude oil and its health effects, dispersant use, seafood safety and health information for pregnant women, www.restorethegulf.gov/task-force/education-resources/fact-sheets;

- A dedicated "Health and Safety" section featuring summary information on impacts to Gulf waters, sediments, fish and shellfish (with links to detailed studies and Q&A documents regarding these issues), and additional resources for healthcare professionals, www.restorethegulf.gov/health-safety;

- A list of "key contact numbers" for reporting spill-related environmental and medical issues, www.restorethegulf.gov/assistance; and

- Updates providing information on containment and control measures deployed during the response, www.restorethegulf.gov/news/response-updates.

Similarly, Transocean provided substantial information to the emergency response community.  For example, in the immediate aftermath of the April 20, 2010 blowout, Transocean coordinated with emergency response officials and provided detailed information to assist in their response, including the quantity of diesel on board the rig at the time of the blowout.  *See* Declaration of Dr. Ian Hudson ¶ 3; Transocean UMF ¶ 5.

The information provided by these outlets far exceeded in scope, level of detail, and timeliness of the information provided, the type of information demanded by an ordinary EPCRA report.  Accordingly, CBD cannot demonstrate any injury — informational or otherwise — based on the absence of the empty formalism of a report submitted specifically for EPCRA purposes.  The EPCRA regulations do not provide for any "particular format" for the written follow-up report(s).  40 C.F.R. § 355.41.  BP's voluminous correspondence with the Unified

Command and the FOSC, as well and its websites (which are also inherently communications to the FOSC), satisfy any requirement to produce a written report.  Under these circumstances, "a further order from the district court would provide no meaningful relief." *CBD*, 704 F.3d at 430.

## IV.   CBD FACES A HEIGHTENED STANDING BURDEN AT THE SUMMARY JUDGMENT STAGE AND ITS CURRENT SHOWING CANNOT SATISFY THAT STANDARD.

1.      A meet and confer that BP held by phone with CBD in an attempt to narrow discovery disputes alerted BP to the fact that CBD intends to argue that the Fifth Circuit decision definitively resolves its standing.  That is plainly in error.  The Fifth Circuit assessed standing only at the motion to dismiss stage, where the burden is light.  *See CBD*, 704 F.3d at 429-30.  To think that the Fifth Circuit somehow reached out to prejudge the Article III sufficiency of a CBD summary judgment motion not yet entertained by this Court on remand, let alone written, is to imagine that the Fifth Circuit violated basic principles of judicial restraint.

2.      Unlike at the motion-to-dismiss stage, where CBD could simply allege — based on conclusory affidavits that could not be challenged or placed in context — that its members felt injury from lack of an EPCRA report, CBD can no longer rest on such "mere allegations, but must set forth by affidavit or other evidence *specific facts*."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added).  Discovery has raised questions as to the reality of any alleged harm.  For example, declarant Dr. David Thrasher, averred that as a physician he lacked EPCRA information necessary to treat patients exposed to the oil.  But, four years after the spill, CBD acknowledges that Dr. Thrasher has not actually treated any such patients.  *See* CBD Resp. to Interrog. No. 4 (BP UMF Ex. 15).  Such never-consummated standing certainly does not suffice at this stage.  And even if Dr. Thrasher had treated actual patients, CBD has provided no excuse as to why he could not have consulted www.restorethegulf.gov/health-safety.

3.      Standing, of course, is jurisdictional and the burden to establish it falls squarely on CBD.  CBD's current showing falls short of the heightened standard at the summary judgment stage.  Going forward, Defendants will carefully assess how CBD tries to demonstrate standing in its opening brief and whether it can meet all three constitutional elements (injury in

fact, fair traceability/causation, and redressability, *see Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147 (2013)), as well as the prudential elements of organizational standing.

