# EXHIBIT 3



# On Scene Coordinator Report *Deepwater Horizon* Oil Spill

Submitted to the
National Response Team
September 2011

On April 20, 2010, 126 workers on the mobile offshore drilling unit *Deepwater Horizon* were in the process of temporarily closing the exploratory Macondo oil well. That evening, an explosion aboard the drilling unit set off a chain of events that eventually led to the sinking of the *Deepwater Horizon*. Eleven crewmembers lost their lives and others were seriously injured, as fire engulfed and ultimately destroyed the rig.

At 10 p.m. CST on April 20, watch standers at the U.S. Coast Guard District Eight command center received a report of an explosion and fire aboard the *Deepwater Horizon*, located approximately 42 miles Southeast of Venice, La. A search and rescue effort began soon after, with Coast Guard District Eight as the Search and Rescue Mission Coordinator. Concurrently, Coast Guard Marine Safety Unit Morgan City, La., began a pollution response case and marine casualty investigation. Aircraft involved in the search reported a variably colored sheen on the surface of the water, two miles long by half-mile wide.

By April 21, 115 of the 126 workers were accounted for. The Coast Guard continued to search for survivors, dispatching 28 air and surface sorties, covering approximately 5,375 square miles. At 5 p.m. CST on April 23, the Coast Guard suspended the search. Initial debriefs of the surviving crewmembers placed the 11 missing in the vicinity of the initial explosions.

The Commanding Officer of Marine Safety Unit Morgan City, La., became the first Federal On-Scene Coordinator (FOSC) to direct the oil spill response. As the search and rescue continued, it was determined the response had the potential to eclipse all others and impact a large portion of the Gulf Coast region. Therefore, the Commandant of the Coast Guard re-assigned the FOSC role to the Commander of Eighth Coast Guard District.

On April 22, dispersants were used for the first time.

On April 23, the FOSC established a Unified Area Command (UAC) in Robert, La. The UAC served as headquarters for the regional response and eventually included representatives from the federal government, Alabama, Florida, Louisiana, Mississippi, and the Responsible Party (RP).

The Coast Guard Incident Command Posts (ICPs) in Houma, La., and Houston, Texas, were also established on April 23. These ICPs, along with

one in Mobile, Ala. established on April 26, 2010, would become the centers of response operations.

On April 29, the *Deepwater Horizon* incident was declared a Spill of National Significance, the first time the federal government used that designation. The declaration permitted a newly designated National Incident Commander to assume the lead role of communicating with affected parties and the public, and coordinating all federal, state, local, and international resources at the national level.

Between May 6 and May 8, the RP unsuccessfully attempted to place a large containment dome, or cofferdam, over the larger of two leaks from the broken riser at the sea floor.

On May 11, Louisiana applied to the Army Corps of Engineers for an emergency permit to construct six large, linear sand berms along Louisiana's barrier islands to guard the coastline from oil. Two weeks later, the Corps approved an emergency permit for a portion of the berms. Just over one week later, the RP began funding all six Louisiana sand berm reaches. The National Incident Commander had also authorized one of the six as a prototype oil spill response mechanism.

On May 12, the RP released a 30-second video of oil and gas streaming from the end of the broken riser.

By mid-May, the Coast Guard evolved the organizational structure for the response and along with other response agencies, began to move resources into the area from all over the country.

As oil flow rate estimates had gone from 1,000 to 5,000 barrels per day, and the RP was unable to ascertain with any certainty the conditions at the wellhead inside of the blowout preventer (BOP), the federal government became increasingly concerned with flow rate estimates. To determine the flow amount, the National Incident Command created an interagency Flow Rate Technical Group and charged it with generating a preliminary flow rate.

On May 26, the Environmental Protection Agency announced that the government instructed the RP to take immediate steps to scale back the use of dispersants. Also on May 26, the RP began a top kill, a process that involved pumping heavy drilling mud into the top of the well at high pressure. After the third unsuccessful attempt, the RP and the government agreed to discontinue the strategy.

On May 27, the Flow Rate Technical Group estimated the range of oil flow from the source

between 12,000 to 19,000 barrels per day (flow rates of up to 25,000 barrels per day were also consistent with data). On May 28, the President of the United States directed federal manpower and resources responding to the spill be tripled.

On May 29, the RP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP on the sea floor and install a collection device—the top hat—that would then be connected via a new riser to the *Discoverer Enterprise*.

On June 1, 2010, Rear Admiral James Watson assumed the role of FOSC.

On June 3, the top hat was in place and functioning at the source. By June 8, the *Discoverer Enterprise* was collecting nearly 15,000 barrels of oil per day.

On June 16, the vessel *Q4000* became operational, and was processing and burning up to 10,000 barrels of oil per day.

On July 9, the National Incident Commander authorized the RP to install a capping stack, but not to close it. The operation began the next day and by July 12, the RP had finished installing the stack. On July 15, the RP closed the stack and a well integrity test commenced.

On July 12, Rear Admiral Paul Zukunft assumed the role of FOSC.

On August 3, the RP began a static kill—an operation that involved pumping heavy drilling mud into the well to push oil and gas back into the reservoir. The static kill succeeded and was followed with cement. On August 8, the National Incident Commander reported that the cement had been pressure tested and was holding.

In mid-September, the first relief well intercepted the Macondo well, allowing the RP to permanently seal the reservoir. On September 19, the National Incident Commander announced the Macondo well was effectively sealed.

On September 20, 2010, the ICPs in Houma, La., and Mobile, Ala., were disestablished, and operations were consolidated under the Gulf Coast Incident Management Team in New Orleans, La.

