Case 2:10-md-02179-CJB-DPC   Document 12676-6   Filed 04/15/14   Page 1 of 22



*KEY WEST, Fla. – A staff member form the Florida Department of Environmental Protection demonstrates how the Neuston net is one of the mechanisms being used to monitor for oil from the Deepwater Horizon oil spill. Photo courtesy of U.S. Coast Guard*

of oil pollution from the marine environment. Rather, dispersants provide a mechanism to alter the nature of the spilled oil's fate, transport, and potential effects. Natural dispersion was occurring at the surface by physical wave action. A trade-off analysis determined the appropriateness of dispersant use. This analysis studied if a particular mitigation strategy would generate a lesser potential for long-term environmental impact relative to conventional response options. Ideally, the best response options would stop the flow of oil, or contain and remove the oil at the source.

Prior to the *Deepwater Horizon* incident, dispersants were used to combat oil spills in the Gulf of Mexico (GOM) as a response tool to mitigate the effects from offshore oil spills on environmentally sensitive coastal habitats. Regional Response Team (RRT) VI developed a pre-approval plan for dispersants using the tools listed in 40 CFR 300.910, Subpart J, FOSC Dispersant Pre-Approval Guidelines and Checklist (2001), Special Monitoring for Applied Response Technologies V. Operationally, the FOSC followed this pre-approval plan during this incident on a daily basis. The FOSCs assigned to the Eighth Coast Guard District were familiar with this tool and were well-versed in its use for spills in the GOM Coastal Zone. In addition, all RRT VI and many National Response Team (NRT) members received briefings on the past uses of dispersants and were aware of the trade-offs associated with the application of dispersants. NOAA and DOI consulted on the use of dispersants in the GOM and the Endangered Species Act (ESA) in 1995.

RRT VI FOSC Dispersant Pre-approval Guidelines and Checklist provided for meaningful, environmentally beneficial, and effective dispersant operation. Both historically and during the response, the programmed checklist approach allowed the FOSC to arrive quickly at a logical go or no-go decision. This allowed dispersant operations to begin in a timely manner to maximize its effectiveness as a countermeasure. The parties requesting approval for use of a dispersant system underwent evaluation criteria for approval for use. In addition to the checklist, parties had to demonstrate the following to the satisfaction of the FOSC:

- That the application system was specifically designed for its intended purpose, and if not specifically designed for dispersant use, had been used previously and deemed to be effective and appropriate; also that it would be used again in a similar manner or by some other specific means, deemed to be effective and appropriate under the circumstances,

- That the design and operation of the application system could reasonably be expected to apply the chemical dispersant in a manner consistent with the dispersant manufacturer's recommendation, especially with regard to dosage rates, and concentrations, and

- That the operation would be supervised or coordinated by personnel with experience, knowledge, specific training, or recognized competence with chemical dispersants and the type of system used.

The effectiveness of dispersants generally decreases as spilled oil weathers. It is therefore best to apply dispersants when the oil is freshest. The pre-approved dispersant area in the GOM includes offshore waters from the ten-meter isobaths and three nautical miles (nm)—whichever is farthest from the shore—to 200 nm offshore, encompassing the Exclusive Economic Zone boundary. This zone extends from the Texas-Mexico border and continues through the states of Texas and Louisiana to the boundary between federal Regions IV and VI. The requirement for dispersant product selection was that the dispersant must be included on the NCP (National Contingency Plan) Product Schedule and considered appropriate by the FOSC for existing environmental and physical conditions. The EPA product schedule listed and approved both COREXIT 9527A and 9500A for use. The *Deepwater Horizon* response effort used both. After responders exhausted the supply of 9527A, the operation used 9500A throughout. In accordance with RRT VI guidelines, the *Deepwater Horizon* RP submitted its first request to use aerial dispersants to the FOSC at Morgan City, La. The FOSC preauthorized its use at approximately 1 p.m. on April 22, 2010, and the RRT received notification a few hours later. Although there was an active search for the survivors of the MODU *Deepwater Horizon*, the FOSC, in concert with the Search and Rescue effort at the Eighth Coast Guard District, approved aerial dispersant use. There were no active searches in the target area,

**Figure 3.3. Diagram of the Aerial Dispersant Operations Group Structure**





**Figure 3.4: Worldwide Dispersant Resource sources for *Deepwater Horizon* spill**



**Figure 3.5: Aerial Dispersant Group Assets**



**HOUMA, La. – The crew of a Basler BT-67 fixed wing aircraft release oil dispersant over an oil slick off the coast of Louisiana. Photo courtesy of U.S. Coast Guard.**

and sufficient safety controls were in place (e.g., spotter aircraft with embarked observers) in the event the Search and Rescue Mission Coordinator detected any survivors. The first aerial application began at 1700, using 1,880 gallons of COREXIT 9527. From aerial observations of the treated slick, the application was effective by employment of Tier I Special Monitoring of Applied Response Technologies (SMART) monitoring. The RRT received notification within the 24-hour period via email on April 22, 2010.

### Aerial Application

Aerial dispersant operations were coordinated through the aerial dispersant operations group located at the ICP in Houma, La. Initially, the operations were small, but expanded within one week to a large and comprehensive operation. The operations consisted of searching for slicks appropriate for dispersant application. This was done late in the day prior to the next day's application. On the day of the operation, the slick target would be reacquired. Communication was made back to the ICP for launching dispersant planes. The group consisted of a spray aircraft and spotter aircraft and sometimes on-water SMART Tier II flourometry boats. The spotter plane guided the spray plane over the slick. After the spray operation, SMART boats would move in to conduct effectiveness monitoring if necessary.

The aerial application bases of operations were situated in the Stennis Space Center Airport in Mississippi and Houma-Terrebonne Airport, Houma, La. The *Deepwater Horizon* response deployed the largest mobilization of aerial dispersant assets and expertise from around the world.

Several types of aircraft conducted the operations, as noted in Figure 3.5.

During the *Deepwater Horizon* response, ninety-eight percent of the total volume aerially sprayed occurred more than 10 nm offshore. The closest area to land sprayed was just outside three nm from shore, in order to reduce the impact of several slicks from reaching Grand Isle and the Chandeleur Islands. There was no dispersant spraying over any land areas. Dispersants' effectiveness decrease dramatically within hours of the oil being released. Thus dispersant application near shore would have been ineffective, as the oil would then have been on the surface for days.

The shaded area on Figure 3.6 shows boundaries of dispersant operations and does not suggest that the entire area was sprayed with dispersants. Each single, discrete operation applied dispersants to a confined and particular target area or slick. Aerial dispersant spraying operations could occur during daylight hours only. Responders made every

**Figure 3.6: Perimeter of All Aerial Dispersant Operations**



reasonable effort to make the first dispersant application as soon as possible after the oil reached the surface, in order to achieve intended results.

As the *Deepwater Horizon* response was an ongoing major spill each day, the pre-designated FOSC in Morgan City approved dispersant operations daily. Later, the FOSC Representative (FOSCR) at ICP Houma and the FOSC at the UAC approved those operations jointly. After May 27, 2010, daily consultation with the EPA, via a senior representative at the UAC, was part of the required process as well. Throughout the response, limitations on aerial dispersant operations were as follows:

- Wind criteria for aircraft was less than 35 knots, however the RRT 6 *guidance* plan specified 25 knots; the increase in wind speed limit was only allowed when the aircraft could correct for spray drift.

- A 1,500 foot cloud ceiling was required, with 4 nm visibility for aerial applications to commence.

- No spray areas were permitted within 5 nm of the source, 2 nm of any vessel, 3 nm from shore, or where the water depth was less than 33 feet.

- Additional guidelines were in place for NOAA observers to ensure no dispersant operations within 3 nm of visible marine life.

- Each spray system was designed and built specifically for each aircraft.

- Dispersant application rate was 5 gallons per acre, applying a film of approximately 0.0002 inch at an altitude of approximately 50 to 75 feet, at a speed of approximately 150 knots.

- All spray systems were flight-tested at 300 to 500 micron droplet size at a swath width of approximately 60 to 150 feet.

- Candidate slicks had to be continuous to avoid over spraying.

