The Alabama Branch was divided into seven Divisions:

| Region | Number of Divisions | Initial Hard Boom Requirement |
|---|---|---|
| Mobile County | 4 | 277,250 ft |
| Baldwin County | 3 | 133,750 ft |

The Florida Branch was divided into 21 Divisions:

| Region | Number of Divisions | Initial Hard Boom Requirement |
|---|---|---|
| Escambia County | 3 | 131,400 ft |
| Okaloosa County | 2 | 12,900 ft |
| Walton County | 2 | 15,300 ft |
| Bay County | 3 | 42,800 ft |
| Gulf County | 3 | 56,300 ft |
| Franklin County | 4 | 115,900 ft |
| Wakulla County | 2 | 30,600 ft |
| Jefferson County | 1 | 4,400 ft |
| Taylor County | 1 | 2,300 ft |

Total hard boom required to accomplish this initial booming strategy was estimated to be approximately 1.2 million linear feet. This provided a single layer of hard boom to protect the specified sites. These numbers grew substantially, however, and by July 17th, 2010, over 1.6 million linear feet of hard boom had been deployed along with another 500 thousand feet of absorbent boom. The increases in numbers were attributable to double and triple booming of some environmentally sensitive sites, the redesigning of strategies at some sites to better protect those locations, the addition of sites in Hancock County, Miss, and the subsequent booming of Tier Two sites in Florida.

In addition, ICP Mobile established a "Skunk Works" team tasked with developing innovative boom deployment strategies to cover large areas containing multiple sensitive sites. The most noteworthy of these attempts was what became known as the Mobile Bay Solution. Mobile Bay has three main access points from the Gulf of Mexico. From west to east there is the Gulf Intracoastal Waterway access under the Dauphin Island Bridge, the mouth of Mobile Bay, and finally Perdido Pass. If oil could be prevented from entering those three access points, the entire Bay would be protected.

The Intracoastal Waterway, as it passes under the Dauphin Island Bridge, allows Gulf water to enter Mobile Bay from the Mississippi Sound and Katrina Cut. Hard boom was deployed at this location, but the currents flowing through the area were substantial and reduced its effectiveness. In addition, the Gulf Intracoastal Waterway is a major thoroughfare for commercial traffic. As a result the boom was pre-positioned so that the waterway could be closed off when the threat of oil was imminent.

The mouth of Mobile Bay presented unique challenges as it was a major artery for commercial deep draft vessels and the currents through it were swift. A lock system was developed using ocean boom. All vessels would be required to pass through this boom-lock system. The outer gate of the lock system was located south of the bay's entrance and the inner gate was located north of the bay entrance. The boom that made up the southern portion of the lock extended from the tip of Pelican Island to Fort Morgan, Ala. The northern lock reached from Dauphin Island to Fort Morgan, Ala. Inbound vessels were required to enter a gate installed in the southern lock, be examined for oil contamination, and exit into Mobile Bay through the gate in the northern lock. The Coast Guard Cutter *Saginaw* drove pilings to attach the ocean boom while several contracted vessels deployed the boom.

Unfortunately, this lock system did not work. The currents were so swift in the area that they exerted forces on the boom that snapped multiple pilings. In addition to problems with entrainment, the currents also tore off boom fittings, anchor points, and caused other damage despite the fact that heavy-duty ocean boom was used.

As an alternative, ocean boom was deployed in the form of in a series of open chevrons south of the Mobile Bay entrance. The goal of this system was to deflect the oil away from the entrance. Despite multiple attempts and redesigns, this system did not work either. The force of the currents caused the boom to act like a sail. The boom dragged several thousands of pounds of anchors across the seabed and could not be kept on station. The boom also suffered significant physical damage from the forces that the currents applied to it. Lastly, and most importantly, there are pipelines that run

ashore from offshore platforms along the seabed in that area. The risk of dragging an anchor across one or more of those pipelines and damaging them was too great.

Perdido Pass was protected by ocean boom laid out in a chevron pattern similar to that discussed above for Mobile Bay. This design did not work at Perdido Pass either. Currents and wave action kept damaging it and shifting its position. An alternate system was designed and installed inside of the pass. This system involved a long run of ocean boom that extended along the entire length of the pass in a deflection pattern. A gate was installed in it to allow recreational vessels to enter and depart the pass. This system, while showing initial signs of success, failed in the end due to the swift currents in the pass.

### Louisiana

In some locations where boom was not deployed, Louisiana parishes took it upon themselves to employ and stage barges across local waterways and entrances to bays in an attempt to prevent oil and tar balls from entering the area. Responders considered the barges an additional protection measure to preserve the water quality in Lake Pontchartrain, for instance, which environmental groups such as the Basin Foundation had spent decades restoring. These floating barriers stretched across the Rigolets and Chef Menteur Pass, the deep waterways that connect Lake Pontchartrain and Lake Borgne in the Orleans and St. Tammany Parish areas. The line of barges across the Rigolets included a small opening at the end to allow for boat traffic, but it could be closed should oil threaten. The barges proved ineffective on July 5, 2010, when tar balls reported at the Rigolets entrance to Lake Pontchartrain and had washed ashore as far west as Treasure Island subdivision in Slidell.

Responders utilized Hesco Baskets to plug other additional gaps along the Louisiana shoreline. Hesco Baskets were primarily used along the northern edge of Grand Isle in Jefferson Parish and Cameron Parish. These baskets are constructed of wire-mesh with fabric containers, which are then filled with sand. The sand-filled baskets were supposed to serve as a barrier to help prevent oily product from washing past the barrier installation and further onto protected beaches.

As a result of the Deepwater Horizon Oil Spill, the State of Louisiana requested the RP be held responsible to build over 100 miles of sand berm along the Louisiana coastline in order to catch oil and protect the estuaries and marshes. The original request included 15 sections of berm (W1-W15) west of the Mississippi River and four sections (E1-E-4) east of the Mississippi River. The berm construction proposals and the approved permit covered state owned lands and waters west of the Mississippi River and the federal and Department of Interior lands, along with the Chandeleur Islands, which are part of the U.S. Fish and Wildlife Agency's Breton National Wildlife Refuge.



These berms did require a permit from the ACOE. After a series of meetings, the Louisiana Office of Coastal Protection and Restoration (OCPR) submitted a permit request to the ACOE to build a berm over 100 miles long that would require over 96 million cubic yards of material. OCPR estimated completion of the entire berm to take 6 to 9 months with an estimated cost of $250 million.

*RIGOLETS CHANNEL, La. – Barges are affixed together in a long line to act as a massive boom in an effort to keep tar balls from making their way into Lake Pontchartrain. Photo courtesy of U.S. Coast Guard*

Many agencies, including the Department of the Interior, Fish and Wildlife Service (FWS), Coastal Scientists with the U.S. Geological Survey, and other stakeholders voiced concerns. These concerns covered a broad range of topics, including the feasibility of the project, the constructability of the berms, the potential for environment impact, and the potential damage to the National Wildlife Refuge islands and aquatic habitat that could result from the dredging operations.

In particular, damage to the National Wildlife Refuge islands and aquatic habitat caused by dredging was a concern voiced by the Department of the Interior (DOI). The state's original request identified dredge areas closest to the barrier islands

both on the seaward and inland sides of the islands. Dredging would remove sand that could be used for future, planned barrier island restoration projects and could accelerate erosion and loss of the islands. Coastal scientists with U.S. Geological Survey showed that taking sand for the berm from the originally identified dredging locations would have negative impacts on the islands. They identified two alternative sand borrow sites that would not negatively impact the island. The decision by the FWS not to oppose the project was based on the best available science using studies conducted by the U.S. Geological Survey (USGS Scientific Investigations Report 2009-5252: Sand Resources, Regional Geology, and Coastal Processes of the Chandeleur Islands Coastal System: An Evaluation of the Breton National Wildlife Refuge). The FWS felt the project would not protect the coast as the state implied, but that as long as the project did not negatively impact the refuge and other resources, FWS would not oppose the project.

The use of sand berms as an oil spill response tactic was untested. It was unclear if the berms would prove beneficial in reducing the impacts of the oil, taking into consideration the long duration of construction versus the rapid movement of oil. The



*MISSISSIPPI DELTA – An Army National Guard UH-60 Blackhawk helicopter crew transports sandbags over the Mississippi Delta in an effort to shore up the state's coastline as the oil spill approaches. Photo courtesy of U.S. Coast Guard*

time, effort, and funding that were required to construct the temporary berm barrier brought into question the projects' feasibility in comparison to other spill response techniques under consideration or being employed over the response area.

To construct the berms, a large amount of dredging equipment needed to be available in a short period of time. The dredging had to produce a large quantity of materials such as sand to construct the berms within the proposed specifications. Given the proximity to hurricane season, the oil and gas pipelines in the area, the presence of protected animal migration and nesting areas within the proposed dredging sites, and the potential for impact to the existing coastal Gulf restoration plans, it was unclear if the project would be able to be constructed on schedule. An added complexity was the resulting land and berms would be both private and federal (USFWS Refuge) lands.

