# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| Applies to: | * | **JUDGE BARBIER** |
| *Pleading Bundle B3* | * | |
| | * | **MAG. JUDGE SHUSHAN** |
| | * | |

## ORDER & REASONS

Before the Court is Defendant Nalco's[1] **Motion for Summary Judgment**, Rec. Doc. 6541, and related briefing.[2]  Nalco's motion seeks to dismiss all claims asserted against it in the B3 Master Complaint.  Oral argument was held on July 13, 2012.  Having considered the arguments presented, the record, and the applicable law, the Court **GRANTS** Nalco's motion for the reasons set forth below.

## I.  FACTUAL AND PROCEDURAL HISTORY

On April 20, 2010, a blowout, explosion, and fire occurred aboard the semi-submersible drilling rig DEEPWATER HORIZON as it was preparing to temporarily abandon the "Macondo Well," located on the Outer Continental Shelf approximately fifty miles south of the Louisiana coast. Eleven workers died in the explosion, and many others were injured.  On April 22, the DEEPWATER HORIZON sank into the Gulf of Mexico, breaking the marine riser that had

---

[1]  "Nalco" refers to Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC, and Nalco Holding Company.

[2]  PSC's Opp'n, Rec. Doc. 6696; Pl. Malcolm Coco's Opp'n, Rec. Doc. 6705; Nalco's Reply, Rec. Doc. 6861; United States' Stmt. of Interest, Rec. Doc. 6851; Pl. Malcolm Coco's Supp. Mems., Rec. Docs. 8025, 8029, 8032; Nalco's Resps. to Supp. Mems., Rec. Docs. 6929, 7050.

connected it to the Macondo Well. Over the next three months, millions of barrels of oil flowed up the well, through the broken riser, and into the Gulf. BP Exploration & Production, Inc. and/or its affiliated entities (collectively "BP") owned the Macondo Well, leased the area where it was located, and chartered the DEEPWATER HORIZON. BP was designated a "responsible party" for the oil spill under the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*

The oil spill instigated a massive response involving government entities and officials, BP and its contractors and subcontractors, and thousands of individuals. Responders attempted a number of countermeasures, including skimming, absorbing, burning, and—most relevant here—chemically dispersing oil. Dispersants "are chemical agents that emulsify, disperse, or solubilize oil into the water column or promote the surface spreading of oil slicks to facilitate dispersal of the oil into the water column." 40 C.F.R. § 300.5. The intended result is to reduce the risk of direct contact by wildlife and reduce the amount of oil impacting sensitive nearshore and shoreline areas. Furthermore, "microbial biodegradation of oil appears to be enhanced by dispersal because of the larger surface area available as compared to a surface slick."[3] Approximately 1.8 million gallons of the dispersants Corexit EC9500A and Corexit EC9527A (collectively, "Corexit") were applied either to the water's surface or beneath the water's surface, near the source of the discharge. Nalco is the manufacturer of Corexit.

On August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred cases arising from the DEEPWATER HORIZON/Macondo Well incident to this Court for consolidated or coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re: Oil Spill by the Oil Rig*

---

[3] Region IV Regional Response Team Policy for Use of Dispersants, Ex. H to Nalco's Stmt. of Undisputed Material Facts, Rec. Doc. 6541-22 at 36-37; *see also* Abby J. Queale, *Responding to the Response: Reforming the Legal Framework for Dispersant Use in Oil Spill Response Efforts in the Wake of Deepwater Horizon*, 18 Hastings W.-Nw. J. Envtl. L. & Pol'y 63, 65 (2012).

*"Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).  This Court organized the various types of claims into several "pleading bundles."  Relevant here is the B3 bundle, which concerns claims relating to post-explosion clean-up efforts.  *See* Pre-trial Order No. 25 ¶ 1, Rec. Doc. 983.

The Plaintiffs' Steering Committee ("PSC") filed a B3 Master Complaint, which asserts, *inter alia*, claims under general maritime law and state law on behalf of individuals allegedly injured by exposure to oil, chemical dispersant, or a mixture of oil and dispersant.  Rec. Doc. 1812.  The B3 Plaintiffs include vessel captains and crew participating in clean-up activities, workers that decontaminated vessels soiled by oil and/or dispersants, workers that participated in onshore clean-up, and coastal residents and vacationers who claim exposure by virtue of proximity to coastal waters.  The B3 Plaintiffs complain of a variety of exposure-related injuries, including headaches, nausea, respiratory problems, eye irritation, rashes, burns, and lesions.  The B3 Master Complaint also alleges that the B3 Plaintiffs may have contracted latent illnesses that may take years to manifest and, accordingly, asserts a claim for medical monitoring costs.  Named defendants include Nalco, the "Clean-Up Defendants" (private entities that sprayed Corexit), BP, and the other parties involved with the DEEPWATER HORIZON and Macondo Well (Transocean Ltd., Anadarko Petroleum Corp., MOEX Offshore 2007 LLC, et al.).

In September 2011, the Court ruled on the Defendants' motions to dismiss the B3 Master Complaint under Fed. R. Civ. P. 12(b)(6).  Rec. Docs. 4159 & 4209, *In re: Oil Spill*, 2011 WL 4575696 (E.D. La. Sept. 20, 2011).  Nalco and the Clean-Up Defendants had contended that they were entitled to derivative governmental immunity and/or the claims were preempted by the Clean Water Act and the National Contingency Plan.  The Court held these defenses were not established

on the face of the B3 Master Complaint and, thus, could not succeed at the Rule 12 stage. However, the Court also noted that the arguments appeared plausible and expressly permitted Nalco and the Clean-Up Defendants to reassert these defenses at a later time.

On November 3 and December 23, 2011, the Magistrate Judge issued limited discovery orders intended to develop the facts relating to the derivative immunity and preemption defenses. Rec. Docs. 4472, 5000. The orders also established deadlines for Nalco and the Clean-Up Defendants to reraise their defenses. Nalco filed a renewed motion to dismiss on January 31, 2012. Rec. Doc. 5531. The PSC's opposition was due on February 21. On February 16, the PSC moved for leave to amend the B3 Master Complaint so as to delete the claims against Nalco and the Clean-Up Defendants, but still proceed against BP and the other parties involved with the DEEPWATER HORIZON's drilling operations. Rec. Doc. 5718. The PSC claimed that its motion would "have the effect of dismissing, *without* prejudice, the claims against [Nalco and the Clean-Up Defendants] . . . , while at the same time preserving the rights of individual plaintiffs to assert claims against such defendants in their own individual petitions or complaints, should they so desire." *Id.* at 2 (emphasis added). Nalco, the Clean-Up Responder Defendants, and BP opposed the PSC's motion on the grounds that the PSC should not be permitted to amend the Complaint unless dismissal is *with* prejudice. Rec. Docs. 5828, 5846, 5871. On April 16, the Court denied the PSC's motion for leave to amend, but also converted Nalco's renewed motion to dismiss to a motion for summary judgment and new deadlines for responding. Rec. Doc. 6247.

Nalco has now submitted its motion for summary judgment, memoranda in support, and reply briefs. The PSC and another plaintiff, Malcolm Coco (allegedly exposed to and injured by Corexit, *see* C.A. No. 11-946), filed oppositions. The Court has also received numerous letters from

*pro se* individuals who are opposed to Nalco's motion. Briefing is also complete on the Clean-Up Defendants' motions for summary judgment, but those motions are not considered here.

## II. LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). "Factual controversies are construed in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists." *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). When the moving party has carried its burden, the nonmoving party must do more than "simply show there is some metaphysical doubt as to the material facts." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 234 (5th Cir. 2010) (citation omitted). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to" defeat summary judgment. *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quotations and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Because summary judgment is designed to pierce the formal allegations of the pleadings, there is great flexibility with respect to the evidence that may be used. 10A Charles Alan Wright, et al., *Federal Practice and Procedure* §§ 2721, 2722 (3d ed. 1998). Accordingly, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to

particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Although the Court need consider only the cited materials, it may consider other materials in the record. *Id.* 56(c)(3).

