# EXHIBIT 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | ) | MDL No. 2179 |
| "Deepwater Horizon" in the | ) | |
| Gulf of Mexico, on April 20, 2010 | ) | Section: J |
| | ) | |
| This document relates to: | ) | Judge Barbier |
| | ) | Mag. Judge Shushan |
| 10-2454 | ) | |
| | ) | |

## AMENDED COMPLAINT

### INTRODUCTION

1.     This is a civil action brought under the citizen suit provisions of the Federal Water

Pollution Control Act, 33 U.S.C. §1365, commonly known as the Clean Water Act ("CWA"), the

Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9659

("CERCLA"), and the Emergency Planning and Community Right-to-Know Act, 42 U.S.C.

§11046 ("EPCRA").  Defendants have discharged, continue to discharge, are reasonably likely to

continue to discharge, or were reasonably likely to discharge at the time of the original

complaints, massive quantities of oil, methane, drilling muds, and other toxic pollutants into the

Gulf of Mexico, the contiguous zone, and other waters of the United States, in violation of the

CWA.  33 U.S.C. §§ 1311(a), 1316, 1317, 1321.  Defendants have also failed to properly report,

and continue to fail to properly report, their releases of hazardous substances, in violation of

CERCLA, 42 U.S.C. § 9603(a), and EPCRA, 42 U.S.C. § 11004.

2.     Since April 20, 2010, tens of millions of gallons of oil have spewed from BP's

ruptured well a mile under the sea surface into the Gulf of Mexico, a fragile and productive

ecosystem with diverse communities of fish and wildlife and home to several species of endangered whales, sea turtles, and sea birds. Estimates have placed the daily flow of oil from 35,000 to 65,000 barrels a day, or more, which amounts to at least 1.5 to 2.5 million gallons per day. Oil has been washing, and continues to wash ashore along the coasts of Louisiana, Alabama, Mississippi, Florida, and Texas. While hundreds of dead birds, sea turtles, and dolphins are being or have been collected onshore, most of the harmful effects of the spill are out of sight beneath the sea surface. The oil spill is the largest environmental disaster in U.S. history.

3.     It is clear that responsibility for the oil spill rests primarily on BP and that numerous efforts to stop the leak failed. Whether the most recent attempts to stop the flow of oil will succeed is far from certain. The oil and toxic pollutants that have flowed and are likely to continue flowing into the Gulf of Mexico violate the Clean Water Act, which is the nation's strongest law protecting water quality. BP has also failed to fully and properly divulge the identities and amounts of toxic constituents discharged with the oil and methane.

4.     Plaintiff seeks a declaratory judgment, injunctive relief, remedial relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 9659(a), 42 U.S.C. § 11046(a) and 28 U.S.C. § 1331. The effects of the oil spill have significantly impacted the people, wildlife, waters, coastal environment, and economy of the state of Louisiana. The relief requested is authorized pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and (d), 42 U.S.C. §§ 9609(c) and 9659(c), 42 U.S.C. §§ 11045(b) and 11046(c), and 28 U.S.C. §§ 2201 and 2202.

AMENDED COMPLAINT                                                      Page 2

6.      In compliance with 33 U.S.C. § 1365(b)(1)(A), 42 U.S.C. § 9659(d)(1) and 42 U.S.C. § 11046(d)(1), on June 1, 2010, Plaintiff gave notice of the violations specified in this complaint and of its intent to file suit to the Defendants, to the Administrator of the U.S. Environmental Protection Agency ("EPA"), to the Regional Administrator of the EPA, and to all other required entities.  A copy of the notice letter was filed as Exhibit A to the original complaint.  A supplemental notice was served on June 4, 2010 concerning violations of section 306 of the CWA, 33 U.S.C. § 1316.  A copy of the supplemental notice letter was filed as Exhibit B to the original complaint.

7.      The violations complained of in the notice are continuing, are reasonably likely to continue, or were reasonably likely to continue at the time the original complaints were filed.  Defendants remain in violation of the CWA, CERCLA and EPCRA.  Neither the EPA nor any other governmental entity has commenced or is diligently prosecuting a civil or criminal action in a court to redress the violations.

