# EXHIBIT 13



# DEEP WATER

## The Gulf Oil Disaster and the Future of Offshore Drilling

### Report to the President

National Commission on the BP Deepwater
Horizon Oil Spill and Offshore Drilling

# OMITTED PAGES

Casing strings, which are a series of steel tubes installed to line the well as the drilling progresses, also help to control pressures. First, they protect more fragile sections of the well structure outside the casing from the pressure of the mud inside. Second, they prevent high-pressure fluids (like hydrocarbons) outside the casing from entering the wellbore and flowing up the well. To secure the casing, crews pump in cement to seal the space between the casing and the wellbore. If a completed well can yield economically valuable oil and gas, the crews can initiate production by punching holes through the casing and surrounding cement to allow hydrocarbons to flow into the well.

Designed and used properly, drilling mud, cement, and casing work together to enable the crew to control wellbore pressure. If they fail, the crew can, in an emergency, close powerful blowout-preventer valves that should seal off the well at the wellhead.

## *Deepwater Horizon* Arrives and Resumes Drilling the Well

After purchasing the rights to drill in Block 252, BP became the legal "operator" for any activities on that block. But BP neither owned the rigs, nor operated them in the normal sense of the word. Rather, the company's Houston-based engineering team designed the well and specified in detail how it was to be drilled. A team of specialized contractors would then do the physical work of actually drilling the well—a common industry practice. Transocean, a leading owner of deepwater drilling rigs, would provide BP with a rig and the crew to run it. Two BP "Well Site Leaders" (the "company men") would be on the rig at all times to direct the crew and contractors and their work, and would maintain regular contact with the BP engineers on shore.

BP actually used two Transocean rigs to drill the Macondo well. The *Marianas* began work in October 2009 and drilled for 34 days, reaching a depth of 9,090 feet, before it had to stop drilling and move off-site to avoid Hurricane Ida. As described in Chapter 1, the storm nevertheless damaged the rig badly enough that BP called in the *Deepwater Horizon* to take over.

While the *Marianas* had been anchored in place with huge mooring chains, the *Deepwater Horizon* was a dynamically positioned mobile offshore drilling unit (MODU).[2] It relied on thrusters and satellite-positioning technology to stay in place over the well. Once the rig arrived on January 31, 2010, and began drilling operations, Transocean's Offshore Installation Manager Jimmy Harrell took over responsibility as the top Transocean employee on the rig.

When the *Deepwater Horizon* arrived, its first task was to lower its giant blowout preventer (BOP) onto the wellhead that the *Marianas* had left behind. The BOP is a stack of enormous valves that rig crews use both as a drilling tool and as an emergency safety device. Once it is put in place, everything needed in the well—drilling pipe, bits, casing, and mud—passes through the BOP. Every drilling rig has its own BOP, which its crew must test before and during drilling operations. After a week of surface testing, the *Deepwater*

**FIGURE 4.1: Macondo Well Schematic**



*TrialGraphix*

*Horizon* rig crew lowered the 400–ton device down through a mile of seawater and used a remotely operated vehicle (ROV) to guide it so that it could be latched onto the wellhead below.

The *Deepwater Horizon*'s blowout preventer had several features that could be used to seal the well. The top two were large, donut-shaped rubber elements called "annular preventers" that encircled drill pipe or casing inside the BOP. When squeezed shut, they sealed off the annular space around the drill pipe. The BOP also contained five sets of metal rams. The "blind shear ram" was designed to cut through drill pipe inside the BOP to seal off the well in emergency situations. It could be activated manually by drillers on the rig, by an ROV, or by an automated emergency "deadman system." A casing shear ram was designed to cut through casing; and three sets of pipe rams were in place to close off the space around the drill pipe.

Below the wellhead stretched four telescopic casing strings installed by the *Marianas* to reinforce the hole it had begun drilling. The *Deepwater Horizon* crew proceeded to drill deeper into the Earth, setting progressively smaller-diameter casing strings along the way as required. (Figure 4.1) They cemented each new string into place, anchoring the well to—and sealing the well off from—the surrounding rock.

