

Surrounded by orange containment boom, National Incident Commander Admiral Thad Allen speaks to the press in Venice, Louisiana.  The outgoing Coast Guard Commandant postponed his retirement to assume the post, drawing on his experience leading the federal response to Hurricane Katrina and overseeing oil-spill readiness exercises in the Gulf.

*Steven Johnson/Miami Herald/MCT via Getty Images*

Bush Administration asked him to replace the stumbling director of the Federal Emergency Management Agency, Michael Brown, as the lead federal official.[44] His leadership during Katrina was widely considered a success. A Baton Rouge *Advocate* editorial published near the end of his time in the Gulf highlighted his local popularity and thanked him for his service.[45] Less celebrated in the media, but no less important for the task facing him as National Incident Commander, was Admiral Allen's role overseeing a 2002 simulation that tested the readiness of the Coast Guard and other agencies to respond to a Spill of National Significance off the coast of Louisiana.[46] As Commandant, Admiral Allen was already participating in the response, and he put off his scheduled retirement when he became National Incident Commander.

As the National Incident Command took shape in early May, BP's efforts to stop the flow of oil continued to focus on actuating the BOP, which BP still believed was the best chance of quickly shutting in the well. These efforts were plagued by engineering and organizational problems. For instance, it took nearly 10 days for a Transocean representative to realize that the stack's plumbing differed from the diagrams on which BP and Transocean were relying, and to inform the engineers attempting to trigger one of the BOP's rams through a hydraulic panel that they had been misdirecting their efforts.[47] (Without properly recording the change, Transocean had reconfigured the BOP; the panel

that was supposed to control that ram actually operated a different, "test" ram, which could not stop the flow of oil and gas.[48] BP Vice President Harry Thierens, who was BP's lead on BOP interventions, stated afterward that he was "quite frankly astonished that this could have happened."[49]) While this and other problems delayed BP's efforts, the flow of oil and sand continued to wear down the BOP's parts, making closure more difficult.[50]

BP stopped trying to close the BOP on May 5.[51] By May 7, it had concluded that "[t]he possibility of closing the BOP has now been essentially exhausted."[52] In mid-May, at the suggestion of Secretary of Energy Steven Chu, BP undertook gamma-ray imaging of the BOP, which lacked instrumentation to show the position of its rams.[53] The imaging indicated that, although the blind shear ram had closed at least partially, oil continued to flow past it.

### The "Social and Political Nullification" of the National Contingency Plan (April 29–May 1)

The hurricane-stricken Gulf states are all too familiar with emergency response; all are among the top dozen states in number of declared major disasters.[54] State and local officials in the Gulf are accustomed to setting up emergency-response structures pursuant to the Stafford Act, under which the federal government provides funding and assists state and local governments during a major disaster.[55] In contrast, the National Contingency Plan, which governs oil spills, gives the Federal On-Scene Coordinator the power to direct all response actions.[56] Thus, while the Stafford Act envisions a state-directed (though in part federally funded) response, the National Contingency Plan puts federal officials in charge.

State and local officials chafed under federal control of the response. Louisiana Governor Bobby Jindal's advisors reportedly spent days trying to determine whether the Stafford Act or the National Contingency Plan applied.[57] On April 29, Governor Jindal declared a state of emergency in Louisiana, authorizing the director of the Governor's Office of Homeland Security and Emergency Preparedness to undertake any legal activities deemed necessary to respond and to begin coordinating state response efforts.[58] These efforts took place outside of the Unified Command framework. The Governors of Mississippi, Alabama, and Florida followed suit, declaring states of emergency the next day.[59]

At the outset of the spill, the pre-designated State On-Scene Coordinators for Louisiana, Alabama, and Mississippi participated in Unified Command.[60] These individuals were career oil-spill responders: familiar with the National Contingency Plan, experienced in responding to spills, and accustomed to working with the Coast Guard. Some had participated in the 2002 spill exercise run by Admiral Allen. They shared the Coast Guard's view that the responsible party is an important ally, not an adversary, in responding to a spill.

During this spill, however, the Governors and other state political officials participated in the response in unprecedented ways, taking decisions out of the hands of career oil-spill responders. These high-level state officials were much less familiar with spill-response

planning. In addition to the National Contingency Plan, each Coast Guard sector is an "Area" with an Area Contingency Plan created by relevant state and federal agencies. When confronted with a contingency plan setting out how the federal and state governments were supposed to run an oil-spill response, one high-level state official told a Coast Guard responder that he never signed it. According to the Coast Guard officer, the state official was not questioning whether his signature appeared on the document, but asserting that he had not substantively reviewed the plan.[61] State and local officials largely rejected the pre-spill plans and began to create their own response structures.

Because the majority of the oil would come ashore in Louisiana, these issues of control mattered most there. Louisiana declined to empower the officials that it sent to work with federal responders within Unified Command, instead requiring most decisions to go through the Governor's office. For example, the Louisiana representative at Unified Area Command could not approve the daily agenda of response activities.[62] Responders worked around this problem, but it complicated operations.

