

A vessel places containment boom in Louisiana's Barataria Bay. Hundreds of miles of boom were deployed along the Gulf coast, but politicians clamored for more of the highly visible barriers.

U.S. Coast Guard photo/Petty Officer 3rd Class Ann Marie Gorden

Boom became a symbol of federal responsiveness to local communities. NOAA scientists worked through the night, every night, to prepare oil trajectory forecasts for federal responders to review as they began their days.[190] Responders used those forecasts to plan their actions, including where to place boom. Federal responders thought that officials and residents complaining about lack of boom did not understand their strategy for deployment; officials and residents thought that federal responders were inattentive to local needs.[191] The National Incident Command was not deaf to these complaints and gave an unofficial order to "keep the parishes happy."[192] Coast Guard responders distributed many miles of boom according to political, rather than operational, imperatives. They felt hamstrung by the outrage that resulted when a parish or state felt slighted by allocation decisions, so they placed boom wherever they could.[193]

Every Governor wanted more boom. When the oiling risk was highest in Louisiana, the Coast Guard directed boom there. Governor Riley of Alabama contended that this decision left his state's shoreline in danger.[194] At a press conference in mid-May, Governor Jindal said that the containment boom provided to Louisiana by the Coast Guard and BP was inadequate, while local officials behind him held up pictures of oil-coated pelicans.[195] Florida Department of Environmental Protection Secretary Mike Sole told reporters, "A lot of the decisions about Florida are being made in Mobile." He said he had warned the Federal On-Scene Coordinator, "Florida is important. We have 770 miles of shoreline to protect. I'm concerned that we're not getting enough focus on Florida."[196]

The competition for boom occurred at the parish and town levels as well. St. Bernard Parish had its own contractor bring in boom; it then sought to make the Coast Guard purchase and deploy that boom locally.[197] Some parishes reportedly ordered boom directly from suppliers and told them to "send the bill to BP."[198] Lafourche Parish kept demanding more boom—until it realized that certain skimmers were more effective and began demanding those skimmers instead.[199] Unified Command struggled to track how much boom was deployed and where.

Initially, responders made booming decisions based on their knowledge of the region's geography, the location of environmentally sensitive areas, and NOAA's oil trajectory forecasts. The oil-spill planning documents did not lay out a specific booming map, because the coastal ecosystem, particularly in the marshes, frequently changes. Unified Command eventually brought the Parish Presidents together to review boom plans that each parish had created. Some were infeasible—for instance, requesting that boom be placed in tidal passes where currents would drive oil under the boom or else damage it. In addition to worrying about useless or unnecessary boom, responders were concerned that storms could blow it into delicate marsh habitat. They deployed boom based on local pressures only to pull it away during bad weather.[200]

Once parishes had boom, they did not want to let it go. On July 22, Parish President Nungesser threatened to blow out the tires of trucks carrying away boom as the Coast Guard prepared for Tropical Storm Bonnie. Though he claimed that he was joking, the FBI called to reprimand him.[201] Other Parish Presidents issued orders prohibiting the removal of response equipment from their parishes and threatened Coast Guard responders with arrest.[202] Officials asked responders to measure "feet of boom deployed"—a statistic that was time-consuming to generate and had little value in assessing response efforts.[203] All of these problems distracted responders from their focus on cleaning up the spill.

The boom wars never reached a resolution. Responders knew that in deploying boom they were often responding to the politics of the spill rather than the spill itself. And the miles of boom along the coastline still did not prevent oil from washing up on the shore.

The boom wars were relatively civil, however, compared to the struggle among the State of Louisiana, the Army Corps of Engineers, the National Incident Command, and, ultimately, the White House over berms. Reinforcing barrier islands had long been a component of Louisiana's and Plaquemines Parish's coastal restoration plans.[204] But by early May, Governor Jindal and Parish President Nungesser had seized on an idea (originally proposed by Deltares, a Dutch independent research institute, together with Van Oord, a Dutch dredging and marine contractor) to construct massive, linear sand berms along Louisiana's barrier islands for spill response, to guard the coastline from oil.[205] The berms project presented an opportunity for Louisiana to take the lead on a large-scale response measure—with BP footing the bill. Moreover, after the spill ended, the berms' purpose could "pivot" from response to coastal restoration.[206]

On May 11, Louisiana's Office of Coastal Protection and Restoration applied to the Corps for an emergency permit to construct berms to "enhanc[e] the capability of the islands to

# Voices from the Gulf
# "If I was a mom, what would I do?"


Michelle Rolls-Thomas/Associated Press

### Sheryl Lindsay, Orange Beach Weddings, Orange Beach AL

When Sheryl Lindsay picked up the April 21 Mobile *Press-Register* and read the headline, "At least 11 workers sought after gulf rig explosion," she recalled, "My heart went out to the workers on that rig, the victims and their families. I couldn't believe what had happened." The newspaper reported that six of the *Deepwater Horizon* survivors had been flown to a Mobile, Alabama, trauma unit.

For six years, Lindsay had been president of Orange Beach Weddings, which coordinated and arranged "The Wedding of Your Dreams" on Alabama's Gulf Coast near the Florida line. Her offices on Perdido Boulevard overlooked the pristine white sand beaches of Orange Beach, Alabama—one of her firm's specialties was elegant beach ceremonies and festivities. Her busy season was starting, with 73 weddings booked for 2010. She worked with numerous contractors, from wedding planners and caterers to ministers and photographers. She knew that BP's Macondo well was now spewing oil; "But I never thought it would affect us here."

