## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by | * | **MDL NO. 2179** |
| the Oil Rig "Deepwater Horizon" | * | |
| in the Gulf of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| This document relates to: | * | |
| *Center for Biological Diversity, Inc. v. BP* | * | **Honorable CARL J. BARBIER** |
| *America Inc., et al.*, Nos. 2:10-cv-01768 & | * | |
| 2:10-cv-02454 | * | **Magistrate Judge SHUSHAN** |
| | * | |
| | * | |

---

## BP PARTIES' ANSWER TO THE AMENDED COMPLAINT

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5705
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1047
Facsimile: (212) 715-1399

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**ATTORNEYS-IN-CHARGE FOR
DEFENDANTS BP AMERICA INC. AND
BP EXPLORATION & PRODUCTION
INC.**

Defendants BP America Inc. and BP Exploration & Production Inc. (collectively "BP"), pursuant to Federal Rule of Civil Procedure 8, hereby answer the Amended Complaint, Rec. Doc. 813, as follows:

## INTRODUCTION

1. This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act, 33 U.S.C. §1365, commonly known as the Clean Water Act ("CWA"), the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9659 ("CERCLA"), and the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §11046 ("EPCRA"). Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to discharge at the time of the original complaints, massive quantities of oil, methane, drilling muds, and other toxic pollutants into the Gulf of Mexico, the contiguous zone, and other waters of the United States, in violation of the CWA. 33 U.S.C. §§ 1311(a), 1316, 1317, 1321. Defendants have also failed to properly report, and continue to fail to properly report, their releases of hazardous substances, in violation of CERCLA, 42 U.S.C. § 9603(a), and EPCRA, 42 U.S.C. § 11004.

**Answer:**

Three years ago, this Court dismissed all of the claims in the Amended Complaint. *In re: Oil Spill*, 792 F. Supp. 2d 926 (E.D. La. 2011). Over one year ago, the Fifth Circuit affirmed dismissal of all but the claims under the Emergency Planning and Community Right-to-Know Act ("EPCRA"), which it remanded for further consideration. *Center for Biological Diversity, Inc. v. BP America Production Co.*, 704 F.3d 413 (5th Cir. 2013). These remaining allegations appear only in Count 7 (¶¶ 91-93). As such, many of the allegations in this paragraph are moot. BP denies the surviving allegations in this paragraph but notes that the *Deepwater Horizon* spill resulted in the release of crude oil and was declared a spill of national significance.

2. Since April 20, 2010, tens of millions of gallons of oil have spewed from BP's ruptured well a mile under the sea surface into the Gulf of Mexico, a fragile and productive ecosystem with diverse communities of fish and wildlife and home to several species of endangered whales, sea turtles, and sea birds. Estimates have placed the daily flow of oil from 35,000 to 65,000 barrels a day, or more, which amounts to at least 1.5 to 2.5 million gallons per day. Oil has been washing, and continues to wash ashore along the coasts of Louisiana, Alabama, Mississippi, Florida, and Texas. While hundreds of dead birds, sea turtles, and dolphins are being or have been collected onshore, most of the harmful effects of the spill are out of sight beneath the sea surface. The oil spill is the largest environmental disaster in U.S.

history.

**Answer:**

BP admits that MC252 oil reached the shorelines of Louisiana, Alabama, Mississippi, and Florida, and that, purely as a consequence of the April 20-July 15, 2010 spill, there have been limited occurrences, in discrete areas, of surface residual balls and other residual oil material becoming unburied and/or mobilizing on the shorelines of those States into 2014. BP further admits that a limited amount of MC252 oil reached the Texas shoreline in 2010. BP denies the remaining allegations contained in this paragraph including that the well ruptured.

3. It is clear that responsibility for the oil spill rests primarily on BP and that numerous efforts to stop the leak failed. Whether the most recent attempts to stop the flow of oil will succeed is far from certain. The oil and toxic pollutants that have flowed and are likely to continue flowing into the Gulf of Mexico violate the Clean Water Act, which is the nation's strongest law protecting water quality. BP has also failed to fully and properly divulge the identities and amounts of toxic constituents discharged with the oil and methane.

**Answer:**

The allegations in this paragraph relating to efforts to stop the flow of oil from the Macondo well are irrelevant. This is because the well was successfully capped on July 15, 2010 and permanently sealed on September 19, 2010, and the allegations related to the CWA are moot, as explained in the Answer to Paragraph 1. BP denies any remaining factual allegations in this paragraph. To the extent that Plaintiff is alleging that BP bears primary responsibility under EPCRA concerning reporting related to the oil spill, BP denies that legal allegation.

4. Plaintiff seeks a declaratory judgment, injunctive relief, remedial relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

**Answer:**

Claims to recovery under any statute other than EPCRA have already been held moot in controlling legal decisions. BP denies any remaining allegations in this paragraph.

5. This Court has subject matter jurisdiction over the claims specified in this Complaint

pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 9659(a), 42 U.S.C. § 11046(a) and 28 U.S.C. § 1331.  The effects of the oil spill have significantly impacted the people, wildlife, waters, coastal environment, and economy of the state of Louisiana.  The relief requested is authorized pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and (d), 42 U.S.C. §§ 9609(c) and 9659(c), 42 U.S.C. §§ 11045(b) and 11046(c), and 28 U.S.C. §§ 2201 and 2202.

**Answer:**

BP denies the allegations in this paragraph.  References to and claims under such substantive statutes other than EPCRA are moot.  And among other jurisdictional defects, Plaintiff lacks constitutional and/or prudential standing.

6. In compliance with 33 U.S.C. § 1365(b)(1)(A), 42 U.S.C. § 9659(d)(1) and 42 U.S.C. § 11046(d)(1), on June 1, 2010, Plaintiff gave notice of the violations specified in this complaint and of its intent to file suit to the Defendants, to the Administrator of the U.S. Environmental Protection Agency ("EPA"), to the Regional Administrator of the EPA, and to all other required entities.  A copy of the notice letter was filed as Exhibit A to the original complaint.  A supplemental notice was served on June 4, 2010 concerning violations of section 306 of the CWA, 33 U.S.C. § 1316.  A copy of the supplemental notice letter was filed as Exhibit B to the original complaint.

