# EXHIBIT A

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL NO. 2179 |
| | SECTION "J" (1) |
| | JUDGE BARBIER |
| This document relates to: 2:10-cv-01768 & 2:10-cv-02454 | MAGISTRATE JUDGE SHUSHAN |

## TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC.'S ANSWER TO THE AMENDED COMPLAINT

Defendant Transocean Offshore Deepwater Drilling Inc. ("Transocean") responds to the Amended Complaint, Rec. Doc. 813, upon information and belief as follows.[1]

### INTRODUCTION

1.      This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act, 33 U.S.C. §1365, commonly known as the Clean Water Act ("CWA"), the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9659 ("CERCLA"), and the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §11046 ("EPCRA"). Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to discharge at the time of the original complaints, massive quantities of oil, methane, drilling muds, and other toxic pollutants into the Gulf of Mexico, the contiguous zone, and other waters of the United States, in violation of the CWA. 33 U.S.C. §§ 1311(a), 1316, 1317, 1321. Defendants have also failed to properly report, and continue to fail to properly report, their releases of hazardous substances, in violation of CERCLA, 42 U.S.C. § 9603(a), and EPCRA, 42 U.S.C. § 11004.

**Answer:**

The Fifth Circuit affirmed this Court's dismissal of all of the claims in the Amended

Complaint, except the claim for injunctive relief under the Emergency Planning and Community

---

[1] CBD's complaint also names Transocean Ltd. and Transocean Inc., but those entities take the position that the Court lacks personal jurisdiction over them, and all jurisdictional discovery and briefing with respect to that issue is stayed.  *See* Rec. Doc. 2274; *see also* Rec. Doc. 1225 (Transocean Ltd.'s motion to dismiss for lack of personal jurisdiction).  Therefore, Transocean Ltd. and Transocean Inc. are not answering the Amended Complaint.

Right-to-Know Act ("EPCRA"), which it remanded for further consideration. *Ctr. for Biological*

*Diversity, Inc. v. BP Am. Prod. Co. et al.*, 704 F.3d 413 (5th Cir. 2013). The only remaining

claim appears in Count 7 (¶¶ 91-93). Many of the allegations in this paragraph concern claims

that have been dismissed and, as such, do not require a response by Transocean. Transocean

denies all remaining allegations in this paragraph.

2.      Since April 20, 2010, tens of millions of gallons of oil have spewed from BP's
ruptured well a mile under the sea surface into the Gulf of Mexico, a fragile and productive
ecosystem with diverse communities of fish and wildlife and home to several species of
endangered whales, sea turtles, and sea birds. Estimates have placed the daily flow of oil from
35,000 to 65,000 barrels a day, or more, which amounts to at least 1.5 to 2.5 million gallons per
day. Oil has been washing, and continues to wash ashore along the coasts of Louisiana,
Alabama, Mississippi, Florida, and Texas. While hundreds of dead birds, sea turtles, and
dolphins are being or have been collected onshore, most of the harmful effects of the spill are out
of sight beneath the sea surface. The oil spill is the largest environmental disaster in U.S. history.

**<u>Answer:</u>**

Transocean admits that, on April 20, 2010, there was a discharge of oil from BP's

Macondo well, that oil subsequently flowed from that well into the Gulf of Mexico until the well

was capped on July 15, 2010, and that Macondo oil reached the shorelines of Louisiana,

Alabama, Mississippi, Florida, and Texas in varying amounts. Many of the allegations in this

paragraph concern claims that have been dismissed and, as such, do not require a response by

Transocean. Transocean does not have sufficient knowledge or information to determine

whether the remaining allegations contained in this paragraph are true and, therefore, denies all

remaining allegations in this paragraph.

3.      It is clear that responsibility for the oil spill rests primarily on BP and that
numerous efforts to stop the leak failed. Whether the most recent attempts to stop the flow of oil
will succeed is far from certain. The oil and toxic pollutants that have flowed and are likely to
continue flowing into the Gulf of Mexico violate the Clean Water Act, which is the nation's
strongest law protecting water quality. BP has also failed to fully and properly divulge the
identities and amounts of toxic constituents discharged with the oil and methane.

**Answer:**

All claims under the CWA in the Amended Complaint have been dismissed and the well was capped on July 15, 2010, therefore, the allegations in this paragraph relating to the CWA do not require a response by Transocean. The allegations directed at BP do not require a response by Transocean. To the extent that the allegations are directed at Transocean by implication, Transocean denies them.

4.      Plaintiff seeks a declaratory judgment, injunctive relief, remedial relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

**Answer:**

All claims for recovery except for the claim for injunctive relief under EPCRA have been dismissed by controlling legal decisions. As to the request for injunctive relief under Plaintiff's EPCRA claim, Transocean denies that Plaintiff is entitled to the relief requested.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 9659(a), 42 U.S.C. § 11046(a) and 28 U.S.C. § 1331. The effects of the oil spill have significantly impacted the people, wildlife, waters, coastal environment, and economy of the state of Louisiana. The relief requested is authorized pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and (d), 42 US.C. §§ 9609(c) and 9659(c), 42 U.S.C. §§ 11045(b) and 11046(c), and 28 U.S.C. §§ 2201 and 2202.

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the allegations relating to these claims do not require a response by Transocean. Transocean denies any remaining allegations in this paragraph. Among other jurisdictional defects, Plaintiff lacks constitutional and prudential standing and its EPCRA claim is moot.

6.      In compliance with 33 U.S.C. § 1365(b)(1)(A), 42 U.S.C. § 9659(d)(1) and 42 U.S.C. § 11046(d)(1), on June 1, 2010, Plaintiff gave notice of the violations specified in this complaint and of its intent to file suit to the Defendants, to the Administrator of the U.S. Environmental Protection Agency ("EPA"), to the Regional Administrator of the EPA, and to all other required entities. A copy of the notice letter was filed as Exhibit A to the original

complaint. A supplemental notice was served on June 4, 2010 concerning violations of section 306 of the CWA, 33 U.S.C. § 1316. A copy of the supplemental notice letter was filed as Exhibit B to the original complaint.

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the allegations relating to these claims do not require a response by Transocean. Transocean denies any remaining allegations in this paragraph. Notice was not properly served on Transocean and Plaintiff did not supply notice of all aspects of the EPCRA claim asserted in the Amended Complaint, either in the original notice letter of June 1, 2010, or in the supplemental notice letter, which refers only to the CWA.

