UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * | MDL NO. 2179 <br><br> SECTION J <br><br> JUDGE BARBIER |
| **THIS PLEADING APPLIES TO:** <br> No. 12-311 | * * * | MAG. JUDGE SHUSHAN <br><br> **JURY TRIAL DEMANDED** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CAMERON'S RESPONSE TO LIBERTY'S OBJECTIONS TO
CERTAIN EVIDENCE CITED IN SUPPORT OF CAMERON'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

In its Response to Cameron's Statement of Uncontested Material Facts In Support of Cameron's Motion for Partial Summary Judgment On Its Claims For Breach of Contract, Indemnity, and Defense Expenses, Liberty lodged "objections" to certain evidence cited by Cameron. (Rec. Doc. 12623-15 at 17-19.) Cameron respectfully submits this brief Response to Liberty's unfounded and improper objections.

**Deposition Testimony of Denise Morris (Ex. 3) and Alan Mandel (Ex. 4)**

**Liberty's Objection:**

> Liberty objects to Cameron's use of testimony from Liberty's underwriting personnel. These witnesses repeatedly testified that they are not claims personnel, and thus they lacked any knowledge concerning the Policy's application to a particular claim. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Furthermore, Cameron attempts to offer their testimony to establish Liberty's knowledge and intent, but these witnesses did not testify as Liberty's corporate representatives but rather only in their individual capacity. Finally, Liberty objects that this extrinsic evidence is irrelevant to interpret the clear Policy terms. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

1156970v1

**Cameron's Response:**

Liberty's objections are misplaced. Denise Morris was identified by Liberty as the employee at Liberty most knowledgeable about the "Other Insurance" provision in the Liberty Policy. (Liberty's Supp. Interrog. Resps. at 9 (Ex. 22 to Cameron's MSJ Mem.).) Alan Mandel was the underwriter at Liberty <u>who sold Cameron the Liberty Policy</u>. (Mandel Dep. at 50 (Ex. 4).) They are clearly competent witnesses with knowledge about the Liberty Policy.

Ms. Morris's and Mr. Mandel's testimony is directly relevant to Liberty's intent—or lack thereof—to invoke the "Other Insurance" clause as a basis to refuse to pay Cameron's losses where the source of a potential contractual indemnity has refused to pay. Both witnesses testified that Liberty had no such intent. Liberty's objections, which merely go to the credibility of Liberty's own witnesses, is not a basis to object to the submission of this evidence. Notably, Liberty has not offered any evidence of a contrary intent nor otherwise controverts the proffered testimony.

**<u>Chub Policy (Ex. 7) and AIG Excess Policy (Ex. 8)</u>**

**Liberty's Objection:**

> Liberty objects that Cameron's other insurance policies are completely irrelevant and inadmissible to the limited issues raised in Cameron's motion, which interpretation and application of the Liberty Policy.  *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") & 403.

**Cameron's Response:**

Liberty's relevance objection is unfounded and not a colorable ground to object to evidence offered in support of a summary judgment motion.

As discussed in Cameron's opening brief, if Cameron's interpretation of the "Other Insurance" clause is reasonable—as the Court held when it denied Liberty's motion for judgment on the pleadings—then Cameron is entitled to summary judgment under established

Texas law.  (Cameron Br. at 9-11.)  In opposition, Liberty asserts that its interpretation is the "only reasonable interpretation" of the "Other Insurance" clause.  (Liberty Opp. at 7.)

AIG and Chubb each had "Restrictive as Underlying" provisions in the policies they issued to Cameron that entitled them to adopt the same "Other Insurance" position as Liberty asserts in this case to deny insurance to Cameron.  Neither AIG nor Chubb agreed with Liberty's interpretation, and AIG specifically criticized Liberty's interpretation as "unreasonable."  (Cameron Br. at 16.)  They both contributed to Cameron's settlement with BP, a fact that Liberty does not deny.  Given that two other insurers with the same economic interests as Liberty agreed with Cameron's interpretation over Liberty's, this evidence is relevant to show that Cameron's interpretation of the "Other Insurance" clause is reasonable.

