UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| | * * | JUDGE BARBIER |
| **THIS PLEADING APPLIES TO:** No. 12-311 | * * | MAG. JUDGE SHUSHAN |
| | * | **JURY TRIAL DEMANDED** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CAMERON'S OPPOSITION TO LIBERTY'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON CAMERON'S COVERAGE AND SECTION 541 CLAIMS

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................3

STATEMENT OF FACTS .....................................................................................................7

ARGUMENT ..........................................................................................................................8

I.      LIBERTY IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
        IMPAIRMENT-OF-SUBROGATION DEFENSE. ...........................................................8

        A.      Liberty Does Not Have Any Subrogation Rights Because It Wrongfully
                Denied Insurance To Cameron. ...................................................................8

        B.      Cameron and BP Expressly Preserved In The BP-Cameron Settlement
                Any Subrogation Rights That Liberty Might Have Had.......................................10

        C.      Cameron Did Nothing "After Loss" To Breach The Transfer Of Rights Of
                Recovery Provision. ...............................................................................14

        D.      Liberty Has Not Carried Its Burden Of Proving That Cameron Had Valid
                And Enforceable Indemnity Rights Against Transocean.......................................15

        E.      Cameron Did Not Breach The "Notice of Occurrence" Provision Of The
                Liberty Policy.....................................................................................19

II.     LIBERTY IS NOT ENTITLED TO SUMMARY JUDGMENT ON
        CAMERON'S CLAIMS UNDER SECTION 541 OF THE TEXAS
        INSURANCE CODE................................................................................19

        A.      Liberty Has Not Sought Summary Judgment On Cameron's Claim That
                Liberty Engaged In Unfair Settlement Practices By Making Material
                Misrepresentations In Violation Of Section 541.060(a)(1). ...................................20

        B.      Whether A "Bona Fide" Dispute Exists And Whether Liability Was
                "Reasonably Clear" Are Fact Issues For The Jury.............................................23

        C.      A Reasonable Jury Could Conclude That Liberty Knew Or Should Have
                Known That A Bona Fide Coverage Dispute Did Not Exist When It
                Refused To Pay Cameron's Loss. ...............................................................24

        D.      A Reasonable Jury Could Conclude That Cameron's Liability Was
                Reasonably Clear When It Settled With BP. ...................................................28

CONCLUSION......................................................................................................................32

Plaintiff Cameron International Corporation ("Cameron") respectfully submits this opposition to: (i) Liberty International Underwriters, Inc.'s ("Liberty") motion for partial summary judgment on Cameron's coverage claims (Dkt. 12580) ("Liberty Coverage Br."); and (ii) Liberty's motion for partial summary judgment on Cameron's bad faith claim under Section 541 (Dkt. 12578) ("Liberty 541 Br."). Pursuant to the Court's Order dated March 31, 2014, Cameron is filing this single opposition to both motions. (Dkt. 12610.)

## INTRODUCTION

In this action, Cameron seeks redress for Liberty's bad faith refusal to honor its insurance obligations and pay the loss that Cameron suffered in the Macondo Well blowout—the very risk for which Cameron purchased insurance in the first place.

Liberty has now filed two additional motions for partial summary judgment to try to escape liability for its wrongdoing. In the first, Liberty seeks summary judgment on Cameron's coverage claims, asserting that Cameron breached the Liberty Policy by impairing Liberty's subrogation rights when it entered into a settlement with BP on December 15, 2011 (the "BP-Cameron Settlement"). In the second, Liberty seeks summary judgment on Cameron's claims under Section 541 of the Texas Insurance Code, arguing that the Court should hold as a matter of law that Liberty acted reasonably when it refused to pay Cameron's loss. Neither motion has any merit.[1]

Liberty's Impairment-of-Subrogation Motion. The only party entitled to summary judgment on Liberty's impairment-of-subrogation defense is Cameron. As an initial matter,

---

[1] These two motions are in addition to a motion Liberty filed earlier seeking summary judgment on Cameron's Texas Insurance Code claims on the theory that Liberty's bad faith did not cause Cameron "actual damages." As discussed in Cameron's opposition (Dkt. 12342), the Supreme Court of Texas has squarely held—in a case ignored by Liberty until reply—that "an insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld." *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988). That case is still the law of Texas, as Liberty's own counsel recognized in his treatise on Texas insurance law.

Liberty waived its subrogation rights when it wrongfully denied insurance to Cameron based on its "Other Insurance" argument. Before the BP-Cameron Settlement was reached, Liberty told Cameron in no uncertain terms that it would not pay Cameron's loss in the settlement, no matter what. Liberty cannot have it both ways. Under Texas law, once Liberty told Cameron it would not pay if Cameron settled with BP, Liberty lost all rights under the policy to require Cameron to protect Liberty's rights in that settlement. Liberty does not even attempt to address the consequences of its own breach in its summary judgment motion, which should be denied on that basis alone.

Liberty's motion should also be denied because its premise is flawed: Cameron and BP in fact expressly preserved in the BP-Cameron Settlement any subrogation rights that Liberty might have had. Liberty's sole response is a single conclusory paragraph in which it claims that Cameron's express preservation of its rights was merely "hollow lip-service." That is wrong. The BP-Cameron Settlement states in paragraph 4.4 that Liberty's subrogation rights are preserved "notwithstanding any other provision of this Agreement."

This language—which is not even mentioned by Liberty—forecloses any argument that Liberty's subrogation rights were impaired in other provisions. This includes those provisions concerning Cameron's indemnity rights against Transocean, which Liberty improperly reads in isolation. To the extent Liberty's subrogation rights would have been impaired by the transfer or release of Cameron's indemnity claims in those other provisions, paragraph 4.4 by its plain terms trumps those other provisions and secures Liberty's right to seek recovery from Transocean.

That Liberty's subrogation rights against Transocean were preserved in the BP-Cameron Settlement is confirmed by another provision—paragraph 4.6. That provision dictates

Cameron's post-settlement obligations with respect to Liberty's right to seek subrogation, among others, against Transocean.  It has also been confirmed by BP, the only other party to the agreement, which shares Cameron's interpretation.  Liberty, by contrast, asks the Court to adopt an interpretation that renders not one, but two, provisions meaningless and to ignore the interpretation of the agreement placed on it by the parties themselves.  No basis exists to do so, and Liberty's defense should be rejected as a matter of law.

Even if Liberty's erroneous interpretation were accepted, there would still be no breach of the Transfer of Rights of Recovery clause in the Liberty Policy for another independent reason.  That provision only restricts what Cameron may do "after loss" and Liberty does not identify anything that Cameron did to prejudice Liberty's rights after Cameron incurred its loss in the BP-Cameron Settlement.

