Confidential - Attorneys' Eyes Only

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA
 3    ------------------------------------X
      In Re:  OIL SPILL BY THE OIL RIG
 4    "DEEPWATER HORIZON" IN THE GULF OF
      MEXICO, ON APRIL 20, 2010,
 5
      Applies to:
 6
      12-311, Cameron Int'l Corp. v. Liberty
 7    Ins. Underwriters, Inc., a/k/a Liberty
      Int'l Underwriters
 8
 9    ------------------------------------X
10
11
              CONFIDENTIAL - ATTORNEYS EYES ONLY
12
              VIDEO DEPOSITION OF CHARLES SLEDGE
13                      Houston, Texas
14              Friday, September 27, 2013
15
16
17
18
19
20
21
22
23    REPORTED BY:
24    Linda Rayburn, CSR
25    JOB NO:   65862
```

TSG Reporting - Worldwide   (877)702-9580

EXHIBIT 1

Confidential - Attorneys' Eyes Only

Page 68

1                       C. SLEDGE
2   read that indemnity.  There was significant --
3   well, strike the word "significant."  There was
4   risk in that indemnity.  We had BP objecting to
5   it.  We had Transocean objecting to it.  We had
6   billions of dollars of exposure.  If those
7   exposures would have hit, we would have
8   bankrupted the company and put tens of thousands
9   of families out of work.  So we were attempting
10  to enforce our indemnity.
11            MR. PATE:  Objection, nonresponsive.
12       Q.   (BY MR. PATE)  Let's talk as
13  businessmen for a second.  You never would expect
14  for Transocean just to step up to the plate and
15  say, "Sure, we'll fully indemnify you and pass on
16  any indemnity to you."
17            MR. AUSLANDER:  I object.  We're not
18  here as businessmen, so I'd ask you to rephrase
19  that question.
20       Q.   (BY MR. PATE)  Okay.  Well, you are a
21  businessman, correct?
22       A.   Yes.
23       Q.   Okay.  And in your experience as a
24  businessman working with companies such as
25  Cameron, Transocean and others, you wouldn't

Confidential - Attorneys' Eyes Only

Page 93

1           C. SLEDGE
2  fundamental, why isn't it listed?"
3       Q.  But you agreed that --
4       A.  And he said -- and he said --
5       Q.  I'm sorry.
6       A.  If I can finish.  I've got two things
7  to say.
8       Q.  I apologize.
9       A.  Okay.  He had no answer.  He
10 literally said, "I don't have an answer."
11          Okay.  So then I said, "Okay.  Well,
12 let's play this through."  This is a meeting in
13 my office.  I said, "Let's play this through.  So
14 what you're telling me, Jim, is you and I both
15 know that TO said they don't have an indemnity
16 obligation to it -- to us.  BP is saying, 'Hey,
17 Transocean, you don't have an indemnity
18 obligation to Cameron.'  Even if you had an
19 indemnity obligation from me, you can't pass it
20 on to Cameron because of the language of our
21 indemnity.  And on top of that, so what you're
22 suggesting is that I have -- that Cameron has to
23 go all the way through, we made" -- we've just
24 got a report out that is finding fault with the
25 BOP, defective design.  Okay.  Serious

Confidential - Attorneys' Eyes Only

Page 94

1                     C. SLEDGE
2    allegation.  BP is in a perfect position to
3    attack the BOP because of their knowledge.  So
4    what happens if" -- "You're saying I've got to
5    litigate the indemnity to the end before your
6    policy kicks in?"
7              "Oh, absolutely that's what I'm
8    saying."
9              Said, "Okay.  So you're saying that
10   Cameron has to put itself at risk of a judgment
11   pre getting the indemnity ruled on.  That would
12   bankrupt the company.  And then ultimately if
13   we're successful in getting an indemnity in
14   bankruptcy, you pay 50 million bucks.  Is that
15   really what -- the policy you intended to write
16   to Cameron?"
17             And he just totally said, "Well, you
18   know, I'm just saying I deserve more money."
19   That was his response.
20             MR. PATE:  Object to nonresponsive.
21       Q.  (BY MR. PATE)  Let me ask you this.
22   Is it your understanding that indemnities can
23   only be resolved by litigating them through the
24   end?
25       A.  No, that's not my understanding.

Confidential - Attorneys' Eyes Only

Page 161

1           C. SLEDGE
2           Actually, I do have something to add.
3  I recall a conversation with Jim.  I'm sorry,
4  maybe I shouldn't.  But I remember Jim in my
5  meeting in Houston saying, "I know" --
6           MR. AUSLANDER:  Jim who?
7           THE WITNESS:  Jim --
8           MR. PATE:  Engel.
9           THE WITNESS:  -- Engel.
10      A.  I remember Jim saying -- of Liberty
11 Mutual.  He says, I know I'm going to pay
12 something here under this policy."  So he was
13 never disputing at the end in our meeting in
14 January in my office that they owed under the
15 policy.  Never disputed that at that meeting face
16 to face.
17          He wanted a bigger discount.  In
18 fact, he said, "You know, Chuck, I've given you
19 an offer of a settlement and I've moved and you
20 haven't responded in any kind."
21          And that's when I went back and said,
22 you know, "It's, you know, 15 percent discount,"
23 which we already talked about.  So that is -- I
24 do remember that.
25      Q.  (BY MR. PATE)  Well, then you bring

Confidential - Attorneys' Eyes Only

Page 162

1            C. SLEDGE
2  up something interesting I've got to ask you
3  about.  You would agree with me that sometimes
4  insurance companies pay something because there's
5  a coverage dispute, to avoid having to litigate
6  it?
7       A.   I don't.
8       Q.   You're not familiar with that?
9       A.   What Jim told me is he knows he owes
10 under the policy.  That's what Jim told me.
11          MR. PATE:  Objection, nonresponsive.
12          THE VIDEOGRAPHER:  Five minutes left
13 on this tape.
14          MR. PATE:  Let's go ahead and change
15 it out now, because I've got to find something.
16          THE VIDEOGRAPHER:  Off the record,
17 11:48 a.m.  Ending tape three.
18      (A break was taken from 11:45 a.m. to
19      11:50 a.m.)
20          THE VIDEOGRAPHER:  Back on the
21 record, 11:53 a.m.  Beginning of tape number
22 four.
23      (Exhibit 72, having been previously marked
24      was referenced.)
25      Q.   (BY MR. PATE)  Mr. Sledge, I'm