1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF LOUISIANA
3  ----------------------------------------X
   In Re:  OIL SPILL BY THE OIL RIG
4  "DEEPWATER HORIZON" IN THE GULF OF
   MEXICO, ON APRIL 20, 2010,
5

6  Applies to:
7  12-311, Cameron Int'l Corp. v. Liberty
   Ins. Underwriters, Inc., a/k/a Liberty
8  Int'l Underwriters
9
   ----------------------------------------X
10
11
12         VIDEO DEPOSITION OF JAMES ENGEL
13                New York, New York
14                   May 29, 2013
15
16
17
18
19
20
21  Reported by:
22  Rebecca Schaumloffel, RPR, CLR
23  Job No.  61441
24
25

EXHIBIT 2

Page 155

1             J. ENGEL
2    uncertain, it had not been decided though,
3    right?
4         A.   Yes. Of course, I understood
5    that.
6         Q.   At the time that Cameron incurred
7    its loss, was there going to be any money
8    forthcoming from Transocean to satisfy that
9    loss or did Cameron have to look to the
10   insurance tower?
11        A.   Well, Cameron incurred its loss
12   when it settled. Because there was no
13   finding by the courts. Cameron settled. And
14   that's when they incurred their loss. And
15   when they incurred their loss, they withdrew
16   their motion, so they withdraw the ability
17   for the courts to rule on whether or not
18   those indemnities were valid and enforceable.
19   When they settled, they gave up all their
20   rights, and thus, they gave up LIU's rights
21   to stand in their shoes and have that issue
22   resolved. So that was Cameron's decision to
23   do that. It was Cameron's decision to bypass
24   the mechanism that Texas law describes as the
25   right mechanism for resolving this kind of

Page 156

1                    J. ENGEL

2  dispute.

3       Q.    So what were Cameron's choices if
4  it wanted to obtain coverage from Liberty?
5             In your view, what did Cameron
6  have to do in order to have coverage under
7  the Liberty policy?
8       A.    Cameron could have asked BP for
9  more time.  Cameron could have gone to the
10 courts and asked the Court to expedite their,
11 Court's decision on that motion.  Even
12 shortly after the settlement, I offered
13 Cameron an opportunity to settle the case
14 with a high-low decision where we would
15 guarantee them a minimum payment and they
16 would put a cap on what LIU would pay, and we
17 would base that upon a decision by the Court
18 to issue a ruling on the validity and
19 enforceability of Cameron's indemnities.  But
20 Cameron rejected that.
21      Q.    That was the settlement offer at
22 the time?
23      A.    That was.
24      Q.    By that point, your position was
25 that Cameron had foregone its ability to

1        J. ENGEL
2    A.    Yes.
3    Q.    Has Liberty ever taken the
4 position, to your knowledge, that other
5 insurance existed, as that term is defined in
6 the form policy, where the source of the
7 other insurance has denied payment to the
8 insured?
9    A.    Not that I can recall exactly as
10 you laid out the question.  There have been
11 circumstances where you see the definition of
12 other insurance includes self insurance.
13 Where Liberty has taken the position that
14 self insurance applies first, SIR would apply
15 first.  Of course, that happens often.
16    Q.    Let me try my question with a
17 little bit more precision.  Has Liberty ever
18 taken the position that other insurance, as
19 that term is defined in the form policy,
20 existed where the other insurance issued is a
21 contractual indemnity and the party that
22 supposedly owes the indemnity has denied
23 payment to the insured?
24    A.    Not that I can recall.  Again,
25 remember, that oil patch operates with

Page 161

1  J. ENGEL
2  indemnifications all around, all the way up
3  through the chain of companies that it
4  operated in oil. So it is a unique industry.
5  Q.  Has Liberty ever taken the
6  position with any other insured that the
7  potential that a contractual indemnity might
8  be applicable means its policy hasn't
9  attached pursuant to the other insurance
10  clause?
11  A.  I think that's the question that
12  you just asked, worded a little differently.
13  So I would say I don't recall any situations.
14      MR. KORN:  Let me mark as Engel
15      Exhibit 8 a two-page E-mail bearing
16      the Bates numbers LIU 10184 to '85.
17      (Whereupon, Engel Exhibit 8, LIU
18      10184 to '85 was marked for
19      identification as of this date by the
20      Reporter.)
21  Q.  Please take a minute and let me
22  know when you have had a chance to review
23  this E-mail.
24  A.  Okay.
25  Q.  Is this an E-mail that you sent

Page 182

1  J. ENGEL
2  precisely know the standards, no.  But I
3  would think if they are questioning me
4  intently about, you know, 10 and $20 million
5  claims, that an exposure that ran into the
6  billions would be something that would hit
7  the threshold of necessary disclosure.
8       Q.    Are you a securities lawyer?
9       A.    No.
10      Q.    Are you responsible at Liberty
11 for making security disclosures?
12      A.    Of course not.
13      Q.    Have you written 10-Ks?
14      A.    Of course not.
15      Q.    Have you written 10-Qs?
16      A.    No, nope.
17      Q.    Fair to say you have never
18 written a public disclosure for the SEC in
19 any of the companies you have worked for?
20      A.    That's correct.
21      Q.    Let's get back on track.  What
22 did you conclude was Cameron's reasonable
23 exposure?
24      A.    Anywhere's from zero up to
25 perhaps a billion dollars.

1       J. ENGEL
2  under advisement.
3       Q.   I would just like to direct to
4  you to a couple of things.  First is, if you
5  look to your E-mail, the second-to-last
6  paragraph starting with "I know that you and
7  I" --
8       A.   Um-hum.
9       Q.   The first sentence says that "I
10 know you and I continue to disagree on LIU's
11 policies, conditions for attachments.  As I
12 have stated often, I believe the language is
13 clear and unambiguous.  We both know that
14 reasonable men can agree to disagree on
15 something seemingly straightforward to each
16 of them."  Do you see that?
17      A.   I do.
18      Q.   I just want to make sure I
19 understand what you are saying there.  Are
20 you saying that it is reasonable to have a
21 disagreement or are you saying that
22 reasonable minds could differ over the policy
23 language at issue?
24      A.   Isn't that the same thing?  I
25 think it is one in the same thing.

```
                                                    Page 267
 1                    J. ENGEL
 2        Q.    Okay.  So I am glad I clarified
 3   this.  Your view is that reasonable minds can
 4   differ over the policy language at issue,
 5   correct?
 6        A.    Yeah, when something is seemingly
 7   straight forward, each of them.  So it is
 8   inviting a compromise here.
 9        Q.    I understand the purpose of the
10   E-mail.  I am just focusing on this point and
11   I want to make sure I understand, it is your
12   view that reasonable minds can differ over
13   the interpretation of the other insurance
14   clause?
15        A.    Happens all the time in our
16   business.
17        Q.    So the answer to my question
18   is yes?
19        A.    Yes.
20        Q.    The next question I have, and it
21   is, I think, the last one on this document
22   is, is this E-mail was sent on January 26,
23   2012, right?
24        A.    Correct.
25        Q.    And we looked and the BP Cameron
```