Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA
 3    -------------------------------------X
      In Re:  OIL SPILL BY THE OIL RIG
 4    "DEEPWATER HORIZON" IN THE GULF OF
      MEXICO, ON APRIL 20, 2010,
 5
 6    Applies to:
 7    12-311, Cameron Int'l Corp. v. Liberty
      Ins. Underwriters, Inc., a/k/a Liberty
 8    Int'l Underwriters
 9
      -------------------------------------X
10
11
12          VIDEO DEPOSITION OF JEFFREY ROBERTS
13                   New York, New York
14                 Thursday, May 30, 2013
15
16
17
18
19
20
21    Reported by:
22    Rebecca Schaumloffel, RPR, CLR
23    Job 61442
24
25
```

EXHIBIT 3

Page 129

1       J. ROBERTS
2  attending the meeting in person?
3     A.   Yes, I did.
4     Q.   And who led the meeting?
5     A.   Brad Eastman, another person from
6  the legal counsel and Tony Black.
7     Q.   Did representatives from the
8  other insurers in Cameron's tower attend the
9  meeting?
10    A.   There were many parties there.
11    Q.   Did you understand that some of
12 them were representatives from other insurers
13 in Cameron's tower?
14    A.   Yes, and their counsel.
15    Q.   Did you ask questions during the
16 meeting?
17    A.   I did.
18    Q.   Did Cameron answer your questions
19 during the meeting?
20    A.   I believe to the best of their
21 ability.
22    Q.   You can put Exhibit 24 to the
23 side.
24         MR. KORN:  I am going to mark as
25    Exhibit 25, a one-page E-mail bearing

1       J. ROBERTS
2  a diagram of the blow-out preventer with its
3  various components from the ground up.  It
4  wasn't an engineering drawing.  But not -- I
5  don't have a specific recollection of
6  something.
7       Q.   Did Cameron provide you access to
8  a database of documents?
9       A.   Cameron did set up -- through a
10 third-party, they had set up a database or a
11 document repository.
12      Q.   Do you recall the nature of the
13 documents that were in the database or
14 document repository?
15      A.   It was documents relating to the
16 claim, suits that Cameron had received,
17 copies of reports.
18      Q.   Would you agree that Cameron
19 provided you with a substantial amount of
20 information pursuant to the terms of the
21 Confidentiality Agreement?
22      A.   No, I would disagree with that
23 statement.  Cameron provided a document room.
24 You know, I could never find anything in it.
25 Nothing was categorized with inside the

Page 151

1      J. ROBERTS
2  given thought prior to Mr. Koepff's
3  engagement of that a defense to the claim
4  might be that the other insurance provision
5  places coverage excess of the Transocean
6  indemnity?
7      A.   Well, I -- think -- you know, as
8  an excess guy, somebody who handles excess
9  claims, other insurance, just one component
10 of many things in the policy of the terms and
11 conditions that a person looks at.  But it
12 was not the focus or -- of any type of
13 discussion or policy decision as to this is
14 how we should go about this.  Because, again,
15 Cameron is not coming after its insurance.
16 Cameron is telling its carriers we are
17 defending the case.  We are going after the
18 indemnity.  We are filing a motion to enforce
19 our indemnity agreements.  So I am not
20 looking to raise policy defenses, potential
21 policy defenses that we may have and then
22 present that position to the insured.
23     Q.   Right.  You only presented that
24 position to the insured after Mr. Koepff was
25 hired and settlement negotiations began,

Page 152

1    J. ROBERTS

2  right?

3       A.    Yes.  I believe that's correct.

4       Q.    Had you analyzed the other

5  insurance provision before that happened?

6       A.    Before what happened?

7       Q.    Had you analyzed the other

8  insurance provision prior to the time that BP

9  and Cameron began engaging in settlement

10 discussions in the fall of 2011?

11      A.    No.  Like I said before, as a

12 point of clarification of the note, no, we

13 had not looked into raising policy coverage

14 defenses at -- prior to Cameron's engagement

15 of BP and settlement negotiations, which was

16 contemporaneous with Mr. Koepff's hiring.

17      Q.    It's true, though, that you did

18 look at other provisions in the policy to see

19 what coverage defenses might apply, correct?

