Page 1

```
 1

 2   UNITED STATES DISTRICT COURT

 3   EASTERN DISTRICT OF LOUISIANA

 4   ---------------------------------------X

 5   In re: OIL SPILL BY THE OIL RIG

 6   "DEEPWATER HORIZON" IN THE

 7   GULF OF MEXICO, ON APRIL 20, 2010

 8

 9   Applies to:

10   12-311, Cameron Int'l Corp. v. Liberty

11   Ins. Underwriters, Inc., a/k/a Liberty

12   Int'l Underwriters
     ---------------------------------------X
13

14

15        VIDEOTAPED DEPOSITION OF ALAN MANDEL

16                 New York, New York

17                 September 12, 2013

18

19

20

21

22

23

24   Reported by:
     Bonnie Pruszynski, RMR
25   JOB NO. 65662
```

EXHIBIT 9

Page 81

1        A. Mandel
2              And that also would be under the
3    guidance of the producer, who knows what
4    premium that they are looking for the client
5    to pay.  The client probably has a budget,
6    like every other company, what they can pay
7    for their insurance budget.
8              But that has nothing to do with the
9    coverages.  It has nothing to do with the
10   pricing.  That's two different animals.  We
11   don't -- you know, it has nothing to do with
12   the coverage -- you know, it could have to do
13   with the coverage if you do -- you know,
14   let's say you are picking up some different
15   exposure, you may want to charge for it, but
16   not -- nothing to do with the -- you know,
17   with what you are referring to.  You look at
18   the losses and the exposures.
19   Q     When you underwrote the Liberty
20   policy for Cameron, did you give any
21   consideration at all to the "other insurance"
22   clause?
23   A     I knew nothing about the "other
24   insurance" clause at the time.  I still
25   don't.  I don't -- that has nothing to do

1                  A. Mandel

2  with pricing.

3     Q    Did the "other insurance" clause in

4  the Liberty policy impact the premium that

5  you charged to Cameron in any way?

6     A    Nothing. It has nothing to do with

7  it.

8     Q    Let's turn to the last page of the

9  Liberty policy.

10        Are you there, sir?

11    A    I'm there. I'm sorry, I'm looking

12  at the page, and then you are looking at me.

13     Q    Clause F on the last page of Engel

14  Exhibit 3 contains the "other insurance"

15  provision; right?

16    A    Yes, it does.

17     Q    What is the purpose of the "other

18  insurance" clause as used in the -- in the

19  Liberty policy?

20    A    Well, not the Liberty policy, but

21  the only thing I know about the "other

22  insurance" clause is that it's other

23  insurance that could be somebody who has

24  self-insurance, and that would be -- in case

25  there is a claim, that would be first that

1                    A. Mandel

2    Q     When Cameron came to Liberty for
3  insurance, what did you understand Cameron's
4  objectives to be?
5    A     The objective was to fill out their
6  tower, because there aren't that many
7  companies that might write this type of a
8  risk, so they needed me, for the limits.
9    Q     Did Cameron -- withdrawn.
10          Is it fair to say that Cameron did
11  not want to have a gap in its tower?
12    A     Yes.
13    Q     The insurance coverage from the
14  bottom of the tower to the top of the tower
15  was supposed to be consistent; right?
16    A     Yes.
17          (Telephone interruption.)
18    A     I will shut it off.  I thought I
19  shut it off.
20    Q     Would it be false to suggest that
21  Liberty relies upon the other insurance
22  provisions and the contractual indemnity's
23  impact on other insurance in determining
24  policy premiums and assessing Liberty's risks
25  when issuing policies?

```
 1                    A. Mandel
 2      A    It has nothing to do with it.
 3      Q    That would be a false statement to
 4 suggest that?
 5      A    False, yeah.
 6      Q    Would it be a false statement to
 7 suggest that the "other insurance" provision
 8 in a Liberty policy is a critical component
 9 in underwriting policies?
10      A    False.
11      Q    Do you think that it is fair to an
12 insured to be required to go to court and
13 obtain a judgment that it is not entitled to
14 contractual indemnity before the coverage
15 that you sold to Cameron is provided under
16 the Liberty policy?
17           MR. DEES:  Object to form.
18      A    I can't -- I can't make an opinion
19 on that.  I'm not a claim person, so my -- I
20 would be guessing.  I have no idea.
21      Q    Do you agree with Liberty's
22 position in this case to deny coverage to
23 Cameron based upon the "other insurance"
24 provision?
25      A    To be perfectly honest, I have no
```

Page 104

1                    A. Mandel
2  with its customers; correct?
3      A    Correct.
4      Q    And it was on that basis that you
5  underwrote this risk; correct?
6      A    Correct.
7      Q    Was it your expectation, when you
8  underwrote that, the risk, that the third
9  parties with whom Cameron had those
10 contractual indemnities would pay the loss
11 that Cameron incurs?
12     A    Yes.
13     Q    And if it didn't pay that loss,
14 then it would be Liberty's responsibility,
15 because it issued an insurance policy, to pay
16 that loss; correct?
17     A    Correct.
18     Q    If you could turn to the last page
19 of the document, please.
20          What does this page describe?
21     A    The conditions of our policy, the
22 endorsements, and the pro and cons, so if
23 somebody looks it over and wants to figure
24 what the exposure is.  With every pro,
25 there's always a con.  Like the glass is half

```
 1                A. Mandel
 2    indemnification agreements was one of the
 3    reasons why -- the reason why we solely wrote
 4    this account, which I have stated in the
 5    past.
 6            So, we had nothing to do with the
 7    "other insurance" clause.  It's never come to
 8    light.  There is no debits, no credits.
 9    There's nothing.  It's not even taken into
10    consideration, so...
11       Q    Right.  You solely underwrote the
12    account because you assumed that those other
13    indemnification agreements would pay and
14    cover the losses that Cameron incurred.
15       A    Yes, and limit the liability.  That
16    was one of the big selling points.  Limit the
17    liability of the cat exposure, which they
18    would not assume.  That's what Tony told us.
19       Q    And that had nothing whatsoever to
20    do with the "other insurance" provision;
21    correct?
22       A    That wasn't even ever -- correct,
23    never mentioned.
24       Q    Did you follow the same process for
25    calculating premiums for Cameron in each of
```