Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
------------------------------------X
In Re:  OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF
MEXICO, ON APRIL 20, 2010,

Applies to:
12-311, Cameron Int'l Corp. v. Liberty
Ins. Underwriters, Inc., a/k/a Liberty
Int'l Underwriters


------------------------------------X


  VIDEO DEPOSITION OF MAUREEN MARTIN
         New York, New York
            June 25, 2013






Reported by:
Rebecca Schaumloffel, RPR, CLR
Job No: 62301

EXHIBIT 13

1      M. MARTIN
2  of the parties that were involved.  So
3  overall damages that we had investigated and,
4  you know, certainly were developing in the
5  nature of the case approached $40 billion at
6  one point in time, if I recall correctly and
7  clearly.  Cameron certainly had potential
8  exposure for some portion of that
9  potentially.
10     Q.    Did you review drafts of
11 Cameron's proposed settlement agreements with
12 BP as part of your involvement in the -- in
13 analyzing Cameron's Deepwater Horizon claim?
14     A.    Certainly I was involved in
15 reviewing drafts of the proposed agreement
16 with my coverage counsel as this claim teed
17 up towards the negotiation process and
18 negotiations were taking place.
19     Q.    Was that review an analysis for
20 purposes of determining whether AIG should
21 consent and contribute to the settlement
22 under the applicable insurance policies that
23 Cameron had purchased from AIG?
24     A.    Would you mind repeating the
25 question, please.

Page 31

M. MARTIN

1
2  Q.   Did you form a view about the
3  settlement and its terms?
4  A.   Did I form a view about the
5  amount and the extent of the releases
6  included within the settlement, is that where
7  we are going?
8  Q.   Yes.
9  A.   That's the question being asked?
10 Yes, I did form a view of the settlement.
11 The settlement, the release, and the amount
12 that was exchanged for consideration of the
13 agreement.
14 Q.   What was that view?
15 A.   My view and my company's view was
16 that this was -- this was a good result for
17 Cameron.
18 Q.   Why is that?
19 A.   The reason we held that viewpoint
20 was this was resulting in closure for Cameron
21 in large regard regarding its exposure.  The
22 exposure Cameron faced for this loss was
23 potentially quite, quite significant, and we
24 felt that this -- this would be a good thing
25 for our client and our insured.

1  M. MARTIN
2  proposed deal in place and give that another
3  go around and another look to see where we
4  felt we fell.
5      Q.    Miss Martin, did you believe this
6  was a good deal for Cameron?
7          MS. BARRASSO:  Object to the
8      form.
9      A.    In my estimation, and
10 specifically just focusing in on the amount
11 that was at stake, it was my opinion that
12 this was a good result for Cameron.
13     Q.    Why is that?
14     A.    In short, this was because I
15 believed Cameron faced significant exposure
16 excess to what this $250 million represented.
17         MR. MISHKIN:  I would like to
18     mark what will be the new Martin
19     Exhibit 54.
20     (Whereupon, Martin Exhibit 54,
21     CIC '0003528 was marked for
22     identification as of this date by the
23     Reporter.)
24     Q.    Miss Martin, I have handed you a
25 document that's Bates stamped CIC '3528.  Do

Page 64

1      M. MARTIN
2      A.    It's my position that we did not
3   read it that way.
4      Q.    Is your view that the definition
5   of other insurance in the Liberty policy
6   should not be interpreted to include the
7   TransOcean contract for indemnity?
8      A.    For the reasons that I just
9   described in the example I just gave, that
10  would be my position.
11     Q.    Did you set out your disagreement
12  with Liberty's position in writing?
13     A.    I believe -- I believe we sent
14  out a communication and a letter a day or so
15  after the Paul Koepff letter.  I just don't
16  recall specifically the exact date, but I
17  believe it was fairly, fairly shortly after
18  he issued his letter, we issued a response in
19  kind.
20     Q.    I am handing you, Miss Martin,
21  what has been previously marked as Roberts
22  Exhibit 39.
23     A.    Thank you.
24     Q.    Miss Martin, I have handed you a
25  document that's Bates stamped LIU '09730

1  M. MARTIN
2  through LIU '09731.  Do you have that in
3  front of you?
4      A.   I do.
5      Q.   Do you recognize this document?
6      A.   I do.
7      Q.   What is this?
8      A.   It is the letter, I guess, I was
9  inarticulately referring to just previously
10 which would have been our response to
11 Paul Koepff's correspondence the day prior.
12     Q.   Is this a true and correct copy
13 of the letter written by your counsel,
14 Richard Bryan to Paul Koepff on December 14,
15 2011?
16     A.   Yes, it would appear to be so.
17     Q.   Did you review a draft of this
18 letter before it was sent?
19     A.   Yes, I would have reviewed a
20 draft.
21     Q.   Would you have approved it before
22 it was sent?
23     A.   I am quite confident I would have
24 discussed it and -- with my coverage counsel,
25 so, yes.

Page 71

1                    M. MARTIN
2    interpretation of its other insurance
3    clause."
4         A.    Yes.
5         Q.    What were you referring to there?
6         A.    Basically, in that sentence, what
7    we are getting to is the restrictive is
8    underlying clause that we had discussed
9    earlier.
10        Q.    Which meant that the Cat excess
11   policy incorporated the Liberty policy's
12   other insurance provision?
13        A.    That's correct.
14        Q.    And why didn't AIG take the same
15   position as Liberty with respect to its other
16   insurance provision?
17        A.    Again, I apologize if I sound
18   very repetitive, but we did not read that
19   language the same -- in the same manner that
20   Liberty did.
21        Q.    Moving down a couple of lines
22   again, do you see the sentence that says, "In
23   the context of this particular loss and the
24   opportunity to settle with BP, the actions of
25   your clients are an unreasonable and

1             M. MARTIN
2  prejudicial impediment to settlement."
3       A.    Yes.
4       Q.    Did you believe that Liberty's
5  actions were unreasonable?
6       A.    If we did not believe -- if we
7  did not believe it was reasonable, we
8  wouldn't have written this sentence the way
9  we did.  We believed it was an unreasonable
10 position.
11      Q.    And the last sentence of the
12 letter, do you see where it says, "If this
13 settlement is not concluded due to the
14 actions, omissions, or positions of one or
15 more of your clients, our clients reserve the
16 right to seek recovery of all financial
17 losses and damages incurred as a result
18 thereof"?
19      A.    Yes, I see that sentence.
20      Q.    And why did -- why did AIG
21 reserve its rights?
22      A.    At the time that this letter was
23 written, we were quite concerned that this
24 settlement opportunity was going to fall
25 apart, so we felt we needed to write

Page 154

1  M. MARTIN
2  didn't participate in those meetings, you
3  don't have a personal knowledge of what was
4  said at the meeting -- those meetings with
5  Cameron?
6      A.  I am just not recalling any such
7  meetings right now.
8      Q.  And what did you do to analyze
9  the indemnification claim?
10     A.  In terms of?
11     Q.  Well, you just testified, you
12 know analysis had been done and that the
13 amount that BP had discounted its claim by
14 was reasonable.
15     A.  In our estimation, looking at the
16 potential exposure of upwards of $40 billion
17 and presuming that even a 1% share of
18 liability would be assessed to Cameron,
19 working out that math, this $250 million
20 settlement appeared to be a solid deal, a
21 good deal.
22     Q.  Well, my question was, what did
23 you do to analyze the indemnification rights?
24     A.  Again, we would have looked at
25 the contract.  We were certainly monitoring