```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3      - - - - - - - - - - - - - - - - - - -
 4      IN RE: OIL SPILL, by the OIL RIG
 5      "DEEPWATER HORIZON" in the
 6      Gulf of Mexico, on APRIL 20, 2010      MDL NO. 2179
 7
 8      This Document Relates to: 12-00311    SECTION: J.
 9
10
11      - - - - - - - - - - - - - - - - - - -
12
13
14
15      This is the deposition of ALEXIS RENÉ NUSUM, taken
16      before an Official Examiner at Hamilton Princess Hotel, 76
17      Pitts Bay Road, Pembroke Hamilton, Bermuda, HM 08, on
18      Wednesday, August 14, 2013 at 9:00 a.m.
19
20                      ---------------------
21
22      Reported by: Lisa M. Barrett, CSR (Ont.) RPR, CRR
23
24                      ---------------------
25
```

```
 1                    A.   Yes.
 2                    Q.   Do you recall on how many
 3   occasions?
 4                    A.   Once in person.
 5                    Q.   You mentioned that as part of
 6   your role in analyzing the claim, you -- and
 7   correct me if I'm wrong -- analyzed the potential
 8   damages and liability; is that correct?
 9                    A.   Yes.
10                    Q.   And did you reach a conclusion
11   as to the potential value of Cameron's liability?
12                    A.   Yes.
13                    Q.   What was your conclusion?
14                    A.   Based on the reports and the
15   sources of information, I saw that there was
16   a potential $20 billion loss.
17                    Q.   Did you learn eventually that
18   Cameron entered into settlement negotiations
19   regarding the Deepwater Horizon oil spill?
20                    A.   Yes.
21                    Q.   Do you recall when you learned
22   of that?
23                    A.   I don't remember.
24                    Q.   Do you recall how you learned
25   of that?
```

```
 1          A.   Not without --
 2          Q.   Did you consider the settlement
 3   with BP to be a good settlement for Cameron?
 4          A.   Yes.
 5          Q.   Why?
 6          A.   For Cameron it's -- their
 7   exposure is significantly decreased.
 8          Q.   I'm handing you an email that
 9   has previously been marked as Engel Exhibit 14,
10   bearing Bates Nos. LIU13509 through LIU13512.
11                    EXHIBIT NO.  2:  Document
12                Bates Nos. CIC0003538-3540, Email
13                message chain.
14          BY MS. TOZESKI:
15          Q.   I'm sorry, I've handed you the
16   wrong document.  You can set that aside.
17               I'm instead handing you a document,
18   which has not previously been marked, bearing Bates
19   stamp CIC0003538 through 3540.
20               THE EXAMINER:  This is Exhibit 2?
21               MS. TOZESKI:  This is Exhibit 2.
22          BY MS. TOZESKI:
23          Q.   Do you recognize this document?
24          A.   Yes.
25          Q.   What is this document?
```

```
 1                    MR. DEES:  Join in the objection.
 2                    THE EXAMINER:  Objection noted.
 3                    THE WITNESS:  My understanding is
 4    that Chubb will follow the underlying policies and
 5    if those -- and if any of those policies are more
 6    restrictive than Chubb's policy, then we would -- we
 7    have the option to take on that more restrictive
 8    policy.
 9                    BY MS. TOZESKI:
10             Q.     Do you recall whether there was
11    a "restrictive as underlying" provision in the
12    policy that Chubb issued to Cameron?
13             A.     Can you repeat that?
14             Q.     Sure.  Do you recall whether
15    there was such a provision in the Chubb policy
16    issued to Cameron?
17             A.     Yes.
18             Q.     So, am I to understand -- first
19    of all, do you recall whether the Liberty Insurance
20    policy was an intervening policy between Chubb's
21    policy and the following policy?
22             A.     Yes.
23             Q.     It was.  So, am I to understand
24    that under Chubb's "restrictive as underlying"
25    provision, you could rely on more restrictive terms
```

```
 1        in the Liberty policy?
 2              A.   Yes.
 3              Q.   And that would include
 4        Liberty's other insurance provision?
 5              A.   Yes.
 6              Q.   Did Chubb rely upon Liberty's
 7        other insurance provision?
 8              A.   No.
 9              Q.   Can you explain to the jury why
10        Chubb did not rely on Liberty's other insurance
11        provision?
12              MR. LARSEN:  To the extent that would
13        call for a privileged communication I would instruct
14        you not to respond, but you can otherwise respond.
