# Exhibit C

# The Donovan Law Group
3102 Seaway Court, Suite 304
Tampa, Florida 33629
(352) 328-7469

December 21, 2012

**VIA Email**

Mr. Stephen J. Herman
Plaintiffs' Liaison Counsel
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70113

Re: An Open Letter to the MDL 2179 Plaintiffs' Steering Committee ("PSC")

Dear Steve,

I am writing this open letter on behalf of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility ("GCCF") victims.

Background

On August 10, 2010, the United States Judicial Panel on Multidistrict Litigation ("JPML") issued its Transfer Order (Rec. Doc. 1) wherein it clearly states:

"IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Eastern District of Louisiana are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Carl J. Barbier *for coordinated or consolidated pretrial proceedings* with the actions pending in that district and listed on Schedule A." (Emphasis added)

In order to efficiently manage MDL 2179, Judge Barbier consolidated and organized the various types of claims into several "pleading bundles" for the purpose of the filing of complaints, answers and any Rule 12 motions. The "B1" pleading bundle includes all claims for private or non-governmental economic loss and property damages.

On December 15, 2010, the PSC filed a "B1" Master Complaint.

Mr. Stephen J. Herman
December 21, 2012
Page 2

On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint." Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the Defendant is named."

In sum, my clients were forced to be represented by the PSC. Accordingly, since you have stepped into my shoes, I, and all similarly-situated attorneys representing BP oil spill and GCCF victims, hold the PSC strictly accountable to zealously advocate on behalf of all MDL 2179 Plaintiffs.

I look forward to receiving the PSC's answers to the following 10 questions.


QUESTION NO. 1

**Why did the PSC designate the "B1" Master Complaint as an admiralty or maritime case, and request a non-jury trial pursuant to Rule 9(h), rather than properly allege claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA")?**

On February 9, 2011, the PSC filed a First Amended Master Complaint. Rather than allege claims under the OPA (which governs the MDL 2179 cases alleging economic loss due to the BP oil spill) and the Outer Continental Shelf Lands Act ("OCSLA") (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the PSC made the unfathomable decision to allege claims under admiralty law. In the "B1" First Amended Master Complaint, the PSC clearly states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

Mr. Stephen J. Herman
December 21, 2012
Page 3

QUESTION NO. 2

**Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has overreached its authority?**

The Supreme Court has held that a district court conducting pretrial proceedings pursuant to 28 U.S.C. §1407(a) has no authority to invoke 28 U.S.C. §1404(a) to assign a transferred case to itself for trial. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

Justice Souter, in delivering the opinion of the Court in *Lexecon*, explained 28 U. S. C. §1407(a) authorizes the Judicial Panel on Multidistrict Litigation (the "Panel") to transfer civil actions with common issues of fact "to any district for coordinated or consolidated pretrial proceedings," but imposes a duty on the Panel to remand any such action to the original district "at or before the conclusion of such pretrial proceedings."

QUESTION NO. 3

**Why has the PSC failed to inform Judge Barbier that the E&PD class settlement violates the Oil Pollution Act of 1990 ("OPA")?**

In violation of the OPA and contrary to the intent of Congress, the E&PD class settlement defines "Class Members" by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

QUESTION NO. 4

**Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has illegally excluded approximately 200,000 BP oil spill victims from the E&PD class settlement thereby greatly decreasing the bargaining power of the remaining class members?**

GCCF's "Release and Covenant Not to Sue" violates the OPA:

(a) by requiring the release of future damages as requirement for receiving a payment from the GCCF claims process, in contravention of 33 U.S.C. § 2705(a) and 33 U.S.C. §§ 2715(b)(1) and (2); and

Mr. Stephen J. Herman
December 21, 2012
Page 4

(b) by allowing Feinberg, et al. to intentionally fail to provide a process for presenting, processing and paying interim, short-term damages, in contravention of 33 U.S.C. § 2705(a) and 33 U.S.C. §§ 2715(b)(1) and (2).

The text and the legislative history of the OPA statute are clear. OPA expressly prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a release and covenant not to sue in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the oil spill.

