# Exhibit D

**The Donovan Law Group**
3102 Seaway Court, Suite 304
Tampa, Florida 33629
(352) 328-7469

December 31, 2012

**VIA Email**

Mr. Stephen J. Herman
Plaintiffs' Liaison Counsel
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70113

      Re: Reply to PSC's Response to the Open Letter Dated December 21, 2012

Dear Steve,

      I refer to the open letter, dated December 21, 2012, wherein I requested the PSC's answers to ten questions in regard to its representation of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility ("GCCF") victims in MDL 2179.

      You promptly responded, via email, by stating, "I respectfully decline to respond to your questions, which seem argumentative and disingenuous. To the extent you sincerely seek answers to the questions you pose, I invite you to review the numerous pleadings, transcripts and orders which are available on PACER."

      As I have already explained, your decision not to address the issues raised in the open letter, although completely understandable, is disturbing.

      On December 21, 2012, subsequent to your receipt of the open letter, Judge Barbier granted final approval to the E&PD class settlement agreement. Notwithstanding this fact, all victims of the BP oil spill and the "Delay, Deny, Defend" strategy employed by Kenneth R. Feinberg, et al. have a right to clearly understand how and why they were represented by the PSC in MDL 2179.

      The PSC's clients are not being "argumentative and disingenuous" when they demand to know why they have not been fully compensated for their damages. Furthermore, as you are well aware, the answers to the ten questions in the open letter are not available on PACER. Only the PSC is in a position to fully and properly respond to these questions.

Mr. Stephen J. Herman
December 31, 2012
Page 2

      On December 25, 2012, you further state via email, "I suppose that you are free to attack the PSC and/or the Court in whatever way you deem appropriate."

      Steve, as you are well aware, the open letter is not an attack on any individual or group of individuals involved in MDL 2179 anymore than it is "argumentative and disingenuous." It is, however, an indictment of a judicial system in which: (a) multidistrict litigation has been allowed to devolve to the point where the "Lexecon Rule" has been supplanted by the "Heyburn Rule;" and (b) district courts permit settlement class actions to continue to erode the public's faith in the federal judicial system.

A. Multidistrict Litigation
      1. The "Lexecon Rule"

      In *In re: Vioxx Prods. Liab. Litig*. ("MDL 1657"), Judge Fallon's analysis in regard to *Lexecon* is instructive.

> "Traditionally, the cases in any given MDL originate from two sources.
>
> First, cases are filed in, or removed to, federal courts across the country and transferred to the MDL court by the Judicial Panel on Multidistrict Litigation. *See* 28 U.S.C. § 1407(a). In these cases, the MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice-of-law rules. *See Ferens v. John Deere Co.*, 494 U.S. 516, 524 (1990). While the precise limits of the MDL court's authority over such cases is currently subject to debate, **it is clear that the court cannot try these cases, but rather must remand them to the transferor forum when pretrial *discovery* is complete**. *See Lexecon, Inc. v. Miberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).
>
> Second, a number of cases are often filed directly into the MDL by citizens who reside in the MDL court's judicial district. In these cases, the MDL court must apply its own state law, that is, the law of the state in which it sits. It is undisputed that the MDL court has complete authority over every aspect of these cases."

*In re: Vioxx Prods. Liab. Litig*., Case 2:05-md-01657 (E.D. La.) ("March 22, 2007 Order and Reasons") (Rec. Doc. 10488).

Mr. Stephen J. Herman
December 31, 2012
Page 3


2. The "Heyburn Rule"

The Heyburn Rule, in pertinent part, states, "To be sure, the *Lexecon* imperative does create severe inefficiencies in some cases as the transferor judge must re-familiarize himself or herself with the remanded action (perhaps many months after it was transferred out of the district under § 1407). However, the Heyburn Rule points out that "transferee judges are nothing if not resourceful where necessity dictates and several appropriate strategies are available by which the *Lexecon* conundrum may be avoided."

Although Judge Barbier, the PSC, and BP refer to the MDL 2179 court's "broad discretionary authority," a "special-procedure" should not be crafted where a mandatory procedure already exists. It is important to remember that the very MDL procedures Judge Barbier, the PSC, and BP wish to circumvent were specifically enacted to reduce costs and promote judicial economy. Allowing the MDL 2179 trial plan is inconsistent with the clear statutory mandate of the multidistrict litigation enabling statute, 28 U.S.C. § 1407(a), and the Supreme Court's holding in *Lexecon*. While the need to promote efficiency in litigation is real, it cannot be accomplished by overriding the applicable provisions set forth by Congress. *In re: FEMA Trailer Formaldehyde Products Liability Litigation*, 2009 WL 2390668 (E.D. La.).

The Heyburn Rule describes the *Lexecon* decision as a "conundrum" which may be avoided by "resourceful" transferee judges. My clients (who are now PSC's clients) respectfully disagree. The *Lexecon* decision is not a conundrum. It is not an obstacle which judicial discretion may circumvent in the name of judicial efficiency/economy or political expediency. It is the law.


