1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4    ******************************************************************

5    IN RE:  OIL SPILL BY THE OIL
     RIG *DEEPWATER HORIZON* IN THE
6    GULF OF MEXICO ON APRIL 20,
     2010
7

8                          CIVIL ACTION NO. 10-MD-2179 "J"
                           NEW ORLEANS, LOUISIANA
9                          WEDNESDAY, FEBRUARY 27, 2013, 8:00 A.M.

10

11   THIS DOCUMENT RELATES TO:

12   CASE NO. 2:10-CV-02771,
     *IN RE:  THE COMPLAINT AND*
13   *PETITION OF TRITON ASSET*
     *LEASING GmbH, ET AL*
14
     CASE NO. 2:10-CV-4536,
15   *UNITED STATES OF AMERICA V.*
     *BP EXPLORATION & PRODUCTION,*
16   *INC., ET AL*

17   ******************************************************************

18

19

20                    **DAY 3   MORNING SESSION**

21          TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22     HEARD BEFORE THE HONORABLE CARL J. BARBIER

23              UNITED STATES DISTRICT JUDGE

24

25

                    **OFFICIAL TRANSCRIPT**

APPEARANCES:


FOR THE PLAINTIFFS:    DOMENGEAUX WRIGHT ROY & EDWARDS
                       BY:   JAMES P. ROY, ESQ.
                       556 JEFFERSON STREET, SUITE 500
                       POST OFFICE BOX 3668
                       LAFAYETTE, LA  70502


                       HERMAN HERMAN & KATZ
                       BY:   STEPHEN J. HERMAN, ESQ.
                       820 O'KEEFE AVENUE
                       NEW ORLEANS, LA  70113


                       CUNNINGHAM BOUNDS
                       BY:   ROBERT T. CUNNINGHAM, ESQ.
                       1601 DAUPHIN STREET
                       MOBILE, AL  36604


                       LEWIS, KULLMAN, STERBCOW & ABRAMSON
                       BY:   PAUL M. STERBCOW, ESQ.
                       PAN AMERICAN LIFE BUILDING
                       601 POYDRAS STREET, SUITE 2615
                       NEW ORLEANS, LA  70130


                       BREIT DRESCHER IMPREVENTO & WALKER
                       BY:   JEFFREY A. BREIT, ESQ.
                       600 22ND STREET, SUITE 402
                       VIRGINIA BEACH, VA  23451


                       LEGER & SHAW
                       BY:   WALTER J. LEGER, JR., ESQ.
                       600 CARONDELET STREET, 9TH FLOOR
                       NEW ORLEANS, LA  70130




**OFFICIAL TRANSCRIPT**

```
 1    APPEARANCES CONTINUED:

 2

 3                         WATTS, GUERRA, CRAFT
                          BY:  MIKAL C. WATTS, ESQ.
 4                        4 DOMINION DRIVE
                          BUILDING 3, SUITE 100
 5                        SAN ANTONIO, TX 78257

 6

 7                         WILLIAMS LAW GROUP
                          BY:  CONRAD S. P. WILLIAMS, ESQ.
 8                        435 CORPORATE DRIVE, SUITE 101
                          HOUMA, LA   70360
 9

10                        THORNHILL LAW FIRM
11                        BY:  THOMAS THORNHILL, ESQ.
                          1308 NINTH STREET
12                        SLIDELL, LA   70458

13

14                        DEGRAVELLES PALMINTIER HOLTHAUS & FRUGE
                          BY:   JOHN W. DEGRAVELLES, ESQ.
15                        618 MAIN STREET
                          BATON ROUGE, LA 70801
16

17

18                        WILLIAMSON & RUSNAK
                          BY:  JIMMY WILLIAMSON, ESQ.
19                        4310 YOAKUM BOULEVARD
                          HOUSTON, TX   77006

20

21                        IRPINO LAW FIRM
                          BY:  ANTHONY IRPINO, ESQ.
22                        2216 MAGAZINE STREET
                          NEW ORLEANS, LA   70130
23

24

25
```

**OFFICIAL TRANSCRIPT**

1    APPEARANCES CONTINUED:

2

3

     FOR THE UNITED STATES
4    OF AMERICA:                U.S. DEPARTMENT OF JUSTICE
                                 TORTS BRANCH, CIVIL DIVISION
5                                BY:  R. MICHAEL UNDERHILL, ESQ.
                                 450 GOLDEN GATE AVENUE
6                                7TH FLOOR, ROOM 5395
                                 SAN FRANCISCO, CA  94102
7

8

                                 U.S. DEPARTMENT OF JUSTICE
9                                ENVIRONMENT & NATURAL RESOURCES DIVISION
                                 ENVIRONMENTAL ENFORCEMENT SECTION
10                               BY:  STEVEN O'ROURKE, ESQ.
                                      SCOTT CERNICH, ESQ.
11                                    DEANNA CHANG, ESQ.
                                      RACHEL HANKEY, ESQ.
12                                    A. NATHANIEL CHAKERES, ESQ.
                                 P.O. BOX 7611
13                               WASHINGTON, DC  20044

14

15                               U.S. DEPARTMENT OF JUSTICE
                                 TORTS BRANCH, CIVIL DIVISION
16                               BY:  JESSICA McCLELLAN, ESQ.
                                      MICHELLE DELEMARRE, ESQ.
17                                    JESSICA SULLIVAN, ESQ.
                                      SHARON SHUTLER, ESQ.
18                                    MALINDA LAWRENCE, ESQ.
                                 POST OFFICE BOX 14271
19                               WASHINGTON, DC  20044

20

21                               U.S. DEPARTMENT OF JUSTICE
                                 FRAUD SECTION
22                               COMMERCIAL LITIGATION BRANCH
                                 BY:  DANIEL SPIRO, ESQ.
23                                    KELLEY HAUSER, ESQ.
                                      ELIZABETH YOUNG, ESQ.
24                               BEN FRANKLIN STATION
                                 WASHINGTON, DC  20044
25

                        **OFFICIAL TRANSCRIPT**

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE STATE OF
     ALABAMA:                 ALABAMA ATTORNEY GENERAL'S OFFICE
 4                            BY:  LUTHER STRANGE, ATTORNEY GENERAL
                                   COREY L. MAZE, ESQ.
 5                                 WINFIELD J. SINCLAIR, ESQ.
                              500 DEXTER AVENUE
 6                            MONTGOMERY, AL  36130

 7

 8   FOR THE STATE OF
     LOUISIANA OFFICE
 9   OF THE ATTORNEY
     GENERAL:
10                            STATE OF LOUISIANA
                              BY:  JAMES D.  CALDWELL,
11                            ATTORNEY GENERAL
                              1885 NORTH THIRD STREET
12                            POST OFFICE BOX 94005
                              BATON ROUGE, LA  70804
13

14
                              KANNER & WHITELEY
15                            BY:  ALLAN KANNER, ESQ.
                                   DOUGLAS R. KRAUS, ESQ.
16                            701 CAMP STREET
                              NEW ORLEANS, LA  70130
17

18

19   FOR BP EXPLORATION &
     PRODUCTION INC.,
20   BP AMERICA PRODUCTION
     COMPANY, BP PLC:         LISKOW & LEWIS
21                            BY:  DON K. HAYCRAFT, ESQ.
                              ONE SHELL SQUARE
22                            701 POYDRAS STREET
                              SUITE 5000
23                            NEW ORLEANS, LA  70139

