**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| Applies to: | * | JUDGE BARBIER |
| *No. 12-970, Bon Secour Fisheries, Inc.,* | * | |
| *et al v. BP Exploration & Production* | * | MAGISTRATE SHUSHAN |
| *Inc., et al.* | | |

## ORDER & REASONS

Before the Court is the **Motion of the Special Master for Return of Payments Made to Casey C. Thonn and Others (Rec. Doc. 12107)**; BP Exploration and Production, Inc., BP America Production Company, and BP p.l.c. (collectively, "BP")'s response to join the Special Master's motion (Rec. Doc. 12336); AndryLerner, LLC, Jon Andry, and Glen Lerner (collectively, "AndryLerner")'s Response to the Special Master's motion (Rec. Doc. 12348) and the Special Master's Response thereto (Rec. Doc. 12411); Casey Thonn ("Thonn")'s Response (Rec. Doc. 12593) and the Special Master's Reply thereto (Rec. Doc. 12612); Lionel H. Sutton, III ("Sutton")'s Motion to Dismiss (Rec. Doc. 12339) and the Special Master's response thereto (Rec. Doc. 12412); Coastal Claims Group, LLC ("CCG")'s Motion to Dismiss (Rec. Doc. 12423-3), the Special Master's Response thereto (Rec. Doc. 12451), CCG's reply (Rec. Doc. 12605-3) and the Special Master's response (Rec. Doc. 12616-2); and the Special Master's Supplemental Memorandum (Rec. Doc. 12422). Having considered the motion and memoranda of counsel, the record, and the applicable law, the Court finds that the Special Master's motion should be **GRANTED** for the reasons set forth more fully below.

<u>**FACTS AND PROCEDURAL BACKGROUND**</u>

**A. Background Regarding the Settlement and the Special Master**

On December 21, 2012, this Court approved the *Deepwater Horizon* Economic and Property Damages Settlement Agreement ("Settlement Agreement"), a class action settlement. (Rec. Doc. 8139) The *Deepwater Horizon* Court Supervised Settlement Program ("Settlement Program") implements and administers the Settlement Agreement. On July 2, 2013, the Court appointed a Special Master pursuant to Federal Rule of Civil Procedure 53 to investigate allegations of misconduct within the Settlement Program. On September 6, 2013, the Court directed the Special Master to examine and investigate any past or pending claims submitted to the Settlement Program and to initiate legal action to clawback funds paid out on fraudulent claims. (Rec. Doc. 11288)

**B. Background Regarding Thonn's  Claims**

In March 2011, Thonn filed a claim with the Gulf Coast Claims Facility ("GCCF") through his then-attorney, Sutton. He submitted what purported to be his 2009 tax return and an amended 2009 return with that claim. These returns, which were prepared less than two weeks prior to the filing of Thonn's GCCF claim, were prepared by a paid preparer at Otis Income Tax, Inc. ("Otis").[1] The 2009 tax return that Thonn submitted with his claim included a Form 1040 reflecting that he was unemployed and a Schedule C indicating $156,000 in business income as a fisherman. A 2009 Form 1040x that amended the tax liability of Thonn, but not his business income, was also attached, but curiously, the amendment is dated with the same date as the Form 1040. (Rec. Doc. at 13-15) According to this return, Thonn incurred a tax liability of $15,557 that he never paid. (Rec. Doc. 12107-2, p. 48).  Thonn also submitted his 2010 returns which included a 2012 Form 1040 and

---

[1] Thonn's claim to the GCCF was filed on March 28, 2011 and the tax forms that he filed with the claim were dated March 16, 2011. (Rec. Doc. 12612-3, pps. 13-15)

Schedule C. In December 2010, the GCCF investigated Thonn's claims based on their suspicion that he was not actually a fisherman due to the fact that his 2009 Form 1040 stated that he was unemployed. (Rec. Doc. 12348-2) After conducting an investigation, the investigator seems to have concluded that the "unemployed" notation was simply a mistake and that the preparer should have put "self-employed" and that no fraud occurred. Id.

In April 2012, Thonn retained AndryLerner as his counsel, and on June 24, 2012 they filed claims on behalf of Thonn with the *Deepwater Horizon Economic Claims Center* ("DHECC") under the Seafood Compensation Program as a vessel owner (Claim 19690) and as a vessel captain (Claim 19691), along with one other claim using the same documentation that was submitted with the GCCF claim.[2] Prior to submitting the claims to the DHECC, AndryLerner retained CCG to prepare a report for Thonn's claims. The Forensic Analysis and Report created by CCG is based, in part, on Thonn's purported 2009 federal tax returns (described above), his 2010 federal tax return and a 2010 Schedule C, and declarations or affidavits from persons who had allegedly purchased shrimp from Thonn.  Several of these "affidavits" were either unsigned or completely vague as to what was purchased, or both. (Rec. Doc. 12107-2, pps. 21-31) Thonn's claim was processed and, around February 28, 2013, the DHECC paid Thonn $166,652.10 on Claim 19690 and $90,350.25 on Claim 19691. The funds were received by Thonn's counsel, AndryLerner. AndryLerner deducted its fees from the amount, and gave the balance to Thonn. Of the attorney's fees taken from the claim award, Sutton received about $35,700.23 as a "referral fee" based on his prior representation of Thonn.[3]

---

[2] Only claims 19690 and 19691 are at issue in this motion.

[3] Thonn claims that he had no knowledge that Sutton received payment in connection with his claim until the instant motion was filed.

CCG also billed AndryLerner in the amount of $20,182.50 for its services.[4]

### C. Investigation of Thonn's Claims by the Special Master

Pursuant to the Court's September 6, 2013 Order, the Special Master investigated Thonn's claims and, on November 6, 2013, issued a show cause order to Thonn. The next day, the Court issued another show cause order directing Thonn to sign a release allowing the Special Master to access Thonn's IRS records and directing Thonn to produce documentation of the kind that claimants use to support their claims under the Seafood Compensation Act. Thonn did not respond to the latter request, but he did sign a release, and the Special Master subsequently reviewed Thonn's IRS records.

