1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4                                      *
   IN RE:  OIL SPILL BY THE OIL RIG    *    Docket 10-MD-2179
5          *DEEPWATER HORIZON* IN THE  *
           GULF OF MEXICO ON           *    Section J (1)
6          APRIL 20, 2010              *
                                       *    New Orleans, Louisiana
7                                      *
                                       *    March 21, 2014
8                                      *
                                       *    9:00 a.m.
9   * * * * * * * * * * * * * * * * *  *
10                                     *
   UNITED STATES OF AMERICA            *    C.A. 10-4536
11                                     *
                                       *    Section J (1)
12  versus                             *
                                       *    New Orleans, Louisiana
13                                     *
   BP EXPLORATION & PRODUCTION,        *    March 21, 2014
14  INC., ET. AL.                      *
                                       *    9:00 a.m.
15  * * * * * * * * * * * * * * * * *  *

16
              STATUS CONFERENCE RE: PENALTY PHASE
17               AND MOTION HEARING BEFORE
              THE HONORABLE CARL J. BARBIER
18            UNITED STATES DISTRICT JUDGE
                        AND
19            THE HONORABLE SALLY SHUSHAN
              UNITED STATES MAGISTRATE JUDGE
20

21

22

23

24

25

                      OFFICIAL TRANSCRIPT

1  | APPEARANCES:

2  | For the United States        U.S. Department of Justice
   | of America:                  Environmental Enforcement Section
3  |                              BY:  STEVEN O'ROURKE, ESQ.
   |                              BY:  NANCY FLICKINGER, ESQ.
4  |                              BY:  ABIGAIL ANDRE, ESQ.
   |                              BY:  SARAH D. HIMMELHOCH, ESQ.
5  |                              BY:  RACHEL HANKEY, ESQ.
   |                              BY:  MICHAEL ZEVENBERGEN, ESQ.
6  |                              Post Office Box 7611
   |                              Washington, DC 20044
7  |

8  |
   | For BP America Inc.,         Kirkland & Ellis, LLP
9  | BP America Production        BY:  J. ANDREW LANGAN, ESQ.
   | Company, BP Company          BY:  HARIKLIA "CARRIE" KARIS, ESQ.
10 | North America Inc.,          BY:  MATTHEW T. REGAN, ESQ.
   | BP Exploration &             300 North Lasalle
11 | Production Inc., BP          Chicago, Illinois 60654
   | Holdings North America
12 | Limited, BP Products
   | North America Inc.:
13 |

14 |
   | For BP America Inc.,         Covington & Burling, LLP
15 | BP America Production        BY:  ROBERT C. "MIKE" BROCK, ESQ.
   | Company, BP Company          1201 Pennsylvania Avenue, NW
16 | North America Inc.,          Washington, D.C.  20004
   | BP Exploration &
17 | Production Inc., BP
   | Holdings North America
18 | Limited, BP Products
   | North America Inc.:
19 |

20 |
   | For Anadarko Petroleum       Bingham McCutchen, LLP
21 | Corporation, Anadarko        BY:  KY E. KIRBY, ESQ.
   | E&P Company LP:              BY:  DAVID B. SAMONS, ESQ.
22 |                              2020 K Street, NW
   |                              Washington, DC 20006
23 |

24 |

25 |

OFFICIAL TRANSCRIPT

1 | <u>APPEARANCES</u>:

2

3 | For Anadarko Petroleum         Bingham McCutchen, LLP
    Corporation, Anadarko          BY:  JAMES J. DRAGNA, ESQ.
    E&P Company LP:                355 South Grand Avenue

4                                  Suite 4400
                                   Los Angeles, California  90071

5

6

7 | For Anadarko Petroleum         Kuchler Polk Schell
    Corporation, Anadarko            Weiner & Richeson, LLC
    E&P Company LP:                BY: DEBORAH D. KUCHLER, ESQ.

8                                  1615 Poydras Street
                                   Suite 1300

9                                  New Orleans, Louisiana 70112

10

11 | For O'Brien's Response          Quinn Emanuel Urquhart & Sullivan
     Management, LLC and              Sullivan LLP

12 | National Response              BY:  MICHAEL J. LYLE, ESQ.
     Corporation:                   777 6th Street NW, 11th Floor

13                                  Washington, D.C.  20001

14

15 | Official Court Reporter:       Jodi Simcox, RMR, FCRR
                                    500 Poydras Street

16                                  Room HB-406
                                    New Orleans, Louisiana 70130

17                                  (504) 589-7780
                                    Jodi_Simcox@laed.uscourts.gov

18

19

20 | Proceedings recorded by mechanical stenography using
     computer-aided transcription software.

21

22

23

24

25

OFFICIAL TRANSCRIPT

## PROCEEDINGS

### (March 21, 2014)

* * * * *

(OPEN COURT)


**THE COURT:**  Good morning, everyone.  Please be seated.

Judge Shushan gets to be seated before anyone else, if you noticed that.

All right.  I asked Judge Shushan to sit in.

Go ahead and call the case, Stephanie.

**THE DEPUTY CLERK:**  Multi-District Litigation 10-2179, *In re:  Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20th, 2010;* Civil Action 10-4536, *United States of America versus BP Exploration and Production, Incorporated, et. al.*

**THE COURT:**  All right.  Let's have counsel who intend to speak today identify themselves.

**MR. O'ROURKE:**  For the United States, this is Steve O'Rourke.  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MS. ANDRE:**  For the United States, this is Abby Andre.  Good morning, Your Honor.

**THE COURT:**  Andre?

```
1              MS. ANDRE:  Andre.
2              THE COURT:  Okay.  Good morning.
3              MS. FLICKINGER:  For the United States, Nancy
4    Flickinger.  Good morning.
5              THE COURT:  Give me your last name again.
6              MS. FLICKINGER:  It's Flickinger.
7              THE COURT:  Flickinger, okay.  Thank you.
8              MR. ZEVENBERGEN:  Good morning, Your Honor.  I'm Mike
9    Zevenbergen for the United States.
10             THE COURT:  How do you spell that?
11             MR. ZEVENBERGEN:  Zeven, is like the number seven
12   with a "Z," bergen is B-E-R-G-E-N.
13             THE COURT:  Okay.  Got it.  Thank you.
14                  All right.
15             MS. HANKEY:  Rachel Hankey for the United States.
16             THE COURT:  All of you intend to speak today?
17             MS. HIMMELHOCH:  Only if necessary, Your Honor.  This
18   is Sarah Himmelhoch.
19             THE COURT:  Ms. Himmelhoch.  Okay.  Is that it on
20   that side?  Over here?
21             MR. BROCK:  Mike Brock for BP, Your Honor.
22             THE COURT:  Okay.
23             MR. LANGAN:  Andy Langan, Your Honor.  Good morning.
24             THE COURT:  Good morning.
25             MS. KARIS:  Good morning, Your Honor.  Hariklia Karis
```

OFFICIAL TRANSCRIPT

1   for BP.

2          **MR. REGAN:**  Good morning, Your Honor.  Matt Regan for

3   BP.

4          **THE COURT:**  Good morning.

5          **MR. LYLE:**  Good morning, Your Honor.  Mike Lyle for

6   NRC and O'Brien's.

7          **MR. DRAGNA:**  Good morning, Your Honor.  Jim Dragna

8   for Anadarko.

9          **THE COURT:**  Okay.

10          **MR. SALMONS:**  Your Honor, David Salmons for Anadarko.

11          **MS. KIRBY:**  Good morning, Your Honor.  Ky Kirby for

12   Anadarko.

13          **THE COURT:**  Good morning.  And Deb Kuchler is

14   remaining silent.

15          **MS. KUCHLER:**  I'm not going to speak, Your Honor.

16          **THE COURT:**  Okay.  I think you just did.

17          All right.  As you can see, we have Judge

18   Shushan present here.  I asked her to not only attend but sit

19   up here because it occurred to me that most of what we're going

20   to talk about is related to deciding what the scope of the

21   discovery should be in this Clean Water Act penalty phase

22   trial.

23          There are a number of motions in limine that the

24   Court has been asked to consider and rule on, and we'll discuss

25   those in a minute.  I want to make some preliminary remarks

 1   first, though, that when this case, when this MDL was created
 2   and assigned to me, actually, on August 10th, 2010 -- we're
 3   going on four years now -- the very first thing I did was issue
 4   Pretrial Order No. 1, which, among other things, scheduled our
 5   first in-court conference.
 6               But I also made the following statements in that
 7   pretrial order.  I said:
 8               "As attorneys involved in a multi-district case,
 9   you will probably be laboring together for some time in the
10   future with work progressively becoming more complicated and
11   exacting.  Some of you know each other and some are complete
12   strangers.  Undoubtedly each has a different style and
13   personality.  It is likely that during the course of this
14   litigation your working relationship will occasionally become
15   strained, communication derailed, and mutual trust questioned.
16               The just and efficient resolution of this
17   litigation will depend in large measure on the way you as
18   attorneys comport yourselves and overcome the temptations and
19   trepidations inherent in a case of this magnitude.
20               The Manual for Complex Litigation recognizes
21   that judicial involvement in managing complex litigation does
22   not lessen the duties and responsibilities of the attorneys.
23   To the contrary, the added demands and burdens of this type of
24   litigation place a premium on professionalism and require
25   counsel to fulfill their obligations as advocates in a manner

1    that will foster and sustain good working relations among
2    fellow counsel and the Court.
3               The Court expects, and indeed insists, that
4    professionalism and courteous cooperation permeate this
5    proceeding from now until the litigation is concluded.
6               The court record should never be the repository
7    of ill-chosen words arising out of a sense of frustration over
8    real or imagined issues.  Because of the high level of the
9    competence and experience of attorneys who are generally
10   involved in multi-district litigation, the Court is confident
11   that this objective will be achieved without judicial
12   intervention."
13              And largely for many, many months after this MDL
14   was created, the Court was very happy that counsel seemed to
15   heed those words and abide and conduct themselves accordingly.
16   Unfortunately -- very unfortunately -- and disappointingly, I
17   have noted in the more recent months an unfortunate dropoff in
18   professionalism among counsel in this case.
19              There have been too many petty disputes being
20   brought to the Court.  At times it's become petty, ugly and
21   distracting.  There have been all sorts of allegations hurled
22   back and forth, accusations of breaches of confidentiality,
23   other accusations.  And this is not intended to accuse everyone
24   by any means, every lawyer in this case of these things, but
25   it's happened too often and by too many lawyers for the Court

1  to ignore any longer.

2            Counsel seem to be unable or unwilling to sit

3  down and agree on sometimes the smallest of things.  I think

4  all of you need to take a deep breath and step back and think

5  about how you're conducting yourselves in this litigation.

6  It's not an excuse, even if your clients want you to act that

7  way, it's not an excuse for lawyers to conduct themselves that

8  way just because clients wish them to act in that manner.

9            I think all of you need to learn again to meet,

10 confer, and reach a reasonable consensus or agreement where

11 they can, and should be, reached.  This has turned out to be a

12 major, major distraction to the Court, to me and Judge Shushan,

13 in this case, I've got to tell you.

14            I feel like I've spent the last year dealing

15 with nothing but distractions, fighting and refighting old

16 battles instead of moving forward with this litigation.  It's

17 been nothing but distracting, disappointing and -- well, I'll

18 leave my remarks at that.

19            I think counsel have to realize that not

20 everything is urgent either.  We, and particularly Judge

21 Shushan, were getting inundated with requests.  Everybody

22 thinks their little issue demands the Court's attention

23 immediately, and that just can't happen.  There are things that

24 we have to prioritize.  Not everything is urgent.  Things may

25 sit for a while as the Court concentrates its time and effort

1  on what's in front of us at the moment.

2          You know, I've reminded everyone of this many,

3  many times, but I'll say it again:  The parties in this case

4  have dozens and dozens of law firms, hundreds and hundreds of

5  lawyers, and you're looking at the four of us.  This is our

6  staff:  Myself, Judge Shushan, Ben and Mike.  So keep that in

7  mind when you're asking to use or impose on the Court for

8  things that are either not important or not urgent.

9          One thing I'm going to ask counsel to do is to

10 stop including Ben Allums on every e-mail that you all

11 circulate among yourselves.  And I know what happens on

12 e-mails, you get on one e-mail and then you're on everybody's

13 e-mail, every reply and everything.  It's been totally

14 distracting for Ben.

15         Judge Shushan is happy to receive your e-mails,

16 she tells me.  So you can keep her on the e-mail.  And she'll

17 let us know if there's something that requires my attention or

18 Ben's attention and we'll deal with it.  But try leaving Ben

19 off for now so he can concentrate on more important things that

20 he's working on and we're working on at this time.

21         Just remember, we're -- as I said on

22 August 10th, 2010, we're all in this thing for the long haul.

23 And even though, I think, in retrospect, is the glass half full

24 or half empty, looking at it on the positive side, I think

25 there's been a heck of a lot accomplished in this case, a lot

1    of good things that have been accomplished in this case.  We've

2    all come a long way.  Nonetheless, there's still a long way to

3    go, and there's so much still left to be done.  It's imperative

4    that we all act civilly and with the utmost professionalism.

5            I know everyone is working under great time

6    pressures and stress, but, again, this is not an excuse for

7    lack of professionalism.

8            Did you want to mention --

9            **MAGISTRATE JUDGE SHUSHAN:**  I believe that covered it.

10   Thank you.

11           **THE COURT:**  I was just going to give an example.

12   It's really not my intent here today to single out any

13   particular person or anything, but I can't help it, I have to

14   say this.  One of the things that just went over the top for me

15   the other day was this exchange of e-mail that arose out of

16   what's going on in front of the claims administrator on the BEL

17   matching issue.

18           And, apparently, the claims administrator -- the

19   issue is coming up to the Court, being referred to the Court,

20   and the parties have been unable to reach agreement, as I

21   understand it, and the claims administrator had asked the

22   parties to make any further submissions by whatever day it was,

23   Wednesday at noon, I think -- Central Time at noon.

24           And lo and behold, the Court gets an e-mail from

25   an attorney representing BP strongly condemning the fact that

OFFICIAL TRANSCRIPT

1    class counsel had the gall to file something with the claims

2    administrator 48 minutes late on Wednesday.

3              Now, anyone that thinks that that's a matter

4    that should be brought to this Court has to rethink how you

5    practice law.  Again, I don't know how they practice law in Las

6    Angeles or New York or Chicago or Atlanta, but I don't think

7    that's how we practice law here in New Orleans, and I don't

8    want this case to condescend to that level.  I mean, to be

9    bringing to the Court the fact that somebody filed something 48

10   minutes late, unless it's something that was so time critical

11   that it just caused tremendous prejudice to somebody, which

12   obviously this didn't, is absurd.

