UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010 | ) ) ) ) ) |
| | ) |
| **This Document Relates to:** **2:10-cv-02454, 2:10-cv-01768** | ) ) ) |
| | ) ) ) ) ) ) |

MDL NO. 2179

SECTION: J

JUDGE BARBIER
MAG. JUDGE SHUSHAN

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT (ECF No. 12676)**

Submitted by:

Charles M. Tebbutt
Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Ph: 541-344-3505

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................... ii

Argument ............................................................................................................................... 1

I.     THE CENTER HAS CONSTITUTIONAL STANDING TO MAINTAIN SUIT. .......... 1

II.    THE PETROLEUM EXCLUSION DOES NOT APPLY TO SPECIFICALLY LISTED
       FRACTIONS OF CRUDE OIL, AND ANY POSSIBLE EXCLUSION WAS VITIATED
       BY DEFENDANTS' CONDUCT. ................................................................................... 3
       1.   Specifically Listed Fractions of Crude Oil Are "Hazardous Substances." ................. 4
       2.   Other Hazardous Substances Were Added to the Crude Oil. ..................................... 6
       3.   The Center Was Not Required to Identify Each and Every Hazardous Substance That
            Was Released by Defendants or Introduced Into the Macondo Well. ........................ 7

III.   EPCRA APPLIES BOTH TO THE MACONDO WELL AND THE *DWH* .................... 9
       1.   The DWH Was a Stationary Structure While at the Macondo Site. ........................... 9
       2.   Oil was Produced at the DWH, and the Facility is Therefore Subject to EPCRA. ... 11
       3.   BP Is Liable Under EPCRA for Releases from the Macondo Well. ......................... 13

IV.    DEFENDANTS MUST STRICTLY COMPLY WITH EPCRA'S REPORTING
       REQUIREMENTS, AND THE INFORMATION THAT IS PUBLICLY AVAILABLE
       FAILS TO SATISFY THOSE REQUIREMENTS. ......................................................... 14
       1.   Defendants Must Strictly Comply with EPCRA's Reporting Requirements. ............ 14
       2.   The Information Provided Does Not Comply with EPCRA's Requirements. .......... 15

V.     LACHES IS INAPPLICABLE. ....................................................................................... 18

Conclusion ............................................................................................................................ 20

**TABLE OF AUTHORITIES**

<u>CASES</u>

*BedRoc Ltd. v. United States*, 541 U.S. 176 (2004)...................................................................4

*B.F. Goodrich v. Murtha*, 958 F.2d 1192 (2d. Cir. 1992)...........................................................4

*Castro v. Collecto, Inc.*, 634 F.3d 779 (5th Cir. 2011) ...................................................10, 11, 12

*Center for Biological Diversity, Inc. v. BP America Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) ...........................................................1, 2, 3, 13, 15, 17, 20

*Center for Biological Diversity, Inc. v. Marina Point Development Co.*,
    566 F.3d 794 (9th Cir. 2009) .............................................................................................9

*Chemical Mfrs. Ass'n v. Natural Resources Def. Council, Inc.*, 470 U.S. 116 (1985)............5, 6

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ...................5

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943 (9th Cir. 2002) . 8

*Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir. 1980)...........................15

*Conservation Law Found. v. Watt*, 560 F. Supp. 561 (D. Mass. 1983)......................................15

*Environmental Def. Fund, Inc. v. Alexander*, 614 F.2d 474 (5th Cir. 1980) .......................18, 19

*FEC v. Akins*, 524 U.S. 11 (1998)................................................................................................2

*Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*,
    240 F.3d 534 (6th Cir. 2001) .............................................................................................6

*Hallstrom v. Tillamook County,* 493 U.S. 20 (1989)...................................................................7

*Hunt v. Wash. State Apple Advertising Comm.*, 432 U.S. 333 (1977).........................................3

*National Cotton Council of America v. E.P.A.*, 553 F.3d 927 (6th Cir. 2009) ...........................5

*National Wildlife Federation v. Andrus*, 440 F. Supp. 1245 (D. D.C. 1977) ...........................15

*Neighbors for a Toxic Free Community v. Vulcan Materials Co.*,
    964 F. Supp. 1448 (D. Colo. 1997).................................................................................14

*Pacific Dawn, LLC v. New Orleans Marine Service, Inc.*, 2012 WL 686034 (E.D. La. 2012).. 19

*SeaRiver Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002)............. 13

*S.F. Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002) ......................................... 8

*Sierra Club et al. v. BNSF Railway Company*,
 Case No. C13-0967-JCC (W.D. Wash. March 12, 2014)................................................ 8

*Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003).................... 9, 10

*Sierra Club Ohio Chapter v. City of Columbus*, 282 F. Supp. 2d 756 (S.D. Ohio 2003)............ 8

*Steeltech, Ltd. v. E.P.A.*, 273 F.3d 652 (6th Cir. 2001)............................................................ 14

*Texas Food Indus. Ass'n v. U.S. Dep't of Agric.*, 81 F.3d 578 (5th Cir. 1996) .......................... 4

*Trinity Indus., Inc. v. Dixie Carriers, Inc.*, 1993 WL 268430 (E.D. La. 1993) ........................... 4

*Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481 (5th Cir. 2013) ......................................... 5

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ................................................................................ 5

*U.S. v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373 (8th Cir. 1989)................................... 11-12

*U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir. 1992) ................................................... 6

*U.S. v. Article of Drug ... Bacto–Unidisk*, 394 U.S. 784 (1969).............................................. 12

*U.S. v. Lee*, 131 F.2d 464 (7th Cir. 1942) .............................................................................. 12

*U.S. v. Pineiro*, 470 F.3d 200 (5th Cir. 2006).......................................................................... 1

*U.S. v. Transocean Deepwater Drilling, Inc.*, 936 F. Supp. 2d 818 (S.D. Tex. 2013).............. 10

*Valley Community Preservation Com'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004) ............... 15

