## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
|     "Deepwater Horizon" in the Gulf | * | |
|     of Mexico, on April 20, 2010 | * | Section:  J |
| | * | |
| | * | |
| This Document Relates To: 2:10-cv- | * | |
| 01768, 2:10-cv-02454 | * | District Judge BARBIER |
| | * | Magistrate Judge SHUSHAN |
| | * | |

---

## DEFENDANT BP'S OPPOSITION TO PLAINTIFF CENTER FOR BIOLOGICAL DIVERSITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5705
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1047
Facsimile: (212) 715-1399

Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**ATTORNEYS-IN-CHARGE FOR DEFENDANTS BP AMERICA INC. AND BP EXPLORATION & PRODUCTION INC.**

## TABLE OF CONTENTS

**Page(s)**

**INTRODUCTION** ................................................................................................ **1**

**BACKGROUND** ................................................................................................... **3**

**STANDARD OF REVIEW** ................................................................................... **7**

**ARGUMENT** ......................................................................................................... **7**

**I.     The Petroleum Exclusion Bars the Heart of CBD's Claim.** .................... **7**

    A.     The Plain Text of the Petroleum Exclusion Applies Here. .................... 8

    B.     CBD Misreads The Provision Its Argument Depends Upon. ................. 9

    C.     The Superfluity Canon Further Eviscerates CBD's Reading of the Statute. ........ 11

**II.    Drilling Mud and Spacer Were Not Raised in CBD's Notice Letters and, in Any Event, Are Not Hazardous Substances.** .................... **11**

    A.     Drilling Mud and Spacer Are Not Lawfully Part of this Case. ............... 12

    B.     Drilling Mud and Spacers Are Not "Hazardous Substances." ............... 12

**III.   CBD Misunderstands EPCRA in Numerous Other Respects.** .................. **13**

    A.     EPCRA Does Not Apply to Releases on the Outer Continental Shelf. ............... 14

    B.     No Reportable Substances Were Released "From" the Macondo Well. ............... 15

    C.     The *Deepwater Horizon* is Not a Facility for Purposes of EPCRA and, in Any Event, BP Did Not Operate It. .............................. 17

**IV.    Even Leaving Aside its Statutory Flaws, CBD's EPCRA Claim Is Also Precluded by Article III of the Constitution.** ............................ **17**

    A.     CBD Lacks Constitutional Standing to Pursue its EPCRA Claim. .................... 17

    B.     CBD's EPCRA Claim is Also Moot. ............................................... 19

**V.     CBD's Sole Remaining Remedy is Barred by Laches.** ............................. **20**

**CONCLUSION** ...................................................................................................... **20**

## TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bunger v. Hartman*,
   797 F. Supp. 968 (S.D. Fla. 1992) ............................................................................ 11

*Cariddi v. Consol. Alum. Corp.*,
   478 F. Supp. 2d 150 (D. Mass. 2007) ....................................................................... 10

*Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
   704 F.3d 413 (5th Cir. 2013) .................................................... 1, 2, 3, 4, 5, 15, 18, 20

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ..................................................................................................... 17

*Clapper v. Amnesty Int'l*,
   133 S. Ct. 1138 (2013) ............................................................................................... 18

*Cont'l Title Co. v. Peoples Gas Light & Coke Co.*,
   No. 96C3257 WL 1250666 (N.D. Ill. Mar. 18, 1999) .............................................. 11

*Davis v. Michigan Dept. of Treasury*,
   489 US 803 (1989) ..................................................................................................... 14

*Diversified Servs., Inc. v. Simkins Indus., Inc.*,
   974 F. Supp. 1448 (S.D. Fla. 1997) .......................................................................... 10

*Envtl. Conservation Org. v. City of Dallas*,
   529 F.3d 519 (5th Cir. 2008) ..................................................................................... 19

*Envtl. Def. Fund, Inc. v. Alexander*,
   614 F.2d 474 (5th Cir. 1980) ..................................................................................... 20

*Esso Standard Oil Co. v. Rodriguez-Perez*,
   No. 01–2012 WL 2238894 (D.P.R. Oct. 1, 2004) ..................................................... 10

*Foley v. Transocean Ltd.*,
   861 F. Supp. 2d 197 (S.D.N.Y. 2012) ....................................................................... 15

*Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*,
   240 F.3d 534 (6th Cir. 2001) ..................................................................................... 13

*Grider v. Cavazos*,
   911 F.2d 1158 (5th Cir. 1990) ..................................................................................... 9

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
   484 U.S. 49 (1987) ..................................................................................................... 12

*Hallstrom v. Tillamook County*,
  493 U.S. 20 (1989) ............................................................................................... 7, 12

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) .................................................................................................. 19

*In re Deepwater Horizon*,
  745 F.3d 157 (5th Cir. 2014) ................................................................................... 14

*In re Deepwater Horizon*,
  No. 12-30883 (5th Cir.) ........................................................................................... 16

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) .................................................................................................. 15

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
  910 F.2d 167 (5th Cir. 1990) ..................................................................................... 7

*Lockett v. EPA*,
  319 F.3d 678 (5th Cir. 2003) ...................................................................................... 7

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................ 17, 18

*Meghrig v. KFC Western, Inc.*,
  516 U.S. 479 (1996) .................................................................................................... 8

*Members of the Beede Site Grp. v. Fed. Home Loan, Mortg. Corp.*,
  No. 09-370-WES, 2013 WL 4778570 (D.N.H. Sept. 5, 2013) .................................. 9

*Nat'l Oilwell Varco, LP v. Hydril Co.*,
  No. 06-170 WL 467119 (S.D. Tex. Feb. 5, 2011) .................................................... 15

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Riggs Nat'l Bank of Wash., D.C.*,
  5 F.3d 554 (D.C. Cir. 1993) ...................................................................................... 16

*Niecko v. Emro Mktg. Co.*,
  769 F. Supp. 973 (E.D. Mich. 1991) ........................................................................ 10

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ............................................................................... 8, 10

*Save Our Wetlands, Inc. v. Army Corps of Eng'rs*,
  549 F.2d 1021 (5th Cir. 1977) .................................................................................. 20

*Sierra Club Ohio Chapter v. Columbus*,
  282 F. Supp. 2d 756 (S.D. Ohio 2003) .................................................................... 12

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .................................................................................................... 17

*St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, LLC*,
    399 F. Supp. 2d 726 (E.D. La. 2005) ....................................................................... 7

*Steel Co. v. Citizens for Better Env't*,
    523 U.S. 83 (1998) ................................................................................................ 17, 18

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................................................... 18

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010) .................................................................................. 15

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...................................................................................................... 11

*Two Rivers Terminal, L.P. v. Chevron USA, Inc.*,
    96 F. Supp. 2d 432 (M.D. Pa. 2000) ........................................................................... 10

