# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" | * | |
| in the Gulf of Mexico, | * | **SECTION: J** |
| on April 20, 2010 | * | |
| | * | **JUDGE BARBIER** |
| **This Document Relates to:** | * | |
| **2:10-cv-04536** | * | **MAGISTRATE SHUSHAN** |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PLAINTIFF UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF
UNITED STATES' SECOND MOTION FOR PARTIAL SUMMARY JUDGEMENT
AS TO THE LIABILITY OF BP EXPLORATION & PRODUCTION INC.,
THE TRANSOCEAN DEFENDANTS, AND THE ANADARKO DEFENDANTS**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................ iv

Table of Exhibits ................................................................................................................... ix

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................2

ARGUMENT ............................................................................................................................4

I.     THE TRANSOCEAN DEFENDANTS AND THE ANADARKO DEFENDANTS ARE
      LIABLE UNDER OPA ....................................................................................................4

      A.    Statutory Background and Elements of Liability for OPA .....................................4

      B.    The Elements Common to the Transocean and Anadarko Defendants Are Widely
          Known and Not Genuinely Contested……………………………………………5

      C.    Transocean Admits that it was an Owner and Operator
          of the *Deepwater Horizon* ...................................................................................6

      D.    The Anadarko Defendants are Both Liable under OPA as Lessees ........................7

           1.    A E&P's retroactive assignment to APC does not vitiate
                A E&P's liability resulting from the April 20, 2010 Macondo
                well blowout and subsequent oil spill .........................................................8

           2.    A E&P's argument that OPA and CWA liability are not
                "lease obligations" is not dispositive of its liability for the
                oil spill and is incorrect as a matter of law .................................................11

      E.    Both Anadarko Defendants are Liable under OPA with no
          "Limit" on their Liability .....................................................................................13

           1.    Legal Standards on Limited Liability under OPA ......................................13

           2.    Both Anadarko Defendants are Liable without Limitation
                 due to Violations of MMS Regulations ......................................................15

II.   BP, THE TRANSOCEAN DEFENDANTS, AND THE ANADARKO
      DEFENDANTS ARE LIABLE UNDER SECTION 311(b) OF
      THE CLEAN WATER ACT ..................................................................................17

      A.   Statutory Background and Elements of Liability for the Clean Water Act ...........17

      B.   The Six Elements of Liability Common to All Defendants
           Under Section 311(b) are Obvious ......................................................................18

           1.   Five of the Elements are not genuinely contested .....................................18

           2.   The Discharge was From Both the *Deepwater Horizon*
                and the Macondo Well .................................................................................21

      C.   Each of the Defendants is Liable Because it is an Owner and/or Operator
           of an Offshore Facility or Vessel within the Meaning of Section 311(b)(7).........22

           1.   Transocean is liable as Owner and Operator ..............................................22

           2.   BP and the Anadarko Defendants are all "Operators" as a matter
                of law because those Defendants were required by statute to
                maintain all operations within the Lease Area in compliance with
                regulations intended to protect the environment........................................23

           3.   BP and APC are Both "Owners" of the Macondo Well .............................26

      D.   Summary .............................................................................................................31

CONCLUSION .................................................................................................................32

iii

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ...................................................24

*Amber Res. Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008) ...............................................13

*Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642 (E.D. La. 2002) ............................4, 17

*Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009) ..................................18

*Chevron, U.S.A., Inc. v. Yost*, 919 F.2d 27 (5th Cir. 1990) .........................................................20

*CleanCOALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008) ...................................................22

*Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x. 901 (6th Cir. 2006) ........................................10

*Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104 (3d Cir. 1994) .........................................10

*Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003) ............................15, 25

*Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917 (5th Cir. 2000) ......................................18

*Guilzon v. Comm'r of Internal Revenue*, 985 F.2d 819 (5th Cir. 1993) ......................................26

*Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385 (5th Cir. 2002) ..................................25

*Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400 (3d Cir. 1995) ........................................10

*Hubbard v. United States*, 514 U.S. 695 (1995) .........................................................................25

*In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710 (E.D. La. 2010) .........................4, 10

*John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993) ....................................10

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) .....................................24

*Liberty Servs., Inc. v. Amoco Prod. Co., et al.*, No. 90-4490, 1991 WL 278673
   (E.D. La. Dec. 23, 1991) ............................................................................................................9

*Mobil Oil Exploration & Producing Southeast v. United States*, 530 U.S. 604 (U.S. 2000) .......13

*Noble Energy, Inc. v. Salazar*, 770 F. Supp. 2d 322 (D.D.C. 2011) ............................................12

iv

*Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir. 2001) ........................................................4

*Sierra Club, Inc. v. Tyson Foods*, Inc., et al., 299 F. Supp. 2d 693 (W.D. Ky. 2003) .................22

*Smith Prop. Holdings v. United States*, 311 F. Supp. 2d 69 (D.D.C. 2004) ...................................4

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ......................................................................................22

*United States v. Bestfoods*, 524 U.S. 51 (1998) .............................................................................25

*United States v. Bodenger*, No. 03-272, 2003 WL 22228517 (E.D. La. Sept. 25,  2003) ........4, 17

*United States v. Bois D'Arc Operating Corp.*, No. 98-157, 1999 WL 130635
  (E.D. La. Mar. 10, 1999) .............................................................................................................4

*United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir. 1981) ..........17, 26

*United States v. M/V Big Sam*, 681 F.2d 432 (5th Cir. 1982) ........................................................22

FEDERAL STATUTES

28 U.S.C. § 2201 ...........................................................................................................................1, 32

33 U.S.C. § 1321 ...............................................................................................................................17

33 U.S.C. § 1321(a)(1) ......................................................................................................................18

33 U.S.C. § 1321(a)(2) ................................................................................................................18, 21

33 U.S.C. § 1321(a)(7) ......................................................................................................................18

33 U.S.C. § 1321(a)(11) ....................................................................................................................19

33 U.S.C. § 1321(b) ...............................................................................................................1, 21, 26

33 U.S.C. § 1321(b)(1) ......................................................................................................................17

33 U.S.C. § 1321(b)(3) .................................................................................................................17-20

33 U.S.C. § 1321(b)(7) ....................................................................................................22, 25, 26, 32

33 U.S.C. § 1321(b)(7)(A) ..................................................................................... 17-19, 21, 31

33 U.S.C. § 1362(7) ...................................................................................................20

33 U.S.C. § 1362(8) ...................................................................................................20

33 U.S.C. § 2701 ..........................................................................................................1

33 U.S.C. § 2701(14) .................................................................................................14

33 U.S.C. § 2701(16) ..............................................................................................7, 9

33 U.S.C. § 2701(21) ...................................................................................................5

33 U.S.C. § 2701(22) ...................................................................................................6

33 U.S.C. § 2701(23) ...................................................................................................5

33 U.S.C. § 2701(32)(A) .............................................................................................7

33 U.S.C. § 2701(32)(C) .............................................................................................7

33 U.S.C. § 2701(35) ...................................................................................................5

33 U.S.C. § 2701(37) ...................................................................................................6

33 U.S.C. § 2701(7) .....................................................................................................5

33 U.S.C. § 2701(8) .....................................................................................................5

33 U.S.C. § 2701(9) .....................................................................................................6

33 U.S.C. § 2702 ........................................................................................................32

33 U.S.C. § 2702(a) ..................................................................................................5, 7

33 U.S.C. § 2704 ........................................................................................................32

33 U.S.C. § 2704(a)(3) ...............................................................................................13

33 U.S.C. § 2704(c)(1)(B) .................................................................................... 13-16

33 U.S.C. § 2710 ........................................................................................................10

33 U.S.C. § 2710(b) .....................................................................................................9

33 U.S.C. § 2716(f) .................................................................................32

42 U.S.C. § 9607(e) .................................................................................10

43 U.S.C. § 1331 et seq...........................................................................7, 9, 17

43 U.S.C. § 1332(6) .................................................................................23

43 U.S.C. § 1337(e) .................................................................................9

43 U.S.C. § 1348(b) .................................................................................23-25

FEDERAL RULES

Fed. R. Civ. P. 30(b)(6) ...........................................................................28, 30

Fed. R. Civ. P. 56(g) ...............................................................................31

Fed. R. Evid. 201(b) ...............................................................................5

Fed. R. Evid. 201(f) ................................................................................5

FEDERAL REGULATIONS

30 C.F.R. § 250.102 (now codified at 30 C.F.R. § 550.102)................................................14

30 C.F.R. § 250.105 (now codified at 30 C.F.R. § 550.105)................................................14

30 C.F.R. § 250.143 (now codified at 30 C.F.R. § 550.143)................................................3

30 C.F.R. § 250.143(b) (now codified at 30 C.F.R. § 550.143) ..........................................24

30 C.F.R. § 250.145 (now codified at 30 C.F.R. § 550.145)................................................3

30 C.F.R. § 250.146(a) (now codified at 30 C.F.R. § 550.146(a))...........................................15

30 C.F.R. § 250.146(c) (now codified at 30 C.F.R. § 550.146(c))…………………………………24

30 C.F.R. § 250.300(a) ...........................................................................16, 23

30 C.F.R. § 250.401 ...............................................................................23

30 C.F.R. § 250.420(a)(2) .........................................................................................15, 16

30 C.F.R. § 256.62 (now codified at 30 C.F.R. § 556.62)..............................................12

30 C.F.R. § 256.62(a) (now codified at 30 C.F.R. § 556.62(a))..................................9, 10

30 C.F.R. § 256.62(c) (now codified at 30 C.F.R. § 556.62(c))......................................12

30 C.F.R. § 256.62(d) (now codified at 30 C.F.R. § 556.62(d)) ....................................12

30 C.F.R. § 256.62(e) (now codified at 30 C.F.R. § 556.62(e))....................................12

30 C.F.R. § 256.64(h) (now codified at 30 C.F.R. § 556.64(h)) ...................................24

33 C.F.R. § 2.30 .................................................................................................................5

40 C.F.R. § 110.3 ............................................................................................................20

