UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br>Section: J |
| This document relates to: 2:10-cv-01768, 2:10-cv-02454 | * * * * * | District Judge BARBIER<br>Magistrate Judge SHUSHAN |

**BP'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BP DEFENDANTS ON COUNT 7 OF THE AMENDED COMPLAINT**

Defendants BP America Inc. and BP Exploration & Production Inc. (collectively "BP") submit this response to the Center for Biological Diversity's ("CBD") Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment Against BP Defendants on Count 7 of the Amended Complaint (the "CBD UMF"). The CBD UMF asserts as undisputed facts items that are actually disputed, including but not limited to the following:

1. CBD asserts that "BP was the operator of the Macondo Well between April 20 and July 15, 2010." CBD UMF ¶ 9 (citations omitted). As this Court knows, BP and the other defendants in MDL 2179 hotly contest which parties were operators of the Macondo well. The Phase 1 testimony on which CBD relies to suggest that BP has conceded operator status is misconstrued. At trial, BP America's chairman, Lamar McKay, recognized that BP was the "designated operator for the lease," 2/26/2013 Tr. at 511:17, and thus held the "operating rights" for the well, *id.* at 512:24 (Ex. 1). These comments refer to the "designated operator" under the Outer Continental Shelf Lands Act ("OCSLA") and its implementing regulations. 30 C.F.R. § 250.105 (defining "operator" for purposes of OCSLA). Taking these quotations out of context, CBD misrepresents them as a legal admission regarding the different but no less technical use of the term "operator" in the Clean Water Act (or the nearly identical provision in CERCLA). *Compare* 33 U.S.C. § 1321(a)(6) (CWA definition of "operator") *with* 42 U.S.C. § 9601(20)(a) (CERCLA definition of "operator," which is *in pari materia*).

2.	The other citations in paragraph 9 of CBD's UMF are *non sequiturs*.  CBD mistakenly refers to "BP Expert Dr. Frederick Beck."  *Id.*  But Dr. Beck is a Halliburton expert.  *See* 4/3/2013 Tr. at 7056:16-17 (Ex. 2).  Moreover, Dr. Beck never takes a position on whether BP was an operator of the well; he merely repeats the phrasing of a question asked by plaintiffs' counsel and discusses BP as an OCSLA operator.  And Dr. Beck is not even an expert in the legal relationships among parties to drilling contracts.  *See* 4/3/2013 Tr. at 7073:15-19 (BP counsel objecting that Dr. Beck, offered by Halliburton, is not an expert "in the legal relationships" among those involved in drilling contracts).  In addition, CBD's citations to Rec. Doc. 7076 have nothing to do with which party was the operator of the Macondo well.  In fact, the word "operator" does not appear anywhere in that document.

3.	Moreover, Transocean was the exclusive operator of the *Deepwater Horizon* and the well at the time of the spill.  *See* BP's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment, Rec. Doc. 12676-2 (the "BP UMF"), ¶ 20.  Transocean controlled the blowout preventer designed as the last barrier to any loss of well control and the potential release of oil to water.

4.	By contrast, OCSLA's concept of "operator" carries a different meaning than its counterpart in the CWA (or CERCLA).  This Court looked to the Supreme Court's analysis of the CERCLA term "operator" for the meaning of the *in pari materia* term "operator" in the CWA.  And under CERCLA, an operator is one who "'must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'"  Order, Rec. Doc. 5809, at 23 (entered Feb. 22, 2012) (quoting *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998)) (Ex. 3).

5.	This hands-on, pollution-control role contrasts with "operator" status under OCSLA, which the United States unsuccessfully argued includes *any* leaseholder.  *See* Rec. Doc. 4836-1 (filed Dec. 8, 2011) (Ex. 4).  Critically, this Court did not accept the invitation of the United States to expand OCSLA's passive notion of lease "operators" to create "operators as a

matter of law" (a non-statutory term the United States coined in its brief to try to support its argument) under the Clean Water Act, which uses the term "operator" to mean an active, onsite pollution manager. To the contrary, determining whether someone qualifies as an "operator" under the CWA or under CERCLA is a question of both law and fact. For that very reason, this Court denied the United States' summary judgment motion against Transocean regarding its role in the "operation" of the *Deepwater Horizon* rig, emphasizing that the inquiry was inherently fact-bound and thus would have to be tried if it needed to be resolved. *Id.* The same factual dispute exists here, and the Court should not look past it on the basis of BP statements about OCSLA, where the term "operator" is ***not*** used in an *in pari materia* fashion as compared to the very different meaning the term "operator" conveys in the CWA and CERCLA contexts.

