```
                                                              Page 1
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF LOUISIANA
 4   ---------------------------------------X
 5   In re: OIL SPILL BY THE OIL RIG
 6   "DEEPWATER HORIZON" IN THE
 7   GULF OF MEXICO, ON APRIL 20, 2010
 8
 9   Applies to:
10   12-311, Cameron Int'l Corp. v. Liberty
11   Ins. Underwriters, Inc., a/k/a Liberty
12   Int'l Underwriters
     ---------------------------------------X
13
14
15         VIDEOTAPED DEPOSITION OF ALAN MANDEL
16                   New York, New York
17                   September 12, 2013
18
19
20
21
22
23
24   Reported by:
     Bonnie Pruszynski, RMR
25   JOB NO. 65662
```

Page 54

 1                    A. Mandel

 2              THE WITNESS:  Do I answer the

 3       question?

 4              MR. DEES:  Yes.

 5       A     Okay.  So, the question is, did I

 6   know --

 7       Q     I can rephrase that.

 8       A     Sure.

 9       Q     Even though you didn't give any

10   consideration to the "other insurance" clause

11   when you sold the policy to Cameron, were you

12   not surprised -- why were you not surprised

13   that the claims people invoked the "other

14   insurance" clause to deny coverage to

15   Cameron?

16       A     Well, I don't know much about the

17   "other insurance" clause.  I just know it's

18   in every insurance contract.  It's just

19   basically underlying insurance comes into

20   play.  That's all I know about it.

21              So, I really have no idea about the

22   "other insurance" clause.  You know, I'm not

23   a claim person, so I -- I -- and I have never

24   been questioned on anything of "other

25   insurance" clause in 37 years in the

Page 55

1                 A. Mandel

2  business, so I don't -- you know.

3     Q   Did you play any role in the

4  decision to deny insurance coverage to

5  Cameron?

6     A   I have never had any claim meeting

7  with anybody in LIU under this claim, with

8  the exception when we had -- the claim came

9  in, and I was instructed to make copies of

10  the account summary, the underlying policy,

11  and the -- the binder.  The account summary,

12  the policy, and the underlying policy, the

13  three documents, that's all I was instructed

14  to do, and then that was it.

15     Q   Did you agree with the decision of

16  Liberty to deny coverage to Cameron?

17     A   I can't make an assumption or an

18  opinion, because I am not a claim person.  I

19  don't have the background to do that.

20     Q   But you would agree that the

21  Deepwater Horizon blowout is the type of

22  incident that you would have assumed would be

23  covered by the Liberty policy that you sold

24  to Cameron; correct?

25     A   It would be covered, yes.

1              A. Mandel

2    A     That's what Tony Black told me.

3    Q     And that was your understanding

4 when you issued the policies to Cameron;

5 right?

6    A     That was the only reason I had

7 issued the policy, to write the account.

8    Q     And so as a result, if Cameron

9 incurred a loss, it would look first to the

10 customer to satisfy its loss; right?

11   A     Correct.  What I was advised.

12   Q     And if the customer did not agree

13 to pay the loss under the customer contracts,

14 Liberty would be responsible for that loss,

15 correct?

16   A     That is a claim issue, so I can't

17 give you -- I can't give you a valid opinion.

18 I just don't know.

19   Q     So, if Cameron had suffered a loss

20 in connection with a blowout for which you

21 sold Cameron an insurance policy, and the

22 customer with whom Cameron had an

23 indemnifying agreement refused to pay, you

24 don't know whether Cameron had insurance?

25   A     I don't know how that would work,

1                A. Mandel

2    no.

3        Q    Would you agree that Cameron faced

4    risk -- risks that might result from a

5    massive oil spill that could put Cameron out

6    of business?

7        A    It's a possibility, depending on

8    how large the company is and how much they

9    have -- and what their other assets are.

10   There is a very big possibility due to fines.

11       Q    That's what you wrote in your

12   account summary; right?

13       A    That's because that's what I was

14   told.

15       Q    If you can turn to page seven of

16   your account summary.

17            Are you with me, sir?

18       A    Yes, I am.

19       Q    What does page seven describe?

20       A    The lead umbrella, the carrier, the

21   limits, the term, the premium, the form,

22   occurrence versus claims made, and the --

23   their conditions of the lead umbrella.

24       Q    Do you see that in describing the

25   lead umbrella policy, there is a section of

1                A. Mandel

2     A    It has nothing to do with it.

3     Q    That would be a false statement to

4  suggest that?

5     A    False, yeah.

6     Q    Would it be a false statement to

7  suggest that the "other insurance" provision

8  in a Liberty policy is a critical component

9  in underwriting policies?

10    A    False.

11    Q    Do you think that it is fair to an

12 insured to be required to go to court and

13 obtain a judgment that it is not entitled to

14 contractual indemnity before the coverage

15 that you sold to Cameron is provided under

16 the Liberty policy?

17         MR. DEES:  Object to form.

18    A    I can't -- I can't make an opinion

19 on that.  I'm not a claim person, so my -- I

20 would be guessing.  I have no idea.

21    Q    Do you agree with Liberty's

22 position in this case to deny coverage to

23 Cameron based upon the "other insurance"

24 provision?

25    A    To be perfectly honest, I have no

1                    A. Mandel

2    idea.  I have no background to know yes or

3    no.  I'm not a claim person.  I don't have

4    that background.

5        Q    Are you aware that -- withdrawn.

6             Do you know which customer of

7    Cameron's Liberty is relying on to say that

8    that customer was required to pay indemnity

9    to Cameron?

10       A    I really have no idea.  I'm not --

11   I'm not aware of that.  I don't know.

12       Q    Do you know on what basis Liberty

13   is relying on the "other insurance" provision

14   to deny coverage to Cameron?

15       A    I don't have -- I really don't

16   know -- I didn't -- I haven't had any

17   discussion with the claim department.  It's a

18   totally -- to be honest with you, I

19   haven't -- I really don't know.

20       Q    When you issued the policy to

21   Cameron, would you have found it hard to

22   believe that Liberty would rely on the "other

23   insurance" provision to deny coverage to

24   Cameron?

25            MR. DEES:  Object to the form of

1                    A. Mandel

2        the question.

3        A     If it's in the contract, then I

4   guess it's correct, if there is -- the way

5   the wording is.  I have no idea.  If it's in

6   the contract, it's a contract.  Nothing was

7   hidden.  It's right in there.

8        Q     When you issued the policy to

9   Cameron, would you have found it hard to

10  believe that Liberty would rely on the "other

11  insurance" provision to refuse to pay

12  Cameron's losses for blowouts?

13             MR. DEES:  Object to form.

14       A     That, I have no idea.  I'm not a

15  claim person.  I can't give you a basis of an

16  opinion.  I really don't know.  I would be

17  guessing.

18       Q     Have you ever discussed the Cameron

19  claim with Jim Engel?

20       A     I'm sorry, sir?

21       Q     Have you ever discussed the Cameron

22  claim with Jim Engel?

23       A     Only in passing once, when we had

24  the problems with the storm.  I asked how

25  everything was going, and he said he was