UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater* | : | MDL No. 2179 |
| *Horizon*" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: 10-4536 | : | Honorable CARL J. BARBIER |
| …………………………………………... | : | Magistrate Judge SHUSHAN |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND RESPONSES TO INTERROGATORIES**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ................................................................................................................1

1.   The Information Sought Is Relevant to the "Economic Impact of the
     Penalty" and to BP's Contention that It Plays an Important Role in the
     Economy .........................................................................................................2

     1.1   Financial Information About BPXP................................................2

     1.2   Tax Returns ....................................................................................3

     1.3   Financial Information about BPXP's Corporate Parents ...............4

     1.4   Information About Officers, Directors, and Other Key Individuals ...........6

     1.5   BP's Contentions Regarding Other Companies' Penalties .........7

2.   The United States' Requests Are Not Overbroad or Unduly Burdensome ............8

     2.1   The Requests Seek a Limited Number of Documents that Should
           be Readily Available .....................................................................9

     2.2   The United States Has Further Narrowed Its Requests Where
           Appropriate ...................................................................................10

3.   BP's Objections and Responses Have No Merit ......................................................11

     3.1   The Requests Are Not Vague or Ambiguous ...........................11

     3.2   For Some Requests, the United States Cannot Discern What BP
           Intends to Produce .......................................................................11

     3.3   BP Must State If There Are No Responsive Materials ..............12

     3.4   BP Has Waived Its Objections By Serving Boilerplate ..............13

4.   United States' Discovery of Anadarko's Board Materials is Not Unduly
     Burdensome and is Relevant to the Penalty Phase ...............................14

CONCLUSION ..............................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**STATUTES**

     Del. Code. Ann. tit. 8, § 142(a) ...............................................................................10

**FEDERAL CASES**

     *Atl. States Legal Found., Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743
     (N.D. Ind. 1992) ..............................................................................................5

     *Branhaven, LLC v. BeefTek, Inc.*, 288 F.R.D. 386 (D. Md. 2013) ....................................13

     *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148 (D.
     Idaho 2012) ....................................................................................................5

     *Jayne H. Lee, Inc. v. Flagstaff Industrial*, 173 F.R.D. 651 (D. Md.1997) .......................13

     *Mancia v. Mayflower Textile Services Co.*, 253 F.R.D. 354 (D. Md. 2008) ....................13

     *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158 (D.N.J. 1989), *rev'd
     in part on other grounds*, 913 F.2d 64 (3rd Cir. 1990).............................................3, 5

     *Rayman v. American Charter Federal Sav. & Loan Association*, 148 F.R.D. 647
     (D. Neb. 1993) ...............................................................................................12

     *Santa Monica Baykeeper v. Kramer Metals, Inc.*, No. 07-3849, 2009 U.S. Dist.
     LEXIS 69130 (C.D. Cal. Feb. 27, 2009) .................................................................3

     *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854 (S.D. Miss 1998)................2, 3

     *United States v. Mun. Auth. of Union Twp. ("Dean Dairy")*, 150 F.3d 259 (3rd
     Cir. 1998) ...................................................................................................5, 6

     *United States v. Stabl, Inc.*, No. 8:11cv274, 2012 U.S. Dist. LEXIS 160426
     (D. Ne. Nov. 8, 2012) .......................................................................................3

**FEDERAL RULES**

     Fed. R. Civ. P. 26(b)(2)(C)(iii) .............................................................................8

     Fed. R. Civ. P. 26(g) .........................................................................................13

     Fed. R. Civ. P. 30(b)(6).....................................................................................14

     Fed. R. Civ. P. 33............................................................................................8, 13

Fed. R. Civ. P. 33(a)(2) .................................................................................................8

Fed. R. Civ. P. 34 .......................................................................................................13

Fed. R. Civ. P. 37(a)(3) ...............................................................................................13

**OTHER AUTHORITIES**

8B *Charles Alan Wright, et al., Federal Practice & Procedure* § 2213
    (3d. ed. 2010) ........................................................................................................12

On April 18, 2014, the United States served its final set discovery requests, including 23 RFPs on BP Exploration and Production Inc. ("BPXP").[1] This final version followed two earlier drafts. Between the drafts and the final version, the Parties have met and conferred in person or by phone at least seven times. Despite these efforts, BP[2] has made few commitments to produce the materials requested, potentially leaving the United States and the Court with insufficient information on which to determine an appropriate penalty.

