# Exhibit 4

**Minutes of a meeting of the Board of Directors of**
**BP p.l.c.**
**Held on 20th June 2010**
**at 1 St James's Square, London SW1Y 4PD**

| | | | | | |
|---|---|---|---|---|---|
| **Present** | Mr. C-H. Svanberg | Chairman | Mr. I. E. L. Davis | | |
| | Dr. A. B. Hayward | | Mr. R. W. Dudley* | | |
| | Mr. P. M. Anderson | | Mr. D. J. Flint* | | |
| | Mr. A. Burgmans | | Dr. B. E. Grote | | |
| | Mrs. C. B. Carroll | | Mr. A. G. Inglis** | | |
| | Sir William Castell | | Dr. D.S. Julius | | |
| | Mr. I. C. Conn | | | | |
| **And** | Mr. D.J. Jackson | Secretary | | | |
| **In attendance** | Mr. R. Bondy | | Mr. S. Robey | Morgan Stanley | Items 80 & 81 |
| | Mr. L. McKay* | | Mr. F. McLeod | | Items 80 & 81 |
| | Mr. D. J. Pearl | | Mr. M. Bly | | Item 82 |
| | | | Mr. S. Westwell | | Item 84 |
| **Apologies** | Mr. G.A. David | | | | |

* by audioconference
** by videoconference

79. **Introduction**

The Chairman outlined the scope of the agenda, noting that it would encompass an update on funding and liquidity, a progress report on Mr. Bly's investigation, PRIVILEGED PRIVILEGED and an initial discussion of the strategic consequences of the Gulf of Mexico incident. He stressed the importance of the Board remaining well briefed when new information becomes available.

80. **Group Funding and Liquidity**

NON RESPONSIVE

81. **Market Reflections**




82. **Investigation Update**

Dr Hayward noted that Mr. Bly's investigation was being conducted independently of executive management and he had open access to all BP information. He had not been granted open access by Transocean or Halliburton to information held by them. Mr. Bly confirmed that his investigation sought to identify the critical factors leading to the fire and explosion on the Deepwater Horizon, it did not seek to address systemic root causes or the spill response. He referred to four critical factors – loss of casing integrity, loss of well hydrostatic control, failure of the BOP and emergency systems to isolate the hydrocarbon source and ignition of the hydrocarbons. He discussed the completion status of his investigations into each critical factor. He noted that he planned to generate an interim report once further testimonies became available from the Marine Board investigation hearings in July.

Mr. Bly reviewed each critical factor (CF) using slides to illustrate the possible immediate causes. For CF1, the loss of integrity of the $9\frac{7}{8}$" x 7" casing, he noted that the most likely scenario at this stage of his investigation was that the annular cement failed and that a leak path existed either through the shoe track or seal assembly. He noted that some information regarding the cementing work was not available to his investigation. Regarding CF2, the loss of well hydrostatic control, Mr. Bly advised that based on analysis

of available data the most likely immediate causes were misinterpretation of the integrity test, failure to recognise well flowing conditions, and the timing and sequence of activation of the blow-out preventer. Mr. Bly then discussed CF4, the ignition of the released hydrocarbon, noting that flow modelling suggested that the surface equipment was overwhelmed by the hydrocarbon flow resulting in multiple potential release points. This modelling indicated that a hydrocarbon plume would have developed with access to multiple possible ignition sources outside the rig's electrically classified areas. Finally Mr. Bly discussed CF3, the failure of the BOP and emergency systems to isolate the hydrocarbon source. He reviewed possible causes including the shear rams' failure to function correctly. It was noted that further information would be available if the BOP can be recovered from the sea floor after the well is closed.

Mr. Inglis noted that additional testing was being conducted on BOPs across the company's drilling operations worldwide.

The Chairman noted that Mr. Bly's interim report was expected to be available to the Board towards the end of July.

83. **Legal Processes**




84. **Strategic Consequences**

NON RESPONSIVE

85. **Operational Update**

Mr. Inglis reported that the Q4000 was now collecting oil and gas via the kill line and in total ca 25,000 b/d of oil was being recovered or flared. He noted that the next step of connecting a permanent riser to the choke line was progressing but may be delayed by bad weather expected in the week ahead. He also advised that relief wells were going well but significant work remained to be completed.

86. **Any Other Business**

Sir William noted that an additional briefing for the SEEAC Chairman from Mr. Viles and Mr. Baxter had been arranged and would be reported to the July Committee. He also noted that SEEAC would co-ordinate its activities with the Gulf of Mexico Committee which the Board was establishing. He noted that there had been a contractor fatality at Rotterdam refinery and this would be reviewed at the next SEEAC meeting.

Mr. Flint noted that a special Audit Committee meeting had been arranged to consider preparations for the half-year report and in particular the representation of matters relating to the Gulf of Mexico incident.

