# Exhibit 16



**U.S. Department of Justice**
Environment and Natural Resources Division
Environmental Enforcement Section

90-5-1-1-10026

*Steven O'Rourke*  *Telephone (202) 514-2779*
*U.S. Mail:  P.O. Box 7611, Washington, DC  20044-7611*  *Facsimile (202) 514-2583*
*Overnight Mail:   601 D Street N.W., Washington, DC, 20004*
*E-mail: steve.o'rourke@usdoj.gov*

May 13, 2014

<u>Via E-Mail</u>
Mark J. Nomellini
Kirkland & Ellis LLP
300 North LSalle
Chicago, Illinois  60654

Re:   *MDL 2179 - 10-4536 Penalty Phase Preparation.*

Dear Mark:

Thank you for your May 6, 2014 letter following up on the telephonic meet and confers on April 23 and April 25, 2014.  We appreciated talking with you in a further effort to resolve remaining issues on May 8.  However, as indicated below, while the parties have made some significant progress related to the production, we have reached an impasse on a number of items that are critical to both our own and BPXPs contentions in the penalty phase.

As an initial matter, the United States strongly disagrees with your characterization of the United States' requests for discovery as overbroad and outside the scope of discovery ordered by Judge Barbier.  You have indicated that the United States' changes to its discovery requests after Judge Barbier's ruling are "minor."  We disagree, as the requests have been altered to specifically target discovery into the relationship between BPXP and its parent companies, as Judge Barbier ordered.  Additionally, the requests seek information on matters which BPXP has itself asserted are relevant to penalty phase determinations or it intends to introduce.  The United States is entitled to conduct discovery relevant to BPXP's contentions.

With respect to a number of requests, BPXP has claimed that the requests are burdensome, but provided no information on how this is true or how the requests can be narrowed.  Such requests ask for financial and corporate information that is required to be maintained by corporate entities and easily accessible for production.  BPXP often objects, for example, to the number of years in a request, even though the years requested are specifically relevant to the issues in the penalty phase.  BPXP has not explained how producing additional years of documents creates any excessive burden given the likely organization of these documents.

We have reviewed the production from BPXP on April 24, comprised of approximately 1,800 pages of documents (1500 pages of which are reports from BP plc which the United States had not requested because they are publicly available), and agreed to compromise where

1

possible. We appreciate the effort to help narrow disputes by producing these in advance. We detail our position on the requests to be resolved below.

Request No. 1: This request seeks financial statements for BPXP and six of its parent companies for 2005-2014.

U.S. Position: This RFP for consolidating financial statements[1] is one of the important standard financial accounting records for assessing the economic impact of the penalty on the violator. These statements contain in succinct, readily accessible, summary document extensive information concerning the finances of the company. Preparing annual financial statements for a company is standard practice, and compilation of a subsidiary's financial data is essential to the financial reporting for the ultimate parent. Production of the consolidating financial statements was requested to minimize the scope of the financial requests by obtaining a comprehensive accounting record. And, as endorsed by Judge Barbier, RFP # 1 seeks only information concerning the BP entities in the line of ownership.[2]

Moreover, BP offers the same universe of documents that it lists in its Response to RFP # 1 in response to multiple RFPs, so full production under this RFP assumes even greater importance.[3] BP has produced an unaudited consolidated financial statement for BPXP only for fiscal year 2013. The level of detail in the document is the level that the United States seeks in this request. Overall, however, BP's response is deficient in the following critical respects:

1) *Time frame*: Several years of data pre-dating the Incident are necessary to fully evaluate economic trends independent of the effects of the spill, to understand how the profits of the business were used pre-spill, and to understand the company's normal operations. Post-spill accounting records are necessary to understand how the Macondo Incident costs were handled within the relevant BP entities. BP, however, has only agreed to produce 2013-2014 unaudited data for BPXP (quarterly financial reports and related spreadsheet documentation). BP further will produce "Excel spreadsheets containing the BPXP trial balances for the time period 2009 to 2013" but the quality and level of detail of those spreadsheets is unknown. For the other requested entities BP has only agreed to produce "recent" financial statements from 2012 or 2013, and not all quarters in each year, for four other entities. For BP Company North America Inc. BP has stated that financial statements or reports do not exist and has proposed no other documents be provided.

