# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : | MDL No. 2179  SECTION: J |
| | : | |
| This Document Relates To: 10-4536 | : | Honorable CARL J. BARBIER |
| …………………………………………………... | : | Magistrate Judge SHUSHAN |

### DEFENDANTS' FIRST SET OF DISCOVERY REQUESTS TO THE UNITED STATES OF AMERICA RELATING TO THE CLEAN WATER ACT PENALTY PHASE

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, BP Exploration & Production Inc. ("BPXP") and Anadarko Petroleum Company ("Anadarko") (collectively "Defendants") propound the following requests for production of documents, interrogatories, and requests for admission to the United States of America to be responded to within 30 days of service. Defendants request that all documents and electronically stored information responsive to the following discovery requests be produced to the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654 and Bingham McCutchen LLP, 355 South Grand Avenue, Suite 4400, Los Angeles, California 90071-3106.  By serving these discovery requests, Defendants do not admit or concede the relevance or admissibility of information or documents responsive to the requests.

**I.     REQUESTS FOR PRODUCTION**

1.     Except to the extent such data has already been provided to Defendants, all data collected as part of, or in connection with, the *Deepwater Horizon* Natural Resource Damages Assessment including but not limited to all analytical data, unstructured data, raw data, unverified data, field notes, photographs, videos, survey responses, cooperative data, and independent data.

2.     All documents, including but not limited to photos, aerial imagery, videos, or

1

graphics, referring or relating to the areal extent, location, duration, thickness, and volume of Oil-Related Materials and/or Dispersants present at the surface of the water (including to a depth of one meter below the surface), including but not limited to all documents from the United States Department of Homeland Security sources.

3. All documents referring or relating to the observation, collection, recovery, restoration, or rehabilitation of Wildlife during, or as part of, any Response Activities.

4. All documents referring or relating to any Mississippi River Diversions attempted, undertaken, discussed, or considered in connection with the *Deepwater Horizon* Incident and Spill, including all documents related to the effects or potential effects of any such Mississippi River Diversions.

5. All documents referring or relating to any Fish Kills that resulted from (or were at any time suspected to have resulted from) the *Deepwater Horizon* Incident and Spill, including without limitation from Oil-Related Materials, Dispersants, and/or any Response Activities.

6. All documents referring or relating to the impact, lack of impact, and/or recovery of the Shoreline Environment from Oil-Related Materials, Dispersants, and/or any Response Activity.

7. All documents referring or relating to any release or spill of oil in the Area of Response since April 2010 other than Oil-Related Materials resulting from the *Deepwater Horizon* Incident and Spill.

8. All documents commending, praising, or otherwise noting the efforts of BPXP (including contractors and other entities assisting BPXP) and the Unified Command to respond to, or otherwise mitigate, minimize, or prevent any environmental, economic, human health, or other effects of the *Deepwater Horizon* Spill.

9. All documents analyzing, evaluating, assessing, or discussing the nature, extent and degree of success of any efforts by Anadarko and any offers of assistance by Anadarko to assist

after the Incident, including to minimize or mitigate the effects of the discharge with respect to the Incident and Spill.

10. All documents referring or relating to the "BP Deepwater Horizon Oil Spill: Incident Specific Preparedness Review (ISPR);" the "On Scene Coordinator Report *Deepwater Horizon* Oil Spill;" and the reports and other work of the Operational Science Advisory Team, such as the "Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring" (OSAT-1 Report), the "Summary Report for Fate and Effects of Remnant Oil in the Beach Environment" (OSAT-2 Report), the "Investigation of Recurring Residual Oil in Discrete Shoreline Areas in the Eastern Area of Responsibility" (the OSAT-3 Report), including but not limited to drafts, notes, communications, and outlines.

11. All documents referring or relating to any analysis, assessment, evaluation, or study of the amount of Oil-Related Materials that was contained, collected, dispersed, burned, removed, or cleaned up in connection with Response Activities and/or any natural processes, including but not limited to documents relating to the preparation and publication of the "Oil Budget Calculator, Deepwater Horizon, Technical Documentation," and its appendices, dated November 2010, such as drafts, interview notes, communications, and outlines.

