# Exhibit K



**U.S. Department of Justice**

Environment and Natural Resources Division

Environmental Enforcement Section

90-5-1-1-10026

---

*Sarah D. Himmelhoch*                                                                 *Telephone (202) 514-0180*
*U.S. Mail:  P.O. Box 7611, Washington, DC  20044-7611*                *Facsimile (202) 514-2583*
*Overnight Mail:   601 D Street N.W., Washington, DC, 20004*
*E-mail: sarah.himmelhoch@usdoj.gov*

May 8, 2014

BY ELECTRONIC MAIL

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
 Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130
Sally_Shushan@laed.uscourts.gov

       Re:    <u>MDL 2179 - 10-4536 Penalty Phase Preparation</u>

Dear Judge Shushan:

      Despite numerous discussions between the United States and BP regarding the scope of environmental discovery and an extensive meet and confer session on the 30(b)(6) proposed by BP in its April 11, 2014 30(b)(6) Deposition Notice to the United States,  the parties have been unable to resolve disputes about certain 30(b)(6) topics proposed by BP.  The United States believes that BP's requests for testimony in Topics 1, 2(a), 2(b), 4, 5, 6, 7 and 10 seek information that should be limited to expert testimony, are overbroad and burdensome, seek information irrelevant to this phase, or constitute attempts to evade this Court's clear instruction on March 21, 2013 against litigating the NRD case during the penalty phase.  *See* Ex. 1 (BP's Proposed Rule 30(b)(6) Topics). The United States is not willing to present a witness on Topics 1, 2(a), 2(b), 4, 5, 6, 7, or 10 as drafted for the reasons set forth below.

      As an overarching matter, the United States has offered to pull down its 30(b)(6) topics 3-6 if BP pulls down 1, 2(a), 4, 5, and 10 because, in addition to other reasons discussed below, all these topics call for expert testimony. *See also* Ex. 2 (US's Proposed Rule 30(b)(6) Topics). Requiring 30(b)(6) testimony on an expert-driven topic several months prior to the issuance of expert reports raises a fundamental issue regarding the timing of expert productions: the environmental harm materials on which the experts will rely will be disclosed with their reports. Both sides' experts will testify about the relevance and strengths and weaknesses of those materials during their depositions.  Previewing an area of expert testimony through fact

witnesses requires not only premature disclosure of expert consideration materials but also requires duplicative agency testimony that will be provided through an expert.  The topics specifically addressing environmental harm (BP's 1, 2(a), 4, 5 and United States' topic 4) all also tread into environmental assessment work Judge Barbier has held to be out of bounds for this Phase.  The topics specifically addressing human health harm present unique privacy concerns that will be best addressed by expert witnesses who have had time to carefully consider the material available and redact any privacy information. BP has responded to this proposal but its response does not resolve the United States' objections.  *See* Ex. 3 (BP Response and US Counter-Response).

    Topic 1

    These topics seek information about the United States' knowledge of the environmental impacts of the *Deepwater Horizon* Spill, including shoreline impacts and impacts on Wildlife, as well as potential mitigation of such environmental impact.  Topic 1, for example, requests testimony regarding the United States' "knowledge of, role, involvement, and efforts in determining the nature and extent of any environmental impacts as to which You contend there has been no or limited recovery to date, any associated data, analyses or determination of such impacts."  By requesting testimony about the United States' knowledge without any time limitation and by seeking testimony about analysis and determinations that are not yet final, these requests seek to probe the ongoing NRD Assessment process, calling for testimony about privileged internal agency communications.  The Court clearly indicated that ongoing analysis from the NRD Assessment was not discoverable in the penalty phase:

    MS. KARIS: Fair enough.  So in addition to not having the underlying data, part of what BP is requesting is the analysis of some of that data that has been conducted by the United States.
    THE COURT: The problem with that, as I understand it, a lot of this analysis is very preliminary and scientists talking to each other.  I don't think you're entitled to that.  You may be entitled to data, but I don't think you're entitled to that. . . .

Tr. of Hearing at 78 (Mar. 21, 2014). Thus, discovery in this phase is restricted to data; by seeking testimony about the United States' knowledge of environmental impacts, including analyses and determinations made, BP is going far beyond the lines drawn by the Court to protect the ongoing NRD Assessment.

    More fundamentally, the United States believes that seeking 30(b)(6) testimony regarding the environmental impact of the spill in this case is unnecessary.  There is at this juncture no finalized view within any agency of the United States about the nature or extent of recovery of the Gulf to date, given the ongoing NRD Assessment.  The environmental harm case will be presented by experts by both the United States and BP.

    Topic 2

    Topic 2 seeks information regarding the United States' knowledge of the nature, extent, and degree of effectiveness of response and alleged mitigation efforts with regard to

environmental, human health, economic, and other effects.  The topic is overbroad and precludes effective testimony by any witness for the United States because the agencies responsible for investigating environmental, human health, economic, and other effects are disparate, and preparing a witness on all of these areas is impossible.  BP is aware of this issue, as it specifically separated out topics concerning environmental damage, human health, economic impact in later topics, such as Topics 4, 9, and 10.  Thus, an attempt to obtain testimony in a catch-all topic is guaranteed to be a waste of discovery resources because no witness or set of witnesses can be adequately briefed on this full set of topics.

In addition, as drafted, each of the subtopics of Topic 2 either seeks information that is part of the NRD Assessment or seeks information to which BP and third parties have far superior access.   Subtopic (a), for example, seeks analyses, studies, and assessments of the effectiveness or success of Response activities, including environmental rehabilitation and restoration efforts.  Subtopic (a) is a stalking horse intended to provide Defendants a preview of the natural resource damages claims not yet brought by the United States.  The United States will not present a witness on Subtopic (a) as drafted.

