# MEMORANDUM

**To:** The Honorable Sally Shushan

**From:** Class Counsel

**Re:** <u>In re: Deepwater Horizon</u>
    MDL No. 2179

**Subject:** Medical Benefits Settlement: Chronic Condition Compensation

**Date:** March 28, 2014

When an eligible Medical Class Member submits a claim for compensation for a Specified Medical Condition (SPC), the Claimant and the Claims Administrator are directed to the Specified Medical Condition Matrix, which is found at Exhibit 8.

Chronic Medical Conditions are defined in Section II and listed in Table 3 of Exhibit 8.

Both Section II and Table 3 define Chronic Conditions in terms of "*manifestation*".  (In particular, the symptoms or conditions must first manifest within 24-72 hours of exposure.)

Under these provisions, the Chronic Condition must be documented, established and/or supported by medical records or test findings.  However, there is no limitation on the timing of those medical findings, conclusions or other documentation.

The date of "diagnosis" is not in any way relevant to the consideration of a Chronic SPC Claim.

BP, however, has apparently urged the Claims Administrator to deny SPC Claims based on the definition of a Later Manifested Physical Condition (LMPC) for which a Class Member might hypothetically, at some point in the future – but has not – sought to invoke the Back End Litigation Option (BELO).[1]

First of all, and as outlined more fully herein, this construction of the Settlement Agreement's terms is not well founded.  But, perhaps more importantly, the interpretation and application of the LMPC and BELO provisions are not properly before the Claims Administrator or the Court.

If and when a Class Member attempts to invoke the Back End Litigation Option, then the Claims Administrator might be faced with the question of whether a given condition qualifies as a Later Manifested Physical Condition under the BELO provisions.

In the meantime, however, the Claims Administrator should apply the SPC terms and provisions to a Chronic SPC Claim.

---

[1] While BP apparently points to the Election of Remedy provision found in Section VIII(B) as some type of alleged limitation, that election clearly falls within the Back-End Litigation Option for Later-Manifested Physical Conditions under Section VIII of the Settlement Agreement, and <u>*not*</u> Compensation for Specified Physical Conditions (which must first manifest within 24-72 hours of exposure) under Section VI.

1

For these reasons, and for the reasons further outlined below, the Court should interpret the Chronic Condition criteria to be satisfied for the purposes of an SPC Claim, irrespective of whether the medical documentation, evidence or support established the existence of such Specified Chronic Condition before or after April 16, 2012.

**Summary of the Dispute**

Where a Medical Benefits Settlement Class Member sustains acute conditions or symptoms from exposure to the oil, (either from work as a clean-up worker or because if his or her residency), which turn into a Chronic Condition as set forth on Exhibit 8, and the Claimant, after April 16, 2012, goes to a doctor who confirms, through the mandatory tests and/or other proof requirements of Exhibit 8, that the Claimant has a Chronic Condition, that Claimant is entitled to SPC Compensation for a Chronic Condition under the Settlement.

BP apparently argues that, because – under the BELO provisions – a Later Manifested Physical Condition (LMPC) is a condition that is first diagnosed after April 16, 2012, that condition must be defined as an LMPC, and cannot qualify as a Chronic Condition.

However, there is no time frame delineated in the Medical Settlement relating to when a Class Member must first seek medical care or the documentation and/or support for his or her Chronic Condition.  Rather, both the SPC provisions and the term "Later *Manifested* Physical Condition" are defined according to the initial "manifestation".

As a practical matter, (and as recognized by BP during the negotiations), it would have been highly unlikely for many Clean-Up Workers to have seen a physician about their condition before the Settlement, as many were seasonal workers and/or unemployed at the time of the Spill, and therefore without health insurance.

Further, (and as also recognized by BP during the negotiations), it would have been all but impossible for any Class Member to have had a doctor diagnose his or her Chronic Condition in accordance with the strict requirements of Exhibit 8 *before* the Settlement, which compels that specific tests be performed to establish most chronic conditions.  A Claimant could not have known such test(s) were required before the Settlement was publicly available.

As a matter of contractual interpretation, the word "diagnosis" is not used in the SPC definitions or provisions.  Rather. Exhibit 8 speaks in terms of Chronic Conditions that are "established", "documented" or "supported".

