# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, Illinois 60654

Hariklia Karis, P.C.
To Call Writer Directly:
(312) 862-2330
hariklia.karis@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

May 16, 2014

**VIA EMAIL**

Honorable Judge Sally Shushan
United States Magistrate Judge
Eastern District Court of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179 Penalty Phase Witnesses

Dear Magistrate Judge Shushan:

I write in response to the Court's instruction to identify the roles of the 16 individuals listed in my email to the Court of Wednesday, May 14, 2014. In addition to providing those descriptions, we want to clarify BPXP's position for each of these witnesses in response to Mr. O'Rourke's letter of last night and email today.

**Rule 30(b)(6) Witnesses**:

The United States has served Rule 30(b)(6) requests for 7 different topics, consisting of many more sub-parts. Two of those requests with 15 separate sub-parts in total that pertain exclusively to the Economic Impact factor. (*See* Ex. A, Rule 30(b)(6) Topic #5(a)-(f) and 6(a)-(i)).

BPXP has agreed to produce witnesses for Topics 1-6 subject to the objections discussed and to be served on May 21, 2014, in accordance with the Court's schedule. With respect to Topic #7, BPXP has offered to resolve the request by providing responsive documentation and BPXP's understanding is that the United States is considering BPXP's proposal.

BPXP has designated the following individuals to testify in response to the US' Rule 30(b)(6) discovery:

(1) *Richard Morrison:* Mr. Morrison is Regional President Gulf of Mexico. He served as BPXP's Deputy Area Commander during the *Deepwater Horizon* Response, providing leadership on logistics, operational support, and other issues. He will

Beijing    Hong Kong    Houston    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai    Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 16, 2014
Page 2

testify regarding the technological and other advancements developed in drilling and response activities and the positive impact of BPXP on the Gulf economy and community, specifically as requested in U.S. Rule 30(b)(6) Topic #1, 2 (Ex. A)

To avoid any confusion, Mr. Morrison previously has been deposed in MDL 2179 for 2 days on October 18-19, 2011. Per the United States' position that previously deposed witnesses cannot be re-deposed in this phase of the litigation, BPXP seeks to confirm that Mr. Morrison's deposition will be limited to the topics for which he is designated as a corporate representative. BPXP reserves the right to call Mr. Morrison to testify as a fact witness at trial regarding his personal knowledge of any and all issues relevant to the Penalty Phase.

(2) *Laura Folse*:   Laura Folse is the Executive Vice President for Response and Environmental Restoration for the Gulf Coast Restoration Organization. Since August, 2010, Ms. Folse has led or overseen BPXP's science team investigating the impacts from the *Deepwater Horizon* incident. Since September, 2012, working with the Unified Command, Ms. Folse has led BPXP's efforts to undertake and complete Response Activities related to the incident. Finally, Ms. Folse is responsible for overseeing the company's participation in the Natural Resource Damages Assessment ("NRDA") process, including Early Restoration. Ms. Folse will testify in response to U.S. Rule 30(b)(6) Topic 3, Ex. A.

(3) *Mike Utsler:* Mike Utsler was the BPXP Incident Commander of the Houma Incident Command Post ("ICP"), which oversaw surface response operations across the Gulf (including surface dispersant application, skimming, and controlled *in situ* burning) and shoreline protection efforts in Louisiana. He was the BPXP Incident Commander for the Unified Area Command. From 2011 through 2013, Mr. Utsler served as President of the Gulf Coast Restoration Organization ("GCRO"), which oversaw remaining response activities and restoration projects. Mr. Utsler will testify in response to U.S. Rule 30(b)(6) Topic 4, Ex. A.

(4) *David Bucknall*: David Bucknall is the BP p.l.c. Group Treasurer. Mr. Bucknall's areas of knowledge include the management of aspects of the BP Group's finances, intercompany capital flows, and access to external capital, including in connection with certain liabilities associated with the Deepwater Horizon Incident. Mr. Bucknall will testify in response to U.S. Rule 30(b)(6) Topic 5(a)-(f), Ex. A.

(5) *Brian Smith*: Brian Smith is Vice President Structured Finance Western Hemisphere and serves as Chief Financial Officer for BP America. Mr. Smith's areas of knowledge include the management of aspects of the capital structure and

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 16, 2014
Page 3

intercompany capital flows with respect to BP Corporation North America Inc. and BP America Inc.  Mr. Smith will testify in response to U.S. Rule 30(b)(6) Topic 6(a)-(i), Ex. A.

