**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | Section: J |
| This document relates to: 2:10-cv-01768, 2:10-cv-02454 | * | |
| | * | District Judge BARBIER |
| | * | Magistrate Judge SHUSHAN |

**BP'S REPLY TO PLAINTIFF'S LOCAL RULE 56.2 RESPONSE TO BP DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS (ECF No. 12676-2)**

Defendants BP America Inc. and BP Exploration & Production Inc. (collectively "BP") respectfully submit this Reply to the Center for Biological Diversity's ("CBD") Local Rule 56.2 Response to BP Defendants' Statement of Undisputed Material Facts (the "CBD Response").

1. CBD disputes that "the 'source' of the oil that was discharged into the ocean was the *Deepwater Horizon* riser." CBD Response ¶ 5. Instead, CBD argues that "'the uncontrolled movement of oil began in the well.'" *Id.* ¶ 5 (quoting Rec. Doc. 5809 at 19) (emphasis omitted). But CBD does not contend — nor could it — that oil entered the Gulf of Mexico ***directly*** from the Macondo well. To the extent that CBD argues that the Macondo well is a "source" even though no oil entered the Gulf directly from it, that is a legal argument and not a factual claim.

2. Along the same lines, the Center also argues that "[t]he source of the oil that was discharged into the Gulf was the Macondo Well, not from the *Deepwater Horizon* or its appurtenances." CBD Response ¶ 6. But again, this is a legal argument, not a factual contention. CBD also purports to quote BP as "admitting that oil flowed 'from the Macondo well, some of which flowed into and upon the Gulf of Mexico and some of which reached the shoreline of the United States.'" *Id.* (quoting Rec. Doc. 12673-5, Ex. 1 at ¶ 61 (BP's Answer)). This mischaracterizes BP's statement. Although any oil that discharged into the Gulf of Mexico at one point passed through the Macondo well, it is undisputed that no oil directly flowed into the Gulf of Mexico from any part of the well. BP has never admitted anything to the contrary. BP

adopts here by reference Paragraphs 8 to 10 of its Response to Plaintiff's Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment Against BP Defendants on Count 7 of the Amended Complaint, Rec. Doc. 12825.

3. The Center repeats its argument that "[t]he source of the oil that was discharged into the Gulf was the Macondo Well." CBD Response ¶ 7. For reasons BP already has given, this contention is a legal argument that BP has disputed and that remains pending in a Fifth Circuit appeal. *In re Deepwater Horizon*, Case No. 12-30883 (5th Cir.). CBD, however, also argues that "[l]eakage continued to occur from the risers into August." *Id.* CBD cites nothing to support this assertion. To withstand summary judgment, however, CBD must offer "proof" — not simply allegations. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In any event, this allegation fails as a matter of law. Before the Fifth Circuit, CBD argued that "that there may have been some minimal additional discharges from the well site after the well was capped on July 15, 2010." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 424 (5th Cir. 2013). Nevertheless, the Fifth Circuit affirmed this Court's decision to take judicial notice of the fact that "the Macondo well was capped in July 2010 and killed in September 2010." *Id.* at 422, 424. Importantly, the Fifth Circuit held that "the Center could have moved for reconsideration or a further hearing [after this Court took judicial notice] but it did not do so." *Id.* at 424; *see also id.* at 423-24 (explaining that this Court "asked the Center what evidence it had that the well was not indeed dead" but "[t]he Center did not indicate that it had at that time any evidence to refute that fact, nor did it state that discovery was necessary"). CBD's argument thus is forfeited; as a matter of law, the fact that the spill ended on July 15, 2010 cannot ***now*** be reconsidered. *See, e.g.*, *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) ("[A]n issue of fact or law decided on appeal may not be reexamined …."). Finally, whether oil last leaked in July or August 2010 is irrelevant to CBD's EPCRA claim; nothing about CBD's remaining EPCRA claim depends on how this question is resolved.

