UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

**MEMORANDUM IN SUPPORT OF
CLASS COUNSEL'S MOTION TO ALTER OR AMEND
ORDER ADOPTING MATCHING POLICY [No. 495]**

Eligible Business Economic Loss (BEL) Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following memorandum in support of their Motion to Alter or Amend the Court's Order of May 5, 2014 Adopting Policy No. 495 ("Business Economic Loss Claims: Matching of Revenue and Expenses") [Rec. Doc. 12817]:

**MAY IT PLEASE THE COURT:**

On May 19, 2014, the U.S. Fifth Circuit Court of Appeals denied BP's Petition for Rehearing and Petition for Rehearing *En Banc,* in No. 13-30095, approving this Court's Order and Judgment Granting Final Approval of the Economic & Property Damages Settlement, on December 21, 2012.[1]  In addition, the Court of Appeals denied BP's Petition for Rehearing and Petition for Rehearing *En Banc,* in No. 13-30315, in which BP sought to alter the causation framework for business claims.  Judge Southwick, writing for the Court, made it clear that "the

---

[1] *See* In re Deepwater Horizon, 910 F.Supp.2d 891 (E.D.La. 2012), *aff'd,* 739 F.3d 790 (5th Cir. 2014) ("*Deepwater Horizon II*"), *reh'g denied,* No.13-30095 (May 19, 2014).

Page | 1

Claims Administrator must establish causation for settlement purposes with respect to every claim under the specific criteria and formulae that BP and Class Counsel agreed would be utilized for that purpose."[2]

The final Policy for the Matching of Revenue and Expenses in Business Economic Loss Claims fundamentally alters these specific criteria and formulae in the context of Construction, Agricultural, Educational, and Professional Services Claims, and otherwise exceeds the authority of the Claims Administrator and the Court to approve, interpret and implement the Economic & Property Damages Settlement Agreement.  The Claims Administrator is to "faithfully implement and administer the Settlement, according to its terms."[3]  The Court, having approved the Settlement, should enforce the agreement as bargained for, and not modify any of its substantive provisions. *See, e.g.,* Evans v. Jeff D., 475 U.S. 717, 726-727 (1986) ("the power to approve or reject a settlement negotiated by the parties … does not authorize the court to require the parties to accept a settlement to which they have not agreed…. Rule 23(e) does not give the court the power … to modify a … consent decree and order its acceptance over either party's objection"); Klier v. Elf Atochem, 658 F.3d 468, 475-476 (5th Cir. 2011) ("the court cannot modify the bargained-for terms of the settlement agreement…. [O]nce approved its terms must be followed by the court and the parties alike").

Specifically, Class Counsel seek to:

    i.    Limit the Matching Triggers and Policies to *Cash Basis* Claims; and,

    ii.    Utilize the Annual Variable Margin Methodology for *all* insufficiently matched Claims, without resorting to different Construction, Agricultural, Educational or Professional Services Frameworks.[4]

---

[2] ORDER ON PETITION FOR PANEL REHEARING (May 19, 2014) [Fifth Cir. Doc. 00512635492] at p.10.

[3] SETTLEMENT AGREEMENT, Section 4.3.1.

[4] In the alternative, the Policy should at least be amended to **(a)** achieve matching, where required, through re-allocation of expenses only, without averaging, 'smoothing' or otherwise re-allocating revenues, **(b)** limit the matching generally, and any re-allocation of revenues in particular, to the transaction or transactions that 'triggered'

Class Counsel do *not* seek to delay the implementation of Policy No. 495 with respect to the application of the Annual Variable Margin Methodology to insufficiently matched Cash Basis Claims.[5]

**Accrual Claims Require No Further Matching**

The BEL Panel repeatedly states that Accrual Claims are already "sufficiently matched" or otherwise "required" under the Settlement Agreement:

- "BP acknowledged that many claims presented data that '*sufficiently match*' revenue and expenses. This is because they apply the *accrual* accounting recognition and matching principles BP advances here as a matter of their ordinary record-keeping";[6]

- "Regardless of whether Exhibit 4C requires matching when it has not been undertaken in the ordinary course of record-keeping, it cannot be said to permit ignoring *sufficiently matched* data from *accrual-basis* claimants";[7]

- "As to *accrual-basis* claimants, matching is '*required*' in the sense that claimants are not permitted to present statements which contain inconsistent methodologies. This means that if a claimant's records are already matched, it must submit them in that form");[8]

