UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater* | : | MDL No. 2179 |
| *Horizon*" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: 10-4536 | : | Honorable CARL J. BARBIER |
| …………………………………………... | : | Magistrate Judge SHUSHAN |

**PLAINTIFF UNITED STATES' PROFFER OF EVIDENCE REGARDING
DEFENDANT ANADARKO'S INVOLVEMENT WITH
THE MACONDO WELL AND INCIDENT**

## TABLE OF CONTENTS

Procedural Background ........................................................................................................1

I.    Evidence of Anadarko's Involvement in and Relationship to the Macondo
      Well and the Incident Should be Admissible in the Penalty Phase ...................................3

II.   The United States Proffers Evidence, Primarily Adduced in Phase I Discovery,
      Which is Not Voluminous Compared to the Existing Record ............................................3

III.  Partial Summary of Relevant Facts in the United States' Proffer ......................................5

      A.    Anadarko is a sophisticated oil and gas company with worldwide operations,
            extensive deepwater operations in the Gulf of Mexico and elsewhere, and a
            "long relationship" with BP ..............................................................................5

      B.    Anadarko's Agreements with BP Show Anadarko had the Opportunity to
            Positively Affect Operations .............................................................................6

            Lease Exchange Agreement ...............................................................6

            Well Participation Agreement ............................................................6

            Joint Operation Agreement ................................................................6

            Authorizations for Expenditure ..........................................................7

      C.    Anadarko Failed to Conduct Any Due Diligence Regarding BP's Process
            Safety or Past Environmental Record .................................................................8

      D.    Anadarko had Extensive Knowledge of and Involvement in Macondo
            Deepwater Operations as Well as the Ability to Raise Questions and Make
            Suggestions to BP ..........................................................................................10

            Communications with BP ..................................................................10

            Real-Time Data ...............................................................................11

            Daily Updates through Wellspace .......................................................12

      E.    Anadarko Employees Actively Monitored Operations at Macondo, and were
            aware of BP's Drilling Losses, Kicks and Problems with Well Control .............12

      F.    Anadarko pressed BP to drill deeper at Macondo, despite knowing
            of "safety concerns and wellbore integrity issues" ..............................................14

i

G.     Anadarko Approved the Final AFE for the Production Casing and
       Related Equipment ...............................................................................................15

H.     On April 20, 2010, Anadarko Gave Its Authorization for the Temporary
       Abandonment of the Well .....................................................................................16

I.     After the Incident Anadarko Took Certain Measures to Evaluate
       Performance of Operators .....................................................................................16

The United States submits this Offer of Proof for the Penalty Phase Trial, which is filed pursuant to Rule 103(a)(2) of the Federal Rules of Evidence and the April 21, 2014 Order Regarding Penalty Phase Schedule [Rec. Doc. 12688].  Through this Offer of Proof and the accompanying evidentiary exhibits, the United States identifies for the record evidence that potentially has been excluded by the Court's ruling granting Defendant Anadarko Petroleum Corporation's Motion *in Limine* to Exclude All Evidence Regarding Anadarko's Culpability. *See*, March 21, 2014 Minute Order [Rec. Doc. 12592] at 2.

**Procedural Background.**

This Court has held Anadarko strictly liable as a partial owner of the Macondo Well.[1]  In Phase I, the Court dismissed private party claims in maritime negligence against Anadarko based on the allegations in the pleadings.[2]  The Court also severed Anadarko from the Phase I trial and allocation of fault.[3]  On the eve of the Phase I trial, the United States and Anadarko entered into a stipulation pursuant to which the two parties agreed, among other things, that (1) the liable party under CWA 311(b) was the parent company, Anadarko Petroleum Corporation ("APC" or "Anadarko"), which was the owner of a 25% share in the Macondo Well; and (2) Anadarko was neither an operator nor a person in charge within the meaning of CWA Section 311(b)(7).  *See*, Rec. Doc. 5930.  Thus, the only evidence presented concerning Anadarko in Phase I was evidence submitted with:  (1) the briefing for United States' Motion for Partial Summary Judgment (Rec. Docs. 4836, 4836-2, and 5214), comprised mostly of the governing contractual documents, BP's invoices, and Anadarko's payments thereunder; (2) Anadarko's Cross-Motion

---

[1] Order and Reasons [As to United States', Transocean's, and Anadarko's Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA] (February 22, 2012), Rec. Doc. 5809.

[2] *See* Rec. Docs. 3830, 4159, 4578, 4845, 4642 (Dismissal Orders).

[3] *See* Rec. Doc. 5836.

for Summary Judgment (Rec. Doc. 5113-2), comprised mostly of evidence that Anadarko argued

demonstrated its lack of involvement in the Macondo well operations; and (3) the United States'

Response to Anadarko's Statement of Undisputed Material Facts in Support of its Cross-Motion

(Rec. Doc. 5216), comprised of limited evidence refuting Anadarko's assertions.

Anadarko moved *in limine* in the Penalty Phase to preclude any evidence under the CWA

Section 311(b)(8) penalty factor "degree of culpability."  Rec. Doc. 12343.  The United States

opposed.  Rec. Doc. 12462.   After oral argument, the Court agreed with Anadarko and excluded

evidence of Anadarko's culpability from the Penalty Phase trial and discovery.  *See* Transcript of

March 21, 2014 Status Conference (Rec. Doc. 12809) at 43-45; March 21, 2014 Minute Order

(Rec. Doc.12592) at 2.  This Order applied to both the "culpability" penalty factor and the "other

matters" factor of section 311(b)(8) of the Clean Water Act.  Transcript at 44-45.[4]

Despite the Court's ruling that any evidence concerning Anadarko's involvement and

activities under its contracts with BP should be excluded from the Penalty Phase, the final

scheduling order contained a line item for the US to submit a Proffer on Anadarko on or before

June 2, 2014.  Accordingly, the United States submits this Proffer.

