# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179  SECTION: J |
| This Document Relates To:  Case No. 10-4536 …………………………………………………... | : : | JUDGE BARBIER MAG. JUDGE SHUSHAN |

## DECLARATION OF DAVID R. DUTTON, PH.D, CIH

I, David R. Dutton, am over twenty-one years of age and of sound mind and body. My declaration is based on personal knowledge, experience, and review of the materials described herein. If called to testify, I could testify to the matters set forth in this declaration.

1. I am a toxicologist and certified industrial hygienist ("CIH") by training. I received a Bachelor of Science degree in biology from the University of Arizona in 1978; a Master's degree in toxicology from the University of Arizona in 1984; and a Doctorate in toxicology from Kansas University in 1988. I also did a post-doctoral fellowship at the University of California San Francisco from 1988 to 1990 in the field of toxicology. I received my CIH certification from the American Board of Industrial Hygiene in 1995.

2. From June 2010 until July 15, 2012, I served as Industrial Hygiene Lead for the Unified Area Command ("UAC") on the *Deepwater Horizon* ("DWH") response. The Safety and Industrial Hygiene ("IH") groups were responsible for developing policies, procedures, and protocols related to worker safety and health, as well as addressing issues such as exposure assessment, safe work practices, personal protective equipment, and worker training. In addition, the Safety and IH groups were responsible for monitoring and responding to any incidences of unexpected or potentially harmful exposures to chemicals or other dangerous

situations encountered in the course of conducting response activities. As IH Lead, any such incidents would have ultimately been reported to me through a variety of reporting processes.

3. From December 2010 until July 15, 2012, I was also the Industrial Hygiene Team Lead for the Gulf Coast Restoration Organization ("GCRO"). As GCRO IH Team Lead, I was responsible for designing, implementing, and overseeing the IH program, which included establishing programs to monitor workers' potential exposure to potentially hazardous materials and being closely involved with the design and implementation of worker training. This declaration relates to my personal experience as an IH Lead for the UAC, as IH Team Lead for the GCRO, and as an embedded member of the response team.

4. To further ensure response worker safety, the response operations plan required implementation of a medical program that provided emergency and first-aid treatment, including access to medics or other emergency medical treatment personnel, at numerous locations during the response. In addition, the IH and Safety groups closely and exhaustively tracked all reports of occupational-related illnesses and injuries and analyzed for trends in order to institute corrective actions and improvements, as needed. BPXP, in consultation with the UAC, established medic stations in Louisiana, Mississippi, Alabama, and Florida. These medic stations were staffed by Emergency Medical Technicians ("EMTs") or paramedics employed by local ambulance companies that were contracted to provide medical services during the response.

5. As part of their required training, response workers were instructed to inform their supervisor, a safety officer, or a health officer if they suffered any injuries or illnesses. When appropriate, response workers were then directed to seek treatment at a medic station for any such injuries or illnesses. Data regarding each response worker visit to a medic station was

logged into individual MC252 Medical Data Forms and daily tracking sheets.  This information was subsequently recorded into a database referred to as the Medical Encounters Database.  The Medical Encounters Database was created and maintained to track all "medical encounters," or visits to any of the medic stations.

6.     The Medical Encounters Database also includes information reflecting visits by the general public—not just response workers—to medic stations.  The Database was designed to reflect any visit to a medic station for any reason by any individual, whether response worker or member of the public.  Therefore, if a local resident visited a medic station for any type of treatment, that visit would be recorded in the Medical Encounters Database.  The Medical Encounters Database contains many medical visit entries that are unrelated to the DWH incident and response, including, for example, some of the visits reporting dental infections, routine blood pressure checks, spider and other insect bites, menstrual cramps, paper cuts, toothaches, elevated heartbeat from energy drink consumption, diabetic issues, and many more.

7.     There are a total of 20,031 entries in the Medical Encounters Database.

8.     A separate database, referred to as the Incident, Injury and Illness Database, contains some medical treatment information but largely serves a different purpose than the Medical Encounters Database.  The Incident, Injury and Illness Database was designed to help BPXP meet Occupational Safety and Health Administration ("OSHA") and other agency reporting obligations.  This database tracks numerous types of work-related incidents, including many unrelated to injury, illness, or medical treatment.  Examples of incidents reported in the Incident, Injury and Illness Database that are unrelated to medical treatment include reports of property damage, vessel and vehicle incidents, and "high potential" events that resulted in no actual worker harm.  Of the 8,373 entries in the Incident, Injury and Illness Database, over 20%

3

of the entries are unrelated to medical treatment. Of the medical treatment entries, almost 83% consist of minor first-aid incidents that do not rise to the level of recordable incidents under OSHA guidelines.

9. The Medical Encounters Database covers the period from the beginning of the response through September 30, 2010. The Incident, Injury and Illness Database also contains entries from this period. This represents the most active period of the response, and, consequently, the frequency of injury and illness reporting was highest at this time. As a result, entries from this period adequately represent the types of injuries and illnesses reported throughout the response. After the well was shut in, the number of response workers greatly declined, and the workers who remained were more experienced and better aware of how to protect themselves in conducting response activities. Additionally, by the end of September, temperatures in the Gulf Region had declined and consequently, the number of reported heat-related illnesses (which represented the majority of health-related incidents) decreased drastically.

10. Under reporting guidelines in place during the response, medical entries found in the Incident, Injury and Illness Database from the beginning of the response through September 30, 2010 should also be found in the Medical Encounters Database. Thus, the Medical Encounters Database substantially, if not completely, incorporates medical entries from the Incident, Injury and Illness Database for this period.

11. As to reported injuries, illnesses, and medical treatment, the Medical Encounters Database provides a more comprehensive picture than the Incident, Injury and Illness Database for several reasons. The Medical Encounters Database was designed to capture all visits to medic stations, including visits by response workers. It also reflects any visits made by members

4

of the public, whereas the Incident, Injury and Illness Database only covers response workers. The Medical Encounters Database also includes visits made by response workers to medic stations for conditions or incidents unrelated to work, but the Incident, Injury and Illness Database only tracks work-related events. In addition to reported workplace injuries and illnesses captured in the Incident, Injury and Illness Database, the Medical Encounters Database goes further and captures medical visits of any kind. Additionally, both databases are comprised of entries reflecting individuals' subjectively reported health conditions, ranging from insect bites and sunburn to dizziness and fatigue. Reports of heat-related health conditions are predominant in both databases. However, both databases lack uniformly sufficient information about either causes of heat-related conditions or prior medical history.

12. I have not analyzed these databases to validate the data and diagnoses they contain, and the databases are comprised of a significant number of entries that have not been verified for consistency or accuracy. I also have not analyzed these databases to verify that all medical entries from the Incident, Injury and Illness Database are also contained in the Medical Encounters Database. To do so would be extremely time-consuming and would likely reveal very few entries in the Incident, Injury and Illness Database that are not contained in the Medical Encounters Database, given the reporting guidance and the tendency to over include information in these databases. In any event, the entries contained in the Incident, Injury and Illness Database are fairly represented by the entries found in the Medical Encounters Database as to both frequency and type of claimed response-related injuries and illnesses. Therefore, the Medical Encounters Database adequately reflects medical treatment provided by the UAC during the response.

I declare under penalty of perjury that the foregoing is true and correct.

Date: June 5, 2014

_____
David R. Dutton