

# DIAMOND McCARTHY LLP

### Attorneys & Counselors

Renaissance Tower | 1201 Elm Street, 34th Floor | Dallas, TX 75270 | Phone: 214.389.5300 | Fax: 214.389.5399

Direct Dial
(214) 389-5306

Email Address
emadden@diamondmccarthy.com

January 18, 2013

BP Claims Program
P.O. Box 330919
Houston, Texas 77233-0919

| |
|---|
| Via email to bpclaimsprogram@bp.com |
| Via facsimile to 1-866-542-4785 |
| Via certified mail, return receipt requested |

> Re:   Claim Form for the Seahawk Liquidating Trust, as the duly authorized successor to Seahawk Drilling, Inc., *et al.*

To Whom It May Concern:

Enclosed are the Claim Form and supporting exhibits for the Seahawk Liquidating Trust. This Claim Form is submitted in order to comply with the requirements of 33 U.S.C. § 2713(a). The Seahawk Liquidating Trust presents this claim to the Responsible Party, BP Exploration & Production, Inc. and its related entities (collectively, "BP"), for an initial sum certain of $174,800,000. This amount is not necessarily indicative of what may be recoverable in a court of law. Rather, it is an opening settlement demand as contemplated under 33 U.S.C. § 2713(a) for damages resulting from and due to the actions of BP.

The Seahawk Liquidating Trust adopts and incorporates by reference all documents, expert reports, scientific data, depositions, and pleadings produced and/or filed in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La.) (Barbier, J.). The Seahawk Liquidating Trust further adopts and incorporates by reference all exhibits, depositions, and trial testimony introduced into the Limitations Trial for MDL No. 2179, which is scheduled to commence on February 25, 2013. Finally, please note that the voluminous documents contained in Exhibit 4 to the Claim Form have been submitted only via certified mail, return receipt requested.

If you wish to conduct discussions to settle this claim, please respond within the next 90 days. Failure to (a) contact the undersigned or (b) request additional documentation and/or information about this claim within the 90-day period will be construed as a denial of the claim and will be deemed a waiver of any argument that presentment of the claim was inadequate.

Very truly yours,

Eric D. Madden

Exhibit A

Diamond McCarthy LLP

Letter to BP Claims Program
January 18, 2013
Page 2

Enclosures (Exhibit 4 to Claim Form via certified mail only)

cc:   Eugene I. Davis
      Allan B. Diamond
      Conrad S.P. (Duke) Williams, III

Exhibit A

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

## BP Claims Program  - Claim Form for Individuals and Businesses

| | |
|---|---|
| BP Claims Program<br>P.O. Box 330919<br>Houston, TX 77233-0919 | Deepwater Horizon Incident<br>CLAIM FORM for Individuals and Businesses |

**INTRODUCTION & INSTRUCTIONS:**

This Claim Form should be used by individuals and businesses submitting the following types of claims related to the April 20, 2010 Deepwater Horizon incident and subsequent oil spill (the "Spill") to the BP Claims Program:

- Property Damage to Real or Personal Property

- Lost Profits or Impairment of Earning Capacity - Individuals

- Lost Profits or Impairment of Earning Capacity - Businesses

- Removal Costs

- Subsistence Use

The BP Claims Program is separate from the Court Supervised Settlement Program (CSSP) established by the settlement reached between BP and the Plaintiffs' Steering Committee in the federal multi-district litigation concerning the Deepwater Horizon incident, MDL 2179.  The BP Claims Program is for claimants who fall into the following two categories:

1) Individuals and businesses that are not class members, as defined in the settlement agreement; and

2) Individuals and businesses that are Settlement Class Members but "opt out" of the class settlement.

This form is intended for use only by individual and business claimants who fall into these two categories.  For more information regarding the Settlement Class, please visit the CSSP's website at www.DeepwaterHorizonSettlements.com or call the CSSP at 1-866-992-6174.

You must include on this form all claims that you have related to the Spill.  This form has separate sections covering five (5) different types of claims that may be asserted under the Oil Pollution Act of 1990 (OPA).  Please complete the sections corresponding to the claims you are asserting.  Please complete all of the questions in the relevant section(s) for your claim(s).  Certain questions marked with an asterisk (*) must be completed in order to process your claim(s).  Do not forget to sign and date the claim form on the last page.

Where indicated, please write your name and Social Security number, Individual Taxpayer Identification Number, or Employer Identification Number on each page of the claim form.  Should you require

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

additional space to answer questions, you may attach extra pages to this form.  Please be sure to write your name and Social Security number, Individual Taxpayer Identification Number, or Employer Identification Number on each extra page that you submit, including your supporting documentation.

Check which type of payment/settlement are you seeking from the BP Claims Program?

Full and Final Payment/ Settlement ?   ☒

Interim Payment/Settlement ?   ☐

Check below which Claim Type(s) you are submitting and follow the instructions contained within each corresponding section:

**1.  Claimant Information (Mandatory for all Claimants)** - All Claimants *must* complete Section I. Individual claimants should complete Subsections I.A, I.B and I.C.  Business claimants should complete Subsections I.A, I.B and I.D.

**2.**  ☐  **Property Damage**  - Complete Section II only if you are asserting a claim for damage to real or personal property.

**3.**  ☐  **Loss of Profits or Impairment of Earning Capacity (Individuals)**  - Complete Section III only if you are an individual asserting a claim for lost profits or impairment of earning capacity.

**4.**  ☒  **Loss of Profits or Impairment of Earning Capacity (Businesses)**  - Complete Section IV only if you are a business asserting a claim for lost profits or impairment of earning capacity.

**5.**  ☐  **Removal Costs**  - Complete Section V only if you are asserting a claim for removal costs.

**6.**  ☐ **Subsistence Use**  - Complete Section VI only if you are asserting a claim related to subsistence use.

Once you have completed this form and attached the relevant documents requested, please mail it to BP Claims Program, P.O. Box 330919, Houston, TX 77233-0919, or email it to us in pdf format to bpclaimsprogram@bp.com, or fax it to us at 1-866-542-4785.  Please keep a copy of this form and your attached documentation for your records.

I.      **Claimant Information**

*Sections I is to be completed by all Claimants.  Individual claimants should complete Subsections I.A, I.B and I.C.  Business claimants should complete Subsections I.A, I.B and I.D.*

A.      **Opt Out Claimants** [*You must complete this Section if you are a member of the Settlement Class.]*

1.  \*If you are a Settlement Class Member <u>and have elected to opt out</u>, have you filed the appropriate written request to "opt out" of the Settlement Class?  ○ Yes      ○ No

Please attach a copy of the written request to opt out from the Settlement Class.  If you do not have a copy, please provide the date you sent the written request to opt out to the court, and any other identifying information you obtained when filing the written request:

2.  If you are a Settlement Class Member but have not filed a written request to opt out of the Settlement Class,        .  You are not eligible to file a claim with the BP Claims Program.  Please contact the Court Supervised Settlement Program (CSSP) at 1-866-992-6174, or visit the CSSP's website at www.DeepwaterHorizonSettlements.com for further information about the opt out procedures.

### B.    **Attorney Representation**

Are you represented by an attorney?  ⊗ Yes      ○ No

[You must *complete this Section if you are represented by an Attorney.  If you are represented by an attorney, the BP Claims Program can communicate only with the attorney you have identified unless your attorney instructs otherwise.  An attorney consent form allowing us to communicate directly with you is available at www.bp.com/claims.*

| 1. \*Attorney Name: Madden | Eric | D |
|---|---|---|
| Last | First | Middle Initial |

2. Law Firm Name:    Diamond McCarthy LLP

3. \*Law Firm Address:    1201 Elm Street, Suite 3400

Street

| Dallas | TX | 75270 |
|---|---|---|
| City | State | Zip Code |

| Dallas | USA |
|---|---|
| Parish or County | Country |

4.\*Attorney Phone:  2143895300

Numbers Only

5. Attorney Email Address:   emadden@diamondmccarthy.com

### C.    **Individual Claimants**  [*Complete this Section only if you are an individual.  If you are a business claimant, skip this Subsection C and proceed to Subsection D below.  However, if you are an individual that filed for business income on Schedule C, D, E or F of a Federal Income Tax return, please complete both Subsections C and D below*].

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

1. \*Name:

| | | |
|---|---|---|
| Last | First | Middle Initial |

2. \*Current Address:

Street

| | | |
|---|---|---|
| City | State | Zip Code |

| | |
|---|---|
| Parish or County | Country |

3. \*Home Phone:

4. Cell Phone:

5. Email Address:

6. \*Date of Birth:

MM/DD/YYYY

7. \*Social Security Number:

OR

Individual Taxpayer Identification Number:

8. Other Name Used
(Maiden Name, Previous Married Name(s), Aliases):

9. \*Current Employer:

Employer Name

Street

| | | |
|---|---|---|
| City | State | Zip Code |

| | |
|---|---|
| Parish or County | Country |

Employer Identification Number (EIN)  (from your W-2 or 1099 Form)

Other/Previous Employer:

Employer Name

Street

| | | |
|---|---|---|
| City | State | Zip Code |

| | |
|---|---|
| Parish or County | Country |

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

_____
Employer Identification Number (EIN)  (from your W-2 or 1099 Form)

10.  * Did you file a claim with BP, the Gulf Coast Claims Facility (GCCF), or the Coast Guard's National Pollution Funds Center (NPFC)?   ◯ Yes       ◯ No

If yes, please provide your BP Claim Number(s), GCCP Claim Number(s) and/or NPFC Claim Numbers(s):

Did you receive a payment from BP, the GCCF, or the NPFC?   ◯ Yes       ◯ No

If yes, please provide the amount(s) and source(s) of each payment you received:

**D.**     **Business Claimants**  *[Complete this Section only if you are a business.]*

1. *Name of Business:  Seahawk Liquidating Trust

2. *Type of Business:  Liquidating Trust

3. *Business Address:  5 Canoe Brook Drive

Street

Livingston                                         NJ      07039

City                                                    State   Zip Code

Essex                                                 USA

Parish or County                               Country

4. *Business Phone:  9735339027

5. Website Address: N/A

6. *Other Business Name:  See attached Exhibit 1

7. *Name of Business on Federal Income Tax Return: Seahawk Liquidating Trust

8. *Employer Identification Number (EIN): 45-6517816
                                        OR

If EIN is also Your Social Security Number:

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

9. Date and Place Founded/Incorporated:     Texas 2011

10. * Person Authorized
    To Act on Behalf
    The Business:

    Davis                                    Eugene
    Last                                     First

    I
    Middle

11. *Title of Authorized Representative:     Trustee

12. Home Address of Authorized Representative:

    (If Different      Street
    From Business
    Address)

                       City                              State     Zip Code

                       Parish or County                  Country

13. *Authorized Representative's Phone:     9735339027

14. Authorized Representative's Cell Phone:

15. Authorized Representative's Email Address :  genedavis@pirinateconsulting.com

16. *Did you file a claim with BP, the Gulf Coast Claims Facility (GCCF), or the Coast Guard's National
    Pollution Funds Center (NPFC)?     ⊗ Yes          ○ No

    If yes, please provide your BP Claim Number(s), GCCF Claim Number(s) and/or NPFC Claim
    Number(s):     1123089

    Did you receive a payment from BP, the GCCF, or the NPFC?     ⊗ Yes          ○ No

    If yes, please provide the amount(s) and source(s) of each payment you received:

    $8,099.04 GCCF Transition Process Final Payment Offer (60% of amount due).  This payment was for
    removal and clean up costs only.

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

## II.   Property Damage Claims

*Complete this section if you are an individual or business asserting a claim for real or personal property damage.  If you allege personal losses for the sale or rental of real property, please complete Section III. If you allege business losses for the sale or rental of real property, please complete Section IV.*

1. *Address Where Property Damage Took Place:

    Street

    City                                                     State      Zip Code

    Parish or County

2. *Provide a detailed description of the real (including Parcel Number or legal description) and/or personal property and the nature of the damage:

3. *Explain your interest in the real or personal property:     Owner ☐  ;   Lease ☐  ;   Other ☐

4. *If you answered "Other" to question 3, please explain:

5. *How much are you claiming for the damage to real property? $

6. *How did you arrive at this figure?

7. *How much are you claiming for the damage to personal property? $

8. *How did you arrive at this figure?

9.  Please list witnesses who have personal knowledge of the damage that occurred:

    Witness Name:

    Last                                                      First

    Middle Initial

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

Address:

_____
Street

_____    ____    _____
City                                      State    Zip Code

_____                 _____
Parish or County                          Country

Home Phone: _____    Cell Phone: _____

Email Address: _____

Relationship of Witness to you or your business: _____

Witness
Name:
_____        _____
Last                                      First

_____
Middle Initial

Address:

_____
Street

_____    ____    _____
City                                      State    Zip Code

_____                 _____
Parish or County                          Country

Home Phone: _____    Cell Phone: _____

Email Address: _____

Relationship of Witness to you or your business: _____

10. *Please describe how the property damage you are claiming was caused by the Deepwater Horizon Incident and resulting oil spill?

_____

11. *Please provide the following documentation in support of your claim for damage to the real or personal property (*a representative of the BP Claims Program will contact you if additional documentation is needed*):
  · Photographs of the property before and after the alleged damage
  · Your calculations and methods for assessing the claim amount
  · Receipts, invoices, estimates or contracts for the work needed or repairs performed

Page 8 of 20

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

    · Deed, lease, license, rental agreement or other documentation evidencing interest in property
    · Maps or other documents illustrating location of property in relation to Spill
    · Proof of expenses related to substitute equipment or property used
    · Documents establishing that the damage claimed was caused by the Spill

### III.    Loss of Income or Impairment of Earning Capacity (Individuals)

*Complete this section if you are an individual asserting a claim for a loss of profits or impairment of earning capacity. If you allege business losses for the sale or rental of real property, please complete Section IV.*

1.* Were you employed at the time of the Spill?

      Yes, by an employer ☐     Yes, self-employed ☐     No ☐

2.* If "Yes," provide the following information for your employer at the time of the Spill (write business name under which you operated if self-employed at the time):

_____
Employer Name or Self-Employed Business Name

_____
Street

_____  ___  _____
City                             State   Zip Code

_____    _____
Parish or County                       Country

_____
Employer Identification Number (EIN) *(from your W-2 or 1099 Form)*

Dates of Employment: _____

Name of Supervisor(s) BP may contact your employer/supervisor to verify your employment or employment aspects of your claim:

_____

3. *Describe your occupation (including job title, if applicable) at the time of the Spill:

_____

4. *Provide a description of how the Spill affected your profits or impaired your earning capacity:

_____

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

5.* How much are you claiming for lost profits or impairment of earning capacity? $ _____

6. How did you arrive at this figure?

7. Provide a description of actions you took and expenses you incurred in trying to offset the loss of profits or impairment of earning capacity caused by the Spill:

8. *Did you receive any payments from the VoO program or from participation in any other response or removal activity? ◯ Yes    ◯ No

If yes, list each month you received such payment, the amount received each month, and the unreimbursed expenses you incurred each month

| Month/Year | Payments Received | Expenses Incurred | Source of Payment |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

9. * Please provide the following documentation in support of the Individual Loss of Income or Impairment of Earning Capacity claim (a representative of the BP Claims Program will contact you if additional documentation is needed):

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

· Documentation reflecting Pay and/or Earnings before, during, and after the Spill, including W-2 forms, 1099 forms, federal and state tax returns from 2007 through the present, pay stubs, etc.
· Driver's license or other personal identifying (photographic) documentation
· Cancelled contracts or reservations documents, along with evidence that the cancellations were spill related
· Replacement contracts or reservation documents
· Cancelled loans, credit agreements, leases, if applicable to the claim
· Receipts for expenses incurred as a result of loss (such as job training or job search costs)
· Evidence showing that the Spill caused the loss of profits or earning capacity, including sworn statement from our former employer if Spill is alleged to have caused a layoff or work stoppage
· Licenses that may be applicable to claim
· Your vessel charter agreement (MVCA) if you participated in the VoO program
· Other documents establishing that your claimed loss was caused by the Spill

## IV.   Loss of Profits or Impairments of Earning Capacity (Businesses)

*Complete this section if you are a business claiming loss of profits or impairment of earning capacity.*

1. * Name of Business:     Seahawk Liquidating Trust

2. * Describe the nature of business as of April 20, 2010:

See attached Exhibit 2

3. * State the sources of income or types of customers for the business as of April 20, 2010:

See attached Exhibit 2

4.  Describe in detail any efforts you have made to increase revenues or reduce costs following the Spill:

See attached Exhibit 2

5.  State the total amount of operating costs you have saved (or were able to avoid) as a result of reduced operations since the Spill:

See attached Exhibit 2

6. * How much are you claiming for lost profits or impairment of earning capacity?

$  174.8 MM

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

7.  How did you arrive at this amount?

See attached Exhibit 2

8. * Provide a description of the alleged loss the business has sustained:

See attached Exhibit 2

9. * Describe how you believe the losses were caused by the Spill:

See attached Exhibit 2

10. * Did the business cease operations, declare bankruptcy or liquidate substantially all of its assets since the Spill?  (X) Yes    ( ) No

11. * Did the business receive any payments from the VoO program or from participation in any other response or removal activity?    ( ) Yes    (X) No

If "Yes", list each month it received such payments, the amount received each month, and the unreimbursed expenses it incurred each month:

| Month/Year | Payments Received | Expenses Incurred | Source of Payment |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

12. * Provide the business address where the loss occurred:

5 Greenway Plaza, Suite 2700

Street

| Houston | | TX | 79046 |
|---|---|---|---|
| City | | State | Zip Code |

| Harris | | USA | |
|---|---|---|---|
| Parish or County | | Country | |

13.  Provide the North American Industry Classification System (NAICS) Code of this business:   213111

14.* Please provide the following documentation in support of your claim for loss of business profits or impairment of earning capacity (*a representative of the BP Claims Program will contact you if additional documentation is needed*):

- Photographs of the business showing its proximity to an affected spill area
- Documents establishing that the damage claimed was caused by the Spill
- Your calculations and methods for assessing the claim amount
- Appropriate licenses necessary to operate the business
- Profit and loss statements (for each facility claimed) 2007 through present
- Annual and monthly financial statements 2007 through present
- Monthly sales or revenues statements 2007 through present
- Monthly sales and use tax returns 2007 through present, if applicable to the business
- Lodging tax returns 2007 through present, if applicable to the business
- Occupancy or rental records 2007 through present, if applicable to the business
- Management contracts 2007 through present, if applicable to the business
- Federal Tax Returns, with attachments and schedules, 2007 through present
- Cancelled contracts or reservations documents, along with evidence that the cancellations were spill related
- Replacement contracts or reservation documents
- Cancelled loans, credit agreements, leases, if applicable to the claim
- Bankruptcy schedules, if applicable
- Your vessel charter agreement (MCVA) if you participated in the VoO program

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

## V.    Removal and Cleanup Costs Claims

*Complete this section if you are asserting a claim for removal or cleanup costs.*

1. * Address Where
Removal or
Cleanup Took
Place:

Street

City                                                    State    Zip Code

Parish or County

2. * Was the Removal or Cleanup Action taken approved by the Federal On-Scene Coordinator (FOSC)?

       Yes ☐    Date of Approval _____    No ☐

3. * Provide a description of the Removal and Cleanup Action taken.  If not approved by the FOSC, please include a discussion of how the Removal and Cleanup Action was reasonable, necessary, and consistent with the National Contingency Plan:

4. * How much are you claiming for Removal and Cleanup costs? $ _____

5.  How did you arrive at this figure?

6. * Please provide the following documentation in support of the Removal and Cleanup Action taken (*a representative of the BP Claims Program will contact you if additional documentation is needed*):
   · Evidence of approval by the FOSC
   · Your calculations and methods for assessing the claim amount
   · Receipts, invoices and contracts for the work performed

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

- Usage logs for equipment and craft used, including policies and rates charged
- Payroll logs and compensation and reimbursement policies for employees who participated
- Activity logs describing the work performed by each employee
- Signed disposal manifests and proof of payment for disposal

## VI.  **Subsistence Use of Claims**

*Subsistence Use claims may be presented only by a claimant who actually uses, for subsistence, the natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources. Pleasure hunting and/or fishing are not eligible for Subsistence Use claims even if the game or fish is consumed. Commercial hunting or fishing also is not included in Subsistence Use. If you have a commercial hunting or fishing claim, you must complete Section IV related to business or economic loss claims.*

1. * Is your Subsistence Use claim based on hunting and/or fishing losses?    Hunting ☐        Fishing ☐

2. * List the species of game or seafood that you hunted and/or fished for Subsistence Use:

3. * Provide the quantity or amount of each species of game and/or seafood you caught in the year before the Spill, including the amount you consumed and the amount you gave your family members for their personal consumption:

4. * Provide a specific description of where you hunted and/or fished for each species in the Gulf of Mexico immediately before the Spill :

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

5. Describe the equipment and methods you used to hunt and/or fish:

6. * For each species, how many people in your family relied on the specific species of game or seafood you provided before the Spill? List each family member along with their relationship to you:

7. * Of the total amount of game or seafood your family relied upon on or before the Spill, what percentage came from the areas that were closed due to the Spill?

8. * Provided a specific description of where you hunted and/or fished for each species in the Gulf of Mexico *after* the Spill until December 31, 2010:

9. * Provide a specific description of how the area you used for hunting and/or fishing was impaired because of the Spill:

10. * How much are you claiming for Subsistence Use? $

11. * How did you arrive at this figure?

