# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | **MDL NO. 2179** |
| **IN RE:  OIL SPILL by the OIL RIG** | * | |
| **"DEEPWATER HORIZON" in the** | * | |
| **GULF OF MEXICO, on** | * | |
| **APRIL 20, 2010** | * | **SECTION: J** |
| | * | |
| **THIS DOCUMENT RELATES TO:** | * | |
| | * | |
| **13-1971** | * | **JUDGE BARBIER** |
| | * | **MAG. JUDGE SHUSHAN** |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF MOTION FOR SPECIFIC PERFORMANCE

**NOW COMES** Plaintiff**,** Edward Wisner Donation (hereinafter "Donation" or "Wisner") through undersigned counsel, who submits the instant Memorandum in Support for Specific Performance.  Wisner moves for the following relief against BP Exploration & Production, Inc.:  (1) referring the matter to Magistrate Wilkinson for resolution; (2) an Order requiring BP to (a) commence remediation efforts at Breach 1 on Wisner Beach, (b) employ the Wisner Science Team's Remediation Plan, and (c) reimburse outstanding expenses; and (3) an Order requiring that the work be conducted as soon as practicable and completed before the completion of the Cam II Project.

-1-

**I.     The Access Agreement.**

On August 23, 2010, the Donation entered into a contract with BP Exploration & Production, Inc., ("BP") entitled "Right-of-Access for Oil Spill Cleanup Operations" ("Access Agreement"), attached as Exhibit "A".  The BP Access Agreement granted BP access to the Donation's Fourchon property for purposes of conducting response activities.  Unlike adjoining landowners, the Donation did not charge BP a rental or lease fee for the Company's occupation of Donation property in connection with the spill response.  Rather, the Access Agreement contained a number of terms aimed at insuring that the Donation had full information regarding the activities on its property, and that the property was returned to its pre-spill condition.

The Access Agreement obligates BP to remove the oil from the Property, employ the highest industry standards in removing the oil, reimburse Wisner to monitor and assess BP's remediation efforts, and turn over all documents and data obtained during the process.   The Access Agreement granted BP access to the Donation's Fourchon property for purposes of conducting response activities.  Unlike adjoining landowners, Wisner did not charge BP a rental or lease fee for BP's occupation of Wisner property in connection with the spill response.  Rather, the Access Agreement contained a number of terms

-2-

ensuring that Wisner had full operational rights that the Property was being properly remediated.

First among these terms was that BP was responsible for removing the oil and paying restoration costs. To ensure that the restoration was to be properly conducted, the Access Agreement provided as follows: "The highest industry standards shall be used to insure environmentally sensitive practices while carrying out operations on the Wisner Property." *Access Agreement*, ¶ 8. *See also id.* at ¶ 9 ("Nothing herein shall be construed to diminish [Wisner's] right to choose and control restoration activities upon its lands. Nothing herein shall act as a waiver or release of any obligation [BP] may owe [Wisner] as a result of oil released from Deepwater Horizon incident.").

For the Access Agreement to operate properly, all clean up operations were under the direction of BP. BP could not assign or transfer any of its obligations under the Agreement. *Id.* at ¶ 14. BP was only allowed to use people or parties under its direct control to access Wisner Property. *Id.*

The Access Agreement required BP to provide Wisner with copies of all work plans, protocols, and contracts related to clean up operations as well as all personnel performing cleanup activities and their contact information. *Id.* at ¶¶ 2-4. As for information, the Access Agreement required BP to provide Wisner with "a weekly summary of all removal/response operations undertaken on Wisner property, including a

-3-

description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation." *Id.* at ¶ 5.  BP had to provide Wisner with records for all waste removed from the property, in whatever form, photographs, video, work logs, etc. *Id.* at ¶ 6.

The Access Agreement required BP to allow the Donations' experts, consultants, personnel, investigators, and even counsel to monitor and be involved in all cleanup operations meetings and strategy. *Id.* at ¶ 7.  All cleanup protocols for the beach, marsh, and upland had to be provided to the Donation ahead of time. *Id.* at 8.  The Donation had the right to veto any clean-up operations.

In addition to the requirement that BP reimburse the Donation for all costs incurred to monitor the clean-up operations, BP was also "responsible for all reasonable costs and expenses associated with assessing damage to Wisner property caused by the oil spill cleanup operations." *Id*. at 9.  The Access Agreement provided that BP must indemnify the Donation for any and all claims made against it related to the cleanup work or BP's personnel. *Id.* at ¶ 10.  Should BP breach the Access Agreement, and the Donation expend funds on counsel and expenses, BP was required to reimburse the Donation.

