**EDWARD WISNER DONATION ADVISORY COMMITTEE**

**L. AMANDA PHILLIPS**
SECRETARY TREASURER
AND LAND MANAGER

935 GRAVIER STREET
SUITE 825
NEW ORLEANS, LA 70112
(504) 210-1152
FAX (504) 210-1156
WISNERDONATION@AOL.COM

MAILING ADDRESS
P. O. BOX 52204
NEW ORLEANS, LA 70152-2204



REPRESENTING

CHARITY HOSPITAL / MEDICAL CENTER
OF LOUISIANA
CITY OF NEW ORLEANS
THE SALVATION ARMY
TULANE UNIVERSITY
THE WISNER FAMILY

DECLARATION OF L. AMANDA PHILLIPS

I.

My name is L. Amanda Phillips. I am fully competent to make this declaration, and all of the statements in it are based on my personal knowledge. I have a B.A. degree from Tulane University, and I received my Masters of Business Administration at Loyola University of New Orleans in 1996. I have been employed by the Edward Wisner Donation since August 2001. Since January 2013 I have been the Secretary Treasurer and Land Manager of the Edward Wisner Donation, when I replaced Ms. C. Cathy Norman upon her resignation. In both capacities I have reviewed numerous documents pertaining to the cleanup, assessment, and remediation of the property, including but not limited to Shoreline Treatment Recommendations (STRs), STR Variances, cleanup proposals, SCAT schedules, and various reports. I have also met personally, and on the phone, with representatives from the State On-Scene Coordinator, the Federal On-Scene Coordinator, BP and other affiliated organizations.

II.

The Wisner Donation is a Louisiana Complex Trust, which was established in 1914 by the businessman and philanthropist Edward Wisner. The original Act of Donation placed over 53,000 acres of land and waterbottoms in Jefferson, St. John, and Lafourche parishes in trust for the benefit of the City of New Orleans, Charity Hospital, Tulane University, and the Salvation Army (a later agreement gave Mr. Wisner's heirs and certain others an interest in the trust as



EXHIBIT B

well). The majority of revenues of the Donation go to fund various philanthropic causes in and around the City of New Orleans.

III.

The Wisner Donation is managed by myself and a small staff under the direction of the Edward Wisner Donation Advisory Committee, which is composed of a representative of each of the beneficiaries. The Mayor of New Orleans acts as Trustee, and acts on the advice and consent of a majority of the Advisory Committee. As Secretary Treasurer my role is to carry out the instructions of the Advisory Committee, and manage the business and assets of the Donation in a prudent manner for the benefit of the City and the other beneficiaries. The Donation currently owns approximately 37,000 acres, with the bulk of its land holdings – approximately 35,000 acres – in southern Lafourche Parish, stretching approximately from Leeville, Louisiana south to the Gulf of Mexico (this property is often referred to as "the Fourchon property"). As Land Manager, part of my job is protecting the land that makes up the corpus of the Donation, to insure that the Donation's purposes can be carried out.

IV.

The Donation's primary sources of income are royalties from oil and gas activities, and industrial leases. The Donation's Fourchon property has been held by production under oil and gas leases since the 1940's, and contain significant oil and gas infrastructure. This includes the Louisiana Offshore Oil Port pipeline and gathering facility, which transports approximately 15% of the U.S. imported oil supply. The Donation's Fourchon property also is the site of Port Fourchon, which is the major support facility for offshore oil and gas exploration in the Central Gulf of Mexico.

V.

The Donation's Fourchon property is primarily fragile coastal wetlands, dunes and beaches, including about nine miles of Fouchon Beach. The Caminada Headland – which is better known as Fourchon Beach – is the last coastal barrier protecting the marshes of the Barataria Basin from the open Gulf. The Caminada Headland and the wetlands and uplands it protects are in an area of the Louisiana coast that provides habitat for hundreds of species of plants and animals. Fourchon Beach is critical nesting habitat for Least Terns (an endangered species), Piping Plovers (a threatened species) and Wilson's Plovers. As Land Manager, part of responsibilities is to be familiar with the requirements for protecting the birds and their nest areas which requires me to be knowledgeable about nesting habits. Based on information provided to me by the Barataria Terrebonne National Estuary Program's (BTNEP) Richard deMay, the nesting season on Fourchon Beach is generally between mid-April and mid-August, with the height of the season being early-June. It is also an area that has experienced major land loss.

VI.

