UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| No. 12-970, Bon Secour Fisheries, Inc., et | : | Mag. Judge Shushan |
| al. v. BP Exploration & Production Inc., et al. | : | |

MEMORANDUM IN SUPPORT OF MOTION OF THE SPECIAL MASTER
FOR RETURN OF PAYMENTS MADE TO JARROD A. BURRLE AND OTHERS

Special Master Louis J. Freeh seeks to have claimant Jarrod A. Burrle return $50,015.87 in payments made by the Deepwater Horizon Economic Claims Center ("DHECC").  In his DHECC claims, Burrle presented false information, such as:  (a) Burrle's claim that he landed over eight tons of seafood per month from a 16-foot aluminum boat without any deckhand assistance; (b) affidavits asserting daily seafood consumption several hundred times greater than the average rate, requiring an alleged daily diet per person of over five pounds of blue crab, almost three pounds of shrimp and almost two pounds of oysters; (c) alleged blue crab sales to non-existent businesses; and (d) tax documents created solely to support Burrle's fictitious claim for lost blue crab revenue.

The DHECC paid Burrle $50,015.87 for his vessel owner claim (Claim 42138) based upon this false information , but stopped other claims before additional money was paid. The Special Master seeks a judgment requiring Burrle to return money paid on the DHECC seafood claim, requiring professionals who assisted Burrle and benefitted from this unjustified payment to similarly return such payments, and prohibiting Burrle from participating in any further seafood distributions.

On June 9, 2014, the law offices of Frank DeSalvo informed the Special Master that the firm no longer represented Burrle, and had no information on a replacement counsel. Communications prior to June 9 to attempt to resolve the issues presented in this motion had gone unanswered.

### A. *Background*

By Order of September 6, 2013, this Court directed the Special Master to examine and investigate any past or pending claims submitted to the Court Supervised Settlement Program ("CSSP") which are deemed to be suspicious and initiate clawback proceedings for fraudulent claims. This Court retains continuing and exclusive jurisdiction over the parties and their counsel for enforcing the Deepwater Horizon Economic and Property Damages Settlement Agreement as amended on May 2, 2012 (the "Settlement Agreement"). *See* Settlement Agreement at ¶ 18.1. Any disputes related to the interpretation, enforcement or implementation of the Settlement Agreement are to be made by motion to this Court. *Id*.

### B. *Burrle's DHECC Claims*

On July 25, 2012, Burrle filed claims under penalty of perjury with the DHECC for compensation under the Seafood Compensation Program as a vessel owner (Claim 42138) and vessel captain (Claim 42139). *See* Exhibit A. He also submitted subsistence and vessel of opportunity ("VoO") claims. In support of his claims, Burrle submitted numerous documents as discussed below.

1. Seafood Income Documentation

Burrle initially filed a claim for lost income from commercial fishing with the Gulf Coast Claims Facility ("GCCF") in 2010. On September 15, 2010, the GCCF notified Burrle that his claim was missing required information documenting his

gross wages in 2008 "such as a W-2 Form, a 1099 form, a complete copy of a federal income tax return with all attachments" or other financial documents.  *See* Exhibit B. Burrle subsequently submitted nine sworn statements to document cash seafood sales to nine customers, all dated October 20, 2010.  *See* Exhibit C.

On January 6, 2011, Burrle presented a 2008 Form 1040 dated January 4, 2011, purportedly indicating $98,950.00 in 2008 business income from commercial fishing.  *See* Exhibit D.  On April 14, 2011, the GCCF advised Burrle he was missing additional information, including his "complete 2010 Federal Income Tax Return, including all schedules, attachments and statements."  *See* Exhibit E.  Burrle soon thereafter presented a 2010 income tax form dated May 13, 2011, which indicated he had $53,385 in 2010 income as a "commercial fisherman."  *See* Exhibit F.

On July 25, 2012, Burrle refiled his claims with the DHECC.  On November 27, 2012, Burrle's counsel signed and submitted a Seafood Compensation Plan Sworn Written Statement for Sufficient Documentation of Benchmark Revenue ("SWS-1"), representing that Burrle landed $98,950 in blue crab in the Gulf Coast Areas in 2008.  *See* Exhibit G.  The SWS-1 was not signed by Burrle himself.

2.  <u>Seafood Subsistence Documentation</u>

Burrle presented affidavits asserting that he consistently and routinely provided substantial amounts of seafood for himself and his family's personal use. Burrle said that he supported five to seven people with the seafood he caught.

