## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MOBILE HOUSING BOARD, acting by** | ) | |
| **and through the Board of Commissioners** | ) | |
| **of the Housing Board of the City of Mobile,** | ) | |
| **Alabama, a body politic and political subdivision** | ) | **MDL NO. 2179** |
| **of the State of Alabama,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: 13-2670** |
| | ) | |
| **BP EXPLORATION & PRODUCTION,** | ) | |
| **INC.; BP AMERICA PRODUCTION** | ) | |
| **COMPANY, INC.; BP AMERICA, INC.;** | ) | |
| **BP P.L.C.; TRANSOCEAN  LTD.;** | ) | |
| **TRANSOCEAN OFFSHORE** | ) | |
| **DEEPWATER DRILLING, INC.;** | ) | |
| **TRANSOCEAN DEEPWATER, INC.;** | ) | |
| **TRANSOCEAN HOLDINGS, LLC;** | ) | |
| **TRITON ASSET LEASING GMBH;** | ) | |
| **HALLIBURTON ENERGY SERVICES,** | ) | |
| **INC.; SPERRY DRILLING SERVICES;** | ) | |
| **M-I, LLC; CAMERON INTERNATIONAL** | ) | |
| **CORPORATION f/k/a COOPER-** | ) | |
| **CAMERON CORPORATION;** | ) | |
| **ANADARKO** | ) | |
| **PETROLEUM CORPORATION;** | ) | |
| **ANADARKO E&P COMPANY LP; MOEX** | ) | |
| **OFFSHORE 2007, LLC; MOEX USA** | ) | |
| **CORPORATION; MITSUI OIL** | ) | |
| **EXPLORATION CO., LTD.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

**COMES NOW** the Plaintiff Mobile Housing Board, acting by and through the Board of

Commissioners of the Housing Board of the City of Mobile, Alabama, a body politic and

political subdivision on the State of Alabama (hereinafter "MHB" or "Plaintiff"), by and through

Counsel, and makes this its Complaint against the herein named Defendants for loss of revenue,

loss of income, loss of marketability, and/or other damages, losses, and/or costs as a result of the

oil spill that occurred subsequent to the explosion and sinking of the MODU Deepwater Horizon on or about April 20, 2010, on the outer Continental Shelf, approximately 50 miles South of the Louisiana coast, which oil spill expanded to the coastline of Mobile County, Alabama, and caused damage to and negatively impacted the Plaintiff.  Plaintiff has made a presentment of its claim to the responsible party, BP, pursuant to the Oil Pollution Act of 1990.  Ninety (90) days has expired since Plaintiff's presentment of its claim to the responsible party without the responsible party settling the Plaintiff's presentment of its claim.  Plaintiff has thus satisfied the mandatory condition precedent to file this civil action under the Oil Pollution Act of 1990.  In support of this Complaint Plaintiff would show as follows:

## NATURE OF ACTION

1.      On April 20, 2010, a blowout, explosion, and multiple fires occurred aboard the mobile offshore drilling unit ("MODU") *Deepwater Horizon*, resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico (the "Spill") that has caused, is causing, and will continue to cause, damage to the Plaintiff.  This is an action for damages, penalties, and other relief by the Plaintiff against the parties known to be responsible for the Spill.  The Defendants named in this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the "Macondo" well site in Mississippi Canyon Block 252 in the Gulf of Mexico, the operation of the *Deepwater Horizon*, and the containment or lack of containment of the Spill.

2.      Defendants' actions resulted in the blowout of the Macondo well, caused the explosion, burning, and sinking of the MODU *Deepwater Horizon*, and directly resulted in the release of crude oil and other pollutants in the waters of the Gulf of Mexico and those of Mobile County, Alabama, where PHA is located.  These pollutants have damaged, are damaging, and

will continue to damage the coastal environment, communities, property, and economic livelihood of the citizens of Mobile County, Alabama, which includes the City of Mobile and PHA.  Businesses and individuals in Mobile continue to suffer from the effects of the Spill, and the loss of revenues and jobs from these businesses and individuals has, is, and will continue to negatively impact the Plaintiff.  The revenues which Plaintiff seeks to recover in this action include, but are not limited to, those revenues lost as a result of the Spill which have a direct impact on Plaintiff.  Plaintiff is a non-profit entity that provides housing to low-income individuals through various government programs.  One way that Plaintiff earns revenue to continue to fund these programs is by renting homes to low-income individuals and families. The rate of rent for each home is directly tied to the renter's income.  After the Spill, individual incomes fell, resulting in a reduction of rental revenue to the Plaintiff.

3.     The image and attractiveness of Mobile for development, tourism, employment, and other purposes has suffered, are suffering, and will continue to suffer because of the known impact of the Spill, as well as the uncertainty that will exist for years over the ongoing impact of the Spill on the Gulf of Mexico, the Gulf's natural resources, and Mobile's natural resources and communities.  These past events and future uncertainty has caused and will cause economic damages to Plaintiff.

4.     Plaintiff, by and through its attorneys, brings this enforcement action for a declaratory judgment, to recover the fines, penalties and damages to which the Plaintiff is entitled, as well as for compensatory, punitive, and other damages, to the fullest extent allowed by Alabama and federal law.

5.     Investigation of other potential claims and assessment of damage amounts by Plaintiff continues.  Therefore, the Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new allegations, new claims, and new defendants.

## PARTIES, JURISDICTION, AND VENUE

### Parties

6.     Plaintiff is the Mobile Housing Board, acting by and through the Board of Commissioners of the Housing Board of the City of Mobile, a body politic and political subdivision of the State of Alabama

7.     Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service[1] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.  BP Exploration was designated as a "Responsible Party" by the U. S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C.§ 2714.  BP Exploration is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

8.     Defendant BP America Production Company, Inc. ("BP America Production") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America Production was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the MODU *Deepwater Horizon*.  BP America Production is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010.  It shall, however, be referred to as the MMS throughout this Complaint

9.      Defendant BP America, Inc. ("BP America") is a Delaware corporation with its principal place of business in Chicago, Illinois.  On information and belief, BP America is the parent company for BP's operations in the United States.  BP America is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

10.      Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  Defendants BP Exploration, BP America Production and BP America are wholly-owned subsidiaries of BP p.l.c.  BP p.l.c. has acknowledged that it is subject to jurisdiction in the United States.  BP p.l.c. does business in Alabama.

11.      BP Exploration, BP America Production, BP America, and BP p.l.c. are generally referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

12.      Defendant Transocean, Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and at all pertinent times was doing business in the State of Alabama.  Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the MODU *Deepwater Horizon*.

13.      Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Alabama.  Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the MODU *Deepwater Horizon*.

14.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Alabama.  Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

15.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Alabama.  Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore.  Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the MODU *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Spill originated.  Transocean Holdings is party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U. S.  Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.

16.     Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

17.     Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean."  At the Macondo site, Transocean provided the MODU *Deepwater Horizon* vessel and personnel to operate it.  At all times relevant to the Spill, Transocean, subject to BP's inspection and approval,

was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support of those drilling activities at all times relevant to the Spill.

