**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179** **SECTION J** |
| Applies to:  *13-2006* | * * * * * * * | **HONORABLE CARL J. BARBIER** **MAGISTRATE JUDGE SHUSHAN** |

**THE BP PARTIES' ANSWER TO THE AMENDED COMPLAINT FOR DAMAGES OF**
**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC**

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the Amended Complaint for Damages of Black Elk Energy Offshore Operations, LLC (Rec. Doc. 12989) as follows: [1]

**Rule 9(h)**

**NOW COMES,** through the undersigned counsel, Plaintiff, Black Elk Energy Offshore Operations, LLC, who submits its Original Complaint and respectfully states and alleges as follows:

---

[1]  Discovery with regard to the subject matter of the allegations in Plaintiff's Amended Complaint is ongoing and not complete, and certain information thus remains unavailable to the BP Parties at this time, and the BP Parties therefore specifically reserve the right to amend or supplement their answers and affirmative defenses to the allegations in Plaintiff's Complaint as additional facts and expert opinions become known to them.

## Introduction

On April 20, 2010, a well blowout on the oil rig *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The uncontrolled blowout caused explosions and a raging fire aboard the *Deepwater Horizon*; after burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that interfered with, damaged, depleted, and destroyed offshore, marine and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (hereinafter "Oil Spill"). As a direct and foreseeable result of the Oil Spill and its devastating impact on the marine and coastal environments, the oil and gas exploration, production and associated activities in the Gulf of Mexico were significantly interrupted, resulting in economic losses to Plaintiff and other companies and employees similarly situated. This Complaint asserts claims under the Oil Pollution Act of 1990 (hereinafter "OPA"), seeking damages arising from the Oil Spill and its environmental devastation.

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the Macondo well in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the *Deepwater Horizon* mobile offshore drilling unit, and a release of oil into the Gulf of Mexico, some of which reached the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties deny the remaining allegations of this paragraph.

## PARTIES

A. **Plaintiff**

1. Plaintiff, Black Elk Energy Offshore Operations, LLC, (hereinafter "Plaintiff"), is a business that is domiciled in Texas, with its principle place of business/operations in Texas, which suffered economic damages as a result of the Oil Spill and due to the Oil Spill's environmental devastation.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

B.      **Defendants**

2.      Defendant BP Exploration & Production Inc. (hereinafter "BP Exploration") is a
Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration
was a leaseholder and the designated operator in the lease granted by the former Minerals
Management Service (hereinafter "MMS") allowing it to perform oil exploration, drilling, and
production related operations Mississippi Canyon Block 252, the location known as "Macondo"
where the Oil Spill originated. BP Exploration was designated the "Responsible Party" by the
U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714.  This Court has personal
jurisdiction over BP Exploration, because BP Exploration is registered to do business in
Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

        The BP Parties admit that BPXP is a Delaware corporation (though deny that its principal

place of business is in Warrenville, Illinois), that it was a partial lease holder in the lease granted

by the MMS/BOEMRE pursuant to which it was allowed to perform oil exploration and offshore

drilling activities in Mississippi Canyon Block 252, in which the Macondo Well was located, and

that BPXP was, together with other entities, designated as a Responsible Party under the Oil

Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay

all legitimate OPA claims. The BP Parties further admit that BPXP is subject to this Court's

jurisdiction. The BP Parties deny the remaining allegations of this paragraph including that the

spill originated from the well because it originated from the *Deepwater Horizon*.

3.      Defendant BP America Production Company (hereinafter "BP America") is a Delaware
corporation with its principal place of business in Houston, Texas. BP America was the party to
the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the
*Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America, because BP
America is registered to do business in Louisiana, does business in Louisiana, and has a
registered agent in Louisiana.

**ANSWER:**

        BP Exploration and Production Inc. was a leaseholder at Macondo and thus was

designated as a "Responsible Party" by the U.S. Coast Guard under OPA, 33 U.S.C. § 2701.  For

that reason, BP objects to the addition of additional/new BP defendants, since their addition is

expressly counter to the Conditions established to govern these OPA test cases. The BP Parties admit that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*. The BP Parties admit that BPAP is a Delaware corporation with its principal place of business in Houston, Texas. The BP Parties further admit that BPAP is subject to this Court's jurisdiction. The BP Parties deny the remaining allegations of this paragraph.

4.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally. Plaintiff further adopt and incorporate by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*.

