**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| Applies to:  *13-1185* | * * | |
| | * | HONORABLE CARL J. BARBIER |
| | * * | |
| | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| | * | |

**THE BP PARTIES' ANSWER TO THE FIRST SUPPLEMENTAL AND AMENDING
COMPLAINT OF BLAKE INTERNATIONAL USA RIGS, LLC**

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the First Supplemental and Amending Complaint of Blake International USA Rigs, LLC (Rec. Doc. 12993) as follows: [1]

**TO THE HONORABLE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA AND THE JUDGES THEREOF:**

1.     Since the time its Complaint for Damages was filed, Blake International USA Rigs, LLC has gone through a restructuring.

---

[1]     Discovery with regard to the subject matter of the allegations in Plaintiff's Amended complaint is ongoing and not complete, and certain information thus remains unavailable to the BP Parties at this time, and the BP Parties therefore specifically reserve the right to amend or supplement their answers and affirmative defenses to the allegations in Plaintiff's Complaint as additional facts and expert opinions become known to them.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

2. Blake Holdings I, LLC and Blake Workover & Drilling Co., Inc. have at all material times retained full ownership of Blake International USA Rigs, LLC and Blake International Rigs, LLC.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

3. Thus, all four (4) entities are proper parties to this suit.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

4. Accordingly, Blake International USA Rigs, LLC shall also mean Blake Holdings I, LLC, Blake Workover & Drilling Co., Inc., Blake International USA Rigs, LLC and Blake International Rigs, LLC, collectively referred to as "Blake" in Plaintiff's original Complaint.

a. Blake Holdings I, LLC, is a Limited Liability Company formed under the Laws of the State of Delaware with its principal place of business in Houma, Louisiana and at all material times has done business in this State and Judicial District.

b. Blake Workover & Drilling Co., Inc., is a Delaware Corporation with its principal place of business in Houma, Louisiana and at all material times has done business in this State and Judicial District.

c. Blake International Rigs, LLC is a Limited Liability Company formed under the Laws of the State of Delaware with its principal place of business in Houma, Louisiana and at all material times has done business in this State and Judicial District.

d. Blake International USA Rigs, LLC is a Limited Liability Company formed under the Laws of the State of Delaware with its principal place of business in Houma, Louisiana and at all material times has done business in this State and Judicial District.

2

The Complaint of **BLAKE INTERNATIONAL USA RIGS, LLC (herein after "BLAKE")**, a Limited Liability Company formed under the Laws of the State of Delaware with its Principal Place of Business located in Metairie, Louisiana and at all material times, doing business in this State and Judicial District, with respect represents:

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

1.     Made Defendants herein are:

    a.     **BP EXPLORATION & PRODUCTION INC. (herein after "BP Exploration")**, a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS"), now Bureau of Ocean Energy Management, Regulation and Enforcement, allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated. BP Exploration was designated the "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. §2714. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPXP is a Delaware corporation (but deny that its principal place of business is in Warrenville, Illinois), that it was a partial lease holder in the lease granted by the MMS/BOEMRE pursuant to which it was allowed to perform oil exploration and offshore drilling activities in Mississippi Canyon Block 252, in which the Macondo Well was located, and that BPXP was, together with other entities, designated as a Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties further admit that BPXP is subject to this Court's jurisdiction. The BP Parties deny the remaining allegations of this paragraph, including that the spill originated from the well because it originated from the *Deepwater Horizon*.

3

b.     **BP AMERICA PRODUCTION COMPANY (herein after "BP America")** is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

BP Exploration and Production Inc. was a leaseholder at Macondo and thus was designated as a "Responsible Party" by the U.S. Coast Guard under OPA, 33 U.S.C. § 2701. For that reason, BP objects to the addition of additional/new BP defendants, since their addition is expressly counter to the Conditions established to govern these OPA test cases. The BP Parties admit that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*. The BP Parties further admit that BPAP is a Delaware corporation with its principal place of business in Houston, Texas. The BP Parties further admit that BPAP is subject to this Court's jurisdiction.

c.     **BP p.l.c.** is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. At all pertinent times, BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fell, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the United States. This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute, in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana and has continuous and systematic contacts with Louisiana and throughout the United States more generally. Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's longarm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, and the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws and BP p.l.c. has been served with a summons in

4

individual complaints within MDL 2179. In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities."

