**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| Applies to:  *13-1222* | * * | |
| | * * | HONORABLE CARL J. BARBIER |
| | * | |
| | * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

**THE BP PARTIES' ANSWER TO THE SECOND SUPPLEMENTAL AND AMENDING
COMPLAINT OF TRINITY OFFSHORE, LLC**

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the Second Supplemental and Amending Complaint of Trinity Offshore, LLC, (Rec. Doc. 12991) as follows[1]:

**NOW COMES PLAINTIFF**, Trinity Offshore, LLC, through undersigned counsel, who does allege, aver and represent as follows:

**<u>Introduction</u>**

On April 20, 2010, a well blowout on the oil rig *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The uncontrolled blowout caused explosions and a raging fire aboard the *Deepwater Horizon*; after burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that interfered with, damaged,

---

[1]    Discovery with regard to the subject matter of the allegations in plaintiff's complaint is ongoing and not complete, and certain information thus remains unavailable to the BP Parties at this time, and the BP Parties therefore specifically reserve the right to amend or supplement their answers and affirmative defenses to the allegations in plaintiff's complaint as additional facts and expert opinions become known to them.

depleted, and destroyed offshore, marine and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill"). As a direct and foreseeable result of the Spill and its devastating impact on the marine and coastal environments, the oil and gas exploration, production and associated activities in the Gulf of Mexico were significantly interrupted, resulting in economic losses to Plaintiff and other companies and employees similarly situated.

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel, and a release of oil into the Gulf of Mexico, some of which reached the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties deny the remaining allegations of this introduction, including the claim that "[a]s a direct and foreseeable result of the Spill," the referenced activities in the Gulf were interrupted and led to purported losses by the Plaintiff and others.

**THE PARTIES, JURISDICTION AND VENUE**

1a.     Trinity Offshore, LLC changed its name to TY Offshore, LLC on or about April 13, 2012.

1b.     On or about May 24, 2013, and subsequent to making presentment of its claim under the Oil Pollution Act of 1990 to Defendant, BP, TY Offshore, LLC assigned and transferred all of its assets to Gulf Coast Shipyard Operations, Inc., a Delaware corporation.

1c.     Gulf Coast Shipyard Operations, Inc. is the legal owner of the claim and is a proper party plaintiff herein.

1d.     Named plaintiff herein is Gulf Coast Shipyard Operations, Inc., a Delaware corporation.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them. Regarding OPA presentment, BP incorporates its response below to paragraph 49.

2.      Plaintiff brings these claims pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 USC §2701, et seq.

**ANSWER:**

The BP Parties acknowledge that plaintiff brings these claims pursuant to OPA.

3.      Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

4.      Jurisdiction before this Court also exists pursuant to OPA, 33 U.S.C. §2717(b).

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

6.      Defendant, BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714. This court has personal jurisdiction over BP Exploration because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPXP is a Delaware corporation (but denies that its principal place of business is in Warrenville, Illinois), and that BPXP was, together with other entities, designated as a Responsible Party under the Oil Pollution Act.  As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties further admit that BPXP is subject to this Court's jurisdiction. The BP Parties deny the remaining allegations of this paragraph.

7.      Defendant, BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. This Court has personal jurisdiction over

BP America because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

BP Exploration and Production Inc. was a leaseholder at Macondo and thus was designated as a "Responsible Party" by the U.S. Coast Guard under OPA, 33 U.S.C. § 2701. For that reason, BP objects to the addition of additional/new BP defendants, since their addition is expressly counter to the Conditions established to govern these OPA test cases. The BP Parties admit that BPAP is a Delaware corporation with its principal place of business in Houston, Texas, and further admit that BPAP is subject to this Court's jurisdiction. The BP Parties deny the remaining allegations of this paragraph.

8.      Defendant, BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana specifically and the U.S. more generally. Plaintiff further adopts and incorporates by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

**ANSWER:**

The BP Parties incorporate their answer to paragraph 7 herein. The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case. The BP Parties adopt and incorporate by reference their answers to Paragraphs 212-218 found in their Answer to the First Amended Master Complaint, Cross-Claims, and Third-Party Complaint for Private Economic Losses (the

"B1 Answer").   Rec. Doc. 4130.   The BP Parties deny the remaining allegations of this paragraph.

9.      BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

**ANSWER:**

The BP Parties admit that Plaintiffs refer to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate.

16.      Prosecution and venue in this district is proper under 28 U.S.C. §1391 because Defendants do business herein and the events or omissions giving rise to the claims asserted herein occurred in this district. Venue is also proper pursuant to the OPA, 33 U.S.C. 2717(b), as the discharge occurred in this district. Venue is also appropriate in this district consistent with 28 U.S.C. §1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation. See *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* 731 F. Supp. 2d 1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiffs to directly file their complaints arising out of the Oil Spill in this District.

