**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| Applies to:  *13-1386* | * * | |
| | * * | HONORABLE CARL J. BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

---

### THE BP PARTIES' ANSWER TO THE FIRST AMENDED COMPLAINT OF SEAHAWK LIQUIDATING TRUST

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the First Amended Complaint  of Seahawk Liquidating Trust (Rec. Doc. 12994) as follows: [1]

Eugene I. Davis, in his capacity as trustee of the Seahawk Liquidating Trust, the duly authorized successor to Seahawk Drilling, Inc. and its various subsidiaries[2] (collectively, "Seahawk"), hereby complains as follows:

### I. NATURE OF ACTION

1.     Seahawk provided contract drilling services to the oil and natural gas exploration and production industry exclusively in the Gulf of Mexico. Seahawk owned a fleet of 20 rigs, making

---

[1]   Discovery with regard to the subject matter of the allegations in Plaintiff's Complaint is ongoing and not complete, and certain information thus remains unavailable to the BP Parties at this time, and the BP Parties therefore specifically reserve the right to amend or supplement their answers and affirmative defenses to the allegations in Plaintiff's Complaint as additional facts and expert opinions become known to them.

[2]   These subsidiaries are as follows: (a) Seahawk Mexico Holdings LLC; (b) Seahawk Drilling Management LLC; (c) Seahawk Offshore Management LLC; (d) Energy Supply International LLC; (e) Seahawk Drilling LLC; (f) Seahawk Global Holdings, LLC; and (g) Seahawk Drilling USA, LLC.

1

it the second-largest jack-up drilling company in the region as of April 2010. Seahawk had a market capitalization of $220 million at the time, with its stock trading at approximately $19 per share. Unfortunately, Seahawk's business was essentially destroyed as a result of the worst environmental disaster in U.S. history—namely the discharge of more than 4.9 million barrels of oil into the Gulf of Mexico following the blowout of the deepwater Macondo well on April 20, 2010 (the "Macondo Disaster").

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

2.     The sheer physical and environmental devastation emanating from the Macondo Disaster and its aftermath killed much of the demand for Seahawk's services and triggered a precipitous 47.3% decline in Seahawk's stock price. In the absence of such an environmental calamity, Seahawk would have been able to obtain capital to diversify its business or pursue other strategic initiatives outside of the Gulf of Mexico and otherwise. Instead, the Macondo Disaster and its aftermath led to reluctance in the market to finance or invest in drilling companies operating in the region (particularly Seahawk, which—unlike other drillers—operated only in the Gulf of Mexico) or their customers (exploration and production companies). With drastically reduced demand for its services and no ability to pursue strategic initiatives, Seahawk was forced to file for bankruptcy and sell its fleet of drilling rigs in February 2011.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

3.     Had it not been for the environmental catastrophe attendant to the Macondo Disaster and the related aftermath, Seahawk would have been able: (a) to operate more profitably between the date of the spill and when it was forced to sell its rigs (thereby obtaining approximately $18.4 million in additional profits), (b) to maintain ownership of its profit-generating rig assets (thereby obtaining at least $156.4 million in additional profits); and (c) to  complete a major pending acquisition (thereby diversifying its business and obtaining substantial additional profits and other value). Seahawk seeks to recover more than $174.8 million in economic damages, including lost profits and impairment of ability to earn future profits, that it suffered as a direct and foreseeable result of the Macondo Disaster and its aftermath.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  Additionally, the BP Parties deny that any purported losses of Plaintiff were "direct and foreseeable result of the Macondo Disaster and its aftermath."

## II. PARTIES

**A.    PLAINTIFF**

4.    On February 11, 2011, Seahawk Drilling, Inc. and its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Corpus Christi Division) (the "Bankruptcy Court").

