# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179** <br><br> **SECTION J** |
| This document relates to all actions. | * * * * * * * | **HONORABLE CARL J. BARBIER** <br><br> **MAGISTRATE JUDGE SHUSHAN** |

---

## BP'S MEMORANDUM IN SUPPORT OF
## MOTION FOR RESTITUTION AND INJUNCTIVE RELIEF

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................2

ARGUMENT ........................................................................................................................5

I.       BP IS ENTITLED TO RESTITUTION .......................................................................6

       A.       Equity Requires Recalculation and Restitution for Awards Made Under
the Now-Invalidated Policy .........................................................................6

       B.       Rule 23 Concerns Require Equal Treatment of Similarly Situated
Claimants ...................................................................................................11

II.      BP IS ENTITLED TO AN ORDER ENJOINING THE DISSIPATION OF
FUNDS .....................................................................................................................12

       A.       BP Is Substantially Likely To Succeed on the Merits of Its Restitution
Claims ........................................................................................................14

       B.       BP Faces a Substantial Threat of Irreparable Injury ...............................15

       C.       The Balance of Equities Favors the Entry of a Preliminary Injunction................17

       D.       The proposed injunction will promote the public interest ......................18

CONCLUSION....................................................................................................................19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...............................................................11

*Atl. Coast Line R.R. v. Florida*, 295 U.S. 301 (1935) ....................................................................6

*Balt. & Ohio R.R. v. United States*, 279 U.S. 781 (1929) ......................................................6, 7, 15

*Bank of U.S. v. Bank of Wash.*, 31 U.S. 8 (1832) ...........................................................................6

*Broadcom Corp. v. Qualcomm Inc.*, 585 F. Supp. 2d 1187, 1188 (C.D. Cal. 2008) ......................8

*Calagaz v. DeFries*, 303 F.2d 588 (5th Cir. 1962) (per curiam) ............................................12, 13

*Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*, 824 F.2d 765
   (9th Cir. 1987) ..........................................................................................................................7

*Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987) ....................................13, 17

*Hinchman v. Ripinsky*, 202 F. 625 (9th Cir. 1913) ........................................................................7

*In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013) ......................................................3, 4, 15, 17

*In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. MDL-1446, 2004 WL
   2889891 (S.D. Tex. Dec. 9, 2004) ...........................................................................................18

*In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467 (9th Cir.
   1994) ........................................................................................................................................13

*In re Fredeman Litig.*, 843 F.2d 821 (5th Cir. 1988) ..............................................................13, 15, 16

*Iowa Elec. Light & Power Co. v. Atlas Corp.*, 654 F.2d 704 (8th Cir. 1981) ................................8

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) .....................................................................12, 17

*Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981) (per curiam) ..........................................................15

*Strong v. Laubach*, 443 F.3d 1297 (10th Cir. 2006) ...............................................................7, 18

*Strouse Greenberg Props. VI L.P. v. CW Capital Asset Mgmt. LLC*, 442 F. Supp.
   2d 313 (E.D. La. 2006) ............................................................................................................19

*Tisino v. R & R Consulting & Coordinating Group, L.L.C.*, 478 F. App'x 183 (5th
   Cir. 2012) (per curiam) ............................................................................................................16

*United States v. First Nat'l City Bank*, 379 U.S. 378 (1965) ..................................................14, 16

*United States v. Morgan*, 307 U.S. 183 (1939)..............................................................................6

*USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir. 1982) ............................13, 19

## STATE CASES

*Berger v. Dixon & Snow, P.C.*, 868 P.2d 1149 (Colo. Ct. App. 1993)..........................................8

*Bernoskie v. Zarinsky*, 927 A.2d 149 (N.J. Super. Ct. App. Div. 2007)..................................8, 19

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060 (Del. 1988)..........................................8

*Schock v. Nash*, 732 A.2d 217 (Del. 1999).....................................................................................8

## OTHER AUTHORITIES

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
   and Procedure § 2948.1 (3d ed. 2013) .....................................................................................13

Federal Rule of Civil Procedure 23 .....................................................................................11, 12

Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011).................................7, 19

## INTRODUCTION

Between August 2012 and October 2013, the Deepwater Horizon Economic Claims Center ("DHECC") made overpayments totaling hundreds of millions of dollars to certain claimants as a result of an erroneous construction of the Settlement Agreement's compensation framework.  Some claimants were paid who would not even have qualified for any payment.

BP objected to the contractual interpretation of the BEL framework that led to these payments, and sought — unsuccessfully — an injunction during the pendency of the resulting litigation.  Those payments, which were paid pursuant to a now-discredited methodology, constitute (or include) windfalls.  Now that this Court has ordered the Settlement Program to apply Policy 495 to claims going forward, principles of equity and Rule 23 entitle BP to recover overpayments made pursuant to the now-invalidated interpretation of the Settlement Agreement.  To do otherwise would be to create discrepancies between similarly-situated claimants based solely on the happenstance of when the awards were made.

