**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | |
| This document relates to all actions. | * | HONORABLE CARL J. BARBIER |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |
| | * | |

## DECLARATION OF BRIAN L. GASPARDO

I, Brian L. Gaspardo, declare and state as follows:

1.       I am over the age of 18 and am a resident of the State of Illinois.   Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called to do so, could testify truthfully thereto.

2.       I am the Managing Member of O'Neill & Gaspardo, LLC, a Consulting and CPA firm located in Mokena, Illinois.  I am a Certified Public Accountant and have over 20 years of professional experience performing audit, tax, accounting, business valuation, financial analysis, and consulting services for clients throughout the United States.  I received a B.A. in economics from Harvard University in 1991 and an M.B.A. from the University of Chicago in 2001.  I serve on the Boards of Old Plank Trail Bank and La Rabida Children's Hospital in Chicago.  I have testified and submitted reports as an expert witness on a variety of topics, including business performance, business valuation, accounting, and financial reporting.

3.       BP retained me to assist in the review of the accounting records and claim files for numerous BEL awards issued by the Court Supervised Settlement Program ("CSSP").  To

date, my firm has reviewed thousands of BEL awards made by the CSSP and the claim files associated with those claims.

4.     In this Declaration, I explain the analysis that I am undertaking to identify certain previously paid claims that, as a result of the Settlement Program's use of insufficiently matched financial data, resulted in significant overpayments to claimants.  I have not yet completed that analysis, but I describe the results of the analysis with regard to 793 claims.   In addition, I address the heightened risks that (i) claimants in receipt of overpayments are likely to disburse the overpayments out of the business and (ii) once the overpayments are disbursed, it will in many cases be difficult for claimants to reimburse the overpayment.

## I.     Background

5.     From the opening of the Settlement Program on June 4, 2012 until October 2, 2013, the CSSP did not take steps to match claimants' revenue with corresponding variable expenses.  The Settlement Program issued and paid more than $2 billion in BEL awards between August 2012-October 2, 2013, many of which were based on insufficiently matched financial data.

6.     I understand that on October 2, 2013, the United States Court of Appeals for the Fifth Circuit reversed and remanded the Claims Administrator's prior policy that did not require the matching of revenue and corresponding expenses.   Among other things, the Fifth Circuit explained that:

- "The difficulty is that subtracting temporally related revenues and expenses recorded by cash basis claimants would not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits'."   *In re Deepwater Horizon*, 732 F.3d 326, 336 (5th Cir. 2013).

- Exhibit 4C should be interpreted as requiring an "accrual style framework" for calculation of lost profits, meaning that revenues and expenses must be properly matched: "[O]nly matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses." *Id*. at 338.

- "[T]he interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of damages." *Id*. at 339.

7.      Compliance with the Fifth Circuit's directives to adopt an accrual style framework for calculation of a realistic measure of actual economic losses consistent with economic reality required consideration of the proper allocation of monthly revenue and the identification of corresponding variable expenses that relate to that revenue so that the revenue and corresponding variable expenses can be sufficiently matched for purposes of applying the Exhibit 4C BEL Compensation Framework.  For example, on November 21, 2013, BP submitted a detailed proposal setting forth a framework for evaluating BEL claims for matching issues and correctly attributing revenue and expenses for insufficiently matched claims.

8.      On December 24, 2013  the District Court held that "the provision [in Exhibit 4C] for subtracting corresponding variable expenses requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses are recorded."  Rec. Doc. 12055 at 5.  The District Court instructed the Claims Administrator to "adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses." *Id*.

9.     In response to the District Court's Order, the Claims Administrator issued Policy 495:  Business Economic Loss Claims:  Matching of Revenue and Expenses on March 12, 2014, which this Court approved on May 5, 2014.  Rec. Doc. 12817

10.     All work described herein was performed by me or by my staff under my direction.

## II.     Identification of Certain Paid Claims With Overpayments

11.     The Settlement Program's prior use of insufficiently matched financial data potentially impacted a large universe of paid awards.  For purposes of my initial analysis, I have focused on paid awards that BP appealed on matching grounds.

