# EXHIBIT 1

# INDEPENDENT EXTERNAL INVESTIGATION OF THE DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT PROGRAM

REPORT OF

SPECIAL MASTER LOUIS J. FREEH

SEPTEMBER 6, 2013

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY.....................................................................................................1
      A.  INTRODUCTION........................................................................................................1
      B.  CONFLICTS OF INTEREST BY ATTORNEYS LIONEL SUTTON, CHRISTINE REITANO, GLEN LERNER, AND JON
          ANDRY REGARDING THE DHECC CLAIMS PROCESS .........................................2
          1.  Casey Thonn Referral Payments to CAO Attorney Lionel Sutton...............2
          2.  CAO Attorney Lionel Sutton's Repeated Denials and Evidence of False Statements about
              Receipt of the Thonn Referral Fee Payments.......................................4
      C.  EVIDENCE OF MATERIAL FALSE STATEMENTS AND OMISSIONS BY ATTORNEYS LIONEL SUTTON,
          CHRISTINE REITANO, GLEN LERNER, AND JON ANDRY..........................................5
      D.  ATTORNEYS LIONEL SUTTON, GLEN LERNER, AND JON ANDRY WORK IN CONCERT TO FACILITATE
          CLAIMS PENDING BEFORE THE DHECC .................................................................5
          1.  CAO Attorney Lionel Sutton Expedites The Andry Law Firm Claim..........6
          2.  Jon Andry and Gilbert Andry Seek to Expedite The Andry Law Firm Appeal ............6
      E.  PERVASIVE CONFLICTS OF INTEREST BY SENIOR CAO STAFF MEMBERS DESPITE PATRICK JUNEAU'S
          PROPER CONDUCT AND ETHICAL "TONE AT THE TOP" .......................................8
          1.  Conflicts of Interest by CAO Executives ...............................................9
          2.  Conflict of Interest by CAO Attorney Christine Reitano..........................9
      F.  RECOMMENDATIONS...............................................................................................10
          1.  The Special Master Recommends Disallowing The Andry Law Firm's Claim under the Unclean
              Hands Doctrine ......................................................................................10
          2.  The Special Master Recommends Disqualifying Attorneys Lionel Sutton, Christine Reitano,
              Glen Lerner, and Jon Andry, as well as Any Associated Law Firms from Representing DHECC
              Claimants under the Unclean Hands Doctrine.......................................10
      G.  THE FRAUDULENT CHARACTERISTICS OF THE THONN CLAIM ...............................10
      H.  ATTORNEY LIONEL SUTTON'S CONFLICT OF INTEREST AND UNDISCLOSED, IMPROPER RELATIONSHIP
          TO DHECC CLAIMANT ROMEO PAPA .................................................................11
      I.  ENHANCED MANAGEMENT OF DHECC VENDORS BY THE CAO WILL CONTROL COSTS, REDUCE
          CONFLICTS OF INTEREST, AND EFFECTUATE THE MANDATE OF THE COURT ............12
      J.  CONCLUSION..........................................................................................................12

II.   SCOPE OF ENGAGEMENT..............................................................................................13
      A.  COURT ORDER........................................................................................................13
      B.  CHRONOLOGY OF THE INVESTIGATION.................................................................13
          1.  Witness Interviews ...............................................................................14
          2.  Computer Forensics ..............................................................................14
          3.  Document Review .................................................................................15
          4.  Special Master Subpoenas ....................................................................15

III.  THE DHECC .................................................................................................................16
      A.  HISTORY OF THE DEEPWATER HORIZON ECONOMIC CLAIMS CENTER.................16
      B.  CHRISTINE REITANO AND LIONEL SUTTON AT THE CAO........................................17
          1.  Sutton & Reitano ..................................................................................17
          2.  DHECC Hires Attorneys Christine Reitano and Lionel Sutton. ..............18
          3.  Christine Reitano and Lionel Sutton's Responsibilities and Ethical Obligations under the
              CAO's Code of Conduct........................................................................20

| | | |
|---|---|---|
| IV. | **EVIDENCE OF AN AGREEMENT AMONG CAO ATTORNEY SUTTON AND DHECC CLAIMANT ATTORNEYS JONATHAN ANDRY AND GLEN LERNER** ................................. | **21** |
| | A. BACKGROUND OF RELATIONSHIPS ........................................................................... | 21 |
| |     *1. Andrys' Firms, Lerner's Firms and the AndryLerner Firm* ............................... | 22 |
| |     *2. Lionel Sutton and Glen Lerner are Business Partners in Crown* ...................... | 23 |
| | B. LIONEL SUTTON'S LACK OF DISCLOSURES REGARDING HIS INTEREST IN CROWN AND PARTNERSHIP WITH GLEN LERNER ............................................................... | 24 |
| | C. REFERRAL OF CASEY THONN TO ANDRYLERNER ...................................................... | 25 |
| |     *1. Evidence of Material False Statements and Omissions by Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry Regarding the Thonn Referral Fee Payments.* ................ | 25 |
| |         a. Statements by Christine Reitano ........................................................ | 25 |
| |         b. Statements by Christina Mancuso ...................................................... | 26 |
| |         c. Statements by Casey Thonn ............................................................. | 27 |
| |         d. Statements by Glen Lerner .............................................................. | 28 |
| |         e. Statements by Leslie Butler Tate ...................................................... | 28 |
| |     *2. Absence of a Written Referral Fee Agreement* ................................................. | 28 |
| | D. REFERRAL FEE PAYMENTS FOR THONN'S CLAIMS TO LIONEL SUTTON .......................... | 29 |
| |     *1. Statements by Jon Andry Regarding the Referral Fee Payments to Lionel Sutton* ........... | 29 |
| |     *2. Movement of Funds from AndryLerner to Lionel Sutton* ................................... | 34 |
| |         a. Thonn Vessel of Opportunity Charter Payment Claim ......................... | 35 |
| |         b. Thonn Seafood Compensation Program - Vessel Owner Claim ............. | 36 |
| |         c. Thonn Seafood Compensation Program - Boat Captain Claim ............... | 40 |
| |     *3. Lionel Sutton's Multiple, Inconsistent Statements about the Thonn Referral Fee Payments* ........ | 41 |
| |     *4. Evidence that Attorneys Lionel Sutton, Glen Lerner, Jon Andry and Gibby Andry Discuss Their Response to the CAO* .................................................................... | 43 |
| V. | **THE ANDRY LAW FIRM CLAIM** ............................................................................... | **45** |
| | A. BACKGROUND ON THE ANDRY LAW FIRM ................................................................ | 45 |
| | B. THE CLAIM ........................................................................................................ | 46 |
| | C. THE ANDRY LAW FIRM COMMUNICATIONS WITH CAO STAFF CONCERNING ITS CLAIM ......... | 47 |
| |     *1. The Andrys' Communications with the CAO Regarding the Claim* ...................... | 48 |
| |     *2. The Andrys' Efforts to Influence The Andry Law Firm Appeal Within the DHECC* ........... | 53 |
| |     *3. Jon Andry Tries to Expedite the Talen's Marine Claim* ................................... | 57 |
| VI. | **THE FRAUDULENT CHARACTERISTICS OF THE CASEY THONN DHECC CLAIMS** ............... | **58** |
| | A. BACKGROUND ................................................................................................... | 58 |
| | B. UNSUBSTANTIATED INCREASES IN THE VALUE OF MR. THONN'S CLAIMS APPEAR TO HAVE FRAUDULENT CHARACTERISTICS ..................................................................... | 58 |
| | C. ISSUES WITH USE OF TAX RETURNS RATHER THAN TRIP TICKETS TO DETERMINE ECONOMIC LOSS ......... | 60 |
| VII. | **CAO ATTORNEY SUTTON'S ROMEO PAPA CLAIM** ................................................... | **62** |
| | A. COMPANY BACKGROUND ..................................................................................... | 62 |
| | B. LIONEL SUTTON'S ROLE AT ROMEO PAPA ............................................................... | 62 |
| | C. LIONEL SUTTON PROCESSES ROMEO PAPA'S DHECC CLAIM WHILE WORKING AT THE CAO ......... | 63 |
| | D. LIONEL SUTTON'S ROLE IN DRAFTING MORATORIUM POLICIES AT THE CAO ..................... | 65 |
| | E. LIONEL SUTTON'S LACK OF DISCLOSURES REGARDING THE ROMEO PAPA CLAIM ............... | 66 |

**VIII.   OTHER CONFLICTS, COMPLIANCE & GOOD GOVERNANCE ISSUES WITHIN THE CAO....67**

    A.   CHRISTINE REITANO RECOMMENDS LIONEL SUTTON FOR A POSITION WITH DHECC VENDOR

        GARDEN CITY GROUP ..................................................................................................................67

    B.   CRESCENT CITY GROUP AND POSTLETHWAITE & NETTERVILLE: "CHINESE DRYWALL" ..........69

        *1.   Founding of Crescent City Group ("CCG") and Proposal to BrownGreer* .....................69

        *2.   BrownGreer Responds to Crescent City Group's Proposal with Postlethwaite & Netterville* ..........71

        *3.   DHECC Code of Conduct and Disclosures to Patrick Juneau about Crescent City Group* ............72

    *C.   BROWNGREER* ........................................................................................................................74

        *1.   Lack of Response to CAO Oversight* ...............................................................................74

        *2.   BrownGreer Employee and Girlfriend of Casey Thonn* ..................................................78

**IX.   CONCLUSION......................................................................................................................................81**

    A.   LEGAL DISCUSSION .................................................................................................................82

        *1.   Mail and Wire Fraud* .......................................................................................................82

        *2.   Money Laundering* ............................................................................................................84

        *3.   Professional Responsibility* ..............................................................................................85

            a.   Attorney Referral Fees ...............................................................................................85

            b.   Duty of Candor ...........................................................................................................86

            c.   Attorney Misconduct ..................................................................................................86

    B.   REFERRALS TO THE UNITED STATES DEPARTMENT OF JUSTICE AND STATE BARS FOR FURTHER

        INVESTIGATIONS ......................................................................................................................86

    C.   APPLICATION OF THE UNCLEAN HANDS DOCTRINE ................................................................87

    D.   CONFLICTS OF INTEREST .........................................................................................................88

    E.   THE SPECIAL MASTER'S THIRD MANDATE .............................................................................89

## I. EXECUTIVE SUMMARY

### A. Introduction

In the aftermath of the *Deepwater Horizon* oil spill on April 20, 2010, and in an effort to begin to fulfill its obligations under the Oil Pollution Act of 1990 ("OPA"), British Petroleum Exploration and Production Inc., British Petroleum North America Production Company, and British Petroleum p.l.c. (collectively, "BP") established a facility to receive and to process claims. On May 3, 2010, BP began paying compensation to individuals and businesses affected by the spill.

Although the OPA limited BP's monetary damages to $75 million for losses to private parties, on August 9, 2010, BP also agreed with the United States Department of Justice ("DOJ") to establish a $20 billion trust available to pay claims of individuals and businesses affected by the oil spill.[1] As part of its agreement with the Government, BP created the Gulf Coast Claims Facility ("GCCF"), a new claims process to be funded by BP and administered by Mr. Kenneth Feinberg. From its inception, the GCCF paid claims for losses resulting from: (1) lost earnings or lost profits, (2) removal and cleanup costs, (3) damage to real or personal property, (4) loss of subsistence use of natural resources, and (5) physical injury or death. On March 2, 2012, BP reached a settlement agreement with plaintiffs in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, a class action lawsuit pending in the United States District Court for the Eastern District of Louisiana ("USDC EDLa").[2] On March 8, 2012, as part of that agreement, the Court ordered that the current GCCF claims process transition to a new court-authorized claims process defined by the settlement. Pursuant to the Court's order, the GCCF immediately ceased accepting, processing, and paying claims.[3] That order effectively terminated the processing of claims by the GCCF and replaced that entity with the Deepwater Horizon Economic & Real Property Claims Center ("DHECC"), which started receiving claims on June 4, 2012.

On July 2, 2013, the Honorable Carl J. Barbier, United States District Judge for the Eastern District of Louisiana, appointed Louis J. Freeh as Special Master in the matter captioned *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*[4]

The appointment, made pursuant to Federal Rule of Civil Procedure 53 and the inherent authority of the Court, enumerated three mandates to be completed:

---

[1] Statement of Associate Attorney General Tom Perrelli on Deepwater Horizon Escrow Fund (August 9, 2010).

[2] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, Order Adjourning Phase I Trial (E.D. La. March 2, 2012).

[3] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, First Amended Order Creating Transition Process (E.D. La. March 8, 2012).

[4] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, Order of Judge Barbier appointing Louis Freeh as Special Master (E.D. La. July 2, 2013). References in this report to the Special Master are to Mr. Freeh and, in some instances, members of his investigative team.

1. Perform an independent external investigation into the facts and circumstances that led to the resignation of Lionel H. Sutton, III, a staff attorney working for the Deepwater Horizon Court Supervised Settlement Program ("CSSP");

2. Conduct fact-finding as to any other possible ethical violations or other misconduct within the CSSP; and,

3. Examine and evaluate the internal compliance program and anti-corruption controls within the CSSP, and make any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.

This report contains findings relative to mandates one and two of Judge Barbier's order. In that regard, the Special Master has not found evidence that Mr. Patrick Juneau engaged in any conflict of interest, or unethical or improper conduct. And while certain conduct of Claims Administration Office ("CAO") employees and DHECC vendors described in this report is problematic, this should not prevent the DHECC from fairly and efficiently processing and paying honest and legitimate claims in a timely manner.

B. <u>Conflicts of Interest by Attorneys Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry Regarding the DHECC Claims Process</u>

In the case of CAO attorneys Lionel Sutton and Christine Reitano, the Special Master finds that their conduct at the CAO may have violated the federal criminal statutes regarding fraud, money laundering, conspiracy or perjury. As set forth in more detail below, the Special Master recommends that this matter be referred to the United States Attorney's Office for the Eastern District of Louisiana for further investigation, along with the activities and conduct of DHECC claimant attorneys Jonathan ("Jon") Andry, a partner at the AndryLerner, LLC ("AndryLerner") law firm and The Andry Law Firm, LLC ("The Andry Law Firm") and Mr. Glen Lerner of the AndryLerner law firm. The Special Master also recommends that the conduct of these four attorneys should be reviewed by the responsible professional bar committees in their licensing jurisdictions.

*1. Casey Thonn Referral Payments to CAO Attorney Lionel Sutton*

Mr. Sutton and Ms. Reitano practiced together as lawyers in New Orleans as Sutton & Reitano prior to Ms. Reitano going to work for the CAO in April 2012. Mr. Sutton went to work as a CAO attorney in November 2012. When Ms. Reitano went to work for the CAO, she and Mr. Sutton referred their client, Casey Thonn, to AndryLerner.

Ms. Reitano said she referred Mr. Thonn to Mr. Jon Andry but denied any expectation or belief that she or her husband would receive some financial benefit if Mr. Thonn's claims were paid. Contradicting Ms. Reitano's assertion, Christina Mancuso, the AndryLerner attorney handling the Thonn claim, said Ms. Reitano contacted her about the Thonn claim and requested a referral fee.  Ms. Mancuso's statement is confirmed by a May 8, 2012 letter from Ms. Mancuso to

Ms. Reitano, with a copy to Mr. Jon Andry and with an attached and unexecuted "Attorney Referral Agreement." The Attorney Referral Agreement between Mr. Jon Andry and Ms. Reitano proposed that Ms. Reitano would refer Mr. Thonn's claim and other potential BP claimants to Mr. Jon Andry, and the two lawyers would evenly split any resulting attorney fees. Ms. Mancuso did not know if the referral fee agreement was signed by Ms. Reitano.

Mr. Sutton said he asked Mr. Lerner, the only other equity partner at AndryLerner, to take the referral to the AndryLerner firm, which Mr. Lerner agreed to do. Mr. Jon Andry then became the attorney of record for Mr. Thonn and AndryLerner prosecuted his claim before the DHECC. Mr. Sutton and Mr. Lerner agreed that Mr. Sutton would receive a "referral fee" for the Thonn case. Although the Louisiana Code of Professional Conduct clearly requires that any such referral be in writing and signed by the client, no such written referral was ever made and Mr. Thonn did not agree in writing to the referral. An employee at AndryLerner stated that this was the only such referral at AndryLerner which did not have a written agreement.

At the time Mr. Sutton went to work for the CAO, Mr. Sutton represented to Mr. Patrick Juneau, the Claims Administrator, who personally queried him about any conflicts, that he had no conflicts in connection with his employment as an attorney. Mr. Sutton failed to advise Mr. Patrick Juneau that he referred DHECC claimant Mr. Thonn to Mr. Jon Andry, and that he, in fact, had a referral fee agreement with Mr. Lerner and Mr. Jon Andry of AndryLerner in connection with the Thonn case. Nor did Mr. Sutton disclose to Mr. Patrick Juneau, or to anyone else at the CAO, that Mr. Sutton continued to represent Mr. Thonn in an unrelated personal injury case. Additionally, Mr. Sutton did not disclose to Mr. Patrick Juneau or to the CAO that Mr. Sutton had a substantial and ongoing business relationship with Mr. Lerner in a water reclamation company called Crown LLC ("Crown"). Mr. Sutton's equity ownership of Crown, from which he was then receiving a $10,000 monthly salary and into which Mr. Lerner had invested over $1 million, should certainly have been disclosed to Mr. Patrick Juneau and to the CAO, given Mr. Lerner's status as one of two equity partners at AndryLerner, which represented hundreds of claimants before the DHECC. Neither attorney Mr. Glen Lerner nor attorney Mr. Jon Andry disclosed these clear conflicts of interest to Mr. Patrick Juneau or to the Court in either Court filings or correspondence prior to the commencement of the Special Master's investigation.[5]

The Special Master's investigation established that the Thonn "referral fee," payments paid to Mr. Sutton by Mr. Jon Andry through Mr. Lerner, consisted of three distributions of $4,940.00 (January 8, 2013), $16,665.21 (March 29, 2013) and $19,035.02 (June 5, 2013), for a total of $40,640.23. Mr. Sutton received all three payments while he worked as an attorney at the CAO.

---

[5] Mr. Lerner ultimately did make such a disclosure in a letter to the Special Master dated August 23, 2013, as well as during his deposition on July 31, 2013, several weeks after the commencement of the Special Master's investigation. During his deposition on July 30, 2013, Mr. Andry stated that he recently learned such payments had been made to Mr. Sutton. Both disclosures post-dated the initiation of the investigation and their review of relevant emails. Letter from Pauline F. Hardin to Special Master (August 23, 2013); Transcript of Glen Lerner at 84 (July 31, 2013); Transcript of Jon Andry at 33 (July 30, 2013).

Rather than send the payments directly to Mr. Sutton, Mr. Jon Andry made the transfers to Mr. Lerner's Las Vegas law firm, Glen J. Lerner & Associates ("Glen Lerner Associates"), which in turn transferred the money to a Crown corporate account in New Orleans (the "old Crown" account), to which Mr. Sutton had access and from which he withdrew the above-described amounts. Mr. Sutton requested that the Thonn referral fee payment be paid to him using the AndryLerner-Lerner-Crown-Sutton channel and Mr. Lerner and Mr. Jon Andry effected the transfers by this means. Interviews of Mr. Sutton, Mr. Jon Andry and Mr. Lerner, taken in combination with emails obtained from the DHECC as well as from subpoenaed materials, confirm their knowledge and agreement to pay Mr. Sutton the Thonn referral fee payment in this circuitous manner. The diagram accompanying this report illustrates this flow of funds.[6]

The Special Master did not find any evidence that either Mr. Sutton or Ms. Reitano directly manipulated the valuation of claims by accessing the DHECC database. The Special Master also did not find any evidence of such manipulation by other CAO officials. However, a comprehensive examination of this issue was not part of the Special Master's mandate.

2.   *CAO Attorney Lionel Sutton's Repeated Denials and Evidence of False Statements about Receipt of the Thonn Referral Fee Payments*

When Mr. Patrick Juneau first confronted Mr. Sutton with the Thonn referral fee payment in May 2013, Mr. Sutton denied that he ever received such fees or that he had any financial interest in any claims before the DHECC. In several additional interviews with Mr. Patrick Juneau and CAO officials, including David Welker, a former FBI official who is now in charge of the CAO's Waste, Fraud, and Abuse investigations, Mr. Sutton continued to deny that he ever received such a referral fee or that he had any "financial interest" in any claim before the DHECC. In his resignation email to Mr. Patrick Juneau on June 21, 2013, Mr. Sutton acknowledged that his relationship with Mr. Lerner and Crown gave him a 'financial interest' in the Thonn fees. Five weeks later, in response to questions from the Special Master, Mr. Sutton for the first time admitted that the $40,640.23 he received from Mr. Jon Andry via Mr. Lerner (in Las Vegas, Nevada) was in fact a referral fee payment for work performed on the Thonn case. Mr. Sutton stated to the Special Master that Mr. Patrick Juneau and Mr. Welker had inaccurately reported his prior interviews.

Mr. Lerner admitted to the Special Master that while he had paid Mr. Sutton the Thonn referral fee as he had agreed to do, Mr. Jon Andry was concerned about making such a referral fee payment to Mr. Sutton, and Mr. Jon Andry "did a Pontius Pilate" and allowed Mr. Lerner to make the payments. Mr. Jon Andry told the Special Master that he objected to the payment of the Thonn referral fee to Mr. Sutton and that Mr. Lerner had "agreed" in April 2013 that no referral fees would be paid to Mr. Sutton. Mr. Jon Andry further stated that he had only recently learned that such payment had in fact been made. Mr. Lerner denied such an agreement with Mr. Jon Andry existed and emails between Mr. Lerner and Mr. Jon Andry in December 2012, confirm

---

[6]   *See* Exhibit A.

4

that they both were involved in making the referral fee payments to Mr. Sutton. Neither Mr. Lerner nor Mr. Jon Andry ever disclosed these payments to the CAO, and Mr. Lerner told the Special Master that he relied on Mr. Sutton's statement that the CAO was aware of the payments.

    C.   <u>Evidence of Material False Statements and Omissions by Attorneys Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry</u>

The Special Master finds that there is substantial evidence that Mr. Sutton deliberately concealed the nature and receipt of the Thonn referral fee payments from Mr. Patrick Juneau and the CAO when he had a clear obligation to disclose them. Mr. Sutton set up an elaborate and circuitous channel through Mr. Jon Andry and Mr. Lerner, his Tulane Law School classmates, to receive the agreed upon Thonn referral fee payments, in effect "laundering" these payments through AndryLerner, Glen Lerner Associates and Crown bank accounts. Mr. Sutton's repeated and material false statements to Mr. Patrick Juneau, a court-appointed officer, as well as to other CAO officials, is further substantial evidence of an intent to conceal the payments. Both Mr. Lerner and Mr. Jon Andry, as lawyers, were aware of the fact that, as a CAO attorney and official, Mr. Sutton had fiduciary obligations to the DHECC and could not act in a manner which violated those duties or which created such a clear and ongoing conflict of interest. Moreover, Mr. Sutton, Mr. Jon Andry and Mr. Lerner failed to execute the required, written fee referral agreement when Mr. Sutton referred the case to them, and which Louisiana law required Mr. Thonn to approve in writing. This constitutes additional evidence of an intent to conceal the $40,640.23 referral fee payments to Mr. Sutton by Mr. Lerner and Mr. Jon Andry.

Ms. Reitano denied under oath that she had any involvement in arranging a referral fee for the Thonn claim. However, an attorney at AndryLerner and AndryLerner firm records contradict her denial. Ms. Reitano continues to insist she had no knowledge or role in arranging a referral fee for the Thonn claim despite this credible evidence to the contrary.

Furthermore, Mr. Sutton admitted to the Thonn payments only after being confronted with his own emails clearly describing them. Neither Mr. Lerner nor Mr. Jon Andry disclosed these payments until they also became aware of the current investigation and emails. The Andry Law Firm made a court filing and sent correspondence to the Special Master that omitted material facts about Mr. Jon Andry's financial relationship with Mr. Sutton, and contained inaccurate material statements concerning Mr. Sutton's involvement with The Andry Law Firm claim.

    D.   <u>Attorneys Lionel Sutton, Glen Lerner, and Jon Andry Work in Concert to Facilitate Claims Pending before the DHECC</u>

The Special Master finds that Mr. Lerner and Mr. Jon Andry utilized and benefited from Mr. Sutton's attorney position inside the CAO in furtherance of their AndryLerner clients' claims, as well as The Andry Law Firm's $7,908,460 claim. The fact that Mr. Jon Andry and Mr. Lerner were making regular and significant salary or referral fee payments to Mr. Sutton while he worked at the CAO also provided them with influence over Mr. Sutton, and served as an

incentive to Mr. Sutton to monitor the progress of their claims before the DHECC and to expedite the processing of The Andry Law Firm claim. The evidence discloses repeated efforts by Mr. Sutton, at times acting at the specific behest and to the special advantage of Mr. Jon Andry and Mr. Lerner, to determine the status of their DHECC claims, facilitate their processing, and expedite payments. Mr. Sutton in fact repeatedly served as the undisclosed, inside "agent" at the CAO for Mr. Jon Andry and Mr. Lerner in an improper manner, with the purpose and effect of giving their claims a special advantage. While he was employed at the CAO, Mr. Sutton viewed various pages of claims in the DHECC claims database 496 times. In 83 of these views, he accessed claims represented by or related to AndryLerner Law Firm clients, plus another 14 views of The Andry Law Firm's claim itself. In total, almost 1 in 5 of all his views related to these claims.

### 1. CAO Attorney Lionel Sutton Expedites The Andry Law Firm Claim

The Special Master finds that Mr. Sutton and Mr. Jon Andry worked together, Mr. Sutton inside the CAO and Mr. Jon Andry from the outside, to expedite the payment of The Andry Law Firm claim for $7,908,460. As previously noted, this concerted action was taken without advising Mr. Patrick Juneau or the CAO that Mr. Sutton and Mr. Jon Andry had a shared financial interest in the Thonn case. Mr. Sutton and Mr. Jon Andry worked to ensure that The Andry Law Firm claim was expeditiously processed. On numerous occasions, Mr. Sutton reached out to a claims analyst or accessed the database to check the status of the claim. Accountants receiving these inquiries from Mr. Sutton, a senior lawyer at the CAO, acted promptly to expedite the claim. The evidence shows that Mr. Sutton's direct intervention to expedite The Andry Law Firm claim was related to the DHECC issuing the notice of eligibility on March 20, 2013.

While Mr. Sutton was working The Andry Law Firm claim from inside the CAO, Mr. Jon Andry and his brother, The Andry Law Firm partner Mr. Gilbert ("Gibby") Andry, were busy and intently focused on lobbying and pressing the CAO and DHECC from the outside to process and to pay this claim. The evidence clearly establishes that during this period, both Andrys were actively and personally pursuing their various claims with Mr. Patrick Juneau as well as with Mr. Sutton. Mr. Patrick Juneau advised the Special Master that Mr. Jon Andry, who he described as a "real pushy kind of guy,"[7] was repeatedly pressing his DHECC claims to him.

### 2. Jon Andry and Gilbert Andry Seek to Expedite The Andry Law Firm Appeal

The evidence further establishes that after the issuance of the eligibility notice for The Andry Law Firm claim on March 20, 2013, Mr. Jon Andry and Mr. Sutton continued their tandem efforts to expedite the payment of this claim, which was then at the DHECC appellate level. Both Mr. Jon Andry and Mr. Gibby Andry pressed The Andry Law Firm claim with Mr. Sutton and David Duval, the CAO's Appeals Coordinator. In fact, Mr. Sutton told the Special Master that the Andry brothers, both of whom were his classmates at Tulane Law School, frequently called

---

[7] Patrick Juneau Transcript at 97 (August 1, 2013).

him about their claim, noting that Mr. Gibby Andry was "just aggravating. He won't stop asking." Mr. Sutton further stated that when The Andry Law Firm claim moved to DHECC appeals, Mr. Sutton disclaimed any involvement in appeals and directed Mr. Gibby Andry to Mr. Duval. Mr. Sutton stated that Mr. Duval later complained that Mr. Sutton had referred Mr. Gibby Andry to him, and called Mr. Duval frequently.

After BP filed its appeal of The Andry Law Firm claim eligibility on April 10, 2013, Mr. Jon Andry engaged in several conversations with Mr. Duval. On April 25, 2013, Mr. Jon Andry forwarded to Mr. Duval a copy of his prior letter to Mr. Patrick Juneau, which referenced The Andry Law Firm claim. Mr. Jon Andry stated he was forwarding this to Mr. Duval in his "capacity as the Head of Appeals," and asking Mr. Duval to "kindly acknowledge and advise." Mr. Jon Andry did not copy BP's counsel on this communication. The next day, Mr. Duval emailed Mr. Jon Andry that he had received the letter and noted that the Court's order only applied to "appeals going forward." Mr. Duval almost immediately forwarded a copy of Mr. Jon Andry's original message and letter to Mr. Sutton. The next day, Mr. Jon Andry replied to Mr. Duval, complaining about BP's arguments causing delay. BP once again was not copied on Mr. Jon Andry's email. Mr. Jon Andry also forwarded a copy of this communication to Mr. Duval to Mr. Sutton. On April 30, 2013, Mr. Gibby Andry complained in writing to Mr. Duval about BP's appeal, providing a copy to BP's counsel.

It was during the pendency of the BP appeal that Mr. Jon Andry had two lunches with Mr. Duval. Both individuals confirm the two lunches. Mr. Jon Andry and Mr. Duval said the purpose of the first lunch was "just general discussion" and that the purpose was not to discuss The Andry Law Firm claim. Mr. Jon Andry stated that he paid for one lunch and the cost of the other was "split." Mr. Duval stated to the Special Master that Mr. Jon Andry paid for both lunches. Mr. Duval stated that Mr. Jon Andry specifically asked about The Andry Law Firm claim during the second lunch and wanted to know the time frame for the appeal.

The evidence establishes that both Messrs. Jon and Gibby Andry contacted, communicated with and requested Mr. Sutton to facilitate and to expedite the processing and payment of The Andry Law Firm claim. The fact that Mr. Duval was forwarding to Mr. Sutton his communications from Mr. Jon Andry regarding the appeal of The Andry Law Firm claim further demonstrates that Mr. Sutton also was involved in the DHECC appeals process of this substantial claim. Mr. Sutton's actions directly facilitated the processing of this claim and expedited its eligibility decision by the DHECC. At the time Mr. Sutton was actively facilitating The Andry Law Firm claim on behalf of and for the financial benefit of the Andry brothers, Mr. Sutton had an undisclosed financial interest with Mr. Jon Andry in connection with the Thonn case, as previously described. Mr. Jon Andry had personal knowledge of this undisclosed financial interest and nonetheless worked in concert with Mr. Sutton to expedite the payment of the claim.

