# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April, 20, 2010 | * * * * | MDL NO.    2179 |
| | | NUMBER: |
| | | SECTION: |
| Relates to case No.: 2:12-cv-02338 Kolian, et al., vs. BP Exploration & Production Inc., et al. | * * * | JUDGE BARBIER |
| | * | MAGISTRATE:  SHUSHAN |
| | * | |
| | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come Plaintiffs, STEPHAN KOLIAN, ET AL., with their Complaint for Damages respectfully avers as follows:

## PARTIES

**PLAINTIFFS:**

1.    Plaintiff, Stephan Kolian, a person of full age and majority who is a resident and domiciliary of East Baton Rouge Parish, Louisiana.

2.    Plaintiff, David Landrieu, a person of full age and majority who is a resident and domiciliary of Jefferson Parish, Louisiana.

3.    Plaintiff, Kim Flair Landrieu, a person of full age and majority who is a resident and domiciliary of Jefferson Parish, Louisiana.

4.    Plaintiff, Michael Boatright, a person of full age and majority who are residents of and domiciled in East Jefferson Parish, Louisiana.

5.    Plaintiff, Charles Taylor, a person of full age and majority who is a resident and domiciliary of Hancock County, Mississippi.

6.    Plaintiff, Christopher Green, a person of full age and majority who is a resident and domiciliary of Washington County, Texas.

7.    Plaintiff, Gregory Scott Turner, a person of full age and majority who are residents of George County, Mississippi.

8.    Plaintiffs, Richard and Janice Danos, persons of full age and majority who are residents of LaFourche Parish, Louisiana.

**DEFENDANTS:**

1.    Defendant, BP EXPLORATION & PRODUCTION INC., a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered business office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose agent for service of process is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808. BP EXPLORATION & PRODUCTION INC. was a leaseholder and designated operator of the Macondo well from which the oil spill originated upon which this complaint is based and was designated as a responsible party by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

2.    Defendant, BP AMERICA PRODUCTION COMPANY, a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered business office in Louisiana is

5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose agent for service of process is C.T. Corporation, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808. BP AMERICA PRODUCTION COMPANY was party to the contract for the drilling of the Macondo well by the Deepwater Horizon vessel with Transocean, Ltd.

3.      Defendant, BP, P.L.C., a foreign corporation at all pertinent times doing business in the State of Louisiana and within this district through control of its wholly-owned subsidiaries BP Exploration & Production, Inc. and BP America Production Company (collectively "BP").

4.      Defendant, TRANSOCEAN LTD., a foreign corporation at all pertinent times doing business in the State of Louisiana and within this district.

5.      Defendant, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., a Delaware corporation at all pertinent times doing business in the State of Louisiana. 5. Defendant, TRANSOCEAN DEEPWATER, INC., a Delaware corporation at all pertinent  times doing business in the State of Louisiana.

6.      Defendant, TRANSOCEAN HOLDINGS, LLC, a Delaware Corporation at all pertinent times doing business in the State of Louisiana.

7.      Defendant, TRITION ASSET LEASING GMBH, a foreign corporation at all pertinent  times  doing  business  in  the  State  of  Louisiana (collectively "Transocean" with Transocean Ltd, Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and Transocean Holdings, LLC).

8.      Defendant, HALLIBURTON ENERGY SERVICES, INC., a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana whose

principal business establishment in Louisiana is 1450 Poydras St., Suite 2070, New Orleans, LA 70112 and whose registered office in the state of Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose registered agent in Louisiana is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 (hereinafter "Halliburton").

9.     Defendant, M-I, LLC, a Delaware limited liability company at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered office in Louisiana is 8550 United Plaza Building II, Suite 305, Baton Rouge, LA 70809, and whose registered agent for service is Capitol Corporate Services, Inc., 8550 United Plaza Building II, Suite 305, Baton Rouge, LA 70809 (hereinafter "M-I").

10.     Defendant, CAMERON INTERNATIONAL CORPORATION, a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment in Louisiana is #6 Holloway Blvd., Ville Platte, LA 70586 and whose registered office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose registered agent in Louisiana is C.T. Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 (hereinafter "Cameron").

12.     Defendant, ANADARKO E&P COMPANY LP, is a Delaware limited partnership at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose registered agent in Louisiana is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808

(hereinafter "Anadarko").

13.     Defendant, ANADARKO PETROLEUM CORPORATION CO., is a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose registered agent in Louisiana is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 (collectively "Anadarko" with Anadarko E&P Company LP).

14.     Defendant, MOEX OFFSHORE 2007 LLC, is a Delaware corporation at all pertinent times doing business in the State of Louisiana (hereinafter "MOEX").

15.     Defendant, MOEX USA CORPORATION, is a Delaware corporation at all pertinent times doing business in the State of Louisiana (hereinafter "MOEX").

16.     Defendant, MITSUI OIL EXPLORATION CO., LTD., is a foreign corporation at all pertinent times doing business in the State of Louisiana through control of its wholly- owned subsidiary, MOEX USA Corporation and through control of MOEX Offshore 2007 LLC, a wholly-owned subsidiary of MOEX USA Corporation (collectively hereinafter "MOEX").

17.     Defendant, NALCO COMPANY, is a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose registered agent in Louisiana is C.T. Corporation System, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 (hereinafter "Nalco")

18.     Defendant, NALCO HOLDINGS, LLC, is a Delaware limited liability company at

all pertinent times doing business in the State of Louisiana through control of its wholly- owned subsidiary Nalco Company (collectively "Nalco").

19.   Defendant, NALCO FINANCE HOLDINGS, LLC, is a Delaware limited liability company at all pertinent times doing business in the State of Louisiana through control of its wholly-owned subsidiary Nalco Holdings, LLC (collectively "Nalco").

20.   Defendant, NALCO HOLDING COMPANY, is a Delaware corporation doing business in the State of Louisiana through control of its wholly-owned subsidiary, Nalco Finance Holdings, LLC (collectively "Nalco").

21.   Defendant, PARSONS CORPORATION, is a Delaware Corporation with its principal place of business in California. The registered agent for service of process for PARSONS CORPORATION is The Trust Corporation, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

22.   Defendant, AIRBORNE SUPPORT, INC., is a Florida Corporation doing business in the state of Louisiana, whose principal business office and registered office in Louisiana is 3626 Thunderbird Rd., Houma, LA 70363 and whose registered agent is Howard Barker, 3626 Thunderbird Rd., Houma, LA 70363 (hereinafter "ASI").  ASI participated in the post-explosion Oil Spill remediation and response efforts including involvement in the spraying or release of dispersant in Louisiana's Territorial Seas and Coastal Waters.

23.   Defendant, AIRBORNE SUPPORT INTERNATIONAL, INC., is a Louisiana corporation, whose domicile address in Louisiana is 3626 Thunderbird Rd., Houma, LA 70363  and whose registered agent is Howard Barker, 3626 Thunderbird Rd., Houma, LA 70363 (hereinafter "ASI International").  ASI International

6

participated in the post-explosion Oil Spill remediation and response efforts including involvement in the spraying or release of dispersant in Louisiana's Territorial Seas and Coastal Waters.

24.     Defendant, ASHLAND SERVICES, L.L.C., a Louisiana Limited Liability Company with a domicile address of 3620 Barataria Boulevard, Marrero, Louisiana 70072 and its registered agent as Paul Hale, 755 Magazine Street, New Orleans 70130.

25.     Defendant, FALCK ALFORD a Louisiana corporation with a domicile address of 209 Clendenning Road, Suite 2200, Houma, LA 70363 and its registered agent for service of process as Karl J. Zimmerman, 1100 Poydras Street, Suite 3600, New Orleans, Louisiana 70163.

26.     Defendant, SHAMROCK MANAGEMENT, L.L.C., a Louisiana Limited Liability Company with a domicile address of 4800 Hwy. 311, Houma, Louisiana, 70360 and its registered agent for service of process as Jeffrey L. Trahan, 4800 Hwy. 311, Houma, Louisiana, 70360.

27.     Defendant, TEAM LABOR FORCE L.L.C., a Louisiana Limited Liability Company with a domicile address of 1730 Coteau Road, Houma, Louisiana 70364. Its registered agent for service of process is Eddie N. Pullaro, 1054 West Tunnel Blvd., Houma, Louisiana, 70360.

28.     Defendant, ES& H, INC., a Louisiana Corporation with a domicile address of 1730 Coteau Road, Houma, Louisiana 70364. Its registered agents for service of process are Eddie N. Pullaro, 1054 West Tunnel Blvd., Houma, Louisiana, 70360 and Lawrence X. Boucvalt, III, 1730 Coteau Road, Houma, LA 70364.

