# M E M O R A N D U M

TO:      The Honorable Sally Shushan

FROM:   BP Counsel

DATE:   April 14, 2014

RE:      *In re Deepwater Horizon*, MDL No. 2179
         Treatment of Conditions First Diagnosed after April 16, 2012

---

## I.   CLASS COUNSEL'S MEMORANDUM RAISES A PRESUMPTION THAT HAS NOT BEEN THE BASIS OF ANY CLAIM DECISION.

On March 28, 2014, Class Counsel submitted a Memorandum captioned "Medical Benefits Settlement: Chronic Condition Compensation."[1]  Notably, that Memorandum does not present an issue that has arisen in the context of any actual claim determination under the Medical Benefits Class Action Settlement Agreement ("MSA").[2]

Under the MSA, individual claims submitted by Class Members are considered in the first instance by the Claims Administrator, Garretson Resolution Group ("GRG"), which is charged with "faithfully implement[ing] and administer[ing] this [MSA] according to its terms."[3] GRG reviews the supporting information submitted by the Class Member and makes a determination of the Class Member's eligibility for compensation.[4]

Class Counsel's request for judicial intervention is made absent any claim that is alleged to have been decided by GRG improperly.  Class Counsel merely presume GRG will get it wrong.  There are no facts relating to an actual claim that the Court could review to assess how the abstract contract interpretation issue raised by Class Counsel has been applied.  Rather, Class Counsel, unilaterally and without prior notice to BP, asks this Court to issue an advisory opinion that GRG must compensate all eligible Class Members at the highest level of benefit under the Specified Physical Condition ("SPC") Matrix—which is reserved only for Class Members who manifested one of five specified Chronic Conditions within 24 to 72 hours after exposure—*even if* that Class Member never sought medical treatment, confirmation or diagnosis of that condition before today.  Given the severe symptoms associated with each of these Chronic Conditions, it is "highly implausible" that a Class Member actually experiencing one of those conditions would

---

[1]   This memorandum will cite to Class Counsel's submission as "Mem."

[2]   After Class Counsel submitted its Memorandum, BP contacted Class Counsel to meet and confer on the issues raised in Class Counsel's submission.  The parties have been unable to resolve this matter informally.  In such circumstances, the MSA specifies how interpretive issues should be resolved:  "[A]ny disputes or controversies arising out of or related to the interpretation, implementation, administration, and enforcement of this [MSA] shall be made by motion to the Court."  MSA § XXVII.  BP submits this memorandum to respond to Class Counsel's claims but expressly reserves all of its rights under the terms of the MSA and the law.

[3]   MSA § XXI.A(8).

[4]   *Id.* § XXI.

have waited months or years and not have sought medical care or treatment until after April 16, 2012.[5]

    If, however, the Court were inclined to address this issue, which has not arisen in the context of any specific claim that GRG has approved or denied, it should enforce the plain language of the MSA and reject Class Counsel's misstatement of the MSA.

## II.    THE MSA IS CLEAR AND UNAMBIGUOUS THAT ANY PHYSICAL CONDITION FIRST DIAGNOSED AFTER APRIL 16, 2012, IS A LATER-MANIFESTED PHYSICAL CONDITION ONLY.

    The MSA expressly provides that a "Later-Manifested Physical Condition" ("LMPC") "shall mean *a physical condition that is first diagnosed* in a Medical Benefits Settlement Class Member *after April 16, 2012*," and that is alleged to have resulted from exposure.[6]  This provision is plain on its face; it contains no express exceptions; and it uses the indefinite article "a," which is equivalent to "any."  *See* Black's Law Dictionary 84 (6th ed. 1990); *Comm'r v. Kelley*, 293 F.2d 904, 912 n.18 (5th Cir. 1961).  The express date restriction in the LMPC definition means that conditions first diagnosed *after* April 16, 2012, are *not* SPCs.[7]

    The MSA makes equally clear that a Class Member's particular condition cannot be treated as both an SPC and an LMPC.  Nor does the Class Member have the option to choose whether the condition should be treated as an SPC or an LMPC.  If a claimed physical condition falls within the LMPC definition, the "***Class Member may not seek compensation from any Released Party in any other manner***" other than that specified in Section VIII of the MSA.[8]

    It is black-letter maritime law that a contract must be read "as a whole," and its words must be "given their plain meaning unless the provision is ambiguous."  *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009) (internal quotation marks omitted); *Fontenot v. Mesa Petrol. Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) ("contract should be read as whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous").  In addition, a contract must be interpreted so as to give effect to each provision, and so that no term is rendered superfluous, ineffective, or in conflict with another provision of the agreement.  *See Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) ("A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous."); *Transco Exploration Co. v. Pac. Emp'rs Ins. Co.*, 869 F.2d 862,

---

[5]    *See* Apr. 14, 2014 Declaration of Dr. Jessica Herzstein ("Herzstein Decl.") ¶¶ 4-5 (attached as Exhibit 1).

[6]    MSA § II.VV (emphases added).

[7]    To the extent that Class Counsel argue that the SPC Matrix implicitly allows for a diagnosis to be made at any time because of its silence as to a date of diagnosis, that purported "implied term must give way to express provisions in the parties' agreement."  *Int'l Bhd. of Teamsters v. Logistics Support Grp.*, 999 F.2d 227, 229 (7th Cir. 1993).

[8]    MSA § VIII.B(1) (emphasis added).

864 n.3 (5th Cir. 1989) (court must, "where possible, construe the words so as to harmonize all while rendering none superfluous").

Reading the MSA as a whole and giving its words their plain meaning reveals the error of Class Counsel's position. Class Counsel's position rests on a mistaken equivalence between two disparate types of claims. According to Class Counsel, if two Class Members submit claims for reactive airways dysfunction syndrome (irritant-induced asthma) ("RADS"), and one Class Member provides medical records confirming the condition one week after manifestation and the other provides medical records with a first diagnosis three years later (and well after April 16, 2012), each Class Member's remedy is controlled by the condition for which they are seeking compensation. But an LMPC is defined by the date of diagnosis, not the condition, date of manifestation, or any other criteria. In other words, any condition diagnosed after April 16, 2012, is defined as an LMPC and compensation is available exclusively through the Back-End Litigation Option ("BELO") process. Unlike an SPC, the manifestation of an LMPC could occur before or after April 16, 2012, provided it allegedly resulted from prior exposure within the requisite time period.

