To:         The Honorable Sally Shushan

From:       The Downs Law Group, Counsel for Select Plaintiffs

Date:       April 22, 2014

Re:         In re *Deepwater Horizon*, MDL No. 2179
            Treatment of Conditions First Diagnosed after April 16, 2012

---

<u>BP'S POSITION IS INCONSISTENT WITH ORAL ARGUMENTS REGARDING LMPC/BELO CLAIMS
AND ALLEGATIONS OF FRAUD ARE A DISINGENUOUS TACTIC TO FURTHER DELAY INJURED
CLASS MEMBERS FROM RECEIVING COMPENSATION.</u>

  BP poisoned the Gulf of Mexico. BP's poison exposed over 170,000 cleanup workers to
toxic chemicals and crude oil that spewed from the depths of the Gulf that resulted when the
*Deepwater Horizon* Oil Rig exploded.  BP's poison exposed countless Zone A and Zone B
residents living along approximately 580 miles of shoreline across four states (Florida,
Mississippi, Alabama, and Louisiana) to toxic danger and harm.
  BP argues today and would have this Court focus not on restoring those that it has
harmed in a manner consistent with arguments made by BP during multiple hearings before this
Court, instead it seeks to have this Court focus on a single word change that it made during
negotiations that are absolutely inconsistent with the words it held out before this Court.[1]  A word
change that is neither relevant nor necessary when determining whether a person can submit a
claim pursuant to the Matrix.

I.  **BP AGREED WITH CLASS COUNSEL'S ASSERTIONS IN OPEN COURT THAT BELO
  CLAIMS FOR LMPCs ARE RESERVED FOR NON SPC CONDITIONS THAT
  MANIFESTED AFTER APRIL 16, 2012.**

  On April 25, 2012, a date after April 16, 2012, the PSC, by and through Robin
Greenwald, explained at the Hearing on the Motions for Conditional Certification of Rule
23(b)(3) *Classes* (plural) that the number of cleanup workers would be capped as of April 16,
2012.  Rec. Doc. 6395 p. 65:15–17.  At that hearing, Ms. Greenwald also explained the different
benefits available to each of the subclass members.  The first benefit was that class members
seeking compensation for a Specified Physical Condition (hereinafter "SPC") that manifested
during each subclass's required time were divided generally into two categories: acute and
chronic.  *See id.* at 68:4–69:11.  She explained "the acute conditions are the conditions where
someone goes out, they are on the water, they have a headache for a couple of days, and then it
goes away.  The chronic conditions are people who had the condition and it never went away, and
they still have it today." *Id.* at 68:22–69:1.  She further explained B-1 claimants as "people who
still have condition[s] today" that will get compensation for their chronic condition under the
Matrix. *Id.* at 72:4–5.
  Later at that hearing, Ms. Greenwald discussed another benefit, the Back-End Litigation
Option for later-manifested illness (hereinafter "BELO Claim").  She explained why it was
necessary for there to be a BELO Claim by saying, "I mentioned before that unfortunately
sometimes people feel healthy today, they had an acute symptom, it's gone, but sadly **five, ten
years from now they get sick.**" *Id.* at 74:2–5 (emphasis added).  The explanation continued with
details of how BELO Claims work.  In essence, the Class Member must file a Notice of Intent to

---

[1]  *BP Memo re LMPC*, Ex. 2 (April 14, 2014) (hereinafter "*BP Mem.*")

sue, *Id.* at 74:14, BP then chooses to either mediate or litigate, *Id.* at 74:14–19, and if litigation ensues, the litigation shall occur in the Eastern District of Louisiana where BP will not contest liability for the oil spill nor the class member's exposure to oil. *Id.* at 74:19–22. "What the plaintiff will have to prove is basic causation. They'll have to prove that their illness is caused, in whole or part, from their exposure to the oil." *Id.* at 74:23–24.

BP's lawyers, by and through statements made by Mr. Richard Godfrey, could not be happier with what was said and explained. "I think Ms. Greenwald said it very, very well. She painted a very adequate picture of the scope of the settlement." *Id.* at 89:19–21. Mr. Godfrey then explained that this settlement does not improperly grant preferential treatment to representatives or class segments. *Id.* at 90:3–4.

> All class members, all of them are eligible. All are eligible for compensation. All are eligible for the back-end litigation opt-out. They are all compensated based on objective factors. They can read the factors and understand them, just as the Court can and just as they were negotiated by the Plaintiffs' Steering Committee on their behalf.

