EXHIBIT 8

**MEMORANDUM AND BRIEF IN SUPPORT OF APPELLEE**
███████████████████

**INITIAL OFFER AND RESPONSE**
**TO THE NOTICE OF APPEAL BY APPELLANT BP**


**August 27, 2013**


**DEEPWATER HORIZON CLAIM CENTER**
**CLAIMANT ID 100118906**



**E. J. Saad**
**Matthew I. D. Andrews**
**Attorneys for Appellee,**

███████████████████

**E. J. SAAD LAW FIRM**
**6207 COTTAGE HILL ROAD, SUITE G**
**Mobile, Alabama  36609**
**(251) 660-0888**
**(251) 660-0777 (Fax)**
ejsaad@ejsaadlaw.com
mandrews@ejsaadlaw.com

# TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

I.    THE SETTLEMENT AGREEMENT MUST BE INTERPRETED
      AND ENFORCED IN THE MANNER MOST FAVORABLE
      TO THE CLAIMANT SO AS TO PRODUCE THE GREATEST
      AWARD SUPPORTED BY THE FINANCIAL DATA
      UNDER THE TERMS OF THE SETTLEMENT . . . . . . . . . . . . . . . . . . . . . 15

      A. It Is The Responsibility Of The Settlement Program (Including The
         Appeal Panelists) To Faithfully Apply The Terms Of The
         Settlement Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B. Under The Express Terms Of The Settlement Agreement, The
         BP Parties Agreed That The Claimant Should Receive
         The Full Compensation To Which The Claimant Is Entitled. . . . . . . . . . 16

      C. The Settlement Agreement Requires All Claims To Be Treated
         Fairly And Equally, Without Any Negative Presumption . . . . . . . . . . . . 18

      D. The Settlement Agreement Is Governed By Maritime Law And
         Must Be Interpreted With The Words That Are Actually Written,
         And Not The Words That BP Wishes Were Written . . . . . . . . . . . . . . . . 19

II.   ████████████████████████     SATIFIED THE DOCUMENTATION
      REQUIREMENTS OF THE SETTLEMENT AGREEMENT. . . . . . . . . . . 20

III.  THE CLAIM ADMINISTRATOR PROPERLY DETERMINED THAT
      ████████████████████████ WAS AN ECONOMIC CLASS
      MEMBER AND SATISFIED THE CAUSATION STANDARD FOR A
      BUSINESS ECONOMIC LOSS CLAIMANT UNDER THE SETTLEMENT
      AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   THE CLAIM ADMINISTRATOR CALCULATED THE CORRECT
      COMPENSATION AMOUNT IN ACCORDANCE WITH THE TERMS

OF THE SETTLEMENT AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A. ██████████████████ Expenses Are Appropriately
Designated As "Fixed," "Variable," "Payroll" or "N/A". . . . . . . . . . . . . 28

B. The Appropriate Bench Mark Compensation Periods Were
Used For Step 1 and Step 2 Compensation . . . . . . . . . . . . . . . . . . . . . . 30

C. The Appropriate RTP Factor of 0.25 Was Applied By The
Claims Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D. The Amount Of Accounting Reimbursement Was Properly
Determined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

Appendix A – March 5, 2013 Opinion by Judge Barbier.
Appendix B – January 15, 2013 Claims Administrator Decision
Appendix C – Information Presented at the Fairness Hearing – 11/8/12, Graphs and
Slides
Appendix D – Economic Loss Zone Map

## STATEMENT OF THE CASE

On September 11, 2012, ████████████████, (███████████████ or Claimant), filed its Registration Form and Claim Form with the Deepwater Horizon Claim Center, (Claim Center), along with its supporting documents as called for by the Settlement Agreement's guidelines for Business Economic Loss Claims.  (Doc. ID 4253551, 4254855).  On July 26, 2013, the Claim Center issued an Eligibility Notice to ████████████. (Doc. ID 11499025).   The award was predicated on a Base Compensation of $446,270.09 and a Risk Transfer Premium Factor of 0.25, which calculated as $111,567.52 and produced a total Economic Damage Compensation Amount of $560,247.61.[1] (Doc. ID 11499025).  On August 20, 2013, BP filed its Notice of Appeal.

## STATEMENT OF THE ISSUES

I.   **WHETHER THE SETTLEMENT AGREEMENT SHOULD BE INTERPRETED AND ENFORCED IN THE MANNER MOST FAVORABLE TO THE CLAIMANT SO AS TO PRODUCE THE GREATEST AWARD SUPPORTED BY THE FINANCIAL DATA.**

II.  **WHETHER ██████████████████, LLC SATIFIED THE DOCUMENTATION REQUIREMENTS OF THE SETTLEMENT AGREEMENT.**

III. **WHETHER THE CLAIM ADMINISTRATOR PROPERLY DETERMINED THAT ██████████████, LLC WAS AN ECONOMIC CLASS MEMBER AND SATISFIED THE CAUSATION STANDARD FOR A BUSINESS ECONOMIC LOSS CLAIMAINT UNDER THE SETTLEMENT AGREEMENT.**

IV.  **WHETHER THE CLAIM ADMINISTRATOR CALCULATED THE CORRECT COMPENSATION AMOUNT FOR ██████**

---

[1]   ████████████ was also awarded $2,410.00 in claimant accounting support reimbursement.

4

**████████████████ IN ACCORDANCE WITH TERMS OF THE SETTLEMENT AGREEMENT.**

## STANDARD OF REVIEW

Section 6 of the Settlement Agreement sets out the provisions governing Appeal of Final Determination of Settlement Program, (Settlement Agreement). (Doc. 6276-1, p. 55-61).   The correct Standard of Review is set out in paragraph 6.4:

> "<u>Appeal Review Standards</u>.   The Standard of Review by the Appeal Panelist or Appeal Panel shall be a de novo review of the complete record of the Claimant in the Settlement Program to enforce compliance with the Agreement as approved by the Court."

<u>Id</u>. at 60. ██████████████ and the BP Parties are both limited to the Record on Appeal except as otherwise noted in Rule 12 of the Rules Governing the Appeals Process, (Appellate Rules).

The Appeal Panel is charged to "enforce compliance with this Agreement as approved by the Court." (Doc. 6276-1 at 60).  The Agreement specifically directs that the claims evaluation must be done in a manner favoring the Claimant; to-wit:

> "4.3.8.  The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms of the Economic Damage Claim Process to produce the greatest **ECONOMIC DAMAGE COMPENSATION AMOUNT** that such information and supporting documentation allows under the terms of the **ECONOMIC DAMAGE CLAIM FRAMEWORK**."

<u>Id</u>. at 19.  The Agreement mandates that the evaluation and processing of a claim should be done in such a manner as to provide the "greatest **ECONOMIC DAMAGE COMPENSATION AMOUNT** that such information and supporting documentation allows under the terms of the **ECONOMIC DAMAGE CLAIM FRAMEWORK**."  <u>Id</u>.

████████████ respectfully submits that the Appeal Panelist should apply the same standard and that all doubts should be resolved in favor of awarding and sustaining the greatest award sustainable.  To do otherwise would be to reject the plain language of the Agreement.

