EXHIBIT 20

BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 38603

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of its Initial Proposal with regard to the appeal of Claim No. 38603 (Claimant ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.). Claimant is a trucking company in Eight Mile, Alabama. The Settlement Program awarded the Claimant $130,543.32 in pre-RTP lost profits and a total award of $165,790.02. BP files this appeal because the Settlement Program misapplied the Settlement Agreement's Business Economic Loss Framework ("BEL Framework") in two respects: (i) it misclassified Claimant's expenses; and (ii) it failed to subtract from revenue corresponding variable expenses incurred in generating that revenue.[1]

Because it is not possible based on the existing record evidence to perform an accurate calculation of what losses, if any, Claimant has incurred that are compensable pursuant to the terms of the Settlement Agreement, BP recommends that this claim be remanded to the Settlement Program with instructions to obtain accurate data from the Claimant and to perform a proper calculation of compensation. If, however, it is determined that a remand is not appropriate in this situation, BP submits an Initial Proposal Compensation Amount of $0.

EXPLANATION OF BP'S POSITION

I.  The Settlement Program Misclassified Claimant's Expenses and Overstated Claimant's Compensation Amount

The Settlement Agreement's Business Economic Loss framework treats different types of costs differently in its calculation of a Claimant's Variable Profit. *See* Settlement Agreement, Ex. 4C. Therefore, a proper classification of a claimant's expenses as either a variable or fixed

---

[1] The first issue is not addressed by the Court's prior Orders. The second issue is governed by the Court's prior Orders and is appealed only for purposes of preserving further rights of appeal. BP refers the Panel to the Court's prior Orders.

1

expense is necessary for an accurate calculation of a claimant's Variable Profit and Compensation Amount.

Variable expenses are "those that change in relation to the level of sales by a business." *Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.*, 650 So. 2d 801, 803 (La. Ct. App. 1995). Fixed expenses, on the other hand, "'are those costs that the business must expend regardless of the sales level. For example, something like rent.'" *Id.* "It has been said that fixed costs are those which 'continue if the firm is temporarily shut down, producing nothing at all.'" *Id.* The Settlement Agreement adopts this same approach, and classifies expenses as fixed or variable according to Exhibits 4C and 4D. *See* Settlement Agreement, Exs. 4C, 4D.

Courts have routinely found that the costs tied directly to output/services are variable costs. As the United States Court of Appeals for the Fifth Circuit has explained: "[S]alaried labor costs, rent or depreciation on real estate and certain capital expenses are considered fixed. But inputs like hourly labor, the cost of materials, transport, and electrical consumption at a plant will vary." *Stearns Airport Equip. Co. v. FMC Corp.*, 1770 F.3d 518, 532 (5th Cir. 1999).

A.   The Settlement Program Misclassified Claimant's 2010 Contributions Expense

The Settlement Program incorrectly classified Claimant's "Contributions" expenses as wholly variable in 2010, despite the fact that the record evidence suggests that $5,000 of these expenses are a fixed cost. *See* CSSP Calculation Spreadsheet at 8 (Doc. ID 11276714). The Settlement Program inquired into a $7,000 spike in Claimant's contributions in July 2010. Claimant submitted a detail of its "Contributions" in July 2010, which included a $5,000 expense for "Big Horn Hunting Club Dues." *See* General Ledger Detail (July 2010), attached hereto as Exhibit 1. These costs, therefore, are a fixed cost for "Dues and Subscriptions" according to Exhibit 4D, and not a variable contribution expense. Alternatively, Claimant's data suggests that

2

this $5,000 expense may be a benefit for Claimant's owners or officers which is a fixed expense under Exhibit 4C, as it is unclear why a trucking company would join a hunting club. When this $5,000 expense is correctly classified as fixed, Claimant's Compensation Amount is reduced by $5,000 ($6,250 post-RTP).

  B. *The Settlement Program Failed to Determine the Nature of Claimant's Substantial "Miscellaneous" Expenses*

Additionally, the Settlement Program classified Claimant's significant "Miscellaneous" costs as fixed, despite the fact the record evidence suggests that it contains variable expenses. These were a significant annual expense about which the Settlement Program should have obtained additional data. *See* Settlement Agreement, Ex. 4A ("The Claims Administrator may, in his discretion, request source documents for profit and loss statements."). For example, Claimant recorded $76,222.88 in these unnamed costs in 2008, including $62,328.85 during its 2008 Benchmark Period (May to November). *See* CSSP Calculation Spreadsheet at 6. Moreover, Claimant's financial data suggests that these miscellaneous costs may include variable expenses. Claimant's miscellaneous costs decreased each year from 2008 to 2010, as Claimant's revenue similarly decreased over the same period. *Id*. at 6-8. On remand, therefore, the Settlement Program should obtain additional detail about these "miscellaneous" expenses and the degree to which they include variable costs.

II. The Settlement Program Erred in its Application of the Settlement Agreement's Business Economic Loss Framework

  A. *The Settlement Agreement's Business Economic Loss Framework*

The BEL Framework provides negotiated methodologies for evaluating (1) whether any purported losses were caused by the Spill and (2) if so, the amount of the losses. The methodologies for evaluating causation and compensation both involve the comparison of

3

claimant's performance before and after the Spill on a monthly basis and thus require the accurate and consistent reporting of pre-Spill and post-Spill monthly performance data.

To determine whether a claimant in Zone D, such as this Claimant, established causation, one test which the Settlement Program applies is the "V-Shaped Revenue Pattern" test set forth in Exhibit 4B, Section III.A.  In order to pass this test, a Claimant must establish:

- "a decline of an aggregate of 15% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant; and

- An increase of an aggregate of 10% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010."

