EXHIBIT 48

BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 39522

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of its Initial Proposal with regard to the appeal of Claim No. 39522 (███████████████████).

Claimant in this appeal is a flooring wholesaler and installation business located in Mobile, Alabama (Zone D).  The Settlement Program awarded Claimant $34,074.91 in pre-RTP lost profit ($43,533.64 post-RTP) despite the fact that Claimant recorded a decline in revenue for every year from 2007 to 2011.  BP files this appeal because the Settlement Program erred in its calculation of the Claimant's Award Amount by misclassifying certain expenses,[1] and by failing to subtract variable expenses from the corresponding revenue they generated, as required by the Settlement Agreement.[2]

In light of the errors by the Settlement Program, and without waiver of any arguments or positions, BP respectfully submits an Initial Proposal Compensation Amount of $9,500 pre-RTP.  In the alternative, the Panel should remand for additional information and an accurate calculation.

EXPLANATION OF BP'S POSITION

I.  The Settlement Program Misclassified Certain Expenses

The Settlement Program erroneously treated the line item "OH-Payroll Taxes" as a variable expense when it should have been classified as a payroll expense.  Exhibit 4C provides that payroll expenses include the following: "(a) Salaries & wages; (b) *Payroll taxes* (including

---

[1] This issue has not been addressed by any of the Court's prior Orders.

[2] This issue is governed by the Court's prior Orders and is appealed solely to preserve rights of further appeal.  BP respectfully refers the Panel to the Court's prior Orders.

1

FICA, workers compensation insurance, unemployment tax); (c) Employer costs for employee benefits." Settlement Agreement, Ex. 4C, at 3 (emphasis added) (specifying how to calculate payroll expenses). Thus, under the express terms of the Settlement Agreement, "OH-Payroll Taxes" must be classified as a payroll expense. The failure to properly classify t OH-Payroll Taxes" overcompensated Claimant.

II.     The Settlement Program Misapplied the Business Economic Loss Framework

    A.     The Settlement Agreement's Business Economic Loss Framework

The BEL Framework provides negotiated methodologies for evaluating (1) whether any purported losses were caused by the Deepwater Horizon Spill and (2) if so, the amount of the losses. The methodologies for evaluating causation and compensation both involve the comparison of claimant's performance before and after the Spill on a monthly basis and thus require the accurate and consistent reporting of pre-Spill and post-Spill monthly performance data from both an economic and financial perspective.

To determine whether a claimant in Zone D, such as this Claimant, established causation, one test which the Settlement Program applies is the "V-Shaped Revenue Pattern" test set forth in Exhibit 4B, Section III.A. In order to pass this test, a Claimant must establish:

- "a decline of an aggregate of 15% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant; and

- An increase of an aggregate of 10% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010."

Settlement Agreement, Ex. 4B, Sec. III.A. Because the V-test turns on changes in monthly revenue over time, it is essential that the financial data used as an input for the test properly

2

measure revenue generated during the relevant months.  Misapplication of revenue, including failure to attribute revenue to the months in which the revenue was earned, would render the test meaningless.  Other causation tests likewise depend on the proper application of revenue.

If a claimant passes one of the applicable causation tests, the Settlement Program then calculates whether the claimant incurred any loss, which is defined as a reduction in monthly variable profit, and, if so, the appropriate amount of compensation.  Compensation is measured by determining the amount of decrease in the claimant's variable profits in defined months before and after the Spill.  The Settlement Agreement instructs that variable profits are to be calculated as follows:

1. Sum the monthly revenue over the period.

2. Subtract the *corresponding* variable expenses from revenue over the same time period.

Settlement Agreement, Ex. 4C, p.2 (emphasis added).  The use of variable profit to measure the compensation amount puts a premium on determining in which months revenue was earned and subtracting the variable expenses incurred in generating the revenue.  If the data entered into the methodology does not assign revenue to the correct months and/or does not properly subtract variable costs, it is impossible to accurately measure variable profit.

The BEL Framework documentation requirements underscore that:  (1) the relevant measurement unit is the month; (2) P&Ls must therefore be accurate on a monthly basis; and (3) the accuracy of the monthly P&Ls is to be verified by reference to annual data and/or source materials.  Specifically, Exhibit 4A, Section 4 requires "*Monthly* and annual profit and loss statements" or "alternate source documents establishing *monthly* revenues and expenses for the claimed Benchmark Period."  Settlement Agreement, Ex. 4A, Sec. 4 (emphasis added).  That same language makes clear that annual P&L and tax information is required in order to permit

3

the Settlement Program to confirm the accuracy of the monthly P&L data and to identify apparent anomalies in that data. If such anomalies are identified, the Settlement Program is to exercise its discretion to "request source documents for profit and loss statements" so that it may resolve such anomalies and be assured that it is using accurate monthly P&L data. *Id.*

    B.    <u>Basic Principles of Subtracting Variable Expenses from the Revenue They Generated</u>

A simple example illustrates the importance of (i) measuring revenue when earned and (ii) subtracting corresponding from its variable expenses incurred in generating the revenue, as well as the distortions that occur when corresponding variable expenses are not properly determined and subtracted.

