EXHIBIT 62

BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 35894

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of its Initial Proposal with regard to the appeal of Claim No. 35894 (Claimant ███████).  Claimant is a company selling sand, dirt, and gravel for construction and renovation projects located in Wilmer, Alabama (Zone D).  The Settlement Program awarded the Claimant $93,264.01 in pre-RTP lost profits ($117,747.51 post-RTP).

BP files this appeal because of several errors made by the Settlement Program.  First, the Settlement Program erred in its calculation of the Claimant's Award Amount by misclassifying certain payroll expenses.[1]

Second, the Settlement Program erred in its calculation of Claimant's award by failing to subtract from revenue the variable expenses incurred in generating such revenue.[2]

As a result of these errors, the Settlement Program generated an award amount that is at odds with the directives of the Settlement Agreement and with economic reality.  Because it is not possible based on the existing record evidence to perform an accurate calculation of what losses, if any, Claimant has incurred that are compensable pursuant to the terms of the Settlement Agreement, BP recommends that this claim be remanded to the Settlement Program with instructions to obtain accurate data from the Claimant and to perform a proper calculation.  If, however, it is determined that a remand is not appropriate in this situation, without waiver of any arguments or positions, BP submits an Initial Proposal Compensation Amount of $0.

---

[1] This issue is not addressed by any of the Court's prior Orders.

[2] This issue is governed by the Court's prior Orders and is appealed only for purposes of preserving further rights of appeal. BP refers the Panel to the Court's prior Orders.

<u>EXPLANATION OF BP'S POSITION</u>

I.      <u>The Settlement Program Misclassified Certain Payroll Expenses</u>

The BEL Framework seeks to identify post-Spill declines in economic performance by comparing variable profit -- defined as revenues minus variable expenses -- earned in a defined period before and after the Spill.

Here, the Settlement Program misclassified certain payroll expenses.  Because the Settlement Agreement's Business Economic Loss methodology treats different types of expenses differently, the Settlement Program's classification errors resulted in an overstatement of compensation.  Per Claimant's accountant, Claimant's 2008 Owner/Officer Compensation was overstated due to an error regarding the classification of employee compensation.  *See* Correspondence from Expert (Doc ID # 7687448).  Despite the fact that he was not a shareholder, Michael T. Byrd's compensation was erroneously classified as officer compensation, rather than as "Salaries and Wages," a payroll expense  *See id*.; Settlement Agreement, Ex. 4C at 1.  Additionally, the Settlement Program misclassified Claimant's "Payroll Tax- Officers" expense account as "Overtime Wages- Payroll" rather than as "Owners/Officer Salaries (Fixed)."

The Settlement Agreement provides a specific methodology for allocating between fixed, variable, and "Payroll" expenses.  Settlement Agreement Exs. 4C, 4D.  Therefore, in order to properly apply the Settlement Agreement's payroll methodology and perform an accurate calculation, Claimant's various payroll expenses must be classified properly.  When these errors are corrected, the Claimant's Compensation Amount is reduced by approximately $14,470 pre-RTP (post-RTP $18,087).

II.      The Settlement Program Misapplied the Business Economic Loss Framework

    A.      The Settlement Agreement's Business Economic Loss Framework

The Business Economic Loss ("BEL") Framework provides negotiated methodologies for evaluating (i) whether any purported losses were caused by the Deepwater Horizon Spill and (ii) if so, the amount of the losses.  The methodologies for evaluating causation and compensation both involve the comparison of claimant's performance before and after the Spill on a monthly basis and thus require the accurate and consistent reporting of pre-Spill and post-Spill monthly performance data from both an economic and financial perspective.

To determine whether a claimant in Zone D, such as this Claimant, established causation, one test which the Settlement Program applies is the "V-Shaped Revenue Pattern" test set forth in Exhibit 4B, Section III.A.  In order to pass this test, a Claimant must establish:

- "a decline of an aggregate of 15% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant; and

- an increase of an aggregate of 10% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010."

