EXHIBIT 76

BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 39486

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of its Initial Proposal with regard to the appeal of Claim No. 39486 (Claimant ▇▇▇▇▇▇▇▇▇▇▇▇▇▇). The standard of review for this appeal is *de novo*. See Rules Governing Appeals 21.

Claimant is an electrical construction company located ▇▇▇▇▇▇ (Zone D). The Settlement Program awarded Claimant $143,955.45 in lost profit ($179,944.31 post-RTP). BP appeals this award because the Settlement Program erred in its calculation of Claimant's award in three ways. *First*, the Settlement Program failed to resolve questions regarding the reconciliation of Claimant's tax returns and profit and loss statements ("P&Ls"). *Second*, the Settlement Program misclassified Claimant's "Licenses and Permits" expense.[1] *Third*, the Settlement Program did not measure revenue when earned or subtract from revenue corresponding variable expenses incurred to generate that revenue.[2]

As a result of these errors, the Settlement Program generated an Award Amount inconsistent with the directives of the Settlement Program and with economic reality. As the existing record lacks the evidence to perform an accurate calculation of what losses, if any, Claimant has incurred that are compensable pursuant to the terms of the Settlement Agreement, BP recommends that this claim be remanded to the Settlement Program with instructions to obtain accurate data from the Claimant and to perform a proper calculation. If, however, it is

---

[1] These issues are not addressed by the Court's prior orders.

[2] The third issue is governed by the Court's prior orders and is appealed only for purposes of preserving further rights of appeal. BP refers the Panel to the Court's prior orders.

determined that a remand is not appropriate in this situation, BP submits an Initial Proposed Compensation Amount of $0, as the current record does not support this award.

## EXPLANATION OF BP'S POSITION

I.   *Claimant's P&Ls and Tax Returns Do Not Reconcile.*

Under the Settlement Agreement, Claimants must submit both P&Ls and Tax Returns for the relevant time period. *See* Settlement Agreement, Exhibit 4A at 1. The Settlement Agreement makes clear that both are required in order to permit the Settlement Program to confirm the accuracy of the monthly P&L data and to identify apparent anomalies in that data. If anomalies are identified, the Settlement Agreement provides that the Settlement Program is to exercise its discretion to "request source documents for profit and loss statements" so that it may resolve anomalies and be assured that it is using accurate monthly P&L data. *Id.* Accurate financial information, of course, is necessary to calculate Claimant's award.

Here, there are significant differences between Claimant's P&Ls and tax returns. *See* CSSP Accounting Schedule, attached as Ex. 1 (noting, for example, Claimant's gross receipts and net income are both over 33% higher on Claimant's P&Ls than its tax returns). The Settlement Program asked Claimant to provide a reconciliation for 2008 and 2009; however, these reconciliations raise more questions as they answer. *See* Claimant's Reconciliations, doc. #10019962. For example, Claimant's putative reconciliations are listed in a column entitled "UNIDENTIFIED VARIATIONS." *Id.* at column AB. This supposed reconciliation does nothing other than point out the difference, and the Settlement Program should have inquired further into what precisely explains these variations. Along the same lines, Claimant's reconciliations list adjustment in a row labeled "BOOK AJES." *Id.* at column AC. However,

-2-

these entries are not reflected in the monthly P&Ls used by the Settlement Program.  *Compare Id. to* Financial Data Used by Accountants, doc. #19105856.

Simply put, Claimant's reconciliations are unhelpfully vague, and fail to demonstrate that Claimant's P&Ls accurately reflect its revenue.  Thus, the Settlement Program erred by failing to make further inquiries into the major discrepancies between Claimant's P&Ls and tax returns.

II. *The Settlement Program Misclassified Claimant Several of Claimant's Expenses.*

A. <u>The Settlement Agreement's Fixed/Variable Expense Framework</u>.

The Business Economic Loss ("BEL") Framework seeks to identify post-Spill declines in economic performance by comparing Variable Profit -- defined as revenue minus corresponding variable expenses -- earned in a defined period before and after the Spill.  As part of this calculation, the Settlement Program must determine whether Claimant's expenses are fixed or variable.  Exhibit 4D of the Settlement Agreement guides that determination by listing several dozen general categories of costs as either fixed or variable.  If an expense does not directly fall under a category in Exhibit 4D, the Settlement Program classifies an expense in the way "that best conforms to [the] delineations" reflected in that exhibit.  *See* CSSP Policy #361.

