# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig     *    **MDL NO. 2179**
       "Deepwater Horizon" in the     *
       Gulf of Mexico, on April 20, 2010    *    **SECTION J(2)**
                                *

**Applies to:**     *    **JUDGE BARBIER**
                                *

**Edward Wisner Donation v.**     *    **MAGISTRATE JUDGE**
**BP Exploration & Production Inc.**    *    **JOSEPH C. WILKINSON, JR.**
                                *

**No. 2:14-cv-1525**     *
                                *

---

## BP EXPLORATION & PRODUCTION INC.'S OPPOSITION TO THE EDWARD WISNER DONATION'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

BACKGROUND .................................................................................................................. 3

    A.    BPXP Conducted Removal Actions As Directed By The FOSC. ......................... 3

    B.    The Access Agreement Concerns Only Access To The Donation's Property. ................................................................................................................. 4

    C.    After Four Years Of Operations, The FOSC Concludes That No Further Removal Activities Are Appropriate On The Donation's Property. ..................... 5

ARGUMENT ...................................................................................................................... 7

I.      THE DONATION LACKS THE CAPACITY TO LITIGATE ON ITS OWN BEHALF. ................................................................................................................ 7

II.    THE DONATION'S MOTION SHOULD BE DENIED BECAUSE IT DOES NOT SEEK PRELIMINARY RELIEF. .............................................................. 8

III.   THE DONATION IS UNLIKELY TO SUCCEED ON THE MERITS, MUCH LESS SHOW THAT THE FACTS AND LAW CLEARLY FAVOR IT. ....................... 10

    A.    The Access Agreement Does Not Give The Donation The Power To Force BPXP To Undertake Operations. ....................................................................... 10

           1.    The Plain Language Of The Access Agreement Does Not Give The Donation The Power To Force BPXP To Undertake Operations. ............ 11

           2.    Other Interpretive Principles Confirm That The Donation Does Not Have The Power To Force BPXP To Undertake Operations. .................. 13

    B.    Specific Performance Is An Inappropriate Remedy For Multiple, Independent Reasons. ..................................................................................... 15

    C.    BPXP's Removal Satisfied The Highest Industry Standards. .............................. 17

IV.   THE DONATION HAS NOT ESTABLISHED ANY IRREPARABLE HARM........... 20

V.    THE BALANCE OF THE EQUITIES FAVORS BPXP. ................................................. 23

VI.   THE PUBLIC INTEREST FAVORS BPXP. ................................................................. 23

VII.  THE DONATION MUST POST A BOND BEFORE ANY PRELIMINARY INJUNCTION COULD BE GRANTED. ........................................................................ 24

CONCLUSION ................................................................................................................. 25

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Am. Family Life Assur. Co. of Columbus v. Aetna Life Ins. Co.*,
    446 F.2d 1178 (5th Cir. 1971) ........................................................................ 8

*Apple Barrel Prods., Inc. v. Beard*,
    730 F.2d 384 (5th Cir. 1984) ......................................................................... 23

*Baker v. Maclay Props. Co.*,
    648 So. 2d 888 (La. 1/17/95) ......................................................................... 16

*Bluefield Water Ass'n v. City of Starkville, Miss.*,
    577 F.3d 250 (5th Cir. 2009) ........................................................................... 8

*Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*,
    288 F.3d 222 (5th Cir. 2002) ......................................................................... 20

*Broad v. Rockwell Int'l Corp.*,
    642 F.2d 929 (5th Cir. 1981) ......................................................................... 13

*Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) ........................................................................... 3

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ......................................................................... 20

*E. Air Lines, Inc v. McDonnell Douglas Corp.*,
    532 F.2d 957 (5th Cir. 1976) ......................................................................... 14

*Freeman v. Top Flight Paper Prods., Inc.*,
    593 So.2d 712 (La. App. 5th Cir. 1991) ........................................................ 11

*FSLIC v. Dixon*,
    835 F2d 554 (5th Cir. 1987) .......................................................................... 22

*Green v. New Orleans Saints*,
    781 So. 2d 1199 (La. 11/30/00) ..................................................................... 14

*Gulf Shores Leasing Corp. v. Avis Rent-A-Car Sys., Inc.*,
    441 F.2d 1385 (5th Cir. 1971) ....................................................................... 15

*Hollon v. Mathis Indep. Sch. Dist.*,
    491 F.2d 92 (5th Cir. 1974) ............................................................................. 8

**Page(s)**

*In re DEEPWATER HORIZON,*
    745 F.3d 157 (5th Cir. 2014) ......................................................... 14

*In re Oil Spill by Oil Rig DEEPWATER HORIZON in Gulf of Mexico,*
    MDL No. 2179, 2012 WL 5960192 (E.D. La. Nov. 28, 2012) ...................................... 3, 4

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ......................................................... 22

*Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,*
    689 So. 2d 60 (La. App. 4 Cir. 2/12/97) .................................................. 8

*Justin Indus., Inc. v. Choctaw Secs., L.P.,*
    920 F.2d 262 (5th Cir. 1990) ........................................................ 8

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976) ..................................................... 8, 9

*Mead Johnson & Co. v. Abbott Labs.,*
    201 F.3d 883 (7th Cir. 2000) ........................................................ 25

*Meadaa v. K.A.P. Enters. LLC,*
    Civ. A. No. 1:09-cv-01211, 2010 WL 3328003 (W.D. La. Aug. 20, 2010) ..................... 15

*N. German Lloyd v. Guar. Trust Co. of N.Y.,*
    244 U.S. 12 (1917) ................................................................. 14

*Nichols v. Alcatel USA, Inc.,*
    532 F.3d 364 (5th Cir. 2008) ..................................................... 24, 25

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
    499 U.S. 117 (1991) ................................................................ 14

*PCI Transp., Inc. v. Ft. Worth & W. R.R. Co.,*
    418 F.3d 535 (5th Cir. 2005) ........................................................ 8

*Phillips v. Chas. Schreiner Bank,*
    894 F.2d 127 (5th Cir. 1990) ........................................................ 24

*Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.,*
    179 F.3d 169 (5th Cir. 1999) ........................................................ 13

*Roark v. Individuals of Fed. Bureau of Prisons,* 2013 WL 2153944
    (E.D. Tex. May 16, 2013), *aff'd,* 558 F. App'x 471 (5th Cir. 2014) ................... 9

*Roark v. Individuals of Fed. Bureau of Prisons, Former and Current,*
    558 F. App'x 471 (5th Cir. 2014) .................................................... 9

**Page(s)**

*Shocklee v. Mass. Mut. Life Ins. Co.*,
    369 F.3d 437 (5th Cir. 2004) ................................................................................................ 11

*Sierra Club, Lone Star Chapter v. FDIC.*,
    992 F.2d 545 (5th Cir. 1993) .................................................................................................. 9

