# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the GULF | * | |
| OF MEXICO, on APRIL 20, 2010 | * | SECTION J(2) |
| | * | |
| Applies to: | * | JUDGE BARBIER |
| | * | |
| Edward Wisner Donation v. | * | MAGISTRATE JUDGE |
| BP Exploration & Production Inc. | * | JOSEPH C. WILKINSON, JR. |
| | * | |
| No. 2:14-cv-1525 | * | |
| | * | |

## DECLARATION OF GARY HAYWARD PURSUANT TO 28 U.S.C. § 1746

I, Gary Hayward, under penalty of perjury, state as follows. I am over the age of 21, and the opinions, statements, and conclusions expressed in this declaration are my own.

*Experience*

1.     I have over 34 years of consulting experience providing environmental and regulatory compliance services to private and public sector clients throughout the United States and around the world since 1979. I have a BA in Geology from New England College (1973) and a MS in Marine Sciences from the University of South Florida (1979). My MS degree included a strong focus on nearshore sediment transport and related coastal processes.

2.     The bulk of my professional career has been involved with various projects related to the oil and gas industry in the United States and around the world. Over the years, I have participated in a wide range of projects involving oil spill response assistance, oil spill response planning/preparedness, drills and training

exercises and related services in the US (Gulf of Mexico, offshore California and in Alaska) as well as in numerous countries in Africa, South/Central America, Europe and Asia. As a result, I am fully familiar with the elements associated with oil spill response, including the Shoreline Cleanup Assessment Techniques (SCAT) process and its associated activities. My CV is attached as Exhibit A to this declaration.

3.      I have been a Partner and Senior Environmental Consultant with NewFields Companies LLC (NewFields) and its Affiliates since joining them in 2000. NewFields is an environmental and engineering consulting company with offices throughout the United States and internationally.

4.      I was retained by BP in early May 2010.  I arrived in the Houma, LA Incident Command Post on May 17, 2010 and served as BP's SCAT Coordinator for Louisiana and worked out of the Houma Incident Command Center.  The Incident Command System was implemented by the United States Coast Guard (USCG) to respond to and manage coordinated response actions. A Unified Command structure allows agencies with different legal, geographic, and functional authorities and responsibilities to work together effectively without affecting individual agency authority, responsibility or accountability.  As an integral member of the Unified Command's Environmental Unit, my primary responsibilities included closely interfacing with both the National Oceanic and Atmospheric Administration SCAT Coordinator and BP's SCAT contractors (Polaris); interfacing with USCG and Louisiana state representatives; attending

daily meetings, briefings and strategy sessions; SCAT reporting and scheduling; and participating in the development of shoreline treatment recommendations.

5.      In October 2010, the Houma Incident Command Post and Mobile Incident Command Post moved to New Orleans where the New Orleans Incident Command Center was established.  My role and responsibilities on the response essentially remained the same as described above, however, at this point I started serving as BP's SCAT Coordinator for the entire Area of Response, which included all affected shorelines in Louisiana, Mississippi, Alabama and Florida.

6.      In September 2012, I served as BP's Environmental Section Chief for the MC252 Response and served as such on the Unified Command's Gulf Coast Incident Management Team until SCAT's activities ceased in mid-April, 2014.  The Gulf Coast Incident Management Team is the organization name for the Federal On-Scene Coordinator directed response that includes the USCG, BP, and the states and various agencies supporting the USCG.  During this period and in addition to SCAT, my other primary areas of focus included compliance with Section 7 of Endangered Species Act, the Migratory Bird Treaty Act, the National Historic Preservation Act, numerous Best Management Practices (BMP), and a wide range of reporting functions.

7.      I made numerous field site visits to affected shorelines across the Area of Response throughout the duration of the response.  As a result, I am fully familiar with the oiling conditions and related SCAT and Operations activities that occurred on Fourchon Beach, which began in mid-May 2010.

### *Description of SCAT and Operations Program*

8.    The shoreline response program for the Deepwater Horizon incident consisted of four stages and the procedures set out in the Shoreline Cleanup Completion Plan, which were designed to address oiling in a rigorous, systematic manner, including repeated shoreline surveys and treatment actions, as detailed below.

9.    On May 6, 2010, and prior to oil reaching the Louisiana shoreline, a "Near Shore and Shoreline Stage I and II Response Plan" (Stage I/II Plan) for Louisiana was developed and signed by the Unified Command's Houma Incident Management Team.   This Plan was developed by a multi-agency group within the Environmental Unit of the Unified Command, and approved and issued by the Federal On-Scene Coordinator.   Group members included representatives from the Louisiana Department of Environmental Quality, Louisiana Department of Wildlife and Fisheries; U.S. Fish and Wildlife Service; National Oceanic and Atmospheric Administration, and BP.

10.   The Stage I/II Plan outlined a multi-stage process for documenting and responding to shorelines in Louisiana affected by oil from the Deepwater Horizon incident (MC 252 oil).   The Stage I/II Plan required assessment of affected shorelines utilizing the SCAT process.

11.   SCAT is a systematic method for surveying shorelines affected by a spill. SCAT teams include people trained in the techniques, procedures, and terminology of shoreline assessment. The roles and responsibilities of a SCAT team are defined in the National Oceanic and Atmospheric Administration's Shoreline Assessment Manuel.

12.     SCAT provides scientifically defensible data on the presence, extent, and duration of observed shoreline oiling.

13.     The SCAT program provides an accurate and detailed understanding of the current level and character of shoreline oiling and the level and character of oiling over time.  SCAT data are the definitive source of information regarding shoreline oiling, and is used to guide the shoreline response to the spill.

14.     The SCAT process is based on specific written procedures that have been extensively used since the Exxon Valdez spill in 1989.  SCAT's role in conducting shoreline assessments has become the accepted industry standard, and is part of the procedure adopted by the National Oceanic and Atmospheric Administration, Environment Canada, USCG, and the U.S. Environmental Protection Agency.

15.     SCAT teams use a collaborative, consensus-building approach to collect and document oiling conditions on affected shorelines.  SCAT teams conduct both aerial reconnaissance and ground surveys to identify and document oiling conditions throughout the impacted area, using standard SCAT terms and forms.

16.     Following each survey, SCAT teams complete detailed data forms that describe the survey, including the size and location of the segment searched, the type and location of any oil observed, and the duration and method of survey.  SCAT teams use a standardized categorization system for the observed oil that takes into account the width of the oil band, the distribution of oil in that band, and the average thickness of the oil.

17.     There is no superior data set for shoreline oiling caused by the Deepwater Horizon incident than SCAT.

18.     The SCAT Team Leads were scientists with experience in assessing shoreline oiling.  In addition to the Team Lead, representatives from each Gulf State, as well as the Federal government, participated on each of the SCAT Teams and the SCAT surveys that were conducted within their geographic boundaries.

19.     In Louisiana, each SCAT Team consisted of three team members: a trained SCAT Team Lead, a representative from the Louisiana Department of Environmental Quality, and a representative from the federal government (either from the National Oceanic and Atmospheric Administration or the USCG).

