**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL     )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010    )  JUDGE BARBIER
                  )  MAG. JUDGE SHUSHAN

_____

ORAL AND VIDEOTAPED DEPOSITION OF
MARSHALL B. ROSE, PH.D.
JUNE 26, 2014

Deposition of MARHALL B. ROSE, PH.D., taken at
the Pan-American Building, 601 Poydras Street, 26th
Floor, New Orleans, Louisiana, 70130, on the 16th day of
June, 2014.

**2**

1                      APPEARANCES
2
3   FOR THE U.S. DEPARTMENT OF JUSTICE:
4       BRANDON ROBERS
        RACHEL EVANS KING
5       U.S. Department of Justice
        Environmental & Natural Resources Division
6       601 D. Street N.W.
        Third Floor
7       Washington, DC 20004
8
9
10  FOR BP, INC.:
11      J. ANDREW LANGAN, P.C.
        MARTIN R. MARTOS, II
12      Kirkland & Ellis, LLP
        300 North LaSalle
13      Chicago, Illinois 60654
14
15  FOR ANADARKO PETROLEUM CORPORATION:
16      THOMAS R. LOTTERMAN
        Bingham McCutchen, LLP
17      2020 K Street, NW
        Washington, DC 20006-1806
18
19
20
21
22
23
24
25

**3**

1                      INDEX
2                                    PAGE
3
4   Appearances.................................  2
5
6
7   MARSHALL B. ROSE, PH.D.
8
        Examination by Mr. Langan..............  9
9
10      Examination by Mr. Lotterman...........  165
11
        Examination by Mr. Robers..............  197
12
13
14
15  Signature and Changes......................  200
16
    Reporter's Certificate.....................  202
17
18
19
20
21
22
23
24
25

**4**

1                      EXHIBITS
2                                        PAGE
3   12147  BOEM Ocean Science, The Science
           & Technology Journal of the Bureau
4          Of Ocean Energy Management,
           Volume 10, Issue 1, dated
5          January/February/March, 2013..........  12
6
    12148  Bureau of Ocean Energy Management
7          (BOEM) Org Chart, Approved
           September 30, 2013...............  13
8
9   12149  Declaration of Dr. Marshall B. Rose,
           In RE: Santa Fe Snyder Corporation,
10         V. Norton, et al., dated March
           27, 2003..............................  16
11
12  12150  MMS Economic Impact Assessment
           Effects of Drilling Pause for
13         6 Months, dated June 10, 2011
           Bates Stamped OSE055-11910 -
14         OSE055-11921.......................  35
15
    12151  E-mail chain from Krisha Pillow to
16         Snl-nisac-dutydesk, Subject:
           Deepwater Economic Impact Data -
17         Govt use only, dated July 30, 2010,
           Bates Stamped SNL004-003547 -
18         SNL004-003561........................  37
19
20  12152  The Department of the Interior's
           Economic Contributions, dated
           June 21, 2011, Bates Stamped
21         US_PP_DO1010384 -
           US_PP_DO1010529......................  38
22
23
24
25

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

5

PAGE

12153   Fact Sheet Regarding Halt on
Permits to Drill New Wells, dated
May 17, 2010, Bates Stamped
LA-DNR 00004340...................... 55

12154   US. Department of the Interior
March 27, 2010, Increased Safety
Measures for Energy Development
On the Outer Continental Shelf,
Bates Stamped IMV200-000843 -
IMV200-00866........................... 65

12155   Memorandum to Director, MMS, from
Secretary, Re:  Suspension of
Outer Continental Shelf (OCS)
Drilling of New Deepwater Wells,
Dated May 28, 2010, Bates Stamped
OSE001-00956S......................... 66

12156   U.S. Department of the Interior,
The Secretary of the Interior,
Washington, Dated July 12, 2010,
To:  Michael R. Bromwich from
Secretary Ken Salazar, Subject:
Decision memorandum regarding the
Suspension of certain offshore
Permitting and drilling activities
On the Outer Continental Shelf,
Bates Stamped HCG037-003148 -
HCG037-003176...................... 68

12157   United States Department of the
Interior Minerals Management Service
National Notice of Lessees and
Operators of Federal Oil and Gas
Leases, Outer Continental Shelf
(OCS), dated June 8, 2010, Bates
Stamped B-HZN-2179MDL00683582 -
B-HZN-2179MDL00683589................ 73

6

PAGE

12158   Order in the Hornbeck Offshore
Services, L.L.C., v. Kenneth
Lee "Ken" Salazar, Bates Stamped
HCG300-007864 -
HCG300-007866; Order and Reasons
In the Hornbeck Offshore Services,
L.L.C., v. Kenneth Lee "Ken"
Salazar, Bates Stamped
BP-HZN-2179MDL05303959 -
BP-HZN-2179MDL05303980................ 75

12159   The Bureau of Ocean Energy Management
Regulation and Enforcement Office of
Public Affairs Fact Sheet,
The Drilling Safety Rule, An Interim
Final Rule to Enhance Safety Measures
For Energy Development on the Outer
Continental Shelf, Bates Stamped
BP-HZN-2179MDL00704368 -
BP-HZN-2179MDL00704369; The Bureau
Of Ocean Energy Management, Regulation
And Enforcement Office of Public
Affairs Fact Sheet, The Workplace
Safety Rule on Safety and
Environmental Management Systems
(SEMS).............................. 77

12160   U.S. Department of the Interiors,
The Secretary of the Interior,
Washington, Decision Memorandum,
To Director, Bureau of Ocean Energy
Management, Regulation and
Enforcement, From Secretary Ken
Salazar, Subject:  Termination of the
Suspension of certain offshore and
Drilling activities on the Outer
Continental Shelf, dated October 12,
2010, Bates Stamped IMS155-006042 -
IMS155-006045........................ 80

7

PAGE

12161   United States Department of the
Interior Bureau of Ocean Energy
Management, Regulation and
Enforcement, National Notice to
Lessees and Operators (NTL) of
Federal Oil and Gas Leases, Outer
Continental Shelf, Statement of
Compliance with Applicable Regulations
And Evaluation of Information
Demonstrating Adequate Spill Response
And Well Containment Resources,
Effective Date:  November 8, 2010,
Expiration Date:  November 8, 2015,
Bates Stamped BP-HZN-2179MDL5927283 -
BP-HZN-2179MDL05927286............... 82

12162   Effects of Drilling Pause for 6
Months, Bates Stamped US_PP_BOEM001121
- US_PP_BOEM001132................... 110

12163   Effects of Drilling Pause for 6
Months, Bates Stamped US_PP_BOEM001159
Through US_PP_BOEM001170 -
US_PP_BOEM001170.................... 111

12164   Louisiana Mid-Continent Oil and Gas
Association, Impacts of President
Obama's Order Halting Work on 33
Exploratory Wells in the Deepwater
Gulf of Mexico, prepared May 28, 2010... 126

12165   Making the Gulf Coast Whole Again:
Assessing the Recovery Efforts of
BP and The Obama Administration
After the Oil Spill, Hearing before the
Committee on Oversight and Government
Reform House of Representatives
One Hundred Twelfth Congress, First
Session, June 2, 2011,
Serial No. 112-59..................... 138

8

PAGE

12166   E-mail from Sarah Peters to
Marshall Rose, dated June 16, 2014,
Subject:  Re: Drilling Pause
Question(sic)...................... 154

12167   GOM Sales Data for the years 1954-
2013; BP Sales Data for the years
1983-2013........................... 172

12168   GOM Sales Data for the years 1954-
2013; BP Sales Data for the years
1983-2013........................... 172

12169   E-mail from Ann Glazner to Matthew
To Matthew Ballenger, Marshall Rose,
Sarah Doverspike, cc, Michele Daigle
Dated June 2, 2014, Subject:
Treasure Security Information........ 174

12170   ONNR Statistical Information Page,
Office Of Natural Resources Revenue
Statistical Information.............. 178

12171   Office of the Secretary U.S. Department
Of the Interior, News Release,
Dated November 19, 2013.............. 191


PREVIOUS EXHIBITS REFERENCED

11888   ...................................... 37
11889   ...................................... 18
11890   ...................................... 52
11923   ...................................... 131

2  (Pages 5 to 8)

9

1    THE VIDEOGRAPHER:  Today is June 26th, 2014.
2    This is the deposition of Marshall Rose regarding the
3    oil spill of the Oil Rig DEEPWATER HORIZON in the Gulf
4    of Mexico on April 20th, 2010.  The time now is
5    8:28 a.m., and we are on the record.
6                MARSHALL B. ROSE, PH.D.
7    having been first duly sworn, testified as follows:
8                    EXAMINATION
9    BY MR. LANGAN:
10        Q.  It's Dr. Rose?
11        A.  Yes.
12        Q.  Dr. Rose, can you state your name for the --
13   for the record, please.
14        A.  Marshall Burgess Rose.
15        Q.  And where do you live, Dr. Rose?
16        A.  6708 Norview Court, Springfield, Virginia.
17        Q.  Dr. Rose, have you ever had your deposition
18   taken before?
19        A.  I think I might have had it taken once before.
20        Q.  Do you remember what kind of a case it was?
21        A.  No.
22        Q.  So I assume you generally understand how the
23   process works?
24        A.  I think so.
25        Q.  Okay.  Is there any reason that you can't give

10

1    truthful answers today?
2        A.  No.
3        Q.  So I'm going to ask questions.  You're going to
4    give answers.
5            If there ever comes a time when you don't
6    understand one of my questions, will you please let me
7    know?
8        A.  Of course.
9        Q.  Because we can clarify or try -- or to make
10   sure it's clear before you answer it.
11           Do you -- do you understand that?
12       A.  Yes.
13       Q.  If you go ahead and answer one of my questions,
14   we're going to assume that you understood it; is that
15   fair?
16       A.  I think so.
17       Q.  Okay.  You currently work for the Bureau of
18   Ocean Energy Management; is that correct?
19       A.  Yes.
20       Q.  And how do you pronounce it?
21       A.  BOEM.
22       Q.  BOEM, B-O-E-M, all caps, BOEM?
23       A.  Yes.
24       Q.  And what is your current position at BOEM?
25       A.  I'm the Chief of the Economics Division there.

11

1        Q.  And we'll get back to that, but I want to turn
2    the clock back now and -- and have you tell us a little
3    bit about your educational background, starting with
4    college, please.
5        A.  Okay.  I went to Queens College in New York and
6    received a Bachelor of Science degree in accounting.
7    That was in 1963.
8            Subsequently, I came down to New Orleans
9    and attended Tulane University and received a -- a
10   Doctorate in economics in 1969.
11       Q.  And after you left Tulane and got a PhD at
12   Tulane, what was your path, your career path, from
13   there?
14       A.  From there, I took a position with a think tank
15   called the Center for Naval Analyses.
16       Q.  Naval?
17       A.  Naval Analyses, working on logistical problems
18   for the F4 aircraft, and worked there for four years.
19           Then in 1970, I took a position with the
20   Xerox Corporation as a systems analyst up in Rochester,
21   worked there for a couple of years.
22           In 1972, I learned about the formation of a
23   new Federal agency called the Environmental Protection
24   Agency.  Came down and worked for Administrator
25   Ruckelshaus for four years.

12

1            And then in 1975, I came to work in the
2    Office of the Secretary at the Department of the
3    Interior and have been there ever since.
4        Q.  So you've really had various jobs within the
5    Department of Interior continuously since 1975?
6        A.  Yes.
7        Q.  So you'll see in Tab 1 of that notebook a
8    document which we're going to mark --
9            MR. LANGAN:  Brandon, how do -- do you mind
10   doing the stickering?
11           MR. ROBERS:  Sure.
12       Q.  (BY MR. LANGAN)  So the next exhibit is 12147.
13   Why don't we mark 12147 with Tab 1, if that's okay.
14           (Discussion Off The Record.)
15           (Exhibit No. 12147 Marked.)
16       Q.  (BY MR. LANGAN)  So, Dr. Rose, we happened to
17   find this nice March 2013 publication from BOEM, on
18   which Page 9 as an interview with you.
19       A.  Uh-huh.
20       Q.  Can you take a look at that?  And again, we're
21   talking about Exhibit 12147, I think.
22           That's you, right?
23       A.  Nice picture.
24       Q.  So -- it's a -- it's a wonderful picture.
25           I -- I'm just curious.  This, among other

13

1   things, sort of sets forth your career path, as well, I
2   think, right?
3       A.  Yes.
4       Q.  And I -- and my question to you is:  Does this
5   accurately set forth, in your words, sort of your career
6   path within the Department of the Interior?
7       A.  Yes.
8       Q.  And it's still an accurate description; is that
9   right?
10      A.  Yes.
11      Q.  Okay.  Tab 2 of this book we'll mark as 12148,
12  if counsel doesn't mind.
13          (Exhibit No. 12148 Marked.)
14      Q.  (BY MR. LANGAN)  Do you recognize
15  Exhibit 12148?
16      A.  Yes.
17      Q.  And what is it?
18      A.  That is the organizational structure of the --
19  the bureau that I work for.
20      Q.  And -- and this is -- says it was approved as
21  of September 30, 2011.
22          Is it basically the same now, if you know?
23  It looks like it was pulled off the website in June,
24  2014.
25      A.  Yes.  It looks substantially equivalent to the

14

1   current structure.
2       Q.  And I see on the left-hand side, about a third
3   of the away down this particular printed page, the
4   Economics Division.
5           That's the Division that you head?
6       A.  Yes.
7       Q.  So that box that says Economics Division,
8   that's -- that's you -- your area, correct?
9       A.  Yes.  That's correct.
10      Q.  And is it correct that, therefore, your
11  Division reports to the Office of Strategic Resources
12  Programs?
13      A.  Yes, that's correct.
14      Q.  What's -- what does the Office of Strategic
15  Resources Programs do?
16      A.  We manage leasing on the Outer Continental
17  Shelf and related responsibilities having to do with
18  resource evaluation and economic analysis.
19      Q.  And that's -- so is it -- is it fair to say the
20  Office of Strategic Resources Programs is primarily
21  about leasing of the Outer -- Outer Continental Shelf
22  in the Gulf of Mexico?
23      A.  No, no.  Not just the Gulf of Mexico.
24      Q.  Where else?
25      A.  In Alaska as -- and -- well, I mean, in theory,

15

1   it -- it could involve, you know, other planning areas,
2   but for this current five-year program, only the Gulf of
3   Mexico and Alaska are involved.
4       Q.  Okay.  How many employees does the Economics
5   Division have?
6       A.  We have 13.
7       Q.  And all of them -- 12 of them report to you?
8       A.  Yes.
9       Q.  And what kind of functions do they perform?
10  I'm just interested in what the 12 people do that --
11  that work in your group.
12      A.  Well, in terms of their expertise, we've got
13  economists.  We've got two petroleum engineers.  We've
14  got statisticians and folks who are expert in IT,
15  information technology, so...
16      Q.  All right.  And who at the Office of Strategic
17  Resource Programs do you report to?  I assume there's
18  somebody?
19      A.  Yes.  There's a Chief of the Office of
20  Strategic Resources named Renee Orr.
21      Q.  Renee Orr?
22      A.  Yes, O-r-r.
23      Q.  O-- okay.  And how long has Renee Orr held
24  her position?
25      A.  She's held her position since the

16

1   reorganization back in probably 2011, so almost three
2   years.
3       Q.  And before that, who did you report to, before
4   the reorganization?
5       A.  Before that, there was an Associate Director
6   named Chris Oynes, who was --
7       Q.  How do you spell it?
8       A.  O-y-n-e-s.  He was my -- my supervisor.
9       Q.  Okay.  Let's go to Tab 3, please.  And we'll
10  mark that, if you don't mind, as 12149.
11          (Exhibit No. 12149 Marked.)
12      Q.  (BY MR. LANGAN)  Dr. Rose, have you -- this --
13  this document, 12149, is a declaration from a case in
14  the Western District of Louisiana that was submitted
15  back, it looks like, in 2003.
16          Do you recognize it?
17      A.  No.
18      Q.  Do you remember the Santa Fe Snyder case?
19      A.  Yes.
20      Q.  What was that case about?
21      A.  It was a dispute over the law relating to
22  royalty relief.
23      Q.  And do you recall that you had some involvement
24  in the case?
25      A.  No, I don't recall that.

4 (Pages 13 to 16)

17

1    Q.  Do you recall filing a declaration in the case?
2    A.  No.
3    Q.  Have you -- do you recall filing declarations
4  in any pending litigation on behalf of the United
5  States?
6         MR. ROBERS:  I object to the scope.
7         MR. LANGAN:  You might want to speak up.
8         MR. ROBERS:  I'm sorry.  I want to object
9  to the scope of this line of questioning.
10        MR. LANGAN:  Okay.  All right.
11   Q.  (BY MR. LANGAN)  Go ahead.
12   A.  To the best of my recollection, I don't recall.
13   Q.  Okay.  I'm just curious.  Could you flip to the
14  second page of Exhibit 12149 and look at Paragraph 3.
15   A.  Sure.
16   Q.  The one that begins "The fair market value of
17  on offshore Federal lease is best established by
18  competitive Federal market forces."
19        Do you see that?
20   A.  Yes, of course.
21   Q.  Yeah.  I gather -- by the way, is that your
22  signature on the third page?
23   A.  Yes.
24   Q.  Okay.  I gather that you consider Paragraph 3
25  to be an accurate statement as made at the time?

18

1         MR. ROBERS:  Object to the scope.
2    A.  Yes.
3    Q.  (BY MR. LANGAN)  Is it still is an accurate
4  statement?
5         MR. ROBERS:  Object to the scope.
6    A.  In my opinion, yes, that's -- that's still an
7  accurate statement.
8    Q.  (BY MR. LANGAN)  Okay.  Dr. Rose, you
9  understand you're being presented here today by the
10  Department of Justice in the U.S. versus BP XP and
11  Anadarko Clean Water Act civil penalty case, right?
12   A.  Yes, I do.
13   Q.  That's why you're here, right?
14   A.  Yes, I do.
15   Q.  And -- and you're here as a representative of
16  the United States on certain topics, correct?
17   A.  Yes.
18   Q.  And you have an understanding about that?
19   A.  Yes.
20   Q.  Let's take a look at Tab 4, which has been
21  previously marked as Exhibit 11889.
22        Do you see that?
23   A.  Yes.
24   Q.  And then if you flip over to Pages 4 and 5 of
25  Exhibit 11889, you will see Topics 9 and Topics 11.

19

1         Have -- have you seen those topics before?
2    A.  I'll need a clarification, when you say have I
3  seen those topics before.
4    Q.  Right.  Have you ever seen a writing that sets
5  forth the topics on which you're going to address?
6    A.  You mean that address information related to
7  these topics?
8    Q.  Correct.
9    A.  Well, certainly 11, I have.
10   Q.  And on 9, is it -- is it your understanding
11  you're here to talk about the Department of Interior's
12  analysis of the economic effect of the 2010 Moratorium?
13  You're here to talk about that, too?
14   A.  Yes.
15   Q.  Well, what is your understanding about what
16  you're here to talk about?  Let's try it that way.
17   A.  We -- you provided a list of -- of 12 topics.
18   Q.  Right.
19   A.  And I'm prepared to -- to discuss any -- any
20  questions you have related to those topics.
21   Q.  All 12?
22   A.  As many as I can do.
23        MR. ROBERS:  Counsel, he's -- so the
24  witness has been designated to testify on Topic 11 in
25  its entirety.

20

1         MR. LANGAN:  Right.
2         MR. ROBERS:  And on Topic 12 as to only the
3  Department of Interior analysis of the Moratorium --
4         MR. LANGAN:  Don't you mean Topic 9?
5         MR. ROBERS:  I'm sorry.  Topic 9.  I do
6  mean Topic -- Topic 9 only to the Department of
7  Interior's analysis of the Moratorium and Topic 11 in
8  its entirety.
9         MR. LANGAN:  I got that.  That's what I'm
10  trying to get clarification about.
11   Q.  (BY MR. LANGAN)  Is that your understanding, as
12  well?
13   A.  Yes.
14   Q.  It's not a trick question.
15   A.  Right.
16   Q.  All right.
17   A.  What I was trying to distinguish was the -- the
18  effects of the spill versus the effects the Moratoria.
19   Q.  Correct.  Two different things, right?
20   A.  Yes, right.
21   Q.  Okay.
22        MR. ROBERS:  To be clear, he's here to
23  discuss the effects of the Moratorium.
24        MR. LANGAN:  Right.
25   Q.  (BY MR. LANGAN)  So when did you first learn

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

21

1    you would be asked to represent the United States in
2    giving testimony about Topic 11 and part of Topic 9?
3    When did that first come to your attention?
4        A. I believe that was, like, mid May.
5        Q. Of this year?
6        A. Yes.
7        Q. Obviously.
8        A. Uh-huh.
9        Q. And huh did you learn that?
10       A. I was first alerted to this by my -- my
11   superior, Renee Orr, who said that I had been designated
12   to -- to -- to undertake this effort, and asked if I
13   would be willing to do so.
14       Q. So it was a voluntary act by you?
15       A. Yes, that's correct.
16       Q. Okay. So what did you do to prepare to
17   testify? Could you just describe generally -- maybe
18   we'll get back into it. Okay. Just generally describe
19   what you did to prepare to testify.
20       A. Sure. Sure. The Justice Department and the
21   Interior Department lawyers provided me --
22           MR. ROBERS: I caution the witness to only
23   answer to the extent it doesn't require you to reveal
24   the contents of conversations with attorneys as part of
25   your preparation.

22

1        Q. (BY MR. LANGAN) I don't disagree with Brandon.
2    I -- I just want to hear a general description of the
3    actions you took to prepare to testify.
4        A. I --
5        Q. Is that fair?
6        A. Yeah.
7        Q. Okay.
8        A. Yeah. I studied several articles and studies
9    that related to the topics that had been identified as
10   the subject of this deposition.
11       Q. Okay. So that's one thing. You -- you took a
12   look at articles and studies?
13       A. Yes.
14       Q. What else did you do?
15       A. I asked my staff to obtain some information
16   related to BP's bidding in lease sales, as well as their
17   economic activity in the Gulf of Mexico.
18       Q. Also Anadarko?
19       A. No.
20       Q. Just BP?
21       A. Uh-huh.
22       Q. Okay. What else did you do?
23       A. That's all I can recall.
24       Q. Did you meet with lawyers?
25       A. Of course.

23

1        Q. That's an action, so that's why I'm asking.
2            So you -- how many meetings did you have
3    with the lawyers?
4        A. Perhaps three or four.
5        Q. And when did those occur?
6        A. Between May and -- and today.
7        Q. All in Washington?
8        A. Well, no, no. Maybe two or three that were in
9    Washington and -- and -- one yesterday.
10       Q. Okay. In New Orleans yesterday?
11       A. Yes.
12       Q. Okay. And who were the lawyers that you met
13   with? Again, I'm on asking you what was said. I'd just
14   like to know who you met with.
15       A. I met with the lawyers that are here with me
16   today.
17       Q. Anybody else?
18       A. Not that I can recall.
19       Q. How about in the prior meetings? Who did --
20   who did you meet with?
21       A. Nobody else that I can recall.
22       Q. Dr. Rose, earlier, you said you had asked staff
23   to obtain information.
24           Who -- who on your staff did you ask to do
25   that?

24

1        A. I asked my IT person, Christina O'Brien, and I
2    asked for some explanations of studies that had been
3    previously done by Sarah Peters, some clarifications of
4    studies that I had been reviewing.
5        Q. Did you conduct any interviews of anybody
6    with -- within the government to help prepare for
7    testimony today?
8        A. No.
9        Q. Did you make any notes to help you organize
10   your thoughts or to otherwise prepare for your testimony
11   today?
12       A. Only notes that summarized the studies that I
13   was reviewing.
14       Q. Okay. And do those notes exist?
15       A. Yes.
16       Q. Where are they?
17       A. They're in my hotel room.
18       Q. Okay. And how many pages of notes are there?
19       A. I would say maybe 15.
20       Q. Okay. Counsel was kind enough to share with us
21   documents last night that were produced to us.
22       A. Uh-huh.
23       Q. I don't think the notes were among those. Was
24   there some -- as far as you know, is there my reason for
25   that, why they weren't produced?

6 (Pages 21 to 24)

25

1      MR. ROBERS: Object to form and scope.
2      A. It wasn't my understanding that notes that --
3  that I was taking of -- of studies that I was reviewing
4  were germane to having to produce them.
5      MR. LANGAN: Okay. Well, I guess, Brandon,
6  I'd like them. So I make that request.
7      MR. ROBERS: All right. We hear your
8  request.
9      MR. LANGAN: Okay. Hopefully before the
10  deposition ends, we'd like an opportunity to see the
11  notes and examine him about them, just so we're clear
12  about that. Okay?
13      MR. ROBERS: We understand your request.
14      MR. LANGAN: All right.
15      Q. (BY MR. LANGAN) I asked you about notes, but
16  let me also broaden the question.
17      Did you create any other writings, any
18  other writings, an outline, a Word document, anything,
19  to help you get ready to give testimony here today?
20      A. No.
21      Q. I guess you sent an e-mail or two, it sounds
22  like.
23      A. Correct.
24      Q. And those have been produced, right, as far as
25  you know?

26

1      A. Yes.
2      Q. Okay. Any other writings that you created in
3  connection with getting ready for your testimony today?
4      A. No.
5      Q. Dr. Rose, before you were notified in May by
6  the Director -- Christina?
7      A. It was my supervisor, the Chief of the --
8      Q. And what's her name again? I'm sorry, I --
9      A. Renee Orr.
10      Q. Renee Orr. My apologies.
11      Before Renee Orr contacted you about this
12  potential assignment, had you had any direct involvement
13  whatsoever in the Drilling Moratorium?
14      A. What do you mean by "direct"?
15      Q. Well, let -- let me -- well, what was your
16  involvement -- let me ask this: What was your
17  involvement, if any, in the Drilling Moratorium before
18  Renee Orr contacted you about potentially giving
19  testimony in this proceeding?
20      A. The only role that we had was a request from
21  the Secretary's office that we evaluate the impacts of
22  the Moratoria after it had been promulgated.
23      Q. Okay. Well, let's talk about that.
24      So your office did have some role in
25  evaluating the effects of the Drilling Moratorium back

27

1  in 2010 or so?
2      MR. ROBERS: Object to form.
3      MR. LANGAN: What's wrong with that
4  question?
5      MR. ROBERS: It's not limited to time. I
6  think you said after the Moratorium.
7      Q. (BY MR. LANGAN) Answer the question.
8      A. The work that we did spanned from mid 2010
9  to -- through early 2011 on different drafts of that
10  study.
11      Q. And you -- were you personally involved in
12  this?
13      A. I was personally involved in reviewing the
14  results of my staff. I wasn't personally involved in
15  undertaking the analysis.
16      Q. Okay. Thank you.
17      This was the Secretary of the Interior that
18  made this request?
19      A. This was his office.
20      Q. Did you ever deal with the Secretary of the
21  Interior personally on this?
22      A. No.
23      Q. Who from his office made this request?
24      A. I don't recall.
25      Q. Who on your staff did the work?

28

1      A. A woman named Sarah Peters.
2      Q. Sarah Peters. And what's her --
3      A. She did most of the work.
4      Q. Okay. Did most of the work.
5      And -- and as far as you can recall, what
6  was the time span in which Sarah did the work? Time
7  span?
8      A. Probably from mid May of 2010 through, perhaps,
9  the end of February of 2011, she was working on various
10  aspects of -- of that study and addressing questions
11  about it.
12      Q. And -- and she was the primary person putting
13  this information together; is that fair?
14      A. That's fair.
15      Q. Anybody else on your staff involved?
16      A. Yes. On selected aspects of that work, Thomas
17  Farndon, F-a-r-n-d-o-n.
18      Q. And do both Thomas and Sarah still work in your
19  group?
20      A. Yes.
21      Q. And, Dr. Rose, I think you told me earlier that
22  your role in this project was supervisory and review?
23      A. Correct.
24      Q. Okay. What was the end result? Was it a --
25  was it a written report or a draft report? What was the

7 (Pages 25 to 28)

29

1   end result of this?
2       A. The end result was a written report.
3       Q. Okay. And -- and maybe they're in the notebook
4   here? I guess we'll find out, but, I mean, do -- can
5   you describe what that report looked like?
6       A. Sure. It -- it basically estimated the number
7   of -- of jobs that -- that we predicted would be
8   affected by the Moratoria, and calculated the potential
9   economic impacts to the region as a result of work not
10  being undertaken during the six-month period of the
11  anticipated length of the -- the drilling pause.
12      Q. All right. Did you have any other involvement
13  in the Moratorium other than what you've already
14  described?
15      A. Not that I can recall.
16      Q. All right. So as counsel has told us, you're
17  here to discuss, as I understand it, relating to
18  Topic 9, the Department of Interior analysis of the
19  Moratorium, right?
20      A. Among 11 other topics.
21          MR. ROBERS: You mean in addition to
22  Topic 11?
23      A. Right. Including Topic 11.
24      Q. (BY MR. LANGAN) So you're here to talk about
25  Topic 11 and part of Topic 9, right? Full stop, right?

30

1       A. Yes, that's correct.
2       Q. And other people are going to talk about the
3   other topics, right, as far as you know?
4       A. I have no idea --
5       Q. Okay. Fair enough.
6       A. -- about anything else.
7       Q. All right. You're not, right?
8       A. No.
9       Q. Okay. We're going to come back to the details,
10  but focusing for a second on your part of Topic 9, can
11  you give me an overview about what you know about that?
12  I'm giving you a chance to give me a narrative, so go
13  for it.
14      A. Well, as I mentioned, we were asked to -- to
15  conduct a -- an assessment of what the potential effects
16  were of the Moratoria.
17      Q. Right.
18      A. And we undertook -- and there was a lot of
19  pressure to turn that around as -- as quickly as we
20  could.
21          We made an estimate of the number of
22  drilling rigs that were affected and the type of rigs
23  and -- and the estimated number of workers on those
24  rigs; and made some assumptions about how long the
25  Moratoria would last and how much those -- those workers

31

1   got paid and what the costs were of -- of renting the
2   rigs and operating the rigs and -- and how much
3   production might have occurred if -- if the drilling
4   hadn't been precluded by the Moratoria; and then put all
5   that together in -- in a spreadsheet model and
6   calculated the overall direct effects of the Moratoria
7   on jobs, on income, and overall economic effects to the
8   region; and then made calculations of the indirect and
9   induced effects associated with -- with the initial
10  direct effects; and then provided that -- that -- a
11  draft of that paper to the Secretary's office.
12      Q. What happened then?
13          MR. ROBERS: Object to form.
14      A. I don't know.
15      Q. (BY MR. LANGAN) Was there ever a final version
16  of the report prepared?
17      A. There were subsequent versions of the report
18  prepared. I'm not aware of any final version.
19      Q. Okay. And was your office or members of your
20  staff involved in preparation of -- of the subsequent
21  versions of the report?
22      A. Yes.
23      Q. Tell me about that. When did that occur, and
24  who worked on it?
25      A. There were questions coming from the -- the

32

1   Secretary's office about differences between their
2   perceptions about counts and numbers, things that might
3   have been included or excluded and should be included.
4           And so it was the typical review process
5   and back and forth of any paper that -- that we write
6   and refinements and updates to -- to try to get it as
7   accurate as possible.
8       Q. I'm sure we'll look at the documents, but
9   sitting here now, can you recite, in a narrative
10  fashion, what conclusions your office reached about the
11  effects of -- of the Moratorium?
12      A. Well, in -- in -- in retrospect, some of the
13  assumptions we made weren't entirely accurate relative
14  to what actually happened. And so the conclusions that
15  we made at the time, we thought, were -- were the best
16  that we can come up with. But in retrospect, the --
17  the -- those assumptions differed from what actually
18  happened.
19      Q. Not unusual in the -- in -- in the projection
20  business, right?
21      A. Right.
22      Q. Okay. All right. And I -- believe me, I'm not
23  trying to be critical. I mean, that's --
24      A. No.
25      Q. -- that's just the reality, right?

8  (Pages 29 to 32)

33

1           MR. ROBERS:  Object to form.
2       A. In my opinion, that's -- that's what could --
3  could happen and is not unusual.
4       Q. (BY MR. LANGAN)  And can you elaborate a little
5  bit more on sort of how the assumptions that you made
6  back in 2010 and I guess -- was it 2010 and early 2011?
7       A. Yes, that's correct.
8       Q. Okay.  How they differ from the reality that
9  actually occurred, can you elaborate a little bit on
10  that?
11      A. Sure.  Some of the -- the main differences were
12  in reviewing the -- report in hindsight, we noticed
13  that -- we assumed that all of the fixed platforms would
14  be affected by the Moratoria, when, in fact, it -- it --
15  that wasn't the case.  The fixed platforms weren't
16  affected.  So we had an overestimate of the number of
17  rigs that were affected by the Moratoria.
18          Also, we assumed that all of the workers
19  would be laid off, when, in fact, it turns out that that
20  wasn't the case.  Okay.  A lot of workers retained their
21  jobs.  So there was, again, an overestimate of -- of the
22  economic impacts based on that assumption.
23      Q. Again, I don't want to oversimplify this, but
24  is it fair to say that with the benefit of hindsight,
25  the effects of the Moratorium were not as negative as

34

1  might have been initially feared?
2           MR. ROBERS:  Object to form.
3       Q. (BY MR. LANGAN)  Is that fair?
4           MR. ROBERS:  Object to form.
5       A. No.  That's not entirely fair, because, I mean,
6  we weren't the only ones making this estimate.  So you
7  know --
8       Q. (BY MR. LANGAN)  I'm talking about your
9  estimate or your office's estimate.
10          MR. ROBERS:  Same objection.
11      A. In my opinion, the -- the work -- there were
12  other offsetting assumptions that we made to reflect
13  this sort of uncertainty, so that our estimate initially
14  was conservative to begin with.
15      Q. (BY MR. LANGAN)  Okay.
16      A. Okay.  And so to -- to say that the -- the
17  overall effects were -- were excessive may be
18  overstating the -- the case, because I had pointed out a
19  couple of assumptions that we made that weren't
20  accurate, but there were other assumptions we made which
21  were fairly conservative, which tended to offset.
22      Q. Okay.  What -- what I'd like to do now is,
23  let's look at the book, and I'd just like you to -- I
24  think they're probably here.  I'd just like you to
25  identify by tab number what the documents were that your

35

1  office and your office's staff produced.  I think
2  they're probably here, but can we take -- take a quick
3  look, probably --
4       A. You want me to go through --
5       Q. Well, you might start with 15.
6       A. -- every --
7       Q. You might start with 15.
8          Is Tab 15 a document that your office staff
9  produced?
10      A. Yes.
11      Q. Why don't we mark that as the next exhibit, and
12  that will be -- can you read the number?
13      A. Yeah.  150.  12150.  Is that the one you want
14  me to use?
15      Q. Yeah.  The next one.  I just -- I think it's,
16  like, a five-digit number.
17      A. Yeah.  12150.
18      Q. 12150.  Thank you.
19          (Exhibit No. 12150 Marked.)
20      Q. (BY MR. LANGAN)  Can we flip over to Tab 16.
21      A. Sure.
22      Q. Do you recognize Tab 16?  And it's a multipage
23  document.  If you'd take a moment to look at it, that
24  would be great.
25      A. And your question is?

36

1       Q. Do you recognize this?
2       A. No.
3       Q. Keep going to, like, the fourth or fifth page
4  of Tab 16.  You'll see a document that -- that says,
5  "Effects of Drilling Pause for 6 Months."
6          Do you recognize that one?
7       A. Yes.
8       Q. Is the document that begins at Page -- and
9  there's a Bates Number in the lower right-hand corner,
10  SNL004-003550 and following.
11          Is that document one that was produced by
12  your office or your office's staff?
13      A. Yes.
14      Q. The cover e-mail was not?  Is that the point?
15      A. Yes.  The cover e-mail wasn't, and -- and I
16  don't recall seeing it.
17      Q. You've never seen the cover e-mail before, but
18  the -- but the attachment to the e-mail, which I -- I
19  believe this is, your office produced; is that right?
20      A. Yes.
21      Q. Okay.  Could you look at -- well, let's mark
22  this one as 12151, if you don't mind, sir.
23      A. Sure.
24      Q. Starting with the cover e-mail.
25      A. Yeah.

37

1          MR. LANGAN:  Tab 16 will be Exhibit 12151.
2    Thank you.
3          (Exhibit No. 12151 Marked.)
4          Q.  (BY MR. LANGAN)  Tab 17, do you recognize that
5    one?  And it's been previously marked as Exhibit 11888.
6          A.  Yes.
7          Q.  Did your office have any involvement in the
8    creation of Exhibit 11888, a September 16, 2010,
9    Interagency Economic Report entitled Estimating the
10   Economics Effects of the Deepwater Drilling Moratorium
11   on the Gulf Coast Economy?
12         A.  Not that I'm aware of.
13         Q.  Okay.  Just so I'm clear, you've seen it
14   before, right?
15         A.  Yes.
16         Q.  When was the first time you saw it?
17         A.  I probably saw it a couple of years ago.
18         Q.  Okay.  But your -- your office had no
19   involvement in its creation; is that correct?
20         A.  Yes.
21         Q.  And you personally had no involvement in the
22   creation of Exhibit 11888; is that also correct?
23         A.  That's correct.
24         Q.  Have you ever read -- read Exhibit 11888?
25         A.  Yes.

38

1          Q.  I guess we'll come back to that.
2          But did -- did you read it in preparation
3    for your testimony today?
4          A.  Yes.
5          Q.  Okay.  And you'd read it prior to that, as
6    well?
7          A.  Yes.
8          Q.  Let's go to Tab 18 for just a second.  Okay?
9    And we'll mark this as Exhibit 12152.  Tab 18 will be
10   12152.
11         (Exhibit No. 12152 Marked.)
12         Q.  (BY MR. LANGAN)  Dr. Rose, take a minute to
13   look at this, if you'd like.
14         But I'm just wondering, do you recognize
15   this document, and did you have anything to do with
16   preparing it?
17         A.  We provided inputs to this document.
18         Q.  Okay.  Thank you.
19         We'll -- we'll get back to that, then.
20   Okay?
21         Let me just -- let me ask you this:  Having
22   looked at Exhibit 12150, which is Tab 15, and
23   Exhibit 12151, which is Tab 16, are there any other
24   documents that your staff created relating to the
25   assignment from the Secretary's office to create an

39

1    analysis of the effects of the drilling pause?
2          A.  Any other documents than -- than -- than these
3    two?
4          Q.  Right.
5          A.  Yes.
6          Q.  What -- which ones are those?
7          A.  There was a document that I recall that we did
8    that basically took the results of this study and added
9    it to an analysis that we did of the Safety Regulations
10   that were promulgated following the spill to -- to
11   determine the cumulative effects on -- on production
12   from both the Moratoria and the added requirements
13   imposed by the new regulations and MTLs.
14         Q.  And when was that done, Dr. Rose?
15         A.  I don't remember exactly when it was done.
16   Presumably it was done after the regulations were --
17   were promulgated, probably at the end of 2011.
18         Q.  Okay.  And you have a copy of that document?
19         A.  Yes.
20         Q.  Did you look at that in preparation for your
21   deposition?
22         A.  Yes.
23         Q.  Do you know whether it's been produced to us?
24         A.  I have no idea.
25         Q.  Okay.  So we'll come back to that, but I just

40

1    want to understand -- and maybe it's in here somewhere,
2    I'm not sure.
3          I want to come back to my original
4    question, which was:  Documents your office created that
5    were responsive to the Office of the Secretary's request
6    to create a Drilling Pause Economic Analysis.  You know
7    what I'm talking about?
8          A.  Yeah.
9          Q.  Okay.  So we have Exhibit 12150, right?
10         A.  Yes.
11         Q.  We have the one you've just talked about, which
12   was -- that had the drilling pause effect, as well as
13   the effect of the new regulations, right?
14         A.  Yes.
15         Q.  Any others?
16         A.  Not that I can recall.
17         Q.  So the -- it's really those two?
18         A.  Right.  But even the second one, like I said,
19   it simply took the -- the -- the results of this study
20   and added it to a new question that was added.
21         Q.  Okay.
22         A.  That wasn't directly related to the Moratoria.
23         Q.  Fair -- fair enough.  Okay.
24         So I'm just trying to make sure I have in
25   my mind the universe of work product --

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

41

```
 1        A. Right.
 2        Q. -- from the Department of Economics -- Division
 3   of Economics --
 4        A. Division.
 5        Q. -- responsive to the Secretary's request.
 6             Have you now described them all?
 7        A. As best as I can recall, yes.
 8        Q. Okay. Thank you, sir.
 9             Looking back at Exhibit 12150, were
10   multiple versions of this document created? In other
11   words, was this an initial draft? Was there a later
12   draft?
13        A. Yes. I had mentioned that early on.
14        Q. I think you had.
15        A. There were multiple drafts of this.
16        Q. Okay. How many drafts do you have in your
17   files, for example?
18        A. In my personal files?
19        Q. The Division's files.
20        A. I really don't know.
21        Q. Okay. How many different drafts were sent on
22   to the Secretary's office?
23        A. I -- I don't know.
24        Q. Was Exhibit 12150 sent on to the Secretary's
25   office?
```

42

```
 1        A. I don't know.
 2        Q. Do you know whether the version which is part
 3   of Exhibit 12151 -- was that sent on to the Secretary's
 4   office?
 5        A. I don't know.
 6        Q. Well, you know one was, at least one?
 7        A. Certainly.
 8             MR. ROBERS: Object to form.
 9        Q. (BY MR. LANGAN) How many versions --
10        A. Oh --
11        Q. I'm sorry.
12        A. Yeah. Go ahead.
13        Q. How many versions of the --
14        A. I -- I mean, I -- I can't -- I can't be sure.
15   I mean, I -- I can't certify, you know, what was sent.
16   I mean, I --
17        Q. Well, who sent them?
18        A. We sent it -- sent it up the -- the chain of
19   command.
20        Q. Ah.
21        A. And, you know, actually, you know, one can
22   presume that, you know, it goes to the requester, but I
23   can't be sure of that.
24        Q. I'm forgetting your boss's name. Renee --
25        A. Renee Orr.
```

43

```
 1        Q. Renee Orr. Okay. So how many versions did you
 2   send to her?
 3        A. Well, she wasn't the -- in this particular
 4   exercise, as I mentioned, there was a staff person
 5   working for the Secretary's office that was involved in
 6   this.
 7        Q. And who was that?
 8        A. That was a person named Brian Screnar.
 9        Q. How do you spell it?
10        A. S-c-r-e-n-n-a-r [sic].
11        Q. Uh-huh.
12        A. That's as best I can recall. I'm not -- not
13   100 percent sure of the spelling.
14        Q. Okay. And were you interacting with Brian --
15        A. Yes.
16        Q. -- on this project?
17        A. Yes.
18        Q. Did you send Brian drafts?
19        A. Yes.
20        Q. How many drafts did you send Brian?
21        A. Maybe three.
22        Q. Over what period of time, as best you can
23   recall?
24        A. Perhaps two months.
25        Q. And would this have -- would this two-month
```

44

```
 1   span have all occurred in the year 2010?
 2        A. Yes.
 3        Q. What time span within 2010, as best you can
 4   recall?
 5        A. Probably from May through July.
 6        Q. Okay. By e-mail in each case?
 7        A. Yes.
 8        Q. Dr. Rose, when we started this conversation, I
 9   remember you told me that when you were asked to take
10   this project on, I think your words were, there was a
11   lot of pressure about this. You recall that?
12        A. Yes.
13        Q. Can you expand on that? What do you mean by a
14   lot of pressure?
15        A. There was a time pressure to get these
16   estimates done quickly.
17        Q. And did you have an impression as to why there
18   was such time pressure? Was there a political interest
19   in this?
20        A. Certainly.
21        Q. Explain that. What kind of political interest?
22   It may be fairly obvious to everyone in the room, but I
23   need you to say it.
24             MR. ROBERS: Object to the form.
25        A. Well, in my -- in my opinion, there were a lot
```

11 (Pages 41 to 44)

45

1  of questions being posed at the Secret- -- to the
2  Secretary by the press, by other politicians about the
3  costs of the Moratorium and the adverse effects it might
4  have on the economy in the -- in the Gulf Coast.
5        And he was being pressured to identify his
6  understanding of -- of what those impacts were likely to
7  be.
8     **Q. (BY MR. LANGAN)  Okay.  And did you get any**
9  **sense from the Secretary's office, either from Brian or**
10 **whomever, about what the expectations were about what**
11 **the answers were going to be?**
12       MR. ROBERS:  Object to form.
13    A. Never.
14    **Q. (BY MR. LANGAN)  I'm -- I'm just asking the**
15 **questions.**
16       **So you were given free rein to give your**
17 **best shot; is that correct?**
18       MR. ROBERS:  Object to form.
19    A. Yes.
20    **Q. (BY MR. LANGAN)  To provide -- to provide**
21 **professional judgement and come up with the best answer**
22 **you could, right?**
23       MR. ROBERS:  Object to form.
24    A. Yes.
25       MR. LANGAN:  I'd think you'd like that

46

1  answer.  Why are you objecting?
2     A. Yes.
3     **Q. (BY MR. LANGAN)  Okay.  So, Dr. Rose, you also**
4  **indicated that -- that there were questions raised about**
5  **the drafts as the process went on, right?**
6     A. Yes.
7     **Q. What kind of questions were raised?**
8     A. Questions were raised about the accuracy of
9  some of our assumptions.
10    **Q. Can you explain?  What kind of assumptions, to**
11 **the best of your recollection, or questions?**
12    A. Questions having to do with the count of the
13 number of rigs, the count of the number of workers that
14 we attributed to -- to rigs, things like that.
15    **Q. Was the -- these were from Brian?**
16    A. They came through Brian.  Whether or not they
17 were Brian -- all of Brian's original thoughts or
18 whether he had shown it to other people and they
19 provided him with questions is not clear.
20    **Q. So do you know who else he was consulting with,**
21 **the names of people or -- or -- that might have**
22 **generated these kind of questions?  Do you know that?**
23    A. No, I don't know that.
24    **Q. Okay.  You -- you really just dealt with Brian**
25 **on this in terms of the Secretary's office?**

47

1     A. He's the only one I can recall dealing with in
2  the Secretary's office, yes.
3     **Q. Did you speak to him on the phone about this?**
4     A. Rarely.
5     **Q. Ever in person?**
6     A. I might have met him once.
7     **Q. In your whole life?**
8     A. Yes.
9     **Q. Okay.  And where?  Where was that meeting, if**
10 **you recall?**
11    A. Probably down at in main Interior.
12       (Discussion Off The Record.)
13    **Q. (BY MR. LANGAN)  The Department of Interior's**
14 **main offices?**
15    A. Yes.
16    **Q. Is that what you mean?**
17    A. Yes.
18    **Q. In -- in the District?**
19    A. Correct.
20    **Q. Okay.  Dr. Rose, when questions would come in**
21 **from or through Brian, were you left with an impression**
22 **that the people asking the questions were hoping the**
23 **numbers would be lower or higher, or did it depend?**
24       MR. ROBERS:  Object to the form.
25    A. There was no hint that -- that they wanted the

48

1  numbers to come out one way or the other, just that --
2  that they wanted them to be defensible.
3     **Q. (BY MR. LANGAN)  So they were just, as often**
4  **happened, sort of pressure testing your analysis, if you**
5  **will?**
6        MR. ROBERS:  Object to the form.
7     A. I -- I wouldn't say they were press- --
8  pressure testing the analysis.
9     **Q. (BY MR. LANGAN)  Okay.**
10    A. They were just questioning certain assumptions
11 and making sure that -- that we were doing the best
12 analysis that we could, and that the analysis would
13 withstand the scrutiny of those who would be reviewing
14 it.
15    **Q. After drafts were produced, including the**
16 **revised drafts, did you ever get any additional comments**
17 **or feedback from any source about the analysis that your**
18 **office had done?**
19    A. Not directly.
20    **Q. How about indirectly?**
21    A. The study that you mentioned that was done on
22 this --
23    **Q. The interagency study?**
24    A. Interagency study.
25    **Q. Yes.**

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

49

1    A. Cited our study.
2    Q. And we're talking about Exhibit 11888, are we
3  not, at Tab 17?
4    A. Yes. It cited our study as one of several
5  studies that had been done on this issue.
6    Q. Okay. Any other indirect comment or feedback
7  besides the interagency study from September 2010?
8    A. Not that I recall.
9    Q. I think where this line started, Dr. Rose, was
10  something along the following lines -- and I want to
11  come back to it.
12         I sort of asked you, and you very kindly
13  have given me, an overview of what you came prepared to
14  testify about in terms of your portion of Topic 9.
15         Do you recall that?
16    A. Yes.
17    Q. Do you have anything else to add to my question
18  to you to tell me what you know about your portion of
19  Topic 9?
20    A. Just that when we undertook this -- this
21  analysis, we had no idea that it would have as much
22  scrutiny as apparently it -- it did. The sense I had
23  was this was almost in the nature of a -- just some
24  information that would -- would be used informally by
25  the Secretary's office; that it wasn't a legal document,

50

1  where -- where we would be, perhaps, a little bit more
2  careful and spend more time, which we didn't have, to --
3  to -- to validate the assumptions and become more
4  expert, which we weren't, about rigs and employment on
5  these rigs and so on.
6         So we viewed this as sort of a first cut,
7  give us a rough estimate of what the effects might be,
8  order of magnitude kind of effects, rather than a
9  precise, rigorous estimate that might be used for legal
10  purposes.
11    Q. Anything else?
12    A. No.
13    Q. Thank you. I just want to make sure I
14  understand.
15         When you -- what kind of scrutiny are you
16  talking about? This deposition or something else?
17    A. This deposition.
18    Q. Anything else besides that? In other words,
19  was there scrutiny from Capitol Hill or the media or the
20  Secretary's office or any other source about this?
21    A. No, because I wouldn't think those sorts of
22  interests would be that concerned about precise issues
23  of counts of rigs and the precise number of workers
24  and -- and things like that.
25         That -- you know, rough estimates of, you

51

1  know, what the impacts would be might be would be
2  sufficient to answer questions like that.
3    Q. Okay. So do I understand you to be saying that
4  it was never your understanding, back in the Summer of
5  2010, that the analysis that was done at the Secretary's
6  request would somehow become an issue in civil
7  litigation?
8    A. Right.
9    Q. Is that fair?
10    A. Yes.
11    Q. And if you had known that, you sure would have
12  liked to have had more time?
13         MR. ROBERS: Object --
14    Q. (BY MR. LANGAN) Correct?
15         MR. ROBERS: Object to form.
16    A. Well, I -- I would have perhaps spent more of
17  my time on this issue.
18         As you pointed out, I'm listed for 11 other
19  topics to -- on this deposition. There are two or three
20  times as many other topics that I work on day-to-day.
21  And so this was one of 20 or 30 issues that I'd work on.
22  Okay. And so had I known the legal
23  ramifications and implications, I might have spent more
24  of my time focusing on -- on this particular effort
25  compared to distributing it as I did.

52

1    Q. (BY MR. LANGAN) All right. So anything else
2  you want to add in terms of your overview of your
3  portion of Topic 9, beyond what you've all right cited?
4    A. No.
5    Q. Okay. What I'd like to do now, if you don't
6  mind, is take a look at Tab 5 of the binder. We're
7  going to go backwards here.
8         Now, Dr. Rose, I'll represent to you that
9  Tab 5 has been previously marked as Exhibit 11890, and
10  it is a copy of a document called the United States'
11  First Supplemental Response to the Defendants' First Set
12  of Discovery Requests to the United States of America
13  Relating to the Clean Water Act Penalty Phase.
14         Do you see that?
15    A. Yes.
16    Q. My first question is: Have you ever seen this
17  document before?
18    A. No, not that I recall.
19    Q. Okay. With that in mind, is it fair to say
20  that you're -- you're not the author of this document or
21  any portion of it, as far as you know?
22    A. As far as I know.
23    Q. And you've never commented on it, as far as you
24  know; is that correct?
25         I'm going to direct you to a page or two,

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

53

1  but, I mean, just in general, you just don't recognize
2  it at all; is that fair?
3      A.  That's fair.
4      Q.  Okay.  With that in mind and -- and perhaps
5  refreshing your recollection, we'll see, can you take a
6  look at about Page 60.
7          You will see at Page 60 there is a No. 6,
8  which is a question that the defendants asked the United
9  States.  Do you see that single-spaced Question 6 at
10  Page 60?
11     A.  Yes.
12     Q.  And, again, for the record, we're looking at
13  Exhibit 11890.
14         Now, Question 6 in this exhibit asks a
15  bunch of things, but it does ask about analyses,
16  studies, assessments, or evaluations regarding the
17  nature, extent, or degree of effectiveness of the
18  efforts to respond to or otherwise mitigate, minimize,
19  prevent any environmental health, human health,
20  economic, or other effects of the DEEPWATER HORIZON
21  spill.
22         And it says some other things, but that's
23  the -- the thrust of it.
24         Do you see that?
25     A.  Yes.

54

1      Q.  All right.  Over on Page 61 and 62, there's a
2  supplemental response of the United States.
3          Do you see that?
4      A.  The middle of the page?
5      Q.  Yes, at Pave 61.  And that has some bullet
6  points with a bunch of documents listed that go -- goes
7  over onto Page 62.
8          MR. ROBERS:  We're going to object to the
9  scope of the line of questioning on this document.
10     Q.  (BY MR. LANGAN)  Okay.  You can answer.
11         Do you see that?
12     A.  Yes.
13     Q.  My question for you is:  Do any of the listed
14  documents here, in your view, bear any relevance to the
15  portion of Topic 9 you're here to testify about today?
16     A.  It doesn't appear so.
17     Q.  Okay.  Dr. Rose, what I want to do now is ask
18  you some basic questions about the Moratorium itself.
19         You know what the Moratorium was, right?
20     A.  Generally.
21     Q.  Okay.  So we're not going to get into a lot of
22  detail, but I just have some baseline facts that we can
23  a common understanding on.  And I'm going to ask you
24  some questions about that.  Okay?
25     A.  Okay.

55

1      Q.  Let's go to Tab 6, and we will mark that as the
2  next exhibit if we could, please.  If you don't mind
3  telling me the number, my memory's not that good.
4      A.  12153.
5      Q.  So Tab 6 will be Exhibit 12153.
6          Thank you very much for your help, Dr.
7  Rose.
8          (Exhibit No. 12153 Marked.)
9      A.  Sure.
10     Q.  (BY MR. LANGAN)  Is it your understanding that
11  on May 6, 2010, after the April 20th Macondo incident,
12  the United States Department of Interior instructed the
13  Mineral Management Service to stop issuing permits for
14  new wells in the Gulf of Mexico pending completion of a
15  Department of Interior safety report on offshore
16  drilling?
17         MR. ROBERS:  Counsel, are you just asking
18  him to read a document or if he had an independent basis
19  to know that?
20         MR. LANGAN:  I'm just asking him a
21  question.
22         MR. ROBERS:  Object to the form and scope.
23     A.  I'm not familiar with the exact date that --
24  that order was issued, nor am I aware -- have firsthand
25  knowledge that that order was issued.

56

1      Q.  (BY MR. LANGAN)  Okay.  Have you ever seen
2  Exhibit 12153 before?
3      A.  Not that I recall.
4      Q.  Would you agree with me, Dr. Rose, that there
5  did come a day in which the Department of Interior
6  instructed the M -- MMS to stop issuing permits?
7          MR. ROBERS:  Object --
8      Q.  (BY MR. LANGAN)  That happened, right?  We can
9  all agree on that, can't we?
10         MR. ROBERS:  Object to form and scope.
11     A.  There was a --
12     Q.  (BY MR. LANGAN)  We wouldn't be here today if
13  it didn't happen, would it?
14     A.  Well, it -- it happened, but it was
15  circumscribed to certain types of permits, certain types
16  of --
17     Q.  What's your understanding?
18         MR. ROBERS:  Object to scope.
19     A.  My understanding is that at different times
20  in -- in the period following the spill, there were
21  different types of orders that were promulgated.
22         The original order was overturned by the
23  court, and then the Secretary issued a revised order.
24         In the end, it involved drilling on certain
25  types of rigs in deeper than 500 feet of water and

14  (Pages 53 to 56)

57

 1  involved actually about 33 rigs that were either
 2  drilling or in the area.
 3      Q. (BY MR. LANGAN)  Okay.  That -- that's helpful.
 4  And we're going to get into some of those details, but I
 5  very much appreciate your answer.
 6          So we're going to take a quick break,
 7  because the video recorder is going to change the tape.
 8      A. Good.
 9          THE VIDEOGRAPHER:  The time now is
10  9:27 a.m.  We are off the record.
11          (Brief Recess Taken.)
12          THE VIDEOGRAPHER:  This begins Disc 2 of
13  today's deposition.  The time now is 9:42 a.m.  We are
14  back on the record.
15          MR. ROBERS:  Counsel, before we get
16  started --
17          MR. LANGAN:  Yeah.
18          MR. ROBERS:  -- I think that Dr. Marshall
19  [sic] would like to -- to clarify one of his previous
20  answers concerning his preparation.
21      A. When you asked me about interviews --
22      Q. (BY MR. LANGAN)  Yes.
23      A. -- I misinterpreted that -- that term to mean
24  in-person conversations.
25          I had some telephone conversations with

58

 1  several people on this issue, that I didn't consider
 2  interviews, but you may consider them interviews, so I
 3  just wanted to clarify that.
 4      Q. Okay.  So why don't you tell me about those.
 5          How many telephone interviews did you
 6  conduct to get -- help to get ready for your testimony?
 7      A. There might have been perhaps five involving
 8  three different people.  Two -- to of them I -- I've
 9  already mentioned.  They're on my staff, and involved
10  the same issues that I'd previously discussed.  That was
11  with Sarah Peters and Tom Farndon, just to clarify
12  their -- their answers or their -- the --
13      Q. Tom who?
14      A. Farndon, F-a-r-n-d-o-n.  I had mentioned them
15  before.
16      Q. Yes.
17      A. But I had one telephone conversation with a
18  person in the Gulf of Mexico named Ann Glazer [sic].
19      Q. Ann Glazer [sic]?
20      A. Glazer, G-l-a-z-e-r [sic].
21          And she was explaining to me how the
22  bonding program worked.  That was one of the issues
23  included in Topic 11 --
24      Q. Uh-huh.
25      A. -- that I wasn't previously that familiar with,

59

 1  a d so she gave me kind of a tutorial on -- on the
 2  bonding program.
 3      Q. So you had telephone conversations to get ready
 4  for your testimony with -- one or more with Sarah, Tom,
 5  and Ann; is that right?
 6      A. Yes.
 7      Q. Anybody else?
 8      A. Not that I can recall.
 9      Q. When did these telephone conversations take
10  place?
11      A. Between mid May and -- and -- and this week.
12      Q. And how long did they last, generally?
13      A. Well, the ones with Tom and Sarah were -- were
14  just a few minutes.
15          The one with Ann might have been a half
16  hour or so.
17      Q. And did you make any notes during any of these
18  telephone calls?
19      A. Not with Tom and Sarah.
20          With -- with Anne, there might have been
21  some -- some brief notes.
22      Q. And would that be included in the notes we
23  talked about earlier that I asked to be produced?
24      A. Yes.
25      Q. Okay.  Besides the telephone calls with Sarah,

60

 1  Tom, and Ann, any other interviews of any kind
 2  whatsoever that you engaged in to help get ready for
 3  your testimony today?
 4      A. No.
 5      Q. Thank you, Dr. Rose.
 6          I want to come back to Exhibit 12153, which
 7  is Tab 6.
 8          Do you see towards the bottom of
 9  Exhibit 12153, a paragraph, the third from the bottom,
10  that begins "On May 6th"?
11      A. Yes.
12      Q. This document says -- this MMS Fact Sheet says,
13  "On May 6, Secretary Salazar directed MMS to stop
14  issuing permits to drill new wells (APDS) pending the
15  completion of the 30-day safety review of safety issues
16  on the OCS that President Obama ordered.  MMS has also
17  suspended permits to drill new wells that were approved
18  after April 2oth and on which operators had not begun
19  drilling by May 6."
20          Do you see this?
21      A. Yes.
22      Q. As far as you know, is that accurate?
23          MR. ROBERS:  Object to scope.
24      A. I could just read that paragraph and assume
25  what it says there is accurate.

15  (Pages 57 to 60)

61

1    Q. (BY MR. LANGAN)  So do you know who wrote this
2    document?
3          MR. ROBERS:  Object to form and scope.
4    A. I do not.
5    Q. (BY MR. LANGAN)  Did it come from MMS?
6          MR. ROBERS:  Object to form and scope.
7    A. I don't know.
8    Q. (BY MR. LANGAN)  Does MMS, when it existed,
9    attempt to be accurate in its publications to the
10   public?
11   A. Yes.
12         MR. ROBERS:  Object to form and scope.
13   Q. (BY MR. LANGAN)  Do you have any reason to
14   disagree with the paragraph we just read?
15         MR. ROBERS:  Object to scope.
16   A. I don't have firsthand knowledge of -- of this
17   or what the implication was of this.
18   Q. (BY MR. LANGAN)  Okay.  In May of 2010, did
19   the -- did the Department of Interior take regulatory
20   action to abolish the MMS and establish new agencies to
21   step into its place?
22         MR. ROBERS:  Object to the scope and form.
23   A. In May of 2010?
24   Q. (BY MR. LANGAN)  Yes.  Don't you remember this?
25   A. I don't remember the exact date that -- that

62

1    the MMS was abolished.
2    Q. It was abolished, right?
3    A. It was abolished, yes.
4    Q. And what took its place?
5          MR. ROBERS:  Object to scope.
6    Q. (BY MR. LANGAN)  Come on.  Go ahead.
7    A. An -- an agency with a different name.
8    Q. That's all that happened?
9    A. In -- initially?
10   Q. Yes.
11   A. To the best of my recollection, yes.
12   Q. And this occurred after the April 20 of 2010
13   DEEPWATER HORIZON incident, right?
14         MR. ROBERS:  Open to scope.
15   A. Yes.
16   Q. (BY MR. LANGAN)  What agencies took MMS's
17   place?
18         MR. ROBERS:  Scope.
19   A. The -- the initial change was to change the
20   names of the Minerals Management Service to the Bureau
21   of Ocean Energy Management, Regulation and Enforcement.
22   Q. (BY MR. LANGAN)  Right.
23   A. And following that, after considerable study
24   and evaluation, there was a major reorganization, and
25   BOEM was created.

63

1    Q. Okay.  Was there an Office of Natural Resource
2    Revenue created?
3          MR. ROBERS:  Object to scope.
4    A. Well, that office had existed.  Its -- its name
5    may have changed, and its reporting requirements may
6    have changed, but that office -- it wasn't -- it wasn't
7    a new office.
8    Q. (BY MR. LANGAN)  How about the Bureau of Safety
9    & Environmental Enforcement -- Enforcement, BSEE?
10         MR. ROBERS:  Scope.
11         Counsel, would you agree to a standing
12   objection to the line of questioning on the
13   reorganization, and I won't continue to object?
14         MR. LANGAN:  Okay.  Sure.
15   A. As I said, the -- the new organization had a
16   different name.  It was the same people, basically the
17   same functions, the same responsibilities.
18   Q. (BY MR. LANGAN)  So -- so in your view, the
19   reorganization of MMS was kind of a non-event, just a
20   name change?
21         MR. ROBERS:  Object to form.
22   A. No.  I didn't say that.
23   Q. (BY MR. LANGAN)  So what was the significance
24   of the abolishment of MMS, then?
25   A. The initial significance was minor.  The

64

1    subsequent change from BOEM -- BOEMRE to BOEM was much
2    more significant.
3    Q. And tell me about the significance of that
4    change.  Why was it significant?
5    A. Because it -- the change to BOEM was
6    significant because it separated the decision-making
7    responsibilities of the organization from a single
8    entity, the head of the Bureau, into three different
9    groups, as you mentioned, the Offshore Natural Resources
10   Revenue, BSEE, and BOEM, instead of just one under
11   BOEMRE or MMS.
12   Q. Okay.  And so what decisions were made by whom
13   in the new organizational structure?
14         MR. ROBERS:  Object to form.
15   A. Well, under the new organizational structure,
16   decisions relating to safety and inspections were
17   delegated to -- to BSEE.
18         Decisions relating to -- to leasing,
19   resource evaluation, economic analysis, renewable energy
20   were delegated to BOEM.
21         And royalty collections, bonus collections,
22   rental collections, the accounting functions were
23   delegated to ONRR.
24   Q. (BY MR. LANGAN)  And to your understanding,
25   what was the purpose of that separate of decision-making

16  (Pages 61 to 64)

65

1  functions?
2      A.  Primarily to provide a -- a more equal
3  distribution of responsibilities and authorities between
4  leasing and environmental protection.
5      Q.  Tab 7, please.  Can we mark this as the next
6  Exhibit 7.
7      A.  12154.
8      Q.  Thank you.
9          (Exhibit No. 12154 Marked.)
10     Q.  (BY MR. LANGAN)  Exhibit 12154.  Take a minute
11  to look at it, Dr. Rose, but have you seen Exhibit 12154
12  before?
13     A.  I don't recall seeing this document before.
14     Q.  Are you aware of whether or not, on May 27,
15  2010, the Department of Interior published a document
16  about increased safety measures for the energy
17  development on the Outer Continental Shelf?
18         MR. ROBERS:  Object to scope.
19     A.  I remember that the Department published such a
20  regulation, but I don't recall the exact date.
21     Q.  (BY MR. LANGAN)  Does Exhibit 12154 look to you
22  like the Department of Interior's Safety Report?
23         MR. ROBERS:  Object to form and scope.
24     A.  It certainly looks like it has those elements
25  in it.

66

1      Q.  (BY MR. LANGAN)  But you don't think you've
2  ever seen it before?
3      A.  No.
4      Q.  In May of 2010, do you recall that the
5  Secretary of the Interior recommended steps to improve
6  the safety of offshore oil and gas drilling in Federal
7  waters?
8          MR. ROBERS:  Object to scope.
9      A.  Again, I don't remember the dates, but I do
10  remember the Secretary promulgating some regulations or
11  NTLs relating to safety.
12     Q.  (BY MR. LANGAN)  Okay.  Let's go to Tab 8 and
13  mark this as 12155, Exhibit 12155.
14         (Exhibit No. 12155 Marked.)
15     Q.  (BY MR. LANGAN)  Have you ever seen this
16  one-page document, Exhibit 12155, before?
17     A.  No.
18     Q.  Did the Secretary of the Interior direct the
19  MMS, in May of 2010, to impose a six-month Moratorium on
20  deep water drilling --
21         MR. ROBERS:  Object to scope --
22     Q.  (BY MR. LANGAN)  -- in the GoM and Pacific
23  regions of the United States and to halt related
24  permitting?
25         MR. ROBERS:  Object to scope.

67

1      A.  I don't have any knowledge on that.
2      Q.  (BY MR. LANGAN)  Well, there was -- there was a
3  Drilling Moratorium?
4      A.  Yes, right.
5          MR. ROBERS:  Scope.
6      Q.  (BY MR. LANGAN)  And are there documents
7  relating to that?
8      A.  I'm sure there were.
9      Q.  And -- and you've never seen them before?
10     A.  Not that I recall.
11     Q.  Okay.  Earlier, Dr. Rose, you talked about the
12  fact that the precise scope of the Drilling Moratorium
13  may have changed from time to time and had different
14  definitional aspects.
15     A.  Yes.
16     Q.  And you mentioned some of those, right?
17     A.  Yes.
18     Q.  Okay.  Sitting here now, can you give me those
19  details, or do you need to look at documents to talk
20  about those?
21     A.  Yeah.  I'm not that -- that familiar with all
22  the details.  I just recall that the -- the scope was --
23  of the original Moratoria was fairly broad, and as I
24  mentioned, we were sued.
25     Q.  Yeah.

68

1      A.  And the Secretary narrowed the scope of -- of
2  the Moratoria.
3      Q.  Okay.  I'm just going to take a second to try
4  to help us nail down those details.
5          Okay.  So if you could take a look at Tab
6  11, please, and we'll mark this as Exhibit 12156.
7          (Exhibit No. 12156 Marked.)
8      Q.  (BY MR. LANGAN)  Let me first ask you,
9  Dr. Rose:  Have you ever seen Exhibit 12156 before, this
10  July 12, 2010, memorandum from the Secretary of the
11  Interior, decision?
12     A.  No, I've never seen this had before.
13     Q.  Did you ever see the -- the document, which
14  was, if you will, the second Moratorium Directive from
15  the Secretary of the Interior?  You've never seen that
16  before?
17     A.  No.
18     Q.  I think that's what Exhibit 12156 is.
19     A.  Uh-huh.
20         MR. ROBERS:  Object to form.
21     Q.  (BY MR. LANGAN)  All right.  Let's take a look,
22  if you will, at Page 6 of Tab 11, which is 12156.
23         Do you see the bottom paragraph on Page 6
24  that begins -- the one that begins on May 28, 2010?
25     A.  Yes.

17  (Pages 65 to 68)

69

1     Q.  And in this document, the author, who I believe
2  to be the Secretary of the Interior, Mr. Salazar, says,
3  "On May 28, 2010, I directed the Mineral Management
4  Service, now BOEM, to exercise its authority under
5  OSCLA" -- O-C-S-L-A, all caps -- "and its implementing
6  regulations to suspend certain deepwater drilling
7  activities.  Accordingly, BOEM issued a notice to
8  lessees and operators (NTL) suspending permitting and
9  drilling operations in the Gulf of Mexico and the
10  Pacific region for operations in water depths greater
11  than 500 feet for a period of six months."
12     Do you see that there?
13     A.  Yes.
14     Q.  Is that consistent with your understanding of
15  what the May 28th Drilling Moratorium involved?
16     MR. ROBERS:  Object to scope.
17     A.  Yes.
18     Q.  (BY MR. LANGAN)  Okay.  Thank you.
19     Now, is it correct and consistent with your
20  understanding that the second Drilling Moratorium had
21  slightly different terms about its scope?  I think you
22  talked about that earlier.
23     MR. ROBERS:  Object to scope.
24     A.  Yes, I believe that's right.
25     Q.  (BY MR. LANGAN)  All right.  Can you go to

70

1  Page 19 of Tab 11, which is Exhibit 12156 -- I'm sorry.
2  Page 19 of Tab 11.
3     A.  Okay.
4     Q.  So we're now at Roman Numeral VI, Subsection A
5  called Effective Oper- -- Affected Operators.
6     Do you see that?
7     A.  Yes.
8     Q.  And do you see in the first paragraph of
9  Section VI.A, where the Secretary says, after citing
10  some statutory language, "I am directing BOEM to direct
11  the suspension of any authorized drilling of wells using
12  subsea BOPs or surface BOPs on a floating facility."
13     A.  I don't see that.  Where is that?  Where are
14  you reading from?
15     Q.  I'm sorry.  The first paragraph of Section VI.A
16  on Page 19 of Exhibit 12156.  It starts with, "For the
17  reasons discussed above."
18     A.  Okay.
19     Q.  Okay.  I skipped the statutory cites, although
20  I'm happy to read them.
21     A.  Okay.
22     Q.  And skipping the citations, do you -- do you
23  see where he says -- and, again, let me quote again --
24  "I am directing BOEM to direct the suspension of any
25  authorized drilling of wells using subsea BOPs or

71

1  surface BOPs on a floating facility."
2     Do you see that?
3     A.  Yes.
4     Q.  And do you see he further says, "I further
5  direct BOEM to cease the approval of pending and future
6  applications for permits to drill wells using subsea
7  BOPs or surface BOPs on a floating facility"?
8     Do you see that?
9     A.  I do.
10     Q.  Is that consistent with your understanding of
11  the second Moratorium Directive and what it applied to?
12     MR. ROBERS:  Object to scope.
13     A.  It is.  It is my understanding.
14     Q.  (BY MR. LANGAN)  And then a couple sentences
15  down in this memorandum from the Secretary, he says --
16  and I'm quoting now, -- "These suspensions do not apply
17  to production activities; drilling operations that are
18  necessary to conduct emergency activities, such as
19  drilling operations related to the ongoing BP Oil Spill;
20  drilling operations necessary for completions or
21  workovers (where surface BOP stacks are installed, they
22  must be installed during these operations), abandonment
23  or intervention operations; or water flood, gas
24  injection, or disposal wells."  End of quote.
25     Do you see those carve-outs from the

72

1  Moratorium?
2     A.  Yes.
3     MR. ROBERS:  Object to form.
4     Q.  (BY MR. LANGAN)  Is that, again, consistent
5  with your understanding?
6     MR. ROBERS:  Object to scope.
7     A.  It is.
8     Q.  (BY MR. LANGAN)  Okay.  Okay.  And you've
9  mentioned this a couple of times, Dr. Rose, and I
10  appreciate it:
11     After the first Moratorium directive on
12  May 28th, litigation by industry participants was
13  initiated, correct?
14     MR. ROBERS:  Object to scope and form.
15     Q.  (BY MR. LANGAN)  People sued the government
16  about the Moratorium?
17     A.  Right.  I don't remember exactly --
18     MR. ROBERS:  Same objections.
19     A.  I don't remember exactly who sued, but I know
20  that we were sued.
21     Q.  (BY MR. LANGAN)  Well, Hornbeck was one of
22  them, right?
23     A.  Right.
24     MR. ROBERS:  Object to form.
25     Q.  (BY MR. LANGAN)  Okay.  They was, like, the

18  (Pages 69 to 72)

73

1  lead plaintiff, if you will?
2      A. I remember that.
3          MR. ROBERS: Object to scope and form.
4      Q. (BY MR. LANGAN) Okay. Can you go to Tab 9,
5  and let's mark this as 12157.
6          (Exhibit No. 12157 Marked.)
7      Q. (BY MR. LANGAN) Exhibit 12157 is dated June 8,
8  2010.
9          Do you see that?
10     A. I do.
11     Q. And do you see that it's a Notice to Lessees
12 and Operators issued by the Department of Interior, MMS?
13 That's who the document's issued by, right?
14         MR. ROBERS: Object to form.
15     Q. (BY MR. LANGAN) You see there at the top of
16 the page?
17     A. Yes.
18     Q. Okay. Is it your understanding that in
19 June 2010, the agency imposed new safety measures
20 concerning well control equipment, practices, emergency
21 procedures, and training applicable to all Federal
22 leases and operators?
23         MR. ROBERS: Object to the scope.
24     A. I'm not sure whether it applied to all Federal
25 leases, but they -- we did issue some sort of a safety

74

1  require- -- new safety requirements.
2      Q. (BY MR. LANGAN) Okay. And that happened,
3  again, in -- in -- after Macondo and as part of this
4  regulatory review, if you will, by the Department of
5  Interior?
6          MR. ROBERS: Object to form and scope.
7      A. I believe that was the -- what happened.
8      Q. (BY MR. LANGAN) I may have asked you this
9  before. I'm sorry if I'm repeating myself.
10         Have you ever seen Exhibit 12157 before?
11     A. No.
12     Q. Or anything like it?
13     A. No.
14         MR. ROBERS: Form.
15     Q. (BY MR. LANGAN) Okay. You've mentioned this
16 before.
17         Did there come a time in which the civil
18 plaintiffs won on injunction against the initial
19 Moratorium in Federal Court?
20         MR. ROBERS: Object to form and scope.
21     A. I'm not -- I don't know.
22     Q. (BY MR. LANGAN) Well, wasn't there an
23 injunction against the Moratorium? Do you recall that?
24         MR. ROBERS: Form and scope.
25     A. I remember there was a suit, and then, yes, I

75

1  believe the court ruled in favor of plaintiffs in -- in
2  that situation.
3      Q. (BY MR. LANGAN) Let's take a look at Tab 10
4  and mark this as Exhibit 12158.
5          (Exhibit No. 12158 Marked.)
6      Q. (BY MR. LANGAN) I'll represent to you that
7  Tab 10, Exhibit 12158, is an Order and then an -- a
8  document called Order & Reasons from Judge Feldman in
9  the United States District Court with the Eastern
10 District of Louisiana, in the Hornbeck case, which is
11 the injunction against the first Moratorium.
12         Have you ever seen this document before?
13     A. No.
14     Q. How did you learn that there had been an
15 injunction against the first Moratorium?
16         MR. ROBERS: Object to form and scope.
17     A. I don't recall. Probably reading about it in
18 the newspaper.
19     Q. (BY MR. LANGAN) And do you have any
20 understanding of what the judge ruled?
21         MR. ROBERS: Object to form and scope.
22     A. It was my impression that the judge ruled that
23 the -- that the injunction was too broad.
24     Q. (BY MR. LANGAN) The Moratorium?
25     A. The -- the Moratorium, right.

76

1      Q. And he enjoined it, correct?
2      A. Right. Correct.
3          MR. ROBERS: Form and scope.
4      Q. (BY MR. LANGAN) Is it your understanding that
5  the judge held the agency action what -- had likely been
6  arbitrary and capricious?
7          MR. ROBERS: Object to form and scope.
8      A. No, I'm not aware of that.
9      Q. (BY MR. LANGAN) Okay. One way or another,
10 whether he did or he didn't, you just don't know; is
11 that correct?
12         MR. ROBERS: Form and scope.
13     A. Yeah. I -- I don't know. I don't know what
14 his reasons were.
15     Q. (BY MR. LANGAN) All right. Now, we've already
16 looked at Exhibit 12156, the July 12th memo, which is
17 Exhibit 12156, correct? It's Tab 11.0.
18     A. Which tab?
19     Q. Tab 11. I tried to put them in chron order as
20 best I could.
21     A. Right.
22     Q. All right. Do you know when the Macondo Well
23 was capped?
24         MR. ROBERS: Object to the scope.
25     A. No, I don't know the exact date.

77

```
1        Q. (BY MR. LANGAN)  July 2010?
2            MR. ROBERS:  Form and scope.
3        A. That may -- I don't know.
4        Q. (BY MR. LANGAN)  You know it was capped, right?
5            MR. ROBERS:  Form and scope.
6        A. I know the well -- there was an attempt to cap
7    the well.
8        Q. (BY MR. LANGAN)  Was it, in fact, capped, as
9    far as you know, or is it still flowing today?
10       A. No.  It's not still flowing, but it's not
11   because of the cap.
12       Q. And do you know when the well was permanently
13   sealed?
14           MR. ROBERS:  Form and scope.
15       A. No, I don't know the date of it.
16       Q. (BY MR. LANGAN)  Did both those events, the
17   capping and the permanent sealing, occur in 2010?  Do
18   you know that much?
19           MR. ROBERS:  Object to form and scope.
20       A. I'm not 100 percent sure of that.
21       Q. (BY MR. LANGAN)  Okay.  Can you go to Tab 12,
22   please, and mark it as the next exhibit, which is --
23       A. 12159.
24           (Exhibit No. 12159 Marked.)
25       Q. (BY MR. LANGAN)  And while you're at it, if you
```

78

```
1    don't mind, Dr. Rose, you might -- no.  That -- that's
2    good.  That's good 12159.  Thank you.
3            This is a two-page -- actually, it's a
4    total of four pages -- two Fact Sheet from the Bureau of
5    Ocean Energy Management, Regulation and Enforcement, one
6    Fact Sheet about the Drilling Safety Rule and another
7    Fact Sheet about the Workplace Safety Rule.
8            Have you ever seen these before?
9        A. No.
10       Q. Do you know when the Department of Interior
11   announced these Workplace Safety and Drilling Safety
12   Rules?
13           MR. ROBERS:  Object to form and scope.
14       A. No, I don't know when -- when they announced
15   it.
16       Q. (BY MR. LANGAN)  Do you know what year?
17           MR. ROBERS:  Form and scope.
18       A. I assume in 2011.
19       Q. (BY MR. LANGAN)  You're off by a year.  How
20   about September 2010?  Does that ring any bells?
21           MR. ROBERS:  Form and scope.
22       Q. (BY MR. LANGAN)  I -- I -- do you know?
23           MR. ROBERS:  Same objections.
24       A. That -- that sounds right.
25       Q. (BY MR. LANGAN)  Okay.
```

79

```
1        A. And by the way, saying "off by a year," that's
2    a little unfair.
3        Q. Fair enough.  You're off by some -- a few
4    months?
5        A. It's a few months.
6        Q. Okay.
7        A. Okay.
8        Q. Fair enough.  It would be more accurate to say
9    you got the wrong year?
10       A. Okay.
11       Q. Fair enough.  Okay.
12           You've never seen Exhibit 12159 before?
13       A. No.
14       Q. Could you go to Tab 13, please, and mark this
15   as 12160.
16       A. By the way, can I clarify something?
17       Q. Sure.  Absolutely.
18       A. You -- you were asking me about this -- this
19   document before I had a chance to -- to look it over.
20       Q. Sure.
21       A. I didn't notice that we're talking about an
22   interim rule.  I was looking at a final rule, thinking
23   this was the final rules, which I recall was promulgated
24   in 2011.
25       Q. There was a subsequent final rule in 2011.
```

80

```
1        A. Right.
2        Q. Okay.
3        A. That's what I was commenting on.  I didn't
4    realize this was the interim final rule.
5        Q. Gotcha.  Thank you for that clarification.
6            So can we now turn to Tab 13 and mark this
7    12160.
8            (Exhibit No. 12160 Marked.)
9        Q. (BY MR. LANGAN)  Have you ever seen this
10   October 12th, 2010, Decision Memorandum from Secretary
11   Salazar?
12       A. No, I don't recall seeing this document.
13       Q. Dr. Rose, did there come a time in which the
14   Department of Interior directed BOEMRE to lift the
15   second Moratorium?
16           MR. ROBERS:  Object to the form and scope.
17       A. I -- I would assume that there did come a point
18   in time.
19       Q. (BY MR. LANGAN)  Do you know when that was?
20       A. No.
21           MR. ROBERS:  Form and scope.
22       Q. (BY MR. LANGAN)  Is October, 2010 consistent
23   with your understanding of the date that the second
24   Moratorium was lifted?
25           MR. ROBERS:  Object to form and scope.
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

81

1      A. That would seem about right.
2      Q. (BY MR. LANGAN)  And do you know whether or not
3   the Department of Interior, in lifting the second
4   Moratorium, also subjected offshore operations to new
5   reporting and certification requirements --
6         MR. ROBERS:  Object --
7      Q. (BY MR. LANGAN)  -- including wellbore
8   integrity and well control equipment?
9         MR. ROBERS:  Object to form and scope.
10     A. I don't have firsthand knowledge of that.
11     Q. (BY MR. LANGAN)  Okay.  You've never heard
12  anything about that?
13     A. I didn't say that.
14        MR. ROBERS:  Form and scope.
15     A. I didn't say I didn't ever hear anything about
16  it.
17     Q. (BY MR. LANGAN)  Okay.  What's your
18  understanding that the new requirements on wellbore
19  integrity and well control equipment?
20     A. My --
21        MR. ROBERS:  Object to form and scope.
22     A. My impression is that there are new
23  certification and testing requirements that have been
24  imposed either via NTLs or regulations.
25     Q. (BY MR. LANGAN)  Okay.  If we go to Tab 14,

82

1   please, and mark this as 12161, if you don't mind.
2         Could you take a minute to look at
3   Exhibit 12161, please, Dr. Rose.
4         (Exhibit No. 12161 Marked.)
5      A. Sure.
6      Q. (BY MR. LANGAN)  Have you ever seen
7   Exhibit 12161 before?
8      A. I don't believe I have.
9      Q. Are you familiar with the fact that BOEMRE, in
10  November of 2010, imposed new certification
11  requirements, evaluation of spill response, and
12  containment resources?
13        MR. ROBERS:  Object to form and scope.
14     A. I was aware that they issued some new safety
15  requirements.  I wasn't necessarily familiar with the
16  details.
17     Q. (BY MR. LANGAN)  Are you familiar generally
18  that some of that occurred in November of 2010?
19        MR. ROBERS:  Object to form and scope.
20     A. I wasn't aware of the exact date.
21     Q. (BY MR. LANGAN)  Okay.  You may have told me
22  this before, but what is your understanding of when the
23  Moratorium ended?
24     A. My recollection is that it ended before the end
25  of the year.

83

1      Q. Of 2010?
2      A. Yes.
3      Q. Okay.  Can you be any more specific than that?
4      A. I rem-- I recall that we originally estimated
5   that the Moratorium would last for six months, and it
6   was probably imposed in early May.  So it probably
7   didn't last until the beginning of November.
8         So October of 2010 probably would be about
9   my guess as to when it ended.
10     Q. Okay.  Okay.  I now want to come back to the
11  issue of DOI eco- -- economic analyses of the
12  Moratorium.  Okay.
13        And I want to focus again on trying to pin
14  down when the request came to your office to do a
15  projection or an estimation of what the effects might
16  be.
17        Can you be any more specific, beyond what
18  you've already said, about when that request came?
19     A. I don't think I can.
20     Q. And so what is your best recollection, sitting
21  here now?
22     A. Probably sometime in May of 2010.
23     Q. Can you say when in May?
24     A. No.
25     Q. When did you first learn, Dr. Rose, that there

84

1   was going to be a Drilling Moratorium?
2         MR. ROBERS:  Object to form.  Scope.
3      A. Probably in May of 2010.
4      Q. (BY MR. LANGAN)  Can you be any more specific
5   than that?
6      A. No.
7      Q. Do you know whether it was before or after the
8   May 28th memorandum from Secretary Salazar that is
9   Exhibit 12155 and contained in Tab 8?
10     A. Okay.  This doesn't clarify for me when -- when
11  I learned about the -- the Moratorium.
12     Q. Can you look at Tab 7, which is Exhibit 12154,
13  the Safety Report, if you will.
14        Do you know whether or not -- does this
15  help you clarify in your mind when the work on the
16  economic effects by your group would have begun or when
17  you got the request to begin that work?  Was it before
18  or after this Safety Report was issued?  Do you -- do
19  you know?
20     A. No, I do not know.
21     Q. It could have been either?  It could have been
22  before or after?
23     A. Yes, it could have been before or after.
24     Q. Okay.  Is it fair to say that no work was done
25  by your group on the economic analysis of the Drilling

21 (Pages 81 to 84)

85

1 **Moratorium before Secretary Salazar had announced there**
2 **would be one?**
3 A. It's my recollection that that's true.
4 **Q. First is his -- his announcement, then the**
5 **request to your group to figure out potential economic**
6 **effects; is that correct?  Is that the sequence?**
7 MR. ROBERS:  Object to the scope.
8 A. That's my recollection of the sequence.
9 **Q. (BY MR. LANGAN)  Okay.  With that sequence in**
10 **mind, do you know how long it was between the public**
11 **announcement of the Moratorium and the request that your**
12 **group got to study its potential economic effects?**
13 MR. ROBERS:  Object to scope.
14 A. My recollection was that it was a very short
15 time.
16 **Q. (BY MR. LANGAN)  A matter of days?**
17 A. Yes.
18 MR. ROBERS:  Same objection.
19 **Q. (BY MR. LANGAN)  So we know it must have --**
20 **well, I assume, therefore, that it must -- the request**
21 **must have come in May of 2010, then?**
22 MR. ROBERS:  Object to form and scope.
23 MR. LANGAN:  Counsel, how is that outside
24 the scope, with all -- I mean, your -- your -- your
25 objections are meaningless, but just -- I'm just

86

1 curious.  How is that possibly outside the scope?
2 Are you just hitting a record button?  How
3 is that outside the scope?
4 He's been -- he's here to testify about it,
5 and I'm asking him the timing of when it's created.  How
6 is that possibly outside the scope?  I'm just curious.
7 MR. ROBERS:  Sorry.  Are you asking me
8 questions now?
9 MR. LANGAN:  Yes.
10 MR. ROBERS:  He's here to testify about the
11 economic analysis that was performed by the Department
12 of Interior, not about the sequencing of political
13 decisions.
14 He's already testified that he's not aware
15 of the process of making the determination of when these
16 directives were issued.  He's here to testify about the
17 economic -- economic analysis performed.
18 MR. LANGAN:  And -- and I'm asking of the
19 timing of when that happened.  And -- and since he can't
20 tell me the date, I'm asking him when it was in relation
21 to the Mor- -- Moratorium announcement.  It's absolutely
22 within the scope.
23 MR. ROBERS:  Well, your --
24 MR. LANGAN:  So --
25 MR. ROBERS:  I'm not instructing him not to

87

1 answer.
2 MR. LANGAN:  I know.
3 **Q. (BY MR. LANGAN)  So was it a matter of days**
4 **between the announcement of the Moratorium and the**
5 **question you got -- the request you got to study its**
6 **economic effects?**
7 MR. ROBERS:  Form and scope.
8 A. My recollection has to do with when we
9 conducted the analysis, not so much how it related to
10 the announcement --
11 **Q. (BY MR. LANGAN)  Okay.**
12 A. -- of the Moratorium.  My recollection was
13 that -- that in -- in May or June, we commenced the
14 analysis.  I seem to recall the first paper we completed
15 was dated May or June.
16 So, I mean, that makes me nervous about my
17 answer to the first question --
18 **Q. I'm not --**
19 A. -- because if the Secretary announced on
20 May 28th, according to this document, it would suggest
21 that it's possible that we were given advance notice
22 that the Moratorium was forthcoming, and we might have
23 been asked to start that analysis earlier.
24 But -- So that's why I'm -- I'm a little
25 bit hesitant about --

88

1 **Q. Fair enough. --**
2 A. -- about answering the question.
3 **Q. Let -- let me see if I can help clarify here.**
4 **I -- again, this is really not a trick question or a**
5 **memory test, either.**
6 **First of all, Tab 15, Exhibit 12150, is**
7 **dated June 10th, and we --**
8 A. Correct.
9 **Q. I -- I think you testified earlier that Tab --**
10 **Exhibit 12150 is, in fact, work product from the**
11 **Economics Division, correct?**
12 A. Absolutely.
13 **Q. That Sarah had the laboring on and you**
14 **reviewed; do I have that right?**
15 A. You have it right.
16 **Q. Okay.  So that's June 10th.**
17 **Dr. Rose, you are correct that I pointed**
18 **you to an announcement by Secretary Salazar that**
19 **occurred on May 28th, according to Exhibit 12155.**
20 A. Uh-huh.
21 **Q. But in fairness to you, I also showed you a**
22 **document earlier, the MMS Fact Sheet, that showed -- if**
23 **you look at Tab 6, 12153, that referred to Secretary**
24 **Salazar directing the MMS to stop issuing permits on**
25 **May 6th.**

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

89

1    A. Uh-huh.
2    Q. So there's a May 6th Directive to MMS from the
3    Secretary and a May 28th public -- or you know, a memo,
4    Directive. Those are two separate events, right?
5    A. Right.
6        MR. ROBERS: Object to form.
7    Q. (BY MR. LANGAN) Does that help you date when,
8    perhaps, your Division was asked to do an economic
9    analysis, or not? Maybe it does; maybe it doesn't.
10   That's my question.
11   A. It -- it helps, a little bit, narrow the -- you
12   know, the range. It makes me a little more confident --
13   confi-- -- comfortable that somewhere between May 6th and
14   the first week in June, we were asked to do that.
15       Obviously, if we produced this document,
16   which may or may not have been the first document --
17   Q. Right.
18   A. You know, it's possible that there were earlier
19   drafts.
20   Q. Right.
21   A. You know, my -- my guess would be that -- that,
22   you know, it would certainly take at -- at least a
23   couple of weeks to get a first draft done.
24       And, you know, so the earliest we could
25   have possibly started would have been around May 28th.

90

1    So -- and -- and clearly we wouldn't have started before
2    May 6th.
3        So somewhere between May 6th and May 28th
4    would be the range of dates when we were first asked to
5    commence this work.
6    Q. Okay. The -- the first document that I've seen
7    that I -- I don't know exactly when it was produced, but
8    the -- the first one, I think, was produced is the one
9    we see at Tab 15, which is 12150, which is dated
10   June 10th.
11       And just -- just for the record, you've
12   already said that Sarah Peters is the primary, but not
13   exclusive, author of this; is that correct?
14   A. Yes.
15   Q. Do you know how much time Sarah spent on this
16   project?
17   A. She spent considerable amount of time, but as
18   far as generating this first draft, I would say a couple
19   of weeks.
20   Q. Was it pretty much a full-time assignment for
21   her within that couple of weeks?
22   A. Yes.
23   Q. And I think you testified earlier this was
24   created in an atmosphere, if you will, of time pressure?
25   A. There was a -- request that we complete this

91

1    fairly quickly, yes.
2    Q. And that was made known to Sarah?
3    A. Of course.
4    Q. Did you tell her that?
5    A. I'm sure I did.
6    Q. Do you recall the conversation?
7    A. No.
8    Q. Was the -- Exhibit 12150, the June 10th report,
9    intended to be a final version?
10   A. No.
11   Q. What was its purpose?
12   A. The purpose -- my recollection was the -- the
13   purpose was to provide some insights to the Secretary as
14   to the ramifications of the decision to pause drilling.
15   Q. And was the June 10th draft, Exhibit 12150, in
16   fact, forwarded to the Secretary's office? We may have
17   talked about that before, but --
18   A. We did. As I said, you know, I forwarded it
19   up. It may have been to Renee; it may have been to
20   Brian Screnar, one of those two. And -- and, you know,
21   exactly what they did with it and who they briefed, I
22   don't know.
23   Q. Okay. But you believe that what we see here as
24   12150 was forwarded up the chain of command, I think you
25   put it?

92

1    A. Oh, yes.
2    Q. Okay. Do you believe you have in your files
3    earlier drafts of what we see here as Exhibit 12150?
4    A. I doubt that I have in my files, anymore,
5    earlier drafts than the June 10th paper.
6    Q. Okay. Do you know whether Sarah does?
7    A. No, I don't know that.
8    Q. Okay. Did you comment to Sarah on earlier
9    versions of Exhibit 12150?
10   A. I assume that I did.
11   Q. Dr. Rose, I know -- I know it's been several
12   years, over four now. Do you recall the nature of the
13   comments that you may have made?
14   A. The -- the comments probably were
15   clarifications of the analytical procedures that she
16   employed in developing these estimates, try to make it
17   transparent to -- more transparent to the reader, how
18   the -- the measures were generated.
19   Q. Okay.
20       MR. ROBERS: Counsel, can I just interject
21   for a moment?
22       MR. LANGAN: Sure.
23       MR. ROBERS: The documents that you've been
24   asking Dr. Rose about, I think I had let you guys know
25   during the break that we did produce them and that Sarah

23 (Pages 89 to 92)

93

1    Peters was the custodian.  I just wanted to note for
2    record, in an appropriate place --
3             MR. LANGAN:  Thank you.  And I -- Counsel,
4    I greatly appreciate that.  We're going to try to find
5    the subsequent versions, if they were produced to us.  I
6    have no doubt that they were.  Maybe we can try to
7    examine about him -- about those later.  So thank you.
8    I appreciate the courtesy.
9             MR. ROBERS:  Sure.
10            **Q. (BY MR. LANGAN)  Do you know how many**
11   **subsequent versions were sent up the chain after 12150?**
12   **We have one here, which is Exhibit 1 -- part of**
13   **Exhibit 12151, but how many others?  Do you know?**
14            A.  No, I don't -- I don't know exactly how many
15   were sent up the chain.
16            **Q.  Okay.**
17            A.  I know there were -- there were several drafts
18   generated after this, but how many were sent up the
19   chain, I don't know.
20            **Q.  So -- so, Dr. Rose, when you were giving me**
21   **your earlier testimony about the topic of DOI analysis**
22   **of the economic effect of the Moratorium, you made some**
23   **comments about assumptions that were made that with the**
24   **benefit of hindsight -- which we all wish we had,**
25   **always -- that you might have done a little bit**

94

1    **differently if you had -- if you'd known, right?**
2             **Now that we have the document in front of**
3    **us, are you able to provide examples of -- of things in**
4    **the document here that, with the benefit of hindsight,**
5    **you wish you might have done differently?**
6             MR. ROBERS:  Object to form.
7             A.  Well, in -- in my opinion, I think that we
8    probably mischaracterized the -- the number of platforms
9    that were affected by the -- the second Moratorium as
10   including platform rigs, as opposed to just the
11   semi-submersibles and drill ships.  So that would have
12   reduced the count by -- by ten.
13            **Q. (BY MR. LANGAN)  You know, let me just ask you**
14   **this question.  June 10th is before the second**
15   **Moratorium, correct?**
16            MR. ROBERS:  Object to scope.
17            A.  Remind me when the second Moratorium was.
18   In -- in late -- later in June?
19            **Q. (BY MR. LANGAN)  July 12th.**
20            A.  Okay.  Right.  It was before the second one.
21   So, you know, at that time, I guess we were less aware
22   that -- that the second Moratorium would -- would be
23   more circumscribed than -- than the first.
24            **Q.  Do you recall making any changes to your**
25   **Division's work, an early draft -- or the June 10th**

95

1    **draft we see as Exhibit 12150, as a result of the**
2    **parameters of the second Moratorium Directive from**
3    **Secretary Salazar?**
4             A.  No, I don't -- I don't recall.  We went on to
5    other things after we completed this -- this work, and
6    I -- I don't recall making that adjustment --
7             **Q.  Okay.**
8             A.  -- for the second Moratoria.
9             **Q.  Okay.  So -- and, again, I'm not trying to be**
10   **critical.  I just want to understand the facts.**
11            **Your office produced this report before the**
12   **second Moratorium?**
13            A.  Right.
14            **Q.  After the second Moratorium was announced, it**
15   **was different in some degree about what it affected,**
16   **correct?**
17            MR. ROBERS:  Object to the scope.
18            A.  Yes, That's correct.
19            **Q. (BY MR. LANGAN)  But you didn't go back and**
20   **make changes to your economic analysis to reflect the**
21   **fact that the second Moratorium was different in scope**
22   **than the first Moratorium; is that -- is that fair?**
23            MR. ROBERS:  Form.
24            **Q. (BY MR. LANGAN)  Maybe there was no reason to,**
25   **but for whatever, you -- you didn't do that?**

96

1             MR. ROBERS:  Same objection.
2             A.  My recollection is that we didn't do that.  We
3    weren't asked to do that, and the effects, actually,
4    would be fairly modest.
5             **Q. (BY MR. LANGAN)  Why do you say that?**
6             A.  I think because the -- the platform -- the
7    effects of the platforms rigs were relatively small
8    compared to -- to the effects of -- of drill ships and
9    semi-submersibles.
10            **Q. (BY MR. LANGAN)  Okay.**
11            A.  So eliminating ten platform -- fixed-rig
12   platforms would have a disproportionately small effect
13   on the economic impacts.
14            **Q.  Dr. Rose, I -- I'm afraid I interrupted you**
15   **when you were answering my earlier question about, with**
16   **Exhibit 12150 in front of you, expanding upon or giving**
17   **details around the concept of what assumptions you now,**
18   **with the benefit of hindsight, might have approached**
19   **differently or -- or -- or written differently, now that**
20   **you know.**
21            MR. ROBERS:  Objection --
22            **Q. (BY MR. LANGAN)  Any others?**
23            MR. ROBERS:  -- form and scope.
24            A.  Well, in my opinion, had we known that the
25   workers -- not all of the workers would be laid off --

97

1    Q. (BY MR. LANGAN) Uh-huh.
2    A. -- we may -- may have made some additional
3 modifications in the anticipated economic impacts.
4    Q. (BY MR. LANGAN) Uh-huh. Any others?
5        MR. ROBERS: Form and scope.
6    A. No. The -- the -- the drilling pause ended a
7 little bit earlier than we assumed, six months, but --
8 but the effects actually lingered.
9        So I think that the original six-month
10 estimate of the -- of the de facto Moratorium were --
11 was -- was suitable.
12    Q. (BY MR. LANGAN) Did there come a time in which
13 the persons you had sent this document to at the
14 Secretary's office communicated, in words or substance,
15 "We're done. That's good enough. You don't need to do
16 anything further. We're satisfied." Or words to that
17 effect. You know what I mean.
18        "Project completion. Move on to your day
19 job."
20        MR. ROBERS: Object to form.
21    Q. (BY MR. LANGAN) Anything like that?
22        MR. ROBERS: Form.
23    A. That never happens. It's never completed.
24 What happens is there's just silence.
25    Q. (BY MR. LANGAN) And in this case, silence

98

1 occurred about the economic analysis?
2    A. Yes.
3    Q. Okay. When -- do you recall when the silence
4 was palpable?
5        MR. ROBERS: Object to form.
6    A. I -- I don't recall. It just sort of --
7 interest petered out.
8    Q. (BY MR. LANGAN) I guess if we had in front of
9 us the other documents and the dates of the later
10 drafts, maybe that would help you date when silence
11 occurred?
12    A. Certainly.
13    Q. Okay. Why don't we go to Exhibit 12151, which
14 is behind Tab 16, which has, as part of an e-mail chain,
15 as an attachment, apparently, to an e-mail chain, dated
16 July 29th and 30th, some version of your office's report
17 on "Effects of Drilling Pause for 6 Months."
18        Do you see that?
19    A. Yes.
20    Q. Now, do you know, sitting here now, Dr. Rose,
21 what changes made to your office's report between
22 June 10th and July 29th?
23    A. No.
24    Q. I -- I can tell you that our examination
25 between the two documents suggests that there was --

99

1 there -- not much was different, but there was an
2 increase in the number of affected wells by two, between
3 the two versions of the documents.
4        Can you -- can you clarify that that's
5 correct?
6        MR. ROBERS: Object to the form.
7    A. I can't say that I see that.
8    Q. (BY MR. LANGAN) You don't see it?
9    A. No.
10    Q. So if you look at Tab 15, and the -- and it --
11 there's a Page 7 with a landscape slide, which is Page 7
12 of your report. I know it's a little difficult to read.
13        Do you see the paragraph that begins
14 "Additional empirical data"?
15    A. On Page 7?
16    Q. Yeah. There's a paragraph that begins,
17 "Additional empirical data indicate that 100 percent of
18 development wells and 33 percent of exploration wells
19 are productive."
20    A. Okay.
21    Q. And the last sentence of that paragraph says,
22 "In total, 46, 15 plus 31, of the 80, 25 plus 55, wells
23 are project -- projected to be productive."
24        Do you see the 55?
25    A. Yes.

100

1    Q. Then if you go over to Slide -- to
2 Exhibit 12151, at Page 7 -- you've got to go to the next
3 exhibit.
4    A. Right.
5    Q. At Page 7 of that exhibit, 12151, there's
6 another paragraph that begins "Additional empirical data
7 indicates."
8        Do you see that?
9    A. Yes.
10    Q. There in the third -- in the second sentence,
11 it talks about 57 new wells. That's the two-well
12 difference we're talking about.
13        Do you -- do you know -- have -- do you
14 understand why there was a difference there?
15    A. No, I don't -- I don't understand. I'd have to
16 dig more deeply into the data to --
17    Q. Okay. And -- and by the way, do you -- do you
18 know, one way or the other, why Tab 16, Exhibit 12151,
19 has a version of the "Effects of Drilling Pause for 6
20 Months" that doesn't have a date on it?
21        The e-mail has a date, but -- but the
22 document produced from your Division doesn't have a
23 date.
24        Do you know why that would be?
25    A. No, I don't know why that would be.

25 (Pages 97 to 100)

101

1      Q. Dr. Rose, do you know what work, if any, was
2   done between June 10th and July 29th by Sarah or anyone
3   within your group on this analysis?
4      A. Other than what's in here?
5      Q. Right.
6      A. No.
7      Q. Well, I -- I guess one reason I ask the
8   question is:  Clearly a report and draft was produced on
9   June 10th, right?
10     A. Yes.
11     Q. And by the end of July, at least somebody in
12  the government was looking at a version of the report,
13  July 29th and 30th, right?  We see that in
14  Exhibit 12151, right?
15     A. Yes.
16     Q. We don't see much difference in the two reports
17  between June 10th and the one somebody was looking at
18  the end of July.
19        Do you see much difference?
20     A. No.  I couldn't even find the difference you
21  just mentioned.
22     Q. Okay.  And so my question is, is:  Do you know
23  how much work was going on in your office by your staff
24  between June 10th and July 29th on this project?
25     A. Well, clearly there was some work done, because

102

1   it -- it took some amount of effort to identify these
2   additional wells.
3      Q. Okay.
4      A. But I -- I can't recall, you know, whether this
5   was a major effort or -- or not in -- in terms of the
6   work that was being undertaken.
7      Q. Would -- would you agree with me that the
8   June 10th version, Exhibit 12150, is substantially
9   similar to Exhibit 12151?
10     A. At first glance, it appears so.
11     Q. Okay.  Does that suggest to you that the --
12  most of the work on the report had been done prior
13  to June 10th?
14        MR. ROBERS:  Object to form.
15     A. It would appear that most of the work in -- in
16  the subsequent document that appears in -- and that's
17  cited in Tab 16 is similar to what's included in Tab 15.
18        MR. LANGAN:  Okay.  I think we need to take
19  a video change.
20        MR. ROBERS:  Okay.
21        MR. LANGAN:  So you want to take five
22  minutes?
23        MR. ROBERS:  Sure.
24        MR. LANGAN:  Okay.  Thank you.
25        THE VIDEOGRAPHER:  The time is 10:42 a.m.

103

1   We are off the record.
2        (Brief Recess Taken.)
3        THE VIDEOGRAPHER:  This begins Disc 3 of
4   today's deposition.  The time now is 10:59 a.m.  We are
5   back on the record.
6      Q. (BY MR. LANGAN)  Dr. Rose, let's go back to
7   Exhibit 12151, which is Tab 16.
8        So I want to focus now on the e-mail
9   traffic from July, 2010 which precedes the attachment of
10  the "Effects of Drilling Pause for 6 Months" report that
11  your office prepared.
12     A. You mean July 29th?
13     Q. Yeah, July 29th and 30th, 2010.
14        Do you see those e-mails?
15     A. Yes.
16     Q. I -- I know you're not copied on any of these
17  e-mails; is that -- is that correct?
18     A. Yes.
19     Q. Is anyone from your office copied on any of
20  these e-mails?  You may have to flip to Page 2.  Just
21  take your time.
22     A. I don't see anybody from my staff copied on
23  these e-mails.
24     Q. So do you recognize any of the names, Richard
25  Alt?  Krisha Pillow?  Lindsey Grandburn -- Grayburn?

104

1   Tiffany Hicks?  Any of those names?  Do you recognize
2   any of them?
3      A. I don't.
4      Q. It's a big government.
5      A. Right.  But usually I'd recognize some of them,
6   but I don't recognize any of those people.
7      Q. How about Jully, Ju-- -- J-u-l-l-y, McWilliams?
8      A. Yes.  I recognize her.
9      Q. Who is Jully McWilliams?
10     A. She is a -- an employee of the Bureau, and she
11  originally came to the Bureau -- and, in fact, I hired
12  her.
13     Q. You hired her?
14     A. Yes.
15     Q. I'm sorry.  Since it's not second nature, can
16  you tell me what "the Bureau" is.
17     A. Oh, the -- the Bureau of Ocean Energy
18  Management.
19     Q. Okay.
20     A. Formally MMS.
21     Q. Very good.
22     A. I'm distinguishing from the Interior
23  Department.
24     Q. Very good.  And what was Jully McWilliams'
25  function in July of 2010?

26 (Pages 101 to 104)

105

1    A. I believe she was working as a staff person
2  for -- in the Office of the Assistant Secretary.
3    Q. And who was the Assistant Secretary for whom
4  she was a staff person, if you recall?
5    A. I don't recall who the Assistant Secretary was
6  at the time.
7    Q. Were you aware that Jully McWilliams apparently
8  had a copy of the Economic Impact Data which your
9  Economics Office had prepared, -- your Division had
10  prepared?
11    MR. ROBERS:  Object to form.
12    A. I -- I wasn't aware of that, no.
13    Q. (BY MR. LANGAN)  Do you know -- did you send it
14  to her?
15    MR. ROBERS:  Object to form.
16    A. I don't recall, but it's possible that I might
17  have.
18    Q. (BY MR. LANGAN)  What was she doing for the
19  Assistant Secretary in July of 2010, if you know?
20    A. She was obviously -- I -- I don't know.
21    Q. Do you have any idea what her role is -- was at
22  the time regarding an analysis of the "Effect of
23  Drilling Pause"?
24    A. Beyond just passing along the work that we did
25  and -- and perhaps summarizing it, no.

106

1    Q. Dr. Rose, you will see that in one of the
2  e-mails, Mr. Alt refers to the fact that -- in his
3  e-mail on July 29th, "Once this is finalized with WH."
4    That's the White House, right?
5    A. Yes.
6    Q. Were you aware that at least some people in the
7  government thought that your work, your staff's work, on
8  "Effects of Drilling Pause for 6 Months" was going to be
9  subject to finalization with the White House?
10    MR. ROBERS:  Object to form.
11    A. I don't believe we were aware of that, no.
12    Q. (BY MR. LANGAN)  Did you have -- ever have any
13  discussions with anybody about the White House having
14  some role in evaluating the "Effect of the Drilling
15  Pause for 6 Months" study that your office had done?
16    A. No.  I don't recall anything like that.
17    Q. Did you talk about that with Brian at any time?
18    A. Well, I knew he was the liaison to the White
19  House, but we didn't talk about what he planned to do
20  with the -- the work that we gave him.
21    Q. And do you know -- do you know who Tiffany
22  Hicks is?
23    A. I've never heard that name.
24    Q. All right.  You'll see Tiffany Hicks' e-mail
25  says -- and she states below, "This is a preliminary

107

1  estimate and not cleared by the White House yet."
2    Again, did you ever have any discussions
3  with anybody about your analysis being, quote/unquote,
4  cleared by the White House?
5    MR. ROBERS:  Object to form.
6    A. I did not.
7    Q. (BY MR. LANGAN)  You never discussed that with
8  Brian or anybody else?
9    A. No.
10    MR. ROBERS:  Form.
11    Q. (BY MR. LANGAN)  If you flip the page to the
12  second page of Exhibit 12151, Jully McWilliams tells
13  Josh Barnes -- do you know who Josh Barnes is?
14    A. I do not.
15    Q. Okay.  Do you see the e-mail where Jully
16  McWilliams tells Josh that your office's analysis, "is a
17  preliminary estimate as of June, 2010, from DOI/BOEM.
18  The Drilling Moratorium references to the original one,
19  not the revised Moratorium"?
20    Do you see that?
21    A. No, I don't.  Where is that?
22    Q. I'm sorry.  There's an e-mail from Jully to
23  Josh, which is the second page of Tab 16, Exhibit 12151.
24    Do you see that at the top of the second
25  page?

108

1    A. The one that says, "Josh, as you requested"?
2    Q. Correct.  Look at the second sentence of that
3  e-mail.
4    A. Okay.
5    Q. Can you read that into record.
6    A. "Also, you may be interested in these recent
7  external studies"?
8    Q. No.  I meant the second sentence.
9    A. Oh, okay.  "This is a preliminary estimate as
10  of June, 2010, from DOE -- DOI/BOEM."
11    Q. And -- and Jully goes on to say, "The Drilling
12  Moratorium referenced is the original one, not the
13  revised Moratorium."
14    Do you see that?
15    A. Yes.
16    Q. Was that a true statement?
17    A. Yes.
18    Q. And I -- I'm sorry if I asked you this before.
19    You never really updated, and Sarah never
20  updated, the Effects of Drilling Pause Analysis to
21  take account of the second Moratorium parameters, right?
22    MR. ROBERS:  Object to form.
23    A. I do not recall updating the analysis in the --
24  in the same form that was presented in these papers.
25    Q. (BY MR. LANGAN)  Okay.  How about any other

27 (Pages 105 to 108)

109

1  form?
2      A. I -- I can't recall any other form either.
3      Q. Dr. Rose, do you know a Kevin Kunkel?
4      A. Yes, I do.
5      Q. Who is Kevin Kunkel?
6      A. Kevin Kunkel is a staff person for BOEM.
7      Q. And what -- I'm sorry.  What is his function?
8  What does he do?
9      A. He's had different functions.  He -- originally
10 he worked in the renewable energy program, and then
11 he -- I'm not sure what he was doing at this point in
12 2010.
13     Q. I already asked you about Joshua Barnes.
14 You -- you don't know Joshua --
15     A. I've never heard of him.
16     Q. Now, according to the bottom of this e-mail
17 chain --
18     A. Uh-huh.
19     Q. -- Exhibit 12151, he was the National Incident
20 Command Economic Solutions Team with a DC phone number.
21 Do you see that?
22     A. Yes, uh-huh.
23     Q. Does that ring any bells?
24         MR. ROBERS:  Object to form.
25     A. Absolutely not.

110

1      Q. (BY MR. LANGAN)  Did you ever have any
2  interactions with the Economic Solutions Team of the
3  National Incident Command?
4      A. I did not.
5      Q. Okay.  During one of our breaks, thanks to the
6  courtesy of counsel, we have located two additional
7  versions of the "Effects of Drilling Pause for 6 Months"
8  document, and I have some copies.
9          I would like to mark this as the next
10 exhibit, if you don't mind.
11         MR. LANGAN:  And here's a copy for you,
12 Counsel.
13         MR. ROBERS:  Thanks.
14     Q. (BY MR. LANGAN)  Can you tell me what number?
15     A. You want to use 12162?
16         (Exhibit No. 12162 Marked.)
17         MR. LANGAN:  And this is Bates Numbered
18 BOEM001121, right, at the bottom there?
19     A. Yes.
20     Q. (MR. LANGAN)  Okay.  So we're looking now at
21 Exhibit 12162, and I -- I will represent to you that we
22 looked at the metadata that came with this production
23 copy, and it suggests that this particular version of
24 the document was created on September 10, 2010.
25         Do you -- do you recognize Exhibit 1 --

111

1  12162?
2      A. It's not distinguishable, at first glance, from
3  the previous documents.
4      Q. Okay.  Do you know whether any additional work
5  was done in the September 2010 timeframe on -- on this
6  particular document?
7      A. After this, are you asking me, or --
8      Q. Leading up to this.  Do you know whether work
9  was under way on this by -- by Sarah or anyone on your
10 staff?
11     A. I don't know.
12     Q. Do you know whether or not Exhibit 12162 was
13 forwarded up the chain to the Secretary's office or
14 anyone else by you or your staff?
15     A. I don't know that.
16     Q. Let's mark this one as 12163, please.
17         (Exhibit No. 12163 Marked.)
18     Q. (BY MR. LANGAN)  Dr. Rose, Exhibit 12163 is
19 another version of the "Effects of Drilling Pause for 6
20 Months" with the BOEM Bates Number beginning 001159
21 through 6 -- I'm sorry -- 70.
22         Do you recognize this document?
23     A. As I indicated before, it's indistinguishable,
24 to me, from previous documents that --
25     Q. Okay.  And, again, just -- just for the record,

112

1  the metadata that we looked at a few minutes ago for the
2  creation of this document suggests it was created on
3  December 9th, 2010.
4      A. Okay.
5      Q. Do you know whether or not work -- any work was
6  done by your staff, Sarah or anyone else, in the
7  December 2010 time period?
8      A. I don't know.
9      Q. Do you know whether or not Exhibit 12163 was
10 forwarded by you or your staff to anyone within the
11 government?
12     A. I'm not aware of that.
13     Q. Okay.  Doc- -- Dr. Rose, would you agree with
14 me that the work done by Sarah and your staff was
15 essentially or substantially complete as of June 10,
16 2010, on this project?
17         MR. ROBERS:  Object to form.
18     A. What exactly do you mean by "complete"?
19     Q. (BY MR. LANGAN)  Well, substantially complete.
20         In other words, you know, the vast majority
21 of the analysis was complete by June 10, 2010, and what
22 happened thereafter were minor corrections or minor
23 modifications.
24     A. There were some modifications subsequently that
25 appear to be relatively small compared to the existing

28 (Pages 109 to 112)

113

1    document generated on June 10th.
2        Q. And beyond what you've already told me, do you
3    know what those minor changes were?
4        A. Other than -- not without reviewing these in
5    depth. You pointed out the additional two wells that
6    were added to the count.
7        Q. Okay.
8        A. Other than that, I can't recall what other
9    changes were made.
10       Q. In preparation for your deposition, did you
11   undertake any analysis of -- of changes that were made
12   to the analysis over time?
13           MR. ROBERS: Object to form.
14       A. I -- I did not.
15       Q. (BY MR. LANGAN) Are there any other documents,
16   besides the exhibits we've marked here today, that are
17   work product from the work done by your staff regarding
18   the "Effects of the Drilling Pause for 6 Months," or
19   have we now seen them all?
20       A. You've seen as many as I've seen.
21       Q. You're not aware of any -- any others; is that
22   correct?
23       A. That's correct.
24       Q. Can we go to Tab 17, please, which has been
25   previously marked as Exhibit 11888?

114

1        A. Uh-huh.
2        Q. We talked about this one earlier. I just don't
3    want to go over old ground here.
4            But am I correct, based on your earlier
5    testimony, that the Economics Division was not involved
6    or consulted in the preparation of this report,
7    Exhibit 11888? Is that correct?
8        A. We -- we certainly weren't involved in it.
9    Whether or not there was a telephone call that might
10   have been made by one staff member to another staff
11   member, I can't -- I can't say for certain about that.
12       Q. You were personally not consulted about
13   Exhibit 11888 before it was created; is that correct?
14       A. That's correct.
15       Q. Did you ever talk to Sarah or any member of
16   your staff about the creation of Exhibit 11888?
17       A. No.
18       Q. So sitting here today, you don't know whether
19   or not there was, in fact, any consultation by members
20   of your staff about Exhibit 11888; is that correct?
21       A. This -- this study cites the result of our
22   study, so somehow, the authors of this got ahold of our
23   study, which was an internal study.
24           Whether or not they contacted, via e-mail
25   or telephone call, my staff to discuss it, I don't know.

115

1        Q. By the way, if, in fact, your staff had been
2    contacted by people involved with creating 11888, would
3    you have expected them to let you know that?
4        A. My staff?
5        Q. Yes.
6        A. Not necessarily.
7        Q. Okay. Dr. Rose, was the work that you and
8    your -- your staff did under your supervision on
9    "Effects of Drilling Pause for 6 Months" a high-profile
10   assignment?
11           MR. ROBERS: Object to form.
12       A. Any assignment that -- that comes down from --
13   from the Office of the Secretary and is being
14   coordinated by a White House coordinator can be
15   considered something that we need to get working on.
16       Q. (BY MR. LANGAN) So you would agree with my
17   characterization, would you not, that this was an
18   important assignment, wasn't it?
19       A. This was a -- a high-profile assignment for us.
20       Q. Okay. That really led me to my other question,
21   which is: If somebody else from the government had
22   contacted your staff about this high-profile assignment,
23   wouldn't you have expected the -- your staff to come to
24   you and tell you that it happened?
25           MR. ROBERS: Object to form.

116

1        A. This -- this study -- the fact that they asked
2    a question about a study that we've already done
3    wouldn't necessarily come to my attention.
4        Q. (BY MR. LANGAN) Okay. After your staff's work
5    on the "Effects of the Drilling Pause for 6 Months," did
6    it ever come to your attention that anyone in the
7    government was raising questions or criticizing or
8    commenting upon the work that your team had done?
9            MR. ROBERS: Object to form.
10       A. Not that I can recall.
11       Q. (BY MR. LANGAN) We already talked about the
12   questions that Brian had as part of the process, and I'm
13   not talking about that.
14           Separate and apart from Brian's commentary,
15   any other commentary, criticism, communications that
16   related to your staff's work on the "Effect of the
17   Drilling Pause"?
18       A. Not that I recall.
19           MR. ROBERS: Form.
20       Q. (BY MR. LANGAN) I -- I guess Exhibit 11888, to
21   a degree, references your work, does it not?
22           MR. ROBERS: Object to the scope.
23       A. The document you're referring to cites several
24   other studies that were done on the same topic, and one
25   of those studies is -- is our study.

29 (Pages 113 to 116)

117

1    Q. (BY MR. LANGAN)  Okay.  Do you know who the
2  author of the Exhibit 11888 is?
3        MR. ROBERS:  Object to scope.
4    A. I do not.
5    Q. (BY MR. LANGAN)  Do you know which agencies
6  contributed to it?
7        MR. ROBERS:  Object to scope.
8    A. I do not.
9    Q. (BY MR. LANGAN)  Let's turn, if we could, to
10  the second page of Exhibit 11888.
11        And in the third full paragraph in the
12  Executive Summary there, there's a sentence that -- that
13  says this:  "Based on conversations with a number of rig
14  operators, along with other publicly-available
15  information, we estimate that during the six-month
16  period of the Moratorium, average employment of rig
17  workers in the Gulf of Mexico fell by about 2,000."
18        Do you see that?
19    A. I do.
20    Q. Is that consistent or inconsistent with the
21  conclusion that your group had reached?
22    A. Inconsistent.
23    Q. How so?
24    A. It's quite a bit less than the -- the numbers
25  that we came up with.

118

1    Q. Do you have an understanding of why that is so?
2        MR. ROBERS:  Object --
3    A. Yes.
4        MR. ROBERS:  Object --
5    Q. (BY MR. LANGAN)  What is your understanding?
6        MR. ROBERS:  Object to scope.
7    A. My understanding is that -- and I had mentioned
8  this earlier --
9    Q. (BY MR. LANGAN) Yes.
10    A. -- that -- that we had assumed that all of the
11  workers would be idle as a result of the Moratorium.
12  And this study, which was done many months later,
13  basically incorporated the assumption that not all of
14  the workers, in fact, would be idle, and made its
15  calculations based on those that were actually idle.
16    Q. (BY MR. LANGAN)  Exhibit 11888 has some of the
17  hindsight benefit that your report did not have the
18  luxury of; is that fair?
19        MR. ROBERS:  Object to scope and form.
20    A. Yes, that's certainly fair.
21    Q. (BY MR. LANGAN)  Do you believe that the
22  statement I read into the record from Exhibit 11888 is
23  accurate?
24        MR. ROBERS:  Object to scope.
25    A. Which -- which statement did you read into the

119

1  record?
2    Q. (BY MR. LANGAN)  The one about the estimation
3  of average employment of rig workers in the Gulf of
4  Mexico falling by about 2,000 during the six-month
5  period of the Moratorium.
6        MR. ROBERS:  Object --
7    Q. (BY MR. LANGAN)  Do you have any idea if it's
8  accurate?
9        MR. ROBERS:  Object to form.
10    A. It's actually misleading.
11    Q. (BY MR. LANGAN)  How so?
12    A. It -- it -- on -- on the face of it, it might
13  be accurate.  But what's important for determining the
14  economic effects is what happens to the workers that
15  were on the rigs and weren't actually laid off.
16    Q. (BY MR. LANGAN)  Please explain.
17    A. Well, if they were --
18        MR. ROBERS:  Object to scope.
19    A. If -- if the workers were put in other less
20  important jobs, jobs that were less productive, that
21  generated less profits, less taxes to the -- for the
22  Federal Government, then there would still be an
23  economic impact.  Okay?
24        So you can't simply ignore the fact that --
25  that their circumstances changed just because they

120

1  weren't laid off.
2    Q. (BY MR. LANGAN)  Uh-huh.
3    A. Okay.  So simply zeroing out those workers
4  because they weren't laid off and focusing the economic
5  impacts only on laid-off workers is a narrow perspective
6  on estimating the economic effects.
7    Q. Have you seen any analysis of the fate of
8  the -- of the workers that lost their job, if any, due
9  to the Moratorium, what they might -- what -- what other
10  tasks they might have done?  Have you seen any analysis
11  of that?
12    A. I have not.
13        MR. ROBERS:  Object to scope.
14    Q. (BY MR. LANGAN)  Is it possible that some of
15  those rig workers took on other employment, such as in
16  the spill response itself?
17        MR. ROBERS:  Object to scope.
18    A. I -- I don't know about -- whether they did or
19  not.
20    Q. (BY MR. LANGAN)  Have you seen any suggestion
21  in any studies that you've seen that, in fact, the spill
22  response itself, and the employment of people in the
23  spill response itself, may have mitigated the economic
24  effect from the Moratorium?
25        MR. ROBERS:  Object to scope.

30 (Pages 117 to 120)

121

1      A. I've seen comments to that effect.
2      Q. (BY MR. LANGAN)  Where -- where have you seen
3  those?
4          MR. ROBERS:  Scope.
5      Perhaps in this first study.
6      Q. (BY MR. LANGAN)  Do you think that line of
7  thinking has validity?
8          MR. ROBERS:  Object to scope.  Form.
9      A. I think -- I think it's misleading.
10      Q. (BY MR. LANGAN)  How so?
11          MR. ROBERS:  Scope and form.
12      A. It's equating sort of national benefits of
13  having a job and generating drilling and oil and gas
14  production with a job that cleans up an oil spill.
15      Q. (BY MR. LANGAN)  Uh-huh.
16      A. And, you know, one is -- is basically a -- a
17  remedial action to try to restore the status quo, and
18  the other is basically an incremental improvement in the
19  country's wealth.
20          So it's true that you're substituting one
21  job for another, but the value of that job is -- is --
22  is not comparable.
23      Q. Uh-huh.  Dr. Rose, as part of the effects of
24  Drilling Pause Analysis that your office did, was -- did
25  the scope of that analysis include any analysis of the

122

1  effect of energy prices --
2      A. Uh-huh.
3      Q. -- on the -- on the Moratorium?
4      A. It did.
5      Q. And what was your conclusion?
6      A. The conclusion was that -- that the effects of
7  the Moratorium would -- would be fairly modest with
8  regard to its effects on world energy prices.
9      Q. And -- and, again, I'm sure it's in the
10  documents.
11          Can you just generally explain why that was
12  your conclusion of you and your staff.
13      A. Sure.  Sure.  The world energy market involves
14  the exchange of about 85 million barrels of oil a day.
15          The Moratorium may have affected anywhere
16  from 30 to 80,000 barrels a day during the two years
17  following the spill.  So that's a -- a tiny fraction
18  of -- of world supply equal to maybe 1/10th of 1
19  percent.
20          And it turns out that if you do the -- the
21  analysis, you'll find that -- that about a proportional
22  effect would occur on the -- world price of oil,
23  which would be about a tenth of 1 percent.
24          So it turns out to be about maybe a dime or
25  $0.20 per barrel during the transition period associated

123

1  with the market restoring production.
2      Q. (BY MR. LANGAN)  You remain comfortable with
3  that conclusion?
4      A. Yes.
5      Q. Even with the benefit of hindsight?
6      A. Oh, yes.
7      Q. Okay.
8          MR. ROBERS:  Object to scope.
9      Q. (BY MR. LANGAN)  Now, if you look at the bottom
10  of the second page of Exhibit 11888, the author of this
11  study also touches on the effect of the Moratorium on
12  delayed oil production --
13      A. What -- what tab are we on?
14      Q. It's Tab 17 --
15      A. Okay.
16      Q. -- which is Exhibit 11888.
17      A. Yes.
18      Q. And the last full paragraph of the first full
19  page there.
20      A. Okay.
21      Q. The paragraph that begins, "The other primary
22  economic consequence of the Moratorium is delayed oil
23  production."
24          Do you see that?
25      A. Uh-huh.  Uh-huh.

124

1      Q. Can you read that to yourself, please.
2      A. Okay.
3      Q. Is this consistent with your own conclusion?
4          MR. ROBERS:  Object to scope.
5      A. It looks like it is our own conclusion.
6      Q. (BY MR. LANGAN)  In other words, no discernable
7  effect on oil price -- oil prices as a result of the
8  Moratorium, right?
9      A. Right.
10      Q. Okay.  The next page of this report,
11  Exhibit 11888, the -- the one that's captioned
12  "Introduction."
13      A. The first paragraph?
14      Q. Well, I'm going to direct your attention to the
15  paragraph which is the fourth full one on the page,
16  which begins, "During the crisis."
17      A. Okay.
18      Q. About 2/3rds of the way down there, it says --
19  a sentence says -- and I'm quoting now -- "Aggregate
20  employment data do not show a meaningful adverse effect
21  in the five Louisiana parishes that support most
22  deepwater drilling activities."
23          Do you see that?
24      A. I do.
25      Q. Is that consistent with your own conclusion?

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

125

1    A. Well, we -- we -- we didn't focus on --
2        MR. ROBERS: Objection. Form.
3    A. -- individual parishes.
4    Q. (BY MR. LANGAN) Do you have --
5    A. We were just focusing on the effects throughout
6    the Gulf of Mexico.
7    Q. Do you have any basis in which to disagree with
8    the conclusion of the author in Exhibit 11888?
9        MR. ROBERS: Object to scope.
10   A. I don't have any reason to agree or disagree
11   with that --
12   Q. (BY MR. LANGAN) Okay.
13   A. -- that conclusion.
14   Q. If you flip over to the next page, the top of
15   Page 2, the carryover paragraph refers to temporary job
16   losses in the Gulf.
17       Do you see that?
18   A. The first set of sentences there?
19   Q. Yes. It starts with "Using information."
20       Do you see that?
21   A. Yes, I do.
22   Q. The last sentence there reads, "These jobs
23   would not be permanently lost as a result of the
24   Moratorium. Most will return following the resumption
25   of deepwater drilling in the Gulf of Mexico."

126

1        Do you see that?
2    A. I do.
3    Q. Do you believe that is a true statement for any
4    jobs that may have been displaced as a result of the
5    Drilling Moratorium?
6        MR. ROBERS: Object to scope.
7    A. I have no basis for concluding, one way or the
8    other, whether or not this assertion is necessarily
9    correct or not.
10   Q. (BY MR. LANGAN) I believe we got, last night,
11   from counsel a document produced to us. I'm going to
12   have you flip to it now.
13       It's the Louisiana Oil and Gas Producers, I
14   think. I think it's at Tab 32.
15       Would you mind turning to Tab 32 and
16   marking that as the next exhibit, Dr. Rose.
17       (Exhibit No. 12164 Marked.)
18   Q. (BY MR. LANGAN) Which I guess will be 12164.
19   A. Right.
20   Q. Have you seen Ex- -- Exhibit 12164 before?
21   A. I don't recall this.
22   Q. Do you know whether or not it was in your
23   files?
24   A. I don't recall.
25   Q. Did you consult Exhibit 12164 in preparing to

127

1    testify today?
2    A. I don't recall. I had a lot of items in my --
3    my folders, and I remember most of them. This one, I
4    can't recall if it was in there or not.
5    Q. Do you -- do you know whether or not
6    Exhibit 12164 was used by your staff in producing the
7    study, "Effects of Drilling Pause for 6 Months"?
8    A. I doubt this was used very much.
9    Q. Okay. Now I want to go back -- sorry to --
10   sorry to go the wrong direction here -- back to Tab 17.
11       If -- can you turn to Pages 14 and 15 of
12   Exhibit 11888?
13   A. Got it.
14   Q. So there's a section here beginning at the
15   bottom of Page 14 entitled, "Estimated production impact
16   of the six-month Moratorium."
17       Do you see that?
18   A. Yes.
19   Q. Did your group also estimate production impacts
20   from the Moratorium?
21   A. Yes.
22   Q. And what was your conclusion?
23   A. I believe we concluded that in the calendar
24   year -- two calendar years following the -- the -- the
25   spill and the Moratorium, that there would be about a

128

1    5-percent reduction in -- in -- in total production.
2    Q. Are you aware of what the actual experience was
3    in the real world, now with the benefit of hindsight,
4    about production?
5        MR. ROBERS: Object to scope.
6    A. I don't think we've made precise calculations
7    about what the -- the effects are.
8    Q. (BY MR. LANGAN) How about generally, general
9    calculations?
10       MR. ROBERS: Object to scope.
11   A. I'm not aware of -- of having done that.
12   Q. (BY MR. LANGAN) You don't have a conclusion
13   of -- in that regard about what the effects on
14   production really were from the Moratorium?
15       MR. ROBERS: Object to scope.
16   A. No, I don't.
17   Q. (BY MR. LANGAN) Take a look at the top of
18   Page 15 of Exhibit 11888, the first full paragraph.
19       Do you see that?
20   A. "While near-term Gulf of Mexico deepwater
21   production"?
22   Q. Correct.
23   A. Uh-huh.
24   Q. There's a sentence in the middle of that
25   paragraph that says -- and I'm quoting now -- "Because

32 (Pages 125 to 128)

129

1    production is delayed rather than permanently foregone,
2    the value of near-term production losses is likely to
3    significantly overstate impacts on the present value of
4    cumulative future Gulf of Mexico deepwater production."
5         Do you see that?
6    A. Yes.
7         Q. Is that consistent with your role and
8    understanding?
9         MR. ROBERS: Object to form and scope.
10   A. Certainly.
11        Q. (BY MR. LANGAN) So you agree with this?
12        MR. ROBERS: Object to form and scope.
13   A. Yes, I do.
14        Q. (BY MR. LANGAN) All right. Could we go to Tab
15   18, please. And this has been previously marked as
16   Exhibit 12152, if I'm not mistaken.
17   A. Yes.
18        Q. And it's -- have you seen this document before?
19   I may have asked you that 90 minutes ago.
20   A. Yes, I've seen this document.
21        Q. You have -- you've seen it?
22   A. Yes.
23        Q. And I think you told me earlier that you --
24   your group may have contributed to portions of this?
25   A. Yes.

130

1         Q. Again, without paging through the whole thing,
2    do you know generally what kinds of contributions you
3    would have made, what -- you know, topically or
4    generally?
5    A. We might have provide some -- provided some
6    information about production of oil and gas. Maybe --
7    maybe the -- I will just leave it at that.
8         Q. Yeah. I -- I gather, Dr. Rose, that you really
9    spend a large portion of your professional time managing
10   the leasing operations and bidding and lease sales and
11   that sort of thing? Do I have that right?
12   A. Correct.
13        Q. Okay. Some of that probably made its way into
14   here, didn't it? I -- I would assume. I mean, you tell
15   me, though.
16        MR. ROBERS: Object to form.
17   A. Maybe a small portion of that --
18        Q. (BY MR. LANGAN) Okay.
19   A. -- may have found its way into here.
20        Q. So looking at Exhibit 12152, can we flip over
21   to Page 116 and 117, please.
22   A. Okay. Did you say 115?
23        Q. 116 to 117.
24   A. 116. Okay.
25        Q. So I'm going to really focus on the first

131

1    bullet point on Page 117.
2         Do you see where it says "BOEMRE's estimate
3    of loss spending"?
4         (Discussion Off The Record.)
5    A. Yes.
6         Q. (BY MR. LANGAN) Do you -- do you see that?
7    A. Yes, I do.
8         Q. Did you have any involvement, to your
9    knowledge, or your group have any involvement in that
10   estimate referred to here?
11   A. My staff may have had some involvement in that.
12        Q. Okay. Are -- are you familiar with that
13   calculation? Did you sign off on it or anything like
14   that?
15   A. No, I don't -- I -- I don't recall.
16        Q. Can we go to Tab 19, please, which is
17   Exhibit 11923. I guess it has been previously marked in
18   another deposition recently.
19        Have you seen this document from the
20   Department of the Interior before?
21   A. No.
22        MR. ROBERS: Object to scope.
23        Q. (BY MR. LANGAN) So I gather that this document
24   played no role in your preparing to testify today; is
25   that right?

132

1    A. No.
2         Q. If you would turn to Page 19 of Exhibit 11923.
3    A. Can you say that again?
4         Q. Page 19 --
5    A. Of?
6         Q. -- Exhibit 11923. Tab 19. Yes.
7    A. Page 19?
8         Q. Yes, please.
9    A. Okay.
10        Q. There's a paragraph that begins at the bottom
11   that begins, "The Moratorium was aimed."
12        Do you see that?
13   A. I do.
14        Q. So the first sentence here says, "The
15   Moratorium was aimed at rigs in the Gulf of Mexico that
16   were exploring new reservoirs, oil and gas, in water
17   deeper than 500 feet."
18        Is that your understanding, as well, sir?
19        MR. ROBERS: Object to scope.
20   A. No, I -- that's not my understanding.
21        Q. (BY MR. LANGAN) What is your understanding?
22   A. That there were certain kinds of rigs that were
23   covered, not all rigs.
24        Q. And I guess we talked about that before.
25   Especially with the second Moratorium, it was rigs with

133

```
 1    subsea BOPs and the like that you're -- that's the
 2    distinction you're drawing?
 3         A. Yes.
 4         Q. Okay.  The last full sentence on Page 19 says,
 5    "Many had begun shifting operations to other offshore
 6    provinces and to onshore fields prior to 2010 and
 7    continued that trend."
 8         Do you see that?
 9         A. Yes, I do.
10         Q. Is that a true statement, as far as you know?
11         MR. ROBERS:  Object to scope.
12         A. I can't comment on that.  I'm not an expert on
13    that.
14         Q. (BY MR. LANGAN)  Can you turn to Page 25 --
15         A. Sure.
16         Q. -- of this exhibit, please, Exhibit 11923.
17         A. Okay.
18         Q. The second full paragraph -- do you see it
19    there.  It begins, "Within the industry"?
20         A. I do.
21         Q. Do you see the sentence that says, "Within the
22    industry, the fear of large scale layoffs was never
23    realized"?
24         A. I do.
25         Q. Do you believe that's accurate?
```

134

```
 1         MR. ROBERS:  Object to scope.
 2         A. I don't have firsthand knowledge of that.  I've
 3    read -- I've read that as it relates to employees on --
 4    on -- on rigs, but as far as the industry as a whole, I
 5    don't know.
 6         Q. (BY MR. LANGAN)  Did you do any study of the
 7    effect of the rig compensation -- worker -- rig worker
 8    compensation fund that BP set up in the aftermath of the
 9    Macondo incident?
10         A. No.
11         MR. ROBERS:  Object to scope.
12         Q. (BY MR. LANGAN)  So you don't know how much was
13    paid out to rig workers who might have been affected by
14    the -- the Moratorium?
15         MR. ROBERS:  Object to scope.
16         Q. (BY MR. LANGAN)  Is that correct?  You don't
17    know?
18         A. I don't know.
19         Q. I'm getting there.  I promise.
20         Page 26 of Exhibit 11923, do you see the
21    summary?
22         A. I do.
23         Q. The first sentence of the summary says, Dr.
24    Rose, "The offshore oil and gas industry in the Gulf of
25    Mexico had entered a downturn prior to the DEEPWATER
```

135

```
 1    HORIZON rig explosion.  At the same time, the activity
 2    was expanding to the offshore oil and gas fields in the
 3    U.S. including Northern Louisiana, Texas, North Dakota,
 4    and Pennsylvania, as well as offshore fields off the
 5    coast of countries including China, Africa, Brazil, and
 6    the Middle East.
 7         "As a result, it is difficult to
 8    distinguish the effects of the DEEPWATER HORIZON
 9    disaster and its aftermath from other changes taking
10    place within the petroleum industry."
11         Do you agree with those statements?
12         MR. ROBERS:  Object to scope and form.
13         A. No, I don't agree with those statements.
14         Q. (BY MR. LANGAN)  What part don't you agree
15    with?
16         MR. ROBERS:  Object to the scope and form.
17         A. In my opinion, the evidence about a downturn
18    in -- in the offshore oil and gas industry was
19    problematic.
20         Q. (BY MR. LANGAN)  How do you mean?
21         MR. ROBERS:  Scope and form.
22         A. There is growing activity in deepwater.  It's
23    true that there has been declining activity in shallow
24    water, which accelerated around the time of the spill.
25    It's -- gas production, for example, which is mostly a
```

136

```
 1    shallow water activity, has declined substantially since
 2    the spill.
 3         Whether the spill contributed to that or --
 4    or some other factors, but to imply that -- that there
 5    would have been a significant downturn absent the spill
 6    is speculative, in my -- in my judgment.
 7         Q. (BY MR. LANGAN)  So what were the other factors
 8    you referred to that might conceivably account for a
 9    downturn in gas production?
10         MR. ROBERS:  Object to scope.
11         A. The fact that gas prices have been -- were low,
12    and a lot of the -- the large discoveries appeared to be
13    in shallow water, and they had been exploited.
14         Q. (BY MR. LANGAN)  Just to follow up:  Can you --
15    I'm sure we can look it up, but can you give me your
16    understanding generally about the decline in gas prices?
17         A. Uh-huh.
18         Q. Natural gas, I guess we're talking about,
19    right?
20         MR. ROBERS:  Object to scope and form.
21         A. Yes.  Yes.  Probably up until about 2008, 2009,
22    gas prices had risen up to, perhaps, anywhere from six
23    to eight dollars per MCF and --
24         Q. (BY MR. LANGAN)  Million cubic feet, as I
25    recall?
```

34 (Pages 133 to 136)

137

```
1      A. A thousand cubic feet.
2      Q. A thousand cubic feet.
3      A. Right.
4      Q. MCF.
5      A. MCF.
6      Q. Got it. Okay.
7      A. Yes. And then -- then started to decline and
8   declined to under two dollars -- two -- three dollars
9   per MCF. And over the last year and a half or so, it's
10  actually recovered up to perhaps anywhere -- in the low
11  four dollars per MCF.
12      Q. And have you ever undertaken a study of the
13  effect the decline in natural gas prices, 2008 forward,
14  might have had on -- on investment, employment, job
15  creation in the industry?
16          MR. ROBERS: Object to scope and form.
17      A. No, we -- we haven't undertaken -- I haven't
18  undertaken such a study.
19      Q. (BY MR. LANGAN) Would you have expected, as an
20  economist, that the decline in natural gas prices would
21  have led to less economic activity in the production
22  area?
23          MR. ROBERS: Object to scope.
24      A. Yes, I would have.
25      Q. (BY MR. LANGAN) And that's a fairly commonly
```

138

```
1   understood phenomenon, right, in the industry, that the
2   decline in natural gas prices has had an effect?
3          MR. ROBERS: Object to scope.
4      A. To some extent, but the lead times are so long
5   offshore, that it -- it would have to take more than --
6   than just a temporary change in prices.
7          It would have to take more of a
8   long-lasting event for investment and ultimately
9   production to decline.
10      Q. (BY MR. LANGAN) Okay. But in any event,
11  that's not a study you or your office have undertaken?
12      A. No, we haven't.
13      Q. Okay. Tab 20, please.
14      A. Okay.
15      Q. Can we mark Tab 20 as the next exhibit.
16          (Exhibit No. 12165 Marked.)
17      A. 12165?
18      Q. (BY MR. LANGAN) That would be wonderful.
19      A. Okay.
20      Q. I gather you're familiar with the fact that
21  from time to time, committees of the United States
22  Congress will hear from agencies such as the Department
23  of the Interior on topics that are of interest to the --
24  our politicians?
25      A. I'm aware of that, yes.
```

139

```
1      Q. Okay. That does happen, right?
2      A. That happens once in a while.
3      Q. Okay. So this is a hearing from June of 2011
4   before the Committee on Oversight and Government Reform
5   of the House of Representatives in the 112th Congress
6   First Session.
7          Do you see that?
8      A. I do.
9      Q. If you turn over to Page 143 of
10  Exhibit 12165, you will see a letter from Mr. Bronwich,
11  B-r-o-n-w-i-c-h.
12          Who's Mr. Bronwich?
13      A. He was the director of our Bureau.
14      Q. The Bureau of Ocean Energy Management,
15  Regulation and Enforcement, correct?
16      A. Correct.
17      Q. BOEMRE?
18      A. Uh-huh.
19      Q. Okay. By the way, did you ever speak about,
20  with Mr. Bronwich, your study on "Effects of Drilling
21  Pause for 6 Months"? Did you ever talk to him about it?
22      A. I don't recall ever talking to him about it.
23      Q. Communicate with him in any way? E-mail?
24  Telephone? Any way?
25      A. No.
```

140

```
1      Q. Okay. With that in mind, can you take a look
2   at the letter that he wrote on June 17, 2011, to the
3   Chairman of the Committee on Oversight and Government
4   Reform.
5      A. Okay. Give me a moment to read over.
6      Q. Yeah. Take a minute, please.
7      A. Okay.
8      Q. Have you had a chance to review Mr. Bronwich's
9   letter to the Chairman of the Committee, dated June 17,
10  2001, which is part of Exhibit 12165?
11      A. I have.
12      Q. Do you generally agree with what Mr. Bronwich
13  had to say?
14          MR. ROBERS: Object to scope.
15      A. I do.
16      Q. (BY MR. LANGAN) On the first page of the
17  letter, it -- there's a reference to the Economic Impact
18  Analysis performed by the former Mineral Management
19  Service, MMS, in June, 2010.
20          Do you know what Mr. Bronwich is referring
21  to?
22      A. Yes. It's the study that we talked about.
23      Q. The -- the study your group did?
24      A. I believe so.
25      Q. Okay. He doesn't call it "Effect of Drilling
```

35 (Pages 137 to 140)

141

1    Pause for 6 Months," but you think it's the same thing?
2        A. I believe it is.
3        Q. Okay.  Were you aware that your study ended up
4    the subject of discussion at a con- -- congressional
5    hearing?
6        A. No.
7        Q. Nobody ever told you that?
8        A. No.
9        Q. That's what -- that's what happens sometimes, I
10   guess.
11       A. That -- that's the way the government is.
12       Q. Okay.  In the second full paragraph
13   Mr. Bronwich says, "I have reviewed the MMS Economic
14   Analysis, and I fully supports my testimony, and the
15   prior testimony of Deputary Sec- -- Deputy Secretary
16   Hayes, that last year's temporary Moratorium on
17   deepwater drilling in response to the DEEPWATER HORIZON
18   Oil Spill has not caused any significant increase in the
19   current price of oil."
20           That's what he says, right?
21       A. Yes.
22       Q. And you agree with it?
23       A. Yes.
24           MR. ROBERS:  Object to scope.
25       A. Yes, I do agree with him.

142

1        Q. (BY MR. LANGAN)  Okay.
2        A. It's consistent with the analysis we prepared.
3        Q. Yeah.  Okay.  Let me put this aside for a
4    second.  I think I have a few more questions for you.
5           So, Prof- -- Dr. Rose, is it correct that
6    the analysis you did of the Moratorium was to look at
7    the effect on operators that had equipment subject to
8    the Moratorium?
9           MR. ROBERS:  Object to form.
10       A. It wasn't limited just to operators who had
11   equipment subject to the Moratorium.  That was just the
12   first order effects.
13          We looked at what the broader scope of what
14   the implications would be, including the first order
15   effects, as well as other effects.
16       Q. (BY MR. LANGAN)  Okay.  But it did include
17   potential effect on operators, among other things?
18          MR. ROBERS:  Object to form.
19       A. Yes.  That was part of it.
20       Q. (BY MR. LANGAN)  And is it your understanding
21   that the Moratorium, in its scope, was attempting to
22   alter behavior by operators which had equipment that
23   posed a perceived safety threat?
24          MR. ROBERS:  Object to scope and form.
25       A. It was my understanding that -- that the

143

1    purpose of the Moratorium was to give the Bureau time to
2    study the requirements that it needed to impose, either
3    through an NTL or regulations, to ensure that -- that
4    going forward, operations would be conducted in a safe
5    and environmentally sound manner.
6        Q. And the Moratorium's scope was designed to
7    reach operators regardless of their proximity to the
8    Macondo incident itself, right?
9            MR. ROBERS:  Form and scope.
10       A. Right.
11       Q. (BY MR. LANGAN)  It wasn't about being close to
12   the DEEPWATER HORIZON?  It was about whether they were
13   performing operations in deepwater, right?
14           MR. ROBERS:  Object to form -- form and
15   scope.
16       A. Well, my -- my own understanding was that the
17   intent was that we had a spill in deepwater involving
18   certain activities, and the intent of the Moratorium was
19   to study what regulatory actions needed to be undertaken
20   to prevent a recurrence of that sort of event.
21       Q. (BY MR. LANGAN)  And proximity to the DEEPWATER
22   HORIZON and the Macondo Well was beside the point,
23   right?
24           MR. ROBERS:  Object to form and scope.
25       A. Well, I wouldn't say it was beside the point.

144

1    Clearly, we didn't impose a Moratorium up in Alaska, and
2    water depth matters, and -- and water depth obviously
3    has something to do with proximity.
4           So I wouldn't categorically say that
5    proximity had no effect at all, but there were more --
6    more important things than just proximity to the spill.
7           It was more of the characteristics of the
8    activities and geology associated with the -- the spill
9    that we were concerned with.
10       Q. (BY MR. LANGAN)  So thinking about your -- your
11   team's Economic Analysis, the rigs that were used as the
12   basis for the Economic Analysis were chosen due to the
13   equipment they were using and the technical aspects of
14   what they were doing, right?
15          MR. ROBERS:  Object to form.
16       A. Well, that was true for the second Moratorium.
17          For the first Moratorium, you know, it was
18   primarily oil and gas rigs that -- as you saw from
19   the -- the initial analysis that was published on
20   June 10th, it covered all the rigs that were associated
21   with drilling in water deeper than 500 feet.
22          Subsequently, it was narrowed to certain
23   kind of rigs.
24       Q. (BY MR. LANGAN)  Your analysis and that of your
25   team was attempting to predict the economic impact that

36 (Pages 141 to 144)

145

1    would result from a pause on drilling for rigs that fell
2    under the Moratorium, right?
3        A. Yes.
4        Q. And your analysis didn't either include or
5    exclude any rigs based upon their proximity to oiling
6    from the DEEPWATER HORIZON, right?
7        A. Right.
8        Q. And your analysis did not include or exclude
9    any rigs based upon physical impact from the DEEPWATER
10   HORIZON and Macondo spill, correct?
11       A. Right.
12       Q. And it's your understanding that the Moratoria
13   itself was not a response to immediate physical threats
14   of the Macondo spill, but rather the potential for
15   future spills in other facilities unrelated to the
16   DEEPWATER HORIZON, right?
17           MR. ROBERS: Object to form and scope.
18       A. That's not quite true. There were resources
19   that were being devoted to mitigating the effects of the
20   spill. And certainly, there were concerns that -- that
21   there might be a scarcity of resources available should
22   there be another spill.
23           And so, you know, the purpose of the spill
24   wasn't simply looking forward to other activities that
25   were going on. It -- it was related to the fact that

146

1    resources were being devoted to -- to the existing
2    spill.
3        Q. (BY MR. LANGAN) Did you mean to say the
4    purpose of the Moratorium?
5        A. Yeah.
6        Q. Okay. The Moratorium focus was an industrywide
7    focus, correct?
8            MR. ROBERS: Object to form and scope.
9        A. I'm not sure what you mean by "industrywide."
10   As opposed to -- to what?
11       Q. (BY MR. LANGAN) Particular operators.
12       A. Right. It wasn't limited to specific
13   operators.
14       Q. Would you agree with me, Dr. Rose, that the
15   Moratoria and the follow-on regulatory actions resulted
16   in new safety requirements?
17           MR. ROBERS: Object to form and scope.
18       A. Yes.
19       Q. (BY MR. LANGAN) And those new safety
20   requirements included things like new kinds of equipment
21   that would be required, such as BOPs and remote operated
22   vehicles, ROVs, things like that?
23           MR. ROBERS: Form and scope.
24       A. We didn't re- -- I mean, those things had been
25   required before, but there were additional safety and

147

1    testing and certification requirements for those -- for
2    those items that you just mentioned.
3        Q. (BY MR. LANGAN) Well, weren't there increased
4    requirements required for BOPs?
5            MR. ROBERS: Form and scope.
6        Q. (BY MR. LANGAN) I know BOPs had been required
7    before, but new and different, better BOPs were
8    required, were they not?
9            MR. ROBERS: Same objections.
10       A. I know there was testing and, I believe, backup
11   systems that were required for the BOPs.
12       Q. (BY MR. LANGAN) Okay. Did the fact of these
13   new safety requirements result in more spending on
14   safety by the industry?
15           MR. ROBERS: Form and scope.
16       A. It might be a little bit early to tell. I -- I
17   don't know. I haven't studied that.
18       Q. (BY MR. LANGAN) Well, did the BOP makers get
19   increased activity by their customers as a result of the
20   new Safety Regulations?
21           MR. ROBERS: Object to form and scope.
22       A. I -- I haven't -- haven't studied that, so I
23   can't -- I can't say.
24       Q. (BY MR. LANGAN) That was going to be my next
25   question.

148

1            Has -- has your group undertaken any study
2    in the spending that was done with BOPs and ROVs and
3    other new safety requirements that arose as a result of
4    this regulatory action?
5            MR. ROBERS: Form and scope.
6        A. We have not. Could I clarify that answer?
7        Q. (BY MR. LANGAN) Sure.
8        A. Okay. I -- my group hasn't. Whether or not
9    the Bureau, in other offices, has considered that
10   question is -- is something I can't comment on.
11       Q. You don't know and you're not prepared to
12   testify about that today; is that fair?
13       A. That's right.
14       Q. All right. Dr. Rose, you're probably familiar
15   with the fact that BP has entered into a settlement with
16   some of the plaintiffs' lawyers, a class action
17   settlement. You've probably read about it in the
18   papers. Is that fair?
19       A. Yeah.
20       Q. Have you ever read the Settlement Agreement?
21       A. No, I have not.
22       Q. Okay. So you haven't analyzed how
23   Moratorium-based claims are either included, excluded,
24   or how they're defined in any way, shape, or form in
25   that settlement; is that correct?

37 (Pages 145 to 148)

149

1    MR. ROBERS:  Object to form and scope.
2    A.  I haven't studied that issue.
3    **Q.  (BY MR. LANGAN)  You haven't looked at it at**
4    **all, right?**
5    MR. ROBERS:  Form and scope.
6    A.  I have not looked at that.
7    **Q.  (BY MR. LANGAN)  So you don't know how the**
8    **Moratorium or Moratorium claims may have been defined in**
9    **BP's settlement; is -- is that -- is that correct?**
10   MR. ROBERS:  Form and scope.
11   A.  Yes.  I'm not aware of that.
12   MR. LANGAN:  Okay.  We're going to change
13   the tape.
14   THE VIDEOGRAPHER:  The time now is
15   12:00 p.m.  We are off the record.
16   (Brief Recess Taken.)
17   THE VIDEOGRAPHER:  This begins Disc 4 of
18   today's deposition.  The time now is 12:19 p.m.  We're
19   back on the record.
20   **Q.  (BY MR. LANGAN)  Dr. Rose, can we go back to**
21   **Tab 15, which is your --**
22   MR. ROBERS:  Counsel, can we -- can I
23   actually have just a moment before you start?
24   MR. LANGAN:  Yeah.
25   MR. ROBERS:  So earlier today you asked us

150

1    about a series of notes that Dr. Rose had taken --
2    MR. ROBERS:  Yeah.
3    MR. ROBERS:  -- during his preparation for
4    his deposition.
5    MR. LANGAN:  Yeah.
6    MR. ROBERS:  During the breaks, we have
7    collected those notes.  And I'll represent to you that
8    they contain privileged material reflecting his
9    conversations with counsel.
10   Our understanding from past depositions is
11   that BP's taking the position that documents and review
12   conducted in the presence -- review of documents
13   conducted in the presence of attorneys is not a proper
14   subject for examination in these depositions.
15   To the extent that BP is willing to agree
16   that preparation for depositions conducted within the
17   presence of attorneys or that documents reviewed in
18   presence of attorneys are the proper subjects for
19   examination in these depositions, we're willing to turn
20   over Dr. Rose's notes, with the understanding that some
21   sections may be redacted.  We'll take a look at that at
22   lunch.
23   But before we're willing to turn over the
24   notes at all, we'll need to reach agreement on that
25   point.

151

1    MR. LANGAN:  Okay.  So I -- I've just asked
2    for the notes to be produced.  I'm happy to sort of take
3    your request under advisement.
4    Either you're going to turn over the notes
5    or you're not, and we'll just go from there, so --
6    MR. ROBERS:  Well, absent --
7    MR. LANGAN:  I'm not -- I'm not making a
8    broad-based agreement on the spot here.  I've got to
9    talk to my client about -- about that, and -- you know,
10   so that's it, really.
11   MR. ROBERS:  Okay.
12   MR. LANGAN:  So I'd like the notes.  If you
13   don't want to give them to me, then I understand.
14   MR. ROBERS:  Okay.  Go ahead.
15   **Q.  (BY MR. LANGAN)  All right.  Tab 15.**
16   **So we're back to Exhibit 12150, your**
17   **June 10th analysis that Sarah prepared and your team put**
18   **together, you remember that?**
19   A.  Yes, of course.
20   **Q.  Okay.  Is it correct that Exhibit 12150, in its**
21   **analysis, assumes that the Drilling Moratorium would**
22   **have a duration of six months?**
23   A.  Yes.
24   **Q.  How long, in fact, was the Drilling Moratorium?**
25   A.  It was somewhat less than that.

152

1    **Q.  How much less?**
2    A.  I don't know exactly.  I don't recall exactly
3    how much less.
4    **Q.  And I think we talked about this earlier.**
5    **You don't have a precise recollection of**
6    **the start date and the end date; is that correct?**
7    A.  Yes, That's correct.
8    **Q.  If you assume, to take a hypothetical, perhaps,**
9    **that Salazar's initial memorandum was May 28th, and the**
10   **rescission memorandum for the second Moratorium was**
11   **October 12th, would you agree with me that represents**
12   **more like four and a half months?**
13   A.  Yes.
14   **Q.  We know four and a half is less than six,**
15   **right?**
16   A.  Yes.
17   **Q.  Okay.  Thank you.**
18   **So that's an assumption that your study**
19   **made that -- again, with the benefit of hindsight, I**
20   **don't want to say is incorrect, but did not pan out**
21   **as -- as accurate, right?**
22   MR. ROBERS:  Object to form.
23   A.  That's correct, technically, that -- that
24   the -- the assumption of a six-month delay did not pan
25   out.

38 (Pages 149 to 152)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

153

1          However, as -- as I mentioned earlier,
2   the -- the time that it would take companies to -- to
3   get back up to speed is such that the assumption
4   associated with the six-month Moratorium, that is,
5   associated with the absence of -- of drilling, is
6   probably reflected accurately in -- in the analysis that
7   we undertook, even though the actual length of the -- of
8   the pause was only four and a half months.
9          Q.  (BY MR. LANGAN)  Did your analysis assume,
10  beyond the six-month, a ramp-up time?
11         A.  Yes.
12         Q.  So what you just were referring to is the fact
13  that after the Moratorium ended, there would be a
14  ramp-up time to get everybody fully back to work?
15         A.  Right.
16         Q.  And your analysis assumed that, correct?
17         A.  Right.
18         Q.  So whether the ramp-up occurs si- -- after four
19  and a half months or six months, there's still a ramp-up
20  time, right?
21         A.  That's true.  But -- but what we've got here is
22  a matter of expectations.  Companies were expecting that
23  the -- that the delay would last six months, and -- and
24  it was -- was terminated after four and a half.
25         So I think it would be fair to say that --

154

1   that their ability to -- to ramp up as quickly after
2   the -- the delay -- the pause had been shortened is --
3   is -- is less than it would have been had the delay
4   lasted for its entirety.
5          Q.  Now, Dr. Rose, is that a view you're expressing
6   based on any analysis you've done of what actually
7   happened?
8          A.  No.
9          Q.  It's just sort of a -- an expectation of what
10  you think might have happened, right?
11         A.  Yes.
12         Q.  Okay.  You haven't done a study to see what
13  actually happened, true?
14         A.  True.
15         Q.  Okay.  Why don't we go to Tab 31, please, and
16  we're going to have to mark this as the next exhibit.
17         Sorry to burden you with the task of
18  stickering once again, and if you could tell me the
19  number, that would be wonderful.
20         A.  The number is going to be 12166.  And you want
21  this on 31?
22         Q.  Please.
23         A.  All right.
24         (Exhibit No. 12166 Marked.)
25         Q.  (BY MR. LANGAN)  Dr. Rose, what is

155

1   Exhibit 12166?
2          A.  These are -- this is a colloquy that -- that I
3   had with Sarah Peters after reviewing her study more
4   than four years later -- or about four years after it
5   was conducted in order to prepare for this deposition.
6          Q.  And the e-mail exchange is dated, it looks
7   like, June 16, 2014, correct?
8          A.  Yes, that's correct.
9          Q.  And it looks like it's three pages long in
10  total, right, Exhibit 12166?
11         A.  Yes.  Uh-huh.
12         Q.  And it looks like you have asked some
13  questions, which appear in purple, and her answers are
14  in black.
15         Do I have that right?
16         A.  Yes, you do.
17         Q.  Is -- is purple a habit of yours?  I'm just
18  curious.
19         A.  No.
20         Q.  Okay.
21         A.  No.
22         MR. ROBERS:  Object to form.
23         Come on, Counsel.
24         MR. LOTTERMAN:  It's privilege, isn't it?
25         A.  It's simply the way she chose to send it back.

156

1   It was her choice to put my comments in purple.
2          Q.  (BY MR. LANGAN)  Okay.
3          A.  I'm not usually that flowery.
4          Q.  All right.  So needless to say, Exhibit 12166
5   suggests that you were contacted about giving this
6   deposition sometime prior to June 16th?
7          A.  Of course.
8          Q.  Do you know how much further?  How much in
9   advance?
10         A.  Yes.  About a month in advance.
11         Q.  Okay.  So you think you heard about the
12  deposition in May, and you talked about that at 8:45
13  this morning, something like that?
14         A.  Yes.
15         Q.  Okay.  One of your questions to her involves
16  the use of the multiplier of 2.46 to direct employment
17  effects to obtain the estimated sum of direct, indirect,
18  and induced employment effects of idling workers.
19         And then -- and then you say, "Please
20  explain the basis for multiplier that you use and its
21  validity."
22         Do you see that?
23         A.  I do.
24         Q.  Now, she answers your question, and she says in
25  the second paragraph, "The analysis conducted for the

39 (Pages 153 to 156)

157

```
1    Drilling Pause was not the same usual analysis that
2    MAG-Plan is designed to calculate impacts -- impacts
3    from."
4             Do you see that?
5    A.  No.  Where's that?
6    Q.  The second paragraph of her answer --
7    A.  Oh.
8    Q.  -- begins "The analysis" --
9    A.  Okay.
10   Q.  Yeah.
11   A.  Okay.  I see it.
12   Q.  What is the MAG-Plan Model?
13   A.  MAG-Plan Model is sort of an addendum to a more
14   macroeconomic model called In-Plan, which is used by
15   governments and private industries as Input/Output
16   Model to estimate effects of activities that they may
17   undertake or others may undertake throughout the
18   economy.
19   Q.  So in other words, your study, which we saw at
20   Tab 15 -- let me be accurate here -- Exhibit 1215, is
21   itself, at least in part, a product of Input/Output
22   Modelling?
23   A.  Yes, That's correct.
24   Q.  What's Sarah saying here about the use of the
25   MAG-Plan Model or the MAG-Plan Analysis?
```

158

```
1            MR. ROBERS:  Object to form.
2    Q.  (BY MR. LANGAN)  What's she saying?  Can you
3    translate this?  What's her point?
4    A.  Her point is that the multiplier that emerges
5    from the direct effects that we initially calculated in
6    the June 10th paper were then multiplied by this 2.46
7    for employment, for example, in order to -- to calculate
8    the total effects on employment.
9            And that multiplier emerged from -- from
10   running the MAG-Plan, In-Plan Combination Model, to see
11   what the effects would be from certain activities on the
12   OCS of a nature that would be similar to the pause
13   effect.
14   Q.  Can you give some nature examples of how an
15   Input/Output Model or a MAG-Plan Model is typically used
16   by government economists?  What would be an example?
17   A.  An example might be the kind of work that --
18   that -- that's done typically in evaluating the effects
19   of a fi- -- a new five-year program or a new lease sale.
20           We would look at what sort of activities
21   would be undertaken, for example, as part of a lease
22   sale.  They could be exploratory drilling.  They would
23   be supply ships coming to provide the necessary factors
24   of production.  It would be men working and being paid
25   for -- for constructing a development platform,
```

159

```
1    producing the resources.
2            It would be the profits and revenues and --
3    and other costs expended for drilling, construction,
4    development, and production, sequenced by year on the
5    tract and the sets of tracts associated with a
6    particular proposal, whether it be an exploration plan
7    of a company or a lease sale for the Bureau.
8            And those -- those expenditures would then
9    be -- be allocated to different industry sectors and
10   different locations in the country, where those sectors
11   are generated, to -- to produce some estimate of the
12   direct, indirect, and induced effects on employment
13   income and -- and other economic measures.
14   Q.  Are the -- Input/Output Models by governments
15   sometimes that used to evaluate things like potential
16   policy changes, like, you know, a -- a new program to --
17   to spend money in this area or that sort -- that -- that
18   sort of thing?
19           MR. ROBERS:  Object to scope.
20   A.  It -- I can't say how other Federal agency
21   do -- do that.
22           For large project -- I mean, it takes a
23   long time to set that up and to do that, and, you know,
24   you're measuring just overall economic impacts, rather
25   than trying to measure the enhancement of wealth to the
```

160

```
1    nation.  So we do that, but, you know, typically, you
2    know, it's limited to special analyses.
3    Q.  (BY MR. LANGAN)  Okay.  Would another typical
4    use of an Input/Output Model be, for instance, just to
5    take an example, if a city was going to build a new
6    stadium --
7    A.  Uh-huh.
8    Q.  -- it could engage consultants or economists to
9    sort of use an Input/Out [sic] Model to sort of talk
10   about what we think the economic impact of this new
11   stadium is going to be?  Would that -- would that be
12   another example?
13   A.  Yes --
14           MR. ROBERS:  Object to form and scope.
15   A.  Yes, it would.
16   Q.  (BY MR. LANGAN)  Dr. Rose, would you agree with
17   me that normally, Input/Output Models are used in
18   situations in which activity is going to be increased,
19   projects are going to be undertaken, wells are going to
20   be drilled, as opposed to this case in which there's a
21   subtraction going on?
22           MR. ROBERS:  Object to scope.
23   Q.  (BY MR. LANGAN)  That is, the Moratorium is a
24   reduction in that activity?
25   A.  I think most policies are -- are focused on --
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

161

1   on sort of positive activities, proactive initiatives,
2   and -- and that's what's usually being evaluated.
3        But there's no reason that -- that this
4   kind of tool can't conceptually be used for either
5   increases or decreases associated with a policy effect
6   that could increase or decrease economic activity.
7        Q. (BY MR. LANGAN)  In your experience at the
8   Economics Division, prior to the "Effects of Drilling
9   Pause for 6 Months," had your staff ever undertaken an
10  Input/Output Analysis about less activity rather than
11  more?
12       MR. ROBERS:  Object to scope.
13       A. Yes, yes.  We -- we look at less activity --
14  when we do the five-year program, you know, we consider
15  options to the baseline proposal, which would be the
16  no-sale option, where -- where basically there would be
17  no new leasing, no new production, drilling associated
18  with, let's say, the next five-year program.
19       Q. (BY MR. LANGAN)  Uh-huh.
20       A. So, yes, we do do that.
21       Q. Would you agree with me that the majority of
22  the time, Input/Output Modelling is done based upon
23  assumptions about increased activity?
24       MR. ROBERS:  Object to scope.
25       A. As I said, I -- I think the proportion of times

162

1   an activity -- a particular methodology is applied is
2   more germane to the proportion of proposals that are of
3   that nature, rather than its efficacy for -- for
4   determining the results more accurately for one -- one
5   direction than another.
6        Q. (BY MR. LANGAN)  Okay.  Looking again at -- at
7   Exhibit 12166, Sarah refers, at the bottom of the first
8   page, to a study for the Louisiana Mid-Continent Oil &
9   Gas Association, attached, used a multiplier of four in
10  calculating the total employment impact.
11       I guess we looked at that document before,
12  right?
13       A. You pointed that out -- that document out to
14  me.
15       Q. That's Exhibit 12164; is that right?  The next
16  tab, I guess the next tab, Tab 32.
17       A. Yes.
18       Q. Is that what Sarah's referring to?
19       A. Yes, I believe so.
20       Q. So is it the case that perhaps you had seen
21  Exhibit 12164 before when -- when Sarah had sent it to
22  you back around June 16th?
23       A. That or -- or I didn't access the -- the
24  attachment that she sent.
25       Q. Okay.  Going to the next page of Exhibit 12166,

163

1   you ask her a question, I believe, that begins, "You
2   also mention the short-term nature of the employment
3   effects."
4        Do you see that?
5        A. Yes.  Uh-huh.
6        Q. You say, "The short-term nature of the
7   employment effects has justified a more conservative
8   multiplier such as the one you used.  This seems
9   logical, but can you cite a source or further justify
10  this rationale," you say to her.
11       And then she says, "This was an assumption
12  used in the estimation process.  It's impossible to be
13  able to estimate the true economic impact in a situation
14  like this."
15       And then she goes on to talk about the
16  justification of conservative multiplier.
17       Do you see that?
18       A. Yes, I do.
19       Q. Do you agree with her, that it's impossible to
20  estimate the true economic impact in a situation like
21  this?
22       MR. ROBERS:  Object to scope.
23       A. I think what -- what she's saying there is to
24  estimate the -- the in- --- indirect and -- and induced
25  effects associated with the multiplier, and less so

164

1   relating to the direct effects.
2        Q. (BY MR. LANGAN)  Later on this page, she
3   defines what a job means.
4        Do you see that?
5        A. I do.
6        Q. And -- and she says -- she talks about the
7   definition of a job year.  And she goes on to say, "A
8   job means one person employed, which could be full time
9   or part time, for a whole year or part of a year."
10       Do you see that?
11       A. No.  Where -- where is that?  In the middle of
12  the page?
13       Q. It's halfway down the same paragraph we were
14  just looking at.  The sentence begins, "A job means one
15  person."
16       A. Yes, yes.  Gotcha.
17       Q. What's she talking about there?
18       A. She's talking about distinguishing between
19  comparing the estimates of the number of jobs that are
20  being calculated here, or could be calculated anywhere,
21  to -- to the number of employees, and trying to -- to
22  distinguish the two in -- in a typical Input/Output
23  Analysis.
24       MR. LANGAN:  I have no further questions at
25  this time.  Thank you, Dr. Rose.

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

165

1    THE WITNESS:  Thank you.
2    (Discussion Off The Record.)
3    THE VIDEOGRAPHER:  The time now is
4  12:38 p.m.  We are off the record.
5    (Brief Recess Taken.)
6    THE VIDEOGRAPHER:  The time now is
7  12:39 p.m.  We are back on the record.
8    EXAMINATION
9  BY MR. LOTTERMAN:
10   Q.  Dr. Rose, my name is Tom Lotterman.  I'm with
11 the law firm of Bingham McCutchen in Washington, D.C.,
12 and I represent Defendant Anadarko in this case.
13   So I'm going to ask you to switch gears a
14 little bit in two respects.
15   First of all, most of my questions, if not
16 all, my questions will pertain to Anadarko, not BP.
17   And secondly, I'm here to ask you about a
18 different topic, which we'll -- I'll -- I'll refresh
19 your recollection in a minute with the actual notes.
20   Before we get started, though, let me make
21 sure we're on the same page so far as ground rules.
22   I want to follow the same rules that
23 Mr. Langan followed, and that is, if -- if I ask you a
24 question, and you answer, I'm going to assume you
25 understand it.  Okay?

166

1    A.  Yes.
2    Q.  And -- and likewise, if at any point you don't
3  understand it, do not hesitate to ask me to rephrase it.
4  It is my job, and I will endeavor, as best I can, to do
5  that.  Okay?
6    A.  Sure.
7    Q.  I also understand it's been a long morning for
8  you.  I don't have a whole lot, and I'll go till lunch,
9  and then we can reconvene after lunch.  Okay?
10   A.  Sure.
11   Q.  Good.  All right.
12   According to background materials I looked
13 at, you joined the MMS when it was first created in
14 1982; is that right?
15   A.  No.
16   Q.  Okay.
17   A.  That's not correct.
18   Q.  Okay.  Please clarify.
19   A.  I actually joined MMS about a year after it was
20 created, in 1983.
21   Q.  Okay.  All right.  And your current job, as I
22 believe you told Mr. Langan, is Chief of the Economics
23 Division, correct?
24   A.  Yes.
25   Q.  Even though Mr. Langan tried to give you a

167

1  promotion to Chief of a department?
2    A.  Right, exactly.
3    Q.  Sorry that didn't work out.
4    Your duties and responsibilities, do
5  they -- from what I could tell from today, they include
6  assisting the Secretary's office from time to time?
7    A.  When asked, yes.
8    Q.  Okay.  Does that include providing input or
9  data for news releases?
10   A.  On rare occasions.
11   Q.  Okay.  Do your duties and responsibilities
12 include working with the ONRR?
13   A.  Occasionally.
14   Q.  Okay.  And I understand -- I believe I found a
15 document which indicated that you had received a
16 Distinguished Service Award from the Department back in
17 2009; is that right?
18   A.  Yes.
19   Q.  Okay.  And I believe the award -- I don't need
20 to show this to you, but it says that you -- you've
21 established a reputation as an energy economics expert;
22 is that right?
23   A.  If that's what it says.
24   Q.  Okay.  Do you disagree with that proposition?
25   A.  I wouldn't want to say.

168

1    Q.  Okay.
2    A.  I'll let others judge that.
3    Q.  Do you -- And it says, also, that you are
4  responsible for establishing royalty policy at the
5  Department; is that right?
6    A.  Yes.
7    Q.  Okay.  And it also says that you undertake
8  various economic analyses of offshore oil and gas
9  leases; is that fair?
10   A.  Yes.
11   Q.  Okay.  Let's turn back to Tab 4, if we could,
12 and I want to reorient you a minute to my line of
13 questions.
14   Again, these are focusing on Anadarko, and
15 that's -- if you have to refer to BP, that's fine, but
16 at this point in time, that -- that's not the focus of
17 my question.
18   Turn, if you would, to Topic 11.
19   A.  Tab 11?
20   Q.  Tab 4.
21   A.  Tab 4.
22   Q.  Topic 11.
23   A.  Okay.
24   Q.  It's on Page 5.
25   A.  Okay.  Okay.

42 (Pages 165 to 168)

169

1    Q.  Are you prepared today to testify about that
2  topic?
3    A.  Yes.
4    Q.  Okay.  Can you tell me what you did in
5  preparation to testify today about Topic 11, leaving
6  aside what you told Mr. Langan, if anything.
7    A.  I just reviewed the history of some of our
8  policies and some of the magnitudes of -- of receipts
9  that were generated for each of these measures.
10    Q.  And as far as you're concerned, did you produce
11  all nonprivileged documents that you reviewed in
12  preparation to testify about Topic 11?
13    A.  Anything that I've reviewed and took notes on
14  was included in the material that my solicitors here
15  have just discussed about turning over.
16    Q.  Okay.  Turn to -- turn to Tab 22, if you would.
17  This is going to be a rather mundane exercise, but I
18  need to do it.
19    A.  Okay.  You're just luring me into a feeling of
20  safety.
21    Q.  Exactly.  Then I'm going to pounce.
22    A.  Exactly, right.
23    Q.  22, please.
24    A.  22?  Okay.  Okay.  Got it.
25    Q.  Do you recognize this document?

170

1    A.  Yes.
2    Q.  What is it?
3    A.  It was a -- a request that I made recently of
4  my staff to get a feel for how much bonuses we had
5  collected in recent years and -- and how BP had
6  contributed to -- to those bonuses.
7    Q.  Okay.  So this relates to Topic 11, correct, my
8  topic?
9    A.  Yes.
10    Q.  Okay.  Does this document indicate Anadarko's
11  contributions?
12    A.  No.
13    Q.  All right.  The reason why I ask is, if you
14  look at the -- I guess these pages aren't numbered.
15       If you look at the fourth page -- turn four
16  pages in, if you would, please.  And it lists "Bus ASC
17  Name" a couple of times.  Do you see that?
18    A.  Yes, uh-huh.
19    Q.  At the very bottom, it mentions Anadarko E&P
20  Company, LP.
21       Do you see that?
22    A.  At the very bottom of the page?
23    Q.  Yes.
24    A.  I do, uh-huh.
25    Q.  Okay.  Do -- do you know what aspect of

171

1  Anadarko, if any, pertains to this tab?
2    A.  What I know is this tab represents the bidders
3  on the block that BP acquired on -- where the DEEPWATER
4  HORIZON Oil Spill occurred.
5       As far as the specific aspects of Anadarko
6  E&P, how that might differ from Anadarko, I'm not sure.
7    Q.  Okay.  But as far as you know, the document
8  contained in Tab 22 here has nothing to do with
9  Anadarko?
10       MR. ROBERS:  Object to form.
11       MR. LANGAN:  Let's go off the record for a
12  second.
13       THE VIDEOGRAPHER:  The time now is
14  12:46 p.m.  We are off the record.
15       (Brief Recess Taken.)
16       THE VIDEOGRAPHER:  The time now is
17  12:47 p.m.  We're back on the record.
18    Q.  (BY MS. KING)  Let me rephrase my question,
19  Dr. Rose, and then I'll mark this exhibit.
20    A.  Okay.
21    Q.  As far as you know, does the document contained
22  in Tab 22 have anything to do with Anadarko?
23    A.  It has something to do with Anadarko E&P.
24    Q.  And can you tell from this document what --
25  what aspect of Anadarko E&P it does relate to?

172

1    A.  Only the fact that they bid on the same block
2  that -- that BP bid on.
3    Q.  All right.  Let's mark this exhibit just in
4  case it's ever important.
5       Why don't you tell us what -- what the
6  exhibit number would be here.
7    A.  This would be 12167.
8       (Exhibit No. 12167 Marked.)
9    Q.  (BY MR. LOTTERMAN)  All right.  Thank you.
10       Let's turn to Tab 23, and do you recognize
11  this document?
12    A.  I do.
13    Q.  All right.  Let's mark this as a 12168.
14       (Exhibit No. 23268 Marked.)
15    Q.  (BY MR. LOTTERMAN)  What does Exhibit 12168
16  depict?
17    A.  It's basically the same information as -- as
18  the previous document, as far as I can tell.
19    Q.  That was my question.  Any -- any difference?
20    A.  I don't see any difference, no.
21    Q.  Okay.  Go to the very last page of this
22  exhibit, 12168, and you'll see a Footnote 3.  I want to
23  talk about that for a moment.
24       Have you had a chance to review Footnote 3
25  in Exhibit 12168?

43 (Pages 169 to 172)

173

1    A. Not very carefully, no.
2        Q. I'm just wondering if -- if Footnote 3 lends
3    any clarity to whether or not this document pertains to
4    Anadarko.
5        A. I can't comment on that.
6        Q. Okay. So just -- just to be clear, at least
7    for the time being, as far as you're concerned,
8    Exhibit 12168 has nothing to do with Anadarko; is that
9    right?
10       A. I don't know that -- that you can use this
11   exhibit to infer anything about Anadarko.
12       Q. Okay. Well, let's -- let's do this: During
13   the lunch break, if, for whatever reason you come to a
14   different conclusion, why don't you let me know after we
15   reconvene, and we can go back at it.
16       A. Sure.
17       Q. All right. Now let's go quickly go through a
18   couple more exhibits which I think I know the answers
19   to, but let's make sure.
20          Exhibit [sic] 24, do you recognize this
21   document?
22       A. Yes.
23       Q. What is it?
24       A. It's basically a citation of key elements of
25   our policy related to bonding.

174

1        Q. Okay. And this is the -- I believe you
2    mentioned surety bonds earlier in response to --
3        A. Right.
4        Q. -- questions from Mr. Langan?
5        A. Right. I mentioned that I had a, quote,
6    interview with Ann Glazner, and she was kind of briefing
7    me on our bonding program. And -- and she followed up
8    with -- with this additional hard copy information.
9        Q. Okay. Let's mark this as 12169.
10          (Exhibit No. 12169 Marked.)
11       Q. (BY MR. LOTTERMAN) We'll come back to that
12   after the break.
13          Now let's turn to Tab 25, please.
14          Do you recognize this document?
15       A. I do.
16       Q. Okay. What is it?
17       A. This was a colloquy that I had with my staff
18   relating to projections that -- that he had made about
19   four or five years ago about the effects of the
20   Deepwater Royalty Relief Act.
21       Q. Okay.
22       A. And I was asking him for some clarification of
23   some of the measures that were included in -- in that
24   study that I was reviewing.
25       Q. All right. Let's turn to Tab 26, please.

175

1          Do you recognize this document?
2        A. Yes.
3        Q. What is it?
4        A. This is a response to a request that I had made
5    of one of my staff to learn more about the bidding and
6    bid adequacy decisions that had been made on a block
7    that the Bureau had determined was on the same geologic
8    prospect as the -- as the block on which the -- BP had
9    acquired and -- and where the -- the spill occurred.
10       Q. Okay. And then let's turn to Tab 27, please.
11          Do you recognize this document?
12       A. Yes.
13       Q. What is it?
14       A. This was a continuation of my search for a
15   better insight relating to BP's role on the OCS, and
16   this focused on BP's participation as a producer.
17       Q. Okay. Does the document contained in Tab 27
18   have any information regarding Anadarko's role?
19       A. No, it doesn't.
20       Q. All right. Let's turn to Tab 28.
21          Do you recognize this document?
22       A. Yes. Uh-huh.
23       Q. What does it depict?
24       A. This is just a clarification. The -- the first
25   set of responses that I got relating to the role of --

176

1    of BP on the OCS simply identified data if BP was an
2    owner.
3          And this is clarifying that BP may own
4    leases jointly with other companies and was
5    proportioning the production in a way that would reflect
6    BP's share of that production.
7        Q. Okay. Nothing -- is there anything on the
8    document contained in Tab 28 that relates to Anadarko?
9        A. No.
10          MR. LOTTERMAN: All right. Why don't we
11   break for lunch. If it's okay with you, we'll come back
12   and -- we'll decide how soon, and then I will continue
13   my examination.
14          THE WITNESS: Whatever you'd like.
15          THE VIDEOGRAPHER: The time now is
16   12:55 p.m. We are off the record.
17          (Lunch Recess Taken.)
18          MR. LANGAN: THE VIDEOGRAPHER: This begins
19   Disc 5 of today's deposition. The time now is 2:10 p.m.
20   We are back on the record.
21       Q. (BY MR. LOTTERMAN) Good afternoon, Dr. Rose.
22       A. Hi.
23       Q. Let's continue our examination with the same
24   ground rules in place. Okay?
25       A. Yes.

44 (Pages 173 to 176)

177

1    Q.  All right.  Let me start by asking you to turn
2  to Tab No. 5 of the Kirkland binder, which has been
3  pre-marked as Exhibit 11890, and direct your attention
4  to Page 49 of that exhibit, the document request at the
5  very bottom of Page No. 19.
6        Do you see that?
7        MR. ROBERS:  Do you mean Page 49, Counsel?
8        MR. LOTTERMAN:  Yes, Page 49.
9    A.  No. 19?
10   Q.  (BY MR. LOTTERMAN)  Yes.
11   A.  Okay.
12   Q.  Just read that to yourself for a minute.  I
13  have a couple questions.
14        Have you had a chance to review it?
15   A.  Yes.
16   Q.  My question is:  Did you personally provide any
17  documents in response to that request?
18   A.  No.
19   Q.  Okay.
20   A.  Not that I can recall, anyway.
21   Q.  Did your office, to your knowledge, provide any
22  documents in response to that request?
23   A.  No.
24   Q.  Okay.  Turn to the next page, which is Page 50,
25  same exhibit.

178

1        And you'll see there's a Request No. 20,
2  and I'll ask you to read that to yourself a moment.
3        Have you reviewed that request?
4    A.  Yes, I have.
5    Q.  Same two questions:  Have you personally
6  provided any documents in response to that request?
7    A.  I personally haven't.
8    Q.  Okay.  To your knowledge, has your office
9  provided any documents in response to that request?
10   A.  I don't recall.
11   Q.  Okay.  All right.  Does the United States
12  receive revenue from oil and gas production?
13   A.  Yes.
14   Q.  Okay.  Let's mark this as the next exhibit.
15        (Exhibit No. 12170 Marked.)
16        MR. LOTTERMAN:  I'll let Dr. Rose tell us
17  where we are.  I believe we are at 12170.
18   Q.  (BY MR. LOTTERMAN)  Do you recognize this?  Is
19  this typical information?
20   A.  This is information, I believe, from the Office
21  of Natural Resource Revenue.
22   Q.  That's correct.  It comes off their database,
23  correct?
24   A.  Yes, I believe that's right.
25   Q.  And if my colleagues did their homework

179

1  correctly, they've typed in certain queries?  Do you see
2  that at the top of the exhibit, on data type?
3    A.  I do.
4    Q.  Single year, year type.  Accounting year,
5  fiscal year -- appears to be 2013.  Is that right?
6    A.  Yes, it is.
7    Q.  Okay.  Land category is Federal offshore, and
8  then the geographic area we've queried was offshore
9  Gulf.
10        Do you see that?
11   A.  Yes, I do.
12   Q.  All right.  As a general matter, is the
13  information that the ONRR contains in its database
14  accurate, to the best of its ability?
15   A.  Yes.
16   Q.  Okay.  Let's walk through this exhibit on a
17  very global basis.
18        I want to start with bonus.  Do you see
19  the -- do you see the revenue type called "bonus" on the
20  bottom left there?
21   A.  Yes, I do.
22   Q.  Okay.  What is a bonus?
23   A.  A bonus is a cash -- a high cash bid that's
24  paid for leases that are accepted in our auction.
25   Q.  All right.  So if you're a successful bidder,

180

1  you pay bonus to the United States; is that right?
2    A.  That's correct.
3    Q.  Okay.  And if I'm not mistaken, there are
4  certain minimums set --
5    A.  There are.
6    Q.  -- for bids?
7    A.  There are.
8    Q.  And if I'm also not mistaken, those minimums
9  are greater for depths, for example, 40 -- 400 meters
10  and greater; is that right?
11   A.  Yes, it is.
12   Q.  Okay.  Do you have to any role in establishing
13  those -- those rates?
14   A.  I have some role in that, yes.
15   Q.  Okay.  All right.  What is your role?
16   A.  My role is to periodically evaluate the minimum
17  bid levels and to recommend, when appropriate, changes
18  in those levels.
19   Q.  Okay.  And if I read Exhibit 12170 correctly,
20  it looks like for the fiscal year 2013, the United
21  States collected $2.6 billion in bonus revenue; is that
22  right?
23   A.  Yes.
24   Q.  All right.  Let's -- let's go to the next
25  category.  I think, chronologically, that would be rent.

45 (Pages 177 to 180)

181

1   Do you see that right above bonus?
2       A. I do.
3       Q. Okay. What does "rents" mean?
4       A. Rents are the holding costs we charge for
5   lessees after they acquire a lease. Between the time
6   they acquire a lease until they commence paying
7   production -- royalties on production, they have to pay
8   a rent.
9       Q. And that rent lasts until the -- the lease
10  begins producing in payable -- paying quantities,
11  correct?
12      A. No, not correct.
13      Q. Okay. What -- how long does -- when does the
14  rent end and the royalties begin?
15      A. The rent ends when royalty-bearing production
16  begins.
17      Q. Okay. All right. And do you know the current
18  rate per acre?
19          MR. ROBERS: Object to form.
20      A. The current rate varies somewhat, depending
21  upon water depth and the year and the primary term of
22  the lease that the royalty payment is due.
23      Q. (BY MR. LOTTERMAN) Is it fair to say that the
24  rates are greater for deepwater production?
25      A. Yes.

182

1       Q. Okay. Is it fair to say that the rates
2   escalate during the duration of the lease?
3       A. They escalate after -- they tend to escalate
4   after the first five years of the lease.
5       Q. Okay. All right. All right. Now let's turn
6   to the first category on Exhibit 12170. Reported
7   royalties, do you see that?
8       A. Yes.
9       Q. What is a -- what is a reported royalty?
10      A. A reported royalty is a proportion of the net
11  value of the wellhead that the lessee has to pay to the
12  Federal Government.
13      Q. And -- and just so I'm clear, those payments
14  are made to the ONRR; is that right?
15      A. Yes, That's correct.
16      Q. All right. And what is the current rate?
17      A. 18-3/4 percent.
18      Q. How is that calculated or derived?
19      A. The rate, initially, for -- for many years was
20  12-1/2 percent in deepwater and 16-2/3 in shallow water.
21  The 16-2/3 percent in shallow water was basically a
22  carryover from what the State was charging early on in
23  the program and maintained at that level for many years.
24          The 12-1/2 percent derived partly from --
25  from State experiences, adjusted for deep -- for

183

1   deepwater, as well as the minimum amount allowed in the
2   OCS Lands Act.
3       Q. I guess what I'm wondering is: Who decides --
4   as of now, is 18.75 percent?
5       A. Well, the -- the Secretary makes that decision.
6       Q. Okay. And do you have input into that?
7       A. I do.
8       Q. Okay. And by the way, if I'm -- if I'm reading
9   Exhibit 12170 correctly, it looks like the total rents
10  collected in 2013 was about $244 million; is that right?
11      A. Yes.
12      Q. All right. What were the total reported
13  royalties collected in 2013?
14      A. Four point -- almost 4.5 billion.
15      Q. All right. Now, how do you get from the
16  18.75 percent to the 24.5 billion, just in -- in
17  hypothetical terms or general terms?
18      A. For any -- for each lease, we -- the lessee is
19  obligated to calculate, on a monthly basis, the total
20  amount of oil and gas that it sells and to determine
21  the -- the price at which the product's sold for.
22          So it takes the price of the product and is
23  able to net out the transportation costs to bring the
24  product to shore. So one can say that's sort of the
25  netback price to bring it to shore.

184

1           And the -- the resulting netback price is
2   multiplied by the royalty rate, which is, as I said,
3   18.75 percent.
4       Q. And as far as the netback price, is it also --
5   is it also reduced for pro- -- other processing costs
6   besides transportation?
7       A. Yes. For gas, that's true.
8       Q. Okay. All right. And can you tell from
9   Exhibit 12170 what the total amount of revenue from
10  Federal offshore Gulf exploration was in 2013?
11      A. Eight -- it looks like 8.7 billion.
12      Q. By the way, what are non-revenue volumes?
13      A. Those are production that relates to leases
14  that are issued under or have been granted royalty
15  relief.
16      Q. Okay. And explain that answer.
17      A. There are different ways that a lease can
18  become eligible for producing product without paying a
19  royalty for at least some portion of the time of its
20  production.
21          Some of that is granted under what we call
22  a Bureau discretionary program where lessees, after
23  making a discovery, can come in with a demonstration
24  that the ultimate development in the production of the
25  resource would be uneconomic at current royalty rates,

185

1  in which case we would evaluate that claim and determine
2  what sort of adjustments would be needed in -- in the
3  royalty terms.
4          Sometimes those adjustments might involve a
5  royalty suspension for some period of time, in which
6  case the product would be produced royalty free, and
7  that would fall under non- -- non-revenue volumes.
8      Q. Okay. And hence, if you look at -- at
9  Exhibit 12170, there is no revenue under that category?
10     A. Right. That's just one category. There is one
11 category under non-revenue volumes.
12         By far the -- the more abundant of those
13 qualities have to do with leases issued under statutory
14 requirements to grant royalty relief, regardless of need
15 for royalty relief on an economic basis. And the main
16 component of -- of that program is the Deepwater Royalty
17 Relief Act.
18     Q. Okay. Thank you. Now, I notice there's a --
19 there's a final category in Exhibit 12170 called other
20 revenues. Do you see that?
21     A. Yes.
22     Q. Let's focus on the oil and gas piece of that.
23         It looks like it's about $34 million. Is
24 that right?
25     A. Yes. Thirty-four -- four point six million.

186

1      Q. Right. And what -- what type of revenues are
2  they?
3      A. I don't know what they are.
4      Q. Could it be surety bonds?
5      A. That could be.
6      Q. Okay.
7      A. That could be.
8      Q. Are you aware of any other sources of monetary
9  payments or revenues, like this depicted on
10 Exhibit 12170, that the U.S. received as part of -- as
11 kind of oil and gas production in the Gulf of Mexico?
12     A. There are some cost recovery fees that we
13 charged to lessees that are not included here. I assume
14 they're not included under other revenues, but I
15 can't -- I can't tell.
16     Q. All right. You had mentioned, in an -- in an
17 answer to Mr. Langan's earlier question, surety bonds.
18 And my sense is you had to sort of get schooled on this
19 for today's purposes.
20         So I'm not going to hold you to anything in
21 detail, but --
22     A. Thank you.
23     Q. -- give me your understanding as to how the
24 United States secures revenue from surety bonds in the
25 production of oil and gas in the Gulf of Mexico.

187

1      A. Well, the objective isn't to secure revenues.
2  It -- it's to try to assure that if a lessee is not able
3  to fulfill its obligations of one form or another,
4  that -- that the taxpayer isn't stuck with the bill.
5      Q. Okay.
6      A. Okay. And in -- there doing that, there --
7  there are two kind of bonds, a general bond that a
8  lessee has to obligate itself for, either with a surety
9  or by putting up Treasury bonds or having an indemnitor
10 or -- well, those are the three -- basically the three
11 ways that it sets up a general bond.
12         The general bond -- I forget the exact
13 amounts, but they may vary between 50,000 and $300,000
14 per lease, depending upon whether it's an area-wide bond
15 or a single bond.
16         And then there's a supplemental bond which
17 focuses on decommissioning responsibilities, and that's
18 really fine-tuned to -- to the individual projects that
19 be -- that are involved when in the -- in the process --
20 in the -- in the timing of the process the -- the bond
21 is being requested and whether or not the -- the company
22 can basically self-insure, has enough equity so that it
23 can receive a waiver on the supplemental bond
24 requirement.
25     Q. Okay. So let me make sure I understand your

188

1  answer.
2          Does the United States receive any revenues
3  from its surety bond requirements?
4          And if you don't know, we'll move on. I
5  just want to make sure -- I'm trying to -- I'm trying to
6  go at this from a revenue generating standpoint. That's
7  why I asked the question.
8      A. I -- I don't know whether it received much
9  revenues. I -- I don't know.
10     Q. Okay. Suffice if it to say that given -- given
11 the dollar amounts shown on Exhibit 12170, there is some
12 economic benefit that the U.S. receives from oil and gas
13 production; is that right?
14         MR. ROBERS: Object to form.
15     A. In my judgment, that's correct.
16     Q. (BY MR. LOTTERMAN) And I take it part of your
17 job is to forecast revenue increases; is that right?
18     A. That's true.
19     Q. Okay. And sitting here today, is it your
20 forecast that the economic benefits to the U.S. of oil
21 and gas production in the Gulf of Mexico will increase
22 in the next two, three, four, five years?
23     A. We're -- we're talking --
24         MR. ROBERS: Object to scope.
25     A. Yeah. We need to distinguish between the

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

189

1   difference between benefits and -- and revenues.
2       Q. (BY MR. LOTTERMAN)  Okay.  Let's talk about
3   revenues.
4       A. Let's -- yeah.  Let's talk about revenues.
5       Q. I think you're more comfortable in that.
6       A. Well, we -- we don't -- the -- the reason I'm
7   more comfortable in it is that we don't really forecast
8   benefits on -- on an annual basis.  We do forecast the
9   revenues.
10      Q. And have you forecasted an increase in revenues
11  from oil and gas production in the Gulf of Mexico in
12  the -- in the near -- near future and the long term?
13          MR. ROBERS:  Object to scope.
14      A. We're forecasting an increase in oil revenues
15  in probably -- depending upon where your baseline is,
16  kind of a flat level of revenues from the gas side of
17  the picture.
18      Q. (BY MR. LOTTERMAN)  What about for the oil
19  side?
20      A. The oil side, I think we're focusing a modest
21  increase in -- in both production and -- and prices, and
22  hence, revenue would tend to increase from the oil side.
23      Q. Okay.  Because I had you had a 17 percent
24  increase last year, didn't Interior, from -- from total
25  amount collected for oil and gas production?

190

1       A. I -- I don't remember the percentage.
2       Q. Okay.
3       A. I'll take your word for it.
4       Q. All right.  Is one of the goals of the
5   Department of Interior's oversight of oil and gas
6   production generally energy independence?
7           MR. ROBERS:  Object to form and scope.
8       A. I -- I think -- I think that is true.
9       Q. (BY MR. LOTTERMAN)  Okay.  Is one of the goals
10  energy security?
11          MR. ROBERS:  Same objections.
12      A. Yes.
13      Q. (BY MR. LOTTERMAN)  Any other benefits that you
14  can think of in -- sort of facilitation of oil and
15  gas production in the Gulf of Mexico or elsewhere?
16          MR. ROBERS:  Form and scope.
17      A. Yes.  The -- the generation of -- of production
18  results in increased revenues to the Federal Government,
19  results in wealth to private companies who are lessees
20  on the OCS, and in addition to the national security and
21  implications of not having to import foreign --
22  unsecured sources of foreign oil.
23      Q. (BY MR. LOTTERMAN)  All worthy goals, correct?
24          MR. ROBERS:  Object to the form and scope.
25      A. In my judgment, they are, yes, sir.

191

1       Q. (BY MR. LOTTERMAN)  Do you know what percentage
2   of the nation's natural gas supply comes from the --
3   from the OCS?
4       A. I believe it's about 10 percent.
5       Q. Okay.  And what percentage of the nation's oil
6   comes from the OCS?
7       A. I believe that's about 20 percent.
8       Q. Okay.  Does the Interior Department disburse
9   portions of those revenues from the oil and gas
10  production to State, Local, and Tribal Governments?
11      A. It does.
12      Q. Okay.  Are you familiar with that process?
13      A. I'm not an expert in the process, but I can
14  talk about it.
15      Q. All right.  Let me give you a document that
16  might assist you in some of my questions.
17          MR. LOTTERMAN:  Where are we on the exhibit
18  list?  121 --
19          MR. ROBERS:  70.
20          MR. LOTTERMAN:  Let's mark this as
21  Exhibit 12170.
22          MR. LANGAN:  It should be 71.
23          MR. LOTTERMAN:  I'm sorry.  71?
24          (Discussion Off The Record.)
25          (Exhibit No. 12171 Marked.)

192

1       Q. (BY MR. LOTTERMAN)  So why don't you take a
2   moment to review Exhibit 12171, and I'll ask you some
3   questions.
4       A. Do you want me to read the whole document?
5       Q. No.  Actually, I'm going to direct you to a
6   couple of statements, and I just wanted to make sure
7   you're comfortable with it.
8           Have you -- are you familiar with this
9   document?
10      A. No.
11      Q. Okay.  Was it your practice to provide input on
12  some of the data that's typically generated from the
13  Office of the Secretary along these lines?
14      A. My office would have provided very little or
15  any of the information provided here.
16      Q. Okay.  Are you familiar with President Obama's
17  All-of-the-Above Energy Strategy?
18          MR. ROBERS:  Objection.  Scope.
19      A. Yes.
20      Q. (BY MR. LOTTERMAN)  Does it include a goal to
21  increase domestic oil production?
22          MR. ROBERS:  Scope.
23      A. It does so in -- in -- in an environmentally
24  responsible way.
25      Q. Does it include a goal to reduce U.S.

48 (Pages 189 to 192)

193

1   dependence on foreign oil?
2          MR. ROBERS: Object to scope.
3       A. My understanding is that it does.
4       Q. (BY MR. LOTTERMAN) Okay. And is it true that
5   the U.S. is less reliant on foreign oil now than at any
6   time in the last 16 years?
7          MR. ROBERS: Object to scope.
8       A. I'm not sure. I know that -- that imports
9   certainly have declined significantly over the last 10
10  years or so.
11      Q. (BY MR. LOTTERMAN) Okay. Now, this document
12  indicates that in fiscal year 2013, which I assume ended
13  in October of 2013, that Interior collected and
14  disbursed more than fourteen mill- -- $14 billion.
15         Do you know that to be true?
16      A. Yes.
17         MR. ROBERS: Objection to scope.
18      Q. (BY MR. LOTTERMAN) And, in fact, according to
19  this press release issued by the Department of Interior,
20  they collected $2.77 billion in bonus bids from the Gulf
21  of Mexico alone.
22         Do you see that in Paragraph 4?
23         MR. ROBERS: Scope.
24      A. I do.
25      Q. (BY MR. LOTTERMAN) Okay. And, you know, in --

194

1   and I guess in response to one of my earlier questions,
2   you see right in the first paragraph where the
3   Department touts a 17 percent increase in revenues over
4   the previous year?
5       A. I do.
6       Q. And if I understand this press release
7   correctly, that money is distributed to 35 states; is
8   that right?
9          MR. ROBERS: Object to scope.
10      Q. (BY MR. LOTTERMAN) Page 2, Paragraph 1.
11      A. That's what it says.
12      Q. Okay. Including Louisiana?
13      A. Uh-huh.
14      Q. Okay. 43 counties, local counties, the next
15  paragraph?
16         MR. ROBERS: Same objection.
17      A. Yes. That's what it says.
18      Q. (BY MR. LOTTERMAN) Yeah. And a number of --
19  34 American Indian tribes and nearly 30,000 individual
20  Indians.
21         Do you see that?
22         MR. ROBERS: Scope.
23      A. No, I don't see the part about the Indians.
24      Q. (BY MR. LOTTERMAN) Okay. Look at the -- the
25  one, two -- the fourth paragraph.

195

1       A. Okay. Got it.
2       Q. Okay.
3       A. Okay. I do see it.
4       Q. Okay. And -- and if you look one paragraph up,
5   it appears that the Federal Government keeps about
6   $8.6 billion itself, right?
7          MR. ROBERS: Scope.
8       A. According to this press release, yes.
9       Q. (BY MR. LOTTERMAN) And it characterizes that
10  money as one of the largest sources of nontax revenue
11  money that it gets?
12         MR. ROBERS: Scope.
13      A. That is true.
14      Q. (BY MR. LOTTERMAN) Okay. And if I understand
15  this release correctly, that money, that specific money,
16  leaving aside the States and the Local Governments and
17  all, is used to source is a number of specific programs,
18  is that right, what they call special use accounts?
19         MR. ROBERS: Object to scope.
20      A. I'm not that familiar with the special use
21  accounts.
22      Q. (BY MR. LOTTERMAN) All right. Are you aware
23  that -- that the money that's collected generally is
24  used for reclamation projects?
25         MR. ROBERS: Scope.

196

1       A. I believe a -- a minority portion of the money
2   is --
3       Q. (BY MR. LOTTERMAN) Okay.
4       A. -- used for that.
5       Q. Also used for conservation projects?
6          MR. ROBERS: Scope.
7       A. Yes.
8       Q. (BY MR. LOTTERMAN) Recreation projects?
9          MR. ROBERS: Scope.
10      A. Some amount, I believe, that goes to the Land
11  and Water Conservation Fund is used for those purposes.
12      Q. (BY MR. LOTTERMAN) And historic preservation
13  projects?
14         MR. ROBERS: Scope.
15      A. Yes.
16      Q. (BY MR. LOTTERMAN) Okay. And, in fact,
17  according to this press release, it's even used to fund
18  schools; is that right?
19         MR. ROBERS: Scope.
20      A. That may well be true.
21      Q. (BY MR. LOTTERMAN) Okay. Well, look at Page
22  one, Paragraph 2, right up front.
23      A. Uh-huh.
24      Q. You see where it says, "ranging from school
25  funding to infrastructure improvements and water

49 (Pages 193 to 196)

**Worldwide Court Reporters, Inc.**
PURSUANT TO CONFIDENTIALITY ORDER

197

1 conservation projects."
2    A. Uh-huh.
3    Q. Is that correct?
4       MR. ROBERS: Scope.
5    Q. (BY MR. LOTTERMAN) Is that your understanding?
6    A. Yes.
7       MR. LOTTERMAN: I have no further
8 questions. Thank you, Doctor.
9       THE VIDEOGRAPHER: The time now is
10 2:36 p.m. We are off the record.
11       (Brief Recess Taken.)
12       THE VIDEOGRAPHER: The time now is
13 2:41 p.m. We are back on the record.
14       EXAMINATION
15 BY MR. ROBERS:
16    Q. Good afternoon, Dr. Rose. My name is Brandon
17 Robers. I'm an attorney for the United States. I just
18 have a few questions for you this afternoon.
19    A. Fine.
20    Q. Do you -- is it your understanding that BP is a
21 publicly-traded company?
22    A. Yes.
23    Q. Is it your understanding that Anadarko is a
24 publicly-traded company?
25    A. Yes.

198

1    Q. Do you have an understanding of the purpose of
2 publicly traded companies?
3       MR. LANGAN: Object to the form.
4    A. The purpose of a publicly-traded company is to
5 maximize profit and sharehold equity.
6    Q. (BY MR. ROBERS) What is your understanding of
7 BP's purpose in operating and investing in the Gulf of
8 Mexico region?
9    A. BP's purpose is the same as any other company,
10 is to maximize its profit and -- to sharehold the
11 equity.
12    Q. And what is your understanding of Anadarko's
13 purpose in investing in and operating in the Gulf of
14 Mexico region?
15       MR. LANGAN: Object to the form and, to
16 invoke your favorite objection, scope.
17    A. The -- investing in -- in the Gulf of Mexico
18 is -- is -- is an attractive proposition for oil
19 companies, in general, and -- and BP and Anadarko, in
20 particular.
21       It's an attractive hydrocarbon province.
22 It has favorable fiscal terms, and has the
23 infrastructure and history to suggest that a profitable
24 return can be generated from activities in the Gulf of
25 Mexico.

199

1       MR. ROBERS: That's all I have. Thank you.
2       MR. LANGAN: No further questions.
3       MR. LOTTERMAN: None here. Thank you,
4 Doctor.
5       THE WITNESS: Thank you.
6       MR. LANGAN: Dr. Rose, thank you.
7       THE VIDEOGRAPHER: The time is 2:43 p.m.
8 Today's deposition of Marshall Rose consisting of five
9 discs is now concluded.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

200

1       CHANGES AND SIGNATURE
2 WITNESS NAME: MARSHALL ROSE, PH.D.
3 DATE OF DEPOSITION: JUNE 26, 2014
4 PAGE LINE    CHANGE       REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

201

```
1        I, MARSHALL ROSE, PH.D., have read the
   foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3
4        _____
5              MARSHALL ROSE, PH.D.
6
7
8
9
10
11  THE STATE OF _____)
12  COUNTY OF _____)
13
14
15        Before me, _____, on
   this day personally appeared MARSHALL ROSE, PH.D., known
16  to me (or proved to me under oath or through
   _____) (description of identity
17  card or other document)) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
18  to me that they executed the same for the purposes and
   consideration therein expressed.
19        Given under my hand and seal of office this
   _____ day of _____, _____.
20
21
22
23        _____
              NOTARY PUBLIC IN AND FOR
24            THE STATE OF _____
              COMMISSION EXPIRES: _____
25
```

202

```
1            UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2
3   IN RE:  OIL SPILL     )  MDL NO. 2179
    BY THE OIL RIG        )
4   "DEEPWATER HORIZON" IN )  SECTION "J"
    THE GULF OF MEXICO, ON )
5   APRIL 20, 2010        )  JUDGE BARBIER
                          )  MAG. JUDGE SHUSHAN
6   _____
7
          REPORTER'S CERTIFICATION
8      ORAL AND VIDEOTAPED DEPOSITION OF
             MARSHALL ROSE, PH.D.
9              JUNE 26, 2014
10
11       I, Kateri A. Flot-Davis, Certified Shorthand
   Reporter in and for the State of Texas, hereby certify
12
   to the following:
13
14       That the witness, MARSHALL ROSE, PH.D., was duly
15  sworn by the officer and that the transcript of the oral
16  deposition is a true record of the testimony given by
   the witness;
17
18       There was a request for examination and signature
19  of the witness to the deposition transcript.  The
20  original transcript was sent for review on
   _____ to the witness or to the attorney
21
22  for the witness for examination, signature and return to
23  me by _____;
24       I further certify that I am neither counsel for,
25  related to, nor employed by any of the parties or
```

203

```
1   attorneys in the action in which this proceeding was
2   taken, and further that I am not financially or
3   otherwise interested in the outcome of the action.
4        Certified to by me this ___ of _____ ,_____.
5
6
7        _____
8              Kateri A. Flot-Davis
              Texas CSR No. 8462
              Expiration Date: 12-31-15
9
10  Worldwide Court Reporters, Inc.
    Firm Registration #223
11  3000 Weslayan, Ste. 235
    Houston, Texas 77027
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

51 (Pages 201 to 203)

| A | | | | |
|---|---|---|---|---|

**abandonment** 71:22

**ability** 154:1 179:14

**able** 94:3 163:13 183:23 187:2

**abolish** 61:20

**abolished** 62:1,2,3

**abolishment** 63:24

**absence** 153:5

**absent** 136:5 151:6

**absolutely** 79:17 86:21 88:12 109:25

**abundant** 185:12

**accelerated** 135:24

**accepted** 179:24

**access** 162:23

**account** 108:21 136:8

**accounting** 11:6 64:22 179:4

**accounts** 195:18,21

**accuracy** 46:8

**accurate** 13:8 17:25 18:3,7 32:7 32:13 34:20 60:22 60:25 61:9 79:8 118:23 119:8,13 133:25 152:21 157:20 179:14

**accurately** 13:5 153:6 162:4

**acknowledged** 201:17

**acquire** 181:5,6

**acquired** 171:3 175:9

**acre** 181:18

**act** 18:11 21:14 52:13 174:20 183:2 185:17

**action** 23:1 61:20 76:5 121:17 148:4 148:16 203:1,3

**actions** 22:3 143:19

146:15

**activities** 5:17 6:21 69:7 71:17,18 124:22 143:18 144:8 145:24 157:16 158:11,20 161:1 198:24

**activity** 22:17 135:1,22,23 136:1 137:21 147:19 160:18,24 161:6 161:10,13,23 162:1

**actual** 128:2 153:7 165:19

**add** 49:17 52:2

**added** 39:8,12 40:20,20 113:6

**addendum** 157:13

**addition** 29:21 190:20

**additional** 48:16 97:2 99:14,17 100:6 102:2 110:6 111:4 113:5 146:25 174:8

**address** 19:5,6

**addressing** 28:10

**adequacy** 175:6

**Adequate** 7:7

**adjusted** 182:25

**adjustment** 95:6

**adjustments** 185:2 185:4

**Administration** 7:21

**Administrator** 11:24

**advance** 87:21 156:9,10

**adverse** 45:3 124:20

**advisement** 151:3

**Affairs** 6:9,14

**affix** 201:1

**afraid** 96:14

**Africa** 135:5

**aftermath** 134:8 135:9

**afternoon** 176:21 197:16,18

**agencies** 61:20 62:16 117:5 138:22

**agency** 11:23,24 62:7 73:19 76:5 159:20

**Aggregate** 124:19

**ago** 37:17 112:1 129:19 174:19

**agree** 56:4,9 63:11 102:7 112:13 115:16 125:10 129:11 135:11,13 135:14 140:12 141:22,25 146:14 150:15 152:11 160:16 161:21 163:19

**agreement** 148:20 150:24 151:8

**Ah** 42:20

**ahead** 10:13 17:11 42:12 62:6 151:14

**ahold** 114:22

**aimed** 132:11,15

**aircraft** 11:18

**al** 4:10

**Alaska** 14:25 15:3 144:1

**alerted** 21:10

**allocated** 159:9

**allowed** 183:1

**All-of-the-Above** 192:17

**Alt** 103:25 106:2

**alter** 142:22

**America** 52:12

**American** 194:19

**amount** 90:17 102:1 183:1,20 184:9 189:25 196:10

**amounts** 187:13

188:11

**Anadarko** 2:15 18:11 22:18 165:12,16 168:14 170:19 171:1,5,6 171:9,22,23,25 173:4,8,11 176:8 197:23 198:19

**Anadarko's** 170:10 175:18 198:12

**analyses** 11:15,17 53:15 83:11 160:2 168:8

**analysis** 14:18 19:12 20:3,7 27:15 29:18 39:1 39:9 40:6 48:4,8 48:12,12,17 49:21 51:5 64:19 84:25 86:11,17 87:9,14 87:23 89:9 93:21 95:20 98:1 101:3 105:22 107:3,16 108:20,23 112:21 113:11,12 120:7 120:10 121:24,25 121:25 122:21 140:18 141:14 142:2,6 144:11,12 144:19,24 145:4,8 151:17,21 153:6,9 153:16 154:6 156:25 157:1,8,25 161:10 164:23

**analyst** 11:20

**analytical** 92:15

**analyzed** 148:22

**ANDREW** 2:11

**Ann** 8:10 58:18,19 59:5,15 60:1 174:6

**Anne** 59:20

**announced** 78:11 78:14 85:1 87:19 95:14

**announcement** 85:4,11 86:21

87:4,10 88:18

**annual** 189:8

**answer** 10:10,13 21:23 27:7 45:21 46:1 51:2 54:10 57:5 87:1,17 148:6 157:6 165:24 184:16 186:17 188:1

**answering** 88:2 96:15

**answers** 10:1,4 45:11 57:20 58:12 155:13 156:24 173:18

**anticipated** 29:11 97:3

**anybody** 23:17 24:5 28:15 59:7 103:22 106:13 107:3,8

**anymore** 92:4

**anyway** 177:20

**apart** 116:14

**APDS** 60:14

**apologies** 26:10

**apparently** 49:22 98:15 105:7

**appear** 54:16 102:15 112:25 155:13

**Appearances** 2:1 3:4

**appeared** 136:12 201:15

**appears** 102:10,16 179:5 195:5

**applicable** 7:6 73:21

**applications** 71:6

**applied** 71:11 73:24 162:1

**apply** 71:16

**appreciate** 57:5 72:10 93:4,8

**approached** 96:18

**appropriate** 93:2

180:17
**approval** 71:5
**approved** 4:7 13:20
60:17
**April** 1:5 9:4 55:11
60:18 62:12 202:5
**arbitrary** 76:6
**area** 14:8 57:2
137:22 159:17
179:8
**areas** 15:1
**area-wide** 187:14
**arose** 148:3
**articles** 22:8,12
**ASC** 170:16
**aside** 142:3 169:6
195:16
**asked** 21:1,12
22:15 23:22 24:1
24:2 25:15 30:14
44:9 49:12 53:8
57:21 59:23 74:8
87:23 89:8,14
90:4 96:3 108:18
109:13 116:1
129:19 149:25
151:1 155:12
167:7 188:7
**asking** 23:1,13
45:14 47:22 55:17
55:20 79:18 86:5
86:7,18,20 92:24
111:7 174:22
177:1
**asks** 53:14
**aspect** 170:25
171:25
**aspects** 28:10,16
67:14 144:13
171:5
**assertion** 126:8
**Assessing** 7:20
**assessment** 4:12
30:15
**assessments** 53:16
**assignment** 26:12
38:25 90:20

**approval**
115:10,12,18,19
115:22
**assist** 191:16
**Assistant** 105:2,3,5
105:19
**assisting** 167:6
**Associate** 16:5
**associated** 31:9
122:25 144:8,20
153:4,5 159:5
161:5,17 163:25
**Association** 7:17
162:9
**assume** 9:22 10:14
15:17 60:24 78:18
80:17 85:20 92:10
130:14 152:8
153:9 165:24
186:13 193:12
**assumed** 33:13,18
97:7 118:10
153:16
**assumes** 151:21
**assumption** 33:22
118:13 152:18,24
153:3 163:11
**assumptions** 30:24
32:13,17 33:5
34:12,19,20 46:9
46:10 48:10 50:3
93:23 96:17
161:23
**assure** 187:2
**atmosphere** 90:24
**attached** 162:9
**attachment** 36:18
98:15 103:9
162:24
**attempt** 61:9 77:6
**attempting** 142:21
144:25
**attended** 11:9
**attention** 21:3
116:3,6 124:14
177:3
**attorney** 197:17
202:21

**attorneys** 21:24
150:13,17,18
203:1
**attractive** 198:18
198:21
**attributed** 46:14
**auction** 179:24
**author** 52:20 69:1
90:13 117:2
123:10 125:8
**authorities** 65:3
**authority** 69:4
**authorized** 70:11
70:25
**authors** 114:22
**available** 145:21
**average** 117:16
119:3
**award** 167:16,19
**aware** 31:18 37:12
55:24 65:14 76:8
82:14,20 86:14
94:21 105:7,12
106:6,11 112:12
113:21 128:2,11
138:25 141:3
149:11 186:8
195:22
**a.m** 9:5 57:10,13
102:25 103:4

---

**B**

**B** 1:9,13 3:7 4:9 9:6
**Bachelor** 11:6
**back** 11:1,2 16:1,15
21:18 26:25 30:9
32:5 33:6 38:1,19
39:25 40:3 41:9
49:11 51:4 57:14
60:6 83:10 95:19
103:5,6 127:9,10
149:19,20 151:16
153:3,14 155:25
162:22 165:7
167:16 168:11
171:17 173:15
174:11 176:11,20

197:13
**background** 11:3
166:12
**backup** 147:10
**backwards** 52:7
**Ballenger** 8:11
**BARBIER** 1:5
202:5
**Barnes** 107:13,13
109:13
**barrel** 122:25
**barrels** 122:14,16
**based** 33:22 114:4
117:13 118:15
145:5,9 154:6
161:22
**baseline** 54:22
161:15 189:15
**basic** 54:18
**basically** 13:22
29:6 39:8 63:16
118:13 121:16,18
161:16 172:17
173:24 182:21
187:10,22
**basis** 55:18 125:7
126:7 144:12
156:20 179:17
183:19 185:15
189:8
**Bates** 4:13,17,20
5:3,7,11,18,22 6:3
6:6,11,22 7:9,11
7:14 36:9 110:17
111:20
**bear** 54:14
**beginning** 83:7
111:20 127:14
**begins** 17:16 36:8
57:12 60:10 68:24
68:24 99:13,16
100:6 103:3
123:21 124:16
132:10,11 133:19
149:17 157:8
163:1 164:14
176:18 181:10,16

**begun** 60:18 84:16
133:5
**behalf** 17:4
**behavior** 142:22
**believe** 21:4 32:22
36:19 69:1,24
74:7 75:1 82:8
91:23 92:2 105:1
106:11 118:21
126:3,10 127:23
133:25 140:24
141:2 147:10
162:19 163:1
166:22 167:14,19
174:1 178:17,20
178:24 191:4,7
196:1,10
**bells** 78:20 109:23
**benefit** 33:24 93:24
94:4 96:18 118:17
123:5 128:3
152:19 188:12
**benefits** 121:12
188:20 189:1,8
190:13
**best** 17:12,17 32:15
41:7 43:12,22
44:3 45:17,21
46:11 48:11 62:11
76:20 83:20 166:4
179:14
**better** 147:7 175:15
**beyond** 52:3 83:17
105:24 113:2
153:10
**bid** 172:1,2 175:6
179:23 180:17
**bidder** 179:25
**bidders** 171:2
**bidding** 22:16
130:10 175:5
**bids** 180:6 193:20
**big** 104:4
**bill** 187:4
**billion** 180:21
183:14,16 184:11
193:14,20 195:6

**binder** 52:6 177:2
**Bingham** 2:16
   165:11
**bit** 11:3 33:5,9 50:1
   87:25 89:11 93:25
   97:7 117:24
   147:16 165:14
**black** 155:14
**block** 171:3 172:1
   175:6,8
**BOEM** 4:3,7 10:21
   10:22,22,24 12:17
   62:25 64:1,1,5,10
   64:20 69:4,7
   70:10,24 71:5
   109:6 111:20
**BOEMRE** 64:1,11
   80:14 82:9 139:17
**BOEMRE's** 131:2
**BOEM001121**
   110:18
**bond** 187:7,11,12
   187:14,15,16,20
   187:23 188:3
**bonding** 58:22 59:2
   173:25 174:7
**bonds** 174:2 186:4
   186:17,24 187:7,9
**bonus** 64:21 179:18
   179:19,22,23
   180:1,21 181:1
   193:20
**bonuses** 170:4,6
**book** 13:11 34:23
**BOP** 71:21 147:18
**BOPs** 70:12,12,25
   71:1,7,7 133:1
   146:21 147:4,6,7
   147:11 148:2
**boss's** 42:24
**bottom** 60:8,9
   68:23 109:16
   110:18 123:9
   127:15 132:10
   162:7 170:19,22
   177:5 179:20
**box** 14:7

**BP** 2:10 7:21 8:6,8
   18:10 22:20 71:19
   134:8 148:15
   150:15 165:16
   168:15 170:5
   171:3 172:2 175:8
   176:1,1,3 197:20
   198:19
**BP's** 22:16 149:9
   150:11 175:15,16
   176:6 198:7,9
**BP-HZN-2179M...**
   6:12
**BP-HZN-2179M...**
   6:12
**BP-HZN-2179M...**
   6:6
**BP-HZN-2179M...**
   6:7
**BP-HZN-2179M...**
   7:9
**BP-HZN-2179M...**
   7:9
**Brandon** 2:4 12:9
   22:1 25:5 197:16
**Brazil** 135:5
**break** 57:6 92:25
   173:13 174:12
   176:11
**breaks** 110:5 150:6
**Brian** 43:8,14,18
   43:20 45:9 46:15
   46:16,17,24 47:21
   91:20 106:17
   107:8 116:12
**Brian's** 46:17
   116:14
**brief** 57:11 59:21
   103:2 149:16
   165:5 171:15
   197:11
**briefed** 91:21
**briefing** 174:6
**bring** 183:23,25
**broad** 67:23 75:23
**broaden** 25:16
**broader** 142:13

**broad-based** 151:8
**Bromwich** 5:15
**Bronwich** 139:10
   139:12,20 140:12
   140:20 141:13
**Bronwich's** 140:8
**BSEE** 63:9 64:10
   64:17
**build** 160:5
**Building** 1:14
**bullet** 54:5 131:1
**bunch** 53:15 54:6
**burden** 154:17
**bureau** 4:3,6 6:8,12
   6:18 7:3 10:17
   13:19 62:20 63:8
   64:8 78:4 104:10
   104:11,16,17
   139:13,14 143:1
   148:9 159:7 175:7
   184:22
**Burgess** 9:14
**Bus** 170:16
**business** 32:20
**button** 86:2
**B-HZN-2179MD...**
   5:23
**B-HZN-2179MD...**
   5:23
**B-O-E-M** 10:22
**B-r-o-n-w-i-c-h**
   139:11

─────── **C** ───────
**calculate** 157:2
   158:7 183:19
**calculated** 29:8
   31:6 158:5 164:20
   164:20 182:18
**calculating** 162:10
**calculation** 131:13
**calculations** 31:8
   118:15 128:6,9
**calendar** 127:23,24
**call** 114:9,25
   140:25 184:21
   195:18

**called** 11:15,23
   52:10 70:5 75:8
   157:14 179:19
   185:19
**calls** 59:18,25
**cap** 77:6,11
**Capitol** 50:19
**capped** 76:23 77:4
   77:8
**capping** 77:17
**capricious** 76:6
**caps** 10:22 69:5
**captioned** 124:11
**card** 201:17
**career** 11:12 13:1,5
**careful** 50:2
**carefully** 173:1
**carryover** 125:15
   182:22
**carve-outs** 71:25
**case** 9:20 16:13,18
   16:20,24 17:1
   18:11 33:15,20
   34:18 44:6 75:10
   97:25 160:20
   162:20 165:12
   172:4 185:1,6
**cash** 179:23,23
**categorically** 144:4
**category** 179:7
   180:25 182:6
   185:9,10,11,19
**caused** 141:18
**caution** 21:22
**cc** 8:11
**cease** 71:5
**Center** 11:15
**certain** 5:16 6:20
   18:16 48:10 56:15
   56:15,24 69:6
   114:11 132:22
   143:18 144:22
   158:11 179:1
   180:4
**certainly** 19:9 42:7
   44:20 65:24 89:22
   98:12 114:8

   118:20 129:10
   145:20 193:9
**Certificate** 3:15
**certification** 81:5
   81:23 82:10 147:1
   202:7
**Certified** 202:11
   203:4
**certify** 42:15
   202:12,24
**chain** 4:15 42:18
   91:24 93:11,15,19
   98:14,15 109:17
   111:13
**Chairman** 140:3,9
**chance** 30:12 79:19
   140:8 172:24
   177:14
**change** 57:7 62:19
   62:19 63:20 64:1
   64:4,5 102:19
   138:6 149:12
   200:4
**changed** 63:5,6
   67:13 119:25
**changes** 3:14 94:24
   95:20 98:21 113:3
   113:9,11 135:9
   159:16 180:17
   200:1
**characteristics**
   144:7
**characterization**
   115:17
**characterizes**
   195:9
**charge** 181:4
**charged** 186:13
**charging** 182:22
**Chart** 4:7
**Chicago** 2:13
**Chief** 10:25 15:19
   26:7 166:22 167:1
**China** 135:5
**choice** 156:1
**chose** 155:25
**chosen** 144:12

**Chris** 16:6
**Christina** 24:1 26:6
**chron** 76:19
**chronologically**
180:25
**circumscribed**
56:15 94:23
**circumstances**
119:25
**citation** 173:24
**citations** 70:22
**cite** 163:9
**cited** 49:1,4 52:3
102:17
**cites** 70:19 114:21
116:23
**citing** 70:9
**city** 160:5
**civil** 18:11 51:6
74:17
**claim** 185:1
**claims** 148:23
149:8
**clarification** 19:2
20:10 80:5 174:22
175:24
**clarifications** 24:3
92:15
**clarify** 10:9 57:19
58:3,11 79:16
84:10,15 88:3
99:4 148:6 166:18
**clarifying** 176:3
**clarity** 173:3
**class** 148:16
**Clean** 18:11 52:13
**cleans** 121:14
**clear** 10:10 20:22
25:11 37:13 46:19
173:6 182:13
**cleared** 107:1,4
**clearly** 90:1 101:8
101:25 144:1
**client** 151:9
**clock** 11:2
**close** 143:11
**coast** 7:20 37:11

45:4 135:5
**colleagues** 178:25
**collected** 150:7
170:5 180:21
183:10,13 189:25
193:13,20 195:23
**collections** 64:21
64:21,22
**college** 11:4,5
**colloquy** 155:2
174:17
**Combination**
158:10
**come** 21:3 30:9
32:16 38:1 39:25
40:3 45:21 47:20
48:1 49:11 56:5
60:6 61:5 62:6
74:17 80:13,17
83:10 85:21 97:12
115:23 116:3,6
155:23 173:13
174:11 176:11
184:23
**comes** 10:5 115:12
178:22 191:2,6
**comfortable** 89:13
123:2 189:5,7
192:7
**coming** 31:25
158:23
**command** 42:19
91:24 109:20
110:3
**commence** 90:5
181:6
**commenced** 87:13
**comment** 49:6 92:8
133:12 148:10
173:5
**commentary**
116:14,15
**commented** 52:23
**commenting** 80:3
116:8
**comments** 48:16
92:13,14 93:23

121:1 156:1
**COMMISSION**
201:24
**Committee** 7:22
139:4 140:3,9
**committees** 138:21
**common** 54:23
**commonly** 137:25
**Communicate**
139:23
**communicated**
97:14
**communications**
116:15
**companies** 153:2
153:22 176:4
190:19 198:2,19
**company** 159:7
170:20 187:21
197:21,24 198:4,9
**comparable** 121:22
**compared** 51:25
96:8 112:25
**comparing** 164:19
**compensation**
134:7,8
**competitive** 17:18
**complete** 90:25
112:15,18,19,21
**completed** 87:14
95:5 97:23
**completion** 55:14
60:15 97:18
**completions** 71:20
**Compliance** 7:6
**component** 185:16
**con** 141:4
**conceivably** 136:8
**concept** 96:17
**conceptually** 161:4
**concerned** 50:22
144:9 169:10
173:7
**concerning** 57:20
73:20
**concerns** 145:20
**concluded** 127:23

199:9
**concluding** 126:7
**conclusion** 117:21
122:5,6,12 123:3
124:3,5,25 125:8
125:13 127:22
128:12 173:14
**conclusions** 32:10
32:14
**conduct** 24:5 30:15
58:6 71:18
**conducted** 87:9
143:4 150:12,13
150:16 155:5
156:25
**confi** 89:13
**confident** 89:12
**Congress** 7:23
138:22 139:5
**congressional**
141:4
**connection** 26:3
**consequence**
123:22
**conservation** 196:5
196:11 197:1
**conservative** 34:14
34:21 163:7,16
**consider** 17:24
58:1,2 161:14
**considerable** 62:23
90:17
**consideration**
201:18
**considered** 115:15
148:9
**consistent** 69:14,19
71:10 72:4 80:22
117:20 124:3,25
129:7 142:2
**consisting** 199:8
**constructing**
158:25
**construction** 159:3
**consult** 126:25
**consultants** 160:8
**consultation**

114:19
**consulted** 114:6,12
**consulting** 46:20
**contacted** 26:11,18
114:24 115:2,22
156:5
**contain** 150:8
**contained** 84:9
171:8,21 175:17
176:8
**containment** 7:7
82:12
**contains** 179:13
**contents** 21:24
**Continental** 5:7,10
5:17,22 6:11,21
7:5 14:16,21
65:17
**continuation**
175:14
**continue** 63:13
176:12,23
**continued** 133:7
**continuously** 12:5
**contributed** 117:6
129:24 136:3
170:6
**contributions** 4:20
130:2 170:11
**control** 73:20 81:8
81:19
**conversation** 44:8
58:17 91:6
**conversations**
21:24 57:24,25
59:3,9 117:13
150:9
**coordinated** 115:14
**coordinator** 115:14
**copied** 103:16,19
103:22
**copies** 110:8
**copy** 39:18 52:10
105:8 110:11,23
174:8
**corner** 36:9
**Corporation** 2:15

4:9 11:20
**correct** 10:18 14:8
14:9,10,13 18:16
19:8 20:19 21:15
25:23 28:23 30:1
33:7 37:19,22,23
45:17 47:19 51:14
52:24 69:19 72:13
76:1,2,11,17 85:6
88:8,11,17 90:13
94:15 95:16,18
99:5 103:17 108:2
113:22,23 114:4,7
114:13,14,20
126:9 128:22
130:12 134:16
139:15,16 142:5
145:10 146:7
148:25 149:9
151:20 152:6,7,23
153:16 155:7,8
157:23 166:17,23
170:7 178:22,23
180:2 181:11,12
182:15 188:15
190:23 197:3
201:2
**corrections** 112:22
**correctly** 179:1
180:19 183:9
194:7 195:15
**cost** 186:12
**costs** 31:1 45:3
159:3 181:4
183:23 184:5
**counsel** 13:12
19:23 24:20 29:16
55:17 57:15 63:11
85:23 92:20 93:3
110:6,12 126:11
149:22 150:9
155:23 177:7
202:24
**count** 46:12,13
94:12 113:6
**counties** 194:14,14
**countries** 135:5

**country** 159:10
**country's** 121:19
**counts** 32:2 50:23
**COUNTY** 201:12
**couple** 11:21 34:19
37:17 71:14 72:9
89:23 90:18,21
170:17 173:18
177:13 192:6
**course** 10:8 17:20
22:25 91:3 151:19
156:7
**court** 1:1 9:16
56:23 74:19 75:1
75:9 202:1 203:10
**courtesy** 93:8
110:6
**cover** 36:14,15,17
36:24
**covered** 132:23
144:20
**create** 25:17 38:25
40:6
**created** 26:2 38:24
40:4 41:10 62:25
63:2 86:5 90:24
110:24 112:2
114:13 166:13,20
**creating** 115:2
**creation** 37:8,19,22
112:2 114:16
137:15
**crisis** 124:16
**critical** 32:23 95:10
**criticism** 116:15
**criticizing** 116:7
**CSR** 203:8
**cubic** 136:24 137:1
137:2
**cumulative** 39:11
129:4
**curious** 12:25
17:13 86:1,6
155:18
**current** 10:24 14:1
15:2 141:19
166:21 181:17,20

182:16 184:25
**currently** 10:17
**custodian** 93:1
**customers** 147:19
**cut** 50:6

**D**

**d** 2:6 59:1
**Daigle** 8:11
**Dakota** 135:3
**data** 4:16 8:5,6,8,8
99:14,17 100:6,16
105:8 124:20
167:9 176:1 179:2
192:12
**database** 178:22
179:13
**date** 7:8,8 55:23
61:25 65:20 76:25
77:15 80:23 82:20
86:20 89:7 98:10
100:20,21,23
152:6,6 200:3
203:8
**dated** 4:4,10,13,17
4:20 5:3,11,14,22
6:21 8:3,12,17
73:7 87:15 88:7
90:9 98:15 140:9
155:6
**dates** 66:9 90:4
98:9
**day** 1:15 56:5 97:18
122:14,16 201:15
201:19
**days** 85:16 87:3
**day-to-day** 51:20
**DC** 2:7,17 109:20
**de** 97:10
**deal** 27:20
**dealing** 47:1
**dealt** 46:24
**December** 112:3,7
**decide** 176:12
**decides** 183:3
**decision** 5:16 6:18
68:11 80:10 91:14

183:5
**decisions** 64:12,16
64:18 86:13 175:6
**decision-making**
64:6,25
**declaration** 4:9
16:13 17:1
**declarations** 17:3
**decline** 136:16
137:7,13,20 138:2
138:9
**declined** 136:1
137:8 193:9
**declining** 135:23
**decommissioning**
187:17
**decrease** 161:6
**decreases** 161:5
**deep** 66:20 182:25
**deeper** 56:25
132:17 144:21
**deeply** 100:16
**deepwater** 1:4 4:16
5:11 7:18 9:3
37:10 53:20 62:13
69:6 124:22
125:25 128:20
129:4 134:25
135:8,22 141:17
141:17 143:12,13
143:17,21 145:6,9
145:16 171:3
174:20 181:24
182:20 183:1
185:16 202:4
**Defendant** 165:12
**defendants** 52:11
53:8
**defensible** 48:2
**defined** 148:24
149:8
**defines** 164:3
**definition** 164:7
**definitional** 67:14
**degree** 11:6 53:17
95:15 116:21
**delay** 152:24

153:23 154:2,3
**delayed** 123:12,22
129:1
**delegated** 64:17,20
64:23
**Demonstrating** 7:7
**demonstration**
184:23
**department** 2:3,5
4:19 5:5,13,20
6:17 7:2 8:16
12:2,5 13:6 18:10
19:11 20:3,6
21:20,21 29:18
41:2 47:13 55:12
55:15 56:5 61:19
65:15,19,22 73:12
74:4 78:10 80:14
81:3 86:11 104:23
131:20 138:22
167:1,16 168:5
190:5 191:8
193:19 194:3
**depend** 47:23
**dependence** 193:1
**depending** 181:20
187:14 189:15
**depict** 172:16
175:23
**depicted** 186:9
**deposition** 1:9,13
9:2,17 22:10
25:10 39:21 50:16
50:17 51:19 57:13
103:4 113:10
131:18 149:18
150:4 155:5 156:6
156:12 176:19
199:8 200:3 201:1
202:8,16,19
**depositions** 150:10
150:14,16,19
**depth** 113:5 144:2
144:2 181:21
**depths** 69:10 180:9
**Deputary** 141:15
**Deputy** 141:15

derived 182:18,24
describe 21:17,18
  29:5
described 29:14
  41:6
description 13:8
  22:2 201:16
designated 19:24
  21:11
designed 143:6
  157:2
detail 54:22 186:21
details 30:9 57:4
  67:19,22 68:4
  82:16 96:17
determination
  86:15
determine 39:11
  183:20 185:1
determined 175:7
determining
  119:13 162:4
developing 92:16
development 5:6
  6:11 65:17 99:18
  158:25 159:4
  184:24
devoted 145:19
  146:1
differ 33:8 171:6
differed 32:17
difference 100:12
  100:14 101:16,19
  101:20 172:19,20
  189:1
differences 32:1
  33:11
different 20:19
  27:9 41:21 56:19
  56:21 58:8 62:7
  63:16 64:8 67:13
  69:21 95:15,21
  99:1 109:9 147:7
  159:9,10 165:18
  173:14 184:17
differently 94:1,5
  96:19,19

difficult 99:12
  135:7
dig 100:16
dime 122:24
direct 26:12,14
  31:6,10 52:25
  66:18 70:10,24
  71:5 124:14
  156:16,17 158:5
  159:12 164:1
  177:3 192:5
directed 60:13 69:3
  80:14
directing 70:10,24
  88:24
direction 127:10
  162:5
directive 68:14
  71:11 72:11 89:2
  89:4 95:2
directives 86:16
directly 40:22
  48:19
director 5:9 6:18
  16:5 26:6 139:13
disagree 22:1 61:14
  125:7,10 167:24
disaster 135:9
disburse 191:8
disbursed 193:14
Disc 57:12 103:3
  149:17 176:19
discernable 124:6
discoveries 136:12
discovery 52:12
  184:23
discretionary
  184:22
discs 199:9
discuss 19:19 20:23
  29:17 114:25
discussed 58:10
  70:17 107:7
  169:15
discussion 12:14
  47:12 131:4 141:4
  165:2 191:24

discussions 106:13
  107:2
displaced 126:4
disposal 71:24
disproportionately
  96:12
dispute 16:21
distinction 133:2
distinguish 20:17
  135:8 164:22
  188:25
distinguishable
  111:2
Distinguished
  167:16
distinguishing
  104:22 164:18
distributed 194:7
distributing 51:25
distribution 65:3
District 1:1,1 16:14
  47:18 75:9,10
  202:1,1
Division 2:5 10:25
  14:4,5,7,11 15:5
  41:2,4 88:11 89:8
  100:22 105:9
  114:5 161:8
  166:23
Division's 41:19
  94:25
Doc 112:13
Doctor 197:8 199:4
Doctorate 11:10
document 12:8
  16:13 25:18 35:8
  35:23 36:4,8,11
  38:15,17 39:7,18
  41:10 49:25 52:10
  52:17,20 54:9
  55:18 60:12 61:2
  65:13,15 66:16
  68:13 69:1 75:8
  75:12 79:19 80:12
  87:20 88:22 89:15
  89:16 90:6 94:2,4
  97:13 100:22

102:16 110:8,24
  111:6,22 112:2
  113:1 116:23
  126:11 129:18,20
  131:19,23 162:11
  162:13 167:15
  169:25 170:10
  171:7,21,24
  172:11,18 173:3
  173:21 174:14
  175:1,11,17,21
  176:8 177:4
  191:15 192:4,9
  193:11 201:17
documents 24:21
  32:8 34:25 38:24
  39:2 40:4 54:6,14
  67:6,19 92:23
  98:9,25 99:3
  111:3,24 113:15
  122:10 150:11,12
  150:17 169:11
  177:17,22 178:6,9
document's 73:13
DOE 108:10
DOI 83:11 93:21
doing 12:10 48:11
  105:18 109:11
  144:14 187:6
DOI/BOEM
  107:17 108:10
dollar 188:11
dollars 136:23
  137:8,8,11
domestic 192:21
doubt 92:4 93:6
  127:8
Doverspike 8:11
downturn 134:25
  135:17 136:5,9
Dr 4:9 9:10,12,15
  9:17 12:16 16:12
  18:8 23:22 26:5
  28:21 38:12 39:14
  44:8 46:3 47:20
  49:9 52:8 54:17
  55:6 56:4 57:18

60:5 65:11 67:11
  68:9 72:9 78:1
  80:13 82:3 83:25
  88:17 92:11,24
  93:20 96:14 98:20
  101:1 103:6 106:1
  109:3 111:18
  112:13 115:7
  121:23 126:16
  130:8 134:23
  142:5 146:14
  148:14 149:20
  150:1,20 154:5,25
  160:16 164:25
  165:10 171:19
  176:21 178:16
  197:16 199:6
draft 28:25 31:11
  41:11,12 89:23
  90:18 91:15 94:25
  95:1 101:8
drafts 27:9 41:15
  41:16,21 43:18,20
  46:5 48:15,16
  89:19 92:3,5
  93:17 98:10
drawing 133:2
drill 5:3 60:14,17
  71:6 94:11 96:8
drilled 160:20
drilling 4:12 5:11
  5:17 6:10,21 7:11
  7:13 8:3 26:13,17
  26:25 29:11 30:22
  31:3 36:5 37:10
  39:1 40:6,12
  55:16 56:24 57:2
  60:19 66:6,20
  67:3,12 69:6,9,15
  69:20 70:11,25
  71:17,19,20 78:6
  78:11 84:1,25
  91:14 97:6 98:17
  100:19 103:10
  105:23 106:8,14
  107:18 108:11,20
  110:7 111:19

113:18 115:9
116:5,17 121:13
121:24 124:22
125:25 126:5
127:7 139:20
140:25 141:17
144:21 145:1
151:21,24 153:5
157:1 158:22
159:3 161:8,17
**due** 120:8 144:12
181:22
**duly** 9:7 202:14
**duration** 151:22
182:2
**duties** 167:4,11
**D.C** 165:11

**E**

**earlier** 23:22 28:21
59:23 67:11 69:22
87:23 88:9,22
89:18 90:23 92:3
92:5,8 93:21
96:15 97:7 114:2
114:4 118:8
129:23 149:25
152:4 153:1 174:2
186:17 194:1
**earliest** 89:24
**early** 27:9 33:6
41:13 83:6 94:25
147:16 182:22
**East** 135:6
**Eastern** 1:1 75:9
202:1
**eco** 83:11
**economic** 4:12,16
4:20 14:18 19:12
22:17 29:9 31:7
33:22 37:9 40:6
53:20 64:19 83:11
84:16,25 85:5,12
86:11,17,17 87:6
89:8 93:22 95:20
96:13 97:3 98:1
105:8 109:20

110:2 119:14,23
120:4,6,23 123:22
137:21 140:17
141:13 144:11,12
144:25 159:13,24
160:10 161:6
163:13,20 168:8
185:15 188:12,20
**economics** 10:25
11:10 14:4,7 15:4
37:10 41:2,3
88:11 105:9 114:5
161:8 166:22
167:21
**economist** 137:20
**economists** 15:13
158:16 160:8
**economy** 37:11
45:4 157:18
**educational** 11:3
**effect** 19:12 40:12
40:13 93:22 96:12
97:17 105:22
106:14 116:16
120:24 121:1
122:1,22 123:11
124:7,20 134:7
137:13 138:2
140:25 142:7,17
144:5 158:13
161:5
**Effective** 7:8 70:5
**effectiveness** 53:17
**effects** 4:12 7:11,13
20:18,18,23 26:25
30:15 31:6,7,9,10
32:11 33:25 34:17
36:5 37:10 39:1
39:11 45:3 50:7,8
53:20 83:15 84:16
85:6,12 87:6 96:3
96:7,8 97:8 98:17
100:19 103:10
106:8 108:20
110:7 111:19
113:18 115:9
116:5 119:14

120:6 121:23
122:6,8 125:5
127:7 128:7,13
135:8 139:20
142:12,15,15
145:19 156:17,18
157:16 158:5,8,11
158:18 159:12
161:8 163:3,7,25
164:1 174:19
**efficacy** 162:3
**effort** 21:12 51:24
102:1,5
**efforts** 7:20 53:18
**eight** 136:23
184:11
**either** 45:9 57:1
81:24 84:21 88:5
109:2 143:2 145:4
148:23 151:4
161:4 187:8
**elaborate** 33:4,9
**elements** 65:24
173:24
**eligible** 184:18
**eliminating** 96:11
**Ellis** 2:12
**emerged** 158:9
**emergency** 71:18
73:20
**emerges** 158:4
**empirical** 99:14,17
100:6
**employed** 92:16
164:8 202:25
**employee** 104:10
**employees** 15:4
134:3 164:21
**employment** 50:4
117:16 119:3
120:15,22 124:20
137:14 156:16,18
158:7,8 159:12
162:10 163:2,7
**endeavor** 166:4
**ended** 82:23,24
83:9 97:6 141:3

153:13 193:12
**ends** 25:10 181:15
**energy** 4:4,6 5:6
6:8,11,13,18 7:3
10:18 62:21 64:19
65:16 78:5 104:17
109:10 122:1,8,13
139:14 167:21
190:6,10 192:17
**Enforcement** 6:9
6:13,19 7:4 62:21
63:9,9 78:5
139:15
**engage** 160:8
**engaged** 60:2
**engineers** 15:13
**Enhance** 6:10
**enhancement**
159:25
**enjoined** 76:1
**ensure** 143:3
**entered** 134:25
148:15
**entirely** 32:13 34:5
**entirety** 19:25 20:8
154:4
**entitled** 37:9
127:15
**entity** 64:8
**environmental** 2:5
6:15 11:23 53:19
63:9 65:4
**environmentally**
143:5 192:23
**equal** 65:2 122:18
**equating** 121:12
**equipment** 73:20
81:8,19 142:7,11
142:22 144:13
146:20
**equity** 187:22
198:5,11
**equivalent** 13:25
**escalate** 182:2,3,3
**Especially** 132:25
**essentially** 112:15
**establish** 61:20

**established** 17:17
167:21
**establishing** 168:4
180:12
**estimate** 30:21 34:6
34:9,9,13 50:7,9
97:10 107:1,17
108:9 117:15
127:19 131:2,10
157:16 159:11
163:13,20,24
**estimated** 29:6
30:23 83:4 127:15
156:17
**estimates** 44:16
50:25 92:16
164:19
**estimating** 37:9
120:6
**estimation** 83:15
119:2 163:12
**et** 4:10
**evaluate** 26:21
159:15 180:16
185:1
**evaluated** 161:2
**evaluating** 26:25
106:14 158:18
**evaluation** 7:6
14:18 62:24 64:19
82:11
**evaluations** 53:16
**EVANS** 2:4
**event** 138:8,10
143:20
**events** 77:16 89:4
**everybody** 153:14
**evidence** 135:17
**Ex** 126:20
**exact** 55:23 61:25
65:20 76:25 82:20
187:12
**exactly** 39:15 72:17
72:19 90:7 91:21
93:14 112:18
152:2,2 167:2
169:21,22

examination 3:8,10
  3:11 9:8 98:24
  150:14,19 165:8
  176:13,23 197:14
  202:18,22
examine 25:11 93:7
example 41:17
  135:25 158:7,16
  158:17,21 160:5
  160:12 180:9
examples 94:3
  158:14
excessive 34:17
exchange 122:14
  155:6
exclude 145:5,8
excluded 32:3
  148:23
exclusive 90:13
executed 201:18
Executive 117:12
exercise 43:4 69:4
  169:17
exhibit 12:12,15,21
  13:13,15 16:11
  17:14 18:21,25
  35:11,19 37:1,3,5
  37:8,22,24 38:9
  38:11,22,23 40:9
  41:9,24 42:3 49:2
  52:9 53:13,14
  55:2,5,8 56:2 60:6
  60:9 65:6,9,10,11
  65:21 66:13,14,16
  68:6,7,9,18 70:1
  70:16 73:6,7
  74:10 75:4,5,7
  76:16,17 77:22,24
  79:12 80:8 82:3,4
  82:7 84:9,12 88:6
  88:10,19 91:8,15
  92:3,9 93:12,13
  95:1 96:16 98:13
  100:2,3,5,18
  101:14 102:8,9
  103:7 107:12,23
  109:19 110:10,16

110:21,25 111:12
  111:17,18 112:9
  113:25 114:7,13
  114:16,20 116:20
  117:2,10 118:16
  118:22 123:10,16
  124:11 125:8
  126:16,17,20,25
  127:6,12 128:18
  129:16 130:20
  131:17 132:2,6
  133:16,16 134:20
  138:15,16 139:10
  140:10 151:16,20
  154:16,24 155:1
  155:10 156:4
  157:20 162:7,15
  162:21,25 171:19
  172:3,6,8,14,15
  172:22,25 173:8
  173:11,20 174:10
  177:3,4,25 178:14
  178:15 179:2,16
  180:19 182:6
  183:9 184:9 185:9
  185:19 186:10
  188:11 191:17,21
  191:25 192:2
exhibits 4:1 8:19
  113:16 173:18
exist 24:14
existed 61:8 63:4
existing 112:25
  146:1
expand 44:13
expanding 96:16
  135:2
expectation 154:9
expectations 45:10
  153:22
expected 115:3,23
  137:19
expecting 153:22
expended 159:3
expenditures 159:8
experience 128:2
  161:7

experiences 182:25
expert 15:14 50:4
  133:12 167:21
  191:13
expertise 15:12
Expiration 7:8
  203:8
EXPIRES 201:24
explain 44:21
  46:10 119:16
  122:11 156:20
  184:16
explaining 58:21
explanations 24:2
exploited 136:13
exploration 99:18
  159:6 184:10
exploratory 7:18
  158:22
exploring 132:16
explosion 135:1
expressed 201:18
expressing 154:5
extent 21:23 53:17
  138:4 150:15
external 108:7
E&P 170:19 171:6
  171:23,25
e-mail 4:15 8:2,10
  25:21 36:14,15,17
  36:18,24 44:6
  98:14,15 100:21
  103:8 106:3,24
  107:15,22 108:3
  109:16 114:24
  139:23 155:6
e-mails 103:14,17
  103:20,23 106:2

——————
F
——————

face 119:12
facilitation 190:14
facilities 145:15
facility 70:12 71:1
  71:7
fact 5:2 6:9,14
  33:14,19 60:12

67:12 77:8 78:4,6
  78:7 82:9 88:10
  88:22 91:16 95:21
  104:11 106:2
  114:19 115:1
  116:1 118:14
  119:24 120:21
  136:11 138:20
  145:25 147:12
  148:15 151:24
  153:12 172:1
  193:18 196:16
facto 97:10
factors 136:4,7
  158:23
facts 54:22 95:10
fair 10:15 14:19
  17:16 22:5 28:13
  28:14 30:5 33:24
  34:3,5 40:23,23
  51:9 52:19 53:2,3
  79:3,8,11 84:24
  88:1 95:22 118:18
  118:20 148:12,18
  153:25 168:9
  181:23 182:1
fairly 34:21 44:22
  67:23 91:1 96:4
  122:7 137:25
fairness 88:21
fall 185:7
falling 119:4
familiar 55:23
  58:25 67:21 82:9
  82:15,17 131:12
  138:20 148:14
  191:12 192:8,16
  195:20
far 24:24 25:24
  28:5 30:3 52:21
  52:22,23 60:22
  77:9 90:18 133:10
  134:4 165:21
  169:10 171:5,7,21
  172:18 173:7
  184:4 185:12
Farndon 28:17

58:11,14
fashion 32:10
fate 120:7
favor 75:1
favorable 198:22
favorite 198:16
Fe 4:9 16:18
fear 133:22
feared 34:1
February 28:9
Federal 5:21 7:5
  11:23 17:17,18
  66:6 73:21,24
  74:19 119:22
  159:20 179:7
  182:12 184:10
  190:18 195:5
feedback 48:17
  49:6
feel 170:4
feeling 169:19
fees 186:12
feet 56:25 69:11
  132:17 136:24
  137:1,2 144:21
Feldman 75:8
fell 117:17 145:1
fi 158:19
fields 133:6 135:2,4
fifth 36:3
figure 85:5
files 41:17,18,19
  92:2,4 126:23
filing 17:1,3
final 6:10 31:15,18
  79:22,23,25 80:4
  91:9 185:19
finalization 106:9
finalized 106:3
financially 203:2
find 12:17 29:4
  93:4 101:20
  122:21
fine 168:15 197:19
fine-tuned 187:18
firm 165:11 203:10
first 7:23 9:7 20:25

21:3,10 37:16
50:6 52:11,11,16
68:8 70:8,15
72:11 75:11,15
83:25 85:4 87:14
87:17 88:6 89:14
89:16,23 90:4,6,8
90:18 94:23 95:22
102:10 111:2
121:5 123:18
124:13 125:18
128:18 130:25
132:14 134:23
139:6 140:16
142:12,14 144:17
162:7 165:15
166:13 175:24
182:4,6 194:2
**firsthand** 55:24
  61:16 81:10 134:2
**fiscal** 179:5 180:20
  193:12 198:22
**five** 58:7 102:21
  124:21 174:19
  182:4 188:22
  199:8
**five-digit** 35:16
**five-year** 15:2
  158:19 161:14,18
**fixed** 33:13,15
**fixed-rig** 96:11
**flat** 189:16
**flip** 17:13 18:24
  35:20 103:20
  107:11 125:14
  126:12 130:20
**floating** 70:12 71:1
  71:7
**flood** 71:23
**Floor** 1:15 2:6
**Flot-Davis** 202:11
  203:7
**flowery** 156:3
**flowing** 77:9,10
**focus** 83:13 103:8
  125:1 130:25
  146:6,7 168:16

185:22
**focused** 160:25
  175:16
**focuses** 187:17
**focusing** 30:10
  51:24 120:4 125:5
  168:14 189:20
**folders** 127:3
**folks** 15:14
**follow** 136:14
  165:22
**followed** 165:23
  174:7
**following** 36:10
  39:10 49:10 56:20
  62:23 122:17
  125:24 127:24
  202:13
**follows** 9:7
**follow-on** 146:15
**Footnote** 172:22,24
  173:2
**forces** 17:18
**forecast** 188:17,20
  189:7,8
**forecasted** 189:10
**forecasting** 189:14
**foregoing** 201:1,17
**foregone** 129:1
**foreign** 190:21,22
  193:1,5
**forget** 187:12
**forgetting** 42:24
**form** 25:1 27:2
  31:13 33:1 34:2,4
  42:8 44:24 45:12
  45:18,23 47:24
  48:6 51:15 55:22
  56:10 61:3,6,12
  61:22 63:21 64:14
  65:23 68:20 72:3
  72:14,24 73:3,14
  74:6,14,20,24
  75:16,21 76:3,7
  76:12 77:2,5,14
  77:19 78:13,17,21
  80:16,21,25 81:9

81:14,21 82:13,19
  84:2 85:22 87:7
  89:6 94:6 95:23
  96:23 97:5,20,22
  98:5 99:6 102:14
  105:11,15 106:10
  107:5,10 108:22
  108:24 109:1,2,24
  112:17 113:13
  115:11,25 116:9
  116:19 118:19
  119:9 121:8,11
  125:2 129:9,12
  130:16 135:12,16
  135:21 136:20
  137:16 142:9,18
  142:24 143:9,14
  143:14,24 144:15
  145:17 146:8,17
  146:23 147:5,15
  147:21 148:5,24
  149:1,5,10 152:22
  155:22 158:1
  160:14 171:10
  181:19 187:3
  188:14 190:7,16
  190:24 198:3,15
**Formally** 104:20
**formation** 11:22
**former** 140:18
**forth** 13:1,5 19:5
  32:5
**forthcoming** 87:22
**forward** 137:13
  143:4 145:24
**forwarded** 91:16
  91:18,24 111:13
  112:10
**found** 130:19
  167:14
**four** 11:18,25 23:4
  78:4 92:12 137:11
  152:12,14 153:8
  153:18,24 155:4,4
  162:9 170:15
  174:19 183:14
  185:25 188:22

**fourteen** 193:14
**fourth** 36:3 124:15
  170:15 194:25
**fraction** 122:17
**free** 45:16 185:6
**front** 94:2 96:16
  98:8 196:22
**fulfill** 187:3
**full** 29:25 117:11
  123:18,18 124:15
  128:18 133:4,18
  141:12 164:8
**fully** 141:14 153:14
**full-time** 90:20
**function** 104:25
  109:7
**functions** 15:9
  63:17 64:22 65:1
  109:9
**fund** 134:8 196:11
  196:17
**funding** 196:25
**further** 71:4,4
  97:16 156:8 163:9
  164:24 197:7
  199:2 202:24
  203:2
**future** 71:5 129:4
  145:15 189:12
**F-a-r-n-d-o-n**
  28:17 58:14
**F4** 11:18

**G**

**gas** 5:21 7:5,16
  66:6 71:23 121:13
  126:13 130:6
  132:16 134:24
  135:2,18,25 136:9
  136:11,16,18,22
  137:13,20 138:2
  144:18 162:9
  168:8 178:12
  183:20 184:7
  185:22 186:11,25
  188:12,21 189:11
  189:16,25 190:5

190:15 191:2,9
**gather** 17:21,24
  130:8 131:23
  138:20
**gears** 165:13
**general** 22:2 53:1
  128:8 179:12
  183:17 187:7,11
  187:12 198:19
**generally** 9:22
  21:17,18 54:20
  59:12 82:17
  122:11 128:8
  130:2,4 136:16
  140:12 190:6
  195:23
**generated** 46:22
  92:18 93:18 113:1
  119:21 159:11
  169:9 192:12
  198:24
**generating** 90:18
  121:13 188:6
**generation** 190:17
**geographic** 179:8
**geologic** 175:7
**geology** 144:8
**germane** 25:4
  162:2
**getting** 26:3 134:19
**give** 9:25 10:4
  25:19 30:11,12
  45:16 50:7 67:18
  136:15 140:5
  143:1 151:13
  158:14 166:25
  186:23 191:15
**given** 45:16 49:13
  87:21 188:10,10
  201:19 202:16
**giving** 21:2 26:18
  30:12 93:20 96:16
  156:5
**glance** 102:10
  111:2
**Glazer** 58:18,19,20
**Glazner** 8:10 174:6

**global** 179:17
**go** 10:13 16:9 17:11
    30:12 35:4 38:8
    42:12 52:7 54:6
    55:1 62:6 66:12
    69:25 73:4 77:21
    79:14 81:25 95:19
    98:13 100:1,2
    103:6 113:24
    114:3 127:9,10
    129:14 131:16
    149:20 151:5,16
    154:15 166:8
    171:11 172:21
    173:15,17,17
    180:24 188:6
**goal** 192:20,25
**goals** 190:4,9,23
**goes** 42:22 54:6
    108:11 163:15
    164:7 196:10
**going** 10:3,3,14
    12:8 19:5 30:2,9
    36:3 45:11 52:7
    52:25 54:8,21,23
    57:4,6,7 68:3 84:1
    93:4 101:23 106:8
    124:14 126:11
    130:25 143:4
    145:25 147:24
    149:12 151:4
    154:16,20 160:5
    160:11,18,19,19
    160:21 162:25
    165:13,24 169:17
    169:21 186:20
    192:5
**GoM** 8:5,8 66:22
**good** 55:3 57:8 78:2
    78:2 97:15 104:21
    104:24 166:11
    176:21 197:16
**Gotcha** 80:5
    164:16
**government** 7:22
    24:6 72:15 101:12
    104:4 106:7

112:11 115:21
    116:7 119:22
    139:4 140:3
    141:11 158:16
    182:12 190:18
    195:5
**governments**
    157:15 159:14
    191:10 195:16
**Govt** 4:17
**Grandburn** 103:25
**grant** 185:14
**granted** 184:14,21
**Grayburn** 103:25
**great** 35:24
**greater** 69:10
    180:9,10 181:24
**greatly** 93:4
**ground** 114:3
    165:21 176:24
**group** 15:11 28:19
    84:16,25 85:5,12
    101:3 117:21
    127:19 129:24
    131:9 140:23
    148:1,8
**groups** 64:9
**growing** 135:22
**guess** 25:5,21 29:4
    33:6 38:1 83:9
    89:21 94:21 98:8
    101:7 116:20
    126:18 131:17
    132:24 136:18
    141:10 162:11,16
    170:14 183:3
    194:1
**Gulf** 1:4 7:18,20
    9:3 14:22,23 15:2
    22:17 37:11 45:4
    55:14 58:18 69:9
    117:17 119:3
    125:6,16,25
    128:20 129:4
    132:15 134:24
    179:9 184:10
    186:11,25 188:21

189:11 190:15
    193:20 198:7,13
    198:17,24 202:4
**guys** 92:24
**G-l-a-z-e-r** 58:20

**H**

**habit** 155:17
**half** 59:15 137:9
    152:12,14 153:8
    153:19,24
**halfway** 164:13
**halt** 5:2 66:23
**Halting** 7:17
**hand** 201:19
**happen** 33:3 56:13
    139:1
**happened** 12:16
    31:12 32:14,18
    48:4 56:8,14 62:8
    74:2,7 86:19
    112:22 115:24
    154:7,10,13
**happens** 97:23,24
    119:14 139:2
    141:9
**happy** 70:20 151:2
**hard** 174:8
**Hayes** 141:16
**HCG037-003148**
    5:18
**HCG037-003176**
    5:18
**HCG300-007864**
    6:4
**HCG300-007866**
    6:4
**head** 14:5 64:8
**health** 53:19,19
**hear** 22:2 25:7
    81:15 138:22
**heard** 81:11 106:23
    109:15 156:11
**hearing** 7:21 139:3
    141:5
**held** 15:23,25 76:5
**help** 24:6,9 25:19

55:6 58:6 60:2
    68:4 84:15 88:3
    89:7 98:10
**helpful** 57:3
**helps** 89:11
**hesitant** 87:25
**hesitate** 166:3
**Hi** 176:22
**Hicks** 104:1 106:22
    106:24
**high** 179:23
**higher** 47:23
**high-profile** 115:9
    115:19,22
**Hill** 50:19
**hindsight** 33:12,24
    93:24 94:4 96:18
    118:17 123:5
    128:3 152:19
**hint** 47:25
**hired** 104:11,13
**historic** 196:12
**history** 169:7
    198:23
**hitting** 86:2
**hold** 186:20
**holding** 181:4
**homework** 178:25
**Hopefully** 25:9
**hoping** 47:22
**HORIZON** 1:4 9:3
    53:20 62:13 135:1
    135:8 141:17
    143:12,22 145:6
    145:10,16 171:4
    202:4
**Hornbeck** 6:2,5
    72:21 75:10
**hotel** 24:17
**hour** 59:16
**House** 7:22 106:4,9
    106:13,19 107:1,4
    115:14 139:5
**Houston** 203:11
**huh** 21:9
**human** 53:19
**Hundred** 7:23

**hydrocarbon**
    198:21
**hypothetical** 152:8
    183:17

**I**

**idea** 30:4 39:24
    49:21 105:21
    119:7
**identified** 22:9
    176:1
**identify** 34:25 45:5
    102:1
**identity** 201:16
**idle** 118:11,14,15
**idling** 156:18
**ignore** 119:24
**II** 2:11
**Illinois** 2:13
**immediate** 145:13
**impact** 4:12,16
    105:8 119:23
    127:15 140:17
    144:25 145:9
    160:10 162:10
    163:13,20
**impacts** 7:17 26:21
    29:9 33:22 45:6
    51:1 96:13 97:3
    120:5 127:19
    129:3 157:2,2
    159:24
**implementing** 69:5
**implication** 61:17
**implications** 51:23
    142:14 190:21
**imply** 136:4
**import** 190:21
**important** 115:18
    119:13,20 144:6
    172:4
**imports** 193:8
**impose** 66:19 143:2
    144:1
**imposed** 39:13
    73:19 81:24 82:10
    83:6

**impossible** 163:12
163:19
**impression** 44:17
47:21 75:22 81:22
**improve** 66:5
**improvement**
121:18
**improvements**
196:25
**IMS155-006042**
6:22
**IMS155-006045**
6:22
**IMV200-000843**
5:7
**IMV200-00866** 5:8
**incident** 55:11
62:13 109:19
110:3 134:9 143:8
**include** 121:25
142:16 145:4,8
167:5,8,12 192:20
192:25
**included** 32:3,3
58:23 59:22
102:17 146:20
148:23 169:14
174:23 186:13,14
**including** 29:23
48:15 81:7 94:10
135:3,5 142:14
194:12
**income** 31:7 159:13
**inconsistent** 117:20
117:22
**incorporated**
118:13
**incorrect** 152:20
**increase** 99:2
141:18 161:6
188:21 189:10,14
189:21,22,24
192:21 194:3
**increased** 5:6 65:16
147:3,19 160:18
161:23 190:18
**increases** 161:5

188:17
**incremental** 121:18
**indemnitor** 187:9
**independence**
190:6
**independent** 55:18
**INDEX** 3:1
**Indian** 194:19
**Indians** 194:20,23
**indicate** 99:17
170:10
**indicated** 46:4
111:23 167:15
**indicates** 100:7
193:12
**indirect** 31:8 49:6
156:17 159:12
163:24
**indirectly** 48:20
**indistinguishable**
111:23
**individual** 125:3
187:18 194:19
**induced** 31:9
156:18 159:12
163:24
**industries** 157:15
**industry** 72:12
133:19,22 134:4
134:24 135:10,18
137:15 138:1
147:14 159:9
**industrywide** 146:6
146:9
**infer** 173:11
**informally** 49:24
**information** 7:6
8:12,14,15 15:15
19:6 22:15 23:23
28:13 49:24
117:15 125:19
130:6 172:17
174:8 175:18
178:19,20 179:13
192:15
**infrastructure**
196:25 198:23

**initial** 31:9 41:11
62:19 63:25 74:18
144:19 152:9
**initially** 34:1,13
62:9 158:5 182:19
**initiated** 72:13
**initiatives** 161:1
**injection** 71:24
**injunction** 74:18
74:23 75:11,15,23
**input** 167:8 183:6
192:11
**inputs** 38:17
**Input/Out** 160:9
**Input/Output**
157:15,21 158:15
159:14 160:4,17
161:10,22 164:22
**insight** 175:15
**insights** 91:13
**inspections** 64:16
**installed** 71:21,22
**instance** 160:4
**instructed** 55:12
56:6
**instructing** 86:25
**instrument** 201:17
**integrity** 81:8,19
**intended** 91:9
**intent** 143:17,18
**interacting** 43:14
**interactions** 110:2
**interagency** 37:9
48:23,24 49:7
**interest** 44:18,21
98:7 138:23
**interested** 15:10
108:6 203:3
**interests** 50:22
**interim** 6:10 79:22
80:4
**Interior** 5:5,13,14
5:20 6:17 7:3
8:17 12:3,5 13:6
20:3 21:21 27:17
27:21 29:18 47:11
55:12,15 56:5

61:19 65:15 66:5
66:18 68:11,15
69:2 73:12 74:5
78:10 80:14 81:3
86:12 104:22
131:20 138:23
189:24 191:8
193:13,19
**Interiors** 6:17
**Interior's** 4:19
19:11 20:7 47:13
65:22 190:5
**interject** 92:20
**internal** 114:23
**interrupted** 96:14
**intervention** 71:23
**interview** 12:18
174:6
**interviews** 24:5
57:21 58:2,2,5
60:1
**Introduction**
124:12
**investing** 198:7,13
198:17
**investment** 137:14
138:8
**invoke** 198:16
**involve** 15:1 185:4
**involved** 15:3
27:11,13,14 28:15
31:20 43:5 56:24
57:1 58:9 69:15
114:5,8 115:2
187:19
**involvement** 16:23
26:12,16,17 29:12
37:7,19,21 131:8
131:9,11
**involves** 122:13
156:15
**involving** 58:7
143:17
**in-person** 57:24
**In-Plan** 157:14
158:10
**issue** 4:4 49:5 51:6

51:17 58:1 73:25
83:11 149:2
**issued** 55:24,25
56:23 69:7 73:12
73:13 82:14 84:18
86:16 184:14
185:13 193:19
**issues** 50:22 51:21
58:10,22 60:15
**issuing** 55:13 56:6
60:14 88:24
**items** 127:2 147:2

**J**

**J** 1:4 2:11 202:4
**January/Februa...**
4:5
**job** 97:19 120:8
121:13,14,21,21
125:15 137:14
164:3,7,8,14
166:4,21 188:17
**jobs** 12:4 29:7 31:7
33:21 119:20,20
125:22 126:4
164:19
**joined** 166:13,19
**jointly** 176:4
**Josh** 107:13,13,16
107:23 108:1
**Joshua** 109:13,14
**Journal** 4:3
**Ju** 104:7
**judge** 1:5,5 75:8,20
75:22 76:5 168:2
202:5,5
**judgement** 45:21
**judgment** 136:6
188:15 190:25
**Jully** 104:7,9,24
105:7 107:12,15
107:22 108:11
**July** 4:17 5:14 44:5
68:10 76:16 77:1
94:19 98:16,22
101:2,11,13,18,24
103:9,12,13

104:25 105:19
106:3
**June** 1:10,16 4:13
4:20 5:22 7:23
8:3,12 9:1 13:23
73:7,19 87:13,15
88:7,16 89:14
90:10 91:8,15
92:5 94:14,18,25
98:22 101:2,9,17
101:24 102:8,13
107:17 108:10
112:15,21 113:1
139:3 140:2,9,19
144:20 151:17
155:7 156:6 158:6
162:22 200:3
202:9
**Justice** 2:3,5 18:10
21:20
**justification** 163:16
**justified** 163:7
**justify** 163:9
**J-u-l-l-y** 104:7

**K**

**K** 2:17
**Kateri** 202:11
203:7
**Keep** 36:3
**keeps** 195:5
**Ken** 5:15 6:3,5,19
**Kenneth** 6:3,5
**Kevin** 109:3,5,6
**key** 173:24
**kind** 9:20 15:9
24:20 44:21 46:7
46:10,22 50:8,15
59:1 60:1 63:19
144:23 158:17
161:4 174:6
186:11 187:7
189:16
**kindly** 49:12
**kinds** 130:2 132:22
146:20
**KING** 2:4 171:18

**Kirkland** 2:12
177:2
**knew** 106:18
**know** 10:7 13:22
15:1 23:14 24:24
25:25 30:3,11
31:14 34:7 39:23
40:6 41:20,23
42:1,2,5,6,15,21
42:21,22 46:20,22
46:23 49:18 50:25
51:1 52:21,22,24
54:19 55:19 60:22
61:1,7 72:19
74:21 76:10,13,13
76:22,25 77:3,4,6
77:9,12,15,18
78:10,14,16,22
80:19 81:2 84:7
84:14,19,20 85:10
85:19 87:2 89:3
89:12,18,21,22,24
90:7,15 91:18,20
91:22 92:6,7,11
92:11,24 93:10,13
93:14,17,19 94:13
94:21 96:20 97:17
98:20 99:12
100:13,18,24,25
101:1,22 102:4
103:16 105:13,19
105:20 106:21,21
107:13 109:3,14
111:4,8,11,12,15
112:5,8,9,20
113:3 114:18,25
115:3 117:1,5
120:18 121:16
126:22 127:5
130:2,3 133:10
134:5,12,17,18
140:20 144:17
145:23 147:6,10
147:17 148:11
149:7 151:9 152:2
152:14 156:8
159:16,23 160:1,2

161:14 170:25
171:2,7,21 173:10
173:14,18 181:17
186:3 188:4,8,9
191:1 193:8,15,25
**knowledge** 55:25
61:16 67:1 81:10
131:9 134:2
177:21 178:8
**known** 51:11,22
91:2 94:1 96:24
201:15
**Krisha** 4:15 103:25
**Kunkel** 109:3,5,6

**L**

**laboring** 88:13
**laid** 33:19 96:25
119:15 120:1,4
**laid-off** 120:5
**Land** 179:7 196:10
**Lands** 183:2
**landscape** 99:11
**Langan** 2:11 3:8
9:9 12:9,12,16
13:14 16:12 17:7
17:10,11 18:3,8
20:1,4,9,11,24,25
22:1 25:5,9,14,15
27:3,7 29:24
31:15 33:4 34:3,8
34:15 35:20 37:1
37:4 38:12 42:9
45:8,14,20,25
46:3 47:13 48:3,9
51:14 52:1 54:10
55:10,20 56:1,8
56:12 57:3,17,22
61:1,5,8,13,18,24
62:6,16,22 63:8
63:14,18,23 64:24
65:10,21 66:1,12
66:15,22 67:2,6
68:8,21 69:18,25
71:14 72:4,8,15
72:21,25 73:4,7
73:15 74:2,8,15

74:22 75:3,6,19
75:24 76:4,9,15
77:1,4,8,16,21,25
78:16,19,22,25
80:9,19,22 81:2,7
81:11,17,25 82:6
82:17,21 84:4
85:9,16,19,23
86:9,18,24 87:2,3
87:11 89:7 92:22
93:3,10 94:13,19
95:19,24 96:5,10
96:22 97:1,4,12
97:21,25 98:8
99:8 102:18,21,24
103:6 105:13,18
106:12 107:7,11
108:25 110:1,11
110:14,17,20
111:18 112:19
113:15 115:16
116:4,11,20 117:1
117:5,9 118:5,9
118:16,21 119:2,7
119:11,16 120:2
120:14,20 121:2,6
121:10,15 123:2,9
124:6 125:4,12
126:10,18 128:8
128:12,17 129:11
129:14 130:18
131:6,23 132:21
133:14 134:6,12
134:16 135:14,20
136:7,14,24
137:19,25 138:10
138:18 140:16
142:1,16,20
143:11,21 144:10
144:24 146:3,11
146:19 147:3,6,12
147:18,24 148:7
149:3,7,12,20,24
150:2,5 151:1,7
151:12,15 153:9
154:25 156:2
158:2 160:3,16,23

161:7,19 162:6
164:2,24 165:23
166:22,25 169:6
171:11 174:4
176:18 191:22
198:3,15 199:2,6
**Langan's** 186:17
**language** 70:10
**large** 130:9 133:22
136:12 159:22
**largest** 195:10
**LaSalle** 2:12
**lasted** 154:4
**lasts** 181:9
**late** 94:18
**law** 16:21 165:11
**lawyers** 21:21
22:24 23:3,12,15
148:16
**layoffs** 133:22
**LA-DNR** 5:4
**lead** 73:1 138:4
**Leading** 111:8
**learn** 20:25 21:9
75:14 83:25 175:5
**learned** 11:22
84:11
**lease** 17:17 22:16
130:10 158:19,21
159:7 181:5,6,9
181:22 182:2,4
183:18 184:17
187:14
**leases** 5:22 7:5
73:22,25 168:9
176:4 179:24
184:13 185:13
**leasing** 14:16,21
64:18 65:4 130:10
161:17
**leave** 130:7
**leaving** 169:5
195:16
**led** 115:20 137:21
**Lee** 6:3,5
**left** 11:11 47:21
179:20

**left-hand** 14:2
**legal** 49:25 50:9
  51:22
**lends** 173:2
**length** 29:11 153:7
**lessee** 182:11
  183:18 187:2,8
**lessees** 5:21 7:4
  69:8 73:11 181:5
  184:22 186:13
  190:19
**letter** 139:10 140:2
  140:9,17
**let's** 16:9 18:20
  19:16 26:23 34:23
  36:21 38:8 55:1
  66:12 68:21 73:5
  75:3 103:6 111:16
  117:9 161:18
  168:11 171:11
  172:3,10,13
  173:12,12,17,19
  174:9,13,25
  175:10,20 176:23
  178:14 179:16
  180:24,24 182:5
  185:22 189:2,4,4
  191:20
**level** 182:23 189:16
**levels** 180:17,18
**liaison** 106:18
**life** 47:7
**lift** 80:14
**lifted** 80:24
**lifting** 81:3
**liked** 51:12
**likewise** 166:2
**limited** 27:5 142:10
  146:12 160:2
**Lindsey** 103:25
**line** 17:9 49:9 54:9
  63:12 121:6
  168:12 200:4
**lines** 49:10 192:13
**lingered** 97:8
**list** 19:17 191:18
**listed** 51:18 54:6,13

**lists** 170:16
**litigation** 17:4 51:7
  72:12
**little** 11:2 33:4,9
  50:1 79:2 87:24
  89:11,12 93:25
  97:7 99:12 147:16
  165:14 192:14
**live** 9:15
**LLP** 2:12,16
**local** 191:10 194:14
  195:16
**located** 110:6
**locations** 159:10
**logical** 163:9
**logistical** 11:17
**long** 15:23 30:24
  59:12 85:10 138:4
  151:24 155:9
  159:23 166:7
  181:13 189:12
**long-lasting** 138:8
**look** 12:20 17:14
  18:20 22:12 32:8
  34:23 35:3,23
  36:21 38:13 39:20
  52:6 53:6 65:11
  65:21 67:19 68:5
  68:21 75:3 79:19
  82:2 84:12 88:23
  99:10 108:2 123:9
  128:17 136:15
  140:1 142:6
  150:21 158:20
  161:13 170:14,15
  185:8 194:24
  195:4 196:21
**looked** 29:5 38:22
  76:16 110:22
  112:1 142:13
  149:3,6 162:11
  166:12
**looking** 41:9 53:12
  79:22 101:12,17
  110:20 130:20
  145:24 162:6
  164:14

**looks** 13:23,25
  16:15 65:24 124:5
  155:6,9,12 180:20
  183:9 184:11
  185:23
**loss** 131:3
**losses** 125:16 129:2
**lost** 120:8 125:23
**lot** 30:18 33:20
  44:11,14,25 54:21
  127:2 136:12
  166:8
**Lotterman** 2:16
  3:10 155:24 165:9
  165:10 172:9,15
  174:11 176:10,21
  177:8,10 178:16
  178:18 181:23
  188:16 189:2,18
  190:9,13,23 191:1
  191:17,20,23
  192:1,20 193:4,11
  193:18,25 194:10
  194:18,24 195:9
  195:14,22 196:3,8
  196:12,16,21
  197:5,7 199:3
**Louisiana** 1:1,15
  7:16 16:14 75:10
  124:21 126:13
  135:3 162:8
  194:12 202:1
**low** 136:11 137:10
**lower** 36:9 47:23
**LP** 170:20
**lunch** 150:22 166:8
  166:9 173:13
  176:11,17
**luring** 169:19
**luxury** 118:18
**L.L.C** 6:3,5

---

**M**

**M** 56:6
**Macondo** 55:11
  74:3 76:22 134:9
  143:8,22 145:10

145:14
**macroeconomic**
  157:14
**MAG** 1:5 202:5
**magnitude** 50:8
**magnitudes** 169:8
**MAG-Plan** 157:2
  157:12,13,25,25
  158:10,15
**main** 33:11 47:11
  47:14 185:15
**maintained** 182:23
**major** 62:24 102:5
**majority** 112:20
  161:21
**makers** 147:18
**making** 7:20 34:6
  48:11 86:15 94:24
  95:6 151:7 184:23
**manage** 14:16
**Management** 4:4,6
  5:20 6:8,13,15,19
  7:3 10:18 55:13
  62:20,21 69:3
  78:5 104:18
  139:14 140:18
**managing** 130:9
**manner** 143:5
**March** 4:10 5:6
  12:17
**MARHALL** 1:13
**mark** 12:8,13 13:11
  16:10 35:11 36:21
  38:9 55:1 65:5
  66:13 68:6 73:5
  75:4 77:22 79:14
  80:6 82:1 110:9
  111:16 138:15
  154:16 171:19
  172:3,13 174:9
  178:14 191:20
**marked** 12:15
  13:13 16:11 18:21
  35:19 37:3,5
  38:11 52:9 55:8
  65:9 66:14 68:7
  73:6 75:5 77:24

80:8 82:4 110:16
  111:17 113:16,25
  126:17 129:15
  131:17 138:16
  154:24 172:8,14
  174:10 178:15
  191:25
**market** 17:16,18
  122:13 123:1
**marking** 126:16
**Marshall** 1:9 3:7
  4:9 8:3,11 9:2,6
  9:14 57:18 199:8
  200:2 201:1,5,15
  202:8,14
**MARTIN** 2:11
**MARTOS** 2:11
**material** 150:8
  169:14
**materials** 166:12
**matter** 85:16 87:3
  153:22 179:12
**matters** 144:2
**Matthew** 8:10,11
**maximize** 198:5,10
**McCutchen** 2:16
  165:11
**MCF** 136:23 137:4
  137:5,9,11
**McWilliams** 104:7
  104:9,24 105:7
  107:12,16
**MDL** 1:3 202:3
**mean** 14:25 19:6
  20:4,6 26:14 29:4
  29:21 32:23 34:5
  42:14,15,16 44:13
  47:16 53:1 57:23
  85:24 87:16 97:17
  103:12 112:18
  130:14 135:20
  146:3,9,24 159:22
  177:7 181:3
**meaningful** 124:20
**meaningless** 85:25
**means** 164:3,8,14
**meant** 108:8

measure 159:25
measures 5:6 6:10
  65:16 73:19 92:18
  159:13 169:9
  174:23
measuring 159:24
media 50:19
meet 22:24 23:20
meeting 47:9
meetings 23:2,19
member 114:10,11
  114:15
members 31:19
  114:19
memo 76:16 89:3
memorandum 5:9
  5:16 6:18 68:10
  71:15 80:10 84:8
  152:9,10
memory 88:5
memory's 55:3
men 158:24
mention 163:2
mentioned 30:14
  41:13 43:4 48:21
  58:9,14 64:9
  67:16,24 72:9
  74:15 101:21
  118:7 147:2 153:1
  174:2,5 186:16
mentions 170:19
met 23:12,14,15
  47:6
metadata 110:22
  112:1
meters 180:9
methodology 162:1
Mexico 1:4 7:18
  9:4 14:22,23 15:3
  22:17 55:14 58:18
  69:9 117:17 119:4
  125:6,25 128:20
  129:4 132:15
  134:25 186:11,25
  188:21 189:11
  190:15 193:21
  198:8,14,17,25

202:4
Michael 5:15
Michele 8:11
mid 21:4 27:8 28:8
  59:11
middle 54:4 128:24
  135:6 164:11
Mid-Continent
  7:16 162:8
mill 193:14
million 122:14
  136:24 183:10
  185:23,25
mind 12:9 13:12
  16:10 36:22 40:25
  52:6,19 53:4 55:2
  78:1 82:1 84:15
  85:10 110:10
  126:15 140:1
Mineral 55:13 69:3
  140:18
Minerals 5:20
  62:20
minimize 53:18
minimum 180:16
  183:1
minimums 180:4,8
minor 63:25
  112:22,22 113:3
minority 196:1
minute 38:12 65:10
  82:2 140:6 165:19
  168:12 177:12
minutes 59:14
  102:22 112:1
  129:19
mischaracterized
  94:8
misinterpreted
  57:23
misleading 119:10
  121:9
mistaken 129:16
  180:3,8
mitigate 53:18
mitigated 120:23
mitigating 145:19

MMS 4:12 5:9 56:6
  60:12,13,16 61:5
  61:8,20 62:1
  63:19,24 64:11
  66:19 73:12 88:22
  88:24 89:2 104:20
  140:19 141:13
  166:13,19
MMS's 62:16
model 31:5 157:12
  157:13,14,16,25
  158:10,15,15
  160:4,9
Modelling 157:22
  161:22
Models 159:14
  160:17
modest 96:4 122:7
  189:20
modifications 97:3
  112:23,24
moment 35:23
  92:21 140:5
  149:23 172:23
  178:2 192:2
monetary 186:8
money 159:17
  194:7 195:10,11
  195:15,15,23
  196:1
month 156:10
monthly 183:19
months 4:13 7:11
  7:14 36:5 43:24
  69:11 79:4,5 83:5
  97:7 98:17 100:20
  103:10 106:8,15
  110:7 111:20
  113:18 115:9
  116:5 118:12
  127:7 139:21
  141:1 151:22
  152:12 153:8,19
  153:19,23 161:9
Mor 86:21
Moratoria 20:18
  26:22 29:8 30:16

30:25 31:4,6
  33:14,17 39:12
  40:22 67:23 68:2
  95:8 145:12
  146:15
Moratorium 19:12
  20:3,7,23 26:13
  26:17,25 27:6
  29:13,19 32:11
  33:25 37:10 45:3
  54:18,19 66:19
  67:3,12 68:14
  69:15,20 71:11
  72:1,11,16 74:19
  74:23 75:11,15,24
  75:25 80:15,24
  81:4 82:23 83:5
  83:12 84:1,11
  85:1,11 86:21
  87:4,12,22 93:22
  94:9,15,17,22
  95:2,12,14,21,22
  97:10 107:18,19
  108:12,13,21
  117:16 118:11
  119:5 120:9,24
  122:3,7,15 123:11
  123:22 124:8
  125:24 126:5
  127:16,20,25
  128:14 132:11,15
  132:25 134:14
  141:16 142:6,8,11
  142:21 143:1,18
  144:1,16,17 145:2
  146:4,6 149:8,8
  151:21,24 152:10
  153:4,13 160:23
Moratorium's
  143:6
Moratorium-bas...
  148:23
morning 156:13
  166:7
move 97:18 188:4
MTLs 39:13
multipage 35:22

multiple 41:10,15
multiplied 158:6
  184:2
multiplier 156:16
  156:20 158:4,9
  162:9 163:8,16,25
mundane 169:17

N

nail 68:4
name 9:12 26:8
  42:24 62:7 63:4
  63:16,20 106:23
  165:10 170:17
  197:16 200:2
  201:17
named 15:20 16:6
  28:1 43:8 58:18
names 46:21 62:20
  103:24 104:1
narrative 30:12
  32:9
narrow 89:11
  120:5
narrowed 68:1
  144:22
nation 160:1
national 5:21 7:4
  109:19 110:3
  121:12 190:20
nation's 191:2,5
natural 2:5 8:14
  63:1 64:9 136:18
  137:13,20 138:2
  178:21 191:2
nature 49:23 53:17
  92:12 104:15
  158:12,14 162:3
  163:2,6
Naval 11:15,16,17
near 189:12,12
nearly 194:19
near-term 128:20
  129:2
necessarily 82:15
  115:6 116:3 126:8
necessary 71:18,20

158:23
**need** 19:2 44:23
  67:19 97:15
  102:18 115:15
  150:24 167:19
  169:18 185:14
  188:25
**needed** 143:2,19
  185:2
**needless** 156:4
**negative** 33:25
**neither** 202:24
**nervous** 87:16
**net** 182:10 183:23
**netback** 183:25
  184:1,4
**never** 36:17 45:13
  51:4 52:23 67:9
  68:12,15 79:12
  81:11 97:23,23
  106:23 107:7
  108:19,19 109:15
  133:22
**new** 1:15 5:3,11
  11:5,8,23 23:10
  39:13 40:13,20
  55:14 60:14,17
  61:20 63:7,15
  64:13,15 73:19
  74:1 81:4,18,22
  82:10,14 100:11
  132:16 146:16,19
  146:20 147:7,13
  147:20 148:3
  158:19,19 159:16
  160:5,10 161:17
  161:17
**news** 8:17 167:9
**newspaper** 75:18
**nice** 12:17,23
**night** 24:21 126:10
**non** 185:7
**nonprivileged**
  169:11
**nontax** 195:10
**non-event** 63:19
**non-revenue**

**184:12 185:7,11
**normally** 160:17
**North** 2:12 135:3
**Northern** 135:3
**Norton** 4:10
**Norview** 9:16
**NOTARY** 201:23
**note** 93:1
**notebook** 12:7 29:3
**noted** 201:2
**notes** 24:9,12,14,18
  24:23 25:2,11,15
  59:17,21,22 150:1
  150:7,20,24 151:2
  151:4,12 165:19
  169:13
**notice** 5:21 7:4 69:7
  73:11 79:21 87:21
  185:18
**noticed** 33:12
**notified** 26:5
**November** 7:8,8
  8:17 82:10,18
  83:7
**no-sale** 161:16
**NTL** 7:4 69:8 143:3
**NTLs** 66:11 81:24
**number** 29:6 30:21
  30:23 33:16 34:25
  35:12,16 36:9
  46:13,13 50:23
  55:3 94:8 99:2
  109:20 110:14
  111:20 117:13
  154:19,20 164:19
  164:21 172:6
  194:18 195:17
**numbered** 110:17
  170:14
**numbers** 32:2
  47:23 48:1 117:24
**Numeral** 70:4
**NW** 2:17
**N.W** 2:6

———————
**O**
———————
**O** 15:23

**oath** 201:16
**Obama** 7:21 60:16
**Obama's** 7:17
  192:16
**object** 17:6,8 18:1
  18:5 25:1 27:2
  31:13 33:1 34:2,4
  42:8 44:24 45:12
  45:18,23 47:24
  48:6 51:13,15
  54:8 55:22 56:7
  56:10,18 60:23
  61:3,6,12,15,22
  62:5 63:3,13,21
  64:14 65:18,23
  66:8,21,25 68:20
  69:16,23 71:12
  72:3,6,14,24 73:3
  73:14,23 74:6,20
  75:16,21 76:7,24
  77:19 78:13 80:16
  80:25 81:6,9,21
  82:13,19 84:2
  85:7,13,22 89:6
  94:6,16 95:17
  97:20 98:5 99:6
  102:14 105:11,15
  106:10 107:5
  108:22 109:24
  112:17 113:13
  115:11,25 116:9
  116:22 117:3,7
  118:2,4,6,19,24
  119:6,9,18 120:13
  120:17,25 121:8
  123:8 124:4 125:9
  126:6 128:5,10,15
  129:9,12 130:16
  131:22 132:19
  133:11 134:1,11
  134:15 135:12,16
  136:10,20 137:16
  137:23 138:3
  140:14 141:24
  142:9,18,24
  143:14,24 144:15
  145:17 146:8,17

**147:21 149:1
  152:22 155:22
  158:1 159:19
  160:14,22 161:12
  161:24 163:22
  171:10 181:19
  188:14,24 189:13
  190:7,24 193:7
  194:9 195:19
  198:3,15
**objecting** 46:1
**objection** 34:10
  63:12 85:18 96:1
  96:21 125:2
  192:18 193:17
  194:16 198:16
**objections** 72:18
  78:23 85:25 147:9
  190:11
**objective** 187:1
**obligate** 187:8
**obligated** 183:19
**obligations** 187:3
**obtain** 22:15 23:23
  156:17
**obvious** 44:22
**obviously** 21:7
  89:15 105:20
  144:2
**Occasionally**
  167:13
**occasions** 167:10
**occur** 23:5 31:23
  77:17 122:22
**occurred** 31:3 33:9
  44:1 62:12 82:18
  88:19 98:1,11
  171:4 175:9
**occurs** 153:18
**Ocean** 4:3,4,6 6:8
  6:13,18 7:3 10:18
  62:21 78:5 104:17
  139:14
**OCS** 5:10,22 60:16
  158:12 175:15
  176:1 183:2
  190:20 191:3,6

**October** 6:21 80:10
  80:22 83:8 152:11
  193:13
**office** 6:9,13 8:14
  8:16 12:2 14:11
  14:14,20 15:16,19
  26:21,24 27:19,23
  31:11,19 32:1,10
  35:1,8 36:12,19
  37:7,18 38:25
  40:4,5 41:22,25
  42:4 43:5 45:9
  46:25 47:2 48:18
  49:25 50:20 63:1
  63:4,6,7 83:14
  91:16 95:11 97:14
  101:23 103:11,19
  105:2,9 106:15
  111:13 115:13
  121:24 138:11
  167:6 177:21
  178:8,20 192:13
  192:14 201:19
**officer** 202:15
**offices** 47:14 148:9
**office's** 34:9 35:1
  36:12 98:16,21
  107:16
**offset** 34:21
**offsetting** 34:12
**offshore** 5:16 6:2,5
  6:20 17:17 55:15
  64:9 66:6 81:4
  133:5 134:24
  135:2,4,18 138:5
  168:8 179:7,8
  184:10
**Oh** 42:10 92:1
  104:17 108:9
  123:6 157:7
**oil** 1:3,3 5:21 7:5,16
  7:21 9:3,3 66:6
  71:19 121:13,14
  122:14,22 123:12
  123:22 124:7,7
  126:13 130:6
  132:16 134:24

135:2,18 141:18
141:19 144:18
162:8 168:8 171:4
178:12 183:20
185:22 186:11,25
188:12,20 189:11
189:14,18,20,22
189:25 190:5,14
190:2 191:5,9
192:21 193:1,5
198:18 202:3,3
**oiling** 145:5
**okay** 9:25 10:17
11:5 12:13 13:11
15:4,23 16:9
17:10,13,24 18:8
20:21 21:16,18
22:7,11,22 23:10
23:12 24:14,18,20
25:5,9,12 26:2,23
27:16 28:4,24
29:3 30:5,9 31:19
32:22 33:8,20
34:15,16,22 36:21
37:13,18 38:5,8
38:18,20 39:18,25
40:9,21,23 41:8
41:16,21 43:1,14
44:6 45:8 46:3,24
47:9,20 48:9 49:6
51:3,22 52:5,19
53:4 54:10,17,21
54:24,25 56:1
57:3 58:4 59:25
61:18 63:1,14
64:12 66:12 67:11
67:18 68:3,5
69:18 70:3,19,21
72:8,8,25 73:4,18
74:2,15 76:9
77:21 78:25 79:6
79:7,10,11 80:2
81:11,17,25 82:21
83:3,10,10,12
84:10,24 85:9
87:11 88:16 90:6
91:23 92:2,6,8,19

93:16 94:20 95:7
95:9 96:10 98:3
98:13 99:20
100:17 101:22
102:3,11,18,20,24
104:19 107:15
108:4,9,25 110:5
110:20 111:4,25
112:4,13 113:7
115:7,20 116:4
117:1 119:23
120:3 123:7,15,20
124:2,10,17
125:12 127:9
130:13,18,22,24
131:12 132:9
133:4,17 137:6
138:10,13,14,19
139:1,3,9,19
140:1,5,7,25
141:3,12 142:1,3
142:16 146:6
147:12 148:8,22
149:12 151:1,11
151:14,20 152:17
154:12,15 155:20
156:2,11,15 157:9
157:11 160:3
162:6,25 165:25
166:5,9,16,18,21
167:8,11,14,19,24
168:1,7,11,23,25
168:25 169:4,16
169:19,24,24
170:7,10,25 171:7
171:20 172:21
173:6,12 174:1,9
174:16,21 175:10
175:17 176:7,11
176:24 177:11,19
177:24 178:8,11
178:14 179:7,16
179:22 180:3,12
180:15,19 181:3
181:13,17 182:1,5
183:6,8 184:8,16
185:8,18 186:6

187:5,6,25 188:10
188:19 189:2,23
190:2,9 191:5,8
191:12 192:11,16
193:4,11,25
194:12,14,24
195:1,2,3,4,14
196:3,16,21
**old** 114:3
**once** 9:19 47:6
106:3 139:2
154:18
**ones** 34:6 39:6
59:13
**one-page** 66:16
**ongoing** 71:19
**ONNR** 8:14
**ONRR** 64:23
167:12 179:13
182:14
**onshore** 133:6
**Open** 62:14
**Oper** 70:5
**operated** 146:21
**operating** 31:2
198:7,13
**operations** 69:9,10
71:17,19,20,22,23
81:4 130:10 133:5
143:4,13
**operators** 5:21 7:4
60:18 69:8 70:5
73:12,22 117:14
142:7,10,17,22
143:7 146:11,13
**opinion** 18:6 33:2
34:11 44:25 94:7
96:24 135:17
**opportunity** 25:10
**opposed** 94:10
146:10 160:20
**option** 161:16
**options** 161:15
**oral** 1:9 202:8,15
**order** 6:2,4 7:17
50:8 55:24,25
56:22,23 75:7,8

76:19 142:12,14
155:5 158:7
**ordered** 60:16
**orders** 56:21
**Org** 4:7
**organization** 63:15
64:7
**organizational**
13:18 64:13,15
**organize** 24:9
**original** 40:3 46:17
56:22 67:23 97:9
107:18 108:12
202:20
**originally** 83:4
104:11 109:9
**Orleans** 1:15 11:8
23:10
**Orr** 15:20,21,23
21:11 26:9,10,11
26:18 42:25 43:1
**OSCLA** 69:5
**OSE001-009565**
5:12
**OSE055-11910**
4:13
**OSE055-11921**
4:14
**outcome** 203:3
**Outer** 5:7,10,17,22
6:11,21 7:5 14:16
14:21,21 65:17
**outline** 25:18
**outside** 85:23 86:1
86:3,6
**overall** 31:6,7
34:17 159:24
**overestimate** 33:16
33:21
**oversight** 7:22
139:4 140:3 190:5
**oversimplify** 33:23
**overstate** 129:3
**overstating** 34:18
**overturned** 56:22
**overview** 30:11
49:13 52:2

**owner** 176:2
**Oynes** 16:6
**O'Brien** 24:1
**O-C-S-L-A** 69:5
**O-r-r** 15:22
**O-y-n-e-s** 16:8

---
**P**
**Pacific** 66:22 69:10
**page** 3:2 4:2 5:1 6:1
7:1 8:1,14 12:18
14:3 17:14,22
36:3,8 52:25 53:6
53:7,10 54:1,4,7
68:22,23 70:1,2
70:16 73:16 99:11
99:11,15 100:2,5
103:20 107:11,12
107:23,25 117:10
123:10,19 124:10
124:15 125:14,15
127:15 128:18
130:21 131:1
132:2,4,7 133:4
133:14 134:20
139:9 140:16
162:8,25 164:2,12
165:21 168:24
170:15,22 172:21
177:4,5,7,8,24,24
194:10 196:21
200:4
**pages** 18:24 24:18
78:4 127:11 155:9
170:14,16
**paging** 130:1
**paid** 31:1 134:13
158:24 179:24
**palpable** 98:4
**pan** 152:20,24
**Pan-American**
1:14
**paper** 31:11 32:5
87:14 92:5 158:6
**papers** 108:24
148:18
**paragraph** 17:14

17:24 60:9,24
61:14 68:23 70:8
70:15 99:13,16,21
100:6 117:11
123:18,21 124:13
124:15 125:15
128:18,25 132:10
133:18 141:12
156:25 157:6
164:13 193:22
194:2,10,15,25
195:4 196:22
**parameters** 95:2
108:21
**parishes** 124:21
125:3
**part** 21:2,24 29:25
30:10 42:2 74:3
93:12 98:14
116:12 121:23
135:14 140:10
142:19 157:21
158:21 164:9,9
186:10 188:16
194:23
**participants** 72:12
**participation**
175:16
**particular** 14:3
43:3 51:24 110:23
111:6 146:11
159:6 162:1
198:20
**parties** 202:25
**partly** 182:24
**passing** 105:24
**path** 11:12,12 13:1
13:6
**pause** 4:12 7:11,13
8:3 29:11 36:5
39:1 40:6,12
91:14 97:6 98:17
100:19 103:10
105:23 106:8,15
108:20 110:7
111:19 113:18
115:9 116:5,17

121:24 127:7
139:21 141:1
145:1 153:8 154:2
157:1 158:12
161:9
**Pave** 54:5
**pay** 180:1 181:7
182:11
**payable** 181:10
**paying** 181:6,10
184:18
**payment** 181:22
**payments** 182:13
186:9
**penalty** 18:11
52:13
**pending** 17:4 55:14
60:14 71:5
**Pennsylvania**
135:4
**people** 15:10 30:2
46:18,21 47:22
58:1,8 63:16
72:15 104:6 106:6
115:2 120:22
**perceived** 142:23
**percent** 43:13
77:20 99:17,18
122:19,23 182:17
182:20,21,24
183:4,16 184:3
189:23 191:4,7
194:3
**percentage** 190:1
191:1,5
**perceptions** 32:2
**perform** 15:9
**performed** 86:11
86:17 140:18
**performing** 143:13
**period** 29:10 43:22
56:20 69:11 112:7
117:16 119:5
122:25 185:5
**periodically** 180:16
**permanent** 77:17
**permanently** 77:12

125:23 129:1
**permits** 5:3 55:13
56:6,15 60:14,17
71:6 88:24
**permitting** 5:17
66:24 69:8
**person** 24:1 28:12
43:4,8 47:5 58:18
105:1,4 109:6
164:8,15 201:17
**personal** 41:18
**personally** 27:11
27:13,14,21 37:21
114:12 177:16
178:5,7 201:15
**persons** 97:13
**perspective** 120:5
**pertain** 165:16
**pertains** 171:1
173:3
**petered** 98:7
**Peters** 8:2 24:3
28:1,2 58:11
90:12 93:1 155:3
**petroleum** 2:15
15:13 135:10
**Phase** 52:13
**PhD** 11:11
**phenomenon** 138:1
**phone** 47:3 109:20
**physical** 145:9,13
**PH.D** 1:9,13 3:7
9:6 200:2 201:1,5
201:15 202:8,14
**picture** 12:23,24
189:17
**piece** 185:22
**Pillow** 4:15 103:25
**pin** 83:13
**place** 59:10 61:21
62:4,17 93:2
135:10 176:24
**plaintiff** 73:1
**plaintiffs** 74:18
75:1 148:16
**plan** 159:6
**planned** 106:19

**planning** 15:1
**platform** 94:10
96:6,11 158:25
**platforms** 33:13,15
94:8 96:7,12
**played** 131:24
**please** 9:13 10:6
11:4 16:9 55:2
65:5 68:6 77:22
79:14 82:1,3
111:16 113:24
119:16 124:1
129:15 130:21
131:16 132:8
133:16 138:13
140:6 154:15,22
156:19 166:18
169:23 170:16
174:13,25 175:10
**plus** 99:22,22
**point** 36:14 80:17
109:11 131:1
143:22,25 150:25
158:3,4 166:2
168:16 183:14
185:25
**pointed** 34:18
51:18 88:17 113:5
162:13
**points** 54:6
**policies** 160:25
169:8
**policy** 159:16 161:5
168:4 173:25
**political** 44:18,21
86:12
**politicians** 45:2
138:24
**portion** 49:14,18
52:3,21 54:15
130:9,17 184:19
196:1
**portions** 129:24
191:9
**posed** 45:1 142:23
**position** 10:24
11:14,19 15:24,25

150:11
**positive** 161:1
**possible** 32:7 87:21
89:18 105:16
120:14
**possibly** 86:1,6
89:25
**potential** 26:12
29:8 30:15 85:5
85:12 142:17
145:14 159:15
**potentially** 26:18
**pounce** 169:21
**Poydras** 1:14
**practice** 192:11
**practices** 73:20
**precedes** 103:9
**precise** 50:9,22,23
67:12 128:6 152:5
**precluded** 31:4
**predict** 144:25
**predicted** 29:7
**preliminary** 106:25
107:17 108:9
**preparation** 21:25
31:20 38:2 39:20
57:20 113:10
114:6 150:3,16
169:5,12
**prepare** 21:16,19
22:3 24:6,10
155:5
**prepared** 7:18
19:19 31:16,18
49:13 103:11
105:9,10 142:2
148:11 151:17
169:1
**preparing** 38:16
126:25 131:24
**presence** 150:12,13
150:17,18
**present** 129:3
**presented** 18:9
108:24
**preservation**
196:12

President 7:17
60:16 192:16
press 45:2 48:7
193:19 194:6
195:8 196:17
pressure 30:19
44:11,14,15,18
48:4,8 90:24
pressured 45:5
Presumably 39:16
presume 42:22
pretty 90:20
prevent 53:19
143:20
previous 8:19
57:19 111:3,24
172:18 194:4
previously 18:21
24:3 37:5 52:9
58:10,25 113:25
129:15 131:17
pre-marked 177:3
price 122:22 124:7
141:19 183:21,22
183:25 184:1,4
prices 122:1,8
124:7 136:11,16
136:22 137:13,20
138:2,6 189:21
primarily 14:20
65:2 144:18
primary 28:12
90:12 123:21
181:21
printed 14:3
prior 2:19 38:5
102:12 133:6
134:25 141:15
156:6 161:8
private 157:15
190:19
privilege 155:24
privileged 150:8
pro 184:5
proactive 161:1
probably 16:1 28:8
34:24 35:2,3

37:17 39:17 44:5
47:11 75:17 83:6
83:6,8,22 84:3
92:14 94:8 130:13
136:21 148:14,17
153:6 189:15
problematic
135:19
problems 11:17
procedures 73:21
92:15
proceeding 26:19
203:1
process 9:23 32:4
46:5 86:15 116:12
163:12 187:19,20
191:12,13
processing 184:5
produce 25:4 92:25
159:11 169:10
produced 24:21,25
25:24 35:1,9
36:11,19 39:23
48:15 59:23 89:15
90:7,8 93:5 95:11
100:22 101:8
126:11 151:2
185:6
producer 175:16
Producers 126:13
producing 127:6
159:1 181:10
184:18
product 40:25
88:10 113:17
157:21 183:22,24
184:18 185:6
production 31:3
39:11 71:17
110:22 121:14
123:1,12,23
127:15,19 128:1,4
128:14,21 129:1,2
129:4 130:6
135:25 136:9
137:21 138:9
158:24 159:4

161:17 176:5,6
178:12 181:7,7,15
181:24 184:13,20
184:24 186:11,25
188:13,21 189:11
189:21,25 190:6
190:15,17 191:10
192:21
productive 99:19
99:23 119:20
product's 183:21
Prof 142:5
professional 45:21
130:9
profit 198:5,10
profitable 198:23
profits 119:21
159:2
program 15:2
58:22 59:2 109:10
158:19 159:16
161:14,18 174:7
182:23 184:22
185:16
programs 14:12,15
14:20 15:17
195:17
project 28:22 43:16
44:10 90:16 97:18
99:23 101:24
112:16 159:22
projected 99:23
projection 32:19
83:15
projections 174:18
projects 160:19
187:18 195:24
196:5,8,13 197:1
promise 134:19
promotion 167:1
promulgated 26:22
39:10,17 56:21
79:23
promulgating
66:10
pronounce 10:20
proper 150:13,18

proportion 161:25
162:2 182:10
proportional
122:21
proportioning
176:5
proposal 159:6
161:15
proposals 162:2
proposition 167:24
198:18
prospect 175:8
protection 11:23
65:4
proved 201:16
provide 45:20,20
65:2 91:13 94:3
130:5 158:23
177:16,21 192:11
provided 19:17
21:21 31:10 38:17
46:19 130:5 178:6
178:9 192:14,15
providing 167:8
province 198:21
provinces 133:6
proximity 143:7,21
144:3,5,6 145:5
public 6:9,13 61:10
85:10 89:3 201:23
publication 12:17
publications 61:9
publicly 198:2
publicly-available
117:14
publicly-traded
197:21,24 198:4
published 65:15,19
144:19
pulled 13:23
purple 155:13,17
156:1
purpose 64:25
91:11,12,13 143:1
145:23 146:4
198:1,4,7,9,13
purposes 50:10

186:19 196:11
201:18
put 31:4 76:19
91:25 119:19
142:3 151:17
156:1
putting 28:12
187:9
P.C 2:11
p.m 149:15,18
165:4,7 171:14,17
176:16,19 197:10
197:13 199:7

_____

Q

qualities 185:13
quantities 181:10
Queens 11:5
queried 179:8
queries 179:1
question 13:4
20:14 25:16 27:4
27:7 35:25 40:4
40:20 49:17 52:16
53:8,9,14 54:13
55:21 87:5,17
88:2,4 89:10
94:14 96:15 101:8
101:22 115:20
116:2 147:25
148:10 156:24
163:1 165:24
168:17 171:18
172:19 177:16
186:17 188:7
questioning 17:9
48:10 54:9 63:12
questions 10:3,6,13
19:20 28:10 31:25
45:1,15 46:4,7,8
46:11,12,19,22
47:20,22 51:2
54:18,24 86:8
116:7,12 142:4
155:13 156:15
164:24 165:15,16
168:13 174:4

177:13 178:5
191:16 192:3
194:1 197:8,18
199:2
**Questionu(sic)** 8:4
**quick** 35:2 57:6
**quickly** 30:19
44:16 91:1 154:1
173:17
**quite** 117:24
145:18
**quo** 121:17
**quote** 70:23 71:24
174:5
**quote/unquote**
107:3
**quoting** 71:16
124:19 128:25

**R**

**R** 2:11,16 5:15
**RACHEL** 2:4
**raised** 46:4,7,8
**raising** 116:7
**ramifications**
51:23 91:14
**ramp** 154:1
**ramp-up** 153:10,14
153:18,19
**range** 89:12 90:4
**ranging** 196:24
**rare** 167:10
**Rarely** 47:4
**rate** 181:18,20
182:16,19 184:2
**rates** 180:13
181:24 182:1
184:25
**rationale** 163:10
**reach** 143:7 150:24
**reached** 32:10
117:21
**read** 35:12 37:24
37:24 38:2,5
55:18 60:24 61:14
70:20 99:12 108:5
118:22,25 124:1

134:3,3 140:5
148:17,20 177:12
178:2 180:19
192:4 201:1
**reader** 92:17
**reading** 70:14
75:17 183:8
**reads** 125:22
**ready** 25:19 26:3
58:6 59:3 60:2
**real** 128:3
**reality** 32:25 33:8
**realize** 80:4
**realized** 133:23
**really** 12:4 40:17
41:20 46:24 88:4
108:19 115:20
128:14 130:8,25
151:10 187:18
189:7
**reason** 9:25 24:24
61:13 95:24 101:7
125:10 161:3
170:13 173:13
189:6 200:4
**reasons** 6:4 70:17
75:8 76:14
**recall** 16:23,25
17:1,3,12 22:23
23:18,21 27:24
28:5 29:15 36:16
39:7 40:16 41:7
43:12,23 44:4,11
47:1,10 49:8,15
52:18 56:3 59:8
65:13,20 66:4
67:10,22 74:23
75:17 79:23 80:12
83:4 87:14 91:6
92:12 94:24 95:4
95:6 98:3,6 102:4
105:4,5,16 106:16
108:23 109:2
113:8 116:10,18
126:21,24 127:2,4
131:15 136:25
139:22 152:2

177:20 178:10
**receipts** 169:8
**receive** 178:12
187:23 188:2
**received** 11:6,9
167:15 186:10
188:8
**receives** 188:12
**Recess** 57:11 103:2
149:16 165:5
171:15 176:17
197:11
**recite** 32:9
**reclamation** 195:24
**recognize** 13:14
16:16 35:22 36:1
36:6 37:4 38:14
53:1 103:24 104:1
104:5,6,8 110:25
111:22 169:25
172:10 173:20
174:14 175:1,11
175:21 178:18
**recollection** 17:12
46:11 53:5 62:11
82:24 83:20 85:3
85:8,14 87:8,12
91:12 96:2 152:5
165:19
**recommend** 180:17
**recommended** 66:5
**reconvene** 166:9
173:15
**record** 9:5,13 12:14
47:12 53:12 57:10
57:14 86:2 90:11
93:2 103:1,5
108:5 111:25
118:22 119:1
131:4 149:15,19
165:2,4,7 171:11
171:14,17 176:16
176:20 191:24
197:10,13 202:16
**recorder** 57:7
**recovered** 137:10
**recovery** 7:20

186:12
**Recreation** 196:8
**recurrence** 143:20
**redacted** 150:21
**reduce** 192:25
**reduced** 94:12
184:5
**reduction** 128:1
160:24
**refer** 168:15
**reference** 140:17
**referenced** 8:19
108:12
**references** 107:18
116:21
**referred** 88:23
131:10 136:8
**referring** 116:23
140:20 153:12
162:18
**refers** 106:2 125:15
162:7
**refinements** 32:6
**reflect** 34:12 95:20
176:5
**reflected** 153:6
**reflecting** 150:8
**Reform** 7:22 139:4
140:4
**refresh** 165:18
**refreshing** 53:5
**regard** 122:8
128:13
**regarding** 5:2,16
9:2 53:16 105:22
113:17 175:18
**regardless** 143:7
185:14
**region** 29:9 31:8
69:10 198:8,14
**regions** 66:23
**Registration**
203:10
**regulation** 6:9,13
6:19 7:3 62:21
65:20 78:5 139:15
**regulations** 7:6

39:9,13,16 40:13
66:10 69:6 81:24
143:3 147:20
**regulatory** 61:19
74:4 143:19
146:15 148:4
**rein** 45:16
**relate** 171:25
**related** 14:17 19:6
19:20 22:9,16
40:22 66:23 71:19
87:9 116:16
145:25 173:25
202:25
**relates** 134:3 170:7
176:8 184:13
**relating** 16:21
29:17 38:24 52:13
64:16,18 66:11
67:7 164:1 174:18
175:15,25
**relation** 86:20
**relative** 32:13
**relatively** 96:7
112:25
**release** 8:17 193:19
194:6 195:8,15
196:17
**releases** 167:9
**relevance** 54:14
**reliant** 193:5
**relief** 16:22 174:20
184:15 185:14,15
185:17
**rem** 83:4
**remain** 123:2
**remedial** 121:17
**remember** 9:20
16:18 39:15 44:9
61:24,25 65:19
66:9,10 72:17,19
73:2 74:25 127:3
151:18 190:1
**Remind** 94:17
**remote** 146:21
**Renee** 15:20,21,23
21:11 26:9,10,11

26:18 42:24,25
43:1 91:19
**renewable** 64:19
109:10
**rent** 180:25 181:8,9
181:14,15
**rental** 64:22
**renting** 31:1
**rents** 181:3,4 183:9
**reorganization**
16:1,4 62:24
63:13,19
**reorient** 168:12
**repeating** 74:9
**rephrase** 166:3
171:18
**report** 15:7,17 16:3
28:25,25 29:2,5
31:16,17,21 33:12
37:9 55:15 65:22
84:13,18 91:8
95:11 98:16,21
99:12 101:8,12
102:12 103:10
114:6 118:17
124:10
**reported** 182:6,9
182:10 183:12
**Reporter** 202:12
**Reporters** 203:10
**Reporter's** 3:15
202:7
**reporting** 63:5 81:5
**reports** 14:11
101:16
**represent** 21:1 52:8
75:6 110:21 150:7
165:12
**representative**
18:15
**Representatives**
7:22 139:5
**represents** 152:11
171:2
**reputation** 167:21
**request** 25:6,8,13
26:20 27:18,23

40:5 41:5 51:6
83:14,18 84:17
85:5,11,20 87:5
90:25 151:3 170:3
175:4 177:4,17,22
178:1,3,6,9
202:18
**requested** 108:1
187:21
**requester** 42:22
**Requests** 52:12
**require** 21:23 74:1
**required** 146:21,25
147:4,6,8,11
**requirement**
187:24
**requirements**
39:12 63:5 74:1
81:5,18,23 82:11
82:15 143:2
146:16,20 147:1,4
147:13 148:3
185:14 188:3
**rescission** 152:10
**reservoirs** 132:16
**resource** 14:18
15:17 63:1 64:19
178:21 184:25
**resources** 2:5 7:7
8:14 14:11,15,20
15:20 64:9 82:12
145:18,21 146:1
159:1
**respects** 165:14
**respond** 53:18
**response** 7:7 52:11
54:2 82:11 120:16
120:22,23 141:17
145:13 174:2
175:4 177:17,22
178:6,9 194:1
**responses** 175:25
**responsibilities**
14:17 63:17 64:7
65:3 167:4,11
187:17
**responsible** 168:4

192:24
**responsive** 40:5
41:5
**restore** 121:17
**restoring** 123:1
**result** 28:24 29:1,2
29:9 95:1 114:21
118:11 124:7
125:23 126:4
135:7 145:1
147:13,19 148:3
**resulted** 146:15
**resulting** 184:1
**results** 27:14 39:8
40:19 162:4
190:18,19
**resumption** 125:24
**retained** 33:20
**retrospect** 32:12,16
**return** 125:24
198:24 202:22
**reveal** 21:23
**revenue** 8:14 63:2
64:10 178:12,21
179:19 180:21
184:9 185:9
186:24 188:6,17
189:22 195:10
**revenues** 159:2
185:20 186:1,9,14
187:1 188:2,9
189:1,3,4,9,10,14
189:16 190:18
191:9 194:3
**review** 28:22 32:4
60:15 74:4 140:8
150:11,12 172:24
177:14 192:2
202:20
**reviewed** 88:14
141:13 150:17
169:7,11,13 178:3
**reviewing** 24:4,13
25:3 27:13 33:12
48:13 113:4 155:3
174:24
**revised** 48:16 56:23

107:19 108:13
**Richard** 103:24
**rig** 1:3 9:3 117:13
117:16 119:3
120:15 134:7,7,13
135:1 202:3
**right** 12:22 13:2,9
15:16 17:10 18:11
18:13 19:4,18
20:1,15,16,19,20
20:24 25:7,14,24
29:12,16,19,23,25
29:25 30:3,7,7,17
32:20,21,22,25
36:19 37:14 39:4
40:9,13,18 41:1
45:22 46:5 51:8
52:1,3 54:1,19
56:8 59:5 62:2,13
62:22 67:4,16
68:21 69:24,25
72:17,22,23 73:13
75:25 76:2,15,21
76:22 77:4 78:24
80:1 81:1 88:14
88:15 89:4,5,17
89:20 94:1,20
95:13 100:4 101:5
101:9,13,14 104:5
106:4,24 108:21
110:18 124:8,9
126:19 129:14
130:11 131:25
136:19 137:3
138:1 139:1
141:20 143:8,10
143:13,23 144:14
145:2,6,7,11,16
146:12 148:13,14
149:4 151:15
152:15,21 153:15
153:17,20 154:10
154:23 155:10,15
156:4 162:12,15
166:11,14,21
167:2,17,22 168:5
169:22 170:13

172:3,9,13 173:9
173:17 174:3,5,25
175:20 176:10
177:1 178:11,24
179:5,12,25 180:1
180:10,15,22,24
181:1,17 182:5,5
182:14,16 183:10
183:12,15 184:8
185:10,24 186:1
186:16 188:13,17
190:4 191:15
194:2,8 195:6,18
195:22 196:18,22
**right-hand** 36:9
**rigorous** 50:9
**rigs** 30:22,22,24
31:2,2 33:17
46:13,14 50:4,5
50:23 56:25 57:1
94:10 96:7 119:15
132:15,22,23,25
134:4 144:11,18
144:20,23 145:1,5
145:9
**ring** 78:20 109:23
**risen** 136:22
**Robers** 2:4 3:11
12:11 17:6,8 18:1
18:5 19:23 20:2,5
20:22 21:22 25:1
25:7,13 27:2,5
29:21 31:13 33:1
34:2,4,10 42:8
44:24 45:12,18,23
47:24 48:6 51:13
51:15 54:8 55:17
55:22 56:7,10,18
57:15,18 60:23
61:3,6,12,15,22
62:5,14,18 63:3
63:10,21 64:14
65:18,23 66:8,21
66:25 67:5 68:20
69:16,23 71:12
72:3,6,14,18,24
73:3,14,23 74:6

74:14,20,24 75:16
75:21 76:3,7,12
76:24 77:2,5,14
77:19 78:13,17,21
78:23 80:16,21,25
81:6,9,14,21
82:13,19 84:2
85:7,13,18,22
86:7,10,23,25
87:7 89:6 92:20
92:23 93:9 94:6
94:16 95:17,23
96:1,21,23 97:5
97:20,22 98:5
99:6 102:14,20,23
105:11,15 106:10
107:5,10 108:22
109:24 110:13
112:17 113:13
115:11,25 116:9
116:19,22 117:3,7
118:2,4,6,19,24
119:6,9,18 120:13
120:17,25 121:4,8
121:11 123:8
124:4 125:2,9
126:6 128:5,10,15
129:9,12 130:16
131:22 132:19
133:11 134:1,11
134:15 135:12,16
135:21 136:10,20
137:16,23 138:3
140:14 141:24
142:9,18,24 143:9
143:14,24 144:15
145:17 146:8,17
146:23 147:5,9,15
147:21 148:5
149:1,5,10,22,25
150:3,6 151:6,11
151:14 152:22
155:22 158:1
159:19 160:14,22
161:12,24 163:22
171:10 177:7
181:19 188:14,24

189:13 190:7,11
190:16,24 191:19
192:18,22 193:2,7
193:17,23 194:9
194:16,22 195:7
195:12,19,25
196:6,9,14,19
197:4,15,17 198:6
199:1
**Rochester** 11:20
**role** 26:20,24 28:22
105:21 106:14
129:7 131:24
175:15,18,25
180:12,14,15,16
**Roman** 70:4
**room** 24:17 44:22
**Rose** 1:9,13 3:7 4:9
8:3,11 9:2,6,10,12
9:14,15,17 12:16
16:12 18:8 23:22
26:5 28:21 38:12
39:14 44:8 46:3
47:20 49:9 52:8
54:17 55:7 56:4
60:5 65:11 67:11
68:9 72:9 78:1
80:13 82:3 83:25
88:17 92:11,24
93:20 96:14 98:20
101:1 103:6 106:1
109:3 111:18
112:13 115:7
121:23 126:16
130:8 134:24
142:5 146:14
148:14 149:20
150:1 154:5,25
160:16 164:25
165:10 171:19
176:21 178:16
197:16 199:6,8
200:2 201:1,5,15
202:8,14
**Rose's** 150:20
**rough** 50:7,25
**ROVs** 146:22

148:2
**royalties** 181:7,14
182:7 183:13
**royalty** 16:22 64:21
168:4 174:20
181:22 182:9,10
184:2,14,19,25
185:3,5,6,14,15
185:16
**royalty-bearing**
181:15
**Ruckelshaus** 11:25
**rule** 6:10,10,14
78:6,7 79:22,22
79:25 80:4
**ruled** 75:1,20,22
**rules** 78:12 79:23
165:21,22 176:24
**running** 158:10

___

**S**

**safe** 143:4
**safety** 5:6 6:10,10
6:14,14 39:9
55:15 60:15,15
63:8 64:16 65:16
65:22 66:6,11
73:19,25 74:1
78:6,7,11,11
82:14 84:13,18
142:23 146:16,19
146:25 147:13,14
147:20 148:3
169:20
**Salazar** 5:15 6:3,6
6:20 60:13 69:2
80:11 84:8 85:1
88:18,24 95:3
**Salazar's** 152:9
**sale** 158:19,22
159:7
**sales** 8:5,6,8,8
22:16 130:10
**Santa** 4:9 16:18
**Sarah** 8:2,11 24:3
28:1,2,6,18 58:11
59:4,13,19,25

88:13 90:12,15
91:2 92:6,8,25
101:2 108:19
111:9 112:6,14
114:15 151:17
155:3 157:24
162:7,21
**Sarah's** 162:18
**satisfied** 97:16
saw 37:16,17
144:18 157:19
**saying** 51:3 79:1
157:24 158:2
163:23
**says** 13:20 14:7
36:4 53:22 60:12
60:12,25 69:2
70:9,23 71:4,15
99:21 106:25
108:1 117:13
124:18,19 128:25
131:2 132:14
133:4,21 134:23
141:13,20 156:24
163:11 164:6
167:20,23 168:3,7
194:11,17 196:24
**scale** 133:22
**scarcity** 145:21
**school** 196:24
**schooled** 186:18
**schools** 196:18
**Science** 4:3,3 11:6
**scope** 17:6,9 18:1,5
25:1 54:9 55:22
56:10,18 60:23
61:3,6,12,15,22
62:5,14,18 63:3
63:10 65:18,23
66:8,21,25 67:5
67:12,22 68:1
69:16,21,23 71:12
72:6,14 73:3,23
74:6,20,24 75:16
75:21 76:3,7,12
76:24 77:2,5,14
77:19 78:13,17,21

80:16,21,25 81:9
81:14,21 82:13,19
84:2 85:7,13,22
85:24 86:1,3,6,22
87:7 94:16 95:17
95:21 96:23 97:5
116:22 117:3,7
118:6,19,24
119:18 120:13,17
120:25 121:4,8,11
121:25 123:8
124:4 125:9 126:6
128:5,10,15 129:9
129:12 131:22
132:19 133:11
134:1,11,15
135:12,16,21
136:10,20 137:16
137:23 138:3
140:14 141:24
142:13,21,24
143:6,9,15,24
145:17 146:8,17
146:23 147:5,15
147:21 148:5
149:1,5,10 159:19
160:14,22 161:12
161:24 163:22
188:24 189:13
190:7,16,24
192:18,22 193:2,7
193:17,23 194:9
194:22 195:7,12
195:19,25 196:6,9
196:14,19 197:4
198:16
**Screnar** 43:8 91:20
**scrutiny** 48:13
49:22 50:15,19
**seal** 201:19
**sealed** 77:13
**sealing** 77:17
**search** 175:14
**Sec** 141:15
**second** 17:14 30:10
38:8 40:18 68:3
68:14 69:20 71:11

80:15,23 81:3
94:9,14,17,20,22
95:2,8,12,14,21
100:10 104:15
107:12,23,24
108:2,8,21 117:10
123:10 132:25
133:18 141:12
142:4 144:16
152:10 156:25
157:6 171:12
secondly 165:17
Secret 45:1
Secretary 5:10,14
5:15 6:17,19 8:16
12:2 27:17,20
45:2 56:23 60:13
66:5,10,18 68:1
68:10,15 69:2
70:9 71:15 80:10
84:8 85:1 87:19
88:18,23 89:3
91:13 95:3 105:2
105:3,5,19 115:13
141:15 183:5
192:13
Secretary's 26:21
31:11 32:1 38:25
40:5 41:5,22,24
42:3 43:5 45:9
46:25 47:2 49:25
50:20 51:5 91:16
97:14 111:13
167:6
section 1:4 70:9,15
127:14 202:4
sections 150:21
sectors 159:9,10
secure 187:1
secures 186:24
security 8:12
190:10,20
see 12:7 14:2 17:19
18:22,25 25:10
36:4 52:14 53:5,7
53:9,24 54:3,11
60:8,20 68:13,23

69:12 70:6,8,13
70:23 71:2,4,8,25
73:9,11,15 88:3
90:9 91:23 92:3
95:1 98:18 99:7,8
99:13,24 100:8
101:13,16,19
103:14,22 106:1
106:24 107:15,20
107:24 108:14
109:21 117:18
123:24 124:23
125:17,20 126:1
127:17 128:19
129:5 131:2,6
132:12 133:8,18
133:21 134:20
139:7,10 154:12
156:22 157:4,11
158:10 163:4,17
164:4,10 170:17
170:21 172:20,22
177:6 178:1 179:1
179:10,18,19
181:1 182:7
185:20 193:22
194:2,21,23 195:3
196:24
seeing 36:16 65:13
80:12
seen 19:1,3,4 36:17
37:13 52:16 56:1
65:11 66:2,15
67:9 68:9,12,15
74:10 75:12 78:8
79:12 80:9 82:6
90:6 113:19,20,20
120:7,10,20,21
121:1,2 126:20
129:18,20,21
131:19 162:20
selected 28:16
self-insure 187:22
sells 183:20
semi-submersibles
94:11 96:9
SEMS 6:15

send 43:2,18,20
105:13 155:25
sense 45:9 49:22
186:18
sent 25:21 41:21,24
42:3,15,17,18,18
93:11,15,18 97:13
162:21,24 202:20
sentence 99:21
100:10 108:2,8
117:12 124:19
125:22 128:24
132:14 133:4,21
134:23 164:14
sentences 71:14
125:18
separate 64:25
89:4 116:14
separated 64:6
September 4:7
13:21 37:8 49:7
78:20 110:24
111:5
sequence 85:6,8,9
sequenced 159:4
sequencing 86:12
Serial 7:24
series 150:1
Service 5:20 55:13
62:20 69:4 140:19
167:16
Services 6:3,5
Session 7:23 139:6
set 13:5 52:11
125:18 134:8
159:23 175:25
180:4
sets 13:1 19:4 159:5
187:11
settlement 148:15
148:17,20,25
149:9
shallow 135:23
136:1,13 182:20
182:21
shape 148:24
share 24:20 176:6

sharehold 198:5,10
Sheet 5:2 6:9,14
60:12 78:4,6,7
88:22
Shelf 5:7,10,17,22
6:11,21 7:5 14:17
14:21 65:17
shifting 133:5
ships 94:11 96:8
158:23
shore 183:24,25
short 85:14
shortened 154:2
Shorthand 202:11
short-term 163:2,6
shot 45:17
show 124:20
167:20
showed 88:21,22
shown 46:18
188:11
SHUSHAN 1:5
202:5
si 153:18
sic 43:10 57:19
58:18,19,20 160:9
173:20
side 14:2 189:16,19
189:20,22
sign 131:13
signature 3:14
17:22 200:1 201:1
202:18,22
significance 63:23
63:25 64:3
significant 64:2,4,6
136:5 141:18
significantly 129:3
193:9
silence 97:24,25
98:3,10
similar 102:9,17
158:12
simply 40:19
119:24 120:3
145:24 155:25
176:1

single 64:7 179:4
187:15
single-spaced 53:9
sir 36:22 41:8
132:18 190:25
sitting 32:9 67:18
83:20 98:20
114:18 188:19
situation 75:2
163:13,20
situations 160:18
six 69:11 83:5 97:7
136:22 151:22
152:14 153:19,23
185:25
six-month 29:10
66:19 97:9 117:15
119:4 127:16
152:24 153:4,10
skipped 70:19
skipping 70:22
slide 99:11 100:1
slightly 69:21
small 96:7,12
112:25 130:17
Snl-nisac-dutyde...
4:16
SNL004-003547
4:17
SNL004-003550
36:10
SNL004-003561
4:18
Snyder 4:9 16:18
sold 183:21
solicitors 169:14
Solutions 109:20
110:2
somebody 15:18
101:11,17 115:21
somewhat 151:25
181:20
soon 176:12
sorry 17:8 20:5
26:8 42:11 70:1
70:15 74:9 86:7
104:15 107:22

108:18 109:7
111:21 127:9,10
154:17 167:3
191:23
**sort** 13:1,5 33:5
34:13 48:4 49:12
50:6 73:25 98:6
121:12 130:11
143:20 151:2
154:9 157:13
158:20 159:17,18
160:9,9 161:1
183:24 185:2
186:18 190:14
**sorts** 50:21
**sound** 143:5
**sounds** 25:21 78:24
**source** 48:17 50:20
163:9 195:17
**sources** 186:8
190:22 195:10
**span** 28:6,7 44:1,3
**spanned** 27:8
**speak** 17:7 47:3
139:19
**special** 160:2
195:18,20
**specific** 83:3,17
84:4 146:12 171:5
195:15,17
**speculative** 136:6
**speed** 153:3
**spell** 16:7 43:9
**spelling** 43:13
**spend** 50:2 130:9
159:17
**spending** 131:3
147:13 148:2
**spent** 51:16,23
90:15,17
**spill** 1:3 7:7,21 9:3
20:18 39:10 53:21
56:20 71:19 82:11
120:16,21,23
121:14 122:17
127:25 135:24
136:2,3,5 141:18

143:17 144:6,8
145:10,14,20,22
145:23 146:2
171:4 175:9 202:3
**spills** 145:15
**spot** 151:8
**spreadsheet** 31:5
**Springfield** 9:16
**stacks** 71:21
**stadium** 160:6,11
**staff** 22:15 23:22
23:24 27:14,25
28:15 31:20 35:1
35:8 36:12 38:24
43:4 58:9 101:23
103:22 105:1,4
109:6 111:10,14
112:6,10,14
113:17 114:10,10
114:16,20,25
115:1,4,8,22,23
122:12 127:6
131:11 161:9
170:4 174:17
175:5
**staff's** 106:7 116:4
116:16
**Stamped** 4:13,17
4:20 5:3,7,11,18
5:23 6:3,6,11,22
7:9,11,14
**standing** 63:11
**standpoint** 188:6
**start** 35:5,7 87:23
149:23 152:6
177:1 179:18
**started** 44:8 49:9
57:16 89:25 90:1
137:7 165:20
**starting** 11:3 36:24
**starts** 70:16 125:19
**state** 9:12 182:22
182:25 191:10
201:11,24 202:12
**statement** 7:5
17:25 18:4,7
108:16 118:22,25

126:3 133:10
**statements** 135:11
135:13 192:6
**states** 1:1 5:20 7:2
17:5 18:16 21:1
52:10,12 53:9
54:2 55:12 66:23
75:9 106:25
138:21 178:11
180:1,21 186:24
188:2 194:7
195:16 197:17
202:1
**Statistical** 8:14,15
**statisticians** 15:14
**status** 121:17
**statutory** 70:10,19
185:13
**Ste** 203:11
**step** 61:21
**steps** 66:5
**stickering** 12:10
154:18
**stop** 29:25 55:13
56:6 60:13 88:24
**Strategic** 14:11,14
14:20 15:16,20
**Strategy** 192:17
**Street** 1:14 2:6,17
**structure** 13:18
14:1 64:13,15
**stuck** 187:4
**studied** 22:8
147:17,22 149:2
**studies** 22:8,12
24:2,4,12 25:3
49:5 53:16 108:7
116:24,25 120:21
**study** 27:10 28:10
39:8 40:19 48:21
48:23,24 49:1,4,7
62:23 85:12 87:5
106:15 114:21,22
114:23,23 116:1,2
116:25 118:12
121:5 123:11
127:7 134:6

137:12,18 138:11
139:20 140:22,23
141:3 143:2,19
148:1 152:18
154:12 155:3
157:19 162:8
174:24
**subject** 4:16 5:15
6:20 8:3,12 22:10
106:9 141:4 142:7
142:11 150:14
**subjected** 81:4
**subjects** 150:18
**submitted** 16:14
**subscribed** 201:17
**subsea** 70:12,25
71:6 133:1
**Subsection** 70:4
**subsequent** 31:17
31:20 64:1 79:25
93:5,11 102:16
**subsequently** 11:8
112:24 144:22
**substance** 97:14
**substantially** 13:25
102:8 112:15,19
136:1
**substituting** 121:20
**subtraction** 160:21
**successful** 179:25
**sued** 67:24 72:15
72:19,20
**Suffice** 188:10
**sufficient** 51:2
**suggest** 87:20
102:11 198:23
**suggestion** 120:20
**suggests** 98:25
110:23 112:2
156:5
**suit** 74:25
**suitable** 97:11
**sum** 156:17
**summarized** 24:12
**summarizing**
105:25
**summary** 117:12

134:21,23
**Summer** 51:4
**superior** 21:11
**supervision** 115:8
**supervisor** 16:8
26:7
**supervisory** 28:22
**supplemental**
52:11 54:2 187:16
187:23
**supply** 122:18
158:23 191:2
**support** 124:21
**supports** 141:14
**sure** 10:10 12:11
17:15 21:20,20
29:6 32:8 33:11
35:21 36:23 40:2
40:24 42:14,23
43:13 48:11 50:13
51:11 55:9 63:14
67:8 73:24 77:20
79:17,20 82:5
91:5 92:22 93:9
102:23 109:11
122:9,13,13
133:15 136:15
146:9 148:7
165:21 166:6,10
171:6 173:16,19
187:25 188:5
192:6 193:8
**surety** 174:2 186:4
186:17,24 187:8
188:3
**surface** 70:12 71:1
71:7,21
**suspend** 69:6
**suspended** 60:17
**suspending** 69:8
**suspension** 5:10,16
6:20 70:11,24
185:5
**suspensions** 71:16
**switch** 165:13
**sworn** 9:7 202:15
**systems** 6:15 11:20

147:11
S-c-r-e-n-n-a-r
43:10

**T**
**tab** 12:7,13 13:11
16:9 18:20 34:25
35:8,20,22 36:4
37:1,4 38:8,9,22
38:23 49:3 52:6,9
55:1,5 60:7 65:5
66:12 68:5,22
70:1,2 73:4 75:3,7
76:17,18,19 77:21
79:14 80:6 81:25
84:9,12 88:6,9,23
90:9 98:14 99:10
100:18 102:17,17
103:7 107:23
113:24 123:13,14
126:14,15 127:10
129:14 131:16
132:6 138:13,15
149:21 151:15
154:15 157:20
162:16,16,16
168:11,19,20,21
169:16 171:1,2,8
171:22 172:10
174:13,25 175:10
175:17,20 176:8
177:2
**take** 12:20 18:20
35:2,2,23 38:12
44:9 52:6 53:5
57:6 59:9 61:19
65:10 68:3,5,21
75:3 82:2 89:22
102:18,21 103:21
108:21 128:17
138:5,7 140:1,6
150:21 151:2
152:8 153:2 160:5
188:16 190:3
192:1
**taken** 1:13 9:18,19
57:11 103:2

149:16 150:1
165:5 171:15
176:17 197:11
203:2
**takes** 159:22
183:22
**talk** 19:11,13,16
26:23 29:24 30:2
67:19 106:17,19
114:15 139:21
151:9 160:9
163:15 172:23
189:2,4 191:14
**talked** 40:11 59:23
67:11 69:22 91:17
114:2 116:11
132:24 140:22
152:4 156:12
**talking** 12:21 34:8
40:7 49:2 50:16
79:21 100:12
116:13 136:18
139:22 164:17,18
188:23
**talks** 100:11 164:6
**tank** 11:14
**tape** 57:7 149:13
**task** 154:17
**tasks** 120:10
**taxes** 119:21
**taxpayer** 187:4
**team** 109:20 110:2
116:8 144:25
151:17
**team's** 144:11
**technical** 144:13
**technically** 152:23
**technology** 4:3
15:15
**telephone** 57:25
58:5,17 59:3,9,18
59:25 114:9,25
139:24
**tell** 11:2 31:23
49:18 58:4 64:3
86:20 91:4 98:24
104:16 110:14

115:24 130:14
147:16 154:18
167:5 169:4
171:24 172:5,18
178:16 184:8
186:15
**telling** 55:3
**tells** 107:12,16
**temporary** 125:15
138:6 141:16
**ten** 94:12 96:11
**tend** 182:3 189:22
**tended** 34:21
**tenth** 122:23
**term** 57:23 181:21
189:12
**terminated** 153:24
**Termination** 6:20
**terms** 15:12 46:25
49:14 52:2 69:21
102:5 183:17,17
185:3 198:22
**test** 88:5
**testified** 9:7 86:14
88:9 90:23
**testify** 19:24 21:17
21:19 22:3 49:14
54:15 86:4,10,16
127:1 131:24
148:12 169:1,5,12
**testimony** 21:2
24:7,10 25:19
26:3,19 38:3 58:6
59:4 60:3 93:21
114:5 141:14,15
202:16
**testing** 48:4,8 81:23
147:1,10
**Texas** 135:3 202:12
203:8,11
**thank** 27:16 35:18
37:2 38:18 41:8
50:13 55:6 60:5
65:8 69:18 78:2
80:5 93:3,7
102:24 152:17
164:25 165:1

172:9 185:18
186:22 197:8
199:1,3,5,6
**thanks** 110:5,13
**theory** 14:25
**thing** 22:11 130:1
130:11 141:1
159:18
**things** 13:1 20:19
32:2 46:14 50:24
53:15,22 94:3
95:5 142:17 144:6
146:20,22,24
159:15
**think** 9:19,24 10:16
11:14 12:21 13:2
24:23 27:6 28:21
34:24 35:1,15
41:14 44:10 45:25
49:9 50:21 57:18
66:1 68:18 69:21
83:19 88:9 90:8
90:23 91:24 92:24
94:7 96:6 97:9
102:18 121:6,9,9
126:14,14 128:6
129:23 141:1
142:4 152:4
153:25 154:10
156:11 160:10,25
161:25 163:23
173:18 180:25
189:5,20 190:8,8
190:14
**thinking** 79:22
121:7 144:10
**third** 2:6 14:2
17:22 60:9 100:10
117:11
**Thirty-four** 185:25
**Thomas** 2:16 28:16
28:18
**thought** 32:15
106:7
**thoughts** 24:10
46:17
**thousand** 137:1,2

**threat** 142:23
**threats** 145:13
**three** 16:1 23:4,8
43:21 51:19 58:8
64:8 137:8 155:9
187:10,10 188:22
**thrust** 53:23
**Tiffany** 104:1
106:21,24
**till** 166:8
**time** 9:4 10:5 17:25
27:5 28:6,6 32:15
37:16 43:22 44:3
44:15,18 50:2
51:12,17,24 57:9
57:13 67:13,13
74:17 80:13,18
85:15 90:15,17,24
94:21 97:12
102:25 103:4,21
105:6,22 106:17
112:7 113:12
130:9 135:1,24
138:21,21 143:1
149:14,18 153:2
153:10,14,20
159:23 161:22
164:8,9,25 165:3
165:6 167:6,6
168:16 171:13,16
173:7 176:15,19
181:5 184:19
185:5 193:6 197:9
197:12 199:7
**timeframe** 111:5
**times** 51:20 56:19
72:9 138:4 161:22
170:17
**timing** 86:5,19
187:20
**tiny** 122:17
**today** 9:1 10:1 18:9
23:6,16 24:7,11
25:19 26:3 38:3
54:15 56:12 60:3
77:9 113:16
114:18 127:1

131:24 148:12
149:25 167:5
169:1,5 188:19
**today's** 57:13 103:4
149:18 176:19
186:19 199:8
**told** 28:21 29:16
44:9 82:21 113:2
129:23 141:7
166:22 169:6
**Tom** 58:11,13 59:4
59:13,19 60:1
165:10
**tool** 161:4
**top** 73:15 107:24
125:14 128:17
179:2
**topic** 19:24 20:2,4
20:5,6,6,7 21:2,2
29:18,22,23,25,25
30:10 49:14,19
52:3 54:15 58:23
93:21 116:24
165:18 168:18,22
169:2,5,12 170:7
170:8
**topically** 130:3
**topics** 18:16,25,25
19:1,3,5,7,17,20
22:9 29:20 30:3
51:19,20 138:23
**total** 78:4 99:22
128:1 155:10
158:8 162:10
183:9,12,19 184:9
189:24
**touches** 123:11
**touts** 194:3
**tract** 159:5
**tracts** 159:5
**traded** 198:2
**traffic** 103:9
**training** 73:21
**transcript** 202:15
202:19,20
**transition** 122:25
**translate** 158:3

**transparent** 92:17
92:17
**transportation**
183:23 184:6
**Treasure** 8:12
**Treasury** 187:9
**trend** 133:7
**Tribal** 191:10
**tribes** 194:19
**trick** 20:14 88:4
**tried** 76:19 166:25
**true** 85:3 108:16
121:20 126:3
133:10 135:23
144:16 145:18
153:21 154:13,14
163:13,20 184:7
188:18 190:8
193:4,15 195:13
196:20 201:2
202:16
**truthful** 10:1
**try** 10:9 19:16 32:6
68:3 92:16 93:4,6
121:17 187:2
**trying** 20:10,17
32:23 40:24 83:13
95:9 159:25
164:21 188:5,5
**Tulane** 11:9,11,12
**turn** 11:1 30:19
80:6 117:9 127:11
132:2 133:14
139:9 150:19,23
151:4 168:11,18
169:16,16 170:15
172:10 174:13,25
175:10,20 177:1
177:24 182:5
**turning** 126:15
169:15
**turns** 33:19 122:20
122:24
**tutorial** 59:1
**Twelfth** 7:23
**two** 15:13 20:19
23:8 25:21 39:3

40:17 43:24 51:19
52:25 58:8 78:4
89:4 91:20 98:25
99:2,3 101:16
110:6 113:5
122:16 127:24
137:8,8 164:22
165:14 178:5
187:7 188:22
194:25
**two-month** 43:25
**two-page** 78:3
**two-well** 100:11
**type** 30:22 179:2,4
179:19 186:1
**typed** 179:1
**types** 56:15,15,21
56:25
**typical** 32:4 160:3
164:22 178:19
**typically** 158:15,18
160:1 192:12

---

**U**

**uh-huh** 12:19 21:8
22:21 24:22 43:11
58:24 68:19 88:20
89:1 97:1,4
109:18,22 114:1
120:2 121:15,23
122:2 123:25,25
128:23 136:17
139:18 155:11
160:7 161:19
163:5 170:18,24
175:22 194:13
196:23 197:2
**ultimate** 184:24
**ultimately** 138:8
**uncertainty** 34:13
**understand** 9:22
10:6,11 18:9
25:13 29:17 40:1
50:14 51:3 95:10
100:14,15 151:13
165:25 166:3,7
167:14 187:25

194:6 195:14
**understanding**
18:18 19:10,15
20:11 25:2 45:6
51:4 54:23 55:10
56:17,19 64:24
69:14,20 71:10,13
72:5 73:18 75:20
76:4 80:23 81:18
82:22 118:1,5,7
129:8 132:18,20
132:21 136:16
142:20,25 143:16
145:12 150:10,20
186:23 193:3
197:5,20,23 198:1
198:6,12
**understood** 10:14
138:1
**undertake** 21:12
113:11 157:17,17
168:7
**undertaken** 29:10
102:6 137:12,17
137:18 138:11
143:19 148:1
158:21 160:19
161:9
**undertaking** 27:15
**undertook** 30:18
49:20 153:7
**uneconomic** 184:25
**unfair** 79:2
**United** 1:1 5:20 7:2
17:4 18:16 21:1
52:10,12 53:8
54:2 55:12 66:23
75:9 138:21
178:11 180:1,20
186:24 188:2
197:17 202:1
**universe** 40:25
**University** 11:9
**unrelated** 145:15
**unsecured** 190:22
**unusual** 32:19 33:3
**updated** 108:19,20

**updates** 32:6
**updating** 108:23
**use** 4:17 35:14
110:15 156:16,20
157:24 160:4,9
173:10 195:18,20
**usual** 157:1
**usually** 104:5 156:3
161:2
**US_PP_BOEM0...**
7:11
**US_PP_BOEM0...**
7:12
**US_PP_BOEM0...**
7:14,14
**US_PP_BOEM0...**
7:15
**US_PP_DO1010...**
4:21
**US_PP_DO1010...**
4:21
**U.S** 2:3,5 5:13 6:17
8:16 18:10 135:3
186:10 188:12,20
192:25 193:5

---

**V**

**v** 4:10 6:3,5
**validate** 50:3
**validity** 121:7
156:21
**value** 17:16 121:21
129:2,3 182:11
**varies** 181:20
**various** 12:4 28:9
168:8
**vary** 187:13
**vast** 112:20
**vehicles** 146:22
**version** 31:15,18
42:2 91:9 98:16
100:19 101:12
102:8 110:23
111:19
**versions** 31:17,21
41:10 42:9,13
43:1 92:9 93:5,11

99:3 110:7
**versus** 18:10 20:18
**VI** 70:4
**video** 57:7 102:19
**VIDEOGRAPH...**
 9:1 57:9,12
 102:25 103:3
 149:14,17 165:3,6
 171:13,16 176:15
 176:18 197:9,12
 199:7
**VIDEOTAPED**
 1:9 202:8
**view** 54:14 63:18
 154:5
**viewed** 50:6
**Virginia** 9:16
**VI.A** 70:9,15
**Volume** 4:4
**volumes** 184:12
 185:7,11
**voluntary** 21:14

**W**

**waiver** 187:23
**walk** 179:16
**want** 11:1 17:7,8
 22:3 33:23 35:4
 35:13 40:1,3
 49:10 50:13 52:2
 54:17 60:6 83:10
 83:13 95:10
 102:21 103:8
 110:15 114:3
 127:9 151:13
 152:20 154:20
 165:22 167:25
 168:12 172:22
 179:18 188:5
 192:4
**wanted** 47:25 48:2
 58:3 93:1 192:6
**Washington** 2:7,17
 5:14 6:18 23:7,9
 165:11
**wasn't** 25:2 27:14
 33:15,20 36:15

40:22 43:3 49:25
58:25 63:6,6
74:22 82:15,20
105:12 115:18
142:10 143:11
145:24 146:12
**water** 18:11 52:13
 56:25 66:20 69:10
 71:23 132:16
 135:24 136:1,13
 144:2,2,21 181:21
 182:20,21 196:11
 196:25
**waters** 66:7
**way** 17:21 19:16
 48:1 76:9 79:1,16
 100:17,18 111:9
 115:1 124:18
 126:7 130:13,19
 139:19,23,24
 141:11 148:24
 155:25 176:5
 183:8 184:12
 192:24
**ways** 184:17 187:11
**wealth** 121:19
 159:25 190:19
**website** 13:23
**week** 59:11 89:14
**weeks** 89:23 90:19
 90:21
**wellbore** 81:7,18
**wellhead** 182:11
**wells** 5:3,11 7:18
 55:14 60:14,17
 70:11,25 71:6,24
 99:2,18,18,22
 100:11 102:2
 113:5 160:19
**went** 11:5 46:5 95:4
**weren't** 24:25
 32:13 33:15 34:6
 34:19 50:4 96:3
 114:8 119:15
 120:1,4 147:3
**Weslayan** 203:11
**Western** 16:14

**we'll** 11:1 13:11
 16:9 21:18 29:4
 32:8 38:1,9,19,19
 39:25 53:5 68:6
 150:21,24 151:5
 165:18 174:11
 176:11,12 188:4
**we're** 10:14 12:8,20
 25:11 30:9 49:2
 52:6 53:12 54:8
 54:21 57:4,6 70:4
 79:21 93:4 97:15
 97:16 100:12
 110:20 136:18
 149:12,18 150:19
 150:23 151:16
 154:16 165:21
 171:17 188:23,23
 189:14,20
**we've** 15:12,13,13
 76:15 113:16
 116:2 128:6
 153:21 179:8
**WH** 106:3
**whatsoever** 26:13
 60:2
**White** 106:4,9,13
 106:18 107:1,4
 115:14
**willing** 21:13
 150:15,19,23
**wish** 93:24 94:5
**withstand** 48:13
**witness** 19:24
 21:22 165:1
 176:14 199:5
 200:2 202:14,17
 202:19,21,22
**woman** 28:1
**won** 74:18
**wonderful** 12:24
 138:18 154:19
**wondering** 38:14
 173:2 183:3
**word** 25:18 190:3
**words** 13:5 41:11
 44:10 50:18 97:14

97:16 112:20
124:6 157:19
**work** 7:17 10:17
 12:1 13:19 15:11
 27:8,25 28:3,4,6
 28:16,18 29:9
 34:11 40:25 51:20
 51:21 84:15,17,24
 88:10 90:5 94:25
 95:5 101:1,23,25
 102:6,12,15
 105:24 106:7,7,20
 111:4,8 112:5,5
 112:14 113:17,17
 115:7 116:4,8,16
 116:21 153:14
 158:17 167:3
**worked** 11:18,21
 11:24 31:24 58:22
 109:10
**worker** 134:7,7
**workers** 30:23,25
 33:18,20 46:13
 50:23 96:25,25
 117:17 118:11,14
 119:3,14,19 120:3
 120:5,8,15 134:13
 156:18
**working** 11:17 28:9
 43:5 105:1 115:15
 158:24 167:12
**workovers** 71:21
**Workplace** 6:14
 78:7,11
**works** 9:23
**world** 122:8,13,18
 122:22 128:3
**Worldwide** 203:10
**worthy** 190:23
**wouldn't** 48:7
 50:21 56:12 90:1
 115:23 116:3
 143:25 144:4
 167:25
**write** 32:5
**writing** 19:4
**writings** 25:17,18

26:2
**written** 28:25 29:2
 96:19
**wrong** 27:3 79:9
 127:10
**wrote** 61:1 140:2

**X**

**Xerox** 11:20
**XP** 18:10

**Y**

**yeah** 17:21 22:6,8
 35:13,15,17 36:25
 40:8 42:12 57:17
 67:21,25 76:13
 99:16 103:13
 130:8 140:6 142:3
 146:5 148:19
 149:24 150:2,5
 157:10 188:25
 189:4 194:18
**year** 21:5 44:1
 78:16,19 79:1,9
 82:25 127:24
 137:9 159:4 164:7
 164:9,9 166:19
 179:4,4,4,5
 180:20 181:21
 189:24 193:12
 194:4
**years** 8:5,6,8,8
 11:18,21,25 16:2
 37:17 92:12
 122:16 127:24
 155:4,4 170:5
 174:19 182:4,19
 182:23 188:22
 193:6,10
**year's** 141:16
**yesterday** 23:9,10
**York** 11:5
**yu** 131:12

**Z**

**zeroing** 120:3

**$**

**$0.20** 122:25
**$14** 193:14
**$2.6** 180:21
**$2.77** 193:20
**$244** 183:10
**$300,000** 187:13
**$34** 185:23
**$8.6** 195:6

---
**#**
---
**#223** 203:10

---
**0**
---
**00004340** 5:4
**001159** 111:20

---
**1**
---
**1** 4:4 12:7,13 93:12
  110:25 122:18,23
  194:10
**1/10th** 122:18
**10** 4:4,13 75:3,7
  110:24 112:15,21
  191:4 193:9
**10th** 88:7,16 90:10
  91:8,15 92:5
  94:14,25 98:22
  101:2,9,17,24
  102:8,13 113:1
  144:20 151:17
  158:6
**10:42** 102:25
**10:59** 103:4
**100** 43:13 77:20
  99:17
**11** 18:25 19:9,24
  20:7 21:2 29:20
  29:22,23,25 51:18
  58:23 68:6,22
  70:1,2 76:19
  168:18,19,22
  169:5,12 170:7
**11.0** 76:17
**110** 7:12
**111** 7:15
**112th** 139:5
**112-59** 7:24
**115** 130:22

**116** 130:21,23,24
**117** 130:21,23
  131:1
**11888** 8:21 37:5,8
  37:22,24 49:2
  113:25 114:7,13
  114:16,20 115:2
  116:20 117:2,10
  118:16,22 123:10
  123:16 124:11
  125:8 127:12
  128:18
**11889** 8:22 18:21
  18:25
**11890** 8:23 52:9
  53:13 177:3
**11923** 8:24 131:17
  132:2,6 133:16
  134:20
**12** 4:5 5:14 6:21
  15:7,10 19:17,21
  20:2 68:10 77:21
**12th** 76:16 80:10
  94:19 152:11
**12-1/2** 182:20,24
**12-31-15** 203:8
**12:00** 149:15
**12:19** 149:18
**12:38** 165:4
**12:39** 165:7
**12:46** 171:14
**12:47** 171:17
**12:55** 176:16
**121** 191:18
**12147** 4:3 12:12,13
  12:15,21
**12148** 4:6 13:11,13
  13:15
**12149** 4:9 16:10,11
  16:13 17:14
**1215** 157:20
**12150** 4:12 35:13
  35:17,18,19 38:22
  40:9 41:9,24 88:6
  88:10 90:9 91:8
  91:15,24 92:3,9
  93:11 95:1 96:16

102:8 151:16,20
**12151** 4:15 36:22
  37:1,3 38:23 42:3
  93:13 98:13 100:2
  100:5,18 101:14
  102:9 103:7
  107:12,23 109:19
**12152** 4:19 38:9,10
  38:11 129:16
  130:20
**12153** 5:2 55:4,5,8
  56:2 60:6,9 88:23
**12154** 5:5 65:7,9,10
  65:11,21 84:12
**12155** 5:9 66:13,13
  66:14,16 84:9
  88:19
**12156** 5:13 68:6,7,9
  68:18,22 70:1,16
  76:16,17
**12157** 5:20 73:5,6,7
  74:10
**12158** 6:2 75:4,5,7
**12159** 6:8 77:23,24
  78:2 79:12
**12160** 6:17 79:15
  80:7,8
**12161** 7:2 82:1,3,4
  82:7
**12162** 7:11 110:15
  110:16,21 111:1
  111:12
**12163** 7:13 111:16
  111:17,18 112:9
**12164** 7:16 126:17
  126:18,20,25
  127:6 162:15,21
**12165** 7:20 138:16
  138:17 139:10
  140:10
**12166** 8:2 154:20
  154:24 155:1,10
  156:4 162:7,25
**12167** 8:5 172:7,8
**12168** 8:8 172:13
  172:15,22,25
  173:8

**12169** 8:10 174:9
  174:10
**12170** 8:14 178:15
  178:17 180:19
  182:6 183:9 184:9
  185:9,19 186:10
  188:11 191:21
**12171** 8:16 191:25
  192:2
**126** 7:18
**13** 4:7 15:6 79:14
  80:6
**131** 8:24
**138** 7:24
**14** 81:25 127:11,15
**143** 139:9
**15** 24:19 35:5,7,8
  38:22 88:6 90:9
  99:10,22 102:17
  127:11 128:18
  149:21 151:15
  157:20
**150** 35:13
**154** 8:4
**16** 4:10 8:3 35:20
  35:22 36:4 37:1,8
  38:23 98:14
  100:18 102:17
  103:7 107:23
  155:7 193:6
**16th** 1:15 156:6
  162:22
**16-2/3** 182:20,21
**165** 3:10
**17** 5:3 37:4 49:3
  113:24 123:14
  127:10 140:2,9
  189:23 194:3
**172** 8:6,9
**174** 8:12
**178** 8:15
**18** 8:22 38:8,9
  129:15
**18-3/4** 182:17
**18.75** 183:4,16
  184:3
**19** 8:17 70:1,2,16

131:16 132:2,4,6
  132:7 133:4 177:5
  177:9
**191** 8:17
**1954** 8:5,8
**1963** 11:7
**1969** 11:10
**197** 3:11
**1970** 11:19
**1972** 11:22
**1975** 12:1,5
**1982** 166:14
**1983** 166:20
**1983-2013** 8:6,9

---
**2**
---
**2** 3:4 7:23 8:12
  13:11 57:12
  103:20 125:15
  194:10 196:22
**2oth** 60:18
**2,000** 117:17 119:4
**2.46** 156:16 158:6
**2/3rds** 124:18
**2:10** 176:19
**2:36** 197:10
**2:41** 197:13
**2:43** 199:7
**20** 1:5 51:21 62:12
  138:13,15 178:1
  191:7 202:5
**20th** 9:4 55:11
**200** 3:14
**20004** 2:7
**20006-1806** 2:17
**2001** 140:10
**2003** 4:10 16:15
**2008** 136:21 137:13
**2009** 136:21 167:17
**2010** 1:5 4:17 5:3,6
  5:11,14,22 6:22
  7:8,18 9:4 19:12
  27:1,8 28:3 33:6,6
  37:8 44:1,3 49:7
  51:5 55:11 61:18
  61:23 62:12 65:15
  66:4,19 68:10,24

69:3 73:8,19 77:1
77:17 78:20 80:10
80:22 82:10,18
83:1,8,22 84:3
85:21 103:9,13
104:25 105:19
107:17 108:10
109:12 110:24
111:5 112:3,7,16
112:21 133:6
140:19 202:5
**2011** 4:13,20 7:23
13:21 16:1 27:9
28:9 33:6 39:17
78:18 79:24,25
139:3 140:2
**2013** 4:5,7 8:6,8,17
12:17 179:5
180:20 183:10,13
184:10 193:12,13
**2014** 1:10,16 8:3,12
9:1 13:24 155:7
200:3 202:9
**2015** 7:8
**202** 3:15
**2020** 2:17
**21** 4:20
**2179** 1:3 202:3
**22** 169:16,23,24
171:8,22
**23** 172:10
**23268** 172:14
**235** 203:11
**24** 173:20
**24.5** 183:16
**25** 99:22 133:14
174:13
**26** 1:10 134:20
174:25 200:3
202:9
**26th** 1:14 9:1
**27** 4:10 5:6 65:14
175:10,17
**28** 5:11 7:18 68:24
69:3 175:20 176:8
**28th** 69:15 72:12
84:8 87:20 88:19

**89:**3,25 90:3
152:9
**29th** 98:16,22
101:2,13,24
103:12,13 106:3

**3**

**3** 16:9 17:14,24
103:3 172:22,24
173:2
**30** 4:7,17 13:21
51:21 122:16
**30th** 98:16 101:13
103:13
**30,000** 194:19
**30-day** 60:15
**300** 2:12
**3000** 203:11
**31** 99:22 154:15,21
**32** 126:14,15
162:16
**33** 7:17 57:1 99:18
**34** 194:19
**35** 4:14 194:7
**37** 4:18 8:21
**38** 4:21

**4**

**4** 18:20,24 149:17
168:11,20,21
193:22
**4.5** 183:14
**40** 180:9
**400** 180:9
**43** 194:14
**46** 99:22
**49** 177:4,7,8

**5**

**5** 18:24 52:6,9
168:24 176:19
177:2
**5-percent** 128:1
**50** 177:24
**50,000** 187:13
**500** 56:25 69:11
132:17 144:21
**52** 8:23

**55** 5:4 99:22,24
**57** 100:11

**6**

**6** 4:13 7:11,13 36:5
53:7,9,14 55:1,5
55:11 60:7,13,19
68:22,23 88:23
98:17 100:19
103:10 106:8,15
110:7 111:19,21
113:18 115:9
116:5 127:7
139:21 141:1
161:9
**6th** 60:10 88:25
89:2,13 90:2,3
**60** 53:6,7,10
**601** 1:14 2:6
**60654** 2:13
**61** 54:1,5
**62** 54:1,7
**65** 5:8
**66** 5:12
**6708** 9:16
**68** 5:18

**7**

**7** 65:5,6 84:12
99:11,11,15 100:2
100:5
**70** 111:21 191:19
**70130** 1:15
**71** 191:22,23
**73** 5:23
**75** 6:7
**77** 6:15
**77027** 203:11

**8**

**8** 5:22 7:8,8 66:12
73:7 84:9
**8.7** 184:11
**8:28** 9:5
**8:45** 156:12
**80** 6:22 99:22
**80,000** 122:16
**82** 7:9

**8462** 203:8
**85** 122:14

**9**

**9** 3:8 12:18 18:25
19:10 20:4,5,6
21:2 29:18,25
30:10 49:14,19
52:3 54:15 73:4
**9th** 112:3
**9:27** 57:10
**9:42** 57:13
**90** 129:19