# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUSIANA

_____ )
)
IN RE: OIL SPILL BY THE OIL RIG DEEPWATER )
HORIZON IN THE GULF OF MEXICO, ON )   MDL No. 2179
APRIL 20, 2010 )
)   Section: J
IN RE THE COMPLAINT AND PETITION OF )
TRITON ASSET LEASING GmbH, ET AL., IN A )   Judge: Barbier
CAUSE OF EXONERATION FROM OR )
LIMITATION OF LIABILITY )   Magistrate: Shushan
)
This Document Relates To: )
2:10-CV-02771 )
_____ )

## MOTION FOR PARTIAL SUMMARY JUDGMENT – SPECIFIC PERFORMANCE OF CONTRACTUAL ACCESS AGREEMENT

**NOW INTO COURT,** through the Plaintiffs' Steering Committee and additional

undersigned counsel of record, comes Plaintiff the Edward Wisner Donation, and respectfully

moves for partial summary judgment finding BP in breach of an August 2010 contractual Access

Agreement permitting oil spill response operations on the Wisner Donation's property. The

basis for this motion is set forth fully in Plaintiffs' Memorandum in Support, Statement of

Uncontested Material Facts, and Exhibits, which are fully incorporated herein.

The Wisner Donation has consulted with the Plaintiffs' Steering Committee in this

proceeding and the PSC has indicated that it concurs with the filing of this motion.

The Wisner Donation further submits that in light of the upcoming Phase I trial

proceedings in the Deepwater Horizon MDL, this motion could be referred to a Magistrate Judge

for findings and recommendations or mediation.



1

Respectfully Submitted:

/s/ Robert Wiygul _____          /s/ Joel Waltzer _____
Robert Wiygul (LA #17411)                      Joel Waltzer (LA #19268)
1011 Iberville Drive                           3715 Westbank Expressway, Ste. 13
Ocean Springs, MS 39564                        Harvey, LA  70058
Office: (228) 872-1125                          Office:  (504) 340-6300
Fax:    (228) 872-1128                          Fax:      (504) 340-6330
robert@waltzerlaw.com                          joel@waltzerlaw.com

*Counsel for Plaintiffs*:


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed

through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial

Order No. 12, which will send a notice of electronic filing to all counsel of record on this 17th

day of February, 2012.

/s/ Robert Wiygul

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

_____ )

IN RE: OIL SPILL BY THE OIL RIG DEEPWATER ) 
HORIZON IN THE GULF OF MEXICO, ON )    MDL No. 2179
APRIL 20, 2010 )

   )    Section: J

IN RE THE COMPLAINT AND PETITION OF )
TRITON ASSET LEASING GmbH, ET AL., IN A )    Judge: Barbier
CAUSE OF EXONERATION FROM OR )
LIMITATION OF LIABILITY )    Magistrate: Shushan

   )

This Document Relates To: )
2:10-CV-02771 )
_____ )

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT – SPECIFIC PERFORMANCE OF CONTRACTUAL ACCESS AGREEMENT

# TABLE OF CONTENTS

I.   FACTUAL BACKGROUND - THE EDWARD WISNER DONATION ......................... 2

II.  THE MC252 SPILL AND ITS IMPACT ON DONATION PROPERTY ......................... 5

III. THE WISNER DONATION/BP ACCESS AGREEMENT ................................................. 8

IV.  BP'S FAILURE  SUPPLY THE INFORMATION THE COMPANY COMMITTED TO
     SUPPLY IN THE ACCESS AGREEMENT .................................................... 10

     A.  Response Planning Documents and Contracts .................................................. 11

     B.  Daily Reports Generated from Activities on the Property .................................. 11

     C.  Information Gathered by SCAT Teams and Other Specialized Bodies ........................... 12

     D.  Aerial Photography, GIS Data and Other Information Developed in the Response ......... 12

     E.  Analysis of Oil Found on the Donation's Property ........................................... 13

     F.  Summary of Operations ......................................................................... 13

V.   THE DONATION'S REPEATED EFFORTS TO HAVE BP HONOR ITS
     CONTRACTUAL COMMITMENT TO PROVIDE DOCUMENTATION ................... 13

VI.  SPECIFIC PERFORMANCE SHOULD BE GRANTED ................................................. 14

     A.  The Terms of the Access Agreement are Unambiguous .................................... 14

     B.  Under Louisiana Law, Specific Performance is the Preferred Remedy for Breach of an
         Obligation to Deliver a Thing .................................................................. 15

VII. CONCLUSION ...................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

American Dredging Co. v. Miller, 510 U.S. 443, 452  (1994) ...................................................... 15

Carter-Green-Redd, Inc. v. USS Cabot/Dedalo Museum Foundation, 756 F. Supp. 276, (E.D. La. 1991) ................................................................................................................................... 15

Charter School of Pine Grove v. St. Helena Parish School Board,  9 So.3d 209, 222 (La. App. 1st Cir. 2009) ..................................................................................................................... 16

J.Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896, 901 (La.1981) ................................. 16

Lombardo v. Deshotel, 94–1172 (La.11/30/94).......................................................................... 16

Romero v. International Terminal Operating Co., 358 U.S. 354 373-74 (1959)......................... 15

Slocum-Stevens Ins. Agency v. International Risk Consultants, 666 So.2d 352, 357 (La. App. 2d Cir. 1995) ..................................................................................................................... 15

Weathersby v. Conoco Oil Co., 752 F.2d 953, 955-56 (5th Cir.1984)........................................ 15

**Civil Code Provisions**

L.S.A.-C.C. Art. 1983 ................................................................................................................. 15

L.S.A.-C.C. Art. 1986 ................................................................................................................. 16

L.S.A.-C.C. Art. 2046 ................................................................................................................. 15

MAY IT PLEASE THE COURT:

The Edward Wisner Donation ("the Wisner Donation" or "the Donation") owns approximately 35,000 acres of land in lower Lafourche Parish, generally bounded by Bayou Lafourche, Caminada Bay and the Gulf of Mexico, extending north to Leeville, Louisiana. This includes approximately nine miles of the area known as Fourchon Beach, which directly fronts on the Gulf of Mexico. The Donation manages this property on behalf of its beneficiaries, including the City of New Orleans, Tulane University, the Medical Center of Louisiana, the heirs of Edward Wisner, and the Salvation Army. Over 60% of the Donation's income ultimately flows to charitable and philanthropic causes. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ II-IV].

Beginning in May, 2010 oil from the Deepwater Horizon spill began washing ashore on the Donation's Fourchon Beach property. The Donation's property was the subject of massive oil spill response operations, at times involving over 1,000 workers, heavy equipment, board roads and massive earthen dams. In August, 2010, the Donation entered into a contractual Access Agreement with BP Exploration & Production, Inc. This agreement (referred to as the "BP Access Agreement" or just "the Access Agreement") governs BP's presence on the Donation's property, and contains a number of very specific commitments on the part of the Company. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ VII-XI].

In the ensuing fifteen months, BP has breached many of these commitments. This motion for partial summary judgment concerns one of the most important and time sensitive of these breaches. In the Access Agreement BP committed to provide the Donation with a broad range of information in connection with oil removal operations on the Donation's property. This information is necessary for the Donation to monitor and provide input on the response,

1

minimize damage to the Donation's property, and for the Donation's advisors and staff to carry out their obligations to act prudently on behalf of the beneficiaries.  The Access Agreement specifically provides that this information will be provided to the Donation as received or on a weekly basis.  Despite this clear commitment, BP has failed to supply much of the documentation it has developed, even after repeated requests and attempts by the Donation to secure good faith performance of the contract.  [Exhibit 1, Declaration of C. Cathy Norman ¶¶ XII-XIV].  These breaches of the Access Agreement were specifically pled in the Donation's Answer in Limitation and Claim in Limitation, and Cross Claim for Damages, Declaratory and Injunctive Relief (Doc. 326).

In this motion the Donation requests that the Court order specific performance of the terms of the Wisner Donation/BP Access Agreement requiring BP to provide the Donation with information about the cleanup on the Donation's own property.  As set out below, there is no issue of material fact as to the terms of the contract, and BP's breach of that contract.  Because the Donation was required to take this action, the Donation also seeks, as provided in the Access Agreement, its attorneys fees and costs incurred in enforcing the Agreement.

## I.      FACTUAL BACKGROUND - THE EDWARD WISNER DONATION

The Edward Wisner Donation is a land-holding Complex Trust created in 1914 by philanthropist Edward Wisner.  The Edward Wisner Donation Advisory Committee, which is composed of a representative of each of the beneficiaries, is responsible for administering the Donation's property.  [Exhibit 1, Declaration of C. Cathy Norman ¶ III]. The Donation's management is required by Louisiana law to manage the property as prudent persons, to control, protect and preserve the corpus of the Donation.  L.S.A.-R.S. 9:2090-91.

The Donation's Fourchon property is outlined in purple below:



The Fourchon property generates millions of dollars annually in income to the beneficiaries of the Donation. Primary sources of revenue, in descending order, include surface leases such as the one for the Port of Fourchon, the LOOP pipeline and a Chevron installation, royalties and rents from oil and gas development, and rents from a variety of other surface leases, including campsites and fishing clubs. Revenues are distributed to the beneficiaries, the majority of which in turn fund scores of charitable, artistic, philanthropic and educational projects. In past years these have included New Orleans' Mayoral Fellow program, the NO Police & Justice Foundation's Cops for Kids program, and the Gun Buy Back Committee. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ II, IV].

The entirety of the Donation's Fourchon property is protected by Fourchon Beach, a coastal sand "levee" consisting of nine miles of native sandy beaches and dunes located between Belle Pass on the west and Elmer's Island on the east. This entire sand "headlands" is a fragile system that is continually reshaped by wind, waves and tide. In recent years the beach has retreated in a northern direction to its rear at a rate of about forty feet per year. In this sense, the beach is continually turning over, retreating and rebuilding atop the unique and rare mangrove forests, salt pans, tidal flats and salt water marsh to its north. All of these areas, together are

critical habitat for hundreds of species of plants and animals, and form a vital buffer against storms for areas inland.  [Exhibit 1, Declaration of C. Cathy Norman ¶¶ V].

Fourchon Beach and the remainder of the Donation's Fourchon property protect the interior coastal wetlands dividing Barataria and Terrebonne Bays, along the banks of Bayou Lafourche (itself, until recently, a distributary of the Mississippi River).  Without the Wisner Donation's Fourchon property, the spit of remaining land on either side of Bayou Lafourche would quickly erode, uniting the Barataria/Caminada and Terrebonne basins and exposing the underbelly of Louisiana to the forces of nature.  If this were to pass, the historic coastal communities of Cocodrie, Dulac, Montegut, Isle Jean Charles, Pointe-Au-Chien, Lockport, Lafitte and Grand Bayou could become relics of the past, with Houma and New Orleans greatly threatened.  If this were to pass, south Louisiana's unique heterogeneous cultures will be forever changed.

The Wisner Donation Advisory Committee understands its critical frontline role in this fight to save south Louisiana.  The Committee and the management of the Donation have for decades worked to protect and restore the headlands and marsh.  Indeed, numerous research and restoration projects make the Donation's Fourchon property one the most studied and active real-time coastal laboratories in the country.  At the time of the Deepwater Horizon spill, a major project called the Caminada Headlands Restoration project was scheduled to begin.  This project is designed to replenish the supply of sand in the system, to ensure the beach will successfully rebuild and remain as a protective barrier.  The Caminada Headlands project is a public-private cooperative endeavor involving hundreds of millions of dollars, and is considered a top priority in preserving Louisiana's endangered coastline.  [Exhibit 1, Declaration of C. Cathy Norman ¶¶ V].

