UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG        ) | MDL NO. 2179 |
|   "DEEPWATER HORIZON" in the   ) | |
|   GULF OF MEXICO, on               ) | SECTION: J |
|   APRIL 20, 2010                         ) | |
|                 ) | JUDGE BARBIER |
| THIS DOCUMENT RELATED TO:        ) | MAG. JUDGE WILKINSON |
|     14-1525                          ) | |
|                 ) | |

### REPLY MEMORANDUM IN SUPPORT OF EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

**NOW COMES** Plaintiff**,** Edward Wisner Donation (hereinafter "Donation" or "Wisner") through undersigned counsel, who submits the instant Reply Memorandum in Support for Preliminary Injunction pursuant to *Federal Rule of Civil Procedure* 65.[1]

### I.  A Contract Is a Contract Is a Contract – Even for BP.

Rather than focusing on the obligations it owes under the Access Agreement, BP spends much of its Opposition returning to the name of the contract being that of an "Access Agreement". BP apparently believes that the name of the contract controls the obligations therein and that paying Wisner millions of dollars to oversee its remediation efforts, to assess the oil on the property, and to direct BP's personnel as to the location of its oil, was mere happenstance.[2] As it has made known in numerous contexts, BP does not pay money that it does not believe it owes.

---

[1] BP initially argued that the Donation did not have procedural capacity to bring this action because the Trustee was the proper party. The Donation amended the Complaint to include the Trustee and beneficiaries for reasons unrelated to BP's argument. [Rec. Doc. 13240] Nonetheless, the filing mooted this argument.

[2] BP and Wisner have agreed to defer Wisner's additional relief of reimbursement of expenses under the Access Agreement until BP provides an updated accounting of what outstanding invoices it is willing to reimburse. BP has indicated that the accounting will be available within the next week.

1

The purpose of the Access Agreement was to clean BP's oil from the Wisner Property. Wisner had control, authority, final approval rights, and was the only party who could terminate the Agreement at will. Wisner hired experts to ensure the oil was being properly remediated, paid for planes to fly overhead to map the property for possible oil, and conducted its own testing for oil on the Property.

In something of an eye-opening argument, BP puts forth the question of why it would sign such an agreement in which it "would receive nothing" in return. *BP Opposition*, at 15. The answer is because BP spilled its oil on Wisner's Property, resulting in the removal of more than 10 millions pounds of oiled material and many million more pounds of oil still remain on the Property. In other words, BP had a legal and moral obligation distinct from the Access Agreement to clean its oil off the Wisner Property. Simply because it obligated itself to clean it up at the direction of Wisner, but still providing Wisner with a full reservation of rights, does not diminish its free-standing duty to clean the Wisner Property.

BP's argument that only the FOSC may direct clean-up operations is an affront to the simple principle under general maritime law that the polluter is responsible for cleaning up its pollution. *State of Louisiana, ex rel Guste v. M/V Testbank*, 752 F.2d 1019, 1028 (5th Cir. 1985). *See also CXY Energy, Inc. v. Jurisich*, 1992 WL 404350, at *5 n.2 (E.D. La. 1992) ("[C]XY had standing to pursue injunctive relief under general maritime law.").

BP long conceded it is the "responsible party" pursuant to OPA. BP is responsible for cleaning up its oil. By coordinating the clean-up effort of BP's oil, the federal government is in no shape or form stepping into BP's shoes as oil polluter. Rather, the federal government is attempting to provide an orderly procedure whereby all of the competing interests of those harmed by the spill can coordinate with one structure to remediate the harm caused by BP's oil. Obviously, had BP not spilled so much oil, there would be no need for federal involvement.

