# Attachment B

http://www.epa.gov/compliance/data/results/annual/. Information concerning penalties awarded by courts in other cases is available on some or all of the standard legal research tools, including PACER, Lexis, Westlaw, the *Federal Reporter* and the *Federal Supplement*.

7. Identify each "action or decision" taken or made by the United States referenced in BP's submission to Magistrate Judge Shushan of March 3, 2014 and state whether and how each such action "made BPXP's remediation and response efforts less effective, and thereby increased BPXP's potential liabilities for the Incident."

**OBJECTIONS:**

BPXP objects to Interrogatory No. 7 to the extent it seeks information that is already in the possession, custody, or control of the United States or is equally available to the United States as to BPXP. BPXP further objects to this request to the extent it calls for information that will be the subject of expert analysis and opinion and calls for BPXP to disclose expert testimony prior to the schedule determined by the Court.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that certain actions or decisions taken or made by the United States made BPXP's remediation and response efforts less effective and thereby increased BPXP's potential liabilities for the Incident. For example:

    1)     **Limitations on Dispersant Applications**

The United States and the oil industry have identified and supported dispersants as a key oil spill response tool and evidence from spills treated with dispersants shows that dispersion of oil can reduce overall environmental impacts by reducing oil impacts at the sea surface and shore. Nonetheless, on May 24, 2010, the Environmental Protection Agency ("EPA") instructed BPXP to "take immediate steps to significantly scale back the overall use of dispersants," and on May 26, 2010, the Federal On Scene Coordinator ("FOSC") directed BPXP to eliminate the

35

surface application of dispersants except in rare cases where approved by the FOSC, on days when weather and sea conditions limited the effectiveness of skimming or controlled *in situ* burns, or when slicks were headed toward land and alternative response methods would not be able to combat the slick in time. The United States' directive to limit the surface application of dispersants and resulting restrictions and delays in approving the surface application of dispersants caused Oil-Related Materials to reach and impact Gulf Coast shorelines to a greater extent and degree than would have been had such limitations not been imposed.

  2)  **Shoreline Impact and Recovery**

The United States failed to exercise its authority over shoreline cleanup in certain instances during the Response, precluding BPXP from employing the most effective cleanup methods and permitting the Gulf States to compound the effects of the Spill. For example, the United States did not exercise its authority to direct Response operations when the States of Florida and Alabama prohibited BPXP from utilizing surf washing, an effective response technique, or when the State of Louisiana placed restrictions on BPXP's ability to employ mechanical recovery methods on Fourchon Beach. The United States' failure to exercise its authority hindered BPXP's ability to effectively clean the Gulf shorelines.

Moreover, the United States permitted the Gulf States to engage in certain shoreline protection and oil recovery efforts that compounded damage to the shoreline. For example, the State of Louisiana was allowed by the FOSC to conduct a protracted monitoring program of the marshes at Middle Ground Shoal long after it was likely that the program would result in recovery of actionable oil and despite a recommendation by NOAA's Scientific Support Coordinator to remove Middle Ground Shoal from the Response. Frequent visits possibly exacerbated the damage to that marsh. In addition, the United States failed to exercise its

authority to prevent further deep cleaning on West Dauphin (West Point) Island, Alabama, despite BPXP's recommendation not to conduct deep cleaning in the potentially sensitive habitat, the U.S. Fish & Wildlife Service's demand that cleanup cease because of potential damage to that habitat, and the conclusion of a Net Environmental Benefit Assessment ("NEBA") conducted in 2011 that found that natural attenuation was the optimal response.

The United States also failed to exercise its authority to compel landowners and Gulf States to grant BPXP access to certain shoreline that BPXP sought to treat, including but not limited to shoreline on property owned by the Wisner Donation.  Furthermore, in Barataria Bay, the United States precluded BPXP from treating various treatment test plots, or "set-asides," in a timely fashion, thereby possibly compounding the damage to the marshes.

