# Exhibit 2



**U.S. Department of Homeland Security**

**United States Coast Guard**

Director
National Pollution Funds Center

4200 Wilson Blvd Stop 7100
Arlington VA 20598-7100
Staff Symbol: Ca
Toll-Free: 1-800-280-7118
Fax: 703-872-6113
Email: ARL-PF-NPFCCLAIMSINFO@uscg.mil

5890
October 22, 2012

SENT VIA EMAIL: ███@jotankers.com

Zippora Pte Ltd
c/o Jo Tankers
Kokstadflaten 5
5257 Kokstad, Norway

RE: N08057-0099

Dear Mr Brautaset:

The National Pollution Funds Center (NPFC), in accordance with the Oil Pollution Act (OPA) (33 U.S.C. 2701 et seq.), has determined that $22,109.11 is compensation for OPA claim number N08057-0099.

This determination is based on an analysis of the information submitted. Please see the attached determination for further details regarding the rational for this decision.

All costs that are not determined as compensable are considered denied. You may make a written request for reconsideration of this claim. The reconsideration must be received by the NPFC within 60 days of the date of this letter and must include the factual or legal basis of the request for reconsideration, providing any additional support for the claims. Reconsideration will be based upon the information provided and a claim may be reconsidered only once. Disposition of the reconsideration will constitute final agency action. Failure of the NPFC to issue a written decision within 90 days after receipt of a timely request for reconsideration shall, at the option of the claimant, be deemed final agency action. All correspondence should include corresponding claim number.

Mail reconsideration request to:
Director
NPFC CA MS 7100
US COAST GUARD
4200 Wilson Boulevard, Suite 1000
Arlington, VA 20598-7100

If you accept this determination, please sign the enclosed Acceptance / Release Agreement where indicated and return to the above address.

If we do not receive the signed original Acceptance / Release Agreement within 60 days of the date of this letter, the determination is void. If the determination is accepted, an original signature and a valid tax identification number (EIN or SSN) are required for payment. If you are a Claimant that has submitted other claims to the National Pollution Funds Center, you are

required to have a valid Central Contractor Registration (CCR) record prior to payment. If you do not, you may register free of charge at www.ccr.gov. Your payment will be mailed or electronically deposited in your account within 60 days of receipt of the Release Agreement.

If you have any questions or would like to discuss the matter, you may contact me at the above address or by phone at 1-800-280-7118.

                                          Sincerely,

                                          MARK ERBE
                                          Claims Manager
                                          U.S. Coast Guard
                                          By direction

CLAIM SUMMARY / DETERMINATION FORM

| | |
|---|---|
| Claim Number | : N08057-0099 |
| Claimant | : Zippora Pte Ltd. |
| Type of Claimant | : Foreign |
| Type of Claim | : Loss of Profits and Earning Capacity |
| Claim Manager | : Mark Erbe |
| Amount Requested | : $59,351.09 |

*FACTS:*

### I. Incident:

On July 23, 2008 at approximately 01:30, the tank barge DM-932 sank after a collision with the M/V TINTOMARA discharging approximately 282,932 gallons of No. 6 fuel oil into the Mississippi River, a navigable waterway of the United States.[1] As a result of the spill, the U.S. Coast Guard, Captain of the Port (COTP) of New Orleans, acting as the Federal On-Scene Coordinator (FOSC), closed a portion of the River and established a Safety Zone from Mile Marker 98 (incident site) in New Orleans, downriver to Mile Marker 1, at Southwest Pass Sea Buoy.[2]

### II. Responsible Party

At the time of the oil-spill incident American Commercial Lines, LLC (ACL) owned the tank barge DM-932. ACL was designated as the Responsible Party (RP) for the oil spill, under the Oil Pollution Act of 1990.[3]

### III. Claimant:

The Claimant is Zippora Pte, Ltd, (Claimant or Zippora) as the owner of the M/T JO ASPEN (JO ASPEN or vessel) and the registered operator as Jo Tankers AS of Kokstad, Norway.[4] Claimant alleges loss of profits and earnings from vessel delay and extra expenses incurred due to the DM-932 incident. Claimant seeks compensation from the Oil Spill Liability Trust Fund (OSLTF or Fund) in the sum certain of $59,351.09.[5]

### IV. Claim:

According to the Claimant the vessel loaded two earlier cargoes in the Mississippi River for different charterers and was enroute to Savannah, Georgia, on July 23, 2008, to load its third and final cargo when, because of the oil spill, the FOSC ordered the vessel to Bonnet Carre Anchorage.[6] Claimant states that the vessel was delayed for 2.196 days. Once again underway on July 26, 2008 the JO ASPEN was required to anchor at Boothville Anchorage for decontamination and inspection by the FOSC for an additional 0.262 days, resulting in a total of 2.458 days of delay. Claimant also asserts that it incurred extra port expenses for pilotage, launch and tugboat fees and additional fuel consumption due to the diversions to Bonnet Carre and Boothville Anchorages.

