# Exhibit 9

CLAIM SUMMARY / DETERMINATION FORM

| | |
|---|---|
| Date | : 1/23/2012 |
| Claim Number | : P05005-125 |
| Claimant | : EIC Associates, Inc. |
| Type of Claimant | : Corporate (US) |
| Type of Claim | : Loss of Profits and Earning Capacity |
| Claim Manager | : Mark Erbe |
| Amount Requested | : $1,255,156.00* |

## I. *BACKGROUND:*

### *A. Oil Spill Incident:*

On November 26, 2004, the Cypriot-flagged tank vessel ATHOS I struck a submerged anchor as it approached the CITGO Asphalt Refining Company terminal at Paulsboro, New Jersey. The anchor punctured the hull causing the release of 265,000 gallons of Venezuelan crude oil into the Delaware River. The oil spill affected property and natural resources on and along the shores of the Delaware River.

To facilitate the containment and removal of the discharged oil, Captain of the Port (COTP), USCG, issued an order effective December 15, 2004 to January 15, 2005 restricting all vessel traffic on the Delaware River and establishing a temporary safety zone. The Safety Zone extended from the Tacony-Palmyra Bridge to Bellevue/Marcus Hook ship range at buoy 2M (upper Delaware Bay) and from shoreline to shoreline.[1] The COTP provided all affected stakeholders the opportunity to obtain authorization for provisional access/transit on the river during the time the order was in effect. Persons seeking to transit within the Safety Zone were instructed to contact the COTP by phone or short wave radio.[2]

### *B. Responsible Party:*

Frescati Shipping Company Limited was designated as the Responsible Party (RP) for the oil spill by the acting Federal On-Scene Coordinator (FOSC). After the RP categorically denied all claims under the Oil Pollution Act of 1990, claimants who were eligible could submit claims directly to the Oil Spill Liability Trust Fund through the National Pollution Funds Center.

### *C. Claimant and Background:*

EIC Associates, Inc. (EIC or the Claimant) is a heavy construction company[3] that added a Marine Operations division in 2002.[4] In February 2004 Claimant entered into a one-year, fixed amount contract

---

*see EIC letter from Bryant October 29, 2010
[1] 33 CFR 165 Federal Register, Rules and Regulations / Safety Zone Delaware River (3) all persons desiring to transit the safety zone must contact the COTP by telephone at (215) 271-4807 or VHF channel 13 or 16 to seek permission prior to transiting the area.
[2] Ibid
[3] See claimant's letter of December/15, 2009 entitled "Restatement and analysis of EIC claims"
[4] Construction Today (Digital Edition, June 2011 ed. http://www.construction-today.com/cms2/index.php?option=com_content&view=article&id=1789:eic-associates-inc&catid=178&Itemid=108)

with South Jersey Port Corporation (SJPC) to construct the New Pier IA at Broadway Marine Terminal in Camden, New Jersey. Construction began on May 20, 2004 and was to be completed by April 15, 2005.[5] Claimant employed up to 18 personnel on the Pier 1A project, including two superintendents.[6]  The Broadway Marine Terminal is owned by SJPC and situated on the Delaware River at Mile Marker 85 and was inside the COTP's Safety Zone.

Prior to the incident on November 26, 2004, Claimant had driven 17 of 423 precast concrete piles into the river-bottom as foundation for the pier at Broadway Marine Terminal.[7]  Also, prior to the incident, Claimant ceased construction for the Thanksgiving holidays.  When Claimant returned on November 29, 2004 its pilings and barges were oiled by the spill.[8]  Claimant informed SJPC that it had to stop work because of the spill.  During the work stoppage Claimant's employees were trained and certified to handle hazardous material and some of EIC's equipment was used to remove residual oil during the spill response.[9]

On December 26, 2004 the FOSC declared the Broadway Terminal clean of oil.[10]  Claimant returned to its construction site 38-days after the incident on January 5, 2005.  Because the 38-day oil spill delay (the work stoppage) was not caused by the Claimant's actions or omissions, SJPC extended the one-year contract by 38-days extending the deadline from April 15, to May 25, 2005, without penalty.  The project was substantially completed by September 8, 2005; approximately three and a half months beyond the amended 38-day contract extension date of May 25, 2005.

*Initial Claim:*

On September 29, 2005, Claimant presented to the National Pollution Funds Center (NPFC) a letter and binder with exhibits alleging removal costs and damages arising from the oil spill.  The NPFC separated the claim into three categories:  lost profits (P05005-125), removal costs (claim # P05005-120) and property damages (claim # P05005-019).  Claimant accepted the NPFC's administrative decision to separate its claim under separate OPA claim categories. The removal cost claim and property damage claim were adjudicated separately and are not addressed in this determination.

In its initial submission letter, Claimant alleged that the oil spill caused an additional 96 days of delay, beyond the 38-day oil spill work stoppage that negatively impacted Claimant's construction schedule resulting in lost profits.

Claimant initially sought lost profits in the amount of $2,801,865.00.  The alleged lost profits represented increased labor costs during the work stoppage ($427,058.00), lost productivity ($949,152.00), liquidated damages ($800,880.00) and home office overhead ($385,152.00).  Claimant also alleged interest payments in the amount of $239,623.00 (Claimant Exhibit 9) but, these costs were not incurred by the claimant.  The NPFC advised Claimant that its financial costs represent an approximation and not a sum certain as required under OPA (33 CFR Part 136.105 (b).

