

**U.S. Department of Justice**
Environment and Natural Resources Division
Environmental Enforcement Section

90-5-1-1-10026
_____

*Sarah D. Himmelhoch*                                    *Telephone (202) 514-0180*
*U.S. Mail:  P.O. Box 7611, Washington, DC  20044-7611*          *Facsimile (202) 514-2583*
*Overnight Mail:   601 D Street N.W., Washington, DC, 20004*
*E-mail: sarah.himmelhoch@usdoj.gov*

August 8, 2014

BY ELECTRONIC MAIL

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
 Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130
Sally_Shushan@laed.uscourts.gov

     Re:     MDL 2179 - 10-4536 Ms. Robin Conmy as a "May Call" For the United States

Dear Judge Shushan:

     BP objects to the United States' addition of Ms. Conmy witness to its Rule 26(a) disclosure.  In evaluating BP's objections, it is important to remember that BP has used the provisions of Rule 26(e) to justify adding an additional witness to its Rule 26(a) disclosure on the relationship between BPXP and the other members of the BP Group.  Ex. A at 1-2.  Despite having availed itself of the "right" to supplement its disclosures, BP asserts that the United States' similar supplementation of its "may call" list was too late and therefore BP has been prejudiced, in some vague way, by the lateness of the disclosure.  BP, however, cites only its own unprompted decision to cancel unspecified depositions and the fact that Ms. Conmy's testimony may conflict with some of its trial strategy as grounds for its claim of prejudice.

     With respect to the deposition cancellation, since BP has not specified the deposition to which it is referring, it is difficult to identify any prejudice. Ms. Conmy's deposition testimony and her expected trial testimony will be confined to the topics addressed in her deposition.  The only deposition related to dispersants (the subject of Ms. Conmy's testimony) which BP cancelled was that of Admiral Landry.  Notably, BP cancelled Admiral Landry's deposition *after* it had received the United States' supplemental Rule 26(a) disclosure.  *See* Ex. B at 7; Ex. C.  Therefore, any prejudice from the cancellation of Admiral Landry's deposition was of BP's own making.

With respect to the trial strategy point, BP can hardly have been prejudiced when notice of the witness came more than a month before *initial* expert reports are due and many months before the trial date.  Moreover, the evidence that will be offered is clear – since Ms. Conmy's trial testimony will be confined to the topic for which she was designated as a Rule 30(b)(6) witness.  In short, BP has identified no real prejudice to it because of the timing of the United States' designation.

BP also asserts that the supplementation was untimely because it asserts that the United States should have understood that BP would seek to introduce technical challenges to the dispersant limits as part of its case. The extent of BP's disclosure regarding its contentions related to dispersants is exemplified by its interrogatory response in which it simply stated that the "The United States' directive to limit the surface application of dispersants and resulting restrictions and delays in approving the surface application of dispersants caused Oil-Related Materials to reach and impact Gulf Coast shorelines to a greater extent and degree than would have been had such limitations not been imposed." Ex. D at 35-36.  This general allegation makes no suggestion that BP would be seeking to offer detailed allegations regarding *why* the United States limited the use of aerial dispersants and certainly not any indication that it would be elucidating testimony regarding the basis of particular limits.[1]

The penalty phase trial is supposed to be focused on what penalty is appropriate to punish BP's violation of federal law and deter future similar violations.  BP, however, has demonstrated through its discovery pursuits that it will seek to distract the Court from its own conduct by throwing out detailed allegations regarding the complex decision making that went on during this massive disaster that threatened the coastal communities of the Gulf as well as the rich ecosystem of the Gulf and its shoreline.  If BP is permitted to do so, fairness to the American people requires that the United States be able to answer those allegations with testimony from a witness that BP has had a full opportunity to depose and whose custodial records were produced during the penalty phase discovery.  For all these reasons, the Court should overrule BP's objection to the supplementation of the United States' Rule 26(a) disclosure to add Ms. Conmy as a "may call" witness.

Respectfully submitted,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch

cc:     Andy Langan
        Ky Kirby

---

[1] BP contended that it was entitled to add Mr. Bray to its disclosure after the deadline because it did not have notice of the United States' contentions regarding the BP group.  The difference in detail between BP's disclosures regarding its contentions on dispersants and the United States' disclosure of its contentions regarding the relationship of BPXP to the rest of the BP group could not be starker.  By contrast to BP's short description in an interrogatory response, the United States filed a lengthy brief with citations to numerous documents to elaborate its contention that "BP operates BP p.l.c. and its subsidiaries as a group enterprise acting through business segments and strategic performance units ("SPUs"), of which BPXP plays only a small part."  *See* Rec. Doc. 12355-1 at 2.

# Exhibit A

**To Letter from Sarah Himmelhoch to Judge Shushan (Aug. 8, 2014)**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, Illinois  60654

J. Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

May 29, 2014

**Via Email**

The Honorable Sally Shushan
United States Magistrate Judge
500 Poydras Street, Room B345
New Orleans, Louisiana  70130

Re:  *MDL 2179 Penalty Phase Witness Issues*

Dear Judge Shushan:

This is in response to Steve O'Rourke's letter of May 27 regarding Penalty Phase Witness issues.  As explained below, the Department of Justice is incorrect in its claims that (a) BPXP should not be allowed to add Steven Bray as a "may call" witness and possibly call him at trial, and (b) the USA witnesses who BPXP has sought to depose, Captain Hanzalik and Captain Hein, are "cumulative" and should be precluded from providing their depositions.

I.   **The Addition of Steve Bray as a Witness Was Timely, and the United States Cannot Establish Any Prejudice As He Has Been Offered for Deposition Before Any Depositions Have Begun and Well Within the Fact Discovery Period.**

The United States complains that BPXP should not be allowed to amend its Rule 26(a) disclosures to add Mr. Steven Bray, who has critical information that is central to the United States' theories about BPXP corporate governance.

Rule 26(a)(1)(A)(i) requires a party to disclose the name and identifying information of individuals "likely to have discoverable information" "that the disclosing party may use to support its claims or defenses…"

BPXP timely served Rule 26(a) disclosures on April 4, 2014, expressly reserving its rights to amend or supplement those disclosures as additional information became known, including a better understanding of the United States' contentions.  The right to amend is by no means unique to BPXP; the United States served Rule 26(a) disclosures on April 4, 2014, also reserving its right to supplement or amend its disclosures.  Under Rule 26(a)(1)(E), a party "must make its initial disclosures based on the information then reasonably available to it."  BPXP complied with this Rule in its disclosures, in good faith.  At the time of its initial disclosures, BPXP had only a general understanding of the USA's claims on corporate governance issues and

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 29, 2014
Page 2

did not list any witnesses on these issues – for example, BPXP did not list Ms. Pennington nor Ms. Robertson in its initial disclosures.[1]

Rule 26(e) requires supplementation of initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." BPXP also followed this Rule, as explained below.

In the weeks following its initial disclosures, as part of the meet and confer process to discuss draft discovery requests as well as areas of expert testimony, it became evident to BPXP that the United States intended to seek discovery of and pursue legal theories regarding BPXP and BP Group corporate governance issues as part of the "Economic Impact of a Penalty on the Violator" factor. Specifically, among other things, the United States informed BPXP as part of a required meet and confer discovery conference on April 16 regarding areas of anticipated expert testimony that the United States intended to proffer expert testimony during the Penalty Phase on corporate governance. The United States further explained its intention regarding corporate governance during meet-and-confer discussions about why it sought the depositions of Brenda Pennington and Denise Robertson.

Given this new information gleaned about the case the United States intends to pursue, BPXP determined that (a) Mr. Bray "had discoverable information" and (b) BPXP might possibly use his testimony in support of its defenses in the Penalty Phase. Therefore, with fact depositions not due to commence until June 9 per the Court's April 21 Scheduling Order (Rec. Doc. 12688), BPXP disclosed to the United States on May 21 that Mr. Bray had information about these corporate governance issues.

Next, in BPXP's letter to the court dated May 22, BPXP stated that:

"In lieu of the depositions of Ms. Pennington and Ms. Robertson, BPXP would produce for deposition Mr. Steven Bray, who since November 2009 to the present has been Vice President and Secretary of BPXP. Mr. Bray has broad knowledge of the corporate governance issues that the United States has sought discovery on, is senior in the organization to both Ms. Pennington and Ms. Robertson, and remains an officer and director of BPXP, while Ms. Pennington and Ms. Robertson resigned from their BPXP director positions in February 2011. Ms.

---

[1] The Court's Order of May 23 (Rec. Doc. 12932) stated that BPXP had identified Ms. Pennington and Ms. Robertson in its Rule 26(a) disclosures, but that is not correct. Both of those witnesses were identified only by the United States, not by BPXP. Further, BPXP wishes to notify the Court and the United States that Ms. Pennington has been experiencing significant health issues, and she is currently hospitalized for surgery, making her availability for a deposition questionable.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 29, 2014
Page 3

Robertson has not been an officer of BPXP since 2012, while Ms. Pennington is presently Assistant Secretary.

**BPXP hereby amends its Rule 26(a) disclosures to identify Mr. Bray as a witness.  He is available for deposition on June 27, 2014."[2]**

BPXP's May 22 letter was a good faith supplementation of its Rule 26(a) disclosures, in compliance with Rule 26(e).  In its May 22 response, the United States did not disagree, and instead said this:

"We will take his [Bray's] deposition, now that BP has informed us that he is a 'may call' witness, and we hereby request that BP identify a date for the deposition."

No objection was made to Mr. Bray's disclosure last week by the United States and indeed the United States asked for a deposition date, which BPXP had already provided.

In response to another email from the United States on May 23 (Rachel Hankey), the United States reserved the right to choose Mr. Bray as one of its two custodial file choices. BPXP again confirmed that Mr. Bray had been identified as a witness BPXP might call at trial and that he would be produced for deposition on June 27.  (Exhibit A hereto.)

Only on May 27, after stating on May 22 that it would take Mr. Bray's deposition, did the United States suddenly claim that Mr. Bray's disclosure was not proper.  But the United States does not and cannot legitimately claim any prejudice from the disclosure of Mr. Bray, especially since fact depositions have not even started, and he has been made available for deposition by BPXP with a suggested date of June 27.  Indeed, from the language of the United States' May 22 and 27 letters, it is obvious that the United States itself has long known of Mr. Bray and they have already been reviewing documents associated with him, rendering any claim of prejudice meritless.

The applicable case law supports BPXP's decision to amend its Rule 26(a) disclosures to include Mr. Bray once it became apparent that the United States intended to include corporate governance issues as part of its case – and it makes clear that BPXP was not obligated to do so prior to that time.  *See, e.g.*, *Meltzer/Austin Restaurant Corp. v. Benihana Nat'l Corp.*, 2013 WL 75762, *2-3 (W.D. Tex. Jan. 4, 2013) (Rule 26(a) disclosures are based on what disclosing party believes it will use to support its claims and defenses, not what opposing party believes to be

---

[2] BPXP has served its Second Amended Rule 26(a)(1) disclosures as of May 29, adding Mr. Bray as the **only** additional witness and dropping a number of others potential witnesses who had been listed on its initial and amended disclosures.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 29, 2014
Page 4

relevant, and as case progresses and scope of issues for trial becomes more defined, parties have a duty to supplement initial disclosures). Moreover, BPXP's amended disclosure simply does not cause the United States any prejudice at this early date, when fact depositions have not yet begun and there remains time to address any issues. *See, e.g.*, *Boudreaux v. State Farm Fire and Cas. Co.*, 2009 WL 5217646, *2 (E.D. La. Dec. 30, 2009) (Barbier, J.) (denying motion to exclude witnesses after plaintiff's failure to comply with scheduling order, in part because any prejudice that could have been caused by delayed disclosures already had been or could be cured).

The United States also raises the specter that the eventual deposition of Mr. Bray may raise issues of privilege because he is a lawyer. While some issues of privilege may arise, depending on the questions asked, those potential issues provide no grounds to short circuit the deposition and deny BPXP's right to call him as a witness. We are confident that the parties, with the assistance of the Court if needed, can navigate the privilege issues, as we have for many other witnesses in MDL 2179.

## II.    BPXP Should Be Allowed to Proceed with the Depositions of the USA's Witnesses Regarding the Company's Response and Mitigation Efforts.

The United States asserts that "virtually all of BPXP's Rule 30(b)(6) topics and the factual depositions sought relate to the penalty factor concerning Defendant's efforts to mitigate, minimize or prevent the effects of the spill." (U.S. Ltr. at 3) In particular, the United States contends that "fact depositions by BPXP include eight witnesses from the United States on this same penalty factor." (*Id.*) The United States is simply incorrect.

As a preliminary matter, it is not true that "virtually all" of BPXP's Rule 30(b)(6) topics relate to the mitigation penalty factor. Indeed, BPXP's Rule 30(b)(6) topics address several other factors, including the seriousness of the violation (*see, e.g.*, Exhibit B at Topics 1, 4) and other matters as justice may require (*id.* at Topics 6 and 11.)

The United States' attempt to "blame" BPXP for cumulative testimony of fact witnesses and to selectively avoid producing two of those witnesses is similarly unfounded. While the United States complains that eight United States witnesses will offer testimony on the same penalty factor, to be clear, BPXP did not notice the depositions of all eight witnesses. The United States *affirmatively* disclosed three of the witnesses identified in its letter — plus another three U.S. Coast Guard witnesses (Frank Kulesa, Stephen McCleary, and Pat Casey) — as trial witnesses or 30(b)(6) deponents. In particular, the United States disclosed Captain Roger Laferriere and Rear Admiral Meredith Austin as "may call" witnesses and agreed that "BP is free to depose [them] during the fact discovery portion of this Phase." (*See* Exhibit C, 5/14/14 Ltr. to Karis). Further, the United States selected Captain Larry Hewett as a 30(b)(6) deponent. (*See* Exhibit D). Given the United States' affirmative designations of these six witnesses (Kulesa,

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 29, 2014
Page 5

McCleary, Casey, Laferriere, Austin, and Hewett), BPXP has no choice but to depose them.[3]  To the extent that the witnesses may have overlapping information with witnesses selected by BPXP, the United States cannot blame BPXP and seek draconian relief, particularly when the United States could resolve its concerns by pulling down certain of its own witnesses.

The five remaining witnesses identified in the United States' letter — Captain James Hanzalik, Captain Julia Hein, Captain Duke Walker, Jane Lubchenco, and Jacqueline Michel — have unique, non-cumulative information about the nature and extent of efforts to mitigate the effects of the spill and the seriousness of the spill, including environmental recovery and human health effects.[4]  As a preliminary matter, the Court has already addressed and ordered some of the depositions about which the United States now complains, and this issue is thus moot.  By cherry-picking Captains Hanzalik and Hein and asking for their depositions to be precluded, the United States reveals its understanding that each of these witnesses will offer unique testimony about his or her experience – the United States could have asked for the Court to select two witnesses to preclude if they were all so similar, but the testimony of these two must be different enough for the United States to prefer precluding them.

In fact, all of these witnesses served varied functions at different times during the response, and consequently, each has non-duplicative information about the response and recovery.[5]  Undoubtedly, each has information about the nature and extent of mitigation efforts, but this does not make their testimony cumulative: rather, their personal knowledge runs the

---

[3] Notably, BPXP did not disclose Captain Hewett in its Second Amended Rule 26(a) Disclosures, has not affirmatively sought his deposition, and would not object if the United States removed him from its witness list.

