**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION: J |
| This Document Relates to: | HONORABLE CARL J. BARBIER |
| No. 12-CV-968 | MAGISTRATE JUDGE SHUSHAN |

MEMORANDUM IN SUPPORT OF THE
MOTIONS FOR RECONSIDERATION FILED BY
THE PLAINTIFF'S STEERING COMMITTEE AND DLG CLASS CLAIMANTS

NOW INTO COURT, comes Timothy Bolden, Aridio Almanzar, Sheila Kelly, Jose Santamaria, Melissa Placide, Uriel Paloblanco, Vladimir Estanque, Emma Escobar, and Kevin Miralda (hereinafter "DLG Class Claimants") and files this Memorandum in Support of the Motions for Reconsideration filed by the Plaintiff Steering Committee ("PSC") and the DLG Class Claimants, respectfully showing this Court as follows:

I.   SUMMARY OF THE ARGUMENTS

On July 23, 2014, this Court affirmed a position taken by Garretson Resolution Group ("GRG" or the "Claims Administrator") for the Medical Benefits Class Action Settlement Agreement ("MSA") whereby GRG **"**will classify physical conditions that are first diagnosed after April 16, 2012 as Later-Manifested Physical Conditions rather than Specified Physical Conditions, regardless of the date when the physical condition was first manifested." Rec. Doc. 13179, at 1.  In its order, this Court held that "the Claims Administrator's Policy Statement is correct."  *Id.* at 6.  DLG Class Claimants urge this Court to reconsider its position due to two separate and distinct results that constitute manifest injustice and three clear errors of law.

The first two arguments relate to manifest injustice.  First, a manifest injustice results when BP is allowed to convince this Court today of a position that is clearly inconsistent with a position relied upon by this Court in January of 2013.  Second, a manifest injustice results when tens of thousands of claimants that ordinarily would have submitted claims through GRG now find themselves with no recourse other than to file a claim in federal court.  Instead of thousands of claims being processed by GRG, a process to be paid for by BP, these claims will instead be processed by this Court and paid for by U.S. taxpayers.  As a matter of public policy, this Court must address this very basic concern.

The next three arguments relate to clear errors of law.  Third, it would be clear error of law for this Court to interpret "Later-Manifested Physical Conditions" to include "earlier manifested" physical conditions because to do so would render the words "Later-Manifested," as meaningless and superfluous.  Furthermore, when read together with the RELEASE, the term "Later-Manifested" is given context that, under this current ruling, exposes claimants to summary judgment. Fourth, this Court was instructed by BP to disregard "BP Counsel's statements made during the settlement approval process" because such information is barred pursuant to the parol evidence rule.  This statement represents a clear error of law because all the statements quoted by the PSC and DLG occurred after the signing of the MSA, not before or contemporaneously with the agreement being signed.  This evidence must be considered when determining estoppel or waiver.  Fifth, even if the plain and ordinary meaning of LMPC includes both earlier manifested physical conditions and later-manifested physical conditions, BP waived its

right to enforce that term when it argued later-manifested physical conditions are latent physical conditions "claimed to have manifested after April 16, 2012."

<u>ARGUMENTS & AUTHORITIES</u>

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985) (citation omitted), *cert. denied* 476 U.S. 1171 (1986); *see Texas Instruments, Inc. v. Hyundai Elecs. Indus., Co., Ltd.*, 50 F. Supp. 2d 619, 621 (E.D. Tex. 1999). A judgment may be altered or amended if the party seeking reconsideration establishes at least one of the following grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . .; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café, by Lou Ann, Inc., v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *Brown v. Miss. Co-op Extension Serv.*, 89 Fed. Appx. 437, 439 (5th Cir. 2004); *see In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002).

A.  *BP* MUST BE JUDICIALLY ESTOPPED FROM ASSERTING ANY POSITION THAT IS CLEARLY INCONSISTENT WITH ITS PRIOR POSITIONS ARGUED BEFORE THIS COURT AND SUBSEQUENTLY ADOPTED BY THIS COURT IN ITS ORDER DATED JANUARY 11, 2013.

"'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), *quoting Davis v. Wakelee*, 156 U.S. 680, 689 (1895).[2] "This rule,

---

[2] *New Hampshire v. Maine* is the landmark case relating to judicial estoppel and the facts are telling. In 1977, "in a dispute between [New Hampshire and Maine] . . . , [the Supreme Court of the United States] entered a consent judgment fixing the precise location of the 'lateral marine boundary. . . .'" *New Hampshire*, 532 U.S. at 746, *quoting New Hampshire v. Maine* (*New Hampshire II*), 426 U.S. 363, 368

known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Id.*, *quoting Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000). "[C]ourts have uniformly recognized that its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749–50 (emphasis added) (internal citations omitted); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982); *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993); *see In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process.").

In essence, "[j]udicial estoppel prevents parties from 'playing fast and loose with the courts.'" *New Hampshire*, 532 U.S. at 750, *quoting Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953). *But see id.* at 756 (explaining that a broad interest of public policy may give a party the prerogative to construe the meaning of a word differently than it had in a prior proceeding); *id.* at 753 ("it may be appropriate [as a defense] to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.'"); *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973) ("Judicial estoppel is a technical rule designed to meet needs of broad

---

(1976); *New Hampshire v. Maine* (*New Hampshire III*), 434 U.S. 1, 2 (1977). Because "[t]heir quarrel was over the location of the 'Mouth of Piscataqua River,' 'Middle of the River,' and 'Middle of the Harbour' within the contemplation of the decree . . . was essential to delineating the lateral marine boundary [used for lobster fishing rights]." *New Hampshire*, 532 U.S. at 747. Subsequently, New Hampshire tried to say that the boundary was in another place ("asserting sovereignty over the entire river and all of Portsmouth Harbor"), which is clearly inconsistent with its interpretation of the words "Middle of the River" in the 1970's litigation. *Id.* at 747–48. The Supreme Court of the United States noted

> [a]lthough New Hampshire now suggests that it "compromised in Maine's favor" on the definition of "Middle of the River" in the 1970's litigation, . . . that "compromise" enabled New Hampshire to settle the case . . . on terms beneficial to both States. Notably, in their joint motion for entry of the consent decree, New Hampshire and Maine represented to this Court that the proposed judgment was "in the best interest of each State. Relying on that representation, the Court accepted the boundary proposed by the States.

