**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**STATUS REPORT FROM THE *DEEPWATER HORIZON***
**MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, submits the following report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Benefits Class Action Settlement Agreement between March 17, 2014 and August 8, 2014 (the "Reporting Period").[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the Medical Settlement Agreement.

This status report provides:

- an overview of the Medical Settlement Agreement;

- an update on the operations and activities of the Class Member Services Center;

- a summary of claims for Specified Physical Conditions and significant developments concerning these claims;

- an account of participation in the Periodic Medical Consultation Program;

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program and the operations of the Gulf Region Health Outreach Program Library.

## I.   <u>OVERVIEW OF SETTLEMENT</u>

The Medical Settlement Agreement became effective on February 12, 2014 (the "Effective Date").  Under its terms, Medical Benefits Settlement Class Members are eligible to receive the following benefits: (1) compensation for Specified Physical Conditions; (2) participation in the Periodic Medical Consultation Program; (3) a Back-End Litigation Option for Class Members who claim Later-Manifested Physical Conditions; and (4) the establishment of the Gulf Region Health Outreach Program.[2]

All claims processing functions performed by the Claims Administrator are driven by the Proof of Claim Form.  This form, which is 29 pages long, was negotiated and adopted by Medical Benefits Class Counsel and BP and approved by the Court prior to the Effective Date. The Claims Administrator understands that the Proof of Claim Form is long and complex because the Parties encountered an extremely complex set of facts and wanted to ensure fair and

---

[2] As used in this status report, the term "claimant" means any individual who filed a Proof of Claim Form with the Claims Administrator, and the term "Class Members" means those claimants who the Claims Administrator has determined to be Medical Benefits Settlement Class Members pursuant to the terms of the Medical Benefits Class Action Settlement Agreement.

equitable delivery of the benefits of the Medical Settlement Agreement to all persons covered by the settlement.  The length and complexity of the Proof of Claim Form obviously presents challenges to claimants and their counsel and to the Claims Administrator.  Those challenges, and the efforts the Claims Administrator has taken to address and overcome them, are described in detail below.

Claimants who wish to seek compensation for a Specified Physical Condition and/or to participate in the Periodic Medical Consultation Program must submit a Proof of Claim Form to the Claims Administrator prior to February 12, 2015.  The Claims Administrator is responsible for reviewing each Proof of Claim Form to determine whether it is timely, sufficient, and complete, whether the claimant is as a Class Member, and, if so, the benefits for which the Class Member qualifies under the Medical Settlement Agreement (i.e., compensation for a Specified Physical Condition and/or participation in the Periodic Medical Consultation Program).  Upon making these determinations, the Claims Administrator will send a Specifed Physical Condition Notice of Determination ("SPC Notice of Determination") and/or a Periodic Medical Consultation Program Notice of Determination ("PMCP Notice of Determination") to the Class Member, informing the Class Member of the benefits for which he or she qualifies.

If a claimant's declaration contains deficiencies, the Claims Administrator will send the claimant a Request for Additional Information (discussed in more detail in Section III.B, below) identifying the deficiencies and giving the claimant an opportunity to cure them.[3]  Likewise, if the Proof of Claim Form contains Defects, the Claims Administrator will send a Notice of Defect to the claimant, identifying the Defects and giving the claimant an opportunity to cure them.  The Claims Administrator then will review the claimant's original and curative submissions to

---

[3] As used in this status report, the term "deficiencies" means a failure to provide required information in a claimant's declaration, and the term "Defect" has the meaning ascribed to it in the Medical Settlement Agreement.

determine whether the claimant is a Class Member and whether the claimant qualifies for compensation for a Specified Physical Condition and/or participation in the Periodic Medical Consultation Program.  The Claims Administrator will issue an SPC Notice of Determination and/or PMCP Notice of Determination or a Notice of Denial to the claimant to inform him or her of the Claims Administrator's determination.

