# Exhibit 5

BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 41841

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of its Initial Proposal with regard to the appeal of Claim No. 41841 (Claimant Benny Whitehead, Inc.).

Claimant is a trucking company located in Eufaula, Alabama (Zone D), approximately 130 miles from the Gulf of Mexico. The Settlement Program awarded Claimant $1,172,565 in lost profit ($1,468,464 post-RTP). This award does not comply with the terms of the Settlement Agreement. BP files this appeal because: (1) the Settlement Program erred in determining Claimant's compensation by including intercompany transactions with a second Benny Whitehead entity, ██████ ███████ ███████████; (2) the Settlement Program misclassified certain fixed expenses as variable expenses;[1] and (3) the Settlement Program failed to apply expense reimbursements to the months in which the expenses were incurred.[2] These errors resulted in a $430,496 overstatement of the Compensation Amount.

When the Settlement Program's errors are corrected, Claimant's Compensation Amount is $742,069. Accordingly, BP respectfully submits an Initial Proposal Compensation Amount of $742,069.

EXPLANATION OF BP'S POSITION

A.   The Settlement Program Failed to Exclude Intercompany/Related-Party Transactions

The Business Economic Loss ("BEL") Framework seeks to identify post-Spill declines in economic performance that might be fairly attributable to the Spill. It does so by comparing

---

[1]   These first two issues are not governed by the Court's prior Orders.

[2]   To the extent this third issue is governed by the Court's prior Orders, it is appealed solely for purposes of preserving further rights of appeal.

██████ WHITEHEAD ██ 072

variable profit -- defined as revenue minus variable expenses -- earned in defined Benchmark and Compensation periods before and after the Spill. Under the Settlement Agreement, "[t]he compensation framework for business claimants compares the *actual profit of a business* during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." Settlement Agreement, Ex. 4C at 1 (emphasis added).

Payments made to related parties do not constitute variable expenses under the Settlement Agreement. As the Claims Administrator has expressly recognized in the context of revenue, "intercompany sales / related party transactions" do not occur "under the normal course of operations in an arm's length transaction." Policy 328 Business Economic Loss Claims: Non-Revenue Items of Entities. Accordingly, such intercompany/related-party transactions cannot be included as variable expenses for the same reason that they "shall not typically be treated as 'revenue' for purposes of the various calculations to be performed under the terms of the Settlement Agreement with regard to entities asserting BEL claims." *Id.*

Here, the Settlement Program erroneously recognized as a variable expense $339,700 in intercompany/related-party transactions between Claimant and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("BWT"), recorded in Claimant's financial records as "Brokerage Expense ▮▮▮▮ from August to November 2010. *See* Accountant Compensation Calculation Schedules (DWH Settlement – PDF) at 15 (Doc ID # 10549381) (classifying Claimant's Profit and Loss Statement items) ("P&Ls"). Claimant is ▮▮▮▮▮▮▮▮▮ family-founded, -owned, and -operated trucking company. In June 2010, ▮▮▮▮▮▮▮▮ started ▮▮▮▮ o haul chips for a local sawmill." Correspondence (attached hereto as Exhibit 1). He had Claimant pay the startup costs for BWT, and, because ▮▮▮▮ was starting up and the employees had some idle time on their hands" and Claimant's employee who "brokered loads found employment elsewhere," "the decision was

WHITEHEAD - 073

made by [M]r. ████████to let [████broker loads for [Claimant]."  Correspondence (attached hereto as Exhibit 2).  Mr. ████████ apparently decided that Claimant would pay ████ ·15% of the gross income of the load that was generated by ████ for [Claimant] to haul."  *Id.*  In other words, Claimant paid a related party $339,700 through an intercompany transaction for four months of work that had previously been performed by a single Claimant employee.  It is unlikely that Claimant would pay $339,700 for four months of a single employee's services in an arm's length transaction.