4.      The injury-in-fact prong of constitutional standing requires that any claimed injury be "**concrete and particularized**."  *Arizona Christian School Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011) (emphasis added).  This requirement has important interaction effects with BP's and Transocean's merits defenses.   For instance, suppose that the Court accepts the petroleum-exclusion defense but rejects all of BP's and Transocean's defenses as to the applicability of EPCRA to releases of drilling mud, methane, etc., then CBD's standing would depend on whether it has alleged a concrete and particularized injury based on the release of those specific types of substances.  Hence, if CBD could not show at that point that its members are harmed by drilling mud or methane releases in particular, then summary judgment must be entered in favor of BP and Transocean for lack of standing.   "[C]ourt[s] must assess the plaintiff's standing to bring **each of its claims** against each defendant," *Coastal Habitat Alliance v. Patterson*, 601 F. Supp. 2d 868, 877 (W.D. Tex. 2008) (emphasis added).

5.      Of course, the "court must assess the plaintiff's standing to bring each of its claims against each defendant."  *Coastal Habitat Alliance*, 601 F. Supp. 2d at 877; *see also Nat'l Fed'n of the Blind*, 647 F.3d at 209.   CBD's claim as to Transocean is subject to a fatal jurisdictional defect that was not addressed by the Fifth Circuit.   CBD has not established that any of its members were exposed to any non-oil substances covered by EPCRA that emanated from the vessel.  The *Deepwater Horizon* was more than forty miles offshore at the time of the Macondo Well blowout.  Rec. Doc. 3830 at 7.  To date, CBD has not submitted any evidence establishing that any of its members were exposed to any substances that were onboard the *Deepwater Horizon* at the time it sank.   General CBD declarations asserting crude-oil injury cannot establish standing as to releases other than crude oil.  When evaluating standing to pursue claims against Transocean, the focus must be on only on the materials released from its vessel.

## V.      CBD'S SOLE REMAINING REMEDY IS BARRED BY LACHES.

CBD abandoned its claims for civil penalties to obtain a final order which it believed

necessary to take its prior appeal. It took this step, in the words of the Fifth Circuit, "strategically" and "at its own peril." *CBD*, 704 F.3d at 427. The price of obtaining a final order immediately was that all claims, save those seeking injunctive relief, were "lost forever." *Id.* But an injunction is now especially pointless after CBD's delay. *See Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980) ("applicability of the doctrine of laches to environmental litigation is no longer open to doubt."); *Save Our Wetlands, Inc. v. Army Corps of Eng'rs*, 549 F.2d 1021, 1026 (5th Cir. 1977) (same).

Equitable injunctive relief is never automatic, even if a violation is proven. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–313 (1982)). *Weinberger* was an environmental case, so the principle that injunctions should not be issued reflexively is fully applicable here.

The *Weinberger* factors and equity doctrine weigh against ordering an ineffectual report under EPCRA 304. CBD has dismissed any claims for money damages, which should prevent CBD from now trying to argue that those foregone damages were inadequate. Most importantly, no one — neither the public, nor CBD — stands to benefit from requiring a report that is years past the spill and would add nothing to the immense stockpile of spill information, while BP and Transocean would suffer prejudice. *See Save Our Wetlands*, 549 F.2d at 1028-29 (finding a NEPA claim — which much like EPCRA claims asserts informational injury — to be barred by laches after weighing the equities and finding the minimal environmental benefit from ordering an environmental impact statement outweighed considering the benefits of a "substantially completed project"). The contents of the Macondo oil are well known, and most clean-up operations long complete. Even if BP and Transocean had failed in their EPCRA reporting duties, which they did not, an injunction ordering an EPCRA report today accomplishes nothing.

## CONCLUSION

For the foregoing reasons, BP and Transocean respectfully request that the Court grant their motions for summary judgment as to CBD's EPCRA claim.

Dated:  April 15, 2014

/s/ Brad D. Brian

Steven L. Roberts
Rachel Giesber Clingman
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas  77002

Kerry J. Miller (Bar # 24562)
FRILOT L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana  70163

Brad D. Brian
Daniel B. Levin
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071

**ATTORNEYS FOR TRANSOCEAN**
**OFFSHORE DEEPWATER DRILLING INC.**

Respectfully submitted,

/s/  Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC  20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1000
Facsimile:  (212) 715-1399

**ATTORNEYS FOR BP EXPLORATION**
**AND PRODUCTION INC. AND BP**
**AMERICA INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 15th day of April, 2014.

/s/ Don K. Haycraft