On October 1, 2010, the National Incident Command was disestablished.

The response to the *Deepwater Horizon* spill continues. As of July 15, 2010—the day the well stopped flowing—the response involved approximately 47,000 responders, more than 6,870 vessels (including skimmers, tugs, barges, and recovery vessels), approximately 4.12 million feet of boom, 17,500 National Guard troops from Gulf Coast states, five states, multiple corporations, and untold hours of work by federal, state, and local officials, employees or contractors of the RP, and private citizens.

# OMITTED PAGES

Thirteen individual sections under the operations heading focused on the most distinct, and challenging operational issues for this response. Unlike most oil spills, which are usually nearly instantaneous events at or near the water's surface, the source of the oil for the *Deepwater Horizon* spill was the *Mississippi Canyon 252* Macondo well, at a depth of 5,000 feet, that spilled continuously for 87 days.

Because of the depth and duration of the spill and size of the area impacted, operations were constrained by certain critical resources: deep water operating equipment, skimmers, boom, trained personnel, and beach cleaning equipment. These resources were essential in responding to the spill, but the duration and size of the event magnified concerns and competing demands for these resources across multiple states. The scope of the impacted area also created the need for an expansive response organization that included branches, forward operating bases, and staging areas, with some branches becoming response organizations larger than the entire organization used for other sizable spills.

Response operations took place in four zones: at the source of the spill, offshore, near shore, and in shore. At the source the drilling rigs and remotely operated vehicles necessary for deep water drilling were the only means of accessing the well. Offshore, the response focused on removal of the oil. Key to these operations were large skimmers and in situ burn task forces. The skimmers, storage for the oil recovered by the skimmers, and fire boom were critical resources. When oil could not be removed through these means, aerial application of dispersants was used. Near shore operations focused on skimming and the use of boom to protect sensitive areas; later, they focused on cleaning as much of the shoreline as possible. Obtaining enough boom was a central concern of near shore operations. In shore operations used barriers such as Hesco Baskets to minimize shoreline impact. Once oil reached the shore, the long, arduous, labor intensive process of shoreline cleanup began. After the well was capped shoreline cleanup became the focus of continued response operations.

## 3.1 Source Control

Securing the source of the oil for the *Deepwater Horizon* spill was challenging and complex. As sub-sea drilling systems are not an area of Coast Guard cognizance and expertise, the Federal On-Scene Coordinator (FOSC) was unfamiliar with the technology and capabilities of the deepwater



PORT FOURCHON, La. – A team of welders fabricates a portion of the subsea oil recovery system chamber. The chamber will be one of the largest ever built and will be used in an attempt to contain the subsea flow of oil. Photo courtesy of U.S. Coast Guard



*GULF OF MEXICO –The damaged blowout preventer and the lower marine riser package were removed and placed aboard the Q4000. Photo courtesy of U.S. Coast Guard*

*GULF OF MEXICO – A small pollution containment chamber, known as a "top hat" was used in an attempt to contain an oil spill caused by the Deepwater Horizon explosion. Photo courtesy of U.S. Coast Guard*



drilling industry. Neither the Coast Guard nor any other federal agency had experience with a massive deep water spill. Ultimately, source control had to be achieved through the Responsible Party (RP), whose employees were not accustomed to extensive government input to their deepwater operations, nor the federal oversight of multiple agencies unfamiliar with working together in a large response organization. The source control effort was a whole of government and whole of industry response. The Department of Energy, Department of Interior, U.S. Geological Survey, and Coast Guard participated extensively in these efforts. Other oil companies, including Shell and Exxon-Mobil, assisted with source control strategy.

### Overview of Source Control Activities (Situation)

Source control was a multifaceted effort that started immediately after the spill and continued until the relief well from the *Development Driller III* intersected the Macondo well on September 19, 2010. Initial activities focused on activation of the seven separate closing devices on the blowout preventer stack, or BOP stack, which includes the Lower Marine Riser Package (LMRP). As it became clear that the initial efforts to activate the BOP stack had been unsuccessful and that there were two separate leaks from the riser, the FOSC and RP began to consider other source control options.

Multiple courses of action were simultaneously considered and acted upon. Relief wells are a commonly used method for stopping a blowout and the after consultation with the FOSC the RP mobilized two rigs to drill separate relief wells within days of the explosion. The RP recognized that it would take at least 100 days to drill a relief well, so began working with Coast Guard and BOEMRE personnel on containment options. These options included adapting shallow-water technology to the deep-water environment or designing entirely new devices. Multiple teams with government and industry personnel were established at the RP's Houston headquarters to develop concurrently different ways

to either stop the flow of oil or collect it at its source. Each team focused on a discrete effort, such as collecting oil from the riser or stopping flow through a top-kill procedure.

Although early attempts failed—in part because of lack of knowledge of the accurate pressure levels at the wellhead—it was recognized that actuating the BOP stack remained the best chance to shut the well quickly or at least slow the flow of oil. A number of organizational and engineering challenges complicated efforts to actuate the BOP stack. Problems arose from the differences between the piping and wiring diagrams for the BOP and the actual installation, as well as from the need to make special tools so the Remotely Operated Vehicles (ROVs) could deliver hydraulic pressure. The RP ceased trying to use the BOP stack rams and shears to stop the flow of oil on May 5.