Aerial application of dispersants continued until sub-surface dispersant testing on April 30, 2010 temporarily halted all use of dispersants. The Deputy Area Commander and the NOAA Scientific Support Coordinator (SSC) in Robert, La., requested an operational pause to review procedures, ensure training of oil target spotters, and ensure documentation of the monitoring data was submitted. After a two-day testing period, the operations continued. Operations resumed, and spotter plane assessments continued daily until aerial dispersant operations were limited upon receipt of the Dispersant Monitoring and Assessment Directive, Addendum 3 of May 26, 2010. This directive limited the use of surface dispersants to rare and unusual circumstances.

From initial application of dispersant on April 22 to May 26, responders used aerial dispersants 28 of 35 days, with an average application of 24,386 gallons.

On May 26, the FOSC issued further instruction to the RP via written directive to reduce the amount of dispersants used. After negotiations with the EPA representative from Region VI and the EPA NRT chair, the FOSC agreed that:

1. The RP would endeavor to reduce the dispersant loading in the Gulf of Mexico by 75 percent, and

2. The RP would eliminate the use of surface dispersants entirely, unless issued a written exception approved the FOSC. This directive limited the use of surface dispersants to rare and unusual circumstances.

Between May 27 and July 19, aerial dispersants were used 33 of 54 days (61 percent), with an average application of 8,892 gallons, a 24 percent reduction in days used and a 64 percent reduction in the amount of dispersant applied as compared to the previous period of application from April 22 to May 26.

Data from the Environmental Unit, established at the UAC in Robert, La., to assist the FOSC with environmental issues, showed a strong correlation between decreased dispersant use and increased shoreline oiling during the period of reduced application.

## Sub-sea Dispersant Operations and Sub-Sea Monitoring

### Feasibility Testing

Prior to *Deepwater Horizon,* the concept of sub-sea dispersant application had only been tested experimentally in shallow water, less than six times anywhere in the world. In late April 2010, the RP presented the UAC with the novel concept of applying dispersants directly at the source to mitigate oil in the offshore environment. At this point in the response,



*KILN, Miss. – A team of U.S. Air Force aerial spray aircraft maintainers from the 910th Aircraft Maintenance Squadron at Youngstown-Warren Air Reserve Station, Ohio, move a chemical pump into position in order to refill a chemical dispersing C-130 aircraft at Stennis International Airport. Photo courtesy of U.S. Air Force*

**Figure 3.7: Shoreline impact Graph – Top graph shows cumulative shoreline impact, the bottom graph depicts aerial dispersant use.**



hopes of a quick intervention and well shut-in had faded. Sub-sea dispersant injection at the source provided two major advantages over aerial application—greater efficiency, and lack of daylight restrictions. The proposed method required less dispersant to oil dose ratios. The FOSC immediately forwarded this plan to the RRT VI for consideration. The plan consisted of a test application at the BOP stack leak, using a coiled tubing supply line from the merchant vessel *Skandi Neptune,* to inject 3,000 gallons of Corexit 9500A at 5,000 feet below the sea surface, using a remotely operated vehicle. During Test 1, one ROV held the injection wand into the plume and injected 9 gallons per minute of dispersants, while a second ROV collected samples and took video of the operation. During this test, the RP used 2,151 gallons of dispersant.

Test No. 1 resulted in a confirmation that dispersant could be injected into the plume at the source

without complication. It also provided qualitative observations of SONAR images taken before and after the dispersant injection, indicating that the density of the plume at depth was diminished. Overall results were difficult to interpret given the unique application of the technology, which was not calibrated. During Test No. 1, samples of the plume prior to and during dispersant application were not collected. Observers could not perform aerial observations of the test dispersed plume at the surface due to weather and visibility problems.

In addition, the captured video of the operation did not demonstrate the effectiveness of the oil dispersion. Observers requested a subsequent test with criteria for monitoring and sampling, which the RRT authorized on May 1, 2010.

The RRT approved a second test that included taking four samples at various depths. The RP did not apply aerial dispersants during the subsurface test. The aerial observation of the spill

area did document oil on the surface before and after the sub-sea dispersant application at depth. The second test used 13,000 gallons of dispersant. The RP collected samples of the non-dispersed oil and the dispersant and oil mixture at depth. Of the four samples, two were fouled and were not collected. The remaining samples had a very small amount of oil and water. Weather conditions offshore hampered aerial observation. Test No.2 proceeded without aerial observation, and intermittent pumping continued until May 3. Aerial over flights resumed on May 4 and 5, but were inconclusive, highlighting the need for additional data. Because of the sampling problem and the lack of aerial visual assessment, EPA requested a meeting with the Environmental Unit located at Robert, La. The meeting was to obtain consensus on the way forward with respect to sub-sea dispersant use.

NOAA and Coast Guard representatives met with EPA representatives on May 7 to discuss the sub-sea dispersant operation. The discussion encompassed concerns, hindrances to the tests, and the monitoring plan.

Both operational tests were conducted during periods of bad weather that hampered the injection of the dispersant at depth and visual monitoring of the results. In addition, there were several delays due to mechanical failures of the wand used to apply the dispersants, and the availability of ROVs to conduct the test. The second test included the injection of 13,000 gallons of dispersant and lasted several hours longer than anticipated. Again, monitoring of the test visually or by SMART was not possible due to adverse weather—all of which contributed to concerns about whether to proceed with sub-sea dispersant application.

The agencies also discussed sub-sea dispersant operations monitoring plan. The parties agreed to work together to ensure that the sub-sea dispersant operation was effective and that robust toxicity testing took place. Additionally, the EPA and Coast Guard issued the RP a directive to construct and establish a monitoring plan for any further application of sub-sea dispersants. EPA, NOAA, and Environment Canada scientists continuously monitored the area in accordance with the dispersant directive, to ensure dissolved oxygen and toxicity tests remained within the defined parameters established by the EPA and NOAA.

### The Dispersant Use Directive and the Decision to Approve Sub-sea Dispersant Application

On May 9, 2010, the FOSC and EPA outlined the initial monitoring requirements for sub-sea use of dispersants and signed their first directive. It paralleled the development of an adaptive monitoring process created within the Environmental Unit, and principally with EPA and NOAA. The directive included requirements for monitoring oceanographic data such as temperature and oxygen concentration, detection of dispersed oil concentration using a fluorometer system, collection of water samples at depth to assess oil concentrations, and biological assessment to rapidly screen observed dispersed oil toxicity. Oil concentration assessments also included tests for volatile organics, such as mono-aromatic hydrocarbons, and semi-volatile organics such as polycyclic aromatic hydrocarbons (PAHs).

On May 10, 2010 a third sub-sea dispersant test was requested and approved after a monitoring plan and shutdown criteria were developed by the RP in concert with the Environmental Unit at the UAC. Test No. 3 included use of a monitoring vessel on site during the test augmented with staff members from NOAA, EPA, and Environment Canada. The test collected samples for evaluation on board ship as well as laboratory analysis. The test demonstrated oil dispersion at depth.

On May 14, 2010, the RP submitted a plan to continue to use sub-sea dispersants. Because of the tests, EPA, Coast Guard, DOI, and NOAA gained concurrence through the RRT VI on May 15. With the consensus of the NRT, the FOSC proceeded with the use of sub-sea dispersants. On May 15, the FOSC approved the RP's plan and issued an addendum to the first dispersant directive requiring additional dispersant monitoring. A total of 771,000 gallons of Corexit 9500A were injected sub-sea during the response.

### Implementing the Decision to Use Sub-sea Dispersants

During the evolution of sub-sea dispersant use, the UAC established an Environmental Unit in Robert, La., to assist the FOSC. It quickly grew to include a wide range of federal, state, and industry scientists and representatives to coordinate elements of the sub-sea dispersant discussion. The Bureau of Ocean Energy Management, Regulation, and Enforcement provided data based on

environmental impact studies and reports generated as part of the exploration and permitting process. The NOAA SSC was a member of the Environmental Unit, a leader for these activities, and functioned as a direct environmental consultant to the FOSC.

The Operations Section coordinated the primary responsibility for all sub-sea dispersant implementation and engineering development. The Environmental Unit initially focused on assessing the environmental trade-offs and providing the FOSC with guidance. By default, and given the expertise assembled, the Environmental Unit directly coordinated much of the operational monitoring for sub-sea dispersant use and evaluation. Based on NOAA recommendations, ICP Houma established a separate Sub-surface Monitoring Unit (SMU). However, the two groups maintained strong links throughout the response. EPA was an active participant in all discussions relative to the use of dispersants, and a member of both the Environmental Unit and the SMU. By the end of the summer, the combination of these activities characterized the *Deepwater Horizon* response Sub-surface Monitoring Program.