Instead of waiting for approval, parish and state officials in Louisiana announced on national media they would begin the berm project utilizing local moneys without federal approval. In response, a section of Louisiana's barrier island project proposal was approved for implementation by the ACOE. Under this permit, but without coordination with NIC and the UAC, ACOE authorized Louisiana to construct the barrier islands at its own expense. ACOE allowed this as long as construction met their terms and conditions and Louisiana obtained all other required permits. If Louisiana opted to move forward with the project, they would be required to address all potential costs and environmental impacts.

On May 27, 2010, the ACOE offered an emergency permit to the state of Louisiana for portions of their barrier island plan. The permit was issued under Emergency Permit NOD-20, with special conditions, authorizing the state to proceed with six reaches, E3 and E4 to the east of the Mississippi River, and W8, W9, W10, and W11 to the west. The six sections included 49 miles instead of the 100+ miles requested. The plans called for the berm to be 320 feet wide at the base 20 wide at the crown and six feet elevation. The sand borrow areas were predicted to be between 500 and 10,500 feet wide and 30-50 feet deep. On June 3, Louisiana accepted the permit and conditions. The permit issued was for only 49 miles and the six sections of berm to be completed. The NIC and RP approved funding in the amount of $360 million dollars.

In September 2010, the FOSC notified Louisiana that although no oil had been seen on the berms in several months and the amount found early in the response was small, the ACOE permit would allow construction of the berms to continue and thus the project could continue until it was complete or the state expended the entire $360 million. There were two instances where the National Guard visited the berm under directions of the state to collect tar balls. These two instances were the only records

of oil landing on, or oil requiring removal from the eastern berm. To complete some of the berms, the most economical sources of fill were borrow areas under the jurisdiction of BOEMRE. After NOAA and the USFWS expressed concern over the number of turtle takes that had occurred already in the berm construction operation and other possible endangered species and essential fish habitat impacts of using the borrow areas, BOEMRE declined to allow the state to use them. This required bringing fill from farther away, driving up the overall costs, and thus reducing the amount of berms that could be built for the original $360 million.

In September, the Fish and Wildlife Service requested the state consider moving the berm closer to the Chandeleur islands. On November 3, ACOE approved the state's request to modify the emergency permit. A few days later, they realigned the berm construction closer to the Chandeleur Islands. The alignment would build the berm in shallower water, thereby reducing costs while providing more benefit to the islands.

Smaller berm projects were also developed to protect sensitive habitats in Alabama. At Bon Secour National Wildlife Refuge near Gulf Shores, Alabama, work began in early May to protect Little Lagoon, an 8-mile wide estuary that provides nursery habitat for juvenile fish, shrimp, crabs, octopus, and other marine life. Refuge personnel constructed this berm across a pass that was formed between the Gulf of Mexico and Little Lagoon when Hurricane Ivan made landfall in 2004. Berms were also constructed in front of storm blowout areas to protect the dune ecosystem on the refuge, which provides habitat for endangered species such as the Alabama beach mouse and nesting sea turtles.

The shoreline protection tactics, techniques, and procedures utilized by the Operations Sections, and within individual states across the response area ensured a layered defense beyond sub-sea dispersant, skimming at the source, in situ burning, aerial dispersant use, and VOOs skimming. All those measures helped minimize the environmental impacts of oiling along the Gulf Coast. The protection plans and actions were made possible through cooperation between federal, state, and local officials, the RP, and environmental experts. These plans and actions minimized not only the threat, but also the actual impact of oil in the marshes and on the beaches.

## 3.6 Search and Respond Standards and Quick Reaction Forces

In June 2010, it became apparent that the response organization needed to react more nimbly to reports of oil. The decision to apply Search and Respond standards, use dedicated resources, and build Quick Response Forces stemmed from this continuing challenge.

### Search and Respond Standards

The ICP Mobile and ICP Houma FOSCRs developed a system to react quickly to oil reports. The proposed solution employed Coast Guard Search and Rescue Standards. These included launching within 30 minutes and arriving on-scene within two hours. The Coast Guard assigned this mission to deployed Coast Guard Marine Safety and Security Teams (MSSTs) in Louisiana and other response resources operating throughout the areas of responsibility.

Usually, the MSSTs did not participate in oil spill response. The MSSTs received a qualified Coast Guard oil spill responder with prior training and experience in quantifying and qualifying observed oil. This was critical, as the information relayed back informed the decisions of ICP Houma on how to prioritize response efforts. If new oil observations reported larger volumes, a threat to sensitive areas, natural resources, or health and human safety, the branch resources responded to the new site.

This concept took the form of a Standard Operating Procedure (SOP) done in concert with a team of Louisiana National Guardsmen and ICP stakeholders. This group was instrumental in facilitating working meetings, capturing ideas, concepts, and goals, and then working them into draft standard operating procedures that could be easily and quickly finalized.

### Quick Reaction Forces

Although the Search and Respond standards (SARES) quickly proved their usefulness, branches

59

had difficulty relying on shifting assignment of resources—such shifts could be cumbersome and time consuming. Moving resources engaged in one site cleanup to another site required withdrawal of gear, often long transit distances, and fully equipped supplies and logistics needed for cleanup. SARES development led quickly to planning for a light, mobile force that sat in reserve for instances where an area observed by a SARES team needed urgent action that could not wait on branch resources. Also, once response resources were at a branch, they became difficult to move from that area due to concerns of local officials. Similarly, placing standby resources at a branch for contingencies was difficult as oil continued to bear down on the shorelines.

Starting with the ground rule that branch level service personnel could not transition out of service at the branch level, planners employed another Coast Guard concept: a self-contained strike team able to support a 72-hour deployment to a site regardless of location—including berthing, food, water, PPE, skimmers, and boom. To avoid confusion with the term strike team, the term Quick Reaction Force (QRF) was adopted. This name corresponded with the FOSC's expectations and avoided any confusion with the Coast Guard's National Strike Force (NSF) teams. The QRF abbreviation also was generally consistent with ICS terminology, as they were essentially a task force. Initially, the Coast Guard assembled only one QRF, operated out of Houma. The basic unit was a contracted OSRO, complemented by Coast Guard members with NSF experience and a direct tie into the Operations Section at ICP Houma. Prior to initial deployment, the QRF engaged in mock operations to ensure this capability was openly communicated and that responders could meet the standards set.

Based on the success of the first QRF, the Coast Guard created others in Grangeville, Slidell, and Joint Air Station New Orleans. As time went on, the efficiency and effectiveness of these teams improved and they were a highly sought resource by the branches and provided invaluable assistance.

Over time, the SARES and QRFs proved the response organization could act quickly to reports of oil, and local leaders and members of the public expressed fewer concerns. Responders developed a thorough knowledge of where the accumulations

of oil in the Louisiana marshes were most severe. This steadily improved the planning for response force placements.

Containment boom was deemed a critical resource. Allowing the QRFs to stockpile a modest supply in the rear proved successful. Once responders provided boom to a local staging area, it was difficult to move, even if operations needed it elsewhere. As the response continued and the QRFs matured, the success of the QRFs eliminated concerns regarding boom assignment as response times continued to improve.

Overall, the SARES and QRFs dramatically improved perceptions about the responsiveness of cleanup efforts in Louisiana. After the QRFs were built, drilled, expanded, and deployed, the ability to take the next step and respond to the triaged sites, essentially eliminated concerns about the timeliness of response. SARES and QRFs demonstrated innovative, adaptive thinking, developed and executed with precision in a short period.

## 3.7 National Guard and Department of Defense Support

During the *Deepwater Horizon* response, the National Guard and Department of Defense (DOD) were exceptional partners across a wide range of response activities. More than 1,530 National Guard members were involved in response efforts. From May 12, when DOD authorized the use of National Guard assets, throughout the response, National Guard aviation crews flew over 3,600 hours, hauled 8,000 tons of cargo, equipment, and supplies, and carried over 6,500 passengers. In addition, National Guard personnel positioned sandbags, conducted evacuations, and provided air operations, public affairs, chaplain, communication, and transportation services.

### Command and Control of National Guard and Department of Defense Assets

The FOSC recognized that National Guard personnel would serve as a critical force multiplier in the response. However, it was unclear how to activate and employ National Guard and other DOD resources. The Department of Defense had no mechanism to accept funding from the *Deepwater Horizon* RP. Thus, funding for any DOD support had

to be accomplished through the Oil Spill Liability Trust Fund. DOD also wanted funding in advance, rather than through the usual practice of providing an invoice to the FOSC and the National Pollution Funds Center for payment of services rendered in accordance with a Request for Assistance. A funding solution was developed through the Secretary of Defense.