## III. DISCUSSION

### A. Objections to Nalco's Evidence

A significant part of Nalco's motion relies upon stipulations of fact by the United States. *See* Rec. Doc. 6541-3. The PSC objects to these stipulations and urges the Court to disregard them. The PSC argues:

> Here, Defendants use of stipulations entered with the government is manifestly unfair. Plaintiffs were not a party to the stipulations, did not assent to them, and, indeed, objected to the proposed stipulations during the limited discovery period. More importantly, Plaintiffs have not been permitted to test the veracity of the stipulations through deposition testimony. Thus, the stipulations rely upon "factual" assertions that are not available to Plaintiffs. See Fed. R. Civ. P. 56(d) (explaining that the court may permit further discovery when a motion for summary judgment relies upon facts not available to the non-movant). In the interest of fairness, the Court should not consider the joint stipulations on this motion.

PSC's Opp'n pp. 24, 26, Rec. Doc. 6696 at 31, 33 (footnote and citation omitted).

The PSC's arguments are contradicted by the Magistrate Judge's discovery orders, which allowed the PSC to serve discovery requests and depose witnesses, including the United States' witnesses. *See* Rec. Docs. 4472, 5000. Furthermore, the PSC admits in its opposition brief that it had the opportunity to conduct its own discovery, but made a "strategic decision" not to do so:

> Plaintiffs acknowledge that the Court's Limited B3 Discovery Order set forth an April 30, 201[2] deadline to conduct "limited" depositions relevant to Defendants'

6

preemption and derivative immunity defense. On February 16, 2012, however, Plaintiffs made a strategic decision to move for the effective dismissal, without prejudice, of Nalco and the Clean-Up Responders. Accordingly, once that motion was filed, Plaintiffs' discontinued further discovery efforts and focused resources on the fast-impending Limitation and Liability Trial and the concurrent settlement discussions with BP. Two months later, the Court denied Plaintiffs' motion. At that point, however, the limited discovery period was essentially closed.

PSC's Opp'n p. 4 n.1, Rec. Doc. 6696 at 11 n.1 (citation omitted). The United States' filed a

response to the PSC, which further reflects that the PSC did not take advantage of the opportunities

it had to challenge the Government's stipulations:

The limited B3 discovery order also allowed all parties, not just defendants, to request documents and/or depositions, but no parties served document requests or deposition notices on the United States during that time window. Thus, the PSC had the opportunity to contest the stipulations with written discovery or deposition requests during the limited discovery period, but did not do so.

U.S. Stmt. of Interest pp. 1-2, Rec. Doc. 6851.

"[A] party suspends discovery at his own risk." *Beattie v. Madison Cnty. Sch. Dist.*, 254

F.3d 595, 606 (5th Cir. 2011); *see also Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th

Cir. 1991) ("If, however, the nonmoving party has not diligently pursued discovery of that evidence,

the court need not accommodate the nonmoving party's belated request [to continue a motion for

summary judgment and allow additional discovery].")." Thus, the PSC's failure to avail itself of the

opportunity to test the veracity of the United States' stipulations provides no reason for the Court

to disregard these stipulations. Furthermore, the Government's statements below convince the Court

it should accept these stipulations:

The United States complied in full with [the Court's discovery orders]. Nalco and the Responder Defendants sought to enter into stipulations with the United States. The United States undertook significant efforts to review the documentary evidence available and canvass the relevant witnesses to assemble stipulations that were eventually served on the other parties. The United States has also responded to a large number of Requests for Admission served by BP and other parties that relate

7

to dispersant use.

. . .

As for whether specific dispersant applications were approved by the Federal On-Scene Coordinator ("FOSC"), the United States has now admitted as much multiple times, both in the stipulations and in response to multiple sets of RFAs [Requests for Admissions]. The relevant approval letters have long since been produced, and the relevant Incident Action Plans have been produced as well. Between the documentary evidence and the multiple admissions of the United States, there is simply no need to depose the individuals involved in this process. To the extent the Court disagrees, the United States has already agreed to produce a Phase 2 30(b)(6) witness to testify about two topics related to dispersants, and the United States suggests that, if further questions are necessary regarding whether the Federal On-Scene Coordinator actually approved of dispersant use, the PSC may ask those questions of that witness.

. . .

Despite being a third party with no direct stake in the outcome of the B3 claims, the United States undertook serious efforts to develop a comprehensive list of stipulations to provide the parties and the Court with the most complete picture possible of the dispersant approval process.

U.S. Stmt. of Interest pp. 1, 2-3, 4, Rec. Doc. 6851. Accordingly, the Court overrules the PSC's objections and will consider the Government's stipulations.

The PSC also raises, but does not discuss, hearsay objections to some of the evidence offered by Nalco. *See, e.g.*, PSC's Resp. to Nalco's Stmt. of Undisputed Material Facts p.13 ¶¶ 68-71, Rec. Doc. 6696-1 ("Plaintiffs object to consideration of the correspondence in these Paragraphs pursuant to Federal Rule of Evidence 801."). At the summary judgment stage, the standard is whether the evidence could be presented at trial in an admissible form. *See* Fed. R. Civ. P. 56(c)(2); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) ("Gannon complains that Hung's statement is partly based on hearsay, but does not even attempt to argue that the information contained in Hung's statement could not have been presented in an admissible form at trial. We conclude that

the district court did not abuse its discretion in overruling Gannon's hearsay objection."). The PSC has not argued that the evidence could not be presented in a form that would be admissible at trial, and, as discussed, failed to conduct its own discovery with respect this evidence. For these reasons, the Court overrules the PSC's hearsay objections. The Court also notes that some of the PSC's hearsay objections lack merit for other reasons—for example, some materials meet the public records exception, Fed. R. Evid. 803(8), or are not offered to prove the truth of the matter asserted in the statement.

## B.    Statutory and Regulatory Background

Since it was enacted in 1972, Section 311 of the Clean Water Act ("CWA")[4] has declared, "it is the policy of the United States that there should be no discharges of oil . . . into or upon the navigable waters of the United States . . . ." Pub. L. No. 92-500, 86 Stat. 816, 863 (1972) (codified at 33 U.S.C. § 1321(b)(1)). Consistent with this policy statement, the CWA established certain federal obligations and powers with respect to an oil spill. As detailed below, the Oil Pollution Act of 1990 ("OPA") made significant changes to these provisions. However, even before OPA's amendments the CWA authorized the President "to act to remove or arrange for the removal" of discharged oil,[5] "unless he determines such removal will be done properly by the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs." 33 U.S.C. § 1321(c)(1) (1988), *amended by* OPA, Tit. II, Sec. 2001, Pub. L. No. 101-380, 104 Stat 484, 523-27 (1990). In the case of a large discharge of oil that "created a substantial threat of a pollution hazard to the public health or welfare of the United States" (hereinafter, "Substantial Spill") the CWA

---

[4]  The Clean Water Act is also known as the Federal Water Pollution Control Act.

[5]  In addition to actual discharges, prior and current versions of the CWA govern instances where there is a substantial threat of discharge. For convenience, this Order only refers to actual discharges.

permitted, but did not require, the federal government to "coordinate and direct" all public and private response efforts and "summarily remove, and, if necessary, destroy such vessel by whatever means are available without regard to any provisions of law governing the employment of personnel or the expenditure of appropriated funds."  *Id.* § 1321(d) (1988).

OPA amended the CWA to, among other things, expand federal authority over, and responsibility for, oil spill responses.  For all spills, regardless of size or character, the CWA now requires that "[t]he President shall, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ***ensure effective and immediate removal*** of a discharge . . . of oil . . . ."  33 U.S.C. § 1321(c)(1)(A) (emphasis added).  In the case of smaller spills, the President may choose from a variety of options when determining how to ensure effective and immediate removal: the President may remove or arrange for the removal of the discharge; direct removal actions; remove or destroy a vessel discharging oil "by whatever means are available"; or simply monitor removal efforts.  *Id.* § 1321(c)(1)(B).  However, when there is a Substantial Spill, the CWA deletes the option of monitoring removal efforts.  Instead, "[t]he President ***shall direct all Federal, State, and private actions*** to remove" a Substantial Spill.  *Id.* § 1321(c)(2)(A) (emphasis added).  Legislative history states that this provision was "designed to eliminate the confusion evident in recent spills where the lack of clear delineation of command and management responsibility impeded prompt and effective response."   H.R. Rep. No. 101-653, at 45 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 825.  When addressing a Substantial Spill, the President may remove the discharge, arrange for the removal of the discharge, or destroy a discharging vessel, as he could for smaller spills; however, to "facilitate emergency response," the President may perform these actions "without regard to any other provision of law governing contracting procedures or

10

employment of personnel by the Federal Government." 33 U.S.C. § 1321(c)(2)(B); H.R. Rep. No. 101-653, at 45.