8.      Venue is appropriate in the Eastern District of Louisiana pursuant to 33 U.S.C. § 1365(c)(1), 42 U.S.C. § 9659(b)(1), and 42 U.S.C. § 11046(b)(1), because the sources of the violations complained of have originated in the contiguous zone and exclusive economic zone of the United States and the impacts of the discharges have been felt so heavily by the people and state of Louisiana from the oily waters of the Gulf of Mexico that have reached Louisiana.

PLAINTIFF

9.      Plaintiff, Center for Biological Diversity ("the Center"), is a nonprofit corporation organized under the laws of the State of New Mexico.  The Center's principal office is located in Tucson, Arizona.  The Center has over one hundred members within the state of Louisiana,

AMENDED COMPLAINT                                                          Page 3

thousands of members in the Gulf region, and many additional members who regularly visit and recreate in Louisiana and other Gulf states that have been and continue to be affected by the BP oil spill.

10.     Plaintiff's members reside throughout the Gulf region, including the coastal areas of Louisiana especially impacted by the pollutants discharged as part of the oil spill from the Deepwater Horizon/Macondo facility.  Plaintiff's members specifically use, recreate in and enjoy these areas in the following ways:

a.      The Center's members live within the Gulf coastal zone impacted by discharges from Defendants' facilities;

b.      The Center's members engage in economic and recreational activities – including but not limited to fishing, swimming, hiking, walking and boating – in and around the waters impacted by discharges from Defendants' facilities;

c.      The Center's members observe and enjoy wildlife in the Gulf in the areas impacted by Defendants' discharges;

d.      The Center's members have an aesthetic and health interest in keeping the waters in the Gulf free of oil and toxic and hazardous pollutants;

e.      The Center's members swim and fish in the waters and breathe the air into which Defendants' release the oil and toxic pollutants which they have discharged and failed to properly report.  Such oil and toxic pollutants are known to cause deleterious effects to human health and wildlife and interfere with members' use and enjoyment of property.

11.     The Center is a non-profit organization with over 40,000 members, including over 3,500 members in the Gulf of Mexico region.  The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has standing in this suit to protect its own interests and those of its individual members in a representative capacity.  The Center's organizational purposes, and the

interests of its members, are adversely affected by Defendants' discharges of oil, methane, drilling muds and other pollutants which degrade waters and adjacent lands, including the habitat for threatened and endangered aquatic species, and impair the habitability, recreational value, and economic and aesthetic benefits of the local communities.

12.     Defendants' discharges alleged herein have adversely affected and continue to adversely affect the Center's members' above-described use and enjoyment of the waters, air and land affected by Defendants' discharges and releases.

13.     Enforcement of the CWA, CERCLA, and EPCRA will help restore and preserve water quality and provide critical information to which the public is entitled, thereby promoting the objectives of the Clean Water Act, CERCLA, EPCRA and the Center, and provide protection of the use and enjoyment of the area by the Center's members.

DEFENDANTS

14.     Defendant BP, PLC is a British based for-profit corporation organized under the laws of the United Kingdom and doing business in the United States as itself and various subsidiaries also named herein. BP America, Inc. is a for-profit wholly-owned corporate subsidiary of BP, PLC, organized under the laws of the state of Delaware. BP Exploration & Production, Inc. is a for-profit wholly-owned corporate subsidiary of BP, PLC, organized under the laws of the state of Delaware. Both BP America, Inc. and BP Exploration & Production, Inc. have their principal places of business in Warrenville, Illinois, and do business in the State of Louisiana. The various BP Defendants (hereinafter referred to collectively as "BP") own the Mississippi Canyon Block 252 license and/or lease. BP leased the Deepwater Horizon rig from Transocean, Ltd., and operates, or operated, the rig in the Gulf of Mexico.