### "Lost Circulation" Event at the Pay Zone, and a Revised Plan for the Well

By early April, the *Deepwater Horizon* crew had begun to penetrate the pay zone—the porous hydrocarbon-bearing rock that BP had hoped to find. But on April 9, they suffered a setback. At 18,193 feet below sea level, the pressure exerted by the drilling mud exceeded

# OMITTED PAGES

**FIGURE 4.5: Temporary Abandonment**



The status of the well before and after temporary abandonment.

*TrialGraphix*

primary criterion BP appears to have used to determine whether to perform the cement evaluation test was whether there were "[l]osses while cementing [the] long string."[57] Having seen no lost returns during the cement job, BP sent the Schlumberger team home and moved on to prepare the well for temporary abandonment.

## Temporary Abandonment and Preparing to Move On to the Next Job

Once BP decided to send the Schlumberger team home, *Deepwater Horizon*'s crew began the final phase of its work. Drilling the Macondo well had required a giant offshore rig of *Deepwater Horizon*'s capabilities. By contrast, BP, like most operators, would give the job of "completing" the well to a smaller (and less costly) rig, which would install hydrocarbon-collection and –production equipment. To make way for the new rig, the *Deepwater Horizon* would have to remove its riser[*] and blowout preventer from the wellhead—and before it could do those things, the crew had to secure the well through a process called "temporary abandonment."

Four features of the temporarily abandoned well are worth noting. First is the single 300-foot-long cement plug inside the wellbore. MMS regulations required BP to install a cement plug as a backup for the cement job at the bottom of the well. Second is the location of the cement plug: BP planned to put it 3,300 feet below the ocean floor, or "mud line" (which was deeper than MMS regulations allowed without dispensation, and deeper than usual).[58] Third is the presence of seawater in the well below the sea floor: BP planned to replace 3,000 feet of mud in the wellbore above the cement plug with much

---

[*] The riser is the piping that connects the drilling rig at the surface with the BOP at the wellhead on the seafloor.

lighter seawater (seawater weighs roughly 8.6 ppg, while the mud in the wellbore weighed roughly 14.5 ppg). Fourth is the lockdown sleeve—a mechanical device that locks the long casing string to the wellhead to prevent it from lifting out of place during subsequent production operations. (Figure 4.5)

At 10:43 a.m., Morel e-mailed an "Ops Note" to the rest of the Macondo team listing the temporary abandonment procedures for the well.[59] It was the first time the BP Well Site Leaders on the rig had seen the procedures they would use that day. BP first shared the procedures with the rig crew at the 11 a.m. pre-tour meeting that morning.[60] The basic sequence was as follows:

> **Lockdown Sleeve**
> Before the Macondo blowout, a *lockdown sleeve* was not generally considered a safety mechanism or barrier to flow prior to the production phase of the well. Drilling rigs did not generally set lockdown sleeves. Rather, completion or production rigs did so after the drilling phase. BP decided to have the Deepwater Horizon set the lockdown sleeve because the Horizon could do the job more quickly than the completion rig. Based on the Macondo event, and given early concerns that upward forces during the blowout had approached or exceeded the force needed to lift the production casing up out of its seat in the wellhead, the Commission believes operators should consider installing a lockdown sleeve or other device to lock the casing hanger in place as part of drilling operations (or, at the very least, at the outset of temporary abandonment).

1. Perform a positive-pressure test to test the integrity of the production casing;
2. Run the drill pipe into the well to 8,367 feet (3,300 feet below the mud line);
3. Displace 3,300 feet of mud in the well with seawater, lifting the mud above the BOP and into the riser;
4. Perform a negative-pressure test to assess the integrity of the well and bottom-hole cement job to ensure *outside* fluids (such as hydrocarbons) are not leaking *into* the well;
5. Displace the mud in the riser with seawater;
6. Set the surface cement plug at 8,367 feet; and
7. Set the lockdown sleeve.[61]

The crew would never get through all of the steps in the procedure.