Local officials were even less familiar with oil-spill planning, though they had robust experience with other emergencies. Under Louisiana law, Parish Presidents exercise substantial authority—mirroring that of the Governor—during hurricanes and other natural disasters.[63] The parishes wanted to assert that same control during the spill, and many used money distributed by BP to purchase their own equipment and establish their own operating centers outside of Unified Command. Eventually, the Coast Guard assigned a liaison officer to each Parish President, who attempted to improve relationships with the parishes by providing information and reporting back to Unified Command on local needs.

Local resentment became a media theme and then a self-fulfilling prophesy. Even those who privately thought the federal government was doing the best it could under the circumstances did not say so publicly.[64] Coast Guard responders watched Governor Jindal—and the TV cameras following him—return to what appeared to be the same spot of oiled marsh day after day to complain about the inadequacy of the federal response, even though only a small amount of marsh was then oiled. When the Coast Guard sought to clean up that piece of affected marsh, Governor Jindal refused to confirm its location.[65] Journalists encouraged state and local officials and residents to display their anger at the federal response, and offered coverage when they did. Anderson Cooper reportedly asked a Parish President to bring an angry, unemployed offshore oil worker on his show. When the Parish President could not promise the worker would be "angry," both were disinvited.[66]

As the media coverage grew more frenzied, the pressure increased on federal, state, and local officials to take action and to avoid being seen as in league with BP. What Admiral Allen would later call "the social and political nullification" of the National Contingency Plan, which envisions "unity of effort" between the federal government, state governments, and the responsible party, was well underway.[67]

### Spill Impacts and Efforts To Help
Effects on the Gulf economy, environment, and way of life increased as the spill dragged on and oil crept closer to shorelines. Concerns about fisheries took hold immediately. The

Gulf of Mexico is home to crab, shrimp, oyster, and finfish fisheries, all of which were affected by the oil. The Louisiana Department of Wildlife and Fisheries and the Department of Health and Hospitals began closing fisheries and oyster grounds in state waters—three miles or less from shore—on April 30. State fishery closures continued piece by piece, beginning on June 2 in Alabama, June 4 in Mississippi, and June 14 in Florida.[68] NOAA's Office of Response and Restoration began conducting flyovers and modeling the movement of the oil beginning April 23.[69] Responders used these daily trajectory forecasts to anticipate where oil would be over the next 24- and 48-hour periods. Based on the forecasts, as well as sampling in or near affected areas, the federal fishery closures began on May 2. Through an emergency rule, NOAA's National Marine Fisheries Service first closed an area spanning approximately 6,817 square miles, or 3 percent of the Gulf federal fishing zone.[70] On May 7, NOAA increased the closed area to 4.5 percent of that zone.[71] A week later, it extended the closures indefinitely.[72] NOAA continued to close additional areas, and on June 2—at the peak of the closures—it prohibited all fishing in nearly 37 percent of the Gulf zone.[73]

Although unable to fish, many fishermen were not content to lay idle. As contractors and subcontractors set up camp in towns across the Gulf to carry out response activities, residents viewed them with suspicion. People in Lafourche Parish, for example, worried about the out-of-state oil-spill-response contractors who took over their shores bringing crime and taking away spill-related job opportunities.[74] Parish Presidents pushed BP and Unified Command to give clean-up jobs to residents and, in the newly out-of-work fishermen, saw a fleet of experienced captains who were more familiar with the intricate shoreline than any out-of-state oil-spill responders.

The Vessels of Opportunity program was BP's answer, and a way for BP to provide some income to affected residents outside of the formal claims process. Through the program, BP employed private vessels to conduct response efforts such as skimming, booming, and transporting supplies. Vessels of opportunity made between $1,200 and $3,000 per day, depending on the size of the boat. Individual crew members made $200 for an eight-hour day.[75] But the program had delays and problems. BP and the Coast Guard were slow to develop eligibility requirements (such as an operable VHF-FM radio) for boats.[76] Initially, there was not enough work. Later, residents and Parish Presidents complained that BP was not sufficiently targeting out-of-work fishermen at whom the program was ostensibly directed, and that wealthy or non-local boat owners were taking advantage of poor oversight to gain spots in the program. Eventually, BP established a verification process that prioritized boats registered with the state before March 2010 and that accepted only one boat per owner.[77] The group that may have lost out the most on the program was the large population of Vietnamese-American fishermen. Many had arrived in the region as refugees and struggled with the lack of Vietnamese-language training.[78] (Chapter 6 discusses the impacts of the spill on minority fishing communities.)

Angry that BP was deploying non-local boats in his parish waters, Craig Taffaro, President of St. Bernard Parish, started his own program using the commercial fishing fleet based there. He submitted invoices to BP, which it paid. The State of Louisiana also began its own program, as did Plaquemines and Jefferson Parishes.[79] Unified Command struggled

to coordinate this floating militia of independent vessels and to give them useful response tasks. Having hundreds of vessels look for oil did not contribute significantly to the response, because aircraft were more effective at spotting oil.[80] Placing boom requires skill and training, and responders differed in their judgments of how much the vessels contributed.