On April 30, the day after the U.S. Coast Guard declared the Macondo blowout a "spill of national significance," Lindsay was in her office when the phone rang. It was her first cancellation. "When the bride called to cancel, she said it was because of the spill. She didn't want her guests coming down to find oil on the beaches. She didn't want to come if they couldn't swim or eat the seafood. That's when I knew."

In the wake of the oil spill, "Every time the phone rang, all we got was another cancellation—or someone asking how bad it was down here. I became a counselor for these brides. Orange Beach is a popular spot for destination weddings, and many of my brides come from out of state. But if girls' weddings were still a few months out, they still had time to change plans and move the wedding somewhere else. A lot of girls asked me what they should do—they were worried about the smell, whether the guests could swim and the quality of the seafood." She continued, "This was their big day. It was tough. And you think, 'If I was a mom, what would I do?'"

"What's funny," Lindsay said, "is we only had about three bad weeks where oil was washing on shore and BP was staging clean-up on the beach. That was in June. The rest of the summer the beaches were pretty much clean but folks still didn't come down." As the spill gushed on, Lindsay began to realize she had no idea what the next year would look like, but it didn't look good. She did not think she could afford to renew her office lease. In 2009, she had taken out a small business loan from the local bank for $55,000 to expand her firm, but now she began to fear she could not meet those payments as her business diminished.

reduce the inland movement of oil from the BP Deepwater Horizon Oil Spill."[207] Colonel Alvin Lee, two months shy of the end of his three-year tour as the Commander of the Corps for the District of New Orleans, cancelled a long-scheduled vacation, and the Corps immediately sought comments on the proposal from relevant federal and state agencies.[208]

The patience of Louisiana officials quickly wore thin. On May 17, Governor Jindal's office summoned Colonel Lee to the New Orleans airport for a meeting that included three Parish Presidents, the Chairman of the Office of Coastal Protection and Restoration, the Adjutant General for Louisiana, and the Governor himself. The group's message to Colonel Lee was clear: approve the berms project, and do it quickly.[209] The entire Louisiana congressional delegation wrote Colonel Lee on May 20, to "implore [him] to immediately approve the emergency authorization request" for the Louisiana berms.[210] In a May 21 letter to President Obama, Senator Vitter asked the President to stop the "tragic bureaucratic stranglehold" and to "make this happen now."[211]

The Corps reviewed agency comments, conducted its own evaluation of the project, and engaged in dialogue with state officials. On May 27—just 16 days after it had received Louisiana's application—the Corps approved the issuance of an emergency permit for a significantly scaled-back berms project: six "reaches" totaling 39.5 miles in length.[212] During the review process, commenting agencies expressed skepticism that the berms could be constructed in time to be effective for spill response and concern that partially completed berms would do more environmental harm than good.[213] The Corps' job, however, was to analyze the "feasibility and environmental impacts" of the berms. The National Incident Commander had the task of determining whether the berms would be "effective. . . in combating the oil spill."[214] That determination was necessary to make BP pay for the project as a response measure.

The same day the Corps approved the six reaches, Admiral Allen authorized one of the six as a prototype oil-spill response mechanism.[215] Earlier in May, an interagency task force had advised the National Incident Command that the project would not be an effective spill-response measure, in part because the berms could not be constructed in time to fight the spill.[216] But public and political pressure had been unyielding. In an attempt to balance both sets of concerns, on May 22, Admiral Allen e-mailed an idea to his deputy: "What are the chances we could pick a couple of no brainer projects and call them prototypes to give us some trade space on the larger issue and give that to Jindal this weekend?"[217] Five days later, the National Incident Command announced its approval of one prototype berm, to cost $16 million.[218] The accompanying press release promised that additional berms could be constructed if the approved section proved effective. Building even one prototype segment would take months, however, and the segment would then need to be analyzed. Any further construction therefore would not begin until the fall.

But because of the meeting in Grand Isle on May 28, where Parish President Nungesser and Governor Jindal urged President Obama to approve the entire project, the National Incident Command would change course.  At the meeting, the President turned to Admiral Allen and, in front of the assembled Governors and other leaders, asked him to assemble a group of experts to examine the merits of Louisiana's proposal as a spill-response measure.

Admiral Allen replied that this might take some time. It was the Friday afternoon before Memorial Day weekend. But the President pushed, asking, "Can you do it next week?" Admiral Allen, put on the spot, pledged to do his best.[219]

After the meeting, Governor Jindal immediately announced that the President had "agreed that work on the first segment must begin immediately" and that the federal government would decide "within two to three days" whether the additional five segments should proceed.[220] Parish President Nungesser told a similar story to Anderson Cooper on *CNN* that evening, saying "The President committed by early next week, we will have an answer and I believe that he's going to task BP."[221]

On June 1, Admiral Allen convened a summit in New Orleans "which included members of academia [one from Louisiana State University and a second from the University of New Orleans], federal trustees, fish and wildlife service and NOAA," as well as Governor Jindal and Parish President Nungesser. Although some experts at the summit expressed concern about causing harm to the environment, the discussion focused on the berms' potential to protect marshlands.[222] The politics of the project remained close at hand: Parish President Nungesser walked out, calling the meeting a "Dog and Pony Show,"[223] only to return in time to speak at the end. Governor Jindal continued to express his frustration and pressed for approval of all six reaches covered by the Corps permit.[224] In the face of the spill and in front of the Louisiana politicians, no one directly opposed the berms, and a "preponderance of opinion" at the summit suggested the berms would be an effective response measure.[225]