**Answer:**

To the extent this paragraph discusses statutes other than EPCRA, references to and claims under such other substantive statutes are moot.  As to Plaintiff's EPCRA claim, BP denies the allegations in this paragraph because Plaintiff did not supply notice of all aspects of the EPCRA claim asserted in the Amended Complaint, either in the original notice letter of June 1, 2010, or in the supplemental notice letter, which refers only to the CWA.

7. The violations complained of in the notice are continuing, are reasonably likely to continue, or were reasonably likely to continue at the time the original complaints were filed.  Defendants remain in violation of the CWA, CERCLA and EPCRA.  Neither the EPA nor any other governmental entity has commenced or is diligently prosecuting a civil or criminal action in a court to redress the violations.

**Answer:**

To the extent this paragraph asserts claims under statutes other than EPCRA, references to and claims under such other substantive statutes are moot.  BP denies any remaining

allegations in this paragraph.

8. Venue is appropriate in the Eastern District of Louisiana pursuant to 33 U.S.C. § 1365(c)(1), 42 U.S.C. § 9659(b)(1), and 42 U.S.C. § 11046(b)(1), because the sources of the violations complained of have originated in the contiguous zone and exclusive economic zone of the United States and the impacts of the discharges have been felt so heavily by the people and state of Louisiana from the oily waters of the Gulf of Mexico that have reached Louisiana.

**<u>Answer:</u>**

To the extent this paragraph asserts claims under statutes other than EPCRA, references

to and claims under such other substantive statutes are moot.  BP agrees that venue is appropriate

in this Court but disagrees that the "alleged violation occurred," 42 U.S.C. § 11046(b)(1), in this

district.  BP denies any remaining allegations in this paragraph.

9. Plaintiff, Center for Biological Diversity ("the Center"), is a nonprofit corporation organized under the laws of the State of New Mexico.  The Center's principal office is located in Tucson, Arizona.  The Center has over one hundred members within the state of Louisiana, thousands of members in the Gulf region, and many additional members who regularly visit and recreate in Louisiana and other Gulf states that have been and continue to be affected by the BP oil spill.

**<u>Answer:</u>**

BP lacks information to determine the truth or falsity of the allegations contained in this

paragraph and therefore denies them.

10. Plaintiff's members reside throughout the Gulf region, including the coastal areas of Louisiana especially impacted by the pollutants discharged as part of the oil spill from the Deepwater Horizon/Macondo facility.  Plaintiff's members specifically use, recreate in and enjoy these areas in the following ways:
   a. The Center's members live within the Gulf coastal zone impacted by discharges from Defendants' facilities;
   b. The Center's members engage in economic and recreational activities – including but not limited to fishing, swimming, hiking, walking and boating – in and around the waters impacted by discharges from Defendants' facilities;
   c. The Center's members observe and enjoy wildlife in the Gulf in the areas impacted by Defendants' discharges;
   d. The Center's members have an aesthetic and health interest in keeping the waters in the Gulf free of oil and toxic and hazardous pollutants;
   e. The Center's members swim and fish in the waters and breathe the air into which Defendants' release the oil and toxic pollutants which they have discharged and failed to properly report. Such oil and toxic pollutants are known to cause deleterious effects

4

to human health and wildlife and interfere with members' use and enjoyment of property.

**Answer:**

BP denies that Macondo oil came "from the Deepwater Horizon/Macondo facility" within the meaning of EPCRA. BP lacks information to determine the truth or falsity of the other allegations contained in this paragraph and therefore denies them.

11. The Center is a non-profit organization with over 40,000 members, including over 3,500 members in the Gulf of Mexico region. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center has standing in this suit to protect its own interests and those of its individual members in a representative capacity. The Center's organizational purposes, and the interests of its members, are adversely affected by Defendants' discharges of oil, methane, drilling muds and other pollutants which degrade waters and adjacent lands, including the habitat for threatened and endangered aquatic species, and impair the habitability, recreational value, and economic and aesthetic benefits of the local communities.

**Answer:**

BP denies the legal sufficiency of the standing allegations contained in this paragraph. BP lacks information to determine the truth or falsity of the other allegations contained in this paragraph and therefore denies them.

12. Defendants' discharges alleged herein have adversely affected and continue to adversely affect the Center's members' above-described use and enjoyment of the waters, air and land affected by Defendants' discharges and releases.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this paragraph and therefore denies them.

13. Enforcement of the CWA, CERCLA, and EPCRA will help restore and preserve water quality and provide critical information to which the public is entitled, thereby promoting the objectives of the Clean Water Act, CERCLA, EPCRA and the Center, and provide protection of the use and enjoyment of the area by the Center's members.

**Answer:**

To the extent this paragraph asserts claims under statutes other than EPCRA, references to and claims under such other substantive statutes are moot. BP lacks information to determine the truth or falsity of allegations concerning the Plaintiff's members and therefore denies them. BP denies any remaining allegations in this paragraph.

14. Defendant BP, PLC is a British based for-profit corporation organized under the laws of the United Kingdom and doing business in the United States as itself and various subsidiaries also named herein. BP America, Inc. is a for-profit wholly-owned corporate subsidiary of BP, PLC, organized under the laws of the state of Delaware. BP Exploration & Production, Inc. is a for-profit wholly-owned corporate subsidiary of BP, PLC, organized under the laws of the state of Delaware. Both BP America, Inc. and BP Exploration & Production, Inc. have their principal places of business in Warrenville, Illinois, and do business in the State of Louisiana. The various BP Defendants (hereinafter referred to collectively as "BP") own the Mississippi Canyon Block 252 license and/or lease. BP leased the Deepwater Horizon rig from Transocean, Ltd., and operates, or operated, the rig in the Gulf of Mexico.

**Answer:**

BP admits that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, with its headquarters in London, England. Proper service under the applicable law was never made on BP p.l.c. and thus this Answer is not filed on behalf of BP p.l.c. BP admits that BP America Inc. and BP Exploration & Production Inc. are Delaware corporations. It denies that their principal places of business are in Warrenville, Illinois. BP admits that BP America Production Company, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*. BP further admits that BP Exploration & Production Inc. was a partial leaseholder in the lease granted by the MMS/BOEMRE pursuant to which it was allowed to perform oil exploration and drilling operations in Mississippi Canyon Block 252, in which the Macondo well was located. BP denies any remaining allegations in this paragraph.