7. The violations complained of in the notice are continuing, are reasonably likely to continue, or were reasonably likely to continue at the time the original complaints were filed. Defendants remain in violation of the CWA, CERCLA and EPCRA. Neither the EPA nor any other governmental entity has commenced or is diligently prosecuting a civil or criminal action in a court to redress the violations.

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the allegations relating to these claims do not require a response by Transocean. Transocean denies any remaining allegations in this paragraph.

8. Venue is appropriate in the Eastern District of Louisiana pursuant to 33 U.S.C. § 1365(c)(1), 42 U.S.C. § 9659(b)(1), and 42 U.S.C. § 11046(b)(1), because the sources of the violations complained of have originated in the contiguous zone and exclusive economic zone of the United States and the impacts of the discharges have been felt so heavily by the people and state of Louisiana from the oily waters of the Gulf of Mexico that have reached Louisiana.

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the allegations relating to these claims do not require a response by Transocean. Transocean agrees that venue is appropriate in this Court, but denies that the "alleged violation occurred" in this district, 42 U.S.C. § 11046(b)(1). Transocean denies all remaining allegations in this paragraph.

4

PLAINTIFF

9.      Plaintiff, Center for Biological Diversity ("the Center"), is a nonprofit corporation organized under the laws of the State of New Mexico. The Center's principal office is located in Tucson, Arizona. The Center has over one hundred members within the state of Louisiana, thousands of members in the Gulf region, and many additional members who regularly visit and recreate in Louisiana and other Gulf states that have been and continue to be affected by the BP oil spill.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

10.     Plaintiff's members reside throughout the Gulf region, including the coastal areas of Louisiana especially impacted by the pollutants discharged as part of the oil spill from the Deepwater Horizon/Macondo facility. Plaintiff s members specifically use, recreate in and enjoy these areas in the following ways:

a.      The Center's members live within the Gulf coastal zone impacted by discharges from Defendants' facilities;

b.      The Center's members engage in economic and recreational activities — including but not limited to fishing, swimming, hiking, walking and boating — in and around the waters impacted by discharges from Defendants' facilities;

c.      The Center's members observe and enjoy wildlife in the Gulf in the areas impacted by Defendants' discharges;

d.      The Center's members have an aesthetic and health interest in keeping the waters in the Gulf free of oil and toxic and hazardous pollutants;

e.      The Center's members swim and fish in the waters and breathe the air into which Defendants' release the oil and toxic pollutants which they have discharged and failed to properly report. Such oil and toxic pollutants are known to cause deleterious effects to human health and wildlife and interfere with members' use and enjoyment of property.

**Answer:**

Transocean denies that it owned or operated any EPCRA-covered facility that discharged

any of the substances identified in this paragraph.  Transocean does not have sufficient

knowledge or information to determine whether the remaining allegations contained in this

paragraph and its subparts are true and, therefore, denies all remaining allegations in this

paragraph and its subparts.

11.     The Center is a non-profit organization with over 40,000 members, including over 3,500 members in the Gulf of Mexico region. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center has standing in this suit to protect its own interests and those of its individual members in a representative capacity. The Center's organizational purposes, and the interests of its members, are adversely affected by Defendants' discharges of oil, methane, drilling muds and other pollutants which degrade waters and adjacent lands, including the habitat for threatened and endangered aquatic species, and impair the habitability, recreational value, and economic and aesthetic benefits of the local communities.

**<u>Answer:</u>**

Transocean denies that Plaintiff has standing to protect its own interests or the interests of

its members.  Transocean further denies that it owned or operated any EPCRA-covered facility

that discharged any of the substances identified in this paragraph.  Transocean does not have

sufficient knowledge or information to determine whether the remaining allegations contained in

this paragraph are true and, therefore, denies all remaining allegations in this paragraph.

12.     Defendants' discharges alleged herein have adversely affected and continue to adversely affect the Center's members' above-described use and enjoyment of the waters, air and land affected by Defendants' discharges and releases.

**<u>Answer:</u>**

Transocean denies that it owned or operated any EPCRA-covered facility that discharged

any substances subject to EPCRA's reporting requirements.  Transocean does not have sufficient

knowledge or information to determine whether the remaining allegations contained in this

paragraph are true and, therefore, denies all remaining allegations in this paragraph.

13.     Enforcement of the CWA, CERCLA, and EPCRA will help restore and preserve water quality and provide critical information to which the public is entitled, thereby promoting the objectives of the Clean Water Act, CERCLA, EPCRA and the Center, and provide protection of the use and enjoyment of the area by the Center's members.

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the allegations relating to these claims do not require a response by Transocean. Transocean does not have sufficient knowledge or information to determine whether the remaining allegations contained in this paragraph are true and, therefore, denies all remaining allegations in this paragraph.

## DEFENDANTS

14.     Defendant BP, PLC is a British based for-profit corporation organized under the laws of the United Kingdom and doing business in the United States as itself and various subsidiaries also named herein. BP America, Inc. is a for-profit wholly-owned corporate subsidiary of BP, PLC, organized under the laws of the state of Delaware. BP Exploration & Production, Inc. is a for-profit wholly-owned corporate subsidiary of BP, PLC, organized under the laws of the state of Delaware. Both BP America, Inc. and BP Exploration & Production, Inc. have their principal places of business in Warrenville, Illinois, and do business in the State of Louisiana. The various BP Defendants (hereinafter referred to collectively as "BP") own the Mississippi Canyon Block 252 license and/or lease. BP leased the Deepwater Horizon rig from Transocean, Ltd., and operates, or operated, the rig in the Gulf of Mexico.

**Answer:**

Transocean admits that at least one of the BP Defendants was a leaseholder of Mississippi Canyon Block 252 where the Macondo well was located. BP America Production Company, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the mobile offshore drilling unit *Deepwater Horizon*. Transocean does not have sufficient knowledge or information to determine whether the remaining allegations contained in this paragraph are true and, therefore, denies all remaining allegations in this paragraph.

15.     Defendant Transocean, Ltd. is the owner of the Deepwater Horizon rig. Transocean Ltd. is a for-profit corporation organized under the laws of Switzerland. Transocean Inc. is a for-profit corporation organized under the laws of the Cayman Islands, with its principal United States place of business in Texas. Transocean Inc. is a wholly-owned subsidiary of Transocean Ltd. with an address of P.O. Box 2765, Houston, TX 77252-2765. Transocean

Offshore Deepwater Drilling, Inc. is incorporated in the state of Delaware and is a wholly-owned subsidiary of Transocean, Ltd and Transocean, Inc.