**Deposition Testimony of Alexis Nusum (Ex. 13) and Maureen Martin (Ex. 26)**

**Liberty's Objection:**

> Liberty objects that this extrinsic evidence, from representatives of Cameron's other insurers, is irrelevant and inadmissible to the limited issues raised in Cameron's motion, which involve the interpretation and application of the Liberty Policy.  *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") & 403.

**Cameron's Response:**

Please see Cameron's response to Liberty's objections to Exhibits 7 and 8.  This testimony is relevant to show the reasonableness of Cameron's interpretation of the "Other Insurance" clause for the same reasons discussed above.

**Dec. 12, 2011 email from M. Auslander (Ex. 17) and BP-Cameron Settlement (Ex. 21)**

**Liberty's Objection:**

> Liberty objects to the use of e-mails from Mitch Auslander, Cameron's trial counsel. (Ex. 17 & 21).  The statements contained in these e-mails are hearsay at minimum and, in some instances, hearsay within hearsay.  *See* Fed. R. Evid. 801 & 802.  Moreover, Cameron's submission of these e-mails potentially violates

> Rule 3.7 of the Louisiana Rules of Professional Conduct, which precludes an attorney from acting as an advocate at trial in which the lawyer is likely to be a necessary witness.

**Cameron's Response:**

The statements contained in the emails annexed as Exhibits 17 and 21 are not hearsay. They are not offered for their truth, but rather to show Liberty's (and other insurer's) knowledge of the status of settlement negotiations between Cameron and BP to Cameron's insurers. They are relevant to show the knowledge of Cameron's insurers, including Liberty, as well as the timing of Cameron's final settlement agreement with BP—*i.e.*, that it was entered over a month <u>after</u> Liberty had unconditionally told Cameron that it would not fund any settlement with BP based on its "Other Insurance" position.

The submission of these emails is also not a violation of the Louisiana Rules of Professional Conduct. These emails were received by many people, including Liberty's own fact witnesses in this case, and accordingly Mr. Auslander is not a "necessary witness" as Liberty suggests.

**Dec. 14, 2011 letter from R. Bryan (Ex. 25)**

**Liberty's Objection:**

> Liberty objects that this extrinsic evidence, from a representative of one of Cameron's other insurers, is irrelevant and inadmissible to the limited issues raised in Cameron's motion, which involve only the interpretation and application of the Liberty Policy. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") & 403. Liberty further objects that this letter is hearsay and not properly authenticated. *See* Fed. R. Evid. 801, 802, & 901.

**Cameron's Response:**

Please see Cameron's response to Liberty's objections to Exhibits 7 and 8. This testimony is relevant to show the reasonableness of Cameron's interpretation of the "Other Insurance" clause for the same reasons discussed above.

This letter is also not offered for the truth of the matter asserted. Instead, it is being offered to show that Cameron's interpretation of the "Other Insurance" clause is reasonable and Liberty's interpretation is unreasonable. That is not hearsay.

Finally, this document was properly authenticated. (Martin Dep. at 64-65 (Ex. 1) annexed hereto.)

**Compl., *Liberty Int'l Underwriters Canada v. Scottsdale Ins. Co.*, Civ. A. No. 1:12-cv-04934 (D.N.J. Aug. 6, 2012) (Ex. 28)**

**Liberty's Objection:**

> Liberty objects that this extrinsic evidence of allegations in a different lawsuit between different parties involving a primary policy with different terms governed by different law and filed in a different jurisdiction is irrelevant and inadmissible to determine the limited issues raised in Cameron's motion, which involve the interpretation and application of the Liberty Policy. Fed. R. Evid. 402 & 403. The evidence is also irrelevant because Cameron never offered Liberty the opportunity in this matter to pay and pursue other insurance; rather, it insisted at all times that any settlement include a transfer of its indemnity rights. *See id.*

**Cameron's Response:**

The fact that Liberty has taken a different position with respect to the interpretation of a similar "Other Insurance" clause in its policies is plainly relevant. Liberty's objections at most go to the weight to be accorded this evidence, not its admissibility under Fed. R. Evid. 402 and 403.