In light of the above, the Court need not and should not reach the unsettled question of whether the indemnity clauses in the Cameron-Transocean contracts were valid and enforceable.  Cameron did not breach the Transfer of Rights of Recovery provision in the Liberty Policy for three reasons so this issue is not relevant.  And, even if the Court were to move past those three reasons, Liberty would still not be entitled to summary judgment.  As Liberty observed, for Transocean to have any indemnity to pass through to Cameron, BP must first be required to indemnify Transocean.  Contrary to Liberty's suggestion, however, the Court has not ruled that BP is required to indemnify Transocean and no indemnity has ever been provided.  Rather, before BP owes indemnity to Transocean, the Court must determine that Transocean did not materially breach the Drilling Contract or otherwise commit an act that voided the indemnities contained therein.  Liberty has not even attempted to make this showing.  Instead,

Liberty raises a series of factual issues concerning Transocean's purported obligation to indemnify Cameron, which show that Liberty has not carried its summary judgment burden.

<u>Liberty's Section 541 Motion.</u>   Liberty's motion for summary judgment on Cameron's claims under Section 541 of the Texas Insurance Code is equally meritless.  To begin with, Liberty completely ignores that Cameron has asserted a claim that Liberty violated Section 541.060(a)(1) by knowingly misrepresenting material facts about its policy.  Instead, Liberty moves solely against Cameron's claim that Liberty violated Section 541.060(a)(2) by failing to act in good faith to effect a settlement once its liability became reasonably clear.  At a minimum, then, Liberty is not entitled to summary judgment on Cameron's bad faith claim under Section 541.060(a)(1).

Liberty also cannot establish as a matter of law that there was a "bona fide coverage dispute" or that liability was not "reasonably clear" when it refused to pay Cameron's admittedly covered loss in the BP-Cameron Settlement.  Those are quintessential fact issues for the jury.  Indeed, in rejecting a similar argument by Liberty in its motion for judgment on the pleadings, the Court explained that "the Texas Supreme Court has expressly 'reject[ed] the suggestion that whether an insurer's liability has become reasonably clear presents a question of law for the court rather than a fact issue for the jury.'"  (Order & Reasons at 28, Aug. 16, 2012, Dkt. 7129 (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997)).

Here, the record is replete with evidence from which a reasonable jury could conclude that there was no "bona fide" dispute and liability was "reasonably clear."  In fact, Liberty's own Chief Claims Officer admitted to Cameron's Chief Financial Officer that "he knows he owes under the policy."  (Sledge Dep. at 162 (Ex. 1); *see also id.* at 161 (testifying that Mr. Engel admitted he "was never disputing at the end in our meeting in January in my office

that they owed under the policy.  Never disputed that at that meeting face to face.").)[2]  Multiple sources of evidence—Cameron's witnesses, Liberty's witnesses, other insurer's witnesses, and documents—likewise demonstrate that Liberty relied on its "Other Insurance" clause as a pretext to try to exact a steep discount, with a critically important settlement held hostage.  In short, this is a fact issue for the jury, not an issue of law for the Court.

Finally, a reasonable jury could also conclude that liability was "reasonably clear" at the time Cameron settled.  Cameron was faced with life-threatening exposure.  Cameron, with the knowledge of all of its insurers and substantial assistance by Magistrate Judge Shushan, engaged in settlement negotiations and reached a settlement that all who were involved thought was fair and reasonable.   That settlement resolved Cameron's liability for the worst environmental disaster in history, potentially running into the billions of dollars.   Liberty's suggestion that Cameron faced no or minimal liability at the time it made its decision to settle is simply not credible.  But, again, this is an issue for the jury and summary judgment is not appropriate on Cameron's Section 541 claims.

Accordingly, Cameron is entitled to summary judgment on its coverage claims and a jury trial on its bad faith claims under the Texas Insurance Code.

## STATEMENT OF FACTS

Cameron set forth the facts relevant to deciding summary judgment in this action in its memorandum of law in support of its motion for partial summary judgment on pages 3 to 7 (Dkt. 12440-1) ("Cameron SJ Br."), and in its opposition to Liberty's motion for partial summary judgment on Cameron's Texas Insurance Code claims on pages 1 to 4 (Dkt. 12342).

---

[2]     Citations to "Ex. __" are to the exhibits annexed to this memorandum.

## ARGUMENT

**I.     LIBERTY IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS IMPAIRMENT-OF-SUBROGATION DEFENSE.**

Cameron, not Liberty, is entitled to summary judgment on Liberty's impairment-of-subrogation defense.  As Cameron demonstrated, Liberty lost its subrogation rights through its own wrongful and unconditional denial of liability to pay insurance to Cameron in any settlement with BP.  (*See* Cameron's Mem. in Supp. of SJ (Dkt. 12440-1) ("Cameron SJ Br.") at 17-19; Cameron's Reply in Supp. of SJ (Dkt. 12701) ("Cameron SJ Reply Br.") at 7-8.) Cameron also demonstrated that, even if Liberty had any subrogation rights after its wrongful denial, Cameron and BP expressly and unambiguously preserved those rights in the BP-Cameron Settlement.  (*See* Cameron SJ Br. at 19-21; Cameron SJ Reply Br. at 8-10.)  Cameron and BP— the only parties to the settlement—have confirmed this was their agreement.

Liberty does not even attempt to address the first point in its motion for summary judgment, and devotes only a single conclusory paragraph to the second point.   (Liberty Coverage Br. at 21-22.)  Liberty therefore cannot as a matter of law satisfy its burden of proof on its impairment-of-subrogation defense in this case, much less on its motion for summary judgment.  And, even if it could get past those two fundamental defects with its defense, Liberty would still not be entitled to summary judgment because it has not established as a matter of law that Cameron had valid and enforceable indemnity claims against Transocean that were impaired after Cameron incurred its loss.

Liberty's motion for partial summary judgment should be denied.

**A.     Liberty Does Not Have Any Subrogation Rights Because It Wrongfully Denied Insurance To Cameron.**

The reasons that Liberty waived its subrogation rights have now been fully briefed in the context of Cameron's motion for summary judgment.   (*See* Cameron SJ Br.

at 17-19; Liberty Opp. at 5-7; Cameron SJ Reply Br. at 7-8.) Cameron incorporates its arguments on this point from its opening and reply briefs.

Liberty elected to ignore this issue in its motion. (Dkt. 12580-1.) Liberty, however, cannot obtain summary judgment unless it establishes that it did not waive its subrogation rights. Here, Liberty wrongfully and repeatedly told Cameron it had no responsibility to pay Cameron's covered loss in any settlement with BP—no matter what— because of its erroneous "Other Insurance" position. (*See* Cameron SJ Br. at 6, 17-19; Cameron SJ Reply Br. at 7-8.) Liberty does not and cannot deny this fact.

While Liberty may argue that it is a "basic principle of contract law" that "a party will not be held to a contract where it has been deprived of essential contract rights for which it bargained" (Liberty Coverage Br. at 13), there is nothing more fundamental in an insurance contract than a policyholder's right to receive insurance proceeds when it suffers a covered loss. Under Texas law, no matter how Liberty may now try to slice it, Liberty's unconditional denial of liability waived Liberty's subrogation rights. *See Scottsdale Ins. Co. v. Knox Park Const., Inc.*, 488 F.3d 680, 688-89 (5th Cir. 2007) (holding that insurer repudiated its obligations and waived its rights by claiming the policy did not attach based on its "erroneous view that coverage existed only for liability in excess of $1,000,000."); *Stephens v. State Farm Mut. Auto. Ins. Co.*, 508 F.2d 1363, 1366 (5th Cir. 1975), *abrogated on other grounds by Holyfield v. Members Mut. Ins. Co.*, 572 S.W.2d 672 (Tex. 1978) (insurer is not "allowed to insist that the insured honor all his contractual commitments" when, prior to settlement, it tells its insured "that the insurer is not concerned, and he is to go his way . . . .").