20      A.    We looked to see if there were

21 any exclusions for specific incidents for

22 anything.  But, no.

23      Q.    So your testimony is that until

24 settlement discussions began in September of

25 2011, you didn't analyze any of the potential

Page 219

1        J. ROBERTS
2     Q.    You see in the second paragraph
3  the first sentence says "Please be advised
4  that we will address all coverage issues upon
5  receipt of all relevant documents."
6           Do you see that?
7     A.    Yes.
8     Q.    At what point in time did Liberty
9  address all coverage issues?
10    A.    Did we address all coverage
11 issues?  Well, we sent a general ROR in my
12 April E-mail, right, which was, I guess, a
13 few days after this and then I believe the
14 next coverage letter that we issued was
15 Mr. Koepff's letter in November.
16    Q.    That was November 2011?
17    A.    Correct.
18    Q.    So there was basically an
19 18-month gap between your general ROR
20 language in your E-mail and Mr. Koepff's
21 letter in which no coverage position was
22 conveyed to Cameron, correct?
23    A.    Correct.
24    Q.    The first time that you came up
25 with the other insurance coverage position

Page 220

1          J. ROBERTS
2  was in October of 2011, sometime?
3       A.   That's fair.
4       Q.   Did you not have all relevant
5  documents until that time to develop the
6  coverage position that you conveyed through
7  Mr. Koepff on November 7, 2011?
8       A.   Well, you know, again, you have a
9  blow-out preventer, so the case was static
10 for a year.  So you have -- you have to keep
11 in mind the time frames and the times here in
12 that nothing really transpired for a year,
13 and it wasn't until that point in time or at
14 that point in time everyone was aligned in
15 this that Cameron was seeking its
16 indemnities, was going to defend the case and
17 wasn't seeking coverage from its insurers.
18 And as you get into that late November
19 timeframe or late -- sorry, late October
20 timeframe, Cameron is now beginning to change
21 its position or its direction of how its
22 handling things or how it is going to proceed
23 forward on the case.
24      Q.   And in what way did Cameron
25 change how it was handling things?

1  J. ROBERTS

2  A.  I believe at that point, Cameron
3  was beginning to entertain settlement
4  overtures from BP.
5  Q.  And so it was at that point that
6  the Liberty policy might be implicated for
7  the first time; is that your testimony?
8  A.  Yes.  When Cameron decided it was
9  potentially going to make a settlement offer.
10  Q.  So when Cameron needed help from
11  Liberty, that's when you developed the other
12  insurance position to say that the policy
13  didn't attach, right?
14      MS. BARRASSO:  Objection to for
15    how long.
16  A.  That's when Mr. Koepff was hired
17  we issued the coverage position to Cameron
18  that we were excess of the indemnities that
19  they were still at that time currently
20  pursuing.
21  Q.  But you waited until Cameron
22  actually came and asked for help and sought
23  the limits under the insurance policy to tell
24  Cameron that they didn't attach?
25  A.  No, because Cameron didn't come

Page 250

1                J. ROBERTS
2   release position in your E-mail to
3   Mr. Eastman, did you mention Liberty's
4   position on the other insurance clause?
5        A.   No.
6        Q.   You can put that document to the
7   side.  Could you please take out of the stack
8   what was marked yesterday as Engel
9   Exhibit 11, please.  We talked about this a
10  little bit earlier today.  This is the letter
11  from Mr. Koepff to Mr. Eastman at Cameron on
12  November 7, 2011, setting forth Liberty's
13  coverage positions, correct?
14       A.   Yes.
15       Q.   And is this letter the first time
16  that Liberty ever mentioned to Cameron that
17  the other insurance provision was a potential
18  basis to refuse to pay Cameron's claim in
19  connection with the Deepwater Horizon
20  incident?
21       A.   Could you repeat that for me?
22  Just so I am clear.
23       Q.   Is this letter from Mr. Koepff
24  the first time that Liberty ever mentioned to
25  Cameron that the other insurance provision

Page 251

1    J. ROBERTS
2    was a potential basis to refuse to pay
3    Cameron's claim in connection with the
4    Deepwater Horizon incident?
5        A.    I believe this may be the first
6    written correspondence to Cameron about that.
7        Q.    Did you review this letter in
8    draft form?