15              THE WITNESS:  No, I can't.
16              BY MS. TOZESKI:
17              Q.   Without revealing
18        attorney-client communications, do you recall
19        whether Chubb -- Chubb did not rely upon Liberty's
20        other insurance provision because Cameron was not
21        being paid any other insurance at the time of its
22        settlement with BP?
23              MR. LARSEN:  Same objection.
24              THE EXAMINER:  Objection noted.
25              THE WITNESS:  I can't answer that.
```

```
 1                    A.   Correct.
 2                    Q.   Do you believe that Chubb's
 3       liability for the claim of Cameron was reasonably
 4       clear at the time you wrote this letter on
 5       December 2, 2011?
 6                    MR. LARSEN:  I'm going to object to
 7       the extent that it's vague.
 8                    THE EXAMINER:  Objection noted.
 9                    THE WITNESS:  Can you please rephrase
10       the question?
11                    BY MR. DEES:
12                    Q.   Sure.  Do you think as of
13       December 2, 2011, Chubb's liability to Cameron was
14       clear?
15                    MR. LARSEN:  To the extent that calls
16       for a legal conclusion, object.
17                    THE EXAMINER:  Objection noted.
18                    THE WITNESS:  I believe so.
19                    BY MR. DEES:
20                    Q.   You believe so?
21                    A.   Yes.
22                    Q.   Do you know whether Chubb
23       believed so?
24                    A.   That's privileged information.
25                    Q.   Okay.  Were you the sole
```

```
 1                      understood that payment of
 2                      $21,250,000 by Chubb to Cameron
 3                      as provided herein shall fully
 4                      exhaust the Policy and no other
 5                      claims, known or unknown,
 6                      whether related to the
 7                      Deepwater Horizon Incident or
 8                      not, shall be submitted for
 9                      coverage under the Policy."
10                 So the policy was discounted; would
11      you agree?
12                      A.   Yes.
13                      Q.   Do you know why the policy was
14      discounted?
15                      A.   Yes.
16                      Q.   Why?
17                      A.   I believe it was discounted
18      because Chubb did the right thing and paid.
19                      Q.   I'm sorry, Chubb --
20                      A.   Chubb did the right thing and
21      paid the limits.
22                      Q.   Well, if Cameron had demanded
23      25 million and Chubb only paid 21,250,000 do you
24      know what consideration, if any, was given for the
25      discount of 8,000,800 -- or 8,750,000?
```

```
 1                    A.   Yes, after negotiation.
 2                    Q.   Thank you, Ms. Nusum.  That's
 3     all the questions I have.
 4                    MR. KORN:   We may have some
 5     re-direct.  Let's go off the record.
 6                    --- RECESS AT 10:35 A.M.
 7                    --- RESUMED AT 10:51 A.M.
 8                    RE-DIRECT EXAMINATION
 9                    BY MS. TOZESKI:
10                    Q.   Ms. Nusum, just a few more
11     questions for you.  Do you recall testifying
12     earlier that the Chubb policy had a "restrictive as
13     underlying" provision?
14                    A.   Yes.
15                    Q.   Would you agree that if
16     Liberty's other insurance provision was more
17     restrictive than Chubb's other insurance provision,
18     Chubb could take advantage of Liberty's other
19     insurance provision?
20                    A.   Yes.
21                    Q.   That would be because Chubb had
22     a "restrictive as underlying" provision; is that
23     correct?
24                    A.   Yes.
25                    Q.   Did Chubb take advantage of
```

```
 1        Liberty's other insurance provision?
 2                   A.    No.
 3                   Q.    Instead, Chubb agreed to pay
 4        Cameron its full limit under the Chubb policy; is
 5        that correct?
 6                   A.    Yes.
 7                   Q.    You testified that you believe
 8        Chubb's liability to pay Cameron was clear; do you
 9        recall testifying to that effect?
10                   A.    Yes.
11                   Q.    What was the basis for your
12        belief that Chubb's liability to pay Cameron's
13        claim was clear?
14                   MR. LARSEN:    To the extent that would
15        call for disclosure of attorney-client
16        communications, I would advise so and instruct you
17        not to answer.    If you have other views outside of
18        the privilege, you can respond.
19                   THE WITNESS:    Through my analysis
20        I weighed the potential loss of the -- potential
21        damages of $20 billion to the $250 million
22        settlement and I -- those were staggering numbers,
23        so I figured: "Why not limit the liability and cap
24        it at 250?"
25                   BY MS. TOZESKI:
```