Furthermore, GCCF's "Release and Covenant Not to Sue" violates State contract law because it:

(a) was obtained through the use of economic duress;

(b) was obtained without free consent (Claimants did not consent to the release by choice, because the only option for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.);

(c) was obtained through fraud;

(d) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen;

(e) was obtained in exchange for inadequate consideration; and

(f) has as its objective the circumvention of the OPA.

Accordingly, GCCF's "Release and Covenant Not to Sue" is void *ab initio*.

In sum, GCCF's "Release and Covenant Not to Sue" and the class settlement's "Release and Covenant Not to Sue" violate federal law, State contract law, and are contrary to public policy. Illegally excluding approximately 200,000 Claimants from the E&PD class settlement also greatly decreases the bargaining power of the "Class Members" and results in an increased loss of faith in the federal judicial system.

As Judge Barbier aptly stated in his Order of August 26, 2011, "The long term effects [of the BP oil spill] on the environment and fisheries may not be known for many years." (p. 31, Rec. Doc. 3830).

Mr. Stephen J. Herman
December 21, 2012
Page 5


Requiring BP oil spill victims, PSC's clients, to prematurely waive their right to sue in exchange for a miniscule single final settlement payment is unconscionable.


QUESTION NO. 5

**Why has the PSC failed to inform Judge Barbier that the E&PD class settlement is not "fair, reasonable, and adequate" and has not been entered into without collusion between the parties?**

For the following reasons, the E&PD class settlement is not "fair, adequate, and reasonable" (at least not for the "Class Members") and has not been entered into without collusion between the parties:

(a) Prior to the class action settlements, the Deepwater Horizon Oil Spill Trust had a balance of approximately $13.8 billion from which BP oil spill victims believed they would be compensated by the GCCF for all "legitimate" claims.

(b) After the class action settlements, the proposed "Settlement Trust" has only a balance of $7.8 billion from which BP oil spill victims are being told they will be compensated by the DHCC "so long as they execute an individual release."

(c) As noted above, under the class action settlements, BP will receive a refund of approximately $6 billion; the PSC and other counsel allegedly performing common benefit work will receive $600 million.

(d) The E&PD class action settlement doesn't actually provide for funds to be distributed to Class Members; it merely gives BP oil spill victims the right to submit, **yet again**, a claim for economic and property damages. The PSC and BP oil spill victims have to ask, "**Where's the settlement?**"

(e) "......within 15 days after the end of each calendar quarter, the BP Parties shall irrevocably pay into the Common Benefit Fee and Costs Fund an amount equal to 6 % (six percent) of the aggregate Settlement Payments paid under the Economic Agreement in respect of Claimants that have executed an Individual Release." In sum, **the PSC and other counsel allegedly performing common benefit work are financially motivated to have as many Claimants execute an Individual Release as expeditiously as possible regardless of whether the negotiated settlements reflect the true value of the claims.**

Mr. Stephen J. Herman
December 21, 2012
Page 6


<u>QUESTION NO. 6</u>


**Why has the PSC failed to inform Judge Barbier that a class action may not be brought in a limitation proceeding?**

The MDL 2179 Court may not certify a class in the limitation action because it would contravene the Fifth Circuit's holding in *Lloyds Leasing Ltd. v. Bates*, 902 F.2d 368 (5th Cir. 1990). In *Lloyds Leasing*, the Fifth Circuit squarely held that a class action may not be brought in a limitation proceeding. *Id.* at 370. In affirming the district court's denial of class certification, the Fifth Circuit reasoned as follows: First, the class action interferes with the concursus contemplated by the limitation of liability proceeding. . . . Second, the notice requirements of the limitation proceeding are more restrictive than the notice requirements of the class action. . . . Third, the entire thrust of Supplemental Rule F is that each claimant must appear individually and this is obviously inconsistent with the class action. Staring, Limitation Practice and Procedure, 53 Tul.L.Rev. 1134, 1150 (1979). In sum, "[t]he two rules are incompatible, and class representation in the sense of Rule 23 should therefore not be allowed in limitation proceedings." *Id.*