B. Settlement Class Actions

Settlement class actions are inherently flawed because they lack the "case" or "controversy" necessary to confer federal jurisdiction under Article III. The settlement class action court is asked not to resolve a real dispute between a litigant class and a party opposing that class, but rather merely to approve and implement a prearranged legal arrangement between the parties that was reached prior to the seeking of class certification.

While settlement class actions may have certain attractive aspects, such as reducing litigation expenses (MANUAL FOR COMPLEX LITIGATION, note 32, at § 21.612 (4th ed. 2004)), many of the traditional aspects of adversarial litigation are missing. As a result, the settlement class action is potentially the product of collusion among the parties: defendants who wish to rid themselves of the burden of litigation and plaintiffs' counsel who wish to receive

Mr. Stephen J. Herman
December 31, 2012
Page 4

immediate compensation. Douglas G. Smith, *The Intersection of Constitutional Law and Civil Procedure: Review of Wholesale Justice – Constitutional Democracy and the Problem of the Class Action Lawsuit*, Northwestern University Law Review Colloquy, Vol. 104:319 (2010); *See also, e.g.*, John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 714 (1986) ("Often, the plaintiffs' attorneys and the defendants can settle on a basis that is adverse to the interests of the plaintiffs. At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney's fees."). (Rec. Doc. 6902-1).

"BP and the PSC report that in February 2011 settlement negotiations began in earnest for two distinct class action settlements: a Medical Benefits Settlement and an Economic and Property Damages Settlement." (p. 3, Rec. Doc. 6418).

In sum, the PSC and other counsel allegedly performing common benefit work in MDL 2179 **initiated settlement negotiations "in earnest" merely four (4) months after Judge Barbier appointed members to the PSC**. (See Rec. Doc. 6831-1). Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

Furthermore, after the Supreme Court's decisions in *Amchem* and *Ortiz* it has become exceedingly difficult to certify a class in the context of a mass tort. (*See* MANUAL, *supra* note 22, § 22.7, at 413–14 ("After experimentation with class treatment of some mass torts during the 1980s and 1990s, the courts have greatly restricted its use in mass torts litigation."); RICHARD A. NAGAREDA, MASS TORTS IN A WORLD OF SETTLEMENT 72 (2007) ("As embodied in Rule 23 of the Federal Rules of Civil Procedure in 1966, the modern class action seemed on its face a device with little applicability to mass torts.")).

The American Law Institute's draft *Principles of the Law of Aggregate Litigation* summarizes the state of the law: "As a doctrinal matter, the class action has fallen into disfavor as a means of resolving mass-tort claims. This development reflects many factors, including concerns about the quality of the representation received by members of settlement classes, difficulties presented by choice-of-law problems, and the need for individual evidence of exposure, injury, and damages." A.L.I., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION: PROPOSED FINAL DRAFT, note 7, § 1.02, notes to cmt. b(1)(B), at 26 (Apr. 1, 2009).

Indeed, even before the *Amchem* and *Ortiz* decisions, courts had recognized that there was a national trend to deny class certification in drug or medical product liability/personal injury cases. This resistance to certification in such cases can be traced to the 1966 amendments

Mr. Stephen J. Herman
December 31, 2012
Page 5

to Rule 23, which specifically noted that the class action device was "ordinarily not appropriate" in a "mass accident" case where there would be "significant questions . . . affecting the individuals in different ways." (*See* FED. R. CIV. P. 23, Notes of Advisory Committee on Rules, 1966 Amend. *See also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 164 (2d Cir. 1987) ("The comment to Rule 23(b)(3) explicitly cautions against use of the class action device in mass tort cases. Moreover, most courts have denied certification in those circumstances." (citation omitted)).

Presentment

In your email of December 25, 2012, you also state, "…….I would suggest that your clients not participating in the Economic Settlement will best be served if you: (i) ensure that you and/or they make Presentment of what you and/or they believe to be their full damages before January 18, 2013; and then, having made such presentment, (ii) file (or re-file) (and/or amend) suit on their behalf by April 20, 2013…."

I appreciate your advice and sudden concern for *my* clients. However, whenever our firm filed a claim on behalf of a client with GCCF, a copy of the claim was also filed directly with BP. In each case, BP provided a letter confirming its receipt of the claim. I understood that if a lawsuit was to be brought against BP, it should be brought under OPA and, therefore, the OPA Presentment requirement would have to be fulfilled.

GCCF Release and Covenant Not to Sue

In your email of December 25, 2012, you further advise, "…. (iii) with respect to any client whom you believe to have executed an invalid GCCF Release, assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error or duress."

As you are aware, our firm's position is that *every* GCCF Release and Covenant Not to Sue violates federal law, State contract law, and is contrary to public policy. We shall address this matter at the proper time.

Steve, the PSC response generated the following additional questions.