24

25

                         OFFICIAL TRANSCRIPT
```

1    APPEARANCES CONTINUED:

2

3                        COVINGTON & BURLING
                          BY:  ROBERT C. "MIKE" BROCK, ESQ.

4                        1201 PENNSYLVANIA AVENUE, NW
                        WASHINGTON, DC  20004

5

6

7                        KIRKLAND & ELLIS
                        BY:  J. ANDREW LANGAN, ESQ.

8                             HARIKLIA "CARRIE" KARIS, ESQ.
                             MATTHEW T. REGAN, ESQ.

9                        300 N. LASALLE
                        CHICAGO, IL  60654

10

11   FOR TRANSOCEAN HOLDINGS
      LLC, TRANSOCEAN

12   OFFSHORE DEEPWATER
      DRILLING INC., AND

13   TRANSOCEAN DEEPWATER
      INC.:                 FRILOT

14                        BY:  KERRY J. MILLER, ESQ.
                        ENERGY CENTRE

15                        1100 POYDRAS STREET, SUITE 3700
                        NEW ORLEANS, LA  70163

16

17

18                      SUTHERLAND ASBILL & BRENNAN
                        BY:  STEVEN L. ROBERTS, ESQ.

19                             RACHEL G. CLINGMAN, ESQ.
                        1001 FANNIN STREET, SUITE 3700

20                        HOUSTON, TX  77002

21

22                      MUNGER TOLLES & OLSON
                        BY:  MICHAEL R. DOYEN, ESQ.

23                             BRAD D. BRIAN, ESQ.
                             LUIS LI, ESQ.

24                      335 SOUTH GRAND AVENUE, 35TH FLOOR
                      LOS ANGELES, CA  90071

25

                      **OFFICIAL TRANSCRIPT**

1    APPEARANCES CONTINUED:

2

3                              MAHTOOK & LAFLEUR
                               BY:  RICHARD J. HYMEL, ESQ.
4                              1000 CHASE TOWER
                               600 JEFFERSON STREET
5                              LAFAYETTE, LA  70502

6

7                              HUGHES ARRELL KINCHEN
                               BY:  JOHN KINCHEN, ESQ.
8                              2211 NORFOLK, SUITE 1110
                               HOUSTON, TX  77098

9

10

11   FOR CAMERON INTERNATIONAL
     CORPORATION:                STONE PIGMAN WALTHER WITTMANN
12                               BY:  PHILLIP A. WITTMANN, ESQ.
                                 546 CARONDELET STREET
13                               NEW ORLEANS, LA 70130

14

15                              BECK REDDEN & SECREST
                               BY:  DAVID J. BECK, ESQ.
16                                   DAVID W. JONES, ESQ.
                                     GEOFFREY GANNAWAY, ESQ.
17                                   ALEX B. ROBERTS, ESQ.
                               ONE HOUSTON CENTER
18                             1221 MCKINNEY STREET, SUITE 4500
                               HOUSTON, TX  77010

19

20

     FOR HALLIBURTON
21   ENERGY SERVICES,
     INC.:                       GODWIN LEWIS
22                               BY:  DONALD E. GODWIN, ESQ.
                                     FLOYD R. HARTLEY, JR., ESQ.
23                                   GAVIN HILL, ESQ.
                                 RENAISSANCE TOWER
24                               1201 ELM STREET, SUITE 1700
                                 DALLAS, TX  75270

25

                              **OFFICIAL TRANSCRIPT**

1    APPEARANCES CONTINUED:

2

3                              GODWIN LEWIS
                              BY:  JERRY C. VON STERNBERG, ESQ.
4                            1331 LAMAR, SUITE 1665
                              HOUSTON, TX  77010
5

6

7    FOR M-I L.L.C.:         MORGAN, LEWIS & BOCKIUS
                              BY:  HUGH E. TANNER, ESQ.
                                   DENISE SCOFIELD, ESQ.
8                                  JOHN C. FUNDERBURK, ESQ.
                              1000 LOUISIANA STREET, SUITE 4000
9                            HOUSTON, TX  77002

10

11

12   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
13                               REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM HB406
14                               NEW ORLEANS, LA  70130
                                 (504) 589-7779
15                               Cathy_Pepper@laed.uscourts.gov

16

17   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

18

19

20

21

22

23

24

25

                         **OFFICIAL TRANSCRIPT**

1                         **I N D E X**

2

3                                                    PAGE

4

5    **LAMAR MCKAY** ....................................... 588

6    CROSS-EXAMINATION BY MR. REGAN...................... 588

7    CROSS-EXAMINATION BY MR. MILLER..................... 593

8    CROSS-EXAMINATION BY MR. GODWIN..................... 611

9    **ANTHONY HAYWARD** VIDEOTAPED DEPOSITION................ 642

10   KEVIN DENNIS LACY VIDEOTAPED DEPOSITION............. 642

11   **DR. ALAN R. HUFFMAN**................................. 642

12   DIRECT EXAMINATION BY MR. SPIRO..................... 646

13   LUNCHEON RECESS.................................... 723

14

15

16                      E X H I B I T S

17

18   DESCRIPTION                                      PAGE

19

20   Exhibits 7510 and 7511 were admitted................ 645

21

22

23

24

25

                      **OFFICIAL TRANSCRIPT**

|   |   |
|---|---|
|   | 1 |

**P-R-O-C-E-E-D-I-N-G-S**

WEDNESDAY, FEBRUARY 27, 2013

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

08:00AM    7    THE DEPUTY CLERK:  All rise.

08:00AM    8    THE COURT:  Good morning, everyone.

08:01AM    9    VOICES:  Good morning, Your Honor.

08:01AM   10    THE COURT:  Any preliminary matters before we resume

08:01AM   11  testimony?

08:01AM   12    MR. BROCK:  Yes, Your Honor, from BP.

08:01AM   13         We have prepared a list of the exhibits that we

08:01AM   14  discussed with Dr. Bea yesterday as I referenced at the end of

08:01AM   15  his examination.  I would like to hand up now the list of

08:01AM   16  exhibits that we offer into evidence.  These are the ones we

08:01AM   17  discussed yesterday.

08:01AM   18    THE COURT:  Are there any objections to any of those?

08:01AM   19         All right, without objection, they are admitted.

08:01AM   20    MR. CUNNINGHAM:  We don't have any objection.

08:01AM   21    MR. GODWIN:  We have no objection.

08:01AM   22    THE COURT:  Mr. Cunningham, let me ask you, I think you

08:01AM   23  did something similar yesterday with Dr. Bea, right?

08:01AM   24    MR. CUNNINGHAM:  Yes, sir.

08:01AM   25    THE COURT:  I admitted the ones that you used.  I said

**OFFICIAL TRANSCRIPT**

08:01AM 1   I did not admit the so-called reliance exhibits that were not

08:01AM 2   used, but they might come in later, right?  I just wanted to

08:01AM 3   make sure we had taken care of that.

08:01AM 4        MR. BRIAN:  Your Honor, Brad Brian on behalf of

08:01AM 5   Transocean.

08:01AM 6             Last night, in preparing for today's session, I

08:01AM 7   realized that during opening statement one of the slides I put

08:02AM 8   up had the wrong caption.  I referred to it as either

08:02AM 9   Don Vidrine interview notes or notes of interview of

08:02AM 10  Don Vidrine.  It actually was an interview of Robert Kaluza,

08:02AM 11  the other company man.

08:02AM 12            I'll notify your clerk of the specific slide in

08:02AM 13  question during a break, but I wanted to alert the Court and

08:02AM 14  all the parties that was in error.

08:02AM 15       THE COURT:  Did we admit that into evidence?

08:02AM 16       MR. BRIAN:  No, it was just an opening statement slide.

08:02AM 17       THE COURT:  Oh, opening statement slide.

08:02AM 18       MR. BRIAN:  The actual exhibit probably will be used

08:02AM 19  during the trial, but I just wanted to let the Court know that

08:02AM 20  that was a mistake.

08:02AM 21       THE COURT:  We said at the beginning of the trial, and

08:02AM 22  actually before trial, I wanted to admit the demonstratives

08:02AM 23  themselves into evidence because I thought they would be

08:02AM 24  helpful to the Court.

08:02AM 25            Did we do that with Dr. Bea, yet, Mr. Cunningham?

**OFFICIAL TRANSCRIPT**

08:02AM 1          MR. CUNNINGHAM:  I don't know if we specifically

08:02AM 2    offered them --

08:02AM 3          THE COURT:  I know we put his report in and all.

08:02AM 4          MR. CUNNINGHAM:  -- but they are on the list that I

08:02AM 5    provided to Cathy.

08:02AM 6          THE COURT:  Okay.  Well, that's considered admitted,

08:02AM 7    okay.

08:02AM 8          MR. CUNNINGHAM:  We marked them as exhibits.

08:02AM 9          THE COURT:  You all are going to have to remind me of

08:03AM 10   this as we go along.  Make sure you tender that, and we'll

08:03AM 11   formally admit those.

08:03AM 12          Just to clarify what was said yesterday -- I

08:03AM 13   think I probably created some confusion, I understand, and

08:03AM 14   probably confusion in my own mind -- but trying to straighten

08:03AM 15   out myself and everybody else to the extent you may be confused

08:03AM 16   also, this business about what we want you to give us in

08:03AM 17   connection with each witness, I tried to make it clear at the

08:03AM 18   end, after the brief discussion, I think, back and forth I had

08:03AM 19   with Mr. Cunningham, that we don't necessarily need you to give

08:03AM 20   us a hard copy of every exhibit that you use with a witness.

08:03AM 21          We do want your demonstratives, which should have

08:03AM 22   references to the exhibit, the source from which the

08:03AM 23   demonstrative is drawn, but you don't have to give us -- as

08:03AM 24   long as you give us a list, like Mr. Brock did today, after the

08:04AM 25   witness testifies, you can give us and offer a list of the

**OFFICIAL TRANSCRIPT**

08:04AM 1    exhibits, so that it will be clear in the record, and we'll

08:04AM 2    have a list, Ben will keep a list, of which exhibits were

08:04AM 3    admitted and which were used with each witness.  Okay?  Does

08:04AM 4    that make it clear?

08:04AM 5                Okay.  All right.  Anything else?

08:04AM 6            MR. MILLER:  Yes, Your Honor.

08:04AM 7                Good morning, Your Honor.  Kerry Miller for

08:04AM 8    Transocean.

08:04AM 9                Last night when we all got back to our work

08:04AM 10   stations, PSC and DOJ sent us an e-mail that I think was very

08:04AM 11   well intentioned and welcomed in some respects, which was to

08:04AM 12   request that additional witnesses who were previously not

08:04AM 13   requested for this week be requested to possibly be here and be

08:04AM 14   present on Thursday.

08:04AM 15               We know from our discussion at the end of

08:04AM 16   business yesterday, we have to finish Mr. McKay today.  I think

08:04AM 17   they are playing some videos that are not very long after that.

08:04AM 18   Then we have Mr. Huffman, Mr. Bly, and Mr. Hurst; so, it's

08:05AM 19   Mr. McKay and three more witnesses and a couple of videos.

08:05AM 20               The requests that were made, one is an employee

08:05AM 21   of Transocean, one is an employee of BP.  Your Honor, I think

08:05AM 22   we're willing and want to get the Transocean employee,

08:05AM 23   Randy Ezell, to testify on Monday, if they want to do him on

08:05AM 24   Monday.

08:05AM 25               I know that they've reached out to Mr. Ezell's

**OFFICIAL TRANSCRIPT**

08:05AM  1    personal counsel, and he's willing to have him here on

08:05AM  2    Thursday.

08:05AM  3            Your Honor, we have lots of rules and regulations

08:05AM  4    in this case.  I've never had a case with so many rules and

08:05AM  5    regulations.  But I think one that's important for scheduling

08:05AM  6    and logistics and hotel rooms and lawyer prep, the way that

08:05AM  7    we're working, is this list of witnesses comes out on Wednesday

08:05AM  8    noon, we understand we all want to move faster, but requests

08:05AM  9    last night came with less than 48 hours notice.  It was Tuesday

08:05AM 10    night, asking a witness to appear on Thursday, and that affects

08:06AM 11    the lawyer prep time.

08:06AM 12            So what we would ask, Your Honor, is, is the

08:06AM 13    Wednesday list, now that we all want to move faster, which is

08:06AM 14    welcome news to everyone, be a little more aggressive in terms

08:06AM 15    of giving us notice as to what witnesses are going to be

08:06AM 16    called.

08:06AM 17            It may be a moot issue with respect to this week.

08:06AM 18    I suspect we're not going to move to these new witnesses until

08:06AM 19    Monday morning anyway; but, we would like to have advanced

08:06AM 20    notice, especially if they intent is to move faster.

08:06AM 21        THE COURT:  I understand.  I think your points are well

08:06AM 22    taken, and everyone should heed that.  If we over estimate,

08:06AM 23    maybe, by a few witnesses, it's probably better.

08:06AM 24            The one thing we don't want to do is I don't want

08:06AM 25    to end up here Thursday morning, and we're all sitting around

**OFFICIAL TRANSCRIPT**

08:06AM 1    twiddling our thumbs because we have no witnesses.  That's not

08:06AM 2    going to make anybody very happy around here.  So that's what

08:06AM 3    we want would avoid.

08:06AM 4              Mr. Roy.

08:06AM 5         MR. ROY:  Jim Roy, Your Honor.

08:06AM 6              To address Kerry's point, things do, believe it

08:06AM 7    or not, seem to be moving considerably faster in terms of

08:06AM 8    projecting.

08:07AM 9              Just so all parties are aware, we're going to

08:07AM 10   list all of the remainder of our witnesses and the Government's

08:07AM 11   witnesses on our Wednesday noon list today for next week, so

08:07AM 12   everybody is aware of it.  They are on deck for next week.

08:07AM 13   It's possible, depending on the cross, to get there.

08:07AM 14        THE COURT:  Okay, very well.

08:07AM 15             One more thing I wanted to state for the record.

08:07AM 16   I guess I sort of owe an apology to Mr. Underhill because he

08:07AM 17   thought that Judge Shushan -- he was going to throw

08:07AM 18   Judge Shushan under the bus, but I guess I did, because it

08:07AM 19   turns out that I was looking at the old list which was in my

08:07AM 20   book.

08:07AM 21             I discovered this morning when I was looking,

08:07AM 22   they look exactly alike except the names were in a somewhat

08:07AM 23   different order.  Sure enough, Dr. Huffman is the second name

08:07AM 24   on the list.  He was Number 10 on the list I was looking at.

08:08AM 25        MR. UNDERHILL:  Your Honor, like that movie, pass it

**OFFICIAL TRANSCRIPT**

08:08AM 1    on, you know, you pass on the favor, I'll take the apology,

08:08AM 2    I'll just pass mine on to Judge Shushan, so she's the one that

08:08AM 3    will receive it at the end of the day.

08:08AM 4           THE COURT:  I managed to blame it all on her this

08:08AM 5    morning anyway.

08:08AM 6                All right.  Let's resume testimony.

08:08AM 7           MR. BROCK:  I'm sorry, just one final point on

08:08AM 8    Mr. Roy's statement.

08:08AM 9                I don't have the precise number, but I think

08:08AM 10   probably the joint plaintiffs' case still has 12 or

08:08AM 11   14 witnesses that are designated to testify next week.  So if

08:08AM 12   they believe they may finish their case next week, that seems

08:08AM 13   appropriate to designate them all.

08:08AM 14               But what we would ask, just in the interest of

08:08AM 15   courtesy, is if they could list them in the order in which they

08:08AM 16   expect --

08:08AM 17          THE COURT:  I think that's what he intends to do.

08:08AM 18               Mr. Roy, you will list them in the order in which

08:08AM 19   they are planned to be called, right?

08:08AM 20          MR. ROY:  We will do our best on a good faith basis,

08:09AM 21   Your Honor.  There are some that have issues of transportation

08:09AM 22   because they weren't expected to testify until the following

08:09AM 23   week.  There are some that we're trying to work out.

08:09AM 24               It will be a proposed order, but -- and it may be

08:09AM 25   optimistic that we get them all next week.

**OFFICIAL TRANSCRIPT**

08:09AM 1          THE COURT:  Give us your best shot at listing them in

08:09AM 2     the order in which they are going to be called.

08:09AM 3          MR. ROY:  We'll give as much notice as possible.

08:09AM 4          THE COURT:  If there is any change to that, of course,

08:09AM 5     notify everyone immediately.

08:09AM 6          MR. ROY:  Absolutely.

08:09AM 7          MR. BROCK:  What we really to know is, we really need

08:09AM 8     to know Monday, Tuesday, because for Monday we have to get our

08:09AM 9     team here.

08:09AM 10          THE COURT:  I understand.  I understand.

08:09AM 11          MR. BROCK:  Okay.

08:09AM 12          THE COURT:  Okay.  Who was up next?  Mr. Maze, Alabama.

08:09AM 13          MR. MAZE:  Alabama has no questions.

08:09AM 14          THE COURT:  All right.  Thank you.

08:09AM 15               Louisiana.

08:09AM 16          MR. KANNER:  No questions at this time, Your Honor.

08:09AM 17          THE COURT:  Transocean.  Oh, no.  That's right.  I'm

08:09AM 18     sorry.  BP.

08:09AM 19          MR. REGAN:  Good morning, Your Honor.  Matt Regan on

08:09AM 20     behalf of BP.

08:09AM 21          Mr. McKay, Good morning.

08:09AM 22          THE WITNESS:  Good morning.

08:09AM 23          MR. REGAN:  Your Honor, the court reporter has asked,

08:09AM 24     for their benefit, for us to announce what examination we're

08:10AM 25     doing, so we'll do our best to do that.

                                **OFFICIAL TRANSCRIPT**

08:10AM 1          This will be the start of Mr. McKay's direct

08:10AM 2    examination.

08:10AM 3          THE COURT:  Well, let me make a comment about that.

08:10AM 4    There was just confusion yesterday of our afternoon reporter

08:10AM 5    that -- I guess she didn't understand that the plaintiffs were

08:10AM 6    calling Mr. McKay under -- we all know so-called

08:10AM 7    cross-examination, even though technically it's not called that

08:10AM 8    anymore, I think, under the rules.  But it's a little different

08:10AM 9    when you're calling an opposing party's witness.

08:10AM 10         So they were unsure how to style it, but I told

08:10AM 11   her, as far as I was concerned, it didn't make a whole lot of

08:10AM 12   difference as long as we were consistent.

13         MR. REGAN:  Not a problem, Your Honor.

14                        **LAMAR MCKAY**

15    was called as a witness and, after being previously duly

16    sworn by the Clerk, was examined and testified on his oath as

17    follows:

08:10AM 18                       CROSS-EXAMINATION

08:10AM 19   BY MR. REGAN:

08:10AM 20   Q.   Good morning, Mr. McKay.

08:10AM 21   A.   Good morning.

08:10AM 22   Q.   Mr. McKay, yesterday Mr. Cunningham asked you a fair

08:10AM 23   number of questions about your background.  I'd just like to

08:10AM 24   fill in a few blanks.

08:10AM 25         Could you let the Court know where you grew up.

                         **OFFICIAL TRANSCRIPT**

08:10AM 1    A.    I grew up in Jackson, Mississippi.

08:10AM 2    Q.    Where did you go to school, Mr. McKay?

08:10AM 3    A.    Mississippi State University.

08:11AM 4    Q.    What did you graduate with a degree in?

08:11AM 5    A.    Petroleum engineering.

08:11AM 6    Q.    Mr. McKay, when did you first start working in the oil

08:11AM 7    industry?

08:11AM 8    A.    Well, I started when I was a freshman in college, and I

08:11AM 9    worked as a roustabout for Amoco.

08:11AM 10   Q.    After graduating, where did you go to work?

08:11AM 11   A.    Lake Charles, Louisiana, for Amoco.

08:11AM 12   Q.    You've been with Amoco or BP Amoco, now BP, from being a

08:11AM 13   freshman in college until today?

08:11AM 14   A.    That is correct.  Yes.

08:11AM 15   Q.    There was some questions to you about deepwater and the

08:11AM 16   use of the word "shelf."  Mindful of the jargon that's in this

08:11AM 17   case, could you just explain what you meant by the Gulf of

08:11AM 18   Mexico shelf.

08:11AM 19   A.    Yeah, the shelf is the shallower water parts of the Gulf

08:11AM 20   of Mexico which were developed, discovered and developed from

08:11AM 21   roughly the '60s through today.

08:11AM 22         Deepwater is after you come off the shelf, the water

08:11AM 23   depth increases pretty -- pretty rapidly.  It's generally where

08:12AM 24   you don't have fixed structures.  You know, you have to have

08:12AM 25   floating or tethered structures.

**OFFICIAL TRANSCRIPT**

08:12AM 1    Q.    After you graduated, I'll just go back one second, where

08:12AM 2    did you start working when you came out of college, Mississippi

08:12AM 3    State?

08:12AM 4    A.    Lake Charles, Louisiana.

08:12AM 5    Q.    I'll fast forward now to 2009, when you became the

08:12AM 6    President of BP America.

08:12AM 7          I think you sort of described your role, but just for

08:12AM 8    the benefit of the Court in one question, could you give the

08:12AM 9    Court an idea of what your role was becoming the President of

08:12AM 10   BP America in 2009?

08:12AM 11   A.    At BP America, the role that I have, it started, I think,

08:12AM 12   in January, February, 2009.

08:12AM 13         BP America was a bit unique in BP.  As I said

08:12AM 14   yesterday, our businesses, our operating businesses are run by

08:12AM 15   what we call line businesses, the Exploration & Production

08:12AM 16   segment as an example.

08:12AM 17         My job as head of BP America was to be the chief

08:12AM 18   representative in the US.  The reason for that is every

08:12AM 19   business that BP has operates in the US.  It's the only country

08:13AM 20   in the world that is like that.

08:13AM 21         The scale of the business is large in the US, so it's

08:13AM 22   about 40 percent of the corporation.

08:13AM 23   Q.    How many employees did BP have in the US at the time when

08:13AM 24   you became President of BP America, around about?

08:13AM 25   A.    Roughly, probably 26,000, something like that.

**OFFICIAL TRANSCRIPT**

08:13AM 1   Q.   Have had that same rough amount through the years?

08:13AM 2   A.   I think it's closer to 21.  We've divested some assets

08:13AM 3   now.

08:13AM 4   Q.   Did you have any role in the Exploration & Production, or

08:13AM 5   E&P, division of BP in 2009 and 2010 or 2011?

08:13AM 6   A.   No.

08:13AM 7   Q.   Did you have any role with respect to the design or the

08:13AM 8   drilling or the execution of the drilling plan with respect to

08:13AM 9   the Macondo well that is the subject of this litigation?

08:13AM 10  A.   No.

08:13AM 11  Q.   You were asked about an investigation that BP commissioned

08:13AM 12  following April 20, 2010.

08:13AM 13       MR. REGAN:  The Bly investigation, as it's been called

08:14AM 14  here, Your Honor.

08:14AM 15                         EXAMINATION

08:14AM 16  BY MR. REGAN:

08:14AM 17  Q.   Mr. McKay, did you have any role with respect to setting

08:14AM 18  up that investigation?

08:14AM 19  A.   No.

08:14AM 20  Q.   Did you have any role with respect to the scope of that

08:14AM 21  investigation?

08:14AM 22  A.   No.

08:14AM 23  Q.   And did you do anything in terms of the actual conducting

08:14AM 24  of the investigation?

08:14AM 25  A.   No.

**OFFICIAL TRANSCRIPT**

08:14AM  1    Q.    Now, today, in 2013, as it was discussed yesterday with

08:14AM  2    Mr. Cunningham, you have a new role with BP; is that correct?

08:14AM  3    A.    Yes.

08:14AM  4    Q.    What is your current title?

08:14AM  5    A.    I'm the CEO of the Exploration & Production segment.

08:14AM  6    Q.    How long have you had that new position?

08:14AM  7    A.    Seven weeks, roughly.

08:14AM  8    Q.    With respect to the -- I understand you've been in that

08:14AM  9    position for a brief period of time.  With respect to being the

08:14AM 10    CEO of E&P, have you had a chance to see result of the company

08:14AM 11    implementing recommendations that came out of the company's

08:14AM 12    investigation done by Mr. Bly?

08:14AM 13    A.    Yes.  Of course, I was aware we were implementing those

08:15AM 14    recommendations prior to this job; but, yes, I have looked at

08:15AM 15    those.  There were 26 of those, and we're implementing all of

08:15AM 16    those.

08:15AM 17    Q.    Has BP kept those recommendations in-house or just to

08:15AM 18    itself?

08:15AM 19    A.    No.  I mean, one of the things we did is we developed a

08:15AM 20    team probably in very early 2011 to share the learnings from

08:15AM 21    the accident.  That team has been around the world working with

08:15AM 22    other operators, including the ones here in the US, but Brazil,

08:15AM 23    Mexico, Angola, Azerbaijan, lots of places around the world.

08:15AM 24    Q.    And in the United States?

08:15AM 25    A.    Yes.

**OFFICIAL TRANSCRIPT**

08:15AM 1    Q.   Has that team been working both with operators and with

08:15AM 2    governmental entities?

08:15AM 3    A.   Yes.  We've tried to share it broadly.  We have tried to

08:15AM 4    share it with -- well, we have shared it with all the other

08:15AM 5    operators in the US that are interested, and regulators as

08:15AM 6    well, in the US administration and other regulators around the

08:15AM 7    world, yes.

08:15AM 8                MR. REGAN:  Thank you, Mr. McKay.

08:15AM 9                     I have no further questions for Mr. McKay.

08:16AM 10               THE COURT:  Thank you.  Transocean?

08:16AM 11                         CROSS-EXAMINATION

08:16AM 12   BY MR. MILLER:

08:16AM 13   Q.   Good morning, Mr. McKay.

08:16AM 14   A.   Good morning.

08:16AM 15   Q.   I'm Kerry Miller.  I represent Transocean.

08:16AM 16            For Ms. Cathy's benefit, I have you under

08:16AM 17   cross-examination.

08:16AM 18   A.   Okay.

08:16AM 19   Q.   Mr. McKay, were you in the courtroom for opening

08:16AM 20   statement?

08:16AM 21   A.   No.

08:16AM 22   Q.   Let's pull up 6593.

08:17AM 23            Mr. Cunningham and Mr. Regan covered your background.

08:17AM 24   I just want to ask you a couple of follow-up questions for

08:17AM 25   that.

                          **OFFICIAL TRANSCRIPT**

08:17AM 1          Mr. McKay, I prepared this demonstrative based upon

08:17AM 2    your deposition testimony, which was in response to questions

08:17AM 3    as to what your position was in 2010.

08:17AM 4          So I understand, Mr. McKay, in 2010, you were the

08:17AM 5    executive -- or an executive vice-president of BP PLC?

08:17AM 6    A.    Yes.

08:17AM 7    Q.    You were the Chairman and President of BP America, Inc.?

08:17AM 8    A.    That's right.

08:17AM 9    Q.    You were the Chairman and Director of BP Corporation North

08:17AM 10   America, Inc.?

08:17AM 11   A.    Correct.

08:17AM 12   Q.    Now, I understand from your testimony yesterday and a few

08:17AM 13   minutes ago that you've recently received a promotion.  Seven

08:17AM 14   weeks, my back calculation was January 1, 2013; is that

08:17AM 15   correct?

08:17AM 16   A.    Correct.

08:17AM 17   Q.    Mr. McKay, if you can tell us with respect to this

08:17AM 18   demonstrative, how would that promotion fit into this

08:18AM 19   demonstrative?

08:18AM 20   A.    Well, the way that BP is organized -- this graph or

08:18AM 21   exhibit you have here is at least pieces of it, the BP America,

08:18AM 22   the BP Corp North America, and BP Exploration & Production is

08:18AM 23   sort of the legal structure of the way the subsidiaries are

08:18AM 24   held.

08:18AM 25          BP as a global company, which is common with global

**OFFICIAL TRANSCRIPT**

08:18AM 1   companies, manages its assets and its varied interests, which

08:18AM 2   are in various subsidiaries around the world, we manage those

08:18AM 3   through what's called an Exploration & Production segment.

08:18AM 4   That contains the operating businesses which would manager Gulf

08:18AM 5   of Mexico, Onshore US, Alaska, those kind of things.

08:18AM 6         That management structure is, as I said yesterday,

08:18AM 7   responsible for the safe and reliable operations.  Those

08:18AM 8   businesses around the world, then, in the E&P segment, report

08:18AM 9   to me.

08:18AM 10  Q.   Let me ask you, Mr. McKay, the BP Exploration &

08:18AM 11  Production, Inc., the legal entity I have depicted on the

08:18AM 12  exhibit, is that the company that you're now CEO of?

08:19AM 13  A.   No.  That is a subsidiary company that holds the Gulf of

08:19AM 14  Mexico assets.  It legally holds the leases in the Gulf of

08:19AM 15  Mexico.

08:19AM 16  Q.   The promotion that you got on January 2013 to become Group

08:19AM 17  CEO of Exploration & Production, that business unit,

08:19AM 18  Exploration & Production, what company, if any, on this list

08:19AM 19  does that fall underneath?

08:19AM 20  A.   Well, we have several hundred subsidiaries around the

08:19AM 21  world.  So, as you can imagine, the operating structure, the

08:19AM 22  way you manage all the assets, is organized in businesses that

08:19AM 23  don't perfectly match this legal entity structure.

08:19AM 24        So the -- if you think of -- the way we're organized

08:19AM 25  right now is we have a worldwide drilling organization that

**OFFICIAL TRANSCRIPT**

08:19AM 1    drills wells for us, regardless of the legal entity, around the

08:19AM 2    world, whether it be in Egypt, whether it be in the US or

08:19AM 3    wherever.

08:19AM 4              So we have an organization that reports to me, which

08:19AM 5    includes drilling, exploration, production, operations, the

08:20AM 6    financial ends, legal, everything.

08:20AM 7    Q.    Mr. McKay, are you still an executive vice-president today

08:20AM 8    of BP PLC?

08:20AM 9    A.    Yes.

08:20AM 10   Q.    Are you still the Chairman and President of BP America,

08:20AM 11   Inc.?

08:20AM 12   A.    No.

08:20AM 13   Q.    What's your position at BP America, Inc., if any?

08:20AM 14   A.    I was replaced as the chairman of BP America.

08:20AM 15   Q.    Are you still the chairman and director of BP Corporation

08:20AM 16   North America, Inc.?

08:20AM 17   A.    No.

08:20AM 18   Q.    Do you have a position with BP Corporation North America,

08:20AM 19   Inc. today?

08:20AM 20   A.    No.  No.

08:20AM 21   Q.    Mr. McKay, in your position at BP PLC, are you part of the

08:21AM 22   company's executive management?

08:21AM 23   A.    Yes.

08:21AM 24   Q.    Mr. McKay, are you on the Board of BP PLC's Gulf of Mexico

08:21AM 25   committee?

**OFFICIAL TRANSCRIPT**

08:21AM 1    A.    No.

08:21AM 2    Q.    Mr. McKay, with respect to Macondo, BP was the operator,

08:21AM 3    correct?

08:21AM 4    A.    Correct.

08:21AM 5    Q.    Transocean was the drilling contractor hired by BP on

08:21AM 6    Macondo, correct?

08:21AM 7    A.    Correct.

08:21AM 8    Q.    Mr. McKay, the *Deepwater Horizon*, the rig that drilled

08:21AM 9    Macondo, was recognized within the BP organization for safety,

08:21AM 10   correct?

08:21AM 11   A.    Yes.  Up until the accident, yes.

08:21AM 12   Q.    The *Deepwater Horizon* was known within the BP organization

08:21AM 13   as a very safe operating rig, correct?

08:21AM 14   A.    Yes.

08:21AM 15   Q.    In fact, Mr. McKay, on April 20, 2010, BP managers,

08:21AM 16   including Pat O'Bryan and David Sims, were on the

08:22AM 17   *Deepwater Horizon*, correct?

08:22AM 18   A.    Yes.

08:22AM 19   Q.    You agree --

08:22AM 20   A.    I'm sorry, I can't remember if David Sims was on the rig

08:22AM 21   or not, but Pat O'Bryan was.

08:22AM 22   Q.    Do you know any other BP managers by name who were on the

08:22AM 23   rig the night of April --

08:22AM 24   A.    I know for sure Pat was there, but I can't remember who