The IRS records show that the only 2009 tax document that Thonn filed with the IRS was a different Form 1040A indicating that he was unemployed with no income, and that it was filed on April 1, 2010, prior to the Deepwater Horizon Oil Spill ("the Spill"). (Rec. Doc. 12612-1) According to this tax return, Thonn was owed a refund of $2,726. (Rec. Doc. 12612-1, p.2) The 2009 Form 1040, 2009 Schedule C reflecting Thonn's purported $156,000 business income, and the Form 1040X, all of which he submitted to the DHECC, were never filed with the IRS, and Thonn never paid the tax liability due on his purported return. (Rec. Doc. 12107-3, 4) The IRS records further show that the 2010 documents submitted to the DHECC were also not filed with the IRS at the time they were submitted, but that those returns were eventually filed in 2012.

Thonn claims that he was unaware that the returns that he filed with the GCCF and DHECC were never filed with the IRS, and nothing on the face of the returns would cause him to question whether they had been filed because Otis Favre had signed the certification on the return, and the

---

[4] CCG avers that it has not yet been fully compensated by AndryLerner for its services in connection to Thonn's claim.

absence of other signatures is not troubling because no such signatures appear when a return is electronically filed. Thonn further explains that the multiple returns could be the result of mere confusion because two different preparers at Otis worked on the two different returns. Thonn's claims are refuted by the forms themselves, however. For example, the 2009 Form 1040X submitted with Thonn's claim makes reference to the tax refund for Thonn from the 2009 Form 1040A that was filed with the IRS. (Rec. Doc.12612-2, p. 1) Thonn's tax preparer was unable to explain the discrepancies in the returns and was unable to tell the Special Master if any of the returns had ever been filed. Further, Thonn's former spouse, who was a joint filer on the 2009 returns, confirmed that Thonn was unemployed in 2009 and that she filed the 2009 Form 1040A that was actually received by the IRS. (Rec. Doc. 12107-6, p. 3, ¶ 5)

Based on these findings, the Special Master initiated the instant clawback proceeding.

## PARTIES' ARGUMENTS

### A. The Special Master's Arguments

The Special Master's motion, which was filed in compliance with this Court's September 6, 2013 Order, is straightforward. He first asserts that the Court should order Thonn to make restitution for the funds received in connection with claims 19690 and 19691 because the claims were fraudulent. In addition to seeking restitution from Thonn, the Special Master also seeks restitution from AndryLerner, Sutton, and CCG (collectively, the "Claim Participants"). He bases the right to restitution from the Claim Participants not on any allegation that they committed fraud or even knew of the fraud, but rather on notions of "equity and good conscience." He contends that, because the Claim Participants all received their fees based on contingency agreements, they have no right to retain their fees if the award is later revoked because their payment hinges on the success of the

claim.

**B. Arguments Against Motion**

**1. Thonn Did Not Commit Fraud**

Both Thonn and AndryLerner argue, as they have argued before, that the Special Master cannot act as both a fact finder and as an advocate. Further, both parties argue that the Court must conduct an evidentiary hearing to determine whether Thonn committed fraud before the Court may order any clawback payments. Thonn and AndryLerner contend that a hearing is necessary in part because the affidavit of Lloyd Day on which the Special Master relies is hearsay, thus is unable to be relied on by the Court in concluding that Thonn committed fraud. In support of their contention that it is reasonable to determine that no fraud was committed, AndryLerner and Thonn point to several factual issues, which are summarized above, and to the fact that GCCF's hired investigators believed that Thonn's claims were reasonable after they conducted an earlier investigation.

**2. Even if Thonn Committed Fraud, the Court Lacks Jurisdiction Over Him**

Sutton argues that restitution cannot be sought from Thonn, let alone from Sutton, because the Court lacks personal jurisdiction over Thonn because the Settlement Agreement only states that the Court will have "continuing and exclusive jurisdiction over the Parties and their Counsel," and Thonn is not a Party as defined in the Settlement Agreement. Sutton admits, however, that under Section 18.1, the Court has jurisdiction over Economic Class members and their counsel, but he avers that the Special Master's motion does not allege that Thonn is a member of that class and there is no allegation that Sutton was ever his counsel while he was a class member.

**3. Even if Thonn May Be Ordered to Repay the Funds, AndryLerner Cannot Be Ordered to Make Restitution**

AndryLerner argues that, even if it is found that Thonn committed fraud, existing case law

does not allow the Court to enter a judgment requiring an attorney to return his earned fees without an express finding by the Court that the attorney participated in the fraud. AndryLerner cites to several cases in support of this contention, including <u>Martin v. Lenahan</u>, 658 So.2d 119 (Fl. 4th DCA 1995), wherein a court found tha, when a plaintiff received a settlement in a medical malpractice case, but was later discovered to have committed criminal fraud in connection with the malpractice suit, the fraudulent party's attorney did not have to pay restitution from the fees received from the settlement because the attorney played no role in the fraud.

### 4. Even if Thonn and/or AndryLerner May Be Ordered to Repay the Funds, Sutton Cannot Be Ordered to Make Restitution

Sutton insists that the Special Master's motion is improper because: (1) the motion does not name Sutton, (2) the Special Master failed to comply with the requirements of Section 18.2 prior to filing his Motion, making it premature, and (3) there was insufficient process and service of process. Even if he was named in the motion as is required, Sutton argues that he cannot be required to return the funds that he received because his law firm did not assist Thonn in submitting his claims to the DHECC as he had already disengaged Thonn as a client when the claim was filed. Instead, Sutton points out that he was only paid based on the settled law that "when an attorney representing a client under a contingency fee contract is discharged and the client retains another attorney under a contingency fee contract, the fee is divided between the two attorneys on 'quantum meruit' basis. (Rec. Doc. 12339-1, p. 4 <u>referencing</u> <u>Saucier v. Hayes Dairy Products, Inc.</u>, 373 So.2d 102 (La. 1978)). Sutton argues that even when the initial attorney is disqualified from representing the client, or even if the initial attorney is disbarred, the LSBA Rules of Professional Conduct Committee has opined that the subsequent attorney must still pay the initial attorney for the services that he

rendered. Public Opinion 12-RPCC-018.