13             And then, of course, that generated a response

14   back the other way, which also was sent to the Court.  I don't

15   want you all to be sending -- and on top of all that, no action

16   was requested by the Court.  It wasn't like somebody was filing

17   a motion for sanctions or some motion to strike something.  No

18   action requested by the Court, but we had to get copies of this

19   e-mail exchange with these snarky remarks back and forth, and I

20   don't appreciate it.  I don't want to receive those.  Judge

21   Shushan doesn't want to receive those.

22             And I just used that as a small example of the

23   level to which the conduct in some instances has been lowered

24   to in this case, and I hope everyone takes that to heart.

25             All right.  Pending motions in limine.  As I

OFFICIAL TRANSCRIPT

1    said, the primary focus at this time seems as to decide the

2    scope of discovery for the penalty phase trial; also,

3    hopefully, to set a trial date for the penalty phase.  Once

4    that's done, Judge Shushan can work with counsel to plan out

5    and oversee the discovery that needs to be done.

6                We do intend, as we did in the last trial, to

7    set time limits for the trial, to set limits on depositions,

8    and limits on experts, and to make sure that any discovery

9    that's necessary is focused and targeted to what's really

10   necessary and important.

11               To the extent there is apparent agreement by the

12   parties -- of course, the parties do agree that there should be

13   some discovery of all three parties in the Clean Water Act

14   penalty phase, ultimately leading to a bench trial on the

15   so-called eight factors under 33 U.S.C. Section 1321(b)(8).

16               Of course, any findings that the Court

17   ultimately makes from Phase One on the issue of gross

18   negligence and from Phase Two on quantification will be

19   relevant to the penalty phase -- or penalty calculations.

20               So let's talk first about the -- my

21   understanding is there is agreement on evidence relating to one

22   of the eight factors at least; that is, the prior violations,

23   that there is a stipulation that's been signed on that.

24            **MR. LANGAN:**  Your Honor, Andy Langan for BP.

25               I think you're referring to the prior fines for

1   the same event.

2           THE COURT:  Prior fines.

3           MR. LANGAN:  There is a stipulation on that.  So, one

4   down, seven to go, I think.

5           THE COURT:  Yeah.  Well, we're making some progress

6   here today.

7           MR. LANGAN:  Yeah.  I think I have that right.

8           THE COURT:  Is that a stipulation that's been filed

9   with the court, Mr. Langan?

10          MR. LANGAN:  Your Honor, we submitted, I think it's

11  Exhibit 3, perhaps, to our March 3rd filing, if I'm not

12  mistaken -- something like that, but I can get that detail --

13  but it hasn't been formally filed yet.  But I believe we

14  have -- the language has been agreed to, that sort of thing.

15  So we could easily do that if Your Honor would like.

16          MS. KIRBY:  Your Honor, Ky Kirby.  There is an

17  agreement on stipulations for prior violations with Anadarko,

18  and that also has not been filed.

19          THE COURT:  But I thought I read -- and, frankly,

20  I've got to tell you, I read so much in preparation for this

21  and other things over the last couple of days that I thought I

22  read somewhere that BP also agreed that there's some

23  stipulation.  Is that --

24          MR. LANGAN:  Your Honor, we did, yes.

25          THE COURT:  This is on the prior violations, we're

OFFICIAL TRANSCRIPT

1   talking about; right?

2          **MR. LANGAN:**  Okay.  Well, on prior violations, I

3   think the state of play is this:  This was a formal stipulation

4   that said BPXP has had no prior Clean Water Act violations, and

5   I think everybody agrees on that.

6          But as to prior violations, there's a pending

7   motion in limine about other entities and that sort of thing

8   that's not agreed upon.  I think I have that right.

9          **THE COURT:**  Okay.  Well, let's talk about that.

10          Let me ask -- Mr. O'Rourke, are you going to

11   talk to this?

12          **MR. O'ROURKE:**  Your Honor, Steve O'Rourke for the

13   United States.

14          **THE COURT:**  Yes.  The issue, as I see it, is whether,

15   and to what extent, you could introduce evidence, or the Court

16   should consider evidence, of previous violations by the BP

17   entities beyond BPXP.  Correct?

18          **MR. O'ROURKE:**  That is certainly one of the issues

19   that's in the two cross-motions.

20          **THE COURT:**  Yes.  You, in your memorandum,

21   indicate -- I think you mention that the government alleged

22   that BP had something like 2700 or so safety or environmental

23   type violations over I don't know what period of time that is,

24   but that the government intends to focus on not more than ten,

25   is the way it was phrased.  Then some other place I saw five to

1   ten what you consider serious violations.  Correct?

2          **MR. O'ROURKE:**  Major incidents, criminal incidents or

3   ones that are quite similar to it.

4          **THE COURT:**  But the number is five to ten; correct?

5          **MR. O'ROURKE:**  Yes, sir, and we're going to forego

6   the other ones.

7          **THE COURT:**  Have you identified those five to ten

8   incidents?

9          **MR. O'ROURKE:**  We've identified, I think it's five of

10  them in the papers that we filed with Judge Shushan.

11         **THE COURT:**  So what I'm trying to get down to is

12  exactly how many and which ones you intend to try to offer so

13  we can focus on those rather than talking about this in a

14  vacuum.  I'd like to talk about specific incidents of

15  violations, that is, that you wish to introduce.

16         **MR. O'ROURKE:**  Yes, Your Honor.  So we listed

17  Endicott, Prudhoe Bay, Texas City, Grangemouth.  Those are ones

18  that had been a part of Dr. Bea's report in Phase One, which

19  you excluded, Your Honor.

20              But in excluding that, you told us we could come

21  back in Phase Three and try again to see if we could get those

22  into evidence.  We would intend to have an expert, one expert,

23  on those four violations.

24              In Phase One, BP had had two experts to rebut

25  that part of Dr. Bea.  So we think that's maybe three experts

1    or so in total on those four violations.

2                    The other types of violations we were

3    considering -- we're still investigating.  We're not sure it's

4    going to work out or not -- were wells in the Gulf drilled by

5    BP where they were using similar methods they used at Macondo.

6    That would be no more than five wells, perhaps as few as three

7    wells.  And we have an expert exploring that.  By the expert

8    report deadline he will either have those violations or not.

9             **THE COURT:**  Are these wells drilled for which they

10   received some sort of violations?

11            **MR. O'ROURKE:**  It's wells drilled in which they acted

12   with behavior similar to Macondo.

13            **THE COURT:**  Well, that's not what the factor is.

14   Doesn't the factor say, "history of prior violations"?

15            **MR. O'ROURKE:**  The factor says, "history of prior

16   violations."  To the extent they are violations, they would be

17   violations of MMS type regulations.  The factor also says --

18   another factor says culpability.

19            **THE COURT:**  Well, I don't want to talk about

20   culpability.  We're going to get to culpability.  I'm going to

21   take this factor by factor.  Okay?  I think that's how we have

22   to work through this.

23                    So it sounds like you only have four or five,

24   really, of prior violations.

25            **MR. O'ROURKE:**  If I may make a comment on the

1  factors, Your Honor.  For any given fact, it's our position

2  that it could fit into more than one factor.  So that's --

3          THE COURT:  Well, we're not talking about culpability

4  now.  Let's talk about prior violations.  How many do you have?

5  It sounds like four or five is what you're down to.

6          MR. O'ROURKE:  We have four or five with the one

7  expert.  We have a second expert exploring MMS type violations

8  that are similar in nature to what happened at Macondo.

9          THE COURT:  Where they've never been given a

10  violation?  A violation has never been assessed?

11          MR. O'ROURKE:  Some of them may have been and some of

12  them may not have been, and that's what the expert is

13  exploring.  And we're planning to divulge that expert report on

14  whatever the expert report deadline is.  If it doesn't pan out,

15  there won't be a --

16          THE COURT:  Well, the problem is we need to know

17  what's -- it seems to me the government, by this point, ought

18  to know and be able to tell the Court and BP specifically which

19  alleged prior violations are in play here so that then, as I

20  said, the Court can deal with those and see which may be

21  admissible, at least discoverable, and which we just say, no,

22  you're not going there.

23              I can't rule on this in a vacuum.

24          MR. O'ROURKE:  Your Honor, so we've named the four --

25          THE COURT:  You've named four so far.

OFFICIAL TRANSCRIPT

 1           MR. O'ROURKE:  -- which we named specifically.

 2                The MMS type wells would be Kodiak, Tiber, and

 3     perhaps one other.

 4           THE COURT:  So it sounds like what you're saying is

 5     you want to be able to get an expert now to go back and look at

 6     how BP drilled other wells using allegedly similar methods and

 7     then come and say those methods also violated MMS regulations

 8     or some other regulation.

 9           MR. O'ROURKE:  Yes.  But we're not proposing to take

10     discovery on that.

11           THE COURT:  Well, how are you going to do that

12     without some kind of discovery?  It sounds like we'd be having

13     to try all those cases.  It's one thing if somebody's been

14     fined or assessed a violation, they paid a violation.  You

15     know, you can prove that as a fact.

16                But to come in and basically try cases, in

17     effect, that have never been -- no one's even alleged a

18     violation, it sounds like, in the past, but you want to do that

19     now as part of this case.

20           MR. O'ROURKE:  What we're trying to get at, Your

21     Honor, is whether BP had a pattern at these wells of doing

22     similar behavior.  So that goes to:  It could be culpability;

23     it could be another matter that justice may require; it could

24     be a violation to the extent the violation was issued.

25           THE COURT:  You didn't even make that argument in

1    Phase One, as I recall.

2            **MR. O'ROURKE:**  Because we were told we couldn't talk

3    about the wells.

4            **THE COURT:**  No.  But you didn't make any argument

5    about some pattern or something.  I don't recall that.

6            **MR. O'ROURKE:**  We were told we couldn't talk about

7    other sites and other wells, Your Honor, for example, with the

8    exclusion of the part of Dr. Bea's report about those other

9    four violations that were mentioned.

10           **THE COURT:**  All right.  So that's the total extent of

11   what we're talking about here under prior violations, the four

12   that you named, and another five or so of other wells, so to

13   speak?

14           **MR. O'ROURKE:**  Yes, sir.  And on none of them are we

15   proposing to take discovery from the defendants.

16           **THE COURT:**  All right.  Let me hear from the other

17   side.

18           **MR. LANGAN:**  Your Honor, a couple of observations

19   here about the prior violation factor.

20                   First of all, as we set forth in our brief -- by

21   the way, I should really step back and say that if the interest

22   of the Court here is in a trial that is to the point and short

23   and manageable and time controlled --

24           **THE COURT:**  All of the above.

25           **MR. LANGAN:**  -- we shouldn't be getting into

1   mini-trials about other incidents, and I think Your Honor's

2   Phase One ruling shows that.  So that's kind of the starting

3   point.

4              But beyond sort of the case management aspects

5   of this and what a waste of time mini-trials would be, we have

6   legal positions that under Section 311 of the Clean Water Act,

7   "any history of prior violations" means violations of Section

8   311 of the Clean Water Act.

9              The Grangemouth --

10             **THE COURT:**  Well, that's another argument.

11             **MR. LANGAN:**  It is.

12             **THE COURT:**  I'm not sure you're right on that or not,

13   but I understand your argument there.

14             **MR. LANGAN:**  It is.

15             **THE COURT:**  But it may be broader than that.  But

16   what I'd like to do before I decide if they can go beyond

17   that -- I understand your argument is that it's only BPXP --

18             **MR. LANGAN:**  Correct.

19             **THE COURT:**  -- and it's only violations of Section

20   311.

21             **MR. LANGAN:**  That's correct.

22             **THE COURT:**  I may not agree with that.

23             **MR. LANGAN:**  All right.

24             **THE COURT:**  But what I'm saying is before I make a

25   ruling on those, I want the government to identify the specific

1   cases they're talking about, and then we can look at each one

2   of those and say which BP entity was involved, when did it

3   occur, what type of violation was it, and so forth; and then we

4   can rule -- I can rule, Judge Shushan can rule -- on whether

5   it's relevant or admissible.

6         **MR. LANGAN:**  Fair enough.  In fact, we've been making

7   the same request about their position on this since last

8   summer, and in their brief they talk about four.  If we're

9   going to move beyond our legal arguments, let's talk about

10  things like Texas City.  It was a refinery, not offshore

11  drilling.  It wasn't the same entity.  And Your Honor's already

12  heard about how different that was.

13         The Endicott plea that they're talking about

14  from Alaska was not deepwater drilling.  It involved a

15  violation in which BP didn't supervise its contractor

16  appropriately and the contractor --

17         **THE COURT:**  Well, I don't want to cut you off --

18         **MR. LANGAN:**  Yeah.

19         **THE COURT:**  -- but that's the type of back and forth

20  and the arguments that we can get into once the government

21  specifically identifies it.

22         **MR. LANGAN:**  Okay.

23         **THE COURT:**  What I intend on this factor is not to

24  rule today.  I'm not going to say it can't go -- the government

25  can't go beyond just BPXP and just Section 311.  I'm not going

1   there today.  You might ultimately convince me of that, but not

2   today.  But I'm going to require the government to identify

3   specifically --

4                How much time do you need to do this,

5   Mr. O'Rourke?  You've given us four today.

6           **MR. O'ROURKE:**  I've given you four today plus named

7   the two other wells, and the third I can't remember the name

8   of.

9           **THE COURT:**  But I've got to tell you, I'm still

10   unclear on what you propose with regard to the other wells.

11           **MR. LANGAN:**  Your Honor, you didn't ask me, but can I

12   point out that Judge Shushan's, your order of February 21st

13   told them they were to have already supposed to have done this.

14   We've known for a month now that they were supposed to

15   specifically identify them.

16              And they did before; but beyond that, they

17   haven't, other than saying, "Well, we don't like their other

18   drilling in the Gulf of Mexico."  So I feel like they've

19   already had a deadline.

20           **THE COURT:**  Mr. O'Rourke?

21           **MR. O'ROURKE:**  Your Honor, the way it usually works

22   is we have an expert report deadline, and in the expert report

23   we identify what's going to be the topics.

24           **THE COURT:**  Well, we're not talking about expert

25   report deadlines now.  We're talking about these motions in

 1    limine and scope of discovery.  So respond to what Mr. Langan

 2    just said.

 3              **MR. O'ROURKE:**  We have our expert working.  He's been

 4    reviewing files without requesting files from the defendant.

 5              **THE COURT:**  Judge Shushan's order asked you to

 6    identify these --

 7                   What did your order say?  Do you have it?

 8              **MAGISTRATE JUDGE SHUSHAN:**  Well, as part of the

 9    initial disclosures, the deadline for initial disclosures was

10    Wednesday --

11              **MR. O'ROURKE:**  I can't remember, but a few weeks ago.