*Walton v. Hammons*, 192 F.3d 590 (6th Cir. 1999)................................................................ 5

*Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801 (9th Cir. 1989) ...... 4, 5

STATUTES

42 U.S.C. § 6901 *et seq.*............................................................................................................ 6

42 U.S.C. § 9601(14) ............................................................................................................... 4

42 U.S.C. § 9601(14)(C).......................................................................................................... 6

42 U.S.C. § 11004(a) ................................................................................ 12

42 U.S.C. § 11004(a)(1)(A) ................................................................ 11, 13

42 U.S.C. § 11004(b) ................................................................. 14, 16, 17

42 U.S.C. § 11004(b)(1) ................................................................... 9, 11

42 U.S.C. § 11004(b)(2)(A) ..................................................................... 17

42 U.S.C. § 11004(b)(2)(B) ..................................................................... 18

42 U.S.C. § 11004(c) .................................................... 11, 14, 15, 16, 17

42 U.S.C. § 11004(d) .............................................................................. 11

42 U.S.C. § 11044(a) .............................................................................. 16

42 U.S.C. § 11044(b) .............................................................................. 17

42 U.S.C. § 11046 .................................................................................. 13

42 U.S.C. § 11046(d)(1) ........................................................................... 8

42 U.S.C. § 11047 .................................................................................. 11

42 U.S.C. § 11049(4) ............................................................................... 9

REGULATIONS
40 C.F.R. § 261.4(b)(5) ............................................................................. 6

40 C.F.R. § 302.4 ................................................................................. 3, 4

40 C.F.R. § 355.40(b) ............................................................................. 17

40 C.F.R. § 355.41 ................................................................................. 17

LAW REVIEW ARTICLES AND OTHER MATERIALS
William H. Rodgers, Jr., Jason DeRosa & Sarah Reyneveld, STRANGER THAN FICTION: AN
"INSIDE" LOOK AT ENVIRONMENTAL LIABILITY AND DEFENSE STRATEGY IN THE DEEPWATER
HORIZON AFTERMATH, 1 Wash. J. Envtl. L. & Pol'y 219-94 (2011) ........................................... 15

Merriam-Webster Online Dictionary .................................................................. 10, 12

Pursuant to Judge Shushan's Order, ECF No. 12090, Plaintiff Center for Biological Diversity (the "Center") respectfully submits its Opposition to Defendants' Joint Motion for Summary Judgment, ECF No. 12676 ("Joint MSJ").  The Court should find that (**I**) the Center has standing; (**II**) specifically listed fractions of crude oil are "hazardous substances," and, in any case, the exemption has been vitiated by BP's conduct; (**III**) the Macondo Well and the *DEEPWATER HORIZON* ("*DWH*") are each a "facility" subject to EPCRA; (**IV**) Defendants are required to strictly comply with EPCRA's reporting requirements, and information that is publicly available does not and cannot satisfy those requirements; and (**V**) laches is inapplicable. Accordingly, the Court should deny Defendants' motion.

## I.    THE CENTER HAS CONSTITUTIONAL STANDING TO MAINTAIN SUIT.

 Defendants assert that the Center lacks constitutional standing.  First, the Fifth Circuit already determined that the Center's members' have suffered informational injuries sufficient to convey standing, and that an order directing Defendants to file EPCRA reports would redress those injuries.  *Center for Biological Diversity, Inc. v. BP America Prod. Co.*, 704 F.3d 413, 429-32 (5th Cir. 2013) ("*CBD v. BP*").  The Court recognized that the Center went beyond its pleading stage requirements when it found that "[a]t least one member specifically averred that he had not seen any reports from BP documenting the substances that were released in the spill despite his search for such reports.  This is the kind of concrete informational injury that the statute was designed to redress."  *Id*. at 429.  The Court's standing analysis was not submitted to the Court on remand, and therefore the law of the case is that the Center has standing.  *See, e.g.,* *U.S. v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006).  Defendants cite no case law to the contrary and ignore the Center's declarations, which contain summary judgment type facts sufficient to establish standing.  *See, e.g.,* ECF No 1984-7 at ¶ 7 (Gabriel Scott) (Mr. Scott has searched for

1

type of information required under EPCRA, but did not find it); ECF No. 1984-4 at ¶¶ 8-9

(Catherine Craig) (Ms. Craig does not know the chemicals to which she was exposed).

Nonetheless, the Center has provided the Court with additional standing declarations

from its members.  Under EPCRA, an injury-in-fact is informational in nature, for the statute

creates an affirmative duty to provide *specific* information to *specific* entities about the releases

of hazardous substances.  A person therefore suffers a constitutionally-cognizable injury when

they fail to obtain the information that must be publicly disclosed pursuant to this statute.  *CBD*

*v. BP*, 704 F.3d at 429-430; *FEC v. Akins*, 524 U.S. 11, 21 (1998).  No other form or type of

injury is required.[1]  Here, the Center's members easily satisfy this threshold.  For instance:

- Gabriel Scott, ECF No. 12673-16.  Mr. Scott was exposed to oil during the spill.  *Id*.
at ¶ 3.  He is concerned about the health impacts from that exposure.  *Id*.  He has
searched for specific information about the chemicals released from the spill,
checking both EPA and the "restorethegulf.com" websites.  He also regularly
reviewed the newspaper.  *Id*. at ¶ 4.  None of Mr. Scott's searches revealed
information about the specific chemicals he was exposed to as a result of the spill.  *Id*
at ¶ 6.  Mr. Scott understands that EPCRA required BP to file reports about the
specific chemicals that were released during the spill.  *Id*. at ¶ 7.  He has not found all
that information in his searches.  *Id*. at ¶ 8.  Mr. Scott called the Orleans Parish to
obtain a copy of any EPCRA report filed by Defendants, but was told that the office
was unaware of any such reports.  *Id*. at ¶ 9.