*United States v. Alcan Aluminum Corp.*,
    964 F.2d 252 (3d Cir. 1992) ........................................................................................ 13

*United States v. Coastal States Crude Gathering Co.*,
    643 F.2d 1125 (5th Cir. 1981) ..................................................................................... 16

*United States v. Diaz-Gomez*,
    680 F.3d 477 (5th Cir. 2012) ....................................................................................... 10

*United States v. Richardson*,
    418 U.S. 166 (1974) ..................................................................................................... 19

*Wademan v. Concra*,
    13 F. Supp. 2d 295 (N.D.N.Y. 1998) ....................................................................... 8, 10

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ..................................................................................... 18

*Wilderness Soc'y, Inc. v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) ..................................................................................... 19

*Wilshire Westwood Assocs. v. Atl. Richfield Corp.*,
    881 F.2d 801 (9th Cir. 1989) ................................................................................ 8, 9, 10

## Statutes

33 U.S.C. § 1321 .......................................................................................................... 8

33 U.S.C. § 2701 .......................................................................................................... 8

42 U.S.C. § 9601(14)(F) ............................................................................................ 8, 9

42 U.S.C. § 9603(a) ...................................................................................................... 6

42 U.S.C. § 11001 ............................................................................................... 14

42 U.S.C. § 11001(a)-(c) ...................................................................................... 6

42 U.S.C. § 11002(c) ........................................................................................... 14

42 U.S.C. § 11004 ............................................................................................ 1, 7

42 U.S.C. § 11004(a) ............................................................................... 14, 16, 17

42 U.S.C. § 11046(d) ................................................................................. 4, 7, 12

42 U.S.C. § 11049(4) ........................................................................................... 15

**Regulations**

40 C.F.R. § 261.4(b)(5) ........................................................................................ 13

40 C.F.R. § 302.4 .................................................................................................. 6

40 C.F.R. Part 355 ................................................................................................ 6

Final Rule, 50 Fed. Reg. 13,456, 13,460 (Apr. 4, 1985) ................................... 10

Recycled Used Oil Management Standards,
  57 Fed. Reg. 41,566, 41,606 (Sept. 10, 1992) ......................................... 10

**Rule**

Fed. R. Civ. P. 56(a) ............................................................................................ 7

**Other Authorities**

Guido Calabresi, *The Decision for Accidents:*
  *An Approach to the Nonfault Allocation of Costs*, 78 HARV. L. REV. 713 (1965) ................... 16

Mem., Scope of the CERCLA Petroleum
  Exclusion Under Sections 101(14) and 104(A)(2), 1987 WL 123926 (July 31, 1987)........... 10

S. Rep. No. 96–848, 96th Cong., 2d Sess., at 28
  (Jul. 11, 1980) ............................................................................................ 13

Substances Covered Under Reporting Requirements:
  Petroleum Exclusion,
  http://www.epa.gov/ceppo/web/content/reporting/faq_subs.htm#exclusion (last visited Apr.
  21, 2014) .................................................................................................... 10

Superfund Reportable Quantities, What
  Substances Are Covered?, www.epa.gov/oerrpage/superfund/policy/release/rq/index.htm (last
  visited Apr. 3, 2014) .................................................................................. 10

www.restorethegulf.gov/health-safety ........................................................................ 18

## INTRODUCTION

Three years ago, this Court issued an important decision.  Taking judicial notice of "easily accessible" information, the Court concluded that the Center For Biological Diversity, Inc.'s ("CBD's" or "the Center's") citizen suit against BP and Transocean must be dismissed because it ran headlong into Article III of the Constitution.[1]  D1 Order at 8, Rec. Doc. 2784 (June 16, 2011) ("D1 Order").  As the Court explained, the Constitution demands that a plaintiff in federal court must be suffering present injury.  Applying that bedrock principle, the Court held that CBD could not seek to halt an oil spill that was already over, nor was CBD entitled to a report under the Emergency Planning and Community Right-to-Know Act ("EPCRA") of information that was already public.  The Court thus dismissed on jurisdictional grounds all of CBD's claims.

The Court was right to view CBD's claims with deep skepticism.  *See Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413 (5th Cir. 2013) (affirming nearly every aspect of the Court's decision).  The Fifth Circuit agreed that CBD cannot bring any claim under the Clean Water Act ("CWA") or the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") because such claims are moot.  *See id.* at 432.  It also held that CBD cannot seek monetary penalties under any statute because the Center "abandoned its civil penalty claims in order to obtain a final appealable judgment."  *Id.* at 427.  The only claim the panel did not reject decisively involves CBD's request for injunctive relief under Section 304 of EPCRA, 42 U.S.C. § 11004.  But even for that claim, the Fifth Circuit only found it survived a motion to dismiss, not that it was valid.  In fact, the panel suggested that CBD cannot prevail if "the information required by EPCRA's reporting provisions may indeed be

---

[1] This opposition and the response to CBD's statement of undisputed material facts are filed on behalf of the BP entities that CBD sued with proper service: BP America Inc. and BP Exploration & Production Inc. (BP p.l.c. was not properly served and thus there is no valid personal jurisdiction over it in this action.)  The Court's scheduling order clearly contemplated that CBD would file a motion for summary judgment against both BP and Transocean, but CBD moved only against BP.  Transocean therefore is not formally a party to CBD's Motion for Partial Summary Judgment.  Nevertheless, Transocean has carefully reviewed CBD's motion and agrees with BP that the motion is meritless for the reasons explained in Arguments Sections I, II, IV, and V and because the *Deepwater Horizon* is not an EPCRA facility.

easily located from alternate sources." *CBD*, 704 F.3d at 432.  Importantly, the panel declined to consider whether CBD's EPCRA theory comports with the statute, determining instead that that question should be addressed by this Court in the first instance.  *See id.* at 428 n.4.

Now that the summary judgment stage has arrived, CBD can no longer take rest on mere allegations — it must come forward with a theory that makes sense and real evidence to back it up.  The Center fails on both fronts.  Its Motion for Partial Summary Judgment ignores settled law and indisputable facts.  Suffice to say, it cannot obtain summary judgment in its favor.

At the outset, the Center misunderstands EPCRA.  Most obviously, CBD has no real answer to the "petroleum exclusion."  With one breath, CBD admits (as it must) that petroleum is excluded from EPCRA's reporting duty.  But with the next, CBD argues that EPCRA requires BP to report releases of petroleum's natural components.  CBD's argument, however, cannot possibly be right; if the components of petroleum must be reported, nothing would be left of the petroleum exclusion.  Unsurprisingly, CBD's statute-nullifying approach (1) is not supported by any precedent at all; (2) ignores the considered view of the United States; and (3) violates core principles of statutory interpretation.  The heart of CBD's argument must be rejected.