48 Fed. Reg. 10,605 (Mar. 10, 1983)................................................................................5

62 Fed. Reg. 27,948, 27,953 (May 22, 1997) .........................................................12, 25

76 Fed. Reg. 64,432 (Oct. 18, 2011) ................................................................................3

LEGISLATIVE HISTORY

H.R. Rep. No. 101-653 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779…………..........14

S. Rep. No. 101-94 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722............................................4, 17

OTHER AUTHORITY

*Webster's Collegiate Dictionary* 447 (11th ed. 2005)...................................................19

*Webster's Third New International Dictionary* 913 (2002) ..........................................21

*Oxford English Dictionary*, Online Edition,
http://www.oed.com/viewdictionaryentry/Entry/74884 ................................................21

<u>TABLE OF EXHIBITS</u>

<u>Exhibit #</u>        <u>Description</u>

1.       Lease Exchange Agreement – BP-MOEX Offshore 2007 (Dep. Ex. 1244) *(Confidential – Pending Motion to File Exhibit Under Seal)*

2.       Lease Exchange Agreement – BP-APC-AEP (Dep. Ex. 1942) *(Confidential – Pending Motion to File Exhibit Under Seal)*

3.       Well Participation Agreement – BP-APC-Kerr McGee (Dep. Ex. 1943)

4.       BP Assignment of Record Title Interest in Lease to AEP and APC (Dep. Ex. 1944)

5.       AEP Assignment of Record Title Interest in Lease to APC

6.       Initial, First and Second Supplemental, and Production Casing Authorizations for Expenditure (Bates # BP-HZN-2179MDL00057193-00057208) (copies produced by BP) *(Confidential – Pending Motion to File Exhibit Under Seal)*

7.       Initial Authorization for Expenditure, prepared 8/28/09 (Dep. Ex. 1919) (copy produced by Anadarko) *(Confidential – Pending Motion to File Exhibit Under Seal)*

8.       First Supplemental Authorization for Expenditure, prepared 1/27/10 (Dep. Ex. 1920) (copy produced by Anadarko) *(Confidential – Pending Motion to File Exhibit Under Seal)*

9.       Second Supplemental Authorization for Expenditure, prepared 3/22/10 (Dep. Ex. 1921) (copy produced by Anadarko) *(Confidential – Pending Motion to File Exhibit Under Seal)*

10.       Production Casing Authorization for Expenditure, prepared 4/14/10 (Dep. Ex. 1922) (copy produced by Anadarko) *(Confidential – Pending Motion to File Exhibit Under Seal)*

11.       Invoice to MOEX, December 2009 Month of Operation (Dep. Ex. 2891) *(Confidential – Pending Motion to File Exhibit Under Seal)*

12.       Invoice to MOEX, January 2010 Month of Operation (Dep. Ex. 2893) *(Confidential – Pending Motion to File Exhibit Under Seal)*

13.     Invoice to MOEX, March 2010 Month of Operation (Dep. Ex. 2895)
        *(Confidential – Pending Motion to File Exhibit Under Seal)*

14.     Invoice to MOEX, April 2010 Month of Operation (Dep. Ex. 2896) *(Confidential
        – Pending Motion to File Exhibit Under Seal)*

15.     Invoice to APC, January 2010 Month of Operation (Dep. Ex. 4204, bates # BP-
        HZN-2179MDL02752577-02752582) *(Confidential – Pending Motion to File
        Exhibit Under Seal)*

16.     1st Payment by APC for January 2010 Invoice, paid 2/26/10 (Dep. Ex. 4205)

17.     Invoice to APC, February 2010 Month of Operation (Dep. Ex. 4206)
        *(Confidential – Pending Motion to File Exhibit Under Seal)*

18.     2nd Payment by APC for February 2010 Invoice, paid 3/25/10 (Dep. Ex. 4207)

19.     Invoice to APC, March 2010 Month of Operation (Dep. Ex. 4208) *(Confidential –
        Pending Motion to File Exhibit Under Seal)*

20.     3rd Payment by APC for March 2010 Invoice, paid 4/23/10 (Dep. Ex. 4209)

21.     Invoice to APC, April 2010 Month of Operation (Dep. Ex. 4210) *(Confidential –
        Pending Motion to File Exhibit Under Seal)*

22.     4th Payment by APC for April 2010 Invoice, paid 6/1/10 (Dep. Ex. 4211)

23.     Invoice to APC, May 2010 Month of Operation (Dep. Ex. 4212) *(Confidential –
        Pending Motion to File Exhibit Under Seal)*

24.     Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co.
        (Dep. Ex. 4271) *(Confidential – Pending Motion to File Exhibit Under Seal)*

25.     Excerpts from Transocean Internal Investigation Report (Dep. Ex. 4248)

26.     Excerpts from Macondo Joint Operating Agreement (Dep. Ex. 1243), Article 6
        and Appendix C.

27.     Deposition of William ("Billy") Dean Ambrose, Vol. 1, dated July 18, 2011
        (excerpts)

28.     Deposition of Michael Beirne, Vol. 1, dated June 27, 2011 (excerpts)

29.     Deposition of Jim W. Bryan, dated May 6, 2011 (excerpts)

30.        Deposition of Jeremy Byrd, dated July 13, 2011 (excerpts)

31.        Deposition of Nicholas G. Huch, dated May 16, 2011 (excerpts)

32.        Deposition of Alan O'Donnell, dated May 5, 2011 (excerpts)

33.        Deposition of Jonathan Sprague, Vol. 1, dated March 21, 2011 (excerpts)

34.        Supplemental Objections and Responses of Defendant Anadarko Petroleum
           Corporation to Revisions to the United States' First Set of Interrogatories,
           Requests for Production of Documents, and Requests for Admissions, dated Sept
           20, 2011 (RFA Response Nos. 1, 2, 3, 4, 5, 6, 7, 8, 12, 13, 25, 26, 33, 36, 37, 38,
           39, 40 and Interrogatory Response Nos. 2(g), 2(x), 17, 18)

35.        BP Exploration & Production Inc.'s Responses and Objections to the United
           States' First Set of Interrogatories and Second Set of Requests for Production
           (Interrogatory Response Nos. 26, 27, 32)

36.        Transocean's Response to BP Parties' First Set of Requests for Admission (RFA
           Response Nos. 1, 3, 5, 6, 7, 12, 17, 21, 44)

37.        Transocean's Response to BP Parties' First Set of Interrogatories (Interrogatory
           Response No. 34)

38.        Transocean Complaint and Petition for Exoneration From or Limitation of
           Liability, No. 2:10-cv-02771 (originally filed in S.D. Tex. May 13, 2010)
           (Paragraph 6 excerpted)

39.        Oil and Gas Lease of Submerged Lands under OSCLA, OCS-G 32306, Block
           252, Mississippi Canyon ("MC 252")

40.        Temporary Abandonment Agreement (Dep. Ex. 1931) *(Confidential – Pending
           Motion to File Exhibit Under Seal)*

41.        Agreed 30(b)(6) Deposition Notice of Anadarko (With 30(b)(5) Document
           Requests) (Dep. Ex. 1597)

42.        Designation of Operator Form for Anadarko E&P Company LP

43.        Designation of Operator Form for Anadarko Petroleum Corporation

# INTRODUCTION

In the matter of *United States of America v. BP Exploration and Production, Inc., et al.*, No. 10-4536, there are two Claims for Relief in the Complaint: (1) the First Claim for Relief seeks civil penalties under Section 311(b) of the Clean Water Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1321(b); (2) the Second Claim for Relief seeks a declaratory judgment of liability under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

The general elements of liability under OPA and the Clean Water Act—such a whether there was a discharge of oil into waters that are subject to the Clean Water Act and OPA—are so widely known that they can be readily established through Defendants' admissions or otherwise. Moreover, liability is strict, defenses are limited, and there is no dispute as to the material facts. The United States accordingly moves for partial summary judgment as to each of the foregoing Defendants – BP Exploration & Production, Inc. ("BP"), the Transocean Defendants,[1] and the Anadarko Defendants[2,3] – based on their Answers to the United States' Complaint, admissions in written discovery, or the testimony of their own witnesses, which establish the following:

> *The Transocean Defendants* are owners and operators of the mobile offshore drilling unit ("MODU") *Deepwater Horizon* and its appurtenances, including the riser and BOP, which renders them liable both under OPA as "responsible parties" and under the Clean Water Act as owners and operators;

> *BP* is an owner and operator of the Macondo Well, an offshore facility, and thus liable under the Clean Water Act;

---

[1] The Transocean Defendants are defendants Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.

[2] The Anadarko Defendants are defendants Anadarko Petroleum Corporation ("APC") and Anadarko E&P Company LP ("A E&P").

[3] Defendant MOEX Offshore 2007 is not included in this Motion, but the United States retains its claims against that defendant. Any references herein to MOEX are purely for background information.

_The Anadarko Defendants_ are "responsible parties" and so are liable under OPA, and are liable as operators of the Macondo Well, an offshore facility, under the Clean Water Act.[4] APC is an owner of the Macondo Well, and is liable under the Clean Water Act on that basis as well.[5]

## FACTUAL BACKGROUND

Citations to the evidence and more details are provided in the Statement of Undisputed Material Facts ("SMF"), but the basic facts concerning the liability of the Defendants are not genuinely in dispute and are few in number:

_Drilling of the Macondo Well_.

- On June 1, 2008, BP Exploration & Production's ("BP") Lease for Mississippi Canyon Block 252 ("MC 252") from the Minerals Management Service ("MMS")[6] became effective.

- BP retained Transocean to provide a rig and personnel to drill the well.

- On or about October 6, 2009, BP and Transocean "spudded" (began drilling) the Macondo Well.

- In February, 2010, the Transocean rig _Deepwater Horizon_ arrived at the Macondo Prospect, replacing another Transocean rig, and took over the drilling of the well.

- Between February, 2010, and April 20, 2010, the rig _Deepwater Horizon_ continued drilling the Macondo Well, and the wellhead, casing, tubular, and other components were installed.