6. Indeed, OCSLA's statutory definitional provisions do not even define and thereby make pivotal the term "operator." Instead, OCSLA references the concept of operations as an aspect of "development," which OCSLA defines as "those activities which take place following discovery of minerals in paying quantities … including … operation of all onshore support facilities …." 43 U.S.C. § 1331(*l*). But the CWA (and CERCLA) are pollution liability statutes and so they impose liability on those who actually are the onsite pollution control managers (not onshore managers of a very different sort scores of miles away from the site) responsible for or that a plaintiff argues could have averted a particular regulated release of pollutants. OCSLA's purpose is very different since that statute is designed to regulate the federal government's control of the submerged lands that it owns and leases out for mineral development.

7. EPCRA also does not define the term "operator," though it does impose liability for failure to file reports about releases from covered facilities of hazardous or extremely hazardous substances and hence the term "operator" should be understood to have the same meaning as that term has under the CWA and CERCLA, especially given the fact that EPCRA piggybacks on those two statutes to define which substances require reporting when released. *See, e.g.,* 42 U.S.C. § 11004 (prescribing certain types of releases that require notification under EPCRA if the releases are reportable under §103 of CERCLA, 42 U.S.C. § 9603(a)). Nothing

about EPCRA indicates that it is intended to incorporate the sense in which OCSLA refers to the undefined term "operation."  Indeed, EPCRA does not reach federal enclaves 50 miles out to sea.  *See* BP UMF, ¶ 45.  For these reasons, trial or other MDL 2179 testimony about BP's status as an OCSLA lease operator simply has no application to the issue of whether BP is liable as an EPCRA "operator" (or CWA "operator").

8. CBD also claims that it is undisputed that oil "flowed continuously from the Macondo Well and into the Gulf of Mexico," (CBD UMF ¶ 12) and asserts that BP conceded that in its Answer to the United States of America's Complaint, Rec. Doc. 1858 (filed Apr. 4, 2011), ¶ 61 (Ex. 1 to CBD UMF).  BP never conceded that oil "flowed continuously from the Macondo Well and into the Gulf of Mexico" without also flowing through the *Deepwater Horizon* and/or its appurtenances.  Although oil discharged into the Gulf of Mexico began in the Macondo reservoir and passed through the Macondo well, the oil that was "discharged into the Gulf came from the *Deepwater Horizon* and/or its appurtenances (*i.e.,* the discharged oil touched water most proximately as it emerged from the vessel and parts thereof)."  BP UMF ¶ 6; *see also id* ¶ 7.

9. Moreover, it is well-established that, while statements in pleadings can constitute judicial admissions of fact, legal conclusions cannot be judicially admitted.  *See Kiln Underwriting Ltd. v. Jesuit High Sch. of New Orleans*, Nos. 06-04350, 06-05060, 06-05057, 2008 WL 3365520, at *5 n.2 (E.D. La. Aug. 8, 2008); *see also, e.g.*, *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993); *Pitcairn v. Am. Refrigerator Transit Co.*, 101 F.2d 929, 935 (8th Cir. 1939).  Accordingly, courts regularly decline to find judicial admissions not only with respect to pure legal questions, but also with respect to questions requiring the application of law to fact.  *See, e.g.*, *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005); *MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997).  Here, BP's Answer simply acknowledged the fact of movement of oil between different instrumentalities; it certainly did not indicate acceptance of a legal conclusion that the Macondo

4

well was the offshore facility "from which" oil was "discharged" for purposes of imposing penalty liability under the CWA. Saying that oil flowed out of the well and into the vessel's appurtenances (which it did) is entirely different from saying that oil was unlawfully "discharged" from the well under Section 1321(b)(7) (or by analogy was "released" from the well within the meaning of EPCRA).