## ARGUMENT

Notwithstanding applicable case law, BP contends that BPXP is the only entity relevant to evaluating the economic impact of the penalty on the violator. There is no publicly available information regarding BPXP, however, as the facts concerning this corporate entity come to light they do not favor BP. First, the United States found a document indicating that BPXP has no employees, a fact BP did not volunteer but which it now admits. *See*, RFA No. 5. Next, preliminary meet and confer discussions brought to light that BPXP historically has not maintained its own financial statements: BP will only provide an unaudited financial statement for 2013 but prior to that can only produce "trial balances" in spreadsheet form. The United States expects to find in discovery that other BP entities have financed the clean-up and mitigation efforts, either directly or through BPXP; that prior to the Macondo Incident BPXP systematically sent dividends or other funds to its parent companies, to BP p.l.c., and/or to other BP entities; and that BP has a centralized financing operation through which funds move from entity to entity as the operating segment or global company deem appropriate. Each of these facts

---

[1] *See generally,* Exs. 1, 15, & 16. Exhibit 16 is a letter from Steve O'Rourke to Mark Nomellini dated May 13, 2014, contains the specific details on 15 of the United States' 23 RFPs to BPXP and on three interrogatories. For each RFP, it sets forth the request, BP's substantive response, and the United States' position after meet-and-confer calls and upon review of BP's final written responses.

[2] BP means the BP Group which BP defines as "BP p.l.c and its subsidiaries." See Ex. 1 to ECF No. 12355-4.

1

are recognized under applicable case law to be relevant to assessing the economic impact of the penalty on the violator, and also are relevant to many other BPXP contentions.

It is critical that the United States be permitted sufficient discovery to develop the facts. If not, when Judge Barbier is confronted with an argument that he can only consider the funds presently contained in BPXP's coffers, he may not have a full record upon which to base his decision, even if he believes a higher penalty is appropriate. Yet BP is vigorously resisting production of the most conventional financial records—records which BP insists that all claimants produce in order to document claims under BP's claims process and settlement.

1.    **The Information Sought Is Relevant to the "Economic Impact of the Penalty" and to BP's Contention that It Plays an Important Role in the Economy**

1.1    **Financial Information About BPXP**

Many of the standard accounting documents sought by the United States are directly relevant to "the economic impact of the penalty" on BPXP. *See, e.g.,* Ex. 1, RFPs 1 & 2. In fact, the types of standard financial records and timeframes that the U.S. requests in this case are the very same types of financial documents and time frames that BP demands from businesses in the BP claims program including: (1) profit and loss statements 2007 to present; (2) annual and monthly financial statements 2007 to present; and (3) federal tax returns, with attachments and schedules, 2007 through the present. *See* Ex. 9 at 13.

It would be difficult or impossible to develop an accurate financial picture of BPXP without sufficient information to evaluate BPXP's finances pre-spill, during the spill, and post-spill. In order to get a complete picture of the economic impact that a penalty might have on BPXP, the Court must consider the actions that BPXP has taken in the past to improve its finances or to divest profits, as well as its prospect for the future.

According to the court in *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854 (S.D.

Miss. 1998), the economic impact factor is not grounds for reducing a penalty unless the violator can show that the penalty would have a "ruinous effect," i.e., that it "would jeopardize defendant's continued operation." *Id.* at 868 (quoting *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1165 (D.N.J. 1989) *reversed in part on other grounds*, 913 F. 2d 64). To meaningfully apply this standard, the Court must understand the nature of the entity subject to the penalty.[3]

### 1.2    Tax Returns

Some of the standard financial business records that BP refuses to produce have been found relevant in other cases seeking to determine an appropriate penalty. For example, BP has refused to produce *any* federal tax returns. In *United States v. Stabl, Inc.*, No. 8:11CV274, 2012 U.S. Dist. Lexis 160426 (D. Ne. Nov. 8, 2012), the court ordered the production of tax returns, finding that tax return information was relevant to the penalty factors under the Clean Water Act. *Id.* at *3–4; *accord., Santa Monica Baykeeper v. Kramer Metals, Inc.*, No. 07-3849, 2009 U.S. Dist. LEXIS 69130, at *9, *16 n.2 (C.D. Cal. Feb. 27, 2009) (finding tax returns relevant to the penalty factors and concluding that "plaintiff is entitled under the liberal discovery rules to review and interpret [tax returns] themselves, not someone else's interpretation of the documents").