CHAIRMAN

**Minutes of a meeting of the Board of Directors of**
**BP p.l.c.**
**Held on 22nd July 2010**
**at 1 St James's Square, London SW1Y 4PD**

| | | | | | |
|---|---|---|---|---|---|
| **Present** | Mr. C-H. Svanberg | Chairman | Mr. I. E. L. Davis | | |
| | Dr. A .B. Hayward | | Mr. R.W. Dudley | | |
| | Mr. P. M. Anderson | | Mr. D. J. Flint | | |
| | Mr. A. Burgmans | | Dr. B. E. Grote | | |
| | Sir William Castell | | Mr. A. G. Inglis | | |
| | Mr. I. C. Conn | | Dr. D.S. Julius | | |
| | Mr. G.A. David | | | | |
| **And** | Mr. D.J. Jackson | Secretary | | | |
| **In attendance** | Mr. R. Bondy | | Ms. K. Campbell | (S&C) | Item 100 |
| | Mr. D.J. Pearl | | Mr. A. Wilson | (E&Y) | Item 100 |
| | Mr. C. Proctor | | Mr. M. Rawlinson | Freshfields | Item 100 |
| | Mr. B. Gilvary | Item 100 | Mr. J. Long | Freshfields | Item 100 |
| | Mr. F. Macleod | Item 100 | Mr. M. Bly | | Item 101 |
| | Mr. R. Harrington | Item 100 | Mr. S. Westwell | | Items 102 & 108 |
| | Mr. B. Puffer | Item 100 | | | |
| **Apologies** | Mrs. C. B. Carroll | | | | |

98. **Group Chief Executive's Review, Executive Directors' and Legal**

Gulf of Mexico Update

Mr. Inglis advised that since the last Board meeting the top flange on the LMRP had been successfully removed and a capping stack installed. The pressure inside the shut in well had reached ca 6850 psi which indicated good casing integrity. After extensive seismic had been undertaken to check for any sub surface leakage, government scientists confirmed that the cap should remain in place and hence no further oil should escape into the Gulf waters. Mr. Inglis noted that careful monitoring of the well would continue.

Mr. Inglis advised that the first relief well was now close to its target but that prior to completion it was now proposed to proceed with a 'static kill'. In this technique heavy drilling mud would be pumped down the capped well. This would stabilise the well before it is intersected by the relief well. Mr. Inglis noted that a tropical storm was developing in the Gulf and it was probable that equipment would need to be moved offsite until it had passed. He noted that a fine weather window of ten days was required to complete the 9⅞" casing in the relief well before attempting the 'static kill'.

Mr. Dudley noted that following the capping of the well the incidence of oil on the beaches was reduced and the number of personnel involved in clean-up operations

was being reduced from 46,000 to 41,000. The company however remained fully committed to continuing the clean-up for as long as necessary. Mr. Dudley described progress in establishing the $20 bn escrow fund, the claims administration arrangements with Mr. Feinberg and the $100 m relief fund for offshore workers. He also reviewed relationships with State Governors and local communities in the Gulf region. He noted that as temporary employment related to the oil spill declines, re-deployment could become an issue. Re-opening of fishing grounds will be an important factor but this will be for the US Federal Government to determine.

NON RESPONSIVE
NON RESPONSIVE
PRIVILEGED

PRIVILEGED

99. **Reports from Committees**

Audit Committee

Mr. Flint noted that the Audit Committee had met four times since its last report to the Board. Two of those meetings had been added to the planned schedule in order to address preparatory work for the Q2 results, notably the provisioning for the Gulf of Mexico incident.

Mr. Flint described the principal agenda items reviewed at the Committee's 20th May meeting. The review of IT with Mr Deasy had highlighted work on digital security, including user access controls, the progress in migrating key systems from the Tulsa Data Centre and the contribution of IT&S in supporting the response to the Gulf of Mexico incident. The Committee also reviewed the recent expansion of regional Business Service Centres noting that standardisation and improvements in business processes were key objectives, not just reduced costs. Mr. Flint also reported that one item of group significance, irregular cost forecasting from the Whiting refinery modernisation project, had been noted in the quarterly report from Internal Audit, and that progress in enhancing spreadsheet controls was on plan.

Mr. Flint also reviewed the items addressed at the Committee's 21st July meeting which had been held at IST's London office. He noted that the Committee had received assurance on the control environment in IST and the resilience of its contingency planning to address risks consequent upon the Gulf of Mexico incident, notably re-ratings by debt rating agencies. The meeting had also reviewed the changes made by the General Auditor to his audit programme for 2010 in the light of the Gulf of Mexico incident. The Committee had been advised by the General Auditor that he had sufficient resources available to resource the programme.