2) *Deficient data re: other entities*: BP is providing financial statements for only five of the six entities in the RFP, and none of these include the entire requested time period. Indeed, for BPAP for example only two quarters of one year are being provided. (Production of reports from BP p.l.c. adds little value since the United States has that publicly available information and

---

[1] A financial statement is comprised of the company's balance sheet, income statement, and statement of cash flows. A *consolidating* financial statement is the information for the relevant entities prior to the consolidation of the data, before the pluses and minuses are cancelled out.
[2] THE COURT: I am going to rule in your favor to the extent that I'm going to allow you, if you wish, to get discovery from BP with respect to the relationship between the entities, between BPXP, BP American, BP p.l.c. and I guess any other entity that's in their direct line. *See*, Status Conference Transcript at 54 (March 21, 2014).
[3] See, BP's responses to RFP Nos. 1, 2, 4 and 13.

2

BP contends the focus must be on BPXP.)  For the reasons set forth in the Memorandum in Support and in the US Motion *in Limine* Regarding Corporate Affiliates, it is important to the United States' theory under this penalty factor to obtain financial data for the entire relevant time period concerning the other BP companies in the line of ownership.  Such information will reveal, for example, the source of the funds used to kill the Macondo Well and in the Response; the source of the funds BPXP used to pay spill related claims and expenses; payment of dividends not only by BPXP but the other entities to BP p.l.c.; frequency and movement of funds throughout the various affiliates in loans, equity injections and service agreements, asset sales, evaluation of the pre-spill capitalization of each entity, and so forth.  Each tier in the line of ownership is important to understanding the source and use of funds related to the Incident as well as the interrelationships of the various entities.  The United States requested that BP explain why it contends that it only needs to provide financial statements from three entities but received no information or explanation.

3) *Quality and completeness of the financial statements:* Despite BP's insistence that Judge Barbier only consider the economic impact of the penalty on BPXP, BPXP and many of its parent companies apparently did not maintain separate financial statements for the corporation until commencement of the penalty phase of the litigation last year.  The United States has expressed to BP that it will accept unaudited financial statements but only with appropriate written verification on behalf of BP that no audited statements exist.  Similarly, it will work with the proposed "Excel spreadsheets containing the BPXP trial balances," but again, only for 2005 forward and with an appropriate BP written verification that no alternative BPXP accounting records exist and that these documents are an accurate representation of the data in BPXP accounting system.

BP has stated it is unable to locate a single spreadsheet with consolidating financial statement information for all of the non-BPXP entities in the request (although BP has not stated what consolidating information otherwise exists), so the United States has agreed that the financial statements themselves will suffice. The requested accounting records should be readily available for all the requested entities, since the overall BP accounting process results in an audited financial report for BPCNA, BP America, and ultimately BP p.l.c. for which these documents are necessary.

BP should produce the financial statements at the subsidiary level for BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., and BP Holdings North America for each year 2005-2014, and if such statements do not exist, the financial data that does exist. If the documents do not exist, and their absence is the underlying reason for BP's objections to these standard accounting documents, BP should be required to advise the United States and the Court that the documents do not exist, specify the entities that do not have them and the years for which they were not maintained, and provide an appropriate written verification to that effect.

Request No.2: This request seeks tax returns for the years 2005-2014.  BPXP has objected to this request as burdensome, and has pointed to its response to RFP#1.

3

U.S. Position: This RFP seeks federal tax returns and supporting worksheets. BP has refused to produce *any* tax returns at all and instead merely repeats its offer of the litany of documents discussed above. Tax returns are standard information sought in almost any arms-length evaluation of ability to pay, both by the government in environmental litigation and by BP in its claims process.