12. All documents referring or relating to the use or potential use of Corexit 9500, Corexit 9527, or other dispersant in connection with the Response Activities, including but not limited to all communications between or among the United States Coast Guard, the Unified Command, the Environmental Protection Agency, National Oceanic and Atmospheric Administration, and any other federal, state, or other governmental department, agency, entity, or body, or any representative or employee thereof, regarding the use (or limitations on use), safety, and/or effectiveness of Dispersants in connection with Response Activities.

13. All documents referring or relating to any analysis, evaluation, determination, or

study of shoreline oiling, impact (including but not limited to any impact on the environment, human health, and Gulf Coast communities), monitoring, and cleanup in connection with the *Deepwater Horizon* Spill and/or Response Activities, including but not limited to documents relating to whether cleanup completion standards had been satisfied.

14. All documents referring or relating to the economic impact of a Clean Water Act penalty on BPXP or on any other BP entity.

15. All documents supporting your contentions against BPXP with respect to the "history of prior violations" under the Clean Water Act.

16. All documents supporting your contentions against BPXP and/or Anadarko with respect to the "other matters as justice may require" factor under the Clean Water Act.

17. All studies, evaluations, analyses or discussions of the impact of imposing penalties on non-culpable NOIs in oil and gas drilling operations, including but not limited to how imposition of such penalties would or might affect or relate to safety.

18. All documents reflecting policies, memoranda, or other guidance regarding the amount of penalties to impose or seek against non-culpable NOIs.

19. All documents reflecting the total royalties paid per annum to the United States from offshore leasing, and activities authorized thereunder, under the Outer Continental Shelf Lands Act and discussing any benefit from such royalties.

20. All studies, analysis, assessments, memoranda or guidance regarding the impacts on the national, regional, or local economies, national security or energy independence associated with offshore drilling.

21. All documents identified in the responses to the Interrogatories set forth below.

## II.   INTERROGATORIES

1. Identify and describe all preliminary and/or final results of testing of toxicity of Oil-

4

Related Materials and/or Dispersants, resulting from the *Deepwater Horizon* Spill and/or Response Activities, to Organisms and all persons with knowledge of, and documents related to such testing.

2. Identify and describe all background rates of land loss and erosion on shorelines in the Gulf Coast states and all persons with knowledge of, and all documents related to, such rates of land loss and erosion.

3. Identify and describe all studies, reports, assessments, and analyses, including without limitation those conducted by government agencies, non-governmental organizations, academic or research institutions, and private consultants, that the United States will or may rely upon regarding actual or potential environmental harms resulting from the *Deepwater Horizon* Incident and Spill.

4. Identify and describe any human health impact, including but not limited to any potential or future health impact, that resulted from the *Deepwater Horizon* Spill and/or Response Activities and all persons with knowledge of, and all documents related to, any such human health impact(s).

5. Identify and describe in detail any and all sampling, monitoring, testing, and analysis that demonstrate exposure to Oil-Related Materials and/or Dispersants, resulting from the *Deepwater Horizon* Spill and/or Response Activities, at levels sufficient to cause any impact on human health, and identify all documents related to that sampling, monitoring, testing, and analysis.

6. Identify and describe any analyses, studies, assessments, or evaluations regarding the nature, extent, or degree of effectiveness of the efforts to respond to, or otherwise mitigate, minimize, or prevent any environmental, human health, economic, or other effects of, the *Deepwater Horizon* Spill, including any statements commending response efforts or determinations that any aspect of the response was effective or successful. As part of your

5

response, identify the persons most knowledgeable about, and all statements, documents, and other materials that describe or reflect, the analyses, studies, assessments, evaluations, or determinations.

7.  Identify and describe any way in which the United States contends that BPXP or any other entity did not effectively respond to, or otherwise mitigate, minimize, or prevent environmental, human health, economic or other effects of, the *Deepwater Horizon* Spill, and the bases for any such contention. As part of your response, identify the persons most knowledgeable about, and all statements, documents, and other materials that describe or reflect, the bases for your contention.