Topics 4 and 5

Topics 4 and 5 seek information regarding the United States' "knowledge of and role, in the collection, observation, and rehabilitation of" Wildlife during the response and the United States' "knowledge of shoreline impacts from the Deepwater Horizon Spill and subsequent recovery," including associated analyses.  The United States is concerned that this Topic, like Topic 1, is an attempt to invade privileged and preliminary NRD work.  For example, in Topic 5, BP specifically requests information concerning "subsequent recovery."  Any analysis of recovery of the Gulf is integrally linked to the ongoing NRD assessment.  The Court granted the United States' motion to preclude evidence of seriousness to the extent it invades the ongoing NRD Assessment.  Tr. of Hearing at 81-84 ("But I'm not going to allow this to evolve into a NRDA case. We're just not going to go there.").  Topic 4 is also unduly burdensome. Because it requests testimony on the United States' role in, and collection, observation and rehabilitation of many types of animals, the United States would be required to provide at least 6 scientists to properly respond, several of whom are working on the ongoing NRD assessment. The United States proposes narrowing Topics 4 and 5 to testimony regarding data from the response period itself, excluding testimony regarding ongoing analyses (including recovery).  Without such narrowing of Topics 4 and 5, the United States cannot produce witnesses on these topics.

Topics 2(b) and 10(d)

Topics 2(b) and 10(d) generally seek testimony regarding any statements "commending" Response Activity and whether such efforts successfully mitigated harm to the environment and human health. The United States cannot provide a witness on 2(b) and 10(d) as written because the topics are essentially asking for testimony about the results of a document search (the topics call for a witness to testify about all "statements" "commending" various BP actions).   In their requests for production, BP has also asked for documents containing statements commending BP.  The United States has agreed to run the document search for BP on that RFP, and will produce the results to BP. BP will therefore have the same ease of access to any statements it

believes commend the company for its response as does the United States.  A deposition would be highly unlikely to provide additional useful information. In light of that fact, depositions on these topics would also be unduly burdensome. These topics are also vague. It is improper to require a representative of the United States to testify about what anyone has ever written about the response that BP may interpret as a commendation—guesses a 30(b)(6) witness may make about the meaning of any such statements will be of as much value as BP's own assumptions.

Topic 6

BP requests testimony regarding the United States' knowledge of, role, and involvement in the operation of freshwater diversion structures in the Mississippi River in 2010.  As the United States articulated in its response to the corresponding Request for Production, the Mississippi River Diversions were not performed by the Defendant and, therefore, cannot constitute efforts by the Defendants to mitigate the effects of their violations.  The attempt to explore an area that is not relevant to any of the factors at issue is not justified, and BP has not articulated any reason it should be entitled to such testimony.

Topic 7

In Topic 7, BP seeks testimony about the United States' knowledge of the amount of oil removed by numerous processes, as well as the preparation and publication of the Oil Budget Calculator.  The United States believes that what the Court needs to know for the penalty phase was already addressed in prior phases and that any more detailed analysis of the fate and transport of oil and dispersants will be an issue in the NRD Assessment and the NRD phase; BP's efforts thus appear to be both an attempt to both prematurely discover the United States' ongoing analyses and to prematurely lock the United States into positions that will necessarily change as those analyses are conducted and completed.  Nonetheless, in the interest of compromise, the United States is prepared to present a witness to testify about areas that do not call for testimony on fate and transport mechanisms.   There is, however, one additional restriction on the scope of Topic 7: during Phase 1, BP sought and elicited 30(b)(6) testimony from the United States regarding the preparation of flow rate calculations, flow rate estimates, and the drafting and releases processes for the Oil Budget Calculator.  Thus, those areas should be excluded from this topic to avoid duplication of efforts.

For these reasons the United States respectfully requests a ruling that it need not produce Rule 30(b)(6) witnesses on topics 1, 2(a), 2(b), 4, 5, 6, 7 and 10 proposed by BP in its April 11, 2014 30(b)(6) Deposition Notice to the United States.

Respectfully submitted,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch

cc:     Andy Langan
        Ky Kirby

4

**EXHIBIT 1 to**

**Letter from S. Himmelhoch to Judge Shushan**

**May 8, 2014**

**UNITED STATES DISTRICT OF COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAG. JUDGE SHUSHAN |
| …………………………………………... | : | |

**DEFENDANTS' 30(b)(6) DEPOSITION NOTICE**
**OF THE UNITED STATES IN THE PENALTY PHASE**

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and Pre-Trial Order

No. 17 (as supplemented and amended by Pre-Trial Order No. 27), the United States shall

designate and produce one or more officers, managers, agents, employees, or other

representatives of the United States to testify on its behalf as to the areas of inquiry described

below.  The times and locations of the depositions will be scheduled in conjunction with the

designees' fact depositions in their individual capacities, where applicable, or otherwise as may

be scheduled by the Court and the parties.  The depositions will take place before a notary public

or some other person authorized to administer oaths and will be recorded by audio, stenographic,

and videographic means.

**DEFINITIONS**

1.     "*Deepwater Horizon* Incident" or "Incident," whether or not capitalized, shall
mean the events leading to (i) the loss of life and injuries on the *Deepwater Horizon* rig on or
about April 20, 2010, and (ii) the eventual sinking of the rig on April 22, 2010, including the
blowout, explosions, and fire.

2.     "*Deepwater Horizon* Oil Spill," the "Oil Spill," or the "Spill," whether or not
capitalized, means the discharge of hydrocarbons that occurred in connection with the
*Deepwater Horizon* Incident.

3.     "Dispersants," whether or not capitalized, shall mean (i) dispersants, (ii) dispersant
constituents, (iii) derivatives of any of the foregoing from biological, chemical, photochemical,
or other processes, or (iv) any aggregation, mixture, or combination of any of the foregoing with

any other material including without limitation organic matter, inorganic matter, sediments, biological exudates, sand and water.

4.      "Environment" "Environmental," or "Environmental Resources," whether or not capitalized, shall refer to (i) air, surface, and subsurface water, beaches, land and sediments, and the organic and inorganic constituents of the foregoing, (ii) Organisms (as defined below), (iii) natural resources, (iv) ecosystems, (v) niches and other habitats, and (vi) combinations or assemblages of any of the foregoing, in each case in or near the Gulf of Mexico or in or near any other location that may have been affected by Oil-Related Materials (as defined below) regardless whether in a natural state or modified by human activity.

5.      "Non-operating investor or party" or "NOI" means any person or entity that holds an ownership interest in a lease or facility related to offshore gas or oil exploration, drilling, or production operations but is not the designated operator for purposes of activities under that lease or on that facility.