Finally, it makes no sense to call a condition formally confirmed or established – or even "diagnosed" – after April 16, 2012, but existing well before that date, a Later Manifested Physical Condition, because by its very terms, a Later Manifested Physical Condition is one that the Claimant could not have known about as of April 16, 2012, (*i.e.* because the condition did not yet exist).  A Chronic Condition, by contrast, must have symptoms which are experienced within 24-72 hours of exposure.

**Discussion**

A Chronic Condition is defined under the Settlement Agreement as "those specified physical conditions compensable on level B1" of Exhibit 8. *See* Medical Benefits Settlement Agreement (MSA), §II, ¶O.  Pursuant to Exhibit 8, a Chronic Condition must derive from an acute symptom or condition; thus, by its very terms a chronic condition necessarily had to exist prior to the date of the Settlement Agreement.  Thus, a condition is chronic if it manifested before April 16, 2012, irrespective of when the condition was first diagnosed, documented, supported or confirmed (and even if not yet diagnosed, documented, supported or confirmed).

To qualify for a Chronic Condition, a claimant must declare that he or she sustained an acute condition or symptom initially – *i.e.,* within 24-72 hours of exposure to the oil (depending on the condition or symptom). *See* Exhibit 8, Section II.  If the Claimant establishes this threshold evidence, a Claimant must also produce:

> Medical records establishing presentment to a medical professional with the condition(s) or symptom(s) claimed in the declaration, where such condition(s) or symptom(s) are persisting at the time of presentment. The CLAIMS ADMINISTRATOR shall determine, based on the totality of the evidence in the medical records, whether that evidence more likely than not supports the assertions made in the declaration.

*See* Exhibit 8, Section II.  There is no provision anywhere in the settlement agreement or in Exhibit 8 that requires a formal Chronic Condition diagnosis to have occurred before April 16, 2012.  Indeed, to the contrary, Exhibit 8 merely states that the Chronic Condition must be persisting at the time of presentment to the medical professional.

The Settlement Agreement leaves no room for a different interpretation.

There is no provision anywhere in the Agreement that would require a claimant to have a formal diagnosis of a Chronic Condition before April 16, 2012, in order to qualify for SPC Compensation.  Thus, if a Class Member today were to go to a doctor, and the doctor confirmed the existence of a Chronic Condition with the tests that are required under Exhibit 8, (and that class member is able to declare that he or she suffered one or more of the acute physical conditions or symptoms set forth in Exhibit 8 within the specified time frames (*see* Exhibit 8, Section I)), then the Claimant would be entitled to SPC Compensation for a Chronic Condition.

Not only is the Agreement plain on its face, but prior drafts of what became Exhibit 8 illustrate that the parties initially considered timeframes that would apply to the formal diagnosis of chronic conditions, and ultimately, through negotiations, omitted from Exhibit 8 any and all such limitations.  Early drafts of Exhibit 8 defined "chronic" as "one of more of the conditions listed on Table 2 that manifests in a medical benefits settlement class member within the time periods specified." That definition was consistent during drafts in November/December 2011 and January 2012. In January 2012, an additional definition was proposed: "'Contemporaneous medical records' shall mean medical records reflecting a visit by a medical benefits settlement class member to a medical professional for treatment or diagnosis of the condition or symptoms described in Table 1 or 2 no later than one month after the first manifestation of that condition or

3

symptom." (Draft, January 6, 2012).[2]  The "Proof of Condition", or Section II, of what became Exhibit 8, changed from draft to draft during the November 2011-January 2012 period, but what remained consistent was the presence of a proposed provision, to which Plaintiffs' counsel consistently objected, that a claimant see a doctor for the condition within a certain time period.[3]

As is evident from the various drafts compared to the final Settlement Agreement and Exhibits thereto, the requirement that a Chronic Condition diagnosis occur within a particular time frame was intentionally omitted by the parties.  Indeed, following the

---

[2] All definitions relevant to the settlement were later placed in the Medical Benefits Settlement Agreement itself and thus were removed from the Exhibits.  Thus, the definition of Chronic Condition appears only in the Settlement Agreement.  Regardless, as set forth above, the definition contained within the final Agreement contains none of the language that appeared in the early drafts as to time frames for the confirmation, diagnosis or other establishment of a chronic condition.  Moreover, the final Settlement Agreement does not contain the term "Contemporaneous medical records",  as that became irrelevant.