BPXP has provided deposition dates for each of the above individuals.  It has not yet determined whether any of the above individuals will be called to testify at trial as fact witnesses as discovery is just getting underway.  As such, BPXP does not object to these individuals being deposed on the same date as their corporate representative depositions about their personal knowledge, with the exception of Mr. Morrison for the reasons stated above.

**Fact Witnesses:**

BPXP has withdrawn numerous witnesses disclosed in its initial Rule 26 disclosures and continues to withdraw individuals as more information becomes known. BPXP has not withdrawn the following individuals as it does not yet know if they will be called to testify at trial as fact witnesses:

(1)     *Mike Robertson:* Mike Robertson is the Director of Finance and Performance Management for the Gulf Coast Restoration Organization.  Mr. Robertson's areas of knowledge include the financial position of BPXP as reflected in its trial balances and quarterly financial reports and the Incident-related and Response-related expenditures of BPXP, including the tracking of BPXP's costs, liabilities, and intercompany payables relating to the *Deepwater Horizon* Incident.  Mr. Robertson also has knowledge of liabilities incurred by BPXP in connection with its non-Deepwater-Horizon-related operating activities.

(2)     *Dr. Richard Heron*:  Dr. Richard Heron currently holds the position of Vice President Health and Chief Medical Officer at BP p.l.c. Dr. Heron's responsibilities include oversight of occupational health and hygiene and some focus on public and community health in the locations where BP operates. In the aftermath of the DWH incident, Dr. Heron worked with the Unified Command and U.S. government personnel to analyze and respond to potential impacts of the spill on human health.

(3)     *Danny Wallace*:  Mr. Wallace served as the BPXP Deputy Incident Commander at the Houma ICP and in 2012 became the BPXP Incident Commander of the Unified Area Command.  Mr. Wallace worked with the Unified Command to oversee response operations, and he is knowledgeable about BPXP's collaboration with the Unified Command and efforts to respond to, and mitigate and prevent the effects of, the *Deepwater Horizon* spill.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 16, 2014
Page 4

    *(4)*    *Tom Zimmer*.  Mr. Zimmer served as the Incident Commander of the Mobile ICP, which directed response operations in Alabama, Mississippi and Florida.  In September 2010, Mr. Zimmer became the Deputy Incident Commander for the Gulf Coast Incident Management Team.  Through these positions, Mr. Zimmer is knowledgeable about BPXP's efforts to respond to, mitigate and prevent the effects of, the *Deepwater Horizon* spill.

    *(5)*    *Iris Cross:* Ms. Cross currently serves as the General Manager of National Programs and Community for BP America Inc.  During the *Deepwater Horizon* Response, Ms. Cross was involved in managing BPXP's community outreach efforts, including with state and local governments, organizations, individuals and communities of the Gulf.  She has knowledge of efforts to respond to, and mitigate the effects of, the spill, including, for example, community outreach centers established by BPXP and grants provided to local governments and non-profit organizations.

    *(6)*    *Dr. Elliott Taylor*.  Dr. Taylor is a Principal at Polaris Applied Sciences, Inc., an environmental consulting firm that was retained by BPXP to assist with shoreline protection efforts during the *Deepwater Horizon* Response.  Dr. Taylor served as the Lead Technical Advisor for the Shoreline Cleanup Assessment Technique ("SCAT") during the Response.  He has information concerning BPXP's efforts to protect the shoreline, and assess, cleanup, and monitor shoreline oiling on the Gulf Coast, as well as shoreline impacts and the effectiveness of shoreline treatment.

    *(7)*    *Duane Wilson:*  Following the Texas City refinery incident, Mr. Wilson was a member of the BP U.S. Refineries Independent Safety Review Panel, chaired by James A. Baker III (the "Baker Panel").  From 2007-2012, Mr. Wilson served as the Independent Expert to monitor and report annually on the progress made toward implementation of the recommendations of the Baker Panel.  Accordingly, Mr. Wilson has knowledge regarding the findings and recommendations of the Baker Panel, as well as his independent assessment of and reports on the progress in implementing those recommendations.