4. CBD next contends that the materials cited by BP from the On Scene Coordinator Report ("FOSC Report") "do not indicate that BP or Transocean were in 'constant'

communication with all federal and state agencies, and do not support Defendants' claim that they 'fully cooperated' with said agencies." CBD Response ¶ 11. This contention is wrong. Within the first few pages cited by BP, the FOSC Report recounts the cooperation between the responsible parties and federal officials. *See, e.g.*, FOSC Report at 22 (detailing how "the FOSC and RP" worked on "source control options"); *id.* at 23 ("With the approval of the National Incident Commander, the RP shut the stack on July 15, 2010."); *id.* ("[W]ith the approval of the National Incident Commander and the FOSC, the RP began the operation and achieved hydrostatic control of the well."). The "RP" terminology refers to BP as a "responsible party" within the meaning of the Oil Pollution Act. The Fifth Circuit, moreover, has determined that "BP participated in the response activities at the direction of the federal authorities." *CBD*, 704 F.3d at 418; *see also id.* at 424 ("It is clear that the Government, which was in charge of the situation, acted to force BP to stop the discharge, kill the well, and abandon the site."). Tellingly, the United States has never argued otherwise. The FOSC Report also recounts federal officials' "twice daily … briefings with their RP counterparts." FOSC Report at 26. This Court witnessed first-hand the scope of this information sharing. *See CBD*, 704 F.3d at 424 ("[T]he district court was receiving regular status updates about the situation …."). CBD finally dismisses the FOSC Report as "contain[ing] inadmissible hearsay and double hearsay, and is therefore inadmissible as evidence." CBD Response ¶ 11. Not so. Courts may take judicial notice of such government materials. *See, e.g.*, *Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

5. CBD also claims that it is unclear who established the website http://www.deepwaterhorizonresponse.com. *See* CBD Response ¶ 13 (stating that "Exhibit 7 merely states … that 'a response website with consolidated information was established at http://www.deepwaterhorizonresponse.com'" but "does not indicate who established the website"). It is public knowledge that BP established the website and operated it in conjunction with the government. *See, e.g.*, Bradley Blackburn, *Oil Spill Suggestion Box? BP is Taking Your*

*Ideas* (May 14, 2010) ("BP is taking suggestions. On its webpage, deepwater horizonresponse.com, it invites anyone to submit ideas over the phone and online."), http://abcnews.go.com/blogs/headlines/2010/05/oil-spill-suggestion-box-bp-is-taking-your-ideas; AP, *Government to Take Over Oil Spill Website* (July 4, 2010) ("The US government is expected to take over control of the central information website on the Gulf oil spill response that has been run jointly by various agencies and BP for the 2 1/2 months since the rig explosion …. [T]he government has been directing BP at every turn."), http://abclocal.go.com/ktrk/story?section=news/national_world&id=7537111.

6. CBD also disputes that its "initial complaint was 'jurisdictionally invalid'" because "Congress [has] authorized citizens to file immediate suit" in situations involving "the discharge of toxic pollutants under the Clean Water Act." CBD Response ¶ 17 (citing 33 U.S.C. § 1365(b)). At the outset, this point is doubly moot because (1) CBD has filed a second complaint; and (2) the Fifth Circuit affirmed the dismissal of CBD's CWA claims. Thus, the Court thus need not wade into this issue. Nevertheless, it is obvious that the first complaint was premature. The only reason for CBD's otherwise inexplicable decision to file a second complaint is that it itself harbored doubts about its first complaint. And with good reason: the CWA provision that CBD cites — 33 U.S.C. § 1365(b) — does not apply in contexts such as this, *see, e.g.*, *Walls v. Waste Res. Corp.*, 761 F.2d 311, 316-17 (6th Cir. 1985), nor does CBD explain how a CWA provision is relevant to an EPCRA claim. Equally flawed, although CBD does not deny that none of its notice letters mention methanol, drilling mud, or dispersants, CBD tries to defend that omission on the grounds that its letters said "including, but not limited to" certain identified substances. CBD Response ¶ 17 (emphasis omitted). That is not how notice works. Notice letters require ***specific*** notice — CBD "must identify the pollutant with sufficient specificity to permit the recipient to identify the specific standard, limitation, or order alleged to be violated and the activity alleged to constitute the violation." *Brod v. Omya, Inc.*, 653 F.3d 156, 169 (2d Cir. 2011) (a notice that specified twenty-one contaminants but did not include two others could not proceed based on those two); *Catskill Mountains Chapter of Trout Unlimited*,