- "the agreement cannot be read to permit ignoring '*sufficiently-matched*' revenue and expenses from *accrual-basis* claimants";[9]

- "At least as to claims presented on an *accrual-basis,* not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly *insisted on it*";[10]

- "We remand because the district court did not acknowledge the *requirement* of matching that is foundational for *accrual-basis* claims and it did not then

---

or caused the claim to be "un-matched", and/or **(c)** eliminate any re-visiting of Causation where the Contemporaneous P&Ls have objectively established a loss caused by the Spill under Exhibit 4B. *See generally* MEMO TO THE CLAIMS ADMINISTRATOR (March 19, 2014) [REC. DOC. 12589-16].

[5] *Nor* with respect to any Economic Class Member who desires and agrees to have his, her or its Accrual and/or Construction, Educational, Agricultural, or Professional Services Claim processed in accord with existing Policy No. 495.

[6] In re Deepwater Horizon, 732 F.3d 326, 334 (5th Cir. 2013) ("*Deepwater Horizon I*") (emphasis supplied).

[7] *Deepwater Horizon I,* 732 F.3d at 335 (some emphasis added).

[8] *Deepwater Horizon I,* 732 F.3d at 336 n.5 (emphasis supplied).

[9] *Deepwater Horizon I,* 732 F.3d at 337 (emphasis supplied).

[10] *Deepwater Horizon I,* 732 F.3d at 338 (emphasis supplied).

> explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims";[11]

- "Part I of the panel opinion identifies the crucial question for remand: should matching be required for ***all*** claims when it is clearly *required* for many?"[12]

Indeed, BP Counsel expressly acknowledged and agreed during the Administrative Panel Meeting that:

- "The Court requires accrual-based accounting"; and
- "We were instructed by the Fifth Circuit to use accrual-style accounting."[13]

The entire basis of the BEL Opinion was that, because Accrual Claims are generally matched, and because the Parties presumably intended that all Class Members be treated the same, then Cash Claims should also generally be matched in the way that Accrual Claims are.[14] As stated by this Honorable Court upon remand: "it is clear that the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[15] While Class Counsel respectfully disagree that the original interpretation and application of Exhibit 4C resulted in anything to the contrary,[16] there is no basis to alter the existing matching in Accrual Claims,

---

[11] *Deepwater Horizon I,* 732 F.3d at 339 (emphasis supplied).

[12] *Deepwater Horizon I,* 732 F.3d at 346 (Southwick, J., concurring) (some emphasis added).

[13] Statements by BP Counsel Wendy Bloom during Administrative Panel Meeting, March 12, 2014.

[14] *See, e.g., Deepwater Horizon I,* 732 F.3d at 337 ("Because cash accounting does not inherently recognize the relationships between cash flows and their underlying transactions, the term 'corresponding variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C"); *Deepwater Horizon I,* 732 F.3d at 338 ("The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims?"); *Deepwater Horizon I,* 732 F.3d at 346 (Southwick, J., concurring) ("Part I of the panel opinion identifies the crucial question for remand:  should matching be required for ***all*** claims when it is clearly required for many?").

[15] ORDER AND REASONS (Dec. 24, 2013) [Rec. Doc. 12055] at p.3.

[16] The underlying assumption to BP's argument is that two hypothetical businesses suffering identical losses but keeping their books differently would be treated differently under the Settlement Agreement. However, the reality is that similar businesses of a similar size and nature will typically keep their books under similar accounting methodologies. Class Counsel are not aware of the hypothetical "two jet ski rental shops just down the beach from each other" that kept their books differently and were therefore treated in materially different ways. Class Counsel believe that most jet ski rental shops of the same size and nature will tend to keep their books in the same or similar ways. Indeed, BP's complaints focused on certain groups of businesses – *e.g.* construction, agriculture, professional services – who *all* keep their books under similar cash-basis methodologies.  The Settlement, moreover, treats all Class Members similarly by applying the same common, objective and transparent

which the BEL Opinion indicates BP "insisted upon" and repeatedly describes as both "sufficient" and "required".