---

[4] The United States notes that the Court's ruling was based at least in part on Anadarko's representation that the topics that it listed under the final penalty factor, "any other matters as justice may require," were merely placeholders and that Anadarko would withdraw them if it prevailed.  March 21, 2014 Status Conference Transcript at 36-37.  Yet Anadarko has withdrawn only two of those topics (including one topic for which the parties already have stipulated to the pertinent facts), leaving several that pertain to the roles of operators and non-operators and pursuing these topics in fact discovery. *See* Defendants' First Set of Discovery Requests to the United States of America Relating to the Clean Water Act Penalty Phase, Requests for Production Nos. 17, 18, at 4; Defendants' 30(b)(6) Deposition Notice of the United States in the Penalty Phase (served May 14, 2014), Topic No. 10, at 4-5.  Although premature at this juncture, there may be additional motion practice if Anadarko continues to contest some of these issues so closely related to evidence of its own involvement in the Incident and the Macondo Well.

I. **Evidence of Anadarko's Involvement in and Relationship to the Macondo Well and the Incident Should be Admissible in the Penalty Phase.**

The United States incorporates by reference into this Proffer all the arguments, both factual and legal, that it made in its Opposition to Anadarko's Motion *in Limine*.  (Rec. Doc. 12462).

A significant penalty against Anadarko is warranted, even given the Court's ruling that evidence of Anadarko's involvement with the Macondo Well should be precluded.  Culpability is only one of eight statutory penalty factors.  The Court has ruled that Anadarko is strictly liable for the discharge from the Macondo Well and the violation of CWA Section 311(b), and, as the Court described in length during the March 21 status conference, Transcript at 80-84, and as counsel for BP admitted in oral argument, the violation was "extremely serious."  Transcript at 68.  Nonetheless, some additional evidence concerning Anadarko's knowledge of and involvement with events at Macondo leading up to the Incident will create a fuller and more accurate record on which to base the civil penalty.

II. **The United States Proffers Evidence, Primarily Adduced in Phase I Discovery, Which is Not Voluminous Compared to the Existing Record.**

The evidence which the United States seeks to introduce against Anadarko for CWA penalty purposes is not voluminous, and is listed in Exhibit 1 to the Proffer.  A DVD containing copies of the proffered evidence will be submitted to the Court, Anadarko, and BP.  This Proffer includes eleven deposition bundles, fully designated and prepared for submission prior to the 2012 deadline for the Phase I trial, and the exhibits associated with those depositions.[5]  It also

---

[5] Depositions submitted that were not admitted in prior Phases are:  James Bryan; Jerry Byrd; Paul Chandler; Stephen Foster; Darrell Hollek; Nicholas Huch; Alan O'Donnell; Dawn Peyton; and Kirk Wardlaw.  Depositions submitted as part of this Proffer that have been admitted in prior Phases are: Robert Bodek; Michael Beirne; Robert Quitzau; and Stuart Strife.

includes Anadarko's Phase I discovery responses to the United States.[6]  The governing contracts – the Joint Operating Agreement, the Lease Exchange Agreement, and the Well Participation Agreement – are already part of the Phase I record.[7]  There are only a handful of documents included in this Proffer that were not marked as deposition or trial exhibits,[8] and very limited references to publicly available documents or websites.[9]

The United States sets forth below, in narrative format similar to post-trial findings of fact, illustrative facts contained in these materials.  Not all relevant facts are included due to the other demands of the Penalty Phase.  If, as the case proceeds, the Court elects to admit into the record evidence pertaining to any topic in this Proffer, in its post-trial briefing the United States reserves the right to expand upon the enumerated facts contained herein, as well as to expand upon any legal arguments as to relevance and admissibility that are not cumulative of prior briefings.

Anadarko has an opportunity under the Penalty Phase schedule to respond to this Proffer. The United States notes the following:  (1) it has stipulated that Anadarko was neither an operator nor a person in charge of the *Deepwater Horizon*;[10] (2) in response to Anadarko's cross-motion on summary judgment, the United States admitted and agreed that Anadarko was not on

---

[6] Anadarko Phase I Discovery Responses to United States (dated July 25, 2011); Anadarko Phase 1 Supplemental Discovery Responses to United States (dated September 20, 2011); Anadarko Phase 1 Supplemental Discovery Responses to US (dated September 27, 2011).

[7] *See* United States' Motion for Partial Summary Judgment (Rec. Doc. 4836), Ex. 2 to Rec. Doc. 4836 (Lease Exchange Agreement, TREX-01942); Ex. 3 to Rec. Doc. 4836 (Well Participation Agreement, TREX-01943); and Ex. 26 to Rec. Doc. 4836 (Excerpts of Joint Operating Agreement, TREX-01243).

[8] *See* Partial Summary of Relevant Facts, part III *infra*, ¶¶ 38-39, 44, 64, 67, 69, 71, 73.

[9] *See* Partial Summary of Relevant Facts, part III *infra*, ¶¶ 1-3.

[10] *See* Rec. Doc. 5930.

the rig nor did it have day-to-day control of many activities;[11] and (3) the United States has never

contended that Anadarko was grossly negligent.   Thus the evidence to be submitted as to

Anadarko's involvement and connection to the Incident shows a much lesser degree of

culpability than evidence concerning BP.   Nonetheless, the record as it now stands as to

Anadarko is misleadingly incomplete and therefore the United States submits this Proffer.