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816

12.* Please provide the following documentation in support of the Subsistence Use claim (*a representative of the BP Claims Program will contact you if additional documentation is needed*):

· Map identifying specific locations for Subsistence Use hunting and/or fishing
· Sworn affidavit signed by you under penalty of perjury verifying the identified closed locations
· Copy of State and Federal commercial or recreational hunting and/or fishing licenses valid at the time of the Spill
· Your calculations and methods for assessing the claim amount
· Other documentation establishing that the losses claimed were caused by the Spill

## VII.    Signature

*I certify under penalty of law that the information provided in this Form is true and accurate to the best of my knowledge, and that supporting documents attached to this form and information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution. By submitting this Form, I consent to the use and disclosure by the BP Claims Program and those assisting the BP Claims Program of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim. I understand that my claims information may also be provided to the Court Supervised Settlement Program, MDL 2179, or to the Plaintiffs' Steering Committee (PSC) or other Class Counsel for the plaintiffs for the purpose of coordinating the processing and potential payment of claims.*

Signature: _____     Date: 1/18/2013

                                                                                        Month/Day/Year

Print Name:  Eugene I. Davis, as Trustee of the Seahawk Liquidating Trust

The Claimant must sign this claim form personally. No one can sign on behalf of the Claimant unless the Claimant is a business or is deceased, a Minor, or Incompetent. If the Claimant is a business, an authorized business representative may sign. If the Claimant is deceased, a Minor, or Incompetent, an authorized representative may sign.

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816



Page2



Page3



Page4a



Page4b



Page5a



Page5b



Page6



Page6b

Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816



Page7a



Page7b



Page8a

Page8b





Page9

Page10a





Field10b

Page11a





Page11b

Page12a



Claimant Name: Seahawk Liquidating Trust

Claimant SSN, TIN or EIN: 45-6517816



Page12b



Page13



Page14a



Page14b



Page15



Page16a



Page16b



Pg17

Claimant Name:  Seahawk Liquidating Trust
Claimant EIN:  45-6517816

## EXHIBIT 1

**Subsection I.D – Business Claimants**

The Seahawk Liquidating Trust is the duly authorized successor to Seahawk Drilling, Inc. (EIN 27-1269401) and its various subsidiaries[1] (collectively, "Seahawk"), pursuant to the joint Chapter 11 plan of reorganization (the "Plan") that was confirmed by the U.S. Bankruptcy Court for the Southern District of Texas (Corpus Christi Division) (jointly administered under Case No. 11-20089) on or about September 28, 2011. Pursuant to the Plan and 11 U.S.C. § 1123(b)(3), the claims and causes of action belonging to Seahawk, including claims for damages resulting from the Deepwater Horizon incident, were transferred to the Seahawk Liquidating Trust. Accordingly, the Seahawk Liquidating Trust submits this Claim Form as the successor to and on behalf of Seahawk.

---

[1] The subsidiaries of Seahawk include the following: Seahawk Drilling LLC (EIN 27-0706629), Energy Supply International LLC (EIN 27-0303795), Seahawk Global Holdings LLC (EIN 27-0796543), Seahawk Mexico Holdings LLC (EIN 48-1305918), Seahawk Drilling Management LLC (EIN 27-0303682), Seahawk Offshore Management LLC (EIN 27-0303733), and Seahawk Drilling USA LLC (EIN 27-3821229).

Claimant Name: __Seahawk Liquidating Trust__
Claimant EIN: __45-6517816__

# EXHIBIT 2

### Section IV – Loss of Profits or Impairments of Earning Capacity (Businesses)

1.  Seahawk Liquidating Trust, as the duly authorized successor to Seahawk Drilling, Inc. and its various subsidiaries[1] (collectively, "Seahawk").

2.  Seahawk operated a jackup rig business that provided contract drilling services to the oil and gas exploration and production industry in the Gulf of Mexico in water depths less than 500 feet.

3.  Seahawk derived income by providing contract drilling services to companies engaged in the oil and gas exploration and production industry in the Gulf of Mexico in water depths less than 500 feet. For further information, please review: (a) the Expert Report of E. Allen Jacobs attached as Exhibit 3; (b) the additional documents attached as Exhibit 4; and (c) Seahawk's public filings with the U.S. Securities and Exchange Commission.

4.  Seahawk engaged in various efforts to increase revenues and/or reduce costs following the Spill, including but not limited to reducing or furloughing crews on certain drilling rigs, suspending fees paid to its directors, and exploring possible strategic alternatives such as additional funding, recapitalizations, sales of assets, and a sale or merger of Seahawk. For further information, please review: (a) the Expert Report of E. Allen Jacobs attached as Exhibit 3; (b) the additional documents attached as Exhibit 4; and (c) Seahawk's public filings with the U.S. Securities and Exchange Commission.

5.  Any saved costs are reflected in the amounts described in the Expert Report of E. Allen Jacobs, upon which the claim and sum certain are based. For further information, please review: (a) the Expert Report of E. Allen Jacobs attached as Exhibit 3; (b) the additional documents attached as Exhibit 4; and (c) Seahawk's public filings with the U.S. Securities and Exchange Commission.

6.  $174,800,000. For further information, please review the Expert Report of E. Allen Jacobs attached as Exhibit 3.

7.  This amount was derived from the analyses and methodologies reflected in the Expert Report of E. Allen Jacobs. For further information, please review the Expert Report of E. Allen Jacobs attached as Exhibit 3.

---

[1] The subsidiaries of Seahawk include the following: Seahawk Drilling LLC, Energy Supply International LLC, Seahawk Global Holdings LLC, Seahawk Mexico Holdings LLC, Seahawk Drilling Management LLC, Seahawk Offshore Management LLC, and Seahawk Drilling USA LLC.

8.  Seahawk suffered lost profits and impairment of earning capacity resulting from and due to the Spill, including: (a) reduction in the utilization of Seahawk's drilling rigs, causing a reduction in revenue and cash flow (EBITDA); (b) reduction in the price (day rate) for Seahawk's drilling rigs, causing a further reduction in revenue and cash flow (EBITDA); (c) reduction in the value of Seahawk's assets that were liquidated at the outset of its bankruptcy case; and (d) lost value from the lost opportunity to continue owning Seahawk's assets and to continue as an ongoing business. For further information, please review the Expert Report of E. Allen Jacobs attached as Exhibit 3.

9.  The Spill significantly affected offshore drilling activity in the Gulf of Mexico, resulting in: (a) a government-imposed moratorium on deepwater offshore drilling in the Gulf of Mexico; (b) a substantial delay in government-issued drilling permits in the shallow water of the Gulf of Mexico; (c) considerable uncertainty regarding the regulatory and cost environment in the Gulf of Mexico; (d) decreased demand for offshore drilling services in the Gulf of Mexico; (e) decreased utilization rates for Seahawk's drilling rigs; (f) decreased price (day rate) for Seahawk's drilling rigs; (g) decreased value of Seahawk's drilling rigs and other assets as a result of the above issues; (h) a precipitous decline in Seahawk's stock price on the NASDAQ exchange, which precluded Seahawk from completing certain strategic transactions that would have diversified the company's geographic and commodity footprint and generated substantial revenue and EBITDA for the company; and (i) the lost opportunity to continue owning Seahawk's assets and to continue as an ongoing business. For further information, please review the Expert Report of E. Allen Jacobs attached as Exhibit 3.

10. Yes. On February 11, 2011, Seahawk filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (Corpus Christi Division). Seahawk then sold substantially all of its assets to Hercules Offshore, Inc.

11. No.

12. 5 Greenway Plaza, Suite 2700
    Houston, Texas 79046

13. NAICS Code: 213111

14. The following documents are enclosed to support this claim: (a) the Expert Report of E. Allen Jacobs attached as Exhibit 3; and (b) the additional documents attached as Exhibit 4.

Claimant Name: __Seahawk Liquidating Trust__
Claimant EIN: ____45-6517816____

## **EXHIBIT 3**

The Seahawk Liquidating Trust hereby submits the attached Expert Report of E. Allen Jacobs in support of its claim.

# Expert Report of E. Allen Jacobs

For

The Seahawk Liquidating Trust (duly authorized successor to Seahawk Drilling, Inc. and its various subsidiaries), by and through its counsel, Diamond McCarthy LLP,

In connection with claims to be presented and/or asserted through the BP Claims Program and otherwise related to the Deepwater Horizon explosion and Macondo well blow out

**Prepared By:**

E. Allen Jacobs, Ph.D.

Director, Berkeley Research Group

2525 McKinnon Street

Suite 400

Dallas, Texas 75201

**January 18, 2013**

## I.      INTRODUCTION, QUALIFICATIONS, AND ASSIGNMENT

1.     I am E. Allen Jacobs, Director at Berkeley Research Group, LLC. I earned my Ph.D. in economics from the Massachusetts Institute of Technology in 1981 where my primary fields were Industrial Organization/Regulation and Econometrics. Industrial Organization is the study of the structure of firms and markets and their interactions. It focuses on such areas as contracting, firm behavior, antitrust, research and development, intellectual property, and distribution. Econometrics focuses on statistical analyses and the measurement of economic data.

2.     I have taught on the faculty at Harvard, M.I.T., and the University of Texas at Austin and have conducted seminars at eleven other universities. My appointments have been in economics and finance departments. I have taught courses in corporate finance, econometrics, financial markets, industrial organization/regulation, microeconomics, and money and banking. I have conducted academic research and written articles in economics and finance. I have worked for both government and private corporations. In particular, classes taught have included industrial organization, regulatory economics, finance, and energy economics. I have conducted seminars on advanced topics in energy related topics at over a dozen universities. I have been an editor of *The Energy Journal*.

3.     I have testified in over a dozen cases and have consulted in others. The testifying assignments have included the estimation of damages, antitrust analyses, corporate valuations, evaluations of financial structures, and valuation of financial instruments. In particular, I have testified on behalf of both plaintiffs and defendants in a variety of cases involving oil and gas markets.

4.     I have consulted with over 100 companies in business, financial, and market strategy. I have evaluated prospective acquisition targets, led due diligence teams on acquisition evaluations, and have advised numerous companies on market structure, strategy, acquisition, divestiture, and restructuring strategies. These

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 29 of 111
Case 2:11-cv-01386-CJB-SS Document 1 Filed 04/19/13 Page 29 of 111
January 18, 2013                E. Allen Jacobs Report                Page 3

clients have included both corporations and investment groups. I have evaluated large investments by investment groups in public companies. I have assisted in the development of post-acquisition business plans and have evaluated acquisition business planning in many more transactions.

5.     I have experience serving on boards of private companies and have been president of an incubator investment corporation that evaluated over 1,000 potential investments in a variety of industries and invested in five of these firms.

6.      I have experience working for government on regulatory issues, market analysis, government policy, legislative issues, and litigation issues. I have testified before a three judge panel on behalf of the National Association of Attorneys General. I have served as independent advisor in the executive branch as an advisor to the Secretary of Energy. I have worked in the U.S. Congress on energy legislative issues. I have served as a member of a governor appointed panel on natural gas issues.

7.     My current employer, Berkeley Research Group, LLC is an international consulting firm that provides a variety of expert consulting services. A copy of my curriculum vitae is included as **Exhibit A**.

8.     I have been retained by Diamond McCarthy LLP, Counsel for the Seahawk Liquidating Trust, in connection with claims to be presented and/or asserted through the BP Claims Program and otherwise. It is my understanding that the Seahawk Liquidating Trust is the duly authorized successor to Seahawk Drilling, Inc. and its various subsidiaries[1] (collectively, "Seahawk") pursuant to the joint Chapter 11 plan of reorganization confirmed by the U.S. Bankruptcy Court for the Southern District of Texas (Corpus Christi Division) on or about September 28, 2011. The billing

---

1    The subsidiaries of Seahawk include the following: Seahawk Drilling LLC, Energy Supply International LLC, Seahawk Global Holdings LLC, Seahawk Mexico Holdings LLC, Seahawk Drilling Management LLC, Seahawk Offshore Management LLC, and Seahawk Drilling USA LLC.

Case 2:10-md-02179-CJB-DPC Document 1294 Filed 06/05/14 Page 30 of 111
Case 2:13-cv-01386-CJB-SS Document 1-24 Filed 04/19/13 Page 30 of 111
January 18, 2013                      E. Allen Jacobs Report                              Page 4

rate for my time is $570 per hour. Other staff members who have assisted me at my direction bill at lesser hourly rates.

9.      I have been asked to evaluate lost profits and lost earning capacity suffered by Seahawk resulting from the Macondo well explosion.

10.     In addition to documents received from Counsel, I have relied upon publicly available documents. A list of documents reviewed is included as **Exhibit B**.

11.     I have based my conclusions upon this listed information, my knowledge of economics and finance, my knowledge of business, and my knowledge of government and regulation. This analysis is ongoing. Should any additional material information become available to me, I reserve the right to supplement this report in a timely manner to modify or extend these opinions or analyses.


## II.     BACKGROUND AND OVERVIEW

12.     In March 2008, BP Exploration & Production Inc. ("BP") leased the Mississippi Canyon Block 252 ("MC252") for oil and gas exploration and designated it the Macondo Prospect ("Macondo"). BP subsequently sold interests in the prospect to Anadarko (25%) and MOEX (10%) but remained the operator and majority owner (65%).[2]

13.     At Macondo, BP began exploration on Oct. 6, 2009, using the Transocean Marianas rig ("Marianas"). On November 9, 2009, Hurricane Ida damaged the Marianas, and drilling on Macondo was suspended following the installation and cementing of the well casing. The Marianas was demobilized to a shipyard for repairs, and BP applied to the Minerals Management Service ("MMS") for permission to use the Transocean Deepwater Horizon rig to continue drilling. MMS approved this change on Jan. 14, 2010.[3]

---

2   "The Macondo Prospect and the Deepwater Horizon," Chapter 1.1 "The Macondo Well," p. 16, Transocean.

3   Ibid.

Case 2:10-md-02179-CJB-DPC Document 12994 Filed 06/05/14 Page 31 of 111
Case 2:13-cv-01386-CJB-SS Document 1-22 Filed 02/19/13 Page 31 of 111
January 18, 2013                    E. Allen Jacobs Report                         Page 5

14.    On April 20, 2010, Deepwater Horizon, a fifth-generation deepwater semi-
       submersible rig owned by Transocean was operating at Macondo (leased by BP)
       when it suffered a blowout incident.[4]   The Deepwater Horizon burned for thirty-six
       hours before sinking to the bottom of the Gulf of Mexico.  The extent of the oil
       leaking from the Macondo well was not immediately apparent after the sinking of
       the Deepwater Horizon, but on April 24 the United States Coast Guard announced
       that it was a significant spill.[5]  BP was unable to stem the oil leaking from the
       Macondo well and approximately 4.9 million barrels of oil spilled from the well
       during the period April 20 to September 19, 2010.[6]   The Macondo well was capped
       on July 15, 2010.[7]

15.    In response to the Macondo oil well spill, the federal government imposed a
       moratorium on the issuance of deepwater drilling permits in the Gulf of Mexico.  On
       May 28, 2010, Department of Interior ("DOI") Secretary Salazar, issued a directive
       declaring a six month deepwater drilling moratorium in the Gulf of Mexico (GOM),
       stating as follows: "I am directing a six month suspension of all pending, current, or
       approved offshore drilling operations of new deepwater wells in the Gulf of Mexico
       and the Pacific regions.  For those operators who are currently drilling new
       deepwater wells, they shall halt drilling activity at the first safe and controlled
       stopping point and take all necessary steps to close the well."[8]

16.    On May 30, 2010, DOI issued a directive to oil and gas lessees and operators on the
       Outer Continental Shelf notifying them of requirements under the six month
       deepwater drilling moratorium ordered by Secretary Salazar, stating as follows:
       "The Moratorium Notice to Lessees and Operators ("Moratorium NTL") issued
       today directs oil and gas lessees and operators to cease drilling new deepwater

---

4    See article "Macondo Prospect, Gulf of Mexico, United States of America," Offshore Technology.com.

5    "Oil rig wreck leaks into Gulf of Mexico," CBS News, April 24, 2010.

6    See "Timeline BP and Oil Spill," BBC, September 19, 2010.  See also "New Estimate Puts Gulf Oil Leak at 205 Million Gallons," PBS
     Newshour, August 2, 2010.  See also "Gulf Spill Is the Largest of Its Kind, Scientists Say," New York Times, August, 2, 2010.

7    "BP Macondo oil well successfully capped," Washington Post, September 18, 2010.

8    See Memorandum, "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells," DOI Secretary Salazar, May 28,
     2010.

Case 2:10-md-02179-CJB-SS Document 12924 Filed 06/05/14 Page 32 of 111
Case 2:13-cv-01386-CJB-SS Document 1-294 Filed 04/19/13 Page 32 of 111

January 18, 2013                        E. Allen Jacobs Report                        Page 6

wells, including wellbore sidetrack and bypass activities; prohibits the spudding of any new deepwater wells; and puts oil and gas lessees and operators on notice that, with certain exceptions, MMS will not consider for six months drilling permits for deepwater wells and for related activities. For the purposes of the Moratorium NTL, "deepwater" means depths greater than 500 feet."[9] Together with this directive, a table for deepwater drilling activities affected was issued.[10]

17.   Although a moratorium never formally extended to shallow water permits, the number of shallow water drilling permits approved by the Bureau of Ocean Energy Management ("BOEM") declined after the Macondo oil well spill.  I will discuss this impact in more detail in subsequent sections.

18.   Seahawk was a provider of contract drilling services to the oil and natural gas exploration and production industry in the Gulf of Mexico ("GOM").  It operated 20 jackup drilling rigs. These rigs were capable of operating in water depths up to 300 feet and drilling at depths up to 25,000 feet.   Seahawk owned the second largest fleet of jackup rigs in the GOM.  Seahawk contracted with its customers on a day rate basis to provide rigs and drilling crews and was responsible for the payment of operating and maintenance expenses associates with its rigs.  It was publicly traded on NASDAQ (Ticker: HAWK).  It had been public since being spun off from Pride International, Inc. ("Pride") in August 2009.[11]

19.   Jackup rigs are drilling platforms equipped with legs that can be lowered to the ocean floor.  Once the legs are lowered, the drilling platform can be jacked up so the platform is at the level of the highest expected waves.  The rig hull includes the drilling rig, jackup system, crew quarters, loading and unloading facilities, storage areas, helicopter landing deck, and other equipment.  Mat rigs have a mat attached to the lower portion of the legs in order to provide a more stable foundation in areas with a soft seafloor.  Fourteen of Seahawk's rigs were of the cantilever design,

---

9 See "Moratorium Notice to Lessees and Operators (Moratorium NTL) ," DOI, May 30. 2010.

10 See "Table of Affected Deepwater Drilling Activities," DOI, May 30, 2010.

11 Seahawk Drilling, Inc. Form 10-K for the fiscal year ended December 31, 2009, p. 4.

Case 2:10-md-02179-CJB-SS Document 12994 Filed 06/05/14 Page 33 of 111
Case 2:13-cv-01386-CJB-SS Document 1-294 Filed 02/19/15 Page 38 of 111
January 18, 2013                    E. Allen Jacobs Report                    Page 7

which permits the drilling platform to be extended out from the hull to perform operations over preexisting platforms or structures. Six of Seahawk's rigs were slot-type designs, where the drilling operations take place through a slot in the hull. Jackup rigs normally operate with crews of 30 to 40 individuals.[12]

20.  On February 11, 2011, Seahawk announced that it was filing for Chapter 11 bankruptcy protection and had entered into an asset sale agreement with Hercules Offshore, Inc. ("Hercules"). The sale was for substantially all of Seahawk's assets and was completed on April 27, 2011, in exchange for total consideration valued at approximately $150.3 million. The consideration paid by Hercules consisted of 22.1 million shares of Hercules stock (with an approximate value of $125.5 million based on Hercules' closing common stock price of $5.68 on April 27, 2011) and $25 million in cash.[13]

21.  On April 19, 2010, the last trading day before the explosion of the Deepwater Horizon, Seahawk's market capitalization (at the close of the trading day) was $220 million.[14] On February 14, 2011, the first trading day after the announcement of Seahawk's Chapter 11 bankruptcy filing and planned sale to Hercules, Seahawk's market capitalization was $56 million.[15] This is illustrated in the graph below:

---

12  Seahawk Drilling, Inc. Form 10-K for the fiscal year ended December 31, 2009, p. 4-5.

13  Hercules Offshore, Inc., Form 10-K for the fiscal year ended December 31, 2011, p. 1. Differences between the total purchase price and the sum of cash and stock (used in the purchase) due to rounding.

14  Closing stock price of $18.63 per share multiplied by 11,817,708 shares. Number of shares outstanding of 11,817,708 as of May 3, 2010 from Seahawk Q1 2010 10-Q, p.2.

15  Stock price of $4.65 per share multiplied by 11,959,873 shares. Number of shares outstanding of 11,959,873 as of November 5, 2010 from Seahawk Q3 2010 10-Q, p. 2.