The Access Agreement attached and incorporated a number of exhibits into the agreement, including a schedule and listing of costs and expenses related to work

-4-

performed by FETI & Associates, LLC, and recommendations on reducing bird disturbances.

As for cancelling the Agreement, only the Donation possessed the right to cancel at will.  *Id.* at ¶12.  The Donation at all times also possessed the right to exclude any individual from its property at its sole discretion.  *Id.*  Given its control over the direction of assessment and remediation, coupled with BP's obligation to reimburse all expenses, the Donation had final approval rights to the decision of whether to declare the Property clean.

## II.    BP Breaches the Access Agreement.

Since the April 20, 2010 oil spill, more than 10 million pounds of oiled material have been removed from the Property.  *Declaration of Wisner Land Manager Amanda Phillips*, at ¶ 12, attached as Exhibit "B".  Oil has been removed from the beach, the sand dunes, and off shore.  *Id.*  Oil has been located and documented in the wetlands.  *Declaration of John Pardue*, at ¶ 21, attached as Exhibit "C".  Documentation has been sent to BP on numerous occasions.  BP has never assessed or removed any oil from the wetlands.  *Id.*  Pursuant to the terms of the Access Agreement, all oil found on the Property is presumed to be BP oil, unless affirmatively tested and proven to the contrary.  *Access Agreement*, at ¶ 6.

As recently as December 2013, BP removed over 2 million pounds of oiled material from the Property. *Phillips Declaration*, at ¶ 12. In the last six months, oil collection has been consistent. However, in spite of very large volumes of oiled sediment being removed from the property, there has been no action to provide clean replacement sand, in spite of repeated requests by the Donation over the past several years. As of today, large swaths of oil remain in various states throughout the beach area, in the wetlands, and near-shore. After any significant weather event, the beaches are re-oiled and/or existing oil is brought to the observable surface. *Pardue Declaration*, at ¶¶ 18 & 21. Re-oiling events occur several times a year with moderate to high winds, high tides, and wave action.

At no point has any authority declared Wisner's beaches, wetlands, or offshore areas as clean. No authority has generated any report providing a comprehensive assessment of the presence of oil in the wetlands or offshore. Even the assessments that were conducted for the beach area grossly underestimated the extent, nature, and constitution of the oil.

Instead, BP's coordinated effort with the Coast Guard placed the Wisner Response in a brand-new category of response known as "Middle R". *See 6/04/14 Email from Commander Kyle Maki to Amanda Phillips*, attached as Exhibit "D". "Middle R" is a scaled down response: "The USCG will continue to respond to NRC calls as long as

Middle R is open. If in the fall, once bird nesting is complete and the young have fledged, your land manager finds oil and notifies us (through an NRC call) we will respond and mitigate the product.  If the USCG cannot mitigate because the amount is too great, and if the product is visually consistent with MC252, we will call for a BP OSRO." *Id.*  BP is still responsible for paying clean-up costs under Middle R.  *USCG Captain Thomas Sparks, Federal On Scene Coordinator, Different Tactics, Deepwater Horizon Response is Far From Complete*, attached as Exhibit "E".

BP has rejected numerous assessment and remediation demands by the Donation pursuant to the Access Agreement.   These demands range from the type of equipment employed, the location of work performed, removal protocol, and assessment protocols. Two of the more comprehensive assessment and remediation demands under the Access Agreement were created by the Wisner Science Team:  *Remedial Plan for Breach 1 DWH Oil Contamination, Fourchon Beach, Louisiana*; and *Scientific Assessment and Remediation of MC252 Oil on Fourchon Beach, Wetlands and Offshore Region, Louisiana*.  BP rejected both protocols before filing suit.

On May 22, 2014, BP through its senior counsel Nathan Block sent a letter purporting to unilaterally cancel the Access Agreement effective immediately as of the date of the letter.  The sole reason provided in one sentence of one paragraph was that it was based upon a May 21, 2014 letter from the interim Federal On-Scene Coordinator,

Captain Walker, which stated that "no further removal activities appropriate on the property." At the time Donation's counsel received the BP's letter, it still had not received the cited letter. After almost four years of active cleanup on the Property, BP did not give the Donation any notice or any opportunity to meet and discuss. At the time it received the letter, Wisner and its Science Team were awaiting a response on its request to schedule a meeting to discuss the Breach 1 oil remediation and other issues.