The Headland is currently retreating at up to 40 feet per year. Without this barrier, the inland communities of the Barataria, Caminada, and Terrebonne basins would be at serious risk because the wetlands would be exposed to the open Gulf of Mexico. At the time of the Deepwater Horizon spill, a $72 million cooperative project called the Caminada Headlands Beach and Dune Restoration Project, Increment I (CAM I) was scheduled to being on the Donation's property. This project began in July 2013 and is still in construction. It will create 303 acres of beach and dunes along approximately 6 miles of beach. It began at Belle Pass and is being built eastward.

VII.

The Caminada Headlands Beach and Dune Restoration Project, Increment II (CAM II) is a $144 million project that being put out for bid this summer (July 2014). It will begin construction where the CAM I project ends and go eastward creating approximately 489 acres of beach and dunes along 8.9 miles of beach. CAM II's footprint encompasses an area of the Donation's beach that is substantially oiled – Zone 1 at the Lafourche/Jefferson Parish line. These projects are designed to replenish the supply of sand in the system, to ensure the beach will successfully rebuild. In Zone 1, the beach is severely sand depleted due to BP's removal activities since 2010, despite the Donation's repeated requests that the sediment be replaced with a clean, like sediment.

VII.

Upon completion of the CAM I and CAM II projects, the entire 9 miles of beaches will be covered with sand and other developments. Any oil that remains at that time will be covered. At the current schedule, the projects will be completed by December 2014.

VIII.

The Donation's Advisory Committee has for several decades focused on protecting the physical integrity of the property through careful monitoring and management of all activities on the property, including maintenance of existing infrastructure and new projects. The Donation has also freely allowed dozens of research projects on its property, and sponsored and participated in restoration projects. The Donation has in place specific procedures which document impacts and damage to the property from activities, determine the mitigation needed to restore damage caused by the activities, and insure that the mitigation is carried out.

IX.

A central part of these procedures is a standard access agreement, which contains terms dealing with liability, indemnification, acceptable equipment usage, best management practices, coordination with Donation staff, and access to information developed on the property. The Donation has an onsite monitor, typically Mr. Forrest Travirca, the Donation's field investigator, who oversees all significant activities on the property. The Donation's experience has been that the Access Agreement typically works well, and companies have no problems determining and complying with their obligations under the agreement.

X.

Response activities on the Donation's Fourchon property began in early May 2010, before oil actually reached the property. Although the Donation was not notified or consulted about these activities, they appeared aimed at preventing oil reaching marsh areas through the bayous and drains (usually referred to as "breaches") which cut through the beach and connect the marsh to the Gulf of Mexico. On May 9, 2010 Blackhawk helicopters began flying in large sandbags and dropping them into the breaches. The Donation was initially contacted by Lafourche Parish authorities in mid-May when it became clear that oil was likely to come ashore on Donation property. Ms. Cathy Norman, the Secretary Treasurer at the time, supplied the parish with all of the aerial photography, video, maps and other information at the Donation's disposal to identify critical areas for the response effort. Early efforts focused on stopping oil at the beach, including placement of containment and absorbent booms on Donation property. These efforts also included building a land bridge completely damming Bayou Fer Blanc, a major bayou draining the marsh on Donation property, and using sheet piling to dam a number of smaller breaches through the beach. This land bridge is in Zone 1, and is one location where substantial oil remains subsurface.

XI.

Oil from the Deepwater Horizon event first began washing onto the Donation's property and into the interior marsh on May 20, 2010. From mid-May 2010 throughout the remainder of 2010 the Donation's personnel were required to devote essentially all of their time to Deepwater Horizon response. The response effort has remained a major commitment for Donation staff up to the present date. Beginning in May 2010 there were literally hundreds of people and heavy equipment of all sorts on the Donation's property. At the height of response operations in the summer and fall of 2010 there were as many as 1500 workers on the Donation's property working 24 hours per day, with entire fleets of all terrain vehicles, earth moving equipment, portable restrooms, hydration stations, decontamination stations, and other support facilities. Based on our observations and the reports we received, hundreds of thousands of cubic yards of sand and sediment were removed over the course of operations, and never replaced.

XII.

Based on LA OPS Collection Data reports from LDEQ-SOSC 10,532,184.25 lbs. of oiled material was collected on the Donation's property from June 2011 through February 28, 2014. This is 69.49% of the total material collected in Louisiana (15,155,899.55 lbs.) and 64.88% of the total material collected Gulfwide (16,234,557.88 lbs.). A spreadsheet with calculations derived from the LA OPS Collection Data reports is attached to this Declaration as Exhibit A.