On July 26, 2011, Burrle said he "averaged taking home approximately 1400 pounds weekly of Blue Crab per week [sic] normally sold at the price of $1400.00 per week."  *See* Exhibit H.  He similarly retained weekly averages of 400 pounds of

shrimp and 15 sacks of oysters. On January 11, 2012, he said that he retained 7,000 pounds per month of crab, 7,500 pounds per month of oysters, and 2,000 pounds per month of shrimp. *See* Exhibit I.

    3. <u>DHECC Payments</u>

On or about April 16, 2013, the DHECC paid Burrle $50,015.87 for his vessel owner claim (Claim 42138). Burrle's vessel captain claim (Claim 42139) has not been paid, but a proposed payment of $26,493.84 has been offered to Burrle and accepted. Burrle also received $46,400 in VoO charter vessel claims. A claim for subsistence is under review.

Upon information and belief, Burrle's former counsel, the AndryLerner LLC law firm, received attorney's fees of $12,503.96 for the seafood vessel owner claim.[1]

Upon information and belief, Burrle obtained monetary advances totaling $24,000 for his claims from Woodbridge Baric Pre-Settlement Investments, LLC, of Boca Raton, Florida ("Woodbridge"). *See* Exhibit J. On or about April 30, 2014, Woodbridge filed a notice of lien with the DHECC in Hammond, Louisiana, concerning its payments to Burrle. Upon information and belief, the AndryLerner law firm made deductions from Burrle's claims payments to repay a portion of the advances and accumulated interest at four percent per month after an initial 90 day grace period.

---

[1] On May 7, 2014, AndryLerner withdrew from representing Burrle before the DHECC. The Special Master requested information concerning the settlement disbursement on Burrle's seafood captain claim, as AndryLerner has provided for other claims and claimants. On June 9, 2013, counsel for Andry Lerner stated that such information was subject to attorney-client privilege, and the information would not be released without Burrle's approval. AndryLerner's counsel stated he would attempt to reach Burrle through U.S. Mail for such approval.

## C. *Evidence of Burrle's Fraudulent Claims*

On February 6, 2014, the Special Master applied for an order to show cause directed to Burrle. On February 7, 2014, the Court issued a show cause order requiring Burrle to sign a release to authorize the Internal Revenue Service ("IRS") to provide the Special Master with Burrle's tax records for 2008, 2009 and 2010. The order also required Burrle to produce documentation required to support a Seafood Compensation Program claim.

Burrle produced no records responsive to the show cause order, but he did sign an IRS form agreeing to release his income tax records to the Special Master.

The totality of the investigative record shows that there is no genuine issue as to any material fact and that the Special Master and the DHECC are entitled to a judgment as a matter of law. *See* Order & Reasons on Special Master's Motion for Return of Payment at 19 (Doc. Rec. 12794) (Apr. 29, 2014) (hereinafter "Order & Reasons"). Drawing an analogy to the procedures used by federal courts to determine summary judgment motions, a genuine issue of fact exists only where competent evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729-30 (5th Cir. 1977) (evidence "manifestly at variance with the laws of nature and the physical facts" is of no value to demonstrating material issues of fact). An opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). No such doubt as to material facts exists in this case, and judgment against Burrle is appropriate as explained in the following pages.

1. Tax Documents

The 2008 Form 1040 presented by Burrle in support of his claims does not evidence an honest and reasonable effort to fulfill Burrle's federal tax obligation, but rather is a document created solely for Burrle to support his fictitious claim for lost blue crab revenue. Although filed with the IRS, the 2008 Form 1040 does not provide adequate proof of revenue from commercial fishing, as is required to support a finding of Burrle's blue crab and seafood landings in the Gulf Coast Areas.  *See* Settlement Agreement at Exhibit 10.  This finding is reached through review of the totality of the following undisputed facts:

- Burrle belatedly filed the 2008 Form 1040 on or about January 22, 2011, more than a year after the latest date for filing a 2008 tax return and eight months after the Deepwater Horizon oil spill.  *See* Exhibit D.

- Burrle filed the 2008 Form 1040 after he received a deficiency notice from the GCCF asking him to provide documents for 2008 showing his total gross wages, such as "a complete copy of a federal income tax return with all attachments."  *See* Exhibits B, D.

- Burrle has produced no contemporaneous third-party records to validate the alleged gross income or expenses from the 2008 Form 1040, such as trip tickets or expense receipts supporting $11,474 in boat fuel, $33,350 in crab traps or $17,475 in bait.  *See* Exhibit B; Settlement Agreement at Ex. 10 IV.B.1(b)(ii).