18. Defendant Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton does business in the State of Alabama. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the MODU *Deepwater Horizon*, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

19. Halliburton division Sperry Drilling Services (formerly Sperry-Sun Drilling Services) was responsible for mudlogging personnel and equipment on the MODU *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. Throughout this Complaint, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

20. Defendant, M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and at all relevant times was doing business in Alabama. M-I (also known as M-I SWACO) supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and elsewhere, providing pressure control,

vessel instrumentation, and drilling waste management products and services.  On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well.  M-I employees planned and/or supervised key fluid-related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

21.     BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling defendants," as they were all involved in the drilling, cementing, and/or other temporary well abandonment activities of the *Deepwater Horizon*, and thus their actions caused and/or contributed to the Spill.

22.     Defendant Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas. Cameron does business in the State of Alabama.  Cameron manufactured, designed, supplied, and/or installed the *Deepwater Horizon*'s sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment.  The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

23.     Paragraph No. 23 initially left blank.

24.     Defendant Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Anadarko does

business in the State of Alabama.  Anadarko is an oil and gas exploration and production company.

25.     Defendant Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  Anadarko E&P does business in the State of Alabama. Anadarko E&P is an oil and gas exploration and production company.

26.     Defendant MOEX Offshore 2007, LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  MOEX Offshore does business in the State of Alabama.  MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation.

27.     Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas.  MOEX USA is the parent company of MOEX Offshore.

28.     Defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates:  MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC.  Each of these subsidiaries of MOECO share the same Houston, Texas, address.

29.     Neither MOEX Offshore nor MOEX USA are distinct corporate entities that perform autonomous business activities.  Instead, both entities are dominated and controlled by their ultimate parent company, MOECO, which wholly owns MOEX USA, which in turn wholly owns MOEX Offshore.  Because MOECO is an alter ego of its subsidiaries (MOEX Offshore

and MOEX USA), any and all liability of MOEX Offshore and MOEX USA is imputed to MOECO.

30.     Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

31.     While BP was the sole lease operator of the *Deepwater Horizon*, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders.  On October 1, 2009, BP Exploration, as operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore Deepwater Operating Agreement.  On December 17, 2009, BP Exploration, MOEX Offshore, Andarko E&P, and Andarko executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following ownership percentages in the Macondo Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%.  According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows:  BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%.  As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act. Anadarko, Anadarko E&P, and MOEX also had access to Halliburton/Sperry Sun INSITE real-time data that was transmitted from the *Deepwater Horizon* on April 20, 2010, and therefore knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster.

32.     Drilling Defendants, Cameron, Weatherford, Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable under various principles of federal maritime, and/or applicable State law, and under the Oil Pollution Act.

*Jurisdiction*

33.     The claims presented in sub-Section I of this Complaint are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Jurisdiction exists pursuant to Article III., Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of Admiralty and maritime jurisdiction."  Jurisdiction also exists pursuant to the Admiralty Extension act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

34.     The claims presented in sub-Section II invoke the Court's jurisdiction under the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").  *See* 28 U.S.C. § 1331.

35.     The claims presented in sub-Section III invoke the Court's supplemental jurisdiction.  *See* U.S.C. § 1367.

36.     All claims presented herein invoke the Court's jurisdiction under 28 U.S.C. § 1332, in that the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and the matter in controversy is between citizens of different states.

*Venue*

37.     Venue is proper in the United States District Court for the Southern District of Alabama pursuant to 28 U.S.C. §§ 1391(b).

38.     If the Plaintiff is transferred to the pending MDL, No. 2179, United States District Court, Eastern District of Louisiana, the Plaintiff reserves the right to seek at transfer of any and all issues and claims not resolved in the proceedings before the MDL Court back to the Southern

District of Alabama for a jury trial, as discussed in more detail *infra* at Paragraphs 311-313.  The Plaintiff objects to the transfer to the MDL in the event the Defendants attempt to transfer this suit as venue is proper in the United States District Court for the Southern District of Alabama.

## GENERAL ALLEGATIONS

### *The Macondo Lease, and BP's Exploration Plan and Drilling Permit*

39.     On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

40.     In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conversation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

41.     BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

42.     Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

43.     After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

### *The Deepwater Horizon's Poor Safety and Maintenance Record*

44.     The *Deepwater Horizon* was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

45.     At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

46.     Prior to the Spill, Drilling Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor.  Drilling Defendants also had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon*'s equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment.

### *The Macondo Well*

47.     The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.  At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep.  Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

13

48.     Drilling Defendants struggled with the Macondo well before the events of April 20, 2010.  The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

49.     As the drilling schedule fell farther behind due to these and other problems, Drilling Defendants—BP in particular—increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo in an effort to reduce costs.  Drilling Defendants repeatedly chose to violate industry guidelines and government regulations and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well.

### Conduct Leading Up to the Explosion

50.     By April 9, 2010, Drilling Defendants had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained.  In their rush to complete the well, Drilling Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-saving over safety and industry best practices.

51.     Drilling Defendants chose a "long string" design for the Macondo well with fewer barriers against the risk of Hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

52.     Drilling Defendants used inferior metal well casings, for the casing pipe material itself, in violation of BP's own safety policies and design standards.

53.     The Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

54.     Drilling Defendants knowingly used too few centralizers on one or more pieces of casing pipe, with the knowledge or acquiescence of other Defendants.

55.     Drilling Defendants failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

56.     Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky.  BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk.  To save time and money, Defendants chose not to run a 9 to 12-hour procedure called a cement bond log to assess the integrity of the cement seal.  Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

57.     Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable.  In addition, Halliburton and BP had results in March, 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

58.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs.  Defendants were aware of the

risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs, Drilling Defendants were also aware that the industry and government had major Concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon*.

59.   Defendants BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, and functional technology to prevent blowouts.

60.   Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that the *Deepwater Horizon*'s BOP had sufficient, functional, built-in redundancy to eliminate single-point failure modes.

61.   Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

62.   Defendants Cameron, BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the testing of the *Deepwater Horizon*'s BOP was comprehensive, reviewed, and verified, and further failed to check and verify that BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

63.   Defendant Cameron failed to ensure and verify that the BOP it designed, manufactured, marketed, and sold, and which was appurtenant to the *Deepwater Horizon* drilling vessel, was suitable for the types of drilling conditions, drill pipes, and casing assembly designs

that would foreseeably be used during the *Deepwater Horizon*'s drilling and exploration operation.

64.     Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*, but did not do so.

65.     Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have installed a back-up acoustic trigger to activate the *Deepwater Horizon*'s BOP in the event that the main trigger failed to activate.

66.     While some testing has been completed, the investigation of the BOP retrieved from the seafloor, and other matters related to the disaster at the Macondo well, is still ongoing. Thus, the Plaintiff reserves the right to amend this Complaint once further information from that and any other future investigations becomes available.

67.     Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon*.   In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches, and a balky propulsion system.   In some cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. These events contributed to the cause of the disaster, or made it worse.