**<u>ANSWER:</u>**

The BP Parties incorporate their answer to paragraph 3 herein. The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case. The BP Parties adopt and incorporate by reference their answers to Paragraphs 212-218 found in their Answer to the First Amended Master Complaint, Cross-Claims, and Third-Party Complaint for Private Economic Losses (the "B1 Answer"). Rec. Doc. 4130. The BP Parties deny the remaining allegations of this paragraph.

5.     BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP."

**ANSWER:**

The BP Parties admit that Plaintiff refers to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate.

## JURISDICTION AND VENUE

6.      Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


7.      The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff hereby designates this case as an admiralty or maritime case, and requests a non-jury trial, pursuant to Rule 9(h).

**ANSWER:**

This paragraph concerns an election and also a jury trial request by Plaintiff and thus does not require a response by the BP Parties.  Moreover, to proceed as a valid OPA test case under this Court's governing orders, Plaintiff accepted that it would proceed exclusively via a bench trial.


8.      Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (hereinafter "OPA").

**ANSWER:**

The BP Parties admit the allegations of this paragraph.


9.      Under Fed. R. Civ. P. 82, no allegation of venue is required for admiralty or maritime claims. Moreover, prosecution and venue in this district is proper under 28 U.S.C. §1391 because Defendants do business herein, Plaintiff resides and does business herein, and the events or omissions giving rise to the claims asserted herein occurred in this district. Venue is also proper pursuant to the OPA, 33 U.S.C. 2717(b), as the discharge occurred in this district.  Venue is also appropriate in this district consistent with 28 U.S.C. §1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation. *See In re Oil Spill by the Oil Rig "Deepwater*

*Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows Plaintiff to directly file their complaints arising out of the Oil Spill in this District.

**ANSWER:**

The BP Parties are not contesting this Court's jurisdiction or whether venue is proper.

FACTUAL ALLEGATIONS

10.    BP is the "responsible party" for the Oil Spill under OPA, 33 U.S.C. §2714.  Because of the strict liability of responsible parties for all damages due to and arising from the Oil Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability. Nonetheless, out of an abundance of caution, the factual background relating to the BP Defendants' acts, omissions and failures set forth in Paragraphs 258-542 of the Amended B1 Master Complaint, Document 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, are adopted and incorporated as if fully restated herein.

**ANSWER:**

The BP Parties admit that the U.S. Coast Guard named BPXP, as well as other entities, a Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties adopt and incorporate by reference their answers to Paragraphs 258-542 found in the B1 Answer.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties or what the Plaintiff must set forth to state a valid OPA claim against the BP Parties.

11.    Plaintiff further adopts and incorporates as if restated herein all factual allegations with information contained in the Direct Filing Short Form/Short Form Joinder, Rec. Doc. No. 85484, filed by Plaintiff into No. 10-8888.

**ANSWER:**

The BP Parties reserve all of their rights concerning the allegations in this paragraph. Pursuant to the Federal Rules, actions in the federal District Courts proceed by way of allegations specifically set forth in complaints.  *See* Fed. R. Civ. P. 3.

12.     As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance (hereinafter "SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan (hereinafter "NCP") (40 CFR §300.323). The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

**ANSWER:**

The BP Parties admit that the Spill was declared a Spill of National Significance, which triggered the National Response Framework.  The BP Parties deny that this was "a direct and foreseeable" result of the Spill.  The BP Parties deny the remaining allegations of this paragraph.

13.     On April 30, 2010, MMS and the U.S. Coast Guard (hereinafter "USCG"), as a direct and foreseeable result of the Oil Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors. This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

**ANSWER:**

The BP Parties admit that on April 30, 2010, MMS and USCG issued a Joint National Safety Alert.[2]   The BP Parties admit that the Joint National Safety Alert contains recommendations, however the entire text of the document should be considered.  The BP Parties deny that this was "a direct and foreseeable result of the Spill . . . ."  The BP Parties deny the remaining allegations of this paragraph.

---

[2]     By referencing this alert, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

14.     Also on April 30, 2010, as a direct and foreseeable result of the Oil Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the *Deepwater Horizon* explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

**ANSWER:**

The BP Parties admit that on April 30, 2010, the President of the United States directed the Secretary of the Interior to conduct a 30-day review.  The BP Parties deny that this was "a direct and foreseeable result of the Spill . . . ."  The BP Parties deny the remaining allegations of this paragraph.