**ANSWER:**

The BP Parties incorporate their answer to paragraph 1(b) herein.  The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case.  The BP Parties deny the remaining allegations of this paragraph.

       d.    BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

**ANSWER:**

The BP Parties admit that Plaintiff refers to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate.

2.    At all material times hereto, Blake was a privately-held offshore platform rig provider in the business of contracting and negotiating the use of their drilling rigs to oil and gas companies who operate and drill oil wells in the Gulf of Mexico.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

3.    Plaintiff has complied with the Presentment requirement under section 2713(a) of the OPA by submitting a claim to BP, the responsible party, in writing for a sum certain for compensation for damages from the incident. Plaintiff presented its claim on January 17, 2013.

Ninety days have since elapsed since Plaintiff made presentment and Plaintiff's claim has not been settled by payment.

**ANSWER:**

Plaintiff seeks to recover damages from (a) lost contract(s); (b) lost asset values; (c) increased borrowing costs; and (d) lost revenue.  However, the only type of damage detailed in Plaintiff's pre-suit claim was lost revenue, allegedly supported through monthly and annual performance documents.  The BP Parties are not aware of any pre-suit supporting documentation of a damages amount for alleged lost contract(s) claims, and neither a pre-suit sum certain nor any pre-suit documentation was provided to support Blake's lost-asset-value and increased-borrowing-costs claims.

Blake also seeks to add three additional entities to its lawsuit:  Blake Holdings I, LLC; Blake Workover & Drilling Co.; and Blake International Rigs, LLC.   The BP Parties have no record of any of those additional entities having submitted pre-suit claims to BP, and thus no record to qualify them to seek legal recoveries under OPA.

Additionally, BP Parties are still engaging in the presentment consultation process with the PSC; *see* OPA Test Case Scheduling Order, Rec. Doc. 12972, ¶7; and thus reserve all of their rights on the issue of presentment.

4.      BP Exploration is the "Responsible Party" for the Oil Spill under OPA, 33 U.S.C. §2714. Because of the strict liability of Responsible Parties for all damages due to and arising from the Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability. Nonetheless, out of an abundance of caution, Plaintiff sets forth the following factual allegations.

**ANSWER:**

The BP Parties admit that the U.S. Coast Guard named BPXP, as well as other entities, a Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties or what the Plaintiff must set forth to state a valid OPA claim against the BP Parties.

## BACKGROUND FACTS

5.     At all times relevant herein, the vessel Deepwater Horizon was leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D Deepwater Horizon ("Drilling Contract"), and later amendments to that agreement.

**ANSWER:**

The BP Parties admit that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon* and that the *Deepwater Horizon* was engaged in drilling activities at the Macondo prospect site at the time of the Incident.

6.     On April 20, 2010, while temporarily abandoning a subsea oil well located at the Macondo prospect site in the area of the Gulf of Mexico known as Mississippi Canyon 252 ("Macondo well"), employees and agents of BP and its subcontractors aboard the vessel Deepwater Horizon lost control of the well and caused a massive blowout.

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel, and a release of oil into the Gulf of Mexico. The BP Parties also admit that the loss of well control was caused in part by the conduct of BP's contractors.  The BP Parties deny the remaining allegations of this paragraph.

7.     After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for over twelve weeks, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment and economies of the Gulf states and businesses, including Plaintiff and others working in and near the Gulf of

Mexico. Meanwhile, BP downplayed the severity of the Spill and was unprepared for the massive clean-up effort required.

**ANSWER:**

The BP Parties admit that hydrocarbons flowed into the Gulf of Mexico from April 20, 2010 until the well was capped on or around July 15, 2010, and that some of the hydrocarbons reached the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties deny the remaining allegations of this paragraph.