**ANSWER:**

The BP Parties are not contesting venue in this Court.

### Factual Allegations

17.      Plaintiff adopts and incorporates as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint").

**ANSWER:**

The BP Parties adopt and incorporate as if fully restated herein the B1 Answer.

18.      Plaintiff further adopts and incorporates as if fully restated herein Plaintiffs' Supplemental and Amended Responses to Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011; and Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012.

**ANSWER:**

The BP Parties deny this paragraph in its entirety as the Plaintiffs' Supplemental and Amended Responses to Phase One Written Discovery Requests are not properly incorporated into this Amended Complaint. The BP Parties also object to the inclusion of the above-referenced discovery responses as irrelevant to this matter since all relate to Halliburton Energy Services, Inc., a non-party to these OPA test cases. Finally, the BP Parties lack information sufficient to admit or deny the allegations made in the PSC's omnibus discovery responses and therefore deny the allegations of this paragraph.

19.  As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance ("SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP") (40 CFR §300.323). The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

**ANSWER:**

The BP Parties admit that the Spill was declared a Spill of National Significance, which triggered the National Response Framework. The BP Parties deny that this was "a direct and foreseeable" consequence of the Spill. The BP Parties deny the remaining allegations of this paragraph.

20.  On April 30, 2010, MMS and the U.S. Coast Guard ("USCG"), as a direct and foreseeable result of the Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors. This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment

and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

**ANSWER:**

The BP Parties admit that on April 30, 2010, MMS and USCG issued a Joint National Safety Alert.[2]   The BP Parties admit that the Joint National Safety Alert contains recommendations, however the entire text of the document should be considered.  The BP Parties deny that this was "a direct and foreseeable result of the Spill . . . ."  The BP Parties deny the remaining allegations of this paragraph.

21.   Also on April 30, 2010, as a direct and foreseeable result of the Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the Deepwater Horizon explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

**ANSWER:**

The BP Parties admit that on April 30, 2010, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the Spill.  The BP Parties deny that this was "a direct and foreseeable result of the Spill."  The BP Parties deny the remaining allegations of this paragraph.

22.   On May 7, 2010, MMS, as a direct and foreseeable result of the Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

---

[2]   By referencing this alert, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  The BP Parties also deny the claim that any letters of the referenced type were "a direct and foreseeable result of the Spill."

23.    In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* ("Safety Report").

**ANSWER:**

The BP Parties admit that in response to the President's Directive, Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* on May 27, 2010.[3]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

24.    In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling. In particular, the Safety Report targets the effectiveness of blowout preventers ("BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

**ANSWER:**

The BP Parties admit that the Safety Report contains recommendations, however the entire text of the document should be considered.[4]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties

---

[3]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

25.    Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Spill and its environmental devastation.

**ANSWER:**

The BP Parties admit that the Safety Report contains recommendations, however the entire text of the document should be considered.[5]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document.  The BP Parties further deny that the measures from the Safety Report "were taken as a direct and foreseeable result of the Spill."  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

26.    On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

---

[4]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[5]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties admit that on May 28, 2010, the Secretary issued a Decision Memorandum that contained the quoted language, however the entire text of the document should be considered.[6]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document.   The BP Parties further deny that the Safety Report was "the direct and foreseeable consequences of the Spill." The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

27.     As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS. On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratorium ("May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices, and procedures

**ANSWER:**

The BP Parties admit that the Decision Memorandum directed the MMS to suspend certain offshore drilling activities, and that MMS imposed a 6-month drilling moratorium.[7]   The BP Parties deny that the Decision Memorandum or its content was the "direct and foreseeable result of the Oil Spill."   The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the documents described in this paragraph.

---

[6]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[7]     By referencing these documents, the BP Parties neither admit nor imply that these documents are admissible into evidence and expressly reserve all objections to the use or admissibility of these documents.

28.     Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS. It also prohibited drilling any wellbore sidetracks and bypasses. Moreover, it halted spudding of any new wells. It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

**ANSWER:**

The BP Parties admit that NTL No. 2010-N04 directed operators to cease drilling, however the entire text of the document should be considered.[8]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

29.     Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172.  The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  Additionally, the BP Parties deny that any such suspensions were "a direct and foreseeable result of the Spill …."

30.     On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the OCS. The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04. These actions were taken as a direct and foreseeable result of the Spill and its environmental devastation.