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

5.    The Seahawk Liquidating Trust was created in accordance with the Seahawk Liquidating Trust Agreement and the First Amended Joint Plan of Reorganization of the Debtors and Debtors-in Possession Under Chapter 11 of the Bankruptcy Code (the "Plan"), which was confirmed by the Bankruptcy Court on September 28, 2011. The Plan expressly retained certain causes of action belonging to Seahawk, including the causes of action asserted in this action, for post-confirmation enforcement by the Seahawk Liquidating Trust under 11 U.S.C. § 1123(b). The Seahawk Liquidating Trust, therefore, has standing to assert the claims in this action.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

6.    The Seahawk Liquidating Trust is a trust organized under Texas law. Eugene I. Davis, a resident of New Jersey, serves as trustee of the Seahawk Liquidating Trust (the "Trustee").

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

**B. DEFENDANTS**

7.      BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Houston, Texas. BP Exploration was a leaseholder and the designated operator in the lease granted by the Minerals Management Service, n/k/a the Bureau of Ocean Energy Management, Regulation and Enforcement ("MMS"), allowing BP Exploration to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Macondo Disaster originated. BP Exploration was designated the "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714. On or about June 3, 2013, BP Exploration was served with process through its registered agent, CT Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, Louisiana 70808.

**ANSWER:**

The BP Parties admit that BPXP is a Delaware corporation with its principal place of Houston, Texas, that it was a partial lease holder in the lease granted by the MMS/BOEMRE pursuant to which it was allowed to perform oil exploration and offshore drilling activities in Mississippi Canyon Block 252, in which the Macondo Well was located, and that BPXP was, together with other entities, designated as a Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties further admit that BPXP is subject to this Court's jurisdiction. The BP Parties deny the remaining allegations of this paragraph.

8.      BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the contract for the drilling of the Macondo well by the Deepwater Horizon vessel. On or about June 3, 2013, BP America was served with process through its registered agent, CT Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, Louisiana 70808.

4

**ANSWER:**

BP Exploration and Production Inc. was a leaseholder at Macondo and thus was designated as a "Responsible Party" by the U.S. Coast Guard under OPA, 33 U.S.C. § 2701. For that reason, BP objects to the addition of additional/new BP defendants, since their addition is expressly counter to the Conditions established to govern these OPA test cases. The BP Parties admit that BP America Production Company ("BPAP"), as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon* and that the *Deepwater Horizon* was engaged in drilling activities at the Macondo prospect site at the time of the Incident. The BP Parties further admit that BPAP is subject to this Court's jurisdiction.

9.     BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo, including its wholly owned subsidiaries, BP Exploration and BP America. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division, which includes BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP Exploration and BP America are sufficiently controlled by BP p.l.c. to constitute its agents in Louisiana. BP p.l.c. may be served with process through its agents BP Exploration and BP America and their registered agent, CT Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, Louisiana 70808.

**ANSWER:**

The BP Parties incorporate their answer to paragraph 8 herein. The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case. The BP Parties deny the remaining allegations of this paragraph.

10.    BP Exploration, BP America, and BP p.l.c. are collectively referred to as "BP."

**ANSWER:**

The BP Parties admit that Plaintiffs refer to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate.

### III. JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b). The claims in this action arise under the Oil Pollution Act of 1990. The Trustee presented his claims, as required by 33 U.S.C. § 2713, more than 90 days prior to filing this action.

**ANSWER:**

The BP Parties admit that this Court has jurisdiction under OPA and the federal question statute.  The BP Parties further admit that the claims in this action arise under OPA.  The BP Parties are still engaging in the presentment consultation process with the PSC; *see* OPA Test Case Scheduling Order, Rec. Doc. 12972, ¶7; and thus reserve all of their rights on the issue of presentment.

12.     This Court has personal jurisdiction over BP because: (a) BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana; (b) BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana; and (c) BP Exploration and BP America are wholly owned subsidiaries of BP p.l.c., and are sufficiently controlled by BP p.l.c. to constitute its agents in Louisiana and the United States more generally.[3]

**ANSWER:**

The BP Parties are not contesting the jurisdiction of this Court.  The BP Parties adopt and incorporate by reference their answers to Paragraphs 212-218 found in their Answer to the First Amended Master Complaint, Cross-Claims, and Third-Party Complaint for Private Economic

---

[3]     The jurisdictional allegations against BP p.l.c. set forth in paragraphs 212-218 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.