BP is entitled to restitution, plus interest, of money wrongly paid.  BP thus moves the Court (i) to order restitution (payable to BP) of the overpayments, and (ii) to stop dissipation of excess payments pending their re-evaluation pursuant to Policy 495.  Both the claimants who received the inflated or unwarranted awards and the professionals who shared in them through contingency fee or other arrangements should return their share of the improperly-calculated awards.

BP's right to restitution is clear, and equity demands that windfall payments in breach of the settlement agreement should be refunded.

## FACTUAL AND PROCEDURAL BACKGROUND

Exhibit 4C to the Agreement sets forth the compensation framework for BEL claimants, which compensates these claimants "for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period." Agreement Ex. 4C, Rec. Doc. 6430-1, at 1.

Disagreement about the BEL Framework arose in the latter part of 2012.  In early November 2012, BP began to file appeals challenging BEL awards.  In early December 2012, BP requested specific information concerning the manner in which the Claims Administrator was implementing the BEL framework.  *See* Declaration of Keith Moskowitz in Support of BP's Emergency Motion for a Preliminary Injunction ("Moskowitz Decl."), Rec. Doc. 8964-12 ¶ 9.

Class Counsel then asked the Claims Administrator to issue a "formal Policy Statement" providing that, "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt," and also that "corresponding variable expenses associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question."  Rec. Doc. 8964-20, at 2.  The Claims Administrator's ensuing Variable Profit policy statement formally endorsed Class Counsel's "cash-in, cash-out" approach to accounting.  Rec. Doc. 8964-22.  The policy statement provided that, "[i]n performing the calculations" required by the Agreement, the Claims Administrator "will typically consider both revenues and expenses in the periods in which those revenues and expenses were ***recorded***" and "will not typically re-allocate such revenues or expenses to different periods."  *Id.* at 3 (emphasis added).  The Claims Administrator acknowledged that this method would result in awards for certain claimants that "appear disproportionate," but explained that he did not "believe it within his authority" to adopt a different interpretation.  Rec. Doc. 8964-21, at 2.

Over BP's objection, the Court adopted the Claims Administrator's interpretation of the Variable Profit provision, stating on March 5, 2013, that the "analysis is to be based on revenue and expenses during the relevant periods," and that "expenses" need not "be 'matched' to revenues." Rec. Doc. 8812, at 1, 4.  BP promptly filed an emergency motion to enjoin further payments and awards for BEL claims based on "non-existent, artificially calculated 'losses.'" Rec. Doc. 8910-3, at 1.  This Court denied BP's motion for a stay and injunction pending appeal on April 5, 2013, and entered a minute order on April 8, 2013, reflecting that denial.  BP appealed this court's March 5, 2013 order, Rec. Doc. 9106, and filed an emergency motion for an injunction and stay pending appeal of this court's decision, seeking to stop the payment of inflated awards based on the Claims Administrator's erroneous policy statement.  That motion was denied, and payments flowed under the now-reversed policy for six additional months until the Fifth Circuit reversed the Claims Administrator's interpretation of the BEL framework on October 2, 2013, and remanded for further factual development with respect to the interpretation of Exhibit 4C.  *In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013).  The next day, October 3, 2013, this Court entered an order suspending "the issuance of any final determination notices or any payments with respect to those BEL claims in which the Claims Administrator determines that the matching of revenues and expenses is an issue" and for the first time halted the payment of BEL claims for which the appropriate methodology of matching revenues to expenses was contested.  Rec. Doc. 11566.

On December 24, 2013, after consideration of evidence concerning the negotiation of the Agreement, this Court adopted BP's position and held that "the provision for subtracting corresponding variable expenses requires that revenue be ***matched*** with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with

when revenue and variable expenses are recorded." Rec. Doc. 12055, at 5 (emphasis added). Accordingly, the Court reversed its March 5, 2013 order and remanded the matter to the Claims Administrator with instructions to develop "an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses." *Id.*

The Administrator has now issued a final Policy No. 495, Business Economic Loss Claims: Matching of Revenue and Expenses, which this Court approved on May 5, 2014. Rec. Doc. 12817. The finalized Policy No. 495 requires the following principles to be applied in evaluating BEL claims under Exhibit 4C of the Settlement Agreement:

1. Loss calculations are to be based upon accounting records that sufficiently match revenue with expenses.

2. The Settlement Agreement's "provision for subtracting corresponding variable expenses requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses were recorded." Rec. Doc. 12055, at 5.

3. Some claimant-submitted contemporaneous accounting records inherently match revenues with expenses sufficiently for purposes of the Settlement Agreement, while others do not ("unmatched claims").