12.     I use the District Court approved Policy 495 for purposes of my analysis described below, because it reflects the District Court's adoption of a comprehensive matching policy that was developed as a result of an extensive process that involved consultations among the CSSP accounting vendors and the parties.  In some cases, I do not currently have access to all of the facts necessary to fully apply Policy 495.  Working with the available data, I have performed an assessment to:  (a) identify whether a claim likely received an overpayment due to the use of insufficiently matched financial data, and (b) for selected claims, estimate the likely amount of the overpayment resulting from the use of insufficiently matched data (access to additional data may reveal that the actual amount of overpayment is different than I have estimated).  These assessments, while reliable for the purposes for which I am using them, are in no way a replacement for the full application of Policy 495.  In addition, it is possible that submission of additional information by a claimant might change the results of my analysis.

13.     I have set forth on Exhibit A a list of previously paid BEL awards that BP appealed on matching grounds for which the Settlement Program's use of insufficiently matched

financial data likely resulted in an overpayment.  The following describes my analysis in identifying the claims on Exhibit A:

- The first step under Policy 495 involves the correction of errors and mismatching in a claimant's financial data.  Once it is completed, Policy 495 uses seven criteria to identify whether indicia of an unmatched claim remain notwithstanding the corrections.  If so, applicable methodologies are applied to further address the matching problem.  Where the claim file does not contain sufficient detail, however, I am unable to fully perform the first step.  Therefore, initially, I applied, solely as a screening tool and without first evaluating the claim for errors and mismatching, the seven criteria indicative of an unmatched claim to the paid claims that BP had appealed on matching grounds.  The presence of one or more of the criteria suggests that the claim may contain insufficiently matched data and requires further analysis.  If a claim did not meet any of the seven criteria, for purposes of this evaluation only I removed it from further consideration.[1]

- As a second step in the screening process, for those claims (other than professional services claims) that contained one of more of the Policy 495 criteria for an insufficiently matched claim, I applied the applicable Policy 495 general methodology for correcting matching problems – annual variable margin ("AVM"), construction, agriculture (using an August to July revenue convention assigned to an April to November growing season), and educational institutions, again without first correcting errors or mismatching in the financial data.  Once more, this was done simply to assist in screening those claims that likely had an overpayment; specific corrections of errors and mismatching is necessary in order to fully apply Policy 495, and, any errors and mismatches related to the independent variable would remain wholly uncorrected even after applying the appropriate Policy 495 general methodology.

- I next compared the estimated compensation calculated using the financial data resulting from the above screening process to the original award amount calculated and paid by the Settlement Program.  If the original award amount exceeds the result derived as a result of the screening process, this provides a strong indication that the claimant likely received an overpayment, and I therefore included the claim on Exhibit A.  Because I am only using screening tools for the claims on Exhibit A, calculation of the precise amount of overpayment requires additional analysis.

- Professional services claims require a different approach for my screening analysis.  Under Policy 495, revenue for professional services claims is measured in one of two ways.  As a general rule, Policy 495 allocates professional services

---

[1] It should be noted that while the seven criteria for identifying unmatched claims set forth in Policy 495 are very helpful, they are not exhaustive and will not identify all unmatched claims.  My use of the seven criteria should not be interpreted to suggest that the claims not included on the list do not have matching problems.

revenue evenly across the months included in the duration of each underlying customer or client engagement. Alternatively, the claimant may try to provide sufficient objective records from which an allocation based on the level of effort over the life of the matter may be made. I do not have access to information necessary to perform either of these revenue allocations. However, as the professional services general methodology reflects, these claims overwhelmingly fail matching criteria due to revenue not being reflected as earned. Cash accounting and contractual provisions lead to spikes in monthly revenues unrelated to economic reality. These accounting conventions, coupled with the BEL framework's mathematical formula, results in distorted award calculations. Eliminating the artificial revenue spikes created by the failure to match will generally reduce optimal compensation calculated under the BEL framework. Thus, with regard to professional services claims, the presence of one or more of Policy 495's seven criteria leads me to conclude that application of matching likely will lower the award by eliminating the revenue spike distortions.