In a filing with the Court, an interview with the CAO and correspondence with the Special Master in furtherance of The Andry Law Firm claim, Mr. Jon Andry did not disclose that Lionel

Case 2:10-md-02179-CJB-SS   Document 13087   Filed 06/30/14   Page 12 of 93

Sutton was being paid the Thonn referral fee. Moreover, The Andry Law Firm claimed to the Court that Mr. Sutton said he did not "have any involvement in the processing or the handling of The Andry Law Firm claim."[8]

E.  Pervasive Conflicts of Interest by Senior CAO Staff Members Despite Patrick Juneau's Proper Conduct and Ethical "Tone at the Top"

The transition from the GCCF to DHECC posed several substantive challenges to Patrick Juneau, who had been appointed to oversee the operations of the DHECC. Mr. Patrick Juneau had the dual responsibility to wind down the GCCF as well as to start adjudicating the thousands of newly-filed claims now being submitted to the DHECC. Mr. Patrick Juneau continued to utilize the services of BrownGreer ("BG"), PricewaterhouseCoopers LLP ("PwC"), and the Garden City Group ("GCG"), which had been administering claims for the GCCF. These same vendors were appointed by the Court to assist the DHECC. Additionally, the Court appointed Postlethwaite and Netterville APAC ("P&N"), a Louisiana based accounting firm, to assist the DHECC. All of the vendors were recommended to the Court, and agreed upon by BP and the Plaintiffs' Steering Committee ("PSC"). As set forth in more detail in the report, the Special Master's investigation disclosed that BG failed to promptly detect and candidly disclose a conflict of interest to Mr. Patrick Juneau. And in the only DHECC claim examined by the Special Master, the "Casey Thonn Claim," BG failed to detect fraudulent characteristics of the claim. BG has also resisted the CAO's efforts to control costs and to create efficiencies. In addition, P&N failed to disclose to Mr. Patrick Juneau the conflict of interest posed by its partnering with five members of the CAO staff in connection with a separate claims administration matter before the USDC EDLa.

Mr. Patrick Juneau was immediately required to create and to staff the CAO with an executive management team, attorneys, professional and administrative personnel. Simultaneously, Mr. Patrick Juneau needed to design and to implement comprehensive programs, policies, procedures, and corresponding training to prevent corruption, fraud, and unethical conduct. In this regard, Mr. Patrick Juneau properly communicated to all CAO personnel that they were required to avoid any actual or apparent conflicts of interest, to engage in ethical conduct, and to protect the confidentiality of the DHECC's information. Moreover, Mr. Patrick Juneau duly required his staff and contractors to sign employment agreements and acknowledgment forms outlining his expectations in regards to these key policies.

Despite the clear ethical "tone at the top" and sound written policies established by Mr. Patrick Juneau, many of his key executives and senior attorneys engaged in conduct which the Special Master finds to be improper, unethical, or not in accordance with the DHECC Code of Conduct.

---

[8]  *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, The Andry Law Firm Opposition to B.P.'s Motion for an Emergency Preliminary Injunction (E.D. La. July 18, 2013); *see also* Billy Gibbens Letter to the Special Master (July 3, 2013).

The nature and seriousness of this type conduct varied in degree but was pervasive and, at its extreme, may have constituted criminal conduct.

In May 2013, Mr. Patrick Juneau became aware of an alleged conflict of interest regarding Mr. Sutton and immediately initiated an investigation, led by Mr. Welker. Mr. Patrick Juneau promptly reported this allegation to the Court, which became the basis for the Court's July 2, 2013 appointment of the Special Master.

### 1. Conflicts of Interest by CAO Executives

The Special Master finds that actual and apparent conflicts of interest involved the most senior officials of the CAO. For example, while functioning as CAO's Chief Executive Officer, David Odom formed Crescent City Group ("CCG") and submitted a written proposal to perform work under BG's supervision in another unrelated multidistrict litigation regarding "Chinese Drywall" claims. This proposal was made at the time Mr. Odom and the CAO were supervising BG, the principal CAO vendor for the CSSP. In addition to Mr. Odom, CCG's Secretary was Kirk Fisher, the Director of DHECC's Business Process Reporting Group. This Odom-Fisher endeavor was in partnership with P&N, one of the accounting firms overseen by Mr. Odom and the CAO. The proposal also listed Chris Reade, David Duval and Scott Sherick, all DHECC officials, as persons who would be part of the CCG's proposal. Upon receipt of the proposal, and after some hesitation due to its ongoing CAO supervision by Mr. Odom and Mr. Fisher, BG reported the matter to Mr. Patrick Juneau. Ultimately, the proposal was withdrawn.

Other CAO senior officials failed to adhere to the conflicts, gifts and gratuities policies set forth by Mr. Patrick Juneau and agreed to by them in writing. Along with other CAO employees, Mr. Duval, the CAO's Appeals Coordinator, had lunch at a restaurant on two occasions with attorney Mr. Jon Andry, while the AndryLerner firm had hundreds of claims pending before the DHECC and The Andry Law Firm was appealing its own $7,908,460 DHECC claim. Mr. Jon Andry paid for the lunches and discussed with Mr. Duval his firm's pending appeal of its multi-million dollar claim. Although the DHECC "Gifts, Entertainment and Gratuities" policy excludes "reasonable and occasional business meals, if necessary and appropriate," the Special Master did not find these luncheon meetings to be "necessary and appropriate."

### 2. Conflict of Interest by CAO Attorney Christine Reitano

Ms. Reitano, the wife of Mr. Sutton, was an attorney hired by Mr. Patrick Juneau as a DHECC Claims Counsel and legal advisor. As all senior staff members were required by Mr. Patrick Juneau, Ms. Reitano signed acknowledgements that she understood the conflicts of interest policy upon her hiring and was also personally instructed by Mr. Patrick Juneau about the requirement to avoid any actual or apparent conflicts of interest while working at the DHECC. Despite this instruction and her written agreements, in response to an inquiry from the GCG, Ms. Reitano personally recommended that the GCG, one of the DHECC's primary vendors, hire her husband for a proposed legal position. The vendor, who told the Special Master that it was

"ludicrous" to hire Mr. Sutton due to the conflict of interest, did not hire Mr. Sutton. When interviewed by the Special Master, Ms. Reitano purported to have difficulty understanding how her request to the GCG would have constituted a conflict of interest.

F.   Recommendations

1.   *The Special Master Recommends Disallowing The Andry Law Firm's Claim under the Unclean Hands Doctrine*

The Special Master recommends that the Court should consider disallowing the payment of The Andry Law Firm claim on the basis of the Unclean Hands Doctrine and the long held principles of equity which prohibit a party before the court to benefit and to enrich itself after having engaged in dishonest, unethical and improper conduct. In this matter, the conduct of The Andry Law Firm is particularly egregious. In effect, Mr. Jon Andry's AndryLerner firm was making secret, improper payments to Mr. Sutton at the precise time Mr. Sutton was a senior CAO attorney, working in concert with Mr. Jon Andry to expedite payment of The Andry Law Firm claim. The undisclosed financial interest between Mr. Sutton and Mr. Jon Andry tainted and corrupted the integrity of the DHECC process and payment of The Andry Law Firm claim should therefore be prohibited under the Unclean Hands Doctrine and well-settled principles of equity, fairness and justice.

2.   *The Special Master Recommends Disqualifying Attorneys Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry, as well as Any Associated Law Firms from Representing DHECC Claimants under the Unclean Hands Doctrine*

Based on the same Unclean Hands Doctrine and equity principles, the Court should consider disqualifying Ms. Reitano, Mr. Jon Andry, Mr. Lerner, the AndryLerner law firm and any firm associated with these individuals, from representing any claimant, past, present and future, in connection with the DHECC. The same disqualification should of course apply to Mr. Sutton based on the Thonn referral fee payment arrangement, and Mr. Sutton's conduct in facilitating and expediting the payment of The Andry Law Firm Claim while receiving payments from AndryLerner, Mr. Jon Andry and Mr. Lerner. Ms. Reitano should be disqualified based on her involvement in arranging the Thonn referral fee payments with AndryLerner, and her denial of this conduct.

G.   The Fraudulent Characteristics of the Thonn Claim

Although the Special Master was not tasked to evaluate the validity of claims submitted to the DHECC, the relevant examination of the Thonn claim discloses fraudulent characteristics. This finding clearly shows that the DHECC needs to apply closer scrutiny and sound anti-fraud and business practices review to such claims. On June 24, 2012, Mr. Thonn submitted Seafood Compensation Claims as a Boat Captain and Vessel Owner and received initial eligibility notices in the total amount of $1,550.36. This amount was based on trip ticket data from the State of Louisiana. Mr. Thonn then asked for reconsideration based on his income tax returns and a

10

signed, sworn statement from his lawyer which stated that all of his $156,000 income for 2009 was derived from shrimping. This sworn statement was inconsistent with other information in the DHECC file showing that Mr. Thonn derived income from multiple sources and fishing for multiple species in 2008 and 2010. The justification for proving that all of Mr. Thonn's income was from shrimping was also based on statements purportedly from eleven separate individuals who had bought shrimp from him, but lacked specifics as to amounts or timing. Mr. Thonn provided these statements, eight of which were not even signed. Mr. Thonn's documentation was not investigated for fraud as part of BG's initial eligibility process. The sources of Mr. Thonn's income, however, were raised in a DHECC internal audit conducted January 23, 2013 on the Thonn claim. However, these "red flags" did not cause any further inquiry to occur. After reductions for prior payments from BP and the GCCF, Mr. Thonn was ultimately paid approximately $357,002.35 on these seafood claims with agreement by BP, at a time when it did not know about Mr. Thonn's relationship with CAO attorney Lionel Sutton.

### H. Attorney Lionel Sutton's Conflict of Interest and Undisclosed, Improper Relationship to DHECC Claimant Romeo Papa

While Mr. Sutton was working at the CAO, Mr. Sutton also maintained an undisclosed ownership interest in Romeo Papa LLC ("Romeo Papa"), an active claimant before the DHECC. Romeo Papa allegedly operated four 160-foot motor vessels in the Gulf of Mexico during the relevant claims period. Mr. Sutton was both a 50% owner of Romeo Papa as well as its attorney in various lawsuits involving insurance and contracts. The other principal of Romeo Papa alleged that Romeo Papa had suffered large economic losses in 2010 as a result of the federal government's "moratorium" on the issuance of new, offshore deep sea drilling leases in the Gulf of Mexico. On December 13, 2012, Romeo Papa registered online to submit a claim to DHECC. Romeo Papa's chief financial officer ("CFO") stated that he called Mr. Sutton regarding this claim, and that after Mr. Sutton said he could not discuss the claim due to Mr. Sutton's position at the CAO, Mr. Sutton then proceeded to give the CFO instructions to upload all the documents and to put as much information into the registration as possible. Mr. Sutton also repeatedly viewed the Romeo Papa claim on the DHECC computer database. In connection with receiving an "incompleteness" notice from the DHECC in March 2013, the CFO discussed this matter with Mr. Sutton, who told the CFO what documents Romeo Papa had to submit in order to complete its registration.

Mr. Sutton stated that, when he first became aware of the Romeo Papa claim, he discouraged the other principal from submitting the claim. The other principal at Romeo Papa denied that Mr. Sutton ever so instructed him. Mr. Sutton also stated to the Special Master that when he became aware that the Romeo Papa claim had been filed, he did not advise Mr. Patrick Juneau because he thought the claim would not be processed. Mr. Sutton never disclosed to Mr. Patrick Juneau at any time that Mr. Sutton had an ownership interest in Romeo Papa. It should also be noted that at the time the Romeo Papa claim was filed, Mr. Patrick Juneau had specifically tasked Mr. Sutton

with formulating the guidelines for "moratorium" claims before the DHECC, thereby highlighting Mr. Sutton's clear conflict of interest.

> I.   Enhanced Management of DHECC Vendors by the CAO Will Control Costs, Reduce Conflicts of Interest, and Effectuate the Mandate of the Court

The Special Master has observed that BG, one of the primary DHECC vendors, earning millions of dollars per month, has at times resisted CAO oversight efforts to control costs and to create efficiencies. For example, BG relied upon Mr. Sutton and Ms. Reitano to advance BG's interests within the CAO in an effort to resist and to undermine the implementation of business practices to control its costs and to eliminate inefficiencies. BG also has demonstrated difficulty in promptly detecting a conflict of interest and fully disclosing it to the CAO when detected. For example, despite a BG employee making numerous, computer-recorded checks of the Thonn claim within the DHECC, BG failed to discover that employee's intimate relationship with Mr. Thonn, despite publicly available social media and Internet information. When BG finally focused on this relationship as a result of the Special Master's investigation, it failed to notify the Special Master and ineptly terminated the employee without advising the Special Master that it was taking such action. Instead, BG complained to the CAO about the Special Master's investigation. Also, BG failed to detect the fraudulent characteristics of the Thonn claim.

> J.   Conclusion

Over the course of this 66-day investigation, the Special Master addressed the first and second of Judge Barbier's mandates, as described above. With respect to the third mandate, work is ongoing and will result in specific recommendations to the Court regarding the CAO's internal compliance program, anti-corruption and anti-fraud controls, as well as additional control policies, procedures, and practices to ensure the integrity of the CSSP.

## II. SCOPE OF ENGAGEMENT

### A. Court Order

On July 2, 2013, the Honorable Carl J. Barbier, United States District Judge for the Eastern District of Louisiana, appointed Louis J. Freeh as Special Master in the matter captioned *In Re: Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico, on April 20, 2010.*[9]

The appointment, made pursuant to Federal Rule of Civil Procedure 53 and the inherent authority of the Court, enumerated three mandates to be completed:

1. Perform an independent external investigation into the facts and circumstances that led to the resignation of Lionel Sutton III, a staff attorney working for the CSSP;

2. Conduct fact-finding as to any other possible ethical violations or other misconduct within the CSSP; and,

3. Examine and evaluate the internal compliance program and anti-corruption controls within the CSSP, and make any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.[10]

This report documents the findings of the independent external investigation of the facts relating to Lionel Sutton's resignation and provides a report regarding the fact-finding as to other ethical violations and misconduct.[11] This investigation has been conducted over a 66-day period.

Although this report addresses some of the procedures and controls used by the CAO and its vendors in the DHECC, this report does not address the Court's third mandate, set forth above. That will be the subject of a separate report.

### B. Chronology of the Investigation

At the outset of this investigation, the Special Master met with Judge Barbier, Judge Sally Shushan, the Claims Administrator, representatives of the Plaintiffs' Steering Committee, and internal and external counsel for BP. All of the parties pledged full cooperation with the investigation.

---

[9] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, Order of Judge Barbier appointing Louis Freeh as Special Master (E.D. La. July 2, 2013).

[10] *Id.*

[11] All references herein to bank documents, phone logs, email communications, DHECC claims documents, and witness statements, transcribed or summarized, are part of the Special Master's investigative record and will be preserved by the Special Master to be provided to the United States Attorney's Office for the Eastern District of Louisiana if directed by the Court. Given the possibility of a criminal investigation, the Special Master is not permitting access to such underlying documents at this time, unless otherwise ordered by the Court.

Throughout the process, the Special Master has maintained an "open-door policy" and has welcomed input from and communications with all parties involved. The parties have provided information relevant to the investigation to the Special Master both voluntarily and upon request. The Special Master has also periodically briefed the Court on the investigation's progress.

On July 9, 2013, the Special Master received a detailed briefing by DHECC Claims Administrator's staff about the known facts that led to the resignation of Mr. Sutton. Also, on July 9, 2013, the Special Master received a detailed briefing on the DHECC and claims process from Claims Administrator Patrick Juneau, other CAO executives, and executives from DHECC court-appointed vendors BG, PwC, and P&N.

On July 25, 2013, the Special Master conducted a site visit of GCG's Hammond, Louisiana, DHECC facility. On August 8, 2013, the Special Master received a briefing and tour of the BG 14th floor area of the DHECC CSSP New Orleans office. On August 28-29, 2013, the Special Master conducted an on-site visit at BG offices in Richmond, Virginia.

### 1. Witness Interviews

From the period July 8, 2013, through August 27, 2013, the Special Master conducted over 80 interviews (several of which were follow-up interviews to those already conducted). The majority of the interviews dealt with the facts and circumstances leading to Mr. Sutton's resignation, but there was also fact-finding about other ethical violations or misconduct within the CSSP. In addition to serving as a basis for this investigative report, the interviews had the dual purpose of identifying other potential ethical violations and misconduct regarding DHECC claimant attorneys and providing a framework for the design and implementation of additional CSSP compliance programs, and anti-fraud, anti-corruption and conflict of interest controls, policies, procedures, and practices.

Interviews were conducted of DHECC claimants, current and former employees of relevant law firms, employees and contractors of the DHECC Claims Administration Office, employees of businesses related to the investigation, BP attorneys, employees of DHECC court-appointed contract vendors, Mr. Sutton and Ms. Reitano.

The interviews were mostly conducted in person, except where telephonic interviews were necessary. Several interviews were recorded and transcribed by a court reporter from the USDC EDLa. In those interviews, the Special Master placed the witnesses under oath and provided appropriate warnings regarding perjury. In other interviews, the witnesses were provided appropriate warnings regarding confidentiality, truthfulness, and the prohibition against making material, false statements.

### 2. Computer Forensics

Beginning on July 8, 2013, the Special Master received data from the CAO related to the investigation, including email correspondence and both electronic and hard copy documents. The

DHECC has employed a hardware email compliance monitoring system since mid-2012. At the Special Master's request, the entire contents of this email system were exported to a Special Master's hard drive. This data was then processed and uploaded into a searchable database application for investigative research. Upon the Special Master's request, the CAO also provided a data listing of all telephone calls placed by or received to the DHECC phone system, during the period relevant to the investigation. Additionally, the Special Master obtained the laptop computers and mobile device hardware belonging to CAO and used by Mr. Sutton and Ms. Reitano during their time at that office. The devices were received by the Special Master and documented. The devices were then transmitted for forensic examination. A chain of custody document was maintained and forensically sound images were created of each hard drive received. The devices were mirrored and examined. Appropriate reports and exported data from the devices were transmitted to the Special Master for integration into a searchable database application.

### 3.  *Document Review*

During the period from July 8, 2013 through September 2, 2013, the Special Master conducted reviews of documents provided by the CAO, including documents from the CAO's Waste, Fraud, and Abuse Director's initial investigation; documents pertaining to employee conduct; policies and procedures; organizational structure and responsibilities; the DHECC's CSSP documents; filings for the United States District Court for the Eastern District of Louisiana and United States Court of Appeals for the 5th Circuit; and, relevant personnel file documents.

DHECC court-appointed contractor vendors provided relevant documents pertaining to the management of CSSP claims and the processes for claims review, claims documentation, claims adjudication and payment. Detailed documents concerning the lifecycle of claims were also provided. Coordinating with the CAO, the Special Master received permission to have read-only access to the DHECC claims database system, in order to access claims related to the investigation. Parties to the settlement, BP and the lead attorneys for the PSC, also provided documents relevant to the investigation.

### 4.  *Special Master Subpoenas*

On July 26, 2013, the Special Master received approval from Judge Barbier to issue subpoenas for documents relevant to this investigation. Starting on July 29, 2013, the Special Master issued subpoenas to certain parties, as well as to relevant financial institutions, telecommunication carriers, and other entities.

## III.   THE DHECC

A.   History of the Deepwater Horizon Economic Claims Center

On April 20, 2010, an explosion occurred on *Deepwater Horizon*, an offshore oil-drilling rig owned by Transocean Ltd., which resulted in the discharge of oil into the Gulf of Mexico. In the weeks that followed, BP and five other companies were designated as "Responsible Parties" under the OPA for spill-related claims. To begin to fulfill its obligations under the OPA, BP established a facility to receive and to process all claims and, on May 3, 2010, began paying compensation to individuals and businesses affected by the spill.

Although the OPA limited BP's monetary damages to $75 million for losses to private parties, on August 9, 2010, BP also agreed with the DOJ to establish a $20 billion trust available to pay claims of individuals and businesses affected by the oil spill.[12] As part of its agreement with the Government, BP created the GCCF, a new claims process to be funded by BP and administered by Mr. Kenneth Feinberg. From its inception, the GCCF paid claims for losses resulting from: (1) lost earnings or lost profits, (2) removal and cleanup costs, (3) damage to real or personal property, (4) loss of subsistence use of natural resources, and (5) physical injury or death. On March 8, 2012, pursuant to a court order, the GCCF immediately ceased accepting, processing, and paying claims.[13]

On March 2, 2012, BP reached a settlement agreement with plaintiffs in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, a class action lawsuit pending in the USDC EDLa.[14] On March 8, 2012, as part of that agreement, the Court ordered that the current GCCF claims process transition to a new court-authorized claims process defined by the settlement. That order effectively terminated the processing of new claims by the GCCF and replaced that entity with the DHECC, which started receiving claims on June 4, 2012.

In order to administer this new claims process, the Court appointed Mr. Patrick Juneau to serve as Claims Administrator for the DHECC, replacing Mr. Feinberg at the GCCF. According to Mr. Patrick Juneau, he was "in charge of the transition, along with the Judge appointed Lynn Greer, of BrownGreer, because they had been involved and would be involved in both, as kind of transition coordinator working directly with me."[15] In his interview with investigators, Mr. Patrick Juneau described the challenges posed by the transition from the GCCF to the new DHECC process:

---

[12]   Statement of Associate Attorney General Tom Perrelli on Deepwater Horizon Escrow Fund (August 9, 2010).
[13]   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, First Amended Order Creating Transition Process (E.D. La. March 8, 2012).
[14]   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 10-MDL-2179, Order Adjourning Phase I Trial (E.D. La. March 2, 2012).
[15]   Patrick Juneau Transcript at 13 (August 1, 2013). Ms. Lynn Greer is a founding partner of BG, a firm that had worked with Mr. Feinberg on administering the GCCF.

> [T]here were a significant number of claims that were still here which
> had not been resolved under the protocol of the Gulf Coast Claims
> Facility. So I had to take over that and make that transition, get those
> claims paid; and, simultaneously, under the order, the original order, I
> was to open the door for this whole program on June 4. So we really had
> two things going on.[16]

In addition to BG, GCG, PwC, and P&N were all appointed as vendors to work as part of the DHECC.[17]

## B. Christine Reitano and Lionel Sutton at the CAO

Mr. Sutton and his wife, Ms. Reitano, founded and operated the Sutton & Reitano law firm in New Orleans. The firm's clients included DHECC claimant Mr. Thonn and a future DHECC claimant, Romeo Papa, LLC, a company of which Mr. Sutton owned fifty-percent. In April 2012, Ms. Reitano went to work as the Claims Counsel for the CAO, despite her lack of experience in corporate governance and ethics.[18] By November 2012, Mr. Sutton was also working as an attorney for the CAO. In their roles as attorneys for the CAO, both agreed to abide by certain CAO policies related to conflicts of interest, outside employments and other ethical issues.[19] Mr. Patrick Juneau personally queried and instructed them about the requirement to avoid any conflict or appearance of a conflict of interest as CAO attorneys. Mr. Patrick Juneau also required both Ms. Reitano and Mr. Sutton to sign detailed provisions, which prohibited them from having any conflict or appearance of a conflict of interest relating to the CAO.

### 1. Sutton & Reitano

Ms. Reitano is a lawyer in good standing in Louisiana.[20] She graduated from the University of Pennsylvania and Tulane University School of Law, and was admitted to the Louisiana Bar in 1993.[21] Mr. Sutton, who is known as "Tiger," is also a lawyer in good standing in Louisiana.[22] Mr. Sutton is a graduate of the Louisiana State University and Tulane University School of Law and was admitted to the Louisiana State Bar in 1990.[23]

---

[16] *Id.* at 13.

[17] *Id.* at 12-13. GCG and PwC, both of which had been subcontractors to the GCCF led by Mr. Feinberg, continued their roles under the DHECC. Additionally, the Court appointed P&N, a Louisiana-based accounting firm, to assist the DHECC.

[18] Christine Reitano Transcript at 49 (July 29, 2013).

[19] *See* Supplement and Amendment to Undertaking of Christine Reitano in Furtherance of the Court's Order Appointing Claims Administrator (August 1, 2012); *see also* Lionel H. Sutton, III, Agreement In Furtherance of Court's Order Appointing Claims Administrator (November 1, 2012).

[20] Christine Reitano Transcript at 6 (July 29, 2013); *see also* The Louisiana State Bar Association Membership Directory (Accessed on August 28, 2013).

[21] *See* Christine Reitano Lawyer Profile on Martindale (August 21, 2013). http://www.martindale.com/Christine-Reitano/603854-lawyer.htm.

[22] Lionel Sutton Transcript at 7 (July 29, 2013); *see also* The Louisiana State Bar Association Membership Directory (Accessed on August 28, 2013).

[23] *See* Lionel H. Sutton, III Lawyer Profile on Martindale (August 21, 2013). http://www.martindale.com/Lionel-H-Sutton-III/599236-lawyer.htm.

Ms. Reitano and Mr. Sutton worked together in Sutton & Reitano.[24] They filed a registration for Sutton & Reitano in 2008 and filed an application to dissolve it on March 11, 2013.[25] The firm was originally located at 610 Baronne Street, New Orleans, Louisiana.[26] In 2011, their firm moved to 935 Gravier Street, New Orleans, Louisiana. Originally, the Sutton & Reitano office was on the 6th floor at 935 Gravier Street, but subsequently moved to the 19th floor, where the DHECC eventually established its offices.[27]

Among Sutton & Reitano clients were Mr. Thonn and the company Romeo Papa, LLC. Ms. Reitano represented Mr. Thonn in a GCCF claim while Mr. Sutton represented Mr. Thonn in an auto accident claim. Mr. Sutton also performed legal work related to a federal civil suit for Romeo Papa, a business in which he owned a fifty-percent share.

### 2. DHECC Hires Attorneys Christine Reitano and Lionel Sutton

In the spring of 2012, Claims Administrator Patrick Juneau had been tasked with transitioning the GCCF to the DHECC and immediately had to hire a staff. Mr. Patrick Juneau highlighted the difficulties in staffing the CAO: "All of these issues are bubbling. We knew we had to activate this thing. It ain't the easiest thing in the world in five states to find somebody who doesn't have any contact with the BP litigation."[28] Around this same time, Mr. Sutton approached Mr. Patrick Juneau, whom he knew, about the possibility of Ms. Reitano working at the Claims Center.[29]

Mr. Patrick Juneau hired Ms. Reitano after reviewing her resume.[30] In explaining his decision, Mr. Patrick Juneau stated: "She had had experience in dealing in this complex litigation world with claims and class action things; about that, I knew. That's all on her resumé."[31]

Mr. Patrick Juneau specifically queried Ms. Reitano about conflicts of interest that she might have and specifically instructed her to avoid any while at the CAO. When asked whether she represented plaintiffs in these areas, Ms. Reitano told the Special Master that she just assisted her husband in, "a lot of discovery work, a lot of research and writing, depositions. You know, never really going before the judge and arguing, that sort of thing. Just, you know, kind of very academic, that type of work."[32] According to Ms. Reitano, she described her experience to Mr. Patrick Juneau as "…that it was very just, you know, document research oriented, administrative oriented."[33]

---

[24] Lionel Sutton Transcript at 78 (July 29, 2013).
[25] "Sutton and Reitano, (A Professional Law Corporation)," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on July 29, 2013).
[26] *Id*. This address is also relevant to Andry entities; discussed further below.
[27] *See* Exhibit B.
[28] Patrick Juneau Transcript at 87 (August 1, 2013).
[29] Lionel Sutton Transcript at 71 (July 29, 2013).
[30] Patrick Juneau Transcript at 85-88 (August 1, 2013).
[31] *Id*. at 89.
[32] Christine Reitano Transcript at 10 (July 29, 2013).
[33] *Id*. at 15.

18

Ms. Reitano acknowledged to the Special Master her lack of experience in corporate governance, conflicts, or ethics.[34] Ms. Reitano became a Claims Counsel on the staff of Mr. Patrick Juneau, Claims Administrator at the DHECC, on April 18, 2012.[35]

Later that year, in October 2012, Ms. Reitano told Mr. Sutton that the CAO needed more help and asked if he was interested in working there.[36] Mr. Sutton indicated that he would be interested in working at the CAO but could not work full-time.[37] She urged her husband to speak with Mr. Patrick Juneau about a part-time opportunity at the CAO. Ms. Reitano recommended to Mr. Patrick Juneau that her husband be hired.[38]

Mr. Patrick Juneau explained his hiring of Mr. Sutton by stating, "I knew Sutton before. He was from New Iberia, Louisiana. He had worked for me for a short period of time, I don't know, maybe a year -- I don't know how many years ago, 15 years ago or something like that -- in Lafayette, Louisiana. I hadn't seen that guy. I had no contact with him subsequent to that."[39] Mr. Patrick Juneau also noted that Mr. Sutton was familiar with the fishing industry.[40]

The CAO's CEO, Mr. Odom, expressed reservations about Mr. Sutton's qualifications. Mr. Odom stated that he initially advised Mr. Patrick Juneau and Mr. Michael Juneau, CAO Special Counsel, not to hire Mr. Sutton because he heard in the community that Mr. Sutton was believed to have "ethical issues."[41] In his statements, Mr. Patrick Juneau said that Mr. Odom expressed reservation about hiring Mr. Sutton, but his reservation was limited to the fact that Mr. Sutton was married to Ms. Reitano. Mr. Michael Juneau said that Mr. Odom had expressed reservations about Mr. Sutton's reputation.[42] Mr. Odom also referenced Ms. Reitano's "big sales job" to both Mr. Patrick Juneau and Mr. Michael Juneau to get her husband hired.[43] On November 1, 2012, Mr. Sutton joined the CAO staff as Claims Counsel.[44]

Mr. Odom also stated that the DHECC media and press coordinator position initially was to be filled by Mr. Sutton's and Ms. Reitano's daughter. Mr. Odom understood that their daughter turned the job offer down as she thought she was not qualified.[45] Mr. Odom felt that, at some point, it was beginning to appear that Ms. Reitano wanted to make the CAO a "family affair."[46]

---

[34]   *Id*. at 48-49.
[35]   Supplement and Amendment to Undertaking of Christine Reitano in Furtherance of the Court's Order Appointing Claims Administrator (August 1, 2012).
[36]   Lionel Sutton Transcript at 71 (July 29, 2013).
[37]   *Id*. at 71.
[38]   Christine Reitano Transcript at 42-43 (July 29, 2013).
[39]   Patrick Juneau Transcript at 40-41 (August 1, 2013).
[40]   *Id*. at 41.
[41]   Interview of David Odom (July 11, 2013).
[42]   Interview of Michael Juneau (July 16, 2013).
[43]   Interview of David Odom (July 11, 2013).
[44]   Lionel H. Sutton, III, Agreement in Furtherance of the Court's Order Appointing Claims Administrator (November 1, 2012).
[45]   Interview of David Odom (July 11, 2013).
[46]   *Id*.

### 3. Christine Reitano and Lionel Sutton's Responsibilities and Ethical Obligations under the CAO's Code of Conduct

In their positions as Claims Counsel for the CAO, both Ms. Reitano and Mr. Sutton were responsible for: (1) working with the parties to identify any policy and legal issues and seek resolution at the direction of the Claims Administrator; (2) assisting the Claims Administrator with interpretation of the Settlement Agreement, Court Orders and other legal documents; and (3) working with the vendors and Contract Administrator's staff on legal issues and providing guidance as needed.

In connection with their work at the CAO, both Ms. Reitano and Mr. Sutton agreed to abide by certain CAO policies.[47] These policies included: avoiding conflicts of interest and appearances of conflicts of interest; not engaging in outside employment, unless disclosed and approved in writing; the handling of confidential information; and, prohibition on the solicitation or acceptance of gifts and gratuities.[48] As he began to set up the CAO, Patrick Juneau instructed Mr. Odom:

> I said, activate, innovate, whatever word you want to use, a process that . . . to include things of conflict of interest and all that sort of stuff, and establish a code . . . a code of conduct that I want the people working here, and circulate that. We established and put in place a program about entertainment, expenses, and regulations that control all of us. We did that.[49]

At Mr. Patrick Juneau's direction, Ms. Reitano, Mr. Sutton, Mr. Odom, and every CAO employee executed a written agreement and acknowledgment to abide by these policies.[50]

In May 2013, upon learning of Mr. Sutton's conflict of interest and receipt of the Thonn referral fee payments, Mr. Patrick Juneau initiated an investigation with Mr. Welker. Mr. Patrick Juneau promptly reported the allegations to Judge Barbier.