29.     Defendant, HEPACO, INC. is a North Carolina corporation with its principal place

of business in North Carolina with its domicile address of 2711 Burch Drive, Charlotte, North Carolina and its agent for service of process is The Prentice-Hall Corporation System, Inc., 320 Somerulos Street, Baton Rouge, Louisiana.  HEPACO, INC. was at all pertinent times licensed and doing business in Louisiana with its principal business establishment in Louisiana address of 320 Somerulos Street, Baton Rouge, Louisiana. BP contracted with HEPACO to manage the handling and deployment of boom.

30.     Defendant, T&M BOAT RENTALS, L.L.C., a Louisiana Limited Liability Company with a domicile address of 403 Woodburn Lane, Berwick, Louisiana 70342. Its registered agent for service of process is Gerald J. Bourgeois, 1025 Victor II Boulevard, P.O. Box 1688, Morgan City, Louisiana 70381.

31.     Defendant, COASTAL CATERING, L.L.C., a Louisiana Limited Liability Company with a domicile address of 3449 Bayou Black Drive, Houma, Louisiana 70360. Its registered agent for service of process is James Gary Fister, II, 3447 Bayou Black Drive, Houma, Louisiana 70360.

32.     Defendant, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, an agency of the  United States government who maybe served via registered or certified mail to the Attorney General of the United States at Washington, D.C.  The United States Attorney General is Eric Holder and his address is Office of the United States Attorney General, Department of Justice, Room B-103, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

33.     Defendant, the UNITED STATES, who may be served via registered or certified mail to the Attorney General of the United States at Washington, D.C.   The United States

Attorney General is Eric Holder and his address is Office of the United States Attorney General, Department of Justice, Room B-103, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

34. Defendant, SUPERIOR LABOR SERVICES, INC., a Louisiana corporation with a domicile address of 8702 Park Avenue, Houma, LA 70364. Its registered agent for service of process is Dan Joseph Falgout, 8702 Park Avenue, Houma, LA 70363.

35. Defendant, ADRIATIC MARINE, LLC, a Louisiana Limited Liability Company with a domicile address of 3916 Highway 308, Raceland, Louisiana 70394. Its registered agent for service of process is Charles Faucheux, 3916 Highway 308, Raceland, Louisiana 70394.

36. Defendant, JULES MELANCON, INC., a Louisiana corporation with a domicile address of 170 Neptune Lane, Grand Isle, Louisiana 70358. Its registered agent for service of process is Jules Melancon, 170 Neptune Lane, Grand Isle, Louisiana 70358.

37. Defendant, USA LABOR, LLC, a Louisiana limited Liability Company with a domicile address of 2910 Hwy 1, Raceland, Louisiana 70394. Its registered agent for service of process is Pershing J. St. Pierre, Jr., 2910 Hwy 1, Raceland, Louisiana 70394.

38. Defendant, USA ENVIRONMENTAL SERVICES, INC., a Louisiana corporation with a domicile address of 2910 Hwy 1, Raceland, Louisiana 70394. Its registered agent for service of process is Pershing J. St. Pierre, Jr., 2910 Hwy 1, Raceland, Louisiana 70394.

39. Defendant, DANOS AND CUROLE STAFFING, LLC, a Louisiana corporation with a domicile address of 13083 Hwy 308, Larose, Louisiana 70373. Its registered agent for service of process is Janell Ledet, 13083 Hwt 308, LaRose, Louisiana 70373.

40.     Defendant, WAM INDUSTRIES, INC., is a Georgia corporation with its principal office address of 902 Mill Pond Dr., SE, Smyrna, Georgia.  Its registered agent for service of process is Mark A Woods with an address of 2341 Hill St. NW, Atlanta, GA 30318.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4), because this matter in controversy exceeds the minimum jurisdictional amount of $75,000.00, exclusive of interest and costs, and this case is between Plaintiff and citizens of a State or of different States.

2.     Jurisdiction is also proper under 28 U.S.C. Section 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of various states which have been declared, pursuant to 43 U.S.C., Section 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated. Federal question jurisdiction under 28 U.S.C. §1331 also exists by virtue of Plaintiff's claims brought herein which arise under the Oil Pollution Act of 1990.

3.     In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. §2717(b) (the "OPA").

4.     Pleading in the alternative, jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C., §30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

5.    This Honorable Court has jurisdiction over the claims pled herein against the National Oceanic and Atmospheric Administration (hereinafter "NOAA") because NOAA is an agency of the United States government and the claims pled against NOAA are maritime tort claims. The Suits in Admiralty Act provides the exclusive jurisdiction for maritime tort claims against the United States. See *T.J. Falgout Boats, Inc. V. United States,* 508 F.2d 855 (9th Cir. 1974), cert denied, 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975).

## FACTUAL ALLEGATIONS

1.    These cases arise from the April 20, 2010, loss of control of the Macondo well that was being drilled by the Deepwater Horizon drilling vessel and the related explosions on that vessel which caused it to sink and resulted in the discharge of significant amounts of oil that spread throughout the Gulf of Mexico over a period of more than three months.  They also arise due to subsequent additional negligent acts and failure of reasonable care which occurred in Florida territorial waters.

   a)    At all times relevant to this action, the Deepwater Horizon, an ultra-deep water semi-submersible drilling rig, was leased to BP. At the time of its explosion on April 20, 2010, the Deepwater Horizon was being operated by BP for the purposes of drilling an exploratory well at the Macondo prospect on Mississippi Canyon Block 252 on the Outer Continental Shelf, south, west and  north  of Florida shores and waters.

   b)    The Macondo prospect was being explored pursuant to a ten-year lease, OCS- G32306, granted by the Minerals Management Services on June 1, 2008, and owned at the time of the explosion by BP.  The lease allowed BP to drill for

hydrocarbons and perform oil production-related operations in the Mississippi Canyon Block 252 area which includes the Macondo prospect. BP was designated the lease operator.

## The Blowout

1. At approximately 10 p.m. on April 20, 2010, following cementing operations aboard the vessel Deepwater Horizon, workers were finishing drilling operations for the Macondo well and displacing the drilling mud in the marine riser at the direction of BP in preparation for completion pursuant to BP's design, when they encountered an uncontrolled influx of highly pressurized hydrocarbons into the wellbore leading to a "blowout" or loss of control of the well.

2. The combustible gas flowing uncontrolled into the wellbore traveled quickly up to the rig floor where it was ignited leading to a fiery explosion on the Deepwater Horizon.

3. Defendant, BP was unable to regain control of the well and the fiery explosions onboard the Deepwater Horizon caused the vessel to be destroyed and sink to the bottom of the Gulf of Mexico.

4. BP did not follow safe procedures, in order to save money, by electing to utilize a risky well design that provided for fewer barriers against hydrocarbon influx into the wellbore relative to well designs typically used in an unknown and troublesome formation like the Macondo prospect.

5. Due to the depth of the Macondo well, BP was also negligent in the selection of a casing material that was vulnerable to collapse under high pressure. BP's negligence in well design and casing selection allowed for an increase risk of a blowout.  BP knew or should have known of those risks but chose risk over increased costs.

6.   In addition to the casing-related problems, the float collar installed on the final section of casing likely failed to seal properly, which may have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

7.   A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.

8.   Upon information and belief BP was negligent in operations to install the float collar and/or in neglecting warning signs of a potentially improper installation of the float collar.

9.   BP was negligent in preparing the wellbore for cementing operations which led to an increased likelihood that the cement job would fail and a blowout would occur.

10.   BP was negligent in electing to utilize an unsafe cement job design that was unlikely to create a secure barrier against hydrocarbon influxes into the Macondo wellbore.

11.   BP was negligent in the selection of an improper cement mixture that was susceptible to failure under the high pressures and temperatures typical in the Macondo well.

12.   Negligent cementing operations failed to isolate the well bore from hydrocarbon zones and seal the bottom of the well against an influx of gas.  BP was negligent in failing to identify this bad cement job ignoring numerous warning signs in the process.

13.   Upon information and belief, the defective cement job allowed a pathway for highly pressured gas to enter the Macondo wellbore and travel rapidly from there to the rig floor.

14.   BP was negligent in the monitoring and design of the drilling mud program which failed to prevent hydrocarbons from flowing into the wellbore and up to the Deepwater Horizon.

15.    BP was negligent in the decision and design to displace the drilling mud from the marine riser before allowing time for the cement to fully set.

16.    BP was also negligent in conducting and monitoring the displacement operations, failing to recognize the many signs of trouble.