The MSA's plain language and structure also make clear that a Class Member cannot choose whether to treat a condition as an SPC or an LMPC. The Class Member's claim will always be an LMPC claim if "first diagnosed . . . after April 16, 2012."[9] The Class Member then has two options: (1) file suit under workers' compensation law or the Longshore and Harbor Workers' Compensation Act; or (2) seek compensation from BP pursuant to the BELO process.

The Class Member "may not seek compensation from any Released Party *in any other manner*."[10] This means that Class Members may *not* seek SPC compensation for a condition that falls within the LMPC definition.[11]

Notably, this plain reading of the language harmonizes the LMPC and SPC provisions, while Class Counsel's position creates a situation in which the SPC and LMPC definitions would overlap and conflict, contrary to the carefully defined compensation categories and criteria established by the MSA. Class Counsel argue that the LMPC and BELO provisions should be ignored, or that the Court should effectively rewrite the definition of LMPC to include an exception for any condition diagnosed after April 16, 2012, that happens to be a condition listed on the SPC Matrix—an exception that cannot be found in the text of the MSA and cannot be reconciled with the MSA when read as a whole.

---

[9]   *Id.* § II.VV.

[10]   *Id.* § VIII.B(1) (emphasis added).

[11]   Though Class Members with LMPCs do not receive compensation under the SPC Matrix, this does not leave them without a remedy because they may receive compensation through either a workers' compensation lawsuit or through the BELO process.

**III.     CLASS COUNSEL'S MISCHARACTERIZATION OF THE MEDICAL PROOF
REQUIREMENTS FOR ENTITLEMENT TO COMPENSATION FOR A
CHRONIC CONDITION IS CONTRARY TO THE TERMS OF THE MSA,
OVERREACHING, AND INVITES FRAUD.**

The MSA was carefully structured to provide Class Members with a clearly defined
process to obtain quantified monetary compensation for a Chronic SPC.  The MSA provides the
BELO process (or a workers' compensation claim) as the exclusive remedy for Class Members
with LMPCs—i.e., Class Members who are "first diagnosed" with a physical condition allegedly
resulting from exposure after April 16, 2012.  Class Counsel seek to up-end this deliberate,
agreed upon compensation structure.  Class Counsel's motivation is suspect, and would eliminate
the certainty achieved in the settlement.  Such an interpretation would allow Class Members to
wait years to obtain medical care or treatment for a Chronic SPC that allegedly first manifested
within hours of exposure.  This result is contrary to the plain language of the MSA and defies
medical science and common sense.  Indeed, the primary beneficiaries of Class Counsel's
interpretation would be individuals with fraudulent claims who are seeking immediate
compensation under the SPC Matrix rather than having their claims processed as LMPCs.

**A.     The SPC Matrix Mandates Stringent Proof Requirements for Compensation
for Chronic Conditions.**

Under the MSA, the term "Specified Physical Condition" is defined to "mean one or
more of the Acute Conditions or Chronic Conditions identified in Exhibit 8 [the SPC Matrix]"
and which is alleged to result from exposure.[12]  There are only *five* Chronic Conditions
compensable under the SPC Matrix:  (1) sequela from direct chemical splash to eye(s); (2)
chronic rhinosinusitis; (3) RADS; (4) chronic contact dermatitis; and (5) chronic eczematous
reaction.[13]  All of these conditions must have manifested within either *24 hours* (for sequela of a
direct chemical splash or RADS) *or 72 hours* (for chronic rhinosinusitis, chronic dermatitis or
chronic eczematous reaction) after exposure.[14]  Due to the seriousness of these conditions, they
receive the highest compensation under the SPC Matrix:  *$60,700* for Clean-Up Workers and
*$36,950* for Zone A or Zone B Residents as well as enhancements for overnight
hospitalization.[15]

Because Chronic Conditions are ongoing and provide the greatest compensation under
the Matrix, the Class Member must meet more stringent documentation requirements than apply
to all other SPC Acute Conditions.  To obtain compensation for a Chronic Condition, a Class
Member must produce *three* distinct categories of proof:

*First*, the Class Member must submit a declaration, under penalty of perjury, "(1)
asserting the manifestation of one or more conditions (or the symptom(s) thereof) . . . , (2)

---

[12]    MSA § II.RRRR.

[13]    MSA Ex. 8, at 13-14.

[14]    *See id.*

[15]    *Id.* at 4.

The Honorable Sally Shushan
April 14, 2014
Page 5

asserting that such condition(s) (or the symptom(s) thereof) occurred within the applicable timeframe . . . , and (3) identifying the route, circumstances, and date(s) or approximate date(s) of alleged exposure."[16]

**Second**, the Class Member must submit one of the following:  (1) "[m]edical records establishing presentment to a medical professional with the condition(s) or symptom(s) claimed in the declaration, where such condition(s) or symptom(s) are persisting at the time of presentment"; (2) "supporting data, documentation, and records from the Medical Encounters database" or from other BP records demonstrating on-site treatment; or (3) "other data, documentation, or records" reflecting the Class Member's "transport to a medical facility during or immediately after the performance of Response Activities."[17]

**Third**, the Class Member must also submit "[m]edical records that (a) establish ongoing care/treatment or chronic nature of the condition(s) or symptom(s) and (b) indicate that exposure was considered by either the claimant or the medical professional to be related to the condition(s) or symptom(s)."[18]

If the Court decides to rule on the interpretation of the proof requirements for a Chronic SPC, the MSA plainly requires a Class Member seeking compensation to provide documentation of medical treatment, confirmation and/or diagnosis proximate to the Class Member's exposure and the condition's manifestation.

### B.    Medical Proof of Presentment of a Chronic SPC Must Be Proximate to the Class Member's Exposure.

The second category of proof (above) is the most relevant to the issues raised in Class Counsel's Memorandum:  the record of presentment to a medical professional with the condition claimed in the declaration, which Class Counsel contend can be satisfied with a medical record of presentment to a doctor after April 16, 2012, and possibly years after the Class Member's alleged exposure and manifestation.  As to that category, however, the Matrix contemplates three possible forms of proof:  medical records "establishing presentment to a medical professional with the condition," an entry in the Medical Encounters database, or records of transport to a medical facility.[19]  The latter two are clearly records of diagnosis or medical treatment that occurred shortly after exposure and the manifestation of the Class Member's condition.  For Class Members who present documents from the Medical Encounters database, the SPC Matrix specifically describes documentation "reflecting such Medical Benefits Settlement Class Member's transport to a medical facility **during or immediately** after the performance of Response Activities."[20]  For Class Members who rely on information in databases other than the Medical Encounters database, the Matrix requires documents "reflecting that Medical Benefits

---

[16]    *Id.*

[17]    *Id.*

[18]    *Id.* at 5.