*Id.* at 90:5–10. Mr. Godfrey then explained that if the class member provides the necessary proof, Mr. Garretson and GRG will pay the claim. *Id.* at 90:16–18.

This is where Mr. Godfrey said the most important statement regarding this matter. He explained that the Settlement Agreement **"preserves the rights of class members to seek compensation for later-manifested physical injuries. Injuries that have not *manifested* themselves today, that perhaps show up, we hope not, but show up five years from now or ten years from now."** *Id.* at 90:19–23 (emphasis added). Thus BP held out to the Court that the date of manifestation, not the date of diagnosis, is what is important when determining whether a condition should be treated as an LMPC or a Matrix.

## II.   BP, BY AND THROUGH ITS OWN MOTIONS, HELD OUT TO THIS COURT THAT A BELO CLAIM FOR AN LMPC IS PROPER WHEN A SYMPTOM MANIFESTS AFTER APRIL 16, 2012.

Two jointly filed documents are of particular interest in this matter. The first is a joint motion filed on April 18, 2012 (hereinafter "First Joint Motion"). Rec. Dec. 6267-1. This motion was signed by James P. Roy and Stephen J. Herman for the Plaintiffs Steering Committee and Richard C. Godfrey and Don K. Haycraft for BP. *Id.* at 42, 45. And although the First Joint Motion explains that the Settlement Agreement "provides for a Back-End Litigation Option process that allows class members to engage in litigation or mediation of claims for Later-Manifested Physical Conditions *diagnosed* after the filing of the Medical Class Action Complaint . . . ," *Id.* at 6 (or 13 of 53) (emphasis added), a subsequent joint proposed finding of fact and conclusions of law in support of the final approval of the Settlement Agreement shows different result. *See generally*, Rec. Dec. 7946, § V.B.1.93–103 , .4.118–19.

In that second joint proposed findings of fact and conclusions of law (hereinafter "Second Joint Motion"), filed on November 20, 2012, both BP and the PSC explain, "The Medical Settlement provides compensation to qualifying Class Members who demonstrate that they *manifested* a [SPC] in the time frames set forth in the Agreement." *Id.* § V.B.1.93 (citing MSA § VI, Ex. 8) (emphasis added). Neither section VI nor Exhibit 8 of the Settlement Agreement ever express they are contingent on the definition of a LMPC and/or BELO Claim. *See* MSA § VI, Ex. 8.

Additionally, the Second Joint Motion clearly explains the BELO Claims process as follows:

118. The Medical Settlement also provides a mediation/litigation process for Class Members who seek compensation from BP in the future for a physical condition that is claimed to have *__manifested after April 16, 2012__* and resulted from exposure to oil and/or dispersants due to the Deepwater Horizon Incident during the time frames set forth in the Settlement Agreement. (MSA § VIII.)

119. Class Members *__diagnosed__* with a Later-Manifested Physical Condition have the option to seek compensation for that condition through the Back-End Litigation Option or, as applicable, pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act. (MSA § VIII.B.)

*Id.* § V.B.4.118–19 (emphasis added).

Therefore when this Court looks at these "joint findings of fact," along with the subsequent rulings made by the Court in support of them where the Court clearly uses the terms manifestation, instead of diagnosis, in its judicial orders, this issue is a non-issue. Rec. Doc. 6419 at 7. *Compare* Rec. Doc. 8217 at 7-8 (explaining that manifestation of symptoms within 24-72 hours is required for compensation under the Matrix for qualifying cleanup workers), *with id.* at 16 (explaining that conditions whose symptoms manifested after April 16, 2012 were subject to LMPC and BELO Claims).

### III.   CLASS MEMBERS CANNOT GO BACK IN TIME TO SEE A DOCTOR IN ORDER TO TAKE AN OBJECTIVE EXAM THAT THEY DID NOT KNOW THEY NEEDED TO TAKE IN ORDER TO RECEIVE COMPENSATION UNDER A CHRONIC SPC CONDITIONS.

BP's interpretation of LMPC and SPC would require a cleanup worker or zone resident to go back in time in order to receive a CT Scan, an Endoscopy, a Pulmonary Function Test (PFT) , Methacholine Challenge Test (MCT) and/or an equivalent, in order to receive compensation for their Chronic Sinusitis, Reactive Airways, etc. as SPCs. As discussed, BP said that "[All class members] can read the factors and understand them, just as the Court can and just as they were negotiated by the Plaintiffs' Steering Committee on their behalf." *Id.* at 90:5–10. Based on this statement, the Medical Benefits class member, **after reading** the final and approved version of the Medical Settlement Agreement as amended as of May 1, 2012, would have to travel back in time, before April 16, 2012, in order to see a doctor and get the objective tests that they could not possibly have known were necessary to prove their Chronic respiratory issues until after the document had been completed and approved by the Court.