Section 6.2 of the Settlement sets out the "Appeal Compensation Method" as follows:

> "6.2     **Appeal Compensation Method. All Appeals where the issue is the Compensation Amount shall be conducted using a baseball process** in which the Claimant and the BP Parties exchange and submit in writing to the Appeal Panelist or Appeal Panel their respective proposals ("Initial Proposal") for the Compensation Amount they propose the Claimant should receive.  **The Appeal Panelists or Appeal Panel may consider only the following documentation: the Initial and Final Proposal and any memorandum in support thereof; the complete record of the Claimant in the Settlement Program; the Agreement and all of its attachments; Court rulings on similar issues; and prior Appeal rulings on similar issues.**  The Claimant and the BP Parties must exchange and submit a final proposal base compensation amount ("Final Proposal") to the Appeal Panelist or Appeal Panel.  Either Party shall have five (5) days to accept the other Party's Final Proposal and end the Appeal.  **Without an agreed resolution, the Appeal Panelist or Appeal Panel must choose to award the Claimant either the Final Proposal by the Claimant or the Final Proposal by the BP Parties but no other amount."**  (emphasis added).

Id. at 6.2.  If the Claimant and the BP Parties cannot reach an agreed settlement, the Appeal Panelist must either award the Claimant's Final Proposal or the BP Parties' Final Proposal, but no other amount. Id.  The BP Parties have urged that the Claimant's case be remanded for further calculations under a different method than that applied by the Claim Administrator and approved by the Court in its Opinion dated March 5, 2013. (Appendix

A).  Under the Appellate Rules, for the Appeal Panel to remand the Appeal for further findings, it must find that:

> "(a) a new document has been introduced on appeal that the Appeal Panel determines would change the outcome of the Program's determination to a value that is neither the claimant nor BP's Final Proposal amount; or (b) the information in the record is not sufficient to support either the claimant or BP's Final Proposal."

(Rule 17(d)(5)).   It is ████████████ position that the record is clear; the standards of the settlement were followed by the Administrator; remand is not called for, and the award should be confirmed.

## **STATEMENT OF THE FACTS**

████████████ seeks confirmation of the Compensation Award issued under the terms of the Settlement Agreement, as approved by the United States District Court on December 21, 2012. (Doc. 8138). ████████████ is an Alabama limited liability company that has done business as a general contractor that builds and repairs residential, commercial and industrial buildings in middle Alabama.  In the normal course of its business ████████████ maintains monthly Profit & Loss Reports, (Monthly P&L Reports). (Doc. ID 4730712, 4730754, 4730789, 4730856, 4730909).  These Monthly P&L Reports were kept contemporaneously and recorded under the Accrual Basis Accounting Method. Id. ████████████ Monthly P&L Reports are accurate, complete and represent a valid record of the Limited Liability Company's history. Id.

Each year, ████████████ filed timely and accurate Federal Tax Returns, under oath with the statutory penalty of perjury. (Doc. ID 4730959, 4731770, 4732770,

7

4734400, 4735085).   These documents were created and maintained in the usual course of business by ███████████████ and were provided as part of the documentary support for the claim.

As a member of the Business Economic Class, ███████████████ filed its Registration Form and Claim Form with the Deepwater Horizon Claim Center on September 11, 2012. (Doc. ID 4253551, 4254855).  As part of the claim documentation methodology, the Claim Administrator compared ███████████████ Monthly P&L Reports (book records) to ███████████████ Federal Tax Returns for the years 2007 through 2011.   This comparison noted some minor variances between ██████ ███████████████ Gross Receipts and Net Income reported on the Monthly P&L Reports as compared to the Gross Receipts and Net Income as set out in ███████████████ Federal Tax Returns. (Doc. File ID 11402181 at 11).  The variations on gross receipts were 6.64% for 2007; 78.15% for 2008; -32.87% for 2009; 17.74% for 2010; and 44.19% for 2011.  (Doc. ID 11402181 at 11).   The variations on net income were 8.02% for 2007; 0.23% for 2008; 0.00% for 2009; -0.03% for 2010; and 1.99% for 2011. Id.  The Claim Administrator, through his Vendors, requested additional source documentation on November 15, 2012 and April 30, 2013, and, in response, ███████████████ provided additional financial statements, business records and a reconciliation. (Doc. ID 6366399, 9923651, 6694933, 9453704, 9453710, 9453719, 9453724, 9453730, 9453735, 9453740, 9453743, 10260449, 10280524).  The Claim Administrator determined in his discretion that there were no material discrepancies between the amounts reflected in ██████

8

█████████ Monthly P&L Reports and its Federal Tax Returns. ████████

█████████ internal record keeping and its tax reporting reflected a true picture of the

Limited Liability Company's operations.

On November 8, 2012, a Final Fairness Hearing was conducted, and the BP

Parties, [the BP Defendants], presented findings of fact and conclusions of law in support

of the final approval of the Economic and Property Damages Settlement Agreement.

(Doc. 7945).  Before the hearing, thousands of businesses had made claims and received

awards for economic loss damages under the Settlement.[2] (Appendix C).  From the

Settlement's inception, the Claim Administrator reported every Compensation Award to

the BP Parties along with a complete explanation of the methodology used to determine

revenues and variable profits. (Doc. 6276-1 Section 6.1.2.4, p. 61).  Except for awards

under $50,000, the BP Parties had an absolute right to challenge the methodology used as

well as the results rendered for each of these awards. Id.  Prior to the Final Fairness

Hearing, the BP Parties had actual knowledge of the means and methods used to calculate

revenues and variable profits. Id.

At the Final Fairness Hearing, the BP Parties could have denounced any aspect of

the Settlement Agreement or the manner by which the Claim Administrator implemented

it.   Instead, the BP Parties urged the Court to make a finding approving the

---

[2]     As of December 11, 2012, the Court noted that 91,902 claims had been submitted
to the Settlement Program of which 50,505 had been reviewed.  Of these claims, 18,332
had been declared eligible for payment with notices issued totalling approximately
$1.377 billion in payments.

methodologies employed in calculating awards for class members; which would include

████████████████. (Doc. 7945 at 43).  The BP Parties did not complain to the Court

that the Settlement should not allow inland claimants to recover.  Indeed, the BP Parties

touted the Settlement's geographic "Loss Zones" as a benefit that should be approved;

stating:

> "Similarly, the zones included in the Economic Loss Zone Map
> reasonably reflect the likelihood of a potential economic effect of the
> spill; it is generally reasonable to posit that as distance increases away
> from the coast, the likelihood of damage is reduced."

(Doc. 7945 at 44).[3]  The BP Parties also advised the Court of the favorable treatment

afforded claimants in the Settlement's causation tests; stating:

> "**For those claimants required to prove causation, however, the tests
> are reasonable.** *See* Landry Decl. (Ex. 13) 38 (describing the causation
> tests as "consistent with ▄▄▄ economic reality").  Indeed, in many ways
> the causation principles are remarkably favorable to claimants. *See, e.g.,*
> Sharp Decl. (Ex. 18) 17 ('**[O]nce a business meets the causation
> requirements, for purposes    of    quantifying    compensation, all
> revenue and variable profit declines during the claimant-selected
> compensation period are presumed to be caused by the spill**, with no
> analysis required to determine whether the declines might have been
> due, at least in part, to other causes.')." (emphasis added).