Settlement Agreement, Ex. 4B, Sec. III.A.  Because the V-test turns on changes in monthly revenue over time, it is essential that the financial data used as an input for the test properly measure revenue generated during the relevant months.  Misapplication of revenue, including failure to attribute revenue to the monthly period(s) in which the revenue was earned, would render the test meaningless.

If a claimant passes one of the applicable causation tests, the Settlement Program then calculates whether the claimant incurred any loss, which is defined as a reduction in Variable Profit, and, if so, the appropriate amount of compensation.  Compensation is measured by determining the amount of decrease in the claimant's Variable Profit in "comparable" months before and after the Spill.  The Settlement Agreement instructs that Variable Profits are to be calculated as follows:

1. Sum the monthly revenue over the period.

2. Subtract the *corresponding* variable expenses from revenue over the same time period. Settlement Agreement, Ex. 4C, p.2 (emphasis added). The use of Variable Profit to measure the compensation amount puts a premium on determining in which months revenue was earned and subtracting the corresponding variable expenses incurred in generating the revenue. If the data entered into the methodology does not properly subtract variable expenses from revenue, it is impossible to accurately measure Variable Profit.

The BEL Framework documentation requirements underscore that: (1) the relevant measurement unit is the month; (2) P&Ls must therefore be accurate on a monthly basis; and (3) the accuracy of the monthly P&Ls is to be verified by reference to annual data and/or source materials. Specifically, Exhibit 4A, Section 4 requires "*Monthly* and annual profit and loss statements" or "alternate source documents establishing *monthly* revenues and expenses for the claimed Benchmark Period." Settlement Agreement, Ex. 4A, Sec. 4 (emphasis added).

      B.     *The Settlement Program Did Not Subtract Corresponding Variable Expenses From The Revenue Generated By The Expenses, As Required*

The Settlement Program also failed, as required by the BEL Framework, to subtract from revenue the corresponding variable expenses incurred to generate that revenue. The Settlement Program's error is demonstrated by fluctuations in Claimant's variable profit percentage during its Benchmark Period (average of May to November 2008/2009). Variable profit percentage measures the portion of each sale that is profit to the claimant, essentially profit margin. Where variable profit percentage is high, that means that the revenue generated by a claimant far exceeds the cost of goods incurred in generating the revenue. On the other hand, where the variable profit percentage is negative, that means that cost of goods, before any rent, insurance, or other administrative costs were subtracted, already exceed revenue.

5

In most businesses where revenues accurately correspond with the cost of goods used to generate those sales, variable profit percentage will fluctuate either minimally or in a predictable pattern over time. Where businesses are selling the same or similar products or services year to year and month to month, some seasonal or general trends may exist, but those operating patterns will be comparable from year to year. While profitability may fluctuate nominally from month to month, repeated and irregular spikes over the course of the year are a red flag for accountants that the Variable Profit calculation is not producing accurate results.

Claimant's financial data raise this red flag. For example, Claimant was profitable during its Benchmark years (2008-2009) and had an average variable profit percentage of 41%. *See* CSSP Calculation Spreadsheet at 6-7. During this period, its variable profit percentage fluctuated significantly between 65% in November, within Claimant's Benchmark Period, and *negative* 61% in January, outside of Claimant's Benchmark Period. *Id*. Moreover, Claimant's Benchmark Period variable profit percentage (56%) was greater than its average variable percentage for the years as a whole (41%). This indicates that the Settlement Program recorded expenses outside of Claimant's Benchmark Period that were used to generate revenue within the period, thereby overstating Claimant's pre-Spill Variable Profit.

The Settlement Program's failure to align Claimant's expenses with its revenue is contrary to the terms of the Settlement Agreement. According to Exhibit 4C of the Settlement Agreement, the Settlement Program must "subtract [from monthly revenue] the corresponding variable expenses from revenue over the same time." The reason for this requirement is straightforward. In order to calculate Variable Profit, it is necessary to determine not just what revenue was earned but what it cost to generate that revenue. In this case, the financial data submitted by Claimant did not perform the required calculation, and the Settlement Program did

6

not do so either, as required by the Settlement Agreement. As a result, revenue reported in the financial data is unhinged from the corresponding costs. This makes it impossible for the Settlement Program to accurately calculate Variable Profit and thus to properly implement the BEL Framework.

***

Because it is not possible based on the existing record evidence to perform an accurate calculation of what losses, if any, Claimant has incurred that are compensable pursuant to the terms of the Settlement Agreement, BP recommends that this claim be remanded to the Settlement Program with instructions to obtain accurate data from the Claimant and to perform a proper calculation of compensation. If, however, it is determined that a remand is not appropriate in this situation, BP submits an Initial Proposal Compensation Amount of $0.

# Exhibit 1

Account Inquiry
6/5/2013
Jul, 2010 to Jul, 2010

Page 1
6/5/13 10:39
L2 10.0.130401

| Account Number | Description | Status | Period Balance | YTD Balance |
|---|---|---|---|---|
| 8070 | Contributions | Active | 7,000.00 | 8,750.00 |

| Date | Reference | Debit | Credit | Balance |
|---|---|---|---|---|
| 7/29/10 | A/P New Invoices | | | |
| 7/29/10 | BIG HORN HUNTING CLUB DUES | 5,000.00 | | 5,000.00 |
| | | 5,000.00 | | |
| 7/30/10 | A/P New Invoices | | | |
| 7/30/10 | SOPHIA HOLMES CONTRIBUTIONS | 2,000.00 | | 7,000.00 |
| | | 2,000.00 | | |