The incurrence of costs and receipt of payments on construction projects are often uneven. Materials inventory needs to be purchased in advance, and payment terms are often dictated either by the contract or by the specific tendencies of the customer.

For example, consider a construction company that purchases $40 in materials in June, performs half of the job in July and half in August, incurring $20 dollars in labor costs in each month, and then gets paid $100 for the job in September. Without proper accounting, the monthly financial statements would reflect a loss of $40 in June, a loss of $20 in July, a loss of $20 in August, and a gain of $100 in September:

| **Month:** | **June** | **July** | **August** | **September** |
|---|---|---|---|---|
| Revenue | 0 | 0 | 0 | 100 |
| Materials Cost | -40 | 0 | 0 | 0 |
| Labor Expense | 0 | -20 | -20 | 0 |
| Variable Profit | -40 | -20 | -20 | 100 |

Such accounting would be an inaccurate and misleading view of a company's economic and financial performance. The project generated $20 in profit for the company. Yet, failure to

4

properly align revenue and costs generates the misleading view that there were three months of loss followed by a month of very large profit.

The Settlement Agreement's variable profit methodology, which seeks to measure changes in monthly economic performance for defined pre-and-post-Spill periods, requires variable expenses incurred to generate revenue to be subtracted from such revenue. Settlement Agreement, Ex. 4C, p.2. Under no theory of economics would one view a $20 profit ($100 Revenue - $40 Materials Costs – $40 Labor Expense) as three months of loss totaling $80 followed by a month of profit totaling $100. Rather, Exhibit 4C to the Settlement Agreement and standard principles of economics require that the costs be associated with and recognized at the same time as the revenue. That is what the Settlement Agreement mandates when it instructs to first sum the revenue for the period at issue and then to "[s]ubtract the *corresponding* variable expenses from revenue over the same time period." Settlement Agreement, Ex. 4C, p.2 (emphasis added). Thus, returning to the above hypothetical, pursuant to the express terms of the Settlement Agreement, the hypothetical construction company realizes $10 of variable profit in July ($50 revenue minus $20 in material cost and $20 in labor expenses), and $10 of variable profit in August ($50 revenue minus $20 in material cost and $20 in labor expenses).

Use of this standard, required methodology avoids the distortions that can result from the vagaries and variances of timing regarding when inventory is acquired, work performed, and payments made pursuant to the terms of different contracts. It provides a uniform methodology that accurately reflects the business' economic condition and performance on a monthly basis.

    C.    <u>The Settlement Program Did Not Subtract Corresponding Variable Expenses From Revenue, as Required by the Settlement Agreement</u>

In addition, the Settlement Program did not subtract from revenue the "corresponding variable expenses" incurred in generating the revenue. This is expressly required by the

5

Business Economic Loss framework. Settlement Agreement, Ex. 4C, p2. Claimant reported uneven amounts of revenue and costs from the Benchmark Years to 2010. For example, fluctuations in Claimant's variable profit percentage confirm that corresponding variable expenses were not subtracted from revenue as required. Variable profit percentage measures the portion of each sale that is profit to the Claimant. Where variable profit percentage is high, that means that the revenue generated by a claimant far exceeds the expenses incurred in generating the revenue. On the other hand, where the variable profit percentage is negative, that means that expenses, before any rent, insurance or other administrative costs were subtracted, already exceed revenue.

In most businesses, where variable expenses are properly subtracted from the sales they generate, variable profit percentage will fluctuate either minimally or in a predictable pattern over time. Where businesses are selling the same or similar products or services year to year and month to month, some seasonal or general trends may exist, but those operating patterns will be comparable from year to year. While profitability may fluctuate nominally from month to month, repeated and irregular "spikes" over the course of the year are a telltale sign for accountants that corresponding expenses are not subtracted from revenue.

Claimant's financial data shows significant fluctuations in variable profit percentage from month to month. For example, in 2010, the percentages ranged from below *negative 200%* to a to a high of 75%. Other years show similar drastic changes. The Benchmark Year 2009 also contains numerous *negative* variable profit percentages (in February, May, June, July, and November. The large variances plus the negative percentages are red flags for the failure to properly subtract variable expenses from corresponding revenue. Thus, the financial data submitted by Claimant, and relied on by the Settlement Program, shows reported revenue

6

unhinged from the corresponding costs.  This makes it impossible to properly implement the BEL framework.

∗ ∗ ∗

In light of the errors by the Settlement Program, and without waiver of any arguments or positions, BP respectfully submits an Initial Proposal Compensation Amount of $9,500 pre-RTP. In the alternative, the Panel should remand for additional information and an accurate calculation.