Settlement Agreement, Ex. 4B, Sec. III.A.  Because the V-test turns on changes in monthly revenue over time, it is essential that the financial data used as an input for the test properly measures revenue generated during the relevant months.  Misapplication of revenue, including failure to attribute revenue to the monthly period(s) in which the revenue was generated, would render the test meaningless.  Other causation tests likewise depend on the proper application of revenue over time.

If a claimant passes one of the applicable causation tests, the Settlement Program then calculates whether the claimant incurred any loss, which is defined as a reduction in monthly variable profit, and, if so, the appropriate amount of compensation.  Compensation is measured by determining the amount of decrease in the claimant's variable profits in defined months before and after the Spill.  The Settlement Agreement instructs that variable profits are to be calculated as follows:

1. Sum the monthly revenue over the period.

2. Subtract the ***corresponding*** variable expenses from revenue over the same time period.

Settlement Agreement, Ex. 4C at 2 (emphasis added).  The use of variable profit to measure the compensation amount puts a premium on determining in which months revenue was earned and subtracting the variable expenses incurred in generating the revenue.  If the data entered into the methodology does not assign revenue to the correct months and/or does not properly subtract variable costs, it is impossible to accurately measure variable profit.

The BEL Framework documentation requirements underscore that: (i) the relevant measurement unit is the month; (ii) P&Ls must therefore be accurate on a monthly basis; and (iii) the accuracy of the monthly P&Ls is to be verified by reference to annual data and/or source materials.  Specifically, Exhibit 4A, Section 4 requires "*Monthly* and annual profit and loss statements" or "alternate source documents establishing *monthly* revenues and expenses for the claimed Benchmark Period."  Settlement Agreement, Ex. 4A, Sec. 4 (emphasis added).  That same language makes clear that annual P&L and tax information is required in order to permit the Settlement Program to confirm the accuracy of the monthly P&L data and to identify apparent anomalies in that data.  If such anomalies are identified, the Settlement Program is to exercise its discretion to "request source documents for profit and loss statements" so that it may

4

resolve such anomalies and be assured that it is using accurate monthly P&L data. *Id*. But the Settlement Program may always "exercise its discretion to request source documents for profit and loss statements" so that it may be assured that it is using accurate monthly P&L data. *Id.*

      B.    Basic Principles of Subtracting Variable Expenses from the Revenue They Generated

A simple example illustrates the importance of (i) measuring revenue when earned and (ii) subtracting variable costs incurred in generating revenue from the revenue, as well as the distortions that occur when proper measuring and subtracting of expenses is not performed.

The incurrence of costs and receipt of payments on sales of sand, dirt, and gravel for construction and renovation projects are often uneven. The expense of obtaining inventory typically occurs before a sale is made. Because the stock inventory is not always sold within the same month as the original purchase, looking at the inventory stock purchases and ultimate receipt of sales revenue separately, without relating them to each other, would provide an incorrect picture of the business's financial performance.

For example, consider the hypothetical in which the company incurs a cost of $1,000 in May to buy an inventory that it intends to sell to construction companies. In June, a portion of the inventory is sold totaling $700. In July, another portion of the inventory is sold totaling $800. A monthly financial statement that simply records "expenses" when cash is paid and "revenue" when cash is received would reflect a loss of $1000 in May, a gain of $700 in June, and a gain of $800 in July:

| Month | May | June | July |
|---|---|---|---|
| Revenue | $0 | $700 | $800 |
| Variable Expenses | $1000 | $0 | $0 |
| **Variable Profit** | $-1000 | $700 | $800 |

Such accounting, which is perhaps acceptable for certain month to month bookkeeping purposes, does not comport with the requirements of the Settlement Agreement. The sale generated $500 in profit for the company ($1,500 Revenue - $1,000 Variable Expenses). Yet, failure to properly align revenue and costs generates the misleading view that there was one month of loss followed by two months of very large profit.