The delineations reflected in Exhibit 4D are firmly grounded in the established understanding of the distinction between fixed and variable expenses.  Variable expenses are "those that change in relation to the level of sales by a business." *Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.*, 650 So. 2d 801, 803 (La. Ct. App. 1995).  For example, "the cost of materials and labor which go directly into production of contract goods are considered variable costs -- they vary with the number of contracts which are performed." *Id.* at 804.  Fixed expenses, on the other hand, "are those costs that the business must expend regardless of the

-3-

sales level. For example, something like rent." *Id.* at 803. "It has been said that fixed costs are those which 'continue if the firm is temporarily shut down, producing nothing at all.'" *Id.*

      B.      <u>The Settlement Program Misclassified Claimant's "Licenses and Permits" Expense</u>.

The Settlement Program misclassified Claimant's "Licenses and Permits" expense as fixed instead of variable. The Settlement Program appears to have mechanically classified this expense as fixed because the account label included the word "licenses," and Exhibit 4D generally categorizes "licenses and taxes" as fixed costs. There is, however, an important difference between "licenses and taxes" contemplated by Exhibit 4D and this particular expense. Exhibit 4D's "Licenses and taxes" refer to fixed fees, like fees paid to a governmental body for professional licensure. These expenses are fixed because they represent the threshold to engage in Claimant's business; regardless of the number of its clients, Claimant would still have to pay for its license that year. Claimant's "license and permits" expense, on the other hand, relates to permits Claimant obtains to work on particular projects; it reflects incremental costs associated with additional work, changing "in relation to the level of sales by a business" as is characteristic of a variable expense. *Morton M. Goldberg*, 650 So. 2d at 803.

Indeed, Claimant's financial submissions reveal that this expense does in fact fluctuate in proportion to Claimant's revenue. For example, even though Claimant recorded significantly different revenue for all five years on record, this expense constantly equaled between 1.27% and 1.88% of Claimant's revenue. *See* Financial Data Used by Accountants, doc. #19105856. BR119 to BV119.

Thus, the Settlement Program's mechanical application of Exhibit 4D without context improperly inflated Claimant's award, requiring remand so that this expense may be properly classified as fixed and so that a proper calculation may be performed.

III.    *The Settlement Program Failed to Assign Revenue to the Months in Which it Was Earned and Subtract Corresponding Variable Expenses.*

    A.    <u>The Settlement Agreement's Business Economic Loss Framework.</u>

The BEL Framework provides negotiated methodologies for evaluating (1) whether any purported losses were caused by the Deepwater Horizon Spill; and (2) if so, the amount of the losses.  The methodologies for evaluating causation and compensation both involve the comparison of Claimant's performance before and after the Spill on a monthly basis and thus require the accurate and consistent reporting of pre-Spill and post-Spill monthly performance data.

If a claimant passes one of the applicable causation tests, the Settlement Program then calculates whether the claimant incurred any loss, which is defined as a reduction in monthly Variable Profit, and, if so, the appropriate amount of compensation.  Compensation is measured by determining the amount of decrease in the claimant's variable profits in defined months before and after the Spill. The Settlement Agreement instructs that Variable Profits are to be calculated as follows:

1. Sum the monthly revenue over the period.
2. Subtract the *corresponding* variable expenses from revenue over the same time period.

Settlement Agreement, Ex. 4C, p.2 (emphasis added).  The use of Variable Profit to measure the compensation amount puts a premium on determining in which months revenue was earned and subtracting the variable expenses incurred in generating the revenue.  If the data entered into the methodology does not assign revenue to the correct months and/or does not properly subtract variable costs, it is impossible to accurately measure Variable Profit.

    B.    <u>Basic Principles of Subtracting Variable Expenses from the Revenue Generated.</u>

-5-

A simple example illustrates the importance of (i) measuring revenue when earned and (ii) subtracting variable costs incurred in generating the revenue, as well as the distortions that occur when revenue is not properly assigned and variable costs are not properly subtracted.

A construction company (such as Claimant, here) may incur many expenses before receiving any associated revenue. For example, the company may need to purchase supplies and incur labor costs months before the associated revenue is received. Similarly, the company may spend several months submitting proposals or courting clients before receiving a contract. Consequently, viewing the company's revenue without relation to the associated expenses provides a distorted picture of its financial performance.

Consider a hypothetical where this company spends $100 dollars in May preparing a bid for a project. In June, the project is awarded to the company, which spends $200 purchasing the necessary supplies. In July and August, the company spends an additional $100 a month on labor. Finally, in September, the company receives a $1,000 payment for the job. For this company, a monthly financial statement that simply records "revenue" when cash is received and "expenses" when cash is paid would reflect losses in each month from May to August, and a $1,000 profit in September.

| Month | May | June | July | Aug. | Sept. |
|---|---|---|---|---|---|
| Revenue | 0 | 0 | 0 | 0 | 1000 |
| Var. Expenses | -100 | -200 | -100 | -100 | 0 |
| Var. Profit | -100 | -200 | -100 | -100 | 1000 |

Such accounting, which may be acceptable for certain month-to-month bookkeeping purposes, does not comport with the requirements of the Settlement Agreement. The company made a profit of $500 from this contract ($1,000 in revenue - $100 bid cost - $200 in supplies - $200 labor). Yet, the failure to properly assign revenue when earned and to subtract variable

-6-

costs from the revenue they generated results in the misleading view that there was one month of very large profit, preceded by four months of loss.