*Silver Dream, L.L.C. v. 3MC, Inc.*,
    519 F. App'x 844 (5th Cir. 2013) ......................................................................................... 11

*Sizeler Prop. Investors, Inc. v. Gordon Jewelry Corp.*,
    544 So. 2d 53 (La. App. Ct. 1989) ....................................................................................... 16

*State ex rel. E.C.*,
    2013-CK-2483, 2014 WL 2694191 (La. 6/13/14) .............................................................. 10

*State v. La. Land & Expl. Co.*,
    110 So. 3d 1038 (La. 1/30/13) ............................................................................................. 20

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
    316 F.2d 804 (9th Cir. 1963) .................................................................................................. 9

*Tex. E. Transmission Corp. v. Amerada Hess Corp.*,
    145 F.3d 737 (5th Cir. 1998) ............................................................................................... 14

*Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*,
    640 F.2d 560 (5th Cir. 1981) .................................................................................................. 8

*Turner v. Murphy Oil USA*,
    759 F. Supp. 2d 854 (E.D. La. 2011) .................................................................................. 20

*United States v. Emerson*,
    270 F.3d 203 (5th Cir. 2001) ............................................................................................... 20

*W.A. Mack, Inc. v. General Motors Corp.*,
    260 F.2d 886 (7th Cir. 1958) .................................................................................................. 9

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................................................. 23

*Williams v. Classic Locksmith, L.L.C.*,
    405 F. App'x 884 (5th Cir. 2010) ......................................................................................... 11

*Winter v. Nat'l. Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................................................................. 23

**Page(s)**

**Statutes**

33 U.S.C. § 1321(c)(2)(A) ....................................................................................... 3

33 U.S.C. § 1321(d)(1) ............................................................................................. 3

33 U.S.C. § 2702(b)(2)(B) ..................................................................................... 20

40 C.F.R. § 1321(c)(3)(B) ........................................................................................ 4

40 C.F.R. § 300.120(a) ............................................................................................. 3

40 C.F.R. § 300.305(d)(2) ........................................................................................ 4

40 C.F.R. § 300.400(d) ...................................................................................... 15, 24

La. Civ. Code art. 1831 ........................................................................................... 10

La. Civ. Code art. 1968 ........................................................................................... 16

La. Civ. Code art. 1986 ...................................................................................... 10, 15

La. Civ. Code art. 1986 Revision cmt. (b) ............................................................. 16

La. Civ. Code art. 1986 Revision cmt. (c) ............................................................. 15

La. Civ. Code art. 2024 ........................................................................................... 11

La. Civ. Code art. 2046 ........................................................................................... 11

La. Code Civ. Proc. art. 699 ..................................................................................... 8

La. Rev. Stat. § 9:1731 ............................................................................................. 8

**Other Authorities**

H.R. Rep. No. 101–653, at 36-37 (1990) (Conf. Rep.),
    reprinted in 1990 U.S.C.C.A.N. 779, 825 .......................................................... 3

Moore, James WM. et al.,
    *Moore's Federal Practice - Civil* (2014) ...................................................... 25

Wright, Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure (3d ed. 2014) ................................................. 25

**Rules**

Eastern District of Louisiana Local Civil Rule 65.1.1 ............................................ 25

**Page(s)**

Fed. R. Civ. P. 65(c) ................................................................................................................... 24

The Edward Wisner Donation's ("Donation") motion attempts to transform an agreement on "Right-of-Access For Oil Spill Cleanup Operations" ("Access Agreement") into a talisman giving it an unrestricted right to force BP Exploration & Production Inc. ("BPXP") to conduct whatever environmental scheme the Donation demands.  What is fatal to the Donation's arguments is that the Access Agreement is exactly what its title says:  a contract governing BPXP's right of access to the Donation's property.  Nothing in the Agreement's text or purpose supports the Donation's assertion that it can force BPXP to conduct operations.  Moreover, allowing a private party to dictate removal operations would be inconsistent with federal law granting the Federal On-Scene Coordinator ("FOSC") ultimate authority over spill response operations.  Accordingly, the Donation's motion for a preliminary injunction should be denied for each of the following independent reasons.

**First**, the Donation lacks the capacity to bring suit or file motions.  Under black-letter Louisiana law, a trust such as the Donation cannot assert claims on its own behalf.  Only the trustee can bring claims, and the trustee has not done so here.

**Second**, the Donation's motion does not seek a preliminary injunction but rather the full, permanent relief of requiring BPXP to execute the Donation's environmental scheme.  Relief that cannot be undone should be granted only after a final decision on the merits.

Furthermore, the Donation does not carry its burden on any of the four elements for preliminary relief.  The Donation fails to show that the law and facts clearly favor it, which is required because the motion seeks a mandatory injunction changing the status quo.

**Third**, the Donation's motion fails the first element of the test for a preliminary injunction:  to show that it is likely to succeed on the merits.  Among other elements, specific performance requires proof of a sufficiently certain contractual duty.  Here, the Access

Agreement is wholly devoid of language requiring BPXP to conduct operations.

The Donation's entire argument is premised on quoting a single phrase regarding "highest industry standards" out of context. Under the plain language of the Agreement, that phrase applies only to using environmentally sensitive practices while carrying out removal operations. The purpose of the Access Agreement — which is to allow BPXP access to the Donation's property — further supports this conclusion. Moreover, the Donation's strained misconstruction would be inconsistent with federal law, which gives the FOSC rather than private parties control over removal operations involving substantial spills.

**Fourth**, the Donation has failed to show that it is likely to suffer irreparable harm without preliminary relief. To the contrary, the Donation has submitted its own estimates of the cost of the very remediation that it is seeking from BPXP. The Donation is free to hire contractors to execute its plan and then attempt to recover the cost from BPXP. In any case, money is the standard remedy for alleged property damage. Furthermore, the Donation's assertion that its proposed remediation must be completed before the end of the year is unsupported.

**Fifth**, the balance of the equities is in BPXP's favor. The Donation has no contractual rights to require BPXP to engage in removal actions and the remedies it seeks would impose significant costs on BPXP. By contrast, the Donation can sue BPXP for property damages or engage its own contractors to execute its scheme, and has no need for equitable relief.

**Sixth**, granting an injunction is strongly contrary to the public interest. Setting such a precedent could empower individual property owners to question and contradict FOSC plans and priorities, resulting in chaos during removal activities. The Supreme Court has found that a preliminary injunction should be denied, regardless of the merits or irreparable harm, where granting the injunction would harm important federal interests. Moreover, granting the

Donation's motion would discourage responsible parties from entering into access agreements, leading to disputes and delays in accessing property to conduct oil removal.