20.     The Stage I/II Plan was in effect from May through August 2010, until the well was plugged and the potential for free floating oil to re-oil affected shorelines was considered no longer a threat.  Stage I primarily involved on-water recovery of floating oil in near-shore areas and Stage II largely consisted of initial removal of bulk oil on the shoreline.

21.     The Stage III Plan was developed in September 2010 when it was determined that there was no more recoverable oil on the water, and it focused on repeated inspection and treatment of shoreline oiling.

22.     The Stage III Plan provided for Shoreline Treatment Recommendations to be prepared by SCAT based on a set of habitat-specific (sand beaches, marsh, man-made structures) cleanup criteria and a set of No Further Treatment guidelines for specific shoreline habitats.

23.    Shoreline Treatment Recommendations are the approved treatment methods developed and recommend by technical working group of experts.  Shoreline Treatment Recommendations describe how to treat specific shoreline segments, including suggested tools, techniques, and frequency. Shoreline Treatment Recommendations were circulated for review by USCG, BP, State of Louisiana representatives (if the treatment recommendations were for property within Louisiana), US Fish and Wildlife (relating to Endangered Species Act concerns) and National Park Service representatives (related to Section 106 of National Historic Preservation Act concerns), and ultimately issued by the Federal On-Scene Coordinator upon completion of the review process.

24.    The No Further Treatment guidelines are the environmentally protective inspection and cleanup standards.  In order for a segment to be moved out of Stage III, the segment had to be inspected and sometimes treated (as necessary) to verify that it complied with the No Further Treatment guidelines.

25.    The Stage III Plan was in effect from September 2010 until mid-March 2011, at which point a Stage 4 Plan was prepared by the Unified Command and issued by the Federal On-Scene Coordinator.

26.    The Stage 4 Plan became necessary once it was determined by SCAT surveys that Stage III No Further Treatment guidelines were met for areas covered by Stage III Shoreline Treatment Recommendations.  Stage 4 involved repeated inspections and treatments for a given shoreline segment.

27.    The Stage 4 Plan also included an additional set of No Further Treatment guidelines that included consideration for "as low as reasonably practicable

7

considering the allowed cleanup methods and net environmental benefit."   Net environmental benefit is the point at which further response actions are determined to likely lead to greater environmental impacts than the remaining oil left in place to naturally attenuate.  A "net environmental benefit" determination was generally made in the field as a unanimous decision by the SCAT team (i.e. SCAT Team Lead, the State representative and the federal representative).   In cases where a unanimous decision could not be reached in the field, the matter would be elevated, and the Federal On-Scene Coordinator would make a determination.

28.   One of the objectives of Stage 4 Plan was to permit SCAT to prepare and issue Stage 4 Shoreline Treatment Recommendations on shoreline areas that did not meet Stage 4 No Further Treatment guidelines. Stage 4 Shoreline Treatment Recommendations provided the Operations Unit of the Unified Command ("Operations") with a mechanism to conduct a period of post-treatment monitoring and maintenance on segments until Stage 4 No Further Treatment guidelines could be achieved.

29.   In order for a segment to be moved out of Stage 4, the segment had to be inspected and sometimes treated (as necessary) to verify that it complied with the No Further Treatment Standards.

30.   Stage I/II, III and 4 Plans were prepared by a group that included representatives from the Louisiana Department of Environmental Quality, Louisiana Department of Wildlife and Fisheries; Louisiana Office of Coastal Protection and Restoration,

U.S. Fish and Wildlife Service; United States Department of Interior; National Oceanic and Atmospheric Administration, and BP.

31. The Stage 4 plan continued in effect until November 11, 2011, at which time the Shoreline Cleanup Completion Plan was developed and approved by the Federal On-Scene Coordinator (FOSC).

32. The Shoreline Cleanup Completion Plan established a set of shoreline cleanup "endpoints," and defined the process for shoreline segments to be removed from the Response.

33. Shoreline cleanup "endpoints" are a set of qualitative and/or quantitative values that aid in the determination of the point at which additional cleanup operations are no longer warranted or would be inappropriate because they would do more harm than good to the environment.  Endpoints are science-based and take into account specific habitat types and other environmental details.

34. As with Stage I, II, III, and 4 Plans, the Shoreline Cleanup Completion Plan was developed and prepared by a core group of representatives from Louisiana, Mississippi, Alabama, and Florida, along with representatives from U.S. Fish and Wildlife Service, United States Department of Interior, National Oceanic Atmospheric Administration, BP, and other members of the Unified Command, under the overall leadership of the USCG.

35. The Shoreline Cleanup Completion Plan included a comprehensive, step-by-step process that was followed from its effective date until the end of the Response. The Shoreline Cleanup Completion Plan process required a series of surveys to be performed for a given segment area over a minimum 30-day period to insure that

the endpoints were consistently met over at least one complete lunar tide cycle. In almost all cases, once a shoreline segment achieved the endpoints based on SCAT surveys as outlined by the Shoreline Cleanup Completion Plan, that segment was deemed "removal actions deemed complete" by the Federal On-Scene Coordinator.  At that point, individual shoreline segments were returned to the process established by the National Contingency Plan with regards to potential future shoreline oiling events. Under the National Contingency Plan, individuals finding oil on water or the shoreline, would call the National Response Center operated by the USCG, who in turn would notify affected state and local officials as well as the closest USCG office, which then would respond to the call.

36.     In addition to the repeated surveys conducted during the noted stages, for any segment that received treatment, SCAT teams are required to survey the segment at least three times  before a determination can be made by the Federal On-Scene Coordinator to remove the segment from the Response.

**Operations and SCAT Program on Wisner Donation Property**

37.     All SCAT and Operations activities on the Wisner Donation Property (also referred to as Fourchon Beach) followed the direction and guidance provided in the Stage I/II, Stage III, Stage 4, and Shoreline Cleanup Completion Plans developed by the Gulf Coast Incident Management Team.

38.     The shoreline assessments conducted by SCAT and the response actions conducted by the Operations were comprehensive, thorough and fully consistent with the highest industry standards for responding to oil spills in sensitive coastal environments.

10

39.   Over the timeframe of this response, SCAT teams conducted over 150 surveys along Fourchon Beach, beginning on May 13, 2010 and concluding on March 25, 2014.   These repeated surveys allowed SCAT to assess changes in oiling conditions over time, assisted in understanding the effectiveness of shoreline treatment activities, and provided an understanding of the shoreline's seasonable variability along the Wisner Donation Property.

40.   Based on the results of the SCAT surveys, 12 Shoreline Treatment Recommendations (some with several variances as well) were developed by SCAT and issued to Operations for removal of oil that came ashore along Fourchon Beach. These included two Shoreline Treatment Recommendations prepared and issued during Stage I/II that directed Operations to recover free-floating bulk oil, along with 6 others that directed Operations to recover mat material in the intertidal zones at various locations along Fourchon Beach.

41.   During Stage III, three more Shoreline Treatment Recommendations were issued to Operations that directed augering and pitting activities to delineate and recover buried weathered oil deposits at various locations in the supratidal and intertidal zones along Fourchon Beach.