The survival of this critical coastal habitat, and the nationally significant energy infrastructure on Donation property, is directly dependent on the survival of Fourchon beach. The contamination from the Deepwater Horizon oil spill has introduced additional risks for the planned restoration project, and has complicated efforts to save this area. Without adequate information about the spill and its impacts, the Donation will not be able to insure that these projects are carried out in a safe and timely manner, and protect the property against future impacts.

## II. THE MC252 SPILL AND ITS IMPACT ON DONATION PROPERTY

On April 20, 2010, the Deepwater Horizon sank, snapping the riser extending from the MC252 well and releasing millions of barrels of oil into the Gulf of Mexico. The MC 252 oil first arrived in large quantities at the Donation's Fourchon property on or around May 20, 2010. Through the ensuing months, waves of additional fresh oil, emulsion, droplets and tarballs appeared along Fourchon beach and the surrounds, particularly during "tidal events," carried by waves associated with tropical storms. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ VII-X].

The photo below demonstrates the extent of oil on the beach after just one of these events:



As the photo below demonstrates, these tidal events carried oil into the mangrove marsh behind the beach ridge.



©2010 C. Sullivan

It is difficult to overstate the degree of intrusion of oil and cleanup operations on the Donation's Fourchon property. In the period May- November 2011 response operations on the

Donation's property involved as many as 1,500 cleanup workers working a 24 hour day, essentially the population of a small town. In the early stages of the operations the Wisner Donation was often not consulted at all, but nonetheless supported the cleanup effort. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ VII-XI].

During the summer of 2010, support infrastructure for the cleanup workers was set up over the entire length of the beach. Entire fleets of all terrain vehicles, earth moving equipment, portable restrooms, hydration stations, decontamination stations, and other support facilities were in heavy use throughout the beach area. [Exhibit 1, Declaration of C. Cathy Norman, ¶ VIII].

Equally important, the response effort actually changed the physical structure of the Donation's property. A major outlet to the Gulf, Bayou Fer Blanc, was dammed as part of the response effort. Other naturally occurring channels connecting the marsh and the beach were dammed with sheet pilings and had board roads laid across them to allow access of motorized equipment for the response effort. [Exhibit 1, Declaration of C. Cathy Norman ¶ IX].

The impacts of damming the naturally occurring outlets through the beach are substantial. After tropical storms or other high water events which push water over the beach ridge and into the marsh, the bayous and breaches allow the water to drain from the marsh. When the breaches are dammed the water either goes around the dams, causing additional erosion at the edges of the structures, or it finds a new route to the gulf, causing new breaches in the beach. Documenting and understanding the changes in the beach caused by the response effort is critical to understanding and preventing additional damage to the beach. [Exhibit 1, Declaration of C. Cathy Norman ¶IX].

Despite the massive cleanup operation, oil can still be found throughout the Donation's property: on the sandy beach, in the washouts and natural bayous, in the salt flats, mangrove and

saltwater marshes found behind the beach crest and on the waterbottoms both in front of and behind the beach. On the beach these layers of oil, intermixed with sediment, in places eighteen inches to several feet deep, are referred to as "tar balls", "tar patties" and "tar mats".  These deposits range widely in size, from inches to hundreds of feet in length.  [Exhibit 1, Declaration of C. Cathy Norman ¶ X].

Although oil also washed deep into the salt marsh behind the beach at Fourchon, BP has never assessed the location of contamination in the marsh, despite requests from the Donation. The Donation has itself identified a number of marsh sites with oil contamination, and is monitoring several of these to determine the degradation rates and other characteristics of the oil remaining.  It is critical to the Donation to have access to the information to determine the degree of contamination of its property.   [Exhibit 1, Declaration of C. Cathy Norman ¶ XII].

Most recently BP has discontinued response operations on large parts of the Donation's property, despite the fact that oil remains in place.  On other parts of the property, response operations continue to a limited extent. [Exhibit 1, Declaration of C. Cathy Norman ¶ X].

### III.    THE WISNER DONATION/BP ACCESS AGREEMENT

The Wisner Donation's Fourchon Property contains a substantial amount of oil and gas and other infrastructure.  The Donation carefully monitors and manages all activities on the property, including maintenance of existing infrastructure and new projects.  Because of its unique resources and location, the Donation also receives and routinely grants requests for the access to the property for research purposes.  [Exhibit 1, Declaration of C. Cathy Norman ¶¶ IV, VI].

In order to carry out the obligation to protect the corpus of the Donation for its beneficiaries, the Donation for many years has routinely required anyone seeking to carry out activities on the property to execute a contractual access agreement.  The Donation's standard

agreement contains provisions dealing with liability, indemnification, acceptable equipment usage, best management practices, coordination with Donation staff, and access to information developed on the property.  [Exhibit 1, Declaration of C. Cathy Norman ¶ VI].

In keeping with its long-standing practice, the Donation requested that BP execute an Access Agreement governing oil spill response on the Donation's property.[1]  After negotiation with BP's legal department, this agreement was executed by the parties in early August, 2010. The signed copy of the Access Agreement is included as Attachment A to Ms. Norman's declaration in support of this motion.  The BP Access Agreement contains the terms found in the Donation's standard Access Agreement, as well as some terms geared to the massive oil spill response itself.   The BP Access Agreement remains in effect today.  [Exhibit 1, Declaration of C. Cathy Norman ¶ XI].

Three provisions of the Wisner Donation/BP Access Agreement are central to this motion.  First, Paragraph 2 of the agreement provides as follows:

> (2) Prior to beginning operations, or as they become available, Grantee will provide Grantor with a copy of all work plans, protocols, or contracts ("cleanup documents") relating to Grantee's oil spill cleanup operations on Grantor's property. Copies of any revised, updated or supplemented cleanup documents will be provided to Grantor as soon as they become available.

[Exhibit 1, Declaration of C. Cathy Norman, Attachment A].

Paragraph 5 provides for BP to provide a written weekly summary of operations on the property:

---

[1] It is clear that landowners like the Donation retain control over their property during spill response.  The MC252 Regional Incident Contingency Plan implemented in Louisiana states: "[l]andowners that provide access to or are affected by a spill have jurisdiction over their lands, and warrant special consideration by the responding agency or unified command.  In the event that an incident poses, or has the potential to pose, an imminent threat to human health and/or the environment, it is in the best interest of the landowner to provide access to a FOSC." MC252 RICP, May 2010, page 40.

(5) Grantee will provide Grantor a weekly summary of all removal/response operations undertaken on Wisner property, including a description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation.

[Exhibit 1, Declaration of C. Cathy Norman, Attachment A].

Paragraph 6 provides that BP will provide the Donation with all of the information developed on the property "as received or on a weekly basis:"

(6) Grantee will provide Grantor with a copy of all waste manifests or other documents detailing all materials removed from Wisner Donation property, the results of all testing of any kind carried out on Grantor's property by Grantee or its contractors or at Grantee's request in connection with operations, and all documentary information such as photographs, video, GPS logs, reports, work logs or journals kept in connection with SCAT assessments and oil removal operations. This information will be provided as received on a weekly basis. If Grantee believes that any oil or oiled waste removed from the Wisner Property is not attributable to the Deepwater Horizon oil spill, Grantee shall segregate that waste and notify Grantor to allow the waste to be documented and samples taken.

[Exhibit 1, Declaration of C. Cathy Norman, Attachment A].

As set out in the next section of this memorandum, BP has supplied only limited information about the massive operations on the Donation's property, despite repeated requests and attempts by the Donation to secure compliance.

## IV.   BP'S FAILURE  SUPPLY THE INFORMATION THE COMPANY COMMITTED TO SUPPLY IN THE ACCESS AGREEMENT

As detailed above, BP's cleanup operations on the Donation property have been massive, and those operations have produced a corresponding amount of documentation.   However, BP has supplied the Donation with only a part, and likely only a very small part, of the information required under the BP Access Agreement.   The Donation does not know the full spectrum of information collected or generated by BP.  As a part of its request for relief in this motion, the Donation therefore requests that BP be required to provide a full list of all documents relating to its operations on Donation property, and a knowledgeable representative to testify regarding the

information that is responsive to the requirements of the Agreement.   Even without full information, however,  the Donation is aware that BP has failed to provide available information in at least the following areas.[2]

A.      Response Planning Documents and Contracts

Response operations on the Donation property were carried out under a number of different documents generated by the Deepwater Horizon Unified Command, of which BP is a part.  These included documents called "Shoreline Treatment Recommendations" and "Shoreline Treatment Plans."

BP has supplied the Donation with some of these documents.  However, operations during 2011 were carried out under a document called the "2011 Interim Louisiana Shoreline Plan," a copy of which has never been provided to the Donation.  BP has not produced any of the contracts with subcontractors and others governing operations on the Donation's property.  The Donation does not know whether other documents governing cleanup have also been withheld. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

B.      Daily Reports Generated from Activities on the Property

Removal activities on the Donation's property are recorded in several types of daily reports.  These include items such as sign in sheets from meetings, waste tracking reports, and other documents.  BP has produced a limited number of these items dated prior to late March, 2011.   The Donation does not know whether all of the daily reports generated prior to that date

---

[2] BP has also breached the Access Agreement in equally important ways that are not included in the present motion for partial summary judgment.  For example, BP has refused to pay for required monitoring and analysis on the Donation's property.  The practical effect of BP's refusal to abide by its payment obligations is that funds which would have gone to support philanthropic causes are instead being diverted to fund Deepwater Horizon spill response. Declaration of Caty Norman, ¶ XII.

have been produced, but it is clear that very few reports have been produced after that date. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

C.     Information Gathered by SCAT Teams and Other Specialized Bodies

Assessment of the condition of the Donation's property was carried out at least in part by by specialized teams of contractors or BP employees.  These included Shoreline Cleanup and Assessment Teams ("SCAT") and in some cases Forensic Research and Assessment Teams ("FRAT").  These groups assessed the amount and type of oil present, determined what response was necessary, performed beach profile measurements, and other tasks.

The SCAT and FRAT observations were recorded in a number of different types of reports.  These include SCAT Liasion Reports, SCAT Daily Reports, SCAT Technical Visit Reports, Field Notes, Photographs, Shoreline Inspection Reports, Stage III Inspection Reports, beach profile reports, and FRAT Reports.

BP provided the Donation with at least some of these various types of reports, the last of which is dated in March 2011.  Since that date BP has supplied very little information regarding SCAT schedules, no SCAT reports have been provided since that date.  Again, the Donation has no way of knowing whether all of the documents prior to March 2011 have been produced, or exactly what documents have been produced after that date.  [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

D.     Aerial Photography, GIS Data and Other Information Developed in the Response

BP has aerial photography, maps, and other information including Geographical Information System ("GIS") data sets related to the Donation's Fourchon property.  BP has produced a limited amount of this type of information to the Donation, and some of this information may be available through other sources.  Information produced included a few maps

indicating locations oil has been found at various points in the cleanup. However, despite

repeated requests BP has never supplied the Donation with any GIS data sets, aerial

photography, or other maps. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

E.      Analysis of Oil Found on the Donation's Property

        The Donation has received little or no analytical reports for oil found on the Donation's

property. BP produced a limited number of documents called "Chain of Custody/Analytical

Request Document," but did not produce the analytical results from any testing of any sort.

[Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

F.      Summary of Operations

        BP has never provided any of the weekly summaries of removal/response operations

undertaken on Donation property. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

## V.  THE DONATION'S REPEATED EFFORTS TO HAVE BP HONOR ITS CONTRACTUAL COMMITMENT TO PROVIDE DOCUMENTATION

        As set out above, the BP Access Agreement provides for information about operations on

the Donation's property to be provided as soon as available, or at a minimum on a weekly basis.