Besides, the federal government is not a party here.  There are no conflicting orders.  BP has never claimed it is unable to act pursuant to the injunctive relief.  Private obligations are created all of the time through written contracts even where there may be multiple overlapping obligations from different sources.  *See Cantrelle Fence & Supply v. Allstate Ins. Co.*, 515 So.2d 1074, 1078 (La. 1987) (recognizing multiple obligations arising from tort and contract being separately actionable).  Sophisticated party such as BP is, with its battalion of lawyers, vendors, and in-house counsel, are more than well-equipped to clear up any perceived vaguery as to what Wisner has control over.   Certainly, BP would have raised some objection over the past 4 years to paying invoice after invoice of assessing oil, directing remediation, and even attorneys' fees.

BP has reimbursed Wisner for the 60 boring samples taken at Breach 1.  BP has reimbursed Dr. Pardue and Dr. Williams for work ranging from overseeing its remediation protocols, commenting on the presence of BP's oil in various locations, and even meeting with BP and the Coast Guard so it could detail what BP needed to do where to clean up its oil.  *See Pardue Power Point Presentation*, at 5 attached to Pardue Reply Declaration as Exhibit "A" (providing photographs of the oil samples).

Not the Coast Guard, Not the Federal On Scene Coordinator, and Not the State of Louisiana are a party to the Access Agreement.[3]  BP stands alone as the obligor.  BP will likely

---

[3] This point is clearly articulated in the one case BP attaches to its Opposition as support, *BP America Inc. v. Chustz*, No. 13-1620 (M.D. La. 7/21/14) (Brady, J.).  In *Chustz*, the district court was confronted with resolving a dispute between the State of Louisiana's Department of Natural Resource ("LDNR") issuance of a cease and desist order to BP to remove anchors left as part of the Vessel of Opportunity program and a FOSC directive that the anchors would not be removed as part of the response effort. *Id.* at *3-*4.  BP filed a declaratory judgment action, along with cross motions for summary judgment and LDNR's motion to dismiss, on the central issue of preemption.  BP argued that field preemption, impossibility preemption, and/or obstacle preemption negated LDNR's cease and desist order. *Id.* at *4.   The district court ultimately held that LDNR's cease and desist order was preempted under the impossibility and obstacle preemption doctrines.
  In this case, BP raises no such preemption arguments.  The reason is obvious – Wisner does not seek any relief from the FOSC.  Wisner seeks enforcement of a private contract, the Access Agreement, entered

either seek cover behind the federal government, claiming that any federal government statement of a clean beach is sufficient, or blame the federal government for precluding it from engaging in adequate clean up measures.  In fact, it has started to do both.

In its Opposition, BP continues to look to OPA as some sort of guiding principle to follow under the Access Agreement, despite Louisiana law governing the Access Agreement. BP does not argue that injunctive relief is available both under Louisiana law (independently and as specific performance under a contract) and even under general maritime law.  Any guidance "by analogy" to OPA is simply misleading.

## II.     BP Concedes that the Breach 1 Site Has Oil, the Wetlands Were Never Assessed For Oil, Offshore Assessment Was Knee Deep 3 Years Late, and Assessment on the Beach was Limited to 18 Inches in Depth.

As recently as April 2014, BP served on the U.S. and the Plaintiff Steering Committee its *Responses to the United States' First Set of Discovery Requests in the Penalty Phase*, attached as Exhibit "1".  In this pleading, BP blames the FOSC and concedes that the clean-up efforts at Fourchon Beach and the Wisner Property were ineffectual:

> For example, the United States did not exercise its authority to direct Response operations . . . when the State of Louisiana placed restrictions on BPXP's ability to employ mechanical recovery methods on *Fourchon Beach*.  The United States' failure to exercise its authority *hindered BPXP's ability to effectively clean the Gulf shorelines*.

*Id.* at 36 (emphasis supplied).

BP further concedes that remediation efforts at the breach sites, which includes Breach 1, were incomplete:

> BPXP further states that, without Unified Command approval, the Louisiana National Guard and/or Lafourche Parish installed breach blocking/damming structures on property owned by the Wisner Donation at Fourchon Beach that were designed to block channels

---

into with the express intent that Louisiana law applies.  Only BP is a party, and only Louisiana law is raised.