       3)     **Louisiana Berm Project**

The United States approved certain state-proposed projects, such as the Louisiana offshore barrier berms project (the "Louisiana Berms Project"), that did not effectively mitigate the Spill's impact and instead diverted resources away from other Response initiatives that could have more effectively mitigated the effects of the Spill.  On May 11, 2010, the Coastal Protection and Restoration Authority ("CPRA") of Louisiana applied for an emergency permit to construct offshore sand barrier berms to "enhance the capability of the islands to reduce the inland movement of oil from the Deepwater Horizon Oil Spill."  The Louisiana Berms Project involved the construction of massive and costly linear sand barrier systems, seaward of the coast, adjoining or extending existing barrier islands.  The Department of the Interior and the EPA, among other federal agencies, expressed skepticism that the berms would be constructed in time to be effective for oil spill response, and various federal agencies highlighted potential adverse impacts, including the dredging operations necessary for the Louisiana Berms Project, the

project's potential to introduce immediate and long-term oil contamination into the environment near the berms, the potential negative effects on endangered and other protected species and habitats, and the potential impact of the berms on the circulation of water, sediment, and salinity in the coastal environment.  Nonetheless, the United States approved the implementation of a portion of Louisiana's berm project proposal.  The Louisiana Berms Project was not an effective spill response measure.  The decision to allocate resources to the Louisiana Berms Project diverted resources from spill response efforts that could have more effectively mitigated the effects of the *Deepwater Horizon* Spill.

### 4)  Mississippi River Diversion

The United States failed to exercise its authority to prevent the diversion of the Mississippi River into the Gulf of Mexico by the State of Louisiana.  On April 29, 2010, Louisiana Governor Bobby Jindal announced that the Office of Coastal Protection and Restoration would begin the release of freshwater from the Mississippi River.  The State of Louisiana independently decided to open gates at diversion structures, including but not limited to the structures at Caernarvon and Davis Pond, to partially divert flow from the Mississippi River into marshes.  The United States did not exercise its authority to prevent the diversion, which likely resulted in negative impacts to the environment, including but not limited to impacts to oyster populations.

### 5)  Boom Placement

The United States directed and/or permitted the deployment and placement of boom in certain locations that funneled oil into sensitive marshes and compounded shoreline oiling, thereby reducing the effectiveness of the Response and increasing BPXP's potential liabilities for the Incident and Spill.

Moreover, certain of the actions or decisions taken or made by the United States that made BPXP's remediation and response efforts less effective are described in government documents and industry publications, such as the On-Scene Coordinator Report for the *Deepwater Horizon* Oil Spill (the "FOSC Report," TREX 9105); the Incident Specific Preparedness Review for the *Deepwater Horizon* Oil Spill (the "ISPR," TREX 9124); and interview notes taken by the Oil Spill Commission or U.S. Coast Guard, as well as other documents already produced and/or to be produced as part of the MDL 2179 proceedings. BPXP reserves the right to present additional evidence regarding the actions or decisions taken or made by the United States that made BPXP's remediation and response efforts less effective and thereby increased BPXP's potential liabilities relating to the Incident and Spill, including through expert discovery.

8. Identify any actions that BPXP contends are Response Activities (as defined in BPXP's discovery requests) that were not conducted at the direction and under the oversight of the Unified Command, and for each such activity, describe the activity in detail, the persons or entities involved, the outcome or result of the activity, the cost associated with the activity (including any amounts paid by BPXP or other BP entities and Identifying those entities), and the reasons why such activity was not conducted at the direction and under the oversight of the Unified Command.

**OBJECTIONS:**

BPXP objects to Interrogatory No. 8 on the grounds that it is vague, overly broad, unduly burdensome, unreasonable, and seeks information not relevant to the claims or defenses of any party. BPXP further objects to this interrogatory on the grounds that the United States use of the phrase "cost associated with the activity" is vague and undefined. BPXP also objects to this interrogatory to the extent it seeks information that is already in the possession, custody, or control of the United States or is equally available to the United States as to BPXP.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that state

39

and local governments and other entities took actions in response to the Spill that were not conducted at the direction or under the oversight of the Unified Command. For example, on April 29, 2010, Louisiana Governor Bobby Jindal announced that the Office of Coastal Protection and Restoration would begin the release of freshwater from the Mississippi River. The State of Louisiana independently, and without Unified Command approval, decided to open gates at diversion structures to partially divert flow from the Mississippi River into marsh lands. The diversion of the Mississippi River into the Gulf of Mexico likely resulted in negative impacts to the environment, including but not limited to impacts to oyster populations.