---

[1] See POLREPs #1 to #7, (7/23/08 - 7/27/08) in Part 5 of the NPFC Administrative Record
[2] See USCG POLREPS #7, #8 & #9 Part 5 of claim Administrative Record
[3] See POLREP #7 (paragraph D) in Part 5 of the NPFC Administrative Record
[4] See claim submission letter to the NPFC dated May 3, 2011
[5] See Claimant's September 5, 2012 email to the NPFC,
[6] The vessel was subsequently scheduled to, and did in fact; discharge its cargoes in Bayonne, France.

3

Claimant provides several theories for quantification and reimbursement of its alleged loss of profits.[7] First, Claimant prorated the contractual demurrage rates provided in its three voyage charters associated with the voyage to New Orleans and Savannah. Claimant then multiplied this rate by 2.458 days of delay. Second, Claimant suggested using the market hire rate for an equivalent vessel to the JO ASPEN on a trip to the United States and back to Europe. Claimant also suggested using the subsequent JO ASPEN voyage from Europe to the United States, calculating that voyage's daily rate and multiplying that by the 2.458-day delay time for the impacted voyage. Finally, Claimant calculated a daily net voyage revenue rate for this voyage and multiplied that rate by 2.458-day delay. These theories will be more fully discussed below.

As evidence of increased port costs, Claimant submitted copies of paid receipts from the time that the vessel was diverted along with a copy of its Port Log and Statement of Facts and summary of fuel consumption during the diversion.[8]

The NPFC received Zippora's claim on May 3, 2011 with exhibits A through J in support of its claim.

**IV. Vessel Delay Time Calculation:**

Claimant's Vessel Log and Statement of Facts, show that on July 23, 2008 the JO ASPEN was at the marine terminal in Avondale (Mile Marker (MM) 107.5).[9] The Vessel Log and Statement of Facts also show that the JO ASPEN was scheduled to depart that evening. However, at 20:15 on July 23, instead of departing for Savannah, the JO ASPEN was diverted upriver to Bonnet Carre Anchorage (MM 127.5) to wait for the reopening of this portion of the River on July 26, 2008. Once the vessel was underway the Coast Guard ordered the vessel to anchor at Boothville Anchorage (MM 12.5) for decontamination. This portion of vessel delay concluded at 01:00 hours on July 26, when the JO ASPEN passed the Avondale terminal on its way downriver to Boothville. Claimant calculates the first portion of vessel delay at 52 hours and 42 minutes or 2.196 days.

The JO ASPEN anchored at Boothville at 07:42 hours on July 26. It remained at anchorage until 14:00 hours on July 26, when it departed for Savannah. Claimant's Vessel Log and Statement of Facts show the JO ASPEN at Boothville Anchorage for six hours, 18 minutes or 0.262 days. Claimant alleges a total of 59 hours or 2.458 days of vessel delay, before the JO ASPEN could depart for Savannah on July 26, 2008.

**V. RP's Response to Claimant:**

Claimant presented its claim to the RP in a letter dated December 1, 2008 with exhibits.[10] The RP denied Zippora's claim for lost profits and filed an action in court (see below).[11] Claimant submitted its claim to the Oil Spill Liability Trust Fund on May 3, 2011 with exhibits A through J in support of its claim.

*APPLICABLE LAW*:

The Oil Pollution Act of 1990 provides that each responsible party for a vessel or facility from which oil is discharged, or which poses a threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive zone is liable for removal costs and damages. 33 U.S.C. § 2702(a).

---

[7] See Claimant's August 9, 2012 email to the NPFC, pg 2 lost profits
[8] See Claimant's submission May 3, 2011 with Claimant Exhibits A-J & pages 1 - 56
[9] See POLREPs #1 to #7, (7/23/08 - 7/27/08) in Part 5 of the NPFC Administrative Record
[10] See Claimant's letter of December 1, 2008 to Worley
[11] The Court subsequently dismissed the court action without prejudice. *See* dismissal American Commercial Lines, LLC v. Shell Trading et al, Civil Action 09-3392.

Damage include damages equal to the loss of profits or impairment of earning capacity, due to the injury, destruction of, or loss of real property, personal property or natural resources, which shall be recoverable by any claimant. 33 U.S.C. § 2702(b)(2)(E).

Congress directed the President to promulgate regulations for the presentation, filing, processing, settlement, and adjudication of claims …33 U.S.C. § 2713(e). Those regulations are found at 33 CFR Part 136.

The Fund shall be available to the President for the payment of claims in accordance with section 2713 of this title for uncompensated removal costs determined by the President to be consistent with the National Contingency Plan or uncompensated damages. 33 U.S.C. § 2712(a)(4).

Under 33 CFR 136.105(a) & 136.105(e)(6), the claimant bears the burden of providing all evidence, information, and documentation deemed necessary by the Director, NPFC, to support the claim.

When adjudicating Claims for loss of profits and impairment of earning capacity, the NPFC must independently determine that the proof criteria in OPA and the implementing regulations, at 33 CFR part 136 are met, including the general provisions of 33 CFR 136.105, and the specific requirements for loss of profits and earning capacity claims in Subpart C, 33 CFR 136.231, *et seq*.

Pursuant to the provisions of 33 CFR 136.231, claims for the loss of profits or impairment of earning capacity due to injury to, destruction or, or loss or real or personal property or natural resources may be presented to the Fund by the claimant sustaining the loss or impairment.