Claimant recalculated its lost profits on October 12, 2007 increasing its sum certain to **$3,217,578.00.** Claimant's amended sum certain represented: $353,655.00 for lost profits associated with the work

[5] See copy of South Jersey Port Corp New Pier 1A Facility Project & Minutes of Construction Meeting June 2, 2005
[6] See Claimant's Exhibit Attachment 1 in Work Stoppage binder dated June 26, 2008
[7] See Claimant's pile driving record beginning November 18, 2004 to November 24, 2004 in the admin record.
[8] See POLREPs and FOSC cleanup area map NJ-2 in admin record
[9] See NPFC claim P05005-120 for EIC & Associates' removal costs for spreadsheet for labor, training and equipment for the cleanup.
[10] See Incident Status Sheet (ICS-209) Summary as of Close of Business December 26, 2004 Completed Decon

stoppage period, $1,540,353.00 for lost productivity or winter weather inefficiencies, $938,418.00 in liquidated damages and $385,152.00 for home office overhead. Claimant retracted its financial costs but, reserved its right once the value of the claim is established.[11] Claimant maintained its argument that the oil spill caused 96 additional days of delay, beyond the 38-day work stoppage period.

## D. Initial Offer:

On January 9, 2008 the NPFC issued its initial determination to pay in part and deny in part. The NPFC offered $48,165.46. The NPFC reviewed all of Claimant's exhibits and specifically focused on exhibits referenced by the Claimant. Claimant provided the minutes of weekly construction meetings recorded by SJPC's Project Engineer from January through August 2005. The NPFC's review of these weekly minutes and found that the alleged 96 days of additional delays, beyond the 38-day work stoppage, were due to Claimant's business decisions and severe weather. There was no evidence that delays were due to oil in the river. Thus, Claimant failed to establish that the oil spill had a continuing impact on Claimant's construction schedule beyond 38 days (November 29, 2004 – January 5, 2005). The offer was only for Claimant's documented increased costs during the work stoppage period for keeping four personnel on-site to maintain equipment and for increased costs of leased equipment that remained idle during the work stoppage.

The NPFC denied the remainder of the claim on the grounds that Claimant had not established that the oil spill-induced delay caused additional delays or associated damages through the end of the project on September 8, 2005. But, the NPFC found that the meeting minutes show other delays caused as follows: an information survey, moving containers, disabled crane, sinkholes, bad batter mix, spalled concrete piles, design changes, late deliveries of rebar.[12] Further, evidence in the administrative record reflects that before to the oil spill incident, the contract was already behind schedule by at least 74 days on November 26, 2004.[13]

The NPFC also found that delays caused by extremely cold weather impacting the Camden, NJ area subsequent to the incident (January 16, 2005 – February 7, 2005, and a second cold spell from February 19, 2005, - March 10, 2005) were not related to the incident. Claimant argued that this weather resulted in winter weather inefficiencies, i.e., workers could not work as efficiently and quickly as they would during better weather causing further delays. Claimant reasoned that if the 38-days delay had not occurred the construction would have been further along and would not have been impacted by the extreme weather. The NPFC determined, however, that the one-year contract, which was from May 2004 – April 2005, posed a weather risk for construction during the weather months and could have caused winter weather inefficiencies if the incident did not occur.

The NPFC denied the $938,418.00 in liquidated damages on the grounds that these alleged damages were a contractual issue between the Claimant and SJPC and not related to the oil incident. SJPC had excused the 38 days under the terms of the contract but, imposed the liquidated damages for the 106-days of delay, from May 26, 2005 to September 8, 2005, after the 38-day one year contract extension and unrelated to the incident.[14]

Finally, the NPFC denied the home office overhead costs ($385,152.00) on the grounds that these costs were imbedded in personnel costs that were already compensated and would be redundant under this claim.

---

[11] See Claimant's binder dated October 15, 2007 outlining its revised claim

[12] See SJPC's Project Engineer's Minutes of Construction Meeting May 26 through August 11, 2005 admin record

[13] See EIC's email attached PDF format Construction Schedule Update #1 submitted October 25, 2006

[14] See Claimant's binder dated June 26, 2008 under Liquidated Damages Attachment #6

## *APPLICABLE LAW:*

Under 33 CFR 136.105(a) & (b) and 136.105(e)(6) & (7), the claimant bears the burden of providing to the NPFC, all evidence, information, and documentation deemed necessary by the Director, NPFC, to support the claim.  If at any time during the pendency of a claim against the Fund the claimant receives any compensation for the claimed amounts, the claimant shall immediately amend the claim.

Each claim must include at least the following, as applicable: Evidence to support the claim.  And, a description of the actions taken by the claimant, or other person on the claimant's behalf, to avoid or minimize costs or damages claimed.

As provided under 33 CFR 136.113, claimant must include an accounting, including the source and value of all other compensation received, applied for or potentially available as a consequence of the incident out of which the claim arises including , but not limited to monetary payments goods or services or other benefits.

Pursuant to the provisions of 33 CFR 136.231, claims for the loss of profits or impairment of earning capacity due to injury to, destruction or, or loss or real or personal property or natural resources may be presented to the Fund by the claimant sustaining the loss or impairment.