[4] Moreover, as BPXP's Rule 26(a) disclosures make clear, these witnesses have information relevant to various penalty factors, including the seriousness of the violation and other matters as justice may require.  (*See* Exhibit E, BP's Second Amended Rule 26(a) Disclosures at 1 (asserting that Captain Meredith Austin may have information concerning any human health effects related to the *Deepwater Horizon* spill); *id*. at 11 (Jane Lubchenco may have information concerning the environmental effects of the spill, and subsequent recovery).

[5] In contrast, the BPXP witnesses whose testimony the Court precluded in its May 19 order do not possess such non-duplicative information, and the Court's decision to preclude their testimony as cumulative does not support the United States' attempt to avoid the depositions of these witnesses.  There was no need to depose both Ms. Pennington and Ms. Robertson given their precisely overlapping service as directors of BPXP (both were BPXP directors from November 1, 2009 to January 11, 2011), the availability of Mr. Bray (who has superior knowledge to either Ms. Pennington or Ms. Robertson on corporate governance matters), and the "limited discovery" the Court has allowed on corporate entity issues.  Similarly, as explained in BPXP's May 16, 2014 letter, any testimony from Mr. Houge would be cumulative of the testimony of Brian Smith and the 30(b)(6) topics noticed by the United States.  Indeed, Rule 30(b)(6) Topics (4), and 5(a)-(b) seek the same information as the one matter -- "to learn about how the BP Group is able to leverage funds across Group entities" -- about which the United States indicated it would question Mr. Houge.  (See May 15, 2014 United States Ltr. to Hon. Sally Shushan).  In sum, the cumulative testimony the Court precluded in its May 19 order is not comparable to the unique and non-duplicative testimony it now seeks to avoid.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 29, 2014
Page 6

gamut from dispersant application to shoreline cleanup to fish and wildlife recovery.   For example:

- Captain Hanzalik (USCG) served as Incident Commander for Louisiana and later as the Federal On Scene Coordinator ("FOSC") during the Response.  In those roles, he led a variety of mitigation efforts, including providing federal oversight of offshore and onshore mitigation efforts, including the deployment of boom, skimming, controlled *in situ* burning, and dispersant application.

- Jane Lubchenco (NOAA) played a role in ensuring that fish and wildlife rebounded from the spill and evaluating the safety of seafood from the Gulf of Mexico.

- Dr. Jacqueline Michel, a third-party contractor for NOAA, served as the SCAT Technical Advisor, locating, assessing, monitoring, and making treatment recommendations for shoreline oiling.

The testimony of these witnesses is not cumulative, but even if it were, the relief requested by the United States would be inappropriate.   Specifically, the United States selectively seeks to block BPXP from deposing Captains Hein and Hanzalik, alleging without support that their testimony will be cumulative of other witnesses.  (U.S. Ltr. at 3.)  In fact, their personal knowledge and information about the response is not only critical to the facts at issue during the Penalty Phase, but is unavailable from other witnesses scheduled to testify.   The United States should not be permitted to selectively preclude BP from seeking to depose two witnesses on a topic, without any basis for that selection and when the United States itself has designated six witnesses on the same topic.

Finally, to the extent the Court is inclined to reduce the number of United States deponents, the solution is for the United States to pull down some of its own Coast Guard "may call" witnesses; Lieutenant Kulesa, for example.  BPXP would not object.  BPXP is entitled to take the depositions of the two U.S. Coast Guard representatives whom it has selected as witnesses, Capt. Hanzalik and Capt. Hein.

Sincerely,

*J. Andrew Langan*

J. Andrew Langan, P.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 29, 2014
Page 7


cc:     Steve O'Rourke
        Sarah Himmelhoch
        Abby André
        Thomas Lotterman
        Ky Kirby
        James Dragna

# Exhibit B

**To Letter from Sarah Himmelhoch to Judge Shushan (Aug. 8, 2014)**

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3
      ***************************************************************
4

5    IN RE:  OIL SPILL BY THE
     OIL RIG *DEEPWATER HORIZON*
6    IN THE GULF OF MEXICO ON
     APRIL 20, 2010
7
                              CIVIL ACTION NO. 10-MD-2179 "J"
8                             NEW ORLEANS, LOUISIANA
                              THURSDAY, JULY 24, 2014, 1:00 P.M.
9

10   THIS DOCUMENT RELATES TO
     *#10-4536*
11

12    ***************************************************************

13

14        TRANSCRIPT OF TELEPHONE STATUS CONFERENCE PROCEEDINGS
             HEARD BEFORE THE HONORABLE SALLY SHUSHAN
15                 UNITED STATES MAGISTRATE JUDGE

16

17   APPEARANCES:

18

19   FOR THE UNITED STATES
     OF AMERICA:            U.S. DEPARTMENT OF JUSTICE
20                          SENIOR LITIGATION COUNSEL FOR E-DISCOVERY
                            ENVIRONMENT & NATURAL RESOURCES DIVISION
21                          BY:   SARAH D. HIMMELHOCH, ESQUIRE
                                  STEVEN O'ROURKE, ESQUIRE
22                                BRANDON ROBERS, ESQUIRE
                            POST OFFICE BOX 7611
23                          WASHINGTON, DC  20044

24

25

                            **OFFICIAL TRANSCRIPT**

```
 1    APPEARANCES CONTINUED:

 2


 3    FOR BP EXPLORATION AND
      PRODUCTION, INC.,
 4    BP AMERICA PRODUCTION
      COMPANY, BP P.L.C.
 5    NORTH AMERICA INC.:      KIRKLAND & ELLIS
                               BY:  J. ANDREW LANGAN, ESQUIRE
 6                                  HARIKLIA KARIS, ESQUIRE
                               300 N. LASALLE
 7                             CHICAGO, IL  60654

 8


 9    FOR ANADARKO
      PETROLEUM CORPORATION,
10    ANADARKO E&P COMPANY
      LP:                      KUCHLER POLK SCHELL
11                             WEINER & RICHESON
                               BY:  ROBERT E. GUIDRY, ESQUIRE
12                             1615 POYDRAS STREET, SUITE 1300
                               NEW ORLEANS, LA  70112
13

14
                               BINGHAM MCCUTCHEN
15                             BY:  THOMAS R. LOTTERMAN, ESQUIRE
                               2020 K STREET, NW
16                             WASHINGTON, DC  20006

17

18    FOR O'BRIEN'S RESPONSE
      MANAGEMENT, INC., AND
19    NATIONAL RESPONSE
      CORPORATION:             QUINN EMANUEL URQUHART & SULLIVAN
20                             BY:  SYLVIA E. SIMSON, ESQ.
                               51 MADISON AVENUE, 22ND FLOOR
21                             NEW YORK, NY 10010

22

23

24

25


                         OFFICIAL TRANSCRIPT
```

1    APPEARANCES CONTINUED:

2

3    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
4                               REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM HB406
5                               NEW ORLEANS, LA  70130
                                (504) 589-7779
6                               Cathy_Pepper@laed.uscourts.gov

7    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          **OFFICIAL TRANSCRIPT**

1                              **I N D E X**

2

3

4    ITEMS                                              PAGE

5

6    DEPOSITIONS..........................................   7

7    ADMIRAL LANDRY.......................................   7

8    CAPTAIN LAFERRIERE...................................   7

9    DATES FOR CAPTAIN LAFERRIERE.........................  11

10   DR. MICHEL...........................................  12

11   PENNINGTON...........................................  12

12   DENISE ROBERTSON.....................................  12

13   SCHEDULE FOR DEPOSITION DESIGNATIONS.................  12

14   PROPOSED ORDER AND SCHEDULE ON DEPOSITION BUNDLING...  13

15   EXCHANGE OF ALL NONDEPOSITION EXHIBITS...............  13

16   DEPOSITION BUNDLE ISSUE.............................  14

17   30(B)(6) TOPIC CONCERNING LIABILITIES AND COSTS FOR

18   THE SPILL...........................................  16

19   REVISED RULE 26(A) DISCLOSURES......................  17

20   ADMIRAL LANDRY......................................  17

21   CAPTAIN LAFERRIERE..................................  17

22   EXPERTS.............................................  19

23   DATE ON THE DEPOSITION BUNDLE SUBMISSION............  20

24   CLOSE TO REACHING AN AGREEMENT ON THE CONSIDERATION

25   MATERIALS ORDER FOR PHASE 3.........................  20

                         **OFFICIAL TRANSCRIPT**

1   IN THE OPA TEST CASES IN DISCUSSIONS WITH BP OVER A

2   SUBPOENA FOR DOCUMENTS................................  21

3   AGENCIES UNDER THE LITIGATION HOLD...................  22

4   MACE BARON CLAWBACK ISSUE............................  23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

|   |   |
|---|---|
| | 1 |

**P-R-O-C-E-E-D-I-N-G-S**

THURSDAY, JULY 24, 2014

(IN CHAMBERS VIA TELEPHONE)

13:00:48  6      THE COURT:  Hi, everybody.  How are you doing?

13:00:51  7      MS. HIMMELHOCH:  Hey, Your Honor.  Pretty good.  How

13:00:51  8  about yourself?

13:00:52  9      THE COURT:  Pretty good.

13:00:55 10      MR. LANGAN:  Hi, Your Honor.

13:00:56 11      THE COURT:  Hi, Andy.  How are you doing?

13:00:56 12      MR. LANGAN:  Good.

13:00:58 13      THE COURT:  Good.

13:00:58 14      MS. HIMMELHOCH:  Your Honor, for the record, I also

13:01:00 15  have with me co-counsel Steve O'Rourke and Brandon Robers, who

13:01:04 16  has not made appearance yet.

13:01:07 17      THE COURT:  Okay.  Should we admit him *pro hac vice*?

13:01:12 18      MS. HIMMELHOCH:  Yes, please.

13:01:13 19      THE COURT:  Okay.  So admitted.

13:01:14 20      MR. LANGAN:  You haven't asked for objections yet.

13:01:16 21      THE COURT:  Well, you're right.  Andy, any objection?

13:01:19 22      MR. LANGAN:  No objection from us, Your Honor.

13:01:24 23      THE COURT:  Thank you, Andy.

13:01:24 24      MS. HIMMELHOCH:  Thank you for your great

13:01:26 25  consideration.

**OFFICIAL TRANSCRIPT**

13:01:26 1          THE COURT:  All right.  Who just popped on?

13:01:29 2          MS. SIMSON:  Hi, Judge Shushan.  This is Sylvia Simson

13:01:32 3     for O'Brien's and NRC.

13:01:33 4          THE COURT:  How are you doing?

13:01:36 5          MS. SIMSON:  Good.  How are you?

13:01:36 6          THE COURT:  Good, thank you.  All right.  Let's talk

13:01:40 7     about how depositions are going.  As I see it, we have just a

13:01:45 8     few fact and 30(b)(6) witnesses left to take.

13:01:45 9          MS. HIMMELHOCH:  Yes.  Oh, sorry.

13:01:45 10          THE COURT:  No, that's okay.

13:01:51 11              How do we look on Admiral Landry?  Are we all

13:01:55 12     set?

13:01:56 13          MS. HIMMELHOCH:  Your Honor, BP has chosen not to

13:01:58 14     depose Admiral Landry, and I do want to note that she is on our

13:02:02 15     revised 26(a) disclosure; so, she remains a may-call witness,

13:02:08 16     but BP has canceled the deposition.

13:02:15 17          MS. KARIS:  Your Honor, this is Kari.  I did notify

13:02:17 18     Sarah yesterday that we were not going forward with the

13:02:20 19     depositions; however, it was our understanding that

13:02:24 20     Admiral Landry would not be called as a trial witness,

13:02:27 21     especially given the US's position at the outset that none of

13:02:30 22     the witnesses that were previously deposed should be deposed in

13:02:33 23     this phase.

13:02:34 24              Admiral Landry was only added when

13:02:37 25     Captain Laferriere became unavailable.  So, if it's the case

                                **OFFICIAL TRANSCRIPT**

8

13:02:42 1    that Admiral Landry is -- I'm not sure when the revised 26(a)

13:02:49 2    was served adding Admiral Landry.  She was never intended to be

13:02:54 3    deposed.  In fact, the US objected to us deposing any witnesses

13:02:57 4    who had previously been deposed, so I want to make sure we're

13:03:02 5    all operating from the same rules.

13:03:05 6              Sarah, when did you guys add her as a potential

13:03:08 7    trial witness?

13:03:08 8        MS. HIMMELHOCH:  We served our 26(a) disclosure a week

13:03:12 9    or two ago.  I can dig it out but we did serve through

13:03:17 10   LexisNexis a revised 26(a) disclosure which included

13:03:21 11   Admiral Landry.

13:03:22 12       MS. KARIS:  Okay.  My understanding was, though, that

13:03:24 13   that was a result of Captain Laferriere being unavailable.

13:03:31 14   There was no -- I certainly don't recall any order of the Court

13:03:34 15   allowing everybody to now supplement at the close of fact

13:03:39 16   discovery their potential trial witnesses.

13:03:43 17             Captain Laferriere, Your Honor, as you may

13:03:46 18   recall, was supposed to be the United States' corporate

13:03:48 19   representative on a number of topics, and we had asked for his

13:03:51 20   fact deposition as well.  For a long time, for understandable

13:03:57 21   reasons, Captain Laferriere became unavailable.  As we butted

13:04:02 22   up to the close of fact discovery, the United States

13:04:05 23   substituted Admiral Landry for Captain Laferriere.

13:04:11 24             We raised the issue with the Court that we were

13:04:13 25   willing to wait for Captain Laferriere's deposition, but at the

**OFFICIAL TRANSCRIPT**

13:04:17 1  last conference, as I understand it, the Court ordered us to go

13:04:20 2  forward with her dep in her corporate rep capacity, which was

13:04:24 3  the only capacity that had ever been discussed for her.

13:04:27 4         So Sarah is correct, we withdrew it, but

13:04:31 5  certainly not with the understanding that now, as a result of

13:04:33 6  Captain Laferriere becoming unavailable, the US was going to

13:04:37 7  add a new witness it had never added in months of fact

13:04:40 8  discovery in this case.

13:04:42 9         THE COURT:  Okay.

13:04:43 10        MS. HIMMELHOCH:  Your Honor, we served the 26(a)

13:04:45 11 disclosure before Admiral Landry's deposition was scheduled to

13:04:49 12 occur, before the close of fact discovery.  BP served a revised

13:04:55 13 26(a) in the mist of discovery.  Granted, not as late as we did

13:04:55 14 but --

13:05:00 15        MS. KARIS:  [Speaking simultaneously] Dropping --

13:05:00 16        MR. LANGAN:  Dropping witnesses.

13:05:01 17        MS. KARIS:  Right.  Exactly.  It's quite different and

13:05:05 18 there is nothing new about Admiral Landry presumably that would

13:05:09 19 not have allowed the United States to list her in March and

13:05:12 20 April in accordance with the Court's deadline.