*Id.* at 752 (citations omitted).

public policy. It is directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings. Because the rule looks toward cold manipulation and not an unthinking or confused blunder, it has never been applied where plaintiff's assertions were based on fraud, inadvertence, or mistake.").[3]  This "rule is intended to prevent 'improper use of judicial machinery' [and] is an equitable doctrine invoked by the court at its discretion." *New Hampshire*, 532 U.S. at 750.

> [S]everal factors typically inform the decision whether to apply the doctrine in a particular case:  First, a party's later position must be 'clearly inconsistent' with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750–51.

"In [the 5th] Circuit, at least two requirements must be met before a party's argument may be judicially estopped.  First, the estoppel party's position must be 'clearly inconsistent with its previous one,' and second, 'that party must have convinced the court to accept that previous position.'"  *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014), *quoting Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003).

---

[3]      Fraud in this instance is not a defense to judicial estoppel because nowhere has BP alleged that the PSC has committed a fraud upon this Court. No Class Members were involved in the signing of the agreement. Further, Class Members sign under penalty of perjury and a vehicle already exists in the MSA under which GRG can determine if it suspects fraud.  Lastly, the defense can only be raised against the individual that committed fraud in order to justify a change in position by BP. BP cannot use this defense against all plaintiffs simply on the off chance a single plaintiff committed fraud.

a. _APPLYING THE NEW HAMPSHIRE V. MAINE HOLDING TO THIS CASE_

The facts of _New Hampshire v. Maine_ and the present case fall squarely within the analysis of the Supreme Court of the United States.  In its holding of _New Hampshire v. Maine_, the Supreme Court explained:

> In short, considerations of equity persuade us that application of judicial estoppel is appropriate in this case.  Having convinced this court to accept our interpretation of "Middle of the River" and having benefitted from that interpretation, New Hampshire now urges an inconsistent interpretation to gain an additional advantage at Maine's expense.  Were we now to accept New Hampshire's latest view, the risk of "inconsistent court determinations" would become a reality.  We cannot interpret "Middle of the River" in the 1740 decree to mean two different things along the same boundary line without undermining the integrity of the judicial process.

_New Hampshire_, 532 U.S. 742, 755 (2001).

Here, like in _New Hampshire v. Maine_, considerations of equity must persuade this Court that the application of judicial estoppel is appropriate.  Having convinced this Court to accept one interpretation of "later-manifested physical conditions" and the mediation/litigation process used for these BELO claims and having benefitted from that interpretation in the form of getting the MSA approved, BP now urges an inconsistent interpretation to gain an additional advantage at the expense of the Class Members.  Were this Court now to accept BP's latest view, the risk of "inconsistent court determinations" would become a reality.  This Court cannot interpret LMPC in the MSA to mean two different things, one interpretation in the context of fairness, reasonableness, and adequacy and something entirely different in the context of implementation and claims administration without undermining the integrity of the judicial process.

b. _BP'S CURRENT POSITION IS CLEARLY INCONSISTENT WITH ITS PREVIOUS POSITION_

BP first asserted that, among the benefits offered, payment was assured for claimants that met the burdens of proof listed in the SPC Matrix.  _BP's Memorandum in_

*Support of its Motion for Final Approval of the Medical Benefits Class Action Settlement*, Rec. Doc. 7112-1, at 41, 44. "[T]he proof required for compensation under the Matrix is more than reasonable. Class Members may receive compensation even without medical records. However, if they can provide medical records or show corroboration in the appropriate database, they can qualify to recover greater amounts."[4] *Id.* at 44. "For those with Specified Physical Conditions, compensation under the Settlement is certain." *Id.* at 64. Under today's position by BP, Class Members that "provide medical records" cannot "qualify to recover greater amounts" if medical records are dated after April 16, 2012.

BP argued at oral arguments requesting conditional certification of the Class on April 25, 2012 a position that is clearly inconsistent with today's argument. In that hearing, BP explained the meaning of Later-Manifested Physical Conditions. When explaining what later-manifested physical injuries were, BP said, "Injuries that have not manifested themselves today, that perhaps show up, we hope not, but show up five years from now or ten years from now." Rec. Doc. 6395, 90:21-23. "Today," in the context of what was said by BP, was April 25, 2012, the date of the hearing. And because it could not have manifested as of that date, then clearly "Later-Manifested" has a meaning that deals with manifestation at a later date. BP argued that the condition must have manifested after April 25, 2012 at this preliminary fairness hearing. Therefore to take a position that the condition could have first manifested before then is clearly inconsistent.[5]

---

[4]    Nowhere in the SPC Matrix is there any requirement that the medical records contain a diagnosis. Further, nowhere does it say that a diagnosis that occurs after April 16, 2012 cannot be used in consideration for an SPC claim. In fact, any medical record can be used to support a claim so long as the condition was persisting at the time of presentment. MSA Ex. 8, Rec. Doc. 6427-10, (hereinafter "SPC Matrix"), at 1, 4.