A claimant who wishes to pursue compensation for a Later-Manifested Physical Condition after being qualified as a Class Member may either (i) seek compensation for that Later-Manifested Physical Condition pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act, as applicable, or (ii) seek compensation from BP for that Later-Manifested Physical Condition pursuant to the Back-End Litigation Option.  A Class Member who wishes to pursue the Back-End Litigation Option must submit a Notice of Intent to Sue to the Claims Administrator within four years after either the first diagnosis of the Later-Manifested Physical Condition or February 12, 2015, whichever is later.  The Claims Administrator will review each Notice of Intent to Sue to determine whether it is compliant and, if so, will transmit the Notice of Intent to Sue to BP.  BP then will determine whether to mediate the claim.  The Claims Administrator will inform the Class Member of BP's decision.  If a BP defendant elects to mediate, the Claims Administrator will notify the Class Member of BP's election, will facilitate the exchange of information between BP and the Class Member, and will select a mediator.  If a BP defendant elects not to mediate, or if the mediation does not resolve the Class Member's claim, the Class Member may file a Back-End Litigation Option Lawsuit.

## II.    CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist Class Members

and their attorneys with filing their claims.  During the Reporting Period, the Class Member Services Center received 26,370 telephone calls.  Since opening, the Class Member Services Center has received a total of 60,099 telephone calls.  The Class Member Services Center handled an average of 241 calls per day.  The average length of each telephone call was seven minutes and fourteen seconds, with an average wait time of twenty-one seconds.  The Class Member Services Center also received 535 emails during the Reporting Period, and 97 individuals visited the Class Member Services Center in person.

| TABLE 1: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Calls Received | 26,370 | 60,099 |
| Average Length of Call (min:sec) | 7:14 | 6:27 |
| Average Wait Time (min:sec) | 0:21 | 0:14 |
| Emails Received | 773 | 1,803 |
| Walk-Ins | 97 | 409 |

## III.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

### A.   Overview of Claims Metrics

During the Reporting Period, the Claims Administrator received 7,352 Data Disclosure Forms, for a total of 18,305 Data Disclosure Forms since the approval of the Medical Settlement Agreement.  The Claims Administrator responded to 6,484 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 18,193 since the approval of the Medical Settlement Agreement.  The small backlog of Data Disclosure Forms awaiting attention at the end of the Reporting Period has since been cleared.

During the Reporting Period, the Claims Administrator received 1,444 Proof of Claim Forms.  Since the Court's approval of the Medical Benefits Class Action Settlement, the Claims Administrator has received a total of  10,600 Proof of Claim Forms.  Of the 1,444 Proof of Claim

Forms filed during the Reporting Period, 1,382 sought compensation for a Specified Physical Condition and participation in the Periodic Medical Consultation Program, 60 sought only participation in the Periodic Medical Consultation Program, and two did not select any benefits.[4]

| TABLE 2: PROOF OF CLAIM FORM FILINGS | | |
|---|---|---|
| | Reporting Period | Total |
| Claims for compensation for both Specified Physical Conditions and participation in the Periodic Medical Consultation Program | 1,382 | 9,351 |
| Claims for Periodic Medical Consultation Program Only | 60 | 1,190 |
| No benefits selected | 2 | 59 |
| | | |
| **Total Proof of Claim Form Filings** | **1,444** | **10,600** |

During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to 6,030 Class Members and SPC Notices of Determination to 148 Class Members. Since the inception of the settlement, the total number of Class Members receiving a PMCP Notice of Determination is 7,195, and the total number of Class Members receiving an SPC Notice of Determination is 148.

Pursuant to the terms and requirements of the Medical Settlement Agreement, the Claims Administrator sent 1,073 Notices of Denial during the Reporting Period, for a total of 1,373 Notices of Denial from the inception of the settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member, primarily because the Proof of Claim Form and supporting documentation showed that the claimant did not reside within Zone A or Zone B or failed to show that the claimant performed Response Activities.

---

[4] If a claimant does not select any benefits but qualifies as a Class Member based on his or her Proof of Claim Form, the Claims Administrator will enroll the Class Member in the Periodic Medical Consultation Program.

During the Reporting Period, the Claims Administrator also sent 1,841 Requests for Additional Information and 670 Notices of Defect to Class Members informing them of missing or incomplete information or Defects in their Proof of Claim Forms and supporting documentation. From the inception of the settlement through the end of the Reporting Period, the Claims Administrator sent 8,069 Requests for Additional Information and 769 Notices of Defect.