In addition, Mr. ████████ had the transaction recorded as a reduction in the account receivable he created when Claimant paid ████s startup costs.  *See* Exhibit 1.  That is, the intercompany brokerage transaction was itself part of a larger intercompany financial arrangement involving ████s startup costs.

Accordingly, based on Claimant's objective financial data and its own correspondence, it is apparent that the $339,700 recorded as "Brokerage Expense ████ from August to November 2010 was an intercompany/related-party transaction and not a variable expense incurred "under the normal course of operations in an arm's length transaction."  Policy 328 Business Economic Loss Claims: Non-Revenue Items of Entities.  The Settlement Program therefore erred by recognizing this amount as a variable expense for purposes of calculating Claimant's compensation.

When the "Brokerage Expense ████ is properly excluded as an intercompany/related-party transaction, Claimant's Compensation Amount is reduced by $339,700.

B.   The Settlement Program Misclassified Claimant's Fixed Expenses as Variable Expenses

As noted above, the BEL Framework seeks to identify post-Spill declines in economic performance by comparing variable profit -- defined as revenue minus variable expenses -- earned in a defined period before and after the Spill.

Variable expenses are "those that change in relation to the level of sales by a business." *Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.*, 650 So. 2d 801, 803 (La. Ct. App. 1995). For example, "the cost of materials and labor which go directly into production of contract goods are considered variable costs -- they vary with the number of contracts which are performed." *Id.* at 804. Fixed expenses, on the other hand, "'are those costs that the business must expend regardless of the sales level. For example, something like rent.'" *Id.* at 803. "It has been said that fixed costs are those which 'continue if the firm is temporarily shut down, producing nothing at all.'" *Id.*

Courts have routinely found that costs that are not tied to output/services are fixed costs. As the United States Court of Appeals for the Fifth Circuit has explained: "[S]alaried labor costs, rent or depreciation on real estate, and certain capital expenses are considered fixed. But inputs like hourly labor, the cost of materials, transport, and electrical consumption at a plant will vary." *Stearns Airport Equipment Co. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999). The Settlement Agreement adopts this same approach and classifies expenses as fixed or variable according to Exhibits 4C and 4D.

Here, the Settlement Program misclassified as variable Claimant's "Publix Discounts Given" expense, which is a finance cost that Claimant incurs to receive payments of accounts receivable faster, in the nature of an "Interest Expense - Fixed" pursuant to Exhibit 4D to the Settlement Agreement. *See* P&Ls at 12, 15. Claimant explains that, starting in 2009, the grocery

4

WHITEHEAD - 075

store chain Publix began offering Claimant full payment of invoices within seven days at the cost of a 1% charge. *See* Correspondence (attached hereto as Exhibit 3); Exhibit 1. That is, instead of the business receiving payment on an account receivable within a typical commercial time period, such as 30-60 days, Claimant allowed Publix to reduce its payment to Claimant by a 1% charge to receive the funds promptly. These prompt pay charges therefore function as an interest expense or similar finance charge. Normally, if a business needs a short-term source of operating funds, such as to make payroll, it may borrow against its accounts receivable and pay interest on a short-term loan that it will repay once its accounts receivable are paid. Claimant's arrangement with Publix serves the same purpose. If Claimant wants a short-term source of funds, it can effectively pay Publix a 1% charge and receive payment on its accounts receivable within 7 days (rather than 30-60 days later). Accordingly, these charges should be classified as fixed in the nature of an interest or similar financing expense under the Settlement Agreement. *See* Settlement Agreement, Ex. 4D.

The Settlement Program erroneously recorded these payments as variable discount and rebates expenses. Discounts and rebates, however, are reductions in the price of goods and services that incentivize their purchase, and are therefore variable because they correspond directly to a business's level of services. Prompt payment charges do not correspond directly to a business's level of services. They are incurred, or not, depending on the business's desire to receive payment sooner than required under standard payment terms, for the same reasons a business would borrow short-term funds and pay interest.

When this classification error is corrected, Claimant's Compensation Amount is reduced by $27,796.