*GULF OF MEXICO – The mobile offshore drilling unit Development Driller III (near) prepared to drill a relief well at the Deepwater Horizon site, as the MODU Q4000 held position directly over the damaged blowout preventer while making preparations for a "junk shot" or a "top kill." The drillship Discover Enterprise (far) continued to capture oil from the ruptured riser. Photo courtesy of U.S. Coast Guard*

Three early containment options were developed and deployed during the month of May with limited success. The RP unsuccessfully tried to install a large containment dome, or cofferdam, over the larger of the two leaks in the broken riser on May 7, 2010. This effort was unsuccessful primarily due to the formation of hydrates while moving the device into position. A smaller device, called the Riser Insertion Tube Tool (RITT), was successfully inserted into the end of the broken riser on May 16, 2010, and carried oil and gas up to the *Discoverer Enterprise* on the surface. The RITT remained in place until May 25, 2010, and collected approximately 22,000 barrels of oil.

# 8. Operations

On May 26, 2010, after the National Incident Commander and FOSC had reviewed plans, the RP removed the RITT and attempted a top kill operation. A top kill, also known as momentum or dynamic kill, involves pumping heavy drilling mud at high pressure and volumetric flow rates into the top of the well through the kill and choke lines in an attempt to push the hydrocarbons back into the reservoir. In conjunction with top kill, after realizing its limited potential for success, the RP attempted to reduce outflow and build back pressure through a junk shot. The term junk shot refers to bridging material, such as pieces of tire rubber and golf balls, which ideally block the flow path for the hydrocarbons and further impede the flow. After three unsuccessful attempts on consecutive days, the RP ended top kill attempts on May 29, 2010.

The next phase of source control involved collection of oil from the well near the seafloor. On June 1, 2010, the RP began cutting the riser from the top of the BOP stack, and by June 3, the top hat was in place and siphoning hydrocarbons to the surface. By June 8, the *Discoverer Enterprise* was collecting nearly 15,000 barrels per day (BPD) of oil through this device. A second connection was made between the Helix *Q4000* and the choke line on June 16. Rather than collecting oil, the *Q4000* used special equipment to process and burn up to 10,000 BPD of oil. The final collection device connected the kill line on the BOP stack to the Helix *Producer* through a freestanding riser. The system became operational on July 12, 2010, and collected oil for two days before the well was capped. These efforts, and several others that were planned but not executed, were continuously being refined to increase redundancy and reduce disconnection time in the event of a hurricane.

On July 10, 2010, the RP started work to install a capping stack, which was essentially a smaller version of a BOP designed to connect to the top of the BOP stack with a tight fitting seal. After two days of complicated activity, the capping stack was installed without incident. With the approval of the National Incident Commander, the RP shut the stack on July 15, 2010, and began a well integrity test (designed for a maximum of 48 hours), marking the first time in 87 days that no oil flowed into the Gulf of Mexico. Government scientists expressed some initial concern that keeping the stack shut could cause subterranean leakage resulting in the broach of the seabed. Despite these concerns, the test continued for 24 hours, and extended in 24-hour increments with constant monitoring, using a variety of sensors and other means. By July 24, 2010, though the response had confidence in the integrity of the well, it continued monitoring.

With the capping stack in place, the RP raised the possibility of killing the well before completing the additional relief wells through a procedure called a static kill or bullhead kill. Like the top kill, the static kill involved pumping heavy drilling mud into the well in an effort to push the hydrocarbons back into the reservoir and establish a column of drilling mud. After successfully completing the preliminary tests on August 3, 2010, and with the approval of the National Incident Commander and the FOSC who approved operational procedures, the RP began the operation and achieved hydrostatic control of the well. The following day, the RP cemented the well and successfully pressure-tested the cement.

While the relief well neared completion, the RP opted to remove the damaged *Deepwater Horizon* BOP stack and replace it with a fully functioning and recently tested BOP stack from the *Development Driller II* to facilitate well abandonment procedures after relief well intersection. Finally, on September 19, the relief well drilled by the *Development Driller III* intersected the Macondo well at 18,000 feet below the surface, plugging the hole with cement, and marking the official sealing, closing, well kill, plug and abandonment of the well.

## Response Organization in Houston

After notification of the *Deepwater Horizon* incident, the Coast Guard activated an Incident Command Post (ICP) in Houston, Texas, to deal with source control. This ICP was separate but integral to the ICPs in Houma and Mobile set up to deal with the response. An Incident Management Team (IMT), following the Incident Command System (ICS) set up the ICP in Houston.



*GULF OF MEXICO – The crew of Blue Dolphin and the HOS Centerline pump mud through lines to the Q4000 and down to the temporary cap and into the well for a static kill, as the DD II crew continues to drill a relief well in the background. Photo courtesy of the U.S. Coast Guard*

*GULF OF MEXICO – Roughnecks maneuver a section of drill collar into position on the drilling floor of Development Driller III, which drilled the relief well and pumped the cement to seal the Macondo well. Photo courtesy of the U.S. Coast Guard*



**Figure 3.1: Organizational Chart Task Forces**



At first, the Operations Section included containment activities such as relief wells, BOP intervention, capping, etc. Later, an Operations Section was created specifically for Source Control and assumed operation of containment activities. Containment activities were then further subdivided into logical work-specific activities in the form of Task Forces, as described in the NIMS ICS. Initially, individual Task Forces were set up for relief wells, BOP intervention and sub-sea containment, ROV operations, and survey operations. Marine operations were originally within the Logistics Section, but later moved to the Source Control Branch, which coordinated overall simultaneous source control operations.