The Environmental Unit also collaborated with the Operations Section and Source Control on sub-sea dispersant issues in an effort to assess effectiveness and proof of action, especially during the initial trials and sub-sea dispersant tests. If the application of dispersants at the source were not successful or did not result in observable reduction of oil reaching the surface, then the continued trade-off discussions and evaluations were moot. The data gained from the proof-of-concept testing provided valuable information and initial confirmation as to how the dispersants physically changed the transport of the oil. These were important elements in assessing overall trade-off risks and providing the FOSC and the RRT with the best information to proceed with a final discussion about the merits of sub-sea dispersant use.

Command and control of sub-sea application assets for sub-sea dispersants use was accomplished from ICP Houston under the direction of source control via an Offshore Supply Vessel (OSV). When sub-sea application was authorized, an order was issued



*The Chief Scientist on the NOAA research vessel PISCES works as part of the Unified Area Command's Subsurface Monitoring Unit. The PISCES completed a 10-day mission in the northern Gulf as part of the Deepwater Horizon response. Photo courtesy of NOAA*

from the FOSC directly to the RP source control representative at the UAC and then to Houston. This information was then passed on to the OSV to begin and cease operations. The RP delivered dispersants either via portable tanks by an OSV on site, or by placing dispersants into integrated tanks on board the vessel. Port Fourchon, La. served as the base for monitoring vessels. When monitoring vessels arrived at the site, they always had an EPA or NOAA representative on board for data quality control purposes.

## Impact Assessments and Considerations for Sub-sea Dispersant Application

Possible impacts and benefits to endangered species were included in the evaluation process. The only listed Gulf species known to swim at great depths is the sperm whale in search of giant squid. The Environmental Unit therefore placed particular focus on threats to sperm whales. Discussions included the effects on whales diving through dispersed oil in deep water or consuming squid that may have been exposed to deep water dispersed oil plumes. It was determined that risks to these animals were greatest at the surface, not in deep water.

Trade-off evaluations from an environmental perspective continued throughout the response with new information collected by the monitoring program. Understanding the transport, or movement, of dispersed oil was important in assessing the effects of dispersed oil originating 5,000 feet below the water's surface. The deep waters of *Mississippi Canyon 252* were very much a separate body of water when compared to the surface above. Much less information was readily available to assess possible effects of dispersants and oil in the deep.

The Gulf of Mexico is like two seas, one above the other, and each with its unique currents and ecosystems. The currents, water movement, and physical mixing mechanisms are different between the upper and deep sea. This is also true for temperatures, pressures, ecosystems, and marine life that inhabit the deep-water world. Unlike the warm, well lighted, mixed surface layer between zero to 700 feet, the deep sea is cold and dark, with mixing occurring only where currents intensify due to sub-sea terrain features. A density interface exists between the surface and deep sea. Scientists expected that interface to prevent movement of a dispersed oil plume above this depth, except at locations of upwelling that were much closer to the continental shelf than the wellhead.

Natural oil seeps and methane vents are known processes of the deep-water world. The presence of natural seeps, and the understanding the deep sea had adapted to those oil releases, were factors in environmental trade-off discussions.

Initial trade-off discussions required extrapolation and hypotheses based on the use of dispersants in mixed systems, such as the surface waters in the open and previous laboratory and wave tank studies. These studies were not intended to assess deep-water conditions. There had been only one deep-water controlled release study, which took place off the Norwegian coast and did not include dispersants. The environmental trade-off discussion at the UAC did not have the benefit of examining impacts of dispersant use during deep-water spills. The Norway experiment provided information regarding spill models for deep-water blow-outs; thus the study offered a foundation for the initial transport discussion.

The Environmental Unit contacted the scientists directly involved with the Norway experiment to assist in the *Deepwater Horizon* response. Use of sub-sea dispersants required actual observation monitoring to lessen uncertainties. The entire process was managed by a strategy that continuously looped observations and new information directly into the continued decision-making process. Scientists incorporated the terms 'adaptive management' and 'adaptive monitoring' as requirements for sub-sea dispersant use. Sub-sea dispersant data collected underwent continual evaluation in relation to the trade-off justifications for approval and continued support by the FOSC. Monitoring was adapted to new concerns identified by responders and stakeholders, and to better data collection methods.

### Implementation of Addendum 3 to Reduce Dispersant Application

As noted above, on May 26, 2010 the FOSC and EPA jointly issued Addendum 3 to the May 9 Dispersant Use Directive. This addendum significantly impacted aerial, surface, and sub-sea dispersant operations for the remainder of the response. Addendum 3 was specifically aimed at reducing the amount of dispersants used, and was intended to focus RP efforts on the use of other available response methods, including booming, skimming, and in situ burning, rather than dispersants alone. Addendum 3 placed dispersants in a category for use as a last resort. The directive required the RP

to request an exemption from its general prohibition on dispersant use in order to use dispersants. Addendum 3 achieved the desired effect: the RP focused on all response options and the amount and frequency of dispersant use dropped (see Figure 3.6).

After May 26, the FOSC, in consultation with RRT VI, was empowered to consider granting exemptions from the dispersant use restrictions imposed by Addendum 3 for two reasons. First, the FOSC and RRT VI could permit sub-sea and vessel surface application of dispersants based on a documented need to control Volatile Organic Compounds in the vicinity of the vessels working to control the source at the well site. Second, the FOSC and RRT VI could grant an exemption to allow aerial dispersant application based on a FOSC assessment that, given weather conditions and response resources available, aerial application was the only means to address a significant accumulation of oil on the surface before the oil moved into more highly sensitive environments.

The directive also outlined data collection and documentation requirements that the RP was required to meet for sub-sea dispersant use and approval.

Two elements of the directive were go or no-go indicators, and required daily evaluation for approval of continued dispersant use. The first



*GULF OF MEXICO – A U.S. Coast Guard Petty Officer lowers a fluorometer into the Gulf of Mexico. The instrument collects water samples and data to help determine the effectiveness of dispersants in breaking down the oil. Photo courtesy of U.S. Coast Guard*

element measured oxygen concentration, which could not drop to a hypoxic level, or below two milligrams per liter. The rotifer assay, the second element, could not show significant toxicity relative to background. The intent of the test was to provide a qualitative indicator to the scientists evaluating the field data (80 percent rotifer survival rate). These elements did not fail the criteria at any time during the monitoring. The application of a direct toxicity assay on living organisms provided the FOSC with another source of field data regarding potential threats. For sub-sea monitoring, a standardized rotifer test was used. The test exposed microscopic invertebrates (rotifers) that are sensitive to chemical hazards, to water collected from the dispersed plume. Rotifer survival rates were then compared to those exposed to background water versus impacted water.

### Surface Application of Dispersant After Addendum 3

After adopting Addendum 3 and until the source was secured, the RP was compelled to request the use of surface dispersants due to health and safety concerns of personnel working on board vessels drilling relief wells, and the work that was continuing on the LMRP at the source. Each of these working vessels contained monitors and alarms to stop work when volatile organic compound readings reached above the threshold limit value of benzene (five parts per million (ppm)). Benzene is a known carcinogen. When vessels were close to the source control applied dispersants, the reduction in VOCs was significant. Based on data received from ICP Houston, readings were at times well above 200 ppm.

High levels of VOCs were more than a respiratory hazard, they were also a significant fire hazard. The events that drove increases in VOCs were not simply a result of oil flowing from the well. Even when RRT VI allowed sub-sea dispersants, weather, specifically lightning strikes in the area of the small city of vessels tethered to the well, required cessation of on-deck activities, including those necessary to operate the sub-sea dispersant applicator. Thus, a thunderstorm near the well site could lead to a dramatic increase in VOCs on the surface soon after the storm passed. As a result, in accordance with Addendum 3, the FOSC routinely allowed the RP to use surface dispersants to control VOCs at the source, in order to protect the health

and safety of workers. EPA conducted air monitoring that confirmed that the use of dispersants had lowered VOC levels.

### Aerial Application of Dispersant After Addendum 3

ICP Houma implemented a decision flow process to request the surface application of dispersants only when a slick moved beyond the recovery capacity of skimmers and in situ burn task forces, or when skimmers and in situ burn task forces could not operate due to weather conditions, making shoreline impact of highly sensitive environmental areas inevitable. Dispersing the oil in deeper Gulf of Mexico waters, which are rich with oil-eating bacteria, was determined to be preferable to risking shoreline impact in sensitive environmental areas such as pelican nesting sites.