An additional hurdle to accessing DOD assets was FOSC coordination of domestic DOD support. Domestic coordination of DD resources is usually the responsibility of NORTHCOM. Coordinating permission for use of the National Guard and other DOD assets involved senior DOD personnel, the Joint Staff, NORTHCOM, and the National Guard Bureau. This was a complicated, time-consuming process. In the end, outside the National Guard, there was limited DOD involvement. The U.S. Navy Supervisor of Diving and Salvage, an organization that regularly participates in oil spills, was present in force. Transportation Command arranged for C17 support to transport resources to the Gulf Coast. DOD also provided some planners and Public Affairs specialists.

Obtaining National Guard support was complex as well. Competing interests and concerns existed over National Guard activation under United States Code Title 10, which is federally controlled and funded, versus United States Code Title 32 activation, which is state controlled and federally funded. State active duty is also available to recall National Guard members and it is state controlled and funded. Ultimately, on May 10, DOD recalled National Guard members to active duty under Title 32.



*GRAND TERRE EAST, La. – Louisiana National Guardsmen with the 2225th Multi-Role Bridge Company support beach cleanup operations by facilitating the transport of heavy machinery to the barrier islands that were affected by the oil spill. Photo courtesy of the U.S. Coast Guard*

National Guard personnel were under state control, but utilized in support of a federal oil spill response mission guided by the NCP. Although funded by the FOSC, the National Guard primarily performed missions directed by the states, frequently without involvement of the Unified Area Command or Incident Command Posts. The NCP addresses state and local participation in a response. According to the NCP, the designated lead state agency is responsible for determining the lead state response official (a member of the UAC) and communicating with any other state agencies (including National Guard). In the *Deepwater Horizon* response, affected states designated senior members to represent state equities at the UAC and ICPs.



*GULF OF MEXICO – A flight engineer with Florida National Guard's Detachment 1, Company H, 171st Aviation, is part of the air support, which flies along the coast to locate oil and expedite the efforts of skimming and booming along affected area. Photo courtesy of U.S. Army*

While each state was represented at the ICPs, state representatives did not coordinate National Guard resources for their respective states. Soon, military Liaison Officers (LNOs) represented the Coast Guard Incident Commander at the ICPs. The primary duty of the Military LNO was to coordinate National Guard and DOD activities in support of the Deepwater Horizon response. The LNOs provided technical and subject matter expertise regarding state processes and resources available to assist the Coast Guard. Military and agency LNOs were embedded in the ICPs to provide face-to-face coordination and to include agency LNOs in the incident planning cycle.

A challenge for both military and agency LNOs was to wed the *Deepwater Horizon* command and control structure with the existing National Guard command and control structure. Under the NCP, a unified command directs and coordinates the actions of all resources toward common objectives. The ICS management structure supports the unified effort and decision-making.

**Demobilization of National Guard Forces**

Every mission assigned to these assets stays operational until the ICP Incident Commander specifically requested the National Guard to demobilize the capability. The process of demobilization can take up to 10 weeks.

## 3.8 Shoreline Assessment, Cleanup, Shoreline Cleanup Assessment Technique

The Shoreline Cleanup Assessment Technique (SCAT) program in response to the *Deepwater Horizon* incident addressed two key challenges—the size of the affected area and the long duration of the response. In addition to these challenges, other issues included the potential for re-oiling before the successful capping of the well and carrying out final cleanup in progressive stages. The areas impacted by the oil spill expanded between Galveston, Texas and Franklin County, Fla.

The SCAT program started in April 2010 and was completed at some point after April 2011. The UAC established two ICPs and the SCAT program was managed consistently across all states, from Houma, La., and Mobile, Ala. One of the most unique challenges characterizing the first few months of the response was oiling and subsequent recontamination

of the shoreline from an uncontrolled, continuous flowing pollution source located beneath 5,000 of water in the Gulf of Mexico. This data, along with natural resources information, was used to develop cleanup priorities, identify site-specific or temporal constraints, and understand and approve the proposed cleanup plan. Using Shoreline Treatment Recommendation (STR) forms, teams implemented initial shoreline cleanup operations for designated shoreline segments. To ensure consistency, improve communications, and effectively coordinate the treatment recommendations with the numerous Operations Branches across the full geographic area of the response, new SCAT Operations Liaison Teams were created at all ICPs. These teams ensured accurate documentation of all findings. For example, the *Deepwater Horizon* Shoreline Inspection Report (SIR) forms were updated with annotations for the following indications: "No Oil Observed," or where no treatment was recommended at that stage, "No Further Treatment." This close engagement between the UAC leadership and the local Branches continued throughout all subsequent stages of the shoreline assessment.



*JEFFERSON PARISH, La. – A U.S. Coast Guard Petty Officer observes the state of an oil-impacted beach, taking note of the water, sand, and debris during a shoreline assessment on Grand Terre Island. Photo courtesy of U.S. Coast Guard*

Following the well control, when the threat of re-oiling substantially reduced, Stage III operations began, which initiated the final stage of the response. This was carried out in several phases to achieve clearly defined goals of cleaning, protection, monitoring, resurvey, and further cleaning as necessary. Stage III commenced with an area-wide re-survey in fall 2010. Treatment recommendations were then generated to reduce oiling levels to lowest practical levels based primarily on Net Environmental Benefit principles. When these levels were achieved, the next phase (Stage III.2) involved monitoring and maintenance to assess natural attenuation of any oil residues within individual segments.

A spring 2011 SCAT survey (Stage 4) is generating further STRs for further treatment where deemed necessary, for remaining oiled shorelines to achieve agreed Stage 4 No Further Treatment (NFT) guidelines. The final step involves inspection by the UAC SCAT teams with the landowner or manager, or resource trustee or manager for each shoreline segment to confirm sufficient treatment has been completed.

## U.S. Geological Survey Site Sampling

Even before the deployment of Shoreline Cleanup Assessment Technique teams, the USGS Science Centers in Texas, Louisiana, Mississippi, Alabama, and Florida began pre-landfall sampling of water and bottom material at 70 sites in priority areas of the northern Gulf of Mexico. Areas specifically sampled were the coastal wetlands and DOI lands at highest risk for oil contamination, including wetlands, shorelines, and barrier islands, which could suffer environmental damage if oil from the *Deepwater Horizon* spill came ashore. The pre-landfall assessment occurred from May 7 through July 2, 2010.

The purpose of the pre-landfall assessment was to define pre-existing or baseline conditions in the physical, chemical, biological, and microbiological quality of the near-shore environment. The USGS independently collected data to develop a perspective on pre-landfall conditions for future comparison to post-landfall samples from the same locations. The pre-landfall assessment is very valuable from a scientific perspective as this information provides a baseline to facilitate comparison of samples taken after-the-fact of the spills impact. It was hoped that these data would have a high degree of transfer value and be informative for



ST. MARY'S POINT, La. – A Shoreline Cleanup Assessment Technique team leader from the University of New Orleans checks impacted shoreline as part of the Deepwater Horizon response. Photo courtesy of the U.S. Coast Guard

response and recovery purposes.

All samples were collected, processed, and shipped under chain of custody according to methods listed in the USGS *National Field Manual for the Collection of Water-Quality Data* (NFM) (http://pubs.water.usgs.gov/twri9A/) as well as other USGS standard operating procedures. By using a standard, documented set of protocols encompassing the entire data-collection process, the integrity, consistency, and comparability of the data from site-to-site and among sites is ensured.

The post-landfall assessment sampling was undertaken from October 5 through 17, and focused specifically on a subset of 48 of the 70 pre-landfall sites in a manner consistent with the pre-landfall assessment. Data collection and analysis activities included sampling water and bottom material for the physical, chemical, biological, and microbiological quality of the near-shore environment. These studies were undertaken after shoreline arrival of petroleum-associated product on beach, barrier islands, and wetland environments of the Gulf of Mexico coastal states.

All post-landfall assessment samples were collected, processed, and shipped in the same manner as the pre-landfall samples. In addition, the USGS wrote and published an addendum to the USGS NFM *National Field Manual for the Collection of Water-Quality Data* (NFM), *http://pubs.water.*

*usgs.gov/twri9A/*, which provides the basis for the post-landfall USGS sampling protocols. The USGS also found it necessary to develop a method for the analysis of dispersant components in the Corexit product used in the oil spill response, as none previously existed at the time of sampling (although EPA also developed a method).

**Shoreline Cleanup Assessment Technique**

The objective of SCAT and subsequent shoreline cleanup operations was to accelerate the physical removal and natural weathering of stranded oil. These operations facilitated the return of the eco-system to pre-spill conditions as soon as practical, using environmental best management practices. The essential elements of SCAT methodology are mobility, surgical deployment, and speed.