The CWA also required the President to prepare a National Contingency Plan ("NCP"), which "shall provide for efficient, coordinated, and effective action to minimize damage from oil . . . , including containment, dispersal, and removal . . . ," as well as a National Response System that is consistent with the NCP. *Id.* § 1321(d), (j). The National Response System establishes three levels of federal contingency plans: the NCP, Regional Contingency Plans, and Area Contingency Plans. 40 C.F.R. § 300.210.

The NCP mirrors the CWA's provision regarding federal authority and responsibility. Under the NCP, the Federal On-Scene Coordinator ("FOSC")[6] "directs response efforts and coordinates all other efforts at the scene of the discharge or release." *Id.* § 300.120(a).[7] When there is a Substantial Spill, "the [F]OSC must direct all response efforts" and "should declare as expeditiously as practicable to spill response participants that the federal government will control the response." *Id.* § 300.305(d)(2); *see also id.* § 300.322(b). The FOSC also may take additional response actions not explicitly provided in the NCP. *Id.* § 300.322(c)(3); *see also id.* § 300.324(a)(4) (permitting similar actions when there is a "worst case discharge"). If a spill "is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge," the Coast Guard may declare a "spill of national

---

[6] The President may delegate his responsibilities under the CWA to other federal entities. 33 U.S.C. § 1321(*l*). When a discharge occurs within or threatens the "coastal zone," the United States Coast Guard provides the FOSC. 40 C.F.R. § 300.120(a)(1).

[7] *See also* 40 C.F.R. § 300.135(d) ("The basic framework for the response management structure is a system (e.g., a unified command system), that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, ***where the [F]OSC maintains authority***." (emphasis added)).

significance" and name a National Incident Commander who will "assume the role of the [F]OSC in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level." *Id.* §§ 300.5, 300.323.

The CWA similarly states that each federal agency, State, or private party participating in an oil spill response under the CWA shall act in accordance with the NCP (or other response plan required by the CWA), unless directed otherwise by the President or the FOSC. 33 U.S.C. § 1321(c)(3); *see also id.* § 1321(d)(4) ("After publication of the [NCP], "the removal of oil . . . and actions to minimize damage from oil . . . shall, to the greatest extent possible, be in accordance with the [NCP]."). Furthermore, parties rendering care, assistance, or advice consistent with the NCP or as directed by the President are explicitly immunized from removal costs or damages that result from their actions or omissions. *Id.* § 1321(c)(4)(A).[8] Legislative history states that this immunity is intended to encourage "immediate and effective responses" and that "[w]ithout such a provision the substantial financial risks and liability exposures associated with spill response could deter vessel operators, cleanup contractors, and cleanup cooperatives from prompt, aggressive response." H.R. Rep. No. 101-653, at 45. The CWA also immunizes the federal government "for any damages arising from its actions or omissions relating to any response plan required by [Section 311 of the CWA]. 33 U.S.C. § 1321(j)(8).

The CWA and the NCP contemplate that chemical dispersants may be used in response to an oil discharge. The CWA requires the NCP to contain, *inter alia*, "[p]rocedures and techniques to be employed in identifying, containing, **dispersing**, and removing oil . . . ," *id.* § 1321(d)(2)(F)

---

[8] This immunity does not extend to "responsible parties" under OPA, claims for personal injury or wrongful death, acts of gross negligence or willful misconduct, or responses under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* 33 U.S.C. § 1321(c)(4)(B). The "responsible party" is liable for removal costs and damages immunized by this provision. *Id.* § 1321(c)(4)(C).

(emphasis added), as well as:

> A schedule, prepared in cooperation with the States, identifying –
>
> > (i) **dispersants**, other chemicals, and other spill mitigating devices and
> > substances, if any, that may be used in carrying out the Plan,
> > (ii) the waters in which such **dispersants**, other chemicals, and other spill
> > mitigating devices and substances may be used, and
> > (iii) the quantities of such **dispersant**, other chemicals, or other spill mitigating
> > device or substance which can be used safely in such waters . . . .

*Id.* § 1321(d)(2)(G) (emphasis added); *see also id.* § 1321(j)(4) (requiring Area Contingency Plans

to list available "dispersants or other mitigating substances and devices").  Furthermore, "in the case

of any dispersant . . . not specifically identified in such schedule[,] . . . the President, or his delegate,

may, on a case-by-case basis, identify the dispersants . . . which may be used, the waters in which

they may be used, and the quantities which can be used safely in such waters." *Id.* § 1321(d)(2)(G).

Accordingly, the EPA prepared and maintains the NCP Product Schedule.  40 C.F.R. §§

300.900(a), 300.905.  If a dispersant is listed on the NCP Product Schedule, then the FOSC may

authorize its use if the EPA (and sometimes other state representatives) concurs in such use and,

when practicable, after consulting with certain natural resource trustees. *Id.* § 300.910(b).  However,

if a dispersant listed on the NCP Product Schedule is also "preauthorized" for use in specified

circumstances under a Regional Contingency Plan or Area Contingency Plan, then the FOSC may

authorize the use of that dispersant without the concurrence of, or consulting with, any other agency

or officer. *Id.* § 300.910(a).  The NCP also permits the FOSC to authorize the use of dispersants not

listed on the NCP Product Schedule when it is necessary to prevent or substantially reduce a hazard

to human life. *Id.* § 300.910(d).

To be included on the NCP Product Schedule, the manufacturer must submit certain data to

the EPA. *See id.* §§ 300.905(2), 300.920(a).  This includes special handling and worker precautions;

13

shelf life; recommended application procedures, concentrations, and conditions for use depending

on water salinity, water temperature, and types and ages of pollutants; results of certain effectiveness

tests; results of certain toxicity tests; and component information. *Id.* § 300.915(a) & app. C. After

reviewing the submission, the EPA determines whether to add the dispersant on the NCP Product

Schedule. *Id.* § 300.920(a)(2). The EPA may also request further documentation or conduct its own

testing on the product. *Id.* The regulation notes, however, that "[t]he listing of a product on the

NCP Product Schedule does not constitute approval of the product." *Id.* § 300.920(e).[9]

## C.     The Use of Corexit During the DEEPWATER HORIZON/Macondo Well Oil Spill

Corexit EC9527A and Corexit EC9500A have been listed on the NCP Product Schedule

since 1978 and 1994, respectively, and continue to be listed to this day. Nalco's Stmt. of Undisputed

Material Facts ¶¶ 2-3 ("SUMF"), Rec. Doc. 6541-2.[10] Both versions of Corexit also were

preauthorized for use under the circumstances described in the Regional Response Plans for Region

---

[9] The provision fully states:

The listing of a product on the NCP Product Schedule does not constitute approval of the product. To avoid possible misinterpretation or misrepresentation, any label, advertisement, or technical literature that refers to the placement of the product on the NCP Product Schedule must either reproduce in its entirety EPA's written statement that it will add the product to the NCP Product Schedule under §300.920(a)(2) or (b)(2), or include the disclaimer shown below. If the disclaimer is used, it must be conspicuous and must be legibly reproduced. Failure to comply with these restrictions or any other improper attempt to demonstrate the approval of the product by any [National Response Team] or other U.S. Government agency shall constitute grounds for removing the product from the NCP Product Schedule.

DISCLAIMER
[PRODUCT NAME] is on the U.S. Environmental Protection Agency's NCP Product Schedule. This listing does NOT mean that EPA approves, recommends, licenses, certifies, or authorizes the use of [PRODUCT NAME] on an oil discharge. This listing means only that data have been submitted to EPA as required by subpart J of the National Contingency Plan, §300.915.

40 C.F.R. § 300.920(e).

[10] Citations to Nalco's SUMF include the documents cited therein.

IV (covering Gulf waters adjacent to Mississippi, Alabama, Florida, and other areas) and Region VI (covering Gulf waters adjacent to Texas and Louisiana). *Id.* ¶ 7. Preauthorization under these plans generally permitted the FOSC to quickly authorize surface application of any dispersant on the NCP Product Schedule to waters either ten meters deep or three nautical miles from shore, whichever is farther from the shore.

The Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana became the first FOSC to direct the response to the DEEPWATER HORIZON/Macondo Well incident. Nalco SUMF ¶ 13. On April 23, Rear Admiral Mary Landry succeeded as FOSC and established the Unified Area Command (discussed below). *Id.* ¶¶ 14-15. On April 29, the United States Coast Guard classified the spill as a "spill of national significance" pursuant to 40 C.F.R. § 300.323, and Admiral Thad Allen subsequently was named "National Incident Commander." *Id.* ¶¶ 16-17. On June 1, Rear Admiral James Watson succeeded Admiral Landry as FOSC, who in turn was succeeded by Admiral Paul Zukunft on July 12. *Id.* ¶¶ 18-19.

The Unified Area Command included representatives from the Coast Guard, EPA, BP, and Transocean (owner of the DEEPWATER HORIZON). *Id.* ¶ 30. Each day, the FOSC and other members of the Unified Area Command would evaluate the risks posed by the oil spill, the tools available to minimize the damage, and otherwise manage the response. *Id.* ¶¶ 29-32. However, the FOSC exercised ultimate decision-making authority over response activities, including the use of dispersants. *Id.* ¶¶ 33, 56-57.

On April 21, 2010, the FOSC determined that the use of dispersants would likely provide a net environmental benefit and authorized the first aerial application of Corexit under the preauthorization guidelines of the Regional Contingency Plan for Region VI. *Id.* ¶¶ 39-42. Between

April 22 and July 19, the FOSC, with the appropriate concurrence of and/or consultation with other officials (when required), approved surface and subsea applications of Corexit on a daily basis. Nalco SUMF ¶¶ 34-35, 43-45, 47-55. These authorizations included limits on when, where, and in what quantities Corexit could be applied. *Id.* ¶¶ 36-39, 50-54. At times the FOSC authorized the use of dispersants outside the preauthorization zones (e.g., within three nautical miles of the shore) when it was deemed necessary to prevent or substantially reduce a hazard to human life. Nalco SUMF ¶ 64. Nalco did not decide whether, when, where, how, or in what quantities Corexit was applied in response to the DEEPWATER HORIZON/Macondo Well oil spill. *Id.* ¶ 72.

## D.     Arguments and Law Regarding Preemption

The Court previously held that state law is preempted by general maritime law. Rec. Docs. 4149 & 4209, *In re: Oil Spill*, 2011 WL 4575696, at *3. For the sake of argument, however, the Court will address preemption with respect to both state law and general maritime law.

The B3 Master Complaint alleged that Corexit was defective, unreasonably dangerous, and toxic under state tort law and general maritime law. *See* B3 Master Compl. ¶¶ 269-78, 310-327, Rec. Doc. 1812; *see also* PSC Opp'n p.39, Rec. Doc. 6696 at 46 ("Nalco . . . did not actively participate in the spill response. . . . Plaintiffs contend that the dispersant chemical was defective and Nalco should be held to account for the harmful effects its product caused."). While Nalco disputes allegations that its products were defective, etc., it also contends that the B3 claims are preempted because they conflict with the FOSC's decisions to use Corexit and/or present an obstacle to the objectives of the CWA and NCP.

The PSC counters the preemption argument by asserting that its claims against Nalco sound in products liability, not that the government was wrong in its decision to use Corexit. According

to the PSC, even if Corexit EC9527A and Corexit EC9500A were not considered unreasonably
dangerous when they were initially listed on the NCP Product Schedule in 1978 and 1994,
advancements in science since that time have raised the standard of care. Thus, Corexit was an
unreasonably dangerous product when it was used in 2010, and tort law imposed a corresponding
duty on Nalco to discontinue Corexit or change its formula. Citing *In re Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation*, the PSC argues that no federal law required Nalco to
submit Corexit for inclusion on the NCP Product Schedule; thus Nalco cannot assert that compliance
with both federal law and state tort law was an impossibility. 175 F. Supp. 2d 593, 615-16
(S.D.N.Y. 2001); 457 F. Supp. 2d 324, 336-37 (S.D.N.Y. 2006). Furthermore, the PSC argues that
the savings clauses in OPA and the CWA[11] and the CWA's immunity provision for

---

[11] OPA states, in pertinent part:

(a) Nothing in this Act or the Act of March 3, 1851 shall--
    (1) affect, or be construed or interpreted as preempting, the authority of any State or political
    subdivision thereof from imposing any additional liability or requirements with respect to--
      (A) the discharge of oil or other pollution by oil within such State; or
      (B) any removal activities in connection with such a discharge; or
    (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any
    person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.
. . .
(c) Additional requirements and liabilities; penalties
Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of Title 26, shall in any
way affect, or be construed to affect, the authority of the United States or any State or political subdivision
thereof--
    (1) to impose additional liability or additional requirements; or
    (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for
    any violation of law;
relating to the discharge, or substantial threat of a discharge, of oil.
. . .
(e) Admiralty and maritime law
Except as otherwise provided in this Act, this Act does not affect--
    (1) admiralty and maritime law; or
    (2) the jurisdiction of the district courts of the United States with respect to civil actions under
    admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they
    are otherwise entitled.

33 U.S.C. §§ 2718(a), (c), 2751(e). The CWA states, in pertinent part:

(continued...)

responders—which does not immunize personal injury claims, *see* 33 U.S.C. § 1321(c)(4)(B) (*supra* note 8 and related text)—reflect Congress' intent to preserve these claims. The PSC also relies upon the NCP's disclaimer regarding dispersants listed on the NCP Product Schedule. *See* 40 C.F.R. § 300.920(e) (*supra* note 9). Finally, the PSC and another Plaintiff, Malcolm Coco, argue that Nalco did not fulfill the NCP Product Schedule's submission requirements.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this principle, federal law may preempt state law. *Arizona v. United States*, --- U.S. ---, 132 S. Ct. 2492, 2500 (2012). Preemption may rest on several different theories. Relevant here is implied conflict preemption:

> [S]tate laws are preempted when they conflict with federal law. This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Id.* at 2501 (citations and quotations omitted). *Arizona* cautions that "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." 132 S. Ct. at 2501 (citations and quotations omitted). Positive federal law

---

[11](...continued)
(o) Obligation for damages unaffected; local authority not preempted; existing Federal authority not modified or affected:

. . .

    (2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State, or with respect to any removal activities related to such discharge.

33 U.S.C. § 1321(*o*)(2).

also may displace judicially-created federal maritime law, i.e. general maritime law.[12]

     Two preemption cases are particularly instructive here. The first is *International Paper Co. v. Ouellette*, 479 U.S. 481 (1989), a case previously discussed in this MDL, *see, e.g.*, Order of Nov. 14, 2011 pp.9-11, Rec. Doc. 4578, 2011 WL 5520295 at *4-5. In *Ouellette*, a paper mill in New York discharged pollutants into New York waters, which flowed into Vermont waters. Residents in Vermont brought nuisance claims under Vermont law against the New York paper mill. The Supreme Court held that the CWA and its regulations, the National Pollutant Discharge Elimination System ("NPDES"), preempted the law of the "affected State," Vermont. *Ouellette*, 479 U.S. at 487. Instead, the plaintiffs' recourse was to bring their claims under the law of the "source State," New York, or under the CWA's citizen's suit provision. *Id.* at 497-98 & n.18.

     Noting that the CWA did not explicitly preempt affected-state law, nor did its saving clauses explicitly preclude preemption of an affected-State's law, the *Ouellette* Court examined the goals and policies of the CWA and the NPDES to resolve the question. The Court explained that the CWA/NPDES established a nation-wide federal permit program to regulate water pollution, in which source States occupied a "regulatory partnership" with the federal government, while affected

---

[12] *See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986) ("Absent a relevant statute, the general maritime law, as developed by the judiciary, applies [to cases within admiralty jurisdiction]."). *Compare Miles v. Apex Marine Corp.*, 498 U.S. 19, 27, 32-33 (1990) (holding that the Jones Act precludes recovery for loss of society in a general maritime action for the wrongful death of a seaman) ("[Admiralty courts] may supplement these statutory remedies where doing so would achieve the uniform vindication of such policies consistent with our constitutional mandate, but we must also keep strictly within the limits imposed by Congress. Congress retains superior authority in these matters, and an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation."), *with Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 424 (2009) (holding the Jones Act did not displace general maritime law remedy of punitive damages against a shipowner who willfully and wantonly denies maintenance and cure, because such damages have long been recognized and nothing in the Jones Act altered this understanding) ("The laudable quest for uniformity in admiralty does not require the narrowing of available damages to the lowest common denominator approved by Congress for distinct causes of action."), *and Exxon Shipping Co. v. Baker*, 544 U.S. 471, 489 (2008) (holding the CWA did not preempt a claim for punitive damages under general maritime law) ("All in all, we see no clear indication of congressional intent to occupy the entire field of pollution remedies; nor for that matter do we perceive that punitive damages for private harms will have any frustrating effect on the CWA remedial scheme, which would point to preemption." (citations omitted)).