AMENDED COMPLAINT                                                  Page 5

15.     Defendant Transocean, Ltd. is the owner of the Deepwater Horizon rig.
Transocean Ltd. is a for-profit corporation organized under the laws of Switzerland.  Transocean
Inc. is a for-profit corporation organized under the laws of the Cayman Islands, with its principal
United States place of business in Texas.  Transocean Inc. is a wholly-owned subsidiary of
Transocean Ltd. with an address of P.O. Box 2765, Houston, TX 77252-2765.  Transocean
Offshore Deepwater Drilling, Inc. is incorporated in the state of Delaware and is a wholly-owned
subsidiary of Transocean, Ltd and Transocean, Inc.

FACTS

16.     BP acquired mineral rights to drill for oil within the Mississippi Canyon Block
252, which is located in the United States sector of the Gulf of Mexico, about 41 miles off the
Louisiana coast.

17.     In February 2010, the Deepwater Horizon drilling rig began drilling operations in
the Mississippi Canyon Block 252 and is also known as the Macondo well.  The Deepwater
Horizon rig is owned by Transocean, and was leased to BP.

18.     The Deepwater Horizon rig and wells constitute new source offshore oil
exploration and production facilities subject to national effluent standards, as authorized by
statute and defined by federal regulations.  33 U.S.C. § 1316; 40 C.F.R. Part 435.  Offshore
facilities are considered point sources under the CWA.  33 U.S.C. § 1362(14).

19.     On April 20, 2010, the Deepwater Horizon rig exploded.  Oil and toxic pollutants
began discharging from the Deepwater Horizon rig, associated well and other sources into the
Gulf of Mexico.

20.     Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any

AMENDED COMPLAINT                                                                    Page 6

pollutant from a point source into waters of the United States, its contiguous zone and the exclusive economic zone unless such discharge is permitted by a National Pollution Discharge Elimination System ("NPDES") permit.

21.     Defendants' discharges are not permitted in any NPDES permit and are prohibited in their entirety by 40 C.F.R. Part 435. No free oil or associated toxic pollutants are allowed to be discharged under any circumstances. Any NPDES general permit does not, and cannot, allow such discharges.

22.     Upon information and belief, Plaintiff alleges that Defendants have repeatedly discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil and associated toxic pollutants through a point source or point sources into waters of the United States, the contiguous zone, the territorial seas, and the exclusive economic zone in the Gulf of Mexico. The discharges are reaching and have reached coastal wetlands, beaches, estuaries and rivers in Louisiana and other Gulf states.

23.     Upon information and belief, Plaintiff alleges that Defendants' point sources include but are not limited to the rig itself, and all pipes associated with the well construction, operation and production of the Deepwater Horizon facility, as well as any cracks and fissures caused by the operation, including attempts to stop the flow of the oil and associated toxic pollutants. The exact point sources, in addition to the well itself, are known to BP.

24.     On or about April 24, 2010, BP reported a leak of 1,000 barrels of day of oil into the Gulf of Mexico.

25.     On or about April 28, 2010, the National Oceanic and Atmospheric

AMENDED COMPLAINT                                                          Page 7

Administration ("NOAA") estimated that the leak was likely 5,000 barrels a day.

26.     On or about April 29, 2010, Louisiana Governor Bobby Jindal declared a state of emergency due to the oil spill.

27.     On or about April 30, 2010, oil began washing ashore in Louisiana.

28.     On or about May 7, 2010, BP attempted to lower a "containment dome" over the largest of the oil leaks, which was unsuccessful.

29.     On or about May 12, 2010, BP released the first public video of the leak.  Based on the footage, a number of outside experts estimated that the leak was significantly higher than previous estimates by BP and NOAA.  One university professor of mechanical engineering estimated the leak may be 70,000 barrels a day.

30.     On or about May 16, 2010, BP inserted a mile-long tube to divert some of the leaked oil.

31.     On or about May 20, 2010, BP claimed to be capturing 5,000 barrels of oil per day.

32.     On or about May 21, 2010, BP began releasing the live underwater video broadcasts of the oil leak.

33.     On May 22, 2010, reporters observed heavy oil coating a pelican colony near North Breton Island off the Louisiana coast.