BP's Macondo team had made numerous changes to the temporary abandonment procedures in the two weeks leading up to the April 20 "Ops Note." For example, in its April 12 drilling plan, BP had planned (1) to set the lockdown sleeve before setting the surface cement plug and (2) to set the surface cement plug in seawater only 6,000 feet below sea level (as opposed to 8,367 feet). The April 12 plan did not include a negative-pressure test.[62]  On April 14, Morel sent an e-mail entitled "Forward Ops" setting forth a different procedure, which included a negative-pressure test but would require setting the surface cement plug in mud before displacement of the riser with seawater.[63] On April 16, BP sent an Application for Permit to Modify to MMS describing a temporary abandonment procedure that was different from the procedure in either the April 12 drilling plan, the April 14 e-mail, or the April 20 "Ops Note."[64] There is no evidence that these changes went through *any* sort of formal risk assessment or management of change process.

# OMITTED PAGES



# Chapter Five
# "You're in it now, up to your neck!"

## Response and Containment

No single story dominated newspaper headlines on April 21 and 22. America's most-read papers led with articles about the progress of financial reform legislation; the Supreme Court's 8–1 ruling in a case about video depictions of animal cruelty and the First Amendment; the death of civil rights leader Dorothy Height; and the Food and Drug Administration's plans to target sodium content in packaged foods.[1] Editors appear to have viewed these as slow news days. The *New York Times*, for example, ran a front-page story on April 22 about how travelers in Europe were coping with flight cancellations caused by volcanic ash, titled "Routine Flights Become Overland Odysseys, Minus Clean Socks."[2]

A reader who flipped 12 more pages into the *Times* would have encountered a less lighthearted headline: "11 Remain Missing After Oil Rig Explodes Off Louisiana."[3] *USA Today* and the *Wall Street Journal* covered the *Deepwater Horizon* explosion on their front pages on April 22.[4] The articles described the tragic accident and ensuing search-and-rescue operation—*USA Today* said it "could be one of the worst offshore drilling accidents in U.S. history"[5]—but did not discuss the potential for environmental calamity. As the *Los Angeles Times* put it, "Coast Guard experts worked to assess any environmental cleanup that may be necessary. . .

Shrimp boats skim oil off the coast of Louisiana in mid-May. At its peak, the response to the spill involved over 45,000 people and thousands of watercraft, including private "vessels of opportunity" put to work by BP. The well was finally capped on July 15—87 days after the explosion.

< *Tyrone Turner/Photo courtesy of National Geographic*

[b]ut the main focus was on the missing workers."[6] Other dimensions of the disaster would emerge in the days that followed.

### The Early Response (April 20–28)

On the night of April 20, as the *Deepwater Horizon* burned and the rig's survivors huddled on the *Bankston*, the response began. Coast Guard helicopters from the Marine Safety Unit in Morgan City, Louisiana searched for missing crew members. The first Coast Guard cutter to join the search was the *Pompano*, with others to follow. An offshore supply vessel found two burned life rafts. Coast Guard responders knew that approximately 700,000 gallons of diesel fuel were on the rig and could spill into the Gulf. By 10:00 the next morning, planes involved in the search for survivors reported a variably-colored sheen, two miles long by half a mile wide, on the water.

The Captain of the Marine Safety Unit, Joseph Paradis, directed these preliminary efforts. He became the first Federal On-Scene Coordinator under what is known as the National Contingency Plan, a set of federal regulations prescribing the government's response to spills and threatened spills of oil and other hazardous materials.* Under the Plan, when a spill occurs in coastal waters, the Coast Guard has the authority to respond.[7]

As the search and rescue continued on April 21, the oily sheen grew, more Coast Guard personnel and resources became involved, and Rear Admiral Mary Landry took over as Federal On-Scene Coordinator. The commander of Coast Guard District 8 (which includes, among other regions, the Gulf coast from Texas to the Florida panhandle), she would remain Federal On-Scene Coordinator until June 1. While the firefighting efforts continued, she told reporters, "We are only seeing minor sheening on the water. . . . We do not see a major spill emanating from this incident."[8] At this point, Admiral Landry's concern was the fuel oil that could spill from the rig, though she cautioned, "We don't know what's going on subsurface."[9]