In addition to overseeing the Vessels of Opportunity program, Unified Command needed to ensure that all workers, whether on boats or on shore, were adequately trained and taking safety precautions. The Occupational Safety and Health Administration (OSHA) began working with Unified Command at the end of April; under the National Contingency Plan, all response actions must comply with OSHA's training and safety requirements.[81] OSHA established rules regarding protective equipment and, because the response relied in part on untrained workers, a shortened training course.[82] Residents were eager to take on clean-up jobs, but some worried that, notwithstanding OSHA's involvement, response-related work would affect their health.[83] (Chapter 6 discusses the impacts of response activities on health.)

Health issues for non-workers were thornier. The Centers for Disease Control and Prevention represents the Department of Health and Human Services on the National Response Team and had participated in recent spill training exercises.  The Centers for Disease Control, however, had not foreseen that an oil spill could affect the health of the broader population and had not fully considered the role health agencies might play in a spill response.[84] Others in the Department, including the Assistant Secretary for Preparedness and Response, had not either.[85] Consequently, the Department had to consider during the disaster how it would fund spill-related activities, because BP would have to pay only for those deemed response measures by Unified Command. The Department was concerned that neither the Oil Spill Liability Trust Fund nor BP would reimburse it for activities such as long-term health surveillance, and negotiations over what costs qualified for reimbursement took time.[86] At the request of Unified Command, Health and Human Services eventually, in June, sent a Senior Health Policy Advisor to support the National Incident Commander on public health issues.[87]

The spill affected wildlife health as well. On April 30, the *Times-Picayune* reported the recovery of the first oiled bird.[88] From then on, crude-covered animals were a fixture in the media coverage and public perceptions of the disaster. The U.S. Fish and Wildlife Service, NOAA's Fisheries Service, state wildlife agencies, and academic organizations oversaw animal response and rehabilitation efforts.[89] Wildlife responders took recovered animals to one of several treatment centers, washing, monitoring, and then releasing them.[90] According to the Audubon Society, more than 12,000 volunteers signed up to help with these efforts during a single week in early May.[91] Not all offers of assistance were accepted. Some groups that could have provided skilled wildlife responders, such as the National Wildlife Federation, felt discouraged from helping; in their view, there was no effective process for integrating skilled volunteers into the response structure.[92] Would-be volunteers worried that animal mortality was greater than it would have been had more rescuers been out looking for oiled animals.[93] (Chapter 6 discusses impacts on wildlife in detail.)



Free once more, a pair of pelicans test their wings in Aransas National Wildlife Refuge after being de-oiled and nursed back to health. Taking part in the release are veterinarian Sharon Taylor and Refuge manager Dan Alonso. Over a thousand birds affected by the spill were rehabilitated; thousands of others were not so fortunate.

*U.S. Coast Guard photo/Petty Officer 3rd Class Robert Brazzell*

Along with volunteering for wildlife rescue, members of the general public submitted to BP and the Coast Guard numerous ideas for how to clean up the oil or plug the well. For instance, movie star Kevin Costner argued for the use of his oil-water separator, and BP eventually purchased 32 units.[94] Citizens without Costner's resources had more trouble getting their ideas reviewed. On June 4, the Coast Guard established the Interagency Alternative Technology Assessment Program to receive, acknowledge, and evaluate ideas.[95] The program received about 4,000 submissions.[96] Most of the proposals were not viable or required too much time for development into operational response tools.* As ideas came in, the Coast Guard screened them and sent the most promising to the Federal On-Scene Coordinator, who ended up testing about a dozen during the course of the spill. None was implemented on a large scale, but the Coast Guard plans to use some of the proposals in its spill-response research.[97]

Foreign companies and countries also offered assistance in the form of response equipment and vessels. The Coast Guard and National Incident Command accepted some of these offers and rejected others.[98] News reports and politicians alleged that the federal government turned away foreign offers of assistance because of the Jones Act, a law preventing foreign vessels from participating in trade between U.S. ports.[99] While decisionmakers did decline to purchase some foreign equipment for operational reasons—

---

 * Although intellectual property concerns prohibit the Coast Guard from disclosing the proposals actually submitted, news outlets reported that individuals suggested ideas like dumping popcorn from airplanes; soaking up the oil with packing peanuts, sawdust, kitty litter, and air conditioning filters; and using liquid nitrogen to freeze the oil. Julie Schmit, "After BP Oil Spill, Thousands of Ideas Poured in for Cleanup," *USA Today,* November 15, 2010; John W. Schoen, "BP's Suggestion Box Is Spilling Over," MSNBC, May 14, 2010.

for example, Dutch vessels that would have taken weeks to outfit and sail to the region, and a Taiwanese super-skimmer that was expensive and highly inefficient in the Gulf—they did not reject foreign ships because of Jones Act restrictions.[100] These restrictions did not even come into play for the vast majority of vessels operating at the wellhead, because the Act does not block foreign vessels from loading and then unloading oil more than three miles off the coast.[101] When the Act did apply, the National Incident Commander appears to have granted waivers and exemptions when requested.[102]

In the end, the response technology that created the most controversy was not a mechanical tool like a skimmer or oil-water separator, but a chemical one.