That evening, following the summit, Admiral Allen and BP's Hayward had dinner together in New Orleans to discuss the berms.[226] The following afternoon, Admiral Allen gave the go-ahead to all six reaches approved by the Corps, to be funded by BP.[227] BP estimated the cost to be $360 million, double the entire amount it had spent as of early June in "helping the region respond to the oil spill."[228] The Corps pegged the cost at $424 million.[229]

Louisiana awarded contracts for the project to Shaw Group, a Baton Rouge–based engineering, construction, and environmental services firm, and C.F. Bean LLC, a dredging contractor based in Plaquemines Parish.[230] Shaw estimated that five of the six berm reaches would be completed by November 1, and that the sixth would be completed by the end of November.[231] The National Incident Command estimated that the construction time for all six reaches would be six to nine months.[232] Even if those estimates had been correct, the project would have been nowhere close to complete by the time the government expected BP to kill the Macondo well with a relief well. As it happened, all of the estimates were far too rosy. Only a fraction of the planned reaches would be finished before the spill ended, and very little oil would be captured.

### From Containment to Collection (Late May to Early July)

Following the unsuccessful top kill, BP teams in Houston met through the night of May 28 to assess the operation.[233] Some meetings occurred behind closed doors, without government participation. At one point, Herbst of MMS and Admiral Kevin Cook, who had been dispatched by Admiral Allen to be his representative in Houston, entered a meeting and stated that they had a right to be present. Apparently, government officials

had not previously insisted on joining these types of meetings, and BP personnel were surprised by the interruption.[234] The failure of the top kill marked a turning point for the government science teams, with the government significantly increasing its oversight of the containment effort.

The next morning, BP presented its analysis of why the top kill failed to stop the flow of oil. The analysis focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet. That casing was purposely fabricated with three sets of weak points, called rupture disks. During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well. If the pressure buildup was too high, it could cause the collapse of one of the two casings. The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed.

The disks could rupture in two ways. If pressure between the 16-inch casing and the production casing were too high, the rupture disks would *burst outward* before the production casing collapsed. If pressure outside the 16-inch casing were too high, the rupture disks would *collapse inward* before the casing itself collapsed.[235] Once ruptured, the disks would create small holes in the 16-inch casing, bleeding built-up pressure off into the rock. According to BP's top-kill analysis, pressures created by the initial blowout could have caused the rupture disks to collapse inward, compromising the well's integrity.[236] BP believed that the mud it had pumped down the well during the top kill could have gone out into the rock through the rupture disks, instead of staying within the well and pushing oil back down into the reservoir as intended.[237]

Collapse of the rupture disks was only one of BP's possible explanations for the unsuccessful top kill.[238] But the company presented it to the government as the most likely scenario.[239] Although the government science teams did not fully accept BP's analysis of what happened to the mud, they agreed that the rupture disks could have collapsed during the blowout, and that the integrity of the well had to be considered in future containment efforts.[240] In retrospect, government officials have suggested that the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per-day estimate. Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser.[241]

BP had previously said that, if the top kill failed, its next step might be to install a second BOP on top of the existing one to shut in the well.[242] But now, the company engineers viewed the possibility that the rupture disks had collapsed as a reason to discard capping the well as an option.[243] If BP shut the well in, oil and gas could flow out the rupture disks and into the rock surrounding the well in a "broach" or "underground blowout." From there, the hydrocarbons could rise through the layers of rock and flow into the ocean from many points on the sea floor. This would make containment nearly impossible, at least until the completion of a relief well. Thus, in the aftermath of the top kill, BP and the government focused on trying to collect the oil, with the relief wells still providing the most likely avenue for killing the well altogether.[244]



Transocean's huge drill ship the *Discoverer Enterprise*, its derrick towering 400 feet above the sea, and Helix's *Q4000* (foreground) sit over the gushing wellhead. Together the vessels were able to recover up to 25,000 barrels of oil per day.

Julie Dermansky ©2010

BP had a team ready to proceed with new collection tools almost immediately.[245] On May 29, the company and the government announced that BP would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device—the "top hat"—which would then be connected via a new riser to the *Discoverer Enterprise* above.[246] BP began installing the device on June 1, and had the top hat in place and functioning by 11:30 p.m. on June 3. Having learned from its cofferdam experience, BP injected methanol to prevent formation of hydrates. By June 8, the *Discoverer Enterprise* was collecting nearly 15,000 barrels of oil per day.

BP also developed a system to bring oil and gas to the surface through the choke line on the BOP. BP outfitted the *Q4000*, a vessel involved in the top-kill effort, with collection equipment, including an oil and gas burner imported from France. After it became operational on June 16, the *Q4000* system was able to process and burn up to 10,000 barrels of oil per day.\*

On occasion, BP was overly optimistic about the percentage of the oil it could remove or collect. On June 1, Suttles said that he expected the top hat, when connected to the *Discoverer Enterprise*, to be able to collect the "vast majority" of the oil.[247] Within days, it became apparent that the top hat and *Discoverer Enterprise* were inadequate. On June 6, Hayward told the *BBC* that, with the *Q4000* in place, "we would very much hope to be containing the vast majority of the oil."[248] But when the *Q4000* came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

---

\* Over the course of June and early July, BP worked on further expanding its containment system, which it asserted would eventually be able to collect up to 90,000 barrels of oil per day. BP never used the complete system, based around two freestanding risers connected to the choke and kill lines on the BOP, because it succeeded in capping the well on July 15.