6

15. Defendant Transocean, Ltd. is the owner of the Deepwater Horizon rig. Transocean Ltd. is a for-profit corporation organized under the laws of Switzerland. Transocean Inc. is a for-profit corporation organized under the laws of the Cayman Islands, with its principal United States place of business in Texas. Transocean Inc. is a wholly-owned subsidiary of Transocean Ltd. with an address of P.O. Box 2765, Houston, TX 77252-2765. Transocean Offshore Deepwater Drilling, Inc. is incorporated in the state of Delaware and is a wholly-owned subsidiary of Transocean, Ltd and Transocean, Inc.

**<u>Answer:</u>**

BP admits that Transocean owned the *Deepwater Horizon*. BP lacks information to determine the truth or falsity of other allegations contained in this paragraph and therefore denies them.

16. BP acquired mineral rights to drill for oil within the Mississippi Canyon Block 252, which is located in the United States sector of the Gulf of Mexico, about 41 miles off the Louisiana coast.

**<u>Answer:</u>**

BP admits that BP Exploration & Production Inc. was a partial leaseholder in the lease granted by the MMS/BOEMRE pursuant to which it was allowed to perform oil exploration, and drilling operations in Mississippi Canyon Block 252, in which the Macondo well was located. BP denies any remaining allegations in this paragraph.

17. In February 2010, the Deepwater Horizon drilling rig began drilling operations in the Mississippi Canyon Block 252 and is also known as the Macondo well. The Deepwater Horizon rig is owned by Transocean, and was leased to BP.

**<u>Answer:</u>**

BP admits that BP America Production Company, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*. The *Deepwater Horizon* arrived at the Macondo well in January 2010. BP admits that Transocean owned the *Deepwater Horizon*. BP denies any remaining allegations in this paragraph.

18. The Deepwater Horizon rig and wells constitute new source offshore oil exploration and production facilities subject to national effluent standards, as authorized by statute and defined by federal regulations. 33 U.S.C. § 1316; 40 C.F.R. Part 435. Offshore facilities are considered point sources under the CWA. 33 U.S.C. § 1362(14).

**Answer:**

This paragraph contains only allegations relating to claims that have been dismissed. Therefore a response by BP is moot.

19. On April 20, 2010, the Deepwater Horizon rig exploded. Oil and toxic pollutants began discharging from the Deepwater Horizon rig, associated well and other sources into the Gulf of Mexico.

**Answer:**

BP admits that on April 20, 2010 *Deepwater Horizon* personnel lost well control over the Macondo well. BP further admits that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through the Transocean-owned vessel appurtenances including the blowout preventer and riser, before discharging into Gulf of Mexico waters or being captured by various containment methods. BP denies the remaining allegations contained in this paragraph.

20. Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, its contiguous zone and the exclusive economic zone unless such discharge is permitted by a National Pollution Discharge Elimination System ("NPDES") permit.

**Answer:**

This paragraph contains only allegations related to claims that have been dismissed. Therefore a response by BP is moot.

21. Defendants' discharges are not permitted in any NPDES permit and are prohibited in their entirety by 40 C.F.R. Part 435. No free oil or associated toxic pollutants are allowed to be discharged under any circumstances. Any NPDES general permit does not, and cannot, allow such discharges.

**Answer:**

    This paragraph contains only allegations related to claims that have been dismissed.

Therefore a response by BP is moot.

    22. Upon information and belief, Plaintiff alleges that Defendants have repeatedly discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil and associated toxic pollutants through a point source or point sources into waters of the United States, the contiguous zone, the territorial seas, and the exclusive economic zone in the Gulf of Mexico.  The discharges are reaching and have reached coastal wetlands, beaches, estuaries and rivers in Louisiana and other Gulf states.

**Answer:**

    This paragraph contains only allegations related to claims that have been dismissed.

Therefore a response by BP is moot.

    23. Upon information and belief, Plaintiff alleges that Defendants' point sources include but are not limited to the rig itself, and all pipes associated with the well construction, operation and production of the Deepwater Horizon facility, as well as any cracks and fissures caused by the operation, including attempts to stop the flow of the oil and associated toxic pollutants.  The exact point sources, in addition to the well itself, are known to BP.

**Answer:**

    This paragraph contains only allegations related claims that have been dismissed.

Therefore a response by BP is moot.

    24. On or about April 24, 2010, BP reported a leak of 1,000 barrels of day of oil into the Gulf of Mexico.

**Answer:**

    BP denies the allegations contained in this paragraph as it is unclear what purported report Plaintiff is referring to.

    25. On or about April 28, 2010, the National Oceanic and Atmospheric Administration ("NOAA") estimated that the leak was likely 5,000 barrels a day.

**Answer:**

    BP admits the allegations contained in this paragraph.

26. On or about April 29, 2010, Louisiana Governor Bobby Jindal declared a state of emergency due to the oil spill.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this paragraph and therefore denies them.

27. On or about April 30, 2010, oil began washing ashore in Louisiana.

**Answer:**

BP admits that oil washed ashore in Louisiana, though BP engaged in extraordinary efforts to minimize the amount of oil that reached shore.

28. On or about May 7, 2010, BP attempted to lower a "containment dome" over the largest of the oil leaks, which was unsuccessful.

**Answer:**

BP admits that on May 6-7, 2010, the Cofferdam was lowered and positioned over the leak at the end of the *Deepwater Horizon* riser, and that while the Cofferdam was being lowered, hydrate crystals formed inside of the Cofferdam which prevented its successful placement over the leaking riser.  BP denies any remaining allegations in this paragraph.

29. On or about May 12, 2010, BP released the first public video of the leak.  Based on the footage, a number of outside experts estimated that the leak was significantly higher than previous estimates by BP and NOAA.  One university professor of mechanical engineering estimated the leak may be 70,000 barrels a day.

**Answer:**

BP admits video footage was released.  BP lacks information to determine the truth or falsity of the remaining allegations contained in this paragraph and therefore denies them.

30. On or about May 16, 2010, BP inserted a mile-long tube to divert some of the leaked oil.

**Answer:**

BP denies the allegations contained in this paragraph.

10

31. On or about May 20, 2010, BP claimed to be capturing 5,000 barrels of oil per day.

**Answer:**

BP admits that it captured oil.  BP and the United States have stipulated, and the Court has confirmed by order, that 810,000 barrels of Collected Oil were collected during the spill.  *See Order Regarding Stipulation Mooting BP's Motion For Partial Summary Judgment Against the United States*, entered Feb. 19, 2013 (Rec. Doc. 8620).  BP denies any remaining allegations in this paragraph.