**Answer:**

Transocean admits that Transocean Offshore Deepwater Drilling Inc. is a Delaware corporation. Transocean further admits that Transocean Offshore Deepwater Drilling Inc. is an owner *pro hac vice* of the *Deepwater Horizon*. The remaining allegations in this paragraph relate to Transocean entities over which the Court lacks personal jurisdiction and which are not answering the Amended Complaint.

FACTS

16.     BP acquired mineral rights to drill for oil within the Mississippi Canyon Block 252, which is located in the United States sector of the Gulf of Mexico, about 41 miles off the Louisiana coast.

**Answer:**

The allegations directed at BP do not require a response by Transocean. Transocean admits that at least one of the BP Defendants was a leaseholder of Mississippi Canyon Block 252 where the Macondo well was located. Transocean denies any remaining allegations in this paragraph.

17.     In February 2010, the Deepwater Horizon drilling rig began drilling operations in the Mississippi Canyon Block 252 and is also known as the Macondo well. The Deepwater Horizon rig is owned by Transocean, and was leased to BP.

**Answer:**

Transocean admits that, in February 2010, the *Deepwater Horizon* was on location in Mississippi Canyon Block 252 for the purpose of conducting drilling operations. Transocean admits that Transocean Offshore Deepwater Drilling Inc. is an owner *pro hac vice* of the *Deepwater Horizon* rig. BP America Production Company, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling

contract concerning the use of the *Deepwater Horizon*.  Transocean denies all remaining

allegations in this paragraph.

18.     The Deepwater Horizon rig and wells constitute new source offshore oil
exploration and production facilities subject to national effluent standards, as authorized by
statute and defined by federal regulations. 33 U.S.C. § 1316; 40 C.F.R. Part 435. Offshore
facilities are considered point sources under the CWA. 33 U.S.C. § 1362(14).

**<u>Answer:</u>**

All of the allegations in this paragraph relate to claims that have been dismissed and, as

such, the allegations do not require a response by Transocean.

19.     On April 20, 2010, the Deepwater Horizon rig exploded. Oil and toxic pollutants
began discharging from the Deepwater Horizon rig, associated well and other sources into the
Gulf of Mexico.

**<u>Answer:</u>**

Transocean admits that, on April 20, 2010, an explosion and fire occurred onboard the

*Deepwater Horizon* while it was located at the Macondo well.  Transocean further admits that oil

was discharged from the Macondo well into the Gulf of Mexico.  Transocean denies all

remaining allegations in this paragraph.

20.     Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any
pollutant from a point source into waters of the United States, its contiguous zone and the
exclusive economic zone unless such discharge is permitted by a National Pollution Discharge
Elimination System ("NPDES") permit.

**<u>Answer:</u>**

The allegation in this paragraph contains a statement of law and relates to claims that

have been dismissed and, as such, the allegation does not require a response by Transocean.

21.     Defendants' discharges are not permitted in any NPDES permit and are prohibited
in their entirety by 40 C.F.R. Part 435. No free oil or associated toxic pollutants are allowed to be
discharged under any circumstances. Any NPDES general permit does not, and cannot, allow
such discharges.

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

22. Upon information and belief, Plaintiff alleges that Defendants have repeatedly discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil and associated toxic pollutants through a point source or point sources into waters of the United States, the contiguous zone, the territorial seas, and the exclusive economic zone in the Gulf of Mexico. The discharges are reaching and have reached coastal wetlands, beaches, estuaries and rivers in Louisiana and other Gulf states.

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.  To the extent that these allegations relate to Plaintiff's EPCRA claim for injunctive relief, Transocean admits that Macondo oil reached the shorelines of Louisiana, Alabama, Mississippi, Florida, and Texas in varying amounts, and denies all remaining allegations in this paragraph.

23. Upon information and belief, Plaintiff alleges that Defendants' point sources include but are not limited to the rig itself, and all pipes associated with the well construction, operation and production of the Deepwater Horizon facility, as well as any cracks and fissures caused by the operation, including attempts to stop the flow of the oil and associated toxic pollutants. The exact point sources, in addition to the well itself, are known to BP.

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

24. On or about April 24, 2010, BP reported a leak of 1,000 barrels of day of oil into the Gulf of Mexico.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits that on or about

10

April 24, 2010, BP provided a flow rate estimate of 1,000 barrels per day to the Unified

Command.  Transocean denies the remaining allegations in this paragraph.

25.     On or about April 28, 2010, the National Oceanic and Atmospheric
Administration ("NOAA") estimated that the leak was likely 5,000 barrels a day.

**<u>Answer:</u>**

Transocean admits that, on April 28, 2010, Admiral Mary Landry, on behalf of the

Unified Command, relying on flow rate estimates from BP, announced that the flow rate was

5,000 barrels a day.  Transocean denies the remaining allegations in this paragraph.

26.     On or about April 29, 2010, Louisiana Governor Bobby Jindal declared a state of
emergency due to the oil spill.

**<u>Answer:</u>**

Transocean admits the allegations in this paragraph.

27.     On or about April 30, 2010, oil began washing ashore in Louisiana.

**<u>Answer:</u>**

Transocean admits that at least some Macondo oil washed ashore in Louisiana.

Transocean does not have sufficient knowledge or information to determine whether the

remaining allegations contained in this paragraph are true and, therefore, denies all allegations in

this paragraph.

28.     On or about May 7, 2010, BP attempted to lower a "containment dome" over the
largest of the oil leaks, which was unsuccessful.

**<u>Answer:</u>**

The allegations directed at BP do not require a response by Transocean.  To the extent the

allegations in this paragraph are directed at Transocean, Transocean admits that a Cofferdam was

lowered over one of the leaks, but did not successfully contain the flow of oil.  Transocean

denies all remaining allegations in this paragraph.