Moreover, Liberty did have the opportunity to pay Cameron and pursue subrogation claims against Transocean or any other responsible party. In their settlement agreement, Cameron and BP included an express provision to preserve all of Liberty's subrogation rights, including its right to seek recovery from Transocean. (BP-Cameron Settlement ¶ 4.4.) BP and Cameron agreed to preserve Liberty's subrogation rights

"notwithstanding any other provision" of their agreement.  (*Id.*)  Liberty thus could have—and should have—paid Cameron and then exercised its subrogation rights.  Liberty never did so.

**Deposition Testimony of Brad Eastman (Ex. 31)**

**Liberty's Objection:**

>Liberty objects to Cameron's use of Brad Eastman's deposition to establish when settlement communications between Cameron and BP began.  Mr. Eastman testified that he lacked personal knowledge concerning the timing of the negotiations and thus his testimony on that point lacks the required foundation.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

**Cameron's Response:**

Liberty has mischaracterized Mr. Eastman's testimony.  While Mr. Eastman did not recall whether BP approached Cameron to initiate settlement negotiations or *vice versa*, he did recall that those negotiations commenced in October 2011.  (Eastman Dep. at 117-18 (Ex. 2) annexed hereto).)  Mr. Eastman was directly involved in the settlement discussions with BP and has personal knowledge to testify about them.  (*Id.* at 88-89.)

**Transocean Ltd, Form 10-K, filed Feb. 27, 2014 (Ex. 32)**

**Liberty's Objection:**

>Liberty objects that this document is incomplete, hearsay, and not properly authenticated.  *See* Fed. R. Evid. 801, 802, & 901.

**Cameron's Response:**

Cameron attached an excerpt from Transocean's recent Form 10-K filing to support the fact that its indemnity dispute with BP remains an open issue.  This is a publicly known fact of which the Court is aware, given that several issues were left open in the Court's decision of January 26, 2012.  (Dkt. 5446.)

**BP Mot. To Quash 8-9, June 13, 2013, Dkt. 10388**

**Liberty's Objection:**

> Liberty further objects to Cameron's reliance on post-execution, self-serving statements contained in BP's Motion to Quash as evidence. These documents are hearsay and are not relevant or admissible to interpret the settlement agreement, the terms of which are clear. The Court previously denied Liberty discovery concerning the Cameron/BP settlement finding no ambiguity. Rec. Doc. No. 10642.

**Cameron's Response:**

The Texas Supreme Court has made clear that courts "should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary." *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979). Both Cameron and BP agree that they preserved, and in no way impaired, Liberty subrogation rights—including its right to pursue recovery from Transocean if Liberty pays Cameron. BP's statements are therefore not only relevant, they are dispositive.

BP's statements are not "self-serving," as Liberty suggests. Far from it. If Liberty obtains recovery from Transocean, then BP is potentially exposed to Transocean. Thus, BP's express acknowledgement that Cameron's subrogation rights are not impaired is an admission by BP that is contrary to BP's financial interests. F.R. Evid. 801 (d)(2)(D).

BP's statements are not hearsay. These statements show what the agreement was between BP and Cameron. They are not offered for the truth of the matter asserted. *See BKCAP, LLC v. CAPTEC Franchise Trust*, 688 F.3d 810, 811 (7th Cir. 2012) (holding that out-of-court statement by other party to agreement was not hearsay); *Rock Creek Hydropower, Inc. v. Enel N. Am. Inc.*, 2006 WL 292107, at *4 n.1 (D. Idaho Feb. 7, 2006) (overruling hearsay objection to letter by draft of agreement setting forth a third party's interpretation of the agreement).

Finally, while Liberty notes that the Court denied Liberty discovery concerning the Cameron/BP Settlement "finding no ambiguity," Liberty omits that BP's motion to quash was granted "for the reasons presented by BP"—namely that the agreement unambiguously preserved Liberty's subrogation rights. (See Order at 2, July 5, 2013, Dkt. 10642; Order, July 16, 2013, Dkt. 10760 (denying appeal).)