**B.    Cameron and BP Expressly Preserved In The BP-Cameron Settlement Any Subrogation Rights That Liberty Might Have Had.**

The parties have also briefed the fact that Cameron and BP, in their settlement, expressly preserved any subrogation rights that might have survived Liberty's repudiation. (*See* Cameron SJ Br. 19-21; Liberty Opp. at 3-4; Cameron SJ Reply Br. at 8-10.)   Cameron also incorporates herein its arguments on this point from its prior briefs.[3]

In its moving brief, Liberty devotes only a single paragraph to this issue. (Liberty Coverage Br. at 21.)    Notably, Liberty concedes that paragraph 4.4 of the BP-Cameron Settlement "purports to reserve Liberty's right to subrogation." (*Id.* at 21; *see also* Liberty Opp. to Cameron SJ at 4 (agreeing that paragraph 4.4 "purports to preserve Liberty's subrogation rights").   There is thus no dispute about interpretation.    Paragraph 4.4 means what it says: Liberty's subrogation rights, including its right to seek recovery from Transocean if it pays Cameron, were preserved.

Liberty's sole response is to call this contractual provision "hollow lip-service." (Liberty Coverage Br. at 21.)   According to Liberty, because Cameron "assigned to BP or released" its indemnification claims against Transocean in other provisions of the BP-Cameron Settlement, namely paragraphs 4.3 and 4.5, Liberty's subrogation rights against Transocean were not preserved. (*Id.*)   Those provisions, however, cannot be read in isolation.   Liberty's argument is fundamentally flawed and should be rejected as a matter of law.

*First*, Liberty ignores key language in paragraph 4.4 itself.   In that provision, the parties agreed that Liberty's subrogation rights were preserved "notwithstanding any other

---

[3]    Liberty's argument that Cameron impaired its subrogation rights is irrelevant because Liberty's refusal to pay its claim based on its "Other Insurance" argument breached the contract, thus freeing Cameron from having to preserve Liberty's subrogation rights. (*See* Point I.A.)   Cameron, however, anticipated that Liberty would try to make this an issue and, to remove any doubt it was entitled to insurance, negotiated specific provisions with BP in the BP-Cameron Settlement to preserve Liberty's subrogation rights.

provision" in the BP-Cameron Settlement. (BP-Cameron Settlement ¶ 4.4 (Dkt. 12580-11).) BP and Cameron thus made clear that paragraph 4.4 trumps every other provision in their agreement, including the other provisions on which Liberty now relies. Put differently, when read together, Cameron's rights against Transocean were assigned or released in paragraph 4.3 or 4.5 except to the extent necessary to preserve Liberty's subrogation rights pursuant to paragraph 4.4. Cameron and BP thereby expressly preserved Liberty's right, if it paid Cameron the $50 million it owed, to subrogate and assert the same indemnification claims that Cameron had before the settlement against Transocean to try to recover that $50 million.

Cameron's approach to preserving Liberty's rights in this fashion plainly satisfied any obligations it may have had under the "Transfer of Rights of Recovery" provision. *See Weinberg v. Transamerica Ins. Co.*, 465 N.E.2d 819, 822 (N.Y. 1984) (observing that "the preferable manner for the discharge of the obligation of the insured not to prejudice the subrogation rights of the insurer [is to] include in the release to the third party a provision explicitly reserving the right of the insurer"); 15 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 224:102 (3d ed. 2005 & Supp. 2013) ("Since a release may be structured so as to preserve an insurer's rights, the execution of a release in such a situation does not violate the policy, destroy the insurer's right to subrogation, nor constitute a defense to an action on the policy."). Notably, Liberty does not cite a single case finding the policyholder in breach despite including an express reservation of rights as was done here.[4]

---

[4] Liberty's unsupported assertion that "Cameron never presented Liberty with the opportunity to consider contributing to a settlement that did *not* require transfer of Cameron's indemnity rights" (Liberty Coverage Br. at 9) is plain wrong. When Cameron settled with BP and preserved Liberty's rights, Liberty had the option of paying Cameron and pursuing recovery from Transocean—as it knew simply by reading the BP-Cameron Settlement. (Roberts Dep. at 294-95 (Ex. 3) (admitting that "Cameron said that they had preserved Liberty's rights within the release").)

*Second*, Liberty also ignores other provisions in the BP-Cameron Settlement that confirm that Liberty's subrogation rights, including its right to seek recovery from Transocean, were preserved.  In paragraph 4.6, Cameron agreed that it would only settle insurance coverage claims for the settlement payment it made to BP (*i.e.*, against Liberty) "if the settlement includes an express waiver of any such Cameron Insurer's rights of contribution, subrogation, indemnity, and rights to bring Claims arising under any other theory of recovery . . . against the BP Released Parties or Third Parties, including Transocean . . . ."  (BP-Cameron Settlement ¶ 4.6 (Dkt. 12580-11).)  That BP and Cameron addressed what to do about Liberty's subrogation rights after the BP-Cameron Settlement, including Liberty's rights against Transocean, demonstrates that those rights were preserved pursuant to paragraph 4.4 notwithstanding any releases or assignments contained in other provisions.

*Third*, Liberty ignores the fact that BP, the only other party to the agreement and a non-party to this lawsuit, interprets the BP-Cameron Settlement the same way as Cameron. According to BP, after the BP-Cameron Settlement, pursuant to paragraph 4.4, Liberty would retain the right "to subrogate and assert the same claims that Cameron could have asserted itself" against Transocean "before entering into the BP-Cameron Settlement." (BP Motion to Quash at 8 (Dkt. 10388-1).)  Both BP and Cameron therefore agree that their settlement agreement preserved Liberty's rights.  Liberty cannot create ambiguity when the actual parties agree to its meaning.  *See Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) ("The court should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary.").

*Fourth*, Liberty's interpretation would render paragraphs 4.4 and 4.6 meaningless. Indeed, Liberty admits as much when it describes those provisions as nothing more than "hollow

lip-service." (Liberty Coverage Br. at 21.)  Liberty's construction thus runs afoul of the "basic principle of contract interpretation" that no terms should be interpreted as "meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).  This highlights the danger of reading contractual provisions in isolation, as Liberty does here.

*Fifth*, Liberty's reliance on paragraphs 4.3 and 4.5 is also misplaced for other reasons.  Paragraph 4.3 is simply a covenant not to sue; it does not release any claims against Transocean and cannot be enforced by Transocean as a non-party.  (BP-Cameron Settlement ¶ 9.14 (Dkt. 12580-11) (no third-party beneficiaries).)  Paragraph 4.5 is an assignment provision and, unlike other provisions in the settlement, is silent as to the rights of Cameron's insurers.