9        A.    I don't believe so.
10       Q.    Was it your decision to take the
11   position that LIU would decline to offer its
12   policy limits based on the other insurance
13   provision?
14       A.    That's not a decision I can make.
15       Q.    Do you know whose decision
16   that was?
17       A.    I believe that was Mr. Engel's
18   decision.
19       Q.    Did you agree with Mr. Engel's
20   position?
21       A.    Yes.
22       Q.    Did you discuss this position
23   with Miss Rogin?
24       A.    We all -- as I had mentioned or
25   said earlier, we all discussed these -- this

Page 294

1  J. ROBERTS
2  was between BP and Cameron in putting
3  particular terms in the contract, correct?
4  A.   No, I don't know what BP or
5  Cameron's intent was.
6  Q.   Do you have any firsthand
7  knowledge about what any of the terms of the
8  BP or Cameron contract mean?
9         MS. BARRASSO:  Object to the
10     form.
11 A.   I guess if you ask me a specific
12 one I can tell you.  I am really not
13 following you -- I am not trying to be
14 evasive here.  I'm just not following what
15 the question is that you are asking me.  Do I
16 have specific knowledge of the terms?  I
17 didn't study the release because the
18 agreement was not -- it was not a settlement
19 between Liberty and its insured or Liberty on
20 behalf of its insured to a third-party BP.
21 So I did not study the release.
22 Q.   And Liberty is not a party to the
23 contract, right?
24 A.   I don't believe we were a
25 signator.  I know that Cameron said that they

1       J. ROBERTS
2  had preserved Liberty's rights within the
3  release.
4       Q.   Is it fair to say that you're not
5  in a position to testify about what the
6  parties intended by any terms in the BP
7  Cameron contract?
8       A.   Yes, I cannot speak to what BP or
9  Cameron intended.
10           MR. KORN:  I am going to mark as
11      Roberts Exhibit 39, a letter dated
12      December 14, 2011, bearing the Bates
13      range LIU 09730 to '731.
14           (Whereupon, Roberts Exhibit 39,
15      LIU 09730 to '731 was marked for
16      identification as of this date by the
17      Reporter.)
18      Q.   Have you had a chance to review
19  Roberts Exhibit 39?
20      A.   I am looking at it now.
21      Q.   Okay.  Please let me know when
22  you have had a chance to.
23      A.   All right.
24      Q.   Have you ever seen this letter
25  before?

1              J. ROBERTS
2   restrictive as underlying provision itself,
3   right?
4       A.   Yes.
5       Q.   And do you see that in the third
6   paragraph, Iron-Starr wrote that quote "It is
7   not confident that Cameron will prevail in
8   obtaining pass-through indemnity from
9   Transocean of the pollution indemnity
10  contained in the transition to drilling
11  contract"?
12      A.   I see that.
13      Q.   Does this refresh your
14  recollection as to whether Mr. Koepff ever
15  shared this correspondence with you?
16      A.   No.
17      Q.   Is it surprising to you that
18  other insurers like Iron-Starr and AIG and
19  INIC were criticizing the coverage positions
20  that Liberty was taking?
21      A.   Not particularly.  I have
22  criticized other carriers on their coverage
23  positions.  They have criticized us before.
24      Q.   Would you agree that reasonable
25  minds could differ on Liberty's

```
1                    J. ROBERTS
2    interpretation of the other insurance
3    provision of its policy with Cameron?
4         A.    I think reasonable minds can
5    agree to disagree on just about anything.
6         Q.    Specifically reasonable minds
7    could disagree on the interpretation of the
8    other insurance clause and the policy that
9    Liberty issued to Cameron, correct?
10        A.    That could be a fair statement.
11        Q.    You can put this exhibit to the
12   side.  Is it correct that Liberty never
13   offered to pay its full limits to Cameron?
14        A.    I believe that's correct.  But I
15   do not have firsthand knowledge of that.
16        Q.    In fact, when it came to
17   discussing the amounts that may or may not be
18   paid to Cameron, Liberty went right into
19   settlement mode and discussed paying Cameron
20   an amount less than its full policy limits,
21   correct?
22        A.    I was not part of the settlement
23   discussions or negotiations.  So I don't know
24   that directly.  But I do know that we did not
25   make a $50 million policy offer to them.
```