Following *Lloyd's Leasing*, courts in this district have routinely stricken class action allegations when they are filed within a limitation proceeding or dismissed class action complaints when they are filed after a limitation proceeding has been instituted. See, e.g., *In re: Ingram Barge Co.*, No. 05-4419, 2006 U.S. Dist. LEXIS 79403, 2006 WL 5377855, at *1 (E.D. La. Oct. 19, 2006) (striking class allegations pursuant to *Lloyd's Leasing*); *In re: River City Towing Servs., Inc.*, 204 F.R.D. 94, 97 (E.D. La. 2001) (same); *Humphreys v. Antillen, N.V.*, Nos. 93-3799, 93-3714, 1994 WL 682811, at *3 (E.D. La. Jan. 31, 1994) (dismissing class action complaint filed after limitation proceeding). The limitation proceedings need not be resolved and limitation of liability upheld in order to dismiss class action allegations. For example, Judge Berrigan in Ingram Barge and Judge Feldman in Humphreys struck or dismissed class action allegations before deciding the limitation issue. See *Gabarick v. Laurin Mar. (America), Inc.*, 2009 U.S. Dist. LEXIS 27180.


<u>QUESTION NO. 7</u>


**Why has the PSC allowed the MDL 2179 Court to decline to permit formal discovery on Feinberg, et al?**

On June 15, 2011, Plaintiff Salvesen, one of my clients, filed his action against Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, GCCF, and William G. Green, Jr. in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims

Mr. Stephen J. Herman
December 21, 2012
Page 7

for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 6, 2011. *See Salvesen v. Feinberg, et al.*, 2:11-cv-02533.

Once the *Salvesen* case was transferred to the MDL 2179 Court, not only was the case automatically stayed, but the *Salvesen* claims, as explained *supra*, were inexplicably deemed "amended, restated, and superseded" by the allegations and claims of the Master Complaint in Pleading Bundle B1 (*See* Pre-Trial Order No. 25, Para. 5, Jan. 12, 2011).

It is important to note that Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a Gulf Coast Claims Facility, are not named Defendants in *any* Master Complaint or Class Action Complaint in MDL 2179.

On August 29, 2011, I emailed a letter to James Parkerson Roy wherein I informed Mr. Roy that the *Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.* case had been transferred to MDL 2179. The letter, in pertinent part, stated "I would like to commence discovery as soon as possible. Since this action does not involve common questions of fact with actions previously transferred to MDL No. 2179, please advise as to how we may most expeditiously initiate and coordinate discovery......**I look forward to working with you on this case."**

**On September 5, 2011, I received an email from you wherein you stated, "***please be advised that the Court has, thus far, declined to permit formal discovery on Feinberg or the GCCF.***"**

Judge Barbier writes, "…the PSC has actively lobbied and argued for increased supervision and monitoring of the GCCF and Kenneth Feinberg/Feinberg Rozen, LLP. These efforts have met with at least partial success. For instance, on February 2, 2011 the Court granted the PSC's motion (in part) and ordered the GCCF and BP to:

(1) Refrain from contacting directly any claimant that they know or reasonably should know is represented by counsel, whether or not said claimant has filed a lawsuit or formal claim.

(2) Refrain from referring to the GCCF, Ken Feinberg, or Feinberg Rozen, LLP (or their representatives), as "neutral" or completely "independent" from BP. It should be clearly disclosed in all communications, whether written or oral, that said parties are acting for and on behalf of BP in fulfilling its statutory obligations as the "responsible party" under the Oil Pollution Act of 1990.

Mr. Stephen J. Herman
December 21, 2012
Page 8

(3) Begin any communication with a putative class member with the statement that the individual has a right to consult with an attorney of his/her own choosing prior to accepting any settlement or signing a release of legal rights.

(4) Refrain from giving or purporting to give legal advice to unrepresented claimants, including advising that claimants should not hire a lawyer.

(5) Fully disclose to claimants their options under OPA if they do not accept a final payment, including filing a claim in the pending MDL 2179 litigation.

(6) Advise claimants that the "pro bono" attorneys and "community representatives" retained to assist GCCF claimants are being compensated directly or indirectly by BP." (Rec. Doc. 1098 at 14).