Mr. Stephen J. Herman
December 31, 2012
Page 6

### QUESTION NO. 11

**Why did the PSC wait until one month before the claim filing deadline to notify all BP oil spill and GCCF victims (its clients) of the OPA "Presentment" requirement?**

On October 8, 2010, Judge Barbier appointed the members to the PSC (Rec. Doc. 506). The PSC sent a letter, dated December 13, 2012 and filed with LexisNexis on December 17, 2012, to all BP oil spill and GCCF victims wherein it finally advises its clients: "you must make 'Presentment' under the Oil Pollution Act for your Short Form Joinder, lawsuit or other claim to be valid…..before January 20, 2013. "

The PSC should have notified all BP oil spill and GCCF victims (its clients) of the "Presentment" requirement in October, 2010, not in December, 2012.

### QUESTION NO. 12

**Why has the PSC failed to notify all BP oil spill and GCCF victims (its clients) that a lawsuit may be filed against Kenneth R. Feinberg, et al. without having to fulfill the OPA "Presentment" requirement?**

GCCF victims may file an action alleging that Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, and GCCF misled them by employing a "Delay, Deny, Defend" strategy. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue." In sum, Plaintiffs would allege that BP is responsible for the oil spill incident; Feinberg, et al. (independent contractors), via employment of their "Delay, Deny, Defend" strategy, are responsible for not compensating and thereby financially ruining Plaintiffs. *See Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.*, 2:11-cv-01987 and *Salvesen v. Feinberg, et al.*, 2:11-cv-02533. Motions to Remand for both cases remain pending in this Honorable Court.

Since Feinberg, et al is not a "Responsible Party" and therefore may not be sued under OPA, a lawsuit against Feinberg, et al. may be filed immediately because it does not require Presentment. The PSC would, however, need to advise all GCCF victims in regard to the statute of limitations and the associated tolling of the statute of limitations for class actions and fraudulent concealment or a misrepresentation by the defendant.

Mr. Stephen J. Herman
December 31, 2012
Page 7

### QUESTION NO. 13

**Why does the PSC, which failed to adequately challenge the legality of the GCCF Release and Covenant Not to Sue for the past two years, suddenly advise non-PSC attorneys to "assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error or duress?"**

The ultimate objective of the "Delay, Deny, Defend" strategy of Feinberg, et al. was to obtain a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible. Here, the GCCF Status Report as of March 07, 2012 is instructive. (*See* background information for "QUESTION NO. 8.").

Feinberg, et al. cannot justify limiting payments under the Quick Payment Final Claim program to just $5,000 for individuals and $25,000 for businesses. There is no evidence that these amounts even remotely represent adequate consideration to compensate Claimants for the damages that Claimants did or will suffer as a result of the BP oil spill.

Steve, if the PSC had properly filed the B1 Master Complaint under OPA rather than alleging claims under admiralty law, Feinberg, et al. would never have been allowed to use the Release and Covenant Not to Sue to illegally exclude approximately 200,000 BP oil spill victims from the E&PD class settlement.

It has been, and remains, the responsibility of the PSC to "assemble and prepare the best case to support the argument that such Release was procured under fraud, error or duress." On September 25, 2012, my clients filed their Motion to Nullify Each and Every Gulf Coast Claims Facility Release and Covenant Not to Sue. (*See* Rec. Doc. 7473-1). Please feel free to use the legal argument in this motion to assist with the preparation of the PSC case.

### QUESTION NO. 14

**Are you declining to answer these questions because you believe that an attorney-client relationship does not exist between the PSC and all BP oil spill and GCCF victims?**

BP is extremely happy with the settlement. In a December 21, 2012 statement, BP said "it was pleased that the court approved the plaintiff steering committee's settlement." The PSC is ecstatic. Attorneys and CPA firms submitting claims for BP oil spill victims are giggling with delight over their new revenue stream. Unfortunately, the vast majority of BP oil spill victims are left scratching their heads over the entire MDL process and settlement class action. The numbers do not lie (*See* background information for "QUESTION NO. 8" and "QUESTION NO. 9").

Mr. Stephen J. Herman
December 31, 2012
Page 8

   The combination of a settlement class action and MDL, which in this case appears to be "the product of collusion among the parties: defendants who wish to rid themselves of the burden of litigation and plaintiffs' counsel who wish to receive immediate compensation," has resulted in BP oil spill and GCCF victims receiving, if they are very fortunate, grossly inadequate compensation.

   Steve, please understand that these fourteen questions are directed to the PSC by me on behalf of my clients (now PSC's clients) and all similarly-situated BP oil spill and GCCF victims. These questions are not directed to the MDL 2179 Court. In sum, the PSC's clients merely seek a better understanding of their representation by the PSC.

   If you have any questions, please do not hesitate to contact me at 352-328-7469 or via e-mail at BrianJDonovan@verizon.net. Again, I would be happy to provide the PSC with any and all supporting documentation.

                  Very truly yours,

                  **/s/ Brian J. Donovan**
                  Brian J. Donovan

cc: James Parkerson Roy (jimr@wrightroy.com)
   Brian H. Barr (bbarr@levinlaw.com)
   Scott Summy (ssummy@baronbudd.com)