08:22AM 25   else there.

**OFFICIAL TRANSCRIPT**

08:22AM 1    Q.    Mr. McKay, do you agree up until the time of the incident

08:22AM 2    and the sinking of the *Deepwater Horizon*, that the

08:22AM 3    *Deepwater Horizon* had had a good safety record?

08:22AM 4    A.    Yes.

08:22AM 5    Q.    Mr. McKay, you have no personal knowledge, sir, that would

08:22AM 6    lead you to be critical of Transocean or its employees,

08:22AM 7    correct?

08:22AM 8    A.    No.

08:22AM 9    Q.    Mr. McKay, you have no personal knowledge that any member

08:22AM 10   of the *Deepwater Horizon* rig crew was incompetent in any way,

08:22AM 11   correct?

08:22AM 12   A.    No.

08:22AM 13   Q.    Let's pull up 2737.

08:23AM 14         Mr. McKay, this is a demonstrative, I think, that

08:23AM 15   Mr. Cunningham used with Dr. Bea yesterday, but this was a

08:23AM 16   depiction of various rigs BP has operating in the Gulf.

08:23AM 17         Do you see that, Mr. McKay?

08:23AM 18   A.    I do.

08:23AM 19   Q.    In your position, are you generally familiar with the

08:23AM 20   rigs, the assets that BP has in the Gulf of Mexico?

08:23AM 21   A.    Yes.

08:23AM 22   Q.    Mr. McKay, I count seven rigs depicted in the Gulf of

08:23AM 23   Mexico, do you see that?

08:23AM 24   A.    I do.

08:23AM 25   Q.    This was a depiction as of April 20, 2010, and it depicts

**OFFICIAL TRANSCRIPT**

08:23AM 1    the *Deepwater Horizon*, which we know is not there anymore,

08:23AM 2    correct, Mr. McKay?

08:23AM 3    A.    That's right, yes.

08:23AM 4    Q.    It also depicts the *Marianas*.  We also know that that's

08:23AM 5    not there anymore, correct?

08:23AM 6    A.    Yes, that's correct.

08:23AM 7    Q.    That was a rig that was damaged in the hurricane in 2009

08:23AM 8    and replaced by the *Horizon*, correct?

08:23AM 9    A.    That's right.

08:23AM 10   Q.    Mr. McKay, with respect to the *Developmental Driller II*,

08:23AM 11   the *Developmental Driller III* and the *Enterprise*, three

08:24AM 12   Transocean rigs, Mr. McKay, are you aware that those rigs are

08:24AM 13   still leased by -- BP is still leasing those rigs from

08:24AM 14   Transocean today?

08:24AM 15   A.    Yes, I am.

08:24AM 16   Q.    Do you now that those rigs are still operating in the Gulf

08:24AM 17   of Mexico for BP today?

08:24AM 18   A.    I do.

08:24AM 19   Q.    Do you also know, Mr. McKay, that the

08:24AM 20   *Development Driller II* and the *Development Driller III* drilled

08:24AM 21   the relief wells for BP?

08:24AM 22   A.    I do.

08:24AM 23   Q.    Those were the relief wells that finally stopped the flow

08:24AM 24   of Macondo oil?

08:24AM 25   A.    It was actually stopped before the relief wells, but,

**OFFICIAL TRANSCRIPT**

08:24AM 1   yeah, they were drilling to be able to do that, yes.

08:24AM 2   Q.   Those drilling operations to completely stop and shut down

08:24AM 3   the oil, those were completely successful operations, weren't

08:24AM 4   they --

08:24AM 5   A.   Yes.

08:24AM 6   Q.   -- Mr. McKay?

08:24AM 7   A.   Yes.

08:24AM 8   Q.   Mr. McKay, in your testimony with Mr. Cunningham

08:24AM 9   yesterday, you mentioned that -- BP's plea agreement,

08:24AM 10  Mr. Cunningham asked you some questions about it.

08:24AM 11          Let's look at the plea agreement.  Let's pull it up.

08:25AM 12          Mr. McKay, this plea agreement was entered by BP

08:25AM 13  Exploration & Production Company, correct?

08:25AM 14  A.   Yes.

08:25AM 15  Q.   Let's go to Exhibit D of the plea agreement.

08:25AM 16          THE COURT:  Could you recite the exhibit number.

08:25AM 17          MR. MILLER:  Sure, Your Honor.  Mr. Cunningham used it

08:25AM 18  yesterday.

08:25AM 19          THE COURT:  2737?

08:25AM 20          MR. MILLER:  No, that was the other one.

08:25AM 21          Plea agreement is TREX 89052.

08:25AM 22          THE COURT:  89052.  Okay.

08:25AM 23                        EXAMINATION

08:25AM 24  BY MR. MILLER:

08:25AM 25  Q.   Mr. McKay, I asked you earlier if you were a member of the

**OFFICIAL TRANSCRIPT**

08:25AM 1   BP PLC executive committee, and you answered yes?

08:26AM 2   A.    The executive team.   Yes.

08:26AM 3   Q.    Executive management.

08:26AM 4   A.    We're not a committee.

08:26AM 5   Q.    Executive management.

08:26AM 6          Mr. McKay, is it true that the BP PLC executive

08:26AM 7   management was involved in the agreement by BP to enter into

08:26AM 8   the plea agreement?

08:26AM 9   A.    Yes.  Yes.

08:26AM 10  Q.    If you look at this, Mr. McKay, this is the Certification

08:26AM 11  of Resolution Adopted By Board of Directors of BP PLC, do you

08:26AM 12  see that?

08:26AM 13  A.    I do.

08:26AM 14  Q.    Do you see it states, "Resolution of the Board of

08:26AM 15  Directors of BP PLC," Mr. McKay?

08:26AM 16  A.    Yes.

08:26AM 17  Q.    This is a resolution providing authority for BP to enter

08:26AM 18  the plea agreement, correct?

08:26AM 19  A.    I believe so, yes.

08:26AM 20  Q.    You see, Mr. McKay, there is a series of whereas clauses

08:26AM 21  that govern the authority of BP PLC to enter the plea

08:26AM 22  agreement.

08:26AM 23  A.    I do.

08:26AM 24          THE COURT:  Is it possible to blow that up more?

08:26AM 25                    EXAMINATION

**OFFICIAL TRANSCRIPT**

08:26AM  1    BY MR. MILLER:

08:27AM  2    Q.   You see that what I have highlighted --

08:27AM  3         MR. MILLER:  You know, Judge, I don't know.  Can you

08:27AM  4    blow it up a little more?

08:27AM  5              I think that would be too hard.  I'm not going to

08:27AM  6    be long with this exhibit.

08:27AM  7         THE COURT:  That's fine.

08:27AM  8                              EXAMINATION

08:27AM  9    BY MR. MILLER:

08:27AM  10   Q.   What I've highlighted, Mr. McKay, is a role of executive

08:27AM  11   management in each of the whereas clauses, can you see that?

08:27AM  12   A.   I do, yes.

08:27AM  13   Q.   You would have been on executive management that

08:27AM  14   participated in creating this authorization, correct?

08:27AM  15   A.   Yes.

08:27AM  16   Q.   So, Mr. McKay, I take it, based upon that and your

08:27AM  17   testimony yesterday, that you're familiar with the

08:27AM  18   plea agreement BP entered with the United States of America?

08:27AM  19   A.   I am.

08:27AM  20   Q.   Let's go to the beginning of the plea agreement, please.

08:27AM  21        Mr. McKay, in fact, sir, have you seen this document

08:27AM  22   before?  United States of America versus BP Exploration &

08:27AM  23   Production Guilty Plea Agreement?

08:27AM  24   A.   Yes.

08:27AM  25   Q.   Mr. McKay, I'm going to read this statement.  "The

                              **OFFICIAL TRANSCRIPT**

08:28AM 1    defendant agrees" -- the defendant here is BP Exploration &

08:28AM 2    Production, correct?

08:28AM 3    A.   Yes.

08:28AM 4    Q.   -- "to waive prosecution by indictment and plead guilty to

08:28AM 5    an information charging it with eleven counts of violations of

08:28AM 6    18 U.S.C. 1115, misconduct or neglect of ship officers."

08:28AM 7         Do you see that, Mr. McKay?

08:28AM 8    A.   I do.

08:28AM 9    Q.   Mr. McKay, do you know that those are eleven felony

08:28AM 10   counts?

08:28AM 11   A.   I do.

08:28AM 12   Q.   One count of a violation of 18 U.S.C. Section 1505,

08:28AM 13   Obstruction of Congress.  Mr. McKay, do you understand that's

08:28AM 14   also a felony count?

08:28AM 15   A.   I believe so, yes.

08:28AM 16   Q.   Then one misdemeanor count of 33 U.S.C. 1391.  That's a

08:28AM 17   Clean Water Act count, and one misdemeanor count of the

08:29AM 18   Migratory Bird Act.  Do you see that, Mr. McKay?

08:29AM 19   A.   Yes.

08:29AM 20   Q.   So those are 14 counts which under BP pled guilty,

08:29AM 21   correct?

08:29AM 22   A.   That's correct.

08:29AM 23   Q.   Mr. McKay, are you familiar with the Transocean plea

08:29AM 24   agreement?

08:29AM 25   A.   Not in detail.

**OFFICIAL TRANSCRIPT**

08:29AM  1    Q.   Mr. McKay, do you know that Transocean pled guilty to only

08:29AM  2    one misdemeanor count?

08:29AM  3    A.   I believe that's correct.

08:29AM  4    Q.   Transocean pled guilty to no felonies?

08:29AM  5    A.   I believe that's correct.

08:29AM  6    Q.   Let's look at some other provisions of the plea agreement.

08:29AM  7    Let's pull it up.

08:29AM  8         Mr. McKay, the plea agreement states that the

08:29AM  9    defendant agrees to the factual allocutions contained in

08:29AM 10    Exhibit A to the plea agreement.

08:29AM 11    A.   Yes.

08:29AM 12    Q.   Do you see that?

08:29AM 13         Are you familiar with Exhibit A, Mr. McKay?

08:29AM 14    A.   I am, yes.

08:29AM 15    Q.   Let's look at Exhibit A.  Let's go on to the highlighted

08:30AM 16    language.

08:30AM 17         THE COURT:  This is which plea agreement?

08:30AM 18         MR. MILLER:  The BP plea agreement.  It's the same

08:30AM 19    TREX, 89052, Your Honor.

08:30AM 20                            EXAMINATION

08:30AM 21    BY MR. MILLER:

08:30AM 22    Q.   Mr. McKay, do you see the highlighted language?

08:30AM 23    A.   I do.

08:30AM 24    Q.   "Defendant BP Exploration & Production agrees that if the

08:30AM 25    case were to proceed to trial, the government could establish

                              **OFFICIAL TRANSCRIPT**

08:30AM 1    beyond a reasonable doubt that, in this capacity, BP, as the

08:30AM 2    designated operator under BOEMRE regulations, was ultimately

08:30AM 3    responsible for conducting operation at Macondo" --

08:30AM 4            Do you see that, Mr. McKay?

08:30AM 5            -- "in a way that ensured the safety and protection

08:30AM 6    of personnel, equipment, natural resources and the

08:30AM 7    environment."

08:30AM 8            Do you see that?

08:30AM 9    A.    I do.

08:30AM 10   Q.    That's a statement that BP agreed to in the plea

08:30AM 11   agreement, correct?

08:30AM 12   A.    Well, those are two pieces of two different paragraphs,

08:30AM 13   yeah.

08:30AM 14   Q.    But that's something BP agreed to, right?

08:30AM 15   A.    Yeah, we agreed to all the language in the plea agreement.

08:31AM 16   Q.    In fact, let's look at the next one.

08:31AM 17           It says right here, again, "Beyond a reasonable

08:31AM 18   doubt, BP agreed that on the night of the explosion, BP had two

08:31AM 19   well site leaders on the *Deepwater Horizon* who were BP's

08:31AM 20   employees, agents and highest ranking representatives on the

08:31AM 21   rig."

08:31AM 22           Do you see that Mr. McKay?

08:31AM 23   A.    I do.

08:31AM 24   Q.    "The well site leaders were responsible for supervising

08:31AM 25   the negative pressure test conducted by Transocean."

OFFICIAL TRANSCRIPT

08:31AM 1          You agree with that statement, correct, Mr. McKay?

08:31AM 2  A.    Yes.

08:31AM 3  Q.    Let's look at the next one.

08:31AM 4          Again, Mr. McKay, "Beyond a reasonable doubt, BP

08:31AM 5  agrees that BP's well site leaders negligently supervised the

08:32AM 6  negative pressure test during this time, failed to alert

08:32AM 7  engineers on the shore of these indications, and, along with

08:32AM 8  others, ultimately deemed the negative pressure test a success,

08:32AM 9  all in violation of the applicable duty of care.  The negligent

08:32AM 10  conduct of BP's well site leaders is attributable to BP."

08:32AM 11          Do you see that, Mr. McKay?

08:32AM 12  A.    Yes.  As I said, we agreed to all the language in the plea

08:32AM 13  agreement.

08:32AM 14  Q.    Let's to go the next one.

08:32AM 15          Again, "Beyond a reasonable doubt, BP agrees that its

08:32AM 16  negligent conduct, among others, was a proximate cause of the

08:32AM 17  deaths of eleven men and pollution resulting from the

08:32AM 18  Macondo well blowout.  As a result of this negligent

08:32AM 19  supervision and decision-making, BP and the Transocean rig crew

08:32AM 20  proceeded with removing drilling mud from the Macondo well

08:32AM 21  until it became so underbalanced that natural gas and oil

08:33AM 22  migrated through the well, up through the riser, and onto the

08:33AM 23  rig floor."

08:33AM 24          Do you see that, Mr. McKay?

08:33AM 25  A.    I do.

**OFFICIAL TRANSCRIPT**

08:33AM 1   Q.   Again, that's something that BP and yourself agreed to,

08:33AM 2   correct?

08:33AM 3   A.   Yes.

08:33AM 4   Q.   Mr. McKay, you know Luke Keller, correct?

08:33AM 5   A.   I do.

08:33AM 6   Q.   He works for you?

08:33AM 7   A.   He did.

08:33AM 8   Q.   Mr. Keller attended the hearing that Chief Judge Vance

08:33AM 9   held in connection with BP's plea agreement, correct?

08:33AM 10  A.   Yes.

08:33AM 11  Q.   Mr. Keller is a senior executive at BP?

08:33AM 12  A.   Yes.

08:33AM 13  Q.   Did he report to you on the plea agreement herein he

08:33AM 14  attended?

08:33AM 15  A.   Yes.

08:33AM 16  Q.   Mr. McKay, do you agree that BP's conduct resulted in the

08:33AM 17  tragic deaths of eleven individuals and caused enormous

08:33AM 18  environmental damages from the discharge of oil into the Gulf

08:33AM 19  of Mexico?

08:34AM 20  A.   Yes, it was a cause.  Yes, we admitted our responsibility.

08:34AM 21       I think what you're reading there is Luke's

08:34AM 22  statement, I believe; is that right?

08:34AM 23  Q.   No, sir.  But do you agree with my question?

08:34AM 24  A.   Could you restate it?

08:34AM 25  Q.   Yes.  It's a quote.

**OFFICIAL TRANSCRIPT**

608

08:34AM 1   A.    Well, could I ask who you are quoting?

08:34AM 2   Q.    I'm quoting Judge Vance.  Do you know who Judge Vance is?

08:34AM 3   A.    I don't know, no.

08:34AM 4   Q.    Do you know that Judge Vance was the judge assigned to the

08:34AM 5   BP plea agreement case?

08:34AM 6         MR. REGAN:  Judge, if I might could interpose an

08:34AM 7   objection to having a witness talk about quotes from a criminal

08:34AM 8   judge in another proceeding.  I don't think it's appropriate.

08:34AM 9         THE COURT:  Yes, I don't think it is either, the way

08:34AM 10  it's phrased.

08:34AM 11        You can certainly ask a question, whether he

08:34AM 12  agrees with the substance of it.

08:34AM 13        MR. MILLER:  Sure, Your Honor.

08:34AM 14        THE COURT:  We don't have to get into who said what.

08:34AM 15        MR. MILLER:  Who said what.  Well, he asked me,

08:34AM 16  Your Honor.

08:34AM 17        THE COURT:  Well, frankly, I think the witness thought

08:34AM 18  you were quoting from something that -- what's the gentleman's

08:34AM 19  name?

08:34AM 20        MR. MILLER:  Mr. Keller.

08:34AM 21        THE COURT:  Mr. Keller said, but, in any event, go

08:34AM 22  ahead --

08:34AM 23        MR. MILLER:  No, it's a factual question.

08:35AM 24        THE COURT:  Rephrase your question.

08:35AM 25                        EXAMINATION

**OFFICIAL TRANSCRIPT**

08:35AM 1    BY MR. MILLER:

08:35AM 2    Q.    Mr. McKay, do you believe that BP's conduct resulted in

08:35AM 3    the tragic deaths of eleven individuals and caused enormous

08:35AM 4    environmental damage from the discharge of oil into the Gulf of

08:35AM 5    Mexico?

08:35AM 6    A.    We have, I think, been very clear.  I guess I will just

08:35AM 7    state in my own words, we are -- we've agreed that we are part

08:35AM 8    of the responsibility for this tragic accident.  We've

08:35AM 9    apologized for that.  We've accepted responsibility for that in

08:35AM 10   many different ways.

08:35AM 11             So I would agree that we are a part of the cause of

08:35AM 12   this accident, yes.

08:35AM 13   Q.    Mr. McKay, do you agree with me, sir, that the explosion

08:35AM 14   on the *Deepwater Horizon* rig would never have occurred if BP's

08:35AM 15   employees had properly supervised the negative pressure testing

08:35AM 16   of the well, had not failed to contact onshore engineers to

08:35AM 17   alert them of problems, and had not negligently deemed the

08:35AM 18   negative pressure test a success?

08:36AM 19   A.    Well, we agreed, as we did in the plea agreement, that

08:36AM 20   there were misinterpretations of the negative pressure test,

08:36AM 21   and that was one of the causes, among others, that was stated

08:36AM 22   by ourselves, as well as in the plea agreement with the

08:36AM 23   U.S. Government.

08:36AM 24   Q.    Mr. McKay, by virtue of your position on executive

08:36AM 25   management of BP PLC, BP PLC or any BP company is not

**OFFICIAL TRANSCRIPT**

08:36AM  1    considered a motion to withdraw it's plea agreement, is it?

08:36AM  2    A.    I'm sorry, could you ask that again?

08:36AM  3    Q.    BP is not considering to withdraw from its plea agreement,

08:36AM  4    correct?

08:36AM  5    A.    Not to my knowledge, no.

08:36AM  6          MR. MILLER:  That's all I have, Mr. McKay.

08:36AM  7                Your Honor, at this time, I don't think

08:36AM  8    Mr. Cunningham did yesterday, but I would like to offer into

08:36AM  9    evidence TREX 89052.  That's the plea agreement with its

08:36AM 10    various attachments.

08:36AM 11          THE COURT:  All right.  Any objection?

08:36AM 12          MR. REGAN:  Your Honor, there are portions of the plea

08:36AM 13    agreement that we would object to that haven't been used yet in

08:36AM 14    open court.  If we could have a reservation of objection to a

08:36AM 15    portion of it.

08:36AM 16          THE COURT:  What portion do you object to?

08:37AM 17          MR. REGAN:  There are aspects of the plea agreement

08:37AM 18    that deal with post-spill issues that are not relevant for this

08:37AM 19    trial.

08:37AM 20          THE COURT:  Well, okay, this is a public document.

08:37AM 21    It's in the public record already as part of the criminal

08:37AM 22    proceeding.

08:37AM 23                I can certainly --

08:37AM 24          MR. MILLER:  Sorry, Your Honor.

08:37AM 25          THE COURT:  I didn't know if that was coming from your

                              **OFFICIAL TRANSCRIPT**

08:37AM 1   stomach or what.

08:37AM 2           MR. GODWIN:  I didn't have breakfast today, Judge.  You

08:37AM 3   start work too early.

08:37AM 4           MR. MILLER:  That's a message not to go till one

08:37AM 5   o'clock before we take a lunch break.

08:37AM 6           THE COURT:  I understand your objection, but I'm going

08:37AM 7   to go ahead and admit the document.  I'll know what's relevant

08:37AM 8   and what's not, obviously, for this case.

08:37AM 9           MR. REGAN:  I understand.

08:37AM 10          MR. MILLER:  Thank you, Your Honor.  I think you had

08:37AM 11  already ruled on that particular issue from an evidentiary

08:37AM 12  standpoint.

08:37AM 13          THE COURT:  Thank you.

08:38AM 14              Who did we agree was going next?

08:38AM 15          MR. GODWIN:  Halliburton, Your Honor.

08:38AM 16                      CROSS-EXAMINATION

08:38AM 17  BY MR. GODWIN:

08:38AM 18  Q.   Good morning, Mr. McKay.  How are you, sir?

08:38AM 19  A.   Good morning.  I'm fine, thank you.

08:38AM 20  Q.   We've met before.  I'm Don Godwin.  I represent

08:38AM 21  Halliburton.  It's nice to see you again, sir.

08:38AM 22  A.   Good to see you.

08:39AM 23  Q.   Mr. McKay, in your years with BP, you've had occasion to

08:39AM 24  deal with the folks over at Halliburton; have you not?

08:39AM 25  A.   I have.  With Amoco and BP, yes.

                           **OFFICIAL TRANSCRIPT**

08:39AM 1    Q.    Right.  You, of course, in fact, consider a number of

08:39AM 2    those folks to be friends of yours, do you not?

08:39AM 3    A.    Yes, over the years.

08:39AM 4    Q.    You have known that Halliburton and BP have enjoyed a

08:39AM 5    long, mutually beneficial relationship spanning over 60 years;

08:39AM 6    you know that, do you not?

08:39AM 7    A.    Yes.

08:39AM 8    Q.    Since the incident, the horrific accident on April 20,

08:39AM 9    2010, you, as the former chairman and CEO of BP America, did

08:39AM 10   not instruct anyone that Halliburton should not be used on any

08:39AM 11   cementing jobs at all for BP, did you, sir?

08:39AM 12   A.    No.

08:39AM 13   Q.    Nor have you recommended, to this date or in the past when

08:39AM 14   you were the CEO and Chairman of BP America, nor did you

08:40AM 15   recommend that Halliburton be removed from the list of

08:40AM 16   contractors to provide services of the kinds that it provided

08:40AM 17   to BP; have you, sir?

08:40AM 18   A.    No, I have not.

08:40AM 19          Just to be clear, in that particular role I wouldn't

08:40AM 20   have, you know, direct say in the operations of the businesses;

08:40AM 21   but, from that role, no, I did not.

08:41AM 22   Q.    Right.  For whatever role you played when you were --

08:42AM 23   after April 20, 2010, you were a member of the senior

08:42AM 24   management of the BP organization, were you not?

08:42AM 25   A.    Yes.

**OFFICIAL TRANSCRIPT**

08:42AM 1    Q.   In that role as a member of the senior management, if you

08:42AM 2    saw anything that was going on in terms of the work that was

08:42AM 3    being done by a contractor such as Halliburton, you wouldn't

08:42AM 4    have allowed that to continue, had you known about it, would

08:42AM 5    you?

08:42AM 6    A.   No.  As I said, I wasn't in the line businesses, but I --

08:42AM 7    I probably wouldn't have seen it, were it there, but, no, I

08:42AM 8    wouldn't.

08:42AM 9    Q.   You, in fact, also consider Halliburton to be a leader in

08:42AM 10   the cementing industry around the world, do you not?

08:42AM 11   A.   I do.

08:42AM 12   Q.   You know that BP, likewise, considers Halliburton to be

08:42AM 13   one of its senior suppliers of cementing and related services

08:42AM 14   around the world, do you not?

08:42AM 15   A.   Yes.

08:42AM 16   Q.   In fact, even as we're here today, Mr. McKay, you know

08:42AM 17   that BP still uses Halliburton as, if not its primary principal

08:43AM 18   cementing company, certainly one of the very few cementing

08:43AM 19   companies in the world that it calls upon for its most

08:43AM 20   difficult jobs; you know that, don't you?

08:43AM 21   A.   Yes, it would be one of the major -- major companies.

08:43AM 22   Q.   In your role as the former chairman and CEO of BP America,

08:43AM 23   and in your new role as what is akin to maybe being the

08:43AM 24   position of Number 2 in the world within the BP organization,

08:43AM 25   you've not heard anybody within the organization at any level,

08:43AM 1     Mr. Bob Dudley or anyone else, say that, we should not allow

08:43AM 2     Halliburton to work for BP again until this lawsuit is over and

08:43AM 3     all issues have been decided; you've not heard anyone say that,

08:43AM 4     have you?

08:43AM 5     A.    No, I've not heard that language.

08:43AM 6     Q.    Thank you, sir.

08:43AM 7             Now, Mr. McKay, I took your deposition in Houston,

08:44AM 8     along with other folks deposing you there.  You recall that, do

08:44AM 9     you not?

08:44AM 10    A.    I do.

08:44AM 11    Q.    You are a trained -- you're a trained and educated

08:44AM 12    petroleum engineer, as I understand it?

08:44AM 13    A.    I have a degree in petroleum engineering, yes.

08:44AM 14    Q.    Okay, sir.  Do you remember we talked during your

08:44AM 15    deposition about a negative pressure test?

08:44AM 16    A.    I don't remember --

08:44AM 17    Q.    One of the subjects that was discussed?

08:44AM 18    A.    That was, yes.

08:44AM 19    Q.    You're familiar with what a negative pressure test is, are

08:44AM 20    you not, sir?

08:44AM 21    A.    Generally, yes.

08:44AM 22    Q.    You're also familiar with what is known as a positive

08:44AM 23    pressure test, are you not?

08:44AM 24    A.    I am.

08:44AM 25    Q.    Does a positive pressure test, test the cement job from

**OFFICIAL TRANSCRIPT**

615

08:44AM 1    the top down, from the top of the well down?

08:44AM 2    A.    In general, yes.

08:44AM 3    Q.    Does a negative pressure test, test the cement job from

08:44AM 4    the bottom?

08:44AM 5    A.    Yes, in general.

08:44AM 6    Q.    Do you agree, Mr. McKay, that the results of the negative

08:45AM 7    pressure test there on the Macondo well were accepted by BP by

08:45AM 8    the well site leaders, although well integrity had not been

08:45AM 9    established?

08:45AM 10   A.    I think what was -- my knowledge comes from our

08:45AM 11   investigation, which I think -- I think what was said was it

08:45AM 12   was misinterpreted, and well integrity had not been accepted;

08:45AM 13   and it was a decision that was collaborative and a consensus.

08:45AM 14   Q.    Okay.  But you do agree that the -- you do agree that well

08:45AM 15   integrity had not been established there?  Regardless of who

08:45AM 16   interpreted the negative test --

08:45AM 17   A.    Yeah.

08:45AM 18   Q.    -- you know that the well integrity had not been

08:45AM 19   established once that test was misinterpreted, do you not?

08:45AM 20   A.    I believe that's -- yes, I believe the investigation said

08:45AM 21   well integrity had not been established.  That's correct.

08:45AM 22   Q.    If you will, tell Judge Barbier and the rest of us, what

08:45AM 23   do you mean by well integrity had not been established.

08:45AM 24   A.    Well, I don't know that there is a perfect definition.  I

08:46AM 25   don't know an official definition --

**OFFICIAL TRANSCRIPT**

08:46AM 1    Q.    Well, give us the best you can.

08:46AM 2    A.    Yeah.  The well was not fully secure.

08:46AM 3    Q.    When you say the well was not fully secure, does that mean

08:46AM 4    that the well was at risk of hydrocarbons escaping from the

08:46AM 5    wellbore to the surface?

08:46AM 6    A.    Potentially, yes.

08:46AM 7    Q.    Excuse me?

08:46AM 8    A.    Potentially, yes.

08:46AM 9    Q.    Of course, we know, do we not, that when hydrocarbons are

08:46AM 10   allowed to escape from the wellbore to the surface, there is a

08:46AM 11   potential for a blowout; is there not?

08:46AM 12   A.    Yeah.  Blowout is the escape of hydrocarbons in an

08:46AM 13   uncontrolled way.

08:46AM 14   Q.    Okay.  Is a blowout a form of a loss of well control?

08:46AM 15   A.    Yes.

08:46AM 16   Q.    With regard to the cement slurry that was pumped downhole

08:47AM 17   by Halliburton and its folks -- do you know a gentleman by the

08:47AM 18   name of Eric Cunningham within the BP organization?

08:47AM 19         He may not be there anymore, I don't know, but he

08:47AM 20   was -- at one point, he was one of the cementing experts in the

08:47AM 21   world for BP.

08:47AM 22   A.    I don't think -- I knew a different Eric Cunningham.  I

08:47AM 23   don't think I know him, no.

08:47AM 24   Q.    In terms of what went downhole in that foam cement slurry,

08:47AM 25   BP would not have allowed Halliburton to have pumped any slurry

**OFFICIAL TRANSCRIPT**

08:47AM 1   into that hole without BP approving it, would it?

08:47AM 2   A.   Well, I wasn't -- I wasn't there through the back and

08:47AM 3   forth of the communications on that, on that particular job, so

08:47AM 4   I don't know what was approved or not approved.

08:47AM 5   Q.   Let me ask you this, you being a petroleum engineer.  You

08:47AM 6   understand that BP ultimately had the final say on what went on

08:47AM 7   in its well there on the Macondo well, do you not?

08:48AM 8   A.   Well, as I understand it, and the investigation, I think,

08:48AM 9   looked at this, BP obviously designs the wells and plans the

08:48AM 10  well.  It depends on its contractors to implement and construct

08:48AM 11  the well, including Halliburton to cement the well.

08:48AM 12  Q.   Right.  But in terms of what's going to happen in BP's

08:48AM 13  well, BP would not have allowed anything to have gone on in

08:48AM 14  that well that it did not ultimately approve, would it?

08:48AM 15  A.   I think, obviously, BP would have the rights to change

08:48AM 16  things and discuss them with the contractors; but, also, it's

08:48AM 17  dependent on the contractors in terms of their recommendations

08:48AM 18  and what they think they need to do for the job.

08:48AM 19  Q.   Well, recommendations, the recommendations are given, but

08:48AM 20  then the final decision would be that of BP with regard to the

08:48AM 21  slurry to be pumped; you would agree with that, would you not?

08:48AM 22  A.   I think it's collaborative.

08:48AM 23  Q.   So are you aware from having read the investigation that

08:49AM 24  there were drilling engineers, Mr. Brian Morel, Mr. Brett

08:49AM 25  Cocales and -- who is the other one -- and Mark Hafle, are you

**OFFICIAL TRANSCRIPT**

08:49AM 1    aware that those three gentlemen were -- that's Mark Hafle,

08:49AM 2    Brett Cocales and Brian Morel, you're aware that those

08:49AM 3    gentlemen worked regularly with Jesse Gagliano in connection

08:49AM 4    with the design of the cement slurry, are you not?

08:49AM 5    A.    I do not know which engineers worked with Halliburton

08:49AM 6    engineers, but I'm aware that there were -- I don't remember

08:49AM 7    the names.

08:49AM 8    Q.    From reviewing the investigation that was conducted by the

08:49AM 9    Bly team, if you will, you're aware that Jesse, on behalf of

08:49AM 10   Halliburton, provided all of the cement slurry design

08:49AM 11   information that he was recommending to BP, he provided that to

08:49AM 12   BP in the form of models along the way prior to the time the

08:50AM 13   slurry was pumped; you know that, do you not?

08:50AM 14   A.    I don't know every communication -- well, I don't remember

08:50AM 15   every reference to it in the Bly investigation.  I do remember

08:50AM 16   there were back and forths between the teams, yes.

08:50AM 17   Q.    As you said, a collaborative effort?

08:50AM 18   A.    Yes.

08:50AM 19   Q.    Has anyone on the investigative team told you that

08:50AM 20   Halliburton pumped slurry into that well that BP was not fully

08:50AM 21   made aware of in terms of the additives in it?  Has anybody

08:50AM 22   with the investigative team told you that Halliburton designed

08:50AM 23   a slurry and pumped it into the well that contained additives

08:50AM 24   that had not been made known to BP?  Have you heard that, sir?

08:50AM 25   A.    From anyone on the investigative team?

**OFFICIAL TRANSCRIPT**

08:50AM 1    Q.   Yes, sir.

08:50AM 2    A.   I don't recall if anyone on the investigative team had

08:50AM 3    said that.

08:50AM 4    Q.   You have, of course, read the Bly Report?

08:50AM 5    A.   I have.

08:50AM 6    Q.   Saw the exhibits and the documents that were attached to

08:51AM 7    it?

08:51AM 8    A.   Yes.

08:51AM 9    Q.   Thank you.

08:51AM 10             Now, you told Mr. Cunningham yesterday that the loss

08:51AM 11   of well control on the Macondo well was the process safety

08:51AM 12   failure, do you remember that?

08:51AM 13   A.   Yes, I think I described it as a loss of primary

08:51AM 14   containment, which was the blowout, the well control blowout.

08:51AM 15   Q.   So the loss of well control, using your words, was the

08:51AM 16   loss of containment, of primary containment, which was, in

08:51AM 17   fact, the blowout of the well, correct?

08:51AM 18   A.   Yes.

08:51AM 19   Q.   As a petroleum engineer, what is your understanding of

08:51AM 20   what is meant by a loss of well control?

08:51AM 21   A.   Well, I don't think I'm an expert in well control.  I

08:51AM 22   mean, I wouldn't claim to be.  Loss of well -- there are many

08:51AM 23   processes to keep a well under control, and it could be, and as

08:51AM 24   was in this case, several different things failed.  So the loss

08:51AM 25   of well control can be, you know, many different things.

**OFFICIAL TRANSCRIPT**

08:52AM 1    Q.   Yes, sir.  You agree that the primary well control barrier