Finally, Sutton argues that, even if restitution is ordered, the Special Master may not recoup more that the DHECC paid, and it appears in the motion that they seek to recover in excess of that amount.

**5. As a Third Party to this Litigation, CCG Cannot Be Ordered to Make Restitution**

**a. The Court Lacks Jurisdiction and the Motion Denies CCG Due Process**

CCG argues that the instant motion is procedurally improper and that CCG has been deprived of due process because it is not a party to the BP litigation, it has never been a party, it has not been sued by DHECC or the Special Master, and it has not been alleged to have committed any wrongdoing. CCG contends that the Court lacks jurisdiction over CCG under the Settlement Agreement because CCG is merely an expert/third party that assisted in the preparation of claims and the Special Master only supports his motion with cases where defendants were liable for restitution. Further, CCG avers that it cannot be subjected to this motion because the DHECC never paid CCG any funds directly. CCG cites to SEC v. Ross, 504 F.3d 1130 (9th Cir. 2007) where the Ninth Circuit would not allow a Receiver to disgorge $21 million in commissions on the sales of unregistered securities because the sales agent was a third party who was named in the motion, but not a named defendant in the litigation. Ross, 504 F.3d at 1135.

**b. Even if the Motion is Proper, CCG is Not Substantively Liable to Make Restitution**

CCG argues that even if it may be subjected to the instant motion, the motion fails because "restitution" is not a cause of action, but rather is merely a remedy, and because the motion does not properly allege fraud. Further, the motion does not state a claim for unjust enrichment. CCG asserts

8

that the elements of an unjust enrichment claim are: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the resulting impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) the lack of another remedy at law. Commercial Union Ins. Co. v. CBC Temp. Staffing Servs., Inc., 2004-0854 (La. App. 1 Cir. 11/3/04), 897 So. 2d 647, 651 writ denied, 2005-0221 (La. 4/8/05), 899 So. 2d 12 and writ denied, 2005-0252 (La. 4/8/05), 899 So. 2d 13. Further, CCG claims that Louisiana courts have held that, when a party seeks restitution under a theory of unjust enrichment and "the party receiving the money payment has disposed of it, in good faith at the time of disposal, the payor may not follow it into the hands of third parties." Great Am. Indem. Co. v. Dauzat, 157 So. 2d 308, 311 (La. Ct. App. 1963) Here, CCG argues that even if the Court were to determine that AndryLerner should have to return the funds it received, the Court cannot clawback the payments made to CCG because CCG is a third party and AndryLerner paid them with the funds in good faith. Similarly, CCG also claims that under La. Civ. Code Art. 2299, a payee who has received payment is only bound to restore it to the person from whom he received it—meaning that CCG would only have to return funds to AndryLerner who does not seek such payment at this time. Finally, CCG argues that the Special Master recognizes that CCG itself committed no fraud.

## DISCUSSION

### A. The Court Has Jurisdiction over Thonn, Andry Lerner, Sutton, and CCG and the Instant Motion is Proper

The parties submit that the Court does not have jurisdiction over them and that the Special Master is required to file a separate complaint against them, rather than a motion. Such arguments raise the issue of whether this Court has subject matter jurisdiction over the instant issues and whether the Court has personal jurisdiction as a matter of process, rather than as a matter of power.

### 1. Subject Matter Jurisdiction

Pursuant to the Settlement Agreement and the Order and Judgment approving same, this Court retains ongoing and exclusive jurisdiction and supervision over the Settlement Program. Settlement Agreement §§ 4.3.2, 4.4.7, 38.41; Order and Judgment ¶¶ 9, 17, Rec. Doc. 8139.  The Court similarly has continuing jurisdiction over the implementation, administration, and enforcement of the Settlement Agreement. Settlement Agreement § 18.1; Order & Judgment ¶¶ 9, 17.  Furthermore, the Court has jurisdiction over counsel who represent claimants in the Settlement Program.[5]  Even the name of the Settlement Program reflects the Court's continuing jurisdiction: "Deepwater Horizon ***Court Supervised*** Settlement Program." Settlement Agreement § 4.1 (emphasis added). Because the Special Master's motion concerns the administration, implementation, and enforcement of the Settlement Agreement and Program, a claimant (Thonn) and his claims, the claimant's attorneys' and their law firms (AndryLerner and Sutton), the firm used to prepare the claims at issue (CCG)[6], and a determination as to whether claim funds should be returned, the Court has subject matter jurisdiction.

It is irrelevant that Sutton was not Thonn's attorney at the time that the claim was filed, and that AndryLerner did not represent Thonn when the tax returns were created because the Settlement Agreement does not impose any temporal requirements in making the finding that an attorney has submitted to the Court's jurisdiction by representing a claimant. To hold otherwise would lead to absurd and unjust results that would allow attorneys to represent a claimant up until the filing of the

---

[5] Settlement Agreement § 18.1 ("[E]ach member of the Economic Class . . . and their Counsel are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to this Agreement." (emphasis added))

[6] CCG admits that it was formed with the sole purpose of preparing claims to be submitted to the DHECC. (Rec. Doc. 12423-3, p. 3)

claim, at which point he or she could withdraw to avoid the Court's jurisdiction. Or, in the inverse, if an attorney is only considered the claimant's counsel when he or she is the attorney at the time of the filing, the attorney would be able to circumvent all responsibility to examine the documents for fraud and accuracy. In fact, by arguing that he is entitled to half of the attorneys' fees resulting from the Thonn claims, Sutton impliedly asserts that he is fifty per cent responsible for the claim that was filed and that he largely participated in compiling the information that was submitted to the DHECC. The Court will not allow Sutton to argue that he has no responsibility for the claim in the same breath in which he argues that he is entitled to half of the attorney's fees. Sutton's claimed financial interest in Thonn's claims subjects Sutton to the jurisdiction of the Court.