12              **MR. LANGAN:**  March 10th.

13              **MAGISTRATE JUDGE SHUSHAN:**  -- March 10th.  Thank you,

14    Andy.

15                   So as part of the initial disclosures,

16    presumably, that would have been the date to identify these

17    other incidents or other investigations.

18              **MR. O'ROURKE:**  And ordinarily, we identify what we

19    are aware of; and if our expert discovers more information as

20    we go along, under Rule 26(e), we would supplement; and under

21    Rule 26(a), we would have an expert report by the deadline.

22              **THE COURT:**  Well, the government shouldn't need a

23    hired expert witness to tell you what prior violations this

24    company has had.  I mean, the government should have access to

25    that data easily, I would imagine.  Some agency of the

OFFICIAL TRANSCRIPT

1  government has to have that information.

2        MR. O'ROURKE:  I apologize for mentioning the other

3  factors, but the factual information I'm talking about could go

4  to violations or it could go to different factors and that's

5  why there's confusion about which it is.

6        THE COURT:  All right.  Mr. Langan wants to say

7  something.

8        MR. LANGAN:  Your Honor, I seldom disagree with Judge

9  Shushan, but actually her order was more specific than just

10  disclosures.  It said at page 3:  "By Wednesday, March 12th,

11  the U.S. is to provide a two-page submission regarding any

12  other statutory violations by BPXP that it believes are

13  pertinent to this factor, along with a listing of the dates and

14  nature of the violations."  And that was under the history of

15  prior violations.

16        THE COURT:  And in response to that, the government

17  said what?  What did they do?  They identified those four?

18        MR. LANGAN:  And they briefed the motion in limine.

19  And, yeah, I believe that's it.

20        THE COURT:  Okay.

21        MR. LANGAN:  And said that they're looking for

22  others, I think.

23        THE COURT:  Here's my ruling on that:  I'm going to

24  rule that the government is limited to -- my initial ruling is

25  the government's going to be allowed to use -- to not go beyond

 1   the four that they've identified.  And with respect to those

 2   four, once the government makes its -- I guess, discloses --

 3   you know, I'm not going to decide now whether any of those four

 4   specifically are admissible or not.  We'll deal with those in

 5   due course.

 6              They'll produce their expert reports, you'll get

 7   a chance to respond, or you can file a motion later to strike

 8   any as not relevant for the reasons you've argued before and

 9   we'll look at each one individually.

10              **MR. LANGAN:**  Thank you, Your Honor.

11              **THE COURT:**  All right.  Thank you.

12              Okay.  Let's talk about the economic benefit to

13   the violator, if any, resulting from the violation.  My

14   understanding from reading the briefs, and I want counsel to

15   correct me if I misunderstood, but my sense is that BP is

16   arguing, of course, that it did not receive any economic

17   benefit; and the government is suggesting that there may have

18   been some economic benefit, but in comparison to the potential

19   fines that we're talking about in this case, it's essentially

20   irrelevant -- this factor is essentially irrelevant.

21              Have I said that right?

22              **MR. O'ROURKE:**  Steve O'Rourke, Your Honor.

23              Yes, you summarized our position correctly.  The

24   evidence of the economic benefit is already in the record from

25   Phase One, if there were delays, that saved them money and so

1   on.  But compared to the size of this case, it's background

2   noise, and we're not going to waste your time with new

3   evidence.

4           **THE COURT:**  So it sounds like both sides agree there

5   should be no further discovery on this issue.

6           **MR. O'ROURKE:**  We just are afraid that they're going

7   to put on something that we would have to rebut, so that's why

8   I wrote all those paragraphs.

9           **THE COURT:**  Well, BP's just going to take the

10  position there is no economic benefit; right?

11          **MR. LANGAN:**  Your Honor, that's correct.

12              By the way, we agree that Phase One and Phase

13  Two, these issues may have been taken up.  Of course, of the

14  things they say were potential economic benefits, we would say

15  were never causal.  But it sounds like we're both agreed that

16  there was no economic benefit from this incident to BPXP, the

17  violator.

18          **MR. O'ROURKE:**  If there's no experts or witnesses

19  from the two defendants, then we're done with this.

20          **THE COURT:**  Both sides agree there's no need for any

21  further discovery or expert testimony on that?  Okay.  Good.

22              The degree of culpability involved, another

23  factor.  Mr. O'Rourke?

24          **MR. O'ROURKE:**  The --

25          **THE COURT:**  Let me state my understanding of where

OFFICIAL TRANSCRIPT

1    you all are on that.  Obviously, we spent -- was it two months

2    in Phase One?  I'm losing track of everything now -- two months

3    in Phase One taking evidence and expert testimony on whether BP

4    and other parties were negligent or grossly negligent in terms

5    of liability for the casualty.

6              My understanding is that BP's position, and I

7    think Anadarko agrees, if I'm right, that there should be no --

8    in fact, Anadarko's in a little bit of a different position

9    because I ruled that they as a matter of law were not negligent

10   or could not be held negligent in Phase One, and that both BP

11   and Anadarko believe that whatever findings are made from Phase

12   One will encompass -- will be the evidence for culpability.

13             The government, I'm not quite sure about, so

14   I'll let you speak, Mr. O'Rourke.  But it seems like the

15   government is arguing that there can be some type of

16   culpability that's greater than being strictly liable but less

17   than being negligent -- legal negligence.

18             So if you want to talk about that.

19        **MR. O'ROURKE:**  Yes, Your Honor, I'll try to talk

20   about the whole factor.  You generally have it correct.

21             Let's talk about the defendants separately.

22             With respect to BP, we agree that Phase One and

23   the source control portion of Phase Two, that's it for BP's

24   culpability.

25        **THE COURT:**  Yes, I should have mentioned that part of

OFFICIAL TRANSCRIPT

1  Phase Two also.
2          **MR. O'ROURKE:**  However --
3          **THE COURT:**  So that's it for BP?  You're not
4  suggesting that there's any other discovery or evidence
5  necessary?
6          **MR. O'ROURKE:**  With one -- about Macondo, that's
7  correct, but with one qualification, which is:  We believe that
8  the four incidents we've just discussed, Texas City, Endicott,
9  et cetera, the same expert, the same evidence may go to the
10  culpability factor as a matter of legal argument.
11              It would be the same evidence.  Does it fall
12  into prior violations or fall into culpability?
13          **THE COURT:**  So you just want to be able to argue that
14  somehow the Court should consider that as part of the
15  culpability analysis?
16          **MR. O'ROURKE:**  Which is just argument with no
17  different evidence.
18          **THE COURT:**  No further witnesses or evidence?
19          **MR. O'ROURKE:**  That's right.
20          **THE COURT:**  We can deal with your argument later.
21  I'm not going to deal with that today.
22              Okay.  Mr. Langan?
23          **MR. O'ROURKE:**  Do you want me to talk about Anadarko?
24          **THE COURT:**  Oh, I'm sorry.  Yes, yes, I'm sorry.
25  Talk about Anadarko, yes.

1          **MR. O'ROURKE:**  If you want any details, I'm going to
2    have Ms. Flickinger get up, but, in general --
3          **THE COURT:**  Well, why don't you just let her speak?
4          **MR. O'ROURKE:**  Great.
5          **THE COURT:**  She's itching to speak, I can tell.
6          **MS. FLICKINGER:**  Good morning, Your Honor.
7          **THE COURT:**  Good morning.
8          **MS. FLICKINGER:**  Anadarko, as you know, was severed
9    from the Phase One trial.  So it's our contention that we
10   should be able to put on some evidence, so I'm going to make
11   basically three points.
12          Number one, there's no evidence of their
13   culpability on the record right now.  No deposition bundles, no
14   fact witnesses, no expert witnesses have been heard.  And
15   really all the Court has concerning Anadarko right now are the
16   limited facts that we put in with the motion for summary
17   judgment.  At the end of the day, the Court's going to affix a
18   civil penalty.
19          **THE COURT:**  What facts were those again?  Remind me.
20          **MS. FLICKINGER:**  It's the basic contract, the bills
21   from BP, and the payments from Anadarko.  In terms of their --
22          **THE COURT:**  Is there any factual dispute as to the
23   relationship between Anadarko and BP related to the Macondo
24   well?
25          **MS. FLICKINGER:**  It's more a question of what their

1  involvement was at Macondo and what their nexus was with the

2  well.  At the end of the day, Your Honor, you're going to have

3  to --

4          **THE COURT:**  Isn't that the same evidence or arguments

5  that the government made initially before I --

6              It seems to me the government, and I think the

7  PSC was, too, other parties were arguing that Anadarko could be

8  potentially liable as a joint venturer, or whatever, a partner

9  in the well because, among other things, they had -- you know,

10  they're not just a -- it's not just like if I would buy stock

11  in BP, I'm an investor, but I obviously have no control, I have

12  no expertise or anything, but Anadarko has expertise, that's

13  their business, too, they bought into this well, they had

14  access to the drilling plan, to the drilling information as it

15  was going on and so forth and they could have stepped in to do

16  something or whatever.

17              That was the argument initially, wasn't it?

18          **MS. FLICKINGER:**  That's correct.  That's correct.

19  That's correct.

20          **THE COURT:**  And despite that, I ruled as a matter of

21  law they could not be negligent under the circumstances of this

22  case; correct?

23          **MS. FLICKINGER:**  That's correct.  We accept that

24  ruling.

25          **THE COURT:**  So why isn't that the end of the story

1   here?

2   **MS. FLICKINGER:** Well, first of all, a lot of the

3   facts that you just mentioned are not on the record. So --

4   **THE COURT:** Well, is there any dispute as to -- I

5   mean, I don't think they dispute that they had access -- maybe

6   there's some factual disputes. I don't want to overstate it.

7   But the point is those are all your facts in your favor and

8   they weren't enough to survive summary judgment. So how do you

9   get --

10  **MS. FLICKINGER:** No, we prevailed on summary

11  judgment. They're the admitted owner of the well and they're

12  strictly liable.

13  **THE COURT:** Well, as the owner of the well, but not

14  on negligence.

15  **MS. FLICKINGER:** Exactly. So then the issue is, when

16  you made your prior rulings, Your Honor, it was on the

17  pleadings. Those were motions to dismiss.

18  **THE COURT:** It was on what?

19  **MS. FLICKINGER:** On the pleadings. Those were

20  motions to dismiss. So there are no deposition bundles,

21  there's -- those other facts that you just recited, which we

22  think should be on the record, are not presently on the record.

23  So that's one reason why.

24  **THE COURT:** But I don't understand how that leads to

25  culpability. I've already ruled that it seems to me as a

OFFICIAL TRANSCRIPT

 1   matter of law that that doesn't result in any culpability on

 2   their part.  It seems like we're splitting hairs here by what

 3   is meant by culpability as opposed to negligence or whatever.

 4          **MS. FLICKINGER:**  That's exactly right.

 5          **THE COURT:**  I don't know if there's a -- the

 6   government's argument seems to be that there's some gradation

 7   of bad conduct that falls between strict liability negligence

 8   and then, of course, you go to gross negligence and worse.  But

 9   I don't know where that's coming from.

10          **MS. FLICKINGER:**  Right.  But that's exactly our

11   theory.  It's called degree of culpability.

12          **THE COURT:**  Is the government's argument that, among

13   other things, I sense, that Anadarko should not have partnered

14   up in this well with BP because BP's bad past conduct was so

15   bad, their environmental record was so awful?  It seems to be

16   that's one of your arguments.

17          **MS. FLICKINGER:**  That's one aspect of it,

18   potentially, yes.

19          **THE COURT:**  It's kind of a hard argument to make

20   right now since the government just let BP back in the Gulf of

21   Mexico, isn't it?

22          **MS. FLICKINGER:**  Right.  I hear you, Your Honor.

23   That's correct.

24                But since they are strictly liable, they have a

25   nexus with the well, they have a relationship with BP, they

```
1    were in privity with BP, and they're one of the liable parties.
2              THE COURT:  Well, all that's fine.  They're
3    strictly -- at least in my view, they're strictly liable as a
4    part owner of the well.  Under the Clean Water Act, it doesn't
5    matter if you're negligent or not.  So I don't understand this
6    gradation of culpability that's something less than negligence.
7              MS. FLICKINGER:  Well, again, another thing with our
8    case is that when we have --
9              THE COURT:  What's your best case for that to support
10   that argument, that proposition?
11             MS. FLICKINGER:  The proposition that there can be a
12   degree of culpability?
13             THE COURT:  That's less than negligence --
14             MS. FLICKINGER:  That's less than --
15             THE COURT:  -- but more than strict liability.
16             MS. FLICKINGER:  I think the statutory construction
17   is helpful.
18             THE COURT:  Do you have a case that construes the
19   statute that way?
20             MS. FLICKINGER:  In the Fifth Circuit we cited a --
21             THE COURT:  What case?
22             MS. FLICKINGER:  -- sentence from the *CITGO* opinion
23   where --
24             THE COURT:  Well, I've read *CITGO* several times.  It
25   does not say that.  It just talks about that you can be
```

OFFICIAL TRANSCRIPT

```
1   negligent -- the ranges of culpability run all the way from
2   strict liability to gross negligence or willful misconduct.  It
3   doesn't say that there's something between strict liability and
4   negligence.  That wasn't the issue in that case at all.
5          MS. FLICKINGER:  No, but there is an indication.  I
6   think it's --
7          THE COURT:  You picked up on one little isolated
8   sentence there.
9          MS. FLICKINGER:  Yes.  But it's in the context of a
10  strict liability case, whereas some of the cases cited by
11  Anadarko are in the context of --
12         THE COURT:  No, no.  Actually, in the CITGO case, I'm
13  pretty sure, Judge Haik found CITGO was negligent.  In fact,
14  the Fifth Circuit indicated they may have been grossly
15  negligent and sent it back to him, among other things, to
16  reconsider that.  So it wasn't just that they were strictly
17  liable, CITGO.
18         MS. FLICKINGER:  Yes.  Thank you, Your Honor.
19              Another point I'd like to make in connection
20  with this evidence is that I know you want to go through
21  penalty by penalty, but Anadarko has indicated that this same
22  topic, the relationship -- the relationship between operators
23  and non-operators and, you know, the kind of evidence that we
24  would seek to get on the record can come in under the final
25  penalty factor which is, "any other matters that justice may
```

1  require."

2      So they're putting these topics into play and

3  intending to put on evidence.  So we would think if you're not

4  persuaded by our arguments on culpability, that this evidence

5  also should come in under that final penalty factor.

6      **THE COURT:**  All right.  Let's see what Anadarko has

7  to say about that.