- Catherine Craig, ECF No. 12673-17.  Ms. Craig searched for information about the
specific names and quantities of chemicals released during the spill.  *Id*. at ¶ 3.  She
primarily searched the internet for this information, including the EPA and CDC
websites.  *Id*. at ¶ 4.  Ms. Craig had been exposed to chemicals from the spill, and
therefore tried to find a laboratory that would test her for chemicals associated with
the spill.  *Id*. at ¶ 5.  The laboratory she contacted informed her that they did not know
what to test for, as the exact types and quantities of chemicals released by the spill
were not publicly reported.  *Id*.  Ms. Craig is aware of the type of information that
EPCRA requires to be filed, and would find such specific information extremely
useful.  *Id*. at ¶¶ 6-7.  Ms. Craig has been suffering from chronic sinus infections

---

[1] Defendants argue that the Center's members must show that they were "harmed by drilling mud or methane
releases" or exposed to hazardous substances in order to have standing.  Joint MSJ at 24.  But that is not the standard
for informational injuries, as expressly held by the Supreme Court in *Akins* and the Fifth Circuit in *CBD v. BP*.  One
need not suffer specific bodily harm or be exposed to chemicals to sustain an informational injury under EPCRA;
instead, a person must merely seek out the information but be unable to obtain it.

since the spill occurred, and believes they may be related to her exposures. *Id*. at ¶ 7. Ms. Craig tried to obtain EPCRA reports from the Orleans Parish, but was told that no such reports exist. *Id*. at ¶ 10.  Ms. Craig also called Palm Beach County to obtain any EPCRA report, and was again told no such reports exist. *Id*. at ¶ 11.

*See also* Keats Decl., ECF No. 12673-14; Sondak Decl., ECF No. 12673-15 (alleging similar facts).  These sworn statements demonstrate that the Center's members have searched for the type of information required by EPCRA, some going so far as to request the specific reports from emergency planners.  They were told no such reports exist, for neither BP nor Transocean has filed them; thus, these members' injuries are directly traceable to Defendants' misconduct. An order requiring Defendants to file such reports would redress these injuries. *CBD v. BP*, 704 F.3d at 430.  Because its members have standing to sue, the Center also has standing.[2]

## II.   THE PETROLEUM EXCLUSION DOES NOT APPLY TO SPECIFICALLY LISTED FRACTIONS OF CRUDE OIL, AND ANY POSSIBLE EXCLUSION WAS VITIATED BY DEFENDANTS' CONDUCT.

Defendants argue that the Center's EPCRA claim is foreclosed because crude oil and its natural constituents fall outside the definition of "hazardous substances," even though many such constituents – like benzene, toluene, and xylene – are "specifically listed" as hazardous substances under CERCLA.  40 C.F.R. § 302.4 (benzene, toluene, and xylene are hazardous substances).  Defendants' premise is based upon a flawed, non-binding Ninth Circuit decision. This Court should reject the reasoning of that decision and follow the plain language of the statute.  Even if the Court were to ignore that language, however, the fact that BP injected other hazardous substances into the Macondo Well vitiates any possible reliance on the petroleum exclusion.  Finally, arguments about the Center's notice letters misrepresent the facts.

---

[2] No party disputes that the interests the Center seeks to protect are germane to its organizational purpose, or that the claim asserted, nor relief requested, requires the participation of individual members. *Hunt v. Wash. State Apple Advertising Comm.*, 432 U.S. 333, 343 (1977).

### 1.     *Specifically Listed Fractions of Crude Oil Are "Hazardous Substances."*

The "petroleum exclusion" excludes from the definition of "hazardous wastes" "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph[.]" 42 U.S.C. § 9601(14).  The meaning of this passage is unambiguous: hazardous substances do not include crude oil or any of its natural compounds *unless* such compounds are "otherwise specifically listed or designated" as hazardous substances.  The substances identified in the Center's amended complaint are "otherwise specifically listed" hazardous substances.  *See* ECF No. 813, Amended Compl. at ¶¶ 61, 65; 40 C.F.R. § 302.4.  Under the plain meaning of the statute, they are therefore substances subject to CERCLA and, consequently, EPCRA's reporting requirements.  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.") (citation omitted).  The Court should liberally construe this definition.  *See Trinity Indus., Inc. v. Dixie Carriers, Inc.*, 1993 WL 268430 at *10 (E.D. La. 1993) ("The term 'hazardous substance' is given a broad and liberal definition under CERCLA.") (citing *B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1199-1201 (2d. Cir. 1992)).

Defendants' reliance upon *Wilshire Westwood Associates v. Atlantic Richfield Corp.,* 881 F.2d 801 (9th Cir. 1989) is misplaced.  There, the Ninth Circuit ignored the plain language of the statute, finding that the "petroleum exclusion" *does apply* to "any fraction of crude oil which has been listed or designated as a hazardous substance" under CERCLA.  *Id*. at 804.  In issuing that holding, the Ninth Circuit violated the bedrock rule of statutory construction: "that the words of a statute will be given their plain meaning absent ambiguity."  *Texas Food Indus. Ass'n v. U.S. Dep't of Agric.,* 81 F.3d 578, 582 (5th Cir. 1996).  The Ninth Circuit never found ambiguity in

the language used by Congress. *Wilshire Westwood Associates*, 881 F.2d at 804 ("Any other construction ignores the plain language of the statute…"). Instead, it interjected its own beliefs by deciding that a literal interpretation of the statute would render the exclusion a "nullity." *Id*. at 805. By doing so, it read an entire sentence out of the statute, a clear violation of the cannons of statutory interpretation. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (citation omitted). Furthermore, when the language of a statute is plain, as is the case here, courts are required to enforce its plain meaning, unless absurd. *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013). Because the *Wilshire Westwood* decision violated these principles of statutory interpretation, the Court should reject the Ninth Circuit's reasoning and apply the statute as written and as Congress intended.