But CBD's mistaken view of the petroleum exclusion only scratches the surface of its EPCRA errors.  EPCRA, for instance, applies to "hazardous substances" — a category that does not include drilling mud or spacer.  And even if that were not so, any claims related to those substances are barred by EPCRA's 60-day notice requirement because CBD never mentioned them in its notice letters.  Equally insurmountable, EPCRA does not apply to oil spills on the Outer Continental Shelf, nor did any release occur from a facility owned or operated by BP.  No matter how one looks at it, CBD's theory is irreconcilable with EPCRA.

CBD's case, moreover, also falters in the face of Article III.  The Court was right the first time it considered CBD's claim that "data regarding the spill and its cleanup are easily accessible."  D1 Order at 8.  Nothing in the Fifth Circuit's decision is to the contrary.  Instead, that Court merely determined that a motion to dismiss was "unavailing, ***at least on the current record***."  *CBD*, 704 F.3d at 430 (emphasis added).  But the Fifth Circuit did not hold that the

record was static (and could not be supplemented by the rich and broader learning contained in the MDL 2179 record). Now that the summary judgment record is near-complete, careful review confirms that there is no information required by EPCRA that cannot readily be located by anyone with a few moments using an Internet search engine. Because all the information that EPCRA requires is already publicly available and easily found, any claim for injunctive relief is forever moot. In any event, CBD's lengthy delay in seeking relief amply confirms that the information it purports to seek is not actually important at all; otherwise, the Center would not have waited eight months (or more, if one discounts its flawed attempts to reactivate the case) to start the remand proceedings. The only plausible explanation for CBD's otherwise inexplicable delay is that the Center, and anyone it purports to represent, already has all the information that EPCRA requires. That uncontestable fact not only means that CBD lacks Article III standing because it has suffered no injury; it also triggers laches.

By any measure, CBD is not entitled to summary judgment. To the contrary, CBD's motion only underscores why BP's and Transocean's cross-motions for summary judgment should be granted. This suit should not drag on any longer. The Center has had its chance to make its case, and it failed. CBD's motion should be denied.

## BACKGROUND

### A.    Factual Background

As the Court well knows, the *Deepwater Horizon* was a drilling rig owned by Transocean and hired by BP to drill the Macondo well. BP was a leaseholder of the area where the Macondo well was located. A blowout occurred at approximately 9:50 p.m. on April 20, 2010, causing an explosion and then oil spill. At 9:56 p.m. — about six minutes later — the *Deepwater Horizon*'s Dynamic Positioning Officer activated the Global Maritime Distress Safety and System alert to notify the U.S. Coast Guard. And at about 10:06 p.m., the BP Shore Base Supervisor provided further notice by phone to federal officials. These alarms were communicated to federal, state, and local officials, who promptly began response efforts. Indeed, "[i]t is undisputed that BP notified the National Response Center of the explosion on Deepwater Horizon and the oil spill soon after they occurred, *which resulted in an immediate governmental response*." *CBD*, 704

F.3d at 428 (emphasis added).  From literally the earliest moments of the spill, BP had alerted government officials about what was happening.  The spill was well-publicized, and no one was in the dark that it was occurring.

Hydrocarbons flowed until July 15, 2010, when the well was capped.  *See id.* at 418 ("On July 15, 2010, a permanent cap was put in place at the well site to halt the flow of oil.").  The United States, led by the Federal On-Scene Coordinator ("FOSC"), engaged in the largest environmental response in history.  *See id.* ("[T]he federal government's response to the spill involved monumental efforts.").  BP was in constant communication with the FOSC, the Unified Command, and participating state agencies.  Indeed, even this Court communicated regularly with federal officials.  *See id.* at 424 ("[T]he district court was receiving regular status updates about the situation in the Gulf and was kept apprised of the well's condition and the ongoing efforts to shut it down.").  As federal law requires, moreover, BP did everything "at the direction of the federal authorities to stop the oil spill."  *Id.* at 418.  *See also* CBD's UMF, Rec. Doc. 12673-2, ¶ 40 (conceding all of this).

Throughout the response, BP, Transocean, and government officials made immense amounts of information available to the public.  This information details the type of oil and chemicals used in the response efforts, both the direct and indirect health effects of the oil spill for numerous categories of people, medical advice for those impacted by the spill, estimates of the quantity of oil discharged, and summaries of response efforts.

**B.     Procedural Background**

**1.     CBD's Complaints**

As this Court also knows, CBD sent its original notice letter to BP on June 1, 2010 and a supplemental letter two days later.  CBD's first complaint, filed June 18, 2010, alleged only violations of Section 306 of the CWA; CBD later amended this complaint to add an EPCRA claim.  But that first complaint was invalid from the outset because it was filed fewer than 60 days after the CBD provided a notice letter to BP.  42 U.S.C. § 11046(d).  Realizing its error, CBD filed a nearly identical lawsuit on August 4, 2010 (after the flow of oil had already been

halted).  CBD then amended that complaint on November 26, 2010.  None of CBD's notice letters mention drilling mud or spacer.

To manage the hundreds of cases (including over 100,000 short-form joinders) then pending in the MDL, this Court placed both of CBD's actions in the D1 Bundle (PTO No. 11) (Rec. Doc. 569).  The D1 Master Complaint was filed on December 15, 2010 (Rec. Doc. 880).

### 2. This Court's Dismissal and the Fifth Circuit's Affirmance and Remand

On June 16, 2011, the Court dismissed the D1 Master Complaint, including CBD's complaints.  As to the EPCRA claim, the Court found that the D1 Plaintiffs lacked standing because even "[a]ssuming that the operations fifty miles out in the Gulf were subject to EPCRA," it was "unclear how the data collected under EPCRA can remedy the injury alleged." D1 Order at 8.  The Court concluded that because there was no ongoing release and the EPCRA data were "easily accessible," injunctive relief would not redress the injury claimed.  *Id.*

On January 9, 2013, the Fifth Circuit affirmed this Court's dismissal of all of CBD's claims, save its single EPCRA claim.  *See CBD*, 704 F.3d at 432.  But the Fifth Circuit did not suggest that CBD's EPCRA claim had merit.  Instead, it concluded that the record developed by the parties on the D1 motions to dismiss did not clearly demonstrate that all of the required information was readily accessible to the public.  *See id.* at 430.  The Fifth Circuit specifically noted that "[i]f the information required by EPCRA[] ... may indeed be easily located from alternate sources, it may be that a further order from the district court would provide no meaningful relief."  *Id.*  The Fifth Circuit, moreover, did not decide any statutory claims.  For instance, the panel determined that any issues surrounding the petroleum exclusion should be resolved by this Court in the first instance.  *See id.* at 428 n.4 ("We do not decide the question in light of our conclusion about mootness, and the fact that the district court made no findings with respect to the petroleum exclusion.").