---

[4] In May 2011, the United States moved for partial summary judgment as to the liability of the Anadarko Defendants as responsible parties under OPA and as operators under the Clean Water Act.   [Rec. Doc. 2587].  No briefing schedule was ever set for the cross-motion for summary judgment.  Accordingly, the United States restates herein its earlier arguments from the Memorandum in Support of the United States' First Motion for Partial Summary Judgment as to the liability of the Anadarko Defendants.

[5] The United States alleges in its Complaint additional valid bases for liability which are not included in this Motion at this time, including, for example:  whether BP is liable as a responsible party under OPA; whether BP was one of the operators of the _Deepwater Horizon_; whether the Transocean Defendants were also operators of the Macondo Well; and whether the Defendants were "persons in charge."

[6] On June 18, 2010, MMS was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  Dep't of the Interior, Sec. Order No. 3302, _available at_ http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=35872.  On October 1, 2011, BOEMRE was divided into two separate bureaus: the Bureau of Safety and Environmental Enforcement ("BSEE") and the Bureau of Ocean Energy Management ("BOEM").  The term MMS will be used to refer to MMS and all of its successor agencies.

2

*The contractual agreements among BP and the Anadarko Defendants:*

- December 17, 2009:  BP assigned APC a 2.5% record title interest in the Lease.  BP assigned A E&P a 22.5% record title interest in the Lease.  BP, APC and A E&P executed a Lease Exchange Agreement and ratified a Joint Operating Agreement.  On this date, BP and APC also entered into a Well Participation Agreement for the Macondo Well at MC 252.

- BP acted as the Anadarko Defendants' operator and local agent on the rig, pursuant to 30 C.F.R. §§ 250.143 and 250.145 (2009).[7],[8]

- January through May, 2010:  BP sent "Joint Interest Billings" or invoices to APC, which APC paid and which included reimbursement to BP for APC's proportionate share of the costs of the casing and other physical components of the well

- February 23, 2010:  MMS approved the lease assignments from BP to APC and A E&P.

- April 20, 2010:  On the same date as the explosion, APC put into overnight mail a reassignment of A E&P's 22.5% interest in the Lease for MMS approval, and on April 21, 2010, MMS stamped the assignment received.

- April 28, 2010:  MMS approved the assignment from A E&P to APC.  Once MMS approved the assignment, the agreement between the parties indicated that it would be effective as of April 1, 2010.

*The explosion at Macondo:*

- On April 20, 2010, the cement at the bottom of the Macondo Well failed to isolate hydrocarbons from the Gulf of Mexico.

- On April 20, 2010, control of the Macondo Well was lost.

- On April 20, 2010, there was a blowout of the Macondo Well, and fires and explosions on the *Deepwater Horizon*.  Following the blowout, oil was discharged from the Macondo Well and the *Deepwater Horizon*, including from the blow-out preventer, riser, and other appurtenances, and continued to flow into the waters of the Gulf of Mexico.

- On July 15, 2010, the Macondo Well was capped.

---

[7] MMS regulations cited herein are to the July 2009 edition of Title 30 of the Code of Federal Regulations, which was in effect at the time of the incident.  Due to the reorganization of BOEMRE, former MMS regulations were reorganized and re-codified in October 2011, and some section numbers have since changed.  *See* 76 Fed. Reg. 64432 (Oct. 18, 2011).  Where this re-organization has affected regulatory provisions cited herein, parallel cites to the new section numbers (which are substantively the same as the July 2009 regulations) are provided.

[8] 30 C.F.R. §§ 250.143 and 250.145 have since been re-codified at 30 C.F.R. §§ 550.143 and 550.145.

**ARGUMENT**

## I.   THE TRANSOCEAN DEFENDANTS AND THE ANADARKO DEFENDANTS ARE LIABLE UNDER OPA

### A.   Statutory Background and Elements of Liability for OPA.

Congress enacted OPA in response to the *Exxon Valdez* oil spill in Prince William Sound, Alaska, and intended the law to "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001) (citing S. Rep. No. 101-94 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722, 723). OPA contemplates the possibility of more than one responsible party, and courts have held that the standard of liability in such circumstances is "strict, joint, and several . . . ." *Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642, 654 (E.D. La. 2002) (quoting S. Rep. No. 101-94, at 11, *as reprinted in* 1990 U.S.C.C.A.N. 722, 732–33, which states that OPA adopts CWA Section 311's standard for liability of dischargers and "[t]hat standard of liability has been determined repeatedly to be strict, joint, and several liability"); *In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710, 714 (E.D. La. 2010) (same); *Smith Prop. Holdings v. United States*, 311 F. Supp. 2d 69, 81 (D.D.C. 2004) (quoting *United States v. Bois D'Arc Operating Corp.*, No. 98-157, 1999 WL 130635, at *3 (E.D. La. Mar. 10, 1999) ("OPA does not limit the number of responsible parties" and "Congress made certain that more than one entity could be held accountable for the costs of pollution stemming from oil discharges."); *United States v. Bodenger*, No. 03-272, 2003 WL 22228517, at *2 (E.D. La. Sept. 25,  2003).

Liability for purposes of OPA is established upon a showing of just a few simple elements:

Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each *responsible party* for a *vessel or a facility* from which *oil is discharged*, or which poses the substantial threat of a discharge of oil, into or upon the *navigable waters or adjoining shorelines or the exclusive economic zone* is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a) (emphasis added). These elements are easily established in this case.

    B.    <u>The Elements Common to the Transocean and Anadarko Defendants Are Widely Known and Not Genuinely Contested.</u>

The Transocean and Anadarko Defendants have admitted virtually all of the elements of OPA liability common to this incident. Moreover, in any event, the Court can take judicial notice of the underlying facts supporting these elements because they are so widely known.[9]

First, there was a "discharge" of "oil," as defined in OPA, resulting from the April 20, 2010 incident.[10] SMF ¶ 14. Indeed, the Transocean Defendants admit that oil flowed or leaked from the Macondo Well into the Gulf of Mexico, and APC admits that oil flowed from the Macondo Well through the BOP and riser into the Gulf of Mexico. SMF ¶¶ 15, 16. Second, the oil was discharged "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone . . . ." 33 U.S.C. § 2702(a);[11] *see also* SMF ¶¶ 3, 19, 20.

Third, this discharge emanated from a "vessel" and an "offshore facility." The Macondo Well included the wellbore, wellhead, casings, and other components below the sea floor in the

---

[9] *See* Fed. R. Evid. 201(b), (f) and SMF at 20 (discussing admissibility of evidence cited and standards for judicial notice).

[10] "Discharge" means "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping." 33 U.S.C. § 2701(7). "Oil" means "oil of any kind or in any form, including petroleum . . . and oil mixed with [other] wastes . . . ." 33 U.S.C. § 2701(23).

[11] OPA defines "exclusive economic zone" to mean "the zone established by Presidential Proclamation Numbered 5030, dated March 10, 1983 . . . ." 33 U.S.C. § 2701(8). In turn, Proclamation 5030 provides that the EEZ "extends to a distance 200 nautical miles" offshore. Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983); s*ee also* 33 C.F.R. § 2.30. "'[N]avigable waters' means the waters of the United States, including the territorial sea." 33 U.S.C. § 2701(21). Territorial seas are also defined as extending from the shore to 3 miles seaward. 33 U.S.C. § 2701(35).

wellbore, SMF ¶ 8, and was located in waters subject to United States jurisdiction.  SMF ¶ 3.

Accordingly, it was an "offshore facility" under OPA.  33 U.S.C. § 2701(9).[12] ("facility" means

The *Deepwater Horizon* was a "vessel."[13]  Transocean does not dispute that the MODU

*Deepwater Horizon* is a vessel for purposes of OPA, and Transocean admits that the blow-out

preventer is an appurtenance of the vessel.  SMF ¶ 6.[14]  The fact that oil exited from the

appurtenances of the *Deepwater Horizon* is a matter of public knowledge.  SMF ¶ 16.

> C.    Transocean Admits that it was an Owner and Operator of the *Deepwater Horizon.*

The Transocean Defendants admit in their pleadings and discovery that they were the

owners, owners *pro hac vice*, and/or operators of the *Deepwater Horizon*.  SMF ¶¶ 42, 43.  Even

though the admissions in their Answer suffice to eliminate any factual issues, facts adduced in

discovery also show that the Transocean Defendants are liable as operators of the *Deepwater*

*Horizon.*  Transocean has responded that

> BP contracted with Transocean to provide the *Deepwater Horizon* drilling rig and
> the personnel to operate it.  As such, Transocean was involved in the day-to-day
> operations of the *Deepwater Horizon.*

---

[12] OPA defines "facility" to mean "any structure, group of structures, equipment, or device (other than a
vessel) which is used for one or more of the following purposes:  exploring for, drilling for, producing…
oil.").  33 U.S.C. § 2701(22).  OPA defines "offshore facility" to mean "any facility of any kind located
in, on, or under any of the navigable waters of the United States, and any facility of any kind which is
subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a
vessel or a public vessel."  33 U.S.C. § 2701(9).

[13] OPA defines "vessel" to mean "every description of watercraft or other artificial contrivance used, or
capable of being used, as a means of transportation on water, other than a public vessel."  33 U.S.C. §
2701(37).

[14] A finding that the *Deepwater Horizon* was either a "vessel" or an "offshore facility," as defined in OPA
or the CWA Section 311(a), or both, is sufficient to establish liability under OPA or the CWA Section
311(b).  The United States notes, however, that the *Deepwater Horizon* was in use as an offshore facility
at the time of the April 20, 2010 incident.

SMF ¶ 44.[15]   In the case of a vessel, a "responsible party" for purposes of OPA means "any person owning, operating, or demise chartering the vessel."  33 U.S.C. § 2701(32)(A).  As discussed above, there is no dispute that the blow-out preventer ("BOP") and riser are appurtenances of the *Deepwater Horizon*.  SMF ¶ 6.