10. The Court's Order resolving various summary judgment motions regarding the liability of BP, Anadarko, and Transocean under the under the Oil Pollution Act of 1990 ("OPA") and the CWA also shows that BP made no such concession. If BP had made such a concession, the Court would not have analyzed in its decision — for over five pages — where the oil came "from" and its significance for liability purposes. *See* Order and Reasons, Rec. Doc. 5809, filed February 22, 2012, at 17-23 (Ex. 3). BP, of course, reserves all of its rights to contest the Court's ruling there, as that ruling remains on appeal before the Fifth Circuit.

11. CBD also asserts:

> Prior to the blowout of the Macondo Well on April 20, 2010, BP and Transocean injected at least 454 barrels of "spacer" into the wellbore. The amount of the spacer was almost twice the quantity used in standard industry practice. BP instructed the crew of *Deepwater Horizon* to inject the greater amount of spacer so that it could avoid the reporting and disposal requirements of [RCRA]. By injecting all of the spacer, BP did not have to dispose of the spacer as "hazardous waste" under RCRA.

CBD UMF ¶ 16 (citations omitted).

12. While CBD is correct as to the amount of spacer that BP and Transocean used in the Macondo well, it is incorrect that BP's motive was to "avoid the reporting and disposal requirements of [RCRA]." *Id.* Not only does BP contest this alleged "fact," the record belies it. The document that CBD cites to support its speculation about BP's intentions — the 2010 testimony of a drilling engineer aboard the *Deepwater Horizon* — tells a different story. *See* Rec. Doc. 1819-3, Ex. M (testimony of Stephen Bertone) (Attached to Ex. 3 to CBD UMF). That testimony makes clear that *Horizon* crew used the 454-barrel "pill" of spacer because the only reason to choose a smaller pill was if "you don't have the fluid already ready." *Id.* at 21. Here, the full amount was already mixed and ready for use. *Id.* When pressed about the

5

inaccurate theory that BP used a large pill to avoid RCRA compliance or avoid violating its NPDES permit, Mr. Bertone appropriately noted: "I am not an environmental lawyer." *Id.* at 28.

13.  Mr. Bertone's response is instructive and points to another flaw in CBD's purported "fact" concerning the motivation for using pills of particular sizes — whether or not injecting the relevant drilling fluids would have any impact on RCRA compliance is a legal, not a factual, question.  And CBD's assumed answer to that question (*i.e.,* that disposing of spacer in the waters of the Gulf could violate RCRA) is incorrect.  As BP has explained, RCRA exempts "[d]rilling fluids . . . and other wastes associated with the exploration, development, or production of crude oil . . . ."  40 CFR § 261.4(b)(5).

14.  CBD's under-seal assertion regarding methanol is not material, even if it were true.  *First*, CBD's notice letters make no mention of methanol.  As BP has explained elsewhere, failure to comply with EPCRA's 60-day notice requirement is fatal to any claim.  *See, e.g.*, Rec. Doc. 12676-1, at 8 n.8 & 13.  Because CBD never mentioned methanol in its notice letters, it cannot now assert claims based on that chemical; any purported "facts" regarding a discharge of methanol are therefore immaterial.  *Second*, the particular methanol at issue cannot form the basis of an EPCRA claim because its use was ordered by the federal government.  *See* CBD Ex. 5 ("Each method [of potential flow containment] may involve the discharge of elevated levels of the injected chemicals, including methanol . . . .  [P]ursuant to my authority as Federal On-Scene Coordinator, I hereby permit both methods outlined in your letter request and also acknowledge that such discharges are excluded from permitting requirements pursuant to 40 CFR part 122.3(d).").  The FOSC's authorization makes any discharge of methanol a "federally permitted release" that is exempted from EPCRA reporting requirements.  42 U.S.C. § 9603(a); *see also id.* § 9603(b)(1)-(3).  Even if that were not true, BP's request was sufficient to provide the notice required in the statute.  42 U.S.C. § 9603(a) (requiring notification of the National Response Center).

Dated:  May 5, 2014

Respectfully submitted,

/s/ Don K. Haycraft

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5705
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1047
Facsimile: (212) 715-1399

Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**ATTORNEYS-IN-CHARGE FOR DEFENDANTS BP AMERICA INC.
AND BP EXPLORATION & PRODUCTION INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of May, 2014.

/s/ Don K. Haycraft
Don K. Haycraft