Tax returns are relevant and important because they are generated each year and contain information required by the tax regulations that is consistent and can be compared over time. BP recognizes the importance of a historical record of tax returns in evaluating a business claim and has stated that "reconciling information to the tax returns can provide additional assurances that

---

[3] BPXP is but one of thousands of BP p.l.c.'s subsidiaries. BP p.l.c. is a publicly traded company and publicly reports approximately $375 billion of annual revenues. The United States seeks discovery into the financial circumstances of BPXP, which are not publically reported, as well as other non-public BP affiliates in the chain of ownership between BPXP and BP p.l.c financials.

3

the fiscal year revenue and expenses are accurate." BP Resp. to Policy Announcement: Policy 495, at 4, ECF No. 12589-8. They are a valid and certified (by the company and its accountants) source of financial information. They provide other financial figures that also assist in evaluating the economic impact of the penalty on the violator, including information on the subsidiaries. Tax returns are also relevant to BP's contention that the Court should consider under the mitigation factor that BP made "substantial voluntary monetary commitments to the Gulf states that have improved public health, the environment and the economies of those states." Whether BP received tax benefits could add important perspective to those voluntary contributions.

### 1.3     Financial Information about BPXP's Corporate Parents

There should be no dispute about the relevance of financial information about BPXP's parents. BP's counsel in this matter stated to the Court, "[w]e've never said that there's no relevance to group finances." Hearing Tr., 51:10–11, Mar. 21, 2014 (Ex. 13). Judge Barbier has said, "I'm going to allow [the United States], if [it] wish[es], to get discovery from BP with respect to the relationship between the entities, between BPXP, BP America, BP p.l.c. and I guess any other entity that's in their direct line." *Id.* at 54:19–22. Yet BP has not agreed to provide the limited discovery requested of the six entities between BPXP and BP p.l.c. *See*, RFPs Nos. 1–4, 8, 10, 14, 16–17.

BP erroneously contends that the Court must focus solely on BPXP's financial condition without any evaluation of its historical and current financial resources within the massive BP p.l.c. organization to evaluate the economic impact of a civil penalty. *See, e.g,.* BPXP's Mem. Re: Scope of the CWA Penalty Phase & Related Disc. at 10, ECF No. 12340. Yet, internally, BP treats the civil penalty to be imposed by the Court as a liability of the entire BP Group, not only BPXP. For instance, in BP p.l.c.'s annual report for 2013, BP p.l.c. identifies itself as the

4

company having liability for civil penalties resulting from the Macondo Incident. *See* BP 2013 Annual Rep., ECF No. 12465-5 at 40.

Even if BP had not made discovery into other BP entities relevant through its contentions, courts have recognized that the financial resources of a parent corporation are relevant. *United States v. Mun. Auth. of Union Twp. ("Dean Dairy")*, 150 F.3d 259, 268 (3rd Cir. 1998) ("Other courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on a violator") (citing *Atl. States Legal Found., Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743, 753 (N.D. Ind. 1992); *PIRG*, 720 F. Supp. at 1166); *see also Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1170 (D. Idaho 2012) ("Cases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of a parent's assets is one factor, among many, that is appropriate in a Clean Water Act case.")

Even BPXP has cited *Dean Dairy*, to suggest that the Court should undertake a "fact-specific assessment that examined the role of the parent[s] in the operations of the subsidiary, particularly with regard to the issue of pollution of the nearby waters and actions that could have resolved it." BPXP's Opp. Pl.'s MIL Re: Evid. Concerning BP Entities at 9, ECF No. 12465. BPXP noted that the district court in *Dean Dairy* looked at the role the parent company played stating: "the court considered that (1) the parent company 'had complete control over whether and when [the violator] would achieve compliance' with its wastewater permit; and (2) the parent company 'was siphoning off profits' from its subsidiary throughout the time the subsidiary was facing wastewater problems." *Id.* However, despite this contention, BPXP is objecting on relevance grounds to discovery requests specifically targeted at the fact specific determination it contends is relevant.