Special Committee

NON RESPONSIVE

Safety, Ethics and Environment Assurance Committee

Sir William reported that at the Committee's meeting on 21st July it had reviewed recent safety and operational integrity performance with Dr. Hayward and Mr. Baxter. He noted that injury and fatality statistics were continuing to show improving trends. NON RESPONSIVE NON RESPONSIVE NON RESPONSIVE A presentation had been made by Mr. Overton on the development of industry standard leading and lagging process safety metrics. He also noted that the trend in overdue plant inspections had continued and showed a very substantial improvement.




Sir William reported that the Committee had received a presentation on the work of E&P's Drilling Rig audit function. Its activities had been consistent with industry practice but consideration was being given to expanding its scope and specific skill base. It was also intended to integrate its activities into the S&O audit function later this year. The Committee noted that the Deepwater Horizon rig had been audited in 2009 and that audit findings would have been addressed early in 2010.

Sir William also reported that Mr. Inglis and Ms Yilmaz had reviewed with the Committee the early actions taken by Drilling & Completions in response to the initial focus areas identified by Mr. Bly in his investigations.

Gulf of Mexico Committee

Mr. Davis noted that the Committee's next meeting was on 10th August in New York would focus on legal matters and Government relations.

100. **Half Year Results Preview**

NON RESPONSIVE

101. **Deepwater Horizon Investigation Update**

Mr. Bly updated the Board on the progress of his investigation. He advised that potential problems with the cementing work in the well had been identified and additional external expertise had been engaged to conduct tests of representative cement samples. He also referred to electrical defects found in the Blow Out Preventer control pods and an analysis of hydraulic leaks that was continuing. Finally he noted that a peer review of activities on the rig during the last thirty minutes before the hydrocarbon release indicated that actions taken by the drill crew were inconsistent with the recognition of a well control situation.

Mr. Bly discussed his initial thoughts on recommendations that might be made on completion of his investigation. He noted a number of items related to the oversight of rig contractors and service providers. These included verifying the completion of hazardous vent studies on all rigs, HAZOP reviews and testing, maintenance and

management of change for Blow Out Preventers (BOPs). He noted that establishing a centralized oversight capability for BOPs and BOP systems provided by drilling contractors, codifying minimum proficiency standards for drilling contractors, strengthening rig auditing and enhancing quality controls on cementing services were all expected to be recommended in his final report.

Mr Bly also discussed recommendations for Drilling and Completions (D&C) in the areas of OMS standards and conformance. He commented on strengthening relevant ETPs and DWOP, accelerating the D&C competency programme and establishing leading indicators for well integrity, well control and rig safety critical equipment. Mr. Bly also commented that he was giving initial thought to a longer term recommendation at the industry level that a layer of protection and reliability analysis be completed in respect of deepwater drilling rigs.

Mr. Bly advised that his team expected to complete its work during August and that his report should be available for dissemination shortly thereafter.

102. **Communications Strategy**

Mr. Conn introduced his paper and outlined the core set of messages contained in the Group Communications Plan. He noted that the three key themes were BP's response to the Gulf of Mexico incident, its current strength and embedded values, and its emergence in the longer term as a stronger and better Company.

Mr. Conn discussed the execution of the communications plan noting that it would be centrally driven but with the agility in the US to respond rapidly to events. He advised that daily meetings will be held to ensure consistent messaging.

Mr. Conn described key success factors, referring to aligned messaging, appropriate resourcing, agility and thinking ahead.

Dr. Hayward noted that accurate feedback would be required on how the Company's messages were being received. Mr. Dudley noted that current polling indicated some variation in perceptions between different audience groups. Mr. Dudley reviewed a selection of television advertisements that had been aired in the US covering BP's role in response to the Gulf of Mexico incident and its oil spill clean-up activities. He noted that considerable communications effort will be required going forward to support the retention of the Company's 'licence to operate' in the US.

103 **Any Other Business**

PRIVILEGED

The Chairman noted that a revised schedule of Board and Committee meetings had been developed for the balance of 2010.

104. **Minutes**

The Board approved the minutes held on 15th April, 4th, 12th, 19th and 29th May, 3rd, 9th, 14th, 15th, 16th, 20th and 30th June 2010 with the addition of minor amendments to minutes 67, 70 and 85. The Board noted the minutes of the Audit

Committee Meetings held on 20th March, 24th June and 7th July 2010, the minutes of the Safety, Ethics & Environment Assurance Committee held on 20th May 2010.

105. **Directors Conflicts**

NON RESPONSIVE

106. **Derivative Actions**

PRIVILEGED

107 **Resource Commitment Meeting Minutes**

NON RESPONSIVE

108. **Seal Register**

NON RESPONSIVE

CHAIRMAN