A tax return poses minimal burden on BP to produce, since it is a discrete document with attachments and consolidating worksheets that undoubtedly is maintained in the files of both BP and its accountants for some period of time, probably in an electronic format. BP stated that all US entities are consolidated into the BP America Inc. tax return filed on behalf of all US entities so that a single entity's tax returns would satisfy this RFP. While the financial statements in RFP #1 are key to the Plaintiffs' financial analysis, tax returns provide contemporaneous and reliable information that provides assurances that the financial information is accurate. Even assuming full production of the financial statements in RFP # 1, tax returns are still relevant and important for the following reasons:

- They were generated shortly after the year in question and had to contain certain information required by the tax regulations that is consistent and can be compared over time;

- They provide a valid and certified (by the company and its accountants) source of financial information, unlike the potentially manipulated and unaudited "Excel spreadsheets containing the BPXP trial balances for the time period 2009 to 2013" that BP is now offering;

- They provide other financial figures that also assist in evaluating the economic impact of the penalty on the violator, including information on the subsidiaries;

- They will reflect which BP entities received tax benefits associated with the Macondo Incident;

- They are the best and most comprehensive source of information regarding the tax treatment of BP's expenditures in response to the Incident; and

- They provide reliable information to reconcile the financial statements.

With respect to this latter point, BP indicated in its March 3, 2014 submission to the Court that it will contend that the Court should consider under the final penalty factor (and as part of the mitigation factor) that BP made "substantial voluntary monetary commitments" to the Gulf states that have improved public health, the environment and the economies of those states." In its Response to the US Interrogatory No. 3 it enumerates those expenditures in detail and undoubtedly will make a similar presentation at trial. Whether BP received tax benefits in connection with those expenditures therefore is relevant and necessary to the United States' ability to respond to BP's contentions.

  Request No. 3: RFP #3 seeks documents relating to Material Transactions with BPXP, including all policies or practices affecting the pricing of such transactions for each year, 2005-2014.

  U.S. Position: BPXP has indicated it will conduct a reasonable search for: (l) non-privileged documents sufficient to summarize the accounts payable and accounts receivable balances between BPXP and other BP entities as of quarterly and annual periods in 2013 and 2014; (2) financing or loan agreements between BPXP and other BP entities for the time period January 1, 2009 to the present; (3) non-privileged documents sufficient to summarize policies relating to the pricing of intra-Group debt between BPXP and other BP entities for the time period January 1, 2009 to the present; (4) non-privileged documents sufficient to summarize injections of equity by BP entities into BPXP from January 1, 2009 to the present; and (5) the services agreements between BPXP and BP America Production Company dated December 31, 2005 and dated December 31, 2001. BPXP will also produce an Excel spreadsheet containing the BPXP trial balances for the time period 2009 to 2013.  Recently BP indicated that it had located another service agreement and would do a reasonable search for such agreements.

  BP also provides this same universe of documents in response to RFP #9 (subparts 1, 2, and 3), 16 and 17(subparts 1, 2, and 3), so again the completeness of this response warrants some discussion.  Although certain aspects of BP's response are potentially acceptable, the deficiencies are as follows:

  *Subpart (1):* BP offers BPXP accounts payable and receivable balances to 2013 and 2014 but does not go far enough back in time. As discussed above, the United States needs to see BPXP information during normal, pre-spill operations.  It also needs to see that information in the years following the spill.  A chart of accounts will be necessary to understand what each account represents and how they interact.

  Since BP relies on this same litany of documents to address other RFPs, other deficiencies arise.  Accounts payable and receivable balances will only show the change in account balances at the end of the period.  As such, it would not be know if one or many transactions between BPXP and the other BP entity occurred during the period.  Furthermore, changes in the ending balances will not provide insight into the reason for the transaction(s), detail of the asset(s) or service(s) involved, and if the transaction was an arm's length transaction/priced at market value.  Lastly, detail of the accounts payable and receivable balances will not identify transactions between BPXP and other BP entities in a particular period, if a transaction involved the payment of cash, transfer of assets or investment of equity (i.e. the transaction impacted a balance sheet line item other than accounts payable or receivable)

  *Subpart (2):*  financing and loan agreements may be sufficient if BP is producing all loans in place or in effect during the period 2005 to present, not merely new loans initiated during that period including revolving credit agreements as well whether or not advances have been made under the agreements.