8.  Identify and describe any decisions or actions by BPXP, the Unified Command, or other agency or entity that limited or constrained efforts to respond to, or otherwise mitigate, minimize, or prevent, environmental, human health, economic or other effects of, the *Deepwater Horizon* Spill. As part of your response, identify the persons most knowledgeable about, and all statements, documents, and other materials that describe or reflect on, such decisions and actions.

9.  Describe in detail the nature, extent, and degree of success of any offer or effort by Anadarko to minimize or mitigate the effects of the discharge from the Incident and Oil Spill, including Anadarko's participation in source control efforts.

10.  Identify the total amount of Oil-Related Materials that you contend were contained, collected, dispersed, burned, and cleaned up as a result of the Response Activities, as well as the amount of Oil-Related Materials that were removed through natural processes, including the portions of the total volume attributable to each process (for example, through the use of skimming, boom, dispersants, *in situ* burning, shoreline cleanup, and natural processes), and a detailed description of how you performed these analyses. As part of your response, please identify the persons most knowledgeable about, and all statements, documents, and other materials that describe or reflect, the analyses.

6

11.     Identify and describe in detail all bases for any contention by the United States that use of Corexit 9500 and/or Corexit 9527 during the Response was ineffective or had any counterproductive or harmful effects on the environment or human health.  As part of your response, please identify the persons most knowledgeable about, and all statements, documents, and other materials that describe or reflect, the alleged ineffectiveness or counterproductive or harmful effects of Corexit 9500 and/or Corexit 9527.

12.     Identify and describe any Response Activities that were not conducted at the direction and under the oversight of the Unified Command, and for any such activity, describe the activity in detail, the persons or entities involved, the outcome or result of the activity, the cost associated with the activity (including any amounts paid by BPXP), and the reasons why such activity was not conducted at the direction and under the oversight of the Unified Command.

13.      Identify and describe the bases for any assertion by the United States that "the economic impact of the penalty on the violator" factor should increase the amount of any Clean Water Act penalty to be paid by BPXP and documents you intend to rely on to support such a contention.

14.      Identify and describe the bases for any assertion by the United States that the "history of prior violations" factor should increase the amount of any Clean Water Act penalty to be paid by BPXP and documents you intend to rely on to support such a contention.

15.     Identify and describe the bases for any assertion by the United States that the "other matters as justice may require" factor should increase the amount of any Clean Water Act penalty to be paid by BPXP and documents you intend to rely on to support such a contention.

16.     At such point, if any, as you believe you may offer evidence regarding prior violations by Anadarko which are not included in the stipulations agreed to with Anadarko on this factor ("additional prior violations"), describe in detail each additional prior violation that you

7

contend should be considered under Section 311 of the Clean Water Act for assessment of a penalty against Anadarko.

17. Identify and describe the bases for your denial of any Request for Admission propounded in connection with this action.

### III. REQUESTS FOR ADMISSION

#### A. Requests for Admission Propounded by BPXP.

1. Admit that coastal land subsidence, habitat conversion and fragmentation, decreasing water quality, invasive species, contamination from agricultural run-off, population growth, and/or other anthropogenic effects have diminished the natural resources of the northern Gulf of Mexico coastal ecosystem.

2. Admit that oil and polycyclic aromatic hydrocarbons ("PAHs") exist naturally in the Gulf of Mexico and are released through natural seeps in the seafloor.

3. Admit that microbes exist in the Gulf of Mexico that consume oil discharged from natural seeps and that these microbes consumed MC252 oil discharged during the *Deepwater Horizon* Spill.

4. Admit that background rates of wetland loss in Louisiana are greater than the rate of wetland loss that is or may be attributable to the *Deepwater Horizon* Spill.

5. Admit that 2011 was the most productive year for Brown Pelican nesting in the northern Gulf of Mexico since Hurricane Katrina in 2005.