6.      "Oil-Related Materials" shall mean any of the following from the *Deepwater Horizon* Oil Spill or response thereto: (i) oil, (ii) polycyclic aromatic hydrocarbons ("PAHs"), (iii) hydrocarbons, (iv) other oil or gas constituents, and (v) well drilling and closure materials, including without limitation drilling muds and fluids and materials injected into the well-head. Oil-Related Materials also shall include (i) derivatives of any of the foregoing from biological, chemical, photochemical, burning or other processes, (ii) any aggregation, mixture, or combination of any of the foregoing with any other material including without limitation organic matter, inorganic matter, sediments, biological exudates, sand and water; or (iii) any combination of the foregoing.

7.      "Organisms" shall refer to any and all members of the six kingdoms of life including animals, plants, fungi, protists, archaea, and bacteria.

8.      "Response Activities" or the "Response," whether or not capitalized, shall mean any and all activities performed to respond to, or otherwise mitigate, minimize, or prevent any environmental, human health, economic, or other effects of, the *Deepwater Horizon* Spill.

9.      "Unified Command" shall mean the structure, organization, and team established to oversee and manage the response to the *Deepwater Horizon* Spill following the Incident.

10.      "United States" shall mean the United States of America, including its departments, agencies, and instrumentalities, any employees, agents or assigns of these departments, agencies, and instrumentalities, and any person who possesses information or documents within the custody and control of these departments, agencies, and instrumentalities.

11.      "Wildlife" shall mean all non-domesticated vertebrate animals including without limitation birds, mammals, amphibians, and reptiles, but not including fish.

12.      "You," "your," and "yours," whether or not capitalized, shall mean the United States.

## AREAS OF INQUIRY

1.      Your knowledge of, role, involvement, and efforts in determining the nature and extent of any environmental impacts from the *Deepwater Horizon* Spill, including any environmental resources as to which You contend there has been no or limited recovery to date, and any associated data, analyses or determination of such impacts.

2.      Your knowledge of the nature, extent, and degree of effectiveness of the efforts to respond to, or otherwise mitigate, minimize, or prevent any environmental, human health, economic, or other effects of, the *Deepwater Horizon* Spill, including but not limited to:

> a.   any analyses, studies, or assessments of the effectiveness or success of the Response Activities (including but not limited to skimming; booming; dispersant application; controlled *in situ* burning; shoreline monitoring, assessment, and cleanup; environmental rehabilitation or restoration efforts; and other health and economic mitigation efforts) in mitigating or minimizing the actual or potential effects of the Spill;

> b.   statements commending the Response Activities, including determinations that any aspect of the Response Activities was effective or successful, and BPXP's role and involvement in and commitment to the Response Activities;

> c.   any response or cleanup activities that were not conducted at the direction and under the oversight of the Unified Command;

> d.   any decisions or actions (or inactions) by the Unified Command, BPXP, or other agency or entity that limited, impeded, delayed, or reduced the effectiveness of efforts to respond to, or otherwise mitigate, minimize, or prevent any environmental, human health, economic, or other effects of, the *Deepwater Horizon* Spill; and

> e.   any contention that BPXP or any other entity did not effectively respond to, or otherwise mitigate, minimize, or prevent any actual or potential environmental, human health, economic or other effects of the Spill, and the bases for any such contention.

3.      Your knowledge of and role in dispersant operations during the Response, including the selection, approval, use, limitations on use, safety, effectiveness, and effects of dispersants and dispersant constituents, including Corexit 9500 and/or Corexit 9527, and BPXP's role and involvement in those dispersant operations.

4.      Your knowledge of and role, in the collection, observation, and rehabilitation of birds, turtles, mammals, reptiles, and other Wildlife during the Response, including associated data, and BPXP's role and involvement in such collection, observation, and rehabilitation.

5.       Your knowledge of shoreline impacts from the *Deepwater Horizon* Spill and subsequent recovery, including the nature, extent, duration, monitoring, and cleanup of shoreline oiling; efforts to mitigate impacts to the shoreline during the Response and the effectiveness of those efforts; and associated data and analyses.

6.       Your knowledge of, role, and involvement in the operation of freshwater diversion structures on the Mississippi River in 2010, including communications and/or analyses regarding (i) plans and the decision(s) to operate such freshwater diversion structures and (ii) any anticipated effects of those operations on water, sediment, and/or organisms.

7.       Your knowledge of the amount of oil and any analysis of the amount of Oil-Related Materials that You contend was contained, collected, dispersed, burned, removed, or cleaned up in connection with Response Activities and/or any natural processes, including but not limited to the amounts attributable to each process (for example, through the use of skimming, boom, dispersants, *in situ* burning, shoreline cleanup, and natural processes), and the preparation and publication of the "Oil Budget Calculator, Deepwater Horizon, Technical Documentation," and its appendices, dated November 2010.

8.       Your knowledge of the facts in and the preparation and publication of "BP *Deepwater Horizon* Oil Spill: Incident Specific Preparedness Review (ISPR);" the "On Scene Coordinator Report for the *Deepwater Horizon* Oil Spill;" and the reports and other work of the Operational Science Advisory Team, including but not limited to the "Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring" (OSAT-1 Report), the "Summary Report for Fate and Effects of Remnant Oil in the Beach Environment" (OSAT-2 Report), and the "Investigation of Recurring Residual Oil in Discrete Shoreline Areas in the Eastern Area of Responsibility" (OSAT-3 Report), including the findings and conclusions of such reports.

9.       Your knowledge of, role, involvement, and efforts in determining the nature and extent of any economic impacts of the *Deepwater Horizon* Spill and subsequent economic recovery, including BPXP's efforts to mitigate or minimize such impacts, and any associated data, analyses, or determination of such impacts.

10.      Your knowledge of any actual, potential, or future human health impact that resulted from or that may result from the *Deepwater Horizon* Spill and/or Response Activities, and of efforts undertaken to assess any such impact including but not limited to:

      a.   efforts to analyze, evaluate, determine, or study any actual, potential, or future impact on human health, including such efforts relating to the seriousness or lack of seriousness of any such impact on human health;

      b.   efforts to sample, monitor, or test Oil-Related Materials and/or Dispersants as part of any assessment of any actual, potential, or future impact on human health;

    c.   efforts to respond to, or otherwise mitigate, minimize, or prevent, any actual, potential, or future impact on human health;

    d.   statements commending Response Activities or mitigation efforts that affected any actual, potential, or future impact on human health, including determinations that any aspect of Response Activities or mitigation efforts relating to human health was effective or successful;

    e.   any contention that BPXP or any other entity did not effectively respond to, or otherwise mitigate, minimize, or prevent any actual, potential, or future impact on human health; and

    f.   any information regarding levels of pollutants that are of concern for long-term health effects.