[3] The November 30, 2011, draft provided the following proof of chronic condition requirement:

> Contemporaneous medical records establishing manifestation of one or more condition(s) on Table 2 within time periods specified.
>
> Contemporaneous medical records establishing ongoing care/treatment and/or chronic nature of condition/exacerbation.

There are two drafts on December 11, 2012.  The first draft of December 11, 2012, provided the following proof of chronic condition requirement:

> Contemporaneous medical records (i) establishing first diagnosis of one or more condition(s) on Table 2 within the time periods specified, (ii) indicating that the class member reported exposure to oil and/or dispersants within specified time periods, and (iii) indicating that the first diagnosis and treatment of the condition occurred within 1 month subsequent to exposure to oil and/or dispersants, and
>
> Contemporaneous medical records establishing ongoing care/treatment and/or chronic nature of condition/exacerbation.

The latter draft of December 11, 2012, provided as follows:

> Medical records (i) establishing one or more condition(s) on Table 2 (ii) indicating that the condition is associated with exposure to oil and/or dispersants or was treated within five months of last exposure to oil and/or dispersants and (iii) establishing ongoing care/treatment or chronic nature of condition/exacerbation.
>
> Contemporaneous medical records establishing ongoing care/treatment and/or chronic nature of condition/exacerbation.

The January 2012 draft provided the following proof of chronic condition requirement:

> Declaration under penalty of perjury: (1) asserting the manifestation of a chronic condition on Table 2; (ii) asserting that such chronic condition first manifested within the timeframe specified in Table 2; and (iii) identifying the route of alleged exposure.
>
> Plus Contemporaneous Medical Records: (i) establishing the first diagnosis or presentation of symptoms to a medical professional of one or more of the conditions on Table 2 within the timeframe specified in Table 2; (ii) documenting that the class member reported to a medical professional facts sufficient to indicate exposure to oil and/or dispersants with the time specified in Table 2; (iii) documenting that the first diagnosis or presentation of symptom(s) to a medical professional occurred within six weeks subsequent to the class member's alleged exposure to oil and/or dispersants; and (iv)establishing ongoing care/treatment or chronic nature of the condition/exacerbation.

4

exchange of numerous drafts and negotiations on multiple terms and conditions, the Parties rejected inclusion of any such requirement in the final Agreement.

There are, of course, practical considerations which compel this result. As mentioned above, the PSC was well aware from its own clients and from discussions with other counsel representing clients with exposure injury claims that many Class Members, and especially Clean-Up Workers, were without health care insurance and most likely had not been formally treated or diagnosed with a formal condition prior to the Settlement. PSC counsel negotiating the Medical Settlement would therefore not agree to a timeframe for Chronic Condition diagnosis or other medical conformation, as it would be unfair that a person with a Chronic Condition would be denied compensation merely because he or she did not have the financial means to obtain medical treatment.

Further, there are substantial proof Requirements under Exhibit 8 to establish a Chronic Condition. The likelihood that a Class Member's doctor would have already performed the specific tests necessary to establish a Chronic Condition for Settlement purposes was questionable at best; thus, Class Counsel insisted that a Class Member be able to obtain the formal diagnosis, confirmation, evidence or other necessary support once the Settlement was final and made public to the Class. Even one of the named Class Representatives, who has a Chronic Condition from his exposure to the oil, (and who actually has health insurance and had seen a doctor for that condition), did not have the required tests pursuant to Exhibit 8 performed by his doctor prior to April 16, 2012. BP was well aware of this fact, and agreed that he could and would be able to have his doctor perform the tests necessary to establish Reactive Airways Dysfunction Syndrome, (one of the specified chronic conditions of Exhibit 8), after April 12, 2012.

While BP apparently points to the Election of Remedy provision found in Section VIII(B) as some type of alleged limitation, that election clearly falls within the Back-End Litigation Option for Later-Manifested Physical Conditions under Section VIII of the Settlement Agreement, and *not* Compensation for Specified Physical Conditions under Section VI. If and when a Class Member attempts to invoke the Back End Litigation Option, then the Election of Remedies will apply to that BELO Claim. In the meantime, however, the Claims Administrator should apply the SPC terms and provisions to a Chronic SPC Claim.