As I noted in my previous email, BPXP objects to the US' request for Mr. Wilson's deposition because his potential testimony relates to the Texas City incident, and the US has represented that it does not intend to take any discovery relating to the "prior violations" factor.  (*See, e.g.*, March 21, 2014 Transcript, at 20.)  Contrary to the US' contention, BPXP is not attempting "to supplement the extensive fact discovery" relating to the Texas City incident.  Mr. Wilson's annual

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 16, 2014
Page 5

reports, which were all publicly available when issued, were the subject of discovery in Phase 1, as were minutes of the Safety, Ethics and Environment Assurance Committee relating to those reports.  Having put the Texas City incident at issue, the United States cannot now complain that testimony from Mr. Wilson relating to his findings and the contents of his reports would be an unfair surprise.

With respect to the remaining witnesses, BPXP continues to work towards further limiting its list of potential fact witnesses recognizing the Court's admonition that discovery should be limited.  In the interim, in the interest of cooperation, BPXP will provide deposition dates for the above witnesses by Tuesday at the latest if it has not withdrawn them from its disclosures.

### Fact Witnesses From United States' Rule 26(a) Disclosures

(1) *Brenda Pennington:* Brenda Pennington served on the Board of Directors of BPXP from November 1, 2009 to January 14, 2011.

(2) *Denise Robinson:*  Denise Robertson served on the Board of Directors of BPXP from November 1, 2009 to January 14, 2011.

BPXP has explained to the U.S. that these witnesses are entirely duplicative of each other.  They served on the Board at the exact same time.  BPXP is in the process of developing a proposal to avoid the depositions of these two witnesses and requests the Court's permission to propose a solution by the middle of next week.

### Fact Witnesses Withdrawn By BPXP Whose Depositions Are Requested

(1) *Nick Bamfield:*  Nick Bamfield is the BP p.l.c. Deputy Group Treasurer, reporting directly to David Bucknall whose role is described above and whose deposition is being taken as a corporate representative as discussed above.  In his position, Mr. Bamfield provides assistance to Mr. Bucknall with respect to the management of aspects of the BP Group's finances, intercompany capital flows, and access to external capital including in connection with certain liabilities associated with the *Deepwater Horizon* incident.

(2) *Jared Hogue:* Jared Hogue is Manager Group Funding Americas, in which position he provides assistance to Mr. Smith with respect to the management of aspects of the capital structure and intercompany capital flows with respect to BP Corporation North America Inc. and BP America Inc.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 16, 2014
Page 6

Neither of these individuals were listed in the US's Rule 26(a) initial disclosures.  BPXP listed these individuals along with many others when it submitted its initial disclosures as it worked diligently towards identifying witnesses who may have knowledge and whom it may rely upon at trial.  Then, as additional information has become known and following the instruction of the Court to limit discovery, discussed below, BPXP withdrew both of these individuals from its Rule 26(a) disclosures.

As demonstrated by the above discussion, and to avoid any misunderstanding, BPXP is not asserting that no fact witnesses who overlap with corporate representative topics should be permitted to testify, as the US suggests.  BPXP has agreed to provide several witnesses listed above.  But, the United States now seeks the depositions of ***all 5 economic impact witnesses identified in BP's disclosures, plus two additional witnesses, all who overlap on a single penalty factor:***  (1) David Bucknall; (2) Nick Bamfield; (3) Brian Smith; (4) Jared Hogue; (5) Mike Robertson; (6) Denise Robertson; and (7) Brenda Pennington.  This request is excessive and cumulative, especially given the broad nature of the United States' Rule 30(b)(6) #5, and #6, and potentially Topic #7 if the US doesn't agree to accept documents in lieu of testimony, all relating to this same factor.

The deadlines set in the Court's Case Management Order reflect what it has previously stated is its objective for the Penalty Phase discovery:  "to make sure that any discovery that's necessary is focused and targeted to what's really necessary and important."  (March 21, 2014 Hearing Tr. at 13, Ex. B).  Judge Barbier has also stated, in connection with the US's discovery on economic impact, ***"I think that the government's request for discovery seemed way, way tremendously overbroad, beyond the scope of what is necessary here."***  (March 21, 2014 Hearing Tr. at 50, Ex. C). The request for 7 deponents – all 5 listed on BPXP's Rule 26(a) disclosures relating to Economic Impact plus 2 listed on the US's disclosures – hardly satisfies the spirit of the Court's admonition.