*Inc. v. City of New York*, 273 F.3d 481, 488 (2d Cir. 2001) ("[The] letter must specify each pollutant unlawfully discharged that will be alleged in a subsequent complaint."); *cf. Stark-Tusc-Wayne Joint Solid Waste Mgmt. Dist. v. Am. Landfill, Inc.*, No. 5:10cv00119, 2012 WL 4475444, at *4 (N.D. Ohio Sept. 26, 2012) ("Plaintiffs' catch-all, single-sentence assertion fails to satisfy the statute and the precedential purpose of providing notice."). In short, CBD's "failure to give notice of the specific pollutants … circumvents the dual goals that the Supreme Court has said motivate the … notice requirements: (1) 'allow[ing] Government agencies to take responsibility for enforcing environmental regulations'; and (2) 'giv[ing] the alleged violator an opportunity to bring itself into complete compliance with the Act.'" *Brod*, 653 F.3d at 169 (quoting *Hallstrom v. Tillamook County*, 493 US 20, 29 (1989)).

7.   EPCRA's reporting duty applies to a facility at which a "hazardous" or "extremely hazardous" substance "is produced, used, or stored." 42 U.S.C. § 11004(a). That obviously does not include the *Deepwater Horizon*. CBD, however, claims that the *Deepwater Horizon* is a "production vessel" because it "was used in connection with the production of oil." CBD Response ¶ 18. According to CBD, "[t]he common definition of the term 'production' means the 'process of making something for sale or use,'" which allegedly captures the *Deepwater Horizon* because it "was used in the 'process of making' oil for sale, as it took the initial steps of well exploration and development to begin the pumping of oil from the Macondo Reservoir." *Id.* This proves too much. The rig was not "producing" oil; it was exploring for oil. CBD's "process of making" argument would capture every location in any way connected with oil drilling — including a terrestrial office building in a landlocked State thousands of miles away — because all are part of the overall "process." That is absurd. CBD's argument would also nullify the statute's use of the word "stored"; after all, ***exploring*** for oil is no more part of the "process of making oil" than is ***storing*** oil. That would make "store" superfluous, which cannot be. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citation omitted).

8. CBD also says that there "***may***" be facts that "prove that BP was an 'operator' of the DWH," such as "BP ***may*** have exercised a degree of control over the *DWH* that would cause it to be considered an 'operator' under EPCRA." CBD Response ¶ 20 (emphasis added). Summary judgment, however, is not a time for speculation; CBD needs facts, which it does not have, even after being given the opportunity pursue discovery. *See, e.g.*, *Celotex*, 477 U.S. at 323. CBD further argues that "the contract cited by BP pertains to movement of the *DWH* only, not to drilling activities that were overseen and directed by BP personnel." CBD Response ¶ 20 (citing Rec. Doc. 12673-2 (CBD UMF) at ¶ 16). But this ignores what the contract says. *See* Drilling Contract by and between Vastar Resources, Inc. and R&B Falcon Drilling Co. (Dec. 9, 1998), as amended (BP UMF Ex. 14) (*available at* http://www.mdl2179trialdocs.com/releases/release201303141200012/TREX-01356A.pdf). Article 15.1 of the Contract states that Transocean "shall be ***solely responsible for the operation of the Drilling Unit***, including, without limitation, supervising moving operations, and the positioning of the Drilling Unit on drilling locations as required by COMPANY, ***as well as such operations on board the Drilling Unit as may be necessary or desirable for the safety of the Drilling Unit.***" *Id.* (emphasis added). The Contract also requires Transocean, *inter alia*, to "use all reasonable means to control and prevent fires and blowouts," (*id.* at Art. 15.2), use "blowout prevention equipment (*id.*), and "exercise due diligence to prevent the well from blowing out," (*id.* at Art. 15.6). The Contract thus concerns much more than merely the terms for moving the *Deepwater Horizon* from place to place. Finally, any suggestion that BP had a motive to evade a reporting requirement is false. BP adopts here by reference Paragraphs 11 to 13 of its Response to Plaintiff's Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment Against BP Defendants on Count 7 of the Amended Complaint, Rec. Doc. 12825.