**All BEL Claims that Are Not "Sufficiently Matched" Should be Matched under the Annual Variable Margin Methodology**

The Court's decision on remand was based largely on the finding that "the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[17]

Indeed, the Settlement Agreement itself dictates that that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."[18]

The Claims Administrator and Program Accountants concede, however, that the new Agricultural and Educational Frameworks depart from the Exhibit 4C analysis,[19] and that the new Professional Services Framework departs from not only the Exhibit 4C analysis,[20] but also from any standard or accepted accounting methodology.[21]

---

frameworks to all businesses, based on their Contemporaneous business records. Finally, BP's argument (and, with all due respect, the Claims Administrator's initial P&L Policy) ignores the fact that the Settlement Program should maximize the Compensation Amount of each and both of the hypothetical Claimants under Section 4.3.8. *See, e.g.,* OPPOSITION TO BP MOTION FOR RECONSIDERATION (Feb. 18, 2013) [Doc 8963-54] p.28; HERMAN DECLARATION (Nov. 12, 2013) [Doc 11833-1] ¶8.

[17] ORDER AND REASONS (Dec. 24, 2013) [Rec. Doc. 12055] at p.3.

[18] SETTLEMENT AGREEMENT, Section 4.4.7.

[19] The Claims Administrator specifically concedes that "a deviation from the existing methodology set forth in Exhibit 4C was deemed necessary." *See* ATTACHMENT D to Proposed Policy No. 495 (Feb. 12, 2014) [Rec. Doc. 12589-7, at 19]. During the meeting with the Program Accountants on February 20, 2014, Mr. John Petzold from PwC further acknowledged that the proposed Agriculture / Educational Framework was not based on the Settlement Agreement, but was a new methodology, which, when using only one benchmark year, effectively eliminates the "Step Two" Calculation to which the BEL Claimant is entitled under Exhibit 4C.

[20] The Claims Administrator specifically concedes that "deviation from the existing methodology set forth in Exhibit 4C was deemed necessary." *See* ATTACHMENT E to Proposed Policy No. 495 (Feb. 12, 2014) [Rec. Doc. 12589-7, at 27]. This was further confirmed by Ted Martens from PwC during the meeting with Program Accountants on February 20, 2014.

[21] During the meeting with the Program Accountants on February 20, 2014, Mr. Ted Martens from PwC acknowledged that the 'straight line averaging' approach to revenue (or expenses) cannot be found in any accepted accounting methodology with respect to (at least) a contingent fee situation, where a fee is not earned unless and until a judgment or settlement is paid. *See also, generally,* CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; BRIEF OF *AMICI CURIAE* CERTIFIED PUBLIC ACCOUNTING SOCIETIES IN SUPPORT OF APPELLEES, No.13-30315 (June 24, 2013) [Fifth Cir. Doc. 00512285581]; FASB CONCEPTS STATEMENT 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraph 83(b); Con 6, Page 35, Footnote 56 references Concepts Statement 5 (Par. 83 and Footnote 50); SECURITIES AND EXCHANGE COMMISSION STAFF

It appears that the development of these new frameworks (as well as the new Construction Framework) was motivated by a desire to achieve some vague, subjective and undefined notion of "economic reality".

Clearly, there is no indication or directive from the BEL Panel that either the Claims Administrator or the Court would set the Agreement aside, start from scratch, and develop a completely new methodology that would attempt to "achieve a realistic measure of economic loss."

The BEL Panel was simply weighing the two proffered interpretations of the term "corresponding" as used in Exhibit 4C, and concluded that, *as between the two,* BP's proffered interpretation was *more* in line with "economic reality".

Upon remand, this Court agreed that the word "corresponding" within the definition of "Variable Profit" should be interpreted to suggest the type of matching of expenses to revenue that one would typically find in accrual-based accounting profit & loss statements.

*However,* this does not in any way suggest or imply that the entire 4C Compensation Framework should be set aside in favor of some new and unspecified standard of "realistic measure of economic loss" – particularly in cases where such methodologies would violate accepted accounting principles.

Class Counsel respectfully submit that the Claims Administrator does not have the authority to abandon the negotiated terms of the Settlement Agreement, and could ensure

---

ACCOUNTING BULLETIN NO. 104 (SAB 104), Pages 10 and 1; KIESO, WEYGANDT & WARFIELD, *Intermediate Accounting* (14th Ed.), at p.60; DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13-14.

sufficient matching for all industry groups using the basic Average Variable Margin Methodology.

This approach is supported by not only the absence of industry-based alternative frameworks within Exhibit 4C for BEL Claims,[22] but is also required by Section 4.4.7 of the Settlement Agreement, which dictates that that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."