III.    **Partial Summary of Relevant Facts in the United States' Proffer.**

A. **Anadarko is a sophisticated oil and gas company with worldwide operations, extensive deepwater operations in the Gulf of Mexico and elsewhere, and a "long relationship" with BP.**

1.  Anadarko's oil and gas portfolio includes both United States onshore and deepwater resources, as well as international production and/or exploration activities in countries including Algeria, Brazil, Colombia, Ghana, Guyana, New Zealand, Mozambique, and Kenya.  Anadarko Operations – Overview, *available at* http://www.anadarko.com/Operations/Pages/Overview.aspx (May 30, 2014).

2.  Anadarko Petroleum Company's oil and gas exploration activities in the Gulf of Mexico include ownership in hundreds of leases, including 363 active leases in which Anadarko is the designated operator.  *See* U.S. Department of the Interior, Bureau of Ocean Management, Active Lease by Designated Operator and Lease Owner by Owner (May 1, 2014), *available at* http://www.data.boem.gov/homepg/data_center/leasing/leasing.asp (May 30, 2014).

3.  For each of the years 2010-2014, Anadarko Petroleum Corporation was one of the top six operators in the Gulf of Mexico, as ranked by oil volume.  *See* U.S. Department of the Interior, Bureau of Ocean Energy Management, Ranking Operator by Oil (Gulf of Mexico Region), *available at* http://www.data.boem.gov/homepg/pubinfo/repcat/product/Rank%20Oil.asp (May 30, 2014).

4.  The number of exploration wells that Anadarko drills in the Gulf of Mexico varies by the year, but in some years has numbered tens of wells.  Deposition of Stuart Strife (Oct. 5, 2011) ("Strife Dep."), at 30:16-24.

5.  As co-owner and co-lessee at Macondo, and as partner with BP elsewhere in the GOM, Anadarko had a "long relationship" with BP.  *See* Deposition of Darrell Hollek (June 22, 2011) ("Hollek Dep.") at 55:13-19.

---

[11] *See* Rec. Doc. 5216 (United States' Response to Anadarko's Statement of Undisputed Materials Facts in Support of Its Cross-Motion for Summary Judgment as to Anadarko's Non-Liability under the CWA).

**B.  Anadarko's Agreements with BP Show Anadarko had the Opportunity to Positively Affect Operations.**

6.  Anadarko[12] executed a number of documents with BP related to the Macondo Prospect:  a lease exchange agreement, a well participation agreement, and a joint operating agreement.

7.  **Lease Exchange Agreement.**  In executing the lease exchange agreement and subsequent approval by the Minerals Management Service, Anadarko became a "lessee" with a 25% interest in the Macondo area lease block.  TREX-01944; Deposition of James Bryan (May 6, 2011) ("Bryan Dep."), at 94:14-97:02; Anadarko Answer ¶¶ 29, 30-31, Rec. Doc. 1860 (filed April 4, 2011).  Anadarko traded its interest in other lease properties for a percentage interest in Macondo.  *See* TREX-01942 at 2.1; Deposition of Michael Beirne (June 27-28, 2011) ("Beirne Dep."), at 98:18-100:14.

8.  The lease exchange agreement was a negotiated document between Anadarko and BP.  *See* Anadarko Phase 1 Discovery Responses (dated July 25, 2011) at 45.

9.  **Well Participation Agreement.**   BP, Anadarko Petroleum Corporation, and an Anadarko subsidiary, Kerr-McGee Oil and Gas Corp., entered into a Well Participation Agreement for the Macondo Prospect, whereby Anadarko would own a 25% interest in the Macondo Well.  TREX- 01943.  Under that Agreement, Anadarko agreed to participate in the Initial Exploratory Well.  Anadarko Phase 1 Supplemental Discovery Responses (Sept. 20, 2011), Request for Admission No. 12, at 15.

10. Anadarko, through Kerr-McGee, was a co-owner with BP in the Pompano production platform.  A key reason for Anadarko becoming a co-owner in the Macondo Well was the possibility that, if feasible, processing and handling of all production from the leased area would be completed via a subsea tieback to the Pompano facility.  Beirne Dep. at 47:25-48:25; *see also* TREX-01943, at Section 3.3, p.5; TREX-02309 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11. The Well Participation Agreement was a negotiated document between Anadarko and BP.  *See* Anadarko Phase 1 Discovery Responses (July 25, 2011) at 46.

12. **Joint Operating Agreement.**  Anadarko ratified and joined a joint operating agreement (JOA) with BP for the Macondo Prospect on or about December 17, 2009.  TREX-01243.  All parties agreed that the JOA would be retroactively effective as of October 1, 2009.  Anadarko Answer ¶¶ 27, 29.

---

[12] For purposes of this stipulation, "Anadarko" is Anadarko Petroleum Corporation (APC).  Although another Anadarko subsidiary, Anadarko Exploration & Production LP, also executed the lease exchange agreement and joint operating agreement, APC stipulated for purposes of the Clean Water Act claims that APC is the owner of Anadarko's full 25% interest in Macondo.  *See* Rec. Doc. 5930 (Stipulated Order Regarding Anadarko Entities).

13. The JOA was modeled on an industry form.  Deposition of Kirk Wardlaw (June 9, 2011) ("Wardlaw Dep.") at 95:24-96:05.  Most companies use a model form as a basis for negotiation.  Beirne Dep. at 33:01-09.

14. Anadarko had the opportunity to suggest changes to JOA before ratifying the Agreement, *see* Wardlaw Dep. at 115:19-24, but did not, Bryan Dep. at 87:07-11, and also failed to read key portions of the JOA prior to executing the agreement.  Deposition of Nicholas Huch (May 16, 2011) ("Huch Dep.") at 182:15-25 (Anadarko negotiator did not read JOA provisions regarding health, safety and environment.).