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 34 of 111
Case 2:13-cv-01386-CJB-SS Document 1-224 Filed 04/19/13 Page 34 of 121
Janua y 18, 2013　　　　　E. Allen Jacobs Report　　　　　Page 8



## III.　NATURE OF THE ECONOMIC HARM TO SEAHAWK'S PROFITS AND EARNING CAPACITY

22.　Although no formal moratorium was place l on the issuance of shallow water (i.e. water d epths less than 500 feet) drilling permits, the ap iroval and issuance of shallow water permits slowed significantly in the week s and months following the Macondo oil well spill and drillers slowed lemand due to this and other uncertainty and rep ercussions of the spill. The reduced level of sh llow water permits can be seen in :he following graph:

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 35 of 111
Case 2:13-cv-01386-CJB-SS Document 1-29 Filed 02/19/13 Page 36 of 111
January 18, 2013      E. Allen Jacobs Report      Page 9



23. The negative impact of the Macondo explosion on Seahawk's business and the industry was also described contemporaneously in statements by industry executives, news media, and Seahawk executives. In addition to the paragraphs below, examples of industry statements on the impact of Macondo on the shallow water drilling industry can be found in **Exhibit D**.

24. An article in Bloomberg discussed the effect of a slowdown in permits on shallow water drilling:

> "Hercules Offshore Inc. and Rowan Cos. face the threat of oil drilling in shallow Gulf of Mexico waters coming to a standstill as the slow pace of U.S. permits after BP Plc's spill adds to the impact of a deep-water moratorium."[16]

---

16 Bloomberg, "Shallow Gulf Drilling Grinds Toward Halt as Permits Trickle Out," July 2, 2010.

Case 2:10-md-02179-CJB-SS Document 12994 Filed 06/05/14 Page 36 of 111
Case 2:13-cv-01386-CJB-SS Document 1-94 Filed 04/19/13 Page 36 of 101

January 18, 2013                    E. Allen Jacobs Report                    Page 10

25.   Hercules' CEO stated in November 2010 that shallow water permitting was still slow and not expected to return to normal levels in the near future and said the following in a CNN article:

> "President Obama lifted his moratorium on deepwater oil drilling nearly a month ago, but the government still hasn't issued any new permits in the Gulf of Mexico. And most analysts say permits will be slow in coming through 2011… 'What's going on over here is a whole lot of nothing,' said Jim Noe, and executive at Hercules offshore, who said they are still having a hard time getting permits even for shallow water wells. Noe said they haven't had to lay off too many people yet, and have kept workers busy doing maintenance work and other jobs. But the longer the permit drought continues, the harder it gets. 'We're not optimistic we'll be back in business in a meaningful way anytime soon,' he said." [17]

26.   And an article in the *Wall Street Journal* stated:

> "Drilling in waters of less than 500 feet also has been snared by the government's increased scrutiny. Regulators requested modifications to 101 shallow-water drilling plans in 2010, compared with 59 such requests in 2009 and just 31 in 2008. Rig operators say drilling permits once approved in a matter of weeks have taken up to five months to process as the government introduced new rules. The lengthy delays in reviewing new permits have caught the industry off guard." [18]

27.   News media attributed the Seahawk bankruptcy to a slowdown in drilling in the Gulf of Mexico associated with the BP oil spill:

> "Seahawk Drilling Inc. said it has filed for bankruptcy protection and plans to sell its fleet of offshore drilling rigs to a competitor for $105 million.

---

17   CNN Money, "New Deepwater Drilling Permits: Zilch," November 12, 2010.

18   Wall Street Journal, "Drilling is Stalled Even After Ban Is Lifted," January 3, 2011

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 37 of 111
Case 2:13-cv-01386-CJB-SS Document 1294 Filed 04/19/13 Page 37 of 101
January 18, 2013                    E. Allen Jacobs Report                    Page 11

Seahawk, which announced the deal with Hercules Offshore Inc. Friday, has
been hurt by a slowdown in Gulf of Mexico drilling after the BP oil spill last
April. The government halted drilling in deep waters and imposed tough new
rules that have curtailed all energy exploration in U.S. waters." [19]

28.   A Rigzone article elaborated on the slowdown and a possible recovery in 2011:

"The bottleneck in the permitting process is impacting utilization, which has
dropped nearly 8 percentage points from approximately 78% to 70% over the
past month. As it will take a few months before order is restored to the
permitting process, we anticipate that jackup utilization will trough near the
end of 2010 and then recover during the ensuing months of 2011"[20]

29.   However, an Off-Shore Magazine article also mentioned the slowdown in shallow
water drilling permit and that this slowdown had continued into 2012:

"While the jackup market was not hit nearly as hard as the deepwater rig
fleet, shallow-water drilling contractors still experienced a decrease in activity
following the Macondo blowout. Numbers have been rising of late. On Feb. 1,
2012, 35 jackups were working out of a total fleet of 73 units. However, 28 of
those rigs were cold-stacked and not marketed for contract, leaving an
effective jackup fleet of 45 rigs. Observers note that shallow-water operators
went from a 'de facto' drilling moratorium, where permits were being issued
at a very slow pace, to a regulatory environment in which drilling permits are
beginning to increase."[21]

30.   Seahawk's CFO at the time of the Macondo spill, in an email, highlighted the
difficult financial situation into which Seahawk had been placed by the spill:

---

19   USA Today, "Seahawk Drilling Seeks Bankruptcy to Sell Assets," February 12, 2011.

20   Rigzone, "Moratorium Leads to Anemic Shallow Water Permitting," July 13, 2010.

21   Off-Shore Magazine, "Gulf of Mexico E&P rising Slowly but Surely," January 16, 2013.

Case 2:10-md-02179-CJB-DPC Document 12994 Filed 06/05/14 Page 38 of 111
Case 2:13-cv-01386-CJB-SS Document 1-24 Filed 02/19/13 Page 38 of 111
January 18, 2013                    E. Allen Jacobs Report                    Page 12

"While each of us has had experience in troubled situations, this particular problem is, as we all know, unprecedented. The cyclicality of the drilling business is well known but unlike the usual down cycle where rigs get stacked and the remainder that continue to work do so at a lower day rate, the situation we're facing is one of not just a lower day rate but essentially a ZERO day rate. The effective moratorium we're facing is of indeterminate duration making it difficult to design a liquidity bridge since we don't know how wide the gap is that our bridge has to span. We also have to keep in mind that we must retain sufficient working capital to 'restart the business' when the drillers can actually get back to work." [22]

31.  In a declaration submitted in connection with the present matter the former CEO of Seahawk, Radall D. Stilley, and the former CFO of Seahawk, James Easter, agreed that "The Macondo Incident adversely affected Seahawk in several significant ways, including a decreased demand for offshore drilling services in the Gulf of Mexico…"[23]

32.  The stock market also reacted by reflecting the reduced value of Seahawk and its comparable companies:

---

[22]  Email from Jim Easter to Randy Stilley et. al., Subject: RE: Cash Preservation, June 11, 2010.

[23]  Declaration of Randall D. Stilley dated January 17, 2013, p. 3-4.   See also Declaration of James R. Easter dated January 17, 2013, p. 3.

Case 2:10-md-02179-CJB-SS Document 12994-1 Filed 06/05/14 Page 39 of 111
Case 2:11-cv-01386-CJB-SS Document 1-224 Filed 04/19/13 Page 39 of 101
January 18, 2013                    E. Allen Jacobs Report                    Page 13



33.   The loss of profits and loss of earning capacity suffered by Seahawk as a result of
      Macondo derives from four components:

      - Reduction in utilization of Seahawk rigs below what it would have been but
        for the Macondo crisis.  This reduced Seahawk revenue and cash flow
        (EBITDA) below what it would otherwise have been but for the Macondo
        crisis up to the time of the sale of assets (from May 2010 through February 10,
        2011).

      - Reduction in the price (day rate) below what it would have been but for the
        Macondo crisis. This reduced Seahawk revenue and cash flow (EBITDA)
        below what it would otherwise have been but for the Macondo crisis up to the
        time of the sale of assets (from May 2010 through February 10, 2011).

Case 2:10-md-02179-CJB-DPC Document 12994 Filed 06/05/14 Page 40 of 111
Case 2:13-cv-01386-CJB-SS Document 1-24 Filed 04/19/13 Page 40 of 111
January 18, 2013      E. Allen Jacobs Report      Page 14

- Loss of future profits from the opportunity to continue owning these assets. But for the Macondo crisis, and especially the resulting drop in the stock price, Seahawk would likely have accomplished one or more of a number of business initiatives in 2010 that would have easily enabled it to continue owning these assets. Even without any of the initiatives, the higher level of cash Seahawk would have had but for the Macondo crisis along with minor financial changes could have enabled it to survive the downturn. These Seahawk assets were very profitable before the 2010 timeframe and were profitable again in 2012.

- Lost profit from the strategic business initiatives that did not go forward. The Seahawk business initiatives in 2010 that were ended by the Macondo crisis were also initiatives which would have generated profit and additional value to Seahawk beyond merely enabling Seahawk to continue owning its original assets.

34.   The following section covers the calculation of lost profits and lost earning capacity related to the first three of these components in detail.

## IV.   COMPUTATION OF LOST PROFITS AND LOST EARNING CAPACITY

35.   Two consequences to Seahawk from the Macondo crisis were reduced rig prices (day rates) and a reduced number of rigs that would have been operating had there been no explosion. The lower level for each of these can be estimated from historical and post Macondo crisis data. The Seahawk assets consisted primarily of 20 rigs. Data were obtained on all the contracts detailing working days in use under contract and daily rig rates from 2002 through 2012. This allowed the examination of the economics of the assets over a period before the spill, during the spill crisis, and after in 2012. This allowed the examination of the economics of the assets over a period before Seahawk's ownership of the assets, during Seahawk's ownership of these assets, and following Seahawk's ownership of these assets.

Case 2:10-md-02179-CJB-DPC Document 12994 Filed 06/05/14 Page 41 of 111
Case 2:13-cv-01386-CJB-SS Document 1-24 Filed 02/19/13 Page 41 of 111
**January 18, 2013**          **E. Allen Jacobs Report**          **Page 15**

36.  The estimation of the incremental effect upon Seahawk is complicated because of the fact that Seahawk was also adversely affected by the loss of the Pemex business in 2009.  It appeared at the time of the Macondo crisis (and still appears today) that the Pemex business is not coming back for those rigs for at least the foreseeable future.  It also appears as if the Pemex business may have been wholly different both in pricing and in contract terms from normal market forces that would be determining contracts for Seahawk after 2009.  Therefore, the specific estimates of Seahawk's day rates and rigs used but for the Macondo crisis utilizes asset data that removes Pemex contracts from the historical utilization and from the computation of historical day rates.[24]

### IV.1.    CALCULATION OF UTILIZATION OF SEAHAWK RIGS

37.  The utilization of the 20 rigs that were owned by Seahawk fluctuated significantly.  Industry trends and natural gas prices were the most significant underlying factors affecting utilization over time as illustrated in the following graph:

---

24  If I had left in the Pemex rig contracts in historical rig utilization levels and day rates, the estimates would have overestimated the level of rates and rig use that would have occurred in the absence of the Macondo crisis and thereby would have overestimated economic damages.

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 42 of 111
Case 2:13-cv-01386-CJB-SS Document 4-1 Filed 02/19/13 Page 42 of 111
Janua y 18, 2013                    E. Allen Jacobs Report                    Page 16



38.   Using t ends and natural gas prices, it is str ightforward to estimate an expected
      level of rig utilization as if there had been no Macondo crisis.  The difference is as
      follows:

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 43 of 111
Case 2:13-cv-01386-CJB-SS Document 1-2 Filed 04/19/13 Page 48 of 101

Janua y 18, 2013      E. Allen Jacobs Report      Page 17



39. This ef ect of the Macondo crisis on Seaha vk's utilization rates from June 2010 through February 10, 2011 is statistically significant w :ll above the 95% level.

**IV.2.**      CALCU ATION OF RIG PRICE (DAY RATE) FOR SEAHAWK RIGS

40. Day rat :s for Seahawk fell below what would have occ urred during the crisis and below t eir traditional relationship with the industry averages of day rates for shallow water jackup rigs. For 2002 throu h 2009, Seahawk's day rates averaged 77.5% of the industry average and in 2012 iveraged 76.9% of the industry average.[25] The relationship of the day rates for the group of rigs owned by Seahawk

---

25 Se hawk and industry average day rates for both the January 2002 through December 2009 calculation and the 2012 calculation co nputed by taking in equal-weighted average of the monthly average day rates for both S :ahawk and the industry during the relevant date range (industry or purposes of this calculation being exclusive of Seahawk).

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 44 of 111
Case 2:13-cv-01386-CJB-SS Document 1-994-1 Filed 04/19/13 Page 44 of 101
**Janua y 18, 2013**               **E. Allen Jacobs Report**               **Page 18**

and the industry day rates for shallow water jackup rigs is illustrated in the
followi g graph:



41.   The da  rates for these Seahawk rigs have historically  een more sensitive to natural
gas prices than industry averages, so it is al o necessary to incorporate that effect in
estimating what the expected day rates would have been.  Using the relationship
betwee  Seahawk's rig day rates and natural gas prices and industry average day
rates fo  jackup rigs, an expected level of S ahawk day rates without the Macondo
crisis e fects can be estimated as follows:



42.    This ef ect of the Macondo crisis on Seaha vk's day rat es from June 2010 through February 10, 2011 is statistically significant well above the 95% level.

### IV.3.    CALCU ATION OF THE DIFFERENCE IN CA H FLOW

43.    The cal :ulation of the effect of the Macondo crisis on the rig utilization totals and day rates allows for the quantification of th e revenue d cline associated with Macondo prior to the sale of the rigs.  To c lculate what this difference means in terms o EBITDA, it is necessary to also consider that costs would also have been greater (due to a greater number of working rigs) in the scenario where there is no Macondo crisis.

44.    Increm ntal (or variable) costs associated with having  higher number of working rigs (or rig full-time equivalents) were calc lated by an alyzing Seahawk's internal and ext rnal communications as well as reviewing Sea awk financial information.

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 46 of 111
Case 2:19-cv-01386-CJB-SS Document 1-294 Filed 04/19/13 Page 46 of 101
January 18, 2013     E. Allen Jacobs Report     Page 20

Working rig costs were applied on a daily cost basis, so that without the Macondo crisis, a higher number of contracted rigs would have resulted in higher total operating costs on a daily (and correspondingly, monthly) basis.

45.     The expected higher level of day rates, rigs in use, revenue, costs, and cash flow net to a higher level of cash flow (EBITDA) that would have resulted but for the Macondo crisis. This is summarized as follows (and the full table can be seen in **Exhibit C**): [26]

| Month | Higher EBITDA w/o Macondo |
|---|---|
| Jun-10 | 1,783,200 |
| Jul-10 | 2,259,374 |
| Aug-10 | 2,743,524 |
| Sep-10 | 1,838,100 |
| Oct-10 | 2,591,568 |
| Nov-10 | 3,331,390 |
| Dec-10 | 1,799,708 |
| Jan-11 | 1,540,794 |
| Feb-11 | 507,344 |
| | |
| **Total:** | **18,395,001** |

46.     The total lost EBITDA from May 2010 through February 10, 2011 is $18.4 million.

### IV.4.    LOST PROFITS AND LOST FUTURE EARNING CAPACITY

### IV.4.1.    Business Initiatives Which Were Killed Off by Macondo Crisis

47.     Up to the time of the Macondo explosion, Seahawk was engaged in a number of strategic business initiatives including financing transactions and acquisitions of rigs. All of these were prevented from fruition by the Macondo crisis. One project in particular, Project Talon, was very close to completion.

---

[26]   February 2011 only includes the first ten days of the month. Increases or decreases in cash flow beginning February 11 accrue to the next owner of the assets.

Case 2:10-md-02179-CJB-DPC Document 12294 Filed 06/05/14 Page 47 of 111
Case 2:19-cv-01386-CJB-SS Document 1-24 Filed 04/19/13 Page 40 of 101
January 18, 2013                    E. Allen Jacobs Report                    Page 21

48.    Project Talon was the purchase of Transocean jackup rigs located in Middle East waters. The asset acquisition was to include 13 independent leg jackups along with associated rig crews and management and the rig contract backlog. The rigs were located in two Middle Eastern geographic markets, the Gulf of Suez and the Arabian Gulf.[27] At the time of a presentation on the acquisition made to the Board of Directors on January 4, 2010, the rigs had a utilization of 69.2%.[28] The acquisition was to close in the 2nd Quarter of 2010. These 13 rigs had a firm contract backlog of $474.8 million with a backlog of $503.7 million including options. The acquisition would have made Seahawk the 2nd largest jackup rig operator in the Middle East.[29]

49.    On April 20, 2010, mere hours before Macondo explosion that evening, the Project Talon term sheet with Transocean was executed. The purchase would have been financed through $450 of senior secured notes, $150 million in equity issued to Transocean, and a private equity placement of $350 million.[30]

50.    Instead of completing Project Talon, Seahawk experienced a 47.3% fall in stock in one month from April 19, 2010 to May 19, 2010 due to the Macondo explosion and emerging crisis and resulting uncertainty. In addition, the financial community and investors paused and pulled back from any financing for assets involved in GOM drilling. Project Talon became impossible to complete as a result. An email from Alex Cestero on May 19, 2010 relayed information from UBS that the transaction was now "on the shelf indefinitely…"[31] Declarations from Seahawk's former CEO, Randall Stilley and Seahawk's former CFO, James Easter, both indicate that these events prevented the Project Talon deal from completion.[32]

---

27  Seahawk Drilling, Project Talon Board of Directors Meeting, January 4, 2010, p. 3.

28  Equal to 9 rigs working and 4 rigs stacked as of January 4, 2010. Seahawk Drilling, Project Talon Board of Directors Meeting, January 4, 2010, p. 4.

29  Equal to 9 rigs working and 4 rigs stacked as of January 4, 2010. Seahawk Drilling, Project Talon Board of Directors Meeting, January 4, 2010, p. 4-6.

30  Seahawk Drilling Project Talon Update, Board of Directors Meeting, May 12, 2000, p. 4 and 5.

31  Email from Alex Cestero, Subject: Re: Window Period, dated May 19, 2010.

32  Declaration of Randall D. Stilley dated January 17, 2013, p. 4. See also Declaration of James R. Easter dated January 17, 2013, p. 4.

Case 2:10-md-02179-CJB-SS Document 12994-1 Filed 06/05/14 Page 48 of 111
Case 2:13-cv-01386-CJB-SS Document 29-4 Filed 02/15/13 Page 48 of 111

January 18, 2013                    E. Allen Jacobs Report                    Page 22

51.   The completion of Project Talon would have brought the following to Seahawk:

- Geographic diversification;

- Increase economy of scale; and

- Increased earnings and cash flow.

52.   The Talon acquisition would have provided Seahawk with rigs that had both higher day rates and higher utilization than its current GOM rigs. Seahawk's pro forma analysis of the Talon Fleet indicates that, in 2010, the Talon acquisition would have contributed $204.1 million to Seahawk's combined EBITDA. Although this EBITDA would have come with increased interest expense due to the debt incurred as part of the acquisition, the significant increase in pro forma EBITDA was projected to result in a combined entity net income of $48.6 million.[33] Declarations from Seahawk's former CEO, Randall Stilley and Seahawk's former CFO, James Easter, both indicate that had Project Talon gone forward, that Seahawk would have weathered the crisis and not liquidated in 2011.[34] The increase in cash flow associated with these assets, had the transaction been completed, would have resulted in Seahawk's survival and profitability through 2010, 2011, and into 2012 and beyond.

53.   Seahawk was also engaged in a number of other strategic initiatives. Project Talon. These included purchases of international and domestic jackup rigs utilizing stock, other acquisitions of rigs, and a $30 to $50 million private offering.[35] The same factors which killed Project Talon also killed these other initiatives: the fall in the stock price, the pull back of investors and financial entities from loans or

---

33 Seahawk Drilling, Project Talon Board of Directors Meeting, January 4, 2010, p. 12 and 15. Note: Seahawk also include a down case pro forma analysis that included a Talon rig EBITDA of $86 million and a combined entity net income of $2.5 million (see Seahawk Drilling, Project Talon Board of Directors Meeting, January 4, 2010, p. 16). Even this would have enabled survival through 2010 and 2011. However, my review of the actual historical Talon day rates and utilization history for 2010 and beyond indicate that the base case scenario identified in paragraph 52 is closer to what actually occurred for these assets.

34  Declaration of Randall D. Stilley dated January 17, 2013, p. 4. See also Declaration of James R. Easter dated January 17, 2013, p. 4.

35  Declaration of Randall D. Stilley dated January 17, 2013, p. 2-3.

Case 2:10-md-02179-CJB-SS Document 12994-1 Filed 06/05/14 Page 49 of 111
Case 2:13-cv-01386-CJB-SS Document 1-994 Filed 02/19/13 Page 49 of 111

January 18, 2013                        E. Allen Jacobs Report                          Page 23

investments in GOM drilling activity, and the uncertainty from the Macondo crisis. Seahawk's financial flexibility to consider these strategic alternatives or to finance continuing operations disappeared.

54.    Any one of a number of potential strategic options available to Seahawk in a world without the Macondo crisis would have made it highly likely that Seahawk would have survived through 2011 without having to sell its 20 rigs in liquidation. Seahawk would have been able to survive the downdraft in 2010 and 2011 and been a very profitable owner of these rigs in 2012.