No other documentation was provided: no written assessment of the property, no scientific analysis; no declaration that the property was clean; no independent analysis of any type was provided; and no correspondence between BP and Captain Walker or his staff. By cancelling the Access Agreement immediately, BP breached the Agreement to reimburse the Donation for expenses incurred to monitor clean-up operations. BP's lack of independent assessment was in bad faith.

Captain Walker's letter similarly contained no assessment or analyses. It merely pointed to some general conversations with members of his staff, conclusory statements, and attached a report that was prepared by a BP vendor. Oddly, although the report was dated April 2014, it focused primarily on oiling events between May and August 2010, despite the bulk of the more than 10 million pounds of oiled material being removed years later.

Nonetheless, whatever may have been Captain Walker's reasons, under the Access Agreement, BP is responsible for its own decisions, conducting its own investigations, pursuant to the strictures of the Access Agreement.   The Access Agreement imposes upon BP the contractual obligation (distinct from OPA, general maritime law, or whatever else the Captain derives his authority from) to assess and remediate the oil spill performing the highest industry standards for clean-up operations.

Wisner's most recent, pressing demands concern the Breach 1 area.  On June 2, 2014, Wisner demanded that BP immediately engage in the remediation efforts outlined by the Wisner Science Team in *Remedial Plan for Breach 1 DWH Oil Contamination, Fourchon Beach, Louisiana*, attached as Exhibit "F",  and to assess the wetlands and near shore area as outlined in the Wisner Science's Team's *Scientific Assessment and Remediation of MC252 Oil on Fourchon Beach, Wetlands and Offshore Region, Louisiana*, attached as Exhibit "G".  *6/02/14 LTR from Gisleson to Block*, attached as Exhibit "H".   On June 4, 2014, BP rejected all demands, arguing that it had no obligations to conduct any further remediation or assessment efforts under the Access Agreement. *6/04/14 LTR from Block to Gisleson*, attached as Exhibit "I".

BP breached the Access Agreement in the following non-exclusive ways:  (1) canceling the Access Agreement; (2) failing to independently assess that the Property was fully remediated; (3) failing to ensure that the assessment and remediation methods on

the Property were based upon the "highest industry standards"; (4) interfering with the Donation's ability to assess whether the property has been fully remediated and restored; (5) denying reasonable and appropriate proposed assessment and remediation plans; (6) refusing to assess and remediate as outlined in the Wisner Science's Team's *Remedial Plan for Breach 1 DWH Oil Contamination, Fourchon Beach, Louisiana*; (7) refusing to assess and remediate as outlined in the Wisner Science's Team's *Scientific Assessment and Remediation of MC252 Oil on Fourchon Beach, Wetlands and Offshore Region, Louisiana*; (8) failing to provide all required documentation under the Access Agreement; (9) failing to reimburse costs and expenses pursuant to the Access Agreement; (10) failing to remove debris and objects placed on the Donation property, including Iron anchors, T-posts, snares dirty boom, and lightning rods which became hazards on the beach, and failed to remove them after verbal and written demand; and (11) any and all other breaches that may become known before trial.

The expedited reason for the request is based on the immediacy of the Cam II project and the destructive nature of the BP Oil. The Cam II project is expected to be completed by December 2014. *Phillips Declaration*, ¶ VII. Upon completion, there will be as much as 7 feet of new dunes over the existing sand. *Camanida Headland Beach & Dune Restoration Increments I and II*, attached as Exhibit "J". The BP Oil that remains on the beach will not be able to be removed. It will take approximately 6-8 months to

complete the remediation outlined by the Wisner Science Team in *Remedial Plan for Breach 1 DWH Oil Contamination, Fourchon Beach, Louisiana*, at 5.  Cam II is too important to the preservation of Port Fourchon and the Barataria Basin to delay.

III.    **BP's Breach of the Access Agreement Requires Immediate Specific Performance.**

The terms of the Access Agreement, as set forth above, are straightforward and unambiguous.  They spell out the duties and obligations operations on the Donation's property.  Indeed, BP has never contested its obligations under the Access Agreement.  Rather, BP has simply stopped unilaterally, without consult or prior notice.

The Louisiana Civil Code provides, in keeping with the near universal principles of contract law, that "[c]ontracts have the effect of law for the parties."  LA. CIV. CODE art. 1983.   "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  LA. CIV. CODE Art. 2046.  The question whether a contract is ambiguous is one of law, and the interpretation of an unambiguous contract is also one of law which may in appropriate cases be resolved on summary judgment.  *Slocum-Stevens Ins. Agency v. International Risk Consultants*, 666 So.2d 352, 357 (La. App. 2d Cir. 1995).