XIII.

The massive response on the Donation's Fourchon property actually changed the physical structure of the beach itself. Thousands of tons of oil and oily sediments were

removed. In some places the clay layer that forms a stabilizing substrate for the beach was removed. Heavy earthmoving equipment left sunken tracks, and removal of sediments left areas more vulnerable to erosion. The damming of breaches, construction of board roads also results in different erosional patterns. After tropical storms or other high water events which push water over the beach ridge and into the marsh, the bayous and breaches allow the water to drain from the marsh. When the breaches were dammed, the water either goes around the dams, causing additional erosion at the edges of the structures, or it finds a new route to the gulf, causing new breaches in the beach. Documenting and understanding the changes in the beach caused by the response effort is critical to understanding and preventing additional damage to the beach.

XIV.

Response operations on the Donation's property in April 2014 have been transferred to the Middle Response ("Middle 'R'"), a never before used method of response. Large amounts of oil remain under the sandy beach, in the washouts and natural bayous, in the salt flats, mangrove and saltwater marshes found behind the beach crest and on the waterbottoms both in front of and behind the beach. "Tarballs" continue to wash up on the Donation's property on a daily basis. Tropical Storm Karen in October 2013 uncovered many buried oil deposits and mats, especially in front of Breach 2. In short, the response effort on the Donation's property is still not complete even today.

XV.

The Donation has cooperated with the response in every way possible given the need for emergency action. In the early stages of the response the Donation permitted highly intrusive activities without any formal agreement, and indeed BP generally undertook these

activities with little or no notice to the Donation. On June 16, 2010, Donna Ward in BP's legal department expressed the company's interest in signing an access agreement governing operations on the Donation's property. In response Ms. Cathy Norman sent Ms. Ward one of the Donation's standard access agreements. On June 24, a BP attorney named Farley Burge responded with proposed changes to the access agreement. Additional consultation followed, and eventually an agreement was reached which essentially followed the form of the standard Wisner Donation Access Agreement, with several changes geared to deal with the scope and complexity of the spill response effort. BP reviewed the agreement and requested several changes, which were made to the final agreement. The final Access Agreement, as signed by BP and the Donation, is attached as Exhibit B to this Declaration.

XVI.

Within months of the signing of the BP Access Agreement, it became clear that BP did not intend to fully comply with its terms. For example, paragraph 7 of the BP Access Agreement recognizes the need for the Donation to have appropriate consultants to monitor BP's cleanup operations, and further provides that BP will reimburse the Donation for the expenses associated with these consultants. Paragraph 9 further provides that BP will be responsible for all the reasonable costs and expenses associated with assessing damage to Wisner property caused by oil spill cleanup operations. The Donation contracted with two well qualified scientists, environmental engineer Dr. John Pardue and coastal geomorphologist Dr. Jeff Williams, to assess and monitor the effects of BP's operations on the property.

XVII.

Among other important work, these scientists have prepared plans for assessment and remediation of oil in the wetland areas impacted by MC252, and for assessment and remediation

of oil in the nearshore areas offshore Edward Wisner Donation Property affected by MC252 oiling. These plans were submitted to GCIMT and BP in February 2014 because BP has never undertaken this work themselves. Dr. Pardue and Dr. Williams have also identified areas of contamination in the marsh and are monitoring those sites to determine the degradation rate and other characteristics of the remaining oil. This step is necessary because BP never assessed the extent of contamination in the marsh on the Donation's property. Dr. Pardue has established monitoring wells in Zone 1 which show the migration of oil from the Gulf towards the marsh. The Donation had to file a Motion for Partial Summary Judgment on February 17, 2012, in order to force BP to comply with reimbursement of all reasonable costs and expenses associated with the hiring of consultants and associated with assessing damage to Wisner property caused by oil spill cleanup operations.

XVIII.

Because the Donation's property is fragile and already subject to threats from coastal erosion, impacts from activities on the property must be assessed and addressed as quickly as possible. For example, if damage to beach or marsh areas is not restored quickly, the damaged area can expand, making restoration more difficult and expensive. As explained earlier in this declaration, the physical impacts of the spill and the response effort are substantial.

XIX.

The Donation has attempted repeatedly to resolve the problems with BP by providing numerous requests for assessment, remediation, and opportunities to respond and offers to discuss. BP has informally and formally rejected all instruction.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 5 day of June, 2014.

_____
L. Amanda Phillips