- Official IRS records, attached as Exhibit K, indicate that Burrle failed to pay the $8,202 in 2008 tax due as shown on the 2008 Form 1040, despite notices and collection efforts from IRS and despite having received $50,015.87 in 2013 from DHECC for his blue crab claim, $46,400 in 2012 from DHECC for his VoO claims, and $24,000 in 2012 from a litigation pre-settlement financing company.  *See* Exhibits D, K.

- Burrle filed no 2009 tax return.  *See* Exhibit K.

- Burrle filed no 2010 tax return, despite having earned at least $50,500 in non-commercial fishing income that year, as documented by third-party tax filings that Burrle received and submitted to the DHECC.  *See* Exhibits F, K. Burrle paid no tax on this income.  *Id*.

- Burrle presented the 2010 Form 1040 to support his alleged loss, even though he never filed this document with the IRS and never paid the $7,831 tax shown as being due on this form.  *See* Exhibits F, K.

- The unfiled 2010 Form 1040 is dated May 13, 2011, a month after Burrle received a deficiency notice from the GCCF requesting his 2010 tax return. *See* Exhibits E, F.

Burrle's pattern of disregarding tax obligations, failing to make required tax payments and failing to keep rudimentary business records demonstrates that Burrle's 2008 Form 1040 was prepared only to lend an air of credibility to his damage claim, not to accurately reflect his income or record a tax liability.  *See United States v. Coney*, 689 F.3d 365, 375-76 (5th Cir. 2012) (non-payment of taxes coupled with a pattern of failing to file tax returns or measures taken to conceal income from the IRS indicate deliberate choice not to fulfill tax obligation, rendering tax debt non-dischargeable in bankruptcy).

   2. Commercial Seafood Sales

The Special Master's investigators attempted to verify Burrle's alleged commercial seafood sales.  On March 26, 2014, investigators spoke to "VJ-D," the mother of Burrle's daughter.  VJ-D said Burrle had outstanding child support obligations to his daughter that he did not meet dating back to 1996.  This is corroborated by Burrle, who requested an exclusion of his 2009 income because he was briefly incarcerated that year for failing to pay child support to VJ-D.  *See* Exhibit L.  VJ-D said Burrle told her he was not working.  VJ-D said she never knew Burrle to catch or sell seafood, and said he did not have a business that made $100,000 a year in sales.  VJ-D said Burrle never gave her any fish or crabs.

The Special Master's investigators also attempted to verify the existence of the nine purported customers documented on affidavits Burrle presented to the GCCF in support of Burrle's claim of selling $98,950 in blue crab in 2008.  The affidavits are identical forms,

- 7 -

dated October 20, 2010.  *See* Exhibit C.  Eight of the statements appear to be signed by Burrle, and one statement is unsigned.  None of the statements are signed by a customer.

The Special Master's investigators found that four of the businesses on the affidavits did not appear to exist, could not be confirmed, and/or did not purchase seafood from Burrle.  Five of the businesses on the affidavits existed and reported some cash purchases of seafood from Burrle; however, none of the business owners were able to provide any record of any of the transactions.  Two of the five businesses reported purchasing only shrimp and/or oysters from Burrle, two of the businesses reported purchasing crab and other seafood types from Burrle, and the final business did not specify.  These claimed purchases are inconsistent with Burrle's SWS-1, which claimed that all of Burrle's 2008 income came from blue crab sales.  *See* Exhibit G.

>Investigation into the four unconfirmed businesses found as follows:
>
>- Richard's, 3120 Odeon St., New Orleans, LA  70131:  An internet search revealed that the address listed by Burrle does not exist, but investigators located an Odeon Avenue, with a zip code of 70114.  Investigators visited the location and found the street to be residential.  A bar named Sportsman's Lounge was located at 3120 Diana Street, a cross street with Odeon Avenue.  The owner of Sportsman's Lounge, Richard Lloyd, said Burrle is a customer but that Lloyd has never purchased seafood from Burrle.  He said he told Burrle in the past not to use Sportsman's Lounge in a claim.
>
>- Dominique's, 1700 Teche St., New Orleans LA  70131:  An internet search revealed that the address listed by Burrle does not exist, but an address of 1700 Teche Street, with a zip code of 70114 was identified.  Investigators visited the area and found that the address is an empty lot located under the overpass of the Expressway Bridge.
>
>- Mercedee's Place, 2502 Burgundy, New Orleans, LA  70144:  An internet search revealed that the address listed by Burrle does not exist, but an address of 2502 Burgundy Street, with a zip code of 70117 was identified.  Investigators visited the address and found it to be residential.  Two neighbors said there has never been a business named Mercedee's Place in the area.  There is no Mercedee's Place incorporated in Louisiana.