68.     The other Drilling Defendants were all aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

69.     Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of Defendants' misconduct, negligence and/or wantonness include:

a.      Utilizing a defective well casing that was prone to fail when under heavy pressure;

b.      Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion,

c.      Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

d.      Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf's crust;

e.      Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

f.      Failure to deploy a casing hanger lockdown sleeve;

g.      Displacing mud in the well with less-dense seawater before cementing had fully set;

h.      Using non-standard spacer fluid mixture and volume;

i.      Continuing to operate the Macondo Well after the well failed pressure tests;

j.      Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout.

k.      Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken.

l.      Consciously electing not to install an acoustically activated remote-control shutoff valve;

m.     Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well;

n.    Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o.    Failing to recognize that pressure and flow data from the well were warning signs of a blowout.

p.    Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well – for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q.    Failing to properly design, install, or maintain power supply to the blow-out preventer ("BOP"), including without limitation the use of only one blind shear ram, faulty maintenance, faulty post-mark modifications, and other issues;

r.    Failing to properly design, install, or maintain connections from the blow-out preventer's control panel to the blow-out preventer;

s.    Failing to properly maintain and repair the BOP: Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems.  In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control problems to the MMS and to stop drilling if either of a BOP'S two control systems is not working properly; and,

t.    Failing to equip the vessel with sufficient safety equipment, including operational gas sensors and a gas alarm system.

70.    The drilling Defendants all knew, or should have known, of the acts and omissions outlined above, and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

71.    In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel.  Yet, Defendants failed to take appropriate measures to prevent damage to the Plaintiff.

***Post –Explosion Conduct***

72.     Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

73.     Defendants failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and they misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations.

74.     Defendants attempted to downplay and conceal the severity of the oil spill after the explosion.  Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the official leak estimate of 60,000 barrels of oil per day.  In addition, the worst-case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

75.     Defendants were also slow and incomplete in their announcements and warnings to Plaintiff's residents and businesspeople about the severity, forecast, and trajectory of the Spill.

76.     Furthermore, the chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects as well.  Corexit EC9500A and Corexit EC9527A were the principal dispersants used.  These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill.  In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be <u>no</u> safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-

accumulate in the tissues of fish or other organisms.  Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

77.     Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other RPA-approved dispersants and are banned from use on oil spills in the United Kingdom.  Defendant stated that they chose to use Corexit because it was available the week of the rig explosion.

78.     More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August.  Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface.  Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

79.     Oil, dispersants, and other pollutants released by Defendants remain in Gulf waters, the Gulf floor, Alabama waters, and lands in Mobile County, Alabama, where Plaintiff is located, and continue to cause damage. Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Alabama, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water, land, property, and resources of Mobile County, Alabama, causing damage to Plaintiff.

80.     The Spill has caused or contributed to, and will continue to cause or contribute to, injuries and damages to the Plaintiff.

81.     The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens.  Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, cooper, mercy, and nickel, all of which are hazardous to the health of humans and marine life.

82.     Moreover, the chemical dispersants used by BP during the Spill response is harmful to the health of humans and marine life.

83.     As a direct result of the Spill, Mobile County, Alabama, has suffered past, present, and future harm to, and contamination of, its waters, property estuaries, seabeds, animals, plaintiffs, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources, which in turn causes economic damages to Plaintiff.

84.     The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico, causing damage to the livelihoods of many Alabamians, which in turn causes economic damages to Plaintiff.

85.     There are a wide variety of commercially valuable fish species in the Gulf of Mexico that have been and will continue to be harmed by the Spill, including, but not limited to, shrimp, crabs, oysters, menhaden, tuna, and pelagic fish.  As sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue, which in turn will cause economic damages to Plaintiff.

*Economic Damages*

86.     The Spill and the resulting contamination of Mobile County, Alabama's coastline have caused, are causing, and will continue to cause a loss of income for individuals and entities in Mobile, including those who rely on the Gulf of Mexico and/or its marine life for their livelihoods.  This loss of income has, is, and will continue to result in a loss of revenue for the Plaintiff.

87.     Moreover, Mobile County, Alabama, has also seen, and is continuing to see, a dramatic drop in Gulf-related tourism as a result of the Spill.  This decrease in Mobile County tourism has, is, and will continue to result in a loss of revenue for the Plaintiff.

88.     Plaintiff seeks both compensatory and punitive damages in this action.   As discussed generally above, Plaintiff's compensatory damages as a result of Defendants' acts and omissions include, but are not limited to, the following:

    a.    Past, present, and future lost rents, income and/or use revenue;

    b.    Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

    c.    Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

    d.    Past, present, and future diminution in value of property;

    e.    Past, present, and future loss of marketability;

    f.    All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

    g.    Other damages, losses or costs as will be shown at trial.

89.    This list is by no means exhaustive.  There are many other forms of harm or damage from the Spill that may be unknown, and the Plaintiff reserves the right to amend this Complaint as additional information becomes available.

## CAUSES OF ACTION

I.    **Claims Under General Maritime Law**

A.    *Negligence*

90.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

91.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

92.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to the Plaintiff to guard against and/or prevent the risk of an oil spill.

93.    In addition, Cameron and Weatherford, as designers, manufacturers, and suppliers of the *Deepwater Horizon's* BOP and float collar, respectively, owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the design, manufacture and supply of the BOP and float collar.

94.    Anadarko, Anadarko E&P, and MOEX had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the *Deepwater Horizon* on April 20, 2010. As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to the Plaintiff to warn of the impending

disaster in sufficient time to avert it.  Anadarko, Anadarko E&P, and MOEX breached their duties to the Plaintiff by failing to warn the drilling vessel crew of the imminent blowout so that the crew could take evasive action.

95.     The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

96.     The blowout and explosions on the *Deepwater Horizon*, its sinking, and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to the Plaintiff.

97.     Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to the Plaintiff,

98.     Defendants were under a duty to exercise reasonable care while participating in drilling operations on the *Deepwater Horizon* to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

99.     Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained, captured and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

100.    Defendants knew or should have known that the acts and omissions described herein could result in damage to the Plaintiff.

101.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties they owed to the Plaintiff.

102. The conduct of Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit the Plaintiff.  One or more of the Drilling Defendants violated these statutory standards.  The violations of these statutory standards constitute negligence per se under the law of Alabama and the general maritime law, including (but not limited to) the Clean Water Act, 33 U.S.C. § 1311.

103. At all times material hereto, the *Deepwater Horizon* was owned, navigated, manned, possessed, and managed by Transocean.

104. As the owner and manager of the *Deepwater Horizon*, Transocean owed duties of care of the Plaintiff to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the *Deepwater Horizon* with reasonable and ordinary care.

105. Transocean breached its duties to the Plaintiff by, inter alia, failing to properly manage, control, maintain and operate the *Deepwater Horizon* and its safety equipment, including, but not limited to, the gas sensors, air intake valves, emergency shut down systems, and BOP, and in disabling vital alarm systems on the *Deepwater Horizon* before the blowout.

106. Transocean also breached its duties to the Plaintiff by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

107. Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which

provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 66 CFR §§ 96.230 and 96.250.

108.    At all times material hereto, the *Deepwater Horizon* was leased and operated pursuant to a contract between Transocean and BP.  Together, Transocean and BP and other Drilling Defendants were responsible for well design and control.

109.    BP owed duties to the Plaintiff to, *inter alia,* exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

110.    BP breached its duties to the Plaintiff by, *inter alia:*

    a.    choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

    b.    using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

    c.    using too few centralizers to ensure that the casing was centered into the wellbore;

    d.    failing to implement a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

    e.    failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

    f.    cancelling the cement bond log test that would have determined the integrity of the cement job;

g. failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

h. using an abnormally large quantity of mixed and untested spacer fluid;

i. failing to train drilling vessel workers and/or onshore employees and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon; and,

j. requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore.