15.     On May 7, 2010, MMS, as a direct and foreseeable result of the Oil Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

16.     In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* (hereinafter "Safety Report").

**ANSWER:**

The BP Parties admit that in response to the President's Directive, Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* on May 27, 2010.[3]  The BP Parties lack knowledge or information sufficient to

---

[3]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

17.     In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling. In particular, the Safety Report targets the effectiveness of blowout preventers (hereinafter "BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

**ANSWER:**

The BP Parties admit that the Safety Report contains recommendations, however the entire text of the document should be considered.[4]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

18.     Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Oil Spill and its environmental devastation.

**ANSWER:**

The BP Parties admit that the Safety Report contains recommendations, however the entire text of the document should be considered.[5]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties

---

[4]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[5]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

19.     On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Oil Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

**ANSWER:**

The BP Parties admit that on May 28, 2010, the Secretary issued a Decision Memorandum that contained the quoted language, however the entire text of the document should be considered.[6]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

20.     As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS. On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratorium (hereinafter "May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices, and procedures.

---

[6]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit that the Decision Memorandum directed the MMS to suspend certain offshore drilling activities, and that MMS imposed a 6-month drilling moratorium.[7]  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the documents described in this paragraph.

21.     Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS. It also prohibited drilling any wellbore sidetracks and bypasses. Moreover, it halted spudding of any new wells. It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

**ANSWER:**

The BP Parties admit that NTL No. 2010-N04 directed operators to cease drilling, however the entire text of the document should be considered.[8]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

22.     Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Oil Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

---

[7]     By referencing these documents, the BP Parties neither admit nor imply that these documents are admissible into evidence and expressly reserve all objections to the use or admissibility of these documents.

[8]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them. The BP Parties deny that MMS moratoria-related actions were the direct and foreseeable result of the spill.

23.     On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the OCS. The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04. These actions were taken as a direct and foreseeable result of the Oil Spill and its environmental devastation.

**ANSWER:**

The BP Parties admit that MMS issued NTL No. 2010-N05, which called for increased safety measures, however the entire text of the document should be considered.[9] The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph. Additionally, the BP Parties deny that the actions referred to were the "direct and foreseeable result" of the Incident.

24.     On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Oil Spill's environmental devastation, and BP's incapacity to adequately respond to the Oil Spill. NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios.

---

[9]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties admit that MMS issued NTL No. 2010-N06, which "required all operators to adhere to revised information requirements for exploration, development and oil spill response plans," however the entire text of the document should be considered.[10]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

25.    On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

**ANSWER:**

The BP Parties admit the allegations in this paragraph.

26.    In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratorium was unenforceable.

**ANSWER:**

The BP Parties admit the allegations in this paragraph.

27.    On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 (hereinafter "July Moratorium").

---

[10]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties admit that on July 12, 2010, the Secretary issued a new decision memorandum recommending that certain drilling operations be suspended, however the entire text of the document should be considered.[11] The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

28.     In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that the Secretary's new decision memorandum discussed the possibility of environmental harm from drilling activities in the Gulf unrelated to the BP Parties, and the entire text of the document should be considered.[12] The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

29.     That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium. The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

---

[11]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[12]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

30.     With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or intervention operations; or waterflood, gas injection, or disposal wells.

**ANSWER:**

The BP Parties admit that the document in question suspended drilling operations, however the entire text of the document should be considered.[13]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

31.     The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October 2010.

**ANSWER:**

The BP Parties admit that the document in question instructed MMS to gather information, however the entire text of the document should be considered.[14]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original

---

[13]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[14]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

32.    On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end to the July Moratorium, which had been scheduled to extend through the month of November 2010.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

33.    On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

**ANSWER:**

The BP Parties admit that on October 14, 2010, MMS published the Interim Final Rule, however the entire text of the document should be considered.[15]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

34.    In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control, such as the kind experienced in the Oil Spill.

---

[15]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties deny that the issued Notice to Lessees and Operators was a direct and foreseeable response to the spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

35.     On January 3, 2011, MMS notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

36.     The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses in various industries across the Gulf Coast OCS and the Pacific OCS.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

37.     The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Outer Continental Shelf or the Gulf of Mexico and its resources in connection with offshore deepwater drilling activities. Further, the Macondo incident, the Oil Spill, and the governmental response created a dramatic decrease in all aspects of energy production activities in the Gulf of Mexico, and, accordingly, caused economic damages to all persons or entities affiliated with, or dependent upon, such industries.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