8.     Prior to the Spill, BP had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance that could lead to loss of life, serious injury, and/or environmental damage, including problems with the vessel's Blowout Preventer ("BOP"), electronic fire and gas and alarm systems, computer software systems, purge air systems, and other vessel equipment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

9.     Further, Defendants failed to plan, monitor, control, and contain the well, and failed to mitigate the risk and potential damages associated with deepwater drilling.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

10.     As described more fully below, the loss of well control and resulting harm was due to the negligent, reckless, callous, and grossly negligent actions on the part of BP and its subcontractors before, during, and after the blowout, including long-standing wanton misconduct by Defendants' corporate management.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## PRE-BLOWOUT FACTS

11.     BP and its subcontractors struggled with the high temperature, high pressure Macondo well repeatedly before the catastrophic events of April 20, 2010. In emails weeks before the

8

blowout, BP employees referred to the Macondo well as "crazy," a "nightmare" well, and the "well from hell."

**ANSWER:**

The BP Parties admit that the text of the emails described in this paragraph speak for themselves, however the entire text of the documents should be considered.[2]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original documents quoted from. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the emails described in this paragraph. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

---

[2]   By referencing these emails, the BP Parties neither admit nor imply that the documents or the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the documents or the referenced statements.

12.     Deepwater Horizon workers struggled to control the problematic well throughout drilling, having suffered numerous kicks, ballooning and lost return events due to the dangerous geological characteristics and narrow drilling margins at Macondo.

**ANSWER:**

The BP Parties admit that a kick occurred at the Macondo Well on March 8, 2010.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

13.     As these problems caused the drilling schedule to fall farther behind schedule and over budget, BP and its subcontractors maintained an unreasonable rate of penetration in the drilling effort at Macondo to a point where drilling compromised the BP petrophysics crew's ability to predict down hole conditions and provide guidance on foreseeable hazards.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

14.     Further, BP's drilling rate and failure to maintain a safe drilling margin violated federal regulations. On December 7, 2011, the federal Bureau of Safety and Environmental Enforcement ("BSE") cited BP for four counts of violation of 30 C.F.R. § 250.427(b) for BP's knowing failure to suspend drilling operations at Macondo when the federally mandated safe drilling margin was no longer present in the well.

**ANSWER:**

The BP Parties deny that they violated federal regulations.   The BP Parties have contested the citations referred to in this paragraph.

15.     Pursuant to its Drilling Contract, BP was paying approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees. BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

**ANSWER:**

The BP Parties admit that the combination of costs incurred under the Drilling Contract with Transocean including day rate charges, day labor rate charges and other charges, totaled

11

approximately $500,000 per day. The BP Parties deny the remainder of the allegations of this paragraph.

16.     At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees and putting them increasingly over budget. This excess cost put the Macondo project in conflict with BP's recent mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico. In spite of the difficult and dangerous nature of the Macondo well, BP made multiple decisions about the drilling plan for purely economic reasons, even though those decisions introduced unnecessary risks and increased the risk of a catastrophic blowout of the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

17.     In order to reduce costs and save time on the dilatory and over budget Macondo well, BP intentionally violated industry guidelines and government regulations, and ignored warnings from their own employees and contractors on the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

18.     This emphasis on speed and money over safety led to numerous errors and omissions by BP and its subcontractors, which, in turn, caused and/or contributed to the blowout and the subsequent Spill. Among these errors and omissions showing callous disregard for safety were the following:

     a.      Decision to use a Long String instead of a Liner.

     b.      Decision to use six instead of twenty-one Centralizers.

     c.      Decision not to run a Bottoms Up Circulation.

     d.      Decision to pump a cement slurry that was defective in design, inadequately tested, and had a very low probability of success.

     e.      Decision to pump a defective cement slurry without waiting for all necessary cement slurry test results.

f.      Decision not to run a Cement Bond Log.

g.      Decision to run a positive pressure test without waiting for the cement to set.

h.      Decision to run a negative pressure test without waiting for a full risk assessment.

i.      Decision to displace to seawater before validating that a proper barrier to flow was in place despite clear signs that the cement did not work, zonal isolation and well integrity had not been achieved, and that the hydrocarbons were likely to flow into the well.

j.      Decision to order simultaneous operations to occur during critical abandonment phase.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