---

[8]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties admit that MMS issued NTL No. 2010-N05, which called for increased safety measures, however the entire text of the document should be considered.[9]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document.  The BP Parties deny that NTL No. 2010-N05 and allegedly related actions "were taken as a direct and foreseeable result of the Spill."  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

31.    On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Spill's environmental devastation, and BP's incapacity to adequately respond to the Spill. NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios

**ANSWER:**

The BP Parties admit that MMS issued NTL No. 2010-N06, which "required all operators to adhere to revised information requirements for exploration, development and oil spill response plans," however the entire text of the document should be considered.[10]  The BP Parties deny that NTL No. 2010-N06 was issued "in direct response to the Oil Spill."  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent

---

[9]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[10]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

32.     On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

**ANSWER:**

The BP Parties admit the allegations in this paragraph.

33.     In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratorium was unenforceable.

**ANSWER:**

The BP Parties admit the allegations in this paragraph.

34.     On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 ("July Moratorium").

**ANSWER:**

The BP Parties admit that on July 12, 2010, the Secretary issued a new decision memorandum recommending that certain drilling operations be suspended, however the entire text of the document should be considered.[11]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document.   The BP Parties deny that the new decision memorandum was "a direct and foreseeable result of the Oil Spill."

---

[11]     By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

35.     In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that the Secretary's new decision memorandum discussed the possibility of environmental harm from drilling activities in the Gulf unrelated to the BP Parties, and the entire text of the document should be considered.[12]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

36.     That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium. The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

37.     With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or intervention operations; or waterflood, gas injection, or disposal wells.

---

[12]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties admit that the document in question suspended certain drilling operations, however the entire text of the document should be considered.[13]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

38.    The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October, 2010.

**ANSWER:**

The BP Parties admit that the document in question instructed MMS to gather information, however the entire text of the document should be considered.[14]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

39.    On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end to the July Moratorium, which had been scheduled to extend through the month of November 2010.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

---

[13]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

[14]    By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

40.     On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

**ANSWER:**

The BP Parties admit that on October 14, 2010, MMS published the Interim Final Rule, however the entire text of the document should be considered.[15]   The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original document. The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the document described in this paragraph.

41.     In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control, such as the kind experienced in the Oil Spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  Additionally, the BP Parties deny that any referenced notices were "[i]n direct and foreseeable response to the Oil Spill …."

42.     On January 3, 2011, MMS notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

---

[15]   By referencing this document, the BP Parties neither admit nor imply that this document is admissible into evidence and expressly reserve all objections to the use or admissibility of the document.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

43.     The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses in various industries across the Gulf Coast OCS and the Pacific OCS.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

44.     The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Outer Continental Shelf and its resources in connection with offshore deepwater drilling activities.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

45.     At the time of the Oil Spill, plaintiff Trinity operated as an offshore supply boat design and construction firm based in Gulfport, Mississippi.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

46.     Prior to the Oil Spill, Harvey Gulf International Marine, LLC ("Harvey Gulf"), a vessel operator, accepted Trinity's bid to design and construct three vessels at a price of $43,200,000 per vessel, with an option to purchase three additional vessels.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

47.     As a direct result of the Oil Spill and the foreseeable governmental response to a disaster of its magnitude, including the deepwater drilling moratorium issued May 30, 2010, Harvey Gulf canceled its agreement to purchase the vessels from Trinity.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph concerning Harvey Gulf's actions, and therefore deny them. Additionally, the BP Parties deny that any federal actions the Plaintiff intends to reference were a "foreseeable governmental response" to the spill.

48.     Thus, as a direct result of the Oil Spill and the foreseeable governmental response to a disaster of its magnitude, including the deepwater drilling moratorium issued May 30, 2010, Trinity suffered significant economic damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

49.     Plaintiff, out of an abundance of caution, made "presentment" of its Claims in accord with 33 USC §§ 2702(b) and 2713, by submitting a description of the claims with a "sum certain" and some supporting documentation to BP as the "responsible party" under OPA, *via* Certified Mail on or about December 19, 2012.

**ANSWER:**

The BP Parties deny the allegations of this paragraph because Trinity Offshore's original pre-suit claim sought a sum of $6,188,172.00, but Trinity Offshore only provided a spreadsheet of calculations, without evidence to support the amounts contained in the spreadsheet. Furthermore, Trinity's Second Amended Complaint inserts the allegation in Paragraph 46 above. This creates an ambiguity concerning the presentment issue that the BP Parties are consulting with the Plaintiffs Steering Committee concerning.   Additionally, the BP Parties are still engaging in the presentment consultation process with the PSC; *see* OPA Test Case Scheduling Order, Rec. Doc. 12972, ¶7; and thus reserve all of their rights on the issue of presentment.

50.     BP either denied the claims or otherwise failed to satisfy them within 90 days of presentment.

**ANSWER:**

The BP Parties adopt and incorporate by reference their answer to paragraph 49 above.