Losses (the "B1 Answer").  Rec. Doc. 4130.  The BP Parties deny the remaining allegations of

this paragraph.

13.      Venue is proper in this district pursuant to 33 U.S.C. § 2717(b), as the discharge of
hydrocarbons that is the basis of this action occurred within this district. Venue is also proper in
this district pursuant to 28 U.S.C. § 1391, in that a substantial portion of the events or omissions
giving rise to the Trustee's claims occurred in this district. Finally, venue is appropriate in this
district based on 28 U.S.C. § 1407 and the transfer order by the Judicial Panel on Multidistrict
Litigation consolidating actions relating to the Macondo Disaster before this Court as MDL No.
2179. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20,
2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).

**ANSWER:**

The BP Parties are not contesting the propriety of venue in this Court.

### IV. FACTUAL BACKGROUND

**A.      SEAHAWK'S BUSINESS**

14.      Seahawk's business consisted solely of providing contract drilling services to the oil and
natural gas exploration and production industry in the Gulf of Mexico. In particular, Seahawk
operated a "jack-up" rig business with a fleet of 20 mat-supported jack-up rigs located entirely in
the Gulf of Mexico. Seahawk's ability to move its rigs to other regions of the world was limited
because Seahawk's mat-supported, variable deckload rigs were less capable than other types of
rigs at managing sea floor conditions found in other regions. Seahawk, therefore, was essentially
a "Gulf coast" business.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

15.      Seahawk contracted with its Gulf of Mexico customers—primarily oil and natural gas
producers and drilling service providers—on a "day rate" basis to provide rigs and drilling
crews. Under such day rate contracts, Seahawk charged its customers a fixed daily amount,
regardless of the number of days needed to drill the well. Typically, these contracts were
terminable by Seahawk's customers if drilling operations were suspended due to events beyond
the control of either party. The demand for Seahawk's drilling services was influenced by the
ability of its customers to obtain necessary permitting and financing for drilling projects and
exploration and production, as well as other market factors.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

16.    In August 2009, Seahawk was spun-off of Pride International, Inc. The 20 rigs that Seahawk obtained through the spin-off had a long history of profitability. Specifically, the average annual revenue generated from these rigs from 2002 through 2009 was approximately $322 million per year. At Seahawk's cost structure after the spin-off, such revenues would have translated to annual EBITDA of approximately $65 million per year.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

**B.     THE MACONDO DISASTER**

17.    In March 2008, BP leased the Mississippi Canyon Block 252 for oil and gas exploration and designated it as the Macondo Prospect ("Macondo"). Although BP subsequently sold interests in the prospect, BP remained the operator and majority owner through all relevant time periods. BP began exploration at Macondo on October 6, 2009.[4]

**ANSWER:**

The BP Parties adopt and incorporate by reference their answers to Paragraphs 258-542 found in the B1 Answer.

18.    To drill exploratory wells at Macondo, BP leased the Deepwater Horizon, which was a fifth-generation deepwater semi-submersible drilling vessel. On April 20, 2010, Deepwater Horizon suffered an uncontrolled loss of hydrocarbon containment, or blowout incident, while operating at Macondo. The blowout caused explosions on the Deepwater Horizon, thereby igniting a raging fire as oil and other hydrocarbons spewed onto the vessel from the blown-out well. After burning for two days, the Deepwater Horizon sank to ocean floor.

---

[4]    The allegations relating to BP's acts, omissions and failures set forth in paragraphs 258-542 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.

**ANSWER:**

The BP Parties admit that the vessel *Deepwater Horizon* was leased to drill exploratory wells at Macondo, and that on April 20, 2010, there was a loss of control of the well being drilled by the vessel, and that there followed one or more fires and explosions, and the sinking of the vessel. The BP Parties deny the remaining allegations of this paragraph.