4. For "unmatched claims," the claimant-submitted accounting records are to be adjusted in "light of the necessity of revenue and expense matching to realistic measurement of economic loss." *In re Deepwater Horizon*, 732 F.3d at 346-47.

*See* Policy No. 495, at 1. Once the CSSP has determined that a particular claim is ***not*** sufficiently matched, it adjusts the claimant-submitted accounting records pursuant to the

appropriate methodology.  Claims are assigned to an industry type for the purpose of determining the correct methodology.  The default methodology is the "Annual Variable Margin" methodology,[1] while four industries — construction, agriculture, educational institutions, and professional services — are calculated under industry-specific methodologies.[2]

This Court's May 28, 2014, Order Dissolving Preliminary Injunction Related to BEL Claims & Implementation of Policy 495: Matching of Revenue and Expenses ordered the Claims Administrator "to resume the processing and payment of claims in accordance with the terms of the Settlement Agreement," and further ordered that Policy 495, with limited exceptions, "shall be applied to all BEL claims currently in the claims process at any point short of final payment, including those claims currently in the claims appeal process."  Rec. Doc. 12948, at 1–2.  The order does not, however, require the Claims Administrator to recalculate claims previously paid pursuant to his now-invalidated policy.  *See id.* at 2 n.3.  Claimants who received an improper or inflated award continue to hold and dissipate monies that do not rightfully belong to them.

## ARGUMENT

The Court should order the restitution of amounts paid pursuant to the Claims Administrator's erroneous implementation of the BEL framework.  Courts have long recognized that restitution should be made where a party benefited from a subsequently-invalidated judgment.  Moreover, serious Rule 23 concerns arise unless all claimants are treated equally. Pending calculation of the amounts improperly paid, the Court should enjoin dissipation of the funds received by the claimants listed in Exhibit B to the Declaration of Brian Gaspardo.  For

---

[1]   The Annual Variable Margin Methodology is described in Attachment B to Policy No. 495.

[2]   *See* Attachment C to Policy No. 495 (construction claims); Attachment D (agriculture claims); Attachment E (educational institutions claims); and Attachment F (professional services claims).

them, the amount of the prior overpayment (and thus the amount of the requested injunction) can

be estimated with reasonable reliability.

I.      **BP IS ENTITLED TO RESTITUTION**

     A.      **Equity Requires Recalculation and Restitution for Awards Made Under the Now-Invalidated Policy**

     BP is entitled to restitution of claims previously paid under the now-invalidated policy.

The Supreme Court affirmed almost a century ago that the "right to recover what one has lost by

the enforcement of a judgment subsequently reversed is well established." *Balt. & Ohio R.R. v.*

*United States*, 279 U.S. 781, 786 (1929);[3] *see also United States v. Morgan*, 307 U.S. 183, 197

(1939) ("What has been given or paid under the compulsion of a judgment the court will restore

when its judgment has been set aside and justice requires restitution."); *Atl. Coast Line R.R. v.*

*Florida*, 295 U.S. 301, 309 (1935) ("[W]hat has been lost to a litigant under the compulsion of a

judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him,

the beneficiaries of the error."); *Bank of U.S. v. Bank of Wash.*, 31 U.S. 8, 17 (1832) ("On the

reversal of the judgment, the law raises an obligation in the party to the record, who has received

the benefit of the erroneous judgment, to make restitution to the other party for what he has

lost.").[4]

---

[3]   In *Baltimore & Ohio Railroad Co.*, the Supreme Court found that railroads benefiting from an invalid order of the Interstate Commerce Commission were obligated to make restitution after the reversal of the judgment sustaining that ICC order.  279 U.S. at 786.

[4]   Other courts to address this issue have similarly affirmed that litigants are entitled to restitution of claims paid pursuant to a subsequently reversed judgment.  *See, e.g.*, *Strong v. Laubach*, 443 F.3d 1297, 1299 (10th Cir. 2006) ("Should the judgment be reversed on appeal, a district court may, on motion or sua sponte, order the judgment creditor to restore the benefits obtained.") (citing *Balt. & Ohio R.R. v. United States*, 279 U.S. 781, 786 (1929)); *Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*, 824 F.2d 765, 767 (9th Cir. 1987) ("Well established principles of restitution permit a court, after being reversed, to order restitution."); *Hinchman v. Ripinsky*, 202 F. 625, 627 (9th Cir. 1913) ("As it respects the restitution awarded by the District Court, that was a relief very properly granted . . . .

The Restatement recognizes this principle.  A party that transferred property in compliance with a subsequently reversed judgment has a claim in restitution.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011) ("A transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution as necessary to avoid unjust enrichment.").  The commentary to the relevant section of the Restatement further explains, "Although the present section refers only to a 'judgment' that is subsequently reversed or avoided, the same principle governs any case of unjust enrichment in consequence of a judicial or administrative order (such as a preliminary injunction or a regulation) that is subsequently dissolved or withdrawn."  Restatement (Third) of Restitution and Unjust Enrichment § 18 cmt. a (2011).