14. As explained above, the claims on Exhibit A likely have matching problems that resulted in an overpayment. For a subset of those claims, I have estimated and set forth on Exhibit B a likely value of the overpayment resulting from the CSSP's use of insufficiently matched data. For these claims, my analysis was limited to the documents and explanations previously provided by the claimant, and it is possible that full application of Policy 495 would reveal that the overpayment is different than I have estimated or that the claimant no longer passes the Exhibit 4B tests and therefore is not entitled to any compensation. I describe below my analysis used to arrive at the estimates on Exhibit B:

- I first reviewed the profit and loss statements for the benchmark years, 2010, and 2011, and evaluated the monthly statements for misstatements, errors and mismatching of revenue and expenses which in my judgment could be specifically identified and corrected. Where sufficient information existed to make a correction, I did so.

- I next applied the seven criteria for identifying unmatched claims as required by Policy 495 to ascertain whether the specific corrections of errors and mismatching discussed above had resulted in sufficient matching. If the corrected financial data did not contain any of the seven criteria -- for purposes of this evaluation only – I deemed the financial data sufficiently matched and applied the BEL framework to the corrected data.[2] If the corrected financial data still contained

---

[2] As explained above, there are situations where none of the seven criteria are triggered, but the financial data is nonetheless insufficiently matched.

one or more of the criteria of an insufficiently matched claim, as required by Policy 495, I applied the applicable Policy 495 methodology to match revenue and corresponding variable expenses.  As explained earlier, such an analysis could not be done for any professional services claimants, and, in this specific review, agriculture growing seasons and related revenues were evaluated specifically to the extent possible with the information provided.

- Consistent with Policy 495, I next applied the appropriate tests set forth in Exhibit 4B of the Settlement Agreement.  If a claim does not pass the applicable 4B test, the claimant is not entitled to any compensation under the Settlement Agreement, and thus the full value of the prior payment constitutes an overpayment.

- For those claims that pass the applicable Exhibit 4B test, I then used the financial data resulting from the above steps to perform the calculations set forth in the BEL framework to estimate whether a claimant is entitled to compensation and, if so, the estimated amount of compensation.

- Once I arrived at an estimated award consistent with Policy 495 (subject to the data limitations discussed herein) I subtracted the estimated award amount from the previously paid amount.  The difference represents an estimate of the approximate amount of overpayment that occurred due to the Settlement Program's use of insufficiently matched financial data.  The "previously paid amount" includes the 5% overpayment penalty that was previously charged to BP and paid to the claimant when BP originally lost the appeal.  BP lost the appeal because the Appeals Panel followed the now reversed CSSP policy that did not require matching.  Had the CSSP required matching from the beginning, BP would not have lost the appeal and the claimant would not have received an additional overpayment in the amount of the 5% penalty paid by BP.

15.    The following examples illustrate some of the types of overpayment that result from the failure to match revenue and corresponding expenses; a problem that is common in the claims listed in Exhibits A and B.

(a)    Claimant ███03 sells animals and animal skins.  The Settlement Program awarded Claimant $7.3 million pre-RTP ($16.9 million final paid award).  This award presents a classic example of how the failure to properly match revenue and expenses leads to distorted award calculations.  During the five-year period from 2007-2011, Claimant never had annual variable profit higher than $██ million in any benchmark year but their award implied 2010 variable profit of $██ million.  In order for this award to be correct, it would mean than in the absence of the spill, Claimant's 2010 variable profit would have more than doubled over any other year.  This enormous award resulted from the failure to match corresponding variable expenses with the revenue associated with those expenses.  This company purchased more than $██ million of inventory between January and March of 2009 and reflected those purchases as expenses in the months of purchase.  Because the sales of the products did not occur until

later months, the approximately $██ million in expenses were not matched with the revenue from the sales, giving the false impression of excessive costs between January and March 2009 and inflated profits (untethered to the actual costs) in later months. Based on the data available to me, I estimate that the Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $14 million. Access to additional data and further analysis may change my analysis and my estimate.

(b)     Claimant ██ 30 is a construction company located hundreds of miles from the Gulf of Mexico. The Settlement Program awarded Claimant $10.1 million pre-RTP ($13.2 million final paid award). This award was based on the use of inaccurate financial data. For example, in December 2009, Claimant recorded only $██████ of revenue against more than $█ million dollars in costs of goods sold to correct for overstatements of monthly revenue earlier in the year. Yet, prior to the implementation of Policy 495, the Settlement Program did not correct the revenue overstatement in the months in which the misstatement actually occurred. Likewise, in both August and October 2010, the Claimant understated monthly revenues leading to negative variable profits in those months and excess revenues and variable profits in the months where the misstatements were corrected. Once again, prior to the implementation of Policy 495, the Settlement Program did not apply the corrections to the months in which the misstatements occurred. By using incorrect monthly revenues, and not accurately matching revenues and expenses, the Settlement Program inflated Claimant's pre-spill performance and artificially depressed Claimant's post-spill performance, leading to an inflated award. Based on the data available to me, I estimate that the Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $8.4 million. Access to additional data and further analysis may change my analysis and my estimate.