---

[47] *See* Supplement and Amendment to Undertaking of Christine Reitano in Furtherance of the Court's Order Appointing Claims Administrator (August 1, 2012); *see also* Lionel H. Sutton, III, Agreement In Furtherance of Court's Order Appointing Claims Administrator (November 1, 2012).

[48] DHECC Policy CA-003, Code of Conduct (effective October 15, 2012).

[49] Patrick Juneau Transcript at 35 (August 1, 2013).

[50] Despite various accounts stating that Mr. Sutton signed the CAO acknowledgment, copies of the signed acknowledgment could not be found by the CAO, and thus were not provided to the Special Master.

20

## IV.  EVIDENCE OF AN AGREEMENT AMONG CAO ATTORNEY SUTTON AND DHECC CLAIMANT ATTORNEYS JONATHAN ANDRY AND GLEN LERNER

### A.  Background of Relationships

The Special Master has found evidence of an agreement among Mr. Sutton, Mr. Jon Andry, and Mr. Lerner to corrupt the DHECC process in order to enrich themselves. More specifically, Mr. Lerner and Mr. Jon Andry, who represented hundreds of claimants before the DHECC, utilized Mr. Sutton as their "insider" at the CAO to track and to expedite their pending claims. Mr. Jon Andry further worked in concert with Mr. Sutton to expedite a payment award of $7,648,722 by the DHECC for The Andry Law Firm claim.

The evidence reflects that Mr. Lerner and Mr. Sutton intended to exercise improper personal influence within the CAO in order to advance their mutual benefit. For example, on March 16, 2012, Mr. Sutton emailed Mr. Lerner to inform him about Ms. Reitano's entry into the CAO: "Just between you and me because they have not made the announcement yet. Christine [Reitano] has been hired by the special master to run his office for the BP settlement. She starts april [sic] 1 on the transition from Fienbergs [sic] office."[51] In reply, Mr. Lerner asked about capitalizing on her new position, "How can we use that to our benefit [?]"[52] Mr. Sutton replied that he was not sure, to which Mr. Lerner asked: "Is there a conflict with my cases (Andry Lerner) going in front of her with our business relationship? Will she get my FLorida [sic] cases too?" Mr. Sutton responded, "No conflict. She will be working for the special master."[53]

In an email to Mr. Sutton dated January 29, 2013, Mr. Lerner answered his own question as to how best to use Ms. Reitano's access. Mr. Lerner wrote to Mr. Sutton not only about Ms. Reitano helping to move Mr. Lerner's claims to the front of the line, but also about how getting claims paid would benefit Mr. Sutton himself: "Can you ask Chris what I need to do to get my BP claims in some sort of priority. We have over a thousand claims and hundreds on file and yet only trickling in a check or two per week. I need my claims expedited. More money coming in means I start getting my sea legs and can keep us going in other areas."[54] Emphasizing this point, Mr. Lerner wrote to Mr. Sutton on February 15, 2013: "I'd be on easy street if Mr. Andry could settle some BP claims!"[55] At this time Mr. Sutton was receiving a $10,000 per month Crown salary from Mr. Lerner, and over $40,000 in Thonn referral fee payments from Mr. Lerner and Mr. Jon Andry.[56]

Mr. Lerner, Mr. Jon Andry, and Mr. Sutton attended Tulane Law School together more than 20 years ago.[57] Ms. Reitano and Mr. Jon Andry's brother, Mr. Gibby Andry, also attended Tulane

---

[51]  Email from Lionel Sutton to Glen Lerner, Subject: Re: private (March 16, 2012 at 12:36 PM).
[52]  Email from Lionel Sutton to Glen Lerner, Subject: Re: private (March 16, 2012 at 1:20 PM).
[53]  Email from Glen Lerner to Lionel Sutton, Subject: Re: private (March 16, 2012 at 5:51 PM).
[54]  Email from Glen Lerner to Lionel Sutton (January 29, 2013 at 7:38 AM).
[55]  Email from Glen Lerner to Lionel Sutton, Subject: Re: Settlement Agreements (February 15, 2013 at 10:06 AM).
[56]  Interview of Jeff Cahill (July 30, 2013).
[57]  Glen Lerner Transcript at 6-9 (July 31, 2013).

Law School at the same time.[58] Over the years, Mr. Jon Andry and Mr. Sutton worked together on legal cases, and at times shared office space.[59] The two men, however, claimed to have had a "falling out" in late 2009 over legal fees in a class action suit.[60] After the alleged dispute, Mr. Lerner supposedly made an effort to bring Mr. Sutton and Mr. Jon Andry together over lunch, which Mr. Jon Andry described as "very" awkward.[61] Mr. Jon Andry claimed that he later spoke to Mr. Sutton by phone regarding an alleged "very personal" situation,[62] and the lines of communications seemed to open.

Mr. Sutton and Mr. Jon Andry both stated to the Special Master that they later only spoke on the phone one or two times after this lunch. However, their statements are substantially contradicted by subpoenaed telephone records that reflect multiple calls between them during the relevant period of this investigation.

### 1. *Andrys' Firms, Lerner's Firms and the AndryLerner Firm*

Mr. Lerner operates several personal injury law firms including Glen Lerner Associates in Las Vegas, Nevada. Mr. Jon Andry operates Andry Law Group. In addition, Mr. Lerner and Messrs. Andry are related to the following legal entities:

- Mr. Lerner operates personal injury law practices in Florida, Illinois, Nevada, Arizona and Minnesota including Glen Lerner Associates in Las Vegas, Nevada.[63]

- Mr. Lerner is a partner with Mr. Jon Andry in the New Orleans-based law firm, AndryLerner, which was established in February 2012.[64]

- Mr. Jon Andry also operates Andry Law Group, a separate firm located in New Orleans, formed on September 9, 2009, in which Mr. Jon Andry is the sole agent and practitioner.[65]

- Mr. Jon Andry also operates The Andry Law Firm, LLC. Mr. Jon Andry formed The Andry Law Firm on July 17, 2000, in partnership with his brother, Mr. Gibby Andry.[66]

AndryLerner's primary legal practice is representing claimants in the Deepwater Horizon Economic Claims Settlement Program. AndryLerner also claims experience in medical class action suits, product liability and personal injury claims, and environmental and mass torts

---

[58] Glen Lerner Transcript at 6-9 (July 31, 2013).
[59] Lionel Sutton Transcript at 13-15 (July 29, 2013).
[60] Jonathan Andry Transcript at 15-16 (July 30, 2013).
[61] *Id*. at 20.
[62] *Id*. at 21.
[63] Glen Lerner Transcript at 13-14 (July 31, 2013*); see also* http://www.glenlerner.com (Accessed on September 2, 2013).
[64] Glen Lerner Transcript at 14 (July 31, 2013); Jonathan Andry Transcript at 6 (July 30, 2013); "AndryLerner LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 28, 2013).
[65] *See* "Andry Law Group, L.L.C.," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 28, 2013).
[66] *See* "The Andry Law Firm, LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 28, 2013).

litigation.[67] Business registration filings from the Louisiana Secretary of State's office indicate AndryLerner is currently active and identify its managers as Messrs. Jon Andry and Mr. Lerner. AndryLerner's office is located at 610 Baronne Street, New Orleans, Louisiana.[68] Under the terms of the AndryLerner operating agreement, all fees generated as a result of clients referred to the firm by Mr. Lerner are divided equally between the two partners.[69] Fees generated from clients that predated the formation of the partnership (Mr. Jon Andry's previous clients) are subject to a 60/40 split, with Mr. Jon Andry retaining the larger portion of those fees.[70]

At the time of Mr. Sutton's employment with the DHECC, AndryLerner or Andry Law Group had a total of 675 claims before the DHECC in which a registration form had been completed identifying one of them as the attorney of record.[71]

Mr. Jon Andry stated to the Special Master that the principal lawyer handling the Thonn claims for AndryLerner was a non-equity staff attorney, Christina Mancuso. She performed work and was paid by both Andry Law Group and AndryLerner.[72] Mr. Jon Andry stated that Ms. Mancuso originally worked for Andry Law Group but began doing work for both firms once AndryLerner was formed. Mr. Jon Andry stated that while Ms. Mancuso has received payment from both firms, her principal work has been for AndryLerner, since that is the entity handling the BP claims.[73]

### 2. *Lionel Sutton and Glen Lerner are Business Partners in Crown*

On April 16, 2010, Mr. Sutton and Mr. Lerner, and two others formed Crown, a privately-held company offering water reclamation solutions for industrial wastewater in the mining, oil and gas industries.[74] Approximately one month later, Mr. Lerner agreed to invest $760,000 in exchange for a 25% equity stake in Crown, thereby reducing the stakes of the original three partners to 25% each.[75] As of August 15, 2013, Louisiana Secretary of State business registration files identified Mr. Sutton as the sole Registered Agent and Manager of Crown, while Mr. Lerner and the two others were listed as Members.[76] The Crown website lists Mr. Lerner as Chairman, a third person as Chief Executive Officer, and one of the two Members as Vice President of Business Development and Marketing.[77]

---

[67]    AndryLerner website, http://andrylerner.com/AndryLerner/about-us.htm (Accessed on August 28, 2013).
[68]    "Andry Lerner, L.L.C.," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 28, 2013).
[69]    Glen Lerner Transcript at 15 (July 31, 2013).
[70]    *Id.* at 15.
[71]    Welker Investigative Report at 2 (June 20, 2013).
[72]    Jonathan Andry Transcript at 8-10 (July 30, 2013).
[73]    *Id.* at 9-10.
[74]    "Crown LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 15, 2013).
[75]    Glen Lerner Transcript at 46-49 (July 31, 2013).
[76]    "Crown LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 15, 2013).
[77]    *See* http://www.crowncleanwater.com (Accessed on August 28, 2013).

In June 2012, Mr. Lerner requested that the original equity distribution of 25% per partner be renegotiated based on the fact that he had invested a little over $1 million in Crown, more cash than he had originally agreed.[78] Lerner had initially agreed to invest the money needed to fund and acquire the initial equipment prototype but delays, cost overruns and unanticipated expenses resulted in his initial investment increasing by over 40%. In response to Mr. Lerner's request, Mr. Sutton and the two Members came to an agreement with Mr. Lerner, whereby each consented to sell 8% of their ownership stakes in Crown to Mr. Lerner, in return for 12 monthly payments between June 2012 and May 2013.[79] Mr. Sutton confirmed this agreement to the Special Master, but stated that while he did receive the full sum of $120,000, it was not paid as agreed on a monthly basis.[80] In their interviews, both Mr. Sutton and Mr. Lerner confirmed their financial interests in Crown, stating that the Crown operating agreement had not been updated to reflect the new equity distribution structure by May 2013.[81]

## B. Lionel Sutton's Lack of Disclosures Regarding His Interest in Crown and Partnership with Glen Lerner

Mr. Sutton made an oral disclosure of his involvement with Crown to the Claims Administrator, as confirmed by Mr. Patrick Juneau.[82] Mr. Sutton told the Special Master that Mr. Patrick Juneau was well aware of his relationship with Crown and, referring to other CAO staff members, he stated, "Everybody knew about it."[83] Mr. Sutton also noted that Crown signs were on the door and the elevator of the 935 Gravier Street office, which was on the same floor as the Claims Administration Office.[84]

Although Mr. Sutton stated that everyone at the DHECC knew about his venture with Crown, he never sought written approval for his outside employment or conflict with Crown.[85] Such approval was required by Mr. Sutton's signed employment agreement.[86] Mr. Sutton also admitted that, although most people were well aware of his financial interest in Crown, he never disclosed to Mr. Patrick Juneau or to any other staff members that Mr. Lerner, whose law firm had claims pending before the DHECC, was a Crown partner.[87] In his interview with the Special Master, Mr. Sutton stated that he did not disclose his relationship with Mr. Lerner to the CAO because he did not believe there to be any conflict of interest.[88] There is also no record of any disclosure by Mr. Sutton as to the conflict which his Crown employment created.[89] Mr. Sutton's signed

---

[78]   Glen Lerner Transcript at 46-49 (July 31, 2013).
[79]   *Id.* at 49-50. For each of the 12 months, Mr. Sutton was to receive $10,000 per month. The two Members originally received lower sums, but were raised to $10,000 per month also.
[80]   Lionel Sutton Transcript at 40 (July 29, 2013).
[81]   *Id.* at 119-20; Glen Lerner Transcript at 121 (July 31, 2013).
[82]   Patrick Juneau Transcript at 47-48 (August 1, 2013).
[83]   Lionel Sutton Transcript at 35 (July 29, 2013).
[84]   *Id.* at 35.
[85]   *Id.* at 35-36.
[86]   Lionel H. Sutton, III, Agreement In Furtherance of Court's Order Appointing Claims Administrator (November 1, 2012).
[87]   Lionel Sutton Transcript at 37-38 (July 29, 2013).
[88]   *Id.* at 54-55.
[89]   Lionel Sutton's personnel file contained no record of any ethics opinion or disclosure related to his relationship and dealings with Mr. Lerner.

employment agreement also required written approval from the CAO to engage in such outside employment.

Mr. Sutton denied that there was any connection between the settlement of AndryLerner claims and the cash flow of Crown.[90] However, in a prior interview by Mr. Patrick Juneau, Mr. Michael Juneau, and Mr. Welker on June 20, 2013, Mr. Sutton stated that it was his financial interest in Crown, which explained his active interest and database searches in AndryLerner claims.[91] In this June 20, 2013 statement, and in his interview by the Special Master, Mr. Sutton stated that he checked on the Thonn and AndryLerner claims to determine when Mr. Lerner could pay his Crown salary.[92] Email correspondence corroborates this direct connection between Mr. Lerner and Mr. Jon Andry receiving attorney fees from DHECC claim payments, and Mr. Sutton then being paid his Crown salary from Mr. Lerner and Thonn referral fee payments from Mr. Jon Andry and Mr. Lerner.[93]

### C. Referral of Casey Thonn to AndryLerner

> *1. Evidence of Material False Statements and Omissions by Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry Regarding the Thonn Referral Fee Payments.*

The Special Master received several conflicting accounts of how AndryLerner came to represent Mr. Thonn in his DHECC claims and how Mr. Sutton came to receive referral fee payments when those claims were paid. Ms. Reitano stated that she only told Mr. Thonn to call Mr. Jon Andry with no expectation of a referral fee for her or Mr. Sutton. However, an attorney at AndryLerner, Ms. Mancuso, remembered communications with Ms. Reitano about the referral and the fee. Mr. Thonn in turn stated that Ms. Reitano referred him to another firm before his claims arrived at AndryLerner through a recommendation from Mr. Sutton. Mr. Lerner stated that he and Mr. Sutton agreed that Mr. Sutton would receive the Thonn referral fee payment after the case was sent to AndryLerner.

The Special Master did not find any evidence that either Mr. Sutton or Ms. Reitano directly manipulated the valuation of claims by accessing the DHECC database. The Special Master also did not find any evidence of such manipulation by other CAO officials. However, a comprehensive examination of this issue was not part of the Special Master's mandate.

### a. Statements by Christine Reitano

Ms. Reitano, while an attorney with Sutton & Reitano, represented Mr. Thonn in a claim before the GCCF.[94] Ms. Reitano told investigators that she had signed up Mr. Thonn and that Mr. Sutton had not worked on the Thonn GCCF claim.[95] On March 30, 2012, Ms. Reitano, on behalf of

---

[90]   Lionel Sutton Transcript at 64 (July 29, 2013).
[91]   Welker Summary of Sutton Interview (June 20, 2013).
[92]   *Id.*; Lionel Sutton Transcript at 43 (July 29, 2013).
[93]   Email from Lionel Sutton to Glen Lerner, Subject: Re logo (May 9, 2013 at 3:07 PM).
[94]   GCCF Client Authorization Form for Casey Thonn (October 11, 2011).
[95]   Christine Reitano Transcript at 72 (July 29, 2013).

Sutton & Reitano, terminated the firm's representation of Mr. Thonn in his GCCF claims as she was about to begin working at the CAO; and, Ms. Reitano stated under oath that she had no expectation to receive funds in connection with this claim after March 30, 2012.[96]

According to Ms. Reitano, she referred Mr. Thonn to Mr. Jon Andry by simply giving him Mr. Jon Andry's name and did not involve her husband, "I told Thonn to go see John [sic] Andry, period. End of it. I had no discussion with my husband. I had no discussion with John [sic] Andry.... I told Casey Thonn, 'Go see John [sic] Andry.'"[97] She denied any expectation or belief that her husband would get some derivative financial interest when Mr. Thonn's claims were eventually paid.[98]

**b.  Statements by Christina Mancuso**

Contradicting Ms. Reitano's assertions, Ms. Mancuso, the AndryLerner attorney handling the Thonn claim, told investigators that not only did Ms. Reitano contact her about the Thonn claim, but that Ms. Reitano also requested a referral fee. Ms. Mancuso recalled a phone conversation with Ms. Reitano in which Ms. Reitano informed Ms. Mancuso that she was sending the Thonn claim to her.[99] On April 3, 2012, Ms. Mancuso sent an email to Mr. Thonn that she had left a message for Ms. Reitano asking for all his claim information. In her interview, Ms. Mancuso said that she had to contact Ms. Reitano two or three times to coordinate Ms. Reitano handing over the disc with all of the Thonn documents for the GCCF claim.[100] Ms. Mancuso informed Mr. Thonn that when she received the disc with the information, she would provide Mr. Thonn a copy.

Ms. Mancuso also stated that Ms. Reitano asked that AndryLerner honor the percentage referral fee that was contained in the Thonn disc.[101]

Ms. Mancuso's statement is confirmed by a May 8, 2012 letter from Ms. Mancuso to Ms. Reitano, with a copy to Mr. Jon Andry and with an attached and unexecuted "Attorney Referral Agreement."[102]  The Attorney Referral Agreement was between Mr. Jon Andry and Ms. Reitano, proposing for Ms. Reitano to "refer to [Mr. Jon Andry], potential claimants in the BP Litigation for all claims they may have as a result of the Oil Spill that occurred from The Deepwater Horizon Oil Rig on April 20, 2010."  Exhibit A to the document included the Casey Thonn claim as a claim "subject to this Agreement."  The Attorney Referral Agreement provided that any attorney's fees recovered would be divided, and "fifty percent (50%) of the fee shall be disbursed to [Ms. Reitano] and fifty percent (50%) of the fee shall be disbursed to [Mr. Andry]."  Both

---

[96]  Letter from Christine Reitano to GCCF terminating representation of Casey Thonn (March 30, 2012); Christine Reitano Transcript at 148-49 (July 29, 2013).
[97]  Christine Reitano Transcript at 104 (July 29, 2013).
[98]  *Id.* at 105.
[99]  Interview of Christina Mancuso (August 7, 2013).
[100]  *Id.*
[101]  *Id.*
[102]  Letter from Christina Mancuso to Christine Reitano (May 8, 2012).

lawyers agreed to adhere strictly to the applicable ethical standards and Rules of Professional Conduct under which they practice.

Ms. Mancuso did not know if the referral fee agreement was ever signed and returned by Ms. Reitano because keeping track of the signed referral agreements would not have been part of her role at AndryLerner.[103]

On July 30, 2013, the Special Master served Mr. Jon Andry with subpoenas calling for production of "[a]ny and all communications from January 2012 to present with: (a) Lionel H. Sutton, III; and (b) Christine Reitano."  Mr. Jon Andry produced documents pursuant to this subpoena, and alleged in court filings that he had fully cooperated with the Special Master's investigations.  Yet Mr. Jon Andry did not produce the Attorney Referral Agreement until September 3, 2013, and he produced the document only after being asked for this specific record by the Special Master's staff.

### c.   Statements by Casey Thonn

Mr. Thonn recalled that Ms. Reitano originally referred him to SmithStag Attorneys at Law to work on his GCCF claims.[104] Mr. Thonn executed a contingency agreement with SmithStag on March 18, 2011, with Ms. Reitano and Tracy Steilberg signing as witnesses.[105]

Mr. Thonn stated that he became dissatisfied with the level of communications by SmithStag and later sought another attorney recommendation from Mr. Sutton.[106] Mr. Sutton and Mr. Thonn continued to communicate and his DHECC claim was referred to AndryLerner. Sutton & Reitano still continued to represent Mr. Thonn in an automobile accident claim against Geico Insurance that was settled in February 2013.[107] Mr. Thonn explained that Mr. Sutton recommended the AndryLerner Law Group but that Mr. Sutton did not refer him to any specific attorney.[108] By June 21, 2012, Mr. Thonn's claims had been registered with the DHECC and Mr. Jon Andry was listed as his attorney.[109] Mr. Thonn primarily worked with Ms. Mancuso and Kaylee LaBoeuf at AndryLerner. Mr. Thonn did not recall ever meeting or speaking with attorney Mr. Jon Andry in the disposition of his five claims before the DHECC.[110]

---

[103]   Interview of Christina Mancuso (August 7, 2013).
[104]   Interview of Casey Thonn (July 31, 2013).
[105]   Contingency Fee Agreement and Authority to Represent for Casey Thonn (March 18, 2011). At the time, Ms. Steilberg was employed at Sutton & Reitano.
[106]   Interview of Casey Thonn (July 31, 2013).
[107]   Sutton and Reitano represented Casey Thonn in a damages suit he brought against Geico and Michael Heuer in 2012. That case, St. Tammany Parish, 2012-11378, was dismissed and settled on February 8, 2013 according to the St. Tammany Parish court clerk.
[108]   Interview of Casey Thonn (July 31, 2013).
[109]   DHECC Settlement Registration Form for Casey Thonn (June 21, 2012).
[110]   Interview of Casey Thonn (July 31, 2013).

### d. Statements by Glen Lerner

Mr. Lerner recalled about a "15-30" second conversation in Mr. Sutton's automobile in which the two men discussed the referral of the Thonn claim.[111] Mr. Lerner stated that during this automobile conversation, Mr. Sutton used words to the effect of "Hey, now that I'm going to go work for the claims administration office, I have one case to refer. And I want to refer the case to you guys."[112] According to Mr. Lerner, when he told Mr. Sutton to send the case over to the AndryLerner office, Mr. Sutton said that he did not feel comfortable sending it there because he felt that Mr. Jon Andry had "screwed him on the Bell South fee," a prior class action that Mr. Sutton and Mr. Jon Andry had worked on together.[113] Mr. Lerner stated that the claim was referred to the AndryLerner office as a Lerner-generated case.[114] Under the operating agreement between Mr. Lerner and Mr. Jon Andry, Lerner would get 50% of the fee if it were a case generated by Mr. Lerner versus 40% if Mr. Jon Andry generated it.[115]

### e. Statements by Leslie Butler Tate

Ms. Leslie Butler Tate, a former employee at AndryLerner who handled the intake of cases and tracked referral agreements, affirmed that Mr. Jon Andry told her that the Thonn case would be coming into their firm.[116] She also remembered being troubled because the Thonn claim was the one claim that did not have a referral agreement.[117] In describing the typical referral fee arrangement at AndryLerner, Ms. Tate stated that the majority of the agreements would provide for 40% of the fee going to the referring attorney but added that, in most cases, the referring attorney maintained attorney relations and performed work on the claim. However, regarding the Thonn claims, she could not recall Mr. Sutton performing any work. She also referenced an instance when Mr. Jon Andry said that Mr. Sutton wanted a referral for the Thonn claim; she inferred from Mr. Jon Andry's tone that he "couldn't believe" that Mr. Sutton had asked for a referral fee.[118]

### 2. *Absence of a Written Referral Fee Agreement*

Mr. Lerner, Mr. Jon Andry and Mr. Sutton all conceded that there was no written Thonn referral agreement signed between Mr. Sutton and AndryLerner. Ms. Tate did not recall having a referral agreement on file for the Thonn case.[119] In addition, Mr. Thonn stated that he was not informed

---

[111]  Glen Lerner Transcript at 29-33 (July 31, 2013).
[112]  *Id.* at 29-30. The Thonn case was registered in the DHECC claims database with Mr. Jon Andry as the attorney of record on June 21, 2012, well before Mr. Sutton started to work at the DHECC in November 2012.
[113]  *Id.* at 30.
[114]  *Id.* at 31.
[115]  *Id.* at 15.
[116]  Interview of Leslie Tate (August 8, 2013).
[117]  *Id.*
[118]  *Id.*
[119]  *Id.*

of any split fee arrangement that AndryLerner had with Mr. Sutton on attorney fees in his case.[120] Mr. Thonn did not sign any such referral agreement with respect to his case.

### D. Referral Fee Payments for Thonn's Claims to Lionel Sutton

In 2012-2013, the DHECC made payments to the AndryLerner Law Firm in satisfaction of Mr. Thonn's claims. Mr. Sutton began to receive the agreed referral fee payments through a circuitous route, which originated with AndryLerner and were transferred to Mr. Lerner's Las Vegas, Nevada law firm, and then to a Crown bank account back in New Orleans, which Mr. Sutton controlled. Mr. Jon Andry's statements to the Special Master about his knowledge of these fees paid to Mr. Sutton, and when he knew it, are contradicted by his own contemporaneous email correspondence and phone and text messaging records. Neither Mr. Jon Andry nor Mr. Lerner ever disclosed these payments to the CAO, and Mr. Lerner told the Special Master that he relied on Mr. Sutton's alleged statement that the CAO was aware of the payments. Mr. Sutton falsely denied to the CAO that he had ever received any referral fee payments, or had any financial interest before the DHECC. Mr. Sutton continued such denials to the CAO on at least three separate occasions. Mr. Sutton finally admitted for the first time to the Special Master that he had received such payments.

#### 1. Statements by Jon Andry Regarding the Referral Fee Payments to Lionel Sutton

Mr. Jon Andry told investigators that, in April 2013, he and Mr. Lerner came to an agreement that Mr. Sutton would not receive referral fee payments for the Thonn claims.[121] Mr. Jon Andry stated that, up until that time, he and Mr. Lerner had multiple discussions about the fees and that he expressed his reservations about paying Mr. Sutton the referral fee, culminating in the alleged April 2013 agreement not to pay Mr. Sutton on the Thonn claim.[122] Mr. Jon Andry stated that he expressed his concerns to Mr. Lerner that it would not be appropriate to pay the fee since Mr. Sutton worked at the Claims Administration Office.[123] Mr. Jon Andry stated that he "learned subsequently a fee was paid by Glen. Andry Lerner did not issue any checks to in [sic] Sutton at all."[124] Mr. Jon Andry stated that he never had any conversations with Mr. Sutton about the Thonn matter.[125] Mr. Jon Andry stated to the Special Master that he learned a fee was paid "recently" when his "name was in the paper."[126] He explained:

> I have learned subsequent to all -- when all of this broke, I talked with Glen about it and I learned that Glen had a relationship with Tiger and that Tiger asked Glen for the fee, and that Glen said, okay, I'll pay you

---

[120] Interview of Casey Thonn (July 31, 2013).
[121] Jonathan Andry Transcript at 32-33 (July 30, 2013).
[122] *Id.* at 31-33.
[123] *Id.* at 48.
[124] *Id.* at 33.
[125] *Id.* at 31.
[126] *Id.* at 33.

the fee. And that they put the money into -- it was a wire transfer into
the Crown account because that's what Tiger asked for.[127]

In describing the first payment received for Mr. Thonn's claims, Mr. Jon Andry stressed again
that he had only after-the-fact knowledge about these fees: "10 percent for him, and that would
have gone to -- I think we received the money in -- and, again, all of this, I'm telling you, it's all
after acquired knowledge because I want you to have the knowledge of the actual stuff. At the
time, I had no idea any of this was going on."[128]

Mr. Jon Andry said he was not a party to the payment, that he objected to the payment, and that
he was surprised, angry and upset to hear about the payment.[129] Mr. Jon Andry explained to
investigators that he did not think that paying a referral fee to Mr. Sutton or Ms. Reitano was
"appropriate, given the fact it was represented to me that [Reitano] had to divest herself of her
cases in order to go work there."[130]

Mr. Jon Andry also made statements to the Special Master that he had no conversations with Mr.
Sutton about sending Mr. Lerner's share of the Thonn claim to Mr. Sutton.[131] When asked if Mr.
Sutton seemed to know when the payments were made from the DHECC, Mr. Jon Andry stated:

> I never had any conversations. I don't know if he knew -- I mean,
> whether he new [sic] when payments -- I don't know. But I never had
> any conversations like the ones you're describing.[132]

Mr. Lerner stated to the Special Master that Mr. Jon Andry expressed reservation about paying
Mr. Sutton the fee, but denied any agreement with Mr. Jon Andry not to pay the fees to Mr.
Sutton. Mr. Lerner characterized Mr. Jon Andry's position on the fee as Mr. Jon Andry acting
like "Pontius Pilate," and "washing [his] hands of it."[133] Mr. Lerner stated that Mr. Jon Andry
told him, "You pay it if you want. I want no involvement in it."[134]

The evidence contradicts Mr. Jon Andry's denial that he had only recently learned about the
Thonn referral fee payments to Mr. Sutton. Mr. Jon Andry cites an "April 2013 agreement" not
to pay Mr. Sutton a referral fee. However, Mr. Sutton had already been paid two of his three
referral fee payments by that time. Mr. Jon Andry's statements that he knew nothing about how
Mr. Sutton was receiving a referral fee for the Thonn claim also are refuted by the record of
communications among the relevant persons as the payments were made.

E-mails between Mr. Sutton and Mr. Lerner referred to the Thonn referral fee payments as
money Mr. Andry owed to Mr. Sutton. For example, on November 7, 2012, Mr. Sutton emailed

---

[127] *Id.* at 33.
[128] *Id.* at 41.
[129] *Id.* at 35.
[130] *Id.* at 49.
[131] *Id.* at 67.
[132] *Id.* at 67.
[133] Glen Lerner Transcript at 58 (July 31, 2013).
[134] *Id.* at 86.