17.    BP was negligent in failing to utilize a casing hanger lockdown sleeve that would have stopped the hydrocarbons from escaping past the wellhead and reaching the rig floor.

18.    BP was negligent in failing to timely identify that hydrocarbons were entering the wellbore during displacement operations and in failing to initiate well control measures.

19.    After hydrocarbons reached the rig floor, the Blowout Preventers (BOP's) for the Deepwater Horizon, failed to activate as designed to prevent the continued uncontrolled flow of gas from the formation.

20.    The BOP utilized by BP was defective and unreasonably dangerous in their manufacture, design, and/or composition, and/or failed to contain adequate warnings and instructions.

21.    BP failed to ensure that the BOP design used on Deepwater Horizon was sufficient for the drilling conditions and program expected at the Macondo site.

22.    BP was negligent in failing to properly maintain the BOP's for the Deepwater Horizon in accordance with safe practices and federal regulations.

23.    BP failed to ensure that the BOP's possessed the necessary technology to properly function including adequate safeguards and redundant systems to prevent blowouts.

24.    BP failed to ensure that the BOP's and all related systems were properly tested

to operational conditions and confirmed to be in good working order.

25.    BP was negligent in failing to properly utilize and maintain emergency systems and equipment on board the Deepwater Horizon or to supervise and/or inspect to assure same.

26.    Defendants' negligent actions and/or omissions caused the blowout of the Macondo well leading to the destruction and sinking of the Deepwater Horizon and subsequent uncontrolled discharge of oil into the Gulf of Mexico.

### Uncontrolled Discharge of Oil into the Gulf and Environmental Implications

After the sinking of the Deepwater Horizon, the well began to release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventors.

1.    Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

2.    The well discharged an estimated 50,000 to 100,000 barrels of oil into the Gulf of Mexico on a daily basis for at least 87 days.

3.    The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

4.    Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo well into the Gulf

of Mexico and to prevent injuring Plaintiffs.

5.  This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.

6.  The oil discharged into the Gulf of Mexico from the Macondo well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including into the environment where Plaintiffs work, live and enjoy the recreational activities of swimming, fishing and boating.

7.  After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Government investigators have found BP's initial leak estimate of 1,000 barrels a per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

8.  Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the shifting mass was large enough to be visible from outer spaces, at times covering tens of thousands of square miles, spreading with the wind and currents towards the Gulf States' coastlines.

9.  Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on

16

white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.   Underwater, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

10.     The oil spewed from the well of twelve weeks until BP finally capped the well on July 15, 2010. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

11.     The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

12.     Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and napththalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zonc, all of which can harm human health.

13.     Chemicals such as benzene, PAHs and many other chemicals in crude oil are toxic and volatile, moving from the oil to the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors.

14.     Dermal exposure to certain VOCs in crude oil can cause, *inter alia*, redness, swelling, irritation, rashes and blisters on the skin and mucous membranes.  Inhalation exposure to certain VOCs in crude oil can cause, *inter alia*, coughing, throat irritation, congestion, shortness of breath and wheezing. Inhalation exposure to other OVCs in crude oil can also affect, *inter alia*, the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities.

Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting and diarrhea.

15.   According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S.  Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

16.   A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia (precursor of leukemia), chromosomal abnormalities in lymphocyctes and bone marrow cells, damage to the immune system, and abnormal development of blood cells.  Long-term low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

17.   As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human Services in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

18.   THE OPA imposes liability upon a "responsible party for a …facility from which oil is discharged …into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. §2702.

19.   The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

20.   After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

21.   In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.   This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

22.   As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct *in-situ* burning of oil that reached the surface of the water.   BP also employed vessels to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

23.   In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

24.   Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

25.   Among other dispersants, BP applied a highly toxic form of chemical dispersant called Corexit.  BP used both Corexit®9500 and Corexit®EC9527A.

26.   The Material Safety Data Sheet ("Data Sheet") – a form that sets forth the properties of a particular substance, including its toxicity and health effects – for Corexit®9500 indicates that it contains hazardous substances, that it is harmful to human health, and that dermal exposure, inhalation and ingestion should be avoided.  The Data Sheet further states that Corexit® 9500 is an eye and skin irritant and may irritate the

respiratory tract if inhaled.  If ingested, it may cause chemical pneumonia.

27.     The Data Sheet for Corexit® EC9527A also indicates that it contains hazardous substances, it is harmful to human health, and that dermal exposure, inhalation and ingestion should be avoided. The Data Sheet further states that Corexit® EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory tract.  If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

28.     In addition, Corexit® EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to male and female reproductive systems in animals.

29.     Both of these Corexit® products also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties. Propylene glycol is an irritant and exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat and lung irritation. Some individuals are allergic to propylene glycol and those with eczema may be at higher risk. Exposure may cause erythema, edema, induration, and other skin problems.

30.     Upon information and belief, BP also authorized the application of other chemical

dispersants, including PES51™ and OMI-500®, to near-shore and on-shore areas, as well as to contaminated vessels and containment equipment, to disperse the oil and clean vessels and equipment.

31. The Data Sheet for PES51™ indicates that it should be handled with gloves, that it is an irritant, and that dermal exposure and ingestion should be avoided.

32. The Data Sheet for OMI-500® indicates that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided. Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur. Exposure may also cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

33. In summary, the dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

34. Upon information and belief, immediately after the Deepwater Horizon disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants

to the resulting oil slick and sheens on the surface of the Gulf. Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the docks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

35.   BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

36.   According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft. At least four spray planes left from Houma, Louisiana. At least six spray planes left from Stennis International Airport in Mississippi. Upon information and belief, aerial dispersant sorties also would leave from airfields in Florida and were conducted and orchestrated by BP.

37.   On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit®.

38.   In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters. BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors to apply considerable amounts of chemical dispersants directly into the Gulf of Mexico.

39.   On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA)

Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than those dispersants that BP had been using, including Corexit®.  BP refused to comply and continued using dispersants of its choice.

40.   On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

41.   BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

42.   Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.  It relied on Corexit® 9500 thereafter.

43.   On May 26, 2010, the EPA directed BP to reduce the overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

44.   BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.  According to the Aerial Dispersants Operations -- Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application.  As of the same date, BP had ordered application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

45.   To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico.

46.   Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing

to use chemical dispersants that are more toxic than others in the response efforts and thereby amplified the toxic effects on the marine environment and the damages to Plaintiffs.

## FACTUAL ALLEGATIONS OF RESIDENTS, SCIENTIFIC DIVERS AND RECREATIONAL TOURISTS INJURED BY THE OIL SPILL

### Plaintiffs David Landrieu and Kimberly Flair Facts:

1.     On or about June 1, 2011, Mr. Landrieu visited Grand Isle, Louisiana and engaged in surf fishing.  Subsequent to his visit to Grand Isle, Mr. Landrieu developed a fever and rash on his legs.  He was admitted to the hospital and diagnosed with *Vibrio vulnificus*.   On or about April 15, 2012, Mr. Landrieu discovered that his illness was causally linked to the Deepwater Horizon Oil Spill when he read an article in the *Times Picayune* newspaper related to an Auburn University study which stated that Deepwater Horizon tarballs found months after the spill contained high levels of bacteria, including 10 times the level of *Vibrio vulnificus* as found in the surrounding sand.

2.     *Vibrio vulnificus* is a species of Gram-negative, motile, curved, rod-shaped bacteria of the genus *Vibrio*.  Present in marine environments such as estuaries, brackish ponds, or coastal areas. *Vibrio vulnificus* is related to *Vibrio cholerae*, the causative agent of cholera. Infection with *Vibrio vulnificus* leads to rapidly expanding cellulitis or septicemia.  *Vibrio vulnificus* causes an infection when the bacteria enters the body through open wounds when swimming or wading in infected waters.

3.     Mr. Landrieu remained in the hospital for approximately four days where he was treated for a severe *Vibrio vulnificus* infection.  While in the hospital Mr. Landrieu suffered with nausea, vomiting, diarrhea, blistering dermatitis, severe fever, chills, and severe sweating.

The total mortality in treated patients for *Vibrio vulnificus* is around 33%. In patients in whom the infection worsens into septicemia, the mortality rate rises dramatically to 50%. Mr. Landrieu's treatment necessitated the insertion of a pic line into his arm so that medications could be administered to him. Mr. Landrieu was required to maintain this pic line for a month. Mr. Landrieu had to hire a nurse to visit him at home to inspect and clean the pic line and administer medication and perform testing. Mr. Landrieu's medical expenses for this illness exceeded $50,000 and he was unable to work for thirty days. Mr. Landrieu was told by his physician that *Vibrio vulnificus* will remain in his body forever. Plaintiff Kimberly Flair is the spouse of Plaintiff David Landrieu and has suffered and continues to suffer a loss of consortium.