[19]    *Id.* at 4-5.

[20]    *Id.* at 4 (emphasis added).

The Honorable Sally Shushan
April 14, 2014
Page 6

Settlement Class Member's transport to a medical facility *immediately* after the performance of Response Activities."[21]

It would be contrary to the terms and structure of the Matrix if the MSA were interpreted to allow the first form of proof—the medical records establishing presentment—to be something a Class Member could acquire years after exposure, while requiring that the other two possible forms of proof be immediate. A basic tenet of contract interpretation demands that a term in a contract be read in relation to the terms that surround it. *Cf. United States v. Golding*, 332 F.3d 838, 844 (5th Cir. 2003) (per curiam) (under *noscitur a sociis*, a term is interpreted by considering the meaning of the terms associated with it); *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n*, 368 F.3d 491, 499 n.8 (5th Cir. 2004) ("[W]here general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." (internal quotation marks omitted)).[22]

Nor would such an unbounded time for first presenting a condition or receiving a diagnosis of that condition be consistent with the hospitalization enhancer. The enhancer provides for additional compensation to Class Members who are hospitalized after presentment, but that hospitalization "must occur within one week of the first presentment of the condition(s) or symptom(s) to a medical professional."[23] The short timeframe for receiving a hospitalization enhancer reinforces the plain import of the MSA: that a Chronic SPC is one of the specifically enumerated conditions that manifests quickly and for which the Class Member seeks proximate medical treatment. Class Counsel's position—that a medical diagnosis could be obtained years after manifestation of the condition—cannot be reconciled with the proof standards or compensation scheme for Chronic SPCs under the Matrix.

###    C.    Class Counsel's "Interpretation" Defies Medical Science and Opens the Door for Fraudulent Claims.

Class Counsel's erroneous contention opens the door to manufactured claims based on fraudulent medical records. For example, a Class Member could be seen by a plaintiffs' law firm's physician today, with the Class Member claiming that he was exposed while performing response activities on April 1, 2011, and had manifested RADS within 24 hours of exposure. The physician could then manufacture a medical record confirming presentment of RADS and that his condition/symptoms are chronic *or* will require ongoing care/treatment for the sole

---

[21]    *Id.* at 5 (emphasis added).

[22]    As stated above, in addition to the medical records establishing the diagnosis, Class Members seeking compensation for Chronic Conditions must also submit separate medical records establishing that that they are receiving ongoing care for that condition. MSA Ex. 8 at 5. This category, unlike the other medical record requirement, calls for records that may not be proximate to the time of manifestation. Class Counsel's interpretation conflates these two categories of medical records, allowing the claimant effectively to satisfy both of these distinct categories with a single medical record. But the SPC Matrix is clear that a claimant needs two separate sets of medical records: records of presentment to a medical professional "*plus*" records that establish the claimant's condition is chronic or requires ongoing care and treatment. *Id.* (emphasis added).

[23]    *Id.* at 4.

The Honorable Sally Shushan
April 14, 2014
Page 7

purpose of supporting that Class Member's claim that he has a Chronic Condition under the SPC Matrix.[24]

This concern is not merely hypothetical, but supported by significant evidence of existing efforts to fabricate medical "diagnoses" of high value settlement claims. Indeed, claimants continue to be actively solicited through advertisements and websites:

- "The chance of you having a claim if you [were] a clean-up worker is pretty big. Clean Up Workers payment up to $60,700 + Hospital expenses . . . all medical claims goes to a firm that only deals with medical and no economic cases, they have doctors on staff and they will be able to deal with only your medical problems."[25]

- "Once BP confirms they have knowledge as to your work on the clean up, we will contact you, to obtain more details as to your injuries and medical history. Once your medical history is completed, you will be scheduled to see a doctor in your area. The doctor will examine you and review your medical history before writing the required medical report to be submitted with your claim documents."[26]

- Attorneys "***are actually having people go to doctors, to be tested and they are paying for it.***"[27]

These are precisely the types of "injuries" that Class Counsel are attempting to shoehorn into the SPC Matrix.[28] But none of the hypotheticals posed by Class Counsel—individuals who supposedly have conditions such as sequela to the eyes but who do not present to a doctor for years—are realistic descriptions of how Class Members who actually have Chronic Conditions would behave. The reality is that workers or residents who legitimately experienced the serious conditions defined as "chronic" in the SPC Matrix would have sought medical care long before the nearly two years that passed between the *Deepwater Horizon* Incident and the settlement agreement, based on the nature of the conditions themselves.[29] For example, both RADS and

---

[24]  *See* Herzstein Decl. ¶ 8 ("I am . . . highly skeptical of the medical legitimacy of any claims resulting from such examinations.").

[25]  "Who Should File A BP Medical Claim?", BP Settlement By BP-Claim.com, http://bp-claim.com/who-can-file-a-bp-medical-claim (last visited Apr. 14, 2014).

[26]  "Are you going to send me to a doctor?", Nations Law Firm (Mar. 16, 2014), http://mybpmedicalclaim.com/blog/?p=58.

[27]  "BP Medical Settlement Update," BPClaims.info (Sept. 20, 2013), http://bpclaims.info/bp-claims/bp-medical-settlement-update.

[28]  Class Counsel's interpretation, if accepted, would also hurt some Class Members. This concern is not at all hypothetical. On the contrary, GRG has received a claim from a Class Member who stated in his declaration that his symptoms first manifested in July 2010, but that he was not diagnosed until July 2012. This Class Member sought to proceed through the BELO process, and GRG has determined that his BELO Notice of Intent to Sue is compliant with the terms of the MSA. GRG correctly decided that the Class Member belongs in the LMPC category.

[29]  *See* Herzstein Decl. ¶¶ 4-5.

sequela from a direct chemical splash to the eye produce severe symptoms that would require immediate medical treatment.[30]  Class Counsel now suggest that some individuals who manifested these serious chronic physical conditions within 24 hours of exposure did not or would not seek medical care until two (or more) years later—or that they **still** have not done so.[31] Such a claim defies common sense in every context but the assertion of fraudulent claims.[32]

Likewise, Class Counsel's unsupported assertion that physicians providing legitimate medical treatment for a Chronic SPC would not have ordered the tests required by the Matrix is spurious.  The parties agreed upon those tests for the very reason that they represent accepted medical practice in diagnosing these five compensable Chronic Conditions.[33]  In other words, they are the routine tests a doctor diagnosing such conditions outside the context of litigation would perform.[34]  Qualified practicing physicians treating patients with these conditions would not have needed the Matrix to guide their diagnoses.