Furthermore, after having read the settlement agreement, hot off the presses on May 1, 2012, if a Class Member sought medical assistance from a doctor who diagnosed the Class Member with a chronic respiratory condition after April 16, 2012, BP would have the Class Member travel back in time in order to take the objective exams the Class Member did not know was required in order to prove that he or she has a Chronic Respiratory problem that he or she had, and still has now. This Court should not hold tens of thousands of litigants to an impossible standard where they would have to have known which tests to take in order to qualify for payment for the conditions they are suffering from now.

If the Chronic Condition existed then, it would still exist now. That is the difference between acute and chronic. Following the plain meaning of these two words simplifies the matter. Chronic conditions are still around today. The Class Members

3

swear under penalty of perjury that they had a condition as of a certain date and, years later when they see a doctor, they should still have that condition.  I do believe that means it is still Chronic.  If the conditions are no longer present, then that would be what makes a Specified Physical Condition Acute.

IV.   **BP is Being Disingenuous Regarding Its Apparent Disagreement with the Number of Contemplated Cleanup Workers Submitting Claims for Injuries Suffered While Working Pursuant to the Matrix.**

BP is being disingenuous when it says, "[w]hen it agreed to settle, [BP] did not agree that such implausible claims would or could be compensated under the SPC Matrix." *BP Memo re LMPC*, p. 12 (April 14, 2014) (hereinafter "*BP Mem.*").  This is just another deflection by BP Counsel to prevent this Court and the Claims Administrator from compensating these injured workers. Both BP and the PSC's experts cited repeatedly to the National Institute Occupational Safety and Health (hereinafter "NIOSH") study on the *Deepwater Horizon* Event in order to support their respective positions throughout the hearings associated with the Medical Benefits Class Settlement. The NIOSH study cites several sources for data collected regarding Health Effects from Crude Oil and Dispersants.  This study also quantifies its statements by saying the following:

> Studies of tanker oil spill responses have reported adverse health effects in response workers.  A summary of studies about the human health effects associated with selected oil tanker disasters can be found in Appendix A.  These studies may underestimate the health effects associated with the Deepwater Horizon Response activities since the magnitude and duration of the Response is unprecedented. In addition, there is an incomplete understanding about the human health toxicity associated with the use of large amounts of dispersant, about the toxicity of the mixed exposure to large amounts of crude oil, dispersants and combustion products together and the cumulative effect of such exposures occurring over a long duration.

NIOSH & OSHA, *Interim Guidance for Protecting Deepwater Horizon Response Workers and Volunteers* (July 26, 2010) (hereinafter the "*Deepwater Horizon* NIOSH Study"), *available at* http://www.cdc.gov/niosh/topics/oilspillresponse/protecting/. Appendix A of the study details figures used to support the NIOSH findings. *Id.* at Appx A.  Two of these studies enumerated in Appendix A provide statistical information supporting the positions taken by the NIOSH studies. *Id.*

The First is the Erika Oil Spill of 1999 that occurred off the shore in France. DEPT. DIRECTORATE OF HEALTH & SOC. AFF. OF LOIRE ALTANTIQUE ET AL., EPIDEMIOLOGICAL STUDY OF HEALTH PROBLEMS THAT OCCURRED IN THE SHORT TERM FOR PEOPLE PARTICIPATING IN THE CLEANING UP OF POLLUTED SITES BY ERIKA OIL, 7 (June 2000) (hereinafter "ERIKA STUDY") *available at* http://www.invs.sante.fr/publications/erika3/rapmaree_dist.pdf. During the Erika oil spill of 1999, 3,669 cleanup workers consisting of both professionals and volunteers assisted in a much smaller spill by comparison to the *Deepwater Horizon* Oil spill. *Id.* at 14.  Of this total, a sampling of 1,465 cleanup workers was surveyed shortly after exposure. *Id.*

at 8.  Approximately 11% of trained and paid professional cleanup workers experienced some sort of injury.[2]  *Id.* at 49.  The main difference between professional cleanup workers[3] and volunteers is that volunteers generally exposed themselves much less than the paid and trained professional cleanup worker.  *Id.* at 20.  The duration of activities in days was identified as a risk factor for all of the surveyed health problems.[4]  *Id.* at 49.  Additionally, of those volunteers and trained and paid professional cleanup workers, the following statistical data is provided:

| PREVALENCE OF DECLARED HEALTH PROBLEMS (OTHER THAN INJURIES) ARISING DURING OR JUST AFTER CLEANUP ACTIVITIES | | |
|---|---|---|
| | Volunteers (948) | Professionals (517) |
| Back Pain | 271 (28.6%) | 168 (32.5%) |
| Headache | 165 (17.4%) | 152 (29.4%)*** |
| Skin Irritation | 123 (13.0%) | 107 (20.7%)*** |
| Eye Irritation | 79 (8.3%) | 47 (9.1%)* |
| Respiratory Problems | 58 (6.1%) | 40 (7.7%) |
| Nausea and Vomiting | 41 (4.3%) | 50 (9.7%)****[sic] |
| Stomach Pain | 24 (2.5%) | 20 (3.9%) |
| Sleep Problems | 43 (4.5%) | 35 (6.8%) |
| Loss of Appetite | 32 (3.4%) | 40 (7.7%)*** |
| At Least One Health Problem | 478 (50.4%) | 294 (56.9%)* |
| Comparison of frequencies between volunteers and professionals *p < 0.05, **p<0.01, ***p<0.001 | | |

*Id.* at 23 (highlighting symptoms listed on the *Deepwater Horizon* Matrix).[5]

The Second is the Exxon Valdez whereby another NIOSH study cited an Alaskan Worker's Compensation sampling to provide details relied upon for its discussion on worker related injuries.[6]  RICHARD W. GORMAN ET AL., *HETA 89-200 & 89-273-2111*

[2]      Injured volunteer cleanup workers constitute 5.6% of the total number of cleanup workers.  DEPT. DIRECTORATE OF HEALTH & SOC. AFF. OF LOIRE ALTANTIQUE ET AL., EPIDEMIOLOGICAL STUDY OF HEALTH PROBLEMS THAT OCCURRED IN THE SHORT TERM FOR PEOPLE PARTICIPATING IN THE CLEANING UP OF POLLUTED SITES BY ERIKA OIL, 22 (June 2000) (hereinafter "ERIKA STUDY") *available at* http://www.invs.sante.fr/publications/erika3/rapmaree_dist.pdf.

[3]      Professional cleanup workers also includes firefighters, military personnel, municipal employees, and other government employees. *Id.* at 20.  The average professional would work seven (7) hour day for not more than ninety (90) days. *Id.* at 24-25.  The average volunteer by contrast would work five (5) hours for a maximum of seventy (70) days. *Id.*

[4]      After adjusting for the duration of the activity, a statistically significant difference between the two populations no longer exists except for skin irritation and neurological problems. *Id.* at 23.

[5]      An important note, according to this study, a little less than roughly 1 in every 3 professional cleanup workers experienced headaches in connection with exposure to oil and just less than 1 in every 5 volunteers experienced headaches.  When you factor in that they worked 7 hour days and 5 hour days respectively, we ask this Court to consider how many cleanup workers would experience headaches if they were working well over 8 hours daily (some as many as 16 hour days) which many of our clients routinely worked.  Additionally, many of our clients worked more than five days a week while performing Response Activities.

[6]      Although this study expressly states that "any recommendations made herein are for the specific facility evaluated and may not be universally applicable", RICHARD W. GORMAN ET AL., *HETA 89-200 & 89-273-2111 Exxon/Valdez*    1   (May  1991),  http://www.cdc.gov/niosh/hhe/reports/pdfs/1989-0200-

*Exxon/Valdez* (May 1991), http://www.cdc.gov/niosh/hhe/reports/pdfs/1989-0200-2111.pdf. In that study, 1,811 injured cleanup workers experienced a wide spread of injuries[7] out of approximately 10,000 cleanup workers. Therefore approximately 18% of cleanup workers were injured. Exxon Valdez Oil Spill Trustee Council, *Questions and Answers*, http://www.evostc.state.ak.us/index.cfm?FA=facts.QA (last visited April 22, 2014).