(Doc. 7114-1 at 49).  Based in part on the urging of the parties, including the BP Parties,

the United States District Court issued its Order and Judgment Granting Final Approval

of Economic and Property Damages Settlement and Confirming Certification of the

---

[3]     The Zone Map allows businesses and individuals to make claims for economic loss if the
claimant is located anywhere in the States of Alabama, Mississippi, Louisiana as well as
significant portions of Texas and Florida. ███████████████ is located in ███████████
██████ within Zone D.  The Zone Map is attached at Appendix D.

Economic and Property Damages Settlement Class, (Order and Judgment), on December 21, 2012. (Doc. 8139).

After reviewing essentially the same arguments presented by BP in other appeals as those presented here, i.e. the "matching" and revenue "smoothing" arguments, on January 15, 2013 the Claims Administrator issued a policy decision adopting specific policies regarding the proper means and methods to be used in the calculation of Business Economic Loss Claims under the Settlement Agreement. The policy decision specifically notes that:

> **1.** *Business Economic Loss Claims: Calculation of Variable Profit.*
> 
>           *            *            *            *
> 
>     In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods…
> 
>           *            *            *            *
> 
> **2.** *Business Economic Loss Claims: Timing of Revenue for Purposes of Causation.*
> 
>     Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims administrator will not typically re-allocate such revenues to different periods…

(Appendix B). The Claim Administrator's Policy Decision specifically rejects the position urged by the BP Parties in this appeal of ███████████ valid claim.

Despite the Claim Administrator's clear policy statement, the BP Parties sought and were allowed to present the issue of "matching" and revenue "smoothing" to the

Court.    After extensive briefing, on March 5, 2013, Judge Barbier issued an opinion which "**affirms the Claim Administrator's interpretation as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims Administration**." (emphasis added). (Appendix A).   The Court notes that "**Nowhere does the Agreement state or indicate that revenue and expenses must be 'matched' or revenues 'smoothed', nor does it state that one should inquire into when revenue was 'earned**.'" (emphasis added). Id.  The Court further states:

> "the same months of the Compensation Period are to be compared with the months in the Benchmark Period; not, as BP urges, that the Claim Administrator's accountants should seek out months where the claimant engaged in comparable activity."  Notably, this is the exact interpretation BP advocated while the parties negotiated the Settlement Agreement:
>
>> The word 'comparable' and phrase 'comparable months of' is used throughout the document in the context of comparing the months selected by the Claimant in 2010 to compare against the *same months* in the Benchmark Period." (emphasis added by Court).

Id.  With regard to the issue of what the word "corresponding" means in the Settlement Agreement, the Court adopted Class Counsel's position which corresponds with the Claim Administrator's Policy Decision and further states that the variability of results was a known and acknowledged factor of the Settlement for the BP Parties:

> "The question is whether variable expenses must correspond to the revenue those expenses produced, as BP contends, or whether variable expenses must correspond to 'the same time period,' as Class Counsel contends.   BP claims Class Counsel's interpretation ignores 'corresponding;' Class Counsel claims that BP's interpretation ignores 'the same time period.'

The Court adopts Class Counsel's interpretation as it is most in line with the rest of the Settlement Agreement….

\*          \*          \*          \*          \*

With respect to BP's argument that this interpretation of the Settlement Agreement can create absurd results, BP's declarant acknowledges that class settlement payments do not always perfectly match economic losses in every instance. Polinsky Declaration, p.5 n.8 Ex. 9 to BP's submission. BP's counsel similarly explained that "false positives" are an "inevitable concomitant of an objective quantitative, data-based test." Letter from Mark Holstein to Patrick Juneau (September 28, 2012), p.3, Ex. 12 to PSC's Submission.

And, as mentioned above, the parties agreed to give Claimants flexibility in choosing the most favorable Compensation and Benchmark Periods. Indeed, the Settlement Agreement provides that if a Claimant fails to select the period that generates the greatest recovery, the Program will choose that period for him. Objective formulas, the possibility of "false positives," and giving claimants' flexibility to choose the most favorable time periods are all consequences BP accepted when it decided to buy peace through a global, class-wide resolution. In light of this, to the extent that the Claims Administrator's interpretation produces "false positives" or, as BP claims, "absurd" results, it appears that the Settlement Agreement anticipates that such results would sometimes occur.

The overarching theme of the Settlement is a transparent, uniform application of an objective quantitative data-based test which can be fairly and efficiently administered by the Claims Administrator. Notably, the Settlement Agreement itself defines those businesses that lost profits, income, and/or earnings "as a result of" the Spill as those businesses that meet the objective causation requirements set forth in Exhibit 4B. Once the Settlement's causation formula is met, then all losses calculated under Exhibit 4C are presumed to be attributable to the oil spill. BP's interpretation injects a subjective notion of alternative causation and a degree of complexity that are contrary to the Settlement's terms."

Id. The Court's March 5, 2013 Opinion and the Claim Administrator's Policy Decision should be given their full weight in ▮▮▮▮▮▮▮▮▮▮ claim and the Claims Administrator's award should be affirmed.

13

It should also be noted that while it benefited the BP Parties to urge approval of the Settlement Agreement, the BP Parties did not complain to the Court about the method(s) used by the Claim Administrator in calculating variable profits. The BP Parties never suggested that any clarification was needed to the phrase "corresponding variable expenses," and they never urged the Court to require "matching of revenue and expenses." In its filings with the Court, during the Final Fairness Hearing and up to the date of the Court's Order and Judgment, the BP Parties never urged use of Internal Revenue Service Federal Tax Regulations §1.460-3 nor any Financial Accounting Standard Board Codifications. On July 26, 2013 the Claim Administrator issued █████████ Economic Loss Claim Eligibility Notice stating:

> "We have reviewed this claim and find that it qualifies for payment under the terms of the Economic and Property Settlement Agreement ('Settlement Agreement')."

(Doc. File ID 11499025 at 1). The Claim Administrator calculated ██████ Compensation Award to be $446,270.09 with a Risk Transfer Premium Amount, (RTP), of $111,567.52 for a total Award Amount of $560,247.61.[4]

## ARGUMENT

This appeal presents an issue decided by the supervisory Federal District Court in its Order entered on March 5, 2013, a copy of which is attached as Appendix A. For the reasons set forth in the March 5, 2013 Order and the facts and arguments presented

---

[4] This Award Amount included a $2,410.00 reimbursement for the Claimant's Accounting Support.

herein, the Claim Administrator's calculation and Notice of Eligibility to 

███████████ should be affirmed in its entirety.

## I.   THE SETTLEMENT AGREEMENT MUST BE INTERPRETED AND ENFORCED IN THE MANNER MOST FAVORABLE TO THE CLAIMANT SO AS TO PRODUCE THE GREATEST AWARD SUPPORTED BY THE FINANCIAL DATA UNDER THE TERMS OF THE SETTLEMENT.

### A.  It Is The Responsibility Of The Settlement Program (Including the Appeal Panelists) To Faithfully Apply The Terms Of The Settlement Agreement.