The Settlement Agreement's variable profit methodology, which seeks to measure changes in monthly economic performance for defined pre- and post-Spill periods, requires the variable expenses incurred to generate revenue to be subtracted from such revenue. *See* Settlement Agreement, Ex. 4C, p.2. Thus, it prohibits the economically unrealistic approach used in the above example. Under no theory of economics would one view a $500 profit as one month of loss totaling $1,000 followed by one month of profit totaling $700 and a second month of profit totaling $800. Rather, Exhibit 4C to the Settlement Agreement and standard principles of economics require that the costs be associated with and recognized at the same time as the revenue. That is what the Settlement Agreement mandates when it instructs first to sum revenue for the period at issue and then "[s]ubtract the *corresponding* variable expenses from revenue over the same time period." Settlement Agreement, Ex. 4C, p.2 (emphasis added).

C.    The Settlement Program Did Not Subtract Corresponding Variable Expenses From Revenue as Required by the Settlement Agreement

Here, the Settlement Program did not subtract from revenue the "corresponding variable expenses" incurred in generating the revenue. This is expressly required by the BEL Framework. Settlement Agreement, Ex. 4C at 2. Without subtracting corresponding variable expenses from revenue, it is impossible to calculate variable profit, which is the cornerstone for evaluating compensation under the BEL Framework.

Here, Claimant's financial data does not align revenue and corresponding variable expenses. Despite Claimant's revenue decreasing by 46% in the 9 month Compensation Period (May to December 2010) compared to the Benchmark Period, Claimant's variable expenses only decreased by 2%. *See* Accountant Compensation Calculation Schedules (DWH Settlement – PDF) at 5-7 (Doc ID # 9764820) ("P&Ls"). Additionally, December 2010 shows both negative revenue and extremely high variable expenses for a large purchase of "Gas/Oil/Diesel." *See id.* at 7. Because variable expenses should decrease with decreasing revenue, Claimant's financial data indicates that variable expenses were not subtracted from the revenue they generated, as required by the Settlement Agreement.

Fluctuations in Claimant's variable profit percentage confirm that corresponding variable expenses were not subtracted from revenue as required. Variable profit percentage measures the portion of each sale that is profit to the Claimant. Where variable profit percentage is high, that means that the revenue generated by a claimant far exceeds the expenses incurred in generating the revenue. On the other hand, where the variable profit percentage is negative, that means that expenses, before any rent, insurance or other administrative costs were subtracted, already exceed revenue.

In most businesses, where variable expenses are properly subtracted from the sales they generate, variable profit percentage will fluctuate either minimally or in a predictable pattern over time. Where businesses are selling the same or similar products or services year to year and month to month, some seasonal or general trends may exist, but those operating patterns will be comparable from year to year. While profitability may fluctuate nominally from month to month, repeated and irregular "spikes" over the course of the year are a telltale sign for accountants that corresponding expenses are not subtracted from revenue.

7

Claimant's financial data shows fluctuations in variable profit percentage from month to month, and multiple months with negative variable profit.  Such variances are red flags for the failure to properly subtract variable expenses from corresponding revenue. As a result, whereas 76% of annual variable profit was recorded in the Benchmark Period, only 63% of annual variable profit in 2010 was recorded in the Compensation Period, resulting in an inflated Compensation Award.

Thus, the financial data submitted by Claimant, and relied on by the Settlement Program, shows reported revenue unhinged from the corresponding costs.  This makes it impossible to properly implement the BEL Framework.

***

As a result of the above errors, the Settlement Program generated an Award Amount that is at odds with the directives of the Settlement Agreement and has no basis in economic reality. The current record does not permit an accurate reevaluation because the necessary data is not in the record.  BP suggests that this matter be remanded to the Settlement Program with instructions to obtain accurate data from the Claimant that permits the Settlement Program to input the correct information and reevaluate the claim.  In the event it is determined that a remand is not appropriate in this situation, without waiver of any arguments or positions, BP submits an Initial Proposal Compensation Amount of $0.