The Settlement Agreement's Variable Profit methodology, which seeks to measure changes in monthly economic performance for defined pre- and post-Spill periods, requires that corresponding variable expenses incurred to generate revenue be subtracted from such revenue, Settlement Agreement, Ex. 4C at 2, and thus prohibits the economically unrealistic approach used in the above example. Under no theory of economics would one view a $500 profit as one month of profit totaling $1,000 preceded by four months of $500 loss. Rather, Exhibit 4C to the Settlement Agreement and standard principles of economics require that revenue be recognized as it is earned and corresponding variable expenses be subtracted from such revenue. That is what the Settlement Agreement mandates when it instructs to first sum revenue for the period at issue and then to "[s]ubtract the *corresponding* variable expenses from revenue over the same time period." *Id.* (emphasis added).

      C.      <u>The Settlement Program Did Not Measure Revenue When Earned as Required by the Settlement Agreement.</u>

Here, the Settlement Program failed to assign revenue to the months when it was earned. Companies such as Claimant frequently perform work in the months preceding the receipt of the associated revenue.

Because Claimant recorded revenue when received, instead of when earned, Claimant's financial statements exhibit revenue spikes in certain months. For example, in June 2008 (in the Benchmark Period), Claimant recorded revenue of $76,922. *See* Financial Data Used by Accountants, doc. #19105856, row 38. In contrast, over the previous five months, Claimant recorded an average of $35,830 a month -- less than half. *Id*. As a construction company, Claimant likely earned a significant portion of the revenue recorded in June 2008 in the previous

months.  However, because Claimant records revenue when received instead of when earned, Claimant's Benchmark Revenue is inflated, artificially increasing Claimant's award.

### D. The Settlement Program Did Not Subtract Corresponding Variable Expenses from the Associated Revenue, as Required by the Settlement Agreement.

Compounding its error, the Settlement Program failed to subtract from revenue the "corresponding variable expenses" incurred in generating the revenue, in contravention of the Settlement Agreement's BEL Framework's express requirements.  Settlement Agreement, Ex. 4C at 2.

For a business where revenues accurately correspond with the cost of goods used to generate those sales, the business's variable profit percentage will fluctuate either minimally or in a predictable pattern over time.  The reason for this is simple: over time, businesses normally spend a predictable amount on variable expenses to generate a predictable amount of revenue.  However, large fluctuations in Claimant's variable profit percentage, including numerous months with negative variable profit, are red flags for failure to subtract corresponding expenses from revenue.

Claimant's financials report several months in both the Compensation and Benchmark Periods with a *negative* variable profit percentage, meaning it spent more on variable expenses than it received in the associated revenue, as well as wild fluctuations on a month-to-month basis.  For example, Claimant's variable profit percentage ranges from -32% to 98% in 2008, -114% to 94% in 2009, and -180% to 93% in 2010.  Claimant's overall profitability does not change so dramatically on a month-to-month basis.  In reality, the reason for these fluctuations are simple: Claimant failed to align its variable expenses with the associated revenue.

Absent an accurate alignment of expenses and revenue, which is required by the Settlement Agreement, a proper comparison of Benchmark Period and Compensation Period

financial performance cannot be done.  This makes it impossible to correctly calculate Variable Profit and thus to properly implement the BEL Framework.

***

The current record does not permit an accurate reevaluation because the necessary documentation and data is not in the record.  BP therefore suggests that this matter be remanded to the Settlement Program with instructions to obtain complete documentation that permits the Settlement Program to accurately perform the necessary calculations.  If, however, it is determined that a remand is not appropriate in this situation, BP submits an Initial Proposed Compensation Amount of $0.

# Exhibit 1

100002383

**Business Economic Loss Claim - Tax Return**

Please select the type of Tax Return form used: **Schedule C (Sole Proprietorship)**

| RECONCILIATION OF MONTHLY P&L VS. TAX RETURN | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Summary | | 2007 | | 2008 | | 2009 | | 2010 | | 2011 |
| Gross Receipts or Sales (per Monthly P&L's) | $ | 542,910.95 | $ | 531,644.65 | $ | 334,854.30 | $ | 285,377.60 | $ | 246,955.00 |
| Gross Receipts or Sales (per Tax Return) | | 524,481.00 | | 501,705.00 | | 201,165.00 | | 338,541.00 | | 236,494.00 |
| Variance - Monthly P&L's vs. Tax Return | $ | 18,429.95 | $ | 29,939.65 | $ | 133,689.30 | $ | (53,163.40) | $ | 10,461.00 |
| Variance % | | 3.39% | | 5.63% | | 39.92% | | -18.63% | | 4.24% |
| Net Income/ Loss (per Monthly P&L's) | $ | 2,123.69 | $ | 65,117.19 | $ | 51,984.42 | $ | (44,714.18) | $ | 23,766.22 |
| Net Income/ Loss (per Tax Return) | | 17,020.00 | | 27,861.00 | | (60,003.00) | | 10,994.00 | | 28,224.00 |
| Variance - Monthly P&L's vs. Tax Return | $ | (14,896.31) | $ | 37,256.19 | $ | 111,987.42 | $ | (55,708.18) | $ | (4,457.78) |
| Variance % - Gross Receipts (per Monthly P&L's) vs. Tax Variance | | -2.74% | | 7.01% | | 33.44% | | -19.52% | | -1.81% |