**Seventh**, especially given the mandatory nature of the relief, a preliminary injunction could be awarded only if the Donation posts a bond so that BPXP can recover its expenses arising from the proposed injunction if BPXP prevails on the merits. The Donation's own consultants have stated that the projected cost of the Donation's scheme is at least $430 million. The bond should be set for the same amount.

## BACKGROUND

### A.    BPXP Conducted Removal Actions As Directed By The FOSC.

Federal statutes including the Oil Pollution Act ("OPA") and Clean Water Act ("CWA") delineate the process for responding to oil spills. *See Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 418 (5th Cir. 2013); *In re Oil Spill by Oil Rig "DEEPWATER HORIZON" in Gulf of Mexico*, MDL No. 2179, 2012 WL 5960192, at *6-8 (E.D. La. Nov. 28, 2012). For a substantial spill, "[t]he President shall direct all Federal, State, and private actions to remove" the substantial spill. 33 U.S.C. § 1321(c)(2)(A). This provision was "designed to eliminate the confusion evident in recent spills where the lack of clear delineation of command and management responsibility impeded prompt and effective response." H.R. Rep. No. 101–653, at 36-37 (1990) (Conf. Rep.), reprinted in 1990 U.S.C.C.A.N. 779, 825. The President must prepare and publish a National Contingency Plan for removal of oil. 33 U.S.C. § 1321(d)(1).

A FOSC will direct all efforts at the scene of the discharge. 40 C.F.R. § 300.120(a). Those "participating in" removal efforts "shall act in accordance with the National Contingency Plan and the applicable [Area] response plan ... , or as directed by the President, except that ... deviat[ion] from the applicable response plan [is possible] if the President or the Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more

3

expeditious or effective response to the spill or mitigation of its environmental effects."  33 U.S.C. § 1321(c)(3)(B).  "When there is a Substantial Spill, 'the [F]OSC must direct all response efforts.'"  *Deepwater Horizon*, 2012 WL 5960192, at *7 (quoting 40 C.F.R. § 300.305(d)(2)).

Following the *Deepwater Horizon* oil spill, BPXP was designated a "responsible party" under OPA.  As part of conducting removal activities under FOSC direction, BPXP executed access agreements with various entities to accommodate landowners and secure uninterrupted access to property.  In August 2010, BPXP and the Donation entered into the Access Agreement. Ex. 1, Access Agreement.

**B.     The Access Agreement Concerns Only Access To The Donation's Property.**

The title of the Access Agreement is "Right-Of-Access For Oil Spill Cleanup Operations."  Ex. 1.  The opening paragraph states that the Donation (the "Grantor") "grants access to its properties in South Lafourche Parish for the following purposes, and under the following conditions."  *Id.*  The first numbered paragraph explains that "[i]n consideration of the need for prompt action to address the presence of oil from the BP Deepwater Horizon oil spill (hereafter 'the oil spill'), Grantor does hereby grant unto [BPXP] a right of access for the purpose of cleanup operations related to the oil spill."  *Id.* ¶ 1.

Paragraph 8 of the Access Agreement states that "[t]he highest industry standards shall be used to insure environmentally sensitive practices while carrying out operations on the Wisner Property."  Ex. 1 ¶ 8.  Paragraph 8 contains two subparagraphs with examples of these standards. Subparagraph 8(a) is entitled "Beach Protocols" and concerns the use of vehicles and heavy machinery in certain areas, and also provides that all materials, trash, and tools must be removed from the beach.  Subparagraph (b) is entitled "Marsh and Upland Protocols" and restricts the use of vehicles and other means of transport in marsh areas.  Ex. 1 ¶ 8.

The Access Agreement contains various provisions requiring that BPXP provide the

Donation with information such as work plans and protocols relating to cleanup operations on Donation property.  *Id.* ¶ 2.  Other provisions require BPXP to provide a list of sub-contractors, cell phone numbers and e-mail addresses of onsite supervisory personnel, a weekly description of removal/response operations and so forth.  *Id.* ¶¶ 3-6.

The Access Agreement does not contain any language stating that the Donation can require BPXP to undertake certain operations.  Nor does it say that BPXP is required to conduct removal operations to the Donation's satisfaction or set forth any standards regarding such operations.  Nor does it require BPXP to implement any environmental scheme proposed by the Donation.

Paragraph 12 of the Agreement permits the Donation to revoke BPXP's right of access at will.  Nothing in the Agreement sets a term for its duration.  Nor does the Agreement prevent BPXP from terminating the Agreement or from deciding that BPXP no longer needs access to the Donation's property.

### C.   After Four Years Of Operations, The FOSC Concludes That No Further Removal Activities Are Appropriate On The Donation's Property.

From the start of the response effort on the Donation property through its completion, all shoreline cleanup and assessment techniques ("SCAT") and operations activities along Fourchon Beach (the majority of which is Donation property) were conducted pursuant to a response plan. This plan was developed by the Gulf Coast Incident Management Team ("GCIMT"), the FOSC-directed response team that included the United States Coast Guard ("USCG"), BPXP, and the states and various federal agencies supporting the USCG, and approved by the FOSC.  Ex. 2, Declaration of Gary Hayward ("Hayward Decl.") ¶¶ 6, 8.  Under the direction of the FOSC, more than 150 SCAT surveys were conducted along the beach between May 13, 2010 and March 25, 2014.  *Id.* ¶ 39.  SCAT is the standard process used worldwide to assess shoreline

oiling to direct shoreline treatment following a spill. *Id.* ¶¶ 11-16. There is no better process. *Id.* ¶ 17. Based on the results of these SCAT surveys, the GCIMT developed shoreline treatment recommendations that were reviewed and approved by the FOSC in consultation with various scientists and other experts. *Id.* ¶¶ 20-36.

Pursuant to the FOSC-approved recommendations, BPXP conducted systematic and comprehensive cleanup operations on the Donation property. *Id.* ¶¶ 37-50. BPXP recovered oil deposits at various locations along Fourchon Beach, which includes the Donation property. *Id.* ¶¶ 42-46, 50. BPXP dug more than 5,400 holes to a depth of approximately 18 inches across the beach area and removed any residual oil encountered. *Id.* ¶ 45. BPXP conducted a mechanical auguring program to dig 5,800 holes to a depth of 3 feet and 4,900 pits to further search out and remove any remaining buried oil. *Id.* ¶ 46. At the FOSC's direction, BPXP also used an innovative application of a SCAT program to find oil below the water line near the shore. *Id.* ¶¶ 53, 83. BPXP conducted a plowing program on the Donation's property to address oil and encourage naturally occurring bioremediation. *Id.* ¶ 50. BPXP conducted a comprehensive monitoring program to ensure that its removal efforts were successful. *Id.* ¶¶ 43, 71.