42.   During the various stages, Operations delineated and recovered buried oil material that either became exposed or was found by Operations, particularly in the vicinity of Breaches 1, 2 and 3.  The locations of the breaches are depicted in Exhibit B.

43.   A Stage 4 Shoreline Treatment Recommendation directed Operations to conduct regularly scheduled monitoring and maintenance activities along Fourchon Beach.

This Shoreline Treatment Recommendation also had variances issued that required removal of buried weathered oil in front of Breaches 1, 3, and 4 as well as plowing.  The purpose of plowing was to turn the sand over to a depth of about 18 inches below the surface to expose Surface Residue Ball material (small sand ball bound by highly weathered oil, typically much less than an inch in diameter), and allow for their recovery.

44.    In May 2010, Operations established, maintained and staffed a Fourchon Branch located in the immediate vicinity of Port Fourchon providing ready access to the beach area. Operations response teams were active on Fourchon Beach nearly daily since the inception of the response until mid- April 2014.  During Stage 4, Operations was directed to conduct beach maintenance activities that consisted of Operations personnel walking the beach and manually recovering small isolated Surface Residue Balls a minimum of 3 times a week, and many times in excess of that frequency.

45.    Early during this nearly 4 year response period, the Federal On-Scene Coordinator directed manual (as opposed to mechanical) removal of oil from the Wisner Donation Property.  This was consistent with the method preferred by the State of Louisiana and the Wisner Donation.   As a result, between early October 2010 and the end of April 2011, Operations manually dug more than 5,400 holes to a depth of about 18 inches all across the beach area in a comprehensive and systematic manner, and removed residual oil that was either  near the surface, or buried to the depths of the hand auger.  Passage of Hurricane Isaac in September 2012 revealed that in some locations on Fourchon Beach, oil was buried deeper than the hand

auger penetrations.   At that point, a deeper mechanical augering program that could penetrate down to 3 feet deep below the beach surface was proposed by BP. Mechanical augering was initially objected to by both the State of Louisiana and the Wisner Donation.  The Federal On-Scene Coordinator did, however, initiate the mechanical augering program as it was the most effective method to assess and remove oil below the beach surface.  Both the State of Louisiana and Wisner withdrew their objections to this program.

46.    In September 2012, BP proposed a "deep-clean" initiative on several Louisiana beaches, including Fourchon Beach.  In December 2012, the Federal On-Scene Coordinator approved the deep-clean initiative.    The Federal On-Scene Coordinator's decision was supported by both the State of Louisiana and the Wisner Donation.  The deep-clean effort included a comprehensive mechanical auger program of targeted areas on Fourchon Beach, where buried oil deposits had the potential to exist based on a series of beach profiles taken at various locations along the beach. This effort was called the Louisiana Augering and Sequential Recovery project.   As a result of this effort, over 5,800 augers were dug to a depth of 3 feet, coupled with over 4,900 pits.  Through this effort, over 1,790,000 pounds of weathered oil deposits and oily debris material were recovered from Fourchon Beach. All the oil and oily debris found that exceeded the surface and subsurface endpoints was recovered as part of this effort.

47.    In January 2013, as part of the Louisiana Augering and Sequential Recovery Project, material recovered from Fourchon Beach was sampled and analyzed. The purpose of the study was to determine the composition of material recovered at

Fourchon Beach. A sampling plan was developed in order to determine how much oil, water, and other material (sand, organic matter, etc.) was present by weight in the in-situ weathered oil deposit, as well as the recovered waste stream.

48.     The results of this study corroborate previous studies that concluded that weathered oil deposits, when sampled in-situ on the beach, only contain between 6 and 15 percent residual oil, a very small fraction of the overall material being recovered and disposed of.  By weight, the majority of the material is sand, shell hash and other non-oil material.

49.     After Tropical Storm Karen in 2013, Operations again instituted a program to address the potential for weathered buried oil material to exist in front of Breaches 1, 3, and 4.  The scope of this effort was detailed in a work plan that was directed by the Gulf Coast Incident Management Team (and supported by the Louisiana On-Scene Coordinator) in early November 2013.   The bulk of this effort was conducted directly in front of Breach 1 and continued until the Federal On-Scene Coordinator concluded that the objectives were met.

50.      In February 2014, the Federal On-Scene Coordinator directed Operations to conduct a plowing program in an area directly in front of Breach 1.  This plowing program entailed plowing down to a depth of about 18 inches to expose and recover Surface Residue Balls buried beneath the surface. As a result of this effort additional material was recovered.  At the conclusion of the plowing program, Operations proposed to conduct a tilling program at the same location as the plowing program. However, the Wisner Donation (and thus the State) objected to the use of tilling as a response action, and Operations was not able to perform

tilling operations over this small location.  At the direction of the Federal On-Scene Coordinator, SCAT conducted a survey of the segment that contains Breach 1 on Fourchon Beach on March 25, 2014 after the proposed tilling program was not approve by the Wisner Donation or the State.  The results of that survey indicated Surface Residue Ball concentrations were less than 1% over the entire surface of the 1537 meter long segment, with the exception of a small 150 by 20 meter area in the supra-tidal zone in the vicinity of Breach 1.  In this small area, surface residue concentrations ranged from 1 to 3%, with an average distribution of just over 1%. With the exception of this small area, all remaining portions of the segment met surface and subsurface endpoints for non-residential beaches in Louisiana. The 150 by 20 meter area that did not meet the Shoreline Cleanup Completion Plan endpoints is the same area where prior augering, trenching and plowing activities were conducted.  This small area is also the same location where Operations proposed to conduct tilling operations once plowing activities were completed. Tilling was the only effective "tool left in the tool box" to use on this small portion of the segment, and I remain confident that if tilling had been approved for use by the Wisner Donation and the State when it was proposed at the end of the plowing program, this small area would have reached numerical endpoints at the time of the March 25, 2014 SCAT survey, as did the rest of the segment.  Without the use of tilling, Operations exhausted all available options to effectively treat this small area in a manner that would allow it to reach the numerical endpoint of less than 1% in a reasonable timeframe.  As a result, the segment clearly met the "As Low As Reasonably Practicable Considering the

Allowed Treatment Methods" portion of the endpoints for non-recreational beaches in Louisiana.  The Federal On-Scene Coordinator agreed with this fact, as indicated by his May 21, 2014 letter (Exhibit C), where he determined that no further removal actions are warranted on this segment and the segment was removed from the active response.

51.    In my opinion, the surface and subsurface endpoints, as established in the Shoreline Cleanup Completion Plan, have been met.

### No Further Assessment and Response Efforts Necessary or Appropriate at Breach 1

52.    Dr. Pardue states that "a substantial amount of oiled sand and free oil remain at Breach 1" (Expedited Motion for Preliminary Injunction, Exhibit 7, Paragraph 14a).  Dr. Pardue's contention is not supported by any data I have reviewed.  Indeed, the data collected during the four year period of the response contradict these assertions.  Both SCAT and Operations have conducted a significant amount of response activities in front of Breach 1 as well as in the washover areas directly adjacent to Breach 1. Response efforts in the immediate vicinity of Breach 1 included a combination of SCAT surface observations, SCAT pitting, Snorkel SCAT activities (discussed below), Operations augering and Operations trenching down to the relic clay/peat marsh platform.