BP has never complied with this commitment. As set out above BP has provided information to

the Donation on an episodic basis, but the full suite of information provided by the agreement

has never been provided.

        BP's breach of the Access Agreeent literally began as soon as it was signed. On

November 9, 2010, the Donation sent a letter to BP's counsel outlining BP's breaches of the

agreement over the preceding three months. These breaches included failure to pay response

costs, failure to provide contact information for people working on the property, and timely

notice of meetings affecting the property. This letter, which is included as Attachment 2 to the

Declaration of Cathy Norman, also listed the documentary information that BP had failed to

provide under the Access Agreement, and requested that BP come into full compliance with the agreement.  As a consequence of this and other communications, as detailed in the previous section of this memorandum BP provided the Donation with a limited amount of the information required under the Access Agreement.  This information was not provided until the spring of 2011, some months later, and only sporadic information has been provided to the Donation since that time. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIV].

Since the spring of 2011 the Donation informally requested this information from BP on a number of occasions.  The Donation was advised that Mike Taylor, a BP contractor, would be responsible for coordinating the provision of the information required by the Access Agreement. On October 18, 2011, Mr. Taylor was provided with a list of information the Donation was missing.  Mr. Taylor responded that BP legal would have to approve the release of any information to the Donation.   [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIV].

 Despite follow up requests which were directly copied to BP's counsel BP has never produced any of this information and has never responded further to requests for the information.  [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIV].  BP's breaches of the Access agreement were specifically pled in the Donation's Answer in Limitation and Claim in Limitation, and Cross Claim for Damages, Declaratory and Injunctive Relief (Doc. 326).

## VI.     SPECIFIC PERFORMANCE SHOULD BE GRANTED

A.     <u>The Terms of the Access Agreement are Unambiguous</u>

The terms of the Access Agreement, as set forth above, are straightforward and unambiguous.  They spell out the information regarding operations on the Donation's property that must be delivered to the Donation, and the time frame within which BP is to deliver that information.  Indeed, BP has never indicated any confusion or uncertainty about the information

that must be provided under the Access Agreement.  Rather, BP has simply declined to provide all of the information required.

The Louisiana Civil Code provides, in keeping with the near universal principles of contract law, that "[c]ontracts have the effect of law for the parties."  L.S.A.-C.C. Art. 1983. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  L.S.A.-C.C. Art. 2046.  The question whether a contract is ambiguous is one of law, and the interpretation of an unambiguous contract is also one of law which may in appropriate cases be resolved on summary judgment. *E.g. Slocum-Stevens Ins. Agency v. International Risk Consultants,* 666 So.2d 352, 357 (La. App. 2d Cir. 1995).[3]

BP's obligation to provide information is plain and unambiguous, and that undertaking is law between the parties.  There is no excuse for BP's breach.

B. <u>Under Louisiana Law, Specific Performance is the Preferred Remedy for Breach of an Obligation to Deliver a Thing</u>

Article 1986 of the Louisiana Civil Code establishes the right of an oblige to obtain specific performance of a contract:

---

[3] The Wisner Donation believes it is clear that the BP Access Agreement is governed by Louisiana state law, since it deals with the transfer of information that occurs on land, concerning activities on land.  *E.g.*, *Carter-Green-Redd, Inc. v. USS Cabot/Dedalo Museum Foundation*, 756 F. Supp. 276, (E.D. La. 1991) ("Clearly, the contract is one which was made on land to be performed on land, and there is no need or justification for resort to the law of the sea. Such matters can and should be dealt with under state law contract principles.").  However, if the Court determines that the Access Agreement is governed by the General Maritime law, the same principles apply.  *E.g.*  *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955-56 (5th Cir.1984) (interpretation of the terms of a contract is a matter of law, and words of maritime contract should be given their plain meaning unless the provision is ambiguous); *American Dredging Co. v. Miller*, 510 U.S. 443, 452  (1994) (state law remedies may be incorporated into admiralty when uniformity not required, citing *Romero v. International Terminal Operating Co.*, 358 U.S. 354 373-74 (1959)).

> Upon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee.
>
> Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.

L.S.A.-C.C. Art. 1986.  As the comment to this article notes, "if an obligor fails to perform an obligation to deliver a thing, the court shall grant specific performance to the obligee."  A recent decision of a Louisiana appellate court summarizes the favored status of specific performance under Louisiana law:

> Under Louisiana's civil law system, specific performance is the preferred remedy for breach of contract. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation. *Lombardo v. Deshotel,* 94–1172 (La.11/30/94), 647 So.2d 1086, 1090; *see* LSA–C.C. art.1986. An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor's interest, or of substantial negative effect upon the interests of third  parties. *J.Weingarten, Inc. v. Northgate Mall, Inc.,* 404 So.2d 896, 901 (La.1981).

*Charter School of Pine Grove v. St. Helena Parish School Board*,  9 So.3d 209, 222 (La. App. 1st Cir. 2009).

The BP Access Agreement creates a classic obligation to deliver a thing – in this case information which is in BP's hands.  BP has simply declined to comply with these terms, and the appropriate remedy is to order BP to specifically comply with its obligations under the Access Agreement.  This remedy is not just the preferred one, it is the only remedy which will permit the Donation to carry out its obligation to protect the property which forms the corpus of the trust.

## VII.   CONCLUSION

For all the reasons set out above, the Edward Wisner Donation requests that the Court grant summary judgment in favor of the Donation, finding that BP Exploration and Production, Inc. has breached its obligation to provide information under the BP Access Agreement.  The

16

Donation requests that the Court require that BP take the following actions to remedy this breach:

(1)  Provide a detailed listing, and provide that listing to the Donation.

(2)  Provide a corporate representative with knowledge of all information relating to the Deepwater Horizon oil spill response on the Donation's property for examination under oath by the Wisner Donation.

(3)  Provide the Wisner Donation with all of the information required by the BP Access Agreement.

(4)  Set a schedule for the submission of the Wisner Donation's application for fees and costs incurred in enforcing the Access Agreement, as provided by Paragraph 11 of the Agreement.


Respectfully Submitted:

/s/ Robert Wiygul                                 /s/ Joel Waltzer
Robert Wiygul (LA #17411)            Joel Waltzer (LA #19268)
1011 Iberville Drive                          3715 Westbank Expressway, Ste. 13
Ocean Springs, MS 39564               Harvey, LA  70058
Office: (228) 872-1125                     Office:  (504) 340-6300
Fax:    (228) 872-1128                      Fax:       (504) 340-6330
robert@waltzerlaw.com                   joel@waltzerlaw.com

*Counsel for Plaintiffs*:


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 17th day of February, 2012.

/s/ Robert Wiygul

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUSIANA

_____ )
)
IN RE: OIL SPILL BY THE OIL RIG DEEPWATER )
HORIZON IN THE GULF OF MEXICO, ON )    MDL No. 2179
APRIL 20, 2010 )
) Section: J
IN RE THE COMPLAINT AND PETITION OF )
TRITON ASSET LEASING GmbH, ET AL., IN A )    Judge: Barbier
CAUSE OF EXONERATION FROM OR )
LIMITATION OF LIABILITY )    Magistrate: Shushan
)
This Document Relates To: )
2:10-CV-02771 )
_____ )

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT – SPECIFIC PERFORMANCE OF CONTRACTUAL ACCESS AGREEMENT

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    The Edward Wisner Donation (hereinafter "the Wisner Donation" or "the Donation")
owns approximately 35,000 acres of land in lower Lafourche Parish, generally bounded by
Bayou Lafourche, Caminada Bay and the Gulf of Mexico, extending north to Leeville,
Louisiana.  This includes approximately nine miles of the area known as Fourchon Beach, which
directly fronts on the Gulf of Mexico.  The Donation manages this property on behalf of its
beneficiaries, including the City of New Orleans, Tulane University, the Medical Center of
Louisiana, the heirs of Edward Wisner, and the Salvation Army.  Over 60% of the Donation's
income ultimately flows to charitable and philanthropic causes.  [Exhibit 1 to Motion for
Summary Judgment, Declaration of C. Cathy Norman ¶¶ II-IV].

2.    The Donation's Fourchon property is primarily fragile coastal wetlands, dunes and beaches,
including about nine miles of Fourchon Beach.  The Caminada Headland – better known as
Fourchon Beach – is the last coastal barrier protecting the marshes of the Barataria Basin from the

1

Case 2:10-md-02179-CJB-SS Document 13737-2 Filed 07/30/14 Page 2 of 5

open Gulf.  The Caminada Headland and the wetlands and uplands it protects are also in an area of the Louisiana coast that provides habitat for hundreds of species of plants and animals.  It is also an area that has experienced major land loss.  The Headland is currently retreating at up to 40 feet per year.  Without this barrier, the inland communities of the Barataria, Caminada and Terrebonne basins would be at serious risk because the wetlands would be exposed to the open Gulf of Mexico.  At the time of the Deepwater Horizon spill, a $72 million cooperative project called the Caminada Headlands Restoration project was scheduled to begin on the Donation's property.  The Caminada Headlands project is now scheduled to begin during 2012. [Exhibit 1 to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶  V].

3.      Beginning in May, 2010 oil from the Deepwater Horizon spill began washing ashore on the Donation's Fourchon Beach property.   The Donation's property was the subject of massive oil spill response operations, at times involving over 1,000 workers, heavy equipment, board roads and massive earthen dams.   The massive response on the Donation's Fourchon property actually changed the physical structure of the beach itself.  Thousands of tons of oil and oily sediments were removed.  In places the clay layer that forms a stabilizing substrate for the beach was removed.   Heavy earthmoving equipment left sunken tracks, and removal of sediments left areas more vulnerable to erosion. The damming of breaches and construction of board roads also resulted in different erosional patterns.  [Exhibit 1 to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶  VII-VIII].

4.      Oil from the Deepwater Horizon spill remains present on the beach and in the marsh areas of the Donation's property.   [Exhibit 1 to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶  X].

5.      In August, 2010, the Donation entered into a contractual Access Agreement with BP Exploration & Production, Inc.  This agreement (referred to as the "BP Access Agreement" or just "the Access Agreement") governs BP's presence on the Donation's property, and contains specific commitments on the part of the Company. [Exhibit 1to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶ XI].

6.      The BP Access Agreement was negotiated between the parties.   BP was represented by attorneys, and changes were made to the Agreement at BP's request.   [Exhibit 1to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶ XI].

7.      Paragraphs 2, 5, and 6 of the Access Agreement provide as follow:

> (2) Prior to beginning operations, or as they become available, Grantee will provide Grantor with a copy of all work plans, protocols, or contracts ("cleanup documents") relating to Grantee's oil spill cleanup operations on Grantor's property. Copies of any revised, updated or supplemented cleanup documents will be provided to Grantor as soon as they become available.

*  *  *

> (5) Grantee will provide Grantor a weekly summary of all removal/response operations undertaken on Wisner property, including a description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation.

*  *  *

> (6) Grantee will provide Grantor with a copy of all waste manifests or other documents detailing all materials removed from Wisner Donation property, the results of all testing of any kind carried out on Grantor's property by Grantee or its contractors or at Grantee's request in connection with operations, and all documentary information such as photographs, video, GPS logs, reports, work logs or journals kept in connection with SCAT assessments and oil removal operations. This information will be provided as received on a weekly basis. If Grantee believes that any oil or oiled waste removed from the Wisner Property is not attributable to the Deepwater Horizon oil spill, Grantee shall segregate that waste and notify Grantor to allow the waste to be documented and samples taken.