4

> leading from the beach to the interior marsh. The structures were not appropriate for their intended purpose. *The breach structures had the unintended effect of driving oil downward and depositing sediment on top of the oil, effectively burying it.* Louisiana subsequently rejected BPXP's requests to utilize mechanical recovery to recover the buried oil. Although the Parish obtained a permit for installation from Louisiana, neither the Parish nor National Guard made any effort to timely remove the structures, *further compounding the damage*.

*Id.* at 40 (emphasis supplied).[4] With this backdrop of admissions, the Wisner Science Team's conclusions are uncontroverted.

### A. Breach 1 Has Oil, and It Must Be Remediated.

The only objective, unimpeached evidence of oil at the Breach 1 site are the 60 boring samples taken in January 2014. In *Remedial Plan for Breach 1 DWH Oil Contamination, Fourchon Beach, Louisiana*, the Wisner Science Team documented significant oiling at the Breach 1 site: "Millions of pounds of oiled sands have been removed from this location, but surface and subsurface oil exceeding the standards are still present." *Pardue Declaration,* at 1. Of the 60 borings using a Geoprobe taken in January 2014, "oil was detected in 54." *Id.* 29 of the borings had thickness exceeding 3 cm, a standard used by BP to determine whether to remediate. *Id.* Because the oil was at a depth below the oxygenated portions of the beach, the oil is unable to be broken down due to any natural process. *Id.* at 1-2. BP reimbursed Wisner for the cost, expense, and testing of these samples. *See Pardue Invoice*, attached as Exhibit 2.

BP's Hayward declaration does not change this reality. Instead, Hayward offers hollow criticism of the methodology by misstating facts and demonstrating a fundamental misunderstanding of the science. He does not challenge that it is oil; he does not challenge that it

---

[4] BP also stated: "The United States also failed to exercise its authority to compel landowners and Gulf States to grant BPXP access to certain shoreline that BPXP sought to treat, including but not limited to shoreline on property owned by the Wisner Donation." *Id.* at 37. Wisner is unsure what is meant by this, since the Access Agreement provided the parameters for access to the property upon Wisner approval.

5

is BP's oil. In a play on semantics, he claims he has not seem any "data" that this is the case, apparently untrusting of the sworn Declaration by Dr. Pardue and the fact that his own client BP had already paid for the testing.

As for the suggested remediation protocol, BP's Hayward and Bruce simply misstates the facts, thereby undermining any supposed scientific conclusions. BP's Hayward's and Bruce's conclusions completely misstate the character of the oil at Breach 1, *Pardue & Williams Rebuttal Declaration*, at ¶¶ 11-17, attached as Exhibit 3, distort the effectiveness of the remediation efforts themselves, *id.* at ¶¶ 18-24, and undermine any reliability of BP's own boring when limited to a depth of a mere 18 inches, *id.* at ¶¶ 37-40. Where Hayward and Bruce have performed no objective tests of their own, they also have not visited or observed the actual remediation efforts on the beach – a stark contrast to Dr. Pardue and Dr. Williams who have been on the beach more than 100 times in the past four years and presented articles on their findings. *Id.* at ¶¶ 2-4.

### B. Wetlands – BP concedes it never even looked for oil.

In a brazen attempt to inform the Court that it has done something, anything, to look for oil in the wetlands, BP claimed that it flew a helicopter over the general area for a few months in 2010. To be clear, BP never stepped foot into the wetlands. Never took a single sample. Never took a boat, though perfectly traversable by those means. BP's oil entered the wetlands through significant weather events that allowed the Gulf waters to flow over the beaches into the wetlands;[5] these weather events had not transpired during the time of the purported helicopter fly-overs.

---

[5] Some BP oil entered the wetlands by poor remediation efforts by BP that allowed oil runoff during excavation of BP oil mats.