BPXP further states that, without Unified Command approval, the Louisiana National Guard and/or Lafourche Parish installed breach blocking/damming structures on property owned by the Wisner Donation at Fourchon Beach that were designed to block channels leading from the beach to the interior marsh. The structures were not appropriate for their intended purpose. The breach structures had the unintended effect of driving oil downward and depositing sediment on top of the oil, effectively burying it. Louisiana subsequently rejected BPXP's requests to utilize mechanical recovery to recover the buried oil. Although the Parish obtained a permit for installation from Louisiana, neither the Parish nor National Guard made any effort to timely remove the structures, further compounding the damage.

BPXP also states that it described in its proposed Mitigation, Health, and Claims Stipulations several Response Activities that BPXP and others have undertaken to respond to, or otherwise mitigate or prevent the effects of, the Spill, some of which have been conducted outside the purview of the Unified Command. For example, as described in its proposed Mitigation Stipulations, BPXP advanced block grants to state and local governments; funded independent research through the Gulf of Mexico Research Initiative ("GoMRI"); provided

grants to the Gulf States for the promotion of tourism; funded environmental restoration projects, including early restoration projects through an Early Restoration Framework Agreement; and undertook other mitigation efforts. Additionally, as set forth in BPXP's proposed Claims Stipulations, BPXP paid a total of more than $9.886 billion in claims between May 5, 2010, and June 30, 2013, to private individuals and businesses through the BP Claims Facility, the Gulf Coast Claims Facility, the transition process, the Court Supervised Settlement Program, and the BP Claims Program.

As additional examples, BPXP identifies without limitation the following actions, as set forth in BPXP's Health Stipulations: recognition of the role of the States in the effort to address behavioral health issues and the critical need for behavioral health services and provided $42 million to state agencies to fund existing behavioral health support and outreach programs across the Gulf Coast region; provision of $10 million to the Substance Abuse and Mental Health Services Administration and other human health services organizations towards the assessment of possible behavioral health needs of Gulf Coast residents; agreement to provide benefits for those who participated in cleanup or resided in certain coastal and wetlands areas, including compensation for qualified Specified Physical Conditions, a Periodic Medical Consultation Program, and $105 million over five years to four projects under the Gulf Region Health Outreach Program; and commitment to fund up to $500 million over ten years to support research through GoMRI. BPXP provided through GoMRI a $10 million block grant to the National Institutes of Health to expedite priority public health research. BPXP also engaged in a variety of educational and public outreach efforts concerning human health in the aftermath of the Incident. Moreover, certain of the Response Activities that were not conducted at the direction and under the oversight of the Unified Command, are described in several government

documents and industry publications, such as the On-Scene Coordinator Report for the *Deepwater Horizon* Oil Spill (the "FOSC Report," TREX 9105); the Incident Specific Preparedness Review for the *Deepwater Horizon* Oil Spill (the "ISPR," TREX 9124); and interview notes taken by the Oil Spill Commission or U.S. Coast Guard, as well as other documents already produced and/or to be produced as part of the MDL 2179 proceedings. BPXP reserves the right to present additional evidence regarding the actions or decisions taken or made by the United States that made BPXP's remediation and response efforts less effective and thereby increased BPXP's potential liabilities relating to the Incident and Spill, including through expert discovery.

## REQUESTS FOR ADMISSION

1. Admit that BP entities other than BPXP provided resources including personnel and equipment prior to, during, and in Response to the Incident.

**OBJECTIONS:**

BPXP objects to Request for Admission No. 1 on the grounds that it is vague, ambiguous, and overly broad to the extent that it requests that BPXP admit that BP entities provided resources "prior to" and "during" the Incident or the Response that were unrelated to the Incident or Response.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

Admitted in part as follows. BPXP admits that it secured resources, including personnel and equipment, from third-party contractors and other BP entities to assist in BPXP's efforts to respond to, or otherwise mitigate or prevent the effects of, the Spill. As the OPA Responsible Party, BPXP bore the vast majority of the costs of the response personnel, equipment, and other

42