The proof requirements follow: "In addition to the requirements of Subparts A & B of this part, a claimant must establish the following-

   (a) That real or personal property or natural resources have been injured, destroyed, or lost.
   (b) That the claimant's income was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.
   (c) The amount of the claimant's profits or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents. In addition, comparable figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.
   (d) Whether alternative employment or business was available and undertaken and, if so, the amount of income received. All income that a claimant receives as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established." 33 CFR 136.233(a-d)

If a third party claimant or RP is able to establish an entitlement to lost profits, then compensation may be provided from the OSLTF, but the compensable amount is limited to the actual net reduction or loss of earnings and profits suffered. Calculations for the net reductions or losses must clearly reflect adjustments for the following: all income resulting from the incident, all income from alternative employment or business undertaken, potential income from alternative employment or business not undertaken but reasonably available, and saved overhead or normal business expenses not incurred as a result of the incident, and state, local, and federal tax savings. 33 CFR 136.235(a-e)

## *DETERMINATION OF LOSS:*

The NPFC reviewed all documentation submitted by Claimant.

### A. *Findings of Fact*:

1. In accordance with 33 U.S.C. § 2712(h)(2) and 33CFR § 136.101(a)(1) the claim was submitted within the three year period of limitations for loss of profits under OPA.
2. In accordance with 33 CFR § 136.103(a) the claimant first presented its claim to the Responsible Party.
3. In accordance with 33 CFR 136.105(e)(10) copies of written communications and substance of verbal communications, between claimant and Responsible Party with the date claim was presented and the date that the claim was denied have been provided.
4. In accordance with 33 CFR § 136.105(b) claimant's sum certain is $59,351.09.
5. In accordance with 33 CFR § 136.105(e)(12), claimant certified no suit has been filed in court for the claimed loss of profits.
6. In accordance with 33 CFR § 136.111(a)(2) claimant asserts that the oil spill delay is not an insured peril and it has not submitted a claim to its insurer.
7. Claimant asserts that it mitigated its vessel delays during the oil spill incident by resuming its voyage as soon as possible after it was decontaminated.

### B. *Claimant's Arguments:*

#### 1. *Alleged Time for Vessel Delay:*

Claimant asserts that the oil spill related vessel delay period began at 20:18 hours on July 23 when the JO ASPEN completed loading at Avondale and was ready to depart for Savannah.[12] Instead of departing, the JO ASPEN was diverted to Bonnet Carre Anchorage due to the oil spill. Bonnet Carre Anchorage is 19.8 miles upriver from Avondale. This initial vessel delay ended at 01:00 hours on July 26 when the JO ASPEN passed Avondale, on its way to Boothville Anchorage. Claimant calculates this portion of spill-related vessel delay comes to 52 hours and 42 minutes.

Claimant asserts that its second period of vessel delay began at 07:42 hours on July 26 when the JO ASPEN stopped at the Boothville Anchorage for decontamination and inspection by the FOSC-R. The JO ASPEN remained at Boothville until 14:00 hours on July 26. Claimant calculates that this portion of spill-related delay added 6 hours and 18 minutes, making its vessel delay a total of 59 hours (total of 2.458-days).[13]

#### *NPFC's Findings on Time of Vessel Delay:*

Review of the Claimant's Statement of Facts/ Port Log entries shows that the JO ASPEN was at Avondale on the Mississippi River at the time of the DM-932 spill incident. In addition, USCG-FOSC kept a list of contaminated and detained vessels and the M/V JO ASPEN is on this document.[14] Further, the NPFC reviewed the Coast Guard Situation Pollution Reports (SITREP-POL) that state vessels transiting the Safety Zone were delayed from July 23, 2008 until after July 28, 2008. The Maritime Transportation System Recovery Unit (MTSRU) coordinated vessel movements during the oil-spill response based on immediate impact on facility operations and potential future economic impact.[15]

The NPFC finds that the evidence supports the conclusion that the JO ASPEN was in the Safety Zone on the day of the spill and contaminated by residual oil from the DM-932. The vessel had to divert to

---

[12] See Claimant's Exhibit C pg 9
[13] See Claimant's Exhibit B pg 4
[14] See FOSC Vessel Decon List in admin record, Part 4 listing the M/T OVERSEAS SERIFOS
[15] See POLREP 7 paragraph 3. E.4

anchorage instead of departing. The NPFC finds that Claimant's vessel was delayed 2.458-days (59 hours) due to the spill incident.

### 2. Claimant's Alleged Lost Profits and Earnings on Vessel Delay:

Claimant quantified its alleged loss of profits on two theories but suggested other methods for quantifying such a loss.[16] First, Claimant calculated its alleged loss of profits under a demurrage theory. The vessel was operating under three voyage charters with different demurrage rates for each of the charters.[17] At the time of the delay on July 23, 2008, the vessel completed the loading of its second cargo and was transiting to Savannah to load its third and final cargo. Claimant acknowledged that at that time the vessel was not under a demurrage regime nor was demurrage charged or incurred for this voyage.[18] Claimant first calculated the weight of each demurrage rate by taking the percentage of the total cargo that applied to each demurrage rate. This percentage was then applied to the total delay hours. The calculated delay hours were then multiplied by the demurrage rate for that cargo. Claimant calculated the demurrage for cargo #1 to be $15,856.25; cargo #2 to be $16,593.75, and cargo #3 to be $5,191.98. Based on this prorated demurrage theory Claimant quantified the loss of profits to be $37,641.98;[19] however, Claimant subsequently used the net daily revenue to support its sum certain.