"In addition to the requirements of subparts A & B or this part, a claimant must establish the following-
   (a) That real or personal property or natural resources have been injured, destroyed, or lost.
   (b) That the claimant's income was reduced as a consequence or injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.
   (c) The amount of the claimant's profits or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents. In addition, comparable figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.
   (d) Whether alternative employment or business was available and undertaken and, if so, the amount of income received. All income that a claimant receives as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established." 33 CFR 136.233(a-d)

Calculations for the net reductions or losses must clearly reflect adjustments for the following: all income resulting from the incident, all income from alternative employment or business undertaken, potential income from alternative employment or business not undertaken but reasonably available, and saved overhead or normal business expenses not incurred as a result of the incident, and state, local, and federal tax savings. 33 CFR 136.235(a-e)

Under the provisions of 33 CFR 136.115(d), reconsideration requests must be submitted in writing, include factual and legal grounds for the relief requested and be received within 60 days after the denial was mailed to the claimant or 30 days after receipt of the letter whichever date is earlier.  Director will provide written notification of the decision within 90 days after receipt of the request for reconsideration. This written decision is final.  Failure of the Director, NPFC, to make final disposition of reconsideration within 90 days after it is received shall, at the option of the claimant any time thereafter, be deemed a final denial of the reconsideration.

## *IV. CLAIMANT's ARGUMENTS on RECONSIDERATION:*

*Request for Reconsideration:*

On February 8, 2008, the Claimant made a written request for reconsideration of its claim. Supplemental documentation was provided on June 26, 2008, which included a series of letters addressing and explaining different components of the lost profits claim. One letter addressed the liquidated damages denied by the NPFC; a second letter explained the calculation of lost profits, a rationalization for employee costs for care-taker employees and the rented and owned construction equipment costs and the weather inefficiency costs. Claimant also submitted a binder entitled *Construction Project Schedule Winter Impact / Weather Inefficiencies and Lost Productivity NPFC Claim Number P05005-125* that included 11 Exhibits.[15]

On December 15, 2009, Claimant restated its request for reconsideration and revised its sum certain in an 18-page letter entitled "*Restatement and analysis of EIC's claims P05005-019 & P05005-125*" and presented a sum certain for this lost profits claim as follows:

| | | |
|---|---|---|
| **a)** | Lost Profits during Work Stoppage (lost daily profits) | $ 379,088.00 |
| **b)** | Cost of Caretaker Employees during Work Stoppage: | $ 32,515.00 |
| **c)** | Rental Equipment Costs during Work Stoppage: | $ 57,820.00 |
| **d)** | Owned Equipment Costs during Work stoppage: | $ 49,854.00 |
| **e)** | Losses Due to Inefficiencies following Resumption of Work: | $ 735,879.00 |
| | Total alleged lost profits for under reconsideration: | $1,302,923.50 |

In a letter to the NPFC dated October 29, 2010 Claimant revised its sum certain to **$1,255,156.00** without breaking out the various sums.[16] The NPFC addressed Claimant's correspondence and binder submitted December 15, 2009 as summarized above.

### a) *Lost Profits during Work Stoppage:*

On the day of the incident, November 26, 2004, Claimant was in the process of pile driving to lay the foundation for the pier at the Broadway Marine Terminal. Claimant alleges that following the spill and during the subsequent work stoppage that it lost profits of $379,088.00. Claimant asserts that it expected to earn a profit for each calendar day during this one-year project. Claimant argues that it was prevented from working by the Coast Guard order. Claimant argues that but for the incident and the active phase of the spill response effort it would have earned this daily profit.[17]

Claimant calculates its alleged lost profits as follows: contract award amount: $15,453,000.00 minus Claimant's estimated cost to complete the project: $11,811,905.00 for a difference of $3,641,095.00 ($15,453,300.00 - $11,811,905.00 = $3,641,095.00). Since the project was a one-year project, Claimant divided by 365-days [$3,641,095/ 365 = $9,976 (rounded-up to nearest dollar)]. Claimant then multiples $9,976.00 by 38 days and concludes that it lost $379,088.00 in lost profit.[18]

Claimant submitted EIC Associates, Inc. Financial Statements from its accountant for the years ending 2004 and 2003. It also submitted EIC Marine Construction Contracts 2003-2007 as purported evidence that Claimant lost a significant portion of its revenue due to the oil spill.

### b) *Cost of Caretaker Employees during Work Stoppage:*

---

[15] See Claimant's letter dated June 26, 2008 to NPFC Received by NPFC on June 27, 2008 pg. 2
[16] See Claimant's letter of October 29, 2010 in admin record.
[17] See Claimant letter December 15, 2009 pg. 12
[18] See Claimant's letter dated June 26, 2008 to NPFC, pg. 2

After the oil-spill related work stoppage Claimant tells us that it cut its labor force from 18 to three employees to mitigate its labor cost. Claimant's initial submission, Attachment 1 explains that these claimed labor costs were to retain "key" marine construction personnel: one Foreman, one Marine Superintendent and one Assistant Marine Superintendent and occasionally, a mechanic. Claimant explains that "*The Marine and Assistant Marine supervisors were used to direct ongoing activities and were only partially stand-by.*" Claimant further explains that it had no other on-going marine construction projects to reassign these key individuals and that it was essential to retain these specific supervisors for continuity and, in anticipation of resuming construction. The foreman maintained and protected the ten barges and equipment left on-site. Claimant seeks $32,515.00 in compensation to retain key personnel and caretaker employees. As evidence of its labor costs Claimant submits its Foreman's Reports and tells us that marine superintendents and caretaker labor hours are coded #2-999 on the Foreman's Reports.

### c) *Costs of Rented Equipment during Work Stoppage:*

Claimant alleges it incurred $57,820.00 for rented construction equipment that it could not use during the work stoppage.[19] Claimant asserts that rental contracts required Claimant to pay for the equipment whether or not Claimant used it. During the spill response effort the Claimant was uncertain as to when it could resume construction. Claimant's rental expenses continued during the oil spill related work stoppage adding to the cost of the rentals.