13:05:16 21        MS. HIMMELHOCH:  There is in this sense, that BP had

13:05:18 22 provided very limited information about its series on the

13:05:22 23 various aspects of its -- such other factors, and as we become

13:05:26 24 more familiar with what BP is asserting, it becomes clear that

13:05:30 25 facts we thought were irrelevant are not irrelevant if BP is

**OFFICIAL TRANSCRIPT**

13:05:36  1  going to be permitted to make those assertions.

13:05:38  2       MS. KARIS:  Well, Your Honor, I would state that the

13:05:40  3  positions of BP on the other factors were set forth in an

13:05:44  4  interrogatory response served months ago.  There are no new

13:05:49  5  factors that we've identified within the last couple weeks that

13:05:53  6  would justify adding new fact witnesses.

13:05:55  7            If we're now going to undertake a process where

13:05:58  8  parties can just supplement their Rule 26(a)'s --

13:06:02  9  Admiral Landry is a U.S. employee.  She was known to the

13:06:06  10  United States, had been deposed previously.  There is

13:06:12  11  absolutely nothing to justify adding her at this juncture.

13:06:15  12       THE COURT:  Okay.

13:06:17  13       MS. KARIS:  There is nothing new that we've disclosed.

13:06:19  14       THE COURT:  I'll tell you what let's do, Sarah, would

13:06:22  15  you send me a no longer than two-page letter as to why

13:06:28  16  Admiral Landry should be listed as an additional fact witness,

13:06:35  17  and if her fact witness testimony is going to be confined in

13:06:40  18  any way, could you describe that to me.

13:06:43  19            Then, Kari, you likewise will respond.  Give me

13:06:49  20  two pages, and let's just set dates for that.

13:06:55  21       MS. HIMMELHOCH:  Will do, Your Honor.  I think we can

13:06:57  22  get that to you by Tuesday of next week.

13:06:58  23       THE COURT:  Okay.  Kari, do you want until Friday or do

13:07:04  24  you want the following Monday?

13:07:05  25       MS. KARIS:  The following Monday would be great,

13:07:09 1    Your Honor, but if we can only have until Friday, I would live

13:07:11 2    with that as well, but if you can give us till the following

13:07:15 3    Monday we would appreciate it.

13:07:15 4         THE COURT:  How about noon on Monday.  We'll split the

13:07:18 5    difference.

13:07:19 6         MR. LANGAN:  That's August 4th?

13:07:21 7         THE COURT:  By my calendar, I think so, Andy.

13:07:24 8         MR. LANGAN:  Thank you, Your Honor.

13:07:25 9         THE COURT:  You're welcome.

13:07:27 10        MS. KARIS:  Just to be clear, once this issue is

13:07:29 11   resolved, if -- hopefully the Court will agree with us, but if

13:07:33 12   Admiral Landry is going to be a trial witness, then we need to

13:07:36 13   revisit this issue of her deposition.

13:07:39 14        THE COURT:  Understood.

13:07:42 15        MS. KARIS:  Thank you.

13:07:43 16        THE COURT:  All right.  How about -- I'm sorry, Sarah.

13:07:45 17   Go ahead.

13:07:45 18        MS. HIMMELHOCH:  I'm sorry, I was just going to pick up

13:07:48 19   on the depositions.  The other outstanding issue, as I

13:07:51 20   understood it, were dates for Captain Laferriere.  Based on

13:07:56 21   information we have available right now, his deployment to the

13:08:01 22   current emergency will end on August 1st.  We want to give him

13:08:05 23   a day or so to sleep; so, we can make him available either the

13:08:09 24   5th or the 6th of August.

13:08:12 25        THE COURT:  Okay.  All right.

**OFFICIAL TRANSCRIPT**

# Exhibit C
**To Letter from Sarah Himmelhoch to Judge Shushan (Aug. 8, 2014)**



E-SERVICE
55720601
Jul 11 2014
03:35PM
File & ServeXpress

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |  |
|---|---|---|---|
| In re: | Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : | MDL No. 2179 |
|  |  | : | SECTION: J |
|  |  | : | JUDGE BARBIER |
| This Document Relates to: 10-4536 |  | : : | MAG. JUDGE SHUSHAN |
| ……………………………………………... |  | : |  |

## CLEAN WATER ACT – PENALTY PHASE

## THIRD AMENDED UNITED STATES INITIAL DISCLOSURES

## UNDER FED. R. CIV. P. 26(a)(1)

The United States is in the process of locating witnesses and documents relevant to the Penalty Phase. The United States reserves the right to: (1) rely on all documents produced by any party in earlier phases or this phase of MDL 2179; (2) rely on any testimony or exhibits offered in any prior trial phase or this phase of MDL 2179; (3) rely on any testimony or exhibits from any deposition previously taken in MDL 2179, or to be taken in this phase; and (4) amend and supplement these disclosures as it conducts further investigation and discovery.  These disclosures do not in any way diminish the United States' right to additional discovery, including 30(b)(6) and other depositions.

The United States reserves the right to supplement or amend this initial disclosure under Rule 26(e) pending resolution of proposed stipulations and issues pertaining to the scope of both discovery and trial.

1

1. **The name, last known address, and telephone number of each person likely to have information as described in Federal Rule of Civil Procedure 26(a)(1)(A), and the subjects of the information.**

United States Coast Guard Lieutenant Frank Kulesa may have information concerning the seriousness of the violation.  Lieutenant Kulesa may be contacted through counsel for the United States, United States Department of Justice, Environment and Natural Resources Division, 601 D St, NW, Washington, D.C. 20004; telephone (202) 514-5471.

Brenda Pennington (BPXP Board Member) may have information concerning the relationship between BPXP, BP America, Inc., BP p.l.c. and other entities in the corporate chain as well as several of the penalty factors including the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.  Ms. Pennington is located at 501 Westlake Park Boulevard, Houston, Texas 77079.

D.B. Pinkert (BPXP Board Member) may have information concerning the relationship between BPXP, BP America, Inc., BP p.l.c. and other entities in the corporate chain as well as several of the penalty factors including the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.  Mr. Pinkert is located at 501 Westlake Park Boulevard, Houston, Texas 77079.

Denise Robertson (BPXP Board Member) may have information concerning the relationship between BPXP, BP America, Inc., BP p.l.c. and other entities in the corporate chain as well as several of the penalty factors including the nature, extent, and degree of success of any efforts of

2

the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.  Ms. Robertson is located at 501 Westlake Park Boulevard, Houston, Texas 77079.

Dr. Robyn Conmy (United States Environmental Protection Agency Research Ecologist) may have information regarding the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge.  Dr. Conmy is located at 26 West Martin Luther King Drive, Cincinnati, Ohio, 45268.

United States Coast Guard Rear Admiral Mary E. Landry (Ret.) may have information regarding the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, and any other matters as justice may require.  Admiral Landry is located at 2701 Martin Luther King Jr. Ave., SE, Washington, DC.

The United States incorporates by reference all individuals identified by BP Exploration & Production, Inc. and Anadarko Petroleum Corporation in their initial disclosures.  The United States reserves the right to call any witness necessary to authenticate, or lay the foundation for, any document the United States might rely upon in this litigation, or otherwise rely on record managers.

2. **A general description, including location of all documents, data, compilations, and tangible things in the possession, custody or control of the United States as described in Federal Rule of Civil Procedure 26(a)(1)(B).**

3

The United States may support its Penalty Phase presentation with the following categories of documents to the extent they are admissible and not protected from disclosure due to privilege:

a.  Documents regarding BP and Anadarko's ability to pay the maximum Clean Water Act penalty that may be imposed in this case.  These documents are publically available, have been previously exchanged in MDL 2179 discovery, will be obtained from BP or Anadarko in Phase III discovery, or are located in the Administrative Records produced in Case No. 4:13-cv-02349 (S.D. Tex.).

b.  Documents regarding BP's management and process safety failures related to the four incidents listed in the United States' March 3, 2014 Submission.  These documents are publically available, have been previously exchanged in MDL 2179 discovery, or are located in the Administrative Records produced in Case No. 4:13-cv-02349 (S.D. Tex.).

c.  Documents concerning the seriousness of the violation.  These documents are publically available, have been previously exchanged in MDL 2179, will be obtained from BP in Phase III discovery, or are located in the records of the United States Coast Guard, the National Oceanic and Atmospheric Administration, the Department of Commerce, the Department of the Interior, the Environmental Protection Agency, the Department of Agriculture, the Department of Labor, or the Department of Health and Human Services.

d.  Documents regarding BPXP's and Anadarko's role in the United States and Gulf Coast economies.  These documents are publically available, have been previously

4

exchanged in MDL 2179 discovery, will be obtained from BP or Anadarko in Phase

III discovery, or are located in the records of the Department of Commerce or

Department of the Interior's Office of Natural Resources Revenue.

**3. Computation of damages, as described in Federal Rule of Civil Procedure 26(a)(1)(C).**

This is a civil action for statutory civil penalties and does not include a claim for

damages.

**4. The existence and contents of any insurance agreement as described in Federal Rule of Civil Procedure 26(a)(1)(D).**

The United States does not have any insurance agreements in its name that are responsive to

this disclosure.

Dated July 11, 2014                                     Respectfully submitted,

JOSHUA WILKENFELD                        SAM HIRSCH
Acting Deputy Assistant Attorney General   Acting Assistant Attorney General
Civil Division                                             Environment & Natural Resources Division
PETER FROST                                          SARAH HIMMELHOCH
Director, Torts Branch, Civil Division         Senior Level E-Discovery Coordinator
Admiralty and Aviation                             MICHAEL MCNULTY
SHARON SHUTLER                                 Senior Litigation Counsel
MALINDA LAWRENCE                          NANCY FLICKINGER
LAURA MAYBERRY                               Senior Attorney
Trial Attorneys                                         PATRICK CASEY
R. MICHAEL UNDERHILL, T.A              RICHARD GLADSTEIN
Attorney in Charge, West Coast Office      DANIEL S. SMITH
                                                              Senior Counsel
                                                              ABIGAIL ANDRE
                                                              A. NATHANIEL CHAKERES
                                                              ANNA CROSS
                                                              RACHEL HANKEY
                                                              JUDY HARVEY
                                                              RACHEL KING
                                                              ERICA PENCAK
                                                              BRANDON ROBERS
                                                              GORDON YOUNG
                                                              Trial Attorneys


                                                              /s/ Steven O'Rourke
                                                              STEVEN O'ROURKE
                                                              Senior Attorney
                                                              Environmental Enforcement Section
                                                              U.S. Department of Justice
                                                              P.O. Box 7611
                                                              Washington, D.C. 20044
                                                              Telephone:  202-514-2779
                                                              Facsimile:  202-514-2583
                                                              E-mail:  steve.o'rourke@usdoj.gov
                                                              KENNETH A. POLITE, JR.
                                                              United States Attorney
                                                              Eastern District of Louisiana
                                                              SHARON D. SMITH
                                                              Assistant United States Attorney
                                                              Eastern District of Louisiana

Attorneys for the UNITED STATES OF AMERICA

6

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  July 11, 2014.                                            /s/  Steven O'Rourke

                                                                              U.S. Department of Justice

7

# Exhibit D

**To Letter from Sarah Himmelhoch to Judge Shushan (Aug. 8, 2014)**



E-SERVICE
55364095
Apr 28 2014
09:42PM
File & ServeXpress

**UNITED STATES DISTRICT OF COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAG. JUDGE SHUSHAN |
| …………………………………………... | : | |

**BP EXPLORATION & PRODUCTION INC.'S RESPONSES TO THE UNITED**
**STATES' FIRST SET OF DISCOVERY REQUESTS IN THE PENALTY PHASE**

Defendant BP Exploration & Production Inc. ("BPXP"), by its undersigned Counsel, and

pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, as well as the

instruction of the Court, hereby submits the following responses to the United States' First Set of

Discovery Requests to Defendant BPXP in the Penalty Phase.

**SPECIFIC RESPONSES AND OBJECTIONS**

BPXP responds as follows to the United States' specific requests for production,

interrogatories, and requests for admission subject to and without waiving its general objections,

each of which is specifically incorporated into each of the individual responses below.

**REQUESTS FOR PRODUCTION**

1.      Provide all consolidating financial statements at the subsidiary level for BPXP,
BP America Production Company, BP Company North America Inc., BP Corporation North
America Inc., BP America Inc., and BP Holdings North America for each year, 2005-2014.

**OBJECTIONS:**

BPXP objects to Request for Production No. 1 on the grounds that it is overly broad,

unduly burdensome, and not reasonably calculated to lead to the discovery of admissible

evidence.  Among other things, the request seeks financial information for six separate BP

1

affiliates over a nearly ten-year period.   BPXP further objects to this request to the extent it seeks "consolidating financial statements" on the grounds that it is vague and ambiguous.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that, given the overbroad time frame and long list of BP Group entities for which the United States seeks discovery, there may be certain periods and entities for which the requested materials do not exist.  BPXP will produce an Excel spreadsheet containing the BPXP trial balances for the time period 2009 to 2013.  BPXP will also undertake a reasonable search for:  (1) unaudited financial reports sufficient to summarize certain financial data for BPXP to the extent available for 2013 and 2014, including summaries of certain balance-sheet, income-statement, and cash-flow information; (2) quarterly and annual financial statements of BP p.l.c. to the extent available for 2013 and 2014; and (3) the annual financial statements of BP America Inc. and BP Corporation North America Inc. for 2013.

The financial statements for BP America Inc., BP Corporation North America Inc., and BP p.l.c. contain three years of income-statement information, three years of cash-flow information, and two years of balance-sheet information.  Accordingly, for example, the annual financial statements of BP America Inc. and BP Corporation North America Inc. for 2013 contain income-statement information for 2011-2013, cash-flow information for 2011-2013, and balance-sheet information for 2012-2013.  Each unaudited financial report for BPXP contains two years of balance-sheet, income-statement, and cash-flow information.

BPXP further states that it has already produced some documents responsive to this request.

2.     Provide all consolidated U.S. Federal income tax returns including all subsidiary level work sheets and consolidating accounting for BPXP, BP America Production Company, BP

Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc for each year, 2005-2014.

**OBJECTIONS:**

BPXP objects to Request for Production No. 2 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Among other things, the request seeks tax and financial information for seven separate BP affiliates over a nearly ten-year period. BPXP further objects to this request to the extent it seeks "consolidated U.S. Federal income tax returns including all subsidiary level work sheets and consolidating accounting" on the grounds that it is vague and ambiguous. BPXP also objects to this request as unduly burdensome in seeking confidential taxpayer information for BP entities in the absence of any showing that such documents would provide substantial additional relevant information beyond that included in the financial information for which BPXP is agreeing to undertake a reasonable search. In particular, the financial information reflected in the consolidated federal U.S. federal tax returns filed by BP America Inc. and including BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., and BP America Inc. is based upon the annual financial statements of BP America Inc. and would not provide additional financial information relevant to the issues in the Penalty Phase for those BP Group entities not already included in the annual financial statements of BP America Inc.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will undertake a reasonable search for: (1) unaudited financial reports sufficient to summarize certain financial data for BPXP to the extent available for 2013 and 2014, including summaries of certain balance-sheet, income-statement, and cash-flow information; (2) quarterly and annual financial

statements of BP p.l.c. to the extent available for 2013 and 2014; and (3) the annual financial statements of BP America Inc. and BP Corporation North America Inc. for 2013.

3.      Provide all documents related to any BP entity's Material Transactions with BPXP, including all policies or practices affecting the pricing of such transactions for each year, 2005-2014.