[5]    We understand that a manifestation must occur before a diagnosis. Therefore, in order to harmonize the statements, we believe that the manifestation and the diagnosis must have occurred at some point after April 16, 2012. BP agreed and corrected its inadvertence in supplemental pleadings. But to

Subsequently, when given a chance at oral arguments for the fairness hearing to correct any inadvertence stated in November, BP did not object to the PSC's explanation of the BELO claim wherein this Court raised questions for clarification while the PSC was speaking. *See infra* p. 12. Instead, when given a chance to address any inadvertence regarding this issue relating to BELO, LMPC, and dates of manifestation versus diagnosis, BP simply said, "the back-end litigation opt-out, about which we've spoken." Rec. Doc. 7892, at 216:10-11. Following up on this statement, BP argued, in its "Proposed" Joint Findings of Fact filed November 20, 2012:

> 118.   The Medical Settlement also provides a mediation/litigation process for Class Members who seek compensation from BP in the future for a physical condition that is claimed to have manifested after April 16, 2012 and resulted from exposure to oil and/or dispersants due to the *Deepwater Horizons* Incident during the time frames set forth in the Settlement Agreement. (MSA § VIII).
>
> 119.   Class Members diagnosed with a Later-Manifested Physical Condition have the option to seek compensation for that condition through the Back-End Litigation Option or, as applicable, pursuant to worker's compensation law or the Longshore and Harbor Workers' Compensation Act. (MSA § VIII.B).

Rec. Doc. 7946, ¶¶ 118-19.

This was the last pleading and/or official communication by BP on the record. BP had ample opportunity to correct these statements, instead it reasserted the statements multiple times. BP cites to its previous memorandum, filed before this Court, where it says that it only asserted "diagnosis." BP Memo II, at 6. The first citation refers to the joint motion for approval at the class certification and preliminary fairness hearing. This document is dated contemporaneously with the settlement agreement, therefore is barred

---

argue that Later-Manifested Physical Conditions include earlier manifested physical conditions is completely and clearly inconsistent with BP's prior position that symptoms manifested "have not manifested today . . . but in the [future]" and "claimed to have manifested after April 16, 2012" and "manifested later in time." *Compare* Rec. Doc. 6395, at 90:19-23; Rec. Doc. 7946, ¶¶ 118-19, *with BP Memo II*, at 7. Essentially, BP first argued LMPCs must have both manifested and diagnosed after April 16, 2012 and now they argue that conditions are for BOTH earlier and later manifested conditions so long as they are diagnosed after April 16, 2012. These are clearly two inconsistent positions.

as extrinsic evidence as a matter of law by the parol evidence rule. This, unlike what BP has suggested to date, is a proper application of that rule.

But even if this Court were to consider that document as evidence in spite of the parol evidence rule, in the introduction of that particular memorandum, BP clearly says the MSA is fair in part because of its "[p]reservation of Class Members' rights to sue BP for compensatory damages for physical conditions that manifest at a later date." Rec. Doc. 6267-1, at 1. This is proof that the condition must both have manifested at a later date and be diagnosed after April 16, 2012. BP only selectively quoted its own memorandum in order to obfuscate the truth from this Court: that it had argued both manifestation and diagnosis after April 16, 2012 in that memorandum.

BP further cites to itself in a memorandum it filed on August 13, 2012. This document is admissible as extrinsic evidence and is not barred by the parol evidence rule to determine waiver and/or estoppel. But BP is only selectively quoting the language it had used in this document. As part of its introduction, BP composed language in which it said the Master Settlement Agreement is fair because of its "Preservation of Class Members' rights to sue BP for compensatory damages for physical conditions that manifest at a later date." It did not say "diagnose at a later date." This is not inadvertent as it is the introduction made to this Court in order to convince this Court that the "Later-Manifested Physical Condition (i.e., condition diagnosed after the filing of the Medical Class Action Complaint)" is fair. So again in the same pleading, BP urged this Court that the physical condition "manifested at a later date" and was a "condition diagnosed

after the filing of the Medical Class Action Complaint.").  Again, BP selectively quoted itself in order to obfuscate the fact that it had argued both manifestation and diagnosis.[6]

BP had ample opportunity to cure the "inadvertence" that BP alleges transpired. It failed to correct any alleged inadvertence.  At that point, BP had held out once in open court and subsequently in its own pleadings on two separate occasions that LMPCs were latent conditions that both manifested at a later date and were diagnosed after April 16, 2012.  This is evidence of a systematic argument woven as a core principle to the fairness this MSA was supposed to provide, not arguments made as a result of an inadvertent blunder or mistake.  The words "manifest" and "diagnose" have completely different meanings.  One is the appearance of a symptom (manifest),[7] and the second is a medical term of art where a doctor identifies the medical condition[8] by observing a symptom (physical diagnosis)[9] or where a doctor identifies the medical condition based on symptoms described (clinical diagnosis).[10]

BP raised a third statement in its April 29, 2014 memorandum. In that 2014 memo, BP tried to draw attention to a statement it had made in the Joint Findings of Fact and Conclusions of Law in Support of Final Approval for the MSA.  BP selectively quotes itself again by claiming the Joint Findings of Fact expressly stated that Class Members need be *diagnosed* with Later-Manifested Physical Conditions in order to have the option to seek compensation for the condition through BELO.  Rec. Doc. 7946, ¶ 119.

---

[6]         We have never argued that a condition must not have also been "first diagnosed after April 16, 2012" we have argued that the condition must both have manifested and been diagnosed after April 16, 2012, a statement that is consistent with BP's prior position.

[7]         *Manifest*, MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/manifest (last visited Aug 12, 2012).

[8]         BLACK'S LAW DICTIONARY 518 (2011).

[9]         *Id.*

[10]        *Id.*

But the sentence preceding BP's quote is omitted entirely where BP clearly says that the injury must have been "claimed to have manifested after April 16, 2012." Rec. Doc. 7946, ¶ 118. By selectively omitting the language, BP provides further evidence of its attempt to actively conceal the truth from this Court.

This Court must combine paragraphs 118 and 119 to put the statements in context. BP and the PSC jointly argue that a Later-Manifested Physical Condition are conditions "claimed to have manifested after April 16, 2012" and, once a diagnosis has been by a medical professional after April 16, 2012, the Class Member can file a BELO claim. This is now the fourth admissible representation to the Court made regarding both manifestation and diagnosis in relation to LMPC.