The table below summarizes the disposition of claims and related correspondence during the Reporting Period and from the beginning of the Medical Settlement Agreement to the end of the Reporting Period.

| TABLE 3: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| PMCP Notices of Determination Sent | 6,030 | 7,195 |
| SPC Notices of Determination Sent | 148 | 148 |
| Claims Paid | 79 | 79 |
| | | |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent | 1,073 | 1,373 |
| Requests for Review Received | 27 | 98 |
| Class Membership Denial Challenges Received | 134 | 134 |
| | | |
| **Requests for Additional Information** | **Reporting Period** | **Total** |
| Requests for Additional Information Sent | 1,841 | 8,069 |
| Responses to Requests for Additional Information Received | 2,374 | 4,787 |
| | | |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 670 | 769 |
| Defect Cure Materials Received | 485 | 487 |

During the Reporting Period, the Claims Administrator sent SPC Notices of Determination to 148 Class Members approving their claims for compensation for Specified

Physical Conditions, for a total compensation amount of $243,050.  During the Reporting Period, the Claims Administrator paid $102,700 to Class Members, for a total of $102,700 in Specified Physical Condition payments to date.  The chart below shows the approvals and payments for all claims for Specified Physical Conditions, broken down by compensation level.

| | TABLE 4: APPROVED CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Reporting Period Amount Paid | Total Amount Paid to Date |
| A1 | 143 | 143 | $243,050 | $243,050 | $102,700 | $102,700 |
| A2 | 1 | 1 | | | | |
| A3 | 4 | 4 | | | | |
| A4 | | | | | | |
| B1 | | | | | | |
| | | | | | | |
| Total | 148 | 148 | $243,050 | $243,050 | $102,700 | $102,700 |

As explained in Section III.C.4, below, the Claims Administrator has finished reviewing the medical records of the majority of claims that have progressed to medical record review.  The Claims Administrator is manually applying the determination rules to the reviewed claims so that it can continue to issue determinations and payment.  In an effort to increase its throughput, the Claims Administrator is finalizing rules in its claims administration system that will allow it to process these claims for determination and payment through automated procedures.  The Claims Administrator expects to make substantial progress in the issuance of determinations for these claims in the upcoming reporting period.

In addition, as discussed in Sections III.B-C, the Claims Administrator is taking several steps to assist claimants in curing the deficiencies and Defects in their claims and to expedite the claims administration process.  The Claims Administrator expects to complete this work within

the next few months and asks for the patience of the claimants and their counsel as these claims deficiencies are cured and the claims review is finalized.

**B.     Efforts to Assist Claimants and Address High Rate of Defects**

As the claims metrics show, claimants are having significant difficulty completing the Proof of Claim Form on their first attempt.  The Proof of Claim Form requires a claimant to, among other things:

- identify the basis on which the claimant claims he or she is a Class Member, Medical Settlement Agreement, Exh. 5 § III.A;

- determine whether any of the exclusions to class membership apply to him or her, *id.* § III.B;

- for those claimants claiming to be Clean-Up Workers, provide employment information establishing his or her status as a Clean-Up Worker, *id.* § IV;

- for those claimants claiming to be Zone A Residents or Zone B Residents, provide their address and dates of residence within the zones, and proof establishing those facts, *id.* § V;

- identify the specific benefits for which they are applying, *id.* § VI;

- for those claimants pursuing compensation for a Specified Physical Condition,

     o select the compensation level for which the claimant is applying,

     o submit proof supporting the claimed conditions, and

     o identify the proof submitted in support of the claimed conditions, *id.* § VII;

- provide detailed information concerning each Specified Physical Condition claimed, including

     o the status of the condition;

     o the dates on which the condition first appeared;

     o the amount of time that passed after exposure to certain substances before the condition manifested;

     o the name, address, telephone number, and fax number of each medical professional who diagnosed the condition;

9

- o   the diagnosis given;

- o   the treatment provided; and

- o   proof of Actual Hospital Expenses, if any, *id.* § VIII.A;

- ▪   provide complete information about whether a claimant has ever been a beneficiary of Medicare, Medicaid, another governmental health care program, or a private insurance plan and whether any of the entities that provided that coverage have asserted liens or claims against the claimant's claim, *id.* § IX; and

- ▪   review and agree to a seven-page release and indemnity agreement, *id.* § X.

In light of the above, a significant percentage of the Proof of Claim Forms have a Defect in the proof they submit for one or more of their claimed physical conditions. The majority of these Defects are the result of the claimants not submitting medical records or not properly completing their declarations. The Medical Settlement Agreement grants a claimant one opportunity to cure the Defects in his or her submission, unless the Defect is in the claimant's declaration, in which case it cannot be cured. *Id.* § V.E ("a Defect in a declaration submitted in support of a claim for compensation for a Specified Physical Condition (other than the failure to sign such declaration) . . . cannot be cured"). The Medical Settlement Agreement then mandates that, if any Defects remain after the curative materials are submitted, the claim must be denied. *Id.* ("Any Proof of Claim Form that continues to suffer from a Defect identified on the Notice of Defect following the submission of curative documentation for such Defect shall be denied by the Claims Administrator and cannot be resubmitted.").