WHITEHEAD 076

C.   The Settlement Program Failed to Apply Expense Reimbursements to the Months in Which the Expenses Were Incurred

The Settlement Program also erred in failing to properly consider Claimant's expense reimbursements. Under the terms of the Settlement Agreement, reimbursements must be applied to the months in which the reimbursed expense was incurred. *See, e.g.*, Settlement Agreement, Ex. 4C at 1 (providing that the compensation framework for business claimants "compares *actual* profit of a business" (emphasis added)). It was therefore erroneous for the Settlement Program to rely on Claimant's data without appropriately applying these reimbursements.

Here, Claimant received $63,000 in insurance proceeds in December 2010 as a reimbursement "for costs incurred to repair a damaged truck. The costs for repairing the damages had been paid in the previous month." Correspondence (attached hereto as Exhibit 4). Under the terms of the Settlement Agreement, which seek to measure changes in actual economic performance, such reimbursements must be applied to the months in which the costs that are being reimbursed occurred. Otherwise, the compensation calculation will be performed with data that do not reflect actual financial performance and the results will be flawed. The Settlement Program should have therefore applied the $63,000 expense reimbursement to the costs apparently incurred in the prior months, during the June-November 2010 Compensation Period. Instead, the Settlement Program improperly excluded the reimbursement from consideration entirely. In doing so, the Settlement Program overstated Claimant's variable profit during the Compensation Period.

When this error is corrected, Claimant's Compensation Amount is reduced by $63,000.

\* \* \*

In this case, the Settlement Program failed to properly determine Claimant's expenses and thus to calculate Claimant's compensation under the Settlement Agreement. When the

6

WHITEHEAD 077

Settlement Program's errors are corrected, Claimant's Compensation Amount is $742,069.

Accordingly, BP respectfully submits an Initial Proposal Compensation Amount of $742,069.

WHITEHEAD - 078

# Exhibit 1

WHITEHEAD - 079

Ms. Crosby,

In response to your request, please see below in Red:

1. Why are Publix Discounts in 2009 and forward, but not in year 2008 and 2007? They did not give the option for the "to pay within 7 days" until year 2009 and as a result Publix charges them a percentage to do that.

2. Attached is a owners compensation breakdown with the related taxes.

3. Why is there a large brokerage expense in December of 2010. Can you explain and provide support that this amount was paid in 2010? The brokerage expense of 341,121.63 on ███████████ books was a year end entry that I made to record brokerage expense incurred by ████████████ that was due to ██████████ Inc for brokering loads for bwi the last quarter of 2010. ████████ was started in June of 2010 to haul chips for a local sawmill. Bwi paid the startup costs for this company and this showed up on the books as an accounts receivable from ██████████. This brokerage expense was paid by bwi by reducing the accounts receivable owed by ██████████████. The entry that was made was a debit to brokerage expense in the amount of 341,121.63 and a credit to accounts receivable ██████████ in the amount of 341,121.63.

Please let me know if there is any further information you need.

Sincerely,

Cathy Mitchell
6207 Cottage Hill Road
Suite G
Mobile, AL 36609

t: 251.660.0888
f: 251.660.0777

ejsaadlaw.com

E.J. SAAD
LAW FIRM

WHITEHEAD 080



Regina,

The CPA is going to look for the invoices to tie to the expense; therefore you will be able to accurately place it in the corresponding month.

A quick explanation after reading this and confirming my understanding with the claimant is as follows:

█ loaned the transportation company startup money and was booked as an account receivable.
The transportation company brokered loads for █ therefore █ incurred expenses owed to the transportation company.
At year end, the amount owed to the transportation company from █ was 341,121.63 for broker fees. █ reduced the AR for the transportation company by this amount and this went against the claimants brokerage expense.

The transportation company received the revenue from the contract with the Saw Mill.

The relation of the two companies is common ownership.

I will be getting you the invoices/support no later than tomorrow morning.

I will be in from 8 to 6, tomorrow CST. Call me anytime with the exception of 11-12.