Task Forces formed, delivered, and deactivated as needed. For example, the BOP Intervention team formed with the goal of actuating the BOP to shut in the well. This team later changed its focus to providing access to the BOP and repairing the control pods. Upon achieving those goals, the team assumed a monitoring role. Similarly, teams formed to address the several containment options, including top hats, hot taps, capping stacks, and collection or processing. By early June, the organization chart was as as shown in Figure 3.1.

The work process generally followed the planning as described in the NIMS ICS. Task Forces would provide regular and frequent status reports and plans to the Incident Management Team for Source Control and Operations. These plans were also included in the Incident Action Plan (IAP) process. Task Forces were operational 24 hours a day, with most of the operational procedures development occurring during the evening.

Containment Task Forces conducted their work applying the following principles:

1. To avoid solutions that might result in a worse situation,

2. That time was of essence,

3. That reaching a solution would require redundancy and contingency, and

4. That resources would be provided as needed to staff the teams and to develop solutions.

As a result, teams worked simultaneously on short-term (e.g., top hats) and longer-term (e.g., Containment and Disposal Projects) solutions. As the Task Forces developed options, both the Incident Command and the RP Senior Management reviewed and selected options, and made priority determinations for review and approval by the National

Incident Commander and FOSC. Task Forces then engineered and fabricated selected options as required, while concurrently developing operational procedures and identifying and managing hazards. Once completed, ICP Houston and the Unified Area Command (UAC) approved the operational procedures. Task Forces interfaced with Coast Guard, the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE, formerly Minerals Management Service), and Science Team personnel during solution development, hazard identification, and management sessions. Incident Command also interfaced frequently with Coast Guard, BOEMRE, and Science Team to focus on activity prioritization and procedure approvals.

Of note, engineering review incorporated lessons learned during this process. For example, the cofferdam execution provided the lessons used to develop the top hat and Riser Insertion Tube Tool. Before deploying the first top hat, the engineering phase of subsequent top hats incorporated lessons from the initial fabrication. Examples of contingency and redundancy included top hats constructed as a contingency to RITTs, as several were designed and built specifically for contingency and redundancy. Similarly, the latch cap and valve manifold for the capping stack were developed as a contingency for the transition spool and 3-ram stack, and two latch caps were developed for redundancy purposes.

## Source Control Oversight (Action and Resources)

Multiple federal entities conducted oversight of decisions and operational procedures to stop the flow of oil from the stricken Macondo well. Entities accomplished this through informal coordination both within and outside of the Incident Command System. The primary participants at ICP Houston included the Coast Guard, BOEMRE, the Science Team, and the National Incident Commander's representative. Other agencies had a more limited presence at the ICP, including U.S. Navy Supervisor of Salvage and Diving (SUPSALV), and National Oceanic and Atmospheric Administration (NOAA).

Coast Guard oversight in Houston began immediately, with Outer Continental Shelf (OCS) inspectors from MSU Morgan City arriving on April 21, 2010, to act as liaisons while the *Deepwater Horizon* was on fire. As the situation evolved, staffing expanded slightly to include incident management expertise from the Gulf Strike Team, engineering

expertise from the Marine Safety Center, and OCS inspectors. This enabled Coast Guard personnel to provide oversight of both incident management and source control development (i.e., design and vessel issues). The Coast Guard solidified the staffing model in mid-May 2010, and it generally remained consistent throughout the response, with the numbers decreasing toward the end.

This Coast Guard contingent served several primary functions. It was responsible for providing situational awareness and updates to the NIC and UAC, and participated in daily teleconference Cabinet Secretary Briefings with the Department of the Interior (DOI) and the Department of Energy. It also served as the senior federal representative at ICP Houston, while providing expertise and oversight to the RP's engineering work groups during their development of concepts, procedures, and equipment to contain the source. The contingent also conducted initial review of source control procedures and plans, coordinated inspection schedules, and lent expertise at meetings to identify hazards, regulatory issues, and scheduling conflicts with planned procedures.

Initially, the Coast Guard personnel at ICP Houston were under the supervision of ICP Houma, but still participated in twice daily UAC briefings with their RP counterparts. In early May 2010, ICP Houston's reporting chain changed to the UAC. By mid-June, the Houston ICP reported to both the NIC and the UAC for source control issues but continued to participate in the twice-daily UAC briefings. Additionally, a daily report describing source control developments and technical oversight activities was provided to the UAC, the Marine Safety Center, and a number of other entities in Coast Guard Headquarters and LANTAREA.

On May 22, 2010, the National Incident Commander dispatched a senior officer to serve as his direct representative in Houston and provide high-level liaison with senior RP management, the Science Team, and high-level officials from the DOI and the Department of Energy. This position was instrumental throughout (i.e., until relief well intersection). Although overseen by a Coast Guard captain at all times, both the flag officer and captain had significant technical engineering expertise and they worked together to provide a continuous presence in Houston, Texas. On July 25, 2010, another Coast Guard senior officer served as the National Incident Commander's representative

and provided relief to the originally assigned flag officer. For the remainder of the incident, they worked together to provide a continuous presence in Houston. However, both remained engaged with source control oversight even when not in Houston, in order to ensure continuity.

BOEMRE served as the primary source of government oversight and expertise on sub-sea source control operations. As with Coast Guard personnel, BOEMRE participated on a number of the RP's work groups to develop source control options and mitigate risks. BOEMRE also conducted a detailed review of source control plans before sending them to UAC for review and approval. BOEMRE had four to five employees in Houston overseeing the RP. BOEMRE did not participate in the ICS structure at ICP Houston, but was fully integrated with the UAC in New Orleans.