### Additional Activities of Note Related to Dispersant Operations

Conducting such deep-water oceanographic assessments and monitoring a mile below the ocean surface required highly sophisticated equipment. It also required vessels capable of properly deploying sensor packages and water sampling equipment. Highly trained scientists and technicians were sought to conduct monitoring, maintain equipment, and interpret data collected. The RP selected the merchant vessel *Brooks McCall*, and adapted it as the sampling platform for the initial oceanographic monitoring cruise. Federal employees and contractors integrated with RP scientists and technicians to ensure the process fully incorporated federal oversight and validated all data.

In late May 2010, LSU assembled an external workshop to evaluate the known information and initial monitoring data. With its findings, the workshop would provide the FOSC additional guidance on the role of dispersants specific to the *Deepwater Horizon* response. There was consensus from the LSU meeting that, up to that point, the use of dispersants and the effects of dispersed oil into the water column had generally been less environmentally harmful than allowing the oil to migrate on the surface into the sensitive wetlands and near-shore coastal habitats.

The LSU workshop confirmed that oxygen, a key monitoring criterion, needed continual monitoring. Oxygen is required for microbes to degrade oil and

**B. Operations**

for most marine life to survive via respiration. Scientists initially believed there was sufficient oxygen in these waters. However, the demand on oxygen caused by degradation of dispersed oil at depth was unknown. Biodegradation is slower at cold temperatures, potentially reducing oxygen availability in the deep-water ecosystem. Therefore, what may take days in warm surface water may take weeks, months, or longer in deep cold water. The deep Gulf contains microbes that have the ability to degrade oil, as observed in seep communities. The concern was the possibility of overloading the deep-sea system and dropping oxygen concentrations to levels that created a dead zone like those which naturally occur off the Mississippi Delta. The monitoring and sampling protocols in place throughout the response helped document that these potential risks and concerns would not materialize.

Trade-off discussions throughout the response also included the impact of additional carbon loading. This concern arose from the additional methane entering into the deep-sea system. The deep-sea food web depends on organic carbon that drifts down from the upper sea and surface. This suggested the ecosystem could accommodate and process oil droplets once the oil toxic compounds dissolved out of the oil droplets or degraded. However, larger PAHs that might have persisted for long periods in the colder water environment could adversely affect very early life stages of fish. No mechanism was in place to assess this during operational monitoring. Input from the scientific community, damage assessment process, and long-term studies would be required to fill data gaps. Oil in the sea was an environmental threat, dispersed or not. The goal of the response was to manage the response strategy to reduce the overall impact of the spill.

The FOSC concluded, based on the continued review of guidance, that the potential environmental benefits in this spill justified sub-sea dispersant use within the parameters established. This determination came in part because the long-term environmental impacts to the near-shore and estuarine environments were well known, and other response options were limited at this stage of the response.

## Monitoring for Effects

The FOSC continually enhanced the monitoring process of the response, which included the number of vessels deployed and addressed new and broadening questions (such as the presence and fate of any additional oil in the offshore environment that might be subject to a removal action). On August 3, 2010, the National Incident Commander issued a directive requiring that *Deepwater Horizon* monitoring and assessment activities be broadened to assess any residual oil pollution that would require removal. This implementation plan required enhanced sampling in three spatial domains, including:



*GRAND ISLE, La. – NOAA personnel collect water and sediment samples off the coast of Grand Isle State Park in the Gulf of Mexico to test for oil and dispersant levels. Photo courtesy of U.S. Coast Guard*

1. Near-shore: from the marshes and beaches to 3 nm offshore,

2. Offshore: from 3 nm to the shelf break, or the 200 meter depth contour, and

3. Deep water: from 200 meter to 2000 meter water depth.

The wellhead was in 5,000 feet of water. Monitoring results and trajectory models for the deepwater layer, where oil and residual oil contamination had previously been detected, guided sampling in deep waters. The directive required enhanced sediment sampling, particularly on the continental shelf and in deep environments. The directive also required the FOSC to expand interactions with the academic community.

To fulfill this requirement, NOAA hosted a series of three listening sessions with the academic community during late August and early September. Each session focused on the sub-surface monitoring plan and collected feedback from the community to ensure the plan did not miss any essential pieces. Many academic vessels on scene participated in the daily mission guidance calls. Engaging the academic community through real-time maximized vessel time and sample location. Some academic vessels accommodated a NRDA sampler, or data processor, which allowed real-time data collected to be added to the sub-surface monitoring data. NOAA also enlisted numerous academics as the Chief Scientists on cruises. The communication allowed for collaboration between the needs of UAC and the ongoing research. The

SMU, in coordination with NOAA and National Science Foundation, employed an academic liaison at the UAC.

As a result, the UAC extended and focused monitoring activities to address the specific elements of the directive. The directive in many ways defined and validated activities that had already been expanding in the monitoring program. Eleven ships were directly or indirectly under the FOSC's coordination and control as part of the Sub-surface Monitoring Program, including three NOAA research vessels. In addition, seven university vessels conducted cruises and research associated with the oil spill and coordinated with the submerged monitoring unit (SMU).

The degree to which monitoring was conducted at the direction of the FOSC in the Gulf of Mexico waters was unprecedented. It provided actionable information and documentation to assess and determine the location, fate, transport of oil, and dispersants. The FOSC also instituted a multi-agency Operational Science Advisory Team (OSAT I) at the UAC. The mission of OSAT I was to provide assessment and analysis of the data collected by the Sub-surface Monitoring Program and to inform the FOSC for the need to conduct any additional monitoring or response actions. During the course of the response, over 17,000 samples collected underwent environmental review by OSAT I per the monitoring requirements defined in the May 9 and August 3, 2010 directives. The last samples collected as part of the Sub-surface Monitoring Program occurred on October 23, 2010, nearly two and a half months after the leak had been stopped.

Oceanographers from NOAA provided data they used for oil trajectory and shoreline threat probability modeling. Besides collecting urgently needed information, BOEMRE modified and extended research studies already under way at the time of the spill. The *Lophelia II* expedition, Loop Current monitoring, socioeconomic studies, and others provided data to help evaluate the impacts of the spill.

### Challenges to Dispersant Use

Dispersants are monitored by using the SMART protocol, which measures dispersant effectiveness, not its effects. Before the *Deepwater Horizon* spill, Self-Monitoring, Analysis, and Reporting Technology (SMART) had been effective, and dispersant use research revealed little or no harmful effect to the environment in the numerous cases where it had been deployed in the United States. Because of the unprecedented volume of dispersants applied to this spill, the SMART protocol was amended to include effects monitoring. The amount of data generated by normal SMART procedures and the new requirement for effects monitoring was enormous, and quickly generated a significant data management requirement. In addition, effects monitoring is not real-time, so there was significant delay in data availability. There was also disagreement on proper monitoring and interpretation of the data. This lack of supporting data fueled uncertainty on the effects to the environment.

### End of Dispersant Use

The well was capped on July 15, 2010. The last use of dispersants took place on July 19. The last sighting of recoverable oil offshore was observed August 1. The volume and duration of dispersant use during this response were unprecedented and included surface and sub-sea applications. The amount used caused public concern and led to the reduction in the frequency and amount of dispersant. However, dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the GOM states. This response tool made it possible to continue source control efforts by the vessels operating at the well site, and were used when other response options were not suitable.



*GULF OF MEXICO-Dark clouds of smoke and fire emerge during a controlled burn in the Gulf of Mexico. Photo courtesy of U.S. Navy*

## 3.3 In Situ Burn Operations

Due to the enormity of the release, initial skimming assets were not sufficient to contain and collect the surface oil. On April 26, 2010, the use of in situ burning in the response was proposed. As part of its laboratory analysis, NOAA tested the combustibility of MC 252 oil, to ensure it was amenable to burning activities and to determine on what scale this technique could be applied. Between April 28 and July 19, 2010, the Controlled In Situ Burn (CISB) Group under the Offshore Operations Branch of ICP Houma conducted 411 burns, removing five percent of the 4.9 million barrels of discharged oil. Burn Task Forces conducted burns within the specified and approved CISB Burn Area, typically within three to eight miles of the *Mississippi Canyon 252* oil spill source.