Traditionally, SCAT is a survey process used by response agencies to document shoreline oiling. The technique employs a systematic approach to assess and develop cleanup treatment recommendations, as well as constraints for cleanup operations. The magnitude of the *Deepwater Horizon* oil spill pushed SCAT well beyond its traditional usage; fortunately, SCAT has intrinsic flexibility and operates as a continuous process from just prior to impact until final restoration begins. In most oil spills, the response is centered on a one time, single spill with a set quantity of product, in a somewhat stable environment. *Deepwater Horizon* exceeded all traditional parameters.

The initial focus of SCAT activities was to help establish oil trajectory models. SCAT Teams then divided the shoreline within the response area into geographic segments based on a combination of factors such as physical features, distance, and natural barriers. Early in the response, the former Mobile Sector Planning Section developed and implemented a Natural Resource

Adviser (NRA) program. Personnel from various private sector environmental contracting firms were hired, trained, and deployed to all operational divisions. The NRA program became an important interface between the Planning Section, Operations Section, and OSRO contractors deployed in the field. Volunteers were also trained and deployed as Wildlife Observers to ensure sensitive species, such as turtles and nesting migratory birds, were not affected by oil removal operations. The NRAs ensured that the staging of equipment utilized in oil removal operations did not impact dune and marsh habitats. Agency representatives from the FWS and National Park Service (NPS) were also embedded as liaisons, as discussed in Chapter 5 of this report, Planning.

A SCAT process was implemented for the *Deepwater Horizon* response and teams of trained observers were deployed to survey affected coastal habitats to document the shoreline oiling conditions and the presence of sensitive and cultural resources. At a minimum, a SCAT team is typically comprised of three positions representing the responsible parties, the federal trustees, and the state trustees. There are additional slots available for land managers and owners, and archaeologists as necessary.

Shoreline Treatment Recommendations (STRs) were developed in collaboration with the Coast



**ST. PETERSBURG, Fla. – A U.S. Coast Guard Petty Officer discusses oil identification procedures with fellow team members during a Shoreline Cleanup Assessment Technique team training scenario held at North Shore Beach near downtown St. Petersburg. Photo courtesy of U.S. Coast Guard**

Guard, NOAA National Marine Fisheries Service (NMFS), Fish and Wildlife Service (FWS) Section 7, and Section 106 Archeologists. Other natural resource trustees, and state representatives such as Alabama Division of Emergency Management (ADEM), Florida Department of Environmental Protections (FDEP), Louisiana Department of Environmental Quality (LDEQ), and Mississippi Department of Environmental Quality (MDEQ) also participated. Furthermore, cleanup operations required compliance with the protection policies of the Endangered Species Act, the National Historic Preservation Act, and the Archaeological Resources Protection Act. See Chapter 8, Natural Resources and Wildlife, for more information.

Throughout the summer of 2010, the SCAT teams were physically located within each state's operational branch and were managed from two ICPs. All operations for Louisiana spill response were located at ICP Houma, whereas ICP Mobile managed spill response for and was the reporting hub for Alabama, Florida, and Mississippi. A SCAT Liaison was embedded into each branch and the ICPs to facilitate communications between SCAT, operations, and the ICPs.

The SCAT Management Teams established Core Groups at each ICP to maximize stakeholder involvement, address special concerns for natural, cultural, and amenity areas, and to promote a unified approach to the cleanup process. Each SCAT Core Group adopted appropriate and effective cleanup strategies by developing a Stage III SCAT Shoreline Treatment Implementation Framework. The strategies outlined the stages of cleanup and survey and verification methodologies. In addition, the strategies implemented a standardized Net Environmental Benefit Analysis (NEBA) to ensure further damage was not caused by the cleanup techniques, and developed NFT guidelines. To support the Core Groups, three Technical Working Groups (TWG) were assembled to conduct detailed evaluations of cleanup techniques and environmental response considerations for three specific shoreline types: sand beaches, marshes and mangroves, and man-made shorelines. The Core Groups, in conjunction with the three TWGs, provided cleanup options and recommended technologies. The options addressed the environmental impacts to the shoreline, critical habitat, endangered species, and cultural concerns for both natural and nourished shorelines that ranged from lightly stained to heavily oiled.

The options included the following:

- Natural attenuation, which referred to processes such as evaporation, wave action, flushing by tidal movements, rainfall flushing, and degradation by microbial and photo-oxidation,



FORT PICKENS, Fla. – Members of a Snorkel Shoreline Cleanup Assessment Technique team find and record evidence of oil below the water's surface at Fort Pickens. Photo courtesy of U.S. Coast Guard

- Grooming,
- Manual removal of oil, oiled sediment, and debris,
- Mechanical Beach Cleaning Machines (sifters),
- Sediment relocation,
- Sediment tilling and mixing,
- Sand treatment (M-I SWACO),
- Raking and cutting vegetation,
- Low pressure, ambient temperature flushing,
- Use of sorbents, and
- Vacuuming.

Methods not utilized included in situ burning, chemical cleaning agents, nutrient enrichment, and solidifiers.

The physical location of the spill presented logistical, tactical, and training challenges as many areas could only be reached by boat, skiff, or helicopter. This was especially true in Louisiana. For example, tide cycles periodically restricted shoreline survey work as certain stretches of shoreline segments were rendered inaccessible to foot traffic or inundated areas impacted by oil. Storm events and periods of high wind and wave action often resulted in the burial or redistribution of stranded oil, requiring additional SCAT surveys and more intrusive survey methods such as auguring, and a combination of plowing and sifting for oil buried within sand berms.

For *Deepwater Horizon*, SCAT teams employed a three-stage plan; Stages I and II were implemented prior to the source being secured, and Stage III commenced after the source was secured. For Stage I, the plan emphasized the on-water recovery of floating oil slicks in near-shore waters. At Stage II,

the plan required initial cleaning of bulk oil from inter-tidal areas until the oil source was secured. For Stage III, SCAT focused on oil removal from specific habitats and the determination of No Further Treatment (NFT) status. SCAT teams combined data collected from land and waterborne field surveys, aerial reconnaissance, and reports of oil sightings from outside sources to project floating oil slicks and bulk shoreline oiling. That information was updated daily in standard forms and mapping products, and was used to prioritize offshore and near-shore cleanup, as well as document which shoreline segments would likely be impacted first and worst.

Initial STRs were drafted to cover each division in support of Stage I and II bulk oil collection and cleanup. These products prescribed appropriate techniques used to address bulk surface oiling only. Branch directors were advised to focus on the largest concentrations of oil using best management practices for surface oil recovery, site access, and resource conservation. Supplemental information on endangered species and the preservation of sensitive archaeological, cultural, and historical objects and sites was also included. Data was also recorded for shoreline segments where no oil had been observed and no bulk cleanup conducted. Those areas received Shoreline Segment Inspection Reports (SIRs) recommending only natural attenuation with NFT in 2010 (NFT-2010) and were forwarded for Incident Command and UAC review. Shoreline segments placed in NFT-2010 status were subject to periodic monitoring pending

a comprehensive resurvey of all affected areas in spring 2011. Tables 2 and 3, provided by the FWS, outline the guidelines that must be met before an area transitioned into the NFT phase of cleanup.

Commencement of Stage III roughly corresponded with permanent well kill and no further observation of waterborne oil slicks. Stage III STRs (STR-3s) were drafted for groups of shoreline segments that required detailed cleanup measures well beyond the scope of bulk cleanup. Stage III STRs often prescribed treatment below the beach surface and addressed sub-surface oil buried under layers of sand due to wave and tidal action. The total number of segments for the *Deepwater Horizon* impacted area was in the thousands; however, segments could be grouped depending on several factors including terrain and the method of cleanup utilized, and sometimes by landowner and managers or state boundaries. As part of the shoreline surveys, SCAT would note observations of stranded boom to assist the Stranded Boom Removal Team.

After the shoreline surveys were completed, SCAT teams interacted with local officials and the Operations Section to identify the appropriate cleanup methods for the contaminated zones. The SCAT teams then returned to Houma to develop the formal STR. SCAT also assisted in drafting STRs to provide guidance for the specific task of Stranded Boom Removal (STR-126). This collaboration allowed for a faster approval process.