States occupied only a subordinate, advisory role. The Court commented that

> This delineation of authority represents Congress' considered judgment as to the best
> method of serving the public interest and reconciling the often competing concerns
> of those affected by the pollution. It would be extraordinary for Congress, after
> devising an elaborate permit system that sets clear standards, to tolerate common-law
> suits that have the potential to undermine this regulatory structure.

*Id.* at 494-95, 497 (citations omitted). The Court reasoned that if the law of an affected State applied

to discharges originating outside that State, it "would undermine the important goals of efficiency

and predictability in the permit system." *Id.* at 496. A discharger would not only have to meet the

standards of the source State, but also the statutory and common law standards of all States

potentially affected by its discharges. "The inevitable result of such suits would be that Vermont

and other States could do indirectly what they could not do directly—regulate the conduct of

out-of-state sources." *Id.*

Ouellette also rejected an argument by the United States Solicitor General that the Vermont

plaintiffs' claims were not preempted to the extent they only sought compensation for a specific

harm. The Solicitor General proposed that, unlike an injunction or punitive damages, compensatory

claims only require the source to pay for external costs created by pollution and consequently do not

regulate in a way inconsistent with the CWA. The Court disagreed:

> If the Vermont court determined that respondents were entitled only to the requested
> compensatory relief, [the New York paper mill] might be compelled to adopt
> different or additional means of pollution control from those required by the Act,
> regardless of whether the purpose of the relief was compensatory or regulatory. *See*
> *Perez v. Campbell*, 402 U.S. 637, 651-652, 91 S. Ct. 1704, 1712, 29 L. Ed.2d 233
> (1971) (effect rather than purpose of a state statute governs pre-emption analysis).
> As discussed, this result would be irreconcilable with the CWA's exclusive grant of
> authority to the Federal Government and the source State.

*Id.* at 498 n.19. Thus, even though the affected-State's law shared the CWA's goal of eliminating

water pollution, it still posed "a serious interference with the achievement of the full purposes and

objectives of Congress" and stood "as an obstacle to the full implementation of the CWA." *Id.* at 493-494.

The second case is *Fireman's Fund Insurance Co. v. City of Lodi*, 302 F.3d 928 (9th Cir. 2002). There the Ninth Circuit held that portions of a municipal ordinance governing remediation of contaminated soil and groundwater were preempted by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the NCP, and a California statute analogous to CERCLA ("HSAA").[13] Specifically, the municipal ordinance was preempted to the extent it (1) imposed a more onerous standard for apportioning liability among defendants than required by CERCLA and the HSAA (both of which required a preponderance of the evidence) and (2) imposed abatement standards more stringent than the NCP (both CERCLA and the HSAA used the NCP's abatement standards). *Id.* at 949, 951. The court explained that a fundamental purpose and objective of CERCLA is to encourage timely cleanup of hazardous waste sites, and one of the greatest obstacles to cleanup is the risk of uncertain or overly strict regulatory demands. *Id.* at 947. "Cleanups conducted pursuant to federal and California law have come to achieve some level of predictability, thus allowing for a reasonable estimate of exposure to liability and of the costs involved in taking on a cleanup." *Id.* at 948. Such predictability, in turn, "encourages prospective purchasers to rehabilitate contaminated property and put it back into productive use." *Id.* Thus,

> [t]o allow literally thousands of different local governments to impose their own liability schemes . . . that make it more difficult to apportion liability than under CERCLA would foster uncertainty and discourage site cleanup. . . . If we were to approve [the municipal ordinance's] standard of proof, other California cities could

---

[13] Although CERCLA permits a State to impose "any additional liability or requirements with respect to the release of hazardous substances within such State," the relevant portions of the HSAA adopted the same standards as CERCLA and the NCP. *See Lodi*, 302 F.3d at 941, 947, 949 (quoting 42 U.S.C. § 9614(a)).

follow, adopting hundreds of different liability schemes all more onerous than CERCLA. The risk of overly strict and uncertain liability would thereby be compounded, thwarting CERCLA's goals.

*Id.* at 948-49; *see also id.* at 951 (applying the same analysis to the municipal ordinance's abatement standards). Accordingly, the court concluded that the municipal ordinance stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 947 (citation and quotations omitted).

In addition to the methods used in *Ouellette* and *Lodi*, when a federal regulation is concerned, the regulator's comments about the regulation have influenced the Supreme Court's preemption analysis. *See Geier v. Am. Honda Motor Co.,* 529 U.S. 861 (2000); *Williamson v. Mazda Motor of Am., Inc.,* --- U.S. ---, 131 S. Ct. 1131, 1139-40 (2011) ("In *Geier*, then, the regulation's history, the agency's contemporaneous explanation, and its consistently held interpretive views indicated that the regulation sought to maintain manufacturer choice in order to further significant regulatory objectives. Here, these same considerations indicate the contrary.").

## E.     Analysis

A fundamental objective of the CWA is to "ensure effective and immediate removal of a discharge . . . of oil . . . ." 33 U.S.C. § 1321(c)(1)(A). Likewise, a goal of the NCP is to "provide for efficient, coordinated, and effective action to minimize damage from oil . . . ." *Id.* § 1321(d)(2). In the case of an oil spill as massive and dangerous as the one from the DEEPWATER HORIZON/Macondo Well (i.e., a Substantial Spill and a "spill of national significance"), Congress determined that these objectives are best achieved if the President directs all levels of the response— federal, state, and private. *See id.* § 1321(c)(2)(A). The purpose was to eliminate confusion that impeded past oil spill responses by establishing a clear chain of command and responsibility. *See*

H.R. Rep. No. 101-653, at 45 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 825.

Notably, the EPA's comments accompanying its post-OPA revisions to the NCP similarly reflect

that when the FOSC directs a response, States and private parties cannot deviate from this direction:

> Two commenters suggested that, contrary to proposed language in [40 C.F.R.]
> §300.305(c), the [F]OSC lacks authority to direct state and local agency actions, but
> rather should/must coordinate with these parties through the unified command
> system. However, the language to which the commenters objected, that the [F]OSC
> "may direct or monitor all Federal, State, and private actions to remove a discharge"
> is taken directly from CWA section 311(c) [33 U.S.C. § 1321(c)], as amended by the
> OPA. ***Thus, EPA disagrees that the OSC does not have the authority to direct state,
> local, or private actions.***
>
> . . .
>
> Another commenter suggested that inclusion of the unified command concept would
> clarify that a state is not at liberty to impose more stringent measures when a federal
> OSC is directing the response. EPA disagrees with the commenter's view that a state
> could initiate more stringent measures than the [F]OSC when the latter is directing
> the response. ***When directing a response, the [F]OSC is more than managing the
> response.*** He or she has specific legal authority to guide the activities of all parties
> responding to a discharge, and ***all actions would have to be authorized or approved
> by the [F]OSC.***

59 Fed. Reg. 47,384, 47,399-400 (Sept 15, 1994) (emphasis added).

The CWA/NCP also expressly contemplated that dispersants may be used in response to an

oil spill. *See* 33 C.F.R. § 1321(d)(2), (d)(2)(F), (d)(2)(G); 40 C.F.R. § 300.910. The NCP

established procedures for submitting and listing a dispersant on the NCP Product Schedule, and

empowered the FOSC (sometimes with the concurrence of the EPA, etc.) to determine when to use

a dispersant. 40 C.F.R. § 300.910.