34.     On or about May 29, 2010, BP attempted its "top kill" plan, which was unsuccessful.

35.     On or about June 1, 2010, oil began washing up on the beaches of Gulf Islands National Seashore.

AMENDED COMPLAINT                                              Page 8

36.     By June 7, 2010, heavy oil had soaked the Queen Bess Island pelican rookery, a nesting site that has been essential to the recovery of the brown pelican population.  Experts worry that the spill could set back the Louisiana state bird's recovery from near-extinction.

37.     On or about June 11, 2010 federal estimates of the size of the leak increased to 20,000 to 40,000 barrels a day.  Since June 11, 2010, estimates of the size of the leak have ranged from 20,000 to 100,000 barrels a day.

38.     On or about July 6, 2010, tar balls reached the shore of Lake Pontchartrain.

39.     On or about July 12, 2010, BP installed a new cap on the leak.

40.     On or about July 15, 2010, BP claimed that the new cap halted the flow of oil into the Gulf for the first time since April.

41.     On or about July 18, 2010, oil and natural gas were discovered seeping into the Gulf of Mexico near the well.  Upon information and belief, methane gas has also been detected near the well.

42.     BP drilled relief wells for a number of weeks, which it hoped would eventually shut the well permanently.  On or about July 21, 2010, BP temporarily ceased drilling the relief wells due to an expected tropical storm.

43.     BP considered an attempt to plug the ruptured well with a procedure called "static kill," which is similar to the earlier and unsuccessful "top kill" procedure.  Drilling mud (which itself includes toxic compounds), cement, and other materials would be pumped in from the top of the well, in an attempt to force the gas and oil downward.  BP is also continuing to drill the relief wells, in which it intends to inject drilling mud and cement.

44.     According to federal estimates, between 93.5 million and 184.3 million gallons of

oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010. Based on the range of daily estimates, over 215 million gallons of oil may have discharged into the Gulf of Mexico from the BP spill since April 20, 2010.

45.    Assuming that 60,000 barrels of oil per day have discharged into the Gulf, approximately 5.2 million barrels of oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010.

46.    Of an estimated 5.2 million barrels of oil discharged into the Gulf since April 20, 2010, some estimates indicate that about 1.2 million barrels have been siphoned, burned or skimmed. This would mean that 4 million barrels or more of oil may remain in the Gulf of Mexico.

47.    Satellite images show that the various surface oil slicks and sheens believed to be associated with the BP spill have covered as much as 23,140 square miles.

48.    Plumes of oil have been spreading beneath the surface of the Gulf, which is feared could devastate zooplankton and invertebrate communities at the base of the aquatic food chain. Researchers from the University of South Florida and NOAA have released studies confirming that the plumes of oil are the result of the Deepwater Horizon well. Initial tests show that some of the most toxic components of the oil are not rising to the surface where they could evaporate, but rather are drifting through the deep water in underwater plumes or layers.

49.    Large "clouds" of oil have been discovered in the Gulf miles away from the well site. Small globs of oil have also been discovered underwater. One researcher from Tulane University has been finding baby crabs with orange blobs of oil or dispersant within their shells, and has found droplets of oil everywhere sampled, from Galveston Bay, Texas to Pensacola,

AMENDED COMPLAINT                                                          Page 10

Florida.  Researchers have also measured extremely high levels of methane, which has spewed

from the gushing BP well, at up to 10,000 times background levels in Gulf waters.

50.     Bacteria are breaking down some of the oil's hydrocarbons in the underwater

plumes, which has resulted in oxygen levels being severely depleted.  Oxygen levels are plunging

close to what is considered "dead zone" conditions, at which most marine life suffocate for lack

of dissolved oxygen.

51.     As of July 22, 2010, approximately 626 miles of Gulf Coast shoreline was oiled:

363 miles in Louisiana, 108 miles in Mississippi, 85 miles in Florida, and 70 miles in Alabama.

52.     The BP spill is having devastating impacts on fish and wildlife.  As of July 16,

2010, over 2,500 dead animals have been collected in areas affected by the Gulf spill, including

over 2,000 birds, over 450 sea turtles, and over 60 dolphins and other mammals.