As Coast Guard vessels continued the search and rescue operation, private offshore supply vessels sprayed water on the fire. Transocean hired Smit Salvage Americas, a salvage company, to try to save the rig. There was confusion about whether Transocean, the Coast Guard, the salvage company, or anyone at all was directing the firefighting operations.† Captain James Hanzalik, Chief of Incident Response in District 8, would later say that the Coast Guard, which was focused on the search and rescue and then on the spreading oil, "monitored what was going on, but [was] not directing any firefighting resources."[10] By the morning of April 21, the rig was listing. At 11:53 that evening, it shifted and leaned even more.

At 10:22 a.m. on April 22, the rig sank, taking with it the diesel fuel still on board. By that time, the Coast Guard had established an Incident Command Post in a BP facility in Houma, Louisiana. BP had formed a command post in its corporate headquarters in

* Created in 1968, the National Contingency Plan has been amended and expanded in the years since. The Oil Pollution Act of 1990 substantially expanded the Plan in response to the *Exxon Valdez* spill.
† The Coast Guard/Bureau of Ocean Energy Management, Regulation, and Enforcement *Deepwater Horizon* Joint Investigation Team, which plans to issue a report in March 2011, is examining the firefighting efforts.

Houston, Texas shortly after the explosion, and the Coast Guard established an Incident Command Post there as well.

These Incident Command Posts, along with one in Mobile, Alabama, and others established later, would become the centers of response operations, with their activities directed by the Federal On-Scene Coordinator as part of the government's Unified Command. The latter is a command structure, created and implemented by the National Contingency Plan, which integrates the "responsible party" (here, BP) with federal and state officials "to achieve an effective and efficient response."[11] The Coast Guard established a Unified Area Command—headquarters for the regional spill response—on April 23 in Robert, Louisiana, later moving it to New Orleans. It eventually included representatives from the federal government, Louisiana, Alabama, Mississippi, Florida, and BP.

Other federal agencies—including the National Oceanic and Atmospheric Administration (NOAA) and Minerals Management Service (MMS)*—immediately sent emergency responders to the Unified Area Command and Incident Command Posts. A host of senior officials, including Secretary of the Interior Ken Salazar and Secretary of Homeland Security Janet Napolitano, briefed the President on their departments' efforts on the afternoon of April 22.[12] Members of the National Response Team, drawn from the 16 federal agencies responsible for coordinating emergency preparedness and response to oil- and hazardous-substance-pollution incidents,[13] began conducting daily telephone meetings.

Even before the rig sank, BP and Transocean directed their attention to the 53-foot-tall blowout preventer (BOP) stack sitting atop the Macondo well. At about 6:00 p.m. on April 21, BP and Transocean began using remotely operated vehicles to try to close the BOP and stop the flow of oil and gas fueling the fire.

These early operations primarily attempted to activate the BOP's blind shear ram and seal off the well. During the attempts, MMS officials were embedded, as observers, in the operations centers at Transocean and BP headquarters in Houston. Because of the emergency, on-scene personnel from BP, Transocean, and Cameron (the company that manufactured the BOP) made decisions without the need for government approvals. Beginning on April 21 and continuing throughout the effort to control the well, Secretary Salazar received daily updates through conference calls with BP's technical teams.

The initial news was encouraging. On April 23, Admiral Landry told the press that, according to surveillance by remotely operated vehicles, the BOP, although "[i]t is not a guarantee," appeared to have done its job, sealing off the flow of oil and preventing any leak.[14] The good news did not last. The Coast Guard suspended its search for the 11 missing workers later that day. And, when Admiral Landry spoke, remotely operated vehicles had not yet surveyed the entire length of the broken riser pipe—previously

---

\* On June 18, 2010, Secretary of the Interior Ken Salazar ordered that the Minerals Management Service be officially renamed the Bureau of Ocean Energy Management, Regulation, and Enforcement. For consistency, throughout this chapter, we refer to the agency as the Minerals Management Service (MMS), its name at the time of the April 20 blowout.