### Initial Dispersant Decisions (April 30–May 10)

Even before they were certain that oil was spilling into the Gulf, responders had readied planes full of dispersants to use in a potential response. Dispersants include surfactants that break down oil into smaller droplets, which are more likely to dissolve into the water column.[103] On April 24, once Unified Command knew a leak existed and coastal impacts were possible, Admiral Landry told reporters: "We have one-third of the world's dispersant resources on standby. . . . Our goal is to fight this oil spill as far away from the coastline as possible."[104] Faced with what one Coast Guard captain called a "tradeoff of bad choices" between spraying chemicals on the water or watching more oil reach the shore,[105] responders would wield dispersants in the battle against oil for the next 12 weeks, using novel methods and unprecedented volumes.

Dispersants do not remove oil from the water altogether. Energy from wind and waves naturally disperses oil, and dispersants accelerate this process by allowing oil to mix with water. Dispersed oil is diluted as it mixes vertically and horizontally in the water column.[106] Using dispersants has several potential benefits. First, less oil will reach shorelines and fragile environments such as marshes.[107] Second, animals and birds that float on or wade through the water surface may encounter less oil.[108] Third, dispersants may accelerate the rate at which oil biodegrades.[109] Finally, responders to an oil spill can use dispersants when bad weather prevents skimming or burning. But dispersants also pose potential threats. Less oil on the surface means more in the water column, spread over a wider area, potentially increasing exposure for marine life. Chemically dispersed oil can be toxic in both the short and long term. Moreover, some studies have found that dispersants do not increase biodegradation rates—or may even inhibit biodegradation.[110]

At the direction of the Federal On-Scene Coordinator, responders first sprayed dispersants on the surface oil slick on April 22.[111] Long before the spill, interagency "Regional Response Teams" had evaluated and preauthorized the use of specific dispersants in the Gulf of Mexico, with limits as to geographic areas where the chemicals could be applied, but not on overall volume or duration of use.[112] The teams included representatives from relevant state governments and from federal agencies with authority over oil spills, including the Coast Guard, EPA, the Department of the Interior, and NOAA. Preauthorization, requiring the concurrence of the Team, allows the Federal On-Scene Coordinator to employ dispersants immediately following a spill.[113] Timing matters, because the chemicals

are most effective when oil is fresh, before it has weathered and emulsified.[114] Without preauthorization, responders can still use dispersants during a spill if EPA and state authorities approve.[115] With the permission of the Federal On-Scene Coordinator, BP and its contractors applied 14,654 gallons of the dispersant Corexit on the surface during the week of April 20 to 26.[116]

Under the terms of the preauthorization, Corexit was a permissible dispersant because EPA listed it on the National Contingency Plan Product Schedule. EPA obtains toxicity data from the manufacturer before placing a dispersant on that schedule.[117] Some toxicologists have questioned the reliability and comparability of the testing by manufacturers.[118] Moreover, the required testing is limited to acute (short-term) toxicity studies on one fish species and one shrimp species;[119] it does not consider issues such as persistence in the environment and long-term effects.

Dispersant use increased during the first weeks of the spill. From April 27 to May 3, responders applied 141,358 gallons to the surface. The following week, they applied 168,988 gallons. The Coast Guard and other responders had often deployed dispersants to respond to spills, but never in such volumes; during the *Exxon Valdez* spill, responders sprayed about 5,500 gallons, and that use was controversial.[120]

Faced with high-volume dispersant use, Gulf residents became concerned that the chemicals were just as bad as the spilled oil itself. Some workers reported nausea and headaches after coming into contact with dispersants.[121] However, OSHA found no evidence of unsafe dispersant exposure among responders.[122] Environmental groups pressured Nalco, the company that manufactures Corexit, to disclose its formula. Although it had given the formula to EPA during the pre-listing process, Nalco declined to make the formula public, citing intellectual property concerns.[123] This decision did not reassure the citizens of the Gulf.

As the volume of dispersants sprayed on the surface grew, BP raised the idea of applying dispersants directly at the well, rather than waiting for the oil to reach the surface a mile above.[124] Responders had never before applied dispersants in the deep sea. Within Unified Command, some scientists were cautiously optimistic. They hoped that, in addition to reducing shoreline impacts, subsea application would mean less dispersants used overall, because they would be more effective in the turbulent subsea environment. Responders would later conclude that subsea dispersant application also helped to protect worker health by lowering the concentrations of volatile organic compounds at the surface.[125]

But responders were concerned about the absence of information on the effects of dispersants in the deepwater environment. No federal agency had studied subsea dispersant use and private studies had been extremely limited.[126] BP's Hayward was less than helpful; he told a British newspaper, "The Gulf of Mexico is a very big ocean. The amount of volume of oil and dispersant we are putting into it is tiny in relation to the total water volume."[127] While federal officials did not possess the scientific information they needed to guide their choices, they had to make choices nevertheless.