It is unclear whether BP could have increased its collection capacity more rapidly than it did. BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.* One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.[249]

## Continued Conflict about Dispersant Use (May 10–July 14)

Because of the insufficient collection capacity, oil continued to flow into the Gulf. Though the subsea use of dispersants proved helpful in preventing huge surface slicks, it did not initially have the predicted effect of reducing the total volume of dispersants applied. At a May 24 press conference, EPA Administrator Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that "we can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more."[250] A Coast Guard–EPA letter and joint directive issued two days later instructed BP to "eliminate the surface application of dispersants," except in "rare cases when there may have to be an exemption."[251]

Despite this directive, surface use of dispersants continued. When surveillance aircraft spotted oil and no other method of cleaning it up was available in the area, BP would ask for an exemption from the Federal On-Scene Coordinator, who would then seek EPA's approval. The Coast Guard could not unilaterally allow the exemption; EPA had the final vote.

EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants.[252] Coast Guard responders, who viewed dispersants as a powerful tool to protect the coastline, wondered why EPA wanted to cast aside the advance planning that went into the preauthorization of surface dispersant use.[253]

These different perspectives on dispersants led to conflicts between EPA and the Coast Guard. For example, on June 7, BP requested permission to spray dispersants on several large slicks. Despite Federal-On Scene Coordinator Rear Admiral James Watson's statement that he had "determined aerial dispersant the best and only way to mitigate the pending landfall effect of the oil spotted," EPA would not approve the exemption.[254] The Coast Guard captain leading the majority of front-line operations was furious. "It would be a travesty," he wrote, "if the oil hits the beach because we did not use the tools available to fight this offshore. This responsibility needs to be placed squarely in EPA's court if it does hit the shoreline."[255] Later that day, without having received responses to its requests for additional data, EPA threatened to issue a directive "to stop the use of all dispersants."[256]

---

* Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

The working relationship between the agencies improved over time, with more complete justifications for dispersant use included in the daily requests for exemptions.[257] But disagreements came to a boil again in mid-July. By this point, EPA had finally installed a senior official, Assistant Administrator for Solid Waste and Emergency Response Mathy Stanislaus, on the ground at Unified Area Command.[258] On July 13, BP's head of dispersant operations made a request to apply 10,000 gallons to slicks.[259] The request ultimately went to Stanislaus, who denied it, noting that skimming in particular had been extremely effective over the past few days.[260] The Federal On-Scene Coordinator (by this time Rear Admiral Paul Zukunft) replied that he could not "take the dispersant tool out of my kit when" oil threatened to hit environmentally sensitive areas in Louisiana. "We spent over a month cleaning Barataria Bay with over 1500 people and 600 vessels," he added, "and still incurred significant wildlife kills while exposing these clean-up crews to extreme heat conditions. That is the trade-off option where dispersants come into play. . . ."[261] The back-and-forth continued, with BP ultimately prohibited from using dispersants on July 14.[262] The capping of the well the next day tabled the conflict.

Months later, Admiral Allen and Administrator Jackson would say that they had cooperated closely, nearly attained the goal of a 75 percent reduction in dispersant use, and were satisfied with the use of dispersants to mitigate the spill.[263]

### The Well Is Finally Capped (Late June to July 15—and Beyond)

Meanwhile, in Houston, the government continued to develop a more effective structure for oversight of well control. The basic elements of the structure were in place by mid-May, and the roles of the different government teams were better defined by mid-June. MMS and the Coast Guard continued to focus on identifying hazards in BP's technical procedures; personnel from the national laboratories and the U.S. Geological Survey provided information and analyses to the science advisors and BP; and the science advisors conducted their own independent analyses and helped inform the government's ultimate decisionmakers, including Secretary Chu, Secretary Salazar, McNutt, Hunter, Carol Browner (Director of the White House Office of Energy and Climate Change Policy), and Admiral Allen.[264]

Following the failure of the top kill, BP began presenting its source-control plans for review by these government teams. The science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risks.[265] The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities.[266] According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best."[267] BP often found the supervision frustrating. Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk.[268] BP, however, was not in the best position to tout that expertise: its well had just blown out.

In mid- to late June, the government teams also began to seek more frequent input from other oil companies, primarily through large conference calls of 30 or more people.

Although BP had previously turned to others in industry for advice, it had generally asked discrete questions about aspects of source control. The government teams, by contrast, asked other companies to comment on BP's overall plans and to help force BP to consider contingencies. BP, which believed its competitors suffered from a conflict of interest, did not appreciate the increased industry involvement. After one meeting in which BP's competitors aggressively challenged its plans, BP refused to meet with them again, forcing the government teams to schedule separate meetings.[269]

The conference calls were somewhat disorganized, with no agenda and participants sometimes not knowing who was speaking. One industry participant recalled an instance when he was chagrined to learn he had been talking to Secretary Chu without realizing it.[270] A senior government official noted that some colleagues viewed BP's conflict-of-interest concerns as valid and took the competitors' advice "with a grain of salt."[271] But government personnel generally found the industry participation helpful.

The science advisors' oversight increased substantially during June. On June 18, Secretary Chu sent an e-mail to the advisory team as well as some national laboratories scientists, describing their expanded role. The e-mail cited a scene from the classic World War II movie *The Guns of Navarone*, and quoted the character played by Gregory Peck: "[Y]our bystanding days are over! You're in it now, up to your neck! They told me that you're a genius with explosives. Start proving it!" Recognizing that there were "[p]robably no shaped charges to be used on this mission," Secretary Chu wrote that "the rest rings true." He enclosed a directive that Admiral Watson, the Federal On-Scene Coordinator, would issue the next day, formally requiring BP to submit any "pending decision" on containment to the government "for review."[272]

The role of the science advisors and the on-site scientists increased just as the source-control effort approached a critical phase. By late June, BP was well on its way toward deploying a "capping stack," which, once installed on top of the BOP, would enable BP to shut in the well. The capping stack was essentially a smaller version of a BOP, similarly designed to stop the flow of oil and gas. BP had internally discussed installing a tight-sealing cap within a week of the blowout.[273] Following the top kill, however, BP and the government had shelved the idea of shutting in the well, in part because of concerns that the rupture disks in the well's 16-inch casing had collapsed, potentially allowing oil to flow out of the well into the rock. The government and BP had to take these concerns into account when planning for use of the capping stack.