32. On or about May 21, 2010, BP began releasing the live underwater video broadcasts of the oil leak.

**Answer:**

BP admits the allegations contained in this paragraph.

33. On May 22, 2010, reporters observed heavy oil coating a pelican colony near North Breton Island off the Louisiana coast.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this paragraph and therefore denies them.

34. On or about May 29, 2010, BP attempted its "top kill" plan, which was unsuccessful.

**Answer:**

BP admits that Top Kill refers to the operations comprised of the Momentum Kill and Junk Shot attempted in May 2010 as a means to kill the MC 252 Well, and that from May 26, 2010 through May 28, 2010, multiple attempts at Momentum Kill and pumping Junk Shot were commenced.  BP further admits that Top Kill operations did not kill the MC 252 Well.  BP denies any remaining allegations in this paragraph.

35. On or about June 1, 2010, oil began washing up on the beaches of Gulf Islands National Seashore.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this

paragraph and therefore denies them.

36. By June 7, 2010, heavy oil had soaked the Queen Bess Island pelican rookery, a nesting site that has been essential to the recovery of the brown pelican population.  Experts worry that the spill could set back the Louisiana state bird's recovery from near-extinction.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this

paragraph and therefore denies them.

37. On or about June 11, 2010 federal estimates of the size of the leak increased to 20,000 to 40,000 barrels a day.  Since June 11, 2010, estimates of the size of the leak have ranged from 20,000 to 100,000 barrels a day.

**Answer:**

BP denies the allegations in this paragraph.

38. On or about July 6, 2010, tar balls reached the shore of Lake Pontchartrain.

**Answer:**

BP lacks information to determine the truth or falsity of any other allegations contained

in this paragraph and therefore denies them.

39. On or about July 12, 2010, BP installed a new cap on the leak.

**Answer:**

BP admits the allegations contained in this paragraph.

40. On or about July 15, 2010, BP claimed that the new cap halted the flow of oil into the Gulf for the first time since April.

**Answer:**

The well was capped on July 15, 2010 and permanently sealed on September 19, 2010.

BP denies any remaining allegations in this paragraph.

41. On or about July 18, 2010, oil and natural gas were discovered seeping into the Gulf of Mexico near the well.  Upon information and belief, methane gas has also been detected near the well.

**Answer:**

BP denies the allegations contained in this paragraph.

42. BP drilled relief wells for a number of weeks, which it hoped would eventually shut the well permanently.  On or about July 21, 2010, BP temporarily ceased drilling the relief wells due to an expected tropical storm.

**Answer:**

BP admits that it drilled relief wells, which ultimately allowed it to permanently kill the well.  BP further admits that on July 23, 2010, some source control efforts, including relief well drilling, were temporarily suspended due to Tropical Storm Bonnie.  BP denies any remaining allegations in this paragraph.

43. BP considered an attempt to plug the ruptured well with a procedure called "static kill," which is similar to the earlier and unsuccessful "top kill" procedure.  Drilling mud (which itself includes toxic compounds), cement, and other materials would be pumped in from the top of the well, in an attempt to force the gas and oil downward.  BP is also continuing to drill the relief wells, in which it intends to inject drilling mud and cement.

**Answer:**

BP admits that on July 27, 2010, the "Hydrostatic Control for MC252-1 Hydrostatic Control Procedure," also known as Static Kill, was approved.  BP further admits that on August 3, 2010, the *Q4000* commenced the Static Kill operation by pumping drilling mud through the choke and kill manifold into the MC 252 Well via the choke side of the *Deepwater Horizon* BOP, and that on August 19-21, 2010, a 48-hour ambient pressure test confirmed that the cement plug set during the Static Kill operation sealed the MC 252 Well.  BP denies the remaining allegations contained in this paragraph, including that the well ruptured.

44. According to federal estimates, between 93.5 million and 184.3 million gallons of oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010.  Based on the range of daily estimates, over 215 million gallons of oil may have discharged into the Gulf of

Mexico from the BP spill since April 20, 2010.

**Answer:**

BP denies the allegations contained in this paragraph.

45. Assuming that 60,000 barrels of oil per day have discharged into the Gulf, approximately 5.2 million barrels of oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010.

**Answer:**

BP denies the allegations contained in this paragraph.

46. Of an estimated 5.2 million barrels of oil discharged into the Gulf since April 20, 2010, some estimates indicate that about 1.2 million barrels have been siphoned, burned or skimmed.  This would mean that 4 million barrels or more of oil may remain in the Gulf of Mexico.

**Answer:**

BP denies the allegations in this paragraph.

47. Satellite images show that the various surface oil slicks and sheens believed to be associated with the BP spill have covered as much as 23,140 square miles.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this

paragraph and therefore denies them.

48. Plumes of oil have been spreading beneath the surface of the Gulf, which is feared could devastate zooplankton and invertebrate communities at the base of the aquatic food chain. Researchers from the University of South Florida and NOAA have released studies confirming that the plumes of oil are the result of the Deepwater Horizon well.  Initial tests show that some of the most toxic components of the oil are not rising to the surface where they could evaporate, but rather are drifting through the deep water in underwater plumes or layers.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this

paragraph and therefore denies them.

49. Large "clouds" of oil have been discovered in the Gulf miles away from the well site. Small globs of oil have also been discovered underwater.  One researcher from Tulane

14

University has been finding baby crabs with orange blobs of oil or dispersant within their shells, and has found droplets of oil everywhere sampled, from Galveston Bay, Texas to Pensacola, Florida.  Researchers have also measured extremely high levels of methane, which has spewed from the gushing BP well, at up to 10,000 times background levels in Gulf waters.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this paragraph and therefore denies them.

50. Bacteria are breaking down some of the oil's hydrocarbons in the underwater plumes, which has resulted in oxygen levels being severely depleted.  Oxygen levels are plunging close to what is considered "dead zone" conditions, at which most marine life suffocate for lack of dissolved oxygen.

**Answer:**

BP admits that bacteria breaks down crude oil but lacks information to determine the truth or falsity of the remaining allegations contained in this paragraph and therefore denies them.

51. As of July 22, 2010, approximately 626 miles of Gulf Coast shoreline was oiled: 363 miles in Louisiana, 108 miles in Mississippi, 85 miles in Florida, and 70 miles in Alabama.