29.     On or about May 12, 2010, BP released the first public video of the leak. Based on the footage, a number of outside experts estimated that the leak was significantly higher than previous estimates by BP and NOAA. One university professor of mechanical engineering estimated the leak may be 70,000 barrels a day.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the

allegations in this paragraph are directed at Transocean, Transocean admits that BP released

video footage  of the oil being discharged from the Macondo well.  Transocean admits that a

university professor of mechanical engineering estimated the leak may be 70,000 barrels a day,

although BP falsely reassured scientists from the National Labs that BP had no modeling "case"

supporting such an estimate.  Transocean does not have sufficient knowledge or information to

determine whether the remaining allegations contained in this paragraph are true and, therefore,

denies all remaining allegations in this paragraph.

30.     On or about May 16, 2010, BP inserted a mile-long tube to divert some of the leaked oil.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the

allegations in this paragraph are directed at Transocean, Transocean admits that BP inserted a

Riser Insertion Tube Tool into the riser pipe to collect oil being released through the riser pipe.

Transocean does not have sufficient knowledge or information to determine whether the

remaining allegations contained in this paragraph are true and, therefore, denies all remaining

allegations in this paragraph.

31.     On or about May 20, 2010, BP claimed to be capturing 5,000 barrels of oil per day.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits the allegations.

32.     On or about May 21, 2010, BP began releasing the live underwater video broadcasts of the oil leak.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits that BP began releasing live underwater video of the oil on May 21, 2010.

33.     On May 22, 2010, reporters observed heavy oil coating a pelican colony near North Breton Island off the Louisiana coast.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

34.     On or about May 29, 2010, BP attempted its "top kill" plan, which was unsuccessful.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits that on May 26-28, 2010, BP attempted the Top Kill six times, but those attempts failed.  Transocean denies any remaining allegations in this paragraph.

35.     On or about June 1, 2010, oil began washing up on the beaches of Gulf Islands National Seashore.

**<u>Answer:</u>**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

36.     By June 7, 2010, heavy oil had soaked the Queen Bess Island pelican rookery, a
nesting site that has been essential to the recovery of the brown pelican population. Experts
worry that the spill could set back the Louisiana state bird's recovery from near-extinction.

**<u>Answer:</u>**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

37.     On or about June 11, 2010 federal estimates of the size of the leak increased to
20,000 to 40,000 barrels a day. Since June 11, 2010, estimates of the size of the leak have ranged
from 20,000 to 100,000 barrels a day.

**<u>Answer:</u>**

Transocean admits that the Flow Rate Technical Group released a flow rate estimate of

20,000 to 40,000 barrels a day on June 11, 2010.  Transocean does not have sufficient knowledge

or information to determine whether any remaining allegations contained in this paragraph are

true and, therefore, denies any remaining allegations in this paragraph.

38.     On or about July 6, 2010, tar balls reached the shore of Lake Pontchartrain.

**<u>Answer:</u>**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

39.     On or about July 12, 2010, BP installed a new cap on the leak.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits that, on or about July 12, 2010, BP landed the three-ram capping stack on the severed end of the riser pipe.

40.     On or about July 15, 2010, BP claimed that the new cap halted the flow of oil into the Gulf for the first time since April.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits that the three-ram capping stack halted the flow of oil on or about July 15, 2010.

41.     On or about July 18, 2010, oil and natural gas were discovered seeping into the Gulf of Mexico near the well. Upon information and belief, methane gas has also been detected near the well.

**Answer:**

Transocean admits that, on or about July 18, 2010, government officials informed BP that tests had detected a seep from the seafloor near the well.  Transocean does not have sufficient knowledge or information to determine whether the remaining allegations contained in this paragraph are true and, therefore, denies all remaining allegations in this paragraph.

42.     BP drilled relief wells for a number of weeks, which it hoped would eventually shut the well permanently. On or about July 21, 2010, BP temporarily ceased drilling the relief wells due to an expected tropical storm.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the allegations in this paragraph are directed at Transocean, Transocean admits that BP drilled relief wells and that the drilling of the relief wells temporarily ceased due to a tropical storm. Transocean denies any remaining allegations in this paragraph.

43.     BP considered an attempt to plug the ruptured well with a procedure called "static kill," which is similar to the earlier and unsuccessful "top kill" procedure. Drilling mud (which itself includes toxic compounds), cement, and other materials would be pumped in from the top of the well, in an attempt to force the gas and oil downward. BP is also continuing to drill the relief wells, in which it intends to inject drilling mud and cement.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the

allegations in this paragraph are directed at Transocean, Transocean admits that BP conducted a

"static kill" operation.  Transocean denies any remaining allegations in this paragraph.

44.     According to federal estimates, between 93.5 million and 184.3 million gallons of oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010. Based on the range of daily estimates, over 215 million gallons of oil may have discharged into the Gulf of Mexico from the BP spill since April 20, 2010.

**Answer:**

Transocean admits that during the quantification segment of the Phase Two trial, in

which Transocean did not participate, the United States argued that approximately 4.2 million

barrels of oil discharged before the well was capped, excluding oil that was collected.

Transocean denies all remaining allegations in this paragraph.

45.     Assuming that 60,000 barrels of oil per day have discharged into the Gulf, approximately 5.2 million barrels of oil have been discharged into the Gulf of Mexico from the BP spill since April 20, 2010.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

46.     Of an estimated 5.2 million barrels of oil discharged into the Gulf since April 20, 2010, some estimates indicate that about 1.2 million barrels have been siphoned, burned or skimmed This would mean that 4 million barrels or more of oil may remain in the Gulf of Mexico.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

47.     Satellite images show that the various surface oil slicks and sheens believed to be associated with the BP spill have covered as much as 23,140 square miles.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

48.     Plumes of oil have been spreading beneath the surface of the Gulf, which is feared could devastate zooplankton and invertebrate communities at the base of the aquatic food chain. Researchers from the University of South Florida and NOAA have released studies confirming that the plumes of oil are the result of the Deepwater Horizon well. Initial tests show that some of the most toxic components of the oil are not rising to the surface where they could evaporate, but rather are drifting through the deep water in underwater plumes or layers.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

49.     Large "clouds" of oil have been discovered in the Gulf miles away from the well site. Small globs of oil have also been discovered underwater. One researcher from Tulane University has been finding baby crabs with orange blobs of oil or dispersant within their shells, and has found droplets of oil everywhere sampled, from Galveston Bay, Texas to Pensacola, Florida. Researchers have also measured extremely high levels of methane, which has spewed from the gushing BP well, at up to 10,000 times background levels in Gulf waters.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

50.     Bacteria are breaking down some of the oil's hydrocarbons in the underwater plumes, which has resulted in oxygen levels being severely depleted. Oxygen levels are plunging close to what is considered "dead zone" conditions, at which most marine life suffocate for lack of dissolved oxygen.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