Respectfully submitted,

*s/ Phillip A. Wittman*

Phillip A. Wittmann, 13625
    pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

WILLKIE FARR & GALLAGHER LLP
Mitchell J. Auslander
Jeffrey B. Korn
787 Seventh Avenue
New York, New York  10019
 (212) 728-8000
mauslander@willkie.com

*Attorneys for Cameron International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Cameron's Response to Liberty's Objections to Certain Evidence Cited in Support of Cameron's Motion for Partial Summary Judgment has been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of April, 2014.

                                                               */s/ Phillip A. Wittmann*

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA
 3    ------------------------------------------X
      In Re:   OIL SPILL BY THE OIL RIG
 4    "DEEPWATER HORIZON" IN THE GULF OF
      MEXICO, ON APRIL 20, 2010,
 5
 6    Applies to:
 7    12-311, Cameron Int'l Corp. v. Liberty
      Ins. Underwriters, Inc., a/k/a Liberty
 8    Int'l Underwriters
 9
      ------------------------------------------X
10
11
12         VIDEO DEPOSITION OF MAUREEN MARTIN
13                 New York, New York
14                   June 25, 2013
15
16
17
18
19
20
21    Reported by:
22    Rebecca Schaumloffel, RPR, CLR
23    Job No: 62301
24
25
```

Exhibit 1

Page 64

1          M. MARTIN

2     A.    It's my position that we did not
3  read it that way.
4     Q.    Is your view that the definition
5  of other insurance in the Liberty policy
6  should not be interpreted to include the
7  TransOcean contract for indemnity?
8     A.    For the reasons that I just
9  described in the example I just gave, that
10 would be my position.
11    Q.    Did you set out your disagreement
12 with Liberty's position in writing?
13    A.    I believe -- I believe we sent
14 out a communication and a letter a day or so
15 after the Paul Koepff letter.  I just don't
16 recall specifically the exact date, but I
17 believe it was fairly, fairly shortly after
18 he issued his letter, we issued a response in
19 kind.
20    Q.    I am handing you, Miss Martin,
21 what has been previously marked as Roberts
22 Exhibit 39.
23    A.    Thank you.
24    Q.    Miss Martin, I have handed you a
25 document that's Bates stamped LIU '09730

Page 65

1           M. MARTIN
2   through LIU '09731.  Do you have that in
3   front of you?
4       A.   I do.
5       Q.   Do you recognize this document?
6       A.   I do.
7       Q.   What is this?
8       A.   It is the letter, I guess, I was
9   inarticulately referring to just previously
10  which would have been our response to
11  Paul Koepff's correspondence the day prior.
12      Q.   Is this a true and correct copy
13  of the letter written by your counsel,
14  Richard Bryan to Paul Koepff on December 14,
15  2011?
16      A.   Yes, it would appear to be so.
17      Q.   Did you review a draft of this
18  letter before it was sent?
19      A.   Yes, I would have reviewed a
20  draft.
21      Q.   Would you have approved it before
22  it was sent?
23      A.   I am quite confident I would have
24  discussed it and -- with my coverage counsel,
25  so, yes.

Confidential Pursuant to Protective Order

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 2   ------------------------------------X
     In Re:  OIL SPILL BY THE OIL RIG
 3   "DEEPWATER HORIZON" IN THE GULF OF
     MEXICO, ON APRIL 20, 2010
 4
     Applies to:
 5   12-311, Cameron Int'l Corp. v. Liberty
     Ins. Underwriters, Inc., a/k/a Liberty
 6   Int'l Underwriters
 7   ------------------------------------X
 8
 9
10       * CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER *
11            VIDEOTAPED DEPOSITION OF BRAD EASTMAN
12                      Houston, Texas
13                   Friday, August 2, 2013
14
15
16
17
18
19
20
21
22   Reported by:
23   SUSAN PERRY MILLER, RDR-CRR, CBC
24   JOB NO. 63308
25
```