*Finally*, Liberty's argument at best is that the agreement as a whole is ambiguous.  The record is clear, however, that both BP and Cameron intended to preserve Liberty's rights to seek recovery from Transocean if it paid Cameron.  (*See, e.g.*, Eastman Dep. at 105 (Ex. 4) ("[I]n the agreement we entered into with BP, we specifically said we would waive those indemnification rights with Transocean except to the extent we needed to preserve Liberty's subrogation rights."); BP Motion to Quash at 8-9 [Dkt. 10388] (confirming that Liberty would have the right "to subrogate and assert the same claims that Cameron could have asserted itself" against Transocean "before entering into the BP-Cameron Settlement").)  Indeed, paragraphs 4.4 and 4.6 were specifically inserted for that very reason.  (Eastman Dep. at 135 (Ex. 4) ("We had to make a lot of changes to this document to protect Liberty's subrogation rights.").)  The record is devoid of any evidence to the contrary.  Consequently, there can be no genuine dispute that BP and Cameron had a meeting of the minds to preserve, not impair, Liberty's rights.  Liberty has no basis to say otherwise and is not entitled to summary judgment.[5]

---

[5]  To the extent that the BP-Cameron Settlement could somehow be construed to be the *opposite* of the parties' mutual intent, Cameron would be entitled to reformation of its terms to reflect the parties' actual

**C. Cameron Did Nothing "After Loss" To Breach The Transfer Of Rights Of Recovery Provision.**

The Transfer of Rights of Recovery provision states that Cameron must do nothing "after loss" to impair Liberty's subrogation rights. (INIC Policy § VI(O)(1) (Dkt. 12580-3).) Courts and *Couch* agree that this restriction is to be narrowly construed and that an insured does not breach this provision unless it does something after loss to impair the insurer's rights. *See Trinity Univ. Ins. Co. v. Bill Cox Const., Inc.*, 75 S.W.3d 6, 10-11 (Tex. Ct. App. 2001) (rejecting claim that insured had breached policy where waiver of subrogation rights was not "after loss"); *Cont. Cas. Co. v. Homontowski*, 510 N.W.2d 743, 746 (Wis. Ct. App. 1993) (refusing to find that pre-loss waiver was a breach because "rather than drafting a contract that prohibited [its insured] from impairing its subrogation rights *at any time*, Continental Casualty required [its insured] to secure its rights and do nothing to impair those rights *after* a loss occurred") (emphasis added); COUCH ON INSURANCE § 224:76 ("pre-loss waivers fully comport with the many policies which explicitly specify that the insured shall do nothing 'after the loss' to prejudice the insurer's subrogation rights").

Here, according to Liberty's own Chief Claims Officer, "Cameron incurred its loss when it settled." (Engel Dep. at 155 (Ex. 2).) Liberty does not, and cannot, identify anything that Cameron did "after loss"—*i.e.*, after Cameron entered into the BP-Cameron Settlement— that impaired Liberty's subrogation rights. Cameron, accordingly, did not breach the Transfer of

---

agreement. *See Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 408 (5th Cir. 2012) ("If a party can prove that a contract is the result of mutual mistake it may be entitled to the equitable remedy of reformation.") (applying Texas law). Given that BP and Cameron have the same understanding of what their original agreement was, there should be no dispute that Cameron would be entitled to this relief. That is another reason that Liberty is not entitled to summary judgment.

Rights of Recovery provision even if Liberty's erroneous interpretation of the BP-Cameron Settlement is accepted.[6]

      *Mendez v. Allstate Property & Casualty Insurance Co.*, 231 S.W.3d 581 (Tex. App. 2007), the case on which Liberty principally relies, is not to the contrary. (Liberty Coverage Br. at 22.) There, the loss occurred in a car accident involving the insured, and the conduct that allegedly prejudiced the insurer's rights occurred after that accident. *See Mendez*, 231 S.W.3d at 583. The only issue was whether this was a breach even though the insurer had not yet paid the claim and obtained subrogation rights. *Id.* at 584-85. The court did not address the distinct factual circumstances of this case, where not only had Liberty not paid the claim but Cameron had not done anything "after loss" to impair Liberty's rights. By contrast, when the Texas courts have addressed the circumstances presented here, they have concluded there was no breach. *See Trinity*, 75 S.W.3d at 10-11.

### D. Liberty Has Not Carried Its Burden Of Proving That Cameron Had Valid And Enforceable Indemnity Rights Against Transocean.

      In deciding Liberty's motion for judgment on the pleadings, the Court observed that it "has never determined whether the indemnity clauses in the Cameron-Transocean Contracts were valid and enforceable." (Order & Reasons at 26, Aug. 16, 2012, Dkt. 7129.) The Court need not and should not decide that question now.

      As an initial matter, as discussed above, Liberty's subrogation rights were either waived by its own conduct or preserved by Cameron. In short, the Liberty Policy has not been breached. The Court thus does not need to reach the issue of whether Cameron had valid and enforceable indemnity rights.

---

[6]     Cameron did not impair Liberty's subrogation rights when it withdrew its motion for summary judgment on December 16, 2011. This simply effected Cameron's settlement with BP, does not impact the merits of any claims in any way, and was done without prejudice in any event. (Dkt. 4941l)

Leaving aside that Cameron did not breach the Liberty Policy, Liberty cannot establish as a matter of law that Cameron had a right to contractual indemnification. As Liberty explains, two conditions had to be satisfied for Cameron to obtain indemnification from Transocean: (1) BP must be required to indemnify Transocean for pollution liability; and (2) Transocean must be permitted to provide Cameron "with the benefit of such indemnity." (Liberty Coverage Br. at 15-16.)

The Court need go no further than the first condition to deny Liberty's motion. Liberty does not offer any evidence that this condition has been satisfied to support its summary judgment motion. Instead, Liberty relies entirely on the Court's decision of January 26, 2012, in which Liberty contends this Court has already decided "that BP owed Transocean full indemnity under the Drilling Contract." (Liberty Coverage Br. at 16.) That, however, is not true.

On January 26, 2012, the Court issued its decision granting in part, and denying in part, Transocean's and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity. (Dkt. 5446.) In that decision, the Court held: "Subject to the provisions below, BP is required to indemnify Transocean for compensatory damages asserted by third parties against Transocean related to pollution that did not originate on or above the surface of the water . . . ." (*Id.* at 29 ¶ 1 (emphasis added).) Liberty ignores this important proviso. As the Court explained three paragraphs later, there remained a fundamental and still undecided issue: "The Court defers ruling on BP's arguments that Transocean breached the Drilling Contract or committed an act that materially increased BP's risk or prejudiced its rights." (*Id.* at 29 ¶ 4.) That issue, as the Court observed, "could invalidate the indemnity clause" in the Drilling Contract, but the Court refrained from addressing "at this stage what sort of breach would cause that result, or whether such a breach occurred." (*Id.* at 25.) Consistent with that ruling, over two years have passed and

Transocean still has not received any indemnity from BP. (*Id.* at 29, ¶6 ("BP is not obligated to fund Transocean's defense against third party claims at this time.").)

For Liberty to prevail on its summary judgment motion, therefore, the Court must rule that Transocean did not materially breach the Drilling Contract or commit an act that materially increased BP's risk or prejudiced its rights. Until that issue is decided, it remains an open question whether BP is required to indemnify Transocean for pollution liability. And if BP is not required to indemnify Transocean, then there is nothing that Transocean might have been obligated to provide to Cameron.