Judge Barbier further writes, "The PSC has advocated for a full and transparent audit of the GCCF and its claims handling practices, and together with the U.S. Department of Justice, *has persuaded Mr. Feinberg to agree to such an audit* which is now in progress. The PSC has advocated, again with some success, for the GCCF to employ a more liberal causation standard in evaluating claims and has advanced similar causation arguments in this MDL proceeding." *See* Order of Aug. 26, 2011, Rec. Doc. 3830 at 32-33. (pp. 4-5, Rec. Doc. 5022).

Again, and please correct me if I am wrong, the PSC represents all plaintiffs in MDL 2179. These plaintiffs deserve more than the PSC merely: (a) "lobbying" for increased supervision and monitoring of Feinberg, et al.; (b) trying to "persuade" Mr. Feinberg to agree to an audit; and (c) "advocating," again with some success, for the GCCF to employ a more liberal causation standard in evaluating claims.

The JPML believes, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund." However, formal discovery on Feinberg and the GCCF, and the associated pressure of a trial, are required in order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of the defendants. Certainly, as has occurred in MDL 2179, without formal discovery on Feinberg and the GCCF, certain claims by private individuals and businesses for economic loss resulting from the operation of the GCCF may never be properly resolved.

Mr. Stephen J. Herman
December 21, 2012
Page 9

<u>QUESTION NO. 8</u>

**Why does the PSC allow its BP oil spill victim clients to receive grossly inadequate compensation?**

<u>The Gulf Coast Claims Facility ("GCCF")</u>
        The GCCF data indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these Claimants. In sum, *the GCCF denied payment to approximately 61.46% of the claimants who filed claims; the average total amount paid per claimant was $27,466.47*.

        The status report data further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, **the GCCF forced 84.68% of the claimants to sign a release and covenant not to sue** in which the claimant agreed not to sue BP and all other potentially liable parties; **only 15.31% of the claimants were not required to sign a release and covenant not to sue** in order to be paid. See "Gulf Coast Claims Facility Overall Program Statistics" (Status Report, Mar. 7, 2012, p. 1).

<u>The Deepwater Horizon Claims Center ("DHCC")</u>
        The DHCC and the GCCF are virtually identical. Under the GCCF, the evaluation and processing of claims were performed by Garden City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP {"PwC"). Under the DHCC, the evaluation and processing of claims shall continue to be performed by Garden City Group, Inc., BrownGreer, PLC, and PwC. Accordingly, although Patrick Juneau has replaced Ken Feinberg, there is no reason to believe that the percentage of claimants denied payment and the average total amount paid per claimant will change under the DHCC.

<u>The DHCC Data</u>
        The DHCC data indicates that a total of 36,468 claimants filed Individual and Business claims with the DHCC during the period from approximately June 4, 2012 to October 5, 2012. The DHCC paid only 71 of these claimants. In sum, *the DHCC paid only 0.19% of the claimants who filed claims.* Of the 19,338 Individual Economic Loss claims submitted, 79 claimants have received payment offers totaling $860,968, resulting in 6 payments totaling $38,173. *This equates to an average payment of only $6,362.17 per Individual Economic Loss Claimant!* (DHCC Status Report, Oct. 5, 2012).

        The DHCC data, dated October 26, 2012, indicates that a total of 41,235 claimants have filed the above types of claims with the DHCC. The DHCC paid only 407 of these claimants. *In sum, the DHCC paid only 0.99% of the claimants who filed claims.* Of the 21,058 Individual

Mr. Stephen J. Herman
December 21, 2012
Page 10

Economic Loss claims submitted, 204 claimants have received payment offers totaling $2,190,404, resulting in 43 payments totaling $599,428. *This equates to an average payment of only $13,940.19 per Individual Economic Loss Claimant!*

The DHCC data, dated November 16, 2012, indicates that a total of 46,159 claimants have filed the above types of claims with the DHCC. The DHCC paid only 996 of these claimants. *In sum, the DHCC paid only 2.16% of the claimants who filed claims.* Of the 22,571 Individual Economic Loss claims submitted, 354 claimants have received payment offers totaling $3,893,028, resulting in 143 payments totaling $1,777,080. *This equates to an average payment of only $12,427.13 per Individual Economic Loss Claimant!*

"I think it's a tribute to the GCCF that all the people we used have been retained [by the DHCC]," Feinberg said. "I take great satisfaction in that fact." David Hammer, *Louisiana lawyer set to take Kenneth Feinberg's role in BP oil spill claims process*, The Times-Picayune (March 9, 2012).