08:52AM 2    in the well is hydrostatic pressure created by drilling mud, do

08:52AM 3    you not, sir?

08:52AM 4    A.   It's one of them, yes.

08:52AM 5    Q.   Okay, sir.  You agree that the BOP is a secondary well

08:52AM 6    control barrier, do you not, sir?

08:52AM 7    A.   It is a barrier.

08:52AM 8    Q.   You also agree that the use of a rig's emergency diverter

08:52AM 9    system is a method of assisting in well control, do you not,

08:52AM 10   sir?

08:52AM 11   A.   Yes, that's associated with the blowout preventer and

08:52AM 12   emergency disconnect, yes.

08:52AM 13   Q.   On the Macondo well, Mr. McKay, Halliburton was not

08:52AM 14   responsible for the removal of the primary well control

08:52AM 15   barrier, the displacement of the heavy mud; was it?

08:52AM 16   A.   I don't believe so, no.

08:52AM 17   Q.   Thank you.

08:52AM 18        Halliburton did not design or execute the

08:52AM 19   displacement procedure on the Macondo well, did it?

08:52AM 20   A.   I don't remember who was -- I read the report.  I don't

08:52AM 21   remember who was responsible, but it's a reasonable -- I think,

08:52AM 22   reasonable speculation that they were not.

08:52AM 23   Q.   That Halliburton --

08:53AM 24   A.   I don't remember.

08:53AM 25   Q.   Well, you read the report.

**OFFICIAL TRANSCRIPT**

621

08:53AM 1    A.   I know, but I don't remember.

08:53AM 2    Q.   You're a petroleum engineer.  You know that Halliburton,

08:53AM 3    on the Macondo well, would not have been the one that you would

08:53AM 4    have thought would have prepared the displacement procedure?

08:53AM 5    A.   Here's why I'm hesitating.  Sometimes you may use a

08:53AM 6    Halliburton pump unit, sometimes you may use the rig pump.  I

08:53AM 7    don't know.

08:53AM 8    Q.   Has anybody in the investigation with the Bly team or

08:53AM 9    anybody else in the entire BP organization told you that

08:53AM 10   Halliburton designed or executed the displacement procedure

08:53AM 11   there on the Macondo well?

08:53AM 12   A.   No.  No.  I'm just saying I don't know who did that.

08:53AM 13   Q.   Thank you.

08:53AM 14        You don't believe that it was Halliburton, though?

08:53AM 15   A.   Probably not, but I'm not sure.

08:53AM 16   Q.   Thank you, sir.

08:53AM 17        Halliburton was not responsible for the design,

08:53AM 18   manufacture, maintenance or operation of the BOP on the

08:53AM 19   Macondo well, was it?

08:53AM 20   A.   No.  No.

08:53AM 21   Q.   Halliburton was not responsible for the use of the

08:53AM 22   emergency diverter system there on the Macondo well, was it?

08:54AM 23   A.   No.

08:54AM 24   Q.   In short, Halliburton was not responsible for the mistakes

08:54AM 25   that were made in the loss of well control, which you testified

OFFICIAL TRANSCRIPT

08:54AM 1    was a process safety failure here, was it, sir?

08:54AM 2    A.    What I know about causes and fault is from the

08:54AM 3    investigation, which there were eight key factors.  And I think

08:54AM 4    you're dividing it in different pieces.  But there were eight

08:54AM 5    key factors that lined up, unfortunately, for this failure.

08:54AM 6    Q.    And that loss of well control -- regardless of the quality

08:54AM 7    of the cement job, would you agree with me that there was other

08:54AM 8    lines of defense that would have determined if the cement job

08:54AM 9    was, in fact, bad?  Measures could have been taken to have

08:54AM 10   remediated the issue and the well would not have been allowed

08:54AM 11   to have blown out, would it?

08:54AM 12   A.    I do agree there were multiple barriers, yes, that were --

08:54AM 13   that could have prevented that, yes.

08:55AM 14   Q.    And do you agree that -- do you agree that cement is

08:55AM 15   generally not thought to be a barrier in a well until cement is

08:55AM 16   confirmed with either a negative pressure test or other test?

08:55AM 17   A.    Well, this is in my general -- general knowledge would be

08:55AM 18   that's the purpose sometimes of doing a negative pressure test,

08:55AM 19   for instance, yes.

08:55AM 20   Q.    To do what, sir?

08:55AM 21   A.    To test the integrity of the cement in the wellbore.

08:55AM 22   Q.    And to test it to determine if, in fact, it is good,

08:55AM 23   correct?

08:55AM 24   A.    Yes.

08:55AM 25   Q.    And if it's not good, and it's determined through a

**OFFICIAL TRANSCRIPT**

08:55AM 1   negative pressure test that the cement job had an issue, then

08:55AM 2   there could be remediation work done, correct?

08:55AM 3   A.   That's correct.

08:55AM 4   Q.   And that would be determined principally by the -- using

08:55AM 5   of a negative pressure test to determine that, as one of the

08:55AM 6   tests?

08:55AM 7   A.   To my general knowledge, yes.

08:56AM 8   Q.   And would you agree with me that one of the forms of

08:56AM 9   remediation of a cement job that was not good would be known

08:56AM 10   as -- what is known as a *squeeze job*?

08:56AM 11   A.   That could be a formed, yes.

08:56AM 12   Q.   And a squeeze job would be done by, say, Halliburton, or

08:56AM 13   another company if BP had chosen to do so there on the

08:56AM 14   Macondo well, to go in there and cured whatever issue might

08:56AM 15   have been done -- or might have been found wrong with the

08:56AM 16   cement job, you agree with that, don't you?

08:56AM 17   A.   Well, I agree that a squeeze job could be done at some

08:56AM 18   point.  I don't know the details of the way that the

08:56AM 19   configuration was and whether it was possible to do one at that

08:56AM 20   point in time.  I don't know.

08:56AM 21   Q.   Okay.  Well, what would you, as a petroleum engineer, have

08:56AM 22   expected to happen if the negative pressure test had been

08:56AM 23   correctly interpreted and shown that there was an issue with a

08:56AM 24   cement job?  What would you have expected to have happen?

08:57AM 25        MR. REGAN:  Your Honor, I'm going to object to -- and

**OFFICIAL TRANSCRIPT**

08:57AM 1    Mr. Godwin has gone a while on this, but Mr. McKay has no

08:57AM 2    percipient knowledge to the accident.  He's made clear that his

08:57AM 3    only knowledge was from a report the he read after it was done

08:57AM 4    by others.  And I think we're just getting a little far afield

08:57AM 5    from what he knows as a fact witness.

08:57AM 6            MR. GODWIN:  I was about ready to move off this

08:57AM 7    subject, Judge, but he has testified with everybody --

08:57AM 8            THE COURT:  I'll let him go, although I understand he's

08:57AM 9    not here testifying as an expert.

08:57AM 10           MR. GODWIN:  I'll withdraw that question.

08:57AM 11           THE COURT:  In fact, he's acknowledged that he has

08:57AM 12   general knowledge of many of these things, but he's not the

08:57AM 13   expert in the area.

08:57AM 14           MR. GODWIN:  I appreciate that, Judge.  Thank you, sir.

08:57AM 15                          EXAMINATION

08:57AM 16   BY MR. GODWIN:

08:57AM 17   Q.   Mr. McKay, on the issue of process safety, you told

08:57AM 18   Mr. Cunningham that you did not read Dr. Bea's report.

08:57AM 19            Do you remember that?

08:57AM 20   A.   Yes.

08:57AM 21   Q.   Did you read Dr. Patrick Hudson's report, expert report on

08:57AM 22   process safety that was submitted by Halliburton in this case?

08:57AM 23   A.   No, I have not.

08:57AM 24   Q.   But you did read the Bly Report?

08:57AM 25   A.   Yes.

08:57AM 1    Q.    Were you asked to read the Bly Report before it was put

08:58AM 2    into final form?

08:58AM 3    A.    No.

08:58AM 4    Q.    Are you familiar with the Swiss cheese model used in the

08:58AM 5    Bly Report?

08:58AM 6    A.    Generally, yes.

08:58AM 7    Q.    And that Swiss cheese model is central to BP's analysis of

08:58AM 8    the purported multiparty -- multiple cause of the nature of the

08:58AM 9    blowout, is it not?

08:58AM 10   A.    I would say it's a pictorial representation.

08:58AM 11   Q.    Are you -- have you finished, sir?  I'm sorry.

08:58AM 12   A.    Yes.

08:58AM 13   Q.    Are you aware that the Swiss cheese model was based on the

08:58AM 14   Reson, R-E-S-O-N, model that Dr.  Hudson helped develop?

08:58AM 15   A.    No, I'm not aware of that.

08:58AM 16   Q.    Was it important to you that the model that BP used to

08:58AM 17   determine what happened there on that fateful evening, that

08:58AM 18   fateful night, and the events leading up to it, was it

08:58AM 19   important to you that the model be correctly applied, this

08:58AM 20   Swiss cheese model?

08:58AM 21   A.    I wasn't part of the investigation.  And as I mentioned

08:58AM 22   yesterday, I think the team had 50 internal and external

08:59AM 23   experts, and it was a substantial and significant

08:59AM 24   investigation.  So I can't -- I can't add anything as to what

08:59AM 25   model should have been used or were used or weren't used.  I

**OFFICIAL TRANSCRIPT**

626

08:59AM  1    trust them.

08:59AM  2    Q.   Thank you, sir.

08:59AM  3         I want to now ask us -- let's pull up, if we can,

08:59AM  4    please -- we talked about the cement job, and I want to show

08:59AM  5    you a couple of e-mails right quick that one of the drilling

08:59AM  6    engineers from BP wrote, if you will.  And I would like to pull

08:59AM  7    up TREX 282.

08:59AM  8         Here is an e-mail that was written on April 20,

08:59AM  9    1053 hours -- or excuse me, on April 20 at 2:52 in the morning,

08:59AM 10    just after the cement job had been completed.  And Brian Morel

08:59AM 11    wrote this to John Guide, Mark Hafle, and others that are

09:00AM 12    associated with the well, he said, "Just wanted to let everyone

09:00AM 13    know the cement job went well."

09:00AM 14         Do you see that, sir?

09:00AM 15    A.   I do.

09:00AM 16         MR. REGAN:  Your Honor, just a foundation objection to

09:00AM 17    showing Mr. McKay documents from the well.  Again, just based

09:00AM 18    on his knowledge.

09:00AM 19         THE COURT:  Go ahead and ask your question.

09:00AM 20         MR. GODWIN:  Thank you, sir.

09:00AM 21                        EXAMINATION

09:00AM 22    BY MR. GODWIN:

09:00AM 23    Q.   You see here it says "the cement job went well."

09:00AM 24         As a part of the investigation -- the report you've

09:00AM 25    read and the people with whom you've spoken, has anybody told

                        **OFFICIAL TRANSCRIPT**

09:00AM 1   you that that was an untrue statement, that the cement job did
09:00AM 2   not go well?
09:00AM 3   A.   Well, I think in relation to the pumping of the cement
09:00AM 4   job, the pumping looked like it went well.
09:00AM 5   Q.   Okay, sir.
09:00AM 6   A.   So the way you asked that question, I would not agree
09:00AM 7   with, but in relation to the pumping of the cement job.
09:00AM 8   Q.   The execution of the job?
09:00AM 9   A.   The pumping of the job.
09:00AM 10   Q.   All right.  Let's go to TREX 283.
09:01AM 11           And here's an e-mail that Mr. Brian Morel wrote on
09:01AM 12   April 20, and he wrote again to Mr. Greg Walz, Mark Hafle and
09:01AM 13   John Guide.
09:01AM 14           You know that John Guide was the wells team leader
09:01AM 15   there on the Macondo well at the time of the time of the
09:01AM 16   incident, was he not?
09:01AM 17   A.   No, I don't think he was.  He wasn't the -- was he the
09:01AM 18   well -- the wells team.
09:01AM 19   Q.   The wells team leader.
09:01AM 20   A.   I was thinking well site leader when you said that.  Yes.
09:01AM 21   Q.   The well site leaders would have been Bob Kaluza and
09:01AM 22   Don Vidrine.
09:01AM 23   A.   Yes, sorry.
09:01AM 24   Q.   That's all right.
09:01AM 25           And here Mr. Morel wrote, "Just wanted to let you

**OFFICIAL TRANSCRIPT**

09:01AM 1    know that the Halliburton cement team they sent out did a great

09:01AM 2    job."

09:01AM 3          Have you learned from your having read the Bly Report

09:01AM 4    or heard from anybody that the Halliburton team that was sent

09:01AM 5    out with regard to the cement job during the Macondo well did

09:01AM 6    not do a great job?

09:01AM 7    A.   No, I had not heard that.

09:01AM 8    Q.   Thank you, sir.

09:01AM 9          I want to now pull up a document that is TREX 04160.

09:02AM 10   It's a Drilling Completions Risk Register as of March 12, 2010.

09:02AM 11        MR. GODWIN:  This document, Your Honor, had no

09:02AM 12   objections, that I put up here on the screen.

09:02AM 13                          EXAMINATION

09:02AM 14   BY MR. GODWIN

09:02AM 15   Q.   I'm not going to go through but just two entries on this

09:02AM 16   document, and I'll highlight the two that I'll be talking

09:02AM 17   about.  Let's pull up, if you will, please, the -- on the

09:02AM 18   second page let's turn over to Item Number 15, if you will,

09:02AM 19   pull that out, please.

09:02AM 20        MR. REGAN:  Mr. Godwin, did you say it's already been

09:02AM 21   offered and in evidence or no objection?

09:02AM 22        MR. GODWIN:  No objection has been made to it.

09:02AM 23        THE COURT:  Mr. Godwin, this is a BP document, right?

09:02AM 24        MR. GODWIN:  Yes, Your Honor.

09:02AM 25        THE COURT:  This is the something prepared -- this is

                              **OFFICIAL TRANSCRIPT**

09:02AM 1    the Drilling Completion Risk Register, is that what we're

09:02AM 2    looking at?

09:02AM 3          MR. GODWIN:  Yes, Your Honor, as of March 12, 2010.

09:03AM 4    I'm just going to cover two entries and I'll be through, Judge.

09:03AM 5          THE COURT:  Go ahead.

09:03AM 6                         EXAMINATION

09:03AM 7    BY MR. GODWIN:

09:03AM 8    Q.   Here we see here, that you have in this Risk Register as

09:03AM 9    of March 12, 2010, with the drilling completions unit of BP, it

09:03AM 10   shows some of the risks, zone isolation and well integrity.  It

09:03AM 11   shows cause and description would be a poor primary cement job,

09:03AM 12   stress contrast between sand and shale not understood.  And

09:03AM 13   that would be the cause.

09:03AM 14          And the event would be frac-pack early screenout,

09:03AM 15   early water production, or potential loss in containment.

09:03AM 16          Did you see that, sir?

09:03AM 17   A.   I do.

09:03AM 18   Q.   Now, over in the next column where it says the

09:03AM 19   consequences of zonal isolation and well integrity being an

09:03AM 20   issue -- a risk, it shows there that, "The loss of reserves,

09:03AM 21   HSE, and reputational additional capital for remediation and

09:04AM 22   schedule impacts."

09:04AM 23          Did I read that correctly?

09:04AM 24   A.   Yes.

09:04AM 25   Q.   Okay, sir.  So you're familiar -- we talked a little bit

                        **OFFICIAL TRANSCRIPT**

09:04AM 1    about lack of zonal isolation and the issue with that, did we

09:04AM 2    not?

09:04AM 3    A.    A little bit.

09:04AM 4    Q.    According to this document here, BP's Risk Register, it

09:04AM 5    shows that if it was determined there was a zonal isolation and

09:04AM 6    well integrity, there could be a loss of reserves and there

09:04AM 7    could be a need for remediation, which we talked about earlier,

09:04AM 8    did we not?

09:04AM 9    A.    I'm not sure -- well, what do you mean by *remediation*?

09:04AM 10   Q.    Remediation being a squeeze job.  In other words, if you

09:04AM 11   have zonal isolation, you have a problem there with well

09:04AM 12   integrity.

09:04AM 13   A.    It doesn't say that, so I'm not sure that's what that

09:04AM 14   means.

09:04AM 15   Q.    Okay.  Well, you do know that remediation of a cement job

09:04AM 16   that is determined to not properly isolate zones would require

09:05AM 17   remediation, would it not?

09:05AM 18   A.    It could.  It could.

09:05AM 19   Q.    And one of the forms of remediation would be a squeeze

09:05AM 20   job, you know that, don't you?

09:05AM 21   A.    It's one of the forms.

09:05AM 22   Q.    Thank you, sir.

09:05AM 23         And it shows here that the impact to BP, if there is

09:05AM 24   determined to be an issue with zonal isolation and well

09:05AM 25   integrity, the impact to BP would be business value.

**OFFICIAL TRANSCRIPT**

09:05AM 1        Do you see that?

09:05AM 2   A.   Well, there are several impacts.  HSE reserves, business

09:05AM 3   value, scheduling.

09:05AM 4   Q.   Yeah, that was a consequence there.  The consequence

09:05AM 5   description would be HSE reserves.

09:05AM 6   A.   Yes.

09:05AM 7   Q.   I'm just talking here, Mr. McKay, about the impact value

09:05AM 8   or type.  It shows just business value, business value only;

09:05AM 9   does it not?

09:05AM 10  A.   It does on this document, yeah.

09:05AM 11  Q.   Thank you, sir.

09:05AM 12       And let's go back now to the last part I want to

09:05AM 13  cover on this document, that is Item Number 1, first page.

09:06AM 14  Pull up Number 1, if you will, please.

09:06AM 15       Here where it says, "MAR," M-A-R, "Well Control" --

09:06AM 16  and if you could, let me see the capitals at the top, please.

09:06AM 17       Okay.  Same headings across the top as on the second

09:06AM 18  page, Mr. McKay.  Here on the first page it shows, "MAR Well

09:06AM 19  Control."  And it shows cause description for a well control

09:06AM 20  risk, and it shows, "BOP failure, wrong well control process,

09:06AM 21  equipment failure and competency," and then "S&O," and then it

09:06AM 22  has "casing failure."

09:06AM 23       Do you see that?

09:06AM 24  A.   I do.

09:06AM 25  Q.   Have you heard it said in your career as a petroleum

**OFFICIAL TRANSCRIPT**

09:06AM 1    engineer, particularly at BP, that casing failure is also known
09:06AM 2    as a form of a casing breach?
09:07AM 3    A.    There are many -- yes.  There are many different types of
09:07AM 4    casing failure.
09:07AM 5    Q.    And a breach would be a form of a casing failure, would it
09:07AM 6    not?
09:07AM 7    A.    A breach is an outcome of a casing failure.
09:07AM 8    Q.    And a breach would allow a casing -- you could either have
09:07AM 9    a parted casing, that would be a form of a breach, would you
09:07AM 10   agree with that?
09:07AM 11          MR. REGAN:  Your Honor, I think we're getting back into
09:07AM 12   the --
09:07AM 13          THE COURT:  I think we are too.  You're venturing into
09:07AM 14   pure expert testimony.
09:07AM 15          MR. GODWIN:  I will withdraw it, Your Honor.
09:07AM 16          MR. REGAN:  Thank you.
09:07AM 17                          EXAMINATION
09:07AM 18   BY MR. GODWIN:
09:07AM 19   Q.    All right.  We have been here -- now, when you have a risk
09:07AM 20   name of well control, you've got BOP failure.  You've got
09:07AM 21   competency.  And the event that would result from a well
09:07AM 22   control event is loss of containment.
09:07AM 23          Do you see that?
09:07AM 24   A.    Yes.
09:07AM 25   Q.    You spoke of containment earlier, remember?

                          **OFFICIAL TRANSCRIPT**

09:07AM 1    A.    Yes.

09:07AM 2    Q.    And what does containment mean to you as a petroleum

09:07AM 3    engineer?  When you spoke of it earlier, loss of containment?

09:07AM 4    A.    Well, in laymen's terms, it means something that's under

09:08AM 5    control and not -- in this case, not a blowout.

09:08AM 6    Q.    And that would be a loss of well control and ultimately

09:08AM 7    leading to the blowout and fire?

09:08AM 8    A.    There would be, as -- well, my understanding comes from

09:08AM 9    the investigation and multiple things failed, including well

09:08AM 10   control, yes.

09:08AM 11   Q.    The well control here would have -- loss of well control,

09:08AM 12   that the ultimate event here was that the hydrocarbons were

09:08AM 13   allowed to escape to the surface, there was a blowout and the

09:08AM 14   ultimate fire resulting in the loss of 11 mens' lives, would

09:08AM 15   you agree with that?

09:08AM 16   A.    Right.  The blowout was a loss of primary containment that

09:08AM 17   caused this.

09:09AM 18   Q.    Okay.  Now, let's look here at the --

09:09AM 19            THE REPORTER:  Judge.

09:09AM 20            THE COURT:  Hold on.  Excuse me one second.

09:09AM 21            We have to take about a 10-minute recess.  It has

09:09AM 22   to be rebooted.  Sorry.

09:09AM 23            THE DEPUTY CLERK:  All rise.

09:09AM 24            (WHEREUPON, at this point in the proceedings, a brief

09:09AM 25   recess was taken.)

                        **OFFICIAL TRANSCRIPT**

09:21AM 1        THE COURT:  All right.  Please be seated, everyone.  I
09:22AM 2   understand we're back in business.
09:22AM 3            I guess it's one of the small inconveniences we
09:22AM 4   have to put up with to have all of this wonderful technology,
09:22AM 5   is it occasionally doesn't work.
09:22AM 6            But, Mr. Godwin, you may continue.
09:22AM 7        MR. GODWIN:  Thank you, Your Honor.  I'm just about
09:22AM 8   through.  I would anticipate maybe two minutes being done
09:22AM 9   completely.
09:22AM 10       THE COURT:  Go ahead.
09:22AM 11       MR. GODWIN:  Thank you, Judge.
09:22AM 12                         EXAMINATION
09:22AM 13  BY MR. GODWIN:
09:22AM 14  Q.   Mr. McKay, before we took a brief break there, we were
09:22AM 15  talking about Item Number 1 on TREX Number 04160, and I would
09:22AM 16  redirect your attention to that, please, sir.  It's up on the
09:22AM 17  screen.
09:22AM 18  A.   Okay.
09:22AM 19  Q.   And here it shows that if there is a risk of a well
09:22AM 20  control event, there would be a loss of containment.  And
09:22AM 21  you've described containment here just a little bit ago, okay?
09:22AM 22  A.   Yes.
09:22AM 23  Q.   I'm just trying to recap where we were.
09:22AM 24  A.   Correct.
09:22AM 25  Q.   Now, we go over to the consequence description of the --

                          **OFFICIAL TRANSCRIPT**

09:23AM 1   of the risk of the well control event, or what's known as an

09:23AM 2   MAR, and it shows potential release of hydrocarbons.  And, of

09:23AM 3   course we know that when there is a potential release for

09:23AM 4   hydrocarbons, there is a potential chance of a blowout, you

09:23AM 5   would agree with that?

09:23AM 6   A.   Yes.  Potentially, yes.

09:23AM 7   Q.   Okay.  And it goes on to show that you have there an S&O

09:23AM 8   and then an infrastructure damage, spill exposure, HSE and

09:23AM 9   license to operate.  Those would be impacted by a well control

09:23AM 10  event, would they not?

09:23AM 11  A.   They could be, yes.

09:23AM 12  Q.   And there was a period of time, after the loss of well

09:23AM 13  control and the blowout and the fire on the Macondo well that

09:23AM 14  BP was prohibited from drilling in the Gulf.  You know that, do

09:23AM 15  you not, sir, as the former chairman and CEO of BP America?

09:23AM 16       MR. REGAN:  Objection, outside of the scope of the

09:23AM 17  cross.

09:23AM 18       MR. GODWIN:  It's not at all.  It's up here as part of

09:23AM 19  this document where it talks about "license to operate."

09:23AM 20       THE COURT:  What's the relevance of that to what I have

09:24AM 21  to decide in the case?

09:24AM 22       MR. GODWIN:  That's the last question on it.  The

09:24AM 23  license to operate is one of the consequences of a loss of well

09:24AM 24  control here, as identified by BP, and it's on the Risk

09:24AM 25  Register, Your Honor.

**OFFICIAL TRANSCRIPT**

09:24AM 1      THE COURT:  Well, even if that's true, what's the
09:24AM 2  relevance of that to what I have to decide in this case?
09:24AM 3      MR. GODWIN:  I'm going to compare that, Your Honor, to
09:24AM 4  a zonal isolation issue where the loss there was business value
09:24AM 5  and economic.
09:24AM 6      THE COURT:  I'm going to sustain the objection.  I
09:24AM 7  don't see the relevance of it.
09:24AM 8      MR. GODWIN:  All right, sir.  Thank you, Your Honor.
09:24AM 9                         EXAMINATION
09:24AM 10  BY MR. GODWIN:
09:24AM 11  Q.   So if you look here again at the screen, very briefly,
09:24AM 12  when there is a well control risk, as determined by BP, you
09:24AM 13  have a potential release of hydrocarbons and a possible blowout
09:24AM 14  as a possibility of what might happen.  You would agree with
09:24AM 15  that, wouldn't you?
09:24AM 16  A.   These are all -- this is a list of the potential
09:25AM 17  consequences.
09:25AM 18  Q.   Yes, sir.  And over to the far right-hand corner there is
09:25AM 19  another column there that shows -- and I believe it shows
09:25AM 20  impact type, if we could pull that out.
09:25AM 21  A.   Yes.  Health and safety, yes.
09:25AM 22  Q.   Over to the right-hand side, you can see here where it
09:25AM 23  shows -- I'm just going to cover here briefly where it says
09:25AM 24  impact type is:  "Health and safety."  That's what you have
09:25AM 25  when there is a risk of a well control, according to this

09:25AM 1    document, the impact could be to the health and safety.  You

09:25AM 2    see that, do you not, sir?

09:25AM 3    A.    I do.

09:25AM 4    Q.    Okay.  Now, let's compare it -- very briefly, let's go

09:25AM 5    back to the second page to where we talked about zonal

09:25AM 6    isolation and well integrity.  There you have a poor primary

09:25AM 7    cement job as a case [verbatim] description.

09:25AM 8           If we will pull that out, please.  Number 15, just

09:26AM 9    pull out the whole top there on 15.

09:26AM 10          When you have a cause description -- for 15, please,

09:26AM 11   poor primary cement job over to the left -- when you have zonal

09:26AM 12   isolation, you have poor primary cement job, and then the

09:26AM 13   consequence would be -- there would be, as you said, one of

09:26AM 14   them would be remediation, correct?  You agree with what?

09:26AM 15   A.    Well, it's listed on this document as that, yes.

09:26AM 16   Q.    And the Risk Register BP?

09:26AM 17   A.    A Risk Register, yes.

09:26AM 18   Q.    Just to wind it up, BP is blaming my client, Halliburton,

09:27AM 19   for part of what ultimately happened there on this well, is it

09:27AM 20   not?

09:27AM 21          MR. REGAN:  Objection, Your Honor, it's argumentative.

09:27AM 22          THE COURT:  Overruled.

09:27AM 23          THE WITNESS:  Well, first of all, I don't think we're

09:27AM 24   blaming anybody.

09:27AM 25          The investigation, as I understand it, and I read

**OFFICIAL TRANSCRIPT**

09:27AM 1   it thoroughly, came up with eight key factors that contributed

09:27AM 2   to this accident.  And it came up with involvement from

09:27AM 3   ourselves, BP, as well as contractors, including Halliburton

09:27AM 4   and Transocean in terms of the potential causes.

09:27AM 5          So that's -- I don't think -- I wouldn't say

09:27AM 6   that's blame.  That's what the investigation came up with.

09:27AM 7                      EXAMINATION

09:27AM 8   BY MR. GODWIN:

09:27AM 9   Q.   Well, and you've already said that the ultimate line of

09:27AM 10  defense, the BP [verbatim], could have stopped any release or

09:27AM 11  containment of the hydrocarbons there in the well.  Regardless

09:27AM 12  of the quality of the cement job, had that BOP been activated

09:28AM 13  properly and timely, that event would not have occurred on

09:28AM 14  April 20, 2010, would it?

09:28AM 15  A.   There were several barriers that were in place or could

09:28AM 16  have been in place that could have prevented it.

09:28AM 17  Q.   And the cement job, being what's supposed to be a barrier,

09:28AM 18  was not confirmed with a good negative pressure test, was it?

09:28AM 19  A.   As I stated in the investigation, it looks like the

09:28AM 20  negative pressure test was misinterpreted.

09:28AM 21  Q.   And that, as a result of misinterpreting the negative

09:28AM 22  pressure test, the cement was not determined to be an effective

09:28AM 23  barrier, was it?

09:28AM 24  A.   It was not an effective barrier.

09:28AM 25  Q.   Yes.  And it was not determined to be because of -- the

**OFFICIAL TRANSCRIPT**

09:28AM 1   negative pressure test was misinterpreted, would you agree with

09:28AM 2   that?

09:28AM 3   A.    Potentially, yes.

09:28AM 4   Q.    Okay.  Going back to my last question, then had the

09:28AM 5   blowout preventer be properly and timely activated, regardless

09:28AM 6   of the quality of the cement job, the hydrocarbons would not

09:28AM 7   have escaped up that wellbore, up that casing to the rig floor

09:28AM 8   and there would have been no blowout, would there, sir?

09:28AM 9         MR. MILLER:  Objection, Your Honor, that's a

09:29AM 10  hypothetical question.  No foundation for this witness.

09:29AM 11        THE COURT:  Sustained.

09:29AM 12        MR. GODWIN:  I pass the witness, Your Honor.  Thank you

09:29AM 13  very much.

09:29AM 14        THE COURT:  Let's see.  Next would be Cameron.

09:29AM 15        MR. JONES:  Cameron, Your Honor.  Cameron has no

09:29AM 16  questions for this witness.

09:29AM 17        THE COURT:  M-I SWACO.

09:29AM 18        MR. TANNER:  M-I has no questions for this witness.

09:29AM 19        THE COURT:  I guess we're back to you, Mr. Cunningham.

09:29AM 20        MR. CUNNINGHAM:  Your Honor, I have no questions for

09:29AM 21  Mr. McKay, but I do have a comment on something I forgot to do

09:29AM 22  yesterday.

09:29AM 23             Your Honor will be presented, I think, on

09:29AM 24  Thursday with some 120-odd witnesses' testimony.  And we would

09:29AM 25  like to know whether the Court thinks it would be helpful for

**OFFICIAL TRANSCRIPT**

09:29AM 1  us, after we call a witness, to state for the record the names

09:29AM 2  of the key witnesses among those 129 whose testimony relates to

09:29AM 3  that witness' testimony.

09:29AM 4          For example, I should have yesterday brought this

09:29AM 5  up, because after Dr. Bea testified, if we were -- we had live

09:30AM 6  witnesses as opposed to the ones that will be presented to the

09:30AM 7  Court, we would have listed four or five process-safety-related

09:30AM 8  fact witnesses, so if and when Your Honor wants to look at the

09:30AM 9  deposition and see what relates to what, it would be in some

09:30AM 10 context.

09:30AM 11         Maybe that would help; maybe it wouldn't.

09:30AM 12     THE COURT:  You're talking about fact witness

09:30AM 13 deposition testimony that is going to be submitted, some of

09:30AM 14 which you believe would be supportive of, like an expert's

09:30AM 15 opinion, is that what you're saying?

09:30AM 16     MR. CUNNINGHAM:  Yes, that's what I'm saying.

09:30AM 17     THE COURT:  I'm thinking that probably the best way to

09:30AM 18 handle that is -- logistically, is maybe for you -- I think you

09:30AM 19 could -- that's something that could be pointed out in proposed

09:30AM 20 findings and conclusions at the conclusion of the trial.

09:30AM 21     MR. CUNNINGHAM:  That's fine.

09:30AM 22     THE COURT:  You'll have an opportunity to do that.

09:30AM 23     MR. CUNNINGHAM:  We have no further questions for

09:30AM 24 Mr. McKay, as I said, and we're ready to present the next

09:31AM 25 witness, which will be in deposition.

**OFFICIAL TRANSCRIPT**

09:31AM 1        THE COURT:  Let me ask Mr. Regan if he has any redirect

09:31AM 2    on his witness.

09:31AM 3        MR. REGAN:  Your Honor, BP has no redirect for this

09:31AM 4    witness.  We ask that he be excused.

09:31AM 5        THE COURT:  Okay.  Thank you, Mr. McKay.

09:31AM 6            Call your next witness.

09:31AM 7        MR. CUNNINGHAM:  We call Tony Hayward by videotaped

09:31AM 8    deposition, Your Honor, and we're also playing a portion of the

09:31AM 9    deposition that was taken in London that was far more lengthy

09:31AM 10   than what the Court will see.

09:31AM 11       THE COURT:  Approximately how long does this take to

09:31AM 12   run?