The fact that separate civil proceedings were not instituted against Sutton, AndryLerner, CCG, and Thonn does not deprive the Court of subject matter jurisdiction. In the post-trial context,[7] it is not uncommon for special masters to perform functions that are "quite unlike the traditional role of judicial officers in an adversary system." Fed. R. Civ. P. 53, Advisory Committee Note, 2003 Amendments; 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 2602.1 at 548 (3d ed. 2008).[8] The Advisory Committee Note specifically mentions "investigation" as an appropriate use of a post-trial master. "Reliance on a master also may be appropriate when a complex decree requires administration or complex policing . . . ." Wright & Miller, *supra*. Here, the duties for which the Special Master was initially appointed to, *inter alia*, investigate were

---

[7] The Settlement Program and Settlement Agreement are certainly post-trial matters, as they resolved a class action filed with this Court.  See Bon Secor Fisheries, Inc. v. BP Exploraiton & Production Inc., Civ. A. No. 12-970; 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2605 at 580-83 (3d ed. 2008).

[8] See also Ruiz v. Estelle, 679 F.2d 1115, 1161-62 (5th Cir. 1982), *amended in part*, 688 F.2d 266 ("Insofar as the special master is to report on TDC's compliance with the district court's decree and to help implement the decree, he assumes one of the plaintiffs' traditional roles, except that, because he is the court's agent, he can and should perform his duties objectively.").  Courts also have inherent authority beyond Rule 53 "to provide themselves with appropriate instruments required for the performance of their duties."  In re Peterson, 253 U.S. 300, 312 (1920).

expanded to include an examination and investigation of  "any past or pending claims submitted to the CSSP which are deemed to be suspicious" and to "initiate legal action to "clawback" the payment of any fraudulent claims [...] in a manner which does not delay or impede the payment of legitimate claims." (Rec. Doc. 11288) Such duties were added to the Special Master's responsibilities as a necessary step to ensure the integrity of the Settlement Program and because the investigation could not be effectively and timely addressed by an available judge or magistrate judge. See Fed. R. Civ. P. 53(a)(1)(C). Therefore, even though the instant motion may not resemble a "case or controversy" in the typical sense, the Court has subject matter jurisdiction.[9]

### 2. Service/Personal Jurisdiction

Some of the Claim Participants contend that the instant motion is improper because no complaint has been filed against them, nor have they been served with a summons and a copy of the complaint as required by Federal Rule 4(c)(1). Initially, the Court notes that such actions are not necessary because the Special Master has not commenced a new action against the parties, but rather has sought post-trial review of a payment made to Thonn by the DHECC. Therefore, as a complaint has not been filed, the formalities that accompany the filing of a complaint need not be followed. However, out of an abundance of caution, the Court will address the parties' claims regarding service and personal jurisdiction.

Even assuming that service is required, the Court finds that there has been no denial of due process in this instance. The parties' arguments raise the issue of whether the Court has personal

---

[9]  Additionally, the Court notes that parties may object to the Special Master's report—as they have all done–and any findings by the Special Master are reviewed by the Court de novo.  See Fed. R. Civ. P. 53(f).  Likewise, the sanctions recommended by the Special Master are just that: recommendations.  See Fed. R. Civ. P. 53(c)(2).  The decision to act on these recommendations remains with the Court.  This provides procedural and substantive protections to the parties.

jurisdiction over the parties as a matter of process, as distinguished from whether the Court has personal jurisdiction as a matter of power. See generally McGuire v. Sigma Coatings, Inc., 48 F.3d 902, 906-07 (5th Cir. 1995) (distinguishing concepts).[10]  Personal jurisdiction flows from the Due Process Clause of the Constitution.  Omni Capital Int'l v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104 (1987).  "Due process, it must be remembered, is a flexible concept, and the procedures that will suffice to accord a person due process vary 'according to specific factual contexts.' Hanah v. Larch, 363 U.S. 420, 442 (1960); see also Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 895 (1961) ('The very nature of due process negates any concept of inflexible procedures applicable to every imaginable situation.')." Hazeur v. Keller Indus., 983 F.2d 1061, 1993 WL 14973, at *6 (5th Cir. 1993) (unpublished per curiam).  In the absence of extraordinary circumstances, procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest. Eash v. Riggins Trucking Inc., 757 F.2d 557, 570 (3d Cir. 1985) (en banc). "The form which those procedural protections must take is determined by an evaluation of all the circumstances and an accommodation of competing interests." Id. (citations omitted); Skinner v. White, 505 F.2d 685, 690 (5th Cir. 1974) (noting that "what constitutes 'reasonable notice' varies depending on the factual context").

The action contemplated in the Special Master's motion is in the nature of proper administration of the Settlement Program that is under the Court's exclusive control and jurisdiction. Furthermore, the recommended action arises from a claimant's fraudulent submission of claims and

---

[10]  Assuming no procedural defects, the Court has personal jurisdiction, as a matter of power, over Sutton, AndryLerner, and CCG, for essentially the same reasons discussed above regarding subject matter jurisdiction:  When each party voluntarily involved themselves in the BP litigation, whether it be through representing a client with a claim against BP or by providing accounting services for claims made to the Settlement program over which the Court maintains ongoing and exclusive jurisdiction—they submitted themselves to the personal jurisdiction of the Court. .

an attempt to recover the fruits of that claim from all parties who benefitted therefrom. The Court's power to order equitable remedies as a result of fraudulent conduct is a broad, flexible, and long-standing power. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944)(rev'd on other grounds)(discussed *infra*). Further, as the attorneys for a claimant to the DHECC, as is the case with Sutton or AndryLerner, or as the accountant for claimants to the DHECC, as is the case with CCG, it is reasonable to expect to be hauled into the Court that exercises exclusive jurisdiction over the DHECC.[11] Though Sutton only represented Thonn when he made claims to the GCCF, the two are sufficiently related so as to make it reasonable to expect to be brought into this Court, and Sutton even claims a fifty per cent interest in the attorney's fees earned from Thonn's DHECC claim. Even more importantly, each party received notice of the motion and was given ample opportunity to be heard, as evidenced by the simple fact that all of the parties filed responses to the instant motion.[12] Accordingly, the Court finds that its assertion of personal jurisdiction over Thonn, Sutton, AndryLerner, and CCG does not create due process concerns and does not offend traditional notions of fair play.