8      **MR. SALMONS:**  Good morning, Your Honor.  David

9  Salmons on behalf of Anadarko.

10      **THE COURT:**  Is Ms. Flickinger right that Anadarko

11  intends to put on some type of case about this?  What is your

12  intent?

13      **MR. SALMONS:**  No, Your Honor.  She's wrong about

14  that.

15      What we have said is if there's going to be

16  evidence, if they're going to be allowed to try to put in

17  evidence that somehow, despite Your Honor's rulings, Anadarko

18  has some kind of culpability as a non-operator here, then we're

19  going to need to put in evidence that sort of puts our spin on

20  that evidence and shows why non-operators aren't culpable.

21      But if this is out because there's no

22  culpability, we're not going to introduce this ourselves.

23  There's no reason to.

24      **THE COURT:**  Let me ask you this:  Is there any reason

25  why Anadarko and the government can't enter into some very

1    basic stipulations along the lines of some of the facts that I

2    said earlier:  Exactly what the relationship was between BP --

3    I mean, between Anadarko and BP, what involvement or

4    non-involvement Anadarko had?

5                    I mean, there's no doubt you did have the things

6    that I said a few minutes ago to start --

7              **MR. SALMONS:**  That's right, Your Honor.

8              **THE COURT:**  -- without repeating them all.  I don't

9    think those are in dispute, are they?

10             **MR. SALMONS:**  We don't think they are.  No.  Our

11   position all along has been they're irrelevant as a matter of

12   law because they don't establish culpability.

13             **THE COURT:**  Well, that's what I -- and I agreed with

14   you when I --

15             **MR. SALMONS:**  So I think the disagreement -- and

16   that's exactly right, Your Honor.  I think the disagreement we

17   have with the government is that the facts they want to put in,

18   that Anadarko is an oil company, that it was engaged in

19   activities --

20             **THE COURT:**  Why don't we handle this issue this way

21   for you:  Why don't we have you and the government, without

22   taking any -- this shouldn't require any discovery

23   whatsoever -- enter into a set of basic stipulations of fact.

24                    The government can then, at trial, or before

25   trial, argue that these are relevant and the Court should

OFFICIAL TRANSCRIPT

1   consider them somehow under some factor; you can make the
2   opposite argument.
3               But the facts shouldn't be, it seems to me, in
4   dispute, those basic facts.
5           **MR. SALMONS:**  I think we can --
6           **THE COURT:**  Because part of her argument was, "Well,
7   a lot of what I said may not be in dispute, but it's not in the
8   record."  So at least --
9           **MR. SALMONS:**  Well, I think if you look at, for
10  example, our statements of undisputed facts that were a part of
11  the summary judgment pleadings on owner liability --
12          **THE COURT:**  Well, I don't want to look at those now.
13  Why don't you all --
14          **MR. SALMONS:**  All I'm saying is I think those facts
15  are sort of there.  We're happy to work with them on that.
16  There's just two critical things, if I could just say, Your
17  Honor, about this that I just want to make clear you're focused
18  on.  One is that --
19          **THE COURT:**  Don't keep speaking when you're winning,
20  you know.
21          **MR. SALMONS:**  Well, I'm happy to sit down.  I'm just
22  concerned about the legal error they're suggesting for Your
23  Honor to adopt in terms of the meaning of the term
24  "culpability," that it somehow includes things that are
25  strictly liable.

1          All the cases they cite, and we cite, involve

2    cases where parties had strict liability to get into the

3    penalty regime, as Your Honor's aware, but they have been held

4    to have no degree of culpability because they violated no legal

5    duty and they weren't responsible for the accident, and that's

6    exactly what Your Honor has held with regard to us.

7          THE COURT:  Yes.  Again, those are legal arguments

8    that if the government wants to reurge something along those

9    lines at trial, or before trial, on some sort of motion, or you

10   make some kind of motion, we could consider that.

11          Right now I'm trying to just focus on, what do

12   we need to do today to get the discovery in place.  It seems to

13   me this shouldn't require any discovery.

14          MR. SALMONS:  Well, we certainly agree that there's

15   no need for -- I think, for discovery as to our culpability.

16          MS. KIRBY:  If I may, Your Honor.  When you say basic

17   stipulations, I'm sure you understand that there are arguments

18   the Court has -- I mean, the U.S. has made about what this

19   e-mail means, or, well, you should have harkened, you should

20   have gone out and done something regardless --

21          THE COURT:  I'm not going down to that level.  I'm

22   talking about the basic stipulations about the relationship

23   between BP and Anadarko, generally, what type -- you know,

24   Anadarko had access to the drilling reports, or, you know,

25   stuff like that.  I mean, I don't think those things are in --

1          **MR. SALMONS:**  Well, our view, Your Honor, is all of

2   that's in your prior decision --

3          **THE COURT:**  And then --

4          **MR. SALMONS:**  -- it's in the summary judgment record.

5          **THE COURT:**  -- you can argue that as a matter of law

6   it's irrelevant, even to the penalty phase under any factor.

7   You can make that legal argument.

8          **MR. SALMONS:**  I think that's right.  My only concern

9   is that I think we're happy along those lines, but I think they

10  still have these other things they're thinking about in terms

11  of e-mails and other kinds of things that they're trying to

12  draw particular inferences from.

13               Although, at the end of the day, they still seem

14  to agree that as a matter of law we weren't negligent.  They

15  just have a different understanding of culpability than the law

16  allows them to have.

17          **THE COURT:**  Yeah.  Well, one of the legal arguments

18  they make, they cite to the case -- I forget what case it is,

19  but there's a case, a reported case, for example, where a --

20  and they distinguished this situation from your situation --

21  where someone owned a pipeline and the pipeline ruptured due to

22  the act -- I don't know if it was a vandal or something -- some

23  unknown person ruptured the pipeline and caused an oil spill.

24  The pipeline owner is strictly liable under the Clean Water

25  Act, but had absolutely no culpability whatsoever.

OFFICIAL TRANSCRIPT

1           And I think they're distinguishing that from
2   your situation.  I'm just kind of trying to restate for the
3   point of argument here the government's argument, I think,
4   that, "Well, you're not quite in that position because not only
5   did you own the pipeline in this case, but you didn't have an
6   outside vandal come in and vandalize your well.  You had some
7   degree of control, oversight," whatever they want to call it.
8           That's how they're trying to draw that line
9   there, I think.
10          **MR. SALMONS:**  That may be right.  I still would say
11  as a matter of law, there's zero degree of culpability because
12  there's no violation of a legal duty, which is what
13  "culpability" means.
14          And if Your Honor is comfortable with that
15  holding, I think that's what puts an end to all of this.  We
16  can still stipulate as to the basic facts you're talking about.
17  But we're just kicking the can down the road again -- and we've
18  done it three times now -- with regard to them constantly
19  coming back with suggestions that somehow we have culpability
20  and responsibility because we saw an e-mail or something along
21  those lines, and we're just trying to get to a resolution.
22          And we're happy to do it as Your Honor sees fit,
23  but I just want you to get a sense of why we are urging for
24  this legal resolution to this point.
25          **THE COURT:**  All right.  Ms. Kirby, did you want to

OFFICIAL TRANSCRIPT

1  say something?

2              MS. KIRBY:  Yeah.  Well, I am highly concerned, Your

3  Honor.

4                   While I understand your request that we try to

5  work out stipulations, we've been in that context before on

6  other factors, and I regrettably foresee a situation where they

7  want us to put a spin or engage in a spin with them on a

8  particular fact, "You had access to -- or you approved the well

9  design," for instance.  The well design that, for instance, was

10 already approved by the government before we even came into the

11 deal.

12                   But things like that that I think are going to

13 cause a huge problem and we're going to end up right back here

14 all over again, whereas right now I think we are in a position

15 where the Court can rule.  This is not a situation of

16 culpability as culpability is generally understood.

17             THE COURT:  All right.  Let me hear from

18 Ms. Flickinger, if she wants to respond.

19             MS. FLICKINGER:  Yes, Your Honor.  We're perfectly

20 happy to try to work out stipulations.  I will say there

21 already is evidence that just hasn't been admitted into the

22 record.  So if the stipulations --

23             THE COURT:  Where is that evidence?

24             MS. FLICKINGER:  There were depositions taken in

25 Phase One.  They've all been designated and the deposition

OFFICIAL TRANSCRIPT

 1   bundles were even prepared, I think, but they just aren't in

 2   evidence.

 3          THE COURT:  I'll say this:  I don't think this

 4   argument is going to get you anywhere, I really don't, at least

 5   not in this court.

 6              It's pretty clear to me that once I -- based on

 7   my ruling that Anadarko had no legal duty to intervene or so

 8   forth in the context of this well and they could not as a

 9   matter of law be negligent, I don't see how you can argue they

10   had some higher degree of culpability beyond strict liability,

11   which there's no dispute they have that.  At least, there's no

12   dispute as far as I'm concerned.

13              So I'm going to -- let's see.  Is there a --

14   it's a motion by Anadarko to exclude culpability; correct?

15          MS. KIRBY:  Yes, Your Honor.

16          MR. SALMONS:  Yes, Your Honor.

17          THE COURT:  I'm going to grant that motion.  This is

18   Record Document 12343.  That's granted.

19          MS. FLICKINGER:  Thank you, Your Honor.

20          THE COURT:  BP's got -- excuse me.  Sarah, I'll let

21   you speak in a minute.

22          MS. HIMMELHOCH:  Okay.

23          THE COURT:  BP has a combined motion in limine to

24   exclude from the penalty phase two things.  One is additional

25   evidence of culpability.  To that extent, I'm granting BP's

1    motion also, which is Record Document 12347.

2                    The second part of that motion by BP is to

3    exclude evidence relating to unrelated prior incidents, and

4    that was what we talked about earlier.  I'm going to --

5                    This is what I'll do:  I'm going to deny BP's

6    motion to the extent it seeks a ruling from the Court, that at

7    this time the government's evidence on prior incidents has to

8    be limited to BPXP violations of Section 311, with a further

9    stipulation that the government is limited to coming forward

10   with the four specific cases that they've identified, and BP

11   will have a chance to -- we'll have a chance to make the final

12   decision before trial as to whether any or all of those are

13   admissible or not.

14                    **MR. LANGAN:**  Thank you, Your Honor.

15                    **THE COURT:**  Okay.

16                    **MS. HIMMELHOCH:**  Your Honor, Sarah Himmelhoch.  Just

17   a quick question on your ruling on the culpability motion.

18                    **THE COURT:**  Yes.

19                    **MS. HIMMELHOCH:**  Since we are going factor by factor,

20   some of these facts may be relevant to arguments under "such

21   other factors as may be required."  So my question is:  Is your

22   ruling that the types of facts discussed in the motion may not

23   be entered as to any factor or only as to the culpability

24   factor?

25                    **THE COURT:**  As to what we just talked about, I don't

OFFICIAL TRANSCRIPT

1  think -- to the extent I've said they're excluded, they're
2  excluded from the trial.  Yeah.
3          **MS. HIMMELHOCH:**  Okay.  Thank you.
4          **THE COURT:**  Another issue deals with the discovery
5  of, I guess it's financial information.  The question is:  Is
6  the government entitled to discover financial information
7  beyond BPXP and beyond Anadarko -- is it Anadarko Petroleum
8  Company?  Is that the name?
9          **MS. KIRBY:**  That's correct.
10          **THE COURT:**  Yeah.  So this goes to the economic
11  impact, I guess, on the violator.
12              Mr. O'Rourke, or who wants to speak on that over
13  here?
14          **MS. HANKEY:**  Yes, Your Honor.  Rachel Hankey for the
15  United States.
16          **THE COURT:**  Okay.
17          **MS. HANKEY:**  So I think -- I think it's a little
18  unclear what our disagreement with BPXP is at this point on
19  what discovery we're entitled to.
20          **THE COURT:**  Well, I think their argument is that --
21  let me state what I understand and then you can tell me if I'm
22  wrong or argue otherwise.  But my understanding is that BPXP
23  says that they're the violator -- that's the entity that is the
24  designated responsible party and violator and, therefore, the
25  Court needs to consider only -- not only their conduct, but

1     only their, I guess, financial wherewithal or ability to pay.

2             **MS. HANKEY:**  They seem to suggest that while the

3     Court can consider the assets of affiliates or the parent

4     companies, the Court's focus should be on the violator.  I'm

5     not sure I understand exactly what that means.

6             In *CITGO*, for example, the Court did, in fact,

7     consider the parent's assets in evaluating impact on the

8     violator; and Courts routinely, in evaluating economic impact

9     on the violator, look at parents' assets.

10            **THE COURT:**  Let me ask BP's counsel, because I have

11     some questions about that that maybe they can answer.

12             My understanding from reading the briefs and all

13     in this matter is that BPXP has no employees.

14            **MR. LANGAN:**  It has no employees, it has officers and

15     directors.

16            **THE COURT:**  They only hold the leases in the Gulf.

17     For example, they hold 600-something leases in the Gulf.

18            **MR. LANGAN:**  They do, but not just only that, but

19     they do hold the leases.

20            **THE COURT:**  And that the people who actually work out

21     there on the rigs -- or the people who work in the Gulf or that

22     otherwise oversee that are employees of a different BP entity

23     called BP America.

24            **MR. LANGAN:**  BP America Production Company --

25            **THE COURT:**  BP America Production Company?

```
 1              MR. LANGAN:  That's correct.  Paid for by BPXP, costs
 2      incurred by.
 3              THE COURT:  That's fine.
 4                     And both of those are -- and there's several
 5      layers of affiliates and whatever, but it all goes back to BP.
 6      Is it BP p.l.c. in London?
 7              MR. LANGAN:  BP p.l.c. is the group-holding entity
 8      that's headquartered in London, correct.
 9              THE COURT:  That's the big -- I'm going to call it
10      "the big BP."  Right, in London?
11              MR. LANGAN:  That's correct.
12              THE COURT:  And all of these are somehow
13      subsidiaries, affiliates, whatever of BP p.l.c.?
14              MR. LANGAN:  Yes, they are, Your Honor, but not
15      publically traded.  That's right.
16              THE COURT:  They're not publically traded.
17              MR. LANGAN:  This is not unusual.  This is not unique
18      to BP.  People operate around the world like this.
19              THE COURT:  I'm not suggesting otherwise.  I'm just
20      trying to understand the situation.
21              MR. LANGAN:  Sure.
22              THE COURT:  So I can't go to my broker and buy a
23      share of stock in BPXP, for example?
24              MR. LANGAN:  That is correct.
25              THE COURT:  I could buy a share of BP p.l.c.
```

1          **MR. LANGAN:**  Or an American Depository Receipt, the
2     same thing.  You could buy a public security, yes.
3          **THE COURT:**  Whatever that is.  Okay.
4          **MR. O'ROURKE:**  We're going to move to recuse you.
5          **THE COURT:**  If I did -- you all are tempting me.
6     That would be an easy way to get out of it, you know.
7               But I guess the question here, and I do think
8     that there was some sense -- I sensed some sense of concession
9     that the government is entitled to look at more than just the
10     narrow BPXP entity because of the relationship here and the way
11     that this is -- all the financial reporting is done on a
12     consolidated basis.
13               And the government even alleged, I don't know if
14     BP disputes this, but there was something in one brief where
15     the government alleged that in -- BP makes the point that since
16     2010 there have been no dividends paid by BPXP to BP p.l.c.
17          **MR. LANGAN:**  Correct.
18          **THE COURT:**  But in 2009, the year right before the
19     spill, there was dividends of like $7 billion.
20          **MR. LANGAN:**  That's correct.  Right.
21          **THE COURT:**  Okay.  So it seems like they should be
22     entitled -- tell me exactly what BP's position is on all this.
23          **MR. LANGAN:**  All right, Your Honor.  So, again, we go
24     back to first principles here.  The company that the government
25     sued in the Clean Water Act case was BPXP only.