Besides *Wilshire Westwood*, Defendants also rely upon statements by the EPA that purportedly confirm that the "petroleum exclusion" applies to specifically listed fractions of crude oil, even though the statute says exactly the opposite. The Court need not defer to decades-old interpretations rendered by the EPA when such interpretations blatantly conflict with clear statutory language. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *see also Walton v. Hammons*, 192 F.3d 590, 601 (6th Cir. 1999) (refusing to consider, much less defer to, agency's interpretation where statutory language was clear); *National Cotton Council of America v. E.P.A.*, 553 F.3d 927, 936 (6th Cir. 2009) (rejecting EPA interpretation that pesticides were not "pollutants" under CWA, because the "plain language" was "unambiguous" that pesticides were pollutants). Even assuming, *arguendo*, that the statute

poses some semblance of ambiguity, EPA's past interpretation is not sufficiently rational to be owed any deference.  *See Chemical Mfrs. Ass'n v. Natural Resources Def. Council, Inc.,* 470 U.S. 116, 125 (1985).

### 2.    *Other Hazardous Substances Were Added to the Crude Oil.*

The statute is clear: the petroleum exclusion is inapplicable to "specifically listed" fractions of crude oil.  But there is another reason why the petroleum exclusion does not apply: BP injected numerous other hazardous substances into the Macondo Well.  Where hazardous substances are added to crude oil or its fractions through methods other than the refining process, then that oil unequivocally falls outside of the petroleum exclusion.  *See, e.g., Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.,* 240 F.3d 534, 541 (6th Cir. 2001) (citing *U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 266-67 (3d Cir. 1992)).  As fully explained in the Center's Motion for Partial Summary Judgment, ECF No. 12673-3 at 17-18, BP injected a slew of other hazardous substances into the Macondo Well during the spill, including excess "spacer," tens of thousands of barrels of used drilling muds (containing ethylene glycol and caustic soda), and other materials.  Because these additions were unrelated to the "refining process," they vitiate the petroleum exclusion as applied to releases from the Macondo Well.

Defendants counter this conclusion by arguing that drilling mud, cement, and spacers used in oil operations are not "hazardous substances."  Joint MSJ at 11.  They contend that CERCLA defines hazardous substances by reference to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq,*  42 U.S.C. § 9601(14)(C), and further that, by regulation, EPA has excluded "drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil" from RCRA's definition of hazardous waste, which means such materials are not "hazardous substance[s]" under CERCLA. 40 C.F.R. § 261.4(b)(5).

Defendants' argument is untenable because the materials injected into the Macondo Well fall outside this regulatory exemption.[3]  The excess "spacer" injected by BP prior to the blowout was intended to *avoid* the reporting and disposal requirements of RCRA, not for any actual bona fide exploration, development, or production of crude oil.  BP has admitted this fact.  *See* Center's Statement of Undisputed Fact, ECF No. 12673-2 at ¶ 16.  The tens of thousands of barrels of drilling muds injected into the well – containing the hazardous substances ethylene glycol and caustic soda – were similarly unrelated to the exploration, development, or production of crude oil.  To the contrary, their purpose was to stop the uncontrolled *release* of oil from the Macondo Well.  The same is true with respect to the other "hazardous substances" BP injected into the Macondo Well to stop the blowout.  *Id*. at ¶ 19 (redacted; supporting document under seal).  In such circumstances, these materials fall within the definition of "hazardous substance."  Therefore, their use at the Macondo Well vitiates any possible petroleum exclusion.

> 3.     *The Center Was Not Required to Identify Each and Every Hazardous Substance That Was Released by Defendants or Introduced Into the Macondo Well.*

Defendants assert that the Center is expanding its EPCRA claim to include hazardous substances that were not first identified in the Center's notice letters.  Joint MSJ at 13.  Defendants misunderstand the law.  The Supreme Court's decision in *Hallstrom v. Tillamook County* stands for the unremarkable proposition that a plaintiff must comply with the statutory notice requirements.  493 U.S. 20, 30 (1989) (no subject matter jurisdiction where plaintiff failed

---

[3] Plaintiff does not assert, at this time, that Defendants were required to independently report these materials under § 304 of EPCRA.  Instead, Plaintiff contends that the introduction of these hazardous substances into the Macondo Well vitiates the petroleum exclusions as applied to releases from the well.  Plaintiff also does not assert that Defendants were required to report the release of methane from the well, and does not assert that Defendants were required to report the releases of Corexit under EPCRA.  The Center's Motion for Summary Judgment, ECF No. 12673-1, presently focuses only the releases of benzene, toluene, and xylene from the Macondo Well.

to notify parties identified under RCRA's citizen suit provision).[4]  Defendants do not and cannot

dispute that the Center complied with the statutory requirements of EPCRA's citizen suit

provision.  42 U.S.C. § 11046(d)(1) (requiring 60-day notice to EPA Administrator, the State in

which the violation allegedly occurred, and the alleged violator).  These statutory requirements

do not require the Center to identify all hazardous substances allegedly released from the

Macondo Well and the *DWH*.  Joint MSJ at 13.  Instead, the Center was obligated only to

provide notice that sufficiently alerted Defendants to the time frame in which violations occurred

and the nature of those violations.  *See, e.g., Cmty. Ass'n for Restoration of the Env't v. Henry*

*Bosma Dairy*, 305 F.3d 943, 951-53 (9th Cir. 2002) (plaintiffs need not "list every specific

aspect or detail of every alleged violation[;]" notice sufficient where violations "originated from

the same source, were of the same nature, and were easily identifiable[.]"); *S.F. Baykeeper, Inc.*

*v. Tosco Corp.*, 309 F.3d 1153, 1158-59 (9th Cir. 2002) (notice sufficient where defendant could

ascertain "the nature of the alleged violations, as well as the likely dates of those violations.");

*see also* Decl. of Daniel C. Snyder, Ex. B at 5-6 (copy of order in *Sierra Club et al. v. BNSF*

*Railway Company*, Case No. C13-0967-JCC (W.D. Wash. March 12, 2014)).