### 3. CBD's Delay on Remand

Rather than diligently pursue the information it says is so vital to its members, CBD allowed its EPCRA claim to languish for more than ***eight months*** after the Fifth Circuit's

remand, taking no action at all.   When CBD finally resurfaced in September 2013, it electronically served, but neglected to file with this Court, a Motion to Lift Stay Under Pretrial Orders 11 & 25 and for Leave to Proceed Before Magistrate Judge.   It then did nothing for nearly four more months.   Only after being advised of the defect by BP's counsel as a professional courtesy did CBD file the motion to lift the stay on December 11, 2013.   *See* Rec. Doc. 11953.

CBD has attempted to deflect attention from its own delay by attacking this Court's pre-trial orders as unduly complicated.   But that does not explain why CBD did not alert the Court of its allegedly paralyzing confusion earlier.   Following a status conference on January 6, 2014, Magistrate Judge Shushan set the litigation schedule now in place.   *See* Rec. Doc. 12090.

## C.    Statutory Background

EPCRA requires regulators to establish state emergency response commissions ("SERCs"), emergency planning districts, and local emergency planning committees ("LEPCs") for responding to emergency releases.   *See* 42 U.S.C. § 11001(a)-(c).   It also requires the owners and operators of certain "facilities" to follow notification procedures in the event of certain chemical releases.

In particular, Section 11004 supplements Section 103(a) of CERCLA, which requires an owner or operator to notify the National Response Center should a "hazardous substance" be released.   *See* 42 U.S.C. § 9603(a); *see also* 40 C.F.R. § 302.4.   Section 11004 enhances this requirement by providing that such releases also must be reported to the community emergency coordinator for the LEPC for any area, and to the SERC of any involved State, likely to be affected by the release, as well as requiring reporting of "extremely hazardous" substances that have been identified by the EPA Administrator and listed in 40 C.F.R. Part 355.   *See* 42 U.S.C. § 11004(a)-(b).   Section 11004 accordingly covers only two categories of materials: "hazardous substances" under CERCLA and "extremely hazardous substances" under EPCRA.

Section 11004(b) sets out the information required to be reported.   The first notice must include eight items of information "to the extent known at the time of the notice and so long as no delay in responding to the emergency results": (1) the chemical; (2) whether the chemical is

extremely hazardous; (3) estimate of the quantity released; (4) time and duration of the release; (5) media into which the release occurred; (6) any known or anticipated health risks and, where necessary, advice regarding medical attention for exposed individuals; (7) proper precautions; and (8) the name and telephone number of a contact person.  *Id.* § 11004(b)(2).  A follow-up notice must be submitted "as soon as practicable" that updates the information in the initial notice and describes measures taken to respond to and contain the release.  *Id.* § 11004(c).

EPCRA also contains a citizen suit provision.  *See* 42 U.S.C. § 11046(d).  No suit may be brought unless the individual notifies the designated officials and the alleged violator 60 days before bringing suit.  *See id.*  Where a plaintiff "fails to meet the notice and 60-day delay requirements ... the district court must dismiss the action …."  *Hallstrom v. Tillamook County*, 493 U.S. 20, 33 (1989); *see also Lockett v. EPA*, 319 F.3d 678, 683 (5th Cir. 2003).

## STANDARD OF REVIEW

This Court can only grant summary judgment if there is no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a).  This means summary judgment is warranted if "'a reasonable jury'" would have no choice but to "'return a verdict in [the moving party's] favor.'"  *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, LLC*, 399 F. Supp. 2d 726, 730 (E.D. La. 2005) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990)).  Summary judgment thus cannot be granted if a claim is either legally flawed or factually unsupportable.  CBD's EPCRA claim fails on both scores.

## ARGUMENT

## I.    THE PETROLEUM EXCLUSION BARS THE HEART OF CBD'S CLAIM.

More than any other issue, CBD argues against applying the so-called "petroleum exclusion" in CERCLA's definition of "hazardous substance."  CBD Br. at 14-18.  CBD's defensiveness is telling.  Statutory text, as well as precedent in the Eighth and Ninth Circuits and the considered view of the United States, supports BP's reading of the exclusion: that it applies both to petroleum and to the chemicals naturally constituting petroleum.  By contrast, CBD cites no authority — none — for its interpretation.  There is no reason for the Court to depart from the

strong judicial consensus that has long existed on this issue.

A.    **The Plain Text of the Petroleum Exclusion Applies Here.**

At the outset, petroleum releases are not addressed by EPCRA at all; instead, they are governed by the Oil Pollution Act, 33 U.S.C. §§ 2701, *et seq.*, and by amendments to Section 311 of the CWA, 33 U.S.C. § 1321.  Indeed, CERCLA, from which EPCRA cribs the definition of "hazardous substance," expressly excludes "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph."  42 U.S.C. § 9601(14)(F).  The Supreme Court has described this definition as "specifically excluding petroleum."  *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996).  In short, it is indisputable that EPCRA does not require that releases of petroleum be reported.  Even CBD concedes this point.  *See* CBD Br. at 14.

Moreover, the chemicals that comprise crude oil are also excluded from EPCRA's reporting duty.  The Ninth Circuit has given the most exhaustive explanation of why such constituent chemicals must be excluded — namely, to avoid "rendering the petroleum exclusion a nullity because all crude oil, petroleum and petroleum fractions, unrefined or refined, would fall outside its ambit."  *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 805 (9th Cir. 1989).  Nor is the Ninth Circuit alone.  *E.g., Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153-54 (8th Cir. 1999); *Wademan v. Concra*, 13 F. Supp. 2d 295, 302 (N.D.N.Y. 1998).  Congress was plain: by extending the petroleum exclusion to "fractions" of crude oil, plaintiffs cannot circumvent the exclusion by complaining of a discharge of oil's component parts.

Here, CBD attempts the precise subterfuge that Congress anticipated and foreclosed.  In particular, CBD winnows its claims to three chemicals: benzene, toluene, and xylene.  *See* CBD Br. at 1 n.1.  But as CBD concedes, all three are indigenous to crude oil.  *See* CBD Br. at 13 ("crude oil contains quantities of benzene, toluene, and xylene.").  In fact, CBD admits its allegations about these three chemicals rest on the fact that they were ***constituents*** of Macondo oil: "The *Q4000* vessel collected ***oil being released directly from the Macondo Well*** ….  The oil …. contain[ed], by weight in a monophasic fluid, 0.03%-0.06% benzene, 0.02% to 0.017%

- 8 -

toluene, and 0.07% to 0.25% xylene." *Id.* at 3; *see also* CBD Response to Request for Admission No. 2 (admitting that each is a "***natural component***[] *of crude oil*").[2]  CBD's notice letters also say nothing about non-petroleum discharges of these chemicals.  CBD thus alleges nothing beyond a discharge of crude oil.[3]  The petroleum exclusion exists for just such cases.