        D.       <u>The Anadarko Defendants are Both Liable under OPA as Lessees.</u>

APC and A E&P were lessees at the time of the discharge from the Macondo Well resulting from the blowout that occurred on April 20, 2010.  SMF ¶¶ 25-29.  As lessees, these defendants are responsible parties as defined in OPA Section 1001(32)(C), 33 U.S.C. § 2701(16) and (32)(C), and as responsible parties they are liable under OPA Section 1002(a), 33 U.S.C. § 2702(a).[16]  Therefore, the United States' Motion for Summary Judgment seeking to hold the Anadarko Defendants liable under OPA should be granted.  With respect to APC, the analysis is complete, but A E&P has tried to create a liability loophole:  on April 20, 2010—the very day of the Macondo Well blowout that caused an explosion and fire that killed 11 men aboard the Deepwater Horizon—A E&P submitted a reassignment of its lease to MMS for approval.  A E&P argues it is not liable based on this reassignment.  However, A E&P's reassignment does not eliminate its liability.  The issue presented is purely a legal one, and the Court should reject A E&P's arguments, and grant Plaintiff United States summary judgment as to its OPA claim against A E&P as well as APC.[17]

---

[15] In this Motion, the United States does not differentiate among the four Transocean Defendants because the admissions in the Answer were made on behalf of all four Transocean Defendants.

[16] For discharges from offshore facilities such as the Macondo Well, a "responsible party" for purposes of OPA liability includes "the lessee or permittee of the area in which the facility is located." 33 U.S.C. § 2701(32)(C). "Lessee," in turn, is defined as "a person holding a leasehold interest in an oil or gas lease . . . on submerged lands of the Outer Continental Shelf, granted or maintained under . . .  the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)." 33 U.S.C. § 2701(16).

[17] A E&P moved to dismiss all of the United States' claims against it.  [Rec. Doc. 1861].  The United States opposed that motion and cross-moved for partial summary judgment as to the liability of A E&P

    1. <u>A E&P's retroactive assignment to APC does not vitiate A E&P's liability resulting from the April 20, 2010 Macondo well blowout and subsequent oil spill.</u>

The basic facts are not in dispute. A E&P submitted its application to reassign its 22.5% interest in the Macondo Lease to APC on April 20, and MMS approved that application on April 28, 2010. The Anadarko Defendants had agreed on an effective date of April 1, 2010. SMF ¶ 28. As of April 20, 2010, however, MMS had not approved the reassignment. SMF ¶ 29. Based on this sequence of events, Defendant A E&P denied it is a responsible party under OPA or that it was a lessee on April 20, 2010. It moved to dismiss the Complaint as to it, arguing that its last-minute reassignment of its 22.5% leasehold interest to APC would be retroactively effective to April 1, 2010.[18] That Motion is still pending, but A E&P's arguments are unavailing. Indeed, A E&P raised similar arguments in its Motion to Dismiss the Private Plaintiffs' OPA claims against it in the B-1 Master Complaint, but the Court nonetheless found that the Plaintiffs had stated a "colorable claim" in the B-1 Master Complaint. Order, Aug. 26, 2011 [Rec. Doc. 3830], at 36. Since the issue ruled upon was based on the same undisputed facts as A E&P's Motion to Dismiss the OPA claim in the instant case, and the issue as framed is purely a legal one, the Court's refusal to accept A E&P's position further supports the United States' interpretation of OPA and the OCSLA regulations.

As noted above, OPA defines "lessee" by reference to OCSLA and points to the OCSLA legal regime to answer the question of who holds a leasehold interest. *See* OPA Section

---

and APC under OPA and the Clean Water Act. [Rec. Doc. 2587]. As discussed *supra* at footnote 4, no briefing schedule was ever set for the cross-motion for summary judgment, and the United States accordingly restates and renews herein its arguments as to the liability of the Anadarko Defendants from its earlier motion for summary judgment.

[18] *See* Mem. in Support of Motion of Defendant Anadarko E&P Co. LP to Dismiss the Complaint of the United States, *United States of America v. BP Exploration & Prod., Inc., et al.*, No. 10-4536 [Rec. Doc. 1861], at 9–14.

1001(16), 33 U.S.C. § 2701(16).[19]  OCSLA expressly states that "[n]o lease issued under this

subchapter may be sold, exchanged, assigned, or otherwise transferred except with the approval

of the Secretary."  43 U.S.C. § 1337(e).  In accordance with the statute, the regulations provide

that an assignment of an OCS lease or interest in a lease pursuant to OCSLA is ineffective unless

it is approved by the Regional Director of the MMS.  30 C.F.R. § 256.62(a) ("MMS may

approve the assignment . . . of the ownership of the record title to a lease . . . only if . . . [t]he

Regional Director approves the assignment."); *see also Liberty Servs., Inc. v. Amoco Prod. Co.,*

*et al.*, No. 90-4490, 1991 WL 278673, at *6 (E.D. La. Dec. 23, 1991) (reasoning that because a

lessee's assignment to another party had not been approved by MMS, the lessee was "still

deemed to possess" its interest in the lease and retained its lease obligations).  On the first day of

the discharge resulting from the April 20, 2010 well blowout, the MMS Regional Director (or a

designee) had not yet approved the lease assignment between A E&P and APC.  SMF ¶ 29.  As

the assignment was not approved until April 28, A E&P was a lessee on the day the discharge

commenced and OPA liability accrued.

     A E&P's argument that it avoids OPA liability through a retroactively-effective lease

assignment contravenes Section 2710(b) of OPA, which states:

> No indemnification, hold harmless, or similar agreement or conveyance shall be
> effective to transfer liability imposed under this Act from a responsible party or
> from any person who may be liable for an incident under this Act to any other
> person.

33 U.S.C. § 2710(b).  In this section, Congress established that accrued OPA liabilities are non-

delegable, requiring responsible parties to shoulder the burden for incidents that occurred on

---

[19]  That section defines lessee as "a person holding a leasehold interest in an oil or gas lease on lands
beneath navigable waters [as that term is defined in the Outer Continental Shelf Lands Act] or on
submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the
Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)."  33 U.S.C. § 2701(16).

their watch.  As with post-incident hold harmless agreements or conveyances purporting to

transfer liability, a retroactive lease assignment cannot change one's status as a responsible party

under OPA.[20]  *Settoon Towing*, 722 F. Supp. 2d at 714 (relying on Section 2710(b) to hold that a

retroactive lease assignment did not change responsible party's status under OPA).  In *Settoon*

*Towing*, a lessee, Alpine, assigned its interest in a state-granted lease effective to a date prior to

when a barge struck a well, causing an oil spill.  *Id*. at 711–12.  The state, the lessor (as the lease

area was within the state's territorial waters), approved the lease assignment eleven months after

the incident.  *Id*. at 712.  Relying on Section 2710, the court held that "Alpine may contract with

[its assignee] for indemnity, and pursue those rights between themselves, but Alpine cannot

under OPA transfer its liability as a responsible party."  722 F. Supp. 2d at 714.[21]

   Accordingly, the retroactive transfer of the record title interest from A E&P to APC in

this case has no bearing on A E&P's OPA liabilities, which accrued in connection with the

---

[20] This conclusion is consistent with cases decided under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which contains a provision virtually identical to OPA Section 2710 and similarly prohibits indemnification or similar agreements or conveyances to transfer liability for a release or threatened release of hazardous substances.  42 U.S.C. § 9607(e).  Courts have interpreted this provision in CERCLA as prohibiting a party who is responsible for cleanup costs to escape liability vis-a-vis the federal government, although parties may still contractually allocate the costs of environmental clean up among themselves.  *Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x. 901, 908 (6th Cir. 2006); *Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400, 404 (3d Cir. 1995) (private agreements to indemnify or hold harmless "cannot nullify a party's underlying CERCLA liability," although they are effective to shift the ultimate financial loss); *Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 1994); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 405 (1st Cir. 1993) ("[A] party . . . cannot escape liability by means of a contract with another party" but parties "can allocate ultimate responsibility among themselves by contract.").

[21]  A E&P argues that *Settoon Towing* is materially distinguishable because in *Settoon Towing* the parties' execution of the transfer of the lease occurred nine months after the incident, whereas the document between A E&P and APC assigning the lease interest appears (on its face) to have been signed on April 15, 2010, before the explosion of the *Deepwater Horizon*.  *See* A E& P Memorandum in Support of Motion to Dismiss [Rec. Doc. 1861] at 13-14.  This is unpersuasive.  The date when the parties execute a lease interest transfer does not complete the assignment.  The OCSLA regulations state unequivocally that a transfer is effective "only if . . . [t]he Regional Director approves the Assignment."  30 C.F.R. § 256.62(a) (re-codified at 30 C.F.R. § 556.62(a)).  In both *Settoon Towing* and this case, the lease assignment had not been approved by the relevant lessor, and thus was not effectuated when OPA liability accrued.

discharge resulting from the well blowout on April 20, 2010, before the date that MMS approved

the lease assignment and effectuated the transfer.

Indeed, discovery has shown that A E&P exercised the rights of a co-owner of the lease

several times between April 1, 2010 and April 20, 2010.  On April 15, 2010, A E&P executed an

Authorization for Expenditure ("AFE") along with APC.[22]  And, on April 20, 2010, it executed a

letter authorizing BP to temporarily abandon the Macondo Well.[23]

In response to the Court's invitation to brief the impact of its B-1 Order, A E&P

conceded that its motion to dismiss the United States' OPA claims on this ground would be

denied.[24]  Although the ruling in the B-1 Order was a denial of A E&P's Motion to Dismiss, the

underlying material facts are not in dispute, and the issue presented is solely a legal one.  Thus

the issue is appropriate for summary judgment and the United States respectfully submits that the

Court's ruling in its B-1 Order provides further support for the United States' position that A

E&P is liable under OPA for the discharge from the Macondo Well.

2.   A E&P's argument that OPA and CWA liability are not "lease obligations" is
not dispositive of its liability for the oil spill and is incorrect as a matter of
law.

Like OPA, OCSLA regulations expressly prohibit a lessee from using a retroactive

assignment to escape obligations it accrued under the lease or regulations.  Although the OCSLA

---

[22] Supplemental Objections and Responses of Defendant Anadarko Petroleum Corp. to Revisions to the
United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for
Admissions, dated Sept 20, 2011, Request for Admission No. 26 (admitting that Alan O'Donnell, on
behalf of A E&P, signed an Authorization for Expenditure for the Macondo Well on April 15, 2010). *See
also* Deposition of Alan O'Donnell ("O'Donnell Dep."), May 5, 2011, at 140–42 (Ex. 32 hereto)
(discussing April 15 AFE for production casing and authenticating Ex. 1922 (Ex. 10 hereto) as copy of
that AFE).