The United States is entitled to discovery on BPXPs contention regarding "material transactions" and dividend payments between BPXP and its affiliates. *See* RFPs 3, 12 & 16. Here, while BPXP has asserted that it has not issued a dividend to its parents since 2010, we do not know to what extent the chain of corporate parents "was siphoning off profits" both before and after the time that BPXP should have been taking actions that would have avoided the Deepwater Horizon disaster. Many of the United States' requests seek information that will fill in these gaps. Other requests seek to establish whether BPXP is a genuinely functioning independent entity, by looking at how BPXP obtained and accounted for important services, given that it did not have any employees and did not alone bear the burden of the $46 billion in spill-related costs. *See* RFP 14.

The United States and the Court also need to understand the extent to which BPXP can draw on assets of other BP entities. BP p.l.c. announced in 2010 that it was divesting holdings from all over the world to pay for the response. *See* Exs. 6–7. BP would have the United States and the Court believe that BPXP and the other BP entities can tap into other entities' assets when it suits them, but not when the Court orders them to pay a penalty.

### 1.4    Information About Officers, Directors, and Other Key Individuals

Just as the United States has little information about the extent to which BPXP corporate parents may have been siphoning off profits, it currently has little information about the extent to which BPXP's corporate parents "had complete control over whether and when [BPXP] would achieve compliance." *Dean Dairy*, 150 F.3d at 268–69. The information sought by several of the United States' requests for production is critical to determining whether any subsidiary board members or board decisions played any role related to the Incident or Response. *See* RFPs 5–6, Interrog. 1–2. This information has also been made relevant by BP's contention that "BPXP's operations are *overseen* by a Board of six directors." *See* BPXP's Opp. Pl.'s MIL Re: Evid.

Concerning BP Entities at 4, ECF No. 12465 (emphasis added). The United States is entitled to discovery to determine the truth of that claim.[4]

Moreover, the United States seeks to know not only the identities of the present officers and directors of BPXP, but also the identities of those at the time of the Incident and the Response. *See*, RFP 7 & Interrog. 1. Although BP's American subsidiaries are required to file certain of this information with various secretaries of state, confirmation regarding the accuracy of BP's public filings is required, especially because BP admitted during the last meet and confer discussion that certain of its filings with the Delaware Secretary of State are false.[5]

BP's contentions have also made relevant the role of certain key individuals identified in the United States' requests. In response to request for admission no. 5, BPXP has admitted that "BPXP utilized personnel and resources from certain of its corporate affiliates and compensated those affiliates, although BPXP does not have its own directly payrolled employees." Ex. 2 at 46. Although the defendant has admitted that the listed individuals were not employed by BPXP, the defendant has refused to affirmatively identify which corporate entity or entities in the chain have employed these individuals. *See* RFP 2. It is critical to know which legal entity employed these key individuals to show the role that various legal entities in the corporate chain have played in the operations of BPXP.

### 1.5    BP's Contentions Regarding Other Companies' Penalties

BP contends that its penalty in this case should be compared to Clean Water Act penalties in other cases. *See* Ex. 10 at 14 ("Justice requires that a penalty here be compared to and

---

[4] In contrast to the idea of board members passively overseeing operations, previously produced minutes from the BP p.l.c. board of directors and the Safety, Ethics and Environment Assurance Committee ("SEEAC") show substantial involvement of the BP p.l.c. board in the management and funding of the Incident and Response. *See* Exs. 4–5.

[5] While BP has contended that BPXP has six members of its board of directors, BPXP's filings with the Delaware Secretary of State consistently state, under penalty of perjury, that BPXP has only three members on its board of directors. *See* Ex. 8.

calibrated with penalties sought and obtained against other companies, both in relation to this case and other environmental incidents.") Interrogatory no. 6 asks which other cases should be compared. In its response, BP failed to identify the specific penalties for other environmental incidents to which it contends the Macondo penalty should be compared. Rule 33 permits interrogatories that ask "for an opinion or contention that relates to fact or the application of law to fact." Fed. R. Civ. P. 33(a)(2). The advisory committee's note only excludes those interrogatories which "extend to issues of 'pure law,' i.e., legal issues unrelated to the facts of the case." Fed. R. Civ. P. 33 advisory committee's note (1970). Contention interrogatories "can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery." *Id.* Interrogatory no. 6 asks for the specific facts that BP intends to rely upon in support of its assertion. Furthermore, interrogatory no. 6 was calculated to narrow the issues under dispute. Lacking information about the specific penalties that BP contends are comparable, the United States must prepare a defense considering all penalties imposed in prior environmental incidents, a universe of thousands of cases. Interrogatory no. 6 is a request for information analogous to the information that the United States provided when it narrowed thousands of potential prior violations down to only four.