5

*Subparts (3) and (4)* BP merely states that it will produce documents "sufficient to summarize" the requested items, without identifying the types of summary documents involved. Although the United States in fact is seeking summary-level information, given the accelerated schedule here, BP should be required to describe, identify or provide representative samples of the accounting records that it will produce in response to this RFP.

*Subpart (5)*: BP offers two (now three) service agreements dated several years ago and agreed to perform a reasonable search for others. In the April 23, 2014 meet and confer, BP agreed to provide some explanation as to why those two agreements were selected for production, whether they still guide BPXP's transactions, and some assurance that these were the only or primary service agreements and that these agreements applied during the entire period (2005-present). No explanation has been provided. In addition, the proposed production of an Excel spreadsheet containing BPXP trial balances may not be sufficient to determine which BP entity paid expenses related to the spill and response.

*Definition of Material Transactions:* This is a standard concept that companies must deal with in preparing financial statements or any public reporting and should not be unfamiliar to BP. Discussions to clarify it or to reach some objective standard[4] were not successful. BP, however, uses the very same term in its Rule 26(a) Initial Disclosure, where in its Listing of Relevant Document and Tangible Things it discloses that it has "*material transaction documents*.[5] (emphasis added.)

The United States requires for this RFP at a minimum: (a) a detailed chart of accounts payable and receivable balances from 2005-2014; (b) financing or loan agreements in place or in effect between BPXP and other BP entities from 2005-2014; (c) a representative sample of documents clarifying what BP contends is "sufficient to summarize" both (i) policies relating to the pricing of intra-Group debt between BPXP and other BP entities; and (ii) injections of equity by BP entities into BPXP from 2005-2014, (as well as the subsequent production of such summary documents if they are found adequate); and (d) all service agreements in effect between BPXP and other BP entities from 2005-2014.

Request No. 4; This request seeks spreadsheets and computations evaluating BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc financial projections for 2014 and forward including any sensitivity analyses (including assumptions of oil and gas prices) that such entities have performed.

U.S. Position: Forward-looking projections are an important part of any business operation and are necessary to evaluate the economic impact of the penalty on the violator. For example, the appropriate amount of the penalty may turn on the violator's access to cash, credit

---

[4] In an effort to narrow its request as a compromise, on April 23, 2014, the United States asked for a list of transactions involving BPXP and other BP entities, by category, in amounts exceeding $1 million. The United States selected this figure in an effort to narrow its requests.

[5] *See*, Defendant BPXP's Initial Disclosures relating to the Clean Water Act Penalty Phase, at 10 (March 10, 2014), item No. 11: "documents sufficient to summarize loans and other *material transactions* between BPXP and other BP Group entities from 2009 to the present.

6

and other financing into the future, and that in turn depends upon its future financial prospects. BP states that it will be calling an expert on this topic and it is possible that the future cash flows and financial status of the company will be disputed.   Thus the information sought is highly relevant to the economic impact penalty factor.

Organizations the size of BP typically draw up multi-year budgets (3 to 5 years into the future) that are authorized by the Board of Directors.   This RFP seeks the final, Board-authorized version of those budgets for each of the relevant entities, and only for the current or most recent version looking forward.

We also seek BP's internal projections for the future prices of Gulf of Mexico oil, natural gas, natural gas liquids, and fuel gas.  While the "SMOG" analysis for BP's Gulf of Mexico assets are helpful and responsive, the SMOG analysis, also called the Midas Workbook, is password protected and we do not have the password.  As a result, we are not able to view the entire file and we agreed to provide you with the specifics of the technical issue.  Moreover, the SMOG analysis projects cash flow from existing proved reserves but does not reflect the identification and extraction of currently unproved reserves.[6]  In other words, it is similar to a liquidation analysis in that it does not forecast any future increase in proved reserves.  This RFP also seeks long term budgets or projections for BPXP and the other BP entities in the line of ownership, including financial performance and discoveries of additional oil and gas.