6. Admit that shorelines characterized as heavily oiled decreased from a maximum of 360 km (224 miles) to 22.4 km (14 miles) by one year after the Incident, and to 6.4 km (4 miles) by two years after the Incident.

7. Admit that the decision to build sand barrier berms to attempt to mitigate the effects of the *Deepwater Horizon* Incident was not an appropriate removal action under the Oil Pollution

Act, 33 U.S.C. §§ 2701 *et seq*.

8. Admit that the decision to open the Mississippi River Diversions in 2010 to attempt to mitigate the effects of the *Deepwater Horizon* Incident was not an appropriate removal action under the Oil Pollution Act, 33 U.S.C. §§ 2701 *et seq*.

9. Admit that based on monitoring as of September 13, 2013, the Environmental Protection Agency had not seen onshore levels of pollutants resulting from the *Deepwater Horizon* Spill and/or Response Activities that are of concern for long-term health effects.

10. Admit that the Unified Command directed all efforts to respond to, or otherwise mitigate, minimize, or prevent the effects of, the *Deepwater Horizon* Spill, including the use of skimming, boom, controlled *in situ* burns, dispersants, and the Shoreline Cleanup Assessment Technique during the Response.

11. Admit that the use of controlled *in situ* burning, coupled with dispersant applications, during the Response significantly reduced the amount of oil that might otherwise have impacted near-shore habitats and environmentally sensitive areas.

12. Admit that the use of Dispersants during the Response prevented millions of gallons of oil from impacting sensitive shorelines of Gulf States.

13. Admit that the Response effectively mitigated the environmental and other effects of the *Deepwater Horizon* Spill.

14. Admit that all applications of dispersants during the Response occurred under the guidance of Environmental Protection Agency and with the direct approval of the Federal On-Scene Coordinator.

15. Admit that BPXP was proactive and placed no limits on what was needed to make the Response successful.

**B.    Requests for Admission Propounded by Anadarko.**

1.    Admit that the Minerals Management Service (now Bureau of Safety and Environmental Enforcement) has not imposed any penalties, under the Outer Continental Shelf Lands Act, against any non-culpable non-operating lessees on the Outer Continental Shelf for violations by the designated operators of offshore oil drilling regulations.

## IV.    DEFINITIONS

1.    "Anadarko" means Anadarko Petroleum Corporation, which was named a defendant in the Complaint, and any other affiliate or subsidiary of Anadarko Petroleum Corporation, including but not limited to Anadarko E&P Company LP (n/k/a Anadarko Onshore United States, LLC), if, and to the extent that, the United States claims that information regarding such affiliate or subsidiary is relevant to the United States' claim for Clean Water Act penalties against Anadarko Petroleum Corporation.

2.    "Area of Response" shall mean the geographical area in and around where Response Activities took place, including without limitation the Gulf of Mexico and contiguous water bodies and adjacent states, provinces, or other sub-national geographic units.

3.    "Communication" or "communications," whether or not capitalized, shall mean any transmission of information by one or more persons to one or more persons by any means including without limitation telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail, computer linkups, written memoranda, and face-to-face conversations; "communication" includes all documents and electronically stored information ("ESI") containing, summarizing, or memorializing any communication.

4.    "*Deepwater Horizon* Incident" or "Incident," whether or not capitalized, shall mean the events leading to (i) the loss of life and injuries on the *Deepwater Horizon* rig on or about April 20, 2010, and (ii) the eventual sinking of the rig on April 22, 2010, including the blowout,

explosions, and fire.

5. "*Deepwater Horizon* Natural Resource Damages Assessment" shall mean the assessment of natural resources conducted pursuant to Section 1006 of the Oil Pollution Act, 33 U.S.C. §2706, and the Oil Pollution Act Regulations, 15 C.F.R. §§990 *et. seq.*, and in connection with the *Deepwater Horizon* Incident and Spill.

6. "*Deepwater Horizon* Oil Spill," the "Oil Spill," or the "Spill," whether or not capitalized, means the discharge of hydrocarbons that occurred in connection with the *Deepwater Horizon* Incident.