11.    Any policies or guidance of the federal government regarding:

    a.   issuance of notices of violation, non-compliance, or incidents against non-operating investors or parties (collectively "NOIs") for violations of federal law applicable to leasing and operations activities on the outer Continental Shelf;

    b.   enforcement, calculation, and application of administrative or civil penalties against NOIs for violations of federal law applicable to leasing and operations activities on the outer Continental Shelf;

    c.   any notices actually issued to and enforcement actions actually taken against NOIs for violations of federal law applicable to leasing and operations activities on the outer Continental Shelf; and

    d.   any settlements, consent decrees, consent orders, administrative orders or other court orders or judgments related to any notices or enforcement actions identified in response to (c).

12.    Any policies, guidance, fair market value procedures, resource evaluations, modeling, or analyses conducted regarding leasing of oil and gas by the United States on the outer Continental Shelf, the Gulf of Mexico, or the Macondo Prospect (Mississippi Canyon Block 252 in particular), including without limitation lease sales, bids on leases, surety bonds, bonuses, royalties and royalty relief, rental payments, or other monetary payments owed to the United States; revenue sharing with the States; and energy security, economic, or other benefits to the United States, any State, or local region.

Dated:  April 11, 2014                Respectfully submitted,

                                       ___ DRAWT _____

                                       ___ DRAFT _____
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985
and

Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

*Attorneys for BP Exploration & Production*
*Inc.*

and


BINGHAM McCUTCHEN LLP
/s/ James J. Dragna_____
James J. Dragna
jim.dragna@bingham.com
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@bingham.com

6

Thomas Lotterman
tom.lotterman@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

*Attorneys for Anadarko Petroleum Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 on this 11th day of April, 2014.

____DRAFT_____

**EXHIBIT 2 to**

**Letter from S. Himmelhoch to Judge Shushan**

**May 8, 2014**

*April 21 merged Draft for meet and confer discussions*

**UNITED STATES DISTRICT OF COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE: OIL SPILL BY THE OIL** | § | **MDL No. 2179** |
| **RIG "DEEPWATER HORIZON"** | § | |
| **IN THE GULF OF MEXICO,** | § | **SECTION: J** |
| **ON APRIL 20, 2010** | § | |
| | § | **JUDGE BARBIER** |
| | § | **MAG. JUDGE SHUSHAN** |

**THIS DOCUMENT RELATES TO ALL CASES**

**<ins>DEPOSITION NOTICE OF DEFENDANTS BP EXPLORATION & PRODUCTION INC.
AND ANADARKO PETROLEUM CORPORATION</ins>**

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and PRE-TRIAL

ORDER NO. 17 (as supplemented and amended by PRE-TRIAL ORDER 27)—designate and

produce one or more officers, managers, agents, employees, or other representatives of  BP

Exploration & Production Inc. and Anadarko Petroleum Corporation, to discuss the Areas of

Inquiry identified below. In identifying each of the Areas of Inquiry below, the United States is

not seeking to discover privileged or work product information, waiving any applicable privilege

or work product claim, or making any representation as to the existence or scope of responsive,

non-privileged information with respect to any particular Area of Inquiry.  The depositions shall

take place in New Orleans unless otherwise scheduled by the Court and parties, and the times of

the depositions will be scheduled in conjunction with the designees' fact depositions in their

individual capacities, or otherwise as may be scheduled with Judge Shushan and the parties.

1

*April 21 merged Draft for meet and confer discussions*

## **DEFINITIONS**

As used herein, the following terms are defined as follows:

1.      "Anadarko," "Anadarko Petroleum Corporation" and "APC" means Anadarko Petroleum Corporation and its consolidated subsidiaries, unless stated otherwise.

2.      "BP" means BP plc and its subsidiaries, including relevant predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its/their behalf.

3.      "BP Exploration & Production Inc." ("BPXP") means the BP entity that bid for and was awarded the right to lease Mississippi Canyon Block 252 ("MC-252").  BPXP is a Delaware corporation with its principal place of business in Texas.  BPXP includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

4.      "BP America Production Company" ("BPAPC") was a party to the drilling contract concerning the use of the Deepwater Horizon to drill the Macondo well. BP America Production Company is a Delaware corporation with its principal place of business in Texas. BPAPC includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

5.      "BP Company North America Inc." is a Delaware corporation with its principal place of business in Illinois.  BP Company North America Inc. includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

2

*April 21 merged Draft for meet and confer discussions*

6.      "BP Corporation North America Inc." is an Indiana corporation with its principal place of business in Texas.   BP Corporation North America Inc. includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

7.      "BP America Inc." is a Delaware corporation with its principal place of business in Texas.  BP America Inc. includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

8.      "BP Holdings North America" is a UK private limited company with its principle place of business in the United States.  BP Holdings North America includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

9.      "BP p.l.c." or "BP plc" means the parent corporation of the BP group of companies.  The company was incorporated in 1909 in England and changed its name to BP p.l.c. in 2001.

10.      "Consolidating financial statements" means the financial reports (income statement, balance sheets, and statement of cash flows) for each subsidiary and the eliminations and adjustments that are made in preparing the ultimate consolidated financial statement for the parent company.

11.       "Identify," whether or not capitalized, with respect to: (a) an individual, shall mean to provide the individual's full name, job title, and employer during the period referred to, and current or last-known address and telephone number and business address and telephone

3

*April 21 merged Draft for meet and confer discussions*

number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) Information, shall mean to provide the date, title, subject matter, author(s), and recipient(s) or the Bates number(s).

12.     "Incident" shall mean the loss of control of the MC252 Well and the fire and explosion(s) on board, and resulting sinking of, Transocean's Deepwater Horizon rig, in addition to the resulting oil spill in the Gulf of Mexico.

13.     "Information" shall have the meaning set forth in Pretrial Order 22, Paragraph 2.