Finally, the fact that a Later Manifested Physical Condition is defined by a specific timeframe does not therefore impose a different timeframe, (or for that matter any timeframe), on a Chronic Condition diagnosis. As stated above, the Settlement Agreement and accompanying Exhibits contain no timeframes for when a formal diagnosis, confirmation, evidence or other support of a Chronic Condition must occur. A LMPC (which is found within, and is relevant to, the Back End Litigation Option (BELO) remedy, not the SPC Compensation) is defined in the Settlement Agreement as "a physical condition that is first diagnosed in a medical benefits settlement class member after April 16, 2012, and which is claimed to have resulted from such medical benefits class member's exposure to oil, other hydrocarbons, or other substances released from the MC252 well and/or the *Deepwater Horizon* and its appurtenances, and/or exposure to dispersants and/or decontaminants used in connection with the Response Activities . . . ." *See* MSA, §II, ¶VV. This provision was intended to address the *Amchem* issue, providing an avenue for Class Members with unknown illness or disease, such as cancer,

5

at the time of the Settlement, to retain the right to sue BP in the future, because the Claimant's illness has not and could not have manifested before April 16, 2012.[4] As Professor Coffee described the provision in his declaration, submitted jointly by BP and Plaintiffs in support of class certification and approval of the Medical Settlement: "The purpose of BELO is to allow class members with *subsequently manifested*, more severe injuries to pursue compensation for those injuries or conditions in mediation or individual litigation." Declaration of John C. Coffee, Jr., dated August 12, 2012, at ¶58 (emphasis added). The key here is the term "subsequently manifested". In other words, even if the class member had seen multiple doctors prior to April 16, 2012, he or she could not have received a LMPC diagnosis because, but its very term, it would not have manifested as of April 16, 2012. In contrast, if a class member had the condition prior to April 16, 2012, but did not yet receive a formal diagnosis, it is by definition not "subsequently manifested" (but simply subsequently diagnosed).

As Professor Coffee explains, the Settlement Agreement "gives class members the best of both worlds: immediate compensation without releasing the BP Parties from potential liability for injuries related to long-term exposure, which class members can pursue through individual litigation without having to risk the expiration of the statute of limitations." Coffee Decl. at ¶2; (*see also* ¶15). Comparing the Settlement's treatment of compensation for conditions already manifested to LMPC, Professor Coffee summed it up as follows:

> In common, class members have incurred injuries of limited severity that would qualify for only modest compensation in most courts. To receive compensation, all must have manifested these conditions within 24 to 72 hours after exposure. Together, these factors imply both that (1) there is no conflict between persons with severe injuries versus those with minor injuries and all persons within the class definition would normally expect compensation within the same general range, and (2) there is no conflict between those immediately injured and those with later developing conditions or injuries. Such conflicts can render the class non-cohesive, but they are simply not present here. Indeed, there are no "future claimants" — persons exposed to a toxic substance who have not yet manifested any injury — who will receive any compensation for future injuries under the Medical Benefits Settlement Agreement. This was the category of class member that most concerned the Supreme Court in *Amchem,* and their absence here increases cohesion.

Coffee Decl. at ¶52; (*see also* ¶10). In sum, the date of diagnosis is irrelevant to a determination of whether a condition is a Chronic Condition under the Settlement Agreement; the critical focus is on when that condition first *manifested.*

---

[4] It should also likely be noted that it was not contemplated that Class Members would invoke the BELO option for Chronic Conditions as defined under Exhibit 8; rather, it was expected that the BELP would be invoked for more serious conditions, such as cancer or leukemia or other long-latency and life-threatening illnesses or disease.

## **Conclusion**

For the above and foregoing reasons, eligible Class Members who have a Chronic SPC that manifested prior to April 16, 2012, but who did not seek medical treatment and/or obtain a formal confirmation or diagnosis by one of the means spelled out in the Settlement Agreement until after that date, are eligible for compensation for a Chronic Condition, provided they otherwise satisfy the requirements for eligibility pursuant to Exhibit 8, Section II and Table 3.


cc: Matthew L. Garretson
    Counsel for BP