The United States asserts now that because these individuals have written a particular document produced in earlier phases of discovery, it should be allowed to take cumulative depositions. First, these documents disprove any assertion that the economic impact factor is a "black box."  They also prove that the United States had information regarding these witnesses when it made its Rule 26(a) disclosures.  In light of the Court's instruction that the parties should conduct limited discovery, and the limited period of 6 weeks to complete the depositions, the United States should not be able to depose these individuals who it never disclosed, and who BPXP as confirmed it will not call at trial.

Moreover, the United States states that it seeks Mr. Hogue's deposition because he is identified in BPXP's disclosures as "the custodian for the loans that BPXP produced" and it is

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 16, 2014
Page 7

"trying to learn about how the BP Group is able to leverage funds across Group entities."  But the United States' Rule 30(b)(6) Topics (4), and 5(a)-(b) seek the same information.

The United States also claims it requires the deposition of Mr. Bamfield because he has knowledge of "'BP p.l.c. Group results Second quarter and half year 2010", and drafted a document that relates to "how BP has flexibility and capitol to meet its financial costs."  Once again, the United States' Rule 30(b)(6) topic 5(a) and (c) seek precisely the same information.  Moreover, there is absolutely nothing to suggest that the Group Treasurer, Mr. Bamfield's boss, David Bucknall, does not have access to the very same information.

In short, the United States does not deny that the topics for which they seek witness testimony are cumulative of the Rule 30(b)(6) topics it has served on BPXP and the document requests it has served.  Indeed, despite the Court's request to speak to the issue of the 30(b)(6) topics, the United States' letter is surprisingly silent on this issue.

Finally, the United States now complains that BPXP is seeking to depose individuals from the United States that it will not call at trial.  One significant difference is that BPXP satisfied its obligations and disclosed these individuals in BPXP's Rule 26(a) disclosures.  Furthermore, it has dropped several of the individuals who were government employees who BPXP disclosed.

Sincerely,

/s/Hariklia Karis, P.C.

Hariklia Karis, P.C.

hk

cc:        Deepwater Horizon Penalty Phase Counsel

Exhibit A

## UNITED STATES DISTRICT OF COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL | § | MDL No. 2179 |
| RIG "DEEPWATER HORIZON" | § | |
| IN THE GULF OF MEXICO, | § | SECTION: J |
| ON APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| | § | MAG. JUDGE SHUSHAN |

**THIS DOCUMENT RELATES TO ALL CASES**

## DEPOSITION NOTICE OF DEFENDANTS BP EXPLORATION & PRODUCTION INC. AND ANADARKO PETROLEUM CORPORATION

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and PRE-TRIAL ORDER NO. 17 (as supplemented and amended by PRE-TRIAL ORDER 27)—designate and produce one or more officers, managers, agents, employees, or other representatives of BP Exploration & Production Inc. and Anadarko Petroleum Corporation, to discuss the Areas of Inquiry identified below. In identifying each of the Areas of Inquiry below, the United States is not seeking to discover privileged or work product information, waiving any applicable privilege or work product claim, or making any representation as to the existence or scope of responsive, non-privileged information with respect to any particular Area of Inquiry. The depositions shall take place in New Orleans unless otherwise scheduled by the Court and parties, and the times of the depositions will be scheduled in conjunction with the designees' fact depositions in their individual capacities, or otherwise as may be scheduled with Judge Shushan and the parties.

1

## DEFINITIONS

As used herein, the following terms are defined as follows:

1.      "Anadarko," "Anadarko Petroleum Corporation" and "APC" means Anadarko Petroleum Corporation and its consolidated subsidiaries, unless stated otherwise.

2.      "BP" means BP plc and its subsidiaries, including relevant predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its/their behalf.