9. CBD next argues that "[t]he Court dismissed the D1 Master Complaint, not the Center's complaints." CBD Response ¶ 21. This defies reality. The resolution of the D1 Master Complaint, by design, applied to the underlying complaints. Indeed, after the overarching D1 complaint that incorporated CBD's causes of action was dismissed, CBD specifically moved to

have its claims dismissed to secure appellate jurisdiction, and this Court granted that motion based on "'the reasons stated in the Court's Order Dismissing the Bundle D1 Master Complaint.'" *CBD*, 704 F.3d at 421 (quoting this Court's order); *see also id.* at 427 (CBD "sought an immediate final judgment ordering that its individual complaints be dismissed in their entirety along with the D1 Master Complaint"). The Fifth Circuit reviewed the dismissal of CBD's complaints by analyzing this Court's dismissal of the D1 Master Complaint.

10. CBD likewise claims that the Fifth Circuit did not mean what it said, *see* CBD Response ¶ 22, when the panel explained that "[i]f the information required by EPCRA's reporting provisions may indeed be easily located from alternate sources, it may be that a further order from the district court would provide no meaningful relief to the Center and its members. Such a conclusion, although not affecting the Center's standing, might render the claim moot." *CBD*, 704 F.3d at 430-31. CBD brushes this language aside as mere "dicta." CBD also cites other language from the Fifth Circuit's decision — language which preceded the language quoted by BP — which CBD suggests nullifies the above-quoted language. What the Fifth Circuit said speaks for itself. The panel held that the Center's EPCRA claim could not be rejected on a motion to dismiss but that mootness could apply upon a more complete record.

11. CBD also purports to contest, *see* CBD Response ¶ 23, a quotation from CBD's own amended complaint: that that Defendants discharged and failed to report under EPCRA "benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (PAHs) (including, but not limited to, phenanthrene, benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzanthracenes, and indenopyrenes), fluoranthene, haloethers, halomethanes, methane, arsenic, cadmium, copper, mercury, and nickel." Am. Compl. ¶ 65. CBD does not claim that BP has misquoted anything. Rather, CBD suggests that BP should have quoted additional sections of the amended complaint — sections in which CBD repeated its "not limited to" formulation of its case. CBD Response ¶ 23 (emphasis omitted); *see also id.* (suggesting that CBD need not list specific substances because there were "numerous hazardous substances" and "BP knows the quantities, or at least the range of quantities, of toxic pollutants released into the environment").

As explained above, CBD's notice letters must be specific; CBD cannot base a citizen suit upon language as amorphous as "not limited to." *See, e.g.*, *Brod*, 653 F.3d at 169; *Catskill Mountains*, 273 F.3d at 488.

12. CBD admits that "benzene, toluene, and xylene are natural components of crude oil." CBD Response ¶ 24. Nevertheless, CBD reiterates its contention that "[t]he chemicals identified in the Center's amended complaint are not exhaustive." *Id.* For reasons explained above, CBD must precisely identify any substances and give advance notice to any citizen suit defendant in order to file suit on such a substance. CBD's failure to do so means that any unidentified substance cannot form the basis of an EPCRA claim.

13. CBD denies that the "petroleum exclusion" applies to what it admits are natural components of crude oil. CBD Response ¶ 25. This is a legal dispute. The contrary view of the Environmental Protection Agency and of numerous courts speaks for itself. CBD offers no opposing authority.