<u>The Specialized Frameworks for Construction, Agricultural, Educational and Professional Services Claims Are Inconsistent with the BEL Opinion, in that They Call for the Re-Allocation or 'Smoothing' of Revenues</u>

The basis of the BEL Panel's decision – upon which this Court's December 24, 2013 Order is also based – is that the term "corresponding variable expenses" within part 2 of the Variable Profit definition:

> could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated. In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract *corresponding* expenses over the same [Benchmark or Compensation] time period.[23]

Clearly, the line item to be adjusted is expense – not revenue.

Not only does the BEL Panel never expressly discuss the re-allocation of revenue in the context of matching, but the only explicit reference to revenue in the BEL Opinion specifically <u>*rejects*</u> the proposition that uneven "cash flows" should be re-allocated or 'smoothed':

> BP's primary concern seems to be the *uneven <u>cash flows</u>* of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have

---

[22] *See also, e.g.,* MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1] pp.6-7; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862] p.9.

[23] *Deepwater Horizon I,* 732 F.3d at 337 (emphasis in original).

considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed.[24]

Nor is the re-allocation of properly recorded revenue supported by accepted Accounting Principles. The Financial Accounting Standards Board directs that revenue and gains are realized when goods, services or other assets are exchanged for cash; revenue is realizable when related assets received or held are readily convertible to known amounts of cash. FASB Codification, §605-10-25-1. The Construction, Agricultural, Educational and Professional Services Frameworks violate this principle by revising the Contemporaneous Profit & Loss Statements to recognize revenue in periods well before they could be recognized under any known accounting standard. As confirmed by Dr. Mark Kohlbeck:

> Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession.[25]

Certified Professional Accountant Allen Carroll further verifies that:

> GAAP recognition rules and 'matching' most often apply to expense recognition not revenue recognition….
>
> [A] proposal to move revenue to match expenses is backwards and violates the very concept referred to as matching in BP's out of date textbook….
>
> The matching approach that BP advocates is not matching in any sense recognized in the accounting world, but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses.[26]

---

[24] *Deepwater Horizon I,* 732 F.3d at 340; *see also* ORDER AND REASONS [Rec. Doc. 12055] at pp.5-6.

[25] DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10, (emphasis supplied); *see also,* PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14.

[26] SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14.

Based on the Settlement Agreement, the BEL Opinion, and accepted Accounting Principles, any required matching should be accomplished by a re-allocation of Variable Expenses alone, and not by any 'smoothing' or other re-allocation of properly recorded revenues.

<u>The Specialized Frameworks for Construction, Agricultural, Educational and Professional Services Claims Alter the Causation Analysis Re-Affirmed By Judge Southwick in the Denial of Rehearing</u>

The specialized frameworks for Construction, Agricultural, Educational and Professional Services Claims under Policy No. 495 call for the Settlement Program to re-visit the issue of Causation after revenues are re-allocated.

As noted, the BEL Opinion – as well as this Court's decision on remand – centered on the "Variable Profit" definition and, specifically, the interpretation of "corresponding variable expenses" in Exhibit 4C.[27]

The separate Causation Test found in Exhibit 4B is a pure revenue test, which has nothing to do with expenses. The terms "Variable Profit" and "variable expenses" are found nowhere in the Exhibit 4B Framework.

Judge Southwick specifically noted in the original BEL Opinion that: "No one on appeal is challenging Exhibit 4B,"[28] and, in denying BP's Petitions for Rehearing, again confirmed that "the Claims Administrator must establish causation for settlement purposes with respect to every claim under the specific criteria and formulae that BP and Class Counsel agreed would be utilized for that purpose."[29]

---

[27] *See Deepwater Horizon I,* 732 F.3d at 332 and 336-339; ORDER AND REASONS (Dec. 24, 2013) [Rec. Doc. 12055] at pp.4-5.

[28] *Deepwater Horizon I,* 732 F.3d at 347 (Southwick, J., concurring); *see also Deepwater Horizon I,* 732 F.3d at 346 (Southwick, J., concurring) (does not join in Part II of Judge Clement's opinion, because it implies "an invalidity to the Settlement Agreement's *causation framework,* **which no one challenges**") (emphasis supplied). *See also, Deepwater Horizon III,* 744 F.3d 370 (5th Cir. 2014) (affirming District Court's interpretation and application of the BEL Causation test under Exhibit 4B).

[29] ORDER ON PETITION FOR PANEL REHEARING (May 19, 2014) [Fifth Cir. Doc. 00512635492] at p.10.