15.  Pursuant to the JOA, Anadarko designated BP to act as the "Operator."  TREX-01243, at Art. 4.1, p.14.  Anadarko submitted paperwork to the Minerals Management Service designating BP as the operator.

16. Anadarko agreed that the designation of BP as the operator did not absolve Anadarko "of responsibility for compliance with the terms of the lease, laws and regulations applicable to the area."  *See* TREX-01944 (Anadarko lease assignment and designation of operator forms).

17. Under the JOA, Anadarko was a non-operating "Participating Party" in the drilling of the Macondo well.  TREX-01243, at Art. 2.52, p.9 (defining "Participating Party" as one who shares in the risks and benefits of an approved operation).

18. BP did not characterize Anadarko as an investor but rather as "co-owner[]" of the well.  Beirne Dep. at 31:16 to 32:11.  In daily reports from BP, Anadarko is referred to as a "partner."  *See, e.g.*, TREX-01252 ("BP Daily Operations Report – Partners (Completion)").

19. The JOA permitted Anadarko to call meetings with the operator to discuss matters relating to Health, Safety and the Environment (HSE) and to request an HSE plan.  TREX-01243, at Art. 5.10, p.25 (the Operator is responsible for executing HSE obligations "with the support and cooperation of the Non-Operators") and Exhibit "K" at APC-HEC1-000001836 (detailing HSE duties and obligations).  There is no evidence that Anadarko took advantage of these rights.  *See* Wardlaw Dep. at 108:20-24, 109:02-06, 109:08-17, 109:21-25, 110:02-07.

20. Under the JOA, Anadarko also had the opportunity to request a visit to the rig during reasonable times to observe and inspect operations.  TREX-01243, at Art. 7.3, pp.36-37; Wardlaw Dep. at 150:06-11; Beirne Dep. at 214:09-215:08.  Anadarko did not take advantage of that opportunity.  Wardlaw Dep. at 150:12-16; Beirne Dep. at 214:24-215:08.  In addition, Anadarko could have requested records concerning the drilling rig.  Beirne Dep. at 216:06-216:23.

21. **<u>Authorizations for Expenditure.</u>**  The JOA provided that BP prepare for the Participating Parties an authorization for expenditure (AFE), i.e., a written description and cost estimate for certain proposed activities and operations a*s* well as an accompanying proposal.  TREX-01243, at Art. 2.7, p.3.  Non-operators had to approve or disapprove each activity or operation exceeding $500,000, as set forth in the JOA.  *Id*. at Art. 6.2, pp.25-26.  In the event

that the actual costs exceeded the AFE amount, then a supplemental AFE was required to be submitted to the Participating Parties. *Id*. at Art. 6.2.2, pp.26-27.

22. Participating parties commit to paying estimated costs set forth in the initial authorization for expenditure (AFE) to cover costs associated with drilling the exploratory well, and can either approve or disapprove additional AFEs. *See* Beirne Dep. at 54:03-15; 105:01-15; 280:16-22. In the event of cost overruns, a co-owner has an opportunity either to withdraw or to pay increased expenses pursuant to a supplemental AFE. *Id.* at 280:07-281:04; *see also* TREX-01243 (JOA) at Art. 6, p.25 (expenditures and annual operating plan), Art. 8, p.37 (approvals and notices), Art. 10, p.47 (exploratory operations), and Art. 16, p.103 (non-consent operations).

23. BP ensured that AFEs had proper information for the non-operating partners to review so they could elect whether to approve or disapprove the AFEs and Anadarko had individuals with sufficient technical expertise to review that information to make that decision. Beirne Dep. at 278:01-20.

### C. Anadarko Failed to Conduct Any Due Diligence Regarding BP's Process Safety or Past Environmental Record.

24. The Macondo Prospect was a project involving the development and exploration teams at Anadarko. These teams jointly recommended the Macondo project to senior vice presidents. The president of Anadarko, Al Walker, ultimately approved the project. Strife Dep. at 40:24-41:07.

25. The exploration team reviewed and approved authorizations for expenditures during the Macondo drilling process. Strife Dep. at 131:21-132:17; 133:12-135:20; TREX-01920; TREX-01921.

26. The development group reviewed and signed the final authorization for expenditure because hydrocarbons had been found and the development group would bear the production casing costs. Deposition of Alan O'Donnell (May 5, 2011) ("O'Donnell Dep.")at 139:21-142:07; TREX-01922 (April 14, 2010 AFE).

27. Anadarko's independent analysis of Macondo's commercial viability included an evaluation of nearby similar wells, comparison of its seismic data to BP's, and a calculation of the chance of success and estimated recovery of hydrocarbons. TREX-01914; O'Donnell Dep. at 86:06-17. Anadarko projected $81 million (risked mean value) for its share of Macondo. TREX-01915; O'Donnell Dep. at 109:08-14; TREX-01915.

28. Anadarko conducted a detailed economic assessment of the Macondo Well in October 2009, and repeated it using higher costs after a storm damaged Transocean's initial drilling rig, the Marianas. *See* TREX-02692, TREX-02693, TREX-02694, TREX-02695 (email chains among Anadarko employees in November-December 2009 discussing revised economics for Macondo). Anadarko Vice-President for Development Darrell Hollek directed his staff to re-run the numbers using the higher estimated costs ($131 million) and they reported that the economics "still look very strong." O'Donnell Dep. at 123:19-125:03; TREX-01918.

8

29. The economic projections performed by the development team assumed reaching the objective or total depth ("TD") criteria set forth in the initial AFE description for the drilling of the well.  O'Donnell Dep. at 190:21-23; 191:06-192:05. The TD reflected the depth Anadarko thought would reach the geologic section that it was interested in, and "total depth needs to test that entire section . . . otherwise we wouldn't drill the well."  O'Donnell Dep. at 192:02-05.