### IV.4.2.    Even Without These Initiatives, Seahawk Could Have Survived Through the Macondo Crisis

55.    Even without accomplishing any of the strategic initiatives potentially available, Seahawk would have had $18.4 million more in cash by February 10, 2011 but for the Macondo crisis.  Even without a single one of the strategic initiatives, some small financing or selling a few rigs together with the extra $18.4 million by February 10, 2011 could have provided an alternative to liquidation, thereby allowing Seahawk to maintain ownership of most or all of these assets through 2011 until the present.

### IV.4.3.    Lost Profits and Lost Earning Capacity From Seahawk's Lost Opportunity to Continue with the Business

56.    Because of the lost cash, the lowered stock price, the lost financing opportunities, and lost business initiatives, Seahawk lost the opportunity to continue owning and operating Seahawk's core assets (the 20 rigs) and had to liquidate its assets in the midst of the Macondo crisis.  It lost the opportunity to continue owning these assets and obtaining future profits from such ownership.

57.    These lost future profits are of two forms.  First is the lost future profits directly related to the continuing ownership of the assets that were sold.  In this section I will estimate that loss.  Second is the lost future profits from lost opportunities to engage in business initiatives and business development that builds value and profits – because every business is more than just a collection of assets, it is also an option

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 50 of 111
Case 2:10-cv-01386-CJB-SS Document 12994-1 Filed 04/19/13 Page 50 of 111
January 18, 2013                    E. Allen Jacobs Report                    Page 24

to develop more business and the opportunity to make deals contributing to profits and value. This too was lost when Seahawk liquidated. It not only lost a set of assets that had future profits, but it also lost future business initiatives and business development that would generate profits and value. For this latter loss of profits and value, I make no attempt to calculate either lost profits or lost value other to note that it was indeed a loss.

58. The lost future profits from not owning the assets may be seen by examining this same set of Seahawk's core assets (the 20 rigs) from 2002 through 2012. The rig use and day rates for all days are known throughout the period so that the revenue can be closely estimated. Seahawk's 2010 cost structure may then be applied to all 11 years to ascertain what EBITDA would have been. Costs are equivalent to a $44 million per year fixed cost and a variable cost equal to $38,000 per day per active rig.

59. If Seahawk had been able to hold these assets through to 2012, it would have obtained an EBITDA of $19.9 million. The incremental EBITDA contribution is considerably higher. The incremental EBITDA contribution from owning these assets in 2012 is $63.9 million. In other words, for an owner or acquirer of these assets, the incremental contribution to EBITDA of these assets is $63.9 million excluding any SG&A costs that might be needed in managing the assets.

60. The improvement in profit in 2012 from these assets resulted despite natural gas prices remaining low. They resulted in part from better rig prices (day rates) resulting from increased demand as these rigs began to be used to pursue not just shallow water natural gas opportunities, but increasingly crude and other liquids opportunities in shallow water locations as crude and liquids prices remained extremely high relative to natural gas prices.

61. EBITDA from 2002 through 2012 for owning this same set of assets with Seahawk's 2010 cost structure would be as follows:

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 51 of 111
Case 2:13-cv-01386-CJB-SS Document 1-294 Filed 04/19/13 Page 51 of 111
January 18, 2013                          E. Allen Jacobs Report                          Page 25

|      | Revenue | Avg Rigs | Incremental EBITDA | Actual EBITDA | EBITDA change from Removal of Pemex Contracts | EBITDA Change from Removal of Macondo Effect | Adjusted EBITDA |
|------|---------|----------|--------------------|---------------|-----------------------------------------------|----------------------------------------------|-----------------|
| 2002 | 102.4   | 10.2     | -39.3              | -83.3         | 1.3                                           | 0.0                                          | -82.1           |
| 2003 | 178.0   | 15.9     | -43.2              | -87.2         | 6.3                                           | 0.0                                          | -80.9           |
| 2004 | 222.1   | 18.3     | -32.3              | -76.3         | 6.6                                           | 0.0                                          | -69.7           |
| 2005 | 298.4   | 19.0     | 34.5               | -9.5          | 4.4                                           | 0.0                                          | -5.1            |
| 2006 | 528.0   | 17.7     | 282.3              | 238.3         | -27.5                                         | 0.0                                          | 210.7           |
| 2007 | 528.3   | 17.0     | 293.1              | 249.1         | -75.4                                         | 0.0                                          | 173.8           |
| 2008 | 508.8   | 16.9     | 273.9              | 229.9         | -77.5                                         | 0.0                                          | 152.4           |
| 2009 | 207.3   | 7.4      | 104.4              | 60.4          | -29.5                                         | 0.0                                          | 30.9            |
| 2010 | 70.7    | 5.4      | -4.0               | -48.0         | 0.0                                           | 17.4                                         | -30.6           |
| 2011 | 107.2   | 6.2      | 20.8               | -23.2         | 0.0                                           | 16.9                                         | -6.3            |
| 2012 | 146.4   | 6.0      | 63.9               | 19.9          | 0.0                                           | 0.0                                          | 19.9            |
|      |         |          |                    |               |                                               |                                              |                 |
| Avg  | 263.4   | 12.7     | 86.7               | 42.7          | -17.4                                         | 3.1                                          | 28.5            |

62.    Financial results of owning these assets fluctuate dramatically from year to year.
The incremental EBITDA from these assets to an acquirer who would have no
additional SG&A cost from owning and managing them ranges from a loss of $43.2
million (2003) to a high of $293.1 million (2007) and has an average of $86.7
million. The actual EBITDA with the Seahawk cost structure ranged from a loss of
$87.2 million (2003) to a high of $249.1 million (2007) with an average of $42.7
million.

63.    To be conservative with respect to what these assets generate through the business
cycles, I have also considered a scenario of what these assets would have generated
if there were no contracts with Pemex. I have noted previously that these contracts
were generally profitable, but may not represent potential after 2009. Since it's
likely that some other contracts would have been obtained if no Pemex contracts
were obtained, their complete removal from analysis is likely to be an overly
conservative adjustment of what EBITDA would have been with no Pemex
contracts. In addition, as this report has previously estimated, there is a lower
EBITDA in 2010 and 2011 due to the Macondo crisis results. Those adjustments to
EBITDA have also been made in an adjusted EBITDA series to indicate how these
assets have performed through the business cycles without the Pemex contracts and

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 52 of 111
Case 2:13-cv-01386-CJB-SS Document 1294 Filed 04/19/13 Page 52 of 101
January 18, 2013                    E. Allen Jacobs Report                    Page 26

without the Macondo crisis. With these adjustments, EBITDA still fluctuates dramatically. Adjusted EBITDA ranges from a loss of $82.1 million (2002) to a high of $210.7 million and an average of $28.5 million.

64. The losses to Seahawk for not being able to hold these assets through 2011 until 2012 and beyond include $19.9 million for 2012. Seahawk also lost the opportunity to obtain the EBITDA beyond the end of 2012.

65. To determine the current value of future profits beyond 2012, a discounted cash flow analysis was performed (using EBITDA) and net present value was determined using the weighted average cost of capital. The weighted average cost of capital to the drilling industry (SIC 1381) is taken from the most recent Morningstar (formerly Ibbotson) calculation of 10.13%.[36] The future EBITDAs are taken as randomly determined for any year as equally likely to be any of the 11 actual historical EBITDAs. A series of 15 years is estimated, each year with a randomly selected EBITDA from any of the 11 prior EBITDAs. Years beyond year 15 (2027 in this case) are treated as a perpetuity of the average of years 11 through 15 (2022-2027 in this case). For each iteration, this EBITDA series is then discounted back to the present. This is then repeated 2,000 times to make 2,000 iterations. The averages and distribution of possible current values are then obtained. This was done for both the actual EBITDAs and the Adjusted EBITDAs (for no Pemex contracts and no Macondo crisis).

66. The distribution of enterprise value relying on the Adjusted EBITDAs is as follows:

---

36  Morningstar Weighted Average Cost of Capital (WACC) cost of capital data as of September 30, 2012 for SIC Code 1381 (Drilling Oil and Gas Wells). The capital weighted average WACC for this group is 9.05%. The capital weighted average WACC adjusted for the size premium is listed as 10.02%. The median WACC adjusted for a size premium is 11.12%. As of yearend 12/31/2012, Bloomberg calculates the WACC for eight drilling rig companies (Hercules Offshore, Inc., Rowan Companies, Noble Corporation, Atwoods Oceanics, Diamond Offshore Drillings, Ensco Plc., Transocean Ltd., and Nabors Industries Ltd.) and found a range of 7.70% to 11.80%, a mean average of 9.88% and a median of 9.77%.

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 53 of 111
Case 2:13-cv-01386-CJB-SS Document 1-29 Filed 04/19/13 Page 58 of 101
January 18, 2013          E. Allen Jacobs Report          Page 27

## NPV Value of Seahawk Assets at Year-End 2012
### (Using Monte Carlo Analysis)



67. Using 2,000 Monte Carlo simulations from the Adjusted EBITDAs yields an average present value of the assets of $286.8 million. Using 2,000 Monte Carlo simulations from the actual distribution of EBITDAs yields an average present value of the assets of $423.9. The value of $286.8 million from relying on the Adjusted EBITDAs is the more conservative calculation of the value of future earnings lost as of the time of this report.

68. The reasonableness of this value of $286.8 million for the assets may be seen by examining enterprise value through EBITDA multiples, a common measure of comparison. Estimating enterprise value through EBITDA multiples is often done, particularly if EBITDA does not change rapidly in businesses (something which is not the case here). If EBITDA is relatively constant in an industry, EBITDA multiples tend toward a multiple equal to the inverse of the cost of capital. Otherwise the EBITDA multiples above or below that typically reflect company-specific or industry-specific expectations of increasing or decreasing EBITDA in the future. For example during boom parts of the business cycle, multiples are less;

Case 2:10-md-02179-CJB-SS Document 12994 Filed 06/05/14 Page 54 of 111
Case 2:19-cv-01386-CJB-SS Document 1-29 Filed 04/19/13 Page 54 of 101
January 18, 2013                          E. Allen Jacobs Report                          Page 28

while during lean years of the cycle, multiples are higher.   Using EBITDA
multiples in valuation is often a proxy for more detailed analysis of future EBITDA.

69.   EBITDA enterprise value multiples on public companies in this sector have varied
from 8.1x to 17.4x from 2002 through 2012.  The following table summarizes
EBITDA multiples for companies that for at least a portion of their business engage
in shallow water offshore drilling in the GOM utilizing jackup rigs:[37]

|         | Enterprise Multiple |
|---------|---------------------|
| 2002    | 17.4                |
| 2003    | 16.6                |
| 2004    | 16.4                |
| 2005    | 12.7                |
| 2006    | 7.6                 |
| 2007    | 9.9                 |
| 2008    | 8.5                 |
| 2009    | 8.1                 |
| 2010    | 9.1                 |
| 2011    | 9.4                 |
| 2012    | 11.2                |
|         |                     |
| Average: | 11.5x              |
| Median:  | 9.9x               |

70.   Normally, a recent EBITDA is used to indicate the run rate and a current industry
EBITDA enterprise value multiple is used to value the EBITDA.  In this case that
yields a value of $222.5 million (11.2 x 19.9).  However, with the Seahawk rig
assets, the volatility is very large.  Therefore it is worth considering how EBITDA
has varied and what an average EBITDA would be.  Average EBITDA across the
business cycles has been $42.7 million, but with adjustments for the Pemex business
and the Macondo crisis, the average EBITDA has been $28.5 million. The average
EBITDA enterprise value multiple has been 11.5x and the median has been 9.9x.
These indicate the following range of values:

---

37 EV/EBITDA multiple from YCharts.

Case 2:10-md-02179-CJB-SS Document 1294-1 Filed 06/05/14 Page 55 of 111
Case 2:13-cv-01386-CJB-SS Document 1-34 Filed 02/19/13 Page 36 of 91
January 18, 2013      E. Allen Jacobs Report      Page 29

|  |  | Enterprise |
| --- | --- | --- |
| **EBIT Mult** | **EBITDA** | **Value** |
| 11.2x | 19.9 | 222.5 |
| 11.5x | 28.5 | 327.3 |
| 9.9x | 28.5 | 281.8 |
| 11.5x | 42.7 | 491.1 |
| 9.9x | 42.7 | 422.7 |

71.    Therefore, the EBITDA multiple approach indicates current value would be between $222.5 million and $491.1 million using this measure. As a forecast, the $19.9 million is too low as an average EBITDA and the $42.7 average is too high. It's likely that the appropriate value using this simple method of EBITDA multiple analysis would be between $282 million and $327 million. The net present value estimate of future losses using monte carlo simulation of $286.8 million of current value lies in this range.

72.    The lost future profits from failing to continue to own the assets are the $19.9 million for 2012 plus the future losses beyond the present -- valued at a net present value of $286.8 million. The total is $306.7 million. From this must be subtracted the $150.3 million in value that was actually obtained through the liquidation sale of its assets which discontinued the business. Therefore, the net amount of additional economic damages is $156.4 million.

IV.5.    **TOTAL LOST PROFITS AND LOSS OF EARNING CAPACITY**

73.    Economic damages from lower EBITDA while Seahawk owned these assets is $18.4 million.

74.    The lost opportunity to continue owning the assets is the lost 2012 EBITDA of $19.9 million plus the $286.8 million present value of future EBITDA lost less the $150.3 million in value obtained in liquidating the assets totaling a net loss of an additional $156.4 million.

75.    Total economic losses are $174.8 million.

Case 2:10-md-02179-CJB-DPC Document 12994-1 Filed 06/05/14 Page 56 of 111
Case 2:13-cv-01386-CJB-SS Document 4-24 Filed 04/19/13 Page 56 of 101
Janua y 18, 2013                    E. Allen Jacobs Report                    Page 30

Signature



_ _____

E. Allen Jaco s

# Exhibit A





## E. Allen Jacobs, Ph.D.

E. Allen Jacobs, Ph.D.
Director
Berkeley Research Group, LLC.
2525 McKinnon Street, Suite 400
Dallas, TX 75201

Direct Dial: 214-233-3085
Cell: 214-695-6545

AJacobs@brg-expert.com

### Education

- 1981.  M.I.T. Ph.D. in Economics, National Science Foundation Fellow (Scholarship).  Concentration: Industrial Organization and Econometrics.

- 1976.  Duke University.  B.A. Magna Cum Laude.  Bache Award (Senior Prize) in Economics.  Honors Program.  Angier Biddle Duke Scholar.  Graduated in three years.

- 1974.  Oxford University.  Angier Biddle Duke Scholar Program (semester abroad).

### Professional History

- 2012-present. Berkeley Research Group, LLC. Dallas, TX. Economic and financial consulting. Director

- 2008-2012.  Navigant Consulting, Inc.  Dallas, Texas.  Economic and financial consulting.  Director.

- 2003-2008.  Charles Rivers Associates.  Dallas, Texas.  Economic and financial consulting.  Vice President.

- 2002-2003.  CPI Advisors, Inc.  Dallas, Texas.  Subsidiary and trade name: Economics, Inc.  Financial and economic consulting.  President.

- 2000-2002.  WhatWorks, Inc.  Dallas, Texas.  Business development, financial and technology incubator.  President.

- 1990-1999.  Corporate Performance, Inc. (CPI).  Dallas, Texas.  Strategy & financial consulting firm.  President.

*Professional History continued at end of CV*

Dr. Jacobs is a Director Berkeley Research Group, LLC.

Dr. Jacobs has testified as an expert on economic and financial issues in Federal Courts, State Courts, and before federal regulatory boards.  He has been certified as an expert by federal courts in Antitrust, Economics, Economic Damages, and Finance.  Dr. Jacobs' testifying assignments have included the estimation of damages, antitrust analyses, corporate valuations, evaluations of financial structures, valuation of financial instruments, evaluation of class certification for securities litigation.

In addition to Dr. Jacobs' testifying experience, he has consulted with over 100 companies in business, financial, and market strategy.  He has evaluated prospective acquisition targets, led due diligence teams on acquisition evaluations, and has advised numerous companies on acquisition, divestiture, and restructuring plans.   Dr. Jacobs has been involved in a variety of financing and restructuring transactions.  Dr. Jacobs has experience serving on boards of private companies and has been president of an incubator investment corporation that evaluated over 1,000 potential investments.

Dr. Jacobs has taught on the faculty at Harvard, M.I.T., and the University of Texas at Austin and has conducted seminars at eleven other universities.  He has taught courses in corporate finance, econometrics, financial markets, industrial organization, microeconomics, and money and banking.   He has given advanced topic seminars at a dozen different universities.  He has also taught over 15 different continuing legal education courses pertaining to economic and financial issues in litigation with certifications in 14 different states.



E. Allen Jacobs, Ph.D.

## Professional Experience

### Acquisition Analysis

- » Led the due diligence and/or investigation of over 100 potential acquisition investigations
- » Led post acquisition strategic analysis and business planning for approximately ten companies
- » Led dozens of projects which investigated and advised companies and investment groups upon acquisition strategies and evaluation of acquisition targets
- » Expert testimony and analysis on acquisition process, due diligence, and valuation in various litigations over acquisitions or failed acquisitions

### Minority Shareholder Valuations

- » Expert testimony and analysis regarding minority discounts, liquidity discounts, control premiums/discounts, and valuation due to various stock restrictions or type of transaction
- » Academic research at M.I.T. on control discount/premiums
- » Expert testimony and analysis concerning squeeze out of minority shareholder in a variety of cases and situations including shares in a private firm, shares in a public firm, buy back options, and disputes over options in a public company
- » Expert testimony and analysis in disputes involving venture capital financing structure terms

### Intellectual Property

- » Expert testimony and analysis of economic damages related to possible violation of software copyright
- » Expert testimony and analysis of economic damages related to possible infringement of software patents
- » Expert testimony and analysis on economic damages in a contract and trademark dispute involving a television show franchise
- » Expert testimony and analysis of economic damages related to trademark infringement dispute between hospitals
- » Expert testimony and analysis on trade secret issues, value of non compete, and value of confidentiality agreements
- » Expert testimony and analysis on economic damages in copyright and design infringement for toy products
- » Consulting expert on damages and alternative damage theories in a case involving trade secrets and intellectual property for a major industrial conglomerate
- » Owned, sold, and licensed software patents and copyrighted software
- » Invested in various patents and copyrighted software
- » Participated in negotiations that obtained a variety of brand, character, and TV show licenses for toy and children's products



E. Allen Jacobs, Ph.D.

- » Valued various patents in digital security
- » Taught intellectual property economics as part of law and economics course
- » Taught C.L.E. course on lost profit and reasonable royalty damages
- » Taught C.L.E. course on antitrust counterclaims in patent cases
- » Taught C.L.E. course on lost profits and unjust enrichment in trademark infringement
- » Academic economic research on the intellectual property – antitrust conflict

**Antitrust**

- » Testifying expert and antitrust economic analysis in major case involving bidding for oil and gas resources in Gulf of Mexico
- » Testifying plaintiff expert and antitrust analysis of predatory pricing in the cable television expansion in Florida leading to treble requested economic damages
- » Testifying plaintiff expert and antitrust economic analysis of telecommunications/internet backbone and network industry leading to several billion dollars arbitration decision.
- » Testifying expert and antitrust economic analysis in aviation turbine engine aftermarket parts industry
- » Testifying expert and antitrust economic analysis in aviation services industry
- » Testifying expert and antitrust pricing and competition analysis for Canadian refined products industry
- » Led competition analysis of computer industry research consortium proposal
- » Led competition analysis of computer industry consortium
- » Led competition analysis of refined petroleum products on West coast of U.S.
- » Led competition analysis of refined petroleum product futures markets and cash spot markets
- » Prepared analysis for several Hart-Scott Rodino filings
- » Taught industrial organization and antitrust economic analysis at university graduate level
- » Taught competition issues in bidding and auction models at university graduate level
- » Academic economic research on natural gas pipelines
- » Academic economic research on the intellectual property – antitrust conflict
- » Taught C.L.E. course on Microsoft case
- » Taught C.L.E. course on Antitrust Economics in Technology and IP Intensive Industries

**Class Action Securities**

- » Consulting expert on class action securities case for large Texas Energy provider on economic and financial analysis of possible economic damages to class of investors and analysis of structured financial transactions
- » Expert Testimony and analysis defeating class certification for an SEC 10b case with Dr. Jacobs testimony quoted in the judicial ruling
- » Testifying expert and analysis on class action securities case on causation and possible economic damages

**Business Valuation**



E. Allen Jacobs, Ph.D.

» Published article on values of alternative values of different financial structures for holding oil and gas assets
» Taught financial economics an analysis at two universities and presented seminars on financial economics issue at over a dozen universities
» Academic research and analysis on value of energy company assets vs. market value of securities
» Taught various C.L.E. courses covering valuation issues
» Testifying expert and economic analysis including value of Gravel and aggregate production facility and value of resources in various land parcels
» Testifying expert and economic analysis including value of natural gas distribution company
» Testifying expert and economic analysis including value of small regional cable TV company and assets
» Testifying expert and economic analysis including value of a chain of radio and TV stations
» Testifying expert and economic analysis including differing values of various equity share holdings in private company, each of which had different covenants, rights, and restrictions
» Testifying expert and economic analysis including value of an acquired company and various manufacturing subsidiaries and other assets
» Testifying expert and economic analysis including value of a paper manufacturing plant
» Testifying expert and economic analysis including value of railroad facilities and related land ownership
» Testifying expert and economic analysis including value of partnership shares of a real estate development company
» Testifying expert and economic analysis including value of branch office of employment and staffing firm
» Testifying expert and economic analysis including value of non-compete and value of proprietary business information
» Testifying expert and economic analysis including value of commodity hedges
» Testifying expert and economic analysis including value of structured financial transaction by major energy company
» Testifying expert and economic analysis including value of refineries
» Testifying expert and economic analysis including value of major truck stop service chain
» Testifying expert and economic analysis including value of a new large petrochemical complex in the Netherlands
» Testifying expert and economic analysis including value of a doll license
» Testifying expert and economic analysis including value of a developer and producer of clean burning technology and additives for diesel engines and electric power plants
» Testifying expert and economic analysis including value of meat packing company, meat packing plant assets, and meat packing company brands
» Testifying expert and economic analysis including value of options held by departing executive in software game company
» Testifying expert and economic analysis including value of wealth management company sold to major money center bank
» Testifying expert and economic analysis including value of a large hydroelectric facility in the Philippines
» Testifying expert and economic analysis including value of telephone calling card company
» Testifying expert and economic analysis including value of an tooth whitening product company