BP's obligation to employ the highest industry standards of remediation is straightforward, and that undertaking is law between the parties.  There is no excuse for BP's breach.

Specific performance is the preferred remedy for breach of a contractual obligation.  Article 1986 of the Louisiana Civil Code establishes the right of an oblige to obtain specific performance of a contract:

> Upon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee.

Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.  LA. CIV. CODE Art. 1986.  As the comment to this article notes, "if an obligor fails to perform an obligation to deliver a thing, the court shall grant specific performance to the obligee."  As another court explained:

> Under Louisiana's civil law system, specific performance is the preferred remedy for breach of contract.  An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation.  *Lombardo v. Deshotel*, 94–1172 (La.11/30/94), 647 So.2d 1086, 1090; see LSA–C.C. art.1986.   An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor's interest, or of substantial negative effect upon the interests of third  parties.  *J.Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So.2d 896, 901 (La.1981).

-12-

*Charter School of Pine Grove v. St. Helena Parish School Board*,  9 So.3d 209, 222 (La. App. 1st Cir. 2009).

The  BP  Access  Agreement  creates  a  classic  obligation  to  perform  certain obligations – in this case using the highest industry standards to assess and remediate its Oil from Wisner's Property.  BP has simply declined to comply with these terms, and the appropriate remedy is to order BP to specifically comply with its obligations under the Access Agreement.  This remedy is not just the preferred one, it is the only remedy which will permit the Donation to carry out its obligation to protect the property which forms the corpus of the trust.

In its letter refusing to engage in the Wisner Science Team's Protocol, BP argued that the Access Agreement does not allow Wisner to dictate the terms of the remediation or whether to remediate in the first instance.  This interpretation violates the letter, spirit, and function of the Access Agreement.  At all times, Wisner controlled who could be on the property, that they were always under the direct control of BP, and that Wisner could deny access to any subcontractor or worker on the Property.  Wisner controlled the type of remediation on the Property, requiring that only the "highest industry standards" be allowed.  Wisner ensured that these obligations were constantly monitored by trained and experienced monitors of the clean-up – all reimbursed by BP.  Wisner hired its own

-13-

Science Team to monitor the remediation efforts, perform their own testing, and advise as to the best method to remediate the Property.  The flow of all information, data, reports, and communications was always to flow to Wisner from BP.

Importantly, the Coast Guard is not a party to the Access Agreement.  All obligations flow from BP to Wisner to assess and remediate BP Oil.  The Access Agreement was constructed for the very purpose to prohibit BP from shirking its obligations by passing the buck to the Coast Guard.  Whatever the Coast Guard has done, said, or intimated as a part of the remediation is of no moment under the Access Agreement.  BP's separate obligations place it on the hook, requiring it to engage in its own assessment and remediation plans – actions that will not allow BP to hide behind the Coast Guard.

Yet, even BP's position is undermined by the Coast Guard.  As Commander Maki of the Coast Guard has noted, the Wisner Property has been placed in Middle Response – a level of response in which BP still pays for remediation and assessment:  "If the USCG cannot mitigate because the amount is too great, and if the product is visually consistent with MC252, we will call for a BP OSRO."  *See 6/04/14 Email from Commander Kyle Maki to Amanda Phillips*, attached as Exhibit "K".  The response is far from over, the Property is still in "response mode", and the Access Agreement remains in full force and effect.

-14-

Because it is still paying the Coast Guard for remediation and assessment in Middle R, BP must reimburse Wisner for oversight of these efforts and ensure that the highest industry levels are being employed.  The obligations under the Access Agreement are affixed to BP regardless of who is doing their dirty work.  *Access Agreement*, ¶ 14 ("This agreement is not transferrable, and conveys no right to [BP] to permit any parties not employed by or under their direct control of [BP] to access the Wisner Property.").

BP's attempt to unilaterally cancel the Access Agreement also ignores that large amounts of BP Oil are still present on the Property, and the Property is continuously being re-oiled by BP Oil.  *Pardue Declaration*, at ¶ 20.  These factors demand constant vigilance by Wisner, its investigator, Science Team, and Counsel.   Expenses related to this work are reimbursable under the Access Agreement.  These Wisner Advisors have demonstrated the value of their efforts time and again.

The sheer volume of the amount of oiled material removed from the beaches demonstrate what a colossal effort has been required on a piece of Property that has proven to be the most affected in the entire Gulf:

> Based on LA OPS Collection Data reports from LDEQ-SOSC 10,532,184.25 lbs. of oiled material was collected on the Donation's property from June 2011 through February 28, 2014. This is 69.49% of the total material collected in Louisiana (15,155,899.55 lbs.) and 64.88% of the total material collected Gulfwide (16,234,557.88 lbs.).