      - <u>Club 636, 636 Franklin St., Gretna, LA</u>:  An internet search revealed that the address listed by Burrle does not exist, but an address of 636 Franklin Avenue was identified.  Investigators visited the address and found it currently to be a vacant lot.  From 2011 to 2012, the address contained a restaurant called Braxton's Restaurant & Lounge that burned down in Hurricane Isaac.  The previous property owner is currently incarcerated.  Investigators could not confirm whether any businesses operated at that location prior to 2011.  There is no Club 636 incorporated in Louisiana.

      3.  <u>Seafood Subsistence Documentation</u>.

Burrle signed a number of sworn affidavits in connection with his subsistence claim to quantify the seafood that Burrle claimed to catch for himself and family members.  For example, on July 26, 2011, Burrle said he "averaged taking home approximately 1400 pounds weekly of Blue Crab per week [sic] normally sold at the price of $1400.00 per week," in addition to 400 pounds of shrimp and 15 sacks of oysters.  *See* Exhibit H.  On January 11, 2012, Burrle estimated that he retained 7,000 pounds per month of crab, 7,500 pounds per month of oysters, and 2,000 pounds per month of shrimp.  *See* Exhibit I.

Comparison of Burrle's subsistence claim against the consumption schedule used by the DHECC for analysis of subsistence consumption indicates a caloric consumption rate several hundred times the "daily allowable" caloric consumption.[2]  Using this DHECC subsistence schedule, if Burrle spread his alleged catch among seven adults as he claimed, *each* adult would have a consumable portion of the harvest *each* day of the year of:

    - Over five pounds of blue crab every day per person;

    - Almost three pounds of shrimp every day per person; and

    - Almost two pounds of oysters every day per person.

---

[2] DHECC considers only the "consumable" portion of a seafood harvest, which is taken as a percentage of the gross harvest.  For example, 17 percent of the gross harvest weight of a blue crab is considered "consumable."

No genuine issue can exist that these consumption rates are impossible and cannot form a basis to reflect with any accuracy a lost quantity of subsistence fishing used to sustain Burrle's basic personal and family dietary needs that were diminished or restricted by the oil spill, as is required by the Settlement Agreement.  *See* Settlement Agreement at ¶ 5.4.1.

4. <u>Burrle's Total Claimed Landings</u>

Burrle claimed to have a 2008 commercial catch that generated over $98,000 in blue crab sales.  Burrle made these landings with no help from a deckhand, *see* Exhibit D at Schedule C line 11 (no contract labor expense claimed in 2008), despite the fact that he used a deckhand in 2010 when he participated in the oil spill cleanup.  Exhibit F at Schedule C line 11 (contract labor expense claimed in 2010).  Using Burrle's value of $1/blue crab at 1/3 pound per blue crab, Burrle would have needed to land approximately 2,500 pounds of blue crab per month in 2008 to generate such revenue.

Adding this volume to Burrle's claimed subsistence catch would have required Burrle to land a total of over 4 tons of blue crab a month, as well as 3½ tons of oysters and 1 ton of shrimp per month.  Burrle had a 16 foot aluminum boat that he used for his landings and worked alone.  His claimed landing far exceeds Gulf Coast area averages even for significantly larger boats.  *See* NOAA National Marine Fisheries Service, *2008 Annual Economic Survey of Federal Gulf Shrimp Permit Holders* at Table 19 (2010) (average 2008 Gulf shrimp landings for vessels under 50 feet is approximately 1.5 tons per month, with annual shrimp and non-shrimp revenue of $69,894).  No genuine issue can exist as to the impossibility of a monthly eight-ton catch on a 16-foot boat operated by Burrle alone.

### D. *Legal Analysis*

1. The Court Should Order Burrle to Return All Funds Received from the DHECC Because Burrle's Claims Were Fraudulent.

The Court's power to order equitable remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944) (affirming judicial power to set aside fraudulently begotten judgments as such cases present "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society"); Order & Reasons at 21.