111. All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to the Plaintiff's injuries and damages.

112. At all times hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

113. At all times material hereto, Halliburton owed duties to the Plaintiff to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the *Deepwater Horizon*'s well.

114. Halliburton breached its duties to the Plaintiff by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well. In addition, Halliburton was negligent by, *inter alia*,

a. failing to use a full "bottoms up" circulation of mud between the running of the casing and beginning of the cement job in violation of industry standards;

b. failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

c. cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; and,

      d.      failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to the Plaintiff's damages.

115.    At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations onboard the Deepwater Horizon and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

116.    At all times material hereto, M-I owed duties of care of the Plaintiff to, *inter alia*, exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the *Deepwater Horizon*.

117.    M-I breached its duties to the Plaintiff by, *inter alia*, failing to provide, control, and monitor the mud and spacer solutions used on the *Deepwater Horizon* in a reasonably safe manner, proximately causing and/or contributing to the Plaintiff's injuries and damages.

118.    At all times relevant hereto, Cameron designed, manufactured, and supplied the BOP that was, at all times relevant herein, appurtenant to and a part of the vessel's equipment.

119.    Cameron owed duties to the Plaintiff to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the *Deepwater Horizon*.

120.    Cameron breached its duties to the Plaintiff by failing to exercise reasonable care in the design, manufacture and supply of the BOP such that it failed to operate to prevent the blowout, thereby proximately causing and/or contributing to the Plaintiff's injuries and damages.

121.    Cameron breached its duties to the Plaintiff by, *inter alia*, failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the Deepwater Horizon's drilling and exploration operations; designing the BOP such that it was vulnerable to a single-point failure; failing to install a backup activation system for the BOP; and failing to provide

adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

122.     At all times relevant hereto, Weatherford designed, manufactured and supplied the float collar used in the Macondo well.

123.     Weatherford owed duties of care to the Plaintiff to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture of the float collar in the long string casing.

124.     Weatherford breached its duties to the Plaintiff in designing and manufacturing a float collar that failed to seal properly and which allowed hydrocarbon backflow into the casing, which proximately caused and/or contributed to the blowout, explosions, fire, and Spill, resulting in the Plaintiff's injuries and damages.

125.     Anadarko and MOEX had actual or constructive notice of the potentially disastrous conditions at the well site.  Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to Health, Safety, and Environmental ("HAS") information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement.  Failure to exercise this role given the known history of specific problems at the wellsite was negligent.

126.     Engineers knowledgeable about blowout responses told BP how to kill the well as early as June, 2010, but BP, after conferring with its Macondo lease partners Anadarko and MOEX, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well or its change to make a profit on Macondo.  Because BP, along with Anadarko and

MOEX, hoped to retap the Macondo Well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.

127.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by the Plaintiff were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants.  The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them, and the Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur.*

128.    In addition to the foregoing acts of negligence, the Plaintiff avers that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

    a.    Failing to properly operate the *Deepwater Horizon*;

    b.    Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

    c.    Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

    d.    Acting in a careless and negligent manner without due regard for the safety of others;

    e.    Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operation of the *Deepwater Horizon* which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

    f.    Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

    g.    Negligently hiring, retaining and/or training personnel;

h.      Accelerating drilling operations in an effort to save money and pressuring employees to work with undue haste in the hours before the blowout; while ignoring or failing to acknowledge the warning signs of the impending disaster;

i.      Failing to take appropriate action to avoid or mitigate the accident;

j.      Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

k.      Failing to observe dangerous and recurring problems with hydrocarbons in the well, and instituting risky cementing and drilling procedures hours before the blowout.

l.      Failing to disclose or correct the fact that the battery on the BOP was weak and one of its control pods was broken;

m.      Consciously electing not to install an acoustically activated remote-control shut-off valve;

n.      Failing to institute common industry protective measures necessary to detect the buildup of hydrocarbons in the well before and during the cementing process;

o.      Using a defective well casing that was prone to failure under heavy pressure;

p.      Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

q.      Failing to warn in a timely manner;

r.      Failing to timely bring the oil release under control;

s.      Failing to provide appropriate accident prevention equipment;

t.      Failing to observe and read gauges that would have indicated excessive pressures in the well;

u.      Failing to react to danger signs; and,

v.      Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

32

129.     The Plaintiff is entitled to a judgment finding Defendants liable, jointly, severally, and solidarily to the Plaintiff for damages suffered as a result of Defendants' negligence and awarding the Plaintiff adequate compensation in amounts determined by the trier of fact.

130.     The injuries to the Plaintiff were also caused by and/or aggravated by the fact Defendants failed to take necessary actions to mitigate the danger associated with their operations.

131.     As a direct and proximate result of Defendants' acts and/or omissions, the Plaintiff has incurred damages, including, but not limited to, the following:

a.     Past, present, and future lost rents, income and/or use revenue;

b.     Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

c.     Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

d.     Past, present, and future diminution in value of property;

e.     Past, present, and future loss of marketability;

f.     All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available.

f.     Other damages, losses or costs as will be shown at trial

for all of which the Plaintiff is entitled to compensatory and punitive damages.

**B.     *Gross Negligence and Willful Misconduct***

132.     The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

133.     Drilling Defendants and Cameron owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the maintenance of, and drilling operation on,

the Deepwater Horizon, and additionally owed and breached duties to the Plaintiff to guard against and/or prevent the risk of the Spill. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

134. Drilling Defendants and Cameron breached their legal duty to the Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the *Deepwater Horizon*.

135. Drilling Defendants and Cameron knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

136. Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiff by, *inter alia*, disabling the gas alarm system aboard the *Deepwater Horizon.*

137. BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiff by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effect an uncontrolled oil spill into the waters of the Gulf of Mexico.

138. BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment by, *inter alia,* using an inappropriate cement mixture for the well; failing to appropriately test that cement

mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

139.    BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

140.    BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiff by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon.*

141.    Anadarko and MOEX had actual or constructive notice of the potentially disastrous conditions at the well site.  Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to Health, Safety, and Environmental ("HSE") information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the wellsite amounts to gross negligence.

142.    Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP, after conferring with its Macondo lease partners Anadarko and MOEX, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well or its chance to make a profit on Macondo.  Because BP, along with Anadarko and

MOEX, hoped to retap the Macondo Well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.  This reckless disregard of the experts' opinions amounts to gross negligence.

143.    The foregoing acts of gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment on the part of the Drilling Defendants and Cameron directly and proximately caused damage to the Plaintiff, including, but not limited to, the following:

a.    Past, present, and future lost rents, income and/or use revenue;

b.    Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

c.    Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

d.    Past, present, and future diminution in value of property;

e.    Past, present, and future loss of marketability;

f.    All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available;

g.    Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

### C.    *Strict Liability for Manufacturing and/or Design Defect*

### Cameron

144.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

145.    The Plaintiff is entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the *Deepwater*

*Horizon*, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

146.     At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the *Deepwater Horizon*.

147.     If operating as intended on the night of the disaster, the BOP used in connection with the drilling operations onboard the *Deepwater Horizon* could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity; thereby sparing the Plaintiff millions of dollars in losses and damage.

148.     Cameron sold and delivered the BOP at the *Deepwater Horizon* to Defendant Transocean in 2001.

149.     Cameron's BOP failed to operate properly or at all, at the time of or following the blowout, and this failure caused and/or contributed to the Spill.