38.     Plaintiff is an oil and gas exploration and production company based in Texas.  Plaintiff has many interests in the Gulf of Mexico. The BP Oil Spill disaster and the resulting shut down of oil and gas related operations in the Gulf of Mexico affected many of Plaintiff's assets in this region. Plaintiff has taken action to mitigate its losses caused by the BP Oil Spill disaster by focusing on non-gulf related assets. However, some losses were unavoidable. Prior to the BP Oil

Spill, Plaintiff had a partial interest in three potential wells to be drilled in the Gulf of Mexico. Pursuant to their interests, Plaintiff and other interest-holders entered into an agreement with a drilling company to hire a drilling rig known as the "Bob Palmer" at a specific daily rate. The terms of that agreement dictated that the interest-holders would be obligated to pay the daily rate for the drilling rig once the wells became available for drilling, regardless of whether the drilling rig was actually performing drilling operations. Due to the BP Oil Spill and resultant moratorium on offshore oil and gas exploration and production operations in the Gulf of Mexico, Plaintiff and the other interest-holders could not obtain the necessary permits to begin drilling the wells in question. However, all interest holders were still contractually obligated to pay their respective pro rata shares of the daily rate for the drilling rig. As a result, Plaintiff suffered significant financial damages by paying for a drilling rig that never drilled a well. Plaintiff suffered lost profits, impairment of earning capacity and lost growth and opportunities as a result of the BP Oil Spill and the foreseeable governmental response, including the Moratoria. In particular, a drilling contractor had been retained in connection with the High Island interests. The drilling contractor had been retained by the operator, Apache. Black Elk had acquired a non-operating interest in the well and tract and was bound by the contractual terms of the operating agreement and the drilling contract. As a result of being unable to secure drilling permits, and as a result of the delay in securing drilling permits, Apache was forced to invoke the *force majeure* provision of the operating agreement and/or drilling contract. As a result of this, certain payments became due and owing to the drilling contractor. Apache paid those amounts, billed the non-operators for their respective portions of those amounts, including Black Elk. Black Elk timely paid its proportionate share, as it was required to do under. That payment and loss was a direct result, and due to, the Deepwater Horizon incident.

## ANSWER:

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

39.     Additionally, another of Plaintiff's Gulf of Mexico interests, a drilling platform referred to as South Pass 86 ("SP 86") was directly impacted by the oil spill. SP 86 was located in relatively close proximity to the Deepwater Horizon. Shortly following the Deepwater Horizon explosion, it became clear that the SP 86 was potentially in the direct path of oil, smoke, and/or hazardous gases/fumes from the Deepwater Horizon. Because of the proximity of SP 86 to the Deepwater Horizon, there was a direct fear that the oil and/or debris would actually come into contact, and/or surround, the SP 86 platform. In addition, there was a realization that smoke, debris, airborne particles, or other materials, may come into contact with the SP 86 or with the personnel who were working aboard SP 86. Accordingly, emergency evacuation became a real possibility and preparations were made for that possibility. In anticipation of an emergency evacuation of SP 86, the vessel Miss Carli was put on stand-by in the vicinity of SP 86. The Miss Carli remained on stand-by for five (5) days when the decision was made, in the interest of safety, to evacuate the personnel stationed at SP 86 via helicopter. At that time, certain personnel were reporting that they were ill, and/or felt negative heath effects from the fallout from the Deepwater Horizon incident. A decision was made to suspend operations of SP 86 and that, in the interest of safety, in the interest of the health of the personnel, and in the interest of caution,

those personnel should be evacuated and operations of SP 86 suspended.   Helicopters were dispatched and all aboard SP 86 were carried ashore. As a result, Plaintiff Black Elk incurred expenses on SP 86, including both the Miss Carli and the helicopter transports.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

## CLAIM FOR RELIEF

40.    Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth to all preceding paragraphs as if

fully restated here.

41.    The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

**ANSWER:**

The BP Parties deny the allegations of this paragraph because it is an attempt to

summarize the highly reticulated provisions of 33 U.S.C. § 2702, which speak for themselves.

42.    The Coast Guard has named BP as the "responsible party" under OPA for the downhole release of oil. Therefore, BP is strictly liable pursuant to 33 U.S.C. § 2702 for all damages due to or resulting from the Oil Spill and its environmental devastation.