19.     Given the history of the Macondo well, and the decisions BP made to save time and money completing the well, they should have been particularly attuned to any signs of trouble during the temporary abandonment phase on April 20, 2010. But instead of the requisite

vigilance, BP and its subcontractors failed to properly monitor the well and ignored and/or missed an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

20.     As a result, BP and its subcontractors did not appreciate the severity of the well control situation until the mud began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

**ANSWER:**

The BP Parties admit that hydrocarbons began to flow into the well from the reservoir at

approximately 20:52 hours. However, the Transocean drill crew and Halliburton Sperry-Sun

mudlogger either did not observe or did not recognize the increasing indications of flow given

the fact that the first well control actions were not taken until around approximately 21:41, 49

minutes after the leak had started at the bottom of the well. The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-

Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in

Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this

paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075,

and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

21.     BP has pled guilty to criminal charges, including eleven counts of seaman's manslaughter pursuant to 18 U.S.C. § 1115, for the grossly negligent actions of its employees and agents in failing to analyze properly the results of the negative pressure test and cease all operations at that time.

**ANSWER:**

The BP Parties deny that their employees and agents engaged in grossly negligent actions.  The criminal plea accepted by Judge Vance is a matter of public record and speaks for itself.  *See United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (Jan. 29, 2013).

22.     At approximately 9:48 p.m., the gas sucked into the Deepwater Horizon's engine #3 caused the engine to rapidly over speed. The vessel lost power a minute later, followed by two explosions that ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well. These flow paths continued unabated until the vessel sank on April 22, 2010.

**ANSWER:**

The BP Parties admit that at approximately 9:48 p.m. on April 20, 2010, at least one engine went into overspeed. The BP Parties also admit that the vessel lost power approximately a minute later, which was immediately followed by two explosions. The BP Parties further admit that the Transocean crew's decision to divert the escaping fluids and gases through the mud-gas separator rather than the starboard overboard diverter line vented gas directly down onto and throughout the rig, creating multiple ignition sources and flow paths for the gases.  Further, the BP Parties admit that the vessel sank on April 22, 2010.  The BP Parties deny the remaining allegations in this paragraph including that hydrocarbons were released from the well because hydrocarbons were released from the *Deepwater Horizon*.

16

23.     Decisions, tradeoffs, actions, and inactions by BP, including the risky well design, procedures that deviated from industry norms and failure to identify and train for foreseeable risks all unnecessarily created and enhanced the risks associated with the drilling and temporary abandonment of the Macondo well. This reckless behavior culminated in insufficient well monitoring and failure to recognize the signs of an influx for 49 minutes prior to the blowout. Underlying it all, BP and its subcontractors' corporate cultures of trading risk identification and safety for speed, production, and profit made this catastrophe inevitable.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

24.     Leading up to the disaster on April 20, 2010, discord, recklessness, and gross negligence pervaded the actions of the BP onshore well team. E-mails from individuals such as Wells Team Leader John Guide and his supervisor, BP's operations leader at Macondo, Operations Manager David Sims, exemplified this callous disregard for human and environmental health and safety.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

25.    The substantial evidence of BP's misguided priorities and imprudent decisions' regarding the Macondo well is all part of a long-standing culture of complacency in BP's deepwater drilling operations. Corporate leaders from Houston to London did not take potentially catastrophic risks of deepwater drilling seriously, did not identify foreseeable risks unique to deepwater drilling, and allowed those risks to result in the April 20, 2010 disaster.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## POST-BLOWOUT FACTS

26.    On the night of April 20, after the explosions ignited the vessel, the resulting gasfueled fire on the Deepwater Horizon raged for two days until she finally sank on April 22, 2010.  The Deepwater Horizon was connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe, and as the vessel sank to the seafloor, it dragged the riser down with it, bending and

breaking the pipe before finally tearing away from it completely. Immediately oil and natural gas began to gush from the open end of the riser and from at least two places along its twisted length.

**ANSWER:**

The BP Parties admit that one or more fires and explosions occurred on the *Deepwater Horizon* April 20, 2010, that the vessel sank on April 22, 2010, and that the riser bent and broke as the vessel sank, resulting in the release of hydrocarbons. The BP Parties deny the remaining allegations of this paragraph.