### Claims for Relief

### The Oil Pollution Act ("OPA")

51.     Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints against the Defendants as responsible parties under the Oil Pollution Act, 33 USC §2701, *et seq*., which holds responsible parties liable to plaintiffs for removal costs and damages arising out of the following:

(a) Loss of Natural Resources;

(b) Loss or Damage to Real or Personal Property;

(c) Subsistence Use;

(d) Loss of Revenues;

(e) Loss of Profits and/or Earning Capacity; and

(f) Loss of Public Services.

**ANSWER:**

The BP Parties adopt and incorporate as if fully restated herein the B1 Answer.  The BP Parties also admit that BPXP was designated as a Responsible Party under the Oil Pollution Act. The BP Parties deny the allegations of this paragraph insofar as it is an attempt to summarize the highly reticulated provisions of 33 U.S.C. § 2702, which speak for themselves.  The BP Parties deny the remaining allegations of this paragraph.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Trinity Offshore, LLC, demands judgment against Defendants, jointly, severally, and in solido, as follows:

(a)     Economic and compensatory damages in amounts to be determined at trial;

(b)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(c)     Reasonable claims preparation expenses;

(d)     Attorneys' fees; and

(e)     Such other and further relief available under all applicable federal laws and any relief the Court deems just and appropriate.

**ANSWER:**

The BP Parties deny that Plaintiff is entitled to any relief in this action.  The BP Parties deny that Plaintiff can pursue attorneys' fees or costs.[16]

## GENERAL DENIAL

The BP Parties deny all allegations in the Second Amended Complaint not specifically admitted herein, including any allegations contained in subparts, footnotes, and argument headings.

## AFFIRMATIVE DEFENSES

The BP Parties set forth their affirmative defenses below. But by setting forth these affirmative defenses, the BP Parties do not assume the burden of proving any facts, issues, or elements of a cause of action where such burden properly belongs to Plaintiff.

## FIRST DEFENSE

The allegations of the Second Amended Complaint fail to state a claim upon which relief may be granted.

---

[16]   Several of the test case plaintiffs have added boilerplate claims for relief for attorney fees, costs, etc.  All such plaintiffs should be aware of the conditions of test case participation, including No. 3, "BP and plaintiffs agree with respect to the test case trials that each party will bear its own costs regardless of outcome."  Given those conditions, BP objects to amendments and claims for relief that are inconsistent with the Conditions.

## SECOND DEFENSE

The blowout, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU *Deepwater Horizon*, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities. The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, plaintiff's claims should be dismissed as to the BP Parties.

## THIRD DEFENSE

Plaintiff's damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

## FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiff were not the result of any negligence, fault, or want of due care on the part of BP Parties. Furthermore, Plaintiff has the burden of proof on this issue, and Plaintiff cannot meet that burden.

## FIFTH DEFENSE

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiff's alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged. Additionally, BP denies that the applicable causal test or tests established by the Oil Pollution Act can be met by the Plaintiff.

## SIXTH DEFENSE

Plaintiff's alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which

the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

## SEVENTH DEFENSE

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP parties.

## EIGHTH DEFENSE

The Plaintiff's claims are barred by the operation and effect of releases of claims and liability on the part of the BP Parties.

## NINTH DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

## TENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

## ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to indemnity from other parties or entities.

## TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contribution from other parties or entities.

### THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to subrogation from other parties or entities.

### FOURTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

### FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff is not entitled under the law to the damages that it seeks, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

### SIXTEENTH DEFENSE

Plaintiff's damages are barred, in whole or in part, by a failure to mitigate damages.

### SEVENTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Second Amended Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by Plaintiff as a result of the allegations contained in the Second Amended Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

### EIGHTEENTH DEFENSE

Claims in this Second Amended Complaint may fail to comport with one or more requirements of presentment as defined by the Oil Pollution Act of 1990 and its case law.

## NINETEENTH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity. Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTIETH DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' contractors or subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-FIRST DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

## TWENTY-SECOND DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

## TWENTY-THIRD DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiff who may have received funds through the BP claims process, the GCCF, and/or the CSSP. Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

**TWENTY-FOURTH DEFENSE**

The BP Parties cannot be held to be responsible under OPA for losses caused by prevailing macro-economic conditions including but not limited to tight credit conditions.

**TWENTY-FIFTH DEFENSE**

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus would fall outside the applicable statute of limitations.

**TWENTY-SIXTH DEFENSE**

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus its allegations would become subject to the doctrine of laches.

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated:  June 23, 2014

Respectfully submitted,

/s/  Don K. Haycraft

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

Christopher W. Keegan
Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Telephone:  (414) 439-1400
Facsimile:   (414) 439-1500

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
202-662-5985

Jeffrey Bossert Clark
Dominic E. Draye
Thomas P. Weir
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

Emily Johnson Henn
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
650-632-4715

*Attorneys for BP Exploration & Production, Inc, BP America Production Company, and BP p.l.c.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of June, 2014.

/s/  Don K. Haycraft