19.     Oil and other hydrocarbons gushed out of the damaged well and into the Gulf of Mexico for three months. Ultimately, 4.9 million barrels of oil spilled from the well, making it one of the largest marine oil spills in the history of the petroleum industry and the worst environmental catastrophe in U.S. history. The spill was so large that it directly impacted approximately 68,000 square miles of navigable waters of the Gulf of Mexico (nearly the size of Oklahoma) and fouled over 600 miles of beaches and wetlands across five Gulf Coast states. The Macondo Disaster caused significant damages to the waters of the Gulf of Mexico, shoreline beaches and wetlands, fisheries and various aquatic life forms, and other natural resources. Much of the ecological damage was made worse by BP's administration of highly toxic dispersants, such as several variants of Corexit.

**ANSWER:**

The BP Parties admit that hydrocarbons entered the water column and reached the surface of the Gulf of Mexico and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties further admit that as permitted in the National Contingency Plan and with the approval of the Unified Command, dispersants were applied to mitigate the potential impacts of the oil spill. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

20.     The physical devastation to natural resources in the Gulf of Mexico resulting from the Macondo Disaster prompted the federal government to take regulatory action.[5] On May 28, 2010, the U.S. Secretary of the Interior, after conducting a 30-day review of the Macondo

---

[5]     The allegations relating to regulatory action set forth in paragraphs 522-529 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.

Disaster, issued a directive declaring a six-month deepwater drilling moratorium in the Gulf of Mexico. Although this moratorium formally applied only to deepwater drilling, the number of shallow-water drilling permits approved by the MMS declined significantly after the Macondo Disaster, as the MMS studied and recommended new safety measures for all drilling activities, including shallow-water drilling, in the Gulf of Mexico. These regulatory actions were a direct and foreseeable result of the Macondo Disaster. Indeed, the federal government would not have taken such actions in the absence of such an epic environmental catastrophe. For the remainder of 2010 and well into 2011, oil and gas exploration and production companies and the offshore drilling industry in the region operated in an environment of regulatory uncertainty.

**ANSWER:**

The BP Parties adopt and incorporate by reference their answers to Paragraphs 522-529 found in the B1 Answer.  The BP Parties admit that the Secretary of the Interior issued a directive declaring a six-month deepwater drilling moratorium in the Gulf of Mexico.  The BP Parties deny that the directive was a direct and foreseeable result of the Incident.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

## C.    THE DESTRUCTION OF SEAHAWK'S STOCK PRICE AND ABILITY TO PURSUE STRATEGIC ALTERNATIVES

21.    The catastrophic environmental harm to the Gulf Coast region associated with the Macondo Disaster predictably triggered negative market sentiment towards offshore drilling companies, especially those with significant operations in the Gulf of Mexico. In the face of such a disaster, investors and the financial community lost much of their appetite for even maintaining—let alone increasing—their financial exposure to offshore drilling companies, especially those with significant operations in the Gulf of Mexico.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

22.    The stock prices of Seahawk, its closest competitor Hercules Offshore, Inc. ("Hercules"), and other drilling companies plummeted as a result of the Macondo Disaster, as shown below:



Indeed, Seahawk's stock price fell 47.3% in the one month from April 19 to May 19, 2010.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


23.    The hesitancy of the financial community and investors to invest in (or lend to) the industry and the precipitous decline in Seahawk's stock price were disastrous for the company. On April 20, 2010, only hours before the Macondo Disaster, Seahawk had executed a term sheet to purchase 13 independent leg jack-up rigs, associated rig crews and management, and associated rig contract backlog for $950 million. The transaction was referred to within Seahawk's management team as "Project Talon." Project Talon would have drastically improved the strength of Seahawk's business in several respects.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


24.    First, consummation of Project Talon would have significantly diversified the company's business by making Seahawk the second-largest jack-up rig operator in the Middle East, thereby

expanding its operations beyond the Gulf of Mexico. The 13 rigs to be purchased as part of the Project Talon transaction were located in the Gulf of Suez and the Arabian Gulf.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