This Court, of course, recently ordered repayment of an improperly granted award, citing the Restatement as authority.  Order & Reasons re Return of Payments Made to Casey C. Thonn and Others ("Thonn Order"), Rec. Doc. 12794, at 23 (stating that the concept embodied in Section 18 of the Restatement (Third) of Restitution and Unjust Enrichment "is based on the general principle that one should not be permitted to keep that which in equity and good conscience should be restored to another" (citations omitted)).  In ordering restitution from the professionals who assisted Mr. Thonn, the Court stated that "restitution is often ordered where

---

[t]he decree of the trial court stood reversed and annulled, and the appellant was entitled to have that returned to him which was taken away by an erroneous judgment."); *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 654 F.2d 704, 706 (8th Cir. 1981) ("[C]ourts have frequently held that, when a benefit has been conferred in compliance with a judgment subsequently reversed, restitution may be required."); *Bernoskie v. Zarinsky*, 927 A.2d 149, 152 (N.J. Super. Ct. App. Div. 2007) ("Restitution on reversal of a judgment is dictated by principles of fairness to the parties and public policy concerns. Between the parties, while the proceeds were obtained lawfully pursuant to a judgment then valid, retention after reversal of that judgment unjustly enriches the recipient.").

there is no fault."  Thonn Order at 22; *see also Berger v. Dixon & Snow, P.C.*, 868 P.2d 1149,

1152–53 (Colo. Ct. App. 1993) ("A claim for equitable restitution does not depend upon a breach

of substantive duty in tort or contract; restoration of a benefit may be ordered without a finding

of fault or misconduct."); *Schock v. Nash*, 732 A.2d 217, 232–33 (Del. 1999) ("Restitution is

permitted even when the defendant retaining the benefit is not a wrongdoer.  Restitution serves to

deprive the defendant of benefits that in equity and good conscience he ought not to keep, even

though he may have received those benefits honestly in the first instance, and even though the

plaintiff may have suffered no demonstrable losses." (internal quotation marks and footnote

omitted)); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1063 (Del. 1988) ("The

remedy of restitution may be invoked regardless of whether or not the party retaining the benefit

is found to be a wrongdoer.").  And the Court further noted that fraud was not a prerequisite for

clawback.  Thonn Order at 22-23, 26.

Another district court opinion applying these principles is instructive.  In *Broadcom

Corp. v. Qualcomm Inc.*, the district court considered Qualcomm's request for a return of the

royalties it had paid to Broadcom on a patent ("the '686 patent") pursuant to an injunction that

had since been reversed.  585 F. Supp. 2d 1187, 1188 (C.D. Cal. 2008).  Following a finding of

infringement, the district court had entered a permanent injunction against Qualcomm, ordering

it to pay to Broadcom an ongoing royalty of 6% of all revenues received by Qualcomm for sales

after a particular date of "'686 Infringing Products," and Qualcomm had thereafter paid

Broadcom approximately $11 million in royalties.  *Id.*  When the Federal Circuit found the

patent invalid and therefore not infringed, Qualcomm moved for the return of the royalty

payments.  *Id.* at 1189.  The district court recognized that "[i]t is black letter law that when

money is paid pursuant to a court order that is subsequently reversed, the disadvantaged party

8

has a right to restitution," and it held that "under the law of restitution, Qualcomm is entitled to restitution" of the royalties, plus interest. *Id.* at 1189, 1191.

Applied here, these legal principles establish BP's right to restitution of the overpayments made pursuant to the former erroneous policy and the March 5, 2013 order. Application of Policy 495 leads to dramatically different calculations of lost profits compared with the calculations that led to these overpayments. A vast number of claimants received awards well in excess of what they are entitled to under the Settlement Agreement (as calculated under Policy 495), and some received entirely unwarranted awards under the correct application of the Agreement. They were unjustly enriched. Although lacking in some cases all of the facts necessary to fully apply Policy 495, as the attached declaration demonstrates, BP's assessment indicates that were the awards correctly calculated, they are sometimes millions of dollars smaller than those calculated under the Settlement Administrator's now-invalidated policy. The claims identified to date for which restitution is likely to be appropriate are contained in Exhibit A. By way of example, the following awards[5] bear no relationship to reality (economic, contractually agreed to, or otherwise) and are representative of common errors in claims listed in Exhibit A:

- Claimant ███03 sells animals and animal skins. The Settlement Program awarded Claimant $7.3 million pre-RTP ($16.9 million post-RTP). This award presents a classic example of how the failure to properly match revenue and expenses led to distorted award calculations. During the five-year period from 2007-2011, Claimant never had annual variable profit higher than $██ million in any benchmark year but their award implied 2010 variable profit of $██ million. In order for this award to be correct, it would mean that in the absence of the spill, Claimant's 2010 variable profit would have more than ████ over any other year. This enormous award resulted from the failure to