(c)     Claimant ██ 37 is a construction contractor in Alabama. The Settlement Program awarded Claimant more than $2 million pre-RTP ($2.7 million final paid award), more than double the annual variable profit for the previous two calendar years. This award was based on financial data that Claimant admits was incorrect. An external review of Claimant's financial records revealed an understatement of Claimant's May 2009 to April 2010 expenses of more than $██ million. Claimant corrected its reviewed annual financial records and its tax returns, but the misstatement was not corrected on the monthly P&Ls submitted to the Settlement Program. The Settlement Program used Claimant's uncorrected and admittedly erroneous monthly P&L's. In addition, Claimant's monthly financial data for May, 2010 recorded $██████ in negative revenue. Revenue is never actually negative and Claimant acknowledged to the Settlement Program that this entry was a correction for an earlier error. Yet, the Settlement Program nonetheless used the claimed negative revenue in its calculation, thus materially understating Claimant's post-spill performance and further overstating the award. In fact, the claimant actually lost money during the May 2009 to April 2010 fiscal year, and had nearly identical variable profit during the May 2010 to April 2011 fiscal year. Based on the data available to me, I estimate that that Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately

$2.0 million.  Access to additional data and further analysis may change my analysis and my estimate.

        (d)      Claimant ██ 18 is an advertising firm that received a $2.9 million pre-RTP ($3.8 million final paid award).  This award was made despite the claimant's 2010 variable profit increasing ██% over the benchmark year variable profit.  The award implied the Claimant's 2010 variable profit would have been more than █ times the variable profit in the 2009 benchmark year.  The Settlement Program failed to match corresponding variable expenses with revenue.  Specifically, in August 2010, the Claimant spent $█ million dollars to purchase media for its client.  During that same month, Claimant only recorded $████ in revenue.  By failing to associate the $█ million in media expenses with the revenue those expenses generated in other months, the Settlement Program erroneously concluded that the Claimant had suffered a nearly $█ million loss in the month in question.  Based on the data available to me, I estimate that that Settlement Program's use of insufficiently matched data resulted in an estimated overpayment to this claimant of approximately $3.3 million.  Access to additional data and further analysis may change my analysis and my estimate.

### III.     Heightened Risk of Dissipation of Assets By Claimants Receiving Overpayments

       16.     I have also been asked to assess whether there is a heightened risk in this case that overpayments received by the claimants would be particularly difficult to recover if they are disbursed outside the corporate form.   Specifically, I examined whether claimants which previously received overstated awards and payments due to a failure to match revenue and expenses:  (i) are likely to disburse the overpayments outside of the corporate form, and, if so, (ii) whether those same claimants likely lack sufficient means to reimburse BP for such overpayments should they be ordered to do so.  As explained below, there is a high risk that claimants who received overpayments will disburse their awards outside of the corporate form.  Based on a sampling of affected claims, many of the claimants who received overpayments are pass-through entities that are specifically set up to allow for the tax efficient  transfer of earnings to their shareholders.  Even those Claimants which are not set up as pass-through entities will have a strong incentive to move their earnings out of the entity, whatever the form.

       17.     Moreover, the results of my sampling of affected claims show that if overpayments are disbursed outside of the corporate form, many claimants will have difficulty

reimbursing the overpayments.  That is because as a general matter the overpayments resulting from the Claims Administrator's erroneous policy often far exceeded claimant's earnings and net worth.

**A.      Many Recipients of Overpayments Are Structured to Distribute Earnings To Shareholders**

18.      One important indicator of the likelihood of a recipient disbursing the overpayment outside of the corporate form is the corporate structure of the claimant.  For example, most closely held businesses are structured to facilitate the distribution of any profits and excess cash to owners.  This goal is principally achieved by structuring the business as a "pass-through entity" such as a Limited Liability Corporation (LLC), partnership or S-corporation for tax purposes.  These structures allow business profits to be taxed directly to the owners, and owners are then eligible to receive cash payments without any additional tax liability.   Business owners specifically select "pass-through entity" status to allow easy, discretionary and tax free distribution of business profits.