Mr. Lerner, looking for the status of payments due from Crown "and what Jon owes me."[135] Mr. Lerner told Mr. Sutton, "I can't pay what John owes you until I get it!"[136] Mr. Sutton advised Mr. Lerner that he "talked to susie 2 weeks ago, jon has had the money for a month."[137] Mr. Lerner told Mr. Sutton, "John has not paid me a cent yet! … The second I get my money I'll cut you a check."[138]

Moreover, Mr. Jon Andry and Mr. Lerner had an extended discussion concerning payment of the Thonn referral to Mr. Sutton. Specifically, on December 14, 2012, the AndryLerner firm issued a check to Glen Lerner Associates for $4,940.00 for "Casey Thonn VoO Charter Payment." That afternoon, Mr. Jon Andry wrote to Mr. Lerner and asked: "did you talk with Tiger about Thonn?"[139] Shortly after this message, Mr. Jon Andry further wrote:

> I spoke with Susan and told her that we needed to figure out what to do and how to do.. [sic] she determined that it would be better to wait until the total thon was done as the initial amount was relatively low. Tiger sent me a text this am and i tried to call him but he didn't answer . . . I will try to call him again. We need to talk about this . . .[140]

Later that afternoon, Mr. Jon Andry instructed Mr. Lerner that payments to Mr. Sutton for a referral fee should be paid from Mr. Lerner's disbursement. Mr. Lerner explained to Mr. Andry, "We were going to pay Thon but only once I'm paid,. [sic] Not paying out of my pocket."[141] Mr. Jon Andry, at 3:51 p.m. on December 14, 2012, explained to Mr. Lerner that he should send Mr. Sutton the money from payments Mr. Lerner had received from Mr. Jon Andry: "you just got paid a disbursement [sic] … pay it out of that."[142]

Following Mr. Jon Andry's suggestion, Mr. Lerner paid Sutton a referral fee from the Thonn claim disbursement. Specifically, on January 7, 2013, Mr. Sutton asked Mr. Lerner by email if he had checked on Mr. Sutton's fee from the Thonn case.[143] Mr. Lerner asked one of his accountants if "we received monies from Andry," and "If so, Tiger, how much is your fee?"[144] Mr. Sutton explained, "They sent you the check for my fee. the total fee on Thonn was 10k (+ or -). They sent you 5 for me and kept the other 5. Check with Susie she has the accounting."[145] Moments later, Mr. Lerner wrote to Susan DeSantis, also one of his assistants, advising her to "[m]ake sure

---

[135] Email from Lionel Sutton to Glen Lerner, Subject: (November 7, 2012 at 8:56 AM).
[136] Email from Glen Lerner to Lionel Sutton, Subject: (November 7, 2012 at 8:57 AM).
[137] Email from Lionel Sutton to Glen Lerner, Subject: (November 7, 2012 at 10:39 AM).
[138] Email from Glen Lerner to Lionel Sutton, Subject: (November 7, 2012 at 10:13 AM).
[139] Email from Jonathan Andry to Glen Lerner, Subject: Re: GQ (December 14, 2012 at 1:23 PM).
[140] Email from Jonathan Andry to Glen Lerner, Subject: Re: GQ (December 14, 2012 at 2:44 PM).
[141] Email from Jonathan Andry to Glen Lerner, Subject: Re: GQ (December 14, 2012 at 4:27 PM).
[142] Email from Jonathan Andry to Glen Lerner, Subject: Re: GQ (December 14, 2012 at 3:51 PM).
[143] Email from Lionel Sutton to Glen Lerner, Subject: Re: (January 7, 2013 at 9:08 AM).
[144] Email from Glen Lerner to Lionel Sutton and Jeff Cahill, Subject: Re: (January 7, 2013 at 9:12 AM).
[145] Email from Lionel Sutton to Glen Lerner, Subject: Re: (January 7, 2013 at 9:25 AM).

out of the $5k John kept I get half since I'm sending full $5k to Tiger."[146] The next day, Mr. Lerner's firm made a $4,940 wire transfer for Mr. Sutton's benefit.

The issue of payments to Mr. Sutton arose again in the days after March 11, 2013, when Andry Lerner sent a $16,665.21 check for the Thonn referral fee payment to Mr. Lerner. On March 15, 2013 starting at 9:45 a.m., Mr. Sutton and Mr. Jon Andry exchanged a series of 12 text messages, with Mr. Sutton pausing at 10:16 a.m. to email Mr. Jeff Cahill, Chief Financial Officer ("CFO") of Glen Lerner Associates, asking him to "let me know about the Thonn money."[147] Four minutes later, Mr. Sutton began a new set of 11 text messages with Mr. Jon Andry, pausing at 10:41 a.m. to review The Andry Law Firm file in the DHECC database and the Thonn file at 10:48 a.m.[148] Mr. Jon Andry sent Mr. Sutton two more text messages, followed minutes later with Mr. Sutton reviewing Mr. Jon Andry's Talen's Marine claim in the DHECC database at 11:02 a.m.[149]

After this extended interchange between Mr. Sutton and Mr. Jon Andry and the review by Mr. Sutton of the DHECC Thonn and The Andry Law Firm files of great interest to Mr. Jon Andry, Mr. Sutton wrote Mr. Lerner at 11:26 a.m., reporting that, "Jon told me that he just disbursed so you won't get it for a few days."[150] Mr. Lerner replied, "Ok. What do I owe you? What did he send me for you?"[151] Starting 11 minutes after this message, Mr. Sutton and Mr. Jon Andry began another exchange of eight text messages over thirty minutes.[152] Mr. Sutton again reviewed the Thonn file on the DHECC system, then sent an email to Mr. Lerner reading, "16,665."[153]

Later in March 2013, Mr. John Andry again received messages concerning payment of the Thonn fee. On March 20, 2013, Ms. DeSantis advised Mr. Lerner that he was being sent several checks from AndryLerner, including one for $16,665.21 for "50% Casey Thonn referral fee." Mr. Lerner wrote to Mr. Jon Andry, Ms. DeSantis and Mr. Cahill, explaining that he was "confused" on Thonn and asking, "I am supposed to give referral attorney 50%, correct? That was our deal with him. If fee was $33k and you send me $16k for my end and I'm supposed to send him the full $16k then I got no fee. Same as the last referral."[154] Moments later, Ms. DeSantis explained to Mr. Jon Andry and Mr. Lerner that, "Your 40% will be in a draw not

---

[146] Email from Glen Lerner to Lionel Sutton; Susan DeSantis; Jeff Cahill, Subject: Re: (January 7, 2013 at 10:49 AM); Email from Lionel Sutton to Glen Lerner, Subject: Disbursement (March 15, 2013 at 10:16 AM).
[147] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[148] Id.; BrownGreer User Access to Claims Report (July 9, 2013).
[149] Id.
[150] Email from Lionel Sutton to Glen Lerner, Subject: Re: crown (March 15, 2013 at 11:26 AM).
[151] Email from Lionel Sutton to Glen Lerner, Subject: Re: crown (March 15, 2013 at 12:25 PM).
[152] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[153] Email from Lionel Sutton to Glen Lerner, Subject: Re: crown (March 15, 2013 at 1:53 PM).
[154] Email from Glen Lerner to Susan DeSantis; Jonathan Andry; Jeff Cahill, Subject: Re: Checks from Andry (March 20, 2013 at 3:25 PM).

referral."[155] Mr. Jon Andry did not respond to this email or raise any issue with the statements from Mr. Lerner or Ms. DeSantis.[156]

The Special Master asked Mr. Lerner's counsel to review Mr. Lerner's email archive for any response by Mr. Jon Andry to Mr. Lerner's March 20, 2013 email. Mr. Lerner's counsel replied that Mr. Lerner had not "not located a response from Jonathan Andry" to the March 20, 2013 email.[157] Counsel further stated that Mr. Lerner had not located any other emails from Mr. Jon Andry within ten days following the March 20, 2013 email.[158] On July 30, 2013, the Special Master further served Mr. Jon Andry with a subpoena calling for production of "[a]ll communications between Jonathan Andry and Mr. Lerner concerning any payment to Lionel H. Sutton, III."[159] Mr. Andry produced no emails reflecting any communication after March 20, 2013.

The available evidence reveals no hint of disagreement by Mr. Jon Andry to paying Mr. Sutton the Thonn referral fee. In fact, Mr. Jon Andry had little incentive to raise this issue in April 2013, given the extensive evidence of communications Mr. Jon Andry and Mr. Gibby Andry had with Mr. Sutton in March 2013 about The Andry Law Firm claim, as well as other claims of interest to Mr. Jon Andry. Indeed, Mr. Jon Andry continued communicating with Mr. Sutton about DHECC claims of interest in April and May 2013, strongly suggesting that there had been no rift in the relationship as would be expected if Mr. Jon Andry had objected to paying Mr. Sutton the remainder of the Thonn fee.

Mr. Jon Andry's prior statement to the CAO also contradicts his sworn testimony to the Special Master, and provides no hint of any alleged "disagreement" over paying Mr. Sutton the Thonn fee. On June 17, 2013, Mr. Michael Juneau spoke with Mr. Jon Andry, and asked him about any interest that Mr. Sutton had in any of Mr. Jon Andry's claims.[160] Mr. Michael Juneau's notes reflect that Mr. Andry stated that Mr. Thonn had a claim pending with Mr. Jon Andry, but "Tiger/Christine have no interest in anything. Absolutely clear about that."[161] Mr. Michael Juneau's notes further reflect that Mr. Jon Andry said: "Given dynamic - made a real point to avoid any issue that would compromise him in any way."[162] Mr. Michael Juneau's notes of this discussion stated that Mr. Andry "made very clear that Tiger Sutton had no financial interest of any kind in any claim of Casey Thonn."[163] Mr. Michael Juneau's notes also stated that Mr. Jon Andry confirmed that Mr. Sutton had "no financial interest (no shared fee, no referral fee,

---

[155] Email from Susan DeSantis to Glen Lerner; Jonathan Andry; Jeff Cahill, Subject: Re: Checks from Andry (March 20, 2013 at 5:35 PM).

[156] When Mr. Lerner expressed confusion about the accounting for the Thonn referral fee payment to Mr. Sutton, they acknowledged that Susan DeSantis had the accounting on this. In her March 20 email to Mr. Lerner, she told him that he was entitled to 40%. This accounting indicates that Thonn was a Mr. Jon Andry-generated case within AndryLerner.

[157] Letter of August 23, 2013 from Pauline F. Hardin to Special Master staff.

[158] *Id.*

[159] Special Master Subpoena to AndryLerner, LLC (July 30, 2013).

[160] Handwritten notes of Michael Juneau (June 17, 2013).

[161] *Id.*

[162] *Id.*

[163] Memorandum from Michael Juneau to Patrick Juneau Re: Lionel Sutton III matter (June 20, 2013).

nothing) in any claim that John Andry was handling."[164] Mr. Jon Andry's statements to Mr. Michael Juneau on June 17, 2013 omitted Mr. Jon Andry's knowledge and role in the Thonn referral fee payment to Mr. Sutton by AndryLerner.

>    2.   *Movement of Funds from AndryLerner to Lionel Sutton*

As the Thonn disbursements came into AndryLerner from the DHECC, Mr. Sutton used his personal access to the claims database to track the payments. Mr. Sutton then communicated to employees at AndryLerner and Mr. Lerner's firm in order to facilitate Mr. Sutton's receipt of the referral fee payment. Ms. DeSantis worked for Mr. Lerner and spent much of her time in the AndryLerner office in New Orleans.[165] Her job was to improve business processes in the AndryLerner firm and to ensure that fees were paid in accordance with the operating agreement between Mr. Lerner and Mr. Jon Andry.[166] Although she did not disburse funds, she knew when AndryLerner received fees, and disbursed proceeds to clients and when AndryLerner would have sent Mr. Lerner his share of attorney fees.[167] Mr. Sutton, as a source of information, tracked the status of the Thonn payments and disbursement of those monies to Mr. Lerner. Similarly, Mr. Sutton also used Mr. Cahill, Glen Lerner Associates CFO in Las Vegas, Nevada, and the employee who had authority to authorize payments, to expedite Mr. Sutton's receipt of the Thonn referral fee payment.

The Thonn referral fee payments were all paid to Mr. Sutton in an old account at Regions Bank in New Orleans which had formerly belonged to Crown. Mr. Sutton maintained sole access to this account after a new Crown account at the Bank of America in Nevada had been opened. On January 7, 2013, Mr. Sutton asked Mr. Lerner and his staff to have Mr. Sutton's share of the Thonn referral fee payment "deposit[ed] in the crown acct so I can get it."[168] In March 21, 2013, Mr. Sutton again directed that the Thonn referral fee payment "can be deposited directly into the old Crown account."[169]

Pursuant to a subpoena, the Special Master has reviewed the records for the old Crown account, as provided by the financial institution where the account was maintained. In addition, records for other bank accounts associated with Mr. Sutton and Ms. Reitano were reviewed pursuant to subpoena. Based upon this review, the following chart reflects the circuitous manner by which Mr. Lerner and Mr. Jon Andry paid Mr. Sutton his Thonn referral fee:

---

[164]   *Id.*
[165]   Interview of Susan DeSantis (July 30, 2013).
[166]   *Id.*
[167]   *Id.*
[168]   Email from Lionel Sutton to Jeff Cahill; Glen Lerner, Subject: Re: (January 7, 2013 at 10:27 AM).
[169]   Email from Lionel Sutton to Jeff Cahill, Subject: Re: (March 21, 2013 at 7:57 AM).



a.    **Thonn Vessel of Opportunity Charter Payment Claim**

On October 10, 2012, the DHECC issued final payment on Mr. Thonn's Vessel of Opportunity Charter Payment claim ("VoO claim") in the amount of $49,400.00.[170] The summary note from the Claims Center explained that Mr. Thonn had provided proof of vessel length, ownership and VoO training and that the $49,400.00 claim could therefore be paid.[171] A week later, on October 17, 2012, the firm of AndryLerner received the $49,400.00 amount from the DHECC and, shortly thereafter, paid Mr. Thonn his share of the settlement, leaving $9,880 for attorney fees.

On October 26, 2012, six days before joining the CAO, Mr. Sutton sent an email to Ms. DeSantis at AndryLerner with the subject heading "casey Thonn."[172] In this email, Mr. Sutton informed Ms. DeSantis that he had learned from Mr. Thonn that the "VoO money" had been paid and asked her, "Can you check on my fee."[173]

---

[170]    DHECC Notice of Payment in Re: Casey Thonn (October 10, 2012).
[171]    *Id.*
[172]    Email from Lionel Sutton to Susan DeSantis, Subject: Re: casey Thonn (October 26, 2012 at 12:17 PM).
[173]    *Id.*

It was not until December 14, 2012, however, that AndryLerner finally forwarded Mr. Lerner's fifty-percent share of the $9,880 attorney fee to Glen Lerner Associates.[174] Around the time of this transfer, Mr. Sutton reviewed the Thonn claim in the DHECC database several times: December 17, 2012, December 18, 2012, and again on January 2, 2013 and January 7, 2013. Finally, on the morning of January 7, 2013, Mr. Sutton emailed Mr. Lerner to ask about the status of his referral fee payment and copied Mr. Lerner's CFO, Jeff Cahill.[175] Mr. Sutton asked Mr. Lerner if he had checked on his "fee from casey thonn" and stated that Ms. DeSantis had sent the money to Mr. Cahill in "mid december [sic]."[176]

Upon this request from Mr. Sutton, Mr. Lerner that morning set in motion a string of emails with Mr. Cahill and Mr. Sutton to determine what funds had been received from AndryLerner and what Mr. Sutton was owed. In his initial response email, Mr. Lerner asked Mr. Cahill whether Mr. Jon Andry had sent the Thonn money and asked Mr. Sutton what portion of that would be Mr. Sutton's fee.[177] In response, Mr. Cahill confirmed that the firm had received $4,940 from Mr. Jon Andry in December.[178]

Mr. Sutton, in turn, explained to Mr. Lerner and Mr. Cahill his understanding that, because the total fee for the Thonn claim was about $10,000, Mr. Jon Andry had kept $5,000 and had sent the other $5,000 to Mr. Lerner for ultimate transfer to Mr. Sutton.[179] Mr. Sutton also urged the two men to "Check with Susie [DeSantis]" since she had the "accounting" for the transaction.[180] Mr. Sutton next emailed that the $4,940 referenced by Mr. Cahill was Mr. Sutton's "share" of the $10,000 and requested that the money be deposited in "the crown acct" so he could access it.[181]

Mr. Lerner did not object to Mr. Sutton's requests or his explanation of the process or amount to be paid. He only instructed Mr. Cahill to "[m]ake sure out of the $5K John kept I get half since I'm sending full $5K to Tiger."[182] The next day, on January 8, 2013, Glen Lerner Associates wired $4,940 to the old Crown account controlled by Mr. Sutton.[183]

### b. Thonn Seafood Compensation Program – Vessel Owner Claim

The next Thonn claim to be paid by the DHECC was the Seafood Compensation Program for Shrimp Vessel Owner Claim ("Vessel Owner Claim"). After being paid his referral fee on the

---

[174] Check from AndryLerner LLC to Glen J. Lerner & Associates. Check No. 1319. Memo: "Casey Thonn VoO Charter Payment" (December 14, 2012).
[175] Email from Lionel Sutton to Glen Lerner, Subject: Re: (January 7, 2013 at 9:08 AM).
[176] *Id.*
[177] Email from Glen Lerner to Lionel Sutton; Jeff Cahill, Subject: Re: (January 7, 2013 at 9:12 AM).
[178] Email from Jeff Cahill to Lionel Sutton; Glen Lerner, Subject: Re: (January 7, 2013 at 8:23 AM).
[179] Email from Lionel Sutton to Glen Lerner, Subject: Re: (January 7, 2013 at 9:25 AM).
[180] *Id.*
[181] Email from Lionel Sutton to Glen Lerner; Jeff Cahill, Subject: Re: (January 7, 2013 at 10:27 AM).
[182] Email from Glen Lerner to Lionel Sutton; Susan DeSantis; Jeff Cahill, Subject: Re: (January 7, 2013 at 10:49 AM).
[183] Regions Bank, *Deposits and Credits*, Crown LLC Account (January 8, 2013).

VoO claim in January 2013, Mr. Sutton continued to closely monitor the processing of the Thonn Claim. Mr. Sutton viewed the claim several more times that month.[184]

On January 16, 2013 at 10:15 a.m., Mr. Duval wrote to Jennifer Goodwin of BG about the Mr. Thonn appeal, stating:

> I know the attorney for this appeal. He was asking me some questions about procedure and I was not real sure. He said they are just appealing the accounting reimbursement and I wanted to make sure that was clear because I did not see this specifically. Does this need to be listed on a special form or in supporting memo?[185]

That evening, Ms. Goodwin responded to Mr. Duval, explaining that the appeal only related to accountant reimbursement, and that the accountant fees may be paid without having to go through the appeal.[186]

On January 17, 2013, Mr. Duval sent an email to Mr. Sutton, explaining that the BG team was working on the appeal and "might be able to pay accounting fees without going through appeal process."[187] Mr. Duval did not recall during his interview with the Special Master why he made this request, but assumed that Mr. Sutton had asked about the appeal status.[188] Mr. Duval could provide no explanation as for why he would incorrectly identify the question as coming from the "attorney for the appeal" if Mr. Sutton had asked the question.[189]

Before Mr. Duval's 10:15 a.m. email on January 16, 2013, Mr. Sutton had conducted a DHECC database search of the Thonn file status at 9:39 a.m., as well as on January 14, 2013.[190] Further, on January 14, 2013 at 9:50 a.m., records show a 25 minute phone call from Mr. Jon Andry's cell phone to Mr. Sutton's cell phone, followed by a series of seven text messages between the two men.[191] Mr. Sutton searched the Thonn claim in the DHECC database at 11:42 a.m., amidst these communications.[192]

Mr. Duval also sent an email to Mr. Sutton on January 31, 2013 with the subject line, "Thonn claim," stating the following: "I just found out that with shrimp claims, the RTP is included in the compensation amount."[193] In response to that email, Mr. Sutton sent a reply stating, "Doesn't say that on the form though. May need to change it."[194]

[184] BrownGreer User Access to Claims Report (July 9, 2013).
[185] Email from David Duval to Jennifer Goodwin, Subject: Casey Thonn – 19691 (January 16, 2013 at 10:15 AM).
[186] Email from Jennifer Goodwin to David Duval, Subject: Casey Thonn – 19691 (January 16, 2013 at 9:04 PM).
[187] Email from David Duval to Lionel Sutton, Subject: Thonn claim (January 17, 2013 at 1:33 PM).
[188] Interview of David Duval (August 22, 2013).
[189] Id.
[190] BrownGreer User Access to Claims Report (July 9, 2013).
[191] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[192] BrownGreer User Access to Claims Report (July 9, 2013).
[193] Email from David Duvall to Lionel Sutton, Subject: RE: Thonn claim (January 31, 2013 at 12:30 PM).
[194] Email from Lionel Sutton to David Duval, Subject: RE: Thonn claim (January 31, 2013 at 1:13 PM).

DHECC paid Thonn's Seafood Compensation Vessel Owner Claim on February 28, 2013. On March 6, 2013, the AndryLerner firm received the $166,652.10 payment.[195] Meanwhile, from February 4, 2013 until the payment's receipt on March 6, 2013, Mr. Sutton used his DHECC database access as Claims Counsel for the DHECC to track the Thonn matter closely, viewing the claim several more times.[196]

On March 7, 2013, Mr. Sutton began a new email exchange with Mr. Lerner and Mr. Cahill to facilitate Mr. Sutton's referral fee payment for the Vessel Owner Claim.[197] That day, Mr. Sutton also wrote to Mr. Cahill about other Crown payments that were owed by Mr. Lerner to Mr. Sutton, closing the email by noting that Mr. Thonn had been paid "another 166,666 last month[,]" and requesting that Mr. Cahill "let [him] know the status of that check."[198] The next day, as a follow-up on his request to Mr. Cahill, Mr. Sutton also emailed Mr. Lerner to say that Mr. Jon Andry had recently been paid more money on the Thonn matter and to ask Mr. Lerner if he could "send [Mr. Sutton] that."[199] That same evening, Mr. Lerner responded to Mr. Sutton, by email, that "[Andry] controls the money man."[200]

A week later, on March 15, 2013, Mr. Lerner emailed his CFO, Mr. Cahill, copying a Crown official and Mr. Sutton, to see if the latest Thonn money had been received. Mr. Lerner also explained that, while Mr. Jon Andry may have received the transfer from the DHECC, that did not mean that Glen Lerner Associates had necessarily received their portion.[201] In that email, he also asked Mr. Sutton if he knew anything about the status of the money: "Tiger what was deal on that?"[202] Mr. Sutton responded by reporting a recent discussion he had with Mr. Jon Andry, where Andry told Sutton that the Thonn money was "just disbursed" so Mr. Lerner should not expect it "for a few days."[203] Mr. Lerner next sought clarification from Mr. Sutton as to how much Mr. Jon Andry would be sending his firm and what portion would be owed to Mr. Sutton.[204] In the exchange that followed, Mr. Sutton explained to Mr. Lerner that Mr. Jon Andry would send over $16,665, which represented half the total $33,000 of attorney fees for the Thonn Vessel Owner Claim. Mr. Cahill was to then transfer the $16,665 to Mr. Sutton.[205]

Mr. Lerner expressed confusion to Mr. Jon Andry and his accounting staff about the Thonn fees. On March 20, 2013, Mr. Lerner wrote:

---

[195]  DHECC Notice of Payment in Re: Casey Thonn (February 28, 2013).
[196]  BrownGreer User Access to Claims Report (July 9, 2013).
[197]  Email from Lionel Sutton to Jeff Cahill, Subject: RE: Salary (March 7, 2013 at 10:23 AM); Email from Glen Lerner to Lionel Sutton, Subject: Re:  (March 8, 2013 at 8:58 PM).
[198]  Email from Lionel Sutton to Jeff Cahill, Subject: RE: Salary (March 7, 2013 at 10:23 AM).
[199]  Email from Lionel Sutton to Glen Lerner, Subject: Re:  (March 8, 2013 at 6:36 PM).
[200]  Email from Glen Lerner to Lionel Sutton, Subject: Re:  (March 8, 2013 at 8:58 PM).
[201]  Email from Glen Lerner to Lionel Sutton, Subject: Re: crown (March 15, 2013 at 11:12 AM).
[202]  *Id.*
[203]  Email from Lionel Sutton to Glen Lerner, Subject: Re: crown (March 15, 2013 at 11:26 AM).
[204]  Email from Glen Lerner to Lionel Sutton, Subject: Re: crown (March 15, 2013 at 12:25 PM).
[205]  Emails between Lionel Sutton and Glen Lerner, Subject: Re: crown (March 15, 2013).

I'm confused on Thon. I am supposed to give referral attorney 50%,
correct? That was our deal with him. If fee was $33k and you send me
$16K for my end and I'm supposed to send him the full $16k then I got
no fee. Same as the last referral.[206]

Ms. DeSantis replied to Mr. Lerner and Mr. Jon Andry, with a copy to the accounting staff,
"Your 40% will be in a draw not referral."[207]

Having grown impatient with the pace of transfers to him from Glen Lerner Associates, on
March 20, 2013, Mr. Sutton emailed Mr. Cahill about the status of his past due salary amounts
from Crown.[208] Mr. Cahill assured Mr. Sutton that he was trying to keep up with the transfers but
also expressed confusion as to which monies Mr. Sutton was specifically referring. In response,
Mr. Sutton explained to Mr. Cahill that, in addition to his Crown salary, he was also owed the
"16,660" that would be received from Mr. Jon Andry. Mr. Sutton emailed that the $16,665 was
distinct from the "4,900" from Mr. Jon Andry that Mr. Cahill had sent to him in January. In these
same emails, Mr. Sutton described the arrangement between himself and Lerner:

> **Sutton**: "Please confirm that you will deposit my past due salary by end of the
> month at the latest. Tiger"

> **Cahill**: "I'm pedaling as fast as I can Tiger. And what was the dollar amount
> of the other payment? I thought it'd gone out a while ago – to the old Crown
> account. I can search easier if I have the dollar figure."

> **Sutton**: "The last payment was a fee not crown salary. You sent Glenn and I
> an email with the balance 2 months ago. Of Course you will have to add
> February March and April now"

> **Cahill**: "Not that one. The one from Andry?"

> **Sutton**: "The one you sent from Andry was 4900. He is sending or sent
> another 16600. I get that when you get it. Glen made a deal to get me made up
> and on time by the end of the month. That was some of the consideration for
> giving up some shares. If he can't do it, we need to talk."[209]

On March 28, 2013, Mr. Sutton followed-up on the above emails with Ms. DeSantis at
AndryLerner and asked her whether AndryLerner had sent the check to Glen Lerner Associates
for the Vessel Owner Claim: "suzy, did you send the thonn fee to glenn yet?"[210] Ms. DeSantis

---

[206] Email from Glen Lerner to Susan DeSantis, Jonathan Andry; Jeff Cahill, Subject: Re: Checks from Andry (March 20,
2013 at 3:25 PM).
[207] Email from Susan DeSantis to Glen Lerner, Jonathan Andry; Jeff Cahill, Subject: Re: Checks from Andry (March 20,
2013 at 5:35 PM).
[208] Email from Lionel Sutton to Jeff Cahill, Subject:  (March 20, 2013 at 3:17 PM).
[209] *Id*.
[210] Email from Lionel Sutton to Susan DeSantis, Subject: thonn (March 28, 2013 at 9:54 AM).

confirmed for Mr. Sutton that AndryLerner had sent the check to Mr. Cahill's attention on March 20.[211]

Later that afternoon, Mr. Cahill informed Mr. Sutton that Glen Lerner Associates had indeed received the funds and would be transferring the money to the old Crown account the next morning.[212] On March 29, 2013, the wire transfer from Glen Lerner Associates account to the old Crown account (Regions Bank) of $16,665.21 was completed.[213]

### c.   Thonn Seafood Compensation Program - Boat Captain Claim

Mr. Sutton continued to monitor closely the continued processing of the Thonn claim in the DHECC's database, viewing it nine times between April 5, 2013 and May 2, 2013.[214] On April 29, 2013, a settlement payment was issued by the DHECC on the Thonn Seafood Program for Shrimp Boat Captain ("Boat Captain Claim") in the amount of $190,350.25.[215]

On May 9, 2013, Mr. Sutton exchanged emails with Mr. Lerner about Crown, his working with Ms. Reitano at the CAO, and his efforts to get Mr. Lerner money. Mr. Sutton started the exchange by discussing different options for a Crown logo, triggering the following exchange:

> **Lerner**: "Glad to see you are working so hard while I try to figure out how to keep paying for shit"
>
> **Sutton**: "u forget. Im also working hard to get you $ so you can pay for shit."
>
> **Lerner**: "Ooh la la. Work harder. How's Chris."
>
> **Sutton**: "she's good. It has actually been pretty fun working together on this."
>
> **Lerner**: "They are not paying claims. Insane"[216]

Mr. Sutton responded to Mr. Lerner's concern about the DHECC not paying claims by providing Mr. Lerner with a complete summary of the 466 claims that AndryLerner had submitted to the Claims Center. In the email, Mr. Sutton provided information to Mr. Lerner by providing examples of why the AndryLerner claims had problems.

On May 14, 2013 at 1:06 p.m., Mr. Sutton sent an email to Ms. DeSantis at AndryLerner to see if she had sent the Boat Captain Claim fee to Mr. Cahill at Glen Lerner Associates for the remaining $19,035.[217] Later that day, Ms. DeSantis responded, via email, to Mr. Sutton that she

---

[211]   Email from Susan DeSantis to Lionel Sutton, Subject: RE: thonn (March 28, 2013 at 10:35 AM).
[212]   Email from Jeff Cahill to Lionel Sutton; Glen Lerner, Subject. RE: thonn (March 28, 2013 at 4:53 PM).
[213]   Regions Bank Statement for Crown LLC March 1 – March 29, 2013 (March 29, 2013).
[214]   BrownGreer User Access to Claims Report (July 9, 2013).
[215]   DHECC Notice of Payment in Re: Casey Thonn (April 29, 2013).
[216]   Email from Lionel Sutton to Glen Lerner, Subject: Re logo (May 9, 2013 at 3:07 PM).
[217]   Email from Lionel Sutton to Susan DeSantis, Subject: (May 14, 2013 at 1:06 PM).

had seen a check for that fee on the desk of Mr. Jon Andry's CFO and that it would be sent to Mr. Cahill in Las Vegas the next morning.[218]

Mr. Sutton, however, waited a week before contacting Mr. Cahill about the latest Thonn money from Mr. Jon Andry. On May 22, 2013, Mr. Sutton emailed Mr. Cahill, copying Mr. Lerner, to ask about his "May salary" and "the final Thonn $ previously sent to you by Jon."[219] Mr. Sutton sent another reminder to Mr. Cahill on June 3, 2013, writing: "You should have received the thonn check some time ago, when can I expect it."[220]

The AndryLerner firm issued a check on May 14, 2013, to Glen Lerner Associates with the notation, "Casey Thon/Boat Captain."[221] Mr. Cahill transmitted this money, along with an additional $5,964.98, to the new Crown account on June 5, 2013, for a total transfer of $25,000.[222] On June 5, 2013, $19,035.02 was transferred from the Crown operating account at Bank of America to the old Crown account (Regions Bank). This reflected the last referral fee payment on the Thonn claims to Mr. Sutton from Glen Lerner Associates, Mr. Lerner and Mr. Jon Andry.[223]

### 3. Lionel Sutton's Multiple, Inconsistent Statements about the Thonn Referral Fee Payments

After allegations against Mr. Sutton first surfaced in May 2013, Mr. Patrick Juneau approached Mr. Sutton about whether he had held any financial interest in any claims before the DHECC. Mr. Sutton stated that he did not retain any financial interest in any claims or clients and that the allegations were incorrect.[224]

Mr. Patrick Juneau and Mr. Michael Juneau interviewed Mr. Sutton on June 17, 2013, as part of the internal investigation commenced by Mr. Patrick Juneau. At that time, Mr. Sutton admitted to having represented Mr. Thonn and referring the case out to Sal Brocato and Mr. Jon Andry.[225] Mr. Sutton then stated that he retained no financial interest in that claim, received no referral fee or any compensation of any kind, and had no future financial interest in the claim.[226] Mr. Sutton acknowledged that he fully understood the underlying issues and prohibitions, and once again

---

[218] Email from Susan DeSantis to Lionel Sutton, Subject: RE: (May 14, 2013 at 6:23 PM).

[219] Email from Lionel Sutton to Jeff Cahill; Glen Lerner, Subject: may (May 22, 2013 at 10:10 AM).

[220] Email from Lionel Sutton to Jeff Cahill, Subject: (No Subject) (June 3, 2013 at 2:39 PM).

[221] Check from AndryLerner LLC to Glen Lerner & Associates. Check No. 1394. Memo: "Casey Thonn/Boat Captain" (May 14, 2013).

[222] Bank of America Merrill Lynch Payment Details Report for $25,000 transfer from Glen J. Lerner and Associates Bank of America account to Crown LLC Bank of America account (June 5, 2013); Email from Pauline Hardin to Special Master staff, Subject: Additional document requested (August 28, 2013 at 12:17 PM).

[223] Merrill Lynch Record of Wire Transfer from Bank of America Crown LLC to Regions Bank Crown LLC (June 5, 2013).

[224] Welker Investigative Report at 3 (June 20, 2013).