### Steve Kolian and Michael Boatright Facts:

1.        Steve Kolian and Michael Boatright are scientific divers and environmental scientists who are members of EcoRigs Non-Profit Corporation. On or about June, 2010, EcoRigs was approached by Jon Fajans of the National Oceanic and Atmospheric Administration (NOAA) regarding work related to the Deepwater Horizon Oil Spill Disaster. Based upon information and belief, Jon Fajans was employed as the Lab Coordinator and Scientific Logistical Support for NOAA Subsurface Monitoring Unit and the BP Operations Learning Center in Houma, Louisiana. EcoRigs was requested by Mr. Fajans of NOAA to submit research proposals regarding subsurface oil and dispersant plumes in the northwest Gulf of Mexico and to conduct offshore research trips whereby water samples from the Gulf of Mexico would be submitted to NOAA and BP. In email communications and telephone conversations, Mr. Fajans promised that EcoRigs would receive funding for their research and that their water samples would help Mr. Fajans obtain funding from NOAA and BP for

EcoRigs' research.

2.      At the request of Mr. Fajans, Steve Kolian and Michael Boatright participated in approximately 25 to 30 dives offshore during August and September of 2010 in the Gulf of Mexico Main Pass, Mississippi Canyon and Grand Isle areas.   Based upon information and belief, NOAA and BP were aware that Mr. Kolian and Mr. Boatright were participating in these dives.  Mr. Fajans took steps to coordinate with Mr. Kolian and Mr. Boatright so that NOAA and BP could receive water samples from these dive excursions.   Based upon information and belief, Mr. Fajans and other employees of NOAA and BP were aware of the locations in which Mr. Kolian and Mr. Boatright were diving in order to obtain water samples for NOAA and BP.  Mr. Kolian and Mr. Boatright were told by Mr. Fajans and others acting on behalf of NOAA and BP that the areas where they were diving were safe for diving.

3.      After completing the dives for NOAA and BP, Mr. Kolian and Mr. Boatright began to suffer from health symptoms, including but not limited to, blood in their stools, bleeding from the nose and eyes, nausea, vomiting, diarrhea, stomach cramps, dizziness and confusion, headaches, shortness of breath, blurred vision, skin rashes, pain in their arms and legs, stress, anxiety and depression. Mr. Kolian has also developed cognitive problems, such as forgetfulness and confusion which have impaired his professional abilities as a scientist.  In the Fall of 2011, Mr. Kolian and Mr. Boatright received treatment at the Gulf Coast Detoxification Program and were told that their symptoms were more likely than not caused by their exposure to the Deepwater Horizon oil spill during their research dives.  In May of 2012, Mr. Kolian's dermatologist stated that his persistent skin rashes were caused by his toxic exposure to the Deepwater Horizon oil spill.

4.      In May 2012, the Government Accountability Project ("GAP") issued a Freedom of

Information Act ("FOIA") request to NOAA regarding diver safety during the Deepwater Horizon oil spill.  In a document dated June 3, 2010 and produced pursuant to GAP's FOIA request, a NOAA Diving Program Manager states "In response to several requests from NOAA divers for clarification on acceptable areas for diving in the Gulf of Mexico, the NOAA diving Control and Safety Board ...decided to establish a 'dive exclusion zone' extending 30  NM beyond the furthest boundary line shown in 72-Hour nearshore Surface Oil Forecast Deepwater Horizon MC252..." Based upon information and belief, Mr. Fajans and others working for BP and NOAA were aware of this dive exclusion zone and failed to inform Mr. Kolian and Mr. Boatright of the dive exclusion zone and further failed to warn Mr. Kolian and Mr. Boatright of the dangers of diving in the zone exclusion zone. Based upon information and belief, Mr. Kolian and Mr. Boatright completed research and water sampling dives within the dive exclusion zone and Mr. Fajans and others working for NOAA and BP were aware that Mr. Kolian and Mr. Boatright were diving in the dive exclusion zone.

5.      In a document dated May 3, 2010, a NOAA Dive Manager states "Diving in water contaminated with crude oil requires specialized training, equipment and diving protocols and is currently outside the scope of the NOAA Diving Program.  Until such time that these elements are established, NOAA divers are prohibited from diving in these waters."  Mr. Fajan and others working for BP and NOAA  failed to warn Mr. Kolian and Mr. Boatright that NOAA divers were prohibited from diving in the Gulf of Mexico.  Additionally, Mr. Fajans and others working for BP and NOAA directed Mr. Kolian and Mr. Boatright to collect water samples via scuba diving and made arrangements to collect Mr. Kolian's and Mr. Boatright's water samples from the Gulf of Mexico.

6.      In a document dated June 16, 2010 and produced by NOAA pursuant to GAP's

FOIA request, an EPA Unit Diving Officer states "As everyone knows, diving in polluted water is just not something to take lightly from a safety or budgetary perspective - or even a matter of just the type of gear to use.  Even if the diver doesn't get sick immediately, in this case we're looking at possible exposure to crude oil (oil and dispersants) - components of which could increase your lifetime cancer risk." NOAA failed to warn Mr. Kolian and Mr. Boatright of the foregoing risks to their health and safety.

7.      A document dated July 7, 2010 and produced by NOAA pursuant to GAP's FOIA request, states "Our basic recommendation for our own EPA operations is that divers that haven't been doing this for a period of time should not attempt to do it 'on the fly' in the Gulf within the areas the NOAA Office of Restoration and Response have shown oil to be present or potentially present - the most likely outcome is that divers will be acutely exposed, or unnecessarily increase their chances of showing long term effects down the road." Based on information and belief, NOAA and BP were aware of the potential for acute toxic exposure and long term adverse health effects for divers exposed to the oil spill and failed to warn Mr. Kolian and Mr. Boatright of these risks.

8.       As more thoroughly explained in this supplemental complaint, Mr. Kolian assert a cause of action for negligence under the general maritime law and Louisiana law against BP and NOAA. They assert a cause of action under the Suits in Admiralty Act, the Jones Act against BP and NOAA, a cause of action for fraudulent inducement, fraudulent misrepresentation,  and breach of contract under maritime and/or Louisiana law.

**Charles Taylor Facts:**

1.      Mr. Taylor is a Bay St. Louis, Mississippi resident and resides approximately one half mile from the beach.  Subsequent to the Deepwater Horizon Oil Spill Disaster, on or

about May 2010, Mr. Taylor's residence was inundated with fumes related to the disaster and the oil burning that the defendants were performing in response to the disaster.  On or about June 2010, Mr. Taylor became ill.  He developed severe abdominal pain, nausea and vomiting, bloody diarrhea, severe headaches, fatigue.  He was diagnosed with Crohn's Disease on or about July, 2010.  He was admitted to the hospital on or about July 2010 and diagnosed with severe anemia and dehydration. His treatment necessitated a colonoscopy and a biopsy of the colon.  After months of pain treatment and tests, he was diagnosed with Crohn's Disease on or about September 3, 2010.  On Christmas, 2010, Mr. Taylor developed pneumonia which recurred three times before it finally remitted on or about April 2011.  On or about February 2011, Mr. Taylor treated with Dr. Michael Robichaux who stated to Mr. Taylor that his illnesses were related to his chemical exposure to the Deepwater Oil Spill Disaster.

2.        As a result of his toxic exposure to the Deepwater Horizon Oil Spill Disaster, Mr. Taylor was hospitalized, suffered the debilitating effects of Crohn's disease and pneumonia, suffered tremendous pain, and underwent numerous painful medical tests.   Mr. Taylor missed forty-five days of work and lost his job because of this missed time.   In order to pay his medical bills related to his treatment, he was forced to withdraw money from his 401K savings plan. Additionally, Mr. Taylor's failing health and medical expenses have made it extremely difficult for him to care for his minor son.

### FACTUAL ALLEGATIONS OF CLEAN-UP AND RESPONSE WORKERS

1.        BP hired clean-up and response contractors, including defendants Ashland Services, L.L.C., Superior Labor, L.L.C., USA Environmental Services, Inc., and Adriatic Marine, LLC to clean up beaches, marshes, wetlands and other onshore areas.  Clean-up workers' primary

tasks were to, *inter alia*, lay and haul oil containment boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants, assist with *in-situ* burning, spray and clean vessels that came into contact with oil, dispersants, and other harmful chemicals resulting from the Oil Spill, decontaminate oiled wildlife, and transport contaminated boom and other clean-up equipment and other Clean-up Workers.  Response workers were also hired as part of the Vessels of Opportunity Program and other offshore cleanup and response efforts. While offshore response workers worked and often lived aboard vessels engaged in oil-skimming and boom retrieval, containment and deployment activities, oil burning activities, and location of oil slicks.