Plaintiffs' lawyers are reportedly preparing to file thousands of Chronic SPC claims, many of them from individuals diagnosed after April 16, 2012.  These large groupings of claimants appear to be concentrated within a few law firms.  For example, the Downs Law Group, which objected to approval of the settlement, signed at least 1,700 clients, and paid for many of them to obtain diagnoses in support of their claims.[35]  The implausibility of Class Counsel's assertion that large groups of Class Members have not sought medical care, treatment or diagnoses of these serious chronic medical conditions for nearly two years (or longer) renders these claims highly suspect.  But even if some of these claims are genuine, BP's interpretation of

---

[30]  *Id.* ¶ 4(a)-(b).

[31]  This assertion is even more dubious, at least as to Clean-Up Workers, in light of the fact that BP established medic stations and provided medical care free of charge to those individuals as part of response activities. Indeed, that medical care is the source of information in the Medical Encounters database, which Clean-Up Workers can use to satisfy the proof requirements of a Chronic Condition claim.  MSA Ex. 8, at 4-5.

[32]  Class Counsel also falsely claim that, after the MSA was finalized and filed with the Court, BP agreed with their flawed reading of the MSA. Class Counsel's Memorandum argues that BP agreed a named Class Representative "could and would be able to have his doctor perform the tests necessary to establish Reactive Airways Dysfunction Syndrome, (one of the specified chronic conditions of Exhibit 8), after April 12, 2012." Mem. at 5.  This assertion is incorrect.  BP's position with respect to the Class Representatives' allegations and their purported medical conditions (or lack thereof) is as stated in BP's Answer to the Medical Class Action Complaint, filed after the MSA was entered into and filed with the Court.  As set forth in its Answer, BP acknowledged the known facts related to the Class Representatives' entries in the Medical Encounters and similar databases, and denied the remaining allegations based on insufficient knowledge to determine their alleged truth.  *See, e.g.*, BP Parties' Answer to Plaintiffs' Medical Class Action Complaint at 7-8, May 7, 2012, Rec. Doc. 6454.  BP has never taken the position that a Class Member first diagnosed with a Chronic Condition after April 16, 2012 would be entitled to compensation under the SPC Matrix, rather than through the BELO process established for LMPCs.

[33]  Herzstein Decl. ¶ 6.

[34]  *Id.*

[35]  *See* Motion To Apportion Attorney Fees, For Injunctive Relief, And For Damages Derived From Claims Submitted Pursuant To The Medical Benefits Class Action Settlement Agreement In Accordance With Section XXVII, And Motion To Stay Pending Florida State Court Action ¶¶ 7, 10, Mar. 13, 2014, Rec. Doc. 12509 (fee dispute litigation between Melancon Rimes LLC and the Downs Law Group).

the MSA does not deny those Class Members recovery; it merely provides that conditions first diagnosed after April 16, 2012, are LMPCs and that relief must be sought through the BELO process.

## IV.   CLASS COUNSEL'S INTERPRETATION OF WHAT CONSTITUTES AN LMPC WOULD BE A MATERIAL MODIFICATION OF THE MSA.

According to Class Counsel, an LMPC is not what the MSA says it is:  any physical condition that is first diagnosed after April 16, 2012.  Instead, they contend that an LMPC is a condition that the Class Member "could not have known about as of April 16, 2012,"[36] because the condition "could not have manifested before April 16, 2012."[37]

To accept Class Counsel's "interpretation" would require a modification of the terms of the MSA in a number of respects.  Class Counsel's position, at a bare minimum, requires the Court to rewrite the definition of an LMPC to mean any "physical condition that ***first manifests is first diagnosed*** in a Medical Benefits Settlement Class Member after April 16, 2012."  It also requires the deletion or modification of the "Election of Remedy" provision, by which a Class Member with an LMPC "may not seek compensation from any Released Party in any other manner."  Class Counsel effectively insert an exception to that categorical limitation:  "***except that the Class Member may make a Specified Physical Condition claim if the alleged condition is one enumerated in the SPC Matrix (Exhibit 8)***."  None of the emphasized language exists in the MSA's text, as drafted and agreed upon by the parties and approved by the Court.[38]

Needless to say, none of this is possible.  The Court cannot "rewrite, under the guise of interpretation," these terms simply because Class Counsel wish they could manufacture more SPC claims.  *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992); *Robin v. Sun Oil Co.*, 548 F.2d 554, 557 (5th Cir. 1977).  Even when the parties expressly agree that the Court "retain[s] jurisdiction to interpret and enforce the settlement," the Court is not authorized "to modify its terms or to impose new terms upon the parties in the absence of their consent."  *In re Cont'l Airlines Corp.*, 907 F.2d 1500, 1511 (5th Cir. 1990).  In *Continental*, an airline negotiated a settlement with its pilots' union that provided for reinstatement of striking pilots except for those who had resigned or retired during the strike.  *Id.* at 1512.  The bankruptcy court approved the settlement but later granted relief to objecting pilots by "interpreting" the agreement to restore reinstatement rights to the excluded group of pilots.  *Id.*  Thus, the court's orders granted rights to a group of potential claimants "notwithstanding their exclusion according to the

---

[36]   Mem. at 2.

[37]   *Id.* at 6.

[38]   Moreover, under Class Counsel's interpretation, the MSA's many other references to the date of diagnosis must be replaced with the date of manifestation.  The MSA provides, for example, that GRG must review each Notice of Intent to Sue to confirm that the form identifies the date of diagnosis and other relevant facts.  MSA § XXI.I(1)-(11).  Presumably, if an LMPC is a condition that cannot have manifested before April 16, 2012, GRG must verify the date of manifestation.  In addition, the Notice of Intent to Sue form itself, Exhibit 4 to the MSA, must be edited so that the Class Member can identify the date of alleged manifestation—something the Class Member currently does not have to provide.  *See* MSA Ex. 4, at 3 (asking Class Member for "Date on which the condition was first ***diagnosed***" (emphasis added)).

settlement's express terms." *Id.*  As the Fifth Circuit noted in striking down these orders, "[t]he bankruptcy court's denomination of the Order  . . . as an 'interpretation' does not change the fact that the bankruptcy court's grant of rights to resigned and retired pilots constitutes a material change from the terms of the settlement." *Id.* at 1513.[39]

Similar to *Continental*, Class Counsel urge the Court to "interpret" a settlement agreement in a manner that would sweep into the defined SPC Matrix a category of claimants that the settlement specifically excludes.  The MSA expressly states that conditions diagnosed after April 16, 2012, are LMPCs only, and that Class Members with LMPC claims are compensated through the BELO process.  To enter an order that alters the compensation structure or categories agreed to in the settlement would amount to a material modification to the MSA.[40]  *See Gossett v. Fed. Home Loan Mortg. Corp.*, 919 F. Supp. 2d 852, 861 (S.D. Tex. 2013) (change is material if it "alters the character or value of the underlying agreement").