Therefore, if this Court takes the range of somewhere between 11% and 18% of cleanup workers that were injured and apply this figure to the 170,000 cleanup workers[8] that were serving this nation in the world's largest oil spill to date, the spread can be anywhere from 18,746 to 30,600 workers.[9] When one heeds the warnings of the *Deepwater Horizon* NIOSH Study that explains that these studies may underestimate the health effects associated with the *Deepwater Horizon* Response activities as the magnitude and duration of the Response is unprecedented and combine them with the Erika Oil Spill study that explains that the greater the exposure in days the more likely an injury will arise, these numbers are much more conservative than what may actually be the final result. *Compare Deepwater Horizon* NIOSH Study, *supra*, *with* ERIKA STUDY, *supra*, at 49.

BP, a foreign entity, is claiming fraud, but the reality is a huge number of U.S. Resident cleanup workers have been injured in the tens of thousands. BP is being disingenuous when it says, "[w]hen it agreed to settle, [BP] did not agree that such implausible claims would or could be compensated under the SPC Matrix." *BP Mem.* at 12. This is just another deflection by BP Counsel to prevent this Court and the Claims Administrator from compensating these injured workers.

---

2111.pdf, we are not using this study for its recommendations, only for its statistical information on how many injured cleanup workers existed out of the total number of cleanup workers available.

[7]    Not all the injuries described in this study would have been paid out based on the *Deepwater Horizon* Matrix, but this study provides a total of persons that reported injuries associated with an oil spill. And although BP experts have testified that Personal Protective Equipment (PPE) and protective gear was made available, our clients explained that often times this equipment was substandard, damaged, and unusable. For these reasons, the equipment was often not used as acknowledged by BP experts. *See* Doc. Rec. 7112-2 p.22 n.6.

[8]    Although the exact number of cleanup workers has not been conclusively determined, as of May 2011, OSHA explains that 130,000 cleanup workers had received training along the Gulf Coast. OSHA, DEEPWATER HORIZON OIL SPILL: OSHA'S ROLE IN THE RESPONSE 10 (May 2011), *available at* https://www.osha.gov/oilspills/dwh_osha_response_0511a.pdf. This figure is one year before April 16, 2012. Through various conversations with NIOSH, our office has established that upwards of 170,000 cleanup workers actually provided services through April 2012.

[9]    Even if the lower and outdated 90,000 cleanup worker estimate were to be applied to these percentages, 9,900 thru 16,200 cleanup workers could have been injured. And when we combine this with the increase of duration for cleanup worker's exposure in days/hours to crude oil and dispersants and the sheer massive scale of the poisons, toxins, and dispersants that infested our Gulf Coast compared to these other studies, these lower figures (9,900 thru 16,200) are likely among the most conservative and unrealistic estimates available.

**V.   BP's Statements Would Flood the Eastern District of Louisiana's Federal Courts with Tens of Thousands of LMPC Litigation Claims.**

As discussed, over 170,000 cleanup workers and countless residents were exposed to the poison used by BP in the form of dispersants and the toxic crude oil that spewed into the Gulf. Now that tens of thousands of these human beings are sick and seeking relief under the SPC, BP is suggesting that all those persons diagnosed after April 16, 2012, which would be almost every single one, submit their claims under the BELO standard.

The big difference between SPC and BELO is that causation would have to be proved. This means mediation, discovery, hearings, and litigation for tens of thousands of people, dragging out matters before the Eastern District of Louisiana for years. Based on these figures, it is likely that tens of thousands of cases flooding this Court with tens if not hundreds of thousands of hearings would be required for these victims of BP's poison to receive relief.

**VI.   BP's Interpretation is Repugnant to *Amchem* and Fed. R. Civ. P. r 23 because it Would Exclude Class Members and Hold Different Class Members to Different Standards for the Same Injury.**

The Matrix has always been held out to the Court to be the shining achievement of the Settlement Agreement. Corrupting it by conditioning its application upon a diagnosis prior to April 16, 2012 is contrary to the Settlement Agreement, Federal Rules of Civil Procedure and binding case law. We believe BP is currently trying to bully GRG and individual Plaintiffs' attorneys to look at the matter as though **only valid claims submitted by Class Members that are not LMPCs should be processed pursuant to the Matrix.** This would exclude class members that otherwise would receive relief under the Matrix simply because they were diagnosed after April 16, 2012. This view is an incorrect interpretation of the agreement because to consider the issue in this way would be repugnant to Rule 23 and *Amchem Prod., Inc v. Windsor*, 521 U.S. 591 (1997) (hereinafter "*Amchem*").