It is important to recognize that the Settlement Agreement is a compromise by the parties involved in litigating disputed claims.  The claimants/plaintiffs relinquished the possibility of unlimited compensatory damages and agreed to accept a potentially lesser amount with more certainty of recovery.  The BP Parties agreed to pay claims it might otherwise have defeated but accepted responsibility for paying every claim that qualified under the causation tests and generated a compensation award in accordance with the terms of settlement.  Both claimants and the BP Parties agreed to a Court supervised, neutral settlement process overseen by the Claim Administrator and his Vendors.  This is the structure the BP Parties praised and urged in the Final Fairness Hearing and the same process they now try to escape.

The terms of the Settlement Agreement do not incorporate the Federal Rules of Evidence, Generally Accepted Accounting Principles (GAAP), or specific IRS Regulations (other than those associated with the filing of valid tax returns).  In some cases, the terms of the Settlement Agreement favor the Claimant.  In other cases, the

15

Settlement Agreement favors BP. In all cases, the terms of the Settlement Agreement reflect a compromise that is the product of eight months of meticulous negotiations, discussions and careful consideration by the Parties, the Claims Administrator, the Vendors, and in some cases the Court. It is the responsibility of the Settlement Program (including the Appeal Panelists) to faithfully apply the terms of the Settlement Agreement, based on the documents that are accepted as sufficient under the terms of that Agreement, and by the Claims Administrator. See, SECTION 4.3.1 (The Claims Administrator shall ... faithfully implement and administer the Settlement, according to its terms and procedures); SECTION 6.4 (the Appeal Panelist or Appeal Panel shall ... enforce compliance with this Agreement as approved by the Court).[5]

> **B.     Under The Express Terms Of The Settlement Agreement, The BP Parties Agreed That The Claimant Should Receive The Full Compensation To Which The Claimant Is Entitled.**

Central to the interpretation, implementation and application of the Settlement Agreement is the assurance of a "Claimant-friendly" process, under which the Program would afford Claimants with notice, information, assistance and opportunity to achieve the *maximum* amount of compensation to which the Claimant is entitled under the Settlement Frameworks that were negotiated. The BP Parties agreed to these principles, which are clearly stated throughout the Settlement Agreement. In particular, Section 4.3.7 of the Settlement Agreement provides that:

---

[5]     Under the "Baseball Rules" the Appeal Panelist or Panel must ultimately, in enforcing the terms of the Settlement Agreement, "award the Claimant either the Final Proposal by the Claimant or the Final Proposal by the BP Parties but no other amount." SECTION 6.2.

"The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes. The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the **Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."** (emphasis added).

(Settlement Agreement §4.3.7). [6]  Moreover, Section 4.3.8. of the Settlement Agreement expressly provides that:

"The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to **produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows under the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK**. By way of example, but not to be exclusive, if the Claimant selected a COMPENSATION PERIOD or BENCHMARK PERIOD based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied." (emphasis added).

---

[6]      *See also,* SECTION 4.3.1 (the Claims Administrator shall implement and administer the Settlement "**for the benefit of the Economic Class"**).

(Settlement Agreement §4.3.8).   The Settlement ensures the Claimant is awarded the most favorable level of compensation allowed under the Settlement Frameworks.

### C.   The Settlement Agreement Requires All Claims To Be Treated Fairly And Equally, Without Any Negative Presumption.

The specific intent to ensure that all claimants are treated fairly, with no "special deals" and without any negative presumption of any kind, is specifically stated throughout the Settlement Agreement.   In particular, Section 4.4.7 of the Settlement Agreement provides that:

> "The criteria, documentation, proof, and Compensation Amount provisions of each of the Claims categories **shall apply equally to all Claimants** regardless whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim." (emphasis added).

(Settlement Agreement §4.4.7).   Section 4.4.7 of the Settlement Agreement similarly makes it clear that:

> "An Economic Class Member who had a claim with the GCCF that was rejected or denied by the GCCF for any reason shall be treated like any other economic Class Member submitting a Claim to the Settlement Program.   **Specifically, there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a settlement Payment under the terms of the Settlement Agreement."** (emphasis added).

(Settlement Agreement §4.4.9).   Taken together, the negotiated terms of the Settlement Agreement make clear that it is the responsibility of the Settlement Program (including the Appeal Panelists) to faithfully apply the terms of the Settlement Agreement, in a manner designed to produce the <u>greatest</u> allowable economic damage compensation

amount, with no negative presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement. Id.

D.     **The Settlement Agreement Is Governed By Maritime Law And Must Be Interpreted With The Words That Are Actually Written, And Not The Words That BP Wishes Were Written.**

The Settlement Agreement provides that interpretation of the Agreement shall be "in accordance with General Maritime Law as well as in a manner intended to comply with the OPA." (Settlement Agreement ¶ 36).  As stated in Kelly v. Bayou Fleet, Inc., 2007 U.S. Dist. LEXIS 73637 *5-6 (E.D. La. 2007):

> "**The Fifth Circuit regards a settlement agreement as a contract and courts are instructed to enforce them as they would a contract.** *See Guidry v. Halliburton Geophysical Servs., 976 F.2d 938, 940 (5th Cir. 1992).*"
>
>        *          *          *          *          *
>
> **It is nearly axiomatic that settlement agreements are a favored means of resolving disputes.** *See, e.g. Williams v. First Nat'l Bank, 216 U.S. 582, 595, 30 S. Ct. 441, 54 L. Ed. 625 (1910)* (*citing Hennessy v. Bacon, 137 U.S. 78, 85, 11 S. Ct. 17, 34 L. Ed. 605 (1890)).* **Because it is presumed that the parties making settlements have consulted their own interests, settlement agreements should not be taken lightly or be interfered with or impeached.** *Thibaut v. Ourso, 605 F. Supp. 1, 2-3 (M.D. La. 1981)*; *see also Hennessy, 137 U.S. at 85*.
>
>        *          *          *          *          *
>
> 'It is well settled that in the absence of fraud, mistake, or other circumstance going to the validity of the agreement, a settlement voluntarily entered into cannot be repudiated by either party or set aside by the court.' *Bisso, No. 94-690, 1996 U.S. Dist. LEXIS 757, 1996 WL 28520, at; see also Thibaut, 605 F. Supp. at 3*. Therefore, **precedent dictates that the contract must be interpreted with the words that are actually written, and not the words that the defendant wishes were written.**" (emphasis added).

<u>Kelly</u>, 2007 U.S. Dist. LEXIS 73637 *5-6, *8, *10.  In <u>Kelly</u> the court noted that the defendant had "fair opportunity" to reject terms it found unacceptable.  <u>Id</u>.  The court rejected defendant's attempt to add provisions as an afterthought.  <u>Id</u>. at *10.

In like manner, the BP Parties must live with the Settlement's terms.  The BP Parties should not be allowed to rewrite the Agreement through the guise of defining terms in BP's favor, but contrary to the mandate of Section 4.3.8. (Settlement Agreement §4.3.8).  The BP Parties may now wish they had insisted on rigidly defined accounting terms to be used in calculating a claimant's award, but they did not.  Instead, the BP Parties and the Plaintiffs charged the Claims Administrator with responsibility to implement the terms of the Agreement by calculating the damage award for each eligible claimant. (Settlement Agreement §4.3.9).  If the Claims Administrator's implementation of the Settlement Agreement is within the wide latitude granted him by the Settlement Agreement and is consistent with the mandate of Section 4.3.8, then the Appeal Panelist should affirm the resulting award.