After nearly four years of these efforts, on May 21, 2014 the FOSC determined that no further removal activities on Donation property were appropriate. Ex. 4, May 21, 2014 Letter from FOSC S. Walker to A. Phillips. The FOSC explained that the removal team had "engaged in considerable cleanup efforts, scientific analysis, and shoreline assessments along the property." *Id.*; *see also* Ex. 2, Hayward Decl. ¶¶ 84-85. The FOSC carefully reviewed the data, consulted with his own scientists, and recognized that oil collection from the property had been low. Ex. 4. The FOSC specifically rejected the Donation's proposal to replace all of the sand that the Donation's consultants believe contains oil from the *Deepwater Horizon* incident. *Id.*

The FOSC concluded that "any future activity provides no net environmental benefit, is insufficiently supported by science, or is otherwise inappropriate under the National Contingency Plan." *Id.*

On May 22, 2014, BPXP informed the Donation that — based on the FOSC determination — BPXP no longer had a need to access Donation property and would cease entering the property.  Ex. 5, May 22, 2014 Letter from N. Block to S. Gisleson.  Thus, the Access Agreement would be terminated.  *Id.*  BPXP confirmed that it would honor any outstanding obligations such as payment of reimbursable expenses incurred prior to the termination date.  *Id.*  Both BPXP and the USCG told the Donation that it should contact the USCG if it encountered removable oil, and that the USCG would then investigate and determine an appropriate response.  Ex. 6, June 4, 2014 Letter from N. Block to S. Gisleon at 2-3, Ex. 7, June 4, 2014 E-mail from K. Maki to Wisner Donation.

Not satisfied with the determination of the FOSC, and apparently unwilling to challenge that determination administratively, the Donation now seeks what it characterizes as a preliminary injunction.  That injunction would require BPXP to adopt and follow the Donation's environmental proposal.  This is the same proposal that the FOSC specifically rejected in his May 21, 2014 letter, stating that it would be "inappropriate and impractical."  Ex. 4.  The Donation's own consultants estimate that the costs of its remediation proposal is at least $430 million.  Donation Memo Ex. 11, J. Pardue and J. Williams Assessment at 13.

**ARGUMENT**

## I.   THE DONATION LACKS THE CAPACITY TO LITIGATE ON ITS OWN BEHALF.

As BPXP explains in its motion to dismiss, a trust such as the Donation is not a juridical entity under Louisiana law and thus cannot bring claims on its own behalf.  Rec. Doc. 13177-1 at

21-22; La. Rev. Stat. § 9:1731; La. Code Civ. Proc. art. 699; *Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 689 So. 2d 60, 654-55 (La. App. 4 Cir. 2/12/97). Only the trustee can pursue litigation, and the trustee for the Donation has not done so. Indeed, the trustee is not even a named party in this litigation. The Donation cannot seek a preliminary injunction based on claims that it lacks the capacity to bring. Thus, the Donation's motion fails at the outset, as it does not have the power to file the motion.

## II.    THE DONATION'S MOTION SHOULD BE DENIED BECAUSE IT DOES NOT SEEK PRELIMINARY RELIEF.

"[T]he essential question determining the propriety of a preliminary injunction" is "whether the injunction is necessary to preserve the court's ability to render a meaningful decision on the merits." *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 568 (5th Cir. 1981); *see also Justin Indus., Inc. v. Choctaw Secs.*, L.P., 920 F.2d 262, 269 (5th Cir. 1990). A preliminary injunction typically preserves this ability by maintaining the status quo. *E.g.*, *Hollon v. Mathis Indep. Sch. Dist.*, 491 F.2d 92, 93 (5th Cir. 1974); *Am. Family Life Assur. Co. of Columbus v. Aetna Life Ins. Co.*, 446 F.2d 1178, 1180 (5th Cir. 1971). Even where a preliminary injunction simply maintains the status quo, a "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009); *see also PCI Transp., Inc. v. Ft. Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

Where a motion requests for preliminary relief beyond preserving the status quo, courts impose a significantly higher burden of proof. A motion seeking to alter the status quo is a mandatory injunction. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). Mandatory injunctions are "particularly disfavored." *Roark v. Individuals of Fed. Bureau of Prisons,*

*Former and Current,* 558 F. App'x 471, 472 (5th Cir. 2014); *Martinez,* 544 F.2d at 1243.  A mandatory injunction will not be granted unless the "facts and law clearly favor the moving party."  *Roark,* 558 F. App'x at 472; *Martinez,* 544 F.2d at 1243.

An even more disfavored category are motions seeking permanent relief that masquerade as preliminary injunction motions.  A motion styled as seeking a preliminary injunction but which actually seeks full relief that cannot be undone after a decision on the merits should not be granted.  *E.g., Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 808-09 (9th Cir. 1963); *W.A. Mack, Inc. v. General Motors Corp.,* 260 F.2d 886, 890 (7th Cir. 1958); *Roark v. Individuals of Fed. Bureau of Prisons,* Civ. A. No. 5:12-cv-60, 2013 WL 2153944, at *4 (E.D. Tex. May 16, 2013), *aff'd,* 558 F. App'x 471 (5th Cir. 2014).

A motion granting full relief contradicts the basic purpose of a preliminary injunction.  Such relief does not preserve the court's ability to render a meaningful decision on the merits, but does the opposite by locking the court into a favorable result for the movant.  Moreover, "at the preliminary injunction stage, the procedures in the district court are less formal." *Sierra Club, Lone Star Chapter v. FDIC.,* 992 F.2d 545, 551 (5th Cir. 1993).  Issuing permanent relief on informal procedures would violate the Rules of Civil Procedure and Rules of Evidence, which guarantee formal protections before a decision on the merits is entered against a party.  Granting permanent relief on a preliminary injunction motion would mean that "the normal procedures of litigation would be short-circuited by the simple vehicle of trying a case by way of a motion for injunctive relief."  *Roark,* 2013 WL 2153944, at *4.

The Donation's requested relief falls into this forbidden category.  The Donation moves for an order requiring BPXP to "complete remediation efforts at the Breach 1 site on Wisner Beach," "employ the Wisner Science Team's Remediation Plan," and complete the work "as

soon as practicable."   Donation Mot. at 1.   The Donation's own consultants estimate that "employ[ing] the Wisner Science Team's Remediation Plan" will cost at least $430 million, Donation Memo Ex. 11 at 13, and its proposal regarding remediation efforts at Breach 1 will only increase that amount.   If BPXP is forced to execute the Donation's environmental scheme, that work cannot be undone by a final decision on the merits.   This is also the full relief the Donation could receive on these issues.   Indeed, the Donation's current motion seeks the same relief as its earlier motion for specific performance, which sought full and permanent relief regarding the Donation's removal proposal.   Rec. Doc. 13002 at 1.   As the Donation's motion does not seek preliminary relief at all but rather permanent relief, it should be denied.