53.    Snorkel SCAT is a specialized application of the SCAT technique and was applied in various areas, including along Fourchon Beach, to find oil in the near-shore environment.   Snorkel SCAT used snorkeling gear to survey areas suspected to contain oil based on various observations.  Upon finding oil, Snorkel SCAT delineated and characterized the oil and its distribution consistent with SCAT procedures.  This information, like other SCAT data, was used by the Gulf

16

Coast Incident Management Team in making decisions for additional assessment or recovery.

54.     Based on my work in the Response and my extensive review of this data, it is my professional opinion that there is not a "substantial amount of oiled sand and free oil" remaining in front of Breach 1 as Wisner Donation consultants assert.  In my opinion, the area in the vicinity of Breach 1 meets the surface and subsurface endpoints contained in the Shoreline Cleanup Completion Plan.

55.     Dr. Pardue claims that "there are layers of oil exceeding 1 [inch] clearly exceeding the remedial standard on the beach" (Expedited Motion for Preliminary Injunction, Exhibit 7, Paragraph 14a). In my professional opinion, Dr. Pardue's statement is flawed. First, his statement does not reflect the correct standard/endpoint for non-residential beaches stated in the Shoreline Cleanup Completion Plan.  The correct standard/endpoints for non-residential beaches like Fourchon Beach are  as follows: (1) **Surface -** <1% distribution of oil that is MC 252, or as low as reasonably practicable considering the allowed treatment methods and Net Environmental Benefit; (2) **Subsurface -** No subsurface oil exceeding 2.54 centimeters in thickness and patchy (<50% distribution) that is greater than Oil Residue, or as low as reasonably practicable considering the allowed treatment methods and Net Environmental Benefit.  These standards recognize that a level of remnant oil may remain on a given property if further response actions would cause more physical harm to a specific shoreline habitat than the remaining oil would cause.   I will note that the government-commissioned and led Operational Science Advisory Team's February 2011

17

Summary Report for Fate and Effects of Remnant Oil in the Beach Environment (OSAT-II), concluded that the environmental effects of the residual oil remaining are relatively minor and that aquatic and wildlife resources would likely experience a greater threat from further cleanup beyond established guidelines than from allowing the oil that still remains on the beaches to naturally attenuate. Second, the use of small diameter geoprobes or vibracores for the purpose of determining whether subsurface endpoints have been met is inappropriate. The approximate 2-inch diameter boring, upon which Dr. Pardue relies for his conclusion, cannot provide any context for the aerial extent of buried oil and is therefore inappropriate for the evaluation of the subsurface "distribution" of buried oil material, a critical and important part of the subsurface endpoint. It is for this very reason that SCAT or Operations were never directed to use this type of equipment on any beaches in the Area of Response at any time in the Response.

56.     Both SCAT and Operations have completed a significant amount of delineation and recovery of weathered buried oil in the immediate vicinity of Breach 1, beginning in May 2010, and continuing until late May 2014, when the Federal On-Scene Coordinator concluded that "…no further removal activities are appropriate on the property…". In my professional opinion, the Federal On-Scene Coordinator's conclusion, set forth in its letter dated May 21, 2014 (Exhibit C), is consistent with and supported by the vast amount of data and information obtained at this site. It is my opinion, based upon the significant cleanup operations conducted, the data generated during operations, SCAT inspections,

18

and my professional experience, that the surface and subsurface endpoints for the portion of beach in the vicinity of Breach 1, as well the entirety of the Wisner Donation Property, have been attained.  As a result, no further response efforts are warranted on Wisner Donation Property.

**No Further Actions are Warranted or Justified Anywhere on Wisner Donation Property, the Wetlands Area, or in the Offshore Area**

57.    I have reviewed the *Scientific Assessment and Remediation of MC252 Oil on Fourchon Beach, Wetlands and Offshore Region, Louisiana*, dated December 31, 2012, prepared by John Pardue and Jeff Williams (hereinafter referred to as the "Wisner Assessment and Remediation Plan") attached to the Expedited Motion for Preliminary Injunction as Exhibit 11.

58.    The Wisner Assessment and Remediation Plan is not current, it is nearly two years old.  Indeed, a substantial amount of the information contained in the Wisner Assessment and Remediation Plan is outdated and does not reflect or acknowledge the current conditions of Wisner Donation Property.  For example, the Wisner Assessment and Remediation Plan does not reflect many comprehensive investigations on Fourchon Beach that have been conducted by both SCAT and Operations (with Wisner representatives present as observers in most instances) since 2012.  Since 2012, over 5800 auger pits have been dug by Operations, over 6200 Snorkel Scat holes have been dug in the subtidal areas, and over 4,800,000 pounds of oil and oily debris material have been recovered and disposed of by Operations. Since 2012, all of the segments have met relevant endpoints contained in the Shoreline Cleanup Completion Plan, and all segments on Wisner Donation Property have been deemed "removal actions deemed

19

complete" by the Federal On-Scene Coordinator.  As such, all segments have been removed from the active response by the Federal On-Scene Coordinator and returned to the legacy process established by the National Contingency Plan for reporting and responding to any potential future oiling events that may occur on Wisner Donation Property.

59.    Since May 21, 2014, when the Federal On-Scene Coordinator determined that "no further removal actions are appropriate on the property," no additional oiling has been reported to the USCG through the National Response Center (NRC) on Fourchon Beach or its adjacent wetlands/marsh and subtidal areas.

60.    Page 2 of the Wisner Assessment and Remediation Plan states that "Results of a comprehensive science-based assessment are critical for closing large data gaps in the SCAT process in the three environmental regions on the Wisner property".  I have been working closely with National Oceanic and Atmospheric Administration and the USCG as part of the SCAT program in Louisiana since May 2010, and there are not any data gaps in the SCAT process, much less the large data gaps alleged in the Wisner Assessment and Remediation Plan.

### *The Wisner Assessment and Remediation Plan - Offshore*

61.    Page 4 of the Wisner Assessment and Remediation Plan states that "The Wisner Science Team has collected some of the only data for the presence of oil in subtidal zones." This statement is incorrect.  Between February and December 2013, Snorkel SCAT teams (which included representatives from USCG and the State of Louisiana) manually dug a total of 6243 holes to a depth of about 40 centimeters (16 inches) below the seafloor in the subtidal zone along Fourchon Beach. These holes were dug along transects normal to shore spaced at

20

approximate 20-meter (65 foot) intervals.   Each transect extended from the land/water interface offshore for distances averaging between 55 – 60 meters (180-200 feet), generally coinciding with water depths of about 1.25 meters (4 feet). Holes were dug at approximate 4 - 5 meter (12 – 15 foot) spacing along each transect.   The results of this extensive effort were as follows: 4545 holes with No Oil Observed; 1591 holes with Very Light Oiling; 81 holes with Light oiling; two holes with Moderate oiling; and 24 holes with Heavy oiling. The 24 holes with heavy oiling were associated with a small mat found in front of Breach 2 after erosion of the nearshore accompanying the passage of Tropical Storm Karen in the fall of 2013. This mat was subsequently removed by Operations. Wisner representatives were present on the beach on many occasions when this study was being conducted and have been presented with the results.   The remaining holes where moderate, light, or very light oiling was observed were determined to be not recoverable by Snorkel SCAT teams.   That determination was approved by the Federal On-Scene Coordinator as well as representatives of the USCG and the State of Louisiana.