8.      BP has provided limited information to the Donation on an episodic basis, but the full suite of information provided by the agreement has never been provided.   For example,

3

operations on Donation property during 2011 were carried out under a document called the "2011 Interim Louisiana Shoreline Plan," a copy of which has never been provided to the Donation. Another example is that no Geographical Information System ("GIS") data has been provided, although such information was developed for the Donation's property. Reports from "SCAT" teams for 2011 have not been provided. [Exhibit 1to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶ XIII].

9.      The Donation has no source other than BP to learn the full suite of information that has been developed on the property.

10.     The Donation has made repeated requests that BP provide all of the information required by the Access Agreement. BP has not provided the information. . [Exhibit 1to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶ XIV].

11.     The Donation has a critical need for immediate provision of information in BP's possession. Multi-million dollar restoration projects are currently planned for the Donation's property. Further, analyzing data on the impacts of response efforts is necessary to determine protective measures that should be taken to prevent damage to the property. [Exhibit 1to Motion for Summary Judgment, Declaration of C. Cathy Norman ¶ IX].

Respectfully Submitted:

/s/ Robert Wiygul                     /s/ Joel Waltzer
Robert Wiygul (LA #17411)            Joel Waltzer (LA #19268)
1011 Iberville Drive                 3715 Westbank Expressway, Ste. 13
Ocean Springs, MS 39564             Harvey, LA 70058
Office: (228) 872-1125               Office: (504) 340-6300
Fax:    (228) 872-1128               Fax:     (504) 340-6330
robert@waltzerlaw.com                joel@waltzerlaw.com

*Counsel for Plaintiffs*:

4

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been electronically filed

through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial

Order No. 12, which will send a notice of electronic filing to all counsel of record on this 17th

day of February, 2012.

/s/ Robert Wiygul

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUSIANA

|  |  |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 | ) ) ) ) | MDL No. 2179 |
| | ) | Section: J |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | ) ) ) ) ) | Judge: Barbier |
| | | Magistrate: Shushan |
| This Document Relates To: 2:10-CV-02771 | ) ) ) ) | |

## DECLARATION OF C. CATHY NORMAN

### I.

My name is C. Cathy Norman. I am fully competent to make this declaration, and all of the statements in it are based on my personal knowledge. I have a B.A. degree from Tulane University, and I received my law degree from Tulane in 1982. My work history and background are primarily as a petroleum landman and attorney, working with contract negotiations and project administration. Since 1992 I have been employed as the Secretary Treasurer of the Edward Wisner Donation.

### II.

The Wisner Donation is a Louisiana Complex Trust, which was established in 1914 by the businessman and philanthropist Edward Wisner. The original Act of Donation placed over 53,000 acres of land and waterbottoms in Jefferson, St. John, and Lafourche parishes in trust for the benefit of the City of New Orleans, Charity Hospital, Tulane University, and the Salvation Army (a later agreement gave Mr. Wisner's heirs and certain others an interest in the trust as well). The majority

of the revenues of the Donation go to fund various philanthropic causes in and around the City of New Orleans. For example, some of the recent recipients have been New Orleans' Mayoral Fellow program, the NO Police & Justice Foundation's Cops for Kids program, and the Gun Buy Back Committee.

III.

The Wisner Donation is managed by myself and a small staff under the direction of the Edward Wisner Donation Advisory Committee, which is composed of a representative of each of the beneficiaries. The Mayor of New Orleans acts as Trustee, and acts on the advice and consent of a majority of the Advisory Committee. As Secretary Treasurer my role is to carry out the instructions of the Advisory Committee, and manage the business and assets of the Donation in a prudent way for the benefit of the City and the other beneficiaries. The Donation currently owns approximately 37,000 acres, with the bulk of its land holdings – approximately 35,000 acres - in southern Lafourche Parish, stretching approximately from Leeville, Louisiana south to the Gulf of Mexico (this property is often referred to as "the Fourchon property"). Part of my job is protecting the land that makes up the corpus of the Donation, to insure that the Donation's purposes can be carried out.

IV.

The Donation's primary sources of income are royalties from oil and gas activities, and various types of surface leases. The Donation's Fourchon property has been held by production under oil and gas leases since the 1950's, and contain significant oil and gas infrastructure. This includes the Louisiana Offshore Oil Port pipeline and gathering facility, which transports approximately 15% of the U.S. imported oil supply. The Donation's Fourchon property also is the

2

site of Port Fourchon, which is the major support facility for offshore oil and gas exploration in the Central Gulf of Mexico.

## V.

The Donation's Fourchon property is primarily fragile coastal wetlands, dunes and beaches, including about nine miles of Fourchon Beach.  The Caminada Headland – better known as Fourchon Beach – is the last coastal barrier protecting the marshes of the Barataria Basin from the open Gulf.  The Caminada Headland and the wetlands and uplands it protects are also in an area of the Louisiana coast that provides habitat for hundreds of species of plants and animals.  It is also an area that has experienced major land loss.  The Headland is currently retreating at up to 40 feet per year.  Without this barrier, the inland communities of the Barataria, Caminada and Terrebonne basins would be at serious risk because the wetlands would be exposed to the open Gulf of Mexico. At the time of the Deepwater Horizon spill, a $72 million cooperative project called the Caminada Headlands Restoration project was scheduled to begin on the Donation's property. The Caminada Headlands project is now scheduled to begin during 2012.  This project is designed to replenish the supply of sand in the system, to ensure the beach will successfully rebuild.

## VI.

The Donation's Advisory Committee has for several decades focused on protecting the physical integrity of the property through careful monitoring and management of all activities on the property, including maintenance of existing infrastructure and new projects.  The Donation has also freely allowed dozens of research projects on its property, and sponsored and participated in restoration projects.  The Donation has in place specific procedures which document impacts and damage to the property from all activities, determine the mitigation needed to restore damage

3

caused by the activities, and insure that the mitigation is carried out.   A central part of these procedures is a standard access agreement, which contains terms dealing with liability, indemnification, acceptable equipment usage, best management practices, coordination with Donation staff, and access to information developed on the property.   The Donation has an onsite monitor, typically Mr. Forrest Travirca, the Donation's field investigator, who oversees all significant activities on the property.   The Donation's experience has been that the Access Agreement typically works well, and companies have no problems determining and complying with their obligations under the agreement.

## VII.

Response activities on the Donation's Fourchon property began in early May 2010, before oil actually reached the property.   Although the Donation was not notified or consulted about these activities, they appeared aimed at preventing oil from reaching marsh areas through the bayous and drains (usually referred to as "breaches") which cut through the beach and connect the marsh to the Gulf of Mexico.   On May 9, 2010 Blackhawk helicopters began flying in large sandbags and dropping them into the breaches.   I was initially contacted by Lafourche Parish authorities in mid-May when it became clear that oil was likely to come ashore on Donation property.   I supplied the parish with aerial photography, video, maps and other information at the Donation's disposal to identify critical areas for the response effort.   Early efforts focused on stopping oil at the beach, including placement of containment and absorbent booms on Donation property.   These efforts also included building a land bridge completely damming Bayou Fer Blanc, a major bayou draining the marsh on Donation property, and using sheet piling to dam several other breaches through the beach.

## VIII.

4

Oil from the Deepwater Horizon event first began washing onto the Donation's property and into the interior marsh on May 20, 2010. From mid-May 2010 throughout the remainder of 2010 the Donation's personnel were required to devote essentially all of their time to the Deepwater Horizon response. The response effort has remained a major commitment for Donation staff up to the present date. Beginning in May 2010 there were literally hundreds of people and heavy equipment of all sorts on the Donation's property. At the height of response operations in the summer and fall of 2010 there were as many as 1500 workers on the Donation's property working 24 hours per day, with entire fleets of all terrain vehicles, earth moving equipment, portable restrooms, hydration stations, decontamination stations, and other support facilities. Based on our observations and the reports we received, hundreds of thousands of cubic yards of sand and sediment were removed over the course of operations, and never replaced.

## IX.

The massive response on the Donation's Fourchon property actually changed the physical structure of the beach itself. Thousands of tons of oil and oily sediments were removed. In places the clay layer that forms a stabilizing substrate for the beach was removed. Heavy earthmoving equipment left sunken tracks, and removal of sediments left areas more vulnerable to erosion. The damming of breaches and construction of board roads also results in different erosional patterns. After tropical storms or other high water events which push water over the beach ridge and into the marsh, the bayous and breaches allow the water to drain from the marsh. When the breaches are dammed the water either goes around the dams, causing additional erosion at the edges of the structures, or it finds a new route to the gulf, causing new breaches in the beach. Given these major changes in the hydrology of the headland, documenting and

understanding the changes caused by the response effort is critical to understanding and preventing additional damage to Donation property.

X.

Response operations on the Donation's property in 2011 have been substantially smaller in scope, although large amounts of oil remain on the sandy beach, in the washouts and natural bayous, in the salt flats, mangrove and saltwater marshes found behind the beach crest and on the waterbottoms both in front of and behind the beach. On the beach these layers of oil, intermixed with sediment, in places eighteen inches to several feet deep, are referred to as "tar balls", "tar patties" and "tar mats". "Tarballs" continue to wash up on the Donation's property on a daily basis, and larger deposits of oil are uncovered on a frequent basis. These deposits range widely in size, from inches to over a hundred feet in length. Tropical Storm Lee in September 2011 resulted in erosion which appeared greater than average, and uncovered many buried oil deposits. In short, the response effort on the Donation's property is not complete even today.

XI.

The Donation has cooperated with the response in every way possible given the need for emergency action. In the early stages of the response the Donation permitted highly intrusive activities without any formal agreement, and indeed BP generally undertook these activities with little or no notice to the Donation. On June 16, 2010, Donna Ward in BP's legal department expressed the company's interest in signing an access agreement governing operations on the Donation's property. In response I sent Ms. Ward one of the Donation's standard access agreements. On June 24, a BP attorney named Farley Burge responded with proposed changes to the access agreement. Additional consultation followed, and eventually an agreement was reached which essentially followed the form of the standard Wisner Donation Access

6

Agreement, with several changes geared to deal with the scope and complexity of the spill response effort. BP reviewed the agreement and requested several changes, which were made to the final agreement. The final Access Agreement, as signed by BP and the Donation, is attached as Exhibit A to this Declaration.

XII.

Within months of the signing of the BP Access Agreement, it became clear that BP did not intend to fully comply with its terms. For example, paragraph 7 of the BP Access Agreement recognizes the need for the Donation to have appropriate consultants to monitor BP's cleanup operations, and further provides that BP will reimburse the Donation for the expenses associated with these consultants. Paragraph 9 further provides that BP will be responsible for all the reasonable costs and expenses associated with assessing damage to Wisner property caused by oil spill cleanup operations. The Donation contracted with two well qualified scientists, environmental engineer Dr. John Pardue and coastal geomorphologist Dr. Jeff Williams, to assess and monitor the effects of BP's operations on the property. Among other important work, these scientists have identified areas of contamination in the marsh and are monitoring those sites to determine the degradation rate and other characteristics of the remaining oil. This step is necessary because BP never assessed the extent of contamination in the marsh on the Donation's property. However, BP has from the beginning refused to reimburse the Donation for these costs, apparently because the scientists' work might be used adversely to BP in this litigation. As a consequence, the funds for this monitoring work have been paid by the Donation, with the result that these funds are not available to support the beneficiaries of the Donation. As a practical matter, BP has diverted the funds available to the beneficiaries of the Donation, which are over 60% philanthropic causes, and forced the Donation to fund response costs for the Deepwater Horizon oil spill.

7

XIII.