Dr. Pardue, however, has not only tested and found oil in the wetlands, but has been studying the degradation rates of the wetlands oil since the beginning. All of these samples and even the articles published on the wetlands oil has been provided to BP. BP has never even assessed the extent of oil in the wetlands to determine whether there is an environmental net benefit to clean the oil. As BP's Hayward explains: "Remediation plans are based on the results of an assessment – they are not made before an assessment." *Hayward Declaration*, at ¶ 65. BP's argument that remediation is unnecessary in the wetlands or offshore contradicts their own "expert" who declared that assessment must come before deciding whether remediation should be attempted.

### C. Offshore – BP concedes they waded out in knee-deep dirty water and dug holes in 2013.

Snorkel SCAT was a never before tried remediation effort before the BP spill. Snorkel SCAT started in Florida and made its way west down the Gulf Coast. Wisner was one of the last places it was used. Testing for oil in offshore water in Florida, Alabama, and even Mississippi is quite different from testing on Fourchon beach. First, the water off Louisiana is incredibly silty from the Mississippi River and completely opaque. This practically negates the "observable" methods of oil samples. *Pardue & William Rebuttal Report*, ¶¶ 46-47.

Second, Snorkel SCAT did not reach Fourchon beach until approximately the three year mark after the spill. By that time, three years of coastal erosion had transpired, meaning that with "historic (1880s to 2005) erosion and land retreat rates of 36 and 55 feet per year, respectively", approximately 108 to 165 feet of erosion had occurred. *Pardue & Williams Rebuttal Report*, at ¶ 4. Mats present at the shoreline in May 2010 are well seaward of the extent of the Snorkel SCAT "surveys". In short, Snorkel SCAT was looking in the wrong places.

Third, the bottom of the water off the coast of Louisiana is different from the rest of the Gulf Coast.  Rather than just being a sandy bottom, the Fourchon offshore areas are the result of millennia of sedimentary deposits, resulting in a clay platform and sometimes spongy, dirty floor.  *Id.* at ¶¶ 46-47.  Methods of hand digging holes are simply not effective.  *Id.*

Instead, the Wisner Science Team takes into account these variables through methodology and location.   The Wisner Science Team's protocol uses appropriate tools in a systematic pattern to evaluate the presence of mats to remediate to prevent future re-oiling.  *See Scientific Assessment and Remediation of MC252 Oil on Fourchon Beach, Wetlands and Offshore Region, Louisiana*, attached as Exhibit 3 to Plaintiff's *Memorandum in Support of Preliminary Injunction*.

### III. Cleaning Up BP's Oil More Than Satisfies the Irreparable Harm, Balance of Equities, and Public Interest Factors for a Preliminary Injunction In This Pollution Case.

In something of a surprising turn, BP appears to argue that even though there may be significant oil on the Wisner Property, it does not qualify as irreparable harm because Wisner can clean up BP's oil for them and that Wisner may be entitled to a money judgment sometime in the future.  *BP Opposition*, at 20-23.  Nor, does BP argue, will the balance of equities favor Wisner because, again, one day in the future Wisner may be entitled to money damages.  *BP Opposition*, at 23.  Lastly, BP argues that the public interest favors leaving BP's oil on the beach because the federal government should be allowed to direct remediation efforts of future spills.  *BP Opposition*, at 23-24.

However, BP's oil spill is an environmental disaster with health and environmental consequences.[6] Preventing or remediating environmental damage is ideally suited for injunctive relief:

> Environmental injury, by its nature, can seldom be adequately remediated by monetary damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Amoco Prod. Co. v. Village of Gambell, Al*, 480 U.S. 531, 544-45 (1987).

As for the public interest, BP appears to forget again that its obligations to clean up its oil is based, for purposes of this proceeding, on the Access Agreement – a private contract between two sophisticated parties. The determination of obligations from the subject preliminary injunction motion is limited to BP and Wisner and will not reverberate beyond these two parties. The federal government is not a party to the Access Agreement. The federal government is not being asked to perform any act – only BP. BP has never argued that it is incapable of assessing and remediating the Wisner Property; BP has never argued that by properly assessing and remediating Wisner Property that material resources would somehow be re-directed from more pressing areas of recovery to the detriment of those areas.