Claimant also calculated its alleged loss of profits under a net daily revenue theory. Claimant reviewed the JO ASPEN's Voyage Account statement for the affected voyage, Voyage #202.[20] Claimant explains that the daily net revenue is calculated by taking the voyage revenue minus the voyage expenses and dividing by the number of days on the voyage. Claimant asserts that had it not been for the spill, the voyage would have been completed in an *estimated* 30.15 days instead of 32.61 days that the voyage actually took. Claimant calculates the *estimated* daily voyage earnings without the 2.458-day delay at $7,531.44 by dividing total voyage revenue ($227,073) by the *estimated* voyage days (30.15 days) to arrive at an *estimated* net daily earnings of $7,531.44 ($227,073/ 30.15 = $7,531.44). Claimant then multiplies the *estimated* net daily earnings by the delay (2.458-days) and arrives at the *estimated* net daily lost revenue of $18,512.28 ($7,531.44 x 2.458-days = $18,512.28). Claimant concludes that this *estimated* daily rate is the correct level of daily lost profits for the spill delay.[21]

Claimant suggested calculating the lost profits by using daily market hire rate for a vessel of the same size and type as the JO ASPEN and multiply that to the 2.458 days of delay.[22] Claimant further suggested that one could establish the daily earnings on JO ASPEN's subsequent voyage and applying that rate to the 2.458-day delay. Claimant did not further discuss or provide calculations or evidence for these theories.

### NPFC Analysis of Alleged Lost Profits & Earnings on Vessel Delay:

Under OPA, a claimant seeking reimbursement of his loss of profits or impairment of earning capacity may be reimbursed due to the injury to, destruction of, or loss of property or natural resources caused by the discharge of oil into the navigable waters of the U.S. In this case the oil spill resulted in injury to natural resources, specifically to the Mississippi River. The claims regulations associated with OPA

---

[16] See Claimant's May 3, 2011 claim submission
[17] Claimant submitted copies of its three voyage charter fixture notes reflecting each demurrage rate.
[18] See Claim submission May 3, 2011 Claimant's Exhibit C (pgs 9, 10 & 11) and emails of June 24, 2011 and September
[19] See Claim submission dated May 3, 2011 received NPFC June 13, 2011
[20] See Claimant's email of September 5, 2012 with attached Voyage Accounts
[21] Ibid
[22] See Claimant's email June 24, 2011

provide that a claimant has the burden of establishing that he suffered a loss of profits and then quantifying that loss. 33 CFR 136.105(a) and 33 CFR 136.235. A loss of profits may be established by objective means, i.e., income tax returns, financial statements, comparable figures for profits or earnings for the same or similar activities outside of the area affected by the incident. 33 CFR 136.233(a)-(d).

The OPA claims regulations comport with maritime case law regarding the burden of proof for loss of profits. The burden of establishing that profits were lost is upon the ship owner. The Nicolaou Maria, 143 F. 2d 406 (5 Cir. 1944); see also Skou v. United States, 478 F. 2d 343, 345 (C.A. 5 1973). A loss of profits may be awarded if it is proven with a reasonable certainty. Atlas Copco Tools, Inc. v Air Power Tool & Hoist, Inc., 131 S.W. 3d 203 (Tex. 2004) (A party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty). The test to establish that profits have been lost is flexible but, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the lost profits may be ascertained.[23] Reasonable certainty is not demonstrated when the profits are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions. Id. at 206.

Once a loss of profits is established there are various ways to ascertain detention damages.[24] Turecamo Maritime, Inc. v. Weeks Dredge No. 516, 872 F. Supp. 1215, 1233 (S.D. N.Y. 1994) (Courts have wide discretion in ascertaining the measure of detention damages. Some commonly used measures are: (1) the value of a specific lost charter, (2) the earnings of an average voyage where the ship was run on a fixed route with relatively stable earnings per voyage, (3) average daily earnings, (4) a demonstrative loss of revenue to the business, or (5) the market cost of a substitute with similar characteristics.

In this claim Claimant quantifies alleged lost profits before he has established that the vessel in fact suffered a loss of profits. Claimant demonstrates a voyage delay and then concludes that the delay caused the loss amount alleged without actually providing evidence that the delay resulted in a loss of profits. Claimant first quantified its alleged loss of profits based on a demurrage theory. While a claimant may *quantify* lost profits by using demurrage rates provided in a charter party, he must first evidence that profits have actually or reasonably supposed to have been lost and the profits were proved with reasonable certainty. Skou, 478 F. 2d at 345. Demurrage from the loss of use of a vessel has traditionally been an item of damages in admiralty but will only be allowed when profits have actually been lost and the amount of profit is proven with reasonable certainty. To enforce the contract without proof of actual damages would be inequitable, permitting the claimant to enrich himself at the expense of the responsible party. Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co., 804 F. 2d 773, 782 (C.A.1 P.R. 1986) (The mere stipulation of a liquidated sum for demurrage in a charter party does not obviate the need to show actual damages ... "Despite the existence of a demurrage clause, ... such penalty can only be claimed if the ship owner can demonstrate that he has suffered actual damage as a result of the charterer's delay." 2 *Benedict on Admiralty*, § 31, at 2-1, 202 (1986))[25]