To show that it continued to pay rental equipment during the work stoppage, Claimant submitted paid invoices and corresponding cashed checks (see Attachment 8 in Claimant's initial reconsideration binder).

### d) *Costs of EIC-Owned Equipment during Work Stoppage:*

Claimant alleges due to the oil spill that it incurred $49,854.00 for the cost of its own equipment. Claimant estimated its cost to demobilize and remobilize its equipment was prohibitive, in the range of $700,000. Also, Claimant was not sure that it could timely remobilize its equipment if it demobilized; therefore, Claimant decided that it was cost effective to keep its equipment on-site.[20]

Claimant argues that it should be compensated for its equipment that sat idle during the work stoppage. Claimant references the "Cost Reference Guide for Construction Equipment" published by EquipmentWatch that breaks down fixed and variable cost for equipment. Claimant asserts that its fixed costs for owned equipment are part of its overhead costs and were incurred whether or not the equipment is idle.[21] Claimant submitted Attachment 4 & 5, providing its daily cost breakdown for the 38-day work stoppage.

### e) *Losses Due to Inefficiencies Following Resumption of Work:*

Claimant alleges lost profits for work inefficiency that occurred after January 5, 2005 when Claimant returned to work. Claimant asserts that after it resumed pile driving it was nowhere near the level of production immediately preceding the oil spill. Claimant gives three factors for this. One, laborers reporting to work in January 2005 had not previously been involved on Claimant's project. Two, equipment that had been idle needed to be remobilized. Three, after the 38-days of work stoppage, SJPC put a lot of pressure on the Claimant to complete this project timely and SJPC insisted that Claimant continue to work in adverse weather when under normal circumstances Claimant would have ceased work

[19] See Claimant's letter of December 15, 2009 pg 18
[20] Ibid pg. 2 & 3
[21] See Claimant's letter of June 26, 2008.

until the weather improved without penalty. Claimant asserts that working in adverse weather leads to further inefficiencies and additional loss of productivity, which could have been avoided but for the oil spill.[22]

Claimant calculates alleged damages for work inefficiencies total $735,879.00 and provides the four components of lost profits from post work-stoppage inefficiencies as follows:

(1) <u>Remobilization costs:</u> Claimant argues that beginning January 6, 2005 it needed five additional days to hire and train its work crew. *$17,035.00*

(2) <u>Weather-induced work inefficiencies</u>: Claimant calculates its pile driving inefficiency based on the number hours it took to place piles before the work stoppage and concludes that after the work stoppage it took 24 additional days of pile-driving to equal the rate of work Claimant anticipated it would have taken to complete. Claimant states that this inefficiency was due to severe freezing weather that occurred in the Camden area, in January and February 2005: *$293,966.00.*

(3) <u>Daily loss of profits:</u> Claimant argues that it expected to earn the $9,976.00 for each of its alleged 24 days of weather delays. Claimant calculates its alleged inefficiency by multiplying its alleged 24 extra days of weather inefficiencies times its alleged daily lost profit of $9,976.00. *$239,434.00*

(4) <u>Liquidated damages</u>: Claimant asserts that SJPC assessed Claimant for delays beyond the work stoppage period and seeks those amounts: $*185,424.00.*

## *NPFC Analysis of Claimant's Reconsideration Arguments:*

The NPFC on reconsideration reviews the claim and the administrative record *de novo*. The initial determination to deny the claim dated January 14, 2008 is incorporated into this analysis. The NPFC will address each of Claimant's arguments below.

### *(a) Alleged Lost Profits during Work Stoppage:*

Claimant argues that it incurred a loss of profits in the amount of $379,088.00 during the 38-day work stoppage. The claimant further argues that the work stoppage was due to the Coast Guard's order restricting vessel traffic on the Delaware River during the cleanup and removal period following the spill.[23] Claimant argues that it was precluded from earning a profit during the 38-days work stoppage period. The NPFC finds that the Claimant's alleged loss was calculated on Claimant's *estimate* of its profits and not an actual incurred loss. Claimant estimated its profits based on the original one-year contract for $15,453,000.00, less its estimated expenses of: $11,811,905.00. The difference of $3,641,095.00 is Claimant's estimated profit. Using this one-year contract with its estimated profit of $3,641,095.00 Claimant divided by 365 days, the contract period and arrived at $9,976.00 (rounded) as its estimated per-day profit. Claimant then multiplied 38 days work stoppage for an estimated total of $379,088.00.[24]

Claimant argues that a person suffering damages for lost profits need not prove with absolute certainty, but must produce sufficient evidence on which to base a reasonable inference as to a damage amount. *Yarmouth Sea Products Ltd. v. Scully*, 131 F. 3d 389 (4th Cir. 1997). While it is true that the damage

---

[22] See Claimant's letter of December 15, 2009 pg16
[23] See Incident Status Sheet (ICS-209) Summary as of Close of Business December 26, 2004 Completed Decon
[24] See Claimant's binder dated June 26, 2008 Construction Project Schedule Winter Impact…Attachment 11

amount does not have to be with certainty a claimant must first establish that damages in fact were suffered. *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W. 3d 203 (Tex. App. 2004) (While the reasonable certainty test is a flexible one, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures or data from which the amount of lost profits can be ascertained.)