## OBJECTIONS:

BPXP objects to Request for Production No. 3 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. BPXP further objects to this request to the extent it seeks "documents related to any BP entity's Material Transactions" on the grounds that it is vague and ambiguous.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP will conduct a reasonable search for: (1) non-privileged documents sufficient to summarize the accounts-payable and accounts-receivable balances between BPXP and other BP entities as of quarterly and annual periods in 2013 and 2014; (2) financing or loan agreements between BPXP and other BP entities for the time period January 1, 2009 to the present; (3) non-privileged documents sufficient to summarize policies relating to the pricing of intra-Group debt between BPXP and other BP entities for the time period January 1, 2009 to the present; (4) non-privileged documents sufficient to summarize injections of equity by BP entities into BPXP from January 1, 2009 to the present; and (5) the services agreements between BPXP and BP America Production Company dated December 31, 2005 and dated December 31, 2001. BPXP will also produce an Excel spreadsheet containing the BPXP trial balances for the time period 2009 to 2013. BPXP further states that it has already produced some documents responsive to this request.

4.      Provide all spreadsheets and computations evaluating BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc.,

BP America Inc., BP Holdings North America, and BP plc financial projections for 2014 and forward including any sensitivity analyses (including assumptions of oil and gas prices) that BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc have performed.

## OBJECTIONS:

BPXP objects to Request for Production No. 4 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. BPXP further objects to this request as unduly burdensome in seeking highly market-sensitive information in the absence of any showing that such documents would provide substantial additional relevant information beyond that included in public reports by rating agencies and in the financial information for which BPXP is agreeing to undertake a reasonable search. BPXP also objects to this request to the extent it calls for information that will be the subject of expert analysis and opinion and calls for BPXP to disclose expert testimony prior to the schedule determined by the Court.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP will produce the BP p.l.c. Investor Update presentation dated March 4, 2014. BPXP will also conduct a reasonable search for: (1) the Standard Measure of Oil and Gas ("SMOG") analysis for Gulf of Mexico assets; (2) credit agency reports relating to BP entities for the period from January 1, 2009 to the present; (3) unaudited financial reports sufficient to summarize certain financial data for BPXP to the extent available for 2013 and 2014, including summaries of certain balance-sheet, income-statement, and cash-flow information; (4) quarterly and annual financial statements of BP p.l.c. to the extent available for 2013 and 2014; and (5) the annual financial statements of BP America Inc. and BP Corporation North America Inc. for 2013. BPXP further states that it has already produced some documents responsive to this request.

5.      Provide all documents authored by, addressed to, received by, or that identify Brenda Pennington, D.B. Pinkert or Denise Robertson (BPXP Board members); Brenda Pennington or Denise Robertson (BPAPC Board members); K.D. Heulitt, R.J. Pillari, P.D. Wessells (BP America, Inc. Board members); and Brenda Pennington and Denise Robertson (BP Company North America Inc. Board members) related to the Macondo Incident.

**OBJECTIONS:**

BPXP objects to Request for Production No. 5 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is not relevant to the claims or defenses of any party.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP refers the United States to the documents BPXP will produce in response to Request for Production No. 7 for an accurate list identifying its officers and directors in 2013 and 2014.

6.      Provide all BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., and BP Holdings North America, Board of Director, Board of Director committee, and officer meeting resolutions and decisions for each year, 2008-2014.

**OBJECTIONS:**

BPXP objects to Request for Production No. 6 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is not relevant to the claims or defenses of any party.

7.      Provide all documents, including any organizational charts, that identify and describe how BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc relate functionally or operationally to the BP Exploration and Production business segment and the Gulf of Mexico Strategic Performance Unit ("GOM SPU"), including any documents that identify the officers and management of each entity and their position within or relationship to the BP Exploration and Production business segment and the GOM SPU for each year, 2005-2014.

**<u>OBJECTIONS:</u>**

BPXP objects to Request for Production No. 7 on the grounds that it is overly broad, unduly burdensome, unreasonable, and seeks information that is not relevant to the claims or defenses of any party, including to the extent that it seeks information regarding seven different BP affiliates over a nearly ten-year period.  BPXP further objects to this request on the grounds that the United States' use of the phrase "relate functionally or operationally" is vague, ambiguous, and undefined.

**<u>RESPONSE:</u>**

Subject to and without waiving its specific and general objections, BPXP will conduct a reasonable search for: (1) an organizational chart sufficient to show the relationship between BPXP and its parent companies; (2) documents sufficient to identify its officers and directors in 2013 and 2014; and (3) the services agreements between BPXP and BP America Production Company dated December 31, 2005 and dated December 31, 2001.

Documents containing organizational charts relating to the BP Exploration & Production Business Segment and/or the Gulf of Mexico Strategic Performance Unit have also previously been produced, including at BP-HZN-2179MDL00054006 to BP-HZN-2179MDL01162510 and BP-HZN-2179MDL01166666.  In addition, BPXP further states that it has already produced an organizational chart showing the relationship between BPXP and its parent companies.

8.      Provide all documents of BP entity guarantees for obligations of BPXP for each year, 2005-2014, including all documents reflecting BPCNA's decision to provide guarantees for Macondo Well or Incident obligations of BPXP, and the involvement of BP plc.

**<u>OBJECTIONS:</u>**

BPXP objects to Request for Production No. 8 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects that, on its face, this request appears to call for documents

protected by attorney-client privilege, work-product protection, or settlement communication privilege.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will undertake a reasonable search for non-privileged documents sufficient to show BP Corporation North America Inc.'s and BP p.l.c.'s guarantees relating to the Macondo well, the Incident, and the Response. BPXP will also undertake a reasonable search for guarantees involving BPXP that are not related to the Macondo well, the Incident, and the Response.

9.      Provide all documents related to loans, revolving credit agreements or any other debt held by BPXP for each year, 2005-2014.

**OBJECTIONS:**

BPXP objects to Request for Production No. 9 on the grounds that it is overly broad, unreasonable, unduly burdensome, and seeks information that is not relevant to the claims or defenses of any party, including to the extent that it seeks information for a nearly ten-year period.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will conduct a reasonable search for: (1) non-privileged documents sufficient to summarize the accounts-payable and accounts-receivable balances between BPXP and other BP entities as of quarterly and annual periods in 2013 and 2014; (2) financing or loan agreements between BPXP and other BP entities for the time period January 1, 2009 to the present; and (3) non-privileged documents sufficient to summarize policies relating to the pricing of intra-Group debt between BPXP and other BP entities for the time period January 1, 2009 to the present. BPXP will also produce an

Excel spreadsheet containing the BPXP trial balances for the time period 2009 to 2013.  BPXP further states that it has already produced some documents responsive to this request.

10.     Provide all documents reflecting BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc policies and targets for key financial ratios or measures, including but not limited to Net Debt to Adjusted Capital, Current Ratio, Quick Ratio, and Free Cash Flow, for each year, 2005-2014.

**OBJECTIONS:**

BPXP objects to Request for Production No. 10 on the grounds that it is overly broad, unduly burdensome, unreasonable, and seeks information that is not relevant to the claims or defenses of any party, including to the extent that it seeks information for seven separate BP affiliates for nearly a ten-year period.  BPXP further objects to this request on the grounds that the United State' use of the phrase "policies and targets for key financial ratios or measures" is vague, ambiguous, and undefined.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will undertake a reasonable search for credit agency reports relating to BP entities for which such reports exist for the period from January 1, 2009 to the present.

11.     Provide all documents reflecting the basis for BPCNA's indemnification agreement with Anadarko for Macondo well costs, and all documents reflecting the basis for BPCNA's guarantee of BPXP's Guilty Plea Agreement payments, *United* States *v. BP Exploration & Production, Inc.*, No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012), and the resulting Judgment (E.D. La. Jan. 29, 2013).

**OBJECTIONS:**

BPXP objects to Request for Production No. 11 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects to this request to the extent it seeks "documents reflecting the basis for BPCNA's indemnification agreement with Anadarko" and "documents reflecting the

basis for BPCNA's guarantee of BPXP's Guilty Plea Agreement" on the grounds that it is vague and ambiguous. BPXP also objects to this request to the extent that it seeks documents in the custody of third parties setting forth those parties' rationales for seeking a guarantee or indemnification. BPXP further objects that, on its face, this request appears to call for documents protected by attorney-client privilege, work-product protection, or settlement-communication privilege.

12.     Provide all documents that describe and identify BPXP's policies and its payment history regarding payment of distributions or dividends for 2005 to present.

**OBJECTIONS:**

BPXP objects to Request for Production No. 12 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will produce documents sufficient to summarize BPXP's payments of dividends, if any, from 2007 to the present and the BPXP Series A preferred stock certificate filed with the State of Delaware that includes provisions regarding the payment of dividends. BPXP last declared and paid a common share dividend in 2009 and last declared and paid a quarterly preferred share dividend effective March 24, 2010. Since April 20, 2010, BPXP has neither declared nor paid a dividend in any form to any parent or affiliate company.

13.     Provide all documents that describe and identify all of BPXP's current contingent liabilities and any BP entity providing BPXP a corporate guarantee or debt financing, including the potential financial exposure of the contingent liabilities, the status of the resolution of the risk, the likely timing and steps to resolve the risk, and the official assessment of the financial exposure.

**OBJECTIONS:**

BPXP objects to Request for Production No. 13 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects to this request to the extent it implies that BP entities have guaranteed BPXP's contingent liabilities relating to the Clean Water Act penalty or any other penalty.  BPXP also objects to this request on the grounds that the United States' use of the phrase "official assessment of the financial exposure" is vague, ambiguous, and undefined. BPXP further objects that, on its face, this request appears to call for documents protected by attorney-client privilege, work-product protection, or settlement communication privilege.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will undertake a reasonable search for the following non-privileged documents setting forth contingent liabilities: (1) unaudited financial reports sufficient to summarize certain financial data for BPXP to the extent available for 2013 and 2014, including summaries of certain balance-sheet information; (2) quarterly and annual financial statements of BP p.l.c. to the extent available for 2013 and 2014; and (3) the annual financial statements of BP America Inc. and BP Corporation North America Inc. for 2013.  Certain potential liabilities of BPXP have not been provisioned for, based on applicable accounting standards.

BPXP will also undertake a reasonable search for non-privileged documents sufficient to show BP Corporation North America Inc.'s and BP p.l.c.'s guarantees relating to the Macondo well, the Incident, and the Response.

BPXP further states that it has already produced some documents responsive to this request.

14.     Provide all documents that describe and identify the BP entity or entities that provided the following services to BPXP in 2005 to present: (a) legal; (b) accounting and finance; (c) environmental; (d) scientific; (e) well-drilling technology and design; (f) personnel (including any secondment agreements); and (f) human resources.

## OBJECTIONS:

BPXP objects to Request for Production No. 14 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information not relevant to the claims or defenses of any party.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP will produce the services agreements between BPXP and BP America Production Company dated December 31, 2005 and dated December 31, 2001.

In addition, BPXP's financial and accounting records and databases contain voluminous documentation and information regarding payments related to the Incident and Response. Because of the sheer number of such expenditures and the form in which this information is kept in the ordinary course of BPXP's business, production of all such information is highly burdensome and impracticable. BPXP is willing to meet and confer regarding providing the United States with documents and information reflecting expenditures relating to the Incident and Response that were paid on behalf of BPXP and were charged to BPXP as intercompany payables.

BPXP further states that thousands of response-related contracts and other materials have already been produced in Phase One and/or Phase Two. For example, many of these contracts may be found at Bates BP-HZN-2179MDL07147963 to BP-HZN2179MDL07159411.[1]  BPXP

---

[1]     Other contracts may be found at the following Bates ranges: BP-HZN-2179MDL05223499 to BP-HZN-2179MDL05227426; BP-HZN-2179MDL05836738 to BP-HZN-2179MDL05852080; BP-HZN-2179MDL06727924 to BP-HZN-2179MDL06741921; BP-HZN-2179MDL06865993 to BP-HZN-

requests that the United States first review the thousands of contracts that BPXP has previously produced to determine specifically what, if any, additional contracts the United States is seeking.

15.    Provide all documents that describe and identify all asset divestment sale proceeds used to meet the obligations arising from the Incident including, the assets sold, the dates of the sales, the owners of the assets sold, amounts received from the sales, and which BP entity received the amounts from the sales, for the period 2009 to present.

**OBJECTIONS:**

BPXP objects to Request for Production No 15 on the grounds that it is vague, ambiguous, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects to this request to the extent that it suggests that proceeds from an asset divestment sale can be traced to specific expenditures relating to the Incident and Response.  BPXP also objects to this request on the grounds that the United States' use of the phrase "used to meet the obligations" is vague, ambiguous, and undefined. Furthermore, BPXP objects to this request as unduly burdensome because its seeks information that is highly complex and involves numerous complex transactions around the globe, and may also be highly market-sensitive and restricted pursuant to contract, in the absence of any showing that such documents would provide substantial additional relevant information beyond that included in public disclosures that BPXP agrees to produce.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will produce the following documents sufficient to summarize divestments by the BP Group since April 20, 2010: (1) the BP p.l.c. Investor Update presentation dated March 4, 2014; (2) the BP Annual Reports and Forms 20-F 2010-2013; and (3) the BP p.l.c. 4Q & Full Year 2013 Results Presentation dated February 4, 2014.  BPXP is willing to continue to meet and confer with the

---

2179MDL06867256; BP-HZN-2179MDL06907950 to BP-HZN-2179MDL06918102; and BP-HZN-2179MDL06940662 to BP-HZN-2179MDL06941287.

United States regarding providing information sufficient to summarize asset divestments conducted by BP entities since April 20, 2010.  BPXP further states that it has already produced some documents responsive to this request.

16.     Provide all documents or records relating to any payment, transfer, loan, or any other Material Transaction between BPXP and any other BP corporate entity for the period 2005 to present.

## OBJECTIONS:

BPXP objects to Request for Production No. 16 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects to this request on the grounds that the United States' use of the term "Material Transactions" is vague and ambiguous.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP will conduct a reasonable search for: (1) non-privileged documents sufficient to summarize the accounts-payable and accounts-receivable balances between BPXP and other BP entities as of quarterly and annual periods in 2013 and 2014; (2) financing or loan agreements between BPXP and other BP entities for the time period January 1, 2009 to the present; (3) non-privileged documents sufficient to summarize policies relating to the pricing of intra-Group debt between BPXP and other BP entities; and (4) non-privileged documents sufficient to summarize injections of equity by BP entities into BPXP from January 1, 2009 to the present.  BPXP will also produce an Excel spreadsheet containing the BPXP trial balances for the time period 2009 to 2013.  BPXP further states that it has already produced some documents responsive to this request.