BP has presented two clearly inconsistent positions that are not inadvertent. Its prior position was that a Later-Manifested Physical Condition must have "manifested at a later time" (i.e., "claimed to have manifested after April 16, 2012") and "first diagnosed after April 16, 2012." BP's current position is that "this definition encompasses later manifested conditions *and* earlier manifested conditions that are first diagnosed after April 16, 2012." These two positions are inconsistent because in no world does "earlier" and "later" mean the same thing.

c. *BP DID IN FACT CONVINCE THIS COURT TO ACCEPT THE POSITION ASSERTED AT BOTH THE HEARING AND THE SUBSEQUENTLY FILED JOINT FINDINGS OF FACT AS EVIDENCED BY THIS COURT'S ORDER AND REASON RELIED UPON THE LANGUAGE FOUND IN THE JOINT FINDINGS OF FACT.*

As evidenced by the independent pleadings, joint finding of fact, and oral arguments described above, BP argued that Later-Manifested Physical Conditions require conditions that "manifested at a later time" (i.e., "claimed to have manifested after April 16, 2012") and that were diagnosed after April 16, 2012. Ms. Cabraser, speaking on

behalf of the Class explained, people developing further symptoms from past exposure have the back-end litigation opt-out which enables them to choose to file a BELO claim. *See* Rec. Doc. 7892, at 206:7-12.  This Court interjected by asking,

> So, as I understand it, that the class, as we defined it, we're dealing with past exposures; and, if someone later – if the exposure – if the symptoms, I guess, the injury, later manifests itself, and its *unknown now or could not be known now*, then they have this back-end litigation option?

*Id.* at 206:13-18 (emphasis added).  Ms. Cabraser responded with "That's right."  BP remained silent and did not object.  Instead, BP adopted Ms. Cabraser's statement when Mr. Godfrey said, "Then the back-end litigation opt-out [sic], about which we've spoken."  Rec. Doc. 7892, 216:10-11.

This question of whether the later manifested condition was "unknown now or could not be known now" was a concern of the Court as evidenced by its questioning of the PSC during the fairness hearing which subsequently resulted in BP and the PSC's joint findings of fact.  So when both parties explained that the mediation/litigation process, known as BELO, was available for LMPCs, physical conditions "claimed to have manifested after April 16, 2012" by "Class Members diagnosed with a Later-Manifested Physical Condition,"[11] this Court adopted those words exactly and relied upon them in its Judicial Order.  *In re Oil Spill by Oil Rig Deepwater Horizon* (hereinafter "*In re Deepwater*"), 295 F.R.D. 112, 124-25 (E.D. La. 2013).  This supports the proposition that this Court was convinced by BP's prior and clearly inconsistent position where diagnosis after April 16, 2012 was a condition precedent to filing a BELO Claim.

---

[11]    *Class Counsel's and BP's Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval of the Deepwater Horizon Medical Benefits Class Action Settlement, as Amended on May 1, 2012*, Rec. Doc. 7946, ¶ 118.

d. *BY ADOPTING THIS SECOND INCONSISTENT POSITION, BP IMPERMISSIBLY DERIVES MULTIPLE UNFAIR ADVANTAGES WHILE CLASS MEMBERS SUFFER EXTREME UNFAIR DETRIMENTS BOTH OF WHICH ARE SUBSTANTIALLY DIFFERENT THAN WHAT WAS RAISED BEFORE THIS COURT BEFORE AND DURING THE FAIRNESS HEARING.*

BP derives multiple unfair advantages under this interpretation of the MSA as well as the misapplication of the parol evidence rule and the plain and ordinary meaning doctrine. First, BP receives the huge financial benefit of not having to pay for the processing of tens of thousands of SPC claims through GRG. Second, BP receives a huge windfall in the form of cost shifting claims processing out of BP's pockets and into the pockets of federal tax payers for thousands of cases. BP can now use this windfall to pay out dividends to its investors or to pay attorneys to stifle litigation wherever possible, outspending the already destitute cleanup worker that can't even afford health insurance. With this new windfall, BP can force the litigation to cost so much money that many cases may result in negative value claims. Shifting the burden of processing these claims from GRG to this Court is an unfair advantage

. . . Can you [imagine] trying a couple thousand of these cases? I mean, it would just take [a] court years.
. . . When you have thousands of cases being tried, because that's the alternative being offered, there is a cost imposed upon the court system and the other citizens of this state and this nation because the court is clogged with thousands and thousands of claims that otherwise would be settled and are settleable.

Rec. Doc. 7892, 213:17-18 (argued by Mr. Richard Godfrey, Esq., on behalf of BP).[12]

As a matter of public policy this Court must address this manifest injustice.[13]

---

[12]    If half the estimated cases actually reach this Court's docket and each of those Class Members requests a jury trial, then this Court will have to manage anywhere between sixty thousand and one hundred twenty thousand jurors (not including alternates). This just seems, as a matter of public policy, an excessive burden on the people of the State of Louisiana.

[13]    Based on estimates provided to DLG by Howard Nations, James Amaro, Allen Lindsay, Jr., and Frank D'Amico, all attorneys representing class member claimants seeking compensation through the MSA, and latest figures provided in March by GRG, we believe that anywhere between 15,000 and 20,000 claimants are currently being processed that will not be able to receive compensation for Chronic

Meanwhile Class Members would derive several substantially unfair detriments contrary to what was argued at the fairness hearing. First, prolonged litigation over a period of ten to twenty years while these thousands of cases make their way through the courts, appeals, and other delays can lead to secondary trauma that this agreement was expected to avoid.[14] Second, clients with chronic conditions would endure continued suffering without medical treatment because the vast majority of these claimants do not have health insurance. BP knows this, this Court knows this, and several experts testified to this.