Since early in the settlement program, the Claims Administrator noticed the high Defect rate in the Proof of Claim Form submissions, particularly in the declarations submitted with the Proof of Claim Forms. In an effort to help claimants, the Claims Administrator suggested to the Parties that they adopt the "Request for Additional Information" or "RAI" procedure that the Claims Administrator designed. The RAI procedure would allow claimants an opportunity to

cure the deficiencies in their declarations, thus creating an exception to the "no declaration cure" rule established by the Medical Settlement Agreement and saving claims that might otherwise have been denied.

Pursuant to the RAI procedure, the Claims Administrator would review a declaration submitted in support of a Proof of Claim Form to determine whether it provided all of the information the declaration must contain to allow the Claims Administrator to determine whether the claimant is a Class Member and whether the physical conditions listed in the declaration qualify as Specified Physical Conditions.  If the declaration lacked any of this information, the Claims Administrator would send an RAI to the claimant identifying the deficiencies and recommending how the claimant can cure them.  The claimant would have sixty days to submit a revised declaration to cure the deficiencies.  If the claimant cured the deficiencies, the Claims Administrator would review the rest of the claimant's submission to determine whether it met the requirements of the Medical Settlement Agreement.  Hence, through the RAI process, the claimant would be given an opportunity to cure deficiencies in the claimant's declaration that he or she never would have had absent the process and thus save a claim that might otherwise have been denied.

The Parties approved the RAI process on May 30, 2013, and the Claims Administrator implemented the process on August 1, 2013.  It has provided a measurable benefit to Class Members.  Since the Claims Administrator implemented it, the Claims Administrator has issued 8,069 RAIs and has received 4,787 RAI responses.  Forty-six percent of those responses have cured the deficiencies in the claimant's original declaration.

Despite the benefit provided by the RAI process, the Claims Administrator continues to see a high Defect rate in the Proof of Claim Forms.  The types of Defects vary, but some

common ones are failing to submit medical records, failing to submit a declaration, failing to submit adequate proof of the claimant's status as a Clean-Up Worker, failing to submit adequate proof of that the claimant resided in a zone for the required duration, and failing to sign the Proof of Claim Form.  These are all requirements imposed by the Medical Settlement Agreement.

The Claims Administrator has taken several additional actions to address these issues. First, the Claims Administrator assigned Firm Liaisons to high volume law firms (i.e., those representing 50 or more claimants) to provide direct and specialized attention to those firms to ensure a more seamless submission process.  The Firm Liaison is the point of contact for the law firm regarding the firm's claimant submissions.  The Firm Liaison also serves as a subject matter expert on key sections of the Medical Settlement Agreement.  The Firm Liaison's job responsibilities include providing updates to law firms regarding the status of claimant submissions; providing guidance and assistance to law firms in filling out and submitting Proof of Claim Forms, Notice of Intent to Sue Forms, and Mediation Information Forms; providing assistance to law firms in responding to Requests for Additional Information and Notices of Defect; notifying law firms of updates and changes to the claims administration procedures, Party-approved directives, and/or policy development; maintaining communication between the law firms and the Claims Administrator; and providing answers to any inquiries the law firms may have regarding the Medical Benefits Class Action Settlement.

Second, the Claims Administrator began sending correspondence to the firms in May 2014, reminding them of pending deadlines, including the expiration of the 120-day Defect cure period.  The Claims Administrator then analyzed the percentage of claimants who were responding to Notices of Defect.  The response rate for claimants represented by counsel was 70%, whereas the response rate for unrepresented claimants was only 44%.  In an effort to

12

provide additional assistance to unrepresented claimants, the Claims Administrator developed a procedure for contacting claimants through outbound calls and mailings to provide them with periodic reminders of the deadline for responding to their Notices of Defect, which is now in effect.