Sincerely,

Cathy Mitchell
6207 Cottage Hill Road
Suite G
Mobile, AL 36609

T: 251.660.0888
F: 251.660.0777

ejsaadlaw.com



E.J. SAAD
LAW FIRM

WHITEHEAD - 081

# Exhibit 2

WHITEHEAD - 082

## RE: Claimant ▮▮▮▮▮▮▮▮▮▮▮▮ Inc. Claimant ID: 100089377

Catherine Mitchell [cmitchell@ejsaadlaw.com]

Sent   Tue 5/14/2013 10:52 AM
To:    Regina Crosby
Cc:    Crystal

📎 Message   📄 Support.pdf (90 KB)

Regina,

The CPA stated he was not correct on his initial statement of the relationship of the two companies and the expense. He apologized and met with the claimant yesterday for clarification.

He stated "With the freight business slowing down in 2010 and ▮▮▮▮▮▮▮▮▮▮ starting up in 2010, ▮▮▮▮▮▮▮▮▮▮ had unloaded trucks on the yard and was needing more freight to haul. Since ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was starting up and the employees had some idle time on their hands, the decision was made by ▮▮▮▮ let transportation broker loads for inc. In 2010, this brokerage agreement was from August through December. The percentage to be paid was 15% of the gross income of the load that was generated by Transportation for Inc. to haul. This brokerage agreement was paid on loads generated by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Another factor that created this brokerage expense arrangement, was that the employee who worked for inc and brokered loads found employment elsewhere, thus creating a need that could be filled by transportation."

Attached are the source documents you requested.

Please call or email me with any questions. I will be out from 11-12 today.

Sincerely,

Cathy Mitchell

6207 Cottage Hill Road
Suite G
Mobile, AL 36609

t: 251.660.0888
f: 251.660.0777

ejsaadlaw.com




E.J. SAAD
LAW FIRM


WHITE-CO - 083

# Exhibit 3

WHITEHEAD - 084

| | |
|---|---|
| **From:** | Matt Andrews |
| **To:** | Katherine Goode |
| **Cc:** | Catherine Mitchell |
| **Subject:** | ████████████ Claim Id.100089377 |
| **Date:** | Wednesday, February 27, 2013 10:49:35 AM |

Kathryn,

We have received some of the information requested from the Claimant, ████████████ ████████. However, the book keeper has been out on vacation and just returned yesterday. As a result, some of the information is still being obtained and we should be able to get it by Friday at the latest. The answers we do have are in red below:

The following line items on your P&L require a description/clarification:

- "Publix Discounts" – Please explain the nature of the line item. THEY PAY US IN 7 DAYS AND THEY CHARGE US 1%...THAT IS WHAT THIS IS
- "Brokerage Income and Brokerage Expense" – This is found in Income. Please explain. WE BROKER SOME LOADS TO OTHER TRUCKS. THE BROKERAGE INCOME IS WHEN WE BILL IT AND THE EXPENSE IS WHEN WE PAY TRUCK
- "Driver Unloading Expense" – please explain. WE HAVE TO PAY FOR SOME LOADS TO BE UNLOADED. THE DRIVERS DON'T DO THIS, THEY HIRE IT OUT AND THIS IS WHERE THEY ARE REIMBURSED FOR IT.
- "Driver Expense" – please explain. THIS IS THE DRIVERS PER DIEM PAY...THAT THE IRS ALLOWS. WE DO $40 PER DAY
- "Driver Safety" – please explain. I'M NOT SURE WHERE THIS IS ON P&L...THE DRIVERS EARN SAFETY BONUSES FOR DRIVING SAFE BUT I THINK THAT'S UNDER EMPLOYEES AWARDS AND BONUSES.
- "Postage and Freight" – Is this just freight, due to the amount of the account, they are asking if this includes your normal postage as well? Can you provide a general ledger detail of the account for all years or some sort of support? THIS IS FOR POSTAGE INCLUDING USPS, FEDEX AND UPS FEES
- "Qualcomm" – please explain. THIS IS OUR ONBOARD SATELLITE TRACKING SYSTEM. WE PAY A MONTHLY FEE AND ALSO PARTS AND REPAIRS FOR THEM.
- "Shop supplies and tools" – please explain.
- "Rental truck and trailer" – please explain. WHEN A TRUCK BREAKS DOWN AND WE HAVE TO RENT A TRUCK ON THE ROAD
- "Wrecker fees" – please explain. WHEN WE HAVE TO HIRE A WRECKER TO TOW TRUCKS AND/OR TRAILERS IF BROKE DOWN
- "Outside truck repair claims" – please explain. WHEN SOMEONE ELSE'S TRUCK IS DAMAGED BY OUR TRUCK AND WE HAVE TO PAY TO GET IT FIXED. IF THEY AREN'T HUGE CLAIMS, WE PAY OUT OF POCKET FOR IT.
- "Recruiting fees" – please explain. A DRIVER CAN EARN A BONUS FOR RECRUITING ANOTHER DRIVER THIS IS WHERE HE IS PAID A FEE FOR THAT
- "Recruiting expense" – please explain. EXPENSES RELATED TO RECRUITING DRIVERS INCLUDING ADVERTISING MATERIAL FOR RECRUITING, MOTEL AND TRAVEL EXPENSES FOR