Under the direction of the Energy Secretary, the Department of Energy assembled a scientific oversight team to monitor the progress and critically review the RP's efforts to contain and secure the source of the leak from the Macondo well. The team consisted of more than 200 scientists, engineers, and other experts from the National Laboratories, U.S. Geological Service (USGS), other government agencies, and major oil companies. Additionally, the team included a small group of the nation's top scientists who served as advisors to the National Incident Commander.

The team, established during the week of April 26, 2010, remained engaged throughout the response. A core group of up to 20 personnel stationed on the ground in Houston provided the needed interaction and coordination with the RP. This core group actively maintained connectivity to the remainder of the team, as well as select industry experts, to bring the appropriate disciplines to bear on individual issues.

On July 14, 2010, the NIC asked NOAA to assist with monitoring the wellhead. The NOAA ship *Pisces* sailed from Pascagoula, Miss., to be on scene with some of NOAA's top acousticians. The vessel was equipped for acoustic monitoring at several kilohertz (18, 36, 48, 96, and 128). These vessels were imaging for sound associated with gas or oil leaks in the ocean floor, which would indicate a potential formation leak. A request came a few days later for an additional support vessel, and NOAA provided the ship *Gordon Gunter*. *Gordon Gunter* had a similar range of acoustics, but did not have



GRAND ISLE, La. – NOAA personnel on a commercial vessel receive a briefing on the Conductivity-Temperature-Depth (CTD) equipment via radio from scientists onboard the NOAA vessel PISCES. Photo courtesy of the U.S. Coast Guard

a dynamic positioning system. Therefore, the *Pisces* worked near the wellhead, and the *Gordon Gunter* farther out, near faults that USGS identified as possible vent locations. After about a week, the Secretary of Energy's team decided one acoustic vessel was sufficient for acoustics monitoring, and the *Gordon Gunter* went off scene. The *Henry Bigelow* relieved the *Pisces* in early August. When not specifically conducting acoustic sampling, both the *Pisces* and *Henry Bigelow* conducted water sampling near the wellhead. These ships spent 81 sea days on scene. NOAA streamed data collected in real time to University of New Hampshire (UNH), where the UNH team processed the data 24 hours a day, 7 days a week.

The Secretary of Energy and senior agency representatives on the team personally participated in daily briefings with the RP's executives and provided real time recommendations on the efficacy of the proposed mitigation measures to the National Incident Commander.

## Operational Procedure Processing

All sub-sea activities conducted by the RP were agreed to in writing through detailed procedures describing the operation to be performed around the wellhead. BOEMRE and Coast Guard personnel in Houston participated in the development and drafting process to help identify and mitigate hazards. Once they finalized the procedures, senior engineers in Houston signed off and forwarded them to the UAC in Louisiana. The senior BOEMRE representative in the UAC would again review and approve the procedures before the Unified Area Commander gave the final permission to proceed. This sign-off process remained in place throughout the containment effort until permanent well kill. After that point, the RP still had to work with BOEMRE to approve procedures related to plug and abandon the well, a typical oil field activity covered by BOEMRE regulations. As the well was no longer a threat for further release of oil, FOSC participation in those operational procedures was not required.

## Source Control Challenges

The Incident Management Team in Houston followed ICS processes, but the overall coordination with the NIC representative, BOEMRE, the Science Team, and other federal agencies present in Houston was informal and outside the ICS planning cycle. The skill sets and perspectives of all the federal entities were essential to successful oversight.

Particularly early in the response, there was a lack of transparency by the RP on source control. Initially, senior RP management in Houston made major decisions outside the ICS. Early on, the Coast Guard Incident Commanders raised this concern with the RP and were subsequently included in the daily meetings with the senior managers. However, it remained apparent that key strategic and tactical planning occurred behind closed doors by RP personnel without government participation in the formulation of those plans. This changed in late May 2010 when the NIC representative vigorously insisted on participating in an internal RP meeting to assess the failed top kill, establishing a new paradigm. From that point forward, the government played a significant role in overarching source control planning and assessment. Ultimately, the NIC asserted authority and ordered specific source control actions through issuance of NIC directives.

Although Coast Guard inspectors and engineers were not well versed in the nuances of sub-sea engineering, they did offer critical thinking, operations and engineering skills to the review process. The RP and industry personnel valued their participation on design and in the hazard operations and hazard identification teams. Even with these contributions, there was a large amount of work. As the operation progressed, it was clear that the pool of Coast Guard personnel with the requisite skill sets was small. Equally clear was the necessity to establish a rotation scheme to sustain the participation of those with the technical background to assess RP proposals at ICP Houston.

This was the first major spill in the United States in deep water that required securing a well blowout in order to stop the flow of oil. Securing the well



GULF OF MEXICO – Transocean's Development Driller II continues to dig a relief well in an effort to stop the flow of oil into the water from the Deepwater Horizon incident. Photo courtesy of U.S. Coast Guard

# Trajectory Forecast
# Mississippi Canyon 252

**NOAA/NOS/OR&R**

Estimate for: 1800 CDT, Saturday, 5/08/10
Date Prepared: 2000 CDT, Wednesday, 5/05/10

This forecast is based on the NWS spot forecast from Wednesday, May 5 PM. Currents were obtained from the NOAA Gulf of Mexico, Texas A&M/TGLO, and NAVO/NRL models and HFR measurements. The model was initialized from early morning satellite imagery analysis provided by NOAA/NESDIS and Wednesday overflight observations. The leading edge may contain tarballs that are not readily observable from the imagery (hence not included in the model initialization).