RRT Region VI published an In Situ Burn Operations Plan in 1994. The plan specified how to determine when to conduct in situ burns, how to conduct them, interaction with other response activities, the ignition process, and residue cleanup procedures. The plan also required safety and health monitoring, operational monitoring, effectiveness monitoring, and guidelines for use of the Vessels of Opportunity (VOO). The One Gulf Plan and ACPs referenced the RRT Plans. In order to fulfill the criteria of the RRT VI Pre-Authorization for in situ burning, the NOAA SSC helped implement the SMART in situ burning monitoring protocols for the first test burns. Coast Guard Strike Team personnel deployed with in situ burning monitoring equipment to an offshore platform approximately 13 miles southwest of the planned burn site. This was the closest location where non-responding personnel were located. SMART in situ burning monitoring protocols are designed to protect the general population and response workers from smoke particulates. SMART sampling revealed no detectable particulates in work zones and population centers.

Additionally, NOAA worked with the National Atmospheric Release Advisory Center (NARAC) to model potential plume releases from in situ burns. It was determined that the offshore location (a great distance from any populated areas) and atmospheric conditions would not pose a problem to the general population from particulates from the burns. SMART monitoring was not required for further burns.

### Overview of Operations

In late April 2010, in accordance with the existing in situ burn plans, the OSC determined in situ burning was a viable response method for several reasons. First, weather and sea-state did not allow continuous skimming and the response needed alternatives to these methods. Second, skimmers and dispersants could not completely remove the oil releasing from the well. Finally, the OSC determined in situ burning was a safe and effective way to remove large volumes of oil from the ocean surface, based on in situ burn data from previous spills.

Over the course of the CISB Group's operations, the team grew from five people to a 264-person group. At the peak of operations, the CISB Group had three task forces, utilizing 43 vessels and two twin-engine aircraft. Each task force had a three-vessel ignition team, two task force vessels, one supply vessel, a safety team, and five two-vessel fire boom teams. The fire boom team vessels were VOO from the Houma. Coast Guard personnel, technical advisors, oil spill contractors, commercial fishermen, NOAA, and EPA representatives staffed the CISB Group.

Personnel in each task force underwent training prior to engaging in situ burning operations. The training was a combination of four hours classroom and 12 hours on-water instruction. Some of the teams had underway practice days as well.



*VENICE, La. – An igniter package is being placed in oil contained by fire boom in the Gulf of Mexico in order to ignite an in situ burn near the* Deepwater Horizon *oil spill site. Photo courtesy of U.S. Air Force*

### Offshore Vessel Fleet

Two spotter planes provided continuous air observation for offshore in situ burning operations. To facilitate identification and communications with the spotters, the fire boom teams color-coded vessels using different colored tarps suspended over the back deck of the boats. In addition, the CISB Group used the Automatic Identification System (AIS) to identify the offshore burn vessels from the air and confirm their positions.



Safety and air monitoring personnel manned the lead boat (one of two) for each fire boom team, which included fishing vessels. With the exception of adverse weather days, the in situ burning Task Forces and all support vessels were available on location by daybreak each day. Throughout each burn day, spotter aircraft guided fire boom teams to the heaviest concentrations of oil. Using two King Air fixed wing spotter planes flying two sorties each, the in situ burning Technical Advisors, Spotters, and Documenters were able to stay on location for approximately two and one-half hours before returning to Houma Airport for fuel. To get more spotting time coverage, the team attempted to fly soon after sunrise and late in the evening. The CISB Group learned from these efforts that the angle of the sunlight determined the effectiveness of spotting and thus flights early in the morning and late in the day proved not as useful.

*GULF OF MEXICO – Two fishing vessels drag an oil boom after trapped oil is set ablaze in the Gulf of Mexico as part of a controlled burn to aid in preventing the spread of oil. Photo courtesy of U.S. Navy*

### Simultaneous Operations

The Offshore Operations Branch of ICP Houma managed an integrated response using mechanical skimming, aerial dispersants, and controlled in situ burning to address approximately 16 percent of the total oil discharged from the Macondo Well. They safely managed high-risk operations to optimize oil removal for more than 40 to 50 miles offshore. In addition, the Operations Branch protected source control efforts at the well site using zone defense and a command and control vessel, merchant vessel *Seacor Lee*, to help coordinate removal operations.

The in situ burning task forces had to perform operations simultaneously with both the mechanical skimming teams and the dispersant group. The CISB Group originally used a burn box to place a boundary around the burn operations in accordance with the RRT in situ burning plan. Over time, the burn box was replaced by a burn circle. This allowed CISB Task Forces to cover greater areas because their turning radius conformed better to a circular rather than a box pattern.

Once on station, spotters circled the area observing oil concentrations and vectoring fire teams to the oil. A log of events (times of arrival and departure for the spotter aircraft, times of ignition, durations of burn, etc.) was contained in the ICS 214 forms recorded for each burn day. Operations moved through heavy patches or long streamers of oil (without deflection), and then ignited the oil once a sufficient amount of oil was contained within the fire boom. By late July 2010, the oil was more weathered and igniting became more challenging.

### Wildlife Monitoring

Burning effectively removed large amounts of oil, approximately 265,450 barrels, from the sea surface, but had potential trade-offs with air quality and wildlife, most particularly turtles. Beginning July 5, 2010 trained and qualified protected species observers were placed within each in situ burning task force to monitor for any sea turtles present within the fire boom area prior to ignition. The observers did not spot turtles in or near fire boom during the period of time when they were deployed on the burn vessels.

### Safety and Smoke Plumes

Attention to safety was always paramount. There were no injuries or illnesses resulting from the burning operations. Vessels downwind from the plume easily removed themselves from paths of exposure. The SMART monitoring results indicated no health impacts to the burn group members. There were some readings generated by the fire boom pumps used to water-cool the fire boom. This was easily remedied by moving the pumps from the front of the vessel to the rear.

The Coast Guard directed air sampling for dioxin, a known carcinogen by-product of burning operations. With the assistance of the Environmental Protection Agency, extensive sampling was performed. Results indicated no dioxin threat to workers and GOM residents.



*GULF OF MEXICO – A controlled burn in the Gulf of Mexico is monitored by members of industry and Coast Guard Gulf Strike Team personnel. Photo courtesy of U.S. Navy*

In the course of the 411 burns at sea, responders only intentionally extinguished two. The first occurred with the longest burn of 11 hours and 48 minutes. Although continuing to catch oil and feed it into the fire boom, crews began to show signs of fatigue. They intentionally extinguished the fire by increasing towing speed, which caused the oil to wash over or entrain under the boom. This thinned out the oil, which caused the fire to extinguish.

The second occurred when a very large area fire spilled out of the containment boom, and continued to grow in size and intensity while moving across the three-mile buffer zone around the source control efforts. The crews of the source control vessels were concerned that the fire was encroaching on the three-mile buffer between the source control vessels and this particular burn. While the CISB determined the burn was still within safe parameters, the crews extinguished the fire. This took approximately 90 seconds to accomplish.

**Mega Volume Burns**

The CISB had their best burns on June 18, 2010. A total of 16 different burns were conducted with an estimated 50,000 to 70,000 barrels of oil consumed. The seas were unusually calm, which provided optimal conditions for burning. Some burns extended outside the fire boom containment, but were allowed to continue to burn because they did not spread significantly.

Burns were sustained by using aircraft to direct Task Forces into streamers of oil that could feed the fire. There was concern that the fire could travel up the boom toward the towing vessels. Careful monitoring

and regulation of towing speeds ensured the fire stayed well within the towed boom configurations. Because of the condition of the oil (weathered and emulsified), feeding of oil into an existing burn was safe and effective. The fire remained within the fire boom and downstream of the towed boom configuration. The CISB was able to burn some emulsified oil, which by itself is not burnable, by towing existing oil fires into emulsified oil patches.

The CISB expansion to two task forces with five fire boom teams each required 10,000 feet of fire boom available at all times. To accomplish this, CISB received boom from South America, Alaska, and Algeria. One boom design with continuous inflation chambers sank several times during operations and was therefore determined to be unusable and potentially a safety risk. The three main types of fire boom, water-cooled, stainless float, and ceramic, all lasted well beyond expected service life. The most destructive action related to the boom occurred when crews attempted to remove a used boom from the water, as the stresses of a crane lifting usually resulted in damaging a boom beyond repair. Early burns revealed that in most cases, fire boom lasted longer than expected, even though fires destroyed between 400 and 500 feet daily.

This was the largest in situ burn operation in U.S. history. The burns conducted during this operation dramatically exceeded any previously documented in duration and in magnitude.