**Table 3.2: NFT Guidelines for Sand Shorelines**

| Oiling Group | Cleanup Methods Recommended | Surface Oil | Subsurface Oil |
|---|---|---|---|
| Oiled Residential and Amenity Beaches | Mechanical (sifting); Manual removal; Tilling; Sediment relocation | No visible oil above background levels | No visible oil above background levels |
| Oiled Non-Residential Beaches | Mechanical (grooming-sifting); Manual removal; Sediment tilling and mixing; Natural recovery | < 1% visible surface oil and oiled debris; and no SRBs >5cm (2 inches) | No sub-surface oil exceeding 1-3 cm in thickness and patchy (10-50%) distribution that is greater than Oil Residue |
| Other Oiled Beaches in Special Management Areas (state and federal wildlife refuges, parks, wilderness areas, which may also have a mix of oiling conditions) | Mechanical (grooming-sifting); Manual removal; Sediment relocation; Natural recovery | < 1% surface oil and oiled debris; no SRBs >2.5cm (1 inch) | Subject to direction of Special Area Managers: No sub-surface oil exceeding 3 cm in thickness and more than patchy (10-50%) distribution that is greater than Oil Residue |

| Cleanup Methods Recommended | NFT Guidelines |
|---|---|
| Low-pressure, ambient-temperature flushing | No flushable oil on the vegetation or soils |
| Use of sorbents (on water) | No release of sheens that can affect sensitive resources |
| Manual removal<br>Use of sorbents (on substrate) Vacuum | No thick or pooled oil at the edges of, the marsh, or the beach and shell berm, and over wash areas<br>No thick or pooled oil in the marsh interior, including isolated oiling patches within the marsh |
| Vegetation cutting | No pooled oil inside dense Roseau cane be accessed by other means |
| Natural recovery | For all other oiling conditions |

**Table 3.3: NFT Guidelines for Coastal Marshes and Mangroves**

The STR approval process involved routing through approximately nine different agencies, including USFWS and NMFS Section 7 (Endangered Species Act review), Section 106 (Historic and Cultural Properties review), NOAA, Environmental Unit Leader, Land Managers, local officials, the state, and the FOSC. In addition to approving the STR, Section 7 required attachment of Applicable Best Management Practices (BMP) Checklists to the STR. The checklists indicated which BMPs were applicable to protect the endangered and threatened species, and critical habitats located in those segments contained in that particular STR. Per the BMPs, Section 7 consulted on the appropriate number of Natural Resource Advisors and Resource Advisors (READs) required to ensure SCAT and the Operations Section were in compliance with implementing the BMPs in the field. Early in the Stage III process, the State of Mississippi made the choice to take over the grooming of its mainland amenity beaches in preparation for spring 2011.

Due to the complexity of the response and the number of stakeholders involved, it was difficult to achieve timely consensus or full UAC endorsement of STRs, the Stage III Framework, and other SCAT plans. The combined framework for Alabama, Florida, and Mississippi was fully endorsed. Louisiana officials had concerns. SCAT members and the UAC Governmental Affairs Director met with Louisiana local and state officials to review and explain the Stage III Framework. On December 20, the Louisiana framework was approved.

The federal trustee role and position on an official SCAT Team may be filled by any of a number of federal entities including Department of the Interior, NPS, NOAA, or the Coast Guard.

Prior to February 2011, only seven of the more than 40 Coast Guard members involved with SCAT activities worked 25 or more days on SCAT teams; NOAA contractors primarily filled the federal representative position.

SCAT will continue for much of 2011. Coast Guard Reserve Marine Science Technicians will move into 14 federal representative slots on the spring resurvey SCAT teams, which began February 2011. A 7-14 day overlap with NOAA will provide training. This is the first survey of nearly all segments in the *Deepwater Horizon* area of impact since May 2010; therefore, it will be a comprehensive examination of the aggregate impact of the entire oil spill. Table 3.4, provided by the FWS, outlines the total shoreline oiling estimates by state as of January 26, 2011.



*GRAND ISLE, La. – A U.S. Coast Guard Shoreline Cleanup Assessment Technique team member observes workers and heavy equipment removing oiled sand and tar balls during beach cleanup operations. Photo courtesy of U.S. Coast Guard*

Over the course of the response, the scale of the SCAT operations contributed to technological innovations. SCAT teams employed electronic data loggers, such as TRIMBLE units, which also served as handheld GPS devices. These electronic logs improved efficiency by reducing fieldwork note taking and report preparation time, and allowed SCAT data to be fed directly into the Common Operating Picture platform and database provided by NOAA through ERMA and GIS. This allowed the incident commander to have near real-time situation awareness of SCAT progress.

## Shoreline Clean Up Operations

The SCAT process defined where the oil was, in what quantity, and assessed cleanup techniques that were appropriate for the shoreline habitat. Following from approved shoreline treatment recommendations were actual shoreline cleanup operations. Most of the impacted shoreline was either sandy beach or salt marshes. The two types of areas required very different shoreline cleanup methods.

In general, cleanup of oiled marsh required recognition that the marsh vegetation was very easily damaged and thus people and machinery could not be placed on the marsh. There were two broad categories of sandy beaches: those owned by federal trustees such as the National Park Service, and FWS, and public "amenity beaches" used for swimming and recreation. The federally owned beaches were, for the most part, sensitive habitats that required careful planning to avoid damage, although the cleanup techniques available could be more invasive than for marshes. Amenity beaches demanded extensive cleaning in order to address public concerns about coming in contact with oil while using the beaches.

## Beaches

Beaches were impacted in Louisiana, Mississippi, Alabama, and Florida. Florida and Alabama in particular had beaches in areas frequented by tourists, and thus cleaning beaches was a high priority in those communities because of concern of the impact oiled beaches would have on tourism, a mainstay of those local economies. Public beaches were also impacted in Louisiana and Mississippi. Although in general not as sensitive an ecosystem as marshes, sensitive beach areas, many of which belonged to the National Parks Service or U.S. Fish and Wildlife Service, were also impacted, mostly in Mississippi, Alabama, and Florida. Mississippi was uniquely challenging because much of the beach impact areas were on barrier islands several miles offshore with little to no public access. The deployment of equipment and manpower to the barrier islands, especially in high winds and seas across Mississippi, proved complex, and delayed more timely response.

Beach cleanup is a time consuming, labor intensive process. SCAT identified oil impacts to beaches in three areas:

- Subtidal, below mean low water,
- Intertidal, between low and high tide, and
- Supratidal, above high tide to dunes.

In subtidal areas, cleanup techniques were limited. Where tar mats could be identified in shallow enough water to permit responders to reach them safely, response crews waded into the water with modified scoops and dug out the mats, scoop by scoop, collected the materials, and packaged them for disposal. Where the the tar mats became too deep for wading, the only effective technique was to map the areas where the mats were known to be and then regularly visit the intertidal areas near the submerged mats to recover tar balls. Some limited attempts were made to scoop the tar mats by mechanical mean in areas where the mats were close enough to be reached by a backhoe bucket arm, but often the sand proved an unstable foundation to support the equipment and most tar mats were beyond mechanical reach.

In intertidal areas, a variety of techniques were used. When oil was still arriving at the shoreline, sorbent boom of various kinds was placed on beaches and then regularly tended. Workers manually removed oil from the surface of the intertidal sand with shovels and rakes. Once oil stopped reaching the beaches, efforts were made to clean the intertidal areas as thoroughly as possible. By this point, most of the oil was in the form of tar balls in the intertidal areas. This required scooping sand and sifting through

**Table 3.4: Shoreline Oiling Estimates as of January 26, 2011**

| State | Total Miles Miss., Ala., Fla. Shoreline Habitat Surveyed | Heavy | Moderate | Light | Very Light | Trace (<1%) | No Oil Observed |
|-------|-----------------------------------------------------------|-------|----------|-------|------------|-------------|-----------------|
| La.   | 3147.4 | 27.3 | 50.4 | 82.1 | 108.4 | 40.2 | 2839 |
| Miss. | 295.7  | 0.3  | 1.3  | 26.3 | 4.9   | 55.0 | 208.0 |
| Ala.  | 266.9  | 0.3  |      | 15.1 | 1.2   | 43.1 | 207.1 |
| Fla.  | 516.1  | 0.4  |      | 8.7  |       | 83.0 | 423.9 |

screens of various sizes to remove the tar balls from the sand. Work crews did this with shovels, rakes and hand sifters. Several types of commercial beach machines were used with modified screen separators. As these beach machines were constructed to remove trash and debris, some modification proved infeasible. In all, these machines were used only for surface sand cleaning. Furthermore, at above 75 degrees Fahrenheit the tar balls on the beach tended to liquefy. Although visibility was reduced during darkness, the beach machines were most effective during nighttime operations when cooler temperatures congealed the oil. Later a mechanical cleaner, known as the Sand Shark, was employed. This scooped sand to a uniform depth that could be modified, sifted the sand, collected the tar balls, and then deposited the sifted sand back onto the beach. After initial tests with the Sand Shark, the RP moved to acquire more of these machines to speed the beach cleaning process, particularly in public "amenity" beaches where tolerance for any form of oil being present was low.

In the supratidal areas, the major concerns were tar mats pushed beyond the intertidal area by storm and tidal activity. These mats could be submerged under a significant depth of sand, and later re-exposed by storm action or wind. However, these areas were also frequently near vegetation critical to beach ecosystems; this meant that cleanup had to be more cautious to avoid damage. Removal of the supratidal mats usually had to be done by work crews working with shovels who would dig down to the mat, sift the sand as they dug, and then dig out the mat by the shovelful.