Although chemical dispersants have been used as an oil spill countermeasure for decades,

it is clear that they are not without controversy. *See, e.g.*, Queale, *supra* note 3, at 66-67 (noting that

dispersants have been used over 213 times since 1967 and explaining that "[i]t is the trade-off

23

between effectiveness and toxicity that is at the heart of the dispersant controversy"). Likewise, the fact that the NCP Product Schedule requires the manufacturer to provide toxicity data and handling precautions suggests that the federal government has long been aware that there may be dangers or drawbacks associated with dispersants. *See* 40 C.F.R. § 300.920(a)(8). However, this also reflects that these dangers do not preclude the use of a dispersant—they are one of several factors to be considered by the FOSC. According to the EPA:

> EPA believes that the best approach to regulating dispersants is to . . . provide [F]OSCs, RRTs [Regional Response Teams], and Area Committees the toxicity data and ***allow them to make decisions on dispersant use by weighing the toxicity data against other variables and the effectiveness data*** for those dispersants that meet or exceed the effectiveness threshold.

59 Fed. Reg. 47,384, 47,410 (Sept. 15, 1994) (emphasis added). The documents provided to the Court similarly evince that the FOSC knew there were potential dangers associated with Corexit, but also that there may be significant negative consequences if Corexit was not used.[14]

Thus, the design of the CWA/NCP is that the FOSC (and sometimes with the concurrence of the EPA, etc.), after weighing the pros and cons, will determine whether it is appropriate to use a particular dispersant. When this is considered with the fact that the CWA and NCP required the FOSC to direct all levels of this response, it follows that it would be improper for the Court to second guess the FOSC's decision to use (or not use) a particular dispersant—just as it would be improper for a State or private person to disobey the FOSC's direction during a response. This

---

[14] *See, e.g.*, Aug. 20, 2010 Letter from Admiral T.W. Allen to Hon. Chairman Edward Markey p.2, Ex. V to Nalco's SUMF, Rec. Doc. 6541-16 ("The decision to use dispersants was never undertaken lightly. In this case there was an environmental trade-off; the known harm of oil to the environmentally sensitive marsh habitat outweighed the potential harm that might be causes by the use of dispersants off shore in the marine benthic environment. Again these decisions were made in full consultation and concurrence with the EPA, [Dept. of Commerce], and [Dept. of the Interior]."); FOSC Report (Nov. 18, 2010), pp.33-34, 44, Ex. 3 to Clean-Up Defendants' Joint SUMF, Rec. Doc. 6535-6; Incident Specific Preparedness Review (Jan. 2011), pp.6-7, Ex. 4 to Clean-Up Defendants' Joint SUMF, Rec. Doc. 6535-7; Dispersant Monitoring and Assessment Directive—Addendum 3, Ex. R to Nalco's SUMF, Rec. Doc. 6541-25.

conclusion is clear even if the CWA did not expressly immunize the government from suit. *See* 33 U.S.C. § 1321(j)(8). The PSC essentially admits this point, but urges that the B3 claims are not preempted because they target the allegedly defective nature of Corexit, not the government's decision to use it. *See* Hr'g Tr., July 13, 2012, pp.100, 105, 107, Rec. Doc. 6932. This distinction lacks significance, however, because—as further discussed below—the B3 claims would still create an obstacle to federal law. *Cf. Ouellette*, 479 U.S. at 497 ("This delineation of authority represents Congress' considered judgment as to the best method of serving the public interest and reconciling the often competing concerns of those affected by the pollution. ***It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure.***" (emphasis added)).

The effect of state law, rather than its purpose, governs the preemption analysis. *Id.* at 498 n.19; *see also Arizona*, 132 S. Ct. at 2501. If the Court were to permit the B3 claims (and irrespective of whether Corexit is found to be defective or unreasonably dangerous), then, during the next Substantial Spill or "spill of national significance," the threat of liability might cause the manufacturer of dispersant X to refuse to provide its product, even though the FOSC determined that dispersant X should be used. Such a refusal, or perhaps even a hesitation by the manufacturer, would conflict with the statutory and regulatory design of placing the FOSC in charge of all levels of the response and empowering him or her to determine if, when, where, and how dispersants should be used.[15] More importantly, this refusal would deprive the response of a tool expressly contemplated by federal law and, consequently, impede the FOSC's ability to "ensure effective and

---

[15] On a related note, the CWA/NPC's requirement that the FOSC direct all levels of the response negates *Arizona*'s caution regarding preemption of a State's historic police powers.

immediate removal" of oil and the "efficient, coordinated, and effective" response intended by the NCP.[16] Thus, despite the fact that the B3 claims avoid a direct attack on the FOSC's decisions to use Corexit, they still stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Cf. Ouellette*, 479 U.S. at 498 n.19 ("If the Vermont court determined that respondents were entitled only to the requested compensatory relief, [the New York paper mill] ***might be compelled to adopt different or additional means of pollution control from those required by the Act***, regardless of whether the purpose of the relief was compensatory or regulatory. . . [T]his result would be irreconcilable with the CWA's exclusive grant of authority . . . ." (emphasis added)); *Lodi*, 302 F.3d at 948-49, 951 (allowing city to impose more stringent abatement and liability standards would foster uncertainty about potential liability and frustrate CERCLA's goal of encouraging cleanup).[17]

---

[16] The evidence reflects that a shortage of dispersant is more than a theoretical problem for the federal response effort. Twice during the response, the FOSC wrote letters to the companies that supplied Nalco with certain chemicals required to make Corexit. In those letters, the FOSC noted that dispersants are "essential to the oil spill response and clean-up effort" and further explained that the current supply of dispersant was nearly exhausted. Consequently, the FOSC requested that the companies make their chemicals available "to the greatest extent possible," so that Nalco could manufacture Corexit at "full capacity." *See* Exs. X & Y to Nalco SUMF.

It is also worth mentioning that the Court's preemption analysis is consistent with the purpose of the CWA's immunity provision for responders—encouraging prompt oil spill responses. *See supra* note 8 and related text. The fact that personal injury and gross negligence claims are excluded from this immunity provision does not alter the analysis, despite the PSC's arguments to the contrary. This provision is similar to an express preemption clause, and "[t]he Supreme Court . . . has recognized that preemption under ordinary implied preemption principles is not necessarily foreclosed by the existence of an express preemption provision." *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 383 (5th Cir. 2004) (citing *Geier*, 529 U.S. at 869 (2000)). Although the Court finds that the instant personal injury claims are preempted, other personal injury or gross negligence claims that do not create an obstacle to the CWA or NCP might be viable.

[17] *Cf. also Witty*, 366 F.3d at 384-85 ("The [Federal Aviation Act] not only authorizes but affirmatively directs the Administrator of the Federal Aviation Administration to promulgate air safety standards and regulations . . . . Pursuant to its congressional charge to regulate air safety, the Federal Aviation Administration has issued a broad array of safety-related regulations . . . . Allowing courts and juries to decide under state law that warnings should be given in addition to those required by the Federal Aviation Administration would necessarily conflict with the federal regulations."); *Geier*, 529 U.S. at 881 (state tort law preempted where it would impose a duty on manufacturers to install airbags in all vehicles produced in 1987, as opposed to only 10% as required under federal law, because it "would have presented an obstacle to the variety and mix of devices that the federal regulation sought," "stood as an obstacle to the (continued...)

The savings clauses in OPA and the CWA, *supra* note 11, do not persuade the Court otherwise. The Supreme Court "has repeatedly decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." *Geier*, 529 U.S. at 870 (citations and quotations omitted); *see also AT&T Mobility LLC v. Concepcion*, --- U.S. ---, 131 S. Ct. 1740, 1748 (2011) ("[A] a federal statute's saving clause cannot in reason be construed as [allowing] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." (citations and quotations omitted)); *Witty*, 366 F.3d at 383 n.4. Additionally, the savings clauses that actually refer to "removal activities," and, consequently, are most relevant to this matter, only apply to discharges **within** a State. *See* 33 U.S.C. §§ 1321(*o*)(2), 2718(a). This Court has previously interpreted this language as meaning a discharge that originates within a State, as opposed to a discharge that began in federal waters and migrated into state waters, as occurred here. *See* Order and Reasons of Nov. 14, 2011, Rec. Doc. 4578, 2011 WL 5520295 at *5-6.