53.     The die-off of wildlife in the Gulf's marshes, beaches and coastal waters is

expected to continue for months or years.

54.     The BP spill threatens some of the most productive and fragile marine ecosystems

in the United States.  About 25 percent of the nation's wetlands lie in the Mississippi River

Delta, providing habitat for nesting seabirds and resting migratory birds.

55.     So far, over 35,000 tons of oily waste and materials collected on beaches and in

wetlands has been taken to landfills around the Gulf region.

56.     The BP spill is resulting in devastating impacts to local communities.  Louisiana's

$2.4 billion seafood industry is responsible for up to 40% of the seafood caught in the continental

United States, and is the leading producer of oysters, crab, crawfish and shrimp.  The Gulf region

accounts for 73% of the nation's shrimp and 59% of its oysters.  As of August 1, 2010, 57,539

AMENDED COMPLAINT                                                                      Page 11

square miles of the Gulf, which is roughly 24% of the federal waters in the Gulf, are under a federal fishery closure due to the BP spill.

57.     Oil reaching the shores of Louisiana has caused headaches, burning eyes, and nausea among the people who live there and more serious illness among cleanup workers.

58.     Dozens of people in Louisiana have been hospitalized with health problems blamed on airborne toxic chemicals in the month after oil began to flood the Gulf of Mexico from the gushing point sources.  Those exposed to the growing oil spill include residents, visitors, cleanup workers and relief aid workers.

59.     According to BP, it has applied 1.8 million gallons of chemical dispersants to waters in the Gulf of Mexico in an attempt to break up and dilute the oil.  The environmental effects of using chemical dispersants at such depths and in such enormous quantities have never been tested.

60.     Upon information and belief, Plaintiff alleges that Defendants have discharged continue to discharge, or are reasonably likely to continue to discharges, pollutants, including but not limited to, oil, methane, drilling muds, toxic pollutants, and chemical dispersants.  Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely include, but are not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs)(including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, arsenic, cadmium, copper, mercury, and nickel.

61.     Upon information and belief, BP has analyzed and knows the concentrations of each of the toxic pollutants present in the oil coming from its wells.  Defendants have discharged

AMENDED COMPLAINT                                                    Page 12

and continue to discharge toxic pollutants in large quantities.  The pollutants discharged and the

likely ranges of discharges are as follows:

| Chemical | Range of presence (in pounds per million gallons of oil) | | |
|---|---|---|---|
| | low | high | average |
| Benzene | 1,595 | 19,216 | 7,643 |
| Toluene | 7,209 | 45,909 | 23,056 |
| Ethylbenzene | 5,509 | 9,569 | 6,698 |
| Arsenic | -- | -- | 14 |
| Nickel | -- | -- | 8 |
| Fluoranthene | 22 | 26 | 24 |
| Benz(a) anthracene | 12 | 39 | 21 |
| Benzo(b) fluoranthene | 3 | 15 | 10 |
| Benzo(k) fluoranthene | 1 | 5 | 3 |
| Benzo(e) pyrene | 8 | 29 | 17 |
| Benzo(a) pyrene | 2 | 4 | 3 |
| Indeno(1, 2, 3) cd pyrene | 0 | 5 | 1 |
| Dibenzo(a, h) anthracene | 0 | 2 | 2 |
| Naphthalene (total) | 2,321 | 71,497 | 36,169 |
| Chrysene (total) | 61 | 1,689 | 894 |
| TOTALS | 16,765 | 146,316 | 73,669 |

62.     Upon information and belief, other pollutants, which include drilling muds and

toxic pollutants listed in 40 C.F.R. § 401.15, were present at and discharged from the Deepwater

Horizon facility when it exploded on April 20, 2010.

63.     The EPA establishes reporting requirements for releases of threshold quantities of

hazardous substances pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602.  Section 103(a) of

CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release

of a hazardous substance in a quantity equal to or greater than the established reportable quantity

to the National Response Center.  Defendants' operations are "facilities" as defined under

CERCLA.  42 U.S.C. § 9601(a)(9).