Oil spews unchecked from the *Deepwater Horizon*'s severed riser in this video frame taken May 26. When the rig sank, the riser broke off, settling on the sea floor.

*© BP p.l.c*

connecting the well to the now–sunk *Deepwater Horizon*—that still jutted out of the top of the BOP. By mid–afternoon on April 23, the vehicles had discovered that oil was leaking from the end of the riser, where it had broken off from the *Deepwater Horizon* when the rig sank. By the next morning, the vehicles had also discovered a second leak from a kink in the riser, located above the BOP. On April 24, Unified Command announced that the riser was leaking oil at a rate of 1,000 barrels per day.[15] This number appears to have come from BP, although how it was calculated remains unclear.[16]

As BP realized that the early efforts to stop the flow of oil had failed, it considered ways to control the well other than by triggering the BOP. A primary option was to drill a relief well to intersect the Macondo well at its source and enable a drilling rig to pump in cement to stop the flow of oil. While it could take more than three months to drill, a relief well was the only source–control option mentioned by name in BP's Initial Exploration Plan.[17] Industry and government experts characterized a relief well as the only likely and accepted solution to a subsea blowout.[18] BP had begun looking for available drilling rigs on the morning of April 21; it secured two, and began drilling a primary relief well on May 2 and a back–up well insisted upon by Secretary Salazar on May 17.[19]

Responders, meanwhile, shifted their focus to the release of large amounts of oil. Although the National Contingency Plan requires the Coast Guard to supervise an oil–spill response in coastal waters, it does not envision that the Coast Guard will provide all, or even most, of the response equipment. That role is filled by private oil–spill removal organizations, which contract with the oil companies that are required to demonstrate response capacity. BP's main oil–spill removal organization in the Gulf is the Marine Spill Response Corporation, a nonprofit created by industry after the *Exxon Valdez* disaster to respond to oil spills. The Marine Spill Response Corporation dispatched four skimmers within hours of the explosion.[20] BP's oil–spill response plan for the Gulf of Mexico claimed that response vessels provided by the Marine Spill Response Corporation and other private oil–spill removal organizations could recover nearly 500,000 barrels of oil per day.[21]

Despite these claims, the oil–spill removal organizations were quickly outmatched. While production technology had made great advances since *Exxon Valdez* (see Chapter 2), spill–response technology had not. The Oil Pollution Act of 1990, by requiring double hulls in oil tankers, had effectively reduced tanker spills.[22] But it did not provide incentives for industry or guaranteed funding for federal agencies to conduct research on oil–spill response. Though incremental improvements in skimming and boom had been realized in

the intervening 21 years, the technologies used in response to the *Deepwater Horizon* and *Exxon Valdez* oil spills were largely the same.[23]

If BP's response capacity was underwhelming, some aspects of its response plan were embarrassing. In the plan, BP had named Peter Lutz as a wildlife expert on whom it would rely; he had died several years before BP submitted its plan. BP listed seals and walruses as two species of concern in case of an oil spill in the Gulf; these species never see Gulf waters. And a link in the plan that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site.[24] (Congressional investigation revealed that the response plans submitted to MMS by ExxonMobil, Chevron, ConocoPhillips, and Shell were almost identical to BP's—they too suggested impressive but unrealistic response capacity and three included the embarrassing reference to walruses.[25] See Chapter 3 for more discussion of these plans.)