From April 30 to May 10, scientists within Unified Command worked intensively to create a monitoring protocol for subsea dispersant use that would detect adverse environmental effects and provide criteria for when the use was appropriate. It was unclear whether the preauthorizations by the Regional Response Teams covered subsea dispersant use. EPA believed they did not and wanted to make decisions about such use at a high level within the agency. But it had trouble establishing clear and rapid communication, both internally and outside the agency.[128] This slowed creation and review of the testing protocols, while Coast Guard responders and NOAA scientists chafed at the delay.

On May 10, after several rounds of testing and revision, EPA adopted a testing protocol created by NOAA and BP scientists as its directive regarding subsea dispersant use. The directive, as later amended by EPA, limited subsea application to 15,000 gallons per day and required monitoring and compliance with environmental toxicity guidelines.[129] Administrator Lisa Jackson ultimately gave EPA's approval for subsea dispersant use and would later call it the hardest decision she ever made.[130] Observed toxicity levels never exceeded the guidelines in EPA's directive, and responders continued to apply dispersants at the source until BP capped the well.

### Deploying the Containment Dome (May 6–8)

While scientists tried to determine if subsea dispersant use was even possible, BP engineers simultaneously worked to contain and recover oil until they could kill the well. Within days of discovering the leaks from the broken riser on the sea floor, they began to consider use of a large containment dome. The idea was to place the dome, also known as a cofferdam, over the larger of the two leaks, with a pipe at the top channeling oil and gas to the *Discoverer Enterprise*, a ship on the surface. BP already had several cofferdams, which it had used to provide safe working space for divers repairing leaks from shallow-water wells following Hurricanes Katrina and Rita.[131] By May 4, BP had finished modifying for deep-sea use and oil collection a preexisting dome that was 14 feet wide, 24 feet long, and 40 feet tall.[132] Following an MMS inspection of the *Discoverer Enterprise*, BP began to lower the 98-ton dome to the sea floor late in the evening of May 6.[133]

The likelihood of collecting oil with the cofferdam was uncertain. BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.[134] BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.[135] Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of the Interior, described the probability of the containment dome's success as "Medium/High."[136] Others in the oil and gas industry were not so optimistic: many experts believed the cofferdam effort was very likely to fail because of hydrates.[137]

The effort did fail, for that reason. Although BP had a plan to deal with hydrates once the cofferdam was in place, it had not planned to mitigate hydrate formation during installation.[138] When crews started to maneuver the cofferdam into position on the evening of May 7, hydrates formed before they could place the dome over the leak, clogging the

opening through which oil was to be funneled.[139] According to Richard Lynch, a vice president overseeing the effort, BP never anticipated hydrates developing this early.[140]

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it. BP engineers told Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface. Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.[141] In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."[142]

Inaccurate estimates of the well's flow also affected the cofferdam effort. According to Suttles, during this time, no one at BP believed the flow was greater than 13,000 to 14,000 barrels per day.[143] The government's then-current estimate of the flow was 5,000 barrels per day. The far larger volume of the actual flow—about 60,000 barrels per day, according to the government's now-current estimate—may be part of the reason hydrates formed more quickly than expected.[144] Moreover, BP had publicly predicted that the cofferdam would remove about 85 percent of the oil spilling into the sea.[145] But the ship it planned to connect to the cofferdam was capable of processing a maximum of 15,000 barrels per day.[146] While BP may have misjudged the probability of success, its decision to deploy the dome instead of another containment device appears to have turned more on timing than on perceived effectiveness: the dome was largely off-the-shelf and therefore ready to use in early May, before other equipment.[147]

With the failure of the cofferdam highlighting the shortage of viable options to contain and control the well, somewhat outlandish suggestions filled the void. In mid-May, a Russian newspaper suggested detonating a nuclear weapon deep within the well to stop the flow of oil, as the former Soviet Union had done on a number of occasions.[148] BP moved on: a little over a week after giving up on the cofferdam, on May 16, it was able to deploy a new collection device. Named the Riser Insertion Tube Tool, the device was a tube, four inches in diameter, that fit into the end of the riser and carried oil and gas up to the *Discoverer Enterprise*. This tool, BP's first effective means of containment, collected approximately 22,000 barrels of oil over its nine days of use.