Secretary Chu and Hunter briefed the President on the capping stack in late June or early July, and he approved its use. The government appears to have delayed installation for a few days, however, to continue analyzing the significant risks of shutting in the well.[274] One critical analysis involved the geology surrounding the Macondo well. The government's scientific Well Integrity Team concluded that it would take a total of approximately 100,000 barrels of oil flowing through the rupture disks into the surrounding rock for oil to create paths through the rock to the sea floor. The Team further concluded that such paths were likely to close or "heal" *if* BP and the government detected oil flow into the rock and reopened the capping stack with sufficient speed. To spot any

# Voices from the Gulf
## "This unnatural, unnatural catastrophe. . . ."



*The Louisiana Seafood Marketing and Promotion Board*

### Al & Sal Sunseri, P&J Oyster Company, New Orleans, LA

Al and Sal Sunseri are co-owners of P&J Oyster Company, their family's 134-year-old business in the French Quarter of New Orleans. P&J processes and sells some 60,000 Louisiana oysters to the city's best restaurants and local oyster bars on a typical day.  When Al first heard about the *Deepwater Horizon* rig accident, he recalled thinking, "'What a terrible thing for those people.'" He added, "I didn't think more about it because the Coast Guard and everyone said it would be limited."

Al's routine remained unchanged in the days after the *Deepwater Horizon* blowout and fire: early mornings bustling with deliveries, the din of his skilled shuckers pounding and prying open oysters, preparing orders. Then, on Saturday, April 24, the Sunseris and the rest of America heard that oil was leaking from the rig's broken riser.  With each passing day, the news only got worse.

P&J oysters are an institution in New Orleans, a celebrated brand proudly listed on local menus as a promise of taste and quality. P&J specializes in Louisiana oysters; most of their suppliers farm in the Barataria Basin, west of the Mississippi River.  P&J had survived floods, the Great Depression, and even Hurricane Katrina. But now, the Sunseri family and the staff were all at the mercy of a runaway oil spill, with no end in sight.

Throughout May, the Macondo well gushed on unchecked, and by early June, the government had closed Louisiana oyster beds.  The Sunseris had taken over from their father 25 years earlier. Now, for the first time, they had to lay off 11 skilled shuckers. "These ladies here, those guys—I grew up with them," Al said. "We were in our twenties when we started."  Longtime employee Wayne Gordon, 42, had been shucking at P&J since he was 18: "Twenty-four years. I cannot imagine not being here."  As the shuckers worked their way through what was to be the final pile of succulent Louisiana shellfish, the owner of a nearby restaurant appeared with a breakfast buffet of scrambled eggs, fried ham, grits, and biscuits. "After a funeral, we bring food," said the restaurateur, a longtime customer.

Al's son Blake, 24, has spent the past three years learning the business, intent on becoming the sixth family generation to run it. "This is a real devastating event for me," he said. "This is my home, it feels like I don't really have a say in what's going on around me." He could have been speaking for millions of his fellow Americans, all along the Gulf of Mexico coast, who suddenly found themselves and their worlds facing ruin from what his uncle, Sal, called "this unnatural, unnatural catastrophe."

problem quickly enough to avoid lasting damage, the Team recommended monitoring shut-in pressure at the BOP as well as visual, seismic, sonar, and acoustic data.[275] Because shutting the capping stack would increase the pressure inside the well, the government was also concerned about bursting either the rupture disks (if they had not already collapsed) or another weak point in the casings. One industry executive recalled discussing this issue on a conference call with the science advisors; he expressed his view that allowing the pressure to climb above the level recorded during the top kill would be traveling into uncharted territory, with uncertain risks.

On July 9, as analysis of these risks continued, Admiral Allen authorized BP to install the capping stack, but not to close it.[276] The extremely complicated operation began the next day. After removing the top hat from the top of the riser, remotely operated vehicles had to unbolt the stub of riser connected to the top of the *Deepwater Horizon* BOP stack, remove this stub, look for any pieces of drill pipe sticking up through the top of the BOP stack, slide the capping stack into place, and bolt it to the BOP stack. The process went smoothly, and BP finished installing the capping stack without incident by July 12. Suttles described this installation as the best operation of the entire source-control effort.[277]

BP next prepared to temporarily close the capping stack in a planned "well integrity test," to determine whether the well had been compromised and oil could flow into the rock formation. In a July 12 letter, Admiral Allen formally authorized the test to begin.[278] But it did not. About two hours before the test was supposed to start, the government teams met with BP and industry representatives, including from Exxon (in person) and Shell (by phone). Secretary Chu and Admiral Allen were both present in person. BP faced significant criticism of the wisdom of attempting the test, with Exxon and Shell raising concerns associated with shutting in the well that had yet to be considered by BP or the government.[279] In the most extreme scenario, one industry expert suggested that an underground blowout could cause the sands around the wellhead to liquefy and the entire BOP to disappear into the sea floor.[280] Because Secretary Chu and the science advisors believed that these risks required further study, Admiral Allen delayed the test to allow for 24 hours of additional analysis.[281]

Overnight, the government science teams reached out to industry and academia for help. By 10:00 the next morning, experts had reassured the government that catching a leak early enough would prevent catastrophic consequences.[282] With the government teams satisfied, Admiral Allen reauthorized the well integrity test. The test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the Well Integrity Team.[283] Secretary Chu required BP to dedicate two remotely operated vehicles to visually monitor for leaks at the wellhead.