**Answer:**

Because Shoreline Cleanup Assessment Technique ("SCAT") practice is to assign the highest observed level of oiling contained within the shoreline segment to the entirety of the particular segment, SCAT oiling categories recorded in the SCAT database do not indicate that the entire length of a shoreline segment was oiled at the level designated.  BP therefore denies the allegations contained in this paragraph.

52. The BP spill is having devastating impacts on fish and wildlife. As of July 16, 2010, over 2,500 dead animals have been collected in areas affected by the Gulf spill, including over 2,000 birds, over 450 sea turtles, and over 60 dolphins and other mammals.

**Answer:**

BP denies the allegations contained in this paragraph.

15

53. The die-off of wildlife in the Gulf's marshes, beaches and coastal waters is expected to continue for months or years.

**Answer:**

BP denies the allegations contained in this paragraph.

54. The BP spill threatens some of the most productive and fragile marine ecosystems in the United States.  About 25 percent of the nation's wetlands lie in the Mississippi River Delta, providing habitat for nesting seabirds and resting migratory birds.

**Answer:**

BP lacks information to determine the truth or falsity of the allegations contained in this

paragraph and therefore denies them.

55. So far, over 35,000 tons of oily waste and materials collected on beaches and in wetlands has been taken to landfills around the Gulf region.

**Answer:**

BP lacks information to determine the truth or falsity of any other allegations contained

in this paragraph and therefore denies them.

56. The BP spill is resulting in devastating impacts to local communities. Louisiana's $2.4 billion seafood industry is responsible for up to 40% of the seafood caught in the continental United States, and is the leading producer of oysters, crab, crawfish and shrimp.  The Gulf region accounts for 73% of the nation's shrimp and 59% of its oysters.  As of August 1, 2010, 57,539 square miles of the Gulf, which is roughly 24% of the federal waters in the Gulf, are under a federal fishery closure due to the BP spill.

**Answer:**

BP denies the allegations contained in this paragraph.

57. Oil reaching the shores of Louisiana has caused headaches, burning eyes, and nausea among the people who live there and more serious illness among cleanup workers.

**Answer:**

BP lacks information to determine the truth or falsity of any other allegations contained

in this paragraph and therefore denies them.

58. Dozens of people in Louisiana have been hospitalized with health problems blamed

on airborne toxic chemicals in the month after oil began to flood the Gulf of Mexico from the gushing point sources.  Those exposed to the growing oil spill include residents, visitors, cleanup workers and relief aid workers.

**Answer:**

BP lacks information to determine the truth or falsity of any other allegations contained

in this paragraph and therefore denies them.

59. According to BP, it has applied 1.8 million gallons of chemical dispersants to waters in the Gulf of Mexico in an attempt to break up and dilute the oil.  The environmental effects of using chemical dispersants at such depths and in such enormous quantities have never been tested.

**Answer:**

BP admits that as permitted in the National Contingency Plan and with the approval of

the Unified Command, approved dispersants were applied to mitigate the potential impacts of the

oil spill.  BP lacks information to determine the truth or falsity of the other allegations contained

in this paragraph and therefore denies them.

60. Upon information and belief, Plaintiff alleges that Defendants have discharged, continue to discharge, or are reasonably likely to continue to discharges, pollutants, including but not limited to, oil, methane, drilling muds, toxic pollutants, and chemical dispersants.  Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely include, but are not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs) (including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, arsenic, cadmium, copper, mercury, and nickel.

**Answer:**

BP denies that any EPCRA-covered facility of which it is the owner or operator has

discharged any of the substances identified in this paragraph within the meaning of EPCRA.

61. Upon information and belief, BP has analyzed and knows the concentrations of each of the toxic pollutants present in the oil coming from its wells.  Defendants have discharged and continue to discharge toxic pollutants in large quantities.  The pollutants discharged and the likely ranges of discharges are as follows:

| Chemical | Range of presence (in pounds per million gallons of oil) | | |
|---|---|---|---|
| | low | High | average |
| Benzene | 1,595 | 19,216 | 7,643 |
| Toluene | 7,209 | 45,909 | 23,056 |
| Ethylbenzene | 5,509 | 9,569 | 6,698 |
| Arsenic | -- | -- | 14 |
| Nickel | -- | -- | 8 |
| Fluoranthene | 22 | 26 | 24 |
| Benz(a) anthracene | 12 | 39 | 21 |
| Benzo(b) fluoranthene | 3 | 15 | 10 |
| Benzo(k) fluoranthene | 1 | 5 | 3 |
| Benzo(e) pyrene | 8 | 29 | 17 |
| Benzo(a) pyrene | 2 | 4 | 3 |
| Indeno(1, 2, 3) cd pyrene | 0 | 5 | 1 |
| Dibenzo(a,          h) anthracene | 0 | 2 | 2 |
| Naphthalene (total) | 2,321 | 71,497 | 36,169 |
| Chrysene (total) | 61 | 1,689 | 894 |
| TOTALS | 17,765 | 146,316 | 73,669 |

**Answer:**

BP denies that any EPCRA-covered facility of which it is the owner or operator has

discharged any of the substances identified in this paragraph within the meaning of EPCRA.  BP

lacks information to determine the truth or falsity of the other allegations contained in this

paragraph and therefore denies them.

62. Upon information and belief, other pollutants, which include drilling muds and toxic pollutants listed in 40 C.F.R. § 401.15, were present at and discharged from the Deepwater Horizon facility when it exploded on April 20, 2010.

**Answer:**

BP denies that any EPCRA-covered facility of which it is the owner or operator has discharged any of the substances identified in this paragraph within the meaning of EPCRA.  BP lacks information to determine the truth or falsity of any other allegations contained in this paragraph and therefore denies them.

63. The EPA establishes reporting requirements for releases of threshold quantities of hazardous substances pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602.  Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.  Defendants' operations are "facilities" as defined under CERCLA. 42 U.S.C. § 9601(a)(9).

**Answer:**

To the extent the allegations in this paragraph relate to claims under EPCRA, BP denies that it was the owner or operator of the *Deepwater Horizon*.  BP also denies that any EPCRA-covered facility of which it is the owner or operator has discharged any of the substances identified in this paragraph within the meaning of EPCRA.  BP denies any remaining allegations contained in this paragraph.

64. Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirements of CERCLA to the emergency coordinator for the local emergency planning committee and the State emergency planning commission.