51.     As of July 22, 2010, approximately 626 miles of Gulf Coast shoreline was oiled: 363 miles in Louisiana, 108 miles in Mississippi, 85 miles in Florida, and 70 miles in Alabama.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

52.     The BP spill is having devastating impacts on fish and wildlife. As of July 16, 2010, over 2,500 dead animals have been collected in areas affected by the Gulf spill, including over 2,000 birds, over 450 sea turtles, and over 60 dolphins and other mammals.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

53.     The die-off of wildlife in the Gulf's marshes, beaches and coastal waters is expected to continue for months or years.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

54.     The BP spill threatens some of the most productive and fragile marine ecosystems in the United States. About 25 percent of the nation's wetlands lie in the Mississippi River Delta, providing habitat for nesting seabirds and resting migratory birds.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

55.     So far, over 35,000 tons of oily waste and materials collected on beaches and in wetlands has been taken to landfills around the Gulf region.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

56.     The BP spill is resulting in devastating impacts to local communities. Louisiana's $2.4 billion seafood industry is responsible for up to 40% of the seafood caught in the continental United States, and is the leading producer of oysters, crab, crawfish and shrimp. The Gulf region accounts for 73% of the nation's shrimp and 59% of its oysters. As of August 1, 2010, 57,539 square miles of the Gulf, which is roughly 24% of the federal waters in the Gulf, are under a federal fishery closure due to the BP spill.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the allegations contained in this paragraph are true and, therefore, denies all allegations in this paragraph.

57.     Oil reaching the shores of Louisiana has caused headaches, burning eyes, and nausea among the people who live there and more serious illness among cleanup workers.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

58.     Dozens of people in Louisiana have been hospitalized with health problems blamed on airborne toxic chemicals in the month after oil began to flood the Gulf of Mexico from the gushing point sources. Those exposed to the growing oil spill include residents, visitors, cleanup workers and relief aid workers.

**Answer:**

Transocean does not have sufficient knowledge or information to determine whether the

allegations contained in this paragraph are true and, therefore, denies all allegations in this

paragraph.

59.     According to BP, it has applied 1.8 million gallons of chemical dispersants to waters in the Gulf of Mexico in an attempt to break up and dilute the oil. The environmental effects of using chemical dispersants at such depths and in such enormous quantities have never been tested.

**Answer:**

The allegations directed at BP do not require a response by Transocean.  To the extent the

allegations in this paragraph are directed at Transocean, Transocean does not have sufficient

knowledge or information to determine whether the allegations contained in this paragraph are

true and, therefore, denies all allegations in this paragraph.

60.     Upon information and belief, Plaintiff alleges that Defendants have discharged continue to discharge, or are reasonably likely to continue to discharges, pollutants, including but not limited to, oil, methane, drilling muds, toxic pollutants, and chemical dispersants. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely include, but are not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAI-15)(including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, arsenic, cadmium, copper, mercury, and nickel.

**Answer:**

Transocean denies that it owned or operated any EPCRA-covered facility that discharged any of the substances identified in this paragraph.  Transocean further states that oil and its constituents are not subject to EPCRA's reporting requirements.  Transocean does not have sufficient knowledge or information to determine whether the remaining allegations contained in this paragraph are true and, therefore, denies all remaining allegations in this paragraph.

61.	Upon information and belief, BP has analyzed and knows the concentrations of each of the toxic pollutants present in the oil coming from its wells. Defendants have discharged and continue to discharge toxic pollutants in large quantities. The pollutants discharged and the likely ranges of discharges are as follows:

| Chemical | Range of presence (in pounds per million gallons of oil) | | |
|---|---|---|---|
| | low | high | average |
| Benzene | 1,595 | 19,216 | 7,643 |
| Toluene | 7,209 | 45,909 | 23,056 |
| Ethylbenzene | 5,509 | 9,569 | 6,698 |
| Arsenic | -- | -- | 14 |
| Nickel | -- | -- | 8 |
| Fluoranthene | 22 | 26 | 24 |
| Benz(a) anthracene | 12 | 39 | 21 |
| Benzo(b) fluoranthene | 3 | 15 | 10 |
| Benzo(k) fluoranthene | 1 | 5 | 3 |
| Benzo(e) pyrene | 8 | 29 | 17 |
| Benzo(a) pyrene | 2 | 4 | 3 |
| Indeno(1, 2, 3) cd pyrene | 0 | 5 | 1 |
| Dibenzo(a, h) anthracene | 0 | 2 | 2 |
| Naphthalene (total) | 2,321 | 71,497 | 36,169 |
| Chrysene (total) | 61 | 1,689 | 894 |
| TOTALS | 16,765 | 146,316 | 73,669 |

**Answer:**

Transocean denies that it owned or operated any EPCRA-covered facility that discharged any of the substances identified in this paragraph.  Transocean does not have sufficient knowledge or information to determine whether the remaining allegations contained in this paragraph are true and, therefore, denies all remaining allegations in this paragraph.

62.     Upon information and belief, other pollutants, which include drilling muds and toxic pollutants listed in 40 C.F.R. § 401.15, were present at and discharged from the Deepwater Horizon facility when it exploded on April 20, 2010.

**Answer:**

Upon information and belief, Transocean denies the allegations in this paragraph.

63.     The EPA establishes reporting requirements for releases of threshold quantities of hazardous substances pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602. Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center. Defendants' operations are "facilities" as defined under CERCLA. 42 U. S.C. § 9601 (a)(9).

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the

allegations relating to these claims do not require a response by Transocean. To the extent that

the allegations in this paragraph contain a statement of law, no response by Transocean is

required.  To the extent that the allegations contained in this paragraph relate to Plaintiff's

EPCRA claim for injunctive relief, Transocean denies that it owned or operated any EPCRA-

covered facility that discharged any of the substances identified in this paragraph.  Upon

information and belief, Transocean denies all remaining allegations contained in this paragraph.

64.     Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirements of CERCLA to the emergency coordinator for the local emergency planning committee and the State emergency planning commission.

**Answer:**

The allegation set forth in this paragraph contains a statement of law and does not require

a response by Transocean, but out of an abundance of caution is denied.