Confidential Pursuant to Protective Order

Page 88

1     B. EASTMAN
2     A.  That would include Transocean?
3     Q.  Yeah. Potentially that claim could
4  be against Transocean. Because Cameron had
5  claims against Transocean, correct?
6     A.  Well, when -- yes, absolutely,
7  uh-huh. They could subrogate the claims
8  against Transocean.
9     Q.  Okay. Very good.
10        MR. KORN:  Just for a second, if
11     we're going to continue down this path,
12     when you answer these questions, just
13     don't reveal any communication you had
14     with counsel.
15        THE WITNESS:  I gotcha. I'm sorry,
16     uh-huh.
17 BY MR. PATE:
18    Q.  Was it your decision to dismiss the
19 claims for indemnification against Transocean?
20    A.  Was it my decision?
21    Q.  Your decision, yeah.
22    A.  No, sir.
23    Q.  Okay. And the reason I ask that is
24 because earlier on in the deposition, you
25 agreed that you were probably the most

Confidential Pursuant to Protective Order

Page 89

1  B. EASTMAN
2  involved in the Deepwater Horizon litigation.
3        A.   Right.
4        Q.   As far as in-house goes.
5        A.   I was most involved, but that
6  decision ultimately whether or not to enter
7  into the BP settlement agreement was with our
8  board of directors.
9        Q.   Correct. But -- and my question is
10 a little bit different than that, and that is
11 as far as -- you had cross-claims against
12 Transocean, right?
13       A.   Uh-huh.
14       Q.   Okay. And the cross-claims were
15 for indemnification, for indemnity. True?
16       A.   Yes.
17       Q.   Okay. And those cross-claims were
18 eventually dismissed. True? At some point in
19 the litigation, after the settlement.
20            MR. KORN: You're trying to
21       separate two things that I'm not sure
22       are separable, so you could try this a
23       different way, but -- I'm nervous that
24       you're going to be bleeding into an
25       attorney-client communication. But he's

Confidential Pursuant to Protective Order

Page 117

1  B. EASTMAN
2  insurance underwriting outside of Cameron that
3  Cameron's indemnification agreement, such as
4  the one found in the Cameron-Transocean MSA,
5  was useless or worthless?
6      A.  No. I don't think I have.
7      Q.  Okay. Let's talk for a minute
8  about the BP-Cameron settlement negotiations,
9  if we can.
10     A.  Okay.
11     Q.  I just want to steer your attention
12 there. We may keep bouncing around a little
13 bit throughout the course of the day and I
14 apologize for that.
15     A.  Okay. It's your time.
16     Q.  Who initiated the settlement
17 negotiations with BP?
18     A.  I don't know. They came to my
19 attention when Bill Lemmer, my boss, told me
20 that we had a -- some communication with BP
21 about possible settlement and would I look
22 over a confidentiality agreement.
23     Q.  Okay. Do you know if it was BP
24 that reached out to Transocean or Transocean
25 reached out to BP? Do you know that?

Confidential Pursuant to Protective Order

Page 118

1           B. EASTMAN
2      MR. KORN: Do you mean Cameron in
3   your question?
4      MR. PATE: I probably screwed that
5   all up.
6      MR. KORN: You said BP and
7   Transocean, and I don't think you meant
8   that.
9      A.   I don't know anything about BP and
10  Transocean settlement talks.
11  BY MR. PATE:
12     Q.   Let me strike that whole question
13  and let me reask it.
14          Do you know if it was BP that
15  reached out to Cameron or Cameron that reached
16  out to BP to initiate the --
17     A.   I don't. It's very unclear to me.
18     Q.   Okay. Bill Lemmer never told you?
19     A.   No, Bill Lemmer never told me.
20     Q.   Okay. Now, you said the first you
21  knew about it was Bill Lemmer came to you and
22  wanted you to oversee the confidentiality
23  agreement with BP?
24     A.   He wanted me to review the
25  confidentiality agreement with BP.