That issue—whether Transocean materially breached the Drilling Contract or otherwise acted in a way that voided the BP-Transocean indemnity—is clearly beyond the scope of this case. Liberty has adduced no evidence on this point, which it ignores entirely. Accordingly, Liberty cannot carry its burden of establishing on this record that Cameron's alleged "breach" was material. (Order & Reasons at 25, Aug. 16, 2012, Dkt. 7129 ("If the indemnity claims were not valid, then Liberty's subrogation rights held no value, and Cameron's release of same caused no prejudice to Liberty; i.e., Cameron's 'breach' was not material.").

Even if Liberty could establish that Transocean is entitled to indemnity from BP, that would not be enough. Liberty must also establish that Transocean was permitted to pass the "benefit" of that indemnity to Cameron. In support, Liberty relies principally on Cameron's summary judgment arguments, and omits that both Transocean and BP disputed Cameron's right to indemnity from Transocean. (*See* Transocean's Opp'n to Cameron's Mot. for Summ. J., Nov. 30, 2011, Dkt. 4778; BP's Opp'n to Cameron's Mot. for Summ. J., Dec. 7, 2011, Dkt. 4828.)[7] This was a hotly contested issue that was uncertain then and is uncertain now.

---

[7]      Contrary to Liberty's suggestion, Transocean did not "acknowledge" at any time that it was required to indemnify Cameron. (Liberty Coverage Br. at 20-21.) While Transocean agreed to tender an indemnity

Rather than confront this issue, Liberty offers a series of unsupported factual allegations to support its motion for summary judgment. For example, Liberty refers to "the obvious fact that Transocean anticipated giving pollution indemnity to its suppliers." (Liberty Coverage Br. at 17.) Liberty also claims that "Transocean knew it had such indemnity from BP" and that Transocean, BP, and Cameron intended the Drilling Contract and Transocean-Cameron contracts to "be read together." (*Id.* at 18.) Further, Liberty asserts that "BP had significant control over the design of the blowout preventer." (*Id.*) These unsupported assertions all create issues of fact that cannot be resolved on summary judgment.

Finally, Liberty cannot satisfy its summary judgment burden by asserting that Cameron "admit[ted] it knew that its insurers had valid subrogation rights." (*Id.* at 19.) Cameron did nothing of the sort. In the paragraph from Cameron's Amended Complaint on which Liberty relies, Cameron alleged that <u>BP</u> was seeking a waiver of insurer subrogation rights as a condition of settlement. (Am. Comp. ¶ 42, Apr. 19, 2012, Dkt. 6287.) Cameron also explained that BP sought that waiver because it would not settle if it might have to repay the settlement proceeds to Cameron's insurers. This is not an admission either that BP owed Transocean indemnity or that Transocean owed Cameron indemnity. The point was that Liberty was putting a critically important settlement at risk by refusing to agree not to sue the party with whom Cameron was settling. Liberty missed the point then, and is missing the point now.[8]

---

demand to BP in August 2010, Transocean later resisted Cameron's efforts to obtain indemnity and argued that Cameron was not entitled to indemnity. (Transocean's Opp'n to Cameron's Mot. for Summ. J., Nov. 30, 2011, Dkt. 4778.) As Transocean made clear when it moved to quash a subpoena issued by Liberty, which motion the Court granted, "Transocean's position regarding indemnity is articulated in publicly available briefing" from November 2011. (Transocean Mot. to Quash at 8, Aug. 5, 2013, Dkt. 10943-1.)

[8]  Ultimately, as discussed previously, Cameron was able to move forward with the settlement based on all the other insurers' agreement to pay and waive their subrogation rights, and Cameron negotiated a specific provision to preserve Liberty's rights, if any. (BP-Cameron Settlement ¶ 4.4 (Dkt. 1580-11).

E. **Cameron Did Not Breach The "Notice of Occurrence" Provision Of The Liberty Policy.**

As an afterthought, Liberty asserts that "Cameron also forfeited coverage by assuming an obligation to transfer its indemnity rights without Liberty's consent." (Liberty Coverage Br. at 23.) Liberty does not cite any authority to support this argument. Nor does Liberty explain how "transfer[ring] its indemnity rights" is the same as "assum[ing] an [] obligation" or why this was not at Cameron's "own cost." (Liberty Policy ¶ E.4 (Dkt. 12580-2).) In any event, except for the "after loss" issue in Point I.C, all of the arguments set forth above apply with equal force to demonstrate that Liberty is not entitled to summary judgment under the "Notice of Occurrence" provision.

In addition, on December 14, 2011, Liberty's counsel stated expressly and in writing: ██████████████████████████████████████████████████ ██████████████████████████ (Letter from P. Koepff, dated Dec. 14, 2011 (Ex. 5).) Having expressly waived its consent rights, Liberty should not now be heard to assert them. *See Swiderski v. Prudential Prop. & Cas. Ins. Co.*, 672 S.W.2d 264, 268-69 (Tex. Ct. App. 1984).

II. **LIBERTY IS NOT ENTITLED TO SUMMARY JUDGMENT ON CAMERON'S CLAIMS UNDER SECTION 541 OF THE TEXAS INSURANCE CODE.**

Section 541 of the Texas Insurance Code prohibits insurers from engaging in "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Tex. Ins. Code § 541.003; *see also Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa*, 77 S.W.3d 253, 260 (Tex. 2002) (stating that Chapter 541 was enacted "to protect insurance consumers by prohibiting unfair or deceptive practices in the business of insurance"). To promote that remedial purpose, the Texas Legislature has directed that the statute is to be "liberally construed and applied." Tex. Ins. Code § 541.008.

Cameron has asserted claims against Liberty under Tex. Ins. Code § 541.060, titled "Unfair Settlement Practices." (Am. Comp., Fifth Cause of Action, Apr. 19, 2012, Dkt. 6287.) That statute provides that an insurer is liable for bad faith and unfair trade practices when it engages in "unfair settlement practices with respect to a claim by an insured." Tex. Ins. Code § 541.060(a). Such practices include (i) "misrepresenting to a claimant a material fact or policy provision relating to coverage at issue," *id.* § 541.060(a)(1), and (ii) failing to attempt in good faith to effectuate "a prompt, fair, and equitable settlement" of "a claim with respect to which the insurer's liability has become reasonably clear," *id.* 541.060(a)(2).

Liberty engaged in both types of unfair settlement practices. Liberty knowingly misrepresented material facts about its policy—namely, the Policy's attachment point and the "Other Insurance" clause—and failed despite its reasonably clear liability to settle the claim. Instead, Liberty attempted to obstruct Cameron's settlement with BP when Cameron was most vulnerable to try to extract a steep discount off policy limits for its own financial gain. Now, despite a clear record demonstrating its bad faith conduct, Liberty seeks summary judgment on what are fact issues for the jury. Liberty's motion should be denied.

## A.   Liberty Has Not Sought Summary Judgment On Cameron's Claim That Liberty Engaged In Unfair Settlement Practices By Making Material Misrepresentations In Violation Of Section 541.060(a)(1).