My clients and all similarly-situated BP oil spill and GCCF victims do not share Feinberg's great satisfaction.

<u>QUESTION NO. 9</u>

**Why does the PSC allow for the E&PD class settlement to provide for a refund of approximately $6 billion to BP while granting *excessive* compensation to the PSC and other counsel allegedly performing "common benefit" work?**

**(a) The Refund**

| | |
|---|---|
| Deepwater Horizon Oil Spill Trust | $20  Billion |
| (Amount set aside by BP to allegedly pay economic damage claims to individuals and businesses affected by the Deepwater Horizon oil spill.) | |
| Approximate Amount Paid to Claimants by GCCF | $6.2 Billion |
| Cost of the Proposed Settlement | $7.8 Billion |
| Amount to be Refunded to BP | $6.0 Billion |

**(b) The *Excessive* Compensation**

The PSC and other counsel allegedly performing common benefit work in MDL 2179 are not double-dipping; they are triple-dipping. The known sources of compensation received by attorneys allegedly doing common benefit work on behalf of BP oil spill victims in MDL 2179 are:

Mr. Stephen J. Herman
December 21, 2012
Page 11

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;

N.B. – Plaintiffs' Counsel received a Final Payment Offer from GCCF on behalf of Plaintiff Pinellas Marine Salvage, Inc. This offer, dated June 3, 2012 and postmarked June 8, 2012, was received by Plaintiffs' Counsel on June 11, 2012. This offer, along with probably hundreds of other offers made to Claimants by GCCF, is dated one day before Claimants are no longer required to pay six percent (6%) of the gross monetary settlement they receive to the MDL 2179 common benefit fund. Plaintiffs respectfully point out to the Court that June 3, 2012 was a Sunday. These offers were dated June 3rd in order to ensure that the PSC received the maximum amount of payment from the 6% hold-back provision.

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million. In order to be awarded a common benefit fee of $600 million, the MDL 2179 Court would have to believe that the PSC attorneys worked two million hours;

(c) Many attorneys doing common benefit work have their own clients and have also received or will also receive a fee directly from them. (N.B. – On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs."); and

(d) Co-counsel fees received by member firms of the PSC for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Counsel for Plaintiff Salvesen received an unsolicited mass email from a member firm of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm. Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…"

The Court has been fully briefed in regard to the excessive compensation being paid to the PSC and other counsel performing common benefit work in MDL 2179. (Rec. Doc. 6831-1)

Mr. Stephen J. Herman
December 21, 2012
Page 12

<u>QUESTION NO. 10</u>

**Given the above-referenced was not merely the result of poor legal strategy, do you believe the MDL 2179 PSC's actions constitute legal malpractice?**

Since April 8, 2012, our firm has filed: (a) a Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint]; (b) three Motions to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]; and (c) a Motion to Nullify Each and Every Gulf Coast Claims Facility ("GCCF") "Release and Covenant Not to Sue."

In contrast, as noted *supra*, the PSC appears to be more interested in maximizing its compensation and ensuring significant economy and efficiency in the judicial administration of the MDL 2179 Court rather than in obtaining justice for the MDL 2179 plaintiffs.

If you have any questions, please do not hesitate to contact me at 352-328-7469 or via e-mail at <u>BrianJDonovan@verizon.net</u>. I would be happy to provide the PSC with any and all supporting documentation.

Very truly yours,

**/s/ Brian J. Donovan**
Brian J. Donovan

cc:    James Parkerson Roy (jimr@wrightroy.com)
       Brian H. Barr (bbarr@levinlaw.com)
       Scott Summy (ssummy@baronbudd.com)