09:31AM 13       MR. CUNNINGHAM:  Approximately 20 minutes.

09:31AM 14       THE COURT:  Okay.  Stephanie, I think usually it's

09:31AM 15   helpful for the big screen if you turn just the main set of

09:31AM 16   lights down, one set of lights down.

09:31AM 17       MR. CUNNINGHAM:  We'll pull up the cover page of the

09:32AM 18   deposition first to identify the witness and the date.

09:32AM 19       THE COURT:  By the way, before it starts, I think I had

09:32AM 20   advised counsel, I believe we talked about this at the final

09:32AM 21   pretrial conference or somewhere along the line, that I do not

09:32AM 22   intend, I'm not going to have the court reporter transcribe the

09:32AM 23   video depositions that are played.  You all will have and will

09:32AM 24   submit the transcripts to go along with them, okay.

09:32AM 25           All right.

**OFFICIAL TRANSCRIPT**

09:32AM 1          (WHEREUPON, at this point in the proceedings, the

09:32AM 2  videotaped deposition of Anthony Hayward was played.)

09:50AM 3          MR. CUNNINGHAM:  Your Honor, that concludes

09:50AM 4  Mr. Hayward's testimony.

09:50AM 5            We now offer a clip of the testimony of

09:50AM 6  Kevin Lacy.

09:50AM 7          THE COURT:  All right.  How long does this one take?

09:50AM 8          MR. CUNNINGHAM:  I think it's about ten or 12 minutes.

09:50AM 9          THE COURT:  You have the transcript for us?

09:50AM 10         MR. CUNNINGHAM:  Yes, we do.

09:51AM 11         (WHEREUPON, at this point in the proceedings, the

10:01AM 12  videotaped deposition of Kevin Dennis Lacy was played.)

10:01AM 13         MR. CUNNINGHAM:  That concludes Mr. Lacy's testimony.

10:01AM 14         THE COURT:  All right.  Stephanie, you can turn the

10:01AM 15  lights back up, please.

10:01AM 16          All right.  Who is going to be the next witness

10:01AM 17  for the plaintiffs?

10:01AM 18         MR. SPIRO:  Dr. Huffman.

10:01AM 19         MR. REGAN:  Your Honor --

20         THE DEPUTY CLERK:  Would you please raise your right

21  hand.  Do you solemnly swear that the testimony you are about

22  to give will be the truth, the whole truth and nothing but the

23  truth, so help you God?

24         THE WITNESS:  I do.

25              **DR. ALAN R. HUFFMAN**

                  **OFFICIAL TRANSCRIPT**

1    was called as a witness and, after being first duly sworn by

2    the Clerk, was examined and testified on his oath as follows:

3         THE DEPUTY CLERK:  Please take a seat.  State and spell

4    your name for the record.

10:02AM  5         THE WITNESS:  My name is Dr. Alan R. Huffman, A-L-A-N,

10:02AM  6    middle initial R, last name H-U-F-F-M-A-N.

10:02AM  7         MR. REGAN:  Your Honor, before the witness begins his

10:02AM  8    testimony --

10:02AM  9         THE COURT:  You can just get up to the podium there.

10:02AM  10         MR. REGAN:  Your Honor, Matt Regan on behalf of BP.

10:02AM  11              We have a pending *Daubert* motion with respect to

10:02AM  12    Mr. Huffman.

10:02AM  13         THE COURT:  I have it right from front of me.  Okay.

10:02AM  14         MR. REGAN:  The motion goes as to his conclusions, his

10:03AM  15    legal conclusions, his qualifications, and also testimony that

10:03AM  16    is outside the scope -- that his deposition is outside the

10:03AM  17    scope of his report.

10:03AM  18              I don't know what Your Honor's preference is with

10:03AM  19    respect to this motion, if you want to take it up now or at a

10:03AM  20    later point in time.

10:03AM  21         THE COURT:  Yes, I'm taking it up right now.  I've read

10:03AM  22    your motion, and I've read the opposition.  I'm overruling or

10:03AM  23    denying your motion.

10:03AM  24              I'm going to let him testify and accept him as an

10:03AM  25    expert in the -- well, he hasn't been tendered yet.  We'll wait

10:03AM  1   to see what he's tendered in.  But I'm denying your motion to

10:03AM  2   preclude his testimony.

10:03AM  3          MR. REGAN:  Thank you, Your Honor.

10:03AM  4          MR. SPIRO:  May it please the Court, Daniel Spiro on

10:03AM  5   behalf of the United States of America.

10:03AM  6              The United States would like to begin by formally

10:03AM  7   offering Dr. Alan Huffman as an expert on issues related to the

10:03AM  8   Macondo well drilling margin.

10:03AM  9              In addition, the United States would like to

10:03AM 10   offer into evidence both the expert report of Alan Huffman,

10:03AM 11   which is TREX 7510, and the rebuttal report of Dr. Alan

10:04AM 12   Huffman, which is TREX 7511.

10:04AM 13          THE COURT:  All right.

10:04AM 14          MR. SPIRO:  Also, as a preliminary matter,

10:04AM 15   Your Honor --

10:04AM 16          THE COURT:  Do those include his CV?

10:04AM 17          MR. SPIRO:  Yes.

10:04AM 18              As a preliminary matter --

10:04AM 19          THE COURT:  Let me just take care of those first.

10:04AM 20          MR. SPIRO:  Please.

10:04AM 21          THE COURT:  In accordance with our Court's pretrial

10:04AM 22   ruling that these expert reports would go into evidence, I'm

10:04AM 23   going to admit those two documents into evidence, okay.  7510

10:04AM 24   and 7511 are admitted.

10:04AM 25          MR. SPIRO:  Thank you, Your Honor.

**OFFICIAL TRANSCRIPT**

10:04AM 1          (WHEREUPON, at this point in the proceedings,

10:04AM 2   Exhibits 7510 and 7511 were admitted.)

10:04AM 3          MR. SPIRO:  Thank you, Your Honor.

10:04AM 4          THE COURT:  Okay.

10:04AM 5          MR. SPIRO:  As a preliminary matter, the United States

10:04AM 6   has provided copies of all the -- hard copies of all of the

10:04AM 7   exhibits that we intended to provide today under direct, as

10:04AM 8   well as a list.  I guess the first part was unnecessary.

10:04AM 9          We also included in that list six reliance

10:05AM 10  exhibits.  I understand from what you said earlier today that

10:05AM 11  they would not -- they should not be included into evidence.

10:05AM 12         THE COURT:  Well, not only what I said today, but that

10:05AM 13  was the ruling a while back.

10:05AM 14         I know this was something that Judge Shushan

10:05AM 15  dealt with, and I think, after she conferred with me, you all

10:05AM 16  were explicitly instructed that as to experts, their reports,

10:05AM 17  without all the hyperlinked exhibits, would go into evidence as

10:05AM 18  part of direct examination.

10:05AM 19         Then we would admit the exhibits that are used

10:05AM 20  during the examination of a witness, subject to any possible

10:05AM 21  objections, of course.  We'll rule on the admission of those

10:05AM 22  exhibits.

10:05AM 23         The other exhibits would not go into evidence,

10:05AM 24  because I'm sure, as you know, first of all, just because a

10:06AM 25  witness talks about an exhibit doesn't mean it comes into

**OFFICIAL TRANSCRIPT**

10:06AM 1    evidence, particularly with respect to experts.

10:06AM 2              Experts may rely on data, other expert reports,

10:06AM 3    things that are not only not admitted into evidence often, but

10:06AM 4    are not even admissible in evidence in many cases, if it's the

10:06AM 5    kind of data and information that an expert ordinarily relies

10:06AM 6    on in their field.

10:06AM 7              So that's the Court's position on that.

10:06AM 8         MR. SPIRO:  Thank you, Your Honor.

10:06AM 9              In order to save time, and based on what we saw

10:06AM 10   yesterday, it wasn't our intent to formally move into evidence

10:06AM 11   each exhibit at the time that we introduced the exhibits,

10:06AM 12   but --

10:06AM 13        THE COURT:  You can do that en globo at the end of the

10:06AM 14   witness' testimony with a list, which it sounds like you've

10:06AM 15   already provided the list.

10:06AM 16        MR. SPIRO:  We provided a hard copy, and we'll be happy

10:06AM 17   to just go through the numbers orally with the parties.

10:07AM 18        THE COURT:  These are a list of the ones you plan to

10:07AM 19   use here during the witness' examination, right?

10:07AM 20        MR. SPIRO:  Correct.

10:07AM 21        THE COURT:  Okay, let's go.

10:07AM 22                    DIRECT EXAMINATION

10:07AM 23   BY MR. SPIRO:

10:07AM 24   Q.   Dr. Huffman, good morning.

10:07AM 25   A.   Good morning.

**OFFICIAL TRANSCRIPT**

10:07AM 1  Q.   Without going into a whole laundry list of your expert

10:07AM 2  credentials in this area, are there one or two credentials that

10:07AM 3  you'd like to highlight for the Court?

10:07AM 4  A.   Yes.  First, I have a doctorate in geophysics from

10:07AM 5  Texas A&M University.  My formal academic training was in

10:07AM 6  theoretical and experimental rock mechanics, rock physics and

10:07AM 7  seismology.  My academic work involved aspects of both geology,

10:07AM 8  geophysics and engineering.

10:07AM 9       For the past 23 years, I have been actively involved

10:07AM 10 in publishing articles in the area of pore pressure and

10:07AM 11 fracture gradient prediction, and working on new technologies

10:07AM 12 in that area, and also hosting and chairing international

10:07AM 13 conferences in the area of pore pressure and fracture gradient

10:07AM 14 prediction and monitoring.

10:07AM 15      At that same time, the last 23 years, I have been an

10:07AM 16 active practicing professional in the field of predicting and

10:08AM 17 monitoring pore pressure and fracture gradient information in

10:08AM 18 wells for clients around the world.

10:08AM 19      If have done numerous deepwater wells, as well as

10:08AM 20 wells on the shelf and onshore for clients around the world.

10:08AM 21 Oil companies contact me and hire me to help them make the key

10:08AM 22 decisions in planning their wells and drilling safely with safe

10:08AM 23 drilling margin.

10:08AM 24 Q.   Is your work commonly known as, in part at least,

10:08AM 25 designing wells?

**OFFICIAL TRANSCRIPT**

10:08AM 1    A.   Yes, it would be called designing or building a plan for a

10:08AM 2    well.

10:08AM 3    Q.   And what does designing wells generally have to do with

10:08AM 4    drilling margins?

10:08AM 5    A.   The design process includes the prediction, before you

10:08AM 6    drill, of the pore pressure, which is the fluid pressure in the

10:08AM 7    rocks, and the fracture gradient, which is the stress at which

10:08AM 8    the rocks will begin to break, and using those two boundaries

10:08AM 9    to determine the safe margin window that you can drill with in

10:08AM 10   planning the well.  That includes the control of your mud

10:08AM 11   program and when and where to case your well as you drill.

10:09AM 12   Q.   What about monitoring of wells as they are being drilled,

10:09AM 13   do you do that as part of your job?

10:09AM 14   A.   Yes, I do.  For the last eleven, almost 12 years in my

10:09AM 15   current company, I have done this on a regular basis when

10:09AM 16   clients have asked me to do monitoring.  That's typically for

10:09AM 17   wells that I have done the predrill work.

10:09AM 18        So the client hires me to interactively work with

10:09AM 19   them to update the predrill and determine when to change the

10:09AM 20   mud program, when to potentially set casing differently than it

10:09AM 21   was originally planned, and when to take measurements in the

10:09AM 22   well, including reservoir measurements, logs and other

10:09AM 23   information.

10:09AM 24   Q.   Are you ever called upon to give advice about drill ahead

10:09AM 25   decisions in tricky situations?

**OFFICIAL TRANSCRIPT**

10:09AM 1    A.    In some cases, yes.

10:09AM 2    Q.    What is your experience working with the MMS drilling

10:09AM 3    margin regulations?

10:09AM 4    A.    The MMS regulations form the basis for everything that we

10:09AM 5    do in pore pressure and fracture gradient prediction.

10:09AM 6          The regulations are based on decades of drilling

10:09AM 7    experience and practice in both onshore and offshore

10:10AM 8    environments, and they are designed based on what we have

10:10AM 9    learned through the industry and what works and what does not

10:10AM 10   work in safely drilling wells.

10:10AM 11         If you look beyond the U.S., the regulations from the

10:10AM 12   MMS are actually the gold standard internationally.  Many of my

10:10AM 13   clients outside the U.S. ask for copies of the regulations

10:10AM 14   because the regulations in their own country may not be as

10:10AM 15   stringent, and they want to follow those as the benchmark.

10:10AM 16   Q.    All right.  I'd like to show you a demonstrative.  This is

10:10AM 17   D-3553.  This is a chart that you've asked to use to amplify

10:10AM 18   some of the basic principles in the report.

10:10AM 19         Why don't you tell us, who created this chart?

10:10AM 20   A.    I did.

10:10AM 21   Q.    What does this chart demonstrate about what you'd take to

10:10AM 22   be the most critical principle of well control?

10:10AM 23   A.    The first and foremost principle I want to describe here

10:10AM 24   is the concept of balancing your mud weight when you drill a

10:10AM 25   well.

**OFFICIAL TRANSCRIPT**

10:10AM 1        As I stated earlier, you have two forces that you're

10:11AM 2   worried about, the pore pressure, which is shown here on the

10:11AM 3   left, and the fracture gradient on the right.  Those are the

10:11AM 4   boundaries within which you have to drill.

10:11AM 5        The first line of defense for controlling your well

10:11AM 6   is keeping the mud high enough to control the pore pressure,

10:11AM 7   but low enough that the rocks will not break as you're drilling

10:11AM 8   an open hole in the well.

10:11AM 9   Q.   So the mud has to be to the right, if you will, of the

10:11AM 10  pore pressure curve and to left of the fracture gradient curve?

10:11AM 11  A.   That is correct.

10:11AM 12  Q.   Is this type of well control that you're talking about

10:11AM 13  proactive or reactive?

10:11AM 14  A.   In planning the well, we are being proactive.  We are

10:11AM 15  taking information and predicting what will occur in the well.

10:11AM 16       When we are actual drilling the well, we are taking

10:11AM 17  measurements and trying to be interactive as much as possible;

10:11AM 18  but, sometimes you encounter events that were not anticipated,

10:11AM 19  so you have to react in those circumstances.

10:11AM 20       In this case, you'll notice that there is a fracture

10:12AM 21  gradient shown on the right in red at 11 pounds per gallon.

10:12AM 22  That's the mud weight equivalent.

10:12AM 23       When you're drilling a new section of a well, that

10:12AM 24  fracture gradient at the last casing shoe is assumed in the

10:12AM 25  normal case to be the weakest fracture gradient you will see as

**OFFICIAL TRANSCRIPT**

10:12AM 1    you drill deeper.

10:12AM 2         You will notice on the left that the pore pressure,

10:12AM 3    the blue curve, is increasing as you go deeper.  Typically, the

10:12AM 4    fracture gradient, the rock strength, will also increase as you

10:12AM 5    drill.

10:12AM 6         So if I were to draw the actual value -- yeah, this

10:12AM 7    does work -- the fracture gradient would be moving higher with

10:12AM 8    the pore pressure.

10:12AM 9         But when you're drilling, that higher fracture

10:12AM 10   gradient is not what you need to pay attention to because the

10:12AM 11   weakest rock strength is presumed to be at the shoe, at the

10:12AM 12   casing shoe at the top.

10:12AM 13        So as I drill deeper, if I use the cursor here, I'm

10:12AM 14   going to keep my mud weight higher than the pore pressure.

10:12AM 15   You'll notice that I get to a point where, if I define my

10:12AM 16   safe -- my kick margin, my safe drilling margin at a half a

10:13AM 17   pound perfect gallon below that weakest fracture gradient, my

10:13AM 18   mud weight will eventually encroach on that limit.

10:13AM 19   Q.   All right.  Well, let me make sure that we all understand

10:13AM 20   these basic principles.

10:13AM 21        You mentioned pore pressure.

10:13AM 22   A.   Yes.

10:13AM 23   Q.   The pore pressure refers exactly to what?

10:13AM 24   A.   The pore pressure is the pressure of the fluids that are

10:13AM 25   trapped in the rocks.

10:13AM 1        So as you drill through the rocks, there are fluids

10:13AM 2   trapped.  If there is any ability for the fluid to flow, you

10:13AM 3   will see that pressure in the well, unless your mud weight is

10:13AM 4   slightly higher than that pressure and will control it and keep

10:13AM 5   it inside the rocks.

10:13AM 6   Q.   The fracture gradient refers to what?

10:13AM 7   A.   The fracture gradient is the pressure at which or the

10:13AM 8   strength of the rocks when they start to crack, when small

10:13AM 9   fractures will start to open in the rock and you will lose your

10:13AM 10  mud into the rocks.

10:13AM 11       THE COURT:  Let me interrupt you.

10:13AM 12            The diagram that you have on the screen, are you

10:13AM 13  saying that the proper place to measure the safe drilling

10:14AM 14  margin would be at the upper casing shoe there?

10:14AM 15       THE WITNESS:  The initial assumption is that that is

10:14AM 16  the case, Your Honor.

10:14AM 17            The next demonstrative we will show will explain

10:14AM 18  a condition where that is no longer true, where it has to

10:14AM 19  change; but, the base assumption is that the line that I've

10:14AM 20  drawn there vertically, the yellow line, is approximately half

10:14AM 21  a pound to the left, which is the margin that's usually

10:14AM 22  assumed, from the weakest fracture gradient, which we're

10:14AM 23  initially assuming is at the casing shoe at the top.

10:14AM 24                          EXAMINATION

10:14AM 25  BY MR. SPIRO:

**OFFICIAL TRANSCRIPT**

10:14AM 1    Q.    Is there a concern if you exceed your fracture gradient

10:14AM 2    with your mud weight?

10:14AM 3    A.    There is a concern if you even get too close to your

10:14AM 4    fracture gradient with your mud weight.

10:14AM 5          The reason for that is this.  As I stated earlier,

10:14AM 6    sometimes we have to be reactive.  We may have something happen

10:14AM 7    in the well, such as the kick or an influx of fluid that we did

10:14AM 8    not anticipate.

10:14AM 9          If that occurs, this vertical line that I've drawn,

10:14AM 10   the safe margin, which we also call the kick margin, is the

10:15AM 11   safety cushion that the drillers must be allowed to have so

10:15AM 12   that if they encounter a kick, they can increase the mud weight

10:15AM 13   to control the kick without breaking the rocks at the last

10:15AM 14   casing shoe, which is assumed to be the weakest point.

10:15AM 15   Q.    So the kick margin that you referred to is not between the

10:15AM 16   pore pressure and the mud weight; it's between the highest mud

10:15AM 17   weight and the weakest fracture gradient?

10:15AM 18   A.    And the weakest fracture gradient, correct.  It is the

10:15AM 19   difference between the highest mud weight you are using in the

10:15AM 20   hole and the offset from the weakest fracture gradient.

10:15AM 21          So you have this margin that you're honoring.  When

10:15AM 22   that mud gets too close to that margin, which we've assumed

10:15AM 23   here is a half a pound, you have to stop drilling.

10:15AM 24   Q.    So, another way of asking the question --

10:15AM 25          THE COURT:  Wait, wait, wait.  You used the term "kick

**OFFICIAL TRANSCRIPT**

10:15AM 1    margin."  Is that different from safe drilling margin?

10:15AM 2              THE WITNESS:  They are treated as one and the same,

10:15AM 3    Your Honor.  The safe margin is the term used in the

10:15AM 4    regulations.  The kick margin is the term used in industry to

10:16AM 5    define the physical reason why you maintain a cushion from your

10:16AM 6    fracture gradient.

10:16AM 7              THE COURT:  But is the definition of safe drilling

10:16AM 8    margin the difference between the pore pressure and fracture

10:16AM 9    gradient?

10:16AM 10             THE WITNESS:  No.  The safe drilling margin is the

10:16AM 11   difference between the highest mud weight you have in the hole

10:16AM 12   that you're drilling with and the weakest fracture gradient.

10:16AM 13             THE COURT:  In other words, obviously, you have to have

10:16AM 14   sufficient mud weight to overcome the pore pressure, first of

10:16AM 15   all.

10:16AM 16             THE WITNESS:  That is correct.  That is correct.

10:16AM 17             THE COURT:  But you have to keep the mud weight less

10:16AM 18   than the fracture gradient?

10:16AM 19             THE WITNESS:  Correct.

10:16AM 20             THE COURT:  What you're saying the differential between

10:16AM 21   those two has to be, that's the safe drilling margin.

10:16AM 22             THE WITNESS:  Correct, and that is typically .5.

10:16AM 23             THE COURT:  Thank you.

10:16AM 24                              EXAMINATION

10:16AM 25   BY MR. SPIRO:

**OFFICIAL TRANSCRIPT**

10:16AM 1   Q.   I want to highlight one other concept, though, what I

10:16AM 2   thought I heard you say.  If your pore pressure exceeds your

10:16AM 3   mud weight, can you take a kick?

10:16AM 4   A.   Yes, if you have a zone that was willing to flow, and your

10:17AM 5   mud weight is too low, below your formation pore pressure,

10:17AM 6   those rocks will start to flow into the well and induce a kick.

10:17AM 7   Q.   Is that potentially dangerous?

10:17AM 8   A.   Absolutely.

10:17AM 9        The two things you want to avoid are kicks and

10:17AM 10  influxes from the pore pressure and breaking the rocks by

10:17AM 11  exceeding the fracture pressure.

10:17AM 12  Q.   So how do you defeat that kick?

10:17AM 13  A.   By increasing your mud weight.  That is the primary line

10:17AM 14  of defense against a kick is to increase the mud weight.

10:17AM 15  Q.   Is the margin related to the idea that you need a margin

10:17AM 16  to be able to increase your mud weight?

10:17AM 17  A.   Yes.  That's why I stated they're essentially the same

10:17AM 18  concept.  One is the legal concept of the safe drilling margin,

10:17AM 19  but it is really the kick margin.  It's the protection against

10:17AM 20  losing control of the well.

10:17AM 21  Q.   How does a well team determine its fracture gradient at

10:17AM 22  the top of an interval?

10:17AM 23  A.   They do what's called a pressure integrity test, which is

10:17AM 24  designed to test the strength of the cement and the casing at

10:17AM 25  the bottom and the rock at the bottom of the casing, which you

10:18AM 1   have drilled out just a small amount of, to test the rock

10:18AM 2   strength before you drill forward.

10:18AM 3   Q.    Now, your report refers to LOTs, leak off tests, and FITs,

10:18AM 4   formation integrity tests.  Are these different from a pressure

10:18AM 5   integrity test, or are they just types of pressure integrity

10:18AM 6   tests?

10:18AM 7   A.    They are types of pressure integrity tests, correct.

10:18AM 8   Q.    Why don't we move to demonstrative 3554.

10:18AM 9         You've also asked to discuss this chart, which is a

10:18AM 10  slightly modified version of the first.

10:18AM 11        Who created this chart?

10:18AM 12  A.    I did.

10:18AM 13  Q.    Now, please tell us what is different about this chart and

10:18AM 14  how this is helpful to your analysis.

10:18AM 15  A.    Okay.  If we assume the same drilling of the pore pressure

10:18AM 16  here -- and I'll, again, draw the yellow line -- but we now

10:18AM 17  have added a new piece of information.

10:18AM 18        Instead of the casing shoe at the top, the 11 value,

10:18AM 19  being the weakest point, we now have new information in the

10:18AM 20  well from what's called a hole behavior observation.

10:19AM 21        The well is essentially telling us that something is

10:19AM 22  happening that we did not anticipate with our assumption of the

10:19AM 23  shoe being the weakest point.

10:19AM 24        So now we have this dot right here, that is the new

10:19AM 25  weakest point in the well.  When that occurs, we now have to

**OFFICIAL TRANSCRIPT**

10:19AM 1    put our half-pound margin to the left of that weakest point in

10:19AM 2    the well.  So the conditions have effectively changed.

10:19AM 3              And our -- now, when we drill forward with our mud

10:19AM 4    weight, when we get to that boundary, that same half-pound

10:19AM 5    offset, we now have to set casing at -- if I can draw the

10:19AM 6    line -- shallower level than we originally assumed.

10:19AM 7              So the well has told us that it is not what we

10:19AM 8    thought was going on, and we have to respond to that.  Because

10:19AM 9    if we keep increasing our mud weight, we will break the rocks

10:19AM 10   at that new weakest point.

10:19AM 11   Q.    When you say *set casing*, do you mean stop drilling?

10:19AM 12   A.    Yes.  Initially you would stop drilling.  That would be

10:19AM 13   the first thing you would do once you reach your safe margin

10:20AM 14   limit and begin to encroach on that margin.

10:20AM 15             And you have several options at that point on how to

10:20AM 16   solve the problem.  One would be to put casing.

10:20AM 17   Q.    How predictable are pore pressures, Dr. Huffman?

10:20AM 18   A.    Pore pressures are very predictable provided that you have

10:20AM 19   sufficient data to do a predrill analysis.  And the reality of

10:20AM 20   the situation is that we sometimes see things that were not

10:20AM 21   predicted predrill, so we still have to be prepared while

10:20AM 22   drilling to respond to things that were not prognosed before

10:20AM 23   the well was drilled.

10:20AM 24   Q.    I would like to show Demonstrative 3564.

10:20AM 25             This is actually -- it's referenced in your report.

**OFFICIAL TRANSCRIPT**

10:20AM 1     This is a page from the BP tubular design manual.  We've agreed

10:20AM 2     with BP only to show this page, and let's to go the flyout.

10:20AM 3     You will note that this is from TREX 32000, a page -- I think

10:21AM 4     it's 93, actually; though it's the 114th page of this exhibit.

10:21AM 5     It's the 93rd page of that particular document.

10:21AM 6          And I want to ask you to look at that plot from this

10:21AM 7     tubular design manual.  And ask if you recognize it?

10:21AM 8     A.   Yes, I do.

10:21AM 9     Q.   What is this?

10:21AM 10    A.   This is a well design schematic, if you will, or a diagram

10:21AM 11    for the pore pressure and fracture gradient as it refers to

10:21AM 12    BP's tubular design manual, as used in the manual.

10:21AM 13    Q.   Please explain the significance of this document to your

10:21AM 14    analysis.

10:21AM 15    A.   Okay.  You'll notice here that on the left we have, again,

10:21AM 16    the pore pressure.  There is a solid curve over here to the

10:21AM 17    left.  And we also have the fracture gradient on the right,

10:21AM 18    which is the other solid curve here.

10:21AM 19         We have also now added additional information.  You

10:21AM 20    will notice that there is a dashed line just to the left of the

10:21AM 21    fracture gradient, that is essentially the kick margin that we

10:21AM 22    have been describing up until now in this previous diagrams.

10:22AM 23         And you will notice that they also have another

10:22AM 24    dashed line called *mud weight curve* on the left.  This is the

10:22AM 25    idea that we're keeping the mud weight slightly higher than the

**OFFICIAL TRANSCRIPT**

10:22AM 1    pore pressure to keep the pore pressure under control.

10:22AM 2                Now, you will notice that at point D right here, we

10:22AM 3    have a casing point.  We have put a casing in the well there,

10:22AM 4    and we have a fracture gradient at that depth, with the offset

10:22AM 5    for the kick margin.

10:22AM 6                As we drill further, our pore pressure, as described

10:22AM 7    in the last two demonstratives, will come to the point where it

10:22AM 8    reaches that margin limit.  At that point, as the diagram

10:22AM 9    shows, you would set another casing at the letter B, and then

10:22AM 10    you would get a new fracture gradient estimate that's higher

10:22AM 11    and then you can drill further, further down the well.

10:22AM 12    Q.    Now, I noticed this refers to kick and cementing margin?

10:22AM 13    A.    That is correct.  And --

10:22AM 14    Q.    Dr. Huffman, please.

10:23AM 15                Can you read that sentence up at the top where they

10:23AM 16    reference this .3 to .5 reduction?

10:23AM 17    A.    Yes.  It reads, "Usually a .3 to .5 ppg reduction as an

10:23AM 18    approximate allowance for swab during pipe movement, well

10:23AM 19    control and ECD during cementing."

10:23AM 20                So the document is referring to two things here.

10:23AM 21    It's the kick margin while drilling, and also they recognize

10:23AM 22    that a similar margin is preferred when they are trying to

10:23AM 23    cement or circulate other fluids in the well than the mud.

10:23AM 24    Q.    And you're saying that they -- set that casing at the

10:23AM 25    place, the C-B line segment, so that enables them to get a new

10:23AM 1    fracture gradient, get enough margin and then drill further

10:23AM 2    down the well?

10:23AM 3    A.    That is correct.  That is the basic process we use to stay

10:23AM 4    within the safe window as we're drilling a well.

10:23AM 5    Q.    And you're saying if they don't set casing, in your view,

10:23AM 6    they couldn't drill any future if encroached on that margin?

10:23AM 7    A.    They would start to have problems eventually physically if

10:24AM 8    they don't stop, but legally, from a regulatory perspective,

10:24AM 9    they should stop when they reach that margin, yes.

10:24AM 10   Q.    Would it have been all right if they had gone to MMS and

10:24AM 11   asked permission and MMS gave permission?

10:24AM 12   A.    Yes.  That is one option available to them, is to request

10:24AM 13   a waiver from the MMS to drill with a smaller margin that the

10:24AM 14   .5.

10:24AM 15         But that is something you have to make a case to MMS

10:24AM 16   each time you want to do this and give them the particulars for

10:24AM 17   that specific condition in the well.

10:24AM 18   Q.    We're going to talk about a few regs this morning, but

10:24AM 19   let's start with TREX 6217.  This is the regulation 250.401,

10:24AM 20   and let's go to the fly out.

10:24AM 21         Thank you.  You beat me to it.

10:24AM 22         Could you read the highlighted portion?

10:24AM 23   A.    Yes.  It starts out, "What must I do to keep wells under

10:24AM 24   control?

10:24AM 25         "You must take necessary precautions to keep wells

**OFFICIAL TRANSCRIPT**

661

10:24AM 1    under control at all times.  You must use the best available

10:24AM 2    and safest drilling technology to monitor and evaluate well

10:25AM 3    conditions and to minimize the potential for the well to flow

10:25AM 4    or kick."

10:25AM 5    Q.   Dr. Huffman, how critical is this regulation to the idea

10:25AM 6    of maintaining a drilling margin?

10:25AM 7    A.   This is the fundamental regulation regarding drilling and

10:25AM 8    other safety margins in the well.  It clearly states that you

10:25AM 9    must keep the well under control at all times, not just while

10:25AM 10   drilling.  This is a general regulation that starts off this

10:25AM 11   section of the regulations.

10:25AM 12           And it is -- the fundamental goal of drilling wells

10:25AM 13   is to keep them safe at all times and to use the best

10:25AM 14   technology available to monitor your well and make decisions