**B. The Special Master's Motion Employs the Proper Procedure to Seek Restitution**

    Initially, the Court notes that the instant motion is proper under the terms of the Settlement

---

[11] This is not a case where a general accounting firm undertook the responsibility of preparing a few claims to be submitted to the DHECC. Kevin Ingram, the Vice President of Operations for CCG, asserts himself that "CCG was formed with the Louisiana Secretary of State on March 18, 2012 *for the purpose of assisting attorneys and law firms in calculation the economic losses of individuals covered by the Settlement Agreement reached between BP and the plaintiffs in this litigation.*" (Ingram Affidavit, Rec. Doc. 12423-4, p. 1. ¶ 2)(emphasis added).

[12] CCG, the entity that is arguably the most removed from Thonn's claim, was served with a copy of the Motion by the U.S. Marshals. (Rec. Doc. 12329). The motion was also sent by electronic mail to the attorneys for Thonn, Jon Andry, Glen Lerner, Sutton, and CCG.  See I.A.M. Nat. Pension Fund, Ben. Plan A v. Wakefield Indus., Inc., Div. of Capehart Corp., 699 F.2d 1254, 1260 (D.C. Cir. 1983)(in the context of a contempt motion, the court recognized that service the motion by mail was permitted for parties, but that "service of the type initially required to obtain jurisdiction over a party" may be required for nonparties.  Here, CCG is the only *arguable* nonparty, as it is not a claimant or an attorney for a claimant; therefore, the Special Master took extra steps to ensure that CCG was personally served by the U.S. Marshals with the motion.

Agreement, which states that "[a]ny disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Agreement and the Release shall be made ***by motion*** to the Court. Settlement Agreement, § 18.1 (emphasis added). Further, the Court finds that in the context of post-trial relief, the filing of a separate complaint has not historically been required when the movant seeks to reverse a judgment obtained through fraud, thus is not required in this instance. In Hazel-Atlas Glass Co, the Supreme Court first recognized that "[f]rom the beginning there has existed [...] a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments." Hazel-Atlas Glass Co., 322 U.S. at 244. The Court went on to emphasize the flexibility of such equitable relief, noting that those "who have sought to invoke this equity power customarily have done so by bills of review or bills in the nature of bills of review,[13] or by original proceedings to enjoin enforcement of a judgment," and that courts exercising this equitable power have done so in a variety of ways, including "setting aside the judgment to permit a new trial, altering the terms of the judgment, or restraining the beneficiaries of the judgment from taking any benefit whatever from it." Id. at 245; Martin v. Lenahan, 658 So. 2d 119, 120 (Fla. Dist. Ct. App. 1995) (recognizing the use a motion as a way to seek relief from judgment). Further, under the modern rules, motions filed pursuant to Federal Rule of Civil Procedure 60 are frequently used to reverse a judgment obtained by fraud. See Fed. R. Civ. Pro. 60. In Hazel-Atlas Glass Co, the Court de-emphasized the importance of the procedure used so long as "the net result [...is that] the court has, in some manner, devitalized the judgment." Hazel-Atlas Glass Co., 322 U.S. at 245.

---

[13] Black's Law Dictionary defines a bill in the nature of bills of review as "[a] postjudgment bill of review filed by someone who was neither a party to the original suit nor bound by the decree sought to be reversed." BILL, Black's Law Dictionary (9th ed. 2009)

Here, as was noted before, this is clearly a post-trial proceeding as the Settlement Agreement resolved the class action suit filed against BP; thus any post-trial discovery of fraud would be grounds to apply equitable principles to reverse the decision made concerning the funds paid to Thonn. Further, the Special Master's motion is similar to the bill in the nature of bills of review referenced by the Supreme Court in Hazel-Atlas Glass Co. in that it is a legal action, that is different than an entirely new complaint, wherein a person who was not "a party to the original suit nor who is bound to the decree," seeks review of the result. BILL, Black's Law Dictionary (9th ed. 2009). Thus, the Special Master's actions are analogous to historical methods for seeking relief from a judgment obtained through fraud; and, even if the instant motion is not precisely the same, such is not relevant in light of the fact that the exact mechanism is not the most important aspect. The most important goal in such action is that the Court is able to devitalize the judgment, which is precisely what will result from this motion.

## C. Finding of Fraud and Necessity of an Evidentiary Hearing

AndryLerner and Thonn contend that Thonn did not commit fraud and that they are entitled to an evidentiary hearing on this issue because that decision may not be based solely on the briefing of the parties. Specifically, they argue that the affidavit of Lloyd Day is inadmissible hearsay, and the other papers submitted by the Special Master present conflicting evidence and credibility issues that can only be addressed through an evidentiary hearing. The Special Master contends that the fact and credibility issues raised by Thonn and AndryLerner do not affect the fact that Thonn submitted unfiled tax returns to support his claim, and that fact alone is sufficient grounds to clawback the funds paid on Thonn's claims.

No party presents the Court with legal support for their position, and case law regarding the