1          THE COURT:  Right.

2          MR. LANGAN:  BPXP was the MC 252 leaseholder.

3          THE COURT:  Right.

4          MR. LANGAN:  They're the ones the Coast Guard said

5   was the responsible party; and they're the ones that the

6   government is claiming is the violator under the Clean Water

7   Act.

8          THE COURT:  Correct.

9          MR. LANGAN:  All of those facts are undisputed.

10          THE COURT:  Sure.

11          MR. LANGAN:  So we think the focus should be on BPXP

12   in terms of Your Honor's evaluation of the economic impact on

13   the violator.  So that's our position.

14              At the same time, we've told the government

15   before they filed their motion, that is not to say there is

16   zero relevance to financial interactions between BPXP and BP

17   p.l.c.  In fact, we gave a list that's part of the record of a

18   number of documents that we would agree documents like this

19   ought to be a part of the discovery:  Intercompany infusions of

20   carve, intercompany transactions and loans.  I mean, we

21   understand that.

22              But at the end of the day, when Your Honor looks

23   at the situation, it's our position you're going to have to

24   focus on BPXP and figure out what's a penalty they can afford

25   to pay.  And when you do that, you're going to have some

1  history, and we understand that.  We're not saying that that's

2  irrelevant, but the focus should be on BPXP for the ability to

3  pay because they're --

4           And, by the way, there's no veil piercing

5  allegation.  I mean, in other words, a lot of what the

6  government's trying to do here looks like an underhanded veil

7  piercing attempt.  I mean, corporate formalities were

8  maintained here.  There have been no such allegations that they

9  haven't.  These were legitimate corporate enterprises,

10  legitimate things were met.

11           And we don't understand the relevance of things

12  like ten years of board minutes for eight BP entities.  That's

13  what we object to what they're asking for.

14       **THE COURT:**  Well, I do agree, and I have not looked

15  at all of the -- there was draft discovery passed back and

16  forth; right?

17       **MR. LANGAN:**  Correct.  And now formal have been

18  served.

19       **THE COURT:**  I haven't looked at those in detail --

20  I'm going to let Judge Shushan do that -- but I did see some

21  references to those in briefs.  I'll say this:  I think that

22  the government's request for discovery seemed way, way

23  tremendously overbroad, beyond the scope of what is necessary

24  here.

25           But with that understanding, it seems to me that

 1    it's just a matter of, you know, what they can get access to.

 2    I don't think I'm going to be able to rule on that today.

 3    Whether you're offering is sufficient or adequate or whatever,

 4    I can't decide today.

 5              **MR. LANGAN:**  One of the points we made, Your Honor,

 6    was that we anticipate that in the normal discovery context

 7    there's going to be back and forth, objections, and Judge

 8    Shushan will guide us, I'm sure, about what's appropriate and

 9    what's not.

10              We've never said that there's no relevance to

11    the group finances.  We've said that BPXP is a defendant, the

12    violator, they're the ones that they moved for summary judgment

13    against and that's where the focus should be.

14              **THE COURT:**  It's a question of what can that entity

15    afford to pay, but considering the various financial

16    relationships and back and forth and all of that.

17              **MR. LANGAN:**  Right.  That's correct.  In fact, we

18    have provided them a draft stipulation that we always knew

19    would be subject to evaluation and discovery with the documents

20    that would back it up.

21              One of the points they made was, "Well, we don't

22    know that."  Well, we understand the stipulations were done

23    before discovery started.  So we're more than willing to engage

24    them in appropriate discovery to confirm what we've told them

25    BPXP's financials look like.

OFFICIAL TRANSCRIPT

1          **THE COURT:**  Let me ask you this:  If I were to look
2   at BP p.l.c. or BP's financial statements, reports, and your
3   annual reports and so forth, that alone would not give the
4   government what they apparently need in this case; do you agree
5   with that?
6          **MR. LANGAN:**  I would agree with that insofar as it
7   relates to BPXP's economic impact from a fine.  We don't
8   disagree with that at all.
9          **THE COURT:**  All right.
10          **MR. LANGAN:**  Thank you, Your Honor.
11          **THE COURT:**  Thank you, Mr. Langan.
12          Ms. Hankey?
13          **MS. HANKEY:**  I guess I'd make a couple points.
14   First, I hope it's clear that the government at this point has
15   literally zero information about BPXP's financials.  None of
16   that has been produced in discovery, and none of it is
17   publically available.  The only thing that's publically
18   available is the numbers on BP p.l.c.
19          The second thing I would note is one of the
20   reasons that we, in fact, filed this motion is it's not just
21   the financial relationship between these entities that's
22   relevant.  It's also the legal relationship between these
23   entities.
24          And the point of our motion is that Phase One
25   already established the legal relationship, and established

1    that they operate as a group entity, and that it wasn't BPXP

2    that drilled the well, it was the business unit.

3            **THE COURT:**  Well, if, in your view, Phase One has

4    established that, then you don't need any further discovery on

5    that; correct?

6            **MS. HANKEY:**  That is precisely the point.  BPXP --

7            **THE COURT:**  Remember, here we're trying to figure out

8    what we need to do to get the discovery underway.

9            **MS. HANKEY:**  Well, my point would be, what BPXP says

10    is before you can consider the financials, you also have to

11    look at the relationship between these entities; and they're

12    reducing that to simply what they're calling material

13    transactions, loans, dividends.

14            And our point is, that's not the only thing that

15    matters, it's also the legal relationship.  And once that's

16    established -- and they're in disagreement with us on this

17    point.  They claim that we do, in fact, have to prove up that

18    these material transactions exist before you look at the

19    numbers from BP p.l.c.  And our point is, that shouldn't be

20    true.  What you have in Phase One should be sufficient.

21            And if you rule on our motion in our favor, that

22    means that most of that discovery goes away, the things like

23    the board minutes that they've complained about.  We asked

24    about the board minutes so that we could produce evidence on

25    the legal relationship, as they suggested that we need to do.

1    **THE COURT:**  Well, I've got to tell you, the longer

2    you speak, the more confused I'm getting about your position.

3    Because I thought the government filed a motion in limine

4    asking me to permit additional discovery or evidence, and it

5    sounds like you're saying if I rule in your favor, you don't

6    need any further discovery or evidence.

7    **MS. HANKEY:**  It's not that we don't need further

8    discovery, it will be far less.  Because, for example, we won't

9    need to establish that these entities acted -- that the

10   affiliates are relevant and that they acted together.

11   **THE COURT:**  What ruling do you want me to make?

12   **MS. HANKEY:**  If you grant our motion that the

13   affiliates are relevant, then we do not need to produce a

14   witness to explain to you why they're relevant.  That's our

15   point.  That the Phase One record already told you enough to

16   know that they're relevant.

17   **THE COURT:**  Well, I'm not going to be able to make

18   that ruling here today, but I am going to rule in your favor to

19   the extent that I'm going to allow you, if you wish, to get

20   discovery from BP with respect to the relationship between the

21   entities, between BPXP, BP America, BP p.l.c., and I guess any

22   other entity that's in their direct line.

23   I don't think we're necessarily talking about BP

24   Malaysia or whatever.  But you understand what I'm talking

25   about.  I know BP probably has hundreds of affiliates, I'm

1  guessing.

2          **MR. LANGAN:**  I'm sure, yes.

3          **THE COURT:**  So we're not talking about every

4  affiliate out there, but the ones that show the connection

5  between these entities.  And it sounds like there may be some

6  hope for some type of cooperation agreement in terms of

7  providing the financial information relating to that

8  relationship.

9          **MR. LANGAN:**  Your Honor, I'm sure -- we've always

10  been willing to talk to them about it.  We've started that

11  process, and I'm sure we can continue it.  Obviously, BP

12  p.l.c.'s financials are largely public.

13          **THE COURT:**  Right.  So I'm going to -- I think Judge

14  Shushan has a good idea now as to where we should go with that

15  and what the limits should be.

16          **MS. HANKEY:**  If I could note, there's one other

17  reason this was raised and that's with respect to the evidence

18  that BP seeks to introduce on the response actions, and the

19  fact that response actions were paid for and performed by

20  various BP entities.

21          **THE COURT:**  Well, I'm going to -- is that a separate

22  motion by BP?  That's not a motion by BP, is it?

23          **MR. LANGAN:**  Your Honor, I think this is how it's

24  presented, if I may.

25          **THE COURT:**  Okay.

1          MR. LANGAN:  So their motion is a request for a broad

2     sweeping ruling that the BP Group is relevant to all factors.

3     We strongly resist that as too blunt of an instrument.  All

4     right.  What counsel is talking about is the fact that what

5     they say is, "If you won't agree to that, then we're not going

6     to let you put in evidence about what the response was like."

7              Because the fact of the matter is that BPXP paid

8     for --

9          THE COURT:  Okay.  I understand that argument --

10         MR. LANGAN:  Okay.

11         THE COURT:  -- and I understand your argument --

12         MR. LANGAN:  The response.

13         THE COURT:  -- and I agree with you on that.

14         MR. LANGAN:  Yeah.

15         THE COURT:  I'm going to rule that the -- I'm going

16    to grant the government's motion, in part, which is Record

17    Document 12355, to permit the hopefully limited discovery that

18    I mentioned a few minutes ago.

19              It seems to me that with -- you don't have a

20    motion asking me to allow that, or does that come in under a

21    mitigation factor?

22         MR. LANGAN:  I think it is.  There's no -- but

23    there's no motion.

24         THE COURT:  But there's no motion in front of me

25    today.

1          **MR. LANGAN:**  We proposed stipulations and the like in
2    response to Judge Shushan's --
3          **THE COURT:**  Yes.  It seems to me that with regard to
4    the response efforts of BP -- well, I'll just say this:  I
5    agree in principle with BP's position on this, that the
6    response efforts in evidence is not limited to just what BPXP
7    did because they were the named responsible party.
8               But as I said, any responsible party can go out
9    and hire any contractor as part of a response and that doesn't
10   mean you don't get credit for who you hire.  The fact that they
11   brought in some other BP entities, I think, is certainly
12   relevant.  So I think all that comes in.
13              To the extent the government wants to argue that
14   it's relevant for something else, we'll deal with that.
15         **MR. LANGAN:**  Thank you, Your Honor.
16         **MS. HANKEY:**  I would just make one point, which is,
17   that to the extent that BPXP had the ability to call on the
18   resources of the vast assets of the BP p.l.c. group in
19   responding to the spill, that does reflect also on the economic
20   impact on the violator, the fact that they have those assets.
21              Where we are now is that what -- you know, we've
22   been attempting to negotiate mitigation stipulations with them.
23   They've taken the position that stipulations will not preclude
24   them from putting on any evidence, that they can put on
25   evidence and do discovery in addition to any stipulations that

1  we do.

2            But one of our problems with them has been that

3  their first draft of stipulations gave us stipulations that

4  simply referred to the actions of BP, even though they've said

5  that the only defendant is BPXP.

6            And then the second draft of stipulations in

7  response to Judge Shushan --

8            **THE COURT:**  But I've just taken care of that issue.

9            **MS. HANKEY:**  I'm sorry?

10           **THE COURT:**  I've just taken care of that issue.  Your

11  argument is that it's all one way or the other.  It's either

12  all only BPXP -- if it's only BPXP for past conduct, past

13  violations or financials, then it's also only BPXP's conduct

14  for response, but I just don't agree with that.

15           **MS. HANKEY:**  That's not our position.  What we're

16  suggesting is that --

17           **THE COURT:**  I'm sorry if I misstated it.  I thought

18  that was your position.

19           **MS. HANKEY:**  No.  What we're suggesting is that it

20  is, indeed, relevant who the other entities were that were

21  involved in the response, and they have not identified that

22  information.

23           **THE COURT:**  Well, I'm sure Mr. Langan can get you

24  that information.

25           **MR. LANGAN:**  I think we have, Your Honor.

 1                Two points, if I might.  Number one, we
 2    understand Your Honor's position on the discovery -- the
 3    financial discovery, and we pledge to work on that with Judge
 4    Shushan.  I think there may be some devil in the details about
 5    the details on that that we're going to need to talk about, but
 6    we hear Your Honor.
 7                Secondly, with response to Ms. Hankey's last
 8    point.  We know Your Honor is going to impose trial time limits
 9    on this trial, and we heard that before, we heard that this
10    morning.  We understand that.  We're going to have some time to
11    put on a case, and when we do, we intend to put on evidence
12    about the scope of our response.
13                We hope to reach stipulations, but that is not
14    in lieu of our ability to show Your Honor, through live
15    witnesses and testimony, the scope of that response.  So they
16    keep raising that, that it's one or the other.  We simply don't
17    agree with that.
18                We want to work on stipulations, that's fine,
19    but not if it's going to be a preclusion to put on live
20    evidence.  And I don't understand why they keep raising that.
21    That isn't how Phase One and Phase Two worked.
22          **THE COURT:**  Well, we're not reaching that issue
23    today.  I'm not ruling today that you're precluded from
24    presenting that evidence at trial.  I would just encourage you
25    all to agree on as many stipulations as you can to reduce the

1  need for live testimony.

2          **MR. LANGAN:**  Understood.  To streamline it, we

3  understand.  Thank you, Your Honor.

4          **THE COURT:**  Okay.  Anadarko's got a similar -- or the

5  U.S. has a similar motion regarding Anadarko; right?

6          Anadarko is in a little bit different situation.

7  My understanding is the entity that's the defendant in the

8  Clean Water Act is the parent and not the affiliate.  So it's

9  kind of the reverse; right?  So tell me what the issue is with

10 respect to Anadarko.