Here, the Center's notice letter alleged that Defendants violated EPCRA by failing to

adequately report the release of more than the reportable quantity of hazardous substances,

"including but not limited to" a specific subset of hazardous substances such as benzene, toluene,

and xylene.  Ex. A at 4, ECF No. 1-2 (2:10-cv-02454-CJB-SS).  The letter then informed

Defendants that these releases occurred "to the ambient air and/or surrounding waters from the

Deepwater Horizon rig and wells[,]" and were taking place on daily basis "since the spill began

---

[4] The only other case cited by Defendants is *Sierra Club Ohio Chapter v. City of Columbus*, 282 F. Supp. 2d 756 (S.D. Ohio 2003).  But that is not an EPCRA case, as Defendants contend.  Rather, that court dealt with notice under the Clean Water Act, finding that plaintiff's notice letters were too vague to confer subject matter jurisdiction.  *Id*. at 775 (dismissing lawsuit).

and continue to occur without proper reporting." *Id.*  The Center was without knowledge at the time notice was sent of the exact, specific hazardous substances being released from the *DWH* or the Macondo Well, for that information was exclusively in the possession of the Defendants. Nonetheless, the Center made a good faith attempt at identifying some potential hazardous substance that were being released.  *Id.* (identifying benzene, toluene, and xylene, among others). Notice letters do not require plaintiffs to do the impossible, such as predicting every possible hazardous substance released from the Macondo Well and the *DWH*, or what hazardous substances would be used by Defendants during source control events.[5]  *See Center for Biological Diversity v. Marina Point Development Co.*, 566 F.3d 794, 801 (9th Cir. 2009).  As such, the Center's notice is sufficient, and the Center may prosecute its EPCRA claim on hazardous substances not specifically identified in that notice.

## III.    EPCRA APPLIES BOTH TO THE MACONDO WELL AND THE *DWH*.

Defendants next argue that EPCRA is not applicable to the *DWH* because it is not a "facility" under the statute and because the *DWH* was not involved in the production of hazardous chemicals.  BP argues that no oil came from the Macondo Well and that it was neither an owner nor operator of the *DWH*.  These arguments are meritless.

### 1.    The DWH Was a Stationary Structure While at the Macondo Site.

EPCRA's reporting requirements apply to the "owner or operator of a facility[.]"  42 U.S.C. § 11004(b)(1).  A "facility" under EPCRA is defined as "buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites[.]" 42 U.S.C. § 11049(4).  "Courts have consistently interpreted the term 'facility' broadly."  *See*

---

[5] Furthermore, if BP continues to take the position that it does not need to comply with EPCRA, then how can it logically explain that it provided notice of releases when it burned oil that reached the Gulf's surface, but not when it was first released.  ECF No. 1819-1 at ¶ 6 (Decl. of Shahrzod Hanizavareh).  By this reporting, BP has effectively admitted that CERCLA/EPCRA applies to releases from the well.

*Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 708-10 (W.D. Ky. 2003) (referring to CERCLA; finding that large chicken operation met definition of "facility" under EPCRA). Defendants argue that the *DWH* is not a "stationary item" because it was a mobile offshore drilling unit. Joint MSJ at 11. Defendants ignore a critical fact: the *DWH was stationary* at the time the Macondo Well was drilled, remained stationary during the development of the well, and was stationary at the time the blowout occurred. Transocean concedes as much. Decl. of Daniel C. Snyder, Ex. A (filed herewith) (Transocean admits that the *DWH* "did not move locations to a new well or drilling site after it began drilling the Macondo Well until after the April 20, 2010 blowout."). If the *DWH* did not move from the site of the Macondo Well, it was "stationary" and therefore a "facility" subject to EPCRA's reporting requirements. In fact, the *DWH* was found by another court to be a "stationary source" under the Clean Air Act. *U.S. v. Transocean Deepwater Drilling, Inc.*, 936 F. Supp. 2d 818, 832 (S.D. Tex. 2013) (*DWH* a stationary source because, *inter alia*, it was "located on one or more contiguous properties…from which an accidental release may occur") (citing 42 U.S.C. § 7412(r)(2)(C)).

The common use of the phrase "stationary" compels this result. *Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011) (undefined terms given ordinary meaning) (citation omitted). The term is defined as "not moving," or "staying in one place or position." As an example of the use of the word, Merriam-Webster suggests the following passage: "The weather front has remained stationary over the Southeast."[6] According to Transocean, the *DWH* "did not move locations" from the start of the drilling until its demise. In other words, it was "staying in one place or position" until after it had completed drilling the well. Simply because it could move *thereafter* does not mean it was not a "stationary item." The example given by Merriam-Webster

---

[6] These definitions were obtained from Merriam-Webster's online dictionary, available at <http://www.merriam-webster.com/dictionary/stationary> (last visiting April 29, 2014).

indicates as much, for a weather front is most certainly moveable.  Similarly, the other examples used in the definition of "facility" may also be stationary for one point in time, but later moved to another location.  For instance, a piece of "equipment" may be housed at one spot during a project, and then moved to a different spot once that project is complete.  That equipment would be "stationary" – *i.e.,* "not moving" – during the project, but thereafter would move to a new project site. [7]   Thus, the statute does not require that a "facility" be fixed at one location.

Nonetheless, Defendants argue that the "area-specific" focus of EPCRA demonstrates that it should not apply to the *DWH*.  Here, Defendants grossly misread the statute.  EPCRA requires immediate and follow-up notification to local and state emergency responders for the areas "likely to be affected" by a release.  42 U.S.C. § 11004(b)(1), (c). It does not matter if a "release" subject to the statute occurs on the Outer Continental Shelf if that release is likely to affect local communities, which is exactly what happened here.  Center's Statement of Undisputed Material Fact, ECF No. 12673-2 at ¶¶ 12-13 (releases reached the shoreline of the United States).