**B.      CBD Misreads The Provision Its Argument Depends Upon.**

To escape the petroleum exclusion, CBD seizes on the phrase "not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph."  42 U.S.C. § 9601(14)(F).  CBD argues that the EPA Administrator's designation of benzene, toluene, and xylene as hazardous substances takes them outside the petroleum exclusion.  CBD Br. at 14-15.  This result, CBD argues, is necessary to give the statutory language its "plain" meaning.  *Id.*  Nothing could be further from the truth.

CBD defends its idiosyncratic argument based on the "plain language of the statute." CBD Br. at 14.  But not only does the plain language of the petroleum exclusion not compel CBD's interpretation, CBD's reading contradicts the Fifth Circuit precedent on which CBD purports to rely.  The Fifth Circuit has rightly explained that "courts are forbidden to tamper with the plain meaning of the words" in a statute — that is, unless the words "are clearly ambiguous or nonsensical."  *Grider v. Cavazos*, 911 F.2d 1158, 1162 (5th Cir. 1990).  Here, it is CBD's reading that is "nonsensical" to its core.  It would nullify the petroleum exclusion because ***every*** discharge of oil includes benzene.  *Wilshire*, 881 F.2d at 805.   Nullifying a statute is

---

[2] CBD, at times, suggests these chemicals were also independently released.  *See* CBD Response to Request for Admission No. 2 (denying "that crude oil was the only source of such substances").  CBD, however, appears to have abandoned this argument, as it nowhere appears in its Motion.  In any event, it is frivolous.  CBD has presented neither evidence nor even a theory for how such a thing could be true.  BP and Transocean bear no burden to disprove CBD's unsubstantiated hypotheses.  *See, e.g.*, *Members of the Beede Site Grp. v. Fed. Home Loan, Mortg. Corp.*, No. 09-370-WES, 2013 WL 4778570, at *5 (D.N.H. Sept. 5, 2013); *cf. also* Rec. Doc. 12794 at 19  (parties trying to resist a judgment being entered against them cannot merely pose rhetorical questions but instead bear "the burden of answering [them]").

[3] CBD's Undisputed Statement of Material Facts (Rec. Doc. 12673-2), at ¶¶ 33-34, locks in the conclusion that CBD is simply complaining about the benzene, toluene, and xylene that are natural constituents of crude.  Paragraph 33 makes this clear because it calculates the amounts of benzene, toluene, and xylene released based on nothing more than multiplying percentages by the amount of oil it estimates in Paragraph 32 to have been released.  CBD's ease (1) in finding the weight of Macondo oil and (2) in calculating the weight of its constituents also belie CBD's claim that it and its members were unaware of what was released without a BP EPCRA report.

quintessentially "absurd."  *United States v. Diaz-Gomez*, 680 F.3d 477, 480 (5th Cir. 2012).

CBD has no real response to *Wilshire*.  Instead, CBD weakly observes that *Wilshire* is "non-binding."  CBD Br. at 14-15.  But that is no answer at all.  While not yet binding in this Circuit, the strength of *Wilshire*'s reasoning has persuaded numerous courts throughout the country — ***because it is correct***.  *See, e.g.*, *Petrovic*, 200 F.3d at 1154; *Wademan*, 13 F. Supp. 2d at 302; *see also Cariddi v. Consol. Alum. Corp.*, 478 F. Supp. 2d 150, 154 (D. Mass. 2007) (reading the exclusion "'to remove from the coverage of CERCLA those otherwise hazardous substances which are inherent in petroleum'") (emphasis omitted) (quoting *Niecko v. Emro Mktg. Co.*, 769 F. Supp. 973, 981 (E.D. Mich. 1991)); *Esso Standard Oil Co. v. Rodriguez-Perez*, No. 01–2012, 2004 WL 2238894, at *10 (D.P.R. Oct. 1, 2004); *Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432, 443-44 (M.D. Pa. 2000); *Diversified Servs., Inc. v. Simkins Indus., Inc.*, 974 F. Supp. 1448, 1454 (S.D. Fla. 1997).  CBD cites no case to the contrary.  This Court should follow *Wilshire* for the simple reason that it is right.

Tellingly, the EPA also interprets the petroleum exclusion "to exclude crude oil and fractions of crude oil — including the hazardous substances, such as benzene, that are indigenous in those petroleum substances."  Substances Covered Under Reporting Requirements: Petroleum Exclusion,      http://www.epa.gov/ceppo/web/content/reporting/faq_subs.htm#exclusion      (last visited Apr. 21, 2014); *see also* Final Rule, 50 Fed. Reg. 13,456, 13,460 (Apr. 4, 1985); Mem., Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(A)(2), 1987 WL 123926 (July 31, 1987); Recycled Used Oil Management Standards, 57 Fed. Reg. 41,566, 41,606 (Sept. 10, 1992); Superfund Reportable Quantities, What Substances Are Covered?, www.epa.gov/oerrpage/superfund/policy/release/rq/index.htm (last visited Apr. 3, 2014).  CBD's citation-free suggestion that EPA does not know what it is talking about and has not known what it has been talking about for nearly 30 years is bold.

At bottom, no court or federal agency has ever adopted CBD's "plain meaning" argument because it leads to the untenable conclusion that the petroleum exclusion does not actually exclude any discharges of petroleum.  That is no way to read a statute.

**C.      The Superfluity Canon Further Eviscerates CBD's Reading of the Statute.**

The reason no court or agency has ever adopted CBD's nullification of the petroleum exclusion is obvious: it is a "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that ... no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation omitted).  By interpreting the petroleum exclusion to exclude nothing, CBD renders it superfluous.  In contrast, BP's reading of the petroleum exclusion and the provision on which CBD relies gives meaning to both.

Contrary to CBD's claim, *see* CBD Br. at 17, the clause on which it relies — "not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph" — has meaning even if this Court accepts EPA's view.  Properly understood, the clause prevents the discharge of components of oil in refined form, or in some other non-petroleum compound, followed by a claim that no reporting is necessary because the chemical is or could be a "fraction" of oil.  The Northern District of Illinois, for example, refused to apply the petroleum exclusion to toluene, despite the fact that the facility had housed both oil and paint, because "toluene is also a constituent of paint." *Cont'l Title Co. v. Peoples Gas Light & Coke Co.*, No. 96C3257, 1999 WL 1250666, at *12 (N.D. Ill. Mar. 18, 1999).[4]  *Continental Title* illustrates the correct use of the "not otherwise specifically listed" clause: it prohibits defendants from importing non-petroleum discharges into the exclusion on the grounds that the chemicals could also appear as constituents of petroleum.  The clause CBD hangs its hopes on means nothing more.