[23] O'Donnell Dep., at 216–17 (Ex. 32 hereto) (discussing Anadarko's approval to temporarily abandon the
Macondo Well, Dep. Ex. 1931 (Ex. 40 hereto), and fact that O'Donnell signed on behalf of both APC and
A E&P).

[24] Mem. of APC and A E&P on the Effect of the Court's Order on the Motions to Dismiss the B1 Master
Complaint [Rec. Doc. 3991] at 2.

regulations allow for retroactive effective dates, *see* 30 C.F.R. § 256.62(c), they expressly extend

duties on assignors of lessees beyond the effective date of a lease transfer.  30 C.F.R.

§ 256.62(d).[25]  These regulations make assignors "liable for all obligations that accrue under [the

assignor's] lease before the date that the Regional Director approves [the assignor's] request for

assignment of the record title in the lease."  *Id.*[26]  Where a lease has been terminated or

rescinded, lessees remain responsible to the United States for fulfilling accrued OCSLA

regulatory obligations.  *See Noble Energy, Inc. v. Salazar*, 770 F. Supp. 2d 322, 324 (D.D.C.

2011).  OCSLA regulations thus reinforce that a lessee cannot avoid an accrued obligation

merely by assigning its interest to another party.  *See also* 62 Fed. Reg. 27,948, 27,953 (May 22,

1997).

A E&P argues that neither OPA nor CWA liability is a "lease obligation" that extends

beyond the effective date of an assignment under 30 C.F.R. § 256.62(d) because that regulation

does not cover obligations that may arise under statutes other than OCSLA.  This assertion is

contrary to the terms of the MC 252 lease and case precedent construing those terms.  The lease

terms provide that A E&P, as a lessee, is "subject to OCSLA, all regulations implemented

pursuant to that Act," and "*all other applicable statutes and regulations*."  *See* Oil and Gas Lease

of Submerged Lands under OCSLA, OCS-G 32306, Block 252, Mississippi Canyon, at Sec. 1

(Ex. 39 hereto).  OPA and CWA, which impose legal requirements and obligations related to the

prevention of, response to, and compensation for, oil spills on the OCS, constitute "other

---

[25] 30 C.F.R. § 256.62 is now re-codified at 30 C.F.R. § 556.62.

[26] By contrast, lease obligations that accrue "*after* the date that the Regional Director approves the
governing assignment" are the responsibility of the assignee, not the assignor.  30 C.F.R. § 256.62(e)
(emphasis added).

applicable statutes" whose requirements are incorporated into a federal lease for oil and gas exploration, drilling and development rights.[27]

The liability provisions of OPA and CWA that are the subject of this litigation were enacted well before June 1, 2008, when the lease for MC252 was issued.  Thus, these statutes are incorporated into the MC 252 Lease, and A E&P is bound to fulfill its responsibilities under OPA and CWA in contract as well as in law.

In short, just as with APC, Plaintiff United States has established the prima facie elements of OPA liability as to A E&P, which was a leaseholder at the time of the discharge and therefore a responsible party under OPA.  There is no genuine dispute as to the underlying facts concerning A E&P's assumption of 22.5% of the record title interest in the lease, and of MMS' approval on April 28, 2010 of A E&P's reassignment of that interest to APC.  Accordingly, partial summary judgment regarding A E&P's liability under OPA is appropriate at this time.

 E. Both Anadarko Defendants are Liable under OPA with no "Limit" on their Liability.

  1. Legal Standards on Limited Liability under OPA.

OPA provides responsible parties a limit on the liability in some cases.  In the case of offshore facilities, liability is limited to "the total of all removal costs plus $75,000,000." 33 U.S.C. § 2704(a)(3).   This liability limitation does not apply if:

 the incident was proximately caused by . . .

---

[27] Two cases construing this identical provision, "other applicable statutes and regulations," which is also found in Section 1 of the MC 252 Lease, found that applicable environmental laws in force at the time those leases were approved were incorporated into the lease.  *See Mobil Oil Exploration & Producing Se. v. United States*, 530 U.S. 604, 615–16 (U.S. 2000) (reasoning that this same "catch-all" provision incorporated other applicable statutes, like the Coastal Zone Management Act ("CZMA"), in force as of the lease's effective date, but not amendments to such statutes or regulations enacted *after* the lease's effective date.); *Amber Res. Co. v. United States*, 538 F.3d 1358, 1371–77 (Fed. Cir. 2008) (concluding that the amendments to the CZMA which created more onerous obligations than those in effect at the time the leases became effective were not incorporated into the OCS lease, but assuming that the terms of the statute in operation at the time of the leases' effective date had been incorporated).

> (B) the violation of an applicable Federal safety, construction, or operating
> regulation by, the responsible party, an agent or employee of the responsible
> party, or a person acting pursuant to contractual relationship with the responsible
> party . . .

33 U.S.C. § 2704(c)(1)(B).  Therefore, a responsible party loses OPA's liability cap if its

violation of an applicable regulation proximately caused an incident, as defined by the statute.[28]

A responsible party may also lose OPA's liability cap when its agents' and contractors' violation

of applicable regulations proximately caused an incident.  33 U.S.C. § 2704(c)(1)(B).

Because the Macondo Well was located on the Outer Continental Shelf, SMF ¶ 3, MMS'

regulations are "applicable" federal regulations under 33 U.S.C. § 2704(c)(1)(B).  These

regulations "govern oil, gas, and sulphur exploration, development, and production, operations

on the [Outer Continental Shelf]."  30 C.F.R. § 250.102 (now re-codified at 30 C.F.R. §

550.102).  The Anadarko Defendants had obligations under MMS regulations based on their

roles as co-lessees of the Macondo Lease.

MMS regulations impose duties on "lessees."  30 C.F.R. § 250.105 (now re-codified at

30 C.F.R. § 550.105).  "Lessee" is defined as an entity that "has entered into a lease with the

United States to explore for, develop, and produce the leased minerals.  The term lessee also

includes the MMS-approved assignee of the lease. . . ."  *Id*.  As MMS-approved assignees of the

Macondo Lease, the Anadarko Defendants are both "lessees."[29]

---

[28] OPA defines an incident as "any occurrence or series of occurrences having the same origin…resulting
in the discharge or substantial threat of discharge of oil[.]"  33 U.S.C. § 2701(14).  OPA's Conference
Report explains that:

> "Incident" is defined to mean an occurrence or series of related occurrences because, as
> under other Federal law it is the intent of the Conferees that the entire series of events
> resulting in the spill of oil comprises one "incident". [sic]

H.R. Rep. No. 101-653, at 2 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 1990 WL 132747.

[29] Some of the regulations impose obligations on "you," which is defined to include "lessee." 30 C.F.R.
§ 250.105 (now re-codified at 30 C.F.R. § 550.105).

Additionally, 30 C.F.R. 250.146(a) holds co-lessees jointly and severally liable for fulfilling regulatory obligations: "When you are not the sole lessee, you and your co-lessee(s) are jointly and severally responsible for fulfilling your obligations under the provisions of 30 C.F.R. parts 250 through 282, unless otherwise provided in these regulations . . . ."[30] Therefore, the Anadarko Defendants are also liable for obligations breached by BP. *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 561–564 (5th Cir. 2003).

Finally, it is beyond dispute that BP was acting pursuant to a contractual relationship with the Anadarko Defendants while drilling the Macondo Well. *See* SMF ¶¶ 23–33.

Thus, any violations of MMS regulations that proximately caused the Macondo Well incident and resulting discharge ("Macondo Well incident")—either by the Anadarko Defendants or by BP—will eliminate the Anadarko Defendants' limit on liability under OPA.[31]

2.      Both Anadarko Defendants are Liable without Limitation due to Violations of MMS Regulations.

Defendants are responsible for violating numerous MMS' Regulations. However, the following Section only outlines MMS regulatory violations linked to the causes of the Macondo Well incident that do not require this Court to make findings on disputed facts. 33 U.S.C. § 2704(c)(1)(B). There are two relevant violations.

First, the cement did not isolate hydrocarbons from the Gulf of Mexico. MMS regulations state that lessees must cement all wells, and that the cementing programs must "Prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters . . . ." 30 C.F.R. § 250.420(a)(2). This regulation amounts to a strict liability

---

[30] The current version of 30 C.F.R. § 250.146(a) is codified at § 550.146(a), and makes lessees responsible for fulfilling obligations under 30 parts 250 through 282 in addition to the newly-codified parts 550 through 582.

[31] This motion does not address the Transocean Defendants' limit of liability, if any applies.

provision.  It is beyond dispute that the cement pumped into the Macondo Well did not prevent the direct or indirect release of fluids from the formation through the wellbore into offshore waters.  SMF ¶ 11.   Had the Macondo Well cement job provided a barrier to hydrocarbon flow in the well, the blowout and subsequent oil spill would have been prevented.  SMF ¶ 10. Identifying the reason why the Macondo Well cement did not prevent oil from flowing to the waters is not necessary to find violations of this regulation.

Second, this oil spill posed an unreasonable risk to human life and wildlife.  MMS regulations also state that lessees:

> shall not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean.

30 C.F.R. § 250.300(a).  This is also a strict liability regulation, and it is beyond dispute that the blowout was a condition created by BP and its co-lessees that posed "unreasonable" risk to human life:  eleven men are dead.  SMF ¶ 13.  Identifying what caused the blowout is not necessary to find violations of this regulation:  its occurrence is sufficient to prove that the actions taken by the co-lessees and their contractors posed unreasonable risk to human life.

As to each violation, it does not matter whether the Anadarko Defendants committed the violation themselves or BP committed the violation:  the limitation is inapplicable in either circumstance.  Accordingly, because the Anadarko Defendants and/or BP violated 30 C.F.R. §§ 250.300(a) and 250.420(a)(2), the Anadarko Defendants cannot limit their liability under OPA § 2704(c)(1)(B).