**2.      The United States' Requests Are Not Overbroad or Unduly Burdensome**

Discovery requests must be proportional to "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). The United States' requests meet this standard because they are minimal. BP, however, has not provided any information that indicates the burden of responding to the requests. It rests instead on the argument that the United States' theory of the case is wrong, and therefore the United States' requests are irrelevant. In other words, BP makes no burden argument at all.

BP itself has taken the position that producing documents such as those sought by the United States is not unduly burdensome. As discussed above, BP asks claimants to submit many of the types of documents that the United States is seeking. BP writes:

> It is not a burden for a claimant seeking a substantial recovery to have to support its claim with underlying documentation. And . . . if a claimant lacks the required substantiating records, then the claimant cannot recover. That result is not unfair, as otherwise, the claimant would be seeking an award based upon gross and unreasonable guesswork at best, or fraud at worst, when making claims.

BP Resp. to Policy Announcement: Policy 495, ECF No. 12589-15 at 13. Without the documents sought by the United States' requests for production, the United States and the Court would similarly have to base the civil penalty on "gross and unreasonable guesswork at best." The result should be the same for BP as it is for business claimants, if BP "lacks the required substantiating records" it should not obtain a reduction in its penalty on account of its alleged financial circumstances.

## 2.1    The Requests Seek a Limited Number of Documents that Should be Readily Available

Most of the United States' RFPs seek such a small number of documents that BP cannot reasonably assert any argument about undue burden. For example:

- BP advised that the tax returns sought by RFP no. 2 are filed by BP America Inc., so BP presumably has one document per year (including attachments with subsidiary worksheets and consolidating accounting) for a total of 10 documents;

- the documentation regarding material entity transactions sought by RFP no. 3 likely includes 5–10 documents that reflect BP's policies and practices, a general ledger for BPXP for each of 10 years, and three service agreements, for a total of 17–22 documents; and

- The financial projections sought by RFP 4 could be contained in a single document, or

could be contained in one document for each of the six entities.
The United States estimates that only a few requests would require more than 500 documents.

Many of the documents sought, such as tax returns, general ledgers, and board of director and corporate officer resolutions and decisions, are standard corporate records and should be accessible in corporate files.[6] Those files may even be co-located, since many of the directors of BPXP are also directors of BPAPC, BP Company North America, Inc., or BP America Inc., who are all listed as having their business address at 501 Westlake Park Boulevard, Houston, Texas. *See* App. A (showing business addresses).

### 2.2    The United States Has Further Narrowed Its Requests Where Appropriate

The United States has made a number of other offers in an attempt to minimize the burden on BP. *See* Ex. 16. For example in response to RFP 1, the United States offered to accept unaudited financial statements, if BP would verify that no audited financial statements exist. *Id.* Through the meet and confer process, the United States has cut the scope of its requests , so that they seek only the bare minimum amount of information necessary to evaluate the Parties' claims and defenses. Without all of the information sought by the discovery requests at issue in this motion, the United States may be unable to fairly build its case and respond to BP's contentions.[7]

---

[6] Under Section 142(a) of the General Corporation Law of the State of Delaware, as a Delaware corporation, BPXP has "the duty to record the proceedings of the meetings of the stockholders and directors in a book to be kept for the purpose." Del. Code Ann. tit. 8, § 142(a).