Credit agency reports, or BP's presentation to those agencies, might be probative and responsive.  BP, however, has not agreed to produce a full set of credit agency reports but rather to perform a reasonable search for them, and further did not agree to adopt and be bound by those projections.   Given the certainty that internal management future projections exist, coupled with BP's refusal to be bound by the offered third-party credit reports, the United States also seeks BP's own internal documents concerning BP's future financial projections, for BPXP and each of the entities in the line of ownership.  Alternatively, the United States would accept BP's verification or statement that it will be bound by the credit agency reports for purposes of this litigation.[7]

Request No. 5: This requests seeks documents authored by, addressed to, received by, or that identify board members from BPXP and its parent companies (other than BP plc) related to the Macondo Incident.

You have stated that the sole purpose of this request would be to support a veil piercing theory.  This is not accurate, nor is it an accurate reflection of the United States' statements during our meet and confers.   The United States expressly pointed out that BPXP has taken the position that "[t]he extent of consideration given to the parent's financial resources depends on

---

[6] The SMOG analysis will be summarized in audited statements.  However, provision of the SMOG analysis is useful where audited financial statements are not provided.

[7] Not only is this forward-looking information important to arriving at an accurate understanding of the financial status of the violator, Plaintiff is entitled to full disclosure at this time to avoid surprise at trial.   The high-level corporate fact witnesses identified in BP's Rule 26(a) disclosures have unfettered access to all internal forward looking projections, for example, and may testify at trial.

7

the facts and circumstances of the specific CWA case.  In *U.S. v. Municipal Authority of Union Township (Dean Dairy)*, 150 F. 3d 259, 268-269 (3rd Cir. 1998), the Court made a "fact-specific assessment that examined the role of the parent in the operations of the subsidiary, particularly with regard to the issue of pollution of the nearby waters and actions that could have resolved it." BP Br. Affiliates at 9.  This request seeks information directly relevant to the role BPXP's parent companies played in the operation of BPXP related to the incident.  BPXP has provided no basis for any contention that this request is burdensome, and this request is narrowly tailored to only six board members.[8]  Nor is it a proper objection that the board members have changed, as the request is specifically related to the incident.  Moreover, in response to interrogatories 4 and 5, you list a number of actions by BPXP you contend the Court should consider under "other matters."  However, you have identified no documents to support that BPXP performed any of these actions.  Indeed, BP plc board minutes and annual reports indicate that it performed many of these actions, not BPXP.  These requests are specifically targeted to determine the role BPXP played in the incident, something you have specifically placed at issue in this phase.  This discovery is therefore clearly relevant to issues BPXP has itself identified in the litigation.

Request No. 6: This request seeks Board of Director, Board of Director committee, and officer meeting resolutions and decisions for BPXP and its parent companies for seven years.

BPXP has agreed to undertake a search for BPXP resolutions for the time period from 2009 to the present.  This response is not adequate, nor has BP indicated how the request is burdensome.  As with request number 5, this request is directly relevant to several contentions by BPXP as to the role of BPXP's parent companies in its operations.  The United States has already significantly limited its request to only requesting board resolutions and decisions, forgoing minutes and other documentation.  We have also limited the number of years requested.  BPXP has itself placed these matters at issue in the litigation, and its claims that these requests are burdensome or irrelevant are unfounded.

Request No: 8: The United States seeks guarantees of BPXP's obligations.

U.S. Position: BPXP has agreed to undertake a search for documents to show BP Corporation North America Inc.'s and BP p.l.c.'s guarantees relating to the Macondo well, the Incident, and the Response.  BPXP also has agreed to search for guarantees involving BPXP that are not related to the Macondo well, the Incident, and the Response, but only to include only the time period 2009 to the present.  BP's response is acceptable to the United States.

Request No. 9: This request seeks documents related to loans, revolving credit agreements or any other debt held by BPXP for each year, 2005-2014.

U.S. Position: BPXP has referred to its responses RFP # 3, items (1), (2), and (3), as well as the Excel spreadsheet identified in response to RFP # 1.  Provided the United States receives a full and complete production pursuant to RFP # 3, as set forth above, no additional documents

---

[8] These are the only six custodians the United States has requested be specifically included in document requests. This stands in contrast to BPXP's contention that not only should the United States search multiple custodial files, you have suggested that custodians that have already been searched should be searched again.

would be required here. In particular, this RFP extends to all loans and credit facilities in place during the relevant years, not merely new ones.