7. "Dispersants," whether or not capitalized, shall mean (i) dispersants, (ii) dispersant constituents, (iii) derivatives of any of the foregoing from biological, chemical, photochemical or other processes, or (iv) any aggregation, mixture, or combination of any of the foregoing with any other material including without limitation organic matter, inorganic matter, sediments, biological exudates, sand and water.

8. "Document" or "documents," whether or not capitalized, shall have the full meaning ascribed to it by Federal Rule of Civil Procedure 34(a), including ESI, and includes the original and any identical or non-identical copy, regardless of origin or location, of any writing or record of any type or description, including but not limited to all writings; records; contracts; agreements; communications (intra- or inter-company); correspondence; memoranda; letters; facsimiles; electronic mail (e-mail); minutes, recordings, transcripts, and summaries of meetings, or recordings of meetings, speeches, presentations, conversations, or telephone calls (whether recorded in writing, mechanically, or electronically); handwritten and typewritten notes of any kind; statements; reports; voice recordings; desk calendars; diaries; logs; drafts; studies; analyses; schedules; forecasts; surveys; invoices; receipts; data of any kind; computer data; working copies of computer programs; computer codes; computer printouts; financial statements; balance sheets;

11

profit and loss statements; statements of earnings; statements of net worth; credit reports; statements of operations; audit reports; financial summaries; statements of lists of assets; work papers; pictures; photographs; videos; computer animations; drawings; computer cards; tapes; discs; printouts and records of all types; instruction manuals; policy manuals and statements; books; pamphlets; cancelled checks; check stubs; and any writing, notes, or information of any kind from any other device or medium by which information or intelligence of any type is transmitted, recorded, or preserved, or from which intelligence or information can be perceived.

9. "Environment" or "Environmental," except when used as or in a proper noun, shall refer to (i) air, surface and subsurface water, beaches, land and sediments, and the organic and inorganic constituents of the foregoing, (ii) Organisms (as defined below), (iii) natural resources, (iv) ecosystems, (v) niches and other habitats, and (vi) combinations or assemblages of any of the foregoing, in each case in or near the Gulf of Mexico or in or near any other location that may have been affected by Oil-Related Materials (as defined below) regardless whether in a natural state or modified by human activity.

10. "Fish Kill" shall mean any accumulation of dead fish in a localized area that is significant and sudden as compared to historical or baseline patterns and conditions.

11. "Identify," whether or not capitalized, when used with respect to: (a) an individual, shall mean to provide the individual's full name, job title, and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number (designating which); (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and Bates number(s).

12. "Including" or "includes," whether or not capitalized, shall mean "including but not limited to" or "including without limitation."

13. "MC252 Well" shall mean the exploratory well that was being drilled by the *Deepwater Horizon* in the Macondo Prospect of Mississippi Canyon 252 in the outer continental shelf of the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

14. "Mississippi River Diversion" shall mean any controlled increase or decrease in the rate of discharge from the Mississippi River, including without limitation through operation of the Bayou Lamoque Diversion, the Davis Pond Diversion, the Violet Siphon, the Caernarvon Diversion, the Whites Ditch Siphon, the Naomi Siphon, the West Point A la Hache Siphon, or the Ostrica Lock.

15. "Non-Operating Investor" or "NOI" means any person or entity that holds an ownership interest in a lease or facility related to offshore gas or oil exploration, drilling or production operations but is not the designated operator for purposes of activities under that lease or on that facility.

16. "Oil-Related Materials" shall mean any of the following from the *Deepwater Horizon* Oil Spill or response thereto: (i) oil, (ii) polycyclic aromatic hydrocarbons ("PAHs"), (iii) hydrocarbons, (iv) other oil or gas constituents, and (v) well drilling and closure materials, including without limitation drilling muds and fluids and materials injected into the well-head. Oil-Related Materials also shall include (i) derivatives of any of the foregoing from biological, chemical, photochemical, burning or other processes, (ii) any aggregation, mixture or combination of any of the foregoing with any other material including without limitation organic matter, inorganic matter, sediments, biological exudates, sand and water; or (iii) any combination of the foregoing.