14.     "Lease" means the Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act, "Serial Number OCS-g 32306" pertaining to "All of Block 252, Mississippi Canyon, OCS Official Protraction diagram, NH 16-10," also known as the Macondo Prospect, an oil and gas prospect in the Gulf of Mexico, off the coast of Louisiana.

15.     "Macondo Prospect" means the Macondo Prospect (Mississippi Canyon Block 252, abbreviated MC252) an oil and gas prospect in the Gulf of Mexico, off the coast of Louisiana. The prospect was the site of the Deepwater Horizon drilling rig explosion on April 20, 2010.

16.     "Macondo Well" means the exploratory well drilled and constructed pursuant to the Lease as defined herein.

17.     "Material Transaction" means a transaction for the subject entity that meets the standards of materiality as described in SEC Staff Accounting Bulletin No. 99 - Materiality and by the FASB Statement of Financial Accounting Concepts No. 2.

*April 21 merged Draft for meet and confer discussions*

18.     "Person" refers to, without limitation, any and every natural individual, each and every association, partnership, joint venture, corporation, professional corporation, trust and any and every other identifiable entity.

19.     "Relating to," "referring to," "regarding," "concerning," "reflecting" or "with respect to" refers to, without limitation, the following concepts: discussing, describing, reflecting, concerning, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

20.     "Response" refers to oil spill response efforts, undertaken pursuant to Section 311(c) of the Federal Water Pollution Control Act, 33 U.S.C § 1321(c) and 40 CFR Part 300, to contain, collect, remove, disperse, and minimize the impact of hydrocarbons released from the Macondo well in connection with the Deepwater Horizon Incident (including through the use of technologies such as controlled in situ burning, dispersants, skimming, and the placement of booms), including any activities BP or APC seeks to introduce evidence of, reference, or discuss in the Penalty Phase.  This includes any natural resource damage costs, or any expenses related to determining, researching, and investigating those damages.

21.

## AREAS OF INQUIRY OF BPXP

1.     BPXP's role in and impact on the economy of the local community, Gulf of Mexico region, and the United States, including harm to the economy from the Deepwater Horizon oil spill

2.     BP's knowledge and adoption of existing technologies and safety practices, including but not limited to deepwater drilling safety practices and technology, prior to and since

5

*April 21 merged Draft for meet and confer discussions*

the Incident, including all factual bases for BPXP's contentions that it has developed

technological and safety advancements during the Response that were substantial, innovative,

highly valuable, and have improved industry standards, as well as all factual bases for BPXP's

contention that it has taken an industry-leading role and expended considerable effort in

improving deepwater drilling safety since the Incident.

3.      BP's knowledge and adoption of existing deepwater drilling safety practices and

technology prior to and since the Incident, including all factual bases for BPXP's contention that

it has taken an industry-leading role and expended considerable effort in improving deepwater

drilling safety since the Incident.

4.      Penalties sought and obtained against other companies, in other environmental

incidents, that BPXP contends the Court should consider in this case, including any similarities

or differences between those incidents and the Deepwater Horizon Incident and Spill.

5.3.     BP's knowledge during the spill of any potential risks of harm to human health or

the environment, including acute, chronic, or cumulative risks, associated with dispersants, and

BP's consideration of such risks when requesting approval to apply dispersants during the

Response.

6.4.     All factual bases for BPXP's contentions regarding the environmental impact,

lack of impact, and/or recovery, (including but not limited to Fish, Shoreline Environment, and

Wildlife), whether positive or negative, from the Deepwater Horizon Incident and Spill and the

subsequent Response, including without limitation impact or lack of impact from Oil-Materials,

Dispersants, any Response Activities, and/or any Mississippi River Diversions attempted,

undertaken, discussed, or considered.

6

*April 21 merged Draft for meet and confer discussions*

7.5.    BP's knowledge of all injuries or illnesses sustained during the Incident  and the subsequent Response, including but not limited to medical claims,  and with respect to such medical claims, investigation of those claims, correspondence, settlement, payments, etc., under any framework, including but not limited to the BP claims facility, the oil spill trust, the GCCF, the  Medical Benefits Settlement, or settlements with rig workers or families of rig workers; and all analyses conducted by BP regarding the impact, effect or seriousness of the Incident and Response on human health.

8.6.    BP's knowledge of the "Medical Encounters" and  "Injury and Illness" databases, including, but not limited to, the underlying Information from which these databases were created, the process by which the databases were created, the fields available, the structure and number tables,  any modifications or upgrades, the applications in which the databases operate, data entry and recall procedures, indexing and searching capability, quality assurance processes and controls, access restrictions, security precautions, the manner in which information from these databases can be accessed, and the ability to generate reports, queries, and other subsets of data.

9.7.    All factual bases for BPXP's contentions regarding actions taken or decisions made by the United States that may have made the any mitigation, remediation and/or Response efforts less effective.

10.8.   The financial performance, historical trends and future projections for BP, including without limitation facts, analyses, policies and practices regarding the following:

*April 21 merged Draft for meet and confer discussions*

a.  The data, metrics and other information bearing on the financial performance and status of BP as publicly reported in its Annual 20-F filings with the United States, SEC and/or the United Kingdom.

b.  Any of BP's contingent liabilities that, alone or combined, could have a significant impact on BP's financial performance or status, and for each such liability, the nature of the liability, the probability of its occurrence and the potential magnitude and timing of its financial impact.

c.  Any unused or available credit lines or debt capacity available to BP, including likely terms.

d.  The basis for BP's forward-looking projections for 2014 and into the future.

e.  The contribution of exploration, production and related operations both as a global segment and in the Gulf of Mexico to BP's profitability.

f.  Plans, proposals, or suggestions under development or consideration by BP, whether preliminary or otherwise, to sell further assets.