3.      "BP Exploration & Production Inc." ("BPXP") means the BP entity that bid for and was awarded the right to lease Mississippi Canyon Block 252 ("MC-252").  BPXP is a Delaware corporation with its principal place of business in Texas.  BPXP includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

4.      "BP America Production Company" ("BPAPC") was a party to the drilling contract concerning the use of the Deepwater Horizon to drill the Macondo well. BP America Production Company is a Delaware corporation with its principal place of business in Texas. BPAPC includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

5.      "BP Company North America Inc." is a Delaware corporation with its principal place of business in Illinois.  BP Company North America Inc. includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

2

6.      "BP Corporation North America Inc." is an Indiana corporation with its principal place of business in Texas.   BP Corporation North America Inc. includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

7.      "BP America Inc." is a Delaware corporation with its principal place of business in Texas.  BP America Inc. includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

8.      "BP Holdings North America" is a UK private limited company with its principle place of business in the United States.  BP Holdings North America includes its predecessors, successors, subsidiaries, departments, and divisions, together with all current and former directors, officers, employees, agents, representatives, or persons acting on its behalf.

9.      "BP p.l.c." or "BP plc" means the parent corporation of the BP group of companies.  The company was incorporated in 1909 in England and changed its name to BP p.l.c. in 2001.

10.      "Consolidating financial statements" means the financial reports (income statement, balance sheets, and statement of cash flows) for each subsidiary and the eliminations and adjustments that are made in preparing the ultimate consolidated financial statement for the parent company.

11.       "Identify," whether or not capitalized, with respect to: (a) an individual, shall mean to provide the individual's full name, job title, and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and

3

current or last-known address (designating which); and (c) Information, shall mean to provide the date, title, subject matter, author(s), and recipient(s) or the Bates number(s).

12.     "Incident" shall mean the loss of control of the MC252 Well and the fire and explosion(s) on board, and resulting sinking of, Transocean's Deepwater Horizon rig, in addition to the resulting oil spill in the Gulf of Mexico.

13.     "Information" shall have the meaning set forth in Pretrial Order 22, Paragraph 2.

14.     "Lease" means the Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act, "Serial Number OCS-g 32306" pertaining to "All of Block 252, Mississippi Canyon, OCS Official Protraction diagram, NH 16-10," also known as the Macondo Prospect, an oil and gas prospect in the Gulf of Mexico, off the coast of Louisiana.

15.     "Macondo Prospect" means the Macondo Prospect (Mississippi Canyon Block 252, abbreviated MC252) an oil and gas prospect in the Gulf of Mexico, off the coast of Louisiana. The prospect was the site of the Deepwater Horizon drilling rig explosion on April 20, 2010.

16.     "Macondo Well" means the exploratory well drilled and constructed pursuant to the Lease as defined herein.

17.     "Material Transaction" means a transaction for the subject entity that meets the standards of materiality as described in SEC Staff Accounting Bulletin No. 99 - Materiality and by the FASB Statement of Financial Accounting Concepts No. 2.

18.     "Person" refers to, without limitation, any and every natural individual, each and every association, partnership, joint venture, corporation, professional corporation, trust and any and every other identifiable entity.

4

19.     "Relating to," "referring to," "regarding," "concerning," "reflecting" or "with respect to" refers to, without limitation, the following concepts: discussing, describing, reflecting, concerning, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

20.     "Response" refers to oil spill response efforts, undertaken pursuant to Section 311(c) of the Federal Water Pollution Control Act, 33 U.S.C § 1321(c) and 40 CFR Part 300, to contain, collect, remove, disperse, and minimize the impact of hydrocarbons released from the Macondo well in connection with the Deepwater Horizon Incident (including through the use of technologies such as controlled in situ burning, dispersants, skimming, and the placement of booms), including any activities BP or APC seeks to introduce evidence of, reference, or discuss in the Penalty Phase.  This includes any natural resource damage costs, or any expenses related to determining, researching, and investigating those damages.

21.

## AREAS OF INQUIRY OF BPXP

1.     BPXP's role in and impact on the economy of the local community, Gulf of Mexico region, and the United States, including harm to the economy from the Deepwater Horizon oil spill.

2.     BP's knowledge and adoption of existing technologies and safety practices, including but not limited to deepwater drilling safety practices and technology, prior to and since the Incident, including all factual bases for BPXP's contentions that it has developed technological and safety advancements during the Response that were substantial, innovative, highly valuable, and have improved industry standards, as well as all factual bases for BPXP's

contention that it has taken an industry-leading role and expended considerable effort in improving deepwater drilling safety since the Incident..