14. CBD admits that "wastes associated with the exploration, development, or production of crude oil are exempted from the definition of 'hazardous wastes' by regulation." CBD Response ¶ 26 (discussing 40 C.F.R. § 261.4(b)(5)). Nonetheless, CBD argues that "the injection of excess 'spacer' into the Macondo Well to avoid disposal requirements of hazardous wastes does not qualify for this exemption." *Id.* Similarly, CBD contends that "any materials used in connection with source control events do not qualify for this exemption, as ceasing the uncontrolled flow of oil from the Macondo Well is not the same as the exploration, development, or production of crude oil." *Id.* At the outset, this argument reflects an internal contradiction in this way — where CBD wants to argue that the *Deepwater Horizon* was a production facility, it broadly contends that anything in any way connected to production, regardless of the number of steps needed to make the connection, is covered. *See supra* ¶ 7. But here, CBD wishes to argue that the use of drilling fluids by the *Deepwater Horizon* must be tightly tied to production activities. The Center's argument, moreover, ignores that the regulatory exception applies broadly to using drilling fluid "***associated with*** exploration, development, ***or*** production." Thus,

the language is different and the exception has a broader scope than EPCRA. In particular, EPCRA applies to a facility at which a "hazardous" or "extremely hazardous" substance ***is*** actually "produced, used, or stored." 42 U.S.C. § 11004(a). Additionally, as pointed out above, *supra* ¶ 7, by interpreting the term "produced" as broadly as it does, CBD renders the term "stored" superfluous, violating a major canon of statutory interpretation. By contrast, the regulatory drilling fluid exception applies more broadly to cover to activities "***associated with***" the "exploration, development, or production" of oil. The exception thus captures more activities than EPCRA's tightly drawn trigger. By contrast, giving the broad textual test of "associated with" its plain meaning violates no canon of textual interpretation.

15. CBD contends that "[t]he cited [EPA] document makes no mention of EPCRA and constitutes inadmissible hearsay." CBD Response ¶ 27 (discussing EPA, Office of Solid Waste and Emergency Response, Directive No. 9360.0-8, *CERCLA Removal Actions at Methane Release Sites*, at 1 (Jan. 23, 1986)). This contention is flawed. As to the assertion that EPA's Directive No. 9360.0-8 does not mention EPCRA, it is an uncontested legal question that EPCRA incorporates CERCLA's definition of the "hazardous substances." *See* 42 U.S.C. § 11004(a)(3). Because — as Directive No. 9360.0-8 states — methane is not a "hazardous substance" for purposes of CERCLA, it also is not a "hazardous substance" for purposes of EPCRA. The suggestion that the Directive is hearsay is also faulty. This Court can take judicial notice of official government documents. *See, e.g.*, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ("[T]he district court took appropriate judicial notice of publicly-available documents and transcripts [from the Food & Drug Administration] ... which were matters of public record directly relevant to the issue at hand."). A citation to an EPA Directive to make a point about existing law is no more "hearsay" than is a citation to the Code of Federal Regulations.

16. CBD continues to blame the Court for supposed failures that purportedly made it difficult for CBD to pursue its case. *See* CBD Response ¶ 29. All of CBD's excuses about this Court being distracted by its need to advance other parts of the ongoing MDL are beside the

point. Countless litigants continued to file motions during the pendency of the Phase 1 trial, and this Court issued at least 100 orders largely unrelated to the Phase 1 during the Phase 1 trial. Moreover, several facts in CBD's own narrative belie its argument that pursuing its case within eight months of remand was futile. *First*, the same Pre-Trial Orders (Nos. 11 and 25), which were in effect when the Fifth Circuit remanded this case, remained in effect when CBD finally got around to actually filing its "Motion to Lift Stay Under Pretrial Orders 11 & 25 and for Leave to Proceed Before Magistrate Judge." If CBD was planning to seek leave from the stay orders, there is no reason that request could not have occurred promptly. *Second*, the Phase 1 trial is a weak excuse because, as CBD notes, "a third trial is still scheduled in this MDL." It makes little sense for CBD to assert that the Phase 1 trial would necessitate delay while the Phase 2 trial (September 30, 2013 through October 18, 2013) and the Penalty Phase trial (scheduled to begin January 20, 2015) would not. A litigant cannot assume that a court is too busy and thus sit on its claims. No court has ever held that a party's private assessment of judicial workload is a defense to laches.