As reflected by the ADDENDUM TO CAUSATION REQUIREMENTS FOR BUSINESS ECONOMIC LOSS CLAIMS AND COMPENSATION FRAMEWORK FOR BUSINESS ECONOMIC LOSS CLAIMS, the two tests are not only separate and distinct, but the Claimant is expressly permitted to use *different months* for the Causation Test than for the Compensation analysis.

The three Scenarios included as examples within this ADDENDUM further reflect that the Causation Test under Exhibit 4B would be applied first.  And, in the ordinary course of human events, B comes before C.  On November 2, 2013, Class Counsel asked BP to provide "any and all support for the proposition … that the Compensation Framework in Exhibit 4C would be applied *before* the Causation Test under Exhibit 4B"?[30]   To the best of Class Counsel's knowledge and recollection, BP did not respond.  Nor are Class Counsel aware of any discussions, written communications or other evidence that the Parties intended or agreed that the Compensation Framework would be applied first.[31]

Under the original BEL Opinion, and particularly the District Court's Order of December 24, 2013 – which has now been affirmed by the BEL Panel, with Petitions for Rehearing and Rehearing *En Banc* denied [32] – there is no basis to alter or re-visit the Exhibit 4B Causation analysis based on adjustments to "corresponding variable *expenses*" under Exhibit 4C.

---

[30] E-Mail from Herman to BP Counsel George Brown, et al (Nov. 2, 2013).

[31] *See, e.g.,* GODFREY E-MAIL (Feb. 17, 2012) [Rec. Doc. 8963-58] No.2 ("The Compensation Framework is not the "causation test," which determines eligibility to claim that there was a loss *caused by* the oil spill. Rather, *once the causation test has been satisfied* (or presumed, as in Zone A for example), the Compensation Framework is designed to determine the compensation amount for a post-spill loss") (some emphasis added); HOLSTEIN LETTER TO JUNEAU (re Alternative Causation) (Sept. 28, 2012) [Rec. Doc. 8963-67] ("If a claimant has submitted the required documentation under the Business Economic Loss (BEL) Documentation Requirements (Ex. 4A), and these documents … establish that the claim satisfies the requirements of the BEL Causation Framework (Ex. 4B), *then* Claimant Compensation should be calculated pursuant to the provisions of the BEL Compensation Framework (Ex. 4C)") (emphasis supplied).

[32] *See* In re Deepwater Horizon, 744 F.3d 370 (5th Cir. 2014) ("*Deepwater Horizon III*"), *reh'g denied,* No.13-30315 (May 19, 2014).

**Conclusion**

For the above and foregoing reasons, the Class Counsel's Motion to Alter or Amend should be granted.

This 27th day of May, 2014.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com |
| *Lead Class Counsel* | *Lead Class Counsel* |

**ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL**

| | |
|---|---|
| Joseph F. Rice | Robin L. Greenwald |
| MOTLEY RICE LLC | WEITZ & LUXENBERG, PC |
| 28 Bridgeside Blvd. | 700 Broadway |
| Mount Pleasant, SC 29464 | New York, NY  10003 |
| Office: (843) 216-9159 | Office:  (212) 558-5802 |
| Fax No. (843) 216-9290 | Telefax: (212) 344-5461 |
| E-Mail: jrice@motleyrice.com | E-Mail:  rgreenwald@weitzlux.com |
| | |
| Brian H. Barr | Rhon E. Jones |
| LEVIN, PAPANTONIO | BEASLEY, ALLEN, CROW, METHVIN, |
| 316 South Baylen St., Suite 600 | PORTIS & MILES, P. C. |
| Pensacola, FL 32502-5996 | 218 Commerce St., P.O. Box 4160 |
| Office:  (850) 435-7045 | Montgomery, AL 36104 |
| Telefax: (850) 436-6187 | Office:  (334) 269-2343 |
| E-Mail: bbarr@levinlaw.com | Telefax: (334) 954-7555 |
| | E-Mail:  rhon.jones@beasleyallen.com |
| Jeffrey A. Breit | |
| BREIT, DRESCHER & IMPREVENTO | Matthew E. Lundy |
| Towne Pavilion Center II | LUNDY, LUNDY, SOILEAU & SOUTH, |
| 600 22nd Street, Suite 402 | LLP |

Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of May, 2014.

/s/ Stephen J. Herman and James Parkerson Roy