30. Anadarko also conducted a detailed geologic analysis of the Macondo Prospect prior to executing the agreements with BP.  Anadarko created an independent geological evaluation of Macondo, and believed in a high chance of finding oil, 76%.  Deposition of Paul Chandler (May 4, 2011) ("Chandler Dep.") at 37:15-40:25, 56:21-57:17.  Chandler thought the geology at Macondo was "very strong."  *Id.* at 69:21-70:10.

31. The chance of success at Macondo was in the range of 60-65 percent of finding hydrocarbons.  Beirne Dep. at 39:04-21.  The mean range of potential resources was projected to be in the 60 million barrels of oil equivalent (MMBOE) range.  TREX-01914; O'Donnell Dep. at 85:14-86:17; TREX-01932; Beirne Dep. at 40:06-14.

32. Anadarko failed to conduct any due diligence into BP's health, safety or environmental record.  *See* Hollek Dep. at 134:17-22; Bryan Dep. at 107:03-08.  Instead, Anadarko relied generally on its knowledge of BP's reputation and experience, BP's safety awards, and Anadarko's prior experience with BP.  Anadarko Discovery Responses (dated July 25, 2011) at 47-48.

33. Anadarko did not request or review any risk assessment or accident risk analysis from BP, stating that "[w]e let the operator do the full risk assessment," Hollek Dep. at 137:11-138:01, adding that reviewing such an assessment "takes a lot of time," and Anadarko trusts the operator to do a good job.  *Id*. at 138:02-11.

34. Anadarko did not review BP's initial exploration plan; BP's Gulf of Mexico regional oil spill response plan; BP's exploration plan; BP's health, safety and environment ("HSE") plan; or any Application for a Permit to Drill filed with MMS.  Bryan Dep. at 92:10-93:6; 107:24-110:8; 136:5-19; Anadarko Phase 1 Discovery Responses, dated July 25, 2011, at 56-57 (Anadarko did not receive, monitor or evaluate BP's submissions to the MMS for the Macondo well prior to April 20, 2010); Hollek Dep. at 134:19-135:15.

35. Anadarko did not discuss BP's HSE record, in the Gulf of Mexico or nationally, prior to executing the agreements.  Bryan Dep. at 136:20-137:01; Huch Dep. at 188:04-189:08.

36. Anadarko had no formal processes in place on or before the Incident for monitoring or evaluating:  BP's quality of work; compliance with applicable operating regulations; and/or compliance with the terms of the agreements, with the exception of internal procedures to approve joint invoices and auditing provisions.  *See* Anadarko Phase 1 Discovery Responses, dated July 25, 2011 at 54-55.

37. Anadarko did not assign anyone to monitor the Macondo well from a safety perspective. Deposition of Robert Quitzau (May 25-26, 2011) ("Quitzau Dep.") at 402:21-403:09; 621:22-623:09.

38. As internal emails after the Macondo Incident document, Anadarko was acutely aware of BP's poor safety record, but failed to take any steps to ensure that operations were safely carried out during Macondo operations.  On April 21, 2010, as the burning Deepwater Horizon was listing on the sea, an Anadarko manager emailed a revealing message to his colleague: "I tell you, BP is up S___t creek; between the Texas City Refinery fire, the Alaska pipeline leak, Thunderhorse almost sinking – not sure I would partner with them any more." *See* ANA-MDL-000015551 – 000015553.

39. 

**D. Anadarko had Extensive Knowledge of and Involvement in Macondo Deepwater Operations as Well as the Ability to Raise Questions and Make Suggestions to BP.**

40. In connection with executing the Macondo agreements, BP provided Anadarko information about the Macondo Well design.  Anadarko Supplemental Phase 1 Discovery Responses, dated September 20, 2011, Response to Request for Admission No. 15, at 18.

41. Anadarko could have proposed a revision to the Macondo well plan, but did not.  Beirne Dep. at 219:08-21.

42. Anadarko approved BP's well design for Macondo well via execution of the first Authorization for Expenditure (AFE).  *See* TREX-01919 (AFE signed December 17, 2009); Beirne Dep. at 218:05-22.

43. After Anadarko signed on to the project, and before drilling started up again at Macondo after the rig damage, Anadarko internally discussed having a "pre-spud" meeting with BP, but ultimately did not go forward with this.  Huch Dep. at 280:12-14; TREX-02327.

44. 

45. **Communications with BP.**  The JOA required BP to keep partners informed of "important matters." TREX-01243, at Art. 5.2, p.21.  BP broadly understood this obligation to encompass "all matters relating to the contract at hand," including relating to drilling operations and regulatory information shared with MMS/BOEM.  Wardlaw Dep. at 142:25-

143:12.  For example, Anadarko could have requested and obtained from BP the Macondo application for a permit to drill and amendments to the permit.  Beirne Dep. at 202:10-23.

46.  Anadarko had assigned contacts at BP whom it could call at anytime concerning the Macondo Well and the contract.  One contact was Michael Beirne, an offshore land negotiator for BP.  Huch Dep. at 52:54-53:06, 243:19-23; Beirne Dep. at 254:09-255:24.  Beirne testified that partners could come to BP with questions about Macondo and, on "numerous occasions," Beirne referred them to a BP technical person for a response.  Beirne Dep. at 204:01-06.

47.  Anadarko also had access to a technical contact at BP, Robert Bodek, an operations geologist.  Deposition of Robert Bodek (April 11-12, 2011) ("Bodek Dep.") at 358:15-19; 364:05-365:07; 372:07-373:18; 375:08-25); TREX-01218 (providing pore pressure and casing plan update to Anadarko).