E. Allen Jacobs, Ph.D.

» Testifying expert and economic analysis including value of a telecommunications company
» Testifying expert and economic analysis including value of a chain of gas stations in the Dallas-Fort Worth area
» Research and analysis of valuation of oil and gas assets using real option pricing
» Research and analysis on valuation of utilities
» Research and analysis on valuation of natural gas pipelines and valuation of shipment contracts
» Research and analysis on valuation of oil shale facilities
» Research and analysis on value of refineries
» Research and analysis on valuation of water rights in Texas
» Research and analysis on valuation of oil and gas assets in OPEC and locations without U.S. reporting standards
» Research and analysis on valuation of petroleum refined contracts vs. spot vs. futures contracts
» Consulting and advisory analysis of value of three major copper companies for major investor
» Consulting and advisory analysis of value of eight major steel manufacturing companies for major investor
» Consulting and advisory analysis of value of natural gas vehicle fuel distribution and retail business for major investor
» Consulting and advisory analysis of value of proposed garbage recycling plant
» Consulting and advisory analysis of value of retail grocery chain for prospective LBO by major investment group
» Consulting and advisory analysis of value of window coverings company for prospective strategic decisions by investor-owners
» Consulting and advisory analysis of value of blind and window covering company for strategic purposes by parent company
» Consulting and advisory analysis of value of big box retailer of home furnishings for strategic purposes
» Consulting and advisory analysis of value of big box retailer of office supplies for prospective investment group
» Consulting and advisory analysis of value of network hardware company for prospective acquisition and strategic purposes post-acquisition
» Consulting and advisory analysis of value of electrical fire alarm and related systems company
» Consulting and advisory analysis of value of electrical products company for owner-investors
» Consulting and advisory analysis of value of surface raceway business for prospective acquisition
» Consulting and advisory analysis of value of ATM network business for parent company
» Consulting and advisory analysis of value of insurance company for strategic purposes
» Consulting and advisory analysis of value of specialty office paper business for strategic purposes of parent company
» Consulting and advisory analysis of value of paper manufacturing business
» Consulting and advisory analysis of value of water systems management company for strategic purposes of parent company
» Consulting and advisory analysis of value of water utility business for board of directors



E. Allen Jacobs, Ph.D.

- » Consulting and advisory analysis of value of municipal water management contracts
- » Consulting and advisory analysis of value of bathroom products company for prospective investors
- » Consulting and advisory analysis of value of shortline railroad company for prospective investors
- » Consulting and advisory analysis of value of public software and service company in medical testing
- » Consulting and advisory analysis of value of aviation fixed base operations company for prospective investors
- » Consulting and advisory analysis of value of retail car wash chain for prospective investors
- » Consulting and advisory analysis of value of shoe company for prospective financial restructuring
- » Consulting and advisory analysis of value of fuel cell and other aviation products company for strategic decisions by board
- » Consulting and advisory analysis of value of various chemical companies for prospective acquisition
- » Consulting and advisory analysis of value of large west coast construction company for board strategic purposes
- » Consulting and advisory analysis of value of candy company for strategic decisions by board
- » Consulting and advisory analysis of value of national donut chain franchise company and real estate assets for strategic decisions by board and possible financial restructuring
- » Consulting and advisory analysis of value of retail department store chain for possible financial restructuring
- » Consulting and advisory analysis of value of international temporary staffing firm for strategic and financial restructuring
- » Consulting and advisory analysis of value of training program company for strategic and financial changes
- » Consulting and advisory analysis of value of waste and metals recycling company
- » Consulting and advisory analysis of value of major distributor to convenience stores for strategic considerations
- » Consulting and advisory analysis including informal valuation related to prospective acquisition or investment in hundreds of companies and businesses for prospective investors or acquirers

**Minority Shareholder Valuations**

- » Expert testimony and analysis regarding minority discounts, liquidity discounts, control premiums/discounts, and valuation due to various stock restrictions or type of transaction
- » Academic research at M.I.T. on control discount/premiums
- » Expert testimony and analysis concerning squeeze out of minority shareholder in a variety of cases and situations including shares in a private firm, shares in a public firm, buy back options, and disputes over options in a public company
- » Expert testimony and analysis in disputes involving venture capital financing structure terms

**Solvency Analysis**

- » Expert testimony and analysis on various aspects of deepening insolvency claims in several cases



E. Allen Jacobs, Ph.D.

» Expert testimony and solvency analysis in two legal disputes involving a large prepaid phone card provider
» Expert testimony and analysis on the ability of a major international manufacturer of DRAM to post a supercedeas bond
» Expert testimony and analysis on the ability of a Texas manufacturer to post a supercedeas bond
» Expert testimony and analysis of solvency for an insurance company
» Expert testimony and analysis involving valuation, damages analysis, and solvency analysis involving a major paper manufacturer
» Taught C.L.E. on insolvency and deepening insolvency issues

**Insurance**

» Expert Testimony and assessment of damages involving insurance company liquidation in Ohio, including deepening insolvency and other issues
» Expert Testimony and analysis including damages, solvency, and business analysis pertaining to a dispute over third party administration of an insurance pool
» Strategic consulting to promotional marketing insurance company
» Acquisition evaluation of several insurance companies

**Derivatives, Options, Futures, Structured Transactions, Hedging and Other Complex Investing**

» Advised in the formulation and analysis of a variety of structured investments, and unique financial and credit instruments including positions used for hedging or investment, and the use of options pricing in evaluation of contracts and asset valuation
» Advised hedge fund on analysis of financial instruments including options, futures, derivatives, and other complex investments
» Research and advice for large active investor on commodity-futures-equity pricing in copper and related markets
» Research and advice for large active investor involving commodity-futures-forward contracts and equities in petroleum markets
» Academic research on development of futures markets
» Taught continuing legal education for attorneys on financial issues including derivatives, structured transactions, and options
» Delivered seminars and teaching at major universities on relationship of futures, commodity, and option markets, valuation, and real options
» Academic research on relationship of cash markets and futures trading
» Consulting advice and research for Secretary of Energy on energy futures markets, OTC forward trading, spot markets, and contract markets
» Expert testimony and analysis of pricing in refined petroleum product markets
» Expert testimony and analysis in criminal litigation of commodity trading and hedging strategy
» Expert testimony and analysis in structured transactions in securities class action case
» Expert testimony and analysis in futures and options trading for class certification issue in Ponzi scheme litigation

**Econometrics and Statistics**



E. Allen Jacobs, Ph.D.

» Taught Econometrics/statistics at graduate level
» Ph.D. at M.I.T. concentration in Econometrics
» Reviewer of submitted academic articles utilizing econometric analysis
» Expert testimony and analysis including event studies and critique of event studies in securities class action cases
» Expert testimony and analysis involving complete credit card transactions for ten years involving pricing and margins at hundreds of truck stops
» Expert testimony and analysis utilizing monte carlo simulation for valuation of investment firm
» Academic studies utilizing econometric analysis

**Business Planning**

» Evaluated, advised on the formulation of, and wrote over 1,000 business plans for companies, start-ups, divisions, subsidiaries, and acquisition targets
» Led over three dozen off-site strategic planning meetings as part of a larger strategic analysis projects

**Management and Business Strategy Consulting Projects**

» Dr. Jacobs has led over 300 corporate strategy projects in a number of industries
» He has advised on projects, taught associates and new consultants at, or devised strategy consulting programs for a number of consulting firms
  – Bain & Co.
  – Booze Allen Hamilton
  – CSC/Index
  – The MAC Group/Gemini
  – Mercer Management
  – McKinsey & Co.
  – RAND
  – Senn-Delany

**Active Investing**

» Dr. Jacobs has participated as an active investor and/or cofounder in eight non-consulting ventures covering a variety of technology, software and other activities and has served on the board of several of these companies

**Courses Taught at M.I.T., Harvard and/or The University of Texas**

» Industrial Organization & Regulation (Graduate level)
» Energy Economics and Industries (Graduate level, Executive MBA)
» Industrial Organizations & Regulation – Research Topics (Graduate level)
» Corporate Finance (Graduate level, Executive MBA)
» Investments (MBA)
» Microeconomics (Graduate level, Undergraduate level)
» Money, Banking, and Finance (Undergraduate level)
» Statistics (Undergraduate level)
» Econometrics (Graduate level, Undergraduate level)



E. Allen Jacobs, Ph.D.

**Peer Reviewed Journals (Served as Referee)**

»   *Rand Journal of Economics*
»   *Quarterly Journal of Economics*
»   *Journal of Financial Economics*
»   *American Economic Review*
»   *The Energy Journal*

**Seminars**

»   Dr. Jacobs has given seminars for faculty and students in economics and finance at the
    following universities:  Duke University, Harvard University, M.I.T., Stanford University,
    Texas A&M University, University of California – Berkeley, University of Chicago,
    University of Rochester, University of Texas – Austin, and Yale University

**CLE Presentations**

»   Various lectures on Law, Economics and Economic Damages
»   Approximately 300 person hours – University of Texas Law School CLE program
»   Approximately 840 person hours – CRA International Dinner Seminars
»   Approximately 600 person hours – Other associations

**Active Committees**

»   Texas Damages Institute – University of Texas School of Law (group of attorneys, academics,
    state and federal judges working on economic damages in Texas state courts and on Daubert
    procedures in federal courts)

**Professional History (continued)**

»   1989-1990.  Craig & Jacobs, Inc.  Dallas, Texas.  Partner
»   1987-1989.  Bain & Company.  Boston, Massachusetts.  Bain Consulting and Bain Holdings
    Strategy Consultant
»   1985-1987.  M.I.T. Assistant Professor of Economics and Finance, Sloan School of
    Management and Research Fellow, M.I.T. Energy Laboratory
»   1984.  Harvard University.  Cambridge, Massachusetts.  Visiting Assistant Professor of
    Economics, Kennedy School of Government
»   1981-1985.  University of Texas at Austin.  Assistant Professor of Finance and Economics
»   1980-1981.  M.I.T.  Cambridge, Massachusetts.  Teaching Assistant (three classes of
    Economics)
»   1978-1979.  Consultant from M.I.T. to U.S. Secretary of Energy (Office of Market Analysis and
    Iranian Task Force)
»   1976.  M.I.T.  Cambridge, Massachusetts.  Energy Laboratory.  Research Assistant

**Previous Positions on Boards of Directors**

»   Always at Market
»   Beyond Conception, Inc.
»   Corporate Performance, Inc. (CPI)
»   CPI Advisors, Inc. ("Economics Inc.")



E. Allen Jacobs, Ph.D.

- »  Eagle Lumber
- »  New Media Gateway
- »  Privacy Infrastructure, Inc. (controlled board seat)
- »  LoSig, Inc.
- »  University Park United Methodist Church
- »  St. Alcuin Montessori School

# Exhibit B

## Documents Considered

### Articles and other References

"BP Macondo oil well successfully capped", The Washington Post, September 18, 2010

"Moratorium Notice to Lessees and Operators (Moratorium NTL)", DOI, May 30. 2010

"Drilling Moratorium Guidance", United States Department of the Interior Minerals Management Service

"Timeline: BP Oil Spill", BBC News, September 19, 2010

"Shallow Gulf Drilling Grinds Toward Halt as Permits Tickle Out", Bloomberg, July 2, 2010

"New Deepwater Drilling Permits: Zilch", CNN Money, November 12, 2010

"Gulf Spill Is the Largest of its Kind, Scientists Say", The New York Times, August 2, 2010

"Macondo Prospect, Gulf of Mexico", Off-Shore Technology

"Memorandum - Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells", United States Department of the Interior Minerals Management Service, May 28, 2010

"New Estimate Puts Gulf Oil Leak at 205 Million Gallons", PBS NewsHour, August 2, 2010

"Gulf of Mexico E&P Activity Rising Slowly but Surely", Off-Shore Magazine

"Analysis – Moratorium Leads to Anemic Shallow Water Permitting", RIGZONE, July 13, 2010

"Seahawk Drilling Inc Announces Sale of Assets to Hercules OffShore", UBM - PR Newswire, February 11, 2011

"The Macondo Prospect and the Deepwater Horizon", Transocean

"Seahawk Drilling Seeks Bankruptcy, To Sell Assets", US Today, February 12, 2011

"Drilling is Stalled Even After Ban is Lifted", The Wall Street Journal, January 3, 2011

"Seahawk Drilling, Project Talon Board of Directors Meeting", January 4, 2010

"Seahawk Drilling Project Talon Update", Board of Directors Meeting, May 12, 2000

"Project Talon Investor Update", UBS, May, 2000

"Oil rig wreck leaks into Gulf of Mexico", CBC News, April 24, 2010

Q2 2010 Seahawk CFO Conference Call Script

## SEC Fillings – Financial Statements 10-K's and 10-Q's

Seahawk Drilling Inc, Form 10-Q, June 30, 2009

Seahawk Drilling Inc, Form 10-Q, September 30, 2009

Seahawk Drilling Inc, Form 10-K, December 31, 2009

Seahawk Drilling Inc, Form 10-Q, March 31, 2010

Seahawk Drilling Inc, Form 10-Q, June 30, 2010

Seahawk Drilling Inc, Form 10-Q, September 30, 2010

Hercules Offshore, Form 10-K, December 31, 2010

Hercules Offshore, Form 10-K, December 31, 2011

Hercules Offshore, Form 10-Q, September 30, 2012

Diamond Offshore Drilling Inc, Form 10-K, December 31, 2010

Diamond Offshore Drilling Inc, Form 10-K, December 31, 2011

Diamond Offshore Drilling Inc, Form 10-Q, September 30, 2012

Nabors Industries Limited, Form 10-K, December 31, 2010

Nabors Industries Limited, Form 10-K, December 31, 2011

Nabors Industries Limited, Form 10-Q, September 30, 2012

Noble Corporation, Form 10-K, December 31, 2010

Noble Corporation, Form 10-K, December 31, 2011

Noble Corporation, Form 10-K, September 30, 20102

Rowan Companies PLC, Form 10-K, December 31, 2010

Rowan Companies PLC, Form 10-K, December 31, 2011

Rowan Companies PLC, Form 10-Q, September 30, 2012

Transocean Limited, Form 10-K, December 31, 2010

Transocean Limited, Form 10-K, December 31, 2011

Transocean Limited, Form 10-Q, September 30, 2012

Atwood Oceanics Inc, Form 10-K, September 30, 2010

Atwood Oceanics Inc, Form 10-K, September 30, 2011

Atwood Oceanics Inc, Form 10-K, September 30, 2012

Ensco PLC, Form 10-K, December 31, 2010

Ensco PLC, Form 10-K, December 31, 2011

Ensco PLC, Form 10-Q, September 30, 2012

## Emails and other communication

Email from Alex Cestero, Subject: Re: Window Period, dated May 19, 2010

Email from Jim Easter to Randy Stilley et. al., Subject: RE: Cash Preservation, June 11, 2010.

## Data

Rig Costs per day (first 6 mos of 2010).xls

Quarterly Comparable Enterprise Value to EBITDA v1.0.xls

GoM Retired Jus.xls

Bloomberg WACC data 2007 to 2012 – Seahawk Drilling and Comparables

JU Fleet Sales.xls

WW JU Attrition Report.xls

RigLogix Industry Jackup contract data (including Mexico) 2000-2012.xls

RigLogix Industry Jackup contract data (excluding Mexico) 2000-2012.xls

RigLogix Industry Jackup rig utilization (including Mexico) 2000-2012.xls

Seahawk Retired Rigs 1-1-2000 to 12-31-2012.xls

Rig Reactivation Costs 8.31.2009.xls

## Morningstar SIC 1381 Year Statements

2010 Statement SIC 1381 Drilling Oil and Gas Wells

2011 Statement SIC 1381 Drilling Oil and Gas Wells

2012 Statement SIC 1381 Drilling Oil and Gas Wells

## Websites and Data Sources

Bloomberg

MorningStar, http://www.morningstar.com/

RigLogix by Rigzone, http://www.riglogix.com/

BOEM, http://www.boem.gov/Oil-and-Gas-Energy-Program/index.aspx

## Depositions

11-30-11 - Seahawk - Storey
12-1-11 - Seahawk - Evans
9-28-11 - Stilley, Randall
9-29-11 - Seahawk - Pacelli
10-13-11 - Seahawk - Miele
10-18-11 - Seahawk - Manz
11-17-11 - Seahawk - Evans
11-30-11 - Seahawk - Hoffman
1-17-13 – Stilley, Randall – Declaration
1-17-13 –Easter, James - Declaration

## SEC Fillings – Hercules Form 8K's and 2009 10-Q's

Hercules 2009 8K April 28
Hercules 2009 8K April 24
Hercules 2009 8K Aug 20
Hercules 2009 8K Dec 16

Hercules 2009 8K Dec 8
Hercules 2009 8K Feb 17
Hercules 2009 8K Feb 19
Hercules 2009 8K Feb 10
Hercules 2009 8K Jan 20
Hercules 2009 8K Jan 6
Hercules 2009 8K Jan 20
Hercules 2009 8K July 23
Hercules 2009 8K July 22
Hercules 2009 8K June 18
Hercules 2009 8K March 19
Hercules 2009 8K March 3
Hercules 2009 8K May 22
Hercules 2009 8K Nov 17
Hercules 2009 8K Oct 28_2
Hercules 2009 8K Oct 5
Hercules 2009 8K Oct 5_2
Hercules 2009 8K Oct 8
Hercules 2009 8K Oct 14
Hercules 2009 8K Oct 26
Hercules 2009 8K Oct 28
Hercules 2009 8K Oct 28_2
Hercules 2009 8K Sept 23
Hercules 2009 8K Sept 22
Hercules 2009 8K Sept 23_2
Hercules 2009 8K Sept 30
Hercules 2010 10-Q 3rd
Hercules 2010 10-K
Hercules 2010 10-Q 1st
Hercules 2010 10-Q 2nd
Hercules 2010 8K April 29
Hercules 2010 8K April 28
Hercules 2010 8K Aug 17
Hercules 2010 8K Aug 3
Hercules 2010 8K Dec 27
Hercules 2010 8K Dec 9
Hercules 2010 8K Dec 15
Hercules 2010 8K Feb 24
Hercules 2010 8K Jan 26
Hercules 2010 8K Jan 19
Hercules 2010 8K July 20
Hercules 2010 8K July 7

Hercules 2010 8K June 28
Hercules 2010 8K June 23
Hercules 2010 8K March 18
Hercules 2010 8K March 2
Hercules 2010 8K March 2_2
Hercules 2010 8K March 18
Hercules 2010 8K May 24
Hercules 2010 8K May 10
Hercules 2010 8K May 13
Hercules 2010 8K Nov 18
Hercules 2010 8K Oct 27
Hercules 2010 8K Oct 21
Hercules 2010 8K Sept 21
Hercules 2011 10-Q 3rd
Hercules 2011 10-Q 1st
Hercules 2011 10-Q 2nd
Hercules 2011 8K April 28
Hercules 2011 8K April 5
Hercules 2011 8K April 7
Hercules 2011 8K April 12
Hercules 2011 8K April 27
Hercules 2011 8K April 27_2
Hercules 2011 8K April 28
Hercules 2011 8K Aug 25
Hercules 2011 8K Dec 23
Hercules 2011 8K Dec 15
Hercules 2011 8K Dec 21
Hercules 2011 8K Dec 23
Hercules 2011 8K Feb 28
Hercules 2011 8K Feb 11
Hercules 2011 8K Feb 15 - 8KA
Hercules 2011 8K Feb 16
Hercules 2011 8K Feb 28
Hercules 2011 8K Jan 25
Hercules 2011 8K Jan 12
Hercules 2011 8K July 28_2
Hercules 2011 8K July 8 - 8KA
Hercules 2011 8K July 8
Hercules 2011 8K July 28
Hercules 2011 8K July 28_2
Hercules 2011 8K June 20
Hercules 2011 8K March 22

Hercules 2011 8K March 31
Hercules 2011 8K March 8
Hercules 2011 8K March 9
Hercules 2011 8K March 10
Hercules 2011 8K May 16
Hercules 2011 8K May 25
Hercules 2011 8K Nov 17
Hercules 2011 8K Oct 27
Hercules 2011 8K Oct 3
Hercules 2011 8K Oct 26
Hercules 2011 8K Oct 27
Hercules 2011 8K Sept 28
Hercules 2011 8K Sept 21
Hercules 2011 8K Sept 28
Hercules 2009 10-Q 2nd
Hercules 2009 10-Q 3rd
Hercules 2009 10-Q 1st