-15-

*Phillips Declaration*, at ¶ XII.

In *Remedial Plan for Breach 1 DWH Oil Contamination, Fourchon Beach, Louisiana*, the Wisner Science Team documented significant oiling at the Breach 1 site that BP refuses to remediate:  "Millions of pounds of oiled sands have been removed from this location, but surface and subsurface oil exceeding the standards are still present."  *Id.* at 1.  Of the 60 borings using a Geoprobe taken in January 2014, "oil was detected in 54."  *Id.*  29 of the borings had thickness exceeding 3 cm, a standard used by BP to determine whether to remediate.  *Id.*  Because the oil was at a depth below the oxygenated portions of the  beach, the oil is unable to be broken down due to any natural process.  *Id.* at 1-2.  Remediation was scientifically justified for a number of reasons:  (1) the remedial guidelines of 1 inch of oil thickness was identified at the site; (2) the site is at a natural breach with the likelihood that it will reopen and cause the sand to re-oil the marsh; (3) the Caminada Headlands Project is scheduled to dump large amount of oil on the site; and (4) "the continued presence of oil on the beach is a major threat to birds, turtles, and other wildlife."  *Id.* at 4-5.

The Wisner Science Team proposed three alternate remediation solutions that qualify as the "highest industry standard": (1) excavate and replace the oiled sand, likely the most successful option given the history of oil at this site; (2) using solid oxidants which will infuse the site with a regimented supply of oxygen, thereby enhancing the

-16-

natural process of breaking down the oil; and (3) employing bioremediation using air sparging. *Id.* at 2-3. The Science Team provided BP with cost ranges and design considerations. *Id.* at 3-4. The Science Team estimates it will take 6-8 months to remediate this area. *Id.* at 5.

BP has never provided Wisner with any declaration or conclusion that the Wisner Property is clean. BP has never informed Wisner that it engaged in some cost/benefit analysis with its scientists and provided Wisner with any support. BP did not provide Wisner the courtesy of advance notice or the opportunity to discuss the matter. BP meekly mailed Wisner a page and a half letter attempting to unilaterally cancel the Access Agreement.

**IV.    The Dispute Should Be Referred to Magistrate Wilkinson.**

This is not the first demand for specific performance against BP under the Access Agreement. In 2012, Wisner filed a *Motion for Partial Summary Judgment – Specific Performance of Contractual Access Agreement* [Rec. Doc. 5751] which was referred to Magistrate Wilkinson [Rec. Doc. 5928]. BP reimbursed expenses and costs. An ultimate amount was submitted to a mediator and ultimately resolved to both parties' satisfaction. Because he has previous experience with the obligations under the Access Agreement, Magistrate Wilkinson is ideally suited to deal with these issues.

**CONCLUSION**

For the above reasons, Wisner respectfully moves the Court to grant the Motion and order the relief requested.


Respectfully submitted,

/s Soren Gisleson

| | |
|---|---|
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| Soren E. Gisleson, La Bar No. 26302 | Bob Wright La Bar No. 13691 |
| HERMAN HERMAN & KATZ LLC | DOMENGEAUX WRIGHT ROY |
| 820 O'Keefe Avenue | & EDWARDS LLC |
| New Orleans, Louisiana 70113 | 556 Jefferson Street, Suite 500 |
| Telephone: (504) 581-4892 | Lafayette, Louisiana 70501 |
| Fax No. (504) 569-6024 | Telephone: (337) 233-3033 |
| E-Mail: sherman@hhkc.com | Fax No. (337) 233-2796 |
| E-Mail: sgisleson@hhkc.com | E-Mail: jimr@wrightroy.com |

Calvin C. Fayard, Jr. La. Bar No. 5486
C. Caroline Fayard La. Bar No. 30888
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Fred Herman La Bar No. 6811
Law Offices of Fred Herman
1010 Common St., Suite 3000
New Orleans, LA  70112
Phone: 504-581-7070
Fax: 504-581-7083

Walter Leger, Jr. La. Bar No. 8278
Leger & Shaw

600 Carondelet St., 9th Floor
New Orleans, LA 70130
Phone: (504) 588-9043
Fax: (504) 588-9980

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been served upon all counsel of record *via* Lexis-Nexis File & Serve in accordance with Pre-Trial Order No. 12, and filed in the record *via* the Court's ECF electronic filing system, and *via* E-Mail and by U.S. Mail this 6th day of June, 2014.

**  /s/Soren Gisleson**