Here, the record unquestionably reveals that Burrle knowingly presented false information to the Court-supervised DHECC to obtain $50,015.87 from the Deepwater Horizon Trust. For example, Burrle provided the DHECC with 2008 tax documents that were created solely to support a fictitious claim for lost blue crab revenue, not documents that had been prepared to accurately reflect any reality of his taxable income or to record a tax liability Burrle would honor. Burrle also made exaggerated claims of seafood landings, claimed an impossible daily consumption of seafood by his family, and asserted sales of blue crabs to non-existent businesses. Taken together, these factors indicate that Burrle's claim was based on false information.

In light of the evidence of fraud and in accordance with Section 18.1 of the Settlement Agreement, the Special Master seeks an order compelling Burrle to return payments made on his DHECC seafood claims. The return of these payments will make the DHECC whole for its loss, deprive Burrle of an unjust enrichment and deter others from engaging in similar misconduct. *See* Order & Reasons at 22.

### 2. The Court Should Order the Return of All Funds Received by Professionals Who Assisted Burrle to Submit False Claims

The professionals who helped Burrle submit his claims also should be required to return any payment received based on Burrle's claims.  *See* Order & Reasons at 26; *SEC v. Blatt*, 583 F.2d 1325, 1335-36 (5th Cir. 1978) (broad power enables courts to order disgorgement of legal and other professional fees "realized by each defendant for his assistance in executing the fraud" up to the amount of the fee realized).  Whether these professionals knew of the falsity of Burrle's claim is immaterial to their duty to make restitution of sums that have been received as a result of this improper claim.  Order & Reasons at 23; *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999) ("Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer.").

Upon information and belief, the AndryLerner law firm received attorney's fees of $12,503.96 for the seafood vessel owner claim based upon a contingency fee contract.  The fee would not have been payable absent a payment on Burrle's fraudulent claim.

### 3. The Court Should Order the Return of All Funds Received By Woodbridge Baric Pre-Settlement Investments, LLC

Upon information and belief, part of the proceeds from Burrle's claims were used to repay a litigation advance from Woodbridge Baric Pre-Settlement Investments, LLC, of Boca Raton, Florida ("Woodbridge").  *See* Exhibit J.

Money paid by contingency fee arrangements may be recouped through restitution where the client's judgment is reversed or voided.  *See Mohamed v. Kerr*, 91 F.3d 1124, 1126 (8th Cir. 1996).  The contingent fee is the relevant factor to this analysis, as the fee in such cases is dependent on "success in the representation, and

the attorney assumes, along with the client, the inherent risks of litigation" thus becoming a "real party-in-interest" to the claim. *See* Order & Reasons at 22-23. In such cases, if the client does not prevail, or if he does prevail but eventually has the award revoked, the client has not received a favorable outcome, thus there is no fee due under the contingency fee contract. *Id*. at 24. Because no fee is due, retaining a payment made on a contingency fee contract would be an unjust enrichment. *Id*. at 24 (citing *Mohamed*, 91 F.3d at 1126).

Here, in exchange for a $24,000 advance repayable at four percent per month interest, Burrle assigned a right of first distribution in his DHECC claims to Woodbridge, which recognized that the likelihood of Burrle recovering money in his claim was "uncertain both as to time and amount." *See* Exhibit J at 4. In the event Burrle "[did] not recover any money from the [claim], [Burrle] shall not be obligated to repay the advance to [Woodbridge]." *Id*. at 4, ¶ 3. The terms of this contingent agreement put Woodbridge in a position as a real party-in-interest, and the payments received pursuant to Burrle's claims are subject to a claim for restitution.

The argument that Woodbridge had no knowledge of Burrle's fraud is of no relevance, as restitution is appropriate even when the party retaining the benefit from an improper claim is not a wrongdoer himself. *See* Order & Reasons at 23; S*chock,* 732 A.2d at 232-33. In this case, Woodbridge knew when it provided high-risk financing that the transaction carried significant uncertainty, and ultimately that Burrle would have no repayment obligation if he did not recover money from his claim.

### E. *Conclusion*

For the reasons stated in this memorandum, the Special Master seeks entry of a judgment requiring Burrle to make restitution to the DHECC for $50,015.87, paid by the DHECC in reliance on Burrle's false representations.  All professionals who assisted Burrle and benefitted from this unjustified payment from DHECC similarly should be required to return these payments, jointly and severally with Burrle up to the value of their payments on his claims.

                Respectfully submitted,


                ____/s/  Louis J. Freeh_____
                Louis J. Freeh
                Special Master

Dated:  June 10, 2014