150.     Cameron failed to effectively design the BOP with a backup activation system, or to provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

151.     The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which rendered the BOP abnormally dangerous.  For instance, all of the emergency methods for closing the BOP provide different ways of closing a single blind shear ram, which must seal to isolate the wellbore.  As such, if the blind shear ram fails to operate for any reason, there is nothing the BOP can do to seal the well.   In additions, all emergency methods of operating the BOP, other than the auto shear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

152.     In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with BOP.

153.     Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades.  If the shuttle valve fails, the blind shear ram will be unable to seal the well.

154.     Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

155.     Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

156.     Cameron's BOP was in a defective condition and unreasonably dangerous to the Plaintiff when it left Cameron's control.

157.     At all times, Cameron's BOP was used in the manner intended, or in a manner reasonably foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

158.     At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to the Plaintiff in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

    a.     Inadequate, faulty, nonfunctioning and defective battery systems;

    b.     Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

    c.     The absence of acoustic triggers;

    d.     Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

e.      Improperly sealed, leaky hydraulic systems;

f.      Improperly designed, manufactured, and installed annular seals;

g.      Insufficiently robust blind shear rams;

h.      Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

i.      Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

j.      In such other particulars as the evidence may show.

159.   At the time the BOP appurtenant to the *Deepwater Horizon* left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

160.   At the time the BPO appurtenant to the *Deepwater Horizon* left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by the Plaintiff without impairing the utility, usefulness, practicality or desirability of the BOP.

161.   At all relevant times, the BOP appurtenant to the *Deepwater Horizon* was used in and intended and/or reasonable foreseeable manner.

162.   The Plaintiff was a foreseeable bystander and victim of the manifestation of the defects in the *Deepwater Horizon's* BOP.

163.   Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP, which caused or contributed to this incident, which in turn caused the Plaintiff's damages and its actions and/or inactions were grossly negligent, reckless, willful and/or wanton.

164.   As a result of manufacturing and/or defects in Cameron's BOP, the Plaintiff has suffered damages including, but not limited to, the following:

a.      Past, present, and future lost rents, income and/or use revenue;

b.  Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

c.  Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

d.  Past, present, and future diminution in value of property;

e.  Past, present, and future loss of marketability;

f.  All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available;

g.  Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

**D.  Strict Liability for Manufacturing and/or Design Defect**

**Weatherford**

165.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

166.    The Plaintiff is entitled to recover from Weatherford for its defective design and/or manufacture of the float collar on the *Deepwater Horizon* pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

167.    At all times relevant hereto, Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deep Horizon.*

168.    Weatherford sold and delivered the float collar at the *Deepwater Horizon* to Defendant Transocean in 2001.

169.     The float collar is a check valve device that is installed to prevent backflow or ingress of fluids into the casing.  Hydrocarbons flowing into the casing from the bottom of the wellbore must first pass through the float collar.

170.     On April 20, 2010, the Weatherford-manufactured float collar did not seal properly, which allowed hydrocarbons to leak into the casing, contributing to the blowout and subsequent explosions, fire, sinking and Spill.

171.     Weatherford's float collar failed to operate properly or at all, at the time of or following the blowout, and this failure caused or contributed to the Spill.

172.     Weatherford's float collar was defective because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

173.     The float collar used on the *Deepwater horizon* was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

174.     Weatherford's float collar was in a defective condition and unreasonably dangerous to the Plaintiff when it left Weatherford's control.

175.     At all times, Weatherford's float collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Weatherford prior to April 20, 1010.

176.     At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, Weatherford knew, or in light of reasonable available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

177.     At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, feasible design alternatives existed, which would have to a reasonable probability prevented the harm suffered by the Plaintiff without impairing the utility, usefulness, practicality or desirability of the float collar.

178.     At all relevant times, the float collar used on the *Deepwater Horizon* site was used in an intended and/or reasonably foreseeable manner.

179.     The Plaintiff was a foreseeable bystander and victim of the manifestation of the defects in the *Deepwater Horizon's* float collar.

180.   Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to this incident, which in turn caused the Plaintiff's injuries and damages, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

181.     As a result of manufacturing and/or defects in the Weatherford float collar, the Plaintiff has suffered damages including, but not limited to, the following:

> a.     Past, present, and future lost rents, income and/or use revenue;
>
> b.     Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.
>
> c.     Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.
>
> d.     Past, present, and future diminution in value of property;
>
> e.     Past, present, and future loss of marketability;
>
> f.     All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available;
>
> g.     Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

**E.  Strict Liability For Manufacturing And/Or Design Defect**

**Halliburton**

182.  The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

183.  Pursuant to Section 402A of the Restatement (Second) of Torts, as adopted by maritime law, the Plaintiff is entitled to recover for Halliburton for its defective design and/or manufacture of the cement mixture, or "slurry," used to seal the well.

184.  At all times relevant hereto, Halliburton was in the business of designing, manufacturing, marketing, selling, and/or distributing cement to be used to seal oil wells.

185.  Halliburton sold and delivered the cement slurry to be used to seal the Macondo well in April, 2010.

186.  On April 20, 2010, the Halliburton-designed cement mixture did not seal properly, which allowed hydrocarbons to leak into the casing, causing and/or contributing to the blowout and subsequent explosions, fire, sinking, and Spill.

187.  The cement provided by Halliburton was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx.  The composition of the cement mixture that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well.

188.  Halliburton defectively designed the cement mixture and failed to thoroughly conduct and/or review the results of laboratory testing of the cement mixture's stability under conditions that would be found in the Macondo well.  The foamed cement mixture it provided, which had been injected with nitrogen gas to lower its density, was defectively designed considering the high temperatures and pressures in wells like Macondo, which can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

189.     The tests conducted by Halliburton in February, 2010, on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo well.  Post-explosion testing also revealed that Halliburton's cement mixture was unstable.

190.     Halliburton's cement mixture failed to operate properly, or at all, at the time of or following the blowout, and this failure caused or contributed to the Spill.

191.     Halliburton's cement mixture was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

192.     Halliburton's cement mixture was in a defective condition and unreasonably dangerous to the Plaintiff when it left Halliburton's control.

193.     At all times, Halliburton's cement mixture was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Halliburton prior to April 20, 2010.

194.     At the time Halliburton's cement mixture left Halliburton's control, Halliburton knew, or in light of reasonably available Knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

195.   At the time the cement mixture left Halliburton's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by the Plaintiff without impairing the utility, usefulness, practicality or desirability of the cement mixture.

196.     The Plaintiff was a foreseeable bystander and victim of the manifestation of the defects in Halliburton's cement mixture.

197.   Halliburton had actual and/or constructive knowledge of the facts and circumstances relative to its cement mixture that caused or contributed to this incident, which in turn caused the Plaintiff's injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

198.   As a result of manufacturing and/or defects in Halliburton's cement mixture, the Plaintiff has suffered, *inter alia*, a loss of tax revenue resulting from (among other things) a decline in tourism, for which the Plaintiff is entitled to actual and compensatory damages.