**ANSWER:**

The BP Parties admit that the U.S. Coast Guard named BPXP, as well as other entities, a

Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has

expressed its commitment to pay all legitimate OPA claims. The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.

43.     Defendant BP is not entitled to limit its liability under 33 U.S.C. § 2704(a) because the Oil Spill was proximately caused by its gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

**ANSWER:**

        The BP Parties deny the allegations of this paragraph.

44.     Moreover, in its Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990, filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

**ANSWER:**

        The filing BP made on October 19, 2010 speaks for itself and should be consulted in its

entirety.

45.     BP, as the operator on the Macondo well, was required to take the necessary precautions to "keep the well under control at all times." BP was required to "use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick." BP was required to "use and maintain equipment and materials necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment." 30 C.F.R. §§ 205.400 – 250.401.

**ANSWER:**

        The BP Parties deny that these regulations establish that any BP entity was the operator

of the well for OPA purposes.  The BP Parties also deny that they violated relevant Outer

Continental Shelf Lands Act regulations.  Furthermore, the referenced regulations speak for

themselves.

46.     As a direct result of the Oil Spill and its environmental devastation, Plaintiff is entitled to recover from BP for such damages in amounts to be determined by the trier of fact.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

47.     OPA imposes strict liability for *all* damages due to and/or resulting from the Oil Spill and its environmental devastation. Therefore, the concepts of "superseding" or "intervening" cause are not applicable. In the alternative, the Moratoria were not "intervening" or "superseding" causes with respect to damages arising from the Oil Spill. The Moratoria, rather, were direct and foreseeable consequences of the environmental havoc wreaked by a spill designated as one of National Significance.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

48.     The size, scope, and breadth of the Oil Spill's environmental damage caused foreseeable actions by the federal and state governments, including the closures of massive portions of the Gulf to fishing and shipping. The Oil Spill's destructive and contaminating qualities directly affected all industries in the Gulf and the federal agencies that oversee them.  The Moratoria was enacted by one such federal agency within its authority to ensure the safety by affecting very narrow activities of an industry under its control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

PRESENTMENT

49.     To the extent required by law, and/or by consent and/or stipulation by BP, Plaintiff has satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), by the submission of their claims to the BP OPA Claims Program, the Deepwater Horizon Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility (hereinafter "GCCF"), as BP's agents and/or designees.

**ANSWER:**

Plaintiff has added a new claim to its Amended Complaint for damages related to

evacuation of the "South Pass 86" platform.  The BP Parties are unaware of any pre-suit

presentment or supporting documentation for this "South Pass 86" platform damage claim in

Black Elk's prior claims filings or its January 2013 presentment letter.  Based on this record, we

do not believe this claim was properly presented under OPA.  The BP Parties are consulting with

the Plaintiff's Steering Committee about whether the "South Pass 86" claim has been presented. Furthermore, the BP Parties note that presentment cannot be complied with on a retroactive basis.  Hence, to the extent a particular claim or claims of Plaintiff was not presented to BP prior to the filing of this suit, then such claim or claims must be dismissed and potentially refiled later, if and when OPA presentment is complied with.  The BP Parties, however, reserve all of their rights against such claims, including under any applicable statutes of limitation.  Additionally, the BP Parties are also still engaging in the presentment consultation process with the PSC; *see* OPA Test Case Scheduling Order, Rec. Doc. 12972, ¶7; and thus reserve all of their rights on the issue of presentment.

50.    In particular, on 1/18/2013, a Claim, including a "sum certain" and a brief description of the claim as well as some supporting documentation, was sent by USPS Express Mail to and filed online with (confirmation number EI376592394US) to the BP OPA Claims Program in Houston, Texas. This information, along any other previous claims information made to BP is cited in support thereof.

**<u>ANSWER:</u>**

The BP Parties incorporate by reference their reservation of rights regarding presentment as laid out in the answer to paragraph 49.

51.    Because Plaintiff previously asserted claims against the responsible party through its prior claim to the Gulf Coast Claims Facility, Document Number 1175570, the presentment on or about 1/18/2013 was made (and/or re-made) out of an abundance of caution. This information, along any other previous claims information made to BP is cited in support thereof.

**<u>ANSWER:</u>**

The BP Parties incorporate by reference their reservation of rights regarding presentment as laid out in the answer to paragraph 49.