27.   For 87 days, the gushing oil and gas continued unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone and ultimately the entire Gulf of Mexico.

**ANSWER:**

The BP Parties admit that hydrocarbons flowed into the Gulf of Mexico from April 20, 2010 until the well was capped on or around July 15, 2010, and that some of the hydrocarbons reached the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties deny that for 87 days the Spill went unabated. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.


28.   From the outset, BP intentionally downplayed and concealed the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day. An internal BP document proves that the company's own analysis had shown that the rate of oil flow could reach as high as 100,000 barrels, or 4,200,000 gallons, per day.

**ANSWER:**

The BP Parties admit that an internal BP document hypothesized that the flow rate up the casing could be as high as 100,000 barrels per day "if BOP and wellhead are removed and if we

have incorrectly modeled the restrictions.[3]" BP-HZN- 2179MDL01443509. The BP Parties deny any and all allegations of wrongdoing against the BP Parties, including allegations that they downplayed, understated, or concealed the severity of the Spill. The BP Parties deny the remaining allegations of this paragraph.

29.     Despite known existing technology and methods, BP Chief Operating Officer Doug Suttles admitted that as of April 20, 2010, BP did not have a response plan with "proven equipment and technology" that could contain the Macondo well. BP p.l.c. CEO Tony Hayward stated that "BP's contingency plans were inadequate," and that the company had been "making it up day to day." In its official statement, BP made the same admission: "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

**ANSWER:**

The BP Parties admit that they released a statement that "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before," and that Doug Suttles and Tony Hayward stated the above quoted language. The BP Parties deny the remaining allegations of this paragraph.

30.     Upon information and belief, BP actually hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about deepwater blowout response told BP how to kill the well in June 2010. But BP chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP hoped to retap the Macondo well and its massive reservoir, they intentionally ignored expert advice that could have killed the well many weeks earlier.

---

[3]     By referencing the BP-HZN-2179MDL01443509, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

> The BP Parties deny the allegations of this paragraph.

31.     These gross failures and intentional acts ensured that this Oil Spill became the largest environmental disaster in the history of the United States.

**ANSWER:**

> The BP Parties deny the allegations of this paragraph.

32.     Due to the events, actions, and inactions of BP described herein, commercial offshore activity in the Gulf of Mexico and surrounding waters ceased, and individuals and entities that rely on the use of the Outer Continental Shelf and its resources to generate revenues suffered both immediate and long-term economic harm.

**ANSWER:**

> The BP Parties deny the allegations of this paragraph.

33.     As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance ("SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP") (40 CFR §300.323). The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

**ANSWER:**

> The BP Parties admit that the Spill was declared a Spill of National Significance, which
>
> triggered the National Response Framework.  The BP Parties deny that this was "a direct and
>
> foreseeable" result of the Spill.  The BP Parties deny the remaining allegations of this paragraph.

34.     On April 30, 2010, MMS and the U.S. Coast Guard ("USCG"), as a direct and foreseeable result of the Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors. This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency

21

shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

**ANSWER:**

The BP Parties admit that on April 30, 2010, MMS and USCG issued a Joint National Safety Alert.[4]   The BP Parties admit that the Joint National Safety Alert contains recommendations, however the entire text of the document should be considered.  The BP Parties deny that this was "a direct and foreseeable result of the Spill . . . ."  The BP Parties deny the remaining allegations of this paragraph.

35.    Also on April 30, 2010, as a direct and foreseeable result of the Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the Deepwater Horizon explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

**ANSWER:**

The BP Parties admit that on April 30, 2010, the President of the United States directed the Secretary of the Interior to conduct a 30-day review.  The BP Parties deny that this was "a direct and foreseeable result of the Spill . . . ."  The BP Parties deny the remaining allegations of this paragraph.