25.     Second, consummation of Project Talon would have drastically increased Seahawk's projected earnings and cash flow. The 13 rigs to be acquired had a firm contract backlog of $474.8 million and a backlog of $503.7 million, including options. Further, these rigs had both higher utilization rates and higher day rates than Seahawk's existing fleet in the Gulf of Mexico. Seahawk projected that the acquisition of these rigs through Project Talon would have contributed $204.1 million to Seahawk's combined, pro-forma EBITDA.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

26.     Finally, consummation of Project Talon would have enhanced Seahawk's profitability by enabling it to capitalize upon various economies of scale.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

27.     Unfortunately, the environmental harm attendant to the Macondo Disaster and its aftermath killed Project Talon. The $950 million purchase price consisted of three components: (a) $450 million of senior secured notes; (b) $150 million in equity issued to the seller; and (c) a private equity placement of $350 million. The collapse of Seahawk's stock price and the retreat of investors and the financial community from the industry made it impossible for Seahawk to raise the necessary capital through these mechanisms to complete the transaction.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

28.    Had it not been for the Macondo Disaster and the associated environmental crisis, Seahawk would have been able to complete the Project Talon transaction. Seahawk had entered into a fully executed term sheet approved by its board of directors, both parties were highly motivated to enter into the transaction, and the proposed transaction was well underway prior to the Macondo Disaster. In particular:

- The deal was consistent with Seahawk's strategy of leveraging its nearly debt-free balance sheet in order to undertake an acquisition to diversify its business;

- The deal was more than four months in as of April 2010, with several high-level negotiations having taken place between Seahawk's CEO and the CEO and other high-level officers of the seller;

- The rigs to be acquired by Seahawk were not part of the core business of the seller, and the seller was highly motivated to sell the rigs;

- Seahawk had established a dedicated "due diligence" room for Project Talon nearly two months before the date of the Macondo Disaster;

- Seahawk had already obtained detailed tax guidance in connection with the transaction; and

- Seahawk had already signed a confidentiality agreement with a major hedge fund for the private placement of more than $300 million in connection with the transaction.

- Project Talon was well on its way to completion at the time of the Macondo Disaster.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


29.    Further, Seahawk would have been able to raise the necessary capital to complete the transaction had it not been for the Macondo Disaster. Market sentiment in early 2010 was turning more bullish towards Seahawk and the offshore drilling industry as a whole. In addition, Seahawk was experiencing higher utilization rates and day rates compared to the end of 2009. As such, Seahawk's stock price would not have precipitously fallen absent the Macondo Disaster. To the contrary, investor appetite toward Seahawk likely would have increased.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

30.     In addition to killing Project Talon, the Macondo Disaster and its aftermath also effectively prevented Seahawk from pursuing other strategic initiatives. For example, Seahawk could have acquired other international rigs or could have raised additional capital through private offerings. Such strategic initiatives would have enabled Seahawk to diversify its business, operate rigs in more profitable geographic regions, and/or strengthen its balance sheet to better weather temporal downturns in the industry. But Seahawk was effectively foreclosed from pursuing these initiatives following the sharp drop in Seahawk's stock price and the pull back of investors and financial institutions from lending or investing in drilling activity in the Gulf of Mexico as a result of the Macondo Disaster and its aftermath.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

### D.     THE DISRUPTION OF SEAHAWK'S BUSINESS AND LOSS PROFITS

31.     As a direct result of the Macondo Disaster and the environmental harm that it caused, the market demand for offshore drilling services in the Gulf of Mexico significantly deteriorated. The reduced demand for drilling services—caused by the Macondo Disaster and its aftermath— led to reductions in both: (a) the number of rigs in operation on a daily basis (reflected in the utilization rate of Seahawk's rigs); and (b) the price, or "day rate," that Seahawk was able to charge for its rigs. Had it not been for the Macondo Disaster and the associated environmental harm, Seahawk would have been able to more fully contract its rigs and charge higher rates for the rigs that it contracted.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

32.     From May 2010 through February 2011, Seahawk would have obtained an additional $31.5 million in revenue through higher utilization rates and day rates in the absence of the Macondo Disaster and the natural, foreseeable consequences of the associated environmental catastrophe. The additional operating costs associated with such increased utilization of Seahawks rigs would have been approximately $13.1 million, resulting in net lost profits of approximately $18.4 million from May 2010 through February 2011.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  Additionally, the BP Parties deny that any purported losses of Plaintiff were "direct and foreseeable result of the Macondo Disaster and its aftermath."