---

[5]   For each of the examples, access to additional data, further analysis and full application of Policy 495 may show that the overpayment amounts exceed these estimates or that the claimant no longer passes the Exhibit 4B tests and therefore is not entitled to any compensation. In addition, these estimates do not include accounting fees, which must be recalculated pursuant to Section 4.4.13.8 of the Settlement Agreement.

match corresponding variable expenses with the revenue associated with those expenses. This company purchased more than $██ million of inventory between January and March of 2009 and reflected those purchases as expenses.  Because the sales of the products did not occur until later months, the approximately $██ million in expenses were not matched with the revenue from the sales, giving the false impression of excessive costs in January and March 2009 and inflated profits (untethered to the actual costs) in later months.  Based upon the available data, it is estimated that the Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $14 million.

- Claimant ██30 is a construction company located hundreds of miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $10.1 million pre-RTP ($13.2 million final paid award).  This award was based on the use of inaccurate financial data.  For example, in December 2009, Claimant recorded only $██████ of revenue against more than $█ million dollars in costs of goods sold to correct for overstatements of monthly revenue earlier in the year.  Yet, prior to the implementation of Policy 495, the Settlement Program did not apply this correction to the months in which the error actually occurred.  Likewise, in both August and October 2010, the Claimant understated monthly revenues leading to negative variable profits in those months and excess revenues and variable profits in the months where the misstatements were corrected.  Once again, prior to the implementation of Policy 495, the Settlement Program did not apply the corrections to the months in which the misstatements occurred.  By using incorrect monthly revenues, and not accurately matching revenues and expenses, the Settlement Program inflated Claimant's pre-spill performance and artificially depressed Claimant's post-spill performance, leading to an inflated award.  Based upon the available data, it is estimated that the Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $8.4 million.

- Claimant ██37 is a construction contractor in Alabama.  The Settlement Program awarded Claimant more than $2 million pre-RTP ($2.7 million final paid award), more than double the annual variable profit for the previous two calendar years.  This award was based on financial data that Claimant admits was incorrect.  An external review of Claimant's financial records revealed an understatement of Claimant's May 2009 to April 2010 expenses of more than $██ million.  Claimant corrected its reviewed annual financial records and its tax returns, but the misstatement was not corrected on the monthly P&Ls submitted to the Settlement Program.  The Settlement Program used Claimant's uncorrected and admittedly erroneous monthly P&L's.  In addition, Claimant's monthly financial data for May, 2010 recorded $██████ in negative revenue.  Revenue is never actually negative and Claimant acknowledged to the Settlement Program that this entry was a correction for an earlier error.  Yet, the Settlement Program nonetheless used the claimed negative revenue in its calculation, thus materially understating Claimant's post-spill performance and further overstating the award.  In fact, the claimant actually lost money during the May 2009 to April 2010 fiscal year, and had nearly identical variable profit during the May 2010 to April 2011 fiscal year.  Based upon the available data, it is estimated that the Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $2.0 million.

- Claimant ███ 18 is an advertising firm that received a $2.9 million pre-RTP ($3.8 million final award paid). This award was made despite the claimant's 2010 variable profit increasing ███% over the benchmark year variable profit. The award implied the Claimant's 2010 variable profit would have been more than █ times the variable profit in the 2009 benchmark year. The Settlement Program failed to match corresponding variable expenses with revenue. Specifically, in August 2010, the Claimant spent $█ million dollars to purchase media for its client. During that same month, Claimant only recorded $███ in revenue. By failing to associate the $█ million in media expenses with the revenue those expenses generated in other months, the Settlement Program erroneously concluded that the Claimant had suffered a nearly $█ million loss in the month in question. Based upon the available data, it is estimated that that Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $3.3 million.

Restitution for such inappropriate awards vindicates the correct interpretation of the BEL framework and prevents unjust enrichment of claimants who received inflated payments, as well as the attorneys and others who benefited from their doing so. For these reasons, BP respectfully requests this Court order that improperly calculated awards be repaid in the amount of overpayment.