19.       From a practical standpoint, "pass-through entities" allow business owners to regularly distribute funds from businesses to pay taxes and to avoid exposing wealth to potential liability of the company.   It is the norm for accountants and other financial advisors to recommend to their closely held clients to distribute earnings outside of the corporate form.  Failing to do so is typically counterproductive to the intent of structuring an entity with pass-through benefits.  In my experience, rational business owners that receive overpayments would likely disburse the overpayments outside of the corporate form.

20.      I reviewed the annual income tax returns of over 200 claimants who received an award from the CSSP that was based on financial data that did not match revenue and

corresponding expenses.   78% of the claimants I reviewed were structured as "pass-through entities".

21.      Where a claimant received a sum of money that is in excess of the claimant's actual loss, or where, as in many actual cases, the claimant incurred no loss whatsoever, the likelihood that the claimant will transfer the funds to its shareholders is heightened even further. That is because such a payment would represent funds in excess of the required capital and normal operating cash flow needed to run the business.  Any overpayment, or other payment untethered to an actual loss, is unnecessary for the operation of the business.

**B.      Many Recipients of Overpayments Would Have Difficulty Reimbursing the Overpayment If the Overpayment Leaves the Corporate Form**

22.      If overpayments from the CSSP to a claimant were to be disbursed or otherwise removed from the corporate form, it becomes appropriate to ask whether the claimant would have sufficient other resources or assets to reimburse the full amount of the overpayment resulting from the Claims Administrator's erroneous policy regarding matching.

23.      In order to evaluate whether there is a heightened risk that many claimants who disburse their overpayments outside of the corporate form would not have sufficient other resources or assets to repay the overpayment, I compared for a sample (203) of the claims at issue, the size of the CSSP award to well-accepted measures of the claimant's financial strength. These measures include the claimant's assets (as reflected on tax returns), the claimant's net worth (as reflected on tax returns), and the claimant's average annual cash flow (as reflected on tax returns).  The results of this comparison are as follows, and demonstrate that many claimants would be unable to repay overpayments received from the CSSP if the overpayments are disbursed out of the corporate form.

11

24.     I reviewed the most recent tax returns available on the CSSP Portal for 203 determined claims, brought by claimants whose awards were appealed for matching issues.  Of those claimants, 24% had negative cash flow.  For claimants with a negative cash flow, overpayments would likely be consumed by corporate liabilities and expenses, and therefore recovery of an overpayment would be difficult.  For the remaining 76% of the claimants sampled, their average CSSP payment was equal to 12.2 times their annual cash flow.  A rational economic actor receiving such a disproportionately high award would disburse the overpayment to the owners.  And once this disbursement occurs, because the overpayment is so much greater than the claimant's cash flow, recovery of the overpayment from continuing operations would be difficult.

25.     As another measure of the difficulty of claimants to reimburse overpayments from ongoing operations, I evaluated the net worth of claimants relative to the size of the CSSP award.  A company's net worth represents the total amount of money owners have invested and retained in the business; their total amount at risk.  Of the 203 claimants sampled, 29% of claimants reflected negative net worth on their most recent tax returns available on the CSSP Portal.  As with claimants having negative cash flow, awards to claimants with negative net worth would be difficult to recover.

26.     Of the 203 claimants studied, the 71% which had positive net worth were paid an average award equal to 15.0 times net worth.  This implies that the claimants received awards 15 times larger than their investment in the business, and these awards on average represented a 1,500% return on invested capital in a single payment.  Given the relatively small amount of net worth of these businesses when compared to the BEL award, it would likely be difficult for the

claimant to return the overpayment should the paid award be distributed to shareholders or paid to creditors.