[225] Memorandum from Michael Juneau to Patrick Juneau Re: Lionel Sutton III matter (June 20, 2013).

[226] *Id.*

stressed that he held no shared fee, no referral fee, and no financial interest in any claim before the DHECC.[227]

In a follow up meeting on June 19, 2013, with Mr. Michael Juneau, during which both Ms. Reitano and Mr. Sutton were suspended, both Mr. Sutton and Ms. Reitano denied to Mr. Michael Juneau that they had any financial interest in any claim filed in the settlement program.[228]

On June 20, 2013, Mr. Patrick Juneau, Mr. Michael Juneau and Mr. Welker[229] interviewed Mr. Sutton once again. In this fourth meeting and interview, Mr. Sutton again denied that he was accepting referral fee payments on any Thonn claims.[230] He affirmed that he had a business relationship with Mr. Lerner in a company called Crown and stressed that any money coming from Mr. Lerner would have been money owed to him under his Crown relationship.[231] Mr. Sutton also stated that he informed Mr. Lerner when Mr. Jon Andry was paid on any of the Thonn claims because he wanted to ensure that Mr. Lerner received his share of the Thonn fees, and that Mr. Lerner had money to pay Mr. Sutton's Crown salary.[232] Mr. Sutton claimed that he did not trust Mr. Jon Andry because Mr. Jon Andry had shorted him on fees in a previous case.[233] Mr. Sutton denied knowing what amount the Thonn VoO claim had settled for, even though his own email communications discussed the amounts.[234] Mr. Sutton stated that he would not have risked his job at the DHECC over a "$4,900" referral fee payment.[235] Mr. Sutton stated that Mr. Lerner often complained that the latter had no money to pay Mr. Sutton's Crown salary until claims settled. Mr. Sutton insisted that he was only tracking the Thonn money to Mr. Lerner in order to know when Mr. Lerner would have money to pay him.[236]

In an email sent from Mr. Sutton to Mr. Patrick Juneau on June 21, 2013 titled "Resignation," Mr. Sutton did acknowledge that his relationship with Mr. Lerner and Crown gave him a "financial interest in those fees, particularly in a case like Thonn where the funding can be tied directly to the fee."[237] Mr. Sutton asserted that he checked the status of the Thonn cases simply because he knew Thonn needed the money and it was not at the request of Mr. Lerner or for his own benefit.[238]

---

[227] *Id.*

[228] *Id.*

[229] Mr. Welker is the CAO's Fraud, Waste, and Abuse Director. He joined Patrick Juneau's staff after a 33-year career in law enforcement, including 25 years of service with the Federal Bureau of Investigation. He retired from the FBI as Special Agent in Charge of the New Orleans Field Office.

[230] Welker Summary of Sutton Interview (June 20, 2013).

[231] *Id.*

[232] *Id.*

[233] *Id.*

[234] *Id.*

[235] *Id.* In fact, the referral fee payments at issue were in excess of $40,000.00 paid to Mr. Sutton. *See* Exhibit A.

[236] Welker Summary of Sutton Interview (June 20, 2013).

[237] Email from Lionel Sutton to Patrick Juneau; Michael Juneau, Subject: Resignation (June 21, 2013 at 8:13 AM).

[238] *Id.*

On June 25, 2013, Mr. Sutton agreed to meet with lawyers and an investigator for The Andry Law Firm.[239] Notes of this meeting indicate Mr. Sutton said it was "[c]ommon knowledge that you should not have financial interest in any case going before settlement" at the DHECC. The notes reflect Mr. Sutton said, "Glenn you can't send me the Thon [sic] referral fee – use for Crown."[240] When asked about his recent meeting with Mr. Patrick Juneau, Mr. Sutton said he had told Mr. Patrick Juneau "I have no financial interest in Thonn case. Thought that was it." [241] Mr. Sutton also explained that he had told Mr. Patrick Juneau that Mr. Lerner "had been under obligation to fund Crown" and that he "told Glen we need $. I know Thon [sic] settled, use that."[242]

Finally, in his interview under oath with the Special Master, Mr. Sutton contradicted his own prior statements and stated that Mr. Patrick Juneau's and Mr. Welker's summaries of what he said in previous meetings were inaccurate. Mr. Sutton admitted to the Special Master that he had accepted referral fee payments on the Thonn claims as compensation for work he had already completed on the Thonn claims, stating, "It was my share of the Thonn fee for the work that I had performed on the Thonn case."[243] He admitted to receiving the three referral fee payments for the Thonn case. Mr. Sutton then claimed that the three payments were for work performed on the Thonn claims by his law firm, Sutton & Reitano, before it was sent to AndryLerner.[244] Mr. Sutton admitted that there was no written agreement for the referral fee arrangement he made with Mr. Lerner and AndryLerner on the Thonn case.[245] Mr. Sutton stated to the Special Master that this was the first time he had ever told anyone that the payments were for work that he performed on the Thonn claim.[246]

### 4. Evidence that Attorneys Lionel Sutton, Glen Lerner, Jon Andry and Gibby Andry Discuss Their Response to the CAO

On June 17, 2013, CAO staff interviewed Mr. Sutton, who stated that he had retained no financial interest in Mr. Thonn's claim and received no referral fee payments or any compensation for the claim.[247] Phone records indicate that Mr. Michael Juneau called Mr. Jon Andry's cell phone around 5:03 p.m. the same day.[248] During the call, Mr. Jon Andry said Mr. Sutton had no financial interest of any kind in any claim of Mr. Thonn.[249] At 5:19 p.m., Mr. Jon

---

[239] The Andry Law Firm refused the Special Master's request to produce records of the interview with Mr. Sutton. On August 22, 2013, the Special Master moved to compel production of the records. On August 27, 2013, Judge Barbier ordered production of the records concerning Mr. Sutton's interview.
[240] Undated notes of Billy Gibbens of Lionel Sutton Interview at 4; Email from Billy Gibbens to the Special Master (August 28, 2013).
[241] Undated notes of Billy Gibbens of Lionel Sutton Interview at 7.
[242] Id. at 9.
[243] Lionel Sutton Transcript at 69 (July 29, 2013).
[244] Id. at 66.
[245] Id. at 129.
[246] Id. at 133-34.
[247] Memorandum from Michael Juneau to Patrick Juneau Re: Lionel Sutton III matter (June 20, 2013).
[248] DHECC Phone System Call Log (July 16, 2012 – July 14, 2013).
[249] Memorandum from Michael Juneau to Patrick Juneau Re: Lionel Sutton III matter (June 20, 2013).

Andry left a voice mail and text message for Mr. Sutton, followed by a 15-minute call with Mr. Sutton at 5:45 p.m.[250]

On June 19, 2013, the CAO suspended Mr. Sutton with pay.[251] On June 20, 2013, Mr. Sutton met with CAO staff for a further interview, where he again denied accepting referral fee payments on any Thonn claims.[252] Significantly, the following communications[253] occurred during these days between Mr. Sutton and Messrs. Jon and Gibby Andry:

| Date | Communication | Gibby Andry | Jonathan Andry |
|---|---|---|---|
| June 19, 2013 | Text | 10 | 15 |
| | Voice | 20 (20:35 min., 9 voice mails) | 6 (25:36 min., 0 voice mails) |
| June 20, 2013 | Text | 0 | 11 |
| | Voice | 8 (13:24 min., 3 voice mails) | 11 (93:03 min., 3 voice mails) |
| June 21, 2013 | Text | 0 | 7 |
| | Voice | 4 (25:59 min., 2 voice mails) | 6 (1:48 min, (4 voice mails) |
| June 22, 2013 | Text | 0 | 0 |
| | Voice | 7 (7:33 min., 4 voice mails) | 0 (0:00 min., 0 voice mails) |

The communication abruptly stopped after June 22, 2013.[254]

---

[250]  AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[251]  Memorandum from Michael Juneau to Patrick Juneau Re: Lionel Sutton III matter (June 20, 2013).
[252]  Welker Summary of Sutton Interview (June 20, 2013).
[253]  AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[254]  Id.

## V.  THE ANDRY LAW FIRM CLAIM

### A.  Background on The Andry Law Firm

Messrs. Jon and Gibby Andry began practicing law together in 1995 when they formed The Andry Law Firm. In 2000, they registered The Andry Law Firm as an S-Corporation. Both Andrys are equal equity partners in this law firm. Messrs. Jon Andry and Gibby Andry are attorneys admitted to practice in Louisiana and are in good standing.[255] In 2000, the firm registered in Louisiana as a limited liability corporation, listing Messrs. Jon Andry and Gibby Andry as the initial members.[256]

Mr. Jon Andry and Mr. Gibby Andry are also members of several other entities involved in different legal practices:

- In September 2009, about seven months before the Deepwater Horizon spill, Mr. Jon Andry formed Andry Law Group.[257]

- In March 2010, about a month before the spill, Mr. Gibby Andry formed Gibby Andry, The Andry Law Firm.[258]

- In February 2012, Mr. Jon Andry also formed the AndryLerner Law Firm with Mr. Lerner, with a focus on advancing legal claims involving the Deepwater Horizon spill.[259]

In a discussion about the establishment of these other firms, Mr. Jon Andry described to the Special Master the decision to focus outside The Andry Law Firm:

> In and around May of 2010, my brother and I took on other endeavors. He wished to be an advertising attorney. You may have seen his billboards. I didn't really want to do that. I wanted to do mass torts. He really didn't want to do that in our main law firm, and so I started what was originally the Mr. Jon Andry Attorney at Law, L.L.C. and subsequently changed the name to The Andry Law Group.[260]

Mr. Jon Andry's assertion that he and his brother Mr. Gibby Andry elected to take on these "other endeavors" in May 2010 is significant because of the timing of their split.[261] The intention to engage in these endeavors would have likely been made prior to the May 2010 date given by

---

[255] Jonathan Andry Transcript at 11 (July 30, 2013); "Gilbert Andry IV," Louisiana State Bar Association Membership Directory (Accessed August 22, 2013).

[256] Jonathan Andry Transcript at 5 (July 30, 2013); The Andry Law Firm LLC, Articles of Organization, (July 13, 2000).

[257] "Andry Law Group LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 28, 2013).

[258] Jonathan Andry Transcript at 8 (July 30, 2013); "Gibby Andry, The Andry Law Firm," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on September 2, 2013).

[259] Jonathan Andry Transcript at 6 (July 30, 2013); "AndryLerner LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 28, 2013).

[260] Jonathan Andry Transcript at 5-6 (July 30, 2013).

[261] *Id*. at 5 (July 30, 2013).

Mr. Jon Andry because the actual formation dates for the "Andry Law Group" and "Gibby Andry, The Andry Law Firm" occurred prior to May 2010 and the Deepwater Horizon spill.

### B.  The Claim

On August 14, 2012, The Andry Law Firm filed a Business Economic Loss ("BEL") claim with the DHECC, alleging economic harm had been caused to the business as a result of the Deepwater Horizon spill.[262] The compensation framework for a BEL claim compares the actual profit of a business during a defined pre-spill period to the profit the business might have expected to earn, yet did not earn, in a comparable post-spill benchmark period.[263]

The Andry Law Firm's initial claim, filed on August 14, 2012, sought an estimated compensation of $7,908,460, based on the revenue difference for the firm of roughly 480 percent between the benchmark period and the compensation period.[264] On March 20, 2013, the DHECC issued a notice of eligibility for The Andry Law Firm claim, calculating the award amount at $7,648,722, which The Andry Law Firm accepted.[265]

On April 10, 2013, BP filed an appeal, asserting that it appeared that there were "significant inconsistencies and anomalies in the financial data provided by the claimant" and because of issues "regarding trends and financial data that impact the calculation and require resolution."[266] BP argued that The Andry Law Firm's 2010 variable profit exceeded its 2009 benchmark year variable profit by nine percent.[267] BP also questioned whether The Andry Law Firm was engaged in activities to generate profit during much of the compensation period, and asserted that a principal may have elected to dedicate efforts to a different but related law firm.[268] BP also raised various accounting issues, such as how a large settlement reached in the late 1990s by the predecessor to The Andry Law Firm should be considered.[269] As noted above, the formation dates of The Andry Law Firm and Andry Law Group indicate the Andrys' intent to change their legal business activities prior to the May 2010 spill.

On April 25, 2013, The Andry Law Firm disputed the appeal, specifically arguing that Judge Barbier's orders in the case made clear that "[n]owhere does the [settlement agreement] state or indicate that revenue and expenses must be 'matched' or revenues 'smoothed,' nor does it state that one should inquire into when revenue was 'earned.'"[270] The Andry Law Firm also argued that BP was ignoring an order from Judge Barbier instructing that the DHECC and appeal

---

[262] DHECC Settlement Registration Form for Andry Law Firm (August 14, 2012).
[263] DHECC Initial Eligibility Notice for Andry Law Firm (March 20, 2013).
[264] *Id.*; *see also* Kushner LaGraize LLC Letter to Gilbert Andry (August 9, 2012); DHECC The Andry Law Firm Claimant-Specific Factor Calculation (August 9, 2012).
[265] DHECC Initial Eligibility Notice for Andry Law Firm (March 20, 2013).
[266] DHECC Notice of BP Appeal for Andry Law Firm (April 10, 2013).
[267] DHECC BP's Initial Proposal with respect to appeal of claim number 54566 (April 25, 2013).
[268] *Id.*
[269] *Id.*
[270] DHECC Memorandum in Support of Andry Law Firm Initial Proposal (April 25, 2013).

panelists were bound by prior orders, including orders addressing analysis of causation and matching of revenue and expenses.[271]

The day before The Andry Law Firm filed its appellate position, Judge Barbier ordered that appeals based on legal issues that have already been decided by the Court, such as alternative causation and matching of revenue and expenses, should be denied based on the Court's prior rulings.[272] On April 25, 2013, The Andry Law Firm also wrote to Mr. Patrick Juneau that BP's appeal was an "amorphous attempt to improperly argue" that there was an alternative causation or that there was no matching of revenue and expenses.[273] The Andry Law Firm claimed that these arguments had previously been rejected by Judge Barbier, and thus came within the Court's order concerning denial of appeals based on issues previously decided.[274]

On April 30, 2013, The Andry Law Firm wrote to Mr. Duval, the Appeals Coordinator at the CAO, arguing that BP did not raise good faith grounds to appeal, and that the appeal was predicated on issues already decided against it by the Court.[275]

On May 6, 2013, BP responded that The Andry Law Firm misconstrued the issues raised on appeal as one of "alternate causation," but BP instead argued that a claimant could not incur economic damage, as defined in the settlement agreement, if the claimant was not engaged in efforts to earn profit during a given period.[276] On June 4, 2013, the appeals panel affirmed The Andry Law Firm's claim, unanimously finding that the award was in accordance with the terms of the settlement agreement and the interpretations by the Court.[277] On June 7, 2013, a post-appeal eligibility notice, reflecting a five percent review cost increase, stated that the award amount should be $7,818,693.[278] On July 18, 2013, The Andry Law Firm signed a release and accepted the award.[279] The claim has not been paid and has been placed on hold pending this investigation.

## C. The Andry Law Firm Communications with CAO Staff Concerning Its Claim

While the DHECC reviewed and processed The Andry Law Firm's claim, Messrs. Jon Andry and Gibby Andry engaged in ongoing communications with members of the CAO staff as set forth below.

---

[271] DHECC Memorandum in Support of Andry Law Firm Final Proposal (May 6, 2013).
[272] *Id*.
[273] Andry Law Firm Letter to Patrick Juneau (April 25, 2013).
[274] *Id*.
[275] Andry Law Firm Letter to David Duval (April 30, 2013).
[276] DHECC BP's Final Proposal with respect to appeal of claim number 54566 (May 6, 2013).
[277] DHECC Notice of Appeal Panel Decision (June 4, 2013).
[278] DHECC Post Eligibility Notice (June 7, 2013).
[279] Full and Final Release Settlement and Covenant Not to Sue (July 18, 2013).

## 1.    The Andrys' Communications with the CAO Regarding the Claim

On March 6, 2013, Mr. Jon Andry contacted Claims Administrator Patrick Juneau for information about claimants he represented, as well as The Andry Law Firm claim. On March 6, 2013, at 3:52 p.m., a phone registered to Mr. Jon Andry called Mr. Patrick Juneau at the CAO.[280] The same day, at 5:42 p.m., Mr. Jon Andry sent an email message to Mr. Patrick Juneau captioned "Information."[281] The email stated "Mr. Juneau" and was followed by a chart listing claim information for twelve claims, including eleven pending at the DHECC where Andry Law Group/AndryLerner served as counsel,[282] as well as the The Andry Law Firm claim for $7,648,722.[283]

The next day, Mr. Patrick Juneau's executive assistant, Rebecca Foreman, sent an email to a BG employee who Ms. Foreman would contact about claim status.[284] The email sought information on the four claimants mentioned in Mr. Jon Andry's March 6, 2013 email, and The Andry Law Firm's claim.[285] The next day, Ms. Foreman received an update on the claims.[286]

Just hours before Mr. Jon Andry sent Mr. Patrick Juneau his March 6, 2013 email, Mr. Sutton had been using his access at the DHECC to gather information on The Andry Law Firm claim. At 8:56 a.m. that day, Mr. Sutton sent an email titled, "BEL Andry Law Firm, Claimant ID 100104880," to Mark Staley, one of the supervisors of the claims adjustors at P&N.[287] Mr. Sutton wrote to Mr. Staley, "I have some questions about the above referenced claim. I believe it is being handled by Christopher Rinaldi with your firm. Please have Christopher contact me when he has a chance."[288] Less than an hour later at 9:44 a.m., Mr. Sutton performed another review of DHECC computer records for The Andry Law Firm claim.[289]

On March 5, 2013, the day before Mr. Sutton's email about The Andry Law Firm claim, records show that Mr. Gibby Andry's cell phone left four voice messages on Mr. Sutton's cell phone in a thirty minute period starting at 11:14 a.m.[290] Mr. Sutton and Mr. Gibby Andry also had two brief conversations that day beginning at 12:11 p.m.[291] On March 6, 2013, Mr. Sutton exchanged six text messages with Mr. Jon Andry, and had a brief phone call with Mr. Gibby Andry.[292] These

---

[280]   DHECC Phone System Call Log (July 16, 2012 – July 14, 2013).
[281]   Email from Jonathan Andry to pjuneau@dhecc.org, Subject: Information (March 6, 2013 at 5:42 PM).
[282]   *Id.* The claimants included: Talen's Marine & Fuel, LLC.
[283]   *Id.*
[284]   Email from Rebecca Foreman to Jennifer Goodwin, Subject: advice on claims (March 7, 2013 at 3:08 PM); Interview of Rebecca Jenkins (Foreman) (July 17, 2013).
[285]   Email from Jonathan Andry to Patrick Juneau, Subject: Information (March 6, 2013 at 5:42 PM); Email from Rebecca Foreman to Jennifer Goodwin, Subject: advice on claims (March 7, 2013 at 3:08 PM).
[286]   Email from Jennifer Goodwin to Rebecca Foreman, Subject: advice on claims (March 8, 2013 at 8:34 AM).
[287]   Email from Lionel Sutton to Mark Staley Subject: BEL Andry Law Firm, Claimant ID *******80 (March 6, 2013 at 8:56 AM).
[288]   *Id.*
[289]   BrownGreer User Access to Claims Report (July 9, 2013).
[290]   AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[291]   *Id.*
[292]   *Id.*

records support the inference that Mr. Sutton and the Andrys were engaged in conversations regarding The Andry Law Firm claim.

Mr. Jon Andry stated to the Special Master that he had conversations with Mr. Patrick Juneau and Mr. Sutton concerning pending claims filed by AndryLerner with DHECC. Mr. Jon Andry explained that he had called Mr. Patrick Juneau about "a bunch of BP claims that I was handling" to complain about delays in payment of the claims.[293] Mr. Jon Andry said he did not ask for a meeting, but rather asked Mr. Patrick Juneau for information on any way we can "kind of get all of this going."[294] Mr. Jon Andry said he spoke to Mr. Patrick Juneau about "a bunch of claims" and that he "didn't single [The Andry Law Firm claim] out in particular, because that would not have been in any discussion I had because my operation was to get every one of them done."[295]

Mr. Jon Andry stated that his requests for information to the claims administrators were regarding all of his DHECC claims without particular attention to his own law firm.[296] Mr. Jon Andry's explanation is not consistent with the evidence. For example, on March 6, 2013, Mr. Sutton did not search for any records concerning the four claimants or the eleven claims mentioned in Mr. Jon Andry's email to Mr. Patrick Juneau.[297] Besides The Andry Law Firm claim, the only other Mr. Jon Andry-related claim that Mr. Sutton searched on March 6, 2013 were records related to the Mr. Thonn file, the AndryLerner case for which Mr. Sutton received referral fee payments.[298]

Mr. Sutton clearly knew of Mr. Rinaldi's involvement with The Andry Law Firm claim when he wrote his 8:56 a.m. email to Mr. Staley, even though Mr. Sutton did not search the DHECC records for the The Andry Law Firm claim that day until 9:44 a.m.[299] Mr. Rinaldi previously had communicated with the accountant handling The Andry Law Firm claim.[300] It can be inferred that Mr. Sutton learned of Mr. Rinaldi's involvement with The Andry Law Firm claim from his telephone calls with Mr. Gibby Andry on March 5, 2013. Mr. Sutton also had reviewed records for The Andry Law Firm claim three times prior to March 6, 2013. Specifically, Mr. Sutton reviewed The Andry Law Firm's claim records on December 18, 2012; January 22, 2013; and, January 28, 2013.[301] On two of these occasions, Mr. Sutton also reviewed the records regarding the Thonn claim as follows:

---

[293] Jonathan Andry Transcript at 22 (July 30, 2013).
[294] *Id.*
[295] *Id.*
[296] *Id.*
[297] Email from Jonathan Andry to Patrick Juneau, Subject: Information (March 6, 2013 at 5:42 PM); BrownGreer User Access to Claims Report (July 9, 2013).
[298] BrownGreer User Access to Claims Report (July 9, 2013).
[299] Email from Lionel Sutton to Mark Staley Subject: BEL Andry Law Firm, Claimant ID *******80 (March 6, 2013 at 8:56 AM); BrownGreer User Access to Claims Report (July 9, 2013).
[300] DHECC Claims Database, The Andry Law Firm claim, Global Notes Contact ID: ***70 (December 7, 2012), ***86 (December 10, 2012).
[301] BrownGreer User Access to Claims Report (July 9, 2013).

| Claimant | Date of Review |
|---|---|
| Casey Thonn | 12/18/12 @ 10:37 AM |
| Casey Thonn | 12/18/12 @ 10:37 AM |
| Casey Thonn | 12/18/12 @ 10:47 AM |
| The Andry Law Firm | 12/18/12 @ 10:48 AM |
| The Andry Law Firm | 01/22/13 @ 2:08 PM |
| Casey Thonn | 01/22/13 @ 2:33 PM |

Mr. Sutton received no response on March 6, 2013 to his message to Mr. Staley captioned, "BEL Andry Law Firm, Claimant ID *******80." Mr. Sutton resent his email message the next day at 9:17 a.m.[302] At 10:29 a.m. that morning, Mr. Sutton searched the DHECC database for a claim by Talen's Marine & Fuel, LLC, which was among the claimants included in Mr. Jon Andry's email to Mr. Patrick Juneau from the prior day.[303] The Talen's claim had previously been disallowed by the GCCF because it was a moratorium claim.[304] Between 9:55 a.m. and 11:10 a.m. that day, Mr. Sutton and Mr. Jon Andry exchanged 11 text messages.[305] At 4:21 p.m., Mr. Sutton again searched the DHECC database for a claim by Talen's Marine & Fuel, LLC.[306] Mr. Sutton exchanged text messages with Mr. Jon Andry starting at 5:06 p.m.[307]

On March 7, 2013 at 12:13 p.m., Mr. Staley told Mr. Sutton, "[t]his [The Andry Law Firm] claim was in line to be processed. I have asked Chris to go ahead and pull the claim down and process. I can keep you posted on the status if that is your preference."[308] Mr. Sutton thanked Mr. Staley and said, "[j]ust let me know if you have any problems with it and when notice goes out."[309] On March 11, 2013, at 11:41 p.m., Mr. Staley told Mr. Sutton, "[t]his [The Andry Law Firm] claims has been prepared and pushed to accountant Q/C review as of today. If it comes back for any reason I will let you know."[310] The next morning at 8:22 a.m., Mr. Sutton thanked Mr. Staley for the update.[311] At 8:35 a.m., Mr. Sutton sent two text messages to Mr. Gibby Andry.[312]

On March 20, 2013, just two weeks after Mr. Sutton wrote to Mr. Staley at P&N about The Andry Law Firm claim, the DHECC issued a notice of eligibility for The Andry Law Firm claim

---

[302] Email from Lionel Sutton to Mark Staley, Subject: BEL Andry Law Firm, Claimant ID *******80 (March 7, 2013 at 9:17 AM).
[303] BrownGreer User Access to Claims Report (July 9, 2013).
[304] GCCF Letter to Jonathan Andry Subject: Denial Letter on Interim Payment/Final Payment Claim (February 28, 2012).
[305] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[306] BrownGreer User Access to Claims Report (July 9, 2013).
[307] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[308] E-mail from Mark Staley to Lionel Sutton, Subject: BEL Andry Law Firm, Claimant ID *******80 (March 7, 2013 at 12:13 PM).
[309] E-mail from Lionel Sutton to Mark Staley, Subject: BEL Andry Law Firm Claimant *******80 (March 7, 2013 at 1:21 PM).
[310] E-mail from Mark Staley to Lionel Sutton, Subject: BEL Andry Law Firm, Claimant ID *******80 (March 11, 2013 at 11:41 PM).
[311] E-mail from Lionel Sutton to Mark Staley, Subject: BEL Andry Law Firm Claimant *******80 (March 12, 2013 at 8:22 AM).
[312] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).

2:20-md-02179-CJB-DPC Document 13080-4 Filed 06/30/14 Page 56 of 96
Case 2:10-md-02179-CJB-SS Document 13087-4 Filed 06/30/14 Page 56 of 93

with an award amount for $7,648,722.34. The Andry Law Firm immediately accepted this award.[313]

Mr. Jon Andry's discussions in March with Mr. Sutton about his claims were not limited to email correspondence. Mr. Jon Andry stated to the Special Master that, "accidently" and without any "plan or arrangement," he ran into Mr. Patrick Juneau and Mr. Sutton on the street a few days after his conversation with Mr. Patrick Juneau.[314] Mr. Jon Andry stated that he and Mr. Sutton decided to have lunch together at that time.[315] Mr. Jon Andry stated that the two men discussed Mr. Jon Andry's pending claims, as follows:

> Nothing more than what I would have told anybody, and that is, you know, whatever help you can give me, give me, I need to get my claims done. They are sitting there and they are kind of languishing, and I don't know what's going on, but, you know, if you could help me out, help me out.[316]

Contemporaneous records indicate the Andry-Sutton lunch took place on March 7, 2013.[317] While Mr. Jon Andry asserted under oath that the March 7 meeting was by "accident" without "any plan or arrangement," records indicate in fact that Mr. Jon Andry and Mr. Sutton exchanged 11 text messages starting at 9:55 a.m. that day.[318] The two men also had a brief cell phone conversation starting at 11:55 a.m.[319]

Mr. Jon Andry stated that he recalled Mr. Sutton saying that Mr. Sutton played no role in claims, but agreed to look into the claims for Mr. Jon Andry.[320] Mr. Jon Andry stated under oath that Mr. Sutton never got back to him with any claim information after the lunch.[321] He also said that Mr. Patrick Juneau did not get back to him with any information, which he found "frustrating."[322]

Despite Mr. Jon Andry's claimed "frustration" and lack of information, on the afternoon of March 7, within hours of the lunch, Mr. Sutton sent Mr. Jon Andry six text messages and appeared to speak by cell phone to both Messrs. Jon and Gibby Andry.[323] Between these communications, Mr. Sutton reviewed DHECC records on the Talen's claim that were of interest to Mr. Jon Andry.[324]

---

[313] DHECC Initial Eligibility Notice ICO Andry Law Firm (March 20, 2013). DHECC Offer Accepted / Claimant Waives Right to Reconsideration (March 22, 2013).
[314] *Id.* at 23.
[315] *Id.* at 24.
[316] *Id.* at 25.
[317] AT&T Mobility Usage, No. 950168-008 (August 28, 2013). E-mail from Glen Lerner to Lionel Sutton (at Mr. Sutton's non-DHECC email address), Subject: Re: CBM Update 3/7 (March 8, 2013 at 11:00 AM) ("I had lunch with Jon *yesterday*. It was nice. Things seem to be healing. Thanks for pushing it.") (emphasis added).
[318] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[319] *Id.*
[320] Jonathan Andry Transcript at 25-26 (July 30, 2013).
[321] *Id.* at 26.
[322] *Id.* at 55-56.
[323] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[324] BrownGreer User Access to Claims Report (July 9, 2013).

Mr. Sutton's recollection of the lunch meeting differs in several significant ways from Mr. Jon Andry's recollection. Mr. Sutton recalled Mr. Patrick Juneau stating "that Jon Andry was bugging him about some claim he had, and he wanted -- and [Mr. Juneau] asked me to look into it, because that's typically what I did for [him]."[325] Mr. Sutton recalled walking out of the DHECC office building with Mr. Patrick Juneau shortly after the conversation, and Mr. Jon Andry approaching to ask Mr. Patrick Juneau, "Hey, did you check on that case." According to Mr. Sutton, Mr. Patrick Juneau explained that he had asked Mr. Sutton to look into the claim, and asked Mr. Sutton to explain what he had found. Mr. Sutton said that he and Mr. Jon Andry went for lunch, and "[t]hat's when [Mr. Sutton] went across the street and started telling [Mr. Jon Andry] about what I found."[326]

Mr. Sutton stated that Mr. Jon Andry had requested information about a specific claim concerning an entity named Talen's, which Mr. Patrick Juneau had asked him to review.[327] Mr. Sutton said he would have pulled the claim up to check the status in the DHECC data system, but that sometimes a person could not determine a claim's status just from the system.[328] Mr. Sutton said:

> On that one, I'm not sure, I think I might have looked to go see what --
> you can also see what accounting -- what accounting firm had it, and
> then sometimes you could see who it was actually assigned to. Then you
> could e-mail them and ask them. I would typically deal with their
> supervisors, not the actual accountant. So I probably either e-mailed the
> accountant or somebody at Brown and Greer and said – because maybe I
> couldn't see the account on the screen, I don't know, but this is what I
> typically would have done -- e-mailed somebody, either the accountant
> or somebody at BrownGreer, and said, 'Hey, can you tell me what's
> going on with this case?' Then, sometimes they would e-mail it back to
> me, or sometimes call me up and tell me.[329]

Mr. Sutton stated that Mr. Jon Andry was asking why the claim was taking so long to be processed, and Mr. Sutton explained that additional tax records were required.[330] Mr. Sutton stated that Mr. Jon Andry "didn't understand why he needed to do that."[331] Mr. Sutton stated that he had no further direct meetings with Mr. Jon Andry, but that Mr. Jon Andry "called me, I think, a few times to ask me about that. He may have called me about two or three other claims, but I don't remember."[332] In a March 8, 2013 email, Mr. Sutton reported to Mr. Lerner:

---

[325] Lionel Sutton Transcript at 26 (July 29, 2013).
[326] *Id.* at 27.
[327] *Id.* at 27-29.
[328] *Id.* at 29.
[329] *Id.* at 29-30.
[330] *Id.* at 28-30.
[331] *Id.* at 30-31.
[332] *Id.* at 32.