2.        As part of these efforts, clean-up workers and response workers, including Plaintiffs, came into contact with crude oil, chemical dispersants and oil/chemical mixtures. Even more disturbing, BP's aerial spray planes negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and crew in the vicinity of the spraying.

3.        Upon information and belief, Plaintiffs were not outfitted with respirators or equivalent safety devices. Some attempted to use respirators while working, but BP and other Defendants prevented them from doing so and threatened them with loss of their clean-up jobs if they did not abide by the instruction.

4.        Plaintiffs working as clean-up and offshore response workers were exposed to oil and dispersants by, *inter alia*, inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist. Many of the chemicals in crude oil and the dispersants to which Plaintiffs were exposed target the organs in the human body, and this increases the risk and may also increase the severity of harm.  The dispersants that were used also can increase

the uptake or dose of crude oil chemicals and movement of chemicals into critical organs. Moreover, the odors emanating from the oil and/or the dispersants are foul, and the fumes are harmful.

5.      The negative health effects caused by exposure to oil, dispersants, and/or some mixture of the two are varied and can cause a wide range of diseases and conditions.  Some of these diseases, conditions, and symptoms may be evident immediately or within several days, and others can appear months or years later.

**<u>Factual Allegations of Christopher Green Facts</u>:**

1.      Mr. Green is a licensed Merchant Marine Mariner and captain.  On or about June 11, 2010 until on or about October 19, 2010, Mr. Green was employed as a captain by a company contracted by BP to provide oil spill disaster response services. While employed to provide disaster response services, Mr. Green worked aboard vessels that were responsible for removing heavily oiled boom from the Gulf of Mexico and storing said boom aboard the vessel until it was removed to another vessel or following return to port.  Mr. Green lived aboard the boat 24 hours a day, seven days a week for 30 day stints for five months. Consequently, Mr. Green inhaled fumes from the oiled boom and from the surrounding waters for the entire duration of his embarkment. Additionally, contaminated boom was removed from the water and placed on the vessel's deck. Thus, the deck of the vessel was often contaminated by oil and oil mixed with dispersants and this material came into contact with Mr. Green's skin and clothing. Additionally, based on information and belief, Mr. Green was in the area when dispersants were deployed from aircraft and other marine vessels in response to the oil spill disaster. Based upon information and belief, Mr. Green suffered exposure to

31

dispersants from inhalation, dermal contact and possibly ingestion.

2.      As a result of his toxic exposure to chemicals and crude oil from the Deepwater Horizon Oil Spill Disaster, Mr. Green has suffered with rashes, severe abdominal pain, nausea and vomiting, diarrhea, severe headaches, muscle aches, and fatigue.

3.      Mr. Green also claims economic damages, including, but not limited to, loss of income, loss of business, loss of business opportunity, loss of goodwill and business reputation related to his charter business and marine supplies business which were negatively impacted by the Deepwater Horizon Oil Spill.

**Factual Allegations of Gregory Turner:**

1.      Mr. Turner was employed by Ashland Contractors, Inc. (hereinafter "Ashland") from on or about May 6, 2010 until on or about July 30, 2010.   Based upon information and belief, Ashland Contractors, Inc. were contracted by BP to respond to the Deepwater Horizon Oil Spill Disaster. While employed by Ashland, Mr. Turner performed beach patrol and tarball removal work in Dauphin Island, Alabama. Mr. Turner worked ten to twelve hour shifts, seven days a week for Ashland. While employed by Ashland, Mr. Turner inhaled fumes from the Deepwater Horizon Oil Spill Disaster.  Defendants failed to provide Mr. Turner with a respirator and failed to warn him of the danger and risk of toxic exposure while performing beach patrol and tarball removal.  Based upon information and belief, Mr. Turner also inhaled fumes from the dispersants utilized by Defendants in the Deepwater Horizon Oil Spill Disaster. Based upon information and belief, as a result of his toxic exposure to tar balls of crude oil and dispersants and fumes from the crude oil and dispersant from the Deepwater  Horizon  Oil Spill Disaster, Mr. Turner developed and was treated for a respiratory infection on or about June 7, 2010.  Mr. Turner has also suffered from other symptoms due to his toxic exposure,

including but not limited to, diminished eyesight, blurred vision, dry eyes, diminished lung capacity and periodic wheezing.

## Factual Allegations of Richard and Janice Danos:

1.      Plaintiff, Richard Danos, was employed by Defendant, SUPERIOR LABOR FORCE, INC., in June 2010 in Port Fouchon, Louisiana.  Plaintiff Danos was employed as a carpenter and renovated and refurbished the living quarters for Deepwater Horizon Oil Spill response workers. While Plaintiff Danos was employed in this work on the Port Fouchon living quarters, a storm occurred and mattresses from the living quarters were blown into the surrounding Gulf of Mexico waters. Plaintiff Danos' employer required Plaintiff Danos to retrieve said mattresses from the water. Based upon information and belief, Plaintiff Danos came into contact with toxic and harmful crude oil and dispersants from the Deepwater Horizon Oil Spill when he retrieved the mattresses from the Gulf of Mexico. Shortly after coming into contact with the contaminated mattresses, Plaintiff Danos became ill and was treated by physicians for respiratory problems, fatigue, nausea, vomiting and various other symptoms.  Additionally, based upon information and belief, Plaintiff Danos inhaled fumes from the crude oil and dispersants from the Deepwater Horizon Oil Spill while employed in Port Fouchon, Louisiana. On or about November 23, 2010, Plaintiff Danos suffered a pulmonary embolism and hospitalized for nine days.   Based upon information and belief, Plaintiff Danos' pulmonary embolism was caused by his toxic exposure to crude oil and dispersants as described above in his employment in Port Fouchon, Louisiana. Plaintiff Richard Danos asserts claims under the Oil Pollution Act, Louisiana Code of Civil Procedure Article 2315, general maritime law, negligence per se, and Louisiana Nuisance Law. Plaintiff Janice Danos asserts a loss of consortium claim pursuant to Louisiana law.

## CLAIMS FOR RELIEF

## COUNT I

## Negligence Under General Maritime
Law

1.       Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

2.       The existence and breach of Defendants' legal duties are established under general maritime law.

3.       At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations and maintenance of the Deepwater Horizon, including its appurtenances and equipment.  BO additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

4.       Further, BP owed a duty to Plaintiffs to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

5.       BP had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

6.       At all times relevant to this litigation, BP and the other defendants knew or should have known that: (a) crude oil contains chemicals hazardous to human health; (b) chemical dispersants contain chemicals hazardous to human health; (c) Plaintiffs were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and (d) Plaintiff should have been provided proper protective clothing and respirators when engaged in

Oil Spill clean-up and response activities; and (d) failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

7.      BP breached its duty of care to the Plaintiffs in the following non-exclusive respects:

a) failing to prevent the explosion on board the Deepwater Horizon;

b) failing to cap the Macondo well in a timely manner;

c) failing to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d) failing to properly train and equip cleanup and response workers to avoid exposure to hazardous substances encountered in connection with relief efforts;

e) failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

f)  failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

g) failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures;

h) failing to operate the Deepwater Horizon in a safe manner;

i) operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

j) failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

k) failing to promulgate, implement, and enforce rules and regulations pertaining to the

safe operations of the Deepwater Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil pill;

l) failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

m) failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

n)  failing to take appropriate action to avoid or mitigate the accident;

o) negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

p) failing to properly train their employees;

q) failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

r) failing to timely warn; Failing to provide respiratory and dormal protective gear to Plaintiffs;

s) failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

t) failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

u) failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

v) failing to provide appropriate accident prevention equipment; Failing to ensure that

36

the casing and float collar were properly designed and installed;

w) providing BOP's that failed to properly function;

x) failing to ensure that BOP's would work as intended;

y) failing to test the BOP's to ensure that they would operate properly;

z) recklessly altering the BOP's and failing to use them in a safe manner;

aa) failing to conduct well cementing operations properly;

bb) failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

cc) failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

dd) failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

ee) failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico.

ff) recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf.

8.        The blowout and explosions on the Deepwater Horizon, its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named herein.

9.        Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

10.       Plaintiffs suffered injury, loss and damages as a direct and proximate result of Defendants' breach of their aforementioned duties.