## V.     THE NEGOTIATION HISTORY OF THE PARTIES SHOULD NOT BE CONSIDERED, BUT IF IT IS, CLASS COUNSEL'S ASSERTIONS ARE INCOMPLETE AND INACCURATE.

Given that Class Counsel's interpretation contradicts the plain terms of the MSA, they instead attempt to rely on a selective and misleading view of the parties' negotiation history.  But the MSA does not permit consideration of any such parol "evidence."

> This Medical Settlement Agreement and its exhibits, attachments, and appendices shall constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, agreements, and understandings relating to the subject matter of this Medical Settlement Agreement.[41]

In addition, the MSA states:

> The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, or understanding concerning any part or all of the subject matter of this Medical Settlement Agreement has been made or relied on except as expressly set forth in this Medical Settlement Agreement.[42]

Integration or merger clauses are common contractual provisions that "negate[ ] the legal introduction of parol evidence."  *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 564 (5th Cir.

---

[39]   The Fifth Circuit made clear that its holding was not limited to the context of a settlement approved by a bankruptcy court.  *See* 907 F.2d at 1510 ("[T]he bankruptcy court has no greater authority to modify the labor portions of the settlement than any federal court would otherwise have.").

[40]   The Parties have the right to terminate the MSA if the Court orders a material modification of any of its terms. MSA § XIV.B, C.

[41]   MSA § XXX.A.

[42]   *Id.* § XXX.B.

The Honorable Sally Shushan
April 14, 2014
Page 11

2005); *see also Har-Win, Inc. v. Consol. Grain & Barge Co.*, 794 F.2d 985, 987 (5th Cir. 1986).[43]

The Court should disregard these attempts to substitute Class Counsel's undocumented and after-the-fact assertions for the plain text of the MSA (which embodies none of Class Counsel's positions). If the Court were to consider the negotiation history, however, it would find that Class Counsel's version of events is incomplete and inaccurate.[44]

First, while Class Counsel ask the Court effectively to change the words "is first diagnosed" (the actual text found in the definition of LMPC) to "first manifests," they neglect to mention that the parties specifically agreed to replace "first manifests"—which was used in earlier drafts of the MSA—with "is first diagnosed" during the drafting process.[45] Indeed, the parties made this change at Class Counsel's request. Yet Class Counsel now insists that the definition of LMPC, "by its very term," limits LMPCs to conditions that "would not have manifested as of April 16, 2012."[46] As explained above, the plain terms of the MSA do no such thing. Moreover, to maintain their position, Class Counsel must ask the Court to disregard—indeed, to undo—this change that they themselves requested.

Second, Class Counsel also fail to mention that throughout the negotiations, BP's counsel repeatedly expressed their concern that plaintiffs' lawyers would send claimants *en masse* for illegitimate, litigation-driven "diagnoses" months or even years after the fact. *Cf. In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 476 (E.D. Pa. 2008) ("numerous attorneys, some with nefarious intentions, operated echocardiogram mills to develop a vast inventory of claimants seeking Matrix Benefits"); *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 636-40 (S.D. Tex. 2005) (criticizing plaintiffs' lawyers, doctors and screeners for creating false claims, and noting that the methods used for diagnosis were "distressing and disgraceful" after identifying thousands of plaintiffs diagnosed by only twelve doctors, who were not their treating physicians). BP's concerns were validated when, during a meeting on December 21, 2011, Class Counsel shared redacted medical records showing "examinations" performed by Dr. William Sawyer of "Toxicology Consultants and Assessment Specialists, LLC" at a Fairfield Inn & Suites motel.[47]

---

[43]   Indeed, even leaving aside the integration clause, the parol evidence rule bars the evidence presented by Class Counsel. The parol evidence rule "is a rule of the substantive law of contract, and its purpose is to preserve the sanctity of a written agreement once it is determined that the writing fully states the agreement of the parties," *Brown v. Fin. Serv. Corp., Int'l*, 489 F.2d 144, 149 (5th Cir. 1974), and to guard against "the possibility that fraud might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning of a contract," *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988).

[44]   As stated above, the language of the MSA is plain and parol evidence is not necessary to determine its meaning. If, however, the Court determines that parol evidence should be considered, BP reserves the right to submit such evidence.

[45]   Mar. 9, 2012 Redline MSA Excerpt, § II.HH (attached as Exhibit 2).

[46]   Mem. at 6.

[47]   In its Order and Reasons Granting Final Approval of the MSA, the District Court discussed at length its extreme skepticism concerning Dr. Sawyer's qualifications and academic honesty:

The Honorable Sally Shushan
April 14, 2014
Page 12

As explained in more detail above, it is "highly implausible" that an individual who had a Chronic SPC would not seek medical care for years.[48]  BP, when it agreed to settle, did not agree that such implausible claims would or could be compensated under the SPC Matrix.  Instead, the MSA provides the BELO process for these Class Members, which gives them a fair opportunity to prove their claims on the merits.

## VI.   CONCLUSION

The MSA defines any physical condition first diagnosed after April 16, 2012 (and satisfying all other requirements) as LMPCs subject to the BELO.  Class Counsel cannot choose to ignore or materially modify the express terms of the MSA to mischaracterize those conditions now as Chronic SPCs.  The MSA should be strictly enforced according to its plain meaning.  If the Court is inclined to address the issue at this time, it should (1) reject Class Counsel's position; (2) direct that conditions first diagnosed after April 16, 2012, be treated as LMPCs pursuant to the express terms of the MSA; and (3) direct that Chronic SPC claims must be supported by medical records establishing presentment, treatment, confirmation and/or diagnoses that were proximate in a time to the manifestation of the claimed condition.

---

Dr. William Sawyer, though a trained toxicologist, asserts conclusions without supporting evidence, mischaracterizes the circumstances of the *Deepwater Horizon* oil spill and response, misstates and omits data from the articles he cites, and offers evidence that does not appear to be tied in any way to the *Deepwater Horizon* Incident.  In addition, the Court notes that Dr. Sawyer has been disqualified as an expert in several cases, including *Whitlock v. Pepsi Americas,* No. C-08-2742, 2011 WL 2746494 (N.D. Cal. Jul. 13, 2011); *Henricksen v. Conoco Phillips Co.,* 605 F.Supp. 2d 1142 (E.D. Wash. 2009); *Hill ex. rel. Hill v. Koppers, Inc.,* Civ. Action No. 3:03CV60-P-D, 2009 WL 4908836 (N.D. Miss. Dec. 11, 2009); and *Adams v. Cooper Indus., Inc.,* Civ. A. 03-476-JBC, 2007 WL 1805586 (E.D. Ky. June 21, 2007).