Instead we read the Settlement Agreement, when combined with the Matrix to mean that **only valid claims by Class Members that are not payable pursuant to the Matrix should be considered for payment as an LMPC if applicable.**[10]   This view

---

[10]   Under B-1 Specified Physical Conditions, the claimant must submit a

Declaration under penalty of perjury (1) asserting the manifestation of one or more conditions (or the symptom(s) thereof) on Table 3, (2) asserting that such condition(s) (or the symptom(s) thereof) occurred within the applicable timeframe specified in Table 3, and (3) identifying the route, circumstances, and date(s) or approximate date(s) of alleged exposure.

*Plus one of the following:*

(1) Medical records establishing presentment to a medical professional with the condition(s) or symptom(s) claimed in the declaration, where such condition(s) or symptom(s) are persisting at the time of presentment.

allows payments to cleanup workers for injuries they sustained without requiring them to prove causation and go through the challenges associated with litigation in Federal Court. If this Court interprets the agreement in this way, then the process is not repugnant to Rule 23 and *Amchem* and is in line with the representations that have been held out to both the Public and the Court.

Let's look at an illustration by example of how this is repugnant to Rule 23 and *Amchem*. If we took two cleanup workers (a certified subclass), both having touched crude oil while performing Response Activities, both contracting Chronic Dermatitis within 72 hours of initial exposure on the exact same location of their body, both having seen medical doctors one year after the symptoms first manifested and both providing medical records sufficient to meet the standards set by the Claims Administrator for Chronic Dermatitis, each of these cleanup workers would be treated differently if one cleanup worker first manifested symptoms while working on May 1, 2010 and the second manifested while working May 1, 2011. Why? Because the first would receive a payout pursuant to the Matrix and the second would receive a payout pursuant to the LMPC simply because the doctor's visits were one year apart from initial manifestation (May 1, 2011 for Cleanup Worker A and May 1, 2012 for Cleanup Worker B). Both of these cleanup workers would be held to different standards thus splitting the subclass creating a conflict of representation repugnant to Rule 23(a)(4) and *Amchem*.[11]

---

*Matrix*, Ex. 8, p.4. We ask that this Court notice the absence of any specific date or deadline for diagnosis. If such a requirement existed, the Matrix **should have** included the following language:

> Medical records establishing the presentment to a medical professional **diagnosing with** condition(s) or symptom(s) claimed in the declaration, where such condition(s) or symptom(s) are persisting at the time of presentment **made on or before April 16, 2012**.

Obviously, **this language does not exist**. Besides the three aforementioned requirements for ALL declarations, the only four requirements for section (1) of the Matrix are (1) presentment of condition(s) or symptom(s) (2) claimed in the declaration (3) to a Medical Professional (4) where such condition(s) or symptoms are persisting at the time of presentment. As you can see, there are no requirements for "diagnosis made on or before April 16, 2012."

Furthermore, the only reference to timeframes and timelines in Section II of the Matrix (the section that discusses burdens of "Proof" for compensations of B-1 Specified Physical Conditions) refers to those listed in Table 3 of the Matrix. Nowhere in Table 3 of the Matrix can any person identify or list any limitations referencing any diagnosis deadlines for compensation. The only requirement is that the symptom "persist[s] at the time of presentment." *See Matrix*, Ex. 8, pp.4, 13-14 (discussing a timeframe requirement of 72 hours between exposure and manifestation for chronic dermal, eczematosis, and/or respiratory/sinusitis specified physical conditions and a timeframe requirement of 24 hours between exposure and manifestation for chronic eye damage/sequela and/or chronic hyperactive airways). Nowhere in the Matrix is a deadline for Diagnosis mentioned because such a deadline was never a requirement. For this reason, the proper view for distinguishing between LMPC/BELO claims and SPC Matrix payouts under the settlement agreement is that **only valid claims by Class Members that are not payable pursuant to the Matrix should be considered for payment as an LMPC if applicable.**

[11] Two members of the subclass of Cleanup Worker would receive two different and inconsistent burdens of proof in their litigation. One would receive a front end payout upon a showing required by the Matrix in medical records. The payout would most assuredly be reached before the LMPC. The second would have to wait years before seeing any money (if at all). The

As we know, Rule 23 requires that all proposed settlements that bind class members to be "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2) (2014). Rule 23 also requires that subclasses of a class be treated as a separate class under this rule. *Id.* r. 23(c)(5). Additionally, "the representative parties will fairly and adequately protect the interests of the class." *Id.* r. 23(a)(4). *Amchem* and its progeny stand for the premise that in order for a class settlement to be binding on all members of a class, there must be no conflict between subclasses of the larger class. *Amchem*, 521 U.S. at 626. Specifically, the example in *Amchem* distinguished between the interests of the "currently injured and exposure only categories of plaintiffs." *Id.* In its decision, the Supreme Court of the United States, by and through Justice Ginsberg, made it clear that it agreed with the Third's Circuit conclusion and quoted the Second Circuit explaining that

> class representatives may well have thought that the Settlement serves the aggregate interests of the entire class, [b]ut the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.