## II. ███████████████ LLC SATIFIED THE DOCUMENTATION REQUIREMENTS OF THE SETTLEMENT AGREEMENT.

Documentation required for a Business Economic Loss Claim is set out in Exhibit 4A of the Settlement Agreement:

"The framework detailed below describes the documentation requirements for business economic loss claims.

In order to be eligible for compensation, a business claimant must provide the following:

1. A claim Form which the claimant (or claimant's representative) shall verify under penalties of perjury.  The Claim Form shall direct the claimant to provide information, including the claimant's chosen Compensation Period and corresponding Benchmark Period in the year(s) selected by the claimant.  The claimant shall attach required documents supporting the claim.  All statements made in and documents submitted with the Claim Form may be verified as judged necessary by the Claims Administrator.

2. Documents reflecting the business structure and ownership of the claimant, including but not limited to articles of incorporation, shareholder list(s), and partnership or limited partnership agreements.

3. Federal tax returns (including all schedules, and attachments) for the years included in the claimant-selected Benchmark Period, 2010, and, if applicable, 2011.
   a. Provide the complete federal tax return and the applicable supporting documentation.
   b. For self employed individuals, provide Form 1040, pages 1 and 2, along with Schedules C, D, E, and F and Form 1099 if applicable.

4. **Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.**  Profit and loss statements shall identify the dates on which they were created.  The Claims Administrator may, in his discretion, request source documents for profit and loss statements.  If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation." (emphasis added).

(Settlement Agreement, Exhibit 4A, Doc. 6276-8 at p.2).  As set out in further detail below, ▇▇▇▇▇▇▇▇ provided all appropriate and/or requested documentation to the Claim Administrator.  The documents and information provided by ▇▇▇ ▇▇▇▇▇ were legitimate, contemporaneous business records.

████████████ provided its Federal Tax Returns, Monthly Profit and Loss Reports, (Monthly P&L Reports), Articles of Organization and all other documents required by the Settlement Agreement.  (Doc. File ID 16628449).  The limited liability company's Monthly P&L Reports were kept contemporaneously and recorded under the Accrual Basis Accounting Method.  (Doc. ID 4730712, 4730754, 4730789, 4730856, 4730909).  ████████████ Federal Tax Returns were filed under oath with the statutory penalty. (Doc. ID 4730959, 4731770, 4732770, 4734400, 4735085).  All of these documents and confirmations were provided as part of the documentary support for ████████████ claim.

The Claim Administrator compared ████████████ Monthly P&L Reports (book records) and Federal Tax Returns for the years 2007 through 2011.  The variations on gross receipts were 6.64% for 2007; 78.15% for 2008; -32.87% for 2009; 17.74% for 2010; and 44.19% for 2011.  (Doc. ID 11402181 at 11).  The variations on net income were 8.02% for 2007; 0.23% for 2008; 0.00% for 2009; -0.03% for 2010; and 1.99% for 2011. Id.  The Claim Administrator determined there were no material discrepancies between the amounts reflected in ████████████ Monthly P&L Reports and its Federal Tax Returns. ████████████ internal record keeping and its tax reporting reflected a true picture of the limited liability company's operations.  The Claim Administrator, through his Vendors, requested additional source documentation on November 15, 2012 and April 30, 2013, and, in response, ████████████ provided additional financial statements, business records and a reconciliation. (Doc. ID 6366399,

9923651, 6694933, 9453704, 9453710, 9453719, 9453724, 9453730, 9453735, 9453740, 9453743, 10260449, 10280524). Once the Claim Administrator was satisfied with the accuracy and acceptability of ██████████████ financial data, the claim process proceeded to a determination of the Claimant's qualification and the amount of the resulting Compensation Award.

The Settlement Agreement states that "the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A." (Doc. 6430-10 at 2).  Under the Agreement, each expense must be classified by a designation of "Fixed," "Variable," "Revenue," "Payroll" or "N/A."   Id.   The Claim Administrator examined ████ ██████████ Monthly P&L Reports and, based on the Claim Administrator's protocols, each line item was assigned a designation.  (Doc. ID 11402181 at 4-9).  These line item designations are noted in the column styled "Type" on the Claim Administrator's independent tabulation of ███████████████ Monthly P&L Calculations.  Id. ██████ ██████████ revenues were used by the Claim Administrator for causation and claim calculation.  Id.

███████████████████ Monthly P&L Reports also reflect monthly expenses under two main cost categories.  The first is "Cost of Sales" and consists of various Cost of Goods Sold (COGS) expenses.  The COGS are detailed by line item with individual categories for client expenses and software expenses.   The Settlement Agreement provides:

> "COGS will be treated as a variable expense after excluding…the following costs which may be imbedded in COGS and are likely to be fixed

in nature: Fixed COGS Payroll, Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services."

(Doc. 6430-10 at 2). ████████████ agrees with the Claim Administrator's designations of line item costs in the COGS.

The second category is "Expense" and includes ██████████ office and administrative expenses. The Claim Administrator appropriately assigned each line item a separate designation of either "Fixed," "Variable," "Payroll" or "N/A." ████████ ██████████ financial data reflect a contemporaneous record of its business operation and was created in the normal course of business. The Claim Administrator found ████████████ financial records to be properly maintained and the resulting data to be sufficient and reliable for calculation of a Compensation Award under the Settlement Agreement. ██████████████ satisfied the documentation and record keeping requirements of the Settlement Agreement.

## III. THE CLAIM ADMINISTRATOR PROPERLY DETERMINED THAT ████████████████, LLC WAS AN ECONOMIC CLASS MEMBER AND SATISFIED THE CAUSATION STANDARD FOR A BUSINESS ECONOMIC LOSS CLAIMAINT UNDER THE SETTLEMENT AGREEMENT

████████████████ operated as a general contractor that builds and repairs residential, commercial and industrial buildings in middle Alabama during April 20, 2010 to April 16, 2012. ██████████████ was not excluded under any provision of the Settlement Agreement. (Doc. 6430-1 at 8-11; 6430-34). As such, ██████████████ is a member of the Economic and Property Damages Settlement Class. (Doc. 6430-1 at 6-7). Because of ██████████████ location, the Claim Administrator properly

24

designated ████████████████ as a "Zone D Business." (Doc. 6430-3, 6430-4).  As a

Zone D Business, ████████████████ had to satisfy one of the agreed economic criteria

in order to qualify for a Compensation Award. (Doc. 6430-9 at 5).   One of these

qualification criteria is the "V-Shaped Revenue Pattern," (the "V-Test"), which requires:

> "III.    Causation Requirements for Zone D
>          If you are not entitled to a presumption as set forth in (1) above and
>          you are located outside of Zones A, B or C, then you must satisfy the
>          requirements of one of the following sections A-F below:
>
> A.  V-Shaped Revenue Pattern:
>        Business revenue shows the following pattern:
>
>   1.    **DOWNTURN:**  a decline of an aggregate of 15% or more in  total
>         revenues over a period of three consecutive months between May-
>         December 2010 compared to the same months in the Benchmark
>         Period selected by the claimant;
>         AND
>
>   2.    **LATER UPTURN**: an increase of an aggregate of 10% or more in
>         total revenues over the same period of three consecutive months in
>         2011 compared to 2010."