Even if the Donation's motion is not denied as seeking permanent relief, the motion seeks a mandatory injunction.   The status quo is that BPXP has not and does not plan to perform the Donation's environmental proposal.   Nor did the FOSC ever direct BPXP to do so.   Indeed, the FOSC determined that the Donation's plan was "inappropriate and impractical."   Ex. 4.   Thus, the Donation must show that the facts and law clearly favor it on each of the four requirements for a preliminary injunction.   The Donation cannot make the required showing on a single element, and indeed cannot even satisfy the lower standard for traditional preliminary injunctions that seek to maintain the status quo.

## III.   THE DONATION IS UNLIKELY TO SUCCEED ON THE MERITS, MUCH LESS SHOW THAT THE FACTS AND LAW CLEARLY FAVOR IT.

### A.   The Access Agreement Does Not Give The Donation The Power To Force BPXP To Undertake Operations.

The Donation has made no effort to establish that the facts and law clearly support its request for specific performance.   A party seeking specific performance must prove the contractual obligation at issue.   La. Civ. Code art. 1831; La. Civ. Code art. 1986; *State ex rel. E.C.*, 2013-CK-2483, 2014 WL 2694191, at *4 (La. 6/13/14).   The Access Agreement does not

obligate BPXP to conduct the environmental activities demanded by the Donation.

1.      **The Plain Language Of The Access Agreement Does Not Give The Donation The Power To Force BPXP To Undertake Operations.**

"When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La. Civ. Code art. 2046. Nothing in the plain language of the Access Agreement gives the Donation power to force BPXP to undertake specific removal or remedial actions.  Such language simply is absent from the Agreement.  The Agreement allows BPXP to access Donation property, governs the terms on which BPXP can access the property, and obligates BPXP to provide certain information to the Donation about response activities on the property.  But the Agreement's plain language does not allow the Donation to force BPXP to undertake activities.

The key here is what the Access Agreement does not say.  The Agreement does not say that BPXP is required to conduct removal activities to the Donation's satisfaction.  The Agreement does not say BPXP is required to implement any removal plan proposed by the Donation.  The Agreement does not say that BPXP is required to keep remediating for as long as the Donation desires.  The Agreement does not say that removal must meet a particular standard. The Agreement does not set forth any particular removal activities that BPXP must do.  The Donation cannot be allowed to rewrite the Agreement to add provisions that do not exist.  *See Freeman v. Top Flight Paper Prods., Inc.*, 593 So. 2d 712, 713 (La. App. 5th Cir. 1991); *Silver Dream, L.L.C. v. 3MC, Inc.*, 519 F. App'x 844, 847 (5th Cir. 2013); *Shocklee v. Mass. Mut. Life Ins. Co.*, 369 F.3d 437, 440 (5th Cir. 2004).

Likewise, BPXP was free to terminate the Access Agreement at any time.  The Agreement does not contain a definite term.  Thus, under Louisiana law either party may terminate at will.  *See* Rec. Doc. 13177-1 at 11-12; La. Civ. Code art. 2024; *Williams v. Classic*

*Locksmith, L.L.C.*, 405 F. App'x 884, 886 (5th Cir. 2010).  Moreover, the language of the Access Agreement gives BPXP a right — not an obligation — to access the property.  If BPXP no longer needs to access the Donation property, BPXP can stop coming.  That is what happened here.  BPXP no longer needs access to Donation property since the FOSC has determined that further removal activities are not appropriate.

The Donation's brief devotes remarkably little content to discussing the actual language of the Agreement.  The Donation primarily relies on Paragraph 8, Donation Memo. at 2, which states:  "The highest industry standards shall be used to insure environmentally sensitive practices while carrying out operations on the Wisner Property."  Ex. 1 ¶ 8.  The phrase "highest industry standards" applies to "environmentally sensitive practices," not to removal operations.  This is confirmed by subparagraph (a) and (b) of Paragraph 8, which the Donation fails to quote.  Those subparagraphs provide greater specificity and discuss the use of vehicles on the property, taking care when using heavy equipment in certain areas, and cleaning up trash and tool.  Ex. 1 ¶ 8(a)-(b).  But BPXP always took its orders regarding removal operations from the FOSC.  Paragraph 8 does not give the Donation a contractual right to force BPXP to undertake activities or establish any standard for removal operations.

The Donation also cites two sentences at the end of Paragraph 9, but neither supports its position.  Donation Memo. at 2.  The first states that "[n]othing herein shall be construed to diminish [the Donation's] right to choose and control restoration activities upon its lands."  This language only affirms whatever rights the Donation has as a property owner.  A property owner does not have the right to force others to perform removal activities on its land, and the Agreement does not create such powers.  Indeed, if the Donation had the power to dictate that BPXP undertake removal activities, there would be no need for this sentence.

The Donation also relies on the last sentence of paragraph 9, which states that the Agreement shall not "act as a waiver or release of any obligation Grantee may owe Grantor as a result of oil released from the Deepwater Horizon incident."  This language merely preserves whatever obligations BPXP may have to the Donation outside of the Access Agreement. Nothing in this language gives the Donation the power to force BPXP to undertake removal activities.  The Donation does not even attempt to explain how this language supports its position.

Because the plain language of the Access Agreement does not give the Donation the power to force BPXP to undertake removal activities, interpretation is at an end.  The Donation cannot succeed on the merits, and its motion should be denied.

> **2.     Other Interpretive Principles Confirm That The Donation Does Not Have The Power To Force BPXP To Undertake Operations.**

In addition to the plain language, other interpretive principles confirm that the Access Agreement does not give the Donation the power to compel BPXP to undertake its environmental schemes.

**First**, as the Donation acknowledges, a contract is interpreted in light of its purposes. Donation Memo. at 10, citing *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 175 (5th Cir. 1999); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 946 (5th Cir. 1981).  The purpose of the Access Agreement is plain from its title and opening paragraph:  to provide terms under which BPXP can access Donation property.  That is all.  The other language of the Agreement confirms this purpose.  It discusses monitoring, reporting, use of vehicles on property, etcetera, but contains no language suggesting that the Agreement's purpose went beyond access.  The Agreement's scope does not encompass wholly separate purposes such as dictating what environmental activities BPXP must undertake.

**Second**, contracts are interpreted in accord with the underlying law, which is incorporated into the Access Agreement.  *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991); *Green v. New Orleans Saints*, 781 So. 2d 1199, 1203 (La. 11/13/00).  The relevant law here is CWA and OPA, which provides that the FOSC has the ultimate authority to control the removal actions of private parties participating in a clean-up. *See* Background A.  "[I]f an individual [the FOSC] possesses sole authority to direct all efforts engaged in by particular parties, and the directing individual asserts that he or she will disapprove all future activities, that disapproval is a de facto prohibition on all future engagements in the relevant activity."  Ex. 8, *BP America Inc. v. Chustz*, Case 3:13-cv-00620, Rec. Doc. 45 at 15 (M.D. La. July 21, 2014).  The FOSC has disapproved further removal activities on the Donation property, and specifically disapproved the Donation's environmental scheme as "inappropriate and impractical."  Ex. 4.