62.    Page 4 of the Wisner Assessment and Remediation Plan states that "This [the Wisner Science Team's] survey employed a series of nearshore shore-normal transects along which 39 vibracores were collected and analyzed" (Wisner Assessment and Remediation Plan, p. 4.)  Based on the information provided to the Gulf Coast Incident Management Team, these cores were all taken over 3.5 years ago, in late December 2010.  Significantly, the Wisner Science Team's own analyses indicated that no evidence of MC 252 oil occurred in 80% (31) of the

21

cores. The Wisner Science Team's analyses concluded that 8 of the cores (20%) along three transects showed evidence of light sheens and/or odors between 0 and 30 cm (0-12 inches) beneath the seafloor that they attributed to MC 252 oil. This assertion, however, is unsubstantiated by the accompanying core descriptions, which indicates that only 3 cores, (not 8) showed evidence of sheen. Accordingly, their data demonstrates that 34 out of 38 (92%) cores contained no evidence of MC 252 oil.

63.  As noted, the data discussed above is from 3.5 years ago and does not reflect current conditions.  Current data obtained by Snorkel SCAT over a 10 month period in 2013 indicates that oil is not present in these coring areas.

64.  It is my opinion that further investigation or response action in the subtidal area off of Fourchon Beach is not justified by scientific data.

65.  With regards to offshore remediation, the Wisner Science Team recommends "sediment capping" a swath of seafloor 200 yards wide by 16,000 yards long, with 2,000,000 cubic yards of sand 0.7 yards (25 inches) deep to cap areas where they contend offshore mats are present.  (Wisner Assessment and Remediation Plan, pp. 6-7.) This concept is flawed on many levels.  The most significant flaw is that while it recommends the performance of a substantial amount of assessment (presumably in an effort to determine the presence, nature, and extent of contamination), at the same time that it provides for a remediation plan.  Based on my experience, remediation plans are based on the results of the assessment – without an assessment, a remediation plan cannot be proposed.  Since the authors of the Wisner Plan believe that "the area offshore of the Fourchon headland has

received little to no assessment," it is difficult to understand the basis of their remediation plan.  If the authors truly believe that no assessment has taken place, they cannot propose a credible remediation plan.

66.   The Wisner remediation plan relies on the assumption that the entire nine mile area of Fourchon Beach contains quantities of MC252 oil significant enough to necessitate remedial action of all nine miles.  The authors provide no basis for this assumption.  Moreover, that assumption is at odds with the vast amount of scientific data collected during the Response.   As noted above, a significant amount of assessment work has been performed under the direction of the Federal On-Scene Coordinator.  The results of those assessments suggest that no offshore mats necessitating remediation are present.  No data supporting an alternative conclusion has been provided to my knowledge.

67.   The flaws with the Wisner remediation plan are not limited to the above.  The remedial actions for the offshore area call for "sediment capping" a swath of seafloor 200 yards wide by 16,000 yards long, with 2,000,000 cubic yards of sand at a depth of 0.7 yards (25 inches).  This is intended to cap, or cover, areas where they contend offshore mats are present, though, as explained above, there is no data or evidence that indicates "mat" material even exists in this area.  Even if Wisner's contention was correct, sediment capping would not be an appropriate response.  Day-to-day coastal processes along with significant storms have the potential to rapidly remobilize the sand and disperse the sediment, defeating its intended purpose.  Remobilization of capping sand would also smother benthic faunal and infaunal species and disrupt the established ecosystem in this area.

68.     Moreover, there are numerous oil and gas pipelines and flow lines on the seafloor, as well as many wellheads and other oil production equipment, and placing sediments in this area could hinder or preclude routine inspections and possibly compromise the safety or operational integrity of these facilities.

69.     For the reasons stated above, it is my opinion that the concept of "capping contaminated sediments" in a dynamic coastal environment such as the Fourchon Beach offshore area is inappropriate and not an industry standard.

70.     Furthermore, it is my understanding that the Wisner Donation does not own the subtidal submerged lands offshore of Fourchon Beach.   Rather, the property belongs to the State of Louisiana, and as such, I question the Wisner Donation's authority to prescribe assessment and remediation activities on property that it does not own.

**_The Wisner Assessment and Remediation Plan – Beach_**

71.     The Wisner Assessment and Remediation Plan was prepared in 2012 and its rationale for the beach assessment is outdated and does not reflect the vast amount of effort directed by the Federal On-Scene Coordinator and  put forth by both SCAT and Operations on Fourchon Beach since 2012.  Between January and May 2013, Operations dug more than 5,800 auger pits on Fourchon and recovered over 1,790,000 pounds of oil and oily debris as part of Louisiana Augering and Sequential Recovery project, discussed above.   The bulk of this material came from buried oil sediment in front of Breaches 1 and 2. Additionally, between October and December 2013 following Tropical Storm Karen, Operations instituted a detailed trenching program, primarily in the vicinity of Breach 1 (but also near Breaches 2 and 4) and recovered and disposed of 2,970,000 pounds of

oil and oily debris. In February 2014, Operations conducted a plowing program in front of Breach 1 recovering and disposing approximately 1,900 pounds of oil and oily debris. The trenching and plowing programs along with routine monitoring and maintenance activities, have removed more than 4,800,000 pounds of oil and oily debris from Fourchon Beach since December 2012.  Based on daily SCAT reports and other reporting from the field, it is my understanding that Wisner representatives were on the beach and present during the vast majority of the activities described above.

72.    The *Comprehensive Assessment and Remediation Plan for the Beach* contained within the Wisner's overall Assessment and Remediation Plan cites oil deposition from offshore deposits as the first factor contributing to the difficulty of beach cleanup.  The Wisner Science Team's own data states that they did not find any offshore oil mats during their studies, and over the 4 years since April 2010, no one else has reported, found or documented oil mats offshore of Fourchon Beach. Further, the Wisner Science Team's remediation plan is not current and does not reflect the significant efforts completed by Snorkel SCAT and Operations in 2013 and through March 15, 2014, on the Wisner Donation Property.  Based on their efforts, along with SCAT survey data, the Federal On-Scene Coordinator determined that all segments on the Wisner Donation Property satisfied subsurface and surface endpoints for non-residential endpoints and "removal actions were deemed complete. A review and consideration of actual assessment data, set out above, reveals that the remediation efforts contemplated by the authors of the Wisner Assessment and Remediation Plan are not supported by the

data, are based on faulty assumptions, and are not consistent with highest industry standards.