Some of the most important aspects of the BP Access Agreement, and the ones at issue in this motion, deal with sharing of information regarding operations on the property.  Because the Donation's property is fragile and already subject to threats from coastal erosion, impacts from activities on the property must be assessed and addressed as quickly as possible.  For example, if damage to beach or marsh areas is not restored quickly, the damaged area can expand, making restoration more difficult and expensive.  The Caminada Headlands project is also slated to begin in the immediate future, so understanding the impacts of the response, and the oil remaining on the property, is critical to insuring this project is not delayed.  Understanding the activities on Donation property and assessing any information regarding those impacts is therefore critical.   As explained earlier in this declaration, the physical impacts of the spill and the response effort are substantial.  Paragraphs 2,  5,  and 6 of the BP Access agreement all deal with information sharing.   These paragraphs provide as follow:

> (2) Prior to beginning operations, or as they become available, Grantee will provide Grantor with a copy of all work plans, protocols, or contracts ("cleanup documents") relating to Grantee's oil spill cleanup operations on Grantor's property. Copies of any revised, updated or supplemented cleanup documents will be provided to Grantor as soon as they become available.

* * *

> (5) Grantee will provide Grantor a weekly summary of all removal/response operations undertaken on Wisner property, including a description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation.

* * *

> (6) Grantee will provide Grantor with a copy of all waste manifests or other documents detailing all materials removed from Wisner Donation property, the results of all testing of any kind carried out on Grantor's property by Grantee or its contractors or at Grantee's request in connection with operations, and all documentary information such as

8

photographs, video, GPS logs, reports, work logs or journals kept in connection with SCAT assessments and oil removal operations. This information will be provided as received on a weekly basis. If Grantee believes that any oil or oiled waste removed from the Wisner Property is not attributable to the Deepwater Horizon oil spill, Grantee shall segregate that waste and notify Grantor to allow the waste to be documented and samples taken.

In the period prior to March, 2011 BP complied to a limited extent with its obligations under these provisions of the BP Access Agreement. Since March 2011 BP has provided information only sporadically, and in some categories has not provided any information at all. The current state of documentation supplied by BP is detailed below.

A.    Response Planning Documents and Contracts

Response operations on the Donation property were carried out under a number of different documents generated by the Deepwater Horizon Unified Command, of which BP is a part. These included documents called "Shoreline Treatment Recommendations" and "Shoreline Treatment Plans."

BP has supplied the Donation with some of these documents. However, operations during 2011 were carried out under a document called the "2011 Interim Louisiana Shoreline Plan," a copy of which has never been provided to the Donation. BP has not produced any of the contracts with subcontractors and others governing operations on the Donation's property. The Donation does not know whether other documents governing cleanup have also been withheld.

B.    Daily Reports Generated from Activities on the Property

Removal activities on the Donation's property are recorded in several types of daily reports. These include items such as sign in sheets from meetings, waste tracking reports, and other documents. BP has produced a limited number of these items dated prior to late March,

2011. The Donation does not know whether all of the daily reports generated prior to that date have been produced, but only a few reports have been produced after that date.

C.    Information Gathered by SCAT Teams and Other Specialized Bodies

Assessment of the condition of the Donation's property was carried out at least in part by specialized teams of contractors or BP employees. These included Shoreline Cleanup and Assessment Teams ("SCAT") and in some cases Forensic Research and Assessment Teams ("FRAT"). These groups assessed the amount and type of oil present for cleanup purposes, determined what response was necessary, performed beach profile measurements, and other tasks.

The SCAT and FRAT observations were recorded in a number of different types of reports. These include SCAT Liaison Reports, SCAT Daily Reports, SCAT Technical Visit Reports, Field Notes, Photographs, Shoreline Inspection Reports, Stage III Inspection Reports, beach profile reports, and FRAT Reports.

BP provided the Donation with at least some of these various types of reports, the last of which is dated in March 2011. BP has supplied information about SCAT scheduling, but no reports, field notes or the like since that date. Again, the Donation has no way of knowing whether all of the documents prior to March 2011 have been produced.

D.    Aerial photography, GIS data and other information developed in the response

BP has aerial photography, maps, and other information including Geographical Information System ("GIS") data sets related to the Donation's Fourchon property. BP has produced a limited amount of this type of information to the Donation, and some of this information may be available through other sources. Information produced included a few maps indicating locations oil has been found at various points in the cleanup. However, despite

10

repeated requests BP has never supplied the Donation with any GIS data sets, aerial

photography, or other maps. This type of information is critical to determining the impacts of

the response operations on the Donation's property.

E.      Analysis of oil found on the Donation's Property

The Donation has received very few analytical reports for oil found on the Donation's

property. BP produced a limited number of documents called "Chain of Custody/Analytical

Request Document," but did not produce the analytical results from any testing of any sort.

F.      Summary of Operations

BP has never provided any of the weekly summaries of removal/response operations

undertaken on Donation property, despite the fact that these were required by Paragraph 5 of the

BP Access Agreement.

XIV.

The Donation has attempted repeatedly to resolve the problems with BP's refusal to

provide information without the need for this filing. On November 9, 2010, the Donation sent a

letter to BP's counsel outlining BP's breaches of the agreement, which included failure to pay

response costs, failure to provide contact information for people working on the property, and

timely notice of meetings affecting the property. This letter, which is included as Attachment B

to this declaration, also listed the documents that BP had failed to provide under the Access

Agreement, and requested that BP come into full compliance with the agreement. As a

consequence of this and other communications, BP eventually provided the Donation with at

least some of the information required under the Access Agreement. The information that was

provided is detailed in the previous paragraph of this declaration. This information was not

provided until the spring of 2011, some months later. Since that time only sporadic information

11

has been provided to the Donation.  The Donation informally requested on a number of occasions that BP provide the information required by the BP Access Agreement.   Following a meeting with BP's counsel in August, 2011, the Donation was advised that Mike Taylor, a BP contractor, would be responsible for coordinating the provision of the information required by the BP Access Agreement.  On October 18, 2011, counsel for the Donation provided Mr. Taylor with a list of information the Donation was missing.  Mr. Taylor responded that "BP legal" would have to approve the release of any information to the Donation.  Attachment C.  Despite follow up requests, Attachment D, BP has never produced any of this information and has never responded further to requests for the information.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 17th day of February, 2012.

/s/ Cathy Norman_____
Cathy Norman

STATE OF LOUISIANA

PARISH OF LAFOURCHE

### RIGHT-OF-ACCESS FOR OIL SPILL CLEANUP OPERATIONS

The EDWARD WISNER DONATION ("Grantor") grants access to its properties in South Lafourche Parish for the following purposes, and under the following conditions:



(1)    In consideration of the need for prompt action to address the presence of oil from the BP Deepwater Horizon oil spill (hereafter "the oil spill"), Grantor does hereby grant unto ~~BP, plc and~~ BP Exploration & Production Inc. ("Grantee"), a right of access for the purpose of cleanup operations related to the oil spill.  This right of access does not grant permission for any other purposes, including research on the impacts of the oil spill.  Any research activities will be the subject of a separate right of access agreement.  This right of access for cleanup operations applies only to the property shown on the plat attached and marked Exhibit A.  This property is referred to in this agreement as "the Wisner Property."

(2)    Prior to beginning operations, or as they become available, Grantee will provide Grantor with a copy of all work plans, protocols, or contracts ("cleanup documents") relating to Grantee's oil spill cleanup operations on Grantor's property.  Copies of any revised, updated or supplemented cleanup documents will be provided to Grantor as soon as they become available.

(3)    Grantee will provide Grantor with a list of all Grantee sub-contractors and all Grantee personnel who will be performing cleanup activity on Grantor's property, including each person's company affiliations.  This list will be attached to this access agreement as Exhibit B.

(4)    Prior to commencing work on Wisner property, Grantee will provide Grantor with the cell phone numbers and email addresses of all onsite supervisory personnel.

(5)    Grantee will provide Grantor a weekly summary of all removal/response operations undertaken on Wisner property, including a description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation.

2

(6)     Grantee will provide Grantor with a copy of all waste manifests or other documents detailing all materials removed from Wisner Donation property, the results of all testing of any kind carried out on Grantor's property by Grantee or its contractors or at Grantee's request in connection with operations, and all documentary information such as photographs, video, GPS logs, reports, work logs or journals kept in connection with SCAT assessments and oil removal operations. This information will be provided as received on a weekly basis.  If Grantee believes that any oil or oiled waste removed from the Wisner Property is not attributable to the Deepwater Horizon oil spill, Grantee shall segregate that waste and notify Grantor to allow the waste to be documented and samples taken.

(7)     Grantee recognizes that it is necessary for Grantor to have personnel, additional equipment and appropriate consultants to monitor Grantee's cleanup operations.  Grantee will reimburse Grantor for all such expenses and increased costs, including overtime, incurred by Grantor in connection with cleanup operations.  Grantee agrees to cooperate with Grantor's representatives and personnel, and to insure that these personnel have full access to all operations. Grantor's personnel will be given prior notice of and will have the right to attend any meetings, briefings, or events regarding operations on the Wisner Property. Grantee's supervisory personnel will keep Grantor's personnel apprised of the status of all operations on the Wisner Property on a daily basis or as requested. Grantor shall also have the right, at Grantee's expense, to have consultants of Grantor's choice monitor Grantee's operations.  Grantee will be invoiced on a biweekly basis for all expenses under this paragraph, payment of which is due within fourteen days of receipt.

(8)     The highest industry standards shall be used to insure environmentally sensitive practices while carrying out operations on the Wisner Property. In addition, Grantee shall adhere to, at a minimum, the following specific standards.  Grantee shall provide appropriate training to insure that all cleanup personnel are familiar with these protocols.

(a)  Beach Protocols

The use of any type of vehicle on the beach area should be limited to the shore face when possible. In particular, ATV's should not be driven off the beach area, through vegetated areas, in the dunes or wash over areas.

3

At the conclusion of each day, all loose clean up materials, trash and tools must be removed from the beach.

In addition to the area over the LOOP pipeline corridor, Exhibit D is a map of the areas of elevated conductivity indicating subsurface pipelines on the beach. These areas are located due west of the staging area, in front of the Chevron facility. Care should be taken to avoid using heavy equipment on this area. Any digging in this area should utilize proper precautions.

(b) Marsh and Upland Protocols

To the extent possible, Grantee shall utilize water access, or access on foot, only, so as to limit the impact on the marshlands, its vegetation and habitats.

No airboats, ATV's, marsh buggies or other equipment are allowed in marsh or wetland areas without specific written permission by Grantor, as well as the presence of the onsite consultant. The marsh area is very sensitive and impacts from clean up may damage the marsh. Clean up efforts of the marsh area must be coordinated with Grantor.

(9) Grantee shall be responsible for all reasonable costs and expenses associated with assessing damage to Wisner property caused by oil spill cleanup operations. Grantee shall be responsible for all reasonable costs and expenses associated with restoring said damage to said property. Examples of such damages include, but are not limited to, damage to vegetation by vehicles, damage to habitat from unattended or abandoned booms, or damage to marsh surface from equipment. Grantor will provide Grantee with a schedule of damaged resources as described herein and an invoice for the cost of restoration. Payment for the cost of restoration will be due within 30 days of receipt of the invoice. Nothing herein shall be construed to diminish Grantor's right to choose and control restoration activities upon its lands. Nothing herein shall act as a waiver or release of any obligation Grantee may owe Grantor as a result of oil released from the Deepwater Horizon incident.