Nor is the fact that the relief sought may be mandatory any impediment to preliminary relief. The Fifth Circuit has repeatedly stated that where the relief sought in a preliminary injunction has the characteristic of finality, relief may still issue on the same terms:

> Citing our opinion in *Martinez v. Mathews*, Delco maintains that a mandatory preliminary injunction that goes beyond the status quo is even more disfavored and "should not be issued unless the facts and law clearly favor the moving party." We fail to see the

---

[6] Nonetheless, these traditional inquires for a preliminary injunction can be dispensed with when equitable principles, such as seeking the enforcement of specific performance of a contract, are found. *See U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1358 (5th Cir. 1996) ("[A] court [may] issue an injunction without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience, provided that traditional equitable principles permit such a course of action.").

>relevance of that proposition here, however, because the preliminary injunction granted by the district court does precisely that; it maintains the status quo by keeping in effect a contractual relationship that has existed between the parties for almost a quarter century. The court merely commanded Delco to maintain the status quo by refraining from terminating the Parts Agreement.

*Lake Charles Diesel, Inc., v. General Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003); *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976). The only difference in the standard is whether the facts and law "clearly favor" the moving party. *Ensco Offshore Co. v. Salazar*, 781 F.Supp.2d 332, 335 (E.D. La. 2/17/11). Wisner easily satisfies this "clearly favored" threshold.

### IV. A Bond Is Not Required Where the Enforcement of the Status Quo Being Sought Is the Interpretation of a Clearly Worded Contract.

There is no absolute requirement for a bond. *See Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'") (quoting *Corrigan Dispatch Co. v. Casa Guzman,* 569 F.2d 300, 303 (5th Cir.1978)). A bond is not required in situations where the preliminary injunction maintains the status quo by requiring the offending party to continue to perform under a contract that it been doing for years. *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F.Supp.2d 582, 589-90 (W.D.N.Y. 2011).[7]

### CONCLUSION

For the above reasons, Wisner respectfully moves the Court to grant the Motion for Preliminary Injunction and order the relief requested.

---

[7] Moreover, the issuance of a bond does not make sense where the Access Agreement being sued under provides for the reimbursement of all costs and expenses related to assessment, remediation, and oversight. Where BP is being directed to perform these activities at its own cost, the status quo is being maintained. In an almost farcical turn, Wisner would simply submit any bond payment to BP for reimbursement under the Access Agreement, thereby requiring BP to reimburse it for this expense as well. As the Access Agreement clearly states: "[BP] shall be responsible for all reasonable costs and expenses associated with assessing damage to Wisner property caused by oil spill operations." *Access Agreement*, at 4.

Respectfully submitted,

/s Soren Gisleson
Stephen J. Herman, La. Bar No. 23129
Soren E. Gisleson, La Bar No. 26302
HERMAN HERMAN & KATZ LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhkc.com
E-Mail: sgisleson@hhkc.com

James Parkerson Roy, La. Bar No. 11511
Bob Wright La Bar No. 13691
DOMENGEAUX WRIGHT ROY
& EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com

Calvin C. Fayard, Jr. La. Bar No. 5486
C. Caroline Fayard La. Bar No. 30888
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Fred Herman La Bar No. 6811
Law Offices of Fred Herman
1010 Common St., Suite 3000
New Orleans, LA 70112
Phone: 504-581-7070
Fax: 504-581-7083

Walter Leger, Jr. La. Bar No. 8278
Leger & Shaw
600 Carondelet St., 9th Floor
New Orleans, LA 70130
Phone: (504) 588-9043
Fax: (504) 588-9980

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading has been served upon all counsel of record *via* Lexis-Nexis File & Serve in accordance with Pre-Trial Order No. 12, and filed in the record *via* the Court's ECF electronic filing system, and *via* E-Mail and by U.S. Mail this 4th day of August, 2014.

**  /s/Soren Gisleson**