Claimant first quantified the loss of profits as $37,641.98 based on a proration of demurrage rates in three voyage charters. The vessel had completed the loading of cargo for two of its three charters at

---

[23] The OPA claims regulations recognize that income taxes, financial statements or comparables are objective means by which a claimant may establish that he suffered a loss of profits.
[24] Damages for lost profits arising from the loss of use of a vessel for repairs after a collision or other maritime tort has traditionally been called detention. Bolivar County Gravel Co., v. Thomas Marine Company, 585 F. 2d 1306, 1308 fn 2 (C.A. Miss. 1978). It is appropriate to refer to detention case law as guidance when adjudicating OPA claims for loss of profits.
[25] Recovery for lost profits under any theory is limited to actual profits, i.e., voyage expenses and costs must be deducted from the gross hire rate to reflect actual profits. Moore-McCormick Lines v. The Esso Camden, 244 F. 2d 198, 203 (C.A. 2 1957)

the time of the oil spill and was transiting to Savannah to load its third and final cargo before transiting to Europe to discharge all three cargoes. The vessel was not under a demurrage regime at the time of the oil spill and the resultant delay. Claimant acknowledged that no demurrage was paid or due and that it received its full freight from the three charters.[26] There is no evidence of a reduction of revenue. No information in the administrative record or the calculation evidences an actual loss of profits because the vessel's voyage was extended by 2.458 days. Simply taking a demurrage rate and applying the delay time does not establish that a loss of profits occurred.

Similarly, Claimant provided a second valuation that quantified its lost profits by utilizing a daily net voyage revenue theory again without establishing that it in fact suffered a loss of profits. Claimant provided the Voyage Account Statement for the voyage at issue, which reflects that the JO ASPEN earned its full contracted revenue for carriage. The Claimant subtracted the voyage expenses from the gross revenue to arrive at the net voyage revenue ($227,073). The Voyage Account Statement reflects that the voyage was completed in 32.61 days. Dividing the net revenue by 32.61 days Claimant calculates the daily net revenue to be $6,963.29 per day with the delay. Dividing the net revenue by the *estimated* number of days for the voyage (without the 2.458 days of delay) the daily net revenue is $7,531.44. Thus, Claimant quantifies the loss of profits under this theory to be $18,512.38. Estimates of lost profits must be based on objective facts or figures. Atlas Copco Tools, Inc., 131 S.W. 3d at 206. Estimated voyage days may not be representative of an actual loss due to the oil spill because the voyage could have been delayed for other reasons.

Simply calculating the lost profits based on the delayed voyage accounting statement does not establish that the vessel suffered a loss of profits. Under certain circumstances and objective data a claimant may establish that it suffered a loss of profits by reviewing average daily earnings. However, Claimant would have to provide a final accounting for not only the impacted voyage, but also for at least one previous voyage and the first subsequent voyage after the impacted voyage. Moore-McCormack Lines v. the Esso Camden, 244 F. 2d 198 (C.A. 2 1957) (A fairer measure of lost profits is the average daily earnings over the entire period of the three voyages in evidence. The average daily earnings are sufficient evidence of lost profits during detention.) A claimant arguing this method would have to demonstrate that the affected voyage resulted in a reduced profit compared to the other comparable voyages. In this claim, Claimant submitted only the accounting for the impacted voyage and the average daily revenue for that voyage in isolation does not establish that the vessel suffered a loss of profits.

As a final alternative, Claimant asserts that it suffered a lost voyage due to a "knock-on" effect when voyages take additional days in port. Stated another way, Claimant argues the 2.458-day delay would result in the loss of a subsequent voyage at some time in the future. While one could establish a loss of profits if the vessel lost a subsequent charter due to the oil spill (Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F. 2d 128, 129 (5th Cir. 1972)), there is no evidence in the administrative record that Claimant in fact lost a subsequent voyage due to the oil spill.
Claimant suggested using the market hire rate for a similar vessel undergoing a similar voyage but did not pursue this theory. Thus, the NPFC did not further analyze or consider this theory.[27]

In summary Claimant has not established that it suffered a loss of profits due to the oil spill in the Mississippi River. Claimant suggests and quantifies lost profits under demurrage and net daily revenue theories but, these calculations do not in themselves establish a loss of profits. Claimant acknowledges that he is attempting to show how much the vessel's time was worth during the delay. But simply quantifying the loss due to 2.458 days of delay under any theory does not establish that the vessel suffered a loss of profits due to the oil spill.