The NPFC agrees, and the OPA claims regulations comport with this theory. The regulations require financial reports or income tax records – objective facts or figures – to evidence a reasonable certainty of the fact of damages. Once the fact of damages is established, there are several methodologies that may be used to quantify the damages.

In this case Claimant attempts to use an estimated or projected daily profit to establish damages. The fact that the Claimant estimated its daily profits and used this as a measure of a loss of profits for 38 days does not establish that it in fact suffered a loss of profits and further, not a loss of profits due to the oil spill. Claimant presented some financial data in its effort to establish a loss of profits, but these documents do not establish that Claimant in fact, suffered either a loss of profits or, an amount of damages. Claimant presented a list of its marine construction contracts for the years 2003-2007. Of interest is the earned marine revenue for the years 2004 and 2005 because the instant contract covered these years. The earned revenue for 2004 was $159,524 more than the earned marine revenue for 2005. However, earned revenue does not necessarily equate to profits.

Claimant also presented EIC Associates, Inc. Financial Statements for the years ending December 31, 2003 and 2004. This information does not establish or support a loss of profits for this contract or an amount of $379,088 for several reasons. First, it is not helpful because it does not include the financial statement for 2005. In order to analyze lost profits the NPFC would require three years of more detailed comparables. See regulations at 36 CFR Part 233. Second, this contract began in 2004 and continued into 2005, and any profit or loss associated with this contract would be reflected in the 2005 statement. Also, the incident occurred at the end of November 2004, with only four weeks left in the fiscal year 2004. Claimant initiated this construction project in May 2004 and Claimant acknowledged that there were construction delays prior to the incident on November 26, 2004. Also, Claimant asserts 96 additional days of delay due to weather and other factors that extended into the fiscal year 2005. Thus the annual financial statements do not establish a loss of profits in the amount of $379,088 due to the incident. Also, the administrative record reveals there were other delays due to late deliveries of equipment and supplies and evidence of equipment with mechanical problems that resulted in delays. Thus, Claimant cannot establish that a 38-day delay due to the incident amounts to $379,088 in lost profits based on the estimated profits for this project, much less an estimated daily profit statement.

The NPFC determines that Claimant has not established that it lost profits in the amount of $379,088.00 due to the incident. Therefore, this portion of lost profits is denied. Additionally, it should be mentioned that the Coast Guard did not "close" the river or order a work stoppage for the period, traffic was managed and work continued for many facilities along the waterfront. In fact, during the river closure, Claimant obtained Coast Guard's permission to move its barge Dale Pyatt. [25]

### (b) Cost of Caretaker Employees:

Claimant tells us that following the oil-spill work stoppage it mitigated labor costs by reducing its personnel on the project from 18 to three employees. Anticipating resuming construction Claimant tells us that during the work stoppage it retained two marine supervisors and dock foreman for their marine project experience. These employees along with an occasionally a mechanic performed ongoing activities

---

[25] See faxed copy of EIC's request to move the barge Dale Pyatt November 30, 2004 & recon binder Attachment 2

and took care of the barges and equipment. Claimant tells us that it had no other construction projects to reassign these marine supervisors and seeks $32,515.00 in additional caretaker employee costs.[26]

The NPFC reviewed Claimant's Payroll Report and Foreman's Reports for labor rates and caretaker activity. The NPFC finds that Claimant demonstrates that it incurred some additional caretaker labor costs that arose from the spill incident and related work-stoppage but, questions Claimant's records.

Claimant tells us that on the daily Foreman's Reports it has identified caretaker labor hours under code 2-999. However, the NPFC finds that Claimant failed to identify its marine supervisors that it had to retain. Additionally, Claimant fails to clearly identify its alleged $32,515.00 in caretaker labor. The NPFC's review of Foreman's Reports shows that some labor hours coded #2-999 do not appear to be caretaker duties and Claimant's employees appear to be engaged in preparing equipment for rent to spill-cleanup contractors. [27] For example, Foreman's Report of December 10, 2004 notes seven employees under code 2-999 for 77 hours. But, Foreman's note reads: *"Men working on barges, organizing materials to be used for rental on oil spill. Moving barges into position to expedite loading of rental equipment."* Another example is Foreman's Report of December 11, 2004 with eight employees and 89 hours under code 2-999. But, Foreman's note reads: *"7 AM - loading material for Ken's Marine, MPC Marine Pollution Control and Eason. 6 PM – Rob Kessler will work w/ Ken's Marine 6 pm – 6am on spill."*[28] And, Foreman's Report on December 16, 2004 shows 44 hours under code 2-999 but, reads: *"travel from oil spill sight* (sic) *back to Pier 1A – Demob (sic) environmental comp materials."* Another example is December 20, Foreman's Report reads:*"loading boom to pressure washing team to De-con (sic) equipment. Securing Barges and Cranes"* 24 hours coded 2-999.

The NPFC compared Claimant's caretaker hours as alleged on Claimant's Work Stoppage Summary[29] to caretaker hours on Foreman's Reports. Claimant's Work Stoppage Summary list only the alleged dollar amount Claimant seeks for caretaker labor costs. The NPFC finds in comparison to daily Foreman's Reports Claimant's Summary of caretaker hours are not always coded on some days. Also, caretaker activities are not indicated on Foreman's Reports but alleged on the Work Stoppage Summary. Examples are November 30, 2004 the Summary shows $3,854.00 for caretaker labor but, the Foreman's Report for that day has no caretaker activities under code #2-999. Again, the Work Stoppage Summary for December 13 shows $1,545.00 in caretaker hours but, there are no corresponding caretaker hours under code 2-999 in the Foreman's Report for that day that notes: *"Cleaning* (barge) *Dale Pyatt for down river (sic) departure 04-99".* This pattern of alleged daily costs but no corresponding hours on Foreman's Reports repeats for December 14, 15, 17 and 24, 2004.