17.     Provide all documents that identify the source (including divestments) of monies paid, loaned, or transferred, or services provided by any BP entity, including accounting records, contracts, and records of payments from 2010 to the present related to the Incident, the Response or any efforts to mitigate the effects of the discharge.  This request includes records relating to

payments 1) for work performed during the Response, or efforts to mitigate the effects of the discharge 2) for early restoration projects, 3) to perform actions required under the Guilty Plea Agreement, (*United States v. BP Exploration & Production, Inc.*, No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012), and the resulting Judgment (E.D. La. Jan. 29, 2013)), 4) made to any state, city, parish or government entity (including any state or federal health organization such as the Gulf of Mexico Research Initiative, the National Fish and Wildlife Foundation, the National Institute of Environmental Health Sciences in the form of a grant, or for any costs related to the spill and its response), or 5) paid through the BP Claims Facility, the Deepwater Horizon Oil Spill Trust established by the August 6, 2010 agreement, the Gulf Coast Claims Facility, and the BP Claims Program which began accepting claims on June 4, 2012.

## OBJECTIONS:

BPXP objects to Request for Production No. 17 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. BPXP further objects to this request to the extent it seeks "the source (including divestments) of monies paid, loaned, or transferred or services provided by any BP entity" on the grounds that it is vague and ambiguous. BPXP also objects to this request to the extent it assumes that the "source" of monies paid to BPXP can be traced to the "payment" of monies by BPXP in connection with the Incident and Response.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP will undertake a reasonable search for non-privileged documents sufficient to summarize payments and liabilities relating to the Incident and the Response. BPXP will also conduct a reasonable search for: (1) non-privileged documents sufficient to summarize the accounts-payable and accounts-receivable balances between BPXP and other BP entities as of quarterly and annual periods in 2013 and 2014; (2) non-privileged documents constituting financing or loan agreements between BPXP and other BP entities for the time period January 1, 2009 to the present; and (3) non-privileged documents sufficient to summarize injections of equity by BP entities into BPXP from January 1,

2009 to the present.  BPXP further states that it has already produced some documents responsive to this request.

In addition, BPXP's financial and accounting records and databases contain voluminous documentation and information regarding payments related to the Incident and Response.  Because of the sheer number of such expenditures and the form in which this information is kept in the ordinary course of BPXP's business, production of all such information is highly burdensome and impracticable.  BPXP is willing to meet and confer regarding providing the United States with documents and information reflecting expenditures relating to the Incident and Response that were paid on behalf of BPXP and were charged to BPXP as intercompany payables.

BPXP further states that thousands of response-related contracts and other materials have already been produced in Phase One and/or Phase Two.  For example, many of these contracts may be found at Bates BP-HZN-2179MDL07147963 to BP-HZN2179MDL07159411.[2]  BPXP requests that the United States first review the thousands of contracts that BPXP has previously produced to determine specifically what, if any, additional contracts the United States is seeking.

18.    Provide all data relevant to the environmental impact, effect or seriousness of the Incident, the Response, or the efforts of the Defendants to minimize or mitigate the effects of their discharge, excluding data already provided to the federal Natural Resource Damage Trustees.

**OBJECTIONS:**

BPXP objects to Request for Production No. 18 on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome.  BPXP further objects to this request to the extent that it calls for the production of documents that are publicly available or otherwise

---

[2]    Other contracts may be found at the following Bates ranges: BP-HZN-2179MDL05223499 to BP-HZN-2179MDL05227426; BP-HZN-2179MDL05836738 to BP-HZN-2179MDL05852080; BP-HZN-2179MDL06727924 to BP-HZN-2179MDL06741921; BP-HZN-2179MDL06865993 to BP-HZN-2179MDL06867256; BP-HZN-2179MDL06907950 to BP-HZN-2179MDL06918102; and BP-HZN-2179MDL06940662 to BP-HZN-2179MDL06941287.

accessible to the United States, and to the extent that it calls for the production of documents that are protected by attorney-client privilege or work-product protection.

**RESPONSE:**

Subject to and without waiving its specific and general objections, and subject to a reciprocal agreement by the United States, BPXP will conduct a reasonable search for: (1) environmental data collected in connection with the Natural Resource Damages Assessment not already provided to one or more of the federal Natural Resource Damage Trustees or otherwise available to the United States, whether collected by BPXP independently or cooperatively with the Natural Resource Damage Trustees; and (2) environmental chemistry, toxicity, and wildlife data collected in connection with the Response not already provided or otherwise available to the United States.  BPXP is in the process of meeting and conferring with the United States regarding the production of raw data.  Subject to a reciprocal agreement with the United States, BPXP is willing to produce responsive environmental data in the highest form of completed processing and quality assurance/quality control available and, if laboratory chemistry data is available only in raw, unvalidated form, to produce such data subject to a mutually acceptable and reciprocal agreement with the United States.

19.    Provide all documents relevant to the impact, effect, or seriousness of the Incident, Response, or the efforts of the Defendants to minimize or mitigate the effects of their discharge on human health, including, but not limited to: (1) documents related to any medical claims made by private parties to BP, including investigation of those claims, correspondence, settlement, payments etc. under any framework, including but not limited to the BP claims facility, the oil spill trust, the GCCF, the  Medical Benefits Settlement, or settlements with rig workers or families of rig workers; (2) any documents related to any analysis conducted by BP regarding the impact, effect or seriousness of the Incident, Response and spill on human health; and (3)  the "Medical Encounters" and  "Injury and Illness" databases, as well as the underlying Information from which these databases were created.

**OBJECTIONS:**

BPXP objects to Request for Production No. 19 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is not relevant to the claims or defenses of any party.  BPXP further objects to this request on the grounds that the United States' use of the phrase "private parties" is vague, ambiguous, and undefined.  BPXP also objects to this request to the extent it calls for information that will be the subject of expert analysis and opinion and calls for BPXP to disclose expert testimony prior to the schedule determined by the Court. Furthermore, BPXP objects to the request for documents relating to medical claims made by individuals as overly broad, unduly burdensome, and duplicative.  Stipulations concerning human health have been proposed by the parties, including stipulations regarding claims.  The information sought through requested documents is duplicative of information to which the parties may stipulate if progress is made on agreement to proposed stipulations.  BPXP further objects to this request on the grounds that it calls for the production of documents that it may not be able to produce due to privacy, confidentiality, and Health Insurance Portability and Accountability Act ("HIPAA") restrictions.  BPXP also objects to the extent this request calls for documents that are publicly available or otherwise accessible to the United States.

**RESPONSE:**

Subject to and without waiving its specific and general objections, and depending on the progress and results of forthcoming meetings regarding stipulations concerning human health, BPXP may conduct a reasonable search, to the extent such documents are not available to the United States and to the extent such documents are in the possession, custody, or control of BPXP, for: (1) non-privileged documents that do not contain private or confidential information,

or other information protected under HIPAA, related to certain medical claims made by individuals as a result of the Spill; and (2) non-privileged documents that do not contain private or confidential information, or other information protected under HIPAA, related to any analysis conducted by BPXP regarding the impact, effect, or seriousness of the Incident, Response, and Spill on human health.  Based on communication with the Department of Justice, BPXP expects to be able to target this search, and discussions will be ongoing regarding the extent and nature of the claims information sought.  BPXP may also conduct a reasonable inquiry, depending, again, on the progress and results of forthcoming meetings regarding stipulations concerning human health, to determine whether any segments or information from the "Medical Encounters" and "Injury and Illness" databases can be produced without private, confidential, and other HIPAA-protected information.

20.    Provide all documents used by BP to evaluate the economic impact of the Spill on the economy of the Gulf States and the United States as a whole, excluding documents related to specific claims submitted as part of the Economic and Property Damages settlement.

**OBJECTIONS:**

BPXP objects to Request for Production No. 20 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects to this request to the extent it calls for the production of documents that are publicly available or otherwise accessible to the United States.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will undertake a reasonable search for non-privileged documents not already available to the United States that

BPXP used to evaluate the impact of the Spill on the economies of the Gulf States and the United States.

21.     Provide all documents related to any fact that BP contends that the court should consider in connection with the penalty factor "any other matters that justice may require."

**OBJECTIONS:**

BPXP objects to Request for Production No. 21 on the grounds that it is overly broad and unduly burdensome.  BPXP further objects to the extent this request calls for documents that are publicly available or otherwise accessible to the United States.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP directs the United States to its responses to Interrogatories 3, 4, 5, 7, and 8.  In addition, BPXP will produce any non-privileged, non-publicly available documents cited in those responses and will conduct a reasonable search for non-privileged documents not already available to the United States supporting its contentions with respect to the "any other matters that justice may require" penalty factor.

22.     Provide all documents identified in response or relating to any contention set forth in response to any of the United States' Penalty Phase Interrogatories or Requests for Admission and rebutting, refuting, or calling into question any aspect of any factual contention BP intends to proffer at trial in the Penalty Phase.

**OBJECTIONS:**

BPXP objects to Request for Production No. 22 on the grounds that it is overly broad and unduly burdensome.  BPXP further objects to the extent this request calls for documents that are publicly available or otherwise accessible to the United States.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP will conduct a reasonable search for non-privileged, responsive documents not already available to the United

States.  BPXP also refers to its responses to the specific interrogatories and requests for admission.

23.     Provide the audit, report, recommendations, and findings of the Task Force convened to provide the Grangemouth Complex Director with prioritized actions and recommendations for changes to site procedures and organization as a result of a power failure, steam line rupture, and fire on the Fluidised Catalytic Cracking Unit that occurred at the Grangemouth complex in May and June 2000.

**OBJECTIONS:**

BPXP objects to Request for Production No. 23 on the grounds that it is vague, ambiguous, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  BPXP further objects to this request on the grounds that it purports to seek information in support of the United States' contentions related to "any history of prior violations," as the United States previously represented to the Court and the parties that it would not affirmatively seek discovery in connection with its contentions concerning this penalty factor: "And on none of [the prior violations] are we proposing to take discovery from the defendants."  March 21, 2014 Hr'g Tr. at 20:10-15.  BPXP also objects to this request to the extent it seeks documents previously produced in Phase One and/or Phase Two.

## INTERROGATORIES

1.     Identify the members of the Boards of Directors and officers of BPXP, BP America Production Company, BP Company North America Inc., BP Corporation North America Inc., BP America Inc., BP Holdings North America, and BP plc, for each year 2008-2014.

**OBJECTIONS:**

BPXP objects to Interrogatory No. 1 on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence.  BPXP also objects to this interrogatory to the extent it seeks information that is publicly available.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP refers the United States to the document showing the officers and directors of BPXP that BPXP will produce in response to Request for Production No. 7.

2.      Identify which BP corporate entity, employed and paid the following persons: Tony Hayward, Robert Dudley, Andrew Inglis, Lamar McKay, Douglas Suttles, James Dupree, David Rainey, Kevin Lacey, Brian Morel, Mark Hafle, Bret Cocales, John Guide, Robert Kaluza, Don Vidrine, Trevor Hill, Mike Mason, and David Sims for each year, for each year, 2010-2011.

**OBJECTIONS:**

BPXP objects to Interrogatory No. 2 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information not relevant to the claims or defenses of any party.

3.      Identify each of the "substantial voluntary monetary commitments" referenced in BP's submission to Magistrate Judge Shushan of March 3, 2014 and state the basis for your contention that such commitments "improved public health, the environment and the economies of" the Gulf States.

**OBJECTIONS:**

BPXP objects to Interrogatory No. 3 on the grounds that it is overly broad, unduly burdensome, and purports to require BPXP to provide a complete and exhaustive list of each and every substantial voluntary monetary commitment undertaken as part of BPXP's efforts during the Response.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that it has made numerous substantial voluntary monetary commitments to the Gulf States that have improved public health, the environment, and the economies of those States.  Many of these monetary commitments are detailed in the proposed stipulations that BPXP has provided to the United States in this matter, including BPXP's Proposed Stipulated Facts Concerning Its Efforts

to Minimize and Mitigate the Effects of the *Deepwater Horizon* Spill ("Mitigation Stipulations"), Proposed Stipulated Facts Concerning Claims Activity ("Claims Stipulations"), Proposed Stipulated Facts Concerning BPXP's Positive Impact on the Economy and Community, and Proposed Stipulated Facts Concerning the Status of Human Health Following the *Deepwater Horizon* Incident ("Health Stipulations").  For example:

a) In August 2010, BPXP established a $20 billion trust fund to pay legitimate claims for damages, response costs, and other costs associated with the Spill.  Between April 20, 2010 and January 31, 2014 BPXP has paid: (1) more than $11 billion to individuals and businesses through various claims processes, and (2) approximately $1.5 billion to state and federal government entities, including advances, claims, and settlements.  Claims activity is described in greater detail in BPXP's proposed Claims Stipulations.

b) BPXP has spent more than $14 billion on Response and cleanup activities in connection with the *Deepwater Horizon* Incident and Spill.  This $14 billion includes block grants that BPXP advanced to state and local governments to cover costs associated with responding to the *Deepwater Horizon* Incident and Spill.  BPXP funded other initiatives as detailed in BPXP's proposed Mitigation Stipulations.  For example, BPXP helped support the seafood industry by paying or committing to pay $82 million to Alabama, Florida, Louisiana, and Mississippi for state-led seafood testing and marketing programs, including a commitment to provide $48.5 million over three years to the States to develop programs to promote Gulf seafood along the coast and around the country.  As another example, BPXP committed $179 million for the promotion of tourism in the Gulf States, including direct payments to States and local communities.

c) BPXP voluntarily committed $1 billion to fund early restoration projects through an Early Restoration Framework Agreement with the state and federal Natural Resource Trustees. As of early 2014, BPXP and the Trustees have reached agreements or agreements in principle on 54 early restoration projects, totaling approximately $698 million.  As of early 2014, 10 projects totaling $71 million have been approved, and the parties have agreed in principle to an additional 44 projects totaling approximately $627 million.  With respect to the 44 projects agreed to in principle, 28 projects were announced in the Federal Register on May 6, 2013, total approximately $594 million, and include numerous ecological and recreational-use projects in all five Gulf States.  On December 6, 2013, the Trustees announced the parties' agreement in principle for 16 early restoration projects to address recreational uses in Florida, at an estimated cost of approximately $33 million.  These efforts are described in more detailed in BPXP's proposed Mitigation Stipulations.

d) BPXP voluntarily committed $500 million over a ten-year period to support independent research through the Gulf of Mexico Research Initiative ("GoMRI"), an independent research program, to study the effect, and potential impact of hydrocarbon releases on the environment and public health and to develop improved spill mitigation technologies.

e) BPXP committed $360 million to the Coastal Protection and Restoration Authority of Louisiana in May 2010.  Approximately $260 million was spent on berm construction seaward of the barrier islands in Louisiana, and the remaining $100 million was spent on barrier island restoration projects.

f) In July 2010, BPXP established a $100 million rig worker assistance fund through the Baton Rouge Area Foundation to support unemployed rig workers.

g) Among the many initiatives and grants BPXP provided to monitor and treat health concerns in connection with the Incident, Spill, and Response, in August 2010, BPXP provided $52 million to federal and state health organizations to fund behavioral health support and outreach programs across the Gulf States.  These efforts are detailed in BPXP's proposed Health Stipulations.

h) BPXP donated its net revenue from the sale of oil recovered from the Macondo well—$22 million—to the National Fish and Wildlife Foundation, which used the funds for projects to protect natural resources in the Gulf States.

i) BPXP committed $15 million to fund a project to fill in erosion on Dauphin Island resulting from Hurricane Katrina (a.k.a. the Katrina Cut) with rocks and other material.  This was proposed by the State of Louisiana as a Response effort.  BPXP followed through on funding the project even though it did not begin until after the well was capped and there was no longer oil on the water that posed a threat of shoreline oiling to the area.