B. *REVISION OF THE LMPC POLICY ORDER IS REQUIRED AS IT IS CLEAR ERROR OF LAW TO RENDER THE TERM "LATER-MANIFESTED" AS MEANINGLESS AND SUPERFLUOUS WHEN INTERPRETING THE PLAIN AND ORDINARY MEANING OF "LATER-MANIFESTED PHYSICAL CONDITION."*

This Court must reconsider the *LMPC Policy Order* as a clear error of law because to ignore the words "Later-Manifested," an adjective that limits the meaning of the subject of the sentence that defines LMPC, would render the meaning of "Later-Manifested" meaningless and superfluous, a preposition that is repugnant to Admiralty and Louisiana law, as well as the basic rules of grammar.[16] "Unless there is no alternative, a clause should not be interpreted such that it is rendered meaningless." *Chembulk Trading, LLC v. Chemex, Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004); La. Civ.

---

Conditions they are claiming and will now be forced onto this Court's docket. *See Appendix* 1, 2, 3, & 4 attached.

[14]     As this Court noted, "experts who studied the effects of the *Exxon Valdez* litigation on the local populace have said that the litigation 'produce[d] an independent secondary disaster, which [rather than the original spill] is the primary source of ongoing secondary trauma.' Rec. Doc 8271, at 63, *quoting* J. Steven Picou, *When the Solution Becomes the Problem: The Impacts of Adversarial Litigation on Survivors of the Exxon Valdez Oil Spill*, 7 U. St. Thomas L.J. 68, 81 (2009).

[16]     UNIVERSITY OF CHICAGO, THE CHICAGO MANUAL OF STYLE: THE ESSENTIAL GUIDE FOR WRITERS, EDITORS, AND PUBLISHERS (hereinafter "CHICAGO STYLES MANUAL") ¶ 5.4, .23, .24, .66, .92, .97 (15th ed. 2003); *see* BRIAN A. GARNER, LEGAL WRITING IN PLAIN ENGLISH: A TEXT WITH EXERCISES 102 (University of Chicago Press 2001) ("The core parts of the English sentence are the subject and the verb (and sometimes an object).").

Code Ann. art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."); La. Civ. Code Ann. art. 2050 ("Each provision in a contract must [also] be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.").

"LATER-MANIFESTED PHYSICAL CONDITION shall mean a physical condition that is first diagnosed in a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER after April 16, 2012 . . . ." MSA § II.VV.  In this sentence, the term "Later-Manifested Physical Condition" is part of the sentence and not a header.  *See id.*  The subject of that definition is "Later-Manifested Physical Condition," the verb is "mean" and the object is "a physical condition."  Together all of these words, not just some of them, generate a complete thought (i.e., a sentence).  Adjectives describe nouns in the sentence, limiting them to mean what the adjectives intend them to mean.[17]

Terms that illustrate this point include "post-partum depression" where "post-partum" replaces "later-manifested" and "physical condition" is replaced by "depression."  "Post-partum depression" clearly does not equate to "pre-partum" feelings of depression.   BP would argue that "post-partum depression" shall mean "any depression" (pre or post) so long as it was diagnosed by a certain date.  The ordinary meaning of post-partum would mean "after birth" not "pre-birth" and by including "pre-

---

[17]     "An adjective is a word that adds a new idea to a noun . . . either by describing it more definitely or fully (a descriptive adjective) or by narrowing a noun's . . . meaning (a limiting adjective)."  CHICAGO STYLES MANUAL, ¶ 5.65.  "An adjective that modifies a noun or noun phrase usually precedes it."  *Id.* ¶ 5.80.  Therefore the noun "condition" with the descriptive adjective "physical" in front of it modifies the noun to create a noun phrase (i.e. "Physical Condition").  "A phrasal adjective (also called a compound modifier) is a phrase that functions as a unit to modify a noun."  *Id.* ¶ 5.92.  "Later-Manifested" has a hyphen which separates Later and Manifested.  Together they are collectively a "phrasal adjective" and/or "compound modifier" that limits the meaning of the noun phrase "physical condition."  "Later-Manifested" appears in the MSA forty-eight (48) times whereas the words "Later-Diagnosed" do not exist.

birth" depression into the meaning of "post-partum depression" it is clear that BP is the one trying to shoehorn all conditions into LMPCs.  The same applies to "post-traumatic stress disorder."  In no world does "post-traumatic stress disorder" mean "pre-traumatic stress disorder" simply because it was diagnosed after April 16, 2012.  Phrasal adjectives matter and cannot be rendered meaningless when their whole purpose is to limit the meaning of the nouns being defined.

C.  *A CLASS MEMBER THAT IS FIRST DIAGNOSED WITH A PHYSICAL CONDITION AFTER APRIL 16, 2012 THAT FIRST MANIFESTED BY APRIL 16, 2012 MAY BE RELEASING BP FROM ANY LIABILITY FOR ANY CLAIM THAT HAVE BEEN OR COULD HAVE BEEN BROUGHT FOR PHYSICAL INJURIES RELATED TO THE DEEPWATER HORIZON INCIDENT.*

There can be no doubt when applying the plain and ordinary meaning doctrine, the entire agreement "as a whole" must be considered.  *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009); *Fontenot v. Mesa Petrol. Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986).  Yet in the present instance the RELEASE[19] may have been overlooked by this Court when this Court reviewed "the terms of the Medical Settlement Agreement."