Third, as it has done since the inception of the settlement program, the Claims Administrator provides claimants with the opportunity to meet with Claims Administrator personnel in person to ask questions about the settlement and to obtain assistance in completing the Proof of Claim Form.  Claimants may schedule appointments for assistance Monday through Friday, 9:00 a.m. to 3:30 p.m. Central Standard Time.  The Claims Administrator places reminder calls to claimants 24 hours prior to their scheduled appointments.  If a claimant fails to appear at his or her scheduled appointment time, the Claims Administrator will contact the claimant to reschedule the appointment or to provide assistance via telephone.  While the Claims Administrator encourages scheduled appointments, it also will see claimants during unscheduled walk-in appointments during its hours of operation.

### C.     Efforts to Expedite Proof of Claim Form Review

As mentioned above, a significant percentage of the Proof of Claim Forms submitted have contained one or more deficiencies or Defects.  These deficiencies and Defects have not only increased the amount of time that it takes for a claimant to reach the determination stage, they also have increased the amount of time it takes the Claims Administrator to process claims. Yet, as of the end of the Reporting Period, the Claims Administrator had issued an RAI, Notice of Defect, Notice of Determination, or Notice of Denial for every one of the 10,600 Proof of Claim Forms it had received as of that date.  Proof of Claim Forms have been queued for review

in various stages of the claims administration process.  The largest queues were at the following

stages in the claims review process:

| TABLE 5: LARGEST CLAIM REVIEW QUEUES | |
|---|---|
| **Stage in Review** | **Number of Claims** |
| BOP Defective – Queued[5] | 655 |
| Total Eligible Claims – PMCP Only – Defective – Queued[6] | 200 |
| Declaration Review Ready Claims – Pending Declaration Review – Queued[7] | 581 |
| Declaration Review Ready Claims – Request for Additional Information – Queued[8] | 343 |
| Notice of Defect (NOD) Gate 1 – Queued[9] | 1,670 |
| Medical Record Review (MRR) Claims [Declaration Valid] – Medical Record Retrieval Queue[10] | 378 |
| Medical Record Review (MRR) Claims [Declaration Valid] – Queued for Determination[11] | 2,146 |

An explanation of the reason for each queue and the steps the Claims Administrator is taking to

clear it is set forth below.

> 1.    BOP Defective – Queued, Total Eligible Claims – PMCP Only –
> Defective – Queued, and Notice of Defect (NOD) Gate 1 – Queued

As of the end of the Reporting Period, there were 655 claims in the "BOP Defective –

Queued" queue, 200 claims in the "Total Eligible Claims – PMCP Only – Defective – Queued"

queue, and 1,670 claims in the "Notice of Defect (NOD) Gate 1 – Queued" queue.  As explained

in more detail below, the primary reason these queues exist has to do with the Notice of Defect

and associated cure process.  The Claims Administrator continues to make progress in reducing

these queues.  It has issued 622 Notices of Defect since the end of the Reporting Period, reducing

---

[5] Total Basis of Participation defective claims that are in the queue to receive a Notice of Defect.
[6] Total PMCP-only defective claims that are in the queue to receive a Notice of Defect.
[7] Total eligible Class Members submitting a declaration (and/or an RAI Response) that are in the queue for Declaration Review.
[8] Total claims requiring an RAI that have been placed in the queue to receive an RAI.
[9] Total claims in Notice of Defect Gate 1 that are in queue to receive a Notice of Defect.
[10] Total claims that have passed through preliminary gates and are in the queue for Medical Record Retrieval.
[11] Total claims that have passed through preliminary gates and are queued for determination.

the "BOP Defective – Queued" queue to 527 claims and the "Notice of Defect (NOD) Gate 1 –
Queued" queue to 1,176 claims.  The Claims Administrator plans to clear these queues by end of
September.

The Medical Settlement Agreement mandates (1) that the Claims Administrator must
send one Notice of Defect to each Medical Benefits Settlement Class Member whose Proof of
Claim Form it is required to reject under the terms of the Medical Settlement Agreement, and
(2) that the Notice of Defect must list the Defects giving rise to the rejection, such that the
claimant has the opportunity to cure "all" of the Defects in the Proof of Claim Form and
supporting documentation.  In certain circumstances, however, the Claims Administrator needs a
claimant to cure certain Defects in his or her Proof of Claim Form before the Claims
Administrator can determine whether other Defects exist.  For example, when a claimant's Proof
of Claim Form does not establish the basis on which he or she is a Class Member, the Claims
Administrator needs the claimant to cure the Defects in that proof before it can determine
whether there are Defects in other aspects of the claimant's Proof of Claim Form, like in the
proof the claimant submitted to substantiate his or her claim for compensation for a Specified
Physical Condition.   The Claims Administrator has been working to design procedures that
would streamline this process for claimants.