RECRUITING DRIVERS, MEALS, ETC.
- "Fuel Wiring Charges" – please explain. OUR FUEL COMPANY CHARGES A WIRE FEE WHEN A DRIVER GETS AN ADVANCE
- "Profit sharing expense" – does this include owners and employees?  If this includes owners, can you give a breakout of the owners portion by month for all years. THIS IS 401K CONTRIBUTIONS FOR EMPLOYEES.
- "American Cancer Society" – each year there is a negative amount in this account. Please explain why.  LOOKS LIKE SOMETHING ISN'T CODED RIGHT.  THIS ISN'T DONE ANYMORE BUT ONE YEAR DRIVERS CONTRIBUTED TO AMERCIAN CANCER SOCIETY AND WE PAYROLL DEDUCTED IT AND IT SHOULD HAVE BEEN A WASH.

We will send the remaining responses by weeks end.  If you have any questions please email or call Cathy Mitchell or myself and we will try to answer them.  Thanks.

Sincerely,

Matt Andrews

6207 Cottage Hill Road
Suite G
Mobile, AL 36609

T: 251.660.0888
F: 251.660.0777

ejsaadlaw.com


E.J. SAAD
LAW FIRM

WHITEHEAD - 086

# Exhibit 4

WHITEHEAD 087

**From:** Robert Headrick, Jr [mailto:rah@rahjrcpa.com]
**Sent:** Wednesday, December 26, 2012 9:27 AM
**To:** DHECC
**Subject:** BP Claim Center's questions regarding ████████████████████████████████████

Two questions were asked of me regarding ████████████████████ claim. Those questions with the answers are listed below.

1. <u>Question</u>: On December 2010's financial statements, $63,000 in insurance proceeds were indicated as revenues on the income statement (P&L). What damages did the insurance proceeds pay? <u>Answer</u>: According to ████████████████████, the insurance proceeds were utilized to reimburse ████████████████████ for costs incurred to repair a damaged truck. The costs for repairing the damages had been paid in the previous month.

2. <u>Question</u>: Could you provide information as to what expenses are recorded in the "Driver's Emergency Fund". <u>Answer</u>: Truck drivers who are employed by ████████████████████ contribute $5 from their paychecks to the Driver's Emergency Fund. Should a truck driver have a heart attack or similar emergency, these funds are utilized to help pay for expenses related to the emergency.

Please let me know if you have any questions regarding the above matter.

Regards,

Robert A. Headrick, Jr., CPA

R A Headrick, Jr, CPA, LLC
Tel: 251-650-2556
Cell:251-776-3119
6207 Cottage Hill Road - Suite A
Mobile, Alabama 36609


WHITEHEAD - 088