Winds are forecast to be light (5-10 kts) and variable (although predominantly onshore in Chandeleur and Mississippi sound) continuing through Thursday. S/SE winds at 10 kts are expected to resume again Thursday afternoon/evening and continue through Friday. The MS Delta, Breton Sound, and Chandeleur Sound continue to be threatened by shoreline contacts throughout the forecast period. Although our trajectories indicate beached oil over the SE portion of the Delta, observations to date suggest surface oil is not crossing the MS river convergence zone.

**Trajectory**
- ☐ Uncertainty
- Light
- Medium
- Heavy
- ✕ Potential beached oil

Next Forecast: May 6th PM

this scale bar shows the meaning of the distribution terms at the current time

was a major technical challenge. The RP initially had the technical expertise to identify the means of controlling the source and developed plans, with the oversight of BOEMRE and the Coast Guard. This resulted in an evolving series of attempts to stop the oil flow, culminating with the successful final capping stack, static kill, and bottom kill through a relief well. From beyond Houston, the perception of the attempts may have appeared as if each was thought of after the previous effort failed. In reality, multiple options were constantly under development and revision.

### Oil Trajectory and Amount

Beginning April 21, 2010, the modeling team at NOAA's Office of Response and Restoration began generating daily trajectories for the *Deepwater Horizon* oil spill and continued for 107 days.

### Background

Cumulative trajectory maps were produced early in the *Deepwater Horizon* spill response. One map displayed the surface location of spilled oil for several consecutive days, as well as a forecast for the following day. As the area of water affected by the spill grew larger, the forecast aspect of these maps became more important than the day-to-day changes in surface oil. Consequently subsequent trajectory products only included forecasts.

Forecasts for 24, 48, and 72 hours were produced for surface oil in the near-shore area to support daily response planning. The production of the forecasts continued until no recoverable oil was seen in over-flights of the area for three weeks.

In mid-May, when a tail of oil entered the northern part of the Loop Current, it created a potential pathway for oil to be transported to the Florida Keys, Cuba, or the Bahamas. With this change in the scale of the trajectory forecasts, the Office of Response and Restoration began to produce forecasts for two regions, near-shore and offshore. The offshore forecasts also supported daily response planning, and predicted surface oil impact by the Loop Current system for the next 24, 48, and 72 hours.

In mid-July, Office of Response and Restoration began to produce maps to provide daily updates of the location of the Loop Current and its major eddies, and the location of floating oil relative to the Loop Current system. After more than a month of daily mapping, over-flights and satellite

analyses eventually showed no recoverable oil in this area; these findings indicated a diminished Loop Current threat. Weeks later, when recoverable oil was no longer observed in over-flights or satellite analyses, the offshore forecasts were phased out.

In addition to surface oil trajectory forecasts, NOAA provided guidance on expected movement of subsurface oil from mid-May through mid-September. The UAC Subsurface Monitoring Unit (SMU) used subsurface forecasts as a tool to direct vessels in sampling. The daily sampling information, including fluorometry, dissolved oxygen, and analytical chemistry, provided usable data on the subsurface oil during the incident.

### Oil Spill Trajectory in Detail

The *Deepwater Horizon* oil spill posed multiple challenges for trajectory modeling and stretched NOAA's capacity to generate timely, accurate, and useful products to the response. Over the course of the spill, NOAA prepared more than 400 trajectory products. They developed multiple new products to address the need for subsurface and long-term forecasts, and to help improve user and public understanding.

NOAA provided the first trajectory forecast to the FOSC on the morning of April 21, 2010. This trajectory focused solely on the 700,000 gallons of diesel aboard the burning *Deepwater Horizon* rig. The first trajectory assumed a continuous release starting at 10:00 a.m. Central daylight time on April 20. NOAA later prepared additional trajectory products with different oil release scenarios. Scenarios included diesel oil spilling from the rig at different times over several days, and a trajectory for a potential continuous release of crude oil from the well. Based on observations from over-flights, the trajectories produced on April 22 and the morning of April 23 assumed no further release from the well or rig. However, on the afternoon of April 23, a Coast Guard and NOAA over-flight confirmed significant amounts of oil near the well and observed surfacing oil. All subsequent trajectory forecasts assumed a continuous release from the well.

NOAA developed four different types of trajectory forecasts used in operations throughout the response effort. They produced a daily Loop Current analysis to address the potential threat of oil transport toward the Florida Straits. A fifth type

**Table 3.1: Trajectory Analyses**

| Type | Frequency | Dates | Distribution |
|---|---|---|---|
| Surface Oil Forecast | Daily | April 21 – August 23 | Within commands, then public after 26 April, 2010 |
| Shoreline Oiling Outlook | Daily | April 27 – August 23 | Within commands only |
| Statistical Long Term Outlook | Irregular | First results: May 2<br>First IC presentation: May 10<br>Press Release: July 2 | Initially within commands, public on July 2 |
| Subsurface Plume Forecast | Irregular, then daily | First forecast: May 15 Forecast based on climatology: May 30<br>Daily: September 7 – September 24 | Used for guidance of vessels as part of SMU |
| Loop Current Analysis | Irregular, then daily | First analysis: May 5<br>Daily: May 17– July 22 | Generally within commands only |

of trajectory forecast was also investigated. The fifth trajectory was a 45-day outlook based on NOAA Climate Center wind forecasts and NOAA generated ocean forecasts. This trajectory yielded results inconsistent with observed oil movement and thus was not introduced to the response. Table 3.1 summarizes the types of trajectory analyses used, the periods required to generate products, and the distribution of the results.