**Burn Volume Calculation**

Controlled In Situ Burn Summary volume calculations for each burn included a minimum and maximum estimate. The minimum volume estimate was based on the lower of any multiple air and

*GULF OF MEXICO – Vessels of Opportunity pull oil into a fire boom in a controlled burn with a second controlled burn visible in the distance. Photo courtesy of U.S. Coast Guard*





*GULF OF MEXICO – Oil is collected in skimming boom attached to the U.S. Coast Guard Cutter Elm operating approximately 21 miles off the coast of Perdido Key, Fla. Photo courtesy of U.S. Coast Guard*

surface estimates of burn size, the duration of burn, and a burn rate of 0.05 gallons per minute (gpm) per square foot—the rate commonly associated with the controlled burning of crude oil that is 25 percent to 40 percent emulsified. The maximum volume estimate was based upon the higher estimates of burn area, the duration of burn for each of those areas, and a burn rate of 0.07 gpm per square foot—the rate commonly associated with the burning of oil that is 10 percent to 20 percent emulsified.

### 3.4 Skimming

During the *Deepwater Horizon* response, skimming was a key measure taken to contain, capture,



recover, and remove oil from the environment. Skimming operations covered a wide geographic area. Hence, skimmers were a critical resource that required strategic management to ensure sufficient capability was available at the right time, in the right place, and with the right support to achieve the best effects. Skimmers were employed in three types of geographic zones offshore, near-shore, and beach, bays, and marshes. Skimmers were also placed inshore, in protected waters.

**Figure 3.8: Geographic skimming areas**

The UAC through the ICPs employed a layered approach to oil containment and recovery. The most effective response method was containment of the leak at the wellhead and the recovery and flaring of the captured oil and gas. Beyond this, the team employed a combination of sub-surface dispersant use, in situ burning, targeted surface

dispersant application, and skimming to minimize shoreline impacts. The recovery operation of last resort was shoreline cleanup.

A skimmer is defined as any mechanical device specifically designed for the removal of oil (or oil and water mixture) from the surface of water without altering its physical or chemical characteristics. A skimmer's performance is measured by the rate at which the machine recovers pure oil from an oily environment, the recovery efficiency (relation between recovered oil and recovered fluids), the throughput efficiency, and the relation between recovered oil and encountered oil. A skimmer's performance is affected by:

- The type of oil,
- The condition or maturity of the oil,
- Oil viscosity,
- The oil slick thickness, the presence of debris (e.g., driftwood, seaweed), and
- The environmental conditions including wind, wave, current, and the current air and sea temperatures.

Although skimmer effectiveness could vary dramatically based on all of these factors, given the indeterminate nature of the *Deepwater Horizon* spill, aggressive skimming was a key component of the success of this response.

There were several vessels and vessel systems used to skim free floating oil offshore. These included Oil Spill Response Vessels, Coast Guard Buoy Tenders equipped with Spilled Oil Recovery



*GULF OF MEXICO – The Coast Guard Cutter Oak skims thick brown oil off the coast of Alabama. Photo courtesy of U.S. Coast Guard*



MOBILE BAY, Ala. – A Vessel of Opportunity sets up its equipment as it prepares for oil-skimming activities in the Gulf of Mexico. Photo courtesy of U.S. Coast Guard

Systems (SORS), vessels equipped with Vessel of Opportunity Skimming System (VOSS), and fishing vessels equipped with boom and skimmers as part of the VOO fleet. OSRVs are designed and built specifically to recover spilled oil. These vessels have temporary storage for recovered oil and have the ability to separate oil and water aboard ship using oil-water separation systems. To sustain cleanup operations, most OSRVs transfer recovered oil onto other vessels or barges. VOSS are self-contained systems that include booms, skimmers, pumps, and temporary storage devices that are placed on vessels of sufficient size to deploy the equipment safely. SORS equipment includes boom, pumps, skimmers, and storage that are part of a Coast Guard Buoy Tender equipment package, available for use when needed and put away when not in use. Finally, commercial fishing vessels from the VOO fleet were reconfigured to carry boom and skimmers instead of nets. One of the biggest issues faced by the offshore skimming group was the offload of oil and oily water from temporary storage devices. The oil became very viscous, making the offload slow and difficult, and until a good method to offload the devices was found, this affected the ability to keep all assets skimming. It was important to understand the effect weathering and skimming had on the physical characteristics of the oil to determine the best temporary storage devices and ways to offload them in a safe and rapid manner.

By the end of April 2010, the UAC established a structured offshore branch comprised of 26 vessels capable of working in deep water, seven dedicated tugboats, and three offshore oil storage barges, which could collectively support and sustain long-term skimming operations near the source. From early June through mid-July, the number of skimmers fighting oil in the Gulf increased to 593 and the UAC increased skimming and beach cleanup activities, and prepared to move to 24-hour cleanup and skimming operations.

## Offshore

The offshore zone encompassed the area immediately above the source where fresh oil first emerged at the surface and outward to where the slick became broken and discontinuous. The extent of this area varied with wind, current, and wave conditions. The types of vessels sourced to this area were at least 50 feet long and equipped with high volume skimming capabilities, temporary storage, and crew accommodations to remain underway for an extended period. OSRVs and VOO Skimming Systems used in the offshore zone were large and required a lot of sea room to operate. The vessels' advancing speeds averaged one knot due to the limitations of towing boom in dynamic offshore waters. Some skimming systems were able to attain three to five knots due to their unique design and affinity for the type of oil spilled.



In the offshore zone, vessels typically encountered fresh oil, which then manifested in large, continuous brown oil slicks, some of which became emulsified. The offshore environment provided the best opportunity for skimming oil where it was abundant, fresh, and far from shore. This was the first line of defense for surface oil recovery. Given favorable skimming conditions—generally seas below six-foot swells and two-foot choppy waves—the number of skimmers in the offshore zone could be increased and directed to the heaviest concentrations of oil with aerial support to optimize recovery.

HOUMA, La. – A sweeping arm skimming system fitted on a commercial vessel collects oil in the Gulf of Mexico. Photo courtesy of U.S. Coast Guard

On April 28, 2010, Marine Safety Unit Morgan City requested immediate assistance from U.S. Navy Supervisor of Salvage and Diving (SUPSALV). SUPSALV equipment began arriving in theatre on April 29th, and SUPSALV continued to fill requirements offshore, near-shore and on shore until there was no oil their skimmers could recover in those zones.



GULF OF MEXICO – The Seacor Lee served as one of the command and control centers for the off shore Deepwater Horizon oil spill response. Photo courtesy of U.S. Coast Guard.

By late June, the *Seacor Lee*, a 280-foot Offshore Supply Vessel (OSV), became the command and control vessel for the offshore skimming fleet. The fleet consisted of twelve offshore skimming vessels and numerous small independent one- and two-vessel operators. The RP retained an emergency response management company to provide services via the offshore branch.

The *Seacor Lee* was large, stable work platform. The bridge was large enough to provide a separate work area for response workers and not interfere with the *Seacor Lee* vessel crew. The vessel had satellite Internet connectivity and wireless local area network. The RP contractor also provided four individuals as communications technicians who stood watch on the communications stack twenty-four hours a day. Almost all communication was VHF Marine Band radios and mobile phones using the oil field offshore networks. Email to those vessels was also available.



GULF OF MEXICO – Crew members from U.S. Coast Guard Cutter Harry Claiborne remove an oil covered boom that was part of a Vessel of Opportunity Skimming System. Photo courtesy of the U.S. Navy

Communication with response vessels only using VHF became a problem when they had to operate at distances greater than twelve miles from *Seacor Lee*—this included many of the smaller assets. The offshore fleet had to rely on relaying messages through several other vessels; this resulted in inefficient communications and misinterpreted instructions. The sheer volume of traffic on the VHF radio frequencies made communication difficult and garbled.

Roll call of all vessels was conducted at 7:00 a.m. when vessel assignments were relayed. The representative based assignment decisions on the information available from the aviation assets, observations taken from vessels operating in the area, and the guidance provided by the UAC. Wind direction, sea state, and the movement of the oil due to tides and currents were important factors in the positioning of assets each day. The size and capability of each vessel was also a factor. Another dynamic was the on board storage and processing capability of the vessel. As the oil aged and became more viscous, the number of assets capable of removing that oil became limited. Removing oily water mixture from vessels and returning them to service was time consuming.