Beaches belonging to the federal trustees required more careful treatment. These areas were generally more environmentally sensitive, and not used nearly as much for tourism. As a result, the trustee agencies had to balance the need for removal of as much oil as possible against the impact to the ecosystems on those beaches. Digging in search of buried tar mats, and for the removal of tar balls, was limited to a depth of six inches in these areas. Mechanical cleaning equipment was also not used; recovery was done almost entirely by work crews using rakes, shovels and hand sifters.

## Heat and Beach Cleaning

During the summer of 2010, the heat had a major impact on beach cleaning operations. The workers removing oil were in exposed areas. With a heat index that regularly rose above 100 degrees Fahrenheit, workers needed to limit their exposure to the oil; and with the labor intensive, physically demanding nature of the work, it became necessary to provide beach workers a place to get out of the sun and heat and keep them hydrated for their own safety. As recounted in Chapter 4, this meant limiting the amount of time workers could actually work between rest periods out of the sun. It also led ICP Mobile, in particular, to adopt night operations where possible, as this allowed work crews to spend more time removing oil from the beaches because the heat related risks were significantly reduced at night.



*PASS CHRISTIAN, Miss. – Beach cleanup crews rest during oil recovery operations on Ship Island due to the oppressive summer heat. Photo courtesy of the U.S. Coast Guard*

## Operational Science Advisory Team II Report on Remaining Oil on Beaches

After the well was capped, the entire impacted shoreline was evaluated by the SCAT process. This process continued past the end of hurricane season and into the winter. The FOSC requested that trustee agencies develop an assessment of the impact of oil on sandy beaches to help determine when to stop cleanup operations. This report was delivered to the FOSC in February 2011. It characterized the impact of oil that remained in the beach areas after cleanup operations. The report examined what oil remained on the beaches, and noted the fact that there was oil present from sources other than the *Deepwater Horizon* spill. It contained specific review of impact of the estimated remaining oil on sandy beaches to human health, sea turtles, water birds, terrestrial animals, and aquatic invertebrates and fish. The report used four locations, Grand Isle,



*VENICE, La. – Response workers clean up tar balls that washed up along the beach. Photo courtesy of U.S. Coast Guard*

Louisiana, Petit Bois Island, Mississippi, Bon Secour, Alabama, and Fort Pickens, Florida as case studies for in-depth analysis.

The report's analysis indicated that the environmental effects of the remaining oil after cleanup were relatively minor, particularly given the pre-spill background exposure to oil, and that continued cleanup to attempt to remove any trace of oil would increase the risk of negative impact to habitats and associated resources.

### Marshes

Table 3.5 lists potential cleanup techniques for oiled marsh developed by the National Response Team.

The methods used most during the course of the response were vacuuming, sorbent boom, and absorbent peat when the oil was fresh and coming into shore in the marshes. As erosion of the existing marshes in coastal Louisiana is a significant concern, and oiling sufficiently severe to kill marsh grasses would accelerate erosion, finding ways to prevent oil from killing the marsh vegetation was a high priority. One of the techniques tried at the recommendation of several agencies was use of bagasse, the fibrous residue from sugar cane processing, which was readily available in Louisiana. This method proved difficult to deploy and then recover, however. Small, carefully targeted barriers constructed in appropriate locations did shield some particularly sensitive areas from heavy oiling. Still, there were some marsh areas that were heavily impacted. Areas of Barataria Bay and Bay Jimmy were the most heavily oiled marsh areas.

In an effort to identify techniques to remove oil from heavily impacted areas, a pilot project was conducted in Bay Jimmy. The project tested a range of cleanup techniques in small plots of heavily oiled marsh in an attempt to identify which technique would prove most effective. Techniques used in the plots included burning, raking, low pressure flushing, vacuuming, and hand application of sorbents. None proved dramatically effective or clearly more effective that natural attenuation, particularly when balanced against the risk of further damage being caused by the cleanup technique itself.

Because of the remote location of marshes, there were many challenges involved with these operations. First, during the summer, heat was a significant concern, as was the threat of severe weather (such as thunderstorms) to those responding from shallow draft boats. Second, logistics to continue operations in these areas were complex. Getting supplies to these areas involved lengthy transits. In order to keep people on scene for longer periods of time jack up boats and flotels were used to house workers near the impacted sites. Third, response operations generated waste that then had to be transported considerable distances just to get to a point where it could be collected and moved to an appropriate disposal facility in order so that response operations could continue. Sorbent boom had to be promptly recovered and removed to avoid risk of further damage to marsh grasses. Vacuuming and skimming generated oily waste that required on site storage, and then transportation for disposal. And finally, great care had to be taken to avoid damaging marsh further through actions to remove the oil, or just from contact with responders.



*BAYOU LA BATRE, Ala. – Cleanup workers push an airboat back into the water which is loaded with bags of oily debris found in the marshes on Coffee Island. Photo courtesy of the U.S. Coast Guard*

**3. Operations**

**Table 3.5: Potential oil spill response methods for marshes.**

| Response Method | Oiling Condition | Advantages | Disadvantages |
|---|---|---|---|
| Natural Recovery (allow the oil to degrade in place or be removed by tidal and wave action) | Lightly or very lightly oiled marshes | Minimal impact, avoids physical disturbance from cleanup actions; studies have shown rapid recovery. | Potential oiling of birds or wildlife using the marsh during the time it takes the oil to be removed. |
| Vacuuming/ Skimming (mostly conducted from boats, in conjunction with flushing to increase recovery rates) | Moderately or heavily oiled marshes | Removes large quantities of oil from the marsh; bulk oil removal will speed natural recovery of remaining oil. | Difficult to bring equipment into marsh without causing some impacts such as crushing of vegetation; impacts may be considerable if not conducted properly. Only very shallow-drafted vessels would be able to access some marsh areas. Collected oil and water must be transported and stored (small oil/water separators would reduce volume of oil to be treated). |
| Low-pressure Flushing (with water comparable to marsh type, or near water source) | Moderately or heavily oiled marshes | Can assist in oil removal by herding oil to collection points (used with vacuuming/skimming); lifts oil off sediment surface (when marsh is not flooded). | Pressure must be carefully controlled to prevent eroding the marsh soils (erosion would expose vulnerable rhizomes). Must be carefully monitored; can cause physical impacts during placement of hoses and pumps. Can be difficult to achieve without removing above-ground vegetation. Can be difficult to flush oil in desired seaward direction without penetrating into marsh, but foot traffic on oiled marsh greatly compromises recovery prospects. May wash away loose soils exposing roots and making them susceptible to further oiling in tidal areas. |
| Manual Removal (by hand or mechanized equipment) | Moderately or heavily oiled marshes | Can be best way to access pooled oil in the marsh interior, using boardwalks to minimize soil disturbance. | Can result in significant damages to the marsh, including soil compaction; Very slow, with challenging logistics for waste management. |
| Natural Sorbent Materials (Technique A) A) Shredded sorbents applied to oiled marsh shorelines (including bagasse, hay, rice hulls, and cotton lint) | Potentially all oiling conditions. Materials can be applied both independently and in coordination with other remediation methods. | Shoreline application of sorbents in strips (2 inches deep by 4-6 feet wide) can prevent further penetration of oil into the interior portions of marsh areas. Low impact on marsh vegetation and soils, as sorbents are applied from shallow-draft boats with blowers onto oiled shoreline areas. Natural materials absorb oil off vegetation and from contaminated soil. Sorbents provide substrate for in situ microbes to attenuate oil, speeding rate of oil degradation. Sorbent materials will also biodegrade quickly. Reduces risk of residual oil to wildlife from both contact with oiled vegetation and released sheens. Available in large quantities at low cost in the Gulf Coast region. | Recovery of loose sorbents is not likely, so use is not appropriate in areas with lots of free-floating bulk oil. Loose materials may be eroded by wave and tidal action from marsh fringe, where the oil is most likely to strand. Limited prior use and wide-scale application or information on effectiveness. Heavily oiled material could be more persistent. Loose natural sorbents may contain residual pesticides and should be tested. |
| Natural Sorbent Materials (Technique B) B) Shredded sorbents applied to unoiled marsh shorelines at imminent risk of oiling (including bagasse, hay, rice hulls, and cotton lint) | Pretreatment of unoiled marsh shorelines in imminent danger of oiling | Pretreatment prior to oiling may prevent damage to shoreline vegetation and soils. Shoreline application of sorbents in strips (2 inches deep by 4-6 feet wide) can prevent further penetration of oil into the interior portions of marsh areas. Applied with minimal physical disturbance (by blower from shallow-draft boats). Sorbents provide substrate for natural microbes to attenuate oil, speeding the rate of oil degradation. Sorbent materials will also biodegrade quickly. Reduces risk of residual oil to wildlife from both contact with oiled vegetation and released sheens. Available in large quantities at low cost in the Gulf Coast region. | Loose materials may be eroded by wave and tidal action from marsh fringe, where the oil is most likely to strand. Limited prior use and wide-scale application or information on effectiveness. If removed after oiling, increases the total amount of material to be removed. Oiled material will be transported to other areas. Heavily oiled material could be more persistent. Oiled materials that disperse into open water may sink. Loose natural sorbents may contain residual pesticides and should be tested. |

Note: This NRT table provides a list of potential response activities to be taken in an oiled marsh. This list is not to be construed as approval by the NRT, but rather to show potential activities that can be considered by the Incident Command.