The Court also is not persuaded by the PSC's reliance on the EPA's disclaimer regarding the NCP Product Schedule. 40 C.F.R. § 300.920(e) (*supra* note 9). As explained above, preemption is not based on the mere fact that the EPA decided to list Corexit on the NCP Product Schedule.

Furthermore, the Court finds the *In re MTBE* cases, cited by the PSC, are distinguishable. 457 F. Supp. 2d 324 (S.D.N.Y. 2006); 175 F. Supp. 2d 593 (S.D.N.Y. 2001). In those cases, federal regulations required petroleum companies to oxygenate gasoline with one of several chemicals approved by the EPA. The companies used MTBE, a chemical on the list of EPA-approved

---

[17](...continued)
gradual passive restraint phase-in that the federal regulation deliberately imposed," and "could have made less likely the adoption of a state mandatory buckle-up law.").

oxygenates. The plaintiffs brought state tort claims alleging that the companies' use of MTBE contaminated ground water. The court disagreed with the companies' contention that the claims were preempted, largely because the defendants' use of MTBE was permissive and alternatives to MTBE existed. 457 F. Supp. 2d at 327, 337; 175 F. Supp. 2d at 615-16. Here the PSC contends that Nalco's decision to list Corexit was similarly permissive, and therefore the B3 claims should not be preempted. However, many of the reasons for finding preemption here were not present in the *In re MTBE* cases. For example, here the FOSC—as opposed to private companies—chose to use Corexit from a list of alternatives, and this decision occurred in the context of a Substantial Spill and "spill of national significance," where the FOSC was statutorily required to direct all levels of the response.

The Court next turns to the arguments that Nalco or its predecessor did not fulfill the submission requirements for the NCP Product Schedule. Plaintiff Malcolm Coco argues that Nalco has not established compliance with 40 C.F.R. § 300.915(a)(4), which required Nalco to provide "[s]pecial handling and worker precautions for storage and field application," among other information, to the EPA. Specifically, Plaintiff Coco contends that Nalco or its predecessor omitted the warnings pertaining to 2-butoxyethanol, one of the components of Corexit EC9527A, that are found in the OSHA[18]-required Material Safety Data Sheet for Corexit EC9527A (the older version of Corexit). The Material Safety Data Sheet provides, in pertinent part:

> WARNING:
> Eye and skin irritant. Repeated or excessive exposure to butoxyethanol may cause injury to red blood cells (hemolysis), kidney or the liver. Harmful by inhalation, in contact with skin and if swallowed. Do not get in eyes, on skin, on clothing. Do not take internally. Use with adequate ventilation. Wear suitable protective clothing.

---

[18] Occupational Safety and Health Administration.

. . .

INGESTION:
May be harmful if swallowed.  May cause liver and kidney effects and/or damage.
There may be irritation to the gastro-intestinal tract.

. . .

HUMAN HEALTH HAZARDS - CHRONIC:
Contains ethylene glycol monobutyl ether (butoxyethanol).  Prolonged and/or
repeated exposure through inhalation or extensive skin contact with EGBE may
result in damage to the blood and kidneys.

Rec. Doc. 6705-3 at 1-2.

Appendix C to the NCP provides a format for submitting the data required by § 300.915(a).

It states, "The numbered headings [which correspond to the subparagraphs in § 300.915(a)] should

be used in all submissions.  The subheadings indicate the kinds of information to be supplied.  The

listed subheadings, however, are not exhaustive; additional relevant information should be reported

where necessary."  Heading IV, "Special Handling and Worker Precautions for Storage and Field

Application," corresponds to § 300.915(a)(4).  There are four subheadings under Heading IV:

1. Flammability.
2. Ventilation.
3. Skin and eye contact; protective clothing; treatment in case of contact.
4. Maximum and minimum storage temperatures; optimum storage temperature
range; temperatures of phase separations and chemical changes.

40 C.F.R. § 300 app. C, sec. 6.0.  With respect to subheadings 2 and 3, the EPA's Technical Product

Bulletin on Corexit EC9527A reflects that Nalco (or its predecessor) provided the following

information to the EPA:

2. Ventilation:
Avoid prolonged breathing of vapors.  Use with ventilation equal to unobstructed
outdoors in moderate breeze.
3. Skin and eye contact; protective clothing; treatment in case of contact:
Avoid eye contact.  In case of eye contact, immediately flush eyes with large

amounts of water for at least 15 minutes. Get prompt medical attention. ***Avoid
contact with skin and clothing. In case of skin contact, immediately flush with
large amounts of water, and soap if available. Remove contaminated clothing,
including shoes, after flushing has begun. If irritation persists, seek medical
attention.*** For open systems where contact is likely, wear long sleeve shirt, chemical
resistant gloves, and chemical protective goggles.

Rec. Doc. 8025-1 at 1-2 (emphasis added).

Although "additional relevant information" could have been submitted to the EPA, the Court

finds for several reasons that the NCP did not require Nalco to list the specific warnings found in

its Material Safety Data Sheet. First, while certainly not as detailed as the information found in the

Material Safety Data Sheet, the quoted language, and the emphasized language in particular,

indicates that Corexit EC9527A can be harmful to humans. The NCP also required component

information for Corexit EC9527A. This information was provided, and 2-butoxyethanol was listed

among the components. Ex. F to Nalco's SUMF, Rec. Docs. 6541-21, 6541-28; *see also* Rec. Doc.

8025-1 at 3. The NCP also required the concentrations of heavy metals, cyanide, and chlorinated

hydrocarbons, as well as the results of certain toxicity testing; all of which were provided. Rec.

Doc. 8025-1 at 2-3; *see also* U.S. Stip. of Fact ¶¶ 2-3, Rec. Doc. 6541-3.

Second, the submission requirements for the NCP Product Schedule serve a different

function than OSHA's Material Safety Data Sheets. When the EPA proposed revisions to the NCP

following OPA, it noted concerns about the proliferation of products on the NCP Product Schedule,

particularly with respect to dispersants. *See* 58 Fed. Reg. 54,702, 54,727 (Oct. 22, 1993). The EPA

responded to this concern by establishing minimum effectiveness criteria. Although certain toxicity

data also had to be provided, the EPA chose not to set a toxicity threshold, explaining:

These proposed revisions to the listing process, which may result in a reduction of
the number of products on the Schedule, are designed to provide more useful and
reliable data to [F]OSCs.

. . .

Only those dispersants that meet or exceed the established effectiveness threshold would be listed on the Schedule. EPA is not proposing to establish a threshold or acceptability criterion for dispersant toxicity because toxicity tends to be more relative. Also, EPA believes that the best approach to regulating dispersants is to provide [F]OSCs and Area Committees with the toxicity data and allow them to make decisions on dispersant use by weighing the toxicity data against the effectiveness data for those dispersants that meet or exceed the effectiveness threshold. For example, in a particular location of possible dispersant use, an OSC may opt to use or an Area Committee may preplan for the use of a highly effective, but highly toxic dispersant. In a different location, the OSC or Area Committee may decide to use a moderately toxic, but less effective dispersant. In either situation, the OSC and Area Committee would know that the selected dispersant, at the very least, meets the level of effectiveness established by the effectiveness acceptability criterion.

*Id.* at 54,727-28. The toxicity tests focus on the marine environment, rather than humans.[19] *See* 40 C.F.R. § 300, app. C, sec. 3.1. The EPA does not comment on the special handling or worker precautions requirement in either its proposed rule or final rule. Thus, it appears that the primary goals of the NCP's submission requirements are to cull from the NCP Product Schedule ineffective dispersants and to inform federal officials of the remaining dispersants' relative effectiveness and potential hazards to the ***marine environment***. By contrast, OSHA's Material Safety Data Sheets are largely focused on the dangers chemicals pose ***to humans***, and are vastly more detailed in this regard. *See generally* 29 C.F.R. § 1910.1200(g) & app. C, D.

Third, the fact that Corexit is listed on the NCP Product Schedule further suggests that the

---

[19] The NCP summarizes the toxicity test as:

exposing two species (Menidia beryllina (silversides) and Mysidopsis bahia (mysid shrimp)) to five concentrations of the test product and No. 2 fuel oil alone and in a 1:10 mixture of product to oil. To aid in comparing results from assays performed by different workers, reference toxicity tests are conducted using dodecyl sodium sulfate (DSS) as a reference toxicant. The test length is 96 hours for Menidia and 48 hours for Mysidopsis. LC50s [median lethal concentration] are calculated based on mortality data at the end of the exposure period.