64.     Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of

AMENDED COMPLAINT                                                            Page 13

any release of a reportable quantity of a hazardous substance subject to the notification requirements of CERCLA to the emergency coordinator for the local emergency planning committee and the State emergency planning commission.

65. Upon information and belief, and depending on variations in the components in the earth's crust, Defendants' operations have released reportable quantities of benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs)(including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, methane, arsenic, cadmium, copper, mercury, and nickel under CERCLA. Consequently, under EPCRA and its implementing regulations, defendants are required to provide notice of reportable releases to the appropriate federal, state and local emergency response officials.

66. The release of these toxic pollutants also exceeds the reportable quantities of hazardous substances required to be reported under the CWA, 33 U.S.C. § 1321(b)(2)(A), CERCLA, 42 U.S.C.§ 9603(a), and EPCRA, 42 U.S.C. § 11004. BP failed to provide notice of the release of reportable quantities of hazardous substances associated with the discharge from the well and platform in the first instance. Upon information and belief, BP knows the quantities, or at least the range of quantities, of toxic pollutants released into the environment associated with the oil spilled from the Deepwater Horizon well and platform. While BP did provide some reports of releases of benzene and ethylbenzene to water and air associated with prescribed surface oil burns of slicks created by the well and platform discharges, even those reports failed to provide the level of detail necessary to comply with CERCLA and EPCRA reporting requirements.

AMENDED COMPLAINT                                        Page 14

67.     The Mississippi Canyon area of the Gulf of Mexico, into which Defendants have discharged, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil, methane, drilling muds and other toxic pollutants, is part of the "contiguous zone" as defined in 33 U.S.C. § 1362(9) and 40 C.F.R. § 122.2, the "ocean" as defined in 33 U.S.C. § 1362(10) or the "exclusive economic zone".

68.     These discharges commenced on April 20, 2010, have continued, are reasonably likely to continue, or were reasonably likely to continue at the time of the original complaints.

69.     Upon information and belief, Plaintiff alleges that Defendants have discharged oil, produced water, and other toxic pollutants in violation of the national standards of performance for new sources for offshore facilities promulgated pursuant to the authority of 33 U.S.C. § 1316(b) and set forth at 40 C.F.R. Part 435.

70.     Upon information and belief, Plaintiff alleges that Defendants' discharges alleged herein are prohibited by 40 C.F.R. Part 435, and actionable as violations of national standards of performance pursuant to 33 U.S.C. § 1316(e).  Such national standards of performance for discharges to the contiguous zone, ocean or exclusive economic zone constitute "effluent standards or limitations," 33 U.S.C. § 1362(11), subject to enforcement.

71.     Upon information and belief, during the exploration and operation of the Deepwater Horizon well, Defendants disregarded safety standards that caused or contributed to the explosion that killed the workers on the rig and caused the blowout of the well, thereby leaking the tens or hundreds of million gallons of oil into the Gulf of Mexico.  Such actions constitute gross negligence or willful misconduct on the part of the Defendants.

AMENDED COMPLAINT                                                          Page 15

## ALLEGATIONS
## COUNT 1
## Discharge of Pollutants Into the Gulf of Mexico
## 33 U.S.C. § 1311

72.     Plaintiff realleges paragraphs 1-71.

73.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of

pollutants from a point source into the contiguous zone, ocean, exclusive economic zone and

navigable waters of the United States, unless in compliance with a NPDES permit issued

pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

74.     Defendants have discharged, continue to discharge, are reasonably likely to

continue to discharge, or were reasonably likely to continue to discharge at the time of the

original complaints, pollutants, including oil, methane, drilling muds, and other toxic pollutants,

from one or more point sources in the Gulf of Mexico into the contiguous zone, ocean, exclusive

economic zone, and waters of the United States in violation of the CWA.  The Defendants'

discharges are not permittable under the CWA and violate national policy.  33 U.S.C. §

1251(a)(3).