By April 25, responders had started to realize that the estimated spill volume of 1,000 barrels per day might be inaccurate. Dispersants applied to break up the surface slick were not having the anticipated effect. Either the dispersants were inexplicably not working, or the amount of oil was greater than previously suspected. Between April 26 and April 28, BP personnel within Unified Command reportedly said that they thought 1,000 to 6,000 barrels were leaking each day.[26]

To alert government leadership that the spill could be larger than 1,000 barrels per day, a NOAA scientist created a one-page report on April 26 estimating the flow rate at roughly 5,000 barrels per day. He based this estimate on other responders' visual observations of the speed with which oil was leaking from the end of the riser, as well as the size and color of the oil slick on the Gulf's surface.[27] Both methodologies, the scientist recognized, were highly imprecise: he relied on rough guesses, for example, of the velocity of the oil as it left the riser and the thickness of the surface slick. He told a NOAA colleague in Unified Command that the flow could be 5,000 to 10,000 barrels per day.[28] At a press conference on April 28, Admiral Landry stated, "NOAA experts believe the output could be *as much as* 5,000 barrels" (emphasis added).[29]

Although it represented a five-fold increase over the then-current figure, 5,000 barrels per day was a back-of-the-envelope estimate, and Unified Command did not explain how NOAA calculated it. Nevertheless, for the next four weeks, it remained the official government estimate of the spill size.

## The Response Ramps Up (April 29–May 1)

At the peak of the response, more than 45,000 people participated.[30] In addition to deploying active-duty members to the Gulf, the Coast Guard called up reservists. Some 1,100 Louisiana National Guard troops served under the direction of Unified Command.[31] The Environmental Protection Agency (EPA), NOAA, and other federal agencies shifted hundreds of responders to the region.

Consistent with the Unified Command framework, BP played a major role from the outset. Most Coast Guard responders had a BP counterpart. For instance, Doug Suttles, BP's Chief



In a joint press briefing, BP Chief Operating Officer of Exploration and Production Doug Suttles takes the podium alongside Federal On-Scene Coordinator and Coast Guard Rear Admiral Mary Landry. The Coast Guard considered BP a co-combatant in the effort to battle the oil.

*U.S. Coast Guard photo/Petty Officer 3rd Class Cory J. Mendenhall*

Operating Officer of Exploration and Production, was the counterpart to the Federal On-Scene Coordinator. BP employees were scattered through the command structure, in roles ranging from waste management to environmental assessment. Sometimes, a BP employee supervised Coast Guard or other federal responders.

The preference under the National Contingency Plan is for the Federal On-Scene Coordinator to supervise response activities while the responsible party conducts—and funds—them. When a spill "results in a substantial threat to public health or welfare of the United States," the Plan requires the Federal On-Scene Coordinator to direct all response efforts.[32]  The Coast Guard also has the option to "federalize" the spill—conducting and funding all aspects of the response through the Oil Spill Liability Trust Fund, and later seeking reimbursement from the responsible party.[33] But in most spills, especially when

the responsible party has deep pockets and is willing to carry out response activities, federalizing is not preferred. Coast Guard leaders, shaped by their experience implementing the National Contingency Plan through a unified command system, viewed the responsible party as a co-combatant in the fight against the oil. From their perspective, BP took its role as responsible party seriously and had an open checkbook for response costs.* That did not mean BP was happy to pay. Tony Hayward, the Chief Executive Officer of BP, reportedly asked board members, "What the hell did we do to deserve this?"[34]

Though willing to fund and carry out the response, BP had no available, tested technique to stop a deepwater blowout other than the lengthy process of drilling a relief well. Forty years earlier, the government had recognized the need for subsea containment technology. In 1969, following the Santa Barbara Channel spill, the Nixon administration had issued a report recommending, in part, that "[u]nderwater methods to collect oil from subsea leaks should be developed."[35] For deepwater wells, however, such development had never occurred. Within a week of the explosion, BP embarked on what would become a massive effort to generate containment options, either by adapting shallow-water technology to the deepwater environment, or by designing entirely new devices. Different teams at BP's Houston headquarters focused on different ways either to stop the flow of oil or to collect it at the source. Each team had what amounted to a blank check. As one contractor put it, "Whatever you needed, you got it. If you needed something from a machine shop and you couldn't jump in line, you bought the machine shop."[36]

While the Coast Guard oversaw the response at the surface, MMS primarily oversaw source-control operations. BP would draft detailed procedures describing an operation it wished to perform around the wellhead. MMS and Coast Guard officials in Houston participated in the drafting process to help identify and mitigate hazards, including risks to worker safety. At Unified Area Command, Lars Herbst, MMS Gulf of Mexico Regional Director, or his deputy, Mike Saucier, would review and approve the procedures, before the Federal On-Scene Coordinator gave the final go-ahead. This hierarchy of approvals remained in place throughout the containment effort.