### Flow-Rate Estimates Creep Up (May 27)

After Unified Command announced its best estimate of the flow rate as 5,000 barrels per day on April 28, a number of independent scientists began to register their disagreement. BP had contacted scientists at the Woods Hole Oceanographic Institution on May 1 about undertaking diagnostic work on the BOP and measuring the flow using a remotely operated vehicle with sonar and acoustic sensors. But BP cancelled the Woods Hole project on May 6 to instead deploy the containment dome.[149] Based on satellite imagery of the surface slick, other non-government scientists arrived at estimates in late April and early May ranging from 5,000 to 26,500 barrels of oil per day.[150] Using the appearance of oil on the surface to assess flow from a source 5,000 feet below is inherently unreliable, but the outside scientists had no other data. That changed on May 12, when BP released

a 30-second video of oil and gas streaming from the end of the broken riser. Within 24 hours, independent scientists had seized on this information and published three new estimates of the combined flow of oil and gas that ranged from 20,000 to 100,000 barrels per day.[151] On May 18, BP released another video, this time of the leak at the kink. Combining estimated flow from the two sources, a non-government scientist, Steve Wereley, testified before Congress that approximately 50,000 barrels of oil per day were flowing into the Gulf.[152]

BP dismissed these new estimates, with spokesman Bill Salvin stating, "We've said all along that there's no way to estimate the flow coming out of the pipe accurately."[153] The government disagrees with Salvin's claim: according to Marcia McNutt, Director of the U.S. Geological Survey, if a similar blowout occurs in the future, the government will be able to quickly and reliably estimate the flow rate using the very oceanographic techniques that Woods Hole was prepared to use on May 6.[154*] At the time, the government responded to the independent estimates by devoting greater resources to the question of flow rate. On May 19, the National Incident Command created an interagency Flow Rate Technical Group and charged it with generating a preliminary flow rate as soon as possible and, within two months, a final estimate based on peer-reviewed methodologies. On May 23, at Secretary Salazar's recommendation, the National Incident Command appointed McNutt the leader.

The Group consisted of both government and non-government scientists, and included subgroups using different methodologies. It published its first estimate on May 27, stating: "The only range of flow rates that is consistent with all 3 of the methods considered by the [the Group] is 12,000 to 19,000 barrels per day. Higher flow rates [of up to 25,000 barrels per day] are consistent with the data considered by [one subgroup]."[155] The Group released little additional information about its calculations. A few days later, it issued a two-page report stating that the 12,000 to 25,000 barrel range represented the "lower bound" of one subgroup's estimates, and that this subgroup had chosen not to release its "upper bound" estimates, deeming them speculative because of "unknown unknowns."[156]

Responders uniformly contended that they were responding to the oil as it appeared on the water's surface, and that the problems with quantifying the flow from the source did not affect their ability to respond. In response to a congressional inquiry later in the summer about dispersant use, however, Admiral Allen indicated that early dispersant decisions were based on the 5,000 barrels per day figure, and that the higher estimate from the Flow Rate Technical Group "spurred responders to consider reassessing the strategy for the use of dispersants as well as other oil recovery methods."[157]

Later studies would conclude that 12,000 to 25,000 barrels a day was still a significant underestimate of the amount of oil streaming into the Gulf.

---

* At the behest of the Coast Guard, Woods Hole used its sonar and acoustic technology on May 31 to gather data that later yielded a flow-rate estimate of 58,000 barrels per day. On June 21, Woods Hole, again with the support of the Coast Guard, collected source samples, which initially demonstrated that 43.7 percent of the total flow was oil, while the remainder was gas. (Woods Hole has since revised this figure to 42.8 percent.)



Top government officials work on source control out of BP's Houston headquarters. At center is Secretary of Energy Steven Chu, flanked by Secretary of the Interior Ken Salazar (right) and Director of Sandia National Laboratories Tom Hunter.

*Unified Area Command, Deepwater Horizon Response*

### The Top Kill and Junk Shot (May 26–28)

Throughout May, the federal government increased its presence in Houston, the hub of the well-control effort. In early May, scientists and engineers from three Department of Energy national laboratories began to work on-site with BP on containment. On May 7, Secretary Salazar asked McNutt, who had traveled to the Gulf with him on May 4, to remain in Houston. Finally, on May 10, President Obama directed Secretary Chu to form a team of government officials and scientists to work with BP on source control.[158] On May 11, Secretary Chu called several prominent scientists and asked them to join him the next morning for a meeting in Houston.[159]

The May 12 meeting signified the beginning of an oversight role for Secretary Chu and his team of science advisors. Secretary Chu is a Nobel Prize-winning physicist who had previously directed the Lawrence Berkeley National Laboratory, where he had led an effort to expand research into synthetic biofuels.[160] Though well known for his wide-ranging intelligence, Secretary Chu was not an oil and gas or drilling expert. During the following weeks, he immersed himself in the finer points of petroleum engineering and became intimately involved in decisionmaking with respect to containment of the well.