Although the Well Integrity Team had calculated that it would take a leak of approximately 100,000 barrels for oil and gas to reach the sea floor, the government was prepared to permit a leak of only 20,000 barrels before requiring the capping stack to be reopened.[284] Using an estimate for the expected pressure at shut-in derived from BP's modeling of the reservoir, the Team developed guidelines for the length of the test.[285] If the pressure at shut-in was less than 6,000 pounds per square inch, major well damage was likely—BP would

FIGURE 5.1: Protocol for Well Integrity Test



- Duration (in hours) calculated by National Labs flow analysts using estimated flow rates at varying BOP (PT-B) pressures and maximum allowable flow into formation of 20,000 bbls.

have to terminate the test within six hours and reopen the well. If the shut-in pressure was greater than 7,500 pounds per square inch, the risk of a leak was low, and the test could proceed for the full 48 hours. Finally, if the shut-in pressure was between 6,000 and 7,500 pounds per square inch, the risk of a leak was uncertain—either there was a medium-sized leak or the reservoir was highly depleted. Under this scenario, the test could proceed for 24 hours. (See Figure 5.1.) If the pressure was too high, there was also the risk of causing a new rupture.

After a 24-hour delay to repair a minor leak, BP shut the stack and began the well integrity test at about 2:25 p.m. on July 15.[286] For the first time in 87 days, no oil flowed into the Gulf of Mexico. Initial wellhead pressure readings were just over 6,600 pounds per square inch—in an uncertain middle range that one senior administration official termed "purgatory"—and rising slowly.[287] Later that afternoon, the science advisors, including McNutt and Hunter, met with Secretaries Salazar and Chu to determine whether to keep the well shut in. Based on the early pressure data, the group appears to have been firmly in favor of reopening the well. Garwin, who had opposed even undertaking the well integrity test, voiced the strongest opinion, arguing BP ought to stop the test immediately and wondering whether it was already too late. No one at the meeting appears to have argued in favor of keeping the well closed.[288]

Following the science team meeting, Admirals Allen and Cook, Browner, Secretaries Chu and Salazar, and McNutt had a series of conversations to determine how to proceed. Keeping the capping stack shut could cause an underground blowout and, in the worst case, loss of a significant portion of the 110-million-barrel reservoir into the Gulf.[289] This risk had to be balanced against the benefit of stopping the spill, a continuing

environmental disaster. The government decisionmakers recognized that the public wanted the well plugged and the flow of oil into the Gulf stopped, but the risk of causing greater harm was real.

Admiral Cook made the argument that eventually prevailed. He reminded the others that, before the test began, BP and the government had considered the possibility of pressure measurements like those being observed. Both had agreed that, in such a case, the test should last 24 hours, with consultation between the parties before reopening the well.[290] The government leaders decided that they should follow this protocol: the stack would stay closed overnight.

This additional time proved critical. Using a single cell-phone photograph of the plot of initial pressure readings, Paul Hsieh, a U.S. Geological Survey scientist then in Menlo Park, California, worked overnight to develop an explanation of the results of the test, including the lower-than-expected shut-in pressure. Pre-test expectations had been based on an incomplete understanding of the reservoir's geometry and on pressure readings from a single gauge at the bottom of the BOP, which was only accurate to plus or minus 400 pounds per square inch and functioning sporadically. At the government's behest, BP had equipped the capping stack with pressure gauges.[291] Following the shut-in of the well, those gauges provided accurate pressure data for the first time. Using that data along with a flow-rate estimate of 55,000 barrels per day and BP's estimate that the reservoir contained 110 million barrels of oil, Hsieh was able to generate a model that predicted the observed shut-in pressure without having to assume a significant oil and gas leak into the rock formation.[292]

The next morning, the government principals and the science advisors—who had been convinced that reopening the stack was necessary—hosted a meeting. Both BP and Hsieh made presentations explaining the observed pressures at shut-in, with BP arguing that the well should remain capped.[293] Participants had different recollections as to whether Hsieh's or BP's presentation carried more weight. But the outcome of the meeting was clear: the stack would stay shut, with the government reevaluating that decision every six hours.

While it went unrealized at the time, a critical point had passed. As intense monitoring of the area around the wellhead continued over the next several days, Hsieh's model continued to predict the behavior of the well, and a leak into the formation became progressively less likely.[294] Although the well integrity test had originally been scheduled to last a maximum of 48 hours, Admiral Allen began to extend it in 24-hour increments beginning on July 17. At his July 24 press briefing, he stated what was by then plain: "our confidence [in the capping stack] is increasing and we have better integrity in the well than we may have guessed."[295]

Meanwhile, on July 19, BP publicly raised the possibility of killing the well before completing a relief well, through a procedure called a "static kill."[296] Like the top kill, the static kill involved pumping heavy drilling mud into the well in an effort to push oil and gas back into the reservoir. But because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than for the top kill.