**Answer:**

BP denies that it was the owner or operator of the *Deepwater Horizon*.  BP also denies that any EPCRA-covered facility of which it is the owner or operator has discharged any hazardous substances within the meaning of EPCRA.  BP also notes that the crude oil discharged

19

from the *Deepwater Horizon* and/or its appurtenances fall within the so-called "petroleum exclusion" at 42 U.S.C. § 9601(14)(F).  BP denies that it failed to make any required report to the appropriate authorities.  BP denies any remaining allegations contained in this paragraph.

65. Upon information and belief, and depending on variations in the components in the earth's crust, Defendants' operations have released reportable quantities of benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs) (including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, methane, arsenic, cadmium, copper, mercury, and nickel under CERCLA.  Consequently, under EPCRA and its implementing regulations, defendants are required to provide notice of reportable releases to the appropriate federal, state and local emergency response officials.

**Answer:**

BP denies that it was the owner or operator of the *Deepwater Horizon*.  BP also denies that any EPCRA-covered facility of which it is the owner or operator has discharged any hazardous substances within the meaning of EPCRA.  BP also notes that the crude oil discharged from the *Deepwater Horizon* and/or its appurtenances fall within the so-called "petroleum exclusion" at 42 U.S.C. § 9601(14)(F).  BP denies that it failed to make any required report to the appropriate authorities.  BP denies any remaining allegations contained in this paragraph.

66. The release of these toxic pollutants also exceeds the reportable quantities of hazardous substances required to be reported under the CWA, 33 U.S.C. § 1321(b)(2)(A), CERCLA, 42 U.S.C.§ 9603(a), and EPCRA, 42 U.S.C. § 11004.  BP failed to provide notice of the release of reportable quantities of hazardous substances associated with the discharge from the well and platform in the first instance.  Upon information and belief, BP knows the quantities, or at least the range of quantities, of toxic pollutants released into the environment associated with the oil spilled from the Deepwater Horizon well and platform.  While BP did provide some reports of releases of benzene and ethylbenzene to water and air associated with prescribed surface oil burns of slicks created by the well and platform discharges, even those reports failed to provide the level of detail necessary to comply with CERCLA and EPCRA reporting requirements.

**Answer:**

To the extent this paragraph asserts claims under statutes other than EPCRA, references to and claims under such other substantive statutes are moot.  BP also denies that any EPCRA-

covered facility of which it is the owner or operator has discharged any hazardous substances within the meaning of EPCRA.  BP also notes that the crude oil discharged from the *Deepwater Horizon* and/or its appurtenances fall within the so-called "petroleum exclusion" at 42 U.S.C. § 9601(14)(F).  BP denies that it failed to make any required report to the appropriate authorities. BP also denies that Plaintiff provided the requisite notice of all aspects of the EPCRA claim asserted in its Amended Complaint, either in the original notice letter of June 1, 2010, or in the supplemental notice letter, which refers only to the CWA.  BP denies any remaining allegations contained in this paragraph.

67. The Mississippi Canyon area of the Gulf of Mexico, into which Defendants have discharged, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil, methane, drilling muds and other toxic pollutants, is part of the "contiguous zone" as defined in 33 U.S.C. § 1362(9) and 40 C.F.R. § 122.2, the "ocean" as defined in 33 U.S.C. § 1362(10) or the "exclusive economic zone".

**Answer:**

This paragraph contains only allegations related to claims that have been dismissed. Therefore a response by BP is moot.

68. These discharges commenced on April 20, 2010, have continued, are reasonably likely to continue, or were reasonably likely to continue at the time of the original complaints.

**Answer:**

BP admits that on April 20, 2010, personnel on the *Deepwater Horizon* lost well control at the MC-252 well being prepared for temporary abandonment in the Gulf of Mexico and that there followed a release of oil from the *Deepwater Horizon* and/or its appurtenances into the Gulf of Mexico.  BP denies the remaining allegations contained in this paragraph.

69. Upon information and belief, Plaintiff alleges that Defendants have discharged oil, produced water, and other toxic pollutants in violation of the national standards of performance for new sources for offshore facilities promulgated pursuant to the authority of 33 U.S.C. § 1316(b) and set forth at 40 C.F.R. Part 435.

21

**Answer:**

This paragraph contains only allegations related to claims that have been dismissed.

Therefore a response by BP is moot.

70. Upon information and belief, Plaintiff alleges that Defendants' discharges alleged herein are prohibited by 40 C.F.R. Part 435, and actionable as violations of national standards of performance pursuant to 33 U.S.C. § 1316(e).  Such national standards of performance for discharges to the contiguous zone, ocean or exclusive economic zone constitute "effluent standards or limitations," 33 U.S.C. § 1362(11), subject to enforcement.

**Answer:**

This paragraph contains only allegations related to claims that have been dismissed.

Therefore a response by BP is moot.

71. Upon information and belief, during the exploration and operation of the Deepwater Horizon well, Defendants disregarded safety standards that caused or contributed to the explosion that killed the workers on the rig and caused the blowout of the well, thereby leaking the tens or hundreds of million gallons of oil into the Gulf of Mexico.  Such actions constitute gross negligence or willful misconduct on the part of the Defendants.

**Answer:**

BP denies the allegations contained in this paragraph.

**COUNT 1**
**Discharge of Pollutants into the Gulf of Mexico**
**33 U.S.C. § 1311**

72. Plaintiff realleges paragraphs 1-71.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully restated here.  To the extent that any more specific response to any purportedly incorporated allegation is required, BP denies such allegations.

73. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into the contiguous zone, ocean, exclusive economic zone and navigable waters of the United States, unless in compliance with a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

74. Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, pollutants, including oil, methane, drilling muds, and other toxic pollutants, from one or more point sources in the Gulf of Mexico into the contiguous zone, ocean, exclusive economic zone, and waters of the United States in violation of the CWA.  The Defendants' discharges are not permittable under the CWA and violate national policy.  33 U.S.C. § 1251(a)(3).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

75. By discharging oil, methane, drilling muds, and toxic pollutants into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are or were reasonably likely to continue to violate section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

## COUNT 2
### Discharge of Oil and Hazardous Substances into the Gulf of Mexico
### 33 U.S.C. § 1321

76. Plaintiff realleges paragraphs 1-75.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully

restated here.  To the extent that any more specific response to any purportedly incorporated

allegation is required, BP denies such allegations.

77. Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into navigable waters of the United States, into the waters of the contiguous zone, the ocean or the exclusive economic zone.