65.     Upon information and belief, and depending on variations in the components in the earth's crust, Defendants' operations have released reportable quantities of benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs)(including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, methane,

arsenic, cadmium, copper, mercury, and nickel under CERCLA. Consequently, under EPCRA and its implementing regulations, defendants are required to provide notice of reportable releases to the appropriate federal, state and local emergency response officials.

**Answer:**

Transocean denies that it owned or operated any EPCRA-covered facility that discharged any of the substances identified in this paragraph.  Transocean further states that oil and its constituents are not subject to EPCRA's reporting requirements.  Transocean denies all remaining allegations in this paragraph as they relate to Transocean.  As to the allegations concerning other Defendants, Transocean does not have sufficient knowledge or information to determine whether these allegations are true and, therefore, denies all remaining allegations in this paragraph.

66.     The release of these toxic pollutants also exceeds the reportable quantities of hazardous substances required to be reported under the CWA, 33 U.S.C. § 1321(b)(2)(A), CERCLA, 42 U.S.C.§ 9603(a), and EPCRA, 42 U.S.C. § 11004. BP failed to provide notice of the release of reportable quantities of hazardous substances associated with the discharge from the well and platform in the first instance. Upon information and belief, BP knows the quantities, or at least the range of quantities, of toxic pollutants released into the environment associated with the oil spilled from the Deepwater Horizon well and platform. While BP did provide some reports of releases of benzene and ethylbenzene to water and air associated with prescribed surface oil burns of slicks created by the well and platform discharges, even those reports failed to provide the level of detail necessary to comply with CERCLA and EPCRA reporting requirements.

**Answer:**

The claims under all statutes other than EPCRA have been dismissed and, as such, the allegations relating to these claims do not require a response by Transocean.  To the extent that the allegations contained in this paragraph relate to Plaintiff's EPCRA claim for injunctive relief, Transocean denies that it owned or operated any EPCRA-covered facility that discharged any of the substances identified in this paragraph.  Transocean denies all remaining allegations contained in this paragraph as they relate to Transocean.  As to the allegations concerning other

Defendants, Transocean does not have sufficient knowledge or information to determine whether

these allegations are true and, therefore, denies all remaining allegations in this paragraph.

67.     The Mississippi Canyon area of the Gulf of Mexico, into which Defendants have discharged, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil, methane, drilling muds and other toxic pollutants, is part of the "contiguous zone" as defined in 33 U.S.C. § 1362(9) and 40 C.F.R. § 122.2, the "ocean" as defined in 33 U.S.C. § 1362(10) or the "exclusive economic zone".

**<u>Answer:</u>**

All of the allegations in this paragraph relate to claims that have been dismissed and, as

such, the allegations do not require a response by Transocean.

68.     These discharges commenced on April 20, 2010, have continued, are reasonably likely to continue, or were reasonably likely to continue at the time of the original complaints.

**<u>Answer:</u>**

Transocean admits that, beginning on April 20, 2010, oil was discharged  into the Gulf of

Mexico from the BP Macondo well.  Transocean denies all remaining allegations contained in

this paragraph.

69.     Upon information and belief, Plaintiff alleges that Defendants have discharged oil, produced water, and other toxic pollutants in violation of the national standards of performance for new sources for offshore facilities promulgated pursuant to the authority of 33 U.S.C. § 1316(b) and set forth at 40 C.F.R. Part 435.

**<u>Answer:</u>**

All of the allegations in this paragraph relate to claims that have been dismissed and, as

such, the allegations do not require a response by Transocean.

70.     Upon information and belief, Plaintiff alleges that Defendants' discharges alleged herein are prohibited by 40 C.F.R. Part 435, and actionable as violations of national standards of performance pursuant to 33 U.S.C. § 1316(e). Such national standards of performance for discharges to the contiguous zone, ocean or exclusive economic zone constitute "effluent standards or limitations," 33 U.S.C. § 1362(11), subject to enforcement.

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

71.     Upon information and belief, during the exploration and operation of the Deepwater Horizon well, Defendants disregarded safety standards that caused or contributed to the explosion that killed the workers on the rig and caused the blowout of the well, thereby leaking the tens or hundreds of million gallons of oil into the Gulf of Mexico. Such actions constitute gross negligence or willful misconduct on the part of the Defendants.

**Answer:**

Transocean denies all allegations contained in this paragraph as they relate to Transocean.  As to the allegations concerning other Defendants, Transocean does not have sufficient knowledge or information to determine whether these allegations are true and, therefore, denies all remaining allegations in this paragraph.

**ALLEGATIONS**
**COUNT 1**
**Discharge of Pollutants Into the Gulf of Mexico**
**33 U.S.C. § 1311**

72.     Plaintiff realleges paragraphs 1-71.

**Answer:**

Transocean has responded to each of the preceding paragraphs and incorporates those responses as if fully restated here.  Accordingly, Paragraph 72 does not require any further response by Transocean.

73.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into the contiguous zone, ocean, exclusive economic zone and navigable waters of the United States, unless in compliance with a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

**Answer:**

The allegation set forth in this paragraph contains a statement of law and relates to claims that have been dismissed.  Therefore, Paragraph 73 does not require a response by Transocean.

74.     Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, pollutants, including oil, methane, drilling muds, and other toxic pollutants, from one or more point sources in the Gulf of Mexico into the contiguous zone, ocean, exclusive economic zone, and waters of the United States in violation of the CWA. The Defendants' discharges are not permittable under the CWA and violate national policy. 33 U.S.C. § 1251(a)(3).

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as

such, the allegations do not require a response by Transocean.

75.     By discharging oil, methane, drilling muds, and toxic pollutants into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are or were reasonably likely to continue to violate section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as

such, the allegations do not require a response by Transocean.

## COUNT 2
### Discharge of Oil and Hazardous Substances Into the Gulf of Mexico
### 33 U.S.C. § 1321

76.     Plaintiff realleges paragraphs 1-75.

**Answer:**

Transocean has responded to each of the preceding paragraphs and incorporates those

responses as if fully restated here.  Accordingly, Paragraph 76 does not require any further

response by Transocean.

77.     Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into navigable waters of the United States, into the waters of the contiguous zone, the ocean or the exclusive economic zone.

**Answer:**

The allegation set forth in this paragraph contains a statement of law and relates to claims

that have been dismissed.  Therefore, this paragraph does not require a response by Transocean.