In its Amended Complaint, Cameron alleged that Liberty violated Tex. Ins. Code § 541.060(a)(1) by "knowingly misrepresenting when Liberty's limit attached and whether Cameron is entitled to indemnity for its losses associated with the Deepwater Horizon incident." (Am. Comp. ¶ 86(a), Apr. 19, 2012, Dkt. 6287.) Liberty has not moved for summary judgment on this claim. (*See, e.g.*, Liberty 541 Br. at 8 (omitting § 541.060(a)(1) from its recitation of the

law).  Accordingly, at a minimum, Cameron's claim that Liberty misrepresented a material fact or policy provision relating to the coverage at issue will go to the jury.[9]

It is also not surprising that Liberty has not moved for summary judgment because there is ample evidence supporting Cameron's claim.  (*See* Cameron SJ Br. at 11-14.) For example, during depositions, Cameron discovered that Liberty's claims personnel and counsel made material misrepresentations about the "Other Insurance" clause during their discussions with Cameron.  On December 13, 2011, ███████████████████████

███████████████████████████████████████████

███████████████████████████

█████████████████████████████████

███████████████████████

███████████████████

(Ltr. From P. Koepff, dated Dec. 13, 2011 (Ex. 6).) ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ (Email from J. Engel, dated Dec. 15, 2011 (Ex. 7).)

Mr. Koepff's and Mr. Engel's statement were false.  During depositions, Liberty's underwriters testified that Liberty's "Other Insurance" clause plays no role at all in the underwriting or pricing of excess casualty insurance at Liberty.  (Morris Dep. at 58-59 (Ex. 8); Mandel Dep. at 81-82, 161 (Ex. 9).) ██████████████████████

████████ Mr. Mandel, the underwriter who sold Cameron the Liberty Policy, candidly testified:

---

[9]       Liberty is not permitted to ask the Court to grant summary judgment on this claim for the first time on reply.  *See John Deere Co. v. Am. Nat. Bank, Stafford*, 809 F.2d 1190, 1192 (5th Cir. 1987); *Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp., Inc.*, 2009 WL 2568323, at *13 (N.D. Tex. Aug. 18, 2009).



(Mandel Dep. at 89-90 (Ex. 9).)  Similarly, Ms. Morris, the employee Liberty identified as most

knowledgeable about its "Other Insurance" clause, testified that it would be "wrong" to suggest,

as Mr. Koepff did, ████████████████████████████████████████

████████████████████ (Morris Dep. at 51 (Ex. 8).)

Liberty's "Other Insurance" clause was the central reason Liberty was refusing to

pay.    Liberty  knowingly  misrepresented  that  provision  to  Cameron  and,  on  that  basis,

misrepresented when the Liberty Policy was intended to attach.  By doing so, Liberty violated

Section 541.060(a)(1).  That alone is sufficient to deny Liberty's summary judgment motion on

Cameron's claim under Section 541.  *See Mason v. Texas Farmers Ins. Co.*, 2011 WL 3702376,

at *3 (S.D. Tex. Aug. 23, 2011) (denying summary judgment where insured had "put forth

evidence creating a fact issue as to whether [the insurer] misrepresented a material fact relating

to coverage."); *Shore Chan Bragalone Depumpo LLP v. Greenwich Ins. Co.*, 856 F. Supp. 2d

891, 902 (N.D. Tex. 2012) (observing that question of misrepresentation under the Texas

Insurance Code "is one of fact and more properly left to the jury").

**B.      Whether A "Bona Fide" Dispute Exists And Whether Liability Was "Reasonably Clear" Are Fact Issues For The Jury.**

Liberty asserts that it is entitled to summary judgment on Cameron's claim under Tex. Ins. Code § 541.060(a)(2)(A) because there was a "bona fide coverage dispute" and liability was not "reasonably clear." (Liberty 541 Br. at 9-16.)   In other words, Liberty is asking the Court to conclude as a matter of law that it acted reasonably when it denied insurance to Cameron.   That is a quintessential fact issue for a jury to decide.

As this Court made clear when it rejected a similar argument made by Liberty in its motion for judgment on the pleadings, "the Texas Supreme Court has expressly 'reject[ed] the suggestion that whether an insurer's liability has become reasonably clear presents a question of law for the court rather than a fact issue for the jury.'" (Order & Reasons, Aug. 16, 2012, Dkt. 7129 (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997)).

Consistent with *Giles*, a long line of Texas cases have rejected insurers' attempts to dispose of Texas Insurance Code claims on summary judgment.   *See Campbell v. Texas Employers' Ins. Ass'n*, 920 S.W.2d 323, 328 (Tex. Ct. App. 1995) ("When it is disputed whether there was any reasonable basis in existence to support the denial of the claim, a jury issue is present."); *Nationwide Mut. Ins. Co. v. Crowe*, 857 S.W.2d 644, 648 (Tex. App. 1993), *vacated pursuant to settlement,* 863 S.W.2d 462 (Tex. 1993) ("A dispute about whether there was any reasonable basis to support the denial of a claim is an issue for the jury."); *Mathews Heating & Air Conditioning LLC v. Liberty Mut. Fire Ins. Co.,* 384 F. Supp. 2d 988, 997 (N.D. Tex. 2004) (denying summary judgment because "there [was] a fact issue as to whether Liberty had a reasonable basis to deny coverage").

As discussed below, there is plenty of evidence in the record from which a reasonable jury could conclude that Liberty did not raise a "bona fide" dispute and liability was "reasonably clear."

### C.   A Reasonable Jury Could Conclude That Liberty Knew Or Should Have Known That A Bona Fide Coverage Dispute Did Not Exist When It Refused To Pay Cameron's Loss.

Even the cases on which Liberty relies recognize that an insurer is liable for acting in bad faith where it "knew (or should have known) that it had no reasonable basis for its decisions and rejected [the insured's] claim for coverage anyway." *Henry v. Mut. of Omaha Ins. Co.*, 503 F.3d 425, 428-30 (5th Cir. 2007) (cited in Liberty 541 Br. at 10 n.33). There is abundant evidence in this record for a reasonable jury to conclude that is the case here.

To begin with, Cameron put Liberty on notice of its claim arising from the DEEPWATER HORIZON disaster in April 2010. (Liberty's Resp. to Req. for Admis. No 1, Apr. 8, 2013 (Ex. 10).) Over the next 18 months, Cameron attended meetings to answer Liberty's questions, established a "document repository" for its insurers, and kept Liberty "constantly updated as to what was going on in the case." (Lee Dep. at 171-172 (Ex. 11); *see also* Roberts Dep. at 129, 136 (Ex. 3).) Nevertheless, Liberty waited 18 months—until November 7, 2011, after settlement discussions with BP had begun—to tell Cameron for the first time that it would not pay anything under the Liberty Policy based on its "Other Insurance" position. (Roberts Dep. at 151-52, 219-21, 250-51 (Ex. 3).)