10:25AM 15   while drilling.

10:25AM 16   Q.   And does that require keeping the well properly balanced

10:25AM 17   in terms of its mud weight?

10:25AM 18   A.   Yes.  The mud is the first line of defense against losing

10:25AM 19   your well control.

10:25AM 20   Q.   Are you saying that a safe margin is an integral part of a

10:25AM 21   balanced well?

10:25AM 22   A.   Yes.

10:25AM 23   Q.   Let's move to the next exhibit, TREX 4022.  This is

10:26AM 24   250.427, and I'm going to ask you to look at Section B, which

10:26AM 25   is in the flyout.

**OFFICIAL TRANSCRIPT**

10:26AM 1       What would you like to highlight for the Court about

10:26AM 2  the concept of the safe drilling margin, which is specifically

10:26AM 3  set forth in this regulation?

10:26AM 4  A.    Okay.  Well, you will note here that it says, "While

10:26AM 5  drilling you must maintain the safe drilling margin identified

10:26AM 6  in the approved APD," which is an application for permit to

10:26AM 7  drill, or a drilling permit in the generic sense, "when you

10:26AM 8  cannot maintain this safe margin, you must suspend the drilling

10:26AM 9  operations and remedy the situation."

10:26AM 10      On its face this regulation is clear.  When you reach

10:26AM 11 the boundary of the safe margin, as defined in your drilling

10:26AM 12 permit, you must stop drilling.  And you have several options

10:26AM 13 available to you at that point to remedy the situation, or you

10:26AM 14 must ask MMS for permission to drill with a smaller margin.

10:27AM 15 Q.    In your view, can you drill ahead 10 feet or 20 feet or

10:27AM 16 50 feet without the safe drilling margin?

10:27AM 17 A.    No.  You should not drill a single foot once you have

10:27AM 18 encroached on that margin without getting a waiver from the MMS

10:27AM 19 to do so.

10:27AM 20 Q.    Do you know whether BP's regulatory specialist would agree

10:27AM 21 or disagree with you on that?

10:27AM 22 A.    I believe Ms. Sherrie Douglass, who was the regulatory

10:27AM 23 specialist, agreed with that statement in her deposition.

10:27AM 24 Q.    In the Gulf, is this margin between the fracture gradient

10:27AM 25 and the mud weight, or between the pore pressure and the mud

**OFFICIAL TRANSCRIPT**

10:27AM 1   weight?

10:27AM 2   A.   It is between the mud weight, the heaviest mud weight used

10:27AM 3   to drill in the open hole and weakest fracture gradient in the

10:27AM 4   open hole.

10:27AM 5   Q.   Is that MMS policy that you're referring to?

10:27AM 6   A.   That is the standard that they use in their application

10:27AM 7   approvals, yes.

10:27AM 8   Q.   Let's move on a little bit and talk a little bit about the

10:27AM 9   general types of concerns that you raised in your reports.

10:27AM 10       What general concerns have you raised with BP's

10:28AM 11   conduct as it pertains to the drilling margin?

10:28AM 12   A.   First and foremost, BP, in drilling this well, repeatedly

10:28AM 13   violated the safe drilling margin, in some case drilling with

10:28AM 14   no margin at all.

10:28AM 15       Secondary to that behavior in the well, BP

10:28AM 16   consistently misreported or did not report critical information

10:28AM 17   to the MMS that was required for the MMS to do its job as a

10:28AM 18   regulator.

10:28AM 19   Q.   Do you view these two concerns at all as related?

10:28AM 20   A.   Yes, they are related.   In the first place, you do not

10:28AM 21   drill without a safe margin.   That is clearly understood, and

10:28AM 22   everyone who is asked that in -- that question in deposition in

10:28AM 23   this trial agrees with that -- with that fact.

10:28AM 24       Secondly, the MMS's job is to monitor the well with

10:28AM 25   information that the operator is providing them, and then

**OFFICIAL TRANSCRIPT**

10:29AM 1    making regulatory decisions on how that well can and should be

10:29AM 2    drilled.

10:29AM 3          If the operator is not providing correct information

10:29AM 4    or complete information, or is providing selective information,

10:29AM 5    to the MMS, they are denying the MMS their right as regulator

10:29AM 6    to have all the information that they need to make their

10:29AM 7    decisions while the well is being drilled.

10:29AM 8    Q.   As a general matter, did you find BP's disclosures to MMS

10:29AM 9    to be consistent with the information in BP's internal

10:29AM 10   documents?

10:29AM 11   A.   I've looked at a lot of documents in this case, and many

10:29AM 12   of those are BP internal documents related to the well.  BP

10:29AM 13   kept copious detailed notes on the drilling operation, as I

10:29AM 14   would expect a deepwater operator to do.

10:29AM 15         On the other hand, when I look at the MMS documents

10:29AM 16   that they were provided from BP, those documents show a

10:29AM 17   consistent pattern of misreporting, and in some cases

10:30AM 18   over-reporting numbers that would give the MMS a very false

10:30AM 19   impression about what was happening in this well.  And this

10:30AM 20   happened on multiple occasions during the well, not just on one

10:30AM 21   or two.

10:30AM 22         If you look at --

10:30AM 23   MR. REGAN:  Your Honor, I'm going to object to the

10:30AM 24   witness saying what a false impression was in the minds of

10:30AM 25   people that are not him.

**OFFICIAL TRANSCRIPT**

10:30AM 1          THE COURT:  Overruled.

10:30AM 2               Go ahead.

10:30AM 3          THE WITNESS:  If you look at the misreporting of

10:30AM 4     information, where numbers were reported that were different

10:30AM 5     than what was in the BP internal documents, those numbers

10:30AM 6     consistently represented to the MMS that the drilling margins

10:30AM 7     were greater than they actually were in the well.  And that is

10:30AM 8     not what a prudent operator does.

10:30AM 9                            EXAMINATION

10:30AM 10    BY MR. SPIRO:

10:30AM 11    Q.   Let's turn to the magnitude of the safe drilling margin.

10:30AM 12    I know you've thrown out a number, but let's explore this a

10:30AM 13    little bit more.

10:30AM 14         In what document did BP originally identify its

10:30AM 15    drilling margin to MMS?

10:30AM 16    A.   That would be in their original application for permit to

10:30AM 17    drill, which was filed in early 2009.

10:31AM 18    Q.   Let's show TREX 4021.  And can you zoom to the top part of

10:31AM 19    that?

10:31AM 20         Is this the application for permit to drill, or APD,

10:31AM 21    that you referred to in your report?

10:31AM 22    A.   Yes.  It's the one dated May 13, 2009, that is correct.

10:31AM 23    Q.   What was the size of the safe drilling margin set forth in

10:31AM 24    this document?

10:31AM 25    A.   In each interval to which the margin applies, it was

10:31AM 1    clearly defined as .5 pound per gallon in each interval.

10:31AM 2    Q.   Do you have any basis for believing that BP shared your

10:31AM 3    understanding about the size of the safe drilling margin?

10:31AM 4    A.   Yes, I do.  BP's regulatory specialist on the well,

10:31AM 5    Ms. Sherrie Douglass, confirmed that in her deposition.  And

10:31AM 6    I've also seen e-mail communications internal to BP that

10:31AM 7    indicated they understood that the .5 was the safe drilling

10:31AM 8    margin.

10:31AM 9    Q.   Let's turn to TREX 3732.  Can you identify this document?

10:32AM 10   A.   Yes, sir.  This is an e-mail dated March of 2010 from

10:32AM 11   Mr. Brett Cocales to Mr. Brian Morel and Mr. Mark Hafle.

10:32AM 12   Q.   Who is Cocales?

10:32AM 13   A.   He was one of the drilling engineers that worked for BP.

10:32AM 14   Q.   Let's look at the flyout.  It's a little easier to see.

10:32AM 15        Why don't up read what you consider to be relevant

10:32AM 16   about this document to make your point.

10:32AM 17   A.   Yes.  And the numbers here refer to the 16 inch casing

10:32AM 18   shoe.

10:32AM 19        It starts out by saying, "Our FIT," which is a form

10:32AM 20   of pressure integrity test, "is 12.55 pounds per gallon and our

10:32AM 21   TDMW," which is the mud weight at the total depth they planned

10:32AM 22   to drill in this part of the well, "will be 12.1 ppg, which

10:32AM 23   falls just short of the .5 ppg margin.  Maybe it is close

10:32AM 24   enough for them," meaning the MMS, "but we would have to ask

10:32AM 25   them for this waiver as they require us to maintain .5 pound

**OFFICIAL TRANSCRIPT**

10:32AM 1    per gallon, unless a waiver is granted, and that would

10:33AM 2    technically be a 12.6 pound per gallon shoe test.

10:33AM 3        "In most cases we can get a .3 waiver; however, I

10:33AM 4    wonder about this in a -- with a well control event in the

10:33AM 5    interval."

10:33AM 6    Q.   So you're saying this partially establishes they

10:33AM 7    understood that there was a .5 drilling margin?

10:33AM 8    A.   Yes.  Correct.

10:33AM 9    Q.   Did BP seek any waivers of the safe drilling margin for

10:33AM 10   the Macondo well?

10:33AM 11   A.   Yes, they did.

10:33AM 12   Q.   What would be your response if BP takes the position that

10:33AM 13   when they needed to seek a waiver, they did so?

10:33AM 14   A.   BP did seek waivers in some cases.  In other cases, where

10:33AM 15   the well was in a potentially dangerous and unsafe condition,

10:33AM 16   they failed to request a margin at all and drilled ahead

10:33AM 17   without informing the MMS that they were doing so.  And that is

10:33AM 18   not what a prudent operator does.

10:33AM 19   Q.   All right.  Let's turn to TREX 4047.  This is the

10:34AM 20   March 26, 2010, application for revised bypass.  I would like

10:34AM 21   you to focus on the next document, the schematic, and ask if

10:34AM 22   you recognize this?

10:34AM 23   A.   Yes.  This is what we call the *wellbore schematic* or

10:34AM 24   *wellbore design diagram*.  And I point out a few key pieces of

10:34AM 25   information on this for the Court's benefit.

**OFFICIAL TRANSCRIPT**

10:34AM 1        Each one of the intervals that you see here is a

10:34AM 2 drilled interval of the well.  So the well is drilled one

10:34AM 3 segment at a time, and you will notice that the diameter of the

10:34AM 4 well is actually getting narrower as we go deeper.  This is

10:34AM 5 because we are adding casing strings, and each string that you

10:34AM 6 add is a little smaller than the one before, so the well gets

10:34AM 7 narrower as we go deeper.

10:34AM 8 Q.   Can you discuss the safety and economic implications of

10:34AM 9 that fact.

10:34AM 10 A.   Yes.  When we design a well, the goal is to drill the well

10:35AM 11 safely, first and foremost, but in doing so, we try to design

10:35AM 12 the well with the minimal number of casing strings that we need

10:35AM 13 to be safe, because each casing costs additional money and rig

10:35AM 14 time to put in the ground.

10:35AM 15        So you want to optimize your drilling process, always

10:35AM 16 keeping safety first, but then trying to keep the number of

10:35AM 17 casing strings to a minimum.  That also adds a benefit in that

10:35AM 18 at the bottom of the well, the larger your diameter, the more

10:35AM 19 you can do in terms of producing any hydrocarbon zones that you

10:35AM 20 do find.

10:35AM 21 Q.   So there is an economic incentive to drill with as few

10:35AM 22 casing strings as possible?

10:35AM 23 A.   Correct.  From both a cost and rig time perspective.

10:35AM 24 Q.   What about safety?  Is there safety also in drilling with

10:35AM 25 as few of them as possible or might there be safety problems in

10:35AM 1   doing that?

10:35AM 2   A.    If you push your casing too far, you will then trigger

10:35AM 3   safety concerns.  But again, the goal is to start with the

10:35AM 4   premise that the safe drilling margin and the other the key

10:36AM 5   safety factors have been met strictly, then you focus on your

10:36AM 6   well design to optimize your cost and rig time.

10:36AM 7   Q.    So the safe drilling margin is like a categorical

10:36AM 8   imperative, you don't encroach on that?

10:36AM 9   A.    That is correct.

10:36AM 10  Q.    Let's go to the color version of the schematic.  Okay, I'm

10:36AM 11  back to not being able to see the difference between the second

10:36AM 12  and third.  I knew this would happen.  Color-blindness in

10:36AM 13  action.

10:36AM 14          But you can see the difference, that's what's

10:36AM 15  important, right?

10:36AM 16  A.    Yes, sir, I can.

10:36AM 17  Q.    Why -- why are there four intervals highlighted here?

10:36AM 18  A.    Okay.  These are the four intervals which I identified in

10:36AM 19  my report.  The first, in yellow at the top, is the October

10:36AM 20  interval.  The second two intervals, in orange and green, are

10:36AM 21  the first and second March intervals.  And the interval at the

10:36AM 22  bottom, in blue, is the final well interval where the

10:36AM 23  hydrocarbon zone was found.

10:36AM 24  Q.    And these are intervals in which he criticize BP's conduct

10:36AM 25  in your report?

**OFFICIAL TRANSCRIPT**

10:36AM 1   A.    That is correct.

10:36AM 2   Q.    In your view, did BP fail to act as a prudent operator in

10:37AM 3   drilling each of the intervals?

10:37AM 4   A.    Yes.

10:37AM 5   Q.    In your view, did BP violate the drilling margin

10:37AM 6   regulations in drilling each of the intervals?

10:37AM 7   A.    Yes.

10:37AM 8   Q.    Do you view BP's misconduct to be equally egregious for

10:37AM 9   each of these intervals?

10:37AM 10  A.    As stated in my report, the first March interval was a

10:37AM 11  little less concern to me; although it did violate the safe

10:37AM 12  margin.  The October and the April intervals were particularly

10:37AM 13  egregious, and I would argue totally unsafe and dangerous, not

10:37AM 14  just regulatory violations here, unsafe from any industry

10:37AM 15  practice I am aware of.

10:37AM 16  Q.    Well, we're going to take a look at some depth at those

10:37AM 17  two intervals, and discuss the others much more briefly.

10:37AM 18          THE COURT:  Before you get into that, I just want to

10:37AM 19  make sure, the diagram that's on the screen now, does that show

10:37AM 20  the sidetracking of the well?  Is that what that is?

10:38AM 21          THE WITNESS:  Yes, sir, it does.  This is the original

10:38AM 22  hole right here, that little plug shown there.  And from here

10:38AM 23  down is the sidetrack.

10:38AM 24          THE COURT:  That's when the pipe got stuck or

10:38AM 25  something?

**OFFICIAL TRANSCRIPT**

10:38AM 1          THE WITNESS:  Correct.

10:38AM 2          THE COURT:  I forget what the time frame was.

10:38AM 3          THE WITNESS:  Early March.

10:38AM 4          THE COURT:  Early March of 2010 they had to sidetrack,

10:38AM 5     right?

10:38AM 6          THE WITNESS:  Correct.

10:38AM 7                          EXAMINATION

10:38AM 8     BY MR. SPIRO:

10:38AM 9     Q.    That was an interval that you gave BP a pass on, was it

10:38AM 10    not?

10:38AM 11    A.    It was.

10:38AM 12          One of the things that's important to note here is,

10:38AM 13    in analyzing this well, I gave BP the benefit of the doubt in

10:38AM 14    every case where I believe that their practices were okay.  But

10:38AM 15    there were still some zones in this well that were egregious

10:38AM 16    beyond anything I have seen in my career and needed to be

10:38AM 17    brought to the Court's attention.

10:38AM 18          MR. SPIRO:  For Your Honor, he's referring to the

10:38AM 19    interval between the yellow and that next color, which I can't

10:38AM 20    see, but I hope you can.

10:38AM 21          THE COURT:  It appears to be orange to me.

10:38AM 22          MR. SPIRO:  I'll take your word for it.

10:38AM 23          THE COURT:  Okay.

10:38AM 24                          EXAMINATION

10:38AM 25    BY MR. SPIRO:

                         **OFFICIAL TRANSCRIPT**

10:38AM 1    Q.    Let's do this chronologically.  Let's start with the

10:39AM 2    October interval.  This is October 2009, correct?

10:39AM 3    A.    Yes, sir.  Correct.

10:39AM 4    Q.    With respect to this late October interval, what generally

10:39AM 5    was your concern?

10:39AM 6    A.    I had grave concerns about this interval because of the

10:39AM 7    blatant violations of the safe drilling margin, including

10:39AM 8    drilling with no margin at all.

10:39AM 9    Q.    How extreme would you view this as a departure from the

10:39AM 10   safe drilling margin concept and requirement?

10:39AM 11   A.    It's beyond any standard I can think of, and, in fact,

10:39AM 12   BP's own expert, Dr. Bourgoyne, agreed with me in his

10:39AM 13   deposition, that this interval violated the safe margin

10:39AM 14   regulations.

10:39AM 15   Q.    You speak in your report about BP's request to MMS for a

10:39AM 16   waiver of the .5 drilling margin, did you not?

10:39AM 17   A.    I did, yes.

10:39AM 18   Q.    I'm going to show you a portion of the waiver request that

10:39AM 19   you referenced.  Let's show TREX 3727.

10:39AM 20         Do you recognize this document?

10:39AM 21   A.    Yes, sir, I do.

10:39AM 22   Q.    What is this, just briefly?  And then we'll do the flyout.

10:40AM 23   A.    This is an e-mail from Ms. Sherrie Douglass, who, again,

10:40AM 24   is the BP regulatory specialist that worked on Macondo, and it

10:40AM 25   is a e-mail communication with Mr. Leonard Carter, from the

10:40AM 1   MMS, regarding the waiver.

10:40AM 2   Q.   Let's go to the flyout.  This is the top e-mail in this

10:40AM 3   exhibit.

10:40AM 4        What would you like to highlight for the Court about

10:40AM 5   this request at the top?  This is October 25th, 2009, from BP.

10:40AM 6   A.   Okay.  It starts out by saying, "I got some clarification

10:40AM 7   on surface and downhole numbers.  The numbers I gave you were

10:40AM 8   downhole instead of surface."

10:40AM 9        And I would note that the reason she's pointing this

10:40AM 10  out is that MMS expects surface numbers, and there was a --

10:40AM 11  original e-mail had the downhole information instead of

10:40AM 12  surface.

10:40AM 13  Q.   Before you get into the numbers, what's the difference

10:40AM 14  between surface and downhole?  Is one going to be greater than

10:40AM 15  the other?

10:40AM 16  A.   Okay.  The surface mud weight is the mud weight that's

10:40AM 17  being put in on the rig topside.  When you have a large column

10:41AM 18  of mud in the hole, that mud has some compressibility, so it's

10:41AM 19  going to be more dense at the bottom of the well because of the

10:41AM 20  weight of the column of mud resting above it, so that the

10:41AM 21  downhole number is going to be slightly higher than the surface

10:41AM 22  number.

10:41AM 23  Q.   Now, which of these two did BP generally disclose to MMS

10:41AM 24  for drilling margin purposes, the surface or the downhole?

10:41AM 25  A.   The surface numbers.

**OFFICIAL TRANSCRIPT**

10:41AM 1    Q.    Okay.

10:41AM 2    A.    The note then goes on to state that, "The max LOT," which

10:41AM 3    is leak-off test, "surface mud weight equivalent is 10.25 pound

10:41AM 4    per gallon."

10:41AM 5    Q.    This is pressure integrity test at the top of the

10:41AM 6    interval?

10:41AM 7    A.    That is correct.

10:41AM 8    Q.    Okay.

10:41AM 9    A.    And then she reports, "Max surface mud weight we will

10:41AM 10   drill with, 9.95."

10:41AM 11          And you will note that the difference between those

10:41AM 12   two numbers is .3.  So she is asking for a .3 pound per gallon

10:41AM 13   waiver from the MMS.

10:41AM 14   Q.    Did BP ever get a waiver to drill ahead in this interval

10:42AM 15   with a smaller margin than that?

10:42AM 16   A.    No, they did not.

10:42AM 17   Q.    Or in any interval in this well with a smaller margin than

10:42AM 18   that?

10:42AM 19   A.    No, they did not.

10:42AM 20   Q.    Was this representation about BP's pressure integrity test

10:42AM 21   accurate?

10:42AM 22   A.    No, it was not.  The actual test at this shoe, the last

10:42AM 23   test, was 10.09 pound per gallon surface, not 10.25.

10:42AM 24   Q.    You said *the last test*.  How many tests did they take?

10:42AM 25   A.    They took eight tests in this interval.  And the first

**OFFICIAL TRANSCRIPT**

10:42AM 1    seven tests were actually behind cement when the last eighth

10:42AM 2    test was taken that gave them the 10.09.

10:42AM 3            So none of those earlier tests were valid or should

10:42AM 4    have been reported to the MMS at that point.

10:42AM 5    Q.   Well, is -- let's assume it weren't behind the cement.  Do

10:42AM 6    you report the first test?  The highest test?  The last test?

10:42AM 7    What's the protocol?

10:42AM 8    A.   The protocol is to report the last test because that test

10:42AM 9    represents the current strength of the rocks that you have

10:42AM 10   measured in the open hole below the shoe.

10:43AM 11   Q.   Does BP's regulatory specialist agree or disagree with you

10:43AM 12   on that?

10:43AM 13   A.   Ms. Douglass agreed with that in her deposition.

10:43AM 14   Q.   All right.  So they said they had a 10.25.  You say they

10:43AM 15   had a 10.09.

10:43AM 16   A.   Correct.

10:43AM 17   Q.   And they said they were going to drill ahead with a mud

10:43AM 18   weight of 9.95 or less?

10:43AM 19   A.   That is correct.

10:43AM 20   Q.   Was it accurate that they never drilled ahead with a mud

10:43AM 21   weight above 9.95?

10:43AM 22   A.   That is not correct.  They actually drilled with a

10:43AM 23   10.1 pound per gallon in this interval.

10:43AM 24   Q.   And a 10.09 pressure integrity test?

10:43AM 25   A.   That is correct.

**OFFICIAL TRANSCRIPT**

10:43AM 1   Q.   And a 10.1 mud weight?

10:43AM 2   A.   That's correct.  Both surface reference numbers.

10:43AM 3   Q.   So, in your view, did they drill part of this interval

10:43AM 4   without a safe drilling margin?

10:43AM 5   A.   Absolutely.  They drilled this interval with essentially

10:43AM 6   no margin at all.

10:43AM 7   Q.   Assume BP had a valid 10.25 pressure integrity test --

10:43AM 8         THE COURT:  Wait, wait, wait.  I want to follow all

10:43AM 9   those numbers.

10:43AM 10         So the -- what you're saying is, what they were

10:44AM 11   actually doing, according to your testimony, is drilling -- the

10:44AM 12   only margin was between 10.09 and 10.1?

10:44AM 13         THE WITNESS:  Right.  And the -- correct.  And the 10.1

10:44AM 14   should be much lower than the 10.09.

10:44AM 15         Their mud weight at the surface was higher by 100

10:44AM 16   than the fracture gradient from their last casing test.  So

10:44AM 17   essentially they had no margin at all.  It was zero.

10:44AM 18                         EXAMINATION

10:44AM 19   BY MR. SPIRO:

10:44AM 20   Q.   So if they had taken a kick, how could they defeat that

10:44AM 21   kick?

10:44AM 22   A.   They could not control this well at that point.  If any

10:44AM 23   higher pressure zones came in on them and influxed into well,

10:44AM 24   the well would have been lost.  They would not have been able

10:44AM 25   to control them.

**OFFICIAL TRANSCRIPT**

10:44AM 1        THE COURT:  Again, what's the time frame you're

10:44AM 2   speaking of here?

10:44AM 3        THE WITNESS:  It's in the drilling of the last 100 feet

10:44AM 4   in interval, Your Honor.

10:44AM 5        MR. SPIRO:  October of 2009.

10:44AM 6        THE WITNESS:  October 2009.  So it's the yellow

10:44AM 7   interval from the earlier diagram.

10:44AM 8                           EXAMINATION

10:44AM 9   BY MR. SPIRO:

10:45AM 10  Q.   Let's assume that BP indeed had a valid 10.25 pressure

10:45AM 11  integrity test result.  Would you still conclude that they

10:45AM 12  drilled this interval without a safe drilling margin?

10:45AM 13  A.   Absolutely.

10:45AM 14  Q.   Why?

10:45AM 15  A.   If you have a 10.25 pound per gallon shoe test and you

10:45AM 16  drill with 10.1, the difference is .15, or half of what they

10:45AM 17  requested in the waiver.  They still did not have a safe

10:45AM 18  margin.

10:45AM 19  Q.   Did BP take a kick at any point in this interval?

10:45AM 20  A.   Yes, they did.

10:45AM 21  Q.   Where?

10:45AM 22  A.   At 8970 feet.

10:45AM 23  Q.   Well, let's talk a bit about what happened after they took

10:45AM 24  that kick.  Start with TREX 1335.

10:45AM 25       What is the daily PPFG report?

                        **OFFICIAL TRANSCRIPT**

10:45AM 1    A.    This is a report that is completed each day on the rig

10:45AM 2    while drilling is occurring by the BP assigned pressure

10:46AM 3    monitoring specialist on the rig.  In this case, it's Kate or

10:46AM 4    Katherine Paine.

10:46AM 5    Q.    So this is October 28, 2009.  And I would like you to

10:46AM 6    go -- go to the flyout, please.

10:46AM 7          How do you see this as significant to your analysis?

10:46AM 8    A.    First it notes that they are at 9090 feet.

10:46AM 9    Q.    So this is after they drilled ahead?

10:46AM 10   A.    This is after they drilled ahead after the kick.

10:46AM 11   Q.    After the kick.

10:46AM 12   A.    And it states, "After killing the well," and the term

10:46AM 13   *killing the well* means suppressing the kick, "the decision was

10:46AM 14   made to drill additional footage for casing seat purposes.

10:46AM 15   Drilled with 10.1 pound per gallon mud.  Updated leak-off test

10:46AM 16   value to 10.46 ppg for reporting purposes."

10:46AM 17   Q.    A few questions on this.  Roughly how many feet did they

10:46AM 18   drill with a 10.1 mud weight in this interval?

10:46AM 19   A.    Roughly 100 feet.

10:46AM 20   Q.    Was this the only document you saw that references their

10:47AM 21   drilling ahead at 10.1?

10:47AM 22   A.    No.  I also saw the same information in the daily log of

10:47AM 23   drilling operations and in other documents of a similar type

10:47AM 24   that record drilling data.

10:47AM 25   Q.    Dr. Huffman, did BP need to drill ahead to get this well

**OFFICIAL TRANSCRIPT**

10:47AM 1   under control after the kick?

10:47AM 2   A.   Absolutely not.  And it was unwise to do so, especially

10:47AM 3   with a mud weight that exceeded their fracture gradient.

10:47AM 4   Q.   So there's no safety reason why they drilled ahead that

10:47AM 5   you can think of?

10:47AM 6   A.   None whatsoever.

10:47AM 7   Q.   Was there a legitimate reason to report a 10.46 ppg?

10:47AM 8   A.   Absolutely not.  There was only one leak-off test in the

10:47AM 9   first seven tests that had a downhole value that approximated

10:47AM 10  10.46.  The last test was nowhere near that result.

10:47AM 11  Q.   And that's downhole, not surface.

10:47AM 12  A.   The 10.46 was the downhole number, not the surface number,

10:47AM 13  correct.

10:47AM 14  Q.   And they were reporting surface.

10:48AM 15  A.   They were reporting surface to MMS.

10:48AM 16  Q.   Which is lower.

10:48AM 17  A.   Which is lower.

10:48AM 18  Q.   Let's go to TREX 1337 or 1053 -- TREX 1337.  They are

10:48AM 19  identical documents.

10:48AM 20         What is this document?

10:48AM 21  A.   This is an PowerPoint that was created by Mr. Bobby Bodek,

10:48AM 22  who was one of the operations geologists working on the

10:48AM 23  *Deepwater Horizon* Macondo project.  He's a BP employee.

10:48AM 24  Q.   Let's to go page 9, and the flyout.

10:48AM 25         What would you like to highlight here?

**OFFICIAL TRANSCRIPT**

10:48AM 1    A.    This shows clearly that the kick occurred at 8970 feet.

10:48AM 2    Q.    Quickly, let's go to page 11, and then the flyout.

10:48AM 3          What would you like to highlight here?

10:48AM 4    A.    This shows that in drilling the last 100 feet they were

10:48AM 5    drilling with a 10.1 pound per gallon mud weight.

10:48AM 6    Q.    Now let's go to page 10, and the flyout.

10:49AM 7          What does this illustrate about the decision to drill

10:49AM 8    ahead after the kick?

10:49AM 9    A.    Okay.  If we start at the bottom segment here, it states

10:49AM 10   that to -- "Drill ahead approximately 100 feet in order to set

10:49AM 11   the 18-inch casing shoe below the problematic interval."

10:49AM 12         And they identified the risk in doing that, that they

10:49AM 13   could drill into another overpressured sand package that would

10:49AM 14   initiate a potentially uncontrollable well control event, they

10:49AM 15   would stick the bottom hole assembly and lose the well.

10:49AM 16         So they recognized the risk of drilling ahead.

10:49AM 17         They also, at the top, document that there was a

10:49AM 18   benefit of drilling ahead to BP in that they could potentially

10:49AM 19   avoid an additional casing string in the hole, and that if --

10:49AM 20   and they would also keep their diameter at the bottom of the

10:49AM 21   hole larger, as we talked about earlier, which helps them in

10:49AM 22   producing any discovered hydrocarbons.

10:49AM 23         So there is an economic benefit to pushing the casing

10:50AM 24   deeper, but in the face of a severe safety risk, including

10:50AM 25   potentially losing the well.

**OFFICIAL TRANSCRIPT**

10:50AM 1    Q.    To what extent did this "drill ahead" decision raise

10:50AM 2    safety concerns, in your view?

10:50AM 3    A.    This -- drilling ahead in this environment was, not only

10:50AM 4    unsafe, it violates every standard I can think of in how wells

10:50AM 5    are drilled in the deep water and elsewhere in our industry.

10:50AM 6    It is truly egregious to drill that extra 100 feet knowing that

10:50AM 7    you could potentially lose the well in the process.

10:50AM 8    Q.    All right.  Let's move on to the next interval that you

10:50AM 9    had concerns about in your report.  I believe it's the one that

10:50AM 10   you said you had the fewest concerns about a few minutes ago.

10:50AM 11   A.    That is correct.

10:50AM 12   Q.    This is the first March interval.  How would you

10:50AM 13   characterize your concerns with BP's conduct in drilling the

10:50AM 14   first March interval?

10:50AM 15   A.    In the first March interval -- if we could pull back the

10:50AM 16   Cocales --

10:50AM 17   Q.    Oh, yes.  Let's show TREX 3727.

10:51AM 18        Oh, I'm sorry.  I guess that's not the right number.

10:51AM 19   3732.  I apologize.

10:51AM 20        Why don't you go to the flyout.  Thank you.  My

10:51AM 21   mistake.

10:51AM 22   A.    That's okay.  This is, again, referring to the 16-inch

10:51AM 23   casing shoe in the well.  The FIT, which is a type of pressure

10:51AM 24   integrity test, has been measured at 12.55.

10:51AM 25        Now, the problem I have with this interval is that in

**OFFICIAL TRANSCRIPT**

10:51AM 1    requesting the waiver, BP requested the waiver by coding 12.6

10:51AM 2    to the MMS, not the 12.55, and asked for permission to drill

10:51AM 3    with 12.3.

10:51AM 4    Q.    Did they drill with 12.3?

10:51AM 5    A.    They did drill with 12.3.

10:51AM 6              They know what their actual test result is.  It's not

10:51AM 7    12.6, it's 12.55.  So they essentially asked for a .3 margin,

10:52AM 8    but on a pressure integrity test it was reported a half a

10:52AM 9    pound, five-hundredths of a pound high.  So, in doing so, they

10:52AM 10   really were planning to drill with .25, not .3 in this

10:52AM 11   interval.

10:52AM 12   Q.    How do you respond to the objection by BP, if they were to

10:52AM 13   make one, that there's nothing wrong with rounding up from a

10:52AM 14   12.55 to a 12.6; that's just math, what's the big deal?

10:52AM 15   A.    If you take the position that it's just math, you

10:52AM 16   essentially gut the regulations of their enforceability.  If