necessity of an evidentiary hearing does not provide the Court with much aid beyond providing that courts have wide latitude in making the decision to hold an evidentiary hearing. Moran v. Kingdom of Saudi Arabia, 27 F.3d 169, 171 (5th Cir. 1994)("The court's denial of an evidentiary hearing is subject to an abuse of discretion standard of review.) Given the novel and complex nature of this multi-district litigation, the Court cannot expect to find any case directly on point with the instant facts; however, in reviewing various cases that considered the necessity of an evidentiary hearing, the Court finds that such hearings are most often granted when the material facts are in dispute. Itochu Int'l, Inc. v. M/V SUNDERLAND, No. 00-980, 2002 WL 318327 (E.D. La. Feb. 26, 2002) (noting that, "although this court has the inherent power to enforce an agreement to settle a case before it *summarily,* when opposition to enforcement is based not on the merits of the claim but on a challenge to the validity of the agreement itself, the parties must be allowed an evidentiary hearing on ***disputed issues*** of the validity and scope of the agreement.") (internal citations omitted, emphasis added); Goodman v. Lee, No. 85-2966, 1990 WL 15259 (E.D. La. Feb. 13, 1990)(faced with an affidavit that was disputed by the opposing party, the court ordered an evidentiary hearing to determine whether fraud was committed so as to merit relief from judgment under Rule 60.); In re Wellington Res. Corp., 23 B.R. 596, 598 (Bankr. N.D. Tex. 1982)(State of Texas brought an application to release funds in a bankruptcy case alleging that the Debtors fraudulently acquired funds from investors. The bankruptcy court found that the State of Texas's "pleadings are clear and unequivocable as to the necessity for a evidentiary hearing to determine the allegations of fraud."). To the contrary, where the material facts before the court are uncontroverted, no evidentiary hearing has been necessary. James v. Frame, 6 F.3d 307, 310 (5th Cir. 1993)(despite general rule requiring evidentiary hearing when awarding non-liquidated damages resulting from a default judgment [...]

17

It was appropriate for a court that had familiarity with the litigation to forego a hearing when awarding punitive damages after a default judgment.); Douglas v. Timex Corp., BTX, Inc., No. 98-985, 1998 WL 34072739 (S.D. Tex. Dec. 30, 1998)(in considering the validity of an arbitration agreement, "an evidentiary hearing is not necessary because this matter can be resolved from the undisputed facts and exhibits submitted by the parties.") In James, in the context of a proceeding to award punitive damages after a default judgment was entered, the Fifth Circuit explained that an evidentiary hearing is often necessary when an issue " arises early in the proceedings, [...] when the court has received little substantive evidence." The Fifth Circuit explained that this concern is relieved when "plentiful evidence on the appellant's conduct has been received [...and t]he district judge, himself, has maintained a long and close familiarity with the issues in this matter." James, 6 F.3d at 310.

    Here, if an evidentiary hearing were held, it would be confined to the issue of whether Thonn submitted fraudulent documentation in support of  his claims to the DHECC. The Special Master has submitted uncontroverted evidence that the returns that were submitted with Thonn's claims and that provided the basis for CCG's report were never filed with the IRS. (Rec. Doc. 12107-3, p. 2; Rec. Doc. 12612) Rather, the IRS report regarding Thonn's 2009 filings shows that he filed a return stating that he was unemployed and had no income. Thonn has not submitted any evidence to controvert the Special Master's evidence on this point, and has made almost no attempt to explain the 2009 return that was filed with the IRS, beyond arguing that the multiple returns could be mere confusion because two different preparers at Otis worked on the two different returns. The Court finds, however, that such claims are refuted by the returns themselves, however. For example, the 2009 Form 1040X submitted with Thonn's claim makes reference to the tax refund for Thonn from

the 2009 Form 1040A that was actually filed with the IRS. (Rec. Doc.12612-2, p. 1) Further, Thonn's tax preparer was unable to explain the discrepancies in the returns, and was unable to tell the Special Master if any of the returns had ever been filed. Further, Thonn's former spouse, who was a joint filer on the 2009 returns, confirmed that Thonn was unemployed in 2009 and that she filed the 2009 Form 1040A that was actually received by the IRS. (Rec. Doc. 12107-6, p. 3, ¶ 5)

Rather than address the 2009 Form 1040A that was actually filed with the IRS, and then not brought to the attention of the GCCF or DHECC, Thonn makes vague arguments in his memorandum–which are copied directly from AndryLerner's brief–that hypothetically question the facts set forth by the Special Master. For example, Thonn and AndryLerner ask "what is meant by Joell Offner [Thonn's ex-wife]'s contention that Thonn was unemployed?" and "did Thonn have a bank account or source of income in 2009 that his ex-wife Joell E. Offner knew nothing about?"(Rec. Doc. 12593) These are questions that Thonn has the burden of answering, and simply posing them in a memorandum to the Court is surely not sufficient to controvert the Special Master's evidence. Moreover, looking at the totality of the evidence presented, there is ample, uncontroverted evidence that Thonn fraudulently prepared tax returns following the Oil Spill and submitted those returns to the GCCF and DHECC despite having never filed those returns with the IRS. Though these facts were discussed above, it is worth recapitulating this evidence: (1) Thonn admits that the forms submitted to the DHECC were never filed; (2) the unfiled return reflecting business income were prepared *after* the Oil Spill and *less than two weeks* prior to the filing of his GCCF claim; (3) the forms showing that he was unemployed with no income, which were filed with the IRS, were prepared prior to the Oil Spill; (4) the filed returns were referenced in the unfiled returns despite Thonn's contention that his tax preparer knew nothing about the previously filed return; (5) the

19

unfiled 1040 and the unfiled 1040X that purports to amend the 1040 are stamped with the exact same date and time; and (6) Thonn never paid the tax liability shown in the unfiled returns.[14] (See Rec. Doc. 12612 and the exhibits referenced therein) In light of this evidence and Thonn's failure to rebut it, the Court finds that the current record is sufficient to support a finding that Thonn committed fraud, without an evidentiary hearing.

### D. Restitution is Proper

As an initial matter, the Court notes that CCG's argument that "restitution" is not a cause of action, but is rather a remedy, is without merit. Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) (discussing the liability in restitution and noting that "[t]he confused view that 'restitution' is merely a remedy appears to result from a historical accident in the American law school curriculum.") Even if restitution is only a remedy, such a fact does not affect the instant motion because the Special Master does not seek to commence an entirely new cause of action against Thonn, Sutton, AndryLerner, or CCG. Rather, the instant motion requests that the Court exercise its well-recognized equitable power to devitalize a fraudulently obtained result. See Hazel-Atlas Glass Co., 322 U.S. at 244 ("[f]rom the beginning there has existed [...] a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments.")[15] Thus, the Court will move on to discuss whether restitution from Casey

_____

[14] Several of the parties contest the admissibility of the Day declaration (Rec. Doc. 12107-6) that was submitted in connection with the Special Master's Motion; however, the Court need not determine the admissibility of this document because the evidence relied on was supported by exhibits other than the contested declaration.