11         Well, let's hear from Anadarko, maybe, as to its

12 position.

13         **MS. KIRBY:**  Your Honor, Ky Kirby for Anadarko.

14         The government has taken the position that

15 although Anadarko, the parent company, is the company that is

16 on the line here, effectively, that it should be permitted to

17 conduct discovery in two transactions among wholly-owned

18 Anadarko subsidiaries.

19         But Anadarko Petroleum Company's financials are

20 consolidated.  So those financials show all of the assets and

21 all of the liabilities of all of the subsidiaries, regardless

22 of who has them.

23         **THE COURT:**  And all of the revenues and so forth?

24         **MS. KIRBY:**  That is correct, Your Honor.

25         And as a result, what we're doing is we're

```
 1    trying to get into the minutia, apparently, of when did a
 2    transaction occur that somehow is reflected in a revenue or an
 3    asset gain or who knows what.  But, in any event, it doesn't
 4    make any difference because it's all there in the consolidated
 5    financials.
 6                 So our position, Judge, is that what the
 7    government is trying to do is unnecessarily complicate
 8    discovery when, in fact, they have everything they could
 9    possibly want in the consolidated financial statements already.
10         THE COURT:  All right.  Let me hear from the
11    government on that.
12         MS. FLICKINGER:  Good morning, Your Honor.  Nancy
13    Flickinger, again, for the United States.
14                 It's true as a general proposition that the
15    defendant is the parent company and the parent company
16    publically reports.  So it's a much simpler kind of exercise in
17    discovery under economic impact than it is with BPXP.
18                 However, Anadarko, as far as we can tell, wants
19    kind of a blanket prohibition on any inquiry into discovery
20    concerning the subsidiaries.
21         THE COURT:  What kind of discovery do you envision?
22         MS. FLICKINGER:  Very limited.  Specifically --
23         THE COURT:  For example?
24         MS. FLICKINGER:  There's something called
25    "consolidating financial statements," which is a preliminary
```

OFFICIAL TRANSCRIPT

1    step to doing consolidated financial statements, and it breaks

2    out financial information subsidiary by subsidiary.

3              What it does is show which components are --

4    it's kind of -- it gives you more of a dynamic picture, which

5    components are contributing, which components aren't.

6              **THE COURT:**  What difference does it make if the

7    parent company is the entity liable here and you've got all

8    their financials?  Why do you need all the minutia?

9              **MS. FLICKINGER:**  Part of the work of the expert in

10   assessing the economic impact on the violator is forward

11   looking projections, and it's very helpful to just have this

12   already compiled, very discrete information to show which

13   segments are performing better than other --

14             **THE COURT:**  You want that for every Anadarko

15   subsidiary?  I don't know how many there are.

16             **MS. FLICKINGER:**  My sense is these are already

17   compiled and it shouldn't be burdensome or onerous.

18             **THE COURT:**  For how many years?  For how many years?

19             **MS. FLICKINGER:**  I think we've asked from 2005 to

20   2014, but we haven't met and conferred yet to know.  That would

21   be our wish list, 2005 to 2014.

22             **THE COURT:**  Let me have Anadarko respond to that

23   request and see what their take is on that.

24             **MS. KIRBY:**  Your Honor, wholly-owned subsidiaries are

25   not required to have independent financial statements.  And as

1   I understand it, there aren't consolidating financial

2   statements, there is a consolidated financial statement that

3   reflects all of their operations in entirety.

4           THE COURT:  You said there's no such animal called

5   the "consolidating financial statement"?

6           MS. KIRBY:  Correct.  Correct.  I mean, there is such

7   an animal but not that they have.  That's correct.

8           THE COURT:  It might exist in the accounting world,

9   but not in --

10          MS. KIRBY:  That's correct.

11          THE COURT:  -- Anadarko's world.

12          MS. KIRBY:  I'll double-check just to be sure, Judge,

13  but my understanding is there are not.

14          THE COURT:  If those existed, would you have any

15  objection to furnishing those for some reasonable period of

16  time?

17          MS. KIRBY:  For a reasonable period of time, no.  I

18  do think that 2005 to 2014 is a bit much.

19          THE COURT:  Maybe five years?  We can negotiate some

20  period of time.

21          MS. KIRBY:  And for every single subsidiary?  Is that

22  what we're...

23          THE COURT:  How many subsidiaries does Anadarko have?

24          MS. KIRBY:  I think that there's hundreds.

25          MR. DRAGNA:  There are many, as you would expect.

```
 1              MS. KIRBY:  Hundreds.
 2              THE COURT:  I don't expect anything anymore,
 3      Mr. Dragna.
 4                   All right.  Well, why don't you -- at this
 5      point, I'm going to deny the government's motion, which is
 6      Record Document 12534, with the caveat that I'm going to
 7      request Anadarko to advise the Court and the government as to
 8      whether there exists such a thing as the consolidating
 9      statements and advise as to -- if they do exist, we can talk
10      about whether they should be produced over some reasonable
11      period of time, let's say, and that would be the extent of
12      discovery.
13              MS. KIRBY:  Yes, Your Honor.  Do you want me to send
14      that e-mail to Judge Shushan?
15              THE COURT:  Send that, no -- to Judge Shushan, yes,
16      and not to Ben.
17              MS. KIRBY:  Will do, won't do.
18              THE COURT:  All right.  I think there's only one
19      remaining motion in limine dealing -- am I right about that? --
20      dealing with seriousness.
21              MR. O'ROURKE:  Judge, could I just make one
22      clarification to the last thing?
23              THE COURT:  Yes.
24              MR. O'ROURKE:  If it's just a happenstance that
25      they don't use the phrase "consolidating statement" and use
```

1    some other phrase for a similar financial function, we'd like

2    to have those instead.

3           **THE COURT:**  Tell me, what's your definition of a

4    consolidating statement?  Because I've got to tell you, I don't

5    know what that is.  It sounds like it's something that leads up

6    to a consolidated statement.

7             Are you just talking about financial statements

8    for the subsidiary?

9           **MS. FLICKINGER:**  Yeah.  I mean, my understanding is

10    these are -- it's part of the process of developing your

11    consolidated financial statement and you package the relevant

12    information together for all the subs.  Then when you

13    consolidate it, there are kind of pluses and minuses that

14    cancel out.  So in a way that doesn't give --

15           **THE COURT:**  I'm still very, very reluctant to let you

16    get into that because it sounds like to me it's something you

17    don't really need here.  But let's see what response we get

18    from Ms. Kirby.  Okay?

19             Ms. Kirby, how long do you need to give us that

20    response?

21           **MS. KIRBY:**  I can probably give it you by the end of

22    next week.

23           **THE COURT:**  Okay.  That's fine.  Give it to Judge

24    Shushan, again.

25             I think that I have dealt with all the motions

1  except the most serious one -- no pun intended -- the

2  seriousness issue.  So let's talk about that.

3           This is, again, a motion by the United States,

4  Record Document 12373, Motion of the United States to Limit

5  Evidence About the Seriousness Factor.  I understand the

6  argument of the government.  Let me hear from BP on this first.

7        **MR. LANGAN:**  Your Honor, the seriousness factor, we

8  know it was a serious incident --

9        **THE COURT:**  Let me -- excuse me.

10        **MR. LANGAN:**  Yeah.

11        **THE COURT:**  Let me just say this first.  I have some

12  real, real concerns about what I understand BP's position to be

13  on this.

14           Because it seems to me that if I went along with

15  BP's suggestion as how we should approach and allow discovery

16  on this, we'd, in effect, be discovering and trying the NRDA

17  case; and as we all know, that could be years away before a

18  NRDA case is ready to be tried.  And it may not even be tried

19  in this Court.  It could be tried somewhere else.  Who knows.

20           So with that said, I'll let you talk.

21        **MR. LANGAN:**  We understand, Your Honor, and we're not

22  proposing that we have a premature NRDA trial here as part of

23  the seriousness factor.  That is not our position.

24           We do take the view, though, that the

25  seriousness factor requires the Court to conduct an inquiry

1  into how serious the spill was, which includes things like the
2  recovery and steps that were taken, and the response, and what
3  the ecosystem was like, and the resiliency of the ecosystem.
4        **THE COURT:**  But isn't that NRDA?
5        **MR. LANGAN:**  Perhaps in part, Your Honor.
6        **THE COURT:**  The statute says, "The seriousness of the
7  violation."  It doesn't say the extent of the NRDA damages.
8        **MR. LANGAN:**  No, that's true, Your Honor.  But a
9  number of courts that have assessed Section 311 penalties,
10 *Hawaii's Thousand Friends*, *U.S. versus Gulf Water Park*, and the
11 *CITGO* case, and many others have looked at how serious the
12 violation was and what the recovery was.
13       **THE COURT:**  Well, it certainly could be relevant at
14 some level.  But, again, the question is:  How far do we go to
15 trying the NRDA case?  You say you don't want to try a NRDA
16 case --
17       **MR. LANGAN:**  We don't.
18       **THE COURT:**  -- but I read what you filed and it
19 sounds like we'd be trying a NRDA case.  And even to the extent
20 that BP says because of this we can't even set a trial date
21 now, and we may be years away, and I'm not going to -- we just
22 can't allow that to happen.
23            So I want to get a reasonable resolution of this
24 as to how we proceed.
25       **MR. LANGAN:**  All right.  So, Your Honor, we

1  understand, and at the same time, in our view, it would not be

2  an acceptable result to have no discovery on seriousness.

3          THE COURT:  Can BP not admit that this was an

4  extremely serious environmental violation?

5          MR. LANGAN:  Your Honor, it was a serious event.

6          THE COURT:  Extremely serious?

7          MR. LANGAN:  I think we could say that.

8          THE COURT:  Okay.  Okay.

9          MR. LANGAN:  But the recovery was significant as

10  well, Your Honor.

11          THE COURT:  I understand that's your position, and

12  there's certainly -- every day, anecdotally, we all see and

13  read, I read this report, I read that report, everything's

14  wonderful in this area of the Gulf and the fish and the

15  shrimp -- all of which I eat, by the way -- are all fine.  And

16  then I read this other story and this other report that

17  everything's awful in this area, the fish are dying or they

18  have weird stuff on their bodies and all.

19               And, you know, there are conflicting reports

20  almost every day, it seems like, coming out.  And I bet five

21  years from now we're going to still have conflicting reports

22  coming out.  Look, there's still conflicting reports coming out

23  in Alaska.  I read something just recently about the herring

24  issue in Alaska, and that will be 25 years on Monday, by the

25  way, of the Exxon Valdez incident.

```
1                   So it seems to me that the Court shouldn't, and
2       I don't think is required to, put such a fine point on the
3       seriousness that we say, you know, I have to say, okay, this
4       was the extent of the damage to this species of fish or this
5       extent of this other damage, because then we would be trying
6       the NRDA case.
7                   MR. LANGAN:  Your Honor?
8                   THE COURT:  Isn't there voluminous data, studies,
9       reports, experts, scientists that have already assessed and
10      that you have access to, the public has access to, the
11      government has access to where BP can certainly make the
12      arguments that things are a lot better than what we expected
13      when this happened --
14                  MR. LANGAN:  Right.
15                  THE COURT:  -- and it certainly could have been a lot
16      worse to the Gulf, to the shorelines, whatever -- and the
17      government maybe can draw other inferences from the evidence?
18                  But, again, how do we approach this without
19      getting into the NRDA, the really details of the NRDA case?
20                  MR. LANGAN:  We have ideas that I want to present to
21      you along those lines.
22                  THE COURT:  Okay.
23                  MR. LANGAN:  But first I want to say that I think we
24      need to take a step back here and understand, as I'm sure Your
25      Honor does, this is a case in which we're being asked to pay
```

1   potentially billions of dollars.

2           And the government has the burden of proof on

3   this.  We believe they have exculpatory materials in their

4   files that will help us defend ourselves on the seriousness

5   case that show recovery that they haven't disclosed to us; and,

6   therefore, before we go to trial, we're entitled to discovery

7   of that exculpatory material.

8           But let me -- so I just want to be very clear

9   about that.  Having said that, we did offer the United States

10  several options as a way to skin this cat and to get a case

11  that can be manageable.  We went to them and proposed a fair

12  and simple approach to limit the environmental scope of the

13  Clean Water Act trial and associated discovery to just a few

14  topics, and they didn't accept that.

15          But what we proposed was to include shoreline

16  environmental issues, including wetlands and animals that live

17  on land, and to put off for another day, like the NRDA case,

18  areas in which the evidence is not that developed and the

19  studies go on and it's not as a mature thing and save that for

20  the NRDA case.

21          Therefore, under our proposal, all the

22  environmental issues relating to the water, like fisheries,

23  water-based wildlife in the deep sea, would be out of scope and

24  reserved for a later NRDA trial.

25          And the parties, we would agree with the United

1   States that those things would be not part of the CWA penalty,

2   and both sides would live by that rule.

3                So one proposal we made was, let's scope things

4   out and have a narrower scope to the Clean Water Act penalty

5   phase.  They didn't want to do that, but that was one approach

6   that we proposed that would accomplish what Your Honor's

7   talking about.

8                Another approach is --

9        **THE COURT:**  Have you all made -- has each party, the

10  government and BP, made Rule 26 initial disclosures on this?

11       **MR. LANGAN:**  Yeah, we have.  They may have not done

12  it because they said they assume they're going to win their

13  motion, so they want to amend that later.  But we certainly

14  have, yes.

15               Your Honor, we've always been willing to sit

16  down with the United States promptly and develop an

17  environmental discovery plan that's equitable for all parties.

18  And we had had some conversations, but then they filed their

19  motion that said essentially there's going to be no discovery

20  on seriousness, which is unacceptable to us.

21       **THE COURT:**  Let me ask you this:  In addition to the

22  government's ongoing NRDA process and investigation, isn't BP

23  also doing -- you're not just sitting back waiting for the

24  government to do its --

25       **MR. LANGAN:**  That's correct.  We're doing our own

OFFICIAL TRANSCRIPT

1    studies as well.

2              THE COURT:  -- you're doing your own studies.

3              MR. LANGAN:  We're paying for theirs and for ours.

4    Right.

5              THE COURT:  Yeah.

6              MR. LANGAN:  Our focus is on the exculpatory material

7    that they have that we don't have access to, and going to trial

8    where seriousness is a major factor where they have information

9    that's not going to be disclosed, and yet they're going to make

10   an issue out of how serious this spill was.  There's something

11   wrong with that, and that has to be addressed.

12              It doesn't have to be scorched-earth discovery,

13   but it has to be addressed.

14              MR. BROCK:  Judge, pardon me, if I could just make

15   one comment.