### 2.   Oil was Produced at the *DWH*, and the Facility is Therefore Subject to EPCRA.

Next, Defendants assert that even if the *DWH* was a "facility" under EPCRA, it did not produce, use, or store oil and therefore is not subject to the reporting requirements of the statute.  Joint MSJ at 18.  EPCRA requires emergency notification of the release from a facility "at which a hazardous chemical is produced, used, or stored[.]"  42 U.S.C. § 11004(a)(1)(A).  The term "produced" is not defined by the statute, so the Court should look to the term's ordinary meaning.  *Castro*, 634 F.3d at 786.  Because EPCRA is an important environmental and public

---

[7] Note that the "transportation exemption" under 42 U.S.C. § 11047 does not apply to the emergency notification provisions.  42 U.S.C. § 11004(d).  This further reinforces that a "facility" subject to those requirements need not be fixed at one location, as Defendants assert.

health statute, the Court should construe the term liberally. *Cf. U.S. v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373, 1383 (8th Cir. 1989) (environmental statutes like RCRA and CERCLA to be liberally construed); *U.S. v. Article of Drug ... Bacto–Unidisk*, 394 U.S. 784, 798 (1969) (public health law to be given liberal construction); *U.S. v. Lee*, 131 F.2d 464, 466 (7th Cir. 1942) (statutes enacted to protect public health "ought to be given a liberal construction"). Moreover, it is a hazardous substance's "release" that triggers EPCRA's reporting requirements, not the nature of the "facility" from which the release occurred.  42 U.S.C. § 11004(a).

The most relevant definition of "production" is "the process of making or growing something for sale or use."[8]  Defendants can hardly contend that the *DWH* was not involved in the "process" of "making" oil "for sale or use."  Without the *DWH*, the oil contained within the Macondo Prospect would never have been made available for exploitation.  While "production vessels" may theoretically come to the site to harvest the oil from the Well in the future, that does not somehow negate the *DWH*'s critical role in the production process by making that oil available in the first place.

Defendants point the Court to OPA and the CWA to support their argument that "hazardous chemicals" were not "produced" at the *DWH* under EPCRA.  The Court need not look to any other statutes, however, to construe what the term "produced" means.  Instead, per the rules of statutory construction, the Court should simply interpret the statute using the ordinary meaning of the term "produced."  *Castro*, 634 F.3d at 786.  The definition given by Congress to the term "facility" under OPA is understandably distinct and different from EPCRA,

---

[8] <http://www.merriam-webster.com/dictionary/production> (Last visited on April 29, 2014).  The definition for "produce" is similar: to make (something) especially by using machines; to make or create (something) by a natural process; to cause (something) to exist or happen; to cause (a particular result or effect).  As a transitive verb, "produce" can also mean "to cause to have existence or to happen" and "to give being, form, or shape to." <http://www.merriam-webster.com/dictionary/produce> (Last visited on April 29, 2014).

considering that OPA's purpose is *different* from that of the present statute.  *Compare SeaRiver Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662, 666-67 (9th Cir. 2002) (purpose of OPA is to prevent oil spills) *with CBD v. BP*, 704 F.3d at 429 (purpose of EPCRA is to "inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the vent of [a] health-threatening release") (citation omitted).  More importantly, neither OPA nor the CWA gives any specific definition of the term "produced."  As such, the Court need not look to different statutes, with different terms, to interpret the common and ordinary meaning of the term "produced" as it is used in 42 U.S.C. § 11004(a)(1)(A).

### 3.    *BP Is Liable Under EPCRA for Releases from the Macondo Well.*

BP asserts that the only releases subject to EPCRA were from the *DWH*, because no oil allegedly entered the ocean from the well itself, but from a broken riser pipe.  Joint MSJ at 19.  This argument has been rejected by the Court.  ECF No. 5809 at 19, 22 ("the uncontrolled movement of oil began in the well…[t]he riser and BOP, by contrast, were merely passive conduits through which oil flowed.").  The Court also determined BP is an owner of the Macondo Well, which constituted an "offshore facility."  *Id*. at 2, 17 n. 24.  These factual findings should have the same force and effect here.  42 U.S.C. § 11046 ("owner or operator" of a "facility" is liable for failure to submit followup written reports); *see also* ECF No. 12673-2 at ¶¶ 1-9, 12-15 (Center's SOMF).  As such, BP is liable for unreported releases of hazardous substances from the Macondo Well.

To the extent that BP argues it is not an "operator" of the *DWH*, there are facts in dispute that make such a finding inappropriate for summary judgment.  *See* Center's Response to Defendants' Statement of Undisputed Material Facts at ¶ 20 (filed herewith).

**IV.    DEFENDANTS MUST STRICTLY COMPLY WITH EPCRA'S REPORTING REQUIREMENTS, AND THE INFORMATION THAT IS PUBLICLY AVAILABLE FAILS TO SATISFY THOSE REQUIREMENTS.**

Defendants contend that all of the information required by EPCRA is "publicly available," and therefore the Center's reporting claim is moot.  Defendants are incorrect for two reasons: first, EPCRA requires strict compliance with its emergency notification and reporting requirements; second, the information cited by Defendants does not contain the specific information required by EPCRA.

> *1.    Defendants Must Strictly Comply with EPCRA's Reporting Requirements.*

Defendants would have this Court read into EPCRA something Congress expressly chose to leave out: what amounts to a "substantial compliance" defense for the statute's emergency notification and reporting requirements.  No court has ever found that the disparate and generic availability of information related to an EPCRA release constitutes compliance with the statute's notification requirements, because EPCRA is a ***strict liability*** statute.  *See Neighbors for a Toxic Free Community v. Vulcan Materials Co.*, 964 F. Supp. 1448, 1453 (D. Colo. 1997) ("public policy favors holding owners fully accountable under EPCRA" and noting that EPCRA employs the same regime as CERCLA, "which imposes strict liability on responsible parties[.]"); *see also Steeltech, Ltd. v. E.P.A.*, 273 F.3d 652, 656 (6th Cir. 2001) (affirming ALJ decision which held that "EPCRA is a strict liability statute[.]").  It is for this reason that EPCRA creates an affirmative duty that owners or operators of a facility from which a reportable quantity of a hazardous substance is released ***must*** immediately notify emergency responders and ***"as soon as practicable"*** thereafter submit followup written reports.  42 U.S.C. § 11004(b), (c).