**II.      DRILLING MUD AND SPACER WERE NOT RAISED IN CBD'S NOTICE LETTERS AND, IN ANY EVENT, ARE NOT HAZARDOUS SUBSTANCES.**

CBD's last-ditch effort to escape the petroleum exclusion focuses on the presence of

---

[4] Similarly, if "'hazardous substances … are added to, or mixed with, a petroleum product during or after use,'" they are removed from the exclusion.  *Bunger v. Hartman*, 797 F. Supp. 968, 972 (S.D. Fla. 1992).  Accordingly, if additional amounts of a hazardous substance that is a natural component of petroleum were mixed with petroleum, such additional amounts also would not fall within the petroleum exclusion.  Needless to say, nothing like that happened here.  Raw crude oil was discharged.

drilling mud and "spacer."  CBD Br. at 17-18.  But this argument is equally hopeless.  Neither of these substances appears in CBD's notice letters, thus precluding this Court from considering them.  In any event, they are not hazardous.  The only thing that the presence of drilling mud and spacer "vitiate" therefore is CBD's argument, CBD Br. at 18 — not the petroleum exclusion.

**A.    Drilling Mud and Spacer Are Not Lawfully Part of this Case.**

As a threshold matter, CBD cannot raise drilling mud and spacer to this Court.  It is a firm prerequisite for bringing an action under EPCRA that the plaintiff provide a written 60-day notice as required in 42 U.S.C. § 11046(d).  *See Hallstrom*, 493 U.S. at 26 (explaining in the context of a parallel requirement that "compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit"); *see also Sierra Club Ohio Chapter v. Columbus*, 282 F. Supp. 2d 756, 763 (S.D. Ohio 2003) (dismissing EPCRA claim for lack of notice).  Here, CBD's notice letters did not identify either drilling mud or spacers, nor did they point to the constituent chemicals that CBD now highlights: "ethylene glycol[,] caustic soda," and the substance referred to in CBD's under-seal filing.  CBD Br. at 18.  This omission prevents CBD from recasting its allegations now.  As much as CBD wishes it were otherwise, these substances are simply not part of this litigation.

It bears emphasis that precluding CBD from pressing an EPCRA claim based on substances not listed in its notice letters does not reflect some arbitrary "loophole" to keep CBD out of court.  Rather, it reflects the citizen suit provisions working precisely as intended.  *See, e.g.*, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (a "citizen suit is meant to supplement rather than to supplant governmental action").  There was never a need for a citizen suit here, as BP and the United States have done all they could to stop the spill since the beginning and are doing all they can to remediate it now.  Instead, it is CBD that has attempted to end-run the carefully crafted prerequisites of the citizen suit provision.

**B.    Drilling Mud and Spacers Are Not "Hazardous Substances."**

Even if CBD could somehow amend its notice letters four years after sending them, Congress has excluded drilling mud and spacers from EPCRA.  The definition of "hazardous

- 12 -

substances" excludes "[d]rilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal energy."  40 C.F.R. § 261.4(b)(5).  This exclusion applies with full force to EPCRA.  *See* S. Rep. No. 96–848, 96th Cong., 2d Sess., at 28 (Jul. 11, 1980) (explaining the exclusion applies across statutes).

With oil exempted by the petroleum exclusion and drilling mud and spacers excluded from the definition of "hazardous substances," CBD has no basis for asserting that either discharge required reporting under EPCRA.  The only purportedly contrary authority CBD cites are two cases that concern the discharge of petroleum mixed with something that *is* a hazardous substance.  *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001) ("petroleum products mixed with hazardous substances"); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992) (same point).  But drilling mud and spacers are not hazardous substances.  Thus, even if CBD could ignore its failure to present the mixture argument in its notice letters, the mixture here is unlike the mixtures in *Franklin* and *Alcan Aluminum* because neither substance is subject to EPCRA reporting.

CBD's apparent argument that drilling fluid releases, even if themselves excluded, must be reported because drilling fluids **contain** the hazardous substances ethylene glycol, caustic soda, and the substance referred to under seal, mirrors its error in construing the "not otherwise specifically listed" clause in the petroleum exclusion.  Both that clause and the rule in *Franklin* have an obvious purpose: preventing the petroleum or drilling-fluid exclusion from being misused to shield discharges of hazardous materials **in addition to** petroleum or drilling mud and their inherent constituents.[5]  The law here is plain.  CBD's contrary argument fails.

## III.   CBD MISUNDERSTANDS EPCRA IN NUMEROUS OTHER RESPECTS.

The catalogue of errors in construing EPCRA, however, is not yet complete.  CBD is also

---

[5] CBD drops a curious footnote in its brief: "The Center alleges that release of numerous **other hazardous substances** also took place and reserves the right to seek relief with respect to those failures to report as well."  CBD Br. at 10 n.3 (emphasis added); *see also id.* at 1 n.1.  CBD then includes a laundry list of chemicals that it is holding in reserve.  For reasons BP has explained in its own motion for summary judgment, none of CBD's arguments have merit.  Moreover, BP submits that the Court set the remanded EPCRA claim for cross-motions for summary judgment to resolve the matter, not to give CBD a series of rolling "bites at the apple."

wrong in assuming that EPCRA applies to releases that occur on the Outer Continental Shelf.  It does not.  And even if EPCRA did apply, nothing was released from the Macondo well.  CBD argues to the contrary, not because there is any basis for it in law or fact, but rather because the Center knows that the *Deepwater Horizon* was not an EPCRA "facility" and that, moreover, whether BP was an "operator" of the rig cannot be decided in CBD's favor because the drilling contract between BP and Transocean assigns all operational responsibilities to Transocean alone.

### A.    EPCRA Does Not Apply to Releases on the Outer Continental Shelf.

CBD's brief breezes past a critical question: whether EPCRA applies to releases that occur on the Outer Continental Shelf.  CBD cites no case for such a proposition.  This failure is unsurprising.  Consistent with the Court's intuition, the structure of the statute makes plain that EPCRA does not apply to "operations fifty miles out in the Gulf."  D1 Order at 8.

EPCRA's reporting provisions should be understood consistent with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Davis v. Michigan Dept. of Treasury*, 489 US 803, 809 (1989).  Here, EPCRA requires establishment of SERCs and LEPCs.  *See* 42 U.S.C. § 11001.  These SERCs and LEPCs play a key role in the statutory scheme — where EPCRA applies, releases of regulated chemicals must be reported to them.  42 U.S.C. § 11004(a).  Armed with the information EPCRA requires, state and local officials can begin response efforts.