## II. BP, THE TRANSOCEAN DEFENDANTS, AND THE ANADARKO DEFENDANTS ARE LIABLE UNDER SECTION 311(b) OF THE CLEAN WATER ACT

A.   <u>Statutory Background and Elements of Liability for the Clean Water Act.</u>

In enacting Section 311(b) of the Clean Water Act, Congress made the "unequivocal declaration," *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir. 1981), that:

> [I]t is the policy of the United States that there should be no discharges of oil . . . into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. §1331 et seq.] . . . .

33 U.S.C. § 1321(b)(1).  Section 311(b)(3) thus prohibits, *inter alia*, the "discharge of oil . . . into or upon the navigable waters of the United States, adjoining shorelines, . . . or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. § 1331 et seq.] . . . in such quantities as may be harmful as determined by the President . . . ."  33 U.S.C. § 1321(b)(3).  Section 311(b)(3) imposes a strict, or "absolute," liability standard on polluters.  *Coastal States*, 643 F.2d at 1127.  Strict liability is appropriate given that "[t]he purpose of the [Clean Water Act] and of section 1321 [of 33 U.S.C., *i.e.*, Section 311 of the CWA] is to achieve the result of clean water as well as to deter conduct causing spills."  *Id.* at 1128*; see also Apex Oil*, 208 F. Supp. 2d at 654 (quoting S. Rep. 101-94, at 11 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 732-33, which states that CWA Section 311's "standard of liability has been determined repeatedly to be strict, joint, and several liability"); *Bodenger*, 2003 WL 22228517, at *2 (same).

Section 311(b)(7)(A) of the Clean Water Act mandates that "[a]ny person who is the owner, operator, or person in charge of any vessel . . . or offshore facility from which oil . . . is discharged in violation of paragraph (3), shall be subject to a civil penalty . . . ."  33 U.S.C.

17

§ 1321(b)(7)(A).[32]  Thus, to establish liability for civil penalties for violation of Section 311(b)(3) of the Act in this case, the United States needs to show that each defendant is:  (1) a "person" who is (2) an "owner, operator, or person in charge" of (3) an "offshore facility" or a "vessel" from which (4) "oil" (5) is "discharged" (6) into or upon the "navigable waters of the United States, adjoining shorelines, . . . or . . . in connection with activities under the Outer Continental Shelf Lands Act . . . " (7) in a quantity "as may be harmful as determined by the President."  33 U.S.C. § 1321(b)(3) & (b)(7)(A).

   B.    The Six Elements of Liability Common to All Defendants Under Section 311(b) are Obvious.

        1.    Five of the elements are not genuinely contested.

There is no material dispute as to the elements of liability under CWA Section 311(b) that are not specific to the involvement of each Defendant.  Many of the CWA elements, while not identical, closely track the elements under OPA, discussed above.

Each defendant admits that it is a corporation and therefore is a "person" under the Clean Water Act.[33]  SMF ¶¶ 41, 45, 54, 55.

There was a "discharge" of "oil."[34]  BP, APC, and the Transocean Defendants have admitted that oil was emitted into the Gulf of Mexico.  SMF ¶¶ 15, 16.   "Discharge" under Section 311(b)(7) "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping, [except listing exclusions not applicable here]…."  33 U.S.C. § 1321(a)(2).  Under the plain language of the statute, the United States need only show that there

---

[32] "[A] facility may have more than one operator." *Geraghty & Miller, Inc. v. Conoco, Inc*., 234 F.3d 917, 928 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009) (construing similar language in CERCLA).

[33] The CWA defines "person" to include corporations.  33 U.S.C. § 1321(a)(7).

[34] 33 U.S.C. § 1321(a)(1) ("oil" means "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil.").

was *any* spilling, leaking, pumping, pouring, emitting, emptying or dumping of oil to show a "discharge." *See* Section 311(b)(7)(A). Indeed, the court can take judicial notice that oil was discharged within the meaning of the CWA as a result of the well blowout on April 20, 2010. SMF ¶ 14.

The discharge came from both an "offshore facility" and from a "vessel." Under the CWA, the Macondo Well is an "offshore facility," which is defined as "any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel." 33 U.S.C. § 1321(a)(11). "Facility" is not defined in the CWA, but the dictionary definition of the term is broad and extends to "something (as a hospital) that is built, installed, or established to serve a particular purpose." Merriam-Webster's Collegiate Dictionary 416 (10th ed. 1999). The wellbore, wellhead, casings, and tubulars constituting the Macondo Well were installed on or before April 20, 2010, SMF ¶ 8, and plainly fall within the broad definition of "offshore facility." BP admits that the Macondo Well is an offshore facility. SMF ¶ 9. Moreover, Transocean and BP admit that the *Deepwater Horizon* was a vessel. SMF ¶ 6; *see also* Order, Aug. 26, 2011 [Rec. Doc. 3038] at 4–7.[35]

Oil admittedly was discharged into or upon the "navigable waters of the United States, adjoining shorelines, . . . or . . . in connection with activities under the Outer Continental Shelf Lands Act . . . ." 33 U.S.C. § 1321(b)(3). SMF ¶¶ 3, 19 & 20. Thus, oil was discharged "in

---

[35] As explained in footnote 14 *supra*, the *Deepwater Horizon* MODU was in use as an offshore facility on April 20, 2010; however, liability is established for a violation of CWA Section 311(b)(3) whether it is classified as an offshore facility or as a vessel.

19

connection with activities under [OCSLA]" and also spread into and upon navigable waters[36] and adjoining shorelines. *Id.*

Finally, the discharge of oil was in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the Act, 33 U.S.C. § 1321(b)(3). Pursuant to its authority under the Act, EPA has promulgated regulations that define quantities of oil that "may be harmful" to include quantities that "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3; *see Chevron, U.S.A., Inc. v. Yost*, 919 F.2d 27, 30–31 (5th Cir. 1990) (upholding EPA's "sheen" test). Although the precise amount of oil discharged will be determined at a later phase of this litigation, the Court can take judicial notice that the amount discharged far exceeded a mere "sheen" and therefore oil was discharged in quantities "as may be harmful" within the meaning of the CWA. SMF ¶ 17 (including links to photographs documenting extensive oil slicks). BP admits that oil was discharged in such quantifies as may be harmful, SMF ¶ 18, and APC admits that there was a film, sheen or discoloration on portions of the waters of the Gulf of Mexico, SMF ¶ 17.

> 2.     The Discharge was From Both the *Deepwater Horizon* and the Macondo Well.

Anadarko—while admitting that the oil created a sheen when it reached waters, SMF ¶ 17—is expected to contend that no discharge came "from" the Macondo Well because the discharge came not from the Well but rather "from" the BOP and riser. SMF ¶ 15. Transocean may argue the inverse: that discharge was "from" the well.

---

[36] As in OPA, the Clean Water Act defines "navigable waters" to mean "the waters of the United States, including the territorial seas" and in turn defines "territorial seas" to mean "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." 33 U.S.C. § 1362(7), (8).

These arguments fail because the material facts establish a discharge from *both* the
Macondo Well and from the BOP and riser as a matter of law.  The ordinary meaning of the
word "from" connotes a physical relationship, such as "a point or place where an actual physical
movement*** has its beginning."  Webster's Third New International Dictionary 913 (2002);
*accord* Oxford English Dictionary, Online Edition,
http://www.oed.com/viewdictionaryentry/Entry/74884 ("prep[osition] . . . Denoting departure or
moving away: governing a n[oun] which indicates a point of departure or place whence motion
takes place").  Under the common usage of  "from," there clearly was a single and continuous
discharge "from" the Macondo Well and the *Deepwater Horizon* within the meaning of  CWA
Section 311(a)(2) as the oil and gas exited (1) from the well, and (2) from the *Deepwater
Horizon* through the blow-out preventer and riser into the Gulf of Mexico.  Nothing in CWA
Section 311(b)(7)(A) says that a discharge cannot be from *both* an "offshore facility" and a
"vessel," here, the blow-out preventer and riser, which are appurtenances to the MODU
*Deepwater Horizon*.[37]

Moreover, Anadarko's argument—that the oil from their 3-mile deep facility cannot
trigger liability because it travelled through the 53-foot BOP before touching water—is at odds
with the statutory definition, which on its face has a very broad reach.  Section 311(a)(2) states
that "'discharge' *includes, but is not limited to, any* spilling, leaking, pumping, pouring,
emitting…"  33 U.S.C. § 1321(a)(2) (emphasis added).  The terms "include" and "any" make
clear Congress' intent that the term "discharge" be construed in the broadest possible sense, and
predicate against Anadarko's attempt to graft on a limitation not found in the statutory language.

---

[37] Additionally, there nothing in the statute that says there cannot be a discharge from multiple facilities or
successive components of one facility.  Even if the BOP were not an appurtenance of the vessel, it would
nevertheless constitute a "facility" or component thereof.  In either event, the Transocean Defendants
would be liable under CWA § 311(b).

C.   Each of the Defendants is Liable Because it is an Owner and/or Operator of an Offshore Facility or Vessel within the Meaning of Section 311(b)(7).

The remaining element of liability involves whether each of the defendants was, during the time of the discharge, an "owner, operator or person in charge." These categories are three separate bases that, for purposes of determining liability under the CWA, must be analyzed separately. *United States v. M/V Big Sam*, 681 F.2d 432, 438–39 (5th Cir. 1982) (recognizing pre-OPA intent of the CWA to provide an effective remedy through strict liability for recovering cleanup costs from oil spills, and concluding that the United States could sue the owner or operator or both); *see also Sierra Club, Inc. v. Tyson Foods, Inc., et al.*, 299 F. Supp. 2d 693, 716 (W.D. Ky. 2003) (declining to define person in charge to always include owner or operator). Treatment of any of the terms as synonymous would render them superfluous and contrary to proper statutory construction. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant.") (internal quotations omitted); *CleanCOALition v. TXU Power*, 536 F.3d 469, 477 n.10 (5th Cir. 2008) (declining to adopt interpretation of one section of the Clean Air Act because it would render superfluous another section of the Act).