[7] For example, in response to RFP 6, the United States' had initially sought "all meeting minutes, notes, resolutions, policies, procedures, directives, and decisions for each year, 2005 to present" for eight entities. However, after a meet and confer between the parties on April 16, the United States significantly narrowed the documents sought, deleting "minutes, notes, . . . policies, procedures, directives" from the request, limiting the starting period to 2008 not 2005, and seeking documents from six not eight entities. The defendant's offer to "search for BPXP resolutions for the time period from 2009 to the present" is inadequate.  *See* Ex. 15 at 5.  BPXP should be required to produce the requested board, committee, and officer meeting resolutions and decisions from 2008 to the present for the six entities so that the United

### 3.     BP's Objections and Responses Have No Merit

### 3.1     The Requests Are Not Vague or Ambiguous

BP makes unfair objections to several requests on the grounds that certain terms are vague and ambiguous. For example, in response to RFP 16, BP states that "Material Transactions" is vague and ambiguous. BP, however, used the same terms in its initial disclosures, identifying "material transaction documents" as among those it may use in support of its claims and defenses. *See* Ex. 12 at 11. BP uses those terms because they are standard accounting concepts that companies routinely deal with in financial statements and public disclosures. To the extent BP is uncertain what the United States means by "material," BP should have responded using the same definition it used to put together its initial disclosures.

### 3.2     For Some Requests, the United States Cannot Discern What BP Intends to Produce

BP states that it will produce documents "sufficient to summarize" certain things, such as "policies relating to the pricing of intra-Group debt." To summarize means to leave out details, but the United States cannot discern from the response what information BP will produce and what it will leave out. For a number of RFPs, BP has not described the categories of accounting records or other documents it will produce, and the United States is being asked to accept that BP will produce the documents it chooses to produce and withhold the documents it chooses to withhold, so long as the disclosed documents provide a sufficient summary. If BP does not wish to fully respond to the request, it should propose a concrete alternative that does not give it *carte blanche* to withhold materials.

BP responded that it will conduct a reasonable search for other documents supporting its contentions under the "any other matters" factor. It is important that this search be targeted to

States can evaluate the role that their subsidiaries played, if any, in the operation of the GOM SPU, particularly regarding the Macondo Incident and Response.

identify documents supporting BPXP's economic role contention. At the very least, documents supporting BPXP's proposed stipulations on its positive economic impact, *see* Ex. 10 at 11–12, must be produced including documents to establish capital expenditures and wages paid from 2008 to 2013. Documents supporting these proposed stipulations have not yet been provided to the United States. In addition, any other BPXP financial data related to BPXP's economic role must be produced to the United States in response to RFP 21. These data could include the number of jobs supported by BPXP. These are factual documents solely within the custody and control of BP.

### 3.3    BP Must State If There Are No Responsive Materials

If there are no materials responsive to United States' requests, BP should clearly indicate that fact in its response to the requests for production. *See* Charles Alan Wright, et al., 8B Fed. Prac. & Proc. Civ. § 2213 (3d ed. 2010); *accord*, *Rayman v. Am. Charter Fed. Sav. & Loan Ass'n*, 148 F.R.D. 647, 651 (D. Neb. 1993) (finding that a statement in a response brief that all responsive documents have already been produced is "insufficient to satisfy the rule"). This is important because for many of the documents sought by the United States, such as the consolidating financial statements, the fact that they do not exist could have as much evidentiary value as the documents themselves. For example, if BP were to state in its response to the requests for production that there are no financial statements for BPXP, the United States might use that information to show that the distinction between BPXP and its affiliates is not one that BP honors, and therefore should not be one that binds the Court in assessing a penalty.[8]

---

[8] In a recent letter, BP's counsel notes that, "there may be certain periods and entities for which the requested materials do not exist . . . financial reports for BP America Production Company have not been prepared to date for 2012 or 2013 . . . Based on our reasonable inquiry, we understand that separate BP Company North America Inc. financial reports or statements have not been and are not currently prepared. Ex. 15 at 3.

### 3.4     BP Has Waived Its Objections By Serving Boilerplate

BP objects to the United States' discovery requests "reflexively—but not reflectively—and without a factual basis." *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 358 (D. Md. 2008). BP objects to nearly every RFP "on the grounds that [the request] is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence." Def.'s Resp. to RFPs.[9] This objection is boilerplate, and is nearly verbatim to the objection that the *Mancia* court identified as such, writing that such boilerplate persists "despite a litany of decisions from courts, including this one, that such objections are improper unless based on particularized facts." *Id.* at 358–59 (citing cases). As the *Mancia* court pointed out, "both Rule 33 and 34 responses must state objections with particularity, on pain of waiver." *Id.* at 359.