Request Number 10: This request seeks documents reflecting policies and targets for key financial ratios or measures, including but not limited to Net Debt to Adjusted Capital, Current Ratio, Quick Ratio, and Free Cash Flow, for BPXP and its parents for each year, 2005-2014.

U.S. Position: BPXP has indicated it will undertake a search for credit agency reports relating to BP entities for which such reports exist for the period from January 1, 2009 to the present. Provided the United States receives a full and complete response to RFP # 1 and to # 4, including all the requested audited or unaudited financial statements, and the forward looking documents, no additional documents would be required pursuant to this RFP.

Request No, 11: This request seeks documents reflecting the basis for BPCNA's indemnification agreement with Anadarko for Macondo well costs, and all documents reflecting the basis for BPCNA's guarantee of BPXP's Guilty Plea Agreement payments, United States v. BP Exploration & Production, Inc., No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012), and the resulting Judgment (E.D. La. Jan. 29, 2013).

U.S. Position: BPXP has indicated it will conduct a search for BPXP and BP Corporation North America Board resolutions "relating to BPCNA's indemnification agreement with Anadarko for Macondo well costs, and all documents reflecting the basis for BPCNA's guarantee of BPXP's Guilty Plea Agreement payments, United States v. BP Exploration & Production, Inc., No. 2:12-cr-00292 (E.D. La. Nov. 15,2012), and the resulting Judgment (E.D. La. Jan. 29, 2013)." The United States accepts this response.

Request No.12: This request seeks documents that describe and identify BPXP's policies and its payment history regarding payment of distributions or dividends for 2005 to present.

U.S. Position: BPXP has indicated it will produce documents sufficient to summarize BPXP's payments of dividends, if any, from 2007 to the present and the BPXP Series A preferred stock certificate filed with the State of Delaware that includes provisions regarding the payment of dividends. BPXP last declared and paid a common share dividend in 2009 and last declared and paid a quarterly preferred share dividend effective March 24, 2010. Since April 20, 2010, BPXP has neither declared nor paid a dividend in any form to any parent or affiliate company.

Evidence of payment of dividends or other distribution of profits from a wholly-owned subsidiary up to parent companies in the line of ownership is highly relevant to the United States' theory of the case. The *Dean Dairy* Court justified looking beyond the subsidiary in evaluating its ability to pay the civil penalty in part because of the history of dividends paid to the parent company. Payment of profits to the parent entities over time is relevant because it impacts the current size of BPXP and its present ability to independently finance a penalty, and because it demonstrates the control and centralized decision-making of the parents over BPXP. This request imposes minimal burden to BP, and the RFP is focused on BPXP, therefore obtaining this highly probative evidence for the full period back to 2005 is reasonable.

9

The type of documentation proposed by BPXP appears to be adequate and further shows that producing it back to 2005 will impose little additional burden.

Request No.13: This request seeks documents that describe and identify all of BPXP's current contingent liabilities and any BP entity providing BPXP a corporate guarantee or debt financing, including the potential financial exposure of the contingent liabilities, the status of the resolution of the risk, the likely timing and steps to resolve the risk, and the official assessment of the financial exposure.

U.S. Position: BPXP has pointed to its responses to request 1 and 8.  The United States seeks in this RFP to obtain any and all information that BPXP intends to present in the Penalty Phase concerning BPXP debt and contingent liabilities.  In particular, any liabilities that are known, even if they cannot be presently estimated and as such would not be required to be disclosed in the financial statements, should be disclosed in response to this RFP.  Provided that BP's response identifies all liabilities that BP's fact or expert witnesses will testify to at trial, and provided that BP's response discloses sufficient information that the United States can evaluate each such contingent liability or debt, BP's response would be sufficient.

Request No. 14: This request seeks documents describing or identifying BP entities that provided services to BPXP from 2005 to the present.