17. "Organisms" shall refer to any and all members of the six kingdoms of life including animals, plants, fungi, protists, archaea, and bacteria.

18. "Person," whether or not capitalized, shall mean any individual as well as any

entity, including any proprietorship, partnership, corporation, firm, committee, government agency or subdivision or consultant, or any other organization.

19. "Relating to" or "related to," whether or not capitalized, when referring to any given subject matter, shall mean any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

20. "Response Activities," "*Deepwater Horizon* Response," or the "Response," whether or not capitalized, shall mean any and all activities performed to respond to, or otherwise mitigate, minimize, or prevent any environmental, human health, economic, or other effects of, the *Deepwater Horizon* Spill.

21. "Shoreline Environment" shall mean the water, sediments, organisms, natural resources, ecosystems, niches, and other habitats, or any combination of the foregoing, of any oceanic shore or intertidal zone in or near the Gulf of Mexico, including without limitation any beach or marsh environment in or near the Gulf of Mexico.

22. "Unified Command" shall mean the structure, organization, and team established to oversee and manage the response to the *Deepwater Horizon* Oil Spill following the Incident.

23. "United States" shall mean the United States of America, including its departments, agencies, and instrumentalities, any employees, agents or assigns of these departments, agencies, and instrumentalities, and any person who possesses information or documents within the custody and control of these departments, agencies, and instrumentalities.

24. "Wildlife" shall mean all non-domesticated vertebrate animals, including without limitation birds, mammals, amphibians, and reptiles, but not including fish.

25. "You," "your," and "yours," whether or not capitalized, shall mean the United States.

## V.     **INSTRUCTIONS**

1. The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

2. Unless otherwise specified, respond to all requests for production by searching for documents created on or after April 20, 2005.

3. Produce all documents in the order in which they appear in your files. Documents that, in their original condition, are stapled, clipped, or otherwise fastened together shall be produced in this same condition.

4. Produce all documents within your possession, custody, or control including all documents in the possession, custody, or control of any United States government employee, agent, representative, consultant, attorney, accountant, advisor, or other person(s) directly or indirectly connected with you or subject to your control, or any government department, agency, or any other government subdivision.

5. If any responsive document has been lost, destroyed, removed from, or is no longer in your possession, custody, or control for any reason, please identify the document, its last known location, and the circumstances surrounding its loss, destruction, or removal.

6. If you contend that any responsive document is protected from disclosure pursuant to any privilege or work-product doctrine, please specifically set forth the privilege being asserted and any factual or legal basis for its assertion. Also set forth the date and title of the document, its subject matter generally, its author(s) and recipient(s), and its Bates number(s).

7. Each paragraph is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular request.

8. If no documents responsive to a particular request exist, or if such documents exist but are not in your possession, custody, or control, then your response to that request shall so state.

9. Defendants reserve the right to revise and/or supplement these discovery requests to reflect future scope limitations.

10. Pursuant to the Federal Rules of Civil Procedure, these requests are continuing and you must revise or supplement your responses and production whenever new or additional responsive information becomes known.

Dated: April 4, 2014

Respectfully submitted,

　/s/ J. Andrew Langan
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

and

Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

*Attorneys for BP Exploration & Production Inc.*

and

        BINGHAM McCUTCHEN LLP
        /s/ James J. Dragna\_\_\_\_
        James J. Dragna
        jim.dragna@bingham.com
        355 South Grand Avenue
        Suite 4400
        Los Angeles, California 90071-3106
        Telephone (213) 680-6436
        Facsimile (213) 680-8636

        Ky E. Kirby
        ky.kirby@bingham.com
        Thomas Lotterman
        Tom.lotterman@bingham.com
        2020 K Street, NW
        Washington, DC 20006-1806
        Telephone (202) 373-6000
        Facsimile (202) 373-6001

        *Attorneys for Anadarko Petroleum Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 on this 4th day of April, 2014.

                                        /s/ Don K. Haycraft
                                        Don K. Haycraft