~~11.~~9.      The factual basis for any contention that a civil penalty of up to $18 billion would have a significant adverse impact on the business operations of BPXP, taking into account without limitation ~~(taking into account~~ its historical financial relationships with other BP entities both pre- and post- Incident, ~~), and including without limitation the following information~~ and its financial and corporate~~ion~~ relationship with ~~for~~ each of ~~BPXP,~~ BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America and BP p.l.c. from 2005 to the present, including without limitation:

*April 21 merged Draft for meet and confer discussions*

  a. Sources and uses of funds and transfers between or among BPXP, BP America

    Production Company, BP Company North America Inc., BP Corporation North

    America Inc., BP America Inc., BP Holdings North America and/or BP p.l.c. or

    loans between or among those BP entities.

  b. Sources and uses of funds and transfers between BPXP and any other BP entity,

    whether referenced above or not, and loans between BPXP and any other BP

    entities, whether referenced above or not.

  c. Payment of dividends from each of BPXP, BP America Production Company, BP

    Company North America Inc., BP Corporation North America Inc., BP America

    Inc., BP Holdings North America and BP p.l.c. to another BP corporate entity,

    including the amount of and history of dividends paid by BPXP to any other BP

    corporate entity.

  d. Practices regarding one or more of BPXP, BP America Production Company, BP

    Company North America Inc., BP Corporation North America Inc., BP America

    Inc., BP Holdings North America or BP p.l.c. financing the investments,

    operations, or other expenditures of other BP entities, and instances where that

    occurred.

  e. Inter-company transactions, including those pursuant to service agreements

    (involving employees, technical, engineering, commercial, marketing,

    environmental, legal, tax, banking, investment, financial, accounting,

    administrative, or other services) or secondment agreements and any other

    transactions;

*April 21 merged Draft for meet and confer discussions*

     f.   Basis for the allocation of overhead or services provided by one BP entity to other BP entities;

     g.   Transfer and inter-company pricing policies and practices for the pricing of goods or services provided by one BP entity to another;

     h.   Guarantees of debt or other obligations by one BP entity for another; and,

     i.   Sales or other transfers of goods, services or assets from BPXP or from BP to unaffiliated third parties, i.e. any non-BP entity.

~~12.~~10.  Any expenditure(s) that any BP entity has made in connection with the Incident or Response or any other mitigation activities that BPXP contends should diminish its obligation to pay a civil penalty, and the facts concerning each such expenditure including:

     a.   Identification of the expenditure, including which BP entity or entities incurred costs at any stage related to the expenditure;

     b.   Which BP entity financed the expenditure, initially and ultimately, including inter--BP company transfers or sales of assets;

     c.   The accounting and tax treatment of the expenditures for all involved BP entities including before and after tax costs;

     d.   Any BP entity providing guarantees for the expenditure;

     e.   Impact of the expenditure on BP's financial condition and operational capability at the time and into the future;

     f.   Any debt owed by BPXP as a result of such expenditure and to whom or what entity such debt is owed.

*April 21 merged Draft for meet and confer discussions*

~~Any facts, information and analyses that BPXP contends are relevant to any of the eight~~

~~penalty factors in 33 U.S.C. § 1321(b)(8) to the extent not already covered by or included~~

~~in any of the foregoing topics.~~

~~The civil penalty amount that BPXP contends would force it to discontinue its business~~

~~operations if imposed by the Court in this case, and the factual basis for that contention.~~

~~The civil penalty amount that BPXP contends would force BP to discontinue its business~~

~~operations if imposed by the Court in this case, and the factual basis for that contention.~~

### AREAS OF INQUIRY OF ANADARKO

1.      Anadarko's ("APC") Gulf of Mexico offshore operations' role in and impact on the economy of the local community, Gulf of Mexico region, and the United States, including harm to the economy from the Deepwater Horizon oil spill.

2.      The financial performance, historical trends and future projections for Anadarko, including without limitation facts, analyses, policies and practices regarding the following:

    a.   The data, metrics and other information bearing on the financial performance and status of APC as publicly reported in its Annual Form 10-K and Quarterly Form 10-Q filings with the United States SEC.

    b.   Any of APC's contingent liabilities that, alone or combined, could have a significant impact on APC's financial performance or status; and for each such liability, the nature of the liability, the probability of its occurrence and the potential magnitude and timing of its financial impact.

11

     c.   Any unused or available credit lines or debt capacity available to APC, including likely terms.

     d.   The basis for APC's forward-looking projections for 2014 and into the future.

     e.   The contribution of exploration, production and related operations both as a global segment and in the Gulf of Mexico to APC's profitability.

     f.   Plans, proposals, or suggestions under development or consideration by Anadarko, whether preliminary or otherwise, to sell further assets.

3.    Facts and information regarding any sale or transfer of assets to third parties (i.e., non-APC companies or affiliates) from 2008 to 2014, including the amount, date, and the APC company or affiliate and third party involved in the transfer.

4.    Any expenditure(s) made by any APC entity since 2010 in connection with the Incident, Response or any other  mitigation activities that APC contends should diminish its obligation to pay a civil penalty; and the facts concerning each expenditure, including without limitation for each:

     a.   Identification and description of the expenditure, including the purpose and scope, and which APC entity or entities were involved at any stage.

     b.   Whether and to what extent the expenditure was expensed or capitalized and, for the latter, the useful life or lives assumed for tax-related purposes.

     c.   Any other tax credits or incentives (e.g., local, State or Federal) APC gained for the expenditure.

     d.   The impact of the expenditure on Anadarko's financial condition and operational capability at the time and into the future.

*April 21 merged Draft for meet and confer discussions*

5.      The economic impact, if any, of the recent settlement filed on April 3, 2014 (Dkt. No. 635) in *In re: Tronox*, Adv. Proc. No. 09-01198-alg (Bankr. S.D.N.Y.) on APC's on-going business operations and its position regarding whether that settlement in any way impacts APC's ability to finance a civil penalty in this litigation.

6.      All facts, analyses, and any other information that supports or may contradict Anadarko's contentions regarding its efforts to minimize or mitigate the effects of the Incident and Response including facts, analyses, and any other information related to the following topics that Anadarko contends are relevant and are cited in its First Amended Initial Disclosures served on April 4, 2014:  Anadarko's offers of assistance after the Incident and its role in responding to the Incident; Anadarko's $4 billion settlement with BP in relation to the Incident; and Anadarko's contribution to the Rockefeller Philanthropy Advisor's Fund for Gulf Communities.

7.      All facts, analyses, and any other information that supports or may contradict Anadarko's contentions regarding the benefit to the United States of offshore drilling development, including, but not limited to:  Anadarko's payments or non-payments of royalties to the United States, or any disputes regarding royalties to the United States, including with respect to oil collected from the Macondo Incident.