3. All factual bases for BPXP's contentions regarding the environmental impact, lack of impact, and/or recovery, (including but not limited to Fish, Shoreline Environment, and Wildlife), whether positive or negative, from the Deepwater Horizon Incident and Spill and the subsequent Response, including without limitation impact or lack of impact from Oil-Materials, Dispersants, any Response Activities, and/or any Mississippi River Diversions attempted, undertaken, discussed, or considered.

4. All factual bases for BPXP's contentions regarding actions taken or decisions made by the United States that may have made the any mitigation, remediation and/or Response efforts less effective.

5. The financial performance, historical trends and future projections for BP, including without limitation facts, analyses, policies and practices regarding the following:

a. The data, metrics and other information bearing on the financial performance and status of BP as publicly reported in its Annual 20-F filings with the United States, SEC and/or the United Kingdom.

b. Any of BP's contingent liabilities that, alone or combined, could have a significant impact on BP's financial performance or status, and for each such liability, the nature of the liability, the probability of its occurrence and the potential magnitude and timing of its financial impact.

c. Any unused or available credit lines or debt capacity available to BP, including likely terms.

d. The basis for BP's forward-looking projections for 2014 and into the future.

6

e.   The contribution of exploration, production and related operations both as a global segment and in the Gulf of Mexico to BP's profitability.

f.   Plans, proposals, or suggestions under development or consideration by BP, whether preliminary or otherwise, to sell further assets.

6.   The factual basis for any contention that a civil penalty of up to $18 billion would have a significant adverse impact on the business operations of BPXP, taking into account without limitation its historical financial relationships with other BP entities both pre- and post-Incident, and its financial and corporate relationship with each of BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America and BP p.l.c. from 2005 to the present, including without limitation:

a.   Sources and uses of funds and transfers between or among BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America and/or BP p.l.c. or loans between or among those BP entities.

b.   Sources and uses of funds and transfers between BPXP and any other BP entity, whether referenced above or not, and loans between BPXP and any other BP entities, whether referenced above or not.

c.   Payment of dividends from each of BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America and BP p.l.c. to another BP corporate entity, including the amount of and history of dividends paid by BPXP to any other BP corporate entity.

7

d.  Practices regarding one or more of BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America or BP p.l.c. financing the investments, operations, or other expenditures of other BP entities, and instances where that occurred.

e.  Inter-company transactions, including those pursuant to service agreements (involving employees, technical, engineering, commercial, marketing, environmental, legal, tax, banking, investment, financial, accounting, administrative, or other services) or secondment agreements and any other transactions;

f.  Basis for the allocation of overhead or services provided by one BP entity to other BP entities;

g.  Transfer and inter-company pricing policies and practices for the pricing of goods or services provided by one BP entity to another;

h.  Guarantees of debt or other obligations by one BP entity for another; and,

i.  Sales or other transfers of goods, services or assets from BPXP or from BP to unaffiliated third parties, i.e. any non-BP entity.

7.  Any expenditure(s) that any BP entity has made in connection with the Incident or Response or any other mitigation activities that BPXP contends should diminish its obligation to pay a civil penalty, and the facts concerning each such expenditure including:

a.  Identification of the expenditure, including which BP entity or entities incurred costs at any stage related to the expenditure;

8

b. Which BP entity financed the expenditure, initially and ultimately, including inter-BP company transfers or sales of assets;

c. The accounting and tax treatment of the expenditures for all involved BP entities including before and after tax costs;

d. Any BP entity providing guarantees for the expenditure;

e. Impact of the expenditure on BP's financial condition and operational capability at the time and into the future;

f. Any debt owed by BPXP as a result of such expenditure and to whom or what entity such debt is owed.

## AREAS OF INQUIRY OF ANADARKO

1. Anadarko's ("APC") Gulf of Mexico offshore operations' role in and impact on the economy of the local community, Gulf of Mexico region, and the United States, including harm to the economy from the Deepwater Horizon oil spill.

2. The financial performance, historical trends and future projections for Anadarko, including without limitation facts, analyses, policies and practices regarding the following:

a. The data, metrics and other information bearing on the financial performance and status of APC as publicly reported in its Annual Form 10-K and Quarterly Form 10-Q filings with the United States SEC.

b. Any of APC's contingent liabilities that, alone or combined, could have a significant impact on APC's financial performance or status; and for each such liability, the nature of the liability, the probability of its occurrence and the potential magnitude and timing of its financial impact.