17. Perhaps knowing that its delay has prolonged this litigation, CBD backtracks on its prior argument that its complaints are somehow independent of the overall MDL. While CBD would like to treat its complaint as independent of the MDL for some purposes, *see* ¶ 21, it claims that the duration of the MDL is the relevant yardstick for assessing CBD's delay. This misses the fact that CBD's appeal had two important effects: (a) admitting that its claims were dismissed along with the D1 Master Complaint, and (b) separating this case from the rest of the MDL for purposes of remand. On the former point, CBD owns its delay and cannot take cover in comparing its delay to the entire MDL 2179. This comparison to the MDL is CBD's only basis for arguing that its delay is not prejudicial. But the fact that BP is involved in other pending litigation is no basis for excusing unjustified delay in the instant case.

18. CBD next asserts that "the information required under EPCRA is not publicly available, as BP has not filed the *specific reports* that are required by the statute." CBD Response ¶ 29 (emphasis in original). But EPCRA does not require any "specific report." It

prescribes only general "contents" for the report. 42 U.S.C. § 11004(b)(2). For this reason, the Fifth Circuit recognized that "[i]f the information required by EPCRA[] . . . may indeed be easily located from alternate sources, it may be that a further order from the district court would provide no meaningful relief." *CBD*, 704 F.3d at 430.

19.     CBD's assertion that BP was "involved" in source-control decisions somehow converts those decisions into private BP action is irrelevant. CBD's admission to Paragraph 30 of BP's Statement of Undisputed Materials Facts In Support of Its Motion for Summary Judgment, Rec. Doc. 12676-2 ("BP UMF") ("The Clean Water Act reserves to the federal government control over all operations in response to a significant oil spill. Indeed, federal law specifies that '[t]he President shall direct all Federal, State, and private actions to remove" a substantial spill.'") (citations omitted), which is the legally significant paragraph establishing that the federal government controlled "all operations" in response to the spill, makes any other "involvement" in giving advice to the federal government irrelevant.

20.     CBD's latest round of standing declarations and ¶ 33 of the CBD Response amount to nothing more than the repeated assertion that the declarants could not locate specific EPCRA notices. As discussed above, *see supra* regarding CBD Response ¶ 29, there is no such thing as a specific EPCRA report. The statute only requires that a regulated party disclose eight categories of information to the public. The Fifth Circuit recognized that those disclosures might be satisfied in this case, despite the fact that BP issued no notice specifically identified as an "EPCRA notice." Importantly, the declarants make no assertion that they could not find the information required by EPCRA. As BP has amply documented, the information required under 42 U.S.C. § 11004(b) is available to anyone with access to the Internet. This Court can take judicial notice of the fact that typing "Macondo Oil Fingerprint" into Google returns a link to a BP website, among other things, with information on the chemicals present in the oil and monthly updates (as recent as April 2014) regarding the impact of the oil on various natural resources. *See* http://gulfsciencedata.bp.com/go/doc/6145/1944578/Oil (last visited May 19, 2014).

21. The objections in ¶ 34 of the CBD Response reflect nothing more than a ***legal*** difference of opinion over whether the petroleum exclusion applies to this case. For the many reasons identified in BP's prior briefing, CBD cannot prevail based on the argument that petroleum is comprised of other chemicals. *See, e.g.*, BP MSJ Opp. at 2, 7-11. This is best illustrated by the fact that the Center faults BP for "fail[ing] to mention whether any of the hazardous substances contained in the oil, such as benzene, toluene, and xylene, were released from the spill." As the CBD recognizes, those chemicals are present in ***all*** oil. *See* CBD MSJ at 13 ("[I]t is commonly known . . . that crude oil contains quantities of benzene, toluene, and xylene."). As for the suggestion that the particular composition of Macondo oil is not publicly available, this is simply inaccurate. The Court can take judicial notice of the fact that the chemical fingerprint of Macondo oil is publicly known. *See, e.g.*, http://usresponse.bp.com/external/content/document/2911/2133930/1/20140328_Oil_Fingerprinting.txt.