48.  Anadarko stated that it had "open lines of communication with BP."  Anadarko Phase 1 Supplemental Discovery Responses, dated Sept. 27, 2011, at 11.

49.  Anadarko regularly communicated with BP about the drilling operations.  *See e.g.*, TREX-02630 (April 5, 2010 email exchange involving APC's Robert Quitzau and BP's Robert Bodek regarding operations at Macondo, including mud weight used, mud losses, plans to set casing liners, and pressure data).

50.  Anadarko had the ability to raise concerns with BP or ask questions if needed to BP about Macondo.  *See* Chandler Dep. at 93:02-19 (Anadarko could "raise objections or ask questions if needed" to BP about Macondo.)

51.  If a partner became concerned about the safety of a particular drilling operation and reported that to BP, Kirk Wardlaw, BP's chief land manager for the Gulf of Mexico who advised on BP's negotiations with Anadarko (Wardlaw Dep. at 17:18-23, 27:08-15), would report that information directly to his vice-president for exploration.  *Id*. at 145:06-17.

52.  Anadarko requested 24-hour advance notification from BP for logging, coring and testing at Macondo, and provided BP with a list of Anadarko individuals to notify about such operations.  TREX-01598.

53.  **Real-Time Data.**  The JOA provided for provision of real-time information to non-operating participating parties.  TREX-01243, at Art. 5.7, p.22-23. This provision was put in the updated industry model form "to make sure that the non-operators had access to . . . all of the real-time information the same as what the operator has."  Wardlaw Dep. at 277:07-18.

54.  BP gave multiple Anadarko employees access to INSITE Anywhere, which provided real-time drilling and formation evaluation data.  Quitzau Dep. at 140:24-141:05.

55.  At least seven Anadarko employees reviewed in real-time Macondo data on INSITE Anywhere, on at least one occasion:  Paul Chandler (Geological Advisor), Derek Folger (Geophysicist II), John Kamm (Project Geological Advisor), Alan O'Donnell (General

Manager), Brian O'Neill (Petrophysics Manager), Dawn Peyton (Senior Reservoir Engineer), and Paul Schlirf (Geoscience Advisor).  Anadarko Phase 1 Discovery Responses, dated July 25, 2011, at 58.

56. Anadarko had real-time access to well logs, electric logs, gamma ray logs and mud log communications.   O'Donnell Dep. at 187:06-16, 245:23-246:05, 254:22-255:07.

57. Anadarko used real-time data to follow drilling through the pay (hydrocarbon-bearing) zones. Quitzau Dep. at 142:07-14.

58. There were no restrictions on Anadarko's access to and use of real-time data.  Quitzau Dep. at 40:21-42:03, 561:22-562:13, 563:23-564:15.  Anadarko witnesses did not recall any problems regarding Anadarko's ability to access or monitor data through INSITE Anywhere. O'Donnell Dep. at 258:20-259:04.

59. **Daily Updates through WellSpace.**  Anadarko also had access to information about Macondo's daily operations through an electronic database, WellSpace, in order to keep track of the progress of the well and view log data.  O'Donnell Dep. at 189:17-190:08, 250:06-16.

60. WellSpace included daily operating reports, daily drilling reports, mudlogging reports, pore pressure/fracture gradient reports, and other documents.  Quitzau Dep. at 37:02-13.

61. When drilling at Macondo concluded, BP provided a copy of the pressure and fluid sampling program to Anadarko.  Anadarko geologist Paul Chandler reviewed the sampling program, commenting back to BP that it "looks good to us."  TREX-01902 (email from Paul Chandler to Robert Bodek, dated April 12, 2010).

62. Other than evidence indicating that BP did not timely post a daily operating report on or about April 18, 2010 (TREX- 5547), which was later provided to Anadarko, there is no indication that Anadarko complained about not getting information to which it was entitled from BP.  Strife Dep. at 129:09-14; Quitzau Dep. at 40:21-41:02; 87:01-88:02.

63. Anadarko also had opportunity to, and to a limited extent did, provide suggestions to BP on drilling operations.  For example, on April 5, 2010, following a ballooning in the well, Quitzau suggested to BP that it use a 14.3 ppg mudweight.  TREX-02630; Quitzau Dep. at 131:06-132:03; 418:06-419:21.  Several days later, Quitzau discussed with BP the possibility of running a different sized liner than BP planned.  *See* TREX-02633.  Ultimately, BP declined to change from the plan, citing "the trouble time we have had in the well."  *Id.*

### E.  Anadarko Employees Actively Monitored Operations at Macondo, and were aware of BP's Drilling Losses, Kicks and Problems with Well Control.

64. In March 2010, Anadarko assigned a veteran drilling engineer, Robert Quitzau, to monitor and evaluate the drilling at the well.  Quitzau Dep. at 99:07-100:03; Huch Dep. at 276:12-15; APC-SHS2A-000001184.  Quitzau's predecessor responsible for monitoring drilling at

Macondo for Anadarko, Josh Nichols, mentioned that there had been "a kick and some hole conditions," which resulted in sidetracking of the well.  Quitzau Dep. at 50:17-20.

65. Quitzau looked at depths, mud weights, shoe tests, and operating summaries, and read all the daily operating reports.  Quitzau Dep. at 59:10-60:04; 99:07-100:03; 394-95; 578:03-17.  Quitzau was particularly interested in monitoring for any indication of "formation fracture weakness."  *Id.* at 397:13-25.

66. Quitzau reported on the Macondo well each weekday during Anadarko's drilling group meeting.  Quitzau Dep. at 31:03-32:17.