## Research Analyst Reports

Wells Fargo Securities Equity Research Report (Seahawk Drilling Inc), September 7, 2010

Wells Fargo Securities Equity Research Report (Seahawk Drilling Inc), February 14, 2011

Nataxis Equity Research, Seahawk Drilling Inc, page August 27, 2010

Nataxis Equity Research, Seahawk Drilling Inc, page August 5, 2010 Outlook

Credit Suisse Equity Research Report, Hercules Offshore, February 14, 2011

Thompson Street Events, HAWK - Q3 2010 Seahawk Drilling Earnings Conference Call, Final Transcript, Event Date/Time: Nov. 09. 2010 / 8:00PM GMT

Jefferies April 1 2011
Jefferies April 15 2011
Jefferies April 21 2011
Jefferies April 28 2011
Jefferies April 8 2011
Jefferies Feb 11 2011
Jefferies Feb 18 2011
Jefferies Feb 25 2011
Jefferies Feb 4 2011
Jefferies February 2011

7

Jefferies Jan 21 2011
Jefferies Jan 28 2011
Jefferies January 2011
Jefferies March 11 2011
Jefferies March 18 2011
Jefferies March 2011
Jefferies March 25 2011
Jefferies May 2011
Jeffries March 4 2011
Jefferies April 13 2009
Jefferies Aug 10 2009
Jefferies Aug 24 2009
Jefferies Aug 3 2009
Jefferies Aug 5 2009
Jefferies Jan 14 2009
Jefferies Jan 20 2009
Jefferies July 13 2009
Jefferies July 20 2009
Jefferies July 2009
Jefferies July 27 2009
Jefferies July 31 2009
Jefferies July 6 2009
Jefferies June 1 2009
Jefferies June 15 2009
Jefferies June 2009
Jefferies June 22 2009
Jefferies June 29 2009
Jefferies June 8 2009
Jefferies March 2009
Jefferies May 1 2009
Jefferies January 2008 - May 2010
Jefferies January 2005 - December 2007


## Seahawk Drilling, Inc.  Specific Reports

Seahawk August 2010 CEO Report
Seahawk February 2010 CEO Report
Seahawk May 2010 CEO Report
Seahawk Macondo Lost Revenue July 22 2010
Seahawk Private Placement Presentation Draft 4.23.2010

## Other Reports

Bassoe Report May 2009
Bassoe Valuation of Rigs July 2010
Houlihan Opinion
MorganKeegan Weekly Report 2.21.11
Seahawk00269949 cancelled contracts
UBS Conference 5.24.2010
Credit Suisse Presentation 2.2.2010
EnerCom Presentation 2.17.2010
ErcomConference 8.22.2010
Howard Weil Conference 3.22.2010
Lecuadia Presentation 10.26.2010
Macquarie Report 4.6.10
Seahawk drilling and financial info as of 4.19.2010
Pareto 9.1.2010
Pritchard Capital Conference 1.6.2010
GBS Group Review of Rig Values 1.12.2011
GBS Group Rig Evaluation 1.10.2011
GBS Group Updated Rig Evaluation 1.17.2010
Hercules Proposal 1.28.2011
Management Presentation 10.14.2010
Management Presentation 10.19.2010
Management Presentation 10.26.2010
Management Presentation 11.1.2010
Management Presentation 11.17.2010
Management Presentation 11.18.2010
Management Presentation 11.29.2010
Management Presentation to First Reserve 10.19.2010
Platinum LOI 11.29.2010
Platinum LOI 12.13.2010
Platinum LOI 12.14.2010 (with notes)
Platinum LOI 12.16.2010 (with FJ comments)
Platinum LOI 12.16.2010
Platinum LOI 12.17.2010
Platinum LOI 12.9.2010
Platinum letter 11.29.2010
Presentation to Platinum 11.16.2010
Riptide Update 1.12.2011
Riptide Update 1.5.2011
Riptide Update 11.19.2010

Riptide Update 2.10.2011
Riptidue Update 2.9.2011
Simmons Marketing Summary 11.3.2010.PPT
Simmons Riptide Report 11.30.2010
Simmons Riptide Report October 2010
Talon Proforma Statement 2
Talon Proforma Statement 3
Talon Proforma Statement 4
Talon Proforma Statement 5
Talon Proforma Statement of Operations
Talon Timeline through 1.15.2010
APM Analysis - Excluding APMs (when the primary APM was approved before moratorium)
RigData - June 2010:  Gulf of Mexico Industry Review 6.28.2010

## **Seahawk Drilling, Inc. Claim and Exhibits**

Seahawk Claim Submittal - 10.26.11 Part 1 of 2
Seahawk00269664 (9.10.10 claim exhibit 1)
Seahawk00269916 (9.10.10 claim exhibit 2)
Seahawk00269924 (9.10.10 claim exhibit 2)
Seahawk00269949 (9.10.10 claim exhibit 4)
Seahawk00269950 (9.10.10 claim exhibit 4)
Seahawk00269953 (9.10.10 claim exhibit 4)
Seahawk00269954 (9.10.10 claim exhibit 6)
Seahawk00269994
Seahawk00269997
Seahawk00270000 (9.10.10 claim exhibit 7)
Seahawk00270004 (9.10.10 claim exhibit 3)
Seahawk00270166 (9.10.10 claim exhibit 3)
Seahawk00270254 (9.10.10 claim exhibit 3)
Seahawk00270377 (9.10.10 claim exhibit 3)
Seahawk00270466 (9.10.10 claim exhibit 3)
Seahawk00270686 (9.10.10 claim exhibit 3)
Seahawk00270881 (9.10.10 claim exhibit 3)
Seahawk00271011 (9.10.10 claim exhibit 3)
Seahawk00271218 (9.10.10 claim exhibit 3)
Seahawk00271426 (9.10.10 claim exhibit 3)
Seahawk00271546 (9.10.10 claim exhibit 3)
Seahawk00271674 (9.10.10 claim exhibit 3)
Seahawk00271760 (9.10.10 claim exhibit 3)
Seahawk00271847 (9.10.10 claim exhibit 3)

Seahawk00271963 (9.10.10 claim exhibit 7)
Seahawk00271968 (3.17.2011 claim letter)
Seahawk00271971 (6.10.2011 appeal letter)
Seahawk00272089 (10.26.2011 claim letter)
Seahawk00272090 (10.26.2011 GCCF packet)


## Seahawk Drilling, Inc. Statement and Exhibits

Seahawk00272119 (10.26.2011 Statement of Claim)
Seahawk00272125 10.26 Ex. 1
Seahawk00272306 10.26 Ex. 2
Seahawk00272321 10.26 Ex. 4
Seahawk00272323 10.26 Ex. 5
Seahawk00272335 10.26 Ex. 6
Seahawk00272344 10.26 Ex. 7
Seahawk00272356 10.26 Ex. 8
Seahawk00272357 10.26 Ex. 9
Seahawk00272358 10.26 Ex. 10
Seahawk00272363 10.26 Ex. 11
Seahawk00272364
Seahawk00272369
Seahawk00272370
Seahawk00272371
Seahawk00272372


## Seahawk Drilling, Inc. Morning Reports

US GOM 08.28.2010
US GOM 08.29.2010
US GOM 08.30.2010
US GOM 08.31.2010
US GOM 09.01.2010
US GOM 09.02.2010
US GOM 09.03.2010
US GOM 09.04.2010
US GOM 09.05.2010
US GOM 09.06.2010
US GOM 09.07.2010
US GOM 09.08.2010
US GOM 09.09.2010

US GOM 09.10.2010
US GOM 09.11.2010
US GOM 09.12.2010
US GOM 09.13.2010
US GOM 09.14.2010
US GOM 09.15.2010
US GOM 09.16.2010
US GOM 09.17.2010
US GOM 09.18.2010
US GOM 09.19.2010
US GOM 09.20.2010
US GOM 09.21.2010
US GOM 09.22.2010
US GOM 09.23.2010
US GOM 09.24.2010
US GOM 09.25.2010
US GOM 09.26.2010
US GOM 09.27.2010
US GOM 09.28.2010
US GOM 09.29.2010
US GOM 09.30.2010
US GOM 04.20.2010
US GOM 04.21.2010
US GOM 04.22.2010
US GOM 04.23.2010
US GOM 04.24.2010
US GOM 04.25.2010
US GOM 04.26.2010
US GOM 04.27.2010
US GOM 04.28.2010
US GOM 04.29.2010
US GOM 04.30.2010
US GOM 05.01.2010
US GOM 05.02.2010
US GOM 05.03.2010
US GOM 05.04.2010
US GOM 05.05.2010
US GOM 05.06.2010
US GOM 05.07.2010
US GOM 05.08.2010
US GOM 05.09.2010
US GOM 05.10.2010

US GOM 05.11.2010
US GOM 05.12.2010
US GOM 05.13.2010
US GOM 05.14.2010
US GOM 05.15.2010
US GOM 05.16.2010
US GOM 05.17.2010
US GOM 05.18.2010
US GOM 05.19.2010
US GOM 05.20.2010
US GOM 05.21.2010
US GOM 05.22.2010
US GOM 05.23.2010
US GOM 05.24.2010
US GOM 05.25.2010
US GOM 05.26.2010
US GOM 05.27.2010
US GOM 05.28.2010
US GOM 05.29.2010
US GOM 05.30.2010
US GOM 05.31.2010
US GOM 06.01.2010
US GOM 06.02.2010
US GOM 06.03.2010
US GOM 06.04.2010
US GOM 06.05.2010
US GOM 06.06.2010
US GOM 06.07.2010
US GOM 06.08.2010
US GOM 06.09.2010
US GOM 06.10.2010
US GOM 06.11.2010
US GOM 06.12.2010
US GOM 06.13.2010
US GOM 06.14.2010
US GOM 06.15.2010
US GOM 06.16.2010
US GOM 06.17.2010
US GOM 06.18.2010
US GOM 06.19.2010
US GOM 06.20.2010
US GOM 06.21.2010

US GOM 06.22.2010
US GOM 06.23.2010
US GOM 06.24.2010
US GOM 06.25.2010
US GOM 06.26.2010
US GOM 06.27.2010
US GOM 06.28.2010
US GOM 06.29.2010
US GOM 06.30.2010
US GOM 07.01.2010
US GOM 07.02.2010
US GOM 07.03.2010
US GOM 07.04.2010
US GOM 07.05.2010
US GOM 07.06.2010
US GOM 07.07.2010
US GOM 07.08.2010
US GOM 07.09.2010
US GOM 07.10.2010
US GOM 07.11.2010
US GOM 07.12.2010
US GOM 07.13.2010
US GOM 07.14.2010
US GOM 07.15.2010
US GOM 07.16.2010
US GOM 07.17.2010
US GOM 07.18.2010
US GOM 07.19.2010
US GOM 07.20.2010
US GOM 07.21.2010
US GOM 07.22.2010
US GOM 07.23.2010
US GOM 07.24.2010
US GOM 07.25.2010
US GOM 07.26.2010
US GOM 07.27.2010
US GOM 07.28.2010
US GOM 07.29.2010
US GOM 07.30.2010 II
US GOM 07.30.2010
US GOM 07.31.2010
US GOM 08.01.2010

US GOM 08.02.2010
US GOM 08.03.2010
US GOM 08.04.2010
US GOM 08.05.2010
US GOM 08.06.2010
US GOM 08.07.2010
US GOM 08.08.2010
US GOM 08.09.2010
US GOM 08.10.2010
US GOM 08.11.2010
US GOM 08.12.2010
US GOM 08.13.2010
US GOM 08.14.2010
US GOM 08.15.2010
US GOM 08.16.2010
US GOM 08.17.2010
US GOM 08.18.2010
US GOM 08.19.2010
US GOM 08.20.2010
US GOM 08.21.2010
US GOM 08.22.2010
US GOM 08.23.2010
US GOM 08.24.2010
US GOM 08.25.2010
US GOM 08.26.2010
US GOM 08.27.2010
US GOM 10.1.2010
US GOM 10.10.2010
US GOM 10.11.2010
US GOM 10.12.2010
US GOM 10.13.2010
US GOM 10.14.2010
US GOM 10.15.2010
US GOM 10.16.2010
US GOM 10.17.2010
US GOM 10.18.2010
US GOM 10.19.2010
US GOM 10.2.2010
US GOM 10.20.2010
US GOM 10.21.2010
US GOM 10.22.2010
US GOM 10.23.2010

US GOM 10.24.2010
US GOM 10.25.2010
US GOM 10.26.2010
US GOM 10.27.2010
US GOM 10.28.2010
US GOM 10.29.2010
US GOM 10.3.2010
US GOM 10.30.2010
US GOM 10.31.2010
US GOM 10.4.2010
US GOM 10.5.2010
US GOM 10.6.2010
US GOM 10.7.2010
US GOM 10.8.2010
US GOM 10.9.2010
US GOM 11.1.2010
US GOM 11.10.2010
US GOM 11.11.2010
US GOM 11.12.2010
US GOM 11.13.2010
US GOM 11.14.2010
US GOM 11.15.2010
US GOM 11.16.2010
US GOM 11.17.2010
US GOM 11.18.2010
US GOM 11.19.2010
US GOM 11.2.2010
US GOM 11.20.2010
US GOM 11.21.2010
US GOM 11.22.2010
US GOM 11.23.2010
US GOM 11.24.2010
US GOM 11.25.2010
US GOM 11.26.2010
US GOM 11.27.2010
US GOM 11.28.2010
US GOM 11.29.2010
US GOM 11.3.2010
US GOM 11.30.2010
US GOM 11.4.2010
US GOM 11.5.2010
US GOM 11.6.2010

US GOM 11.7.2010
US GOM 11.8.2010
US GOM 11.9.2010
US GOM 12.1.2010
US GOM 12.10.2010
US GOM 12.11.2010
US GOM 12.12.2010
US GOM 12.13.2010
US GOM 12.14.2010
US GOM 12.15.2010
US GOM 12.16.2010
US GOM 12.17.2010
US GOM 12.18.2010
US GOM 12.19.2010
US GOM 12.2.2010
US GOM 12.20.2010
US GOM 12.21.2010
US GOM 12.22.2010
US GOM 12.23.2010
US GOM 12.24.2010
US GOM 12.25.2010
US GOM 12.26.2010
US GOM 12.27.2010
US GOM 12.28.2010
US GOM 12.29.2010
US GOM 12.3.2010
US GOM 12.30.2010
US GOM 12.31.2010
US GOM 12.4.2010
US GOM 12.5.2010
US GOM 12.6.2010
US GOM 12.7.2010
US GOM 12.8.2010
US GOM 12.9.2010
US GOM 2.1.2011
US GOM 2.10.2011
US GOM 2.11.2011
US GOM 2.12.2011
US GOM 2.13.2011
US GOM 2.14.2011
US GOM 2.15.2011
US GOM 2.16.2011

US GOM 2.17.2011
US GOM 2.18.2011
US GOM 2.19.2011
US GOM 2.2.2011
US GOM 2.20.2011
US GOM 2.21.2011
US GOM 2.22.2011
US GOM 2.23.2011
US GOM 2.24.2011
US GOM 2.25.2011
US GOM 2.26.2011
US GOM 2.27.2011
US GOM 2.28.2011
US GOM 2.3.2011
US GOM 2.4.2011
US GOM 2.5.2011
US GOM 2.6.2011
US GOM 2.7.2011
US GOM 2.8.2011
US GOM 2.9.2011
US GOM 1.1.2011
US GOM 1.10.2011
US GOM 1.11.2011
US GOM 1.12.201
US GOM 1.13.2011
US GOM 1.14.2011
US GOM 1.15.2011
US GOM 1.16.2011
US GOM 1.17.2011
US GOM 1.18.2011
US GOM 1.19.2011
US GOM 1.2.2011
US GOM 1.20.2011
US GOM 1.21.2011
US GOM 1.22.2011
US GOM 1.23.2011
US GOM 1.24.2011
US GOM 1.25.2011
US GOM 1.26.2011
US GOM 1.27.2011
US GOM 1.28.2011

US GOM 1.29.2011
US GOM 1.3.2011
US GOM 1.30.2011
US GOM 1.31.2011
US GOM 1.4.2011
US GOM 1.5.2011
US GOM 1.6.2011
US GOM 1.7.2011
US GOM 1.8.2011
US GOM 1.9.2011

## Exhibit C: Lost Profits from June 2010 through First Ten Days of February 2011

|  | [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] |
|---|---|---|---|---|---|---|---|---|
|  | Month | Rig Use | Dayrate | But-for Increase in Rig Use | But-for Increase in Day Rate | But-for Revenue Increase | But-for Cost Increase | But-for EBITDA Increase |
| [1] | Jun-10 | 5.63 | 36,563 | 1.38 | 6,391 | 2,861,402 | 1,078,202 | 1,783,200 |
| [2] | Jul-10 | 4.61 | 36,167 | 2.64 | 6,355 | 4,384,728 | 2,125,354 | 2,259,374 |
| [3] | Aug-10 | 4.74 | 31,722 | 2.54 | 10,162 | 4,789,288 | 2,045,764 | 2,743,524 |
| [4] | Sep-10 | 6.00 | 37,429 | 0.99 | 7,135 | 2,613,675 | 775,575 | 1,838,100 |
| [5] | Oct-10 | 4.32 | 36,875 | 2.52 | 8,199 | 4,626,618 | 2,035,050 | 2,591,568 |
| [6] | Nov-10 | 2.33 | 37,250 | 4.31 | 9,425 | 6,691,064 | 3,359,674 | 3,331,390 |
| [7] | Dec-10 | 5.06 | 40,333 | 1.46 | 5,702 | 2,973,409 | 1,173,701 | 1,799,708 |
| [8] | Jan-11 | 6.00 | 41,900 | 0.56 | 6,219 | 1,992,228 | 451,435 | 1,540,794 |
| [9] | Feb-11 | 6.46 | 40,563 | 0.09 | 7,553 | 529,808 | 22,464 | 507,344 |
| [10] |  |  |  |  |  |  | Total: | 18,395,001 |

**Notes and Sources:**

**Notes:**

February 2011 only includes first 10 days of that month.

**Sources:**

| | |
|---|---|
| [b][1]-[b][9] | Actual Rig FTE (Full Time Equivalent) values calculated based on RigLogix Seahawk's rig contract data |
| [c][1]-[c][9] | Rig Average Day Rate values calculated based on RigLogix Seahawk's rig contract data |
| [d][1]-[d][9] | Difference between But-for Rig FTE predicted values and Actual Rig FTE values calculated based on RigLogix Seahawk's |
| [e][1]-[e][9] | Difference between But-for Average Day Rate predicted values and Actual Average Day Rate values calculated based on |
| [f][1]-[f][9] | Difference between But-for Revenue and Estimated Actual Revenue |
| [g][1]-[g][9] | Difference between But-for Operating Costs and Estimated Operating Costs |
| [h][1]-[h][9] | Difference between But-For Revenue Minus But-For Costs and Revenue Minus Costs |
| [h][10] | = sum of [h][1]-[h][9] |

## Exhibit D

## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| **Diamond Offshore Drilling, Inc.** | **Overview - Industry Conditions**<br>We are continuing to actively seek international opportunities to keep our rigs employed. However, we can provide no assurance that we will be successful in our efforts to employ our remaining impacted rigs in the GOM in the near term. In addition, given the ongoing uncertainty in the GOM with respect to drilling activity and other industry factors, we have cold stacked two intermediate floaters and four jack-up rigs in the GOM. **(1)**<br><br>**Overview - Industry Conditions - U.S. Gulf of Mexico Jack-ups**<br>The jack-up market in the GOM has been negatively impacted by the slow issuance of jack-up permits subsequent to the lifting of the drilling moratorium, as well as the impact of lower natural gas prices on both demand and dayrates. Our two remaining jack-ups in the GOM are largely working under short-term contracts and could experience significant downtime unless permitting activity increases. Absent an increase in permitting activity and a sustained improvement in natural gas prices, weakness in the GOM jack-up market is likely to continue in 2011, with the possibility of additional rigs being cold-stacked by us and others in the industry.<br>The inability to redeploy our rigs impacted by the drilling moratorium, or to obtain dayrates sufficient to cover our additional operating expenses and mobilization costs if such impacted rigs are redeployed in international waters, could adversely affect our financial | Deepwater drilling activity in the GOM, while strengthening, continues to be impacted by the issuance of oil and gas drilling permits for operations on the OCS, which has not yet returned to pre-Macondo levels. In addition, since the Macondo well blowout in 2010 more stringent and encompassing rules for oil and gas operations on the OCS have been implemented. As of the date of this report, we have two actively marketed rigs in the GOM, consisting of one semisubmersible and one jack-up rig. **(3)**<br><br>Revenue generated by our ultra-deepwater floaters decreased $27.6 million during 2010 compared to 2009. Our newest ultra-deepwater rigs, the Ocean Courage and Ocean Valor, generated $109.3 million in revenue during 2010 and worked a combined 280 revenue earning days. However, aggregate revenue earned by our other six ultra-deepwater rigs decreased $137.0 million in 2010 compared to 2009, due to 437 fewer revenue earning days ($160.4 million), largely resulting from effects of the April 20, 2010 Macondo well blowout in the GOM, as well as a decrease in average daily revenue earned ($19.3 million). **(4)**<br><br>Moreover, insurance costs across the industry have increased following the Macondo incident and, in the future, certain insurance coverage is likely to become more costly and may become less available or not available at all. Accordingly, it is possible that our losses from the hazards we face could have a | **GOM Floater and Jack-up Market:**<br>Drilling activity on the Outer Continental Shelf of the Gulf of Mexico has continued to strengthen and some industry analysts predict that drilling activity, particularly in the deepwater market, will surpass pre-Macondo levels in 2013. However, our ability to meet this demand is limited, as many of our rigs that previously operated in the U.S. Gulf of Mexico, or GOM, have been relocated to international markets and continue to work outside the GOM on long-term contracts. **(6)**<br><br>**Forward-Looking Statements:**<br>effects of the Macondo well blowout, including, without limitation, the impact of the moratorium and its aftermath on drilling in the U.S. Gulf of Mexico, related delays in permitting activities and related regulations and market developments; **(7)** |