199.   As a result of manufacturing and/or defects in the Halliburton's cement mixture, the Plaintiff has suffered damages including, but not limited to, the following:

a.   Past, present, and future lost rents, income and/or use revenue;

b.   Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

c.   Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

d.   Past, present, and future diminution in value of property;

e.   Past, present, and future loss of marketability;

f.   All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available;

g.   Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

## II.  The Oil Pollution Act

### BP, Transocean, Anadarko, Anadarko E & P, and MOEX

200.  The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

201.   The Oil Pollution Act, 33 U.S.C. § 2701, *eq. seq.* (the "OPA"), imposes liability upon a "responsible party for a … vessel or a facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

202.    The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface.

203.    BP and Transocean are responsible parties under the OPA, and they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

204.    Defendants Anadarko, Anadarko E&P, and MOEX held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), and oil lease on lands beneath navigable waters, before and/or at the time of the Spill.  As such, they were lessees of the area within which the well and drilling vessel, both offshore facilities, were located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA.  They are therefore strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

205.    Defendants BP, Transocean, Anadarko, Anadarko E&P, and MOEX are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations.  33 U.S.C. § 2704(c).

206.    In its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

207.    Pursuant to Section 2702(b)(1) of the OPA, the Plaintiff is entitled to all removal costs, if any, it has incurred, or will incur, as a result of the Spill.

208.    As a result of the Spill, the Plaintiff is entitled to damages pursuant to 2702(b)(2)(A), which provides for recovery of damages "for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage," if any.

209.    The Plaintiff is also entitled to damages pursuant to Section 2701(b)(2)(B), which provides for recovery of damages to real or personal property, including "damages for injury to,

or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

210.    The Plaintiff is also entitled to damages pursuant to Section 2702(b)(2)(D) "equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources…"

211.    The Plaintiff is further entitled to damages pursuant to Section 2702(b)(2)(F) "for net costs of providing increased or additional public services, if any, during or after removal activities, including protection from fire, safety, or health hazards, caused by" the Spill.

212.    The Plaintiff has satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b).  Ninety (90) days have passed from the presentment without the Plaintiff receiving any payment or settlement on its claim pursuant to 33 U.S.C. § 2713(c)(2).  Because the full extent of the Plaintiff's damage is still unknown, and the Plaintiff is presently assessing the breadth of its damages, the Plaintiff may make additional presentments to the Defendants.

213.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. § 2717(f)(2), the Plaintiff seeks a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants, jointly and severally and without limitation, that said Defendants are liable for removal costs and damages in this action and in any subsequent action or actions.

214.    The Plaintiff further seeks all damages available to it pursuant to the OPA.

### III.  State Law Claims For Relief

#### A.  Public Nuisance (Drilling Defendants, Cameron, and Weatherford)

215.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

216.    The negligence of Drilling Defendants, Cameron, and Weatherford caused and/or contributed to the blowout and subsequent Spill that invaded and polluted the public waters of Alabama, damaging all persons who came within the sphere of its operation, resulting in a devastating economic and ecological disaster that has interfered, is interfering, and will continue to interfere with the Plaintiff's interests and the use and enjoyment of the Alabama's waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources that benefit the Plaintiff, which constitutes a public nuisance pursuant to Ala. Code § 6-5-120 *et seq.* and/or common law.  This public nuisance has caused special damages to Plaintiff pursuant to Ala. Code § 6-5-123.

217.    Drilling Defendants, Cameron, and Weatherford acted in an unreasonable manner in creating the nuisance described herein.

218.    As a direct and proximate result of the creation and continuing creation of a public nuisance, the Plaintiff has suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, loss of revenue for the Plaintiff, and a substantial increase in expenditures by the Plaintiff to deal with the effects of the nuisance caused by the Defendants.

219.    Drilling Defendants, Cameron, and Weatherford were under a duty to take positive action to prevent or abate the interference, including determining the nature and extent of the past, present, and future harm to human, animal, and plant live, and other natural resources caused by the Spill, and appropriate measures needed to abate such harm and threat of harm to the Plaintiff, but failed to do so.

220.    As a direct and proximate result of the creation of a public nuisance by Drilling Defendants, Cameron, and Weatherford, and their failure to perform their duties and obligations,

the Plaintiff has suffered and will continue to suffer losses, for which the Plaintiff is entitled to be compensated.

221.    Drilling Defendants, Cameron, and Weatherford are liable to the Plaintiff, jointly and severally, to take all appropriate actions to remedy and abate the harm to the environment and public health caused by the public nuisance they created, and any other relief the Court deems just and appropriate.

### B.  Private Nuisance (Drilling Defendants, Cameron, and Weatherford)

222.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

223.    The negligence of Drilling Defendants, Cameron and Weatherford caused and/or contributed to the blowout and subsequent Spill that invaded and polluted the public waters of Alabama, damaging all persons who came within the sphere of its operation, resulting in a devastating economic and ecological disaster that has interfered, is interfering, and will continue to interfere with the Plaintiff's interests and the use and enjoyment of the Alabama's waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources that benefit the Plaintiff, which constitutes a public nuisance pursuant to Ala. Code § 6-5-120 *et seq.* and/or common law.  This public nuisance has caused special damages to Plaintiff pursuant to Ala. Code § 6-5-123.

224.    Drilling Defendants, Cameron, and Weatherford were under a duty to take positive action to prevent or abate the interference, but failed to do so.

225.    The creation of the private nuisance by Drilling Defendants Cameron and Weatherford proximately caused past, present, and future damages to the Plaintiff by allowing

oil, chemical dispersants, and other materials and substances to contaminate property in Mobile County, Alabama, thereby causing damages to Plaintiff.

226.    As a direct and proximate result of the creation of the private nuisance, the Plaintiff has suffered and will continue to suffer losses, for which the Plaintiff is entitled to be compensated.

227.    Drilling Defendants, Cameron, and Weatherford are liable to the Plaintiff for actual and compensatory damages sustained as the direct and proximate result of the private nuisance alleged herein.

### C.  Alabama Extended Manufacturer's Liability Doctrine (Cameron)

228.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

229.    Defendant Cameron designed, manufactured and/or supplied the *Deepwater Horizon's* BOP.

230.    Defendant Cameron's BOP failed to operate properly or at all to prevent the blowout, and this failure caused or contributed to the blowout, explosion, fire, and Spill.

231.    Defendant Cameron's BOP was  defectively manufactured and/or designed because it failed to operate as intended, either by manual trigger of by automatic trigger.

232.    As a result of the BOP product defect, massive amounts of oil were discharged from the Macondo well, causing injury to the Plaintiff.

233.    Defendant Cameron's BOP was in a defective condition and unreasonably dangerous to the Plaintiff when the BOP left Defendant Cameron's control.

234.    At all times, Defendant Cameron's BOP was used in the manner intended.

235.   By reason of the foregoing, the Plaintiff has suffered and will suffer damages including, but not limited to, the following:

      a.   Past, present, and future lost rents, income and/or use revenue;

      b.   Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

      c.   Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

      d.   Past, present, and future diminution in value of property;

      e.   Past, present, and future loss of marketability;

      f.   All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

      g.   Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

### D.  Alabama Extended Manufacturer's Liability Doctrine (Weatherford)

236.   The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

237.   Defendant Weatherford designed, manufactured and/or supplied the float collar installed near the bottom of the casing string which, if operating properly, prevents the backflow of fluids or cement after the fluids or cement have been pumped through, thereby preventing the influx of hydrocarbons below the float collar from rising farther up the casing.