52.    BP either denied the claims or otherwise failed to satisfy within 90 days of presentment.

**ANSWER:**

The BP Parties incorporate by reference their reservation of rights regarding presentment as laid out in the answer to paragraph 49.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the BP Defendants, jointly, severally, and *in solido,* as follows:

1. economic and compensatory damages for loss of income and/or loss of income opportunities and/or earning capacity in amounts to be determined at trial;

2. pre-judgment and post-judgment interest at the maximum rate allowable by law;

3. reasonable claims preparation expenses;

4. attorneys' fees;[16]

5. the costs of litigation;

6. such other and further relief as the Court deems just and appropriate.

**ANSWER:**

The BP Parties deny that Plaintiff is entitled to any relief in this action.  The BP Parties deny that Plaintiff can pursue attorneys' fees or costs.[17]

---

[16]   Although this Court has dismissed similar claims for attorneys' fees asserted by Plaintiff under general maritime law in the operative B1 Master Complaint. (Rec. Doc. 1128), Plaintiff realleges them here out of an abundance of caution to preserve them for potential reconsideration, appeal, or other resolution.

[17]   Several of the test case plaintiffs have added boilerplate claims for relief for attorney fees, costs, etc.  All such plaintiffs should be aware of the conditions of test case participation, including No. 3, "BP and plaintiffs agree with respect to the test case trials that each party will bear its own costs regardless of outcome."  Given those conditions, BP objects to amendments and claims for relief that are inconsistent with the Conditions.

## GENERAL DENIAL

The BP Parties deny all allegations in the Amended Complaint not specifically admitted herein, including any allegations contained in subparts, footnotes, and argument headings.

## AFFIRMATIVE DEFENSES

The BP Parties set forth their affirmative below. But by setting forth these affirmative defenses, the BP Parties do not assume the burden of proving any facts, issues, or elements of a cause of action where such burden properly belongs to Plaintiff.

## FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

## SECOND DEFENSE

The blowout, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU *Deepwater Horizon*, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities. The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, plaintiff's claims should be dismissed as to the BP Parties.

## THIRD DEFENSE

Plaintiff's damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

## FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiff were not the result of any negligence, fault, or want of due care on the part of BP Parties. Furthermore, Plaintiff has the burden of proof on this issue, and Plaintiff cannot meet that burden.

**FIFTH DEFENSE**

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiff's alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged. Additionally, BP denies that the applicable causal test or tests established by the Oil Pollution Act can be met by the Plaintiff.

**SIXTH DEFENSE**

Plaintiff's alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

**SEVENTH DEFENSE**

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP parties.

**EIGHTH DEFENSE**

The Plaintiff's claims are barred by the operation and effect of releases of claims and liability on the part of the BP Parties.

**NINTH DEFENSE**

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

## TENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

## ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to indemnity from other parties or entities.

## TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contribution from other parties or entities.

## THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to subrogation from other parties or entities.

## FOURTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff is not entitled under the law to the damages that it seeks, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

## SIXTEENTH DEFENSE

Plaintiff's damages are barred, in whole or in part, by a failure to mitigate damages.

## SEVENTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by Plaintiff as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

## EIGHTEENTH DEFENSE

Claims in this Complaint may fail to comport with one or more requirements of presentment as defined by the Oil Pollution Act of 1990 and its case law.  Retroactive compliance with OPA presentment requirements is not permissible.

## NINETEENTH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity. Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTIETH DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' contractors or subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-FIRST DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

### TWENTY-SECOND DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

### TWENTY-THIRD DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiff who may have received funds through the BP claims process, the GCCF, and/or the CSSP. Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

### TWENTY-FOURTH DEFENSE

The BP Parties cannot be held to be responsible under OPA for losses caused by prevailing macro-economic conditions including tight credit conditions.

### TWENTY-FIFTH DEFENSE

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus would fall outside the applicable statute of limitations.

### TWENTY-SIXTH DEFENSE

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus its allegations would become subject to the doctrine of laches.

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated:  June 23, 2014

Respectfully submitted,

/s/  Don K. Haycraft

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

Christopher W. Keegan
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:  (414) 439-1400
Facsimile:  (414) 439-1500

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
202-662-5985

Jeffrey Bossert Clark
Dominic E. Draye
Thomas P. Weir
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

Emily Johnson Henn
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
650-632-4715

*Attorneys for BP Exploration & Production, Inc, BP America Production Company,*
*and BP p.l.c.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of June, 2014.

/s/  Don K. Haycraft