36.    On May 7, 2010, MMS, as a direct and foreseeable result of the Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

---

[4]    By referencing this alert, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties deny that any such letters were "a direct and foreseeable result of the Spill . . . ." The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

37.    In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* ("Safety Report").

**ANSWER:**

The BP Parties admit that in response to the President's Directive, Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* on May 27, 2010.[5]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

38.    In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling. In particular, the Safety Report targets the effectiveness of blowout preventers ("BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

**ANSWER:**

The BP Parties admit that the Safety Report contains recommendations, however the entire text of the document should be considered.[6]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties

---

[5]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

39.     Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Spill and its environmental devastation.

**ANSWER:**

The BP Parties admit that the Safety Report contains recommendations, however the entire text of the document should be considered.[7]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

40.     On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

**ANSWER:**

The BP Parties admit that on May 28, 2010, the Secretary issued a Decision Memorandum that contained the quoted language, however the entire text of the document

---

[6]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[7]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

should be considered.[8]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

41.   As a direct and foreseeable result of the Oil Spill and it's environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS. On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratorium ("May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices, and procedures.

**ANSWER:**

The BP Parties admit that the Decision Memorandum directed the MMS to suspend certain offshore drilling activities, and that MMS imposed a 6-month drilling moratorium.[9]  The BP Parties deny that the Decision Memorandum was "a direct and foreseeable result of the Spill . . . ."  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the documents described in this paragraph.

42.   Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS. It also prohibited drilling any wellbore sidetracks and bypasses. Moreover, it halted spudding of any new wells. It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

---

[8]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[9]   By referencing these documents, the BP Parties neither admit nor imply that these documents are admissible into evidence and expressly reserve all objections to the use or admissibility of these documents.

**ANSWER:**

The BP Parties admit that NTL No. 2010-N04 directed operators to cease drilling, however the entire text of the document should be considered.[10]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

43. Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

**ANSWER:**

The BP Parties deny that any such suspensions were "a direct and foreseeable result of the Spill . . . ."  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

44. On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the OCS. The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04. These actions were taken as a direct and foreseeable result of the Spill and its environmental devastation.

---

[10]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties admit that MMS issued NTL No. 2010-N05, which called for increased safety measures, however the entire text of the document should be considered.[11]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph. Finally, the BP Parties deny that NTL No. 2010-N05 was "a direct and foreseeable result of the Spill . . . ."

45.     On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Spill's environmental devastation, and BP's incapacity to adequately respond to the Spill. NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios.

**ANSWER:**

The BP Parties admit that MMS issued NTL No. 2010-N06, which "required all operators to adhere to revised information requirements for exploration, development and oil spill response plans," however the entire text of the document should be considered.[12]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent

---

[11]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[12]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

they are directed at the BP Parties or are inconsistent with the document described in this paragraph.  The BP Parties deny that NTL No. 2010-N06 was "a direct response to the Oil Spill . . . ."

46.     On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

**ANSWER:**

The BP Parties admit the allegations in this paragraph.

47.     In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratorium was unenforceable.

**ANSWER:**

The BP Parties admit the allegations in this paragraph.

48.     On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 ("July Moratorium").

**ANSWER:**

The BP Parties admit that on July 12, 2010, the Secretary issued a new decision memorandum recommending that certain drilling operations be suspended, however the entire text of the document should be considered.[13]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties

---

[13]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

28

deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.  Finally, the BP Parties deny that the July 12, 2010 decision document was "a direct and foreseeable result of the Spill . . . ."

49.     In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that the Secretary's new decision memorandum discussed the possibility of environmental harm from drilling activities in the Gulf unrelated to the BP Parties, and the entire text of the document should be considered.[14]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

50.     That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium. The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

51.     With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on

---

[14]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or intervention operations; or waterflood, gas injection, or disposal wells.

**ANSWER:**

The BP Parties admit that the document in question suspended drilling operations, however the entire text of the document should be considered.[15]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

52.   The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October, 2010.

**ANSWER:**

The BP Parties admit that the document in question instructed MMS to gather information, however the entire text of the document should be considered.[16]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

53.   On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end

---

[15]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[16]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

to the July Moratorium, which had been scheduled to extend through the month of November 2010.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

54.     On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

**ANSWER:**

The BP Parties admit that on October 14, 2010, MMS published the Interim Final Rule, however the entire text of the document should be considered.[17]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

55.     In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control, such as the kind experienced in the Oil Spill.

---

[17]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties deny that any such notice was "a direct and foreseeable result of the Spill

. . . ." The BP Parties lack knowledge or information sufficient to form a belief about the truth of

the remaining allegations of this paragraph, and therefore deny them.