33.     Unable to reap these profits and unable to consummate the Project Talon transaction and/or other strategic initiatives as a result of the Macondo Disaster, Seahawk ultimately entered into an asset sale agreement with Hercules and filed a Chapter 11 bankruptcy case to liquidate its assets in February 2011. Seahawk sold all of its rigs to Hercules in connection with the sale, which closed on April 27, 2011.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

34.     Had it not been for the Macondo Disaster and the associated environmental catastrophe, Seahawk would not have been forced to liquidate its fleet of jack-up rigs—its sole income-producing assets—but rather would have been able to remain in operation through consummation of Project Talon or otherwise. By losing the opportunity to continue to own these rigs, Seahawk lost out on the ability to obtain future substantial profits from these rigs.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

35.     Seahawk missed out on $19.9 million in lost profits in 2012 that it would have otherwise received had the company been able to continue owning and operating its rigs (as it would have in the absence of the Macondo Disaster). Seahawk also missed out on approximately $286.8 million of lost future profits (valued at net present value) from being able to own and operate the rigs in the future. In total, therefore, Seahawk suffered lost profits in excess of $306 million from being forced to sell its rigs as a result of the Macondo Disaster and its aftermath. Because Seahawk received as much as $150.3 million in exchange for selling these assets, its net loss from not being able to maintain ownership of its rigs was at least $156.4 million.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


36.     Seahawk suffered more than $174.8 million in lost profits with respect to these rigs
through: (a) decreased demand for its rigs in 2010 and early 2011 (approximately $18.4 million);
and (b) losing the opportunity to continue to own its rigs (at least $156.4 million of lost profits,
net of the amount Seahawk received for the sale of these assets). Had it not been for the
Macondo Disaster and the associated environmental harm, Seahawk would have been able to
operate more profitably in 2010 and early 2011 and to maintain ownership of its highly
profitable rigs.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


37.     In addition, Seahawk suffered additional damages, including lost profits and impairment
of earning capacity, from the loss of Project Talon. Had it not been for the Macondo Disaster and
the associated environmental harm, Seahawk would have completed Project Talon, diversified its
business, and generated substantial additional profits and other value from the rigs and other
assets involved in that transaction.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


**E.     PRESENTMENT OF SEAHAWK'S CLAIM**

38.     On January 18, 2013, the Trustee presented his claim to BP, pursuant to 33 U.S.C. §
2713, by delivering a copy of the following documents, by certified mail, e-mail, and facsimile,
to the BP Claims Program: (a) a cover letter to the BP Claims Program; (b) a claim form listing a
"sum certain" and exhibits thereto; and (c) supporting documents attached to the claim form,
including the expert report of Dr. E. Allen Jacobs, documents relied upon by Dr. Jacobs, and
declarations submitted by Randall D. Stilley, Seahawk's former Chief Executive Officer, and

James R. Easter, Seahawk's former Chief Financial Officer.[6] BP subsequently acknowledged its receipt of these presentment-related documents.[7]

**ANSWER:**

The BP Parties incorporate by reference their reservation of rights regarding presentment as laid out in the answer to paragraph 11.

### V. CAUSE OF ACTION UNDER THE OIL POLLUTION ACT OF 1990

39.     The Trustee re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

**ANSWER:**

The BP Parties re-allege and fully incorporate their answers to the allegations pleaded above as if fully set forth herein.

40.     The Oil Pollution Act of 1990 imposes liability upon a "responsible party for a . . . vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

**ANSWER:**

The BP Parties deny the allegations of this paragraph because it is an attempt to summarize the highly reticulated provisions of 33 U.S.C. § 2702, which speak for themselves.