**B.     Rule 23 Concerns Require Equal Treatment of Similarly Situated Claimants**

One of the hallmarks of the Settlement Agreement is that it seeks to treat similarly-situated claimants in a similar fashion. The parties agreed on this principle, and Federal Rule of Civil Procedure 23 requires it. *Cf.* Order & Reasons Responding to Remand of Business Economic Loss Issues, Rec. Doc. 12055 (finding that the parties were "in agreement that similarly situated claimants must be treated alike, and that in order to achieve a class settlement agreement, it was necessary that there be a transparent, objective methodology adopted to determine lost profits"). Rule 23(a) and 23(b) "focus court attention on whether a proposed class has sufficient unity so that absent [class] members can fairly be bound by decisions of class representatives," and "[t]hat dominant concern persists when settlement, rather than trial, is proposed." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997). The superiority requirement of Rule 23(b)(3) seeks to "'achieve economies of time, effort, and expense, and

promote **uniformity of decision as to persons similarly situated**.'"  *Id.* at 615 (emphasis added) (quoting Fed. R. Civ. P. 23 advisory committee's note (1966 amends.)).  Requiring that paid claims be recalculated consistent with Policy 495 would ensure compliance with Rule 23. Absent such recalculation, two similarly situated businesses, with similar financial performance before and after the Spill, would get very different awards based solely on whether the Claims Administrator processed the claim before or after October 3, 2013.

This Court recognized the importance of reliable, common methodologies when, in approving the Settlement Agreement, it described the Settlement Program as "calculat[ing] awards using public, transparent frameworks that apply standardized formulas derived from generally accepted and common methodologies," and ensuring that "similarly situated class members are treated similarly." Rec. Doc. 8138, at 8.  Allowing award calculations for similarly situated claimants pursuant to vastly different compensation policies would upend the "common methodologies" integral to the Settlement Agreement.

## II.    BP IS ENTITLED TO AN ORDER ENJOINING THE DISSIPATION OF FUNDS

In addition to a restitution order, BP seeks a preliminary injunction prohibiting certain BEL claimants (Exhibit B) from dissipating awards they received under the Administrator's now-invalidated interpretation of the Agreement.  In order to secure a preliminary injunction, the movant must establish four elements:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (internal quotation marks omitted).  In deciding a motion for preliminary injunction, the Court's "task is to balance the relative

conveniences of the parties," *Calagaz v. DeFries*, 303 F.2d 588, 589 (5th Cir. 1962) (per curiam), bearing in mind that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm."  11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013); *Calagaz*, 303 F.2d at 589.  An injunction should issue in this case because BP meets all four required elements and is certain to suffer an irreparable injury without prompt relief.

In addition, an injunction preventing the further dissipation of erroneous BEL awards is within the inherent equitable authority of this Court.  The Fifth Circuit has noted that "case law *does* allow a district court to exercise its equitable powers in ordering a preliminary injunction to secure an equitable remedy such as restitution," *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 560 (5th Cir. 1987), and further that "case law provides several examples of courts properly freezing assets prior to a final determination on the merits," *id.* at 561.  It has held that "general equitable powers give the district court the authority to freeze assets when necessary, as here, to preserve meaningful equitable remedies."  *Id.* at 563; *see also In re Fredeman Litig.*, 843 F.2d 821, 827 (5th Cir. 1988) ("[A]n injunction may issue to protect assets that are the subject of the dispute."); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 96 (6th Cir. 1982) (affirming a district court's grant of a preliminary injunction restraining the corporate defendants from disposing of their assets, noting that the "district court issued the injunction upon finding a substantial likelihood that plaintiffs would ultimately prevail on a claim for restitution based on the allegation of a breach of fiduciary duty"); *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1476 (9th Cir. 1994) (stating that "[i]t is unquestionable that it is within the district court's authority to issue a preliminary injunction where final equitable relief is sought"

13

and upholding the district court's entry of a preliminary injunction prohibiting the defendants from "transferring, secreting or dissipating" assets).

A preliminary injunction freezing the awards paid to the identified BEL claimants is "a reasonable measure to preserve the status quo." *United States v. First Nat'l City Bank*, 379 U.S. 378, 385 (1965) (internal quotation marks omitted).[6]  The amount of overpayments to these claimants is identifiable at this stage with reasonable reliability.  For the claims identified in Exhibit B, BP's accounting expert has estimated and set forth a likely value of the overpayment resulting from the CSSP's use of insufficiently matched data.  For these claims, it is possible that full application of Policy 495 will reveal that the overpayment is different than estimated or that the claimant no longer passes the Exhibit 4B tests and therefore is not entitled to any compensation.  Accordingly, this Court should exercise its inherent equitable powers to enter an injunction prohibiting the further dissipation of BEL awards pending recalculation of these claims.

### A.   BP Is Substantially Likely To Succeed on the Merits of Its Restitution Claims

BP is entitled to injunctive relief because it is substantially likely to succeed on the merits of its claims for restitution against individual claimants who received inflated awards under the Claims Administrator's erroneous interpretation of the BEL Framework.  As discussed in Part I *supra*, a party's "right to recover what one has lost by the enforcement by a judgment subsequently reversed is well established." *Balt. & Ohio R.R.*, 279 U.S. at 786.  This court has