27.     Finally, as yet another measure of claimants' difficulty to repay overpayments, I evaluated the book value of assets for the sample population of 203 claimants.  Book value of assets is a more encompassing measure than net worth for it includes not only the investments of the owners but also investments from all other sources, including lenders.  Thus, where an award is disproportionally large in relation to the book value of assets, that is a particularly strong indicator that it would be difficult for the claimant to repay the overpayment if the overpayment is disbursed.  For the 203 claimants reviewed, the average CSSP award payment was 9.7 times the total net assets of the business.  In other words, claimants received an average payment that would have allowed them to replace all the assets in the business nearly 10 times over.  Once again, these metrics show that recipients would be likely to disburse the overpayments by the CSSP as there seldom would be a reason to expand a business by 970% of the asset base.  And, once again, the metrics show that the value of the overpayments overwhelms the value of the claimant, meaning that it be difficult for the claimant to repay the overpayment once it is disbursed.

28.     The following are some examples that illustrate the disparity between the size of the CSSP's award, on the one hand, and the claimant's financial wherewithal independent of the overpayment. For example:

- Claimant ███55 is a crop farmer in northeastern Louisiana more than 250 miles from the Gulf.  Claimant received a $3,140,000 award despite having invested net worth of $██████ and annual cash flow of $███████.  The award is more than ███ times the invested equity and more than ██ times annual cash flow.  Claimant is organized as a partnership with pass-through tax status and has an estimated overpayment of approximately $3,044,000.  Access to additional data and further analysis may change my analysis and my estimate.

13

- Claimant ██94 is a salvage company in the south Florida.  Claimant received a $570,000 award while having invested net worth of $██████ and annual cash flow of $█████.  The award is more than ██ times the invested equity and more than █ times annual cash flow.  Total revenue for the business was $██████ (██% of the award) in the 2009 benchmark year.  Claimant is organized as an S-corporation with pass-through status and has an estimated overpayment of approximately $538,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ██49 is a construction company in Louisiana.  Claimant received a $5,599,000 award while having invested net worth of $██████ and annual cash flow of $█████.  The award is more than ██ times the invested equity and more than █ times annual cash flow.  Claimant is organized as an LLC with pass-through status and has an estimated overpayment of approximately $4,943,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ███49 is a wholesale supplier located in Texas.  Claimant received a $1,069,000 award while having invested net worth of $██████ and annual cash flow of $█████.  The award is more than █ times the invested and retained equity and almost █ times annual cash flow.  Claimant is organized as a partnership with pass-through tax status and has an estimated overpayment of approximately $992,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ███85 is a bar/restaurant located over 100 miles from the Gulf.  Claimant received a $309,000 award while having invested net worth of $██████ and annual cash flow of $█████.  The award is over ██ times the invested and retained equity and over █ times annual cash flow.  Claimant is organized as an S-Corporation with pass-through tax status and has an estimated overpayment of approximately $181,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ███59 is a real estate sales business located approximately 200 miles from the Gulf.  Claimant received an award of $1,179,000 while having invested net worth of $██████ and annual cash flow of $██████.  The award is over █ times the invested and retained equity and almost █ times annual cash flow.  Claimant is organized as an S-Corporation with pass-through tax status and has an estimated overpayment of approximately $643,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ███38 is a construction company in Louisiana.  Claimant received an award of $702,000 while having invested net worth of $██████ and annual cash flow of $█████.  The award is almost ██ times the invested equity and more than

██ times the annual cash flow of the entity.  Claimant is organized as a Limited Liability Corporation with pass-through tax status and has an estimated overpayment of approximately $556,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ██95 is a construction company in south Florida.  Claimant received an award of $806,000 while having invested net worth of $████ and annual cash flow of $████.  The award is more than ██ times the invested equity and more than █ times the annual cash flow of the entity.  Claimant is organized as an S-Corporation with pass-through tax status and has an estimated overpayment of approximately $736,000.  Access to additional data and further analysis may change my analysis and my estimate.

- Claimant ██02 is a destination management company located in Louisiana.  Claimant received an award of $2,037,000 while having invested net worth of $████ and annual cash flow of $████.  The award is more than █ times the invested equity and more than █ times the annual cash flow of the entity.  Claimant is organized as an S-Corporation with pass-through tax status and has an estimated overpayment of approximately $1,718,000.  Access to additional data and further analysis may change my analysis and my estimate.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 27th day of June, 2014.

Brian L. Gaspardo
O'Neill & Gaspardo, LLC

15

# Exhibit A

**Filed Under Seal**

# Exhibit B

# Filed Under Seal