> I had lunch with Jon yesterday. It was nice. Things seem to be healing.
> Thanks for pushing it. I am working with him to get your Talens claim
> pushed through as quick as possible.[333]

Mr. Sutton also discussed the Thonn referral fee with Mr. Jon Andry in this time period. Mr.
Sutton advised Mr. Lerner in a March 15, 2013 email concerning the status of the Thonn referral
fee payment: "Jon told me that he *just disbursed* [emphasis added] so you won't get it for a few
days."[334] Mr. Sutton and Mr. Jon Andry exchanged 25 text messages in the two hours before Mr.
Sutton reported that Mr. Jon Andry had "just disbursed."[335]

Mr. Sutton also had extensive communication with Messrs. Gibby and Jon Andry when the
DHECC issued a notice of eligibility for The Andry Law Firm's $7,648,722 claim on March 20,
2013.[336] The next day at 7:52 a.m., Mr. Sutton received a report of DHECC claims that received
payable notices on March 30, including The Andry Law Firm claim.[337] At 9:17 a.m., Mr. Sutton
placed a text message to Mr. Gibby Andry.[338] The next day, Mr. Sutton sent a text message to
Mr. Gibby Andry at 7:57 a.m., followed by cell phone calls with both Messrs. Jon and Gibby
Andry.[339] Mr. Sutton and Mr. Jon Andry also exchanged 23 text messages that day.[340]

Patrick Juneau said he had no recollection of giving Mr. Sutton any direction to review the status
of any claims for Mr. Jon Andry.[341] Moreover, he had no recollection of asking Mr. Sutton to
review a claim being made by The Andry Law Firm.[342] Mr. Patrick Juneau described Mr. Jon
Andry as "a real pushy kind of guy." Mr. Patrick Juneau added that many people try to push the
claims process but said "[d]elay, you didn't process a claim, da-da, da-da, we respond
individually to requests like that, but that's just to find what the answer is. It's not to assist
somebody with the claim."[343]

### 2. The Andrys' Efforts to Influence The Andry Law Firm Appeal Within the DHECC

On April 10, 2013, BP filed an appeal regarding The Andry Law Firm claim.[344] On April 25,
2013, The Andry Law Firm disputed the appeal,[345] writing to Mr. Patrick Juneau with copies to
BP's counsel, that BP's appeal fell within an April 24, 2013 order from the Court concerning

---

[333] E-mail from Glen Lerner to Lionel Sutton (at Mr. Sutton's non-DHECC email address), Subject: Re: CBM Update 3/7 (March 8, 2013 at 11:00 AM).
[334] E-mail from Glen Lerner to Lionel Sutton, Subject: Re: Crown (March 15, 2013 at 11:26 AM) (emphasis added).
[335] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[336] DHECC Initial Eligibility Notice for Andry Law Firm (March 20, 2013).
[337] E-mail from Henry Mitchell to Michael Juneau; Lionel Sutton; Christine Reitano, Subject: IEL, BEL, Seafood, Wetlands, and Subsistence Eligible Payable (March 21, 2013 at 7:52 AM).
[338] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[339] *Id.* (reflecting call from Jonathan Andry cell phone to Sutton cell phone at 10:54 a.m. for 9 minutes 44 seconds, and call from Gibby Andry cell phone to Sutton cell phone at 11:09 a.m. for 2 minutes and 49 seconds).
[340] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[341] Patrick Juneau Transcript at 96-97 (August 1, 2013).
[342] *Id.* at 96-97.
[343] *Id.* at 97.
[344] DHECC Notice of BP Appeal (April 10, 2013).
[345] DHECC Memorandum in Support of Andry Law Firm Initial Proposal (April 25, 2013).

denial of appeals based on issues that have been addressed by the Court's prior rulings.[346] During this appeal period, both Messrs. Jon Andry and Gibby Andry continued communications with CAO staff in an effort to advance their claim, contacting Mr. Duval, Mr. Patrick Juneau, and Mr. Sutton.

Mr. Jon Andry had several communications with CAO staff during the pendency of the appeal. On April 25, 2013, Mr. Jon Andry forwarded a copy of the letter to Mr. Patrick Juneau to Mr. Duval, stating that the letter was forwarded to Mr. Duval in his "capacity as the Head of Appeals" and asking him to "kindly acknowledge and advise."[347] Mr. Jon Andry did not copy BP's counsel on this communication.[348]

The next day, at 9:33 a.m., Mr. Duval contacted Mr. Jon Andry, advising that he had received the letter, but that the Court's order only applied to "appeals going forward and is not retroactive."[349] Minutes later, Mr. Duval forwarded a copy of Mr. Jon Andry's original message and letter to Mr. Sutton.[350] Later the same morning, Mr. Jon Andry replied to Mr. Duval, again without copying BP's counsel, stating:

> It is ludicrous that they notify he [sic] panelists of the orders then they advance arguments that contrary [sic] to the orders. Our appeal is in its very early stages and, in light of the April 24, 2013, Order, we should not be forced to wait an additional two or three months while the panel considers arguments that BP is effectively prohibited from advancing. What happens in the event that the panelists disregard the qualifiers and make a ruling based on a prohibited ground?[351]

Mr. Jon Andry also forwarded Mr. Sutton a copy of his message to Mr. Duval.[352] That morning, Mr. Sutton and Mr. Jon Andry spoke by cell phone for over 18 minutes, and exchanged 15 text messages in just over an hour.[353]

On April 29, 2013, Mr. Duval answered Mr. Jon Andry, explaining that the appeal rules "allow[] you to request a review by the Court if the Panelists render a decision contrary to any of

---

[346] Andry Law Firm Letter to Patrick Juneau (April 25, 2013).

[347] Email from Jonathan Andry to David Duval, Subject: RE: Andry Law Firm Appeal DHEEC Claimant ID *******80 (April 25, 2013 at 6:46 PM).

[348] *Id.*

[349] Email from David Duval to Jonathan Andry, Subject: RE: Andry Law Firm Appeal DHEEC Claimant ID *******80 (April 26, 2013 at 9:33 AM).

[350] Email from David Duval to Lionel Sutton, Subject: RE: Andry Law Firm Appeal DHECC Claimant ID *******80 (April 26, 2013 at 9:38 AM).

[351] Email from Jonathan Andry to David Duval, Subject: RE: Andry Law Firm Appeal DHECC Claimant ID *******80 (April 26, 2013 at 10:06 AM).

[352] Email Jonathan Andry to Lionel Sutton, Subject: RE: Andry Law Firm Appeal DHECC Claimant ID *******80 (April 26, 2013 at 10:14 AM).

[353] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).

Barbier's Orders. I'm currently working on the procedures, but you would file with me and I will forward to the Court."[354]

On April 30, 2013, Mr. Gibby Andry wrote to Mr. Duval concerning The Andry Law Firm appeal, with a copy provided to counsel for BP.[355] Mr. Gibby Andry argued that BP did not raise good faith grounds to appeal and that the appeal was predicated on issues already decided against it by the Court.[356]

Mr. Sutton stated to the Special Master that the Andry brothers called frequently about their claim, and noted, "Gibby, in particular, is very -- I mean, he's just aggravating. He won't stop asking."[357] Mr. Sutton stated that when The Andry Law Firm claim moved to appeals, he described a conversation with Mr. Gibby Andry where Mr. Sutton said, "I don't even know anything about appeals. You can't ask me anymore. You have got to start asking David Duval."[358] Mr. Sutton stated Mr. Duval later said to Mr. Sutton, "Why the hell did you tell Gibby that he's got to ask me, because now he's calling me all the time?"[359] Mr. Jon Andry also had a conversation with Mr. Duval during the period when the appeal was pending. Mr. Jon Andry said he talked to Mr. Duval:

> [H]e was head of appeals and, in my opinion from an advocate perspective, the appellate grounds that were chosen by BP matched those that were mentioned in Judge Barbier's 4/24 order, and so I asked David the proper procedure to -- and then we subsequently sent him a letter about trying to get it dismissed either through -- because they didn't use the proper verbiage.[360]

Mr. Jon Andry also had two lunches with Mr. Duval during the time that the appeals were pending,[361] and during the second lunch The Andry Law Firm claim was discussed. Mr. Jon Andry said he saw Mr. Duval at a basketball game and the two decided to have lunch.[362] At the first lunch during the pending appeals process, Mr. Jon Andry and Mr. Duval were joined by Ms. Reitano and Tracy Steilberg, an administrative assistant at the CAO who previously worked for Mr. Sutton at his law firm.[363] Mr. Jon Andry said Ms. Reitano and Ms. Steilberg were invited "[b]ecause [Mr. Jon Andry] was very close with them and very good friends with them."[364]

---

[354] Email from David Duval to Jonathan Andry, Subject: RE: Andry Law Firm Appeal DHECC Claimant ID *******80 (April 29, 2013 at 8:23 AM).
[355] Email from Gibby Andry to David Duval, Subject: RE: BP Claim No. ***66 (April 30, 2013 at 12:34 PM).
[356] DHECC BP's Final Proposal With Respect to Appeal of Claim No. ***66 (April 30, 2013).
[357] Lionel Sutton Transcript at 102 (July 29, 2013).
[358] *Id.*
[359] *Id.*
[360] Jonathan Andry Transcript at 52-53 (July 30, 2013).
[361] *Id.* at 62.
[362] *Id.* at 63.
[363] *Id.* at 62-63.
[364] *Id.* at 64.

Mr. Jon Andry described the first lunch as involving "just general discussion"[365] and said the purpose of the lunch was not to discuss The Andry Law Firm claim.[366] Mr. Jon Andry explained that the "purpose was to find out about the 4/24 order and just to kind of visit with [Mr. Duval]."[367] He also said, "I think I asked David about the appeal process as it relates to the 4/24 order in dismissing the appeal, but beyond that, it was just general discussion."[368] Mr. Jon Andry said that he thought he paid for one of the lunches and the other was split.[369]

Mr. Duval stated that his second lunch with Mr. Jon Andry included only Ms. Steilberg.[370] Mr. Duval in his first interview and Ms. Steilberg in her second interview stated that Mr. Jon Andry asked about The Andry Law Firm claim during the second of the two lunches, and wanted to know about the time frame on the appeal.[371] In his second interview, Mr. Duval said that Mr. Jon Andry asked about a claim by Talen's Marine.[372] Ms. Steilberg reviewed DHECC files concerning the Talen's Marine claim on May 21 and May 29, 2013.[373]

Mr. Duval and Ms. Steilberg stated that Mr. Jon Andry picked up the lunch tab both times, involving approximately $20 per person.[374] Mr. Duval stated that he could understand how outside parties could feel "uncomfortable" about his having a lunch with Mr. Jon Andry, but added that he also has had lunches with attorneys from BP on occasion.[375]

The DHECC Code of Conduct addresses accepting meals from attorneys with pending claims, providing:

> To avoid even the appearance of a conflict of interest or loss of impartiality with respect to the performance of their official duties as part of the Court Supervised Claims Program, [staff] are prohibited from soliciting of accepting any gifts or gratuities from any person or entity that may be associated with the Court Supervised Claims Program of Claims Administration Services, including but not limited to any Claimant, party, attorney, vendor or other contractor or subcontractor. Gifts and gratuities include but are not limited to … food … Reasonable business meals may, on occasion, be necessary and appropriate. Such meals are acceptable, if they are not lavish or frequent.[376]

The Special Master does not find that the above-described lunches between Mr. Duval and Mr. Jon Andry were "necessary and appropriate."

---

[365] *Id.* at 63.
[366] *Id.* at 62.
[367] *Id.* at 63.
[368] *Id.*
[369] *Id.* at 64.
[370] Interview of David Duval (July 15, 2013).
[371] *Id.*; Interview of Tracy Steilberg (August 27, 2013).
[372] Interview of David Duval (August 27, 2013).
[373] BrownGreer User Access to Claims Report (July 9, 2013).
[374] Interview of David Duval (July 15, 2013); Interview of Tracy Steilberg (August 27, 2013).
[375] Interview of David Duval (July 15, 2013).
[376] Code of Conduct Policy CA-003 at 6.0 (October 15, 2012).

### 3. *Jon Andry Tries to Expedite the Talen's Marine Claim*

Mr. Jon Andry also initiated several communications with CAO staff in order to expedite AndryLerner's Talen's Marine claim. Specifically, Mr. Jon Andry pressed Mr. Duval to reassign the Talen's claim to speed up processing.

Mr. Jon Andry included the Talen's Marine claim in his March 6, 2013 email to Mr. Patrick Juneau. On May 7, 2013, Mr. Jon Andry sent a message to a claims analyst explaining, "we forwarded you the remaining documents/information for the non-claiming facilities and our experts calculations which show that the data allows for reconciliation to the consolidated financials and then to the consolidated tax return."[377] Mr. Jon Andry asked if he could "have a call with [the analyst] to discuss the status of these claims and what, if any, additional information you may need."[378] On May 10, 2013, the analyst said that he had received the information, but "the claims have not been turned back over to the accounting team yet."[379] The analyst said that if additional information was needed, "a member of our accounting team will be in touch."[380]

Later that day, Mr. Jon Andry forwarded these messages to Mr. Duval asking, "[i]s there a way that I can get this claim back to the same guy. [He] worked on it earlier and is up to speed with all of the claims and the respective accounting. Thanks and kindly acknowledge and advise."[381]

---

[377] Email from Andry to DHECC, Subject: Talens Claims (May 7, 2013).
[378] *Id.*
[379] Email from Andry to DHECC, Subject: Talens Claims (May 10, 2013).
[380] *Id.*
[381] *Id.*

## VI.  THE FRAUDULENT CHARACTERISTICS OF THE CASEY THONN DHECC CLAIMS

### A.  Background

The Court's mandate to the Special Master did not include a directive to review the accuracy and appropriateness of claims pending before the DHECC. However, the facts relating to the claims of one DHECC claimant, Mr. Thonn, were essential to the investigation of Mr. Sutton's conduct while at the CAO and therefore were closely examined. While working for the CAO, Mr. Sutton received referral fee payments from Mr. Lerner and Mr. Jon Andry for passing Mr. Thonn's DHECC claims to AndryLerner. The Special Master finds that the Thonn claims before the DHECC evidence fraudulent characteristics. This finding therefore raises serious questions about the standards of proof to authenticate and to validate the veracity of claims and the anti-fraud policies and procedures used by the DHECC and its vendors.

### B.  Unsubstantiated Increases in the Value of Mr. Thonn's Claims Appear to Have Fraudulent Characteristics

On June 24, 2012, Mr. Thonn submitted a Seafood Compensation Program Claim, Shrimp Boat Captain (Claim 19691). On November 6, 2012, Mr. Thonn received an eligibility notice related to this claim in the amount of $685.58, based on trip ticket data from the Louisiana Department of Wildlife and Fisheries ("LDWF") Trip Ticket Database.[382]

On December 3, 2012, Mr. Thonn submitted a request for reconsideration of his $685.58 eligibility notice, requesting that the compensation be recalculated based not on trip tickets, but instead on his tax returns and a sworn written statement signed by his attorney.[383] The reconsideration increased Mr. Thonn's compensation to the amount of $189,189.00. However, the sworn written statement and the supporting documentation, on which the dramatic increase is based, are inconsistent with other information then contained in Mr. Thonn's DHECC claim file for at least four significant reasons.

First, the majority of the compensation amount is based on submission forms with fraudulent characteristics. Mr. Thonn's reconsideration request states that, in 2009, he earned $156,000.00 solely from shrimping. However, 99.71% of this income estimate cannot be traced, except through written submissions purportedly from eleven shrimp "purchasers." While the submissions claim to be from eleven different purchasers: (1) eight of the individuals did not even sign the form; (2) one of the purported shrimp "purchasers" shares a surname with Mr. Thonn; and, (3) none of the eleven submissions identifies a date, place or amount of purchase.[384]

---

[382] DHECC Initial Eligibility Notice for Casey Thonn (November 6, 2012).
[383] Seafood Compensation Plan Sworn Written Statement for Sufficient Documentation of Benchmark Revenue for Casey Thonn (December 3, 2012). Pursuant to 28 U.S.C. § 1746, the sworn written statement states that all data and supporting documentation are true, accurate and complete to the best of the claimant's knowledge.
[384] Affidavit/Sworn Statement DHECC Document ID *****85 (June 21, 2012).

Second, Mr. Thonn's assertions in his sworn written statement that 100% of his 2009 revenue was derived from shrimping, thereby seeking a higher payout from the DHECC, is contradicted by other documentation supplied.[385] For example, while Mr. Thonn claims that all of his 2009 revenue came from shrimping, trip tickets data from 2008 show that he also derived revenue from finfish and blue crab.[386] Also, in his 2010 Federal Income Return Form, Mr. Thonn reported revenue from sources like carpentry, not just shrimping. In that return, Mr. Thonn even shows revenue from "Fishing Shrimp" as distinct from "Fisherman," suggesting that he was earning revenue from species other than shrimp.

Third, Mr. Thonn failed to submit a 2008 tax return, stating that in 2008 he had only recently purchased his boat and "never really made any money with the boat,"[387] even though trip ticket data shows $677.70 in shrimp revenue for Mr. Thonn in 2008. Mr. Thonn's assertion that he did not submit a 2008 Federal tax return appears to have been accepted without further inquiry.

Finally, Mr. Thonn himself pointed to sources of income he had beyond shrimping. He stated to the Special Master that prior to the 2010 oil spill, he was a commercial fisherman who sold shrimp largely on the street because that was the only way to "make any money." He also stated that he did work as a "finish carpenter" and was particularly busy in that work for a period of time after Hurricane Katrina. He further stated that his family also "flipped houses" as a source of income.

Some of these very issues were raised in a DHECC internal audit conducted on Mr. Thonn's claim on January 23, 2013, directed by Kirk Fisher, but that audit did not cause any further inquiry to occur.[388] Without knowing of Mr. Sutton's interest in Mr. Thonn's claims, BP agreed on a base compensation amount of $22,932, which, after calculation of a Risk Transfer Premium, resulted in a final compensation amount of $189,189 on this claim.

Mr. Thonn's Seafood Compensation Program – Shrimp Vessel Owner claim was resolved in a similar manner while also evidencing fraudulent characteristics. This second claim, which should have raised questions as to its veracity, was given an initial eligibility amount of $864.78. Mr. Thonn then sought reconsideration, making the same contention that his 2009 income should all be attributed to shrimping. This request was based upon similar suspicious claims, yet resulted in a new post-reconsideration eligibility notice in the amount of $238,636.13. BP agreed to this amount in the appeal process, but again without knowing of the Sutton-Thonn relationship. The final amount paid on this claim was $166,652.10, which reflected a subtraction for seafood

---

[385] DHECC Internal Audit, Preliminary Findings of Seafood Claims for Casey Thonn (January 23, 2013).
[386] Id.
[387] Affidavit/Sworn Statement DHECC (June 21, 2011).
[388] DHECC Internal Audit, Preliminary Findings of Seafood Claims for Casey Thonn (January 23, 2013). BG did not question the documents as part of the initial eligibility determination.

compensation payments direct from BP and payments made under the GCCF, as well as an amount for accounting fees.[389]

The escalation of Mr. Thonn's claims evidencing suspicious and fraudulent characteristics are summarized in the following chart:

| Claim Number | Initial Eligibility | Final Payment | Variations |
|---|---|---|---|
| 19691 | $ 685.58 | $ 190,350.25 | $ 189,664.67 |
| 19690 | $ 864.78 | $ 166,652.10 | $ 165,787.32 |
| **Totals** | **$ 1,550.36** | **$ 357,002.35** | **$ 355,451.99** |

Since the appointment of the Special Master, the Thonn case has been referred for further investigation by the CAO. HUB Enterprises ("HUB"), a private investigative firm for the CAO, initiated an investigation on July 24, 2013. As of the date of this report, HUB has not made a final determination on the veracity of the Thonn claim.

### C.   Issues with Use of Tax Returns Rather Than Trip Tickets to Determine Economic Loss

In interviews conducted with the DHECC Quality Control Group, it was pointed out that BG noticed that several claimants from AndryLerner and another law firm were submitting claims in which the claimants' tax returns were significantly more favorable than their trip tickets, as was the case with Mr. Thonn.

Kirk Fisher asked his Quality Control team to review the identified claimants to determine whether BG's assertions about the use of tax returns were accurate. Quality Control provided their report/analysis to the Special Master of the four claimants represented by the second law firm and comparing the potential outcomes if either tax returns or trip tickets were used as the source of revenue. In all four cases, the revenue sourced to tax returns generated a larger outcome than the trip tickets did. Specifically, the tax returns yielded results ranging from 23% to 114% greater, for an average 65%.[390]

In addition to this investigation, the DHECC has also conducted an internal audit into the Seafood Compensation Program claims represented by AndryLerner. Preliminary results of that audit have identified a number of exceptions, which require further clarification.[391] Specific exceptions relate to incorrect calculations of compensation amounts for using trip tickets as opposed to income tax returns, using the wrong dates to determine Benchmark Revenue, and providing insufficient documentation to support the claims.

---

[389]  Casey Thonn had received previous seafood compensation payments directly from BP in the amount of $11,000 and seafood compensation from GCCF in the amount of $61,500.

[390]  Interview of Benjamin Arceneaux/Kyle Neathery (July 24, 2013).

[391]  DHECC Exception Analysis for Claimants Represented by AndryLerner LLC, Seafood Compensation Program (July 31, 2013).

This DHECC internal audit also identified a number of variances and trends when reviewing the sworn written statements of claimants represented by AndryLerner related to the same Seafood Compensation Program. Of particular note is that 12 claimants and 21 claims displayed sworn written statements that did not match the LDWF Trip Ticket Database. Further, 28.57% of claims or 25% of claimants specifically mention cash sales as the cause behind the variance between the LDWF Trip Ticket Database and the sworn written statement.[392] This is significant because it increases the risk of claimants inflating compensation amounts by reporting fictitious revenue related to cash sales without adequate proof.

---

[392]   DHECC SWS-1 Variance Analysis for Claimants Represented by AndryLerner LLC (July 31, 2013) .

## VII.   CAO ATTORNEY SUTTON'S ROMEO PAPA CLAIM

Romeo Papa LLC is an oilrig support and marine company that was a client of the Sutton & Reitano law firm. In addition to representing Romeo Papa, Mr. Sutton also owned 50% of the company. After going to work as an attorney at the CAO, Mr. Sutton continued to represent Romeo Papa in a federal civil suit and maintained his 50% share in that company. Neither of these facts were ever disclosed to Mr. Patrick Juneau.

Because of the nature of its business in the Gulf and losses allegedly incurred due to the federal offshore drilling moratorium, Romeo Papa submitted a moratorium claim to the DHECC in late 2012 upon Mr. Sutton's urging. Mr. Sutton was working on moratorium claims for the CAO when he contacted his fellow principals at Romeo Papa to advise them that these claims might begin to be paid out and that Romeo Papa should submit one. Additionally, after the claim was submitted, Mr. Sutton helped to process the claim through the DHECC.

### A.   Company Background

Romeo Papa LLC was registered with the Louisiana Secretary of State on February 21, 2001. The incorporation papers list Robert Perez as the registered agent and sole officer.[393] Currently, Mr. Perez and Mr. Sutton own equal shares in Romeo Papa.[394] Romeo Papa's tax returns, dating back to 2008, reflect Mr. Sutton's financial interest in the company, both personally and through a company called T-Blue, LLC, of which Mr. Sutton is the Managing Member and sole registered agent.[395] The company's headquarters is located in Houma, Louisiana and its vessels purportedly operate in the Gulf of Mexico.[396]

Romeo Papa allegedly operates four 160-foot motor vessels[397] but these vessels are leased to Romeo Papa by an affiliated entity named "Romeo Papa Hawaiian Lines." Mr. Perez and Mr. Sutton also own this second entity along with a third equity partner.[398] The vessels are supposedly leased under standard charter agreements to provide marine support, environmental response, and oilrig support in the Gulf of Mexico.[399]

### B.   Lionel Sutton's Role at Romeo Papa

In addition to owning half the company, Mr. Sutton also provided legal services to Romeo Papa during his time at the CAO. Mr. Perez mainly handles the company's day-to-day operations as

---

[393] "Romeo Papa LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on July 29, 2013).

[394] Lionel Sutton Transcript at 87 (July 29, 2013). Interviews of Robert Perez and Bart Haddad (August 2, 2013).

[395] See "T-Blue, LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on July 29, 2013).

[396] Interview of Robert Perez (August 2, 2013); see also "Romeo Papa LLC," Certificate of Incorporation, State of Louisiana Secretary of State Business Filings (Accessed July 29, 2013).

[397] Interview of Robert Perez (August 2, 2013).

[398] Interviews of Robert Perez and Bart Haddad (August 2, 2013).

[399] Interview of Robert Perez (August 2, 2013); see also http://www.romeopapaboats.com (Accessed on August 21, 2013).

its President.[400] From the fall of 2008 until May 2013, Mr. Bart Haddad served as Romeo Papa's Chief Financial Officer.[401] Mr. Sutton has provided legal representation to the company in several lawsuits involving insurance and contractual disputes, and continued to do so after joining the CAO.[402]

Ms. Tracy Steilberg, an administrative assistant at the CAO who previously worked for Mr. Sutton at his law firm,[403] recalled Mr. Sutton asking her to file court documents related to federal litigation.[404] At the time of this request, both she and Mr. Sutton worked for the CAO. Mr. Sutton acknowledged to the Special Master that he continued to represent Romeo Papa in active litigation while employed at the CAO.[405]

### C.   Lionel Sutton Processes Romeo Papa's DHECC Claim While Working at the CAO

Mr. Perez claimed to the Special Master that Romeo Papa suffered large losses in 2010 as a result of the federal government's moratorium on the issuance of new offshore deep sea drilling leases in the Gulf of Mexico.[406] Mr. Perez explained that, as a result of this financial loss, he directed Mr. Haddad to file a claim if there was an opportunity for Romeo Papa to recover some of the losses caused by the moratorium.[407]

Mr. Sutton stated to the Special Master that when he became aware that Romeo Papa was planning to submit a claim to the DHECC, he called Mr. Perez and discouraged him from submitting the claim.[408] Both Mr. Perez and Mr. Haddad denied ever receiving this direction from Mr. Sutton. Conversely, Mr. Haddad recalled receiving personal assistance from Mr. Sutton during the submission process.[409] Records of Mr. Sutton's cell phone calls and other DHECC records corroborate Mr. Haddad's recollection. The phone records indicate that Mr. Haddad and Mr. Sutton have little phone contact other than at critical times in the Romeo Papa claim review process.[410]

Mr. Haddad stated that Mr. Perez directed him to submit a claim in late 2012 and added that it was because Mr. Sutton had told Mr. Perez that the DHECC might start paying moratorium

---

[400] Interview of Robert Perez (August 2, 2013); *see also* "Romeo Papa LLC," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on July 29, 2013).
[401] Interviews of Robert Perez and Bart Haddad (August 2, 2013).
[402] Lionel Sutton Transcript at 88-90 (July 29, 2013).
[403] Interview of Tracy Steilberg (July 11, 2013).
[404] Interview of Tracy Steilberg (August 27, 2013).
[405] Lionel Sutton Transcript at 90 (July 29, 2013).
[406] Interview of Robert Perez (August 2, 2013).
[407] *Id.*
[408] Lionel Sutton Transcript at 81 (August 2, 2013).
[409] Interviews of Robert Perez and Bart Haddad (August 2, 2013).
[410] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).

claims.[411] Mr. Sutton was, at that time, one of the attorneys at the CAO responsible for dealing with issues associated with moratorium claims.[412]

Mr. Sutton became personally involved in the processing of the Romeo Papa claim in which he had a direct financial interest. On December 13, 2012, Mr. Haddad registered online to submit the claim on the DHECC website, known as "the portal."[413] Mr. Haddad stated that he was confused because, while there were a number of different claim types listed on the site, he could not find a way to designate a claim as a "moratorium claim."[414]

Mr. Haddad stated that he called Mr. Sutton to seek clarification on this issue. Mr. Sutton first told Mr. Haddad that he could not speak with him about the claim because of Mr. Sutton's position at the CAO.[415] Nevertheless, Mr. Haddad stated that Mr. Sutton did indeed instruct him to upload all of the documents and put into the registration form as much information as possible.[416] Records indicate that Mr. Sutton and Mr. Haddad exchanged four text messages on December 11, 2012, and that Mr. Haddad left a voice mail message that day on Mr. Sutton's cell phone.[417] On December 12, 2012 at 11:50 a.m., Mr. Sutton and Mr. Haddad had a cell phone call lasting over 12 minutes, followed that afternoon by five text messages.[418] On December 13, 2012, the two men had another cell phone call lasting two minutes.[419]

Following Mr. Sutton's direction, on December 18, 2012, Mr. Haddad uploaded forty-five documents to the DHECC portal, including Romeo Papa's tax returns from 2007 through 2011.

On January 4, 2013, Mr. Sutton viewed the Romeo Papa claim via the DHECC portal.[420] Then on January 7, 2013, a shareholder list was uploaded into the claims database from an IP address in Houma, LA.[421] This shareholder list indicated that Lionel Sutton held a 50% interest in Romeo Papa, LLC.