## COUNT II

## Gross Negligence Under General Maritime Law

1.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

2.    Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

3.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to prevent and contain the oil spill.

4.    Defendants knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiffs.

5.    Defendants' willful, wanton, reckless, and/or grossly negligent conduct is the factual and legal cause of Plaintiffs' injuries and damages.

6.    Defendants were aware at all times relevant hereto that their operations and the acts and/or omissions described above created an unreasonable risk of harm the plaintiffs and knew that catastrophic environmental destruction and economic loss would occur if the well being serviced by the DEEPWATER HORIZON were to blow out.

7.    Defendants were indifferent to this risk of harm. Defendants intentionally failed to perform the duties owed to Plaintiffs in reckless disregard of the consequences their actions and/or omissions would have on Plaintiffs.

8.    Moreover, Defendants acted intentionally with knowledge that their acts would probably result in injury or in such a way as to allow an inference of a reckless disregard of the probable consequences of their acts. Therefore, Defendants are also liable to Plaintiffs for gross

negligence and/or willful misconduct.

9.    The oil spill and subsequent response and recovery efforts that have caused damage and continue to cause damage to Plaintiffs was proximately caused by Defendants' negligence, gross negligence and/or willful misconduct.

10.    Further, upon information and belief, the oil spill was proximately caused by the Defendants' violation of applicable federal safety, construction, or operating regulations and/or by violations of such regulations by an agent or employee of the Defendants and/or a person acting pursuant to a contractual relationship with Defendants.

11.    Defendants had a duty to conform their conduct in such a manner as to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist in case of emergency pursuant to federal and Louisiana, Mississippi, Alabama and Florida law.

12.    Defendants failed to conform their conduct to the appropriate legal standard, thereby breaching their duty to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist and be properly implemented in case of emergency pursuant to federal and Louisiana, Mississippi, Alabama and Florida law.

13.    Defendants' substandard conduct in failing to prevent the blowout, the ensuing destruction and sinking of the Deepwater Horizon, and the uncontrolled discharge of oil from the Macondo well into the Gulf of Mexico pursuant to federal and state laws was the cause-in-fact of the injuries, harm, and damages suffered by the Plaintiffs.

14.    Defendants' substandard conduct in failing to prevent and/or contain the blowout that

resulted in the sinking of the Deepwater Horizon and the subsequent oil spill from the Macondo well was the legal cause of the Plaintiffs' injuries, harm, and damage.

15.     In addition, and/or in the alternative, the blowout, fire, explosion, destruction of the Deepwater Horizon and ensuing oil spill were caused by defective equipment and would have been prevented by non-defective equipment, including the BOP and float collar, which were in the care, custody, and control of the Defendants and over which the Defendants had *garde*. Defendants knew or should have known of these defects and Defendants are therefore liable for the defects.

16.     BP has taken responsibility for the oil spill and cleaning up the oil spill, as former BP Chief Executive, Tony Hayward, had issued a statement on the BP website that BP is "… taking full responsibility for the spill and we will clean it up." BP has therefore admitted its liability for the oil spill.

17.     BP's duties are non-delegable.

18.     It was foreseeable that the Defendants' actions and/or omissions, resulting in the blowout of the Macondo well, the sinking and destruction of the Deepwater horizon, and the ensuing uncontrolled oil spill from the Macondo well, would proximately cause the damage, injury, and harm that Plaintiffs did suffer and will continue to suffer, as alleged herein.

19.     The injuries to the Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take reasonably necessary actions to mitigate the dangers associated with their operations.

20.     As a direct and proximate result of the Defendants' negligence and gross negligence, Plaintiffs have each suffered and will continue to suffer significant physical, economic and other damages in excess of $75,000.00

21.     As a direct and proximate result of the negligence of the Defendants, the Plaintiffs suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.  These losses are either permanent or continuing in nature and Plaintiff will continue to suffer these losses in the future.   Plaintiffs' physical injuries required medical care in the past and will likely require ongoing care in the future. The Defendants are liable jointly and severally for Plaintiffs' damages resulting from Defendants negligence and gross negligence.  As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages.

## COUNT III

### Negligence Per Se Under General Maritime Law, State and Federal Law

1.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

2.     Defendants' conduct with regard to the manufacture, maintenance and/or operation of oil- drilling vessels such as the Deepwater Horizon, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.* 40 C.F.R.§300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. §1910.120.  Additionally, BP

failed to adhere to regulations set forth in Section 311 of the Clean Water Act, 40 C.F.R. §300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. §2717(b) (the "OPA"). One or more of Defendants violated these statutory and/or regulatory standards and therefore breached their responsibilities under these regulatory provisions.

3. In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

a. BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. §250.107(a)(1);

b. BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. §250.300.;

c. BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. §250.401(a);

d. BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §250.420(a)(1) and (2);

e. BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. §250.427;

f. BP failed to maintain the Deepwater Horizon's BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 §18.10.3, in violation of 30 C.F.R. §250.446(a);

g. BP failed to obtain approval of the Temporary Abandonment procedures

42

it actually used at the Macondo well, in violation of 30 C.F.R. §250.1721(a);

h.   BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R.  §250.427; and

i.   BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. §250.427 (b).

4.   Defendants' violations of these statutory and/or regulatory standards constitute negligence per se under federal law, as well as general maritime law.

5.   Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida Law.

6.   Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiffs' injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

7.   As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, the Plaintiffs have suffered injuries and are entitled to damages.

## Claims Under The Oil Pollution Act As to BP Defendants

### (Economic Loss)

### *COUNT IV*

1.   Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

2.   Under the Oil Pollution Act, 33 U.S.C. §2701, *et seq* ("OPA"), "each responsible party for a vessel or facility…from which oil is discharged…is liable for removal costs and

damages", including "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. §2702.

3.     A responsible party in the case of a vessel is any person owning, operating, or demise chartering the vessel. 33 U.S.C. §2701(32)(A). A responsible party for an offshore facility is the lessee or permittee of the area in which the facility is located. 33 U.S.C. 33 U.S.C. §2701(32)(C). A lessee is any "person holding a leasehold interest in an oil or gas lease on lands beneath navigable waters (as that term is defined in section 1301(a) of Title 43) or on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)." 33 U.S.C. §2701(16).

4.     For purposes of determining the responsible parties for a mobile offshore drilling unit, it is first deemed to be a tank vessel and then treated as an offshore facility for excess liability. 33 U.S.C. §2704(b) (1)&(2).

5.     At all pertinent times herein, BP leased the Deepwater Horizon.  BP was also a lessee in the Mississippi Canyon, Block 252 lease granted by the United States Mineral Management Services (hereinafter "MMS") under which the Macondo well was drilled by the Deepwater Horizon.  BP was the designated operator for said lease.

6.     The United States Coast Guard identified BP as responsible party pursuant to OPA. Thus, BP's strictly liable under OPA for economic damages that resulted from the oil spill.

7.     Defendant, BP is not entitled to limit its liability under § 2704(a) of OPA because the oil spill disaster was proximately caused by its gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations as alleged above.

Additionally, BP explicitly waived the right to raise the statutory limitation on liability under OPA.

8.      As a result of the oil spill and the resulting damages to the natural resources in the Gulf of Mexico, Plaintiffs have sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.

9.      As a result of the oil spill and the resulting damage to the marine environment in the Gulf of Mexico, Plaintiffs are entitled to damages pursuant to OPA, § 2702(b)(2)(E), which allows for "[D]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

10.     It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiffs.

## COUNT V

### Claims under Louisiana Nuisance Law

1.      Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

2.      BP's oil disaster has significantly interfered with Plaintiffs' right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

3.      Prior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

4.      Since the disaster, Plaintiffs have been unable to fish or boat, and many have lost

their livelihoods.

5.     As a direct and proximate cause of the oil disaster, and during their work to assist in the relief effort, Plaintiffs, Christopher Green, Gregory Turner, and Richard Danos were exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public.

6.     As a result of the oil disaster, Plaintiffs, as residents living in close proximity of the Gulf of Mexico, are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

7.     Moreover, all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersers. Tarballs, oil and dispersants mixed with crude oil continue to contaminate the Gulf of Mexico and the Plaintiffs' environment.

8.      Plaintiffs have a substantial likelihood of success based on the allegations, and Plaintiffs' allegations are likely to be proven and are not merely speculative.

## COUNT VI

### Loss of Consortium Claims under Louisiana Law

1.     Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

As a result of defendant's fault, Plaintiffs, Stephane Aguinaga, Janice Danos, and Kim Flair Landrieu, have and will have a loss of consortium due to the injuries to their husbands. Therefore, these plaintiffs assert a cause of action for loss of consortium or any other cause of action under state or federal law.