*In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D. 112, 153 (E.D. La. 2013) (footnote omitted).  Ultimately the Court did not accept medical opinions Dr. Sawyer offered in objection to the settlement.  *Id.*

[48]     *See* Herzstein Decl. ¶¶ 4-5.

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ** ** ** * ** * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class, | ** ** ** * * ** * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER |
| Plaintiffs, | * | MAGISTRATE JUDGE SHUSHAN |
| v. | ** | |
| BP Exploration & Production Inc., *et al.*, | | |
| Defendants. | | |

## DECLARATION OF JESSICA HERZSTEIN, M.D.

I, Dr. Jessica Herzstein, am over twenty-one years of age and of sound mind and body. My declaration is based on my personal knowledge, experience, and review of the materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

1.        I am a physician licensed to practice medicine in Pennsylvania. I have worked for more than 20 years as an occupational and environmental physician with a specific focus on the care of workers who have been exposed to potential environmental or occupational hazards.  I am board certified in internal medicine and occupational medicine.  I am a Fellow of the American College of Physicians, a Fellow of the American College of Occupational and

Environmental Medicine, and a member of the International College of Occupational Health. In February 2012, I was appointed to the United States Preventive Services Task Force. I also have served on the Agency for Toxic Substances and Disease Registry (ATSDR) expert panel that developed the Final Criteria for Determining the Appropriateness of a Medical Monitoring Program under CERCLA (Federal Register, 1995).

2.  In preparing this declaration, I have reviewed the following materials:

   a.  Class Counsel's Memorandum to Magistrate Judge Sally Shushan, dated March 28, 2014;

   b.  The Specified Physical Conditions Matrix ("SPC Matrix"), which is Exhibit 8 to the Medical Benefits Class Action Settlement Agreement ("Medical Settlement Agreement");

   c.  My declaration dated August 12, 2012 and supplemental declaration dated October 22, 2012;

   d.  The declaration of Dr. Peter Lees dated August 13, 2012; and

   e.  Literature listed in Exhibit A to this declaration.

3.  Table 3 of the SPC Matrix lists the five Chronic Specified Physical Conditions ("Chronic SPCs"). They are:

   a.  Sequela from a direct chemical splash to eye(s);

   b.  Chronic rhinosinusitis;

   c.  Reactive Airways Dysfunction Syndrome ("RADS");

   d.  Chronic contact dermatitis at the site of contact with oil and/or dispersants; and

   e.  Chronic eczematous reaction at the site of contact with oil and/or dispersants.

4.  Class Counsel argues that Class Members who developed these Chronic SPCs could have waited until after April 16, 2012, which in most cases would be nearly two years after exposure, or later to see a medical professional for treatment of these conditions.   From a medical perspective, it is highly implausible that any significant number of people  who legitimately have Chronic SPCs could function and continue to perform activities of daily living without medical treatment for this length of time.   The reasons for this are as follows:

a.  Both RADS and sequela of a direct chemical splash to the eye occur as a result of acute exposure to a chemical irritant and result in the rapid onset of severe symptoms, for which immediate first aid and/or medical treatment is required. RADS is a type of irritant-induced asthma that occurs after an acute exposure to a high concentration of an irritant gas, vapor, fume or smoke (Brooks and Bernstein 2011, Tarlo et al. 2008, Brooks et al. 1985).   It typically occurs after a release of irritants under pressure or use of products in a confined space with limited ventilation.  This exposure produces severe airway inflammation, followed by the rapid onset of respiratory symptoms.   The severe inflammatory response can result in permanent residual airway hyperreactivity with other respiratory symptoms.   Typically, people are overwhelmed by such exposure and require immediate medical attention (Brooks and Bernstein 2011).  In a recent study, 78% of work-related RADS cases sought emergency room treatment, 39% required initial hospitalization, and 10% required multiple hospitalizations (Henneberger et al. 2003).

b.  A chemical splash to the eye would also result in immediate severe painful symptoms necessitating prompt first aid and medical treatment.

3

c.  Chronic rhinosinusitis is by definition an inflammatory condition that persists despite attempts at medical management, and includes, among other symptoms, drainage, obstruction, pain, or loss of smell.  If there were no attempts at medical management for nearly 2 years, the condition -- by definition -- would not be chronic rhinosinusitis.

d.  Chronic contact dermatitis and chronic eczematous reaction both involve significant persisting dermal reactions that would be expected to produce marked discomfort and could include various physical manifestations, such as scaling, crusting, and oozing, as well as infections, if left untreated.

5.  Given the severe symptoms that occur following the onset of the chronic Specified Physical Conditions, it is highly implausible that large numbers of people would have failed to seek first aid and/or medical attention from a medical professional promptly after the onset of symptoms and would not do so for several months or a year or more after the onset of symptoms. The symptoms of the Chronic SPCs would likely result in significant impairment of daily activities.  I would be highly skeptical of SPC claims made by large numbers of individuals who claim Chronic conditions but had not sought medical care for years after claimed onset.

6.  Class Counsel also suggest that the medical tests set forth in the SPC Matrix are so unique that individuals would not have had any reason to have had these tests performed prior to the publication of the SPC Matrix in April 2012.  Class Counsel are incorrect.  The definitions set forth in the SPC Matrix for Chronic SPCs are consistent with the standard diagnostic testing of the symptoms associated with these conditions.   Treating medical physicians would be expected to order the tests for the chronic respiratory SPCs as part of a diagnostic assessment for individuals exhibiting symptoms of these conditions.  In this regard:

a.  The RADS definition in the SPC Matrix requires: (1) a positive methacholine challenge test finding or equivalent test, which signifies hyperactive airways; (2) the absence of pre-existing respiratory disease or asthma; and (3) the exclusion of other causes of symptoms.  These requirements for diagnosing RADS are reflected in the medical literature for RADS. (Brooks et al. 1985, Brooks and Bernstein 2011, Tarlo et al. 2008).  I would expect that a physician seeing a patient presenting with symptoms of RADS would attempt to determine whether that person has asthma, and if RADS is suspected, would perform more specific testing, such as a methacholine challenge or equivalent test.

b.  The definition of chronic rhinosinusitis in the SPC Matrix is an inflammatory condition involving the paranasal sinuses and linings of the nasal passages that lasts 12 weeks or longer, despite attempts at medical management, as supported by (i) evidence of at least two of the following four signs: (1) anterior and/or posterior mucopurulent drainage; (2) nasal obstruction; (3) facial pain, pressure and/or fullness; and (4) decreased sense of smell; and (ii) objective evidence of sinus mucosal disease on CT imaging or endoscopic examination.  These requirements are reflected in the commonly available medical literature. (Benninger et al. 2003, Meltzer et al. 2004, Rosenfeld et al. 2007).  I would expect that a physician with a patient presenting with signs of symptoms of chronic rhinosinusitis would perform the objective tests (CT scan, endoscopy) described above.