*Id.* at 627 (citing *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 630–31 (3d Cir. 1996); *In re Joint E. and S. Dist. Asbestos Litigation*, 982 F.2d 721, 742-743 (2d Cir. 1992).

Because we have two persons with the exact same facts whose only difference is the date of diagnoses receiving such drastically different outcomes, this would clearly violate Rule 23 subsections (a)(4). The conflict would, and likely will, destroy the certification of the class if BP were to prevail on their interpretation of this particular issue. In essence, this interpretation takes a subclass (for example, the cleanup worker) and shatters it into three smaller pieces. First, there would be exposure only cleanup workers which we know are represented because LMPC would protect them if injuries first manifested after April 16, 2012. Second there would be injured cleanup workers manifesting conditions before April 16, 2012 that saw doctors and were diagnosed before April 16, 2012 which would be treated as a Claimant pursuant to the Matrix. And lastly, there would be injured cleanup workers also manifesting conditions before April 16,

---

second would also have (1) to spend time in litigation and/or mediation (a costly endeavor), (2) to litigate in the Eastern District of Louisiana (as opposed to merely sending documents to the Claims Administrator) regardless of where they lived or where they worked, (3) the burden of showing causation (a substantial burden given a year has passed from the date of initial manifestation to the date of initial diagnosis), and (4) would most assuredly require an attorney when the first may be able to navigate the Proof of Claim Form pro-se. Yes, the second would have a removed cap on how much could be claimed, but that second person would also have to prove damages whereas the first is receiving a fixed amount!

Note the two vastly disparate results for members of the subclass, a subclass that MUST be treated as a class for purpose of Rule 23, which were exposed and injured merely because the date of diagnosis fell before or after an arbitrary date. Thus we identify several conflicts in representation between members of a single subclass. This is the very issue that *Amchem* discussed. This interpretation could possibly blow up the entire settlement agreement because such an interpretation would violate Rule 23 due to a conflict of representation of members of that subclass (cleanup workers).

2012 diagnosed after April 16, 2012 that would be treated as an LMPC claimant. The conflict in representation exists between the latter two and the certification would require reconsideration.

**VII.** **FOUR YEARS HAVE PASSED, PEOPLE ARE DYING OF CANCER, AND NOT ONE DIAGNOSED ACUTE OR CHRONIC CONDITION HAS BEEN PAID OUT BECAUSE BP WOULD CLOUD THIS MATTER UNDER THE GUISE OF FRAUD WHEN THE SETTLEMENT AGREEMENT ALREADY HAS A MEANS TO ADDRESS THAT CONCERN.**

To taint the issues associated with our clients under a cloud of fraud deflects away from the real issue which is to help injured class members suffering from exposure to BP's poison and how quickly they can receive compensation to help them address their medical concerns. By not timely paying injured class members, human beings suffer.

On March 24, 2014, _____, a cleanup worker for the *Deepwater Horizon* Event, died of cancer. It is our position that this cancer resulted from exposure to crude oil, dispersants, and other petro-chemicals. She is survived by her orphaned minor son. She was exposed to crude oil three and a half years ago. She is not the first of our clients to die of cancer and she is certainly not going to be the last.

Here are some images that demonstrate the level of suffering our clients have endured.

REDACTED

  _____ born _____ 1960, is a fire-fighter who would pull in oil covered booms from the Gulf on his time off by participating in the Vessel of Opportunity Program. He is suffering from a chronic skin condition that recurs and affects his skin as illustrated here through pictures of his hands and his feet. His ailments are recurring and constantly affecting his life. His symptoms manifested during his time performing a Response Activity under the

 direction of Unified Command as a cleanup worker. He was affected during the oil spill and saw a doctor for the first time through his insurance after April 16, 2012. This cleanup worker and firefighter is submitting a Proof of Claim form to the SPC for a condition that manifested while working and that was diagnosed as a chronic skin condition after April 16, 2012. He does not want to wait for years for a BELO claim to make its way through the

Courts in order to receive payment that will help him pay for further treatments.  These images were taken before April 16, 2012.

BP would have this Court believe this is a fraudulent claim.  *See BP Mem.* at 8.

REDACTED

Born on _____ 1960, _____ was a shoreline cleanup worker cleaning the shoreline of Alabama.  She is not a woman of means and lives hand to mouth.  Like the vast majority of our clients, Ms. _____ did not go see a doctor before April 16, 2012 because she did not have any health insurance and could not afford to pay out of pocket to see any medical professionals.  She first manifested rashes on her skin within 72 hours of exposure through direct contact of tar balls while performing Response Activities under the direction of Unified Command.  Her skin is now covered



with recurring blotches, lesions, welts, rashes, scars, scabs, swelling, bleeding, scaly skin, and various other skin problems as evidenced by this image of her chest and abdomen.

Additionally, while performing response activities under the direction of Unified Command and within 24 hours of her exposure to the oil fumes and dispersants sprayed over the oil near and along the shoreline, she began to suffer from respiratory issues that have not stopped.  The complained of symptoms are mucopurulent (mucus) drainage, nasal obstructions, facial pain, pressure, and/or fullness, and decreased sense of smell. She further has claimed to have experienced hyperactive airways, suffering from a recurring cough, chronic wheezing, chest tightness, and breathlessness. She has been experiencing difficulties through her sinus and her airways have reacted adversely since

11

her exposure to these fumes. She will be seeing a doctor for diagnostic purposes after April 16, 2012 because she has not been able to afford seeing a doctor.

BP would have this Court believe this is a fraudulent claim. "Class Counsel now suggest that some individuals who manifested these serious chronic physical conditions within 24 hours of exposure did not or would not seek medical care until two (or more) years later—or that they *still* have not done so. Such a claim defies common sense in every context but the assertion of fraudulent claims." *Id*. **The ultimate result of BP's position is that BP will not end up paying proportionate damages suffered by people that can't afford to see doctors. Those that saw doctors before April 16, 2012 will be paid based on the Matrix but those that could not afford would not be eligible for anything greater than an A-1 payment of $1,300.**

---

BP would have this Court believe that every claim filed by every verified class member (whether a cleanup worker performing response activities or a zone resident) that was not initially diagnosed until after April 16, 2012 is fraudulent and therefore should be required to show proof of causation through a BELO claim. This supposition would unduly impact those that could not afford to see a doctor; the tens of thousands of cleanup workers injured while working that were brought in from around the country on busses because they could not afford a ride themselves. They could not afford gas, housing, and food, much less access to medical doctors.

BP might say that they had access to medical tents. Those workers that were not threatened with losing their jobs and that were brave enough to risk it by visiting a Medical Triage Tent did not have access to CT Scans, Endoscopies, Spirometries, Pulmonary Function Tests, and Methacholine Challenge Tests at these tents to support a diagnosis of RADS or Chronic Sinusitis. They had no way of getting such a diagnosis with the requisite testing done beforehand. These services cost thousands of dollars, but choosing to live with a chronic cough and/or a serious rash until a viable diagnostic opportunity presented itself "defies common sense in every context but the assertion of fraudulent claims[?]" *See BP Mem.*, at 8.

BP sent medals and awards to several cleanup workers, thanking them for their service. Over 170,000 cleanup workers and countless zone resident class members did not ask for oil to spew from the depths of the Gulf from a defective and exploding instrumentality created by BP and injure them. The cleanup workers decided to help restore the Gulf; they served this Nation with honor and dignity. To have their service and sacrifices diminished by the very people that would give them a medal is disingenuous, disrespectful, and downright repulsive.

## VIII.  CONCLUSION

We join the Plaintiff's Steering Committee's plea and humbly ask this Court to treat all Specified Physical Conditions delineated in the Matrix that first manifested within the timeframes listed in the Matrix as SPC conditions payable subject to that very Matrix, not subject to a different set of requirements listed under the LMPC/BELO Claim umbrella. Conditions that **manifested after** April 16, 2012 were always clearly intended to be a second set of claims in this **two part settlement**. Many of our clients, as with all

Plaintiffs that share these circumstances, have already been robbed of several months of precious time in a one year settlement.  These clients have waited long enough; now that the effective date is ticking away, BP needs to pay for the damage it is responsible for. BP's stall tactic is irreparably harming the numerous class members that were promised a remedy to their injury and only benefits BP.  Some have already died without ever seeing a penny for their suffering. **Further delays should result in an extension of the deadline proportionate to such delays**.