(Doc. 6430-9 at 6).  As required, ████████████████ provided its Monthly P&L Reports

for the years 2007 through 2011, which set out the data needed to perform the V-Test.

(Doc. ID 4730712, 4730754, 4730789, 4730856, 4730909).   The Claims Administrator

determined that ████████████████ satisfied the "V-Shaped Revenue Pattern Test" in

the benchmark periods of 2008 and 2009. (Doc. ID. 11499025 at 1, 6).  In each test

period, ████████████████ demonstrated a 15% or greater decrease in the pre-spill test

periods with a corresponding increase in 2011 of greater than 10% in revenues. (Doc.

6430-9 at 6).  The Claim Administrator performed this V-Test and confirmed ████████

███████████ was an eligible class member that met the agreed causation standard for recovery. (See Doc. ID 11499025).

## IV.   THE CLAIM ADMINISTRATOR CALCULATED THE CORRECT COMPENSATION AMOUNT IN ACCORDANCE WITH THE TERMS OF THE SETTLEMENT AGREEMENT

Under the Settlement Agreement, the Compensation Award is determined in two "Steps"; the first of which is set out as:

> **"Step 1**- Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period."

(Settlement Agreement, Exhibit 4C).  The "Compensation Period" and "Benchmark Period" are the results negotiations.  The "Compensation Period" is defined as:

> "The Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010."

(Settlement Agreement, Exhibit 4C).  If a settlement had not been reached, the compensation, or damages, would have been left for proof at trial and a jury would have made the determination.  Instead of a negotiated Compensation Period, the jury award could legally have ranged well beyond the eight months, (May through December 2010), that form the upper limit allowed by the Settlement Agreement. Id.  At trial, a plaintiff could establish that the oil spill's impact lasted well into 2012 or even longer, depending on the evidence.  The limited Compensation Period that the BP Parties bargain to receive is a benefit that they now enjoy only because of the Settlement Agreement.

In like manner, the "Benchmark Period" is a defined term under the Settlement Agreement:

> "The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance. The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes."

(Settlement Agreement, Exhibit 4C).  Under Section 4.3.8 of the Settlement Agreement, the Claims Administrator is charged to select the best combination of months to define the claimant's Compensation Period and to make the comparison to the corresponding Benchmark Period to calculate the greatest award supported by the data.  That is what the Claims Administrator did in this case and his decision should be affirmed.

Absent the Settlement Agreement, plaintiffs, such as ██████████████, would have taken the BP Parties to trial and would not have been limited to the Settlement's 3-year Benchmark Period of 2007 through 2009 in proving damage. Id.  Rather, a plaintiff might use a 4-year period or a 5-year period to show its prior economic strength in support of damages.  However, because BP entered the Settlement Agreement, claimants are allowed only a more limited recovery consisting of loss of Variable Profits calculated for a period of time restricted to between 3 and 8 months in a consecutive series.  If claimant's damages extended for 9 months, 19 months or even longer, the claimant's losses for all of those months cannot be considered.  The BP Parties bargained for and received a great benefit from the Settlement Agreement.  They must accept the

Agreement, with both its benefits and the discomforts, as it is written and not as they now wish it had been written.

When the BP Parties now speak of the Claimant's Award being excessive or complain that it is the product of unintended consequence, they speak while holding tightly to all the benefits they gained by settling. The BP Parties traded use of 8 months to calculate damages in exchange for not experiencing jury award for damages that may have reached for years into the future. The Settlement Agreement does not compensate the Claimant solely for losses in a single 8 month period, it is all the compensation the Claimant will receive for any and all damages that Claimant may have suffered or may suffer at any time in the future. (Settlement Agreement and Release). The BP Parties cannot have their cake and eat it too. If they want the benefit of the Settlement when it limits their liability, they must accept the results in all cases where the claimant qualified to participate in the Settlement. As has been demonstrated, ████████████ met the V-Test that the BP Parties designed. ████████████ is a qualified member of the class and is qualified to recover a Compensation Award. The Claim Administrator correctly calculated the ████████████ Compensation Award and RTP factor. ████████████ Award should be affirmed.

**A.    ████████████, LLC's Expenses Are Appropriately Designated as "Fixed," "Variable," "Payroll" or "N/A."**

The Claim Administrator employs certain "Claim Administration Vendors," (Vendors), as allowed by the Settlement Administrator. These Vendors are recognized accounting firms or companies with significant experience is adjusting financial loss

claims. Id.  The Claim Administration Vendors were experienced accounting firms, who had previously been approved by the BP Parties. (Settlement Agreement, Sec. 4.3.5).

The Vendors designated each of ████████████ expenses according to the four classifications: "Fixed," "Variable," "Payroll" or "N/A."  The Vendors then calculated ████████████ Compensation Award based on ████████████ financial data.  The methods of designating expenses and the calculation of Pre-RTP Compensation Awards were applied by these Claim Administration Vendors. (Settlement Agreement, Sec. 4.3.5).  The Vendors calculated ████████████ Pre-RTP Compensation Amount to be $446,270.09.  (Doc. ID 11499025).  The Claim Administrator accepted this calculation. Id. ████████████ agrees with the Claim Administrator's determination and believes that expenses, including payroll, have been correctly entered as "Fixed," "Variable," "Payroll" or "N/A." ████████████ recognizes that the BP Parties have alleged that "the Settlement Program erred in its application of the Business Economic Loss Framework" and that "the Settlement Program erred in its treatment of certain revenue and expense items." (Doc. ID 11886464 at 1). ████████████ recognizes that the BP Parties have further alleged that "there are issues with the reconciliation of financial data," "the determination should be revised to exclude any revenue generated by out of zone facilities" and "there are significant inconsistencies and anomalies in the financial data," "there are a number of questions and issues regarding trends and financial data that impact the calculation" and "it does not appear that claimant incurred in whole, or in part, a compensable loss under the

Settlement Agreement or is otherwise entitled to compensation." (Doc. ID 11886464 at 1). Without the exact details of the BP Parties dispute, it is difficult to evaluate the merits of these arguments and therefore ██████████ reserves the right to further respond on these issues.

### B. The Appropriate Bench Mark Compensation Periods Were Used For Step 1 and Step 2 Compensation

As shown in the Claim Administrator's Calculations, the Benchmark Compensation Period of 2008 and 2009 was selected as the optimum compensation period. Additionally, the applicable Step 1 Period of June 2010 to November 2010 and Step 2 Compensation Period of July 2010 to December 2010 were selected as the periods during the Benchmark Period which allowed the greatest benefit to the Claimant. The resulting Step 1 Compensation was determined to be $412,598.38, and the Step 2 Compensation was calculated as $33,671.71. (Doc. ID 11499025 at 1). This was in keeping with the provisions of the Settlement Agreement, which directs that the method used should produce the "greatest" award allowed by the financial data – not a lesser award. See, Settlement Agreement at Paragraph 4.3.8, p. 19. The approach used by the Claim Administrator was the same used many hundreds, if not thousands, of times for other economic loss claimants. Any misgivings by the BP Parties' are inappropriate at this stage – the Settlement has been reached and its terms should be applied to grant Claimants, such as ██████████, the full benefits of its provisions.