The Fifth Circuit has recently explained that "[a]llowing up to five states along the Gulf Coast to apply their individual laws to discharges arising on the Shelf would foster [] legal chaos."  *In re DEEPWATER HORIZON*, 745 F.3d 157, 170 (5th Cir. 2014).  That chaos would be infinitely worse if, instead of five states, hundreds or even thousands of individual property owners were attempting to impose their own views on proper environmental activities.  Contracts should be interpreted to preserve unified federal control over responses to substantial spills.

**Third**, "Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit." *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir. 1998); *see also N. German Lloyd v. Guar. Trust Co. of N.Y.*, 244 U.S. 12, 24 (1917) ("Business contracts must be construed with business sense, as they naturally would be understood by

14

intelligent men of affairs."), *quoted by E. Air Lines, Inc v. McDonnell Douglas Corp.*, 532 F.2d 957, 996 (5th Cir. 1976) *and Gulf Shores Leasing Corp. v. Avis Rent-A-Car Sys., Inc.*, 441 F.2d 1385, 1392 n.5 (5th Cir. 1971). The Donation would have this Court believe that BPXP agreed to give the Donation the power to force BPXP to take whatever remediation actions the Donation wants and that the Donation can require BPXP to enter Donation land and continue removal activities for as long as the Donation sees fit. This purported power of the Donation would trump the federal policy that the FOSC direct the unified control over the response. In exchange, BPXP would receive nothing. The absurdity of the Donation's interpretation is further highlighted by the fact that federal agencies and those working on their behalf have the power to enter property to conduct response operations under the National Contingency Plan regardless of whether the property owner agrees to provide access. 40 C.F.R. § 300.400(d). To state this proposition is to see its irrationality. No reasonable party would agree to anything of this sort, and BPXP did not.

> **B.   Specific Performance Is An Inappropriate Remedy For Multiple, Independent Reasons.**

Before specific performance can be awarded, the moving party must show not only that the other party has a contractual obligation but must also show that specific performance is an appropriate use of the court's discretion. The Donation misstates the availability of specific performance as a preferred remedy. Donation Memo at 11. Louisiana's presumption in favor of specific performance applies only to "an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument." La. Civ. Code art. 1986. By contrast, "[u]pon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court." *Id.*; *see also* La. Civ. Code art. 1986 Revision cmt. (c); *Meadaa v. K.A.P. Enters. LLC*, Civ. A. No. 1:09-cv-01211,

2010 WL 3328003, at *4 (W.D. La. Aug. 20, 2010).   The Donation seeks to impose "an obligation to do" on BPXP, namely an obligation to execute the Donation's environmental schemes.  Thus, even if there were a valid obligation, specific performance would be left to the discretion of the Court.  That discretion should be exercised to deny specific performance for multiple, independent reasons.

**First**, specific performance is "impracticable when it requires the continuous supervision of the court."  La. Civ. Code art. 1986 Revision cmt. (b); *Sizeler Prop. Investors, Inc. v. Gordon Jewelry Corp.*, 544 So. 2d 53, 54-55 (La. App. Ct. 1989).  The Donation demands that BPXP undertake an environmental scheme that it estimates will take 6-8 months to complete.  Conflicts between BPXP and the Donation surely would arise over the course of the scheme.  This would necessitate frequent Court intervention, effectively requiring the Court to direct environmental activities.  This reality establishes that specific performance is impractical and should be denied.

**Second**, specific performance cannot be granted where it would conflict with public policy.  La. Civ. Code art. 1968; *Baker v. Maclay Props. Co.*, 648 So. 2d 888, 895 (La. 1/17/95).  Both public policy as well as the language of federal statutes require that the FOSC — and not private parties — control all response activities.  The FOSC has specifically concluded that the Donation's environmental scheme is "inappropriate and impractical."  Ex. 4.  Ordering removal activities that have been disapproved by the FOSC would conflict with public policy.

**Third**, the Access Agreement does not set forth any obligation regarding removal, and thus does not provide a basis for this Court to craft a proper order requiring specific performance.  In particular, the Donation's reliance on the phrase "highest industry standards" does not provide this Court with sufficient guidance to enter a clear order requiring specific performance.   The Agreement contains no specifics regarding what remediation BPXP is

16

supposed to perform, what standards it must satisfy, or other essential information needed for an appropriate order. Thus, for this additional reason specific performance cannot be granted.

### C.      BPXP's Removal Satisfied The Highest Industry Standards.

The Agreement's language on "highest industry standards" does not apply to removal operations. But BPXP does not want there to be any confusion or misunderstanding. BPXP in fact performed removal operations in accord with the "highest industry standards." That is one of the reasons why the FOSC "concluded that no further removal activities are appropriate on the property managed by" the Donation. Ex. 4.

BPXP, under the direction of the FOSC, used the highest industry standards in assessing, documenting, and responding to oiling on Fourchon Beach, which includes the Donation property, and throughout the Gulf Coast. Ex. 2, Hayward Decl. ¶¶ 37-51; Ex. 3, Declaration of Lyle Bruce ("Bruce Decl.") ¶¶ 23, 26-29; *see generally* Background C. BPXP implemented the SCAT program under the direction of the FOSC as a technique to respond to the spill. Ex. 2, Hayward Decl. ¶¶ 9-19. Between May 2010 and March 2014, SCAT teams conducted over 150 surveys along Fourchon Beach, which they used to develop Shoreline Treatment Recommendations which directed the recovery of both free-floating and buried oil. *Id.* ¶¶ 39-40.

Operations response teams were active on Fourchon Beach almost daily since the inception of the response until mid-April 2014, and during later stages of the response conducted beach maintenance activities a minimum of three times per week. *Id.* ¶ 44. Between October 2010 and April 2011, the response team followed the FOSC's direction to remove oil from the Donation's property by hand so as to attempt the most environmentally delicate (though manpower intensive) strategy. *Id.* ¶ 45. In September 2012, BPXP proposed a "deep-clean" initiative for Fourchon Beach involving a comprehensive mechanical auger program, which the FOSC approved, and which the Donation supported. *Id.* ¶ 46. In 2013, BPXP instituted another

17

program to address weathered buried oil materials in a work plan directed by the Incident Management Team and which continued until the FOSC concluded that the objectives had been met. *Id.* ¶¶ 47-49. Moreover, innovative response techniques were used during the response that raised the level of the highest industry standard, such as using snorkel SCAT to identify oil in the near-shore environment of Fourchon Beach. *Id.* ¶¶ 52-53; Ex. 3, Bruce Decl. ¶ 28.