73.     It is my opinion that further investigation or response action is not warranted or justified.

**The Wisner Assessment and Remediation Plan – Wetlands Environment**

74.     I have reviewed the section of the Wisner Plan entitled *Comprehensive Assessment and Remediation Plan for the Wetland* that includes mudflats, marsh, and mangrove areas.  During the May 2010 through the mid-August 2010 period when periods of free floating oil was coming ashore, SCAT took almost daily (weather permitting) slow and low level (+/- 500 foot) helicopter overflights of the wetlands area landward of Fourchon Beach with the goal of aerially observing and documenting the condition of the wetlands in this area. During this period, no oiling conditions that warranted any response actions were observed by SCAT in the Fourchon wetlands.

75.     The National Oceanic and Atmospheric Administration has recently prepared a document entitled *Oil Spill in Marshes, Planning and Response Considerations - September 2013*. This document addresses planning and response considerations for oil spills in marshes and notes that "…there are many spill circumstances where the decision is made to allow natural recovery to proceed without any active clean-up, because active clean-up would cause more harm than benefit to the habitat and animals using that habitat" (page 3-4 of document).  There have been several locations in Louisiana where oiled marsh segments were either below No Further Treatment guidelines or endpoints which were permitted to recover naturally.  At other sites, marsh segments were more heavily oiled, but

SCAT determined that natural recovery was preferred due to "net environmental benefit."

76.    A SCAT survey recorded 25 meters of moderate oiling of the marsh fringe along the western shore of Bay Champagne, on Wisner Donation Property, during the summer of 2010. However, no treatment was warranted due to net environmental benefit because treatment would have done more harm than good to the environment. A second SCAT visit to this site in July 2011 recorded no observable oil and thus, the segment was determined to be "removal actions deemed complete" and was removed from the active response in July 2012.

77.    In November 2010, after the passage of Hurricane Alex and Tropical Storm Bonnie, a SCAT Survey was conducted in the wetland area directly behind Breach 2. Based on my review of the SCAT forms, Ms. Cathy Norman, then the Land Trust Manager of the Wisner Donation Trust, accompanied the SCAT team on the survey. The survey visited locations behind Breach 2 at Ms. Norman's request, where the Wisner Donation thought oil would be found.  During that SCAT visit, and as documented in the SCAT data recorded on that visit, no oil was observed at any location behind Breach 2.

78.    In early May 2010 before the barricade at Breach 1 had been fully constructed, some oil became stranded on the sandy bank directly behind the barricade. This oil was observed and documented by a SCAT team the next day. One day later, the entire area was cleaned up by Operations. No further oil has been observed by SCAT teams on subsequent visits to that segment since that point in time.

79.     It is possible that some Surface Residue Balls may have been entrained with other beach sediment in washover areas associated with significant storm events. However, possible Surface Residue Balls deposited in adjacent marsh areas would be far below the endpoint criteria for marshes in Louisiana as instructed in the Shoreline Cleanup Completion Plan, and as such would not trigger removal actions.

80.     In the Wisner Assessment and Remediation Plan, the authors claim that they have documented oiling in the marsh behind breaches 3 and 1 and other washover areas in 2011 and 2012 after significant storm events.   (Wisner Assessment and Remediation Plan, pp. 10-11).  Over the course of this response, no one from the Wisner Donation or the Wisner Science Team has provided credible evidence to the Unified Command (including SCAT, National Oceanic Atmospheric Administration, Louisiana State On-Scene Coordinator, and USCG) that oiling conditions in the wetlands were a threat to the health of vegetation or wildlife, or that oiling conditions were such that they exceeded No Further Treatment guidelines or endpoint criteria to warrant any response actions in these areas.

81.     The Wisner Assessment and Remediation Plan does not reflect the many comprehensive investigations on Fourchon Beach that have been conducted by both SCAT and Operations since 2012. Since 2012, all of the segments have met relevant endpoints contained in the Shoreline Cleanup Completion Plan, and all segments on Wisner Donation Property have been designated "removal actions deemed complete" by the Federal On-Scene Coordinator.

82.     In realization of the above, further assessment and remediation activities in the wetlands behind the Wisner Donation Property on Fourchon Beach is not supported by the data and is unnecessary.  Any intrusive investigations (*i.e.,* monitoring natural recovery by sampling oiled sediments and plant material as proposed in the Wisner Assessment and Remediation Plan) in these sensitive wetland areas would only cause harm and injury to healthy vegetation and wildlife in pursuit of undocumented oil.

**Conclusions**

83.     Since May 2010, BP as part of the Gulf Coast Incident Management Team, has used the highest industry standards in documenting and responding to the oiling conditions on Fourchon Beach, including offshore areas.  For example, the use of Snorkel SCAT as a tool for detecting buried oil in the subtidal areas was developed and perfected on this Response.  It did not exist as a response tool in prior oil spill responses.  Similarly, the comprehensive augering and trenching programs implemented by Operations have not, to the best of my knowledge, ever been implemented as part of prior emergency response actions undertaken by USCG.  The highest industry standards were used in conducting all Response operations.

84.     Based on the vast amount of nearshore subtidal data (Snorkel SCAT), beach data (SCAT surveys, pits, augers, trenches, plowing  and maintenance and monitoring activities), and wetlands/marsh data (aerial overflight data, SCAT surveys), coupled with the fact that all shoreline segments on Wisner Donation Property have met endpoints established in the Shoreline Cleanup Completion Plan and determined to be "removal actions deemed complete" by the Federal On-Scene

29

Coordinator, it is my professional opinion that no further actions are warranted or justified anywhere on Wisner Donation Property, the wetlands area, or in the nearshore subtidal area.

85.    The Federal On-Scene Coordinator reviewed the claims and demands made by the Wisner Donation's Science Team, and in his letter to the Wisner Donation dated May 21, 2014 (Exhibit C) concluded that no further removal actions are appropriate on the Wisner Donation Property.  The Federal On-Scene Coordinator specifically noted that he will take no action on the unsubstantiated reports made by the Wisner Donation of the presence of offshore oil mats, or any oil the Wisner Donation purports to be contained in the wetlands.  The Federal On-Scene Coordinator further concludes that any future activity on the beach would provide no net environmental benefit, is insufficiently supported by science, or is otherwise inappropriate under the National Contingency Plan. I agree with the Federal On-Scene Coordinator's conclusions.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis and that, if called as a witness, I would and could testify to the above based on my own personal knowledge, training, and experience.

EXECUTED on July 28, 2014.