(10) Grantee assumes the responsibility for, and agrees to indemnify and to hold harmless Grantor and its beneficiaries, trustees, principals, employees, officers, agents and contractors, against any claim, loss, damage, liability, cost or expense, including fines, penalties and punitive damage awards, if any, or the violation of any law or regulation, including costs and expenses incident thereto, arising wholly or in part from, or in connection with access given to Grantee

4

under this right-of-access agreement. In the event any administrative charge, proceeding or investigation or any suit is brought against Grantor on the account of such damage, injury or death, Grantee shall, at Grantor's request, appear and defend said suit, at Grantee's sole cost and expense, including provision of any appeal bond, and shall pay any judgment or settlement that may be entered against Grantor, therein when said suit is finally determined. This Paragraph 11 *10* does not apply to, and Grantee shall not be responsible for, the intentional or reckless misconduct or the active negligence of Grantor, its beneficiaries, trustees, principals, employees, officers, agents and contractors.

(11)   In the event Grantor obtains the services of an attorney, or attorneys, to institute suit (a) to enforce any of the provisions of this right-of-access agreement, or (b) to make a claim, or claims, for damages resulting from Grantee's operations under the right-of-access agreement or to make a claim, or claims, for specific performance against Grantee, or (c) to make a claim, or claims, for any active or passive breach by Grantee of this right-of-access agreement, or (d) to make a claim, or claims, for the failure of Grantee to perform under any of the provisions of this right-of-access agreement, then Grantee shall be liable for reasonable fees for the attorney, or attorneys, as incurred by Grantor, and the reasonable costs concomitant thereto, to the extent Grantor prevails ~~in part or in whole, by settlement or by judgment~~.

(12)   This access agreement is revocable at will by Grantor.  Grantor retains the right to exclude any individual from its property at its discretion, regardless of that individual's relationship with Grantee.

(13)   All notifications or delivery of documents or information under this agreement must be made to the following:

GRANTOR:                          GRANTEE:

Cathy Norman                      Farley Burge, Jd.
Secretary Treasurer/Land Manager  BP Exploration and Production, Inc.
Cell – 504.616.7985               Cell:  713.715.9606
Office – 504/658.4060             Office:281.366.2415
Email: wisnerdonation@aol.com     Email: farley.burge@bp.com

Until further notice, Grantee must notify Grantor's on site supervisor as well:
Forrest Travirca, FETI & Associates, LLC Cell – 985/232.1483
Email – feti@travirca.com

(14)  This agreement is not transferable, and conveys no right to Grantee to permit any parties not employed by or under the direct control of Grantee to access the Wisner Property.

(15)   This agreement constitutes the entire agreement between the parties, and may be amended only in writing.  In the event that any provision of this agreement shall be found invalid, the other provisions of the agreement are deemed to be separable and remain in effect.

IN  WITNESS  WHEREOF,  Grantor  has  executed  this  right  of  access  on  this 23rd day of _Augus T_____, 2010.

WITNESSES:                                    GRANTOR:

_____          **EDWARD WISNER DONATION**

Print Name: L. Amanda Phillips

_____          By: _C. Cathy Norman__
Print Name: Forrest Travirca IV          Print Name: C. Cathy Norman

                                        GRANTEE:

_____          **BP**
Print Name:

                                        By: _BRAD J. BYGZYNSKI_
_____          Print Name:
Print Name:

STATE OF LOUISIANA
PARISH OF _Lafourche_

        On this 23 day of _Aug_ 2010, before me appeared _____, who, being duly sworn, did state that he is Grantee's duly authorized agent and that he executed this document on behalf of Grantee as the free act and deed of said corporation.

                              _____
                              NOTARY PUBLIC (# 11881     )
                              Print Name: Joel Waltzer

                                        6

Attachment A
Declaration of Cathy Norman



EXHIBIT A

Attachment A
Declaration of Cathy Norman

## Recommendations for Reduction in Disturbance of Bird Colonies on the Wisner Beach in Relation to Oil Spill Cleanup Activities.

Monitoring Report for
Wisner Advisory Donation
1300 Perdido St. Room 8E06
New Orleans, LA 70112

by

Donald Norman
Norman Wildlife Consulting (NWC)
2112 NW 199th Shoreline, WA 98177

### Summary Recommendations

As part of assessment of impacts of the Deep Horizon Oil Spill, NWC has inventoried the avian resources on the Wisner beach and surrounding wetlands between 15 May to 1 June and makes the following recommendations:

1. Keep all personnel, including SCAT and other NRDA teams out of wetlands, shell mounds, dunes, and upland areas. NRDA and SCAT teams required to do assessments in these areas should record all disturbances that occur during their activities in a written report to Wisner. Areas to avoid are shown in Figures 1 and 2.

2. At the entrance of Belle Pass, no staging or cleanup activities should occur on the shell habitat area above (east) of the beach at the east jetty area. The western edge of the shell beach area is within 200 feet of a mixed species colonial waterbird colony protected by the Migratory Bird Treaty Act, and no staging or cleanup activities must occur on that shell habitat area.

3. Any cleanup activities necessary further up Belle Pass along the edge of the colonial Waterbird colony should have supervision of the Natural Resource Trustees, such as LA Department of Wildlife and Fisheries, US Fish and Wildlife Service, or their designated representatives, as this beach is within 200 feet of the colony. A report on disturbance related to any activities in this area should be submitted to Wisner on a daily basis as such activity occurs.

4. If possible, locate worker tents away from overwash areas and beach nesting areas. This will prevent workers from entering these areas.

Figure 1. Location of Colonial Bird Colonies on Wisner Beach.
Picture captured from Google Earth.



Figure 2. View of Shell Habitat to be Avoided during Oil Cleanup. This view is of the shell habitat east of Belle Pass Beach looking west at west Belle Pass jetty. These areas shown in red in Figure 1 can be identified by this shell and stone matrix and higher elevation.



### Background

As part of the Natural Resource Damage Assessment (NRDA) under the Oil Pollution Act of 1990 (OPA), Norman Wildlife Consulting (NWC) was asked to perform assessments of the emergency activities occurring on the Wisner beach as a result of the Deepwater Horizon Oil Spill. NWC is familiar with this beach having performed Piping Plover surveys for Wisner to provide them with permits for restoration activities. Piping Plovers are, in general, gone from the Wisner beach by late April, otherwise contractors would be subject to fines under the Endangered Species Act (ESA). NWC will be initiating a Section 7 ESA consultation with the US Fish and Wildlife Service (USFWS) to determine what actions need to be taken by the fall to mitigate the long term impact of spill response activities on the Wisner beach relating to Piping Plover critical habitat.

The presence of large back dune shell habitat, overwash areas, shallow bays and wetlands behind the Wisner beach makes it some of the most important wildlife habitat in the area. Many of the nearby barrier islands in Timbalier and Barataria Bay are losing the habitats behind their beaches due to coastal erosion and subsidence, and the island of Grand Isle has no such habitat. Wisner has attempted to keep vehicular traffic to a minimum on the beach, for safety, security, and wildlife reasons. The fall, winter and spring months are critical habitat for the ESA listed Piping Plovers and the spring months are nesting season for Least Terns, Wilson's Plover, Black Skimmers, and several additional waterbird species of concern that nest at Belle Pass, the Reddish Egret and Roseate Spoonbill. Large numbers of species of shorebirds and waterfowl also use the area. A large part of the Wisner lands have been, until recently, in a Wildlife Management Area of the Louisiana Department of Wildlife and Fisheries, indicating its importance.

Donald Norman from NWC did surveys of the area on 15th, 18th, 20th, 26th, 29th and 31st of May and the 1st of June. The primary goal of the surveys was to record any oiling found on birds, especially those using the beach, however, after oil entered the wetlands and inland areas of Barataria and Timbalier Bays on the night of the 19th, some surveys of the Belle Pass colonial waterbird colony were performed, as well as surveys of the oiled wetland areas. In addition, NWC performed a Wilson's Plover survey on the eastern portion of the beach to assist in a survey gap for the Barataria-Terrebonne National Estuary Program (BTNEP) plover survey and documented activities of the cleanup. These surveys are being compiled for Wisner and the Trustees.

Unfortunately, by the time NWC was contracted to perform an assessment of the beach, contractors hired by Lafourche Parish, Parish departments, and National Guard personnel were already on the beach, attempting to close breeches on the beach and provide beach oiling prevention. In general, most of the activities occurred along the beach and not in the shell habitats used by Least Terns and Wilson's plovers to nest. However, it is not known if Black Skimmers that were observed at Bay Champagne on 18 May had been nesting in the large Least Tern colony there on the east side of Bay Champagne. Black

skimmers are more sensitive to disturbance than Least Terns, and with the combination of truck traffic and colony disturbance, possibly impacted by inclement weather, could have abandoned their colony.

However, some truck and ATV traffic did occur through colony areas. In several incidents, sheriff officers on ATVs rode through colony areas and dunes despite knowledge from Parrish regulations such activities are subject to fines. Officers were also observed making "doughnuts" with their vehicles in backdune areas. The arrival of oil cleanup activities inside Belle Pass close to the major waterbird colony has made it imperative that actions be take to reduce such disturbance actions.

### Implementation of Disturbance Monitoring in Key Wildlife Habitat Areas

NWC has adapted disturbance guidelines developed from local and national guidelines to measure and respond to disturbance. For areas of shell habitat, there is no current reason for any personnel to be in those areas, so there is no real need for an actions to be taken.

For the colonial waterbird colony, any initial booming action along the beach closer than 200 feet to the colony, in the area north of the existing beach, should be performed with a local Trustee employee present to be able to determine if there has been any disturbance to the herons and egrets. This has occurred in other colonial waterbird colonies in the area. A Standard Operating Procedure and data sheet will be made available and discussion with Trustees and booming personnel can determine the best method, as has been occurring in other areas with wildlife habitat. It is likely that mid-morning operations will result in the least amount of disturbance. It is important that no activities occur during threatening inclement weather, which should typically not occur due to the hazard of lightning to workers. Booming will be difficult to maintain with boat wake, but should oiling occur inside Belle Pass, boat traffic should be monitored and additional boom away from the beach be placed.

11

Attachment A
Declaration of Cathy Norman



FIGURE 17

CONDUCTIVITY ANOMALY MAP

12




**FETI & Associates, L. L. C.**
Dba: FETI Inspections
Post Office Box 293
Lockport, Louisiana 70374
985 532 3555 Office Fax 985 532 1526
http://www.travirca.com      feti@travirca.com

**BP Horizon Oil Spill Response**
**Edward Wisner Trust property (Fourchon Beach and supporting Marsh)**
**Rate Sheet**

**Number of operators:**
Three operators; qualified in boat operation as well as beach frontage and knowledge of the property. Sub-contracted by Wisner

**Hourly rate - Field Inspector; NRDA, SCAT**
Field Inspector/Operator: Forrest A. Travirca III - $100. 00 per hour
Assistant Field Inspector/Operator: Timothy Travirca - $60.00 per hour
Assistant Field Inspector/Operator: Forrest A. Travirca IV - $60.00 per hour
NRDA/Biologist/Ecologist: Don Norman - $100.00 per hour

**Equipment to be used and cost:**
4 X 4 trucks $100.00 per day
Small flat boat - $150.00 per day
Air Boat - $400.00 per day

**Reimbursable expenses on a dollar for dollar basis:**
Vessel fuel and oil
Vehicle mileage @ .505 per mile
Repairs as needed for equipment and or replacement

**Duties and Responsibilities:**
Observe all activities being performed on private property due to oil related cleanup efforts by BP, including all SCAT, NRDA Teams, Wildlife Recovery Units, assigned by BP, etc. Prevent entry of unncessary personnel onto property. Survey the marsh and water areas for oil intrusion and animal needs. Provide information to clean up crews necessary to address the presence of oil in the marsh to prevent them from causing more damage to the marsh by lack of knowledge of the land and to otherwise assure safe ingress and egress of the property. Work with USCG and Contractors regarding the overall clean up plan and results of the clean up effort. Identify concerns of Wisner such as removal of buried snare, oil, and related clean up debris. Identify deposits by the securing of Latitude and Longitude positions of those deposits and related information. Share photographic evidence of these concerns to all concerned parties, take part in the planning stage meeting established by USCG. Assess affects on wildlife as a result of the spill and its response measures.