---

[26] See Claimant's email of September 17, 2012
[27] See Claimant's email of June 24, 2011

9

### 3. Claimant's Increased Port Costs:

Claimant submitted invoices for increased port costs arising from the incident. Invoiced services are reflected in the daily and hourly entries in Claimant's Statement of Facts/ Port Log.[28] Invoices are for increased or extra costs for pilotage, transportation, tugboat fee along with fuel and water used when the vessel was diverted to anchorage due to the spill response. Claimant's alleges increased costs totaling $21,709.11.[29]

### NPFC's Findings on Increased Port Costs:

The NPFC reviewed the invoices and finds that they include expenses that relate to the diversion of the JO ASPEN to anchorages at Bonnet Carre and Boothville during the DM-932 oil spill incident. The Claimant identified increased port charges on its invoices and deducted items that were not related to diverting the vessel due to the spill. The NPFC finds that the JO ASPEN could not depart the Mississippi River without inspection by the FOSC. If the spill had not occurred, the JO ASPEN would have departed directly from Avondale on July 23. The NPFC finds that Claimant identified and documented increased port costs totaling $22,349.00. Below is a detailed review of port costs that are compensable under the OPA.

### A. Extra Pilotage at Bonnet Carre Anchorage:

Relating to these claimed expenses, the NPFC discusses each invoice separately below:

*1.* July 23, 2008, Invoice #0098756 New Orleans Baton Rouge Steamship Pilots Association[30] Claimant paid to *Undocking & shift to Bonnet Carre at 20:18 hours.* Invoice Amount: $3,074.82

Claimant identified $2,600 in costs from the July 23 invoice: *a)* draft charge of $1,910.64, *b)* mileage to anchorage $310.86, *c)* transportation one-way $166.28, *d)* communication $5.57 and *e)* pension and VTS surcharges of $207.25. Claimant calculates $2,600.60 ($1,910.64 + $310.86 + 166.28 + $1.57 + $207.25 = $2,600.60) in pilotage due to the spill.

*2.* July 25, 2008, Invoice #0098945 New Orleans Baton Rouge Steamship Pilots Association[31] *One turn & shift Bonnet Carre (pilot's fee per mile = $15.70)* Claimant paid the outbound pilotage for the vessel after it was directed from Bonnet Carre to Boothville Anchorage. Invoice Amount $3,334.74

Claimant identified the following pilotage charges on July 25 invoice: *a)* pilotage to turn the JO ASPEN at Bonnet Carre then downriver only as far as Avondale at $15.70 per mile ($310.89/ 19.8 mi = $15.70). This amount is verified by the pilotage fees from Avondale to Bonnet Carre (see July 23 pilotage invoice). And, *b)* a one-way transportation charge of $166.28 to bring the pilot to anchorage. Claimant calculates $477.17 (310.89 + 166.28 = 477.17) in increased pilotage due to the spill.

### NPFC Findings on Extra Pilots Fees to& from Bonnet Carre:

---

[28] See Claimant Exhibit C, pg 9
[29] See Exhibits B, C, & D pgs 3 - 22
[30] See Claimant Exhibit C, pg 13 & 16
[31] See Claimant's Exhibit D, pg 20

10

On the July 23, 2008 invoice #0098756, the NPFC finds that Claimant properly identified and calculated increased costs for pilotage to divert the vessel to Bonnet Carre Anchorage. The NPFC finds the pilotage costs of **$2,600.60** are directly related to diverting the vessel due to the oil spill.

On the July 25, 2008 invoice #0098945, the NPFC finds that Claimant properly identified increased charges to pilot the vessel downriver back to Avondale on July 26 that the vessel would not have incurred had it departed immediately downriver, as it would have, had the spill not caused the river closure. The NPFC finds that $310.89 represents pilotage back to Avondale and finds the charge for one-way transportation to anchorage at $166.60 to be related to the increased costs of diverting the vessel to anchorage because of the spill. The NPFC finds that increased pilotage on July 25, 2008 totals **$477.14.**

The NPFC finds the total OPA compensable costs for increased pilotage on July 23 is $2,600.60 and for July 25, 2008 is $477.14. The total for pilotage due to the spill and diverting the vessel to Bonnet Carre is **$3,077.77. ($2,600.60 + $477.14 = $3,077.74)**

### B. Extra Tug Fees at Bonnet Carre:

Claimant submitted one paid invoice for Bisso Towboat service on July 25, invoice #54139 in the amount of $2,829.00. [32] Claimant paid for the first tug boat fee July 23 to undock the vessel at Avondale.[33]

### NPFC Findings on Tug Fees:

The NPFC finds that the JO ASPEN was diverted from Avondale to Bonnet Carre instead of departing to Savannah. The NPFC finds that Claimant paid one tugboat fee to undock the vessel at Avondale on July 23 when vessel diverted to Bonne Carre Anchorage due to the spill incident. Claimant would *not* have incurred two tugboat charges upon departing. Therefore, one tugboat invoice is an additional or increased cost. The NPFC finds **$2,829.00** to be compensable under OPA as an increased port charge to divert the vessel to anchorage because of the spill incident.

### C. Extra Launch Services:

Claimant submitted a copy of its paid invoice #11633 from Belle Chasse Marine Transport totaling $3,432.00 for launch services.[34] Claimant included copies of receipts with dates of July 24 and July 25 and identified these dates relate to taking the pilot *off* and *on* the JO ASPEN at Bonnet Carre Anchorage.