To reconcile these anomalies the NPFC took caretaker activities that we could identify on each Foreman's Report and used the labor rate for the individual. We find that four employees generally appear to be identified as caretakers. We identified a total of 152 caretaker labor hours during the work stoppage period. Caretaker hours and rates for these four personnel breakdown as follows: 48 hours for W. Simmerman at $38.66 per hour ($1,855.68). 56 hours for P. Montgomery at $38.32 per hour ($2,140.32). 24 hours for R. Cole at $36.72 per hour ($881.28) and 24 hours for S. Nylec at $36.72 per hour ($881.28). The total compensable caretaker hours comes to $5,758.56.

Also, if Claimant received revenue for its personnel during the work-stoppage the Claimant has not related this information to the NPFC. Claimant has not shown any cost savings to off-set its alleged caretaker labor. The NPFC compensated NRC and Ken's Marine its labor hours for removing oil after

---

[26] See Claimant binder Work Stoppage June 26, 2008 Attachments 1& Attachment 2 & Attachment 5

[27] See Claimant's letter of June 26, 2008 Attachments 7

[28] Ibid

[29] See Claimant's binder June 26, 2008 Attachment 5 Work Stoppage Summary (Dates & Labor categories)

the spill. If Claimant's employees were working for these contractors and were compensated by these contractors then the NPFC cannot compensate Claimant because we would be paying twice for the same labor.[30]

Additionally, Claimant also received compensation from the NPFC for its labor costs to clean its own equipment under Claimant's separate but companion removal cost claim (P05005-120). Claimant does not show in this claim what compensation it received under its removal claim. Again, Claimant cannot be compensated twice for labor costs.

In summary the NPFC finds that: 1) Claimant fails to identify who are its marine and caretaker personnel. 2) Claimant fails to clearly identify caretaker activities on its Foreman's Reports. 3) Claimant's alleged daily labor costs on its Work Stoppage Summary do not match hours on its Foreman's Reports. 4) Claimant's fails to provide, offset or address how additional labor income was applied to the claimed amount. 5) Claimant fails to account for compensation it received for its laborers under its removal cost claim. For these reasons the NPFC could only identify $5,758.56 in OPA compensable "caretaker" labor activities that were accurately documented and not potentially compensated, in whole or in part, by others or for costs for which Claimant has already released its rights. The NPFC offers the Claimant **$5,758.56** under this category of lost profits. Please refer to NPFC's attachment for labor.

### (c) Costs of Rental Equipment:

Claimant argues that during the 38-day work stoppage it incurred increased cost of rented equipment because this cost continued whether or not the equipment was in use. Claimant also explained that given that the duration of cleanup activities was uncertain that it could not timely remobilize if it demobilized. Claimant asserts that it could not mitigate the cost of its rented equipment.[31] In reconsideration, Claimant provided evidence of its purchase orders, paid invoices and associated cashed checks to support its alleged rented equipment costs continued during the 38-day work stoppage. The NPFC finds that Claimant was obligated to pay for daily rented equipment whether or not it was used.

The NPFC focused on Claimant's submission of June 26, 2008 (Attachment 8) presenting its monthly rented equipment invoices. The NPFC totaled all of Claimant's rental equipment receipts for the 38-day work stoppage period and finds that Claimant's total rent for equipment exceeds Claimant's alleged costs. On December 15, 2009 Claimant reduced its alleged cost for rented equipment from $79,696.00 to $57,820.00 but, Claimant did not provide an explanation or accounting for this.[32]

The NPFC finds evidence that during the work stoppage Claimant provided rented equipment for use to other companies.[33] Foreman's Reports show Claimant rented equipment to include barges to other contractors during the oil spill related work stoppage.[34] If Claimant rented equipment during the oil spill work stoppage the Claimant has not informed the NPFC. Because Claimant fails to show any accounting or off-set for income from renting its equipment, the NPFC cannot determine how much Claimant received (if any). Therefore, the NPFC cannot determine what rent Claimant incurred after December 10, 2004 when evidence in the claim indicates Claimant was renting out or subletting its equipment. Although, Claimant reduced its alleged damages for cost of rented equipment Claimant fails to account for reducing its claim by $21,876 and as a result the NPFC cannot determine what this amount represents or how and where to apply it.

---

[30] See email from D. Hellberg to M. Erbe regarding EIC & Associate laborer hired out to NRC/ Ken's Marine

[31] See Claimant's letter dated December 15, 2009 to M. Erbe Page 15.

[32] Ibid

[33] See Claimant's binder June 26, 2008 - Attachment 2, Foreman's Reports December 9, 10, 11, 12, 2004

[34] See NPFC claim P05005-110; specific invoices for Ken's Marine Service Inc.

The NPFC also reviewed Claimant's removal cost claim, which in addition to compensating Claimant's workers for clean-up labor, provided compensation for certain rented equipment during the clean up (NPFC claim P05005-120). The NPFC finds that Claimant received compensation for some daily rental equipment costs.[35] When submitting its rented equipment costs associated with this subject claim. Claimant fails to identify what equipment was previously compensated.[36]

In summary, the NPFC finds the following with regard to the costs of rented equipment: 1) Claimant fails to explain why it reduced its alleged rental equipment costs and how to apply that reduction to the basis of the original claimed amount. 2) Claimant fails to explain to the NPFC how it calculated cost of its rental equipment. 3) Evidence in the claim and other claims indicate EIC received compensation for certain rented equipment that are the subject of this claim, yet the mitigating income is unaddressed and the NPFC cannot accurately determine actual damage for this equipment without that information. 4) Claimant fails to account for its rented equipment that was compensated under its removal claim. The NPFC concludes that Claimant has not demonstrated that it incurred rental costs of $57,820.00.