In addition to the handful of specific voluntary monetary contributions described above, BPXP has supported and continues to support the health, environment, and economies of the Gulf States through numerous other large and small-scale efforts including grants, initiatives, contributions, and donations.   BPXP's efforts, and the effectiveness of those efforts in promoting the environment, human health, and the economy of the Gulf States, have been recognized by U.S. government, state and local officials in numerous publicly available reports, submissions, and statements, as well as in other documents already produced and/or to be produced as part of the MDL 2179 proceedings.   BPXP reserves the right to present additional evidence regarding its substantial voluntary monetary commitments and the effectiveness of those commitments in promoting the environment, human health, and the economy of the Gulf

States through the presentation of additional evidence, including through the production of documents relating to BPXP's initiatives and expert discovery.

4.     Identify each "technological achievement[] and industry leading safety advancement[]" referenced in BP's submission to Magistrate Judge Shushan of March 3, 2014 and state the basis for your contention that such achievements and advancements "were substantial, innovative and highly valuable and have improved standards in other companies throughout the industry."

**OBJECTIONS:**

BPXP objects to Interrogatory No. 4 on the grounds that it is overly broad, unduly burdensome, and purports to require BPXP to provide a complete and exhaustive list of each and every technological achievement and industry leading safety advancement developed in connection with the Response.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that numerous technological achievements and industry leading safety advancements were developed during and as a result of the Response that were substantial, innovative, and highly valuable, and have improved standards throughout the industry.  These technological achievements and other advancements, some of which are the subject of pending patent applications, are described in several government and industry publications, such as the On-Scene Coordinator Report for the *Deepwater Horizon* Oil Spill (the "FOSC Report," TREX 9105); the Incident Specific Preparedness Review for the *Deepwater Horizon* Oil Spill (the "ISPR," TREX 9124); *Deepwater Horizon* Containment and Response: Harnessing Capabilities and Lessons Learned (TREX 6113); and *Alternative Response Technology Program for the* Deepwater Horizon *in the Gulf of Mexico—An Overview*, Michael J. Cortez and Hunter G. Rowe; the many presentations given by BP personnel around the globe sharing advancements in deepwater and response capabilities developed during and as a result of the Response; as well as other documents already produced

and/or to be produced as part of the MDL 2179 proceedings. Some examples of these innovations include advancements in the following areas:

### 1) Collaboration

A broad range of stakeholders came together in the wake of the *Deepwater Horizon* Incident to provide effective solutions and build new capabilities. As a result of this extensive collaboration, the industry and the nation as a whole now have these capabilities available, including greater familiarity and strengthened relationships among industry, government, and responders; a network of seasoned experts and support personnel drawn from around the world; and an expanded and proven roster of suppliers and vendors with specific capabilities.

### 2) Organizational Capabilities

BPXP, together with the Unified Command, developed and expanded extensive systems, procedures, and organizational capabilities to advance work flow, improve coordination, focus efforts, and manage risks as part of the Response. Some of these new, modified, or expanded systems included the expanded use of visual 4D planning for complex surface and subsea operations and advancements in simultaneous operations ("SIMOPs"), including an offshore SIMOPs director position, staffed 24/7 to oversee and safely coordinate the movements of highly complex operations. The Response also advanced new systems, protocols, and organizational capabilities, such as expansion of the Branch Office Structure within the Incident Command Posts to facilitate efficient operations across a large geographic area and to engage with local communities (including as part of the Vessels of Opportunity program), and improved supply chain management. The adoption of these and other systems created new capabilities available to future spill response efforts.

### 3)      Information-Sharing Advancements

BPXP, together with the Unified Command, took advantage of cutting-edge tools to manage information-sharing inside the Unified Command and externally, to improve decision making and coordinate complex activities such as SIMOPs.  Examples of the countless state-of-the-art information capabilities developed during the Response include:  deployment of a range of information tools in SIMOPs; creation of a Common Operating Picture, which created an integrated view across more than 200 previously disparate data types, enabling rapid, coordinated decision-making; development of common communication tools; training responders to "know your oil," to understand the characteristics of surface oil and its movement, distinguish the type of oil, and identify appropriate responses; and the Alternative Response Technology Program, through which more than 120,000 response ideas were received.

### 4)      Containment and Collection Technologies

BPXP developed subsea drilling and containment technologies as part of the Response.[3] The resulting capabilities available for deployment include, for example: new equipment for use in the event of a future subsea blowout (including capping stacks and transition spools, fluid transfer systems and methods, connections between the wellhead and capping stack, collection devices, free standing risers and collection systems, specialized tools to work at depth to remove and install well-capping equipment, and ROV advancements); new SIMOPs methods (including innovative use of dynamic positioning technology and planning tools); and development of new techniques and methods to approach a subsea blowout (including demonstrated techniques to minimize hydrates, protocols for system-integration tests and diagnostic-pressure measurements, the creation of a closed system to control a source at 5,000 foot depth, and the conversion to

---

[3] Though Source Control issues were addressed during the Phase Two trial, certain subsurface and other containment and collection technologies and advancements were made during the Response that are responsive to Interrogatory No. 4 and may relate to issues presented during the Penalty Phase trial.

standardized components for tool inter-changeability).   In addition, BPXP, together with the

Unified Command, put existing technology to innovative use for purposes of subsea operations

and hydrocarbon collection, processing, offloading, and flaring.   The resulting capabilities

available for future deployment include advanced knowledge regarding the use of flexible

multipurpose vessels to accommodate these varied tasks.   These technological achievements

were also addressed in testimony presented during the Phase Two trial, including for example,

testimony from Trevor Smith, Mark Mazzella, and James Dupree, and in BP's Phase Two

Findings of Fact and Conclusions of Law (Rec. Doc. 12047) *see e.g.*, Section II.B.2(g).

     **5)**     **Response Technologies**

BPXP, together with the Unified Command, developed several innovative advancements

in spill-response technologies, tools, equipment and processes.   For example, BPXP helped to

develop technological and other advances in the areas of: (1) shoreline cleanup and assessment

(including mechanical cleanup tools such as the Sand Shark, advanced use of Shoreline Cleanup

Assessment Technique methods, updated mapping of the shape and characteristics of thousands

of miles of ever-changing coastline, and cleaning oil from marsh shorelines through the use of

innovative tools);  (2) booming  (including  boom-placement  technologies  and  boom-cleaning

tools such as the Boom Blaster and Yates Boom Cleaner); (3) skimming (including the Big Gulp

Skimmer and Rapid Attack Tactic Pack skimming fleet concept); (4) *in situ* burning (including

development of field-tested fire boom and new techniques and protocols for use in burning);

(5) separation of oil and water (including Ocean Therapy oil-water separator); (6) surveillance

(including sonar, radiography, and acoustic detection methods); (7) wildlife protection (including

new  systems  to  closely  integrate  wildlife  teams  into  the  overall  response  effort  and  new

procedures for the protection of sensitive nesting areas); (8) submerged and residual oil detection

tools (such as the Laser Fluorometer Submerged Oil Detection ("Oscar")); (9) water and air quality testing methods (including a streamlined system to acquire, process, and interpret geophysical data in less than 24 hours); (10) dispersant application innovations (such as subsea injection of dispersant at the source, using newly engineered tools, testing of alternative subsea dispersant mechanisms such as subsea bladders and Subsea Autonomous Dispersant Injection, and advancements for aerial dispersant application, monitoring, and effectiveness); and (11) technological advances for on-shore response support activities (such as data management, storage, and processing; tactical communications, waste management, and recycling innovations; and decontamination of equipment and vessels used in the Response as well as sand-cleaning innovations).

### 6)   Industry Leading Safety Advancement

Since the Incident, BPXP has worked to enhance safety through efforts relating to spill response planning and operations in several ways. These efforts are described in documents that are publicly available or already accessible to the United States, as well as documents already produced or to be produced as part of the MDL 2179 proceedings, including efforts with the United States and international industry associations.

In addition to these technological, safety, and organizational advancements developed as part of the Response, BPXP is supporting continued research and development through, among other things, funding research through GoMRI, which as described above is an independent research program committed to studying the effect of hydrocarbon releases on the environment and human health and the development of improved spill mitigation technologies.

BPXP reserves the right to present additional evidence regarding the numerous technological and other advancements that were developed during and as a result of the

Response that were substantial, innovative, highly valuable, and have improved standards throughout the industry, including through the production of documents relating to BPXP's technological, safety, and organizational advancements and through expert discovery.

5.     Identify each "effort[] to improve deepwater drilling safety since the *Deepwater Horizon* incident," referenced in BP's submission to Magistrate Judge Shushan of March 3, 2014.

## OBJECTIONS:

BPXP objects to Interrogatory No. 5 on the grounds that it is overly broad and unduly burdensome to the extent it purports to require a complete and exhaustive list of each specific effort to improve deepwater drilling safety since the *Deepwater Horizon* Incident.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP states that it has engaged and participated in numerous efforts to improve deepwater drilling safety since the *Deepwater Horizon* Incident.  Some of these efforts are described in greater detail in publicly available documents, as well as documents already produced or to be produced as part of the MDL 2179 proceedings.  Many of the efforts to improve the safety of deepwater drilling have also been proactively shared with industry and government.  Some illustrative examples of BPXP's efforts specifically aimed at improving the safety of deepwater drilling operations include but are not limited to:

### 1)     Enhanced Written Standards

BPXP has taken part in BP's progress developing various rigorous written standards by developing and applying new and revised engineering technical practices (ETPs) for well barriers, and implementing these standards.

### 2) Additional Technical Expertise

BPXP has taken part in efforts to strengthen technical expertise and competency in key areas relating to deepwater drilling operations.  In addition to strengthening technical expertise, there have been efforts to strengthen competency through the continued development of process safety training for wells engineering and operations engineers and competency assurance programs for key operational leadership positions.

### 3) Houston Monitoring Center

BPXP developed a new, state-of-the-art monitoring center in Houston, providing additional 24/7 support for every offshore rig conducting drilling operations in the Gulf of Mexico.  This Collaborative Real-Time Environment provides information feeds and instant communication between rigs in the Gulf and experts on shore.  Although the driller and mudlogger retain responsibility for monitoring the well, the Houston Monitoring Center provides an extra set of eyes viewing data from the rig.  By monitoring data from each rig and providing support to offshore teams, the risk in drilling operations can be further reduced.  BPXP is providing BSEE inspectors access to this facility for use in monitoring activities from shore.

### 4) Global Wells Institute

BPXP has taken part in the development of a Global Wells Institute, which offers courses in areas such as applied deepwater well control, drilling engineering and well site leadership. The Global Wells Institute incorporates a simulator facility and an applied deepwater well control course where drilling personnel, including contractors, can work together and practice a variety of well-control situations.  The Global Well Institute's training facility in Houston, Texas has received accreditation by the International Association of Drilling Contractors' Well Control

Accreditation Program and the International Well Control Forum to teach "Drilling Well Control – Supervisor Level – Surface & Subsea BOP Stacks."

**5)      Sharing of Lessons and Safety Enhancements**

BPXP has been and continues to be committed to sharing the lessons and improvements that it has identified with industry and government in an effort to improve deepwater drilling safety throughout the industry.  For example, BPXP has been an active participant in industry efforts to improve offshore drilling safety.  In March 2011, the industry created the Center for Offshore Safety.  A BPXP executive serves on the Center's Board, and BPXP has helped lead several of the Center's safety initiatives.  Additional efforts include working closely with the API to incorporate lessons learned throughout the industry, and actively participating in efforts such as industry task forces created by the API in response to the *Deepwater Horizon* accident that were charged with identifying ways to improve offshore drilling safety.   BPXP also works closely with and supports the efforts of the Ocean Energy Safety Institute ("OESI") and the Mary Kay O'Conner Process Safety Center.   More information on the OESI can be found at: http://www.bsee.gov/BSEE-Newsroom/BSEE-Fact-Sheet/FACT-SHEET--Ocean-Energy-Safety-Institute/.

In addition to the foregoing specific examples, BPXP has taken part in fundamental organizational changes and other initiatives aimed at providing an even greater emphasis on accountability, uniformly high safety standards, systematic operating procedures, and enhancements to contractor management and oversight throughout all business divisions.

6.      Identify each penalty obtained against other companies and each environmental incident referenced in BP's submission to Magistrate Judge Shushan of March 3, 2014, and how you contend the penalty in this should be "calibrated" to the penalty to be imposed for BPXP's violations of the Clean Water Act.

**OBJECTIONS:**

BPXP objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and calls for legal argument and conclusions.  The factual bases behind BPXP's contentions (penalties assessed against other companies both with respect to this incident and in other matters) are matters of public record.  Furthermore, the request for identification of specific penalties is not an appropriate interrogatory because the reports of the assessment of such penalties are analogous to the precedential case law upon which a party relies in support of its legal arguments.  Finally, BPXP's pure legal argument concerning these precedents is likewise not an appropriate subject of interrogatories, but instead will be the subject of later briefing.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that information concerning the civil penalties assessed under Section 311 of the Clean Water Act against other companies with respect to the *Deepwater Horizon* incident is part of the record in these proceedings and is the subject of a stipulation among the parties.  Information concerning civil penalties assessed under Section 311 of the Clean Water Act with respect to other incidents, and, to the extent relevant, information with respect to penalties assessed under other environmental laws in other matters, is also a matter of public record, and indeed is published by the United States Government on its own websites and in its own publications, including the website and publications of the Environmental Protection Agency, for example, the EPA's website at http://cfpub.epa.gov/compliance and

http://www.epa.gov/compliance/data/results/annual/.  Information concerning penalties awarded

by courts in other cases is available on some or all of the standard legal research tools, including

PACER, Lexis, Westlaw, the *Federal Reporter* and the *Federal Supplement*.

      7.     Identify each "action or decision" taken or made by the United States referenced
in BP's submission to Magistrate Judge Shushan of March 3, 2014 and state whether and how
each such action "made BPXP's remediation and response efforts less effective, and thereby
increased BPXP's potential liabilities for the Incident."

## OBJECTIONS:

      BPXP objects to Interrogatory No. 7 to the extent it seeks information that is already in

the possession, custody, or control of the United States or is equally available to the United

States as to BPXP.  BPXP further objects to this request to the extent it calls for information that

will be the subject of expert analysis and opinion and calls for BPXP to disclose expert testimony

prior to the schedule determined by the Court.

## RESPONSE:

      Subject to and without waiving its specific and general objections, BPXP states that

certain actions or decisions taken or made by the United States made BPXP's remediation and

response efforts less effective and thereby increased BPXP's potential liabilities for the Incident.

For example:

### 1)     Limitations on Dispersant Applications

      The United States and the oil industry have identified and supported dispersants as a key

oil spill response tool and evidence from spills treated with dispersants shows that dispersion of

oil can reduce overall environmental impacts by reducing oil impacts at the sea surface and

shore.  Nonetheless, on May 24, 2010, the Environmental Protection Agency ("EPA") instructed

BPXP to "take immediate steps to significantly scale back the overall use of dispersants," and on

May 26, 2010, the Federal On Scene Coordinator ("FOSC") directed BPXP to eliminate the

surface application of dispersants except in rare cases where approved by the FOSC, on days when weather and sea conditions limited the effectiveness of skimming or controlled *in situ* burns, or when slicks were headed toward land and alternative response methods would not be able to combat the slick in time.  The United States' directive to limit the surface application of dispersants and resulting restrictions and delays in approving the surface application of dispersants caused Oil-Related Materials to reach and impact Gulf Coast shorelines to a greater extent and degree than would have been had such limitations not been imposed.