Medical Benefits Class Members filing Proof of Claim Forms seeking compensation for a Specified Physical Condition (SPC) must sign a RELEASE, detailed in Section XVI of the MSA, before being considered for compensation pursuant to the Exhibit 8 of the MSA (hereinafter "SPC Matrix").[21]  The terms of the RELEASE expressly release BP of any liability for "[p]ersonal injury or bodily injury . . . that first

---

[19]      *Deepwater Horizon Medical Benefits Class Action Settlement Agreement, as Amended May 2, 2012*, Rec. Doc. 6427-1 (hereinafter "MSA" or "Master Settlement Agreement"), § XVI.
[21]      MSA § V.D ("The CLAIMS ADMINISTRATOR shall reject a claim . . .  if the related PROOF OF CLAIM FORM has not been properly completed, including all required documentation and authorizations by or on behalf of such MEDICAL BENEFITS SETTLEMENT CLASS MEMBER . . . ."); MSA § II.HHHH (defining Proof of Claim Form as the document listed in Exhibit 5); MSA, Ex. 5, at 21 ("You must submit this form in its entirety and return it signed").  *But see id.*, Ex. 5, at 21 ("I understand that . . . the RELEASE in this Section X does not become effective until the EFFECTIVE DATE.").

manifested by April 16, 2012. . . where such injury . . . was related to, directly or indirectly, the *DEEPWATER HORIZON* INCIDENT . . . ."  MSA § XVI.A.1.

Even though this Court ruled that "Class Members do not release claims against BP for Later-Manifested Physical Conditions provided that they follow the procedures for asserting such claims established by the Settlement Agreement. (MSA § XVI.B)."  *In re Deepwater*, 295 F.R.D. at 125, the MSA clearly says,

> MEDICAL BENEFITS CLASS MEMBERS . . . agree that, . . . by operation of the FINAL ORDER AND JUDGMENT, . . . the . . . CLASS MEMBERS . . . shall release and forever discharge the RELEASED PARTIES . . . from any liability for all claims of any nature whatsoever in law or in equity, past and present, and whether known or unknown . . . that have been or could have been brought in connection with [p]ersonal injury or bodily injury . . . , and any progression and/or exacerbation . . . that first manifested by April 16, 2012 . . . ."

MSA § XVI.A.1,  *But see* MSA § XVI.B (explaining that LMPCs are also discharged, pursuant to the terms of the MSA, unless the procedures of Section VIII are followed).

Under this Court's present interpretation of LMPC, any claim that is an LMPC may not be discharged under the release pursuant to Section XVI.B if they follow the procedures of Section VIII, but can, and likely will be, released under the plain and ordinary meaning of Section XVI.A as this is an alternative version of releasing the RELEASED PARTIES.

BP said in its May 22, 2012 memo cover letter to this Court:

> Class Counsel's May 21, 2014 letter also posits an unfounded "third issue" that is not addressed in Class Counsel's Motion.  Class Counsel speculates that BP may argue that a Class Member's opportunity to pursue recovery for a claimed Later-Manifested Physical Condition ("LMPC") could be barred because it "manifested within the first 24-72 hours" of exposure.  BP has not taken, and does not take such a position.  An LMPC as defined by the date when the condition is "first diagnosed," not when the condition first manifests.  Class Members . . . may proceed through the procedures available for LMPCs, including Back-End Litigation Option ("BELO") . . . .

*BP Memo. re BP's Opposition to Class Counsel's Motion for Leave to File Request for Oral Argument and Motion to Strike*, 1 n.1 (May 22, 2014) ("By its plain terms, this definition encompasses later manifested conditions and *earlier manifested conditions*[23] that *are* first diagnosed after April 16, 2012."). BP merely speaks to "the opportunity to pursue recovery" and explains that Class Members "may proceed through the procedures available for LMPCs." *Id.* Nowhere does BP say that they will not use the RELEASE to bar recovery for anyone who first manifested conditions by April 16, 2012. *See, e.g.*, BP Memo I & II. *Compare* MSA § XVI.A.1, *with* MSA § VIII.

By illustration, if a verified cleanup worker suffers from a chronic condition that first manifested by April 16, 2012 within the timeframes detailed in the SPC Matrix, but has not yet been diagnosed, and he decides to seek compensation through the MSA, he would be barred from recovering anything but $1,300 for his SPC. If he receives a diagnosis after April 16, 2012, he will be subject to summary judgment as a matter of law when the federal court reviewing his case sees the RELEASE presented by BP. In this last order, this Court held "while in some cases a Class Member may have a condition which fits the definition of a Chronic Condition, if it was not diagnosed by April 16, 2012, it is, by definition, a LMPC." Rec. Doc. 13179, at 6. So, when looking at the RELEASE in conjunction with this ruling, the claimant is releasing BP of any liability associated with an LMPC that manifested by April 16, 2012 because Section XVI.A expressly says that any condition, including LMPCs, that first manifested by April 16, 2012 is released. The RELEASE needs to be signed when applying for an SPC, but not

---

[23]     "Earlier manifested physical conditions" is a term never before heard or used until two years after the settlement agreement was executed. The "timeframe" is "later," not "earlier." If by "earlier" BP means "SPC" then we encourage this Court look at the definition for SPC and see if the term "earlier manifested" exists. We cannot find it.

so for an LMPC.  But if the signature exists for a claimant that filed for an SPC, then the RELEASE would apply to any LMPC, even if it manifested within the timeframes listed in the SPC Matrix. Under this Court's current ruling, we know of no other possible way to interpret the plain and ordinary meaning of these two conflicting portions of the RELEASE, Section XVI.A.1 and XVI.B.[26]

    D. *THE PLAIN AND ORDINARY MEANING OF LATER-MANIFESTED PHYSICAL CONDITION MEANS A PHYSICAL CONDITION THAT LATER-MANIFESTED, THAT IS, THE CONDITION MUST FIRST MANIFEST, AND SUBSEQUENTLY ALSO HAVE BEEN FIRST DIAGNOSED, AFTER APRIL 16, 2012.*

Because the plain and ordinary meaning of LMPC must include "later-manifested," we look to the agreement as a whole to put that term into context.  Class Members include cleanup workers that performed response activities between April 20, 2010 and April 16, 2012.  SPCs are conditions that first manifest within the first 24-72 hours of exposure as specified in the SPC Matrix which this Court has decided is to have "equal footing" with the rest of the agreement.  Section XVI.A.1 of the MSA expressly releases any physical injuries that first manifested by April 16, 2012. Because the RELEASE must be signed as part of the Proof of Claim Form and cleanup workers must have first manifested specified physical conditions not later than April 16, 2012 to receive compensation under the Matrix, it only stands to reason that Section XVI.A.1 of the MSA applies to SPCs while Section XVI.B applies to LMPCs. Later-Manifested Physical Conditions, as it relates to the RELEASE, fall under the Section XVI.B and therefore should be given context in relation to that section.