      2.     Declaration Review Ready Claims – Pending Declaration Review –
Queued, and Declaration Review Ready Claims – Request for Additional
Information – Queued

As of the end of the Reporting Period, there were 581 claims in the "Declaration Review
Ready Claims – Pending Declaration Review – Queued Queue," and 343 claims in the
"Declaration Review Ready Claims – Request for Additional Information – Queued Queue."
The Claims Administrator is staffed to handle the volumes of claims in these queues.  It expects
to clear the claims in the "Declaration Review Ready Claims – Pending Declaration Review –

Queued" queue and the "Declaration Review Ready Claims – Request for Additional Information – Queued" queue within the next three weeks.

    3.    Medical Record Review (MRR) Claims [Declaration Valid] – <u>Medical Record Retrieval Queue</u>

As of the end of the Reporting Period, there were 378 claims in the "Medical Record Review (MRR) Claims [Declaration Valid] – Medical Record Retrieval" queue.  Although a third-party vendor will retrieve the records, the retrieval process must be administered through the medical record retrieval module in the Claims Administrator's system to ensure that retrieval requests are sent for the correct claims and to ensure that the Claims Administrator can accurately track ordering, inbound order arrival, order completion, and the review of the retrieved records. Before it could make considerable progress in developing this module, the Claims Administrator first had to know which third-party vendor would be providing the retrieval services, since each vendor uses different procedures and processes, which the module would have to track.

    The Parties approved the Claims Administrator's recommended vendor on March 4, 2014.  The Claims Administrator has fully staffed its medical record retrieval team and has finalized its operating procedures for this task.  The Claims Administrator expects to clear this queue by the end of September.

    4.    Medical Record Review (MRR) Claims [Declaration Valid] – <u>Queued for Determination Queue</u>

    As mentioned above, the Claims Administrator has reviewed the medical records of the majority of claims that have proceeded to the "Medical Record Review (MRR) Claims [Declaration Valid] – Queued for Determination" queue.  Based on its reviews, the Claims Administrator must now determine whether these claims qualify for compensation for a Specified Physical Condition and, if so, the amount.  These determinations are multifaceted and elaborate.  Claimants can apply for compensation for multiple Specified Physical Conditions,

each of which has its own lump sum amount and may be eligible for an overnight hospitalization enhancer and for reimbursement for Actual Hospital Expenses.  Claimants, however, after being determined to be Class Members, may only recover for the Specified Physical Condition with the highest gross value, taking into account the lump sum and the enhancers.  The Claims Administrator, therefore, must calculate the gross settlement amount for each Specified Physical Condition to determine the one with the highest value, which will be the one the Claims Administrator awards to the Class Member.

Currently, the Claims Administrator is manually applying the determination rules to the reviewed claims so that it can issue determinations and payments.  To expedite this process, the Claims Administrator is finalizing rules in its claims administration system that will automate these calculations and determinations and will reduce the processing timelines.  The Claims Administrator expects to make substantial progress in the issuance of determinations for these claims in the upcoming reporting period.

> **D.**     **The Court's July 23, 2014 Order**

On July 23, 2014, the Court entered its Order Regarding Medical Benefits Settlement — Policy Statement on Classification of Chronic Physical Conditions First Diagnosed After Aril 16, 2012 (Rec. doc. 12862) (the "Order"), affirming that all physical conditions first diagnosed after April 16, 2012 shall be classified as Later-Manifested Physical Conditions, regardless of whether any such conditions are of the type listed in the Specified Physical Conditions Matrix and otherwise meet the manifestation requirements set forth in the matrix.  On August 20, 2014, Medical Benefits Class Counsel and certain claimants' counsel filed motions asking the Court to reconsider its Order.  Those motions are pending before the Court.

## IV.   PERIODIC MEDICAL CONSULTATION PROGRAM

### A.   Provider Network

During the Reporting Period, the Claims Administrator added 18 medical provider organizations to its network of providers established to provide certain Covered Services to Class Members who participate in the Periodic Medical Consultation Program, bringing the total number of medical provider organizations to 18. These medical provider organizations represent 64 service delivery sites. As a result of these additions, 64% of eligible Class Members resided within 25 miles of a network provider at the conclusion of the Reporting Period. The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than 30 days or travel more than 25 miles for an appointment.