The surface oil forecasts occurred twice a day from April 23 to May 19, 2010, once daily after then until August 13, then every few days until the final forecast on August 23. From May 18 to June 17, the surface forecast split into a near-shore and offshore forecast. Lack of observable sheens in the offshore area and the clear separation of the Loop Current resulted in discontinuation of the offshore forecasts on June 18. This indicated a reduced likelihood of oil transported to the Florida Straits. Trajectory forecasts from August 3 through the final forecast produced August 23 indicated no recoverable surface oil.

The Comprehensive Deepwater Oil and Gas model (CDOG) and the SINTEF (a Norwegian research organization) Deepblow model produced the initial subsurface plume forecasts. The subsequent daily subsurface plume forecast identified potential locations of oxygen depression at depth.

NOAA contacted a third party for additional subsurface plume modeling, but that modeling was unsuccessful.

Producing reliable surface trajectory forecasts required a significant number of supporting data sources. In particular, observations of oil distribution and forecasts of winds and currents were critical. Oceanographers in NOAA's Office of Response and Restoration compiled all available observational data, evaluated six hydrodynamic forecast models, and loaded relevant information into the General NOAA Operational Model Environment to carry out the daily trajectory forecasting. Not all data were of the same quality, nor were all data sources prepared to provide operational support at the beginning of the spill. However, over time the quality and availability of data and information became more robust and reliable.

In addition, Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) oceanographers provided NOAA with data used for oil trajectory and shoreline threat probability modeling. They collected urgently needed information and modified and extended research studies already underway at the time of the spill. The *Lophelia II* expedition, Loop Current monitoring, socioeconomic studies, and other studies provided data to help evaluate the impacts of the spill.

## The Loop Current

Early in the response, NOAA recognized the threat of oil entering the Loop Current and potentially affecting shorelines beyond the northern Gulf of Mexico. There was particularly strong concern this transport pathway could rapidly bring oil to southern Florida. Therefore, when scientists observed oil entering the northern edge of the Loop Current, a separate offshore trajectory tracked this oil. The oil in the offshore area consisted of very widely scattered light sheens with vessel-observed tar balls in the northern section on June 8 and again on June 15. The modeling team attempted to convey this was significantly less oil than was present in the northern Gulf by changing the pattern of the oil distribution, and by using labeling to associate this with widely scattered sheens. However, when users separated the assumptions and labeling from the trajectory shape files, this information was lost.

By late May, it became clear the northern extent of the Loop Current was unstable. After several conversations with scientists who had spent decades observing the Loop Current, there was no consensus on whether the northern intrusion would permanently detach. However, by mid-June it appeared to have formed a permanent separation. The statistical analyses conducted in early May considered all scenarios, most of which estimated the Loop Current would extend into the central or northern Gulf. NOAA SSCs briefed the results of these statistical analyses to the NIC, FOSC and FOSCRs. However due to a protracted OMB clearance process, the public release of the document did not occur until early July; after the Loop Current no longer provided an oil transport pathway to the Florida Straits. This delayed public release caused confusion for the public.

## Oil Trajectory Challenges Encountered

Trajectory forecasting development and execution encountered several challenges. Communicating forecasting results was the first. The broad public distribution of trajectory forecast products generated for the *Deepwater Horizon* oil spill was unprecedented. In general, the UAC used trajectory forecast products as one piece of information to determine resource allocation. During the *Deepwater Horizon* response, significant public interest resulted in the availability of surface trajectories to a very wide and diverse audience. Until oil began



ST. PETERSBURG, Fla. – Captain Tim Close, Commander of U.S. Coast Guard Sector St. Petersburg, discusses a NOAA oil spill trajectory with the media. Photo courtesy of U.S. Coast Guard

stranding on the shorelines, the trajectory product was one of the few visuals available to media. The trajectory modeling team was unprepared for this widespread use. Details on the assumptions and uncertainties were often difficult to explain to the public and media, and occasionally resulted in confusion. The forecasts showed areas of varying probability that oil would be found, not an actual depiction of the location of oil, and even within the areas shown by the forecast, the maps were never intended to imply that the entire surface area of the water would be covered by oil. In particular, the FOSC had to explain jumps in the heavy, medium, and light contours on the surface trajectories, which required describing the complex modeling processes that could lead to such a jump. This potentially eroded public confidence in the forecasts. Because of uncertainties in the release rate and weathering processes, associating concentrations or volumes with the shoreline impacts was generally not possible, but at times the lack of volume estimates caused others to question the forecasts. The modeling team was not prepared to manage the expectations arising from such a diverse audience.

Significant observational efforts determined the surface and subsurface extent of the oil. During the early stages of the spill, determining who collected what data in what formats, and how to access it, was challenging. As the spill progressed, the access and quality of data improved significantly.

## The Size of the Oil Spill

Estimating the size of oil spills has historically been a contentious, uncertain, and politically charged process. The *Deepwater Horizon* spill was no exception. Determining flow rates and overall mass balance was especially difficult in the *Deepwater Horizon* spill as there were no proven techniques for estimating flow under conditions found at the wellhead. Over time, the RP developed peer-reviewed estimates of the spill release, but the substantial discrepancies between the preliminary estimates created a great deal of public distrust. Several other challenges complicated these efforts.



**GULF OF MEXICO – Video acquired by a remotely operated vehicle is monitored and recorded. The video display shows a small pollution containment chamber, known as the "top hat" being lowered into the Gulf of Mexico. Photo courtesy of U.S. Coast Guard**

The response was regarded as a worst-case spill, despite quantification difficulties. The protracted campaign necessary to deal with the 87-day spill required significant and sustained levels of resources, including skimmers, fire boom, dispersants, boats, and personnel. The estimates as to spill size did not drive the amount of resources brought to the spill. The oil spill response plan for the well included a worst-case discharge of approximately 250,000 barrels per day. The RP's initial estimates were far below that, but the spill was always handled by the FOSC as a worst-case discharge.