New skimming equipment, including the *Big Gulp* weir skimmer, was deployed offshore. Weir skimmers collect oil floating on the water surface via weir technology, a mechanical wall whose top edge is placed at the oil water interface to allow the oil to be separated by the water. Once collected, the oil transferred from the weir central sink by gravity or by pump to storage tanks. The *Big Gulp* was a converted barge that acted as a large-capacity skimmer. A tugboat guided the barge-turned-skimmer into a patch of oil, often near the spill site. Oil entered the skimmer through a big opening in the bow of the barge, gathering against a bulkhead and finally spilling over into a holding tank. From there, oil was pumped into two holding tanks, where gravity separated the oil from the heavier water. Crewmembers opened a valve, sending clean water back into the Gulf, while capturing a mix that was 98 percent oil. Similar barges worked in shallow waters and were called *Little Gulps*.

The Coast Guard owns and maintains pre-positioned VOSS equipment suites throughout the country at three spill response strike teams and at strategic sites within each Coast Guard District. The Coast Guard utilized the equipment suites in support of the response. There are 22 cleanup systems located nationwide to ensure a rapid first response to an oil or chemical spill.

Each Coast Guard VOSS consists of two of the following:

- Outrigger assembly with lifting davit,
- Sweep boom to collect the oil, DESMI 250 floating weir skimmer with diesel-driven hydraulic prime mover and control stand and air compressor to recover the oil,
- Submersible 6-inch off-loading pump, or
- Portable inflatable barges (26,000 gallons) to store the oil.

*A Whale* arrived in the Gulf of Mexico on June

30. *A Whale*, a 1,115-foot long supertanker, was retrofitted and converted into a skimmer in Portugal to assist in the *Deepwater Horizon* response. The vessel went through an extensive operational review by a multi agency team under the supervision of the Coast Guard. After an extended trial period during which the supertanker-skimming vessel was given an opportunity to demonstrate its capability to remove oil in open seas of the Gulf of Mexico, the FOSC announced on July 16 that it would not be deployed as a part of the *Deepwater Horizon* oil spill response. (See more detailed discussion in Alternative Technologies section of testing of *A Whale*.)



GULF OF MEXICO - The converted tank ship A Whale conducts a test of its oil skimming capabilities on open water as part of the Deepwater Horizon response. Photo courtesy of U.S. Coast Guard

The crew boats available to the offshore skimming group were strained by the number of crew changes and vessel transfers conducted. These boats were older vessels—built in the 1970s—and generally were 75 to 90 feet long. They proved too small and unstable to provide safe crossing between vessels. This made personnel transfers between vessels challenging and resulted in several aborted transfers for safety reasons. Some smaller vessels and assist boats were also older and not outfitted to sustain operations.

**Near-shore Zone**

The near-shore zone encompassed the geographic area just off the coast and out three miles where surface oil manifested itself in smaller, widely spread patches. The types of vessels sourced to this area were typically less than 50 feet long. Agile skimming platforms were more effective in this area because the vessels could quickly move between patches of oil. The vessels in the near-shore zone were equipped with weir skimmers or other types of skimmers appropriate for the oil encountered.

In the near-shore zone, oil manifested itself in a variety of ways, from bands of emulsion to racks of semi-solid tar balls and mats that combined with debris in bands. Response parties organized near-shore skimming operations into task forces that operated within branches along the impacted coastal areas. In addition, the Coast Guard stationed the task forces in gaps between barrier islands to skim oil before it entered sounds where it could impact environmentally sensitive areas. Aerial observations provided directional targeting to maximize oil recovery.



GRAND ISLE, La. – Two Vessels of Opportunity converted to oil skimmers conduct skimming operations in the waters near Grand Isle, La. Photo courtesy of U.S. Air Force

In the early stages of the *Deepwater Horizon* incident, near-shore and inland Oil Spill Response Organizations (OSROs) mobilized extensive resources. Resources cascading into the Gulf region supplemented the robust OSRO network already in the region from all areas of the country. The majority of skimming assets owned by the OSRO community are designed for near-shore and inland environments. During the *Deepwater Horizon* response, much of the oil that reached the near-shore environment co-mingled with debris or was tar-like and difficult or impossible to skim. As such, many of the skimmers mobilized to the offshore sites were ineffective in removing this material. To retrieve oil, manual methods such as nets, pool skimmers, and absorbents were more effective for work in this environment.

By June, SUPSALV deployed 18 Marco Class V skimmers to conduct near-shore skimming operations in Pensacola, Fla., Panama City, Fla., Gulfport, Miss., Ship Island, Miss., Bayou LaBatre, Ala., Slidell, La., and Venice, La. Skimmers such as the Marco skimmers proved effective because the viscosity of the oil particularly suits the belt skimmers, and that the mobile skimming system could work both close inshore and offshore.



RIGOLETS, La. – A fishing vessel equipped with skimmers makes its way up and down the Rigolets as a precautionary measure to capture any stray tar balls. Photo courtesy of U.S. Coast Guard

Nearshore and inshore skimming operations led to the design and use of the *Little Gulp*. The efficient design of the *Big Gulp* skimmer for offshore served as the template for design of *Little Gulp* skimmers. Used primarily in shallow water environs, like the *Big Gulp*, *Little Gulp* skimmers employed a barge design that transported oily water on board, and then separated the oil from water.





*HOPEDALE, La. – A concrete pumper has been converted into a shallow water skimmer and marsh washing system used to remove oil from the shoreline. Photo courtesy of U.S. Coast Guard*

### Beach, Bays, and Marshes

The beach, bays, and marshes zone encompassed a wide range of shoreline types in the inshore environment where water and land meet. This was the most diverse skimming operating area due to the varied combinations of shoreline type, accessibility, oil type, and sensitivity of the environment involved.

This zone sourced a variety of skimmer types, including vacuum, brush, oil mop, disc, drum, belt, and weir skimmers. The skimmers deployed from land or small vessels and barges in inaccessible areas.

Oil in this area occurred in a wide range of conditions, including highly weathered mousse and pockets of black oil, tar balls, and mats of weathered oil and sheens. Local conditions determined the method skimming equipment deployed to remove recoverable oil.

### 3.5 Shoreline Protection (Boom, Berms, Hesco)

Across the Gulf Coast, the current ACPs and other spill response plans were reviewed to determine if they contained incorrect or obsolete information. As a result, the UAC and ICP Houma worked with federal, state, and local stakeholders, including environmental subject matter experts to draft, approve, and implement the Unified Command Contingency Plan (UCCP).

They developed the UCCP during the spill to correct inconsistent or obsolete information contained in the current ACP, State Contingency Plan, and

Geographic Response Plans (GRP). The current plans contained inaccurate reflections of the land topography and the locations of critical resources because of recent hurricanes and storms in the region. In the UCCP, the UAC and ICP developed a tiered approach for the planning of and strategic use of boom quantities and its placement at the local level. The tiered approach as outlined in the UCCP included Tier 1–ACP, Tier 2–State Oil Spill Contingency Plan, and Tier 3–UCCP. The State On-Scene Coordinator (SOSC), the FOSC, the Responsible Party Incident Commander (RP IC), as well as eight of the 11 parishes along the Louisiana shoreline approved, signed, and implemented the final UCCP document.

The UAC utilized the UCCP as a tool for boom allocations across the area parishes and counties, as agreed upon by all parties at the time. The UAC also designated boom as a critical resource. The UCCP acted as a priority mechanism for boom placement at the branch level, once the UAC designated containment boom as a critical resource nationally.

The Coast Guard based booming planning strategies that took into account local currents, wind, sea states, and shoreline types throughout the response area. The overall shoreline protection strategy included skimming, mechanical oil removal, burning, applying dispersants near the source, detecting and skimming oil not contained or removed by other means at the source, and placing boom near-shore in attempt to keep oil from entering inland water passes. Skimming vessels deployed in a staggered formation from offshore to inshore waters, and air assets guided them to specific response locations. Shallow-draft skimming vessels removed oil that passed through protective barriers and reached inland waters. ACPs and the UCCP required that boom deploy with the purpose of shielding environmentally and politically sensitive areas and beaches. For the oil that reached beaches, work crews removed the oil using hand tools and beach cleaning equipment.