## 3.9 Alternative Technologies

### Federal Agency Response Research and Development Funding

The OPA 90 establishes an Interagency Coordinating Committee on Oil Pollution Research to "coordinate a comprehensive program of oil pollution research, technology development, and demonstration among the Federal agencies, in cooperation and coordination with industry, universities, research institutions, State governments, and other nations, as appropriate, and . . . foster cost-effective research mechanisms, including the joint funding of research." The Coast Guard chairs the committee, which includes representatives from fourteen federal agencies. The Committee produced the first Oil Pollution Research and Technology Plan in 1992, and a second plan and the most updated plan in 1997.

### Coast Guard Oil Spill Research

The Coast Guard conducts oil spill research through its Research and Development Center in Groton, Connecticut. Coast Guard's budget for oil spill research was $5.6 million in 1993, held constant at $3.5 million from 1998 through 2004, and was $500,000 per year between 2007 and 2010. The Coast Guard allocated its research and development budget to four main areas: spill response planning and management, spill detection and surveillance, vessel salvage and on-board containment, and spilled oil cleanup and countermeasures.

### Assessment of Alternative Response Technology at the Unified Area Command and Incident Command Posts

The Alternative Response Technology Evaluation System (ARTES) teams reviewed over 10,000 submissions for ideas for the cleanup operations. Despite their tremendous accomplishments, they were quite understaffed. ARTES has existed since 1993 and has been effective in addressing ideas submitted during past oil spill responses. The Coast Guard Research and Development Center staff provided the key positions for the ARTES team.

### Interagency Alternative Technology Assessment Program

On May 10, 2010, the National Incident Command established the Interagency Technology Assessment Program (IATAP). The NIC established IATAP to allow government-led evaluation of the thousands of offers of innovative response technologies from both domestic and international entities. This was made possible by means of a Broad Agency Announcement (BAA) for vendors to submit proposals. Proposals were evaluated based upon overall scientific and technical merit, feasibility, the availability of the proposed solution, and a rough order of magnitude cost. As of September 2, the IATAP received approximately 3,900 submissions, 96 percent of which underwent evaluation and adjudication. Proposals that had the potential to assist in the response were forwarded to the Critical Resources Unit at the UAC for possible implementation.

### *A Whale*: An Example

Not all innovative technologies tested during the response were successful. Some were tried after they caught press and public attention. When such applications proved ineffective, considerable time and effort were required to explain why these tools were not used further. *A Whale* is an example of this phenomenon.

In May, an owner proposed the modification of the 1,100 foot, "very large ore and oil carrier," *A Whale*, to make it the world's largest weir skimmer. Weir skimmers function by allowing the thin surface layer of oil to pass over the top of the weir while the water is held back. Efficiency is determined by how accurately this oil layer is "sliced" to produce a high oil-to-water recovery ratio. *A Whale*'s design theorized that the ship's huge capacity and ability to separate oil from water would make up in volume what it lacked in finesse (in terms of efficient oil/water intake ratio).

A team of specialists representing naval architecture (for ship strength and stability concerns), spill response technology, and ship operations reviewed the proposal and concluded that the design theory could not overcome the sea conditions and the low oil encounter rate the ship would experience on the Gulf of Mexico. ("Encounter rate" is the amount of

**B. Operations**



*GULF OF MEXICO – The Coast Guard Cutter* **Resolute** *steams alongside* A Whale, *which is a tanker converted into an oil skimmer. Photo courtesy of the U.S. Coast Guard*

oil presented to the skimmer and is determined by oil thickness, sweep width and speed of advance.) Due to the thin layer of oil surfacing in the Gulf, encounter rates were low and required very efficient booming operations. Sea conditions, even swells as low as one to two feet, would cause far more water to be taken in than oil. Ship stability and structural loads were also a concern. Based on the expert review, the offer was declined.

The owner of *A Whale* proceeded to modify the ship in Europe, again made an offer to assist (this time directly to the government through the IATAP process), set sail for the US east coast, and hired a publicist "to help negotiate with federal regulators and to create public pressure in favor of *A Whale*." (Roanoke Times, June 26, 2010.) When *A Whale* arrived in the Gulf of Mexico, the owner, FOSC, and RP agreed to a proof-of-concept test in the vicinity of the spill site where the other "large" skimmers were operating. ("Large" is relative: at 208 feet, the oil skimming ships owned by MSRC were dwarfed by *A Whale*.)

In early July, the initial design was tested. The design incorporated large slits near the bow to act as a weir for oil and water intake. The slits led into a chamber intended to break up thick, heavy oil into a form that would flow more easily. The inboard bulkhead of the chamber, opposite the weir, had a series of pipes that could be opened to allow oil and water to enter the cargo tanks to begin separation. Because more water entered the chamber past the weir than could flow through the

pipes leading into the cargo tank, water also flowed back out of the weir as the trough of a swell passed. The turbulence created around the intake by this constant in and out flow of water created a barrier to oil floating on the surface (see photo below).

After two days of testing, including the use of a boom to increase the encounter rate, *A Whale* collected virtually no oil. It was evident that the barrier created by the turbulence prevented oil from entering the weir. The owner requested, and the FOSC approved, an extension of time in which to modify *A Whale*'s design to one in which the side openings would be directly piped into the cargo system. The new design was tested in mid-July. It resolved the turbulence problem, but the intake efficiency was very low, even in "calm" seas in which the opening was alternatively submerged and "high and dry" as the crest and trough of a swell passed. After a full day of testing, no oil was found in the main cargo tank and only residue found in an intervening wing tank. Based on the testing, the FOSC concluded that *A Whale* was ineffective in the conditions found on the Gulf— thin, patchy oil in a slight to moderate sea state.



*GULF OF MEXICO-The* A WHALE, *a cargo ship converted to a weir skimmer, discharges water while undergoing proof of concept testing*

### 3.10 Concurrent Emergency Response and Natural Resource Damage Assessment

A major goal of OPA 90 is to make the environment and public whole for injury to or loss of natural resources and services due to a discharge or substantial threat of a discharge of oil (referred to as an incident). This goal is achieved through returning injured natural resources and services to the condition in which they would have been if the incident had not occurred, otherwise referred to as baseline conditions. It is also achieved through compensating for interim losses from the date of the incident until recovery of such natural resources and services through the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources and services.

The Natural Resource Damage Assessment (NRDA) process in the OPA 90 regulations includes three phases: Preassessment, Restoration Planning, and Restoration Implementation.

The purpose of the Preassessment Phase is to determine if the trustees have the jurisdiction to pursue restoration under OPA 90 and, if so, whether it is appropriate. In the case of *Deepwater Horizon*, the trustees did determine that they had the jurisdiction to pursue restoration. The preliminary assessment phase began when the trustees were notified of the incident by response agencies. Once notified of the incident, trustees first determined the threshold criteria that provided their authority to initiate the NRDA process. Based on early available information, trustees made a preliminary determination that natural resources or services had likely been injured. Through coordination with response agencies, trustees next determined whether response actions were expected to adequately address injuries resulting from the spill.

Restoration Planning evaluates potential injuries to natural resources and services, and uses that information to determine the need for and scale of restoration actions. The Restoration Planning Phase has two basic components, injury assessment and restoration selection.

Injury assessment determines the nature, degree, and extent of any injuries to natural resources and services. This information is necessary to provide a technical basis for evaluating the need for, type of, and scale of restoration actions. Under the OPA 90 regulations, injury is defined as an observable or measurable adverse change in a natural resource or impairment of a natural resource service.



*COCODRIE, La. – Absorbent boom, which helps reduce the amount of oil reaching the marshes, lies in the marshes near Cocodrie. Photo courtesy of the U.S. Coast Guard*

In considering both natural resources and services, trustees are addressing the physical and biological environment, and the relationship of people with that environment.

NOAA's Damage Assessment Remediation and Restoration Program (DARRP) acts on behalf of the public as a trustee to manage, protect, and restore coastal and marine resources. Public lands, waters, and living resources are held in trust for the benefit of all people and future generations. Stewardship of the nation's natural resources is shared among several federal agencies, states, and tribal trustees.