40 C.F.R. § 300 app. C, sec. 3.1.

submission requirements have been met. Although listing a dispersant on the NCP Product Schedule does not mean the EPA approves, recommends, or authorizes the use that dispersant, it is does mean that "data have been submitted to EPA *as required by* [the NCP], § 300.915." *Id.* 300.920(e) (emphasis added). Likewise, the EPA had the power to reject a submission, request further information, or request a sample; but chose to list Corexit EC9527A. 40 C.F.R. § 300.920(a)(2)-(3). Related to this point is the concept that administrative agencies are given a presumption of regularity in regard to adherence to their own regulations. *See United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *BCCA Appeal Grp. v. United States EPA*, 355 F.3d 817, 832 (5th Cir. 2003) ("[T]here is a presumption of regularity to the EPA's choice of analytical methodology, so challenging parties must overcome a 'considerable burden.'" (citation omitted)); *Cent. Elec. Power Co-op v. Se. Power*, 388 F.3d 333, 337 (4th Cir. 2003) ("Given the expertise of agencies in the fields they regulate, a presumption of regularity attaches to administrative actions.").

For these reasons, the Court finds that Nalco has established compliance with 40 C.F.R. § 300.915(a)(4) and Plaintiff Coco's arguments fail to raise a genuine dispute of material fact. The Court does not address the other arguments raised by Plaintiff Coco, but notes that they lack merit for similar reasons or are irrelevant to the issue of preemption.

The PSC argues that the requirements of 40 C.F.R § 300.915(a)(6) ("Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions") were not met because, "there is evidence that Nalco determined that some level of respiratory protection was necessary for application of Corexit." PSC Opp'n p.42, Rec. Doc. 6696 at 49. The PSC cites to a deposition transcript where Nalco's 30(b)(6) deponent appears to acknowledge that a Nalco

employee raised a concern that "the BP Source Control Air Monitoring Plan . . . alone would not ensure proper Respiratory Protection from Corexit exposure." Ex. 9 to PSC Opp'n p.46:2, :21-23, Rec. Doc. 6696-10. The deponent also stated that, to the best of his knowledge, this concern was not communicated to the federal government. *Id.* at 52:11-22. Accordingly, the PSC claims Nalco did not submit the recommended "conditions for [Corexit's] use" to the EPA.

Because the PSC's arguments concern respiratory protection, they actually relate to § 300.915(a)(*4*), the subsection just discussed, rather than § 300.915(a)(*6*). As mentioned above, the EPA's Technical Product Bulletin for Corexit EC9527A states, "Avoid prolonged breathing of vapors. Use with ventilation equal to unobstructed outdoors in moderate breeze." The EPA's Technical Product Bulletin for Corexit EC9500 states, "Use with ventilation equal to unobstructed outdoors in moderate breeze." EPA Technical Product Bulletin #D-4 for Corexit EC9500A (rev. Dec. 18, 1995), *available at* http://www.epa.gov/osweroe1/content/ncp/products/corex950.htm; *see also* Ex. D to Nalco SUMF.

For reasons similar to those respecting Malcolm Coco's arguments, the Court finds that the PSC has failed to fail to raise a genuine dispute as to whether the submission requirements for 40 C.F.R. § 300.915(a)(4) were fulfilled. Additionally, the record reflects that the federal government was conscious of the possible need for respirators. For example, the PSC does not contest the following facts:

> 92. Throughout the course of the DEEPWATER HORIZON response, OSHA, the National Institute of Occupational Safety and Heath ("NIOSH"), EPA, NOAA [National Oceanic and Atmospheric Administration), and other governmental agencies monitored daily air sample results/reports to ensure that clean-up workers were not exposed to harmful conditions.
>
> 93. Air monitoring data collected by government agencies confirmed that exposure levels for toxic chemicals were generally not high enough to necessitate the use of

respirators by cleanup workers. *See* Ex. 31 – OSHA Keeping Workers Safe Report, . . . at 3 ("OSHA has found no exposures to toxic chemicals (including oil **and dispersants**) that would necessitate the use of respirators for cleanup workers.").

94. The "Respiratory Protection" policy for the clean-up efforts was developed by the UAC [Unified Area Command] and was based on air sampling results. The UAC's policy determined the circumstances for which respirator use was required.

95. The UAC concluded that "[e]xtensive air sampling data do not indicate the need for respirator use."

96. The UAC recognized that the "use of respirators places an additional load on the respiratory system and would lead to increased vulnerability to heat-related illnesses." . . . *see also* Ex. 31 – OSHA Keeping Workers Safe Report, . . . at 3 ("Because of the potential health problems associated with respirators and the high heat and humidity conditions in the Gulf area, OSHA does not recommend the use of respirators unless a toxic chemical threat is identified.").

97. OSHA agreed that "respirators should be considered the protection of last resort, as they can be physically taxing on the body, particularly for workers who have not used them before and in conditions of extreme heat."

Clean-Up Defendants' Joint SUMF, ¶¶ 92-97, Rec. Doc. 6545-49 (emphasis added; most citations

omitted). OSHA's report on the response to the DEEPWATER HORIZON/Macondo Well oil spill

further explains:

OSHA was concerned about the potential health effects to workers from inhalation and skin exposure to chemicals including, . . . dispersants . . . . Early in the response, OSHA personnel provided input to help BP develop a sampling strategy to address these hazards. OSHA also developed its own sampling protocol and strategy . . . . based on the specific tasks workers would be performing, the chemicals of concern from the oil and dispersants, and available Occupational Exposure Limits. . . .

. . .

Based on the scientific evidence from the sampling data, OSHA determined that respiratory precautions were important near the source to prevent inhalation exposures from volatile chemicals, but were not necessary for most shoreline cleanup operations. OSHA was also aware that respirators should be considered the protection of last resort, as they can be physically taxing on the body, particularly for workers who have not used them before and in conditions of extreme heat. . . .

34

> OSHA ensured that respirators were used wherever the data indicated that they were necessary to protect workers. . . .
>
> In characterizing worker exposure during the Deepwater Horizon oil spill response, OSHA compared the results of air monitoring to the lowest known [Occupational Exposure Limit] for purposes of risk assessment and protective equipment recommendations. . . . [U]sing [Occupational Exposure Limits] was a very conservative approach for protecting response workers.
>
> . . .
>
> OSHA stressed throughout the response that decisions about [personal protective equipment] should be based on a scientific characterization of the hazards, including air sampling . . . . Respirators, and training in how and when to use them, were required for workers on vessels near the source of the crude oil discharge.

Ex. 29 to Clean-Up Responders' Joint SUMF, Rec. Doc. 6535-38. Finally, given that OSHA was monitoring workers' safety, it should also be noted that the *OSHA*-required Material Safety Data Sheets for both versions of Corexit recommend the use of respirators in certain situations. *See* Rec. Docs. 6705-2 at 4, 6705-3 at 4.

The Court has also received numerous letters from *pro se* individuals who complain of the harmful effects of Corexit and, for this reason, oppose Nalco's motion. The issue before the Court is whether the claims against Nalco are, as a matter of law, preempted by the CWA and NCP. For clarity, the Court does not decide whether Corexit was toxic, defective, unreasonably dangerous, etc. While the Court is sympathetic to these complaints, they are irrelevant to the issue of preemption.

The Court also makes clear that today's decision is limited to Nalco. The Court does not address the pending motions by the Clean-Up Defendants, nor does this decision affect the liability of BP or any other defendants. On a related note, Nalco argued derivative immunity as an alternative defense to liability. Because resolution of the preemption issue is dispositive of Nalco's motion, the Court does not address derivative immunity.

35

## IV.  CONCLUSION

For the reasons explained above, the Court finds that the claims in the B3 Master Complaint asserted against Nalco, whether brought under state law or general maritime law, are preempted by the Clean Water Act and the National Contingency Plan.  Accordingly,

**IT IS ORDERED** that Nalco's Motion for Summary Judgment, Rec. Doc. 6541, is **GRANTED** and the claims against Nalco in the B3 Master Complaint are **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, this 28th day of November, 2012.

_____
United States District Judge