75.     By discharging oil, methane, drilling muds, and toxic pollutants into the Gulf of

Mexico, as described herein, Defendants have violated, continue to violate, or are or were

reasonably likely to continue to violate section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## COUNT 2
## Discharge of Oil and Hazardous Substances Into the Gulf of Mexico
## 33 U.S.C. § 1321

76.     Plaintiff realleges paragraphs 1-75.

77.     Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or

hazardous substances into navigable waters of the United States, into the waters of the

AMENDED COMPLAINT                                                    Page 16

contiguous zone, the ocean or the exclusive economic zone.

78.     Defendants have discharged, continue to discharge, are reasonably likely to

continue to discharge, or were reasonably likely to continue to discharge at the time of the

original complaints, oil, methane, drilling muds, and hazardous substances into the Gulf of

Mexico.  By discharging oil, methane, drilling muds and hazardous substances into the Gulf of

Mexico, as described herein, Defendants have violated, continue to violate, or are reasonably

likely to continue to violate section 311(b) of the CWA, 33 U.S.C. § 1321(b).

### COUNT 3
### Discharge of Toxic Pollutants Into the Gulf of Mexico
### 33 U.S.C. § 1317

79.     Plaintiff realleges paragraphs 1-78.

80.     Section 307(a) of the CWA, 33 U.S.C. § 1317(a), requires EPA to publish a list of

toxic pollutants.  Each toxic pollutant published by EPA is subject to effluent limitations

established by EPA.  *Id*.  After the effective date of any effluent standard or limitation established

for a toxic pollutant, it is unlawful for any owner or operator to violate such effluent standard.  33

U.S.C. § 1317(d).

81.     Defendants discharge of oil, methane, and toxic pollutants into the Gulf of

Mexico violated, continues to violate, or was reasonably likely to continue to violate at the time

of the original complaints,  the effluent standards and limitations for a number of toxic

pollutants, including but not limited to, benzene, toluene, naphthalene, polynuclear aromatic

hydrocarbons, arsenic, cadmium, mercury, haloethers, halomethanes, and nickel, in violation of

the CWA.  33 U.S.C. § 1317(d).

AMENDED COMPLAINT                                                                      Page 17

## COUNT 4
**Discharge of Pollutants in Violation of National Standards of Performance**
**33 U.S.C. § 1316**

82.     Plaintiff realleges paragraphs 1-81.

83.     Section 306(b) of the CWA, 33 U.S.C. § 1316(b), requires EPA to develop

national standards of performance for certain new sources, including offshore oil drilling

operations.  After the effective date of such standards of performance, the owner or operator of

any new source is prohibited from operating such source in violation of any standard of

performance applicable to such source.  33 U.S.C. § 1316(e).

84.     Defendants discharge of oil, methane, drilling muds, and other pollutants into the

Gulf of Mexico violates the national standards of performance for offshore oil drilling

operations.  By discharging pollutants in violation of national standards of performance for

offshore facilities into the contiguous zone and waters of the United States as detailed herein,

Defendants have violated, continue to violate, are reasonably likely to continue to violate, or

were reasonably likely to continue to violate at the time of the original complaints, section 306 of

the CWA, 33 U.S.C. § 1316.

## COUNT 5
**Gross Negligence or Willful Misconduct**
**33 U.S.C § 1321(b)(7)(D)**

85.     Plaintiff realleges paragraphs 1-84.

86.     Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), provides that if the

defendants' actions that caused the spill were the result of gross negligence or willful misconduct

that the civil penalties per barrel of oil or unit of reportable quantity of hazardous substance

discharged shall be up to $4,300 per barrel or unit.

AMENDED COMPLAINT                                                            Page 18

87.     Defendants' actions in the exploration and operation of the Deepwater Horizon well constituted gross negligence or willful misconduct.

**COUNT 6**
**Violations of CERCLA**
**42 U.S.C. § 9603**

88.     Plaintiff realleges paragraphs 1-87.

89.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.

90.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico and failing to report, or failing to adequately report, such releases to the National Response Center as detailed herein, Defendants have violated their duties under CERCLA, 42 U.S.C. § 9603(a).

**COUNT 7**
**Violations of EPCRA**
**42 U.S.C. § 11004**

91.     Plaintiff realleges paragraphs 1-90.

92.     Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirement of CERCLA to the emergency coordinator for the local emergency planning committee.