MMS was the sole government agency charged with understanding deepwater wells and related technology, such as BOPs. But its supervision of the containment effort was limited, in line with its role in overseeing deepwater drilling more generally. Its staff did not attempt to dictate whether BP should perform an operation, determine whether it had a significant likelihood of success, or suggest consideration of other options. This limited role stemmed in part from a lack of resources. At most, MMS had four to five employees in Houston trying to oversee BP's efforts. One employee described his experience as akin to standing in a hurricane.

Interviews of MMS staff members involved in the containment effort also suggest that the agency did not view itself as capable of, or responsible for, providing more substantive oversight. One MMS employee asserted that BP, and industry more broadly, possessed 10

---

* The day the rig exploded, the emergency reserve available to the Federal On-Scene Coordinator in the Oil Spill Liability Trust Fund and not obligated to other ongoing response actions amounted to $18,600,000. In contrast, by November 11, 2010, BP had paid $580,977,461 to the federal government for response costs. BP's total expenditures on the response also included payments to states and to contractors it hired directly. Paul Guinee, e-mail to Commission staff, November 16, 2010; BP, *Claims and Government Payments Gulf of Mexico Oil Spill Public Report* (November 11, 2010).

times the expertise that MMS could bring to bear on the complex problem of deepwater spill containment. Another pointed out that MMS had trouble attracting the most talented personnel, who are more likely to work in industry where salaries are higher. A third MMS employee stated that he could count on one hand the people from the agency whom he would trust to make key decisions in an effort of this magnitude. Perhaps most revealingly, two different MMS employees separately recalled being asked—one by Secretary Salazar, and the other by Assistant Secretary Tom Strickland—what they would do if the U.S. government took over the containment effort. Both said they would hire BP or another major oil company.

Though the Coast Guard and MMS believed they had to work closely with BP, others in government did not share this view of the relationship with the responsible party. At an April 29 press conference with several senior administration officials, Coast Guard Rear Admiral Sally Brice O'Hara referred to BP as "our partner," prompting Secretary Napolitano to emphasize, "They are not our partner."[37] Secretary Salazar later said on *CNN* that the government would keep its "boot on the neck" of BP.[38]

While struggling to explain its oversight role to the public, the federal government increased its commitment to the spill response. On April 29, a week after the rig sank and a day after the flow-rate estimate rose to 5,000 barrels per day, the Coast Guard designated the disaster a "Spill of National Significance"[39]—the first time the government had used that designation. A Spill of National Significance is one "that due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge."[40] The designation permitted a National Incident Commander to "assume the role of the [Federal On-Scene Coordinator] in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."[41] Other than the quoted sentence, the National Contingency Plan is silent on the role of the National Incident Commander, who can fill the position, and what tasks he or she will handle. As a result, there is no clear line between the National Incident Commander's responsibilities and those of the Federal On-Scene Coordinator. During the *Deepwater Horizon* spill response, the National Incident Commander coordinated interagency efforts on the wide variety of issues responders faced, and dealt with high-level political and media inquiries, while the Federal On-Scene Coordinator generally retained oversight of day-to-day operations. More than anyone else, the National Incident Commander became the face of the federal response. When President Obama visited the Gulf on May 2, a fisherman asked who would pay his bills while he was out of work; the President responded that the National Incident Commander would take care of it.[42]

On May 1, Secretary Napolitano announced that Admiral Thad Allen, the outgoing Commandant of the Coast Guard and then its only four-star Admiral, would serve as National Incident Commander.[43] Admiral Allen was well known in the Gulf.  He had previously overseen the ocean rescue and return to Cuba of Elian Gonzalez in 1999; the Coast Guard's work securing harbors along the Eastern Seaboard after the attacks of September 11, 2001; and the federal response to Hurricanes Katrina and Rita, after the