Although they were highly respected within their fields of study, the members of the advisory team had limited experience with well control and varying levels of experience with petroleum engineering generally. Secretary Chu assumed—correctly—that BP had

already hired a host of containment experts, and he wanted advisors known for creative thinking. His principal deputy on the team, Tom Hunter, was about to retire from his position as Director of Sandia National Laboratories. Along with McNutt, Hunter served as a link between the on-site government scientists and engineers and the rest of Secretary Chu's science advisors, who were for the most part based elsewhere. Another team member, Richard Garwin, helped design the world's first hydrogen bomb and had worked to extinguish oil fires in Kuwait following the first Gulf War. Alexander Slocum, an MIT professor who holds about 70 patents, had done some previous work on drilling design. George Cooper had been the head of the Petroleum Engineering Program at the University of California, Berkeley.

The role of both the national laboratories scientists and Secretary Chu's advisors took time to evolve from helping BP diagnose the situation—for instance, using gamma-ray imaging to show the position of the BOP's rams—to substantively overseeing BP's decisions on containment. In part, this was because the Secretary of Energy, his team of advisors, and the national laboratories personnel lacked a formal role within Unified Command. Their supervision was informally grafted onto the command framework.

In addition, the national laboratories team did not immediately integrate itself into the existing source-control structure, led by MMS and the Coast Guard. While MMS, the Coast Guard, and McNutt worked out of offices on the third floor of BP's Houston headquarters, the national laboratories team sat on the eighteenth floor.[161] One MMS staff member who was in Houston from late April through early July said that he never interacted with the national laboratories team: they never reached out to him, and he had no idea what they were working on. Perhaps because the lines of authority were unclear, BP's sharing of data with the government science teams was uneven at first. BP gave information when asked, but not proactively, so government officials had to know what data they needed and ask for it specifically.[162] Finally, both the national laboratories team and the science advisors had to educate themselves on the situation, and on deepwater petroleum engineering, before they knew enough to challenge BP and participate in high-level decisionmaking.[163]

With more substantive government oversight on the way but not yet in place, BP moved toward its first attempt to kill the well completely, via procedures called the "top kill" and "junk shot." Those names were fodder for late night comics: Jay Leno suggested that the top kill "sound[ed] like some bad Steven Seagal movie from the '80s."[164] In fact, both procedures are standard industry techniques for stopping the flow from a blown-out well (though they had never been used in deepwater[165]). A top kill—also known as a momentum or dynamic kill—involves pumping heavy drilling mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir. A junk shot complements a top kill. It involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines. That material ideally gets caught on obstructions within the BOP and impedes the flow of oil and gas. By slowing or stopping the flow, a successful junk shot makes it easier to execute a top kill.

BP's top-kill team began work in the immediate aftermath of the initial efforts to trigger the BOP.[166] In planning the operation, both BP and federal engineers modeled different scenarios based on different rates at which oil might be flowing from the well. National laboratories engineers used the then-current flow-rate estimate of 5,000 barrels per day.[167] Paul Tooms, BP's Vice President of Engineering, recalled that given the planned pumping rates, the top kill was unlikely to succeed with flow rates greater than 15,000 barrels of oil per day.[168] A senior administration official similarly recalled being told by a BP engineer that the top kill would not work if the flow rate exceeded 13,000 barrels per day.[169]

With the approval of the Federal On-Scene Coordinator, the top kill began on the afternoon of May 26. Secretary Chu and some members of his science team were in the command center in Houston.[170] During three separate attempts over three consecutive days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of junk into the BOP.[171] During each effort, pressures within the well initially dropped, but then flattened, indicating that the top kill had stopped making progress.[172] After the third unsuccessful attempt, BP and the government agreed to discontinue the strategy.[173]

As with the cofferdam, BP struggled with public communications surrounding the top kill. At the time, both industry and government officials were highly uncertain about the operation's probability of success. One MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a "tiny" chance to succeed.[174] But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent."[175] After the top kill failed, that prediction may have lessened public confidence in BP's management of the effort to control the well.

### The Federal Role Increases (Late May)

By late May, the competence and effectiveness of the federal response was under assault. Polls showed that 60 percent of adults thought the government was doing a poor job of handling the spill.[176] News articles chronicled local anger that BP appeared in charge of clean-up efforts.[177] The government's estimate of the flow rate was climbing and, with the failure of the top kill, no end to the spill was in sight.

On May 28, President Obama made his second trip to the region to see response efforts and meet with state and local leaders. Plaquemines Parish President Billy Nungesser would later claim, incorrectly, that he had not been invited to this important meeting.[178] He told the *Plaquemines Gazette* that he had smuggled himself and another Parish President across bays and bayous and through an armada of state boats, gaining access only after threatening to call Anderson Cooper.[179]

The meeting with the President occurred at the Coast Guard station in Grand Isle, Louisiana, and included, among others, Governor Jindal, Florida Governor Charlie Crist, Alabama Governor Bob Riley, Louisiana Senators David Vitter and Mary Landrieu, Louisiana Congressman Charlie Melancon, New Orleans Mayor Mitch Landrieu, Lafourche Parish President Charlotte Randolph, and Parish President Nungesser.[180] President Obama emphasized the seriousness with which the government was treating the spill, announcing at a press conference after the meeting that he would triple the federal manpower and

equipment involved in the response.[181] Though Coast Guard responders believed they were already dedicating every available resource to the spill, and did not see across-the-board "tripling" as the best use of resources, they dutifully attempted to triple the personnel engaged and boom deployed. They chronicled their progress in Louisiana in a report titled "Status on Tripling."[182]