The primary concern with the static kill was the pressure it would put on the well. On July 28, BP received an unsolicited letter from Pat Campbell, a Vice President at Superior Energy Services, which owned BP contractor Wild Well Control, recommending in no uncertain terms that the static kill not proceed. Campbell, who had worked with legendary well-control expert Red Adair, reiterated a point already raised by others in the industry: that the only pressure the well could withstand for certain was the current shut-in pressure (approximately 6,920 pounds per square inch at the time he wrote).[297]

Despite these issues, after some delays caused by weather and work on the first relief well, the government approved the plan for the static kill on August 2.[298] A mud injection test began on August 3, and pressure at the wellhead increased only slightly before beginning to drop.[299] Based on the positive results of the test, BP began slowly pumping more drilling mud into the well later that same day. By 11:00 p.m., the static kill had succeeded.[300] The following evening, Admiral Allen authorized BP to follow the mud with cement.[301] BP finished cementing the next day. On August 8, Admiral Allen reported that the cement had been pressure-tested and was holding.[302]

## The Fate of the Oil (August 4)

On August 4, the same day it announced the static kill's success, the federal government released a 5-page report titled *BP Deepwater Horizon Oil Budget: What Happened to the Oil?*, as well as a 10-page supporting document titled *Deepwater Horizon MC252 Gulf Incident Oil Budget*.[303] The "Oil Budget" provided the government's first public estimate of the total volume of oil discharged during the spill—roughly 4.9 million barrels. The government arrived at this number using its current flow-rate estimate, which ranges from 62,200 barrels per day on April 22 to 52,700 barrels per day on July 14, just before the capping stack stopped the flow.[304] [*] The Oil Budget also described the efficacy of different response methods.

The Oil Budget was originally an operational tool, intended as a guide for responders, not as the basis for a scientific report on what happened to the oil. Nonetheless, in late July, the White House decided to publicly release the Oil Budget and asked NOAA to take the lead on drafting a short report to introduce the tool.[305] The Budget cleared the interagency review process in time for its August 4 release.[†]

The White House's Browner appeared on six morning newscasts on August 4 to discuss both the successful static kill and the Oil Budget report. On *NBC*, *MSNBC*, and *ABC*, she told viewers that, according to the report, "the vast majority," or approximately three-quarters, of the oil "is gone" or "appears to be gone."[‡] The Budget, however, did not

---

[*] The government's estimate, which is current as this report goes to press, has an uncertainty factor of ±10 percent. It is the Commission's understanding that the government's Flow Rate Technical Group will issue a final report in January 2011. In a peer-reviewed paper published in *Science Express* on September 23, 2010, Timothy Crone and Maya Tolstoy of Columbia University's Lamont-Doherty Earth Observatory estimated that the total release was roughly 5.2 million barrels—slightly higher than the government's estimate. While BP has not released its own flow-rate figures, it has suggested that the government's estimate of the total amount of oil released from the Macondo well is 20 to 50 percent too high.

[†] During the review process, EPA expressed concerns about the pie chart's potential to obscure the uncertainty of the government's estimates. Lisa Jackson, e-mail to Jane Lubchenco, July 31, 2010. For example, EPA recommended that NOAA combine chemically and naturally dispersed oil into a single category because there was not enough information to accurately distinguish between the two mechanisms. Bob Perciasepe, e-mail to Jane Lubchenco and others, July 31, 2010; Bob Perciasepe, e-mail to Stephen Hammond and others, August 1, 2010. NOAA disagreed. Administrator Jane Lubchenco asserted that combining the two categories would not decrease any uncertainty and that "'[c]hemically dispersed' is part of the federal response and 'naturally dispersed' is not, and there is interest in being able to sum up the federal response efforts." Jane Lubchenco, e-mail to Bob Perciasepe and others, August 1, 2010.

[‡] On the other three shows, Browner similarly stated that "what the scientists are telling us is that the vast majority of the oil has been cleaned, it's been captured, it's been skimmed, it's been burned, mother nature has done its part" (*Fox News*); "our scientists are telling us that the vast majority of the oil has been contained, it's been burned, it's been cleaned" (*CBS*); and "our scientists and external scientists believe that the vast majority of the oil has now been contained, it's been skimmed, mother nature has done its part, it's been evaporated" (*CNN*).



**FIGURE 5.2: August 4 Oil Budget**

show that most of the oil was gone. The three-quarters of the oil not in the "remaining" category included "dissolved" and "dispersed" oil that was potentially biodegrading, but not necessarily gone. By 9:00 a.m., NOAA Administrator Jane Lubchenco e-mailed Browner's deputy and other officials to express her concern "that the oil budget is being portrayed as saying that 75% of the oil is gone": "It's not accurate to say that 75% of the oil is gone. 50% of it is gone—either evaporated or burned, skimmed or recovered from the wellhead." Lubchenco asked the officials to "help make sure" the error was corrected.[306]* She had made the same point to the White House before the Budget rollout; a July 30 e-mail to Browner's deputy had emphasized that Lubchenco opposed grouping dispersed oil with recovered oil because the former was "still out there or [was] being degraded."[307]

At a press briefing that afternoon, Browner said that the report had "been subjected to a scientific protocol, which means you peer review, peer review, and peer review." Earlier in the same briefing, Lubchenco had said "[t]he report was produced by scientific experts from a number of different agencies, federal agencies, with peer review of the calculations that went into this by both other federal and non-federal scientists."[308] The Budget, however, was not "peer-reviewed" as the scientific community uses that term. Many of the outside scientists listed as reviewers had not even seen the final report.