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

78. Defendants have discharged, continue to discharge, are reasonably likely to continue
to discharge, or were reasonably likely to continue to discharge at the time of the original
complaints, oil, methane, drilling muds, and hazardous substances into the Gulf of Mexico.  By
discharging oil, methane, drilling muds and hazardous substances into the Gulf of Mexico, as
described herein, Defendants have violated, continue to violate, or are reasonably likely to
continue to violate section 311(b) of the CWA, 33 U.S.C. § 1321(b).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

### COUNT 3
### Discharge of Toxic Pollutants into the Gulf of Mexico
### 33 U.S.C. § 1317

79. Plaintiff realleges paragraphs 1-78.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully

restated here.  To the extent that any more specific response to any purportedly incorporated

allegation is required, BP denies such allegations.

80. Section 307(a) of the CWA, 33 U.S.C. § 1317(a), requires EPA to publish a list of
toxic pollutants.  Each toxic pollutant published by EPA is subject to effluent limitations
established by EPA.  *Id.*  After the effective date of any effluent standard or limitation
established for a toxic pollutant, it is unlawful for any owner or operator to violate such effluent
standard. 33 U.S.C. § 1317(d).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

81. Defendants discharge of oil, methane, and toxic pollutants into the Gulf of Mexico
violated, continues to violate, or was reasonably likely to continue to violate at the time of the

24

original complaints, the effluent standards and limitations for a number of toxic pollutants, including but not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons, arsenic, cadmium, mercury, haloethers, halomethanes, and nickel, in violation of the CWA. 33 U.S.C. § 1317(d).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by BP is moot.

**COUNT 4**
**Discharge of Pollutants in Violation of National Standards of Performance**
**33 U.S.C. § 1316**

82. Plaintiff realleges paragraphs 1-81.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully restated here.  To the extent that any more specific response to any purportedly incorporated allegation is required, BP denies such allegations.

83. Section 306(b) of the CWA, 33 U.S.C. § 1316(b), requires EPA to develop national standards of performance for certain new sources, including offshore oil drilling operations. After the effective date of such standards of performance, the owner or operator of any new source is prohibited from operating such source in violation of any standard of performance applicable to such source.  33 U.S.C. § 1316(e).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by BP is moot.

84. Defendants discharge of oil, methane, drilling muds, and other pollutants into the Gulf of Mexico violates the national standards of performance for offshore oil drilling operations.  By discharging pollutants in violation of national standards of performance for offshore facilities into the contiguous zone and waters of the United States as detailed herein, Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely to continue to violate at the time of the original complaints, section 306 of the CWA, 33 U.S.C. § 1316.

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

**COUNT 5**
**Gross Negligence or Willful Misconduct**
**33 U.S.C. § 1321(b)(7)(D)**

85. Plaintiff realleges paragraphs 1-84.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully

restated here.  To the extent that any more specific response to any purportedly incorporated

allegation is required, BP denies such allegations.

86. Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), provides that if the
defendants' actions that caused the spill were the result of gross negligence or willful misconduct
that the civil penalties per barrel of oil or unit of reportable quantity of hazardous substance
discharged shall be up to $4,300 per barrel or unit.

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.

87. Defendants' actions in the exploration and operation of the Deepwater Horizon well
constituted gross negligence or willful misconduct.

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by

BP is moot.  Nevertheless, BP denies the allegations contained in this paragraph.

**COUNT 6**
**Violations of CERCLA**
**42 U.S.C. § 9603**

88. Plaintiff realleges paragraphs 1-87.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully restated here.  To the extent that any more specific response to any purportedly incorporated allegation is required, BP denies such allegations.

89. Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by BP is moot.

90. By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico and failing to report, or failing to adequately report, such releases to the National Response Center as detailed herein, Defendants have violated their duties under CERCLA, 42 U.S.C. § 9603(a).

**Answer:**

This paragraph contains only claims that have been dismissed.  Therefore a response by BP is moot.

**COUNT 7**
**Violations of EPCRA**
**42 U.S.C. § 11004**

91. Plaintiff realleges paragraphs 1-90.

**Answer:**

BP realleges each and every answer set forth in all preceding paragraphs as if fully restated here.  To the extent that any more specific response to any purportedly incorporated allegation is required, BP denies such allegations.

92. Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirement of CERCLA to the emergency coordinator for the local emergency planning committee.

27

**Answer:**

BP denies that 42 U.S.C. § 11004 was violated by BP or applies to the facts of this case.

93. By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico, and failing to report, or failing to adequately report, such releases to local and State emergency planning committees as detailed herein, Defendants have violated their duties under EPCRA, 42 U.S.C. § 11004.

**Answer:**

BP denies the allegations contained in this paragraph.  It specifically denies that it had any relevant reporting obligations under EPCRA.  As the owner of the Macondo well, BP was not the owner or operator of an EPCRA-covered facility from which any releases occurred.  By its terms, EPCRA applies to a "release . . . from a facility at which a hazardous chemical is produced, used, or stored."  42 U.S.C. § 11004(a)(1)-(3).  A facility includes "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person . . . ."  42 U.S.C. § 11049(4).  This definition does not include a natural reservoir like that present in the Macondo leasehold or embrace sea vessels like the *Deepwater Horizon*.  BP was not the owner or operator of Transocean's *Deepwater Horizon* drilling rig.  BP therefore denies that it could ever have a duty to report under EPCRA.  Moreover, BP denies that Plaintiff provided the requisite notice of all aspects of the EPCRA claim asserted in its Amended Complaint, either in the original notice letter of June 1, 2010, or in the supplemental notice letter, which refers only to the CWA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant Plaintiff the following relief:

a. Issue a declaratory judgment that Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely at the time of the filing of the original complaints to violate, the CWA, as alleged in counts one through five, CERCLA, as alleged in count six, and EPCRA, as alleged in count seven;

b. Enjoin Defendants from operating their offshore facility in such manner as will result in further violation of the CWA, CERCLA, and EPCRA.  In particular, Plaintiff seeks an order enjoining Defendants from discharging any further pollutants to the contiguous zone, ocean or exclusive economic zone and other waters of the United States, from releasing any hazardous substance without full and complete reporting as required under CERCLA and EPCRA, and requiring full and complete reporting for all hazardous substances already released;

c. Order Defendants to immediately divulge the complete list and amounts of toxic pollutants contained in the oil and other releases from the Deepwater Horizon rig and wells;