78. Defendants have discharged, continue to discharge, are reasonably likely to continue to discharge, or were reasonably likely to continue to discharge at the time of the original complaints, oil, methane, drilling muds, and hazardous substances into the Gulf of Mexico By discharging oil, methane, drilling muds and hazardous substances into the Gulf of Mexico, as described herein, Defendants have violated, continue to violate, or are reasonably likely to continue to violate section 311(b) of the CWA, 33 U.S.C. § 1321(b).

**<u>Answer:</u>**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

**COUNT 3**
**Discharge of Toxic Pollutants Into the Gulf of Mexico**
**33 U.S.C. § 1317**

79. Plaintiff realleges paragraphs 1-78.

**<u>Answer:</u>**

Transocean has responded to each of the preceding paragraphs and incorporates those responses as if fully restated here. Accordingly, Paragraph 79 does not require any further response by Transocean.

80. Section 307(a) of the CWA, 33 U.S.C. § 1317(a), requires EPA to publish a list of toxic pollutants. Each toxic pollutant published by EPA is subject to effluent limitations established by EPA. Id. After the effective date of any effluent standard or limitation established for a toxic pollutant, it is unlawful for any owner or operator to violate such effluent standard. 33 U.S.C. § 1317(d).

**<u>Answer:</u>**

The allegations set forth in this paragraph contain a statement of law and relate to claims that have been dismissed. Therefore, Paragraph 80 does not require a response by Transocean.

81. Defendants discharge of oil, methane, and toxic pollutants into the Gulf of Mexico violated, continues to violate, or was reasonably likely to continue to violate at the time of the original complaints, the effluent standards and limitations for a number of toxic pollutants, including but not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons, arsenic, cadmium, mercury, haloethers, halomethanes, and nickel, in violation of the CWA 33 U.S.C. § 1317(d).

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

## COUNT 4
## Discharge of Pollutants in Violation of National Standards of Performance
## 33 U.S.C. § 1316

82.     Plaintiff realleges paragraphs 1-81.

**Answer:**

Transocean has responded to each of the preceding paragraphs and incorporates those responses as if fully restated here.  Accordingly, Paragraph 82 does not require any further response by Transocean.

83.     Section 306(b) of the CWA, 33 U.S.C. § 1316(b), requires EPA to develop national standards of performance for certain new sources, including offshore oil drilling operations. After the effective date of such standards of performance, the owner or operator of any new source is prohibited from operating such source in violation of any standard of performance applicable to such source. 33 U.S.C. § 1316(e).

**Answer:**

The allegations set forth in this paragraph contain a statement of law and relate to claims that have been dismissed.  Therefore, Paragraph 83 does not require a response by Transocean.

84.     Defendants discharge of oil, methane, drilling muds, and other pollutants into the Gulf of Mexico violates the national standards of performance for offshore oil drilling operations. By discharging pollutants in violation of national standards of performance for offshore facilities into the contiguous zone and waters of the United States as detailed herein, Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely to continue to violate at the time of the original complaints, section 306 of the CWA, 33 U.S.C. § 1316.

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

## COUNT 5
### Gross Negligence or Willful Misconduct
### 33 U.S.0 § 1321(b)(7)(D)

85.     Plaintiff realleges paragraphs 1-84.

**Answer:**

Transocean has responded to each of the preceding paragraphs and incorporates those responses as if fully restated here.  Accordingly, Paragraph 85 does not require any further response by Transocean.

86.     Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), provides that if the defendants' actions that caused the spill were the result of gross negligence or willful misconduct that the civil penalties per barrel of oil or unit of reportable quantity of hazardous substance discharged shall be up to $4,300 per barrel or unit.

**Answer:**

The allegation set forth in this paragraph contains a statement of law and relates to claims that have been dismissed.  Therefore, Paragraph 86 does not require a response by Transocean.

87.     Defendants' actions in the exploration and operation of the Deepwater Horizon well constituted gross negligence or willful misconduct.

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

## COUNT 6
### Violations of CERCLA
### 42 U.S.C. § 9603

88.     Plaintiff realleges paragraphs 1-87.

**Answer:**

Transocean has responded to each of the preceding paragraphs and incorporates those responses as if fully restated here.  Accordingly, Paragraph 88 does not require any further response by Transocean.

89.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires any person in charge of a "facility" to report any release of a hazardous substance in a quantity equal to or greater than the established reportable quantity to the National Response Center.

**Answer:**

The allegation set forth in this paragraph contains a statement of law and relates to claims that have been dismissed.  Therefore, Paragraph 89 does not require a response by Transocean.

90.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico and failing to report, or failing to adequately report, such releases to the National Response Center as detailed herein, Defendants have violated their duties under CERCLA, 42 U.S.C. § 9603(a).

**Answer:**

All of the allegations in this paragraph relate to claims that have been dismissed and, as such, the allegations do not require a response by Transocean.

**COUNT 7**
**Violations of EPCRA**
**42 U.S.C. § 11004**

91.     Plaintiff realleges paragraphs 1-90.

**Answer:**

Transocean has responded to each of the preceding paragraphs and incorporates those responses as if fully restated here.  Accordingly, Paragraph 91 does not require any further response by Transocean.

92.     Section 304 of EPCRA, 42 U.S.C. § 11004, requires emergency notification of any release of a reportable quantity of a hazardous substance subject to the notification requirement of CERCLA to the emergency coordinator for the local emergency planning committee.

**Answer:**

The allegation set forth in this paragraph contains a statement of law and does not require a response by Transocean, but out of an abundance of caution is denied.

93.     By releasing numerous hazardous substances in excess of the applicable reportable quantities into the Gulf of Mexico, and failing to report, or failing to adequately

report, such releases to local and State emergency planning committees as detailed herein, Defendants have violated their duties under EPCRA, 42 U.S.C. § 11004.