Liberty's "Other Insurance" position, however, was a pretext that Liberty invented after the fact to try to convince Cameron to settle with Liberty for tens of millions of dollars less than Liberty owed. It was not a bona fide coverage position, and Liberty can only assert otherwise by ignoring admissions made by its own Chief Claims Officer, James Engel, during meetings with Cameron's Chief Financial Officer, Charles Sledge. As Mr. Sledge testified, when

- 24 -

he and Mr. Engel met about this dispute: "What Jim told me is he knows he owes under the policy. That's what Jim told me." (Sledge Dep. at 162 (Ex. 1); *see also id.* at 161 (testifying that Mr. Engel admitted he "was never disputing at the end in our meeting in January in my office that they owed under the policy. Never disputed that at that meeting face to face.").) Rather, Mr. Engel simply "wanted a bigger discount." (*Id.*)

Liberty also sought to use Cameron's critically important settlement with BP as leverage in its discussions with Cameron. With tens of thousands of jobs in the balance, Mr. Engel gave Cameron the following Hobson's choice:

> So you're saying that Cameron has to put itself at risk of a judgment pre getting the indemnity ruled on. That would bankrupt the company. And then ultimately if we're successful in getting an indemnity in bankruptcy, you pay 50 million bucks. Is that really what – the policy you intended to write to Cameron? And [Mr. Engel] just totally said, "Well, you know, I'm just saying I deserve more money." That was his response.

(Sledge Dep. at 94 (Ex. 1).) Mr. Engel's admissions plainly create a genuine issue of material fact over whether Liberty's denial of coverage was bona fide.

Cameron's other insurers also recognized the dangerous game that Liberty was playing. For example, AIG Excess—who could have adopted the same "Other Insurance" position as Liberty— ██████████████████████████████████████████ ██████████████████████████████████ (*See* Dec. 14, 2011 letter from R. Bryan (Ex. 12); Martin Dep. at 64-65, 71-72 (Ex. 13).) Likewise, Chubb, which also could have relied on Liberty's "Other Insurance" position, believed that its "liability to Cameron was clear." (Nusum Exam. at 59 (Ex. 14); *see also id.* at 39-40, 67, 70-71.)

Nor did Liberty have any basis for its "Other Insurance" position. The record is clear that Liberty had never before taken the position that "other insurance" existed where "the party that supposedly owes the indemnity has denied payment to the insured." (Engel Dep.

at 160-61 (Ex. 2).)  That is the case even though Liberty's "Other Insurance" clause has been in all Liberty excess policies in this exact form since "late 1999 or early 2000."  (Liberty Supp. Interrog. Resp. No. 11, Feb. 25, 2013 (Ex. 15).)

Liberty's position is also inconsistent with the understanding of the underwriter who sold Cameron the Liberty Policy.  When Liberty sold the policy, its underwriter understood that, if the source of potential indemnity refused to pay Cameron's loss, it would be Liberty's responsibility to pay.  (Mandel Dep. at 104 (Ex. 9) ("Q: And if [the indemnitor] didn't pay that loss, then it would be Liberty's responsibility, because it issued an insurance policy, to pay that loss, correct?  A: Correct.").)  In short, Liberty had no support for the unprecedented position it took when it refused to pay Cameron's claim.

Moreover, Liberty's position is inconsistent with its conduct in analogous circumstances.  *See* Comp. at 9, *Liberty Int'l Underwriters Canada* v. *Scottsdale Ins. Co.*, Civ. A. No. 1:12-cv-04934 (D.N.J. Aug. 6, 2012) ("As a result of Scottsdale's denial, LIU was <u>forced</u> to front all defense and indemnity payments relating to the underlying action.") (emphasis added).

It is therefore no answer for Liberty to say that the Court "has ruled that LIU's interpretation of its OIC was reasonable."  (Liberty 541 Br. at 11.)  Under Texas law, as Liberty knew or should have known, an insurer's reasonable interpretation is not a basis to deny insurance when that insurer knows that the policyholder's interpretation is also reasonable.  *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("if a contract of insurance is susceptible of more than one reasonable interpretation, [a court] must resolve the uncertainty by adopting the construction that most favors the insured.") (citations omitted).  There is abundant evidence in the record that Liberty knew—and even admitted—that Cameron's interpretation was reasonable.  (Engel Dep. at 266-67 (Ex. 2)

(testifying that he knew in January 2012 that "reasonable minds can differ over the interpretation of the other insurance clause"); Roberts Dep. at 311 (Ex. 3) ("reasonable minds could disagree on the interpretation of the other insurance clause and the policy that Liberty issued to Cameron").

Similarly, Liberty was well aware that Cameron and BP included an express provision preserving Liberty's subrogation rights in the BP-Cameron Settlement. (Roberts Dep. at 294-95 (Ex. 3) (admitting that "Cameron said that they had preserved Liberty's rights within the release.").)  Contrary to Liberty's suggestion, Liberty could not have "reasonably" concluded that Cameron "forfeited coverage" by extinguishing Liberty's rights. (Liberty 541 Br. at 13.)

These, however, are all factual issues for the jury to resolve.  The point is that there is ample evidence—all of which is ignored by Liberty—from which a reasonable jury could conclude that Liberty knew or should have known it had no basis for its decision to deny insurance to Cameron.  Liberty was not taking a bona fide coverage position in good faith, and it knew it—as its own Chief Claims Officer admitted to Cameron.

This case is thus readily distinguishable from *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848 (5th Cir. 2014).  In that case, the Fifth Circuit affirmed the award of summary judgment to a title insurer on a Texas Insurance Code claim because it "had a reasonable basis for its denial of coverage." *Id.* at 869-70.  No evidence was presented, however, that the insurer was aware at the time of denial that it "owed under the policy." (Sledge Dep. at 161 (Ex. 1).)  Nor was there any evidence to suggest that the insurer knew that the policyholder's interpretation was reasonable. (*See* Engel Dep. at 266-67 (Ex. 2); Roberts Dep. at 311 (Ex. 3).)  And there was also no evidence that the insurer was taking an unprecedented coverage position with which other insurers disagreed in order to extract a major discount by using a critical settlement as leverage. (Sledge Dep. at 94 (Ex. 1).)  This case is very different

and a reasonable jury could conclude from those facts, taken individually or together, that Liberty did not have a reasonable basis for its denial of coverage. Indeed, in *Lawyers Title*, unlike here, the "parties consented to proceed for all purposes before a magistrate judge" and no Seventh Amendment rights were even implicated. *Lawyers Title*, 739 F.3d at 855.[10]

**D.    A Reasonable Jury Could Conclude That Cameron's Liability Was Reasonably Clear When It Settled With BP.**

Liberty's second argument for summary judgment on Cameron's Section 541 claim is equally meritless. Liberty seems to be asking the Court to accept as a matter of law that Cameron's potential exposure at the time of the BP-Cameron Settlement was minimal or non-existent. From Liberty's perspective, Cameron should have passed up the BP-Cameron Settlement, even though it resolved Cameron's liability for the largest environmental disaster in history. As far as Liberty is concerned, Liberty had no obligation to engage in good faith settlement discussions at that time because Cameron's liability was not "reasonably clear." (Liberty 541 Br. at 14.) Putting aside that Liberty's cavalier approach would set a horrible precedent, this is an issue of fact for the jury.