10:52AM 17   you are given permission to drill with a .3, that doesn't mean

10:52AM 18   .25, it doesn't mean .21.  It means .3.

10:52AM 19   Q.    Why do you say .21?

10:52AM 20   A.    Because if you play the rounding game, which has been

10:52AM 21   suggested here several times during deposition, you are giving

10:52AM 22   the operator the latitude to play with the numbers, and that's

10:52AM 23   not the intent of the regulations.

10:52AM 24             The regulations, when it comes to safety, are

10:52AM 25   designed to get permission to drill with a specific safe

**OFFICIAL TRANSCRIPT**

10:53AM 1   margin.  That margin in the case was .3, not .25.

10:53AM 2   Q.   So, for example, do you mean, hypothetically, if you have

10:53AM 3   a 10.05 fracture gradient and a 9.84 pore pressure -- excuse

10:53AM 4   me, mud weight, if you round one up and the other down, you get

10:53AM 5   .3, but, in fact, you have a .21 margin?

10:53AM 6   A.   That is correct.  That's not the kind of game you should

10:53AM 7   play.  It is not only inappropriate from a safety perspective,

10:53AM 8   it's unfair to the regulator to give him numbers that are

10:53AM 9   misleading that he can't make valid decisions on, on his job of

10:53AM 10  monitoring your operations.

10:53AM 11  Q.   What if they had a .28 or a .29, would you have looked the

10:53AM 12  other way?

10:53AM 13  A.   As I stated in deposition, I gave -- I allowed for a small

10:53AM 14  variance there of one or two-hundredths; but, when you get to

10:53AM 15  five hundredths or ten hundredths, where you're getting

10:53AM 16  significantly away from the .3, the reality is when they got

10:53AM 17  below .3, they should have backed up and gotten back to it.

10:54AM 18  They should have honored the margin to within their ability in

10:54AM 19  drilling the well.

10:54AM 20  Q.   Let's move on to the next interval.  This is second of the

10:54AM 21  two March intervals that you complained about.

10:54AM 22       Briefly, how would you characterize your concern with

10:54AM 23  BP's conduct in drilling the second of the Macondo March

10:54AM 24  intervals?

10:54AM 25  A.   In this interval, which started with the 13 and

**OFFICIAL TRANSCRIPT**

10:54AM 1  five-eighths casing shoe, BP did not have a valid pressure

10:54AM 2  integrity test that they believed represented the strength of

10:54AM 3  the rocks at that casing shoe, which means that they drilled

10:54AM 4  the entire interval blind, in essence, without any

10:54AM 5  understanding of what the upper boundary was on their safe

10:54AM 6  margin.

10:54AM 7          MR. REGAN:  Your Honor, if I may impose an objection to

10:54AM 8  the answer as to witness interposing his statement of someone

10:54AM 9  else's belief.  His testimony is that -- he's testifying as to

10:54AM 10 what BP people believed.  He's not a psychiatrist.  He's not a

10:54AM 11 mind reader.  He's a geophysicist.

10:55AM 12         THE COURT:  Well, you did use the word "believed."

10:55AM 13 What are you basing that on?  Tell me what you're basing that

10:55AM 14 on.

10:55AM 15         THE WITNESS:  Based on their own internal e-mail

10:55AM 16 communications, Your Honor.  I've read hundreds of e-mails from

10:55AM 17 BP people stating numbers.

10:55AM 18         THE COURT:  That's your interpretation of their e-mail

10:55AM 19 communication?

10:55AM 20         THE WITNESS:  That's correct.

10:55AM 21         THE COURT:  Okay.  Overrule the objection.

10:55AM 22                       EXAMINATION

10:55AM 23 BY MR. SPIRO:

10:55AM 24 Q.   Let's show TREX 4533.

10:55AM 25         What is this document?

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 10:55AM 1 | A.    This is an e-mail from Mr. Mark Alberty in September of |
| 10:55AM 2 | 2010 that was part of a large bundle that I saw. |
| 10:55AM 3 | Q.    Who is Alberty? |
| 10:55AM 4 | A.    Mr. Alberty was BP's -- I believe he was their global |
| 10:55AM 5 | specialist on pore pressure frac gradient issues. |
| 10:55AM 6 | He was actually, I believe, called into the process |
| 10:55AM 7 | later.  I don't believe he was actively involved every day |
| 10:55AM 8 | early on in the well, as I understand it. |
| 10:55AM 9 | Q.    Can you go to the flyout of the second to the last -- this |
| 10:55AM 10 | is the right one. |
| 10:55AM 11 | A.    That is correct. |
| 10:55AM 12 | Q.    What is the curve? |
| 10:56AM 13 | A.    This is what we call a pressure integrity test diagram or |
| 10:56AM 14 | plot. |
| 10:56AM 15 | When we speak about how we do a pressure integrity |
| 10:56AM 16 | test, this is the plot that I or an engineer or geophysicist |
| 10:56AM 17 | who specializes in this would analyze to determine whether it's |
| 10:56AM 18 | a valid test or not. |
| 10:56AM 19 | You'll notice three curves.  There is a blue curve -- |
| 10:56AM 20 | THE COURT:  Just so everybody is clear that's listening |
| 10:56AM 21 | to this, when you talk about a pressure integrity test, this is |
| 10:56AM 22 | a completely different test than a negative pressure test that |
| 10:56AM 23 | there has been so much testimony about. |
| 10:56AM 24 | THE WITNESS:  Yes, Your Honor, that is correct. |
| 10:56AM 25 | I'll define it again for the Court.  The pressure |

**OFFICIAL TRANSCRIPT**

10:56AM 1    integrity test is a test that's done after you have put a

10:56AM 2    casing in the well and cemented that casing in.  So you now

10:56AM 3    have casing with some cement at the bottom that has filled the

10:56AM 4    hole.

10:56AM 5            You then take the drill bit, and you drill out of

10:56AM 6    the casing and the cement, and you drill between 10 to 50 feet

10:56AM 7    of new rock.  So you expose a little bit of the new rock you're

10:57AM 8    going to drill into.

10:57AM 9            You then pump up the mud weight.  That's what

10:57AM 10   this curve represents is the pumping of that mud to raise the

10:57AM 11   pressure in that small amount of open hole that you've created.

10:57AM 12           You're watching to see when the pressure is going

10:57AM 13   to change to tell you that the rocks are just starting to

10:57AM 14   crack, to give you the strength of the rocks.

10:57AM 15      THE COURT:  So basically you're testing for a new

10:57AM 16   fracture gradient?

10:57AM 17      THE WITNESS:  That is correct.  Right.  You're trying

10:57AM 18   to determine the new upper boundary on your safe drilling

10:57AM 19   margin by doing the test.

10:57AM 20           The presumption is that you have a valid test in

10:57AM 21   order to report that information.  In this case -- I'll

10:57AM 22   describe the three curves you see here.  The blue curve that

10:57AM 23   you see on this diagram, very straight line, is the casing

10:57AM 24   test.  This is where they have not drilled out the cement yet.

10:57AM 25           They have cemented the casing in, and they pump

**OFFICIAL TRANSCRIPT**

10:57AM 1   in the cement in casing string to make sure that it has

10:57AM 2   integrity.  So they typically pump this to a fairly high

10:58AM 3   pressure relative to the pressure integrity test, to make sure

10:58AM 4   the casing is secure.

10:58AM 5                        EXAMINATION

10:58AM 6   BY MR. SPIRO:

10:58AM 7   Q.    The casing is made of what?

10:58AM 8   A.    Steel, usually.  They do some others sometimes, but mainly

10:58AM 9   steel.

10:58AM 10        So they do the casing test first.  Then they drill

10:58AM 11  out the cement and a little bit of the new rock.  Then they do

10:58AM 12  the pumping up of pressure again, to test both the integrity of

10:58AM 13  the cement at the bottom of the shoe, to make sure it is

10:58AM 14  intact, and to test the strength of the new rocks below.

10:58AM 15        So they are really trying to make sure here that they

10:58AM 16  have a secure wellbore for everything they've done to that

10:58AM 17  point before they continue to drill.  Okay.

10:58AM 18        Now, the red curve here -- remember, the blue curve

10:58AM 19  is the casing pressure.  The red curve here is the pressure

10:58AM 20  curve as they are pumping up in that newly drilled little piece

10:58AM 21  of hole.

10:58AM 22        You'll notice at the top that the curve breaks over

10:58AM 23  abruptly.  The last two pressure points right here at the top

10:58AM 24  are breaking over abruptly, and then they turn off the pumps at

10:58AM 25  the surface, and they drop the pressure to the brown curve.

**OFFICIAL TRANSCRIPT**

10:59AM 1      You'll notice that that brown curve has a very rapid

10:59AM 2  pressure drop.  In fact, this was the largest pressure drop

10:59AM 3  exhibited on any of the pressure integrity tests in the

10:59AM 4  Macondo well.

10:59AM 5      The reason I argue that this is an invalid test is,

10:59AM 6  Number 1, it was pumped to a very high pressure, what I would

10:59AM 7  view as an absurdly high pressure for this depth and what they

10:59AM 8  thought the rock strength was.

10:59AM 9      The breakover at the top, the last two red dots on

10:59AM 10  the red curve, is very abrupt, does not look like a normal

10:59AM 11  initiation of small fractures in the rock, and then you turn

10:59AM 12  off the pumps and you lose a lot of pressure.

10:59AM 13      That is telling me that this test most likely

10:59AM 14  encountered a channel in the cement job, which implied that

10:59AM 15  they didn't have integrity of the casing shoe.  This should

10:59AM 16  have been retested.  By any measure I can think of, they should

10:59AM 17  have retested this shoe.

10:59AM 18      THE COURT:  What was the date of this test, again?

10:59AM 19      THE WITNESS:  I'm trying to remember the exact date.

10:59AM 20  It's at the top of the diagram.

11:00AM 21      MR. SPIRO:  Late March 2010.

11:00AM 22      THE COURT:  March what?

11:00AM 23      MR. SPIRO:  2010.

11:00AM 24      THE COURT:  March what?

11:00AM 25      MR. SPIRO:  Hold on.

**OFFICIAL TRANSCRIPT**

11:00AM 1          THE WITNESS:  It's at the top of the diagram.  I can't

11:00AM 2   see it with the flyout.  I apologize, I don't remember the

11:00AM 3   exact date.

11:00AM 4          MR. SPIRO:  22.

11:00AM 5          THE COURT:  March 22, 2010?

11:00AM 6          MR. SPIRO:  Yes.

11:00AM 7          THE COURT:  What's that exhibit number, again?

11:00AM 8          MR. SPIRO:  The TREX number?

11:00AM 9          THE COURT:  Yes.

11:00AM 10         MR. SPIRO:  It's in Exhibit 4533, which lists all the

11:00AM 11  LOT tests.  Excuse me, all the pressure integrity tests.

11:00AM 12                          EXAMINATION

11:00AM 13  BY MR. SPIRO:

11:00AM 14  Q.   Technically, some are not LOT tests, correct?

11:00AM 15  A.   That is correct.

11:00AM 16  Q.   You've referenced some contemporary accounts from the

11:00AM 17  Macondo well team regarding the validity or reliability of the

11:00AM 18  pressure integrity tests, correct?

11:00AM 19  A.   That is correct.

11:00AM 20  Q.   I would like to call very briefly some of these documents

11:00AM 21  to the Court's attention before we get into April.

11:00AM 22          Let's go with TREX 3733.  Focus your attention on the

11:01AM 23  bottom e-mail from Albertin dated March 23rd.  Let's just go to

11:01AM 24  the flyout.

11:01AM 25          By the way, who is Martin Albertin?

                          **OFFICIAL TRANSCRIPT**

690

A.   Martin Albertin is a BP geophysicist who was the single point of contact for pore pressure and fracture gradient issues on the Macondo well.

Q.   We have two little flyouts on this, but why don't you tell us what's significant about what's on this first page.

A.   Well, the first statement at the top, leak off well above overburden, this reinforces my earlier statement that the test was absurdly high.  They pushed it far beyond what the rock strength was expected to be at this depth in the well.

     Then he goes on that, I've been scratching my head as to the origin of the measurement.  Option one, not a valid leak off test; somehow performed another casing test.  Option two, our overburden, OB, and pore pressure, PP, models are wrong. But he notes that it's tough to get them high enough to explain what they're seeing.

     Then, if we go to the next --

Q.   The next flyout.

A.   He then states two other options, tectonic effects, but he notes -- and I believe he's correct here -- that they're too far away from things like salt domes and salt bodies, that that shouldn't be an issue, and tensile strength, meaning the rock is very strong.

     He notes that that seems farfetched, given other things that they know, including the Poisson's ratio in the rock.  So that's --

**OFFICIAL TRANSCRIPT**

11:02AM 1   Q.   What's the significance of the verbiage at the bottom of

11:02AM 2   this page?

11:02AM 3   A.   Okay.  He is stating that -- he's saying, anybody have any

11:02AM 4   ideas?  We have been discussing an open hole leak off test with

11:02AM 5   much opposition.  This is something drillers often don't like

11:02AM 6   to do.  It's basically with more open hole, you've already done

11:03AM 7   some drilling now and you have a bigger hole open, let's pump

11:03AM 8   up the pressure again, and see when the rocks start to fail.

11:03AM 9   So this is called an open hole leak off test, because you have

11:03AM 10  a lot of well that you've drilled now, and it's all exposed, if

11:03AM 11  you try it.  But it is one way to tell what the weakest

11:03AM 12  fracture gradient is in the well.

11:03AM 13  Q.   If you're not confident in your fracture gradient?

11:03AM 14  A.   Correct, if you're not confident.

11:03AM 15         So, in the end, when you look at this e-mail on its

11:03AM 16  face, if you discount three and four, which I believe

11:03AM 17  Mr. Albertin was correct to do, you have two options left, one

11:03AM 18  of which is we retested casing and cement.

11:03AM 19         In that scenario, as someone who advises clients on

11:03AM 20  how to handle these situations, I would have told them to do a

11:03AM 21  cement squeeze to make sure that channel that I believe is

11:03AM 22  there is taken care of, so you don't have any way to leak

11:03AM 23  through the cement through a little channel.

11:03AM 24         Then retest the shoe.  Get a valid measurement, so

11:03AM 25  you know what the upper bound is on your safe drilling margin.

**OFFICIAL TRANSCRIPT**

11:03AM  1    In this case, they didn't know.

11:03AM  2    Q.   Let's go to TREX 1311.  This is an e-mail from

11:04AM  3    Brian Morel.

11:04AM  4         Who is Brian Morel?

11:04AM  5    A.   Brian Morel is one of the Drilling Engineers for BP that

11:04AM  6    was working on the well.

11:04AM  7    Q.   Show the flyout, please.

11:04AM  8         Real briefly, without going into all of the verbiage,

11:04AM  9    what is significant about this to you?

11:04AM 10    A.   Well, you'll notice in the third line here, he notes that

11:04AM 11    they had a 14.7 LOT.  That was the test that they reported.

11:04AM 12         But he is stating that the pore pressure team wants

11:04AM 13    to use a 13.7, a full pound per gallon lower, because they

11:04AM 14    recognize that the test is probably not valid, and they can't

11:04AM 15    trust it, so they can't use it in terms of setting their safe

11:04AM 16    drilling margin.

11:04AM 17    Q.   By the way, did they drill part of this interval with less

11:04AM 18    than a .5 gap below that 13.7?

11:04AM 19    A.   I believe they drilled with 13.3 at some point in the

11:04AM 20    interval, so .4 margin as opposed to .5.

11:04AM 21    Q.   Did they have a waiver to do that?

11:04AM 22    A.   They did not.

11:04AM 23    Q.   Let's move to TREX 2654.  This is one of the PPFG reports

11:05AM 24    for this time period, March 23rd.  Let's to go the flyout.

11:05AM 25         Again, briefly, what do you think is significant

**OFFICIAL TRANSCRIPT**

11:05AM 1   about this document?

11:05AM 2   A.   Well, at the top, you'll notice that Ms. Paine is very

11:05AM 3   candid.   Performed leak off test that gave no meaningful

11:05AM 4   formation data.   Drilled.

11:05AM 5       She basically didn't believe that the test was valid.

11:05AM 6   She's the specialist on the rig who is required to deal with

11:05AM 7   these issues every day.

11:05AM 8       She then notes at the bottom, under additional

11:05AM 9   observations, LOT broke over at 1480 psi -- which was those

11:05AM 10  last two points I identified on the diagram -- which was above

11:05AM 11  overburden of 14.5 causing uncertainty about its usefulness as

11:05AM 12  a formation evaluation tool.

11:05AM 13      Again, this document shows that BP had no confidence

11:05AM 14  in the test, either in their onshore group or on the person on

11:05AM 15  the rig doing the pressure monitoring.

11:05AM 16  MR. SPIRO:  With the Court's permission -- and this is

11:05AM 17  the only time I'm going to do this today -- I would like to

11:06AM 18  show a document that appears to contain comments about a pit

11:06AM 19  from a BP Drilling Engineer dated in April of 2010, and that

11:06AM 20  was not referenced in his report.

11:06AM 21      The reason is because it deals with these issues

11:06AM 22  that we have been discussing, which he lists several

11:06AM 23  contemporaneous accounts regarding validity reliability.  We've

11:06AM 24  just been considering this.  This is the one that's just about

11:06AM 25  a month after this was drilled by a BP Drilling Engineer.

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 11:06AM | 1 | THE COURT:  Is there any issue with this? |
| 11:06AM | 2 | MR. REGAN:  Your Honor, I would just -- |
| 11:06AM | 3 | THE COURT:  I don't know what the document is. |
| 11:06AM | 4 | MR. SPIRO:  Well, I'm trying to be fair to counsel |
| 11:06AM | 5 | here. |
| 11:06AM | 6 | MR. REGAN:  I appreciate that, but -- |
| 11:06AM | 7 | THE COURT:  Do you know what it is that he's talking |
| 11:06AM | 8 | about? |
| 11:06AM | 9 | MR. REGAN:  I have a basis to know what it is, Your |
| 11:06AM | 10 | Honor; but, from our perspective, I think the witness can give |
| 11:06AM | 11 | his testimony on it, and he can be cross-examined about it. |
| 11:06AM | 12 | THE COURT:  Very well. |
| 11:06AM | 13 | MR. SPIRO:  Thank you. |
| 11:06AM | 14 | THE COURT:  Proceed. |
| 11:06AM | 15 | MR. SPIRO:  Appreciate it. |
| 11:06AM | 16 | EXAMINATION |
| 11:06AM | 17 | BY MR. SPIRO: |
| 11:06AM | 18 | Q.    TREX 4535. |
| 11:06AM | 19 |       Again, we talked about Brian Morel.  This is a Lesson |
| 11:07AM | 20 | Learned document from April 28th. |
| 11:07AM | 21 |       Why don't you go to the flyout, please.  Why don't |
| 11:07AM | 22 | you take a look at the higher of the two.  Right. |
| 11:07AM | 23 |       Explain why this is significant to you. |
| 11:07AM | 24 | A.    Yes.  I want to clarify here, so there is no confusion. |
| 11:07AM | 25 | You'll notice it says 11 and seven-eighths liner interval. |

**OFFICIAL TRANSCRIPT**

11:07AM 1    This is the interval that started at the 13 and five-eighths

11:07AM 2    casing shoe and then drilled down to the 11 and seven-eighths.

11:07AM 3    Q.   So this is the one we've been discussing.

11:07AM 4    A.   This is the one we've been discussing in the most recent

11:07AM 5    part of this, yes.

11:07AM 6         You will notice, again, that Mr. Morel documents,

11:07AM 7    high leak off test over overburden experienced.

11:07AM 8         What he is acknowledging here is that the test was

11:07AM 9    anomalously high.  So he's, again, restating what we've already

11:07AM 10   seen.

11:07AM 11        The interesting information here is the last

11:07AM 12   statement in this paragraph, where he says, "Not setting casing

11:08AM 13   on bottom or drilling more formation prior to doing the leak

11:08AM 14   off test is expected to alleviate this issue."

11:08AM 15        This was something that I learned after my report was

11:08AM 16   written, that at both this casing shoe and in the April

11:08AM 17   interval, at the nine and seven-eighths, the casing was set on

11:08AM 18   the bottom of the well, which is not the industry standard

11:08AM 19   practice.  You normally leave what is called some rat hole, is

11:08AM 20   the term we use, to fill with cement, and you set the casing a

11:08AM 21   little bit off the bottom of the hole, so that you have that

11:08AM 22   good cement zone at the bottom that you can drill out of to do

11:08AM 23   your leak off test.

11:08AM 24        MR. REGAN:  Your Honor, the witness is going outside

11:08AM 25   the scope of his opinion.  He's now become a casing expert and,

**OFFICIAL TRANSCRIPT**

11:08AM 1    I guess, a cementing expert, as well.  This is not what he was

11:08AM 2    supposed to testify about.

11:08AM 3              THE COURT:  That does seem beyond his expertise that he

11:08AM 4    was offered for.

11:08AM 5              MR. REGAN:  I move to strike his answer.

11:08AM 6              THE COURT:  I'll grant your motion.

11:08AM 7                             EXAMINATION

11:08AM 8    BY MR. SPIRO:

11:08AM 9    Q.    Dr. Huffman, what should BP have done in your view if they

11:09AM 10   obtained the pit result that they obtained before drilling

11:09AM 11   ahead in this interval?

11:09AM 12   A.    They should have retested the interval.  Most likely, do a

11:09AM 13   cement squeeze to protect the channel that I believe they had

11:09AM 14   encountered in the first test, and then retest the shoe and get

11:09AM 15   a valid number that they could report to MMS.

11:09AM 16   Q.    Was drilling ahead with this pit the conduct of a prudent

11:09AM 17   operator?

11:09AM 18   A.    No, they did not know what the upper boundary on their

11:09AM 19   safe drilling margin was.

11:09AM 20             MR. SPIRO:  Your Honor, we have one final interval, and

11:09AM 21   that was in April, the final interval of the well.

11:09AM 22                             EXAMINATION

11:09AM 23   BY MR. SPIRO:

11:09AM 24   Q.    Can you identify, Dr. Huffman, the two types of concerns

11:09AM 25   set forth in your report with the April interval?

**OFFICIAL TRANSCRIPT**

11:09AM 1   A.    Yes.  First, the pressure integrity test at the nine and

11:09AM 2   seven-eighths casing shoe at the top of this interval was not a

11:09AM 3   valid test, which means that they initially had no upper

11:09AM 4   boundary on their safe margin.

11:09AM 5         Secondly, further down the hole, they had valid hole

11:09AM 6   behavior observations, which told them that the conditions in

11:09AM 7   the well had changed, and they continued to drill after that.

11:10AM 8   Q.    All right.  Let's go to TREX 4533.  This time, we're going

11:10AM 9   to go to the last -- this is the last one -- the last pit of

11:10AM 10  the well.

11:10AM 11        Is this the pressure integrity test for the shoe

11:10AM 12  above the final interval in April?

11:10AM 13  A.    Yes, it is.

11:10AM 14  Q.    Explain the concerns that you have with this pressure

11:10AM 15  integrity test.

11:10AM 16  A.    On its face, this test is so absurdly high in terms of the

11:10AM 17  pressure that it was pumped to, and every primary indicia of

11:10AM 18  this test tells me that it's a retest of the casing, that they

11:10AM 19  did not have a valid formation integrity test or leak off test,

11:10AM 20  either one.  No pressure integrity test.

11:10AM 21        This should have been drilled out further and

11:10AM 22  retested, period.  It should never have been used for a safe

11:10AM 23  margin determination.

11:10AM 24  Q.    Now, why do you say that this was absurdly high?

11:10AM 25  A.    We've seen references to things being above overburden;

**OFFICIAL TRANSCRIPT**

but, this test didn't just go above overburden, it was pumped
to the same pressure as the casing integrity test was pumped.

In this scenario, had they pumped the pressure
integrity test any higher, they would not have known what they
were testing, whether it was testing cement in casing or rock
at the bottom of well.

So you cannot pump a pressure integrity test this
high.  I've never seen this done in any test that I have had
data for in the past, and I've analyzed thousands of these
pressure integrity tests in my career.

So I've never seen one do this before, where the
pressure integrity test was pumped as high as the casing test
was.  That is just not done.

Q.    They were expecting more or less what?

A.    About a 15 to 15.2, and they got 16 pound per gallon from
this test.

Q.    Did it start to show fracturing at 16?

A.    Absolutely no sign of any evidence of fracturing or
interaction with the rocks that they should be testing at the
bottom.

Q.    What is the significance of the right horizontal line?

A.    The brown curve, as I noted in the earlier test
discussion, is the -- what we the shut in curve.  It is the
curve after you have turned off the pumps from the integrity
test.

**OFFICIAL TRANSCRIPT**

11:12AM 1        You normally expect to see a small pressure drop in

11:12AM 2   that curve.  In this case, it did not drop at all.  This well

11:12AM 3   had absolute integrity at this casing shoe.  There was no

11:12AM 4   evidence of any interaction with the rocks outside the casing.

11:12AM 5   Q.   Can you show TREX 1343.

11:12AM 6        This is an e-mail from Martin Albertin.  Let's go to

11:12AM 7   the flyout.

11:12AM 8        This is dated April 2nd.  I guess this is pertaining

11:12AM 9   to this pressure integrity test.

11:12AM 10       What is significant about this e-mail to you?

11:12AM 11  A.   Okay, he starts off by saying, team, either the rock or

11:12AM 12  the casing and cement are very strong.

11:12AM 13       So Mr. Albertin is acknowledging the same thing that

11:12AM 14  I'm seeing here.  It's not clear what they tested, which means

11:13AM 15  they really don't have any confidence in the test.

11:13AM 16       He then goes on at the bottom to talk about tensile

11:13AM 17  strength and other aspects.  But, basically, he finishes by

11:13AM 18  saying, we should manage drilling this last hole section with

11:13AM 19  the expectation that the shales will fail at about the

11:13AM 20  predicted values, the 15.0 to 15.2, which means he did not

11:13AM 21  believe the test.

11:13AM 22  Q.   Then let's see TREX 3734, which is an April 3rd e-mail

11:13AM 23  from Morel.  Please show the flyout.

11:13AM 24       What is the significance of this document to you?

11:13AM 25  A.   Mr. Morel is noting that they did a second test on the

**OFFICIAL TRANSCRIPT**

11:13AM 1    casing to 1500 psi, is what the 1500 refers to, which isn't on

11:13AM 2    the report.

11:13AM 3              "As we were not expecting to get anywhere close to

11:13AM 4    16 ppg with the leak off test, we decided not to test any

11:13AM 5    higher than 1500 psi.  So when pressure did get that high on

11:13AM 6    the LOT, we opted to shut down without going to leak off

11:14AM 7    because we wouldn't know if it was casing or formation."

11:14AM 8              Again, a consistent view by BP's own people that the

11:14AM 9    test was not valid or reliable.

11:14AM 10   Q.   How would you compare BP's conduct in October and

11:14AM 11   February, in terms of its PITs, with its conduct in mid-March

11:14AM 12   and April?

11:14AM 13   A.   In October when they were facing low values below what

11:14AM 14   they wanted to get in their leak off tests, pressure tests,

11:14AM 15   they retested eight times to try and get a better result.

11:14AM 16              In February, they retested multiple times in the face

11:14AM 17   of low values.

11:14AM 18              In the March and April intervals, by stark contrast,

11:14AM 19   where they had absurdly high values that they did not trust,

11:14AM 20   they did not retest and drilled ahead without any determination

11:14AM 21   of what the upper bound was on their safe drilling margin.

11:14AM 22   That's not what a prudent operator does.

11:14AM 23   Q.   Let's move to the issue of hole behavior observations for

11:15AM 24   the April interval.

11:15AM 25              Before we address these issues, I would like to ask

**OFFICIAL TRANSCRIPT**

11:15AM 1   you about a couple of documents, only two that you relied on

11:15AM 2   with respect to this issue in your report.

11:15AM 3   　　　　　Can we see TREX 4776.

11:15AM 4   　　　　　This says daily geological reports.  I guess this

11:15AM 5   TREX goes from April 1st on.

11:15AM 6   　　　　　What are these daily geological reports?

11:15AM 7   A.   This is a report that is -- that is put together by the

11:15AM 8   operations geologist on the rig.  It is done every day that the

11:15AM 9   rig is operating, in comparison to the PPFG report that we

11:15AM 10  looked at earlier that's only done on days where drilling is

11:15AM 11  occurring.

11:15AM 12  　　　　　So where I don't have a PPFG document, I still have

11:15AM 13  the daily geological report, which does contain much of the

11:15AM 14  same information that Ms. Paine was capturing on her PPFGs.

11:15AM 15  Q.   Was this one of the documents you relied on to evaluate

11:15AM 16  the margin near the bottom of the well?

11:15AM 17  A.   Yes, it was.

11:15AM 18  Q.   Let's show TREX 32019.

11:16AM 19  　　　　　What is this document?

11:16AM 20  A.   This is the document that we call the daily log of

11:16AM 21  operations, or daily drilling log.  This is the master document

11:16AM 22  that is kept by the drillers on the rig which documents hour by

11:16AM 23  hour what has happened in every aspect of rig operations, not

11:16AM 24  just drilling.

11:16AM 25  　　　　　So this document starts from the moment they get to

**OFFICIAL TRANSCRIPT**

11:16AM 1    the location all the way to the end of the well.

11:16AM 2             This is sort of the master document that I and

11:16AM 3    specialists like myself rely on, and most other documents that

11:16AM 4    we get are transcriptions of things that are on this document.

11:16AM 5    Q.   Let's go back to Exhibit 4022, TREX 4022.

11:16AM 6             This is the regulation 250.427, but we're going to

11:16AM 7    focus specifically on 427(a).

11:16AM 8             What is the relevance to you of this statement about

11:16AM 9    hole behavior observations, to your analysis?

11:16AM 10   A.   It reads, "You must use the pressure integrity test and

11:17AM 11   related hole behavior observations," and it lists a series of

11:17AM 12   them, "to adjust the drilling fluid program and the setting

11:17AM 13   depth of the next casing string."

11:17AM 14            This regulation is clear.  We assume, in drilling the

11:17AM 15   well, that the casing, the shoe strength or pressure integrity

11:17AM 16   test is the weakest rock in the hole, but that's only an

11:17AM 17   assumption that we start out with.

11:17AM 18            As we drill further down the well, if we see evidence

11:17AM 19   in the form of what we call hole behavior observations -- this

11:17AM 20   could be losses of mud into the rocks or other things that tell

11:17AM 21   us the conditions have changed -- we are obligated to use that

11:17AM 22   information in determining our safe drilling margin --

11:17AM 23            MR. REGAN:  Your Honor --

11:17AM 24            THE WITNESS:  -- and in changing casing plans and our

11:17AM 25   mud program.

**OFFICIAL TRANSCRIPT**

11:17AM 1          MR. REGAN:  Pardon me.  I didn't mean to interrupt you.

11:17AM 2              I'd like to move to strike that answer.  He comes

11:17AM 3      as a regulatory expert.  He says the regulation is clear.  As a

11:17AM 4      regulatory expert reading a regulation that's clear, he need

11:17AM 5      not interpret it or add any language that's not in it.

11:18AM 6              He should stay with the language that's there,

11:18AM 7      rather than add language, if he is going to say, I am a

11:18AM 8      regulatory expert, I can read a regulation, and this is what it

11:18AM 9      says.  I move to strike that answer.

11:18AM 10         THE COURT:  Well, if they were all that clear, we