[15] The Court further rejects CCG's contention that this motion must be dismissed because the Special Master has not proven all of the elements of unjust enrichment, listing the five elements for the claim. As the Court noted, this motion is not a separate cause of action based on unjust enrichment and, even if the Court was persuaded otherwise, a claim for "unjust enrichment" is not subject to such strict elemental analysis. As is noted in the Restatement, it "is an understandable temptation to limit the far-reaching notion of unjust enrichment within the manageable confines of a checklist, but the attempt usually leads to trouble." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) citing to DCB Construction Co. v. Central City Development Co., 965 P.2d 115, 118-120 (Colo. 1998) (reconsidering its earlier checklist, which included the element of "appreciation," and substituting a shorter one); and citing LaSalle Nat'l

Thonn, AndryLerner, Sutton, and CCG is proper.

**1. By Casey Thonn**

The Court has already determined that Thonn committed fraud in connection with his seafood compensation fund claims, thereby committing fraud upon the DHECC. In light of this finding, it is both reasonable and proper under the terms of the Settlement Agreement to order Thonn to make restitution for the funds that he received as a result of his fraudulent claims. It is well-accepted that one who receives a judgment through fraud is bound to make restitution, and even absent fraud, it is the general rule that when a judgment is reversed, restitution is required. Restatement (Third) of Restitution and Unjust Enrichment § 13 (2011) ("A transfer induced by fraud or material misrepresentation is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment.");Wall v. Johnson, 80 So. 2d 362, 364 (Fla. 1955) (recognizing the general "rule that restitution may be required of amounts paid under a judgment that is subsequently reversed.") In fact, "[f]raud is one of the most common grounds of rescission." Restatement (Third) of Restitution and Unjust Enrichment §  13 (2011).

The Court's opinion is not swayed by Thonn's contention that the GCCF's hired investigators believed that Thonn's claims were reasonable, as that unrelated, independent investigation has no bearing on the instant motion. See Hazel-Atlas Glass, Co., 322 U.S. at 246 (prior failure to detect misconduct is not a license for the Court to turn a blind eye to fraud that will affect the public.) In Hazel-Atlas Glass Co., the Supreme Court did not find it relevant that the plaintiff did not detect the

---

Bank v. Perelman, 82 F. Supp. 2d 279, 294-295 (D. Del. 2000) (rejecting elements identical to those listed by CCG and noting that "[t]he first four elements of this list might make a plausible definition, though the reference to impoverishment is too narrow: there is often no impoverishment other than a violation of the claimant's rights. The fifth element is plainly erroneous, since so much of unjust enrichment is legal in origin.")

fraud, noting that even if the plaintiff "did not exercise the highest degree of diligence[, the defendant's] fraud cannot be condoned for that reason alone." Id. at 246. The rationale for this is rooted in the fact that the matter was not only a private issue, but rather concerned "issues of great moment to the public" and "involve[d] far more than an injury to a single litigant." Id. (" It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.") Here, Thonn's fraud undermines the integrity of the entire Settlement Program; therefore, while it is unfortunate that his misrepresentations were not detected earlier, such an oversight does not allow the Court to give Thonn a free pass now.

### 2. By the Claim Participants

The overarching substantive argument advanced by the Claim Participants is that their innocence in Thonn's fraud shields them from a judgment ordering restitution based on Thonn's award under the Settlement Program. The relevant legal authority, discussed more fully below, indicates, however, that such is not always the case and that, when a person or entity is a "party-in-interest," he may be liable in restitution even when the Court finds no wrongdoing or fault on his part. It is clear from the arguments advanced by the Claim Participants that they construe the Special Master's motion as a punishment for wrongdoing. Such beliefs are incorrect, however, and misunderstand the purpose of restitution. The instant clawback motion only seeks to recover that which was incorrectly and unjustifiably paid to Thonn, Sutton, CCG, and Andry Lerner. In fact, restitution is often ordered where there is no fault. See Berger v. Dixon & Snow, P.C., 868 P.2d 1149, 1152-53 (Colo. Ct. App. 1993)("A claim for equitable restitution does not depend upon a breach of substantive duty in tort or contract; restoration of a benefit may be ordered without a

finding of fault or misconduct.") The intent here is not to punish those who provided services to Thonn, but merely to remedy an unjust result. With this goal in mind, and for the specific reasons that follow, the Court finds that the Claim Participants are all liable for restitution for the funds received in connection to Thonn's fraudulent claims.

The Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011) ("the Restatement") states that "[a] transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution as necessary to avoid unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011). This concept "is based on the general principle that one should not be permitted to keep that which in equity and good conscience should be restored to another." Berger, 868 P.2d at 1152 (internal citations omitted). Generally, if a judgment is reversed upon a finding that the successful party committed fraud, the attorney is not liable to return the fees that he collected in connection therewith unless he is implicated in the fraud. Martin, 658 So.2d 119. This general rules does not hold true, however, when a contingency fee contract exists between the attorney and the client. See, e.g. Mohamed v. Kerr, 91 F.3d 1124, 1126 (8th Cir. 1996); Ehsani v. McCullough Family Partnership, 159 P.3d 407, 413 (Wash. 2007). A comparison of Illustrations 15 and 16 of Section 18 of the Restatement show that the fault or innocence of a party is not relevant where there is a contingency fee contract in place. See Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011). To lay the foundation for this comparison, Illustration 15 explains that:

> if A sues B and obtains a money judgment of $150,000, which B pays. A pays $50,000 of this amount to discharge an obligation to Bank, *a bona fide payee*. A's judgment against B is later set aside on the ground that it was based on a claim that A knew to be fraudulent. B is entitled to restitution from A of $150,000 with interest from the date of payment. B has no claim against Bank.