16              THE COURT:  Sure.

17              MR. BROCK:  I know we'll probably have a discussion

18   at some point today about -- or at some point about the length

19   of time and allocations of time and that type of thing.

20              Our intent in obtaining some discovery from the

21   United States and making a presentation to you at trial does

22   not encompass anything near the scope of what an NRDA trial

23   would look like.  Obviously, that trial will be about

24   identifying injury and then assessing what the appropriate

25   amount of money would be to restore the resources.  So, I mean,

1    it's -- we would not be getting into anything like that.

2              I think what we have in mind is a presentation

3    to Your Honor using some data that we have, some data and

4    information that they have that we don't have access to at this

5    point, a summary presentation that would allow Your Honor to

6    understand, big picture, injury to the Gulf, resiliency of the

7    Gulf, restoration that has taken place and how that has

8    impacted the issues, as well as how our interventions during

9    the time of the spill and immediately thereafter were helpful

10   to the recovery that's occurred.  Those types of conduct things

11   that we think as a matter of policy should be encouraged.

12             So it all fits together there as part of the

13   same piece.  It's probably a couple of days of evidence, maybe

14   two and a half, but it would certainly be --

15             THE COURT:  I'm not so concerned now about the two

16   days of trial.  I'm concerned about the two years of discovery

17   that it sounds like would be envisioned here and the two-year

18   delay in getting this to trial.

19             Because BP's memorandum said we can't even talk

20   about setting the trial date on the penalty phase.  And I've

21   got to tell you, when we finished Phase Two last fall, I was

22   under the impression, I said, "Okay.  We'll all take a break.

23   I have a few other things to do."  We all took the holidays,

24   and I was thinking we'd be back here certainly by this summer

25   trying the penalty phase, and obviously we're nowhere near

OFFICIAL TRANSCRIPT

1   going to make that.

2           **MR. BROCK:**  Our statement is really about -- setting

3   a trial date is based on their statement about what effort it

4   would take to get the discovery produced.

5                Obviously, there's a way to work through that

6   issue.  I think we could work through it with Judge Shushan in

7   terms of something that would be, hopefully, acceptable to the

8   Court.

9                We do believe that they have evidence that we

10  don't have that relates to the initial injury as well as

11  recovery that we would like to see and have the opportunity to

12  present as part of the penalty phase, but not asking you to

13  make NRDA-type determinations and/or decisions.

14          **THE COURT:**  All right.

15          **MS. ANDRE:**  Your Honor, could I address a couple of

16  points on the seriousness motion?

17          **THE COURT:**  Yes.

18          **MS. ANDRE:**  Abby Andre for the United States.

19                So, first, Your Honor --

20          **THE COURT:**  Are you suggesting there would be no

21  discovery at all or just very limited discovery?

22          **MS. ANDRE:**  We're discuss- -- we think that no

23  discovery is required; and the reason why is what's already in

24  the record --

25          **THE COURT:**  Well, what about their argument that if

 1   the government does have so-called exculpatory -- I know this
 2   is not a criminal case, we don't have a Brady rule here, but
 3   sort of that principle -- that if you've got some exculpatory
 4   evidence that would be beneficial to them, that they, in
 5   fairness, they ought to have access to it?
 6          MS. ANDRE:  Well, Your Honor, frankly, I'm not sure
 7   exactly what evidence BP is talking about.  As far as NRD data
 8   goes, a large majority of the data has already been shared or
 9   is being shared through the cooperative process.
10          THE COURT:  Explain that process to me, how it works,
11   because I'm not really overly familiar with that whole process.
12   How does it work, and just a generalization of what's been --
13   what schedule are things disclosed or made publically available
14   or available to the parties, for example?
15          MS. ANDRE:  It varies.  My understanding is that
16   generally BP, the state trustees and the United States are all
17   very involved in data collection on a case-by-case,
18   project-by-project basis.  In some cases, representatives from
19   BP and the United States are present for the collection of
20   data.
21             Now, recently, Your Honor, BP has been denying
22   some of the proposals from the state trustees for new analysis
23   or ongoing analysis.  So in that case, it is true that BP may
24   not have some of the data for projects they didn't approve of,
25   didn't pay for.

1          But as the U.S. --

2          **THE COURT:**  Are those projects still going forward

3  even though they're not approving them?

4          **MS. ANDRE:**  Yes, Your Honor.

5          **THE COURT:**  How are they being paid for?

6          **MR. O'ROURKE:**  Either from the budgets of the

7  agencies themselves or the agencies can go to the Coast Guard's

8  Oil Spill Response Fund and ask for money to do the assessment

9  from that; and then if so, we would seek that money back from

10  the defendants in any NRD case later.

11          **MS. ANDRE:**  Right.  We did propose, Your Honor, in

12  our reply brief that for any data BP has not yet received --

13  and we're talking about data only, because we can't imagine why

14  anything more would be necessary to prove seriousness here --

15  the United States will move forward to try to produce that.

16          One of the big problems, of course, is that we

17  are not the only ones involved here.  The states have claims,

18  are doing their own work, and it's unclear how BP's proposal

19  might impact them, but it seems certain that their proposal

20  would impact them.

21          So we have suggested that we would be willing to

22  produce any data it doesn't have yet.  And I just want to --

23          **THE COURT:**  So, for example, are you saying you would

24  be willing to produce data from a study, for example, the

25  restoration project, that BP for whatever reason refused to

1  approve or pay for but the government's going forward on it?
2  You would have no objection to producing that data?
3       **MS. ANDRE:**  With some caveats for PTO 14, for
4  validation.  Some of this hasn't been validated, some of it
5  hasn't been collected.  But the agencies have been making every
6  effort to respond to FOIA requests for this data.
7            And we think given what BP has represented about
8  seriousness here, the United States, it's in our best interests
9  to move forward and produce data for any project, regardless of
10 whether or not BP has funded it, but it should be data only.
11           And, Your Honor, if we have to produce our data
12 about NRD, we feel that the work that Mr. Brock and Mr. Langan
13 referenced that BP is doing should also be produced.
14           But the important thing about this motion is
15 that the United States is saying that this type of evidence
16 simply isn't required at trial because the general magnitude of
17 the spill has already been established in the record before the
18 Court, and all the Court need prove is potential harm.
19       **THE COURT:**  Okay.  I understand.
20           Ms. Karis, do you want to be heard?
21       **MS. KARIS:**  Yes, Your Honor.
22           Your Honor, I'd like to address a couple of
23 points that the United States has just made, and I want to
24 start first by saying that despite the fact that BP has paid
25 millions -- hundreds of millions of dollars for much of these

```
1   studies, it is not the case that BP has the data for many of
2   those studies.
3             And, in fact, I'm happy to discuss with the
4   Court various categories --
5             THE COURT:  No.  I don't want to get down into
6   minutia here today.
7             MS. KARIS:  Fair enough.
8             So in addition to not having the underlying
9   data, part of what BP is requesting is the analysis of some of
10  that data that has been conducted by the United States.
11            THE COURT:  The problem with that is, as I understand
12  it, a lot of this analysis is very preliminary and scientists
13  talking to each other.  I don't think you're entitled to that.
14            You may be entitled to data, but I don't think
15  you're entitled to that.  But go ahead.
16            MS. KARIS:  Very well.
17            THE COURT:  Yeah.
18            MS. KARIS:  But some of the --
19            THE COURT:  You can do your own analysis.  You have
20  scientists.  I'm sure you're already doing that.
21            MS. KARIS:  Understandable.  However, Your Honor,
22  what I would say is to the Court's first question of the United
23  States' what we're calling exculpatory documents, we have
24  gotten a glimpse of some documents that exist through
25  productions that have been made in Phase One and Phase Two
```

OFFICIAL TRANSCRIPT

where the United States' internal e-mails speak to the extent
of harm, for example, for a particular species.

**THE COURT:**  You refer to a lot of what you call
"exculpatory information" in your briefs, so obviously you have
a lot of information already.

**MS. KARIS:**  I'm not quite sure I would characterize
it as a lot of information.  It was information that was
produced in response to various other requests.

What we are asking the United States for is
because that information has never been discovered as part of
an environmental harm factor or request.  Many of our discovery
requests seek to get from the United States similar evidence or
information that has not been previously produced.

So we understand what the Court is saying, the
amount of time that some of this discovery would take largely
is controlled by how much time the United States would need to
respond.  We're happy to work with the United States to try and
narrow those categories, hearing the Court's admonition that
this is not to be an NRD trial, hearing the Court's admonition
that BP is conducting some analysis, the U.S. is conducting
some analysis, to the extent that's preliminary, what the
Court's view on it is.

However, we cannot -- we do not believe that it
is appropriate, or quite accurate, to say that these issues
have already been tried, the issue of seriousness, as part of

1   Phase One and Phase Two.

2                   So to the extent the Court would like us to work

3   with the United States, and then ultimately Magistrate Shushan,

4   to achieve a comparable goal of defining and refining our

5   discovery to make it manageable for both sides, but to give BP

6   an opportunity to, in fact, present a response to the

7   seriousness factor, which is not a binary, "was it serious, was

8   it not" analysis.

9                   That is what we are asking the Court for.

10          **THE COURT:**  Okay.  Thank you.

11          **MS. ANDRE:**  I don't know if you want to hear anything

12   else, Your Honor.

13          **THE COURT:**  I don't.  I don't.

14          **MS. ANDRE:**  Okay.

15          **THE COURT:**  All right.  The government's motion says

16   the government -- this is Record Document 12373 -- says, "The

17   United States seeks a ruling in limine pursuant to Federal Rule

18   of Evidence 403 and 201 that the Court will limit the evidence

19   and thus discovery regarding the impacts of the Macondo oil

20   spill on the environment, human health and private parties'

21   economic interest."

22                   The government, as I interpret the motion,

23   essentially seeks to prohibit discovery on these topics and

24   alleges that the facts that are in the record already as

25   summarized in Appendix A to the government's motion are

1   sufficient, and that no new evidence could possibly disprove

2   those facts, no amount of new evidence of recovery could

3   possibly disprove these facts, and that the Court need only

4   rule that these already known facts are sufficient in this case

5   to find that the violation was very serious and use its

6   discretion to prohibit any additional evidence.

7            I am not going to absolutely prohibit any

8   further discovery or evidence on this issue at this time.

9   However, I am going to grant the government's motion, in part,

10   to the extent that what I interpret to preclude as what I

11   interpret, and I know BP's counsel doesn't agree with this, but

12   my sense is that if I went along with BP's suggestion on this,

13   the Court would, in effect, be trying the NRDA case as part of

14   the penalty phase.

15            It would cause what I consider unreasonable

16   delays in resolving the Clean Water Act penalty case.  I've

17   looked at some of the proposed discovery that BP has propounded

18   and it seems tremendously and overly broad.

19            It seems to me -- first of all, BP already

20   produces what must be voluminous data and information, in

21   addition to having access to at least significant amounts,

22   although not all, of the data and information that the

23   government may have.  BP has been doing its own scientific and

24   natural resource damage assessment over the last several years.

25            It seems to me that we have to find a way to cut

1   off or limit this evidence and this discovery in a reasonable

2   way.  I went back and looked at Judge Haik's case, the *CITGO*

3   case.  In the Fifth Circuit opinion, it points out -- this is

4   what they say about the *CITGO* case.

5            "The incident occurred in 2006 when a severe

6   rainstorm caused two wastewater storage tanks at CITGO's Lake

7   Charles, Louisiana refinery to fail.  Two million gallons of

8   oil flooded the surrounding waterways."

9            Two million gallons of oil is literally a drop

10  in the bucket compared to what we're looking at in this case.

11  I think Ben did the math.  He said it's 47,000 barrels as

12  opposed to somewhere between 2.4 to 5 million barrels in this

13  case.

14            So in that case, the court found that over

15  2 million gallons, or 47,000 barrels, of oil flooded into the

16  surrounding waterways.

17            "The spill forced the closure of a nearby

18  navigation channel for ten days, disrupting local businesses.

19  Recreational activities on the impacted waterways were

20  restricted for weeks following the spill.  The spill also

21  damaged over 100 acres of marsh habitat.  Fish and other

22  aquatic life were adversely impacted, and several birds were

23  killed."

24            That was essentially apparently the findings of

25  the court in that case.  Based on that, when they talked about

 1   the seriousness of the violation factor, the District Court
 2   found that the spill was "massive" -- these are all words in
 3   quotes -- "massive," "excessive," and a "tragedy."
 4                    The Court goes on to say, "Both parties agree
 5   with this assessment, as do we."
 6                    So it strikes me that we're not necessarily
 7   looking -- that we don't have to put such a fine point on this,
 8   again, that we're trying the Natural Resource Damage claims,
 9   and that we're looking at, what is the magnitude of the
10   environmental violation in this case.
11                    I mean, Mr. Langan, without pre-trying a case
12   that I haven't heard any evidence in yet, I don't know how
13   anyone's going to stand up in this court and argue that this
14   case was not extremely serious.
15                    I know that's not -- I'm not saying that's it,
16   that's the end of the story.  There's other factors and
17   considerations for the Court to consider.  But, again, the
18   question is:  How fine of a point do we have to put on this
19   analysis?  So...
20          **MR. LANGAN:**  We understand, Your Honor.
21          **THE COURT:**  Yeah.
22          **MR. LANGAN:**  Judge Haik also said in his opinion
23   that, "The environmental impact was almost fully rectified by
24   2009, and the wildlife seems to be showing no adverse impact
25   from the spill."

1          **THE COURT:**  That's fine.  And you all can make that

2     argument.  I've heard already -- seen and heard so many reports

3     about that.  And you all have it, and you know what it is.  You

4     have your own scientists, you have your own evidence, you have

5     government evidence.  I'm sure you can call experts to show

6     that.

7               We can argue about the recovery.  But, you know,

8     I think there are many facts on this area from which the Court,

9     frankly, could take judicial notice, and then the experts can

10    opine as they wish.

11              But I'm not going to allow this to evolve into a

12    NRDA case.  We're just not going to go there.  Also, I note

13    that the statute itself, if you look at the statutory language,

14    it talks about the seriousness of the violation.  It doesn't

15    talk about the extent of the environmental damage.  I'm not

16    suggesting that that's not relevant at all, but that's not what

17    this factor says.  It says, "the seriousness of the violation."

18              You can have an extremely serious violation that

19    results in little or no damage, but it could have potential to

20    do catastrophic damage, but it could be good fortune that it

21    doesn't do extensive damage.  It doesn't mean it's not an

22    extremely serious violation.

23              So with that being said, the United States has

24    agreed to -- it sounds like they've agreed here today that they

25    are willing and able to produce data that BP is seeking.