Defendants fail to cite even a scintilla of legal support for their position.  This is understandable, for the courts have recognized that the public interest is served by requiring

14

*strict compliance* with environmental statutes. *See, e.g., Valley Community Preservation Com'n v. Mineta*, 373 F.3d 1078, 1087 (10th Cir. 2004) ("the public interest is served by strict compliance with environmental laws"); *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 781 (9th Cir. 1980) (same); *Conservation Law Found. v. Watt*, 560 F. Supp. 561, 583 (D. Mass. 1983) (same) (citing *National Wildlife Federation v. Andrus*, 440 F. Supp. 1245, 1256 (D. D.C. 1977)). The interests of the public are well served here by requiring strict compliance with EPCRA's reporting requirements, as the statute promotes both environmental and public health interests. *See CBD v. BP*, 704 F.3d at 429. Indeed, the Fifth Circuit effectively rejected Defendants' argument, finding that "[Defendants'] claim that information about the disaster may be found by hunting on the Internet ignores the fact that EPCRA places an affirmative statutory duty on the owner or operator of the facility to report the information." *See id*. at 430. The Court should follow suit and read EPCRA exactly as Congress intended, requiring Defendants to strictly comply with their statutory duty of filing followup written reports under 42 U.S.C. § 11004(c).[9]

>    2.    *The Information Provided Does Not Comply with EPCRA's Requirements.*

It is undisputed that Defendants have not filed followup EPCRA reports for releases from the spill. Because the Court should require strict compliance with EPCRA's reporting provisions, it need not look any further into the generic information attached in the exhibits to

---

[9] In a footnote, BP argues that liability under EPCRA cannot be imposed because of the "practical limits on the extent to which the flow rate was knowable while the spill was still unfolding." Joint MSJ at 21 n. 17. As explained in the Center's Motion for Partial Summary Judgment, however, using BP's own sampling data, representations about the total amount of oil released from the Macondo well, and basic mathematical principles, one can quickly determine that the Macondo Well was releasing amounts of benzene, toluene, and xylene that grossly exceeded those substances' reportable quantities. Even using the most conservative estimates of flow rate, there can be no meaningful dispute that the Macondo Well still caused reportable releases of these hazardous substances. BP was apparently ignoring EPCRA in order to protect its scheme to avoid full disclosure of the amount of its ongoing releases. *See* William H. Rodgers, Jr., Jason DeRosa & Sarah Reynveld, STRANGER THAN FICTION: AN "INSIDE" LOOK AT ENVIRONMENTAL LIABILITY AND DEFENSE STRATEGY IN THE DEEPWATER HORIZON AFTERMATH, 1 Wash. J. Envtl. L. & Pol'y 219-94 (2011).

Defendants' Statement of Undisputed Fact.  But if it did, the errors it would find are twofold.

First, *even if* the volumes of generic information in those exhibits contained the *specific* data

required by EPCRA (they do not), Defendants overlook a critical component of EPCRA's

written notification requirement: the required information must be described in *one document*

and made available to the public *at a specific location*.  The statute is unambiguous on this point.

To explain, a written followup notice under 42 U.S.C. § 11004(c) is required to contain a

specific set of information.  Such notice must set forth and update "the information required

under subsection (b) of this section[.]"  42 U.S.C. § 11004(c).  "Subsection b" lists information

that must be sent to emergency responders under EPCRA's "immediate notification" provision:

> (A) The chemical name or identity of any substance involved in the release.
> (B) An indication of whether the substance is on the list referred to in section 11002 (a) of this title.
> (C) An estimate of the quantity of any such substance that was released into the environment.
> (D) The time and duration of the release.
> (E) The medium or media into which the release occurred.
> (F) Any known or anticipated acute or chronic health risks associated with the emergency and, where appropriate, advice regarding medical attention necessary for exposed individuals.
> (G) Proper precautions to take as a result of the release, including evacuation (unless such information is readily available to the community emergency coordinator pursuant to the emergency plan).
> (H) The name and telephone number of the person or persons to be contacted for further information.

42 U.S.C. § 11004(b).  A written followup notice must also identify three other categories of

information.  42 U.S.C. § 11004(c).  Followup notices are required to be submitted to emergency

planning committees for the areas likely to be affected by the EPCRA release.  *Id*.  They "shall

be made available to the public" by those committees.  42 U.S.C. § 11044(a).  To promote their

availability, emergency planning committees must inform the public that it may "review any

such…followup notice…at the location designated" under the statute.  42 U.S.C. § 11044(b).

16

This statutory scheme makes clear that the categories of information identified in 42 U.S.C. § 11004(b), as well as the additional three categories of information described in 42 U.S.C. § 11004(c), are to be found in *one document* (the "notice"), available to the public at a *specific location* (local or state emergency response commissions).  The Fifth Circuit agrees. *CBD v. BP*, 704 F.3d at 430 (EPCRA requires that "reports provided by owners or operators be maintained by state emergency planning authorities and be made available to the public at a designated location" and that "[t]he obvious advantage of this requirement is to have vital health information available in one easily accessible place.").  While the statute does not require any particular "format" for followup written notice, 40 C.F.R. § 355.41, it does require that all the information be listed *in the notice*.  *Id.*; 40 C.F.R. § 355.40(b).  The public availability of generic information located across a variety of sources does not equate to compliance with these specific statutory requirements.  *CBD v. BP*, 704 F.3d at 431 n.5 ("We do not think that the intent of EPCRA is met by requiring the public to search for a needle in a cyberspace haystack.").