That statutory scheme works well when a release occurs within the territory of a State.  It does not work at all, however, when a release occurs on the Outer Continental Shelf, an exclusive federal enclave.  *See In re Deepwater Horizon*, 745 F.3d 157, 170-71 (5th Cir. 2014).  For such a release, there is no specific SERC to contact nor LEPC to notify.  *Compare* 42 U.S.C. § 11002(c) (requiring notification to "the State emergency response commission for the State in which such facility is located") *with In re Deepwater Horizon*, 745 F.3d at 170 (oil pollution here "originat[ed] from the OCS," not from inside a single State).  Indeed, just as States have no authority over response efforts for oil spills that occur in federal enclaves, *see id.* (following *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987)), there is no duty to file EPCRA reports with them

- 14 -

for oil spills that occur in federal enclaves.  After all, the federal government directs all response efforts — including state response efforts.  *See CBD*, 704 F.3d at 418 ("[F]ederal law directs the President to ensure the effective and immediate removal of the oil in accordance with a National Contingency Plan and to direct all federal, state and private actions in that regard.").  Because state officials do not have a managerial role in such case, EPCRA does not require reporting to them.

Moreover, for reasons BP has already given in its Motion for Summary Judgment, the *Deepwater Horizon* is not a "facility" subject to EPCRA.  That fact provides additional structural evidence that the Macondo well is also not subject to EPCRA.  EPCRA excludes vessels from its definitional section, *see* 42 U.S.C. § 11049(4), for an obvious reason: because the reporting duties do not apply to discharges that occur offshore.  Given that reality, it makes no sense to think that a well, located under a mile of water, would somehow be covered.  What possible reason would Congress have had to exclude vessels from EPCRA's reporting duties but not undersea wells that are connected to those vessels?  *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1317 (D.C. Cir. 2010) (rejecting argument where there was "not a single cogent reason why Congress might have permitted" the incongruity) (emphasis omitted).

### B.     No Reportable Substances Were Released "From" the Macondo Well.

CBD's argument also falters on the word "from."  It is indisputable that oil originating in the Macondo well flowed through Transocean's *Deepwater Horizon* and its appurtenances and, from there, entered the Gulf of Mexico; it was not released from the Macondo well proximately to water.  Indeed, at no point did the well rupture.  And it is not as if the *Deepwater Horizon* played no active role in the spill.  To the contrary, Transocean operated the blowout preventer. A blowout preventer is not a passive conduit but an active barrier designed to maintain well control.  *See, e.g.*, *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 202 (S.D.N.Y. 2012) ("The BOP is equipped with multiple means of controlling well pressure."); *Nat'l Oilwell Varco, LP v. Hydril Co.*, No. 06-170, 2011 WL 467119, at *1 (S.D. Tex. Feb. 5, 2011) ("Blowout preventers are used in drilling oil wells to control pressure …."); Nat'l Comm'n on the BP Deepwater

Horizon Oil Spill & Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling*   114 (2011) ("The BOP is designed to … halt an uncontrolled flow of hydrocarbons to the rig.   The *Deepwater Horizon*'s BOP did not succeed in containing the Macondo Well.").   Because no oil entered the Gulf "from" the Macondo well, BP had no EPCRA reporting duty.  42 U.S.C. § 11004(a).  The statute means what it says.

To be sure, BP is aware that the Court has held that oil was "discharged" from the Macondo well and not from the *Deepwater Horizon* for purposes of the CWA.  *See* Order as to Cross-Motions for Summary Judgment Regarding CWA and OPA Liability, Rec. Doc. 5809 (Feb. 22, 2012) ("CWA Penalty Order").   That Order is on appeal.   *See In re Deepwater Horizon*, No. 12-30883 (5th Cir.).  BP wishes to preserve the analogous argument in this case. No doubt a ruling in the pending Fifth Circuit appeal concerning the legal locus of a CWA discharge would inform the analogous question here of the legal locus of an EPCRA release.

Additionally, any attempt to distinguish the CWA and EPCRA would only work in BP's favor.  This Court's CWA Penalty Order concluded that the discharge to water there occurred "from" the Macondo well in large part because CWA penalties are "designed to 'place[] a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same.'"   CWA Penalty Order at 20 (quoting *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir. 1981)).   Transocean was also engaged in profit-making activities.  And in any event, BP disagrees with such policy reasoning because the CWA's text controls and is unambiguous.  Moreover, even if such non-textual reasoning were valid, it would not apply to EPCRA.  EPCRA is not designed to shift liability onto deep pockets;[6] EPCRA instead is only designed to require information disclosure in certain limited circumstances.  Given that key difference, there is no reason here to read "from" as referring to any facility other than to the last

---

[6] *See, e.g., National Union Fire Ins. Co. of Pittsburgh, Pa. v. Riggs Nat'l Bank of Wash., D.C.*, 5 F.3d 554, 557 (D.C. Cir. 1993) (Silberman, J., concurring) (citing Guido Calabresi, *The Decision for Accidents: An Approach to the Nonfault Allocation of Costs*, 78 HARV. L. REV. 713 (1965) (pioneering least-cost avoider logic in the allocation of substantive liability by lawmakers)).

point of the actual release.  That point is not the Macondo well.

### C. The *Deepwater Horizon* is Not a Facility for Purposes of EPCRA and, in Any Event, BP Did Not Operate It.

Finally, it bears emphasizing why CBD strains to label the Macondo well a "facility" even though the undisputed facts show that no oil was released from it — because CBD has no other option.  As noted above, the *Deepwater Horizon*, like any other vessel, is not a "facility." Focusing on the *Deepwater Horizon* is therefore a nonstarter.   In any event, even if the *Deepwater Horizon* were a facility, BP did not operate it, meaning EPCRA remains irrelevant to BP here.  42 U.S.C. § 11004(a).  The drilling contract between BP and Transocean expressly assigns all operational responsibilities to Transocean alone.  BP thus is not an operator.

## IV. EVEN LEAVING ASIDE ITS STATUTORY FLAWS, CBD'S EPCRA CLAIM IS ALSO PRECLUDED BY ARTICLE III OF THE CONSTITUTION.

Finally, even if CBD could state a statutory violation, which it cannot, Article III of the Constitution would still stand in the way.  *See, e.g.*, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998) (rejecting an EPCRA citizen suit for lack of Article III jurisdiction).  The reality is that the informational injury CBD asserts  is a fig leaf — CBD already has ready access to all the information it purports to seek (at the very least through its counsel).   CBD thus lacks standing to pursue an EPCRA claim because it has suffered no injury; in any event, the claim is moot.  Any demand for injunctive relief has been overtaken by the fact that the information is publicly available.