1.   Transocean is liable as Owner and Operator.

The Transocean Defendants admit in their Answer that one or more of the Transocean Defendants were the owners, owners *pro hac vice*, and/or operators of the *Deepwater Horizon*, SMF ¶ 42. The Transocean Defendants have continued to admit their ownership of the *Deepwater Horizon* in pleadings, discovery, and public reports. SMF ¶ 43. In response to written discovery, the Transocean Defendants make additional admissions that support their status as operators of the *Deepwater Horizon*. For example, the Transocean Defendants admit

22

that Transocean was involved in the day-to-day operations of the *Deepwater Horizon* and had in place Offshore Installation Managers ("OIMs") who directed and controlled the drilling crew. SMF ¶ 44. Thus, as a matter of law, based on the undisputed material facts, the Transocean Defendants owned and operated the MODU *Deepwater Horizon.*

> 2.  <u>BP and the Anadarko Defendants are all "Operators" as a matter of law because those Defendants were required by statute to maintain all operations within the Lease Area in compliance with regulations intended to protect the environment.</u>

BP and the Anadarko Defendants held a leasehold interest in the Macondo Prospect as of April 20, 2010, and were subject to the express statutory obligation imposed on the lessees under the Outer Continental Shelf Lands Act ("OCSLA"); an obligation that the lessees cannot contract away. OCSLA provides:

> b) Duties of holders of lease or permit
> It shall be the duty of any holder of a lease or permit under this subchapter to–
>  . . .
>> (2) maintain all operations within such lease area or within the area covered by such permit in compliance with regulations intended to protect persons, property, and the environment on the outer Continental Shelf. . . .

43 U.S.C. § 1348(b)[38]; *see also* 43 U.S.C. § 1332(6) ("[O]perations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.").[39]

---

[38] This same obligation is reiterated in the lease between the United States and the lessees for the Macondo area. *See* Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act, Serial No. OCS-G 32306, at Sec. 12 (Ex. 39 hereto).

[39] The OCSLA regulations contain a number of provisions obligating lessees to avoid discharges and other harm to the environment. *See, e.g.*, 30 C.F.R. § 250.300(a) ("[T]he lessee shall take measures to prevent unauthorized discharge of pollutants into the offshore waters."); *id.* § 250.401 (requiring lessees to "take necessary precautions to keep wells under control at all times").

Given that each of the Anadarko Defendants and BP was a "holder of a lease,"[40] each had an explicit statutory duty to "maintain all operations within [the] lease area . . . in compliance with regulations intended to protect . . . the environment on the outer Continental Shelf." 43 U.S.C. § 1348(b).  Thus, the defendants cannot avoid liability as "operators" under the CWA based on their failure to comply with that duty.  Furthermore, the duty imposed by OCSLA cannot be contracted away.  As the Supreme Court has stated:

> '[T]he police power[] is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. . . .' 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. . . .'

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503–04 (1987) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241–42 (1978), and cases cited therein).

This precept is reinforced by the regulations promulgated under OCSLA.  While the regulations provide that a lessee may designate an "operator to act on your behalf and to fulfill your obligations under the Act, the lease, and [applicable] regulations," 30 C.F.R. § 250.143(b), those regulations expressly provide that co-lessees "are jointly and severally responsible" for fulfilling the obligations imposed by the regulations and the statute.  *Id*. § 250.146(c) ("the lessee, operator . . . and the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation.").[41]  As the Department of the Interior has stated, "While parties to a contract may agree to limit liability,

---

[40]  As discussed *supra* at Part I.E.1, A E&P was a lease holder on April 20, 2010, as MMS had not yet approved the lease assignment.

[41]  These regulations have been re-codified at 30 C.F.R. §§ 550.143(b) and 146(c).  *See also id.* § 256.64(h)(1) (now § 556.64(h) ("You are jointly and severally liable for the performance of each nonmonetary obligation under the lease and under the regulations in this chapter with each prior lessee and with each operating rights owner holding an interest at the time the obligation accrued. . . . .").

neither Congress nor the Secretary ever agreed to limit the liabilities of OCS lessees for operational obligations." 62 Fed. Reg. 27,948, 27,950 (May 22, 1997); *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 562–64 & n.5 (5th Cir. 2003) (quoting the foregoing and stating that the "regulations govern the parties' joint and several liabilities vis-a-vis the Government").[42]

Given OCSLA's express directive that leaseholders "maintain all operations . . . in compliance with regulations intended to protect . . . the environment on the outer Continental Shelf," 43 U.S.C. § 1348(b), BP and the Anadarko Defendants each qualifies as an "operator" for purposes of Clean Water Act liability under Section 311(b)(7), 33 U.S.C. § 1321(b)(7).

Unlike the situation presented in *United States v. Bestfoods*, 524 U.S. 51, 66 (1998), the court need not "rue the uselessness" of the circular definition of "operator," nor examine the particular facts regarding the lessees' actions under their contracts to determine whether they actually "manage[d], directe[d] or conduct[ed] operations specifically related to pollution . . . ." *Id.* at 66. Instead, the obligation to maintain all operations in compliance with regulations intended to prevent pollution is placed squarely on co-lessees by OCSLA and, therefore, each Anadarko Defendant is an operator within the meaning of the Clean Water Act.

As the Fifth Circuit has stated, "[i]n the absence of ambiguity, our inquiry ends with the text [of the statute] itself." *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002). "[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it." *Id.* at 392 (quoting *Hubbard v. United States*, 514 U.S. 695, 703 (1995)).

---

[42] In fact, the MMS Designation of Operator Forms, in which A E&P and APC designated BP as the operator for the MC 252 Lease, make clear that such a designation "does not relieve the lessee of responsibility for compliance with the terms of the lease, laws, and regulations applicable to the area." *See* Exs. 42, 43 hereto.

Stated even more simply, "[c]lear statutory language is dispositive." *Guilzon v. Comm'r of Internal Revenue*, 985 F.2d 819, 823 n.11 (5th Cir. 1993). Because OCSLA's mandate is clear that a co-lessee must "maintain all operations within [the] lease area . . . in compliance with regulations intended to protect persons, property, and the environment," each co-lessee is an "operator" within the meaning of Section 311(b) of the Clean Water Act, 33 U.S.C. § 1321(b).

The imposition of liability upon the Anadarko Defendants and BP under Section 311(b) of the CWA squares precisely with the objectives of the statute. As the Fifth Circuit succinctly put it:

> The intendment of the statute is clear: Congress places a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same.

*Coastal States*, 643 F.2d at 1128. Thus, there is no genuine dispute as to the material facts, and each Anadarko Defendant and BP is liable as an operator under Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), by virtue of the statutory scheme under which each assumed its leasehold interests.

### 3. BP and APC are Both "Owners" of the Macondo Well.

The physical components of the Macondo Well, from the wellhead down through the wellbore to total depth, comprise an "offshore facility" within the meaning of Section 311(b)(7)(A). The undisputed material facts show that each of the co-lessees owned their proportionate share of the wellhead, casings, and other components that comprised the Macondo Well.[43]

---

[43] Plaintiff United States does not include defendant MOEX in this Motion but notes that the United States also alleges that MOEX is an owner of the Macondo Well under the CWA. MOEX apparently disputes that status.

BP entered into three agreements with the Anadarko Defendants at the end of December, 2009, to effect the transfer of interests:

- a Joint Operating Agreement ("JOA") (SMF ¶ 33), which outlined each participating party's rights and responsibilities with respect to the Macondo Prospect;

- a Lease Exchange Agreement ("LEA" or "lease exchange agreement") pursuant to which BP transferred to the Anadarko Defendants a 25% record title interest in the Macondo Prospect (SMF ¶ 27);  and

- a Well Participation Agreement  ("WPA") (SMF ¶ 31), which provided that APC would own a 25% working interest in the Macondo Prospect leasehold and that the interest in the Macondo Well assigned to APC "consists of all tangible personal property in the well, including the tubular and wellhead costs as set forth in the AFE [Authorization for Expenditure]."[44]

There can be no genuine dispute that BP owned its proportionate share of the Macondo Well.  Initially, as sole leaseholder, when it spudded the well in early October, BP owned *all* of the tangible and intangible aspects of the well.  Pursuant to the Lease Exchange Agreements, it reassigned 25% of its interests to the Anadarko Defendants, but retained a 65% record title interest in the lease.[45]  SMF ¶ 30.  The evidence shows that BP adhered to the financial and accounting procedures set forth in the JOA, pursuant to which it incurred costs and sent monthly bills for reimbursement or cash advances to the co-lessees.[46]  The Anadarko Defendants executed

---

[44] Well Participation Agreement, Definition of "Initial Exploratory Well," at 2 (Ex. 3 hereto).

[45] BP assigned the remaining 10% to MOEX.  SMF ¶¶ 23, 24.  The "BP Property" transferred to the Anadarko Defendants and to MOEX under their respective Lease Exchange Agreements excluded tangible personal property, which the LEAs stated included the tubulars and wellhead for the Macondo Well.  This exclusion, however, was primarily for tax reasons.  Deposition of Michael Beirne ("Beirne Dep."), June 27, 2011, at 234 (Ex. 28 hereto).  Given that both APC and MOEX proceeded to pay their proportionate share of the physical components of the Macondo Well subsequent to execution of the agreements, the United States alleges that both defendants are liable as "owners" within the meaning of the CWA and, for the reasons discussed in this section, moves for summary judgment on that basis as to APC.

[46] Under the JOA, the co-lessees first authorize general categories of operations and costs by execution of an Authorization for Expenditure ("AFE").  Beirne Dep., at 105 (Ex. 28 hereto). Then as operations progress, "the Operator shall pay all costs of all activities and operations under this Agreement, and each

a number of AFEs.  SMF ¶¶ 35–37.  And, consistent with the JOA, BP issued "JIBs" (i.e., joint interest billings).  Commencing in January, 2010, BP issued monthly invoices for the Macondo Well to APC through at least May, 2010.  SMF ¶ 38.  It also made "cash calls" for advance payments, to be drawn down as it incurred costs, as permitted by the JOA.  SMF ¶¶ 33, 46.  The invoices itemized tangible equipment—physical assets, such as the wellhead and casing—which was included as part of the costs to be reimbursed.  SMF ¶ 38.  APC made payments for its proportionate share.  SMF ¶¶ 46, 49.  BP did not bill for its proportionate share and therefore BP acquired and retained ownership of its 65% share of the "offshore facility."  SMF ¶ 40.