Even if BP's objections are not invalid on their face, BP's failure to come forward with particularized facts to support its objections, and to provide a reasonable alternative production, will waive BP's objections. *Jayne H. Lee, Inc. v. Flagstaff Indus.*, 173 F.R.D. 651, 656 (D. Md. 1997) ("Fed. R. Civ. P. 37(a)(3) provides that an evasive or incomplete answer or response to a discovery request, including a request for production of documents, 'is to be treated as a failure to disclose, answer, or respond.'") BP was obligated to engage in a reasonable inquiry before making its objections to the United States' requests for production. *See Branhaven, LLC v. BeefTek, Inc.,* 288 F.R.D. 386, 388–389 (D. Md. 2013) ("The Advisory Notes to Rule 26(g) provide that 'the signature certifies that the lawyer has made a reasonable effort to assure that the client *has provided* all the information and documents available to him that are responsive to the discovery demand.'") Yet BP's boilerplate responses and vague promises that it "will conduct a reasonable search" provides the United States and the Court with no information about what BP

---

[9] For some requests, such as RFP 12, BP makes no other objection.

will produce and, in light of the small number of easily identifiable documents sought by some

of the United States' requests, indicates that BP has not conducted a reasonable inquiry into the

materials that might be responsive to the United States' requests.

**4.      United States' Discovery of Anadarko's Board Materials is Not Unduly Burdensome and is Relevant to the Penalty Phase**

Anadarko has provided an inadequate response to the United States' request for certain

corporate resolutions and decisions for 2008–14. *See*, Ex. 3, APC Resp. to RFP 10. The United

States offered to narrow the request to seek only those Board materials that relate to BP or to

four topics Anadarko identified in its disclosures in connection with the penalty factor "any other

matters that justice may require." [10] Anadarko has not responded to this narrowed proposal

although it recently indicated it may be formulate a counter-offer. Anadarko indicated that it will

designate a vice-president, Darrell Hollek, to be its 30(b)(6) representative on corporate and

management issues, as well as mitigation efforts. The United States should have access to board

documents that may bear on Mr. Hollek's testimony. This production is warranted given

Anadarko's responses with respect to its contentions regarding the "other matters factor." *See*,

Ex. 3, APC Resp. to RFP 11. Anadarko has indicated that these topics generally will be

presented in the form of expert testimony, and has offered to produce only very limited

information at this stage. The United States should have access to information in Anadarko's

---

[10] In an email to Anadarko counsel dated April 23, 2014, the United States offered to revise the request for production as follows:  "Provide all Anadarko Petroleum Corporation Board of Director and Board of Director committee and officer meeting resolutions and decisions for each year 2008-2104 that describe, discuss, refer or relate to (1) BP as defined herein (i.e. any BP entity); or (2) Anadarko's investment in oil and gas production in the United States; or (3) operators and non-operators; or (4) oil and gas industry customs, practices, contractual relationships, and responsibilities between operators and non-operators; or (5) the impact of civil penalties on non-operating participating parties." Ex. 14. Subtopics (2)-(5) relate to topics listed in Anadarko's March 3, 2014 submission to the Court. *Id.* Despite Judge Barbier's ruling excluding evidence of Anadarko's culpability from this phase, see Hearing Tr., 43–45, Mar. 21, 2014 (Ex. 13), and Anadarko's representation that certain topics in its list of "other matters" were merely placeholders and would be removed following the ruling, *id.* at 36-37, Anadarko maintains that it may produce expert testimony on these topics, see Ex. 3, Resp. to RFP 11, at 35-36.

Board materials that may contradict any expert testimony it offers.

## CONCLUSION

For the foregoing reasons, the Court should enter the proposed order filed herewith.

Respectfully Submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys


R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
SARAH HIMMELHOCH
MICHAEL MCNULTY
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
RICHARD GLADSTEIN
PATRICK CASEY
Senior Counsel
A. NATHANIEL CHAKERES
JUDY HARVEY
RACHEL KING
ERICA PENCAK
ABIGAIL ANDRE
RACHEL HANKEY
BRANDON ROBERS
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130

15

Telephone: (504) 680-3000
Facsimile: (504) 680-3184
E-mail: sharon.d.smith@usdoj.gov