U.S. Position: This RFP is relevant for two reasons.  First, BPXP has no employees and has no independent operations, but rather appears to rely on accounting techniques to maintain any semblance of a corporate identity.   This RFP seeks information to understand more precisely how that interaction with other BP entities is structured.  Second, this RFP seeks the detail of BPXP's dependence on the other BP entities to demonstrate again that BPXP can reach the resources of its parent companies readily, just as it has historically.

Despite the "all documents" formulation in the RFP, the United States seeks summary accounting or contractual information.  The United States seeks the primary service contracts and summaries of the payments made pursuant to those contracts, for some period prior to the Incident and the relevant payments post-Incident.[9]

BP does not explain or clarify how it selected the two service contracts identified in its Response, one of which is thirteen years old and the other seven years old.  In the meet and confer discussion, BPXP indicated that it would provide further information to clarify why it selected those two service contracts, confirm that the contracts are still in effect, and indicate whether those are the primary contracts and what other contracts between BPXP and other BP entities exist. In the most recent meet and confer on May 8, 2014, however, BP could not answer those questions and said that it had located a third service agreement and would be performing a reasonable search for others.

---

[9] With respect to the post-spill payments, there will be some overlap with RFP # 17, which seeks the costs associated with various Response activities, although this RFP is slightly different and extends to additional topics.

The RFP also seeks summary accounting information tracking the payments made by BPXP to the BP entities providing those contracts.

BP provided the bates-range of documents referenced in its response to the United States. While some contracts are included in that bates-range, it also includes a host of other, extraneous and non-responsive materials. And, many of the contracts are with third party contractors and also are not responsive to this document request. The United States appreciates that BPXP provided the bates-range but also requested confirmation that all applicable BPXP service agreements with other BP entities are included in that bates range. BP could not provide assurance that all agreements were in that bates range of document. If not, BPXP must produce any remaining service agreements that were in place during the relevant years. The defendant also must, at a minimum, identify BP entities that provided the seven specific services for each year and the amounts paid.

Request No. 15: The United States seeks documents "that describe and identify all asset divestment sale proceeds used to meet the obligations arising from the Incident including, the assets sold, the dates of the sales, the owners of the assets sold, amounts received from the sales, and which BP entity received the amounts from the sales, for the period 2009 to present."

U.S. Position: BPXP has agreed to produce "documents sufficient to summarize divestments by the BP Group since April 20, 2010: (1) the BP p.l.c. Investor Update presentation dated March 4, 2014; (2) the BP Annual Reports and Forms 20-F 2010-2013; and (3) the BP p.l.c. 4Q & Full Year 2013 Results Presentation dated February 4, 2014." In its written responses, BPXP stated it would meet and confer on this RFP.

The request is relevant as BP p.l.c. has announced publicly as early as 2010 that it was divesting assets from holdings from around the globe to help defray the costs of the Incident and Response. Its public reports provide a total figure for the divestments without much more detail. Therefore BP's proposal to produce its public reports is not sufficient. The United States has indicated it is willing to accept summary information on these sales. Since BP was tracking these divestments in such a fashion that it could provide an aggregate figure in its public reports, one would assume that some summary-level accounting records exist tracking the divestments. It would be sufficient to receive contemporaneous accounting records, generated for business purposes or for public reporting, reflecting even in spreadsheet form the following information: the BP entity owning the asset, the names/description of the asset, the date of the sale of the asset, the book or carrying value of the asset, the sales price of the asset, and the gain on the sale of the asset. In our meet and confer, BP indicated that no such summary level accounting records exist. In that event, the United States would accept the Purchase and Sale document for the major transactions. BP has responded that such documents were unduly burdensome.

Request No. 16: This request seeks documents or records relating to any payment, transfer, loan, or any other Material Transaction between BPXP and any other BP corporate entity for the period 2005 to present.

U.S. Position: RFP #16 seeks comprehensive data concerning transactions between BPXP and other BP corporate entities. Provided the United States receives a full and complete

11

response, as set forth above, to RFP #3 (all Material Transactions); RFP #9 (loans and revolving credit agreements); RFP #12 (dividends); RFP # 13 (contingent liabilities); RFP #14 (service agreements); and RFP #15 (asset divestment), no additional documents would be required in response to this RFP.

Interrogatory No. 1: The United States has asked the defendant to identify the members of the Boards of Directors and officers of BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc, for each year 2008-2014.

U.S. Position:  BP has objected and inadequately responded, stating that it will only produce documents showing the identity of [BPXP's] officers and directors in 2013 and 2014." It is not sufficient for the defendant to only identify the directors and officers of BPXP for 2013 and 2014.  The United States is entitled to know the identity of the officers and directors of the BPXP board not only at present, but also at the time of the Incident and Response.  In addition, the government has the right to know the identity of the officers and directors of the intermediate parents between BPXP to BP pl.c. Such information is potentially relevant to the role of the intermediate parents in the operations of BPXP.  Dean Dairy, 150 F. 3d at 268-269.  Although BP's American subsidiaries are required to file certain of this information with various Secretaries of States, BP explained during the last meet and confer that information from its filings with the Delaware Secretary of State, is incorrect.  For instance, while the defendant has contended that BPXP has six members on its board of directors, BPXP's filings with the Delaware Secretary of State consistently state that BPXP has only three members on its board of directors. [10]

Interrogatory No. 2:  The United States has asked the defendant to identify which BP corporate entity, employed and paid the following persons: Tony Hayward, Robert Dudley, Andrew Inglis, Lamar McKay, Douglas Suttles, James Dupree, David Rainey, Kevin Lacey, Brian Morel, Mark Hafle, Bret Cocales, John Guide, Robert Kaluza, Don Vidrine, Trevor Hill, Mike Mason, and David Sims, for each year, 2010-2011.

U.S. Position: It is critical to know which legal entity employed these key individuals to show the role of that various legal entities in the corporate chain have played in the operations of BPXP.  In response to Request for Admission No. 5, BPXP has admitted that "BPXP utilized personnel and resources from certain of its corporate affiliates and compensated those affiliates, although BPXP does not have its own directly payrolled employees."[11]  Although the defendant has admitted that the listed individuals were not employed by BPXP, the defendant has refused to affirmatively identify which corporate entity or entities in the chain employed these individuals.  The United States is entitled to such information.

---

[10]According to BPXP's State of Delaware Annual Franchise Tax Reports for 2010-2013, BPXP has three, not six, directors. *See* BPXP State of Delaware Annual Franchise Tax Reports for 2010-2013.
[11]*See* BPXP Response to U.S. Discovery, at 45-46.

12

Interrogatory No. 6: The United States requested that BP identify the penalties that it contends should be calibrated to the penalty to be imposed in this case.[12]

U.S. Position: In its response, BP failed to identify the specific penalties for other environmental incidents to which it contends the Macondo penalty should be compared. Rule 33 permits interrogatories that ask "for an opinion or contention that relates to fact or the application of law to fact." Fed.R.Civ.P. 33(a)(2). The Advisory Committee Note only excludes those interrogatories which "extend to issues of 'pure law,' i.e., legal issues unrelated to the facts of the case." Note to 1970 Amendment of Rule 33. Contention interrogatories "can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery." *Id.* Interrogatory 6 is far from a question of law unrelated to the facts of the case. It asks for the specific facts that BP intends to rely upon on support of its assertion. Furthermore, interrogatory no. 6 was calculated to narrow the issues under dispute. Lacking information about the specific penalties that BP contends are comparable, the United States must prepare a defense considering all penalties imposed in prior environmental incidents, a universe of hundreds of cases. Interrogatory no. 6 is a request for information analogous to the information that the United States provided when it identified the four prior violations that it intends to rely upon. The defendant must identify the specific penalties in other environmental incidents against which it contends the penalty in this case should be calibrated.

Sincerely,

/s/ Steve O'Rourke
Steven O'Rourke

---

[12] BP asserts that "Justice requires that a penalty here be compared to and calibrated with penalties sought and obtained against other companies, both in relation to this case and other environmental incidents." BPXP March 3 Submission to Magistrate Judge Shushan, Exhibit 11.

13