8.      All facts, analysis, and any other information that supports or may contradict Anadarko's contentions regarding the "other matters as justice may require" penalty factor, including, if Anadarko contends such topics are relevant, its contentions related to (1) government oversight, approvals, and compliance requirements for deepwater drilling generally and for the Macondo well specifically; (2) ~~government enforcement actions, including criminal actions, with respect to the Incident; (3)~~ pre- and post-Incident regulatory guidance,

13

recommendations and practice regarding deepwater drilling and enforcement history as it relates to operators; (34) industry custom and practice (including contractual relationships) between designated operators and non-operators; (45) potential and actual impacts on (i) non-operators; (ii) investment in offshore oil development, (iii) offshore drilling operations, and (iv) industry custom and practice (including contractual relationships) if penalties (or threat of penalties) are imposed on non-operators; and (56) efficacy of penalties against non-operators, contractors, and non-operating parties.

9.     All facts, analyses or any other information that supports or may contradict Anadarko's contentions in the Penalty Phase regarding the impact, effect or seriousness of the Incident and Response on the environment, human health, and the economy, to the extent that Anadarko's contentions or facts, information or analyses are separate and independent from BP's contentions in the Penalty Phase.

10.     Any facts, information and analyses that Anadarko contends are relevant to any of the eight penalty factors in 33 U.S.C. § 1321(b)(8) to the extent not already covered by or included in the foregoing topics.

11.     The civil penalty amount that Anadarko contends would force it to discontinue its business operations if imposed by the Court in this case, and the factual basis for that contention.

14

*April 21 merged Draft for meet and confer discussions*

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
MICHAEL MCNULTY
SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
PATRICK CASEY
RICHARD GLADSTEIN
DANIEL S. SMITH
Senior Counsel
ABIGAIL ANDRE
A. NATHANIEL CHAKERES
ANNA CROSS
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:   202-514-2583
E-mail:  steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana

15

_April 21 merged Draft for meet and confer discussions_

SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

# EXHIBIT 3 to

# Letter from S. Himmelhoch to Judge Shushan

# May 8, 2014

## Himmelhoch, Sarah (ENRD)

| | |
|---|---|
| **From:** | Himmelhoch, Sarah (ENRD) |
| **Sent:** | Thursday, May 08, 2014 10:29 AM |
| **To:** | 'Langan, Andrew'; O'Rourke, Steve (ENRD); Karis, Hariklia; Kirby, Ky E. |
| **Cc:** | *mbrock@cov.com; Nomellini, Mark J.; Jakola, Katie; *Brian.Israel@aporter.com; Andre, Abigail (ENRD); DeSantis, Karen McCartan; Horizon, Deepwater; Lotterman, Thomas R.; Dragna, Jim; Halverson, David M. |
| **Subject:** | RE: MDL2179-, 10-4536 Penalty Phase -- Numbers of Depositions |

Andy –

Thank you for your response to our offer to mutually withdraw all environmental and human health impact Rule 30(b)(6) topics.  Unfortunately, your proposal would leave us with no opportunity to discover BP's positions with respect to environmental and human health impacts, while imposing a significant burden upon the United States.  For these reasons, we cannot accept your offer.  I believe we are now at an impasse with respect to these issues and will bring the issue to Judge Shushan for resolution.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

---

**From:** Langan, Andrew [mailto:alangan@kirkland.com]
**Sent:** Tuesday, May 06, 2014 7:57 PM
**To:** O'Rourke, Steve (ENRD); Karis, Hariklia; Himmelhoch, Sarah (ENRD); Kirby, Ky E.
**Cc:** *mbrock@cov.com; Nomellini, Mark J.; Jakola, Katie; *Brian.Israel@aporter.com; Andre, Abigail (ENRD); DeSantis, Karen McCartan; Horizon, Deepwater; Lotterman, Thomas R.; Dragna, Jim; Halverson, David M.
**Subject:** RE: MDL2179-, 10-4536 Penalty Phase -- Numbers of Depositions

Dear Steve,

Thank you for your May 5 mail below responding to our proposal of last Wednesday, April 30, regarding depositions of fact witnesses.

We decline the US's proposal below for several reasons.  First, we continue to believe it is premature to identify BPXP's trial witnesses  now, when written discovery has just begun and no depositions have been taken.  We view the US's proposal for "may call" witnesses as requiring precisely that.  As you are aware, BPXP provided a list of potential witnesses who may be called upon to testify in its initial and supplemental Rule 26(a) disclosures.  We will once again review our list to determine if any names can be withdrawn but beyond that, we believe that those individuals are potential witnesses.  Moreover, to streamline the process, as we indicated during our meet and confer last week, we propose that the parties first discuss fact witnesses and then identify 30(b)(6) witnesses, as doing so may decrease the total number of fact witnesses necessary for deposition and total number of deposition bundles to be submitted for trial.

Perhaps a compromise the parties might consider is to have the parties identify the top 10 witnesses each side wishes to depose, allow the other side a couple of days to determine how many deponents it needs to present on Rule 30(b)(6) topics beyond the individuals identified for deposition, and then discuss those

additional witnesses, and whether additional deponents are required.  It may be the case that very few, if any, additional witnesses are required.

Then, if during the course of discovery, any individual is identified as a witness to be called to trial, that fact can be disclosed to the other side and their deposition can be taken.  This will allow each party to take the depositions required to support its case and also allow the other side an opportunity to examine a witness if he/she is identified as a trial witnesses.

Please let us know if this proposal is acceptable.

Second, BPXP does not agree with the various fact witness restrictions the US has asserted for at least 6 of the government's current and former employees.  (See your April 25, 2014 letter, which has a January 17, 2014 date, which we think is an error.)  BPXP timely and properly disclosed such witnesses in its Rule 26(a) submissions.  As an initial matter, BPXP agrees to not deposing previously deposed witnesses, specifically, Admirals Allan and Watson.  However, the other witnesses to which the US has asserted objections to their depositions, including Poulin, Zukunft, Lubchenco, Haddad and Michel, each have relevant fact information that BPXP has never been permitted to discover.

Specifically, you have objected to certain witnesses because you assert they have substantial NRD involvement.  In the interest of compromise and cooperation, in response to your offer, we will agree to depose Dr. Childs, whom you say has greater knowledge than Dr. Haddad,  in lieu of Dr. Haddad, provided that the U.S. also agrees to produce Dr. Michel for deposition.  If Dr. Childs cannot answer the questions that would have been appropriate for Dr. Haddad, we reserve the right to seeks Dr. Haddad's deposition.

As for the other witness in this category, namely Jaqueline Michel, the US SCAT Team Lead during the Response, it is BPXP's view that she is required to appear for deposition pursuant to the federal rules.  To the extent that she or any other witnesses have access to privileged information through their NRD or involvement in privileged work streams, if questions are asked during their depositions that call for such information, appropriate objections can be lodged at that time.  We do not agree that merely because a witness has been involved in NRD related work, all their testimony is off limits.  Such a restriction and objection is broader than the limitation the court imposed for NRD related work and broader than the federal rules permit.  These witnesses also have substantial non-NRD related knowledge.  BPXP is permitted to discover such information. As you are likely aware, some of BPXP's current and former employees also have substantial NRD  related knowledge and involvement, but we are not objecting to their depositions, though we reserve the right to assert appropriate objections during the depositions.

DOJ has identified category of individuals as "high level government officials" and objected to their deposition (except we note that DOJ no longer objects to the deposition of Dr. Howard).  We likewise do not agree that their depositions are off limits.  Indeed, some of these witnesses are no longer with the US government.

Separately but relatedly, you have also asked about each side potentially "pulling down" topics identified in the parties' draft Rule 30(b)(6) deposition notices.  Specifically, during the May 1 telephone conference with the Court, the U.S. proposed that it would withdraw topics 3-6 of its Rule 30(b)(6) notice in exchange for BPXP's withdrawal of topics 1, 2(a), 4, 5 and 6.  At this point, BPXP cannot agree to withdraw topics 1, 2(a), or 4 from the draft defense notice.  In exchange for the U.S.'s withdrawal of topics 3-6 as offered by the U.S., however, BPXP is willing to withdraw  BPXP's topic 5 (on the condition that Jacqui Michel, Jane Lubchenco and Carl Childs be made available for deposition).  In addition, as part of this arrangement, BPXP would also withdraw topic 6 in return for the USA agreeing to run searches of particular custodians pursuant to search terms we would propose (and to which the USA would reasonably agree)  re the Mississippi River diversion.  As another part of this compromise, with respect to topic 1, we would also agree to exclude questioning regarding non-public NRDA information, but BPXP should be able to ask about public statements

and publications related to the environment, even if part of the NRDA.  Please let us know if this proposal is acceptable to you.

We look forward to further discussing these issues with you.  If we cannot reach an agreement on the fact witnesses, we will require the court's assistance before we finalize the list of deponents and deposition dates.  Further, given the various open issues facing the parties, we should discuss the way forward given the May 12 deadline the parties face per the Court's April 21 scheduling order.


Best regards

Andy Langan


**J. Andrew Langan, P.C.**

**KIRKLAND & ELLIS LLP**
300 North LaSalle Street Chicago, IL 60654
Tel. +1-312-862-2064  Fax +1-312-862-2200

andrew.langan@kirkland.com

---

**From:** O'Rourke, Steve (ENRD) [mailto:Steve.O'Rourke@usdoj.gov]
**Sent:** Monday, May 05, 2014 2:21 PM
**To:** Karis, Hariklia; *Sarah.Himmelhoch@usdoj.gov; Kirby, Ky E.
**Cc:** *mbrock@cov.com; Langan, Andrew; Nomellini, Mark J.; Jakola, Katie; *Brian.Israel@aporter.com; *abigail.andre@usdoj.gov; DeSantis, Karen McCartan; *deepwater.horizon@usdoj.gov; Lotterman, Thomas R.; Dragna, Jim; Halverson, David M.
**Subject:** MDL2179-, 10-4536 Penalty Phase -- Numbers of Depositions

Dear Counsel:

I write regarding the number of depositions. We understand the bidding as follows:

-BP proposes that BP and the US each can take 10 to 12 depositions, with each side getting to depose whoever they want from the witnesses listed in the 26(a) disclosures. That limit includes anyone who is also designated a 30(b)(6) designee. To the extent that BP "may call" witnesses at trial that the US had not named for deposition, there will be additional depositions of those witnesses, above the limit of 10 (or 12). If I have misunderstood your offer, please correct my error.

-The US proposed that each side could take five depositions from those listed in the 26(a) disclosures, and that each party could also identify up to five additional "may call" witnesses to support its case, and those five would have their depositions taken too. That would yield a hard limit of 10 fact witnesses to be bundled for trial (in addition to Rule 30(b)(6) designees).

-Under either proposal, the US and APC will discuss depositions separately, and not as part of the BP-US discussions.

We do not agree with BP's proposal, as it gives an uncertain number of depositions, and uncertain number of transcripts to be bundle for trial. The US would also be at some level guessing at who BP might call to trial when selecting the initial 10.

Therefore, as a compromise between our two proposals, we suggest that the limit be 12 (an increase from our first proposal). Seven of those twelve would be affirmative depositions, selected by the opposing party, and five would be

3

"may call" witnesses selected by the offering party. No witness who does not sit for deposition can appear at trial. That would yield a hard limit of 12 fact witnesses to be bundled for trial (in addition to Rule 30(b)(6) designees), and eliminate any "work around" witnesses.

As to the 30(b)(6) designees, we all seem to agree that identifying the Rule 30(b)(6) designees by name, this week, is the goal, although the exact date remains unclear.

Regarding the 30(b)(6) topics, last week we had proposed to mutually drop all topics about human health or environmental harm (essentially to agree that those topics would be for expert rather than 30(b)(6) witnesses). Please let us know whether you have decided to agree with that idea or not.

Finally, we are considering the limit on the number of expert witnesses and will get back to you shortly.

Thank you,
Steve

Steven O'Rourke
Environmental Enforcement Section
U.S. Department of Justice
Mail: P.O. Box 7611 Washington, D.C. 20044-7611
Overnight: ENRD Mail Room, 601 D Street, N.W. Washington D.C. 20004
Telephone: (202) 514-2779
Facsimile: (202) 514-2583
E-mail:  steve.o'rourke@usdoj.gov

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*