9

    c.   Any unused or available credit lines or debt capacity available to APC, including likely terms.

    d.   The basis for APC's forward-looking projections for 2014 and into the future.

    e.   The contribution of exploration, production and related operations both as a global segment and in the Gulf of Mexico to APC's profitability.

    f.   Plans, proposals, or suggestions under development or consideration by Anadarko, whether preliminary or otherwise, to sell further assets.

3.    Facts and information regarding any sale or transfer of assets to third parties (i.e., non-APC companies or affiliates) from 2008 to 2014, including the amount, date, and the APC company or affiliate and third party involved in the transfer.

4.    Any expenditure(s) made by any APC entity since 2010 in connection with the Incident, Response or any other  mitigation activities that APC contends should diminish its obligation to pay a civil penalty; and the facts concerning each expenditure, including without limitation for each:

    a.   Identification and description of the expenditure, including the purpose and scope, and which APC entity or entities were involved at any stage.

    b.   Whether and to what extent the expenditure was expensed or capitalized and, for the latter, the useful life or lives assumed for tax-related purposes.

    c.   Any other tax credits or incentives (e.g., local, State or Federal) APC gained for the expenditure.

    d.   The impact of the expenditure on Anadarko's financial condition and operational capability at the time and into the future.

5.      The economic impact, if any, of the recent settlement filed on April 3, 2014 (Dkt. No. 635) in *In re: Tronox*, Adv. Proc. No. 09-01198-alg (Bankr. S.D.N.Y.) on APC's on-going business operations and its position regarding whether that settlement in any way impacts APC's ability to finance a civil penalty in this litigation.

6.      All facts, analyses, and any other information that supports or may contradict Anadarko's contentions regarding its efforts to minimize or mitigate the effects of the Incident and Response including facts, analyses, and any other information related to the following topics that Anadarko contends are relevant and are cited in its First Amended Initial Disclosures served on April 4, 2014:  Anadarko's offers of assistance after the Incident and its role in responding to the Incident; Anadarko's $4 billion settlement with BP in relation to the Incident; and Anadarko's contribution to the Rockefeller Philanthropy Advisor's Fund for Gulf Communities.

7.      All facts, analyses, and any other information that supports or may contradict Anadarko's contentions regarding the benefit to the United States of offshore drilling development, including, but not limited to:  Anadarko's payments or non-payments of royalties to the United States, or any disputes regarding royalties to the United States, including with respect to oil collected from the Macondo Incident.

8.      All facts, analysis, and any other information that supports or may contradict Anadarko's contentions regarding the "other matters as justice may require" penalty factor, including, if Anadarko contends such topics are relevant, its contentions related to (1) government oversight, approvals, and compliance requirements for deepwater drilling generally and for the Macondo well specifically; (2) pre- and post-Incident regulatory guidance, recommendations and practice regarding deepwater drilling and enforcement history as it relates to operators; (3) industry custom and practice (including contractual relationships) between

11

designated operators and non-operators; (4) potential and actual impacts on (i) non-operators; (ii) investment in offshore oil development, (iii) offshore drilling operations, and (iv) industry custom and practice (including contractual relationships) if penalties (or threat of penalties) are imposed on non-operators; and (5) efficacy of penalties against non-operators, contractors, and non-operating parties.

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division
PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
MICHAEL MCNULTY
SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
PATRICK CASEY
RICHARD GLADSTEIN
DANIEL S. SMITH
Senior Counsel
ABIGAIL ANDRE
A. NATHANIEL CHAKERES
ANNA CROSS
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

12

Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

13

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

/s/ Steven O'Rourke

Exhibit B

1    class counsel had the gall to file something with the claims

2    administrator 48 minutes late on Wednesday.

3              Now, anyone that thinks that that's a matter

4    that should be brought to this Court has to rethink how you

5    practice law.  Again, I don't know how they practice law in Las

6    Angeles or New York or Chicago or Atlanta, but I don't think

7    that's how we practice law here in New Orleans, and I don't

8    want this case to condescend to that level.  I mean, to be

9    bringing to the Court the fact that somebody filed something 48

10   minutes late, unless it's something that was so time critical

11   that it just caused tremendous prejudice to somebody, which

12   obviously this didn't, is absurd.

13             And then, of course, that generated a response

14   back the other way, which also was sent to the Court.  I don't

15   want you all to be sending -- and on top of all that, no action

16   was requested by the Court.  It wasn't like somebody was filing

17   a motion for sanctions or some motion to strike something.  No

18   action requested by the Court, but we had to get copies of this

19   e-mail exchange with these snarky remarks back and forth, and I

20   don't appreciate it.  I don't want to receive those.  Judge

21   Shushan doesn't want to receive those.

22             And I just used that as a small example of the

23   level to which the conduct in some instances has been lowered

24   to in this case, and I hope everyone takes that to heart.

25             All right.  Pending motions in limine.  As I

OFFICIAL TRANSCRIPT

1    said, the primary focus at this time seems as to decide the

2    scope of discovery for the penalty phase trial; also,

3    hopefully, to set a trial date for the penalty phase.  Once

4    that's done, Judge Shushan can work with counsel to plan out

5    and oversee the discovery that needs to be done.

6                We do intend, as we did in the last trial, to

7    set time limits for the trial, to set limits on depositions,

8    and limits on experts, and to make sure that any discovery

9    that's necessary is focused and targeted to what's really

10   necessary and important.

11               To the extent there is apparent agreement by the

12   parties -- of course, the parties do agree that there should be

13   some discovery of all three parties in the Clean Water Act

14   penalty phase, ultimately leading to a bench trial on the

15   so-called eight factors under 33 U.S.C. Section 1321(b)(8).

16               Of course, any findings that the Court

17   ultimately makes from Phase One on the issue of gross

18   negligence and from Phase Two on quantification will be

19   relevant to the penalty phase -- or penalty calculations.

20               So let's talk first about the -- my

21   understanding is there is agreement on evidence relating to one

22   of the eight factors at least; that is, the prior violations,

23   that there is a stipulation that's been signed on that.

24          MR. LANGAN:  Your Honor, Andy Langan for BP.

25               I think you're referring to the prior fines for

OFFICIAL TRANSCRIPT

Exhibit C

```
1    history, and we understand that.  We're not saying that that's
2    irrelevant, but the focus should be on BPXP for the ability to
3    pay because they're --
4              And, by the way, there's no veil piercing
5    allegation.  I mean, in other words, a lot of what the
6    government's trying to do here looks like an underhanded veil
7    piercing attempt.  I mean, corporate formalities were
8    maintained here.  There have been no such allegations that they
9    haven't.  These were legitimate corporate enterprises,
10   legitimate things were met.
11             And we don't understand the relevance of things
12   like ten years of board minutes for eight BP entities.  That's
13   what we object to what they're asking for.
14        THE COURT:  Well, I do agree, and I have not looked
15   at all of the -- there was draft discovery passed back and
16   forth; right?
17        MR. LANGAN:  Correct.  And now formal have been
18   served.
19        THE COURT:  I haven't looked at those in detail --
20   I'm going to let Judge Shushan do that -- but I did see some
21   references to those in briefs.  I'll say this:  I think that
22   the government's request for discovery seemed way, way
23   tremendously overbroad, beyond the scope of what is necessary
24   here.
25             But with that understanding, it seems to me that
```

 1   it's just a matter of, you know, what they can get access to.

 2   I don't think I'm going to be able to rule on that today.

 3   Whether you're offering is sufficient or adequate or whatever,

 4   I can't decide today.

 5           **MR. LANGAN:**  One of the points we made, Your Honor,

 6   was that we anticipate that in the normal discovery context

 7   there's going to be back and forth, objections, and Judge

 8   Shushan will guide us, I'm sure, about what's appropriate and

 9   what's not.

10           We've never said that there's no relevance to

11   the group finances.  We've said that BPXP is a defendant, the

12   violator, they're the ones that they moved for summary judgment

13   against and that's where the focus should be.

14           **THE COURT:**  It's a question of what can that entity

15   afford to pay, but considering the various financial

16   relationships and back and forth and all of that.

17           **MR. LANGAN:**  Right.  That's correct.  In fact, we

18   have provided them a draft stipulation that we always knew

19   would be subject to evaluation and discovery with the documents

20   that would back it up.

21           One of the points they made was, "Well, we don't

22   know that."  Well, we understand the stipulations were done

23   before discovery started.  So we're more than willing to engage

24   them in appropriate discovery to confirm what we've told them

25   BPXP's financials look like.