22. In ¶ 35, CBD reprises its argument that the petroleum exclusion is a nullity because each chemical indigenous to oil triggers EPCRA reporting obligations. Even if BP (and the EPA and every court in America to address the issue) were legally incorrect about the petroleum exclusion, BP has identified numerous websites that detail the chemical composition of Macondo oil. *See supra* regarding CBD Response ¶ 34; BP UMF ¶¶ 34-44. To avoid these fatal facts, CBD complains that BP's public disclosures "mention only oil and dispersants, not any of the hazardous chemicals contained in those substances." CBD Response ¶ 35. This is both false, *see supra* regarding CBD Response ¶ 34, and irrelevant in light of CBD's concession that "it is commonly known . . . that crude oil contains quantities of benzene, toluene, and xylene," CBD MSJ at 13. Because any who cared to look could discover (four years ago) the particular chemicals contained in Macondo oil and Corexit dispersants, CBD cannot show any injury from the absence of formal EPCRA reports — even if such reports were required, which they were not.

23. CBD Response ¶ 36 is another legal argument, and it is mistaken for reasons largely identified above. CBD continues to attempt to amend EPCRA to include unwritten requirements regarding the form of a notice that satisfies the statute. As explained above, the notice requirement is broad and does not mandate a particular form of disclosure. *See supra* regarding CBD Response ¶ 29. Thus, CBD is mistaken in disputing BP's factual assertions based on the legal argument that EPCRA requires all disclosures to occur in "one location." This is contrary to the Fifth Circuit's instruction on remand that BP should prevail "[i]f the information required by EPCRA[] . . . may indeed be easily located from alternate ***sources*** . . . ." *CBD*, 704 F.3d at 430 (emphasis added). It also misses the point that BP's substantial compliance with the EPCRA notice requirements by making functionally equivalent public disclosures undercuts standing. Even if the CBD were correct that BP has not complied with every technicality of EPCRA — and BP has never argued that it made EPCRA reports — the Center nevertheless fails to show an injury because "the information required" may be "easily located from alternate sources."

24. For all of the reasons explained above, CBD accomplishes nothing with its ¶ 37 argument that all EPCRA information must be available in "one location." *See supra* regarding CBD Response ¶¶ 35-36. This is neither a requirement of the statute, nor does it establish the constitutionally requisite injury in fact.

25. CBD asserts that "[n]one of the cited exhibits state the media or medium into which the release of all hazardous substances involved in the spill occurred in one, accessible place." CBD Response ¶ 38. But no fact perhaps is more "easily located from alternate sources," *CBD*, 704 F.3d at 430, than the fact that, in this subsea spill a mile below sea level, oil was released into water. For example, this Court can take judicial notice of its own decision regarding liability under the Oil Pollution Act and the Clean Water Act, which notes that a discharge occurred to water. Order and Reasons, Rec. Doc. 5809 (Feb. 22, 2012). (BP reserves all of its rights to continue challenging the aspects of the February 22, 2012 order that it appealed to the Fifth Circuit.) While that decision notes that some discharge "***may*** have occurred on or

above the surface of the water," *id.* at 2 n.4 (emphasis original), CBD has never sought EPCRA notification with respect to any discharge from the *Deepwater Horizon* itself. CBD therefore cannot claim that it suffered an injury because it did not know that the discharge in question was to water.

26. In paragraph 39 of the CBD Response, CBD reiterates its mistaken demand that all information must appear in "one location," despite the Fifth Circuit's statement that as long as the information is publicly available from a source or "sources," CBD lacks an injury and therefore lacks standing. *See* CBD Response ¶ 39. Likewise, CBD's objections based on the health effects of exposure to oil rely on the Center's flawed effort to undermine the petroleum exclusion by asserting that EPCRA requires reports for each specific chemical that comprises petroleum. BP's many communications related to the health risks accompanying exposure to petroleum and dispersants, as well as instructions for persons who have experienced such exposure, convey all of the information contemplated by EPCRA. Thus, even if the petroleum exclusion did not apply, CBD has suffered no injury due to the lack of a specific EPCRA report and therefore lacks standing.

27. In paragraph 40 of the CBD Response, CBD again demands all information must appear in "one location" (*e.g.*, "the contact information listed in BP's Exhibit 37 is not apparent in Exhibit 30"), despite the Fifth Circuit's statement that as long as the information is "easily located from alternate sources," CBD lacks an injury and therefore lacks standing. Likewise, CBD's attempt to dismiss BP Exhibits 35 and 36 because they "do not list chemical names" is a variation on the theme that public notices based on petroleum releases are somehow insufficient. And once again, this CBD argument stands in stark contrast to CBD's admission that "it is commonly known . . . that crude oil contains quantities of benzene, toluene, and xylene." CBD MSJ at 13; *see also supra* ¶ 34 (citing BP UMF ¶ 34 and associated exhibits listing all chemicals in Macondo oil).

28. CBD argues that BP's well-publicized hotline does not qualify as a "telephone number of the person or persons to be contacted for further information," 42 U.S.C.

§ 11004(b)(2)(H), because "[i]t was not set up for purposes of EPCRA . . . ." CBD Response ¶ 41. CBD fails to explain how it suffers an injury because BP did not mention EPCRA when it told the public about the hotline. Paragraph 41 of CBD's Response also reiterates CBD's "one location" argument, which has already been refuted above. *See supra* ¶¶ 23, 24, 26, 27.

29. Paragraph 42 of CBD's Response is also flawed because it makes the flawed "one location" argument. CBD also maintains that the Federal On-Scene Coordinator's ("FOSC's") report — like the telephone hotline in the preceding paragraph — does not count for EPCRA compliance purposes because it "is not designed to serve the purposes of EPCRA." CBD Response ¶ 42. As before, an author's motive in writing the report or BP's motives in making it publicly available are irrelevant to the question of whether the information is "easily located from alternate sources." For the same reason, it is irrelevant that "it was not published or produced by BP." CBD's attack on the FOSC Report is especially odd in light of the Center's concession that the federal government directed every aspect of the spill response. CBD Response ¶ 30. Unsurprisingly, the government, rather than BP, authored reports discussing the response measures.

30. Paragraph 43 of CBD's Response is also flawed because it repeats the mistaken "one location" argument.

31. Paragraph 44 of CBD's Response is also flawed because it repeats the mistaken "one location" argument. New to this paragraph is CBD's attempt to argue for the extra-textual requirement that medical advice must be presented in language that the CBD deems "written in a way that the average person may understand." CBD Response ¶ 44. This condition appears nowhere in EPCRA, and objecting to medical information "meant for healthcare professionals" is contrary to the declarations CBD has filed in an attempt to resuscitate standing. *E.g.*, Craig Decl. ¶ 8 (Rec. Doc. 1984-4) (claiming to need information to present to the declarant's doctor); Thrasher Decl. ¶ 3 (Rec. Doc. 1819-4) ("physicians need to know the types and amounts of chemicals released").

32. CBD alleges that Defendants violated EPCRA by "failing to adequately report, such releases to local and State emergency planning committees." Am. Compl. ¶ 93 (Rec. Doc 813). Moreover, CBD notes that "oil from the Macondo Well reached the shores of the Gulf Coast states, including Florida, Louisiana, Texas, Alabama, and Mississippi[, e]ach of these states have state emergency planning committees, and each of the seaside counties have local emergency planning committees. These areas were likely affected by the spill." CBD Response ¶ 45 (citing 42 U.S.C. § 11004(b)). But CBD ignores the controlling structural provisions of EPCRA: 42 U.S.C. § 11001(b) ("In emergency planning areas ***that involve more than one State, the State emergency response commissions of all potentially affected States may designate emergency planning districts and local emergency planning committees by agreement***.") (emphasis added). And CBD ignores the fact that the impacted States have not entered into a multi-state agreement to create a multi-state emergency planning district.

Dated: May 19, 2014

Respectfully submitted,

/s/ Don K. Haycraft

Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Jeffrey Bossert Clark
Joseph A. Eisert
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Joel M. Gross
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5705
Facsimile: (202) 942-5999

Kerri L. Stelcen
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1047
Facsimile: (212) 715-1399

**ATTORNEYS-IN-CHARGE FOR DEFENDANTS BP AMERICA INC. AND BP EXPLORATION & PRODUCTION INC.**

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of May, 2014.

                                                                       /s/ Don K. Haycraft
                                                                       Don K. Haycraft