67. Quitzau emailed updates and reviewed detailed pore pressure/fracture gradient (PPFG) plots showing narrow drilling margins to the Anadarko Macondo team, including Anadarko managers and executives, to compare the actual progress against the well plan.  Quitzau Dep. at 561:22-562:13, 563:23-564:15; TREX-002624, TREX-002627, TREX-002628 (examples of PPFG plots provided to Anadarko).  *See also* ANA-MDL-000007258 ████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████

68. Quitzau was aware of changes in well design related to casing points and depths that occurred during the drilling of the well in March and April 2010.  Quitzau Dep. at 69:14-19.

69. Mr. Quitzau emailed BP contacts with technical questions, comments and suggestions.  *See, e.g.*, APC-SHS2A-000001184 to -000001185 ███████████████████████████████
████████████████████████████████████████████████████████████████

70. BP's Robert Bodek reported that he had "many, many telephone calls with Mr. Quitzau" and provided "operational updates dozens of times on numerous occasions" to "keep partners in the loop."  Bodek Dep. at 715:06-12, 717:08-11.  Bodek believed Anadarko understood from a technical perspective what was happening at the well.  *Id.* at 373:13-18.

71. Paul Chandler, a geologist at Anadarko also assigned to Macondo, testified that his role was to "monitor the drilling activities" and "stay current with information provided to [him] by BP[.]"  Chandler Dep. at 82:21-83:05.  Mr. Chandler monitored Macondo to "stay current on the drilling activity" so Anadarko knew when total depth ("TD") was reached and to analyze the reservoir.  *Id.* at 83:06-21; 130:23-131:10.  *See also* ANA-MDL-000007258 (email from Chandler to Anadarko team members, reporting that setting 11 7/8" liner at the depth BP proposed "could really jeopardize getting to TD with enough casing size.").

72. Anadarko was aware of BP's drilling losses, kicks and problems with well control at Macondo that took place at the Macondo Well between December 17, 2009 and April 20, 2010 on the following dates: 2/17/10, 3/2/10, 3/8/10, 4/3/10, 4/4/10, and 4/9/10."  *See* Anadarko Discovery Responses, dated July 25, 2011, at 52.

73. With regard to the February 17 well control event, ███████████████████ ████████████████████████████████████████████████████████████ ANA-MDL-000001275 to -000001276.

74. Anadarko was in communication with BP about the March 8, 2010 kick that resulted in work stopping to fish out a drillpipe and to sidetrack the area.  Bodek Dep. at 185:14-186:01, 186:09-186:16, 186:19-187:10; Quitzau Dep. at 50:17-24, 66:13-67:24, 578:12-24.

75. In a March 24, 2010 email exchange, Derek Folger inquires of Quitzau, "*What is BP up to at Macondo? From this last plan update you emailed they were supposed to drill down to 17,000ft before setting the 11.75" liner. Now their report shows they are pulling out of hole at 15,100' to run liner. What is going on at the well?*"  TREX-02655 (emphasis added).

76. Despite knowledge of problems at the well, on May 30, 2010 Anadarko approved a second supplemental AFE for an additional $27 million to total project cost, required because of cost overruns stemming from well control issues.  TREX-01921 (signed March 30, 2010); Strife Dep. at 134:05-135:04.  The AFE stated that "[t]he first Supplemental AFE was exceeded due to unexpected lost circulation and well control events resulting in earlier than planned setting of [two well casings]."  TREX-01921.

**F.  Anadarko pressed BP to drill deeper at Macondo, despite knowing of "safety concerns and wellbore integrity issues."**

77. Pursuant to the JOA, once drilling the exploratory well commenced, BP was required to drill the well to its objective depth specified in the initial AFE, subject to any supplemental AFEs, unless all participating parties unanimously agreed to stop drilling sooner or if, in BP's determination, mechanical difficulties rendered further drilling impracticable.  TREX-01243, at Art. 2.46 (defining "objective depth"), Art. 10.1.4, at p.50.  *See also* TREX-01243, Arts. 10.2, 10.2.1, at pp.47-48 (requiring BP to seek approval from Anadarko before proceeding with subsequent operations reaching total depth of the well, and allowing for Anadarko to make separate operations proposals).

78. The initial AFE defined objective depth as the first to occur of:  (1) total vertical depth of 19,561 feet; (2) indications of a specified geological zone; or (3) the onset of pressure beyond a total vertical depth of 16,561 feet that requires a new casing string to continue drilling.  TREX-01919.

79. Although the JOA and the initial AFE set the Objective Depth (subject to certain conditions) to be 19,650 feet total vertical depth, BP stopped drilling the well at 18,360 feet.  TREX-01256.

80. On April 9, 2010, Quitzau was asked whether he thought BP could drill deeper.  Quitzau advised Anadarko that "[BP] clearly cannot tolerate any well control incident based on their recent mud losses" and that "[i]f there is any risk of seeing a pressure gradient increase below the pay sand, it would be wise to case the future completion zone now."  TREX-02635.

81. On April 12, 2010, a number of Macondo team members met to "discuss our options for possibly drilling deeper beyond our current [Total Depth] for the Macondo well."  TREX-01592.

82. Anadarko then contacted BP to inquire whether "BP has entertained the idea of drilling below our current [total depth]" and that Anadarko "would support this position if BP was in agreement . . . ."  TREX-01593 (April 12, 2010 email from APC geologist Paul Chandler to BP's Bobby Bodek).

83. BP called total depth because there was a wellbore stability issue.  Beirne Dep. at 221:18-222:03, 356:06-24; TREX-02863.

84. Anadarko nonetheless continued to want to drill the well deeper. After BP stopped drilling, Anadarko reviewed whether the AFE requirements on total depth had been met.  O'Donnell Dep. at 193:20-194:3.  Anadarko thought there might be additional prospective pay zone deeper down, O'Donnell Dep. 269:04-271:07, and was "interested in drilling deeper to test whatever section that we left there." O'Donnell Dep. at 273:02-09, 269:04-270:09; TREX-01913 ("It looks like BP is stopping here . . . Maybe we can talk them into drilling deeper . . . .").

85. O'Donnell and Chandler both called BP to see if they would consider drilling deeper.  O'Donnell Dep. at 197:02-14; 198:02-04; 198:07-10.  O'Donnell had several conversations with BP's exploration manager about drilling deeper to the prospective section.  O'Donnell Dep. at 193:20-194:03; 196:09-19; 196:20-198:01; TREX-01929.

86. On April 13, 2010, BP emailed Anadarko that:  "Due to safety concerns and wellbore integrity issues, BP, as operator, has deemed the Macondo exploratory well as achieving Objective Depth at 18,360' MD.  Having both loss zones, and comparatively over-pressured sands in the open hole provided for little to no margin to continue drilling."  TREX-01256.

87. After another internal discussion with managers, TREX-02985, Anadarko provided its approval to conclude the drilling of the well on April 14, 2010, but added, "However, in the event BP concludes that it is safe and prudent to continue drilling to original Objective Depth Anadarko would not oppose [ ] BP doing so." TREX-01256; O'Donnell Dep. at 293:06-17.

88. Michael Beirne, BP's offshore land negotiator responsible for communications with the co-owners, testified that Anadarko never instructed BP to discontinue operations at the well based on safety and well integrity issues nor did they raise any concerns in that regard.  Beirne Dep. at 281:14-282:04.

### G. Anadarko Approved the Final AFE for the Production Casing and Related Equipment.

89. After making the decision to call total depth, BP sought Anadarko's approval to set the production casing in the Well and temporarily abandon ("TA") the Well prior to going

forward.  TREX-02855.  Calling total depth triggered certain obligations under the JOA, including performing the geologic evaluation of the prospect.  Then the operator has an opportunity to propose a subsequent operation.  BP had discussed the next operation with its co-owners and BP's recommendation was to set the production casing.  Beirne Dep. at 223:08-224:13.

90. Anadarko and co-owners could non-consent to the final AFE but then they would be non-participating parties subject to penalties prescribed in the JOA, Article 16.  Beirne Dep. 227:16-228:19.

91. On April 14, 2010, Michael Beirne emailed members of BP's Macondo team, emphasizing that with regard to setting the production casing, "*We need to be sure we have co-owner [Anadarko and MOEX] approval prior to initiating this operation.*") (emphasis in original).  TREX-02855 (April 14, 2010 email from Beirne to other BP employees).

92. Anadarko had a meeting to review the pipe setting recommendation of BP for the production casing and after discussion approved BP's recommendation and executed the AFE.  O'Donnell Dep. at 209:09-15, 209:18-211:04, 211:12-15; TREX-01930.

93. On April 15, 2010, Anadarko returned to BP the executed AFE authorizing setting the production casing and other tasks described in the AFE and expenditures of $3.5 million.  Beirne Dep. at 266:15-268:09; TREX-01922 (signed AFE dated April 15, 2010).  The final AFE also authorized release of funds to cover "9 7/8" production casing, casing hanger, cement, casing accessories, lockdown sleeve (LDS) and installation of the LDS" on the Macondo Well.  *See* TREX-01922; O'Donnell Dep. at 219:15-220:19; Deposition of Dawn Peyton (Sept. 8, 2011) at 191:19-25.  Daily drilling operations reports provided to Anadarko included information in the 24-hour forecast about cementing, centralizers, and spacer.  *See, e.g.*, TREX-02637, TREX-02638, TREX-02639.

**H.  On April 20, 2010, Anadarko Gave Its Authorization for the Temporary Abandonment of the Well.**

94. Ultimately Anadarko approved the decision to temporarily abandon the well.  TREX-01931; Beirne Dep. 228:24-229-13; O'Donnell Dep. at 216:07-18.  The co-lessees' approvals put into motion the temporary abandonment procedures, which included the cementing and negative pressure test.  Findings of Fact by the United States (June 21, 2013), Rec. Doc. 10460, at ¶¶ 77-79, 144-166.

95. Anadarko's approval to temporarily abandon the well was required unless Anadarko wanted to be a "nonconsent" party subject to financial penalties.  Huch Dep. at 218:14-220:10.

**I.  After the Incident Anadarko Took Certain Measures to Evaluate Performance of Operators.**

96. Post-blowout, Anadarko put in place a committee to evaluate risk and the performance of operators.  After the Macondo Incident Anadarko put in place a risk analysis program to

evaluate operators for purposes of whether they are complying with the operating agreement and whether the operator is prudent and capable of operating.  Huch Dep. at 270:11-24, 271:03-17, 272:01-08.

Respectfully Submitted,

SAM HIRSCH

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
SHARON SHUTLER
MALINDA LAWRENCE
LAURA MAYBERRY
Trial Attorneys


R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office

SAM HIRSCH
Acting Assistant Attorney General
Environment & Natural Resources Division
SARAH HIMMELHOCH
MICHAEL MCNULTY
Senior Litigation Counsel
NANCY FLICKINGER
Senior Attorney
RICHARD GLADSTEIN
PATRICK CASEY
Senior Counsel
A. NATHANIEL CHAKERES
JUDY HARVEY
RACHEL KING
ERICA PENCAK
ABIGAIL ANDRE
RACHEL HANKEY
BRANDON ROBERS
Trial Attorneys

*/s/ Steven O'Rourke*
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov
KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Telephone: (504) 680-3000
Facsimile: (504) 680-3184
E-mail: sharon.d.smith@usdoj.gov

17

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: June 2, 2014.

/s/ Steven O'Rourke
U.S. Department of Justice