Exhibit D

## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | position, results of operations and cash flows. In addition, implementation of additional regulations may subject us to increased costs of operating and/or a reduction in the area of operation in the GOM. **(2)** | material adverse effect on our results of operations, financial condition and cash flows. **(5)** | |
| **Atwood Oceanics, Inc.** | **Industry Trends:** The offshore markets where we currently operate (offshore Southeast Asia, offshore Africa, offshore Australia, offshore South America, and the Mediterranean Sea), offer the potential for high utilization over the long-term.  However, the current market activity reflects a modestly improving global macro environment with most economies returning positive GDP growth again offset by the slowdown in deepwater tender activity driven by the six month moratorium on certain deepwater drilling activities in the U.S. Gulf of Mexico issued by the U S. Department of the Interior in May 2010 as a result of the Macondo incident and subsequently lifted in October 2010. **(8)**<br><br>**Insurance and Risk Management** To date, we have not experienced difficulty in obtaining insurance coverage, although we can provide no assurance as to the future availability of such insurance or the cost thereof, particularly in light of the uncertainties relating to the Macondo incident and their potential impact on the insurance industry. **(9)**<br><br>**U.S. Environmental Regulation** As the Macondo incident has highlighted, all water areas of the U.S. Gulf of Mexico are | **Environmental Regulation** Our operations are subject to a variety of U.S. and foreign environmental regulation. We monitor environmental regulation in each country in which we operate and, while we have experienced an increase in general environmental regulation, we do not believe compliance with such regulations will have a material adverse effect upon our business or results of operations. Past environmental issues, such as the Macondo incident, have led to higher drilling costs, a more difficult and lengthy well permitting process and, in general, have adversely affected decisions of oil and gas companies to drill in these areas. **(12)**<br><br>Government regulation and environmental risks could reduce our business opportunities and increase our costs. The Macondo well incident in the U.S. Gulf of Mexico in April 2010 and its impact on worldwide drilling operations could have a material adverse effect on our business. The Atwood Condor, which is expected to be delivered from the shipyard in June 2012, will mobilize to the U.S. Gulf of Mexico to operate under a 21-month contract expected to commence in September 2012. In the future, we may relocate other rigs to or place other new build rigs in service in the U.S. Gulf of | **Industry Conditions** Drilling activity in the U.S. Gulf of Mexico is rebounding to pre-Macondo levels and the drilling permit approval process is now functioning capably. However, we cannot be certain that this level of activity will continue into the future or that additional restrictions or regulations will not be implemented which might negatively impact drilling activity or the drilling permit approval process in the U.S. Gulf of Mexico. **(14)** |

Exhibit D

Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | ecologically sensitive. Past environmental issues have led to higher drilling costs, a more difficult and lengthy well permitting process and, in general, have adversely affected decisions of oil and gas companies to drill in these areas. **(10)**<br><br>**Risk Factors**<br>On April 20, 2010, an explosion and fire at the Macondo well, a deepwater U.S. Gulf of Mexico offshore drilling location, resulted in 11 deaths, multiple personal injuries and significant property damage and pollution. As a result of this incident, hydrocarbons flowed from the well resulting in significant pollution and contamination. The U.S. Department of Interior issued a memorandum imposing a temporary moratorium on deepwater drilling on the outer continental shelf, which was lifted in October 2010.<br> At this time, we cannot predict what, if any, impact this incident may have on the regulation of offshore oil and gas exploration and development activity, the cost or availability of insurance coverage to cover the risks of such operations, the technical requirements or certifications of rigs or what actions may be taken by our customers, governmental agencies, or other industry participants in response to the incident.<br><br>Based upon the recent Macondo incident in the U.S. Gulf of Mexico, additional rigs may be relocated to markets in which we operate, which could result in or exacerbate excess rig supply and lower day rates in those markets. | Mexico. The Macondo incident and its consequences, including actions taken, or that may be taken, by the U.S. and other governments or our customers, could have a material adverse effect on our business. In addition, regulatory actions within a region, such as the U.S. Gulf of Mexico, may have an impact on global utilization and day rates. **(13)** | |

3

Exhibit D

Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | Lower utilization and dayrates in one or more of the regions in which we operate would adversely affect our revenues and profitability. Prolonged periods of low utilization and dayrates could also result in the recognition of impairment charges on certain of our drilling rigs if future cash flow estimates, based upon information available to management at the time, indicate that the carrying value of these rigs may not be recoverable. **(11)** | | |
| Hercules Offshore, Inc. | **Regulation**<br>In response to the Macondo well blowout incident in April 2010, the Department of Interior, through the BOEMRE, has undertaken an aggressive overhaul of the offshore oil and natural gas regulatory process that has significantly impacted oil and gas development in the United States Gulf of Mexico (the "GOM"). From time to time, new rules, regulations and requirements have been proposed and implemented by the BOEMRE and the United States Congress that materially limit or prohibit, and increase the cost of, offshore drilling in the GOM. These new rules, regulations and requirements include the moratorium on shallow-water drilling that was lifted in May 2010, but which has resulted in a significant delay in permits being issued in the GOM, the adoption of new safety requirements and policies relating to the approval of drilling permits in the GOM, restrictions on oil and gas development and production activities in the GOM, and the promulgation of numerous Notices to Lessees ("NTLs") that have impacted and may continue to impact our operations. **(15)** | **Regulation**<br>In response to the Macondo well blowout incident in April 2010, the U.S. Department of Interior, initially through the U.S. Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") and, upon dissolution of the BOEMRE effective October 1, 2011, through the BOEM and BSEE, has undertaken an aggressive overhaul of the offshore oil and natural gas regulatory process that has significantly impacted oil and gas development in the U.S. Gulf of Mexico. From time to time, new rules, regulations and requirements have been proposed and implemented by BOEM, BSEE or the United States Congress that materially limit or prohibit, and increase the cost of, offshore drilling in the U.S. Gulf of Mexico. These new rules, regulations and requirements include the moratorium on shallow-water drilling that was lifted in May 2010, but which has resulted in a significant delay in permits being issued in the U.S. Gulf of Mexico, the adoption of new safety requirements and policies relating to the approval of drilling permits in the U.S. Gulf of Mexico, restrictions on oil and gas | **Outlook**<br>In the wake of the Macondo well blowout incident, new regulations for offshore drilling imposed by the former U.S. Bureau of Ocean Energy Management, Regulation Enforcement ("BOEMRE") in June 2010 have resulted in our customers experiencing significant delays in obtaining necessary permits to operate in the U.S. Gulf of Mexico. While we believe that the current state of the permit approval process appears to have improved since the advent of these new regulations, and the trend in the number of permits issued by the Bureau of Safety and Environmental Enforcement over the past quarter has increased from prior periods, it is likely that our customers will continue to experience some degree of delay in obtaining drilling permits for the foreseeable future.<br>The supply of marketed jack-up rigs in the U.S. Gulf of Mexico has declined significantly since the financial crisis starting in 2008 and again with the imposition of new regulations during 2010. Drilling contractors have elected to cold stack, or no longer actively market, a number of rigs in the region, and in other instances have mobilized rigs out of the U.S. Gulf of Mexico. As a result, |

4

# Exhibit D
## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | **Risk Factors**<br>New and proposed laws, regulations and requirements arising out of the Macondo well blowout incident could prevent or cause delays for our customers in obtaining approval to conduct drilling operations and lead to increased potential liability and costs for us and our customers, which could adversely impact our operations and profitability in the United States Gulf of Mexico.<br><br>The implementation of some of the currently proposed laws and regulations could lead to substantially increased potential liability and operating costs for us and our customers, which could cause our customers to discontinue or delay operating in the Gulf of Mexico and/or redeploy capital to international locations. These actions, if taken by any of our customers, could result in underutilization of our Gulf of Mexico assets and have an adverse impact on our revenue, profitability and financial position. The regulatory and legal environment in the Gulf of Mexico remains uncertain and is currently in a state of flux. Accordingly, we cannot predict at this time the impact that any potential changes in laws and regulations relating to offshore oil and gas exploration and development activity in the United States Gulf of Mexico may have on our operations or contracts, the extent to which the issuance of drilling permits will continue to be delayed, the effect on the cost or availability of insurance, or the impact on our customers and the demand for our services in the U.S. Gulf of | development and production activities in the U.S. Gulf of Mexico, and the promulgation of numerous Notices to Lessees that have impacted and may continue to impact our operations. **(17)**<br><br>**Risk Factors**<br>In response to the Macondo well blowout incident in the U.S. Gulf of Mexico in April 2010, the Obama Administration and regulatory agencies with jurisdiction over oil and gas exploration, including the U.S. Department of the Interior ("DOI") imposed temporary moratoria on drilling operations, required operators to reapply for exploration plans and drilling permits which had previously been approved, and adopted numerous new regulations and new interpretations of existing regulations regarding operations in the U.S. Gulf of Mexico that are applicable to our oil and gas exploration and production customers and with which their new applications for exploration plans and drilling permits must prove compliant. **(18)**<br><br>**Results of Operations**<br>Generally, domestic drilling industry conditions improved in 2011, as supply was further diminished and demand increased for jackup rigs. Factors that led to the increase in demand included the high price of crude oil, the shift by operators to liquids-rich drilling activity, and the improvement in our customers' ability to obtain necessary drilling permits to operate in the U.S. Gulf of Mexico, which tightened during 2010 due to the new federal | the number of existing, actively marketed jack-up rigs in the U.S. Gulf of Mexico, excluding rigs scheduled to move to international locations, has declined from approximately 63 rigs in late 2008 to 38 rigs as of October 23, 2012, of which we estimate that 34 rigs are contracted. **(20)** |

Exhibit D

## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | Mexico. Future legislation or regulations may impose new equipment and environmental requirements on us and our customers that could delay or hinder our operations and those of our customers in the United States Gulf of Mexico, which could likewise have an adverse impact on our business and financial results. **(16)** | regulations in the wake of the Macondo well blowout incident. Furthermore, our Domestic Offshore segment benefited from the addition of rigs from the Seahawk Transaction. Our Domestic Liftboat performance weakened in 2011, primarily because 2010 results benefitted from a significant increase in utilization stemming from coastal restoration efforts related to the Macondo well blowout incident. **(19)** | |
| **Noble Corporation** | Subsequent to the April 20, 2010 fire and explosion on the Deepwater Horizon, a competitor's drilling rig in the U.S. Gulf of Mexico, U.S. governmental authorities implemented a moratorium on and suspension of specified types of drilling activities in the U.S. Gulf of Mexico. On October 12, 2010, the U.S. government lifted the moratorium following adoption of new regulations including a drilling safety rule and a workplace safety rule, each of which imposed multiple obligations relating to offshore drilling operations. **(21)**<br><br>Our existing U.S. Gulf of Mexico operations have been and will continue to be negatively impacted by the events and governmental actions described above. U.S. governmental restrictions and regulations have and may continue to result in a number of our rigs and those of others being moved, or becoming available for moving, to locations outside of the U.S. Gulf of Mexico, which could potentially reduce global dayrates and negatively affect our ability to contract our rigs that are currently uncontracted or coming off | The U.S. governmental, regulatory, and industry response to the Deepwater Horizon drilling rig accident and resulting oil spill has, and could continue to have, a prolonged and material adverse impact on our U.S. Gulf of Mexico operations. **(23)**<br><br>**Executive Overview**<br>The overall offshore drilling market has been challenging since the events occurring in connection with the Deepwater Horizon and the U.S. governmental response to the incident. Despite the lifting of the moratorium and publication of new safety rules, we are unable to predict when normal drilling operations will resume in the U.S. Gulf of Mexico and we believe it is unlikely that we will see significant activity in the U.S. Gulf of Mexico for some time as indicated by the difficulties surrounding the issuance of new drilling permits. Outside of the U.S. Gulf of Mexico, demand has been fairly steady, but well below the previous peak levels of 2008. We believe the risk for early contract terminations or defaults under existing contracts has decreased and the overall future | |

Exhibit D

## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | contract. In addition, U.S. or other governmental authorities could implement additional regulations concerning licensing, taxation, equipment specifications and training requirements that could increase the costs of our operations. Additionally, increased costs for our customers' operations, along with permitting delays, could negatively affect the economics of currently planned or future exploration and development activity and result in a reduction in demand for our services. Furthermore, due to the Deepwater Horizon accident and resulting oil spill, insurance costs across the industry could increase, and certain insurance may be less available or not available at all, which could negatively affect us over time. **(22)** | market for offshore drilling activity is positive. **(24)** | |
| **Transocean Ltd.** | In May 2010, the U.S. government implemented a six-month moratorium on certain drilling activities in the U.S. Gulf of Mexico, which was lifted on October 12, 2010. While the moratorium was in place, some operators claimed that the moratorium was a force majeure event under their drilling contracts that allowed them to terminate these contracts. We do not believe that a force majeure event existed as a result of the moratorium or the enhanced drilling regulations in effect following the moratorium and are in discussions with our customers. In some instances, we have negotiated lower special standby dayrates with our customers for rigs in the U.S. Gulf of Mexico for the period in which the moratorium was in effect or while our customers are unable to obtain drilling permits and have also agreed that for | **Risks related to our business**\nThe incident has had and could continue to have a material adverse effect on our consolidated statement of financial position, results of operations and cash flows. Our business has been negatively impacted by the loss of revenue from Deepwater Horizon. The backlog associated with the Deepwater Horizon drilling contract was approximately $590 million through the end of the contract term in 2013. We do not carry insurance for business interruption or loss of hire. In the two years ended December 31, 2011, we estimate that the Macondo well incident had a direct and indirect effect of greater than $1.0 billion in lost revenues and incremental costs and expenses associated with extended shipyard projects and increased downtime, both as a result of complying with the | **Outlook**\nFollowing the Macondo well incident, the U.S. government implemented enhanced regulations related to offshore drilling in the U.S. Gulf of Mexico, which require operators to submit applications for new drilling permits that demonstrate compliance with such enhanced regulations. The enhanced regulations require independent third-party inspection, certification of well design and well control equipment and emergency response plans in the event of a blowout, among other requirements. Since their inception in the first quarter of 2011, the permitting under these enhanced regulations has steadily increased, and as of October 17, 2012, authorities have approved 76 new drilling permits and 72 new exploration plans under these enhanced regulations to customers utilizing our rigs in the U.S. Gulf of Mexico. The |

Exhibit D

Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | every day on a special standby rate the contract term is extended by an equal number of days.<br><br>The continuing effects of the moratorium and enhanced regulations may result in a number of rigs being moved, or becoming available for movement, to locations outside of the U.S. Gulf of Mexico, which could potentially reduce dayrates worldwide and negatively affect our ability to contract our rigs that are currently uncontracted or coming off contract. The continuing effects of the moratorium and enhanced regulations may also decrease the demand for drilling services, negatively affect dayrates and increase out-of-service time, which could ultimately have a material adverse affect on our revenue and profitability. We are unable to predict the full impact that the continuing effects of the moratorium and the enhanced regulations will have on our operations. **(25)** | enhanced regulations and our customers' requirements. **(26)**<br><br>We are currently unable to estimate the full impact the Macondo well incident will have on us. We have recognized a liability for estimated loss contingencies that we believe are probable and for which a reasonable estimate can be made. As of December 31, 2011, we have recognized a liability for such loss contingencies in the amount of $1.2 billion. This liability takes into account certain events related to the litigation and investigations arising out of the incident. There are loss contingencies related to the Macondo well incident that we believe are reasonably possible and for which we do not believe a reasonable estimate can be made. Following the Macondo well incident, the U.S. government implemented enhanced regulations related to offshore drilling in the U.S. Gulf of Mexico. In order to obtain new drilling permits and pursue drilling activities, operators must submit applications that demonstrate compliance with enhanced regulations that require independent third-party inspection, certification of well design and well control equipment and emergency response plans in the event of a blowout, among other requirements. In the first quarter of 2011, the U.S. government began issuing new drilling permits under these enhanced regulations. As of February 14, 2012, authorities approved 37 new drilling permits and 27 new exploration plans under these enhanced regulations to customers | voluntary application by some of our customers of such third-party inspections and certifications of well control equipment operating outside the U.S. Gulf of Mexico has caused and may continue to cause us to experience additional out of service time and incur additional maintenance costs. **(28)**<br><br>Definite-lived intangible assets—During the nine months ended September 30, 2012, we determined that the customer relationships intangible asset associated with our drilling management services reporting unit was impaired due to the declining market outlook for these services in the shallow waters of the U.S. Gulf of Mexico as well as the increased regulatory environment for obtaining drilling permits and the diminishing demand for our drilling management services. **(29)** |

Exhibit D

Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | | utilizing our rigs in the U.S. Gulf of Mexico. **(27)** | |
| **Nabors Industries Ltd.** | The decrease in operating results from 2009 to 2010 primarily resulted from receiving standby rates and lower utilization for the MODS® rigs, SuperSundowner platform rigs and Sundowner® platform rigs. Drilling activities significantly declined as our customers suspended their operations in the Gulf of Mexico, largely as a result of their inability to procure government permits. **(30)**<br><br>Goodwill Impairments<br>Many of our customers have suspended drilling operations in the Gulf of Mexico, largely as a result of their inability to obtain government permits. A significantly prolonged period of lower oil and natural gas prices or changes in laws and regulations could continue to adversely affect the demand for and prices of our services, which could result in future goodwill impairment charges for other reporting units due to the potential impact on our estimate of our future operating results. **(31)**<br><br>Our U.S. Offshore operations were improving during the first half of 2010 until the Gulf of Mexico explosion and oil spill occurred mid-year, which resulted in temporary suspension of offshore drilling and further delays in our customers' ability to obtain permits, which has limited the use of our assets. Specifically, operating results have been impacted because our customers have suspended most of their operations in the Gulf of Mexico, largely as a result of their inability to obtain government | Our U.S. Offshore operations were improving during the first half of 2010 until the Gulf of Mexico explosion and oil spill occurred mid-year, which resulted in temporary suspension of offshore drilling and further delays in our customers' ability to obtain permits, which limited the use of our assets. Specifically, operating results were impacted because our customers suspended most of their operations in the Gulf of Mexico, largely as a result of their inability to obtain government permits. **(33)**<br><br>Goodwill Impairments<br>The impairment charge was deemed necessary due to the uncertainty of utilization of some of our rigs as a result of changes in our customers' plans for future drilling operations in the Gulf of Mexico. Many of our customers suspended drilling operations in the Gulf of Mexico, largely as a result of their inability to obtain government permits. Although the U.S. deepwater drilling moratorium has been lifted, our customers have continued to encounter delays in obtaining government permits. It is uncertain when this will improve. A significantly prolonged period of lower oil and natural gas prices or changes in laws and regulations could adversely affect the demand for and prices of our services, which could result in future goodwill impairment charges for other reporting units due to the potential impact on our estimate of our future operating results. **(34)** | |

Exhibit D

Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | permits. Although the previously issued U.S. deepwater drilling moratorium has been lifted, it is uncertain whether our customers' ability to obtain government permits will improve in the near term. Our Alaska operating segment has been negatively impacted because the largest operator in the area has curtailed and suspended drilling operations, creating a surplus of rigs in the market and causing price competition. We expect that these conditions will persist and continue to adversely impact our Alaska operating results through 2011. We expect our International results to remain flat in 2011 as the increase of land rig activity is expected to be essentially offset by contract renewals on our jack-up rigs at significantly lower average dayrates. **(32)** | | |
| **Ensco PLC** | the impact of the BP Macondo well incident in the U.S. Gulf of Mexico upon future deepwater and other offshore drilling operations in general, and as respects current and future actual or de facto drilling permit and operations delays, moratoria or suspensions, new and future regulatory, legislative or permitting requirements (including requirements related to equipment and operations), future lease sales, laws and regulations that have or may impose increased financial responsibility and oil spill abatement contingency plan capability requirements and other governmental activities that may impact deepwater and other offshore operations in the U.S. Gulf of Mexico in general, and our existing drilling contracts for ENSCO 8500, ENSCO 8501, ENSCO 8502, ENSCO 8503 and our U.S. Gulf of Mexico jack-up rigs in | **Environmental Matters**<br>We are adversely affected by restrictions on drilling in certain areas of the U.S. Gulf of Mexico and elsewhere, including the conditions for lifting the recent moratorium/suspension in the U.S. Gulf of Mexico, the adoption of associated new safety requirements and policies regarding the approval of drilling permits, restrictions on development and production activities in the U.S. Gulf of Mexico and associated Notices to Lessees ("NTLs") that have and may further impact our operations.  If new laws are enacted or other government action is taken that restrict or prohibit offshore drilling in our principal areas of operation or impose environmental protection requirements that materially increase the liabilities, financial requirements or operating or equipment costs | |

10

Exhibit D

Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | particular. **(35)** <br><br> Certain of our drilling rigs currently in the U.S. Gulf of Mexico have been or may be further affected by the regulatory developments and other actions that have or may be imposed by the U.S. Department of the Interior, including the regulations issued on September 30, 2010. The moratoriums/suspensions (which have been lifted), related NTLs, delays in processing drilling permits and other actions are being challenged in litigation by Ensco and others. Ensco rig utilization and day rates have been negatively influenced due to regulatory requirements and delays in our customers' ability to secure permits. Current or future NTLs or other directives and regulations may further impact our customers' ability to obtain permits and commence or continue deep or shallow water operations in the U.S. Gulf of Mexico. **(36)** <br><br> **Risk Factors - Risks Related to Our Business** <br> OUR OFFSHORE DRILLING OPERATIONS COULD BE ADVERSELY IMPACTED BY THE BP MACONDO WELL INCIDENT AND THE RESULTING CHANGES IN REGULATION OF OFFSHORE OIL AND GAS EXPLORATION AND DEVELOPMENT ACTIVITY **(37)** <br><br> **Liquidity and Capital Resources** <br> During 2010, our cash flows from operations were negatively influenced by the BP Macondo well incident and associated new regulatory, legislative or permitting requirements, which is expected to continue during 2011. **(38)** | associated with offshore drilling, exploration, development or production of oil and natural gas, our financial position, operating results and cash flows could be materially adversely affected. **(39)** <br><br> **U.S. Gulf of Mexico Drilling Moratorium and Permitting Delays** <br> On July 9, 2010, ENSCO Offshore Company, a subsidiary of Ensco plc, filed suit in the U.S. District Court for the Eastern District of Louisiana in New Orleans against the U.S. Department of the Interior and other federal defendants seeking a ruling that the federal defendants' actions following the Macondo well incident in April 2010 violated the Administrative Procedure Act and the Outer Continental Shelf Lands Act. As amended, the complaint challenged, among other matters, the federal defendants' imposition of several deepwater drilling moratoria in the U.S. Gulf of Mexico and the federal defendants' unreasonable delays in processing six Ensco-related applications for permits to drill in the U.S. Gulf of Mexico following the formal lifting of the moratoria. **(40)** <br><br> **Drilling Rig Demand** <br> During 2010, demand remained weak in most regions for shallow-water drilling while demand for deepwater and midwater drilling came under additional pressure as a result of delays in operators' ability to secure permits in the U.S. Gulf of Mexico due to the Macondo well incident and related regulatory developments and other actions imposed by | |

## Exhibit D
## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

| Company Name | Macondo Financial and Operational Impact (quotes from 2010 10-K) | Macondo Financial and Operational Impact (quotes from 2011 10-K) | Macondo Financial and Operational Impact (quotes from 2012 3Q 10-Q) |
|---|---|---|---|
| | | the U S. Department of the Interior.  During 2011, tender activity increased as demand for shallow-water drilling improved, which helped to stabilize jackup rig utilization and day rates, while demand for midwater drilling remained under pressure.  Furthermore, permit issuances in the U.S. Gulf of Mexico related to deepwater programs improved, in addition to an upward movement in global demand for deepwater drilling. **(41)** | |

**Footnotes**

(1)  See Diamond Offshore Drilling Inc, section "Overview - Industry Conditions", p. 21, Form 10-K  Filing, December 31, 2010.

(2)  See Diamond Offshore Drilling Inc, section "Overview - Industry Conditions - U.S. Gulf of Mexico Jack-ups", p. 22, Form 10-K  Filing, December 31, 2010.

(3)  See Diamond Offshore Drilling Inc, section "Overview *International Floater Market - GOM Floater and Jack-up Market* ", p. 22, Form 10-K Filing, December 31, 2011.

(4)  See Diamond Offshore Drilling Inc, section "Contract Drilling Revenue and Expense by Equipment Type - 2010 Compared to 2009 ", p. 35, Form 10-K Filing, December 31, 2011.

(5)  See Diamond Offshore Drilling Inc, section "Item 1A.  Risk Factors. ", p. 11, Form 10-K Filing, December 31, 2011.

(6)  See Diamond Offshore Drilling Inc, section "Overview- GOM Floater and Jack-up Market ", p. 22, Form 10-Q Filing, September 30, 2012.

(7)  See Diamond Offshore Drilling Inc, section "Forward-Looking Statements", p. 34, Form 10-Q Filing, September 30, 2012.

(8)  See Atwood Oceanics Inc, section "Industry Trends", p. 5, Form 10-K Filing, September 30, 2010.

(9)  See Atwood Oceanics Inc, section "Insurance and Risk Management", p. 4, Form 10-K Filing, September 30, 2010.

(10) See Atwood Oceanics Inc, section "U.S. Environmental Regulation", p. 7, Form 10-K Filing, September 30, 2010.

(11) See Atwood Oceanics Inc, section "Risk Factors", p. 11, Form 10-K Filing, September 30, 2010.

12

# Exhibit D
## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

(12) See Atwood Oceanics Inc, section "Environmental Regulation", p. 7, Form 10-K Filing, September 30, 2011.

(13) See Atwood Oceanics Inc, section "Risk Factors", p. 15, Form 10-K Filing, September 30, 2011.

(14) See Atwood Oceanics Inc, section "Industry Conditions", p. 25, Form 10-K Filing, September 30, 2012.

(15) See Hercules, section "Regulation", p. 16, Form 10-K Filing, December 31, 2010.

(16) See Hercules, section "Risk Factors", p. 17, Form 10-K Filing, December 31, 2010.

(17) See Hercules, section "Regulation", p. 15, Form 10-K Filing, December 31, 2011.

(18) See Hercules, section "Risk Factors", p. 17, Form 10-K Filing, December 31, 2011.

(19) See Hercules, section "Results of Operations", p. 40, Form 10-K Filing, December 31, 2011.

(20) See Hercules, section "Outlook - Offshore", p. 35, Form 10-Q Filing, September 30, 2012.

(21) See Noble Corporation, section "Risk Factors", p. 10, Form 10-K Filing, December 31, 2010.

(22) See Noble Corporation, section "Risk Factors", p. 11, Form 10-K Filing, December 31, 2010.

(23) See Noble Corporation, section "Risk Factors", p. 10, Form 10-K Filing, December 31, 2011.

(24) See Noble Corporation, section "Executive Overview", p. 28, Form 10-K Filing, December 31, 2011.

(25) See Transocean Ltd, section "Risk Factors", p. 15, Form 10-K Filing, December 31, 2010.

(26) See Transocean Ltd, section "Contingencies", p. 62, Form 10-K Filing, December 31, 2011.

(27) See Transocean Ltd, section "Outlook", p. 41, Form 10-K Filing, December 31, 2011.

(28) See Transocean Ltd, section "Outlook", p. 48, Form 10-Q Filing, September 30, 2012.

(29) See Transocean Ltd, section "Impairments", p. 11, Form 10-Q Filing, September 30, 2012.

(30) Nabors Industries Ltd, section "Segment Results of Operations ", p. 36, Form 10-K Filing, December 31, 2010.

(31) Nabors Industries Ltd, section "Critical Accounting Estimates", p. 55, Form 10-K Filing, December 31, 2010.

(32) Nabors Industries Ltd, section "Management Overview", p. 31, Form 10-K Filing, December 31, 2010.

(33) Nabors Industries Ltd, section "Management Overview", p. 33, Form 10-K Filing, December 31, 2011.

13

Exhibit D

## Macondo Impact as Reported by Jackup Rig Owners in Financial Statements

(34) Nabors Industries Ltd, section "Goodwill Impairments", p. 45, Form 10-K Filing, December 31, 2011.

(35) Ensco PLC, section "Forward Looking Statements", p. 2, Form 10-K Filing, December 31, 2010.

(36) Ensco PLC, section "Risk Factors", p. 18, Form 10-K Filing, December 31, 2010.

(37) Ibid.

(38) Ensco PLC, section "Liquidity and Capital Resources", p. 66, Form 10-K Filing, December 31, 2010.

(39) Ensco PLC, section "Environmental Matters ", p. 9, Form 10-K Filing, December 31, 2011.

(40) Ensco PLC, section "U.S. Gulf of Mexico Drilling Moratorium and Permitting Delays ", p. 40, Form 10-K  Filing, December 31, 2011.

(41) Ensco PLC, section "Drilling Rig Demand ", p. 51, Form 10-K Filing, December 31, 2011.

Claimant Name: __Seahawk Liquidating Trust__
Claimant EIN: ___45-6517816___

## **EXHIBIT 4**

The Seahawk Liquidating Trust hereby submits the attached additional documents in support of its claim. Given the voluminous nature of such documents, they have been submitted on two disks to the BP Claims Program only via certified mail, return receipt requested.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

In Re: Oil Spill by the Oil Rig
    "Deepwater Horizon" in the
    Gulf of Mexico, on April 20, 2010,

\*  **MDL NO. 2179**
\*
\*  **SECTION: J**
\*
\*  **HONORABLE CARL J. BARBIER**
\*
\*  **MAGISTRATE JUDGE SHUSHAN**
\*

---

## DECLARATION OF JAMES R. EASTER

I, James R. Easter, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.    My name is James R. Easter. I am over twenty-one (21) years of age, of sound mind, and capable of making this declaration. I have never been convicted of a felony or a crime involving moral turpitude, nor have I ever been adjudged incompetent. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.    I am a currently a co-managing member of SEH Offshore Ventures, LLC, which is engaged in exploring various oilfield business opportunities. I have over 25 years of corporate-level management experience in the energy and banking industries. I received a Bachelor of Arts in German from the University of Texas at Austin and later received a Master's in Business Administration from Thunderbird, The American Graduate School of International Management.

3.    From May 2010 to February 2011, I served as Chief Financial Officer of Seahawk Drilling, Inc. ("Seahawk"), a public company which operated a jackup rig business that provided contract drilling services to the oil and gas exploration and production industry in the Gulf of Mexico.



4.      Prior to joining Seahawk, I served in various management positions with other companies in the oil and gas industry, including: (a) from May 2002 to September 2008, I was employed by McDermott International, Inc. and served as the Vice President of Corporate Development and Strategic Planning (February 2006 to September 2008), the Vice President of Finance and Treasurer (September 2002 to February 2006), and as Assistant Treasurer (May 2002 to September 2002); (b) from December 2000 until May 2002, I served as Vice President, Transaction Development and Support at Reliant Energy, Inc.; (c) from 1996 to 2000, I was employed by Enron Corporation as both a Vice President of Enron International (1998 to 2000) and prior to that as a Director of Deal Structuring and Execution/Underwriting (1996 to 1998); (d) and prior to 1996, I worked in the energy banking industry for Bank of Montreal (1984 to 1996), Barclays Bank (1981 to 1984), and Bank of America (1980 to 1981).

5.      Seahawk was a former subsidiary of Pride International, Inc. ("Pride"). On August 24, 2009, Seahawk became an independent public company when it was spun-off from Pride ("Spin-Off"). Seahawk's primary assets consisted of a fleet of 20 mat-supported jackup rigs that provided shallow-water drilling services to the oil and gas exploration and production industry in the Gulf of Mexico.

6.      Following the Spin-Off, Seahawk explored several strategic alternatives to expand and diversify its business beyond the Gulf of Mexico and to provide additional cash flow and liquidity for the company (collectively, the "Strategic Alternatives"), including: (a) a purchase of 13 jackup rigs located in the Middle East from Transocean ("Project Talon"); (b) a purchase of 10-15 international and domestic jackup rigs from



Ensco ("Project Eagle"); (c) a purchase of 5 jackup rigs from Diamond Offshore ("Project El Dorado"); and (d) a $30 to $50 million private offering.

7.     Seahawk reached an advanced stage in its due diligence and negotiations regarding Project Talon. Seahawk management, including myself, expected that Project Talon would not only diversify the company's operating geography, but also generate substantial revenue and EBITDA for the company, including: (a) more than $275 million in projected revenue and more than $145 million in projected EBITDA for 2010; and (b) more than $346 million in projected revenue and more than $156 million in projected EBITDA for 2011.

8.     On April 20, 2010, Seahawk and Transocean executed a term sheet for Project Talon whereby Seahawk would purchase 13 jackup rigs located in the Middle East for $934 million to be funded as follows: (a) approximately $150 million in Seahawk stock; (b) approximately $350 million in a private placement or public offering; and (c) approximately $450 million in senior secured notes.

9.     On the evening of April 20, 2010, the Deepwater Horizon rig exploded and the Macondo well blew out, resulting in a significant oil spill in the Gulf of Mexico, a government-imposed moratorium on offshore drilling in the Gulf of Mexico, a substantial delay in government-issued drilling permits once the moratorium was lifted, and considerable uncertainty regarding the regulatory and cost environment in the Gulf of Mexico (the "Macondo Incident").



10.     The Macondo Incident adversely affected Seahawk in several significant ways, including a decreased demand for offshore drilling services in the Gulf of Mexico and a precipitous decline in Seahawk's stock price on the NASDAQ exchange. The

stock price, for example, fell from approximately $19 per share to approximately $11 per share in the weeks following the Macondo Incident.

11.     This decrease in the stock price resulting from the Macondo Incident precluded Seahawk from moving forward with Project Talon (or one of the other Strategic Alternatives), which depended on Seahawk stock trading at approximately $18 to $20 per share.  In addition, based upon my discussions with Seahawk's financial advisors and various investment groups, I believe the regulatory uncertainty and negative financial effects resulting from the Macondo Incident prevented Seahawk from raising the necessary capital for Project Talon (or one of the other Strategic Alternatives) through a private placement, a public offering, or the issuance of senior secured notes.

12.     Based upon my involvement in the negotiations and due diligence, I believe there was a very substantial likelihood that Seahawk would have completed the Project Talon transaction had it not been for the Macondo Incident.  Alternatively, I believe it was more likely than not that Seahawk would have completed one of the other Strategic Alternatives had it not been for the Macondo Incident.

13.     I believe that Seahawk would have been a profitable company and would have avoided filing bankruptcy if it had been able to complete the Project Talon transaction or one of the other Strategic Alternatives.

14.     In late 2010 and early 2011, as the company continued to suffer from the ongoing negative effects resulting from the Macondo Incident, Seahawk explored other alternatives, including a sale of its assets to various parties.  In February 2011, Seahawk agreed to sell substantially all of its assets and jackup rigs to Hercules Offshore, Inc. ("Hercules") in exchange for approximately 22.3 million shares of Hercules stock and



approximately $25 million in cash in aggregate consideration (the "Purchase Price"). Based upon my involvement in the negotiations with Hercules and my experience in the drilling industry, I believe that the Purchase Price reflected not only the fact that Seahawk's rigs had been operating at less than full potential in terms of day rates and utilization rates, but also the expectation that those rigs would continue to do so for the foreseeable future as a result of the Macondo Incident.

15.     On February 11, 2011, Seahawk filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in order to facilitate a prompt sale of substantially all of its assets to Hercules.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on January 17, 2013, in Houston, Texas.

_____
James R. Easter

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig | * **MDL NO. 2179** |
| "Deepwater Horizon" in the | * |
| Gulf of Mexico, on April 20, 2010, | * **SECTION: J** |
| | * |
| | * **HONORABLE CARL J. BARBIER** |
| | * |
| | * **MAGISTRATE JUDGE SHUSHAN** |
| | * |

## DECLARATION OF RANDALL D. STILLEY

I, Randall D. Stilley, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.      My name is Randall D. Stilley.  I am over twenty-one (21) years of age, of sound mind, and capable of making this declaration.  I have never been convicted of a felony or a crime involving moral turpitude, nor have I ever been adjudged incompetent. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.      I am currently a Managing Director of SEH Offshore Ventures, LLC, which is engaged in exploring various oilfield business opportunities.  I am a registered professional engineer in the State of Texas and a member of the Society of Petroleum Engineers.  I received a Bachelor of Science degree in Aerospace Engineering from the University of Texas at Austin.

3.      From August 2009 to February 2011, I served as President, Chief Executive Officer, and Director of Seahawk Drilling, Inc. ("Seahawk"), a public company which operated a jackup rig business that provided contract drilling services to the oil and gas exploration and production industry in the Gulf of Mexico.

4.     Prior to joining Seahawk, I served in various management positions with other companies in the oil and gas industry, including: (a) from September 2008 to August 2009, I served as the Chief Executive Officer—Mat Jackup Division of Pride International, Inc. ("Pride"), working to implement the spin-off of Seahawk as an independent public company in late August 2009; (b) from October 2004 to June 2008, I served as President and Chief Executive Officer of Hercules Offshore, Inc., leading the company through an initial public offering in late 2005 and a major acquisition of TODCO, Inc. in early 2006; (c) from 1997 to 2000, I served as President of the Oilfield Services Division at Weatherford International, Inc., an oilfield services company; and (d) prior to 1997, I served in a variety of positions at Halliburton Company, one of the world's largest oilfield services companies, where I spent 22 years in international operating locations.

5.     Seahawk was a former subsidiary of Pride.  On August 24, 2009, Seahawk became an independent public company when it was spun-off from Pride ("Spin-Off"). Seahawk's primary assets consisted of a fleet of 20 mat-supported jackup rigs that provided shallow-water drilling services to the oil and gas exploration and production industry in the Gulf of Mexico.

6.     Following the Spin-Off, Seahawk explored several strategic alternatives to expand and diversify its business beyond the Gulf of Mexico and to provide additional cash flow and liquidity for the company (collectively, the "Strategic Alternatives"), including:  (a) a purchase of 13 jackup rigs located in the Middle East from Transocean ("Project Talon"); (b) a purchase of 10-15 international and domestic jackup rigs from Ensco ("Project Eagle"); (c) a purchase of 5 jackup rigs from Diamond Offshore

("Project El Dorado"); and (d) a $30 to $50 million private offering. I was personally involved in the negotiations and/or due diligence regarding many of the Strategic Alternatives, particularly Project Talon.

7.      Seahawk reached an advanced stage in its due diligence and negotiations regarding Project Talon. Seahawk management, including myself, expected that Project Talon would not only diversify the company's geographic and commodity footprint, but also generate substantial revenue and EBITDA for the company, including: (a) more than $275 million in projected revenue and more than $145 million in projected EBITDA for 2010; and (b) more than $346 million in projected revenue and more than $156 million in projected EBITDA for 2011.

8.      On April 20, 2010, Seahawk and Transocean executed a term sheet for Project Talon whereby Seahawk would purchase 13 jackup rigs located in the Middle East for $934 million to be funded as follows: (a) approximately $150 million in Seahawk stock; (b) approximately $350 million in a private placement or public offering; and (c) approximately $450 million in senior secured notes.

9.      On the evening of April 20, 2010, the Deepwater Horizon rig exploded and the Macondo well blew out, resulting in a significant oil spill in the Gulf of Mexico, a government-imposed moratorium on offshore drilling in the Gulf of Mexico, a substantial delay in government-issued drilling permits once the moratorium was lifted, and considerable uncertainty regarding the regulatory and cost environment in the Gulf of Mexico (the "Macondo Incident").

10.     The Macondo Incident adversely affected Seahawk in several significant ways, including a decreased demand for offshore drilling services in the Gulf of Mexico

and a precipitous decline in Seahawk's stock price on the NASDAQ exchange. The stock price, for example, fell from approximately $19 per share to approximately $11 per share in the weeks following the Macondo Incident.

11.     This decrease in the stock price resulting from the Macondo Incident precluded Seahawk from moving forward with Project Talon (or one of the other Strategic Alternatives), which depended on Seahawk stock trading at approximately $18 to $20 per share. In addition, based upon my discussions with Seahawk's financial advisors and various investment groups, I believe the regulatory uncertainty and negative financial effects resulting from the Macondo Incident prevented Seahawk from raising the necessary capital for Project Talon (or one of the other Strategic Alternatives) through a private placement, a public offering, or the issuance of senior secured notes.

12.     Based upon my involvement in the negotiations and due diligence, I believe there was a very substantial likelihood that Seahawk would have completed the Project Talon transaction had it not been for the Macondo Incident. Alternatively, I believe it was more likely than not that Seahawk would have completed one of the other Strategic Alternatives had it not been for the Macondo Incident.

13.     I believe that Seahawk would have been a profitable company and would have avoided filing bankruptcy if it had been able to complete the Project Talon transaction or one of the other Strategic Alternatives.

14.     In late 2010 and early 2011, as the company continued to suffer from the ongoing negative effects resulting from the Macondo Incident, Seahawk explored other alternatives, including a sale of its assets to various parties. In February 2011, Seahawk agreed to sell substantially all of its assets and jackup rigs to Hercules Offshore, Inc.

DECLARATION **OF RANDALL D. STILLEY**                                                          Page 4

("Hercules") in exchange for approximately 22.3 million shares of Hercules stock and approximately $25 million in cash in aggregate consideration (the "Purchase Price"). Based upon my involvement in the negotiations with Hercules and my experience in the drilling industry, I believe that the Purchase Price reflected not only the fact that Seahawk's rigs had been operating at less than full potential in terms of day rates and utilization rates, but also the expectation that those rigs would continue to do so for the foreseeable future as a result of the Macondo Incident.

15.    On February 11, 2011, Seahawk filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in order to facilitate a prompt sale of substantially all of their assets to Hercules.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 17, 2013, in Houston, Texas.

Randall D. Stilley

DECLARATION OF RANDALL D. STILLEY