238.   A failure of the float collar appurtenant to the *Deepwater Horizon* would have allowed hydrocarbons to flow up through the casing, towards the riser and the *Deepwater Horizon* at the surface, contributing to the blowout and the subsequent explosions, fire, sinking, and Spill.

239.    Defendant Weatherford's float collar failed to operate properly, or at all, to seal the well and prevent the blowout, and this failure caused or contributed to the blowout, explosion, fire and Spill, which caused injury and damage to the Plaintiff.

240.    Defendant Weatherford's float collar was defectively manufactured and/or designed because it failed to operate as intended.

241.    Defendant Weatherford's float collar was in a defective condition and unreasonably dangerous to the Plaintiff when it left Defendant Weatherford's control.

242.    At all times, Defendant Weatherford's float collar was used in the manner intended.

243.    Weatherford consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the Plaintiff and its citizens.

244.    By reason of the foregoing, the Plaintiff has incurred, and continues to incur, damages, including, but not limited to, the following:

      a.     Past, present, and future lost rents, income and/or use revenue;

      b.     Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

      c.     Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

      d.     Past, present, and future diminution in value of property;

      e.     Past, present, and future loss of marketability;

      f.     All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

      g.     Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

### E.  Alabama Extended Manufacturer's Liability Doctrine (Halliburton)

245.   The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

246.   Defendant Halliburton designed, manufactured and/or supplied the cement slurry mixture to be used at the Macondo Well.

247.   Defendant Halliburton's cement mixture failed to operate properly or at all to prevent the blowout, and this failure has caused or contributed to the blowout, explosion, fire and Spill.

248.   Defendant Halliburton's cement mixture was defectively manufactured and/or designed because it failed to operate as intended, either by manual trigger or by automatic trigger.

249.   As a result of the defects in Halliburton's cement mixture, massive amounts of oil were discharged from the Macondo well, causing injury to the Plaintiff.

250.   Defendant Halliburton's cement mixture was in a defective condition and unreasonably dangerous to the Plaintiff when the BOP left Defendant Halliburton's control.

251.   At all times, Defendant Halliburton's cement mixture was used in the manner intended.

252.   By reason of the foregoing, the Plaintiff has incurred, and continues to incur damages, including, but not limited to, the following:

    a.    Past, present, and future lost rents, income and/or use revenue;

    b.    Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

    c.    Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

d.      Past, present, and future diminution in value of property;

e.      Past, present, and future loss of marketability;

f.      All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

g.      Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

**F.  Fraudulent Concealment or Suppression of Material Facts (BP, Halliburton, and Transocean)**

253.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

254.    The Plaintiff is entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment or suppression of material facts concerning the Spill under Alabama law, general maritime law, and/or common law.

255.    After the Spill, the Defendant BP attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

256.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

257.    In addition, BP misrepresented its capabilities to respond to the Spill.  BP overstated its ability to handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

258.     In fact, BP did not have proven equipment and technology to respond to the Spill; instead, as stated in the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico."   As noted further in the letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

259.     BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

260.     Despite its inability to respond and to control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

261.     The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

262.     In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the blowout, all of which demonstrated that the foam cement used at Macondo was unstable.

263.     The instability of the cement used at the Macondo well and the results of the testing performed before the blowout were material facts that Halliburton had a duty to disclose because of the dire consequences of these facts and the risks attendant with the failure to disclose.

264.    Moreover, BP was aware, before the blowout, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

265.    For its part, Transocean misrepresented, concealed and suppressed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.  Transocean misrepresented, suppressed, and concealed the condition of the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury, or environmental damage.

266.    Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

267.    The foregoing known hazards, poor condition, and maintenance and safety issues associated with the *Deepwater Horizon* and its appurtenances and equipment were material facts that Transocean had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

268.    Defendants Halliburton, BP, and Transocean failed to disclose, suppressed and/or concealed the foregoing material facts, and their failure to do so induced the Plaintiff to act or to refrain from acting to protect its property and income.

269.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, the Plaintiff has and will continue to incur damages, including, but not limited to, the following:

      a.    Past, present, and future lost rents, income and/or use revenue;

b.      Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

c.      Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

d.      Past, present, and future diminution in value of property;

e.      Past, present, and future loss of marketability;

f.      All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

g.      Other damages, losses or costs as will be shown at trial;

for all of which the Plaintiff is entitled to compensatory and punitive damages.

270.    Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by Halliburton, BP, Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the Plaintiff is entitled to an award of compensatory and punitive damages.

### G.    *Negligence*

271.    The Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

272.    Defendants owed a duty to the Plaintiff to exercise reasonable care with respect to the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and Macondo Well; with respect to the disaster's containment and prevention planning prior to the disaster; and with respect to the containment and prevention efforts following the initial oil disaster.

273.    Defendants had a heightened duty of care to the Plaintiff because of the great danger and environmental concerns associated with deepwater drilling for oil in the Gulf.

274.    Defendants, directly or through agents, breached their legal duties to the Plaintiff because by failing to exercise reasonable care and were negligent in their construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon*, and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

275.    Upon information and belief, the Plaintiff avers that the fire, explosion, resulting oil disaster, and damages were caused by the Defendants' negligence in the following non-exclusive particulars:

a.    Failing to properly operate the *Deepwater Horizon* and Macondo Well;

b.    Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

c.    Failing to properly inspect the *Deepwater Horizon* and Macondo Well to assure that its equipment and personnel were fit for their intended purposes;

d.    Acting in a careless and negligent manner without due regard for the safety of others;

e.    Failing to promulgate, implement, follow, and enforce procedures, rules, and regulations pertaining to the safe operations of the *Deepwater Horizon* and Macondo Well which, if they had been so promulgated, implemented, followed and enforced, would have averted the fire, explosion, sinking and oil disaster;

f.    Operating the *Deepwater Horizon* and Macondo Well with untrained and/or unlicensed personnel;

g.    Inadequately and negligently training and/or hiring personnel;

h.    Failing to take appropriate action to avoid and/or mitigate the accident;

i.    Negligently implementing policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

j.    Failing to ascertain that the *Deepwater Horizon* and Macondo Well and associated equipment were free from defects and/or in proper working order;

k.    Failing to take reasonable precautions to prevent and timely warn of the failure of the Macondo Well or drilling rig;

l.    Failing to timely bring the oil release under control;

m.    Failing to provide appropriate accident prevention equipment;

n.    Failing to undertake required tests and measurements of the Macondo Well and to observe or respond to measuring devices that indicated excessive pressures in the Macondo Well;

o.    Failing to react to danger signs of catastrophic Macondo Well or drilling rig failure;

p.    Using defective BOPs that were improperly installed, maintained, and/or operated;

q.    Conducting well and well cap cementing operations improperly;

r.    Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

s.    Failing to assure that, once well control initially well control was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons;

t.    Failing to prepare an adequate oil disaster response plan;

u.    Failing to marshal sufficient resources to adequately respond to the oil disaster and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of Alabama, thus damaging Plaintiff;

v.    Failing to use BOPs appropriate for this drilling operation, and failure to test the BOPs that were used;

w.    Failing to follow plans and specifications applicable to the design and construction of the Macondo Well and its components;

x.    Failing to use safety devices adequate to arrest the flow of oil in the event of catastrophic failure of the Macondo Well or drilling rig;

y.     Failing to properly design the *Deepwater Horizon* and Macondo Well;

z.     Concealing or misrepresenting the nature, size and extent of the oil disaster;

aa.     Using dangerous chemical dispersants of an incorrect nature, type, and amount;

bb.     Acting in a manner that justifies imposition of punitive damages;

cc.     The knowing use of dangerous dispersants; and,

dd.     Such other acts of negligence and omissions as will be shown at the trial of this matter.

276.    The Defendants were also negligent in their attempts and omissions in trying to plug the Macondo Well, contain the oil, and clean-up the oil disaster on Alabama's waters and shores, thus damaging Plaintiff.

277.    Defendants knew or should have known that their negligent conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, tax base, estuaries seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of Alabama, thus damaging Plaintiff.

278.    The past, present, and future injuries to the Plaintiff were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

279.    In addition, the circumstances surrounding the fire, explosion, and sinking of the Deepwater Horizon, and the resulting Spill are such that, according to common knowledge and the experience of mankind, the accident could not have occurred had the Defendants exercised the high degree of care imposed on them.  Moreover, the Defendants had full management and control of the instrumentalities that caused the oil spill.  The Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur*.

280.     As a direct and proximate result of the combining and concurring negligence of all Defendants, the Plaintiff has suffered and will continue to suffer damages, including, but not limited to, the following:

   a.     Past, present, and future lost rents, income and/or use revenue;

   b.     Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

   c.     Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

   d.     Past, present, and future diminution in value of property;

   e.     Past, present, and future loss of marketability;

   f.     All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

   g.     Other damages, losses or costs as will be shown at trial;

281.     The Plaintiff therefore demands judgment against all Defendants, jointly and serverally, for compensatory damages in an amount to be determined by a jury.

**H.**     *Wantonness*

282.     The Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

283.     Defendants, directly or through agents, breached their legal duties to the Plaintiff by failing to exercise reasonable care and acted with reckless, willful, and wanton disregard for the Plaintiff in the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

284.    Upon information and belief, the Plaintiff avers that the fire explosion and sinking of the Deepwater Horizon, resulting Spill, and damages were caused by the Defendants' reckless, willful, and wanton conduct as more fully set forth above.

285.    Defendants knew or should have known that their willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, tax base, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of Alabama, thus damaging Plaintiff.

286.    As a direct and proximate result of the combining and concurring wantonness of all Defendants, the Plaintiff has suffered and will continue to suffer damages, including, but not limited to, the following:

        a.    Past, present, and future lost rents, income and/or use revenue;

        b.    Past, present, and future costs expended by the Plaintiff for providing increased or additional services and increased administrative and personnel costs and expenses related to same.

        c.    Past, present, and future damages associated with the long-term stigma of the oil disaster, resulting in lost rents, revenues and other income.

        d.    Past, present, and future diminution in value of property;

        e.    Past, present, and future loss of marketability;

        f.    All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and,

        g.    Other damages, losses or costs as will be shown at trial;

287.    The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff.

288.    The Plaintiff therefore demands judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined by a jury.

IV.    **Punitive Damages**

289.    The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

290.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton, and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optional punishment and deterrence.  The Plaintiff, society as a whole, and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

291.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

292.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting, time-saving, and financial gain.

293.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire, and loss of life.

294.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few barriers to gas flow.

295.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

296.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

297.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

298.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log test to evaluate the integrity of the cement job.

299.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities

on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

300.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

301.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

302.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant to the *Deepwater Horizon*.

303.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

304.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

305.    BP and Transocean willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

306.   BP recklessly, willfully and/or wantonly failed to utilize reasonable safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and thus the property of the Plaintiff.

307.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Plaintiff.

308.   The conduct of BP, Transocean, and Halliburton was oppressive, wanton, malicious, reckless, or grossly negligent because they:

    a.    failed to properly maintain and/or operate the *Deepwater Horizon*;

    b.    operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;

    c.    ignored warnings that the integrity of the well, the cementing job and the vessel were in jeopardy;

    d.    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

    e.    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

    f.    failed to take appropriate action to avoid or mitigate the accident;

    g.    failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.      failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

i.      failed to provide appropriate disaster prevention equipment; and,

j.      failed to have an appropriate emergency spill response plan or readily available spill response equipment.

309.   The conduct of BP, Transocean, and Halliburton, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because their conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of the people of Mobile, Mobile County, Alabama, and the State of Alabama and the taxes, incomes and revenues of the Plaintiff resulting therefrom; because it was not isolated or accidental, but of a culture and ongoing pattern of conduct that consistently and repeatedly ignored the risks to others in favor of their financial gain; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish them and deter further repetition by them or others.

310.   The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff and its citizens.

311.   Accordingly, the Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## RESERVATION OF RIGHTS

### *Right to a Trial by Jury*

312.   The Plaintiff demands a jury trial for any and all claims pleaded herein in which a jury trial is available by law.

313.    The Plaintiff recognizes that, as part of its duty to efficiently manage the thousands of claims arising from the *Deepwater Horizon* explosion and resulting Spill, the MDL Court has set a trial to decide common issues of limitation and liability.

314.    Neither the Plaintiff's pleading of general maritime claims, nor its participation in any bench trial(s) on limitation and liability issues common to the MDL, amounts to a waiver of the Plaintiff's right to a jury trial.   Once the MDL Court determines the common factual and legal issues regarding limitation and liability, the Plaintiff reserves its right to seek a remand of all remaining issues and claims that uniquely apply to the Plaintiff – including, but not limited to, the quantification of the Plaintiff's damages – to the originating transferor district, the Southern District of Alabama, for a trial by jury.

### Right to File Amendments

315.    The full extent of the Plaintiff's damages is yet unknown.   The Plaintiff is continuing its assessment of economic damages.   The Plaintiff reserves the right to amend this complaint and/or file additional complaints to supplement the Plaintiff's present claims or assert additional claims against the Defendants named herein and/or against any additional parties.   The Plaintiff also reserves the right to make or alter an election to proceed in admiralty under Rule 9(h).  *See* FRCP 15(a)(2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.  declaratory and injunctive relief;

2.  economic and compensatory damages in amounts to be determined at trial;

3.  punitive damages;

4.  pre-judgment and post-judgment interest at the maximum rate allowable by law;

5.  attorneys' fees and all costs and expenses of litigation; and,

6.  such other and  further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate to which the Plaintiff may be entitled, the premises considered.

Dated: June 17, 2014

Respectfully submitted,

Mobile Housing Board

By:  Braswell Murphy, LLC
Its Attorneys

By:/s/ *Kasie M. Braswell*
Kasie M. Braswell (BRASK5769)
kasie@braswellmurphy.com

By:/s/ *D. Brian Murphy*
D. Brian Murphy (MURPD0754)
brian@braswellmurphy.com

OF COUNSEL:

BRASWELL MURPHY, LLC
59 St. Joseph St.
Mobile, AL 36602
(251) 438-7503
(251) 438-7949 (fax)

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on this 17th day of June, 2014, electronically filed the foregoing utilizing the LexisNexis File and Serve system, which will send notification of such filing to all counsel of record.

*Kasie M. Braswell*
Kasie M. Braswell
BRASWELL MURPHY, LLC
59 Saint Joseph Street
Mobile, Alabama 36602
(251) 438-7503
(251) 438-7949 (fax)