56.     On January 3, 2011, MMS notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

57.     The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses in various industries across the Gulf Coast OCS and the Pacific OCS.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

58.     The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Outer Continental Shelf and its resources in connection with offshore deepwater drilling activities.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## FOR A FIRST CAUSE OF ACTION

59.     The April 20, 2010 blowout of the Macondo well and consequent explosion, fire, vessel sinking and massive oil spill prohibited Blake from engaging in their business purpose to negotiate and contract the use of their drilling rigs to various oil and gas customers in the Gulf of Mexico.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

60.     As a result of the April 20, 2010 blowout of the Macondo well and consequent explosion, fire, vessel sinking, massive oil spill, and resulting moratorium that ceased drilling activity in the Gulf of Mexico, Blake was forced to take their rigs out of commerce.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

61.     BP Exploration was named the responsible party under the Oil Pollution Act, 33 U.S.C. §2701, et seq. ("OPA"), and is therefore strictly liable to Blake for economic damages that resulted from the blowout, explosion, fire and resulting massive oil spill that led to the imposition of the moratorium.

**ANSWER:**

The BP Parties admit that the U.S. Coast Guard named BPXP, as well as other entities, a Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

62.     Commencing on April 20, 2010 and continuing through today and into the foreseeable future, Blake has suffered and will continue to suffer extensive economic and formidable monetary damages including past and future lost revenues and profits, lost business opportunities, and diminution in asset values due to the April 20, 2010 casualty described herein, in amounts to be proven at trial of this cause.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

63.     Commencing on April 20, 2010 and continuing through today and into the foreseeable future, Blake has suffered increased financing and lending costs from banks with whom Blake was negotiating due to the uncertainty attributed to the oil and gas industry due to the April 20, 2010 casualty described herein, in amounts to be proven at trial of this cause.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

64.     There were no other events, occurrences, actions or inactions that caused Blake losses, no superseding or intervening cause(s) of Blake's losses, and no other events, occurrences, actions or inactions that factually or legally relieve or reduce BP Exploration's strict liability or the damages owed to Blake under the Oil Pollution Act. OPA imposes strict liability for *all* damages due to and/or resulting from the Spill and its environmental devastation. Therefore, the concepts of "superseding" or "intervening" cause are not applicable. In the alternative, the Moratoria were not "intervening" or "superseding" causes with respect to damages arising from the Oil Spill. The Moratoria, rather, were direct and foreseeable consequences of the environmental havoc wreaked by a spill designated as one of National Significance.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

65.     The size, scope, and breadth of the Spill's environmental damage caused foreseeable actions by the federal and state governments, including the closures of massive portions of the Gulf to fishing and shipping. The spill's destructive and contaminating qualities directly affected all industries in the Gulf and the federal agencies that oversee them. The Moratoria was enacted by one such federal agency within its authority to ensure the safety by affecting very narrow activities of an industry under its control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph, and therefore deny

them.

66.    Jurisdiction of this Cause of Action against BP Exploration is based upon the general maritime law of the United States.

**ANSWER:**

Jurisdiction of Plaintiff's action exists under 28 U.S.C. § 1333(1).

67.    Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. §2717(b).

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

68.    Blake Holdings I, LLC, Blake Workover & Drilling Co., Inc., Blake International Rigs, LLC and Blake International USA Rigs, LLC brings all of its claims and causes of action under Federal Rule of Civil Procedure 9(h),

**ANSWER:**

This paragraph concerns an election by Blake, and thus does not require a response by the

BP Parties.

**WHEREFORE**, based on the foregoing, **BLAKE HOLDINGS I, LLC, BLAKE WORKOVER & DRILLING CO., INC., BLAKE INTERNATIONAL RIGS, LLC AND BLAKE INTERNATIONAL USA RIGS, LLC** prays for judgment in its favor and against Defendants' BP Exploration & Production, Inc., BP America Production Company; and BP p.l.c., jointly, severally, and in solido, for compensatory damages as alleged herein in an amount reasonable under the circumstances of this case, for legal interest at the maximum allowable rate on those amounts for which Blake Holdings I, LLC is entitled to obtain legal interest, for all reasonable claim preparation expenses, for litigation costs, attorney's fees, pre-judgment and post-judgment interest at the maximum rate allowable by law, and for any additional general and equitable relief as facts of this case may require.

**ANSWER:**

The BP Parties deny that Plaintiff is entitled to any relief in this action. The BP Parties deny that Plaintiff can pursue attorneys' fees or costs.[18]

## GENERAL DENIAL

The BP Parties deny all allegations in the Amended Complaint not specifically admitted herein, including any allegations contained in subparts, footnotes, and argument headings.

## AFFIRMATIVE DEFENSES

The BP Parties set forth their affirmative defenses below. But by setting forth these affirmative defenses, the BP Parties do not assume the burden of proving any facts, issues, or elements of a cause of action where such burden properly belongs to Plaintiff.

## FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

## SECOND DEFENSE

The blowout, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU *Deepwater Horizon*, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities.

---

[18] Several of the test case plaintiffs have added boilerplate claims for relief for attorney fees, costs, etc. All such plaintiffs should be aware of the conditions of test case participation, including No. 3, "BP and plaintiffs agree with respect to the test case trials that each party will bear its own costs regardless of outcome." Given those conditions, BP objects to amendments and claims for relief that are inconsistent with the Conditions.

The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, plaintiff's claims should be dismissed as to the BP Parties.

### THIRD DEFENSE

Plaintiff's damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

### FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiff were not the result of any negligence, fault, or want of due care on the part of BP Parties. Furthermore, Plaintiff has the burden of proof on this issue, and Plaintiff cannot meet that burden.

### FIFTH DEFENSE

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiff's alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged. Additionally, BP denies that the applicable causal test or tests established by the Oil Pollution Act can be met by the Plaintiff.

### SIXTH DEFENSE

Plaintiff's alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

## SEVENTH DEFENSE

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP parties.

## EIGHTH DEFENSE

The Plaintiff's claims are barred by the operation and effect of releases of claims and liability on the part of the BP Parties.

## NINTH DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

## TENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

## ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to indemnity from other parties or entities.

## TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contribution from other parties or entities.

## THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to subrogation from other parties or entities.

## FOURTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff is not entitled under the law to the damages that it seeks, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

## SIXTEENTH DEFENSE

Plaintiff's damages are barred, in whole or in part, by a failure to mitigate damages.

## SEVENTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by Plaintiff as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

## EIGHTEENTH DEFENSE

Claims in this Complaint may fail to comport with one or more requirements of presentment as defined by the Oil Pollution Act of 1990 and its case law. Retroactive compliance with OPA presentment requirements is not permissible.

## NINETEENTH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity. Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTIETH DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' contractors or subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-FIRST DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

## TWENTY-SECOND DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

## TWENTY-THIRD DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiff who may have received funds through the BP claims process, the GCCF, and/or the CSSP. Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

## TWENTY-FOURTH DEFENSE

The BP Parties cannot be held to be responsible under OPA for losses caused by prevailing macro-economic conditions including but not limited to tight credit conditions.

## TWENTY-FIFTH DEFENSE

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus would fall outside the applicable statute of limitations.

## TWENTY-SIXTH DEFENSE

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus its allegations would become subject to the doctrine of laches.

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated:  June 23, 2014

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Christopher W. Keegan
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:  (414) 439-1400
Facsimile:  (414) 439-1500

Jeffrey Bossert Clark
Dominic E. Draye
Thomas P. Weir
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

Respectfully submitted,

/s/  Don K. Haycraft
Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
202-662-5985

Emily Johnson Henn
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
650-632-4715

*Attorneys for BP Exploration & Production, Inc, BP America Production Company,*
*and BP p.l.c.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of June, 2014.

/s/  Don K. Haycraft