41.     BP, as the lessee or permitee of Macondo, is a "responsible party" under the Oil Pollution Act with respect to the Macondo Disaster. BP, moreover, has been named as a "responsible party" by the U.S. Coast Guard. Therefore, BP is strictly liable under 33 U.S.C. § 2702 for all damages due to and/or resulting from the Macondo Disaster and its environmental devastation.[8]

---

[6]     A copy of these presentment-related documents (except for the voluminous documents relied upon by Dr. Jacobs) is attached hereto as Exhibit "A."

[7]     A copy of BP's acknowledgment is attached hereto as Exhibit "B."

[8]     Given BP's strict liability, the Seahawk Liquidating Trust need not make factual allegations regarding BP's culpability in order to state its claim. Nonetheless, out of an abundance of caution, the allegations relating to

**ANSWER:**

The BP Parties admit that the U.S. Coast Guard named BPXP, as well as other entities, a Responsible Party under the Oil Pollution Act. As a Responsible Party under OPA, BPXP has expressed its commitment to pay all legitimate OPA claims. The BP Parties adopt and incorporate by reference their answers to Paragraphs 258-542 found in the B1 Answer. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

42.     BP is not entitled to limit its liability under 33 U.S.C. § 2704(a) because the Macondo Disaster was proximately caused by BP's gross negligence, willful misconduct, and/or violation of applicable safety, construction or operating regulations. BP, moreover, waived the statutory limitation on liability in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," which was filed on October 19, 2010.

**ANSWER:**

The BP Parties admit that they filed the referenced statement on October 19, 2010, which speaks for itself. The BP Parties deny the remaining allegations of this paragraph.

43.     The Macondo Disaster resulted in the discharge of more than 4.9 million barrels of oil into or upon the navigable waters of the Gulf of Mexico and the adjoining shorelines of several states. The Macondo Disaster caused widespread environmental damage to the Gulf of Mexico and shorelines of several Gulf Coast states that consisted of the injury, destruction, or loss of various natural resources, including but not limited to the waters of the Gulf of Mexico, fisheries, and other aquatic and marine life in the region.

---

BP's acts, omissions and failures set forth in paragraphs 258-542 of the Amended B1 Master Complaint (Docket No. 1128 in MDL No. 2179) are adopted and incorporated by reference.

BP denies the allegations of this footnote and incorporates its answer to paragraphs 258-542 as found in the B1 Answer. The BP Parties deny the legal conclusions of this footnote relating to what Plaintiff must set forth to state a valid OPA claim against the BP Parties.

**ANSWER:**

The BP Parties admit that hydrocarbons from the Macondo reservoir entered the water column and reached the surface of the Gulf of Mexico and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

44.     Resulting from the Macondo Disaster, and due to the injury, destruction, or loss of property or natural resources entailed in and emanating from the Macondo Disaster and its aftermath, Seahawk suffered the following lost profits, impairment of earning capacity, and other economic damages: (a) approximately $18.4 million from May 2010 through the sale of its rigs in early 2011; (b) at least $156.4 million from the sale of its rigs, discounted to net present value (and offsetting the value of the consideration that Seahawk received in exchange for the sale of those rigs); and (c) substantial additional amounts related to the loss of Project Talon.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

45.     Had it not been for the massive environmental catastrophe emanating from the Macondo Disaster, (a) the federal government would not have imposed a moratorium on deepwater drilling and/or taken other action that slowed the permitting process and created regulatory uncertainty for the entire drilling industry; (b) financial institutions and other investors would not have recoiled from investing in offshore drilling entities with operations in the Gulf of Mexico; and (c) the market for Seahawk's drilling services and its stock price would not have declined. Each of these outcomes was a direct and entirely foreseeable result of an environmental disaster of the magnitude of the Macondo Disaster.

**ANSWER:**

The BP Parties deny that federal moratoria actions were the direct and foreseeable result of the Incident.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

46.     BP is strictly liable to the Trustee, without limitation, for all of the above-referenced damages under the Oil Pollution Act of 1990.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that the Court enter judgment against the Defendants for the following:

(a)     economic and compensatory damages sustained by Seahawk, including lost profits and/or impairment of earning capacity, in an amount to be determined at trial;

(b)     pre-judgment and post-judgment interest such amount at the maximum rate allowable by law and/or equity;

(c)     reasonable attorney's fees, costs, and other expenses incurred by the Trustee in presenting and prosecuting his claims; and

(d)     such other relief that the Court deems just and proper.

**ANSWER:**

The BP Parties deny that Plaintiff is entitled to any relief in this action.  The BP Parties deny that Plaintiff can pursue attorneys' fees or costs.[9]

## GENERAL DENIAL

The BP Parties deny all allegations in the Amended Complaint not specifically admitted herein, including any allegations contained in subparts, footnotes, and argument headings.

---

[9]     Several of the test case plaintiffs have added boilerplate claims for relief for attorney fees, costs, etc.  All such plaintiffs should be aware of the conditions of test case participation, including No. 3, "BP and plaintiffs agree with respect to the test case trials that each party will bear its own costs regardless of outcome."  Given those conditions, BP objects to amendments and claims for relief that are inconsistent with the Conditions.

## AFFIRMATIVE DEFENSES

The BP Parties set forth their affirmative defenses below. But by setting forth these affirmative defenses, the BP Parties do not assume the burden of proving any facts, issues, or elements of a cause of action where such burden properly belongs to Plaintiff.

### FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

The blowout, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU *Deepwater Horizon*, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities. The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, plaintiff's claims should be dismissed as to the BP Parties.

### THIRD DEFENSE

Plaintiff's damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

### FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiff were not the result of any negligence, fault, or want of due care on the part of BP Parties. Furthermore, Plaintiff has the burden of proof on this issue, and Plaintiff cannot meet that burden.

### FIFTH DEFENSE

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiff's alleged damages and there is no

causal connection between the acts complained of and the damages and injuries alleged. Additionally, BP denies that the applicable causal test or tests established by the Oil Pollution Act can be met by the Plaintiff.

## SIXTH DEFENSE

Plaintiff's alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

## SEVENTH DEFENSE

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP parties.

## EIGHTH DEFENSE

The Plaintiff's claims are barred by the operation and effect of releases of claims and liability on the part of the BP Parties.

## NINTH DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

## TENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

### ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to indemnity from other parties or entities.

### TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contribution from other parties or entities.

### THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to subrogation from other parties or entities.

### FOURTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

### FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff is not entitled under the law to the damages that it seeks, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

### SIXTEENTH DEFENSE

Plaintiff's damages are barred, in whole or in part, by a failure to mitigate damages.

### SEVENTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by

Plaintiff as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

## EIGHTEENTH DEFENSE

Claims in this Complaint may fail to comport with one or more requirements of presentment as defined by the Oil Pollution Act of 1990 and its case law.  Retroactive compliance with OPA presentment requirements is not permissible.

## NINETEENTH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity. Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTIETH DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' contractors or subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-FIRST DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

## TWENTY-SECOND DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

### TWENTY-THIRD DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiff who may have received funds through the BP claims process, the GCCF, and/or the CSSP. Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

### TWENTY-FOURTH DEFENSE

The BP Parties cannot be held to be responsible under OPA for losses caused by prevailing macro-economic conditions including tight credit conditions.

### TWENTY-FIFTH DEFENSE

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus would fall outside the applicable statute of limitations.

### TWENTY-SIXTH DEFENSE

To the extent this action was not filed in compliance with OPA's presentment requirements, it would need to be refiled as a new action and thus its allegations would become subject to the doctrine of laches.

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated:  June 23, 2014

Respectfully submitted,

/s/  Don K. Haycraft
Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
202-662-5985

Christopher W. Keegan
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:  (414) 439-1400
Facsimile:  (414) 439-1500

Emily Johnson Henn
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
650-632-4715

Jeffrey Bossert Clark
Dominic E. Draye
Thomas P. Weir
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

*Attorneys for BP Exploration & Production, Inc, BP America Production Company,
and BP p.l.c.*

26

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of June, 2014.

/s/  Don K. Haycraft