---

[6]   In *United States v. First National City Bank*, the United States was attempting to collect taxes owed to it by a taxpayer, a foreign corporation.  379 U.S. 378, 379 (1965).  While attempting to obtain personal jurisdiction over the taxpayer, the government sought a preliminary injunction ordering the bank, over which the court clearly had personal jurisdiction, to freeze the taxpayer's accounts in its foreign branches. *Id.* at 379–80.  The district court obliged, and the Supreme Court approved the injunction, stating, "The temporary injunction issued by the District Court seems to us to be eminently appropriate to prevent further dissipation of assets." *Id.* at 385.

already confirmed in its December 24, 2013, Order that the Settlement Agreement requires matching of corresponding revenues and expenses, and ordered the Claims Administrator to establish policies and protocols implementing the matching directive.  Now that Policy No. 495 has been finalized and approved by this Court, the proper amount due to BEL claimants as compensation can be calculated using the correct methodology.  Once that figure is known, there is no basis for a claimant to retain funds paid by the Claims Administrator beyond what they are due pursuant to the Settlement Agreement.

### B.      BP Faces a Substantial Threat of Irreparable Injury

An order "maintaining the status quo" is "appropriate when . . . denial of the order would inflict irreparable injury on the movant."  *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (per curiam) (internal quotation marks omitted); *In re Fredeman Litig.*, 843 F.2d at 827.

Here, the harm threatening BP is irreparable because, as a practical matter, once claimants have spent their awards, BP is unlikely to be able to recover fully the monies improperly paid.  Both prior precedent and the facts here demonstrate the injury that BP will suffer and, indeed, is suffering on an ongoing basis.  The Fifth Circuit has already recognized the irreparable injury that BP suffered upon distribution of the awards.  *See In re Deepwater Horizon*, 732 F.3d at 345 (finding irreparable harm when, absent a preliminary injunction barring further payouts of BEL claims, BP stood to lose "hundreds of millions of dollars of unrecoverable awards"); *see also id.* at 332 n.3 (noting that "improper awards will have been distributed to potentially thousands of claimants and BP will have no practical way of recovering these funds should it prevail").  An order enjoining further dissipation is the only means by which not to compound this injury.  A preliminary injunction preventing the enumerated claimants from spending the overpayments described in Exhibit B would only "enjoin conduct

that might be enjoined under a final order." *In re Fredeman Litig.*, 843 F.2d at 827.  In these circumstances, a preliminary injunction is "eminently appropriate to prevent further dissipation of [those] assets." *First Nat'l City Bank*, 379 U.S. at 385.[7]

The record also demonstrates that the corporate structure of many of the claims recipients heightens the risk of dissipation.  The legal and tax structure of most closely-held businesses incentivizes the distribution of profits and excess cash to owners, primarily by structuring the business as a "pass-through" entity such as a Limited Liability Corporation (LLC), partnership, or S-corporation.  These structures allow business profits to be taxed directly to owners, allowing owners to receive cash payments without any additional tax liability.  Thus the movement of monies out of claimants with such a structure is easily accomplished, making dissipation more likely.  BP's accounting expert reviewed the annual income tax returns of 205 claimants, and found that more than three quarters of them were structured as pass-through entities.  *See* Declaration of Brian Gaspardo ¶¶ 17-30.

BP's accounting expert further evaluated whether the claimants structured as pass-through entities would have sufficient other resources or assets to repay the portion of their claim awards that represents an overpayment, if the claim award was disbursed outside the corporate form.  For many of the claimants, he found that the paid awards represented a payment many

---

[7]  *Tisino v. R & R Consulting & Coordinating Group, L.L.C.*, 478 F. App'x 183 (5th Cir. 2012) (per curiam), is instructive.  In that case, plaintiffs in a class action lawsuit sued to recover settlement funds that had been paid improperly to a disbarred attorney who had illegally solicited class members.  *Id.* at 184.  The district court issued a preliminary injunction freezing the defendant's assets derived from those settlement proceeds.  The Fifth Circuit affirmed, explaining that "[t]he significant risk that [the] settlement funds would be dissipated and placed beyond Appellees' reach constitutes a threat of substantial irreparable injury."  *Id.* at 186.  As in *Tisino*, BP here faces a substantial risk that the erroneous awards will be dissipated before the compensation amounts due under the now-approved Policy No. 495 is recalculated.

times greater than existing net worth and a cash infusion well in excess of annual earnings. *Id.* Under these circumstances, it is highly likely that many of these claimants would lack sufficient financial resources to return in full any overpayment from general corporate assets beyond the overpayment. As such, BP faces a high likelihood of irreparable injury if these claimants are not enjoined from further dissipating their BEL awards before Policy No. 495 is applied to them.

### C.   The Balance of Equities Favors the Entry of a Preliminary Injunction

The balance of equities favors freezing probable overpayments from previously-paid BEL awards until the correct compensation amount under Policy No. 495 is determined. First, the proposed injunction will not affect claimants who have received or are seeking awards for individual economic loss, property damage, subsistence, vessels of opportunity, and vessel physical damage. These claimants will continue to have their claims processed and, if appropriate, paid by the Settlement Program. *Cf. Janvey*, 647 F.3d at 601 (finding that the fact that plaintiff reached an agreement to allow defendants to use "all but certain discrete categories of compensation" supported balance of harms favoring preliminary injunction).

As for BEL claimants who received erroneous awards, they have no legitimate interest in retaining that portion of awards that represent payments they are not entitled to under the terms of the Settlement Agreement. *Cf. In re Deepwater Horizon*, 732 F.3d at 345 ("The interests of individuals who may be reaping windfall recoveries because of an inappropriate interpretation of the Settlement Agreement and those who could never have recovered in individual suits for failure to show causation are outweighed by the potential loss to [BP] and its public shareholders of hundreds of millions of dollars of unrecoverable awards."); *Dixon*, 835 F.2d at 563 (preliminary injunction was appropriate to preserve right to restitution of unjustified payments to bank officers, "regardless of whether these officers *knew* that [their] compensation was not justified"). To the extent that they might have compensable claims even under the appropriate

matching protocol, any effect of an injunction is temporary.  On the one hand, the claimant faces only delay in potential spending of the portion of the award that represents overpayment; on the other hand, BP faces the very real prospect that money, once spent, will not be recoverable.  *Cf. In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. MDL-1446, 2004 WL 2889891, at *6 (S.D. Tex. Dec. 9, 2004) ("While there may be some delay in payment, . . . any perceived harm is outweighed by the significant and irreparable harm that will be inflicted on the [moving party] if the [assets] are depleted . . . .").

Further, BP disputed in court the Claims Administrator's interpretation of the BEL framework from the outset, creating the risk to claimants that BP would eventually prevail on this issue.  *Cf. Strong v. Laubach*, 443 F.3d 1297, 1300 (10th Cir. 2006) ("By executing on their judgment and receiving [the property] during the pendency of the appeal, the [plaintiff] assumed the risk that [it] might have to repay the money if [defendants] prevailed on appeal.").  Every claimant from whom BP is seeking restitution pursuant to this motion was specifically and expressly put on notice when BP appealed the claimant's award within the CSSP.  Moreover, BP made every effort to prevent this situation from occurring by seeking an injunction pending appeal both from this Court and from the Fifth Circuit. Class Counsel resisted that approach and instead insisted on running the risk that BP would prevail and claimants would be obligated to repay excessive awards.  Under these circumstances, the balance of equities favors granting the injunction and preventing the paid awards from being dissipated while the Claims Administrator calculates the proper amounts due to BEL claimants under Policy No. 495.

**D.**    **The proposed injunction will promote the public interest**

The public interest is served by a correct interpretation and implementation of the Settlement Agreement.  There is no public interest in permitting dissipation of assets to which

claimants had no right.  *See USACO Coal Co.*, 689 F.2d at 99–100 ("[W]e conclude that the public interest is no way disserved by the order prohibiting defendants from dissipating and concealing assets until the plaintiffs' equitable claims are resolved.").  By contrast, there is a strong public interest in ensuring that funds remain available to satisfy BP's claims for restitution once the proper amounts due to BEL claimants under Policy No. 495 are calculated.  *Cf. Strouse Greenberg Props. VI L.P. v. CW Capital Asset Mgmt. LLC*, 442 F. Supp. 2d 313, 321 (E.D. La. 2006) (concluding that "there is a greater public interest in granting injunctive relief to assure that the funds remain available" to enforce a contract than in allowing the funds to be used for other efforts).

Finally, a strong public interest exists in ensuring that parties who pay claims in compliance with a judgment that is later reversed are able to receive repayment of their claims.  "As a matter of policy, there is a 'need to remedy [a] misapplication of the coercive force of legal process' and avoid discouraging compliance with lawful orders not stayed pending appeal."  *Bernoskie v. Zarinsky*, 927 A.2d 149, 152 (N.J. Super. Ct. App. Div. 2007) (alteration in original) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 18 cmt. e).

## CONCLUSION

BP respectfully requests that this Court enter an order directing that BP is entitled to restitution, plus interest, from claimants who were overpaid as a result of the erroneous matching policy or should not have been paid at all.  To the extent that professionals (lawyers, accountants, or others) have been paid a proportional amount of those recoveries, they must repay that amount as well, plus interest.  These awards should be recalculated under the now-approved Policy No. 495.  In addition, BP respectfully requests that this Court enter an injunction preventing the BEL claimants identified in Exhibit B from dissipating the overpaid portion of those awards pending the recalculation of their compensation amounts under Policy No. 495.

June 27, 2014

Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

**OF COUNSEL**

Respectfully submitted,

  _/s/ Kevin M. Downey_
Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029

  _/s/ Don K. Haycraft_
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of June, 2014.

 */s/ Don. K. Haycraft*
Don K. Haycraft