Mr. Sutton also assisted Mr. Haddad is addressing an incompleteness notice from the DHECC. Mr. Sutton viewed the Romeo Papa claim on February 21, 2013, and again on February 28, 2013, a day after DHECC reviewers had entered notes concerning information missing from the claim.[422] On March 1, 2013, an incompleteness notice was sent to Mr. Haddad to inform him that

---

[411] Interview of Bart Haddad (August 2, 2013).
[412] Lionel Sutton Transcript at 200 (July 29, 2013); Interview of David Odom (July 11, 2013); E-mail from Lionel Sutton to Sandra Maria T Parrado (PwC), Subject: Review and Approval of Claims to be Released from Potential Moratoria Holds… (April 15, 2013 at 4:12 PM). In addition to drafting policy, there is also evidence in email exchanges that in April, 2013, Mr. Sutton was involved in discussions about releasing some claims subject to moratoria holds.
[413] DHECC Settlement Registration Claim Form for Romeo Papa (December 13, 2012).
[414] Interview of Bart Haddad (August 2, 2013).
[415] *Id.*
[416] *Id.*
[417] AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[418] *Id.*
[419] *Id.*
[420] BrownGreer User Access to Claims Report (July 9, 2013).
[421] CAO database IP address report for Romeo Papa Claim (undated).
[422] DHECC Initial Account Review (February 27, 2013); BrownGreer User Access to Claims Report (July 9, 2013).

the DHECC required monthly and annual profit and loss statements for Romeo Papa for 2009 and 2010.[423] In addition, Mr. Haddad was informed that the Romeo Papa claim had been given an industry designation of "tourism" and was deemed to be in Economic Loss Zone B.[424]

Around the time of the incompleteness notice, Mr. Haddad received a telephone call from Mr. Sutton.[425] He and Mr. Sutton discussed what additional documents needed to be submitted to the DHECC, as well as the significance of the Tourism and Zone B designation.[426] Records indicate that on February 27, 2013, Mr. Sutton and Mr. Haddad exchanged four text messages.[427] On February 28, 2013 at 11:41 a.m., Mr. Sutton used his cell phone to call Mr. Haddad, and the two men had a call lasting over 14 minutes, followed by another call lasting almost two minutes.[428] Records for Mr. Sutton's cell and office phones indicate that the calls on February 28, 2013, are the only calls between Mr. Sutton and Mr. Haddad in February 2013.[429] These records do not indicate another call between the two men until March 25, 2013.[430]

The same day that Mr. Haddad received the incompleteness notice, he responded to the DHECC.[431] Mr. Haddad argued that Romeo Papa's claim should not have been designated a Tourism claim and that, based on the fact that the company's vessels operate in the Gulf of Mexico, Romeo Papa should have been identified as having done business in Zone A, not Zone B.[432] Three days later, on March 4, 2013, Mr. Haddad uploaded the requested profit and loss statements for 2009 and 2010 from his home in Mississippi.[433]

### D. Lionel Sutton's Role in Drafting Moratorium Policies at the CAO

It is important to note that at the same time Mr. Sutton was assisting Mr. Haddad submit Romeo Papa's moratorium claim, the CAO was drafting policies defining which claims would be excluded by the settlement agreement and which would be paid.[434] The drafting of these policies was one of Mr. Sutton's primary responsibilities.[435] Specifically, Mr. Sutton was drafting a policy aimed at providing guidance to DHECC claims analysts as to when a BEL claim should be denied on the basis of the damage deemed a result of the 2010 United States government moratorium on deep sea drilling in the Gulf of Mexico, as opposed to the explosion of the

---

[423]  DHECC Incompleteness Notice for Romeo Papa Claim (March 1, 2013).
[424]  *Id.*
[425]  Interview of Bart Haddad (August 2, 2013).
[426]  *Id.*
[427]  AT&T Mobility Usage, No. 950168-008 (August 28, 2013).
[428]  *Id.*
[429]  AT&T Mobility Usage, No. 950168-008 (August 28, 2013); DHECC Phone System Call Log (July 16, 2012 – July 14, 2013).
[430]  *Id.*
[431]  DHECC Correspondence from Claimant Doc ID *****70 (March 1, 2013).
[432]  *Id.*; *see also* The Economic and Property Damages Settlement Agreement as amended on May 2, 2012 at 113.
[433]  CAO database IP address report for Romeo Papa Claim (undated).
[434]  Interview of David Odom (July 11, 2013); Interview of Kirk Fisher (July 18, 2013).
[435]  *Id.*

Deepwater Horizon oil rig.[436] Therefore, Romeo Papa's claim would have been directly affected by the policy being drafted by Mr. Sutton, a 50% shareholder.[437]

E.  Lionel Sutton's Lack of Disclosures Regarding the Romeo Papa Claim

When Romeo Papa submitted its claim to the DHECC, Mr. Sutton failed to disclose to Mr. Patrick Juneau that he owned 50% of this claimant and acted as its attorney. In his interview with the Special Master, Mr. Sutton claimed that he did inform either Mr. Patrick Juneau or Mr. Michael Juneau about his continued involvement with Romeo Papa and the fact that Romeo Papa had a pending claim.[438] Mr. Sutton stated that if the Romeo Papa claim turned out to be valid, he might have asked Romeo Papa to withdraw its claim in return for Mr. Sutton personally paying Robert Perez half the value of the claim in order to eliminate the conflict.[439] Mr. Sutton also told the Special Master that he considered this as a viable option to eliminate the conflict of interest because Mr. Patrick Juneau allegedly had considered doing something similar regarding a family member's claim.[440] Mr. Patrick Juneau denied any such conversation and stated that Mr. Sutton never disclosed to him at any time that Mr. Sutton had an ownership interest in a claim before the DHECC.[441]

In contrast to Mr. Sutton's assertions to the Special Master that he disclosed the connection, Mr. Patrick Juneau, Mr. Michael Juneau, and Mr. Odom all stated that Mr. Sutton never declared his connection to Romeo Papa.[442] Nor could Mr. Sutton, when asked, reference any emails or written materials that would have mentioned any conversation in which he might have disclosed his involvement with Romeo Papa to Mr. Patrick Juneau or to Mr. Michael Juneau.[443]

---

[436]  *See* Lionel H. Sutton, III, Agreement In Furtherance of Court's Order Appointing Claims Administrator (November 1, 2012).

[437]  The Settlement Agreement precludes the payment of claims that are deemed to have been caused by the 2010 United States Government moratorium on deep sea drilling.

[438]  Lionel Sutton Transcript at 81-83 (July 29, 2013).

[439]  *Id.*

[440]  *Id.*; Patrick Juneau Transcript at 51-52 (August 1, 2013). Note: Mr. Patrick Juneau did not specifically recall discussing this fact with Mr. Sutton.

[441]  Patrick Juneau Transcript at 64 (August 1, 2013).

[442]  Lionel Sutton Transcript at 81 (July 29, 2013); Patrick Juneau Transcript at 50-51 (August 1, 2013); Interview of David Odom (July 11, 2013); Interview of Michael Juneau (August 21, 2013).

[443]  Patrick Juneau Transcript at 84-85 (August 1, 2013).

# VIII.  OTHER CONFLICTS, COMPLIANCE & GOOD GOVERNANCE ISSUES WITHIN THE CAO

On the one hand, the CAO was the victim of a scheme by claimants' attorneys Mr. Lerner and Mr. Jon Andry who utilized and paid CAO 'insider' Mr. Sutton to advance their DHECC claims. In addition, the CAO was also the victim of conduct on the part of its own executives and vendors who created other conflicts, compliance and good governance issues within the CAO.

These issues included: (1) a senior CAO attorney recommending that a CAO vendor hire her husband for a position related to DHECC business; (2) the CAO's CEO forming a company with other CAO officials and partnering with a DHECC vendor to solicit work from yet another DHECC vendor being supervised by the CAO; (3) a vendor failing to detect an employee's intimate relationship and conflict with a claimant, despite publicly available social media and internet information; and when finally focusing on this relationship as a result of the Special Master's investigation, failed to notify the Special Master and ineptly terminated the employee without advising the Special Master that it was taking such action.

Ms. Reitano expressed to the Special Master an almost complete lack of awareness of potential conflicts of interest or ethics issues relating to her legal duties at the CAO. Ms. Reitano stated that she had no experience in ethics and had not made any inquiries or responded to inquiries about the Code of Conduct or ethics issues at the CAO.[444] When asked if she saw ethics as a part of her responsibilities, she replied, "No, I saw it as part of my responsibilities, but I never envisioned an issue arising from it, so I wasn't overly concerned with it."[445] When specifically asked whether she had ever discussed ethics with Mr. Patrick Juneau she stated, "No. Because there was no problem. No issue."[446]

Ms. Reitano, a licensed attorney, stated that she was unaware whether the DHECC had a Code of Conduct Policy even though they had implemented an updated policy in October 2012, which required her signed acknowledgement indicating her understanding of key ethics provisions. She considered ethics and conflicts as topics that were not integrated into her busy workload stating, "No. It was not forefront in my mind. You know, I didn't – I didn't feel I had any of those ethical conflicts, and you know, I had a lot, a lot, a lot, a lot of work to do."[447]

### A.  Christine Reitano Recommends Lionel Sutton for a Position with DHECC Vendor Garden City Group

In his interview, Neil Zola, President of GCG, stated that in 2012 he was considering hiring an attorney to work for GCG in New Orleans, and to represent GCG at the CAO. In approximately July 2012, he approached Ms. Reitano, at the time an attorney at the CAO, asking whether she

---

[444] Christine Reitano Transcript at 51 (July 29, 2013).
[445] *Id*. at 52.
[446] *Id*. at 52.
[447] *Id*. at 54.

knew of any attorneys in New Orleans that would be both qualified and interested in such a position. Mr. Zola responded that Ms. Reitano got back to him and said that her husband would be interested in the job.

Mr. Zola thought that the suggestion did not make any sense and was "ludicrous" because of the conflict of interest. Mr. Zola said that he felt like he was in a difficult position because Ms. Reitano was his client and he did not want to be rude to her husband. Therefore, Mr. Zola did speak with Mr. Sutton, but told him that he did not consider it appropriate for GCG to hire Ms. Reitano's husband. Mr. Zola said that Mr. Sutton was very understanding and almost seemed a little embarrassed. Mr. Zola recalled that after that meeting, he likely did not see Mr. Sutton until after Mr. Sutton came to work at the CAO.[448]

Mr. Zola's account of Ms. Reitano's recommendation of her husband for a job is corroborated by a series of emails from June 29, 2012 to July 1, 2012, between GCG Executive Vice President, Jennifer Keough, and Ms. Reitano, in which they discussed the issue.[449] During the course of this exchange, Ms. Keough wrote to Ms. Reitano about the possible referral of a local attorney to work for GCG: "When you can, talk to Tiger about that other issue and the referral, and see what he thinks."[450] Ms. Reitano responded that "Tiger is interested" in the position and then went on to advocate for him by noting his understanding of the claims process and her opinion that he would work well with Mr. Zola and Ms. Keough. At one point, she said, "Tiger will talk to Pat on Monday to get his thoughts." Ms. Keough responded that Mr. Zola thought it would be better if Mr. Sutton called him before consulting with Mr. Patrick Juneau.[451]

In his July 29, 2013, interview with the Special Master, Mr. Sutton was questioned about his wife's recommending him to the GCG for employment as an attorney. He stated that Ms. Reitano had been told that the GCG was looking for an attorney to represent them in meetings of DHECC vendors, the Claims Administration Office and settlement parties. He stated that his wife told GCG executives that he might be available. He recalled that Neil Zola called him regarding the job and expressed concern that Mr. Patrick Juneau might think GCG was trying to get into "his good graces or something" by hiring Mr. Sutton. He stated that he told Mr. Zola he understood and that was the end of it.[452]

Ms. Reitano confirmed that in her role at the CAO, she had an oversight role with respect to GCG.[453] Ms. Reitano stated that she sent the email about her husband because he was not doing

---

[448]   Interview of Neil Zola (July 17, 2013).
[449]   Emails between Jennifer Keough and Christine Reitano, Subject: RE: Sarasota (June 29, 2012 and July 1, 2012).
[450]   *Id.*
[451]   *Id.*
[452]   Lionel Sutton Transcript at 165-167 (July 29, 2013).
[453]   Christine Reitano Transcript at 64 (July 29, 2013).

much of a legal practice. Ms. Reitano stated that she spoke to her husband about the job prior to sending the email, and that he was interested.[454]

When asked by the Special Master if she saw this action as a conflict of interest, Ms. Reitano replied that she did not. She did not feel that the CAO was in conflict with one of the vendors. Ms. Reitano was asked if she oversaw vendor activities and supervised them from time to time. She replied that was true, but thought she could do that within the CAO office. She answered, "At the time I did not see it as a conflict." When asked if she now thought of it as a conflict, Ms. Reitano replied: "Um – – I guess I view my relationship with them as a working relationship."[455]

## B. Crescent City Group and Postlethwaite & Netterville: "Chinese Drywall"

### 1. Founding of Crescent City Group ("CCG") and Proposal to BrownGreer

In early 2013, David Odom and Kirk Fisher formed Crescent City Group ("CCG"). CCG is a Louisiana corporation, incorporated on February 28, 2013.[456] The company's leadership includes its President, Mr. Odom, and Secretary, Mr. Fisher. CCG marketing materials identify Messrs. Odom and Fisher as the company's founding members.[457]

On its web page, CCG states that it was "formed by business professionals with years of experience in business management, financial analysis, and IT services."[458] The website also lists and describes its services offered including business and management consulting. In its marketing materials, CCG cites to work on the Deepwater Horizon claims process, describing itself as a:

> Louisiana-based firm with proven experience on large, complex settlement and housing rehabilitation programs throughout the Gulf Coast. The CCT (Crescent City Team)[459] team brings experience on over $20 billion in housing rehabilitation and settlement programs, including management and implementation of the Deepwater Horizon Economic and Property Damages Settlement, one of the largest class-action settlements to date.[460]

With his DHECC colleague, Mr. Odom not only formed the CCG while working for the CAO, but also went on to market its services to one of the CAO vendors, BG, by partnering with

---

[454] Emails between Jennifer Keough and Christine Reitano, Subject: RE: Sarasota (June 29, 2012 and July 1, 2012).

[455] Christine Reitano Transcript at 66 (July 29, 2013).

[456] "Crescent City Group Inc., (A Business Corporation)," Certificate of Incorporation, Louisiana Secretary of State Business Filings (Accessed on August 29, 2013).

[457] Proposal to Assist in the Chinese Drywall Settlement Program Administration. MDL No. 2047. USDC EDLa (March 19, 2013).

[458] "About Us" Webpage Screenshot for Crescent City Group, Inc. (Assessed July 31, 2013).

[459] Proposal to Assist in the Chinese Drywall Settlement Program Administration. MDL No. 2047. USDC EDLa (March 19, 2013). The CCT is how the partnership between CCG and P&N is referenced in the Chinese Drywall Proposal.

[460] *Id.*

another CAO vendor, P&N. On March 19, 2013, Mr. Odom sent an email[461] to Lynn Greer of
BG, with a copy to Mr. Patrick Juneau, explaining:

> As you may know, we have been in touch with various stakeholders to
> see if we can assist with the Chinese Drywall program. In addition to
> you we are reaching out to Judge Fallon . . .  Pat Juneau . . . [and
> others][462] and are providing the attached proposal. Wanted to meet with
> you in person, but looks like you will not be in town until next week. So
> lets [sic] touch base then. In the meantime, please review the enclosed
> proposal and let's discuss when you get in town.[463]

The program referenced in the email related to a settlement of multidistrict litigation concerning
imported Chinese drywall that was installed in homes and buildings primarily in the Gulf Coast
region and Virginia from 2005 to 2008.[464] Installation of this drywall resulted in foul odors,
corrosion of metal components, electronics and appliance failure, and, in some cases, adverse
health and medical reactions. Judge Fallon of the USDC EDLa oversaw the multidistrict
litigation, approving a settlement on February 7, 2013, that named a Special Master and
appointed Mr. Patrick Juneau to serve as a substitute Special Master. BG was appointed to
administer the program.[465] The other references in Mr. Odom's email included plaintiffs' liaison
counsel and defendants' liaison counsel in the Chinese drywall litigation.[466]

The attachment to which Mr. Odom referred in his email to Ms. Greer was a joint proposal from
CCG and DHECC accounting vendor P&N to assist in the Chinese drywall settlement.[467] In the
proposal, the two firms, which referred to their partnership as the "Crescent City Team," claimed
to offer "a team of highly skilled professionals with extensive experience in performing the
required services, including experience in managing and implementing the Deepwater Horizon
Economic and Property Damages Settlement administration (currently over $1.7 billion in paid
claims)."[468]

The proposal sent to BG was riddled with potential conflicts of interest. Not only did the CCG
use its experience with the CAO to market itself to a major supervised DHECC vendor on
another matter, but it also offered the services of numerous individuals currently employed by
the CAO itself. The proposed "Crescent City Team" team included several principals who were,
at the time, actively employed at the CAO, including: Mr. Odom; Mr. Fisher; Mr. Duval; and

---

[461] Email from David Odom to Lynn Greer, Subject: RE: Chinese Drywall Proposal (March 19, 2013 at 2:51 PM).
[462] The proposal was sent to a lawyer at one of the plaintiff law firms in this litigation. There is no evidence that the lawyer solicited the proposal.
[463] Email from David Odom to Lynn Greer, Subject: RE: Chinese Drywall Proposal (March 19, 2013 at 2:51 PM).
[464] Proposal to Assist in the Chinese Drywall Settlement Program Administration. MDL No. 2047. USDC EDLa (March 19, 2013). Several Chinese companies have been linked to the production and export of the defective drywall, most notably, Knauf Plasterboard Tianjin Co. Ltd., a subsidiary of Knauf Gaps KG.
[465] Order of Judge Fallon In RE: Chinese Manufactured Drywall Products Liability Litigation, MDL 2047 (December 20, 2011).
[466] Id.
[467] Proposal to Assist in the Chinese Drywall Settlement Program Administration. MDL No. 2047. USDC EDLa (March 19, 2013).
[468] Id.

Chris Reade, the CAO Chief Information Officer.[469] The "Crescent City Team" team also included several P&N employees who were at the time working on DHECC matters, including: Robin Pilcher; Mark Staley; William Potter; and, Brandon Lagarde.[470] Additionally, Claims Administrator Mr. Patrick Juneau was even listed as a reference in the proposal.[471]

> ### 2. BrownGreer Responds to Crescent City Group's Proposal with Postlethwaite & Netterville

The same day that Mr. Odom emailed the proposal to Lynn Greer, her partner, Orran Brown, sent an email to Ms. Reitano and Mr. Sutton, forwarding Mr. Odom's email along with the attached business proposal for the Chinese drywall settlement program.[472] Mr. Brown explained to Ms. Reitano and Mr. Sutton that "[w]e have handled the Drywall program for a couple of years. It is now expanding. Lynn got this from Mr. Odom today out of the blue. There is nothing for them to do in that program."[473]

In an interview with the Special Master, Mr. Brown stated that, on learning of the partnership between CCG and P&N, he felt it to be an improper arrangement as the principal parties of CCG, including its founding members, were charged with monitoring P&N's performance with regard to the DHECC claims process.[474] Asked her reaction to receiving the Chinese drywall proposal from the "Crescent City Team," Ms. Greer stated that she was "incredulous" when she received the proposal, because CCG was comprised of CAO executives. Ms. Greer also remarked that her hands "shook" as she read the proposal.[475]

Mr. Brown's apprehensions, as expressed to investigators, about how best to address the "Crescent City Team's" proposal highlight the conflicts inherent in Mr. Odom and Mr. Fisher's actions. Mr. Brown stated that he had some concern about bringing this issue to the attention of Mr. Patrick Juneau, for fear of reprisal from either Mr. Odom or Mr. Fisher, both of whom he would have to continue to work with at the DHECC.[476] Mr. Brown further explained that the proposal put his firm in a difficult position, as "we would feel like they have to be brought in because they were still supervising us."[477] Mr. Brown remarked, "[i]t felt like if we played ball with [Mr. Odom and Mr. Fisher] over there, maybe they'd continue to play ball with us over here."[478]

---

[469] Mr. Reade is also the President of the Carrollton Group.
[470] Proposal to Assist in the Chinese Drywall Settlement Program Administration, MDL No. 2047. USDC EDLa (March 19, 2013).
[471] *Id.*
[472] Email from Orran Brown to Christine Reitano; Lionel Sutton, Subject: FW: Chinese Drywall Proposal (March 19, 2013 at 2:02 PM).
[473] *Id.*
[474] Interview of Orran Brown (July 23, 2013).
[475] Interview of Lynn Greer (July 24, 2013).
[476] Interview of Orran Brown (July 23, 2013).
[477] *Id.*
[478] *Id.*

Nevertheless, Mr. Brown and Ms. Greer advised Mr. Patrick Juneau of the CCG-P&N proposal. Mr. Odom withdrew the proposal shortly thereafter.[479]

### 3. DHECC Code of Conduct and Disclosures to Patrick Juneau about Crescent City Group

All DHECC contractors, subcontractors, and vendors ("DHECC Personnel") are required to read and sign several acknowledgements and agreements, including the DHECC Code of Conduct ("the Code").[480] Among its provisions, the Code states that all DHECC Personnel will carry out their work "[at] all times during the term of this Agreement free of any conflict of interest as an independent contractor not affiliated with another person or entity other than the Claims Administrator."[481]

Additionally, DHECC Personnel also agreed to "take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality with respect to the performance of [his/her] official duties as part of the Court Supervised Claims Program."[482] The Code further states that DHECC Personnel, and contractor, subcontractor, and vendor personnel are not to participate, without prior written approval from the Claims Administrator, in any activity that presents or would appear to present to a reasonable person who is knowledgeable of the relevant facts, a conflict of interest with the Court Supervised Claims Program.[483] All members of the "Crescent City Team," whether they are DHECC Personnel or P&N employees assigned to the DHECC matter, submitted to these terms as part of their agreement to work with the DHECC and were required to submit a written request to engage in outside work of this nature.

Mr. Patrick Juneau was asked if he recalled whether Mr. Odom or Mr. Reade had ever talked to him about a company called the CCG. Mr. Patrick Juneau stated that he did not have any recollection or memory of such a discussion. Regarding Mr. Fisher's outside employment, Mr. Patrick Juneau stated that he recalled knowing "verbally" about Mr. Fisher's outside company interests. The only thing he recalled regarding any of his employees taking on a role in the "Chinese Drywall" settlement administration was that he had seen a brochure. He recalled that Mr. Odom had been the "initiator of that." Mr. Patrick Juneau recalled that Mr. Duval, Mr. Fisher and some others were listed in the brochure. Mr. Patrick Juneau stated, "I told him I didn't like that. I thought that conflicted with what we're doing there. He told me that they pulled that proposal down."[484]

Mr. Patrick Juneau was also asked whether anyone who was on the proposal sought permission to submit it or to obtain outside employment. Mr. Patrick Juneau stated that he did not recall any such requests. He did recall seeing in the proposal a reference to himself and had told Mr. Odom

---

[479] *Id.*
[480] DHECC Policy CA-003, Code of Conduct (effective October 15, 2012).
[481] DHECC Policy CA-003, Code of Conduct, 5.0 Conflict of Interest and Recusal (effective October 15, 2012).
[482] *Id.*
[483] *Id.*
[484] Patrick Juneau Transcript at 107-09 (August 1, 2013).

that Mr. Patrick Juneau had a program to run and not to reference him on anything. Mr. Patrick Juneau stated that he told Mr. Odom that he was not applying for any work and he objected to being mentioned in the brochure. He stated that Mr. Odom told him shortly thereafter, "We concur. We pulled down this application."[485]

At the time of the CCG's formation, there is no record of Mr. Fisher, Mr. Odom, Mr. Duval or Mr. Reade furnishing the CAO with specific notice of their involvement with CCG. On July 17, 2012, several months before creating the CCG, both Mr. Odom and Mr. Reade sent virtually identical, generic emails requesting authorization for "outside employment," which Mr. Patrick Juneau approved. Their emails neither mentioned the involvement of P&N, nor the fact that their proposal would be soliciting work from BG, barely describing the nature of the work itself:[486]

> Pursuant to the Deepwater Horizon Claims Center (DHECC) Confidentiality/Non – Disclosure Agreement, Conflict of Interest and Recusal section, I am seeking your approval to continue work with other companies that I have established. Although I work full-time … on the Deepwater Horizon Economic Claims Program, I spend some additional time in these companies which provide software and other services. These companies, products and services do not in any way present a conflict of interest to my role as the [CEO/CIO] of the DHECC.[487]

When asked by the Special Master if he recalled being informed by either Mr. Odom or Mr. Reade of their connection to any outside companies, Mr. Patrick Juneau stated that he recalled conversations with Mr. Odom regarding his involvement in a "software company" but that Mr. Odom continued to represent to Mr. Patrick Juneau that he was not involved with any business that would have caused a conflict of interest with his position at the DHECC.[488] When asked if either Mr. Odom or Mr. Reade had mentioned CCG, Mr. Patrick Juneau responded that he did not recall.[489]

Mr. Odom stated that he gave the CCG-P&N Chinese Drywall proposal to Mr. Patrick Juneau and that Mr. Patrick Juneau approved it. Mr. Patrick Juneau denied this. Mr. Patrick Juneau reiterated that, once he saw the proposal and the fact that it carried him as a reference, he objected to the proposal and it was withdrawn.[490] Further, there is no evidence that Mr. Odom, Mr. Fisher, Mr. Duval, Mr. Reade, or any of the involved parties from P&N,[491] ever informed the CAO of their intent to submit a joint proposal from CCG and P&N, or sought permission to do so in writing, before seeking to obtain work in the Chinese drywall settlement.

---

[485] *Id.* at 111.
[486] Email from Chris Reade to Patrick Juneau, Subject: RE: Outside Employment (July 17, 2012 at 5:01 PM); Email from David Odom to Patrick Juneau, Subject: Re: Outside Employment (July 17, 2013 at 3:34 PM).
[487] *Id.*
[488] Patrick Juneau Transcript at 106 (August 1, 2013).
[489] *Id.* at 107.
[490] *Id.* at 107-11.
[491] Mr. Pilcher, Mr. Staley, Mr. Potter and Mr. Lagarde.

The participation of the abovementioned CAO executives in a joint proposal between CCG and P&N presented the clear appearance of a significant conflict of interest and would have compromised the CAO's ability to oversee one of its most important vendors. Even though their proposal ultimately was withdrawn, the fact that these senior CAO officials formed CCG and then formally proposed to work for a vendor they oversaw constituted a clear conflict of interest, violating the DHECC Code of Conduct Policy.[492] Such a conflict would have compromised the fair and impartial appearance of decision-making processes within the CAO.

## C. BrownGreer

### 1. Lack of Response to CAO Oversight

In addition to BG's failure to find and report the fraudulent characteristics of the Thonn claim, BG utilized Mr. Sutton and Ms. Reitano to promote BG's own business and financial interests within the CAO in an effort to resist and undermine the implementation of new business practices which would control costs and eliminate inefficiencies. According to Mr. Patrick Juneau, Ms. Reitano became an integral part of his legal team, working on policy and general legal matters.[493] In her interview with the Special Master, Ms. Reitano described her role, when hired into the CAO, as "general counsel" who was responsible for interpreting the DHECC settlement.[494] Mr. Sutton was primarily focused on drafting policy for Subsistence Claims and Moratorium claims. Both Mr. Sutton and Ms. Reitano were in positions to influence or make policy decisions which directly affected BG.

During the course of the investigation, several individuals who were interviewed related instances wherein both Ms. Reitano and Mr. Sutton advocated on behalf of BG when other CAO staff were seeking business process improvements or efficiencies. In particular, email exchanges were identified that show discussions among the CAO staff and the DHECC vendors regarding efficiencies, system reporting, and senior staff communications. In a number of these cases, Mr. Sutton and Ms. Reitano appear to be acting in the best interest of BG by advocating BG's positions, rather than the interests of the CAO. CAO staff expressed frustration with flaws in BG operations and business processes; however, the CAO staff informed the Special Master that BG was not always receptive of their concerns and was generally unaccountable. For example, Mr. Odom said that Orran Brown of BG made clear to him from the outset of Mr. Odom's tenure at the CAO that Mr. Brown reported only to Mr. Patrick Juneau and not to Mr. Odom.[495]

In an email chain between senior leadership at DHECC (including BG, GCG, PwC, and P&N) from January 16-18, 2013, there were discussions regarding the CAO's efforts to conduct a comprehensive study of analyst resources. Scot Sherick, the former Director of the Business Practices and Reporting Group ("BPRG") at the CAO, transmitted an email with an attachment

---

[492]   DHECC Policy CA-003, Code of Conduct (effective October 15, 2012).
[493]   Patrick Juneau Transcript at 88-89 (August 1, 2013).
[494]   Christine Reitano Transcript at 32 (July 29, 2013).
[495]   Interview of David Odom (August 8, 2013).

of a Microsoft Excel spreadsheet asking each vendor to identify the number of full-time employees assigned to each step or task in the claims process.[496] Bill Atkinson of BG responded to Mr. Sherick's email with some of the data that Mr. Sherick had requested.[497] In reply, Mr. Sherick thanked Mr. Atkinson but said that he required additional data regarding the reviewers and their tasks.[498] Mr. Brown then responded to the email chain, copying Mr. Patrick Juneau and Mr. Michael Juneau and questioning the necessity of the request and whether it was possible. He was also concerned that BG did not have time to respond to the request.[499]

Mr. Brown then sent a separate email to Mr. Sutton and Ms. Reitano complaining that such tasking required a great deal of time. He also expressed his concerns that "they" were using it to speak against BG:

> This sort of thing is diverting a lot of our key people from their real jobs. We spend a lot of time compiling all sorts of information and giving it to them. Then they use it as they wish to say what they want to say against us. I assume they are trying to figure out how many new people will have to be hired and trained by the accountants to assume all BEL duties. But they have not told us that. I am near the point where I want to write a letter to Pat, David and others saying that these teams and these demands, which always come on little or no notice with very little time to respond, continue to interfere with our operations and are impairing our ability to perform the tasks we have to perform to implement the Settlement Agreement.[500]

Mr. Sutton replied that he agreed and believed the matter should be formally brought to Mr. Patrick Juneau's attention.[501] Ms. Reitano sent a short email concurring.[502]

In response to Mr. Brown's email questioning the necessity of the tasking, Kirk Fisher forwarded Mr. Brown's response to Mr. Odom. Mr. Odom responded to Mr. Brown, asking that BG provide the data, noting that the other vendors had already complied. Mr. Odom set a deadline for close of business the next day. Mr. Brown responded by email to Mr. Odom that BG was doing the best it could, but he was concerned that not all of the request could be completed. He also stated "it is not really possible to be precise, or perhaps even reasonably reliable on bucketing reviewers by task. Because we do not know what you do with all this information, it is

---

[496] Email from Scot Sherick to DHECC vendors, Subject: DHECC BEL Current Resourcing.xlsx (January 16, 2013).
[497] Email from Bill Atkinson to Scot Sherick, Subject: DHECC BEL Current Resourcing.xlsx (January 17, 2013).
[498] Email from Scot Sherick to DHECC vendors, Subject: DHECC BEL Current Resourcing.xlsx (January 17, 2013).
[499] Email from Orran Brown to Scot Sherick, Subject: DHECC BEL Current Resourcing.xlsx (January 18, 2013).
[500] Email from Orran Brown to Christine Reitano, et al, Subject: FW: 20130116 DHECC BEL Current Resourcing (January 18, 2013 at 9:11 AM).
[501] Email from Lionel Sutton to Orran Brown, Subject: FW: 20130116 DHECC BEL Current Resourcing (January 18, 2013 at 9:25 AM).
[502] Id.

hard for us to make sure that we're giving you the data that you really want or that the data is suitable for the purpose for which you use it."[503]

Both Mr. Fisher and Mr. Sherick were hired by Mr. Odom to work on business processes and efficiencies that could be achieved within the DHECC and among its court-appointed vendors. As part of that responsibility, Mr. Sherick's efforts often involved scrutiny of the claims database system managed by BG and examining personnel resources for efficiencies. During his interview, Mr. Sherick explained that Ms. Reitano was the "biggest opponent of [the BPRG]" and that she "either didn't understand or pretended not to understand [the] value of the BPRG."[504] Mr. Sherick stated that Ms. Reitano "chose not to understand" the BPRG's role and importance because "she had an affinity for BG and a lot of the results of the BPRG didn't always speak highly of BG's performance and occasionally made recommendations to limit their scope or be more probing in the analysis of BG's processes."[505] Mr. Sherick said that, because Ms. Reitano acted as the "gatekeeper" between CAO employees and Mr. Patrick Juneau, and Mr. Sutton "certainly had Pat Juneau's ear," Mr. Sherick believed the two would not always accurately deliver to Mr. Patrick Juneau the concerns of CAO employees if they disagreed with their opinions.[506] BG exploited its influence with Ms. Reitano and Mr. Sutton to receive results that it desired rather than acquiescing to simple requests that were made in the best interests of the DHECC.

In a January 18, 2013 email from Roma Petkauskas, an employee at BG, to Mr. Brown and other BG executives, she detailed an "emergency" from Mr. Odom. She reported that Mr. Odom had called her to his office with the tasking on "502 errors" that she believed would take hours.[507] The email contained a list of 16 URLs to be reviewed. Mr. Brown forwarded that email to Ms. Reitano and Mr. Sutton, copying Lynn Greer of BG, adding the comment "another example" referring to another example of the CAO asking for reports, thereby distracting BG from adjudicating claims. Ms. Reitano responded to all in an email that she and Mr. Sutton would make it an "issue" to address at vendor meetings. She stated that they [Mr. Sutton and Ms. Reitano] would be the ones to put it on the table.[508] Mr. Brown thanked Ms. Reitano and Mr. Sutton for addressing the issue.[509]

During his interview, Mr. Odom said that Ms. Reitano acted in a manner that effectively protected BG. According to Mr. Odom, when he sought information from BG and attempted to cut costs and inefficiencies by limiting the number of staff BG utilized, BG would push back and

[503] Email from Orran Brown to David Odom, et al, Subject: RE: 20130116 DHECC BEL Current Resourcing (January 21, 2013 at 5:42 PM).
[504] Interview of Scot Sherick (July 26, 2013).
[505] Id.
[506] Id.
[507] Email from Roma Petkauskas to Orran Brown, et al, Subject: RE: 502 Errors (January 18, 2013 at 11:36 AM).
[508] Email from Christine Reitano to Orran Brown; Lionel Sutton; Lynn Greer, Subject: RE: 502 Errors (January 18, 2013 at 2:06 PM).
[509] Email from Orran Brown to Christine Reitano; Lionel Sutton; Lynn Greer, Subject: RE: 502 Errors (January 18, 2013 at 4:06 PM).

did not cooperate.[510] BG would use Ms. Reitano as "an end-around" in order to override Mr. Odom's requests.[511] In this capacity, BG used Ms. Reitano as a shield against policy decisions or requests that BG deemed burdensome, unnecessary or against BG's business and financial interests.

On January 28, 2013, Mr. Brown wrote an email to Chris Reade, the Chief Information Technology Officer at DHECC, stating that BG had received "a lot of requests" from Sara Cullen for "information, training and materials on BEL processes, Exclusions and the QA processes used in this Program."[512] In his email Mr. Brown stated, "We need to know what her role is and whether she is authorized to receive all this information, for this is taking up a lot of time and involves confidential material."[513] Ms. Cullen had sent the email in her capacity as a DHECC Claims employee. In his response, Mr. Reade explained that Mr. Brown should contact Ms. Cullen at her DHECC email address and provide the information because "Sara is just helping get the process documented." Mr. Reade offered to "speak to her about [her request] and find out specifically what she needs." Mr. Reade attempted to compromise with Mr. Brown by explaining, "She's a very thorough analyst so if she's asked for anything that will take a lot of time we can work around that."[514] Mr. Brown responded to Mr. Reade, copying Ms. Reitano, Mr. Sutton, Mr. Odom, Mr. Patrick Juneau and Mr. Michael Juneau, and said that the process is already documented.[515] Mr. Brown further stated:

> We need to discuss why, with all the written procedures we prepare
> and follow, there is any need for us to educate someone else who
> then will try to write up what we tell her, which was already written
> up to begin with.[516]

Mr. Reade responded to Mr. Brown and suggested, "perhaps you're missing the intent of what was requested."[517] Mr. Reade explained that the request by Ms. Cullen was not asking about documenting processes; rather, Ms. Reade needed information about the location of data processing to determine where DHECC could add additional IT capacity.[518]

---

[510] Interview of David Odom (July 11, 2013).
[511] *Id.*
[512] Email from Orran Brown to Christopher Reade, Subject: Sara Cullen with Carrolton Group (January 28, 2013 at 6:17 PM).
[513] *Id.*
[514] Email from Christopher Reade to Orran Brown, Subject: Sara Cullen with Carrolton Group (January 28, 2013 at 7:33 PM).
[515] Email from Orran Brown to Christopher Reade, Subject: Sara Cullen with Carrolton Group (January 28, 2013 at 7:10 PM).
[516] *Id.*
[517] Email from Christopher Reade to Orran Brown, Subject: Sara Cullen with Carrolton Group (January 28, 2013 at 8:25 PM).
[518] *Id.*

Mr. Odom responded to Mr. Reade's email but omitted Mr. Brown. Mr. Odom said, "Chris, Stand down. We will discuss when I get back."[519] Ms. Reitano forwarded Mr. Odom's email to Mr. Sutton only and stated:

> "Stand down or you will disappear!"[520]

Mr. Odom said that Ms. Reitano sent emails to BG employees that expressed a sentiment, "don't worry we will get Chris Reade off [you] and you won't have to worry about your IT."[521] These examples, among others, are indicative of how BG coordinated with Ms. Reitano and Mr. Sutton to accommodate BG's interests and efforts to resist and undermine the implementation of new policies which would control costs and eliminate inefficiencies.

### 2. *BrownGreer Employee and Girlfriend of Casey Thonn*

During the course of the investigation, it was learned that a BG claims reviewer (the "BG Employee") had an intimate relationship with Mr. Thonn. The chronology below highlights BG's failure to detect this conflict promptly and the lack of a proper investigative response to potential fraud.

As discussed above, Mr. Thonn filed five claims for compensation with the DHECC. On July 25, 2013, the Special Master requested all BG reports produced regarding Ms. Reitano, Mr. Sutton and the Thonn claim. The next day, BG transmitted reports that included a spreadsheet reflecting persons who had accessed Mr. Thonn's claims in the DHECC claims database from October 1, 2012 to June 17, 2013. The spreadsheet, previously provided to the CAO on July 9, 2013, indicated that the BG Employee checked Mr. Thonn's claims in the DHECC database most frequently. The BG Employee checked Mr. Thonn's claims numerous times,[522] exceeding the number of times Mr. Sutton checked the claims. The Special Master performed research on the BG Employee to assess any possible connection between her and Mr. Thonn.

Public source materials revealed that the BG Employee gave birth to Mr. Thonn's son on May 9, 2013.[523] This was consistent with the fact that the BG Employee had been on maternity leave from BG through July 10, 2013,[524] and also consistent with a reference Mr. Sutton made during his June 20, 2013 interview with Mr. Patrick Juneau, Mr. Michael Juneau, and Mr. Welker. Mr. Sutton said then that he had accessed Mr. Thonn's claim because Mr. Thonn expressed concern

---

[519] Email from David Odom to Christopher Reade, Subject: Sara Cullen with Carrolton Group (January 28, 2013 at 7:37 AM).
[520] Email from Christine Reitano to Lionel Sutton, Subject: Sara Cullen with Carrolton Group (January 28, 2013 at 9:27 AM).
[521] Interview of David Odom (July 11, 2013).
[522] BrownGreer User Access to Claims Report (July 9, 2013).
[523] *See* Publicly available media document, copy retained on file with the Special Master.
[524] Interview of Orran Brown (August 1, 2013).

that he had broken up with a girl working at BG and she could possibly adversely impact his claims.[525]

BG fired the BG Employee after the Special Master's investigation determined her intimate relationship to Mr. Thonn and after BG knew of the importance of Mr. Thonn to the Special Master's investigation. Without conducting a proper investigation to examine whether the BG Employee improperly advanced or influenced the Thonn claims, BG terminated the BG Employee, stating she allegedly lacked candor in her representations about her relationship with Mr. Thonn.[526]

When questioned as to whether the BG Employee's potential importance to the Special Master investigation was considered in her firing, both Mr. Brown and Ms. Greer said that neither of them had considered advising the Special Master regarding the BG Employee checking the claim, her relationship to Mr. Thonn, or her dismissal from BG.[527] Mr. Brown also stated he felt as if BG was being investigated and did not really know what the investigation was about. He also emphasized that it had always been important to be responsive to claimants and checks were made often.[528] During his interview with the Special Master, Mr. Brown stated he was not aware that the Thonn claim was of significant interest to the Special Master investigation even though he had been copied on various email requests for reports on who had accessed the Thonn claims. Mr. Brown also failed to appreciate the importance of monitoring employees on the frequency of their accessing claims within the database as a potential anti-fraud measure.

In an email dated August 5, 2013, Mr. Brown wrote to Mr. Patrick Juneau, Mr. Michael Juneau, Mr. Odom, Charles Hacker (PwC), Ms. Greer, Mr. Welker, and Ms. Petkauskas, about his concerns regarding the Special Master's investigation. Specifically, Mr. Brown's email expressed concerns that he was questioned regarding the DHECC claims database system's capacity to determine who had looked at claims. He reported, "They were very critical of me for not running the report … and for not giving it to the Claims Administrator any time since March 2013. They did not instruct me in that session not to discuss my interview with anyone else. Because their mindset affects the Program as a whole and what we can do in it, I have to alert you to what transpired."[529] In fact, the focus of the interview was the circumstances of the BG Employee's dismissal relative to the importance of the Thonn claim to the investigation, and the lack of investigative action following BG's knowledge as of July 9, 2013 that the BG Employee had been checking on the Thonn claim.

---

[525]  Welker Summary of Sutton Interview (June 20, 2013).
[526]  Interview of Orran Brown (August 1, 2013).
[527]  Interview of William Atkinson (August 10, 2013). During his interview, Mr. Atkinson was asked if he was aware that the Casey Thonn claim was part of the Special Master investigation. He stated that all BrownGreer executives knew it was a sensitive matter. Mr. Atkinson stated that he understood the gravity of the connection between Mr. Thonn and the BG Employee.
[528]  Interview of Orran Brown (August 1, 2013).
[529]  Email from Orran Brown to Patrick Juneau, et al, Subject: Former PwC Employee [M.A.] (August 5, 2013 at 3:09 PM).

The Special Master interviewed Mr. Thonn and the BG Employee, and reviewed access controls to assess whether the Thonn claim was inappropriately advanced or influenced by the BG Employee. The Special Master did not find evidence indicating that the BG Employee had taken any official action on the Thonn claim or that she improperly advanced or influenced the claim.

## IX.  CONCLUSION

The Special Master finds ample evidence that three attorneys worked together to corrupt a settlement process, written and administered in good faith and designed to benefit persons and businesses that suffered serious harm from the catastrophic 2010 Deepwater Horizon oil spill in the Gulf of Mexico. This evidence demonstrates that Mr. Lerner and Mr. Jon Andry utilized Lionel Sutton's position inside the Claims Administration Office for the benefit of Mr. Lerner and Mr. Jon Andry's clients at the AndryLerner law firm, and that Mr. Jon Andry also used Mr. Sutton to facilitate and expedite a DHECC claim of The Andry Law Firm for $7,908,460. In return, and using circuitous and convoluted interstate wire transfers, Mr. Lerner and Mr. Jon Andry paid CAO attorney Sutton over $40,000 in fees for referring DHECC claimant Mr. Thonn to their AndryLerner law firm. There is also credible evidence that Mr. Sutton acted in concert with Mr. Lerner and Mr. Jon Andry to arrange for the Thonn referral fee payments.

The Special Master did not find any evidence that either Mr. Sutton or Ms. Reitano directly manipulated the valuation of claims by accessing the DHECC database. The Special Master also did not find any evidence of such manipulation by other CAO officials. However, a comprehensive examination of this issue was not part of the Special Master's mandate.

As a CAO employee, Mr. Sutton knew and was bound by the policies set forth by Claims Administrator Mr. Patrick Juneau which govern conflicts of interest, the appearance of conflicts of interest, outside employment, and gift-giving. Mr. Sutton violated Mr. Patrick Juneau's clear ethical "tone at the top" by accepting money from Mr. Lerner and Mr. Jon Andry and helping to facilitate and to expedite their claims. In doing so, Mr. Sutton violated his duty of loyalty to the Claims Administrator and worked, instead, for his own financial gain and the benefit of Mr. Lerner and Mr. Jon Andry. Mr. Sutton abused his CAO access and position of influence inside the CAO on behalf of Mr. Lerner and Mr. Jon Andry to gather information at their behest and advocate on their behalf. Further, Mr. Sutton never told Mr. Patrick Juneau that he was receiving referral fee payments from Mr. Lerner and Mr. Jon Andry, that Mr. Lerner was a business partner of his in Crown from which Mr. Sutton was earning $10,000 per month from Mr. Lerner, or that Mr. Lerner had told Mr. Sutton that he needed his "claims expedited" because "[m]ore money coming in means I start getting my sea legs and can keep us going in other areas." Instead, Mr. Sutton concealed his improper financial relationships and interests, hid the receipt of his payments by having them passed to a defunct corporate bank account, misrepresented the payments when asked about them by a court official, and misrepresented his actions before the Special Master.

Mr. Jon Andry and Mr. Gibby Andry aggressively sought information from the DHECC about pending claims, including The Andry Law Firm's $7,908,460 claim. Their quest for information led them to Mr. Patrick Juneau, Lionel Sutton, and David Duval. While they consistently approached Mr. Patrick Juneau and Mr. Duval to expedite their claims from the outside, in Mr. Sutton they had a resource on the inside of the CAO to render direct assistance.

In return for payments from Mr. Lerner and Mr. Jon Andry, Mr. Sutton checked on their clients' claims, expedited the processing of the claims, and gave advice on how to remedy deficiencies in some claims. While employed at the CAO, Mr. Sutton accessed various pages of claims in the DHECC claims database a total of 496 times. Of those, in 83 reviews he accessed claims represented by or related to AndryLerner law firm clients, plus another 14 reviews of The Andry Law Firm's claim itself. In total, almost 1 in 5 of his searches related to these claims.

Mr. Jon Andry's explanations about these events are contradicted by clear evidence, including his knowledge of payments being made to Mr. Sutton. Specifically, Mr. Jon Andry said under oath that at the time of the payments to Mr. Sutton, he "had no idea any of this was going on," and had no conversations with Mr. Sutton about getting Mr. Lerner's share of the Thonn claim. Yet in emails and telephone records from December 2012, Mr. Lerner reminded Mr. Jon Andry that, "We were going to pay Thon but only once I'm paid,. [sic] Not paying out of my pocket." Mr. Jon Andry's response to Mr. Lerner was direct and in contradiction to his sworn testimony:

> "you just got paid a disbursement [sic] … pay it out of that."

Mr. Jon Andry also made statements about his interactions with Mr. Duval which are contradicted by Mr. Duval and other evidence. With regard to the Mr. Jon Andry-David Duval lunches, the Special Master does not find that they were "necessary and appropriate" under the circumstances and, therefore, violated the DHECC's "Gifts, Entertainment and Gratuities" policy that Claims Administrator Mr. Patrick Juneau had promulgated.

A. Legal Discussion

Based upon the facts established by the Special Master's 66-day investigation, it is recommended that the United States Department of Justice consider whether Mr. Sutton, Ms. Reitano, Mr. Lerner, and Mr. Jon Andry have violated the federal criminal statutes regarding fraud, money laundering, conspiracy or perjury. The conduct of these attorneys, as well as their representation of DHECC claimants and receipt of DHECC payments, should be examined by the Court and appropriate authorities.

1. Mail and Wire Fraud

Federal criminal law prohibits the use of the mails or wires in furtherance of a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises.[530] The offenses have three elements: (1) a scheme to defraud another of money or property; (2) foreseeable use of the mails or interstate wires to further that scheme; and (3) fraudulent intent.[531]

While the law does not define what is required to establish the existence of a "scheme to defraud," courts and Congress have long accorded the phrase broad meaning to include

---

[530] 18 U.S.C. §§ 1341, 1343.
[531] *United States v. Radley*, 632 F.3d 177, 184-85 (5th Cir. 2011).

"everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."[532] The Supreme Court has observed that Congress intended a broad law that refers "to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching."[533]

Because the statutes do not define the phrase "scheme or artifice to defraud," courts interpreting the statutes also have found that Congress incorporated the common law meaning of the relevant terms, including the notion requiring a misrepresentation or concealment of a material fact having a "natural tendency to influence, or [be] capable of influencing, the [person] to [whom] it was addressed."[534]

While a fiduciary relationship need not exist to give rise to mail or wire fraud, a breach of such a relationship through self-dealing or breaches of the duty of loyalty or the duty to disclose material facts can form the basis of a scheme or artifice to defraud.[535] As Judge Cardozo summarized nearly a century ago:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.[536]

Federal courts had interpreted the term "scheme or artifice to defraud" to include deprivations not only of money or property, but also of intangible rights of honest services in both public and private settings. Congress codified this theory of honest services fraud in 18 U.S.C. § 1346. The Supreme Court in *Skilling v. United States*, however, held that § 1346 criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks" and rejected the Government's argument that the law also should encompass "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that furthers

---

[532] *Durland v. United States*, 161 U.S. 306, 312-13 (1896) ("The significant fact is the intent and purpose."); *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1314 (11th Cir. 2000) ("Schemes to defraud can take many forms -- criminal ingenuity is an amazing, if disturbing, thing to behold.").

[533] *McNally v. United States*, 483 U.S. 350, 358 (1987).

[534] *Neder v. United States*, 527 U.S. 1, 22-23, 25 (1999); *see also United States v. Aubin*, 87 F.3d 141, 146-47 (5th Cir. 1996) (the "very structure of the transaction would allow a reasonable inference of an intent to defraud"); *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982) ("[S]tatements need not be false or fraudulent on their face, and the accused need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive").

[535] *United States v. Henderson*, 19 F.3d 917, 923 (5th Cir. 1994) (fiduciary duty required disclosure and abstention; breach satisfied fraud element under bank fraud statute); *United States v. Ballard*, 663 F.2d 534, 541 (5th Cir. Unit B 1981) (duty to disclose may arise from the relationship itself); *see also United States v. Cochran*, 109 F.3d 660, 665 (10th Cir.1997) ("While a fiduciary relationship is not an essential element of a wire fraud prosecution ... it can trigger a duty of disclosure as can some other relationship of trust and confidence between the parties.").

[536] *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty."[537]

To distinguish between a fraud scheme under § 1341 and § 1346, "one must look to the object of the deprivation and not the underlying fraudulent act."[538] As the court in *Riley* observed, "[t]he underlying fraudulent act (e.g., the misrepresentation or omission of a material fact) can be exactly the same in [both] provisions."[539] Under § 1341, the deprivation at issue is "money or property," while under § 1346, the deprivation of one's honest services is "biased decision making for personal gain."[540]

### 2.   Money Laundering

The federal money laundering statutes relevant here criminalize the flow of resources to and from various federal crimes, including by engaging in a financial transaction involving the proceeds of certain crimes in order to conceal the nature, source, or ownership of the proceeds they produced or by engaging in the spending of more than $10,000 of the proceeds of certain criminal activities.

The first relevant money laundering provision addresses financial transactions intended to disguise or conceal the source of illegal proceeds. Specifically, 18 U.S.C. § 1956(a)(1)(B)(i) outlaws financial transactions involving the proceeds of other certain crimes, referred to in the statute as "specified unlawful activities," committed or attempted knowing the transaction is designed to conceal the laundering of the proceeds. The list of federal predicate offenses includes mail and wire fraud.[541] This offense requires "a design" to conceal, not just the effect of concealment.[542] A design to conceal can be found from evidence showing that a defendant made deceptive statements, used third parties to conceal the true source of property, structured a transaction to avoid attention, surrounded the transaction with unusual secrecy, deposited illegal profits in the bank account of a legitimate business, or used a series of unusual financial moves in the transaction.[543] The fact that the defendant made no effort to conceal his identity is no defense, however, when the transactions were intended to conceal the nature, location, or origin of the property involved.[544]

The second relevant provision addresses financial transactions involving more than $10,000 in proceeds of a crime. Specifically, § 1957 addresses financial transactions involving proceeds of

---

[537] *Skilling v. United States*, 130 S. Ct. 2928, 2931-32 (2010) (internal quotation marks and citation omitted).

[538] *United States v. Riley*, 621 F.3d 312, 327 (3d Cir. 2010).

[539] *Id*. at 327; *United States v. Wright*, 665 F.3d 560, 573 (3d Cir. 2012) ("Traditional mail fraud under § 1341 involves defrauding a private party of money or property, whereas honest services fraud under § 1346 involves defrauding the public of an official's 'honest services.'").

[540] *Id*. at 327.

[541] *See* 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1)(B).

[542] *See Cuellar v. United States*, 553 U.S. 550, 567 (2008).

[543] *See United States v. Magluta*, 418 F.3d 1166, 1176 (11th Cir. 2005); *United States v. Baldridge*, 559 F.3d 1126, 1141 (10th Cir. 2009); *United States v. Adefehinti*, 510 F.3d 319, 323-24 (D.C. Cir. 2007).

[544] *See United States v. Delgado*, 653 F.3d 729, 737-38 (8th Cir. 2011); *United States v. Tekle*, 329 F.3d 1108, 1113-14 (9th Cir. 2003).

certain illegal activity, and prohibits a person from engaging in or attempting to engage in a monetary transaction in criminally derived property worth at least $10,000 with knowledge that the property was derived from unlawful activity where the property is, in fact, derived from specified unlawful activity.[545] A monetary transaction under § 1957 is a financial transaction as defined in § 1956 or any other deposit or transfer of cash or check or the like, in or affecting interstate commerce and involving a financial institution.[546]

Section 1957 only applies to transactions involving $10,000 or more at the time of the transaction.[547] The government must prove that the defendant knew the property in the transaction was the product of some criminal activity, but it need not show that he knew that it was the product of a "specified unlawful activity."[548] Section 1957(f)(2) describes "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." The property must in fact be derived from a specified unlawful activity.[549]

### 3.  *Professional Responsibility*

Louisiana courts recognize that the Louisiana Rules of Professional Conduct "have the force and effect of substantive law," and can "override legislative acts which tend to impede or frustrate that authority."[550]

### a.  **Attorney Referral Fees**

Rule 1.5 of the Louisiana Rules of Professional Conduct addresses attorney fee sharing agreements. Rule 1.5 provides that a division of fees between lawyers who are not in the same firm may be made only if (1) The client agrees in writing to the representation by all of the lawyers involved, and is advised in writing as to the share of the fee that each lawyer will receive; (2) The total is reasonable; and (3)Each lawyer renders meaningful legal services for the client in the matter.

Nevada applies a slight variation of this rule. In Nevada, Rule 1.5 of the Rules of Professional Responsibility provides a division of fee between lawyers who are not in the same firm may be made only if: (1) Reserved; (2) The client agrees to the arrangement, including the share each lawyer will receive; (3) The agreement is confirmed in writing; and (4) The total fee is reasonable.

Rule 1.5 does not permit fee sharing as a means for payment of a "referral fee" between lawyers who are not in the same firm when the referring lawyer has not "render[ed] meaningful legal

---

[545] 18 U.S.C. § 1957(a).
[546] 18 U.S.C. § 1957(f)(1).
[547] *See United States v. Wright*, 651 F.3d 764, 774 (7th Cir. 2011).
[548] 18 U.S.C. § 1957(c); *United States v. Flores*, 454 F.3d 149, 155 (3d Cir. 2006).
[549] 18 U.S.C. § 1957(a).
[550] *See Soderquist v. Kramer*, 595 So. 2d 825, 829 (La. Ct. App. 1992).

services for the client in the matter."[551] The requirement of full disclosure serves to protect the client by putting him on notice of the attorney's financial interest in the case.[552]

### b. Duty of Candor

Rule 3.3 of both the Louisiana Rules of Professional Conduct and the Nevada Rules of Professional Conduct sets forth a lawyer's duty of candor towards the tribunal. Specifically, a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. Nor shall the lawyer offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter that the lawyer reasonably believes is false. As the Louisiana Supreme Court has recognized, "[c]andor and honesty are a lawyer's stock and trade. Truth is not a matter of convenience. Sometimes lawyers may find it inconvenient, embarrassing, or even painful to tell the truth."[553] A "material fact" is one whose "existence or nonexistence" is "essential" to the resolution of a matter.[554]

### c. Attorney Misconduct

Rule 8.4 of the Louisiana Rules of Professional Conduct states that it is professional misconduct for a lawyer to, among other things:

- Commit a criminal act especially one that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

- Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

- Engage in conduct that is prejudicial to the administration of justice; and,

- State or imply an ability to influence improperly a judge, judicial officer, governmental agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law.

### B. Referrals to the United States Department of Justice and State Bars for Further Investigations

The Special Master's report should be provided to the United States Department of Justice and the United States Attorney's Office for the Eastern District of Louisiana as part of the Court's prior notification to the United States Attorney's Office to determine whether Mr. Sutton, Ms. Reitano, Mr. Lerner, and Mr. Jon Andry violated the federal criminal statutes regarding fraud,

---

[551] *Dukes v. Matheny*, 878 So. 2d 517, 521 (La. App. 1 Cir. 2004).
[552] *Schniederjon v. Krupa*, 162 Ill. App.3d 192, 514 N.E.2d 1200, 1202 (1987).
[553] *In re: Jerry Jackson Stamps*, 874 So.2d 113 (2004) (per curiam).
[554] *Smith v. Our Lady of the Lake Hosp., Inc.*, 639 So. 2d 730, 751 (La. 1994).

money laundering, and conspiracy in connection with the attorney referral fee payments to Mr. Sutton while he was working at the CAO. The United States Department of Justice and the United States Attorney's Office for the Eastern District of Louisiana should also examine whether any of these attorneys have committed perjury, or have made any materially false statements or omissions to the CAO, Special Master, and/or the Court.

Additionally, this report should be referred to the State Bar of Louisiana to determine whether Lionel Sutton, Christine Reitano, Glen Lerner, and Jon Andry have violated any disciplinary rules, including the rules relating to the division of attorney fees. In the case of Mr. Lerner, this matter should also be referred to the State Bar of Nevada.

Documents provided in support of the Thonn claims were suspicious, and contained fraudulent characteristics. BG should have initiated an investigation once those documents were tendered, but no investigation was ordered, and potentially fraudulent claims were certified as eligible for payment. Later, an internal CAO audit of the Thonn claim was conducted, but no further inquiry occurred. Payments to Mr. Thonn should have been put on hold, pending further inquiry. Instead, Mr. Thonn was paid larger amounts than previously determined based upon suspicious documents. The Court should refer this matter to the United States Attorney's Office for the Eastern District of Louisiana to determine whether Mr. Thonn violated the federal mail fraud and wire fraud statutes in connection with the submission of his Seafood Compensation Program claims: Shrimp Boat Captain and Shrimp Vessel Owner.

Finally, despite knowing his responsibilities as a CAO Attorney, Mr. Sutton failed to disclose to Mr. Patrick Juneau and to the CAO his ownership interest in and representation of DHECC claimant Romeo Papa. Further, the inherent conflict of interest presented by his ownership and representation of the company are compounded by Mr. Sutton being responsible for drafting the CAO's moratorium claim policy while Romeo Papa was submitting a moratorium claim. When asked about the issues associated with Romeo Papa and his work at the CAO, Mr. Sutton was not candid and instead chose to offer self-serving responses. The United States Attorney's Office should determine whether Mr. Sutton's actions and lack of disclosures in connection with the Romeo Papa claim constituted criminal conduct.

### C. Application of the Unclean Hands Doctrine

In view of the conduct of attorneys Lionel Sutton, Christine Reitano, Glen Lerner, and Mr. Jon Andry, the Court should consider applying the doctrine of "Unclean Hands" to ban them from any DHECC representation and payment, and to disallow the $7,908,460 The Andry Law Firm claim. To protect judicial integrity and promote justice, a court may deny relief to a party where that party has violated principles of law, ethics, equity, or morality, even though the party

otherwise would have been entitled to the remedy absent the wrongdoing.[555] This discretionary judicial power "preserve[s] the judicial process from contamination" and promotes public confidence in the administration of justice.[556] This rule "closes the door" of a court to one tainted by inequitable conduct relative to the matter in which he seeks relief.[557]

As a guarantor for judicial integrity, the Unclean Hands Doctrine "assumes even wider and more significant proportions" where a claim concerns the public interest as well as the private interests of the litigants, as the doctrine averts an injury to the public.[558] The doctrine, "flexible in application," protects against "a wrong against the institutions set up to protect and safeguard the public."[559]

The Court should consider applying the doctrine of "Unclean Hands" to:

  (a) Prohibit Mr. Lerner, Mr. Jon Andry, Lionel Sutton and Christine Reitano, as well as any law firms associated with them, from representing any claimants before the DHECC, or from receiving any related legal fees, based on their conduct as described in this report; and,

  (b) Disallow The Andry Law Firm's pending $7,818,693.95 award based on the conduct of Messrs. Jon Andry and Gibby Andry in their dealings with the DHECC and Mr. Sutton while Mr. Sutton was employed at the CAO.

### D. Conflicts of Interest

Despite Mr. Patrick Juneau's best efforts at setting an ethical "tone at the top" to ensure that senior CAO employees and DHECC vendors were free of conflicts of interest, such conflicts were pervasive and impaired the integrity of the DHECC process. These included:

  (a) Ms. Reitano seeking employment for her husband with a DHECC vendor prior to Mr. Sutton joining the CAO;

---

[555] *Deweese v. Reinhard*, 165 U.S. 386, 390 (1897) ("if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.").

[556] *Olmstead v. United States*, 277 U.S. 438, 484 (1928) (J. Brandeis, dissenting); *Adams v. Manown*, 615 A.2d 611, 616 (Md. 1992) ("The clean hands doctrine is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct.").

[557] *N.Y. Football Giants, Inc. v. L.A. Chargers Football Club, Inc.*, 291 F.2d 471, 473 (5th Cir. 1961); *see also Mas v. Coca-Cola Co.*, 163 F.2d 505, 508 (4th Cir. 1947) ("It is sufficient to bar relief that plaintiff has been guilty of unconscionable conduct directly related to the cause of action, such as the fabrication of testimony, the subornation of perjury or other like attempt to perpetrate a fraud upon the court or take an unconscionable advantage of his adversary.").

[558] *N.Y. Football Giants, Inc.*, 291 F.2d at 474; *Byron v. Clay*, 867 F.2d 1049, 1051 (7th Cir. 1989) ("The doctrine of unclean hands, functionally rather than moralistically conceived, gives recognition to the fact that equitable decrees may have effects on third parties—persons who are not parties to a lawsuit, including taxpayers and members of the law-abiding public—and so should not be entered without consideration of those effects.").

[559] *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).

    (b)    Senior CAO officials and officials from a DHECC vendor submitting a proposal to a supervised DHECC vendor, while all of them were working as part of the DHECC, in order to provide services in connection with unrelated litigation; and,

    (c)     A DHECC vendor failing to detect that one of their employees had a conflict of interest due to an intimate relationship with DHECC claimant Mr. Thonn.

While these conflicts of interest within the CAO have now been remediated or otherwise resolved, their occurrence requires that more effective policies and procedures, as well as training and testing, be designed and implemented as part of the Court's third mandate.

    E.  The Special Master's Third Mandate

With this report, the Special Master has addressed the first and second of Judge Barbier's mandates, as described above. With respect to the third mandate, work is ongoing and will result in recommendations to the Court on improvements to be made to strengthen the CAO's operations and, in particular, the DHECC's anti-fraud measures.



**Payments to OLD Crown LLC (Lionel Sutton)**
*(figures have been rounded to nearest U.S. Dollar)*

| Date | Description | Amount |
|------|-------------|--------|
| 1-08-13 | Thonn Referral Fee | $4,940 |
| 3-22-12 | Crown LLC | $20,000 |
| 3-26-12 | Crown LLC | $20,000 |
| 3-29-13 | Thonn Referral Fee | $16,665 |
| 3-29-13 | Crown LLC | $14,000 |
| 4-11-13 | Crown LLC | $10,000 |
| 5-24-13 | Crown LLC | $10,000 |
| 6-05-13 | Thonn Referral Fee | $19,035 |
| 7-12-13 | Crown LLC | $40,500 |

**New Orleans, LA**

Sutton & Reitano

Casey Thonn Referral

Jon Andry at AndryLerner

Thonn Claim

Thonn Claim Payments:

1. 10/10/12  **$49,400.00**
2. 02/28/13  **$166,652.10**
3. 04/29/13  **$190,350.25**

DHECC

**Las Vegas, NV**

$4,940.00 on 12/14/12

$16,665.21 on 3/11/13

$19,035.02 on 5/14/13

**Total:  $40,640.23**

Lerner & Associates

NEW Crown Account

**New Orleans, LA**

OLD Crown Account (*Lionel Sutton DHECC / CAO Attny.*)

**$40,640.23**

SPECIAL MASTER REPORT

Ex. **A**



19
← 1900 Gertler Law Firm, LLP
← 1905 DH Claims Administrator
→ 1910 Sutton & Reitano / Crown, LLC
→ 1920 PRA New Orleans
→ 1940 ADR
→ 1950 Benefit Administration Group, LLC

SPECIAL MASTER
REPORT

Ex. **B**