46

## COUNT VII

### Suits in Admiralty Claims

1.    Plaintiffs, Stephan Kolian and Michael Boatright assert claims pursuant to the Suits in Admiralty Act §30907.  Suits in Admiralty does not create a cause of action against the United States but requires that plaintiff show liability under federal maritime law without incorporation of state law.  *Sagan v. U.S.*, 342 F.3d 493, 62 Fed.R.Evid. Serv. 318, 2003 FED App. 0302P, 11 A.L.R. Fed. 2d 977 (6th Cir. 2003).  Suits in Admiralty provides coverage to Plaintiffs Stephan Kolian and Michael Boatright because they are asserting claims under the Jones Act – a federal maritime law.

22.    Plaintiffs', Stephan Kolian's and Michael Boatright's Jones Act claims are discussed in the following paragraphs.

## COUNT VII

### Jones Act Claims

1.      Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

2.      Plaintiffs, Stephan Kolian and Michael Boatright assert claims pursuant to the Jones Act under 46 U.S.C. § 688. Plaintiffs Stephan Kolian and Michael Boatright assert this claim against NOAA and the BP defendants.

3.      Plaintiffs, Mr. Green, Mr. Kolian, and Mr. Boatright, were injured while employed on vessels engaged in commerce and navigation on navigable waters, performing service work entailing inspection and maintenance of vessel appurtenances, and their injuries bear a significant relationship to maritime activity, thus invoking general maritime law and the Jones Act under 46 U.S.C. § 688.

47

4.      During this time, Plaintiffs were Jones Act seamen because (1) their duties contributed to the function of the vessel and to the accomplishment of its mission, and (2) their connection to the navigational vessels was substantial in duration and nature.  *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995).   Alternatively, these plaintiffs were maritime workers entitled to compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA) codified at 33 U.S.C. §§ 901-950 (2003).  *Id.* at 356.

5.      A third person who borrows a worker may become the Jones Act employer if the borrowing employer assumed sufficient control over the worker. Factors indicating control include payment, direction and supervision of the employees, and the power to hire and fire. See Volykis v. M-V Isabelle, 668 F.2d 863 (5th Cir. 1982).  See also Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1986).   Defendants, NOAA and BP, were the employers of Stephan Kolian and Michael Boatright as these defendants directed the dives and water sampling activities, controlled payment and exercised the power to hire and fire Mr. Kolian and Mr. Boatright. An employer may be liable under the Jones Act although he is not the owner or operator of the vessel as to which his employee is a seaman. *Id*. Therefore, Mr. Kolian and Mr. Boatright may prosecute their Jones Act claims against NOAA and BP, although NOAA and BP did not own or operate the vessel upon which Mr. Kolian and Mr. Boatright were employed. Alternatively, and as to defendant NOAA only, Plaintiffs, Stephan Kolian and Michael Boatright assert a cause of action against NOAA pursuant to the Federal Employers Compensation Act. *See* 5 U.S.C. §8108. *See also Johansen v. United States*, 343 U.S. 427 (1952).

## **COUNT VIII**

### **Unseaworthiness Claims**

1.         Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

## COUNT IX

## Negligence, Gross Negligence and/or Failure to Warn Under
## Louisiana, Mississippi and Texas Law

1.         Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

2.         Plaintiffs' Steven Kolian, Michael Boatright, and David Landrieu assert that defendants are jointly and severally liable for damages under Louisiana law for grossly negligent and/or intentional failure to conduct reasonable inspection and to do what they should have done and for grossly negligent and/or intentional failure to warn.

3.         In order to prevail on a negligence claim, a plaintiff must prove by a preponderance of the evidence each element of negligence: duty, breach of duty, proximate causation, and injury. *Lovett v. Bradford,* 676 So.2d 893, 896 (Miss 1996) (*citing Palmer v. Anderson Infirmary Benev. Ass'n.*, 656 So.2d 790,794 (Miss. 1995)).   Plaintiffs, Gregory Turner and Charles Taylor, assert a cause of action for negligence pursuant to Mississippi Law against all defendants.

4.         Negligence actions in Texas require "a legal duty owed by one person to another. A breach of that duty, and damages proximately caused by the breach." Love, 92 S.W.3d at 454(*citing El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). Plaintiff, Christopher Green, asserts a cause of action for negligence pursuant to Texas Law against all defendants.

5.         Defendants owed and breached duties of reasonable care to ensure the safety of their

operations and to guard against and prevent injury to the Gulf Coast region residents and tourists and disaster response workers such as Plaintiffs who were located in the environments where Defendants chemical spraying activities occurred.

6.      Defendants owed a duty and failed in their duty to know what products they were spraying or applying onto the waters of the Gulf of Mexico and into the environment where Plaintiffs were located and to know the likely impact that their activities would have upon the environment and the health and welfare of Gulf Coast Region residents and tourists and disaster response workers such as Plaintiffs. Defendants applied the chemicals and dispersants without regard to the likely short and long term impacts upon human health likely to be caused by the quantity and geographic broad scope of their chemical applications onto hydrocarbons.

7.      Defendants owed a duty and breached the duty to spray chemicals onto the waters of the Gulf of Mexico and into Plaintiffs' environment in a way which was consistent with their product labels.

8.      Defendants owed a duty, and breached the duty, to warn of the effects of their spraying activities to Plaintiffs and all those who would be potentially injured or damaged by their activities in a time frame which would have allowed Plaintiffs to attempt to stop or reduce the quantity or location of the spraying activities, or alternatively to devise plans to mitigate or prevent damage to the Plaintiffs' health and environment.

9.      Defendants owed a duty to reject spraying huge quantities of dispersants onto the Gulf and into Plaintiffs' environment in order to protect the environment where Plaintiffs were locatedand the safety, health and welfare of Gulf Coast residents and tourists and disaster response workers. Defendants knew or should have known that they would be spraying

quantities of chemicals over volumes of water in ways which had never been tested for affect.  Defendants breached that duty of reasonable care.

10.     Defendants owed a duty and failed in its duty of exercising reasonable care in the use of dispersants repetitiously in the same and contiguous areas, and in the type of the dispersants used.

11.     Defendants owed a duty and failed in that duty to mitigate the damages caused by the negligent activities in order to prevent its harm or to reduce the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico and the health, safety and welfare of Plaintiffs.

12.     Defendants owed a duty and failed in that duty to warn Plaintiffs of the deleterious health effects of crude oil and dispersants.

13.     Defendants owed a duty and failed in that duty to provide Plaintiffs who were providing disaster response services with proper protective equipment, including, but not limited to respirators.

14.     Defendant knew or should have known that burning crude oil would negatively impact the health, safety and welfare of Plaintiffs and did not bother to warn Plaintiffs of the dangers associated with exposure to fumes from burning crude oil.

15.     Defendants knew or should have known that the crude oil from the DeepWater Oil Spill would cause significant environmental problems, including the widespread growth of toxic bacteria, including Vibrio Vulnificus, and owed a duty and failed in that duty to warn Plaintiffs of this environmental impact and the potentially harmful consequences of bodily contact with this bacteria.

16.     As a direct and proximate result of the negligence of the Defendants, the Plaintiffs'

were physically exposed to the subject chemicals on their bodies and via inhalation. Each was injured as a result of said exposure, suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition. These losses are either permanent or continuing in nature and Plaintiff will continue to suffer these losses in the future. As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages. Defendants are liable jointly and severally for Plaintiffs' damages resulting from Defendants' negligence.

## COUNT IX

## Plaintiffs', Kolian's and Boatright's, Breach of Contract Claims under General Maritime and Louisiana Law and alternative Claims of Justifiable Reliance Against the BP Defendants and NOAA

Plaintiffs, Stephan Kolian and Michael Boatright assert a cause of action for breach of contract under maritime law. There is maritime jurisdiction over maritime contract disputes. The guiding principle is that a contract is maritime if its "subject matter" is maritime. *North Pac. S.S. Co. V. Hall Bros. Marine Ry. & Shipbldg. Co.*, 249 U.S. 119 (1919). Based upon information and belief, the BP defendants and defendant NOAA hired plaintiffs, Stephan Kolian and Michael Boatright, to charter a vessel to offshore locations and to collect water samples. The BP defendants and defendant NOAA offered to provide funding to Stephan Kolian and Michael Boatright in exchange for the water samples that were retrieved during the offshore charters. Plaintiffs Stephan and Michael Boatright accepted

this offer and performed several offshore charters and numerous dives in effort to retrieve water samples for the BP defendants and defendant NOAA. The BP defendants and defendant NOAA received numerous water samples from plaintiffs, Stephan Kolian and Michael Boatright.  Thus, based upon information and belief, plaintiffs performed all obligations under the contract. The BP defendants and defendant NOAA failed to provide funding to plaintiffs. The BP defendants and NOAA breached their maritime contract with plaintiffs by failing to provide the agreed upon funding.

Further based upon information and belief, the BP defendants and NOAA promised funding to Plaintiffs, Stephan Kolian and Michael Boatright, in exchange for written proposals of Natural Resource Damage Assessment (NRDA) that was to be completed by Plaintiffs, Stephan Kolian and Michael Boatright.  Plaintiffs submitted a written proposal on or about July 15, 2010 entitled "Investigation, Delineation and Analysis of Subsurface Oil and Dispersants in the Northwest Gulf of Mexico" Jon Fajans, who was upon information and belief, acting on behalf of the BP defendants and NOAA responded that the proposals needed to be "tweaked" and they would be accepted by the BP defendants.  Plaintiffs accepted the BP defendants and NOAA's offer to allow Plaintiffs to complete the NRDA by changing the proposal to conform with Mr. Fajan's directives who was based upon information and belief representing the BP defendants and NOAA in the contract between Plaintiffs and the BP defendants and defendant NOAA.  BP and NOAA breached this contract by failing to provide the promised funding.

Alternatively, if these contracts are determined not to be maritime in subject matter, Plaintiffs assert a cause of action under Louisiana law for breach of oral contract.  Oral contracts are enforceable under Louisiana law. Plaintiffs assert that the same operative factual

allegations stated in the preceding paragraphs relevant to the breach of maritime contract apply and are reasserted and restated herein.

Alternatively, if a contract is not found to have existed under maritime or Louisiana Law, Plaintiffs assert a cause of action for justifiable reliance, negligent representation and fraudulent inducement.

## COUNT X

## Plaintiffs', Kolian's and Boatright's, Claims of Fraudulent Misrepresentation Against BP Defendants and NOAA

1. Petitioners incorporate by reference the preceding allegations of this Petition for Damages as if fully set forth below.

2. Defendants made false representations of material facts to Mr. Kolian and Mr. Boatright. Representatives of NOAA and BP represented to Mr. Kolian and Mr. Boatright that scuba diving in the Gulf of Mexico was safe.  Based upon information and belief, defendants were aware that scuba diving in the Gulf of Mexico following the Deepwater Horizon Oil Spill would present hazards to human health and safety and that Mr. Kolian and Mr. Boatright were likely to receive an injury.

3. Plaintiffs, Mr. Kolian and Mr. Boatright, relied on the Defendants' false representations of material facts to Petitioners regarding the safety of diving in the Gulf of Mexico as set forth above.

4. Plaintiffs', Mr. Kolian's and Mr. Boatright's, reliance on the Defendants' false representations of material facts regarding the safety of scuba diving in the Gulf of Mexico was reasonable under the circumstances.

5. Plaintiffs have been damaged as the proximate result of their reliance on the

Defendants' false representations of material facts regarding the safety of scuba

## COUNT

## XII

## BATTERY

1.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

2.     Defendants place VoO Plaintiffs on VoOs without adequate training, warning of risks, or safety equipment.

3.     Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of VoO Plaintiffs or Vessel Plaintiffs.

4.     Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiffs on VoOs without warning or safety equipment has caused some VoO Plaintiffs to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

5.     Defendants spraying of chemical dispersants in the immediate vicinity of Vessel Plaintiffs without warning has caused some Vessel Plaintiffs to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

6.     VoO and Vessel Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward VoO and Vessel Plaintiffs.

## COUNT XIII.

## STRICT LIABILITY UNDER GENERAL MARITIME LAW FOR DESIGN

## DEFECT

## AGAINST NALCO

1.   Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and futher state:

2.   Plaintiffs are entitled to recover from Nalco for its defective design of Corexit®.

3.   At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

4.   Nalco sold and delivered the Corexit® to BP and the Dispersant Defendants immediately after the Oil Spill and placed the chemical dispersants in the stream of commerce.

5.   Nalco knew that the Corexit® would be used without inspection for defects by consumers.

6.   Nalco's dispersants were unreasonably dangerous to Plaintiffs for its intended purpose when it left Nalco's control.

7.   When BP and Dispersant Defendants used Corexit®, it was in substantially the same condition when it was sold.

8.   At all times, Nalco's dispersants were used in a manner consistent with the uses intended by or known to Defendant and in accordance with Defendant's directions and instructions.

9.   At all relevant times, the dispersant was used in an intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

10.   At the time the dispersants left Nalco's control, Nalco knew, or in light of

reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Plaintiffs who were not properly equipped with protective gear.

11.     At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the dispersant.

12.     At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

13.     Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the dispersants.

14.     The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity. The Corexit® was also defectively inspected, tested, marketed and sold.

15.     Defendant's product was not misused or altered by any third parties, Plaintiffs or class members.

16.     Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed Plaintiffs' injuries, and its actions and inactions were grossly negligent, reckless, willful and/or wanton.

17.     As a direct and proximate result of the design defect, Plaintiffs have suffered physical injury damages, damage to or diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

18.     In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); the Alabama Extended Manufacturer's Liability Doctrine; and Florida common law.

## COUNT XIV

## PUNITIVE DAMAGES

1.     Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

2.     Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein..

3.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

4.      BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

5.      Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

6.      BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

7.      BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

8.      BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

9.      BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that

cement mixture prior to using it in the well.

10.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

11.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

12.  BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

13.  BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

14.  BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

15.  BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the

Deepwater Horizon in the event of a blowout.

16.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

17.   BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

18.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

19.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

20.   Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

    (a)   failed to properly maintain and/or operate the Deepwater Horizon;

(b)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

(c)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

(d)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

(e)    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

(f)    failed to take appropriate action to avoid or mitigate the accident;

(g)    failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)    failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

(i)    failed to provide appropriate disaster prevention equipment;

(j)    failed to have an appropriate emergency spill response plan or readily available spill response equipment.

21.    BP and Dispersant Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

22.    BP and Dispersant Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

23.     Defendants willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

24.     BP and Nalco recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

25.     Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

26.     Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT XV

## Federal Tort Claims Act Claims

1.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as

if fully restated here.

2.    Plaintiffs Stephan Kolian and Michael Boatright assert claims (for money damages for personal injury against the United States pursuant to the Federal Tort Claims Act under 28 U.S.C. §1346.

3.    Under the Act, Plaintiffs must present their claims to the appropriate Federal Agency, here NOAA, prior to filing suit.  The Agency must make a final disposition of the claim within six months after the presentment of the claim or the failure to deny can be deemed by the claimant to be a final denial and the Plaintiff may file suit. 28 U.S.C.A. § 2675(a). Plaintiffs presented their claims in writing to NOAA in the attempt to settle their claims but the claims remain unresolved more than six months later. *See* Exhibit A Therefore, Plaintiffs assert their claims for money damages in this Court pursuant to the Federal Tort Claims Act.

<u>DAMAGES</u>

1.    Defendants are jointly, severally and solidarily liable for the past, present and future damages suffered by plaintiffs in the following non-exclusive particulars:

      a.    loss of enjoyment of life;

      b.    physical disability, pain and suffering;

      c.    past and future mental pain and suffering;

      d.    past and future loss of income and benefits;

      e.    past and future medical expenses;

      f.    loss of family relationships, love and affection;

      g.    loss of consortium;

      h.    punitive damages to be set by a jury; and

i.      Any other damages available under state or federal law that may be proven at trial.

WHEREFORE, Plaintiffs, demand judgment against Defendants in an amount which will adequately compensate them for actual damages herein. In addition, Plaintiffs seek punitive damages against Defendants, the amount of said punitive damages to be set by a jury. Plaintiffs also seek pre-judgment and post-judgment interest, costs, attorney's fees, along with any other damages available, and demands trial by jury of all issues triable as of right by jury.

Respectfully submitted,

*By /s/ Bonnie A. Kendrick*
**BONNIE A. KENDRICK (31806)**
Email bkendrick@smithstag.com
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601

**STUART H. SMITH (17805)**
Email: ssmith@stag.com
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601

Attorney for Plaintiffs

Co-Counsel for Plaintiffs

**KELLEY B. STEWART (FL # 492132 )** Email:
KStewart@krupnicklaw.com
The Law Offices of Krupnick,
Campbell, et al
12 Southeast 7th Street - #801
Fort Lauderdale, Florida 33301
Telephone: (954) 763-8181 #8619
Facsimile: (954) 763-8292