7.  Based on my experience and review of the medical and scientific literature, a high incidence of these Chronic SPCs is not expected among the Class Member population.

a. For example, numerous RADS cases would not be expected among clean-up workers since there is no indication that overall airborne exposure levels of the chemical agents to which clean-up workers were potentially exposed were at high enough concentrations to result in marked airway inflammation. One of the diagnostic criteria for RADS that is well recognized by the medical community is that the person has an acute exposure to a high concentration of an atmospheric irritant closely followed by onset of respiratory symptoms (Brooks and Bernstein 2011). However, tens of thousands of personal breathing zone samples obtained by BP, OSHA, and NIOSH from Clean-Up Workers did not reveal airborne exposures over acceptable occupational exposure limits, let alone high enough that they would be expected to cause marked airway inflammation and RADS (Declaration of Peter Lees, ¶ 34). While some unusual accidental exposure to irritant levels of a strong cleanser, such as one that contains ammonia, might have occurred, there is no evidence that a significant number of inhalation injuries causing RADS occurred or could have occurred in individuals performing Response Activities.

Estimates of risk data drawn from registry and worker reporting systems involving RADS suggest that the prevalence in the U.S. is estimated to be well below one percent (Akinbami et al. 2012, Tarlo et al. 2008, Henneberger et al. 2003). The general population is expected to have an even smaller percentage because they are not as heavily exposed as a worker population.

CDC, with state and local health departments, conducted surveillance across the four Gulf States for track health effects possibly related to the oil spill

using national and state-based surveillance systems. While there were reports of a few complaints of respiratory symptoms in people who possibly were exposed to oil, "[s]urveillance reveals no trends of public health concern related to the oil spill." (Health Surveillance, CDC, 2010.)

If a physician were diagnosing RADS in large numbers in the clean-up worker or resident population, based on the scientific data, I would be skeptical of the legitimacy of those diagnoses.

b. Estimates of background rates of chronic rhinosinusitis vary, but when defined by both objective imaging and symptoms, I would expect there to have been few individuals who developed their first symptoms of rhinosinusitis coincidentally within the 72 hour timeframe from exposure (Benninger et al. 2003).

c. Background rates of chronic dermatitis and chronic eczematous reaction are low, but vary, with incidence rates of chronic dermatitis in full-time workers having been reported to be 0.005% to 0.2% (Cashman 2012).

d. There is no available prevalence data on the number of individuals who have had long-term consequences of a direct chemical splash in the eye, given the rarity of this occurrence.

8. I am aware of advertisements by the Nations Law Firm offering to pay for Clean-Up Workers to have an examination "for physical symptoms related to a specified chronic or acute injury" allegedly resulting from their working on Response Activities and to have a physician write a report to be submitted with a claim for compensation on the SPC Matrix. ( http://mybpmedicalclaim.com/blog/?p=58; http://mybpmedicalclaim.com/blog/?p=132). It appears that no treatment is provided during these visits, and that no ongoing medical care is offered. I

believe that the limited purpose of these visits -- to generate a claim for compensation on the SPC Matrix --  and the fact that a law firm is paying for them, create an incentive for the physicians involved  to limit improperly their "diagnoses" to those conditions on the SPC Matrix.   The likely result of physicians conducting these exams focusing only on the conditions on the SPC Matrix include:  failure  properly to evaluate the individuals' actual health conditions, delays in obtaining legitimate medical diagnoses and treatment, anxiety and fear that such individuals have conditions that  they do not really have, adverse health effects from unnecessary testing, and adverse health effects from improper treatment of conditions they actually do have.  I am therefore highly skeptical of the medical legitimacy of any claims resulting from such examinations.


I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Executed on April 14, 2014.

Dr. Jessica A. Herzstein

## EXHIBIT A

1.  Akinbami LJ, Moorman JE, Bailey C, et al. Trends in asthma prevalence, health care use, and mortality in the United States, 2001-2010. NCHS data brief, no 94. Hyattsville, MD: National Center for Health Statistics. 2012.

2.  Benninger MS, Ferguson BJ, Hadley JA, Hamilos DL, Jacobs M, Kennedy DW, Lanza DC, Marple BF, Osguthorpe JD, Stankiewicz JA, Anon J, Denneny J, Emanuel I, Levine H. Adult chronic rhinosinusitis: definitions, diagnosis, epidemiology, and pathophysiology. Otolaryngol Head Neck Surg. 2003 Sep;129(3 Suppl):S1-32.

3.  Brooks SM, Weiss MA, Bernstein IL. 1985. Reactive airways dysfunction syndrome (RADS): persistent asthma syndrome after high level irritant exposures. Chest 88:376-384.

4.  Brooks SM, Bernstein IL. 2011. Irritant-induced airway disorders. Immunol Allergy Clin North Am. 31(4):747-68.

5.  Cashman MW, Reutemann PA, Ehrlich A. Contact dermatitis in the United States: epidemiology, economic impact, and workplace prevention. Dermatol Clin. 2012 Jan;30(1):87-98, viii.

6.  CDC. 2010. Health Surveillance. http://emergency.cdc.gov/gulfoilspill2010/2010gulfoilspill/health_surveillance_082510.asp. Accessed April 10, 2014. Last updated August 25, 2010.

7.  Henneberger PK, Derk SJ, Davis L, et al. 2003. Work-related reactive airways dysfunction syndrome cases from surveillance in selected US states. J Occup Environ Med 45:360.

8.  Meltzer EO, Hamilos DL, Hadley JA, Lanza DC, Marple BF, Nicklas RA, Bachert C, Baraniuk J, Baroody FM, Benninger MS, Brook I, Chowdhury BA, Druce HM, Durham S, Ferguson B, Gwaltney JM, Kaliner M, Kennedy DW, Lund V, Naclerio R, Pawankar R, Piccirillo JF, Rohane P, Simon R, Slavin RG, Togias A, Wald ER, Zinreich SJ, American Academy of Allergy, Asthma and Immunology (AAAAI), American Academy of Otolaryngic Allergy (AAOA), American Academy of Otolaryngology--Head and Neck Surgery (AAO-HNS), American College of Allergy, Asthma and Immunology (ACAAI), American Rhinologic Society (ARS) Rhinosinusitis: establishing definitions for clinical research and patient care. J Allergy Clin Immunol. 2004;114(6 Suppl):155.

9.  NIOSH Health Hazard Evaluation Report. Centers for Disease Control and Prevention. HETA 2010-0115 & HETA 2010-0129-3138 (2011). http://www.cdc.gov/niosh/hhe/reports/pdfs/2010-0115-0129-3138.pdf. Retrieved April 2014

10. Rosenfeld RM, Andes D, Bhattacharyya N, et al. Clinical practice guideline: adult sinusitis, Otolaryngol Head Neck Surg. 2007;137:S1-S31.

11. Tarlo SM, Balmes J, Balkissoon R, Beach J, Beckett W, Bernstein D, Blanc PD, Brooks SM, Cowl CT, Daroowalla F, Harber P, Lemiere C, Liss GM, Pacheco KA, Redlich CA, Rowe B, Heitzer J.  Diagnosis and management of work-related asthma: American College Of Chest Physicians Consensus Statement Chest. 2008 Sep;134(3 Suppl).

# Exhibit 2

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT
RULE 408 SETTLEMENT COMMUNICATION

## "MEDICAL BENEFITS CLASS ACTION
## SETTLEMENT AGREEMENT"

### PREAMBLE

This MEDICAL BENEFITS CLASS ACTION SETTLEMENT AGREEMENT ("MEDICAL SETTLEMENT AGREEMENT"), dated as of _____, 2012, is made and entered into by and among defendants BP Exploration & Production Inc. and BP America Production Company (collectively "BP"), [other co-defendants] (collectively, the "DEFENDANTS"), by and through their attorneys, and the MEDICAL BENEFITS CLASS REPRESENTATIVES, individually and on behalf of the MEDICAL BENEFITS SETTLEMENT CLASS, by and through the MEDICAL BENEFITS CLASS COUNSEL.  BP Corporation North America Inc. ("BPCNA") shall not be a PARTY to this MEDICAL SETTLEMENT AGREEMENT, but shall serve as a guarantor of BP's obligation, and BP p.l.c. shall serve as a back-up guarantor to BPCNA for a period of 5 years after the EFFECTIVE DATE.  This MEDICAL SETTLEMENT AGREEMENT is intended by the PARTIES fully, finally, and forever to resolve, discharge, and settle all RELEASED CLAIMS against the RELEASED PARTIES, as set forth below, subject to approval by the COURT.

### RECITALS

A.     BP Exploration & Production Inc. and BP America Production Company are corporations organized under the laws of the State of Delaware and are engaged in the business of oil and gas exploration, production, and/or development.

B.     The MEDICAL BENEFITS CLASS REPRESENTATIVES are the named plaintiffs in the MASTER MEDICAL CLASS ACTION COMPLAINT in the action entitled [NAME] v. BP[, *et al.*], filed on [DATE] _____ in the COURT.

II.     OTHER DEFINITIONS

For purposes of this MEDICAL SETTLEMENT AGREEMENT, the following terms (designated by capitalization throughout this MEDICAL SETTLEMENT AGREEMENT) shall have the meanings set forth below:

A.     ACTUAL HOSPITAL EXPENSES shall mean those expenses incurred by or on behalf of a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER for treatment while hospitalized for an ACUTE CONDITION or CHRONIC CONDITION where the hospitalization occurs within the timeframe set forth ~~in Exhibit __;~~on the SPECIFIED PHYSICAL CONDITION MATRIX; provided, however that where the MEDICAL BENEFITS SETTLEMENT CLASS MEMBER is diagnosed with or treated for a condition other than an ACUTE CONDITION or CHRONIC CONDITION, the costs incurred in connection with such diagnosis or treatment are not ACTUAL HOSPITAL EXPENSES.  In no case shall ACTUAL HOSPITAL EXPENSES exceed the actual amount paid for the medical item, service, or prescription drug by the MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, any insurer, GOVERNMENT PAYER, or OTHER PAYER/PROVIDER as satisfaction in full for the claim, whether under a negotiated payment rate or otherwise.

B.     ACUTE CONDITION shall mean those SPECIFIED PHYSICAL CONDITIONS compensable on levels A1, A2, A3, and A4 of the SPECIFIED PHYSICAL CONDITION MATRIX.

C.     BACK-END LITIGATION OPTION shall mean the right of certain MEDICAL BENEFITS SETTLEMENT CLASS MEMBERS to bring a lawsuit against a BACK-END

HEALTH CAPACITY AND LITERACY PROJECT, the ~~PRIMARY CARE CAPACITY PROJECT, and the~~ MENTAL AND BEHAVIORAL HEALTH CAPACITY ~~GRANT~~PROJECT and the PRIMARY CARE CAPACITY PROJECT.

~~GG.~~EE.        GULF REGION HEALTH OUTREACH PROGRAM LIBRARY shall mean the library described in Section [VIII~~.    ~~].

FF.     HALLIBURTON shall mean Halliburton Energy Services, Inc. and all and any of its Affiliates.

~~HH.~~GG.        HIPAA shall mean the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

~~II.~~HH. LATER-MANIFESTED PHYSICAL CONDITION shall mean a physical condition that is first ~~manifests~~diagnosed in a MEDICAL BENEFIT SETTLEMENT CLASS MEMBER after the date of the filing of the MASTER MEDICAL CLASS ACTION COMPLAINT and which is claimed to have resulted from such MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S exposure to oil, other hydrocarbons, or other substances released from the MC252 WELL, and/or exposure to dispersants and/or decontaminants used in connection with the RESPONSE ACTIVITIES, where such exposure occurred on or prior to September 30, 2010, for ZONE A RESIDENTS~~,~~; on or prior to December 31, 2010 for ZONE B RESIDENTS~~,~~; and on or prior to [insert the date of the filing of the MASTER MEDICAL CLASS ACTION COMPLAINT] for CLEAN-UP WORKERS.

~~JJ.~~II.    LEGAL REPRESENTATIVE shall mean, as to a NATURAL PERSON who is (1) a minor, (2) lacking capacity or incompetent, or (3) an estate of a deceased human being, that NATURAL PERSON's guardian, conservator, tutor, executor, personal representative,