### C. The Appropriate RTP Factor of 0.25 Was Applied by The Claims Administrator

██████████████ is a Non-Tourism and Non-Seafood Business located in Zone D.  The Compensation and RTP Guidelines set out in the Settlement Agreement require that the appropriate RTP Factor to be applied to ████████████ Compensation Amount is 0.25. (Doc. 6430-10; 6430-33 at 3).  The Claim Administrator appropriately applied this RTP factor to ██████████ Compensation amount.

### D.     The Amount of Accounting Reimbursement Was Properly Determined

Pursuant to the Claimant Accounting Support guidelines of the Settlement Agreement, ███████████ is allowed to retain reimbursable accounting support to assist in the calculation of the claim within certain guidelines stated by the Settlement Agreement. (Doc. 6430-1 at 27-31).   For Business Economic Loss Claimants the maximum amount of reimbursement is 2% of the total Economic Compensation Amount not to exceed $50,000. (Doc. 6430-1 at 30). ████████████ is seeking an Accounting Reimbursement of only $2,410.00 and has appropriately provided the applicable sworn statements and itemized billing. (Doc. ID 5868147, 5868112, 7419271). The amount determined by the Claim Administrator was $2,410.00. (Doc. ID 11499025 at 9).  There was no calculation error.  This modest compensation should be affirmed.

## CONCLUSION

█████████████ requests that the Appeal Panelist rule that the Claimant complied with the terms of the Settlement Agreement and that the Compensation Amount of $446,270.09 and the RTP Multiplier of 0.25 be upheld.  Such a result is in keeping with the terms, methods and formulae established by the Settlement Agreement, the

Court's Order of March 5, 2013, and the Claims Administrator's Policy Decision of January 15, 2013. To follow the path urged by the BP Parties is to ignore the plain language of the Agreement and to actually add terms not found in its pages. With the BP Parties' endorsement and consent, the Claim Administrator was charged with testing Claimant's eligibility and, if eligible, with calculating Claimant's Award. The BP Parties may now wish to apply a different method. However, if the methods applied by the Claim Administrator are valid – and they are – it is immaterial that a different method would produce a result more to the BP Parties' liking. The duty of the Claim Administrator and, with respect, the duty of the Appeal Panelist is to examine ██████ ██████████ claim so as to reach the greatest Compensation Award allowable under the Settlement Agreement. The Compensation Award of $446,270.09 with a RTP Multiplier of 0.25 is sound, appropriate and meets the mandate of the Settlement Agreement. It should be affirmed.

s/E. J. Saad_____
E. J. Saad

s/Matthew Andrews_____
Matthew Andrews
Attorneys for Appellee/Respondent,
██████████████, LLC

OF COUNSEL:

E. J. SAAD LAW FIRM
6207 Cottage Hill Road, Suite G
Mobile, Alabama  36609
Telephone (251) 660-0888
Fax:  (251) 660-0777
ejsaad@ejsaadlaw.com
mandrews@ejsaadlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Brief has been served on the following named persons by electronic filing on this 27th day of August, 2013:

Richard C. Godfrey, Esq.
Kirkland & Ellis, LLP
300 North LaSalle Blvd.
Chicago, Illinois 60654

R. Keith Jarrett, Esq.
Liskow & Lewis
Suite 500
One Shell Square
701 Poydras Street
New Orleans, Louisiana 70113

 /s/ Matthew Andrews
Matthew I. D. Andrews

# Appendix A

49934681
Mar 05 2013
04:27PM
E-SERVICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| In re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
|---|---|---|
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION "J"** |
| | * | |
| **This Document Relates To:** | * | **JUDGE BARBIER** |
| **No. 12-970** | * | |
| | * | **MAGISTRATE SHUSHAN** |

### Review of Issue from Panel (Matching of Revenue and Expenses)

Before the Court is a motion by BP, asking the Court to review and reverse the Claims

Administrator's January 15, 2013 policy decision interpreting certain portions of the Economic

Settlement Agreement.[1]

Accordingly, the Court has re-visited the issue of whether the Claims Administrator has

correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it

applies to the calculation of "Variable Profit" for Business Economic Loss Claims.

After fully reviewing the additional materials submitted by the parties and the relevant

portions of the Settlement Agreement, the Court affirms the Claims Administrator's interpretation

as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims

Administration.

Nowhere does the Agreement state or indicate that revenue and expenses must be "matched"

or revenues "smoothed," nor does it state that one should inquire into when revenue was "earned."

---

[1]Following the vacation of the Court's prior ruling in an email dated January 30, 2013, the parties have made further submissions to the Court and have met with Dan Balhoff, court appointed neutral, both privately and jointly. Mr. Balhoff also had the opportunity to meet with the Claims Administrator, Pat Juneau, and representatives of his professional accounting staff. The Court met with Mr. Balhoff on February 19, 2013 and received a report from him regarding his efforts. Mr. Balhoff reported that there is no likelihood of a negotiated resolution of the dispute. The fees of Mr. Balhoff for his participation in attempting to resolve this dispute shall be paid by BP as part of the cost of claims administration.

Rather, the provisions of Exhibit 4C and 4A, when read together, support the Claims Administrator's

interpretation.

For example, Step 1 of the of Exhibit 4C's Compensation Framework states:

Step 1 of the compensation calculation is determined as the difference in Variable
Profit between the 2010 Compensation Period selected by the claimant and the
Variable Profit over the *comparable* months of the Benchmark period.

Exhibit 4C p. 3 (emphasis added); *see also id.* at 1 ("**Step 1** – Compensates claimants for any

reduction in profit between the 2010 Compensation Period selected by the claimant and the

*comparable* months of the Benchmark Period. Step 1 compensation reflects the reduction in

Variable Profit (which reflects claimant's revenue less its variable costs) over this period."

(emphasis added)). The meaning of "comparable" is illustrated by the examples provided in Exhibit

4C:

Scenario 1:
1) Claimant selected the months of May-July 2010 for the purpose of determining
causation, and the claimant, using these months, meets the causation test for the
Benchmark period years of 2009, 2008-2009 and 2007-2009;
2) In determining Compensation, Claimant would be allowed to select the months
of August through November 2010 *as compared to the months* of August through
November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years –
whichever provides the highest compensation.

Scenario 2:
1) Claimant selected the months of October – December 2010 for the purpose of
determining causation and the claimant, using these months, meets the causation test
for the Benchmark period years of 2009, 2008-2009;
2) In determining compensation, Claimant could select the months of
May-September 2010 *as compared to the months* of May-September in either 2009
or 2008-2009 – whichever provides the highest compensation.

Scenario 3:
1) Claimant selected the months of June – August 2010 for the purpose of
determining causation and the claimant, using these months, meets the causation test
for the Benchmark period year of 2009. In addition, Claimant selected the months
of August – October 2010 for the purpose of determining causation, and the

2

claimant, using these months, meets the causation test for the Benchmark period
years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December
2010 *as compared to the months* of May-December in either 2009 or 2007-2009 –
whichever provides the highest compensation.

Exhibit 4C, Addendum. These examples make clear that the same months of the Compensation

Period are to be compared with the months in the Benchmark period; not, as BP urges, that the

Claims Administrator's accountants should seek out months where the claimant engaged in

comparable activity. Notably, this is the exact interpretation BP advocated while the parties

negotiated the Settlement Agreement:

> The word "comparable" and phrase "comparable months of" is used throughout the
> document in the context of comparing the months selected by the Claimant in 2010
> to compare against the *same months* in the Benchmark Period.

E-mail from Richard Godfrey to Joe Rice and Calvin Fayard (Feb. 17, 2012), Ex. 3 to PSC

Submission (emphasis added).

The heart of this dispute, however, appears to center on the word "corresponding" as it is

used in the calculation of "Variable Profit" (which, in turn, is used in Step 1 of the Compensation

Framework):

> Variable Profit: This is calculated for both the Benchmark Period and the
> Compensation Period as follows:
>
> 1. Sum the monthly revenue over the period.
> 2. Subtract the *corresponding* variable expenses from revenue *over the same
> time period*. . . .

Exhibit 4C at 2 (emphasis added). The question is whether variable expenses must correspond to

the revenue those expenses produced, as BP contends, or whether variable expenses must correspond

to "the same time period," as Class Counsel contends. BP claims that Class Counsel's interpretation

ignores "corresponding;" Class Counsel claims that BP's interpretation ignores "the same time

3

period."

The Court adopts Class Counsel's interpretation as it is most in line with the rest of the

Settlement Agreement. For example, the documentation provisions contained within Exhibit 4A

make it clear that the Program's analysis is to be based on revenue and expenses during the relevant

periods chosen by the claimant, as reflected in historical business records. Specifically, the

Framework requires:

> Monthly and annual profit and loss statements (which identify individual expense
> line items and revenue categories), or alternate source documents *establishing
> monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if
> applicable, 2011.*

Exhibit 4A ¶ 4 (emphasis added, footnotes omitted). If expenses had to be "matched" to revenues,

then the Settlement Program would potentially need to consider financials that pre-date the

Benchmark Period. Likewise, Exhibit 4A does not require that accounting occur on an "accrual"

basis, as opposed to a "cash" basis.[2] Similarly, Exhibit 4C's examples quoted above reflect that the

Framework is based on the expenses and revenues that were recorded in the Claimant-selected

months, not expenses and revenues that occurred outside these months. Furthermore, although a

claimant may select the Benchmark and Compensation Periods, his choice is subject to certain

restrictions. Notably, the Benchmark and Compensation Periods must be a minimum of three

consecutive months. This demonstrates that the parties anticipated that too short a snapshot could

create "anomalies," and the three-month minimum was the agreed-upon method for controlling for

---

[2] On a related note, Exhibit 4A ¶¶ 5, 6 does require certain additional documents for certain types of businesses and for certain types of causation tests. However, Exhibit 4A does not require extra documents or a specific type of accounting for the businesses that are the subject of the instant dispute. Similarly, while the Settlement Agreement permits the Claims Administrator to exercise his discretion to request *source* documents for profit and loss statements; it appears that this is to ensure that the statements are accurate and consistent, not that they use one accounting method over another. *See* Exhibit 4A ¶ 4 ("If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.").

4

such anomalies. *See* Fishkind Decl. ¶ 87;[3] Henley Decl. ¶ 30 (submitted with BP's motion for final approval).

With respect to BP's argument that this interpretation of the Settlement Agreement can create absurd results, BP's declarant acknowledges that class settlement payments do not always perfectly match economic losses in every instance. Polinsky Declaration, p.5 n.8, Ex. 9 to BP's submission. BP's counsel similarly explained that "false positives" are an "inevitable concomitant of an objective quantitative, data-based test." Letter from Mark Holstein to Patrick Juneau (Sept. 28, 2012), p. 3, Ex. 12 to PSC's Submission.

And, as mentioned above, the parties agreed to give Claimants flexibility in choosing the most favorable Compensation and Benchmark Periods. Indeed, the Settlement Agreement provides that if a Claimant fails to select the period that generates the greatest recovery, the Program will choose that period for him. Objective formulas, the possibility of "false positives," and giving claimants flexibility to choose the most favorable time periods are all consequences BP accepted when it decided to buy peace through a global, class-wide resolution. In light of this, to the extent that the Claims Administrator's interpretation produces "false positives" or, as BP claims, "absurd" results, it appears that the Settlement Agreement anticipates that such results would sometimes occur.

The overarching theme of the Settlement is a transparent, uniform application of an objective quantitative data-based test which can be fairly and efficiently administered by the Claims Administrator. Notably, the Settlement Agreement itself defines those businesses that lost profits,

---

[3] "[T]he requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event."

5

income, and/or earnings "as a result of" the Spill as those businesses that meet the objective causation requirements set forth in Exhibit 4B. Once the Settlement's causation formula is met, then all losses calculated under Exhibit 4C are presumed to be attributable to the oil spill. BP's interpretation injects a subjective notion of alternative causation and a degree of complexity that are contrary to the Settlement's terms.

New Orleans, Louisiana, this 5th day of March, 2013.

United States District Judge

6

# Appendix B

DEEPWATER-CJB-DPC Document 8913-2   Filed 03/17/13   Page 27 of 28
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## MEMORANDUM

| | |
|---|---|
| TO: | Class Counsel |
| | BP |
| FROM: | Patrick A. Juneau, Claims Administrator |
| DATE: | January 15, 2013 |
| RE: | Announcement of Policy Decisions Regarding Claims Administration |

Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In accordance with these provisions, the Claims Administrator has adopted the following policies affecting the administration of claims under the Settlement Agreement. These polices will be the subject of the 1/16/13 session of the Claims Administration Panel and are not to be made public until after those proceedings have been concluded.

### 1. *Business Economic Loss Claims: Calculation of Variable Profit.*

Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation.

That methodology is as follows:

(1) Sum the monthly revenue over the period.

(2) Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include:

(a) Variable Costs as identified in Attachment A.

418993

CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

      (b) Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.

      (c) Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

    **2.** *Business Economic Loss Claims: Timing of Revenues for Purposes of Causation.*

Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

418993

Appendix C

## Total Claims Receiving Notices

Updated: November 7, 2012





## Total Claims Submitted
Updated: November 7, 2012





## Dollar Amount of Payable Notices

Updated: November 7, 2012



DEEPWATER HORIZON
CLAIMS CENTER

## Total Awards Processed
### As of 11/6/12

| | | |
|---|---|---|
| Payments Made Through The Transition Process | $ | 405,040,339 |
| DWH Payment Notices Issued | $ | 952,671,136 |
| **Economic Settlement Awards to Date** | **$** | **1,357,711,475** |



Updated: November 7, 2012

## Acceptance Rate
### As of 11/6/12

# 95.0%

*Acceptance rate is calculated using the total amount of acceptances divided by the total responses.

## Individual Economic Loss Incomplete and Denial Reasons

Updated: November 7, 2012





## Business Economic Loss Incomplete and Denial Reasons

Updated: November 7, 2012





## Largest Subset of Opt Outs



Updated: November 7, 2012

| | |
|---|---|
| Opt Out Submissions | 10,765 |
| Less Opt Outs Signed by Attorney | 7,928 |
| Less Opt Outs Not Signed | 28 |
| Signed by Clients | 2,809 |
| Less GCCF Releases | 110 |
| Less DWH Releases (Signed by Client) | 1 |
| Less Duplicate Tax Identification Numbers | 110 |
| **Total Potential Opt Outs** | **2,588** |



Appendix D

# All Economic Loss Zones



028315

2