The FOSC developed a cleanup completion plan in late 2011. Ex. 2, Hayward Decl. ¶ 31. This cleanup completion plan established a set of shoreline cleanup "endpoints," which are science-based quantitative or qualitative values that aid in determining when additional cleanup operations would do more harm than good to the environment. *Id.* ¶¶ 32-33; Ex. 3, Bruce Decl. ¶ 20. In early 2014, the SCAT teams found that all areas of the Donation's property satisfied these endpoints, with one exception. Ex. 2, Hayward Decl. ¶ 50. The exception was a small 150 by 20 meter area that was close to meeting its endpoints, and that had been treated with augering, trenching, and plowing. *Id.* ¶ 50. The only remaining effective method to remove oil from this area was tilling, but tilling was not approved of by the State or the Donation. *Id.* Absent tilling, this area — along with all other Donation property — met the standard of having oil as low as reasonably practical considering the allowed treatment methods. *Id.*

By contrast, the Donation's environmental schemes are not in accord with the "highest industry standard," because they would do more harm to the environment than any benefit produced; they are not scientifically sound; and in any case, they are likely impossible to complete in the timeframe demanded by the Donation. This is why the FOSC has previously rejected them as "inappropriate and impractical." Ex. 4.

For example, the Donation's Assessment and Remediation Plan is outdated. Ex. 2, Hayward Decl. ¶¶ 58, 71; Ex. 3, Bruce Decl. ¶ 33. The Donation's Plan was proposed at the end

of 2012 and thus is a year-and-a-half old.  Donation Memo Ex. 11, J. Pardue and J. Williams Assessment at 1.  Indeed, some portions of the plan rely on information from December 2010, three-and-a-half-years ago.  Ex. 2, Hayward Decl. ¶¶ 62-63.  The Donation's Plan does not reflect the numerous operations that have taken place since 2012.  *Id.* ¶¶ 58, 71; Ex. 3, Bruce Decl. ¶ 33.  Similarly, the efficacy of the Plan's offshore remediation recommendations is undermined by its claim that further assessment is required.  Remediation plans are based on the results of an assessment — they are not made before an assessment.  Ex. 2, Hayward Decl. ¶ 65.  Claims by Dr. Pardue and the Donation's Plan that a substantial amount of oil remains on Donation Property is contradicted by the actual data collected by SCAT and operations teams.  *Id.* ¶¶ 52, 55-56, 66, 72.  Furthermore, the proposals in the Donation Plan would be either ineffective or harmful to the environment, and do not meet industry standards.  *Id.* ¶¶ 67-69, 75-76; Ex. 3, Bruce Decl. ¶¶ 20, 22-24, 36.

The Donation's Plan is also premised upon the incorrect notion that crude oil components require the presence of oxygen to biodegrade.  Ex. 3, Bruce Decl. ¶¶ 15-18; 21-22.  Crude oil components do biodegrade without the presence of oxygen, and Dr. Pardue has recognized this fact in his previous work.  *Id.* ¶ 16.  Indeed, biodegradation of crude oil components is taking place at a significant rate on the Donation Property.  *Id.* ¶¶ 21-22.  Moreover, the Donation's Plan, which includes adding oxygen to the Donation's Property, is not appropriate — much less industry standard — because it would cause more harm than good to the Donation's Property.  *Id.* ¶¶ 24-25.

Finally, the Donation can still contact the USCG if it believes it has discovered removable oil from the *Deepwater Horizon* incident on Donation property.  Exs. 6-7.  If the USCG instructs BPXP to perform additional removal operations, an access agreement would be

19

unnecessary because BPXP can enter the land at the USCG's direction to conduct removal operations.  40 C.F.R. § 300.400(d).

## IV.    THE DONATION HAS NOT ESTABLISHED ANY IRREPARABLE HARM.

The irreparable harm prong requires that a party demonstrate that it will suffer harm before a ruling on the merits that is irreparable.  *See United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001).  The Donation has failed to establish that its need for relief is urgent or that any alleged harm cannot be remedied by money damages.

"[A]n injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (internal quotation marks omitted).  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Id.*  (internal quotation marks and brackets omitted).

The Donation's own consultants have estimated the monetary cost of performing their environmental initiatives.  Donation Memo Ex. 11, J. Pardue and J. Williams Assessment at 13.  The Donation can hire contractors to perform whatever work it desires and then seek to recover those costs.  Tellingly, if the Donation truly believed that its environmental scheme needed to be implemented urgently, that is what it would do.

Moreover, a suit for money is an adequate remedy for alleged damage to property.  *See State v. La. Land & Expl. Co.*, 110 So. 3d 1038, 1047 (La. 1/30/13); *Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 230-31 (5th Cir. 2002); *Turner v. Murphy Oil USA*, 759 F. Supp. 2d 854, 858 (E.D. La. 2011).  OPA specifically provides that money damages are available for injury to real property.  33 U.S.C. § 2702(b)(2)(B).  Indeed, the Donation has filed several

claims specifically seeking money damages to restore Donation property, remove oil, and perform assessments.[1] *E.g.*, Case No. 2:10-cv-02771, Rec. Doc. 326 at 16-17; *see also* Case No. 2:13-cv-01971, Rec. Doc. 1 (complaint seeking money damages, including for damage to property). The Donation does not explain why these claims are insufficient to compensate it.

In addition, the Donation's assertion that relief must be granted now is unsupported. The Donation claims that the Cam II project is "too important" to delay, Donation Memo. at 9, but the State of Louisiana controls the timing of that project. The Donation could seek to have Louisiana delay the project if the Donation thought that were necessary, or the State could delay the project on its own. In any event, proceeding with the Cam II project without implementing the Donation's proposed remediation actually would be beneficial. The Cam II project would bury any remaining oil and allow natural processes to continue decaying any oil without the need for remediation that could damage the environment. Ex. 3, Bruce Decl. ¶¶ 30, 32. The Donation does not explain why it did not seek an order to have BPXP perform its environmental scheme earlier during the four years when BPXP had been conducting removal operations. Indeed, the Donation proposed its remediation plan at the end of 2012, a year-and-a-half-ago, but has not sought court relief until now. Donation Memo Ex. 11, J. Pardue and J. Williams Assessment at 1. The Donation also fails to explain why it did not seek review of the FOSC's determination, which was made two months ago. Ex. 8, *Chustz*, Rec. Doc. 45 at 35 (noting that a party can seek review or reconsideration of FOSC determinations).

---

[1] Specifically, the Donation's complaint requests that the court "1) Award such sums as necessary to allow Wisner Donation to fully assess the extent and fate of contamination resulting from the MC252 spill; 2) Award such sums as necessary to remove the MC252 contaminants from the Donation's Fourchon property; 3) Award such sums as necessary to restore the Wisner Donation's property to its condition prior to the MC252 spill; 4) Award such sums as necessary to undertake the coastal restoration projects now delayed as a result of the contamination, leaving BP the right to pursue reimbursement from the government … ." Case No. 2:10-cv-02771, Rec. Doc. 326 at 16.

The Donation cites two cases in support of its irreparable harm argument, but neither has any relevance.  Donation Memo. at 14.  *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) involved a preliminary injunction to freeze the accounts of employees who had received money from a Ponzi schemer while the receiver sought a constructive trust as permanent relief.  *Id.* at 589, 600-01.  The Fifth Circuit was concerned that the employee defendants could dissipate the ill-gotten funds, preventing the district court from granting effective relief.  *Id.* at 600-01.  Similarly, in *FSLIC v. Dixon*, 835 F2d 554 (5th Cir. 1987) the Federal Savings & Loan Insurance Corporation ("FSLIC") sought a preliminary injunction to freeze the accounts of the officers and directors of an insolvent savings and loan association who had paid themselves exorbitant salaries and bonuses.  *Id.* at 556, 561.  FSLIC sought a constructive trust and similar remedies to recover these monies, and the Fifth Circuit was concerned that the funds could be dissipated before a final judgment unless preliminary injunctive relief was granted.  *Id.* at 561.

*Janvey* and *Dixon* are strikingly different from this case.  This case does not involve claims that BPXP illegally obtained money.  There is no claim for a constructive trust or similar remedies.  There is no concern that BPXP will dissipate assets.  *Janvey* and *Dixon* maintained the status quo (the defendants keeping the money in their current bank accounts); the Donation seeks relief that would not only change the status quo, but change it permanently in its favor.

The Donation's citation of cases for the proposition that a preliminary injunction is appropriate to grant intermediate relief of the same character as that which may be granted finally is also off the mark.  Donation Memo. at 13-14.  Each one of the cases the Donation cites involved a preliminary injunction to prevent the dissipation of assets.  Each one of these injunctions maintained the status quo.  None of them involved specific performance.  And in particular none involved a remedy that would give the moving party full relief that could not be

undone by a decision on the merits.

## V.     THE BALANCE OF THE EQUITIES FAVORS BPXP.

The Donation does not even address its burden of proof to establish that the balance of the equities favors its position, a tacit admission that the balance favors BPXP.  The Donation's own consultants expect their proposed remediation plan will cost at least $430 million dollars. Donation Memo Ex. 11 at 13.  The Donation improperly seeks to impose that cost on BPXP now, without a final decision on the merits.  By contrast, the Donation will not be harmed if its requested relief is denied because it can seek money damages.  Because the balance of the equities favors BPXP, the preliminary injunction should be denied.  *See,* e.g., *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 390 (5th Cir. 1984) (holding that injunction should be denied if the non-moving party would suffer at least as much harm from the injunction being granted as the moving party would if the injunction were denied).

## VI.    THE PUBLIC INTEREST FAVORS BPXP.

Once again, the Donation fails to discuss this element.  "[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

There is a strong public interest in maintaining the FOSC's control over all spill responses.  *See* Background A.  Granting the Donation's relief would destroy that control and lead to chaos, as individual property owners would each assert that a responsible party must carry out its own preferred removal plans.  Notably, the Supreme Court has previously found that a preliminary injunction which conflicts with powerful federal interests should be denied, regardless of the merits or plaintiffs' alleged irreparable harm.  *See Winter v. Nat'l. Res. Def.*

*Council*, 555 U.S. 7, 24-26 (2008).  Unified federal control over oil spill removal operations so as to allow rapid response is a critical federal interest that should not be impaired by a preliminary injunction.

Granting the Donation's requested relief also creates precedent that could be detrimental to future property owners.  Under the National Contingency Plan, federal agencies and those performing work for them have the authority to enter property and conduct response actions as a matter of law.  40 C.F.R. § 300.400(d).  Thus, access agreements are not needed to enter onto properties, and are a good will accommodation to property owners.  If the Donation were to receive injunctive relief, responsible parties under OPA would rely on the National Contingency Plan and refuse to enter into access agreements for fear that property owners would attempt to twist them into forcing the responsible parties to undertake environmental schemes that were never agreed to, as the Donation is doing here.  This result would make property owners worse off as responsible parties would no longer accommodate them.  It also would cause more conflicts between property owners and federal government response teams during spills, leading to a delay in oil spill removal that is the antithesis of federal policy.

## VII.    THE DONATION MUST POST A BOND BEFORE ANY PRELIMINARY INJUNCTION COULD BE GRANTED.

Federal Rule of Civil Procedure 65(c) states that the "court may issue a preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "Because of the importance of the bond requirement, failure to require the posting of a bond or other security constitutes grounds for reversal of an injunction."  *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 379 (5th Cir. 2008); *Phillips v. Chas. Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990).

The bond must be sufficient to compensate the non-moving party for any damages it has suffered if the non-moving party ultimately prevails in the case. *Nichols*, 532 F.3d at 379. "[T]he judge usually will fix security in an amount that covers the potential incidental and consequential costs … ."  11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2954 (3d ed. 2014).  "When setting the amount of security, district courts should err on the high side."  *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). Setting the bond too low "produces irreparable injury, because the damages for an erroneous preliminary injunction may not exceed the amount of the bond."  *Id.*; James WM. Moore et al., 13-65 *Moore's Federal Practice - Civil* § 65.50 (2014); *see also Nichols*, 532 F.3d at 379.

Under these authorities, the Court should require that plaintiffs post a bond in a form that meets Local Rule 65.1.1 and in an amount no less than the cost of the Donation's proposed removal plan.   The Donation has estimated that its remediation plan will cost at least $430 million, Donation Memo Ex. 11, J. Pardue and J. Williams Assessment at 13, so that should be the minimum amount of the bond.   Such a bond is particularly appropriate here where the Donation is demanding immediate affirmative relief that cannot be undone after a final judgment.

## CONCLUSION

The Donation seeks truly extraordinary relief:  an order requiring affirmative action by BPXP at a cost of at least $430 million that cannot be undone after a final judgment on the merits, all based on the abbreviated procedures applicable to a preliminary injunction motion. The premise for this drastic relief is a contract whose plain language, purpose, and underlying legal background definitively establish that the Donation has no valid claim.   Indeed, the Donation cannot establish a single one of the four required elements for a preliminary injunction. Therefore, its motion should be denied.

Dated:  July 28, 2014

Respectfully submitted,

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
Shannon S. Holtzman (Bar #19933)
Greg Johnson (Bar #24477)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
R. Chris Heck
Christopher J. Esbrook
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Attorneys for BP Exploration & Production Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of July, 2014.

/s/ Don K. Haycraft _____