Gary Hayward

# EXHIBIT A



# Curriculum Vitae

## GARY L. HAYWARD

| | |
|---|---|
| **Title** | Senior Environmental Consultant |
| **Expertise** | Oil Spill Response, Planning and Related Environmental and Technical Studies |
| | Environmental Impact Studies |
| | Environmental Mitigation Planning and Compliance Program Development/Implementation |
| | Siting and Planning Analyses |

**Career Summary**   Mr. Hayward began his career as an environmental consultant in 1979.  Since that time, Mr. Hayward's career has had a major emphasis on projects associated with the oil and gas industry including oil spill response, planning and a wide range of related environmental and technical studies. Mr. Hayward as been directly involved with the development and implementation of both environmental and oil spill response protection measures associated with the construction and operation of oil and gas pipelines, onshore and offshore field development areas, and terminal and distribution facilities. In addition, Mr. Hayward has provided independent third-party audit and technical review of environmental and social management plans and related documents to ensure compliance with project commitments and World Bank Group Environmental Safeguard Policies.

**Relevant Experience**

- From May – September 2010, served as BP's Shoreline Cleanup Assessment Techniques (SCAT) Coordinator for Louisiana and working out of the Houma Incident Command Center.  As an integral member of the Unified Command's Environmental Unit, primary responsibilities included managing and coordinating BP SCAT contractors (Polaris) daily field activities; interfacing with USCG and LA state reps; attending daily meetings, briefings and strategy sessions; SCAT reporting and scheduling; and development of shoreline treatment recommendations (STRs). From October 2010 – September 2012 served as BP's SCAT Coordinator for Louisiana, Mississippi, Alabama and Florida and working out of the Incident Command Center in New Orleans.  Essentially same responsibilities as above but for all 4 states.  From October 2012-April 2014, served as BP's Environmental Section Chief for the MC252 Response.  Primary areas of focus included compliance with Sec 7 of Endangered Species Act, Migratory Bird Treaty Act, National Historic Preservation Act, numerous Best Management Practices, SCAT, and a wide range of reporting.

- Project Manager:  Development of a comprehensive generic oil spill response management and strategy plan and numerous regional spill response plans for petroleum transport/transfer operations along the U.S. east coast, Gulf Coast, and Caribbean Sea region for Aramco Services Company.  Other project activities included overseeing general permitting, waste disposal, spill trajectory, shoreline protection strategies, and health and safety issues for Aramco Services Company's U.S. oil spill response organization.   Overseeing general permitting, waste disposal, spill trajectories, shoreline protection strategies, and health and safety issues for Aramco Services Company's oil spill response organization.

- Project Director: Third-party compliance review and audit of project environmental commitments and Peru and World Bank Group environmental safeguard policies in connection with the Camisea Project on behalf of the Inter-American Development Bank (IDB). The Camisea Project is a gas field development in the Amazon Basin in Peru, with twin 600-mile connecting gas and gas condensate pipelines over the Andes to a coastal

**G. L. HAYWARD**

fractionation plant, offshore pipeline and marine export terminal facility. Critical issues included emergency response planning, concerns regarding indigenous peoples, health and medical services, a range of potential impacts to sensitive habitats including rainforest areas and an adjacent offshore marine preserve, a range of socioeconomic concerns, worker safety, and emergency response.

- Principal Investigator: Third Party compliance audit of compliance with World Bank Group environmental safeguard requirements applicable to the West African Gas Pipeline System construction activities in Nigeria, Benin, Togo, and Ghana. This effort involved an approximate 300 mile onshore and offshore pipeline and terminal facilities in Benin, Togo and Ghana.

- Principal Investigator: IFC/World Bank Environmental Safeguard policies environmental audit of Petzed Gamma and Shukhier Bay offshore oil production and associated onshore and offshore pipelines and processing facilities in the Gulf of Suez, Egypt. A major focus on this project involved technical reviews and readiness determinations associated with oil spill response planning and preparedness in along a very sensitive coastal and nearshore environment is the Gulf of Suez.

- Principal Investigator: Zetah Oil Company review of World Bank Safeguard policy compliance and Benin national environmental policy compliance associated with the potential acquisition of the Seme Oil Field offshore oil production concession and related offshore and onshore pipelines and storage facilities in Benin.

- Principal Investigator: PanAfrican Energy Environmental Impact Analysis and International Finance Corporation Environmental Performance Audit of onshore oil exploration and development in the Panthere concession area, Gabon. A major focus of this effort related to oil spill prevention and response in a sensitive jungle setting along a major river that was used for subsistence fishing and transportation by local indigenous peoples.

- Principal Investigator: Environmental audit of oil refinery and marine terminal operations related to oil spill prevention/oil spill response and contingency planning for Ertoil, S.A., in Huelua, Spain.

- Principal Investigator: Environmental Impact Assessment for the Texaco Fur Seal prospect oil and gas exploratory drilling island offshore the north slope of Alaska, USA.

- Principal Investigator: Environmental Impact Assessment for the Amoco ice island construction and exploratory drilling, North Slope, Alaska.

- Principal Investigator: Tenneco oil and gas exploration environmental impact analysis and oil spill contingency plan, North Slope, Alaska.

- Principal Investigator: Environmental Report (Exploration) for two dozen federal offshore leases in the Santa Barbara Channel and Santa Maria Basin, addressing exploration plans proposed by: Pennzoil, Getty Oil Company, Chevron USA Inc., Ogle Petroleum Company, Reading & Bates Petroleum, Conoco, Exxon Company USA, Arco Oil and Gas Company, and Texaco.

- Project Manager and principle investigator: Environmental assessment Phillips 66/Marathon Oil Company's Kenai LNG facilities near Kenai, Alaska to support permit applications for the continued manufacture and sale of LNG to world markets.

- Senior Project Manager and Technical Advisor for the preparation, finalization and implementation of a comprehensive environmental impact assessment for the Chad Export Project for ExxonMobil and their co-venture partners Chevron and Petronas. The primary project components included a 350-well oilfield development program in Southern Chad and an approximate 650-mile, 30-inch oil export pipeline from the oilfield development area through Cameroon to the Atlantic coast, and continuing 8 miles offshore to a moored floating

storage and offloading (FSO) vessel. Mr. Hayward's involvement with this project spanned more than 10 years and included initial planning and routing studies, preparation of a 20-volume set of environmental documentation compliant with World Bank Group and other international lending institution (ABN AMRO, COFACE and the US Export/Import Bank) policies and directives, coordination and oversight of pipeline construction contractors, and construction monitoring activities.

- Senior Technical Advisor and principal investigator for the preparation of a comprehensive third party EIS for BP Exploration (Alaska), Inc.'s Northstar Development Project, the first offshore oil and gas development project in the Alaska Beaufort Sea. Major issues addressed in this EIS included a detailed alternatives analysis, a comprehensive approach to cumulative effects analyses, a thorough and detailed consideration of traditional knowledge, an analysis of the current technology and effectiveness of oil spill prevention and response during solid and broken ice conditions, an evaluation of the potential for ice override and ice scour events, subsistence issues and concerns, threatened and endangered species and operational integrity issues in a dynamic ice environment.

- Principal Investigator: Environmental impact studies and mitigation monitoring plan for onshore natural gas exploration proposals by Northern Michigan Exploration Company, Santa Barbara, California.

- Project Manager: Development of an oil spill response plan for Mobil Oil Hong Kong, Ltd.'s new Tsing Yi Island Fuels Terminal in Hong Kong.

- Project Manager: Efforts associated a restructuring of the Clean Caribbean Cooperative and the Marine Industry Group, two oil spill cooperatives with responsibility to respond to oil spills in the Caribbean and the Gulf of Mexico.

- Project Manager/Senior Author - developed and prepared Spill Prevention Control and Countermeasures Plans for: proposed oil exploration and development projects adjacent to several environmentally sensitive areas on Vandenberg Air Force Base, for four different oil companies; an onshore oil pipeline within the Santa Ynez River flood plain, for Unocal; U.S. Navy operations on Amchitka Island, Alaska; and at two coastal locations near the Colville River Delta in Alaska, for Texaco.

- Principal Investigator: Oceanographic surveys and spill response planning associated with siting a FPSO, associated mooring facilities and connecting oil pipelines in the Lalang Channel, Sumatra, Indonesia, for Hudbay Oil (Malacca Straits), Ltd.

- Principal Investigator: Environmental studies and oil spill contingency plans for development for a major petrochemical complex on Das Island, Abu Dhabi for the Abu Dhabi National Oil Company.

- Principal Investigator: Conducted an oil spill training seminar for onsite personnel in support of exploratory drilling activities in the Bering Sea, for Arco.

- Project Manager: Evaluated oil spill response capabilities for the American Samoa Islands and developed an oil and hazardous substance spill response plan for implementation by local government and private sector personnel.

- Project Manager: Qualitative/quantitative risk assessment for petroleum exploration and production operations offshore of Indonesia for Maxus Energy Corporation. Field facilities included more than 50 fixed production platforms, 3 processing platforms and more than 500 miles of sub-sea pipelines.

- Principal Investigator: Acquisition of high resolution geophysical data and oceanographic data associated with an offshore pipeline and FSO offshore Cameroon. The oceanographic surveys included the acquisition of water quality, current and wave data, marine biological data, sediment chemistry data, diver reconnaissance over an approximate 25 square mile area.

**G. L. HAYWARD**

- Principal Investigator: Acquisition of detailed bathymetric data and sediment characterization analyses associated with channel deepening and expanded docking facilities for a coastal oil refinery in Balikpapan Bay, Borneo.
- Principal Investigator: Acquisition of over 18 miles of high resolution geophysical survey data and sediment sampling associated with gas pipeline siting studies in Mobile Bay.
- Principle Investigator: Acquisition of a series of piston cores over the continental slope and rise between Hudson and Wilmington Canyons in water depths ranging between 2000 and 3000 feet of water associated with potential for offshore oil and gas exploration activities.
- Principal Investigator for a multi-year marine environmental baseline program to better understand the wide range of oceanographic conditions of the Mississippi, Alabama and Florida continental shelf in north and western Gulf of Mexico. The marine program included a comprehensive range of sediment studies, biological surveys, and water quality analyses to determine environmental baseline conditions in this area prior to oil and gas leasing activities.

| | |
|---|---|
| **Academic Background** | M.S. (1979) Marine Science, University of South Florida<br>B.S. (1973) Geology, New England College |
| **Citizenship** | USA |
| **Countries Work In** | American Samoa, Australia, Bahamas, Cameroon, Chad, Indonesia, Kuwait, Peru, Puerto Rico, Spain, Hong Kong, Gabon, Benin, Togo, Nigeria, Egypt, Mexico, France, United States, Japan, Equatorial Guinea, Dominican Republic |
| **Publications, Reports, and Presentations** | Principal or contributing author of over 450 technical articles, reports, and environmental studies, including peer reviewed publications and technical conference presentations. |

# EXHIBIT B



# EXHIBIT C

**U.S. Department of Homeland Security**

**United States Coast Guard**



Federal On-Scene Coordinator
United States Coast Guard

Gulf Coast Incident Management Team
1250 Poydras Street, 5th Floor
New Orleans, LA 70113

5750
May 21, 2014

Edward Wisner Donation Advisory Committee
Attn: Amanda L. Phillips
935 Gravier Street, Suite 825
New Orleans, LA 70112

Dear Ms. Phillips,

I am responding to the Edward Wisner Donation Advisory Committee letter of March 26, 2014, as well as the series of previous letters and emails that the Advisory Committee and its legal counsel have sent to the Gulf Coast Incident Management Team (GCIMT).The above referenced documents, along with letters and emails addressed to the FOSC independently, were all in reference to the Deepwater Horizon spill response activities that took place on and along property managed by the Advisory Committee in Lafourche Parish, Louisiana.

The property managed by the Advisory Committee was directly and intensely impacted during the Deepwater Horizon oil spill. In response, the GCIMT engaged in considerable cleanup efforts, scientific analysis, and shoreline assessments along the property. In doing so, we have met with you, other Wisner Advisory Committee members, and the Advisory Committee's legal counsel on numerous occasions to discuss plans and address concerns drafted in various scientific reports, the letters and emails from the Advisory Committee, and the Committee's lead scientist.

I have carefully reviewed all available data, along with the correspondence and materials that the Advisory Committee or the Committee's lead scientist provided.  I have also consulted with my Scientific Support Coordinator on data and data results. I have reviewed the limited response options made available to GCIMT Planning and Operations personnel, the recent low collection numbers resulting from an open National Response Center (NRC) case and the equipment and operational constraints that the Advisory Committee imposed during response. Additionally, I have reviewed the enclosed report, prepared by the responsible party, which focuses on the history of response activities that took place in the vicinity of breaches 1 and 2 along Fourchon Beach.

Having done so, I have concluded that no further removal activities are appropriate on the property managed by the Edward Wisner Donation Advisory Committee. In particular, we intend to take no further action with respect to oil that the Advisory Committee purports to be entrained within the marsh, nor will there be any further action to address unsubstantiated reports of potential oil mats offshore, below the relic clay and peat platforms.

Additionally, after review of all treatments that occurred in the Operational Zone PF-1, I have further concluded that it would be inappropriate and impractical to replace all of the sand that the Advisory Committee's scientist believes to be contaminated with MC252 oil. I further conclude that any future activity provides no net environmental benefit, is insufficiently supported by science, or is otherwise inappropriate under the National Contingency Plan.

I note that we have now completed the processing of all shoreline segments on the Gulf under the Shoreline Clean-up Completion Plan. Any questions regarding the history of any particular segments should be addressed to the Louisiana On-Scene Coordinator by contacting either Mr. Sam Broussard at Samuel.Broussard@LA.Gov or Mr. Daniel Lambert at Daniel.Lambert@LA.Gov.

We continue to respond to reports of oiling pursuant to the National Response Center framework. One National Response Center (NRC) case is currently open on the property being managed by the Advisory Committee, on segment LALF01-001-10A. We will be closing this case for the above mentioned reasons and because of the recent reports of the presence of nesting Least Terns in the area.

Sincerely,

S. Walker
Captain, U.S. Coast Guard
Federal On-Scene Coordinator
Gulf Coast Incident Management Team

1 Enclosure

Copy:  Laura Folse, BP Executive Vice President

2