**Waltzer & Associates**
L A W   F I R M

November 9, 2010

Mr. Gordon Johnson
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139

      Re:   BP MC252 Spill Response Costs
             Wisner Donation Reimbursement

Dear Mr. Johnson:

      This is in response to your letter of November 5, 2010 regarding the expenses incurred by the Edward Wisner Donation in responding to the contamination of its property by the BP Deepwater Horizon oil spill. As you know BP has signed a contract committing to promptly reimburse the Donation for the expenses associated with permitting BP access to the property to clean up the oil.

      Mr. Johnson, you may not be aware of the background and purposes of the Wisner Donation. The Donation is not a for profit company. It is a charitable trust. I have attached a list of the organizations that receive funding from the Donation. These include the Salvation Army, Charity Hospital, NO Police & Justice Foundation - COPS for Kids program, and many others. I hope you will understand that the money that the Wisner Donation has been forced to expend on responding to BP's oil spill is money that cannot be dedicated to these charitable purposes.

      With due respect, the practical effect of your letter of November 5 is to force the Donation – and the charities that rely upon it – to fund the cleanup expenses caused by BP's carelessness. This is not an outcome that the Donation can accept, and it is not an outcome BP should seek. We will do anything within reason to insure that we have a productive partnership in cleaning up the oil contamination on the Wisner property. We cannot, however, compromise our duty to the beneficiaries of the trust.

      We respond to your various excuses for failing to promptly reimburse the donation, as you contractually committed to do, below. Please note that BP has also failed to live up to its commitments under our access agreement in almost every other respect as well. We list below the information and other items which BP was required to provide under the agreement, but has never provided. We are requesting now that you live up to your obligations under this agreement within fourteen days of the date of this letter.

3715 Westbank Expressway, Suite 13  |  Harvey, LA 70058  |  1-504-340-6300  |  (f) 1-504-340-6330

NEW ORLEANS | BILOXI | HARVEY

Waltzer*&*Associates
L A W   F I R M

Wisner Cost Reimbursement
November 9, 2010
Page 2

Additional Payroll Expenses Incurred by the Wisner Donation

As a general matter, BP is taking a very adversarial approach to a document that was intended to create a partnership to assist in the cleanup effort. The Donation is not charging BP a per square foot access fee, as have the adjacent landowners. The Donation's employees have worked absurd hours, and gone out of their way to assist your contractors. Your attempts to interpret this access agreement to evade your obligations are really contrary to the spirit in which we have been trying to work. As you know, the access agreement is terminable at will by the Donation. If BP persists in taking such an adversarial stance on clearly reimbursable expenses, we will either invoke this provision or seek to enforce the contract with injunctive relief, as your actions are causing irreparable injury to the charities we fund.

You refusal to reimburse the Donation for expenses prior to the access agreement is inconsistent with what you have asked the Donation to do in the past. We were instructed by BP and the Gulf Coast Compensation Fund to submit expenses for reimbursement under the access agreement. For this reason, GCCF has not considered our requests under the OPA. In any case, the language of the Access Agreement is not limited to the period after its signing. BP has certainly recognized this. As you know, BP has already reimbursed the Donation for $158,469.88 in expenses incurred prior to the execution of the Access Agreement. Of this amount, $19,261.80 was denied by your firm and subsequently paid to Wisner directly by BP.

In any case, as you are aware, OPA mandates that BP as responsible party pay "all removal costs incurred." OPA, Sec. 1002(b)(2), 33 USC 2702(b)(2). Incident Commander Captain Perry and Commander Hahn have both stated in front of BP incident response personnel that the Wisner response at F.O.B. Fourchon has been reasonable, helpful, appropriate and consistent with the NCP and the directives of Unified Command. There is no issue that Wisner's actions must be reimbursed under OPA.

You state that BP will only reimburse additional payroll expenses "to the extent that they are provided for by Paragraph 7 of the Access Agreement." Paragraph 7 provides as follows: "Grantee will reimburse Grantor for all such expenses and increased costs, including overtime, *incurred* by Grantor in connection with cleanup operations. In addition, Paragraph 9 also calls for "all reasonable costs and expenses associated with assessing damage caused by cleanup operations and with restoring said damage to WD land."

All of the staff time billed to BP was in connection with monitoring cleanup efforts and assessing damage to Wisner property. The contract does not call for the kind of audit documentation that you request. This level of detail will simply cause more expense, which it seems apparent BP will then refuse to pay.

## Waltzer & Associates
### LAW FIRM

Wisner Cost Reimbursement
November 9, 2010
Page 3

With respect to rates of pay, those rates have increased as a result of the demands placed on the staff by the oil spill. The Wisner Donation Advisory Committee has approved an increase in WD personnel rates, retroactively, to address the fact that personnel have had to work overtime, weekends and under considerable pressure from BP and its contractors. The Wisner employees are the only parties with knowledge of the property and the ability to assist in the cleanup and protection of resources. Their rates of pay are commensurate with their knowledge and the efforts they have expended. Ms. Penland, who is in house counsel for the Donation and a member of the Louisiana bar (Cornelia C. Norman) has a rate of pay which is probably about 50% of what you are charging BP for your advice, and her specific knowledge is much more important to the cleanup effort. Ms. Amanda Phillips has an MBA. The demands on all Wisner employees are no less.

### FETI & Associates

Your letter frankly implies that FETI Associates has falsified invoices. Please note that from sunrise to sunset, multiple FETI personnel have been on location guiding the cleanup and interacting with BP and Unified Command personnel. BP personnel stationed onsite can verify this fact. The WD Board of Directors has approved the expenditures as recommended and the cost of consultants "of Grantor's choice" to monitor said cleanup is yours to bear under both Paragraph 7 and 9 of the Agreement.

Please note that since the oil spill occurred, FETI personnel have essentially done nothing but monitor and assist the massive cleanup effort. In the past the Donation has paid FETI personnel to perform the duties required to manage the property. As a consequence of the spill FETI has not been able to perform these duties. All of FETI's time billed is associated with your oil spill, not the ordinary tasks associated with managing the property. Also of note, you have previously paid FETI invoices in full.

Again, the Access Agreement does not require the audit level material you seek. This requirement cannot be read into the agreement unilaterally by BP. FETI's time and expenses are documented in the standard manner utilized in the business setting. This is what the contract requires.

### Legal Expenses

The complexity of the legal regime in this spill of national significance has indeed required legal consultation. BP has relied on you and in house counsel in every step of the way in interacting with Wisner Donation. The Donation has likewise required representation by attorneys who understand the NCP and Unified Command as part of assessing and responding to

3715 Westbank Expressway, Suite 13  |  Harvey, LA 70058  |  1-504-340-6300  |  (f) 1-504-340-6330
NEW ORLEANS | BILOXI | HARVEY

Attachment B
Declaration of Cathy Norman

## Waltzer &Associates
#### L A W   F I R M

Wisner Cost Reimbursement
November 9, 2010
Page 4

your spill.  As reading our invoices would show, WD's attorneys have in fact been involved in assessing and monitoring the spill.  Your statement to the contrary is completely without basis in fact.  The fact that legal expenses are particularly set forth in the enforcement provisions do nothing to the contrary.  Again, what was supposed to be a cooperative agreement is essentially being treated as an opportunity to shift response costs to a charitable trust.

BP's Breaches of the Access Agreement

 While BP relies on an adversarial interpretation of the Access Agreement to attempt to shift costs to the Wisner Donation, BP itself has repeatedly breached the agreement itself.  BP has been in breach of the access agreement since its signing in the following respects:

 a)  Paragraph 2 of the Access Agreement states that prior to beginning operations, BP will provide a copy of all work plans, protocols, or contracts relating to spill cleanup on WD property.  That clearly has not happened.  We have but one plan and one protocol (for beach/sand cleanup), none for saltwater flats or marshes, and absolutely no contracts with your clean up contractors.

 b)  Paragraph 3 of the Access Agreement calls for a list of BP's sub-contractors and personnel who will be performing cleanup activities, including company affiliations. BP has failed to do so.

 c)  Paragraph 4 of the agreement provides that BP will provide cell phone numbers and email addresses of all onsite supervisory personnel. BP has failed to do so.

 d)  Paragraph 5 calls for a weekly descriptive summary of all removal/response operations on WD property.  BP has failed to do so.

 e)  Paragraph 6 calls for BP to provide WD with a copy of all waste manifests and other documents detailing all materials removed from WD property, the results of all tests and all photos, video and SCAT documents.  BP has failed to do so.

 f)  Under Paragraph 7, BP must notify WD timely of all meetings concerning WD property.  To date, the only meetings about which we have been told are those between BP and USCG.  While we have been notified of some meetings, we are aware of other instances where we were not notified.  In no instance has BP informed WD of meetings between BP and your contractors as well as certain government officials.  BP has thus failed to fulfill this obligation.  BP has been in breach of this provision for some time. We want to attend all future cleanup

Attachment B
Declaration of Cathy Norman

Waltzer&Associates
L A W   F I R M

Wisner Cost Reimbursement
November 9, 2010
Page 5

meetings between BP and Entrix, Polaris, HDR and SCAT personnel.  We are entitled to same, as BP has waived any privilege that may have attached, as per the Access Agreement.

   g)  A great deal of cleanup materials has been left on the beach. Much of that is now covered over by sand.  Under Paragraph 8, you are to remove such materials.  While BP has tried, BP has failed to do so.

   Please accept this letter as notice of these breaches.  We request that you come into full compliance with the Access Agreement, including full payment of all outstanding invoices, within fourteen (14)  days of the date of this letter.

   We appreciate your attention to this letter.  We would like to return the BP – Wisner relationship to a cooperative one, but we will need your assistance to do so.  We will no doubt be discussing this at our meeting with BP regarding spill response this Thursday.

                    Sincerely,

                    Joel Waltzer

Attachment B
Declaration of Cathy Norman

**WISNER GRANT PUBLIC VOUCHERS**

| DATE | P.V. NUMBER | ORGANIZATION | AMOUNT |
|---|---|---|---|

## 2003 WISNER GRANTS

| DATE | P.V. NUMBER | ORGANIZATION | AMOUNT |
|---|---|---|---|
| Jan, 2003 | | N.O. Ballet Assoc (appvd 2/25 mtg) | $10,000.00 |
| Feb, 2003 | | Advocates for Science & Math | $15,000.00 |
| Feb, 2003 | | Methodist Home for Children | $20,000.00 |
| Mar, 2003 | | Gordon Sister Restoration Window | $12,500.00 |
| Mar, 2003 | | Mayoral Fellows Program | $150,000.00 |
| Apr, 2003 | | Dillard University - Project SEEC | $25,000.00 |
| Apr, 2003 | | New Orleans Police Foundation - "COPS for Kids" | $15,000.00 |
| Apr, 2003 | | Salvation Army Summer Camp & After School for Hom | $20,000.00 |
| Apr, 2003 | | Summerbridge "Students Teaching Students" | $15,000.00 |
| May, 2003 | | African American Male & Female Institute - Juneteenth | $15,000.00 |
| May, 2003 | | CURE: The Center for Urban and Regional Equity | $50,000.00 |
| May, 2003 | | Family Advocacy Neighborhood Services, Inc. (FANS) | $15,000.00 |
| June, 2003 | | Children's Bureau "Survive Program" | $25,000.00 |
| June, 2003 | | National Conference for Communtiy & Justice "Anytow | $10,000.00 |
| June, 2003 | | Sisters of the Holy Family (orig request $25k) | $20,000.00 |
| June, 2003 | | Young Leadership Council "Project Prodigy" | $10,000.00 |
| July, 2003 | | Central Civic Improvement Assn. Boy's Club "Op Educ | $15,000.00 |
| July, 2003 | | House of Ruth | $10,000.00 |
| July, 2003 | | Kids to Afrika, Inc. "Maiden Voyages" | $10,000.00 |
| July, 2003 | | Op Clean Sweep: Education & Development | $10,000.00 |
| July, 2003 | | St. Thomas Health Services, Inc. | $25,000.00 |
| July, 2003 | | Tulane University for the Children Literacy Program | $20,000.00 |
| July, 2003 | | Junior Acheivement (2nd of 2nd) | $50,000.00 |
| Aug, 2003 | | City Park Improvement Assn. | $25,000.00 |
| Aug, 2003 | | Good Shepherd Nativity Mission School | $16,000.00 |
| Aug, 2003 | | Louisiana Philharmonic Orchestra | $100,000.00 |
| Aug, 2003 | | Relocate New Orleans | $10,000.00 |
| Sep, 2003 | | Odgen Museum of Southern Art (3rd of 5) | $100,000.00 |
| Oct, 2003 | | Methodist Health System Foundation | $35,000.00 |
| Dec, 2003 | | Greater New Orleans Youth Orchestra | $10,000.00 |
| Dec, 2003 | | New Orleans MLK, Jr. Holiday Planning Commission | $25,000.00 |
| Dec, 2003 | | Save Our Cemeteries | $25,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL | $913,500.00 |

Attachment B
Declaration of Cathy Norman

**WISNER GRANT PUBLIC VOUCHERS**

| DATE | P.V. NUMBER | ORGANIZATION | AMOUNT |
|---|---|---|---|

## 2003 WISNER GRANTS

| DATE | P.V. NUMBER | ORGANIZATION | AMOUNT |
|---|---|---|---|
| Jan, 2003 | | N.O. Ballet Assoc (appvd 2/25 mtg) | $10,000.00 |
| Feb, 2003 | | Advocates for Science & Math | $15,000.00 |
| Feb, 2003 | | Methodist Home for Children | $20,000.00 |
| Mar, 2003 | | Gordon Sister Restoration Window | $12,500.00 |
| Mar, 2003 | | Mayoral Fellows Program | $150,000.00 |
| Apr, 2003 | | Dillard University - Project SEEC | $25,000.00 |
| Apr, 2003 | | New Orleans Police Foundation - "COPS for Kids" | $15,000.00 |
| Apr, 2003 | | Salvation Army Summer Camp & After School for Hom | $20,000.00 |
| Apr, 2003 | | Summerbridge "Students Teaching Students" | $15,000.00 |
| May, 2003 | | African American Male & Female Institute - Juneteenth | $15,000.00 |
| May, 2003 | | CURE: The Center for Urban and Regional Equity | $50,000.00 |
| May, 2003 | | Family Advocacy Neighborhood Services, Inc. (FANS) | $15,000.00 |
| June, 2003 | | Children's Bureau "Survive Program" | $25,000.00 |
| June, 2003 | | National Conference for Communtiy & Justice "Anytow | $10,000.00 |
| June, 2003 | | Sisters of the Holy Family (orig request $25k) | $20,000.00 |
| June, 2003 | | Young Leadership Council "Project Prodigy" | $10,000.00 |
| July, 2003 | | Central Civic Improvement Assn. Boy's Club "Op Educ | $15,000.00 |
| July, 2003 | | House of Ruth | $10,000.00 |
| July, 2003 | | Kids to Afrika, Inc. "Maiden Voyages" | $10,000.00 |
| July, 2003 | | Op Clean Sweep: Education & Development | $10,000.00 |
| July, 2003 | | St. Thomas Health Services, Inc. | $25,000.00 |
| July, 2003 | | Tulane University for the Children Literacy Program | $20,000.00 |
| July, 2003 | | Junior Acheivement (2nd of 2nd) | $50,000.00 |
| Aug, 2003 | | City Park Improvement Assn. | $25,000.00 |
| Aug, 2003 | | Good Shepherd Nativity Mission School | $16,000.00 |
| Aug, 2003 | | Louisiana Philharmonic Orchestra | $100,000.00 |
| Aug, 2003 | | Relocate New Orleans | $10,000.00 |
| Sep, 2003 | | Odgen Museum of Southern Art (3rd of 5) | $100,000.00 |
| Oct, 2003 | | Methodist Health System Foundation | $35,000.00 |
| Dec, 2003 | | Greater New Orleans Youth Orchestra | $10,000.00 |
| Dec, 2003 | | New Orleans MLK, Jr. Holiday Planning Commission | $25,000.00 |
| Dec, 2003 | | Save Our Cemeteries | $25,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL | $913,500.00 |

Attachment C
Declaration of Cathy Norman

**From:** Robert Wiygul
**To:** "Taylor, Mike (BROWN & CALDWELL)"; "Rodriguez, Jake H (BP MC252)"
**Bcc:** Joel Waltzer; Thanh Bui
**Subject:** FW: Meeting on Wednesday
**Date:** Friday, November 11, 2011 2:07:00 PM
**Attachments:** image002.png

Gentlemen:

It has been about three weeks since I requested a schedule for supplying the information by BP's contract with the Donation.  By November 15, 2011, please provide a schedule for completing and bringing the information transfer up to date.  In light of the delay thus far, the schedule should bring all the required items current by December 1, 2011.

Thanks for your attention,

ROBERT B. WIYGUL  |  PARTNER  |  Waltzer&Wiygul  |  1011 IBERVILLE DRIVE, OCEAN SPRINGS, MS 39564  |
Phone : 228.872.1125  |  Fax: 228.872.1128  |  Cell: 228.990.1228  |  E: robert@waltzerlaw.com

**From:** Robert Wiygul
**Sent:** Tuesday, October 18, 2011 4:24 PM
**To:** 'Taylor, Mike (BROWN & CALDWELL)'
**Cc:** 'Rodriguez, Jake H (BP MC252)'
**Subject:** RE: Meeting on Wednesday

Mike, let's see what Jake and the legal folks have to say.  We were referred to you, but if they have some objection to producing information no need for you to be in the middle of that.

I think the virtue of meeting would be that we might be better able to figure out what has been generated that still needs to get produced to us, and how to make this process run a little more on autopilot, so that the information gets pushed to us rather than us having to pull it, as the internet people like to say.

Otherwise, as we discussed, you could just let me know what kind of schedule we're looking at.

Thanks for your assistance,

ROBERT B. WIYGUL  |  PARTNER  |  Waltzer&Wiygul  |  1011 IBERVILLE DRIVE, OCEAN SPRINGS, MS 39564  |
Phone : 228.872.1125  |  Fax: 228.872.1128  |  Cell: 228.990.1228  |  E: robert@waltzerlaw.com

**From:** Taylor, Mike (BROWN & CALDWELL) [mailto:Mike.Taylor@bp.com]
**Sent:** Tuesday, October 18, 2011 3:29 PM
**To:** Robert Wiygul
**Cc:** Rodriguez, Jake H (BP MC252)
**Subject:** RE: Meeting on Wednesday

Robert,

I'll vet this request through BP legal.  The Response GIS function has been re-located to Houston, so

there will be a lag in getting that quantity of information together. I would think that I can start transferring some of the information early next week.

Do you still want to meet tomorrow?

Regards,

*Michael Taylor, P.G.; P.E.A.*
*Louisiana Branch OPS Environmental Coordinator*
*1250 Poydras*
*New Orleans, LA*
*901-482-2500*
*Mike.taylor@bp.com*



---

**From:** Robert Wiygul [mailto:Robert@waltzerlaw.com]
**Sent:** Tuesday, October 18, 2011 3:10 PM
**To:** Taylor, Mike (BROWN & CALDWELL)
**Subject:** RE: Meeting on Wednesday

Thanks Mike, here's what I think at this point about what we have and what we need to get.

We have the following:

    (a)  SCAT/OPS Daily Reports through sometime in March, 2011.

    (b)  FRAT reports dated in may June September and October 2010

    (b)  A limited number of Load Tracking reports.  The most recent reporting period is the week of February 13, 2011.

    (c)  A limited number of maps the latest of which appears to be in the fall of 2010.

    (d)   A number of photographs and notes.

    (e)  SCAT beach profile information from three dates in 2010.

    We still need to get the following:

    (a)  SCAT reports after March 2011

(b)  FRAT reports after October 2010

(b)  Aerial photography or GIS layers relating to Wisner Donation property

(c)  Beach profiles other than three dates in 2010

(d)  Analysis of any samples taken

(e)  Information regarding permitting of hard structures on Donation property

(f)  Full information regarding personnel on the Donation's property

(g)  A full set of all documents governing response, including Shoreline Treatment Plans, the 2011 Louisiana Interim Shoreline Plan, and any other documents guiding the response effort on Donation property.  We have some of these but have no way of knowing if we have a full set.  We definitely don't have the 2011 Louisiana Interim Shoreline Plan.

Really appreciate your help on this.

ROBERT B. WIYGUL  |  PARTNER  |  Waltzer&Wiygul  |  1011 IBERVILLE DRIVE, OCEAN SPRINGS, MS 39564  |
Phone : 228.872.1125  |  Fax: 228.872.1128  |  Cell: 228.990.1228  |  E: robert@waltzerlaw.com

---

**From:** Taylor, Mike (BROWN & CALDWELL) [mailto:Mike.Taylor@bp.com]
**Sent:** Tuesday, October 18, 2011 2:56 PM
**To:** Robert Wiygul
**Subject:** RE: Meeting on Wednesday

Robert,

---

10:00. Call when you get to the 2nd floor guard desk and I'll come down and escort you up.

*Michael Taylor, P.G.; P.E.A.*
*Louisiana Branch OPS Environmental Coordinator*
*1250 Poydras*
*New Orleans, LA*
*901-482-2500*
*Mike.taylor@bp.com*

bp
  

Official Partner

Attachment C
Declaration of Cathy Norman

**from:** Robert Wiygul [mailto:Robert@waltzerlaw.com]
**Sent:** Tuesday, October 18, 2011 9:29 AM
**To:** Taylor, Mike (BROWN & CALDWELL)
**Subject:** RE: Meeting on Wednesday

Great – does 10 AM work for you?  And what floor?

I'll send over a list of what I think we're talking about document wise a little later today.

Regards,

ROBERT B. WIYGUL  |  PARTNER  |  Waltzer&Wiygul  |  1011 IBERVILLE DRIVE, OCEAN SPRINGS, MS 39564  |
Phone : 228.872.1125  |  Fax: 228.872.1128  |  Cell: 228.990.1228  |  E: robert@waltzerlaw.com

---

**From:** Taylor, Mike (BROWN & CALDWELL) [mailto:Mike.Taylor@bp.com]
**Sent:** Tuesday, October 18, 2011 6:35 AM
**To:** Robert Wiygul
**Subject:** Meeting on Wednesday

Robert,

I am free all of Wednesday and will be free to meet.

Regards,

*Michael Taylor, P.G.; P.E.A.*
*Louisiana Branch OPS Environmental Coordinator*
*1250 Poydras*
*New Orleans, LA*
*901-482-2500*
*Mike.taylor@bp.com*



Official Partner