### NPFC Findings on Launch Services:

The NPFC finds that launch service at Bonnet Carre was necessary because the vessel was diverted to anchorage due to the spill and to wait FOSC inspection before departing the Mississippi River. The NPFC finds two launch fees at Bonne Carre for $600 each total of $1,200. In addition, this invoice includes a 20% fuel surcharge. Claimant calculated 20% fuel surcharge on $1,200 is $240 ($1,200 x 20% = $240). Launch service $1,200 plus fuel surcharge $240 is $1,440.

---

[32] See Claimant Exhibit D, pg 21
[33] See Claimant Exhibit C, pg 9 Port Log July 23
[34] See Claimant's Exhibit D, pg 10

11

The NPFC determines the launch service at Bonnet Carre relates to diverting the vessel to anchorage because of the spill incident and that **$1,440.00** represents OPA compensable increased port charges.

### D. Extra Pilotage at Boothville Anchorage:

Claimant submitted copies of two paid invoices #218073 and #216074 from Crescent River Port Pilots' Association for services on July 26, 2008. [35] Claimant asserts that before departing the Mississippi River the JO ASPEN had to anchor for inspection by the FOSC-R. Claimant seeks compensation for additional and increased pilotage Claimant identified at the Boothville Anchorage.

Invoice #218073 Claimant identifies charges for *a)* pilot's transportation off the vessel at Boothville/ Venice at $183.00 and *b)* boat service at Boothville $373.64 for total $556.64 ($183 + $373.64 = $556.64).

Invoice #216074 Claimants identifies three specific fees for the additional pilot after the JO ASPEN was inspected by the FOSC-R: *a)* draft charge of $596.49 for pilotage from Boothville to Pilottown *b)* transportation at Boothville/ Venice $183 and *c)* boat service at Boothville $373.64. Claimant calculates $1,153.13 ($596.49 + $183 + $373.64 = $1,153.13)

*NPFC Findings on Extra Pilotage at Boothville Anchorage:*

The NPFC finds that because of the spill the JO ASPEN had to be inspected by the FOSC-R before departing the Mississippi River. The FOSC-R maintained an inspection station at Boothville Anchorage where the JO ASPEN anchored for inspection before departing.

The NPFC finds that invoice #218073 shows transport cost for the pilot after the JO ASPEN arrived at Boothville. The NPFC finds $183.00 for transportation and $373.64 for boat service are additional and increased costs for pilotage because JO ASPEN had to be inspected by the FOSC-R before departing the Mississippi River. Inspection was necessary to contain the oil spill. The NPFC finds the extra pilotage on this invoice comes to $556.34. ($183 + $373.64 = $556.34)

The NPFC finds that invoice #216074 reflects extra cost to return the pilot to the vessel. After inspection the JO ASPEN continued its outbound voyage. The NPFC finds that had the JO ASPEN not had to stop at Boothville for inspection due to the spill that Claimant would have only incurred one draft charge of $596.49. Claimant paid a draft charge in the previous invoice #218073. Therefore, the second draft charge is an extra expense. NPFC finds that if the JO ASPEN did not have to stop for inspection at Boothville that it would have continued outbound to Pilottown. This second draft charge is applied when the JO ASPEN hired a pilot to continue outbound. Therefore, the NPFC finds the extra costs for pilotage at Boothville includes the draft charge of $596.49, plus transportation cost of $183, plus boat service of $373.64 because the stop at Boothville would not have been incurred but for the oil spill and vessel inspection.

The NPFC finds increased costs for pilotage at Boothville are **$1,709.77.** ($556.64 + $1.153.13 = $1,709.77)

### E. Increased Fuel Costs:

---

[35] See Claimant's Exhibit D, pg 13 & 16

12

Claimant submitted a paid receipt (#INV001039014) from Curoil, N.V. that was paid July 10, 2008. The invoice reads 100 metric tons of LV-FO (180 cst) at $745 per ton for a subtotal of $74,500. The invoice shows an additional amount of $1,500 for transportation cost adding $15 per ton. Total cost on the invoice is $76,000 or $760 per ton. Claimant provided fuel readings of the vessel taken from the time the vessel diverted at Avondale to Bonne Carre and ending when the vessel pasted Avondale (19.8 miles) on its way outbound. Claimant started fuel consumption again after the vessel anchored at Boothville and continued until it weighed anchor.[36]

Claimant's readings and calculations:

First Delay Period:

July 23 at 20:18 hours last line at Avondale…IFO = 158.3…MDO = 20.9…LO = 18328 liters
July 26 at 01:00 hours passing Avondale…….IFO = 148.5…MDO = 20.8…LO = 18228 liters
Subtotal…………………………………………….IFO = 9.8   MDO =   .1   LO =    100 liters

Second Delay Period:

July 26 at 07:42 anchor at Boothville……..IFO = 147.8….MDO = 20.7….LO = 18228 liters
July 26 at 14:00 depart Boothville………..IFO = 140.8….MDO = 20.7….LO = 18028 liters
Subtotal…………………………………………….IFO =  7.0    MDO = -0-    LO =    200 liters

Totals:
HFO……….16.8 mts =  $ 12,516.00 (16.8 x $760 = $12,768.00)
MDO……..   .2 mts =  $      136.60
LO………. 250  ltrs =  $      400.00
Water…… 24  mts =  $      240.00
Total………………….. $ 13,292.60

***NPFC's Findings on Increased Fuel Costs:***

The NPFC finds Claimant's that the JO ASPEN was diverted to anchorages because of the spill incident. The NPFC determines Claimant's calculation for the amount of fuel consumed relates to the hours that the vessel was diverted and at anchorage. The NPFC finds Claimant's fuel costs are supported by a copy of its paid receipt.

Additionally, the NPFC finds that Claimant's assertion that it consumed 24 metric tons of water during the above periods is not supported by the evidence presented by the Claimant. Claimant asserts that the vessel uses about 10 MT of water per day. The NPFC finds the quantity of fuel consumed is supported by the evidence in the administrative record. The NPFC concludes increased fuel costs are **$13,052.60.  ($12,516.00 + $136.60 + $400.00 + 240.00 = 13,052.60)**

<u>DETERMINATION:</u>

For the reasons stated above the Claimant has not established that it in fact suffered a loss of profits. OPA places the burden for demonstrating damages, including a loss of profits or earning capacity, on the claimant and subsequently on the valuation or quantification of that damage. A claimant has the best understanding of the business operations, financial reporting and documentation of its activities. There may be several methodologies to demonstrate damages and the valuation depending on the specific

_____

business, venture or voyage. It is the claimant's burden to choose the methodologies, based on the facts and circumstances of the claim, that best evidence a loss of profits and quantification of that loss.

The evidence demonstrates that the vessel movements during this period are because of the requirement to decon the vessel. Claimant has demonstrated that the pilotage, launch service and towboat service costs detailed in the invoices are a direct result of the oil spill injury and closure to the river and are evidence that the claimant incurred increased port costs on July 23, through July 26, 2008 to decontaminate the vessel because of the oil-spill. These additional costs increased claimant's port costs and reduced claimant's profits. So, these costs are compensable under OPA.

NPFC Approved Increased Port Costs:

| | |
|---|---|
| Pilotage to divert to Bonnet Carre: | $ 3,077.74 |
| Towboat at Bonnet Carre: | $ 2,829.00 |
| Launch Boat Fees at Bonnet Carre: | $ 1,440.00 |
| Pilotage at Boothville: | $ 1,709.77 |
| Fuel Consumed to divert vessel: | $13,052.60 |
| Total: | $22,109.11 |

*AMOUNT: $22,109.11*

*Conclusion:*

The claimant demonstrated that its vessel was delayed in the Mississippi River as a result of this incident, but was able to complete its final load of cargo In Savannah, GA and delivered all cargoes in France as planned. No loss of cargo or revenue was established, no future venture was proven lost, no penalty was assessed as a result of the spill. As determined above $22,109.11 in increased expenses resulted from the incident and were proven to impact earnings for the claimant.

Claim Supervisor: Robert Rioux

Date of Supervisor's Review: 10/25/12

Supervisor's Comments: Approved.

14

## ACCEPTANCE / RELEASE AGREEMENT

| Claim Number: N08057-0099 | Claimant Name: Zippora Pte Ltd |
|---|---|

I, the undersigned, ACCEPT this settlement offer of $22,109.11 as full and final compensation for damages arising from the specific claim number identified above. With my signature, I also acknowledge that I accept as final agency action all costs submitted with subject claim that were denied in the determination and for which I received no compensation.

This settlement represents full and final release and satisfaction of the amounts paid from the Oil Spill Liability Trust Fund under the Oil Pollution Act of 1990 for this claim. I hereby assign, transfer, and subrogate to the United States all rights, claims, interest and rights of action, that I may have against any party, person, firm or corporation that may be liable for the amounts paid for which I have been compensated under this claim. I authorize the United States to sue, compromise or settle in my name and the United States fully substituted for me and subrogated to all of my rights arising from and associated with those amounts paid for which I am compensated for with this settlement offer. I warrant that no legal action has been brought regarding this matter and no settlement has been or will be made by me or any person on my behalf with any other party for amounts paid which is the subject of this claim against the Oil Spill Liability Trust Fund (Fund).

This settlement is not an admission of liability by any party.

With my signature, I acknowledge that I accept as final agency action all amounts paid for this claim and amounts denied in the determination for which I received no compensation.

I, the undersigned, agree that, upon acceptance of any compensation from the Fund, I will cooperate fully with the United States in any claim and/or action by the United States against any person or party to recover the compensation. The cooperation shall include, but is not limited to, immediately reimbursing the Fund for any compensation received from any other source for those amounts paid for which the Fund has provided compensation, by providing any documentation, evidence, testimony, and other support, as may be necessary for the United States to recover from any other person or party.

I, the undersigned, certify that to the best of my knowledge and belief the information contained in this claim represents all material facts and is true. I understand that misrepresentation of facts is subject to prosecution under federal law (including, but not limited to 18 U.S.C. §§ 287 and 1001).

| _____ | _____ |
|---|---|
| Title of Person Signing | Date of Signature |
| _____ | _____ |
| Printed Name of Claimant or Authorized Representative | Signature |

| _____ | _____ |
|---|---|
| Title of Witness | Date of Signature |
| _____ | _____ |
| Printed Name of Witness | Signature |

| *DUNS/EIN/SSN | | |
|---|---|---|
| *Required for Payment | Bank Routing Number | Bank Account Number |

15