Despite these issues, the NPFC proactively reviewed all rented equipment documentation. In order determine what could be compensated we de-conflicted what rental costs were addressed in claim P05005-120 and determined that no equipment was rented to others prior to December 11, 2004. It should also be noted that within the 38-days of alleged "extra rent" there were several holidays that Claimant may very well have voluntarily stopped work similar to Thanksgiving and its rented equipment would have remained idle, even if there had not been an oil related work stoppage. Therefore, the NPFC calculated Claimant's rented equipment cost from November 29, through December 10, 2004, before Claimant's documentation indicates that Claimant may have started earning income by renting its equipment to other companies. The NPFC determines OPA compensable costs for Claimant's rented equipment totals **$36,361.53**.

### (d) Cost of EIC-Owned Equipment:

Claimant has not demonstrated how the spill had increased Claimant's cost of owning its equipment. Claimant argues that even though its own equipment was not in use during the work stoppage that Claimant continues to incur costs associated with its equipment such as, depreciation, cost of facilities capital, indirect cost and certain repair costs. Claimant cites, and relies on industry-wide accounting methods that are recognized by both government and private companies to compensate contractors for their costs for idle or standby equipment during delay periods. The NPFC denies this portion of the claim because the Claimant has not shown how the oil spill caused Claimant to incur additional or increased costs of owning its equipment beyond costs that Claimant would incur whether equipment is in use or idle.

### (e) Winter Weather Inefficiencies:

(1) The NPFC finds that the claimant has not demonstrated that the costs associated with the hiring and training of a work crew after the 38-day work stoppage were the result of the incident. The administrative record indicates that the FOSC and SJPC's project engineer communicated as to when Broadway Marine

---

[35] See NPFC claim P05005-120 (Excel Spreadsheet on costs)

[36] See email between Project Engineer and SJPC December 2004 in admin record.

[36] See Incident Status Sheet (ICS-209) Summary as of Close of Business December 26, 2004

[36] See email between Project Engineer and SJPC December 2004 in admin record.

Broadway Marine Terminal was cleaned by the end of business on December 26, 2004.[38] Claimant's management could have or should have anticipated when Broadway Terminal would be ready for Claimant to resume work and begin hiring and remobilizing in anticipation of returning to work. Delays that Claimant has asserted were caused because of the time it took to hire and train a work crew have not been fully or convincingly made or tied to oil in the river. Why could the Claimant not hire the qualified and trained personnel who were laid-off less than one month earlier? Why could the Claimant not commence "ramp up" efforts prior to or even when the pier was deemed clean? Did the caretaker and clean-up team not maintain the worksite was ready for work? Could any of the delay be due to equipment being off-site due to the decision to rent to others? The possibility of intervening causation resulting from management decisions and actions associated with the remobilization are real and not addressed by the claimant.

(2) Claimant has not proven that winter weather inefficiency was a direct result of the oil spill. Claimant states that it would have ceased work in such extreme weather conditions but could not do so because SJPC pressured it to work because the contract was behind schedule. Claimant argues that the SJPC pressure was due to the 38-day work stoppage resulting from the incident. Had it ceased work instead of working at SJPC's direction, Claimant would have completed nothing during this period. In its request for reconsideration the Claimant admits that it was behind on its pile driving schedule.[39] The administrative record shows that Claimant was at least 74 days behind in its pile driving efforts prior to the oil spill.[40] Claimant's argument that the oil spill pushed its pile driving schedule further into winter months is not persuasive because it was already behind schedule. Even if the contract was on schedule it was foreseeable that some work would be done in winter weather because the contract dates were from May 2004 through April 2005.

(3) Claimant argues that it lost profits of $9,976.00 per day due to the winter weather inefficiency and that this loss is due to the oil spill. Claimant has not provided supporting documentation or an argument beyond stating that it expected to earn its estimated $9,976.00 per calendar day. The project's expected estimated profit cannot be broken down to a daily profit amount as purported evidence of lost profits. Claimant attempts to relate all winter weather inefficiency to the oil spill. The NPFC finds that the record indicates that Claimant was going to work in January and February even if the oil spill had not occurred. Claimant's pile driving records indicate that Claimant planned to take 85 days to complete its pile driving prior to the oil spill.[41] Claimant began pile driving on November 18, 2004 and placed only 17 of 423 piles in the river prior to the oil spill[42]. Claimant argues that the spill incident pushed its pile work into winter months where "*abnormally cold weather*" occurred during January and February 2005.[43] The NPFC finds that all three of Claimant's project schedules show that the Claimant was delayed before the spill. Therefore, the NPFC finds that Claimant would have had to continue pile-driving into January and February of 2005, even if the spill had not happened. The NPFC accepts Claimant's statement that "*abnormally cold weather*" occurred in the Camden area in January and February of 2005. However, the NPFC finds that the "*abnormally cold weather*" was an intervening cause of the Claimant's winter weather inefficiency, not the oil spill. Further, even if Claimant could establish that the inefficiency was due to the incident, it has not established that it lost profits in the amount of $9,976.00 per day.[44] This portion of the claimed loss is not compensable under OPA.

---

[38] See Incident Status Sheet (ICS-209) Summary as of Close of Business December 26, 2004

[39] See Claimant's letter to NPFC dated December 15, 2009, pg.

[40] See EIC's Construction Schedule Update #1 submitted October 25, 2006  via email attached PDF format

[41] See all three of Claimant's production schedules submitted October 25, 2006  via email attached PDF format

[42] See email October 25, 2007 from M. Fasnacht, P.E. providing pile driving records (P05005-019)

[43] See Claimant's letter 12/2009 to NPFC

[44] See subsection (a), NPFC alleged lost profits analysis above.

(4) Claimant submitted a copy of the pier construction closing contract documentation[45] that clearly indicates that it was assessed liquidated damages by SJPC. The document indicates that the dates for the liquidated damages do not include the 38-day work stoppage period. The pier construction closing contract shows that SJPC approved a Change of Contract from April 15, 2005 to May 26, 2005 (38 days). SJPC approved the change order allowing for 38-days delay due to the oil spill and extended the project deadline without penalty to EIC. Claimant insists that the oil spill is the proximate cause of its project delays even though this document shows two additional punch list items (unexpected work) that likely added time to Claimant's schedule. The document specifically states liquidated damages are for 106-days May 26, 2005 to September 8, 2005 at ($7,726.00 per day). This is after the 38-day oil spill related extension and appears to be unrelated to the oil spill. Liquidated damages are a contractual agreement between the two parties. SJPC waived or forgave liquidated damages during the work stoppage period, which is the only time delay the NPFC finds to be the direct result of the oil spill. The NPFC finds that Claimant's attempts to relate all delays and inefficiencies to the oil spill are not supported by the evidence and any assessed liquidated damages were the result of intervening causes, business decisions or other factors unrelated to the incident.

### *NPFC's Determinations of Inefficiencies following the Work Stoppage:*

The NPFC denies the alleged four components of lost profits for winter weather inefficiency presented by Claimant. The NPFC determined that these alleged inefficiencies are not due to injury to or destruction of property or natural resources by the oil-spill incident (oil in the water).

## *Summary of Determination*

In summary, Claimant's worksite was impacted by the Athos I oil spill and the Claimant stopped construction efforts on the Broadway Pier 1A project for a period of 38 days. Performance reports prior to the spill show the project more than two months behind schedule. During this impact period personnel and rented equipment remained on scene carrying out oil removal activities at the site as well as tending to equipment, barges materials and staging some equipment for use by others. On December 26, 2004 during Claimant's 38-day work stoppage, the Coast Guard FOSC deemed the Broadway Pier clean. The Claimant resumed construction efforts on January 5, 2005 and South Jersey Port Authority agreed to a contract adjustment that would result in no liquidated damages for this 38-day work stoppage insuring that any inclusive impact from the oil spill would have no impact on Claimant's revenues. In January 2005 weather and personnel made Claimant's team less productive, but Claimant has failed to establish that the oil spill was the cause. For claimed expenses during the 38 day period, the NPFC has conducted a thorough review of Claimant provided information and additional related information from the incident and other related claims. The NPFC has determined to offer $42,120.09 for some very specifically identified labor and rental equipment costs that Claimant incurred as a result of the Athos I incident. The offer for these increased expenses had to be carefully determined to be separate from the $130,340.62 compensation paid to the claimant by the NPFC for the removal cost claim as well as insuring that reimbursement offered was not for any costs that may have been mitigated through the rental of equipment to other's reimbursed by the responsible party and subsequently the NPFC.

### *DETERMINED AMOUNT: $42,120.09*

---

[45] See Status of EIC, Associates contract completed punch list dated July 10, 2006

Claim Supervisor:  Thoma

Date of Supervisor's Revi

Supervisor Action:  *offen of $42,120.09 Allnowss*
*claim #105005-125*

Supervisor's Comments:

U.S. Department of
Homeland Security

**United States
Coast Guard**



Director
United States Coast Guard
National Pollution Funds Center

4200 Wilson Blvd. Suite 1000
Arlington, VA 20598-7100
Staff Symbol: (CA)
Phone: 202-493-6824
E-mail ███████@uscg.mil
Fax: 202-493-6937

5890
1/20/2012

Sent VIA email in PDF attachment:

EIC Associates, Inc.
ATTN: Dennis Bryant
4845 SW 91st Way
Gainesville, FL 32608-8135

Re: NPFC Claim P05005-125, EIC & Associates - Lost Profits ATHOS I incident

Dear Mr. Bryant:

The National Pollution Funds Center (NPFC) in accordance with the Oil Pollution Act (OPA) (33 U.S.C. 2701 et seq.), has determined that $42,120.09 is compensable for OPA claim number P05005-125.

This reconsideration determination is based on an analysis of information submitted.

All costs that are not determined as compensable are considered denied. Disposition of this reconsideration constitute final agency action.

If you accept this determination, please sign the enclosed Acceptance/Release Form where indicated and return to:

Director (ca)
U.S. Coast Guard
National Pollution Funds Center
4200 Wilson Boulevard, Suite 1000
Arlington, VA 20598-7100

If we do not receive the signed original Acceptance/Release Form within 60 days of the date of this letter, the determination is void. If the determination is accepted, your payment will be mailed within 30 days of receipt of the Release Form.

If you have any questions or would like to discuss the matter, you may contact me at the above address or by phone at 202-493-6824.



Division Chief

ENCL: Acceptance/Release Form