### 2)       Shoreline Impact and Recovery

The United States failed to exercise its authority over shoreline cleanup in certain instances during the Response, precluding BPXP from employing the most effective cleanup methods and permitting the Gulf States to compound the effects of the Spill.  For example, the United States did not exercise its authority to direct Response operations when the States of Florida and Alabama prohibited BPXP from utilizing surf washing, an effective response technique, or when the State of Louisiana placed restrictions on BPXP's ability to employ mechanical recovery methods on Fourchon Beach.  The United States' failure to exercise its authority hindered BPXP's ability to effectively clean the Gulf shorelines.

Moreover, the United States permitted the Gulf States to engage in certain shoreline protection and oil recovery efforts that compounded damage to the shoreline.  For example, the State of Louisiana was allowed by the FOSC to conduct a protracted monitoring program of the marshes at Middle Ground Shoal long after it was likely that the program would result in recovery of actionable oil and despite a recommendation by NOAA's Scientific Support Coordinator to remove Middle Ground Shoal from the Response.  Frequent visits possibly exacerbated the damage to that marsh.  In addition, the United States failed to exercise its

authority to prevent further deep cleaning on West Dauphin (West Point) Island, Alabama, despite BPXP's recommendation not to conduct deep cleaning in the potentially sensitive habitat, the U.S. Fish & Wildlife Service's demand that cleanup cease because of potential damage to that habitat, and the conclusion of a Net Environmental Benefit Assessment ("NEBA") conducted in 2011 that found that natural attenuation was the optimal response.

The United States also failed to exercise its authority to compel landowners and Gulf States to grant BPXP access to certain shoreline that BPXP sought to treat, including but not limited to shoreline on property owned by the Wisner Donation. Furthermore, in Barataria Bay, the United States precluded BPXP from treating various treatment test plots, or "set-asides," in a timely fashion, thereby possibly compounding the damage to the marshes.

### 3)  Louisiana Berm Project

The United States approved certain state-proposed projects, such as the Louisiana offshore barrier berms project (the "Louisiana Berms Project"), that did not effectively mitigate the Spill's impact and instead diverted resources away from other Response initiatives that could have more effectively mitigated the effects of the Spill. On May 11, 2010, the Coastal Protection and Restoration Authority ("CPRA") of Louisiana applied for an emergency permit to construct offshore sand barrier berms to "enhance the capability of the islands to reduce the inland movement of oil from the Deepwater Horizon Oil Spill." The Louisiana Berms Project involved the construction of massive and costly linear sand barrier systems, seaward of the coast, adjoining or extending existing barrier islands. The Department of the Interior and the EPA, among other federal agencies, expressed skepticism that the berms would be constructed in time to be effective for oil spill response, and various federal agencies highlighted potential adverse impacts, including the dredging operations necessary for the Louisiana Berms Project, the

project's potential to introduce immediate and long-term oil contamination into the environment near the berms, the potential negative effects on endangered and other protected species and habitats, and the potential impact of the berms on the circulation of water, sediment, and salinity in the coastal environment.   Nonetheless, the United States approved the implementation of a portion of Louisiana's berm project proposal.  The Louisiana Berms Project was not an effective spill response measure.   The decision to allocate resources to the Louisiana Berms Project diverted resources from spill response efforts that could have more effectively mitigated the effects of the *Deepwater Horizon* Spill.

### 4)  Mississippi River Diversion

The United States failed to exercise its authority to prevent the diversion of the Mississippi River into the Gulf of Mexico by the State of Louisiana.   On April 29, 2010, Louisiana Governor Bobby Jindal announced that the Office of Coastal Protection and Restoration would begin the release of freshwater from the Mississippi River.  The State of Louisiana independently decided to open gates at diversion structures, including but not limited to the structures at Caernarvon and Davis Pond, to partially divert flow from the Mississippi River into marshes.  The United States did not exercise its authority to prevent the diversion, which likely resulted in negative impacts to the environment, including but not limited to impacts to oyster populations.

### 5)      Boom Placement

The United States directed and/or permitted the deployment and placement of boom in certain locations that funneled oil into sensitive marshes and compounded shoreline oiling, thereby reducing the effectiveness of the Response and increasing BPXP's potential liabilities for the Incident and Spill.

Moreover, certain of the actions or decisions taken or made by the United States that made BPXP's remediation and response efforts less effective are described in government documents and industry publications, such as the On-Scene Coordinator Report for the *Deepwater Horizon* Oil Spill (the "FOSC Report," TREX 9105); the Incident Specific Preparedness Review for the *Deepwater Horizon* Oil Spill (the "ISPR," TREX 9124); and interview notes taken by the Oil Spill Commission or U.S. Coast Guard, as well as other documents already produced and/or to be produced as part of the MDL 2179 proceedings. BPXP reserves the right to present additional evidence regarding the actions or decisions taken or made by the United States that made BPXP's remediation and response efforts less effective and thereby increased BPXP's potential liabilities relating to the Incident and Spill, including through expert discovery.

8.     Identify any actions that BPXP contends are Response Activities (as defined in BPXP's discovery requests) that were not conducted at the direction and under the oversight of the Unified Command, and for each such activity, describe the activity in detail, the persons or entities involved, the outcome or result of the activity, the cost associated with the activity (including any amounts paid by BPXP or other BP entities and Identifying those entities), and the reasons why such activity was not conducted at the direction and under the oversight of the Unified Command.

**OBJECTIONS:**

BPXP objects to Interrogatory No. 8 on the grounds that it is vague,  overly broad, unduly burdensome, unreasonable, and seeks information not relevant to the claims or defenses of any party.  BPXP further objects to this interrogatory on the grounds that the United States use of the phrase "cost associated with the activity" is vague and undefined.  BPXP also objects to this interrogatory to the extent it seeks information that is already in the possession, custody, or control of the United States or is equally available to the United States as to BPXP.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states that state

and local governments and other entities took actions in response to the Spill that were not conducted at the direction or under the oversight of the Unified Command.  For example, on April 29, 2010, Louisiana Governor Bobby Jindal announced that the Office of Coastal Protection and Restoration would begin the release of freshwater from the Mississippi River. The State of Louisiana independently, and without Unified Command approval, decided to open gates at diversion structures to partially divert flow from the Mississippi River into marsh lands. The diversion of the Mississippi River into the Gulf of Mexico likely resulted in negative impacts to the environment, including but not limited to impacts to oyster populations.

BPXP further states that, without Unified Command approval, the Louisiana National Guard and/or Lafourche Parish installed breach blocking/damming structures on property owned by the Wisner Donation at Fourchon Beach that were designed to block channels leading from the beach to the interior marsh.  The structures were not appropriate for their intended purpose. The breach structures had the unintended effect of driving oil downward and depositing sediment on top of the oil, effectively burying it.  Louisiana subsequently rejected BPXP's requests to utilize mechanical recovery to recover the buried oil.  Although the Parish obtained a permit for installation from Louisiana, neither the Parish nor National Guard made any effort to timely remove the structures, further compounding the damage.

BPXP also states that it described in its proposed Mitigation, Health, and Claims Stipulations several Response Activities that BPXP and others have undertaken to respond to, or otherwise mitigate or prevent the effects of, the Spill, some of which have been conducted outside the purview of the Unified Command. For example, as described in its proposed Mitigation Stipulations, BPXP advanced block grants to state and local governments; funded independent research through the Gulf of Mexico Research Initiative ("GoMRI"); provided

grants to the Gulf States for the promotion of tourism; funded environmental restoration projects, including early restoration projects through an Early Restoration Framework Agreement; and undertook other mitigation efforts.   Additionally, as set forth in BPXP's proposed Claims Stipulations, BPXP paid a total of more than $9.886 billion in claims between May 5, 2010, and June 30, 2013, to private individuals and businesses through the BP Claims Facility, the Gulf Coast Claims Facility, the transition process, the Court Supervised Settlement Program, and the BP Claims Program.

As additional examples, BPXP identifies without limitation the following actions, as set forth in BPXP's  Health Stipulations: recognition of the role of the States in the effort to address behavioral health issues and the critical need for behavioral health services and provided $42 million to state agencies to fund existing behavioral health support and outreach programs across the Gulf Coast region; provision of $10 million to the Substance Abuse and Mental Health Services Administration and other human health services organizations towards the assessment of possible behavioral health needs of Gulf Coast residents; agreement to provide benefits for those who participated in cleanup or resided in certain coastal and wetlands areas, including compensation for qualified Specified Physical Conditions, a Periodic Medical Consultation Program, and $105 million over five years to four projects under the Gulf Region Health Outreach Program; and commitment to fund up to $500 million over ten years to support research through GoMRI.  BPXP provided through GoMRI a $10 million block grant to the National Institutes of Health to expedite priority public health research.  BPXP also engaged in a variety of educational and public outreach efforts concerning human health in the aftermath of the Incident.   Moreover, certain of the Response Activities that were not conducted at the direction and under the oversight of the Unified Command, are described in several government

documents and industry publications, such as the On-Scene Coordinator Report for the *Deepwater Horizon* Oil Spill (the "FOSC Report," TREX 9105); the Incident Specific Preparedness Review for the *Deepwater Horizon* Oil Spill (the "ISPR," TREX 9124); and interview notes taken by the Oil Spill Commission or U.S. Coast Guard, as well as other documents already produced and/or to be produced as part of the MDL 2179 proceedings. BPXP reserves the right to present additional evidence regarding the actions or decisions taken or made by the United States that made BPXP's remediation and response efforts less effective and thereby increased BPXP's potential liabilities relating to the Incident and Spill, including through expert discovery.

## REQUESTS FOR ADMISSION

1.     Admit that BP entities other than BPXP provided resources including personnel and equipment prior to, during, and in Response to the Incident.

## OBJECTIONS:

BPXP objects to Request for Admission No. 1 on the grounds that it is vague, ambiguous, and overly broad to the extent that it requests that BPXP admit that BP entities provided resources "prior to" and "during" the Incident or the Response that were unrelated to the Incident or Response.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP states:

Admitted in part as follows. BPXP admits that it secured resources, including personnel and equipment, from third-party contractors and other BP entities to assist in BPXP's efforts to respond to, or otherwise mitigate or prevent the effects of, the Spill. As the OPA Responsible Party, BPXP bore the vast majority of the costs of the response personnel, equipment, and other

resources.  In that respect, BPXP utilized personnel and resources from certain of its corporate affiliates and compensated those affiliates, as it did third-party contractors.

2.      Admit that BP entities other than BPXP provided funding for costs prior to, during, and in Response to the Incident.

## OBJECTIONS:

BPXP objects to Request for Admission No. 2 on the grounds that the United States' use of the phrase "funding for costs" is vague, ambiguous, and undefined.  Read literally, this request relates to any "costs" incurred by any BP entity for any reason, whether relating to the Incident or otherwise.  BPXP further objects to this request to the extent it suggests that "funding" received by BPXP can be traced directly to Incident "costs" incurred by BPXP.  BPXP also objects to this request on the grounds that it seeks information not relevant to the claims or defenses of any party.

## RESPONSE:

Subject to and without waiving its specific and general objections, BPXP states:

Admitted in part as follows.  The vast majority of the BP liabilities relating to the Incident and Spill have been incurred by BPXP.  As of December 31, 2013 ("YE 2013"), BPXP has incurred gross liabilities of $46.7 billion relating to the Gulf Oil Spill, for payments already made and provisions for certain estimated future payments.  As of YE 2013, BPXP has received $5.5 billion in cash recoveries related to the Gulf Oil Spill, primarily as a result of settlements with Anadarko, Cameron International Corporation, MOEX USA Corporation, MOEX Offshore 2007 LLC, Weatherford U.S., L.P., and Weatherford International Inc.  As of YE 2013, the total amount of the $42.7 billion of BP Group liabilities, net of cash recoveries, related to the Gulf Oil Spill incurred by other BP entities, and not incurred by BPXP, was approximately $875 million.

# REDACTED

BPXP otherwise denies Request for Admission No. 2.

3.     Admit that if BPXP was required to pay an $18 billion civil penalty in this case, that BPXP could continue its business operations.

**OBJECTIONS:**

BPXP objects to Request for Admission No. 3 on the grounds that the phrase "continue its business operations" is vague, ambiguous, calls for information that will be the subject of further discovery and expert analysis and testimony under dates established by the April 21, 2014 scheduling order, and calls for a conclusion relating to one of the ultimate issues in the case.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

# REDACTED

4.     Admit that if BPXP was required to pay an $18 billion civil penalty in this case, that BP could continue its business operations.

**OBJECTIONS:**

BPXP objects to Request for Admission No. 4 on the ground that "BP" is not a defendant in this action.   BPXP is the only BP entity named as a defendant in the United States' Clean Water Act complaint against BPXP, the only BP Group entity potentially liable for a Clean Water Act civil penalty in connection with the Incident.   Accordingly, the request is not reasonably calculated to lead to the discovery of admissible evidence.

BPXP objects to Request for Admission No. 4 on the grounds that the phrase "continue its business operations" is vague and ambiguous, calls for information that will be the subject of further discovery and expert analysis and testimony under dates established by the April 21, 2014 scheduling order, and calls for a conclusion relating to one of the ultimate issues in the case.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

REDACTED

5.       Admit that BPXP is not an employing entity.[4]

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

---

[4] *See* BP Exploration & Production Inc.'s Memorandum In Opposition to the United States' Motion *In Limine* to Permit Relevant Evidence Concerning BP P.L.C. and Other BP Affiliates at 4, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, Plaisance et al. v. BP Exploration & Production, Inc.*, et al., No. 2:10-md-02179, 12-CV-968 (E.D. La. March 6, 2014), Rec. Doc. 12465). Responses of BP to EPA's Questions of October 12, 2012, filed as Exhibit 11 to Plaintiff United States' Motion *In Limine* to Permit Relevant Evidence Concerning BP P.L.C. and Other BP Affiliates, *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md- 02179 (E.D. La. Feb. 14, 2014), Rec. Doc. 12355-11 at 39.

Admitted as follows.  BPXP admits that, in conducting its operations, BPXP relies on certain payrolled employees of BP America Production Company ("BPAPC"), a separate legal entity incorporated in Delaware.  BPAPC's provision of employees and resources to BPXP is addressed in part by a Services and Agency Agreement between BPXP and BPAPC.  BPXP is charged, and BPAPC credited, for personnel costs associated with the work performed on BPXP operational assets by BPAPC payrolled employees.  Moreover, as the OPA Responsible Party, BPXP bore the vast majority of the cost of the response personnel and resources of other BP affiliates as well as third-party contractors.   In that respect, BPXP utilized personnel and resources from certain of its corporate affiliates and compensated those affiliates, although BPXP does not have its own directly payrolled employees.

6.      Admit that BP sold assets not owned by BPXP to help meet obligations arising from the Incident.

**OBJECTIONS:**

BPXP objects to Request for Admission No. 6 on the grounds that the United States' use of the phrase "sold . . . to help meet obligations" is vague and ambiguous.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

# REDACTED

# REDACTED

BPXP is the sole grantor of the *Deepwater Horizon* Oil Spill Trust ("Trust").  The Trust is not guaranteed by other BP entities.  The collateral provided pursuant to the Trust Agreement was provided by BPXP and consists of the assets of BPXP and its wholly owned subsidiary Verano Collateral Holdings LLC.

~~7.      Admit that the Oil Spill impacted many individuals, businesses and the environment around the Gulf, and that the Oil Spill resulted in the temporary closure of some areas of the Gulf of Mexico and adjacent lands, waters and wetlands.~~[5]

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

~~8.      Admit that some portions of the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the Gulf of Mexico were impacted by the Spill.~~[6]

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

~~9.      Admit that at the peak of shoreline oiling, at least 1,100 miles of the coast contained some oil.~~[7]

---

[5] ~~*See* BP Parties' Answer to Plaintiff's Amended Class Action Complaint for Private Economic Losses and Property Damages, *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179 ( E.D. La. May 7, 2012), Rec. Doc. 6453 at 8 (¶ 8).~~

[6] ~~*See* BP Parties' Answer to Plaintiff's Amended Class Action Complaint for Private Economic Losses and Property Damages, *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179 ( E. D. La. May 7, 2012), Rec. Doc. 6453 at 177 (¶ 269)).~~

[7] ~~*See* Declaration of Elliott Taylor, Ph.D. at ¶ 20, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, Plaisance et al. v. BP Exploration & Production, Inc., et al.*, No. 2:10-md-02179, 12-CV-968 (E.D. La. Aug. 13, 2012), Rec. Doc.7114-20.~~

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

~~10.      Admit that approximately 20,000 visits were made to available mobile medic stations by approximately 13,000 individuals.~~[8]

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

~~11.      Admit that approximately 70% of the persons visiting the available mobile medic stations individuals reported conditions identified in the Medical Benefits Class Action Settlement Agreement Specified Physical Conditions Matrix Agreement Table 1, Table 3 or Level A4.~~[9]

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

~~12.      Admit that the conditions and symptoms reported by the remaining 30% of the approximately 13,000 individuals who visited the available mobile medic stations consisted of trauma (e.g., cuts, lacerations, broken bones), musculoskeletal problems (e.g., back pain), routine care (e.g., routine checks of blood pressure and blood sugar), and other events generally unrelated to exposure to oil and/or dispersants or heat (e.g., cardiac events, stroke, and pre-existing conditions).~~[9]

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

~~13.      Admit that during the initial claims process established by BP under the dictates of and as required by the Oil Pollution Act of 1990, 33 U.S.C. §2701, *et seq.* ("OPA"), nearly $400 million in claims were paid.~~[9]

**RESPONSE:**

Withdrawn by the United States on April 18, 2014, pursuant to Court directive.

7.      Admit that on August 23, 2010, the claims process was transitioned to the Gulf Coast Claims Facility (GCCF) from which more than $6.3 billion was paid for claims to individuals and businesses.[10]

---

[8] ~~*See* Declaration of Dr. Jessica Herzstein at 8, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, Plaisance et al. v. BP Exploration & Production, Inc., et al.,* No. 2:10-md-02179, 12-CV-968 (E.D. La. Aug. 13, 2012), Rec. Doc.7112-7).~~

[9] ~~The BP Parties' Answer to the State of Louisiana's First Amended Complaint ¶1, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* No. 2:10-md-02179, related to 11-0516, 10-3059 (E.D. La. Dec. 14, 2011), Rec. Doc. 4907; see also 33 U.S.C. §2714.~~

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

Admitted as follows.  BPXP admits that the GCCF was established and began accepting claims on August 23, 2010, and that BPXP paid more than $6.3 billion through the GCCF to individual and business claimants.

8.     Admit that the Macondo Incident was an extremely serious violation.

**OBJECTIONS:**

BPXP objects to Request for Admission No. 8 to the extent that it seeks a legal conclusion to which no response is required.  BPXP further incorporates its legal arguments regarding its Clean Water Act liability as set forth in the current Fifth Circuit appeal from the February 2012 summary judgment ruling in this proceeding.

**RESPONSE:**

Subject to and without waiving its specific and general objections, BPXP states:

Admitted in part as follows.  BPXP admits that the Macondo Incident was a serious event that involved a spill that was declared a Spill of National Significance pursuant to the National Contingency Plan.  BPXP has previously stated that BP deeply regrets the tragic loss of life cause by the *Deepwater Horizon* blowout and explosion as well as the impact of the spill on the Gulf Region.  From the outset, BP has stepped up by responding to the Spill, paying legitimate claims, and helping to fund restoration efforts in the Gulf.  BPXP further states that the adverb "extremely" is a matter of opinion and conjecture, and that the degree of "seriousness" of the violation is a matter for the Court to determine as a part of the Penalty Phase trial.  BPXP otherwise denies Request for Admission No. 8.

---

[10] The BP Parties' Answer to Plaintiffs' Amended Class Action Complaint for Private Economic Losses and Property Damages ¶ Introduction, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179 (E.D. La. May 7, 2012), Rec. Doc. 6453.

## GENERAL RESPONSES AND OBJECTIONS

BPXP asserts the following objections to each of the United States' requests for production, interrogatories, and requests for admission, including the definitions and instructions associated therewith (collectively, "the United States' Discovery Requests").  These general objections are incorporated by reference into each specific response set forth by BPXP and are neither waived nor limited by any specific responses.

1.      To the extent the United States seeks the production of documents for the years 2005 to 2014, BPXP objects to the requests as overly broad, unduly burdensome, and inconsistent with the time frames imposed by the Court for Phase One and Phase Two discovery. Such requests have been deemed by Judge Barbier as overly broad as stated at the March 21, 2014, status conference (H'rg Tr. at 50:21-24).

2.      BPXP objects to the United States' Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the Penalty Phase of these proceedings, prior to the substantial completion of BPXP's efforts to identify and produce documents in response to other requests of the United States and other parties to the litigation.

3.      BPXP is the sole BP defendant in this action.  With respect to the penalty factor relating to the economic impact on the violator, BPXP objects to requests for documents relating to other BP entities, to the extent the documents are not relevant to the economic impact of the penalty on BPXP.  Documents relating to other entities are relevant to this penalty factor only to the extent that they also relate to the economic impact of the penalty on BPXP.

4.      BPXP objects to United States' Discovery Requests to the extent they seek documents or information relating to Phases One or Two of the litigation.  *See, e.g.*, Rec. Doc. 3354 ("No party may serve any party with any further Phase One RFPs, interrogatories, or RFAs

without leave of Court.").  Discovery for Phase One and Phase Two is complete, and the trial record for the Limitation and Liability Trial is closed.  BPXP expressly reserves the right to rely on discovery taken and the record developed in Phase One and Phase Two of the Limitation and Liability Trial.

5.      BPXP objects to the United States' Discovery Requests to the extent they are compound and contain multiple subparts that should be counted as separate requests.  The Court expressly limited the United States to 50 requests for production and interrogatories, to be allocated between BPXP and Anadarko at the United States' discretion, and 18 requests for admission.  Rec. Doc. 12688.  The United States' Discovery Requests exceed these Court-imposed limitations through its use of compound and multi-part requests.

6.      BPXP objects to the United States' Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

7.      BPXP objects to the United States' Discovery Requests to the extent they call for the production of ESI in any manner other than required under Federal Rule of Civil Procedure 34, the Rules and Orders of this Court, and ongoing negotiations and discussions among counsel.

8.      BPXP objects to the United States' Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint-defense or common-interest privilege, or any other applicable privilege, exemption, or immunity.  BPXP will identify specific documents withheld on these grounds in accordance with the schedule set forth in, and provide the information required by, the Court's Pretrial Order No. 14, and such further Orders of the Court and ongoing negotiations and discussions among counsel.  BPXP incorporates its forthcoming privilege logs and all related information into this

general objection to the extent necessary to preserve against any waiver of any applicable privilege or immunity from discovery.

9.      BPXP objects to the United States' Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and discovery of such information would be prejudicial to the efforts of BPXP and any opposing parties to resolve their disputes in a fair and efficient manner.

10.      BPXP objects to the United States' Discovery Requests to the extent they call for information or documents not within BPXP's possession, custody, or control, including but not limited to the documents of BPXP's affiliates.  All responses are made on behalf of BPXP only, and are limited to information and documents within BPXP's possession, custody, or control.

11.      BPXP objects to the United States' Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overly broad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

12.      BPXP objects to the United States' Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BPXP

facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

13.     BPXP objects to the United States' Discovery Requests as premature to the extent they call for expert discovery or seek information or documents that may not be identified until all fact and expert discovery is complete.

14.     BPXP objects to the United States' Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

15.     BPXP objects to the United States' Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the Marine Board of Investigation, and the protections of the Health Insurance Portability and Accountability Act, or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

16.     BPXP objects to the United States' Discovery Requests to the extent they seek documents already in the possession of the United States or equally available to the United States from sources other than BPXP, including publicly available sources.

17.     BPXP objects to the United States' "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  BPXP further objects to, and will read and respond

to, the United States' "Definitions" and "Instructions" (labeled to correspond to the United States' list) as follows:

(1, 2, 3, 4, 5, 6, 7, 8, 9) The United States' definitions of "Anadarko," "BP," "BP Exploration & Production Inc.," "BP America Production Company," "BP Company North America Inc.," "BP Corporation North America Inc.," "BP America Inc.," "BP Holdings North America," and "BP p.l.c." or "BP plc" are vague, overly broad, and confusing.  BPXP will read and respond to the United States' requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(10)    The United States' definition of "Communication" is vague and overly broad; it includes practically everything written or spoken by any person, regardless of whether it was actually communicated in any meaningful sense.  BPXP will read and respond to the United States' requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.  BPXP further objects to the specific inclusion of "oral conversations" and "meetings among the officers, board members, employees or other representatives of any defendant" within the definition of "communication."

(11)    The United States' definition of "Computer" is vague and overly broad; it includes every device that processes or stores information, including any number of things that no person would reasonably conclude constitutes a computer, such as a clock, voice recorder, camera, or cell phone.  BPXP will read and respond to the United States' requests with the understanding that the term "computer" means a mainframe, desktop, laptop, or tablet computer.

(12)    The United States' definition of "Consolidating financial statements" is vague and overly broad; it includes practically every financial document generated by a company.  BPXP

will read and respond to the United States' requests with the understanding that the term "consolidating financial statements," in the context of a subsidiary, means that subsidiary's income statement, balance sheet, and statement of cash flows.

(13)    The United States' definition of "Control" is improper to the extent it seeks to impose any obligation on BPXP beyond that imposed under Federal Rule of Civil Procedure 34(a)(1).  BPXP will read and respond to the United States' requests with the understanding that the term "control" means "possession, custody, or control" as used in Federal Rule of Civil Procedure 34(a)(1).

(14)    The United States' definition of "Identify" is overly broad; it includes a request for detailed information far beyond whatever may be reasonably necessary to distinguish one individual, one document, or any ESI, from any other.  BPXP will read and respond to the United States' requests with the understanding that the term "identify" means, in the context of an individual, an individual's name, and where the context reasonably requires, his or her employer and title, and in the context of a document or ESI, a Bates number or other available information necessary to isolate the document or ESI.

(16)    The United States' definition of "Incident" is overly broad.  BPXP will read and respond the United States' requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and the resulting sinking of, the *Deepwater Horizon*.  BPXP separately understands "the Spill" to mean the discharge of hydrocarbons that occurred in connection with the *Deepwater Horizon* Incident.

(17)    The United States' definition of "Information" is unobjectionable.

(18)    The United States' definition of "Lease" is unobjectionable.

(19)     The United States' definition of "Macondo Prospect" is vague and overly broad, particularly as the United States does not appear to use this phrase in its discovery requests.

(20)     The United States' definition of "Macondo Well" is vague and overly broad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.  BPXP will read and respond to the United States' requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

(21)     The United States' definition of "Material Transaction" is vague, ambiguous, and overly broad; it fails to define the term "transaction" or to specify the entity from whose perspective materiality is to be determined.

(22)     The United States' definition of "Person" is unobjectionable.

(23)     The United States' definitions of "Relating to," "referring to," regarding," "concerning," and "with respect to," are vague and overly broad; they render these and innumerable other words void of any independent meaning.  BPXP will read and respond to the United States' requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(24)     The United States' definition of "Response" is vague and overly broad.  BPXP will read and respond to the United States' requests with the understanding that this term includes actions taken beginning April 20, 2010 to respond to, or otherwise mitigate or prevent the effects of, the *Deepwater Horizon* Incident or Spill.

(25)     The United States' definition of "You" or "Your" is unobjectionable.

18.     These responses are made without waiving, in any manner, BPXP's right to object to the use of any information or documents provided in response to these requests at any trial or

evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

19.     To the extent BPXP states it will produce documents in response to the requests, BPXP will produce such documents on a rolling basis with such reasonable speed as BPXP can locate and process them, without sacrificing a meaningful review for responsiveness, privilege, and confidentiality, as this is the only feasible and physically possible method given the scope and breadth of the requests.

20.     Neither BPXP's agreement to produce documents, if any, nor BPXP's agreement to search for documents responsive to a request shall imply that responsive documents exist, or constitute BPXP's admission or acknowledgment as to the relevance or admissibility of any documents or as to the truth of any allegation or assumption contained in the requests.

21.     To the extent that BPXP responds that it will search for and produce responsive documents, BPXP is only undertaking to make a good-faith effort to conduct a reasonable search of non-privileged documents of the files and records of those individuals likely to have meaningful information responsive to a request as maintained in the ordinary course of business, and/or to apply a reasonable set of search terms, including those the parties have already agreed upon, to available collections of ESI as maintained in the ordinary course of business reasonably likely to yield a meaningful amount of information responsive to a request.  BPXP is not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of the BP entities' tens of thousands of employees and agents where any such items are not included within the results of a reasonable search as described above.

22.     Where documents are identified, BPXP incorporates into its response all similar documents, which are equally available to the United States via electronic searches of BPXP's production.

23.     BPXP's decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the document requests themselves, should not be construed as: (a) a stipulation that the material is relevant or admissible, (b) a waiver of BPXP's general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

24.     BPXP reserves the right to modify, amend, or supplement its responses, which are made based on the current status of its knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.

## <u>VERIFICATION</u>

I, Bill Kirton, an officer of BP Exploration & Production Inc., having undertaken a reasonable inquiry under the circumstances into the process by which the foregoing responses to interrogatories were compiled, hereby certify, under penalty of perjury, that, to the best of my knowledge, information, and belief, the foregoing responses to interrogatories accurately reflect the information available to BP Exploration & Production Inc. as specified therein.

State of Texas          :
                        :        ss.
County of Harris        :

Sworn and ascribed to before me
this 28th day of APRIL , 2014


Notary Public

LAURA M. RIDDLER
MY COMMISSION EXPIRES
May 11, 2015

Dated:  April 28, 2014                    Respectfully submitted,

   /s/ J. Andrew Langan

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

and

Don K. Haycraft (Bar # 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
*Attorneys for BP Exploration & Production Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 on this 28th day of April, 2014.

<u>   /s/ Don K. Haycraft   </u>
Don K. Haycraft