---

[26]     GRG may issue a policy statement to address this issue stating that LMPCs that first manifested by April 16, 2012 are not released but it does not now, nor will it ever, have the authority to decide whether the RELEASE could provide summary judgment protection to released party.  At best, GRG can assert that it shall allow Class Members to file a notice of intent to sue, but this Band-Aid does not provide claimants the compensation for their injuries nor does it protect claimants in any way shape or form. This is simply an illusion of fairness.

Essentially, the SPC Matrix has always been the centerpiece of this MSA and was designed to efficiently and expeditiously process the vast majority of the Class Members' claims.  Instead, by reading a "later-diagnosed" deadline into the SPC Matrix, this interpretation eviscerates the purpose of this mechanism and now forces Class Members to file lawsuits in federal court to receive compensation for injuries that could have been settled through the SPC Matrix. If the symptoms first manifested by April 16, 2012, then it can only be processed as an SPC.  If the symptoms first manifested after April 16, 2012, then, unless it was first diagnosed after April 16, 2012, it could not find its way to federal court under the procedures listed in Section VIII of the MSA.  This reading harmonizes the entire agreement and puts the agreement back in track with what was proffered by the PSC, BP, and their respective and joint experts.

E. STATEMENTS MADE BY BP COUNSEL AFTER THE SIGNING OF THE AGREEMENT ARE NOT EXTRINSIC EVIDENCE BARRED FOR CONSIDERATION UNDER THE PAROL EVIDENCE RULE.

BP stated in its April 29, 2014 memorandum to this Court, "Downs selectively quotes and takes out of context BP counsel's statements made during the settlement approval process.  As a threshold matter, such statements cannot be used to contravene the plain language of the MSA . . . ."  BP Memo II, at 6 (explanations by BP Counsel that such evidence is barred by the parol evidence rule).  BP incorrectly states and misapplies the law regarding parol evidence; a clear error of law that this Court cannot condone.

"This    MEDICAL    BENEFITS    CLASS    ACTION    SETTLEMENET AGREEMENT [is] dated . . . April 18, 2012, . . . .").  MSA, Preamble, at 5.

The Fifth Circuit has repeatedly held

> [w]hen two parties have made a contract and have expressed it in a
> writing to which they have both asserted as the complete and accurate integration

of that contract, evidence, whether parol or otherwise, of antecedent
understandings and negotiations will not be admitted for the purpose of varying
or contradicting the writing.

*Har-Win, Inc. v. Consol. Grain & Barge Co.*, 794 F.2d 985, 987 (5th Cir. 1986)
(explaining that Admiralty law on parol evidence, not state law, must be applied relating
to parol evidence); *Cashman Equip. Corp. v. Boh Bros. Const. Co., LLC*, CIV.A. 10-
00021, 2014 WL 1118109 (M.D. La. 2014); *Torres v. Danos & Curole Marine
Contractors, LLC*, CIV.A. 11-1413, 2013 WL 2903068 (E.D. La. 2013) (explaining that
the Fifth Circuit uses the aforementioned rule for defining the parol evidence rule).

The language quoted by the PSC and DLG of what BP and their experts used to
convince this Court of the fairness of the MSA were all made by BP subsequent April 18,
2012.  The preliminary fairness hearing occurred before this Court on April 25, 2012.
Rec Doc. 6395.  Also, BP's motion in support of fairness was filed August 13, 2012.
Rec. Doc 7112-1.  Furthermore, the Joint Findings of Fact and Conclusions of Law in
Support of the Final Approval Order was jointly signed and filed with this Court on
November 20, 2012 (almost 7 months after the signing of the agreement). Rec. Doc.
7946.  Expert testimonies quoted all come from appendixes to statements made well after
the agreement had been signed.  *See, e.g.*, Rec. Doc. 7113-2; Rec. Doc. 7112-7; Rec.
Doc. 7116-1.  All of these quotes, these statements made both orally and in writing by BP
and its experts sworn under penalty of perjury, were made after April 18, 2012, therefore
not "antecedent understandings and negotiations." For these reasons, as a threshold
matter, BP is wrong as a matter of law to instruct this Court to disregard these statements.

As to the extent that the agreement was "Amended on May 1, 2012," it is well
established law that the parol evidence rule does not bar "extrinsic evidence regarding a

subsequent modification of a written agreement or to the waiver of contractual terms by language or conduct." 29A Am. Jur. 2d Evidence § 1125 (2014); *Emerson v. Slater*, 63 U.S. 28, 43 (1859); *Tratree v. BP N. Am. Pipelines, Inc.*, 390 Fed. Appx. 386, 392 (5th Cir. 2010) ("The evidence regarded both parties' conduct *after* contracting and illustrated a modification to the [agreement], agreed to by both the Union and BP."); *Deerfield Specialty Papers, Inc. v. Black Clawson Co., Inc.*, 751 F. Supp. 1578, 1582 (S.D.N.Y. 1990) ("The [parol evidence] rule is inapplicable to negotiations or agreements entered into after the contract has been recommended");

> Corbin makes very clear that neither the parol evidence rule . . . nor express provision in the written contract against waiver by subsequent oral agreement or conduct . . . prevent the introduction of evidence that a party to the contract by subsequent conduct or agreement—oral or written— waived a condition to his performance of the contract. As clearly stated:
> '* * * A provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. ***The promisor still has the power to waive the condition, or by his conduct to estop himself from insisting upon it***, to the same extent that he would have had this power if there had been no such provision.'

*Searoad Shipping Co. v. E. I. duPont de Nemours & Co.*, 361 F.2d 833, 838 (5th Cir. 1966) (emphasis added).

Therefore, based on these rules, BP's prior words can be used to interpret whether its words and conduct constitute waiver and/or whether BP should be judicially estopped. These statements are not barred by the parol evidence rule because they were said before this Court, the PSC, and Class Members each after the agreement was entered.

> F. THIS ISSUE IS MOOT AND THEREFORE UNENFORCEABLE AS A MATTER OF LAW BECAUSE BP WAIVED ITS RIGHT TO ASSERT THIS SECOND INCONSISTENT POSITION FOR THE NINE MONTHS BETWEEN EXECUTING THE AGREEMENT AND THIS JUDGES JANUARY 2013 ORDER.

"A waiver is an intentional release of a known right or intentional conduct inconsistent with claiming it." *Broad. Satellite Intern., Inc. v. Nat'l Digital Television Ctr., Inc.*, 323 F.3d 339, 345 (5th Cir. 2003) (internal citations omitted). "The following elements must be met to find waiver: 1) a right must exist at the time of the waiver; 2) the party who is accused of waiver must have constructive or actual knowledge of the right in question; and 3) the party intended to relinquish its right." *Id.*[27]

If this Court were to believe BP when it claims that it always intended that conditions that were diagnosed after April 16, 2012 included both "earlier manifested" and "later manifested" physical injuries, then BP waived its right to claim this position when it had argued a prior inconsistent position at the fairness hearing.  As to the first element, BP had the right to argue over the span of six months (half a year), including at the fairness hearing, the certification of the class/preliminary fairness hearing, and by its three pleadings supporting fairness, that an LMPC need only be diagnosed after April 16, 2012 and there is no manifestation deadline requirement to SPCs.

Further, Class Counsel repeatedly explained that a claimant first manifesting injuries during the timeframes in the SPC Matrix would be paid pursuant to the matrix. The PSC also explained that LMPCs were reserved for conditions that did not manifest until after April 16, 2012.  BP supported this position throughout its pleadings and arguments when it should have objected as a matter of right.

As to the second element, BP knew, or should have known, that it had these rights because it was arguing before this Court, addressing whether LMPCs required

---

[27]     Admiralty law explains that failing to object to the settlement terms being contemplated, where a party is continuously informed or aware of the progress of a position, resulted in the waiver of the protected interests.  *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296, 304-06 (5th Cir. 1973), *cert. denied*, *Ruppel v. Travelers Indem. Co.*, 415 U.S. 957 (1974).

manifestation after April 16, 2012. On multiple occasions either the PSC or this Court asked questions relating to manifestation times and BELO claims.  BP did not object. Yet BP counsel was present, and actively engaged, the entire time.  BP did not explain that manifestation times were irrelevant in its position.  Quite the contrary, it argued that the condition must have "manifested later in time" and that later manifested conditions are physical conditions "claimed to have manifested after April 16, 2012."

As to the third element, in oral arguments back in April 25, 2012, BP argued that later-manifested physical injuries were injuries that did not exist now but manifested, hopefully not, but manifested in the future.  It clearly made all these arguments because it intended on relinquishing whatever right it had to secure a fairness order from this Court, a benefit that it in fact received.  So if BP's statements relating to its prior position were to ring true to this Court, its later inconsistent position which we first raised in our February 2014 memorandum could not be asserted because BP had already waived its rights to assert such a position.  Based on waiver, BP's current inconsistent position is now moot and therefore unenforceable as a matter of law.

II.    CONCLUSION

This order must be reconsidered because not to do so would result in two separate and distinct forms of manifest injustice.  First, BP must be judicially estopped from raising a second position that is inconsistent with the first when it had already derived a benefit from the first position. Second, shifting tens of thousands of Class Members out of the SPC process will flood this Court with tens of thousands of new cases.

This order currently also presents three clear errors of law that must be addressed. First, this Court must address the misapplication of the plain and ordinary meaning

doctrine. Second, this Court must address a misapplication of the parol evidence rule based on BP's misrepresentation of the law.  Third, even if BP's interpretation were correct, BP waived its right to enforce the provision relating to the LMPC definition when it held out to this Court a position inconsistent with a diagnosis only requirement.

For the foregoing reasons, we respectfully request this Court reconsider its July 23, 2014 Order affirming GRG's position pursuant to Rule 59(e).  We ask that this Court overrule GRG's Policy statement and instead hold that the plain and ordinary meaning of a Later-Manifested Physical Condition requires that the physical condition must have first manifested, and subsequently diagnosed, after April 16, 2012.  We further request this Court instruct GRG that the definition of LMPC shall have no impact on claimants seeking compensation for a Specified Physical Condition because any condition that first manifests by April 16, 2012 must be paid pursuant to the SPC Matrix only.  Lastly, we pray that this Court judicially estop BP from raising any position inconsistent with its prior position in this proceeding and any other future proceedings in order to harmonize all current and future positions raised by BP with this Court's January 2013 fairness order.  We thank this Court for its time.

Respectfully Submitted,

Craig T. Downs /s/
Appearing for DLG Class Claimants

Law Firm
**The Downs Law Group**
3250 Mary Street, Suite 307
Coconut Grove, FL 33133
Phone: (305) 444-8226
Fax: (305) 444-6773

**Craig T. Downs**
Fla. Bar No: 801089
cdowns@downslawgroup.com
**Ramon Guillen**
Fla. Bar. No. 99789
rguillen@downslawgroup.com
**Daniel A. Perez**
Fla. Bar. No. 98725
dperez@downslawgroup.com