### B.   Class Member Participation in the Periodic Medical Consultation Program

During the Reporting Period, the Claims Administrator approved 7,423 claims for participation in the Periodic Medical Consultation Program and mailed 7,195 PMCP Notices of Determination. The Claims Administrator received requests for and scheduled 383 physician visits during the Reporting Period, and Class Members attended 237 appointments in the Reporting Period.

| TABLE 6: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Eligible to Receive Physician Visits | 7,423 | 7,423 |
| PMCP Notices of Determination Sent | 7,195 | 7,195 |
| Physican Visits Requested and Scheduled | 383 | 383 |
| Appointments Attended by Class Members | 237 | 237 |

## V.    BACK-END LITIGATION OPTION

During the Reporting Period, 38 Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 149 Class Members to date.  Of the 38 Notices of Intent to Sue filed in the Reporting Period, four were approved, 14 contained deficiencies that could be corrected by the Class Member, and 20 were denied.

| TABLE 7: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 38 | 149 |
| Notices of Intent to Sue Approved | 4 | 5 |
| Notices of Intent to Sue Denied | 20 | 78 |
| Notices of Intent to Sue Deficient | 14 | 66 |

Out of the five approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims.  During the Reporting Period, four Class Members became eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to five.

| TABLE 8: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| Mediation Elections | Reporting Period | Total |
| Later-Manifested Physical Condition claims for which at least one BP Defendant elected mediation | 0 | 0 |
| Later-Manifested Physical Condition claims pending a decision from one or more BP Defendants regarding mediation | 0 | 1 |
| Later-Manifested Physical Condition claims for which no BP Defendants elected mediation | 4 | 5 |
| | | |
| TOTAL: | 4 | 5 |
| | | |

| Results of Mediation | Reporting Period | Total |
|---|---|---|
| Later-Manifested Physical Condition claims settled by mediation | 0 | 0 |
| Later-Manifested Physical Condition claims settled by mediation as to one but not all BP Defendants listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition claims mediated but not settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition claims for which no BP Defendant elected mediation | 4 | 5 |
| Later-Manifested Physical Condition claims mediated but not settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT:** | **4** | **5** |

## VI.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the Medical Settlement Agreement, the Gulf Region Health Outreach Program was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care, and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.   The program consists of five integrated projects: the Primary Care Capacity Project, Community Involvement, the Mental and Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Project.  As of the end of the Reporting Period, the Claims Administrator disbursed $79,081,738 to the projects, as detailed in the chart below.

| TABLE 9: GULF REGION HEALTH OUTREACH PROGRAM | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $38,660,578 |
| Community Involvement | $1,733,321 |
| Mental and Behavioral Health Capacity Project | $26,709,394 |
| Environmental Health Capacity and Literacy Project | $9,024,161 |
| Community Health Workers Training Project | $2,954,284 |
| | |
| **TOTAL:** | **$79,081,738** |

Two additional disbursements are scheduled for May 2015 and May 2016, which will bring the total funding of the Gulf Region Health Outreach Program to $105 million.

The Gulf Region Health Outreach Program is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as biweekly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the Gulf Region Health Outreach Program as a whole. The last quarterly meeting was held on July 31, 2014 in Mobile, Alabama, and encompassed discussion on a variety of topics, including but not limited to, funding updates, continuing and increasing community involvement throughout the projects, and interdependencies, synergies, and solutions amongst the projects. The next quarterly meeting will be held on November 14, 2014 in New Orleans, Louisiana. Though not specifically mandated by the Medical Settlement Agreement, the biweekly conference calls are also held to promote open conversation between projects regarding updates, progression, and collaboration.

The Coordinating Committee recently requested the Claims Administrator to establish a Gulf Region Health Outreach Program website. This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the Gulf Region

21

Health Outreach Program Coordinating Committee, news/events, and publications. The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

**B.     Gulf Region Health Outreach Program Project Updates**

Each Gulf Region Health Outreach Program project has made substantial progress in achieving the goals set forth in their respective Grant Proposals. Some notable accomplishments of the projects include:

- The Primary Care Capacity Project, led by the Louisiana Public Health Institute, which has:

    o   Provided funds to 13 Federally Qualified Health Centers ("*FQHCs*") and FQHC Look-alikes located within the 17 coastal counties and parishes covered by the settlement program;

    o   Developed or augmented, where appropriate, community health assessments for the 17 Gulf Region Health Outreach Program-eligible counties and parishes;

    o   Developed and conducted clinic assessments of 11 participating clinic operators that include over 50 total sites across four states to assess their current status as compared to standards and guidelines for high-performing, sustainable, clinics ready to function in the healthcare reform environment; and

    o   Developed strategic state partnerships with state entities in each Gulf Region Health Outreach Program state.

- Alliance Institute, the grantee responsible for Community Involvement, has:

    o   Identified and executed contracts with Community-Based Organizations ("*CBOs*") in Louisiana, Mississippi, and Alabama – including Vietnamese Initiatives in Economic Training and Bayou Interfaith Shared Community Organizing in Louisiana, Steps Coalition in Mississippi, and Boat People SOS in Alabama;

    o   Led a symposium on how the implementation of the Affordable Care Act will impact Gulf State communities in Louisiana, Mississippi, Alabama, and Florida;

    o   Identified participants for focus groups for community health assessments and key informant interviews;

    o   Provided technical skills assistance to the CBOs in the areas of financial infrastructure and alternative fund stream development; and

- o Begun the process of building State Health Coalitions via meetings with the CBOs, Gulf Region Health Outreach Program partners, participating health centers, as well as in-state partners and strategic allies.

- The Mental and Behavioral Health Capacity Project, implemented by a coalition of four academic institutions (including Louisiana State University Health Sciences Center, the University of Southern Mississippi, the University of South Alabama, and the University of West Florida) has:

  - o Implemented supplemental integrated therapeutic services in five primary care facilities;

  - o Expanded telepsychiatry services in clinics in Orleans, Plaquemines, St. Bernard, and Cameron parishes;

  - o Graduated 26 Masters of Social Work interns in Mississippi, who completed their final internships with an integrated health training module;

  - o Established permanent Mississippi Integrated Health Disaster Program offices in four FQHC clinics in Mississippi;

  - o Launched an intensive care coordination program for patients with chronic health conditions in multiple clinics in Mississippi;

  - o Placed Mental Health Professionals in two FQHCs at six separate sites in lower Alabama to integrate mental and behavioral health services within primary care, as well as within lower Alabama's public school systems;

  - o Placed four graduate assistants in Baptist and Sacred Heart Hospital to assist the Escambia County Community Clinic identify, assess, and refer qualified patients to the clinic; and

  - o Placed graduate assistants and Licensed Certified Social Workers in two FQHCs in Florida and integrated mental and behavioral health services with primary care.

- The Environmental Health Capacity and Literacy Project, with its grantee being Tulane University, has:

  - o Established three programs to achieve its goals – the Environmental Health Education and Referral Program, the Community Environmental Health Wellness Program, and the Environmental Health Literacy Program;

  - o Developed and implemented a learning objectives-driven curricular in partnership with the Community Health Worker Training Project to train Community Health Workers to be embedded in FQHCs and other CBOs in the designated Gulf region;

  - o Awarded 13 FQHCs and CBOs funding to place 19 community health workers throughout Louisiana, Mississippi, Alabama and Florida;

- o Created and implemented the Environmental Sciences Teacher Workshop to provide rigorous professional development in environmental health sciences to certified high school science teachers from Southeast Louisiana;

- o Created and implemented the Emerging Scholars Environmental Health Sciences Academy to provide students from public/charter high schools in Southeast Louisiana the opportunity to conduct environmental health science research alongside Tulane faculty and post-doctoral scholars; and

- o Established a Fussy Baby Network Site in Southeast Louisiana to support families with children under 12 months of age.

- The Community Health Workers Training Project, directed by the University of South Alabama's Coastal Resource and Resiliency Center, has:

- o Trained 49 Community Health Workers through two training sessions held in New Orleans, Louisiana, and Mobile, Alabama; and

- o Developed and piloted a Peer Health Advisers ("*PHA*") training program with a curriculum focused on community outreach, peer listening, basics of chronic diseases, and disaster preparedness and recovery.

## VII. <u>GULF REGION HEALTH OUTREACH PROGRAM LIBRARY</u>

In accordance with Section IX.H of the Medical Settlement Agreement, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

As of the end of the Reporting Period, the Library housed over 103,000 relevant documents, each tagged with a specific search category based on the type of information identified within the Medical Settlement Agreement.  The Claims Administrator will continue to add Library Materials in accordance with the Medical Settlement Agreement.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
        Matthew L. Garretson