Researchers had not experienced an unbounded source and timeline of this extent before. Typically, ship or tank-based spills have a clear upper bound in the form of the total capacity of the ship or tank, and releases are generally over in a matter of hours. The depth of the *Deepwater Horizon* leak source and its multiple leak points, without geometrically simple openings, also contributed to difficulty in understanding the extent of damage to the well and riser pipe. Additionally, the poorly known gas-liquid mixture coming from what was an exploratory well fluctuated over time. The available information on the leaks was of poor quality and not readily available to experts working in spill volume estimation. Visual estimation was difficult because of uncertainties in the fate and behavior of the oil and gas mixture as it travelled to the surface. As the well was not yet producing, there was also uncertainty over reservoir conditions and a lack of prior production rates to bound the problem.

The initial response efforts focused on fire fighting, search and rescue of the crew, and the potential fate of the 700,000 gallons of diesel aboard the *Deepwater Horizon* rig. Early reports did not indicate the well was leaking. However, remotely operated vehicles (ROVs) diving near the wellhead as early as April 22 found hydrocarbons escaping from kinks in the toppled riser pipe. At this time, the RP was reporting a release rate of 1,000 barrels per day (BPD). Over the next several days other leaks were discovered as the ROVs continued to explore the wreckage and attempt to activate rams on the blow out preventer (BOP). At the surface, efforts began to shift from search and rescue to pollution

reconnaissance. Trained aerial observers quickly realized the spill was much larger than the 1,000 BPD estimate. When Coast Guard requested a more accurate estimate, NOAA reported on April 28 the spill was at least 5,000 BPD based on over-flights and satellite views. Five thousand BPD became the official estimate. After the May 12, 2010 public release of videos showing the plume of hydrocarbons escaping from the damaged riser in the deep sea, many academic scientists insisted the flow rate was much higher than 5,000 BPD. On May 14, the NIC asked its Interagency Solutions Group (IASG) to provide scientifically based information on the discharge rate of oil from the well.  On May 16, the RP placed the Riser Insertion Tube Tool (RITT), a snorkel-type device, in the broken riser end to capture some of the escaping oil. The sustained rate of this partial capture yielded 8,000 BPD, and only captured a fraction of the oil.

In response, the NIC IASG chartered the Flow Rate Technical Group (FRTG) on May 19, 2010. Experts from many scientific disciplines were brought together to perform the FRTG's two primary functions:

1.  As soon as possible, generate a preliminary estimate of the flow rate, and

2.  Within approximately two months, use multiple, peer-reviewed methodologies to generate a final estimate of flow rate and volume of oil released.

Several methods employed contained individual strengths and limitations. One technique, called mass balance, relied only on observations available on the ocean surface, and yielded a flow rate of 13,000 to 22,000 BPD early in the incident. Two techniques, video and acoustic, used observations from ROVs of the oil plume as it exited the well a mile deep. These techniques yielded consistent flow rates of 25,000 to 60,000 barrels per day. An in-place hydrocarbon sample not only improved those flow estimates, but also independently combined with surface collection data to yield a flow rate of 46,000 to 63,000 barrels per day. The final approach, reservoir and well modeling, did not need new observations, but instead relied on industry proprietary data. This included seismic data on the reservoir structure and properties, well logs, and others. This approach produced the largest range and number of uncertain parameters in estimated flow rates, from less than 30,000 to more than 100,000 BPD.

**Figure 3.2:** *Deepwater Horizon* Oil Budget (August 4, 2010)



The most definitive information came from data collected after installation of the capping stack on July 12. This structure ultimately stopped oil flowing into the Gulf. Pressure measurements were recorded as the choke valve closed to yield the most precise and accurate estimation of flow: 53,000 BPD just prior to shut in. The teams assigned an uncertainty on that value of ± 10 percent based on their collective experience and judgment. They then combined the final flow rate with a well-calibrated simulation for the rate of depletion of the reservoir to produce an estimate of the flow rate as a function of time throughout the incident. The net result was a flow rate estimate that decreased over the 87 days from an initial 62,000 to a final 53,000 BPD. This put the total amount released at 4.9 million barrels of oil, before accounting for containment. The estimated uncertainty on these flow estimate values was also approximately ± 10 percent.

**The Fate of the Oil**

Part of the National Incident Command Interagency Solutions Group, the Oil Budget Calculator Science and Engineering Team, developed a scientifically valid tool that could be used to calculate the fate of the oil discharged from the Macondo well. That is to say, how much was dispersed, mechanically recovered (through skimming, sorbents, etc.), evaporated, dissolved, or burned.

**3.2 Dispersant Use and Monitoring**

Oil on the surface posed an immediate threat to marine life that live and spawn in the open ocean or live and breathe at the interface of the ocean and atmosphere, such as marine mammals and sea turtles. Unrecovered oil on the ocean's surface was a known threat to marine fisheries and estuarine communities near-shore. The decision to use dispersants required a robust assessment of net environmental benefits and monitoring activities at the wellhead, in the benthos, water column, water surface, and along the shoreline. Despite political concerns and public misperceptions, those assessments and monitoring protocols generally supported continued application of dispersants aerially, on the surface, and sub-sea at the wellhead throughout the incident.

The FOSC and emergency responders clearly understood dispersants do not remove the threat