For shoreline protection, responders employed multiple near-shore booming tactics. Deflection boom was deployed near shorelines to deflect oil onto pooling areas and allow recovery from land. The deflection approach was utilized appropriately for higher current areas. Containment boom surrounded the collection areas created by the deflection boom. Once responders corralled the oil into a collection

area surrounded by containment boom, skimming vessels or portable skimmers—also known as vacuums—removed the product. Responders used isolation boom, also known as barrier or protection boom, in areas of high environmental sensitivity with very low or no current, such as within inland estuaries. They deployed it just off a shoreline or marsh area in an attempt to keep oil from reaching the sensitive areas. Responders took extra care not to disturb the environment when deploying boom into these areas. Most of this type of boom was never deployed unless the potential for oil contamination was identified in the area. Instead, responders staged the boom and made it ready for deployment if needed.

Across the response area in an effort to plug the potential gaps in the shoreline protection efforts, ICP Houma began utilizing ocean booming tactics and techniques in an attempt to ensure free-floating oil would not impact environmentally sensitive areas. The UAC's Critical Resources Unit, ICP Houma, together with individual states sourced, delivered, and implemented various types of shoreline protection strategies, such as the use of rigid pipe boom (deflection boom) and flexible boom placed between pilings and barges.

Upon completion across six Louisiana parishes and multiple counties in Alabama and Florida, more than 2,000 pilings were installed to hold rigid pipe boom and flexible boom to protect inlets, beaches, and marshes. Despite lighting and other visible markings, this strategy posed risks to boaters and kayakers operating near the pilings and fixed boom sections. Ultimately, the high currents in the passes, the lack of buoyancy in the weathered oil, and periodic heavy weather in the operational area defeated this type of protective barrier.

In contrast, some Florida counties used the strategy that followed the doctrine presented in the Coast Guard Research and Development Report entitled "Oil Spill Response in Fast Currents: A Field Guide" (CG-D-01-02). The swift water booming strategy was much less expensive and required no pilings or other permanent construction to operate. Responders staged deflection boom in a format that took advantage of the natural current and tidal flow to deflect the product into containment areas lined for removal. This booming strategy is illustrated in Figure 3.9.

Responders deployed large amounts of protection and deflection boom throughout the response area. The protection strategy for St. Joseph Bay in Florida called for boom across the entire opening of the bay with several smaller sections of deflection boom positioned near the shipping piers for collection, and a final layer of protection boom stretched along the inner shoreline. Responders deployed most of this boom, but soon discovered that the boom did not protect from oil inundation but rather blocked the opening to the bay, and thus was impractical. Through the Mobile ICP, the UAC was able to revise the protection plan for St. Joseph Bay. The new plan employed VOO to tow collection boom with skimmers to collect any product reported in the area.

A final type of boom utilized throughout the response was snare boom. Instead of being a traditional protection or deflection type of boom, snare boom works by collecting oily residue much like a



*JEFFERSON PARISH, La. – A vessel places containment boom along Barataria Bay to prevent oil from coming ashore. Photo courtesy of U.S. Coast Guard*

common household mop. Snares are composed of multiple small oleophilic fibrous strands extending from a central point in a ball or pom-pom shape. The individual snares were then combined in continuous lines to form snare boom. The lengths of boom were then deployed along shorelines, marshlands, or in the water to absorb oily product. Snare boom is different from sentinel snares. Sentinel snares are crab trap-like devices that sit on the sea bottom tethered to a floating line. Attached to line at set intervals are pom-pom snares intended to mark the presence of oil. Sentinel snares were utilized in the water column as part of the sub-sea sampling and monitoring programs to help indicate the presence or absence of sub-sea oil.

**Figure 3.9:
Swift water
booming strategy
eventually
adopted for East
Pass.**



In addition to Piling Projects and boom strategies, the ICP utilized Tiger Dam to plug gaps onshore where boom could not be used to protect certain environmentally sensitive areas. Tiger Dam is a heavy, thick water boom consisting of three layers of water-filled tubes utilized to mitigate the extent of oil impacting shorelines. Tiger Dam protected shorelines in several locations throughout Louisiana, such as seven miles at the Southwest Pass and a seven-mile stretch near Grand Isle.

Once the assigned boom was deployed to the satisfaction of the ICP Operations Section and other vested parties, boats and crews spent time inspecting, tending, and replacing boom as needed. Air crews conducted daily over flights to survey the deployed boom. Results of the surveys were routed daily to the field for Operations personnel to conduct boom removal, replacement, and repair as

necessary. The use of aircraft significantly reduced the response time to tend or remove misplaced boom. After the wellhead was capped, operations focused on boom removal. Removal took several weeks, despite the many resources devoted to the tasks, including barges and cranes for boom storage. As part of the Florida boom removal process, the RP established a boom decontamination station in Port St. Joe, Fla. to clean non-oiled boom. Once clean, responders shipped the boom to an airfield in Tallahassee, where it was stored until it could be returned to its owner. The RP established other similar boom cleaning stations and storage facilities throughout the response area, such as the boom decontamination and storage facility in Prichard, Ala.

### Mobile Bay Booming

ICP Mobile faced the task of protecting over 500 separate environmentally sensitive sites that had been pre-designated in the Area Contingency Plan (ACP). These sites were located across several hundred miles of coastline along Mississippi (94 sites), Alabama (113 sites), and the Florida panhandle (300 sites). As the response evolved, additional locations were identified and added to the lists as part of the ACP 2.0 process. Highly diverse and sensitive ecosystems and resources were at stake throughout the coastal region.

*GRAND ISLE, La. – A section of rigid pipe boom, which is more resistant to rough seas, is deployed in the waters near Grand Isle to help contain oil from the Deepwater Horizon spill. Photo courtesy of U.S. Air Force*



DAUPHIN ISLAND, Ala. – An oil spill worker posts stanchions to ensure that the snare booms remain along the shoreline. Photo courtesy of BP

In the Florida Panhandle Coastal Areas, these consisted of approximately:

- 80 Bird species, 6 of which are threatened or endangered,
- 4 Reptile species, all of which are threatened or endangered,
- 4 Mammal species, all of which are threatened or endangered,
- 9 Shellfish species,
- 25 Sensitive Human Use or Wildlife Refuge and Management areas/resources, and
- 7 barrier islands of concern, 4 Gulf islands National Seashore Management Areas.

In the Alabama Coastal Areas, these consisted of approximately:

- 112 Bird species, 13 threatened or endangered,
- 113 Fish species, 2 threatened or endangered,
- 16 Invertebrate species,
- 4 Mammal species, 3 threatened or endangered,
- 11 Reptile species, 10 threatened or endangered,
- 19 Sensitive Human Use or Wildlife Refuge and Management areas/resources, and
- 1 barrier island of concern.

In the Mississippi Coastal Areas, these consisted of approximately:

- 71 Bird species, 6 threatened or endangered,
- 78 Fish species, 1 threatened or endangered,
- 9 Shellfish species,

- 4 Reptile species,
- 7 Mammal species, and
- 4 barrier islands of concern, which are all Gulf Islands National Seashore management areas.

In May ICP Mobile signed a Decision Memo that laid out the final booming strategies developed jointly by the U. S. Coast Guard, the states of Mississippi, Alabama and Florida, the U. S. National Park Service, and the EPA. Although the boom was already in the process of being deployed throughout the region, this memo refined and defined the strategies. Through this document and its accompanying boom maps, the ICP Mobile and the relevant stakeholders formally agreed to the overarching strategy and the amount of boom needed to meet the basic requirements of the ACP. It was understood by all parties that the strategies would likely be modified depending on operational needs, environmental conditions, the intensity of oiling, and the availability of hard boom, but the strategies served as a well defined and agreed upon baseline.

Under the strategies, all priority environmental sites within the states of Mississippi and Alabama were boomed. A two tiered booming system was deployed in Florida, with Tier One sites boomed first. Tier One sites were defined as select environmentally sensitive sites listed in the ACP, as well as entrances to inlets that contained multiple environmentally sensitive sites. If there were multiple sites within the same inlet, it was acceptable to boom the entrance to the inlet. Tier Two sites were environmentally sensitive sites contained within those inlets. This strategy ensured that sensitive sites identified in the ACP would be initially protected by at least one layer of hard boom.

To accomplish this deployment, ICP Mobile split its AOR into three geographic Branches—one each for Mississippi, Alabama, and Florida.

The Mississippi Branch was divided into 10 Divisions:

| Region | Number of Divisions | Initial Hard Boom Requirement |
|---|---|---|
| Hancock County | 1 | 50,500 ft |
| Harrison County | 5 | 139,950 ft |
| Jackson County | 4 | 211,300 ft |