When possible, NOAA works cooperatively with the parties responsible for the injury. By working with the RP and co-trustees to collect data, conduct assessments, and identify restoration projects, NOAA avoids lengthy litigation and achieves restoration of injured resources more efficiently.

The scope of the Natural Resource Damage Assessment will include impacts to fish, shellfish, marine mammals, turtles, birds, and other sensitive resources, as well as their habitats, including wetlands, beaches, mudflats, bottom sediments, corals, and the water column. The trustees will assess any lost human uses of these resources, for example, fishing, hunting, and beach recreational closures. The trustees will also determine the efficacy of evaluating impacts from the response, including burning, and dispersant use at the surface and at depth.

NOAA's DARRP is coordinating this effort with natural resource trustees in five states (La., Miss., Ala., Tx., and Fla.), the Department of Interior FWS and National Park Service (NPS), and the RP. Multiple agencies from each state are engaged. DoD is also a trustee in this case due to impacted property, though they do not actively participate.

Natural resource trustee agencies (including NOAA, DOI, state agencies, and Tribal Governments) are responsible for trust resources as designated by the National Contingency Plan (40 CFR 300.600).

The DOI trust resources include migratory birds, andromous fish, endangered species, marine mammals, federally owned minerals, and certain federally managed water resources. DOI is also a trustee for natural resources for which an Indian tribe would otherwise act as trustee. In those cases the United States acts on behalf of the Indian tribe.

State trust resources include wetlands, surface



GRAND ISLE, La. – Laughing gulls congregate in the marshes near Bay Jimmy. These marshes are home to many species of birds including brown pelicans, egrets, roseate spoonbills, and stilts. Photo courtesy of the U.S. Coast Guard

waters, ground waters, air, soil, wildlife, aquatic life, and the habitats on which they depend

The work that is being conducted under the Pre Assessment Phase of the NRDA is being carried out cooperatively with RP. This means that the trustees are jointly meeting with RP to discuss NRDA actions, and that RP is integrated into several NRDA Technical Working Groups (TWGs) that have been formed to investigate potential injuries to particular resource groups or habitats.

The focus of the TWGs is to assemble a variety of existing data on resources, their habitats, and their human uses, and to collect baseline, or pre-spill, data wherever possible. Information about impacts on these resources and their uses is also being assembled. NOAA is providing scientific and technical expertise and information management to many parts of the overall NRDA effort.

Trustees are required to demonstrate causality between the release—or substantial threat of a release—of oil, and injured resources, lost services, or lost human use of those resources and services. This requires linking the release of oil, its fate, and transport in the environment, exposure of natural resources to the oil, and its effects on the biota and human uses. Determining the amount of injury and appropriate restoration also requires consideration of the condition of the natural resources and human uses if the spill had not occurred, i.e., baseline conditions.

Trustees seek to restore injured resources and services to baseline and to compensate the public for interim losses, i.e., the time it takes the resources to recover. Over the course of the NRDA process, the trustees assess the nature and extent of the injuries, develop a restoration plan, seek compensation from the RP for damage assessment and restoration costs, oversee or implement the restoration plan, and conduct and oversee monitoring to ensure restoration has occurred. Liability for natural resource damages is in addition to liability for cleanup.

During an oil spill, response and NRDA activities may be occurring simultaneously. It is sometimes assumed that these two processes exist independently of each other and that the data collected to guide the response operations are different from the data gathered for NRDA. However, a review of OPA 90 and guidance documents indicates that these activities are intended to work in a cooperative, holistic manner. Typically, trustees work in the environmental unit under the ICS, providing data such as resources at risk. However, they may also be trying to gather ephemeral data necessary to support a NRDA and looking for opportunities for emergency restoration projects that may mitigate further injury or help the injured resource recover more quickly.

Trustees have a somewhat different job from that of the oil spill-response personnel. Responders, such as the SCAT teams, do not generally have time to do detailed scientific studies. Their interest is in reducing the impact of the spill and cleaning it. The trustees, on the other hand, need to assess the extent of the injuries and may use data gathered from SCAT to determine oiled habitats requiring further assessment. The assessment can be used to determine the extent of the impacts and scale of restoration necessary to compensate the public for the lost resources.

Funds eventually recovered through the NRDA process are used to restore injured resources, or the RP may implement restoration projects with trustee oversight. Much of the evidence of these injuries is ephemeral and will gradually be removed by cleanup and natural processes, therefore the trustees need to be on scene to collect the injury data immediately following an incident. In addition to assessing damage for long-term restoration, the trustees may be able to identify emergency restoration actions that will reduce the impacts from spills, thus assisting the responders.

However, OPA 90 makes it clear that NRDA does not and should not trump response actions. If emergency restoration actions are proposed to occur during the active response phase, which may impede the response, these regulations ensure that the OSC is the final word on whether this emergency restoration should be undertaken. If response actions are still under way, trustees must coordinate with the OSC to ensure emergency restoration actions will not interfere with or duplicate ongoing response actions. The OPA 90 regulations also prescribe that trustees make an effort to coordinate emergency restoration actions with the RP. Typically, there is a formal invitation from the trustees to the RP for a cooperative assessment, but this usually occurs after the response phase ends or is nearly ended. However, coordination between the trustees and RP usually begins soon after the trustee and RP representatives arrive on scene.

OPA 90 also provides guidance on how ephemeral data should be collected and treated during an ongoing response. The regulations state that trustees may conduct data collections that are reasonably related to Preassessment Phase activities. However, data collection must be coordinated with response actions such that collection of the data does not interfere with response actions. Trustees may collect and analyze ephemeral data; and information needed to design or implement anticipated injury assessment procedures. Examples of ephemeral data include:

- Surface water or soil likely to contain oil, where those samples may be necessary for identification and for measurement of concentrations,

- Samples that may be lost because of factors such as dilution, movement, decomposition, or leaching,

- A source sample, vital for fingerprinting that can be used to calibrate and verify model results,

- Counts of dead or visibly injured organisms because of factors such as decomposition, scavenging, or water movement, and

- Scavenging experiments that may need to be performed to understand how quickly dead and injured wildlife may have been removed from the area.

The Incident Management Handbook (IMH) is another good resource to determine how NRDA activities relate to response activities. It prescribes responsibilities to parties that act in the response planning, logistics, and operations, as well as the command staff. For example, it states that the Liaison Officer should coordinate response resource needs for NRDA activities with the OSC during oil and hazmat responses.

The IMH also states that the Lead Administrative Trustee (LAT) is responsible for coordinating NRDA needs and activities of the trustee team. NRDA activities generally do not occur within the structure, processes, and control of the ICS. However, particularly in the early phases of a spill response, many NRDA activities overlap with the environmental assessment performed for the sake of spill response. Therefore, the trustees should remain coordinated with the spill response organization through the Liaison Officer. The trustees then may need to work directly with the unified command , Planning Section, Operations Section, and, if working on the spill, the NOAA Scientific Support Coordinator to resolve any problems or address areas of overlap. This includes close coordination with the Liaison Officer for obtaining timely information on the spill and injuries to natural resources. The trustees should seek the OSC's cooperation in acquiring response-related samples or results of sample analyses applicable to NRDA. Furthermore, they should obtain necessary safety clearances for access to sampling sites. It is worth noting that often NOAA's SSC and not the Liaison Officer becomes the conduit between the trustees and the OSC. This often occurs because the SSC has more knowledge of the NRDA process than most Liaison Officers.



*CHAUVIN, La. – A shrimp boat captain sets his rig to pull in his catch after trawling on Robinson Canal during the third day of commercial fishing season. Photo courtesy of U.S. Coast Guard*

### 3.11 FOSC Key Points

**Response and Restoration, Removal, and Damage Assessment**

It is difficult to explain the differences and distinctions between oil spill response, performed under the FOSC's supervision, and Natural Resource Damage Assessment (NRDA), performed separately under the oversight of natural resource trustees agencies. Particularly in large spills, the National Incident Commander or FOSC acts as a single spokesperson for government involvement with the response. While NRDA frequently begins before response activity stops, it may continue for years. The FOSC does not participate in NRDA, but this lack of participation is confusing to officials and the public. A process is needed to pre-identify a lead spokesman for NRDA activities during major spills to work alongside the FOSC, to explain the full scope of activities.

**Ineffective Boom Deployment**

In hindsight, extensive petroleum-based containment boom was deployed in unmanageable areas, and then retrieved and disposed of as waste. Tending such long expanses of containment boom along the vast Gulf of Mexico shorelines while subject to tide, current and sea conditions, was not possible. Environmentally sensitive areas (ESAs) where containment boom was appropriate were not shown in plans, tested, or identified well. FWS noted that this resulted in oil getting to the wrong (protected) side of the boom and then being held there adjacent to the ESA. Explaining the nuances of entrainment and permeability of containment and deflection booming proved difficult. Most of the booming was counter-productive, but became viewed as necessary as oil approached the shore from 50 miles at sea.