93.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico, and failing to report, or failing to adequately report, such releases to local and State emergency planning committees as detailed herein,

AMENDED COMPLAINT                                                    Page 19

Defendants have violated their duties under EPCRA, 42 U.S.C. § 11004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant Plaintiff the following relief:

a.      Issue a declaratory judgment that Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely at the time of the filing of the original complaints to violate, the CWA, as alleged in counts one through five, CERCLA, as alleged in count six, and EPCRA, as alleged in count seven;

b.      Enjoin Defendants from operating their offshore facility in such manner as will result in further violation of the CWA, CERCLA, and EPCRA.  In particular, Plaintiff seeks an order enjoining Defendants from discharging any further pollutants to the contiguous zone, ocean or exclusive economic zone and other waters of the United States, from releasing any hazardous substance without full and complete reporting as required under CERCLA and EPCRA, and requiring full and complete reporting for all hazardous substances already released;

c.      Order Defendants to immediately divulge the complete list and amounts of toxic pollutants contained in the oil and other releases from the Deepwater Horizon rig and wells;

d.      Order Defendants to pay civil penalties of up to $1,100 per barrel 1 (or up to $4,300 per barrel if the violations were the result of gross negligence or willful misconduct) or $37,500 per day of violation, whichever is greater, pursuant to sections 309(d), 311(b)(7) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1321(b)(7) and 1365(a), including violations listed in the attached exhibits, those identified in this complaint and violations committed subsequent to those identified in this complaint;

e.      Order Defendants to pay civil penalties of up to $37,500 per day of violation for

AMENDED COMPLAINT                                                    Page 20

each hazardous substance it failed to report or adequately report, pursuant to CERCLA, 42

U.S.C. §§ 9609(c) and 9659, and EPCRA, 42 U.S.C. §§ 11045(b) and 11046(c), including

violations listed in Exhibits A and B, those identified in this complaint and violations committed

subsequent to those identified in this complaint;

       f.      Authorize the Plaintiff, for the period beginning on the date of the Court's order

and running for ten years after the Defendants achieve compliance with the CWA, CERCLA, and

EPCRA, to sample or arrange sampling of any discharge of pollutants from the wells in question,

with the costs of the sampling to be borne by Defendants;

       g.      Order Defendants to provide Plaintiff, for a period beginning on the date of the

Court's order and running for five years after Defendants achieve compliance with the CWA,

CERLCA, and EPCRA, with a copy of all reports and other documents which Defendants submit

to appropriate regulatory authorities concerning the allegations set forth herein;

       h.      Issue a remedial injunction ordering Defendants to pay the cost of any

environmental restoration or remediation deemed necessary and proper by the Court to

ameliorate the degradation caused by Defendants' violations;

       i.      Award Plaintiff its costs, including reasonable attorney and expert witness fees, as

authorized by 33 U.S.C. § 1365(d), 42 U.S.C. § 9659(f), and 42 U.S.C. § 11046(f); and

       h.      Award such other relief as this Court deems appropriate.

AMENDED COMPLAINT                                        Page 21

Respectfully submitted this 26th day of November, 2010.


<u>s/ Damon A. Kirin</u>
Damon A. Kirin, LSBA 24729
Diliberto & Kirin, L.L.C.
3636 S. I 10 Service Rd., W., Ste 210
Metairie, LA  70001
Tel: (504) 828-1600
Fax: (504) 828-1555
kirin@attorneys-louisiana.com

Charles M. Tebbutt, *pro hac vice*
Law Offices of Charles M. Tebbutt, P.C.
451 Blair Blvd.
Eugene, Oregon 97402
Tel:  (541) 344-3505
Fax: (541) 344-3516
charlie.tebbuttlaw@gmail.com

Marc Fink, *pro hac vice*
Center for Biological Diversity
209 East 7th St.
Duluth, Minnesota  55805
Tel: (218) 525-3884
Fax: (817) 582-3884
mfink@biologicaldiversity.org

AMENDED COMPLAINT                                    Page 22