While in Grand Isle, President Obama also received an "earful" about Louisiana's proposal to build massive offshore sand berms as a physical obstacle to oil, which



Under fire, President Barack Obama meets with dissatisfied state and local officials in Grand Isle, Louisiana on May 28, during his second visit to the Gulf since the spill began. Visible clockwise from the President: Plaquemines Parish President Billy Nungesser, Louisiana Governor Bobby Jindal, New Orleans Mayor Mitch Landrieu, Grand Isle Mayor David Camardelle, and Florida Governor Charlie Crist.

David Grunfeld/The Times-Picayune. Photo © 2010 The Times-Picayune Publishing Co., all rights reserved. Used with permission of The Times-Picayune.

the National Incident Command had declined to approve in its entirety.[183] Parish President Nungesser, seated immediately to the President's left, was the first attendee to speak at the meeting and was adamant about the need for the entire berms project. Governor Jindal echoed him. In line with the federal government's effort to be more responsive to local demands, President Obama turned to Admiral Allen and asked him, in front of the berms' strongest proponents, to figure out a solution.[184]

The "tripling" order and promise to promptly reevaluate the berms project were only two of many actions at the end of May by which the federal government attempted to demonstrate its focus on the *Deepwater Horizon* disaster and commitment to the communities in the Gulf. The President signed the Executive Order creating this Commission on May 21.[185] On May 27, he announced a moratorium on offshore deepwater drilling and held a press conference about the administration response.[186] The same day, Elizabeth Birnbaum, the head of MMS, resigned—"on her own terms and on her own volition," according to Secretary Salazar.[187] Most symbolically, the federal government stopped holding joint press conferences with BP. From June 1 on, Admiral Allen gave his own daily press briefing.[188] But local officials continued to attack the adequacy of the federal response and to assert that that BP was running the response effort.

## The Battles over Boom and Berms (May to June)

While the response had many dimensions, local communities fixated on the deployment of boom to prevent oil from washing ashore. Although not the most effective response tool, boom is a measurable, physical object that visibly stops oil. Residents could not see source-control efforts on the ocean floor or skimming far out in the Gulf, but they could see boats laying ribbons of bright orange or yellow floating boom to protect their shorelines. According to one Terrebonne Parish resident, boom was eye candy—seeing it gave him a sense of satisfaction (even if it did not do much).[189]

### The Moratorium

On May 27, after a 30-day interagency examination of deepwater drilling operations, Secretary Salazar directed MMS to issue a six-month moratorium on all drilling at a water depth of more than 500 feet in the Gulf of Mexico and the Pacific Ocean. Department officials justified the moratorium as providing time for this Commission to do its work and for MMS to undertake needed safety reforms. The moratorium took effect on May 30 and halted work on 33 offshore deepwater rigs in the Gulf.

The oil and gas industry, local communities, and elected officials from the region immediately criticized the action. Senator Landrieu testified before this Commission in July that the moratorium was "unnecessary, ill-conceived and has actually created a second economic disaster for the Gulf Coast that has the potential to become greater than the first." On July 30, BP established a $100 million charitable fund to assist rig workers experiencing economic hardship because of the moratorium.

The federal government concluded that the moratorium's impact would be less severe. On September 16, a federal interagency report stated that the moratorium "may temporarily result in up to 8,000 to 12,000 fewer jobs in the Gulf Coast," with these losses attributed mostly to small businesses. Louisiana elected officials criticized the report's methodology and the decision to conduct this analysis after, instead of before, the moratorium began.

A group of companies that provide support services for deepwater drilling vessels challenged the moratorium in federal district court in Louisiana. On June 22, the court ruled that the moratorium violated the Administrative Procedure Act and enjoined its continued enforcement. The federal government asked the Fifth Circuit Court of Appeals to stay the district court's ruling, but the Fifth Circuit denied that request on July 8. The Department of the Interior then issued a revised moratorium on July 12, which limited drilling based on the equipment a rig used rather than the depth of the wellhead. Neither the first nor the second moratorium provided a company with the option of avoiding the bar on drilling by proving the safety of its rig operations to the government. A second group of offshore support companies challenged the revised moratorium. Before the district court could rule on this new lawsuit, the Department lifted the moratorium on October 12, seven weeks ahead of its scheduled November 30 expiration.

On September 30, a few weeks before lifting the moratorium, the Department promulgated new regulations on topics such as well casing and cementing, blowout preventers, safety certification, emergency response, and worker training. Compliance with the new rules is a prerequisite for both shallow and deepwater drilling permits. Some companies called these new requirements a "de facto moratorium" because of the time needed to meet them and for the Department to verify compliance.