The rollout of the Oil Budget drew immediate criticism, with scientists pointing out that Browner's optimism about the percentage of the oil that was gone was unsupported, especially because of the uncertain rate of biodegradation.[309] Moreover, after a summer of ever-increasing official estimates of the spill's size, the public was dubious of the government's conclusions. As a *Times-Picayune* editorial noted, "From the start of the

---

\* The U.S. Geological Survey, which had also been involved in developing the Oil Budget tool and editing the report, expressed similar misgivings about the portrayal of the report. At 11:00 a.m., U.S. Geological Survey scientist Mark Sogge told a colleague, "We need to keep in mind, and make it clear to others, that this is NOT a [U.S. Geological Survey] product." Mark Sogge, e-mail to Stephen Hammond, August 4, 2010.

disaster. . . the government has badly underestimated the amount of oil spewing from the runaway well. That poor track record makes people understandably skeptical of [the Oil Budget] report."[310] Lubchenco has since acknowledged that she was "in error" when claiming that the Oil Budget had been peer-reviewed.[311] NOAA has emphasized that the report's "purpose was to describe the short-term fate of the oil and to guide immediate efforts to respond to the emergency" rather than to "provide information about the impact of the oil" or "indicate where the oil is now."[312]

NOAA supplied these explanations on November 23, when it released a new version of the Oil Budget: *Oil Budget Calculator Technical Documentation*, a peer-reviewed report of over 200 pages that gave the formulas used and updated the percentages in the original budget.[313] The new version's biggest change was its estimate of the amount of oil chemically dispersed, which doubled from 8 percent to 16 percent. Of this additional 8 percent, 3 percent came from the "naturally dispersed" category, 2 percent from the "evaporated or dissolved" category, and 3 percent from the "residual" category. (These changes brought the total amount of "residual" oil down from 26 to 23 percent.)

As a tool for responders, the Oil Budget indicated that response and containment operations collected, eliminated, or dispersed about 41 percent of the oil, with containment ("direct recovery from wellhead") the most effective method, and chemical dispersants breaking down a substantial fraction. Response technology (skimming or burning) removed—as opposed to dispersed—only 8 percent of the oil. Dispersion of the oil before it reached the surface limited the amount that responders could skim, burn, or disperse at the surface. Nevertheless, responders considered burning an important success: it had never before been attempted on this scale, and burning techniques advanced during the spill.[314] Skimming was less of a success: despite the participation of hundreds of ships and thousands of people, it collected only 3 percent of the oil.

The least effective response technology was the berms, which the Oil Budget documents do not even mention. By the time BP capped the well on July 15—day 44 of the berm construction project—Louisiana's contractor estimated that 10 percent of one reach—6 percent of the total project—had been completed.[315] In late May, Governor Jindal had asserted that "[w]e could have built 10 miles of sand [berms] already if [the Corps] would have approved our permit when we originally requested it."[316] In fact, it took five months to build roughly 10 miles of berms, at a cost of about $220 million.[317] Estimates of how much oil the berms collected vary, but none is much more than 1,000 total barrels.[318] On November 1, Governor Jindal announced plans to convert the berms into part of a long-term coastal restoration project, which BP would continue to fund. In his recently released book, the Governor maintained that the berms were "one of the most effective protection measures" against oil reaching the Louisiana coast.[319]

### The End of the Well, but Not the End of the Response

In mid-September, the first relief well—which BP had begun drilling in early May—finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir. On September 19, 152 days after the blowout, Admiral Allen announced: "the Macondo 252 well is effectively dead."[320]

But fears about health and safety did not die with the well. Some Gulf residents continued to believe that BP had used dispersants onshore, nearshore, at night, and without government approval, and that it had continued using them after it capped the well. The Commission has not seen credible evidence supporting these claims. NOAA reopened one-third of the area closed to fishing on July 22 and continued to reopen additional sections based on a testing and sampling protocol developed and implemented with the Food and Drug Administration.[321] But some scientists questioned the protocol, while some fishermen were hesitant to give up income from the Vessels of Opportunity program and return to their regular jobs in the midst of public concern about Gulf seafood.[322] (Chapter 6 discusses seafood safety.)

Residents also had to cope with the miles of used boom and other debris. Despite the typical spill-responder uniform of rubber gloves and protective coveralls, BP planned to send the thousands of tons of oily debris generated over the summer to ordinary municipal landfills.[323] Wastes from oil exploration and production are classified as non-hazardous by law and do not require specialized disposal.[324] Although the federal government generally does not supervise the disposal of non-hazardous waste, on June 29, the Coast Guard and EPA issued a directive requiring BP to test its waste for hazardous elements, publicize the results, and consult with the communities where the waste was to be stored.[325] In addition, EPA announced it would conduct its own twice-monthly testing of the debris and would post the results online.[326] BP was initially slow to release its testing data. After receiving a sternly-worded letter from Federal On-Scene Coordinator Admiral Zukunft on July 24, however, it started regularly posting the results on its website.[327] EPA began sampling the waste and posting the test data as well, after some criticism and delay.[328] As of November 17, EPA's tests had not shown any of the waste to be hazardous.[329]

As BP and EPA implemented the waste directives, environmental justice activists argued that BP was dumping the debris disproportionately in poor and non-white communities.[330] Residents of Harrison County, Mississippi fiercely opposed the disposal of oiled waste in their Pecan Grove landfill, and BP agreed not to use it.[331] Environmental justice advocate and scholar Robert Bullard contended that the racial makeup of Harrison County was a factor, and EPA objected to BP's decision.[332] The Federal On-Scene Coordinator instructed BP to follow the approved waste plan, noting that "[a]llowing one community to reject acceptance of waste. . . may complicate remaining waste disposal efforts." BP began to use the site for waste staging, though not for disposal.[333]

With the well sealed, the number of responders in the Gulf decreased. The National Incident Command officially stood down on October 1.[334] Admiral Allen turned over the remaining tasks to Federal On-Scene Coordinator Admiral Zukunft and finally retired. BP started to shut down some of its programs, and Coast Guard responders started to head to their next posts. The spill and the emergency response had ended. Figuring out the extent of the damage, and how to repair it, had begun.