d. Order Defendants to pay civil penalties of up to $1,100 per barrel 1 (or up to $4,300 per barrel if the violations were the result of gross negligence or willful misconduct) or $37,500 per day of violation, whichever is greater, pursuant to sections 309(d), 311(b)(7) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1321(b)(7) and 1365(a), including violations listed in the attached exhibits, those identified in this complaint and violations committed subsequent to those identified in this complaint;

e. Order Defendants to pay civil penalties of up to $37,500 per day of violation for each hazardous substance it failed to report or adequately report, pursuant to CERCLA, 42 U.S.C. §§ 9609(c) and 9659, and EPCRA, 42 U.S.C. §§ 11045(b) and 11046(c), including violations listed in Exhibits A and B, those identified in this complaint and violations committed subsequent to those identified in this complaint;

f. Authorize the Plaintiff, for the period beginning on the date of the Court's order and running for ten years after the Defendants achieve compliance with the CWA, CERCLA, and EPCRA, to sample or arrange sampling of any discharge of pollutants from the wells in question, with the costs of the sampling to be borne by Defendants;

g. Order Defendants to provide Plaintiff, for a period beginning on the date of the Court's order and running for five years after Defendants achieve compliance with the CWA, CERCLA, and EPCRA, with a copy of all reports and other documents which Defendants submit to appropriate regulatory authorities concerning the allegations set forth herein;

h. Issue a remedial injunction ordering Defendants to pay the cost of any environmental restoration or remediation deemed necessary and proper by the Court to ameliorate the degradation caused by Defendants' violations;

i. Award Plaintiff its costs, including reasonable attorney and expert witness fees, as

authorized by 33 U.S.C. § 1365(d), 42 U.S.C. § 9659(f), and 42 U.S.C. § 11046(f); and

h. Award such other relief as this Court deems appropriate.

**Answer:**

To the extent this paragraph asserts claims under statutes other than EPCRA, references to and claims under such other substantive statutes are moot.  Plaintiff's request in subparagraph c. above is also moot even as applied to Plaintiff's EPCRA claims since such information is publicly available and the fingerprint of MC-252 oil is publicly known.   BP denies any remaining allegations in this paragraph to the extent they concern the conduct or asserted liability of BP.  BP also denies that the broad injunctive relief sought in the paragraph above would be appropriate even if an EPCRA violation could be shown, which it cannot.

### AFFIRMATIVE DEFENSES

### First Defense

The dismissal of all but one count of this Amended Complaint was affirmed by the Fifth Circuit (leaving only one live claim, which was remanded).  Hence, it is unnecessary for BP to set out its affirmative defenses to Counts 1 through 6, since those are all *res judicata*.

### Second Defense

The allegations of the Amended Complaint fail to state a claim on which relief can be granted.

### Third Defense

Plaintiff lacks constitutional and/or prudential standing to assert claims under EPCRA.

### Fourth Defense

This case is moot because the information that the Plaintiff purportedly seeks is readily available in the public domain.  More information is available about this spill than perhaps any other in history.

### Fifth Defense

The *Gwaltney* doctrine applies to and bars this suit under EPCRA.  *See Gwaltney of Smithfield v. Chesapeake Bay Found. Inc.*, 484 U.S. 49 (1987); *Atlantic States Legal Found., Inc. v. United Musical Instruments, U.S.A., Inc.*, 61 F.3d 473 (6th Cir. 1995).  The information Plaintiff seeks was readily available.

### Sixth Defense

Plaintiff's case was remanded to this Court on January 9, 2013.  Plaintiff then took no action to pursue it for nearly a year.[1]  Plaintiff has no excuse for this extended delay.  There is no environmental benefit to be achieved by requiring a report duplicative of already available information to be filed whereas BP's burden of responding to this nonmeritorious litigation continues.  As a result, and on a balance of all relevant equitable factors, Plaintiff is barred from pursuing its claims by the equitable doctrine of laches.

### Seventh Defense

BP did not violate EPCRA because it was not an owner or operator of a facility from which a reportable release occurred.

### Eighth Defense

There is no vicarious liability under EPCRA.  Hence, even if Plaintiff could demonstrate that Transocean violated EPCRA because oil was released from the *Deepwater Horizon* and/or its appurtenances, that would not establish that BP is liable under EPCRA.

### Ninth Defense

BP did not violate EPCRA because the crude-oil discharge in question falls within the

---

[1]   In fact, the delay would have continued even longer, if not for **BP** informing Plaintiff that it failed to file its pleadings on remand with this Court and instead only served them via LexisNexis File & Serve.  That action by BP reinforces that it is in the superior equitable position to the Plaintiff and thus that applying laches against the Plaintiff is more than appropriate here.

petroleum exclusion.  42 U.S.C. § 9601(14)(F).

## Tenth Defense

BP did not violate EPCRA because response activities including any applications of dispersant that BP undertook pursuant to exclusive federal government direction are not attributable to BP.

## Eleventh Defense

Any release to the environment came exclusively from the *Deepwater Horizon* and/or its appurtenances and since the *Deepwater Horizon* is neither a facility nor a facility at which crude oil was produced, used, or stored, BP cannot have violated EPCRA with respect to crude oil discharges, even if BP had owned or operated the *Deepwater Horizon*, which it did not.

## Twelfth Defense

BP did not violate EPCRA because there is no relevant local emergency planning committee or state emergency planning commission as to a spill occurring in the exclusive federal enclave of the Outer Continental Shelf.

## Thirteenth Defense

BP cannot be liable to Plaintiff in a citizen suit under EPCRA because Plaintiff failed to provide the requisite notice of all aspects of the EPCRA claim asserted in Plaintiff's Amended Complaint.  *See* 42 U.S.C. § 11046(d).  Plaintiff's original notice letter of June 1, 2010 did not encompass all allegations asserted in the Amended Complaint, and Plaintiff's June 3, 2010 supplemental notice letter refers only to the CWA and makes no reference to EPCRA.

## Fourteenth Defense

BP has no obligation to report discharges of substances that are not covered by EPCRA whether because they are not hazardous or extremely hazardous substances, or because they are

exempt for any reason.

\* \* \*

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Date: April 11, 2014

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5705
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1047
Facsimile: (212) 715-1399

Respectfully Submitted,

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**ATTORNEYS-IN-CHARGE FOR
DEFENDANT BP AMERICA INC. AND
BP EXPLORATION & PRODUCTION
INC.**

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 11, 2014, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system. I also certify that I have served this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

/s/ Don K. Haycraft              .