**Answer:**

Transocean denies all allegations contained in this paragraph as they relate to

Transocean.  As to the allegations concerning other Defendants, Transocean does not have

sufficient knowledge or information to determine whether these allegations are true and,

therefore, denies all remaining allegations in this paragraph.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant Plaintiff the following relief:

a. Issue a declaratory judgment that Defendants have violated, continue to violate, are reasonably likely to continue to violate, or were reasonably likely at the time of the filing of the original complaints to violate, the CWA, as alleged in counts one through five, CERCLA, as alleged in count six, and EPCRA, as alleged in count seven;

b. Enjoin Defendants from operating their offshore facility in such manner as will result in further violation of the CWA, CERCLA, and EPCRA. In particular, Plaintiff seeks an order enjoining Defendants from discharging any further pollutants to the contiguous zone, ocean or exclusive economic zone and other waters of the United States, from releasing any hazardous substance without full and complete reporting as required under CERCLA and EPCRA, and requiring full and complete reporting for all hazardous substances already released;

c. Order Defendants to immediately divulge the complete list and amounts of toxic pollutants contained in the oil and other releases from the Deepwater Horizon rig and wells;

d. Order Defendants to pay civil penalties of up to $1,100 per barrel 1 (or up to $4,300 per barrel if the violations were the result of gross negligence or willful misconduct) or $37,500 per day of violation, whichever is greater, pursuant to sections 309(d), 311(b)(7) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1321(b)(7) and 1365(a), including violations listed in the attached exhibits, those identified in this complaint and violations committed subsequent to those identified in this complaint;

e. Order Defendants to pay civil penalties of up to $37,500 per day of violation for each hazardous substance it failed to report or adequately report, pursuant to CERCLA, 42 U.S.C. §§ 9609(c) and 9659, and EPCRA, 42 U.S.C. §§ 11045(b) and 11046(c), including violations listed in Exhibits A and B, those identified in this complaint and violations committed subsequent to those identified in this complaint;

f. Authorize the Plaintiff, for the period beginning on the date of the Court's order and running for ten years after the Defendants achieve compliance with the CWA, CERCLA, and EPCRA, to sample or arrange sampling of any discharge of pollutants from the wells in question, with the costs of the sampling to be borne by Defendants;

g. Order Defendants to provide Plaintiff, for a period beginning on the date of the Court's order and running for five years after Defendants achieve compliance with the CWA, CERLCA, and EPCRA, with a copy of all reports and other documents which Defendants submit to appropriate regulatory authorities concerning the allegations set forth herein;

h. Issue a remedial injunction ordering Defendants to pay the cost of any environmental restoration or remediation deemed necessary and proper by the Court to ameliorate the degradation caused by Defendants' violations;

i. Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by 33 U.S.C. § 1365(d), 42 U.S.C. § 9659(f), and 42 U.S.C. § 11046(f); and

h. Award such other relief as this Court deems appropriate.

**Answer:**

With respect to the Prayer for Relief, to the extent that this paragraph and its subparts assert requests for relief under claims that have been dismissed, no response from Transocean is necessary.  As to the request for injunctive relief under Plaintiff's EPCRA claim, Transocean denies that Plaintiff is entitled to the relief requested.

## GENERAL DENIAL

Transocean denies all allegations in the Amended Complaint not specifically admitted herein, including any allegations contained in subparts, footnotes, and argument headings.

## AFFIRMATIVE DEFENSES

1.      Transocean sets forth its affirmative defenses to the only remaining claim in the Amended Complaint.  By setting forth these affirmative defenses, Transocean does not assume the burden of proving any facts, issues, or elements of a cause of action where such burden properly belongs to Plaintiff.

2.      The Fifth Circuit affirmed the dismissal by this Court of all but one count of the Amended Complaint.  Accordingly, it is unnecessary for Transocean to set out its affirmative defenses to Counts 1 through 6 of the Amended Complaint.

**Failure to State a Claim**

3.      The allegations in the Amended Complaint fail to state a claim on which relief can be granted.

**Standing**

4.      Plaintiff lacks constitutional and prudential standing to assert claims under EPCRA.

**Mootness**

5.      Plaintiff's EPCRA claim is moot because, among other things, no further order from this Court could provide Plaintiff with any meaningful relief in light of the information that has already been made available to the government and the public and the extensive reporting and other requirements imposed by Transocean's consent decree with the government.

**Laches**

6.      After Plaintiff's case was remanded to this Court on January 9, 2013, Plaintiff took no action on its sole remaining claim for nearly a year, without any excuse for the extended delay.  Furthermore, the information Plaintiff seeks to be disclosed in its EPCRA claim is already publicly available.  Requiring Transocean to disclose this information again nearly four years after the Macondo well oil spill cannot provide any benefit to Plaintiff or its members.  Given the balance of all relevant equitable factors, Plaintiff is barred from pursuing its remaining claim by the doctrine of laches.

**No EPCRA-Covered Facility**

7.      Plaintiff cannot assert a claim under EPCRA because Transocean is not an owner or operator of a facility within the meaning of EPCRA from which a reportable release occurred.

**Petroleum Exclusion**

8.      Plaintiff cannot assert a claim under EPCRA because petroleum, including crude oil, its constituents, and refined oil products, is excluded from EPCRA's reporting requirements. 42 U.S.C. § 9601(14)(F).  Transocean has no obligation to report discharges of substances that are not covered by EPCRA.

**EPCRA Does Not Apply to Activities on OCS**

9.      Plaintiff cannot assert a claim under EPCRA because the statute does not apply to activities on the Outer-Continental Shelf.

**Notice**

10.      Plaintiff's EPCRA claim is barred under 42 U.S.C. § 11046(d) because Plaintiff failed to provide proper notice of all aspects of its EPCRA claim asserted in the Amended Complaint.

**Adoption of Affirmative Defenses and Reservation to Amend Answer**

11.      Any affirmative defenses pleaded by the other defendants and not pleaded by Transocean are incorporated herein to the extent such defenses do not conflict with Transocean's affirmative defenses.

12.      Transocean reserves the right to amend its Answer and affirmative defenses as appropriate.

DATED: April 22, 2014

By: /s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Grant Davis-Denny
Daniel B. Levin
MUNGER TOLLES & OLSON, LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA  90071
Tel: (213) 683-9100
Fax: (213) 683-5180
Email: brad.brian@mto.com
          michael.doyen@mto.com
          grant.davis-denny@mto.com
          daniel.levin@mto.com

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, TX  77002
Tel: (713) 4710-6100
Fax: (713) 354-1301
Email: steven.roberts@sutherland.com
          rachel.clingman@sutherland.com
          sean.jordan@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
1100 Poydras Street, Suite 3800
New Orleans, LA  70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email:  kmiller@frilot.com

*Counsel for Defendant Transocean Offshore Deepwater Drilling Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2014, I electronically filed the foregoing with the

Court's CM/ECF system and service on all counsel of record by using the LexisNexis File &

Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel

accepting electronic notice.

   /s/ Kerry J. Miller                                   
Kerry J. Miller