The clearest evidence that Cameron's liability was "reasonably clear" in December 2011 is the BP-Cameron Settlement itself. This is not a case like those cited by Liberty where an insurer controlled the defense, refused to settle, and later defended a bad faith claim on the grounds that liability was not reasonably clear. *See Rocor Int'l, Inc.*, 77 S.W.3d 253; *Gulf Ins. Co. v. Jones*, 2003 WL 22208551 at *3-*4 (N.D. Tex., Sept. 24, 2003).[11]

---

[10]    Notably, the Fifth Circuit separately held that Texas law "mandates" that "we adopt Doubletree's interpretation since Doubletree is the insured and its interpretation is reasonable." *Id.* at 864. Even though Doubletree was a sophisticated real estate investor who hired its own surveyor before purchasing title insurance, *id.* at 853-54, the Court did not consider whether to create a "sophisticated insured" exception to this well established rule. That same reasoning applies with equal force here to "mandate" the adoption of Cameron's interpretation of the "Other Insurance" clause. (*See* Cameron SJ Br. at 8-11.)

[11]    Notably, in *Rocor*, the issue about whether liability was reasonably clear was decided by the jury. *See Rocor Int'l Inc.*, 77 S.W.3d at 260-61. In *Gulf Insurance*, contrary to Liberty's suggestion, the court did not

Rather, in this case, there is an actual settlement: the BP-Cameron Settlement, in which Cameron agreed to pay $250 million. The fact that Cameron chose to settle reflects its determination that its liability was reasonably clear and should be settled. Cameron's other insurers agreed and contributed to that settlement. They did so because they recognized the magnitude of Cameron's potential liability and that it was essential for Cameron to settle with BP to resolve that liability. (*See, e.g.*, Martin Dep. at 31 (Ex. 13) (testifying that AIG Excess's view was that the settlement "was a good result for Cameron. . . . The exposure Cameron faced for this loss was potentially quite, quite significant, and we felt that this – this would be a good thing for our client and our insured."); Nusum Exam. at 15 (Ex. 14) (Chubb claims handler testifying, "[b]ased on the reports and the sources of information, I saw that there was a potential $20 billion loss" for Cameron).) Even Liberty's Chief Claims Officer testified that Cameron's "reasonable exposure" was "[a]nywhere from zero up to perhaps a billion dollars." (Engel Dep. at 182 (Ex. 2).) ███████████████████████████████████████

█████████████████████ (Letter from P. Koepff dated Dec. 13, 2011 (Ex. 6).)

Nevertheless, Liberty would have the Court believe that, in December 2011, Cameron faced little or no liability arising from the worst environmental disaster in history and it was not reasonable to settle. That is simply not credible, and even a cursory review of the evidence cited by Liberty demonstrates that Liberty has no basis for its claim.

*First*, Liberty cites Cameron's SEC filings, in which Cameron expressed "the opinion" that its blowout preventer was not defective. (Liberty 541 Br. at 14.) Cameron's statements about how it planned to defend the Oil Spill MDL litigation does not mean its liability was not reasonably clear. Indeed, if that were the case, then every corporation in the country that

---

grant summary judgment on the ground that the "insurer's liability was not reasonably clear" (Liberty 541 Br. at 14). *See Gulf Ins.*, 2003 WL 22208551, at *3-4.

denies liability would have no recourse against its insurers for their bad faith conduct. That is not, and should not be, the law.

*Second*, Liberty relies on a Morgan Stanley analyst report from May 2010—a few weeks after the DEEPWATER HORIZON blowout—to suggest that Cameron's liability was "highly unlikely." (Liberty 541 Br. at 15.) The fact that Liberty needs to resort to a Morgan Stanley analyst report to make its case demonstrates that it has no case. The uninformed hearsay statements of an investment analyst written at a time when Cameron's blowout preventer was at the bottom of the ocean say nothing about the reasonable likelihood of Cameron's liability at the time of the BP-Cameron Settlement.

*Third*, Liberty points to the fact that Cameron prevailed in the Phase I trial. (Liberty 541 Br. at 15.) Contrary to Liberty's suggestion, Cameron's potential liability in December 2011 cannot be assessed in hindsight. As Cameron and its insurers recognized, as discussed above, Cameron faced potentially ruinous liability and settlement was Cameron's best option because liability at least for $250 million was reasonably clear. And, by settling with BP, Cameron removed the party with the greatest motive to establish Cameron's liability at trial, as BP had tried to do in pre-trial proceedings and discovery.

Liberty also asserts that Cameron's potential claim against Transocean relieved Liberty of its obligation to engage in good faith settlement discussions. That is wrong. As discussed above, Transocean rejected owing any pollution indemnity and both Transocean and BP were vigorously contesting Cameron's right to any such indemnity. As Mr. Sledge put it:

> There was risk in that indemnity. We had BP objecting to it. We had Transocean objecting to it. We had billions of dollars of exposure. If those exposures would have hit, we would have bankrupted the company and put tens of thousands of families out of work.

(Sledge Dep. at 68 (Ex. 1).)   The existence of an untested and disputed indemnity cannot demonstrate as a matter of law that Cameron's liability was not reasonably clear.   This is especially the case here, given that Cameron was negotiating the settlement with the very party who might ultimately be responsible for that indemnity.[12]

Tellingly, Liberty does not offer any evidence concerning its internal assessment based on its own investigation of Cameron's reasonable liability.   Indeed, no evidence has been presented that Liberty actually believed that Cameron's liability was not reasonably clear in December 2011.   The absence of such evidence as to Liberty's own internal assessment is sufficient reason by itself to reject Liberty's argument.

Here, Cameron settled with BP for $250 million because its liability for at least that amount was "reasonably clear" at the time.   That Cameron was willing to settle for this amount, and Cameron's other insurers considered this a favorable settlement, is plainly sufficient evidence from which a reasonable jury could conclude that Cameron's liability in that amount at that time was reasonably clear.   And, once Cameron entered into the BP-Cameron Settlement, it certainly had clear liability to pay $250 million to BP.

Accordingly, Liberty had no good faith basis to refuse to effectuate a settlement of Cameron's admittedly covered loss.   By failing to do so, Liberty violated Section 541 of the Texas Insurance Code.

---

[12]   Tony Black's testimony is not to the contrary.   His testimony was only that he "assumed" that whether Cameron would receive indemnity was unknown because the issue "hadn't been resolved."   (Black Dep. at 235 (Ex. 16).)

## CONCLUSION

For the reasons discussed above, Liberty's motion for partial summary judgment should be denied in its entirety. Cameron is entitled to summary judgment on its coverage claims and a jury trial on its bad faith claims under the Texas Insurance Code.

Respectfully submitted,

*/s/ Phillip A. Wittmann*

Phillip A. Wittmann, 13625
    pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
504-581-3200
504-581-3361 (fax)

WILLKIE FARR & GALLAGHER LLP
Mitchell J. Auslander
Jeffrey B. Korn
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
mauslander@willkie.com

*Attorneys for Cameron International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Cameron's Opposition to Liberty's Motions for Partial Summary Judgment on Cameron's Coverage And Section 541 Claims has been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of April, 2014.

*/s/ Phillip A. Wittmann*