11:18AM 11     wouldn't need a regulatory expert at all.  So I'll overrule

11:18AM 12     your objection.

11:18AM 13                          EXAMINATION

11:18AM 14     BY MR. SPIRO:

11:18AM 15     Q.   Does this regulation and your interpretation have anything

11:18AM 16     to do with the idea of, quote, listening to your well?

11:18AM 17     A.   Yes.  There is a colloquial term that we use in the

11:18AM 18     geophysical and drilling communities that the well can talk to

11:18AM 19     you.  It's tell you what's going on in the subsurface.

11:18AM 20             One of the things we say among ourselves is we have

11:18AM 21     to listen to the well when it talks to us.  It is telling us

11:18AM 22     the conditions in the subsurface as we're drilling.

11:18AM 23     Q.   We have one final reg for you to look at before we get

11:18AM 24     into the events in mid-April -- early to mid-April, I should

11:19AM 25     say, and that is TREX 5837, which is regulation 250.428.  Let's

**OFFICIAL TRANSCRIPT**

11:19AM 1   do the flyout to get to subsection (a).

11:19AM 2        Why don't you read what you think is significant

11:19AM 3   there, first of all?

11:19AM 4   A.   Okay.  It starts out by saying, "If you encounter the

11:19AM 5   following situation," and (a) is that you, "have unexpected

11:19AM 6   formation pressures or conditions that warrant revising your

11:19AM 7   casing design."  Then you must, "submit a revised casing

11:19AM 8   program to the district manager for approval."

11:19AM 9   Q.   You're a well designer, you said?

11:19AM 10  A.   That is correct.

11:19AM 11  Q.   As a well designer, how would you apply this reg to the

11:19AM 12  situation presented in the final interval of the Macondo after

11:19AM 13  they started drilling ahead.

11:19AM 14  A.   If you are drilling and you encounter a situation where

11:19AM 15  you have hole behavior observations that tell you that the well

11:19AM 16  is weaker than you thought --

11:19AM 17  Q.   You mean the fracture gradient has dropped?

11:20AM 18  A.   Has dropped.

11:20AM 19       -- and your mud weight is now encroaching on the safe

11:20AM 20  margin determined by that weakest fracture gradient, you must

11:20AM 21  stop drilling at that point.  Then, you have to make a

11:20AM 22  determination of other remedies, as we talked about earlier, in

11:20AM 23  427.

11:20AM 24       But then your alternative, if you can't remedy the

11:20AM 25  situation, is you revise your casing plan, and you set casing

**OFFICIAL TRANSCRIPT**

11:20AM 1   and get a new leak off pressure to continue drilling.

11:20AM 2   Q.   Is this one of those situation where, in your view, the

11:20AM 3   fracture gradient dropped?

11:20AM 4   A.   Yes, it is.

11:20AM 5   Q.   So this is -- the second demonstrative that we presented

11:20AM 6   earlier this morning, this is that scenario?

11:20AM 7   A.   It is, correct.

11:20AM 8        I would note something here, too.  That if you take

11:20AM 9   everything else that we've talked about in the regulations

11:20AM 10  today, and you throw them out.  You say, you know, don't worry

11:20AM 11  about safety, it's not a problem, just drill.  This is based on

11:20AM 12  fundamental physics.  The physics of the strength of the rocks

11:20AM 13  won't let you drill with a mud weight that is appreciably

11:21AM 14  higher than the fracture strength of the weakest rocks.

11:21AM 15       These regulations are here because we've learned from

11:21AM 16  hard experience how the real world behaves.

11:21AM 17  Q.   Does the idea of the kick margin stop applying in this

11:21AM 18  type of situation, or does it continue to apply in your view?

11:21AM 19  A.   The kick margin applies at all times in the well when you

11:21AM 20  have any zone that can flow on you.  You have to maintain that

11:21AM 21  margin in terms of controlling your well.

11:21AM 22  Q.   To you, that's a matter of physics?

11:21AM 23  A.   Yes.  It's not only a matter of physics, it's why 401 is

11:21AM 24  there in the first place.  401 says you main safety and well

11:21AM 25  control at all times, not just while drilling.

**OFFICIAL TRANSCRIPT**

11:21AM 1   Q.   So we're at 18220 feet, right?

11:21AM 2   A.   Correct.

11:21AM 3   Q.   Let's talk a little bit about the situation of the well

11:21AM 4   when BP had drilled to that depth, 18220 feet.

11:21AM 5        Without going into a whole laundry list of hole

11:21AM 6   behavior observations, please focus on the most relevant ones,

11:22AM 7   what hole behavior observations did they have in drilling that

11:22AM 8   interval before they got to 18000, or at as they got to

11:22AM 9   18220 feet?

11:22AM 10  A.   As counsel has noted, there were a lot of events in the

11:22AM 11  well down here.

11:22AM 12  Q.   Yeah, I know.  We don't have all day.

11:22AM 13  A.   I want to focus on the measurements that we refer to as

11:22AM 14  GeoTaps.

11:22AM 15       The GeoTap is a drill string conveyed tool that

11:22AM 16  allows you to measure the pore pressure directly at a depth in

11:22AM 17  the well as you're advancing your drill string.

11:22AM 18       The GeoTap basically reaches out and touches the

11:22AM 19  rocks and takes a pressure measurement at a given depth that is

11:22AM 20  a reasonably reliable measurement in good porous sands and

11:22AM 21  other rocks of that type.

11:22AM 22       The GeoTap also has an additional value in that once

11:22AM 23  you have that pore pressure measurement, direct measurement,

11:22AM 24  you now use your fracture gradient model for the area to

11:22AM 25  predict the value of the fracture gradient at the same depth.

**OFFICIAL TRANSCRIPT**

11:23AM 1     So the GeoTap is a very useful tool.  It is a recent

11:23AM 2 technology that is deployed now more and more commonly on rigs

11:23AM 3 and was deployed here.

11:23AM 4 Q.   Let's look at some numbers about the GeoTaps that had been

11:23AM 5 conducted by the time they got there.

11:23AM 6     Let's start with TREX 8186, our old friend the PPFG

11:23AM 7 report.  This one is for April 4th.  Let's to go the flyout.

11:23AM 8     What would you like to highlight about this flyout?

11:23AM 9 A.   This flyout notes in the area in yellow that at about

11:23AM 10 17712 feet they took multiple GeoTaps, and the pore pressure at

11:23AM 11 that depth -- this is an downhole number now, in the

11:23AM 12 reservoirs -- is 14.15 pound per gallon.

11:23AM 13 Q.   Did they trust these numbers?

11:23AM 14 A.   They did.  BP honored them and utilized them in the rest

11:23AM 15 of the well.  They actually trusted them.

11:23AM 16 Q.   So they needed a mud weight to go beyond these numbers?

11:23AM 17 A.   Correct.

11:24AM 18     They now know that their mud weight has to be at

11:24AM 19 least about 14.2 to 14.25 to keep an overbalance relative to

11:24AM 20 that new pore pressure.

11:24AM 21 Q.   To avoid confusion, we have been talking about surface mud

11:24AM 22 weights in the past.  I think what you said in your report is

11:24AM 23 you're now talking about downhole mud weights?

11:24AM 24 A.   That's correct.

11:24AM 25 Q.   So these are downhole mud weights.

**OFFICIAL TRANSCRIPT**

11:24AM 1    A.    That is correct.

11:24AM 2    Q.    Let's go to TREX 1967, the PPFG report for the next day,

11:24AM 3    and let's to go the flyout.

11:24AM 4              What is the significance of this to your analysis?

11:24AM 5    A.    This is stating that they had additional GeoTap data at

11:24AM 6    18079 feet, which gave them a 12.58 pound per gallon pore

11:24AM 7    pressure that had a corresponding fracture gradient of

11:24AM 8    14.4 pound per gallon.

11:24AM 9    Q.    So this is a big drop in pressure?

11:24AM 10   A.    A big drop in pore pressure and a drop in fracture

11:25AM 11   gradient related to that drop in pore pressure in those

11:25AM 12   specific reservoirs, in those sandstones.

11:25AM 13   Q.    Now, the 14.4, is that the most precise number for the

11:25AM 14   fracture gradient that you have seen?

11:25AM 15   A.    I actually saw numbers from Mr. Alberty and Mr. Albertin

11:25AM 16   that were about 14.35.  So this may have been a round-up of

11:25AM 17   that.

11:25AM 18   Q.    Okay.

11:25AM 19   A.    But roughly 14.35 to 14.4.

11:25AM 20   Q.    You've discussed now, I think, four different regulations.

11:25AM 21   How do they come into play in terms of BP's drill ahead

11:25AM 22   decision at eighteen thousand, roughly, two hundred feet?

11:25AM 23   A.    Okay.  If you consider where they were at this depth, they

11:25AM 24   now have a maximum, a highest pore pressure in one of the rock

11:25AM 25   intervals of 14.15 pound per gallon.

**OFFICIAL TRANSCRIPT**

11:25AM 1          They have a fracture gradient in another sand below

11:25AM 2    it with a calculated fracture gradient of 14.35.

11:26AM 3          The mud that they need to control that upper zone has

11:26AM 4    to be at least 14.2.

11:26AM 5          Do the math.  You have .15, maybe .2 at best, margin

11:26AM 6    between the mud weight and the weakest fracture gradient in the

11:26AM 7    open hole.  They had totally lost their margin at this point.

11:26AM 8    Q.   Did they use any tool to strengthen --

11:26AM 9          THE COURT:  Excuse me, what was that date again for

11:26AM 10   this test?

11:26AM 11         THE WITNESS:  That would have been April 5th, when the

11:26AM 12   second set of the tests was taken.

11:26AM 13         MR. SPIRO:  April 4th, I think we were looking -- the

11:26AM 14   document was from April 5th.

11:26AM 15         THE WITNESS:  Yeah, you're right.  That's correct.

11:26AM 16                       EXAMINATION

11:26AM 17   BY MR. SPIRO:

11:26AM 18   Q.   They drilled ahead, what was it, 10:30 at night on the 4th

11:26AM 19   of April?

11:26AM 20   A.   I believe so, yes.

11:26AM 21   Q.   No, this was even earlier in the day, the 18220 feet.  It

11:26AM 22   was early in the day of April 4th.

11:26AM 23         So did they use any tool to strengthen their wellbore

11:26AM 24   at 18220 feet after they did the GeoTaps in the lower sand and

11:27AM 25   before they drilled ahead?

**OFFICIAL TRANSCRIPT**

11:27AM 1    A.    At 18220, they did not attempt any wellbore strengthening,

11:27AM 2    no.

11:27AM 3    Q.    In your view, could a prudent operator have drilled ahead

11:27AM 4    at that point in this interval without asking for a waiver from

11:27AM 5    MMS?

11:27AM 6    A.    Absolutely not.  They should not have drilled another

11:27AM 7    foot.

11:27AM 8              The situation was aggravated by the fact that they

11:27AM 9    had hydrocarbons in the open hole.

11:27AM 10   Q.    Do you have information as to whether BP thought it would

11:27AM 11   be easier or harder to get a waiver in a hydrocarbon zone from

11:27AM 12   MMS?

11:27AM 13   A.    Their internal e-mails which I saw indicated that they

11:27AM 14   recognized that MMS would probably not grant a waiver in the

11:27AM 15   presence of hydrocarbons in the open hole.

11:27AM 16   Q.    Simple yes or no question.  Did BP drill ahead at 18220

11:27AM 17   feet?

11:27AM 18   A.    Yes, they did.

11:27AM 19   Q.    Before we move further, I have to ask you, if you were on

11:27AM 20   that rig, and you heard that the decision was made to drill

11:27AM 21   ahead at 18220 feet, at the pressure that BP, in fact, applied

11:28AM 22   when they drilled ahead, how would you have felt, Dr. Huffman?

11:28AM 23             MR. REGAN:  Your Honor, I object to the question.  The

11:28AM 24   witness, we're going to establish, has never been on a drilling

11:28AM 25   rig that's operating, and I don't think he has a basis to

**OFFICIAL TRANSCRIPT**

11:28AM 1   answer that question.

11:28AM 2        THE COURT:  I'll sustain that question.  You may be

11:28AM 3   able to try to rephrase it, but not the form it's in.

11:28AM 4        MR. SPIRO:  All right.

11:28AM 5                          EXAMINATION

11:28AM 6   BY MR. SPIRO:

11:28AM 7   Q.   To what extent do you believe, Dr. Huffman, that BP

11:28AM 8   departed from prudent industry safety practices when they

11:28AM 9   drilled ahead at 18220 feet?

11:28AM 10  A.   This was, in my view, beyond just imprudent.  It was

11:28AM 11  unsafe, and it was dangerous to drill ahead at 18220 feet.

11:28AM 12        With my experience monitoring wells from shore, which

11:28AM 13  I do routinely for clients, now that we have digital age of

11:28AM 14  information, I would have been very concerned for everyone on

11:29AM 15  that rig because the condition of the well was fragile and

11:29AM 16  dangerous at that point, and they should not have drilled ahead

11:29AM 17  at all.

11:29AM 18  Q.   So what happened next after they started drilling ahead at

11:29AM 19  18220 feet?

11:29AM 20  A.   They drilled another 40 feet, to 18260, and then lost

11:29AM 21  total returns of their mud.

11:29AM 22  Q.   What does that mean?

11:29AM 23  A.   That means that as they were pumping mud down from the

11:29AM 24  surface, they had no returns coming back to the rig because it

11:29AM 25  was being lost into open fractures in the rocks at the bottom

**OFFICIAL TRANSCRIPT**

11:29AM 1    of the well.

11:29AM 2    Q.    Let's show TREX 1220.

11:29AM 3          This is an e-mail from Bobby Bodek from April 13th.

11:29AM 4    Let's look at the flyout, first flyout.

11:29AM 5          What would you like to highlight from this?

11:29AM 6    A.    Mr. Bodek is documenting what I just stated, that they

11:29AM 7    drilled ahead through the reservoir interval to a depth of

11:29AM 8    18260 and, "upon pulling off bottom, we lost full returns and

11:30AM 9    had to shut in the well."

11:30AM 10   Q.    Let's go to the next flyout.

11:30AM 11         What would you like to highlight from this?  This is

11:30AM 12   further down the e-mail.

11:30AM 13   A.    There is a lot of numbers here.  Just to keep it simple

11:30AM 14   for the record, I want to note that Mr. Bodek is stating that

11:30AM 15   they had a downhole static mud pressure of 14.2 -- so that was

11:30AM 16   just enough to control the high pressure sand that was further

11:30AM 17   up the well -- and they had experienced static losses here

11:30AM 18   shown at the bottom with a 14.5 static density.

11:30AM 19         It's my view that their frac gradient was actually

11:30AM 20   lower than that 14.5.  So it was actually looking -- he's

11:30AM 21   quoting numbers that are .3 different, but I believe the actual

11:30AM 22   window was even smaller.

11:30AM 23         And he notes that, "It appears as if we had minimal,

11:30AM 24   if any, drilling margin."

11:30AM 25         Mr. Bodek is calling it correctly here.  He

**OFFICIAL TRANSCRIPT**

11:30AM 1    recognizes that the margin has been lost, and under no

11:31AM 2    circumstances should they have drilled forward at this point.

11:31AM 3    Q.    They didn't have a waiver from the .5?

11:31AM 4    A.    They did not.

11:31AM 5    Q.    Couldn't they have just repaired their fracture gradient

11:31AM 6    after they lost total returns in order to regain their margin?

11:31AM 7    A.    I don't believe so.  The concept of repairing your

11:31AM 8    fracture gradient becomes more difficult after you've had total

11:31AM 9    losses.  That's something that Mr. Alberty also confirmed in

11:31AM 10   his deposition, that that remedy is not easy to apply once

11:31AM 11   you've had total losses and open big fractures in the rock.

11:31AM 12   Q.    I want to go to TREX 4533, the final flyout for that

11:31AM 13   PowerPoint.

11:31AM 14          What would you like to highlight from this?  This is

11:31AM 15   a PowerPoint by who?

11:31AM 16   A.    By Randall Sant, who is a BP employees.

11:31AM 17          He notes here that they had a third lost circulation

11:31AM 18   event.  This is after the loss of total returns.

11:31AM 19   Q.    What was the date?

11:31AM 20   A.    This was, I believe, April 9, if I remember correctly.

11:31AM 21          The highlighted area says that they shut off the

11:32AM 22   pumps -- so they are not circulating the mud anymore, it's just

11:32AM 23   sitting in the hole -- and had initial static losses of

11:32AM 24   6 barrels per hour, which decreased to 1.2 barrels per hour.

11:32AM 25          So after they drilled to 18260, and they did their

11:32AM 1    remedies, they did a series of loss control materials to try

11:32AM 2    and heal the fractures, when they turned the pumps off, which

11:32AM 3    means the mud is a little lighter, they still were losing

11:32AM 4    returns.

11:32AM 5            So the well was still leaking on them at this point.

11:32AM 6    They had not healed the fractures.  They were still losing mud.

11:32AM 7    Q.   So we're at 18260 feet.  They are having these lost

11:32AM 8    returns.  Did they drill ahead?

11:32AM 9    A.   Yes.

11:32AM 10   Q.   Did they check with MMS first as to whether their drilling

11:32AM 11   margin was adequate to MMS?

11:32AM 12   A.   They did not.

11:32AM 13           THE COURT:  Just so I'll be clear, lost returns means

11:32AM 14   you're pumping mud into the well, and you're not getting the

11:32AM 15   same amount back, correct?

11:32AM 16           THE WITNESS:  Yes.  The generic term "lost returns" or

11:33AM 17   "losses" means you're not keeping the balance in your pits.

11:33AM 18   You're losing mud somewhere.

11:33AM 19           Total losses means that you're pumping it in and

11:33AM 20   nothing is coming back, which is a very dangerous condition,

11:33AM 21   Your Honor.

11:33AM 22                        EXAMINATION

11:33AM 23   BY MR. SPIRO:

11:33AM 24   Q.   In light of the data that you have seen, what do you

11:33AM 25   believe BP's margin was when it drilled ahead that final 100

**OFFICIAL TRANSCRIPT**

11:33AM 1    feet, from 18260 to 18360 feet?

11:33AM 2    A.    At best, it was .2, possibly smaller.

11:33AM 3    Q.    Did you see any expert report in this case that even

11:33AM 4    purported to contradict your claim that BP's final drilling

11:33AM 5    margin was no more than .2?

11:33AM 6    A.    I did not.

11:33AM 7    Q.    And whose expert reports did you read?

11:33AM 8    A.    Dr. Bourgoyne and Mr. Schoennagel.

11:33AM 9    Q.    That was tendered by what company?

11:33AM 10   A.    Those were BP's experts.

11:33AM 11   Q.    Did you review documents from BP representatives to find

11:33AM 12   their own views of the margin in this final interval?

11:33AM 13   A.    Yes.

11:33AM 14   Q.    Let's show TREX 4538.

11:34AM 15         Okay.  Now, this is -- explain what this document is.

11:34AM 16   A.    This is a Memorandum of Change, or MOC, as they are

11:34AM 17   called, which is an international BP document.

11:34AM 18   Q.    I believe the date is April 15th of 2010.

11:34AM 19   A.    That is correct.

11:34AM 20   Q.    Let's go to the flyout, which is still hard to read.  I'm

11:34AM 21   going to try to read this.  You tell me if I'm reading it

11:34AM 22   correctly.

11:34AM 23         "The model estimates the maximum ECD to be 14.583.

11:34AM 24   The FIT on the previous shoe was 16.  There have been two lost

11:34AM 25   circulation events in this whole section.  The first occurred

**OFFICIAL TRANSCRIPT**

11:34AM 1    when ECD exceeded 14.9 prior to drilling the pay sands.  The

11:34AM 2    second event, major losses, occurred ECD exceeded 14.7-plus."

11:34AM 3         ECD, is that downhole pressure?

11:35AM 4    A.   That is correct, while circulating the mud.

11:35AM 5    Q.   "Losses for this event were cured with Form-a-Set and mud

11:35AM 6    weight reduction.  Since that second event, we have been using

11:35AM 7    a 14.5 arbitrary frac gradient that we are attempting to abide

11:35AM 8    by based on actual circulating conditions we have put the

11:35AM 9    wellbore under since having issues and fixing them.  The cement

11:35AM 10   job has been designed to minimize the ECD as low as practical.

11:35AM 11   Foam cement, lightweight spacer, and a small-base oil spacer,

11:35AM 12   along with low pump rates, will be used together to keep ECD

11:35AM 13   below an acceptable level."

11:35AM 14        Did I read that right?

11:35AM 15   A.   I believe you did.

11:35AM 16   Q.   What is the significance of this document?  Why did you

11:35AM 17   cite this in your report?

11:35AM 18   A.   This is showing, again, clearly that they understood the

11:35AM 19   condition of the well at the bottom.  They are giving

11:35AM 20   themselves a little higher fracture gradient than I believe

11:35AM 21   they had.  They were quoting 14.5.

11:35AM 22        But it clearly shows that they understood that any

11:36AM 23   circulation of mud or other things, like cement, any fluid that

11:36AM 24   they circulate, would have to be done at low pump rates, which

11:36AM 25   keeps the pressure change when you're circulating as low as

**OFFICIAL TRANSCRIPT**

11:36AM 1    possible to avoid breaking down the rocks again.

11:36AM 2    Q.    There is a statement here about major losses occurring

11:36AM 3    when their downhole pressure exceeded 14.7.  Was this before or

11:36AM 4    after the GeoTap was taken that generated the estimated

11:36AM 5    fracture gradient of 14.35?

11:36AM 6    A.    This was after the GeoTaps were made available to them.

11:36AM 7    Q.    Is it reasonable to allow your well to have a downhole mud

11:36AM 8    weight of 14.7-plus in a hydrocarbon interval when you have a

11:36AM 9    measure of your fracture gradient of only 14.35?

11:36AM 10   A.    It is unsafe and dangerous, and I have never seen an

11:36AM 11   operator do this in my entire career.

11:36AM 12   Q.    So we're talking about two decisions, are we not?  We're

11:37AM 13   talking about a drill ahead decision at 18220 feet, and another

11:37AM 14   decision at 18260 feet, after they lost total returns.

11:37AM 15   A.    That is correct, in terms of drilling ahead, yes.

11:37AM 16   Q.    Are your views the same about the departure from prudent

11:37AM 17   drilling for both of those decisions?

11:37AM 18   A.    If you look at where they were at 18220, they had not yet

11:37AM 19   lost the total returns.  The well became even -- it was already

11:37AM 20   dangerous at 18220, in my view, unsafe and dangerous.  At

11:37AM 21   18260, that well was in a critical condition.  They had lost

11:37AM 22   total returns, and that well could have failed at any moment.

11:37AM 23         So the two decisions increased the level of risk and

11:37AM 24   danger as they drilled further down into the interval.

11:37AM 25   Q.    What do you say in response to the hypothetical point,

**OFFICIAL TRANSCRIPT**

11:38AM 1    well, at least they drilled to the bottom of the well without

11:38AM 2    blowing it up?

11:38AM 3              MR. REGAN:  Your Honor, I'm going to object to that

11:38AM 4    question.  I don't even know if it is a question.

11:38AM 5              THE COURT:  Well, why don't you rephrase that.

11:38AM 6              MR. SPIRO:  All right.

11:38AM 7                           EXAMINATION

11:38AM 8    BY MR. SPIRO:

11:38AM 9    Q.   It's just another way of saying, why is this relevant, all

11:38AM 10   of this relevant, given that the blowout took place on

11:38AM 11   April 20th?

11:38AM 12   A.   If you look at where they were in this bottom interval, at

11:38AM 13   18220 and below, at 18220 they knew that they had no margin to

11:38AM 14   drill and that the well was in critical condition.

11:38AM 15              Once they drilled past that, they were drilling

11:38AM 16   without permission from the MMS.  They had no permission to

11:38AM 17   continue to explore the Outer Continental Shelf of the

11:38AM 18   United States.

11:38AM 19              Now, I've been an explorationist my whole career.

11:38AM 20   It's part of what I do.  You don't do that.  You don't continue

11:38AM 21   to drill without permission from the government.

11:38AM 22              They did that.  They drilled forward to 18360, and

11:39AM 23   left the well in a critical condition, which, in my view as an

11:39AM 24   expert on this topic, left the well so delicate and so fragile

11:39AM 25   that anything else they did from that point forward had to be

11:39AM 1     done with extreme care at the risk of losing the well

11:39AM 2     completely.

11:39AM 3     Q.    Let's go to the expert report of Mr. Schoennagel.  This is

11:39AM 4     7411.  We've agreed only to look at a single paragraph of this,

11:39AM 5     the flyout from page 24.

11:39AM 6              I'll just read to you the parts beginning with the

11:39AM 7     second sentence.  "For the purposes of calculating a safe

11:39AM 8     drilling margin, the PIT obtained as required by 30 CFR 250.427

11:39AM 9     is not changed or updated to reflect any additional downhole

11:39AM 10    data.  The operator does not decrease the value of the PIT

11:39AM 11    obtained at a casing shoe because they drilled into a zone that

11:40AM 12    had lesser pressure integrity than was obtained at the shoe and

11:40AM 13    does not use the downhole data to define the regulatory safe

11:40AM 14    drilling margin."

11:40AM 15             Now, this was from an expert tendered by BP.  What is

11:40AM 16    your reaction to this statement?

11:40AM 17    A.    This statement on its face is absurd, and it flies in the

11:40AM 18    face of everything that I understand and know about not just

11:40AM 19    safe drilling practices, but about the basic physics of

11:40AM 20    drilling a well.

11:40AM 21             It is correct that the PIT stands as a measurement.

11:40AM 22    You don't change the PIT if you find out something further down

11:40AM 23    the hole.  But to then make the statement that you ignore the

11:40AM 24    downhole observations in understanding and defining your safe

11:40AM 25    drilling margin violates all of the rules, including the rules

11:40AM 1  of physics.

11:40AM 2          If I drill with a mud greater than that weakest

11:40AM 3  point, I will start to lose control of my well.  So I cannot

11:40AM 4  use the pressure integrity test if I have another observation

11:40AM 5  that tells me the rocks are weaker.

11:41AM 6  Q.    In light of this document, what is your reaction to the

11:41AM 7  way BP used formation tests and hole behavior observations in

11:41AM 8  drilling the Macondo well?

11:41AM 9  A.    BP played it fast and loose with their pressure integrity

11:41AM 10 tests, and yet when they had hole behavior observations that

11:41AM 11 were clearly valid, they tended to discount them and continue

11:41AM 12 to drill ahead without a safe margin.

11:41AM 13 Q.    Hypothetically, let's say you have a pressure integrity

11:41AM 14 test result of 15, 1-5, and you estimate your weakest fracture

11:41AM 15 gradient in the interval at 1-4, 14.  Your APD, your

11:41AM 16 application for permit to drill, says that you need a

11:41AM 17 .5 margin.  Can you drill ahead at a 14.5?

11:41AM 18 A.    There are two ways to answer that, counselor.  The first

11:41AM 19 is you're not going to be able to do it.  It won't work.

11:41AM 20          The second answer is, you can try it, but it won't

11:42AM 21 last very long because the rocks will begin to fail, and you

11:42AM 22 will lose total returns.

11:42AM 23          The physics says that that is the case.  If you throw

11:42AM 24 all the regs out, the physics is still there.  You can't drill

11:42AM 25 with mud weights significantly higher than the weakest rocks in

**OFFICIAL TRANSCRIPT**

11:42AM 1   the open hole.  The rocks will break.

11:42AM 2   Q.    So you said before that you are called upon sometimes to

11:42AM 3   advise clients about drill ahead decisions in tricky

11:42AM 4   situations.

11:42AM 5   A.    Yes.

11:42AM 6   Q.    Had BP asked you when they were at 18200 feet, say, what

11:42AM 7   to do, and they had said they were thinking about drilling

11:42AM 8   further, what would your advice have been?

11:42AM 9   A.    My advice have been, we're done, stop drilling now.

11:42AM 10          Keep in mind where they were at that point.  They had

11:42AM 11  a surface mud weight of 14.3 and downhole mud weights that were

11:42AM 12  higher.

11:42AM 13          I would have advised them at that point, stop

11:42AM 14  drilling, lower your surface mud weight to 14.0, which is what

11:42AM 15  they did later, and that would get your downhole pressures back

11:43AM 16  below your fracture gradient, but still slightly above the high

11:43AM 17  pressure sand.

11:43AM 18          So you regain stability of the wellbore.  That is the

11:43AM 19  primary directive once you encounter this kind of a situation.

11:43AM 20          Once that wellbore was stable, I would have

11:43AM 21  recommended to them that they put a casing string in to isolate

11:43AM 22  the high pressure sands further up the hole and get them

11:43AM 23  separated from the hydrocarbon sands to make sure that well was

11:43AM 24  stable and had integrity.

11:43AM 25  Q.    But that would have created a narrower wellbore, would it

**OFFICIAL TRANSCRIPT**

11:43AM 1    not?

11:43AM 2    A.   It would have, yes.

11:43AM 3         MR. SPIRO:  Your Honor, those are all of my questions.

11:43AM 4    I would move for these documents to be put into evidence.  I

11:43AM 5    can list them again by number now or --

11:43AM 6         THE COURT:  Well, you don't have to list them by number

11:43AM 7    now.  I want you to give us a list.

11:43AM 8         MR. SPIRO:  Okay.  You have the list.

11:43AM 9         THE COURT:  Are there any objections -- well, let's

11:43AM 10   wait until cross-examination, and then you can tender those,

11:43AM 11   okay.  Somebody will likely ask questions about them.

11:44AM 12        MR. DEGRAVELLES:  Your Honor, the individual plaintiffs

11:44AM 13   have no questions.

11:44AM 14        THE COURT:  What about Alabama?

11:44AM 15        MR. MAZE:  Alabama has no questions.

11:44AM 16        THE COURT:  Louisiana?

11:44AM 17        MR. KANNER:  No questions, Your Honor.

11:44AM 18        THE COURT:  Okay.  We're on to Transocean.

11:44AM 19            Probably we'll have to break, I'll just advise

11:44AM 20   you, Mr. Miller.  I'm not trying to interrupt you, but maybe

11:44AM 21   we'll be at a natural point.  But I do have to recess right at

11:44AM 22   about noon.  I need to make a phone call.

11:44AM 23        MR. MILLER:  Judge, would it make sense to recess now?

11:44AM 24   Given the thoroughness of Mr. Spiro's examination, I could use

11:44AM 25   the break to maybe cut down.  I mean, I don't have a long

**OFFICIAL TRANSCRIPT**

11:44AM 1    cross-examination, but it might get even shorter.

11:44AM 2              THE COURT:  It's quarter to twelve.  Let's come back at

11:44AM 3    one o'clock, okay.

11:44AM 4              MR. MILLER:  Sounds good.  Thank you.

11:45AM 5              (WHEREUPON, at 11:45 a.m., the Court was in luncheon

6    recess.)

7                                  *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

1                    REPORTER'S CERTIFICATE

2

3      I, Cathy Pepper, Certified Realtime Reporter, Registered

4  Merit Reporter, Certified Court Reporter of the State of

5  Louisiana, Official Court Reporter for the United States

6  District Court, Eastern District of Louisiana, do hereby

7  certify that the foregoing is a true and correct transcript to

8  the best of my ability and understanding from the record of the

9  proceedings in the above-entitled and numbered matter.

10

11

12                              *s/Cathy Pepper*_____

13                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
14                              Registered Merit Reporter
                                Official Court Reporter
15                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
16

17

18

19

20

21

22

23

24

25

                           **OFFICIAL TRANSCRIPT**