23

Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011)(emphasis added). Compare

that scenario to a slightly different version of the facts, as laid out in Illustration 16:

> Same facts as Illustration 15 [above], except that another $50,000 of A's judgment
> is paid to A's Lawyer, pursuant to a contingent-fee arrangement between A and
> Lawyer. Although Lawyer received payment without notice of A's fraud, B is
> entitled to restitution from Lawyer of $50,000, with interest from the date Lawyer
> obtained notice of the fraud.

Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011). The difference between

these two scenarios lies in the fact that, in the latter situation, there was a contingency fee contract

between the lawyer and "A" that was not present in the former situation between "A" and the Bank.

The reason for the difference in treatment is rather clear, and has been recognized by courts. See,

e.g. Mohamed v. Kerr, 91 F.3d at 1126; Ehsani v. McCullough Family Partnership, 159 P.3d at 413

(Recognizing the fact "[t]hat an attorney who is not a party to the action but is a ***real party-in-***

***interest*** [rather than a bona fide payee] can be required to make restitution is confirmed by case law

from a number of other jurisdictions.") Under a contingency-fee contract, the attorney is a real party-

in-interest because the client's obligation to pay for the legal services rendered is predicated on a

favorable outcome for the client. In such cases, if the client does not prevail, or if he does prevail

but eventually has his award revoked, the client has not received a favorable outcome, thus there is

no fee due under the contingency fee contract. See  Mohamed, 91 F.3d at 1126. Because no fee is

due, if the lawyer were to retain the fee that was already paid to him, he would be unjustly enriched.

See id. ("The contingent fee is dependent on success; the attorney assumes, along with the client,

the inherent risks of litigation.") On the other hand, where the client has not entered into a

contingency fee contract, but rather is obligated to pay for the services rendered regardless of the

outcome, the attorney is a bona fide payee and is owed his fee even if the outcome is negative, or,

as in this case, is revoked. Ehsani 159 P.3d at 413. In the latter situation, restitution is not owed because, as the Washington Supreme Court explains in Ehsani, "there is no unjust enrichment vis-à-vis the judgment debtor where a party receives only that to which he is entitled under the terms of a valid, preexisting agreement with the judgment creditor." Id. at 411.

In this matter, the cases to which the Claim Participants cite place them in the position of a "bona fide payee." In Martin, the Court never addresses whether the fee paid was pursuant to a contingency fee arrangement and then goes on to rely on Wall and Comment H of the Restatement (First) of Restitution § 74.  Comment H involves a situation wherein the attorney "received the money as a bona fide purchaser." Martin, 658 So. 2d  at 121 (citing Comment H). Calling AndryLerner, CCG, and Sutton "bona fide purchasers" would put them in the same position as the Bank in Illustration 15 of the Restatement, and such an analogy cannot be properly made. Rather, because the Claim Participants all received a portion of Thonn's claims proceeds *based on their contingency fee relationship to Thonn's fraudulent claim,* they are more akin to a real party-in-interest as described in Illustration 16 of the Restatement. This is most clear in the context of AndryLerner, who represented Thonn at the time Thonn received the funds from the DHECC and who retained a portion thereof based on their existing contingency fee contract. (Rec. Doc. 12348-1, ¶ 7) As for CCG, though their contractual relationship existed with Andry Lerner, and not with Thonn personally, CCG's payment ultimately depended on the success or failure of Thonn's claim.[16] (Rec. Doc. 12423-5, p.2, ¶ 3) Finally, as to Sutton, his claim for payment from Thonn's claim also arose from a contingency fee contract that was in place when Sutton represented Thonn. (Rec. Doc.

---

[16] Under CCG and AndryLerner's contract, because CCG deemed Thonn's claim to qualify as compensable, CCG was only entitled to payment by AndryLerner if Thonn's claim was ultimately successful. (Rec. Doc. 12423-5, p.2, ¶ 3(a))

12337-1, p. 4) Again, if Thonn's claim were to fail, which it did, Sutton would have had no right to claim a fee under the contingency fee contract, thus no right to claim a portion of the fees collected by AndryLerner. Sutton argues that the law permits him to recover from AndryLerner the fees that he is owed for his prior work on Thonn's claim, which would be accurate had Thonn's claim ultimately succeeded. But the fact is that Thonn's claim did not succeed; therefore, Sutton has no right to collect a fee from Thonn or AndryLerner.

Accordingly, as real parties-in-interest, the Claim Participants' fault or lack thereof is irrelevant, and if the Court were to allow them to keep the fees when such fees are not owed to them under their contingency fee arrangements, the Claim Participants would be unjustly enriched. Therefore, restitution is both proper and necessary.

### E. Joint and Several Liability

The argument is made that, even if restitution is ordered, the Special Master may not recoup more that the DHECC paid. Sutton specifically notes that it appears that the Special Master's motion seeks a windfall because he seeks the full amount from Thonn and also the fees paid to the Claim Participants, which came from the amount paid.

It is clear to the Court that the Special Master does not seek a windfall, but rather he seeks a judgment stating that Thonn, AndryLerner, Sutton, and CCG are jointly and severally liable for the full restitution amount, with the Claim participants being liable to make restitution only in an amount equal to the fees paid to them.

Accordingly,

**IT IS ORDERED** that the **Motion of the Special Master for Return of Payments Made to Casey C. Thonn and Others (Rec. Doc. 12107)** is **GRANTED**.

26

Casey C. Thonn, AndryLerner LLC, Jonathan Andry, Glen Lerner, Lionel Sutton, III, and Coastal Claims Group, LLC  shall make full restitution to the DHECC for all monies received in connection with Thonn's Claims 19690 and 19691.  Casey C. Thonn is liable for the full amount he received on these claims, which total $357,002.35.   AndryLerner LLC, Jonathan Andry, Glen Lerner, Lionel Sutton, III, and Coastal Claims Group, LLC, are jointly and severally liable with Casey C. Thonn, but only up to the amount of the fees or payments they received in relation to Thonn's claims.  In no event shall the restitution payable to the DHECC exceed the total amounts paid to Thonn on Claims 19690 and 19691.

The Special Master shall submit a proposed form for entry of a Final Judgment in accordance with this Order.

New Orleans, Louisiana, this 29th day of April, 2014.

United States District Judge