OFFICIAL TRANSCRIPT

1  Again, I think BP's present discovery that it's seeking is

2  overly broad.  So I'm going to allow Judge Shushan to work with

3  you all to see exactly how this should be handled going

4  forward.

5            So I have granted the government's motion to

6  that extent, but I'm not granting it to the extent that the

7  government seeks to totally preclude any discovery or evidence

8  on this point.

9            Okay.  I think we've talked about all the

10  pending motions in limine.  What I'd like to do is look at the

11  calendar and try to look ahead and see when we might be able to

12  set a trial in this case.

13            My sense is that we don't have to work out all

14  the details now, but it seems to me, the government proposed,

15  as I recall, in their briefs a time limit similar to what we

16  had in Phase Two, which was a total of 90 hours of trial time,

17  which is three weeks essentially.  If we go four days, as we

18  have in the past trials, with the breaks and so forth, we get

19  in at least seven and a half hours of actual testimony per day.

20  That's 30 hours a week.  So that would be a three-week trial, a

21  three four-day week trial, is what the government's

22  envisioning.

23            So I don't know -- I haven't seen any estimate

24  from BP or anyone else on that.  But that sounds -- frankly, I

25  was thinking of a two-week trial.  I was not envisioning this

1  trial taking three weeks, but I could probably live with three

2  weeks if that's what it takes.

3          **MR. O'ROURKE:**  We could live with two weeks, Your

4  Honor.

5          **THE COURT:**  Let's hear from Mr. Brock.

6          **MR. BROCK:**  Your Honor, from our perspective,

7  obviously, we'll gain a better understanding of the issues as

8  we move further along in the process, the number of witnesses

9  that we'll need, the time that we'll need for those witnesses.

10         I think we have done a pretty good job of being

11 able to estimate how long it will take us to present our case.

12 As you may recall in the Phase Two trial, I think I shared with

13 the Court, it's going to be really tight on source control, and

14 I think we had a minute left.

15         **THE COURT:**  One of them you came within a minute, I

16 think.  Right.

17         **MR. BROCK:**  Yes, sir.

18         And on quantification, I felt like we had plenty

19 of time, and actually we finished a week earlier than we

20 thought we would.

21         **THE COURT:**  Right.

22         **MR. BROCK:**  I'm not saying that we can't work with --

23 you know, if our time allocation is 45 hours, I'm not saying

24 that we can't work with that.  Some of this is going to depend

25 on if you're assigning 45 to the United States and 45 to BP,

1    what the split is between Anadarko and BP.  So Anadarko would

2    be getting some of that time.

3              If they don't need 45 hours, if they only need

4    30 to present their case and conduct their examinations and we

5    took that 15 hours and put it over on the defense side, I

6    think --

7              THE COURT:  You want the government to cede some of

8    their time to you?

9              MR. BROCK:  Well, he said they could do it in two

10   weeks, so I took that as an indication that maybe their case is

11   not that long.  Obviously, we're going to work with whatever

12   the Court asks us to do.  Forty-five feels just a little tight

13   to me right now looking at the case we would present if we did

14   everything we have in mind.  But, of course, we never do it

15   that way.

16             So I guess what I would say from our perspective

17   is, as a default, that would certainly be something we could

18   look at and work with.  And if we got a little closer and we

19   thought we needed a little more, we could come back to you, if

20   that would be okay.

21             THE COURT:  Let me hear from Anadarko.

22             Thank you, Mr. Brock.

23             MS. KIRBY:  Judge, as we put in our submissions here,

24   we think it's really important that the time allocation be by

25   party and not by side so that the defendants don't have to

1  engage in bartering between them.

2          THE COURT:  My understanding is you'll be aligned

3  with BP on some of these issues, but not all of them obviously.

4  But, in fairness, at least as a default option, unless the

5  government can agree otherwise, it seems to me that's the way

6  we do it in trials in general.

7              If you're going to -- if BP's going to put on a

8  case, which it is, and you're going to put on a case, which you

9  are, of some length, it seems the government's got to respond

10  to both of you.  So, generally speaking, my rule would be,

11  whatever time you two get, the government gets equal time.

12  That's not necessarily meaning you splitting BP's time, but it

13  sort of is.

14          MS. KIRBY:  I understand, Judge.  But my concern --

15          THE COURT:  Maybe what we need to do is find out how

16  much time you reasonably need for your case, we'll factor that

17  into BP's case and then I'll offer the government equal time.

18  Although, we can encourage them not to use all their time.

19          MS. KIRBY:  I think that with culpability out of the

20  case and with economic benefit out as well that we could do our

21  case, direct and cross, in about two and a half days, total.

22          THE COURT:  Okay.  We'll keep that in mind.  I note

23  the government proposed that we set a trial this fall.  It

24  doesn't seem to me that that's reasonable or that's doable for

25  several reasons.

1            First of all, even with my rulings here today,

2    there's a lot to be done.

3            Secondly, I know Mr. Brock has a problem in the

4    fall, as I appreciate it.  Tell me about that trial.

5            **MR. BROCK:**  Well, Your Honor, we're on a docket for

6    October the 14th.  It's possible --

7            **THE COURT:**  This is in Judge Ellison's court?

8            **MR. BROCK:**  This is before Judge Ellison.  There's a

9    hearing on class certification in the case on April the 21st.

10   There is no class certified at this point.  But we are,

11   obviously, in the throes of preparing that case for trial.

12           **THE COURT:**  Is that proposed to be a class trial --

13           **MR. BROCK:**  It's proposed to be a class trial, yes,

14   sir.

15           **THE COURT:**  -- not a bellwether or something?

16           **MR. BROCK:**  No, sir, it's a class trial.

17           **THE COURT:**  So your thinking is that if the class is

18   not certified there won't be a trial in October?

19           **MR. BROCK:**  I'm not assuming that.  Because there are

20   individual shareholders who also have cases who could

21   potentially present their cases during that same time slot.  I

22   think we'll probably get a little more information from Judge

23   Ellison on the 21st, but for now we're planning on that trial.

24   Yes, sir.

25           **THE COURT:**  Okay.  Well, coincidentally, I also have

OFFICIAL TRANSCRIPT

1    a problem in October.  I'm going to be out of the country for
2    two and a half weeks or so.
3              **MR. BROCK:**  Your gig sounds better than mine.  I
4    don't know what it is, but that sounds like a better
5    opportunity.
6              **THE COURT:**  Well, it's probably better than Houston,
7    and it is, in the summer especially -- oh, that's the fall.
8    It's not too bad in Houston in the fall.
9                   I'm actually thinking that realistically we need
10   to be looking after the first of the year.  It wasn't my
11   inclination originally; but after receiving all of these
12   motions and these issues and having to work through them and
13   what you all are facing, and Judge Shushan's going to have to
14   do, it seems to me realistically we're looking after the first
15   of the year sometime.
16                  So I could propose to you all that we start --
17   one date I could start -- I'm really flexible after the first
18   of the year.  I don't have a whole lot scheduled early next
19   year.
20             **MR. BROCK:**  The only thing I would ask for our team,
21   and I'm sure the government would feel the same way, if we
22   started the trial immediately after the new year, it's going to
23   put us here through the holidays.
24             **THE COURT:**  You don't want to spend Christmas in New
25   Orleans?  It's very nice, you know.

1       **MR. BROCK:**  I know that.  It's not as hot, that's
2   nice.  I'd love to be here, but my wife might object.  So maybe
3   if we were looking at after the first of the year, either the
4   first of February or sometime early, a couple of weeks into the
5   month of January.
6       **THE COURT:**  Yeah.  Of course, then we have the Mardi
7   Gras problem here in New Orleans.
8       **MR. BROCK:**  Yes, sir.
9       **THE COURT:**  Mardi Gras is earlier next year.  Mardi
10  Gras falls on February 17th, which means that New Orleans is
11  kind of shutdown not just those days, but backing up into the
12  part of the week before.  You probably don't want to be here
13  during the Mardi Gras craziness.
14      **MR. BROCK:**  It sounds like if we started maybe the
15  third week of January.
16      **MR. O'ROURKE:**  We do.  We want to be here.
17      **THE COURT:**  We could start -- let's see if we
18  started -- how about January 20th?  How does that look to you?
19  The 19th is a Monday, but that's ML King Day, so that's a
20  federal holiday.  I could start it on the 20th and that would
21  give us three solid weeks before we even get into the week
22  before Mardi Gras.  If we had to fit in an extra day somewhere,
23  we could figure it out.
24      **MR. BROCK:**  Yes, sir.
25      **THE COURT:**  Is that all right with everyone?

OFFICIAL TRANSCRIPT

1        **MS. KIRBY:**  Yes, Your Honor.

2        **THE COURT:**  All right with the government?

3        **MR. O'ROURKE:**  That date's no problem, Your Honor.  I

4   guess I would reurge that we could do the trial sooner.

5   Perhaps, if Mr. Brock's conflict goes away, we could get it

6   done before Christmas.

7        **THE COURT:**  Well, I don't think that's reasonable.

8   Let's go ahead and set it for January 20th.  As of now, we'll

9   plan on a three-week -- what would that be?  How many hours is

10   that?  Is that 90 hours? -- 90-hour total trial.  We'll work

11   out the details and the logistics.

12        Mr. Brock, your point is, obviously, anything we

13   do is always subject to reconsideration or...

14        **MR. BROCK:**  If we need much less than 45 hours to

15   present our case, I think we'll have a decent sense of that by

16   the time we get to the end of the year, and I'll share that

17   with you also.

18        **THE COURT:**  I appreciate that.  Okay.

19        **MR. O'ROURKE:**  The only other request we would make,

20   Judge, is if you're going to impose limits on the number of

21   witnesses --

22        **THE COURT:**  We're going to do that, too.  I'm going

23   to let Judge Shushan work with you all on that.  We're going to

24   impose limits on the number of witnesses, the number of

25   depositions, the number of experts.  But I'm not going to set

OFFICIAL TRANSCRIPT

1   that today.  You all will have input on that with Judge

2   Shushan.

3              Mr. Lyle, you wanted to say something, I

4   believe, didn't you?

5              **MR. LYLE:**  I did.

6              **THE COURT:**  You asked for permission to come and

7   speak and I totally overlooked you there while we were talking

8   about all this.

9              **MR. LYLE:**  Your Honor, Michael Lyle on behalf of

10  O'Brien's and NRC.

11             Just simply, we filed a paper with Your Honor

12  simply to point out to the extent there is going to be

13  discovery and it impacts any of the cleanup responder

14  defendants in terms of testimony that may be elicited from any

15  witnesses, either from the government or from our people, that

16  we have a seat at the table and participate in that discovery

17  because of the one-deposition rule, and there may be testimony

18  that we need for purposes of our motions for summary judgment,

19  which we're working with Judge Shushan on and getting our

20  protocol in order and so on.

21             **THE COURT:**  Well, I don't envision that the testimony

22  that we're going to be having on this phase is going to be

23  something that you would need to participate in.  Certainly, if

24  any of your clients' employees are witnesses, you, or whoever

25  their attorney is, would have the right to attend the

1   deposition with them, as any witness has a right to have an
2   attorney present.
3                 But, ordinarily, that doesn't give you the right
4   to participate.  You can voice objections like on privilege or
5   something like that.  But I'll let you talk further with Judge
6   Shushan if there's a particular witness or a type of deposition
7   testimony that might go beyond what I'm envisioning.
8           **MR. LYLE:**  We're happy to work with Judge Shushan.
9           **THE COURT:**  I know -- and this is not really relevant
10   to what we're talking about today, but Judge Shushan tells me
11   that she is -- well, why don't you -- you've talked to them
12   about a case management order.
13           **MAGISTRATE JUDGE SHUSHAN:**  We've communicated
14   recently about trying to get the remaining opt-outs taken care
15   of, one way or the other.
16           **MR. LYLE:**  Yes, yes.  And we appreciate that.  Thank
17   you, Your Honor.
18           **THE COURT:**  My understanding is, one of the things --
19   we had kind of put your case aside to see if the medical
20   settlement was going to be finalized.  And now that it has,
21   we've got to figure out who are the opt-outs, and then figure
22   out how to identify those people, and maybe we're thinking of
23   some sort of *Lone Pine* type order or something to make them
24   come forward to see if they have a recoverable claim or not.
25           **MR. LYLE:**  Yes, Your Honor.

1          THE COURT:  How many opt-outs do we have in that?
2    Does anybody know?
3          MR. LANGAN:  Your Honor, on the medical settlement, I
4    want to say 1500, something in that neighborhood.
5          MR. LYLE:  We agree with that.
6          MR. LANGAN:  Yeah, something in that neighborhood.
7    Some have been revoked and that sort of thing.
8          THE COURT:  Right.  Right.
9          MR. LANGAN:  By the way, as I think Judge Shushan
10   knows, it's a bit complex to figure out who's a class member.
11   There's no list.
12         THE COURT:  Right.  Right.  Okay.  Anything else,
13   Mr. Lyle?
14         MR. LYLE:  That's all, Your Honor.  Thank you.
15         THE COURT:  Anything else from the government?
16         MS. HIMMELHOCH:  Your Honor, this is Sarah
17   Himmelhoch.  I just briefly wanted to note, as a procedural
18   matter, we have all served the discovery contemplated by Judge
19   Shushan's order and there would be a lot of changes that I
20   think everybody would make to their discovery in light of your
21   rulings today.
22              May I suggest that we simply toll the response
23   period on that discovery until we've had an opportunity to
24   regroup amongst ourselves and meet with Judge Shushan about how
25   to proceed going forward?

OFFICIAL TRANSCRIPT

1        **MAGISTRATE JUDGE SHUSHAN:**  I think that's fine.  Why

2   don't you toll what you have and think about what substitute

3   discovery you may want to propound and we can have a telephone

4   status conference in the next week or so.

5        **MS. HIMMELHOCH:**  I'll try to set up a call among

6   counsel before that to see if we can't work out some of it

7   before --

8        **THE COURT:**  Do you want to schedule anything here

9   today?

10        **MAGISTRATE JUDGE SHUSHAN:**  No, I'll get back to them

11   on that.

12        **THE COURT:**  Anything else you want to add?

13        **MAGISTRATE JUDGE SHUSHAN:**  No.

14        **THE COURT:**  Okay.  Anybody have anything else?

15        All right.  Have a good day.

16        (WHEREUPON, the proceedings were concluded.)

17                            *****

18                         <u>**CERTIFICATE**</u>

19        I, Jodi Simcox, RMR, FCRR, Official Court Reporter
    for the United States District Court, Eastern District of
20   Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
21   understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

22

23                    *s/Jodi Simcox, RMR, FCRR*
                         Jodi Simcox, RMR, FCRR
24                        Official Court Reporter

25

OFFICIAL TRANSCRIPT