Second, the volumes of webpages and other sources cited by Defendants do not contain the specific type of information required by 42 U.S.C. § 11004(b) or (c), and are therefore both insufficient and incapable of demonstrating compliance with EPCRA.[10]  For instance, BP provides exhibits that allegedly comply with EPCRA's requirement that a written followup notice identify the "chemical name or identify of any substance involved in the release[.]" 42 U.S.C. § 11004(b)(2)(A).  ECF No. 12676-2 at ¶ 34 (Defendants' Statement of Undisputed

---

[10] BP argues that its "voluminous correspondence with the Unified Command and the FOSC" satisfies its requirement to provide written followup notification under EPCRA.  Joint MSJ at 22-23.  As argued *supra*, there can be no "substantial compliance" with EPCRA because it is a strict liability statute and the public interest demands strict compliance with its reporting provisions. BP does not explain how its "correspondences" constitute a written "notice" containing, in one document, all of the information required by the statute.  Nor does BP articulate how its correspondences result in this information being placed with any specific local or state emergency planning commission, as required by the statute.  Corresponding with the federal government is not the same thing as complying with an affirmative statutory duty under EPCRA.

Material Fact).  Besides the glaring error that no EPCRA notice was ever provided, none of the exhibits provided by Defendants actually identify any of the discrete hazardous substances involved in the release, such as benzene, toluene, and xylene, but rather mention only crude oil and dispersants.  Center's Response to Defendants' Statement of Undisputed Material Facts at ¶ 34.  Similarly, Defendants proffer exhibits that allegedly demonstrate compliance with EPCRA's requirement that written followup notices identify "whether the substance is on the list referred to in section 11002(a) of this title."  42 U.S.C. § 11004(b)(2)(B); ECF No. 12676-2 at ¶ 35 (citing Defendants' exhibits).  But none of these exhibits actually state whether the limited substances identified therein *are on the 11002(a) list*.  Center's Response to Defendants' Statement of Undisputed Material Facts at ¶ 35.  These problems continue throughout the exhibits cited by Defendants.  *See id.* at ¶¶ 36-44.  Transocean's communications with federal officials fail for similar reasons, as that Defendant does not describe how its communications contain the information required by EPCRA or how that information was made publicly available.  Because these exhibits do not contain the specific information required by EPCRA, and because Defendants have not filed actual EPCRA notices with emergency planners containing the statutorily-required information, the Center's EPCRA claim is not moot.

## V.      LACHES IS INAPPLICABLE.

Finally, Defendants contend that the Center's EPCRA claim is barred by laches.  Defendants must prove "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice against whom the claim is asserted."  *Environmental Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980).  First, there was no delay in the Center's "assertion" of its claim.  The Center provided Defendants notice of its intent to sue while the spill was ongoing and brought this case at the expiration of the 60-day

waiting period, within the statute of limitations.  After the D1 Master Complaint was dismissed, the Center undertook a series steps to appeal that decision to the Fifth Circuit.  When the Fifth Circuit remanded the Center's EPCRA claim, this Court was preparing for and conducting the Phase I trial.  *See* Center's Response to Defendants' Statement of Undisputed Material Fact at ¶ 29.  Considering that the Center's individual cases were stayed under PTO 11 and 25, the Center believed it appropriate to wait until after the Phase I trial to proceed.  It thereafter prepared and served its Motion to Lift Stay under Pretrial Orders 11 and 25 and for Leave to Proceed Before Magistrate Judge on September 13, 2013.  *Id*.  Due to an inadvertent error, that motion was not filed, but it was served on both Defendants.  The Center corrected that mistake on December 12, 2013.  These actions in no way constitute a "delay" in the Center's assertion of its EPCRA claim, considering BP and Transocean have been on notice of that claim since receiving the Center's notice letters in 2010.  *See Envtl. Def. Fund, Inc.*, 614 F.2d at 479 (five year delay in filing of complaint *after* complained of transaction gave rise to laches).

Second, even if there was a delay that could give rise to laches, such delay was excusable in light of the Court's pretrial orders staying the Center's individual claims.  Had the Center not moved for relief from those orders, then its individual complaints would *still* be stayed and no action could be taken thereunder.  PTO 25 at ¶ 8.  The Center timely moved for relief from the orders, giving rise to the current briefing before the Court.

Finally, Defendants offer no evidence of prejudice.  Instead, they argue only that the prolongation of litigation has caused them harm.  The MDL, of course, is not over.  The Phase III trial is on the Court's schedule.  To establish undue prejudice, Defendants must be subjected "to a disadvantage in asserting and establishing his claimed right to defense." *Pacific Dawn, LLC v. New Orleans Marine Service, Inc.*, 2012 WL 686034 at *4 (E.D. La. 2012) (citation omitted).

19

This would include "loss of records, destruction of evidence, fading memories, or unavailability of witnesses[.]"  *Id*.  Defendants offer no facts that would establish prejudice and they have suffered no disadvantage in asserting a defense.  Accordingly, laches does not apply.

Defendants assert that the public would not benefit from requiring Defendants to file EPCRA reports.  Joint MSJ at 25.  The Center's members have submitted testimony establishing the exact opposite.  *See* ECF Nos. 12673-14 through 12673-17 (declarations identifying why information would be useful).  As BP's own exhibits demonstrate, the information required under EPCRA is *not* found in one document and is not available in one location.  Rather, one must search through volumes of documents to even begin to gather only some of the information that EPCRA mandates be easily and readily accessible.  *CBD v. BP*, 704 F.3d at 431 n. 5.

## CONCLUSION

For the foregoing reasons, the Center respectfully requests that the Court deny Defendants' Joint Motion for Summary Judgment.

DATED this 5th Day of May, 2014.

Respectfully submitted,

s/Charles M. Tebbutt
Charles M. Tebbutt
Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Ph: 541-344-3505
E-mail: charlie.tebbuttlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2014, I electronically served the foregoing on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing in accordance with the procedures established in MDL 2179.

s/ Charles M. Tebbutt
Charles M. Tebbutt
Law Offices of Charles M. Tebbutt, P.C.