### A. CBD Lacks Constitutional Standing to Pursue its EPCRA Claim.

At the outset, CBD lacks standing.  The "irreducible constitutional minimum of standing" requires three showings.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  **First**, there must be an "injury in fact" — a harm suffered by the plaintiff that is "concrete" and "'real and immediate,' not 'conjectural' or 'hypothetical.'"  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983).  **Second**, there must be causation — a fairly traceable connection between the plaintiff's injury and the complained of conduct.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  And ***third***, there must be redressability.  *Id.* at 45-46.

Here, CBD "abandoned its civil penalty claims in order to obtain a final appealable judgment." *CBD*, 704 F.3d at 427. All CBD seeks is an injunction. But it cannot seek any relief, injunctive or otherwise, without a real, non-speculative injury in fact. Here, CBD cannot show that it has any need for the information it claims it wants. And without a substantive injury, CBD cannot pursue its claim any further — full stop. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting standing despite a procedural injury where no concrete interest was affected by the deprivation); *Steel Co.*, 523 U.S. at 106 (rejecting standing in an EPCRA case where the plaintiffs could not show a personal interest).

CBD cannot evade this straightforward logic. The best it can offer is that because the Fifth Circuit concluded that CBD had standing at the pleading stage, that is now the "law of the case." CBD Br. at 6. But CBD misunderstands how Article III works. The Fifth Circuit assessed standing only at the motion to dismiss stage, *see CBD*, 704 F.3d at 429-30, where CBD could simply allege — based on conclusory and improbable affidavits — that its members suffered injury. Not so now. CBD now "must set forth by affidavit or other evidence *specific facts*." *Lujan*, 504 U.S. at 555 (emphasis added). Each "stage[] of the litigation," in other words, requires a graduated showing. *Id.* at 561; *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1143 n.6 (9th Cir. 2013) (rejecting standing where a matter "involved a different procedural posture (a motion to dismiss, rather than summary judgment)").

Here, discovery confirms that CBD has not suffered any actual harm. For example, Dr. David Thrasher, a CBD declarant, averred that as a physician he lacked EPCRA information necessary to treat patients exposed to the oil. But Dr. Thrasher has not treated any such patients. CBD Resp. to Interrog. No. 4 (Rec. Doc. 12676-21). And given that the well was permanently capped nearly four years ago, it is extraordinarily unlikely that he will ever do so. Such speculative injury does not suffice when summary judgment is the current posture. *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013) (rejecting standing at summary judgment because "'[a]llegations of possible future injury'" are insufficient). In any event, CBD offers no reason why Dr. Thrasher could not have consulted www.restorethegulf.gov/health-safety.

The experience with Dr. Thrasher is par for the course. CBD's new standing declarations attempt to establish only that the declarants searched in vain for information in EPCRA reports. *E.g.,* CBD Br. at 4 ("Members of the Center have searched for information concerning the specific chemicals contained in the oil ... but have not found that information because BP has not submitted any reports."). But that is not the constitutional question. The correct inquiry is whether the declarants have suffered a "concrete and particular" injury to a ***substantive*** interest, meaning there is information they are entitled to that is not available that they need for non-speculative, substantive reasons. *See, e.g.*, *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010) (rejecting standing because mere "procedural injury" — including "informational injury" — cannot ground standing absent injury to a "concrete and particular" substantive interest); *see also United States v. Richardson*, 418 U.S. 166, 175 (1974) (rejecting standing where the plaintiff could not show a specific need for the information). Nothing in CBD's declarations even begin to show such injury. Because none of CBD's declarants have suffered constitutional injury, CBD lacks associational standing to represent them. *See, e.g.*, *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342 (1977).

**B.      CBD's EPCRA Claim is Also Moot.**

In any event, even on the doubtful assumption that CBD could once have asserted a valid EPCRA claim, the claim would now be moot. BP and Transocean have not only made the required information available to the entire world, but did so in a far more comprehensive and real-time manner than what the statute requires. CBD's citizen suit thus is thoroughly moot. *See, e.g.*, *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 526 (5th Cir. 2008) ("[D]evelopments subsequent to the filing of a citizen suit may moot the citizen's case."). That mootness and Article III standing overlap here is natural. After all, "[m]ootness is the 'doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Id.* at 524-25.

As BP has previously explained in its briefing supporting its own motion for summary judgment — submissions adopted by reference here — the information provided to the public by

BP, Transocean, and governmental officials has far exceeded in scope, detail, and timeliness the information demanded by EPCRA.  Literally anyone with reasonable competence on Google and a few minutes can find all the information EPCRA requires and more about the *Deepwater Horizon* spill.  Accordingly, "a further order from the district court would provide no meaningful relief," *CBD*, 704 F.3d at 430, because CBD has suffered no injury, informational or otherwise.

Indeed, CBD's own brief underscores the weakness of its position.  CBD admits that "***it is commonly known*** and accepted in the oil industry that crude oil contains quantities of benzene, toluene, and xylene."  CBD Br. at 13 (emphasis added).  But it is not just "the oil industry" that has such knowledge; CBD knows it perfectly well, too.  In any event, CBD's attempt to confine knowledge to "the oil industry" does nothing undermine the fact that anyone with Google could tap into that "common" industry knowledge.  Mootness speaks for itself.

## V.    CBD'S SOLE REMAINING REMEDY IS BARRED BY LACHES.

Finally, CBD is not entitled to summary judgment on its claim for injunctive relief (the only claim it has left) because of the equitable doctrine of laches.  As the Fifth Circuit has held, "applicability of the doctrine of laches to environmental litigation is no longer open to doubt." *Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980); *see also Save Our Wetlands, Inc. v. Army Corps of Eng'rs*, 549 F.2d 1021, 1026 (5th Cir. 1977) (applying laches to a claim for informational injury under NEPA).  Here, because CBD and anyone who wants it has, or at least has ready access to, all the information that EPCRA requires and more, no one benefits from this litigation.  At the same time, an injunction forcing BP and Transocean to prepare meaningless reports would constitute obvious prejudice.  At bottom, the only plausible explanation for CBD's failure to do anything on remand for nearly eight months is that the information CBD purports to seek does not truly matter to anyone.  Now, more than four years after the accident, neither CBD nor anyone else is champing at the bit for an EPCRA report.

## CONCLUSION

For the foregoing reasons, BP respectfully requests that the Court grant their motions for summary judgment as to CBD's EPCRA claim.

Dated:  May 5, 2014

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5705
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1047
Facsimile: (212) 715-1399

Respectfully submitted,

/s/ Don K. Haycraft

Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**ATTORNEYS-IN-CHARGE FOR DEFENDANTS BP AMERICA INC.
AND BP EXPLORATION & PRODUCTION INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 5th day of May, 2014.

/s/ Don K. Haycraft