Similarly, as a matter of law and undisputed fact, APC is the "owner" of a 25% share of the offshore facility.  In fact, as set forth below, APC admits that it owned the physical components, or "tangible personal property," through the testimony of two corporate designees and the employee who negotiated the key agreements, and its response to the United States' written discovery.

Through the testimony of its Fed. R. Civ. P. 30(b)(6) designee on this topic, Mr. Jeremy Byrd,[47] APC admitted that APC's payment of invoices listing equipment meant that APC would hold a share in such equipment.  Mr. Nick Huch, the APC employee who conducted the negotiation of all three agreements on behalf of both Anadarko Defendants, also admitted that

---

Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the Costs of these activities and operations."  *See* JOA, Article 6 and Appendix C (Ex. 26 hereto).  Appendix C requires Operators such as BP to bill Non-Operators monthly for their proportionate share of the Joint Account for the preceding month, JOA, Appx. C, Section 2.A, and, where costs for the next month's operation are anticipated to exceed $50,000, the Operator may require the co-lessees to advance their proportionate share, JOA, Appx C, Section 3.A.

[47] Mr. Byrd was designated as a corporate designee for "All financial transactions occurring pursuant to the JOA, including without limitation the preparation, existence, purpose and amount of any and all Authorizations for Expenditures (AFEs) and your approval thereof; any invoices from BP or others that you received pursuant to the JOA or the Joint Account created thereunder; any payments you made to BP . . . ."  *See* Agreed 30(b)(6) Deposition Notice of Anadarko, Topic #14, Dep. Ex. 1597 (Ex. 41 hereto).

APC intended to own the tangible personal property comprising the Macondo Well. SMF ¶ 51 (citing deposition testimony of Mr. Huch, agreeing that "the intent was that APC would end up with the tangible personal property"). Mr. Huch clarified that tangible personal property included equipment associated with the well, such as downhole pipe, wellheads, and casing equipment downhole. *Id.*

Moreover, APC admits that it paid BP's invoices for the 25% Anadarko share of the costs of the Macondo Well, including for those physical components, that were incurred from October 1, 2009, through the date of the incident on April 20, 2010. As consideration for its 25% working title interest in the Macondo Well, the parties agreed that APC would pay a "promote" in excess of 25% of the costs, so that the full amount to be paid by APC was 33% of the initial estimate for 100% of the costs of the well as set forth in the initial Authorization for Expenditure attached to the Well Participation Agreement. SMF ¶¶ 32, 49. Thereafter, APC would pay its 25% share, without the promote. *Id.* Pursuant to the procedures set forth in the JOA, APC admits that it received from BP five monthly invoices, including cash calls, for the costs of the Macondo Well, commencing in January, 2010. SMF ¶ 46. APC further admits that it paid each invoice and cash call, SMF ¶¶ 46, 49, so it paid the full negotiated amount for its 25% working title interest in the Macondo Well.[48]

Each of the invoices itemizes physical components of the well that comprise the "offshore facility" as alleged by the United States and that constitute "tangible personal property" under the Well Participation Agreement. The wellhead, casings, and other materials are designated in the invoices collectively as "tangible controllable equipment" but also are listed

---

[48] APC did not pay any invoices associated with the "incident" despite receiving invoices from BP after May, 2010.

individually and specifically.[49]  The Anadarko payments to BP include all costs under the JOA,

including the costs of the physical components of the well, from the date of spudding of the well

in October, 2009, through the costs incurred in April, 2010.[50]  Thus, the record is clear that

payments from APC to BP included payments for the "offshore facility."

These payments to BP render APC the owner of the full 25% proportionate share of the

offshore facility.  Anadarko's designee on financial matters, Mr. Jeremy Byrd, unequivocally

stated that APC paid the full 25% share on its own behalf, and not on behalf of A E&P.  SMF ¶

50 (citing deposition testimony of Jeremy Byrd, Ex. 30 hereto, at 87:17–88:16 ("Anadarko

Petroleum Corporation . . . [is] the only party that's being billed on this invoice for 33

percent.")).  Mr. James Bryan, Anadarko's corporate designee,[51] confirmed that A E&P was only

involved for purposes of the Lease Exchange Agreement and the fair market valuation, but that

the intent was always that the 25 percent interest was completely in APC.  Deposition of James

Bryan ("Bryan Dep."), May 6, 2011, at 78:10–25 (Ex. 29 hereto).  Although Mr. Bryan testified

that he was not directly involved in invoicing and payments under the JOA (Bryan Dep., at

---

[49] For example, the January invoice itemizes casing/line pipe conductors for the 28" and 22" casing, the hanger, a weld-on flange for the wellhead, the housing for the wellhead, and similar items.  *See* Ex. 15 hereto.  The April, 2010 invoice itemizes three different sizes of casing (18", 11 7/8", and 9 7/8"), a shoe guide and float collar.  *See* Ex. 21 hereto.

[50] Through payment of a "cash call" or advance payment, APC had a credit with BP and the Joint Account of approximately $6 million at the time of the explosion on April 20, 2010.  APC therefore paid the final invoice for costs of the Macondo Well, incurred in April 2010, through use of that credit.  SMF ¶ 49 (citing deposition testimony of Jeremy Byrd, Ex. 30 hereto, at 92–97).

[51] Mr. Bryan was designated as a corporate designee for topics related to the lease, contracting, and other processes by which Anadarko obtained the rights to participated in the exploration, drilling and development of oil from the Macondo Prospect.  *See* Agreed Upon 30(b)(6) Deposition Notice of Anadarko, Topic #2, Dep. Ex. 1597 (Ex. 41 hereto).

133:16–134:2), Mr. Bryan also indicated that payment by APC alone is consistent with his understanding of the role of the two corporate entities.[52]

Here, pursuant to the financial procedures in the JOA, under which the physical assets of the Macondo Well were Joint Property held by a Joint Account, BP was the owner of its proportionate share of the Macondo Well. The Well Participation Agreement between BP and APC unambiguously provides that APC is the owner of a 25% share in the "tangible personal property"—the wellhead, tubular, etc.—as set forth above. APC admits as much and the undisputed material facts establish that APC paid for 25% of the costs of the "offshore facility," i.e., the physical components of the Macondo Well, including the wellhead and casing downhole. Accordingly, BP and APC are owners of their proportionate share of the offshore facility from which oil was discharged following the explosion on April 20, 2010. Thus, partial summary judgment as to the liability of BP and APC as owners under CWA Section 311(b)(7)(A), (33 U.S.C. § 1321(b)(7)(A)), based on the material undisputed facts, is appropriate.

D.      Summary.

In summary, BP, the Transocean Defendants, and the Anadarko Defendants are liable as a matter of law, because there is no genuine dispute as to the materials facts on which their liability rests:[53]

> *The Transocean Defendants* admit that they are owners of the *Deepwater Horizon*, which they also admit is a vessel and a MODU, and therefore they are liable under OPA and the Clean Water Act. They further are liable as operators of the *Deepwater Horizon* under

---

[52]   Mr. Bryan testified as follows: "there were two entities for the effect of the lease exchange. And to answer your question, it would not surprise me that APC paid for the 25 percent." Bryan Dep. 134:3–19 (Ex. 29 hereto).

[53] Even if the Court does not enter a partial summary judgment in the United States' favor as to each Defendant under each claim, it should still grant the United States' motion for summary judgment with respect to those matters on which it finds that there is no genuine factual dispute, pursuant to Fed. R. Civ. P. 56(g).

OPA and the CWA, based on admissions in their Answer and the fact that they exercised "day to day" control and had in place Offshore Installation Managers ("OIMs") who directed and controlled the drilling crew.

*BP* is liable under CWA Section 311(b)(7) as an owner and operator of the Macondo Well, based on evidence of its payment for its proportionate share of the Macondo Well and its status as a lessee under OCSLA.

*The Anadarko Defendants* as lessees are liable without limitation under OPA, which defines lessees to be Responsible Parties, and as operators under the Clean Water Act. Moreover, defendant APC is liable as an owner of its proportionate share of the Macondo Well, an offshore facility.

Given the strict liability scheme of OPA and the Clean Water Act, and the undisputed facts upon which this motion is based, there is no need for a trial as to the liability of the defendants outlined above, and the Court should grant the United States' Motion for Summary Judgment.

## CONCLUSION

For the reasons stated herein, Plaintiff United States respectfully requests that the Court grant its motion for partial summary judgment (1) as to the liability of  BP, the Transocean Defendants, and the Anadarko Defendants under CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7); and (2) as to the liability of the Transocean Defendants and the Anadarko Defendants as responsible parties under OPA Section 1002, 33 U.S.C. § 2702; and (3) that the Anadarko Defendants are not entitled to limited liability under OPA Section 1004, 33 U.S.C. § 2704.  The United States further requests that the Court separately enter a declaratory judgment as to the Anadarko Defendants' liability under 33 U.S.C. § 2716(f) and 28 U.S.C. § 2201.

Respectfully submitted,

IGNACIA S. MORENO                      TONY WEST
Assistant Attorney General             Assistant Attorney General
Environment & Natural Resources Division   Civil Division

JAMES NICOLL
 Senior Counsel
NANCY FLICKINGER
SARAH HIMMELHOCH
Senior Attorneys
ABIGAIL ANDRE
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
MATT LEOPOLD
ABIGAIL ANDRE
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

JIM LETTEN
United States Attorney
SHARON SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

PETER F. FROST
 Director, Torts Branch, Civil Division
  Admiralty and Aviation
STEPHEN G. FLYNN,
 Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
 MICHELLE LAWRENCE
 DAVID PFEFFER
 Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg, Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA