**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater** | * | **MDL NO. 2179** |
| **Horizon" in the Gulf of Mexico, on** | * | |
| **April 20, 2010** | * | **SECTION J** |
| | * | |
| **This document relates to all actions.** | * | |
| | * | **Honorable CARL J. BARBIER** |
| | * | |
| | * | **Magistrate Judge SHUSHAN** |
| | * | |
| | * | |
| | * | |

**BP'S MEMORANDUM IN SUPPORT OF
MOTION TO REMOVE THE CLAIMS ADMINISTRATOR**

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................4

I.   THE COURT SHOULD REMOVE MR. JUNEAU AS CLAIMS
     ADMINISTRATOR BECAUSE HE HAS A CONFLICT OF INTEREST
     THAT PRECLUDES HIS SERVICE AND THAT HE FAILED TO
     DISCLOSE ..............................................................................................4

     A.   Mr. Juneau Has a Conflict of Interest That Should Have Prevented
          His Appointment and Now Requires His Removal................................5

     1.   His Representation of the State ...............................................5

     2.   His Appointment as Claims Administrator.................................7

     3.   His Conflict of Interest ........................................................8

     B.   The Applicable Legal Standards Require Disqualification of the
          Claims Administrator.......................................................................10

     C.   The Law Compels the Claims Administrator's Removal ...................13

II.  THE CLAIMS ADMINISTRATOR'S STATEMENT TO JUDGE FREEH
     INDEPENDENTLY WARRANTS REMOVAL..........................................17

III. THE COURT SHOULD REMOVE MR. JUNEAU AS CLAIMS
     ADMINISTRATOR BECAUSE HIS PUBLIC COMMENTS VIOLATE
     THE JUDICIAL CODE OF CONDUCT. ..................................................19

IV.  THE COURT SHOULD REMOVE MR. JUNEAU AS CLAIMS
     ADMINISTRATOR BECAUSE HE HAS FAILED TO PREVENT
     MISCONDUCT AND UNCONSCIONABLE WASTE ................................21

     A.   The Claims Administrator Has Failed to Prevent Misconduct by
          Senior CSSP Personnel....................................................................21

     B.   Mr. Sutton Has Accused the Claims Administrator Himself of
          Misconduct and this Court Should Address and Resolve that
          Question. ........................................................................................24

     C.   The Failure to Prevent Misconduct Confirms the Necessity of the
          Claims Administrator's Removal.......................................................26

V.   THE COURT SHOULD REMOVE THE CLAIMS ADMINISTRATOR
     BECAUSE OF HIS WASTEFUL OVERSIGHT OF THE PROGRAM. .................29

i

      A.      **The True Condition of the CSSP Is Alarming.** .................................................**29**

      B.      **The Costs of this Poor Performance Are Alarming.**..........................**32**

      C.      **The Claims Administrator Should Be Removed Because He Failed to Control Costs.**.....................................................................................**33**

      D.      **The Claims Administrator Breached Contractual and Fiduciary Duties.**...............................................................................................**34**

**CONCLUSION** ...............................................................................................................**35**

**CERTIFICATE OF SERVICE** ......................................................................................**2**

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Brady v. Capital Grp., Inc.*, No. 91-3873, 1992 WL 46337 (E.D. La. Mar. 4, 1992) ...............................................................................................................28

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ............................................34

*Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348 (5th Cir. 2000) ...............................................................................................................28

*Hall v. Small Business Admin.*, 695 F.2d 175 (5th Cir. 1983) ...............................12, 17

*Hunt v. Am. Bank & Trust Co. of Baton Rouge, La.*, 783 F.2d 1011 (11th Cir. 1986) ...............................................................................................................12

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) .......................................21

*In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995)........................................................21

*In re Kempthorne*, 449 F.3d 1265 (D.C. Cir. 2006)........................................................11

*In re Nat'l Gypsum Co.*, 243 B.R. 676 (Bankr. N.D. Tex. 1999) ...........................28

*In re Rodgers*, 537 F.2d 1196 (4th Cir. 1976) ........................................................13

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 839 F.2d 1296 (8th Cir. 1992) ...............................................................................................14

*Mazur v. Gaudet*, 826 F. Supp. 188 (E.D. La. 1992).............................................28, 34

*Preston v. United States*, 923 F.2d 731 (9th Cir. 1991)........................................13

*Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343 (5th Cir. 2000) .....................14

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) ........................................21

*United States v. Michel*, 879 F. Supp. 2d 291 (E.D.N.Y. 2012) ...........................28

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (*per curiam*)............21

*United States v. Werner*, 916 F.2d 175 (4th Cir. 1990) (28 U.S.C. § 455 applies to a land commissioner) ..................................................................................11

*United States v. York*, 888 F.2d 1050 (5th Cir. 1989)..................................................17

## STATE CASES

*DuPont v. Del. Trust Co.*, 320 A.2d 694 (Del. 1974) ................................................................21

*Law v. Law*, 753 A.2d 443 (Del. 2000)........................................................................................21

*McNeil v. McNeil*, 798 A.2d 503 (Del. 2002) ..............................................................................26

*Riggs Nat'l Bank v. Zimmer*, No. 3886, 1977 WL 5316 (Del. Ch. Nov. 30, 1977)......................28

## OTHER AUTHORITIES

76 Am. Jur. 2d *Trusts* § 228 ..........................................................................................................27

76 Am. Jur. 2d *Trusts* § 230 ..........................................................................................................27

90 C.J.S. *Trusts* § 313 ...................................................................................................................27

28 U.S.C. § 455 ...............................................................................................................11, 12, 13

28 U.S.C. § 455(a) ................................................................................................................ passim

28 U.S.C. § 455(b)(1) .....................................................................................................................15

28 U.S.C. § 455(b)(2) ......................................................................................................12, 13, 17

28 U.S.C. § 455(e) ..................................................................................................................16, 17

Claire Taylor, "BP Settlement Money Expected Soon," *The Advertiser* (Lafayette, La.), June 28, 2012     3

Code of Conduct for Judicial Employees ........................................................................................11

Code of Conduct for United States Judges .............................................................................11, 12

David Hammer, "New Gulf Oil Spill Claims Administrator's Message: We Are
Not BP. We Are Here To Help," *The Times-Picayune* (June 4, 2012)...................................32

Del. Code Title 12 § 3302 ...............................................................................................................27

Del. Code Title 12 § 3322(a) ..........................................................................................................27

Del. Code Title 12 § 3327 ...............................................................................................................27

Del. Code Title 12, § 3327(1), (3)(b)..............................................................................................26

Dennis Persica, "Ken Feinberg's Claim Agency Starts Work Tomorrow," *The
Times-Picayune* (Aug. 22, 2010) ............................................................................................5

Federal Rule of Civil Procedure 53(b)............................................................................................15

La. Rev. Stat. § 9:2087(D)(1) ................................................................................28

Louisiana Code of Professional Conduct 3.3(d) ....................................................17

Restatement (Second) of Trusts § 183 ...................................................................13

Restatement (Second) of Trusts § 232 (1959) ..................................................13, 21

Restatement (Third) of Trusts § 37 & cmt. ............................................................26

Restatement (Third) of Trusts § 80 ........................................................................28

*Wall Street Journal* ...............................................................................................21

## INTRODUCTION

With billions of dollars at stake, the Court, the parties, and the public rightly expected that the Claims Administrator would be a neutral, not a partisan.  Fairness, and the appearance of fairness, required that he be a neutral.  Because he is Court-appointed and functions as an arm of the Court, he must be a neutral, free of a disqualifying conflict of interest.  Mr. Juneau, however, was not a neutral when the Court appointed him.  He was former counsel *in the Deepwater Horizon oil spill controversy* for the State of Louisiana, a party adverse to BP in oil spill litigation at the time he represented it.  Recently disclosed evidence reveals that he advocated vigorously on behalf of individual and business claimants seeking compensation from BP for alleged spill-related injuries, the parties whose claims he now decides.

The State retained him in July 2010 to represent it in connection with "the claims process and allocation protocols utilized and developed by the Responsible Parties associated with and/or arising from the Deepwater Horizon Oil Spill."[1]  Nine months later, because of his active representation to that point (an "increase in the number of hours required to provide legal services"), the State amended the retainer agreement with his law firm in March 2011 to increase his potential fee to $275,000.[2]  The full extent of his activities as the State's lawyer are yet to be determined, but the recently obtained correspondence (which is between his law firm and the Gulf Coast Claims Facility ("GCCF")) reflects that he advocated on behalf of Louisiana businesses and residents (now claimants in the settlement facility) for, among other things, liberal compensation protocols, flexible documentation requirements, and release language that

---

[1]   Ex. 3, Contract for Professional Legal Services between Louisiana Department of Public Safety, Public Safety Services, Oil Spill Coordinator's Office (LOSCO) and Juneau David APLC (hereinafter the "Contract") at 1, July 2, 2010.

[2]   Ex. 4, Amendment to the Contract, *effective date* Mar. 3, 2011.

would benefit Louisiana claimants at BP's expense.[3]  As the Claims Administrator who would resolve disputes about many of these issues, Mr. Juneau should have encountered them as a neutral.  Instead, he had been one side's lawyer.  This taints the CSSP.  On many occasions, the CSSP abandoned the parties' Settlement Agreement (or advocated for ignoring it), and adopted policies or determined awards that echo Mr. Juneau's earlier advocacy.  Meanwhile, his former client Louisiana continues to be adverse to BP in this multidistrict litigation and seeks billions of dollars based on claims that, it now seems, are consistent with, and possibly based on, legal work performed by the Claims Administrator as counsel for the State.

The Claims Administrator never properly disclosed his role as counsel for Louisiana and as an advocate for claimants seeking compensation for economic loss as a result of the Spill. And, when questioned about conflicts of interest by the Special Master, he seems not to have revealed the truth.  Describing the background to his own appointment, the Claims Administrator volunteered:  "Now, I knew, from reading the newspaper—***I didn't have any involvement in anything in the spill.***  I didn't represent any claimants in the spill, wasn't representing any defendants in the spill, had really had no connection with the spill per se."[4]

Mr. Juneau's clear-cut conflict of interest and his failure to disclose it fully and on the record warrant his removal.  The conflict of interest taints the public perception of how the facility operates.  It colors perception of the Claims Administrator's past public comments about the facility as an economic boon to the state ("It will be one of the biggest economic investments

---

[3]    The protocols were developed by GCCF Claims Administrator, Kenneth Feinberg, and applied to BP as an Oil Pollution Act "responsible party."  BP was the only "responsible party" that participated in and funded the GCCF claims process.  This Court held that the GCCF was a "hybrid entity" and could not be considered "'neutral' or totally 'independent' of BP."  Order and Reasons at 8, 11, Feb. 2, 2011, Rec. Doc. 1098. Nevertheless, the Court recognized that the GCCF appeared "independent" in the sense that BP did not control its evaluation of individual claims.  *See id.*

[4]    Ex. 5, Transcribed Sworn Statement of Patrick Juneau before Special Master Louis Freeh at 8, Aug. 1, 2013, Rec. Doc. 12182-16 (withdrawn).  The publicly available transcript contains redactions, and BP has no access to the redacted portions.

in the state in years and it doesn't come from government funds or tax breaks")[5] and recent comments attributed to him that attack the credibility of BP and its CEO, and appear to threaten to sue them for libel ("BP's CEO Bob Dudley said I was willfully misinterpreting the settlement; that's a lie and, yes, it is actionable").[6]  This should not happen.  An advocate for one side can never become the neutral, and the neutral can never be influenced by considerations outside the law and the merits—in this matter or any other.

News of this disabling conflict follows a calamitous record made plain over the last twelve months: a string of resignations for brazen misconduct; apparent crimes within the Claims Administrator's office; bloated budgets, resulting in more than $1 billion in administrative costs and rising (or $1 to the Claims Administrator's operation for every $5 paid out to claimants); and spending to construct systems that fail, are rebuilt, and fail again.  The Claims Administrator had a disabling conflict from the beginning, and he never should have allowed himself to be considered for the job.  He should be removed, and he should be recused at the CSSP until this motion is decided.[7]

## LEGAL STANDARD

The Court has the power and duty to supervise the CSSP, rooted in both its inherent power to enforce settlements and the Settlement Agreement's terms.

Under this Settlement Agreement, the Court has continuing jurisdiction over the "administration and enforcement of the Agreement and the distribution of its benefits to

---

[5]   Ex. 6, Claire Taylor, "BP Settlement Money Expected Soon," *The Advertiser* (Lafayette, La.), June 28, 2012.

[6]   Ex. 7, Lynda Edwards, "BP makes it personal: Lafayette lawyer takes heat handling oil spill claims," *Shreveport Times* (July 6, 2014).

[7]   The Record is sufficient to remove the Claims Administrator.  If, however, the Court believes the record is insufficient at this time, BP requests that the Court authorize it to conduct discovery and/or an evidentiary hearing to allow the Court and the parties to understand the scope of the Claims Administrator's representation of Louisiana and its impact here.  A list of the appropriate discovery is set forth in Exhibit 2.

Economic Class Members."[8]  The Settlement Agreement and Order granting final approval of the Settlement Agreement recognize the Court's ongoing jurisdiction over the Settlement Program.[9]  The Court exercised its supervisory power and duty when it appointed Special Master Freeh.[10]  The very name of the program, Court Supervised Settlement Program, recognizes the Court's supervisory role.

The Court appointed the Claims Administrator with the agreement of the Parties, and the Court alone has the power to replace him.[11]  He is responsible to the Court and serves at its direction.[12]  The Claims Administrator also reports to the Court in his role as Settlement Trustee, and the management of the Settlement Trust—including the costs of administering the trust—is subject to the Court's supervision.[13]

## ARGUMENT

### I.      THE COURT SHOULD REMOVE MR. JUNEAU AS CLAIMS ADMINISTRATOR BECAUSE HE HAS A CONFLICT OF INTEREST THAT PRECLUDES HIS SERVICE AND HE FAILED TO DISCLOSE IT

What is known already demonstrates that the Claims Administrator has a clear conflict of interest and that his disclosure of that conflict has been (at best) incomplete, (at worst) misleading, and, at all events, inadequate as a matter of law.

A chronology of the known facts is set forth in Exhibit 1.

---

[8]     Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 ("Settlement Agreement") § 18.1, Rec. Doc. 6430-1.

[9]     Settlement Agreement §§ 4.3.2, 4.4.7; Order Granting Final Approval of the Economic and Property Damages Settlement Agreement at 9, Dec. 21, 2012, Rec. Doc. 8138 ("Order Granting Final Approval").

[10]    *See* Order at 2, July 2, 2013, Rec. Doc. 10564.

[11]    *See* First Amended Order Creating Transition Process at 1, Mar. 8, 2012, Rec. Doc. 5995 (appointing Patrick Juneau as Claims Administrator); Settlement Agreement §§ 4.3.1, 4.3.3, 5.12.1.

[12]    *See* Settlement Agreement § 4.3.1.

[13]    Settlement Agreement §§ 5.12.1.2, 5.12.1.4.

4

A.     **Mr. Juneau Has a Conflict of Interest That Should Have Prevented His Appointment and Now Requires His Removal.**

1.     **His Representation of the State**

In June 2010, the GCCF was created, and Ken Feinberg was named to serve as its administrator.[14]  The GCCF initiated procedures to receive, process and, where appropriate, pay claims of loss resulting from, among other things: (1) lost earnings or profits for individuals and businesses; (2) removal and clean-up costs; (3) damage to real or personal property; and (4) loss of subsistence use of natural resources.[15]  It began accepting claims on August 23, 2010.[16]

Two weeks after the announcement of the GCCF's formation—and before any claims were paid—Louisiana entered into a three-year retainer agreement with Mr. Juneau's law firm to provide  "advice and counsel . . . *related to the claims process and utilization protocols* utilized and developed by the Responsible Parties *associated with and/or arising from the Deepwater Horizon Oil Spill*."[17]  Mr. Juneau personally executed the agreement.  He later signed two amendments.

He went to work as an aggressive advocate for Louisiana claimants' interests.   He sent extensive written comments to the GCCF regarding Louisiana claimants.  BP recently obtained copies of some of those emails, as well as attached documents.[18]  They concern subjects that directly overlap the questions he would later consider (and often decide) as Claims Administrator: (1) documentation requirements for claimants to file a claim and qualify for an award (he sought looser standards than proposed by the GCCF, including payments for claimants

---

[14]    *See, e.g.,* Ex. 8, Statement of President Obama, June 16, 2010.

[15]    *See, e.g.,* Gulf Coast Claims Facility, Frequently Asked Questions at §§ 8–12, *available at* http://www.restorethegulf.gov/sites/default/files/imported_pdfs/library/assets/gccf-faqs.pdf.

[16]    Ex. 9, Dennis Persica, "Ken Feinberg's Claim Agency Starts Work Tomorrow," *The Times-Picayune* (Aug. 22, 2010).

[17]    Ex. 3, Contract at 1(emphasis added).

[18]    *See* Ex. 10, Declaration of Mark Holstein ¶ 14 and Exhibit H.

with no supporting documentation); (2) compensation formulas (he advocated fixed formulas favorable to claimants, and which were designed to make proof of economic loss easier); and (3) causation requirements.  He peppered the GCCF with requests for data, including data related to industry benchmarks used to calculate awards.  He also apparently evaluated the GCCF release and presented arguments for limiting it.[19]

During the period when Mr. Juneau was representing the State, it joined with Class Counsel to seek relief in this Court related to the GCCF.  On February 1, 2011, the State joined Class Counsel's motion calling upon the Court to "supervise" the GCCF's communications with plaintiffs.[20]  Louisiana's submission added requests for relief that addressed GCCF protocols and the GCCF release—both issues on which Mr. Juneau had addressed the GCCF on behalf of the State, taking the same or similar positions.[21]

We do not know the full extent of Mr. Juneau's work on behalf of Louisiana resident-claimants nor what precise role he played in developing and advancing arguments that the State has asserted in this proceeding, often in coordination with Class Counsel.  It is apparent from even the small number of available documents, however, that there is a direct overlap between that work, the arguments that Louisiana has advanced in its pleading in this MDL proceeding, and the policy issues decided by the Claims Administrator in his current capacity.[22]

On approximately March 3, 2011, the State amended the retainer agreement with the Claims Administrator's law firm to increase the limits of its fees by $100,000 in recognition of

---

[19]  *See id.*

[20]  *See* Pls.' Motion to Supervise *Ex Parte* Communications Between BP Defendants and Putative Class Members, Dec. 21, 2010, Rec. Doc. 912; Louisiana Notice of Joinder in Motion to Supervise *Ex Parte* Communications Between BP Defendants and Putative Class Members, Feb. 1, 2011, Rec. Doc. 1091.

[21]  *Compare* Louisiana Notice of Joinder in Motion to Supervise *Ex Parte* Communications Between BP Defendants and Putative Class Members at 3-4, Feb. 1, 2011, Rec. Doc. 1091, *with* Ex. 11, Email from Patrick Juneau to Kenneth Feinberg, "GCCF Protocol," Nov. 24, 2010.

[22]  *See infra*, Part. I.A.III.

the need "to increase the number of hours required to provide legal services as described in the original scope of services."[23]  BP does not know what additional services he provided over the next six months.

Shortly thereafter, in April 2011, the State sued BP, alleging among other things, that "[a]s a result of the Gulf Oil Spill, the State of Louisiana has suffered, and will continue to suffer, extensive injury to its natural resources as well as damage to its real and personal property, loss of subsistence use of its natural resources, loss of taxes, rents, royalties and fees due to the injury to, loss or destruction of its real property, personal property and natural resources" and that the compensation BP has paid to these claimants through the GCCF did not provide "full restitution."[24]  Mr. Juneau did not sign the pleading or appear as counsel of record. (It was instead signed by the lawyer who originally supervised his work on behalf of the State.)[25] The allegations echo Mr. Juneau's position as Louisiana's advocate, that the GCCF was not sufficiently compensating Louisiana claimants.

Mr. Juneau ended his representation of the State of Louisiana on July 21, 2011, for reasons unknown to BP.[26]  Four days later, on July 25, 2011, Class Counsel filed a motion seeking appointment of a Special Master to oversee the GCCF.[27]

### 2.    His Appointment as Claims Administrator

When the time came to select a Claims Administrator for the facility in February 2012, the PSC proposed Mr. Juneau as a candidate.[28]  Just weeks later, with the parties' agreement, he

---

[23]   Ex. 4, Amendment to the Contract, *effective date* Mar. 3, 2011.

[24]   Louisiana First Amended Complaint ¶¶ 130, 138, Apr. 19, 2011, Rec. Doc. 2031.

[25]   The pleading was signed by Elizabeth Murrill, *see id.*, who was identified as the person supervising the Claims Administrator in the original contract between the State and the Juneau David firm, *see* Ex. 3, Contract at 1, July 2, 2010.

[26]   Ex. 12, Amendment to the Contract, *effective date* July 21, 2011.

[27]   Pls.' Supplemental Brief in Support of Supervision Over the BP Interim Claims Process, July 25, 2011, Rec. Doc. 3423.

was appointed Claims Administrator.[29]  Neither at the preliminary approval hearing on May 1,

2012, nor the November 8, 2012 final hearing, nor in any public filing did he disclose his prior

representation of the State before the GCCF.[30]  Seventeen months after ending his lucrative,

year-long representation of Louisiana, he told Special Master Freeh that he "didn't have any

involvement in anything in the spill [and] didn't represent any claimants in the spill."

### 3.   His Conflict of Interest

The available documents provide a number of examples of issues on which Mr. Juneau

formed views and/or took positions on behalf of the State, then made policy decisions in his later

work as Claims Administrator.  These are explained in detail in the attached declarations of Mark

Holstein and Daniel Cantor.  The following are examples of policy decisions that deviate from

the Settlement Program in ways that parallel positions taken by the Claims Administrator when

he represented Louisiana.

- ***BEL and IEL Documentation Requirements for Claimants Seeking Awards***:  As

  counsel for the State, Mr. Juneau sought relaxed documentation requirements to benefit

  claimants before the GCCF, including hotels, restaurants, and seafood claimants.[31]  As

  Claims Administrator, a supposed neutral arbiter, he has pressed BP to waive

  documentation requirements explicitly required by the Settlement Agreement, saying that

  doing so would "speed the process while still maintaining the intent of the agreement."[32]

  He has made numerous decisions (and continues to make decisions) regarding

---

[28]   *See* Ex. 10, Holstein Decl. ¶ 3.

[29]   First Amended Order Creating Transition Process at 1, Mar. 8, 2012, Rec. Doc. 5995 (appointing Patrick Juneau as Claims Administrator).

[30]   *See* Tr. of Final Fairness Hr'g Proceedings, Nov. 8, 2012, Rec. Doc. 7892; Tr. of Hr'g on the Mots. For Conditional Certification of Rule 23(B)(3) Classes for Settlement Purposes, Apr. 25, 2012, Rec. Doc. 6395.

[31]   Ex. 11, Email from Patrick Juneau to Kenneth Feinberg, "GCCF Protocol," Nov. 24, 2010.

[32]   Ex. 10, Holstein Decl. ¶ 16 & Ex. I.

documentation requirements.[33]  Appeal Panelists have often been troubled by the absence

of sufficient documentation supporting claims awards by the CSSP under the Claims

Administrator's leadership.   (*E.g.*, "The claim is remanded in order for the Settlement

Program to obtain the requisite documentation from Claimant and to perform a proper

loss earnings calculation.")[34]  Only now has BP appreciated that loosened requirements

are consistent with the positions he advocated as Louisiana's lawyer (but not the

Agreement he is charged with enforcing).[35]

- ***Claimant Compensation***:  As Louisiana's lawyer, the Claims Administrator forcefully

  advanced the interests of Louisiana shrimpers, fin fishermen, and crabbers, urging that

  claims be paid with minimal or no documentation.[36]  Those same businesses and

  individuals are now claimants in the Seafood Compensation Fund (and, to some extent,

  have competing interests with claimants from other states in that capped fund), and the

  Claims Administrator has overlooked flaws in their claims and been generous in making

  awards in ways inconsistent with the Settlement Agreement.  For example, the Claims

  Administrator has allowed Seafood Claimants to substitute an unsubstantiated sworn

  written statement for the required documentation.[37]

- ***Vessel Physical Damage Compensation Calculations***:  For some claims, the CSSP has

  simply ignored the Agreement's documentation requirements and awarded significant

  compensation for alleged vessel damage without any evidence that such alleged damage

---

[33]   *See id.* ¶¶ 16–26 & Exs. I-K.

[34]   *See* Ex. 13, Declaration of Daniel A. Cantor ¶ 23 (quoting from Appeal Panel's reversal and remand of claim XXX81).

[35]   *Compare* Ex. 13, Cantor Decl. ¶ 21 (discussing Settlement Agreement Ex. 8A) *with* Ex. 14, Email from Patrick Juneau to Kenneth Feinberg, "Narratives for Valuation Templates," Nov. 24, 2010.

[36]   Ex. 14, Email from Patrick Juneau to Kenneth Feinberg, "Narratives for Valuation Templates," Nov. 24, 2010.

[37]   Ex. 13, Cantor Decl. ¶ 14.

was compensable under the Terms of the Settlement Agreement.[38]  There are several examples of awards either being reversed by appeals panelists or voluntarily reduced as a result of this error.  (*E.g.,* "Of great[] concern is the dearth of evidence offered in support of this claim . . .).[39]

- *__GCCF Release__*:  As counsel for the State, Mr. Juneau criticized the scope of the GCCF release and argued for narrowing it.[40]  He now oversees the program that decides its effect on individual claims and policies related to it.

At the most fundamental level, Mr. Juneau, as the State's lawyer, was part of the earliest efforts to develop "industry benchmarks" and detailed protocols as to how precisely damaged claimants should be compensated.[41]  But developing such benchmarks and protocols is at the core of his current job as a neutral.  This is the very definition of a conflict of interest: he cannot now be impartial about the very issues on which Louisiana paid him to be partial (and, if he can, not without an appearance of partiality).  Put differently, he came to his current job with knowledge of extensive facts and formed views adverse to BP related to the very claims he now decides.  The substantive overlap between his prior representation and his current job is extensive.  And his decisions cannot plausibly be said to result only from information obtained in the settlement process.

### B.    The Applicable Legal Standards Require Disqualification of the Claims Administrator.

The Settlement Program is Court-supervised, and the Court-appointed Claims Administrator serves as the right arm of the Court.  Although the breadth of his claim is

---

[38]   *See id.* ¶ 19.

[39]   *See id.* (quoting Appeal Panel Decision for Claim No. XXXX11).

[40]   *See, e.g.*, Ex. 15, Email from Patrick Juneau to Kenneth Feinberg, "Draft Final Protocol," Nov. 8, 2010.

[41]   *See* Exs. 11, 14, & 15, Emails from Patrick Juneau to Kenneth Feinberg, Nov. 2010.

overstated,[42] Mr. Juneau has taken the position as Claims Administrator that, because he

interprets the Settlement Agreement in the first instance (subject to the Court's supervision and

review), he performs "acts that are judicial in nature and 'intimately associated with the judicial

function'" and therefore "quasi-judicial in nature."[43]  He claims that his decisions are

"inextricably intertwined" with the judiciary.[44]  He should be held to the ethical standards that

govern judges, not just because he has taken the position that he functions as a judicial officer,

but because the courts have held that court-appointed special masters and analogous judicial

officers will be held to the same ethical standards, including disqualification, as judges.[45]  Those

standards include 28 U.S.C. § 455 and the Code of Conduct for United States Judges (the

"Judicial Code").[46]  Professor William Ross, an expert in judicial ethics at Cumberland School of

---

[42]   BP has previously (without success) disputed Mr. Juneau's entitlement to judicial immunity.  *See* BP's Opp. to
Claims Administrator's Mot. to Dismiss, Apr. 4, 2013, Rec. Doc. 9119.  The Court does not need to resolve the
question of judicial immunity to decide the conflict issue.  For purposes of applying the ethical precepts of 28
U.S.C. § 455 and the Judicial Code, Mr. Juneau's view of himself as a judicial officer necessitates that he be
held to those standards.  Moreover, even if this Court concludes that Mr. Juneau is not a judicial officer, he is at
the very least analogous to a judicial employee and subject to essentially the same principles.  Code of Conduct
for Judicial Employees, *available at*
http://www.uscourts.gov/rulesandpolicies/codesofconduct/codeconductjudicialemployees.aspx.  Like a judicial
employee, Mr. Juneau functions under this Court's direct supervision—a fact this Court consistently has
acknowledged.  *See, e.g.*, Order at 8, Feb. 28, 2014, Rec. Doc. 12436 ("This is a Court-supervised settlement
program.").

[43]   Mem. in Support of Mot. to Dismiss at 7, Apr. 1, 2013, Rec. Doc. 9066-1.

[44]   Brief for Appellees Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau at 40
(internal quotation marks and citations omitted), *In re Deepwater Horizon*, No. 13-30315 (5th Cir. 2013).  Mr.
Juneau also conceded that he had a duty to remain "independent and objective."  *Id.* at 44.

[45]   *In re Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2006) (special master charged with the same ethical
restrictions as judges, including disqualification under 28 U.S.C. § 455); *see also United States v. Werner*, 916
F.2d 175, 178 (4th Cir. 1990) (28 U.S.C. § 455 applies to a land commissioner).

[46]   Judicial Code, Compliance with the Code of Conduct, *available at*
http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConductUnitedStatesJudges.aspx.  The Code
governs the official conduct of "[a]nyone who is an officer of the federal judicial system authorized to perform
judicial functions."  Mr. Juneau performs quasi-judicial functions, including issuing policy statements that
determine how the Settlement Agreement is to be implemented and, with the Claims Administration Panel.
attempting to resolve "any issues or disagreements that arise."  Settlement Agreement § 4.3.4.

Law—Samford University, has opined that Mr. Juneau appears to be subject to 28 U.S.C. § 455 and the ethical requirements of the Judicial Code.[47]

Under Section 455, a judge shall disqualify himself when he has represented a party in "the same matter in controversy,"[48] and also "in any proceeding in which his impartiality might reasonably be questioned."[49]  Judges ensure that law clerks with a conflict of interest do not participate in the case, and law clerks have an obligation to bring any potential conflicts of interest to the judge's attention.  This demonstrates the seriousness of a failure to clearly bring conflicts of interest to the attention of the Court and the parties.[50]

Under the Judicial Code, officers of the federal judiciary must "maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved."[51]  Canon 2A requires judicial officers to "respect and comply with the law and . . . act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."[52]

The Settlement Program's own Code of Conduct admonishes employees to avoid conflicts of interest or even the appearance of a conflict.  It specifically prohibits employees from carrying out certain functions where "[t]he Covered Party, to its knowledge, served as counsel or assisted counsel in a matter *related to* a claim to which the [Program employee] is currently

---

[47]   Ex. 16, Declaration of Professor William G. Ross ¶¶ 10–19.

[48]   28 U.S.C. § 455(b)(2).

[49]   28 U.S.C. § 455(a).

[50]   *See Hunt v. Am. Bank & Trust Co. of Baton Rouge, La.*, 783 F.2d 1011, 1015–16 (11th Cir. 1986) (a judge with a conflicted clerk must recuse unless the clerk with the conflict "refrains from participating in" that case); *see also Hall v. Small Business Admin.*, 695 F.2d 175, 179 (5th Cir. 1983); Code of Conduct for Judicial Employees, Canon 3F(3).

[51]   Judicial Code, Canon 1.

[52]   Judicial Code, Canon 2A.

assigned."[53]  Thus, that Code too would operate to require the Claims Administrator's

disqualification, but for the fact that the Claims Administrator exempted himself from it because

he is "a court appointed official, [who has] affirmed to the Court that there were no grounds for

disqualification that would prevent his service as the Claims Administrator."[54]

Other codes governing neutrals are to the same effect.[55]  The Trust Agreement imposes

the same restrictions in substance.  It requires that Mr. Juneau "shall act as the fiduciar[y] of the

Settlement Trust"[56] and that he shall be "independent."[57]

### C.    The Law Compels the Claims Administrator's Removal

The now-known facts warrant removal under all these standards.  First, 28 U.S.C.

§ 455(b)(2) states a *per se* rule of disqualification: It prohibits a judicial officer from serving

"***[w]here in private practice he served as lawyer in the matter in controversy***,"[58] as Mr. Juneau

did here.  He not only served as a lawyer in the matter in controversy, but as a lawyer for a client

---

[53]   Ex. 17, Court Supervised Settlement Program, "Code of Conduct," at ¶¶ 4.2.2 and 5 (emphasis supplied).  The Claims Administrator expects that employees will ***self-report*** any potential issue of conflict or improper behavior and that they will do so providing ***full disclosure*** allowing for a ***thorough ethics review***.

[54]   *Id.* at ¶ 2.2.2.

[55]   The Academy of Court-Appointed Masters has proposed similar rules based on existing law for all court-appointed neutrals.  *See* Academy of Court Appointed Masters, "Appointing Special Masters and Other Judicial Adjuncts: A Benchbook for Judges and Lawyers," *available at* http://www.courtappointedmasters.org/resource-center/appointing-masters-handbook.  Proposed Rule 5(a) provides on disqualification:

  Federal:  A master may not have a relationship with the parties, counsel, action, or appointing court that would require disqualification of a judge under 28 U.S.C. § 455, unless waived by the parties with the court's approval after full disclosure of any potential grounds for disqualification.

[56]   Trust Agreement § 2.1, Rec. Doc. 10761-12. Under the Trust Agreement, all matters pertaining to the validity, construction and trust administration are governed by Delaware law.  *See id.* § 7.8.

[57]   Restatement (Second) of Trusts § 232 (1959) (noting that acting contrary to the beneficiaries' interests is contrary to duty of loyalty); *see also* Restatement (Second) of Trusts § 183 ("When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them.").

[58]   *See also In re Rodgers*, 537 F.2d 1196, 1198 (4th Cir. 1976) (granting writ of mandamus requiring recusal of district court judge where his law partner had given out-of-court lobbying advice to defendants that was at issue in case even though the judge himself had no personal knowledge of the issue); *Preston v. United States*, 923 F.2d 731, 734–35 (9th Cir. 1991) (granting writ to disqualify district court judge where  law firm where judge was formerly of counsel served as counsel to indemnitee in action).

*adverse* to BP.[59]  Indeed, Louisiana was and is adverse in three ways.  It sued BP in its own

name.  It claimed damages based on purported injuries it has suffered through losses allegedly

suffered by individual claimants and businesses, many of whom were claimants themselves.

And it urged the adoption of protocols and practices by the GCCF that were meant to maximize

claimant compensation.  That role is so intertwined with the matter on which he is now a neutral

that separating it out would prove impossible.  The situation presented is unusual.  As Professor

William Ross opines:  "Cases where a judge has previously served as an advocate are unusual,

perhaps because few judges would be so brazen as to presume to adjudicate a case in which they

had served as an advocate."[60]

In addition, Mr. Juneau's service as Claims Administrator is precluded under Section

455(a), which compels disqualification where the neutral's impartiality might "reasonably" be

questioned.  In the Fifth Circuit, the rule is that close cases should be decided in favor of

disqualification.[61]  Here, removal is not a close call.  Although the facts related to the prior

representation are not fully available, it is apparent that the Claims Administrator advised his

client on matters related to how best to position the case for its own recovery and that he

advocated for maximum recovery for in-state claimants against BP.  He engaged in oral and

written advocacy for his client on those subjects.  Such a lawyer could hardly then adjudicate

---

[59]  Some courts have construed the "same matter" language of 455(b) narrowly, requiring that the matter be the very same docket number.  *See, e.g., Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 839 F.2d 1296, 1301–02 (8th Cir. 1992) (in dicta, reading prior cases as requiring that the matter be the same docket number).  Even if that view were accepted, removal is appropriate here.  Louisiana's claims against BP are docketed under the same number, and Louisiana advanced the same arguments in this very matter that Mr. Juneau was advancing simultaneously to the GCCF.  To the extent that he was seeking to advance the interests of Louisiana claimants, that is the very matter on which the Claims Administrator sits as a neutral.

[60]  Ex. 16, Ross Decl. ¶ 31.

[61]  *Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000).  Even where the Court, as private counsel, had not worked on an *amicus* brief, but had only signed it, the Court of Appeals held that the appearance of impartiality could reasonably be questioned.  *Id.*  The facts here weigh more strongly in favor of disqualification, because Mr. Juneau was not merely a name on the brief, but the State of Louisiana's principal advocate before the GCCF.

neutrally and impartially claims against BP arising out of the same events where the interests of hundreds of thousands of those same claimants are at issue and their claims for recovery are being decided.  It may very well present an issue of disqualification under 28 U.S.C. § 455(b)(1), and further discovery might substantiate that claim, but certainly a reasonable observer would perceive partiality on Mr. Juneau's part.[62]

Moreover, as Claims Administrator, Mr. Juneau has not mechanically implemented the Settlement Agreement.  He admits as much.  He has claimed (when seeking immunity) that he exercises discretion in implementing the agreement.[63]  He has proactively sought waiver of the explicit requirements of the Settlement Agreement and advised the parties of his views on necessary deviations from the Settlement Agreement for the Settlement Program to operate efficiently.[64]  A clearer case requiring recusal under Section 455(a) could hardly be imagined.

Nor did Mr. Juneau properly apprise BP of this conflict of interest.  These facts are certain: he did not file a declaration on the record pursuant to Federal Rule of Civil Procedure 53(b), nor did he make an oral disclosure at the preliminary or final approval hearings in May 2012 and November 2012.  Questioned by Special Master Freeh under oath as part of a larger investigation of conflicts of interest, Mr. Juneau said, "I didn't have any involvement in anything in the spill. I didn't represent any claimants in the spill, wasn't representing any defendants in the spill, had really had no connection with the spill per se."[65]

---

[62] Professor Ross, having been apprised of these facts, has concluded that "[i]t is reasonable to question Mr. Juneau's impartiality because he served as a highly paid attorney . . . for the state of Louisiana" and therefore should be disqualified under Section 455(a).  *See* Ex. 16, Ross Decl. ¶¶ 22–23.

[63] Brief for Appellees Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau at 43, *In re Deepwater Horizon*, 13-30315 (5th Cir. 2013).

[64] *E.g.,* Ex. 10, Holstein Decl. ¶¶ 16–26 (detailing Claims Administrator's participation in request to BP to waive business license requirement of the Settlement Agreement because such waiver would "speed the process while still maintaining the intent of the agreement").

[65] Ex. 5, Transcribed Sworn Statement of Patrick Juneau before Special Master Louis Freeh at 8, Aug. 1, 2013, Rec. Doc. 12182-16 (withdrawn).

BP has recently located, after a search, a small number of records in its files that relate to the Claims Administrator's relationship with Louisiana.  But, with one limited exception, none relates to any disclosure by the Claims Administrator, and none reveals the breadth of the Claims Administrator's advocacy seeking to maximize compensation for Louisiana claimants at BP's expense.  That limited and unclear exception is a note of a lawyer for BP that reads:  "Consulted with La.(State) about whole Feinberg process."[66]  If attributable to the Claims Administrator, this statement, like the statement made to Special Master Freeh, smacks more of non-disclosure than disclosure, for it is notable primarily for what it does ***not*** say.  It does not say that the State retained him and his law firm to represent it before the GCCF as its advocate; that the State agreed to pay a maximum retainer fee of $275,000; that he represented the State for a year; and that, on behalf of the State, he advocated in support of the interests of Louisiana (and claimants generally), urging the GCCF to adopt compensation-maximizing policies and protocols on the very subjects that would have to be addressed by a Claims Administrator for the settlement facility; and that he made the same arguments on behalf of Louisiana to the GCCF that it made in this Court in this proceeding after his advocacy proved unsuccessful.

An informal, oral disclosure would be insufficient in any event and would not be an acceptable form of dealing with the situation for someone who viewed himself as a quasi-judicial officer.  In situations where only Section 455(a) applies (i.e., where the judicial officer's impartiality might be questioned), section 455(e) requires ***on the record notice*** (as all parties, including objectors would have the right to know the information) and a knowing and informed

---

[66]   Ex. 18, Handwritten notes of Keith Moskowitz.  Mr. Moskowitz's notes appear to consist of facts stated during a meeting.  One note that does not constitute a factual statement has been redacted.  The redacted information does not concern Mr. Juneau's representation of the State of Louisiana.

waiver.[67]  It also requires "full disclosure,"[68] which appears to be absent here.   And, where

Section 455(b)(2) (prior representation of a party) is implicated, the statute prohibits waiver.  "In

other words, if Mr. Juneau believed in March 2012 that (i) BP had consented to his service as

Claims Administrator after full disclosure, and (ii) he had presented that consent or waiver to the

Court, the Court could not have accepted that waiver as valid under section 455(e)."[69]

       This motion is undoubtedly timely under Fifth Circuit case law.  As explained in *United
States v. York*:  "Timeliness is a different issue.  A timeliness requirement forces the parties to

raise the disqualification issue at a reasonable time in the litigation.  It prohibits knowing

concealment of an ethical issue for strategic purposes."[70]  That is not the case here.[71]  Moreover,

as Professor Ross notes, "[a]bsent a full disclosure – or evidence that BP knew all the pertinent

facts a full disclosure would provide – there can be no timeliness issue."[72]

## II.     THE CLAIMS ADMINISTRATOR'S STATEMENT TO JUDGE FREEH INDEPENDENTLY WARRANTS REMOVAL

       The codes of conduct relevant to the Claims Administrator confirm the obligation to raise

potential conflicts.  Canon 3(F)(3) of the Code of Conduct for Judicial Employees  provides that

"[w]hen a judicial employee knows that a conflict of interest may be presented, the judicial

employee should promptly inform his or her appointing authority."  The Louisiana Code of

Professional Conduct 3.3(d) provides that "[i]n an *ex parte* proceeding, a lawyer shall inform the

tribunal of all material facts known to the lawyer that will enable the tribunal to make an

---

[67]   The statute's requirement is one of common sense.   An out-of-court disclosure—particularly an oral disclosure—invites dispute and only compounds the problem of avoiding even the appearance of partiality.

[68]   28 U.S.C. § 455(e).

[69]   Ex. 16, Ross Decl. ¶ 34.

[70]   *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) (emphases added).

[71]   Ex. 10, Holstein Decl. ¶ 15.

[72]   Ex. 16, Ross Decl. ¶ 39 (quoting *Hall*, 695 F.2d at 179 (there can be no timeliness issue when there was no "full disclosure" of a conflict of interest)).

informed decision, whether or not the facts are adverse."  And the Settlement Program's own Code of Conduct requires self-reporting of "potential conflicts" and deems a waiver to be valid only if there is "full disclosure of all known facts."[73]

The Court appointed Special Master Freeh to investigate suspected misconduct by former Settlement Program counsel Lionel Sutton, to find facts "as to any other possible ethical violations or other misconduct within the CSSP," and to "examin[e] and evaluat[e] the internal compliance program and anti-corruption controls within the CSSP" to "ensure the integrity of the CSSP."[74]  The Special Master ultimately concluded that there were "pervasive" conflicts of interest among senior CSSP staff members "despite Patrick Juneau's proper conduct and ethical 'tone at the top.'"[75]  That finding was made several weeks after the Claim's Administrator's sworn statement.  The unredacted portion of that statement does not reveal the Claims Administrator's prior representation of the State of Louisiana—and in fact denied it.  In his sworn statement, when discussing how he came to be appointed, the Claims Administrator stated that he "didn't have any involvement in the spill, … had really no connection with the spill per se."[76]  Unless more was revealed elsewhere, the under oath statement cannot be squared with the facts now known about his representation of the State, as detailed above.

BP is not aware of any instance where the Claims Administrator advised the Special Master of his conflict issue.  The Freeh investigation's focus on conflicts and the appearance of

---

[73]   Ex. 17, CSSP Code of Conduct at ¶¶ 3.0, 4.2.

[74]   Order at 2, July 2, 2013, Rec. Doc. 10564.  After Special Master Freeh completed the first phase of his investigation in September 2013, the Order that expanded his responsibilities included a mandate to "examine and investigate" certain issues.  The very first was to "investigate conflicts of interest by parties involved in the CSSP."  Order at 3, Sept. 6, 2013, Rec. Doc. 11288.

[75]   Independent External Investigation of the Deepwater Horizon Court Supervised Settlement Program ("First Freeh Report") at 8, Sept. 6, 2013, Rec. Doc. 11287.

[77]   Judicial Code, Canon 3(A)(6).  Judicial employees also should "avoid making public comment on the merits of a pending or impending action and should require similar restraint by personnel subject to the judicial employee's direction and control."  Code of Conduct for Judicial Employees, Canon 3(D).

conflicts reached startling conclusions about conflicts ignored by the Settlement Program and its senior staff, but no report mentioned, much less analyzed, the Claims Administrator's prior representation related to the spill.  Certainly any individual reading the publicly-available portion of the Claims Administrator's sworn statement would conclude that he knew about the oil spill only from information that he had learned by reading the newspaper—and not that he personally had signed a contract for his law firm to receive hundreds of thousands of dollars for representing a party adverse to BP on oil-spill matters, which had terminated only six months before.  Nor would a reasonable person conclude that the Claims Administrator had advocated extensively as to how oil spill claimants should be compensated.  To decide this motion, the Court does not have to evaluate all of the implications if there was not further disclosure to the Special Master.  The failure to identify the conflict runs contrary to the principles of the Judicial Code and the Claims Administrator's own code of conduct.  To ***volunteer*** that he had no involvement in or connection to the spill (ignoring his client's claim against BP and his own advocacy for claimants) is even worse.

### III.   THE COURT SHOULD REMOVE MR. JUNEAU AS CLAIMS ADMINISTRATOR BECAUSE HIS PUBLIC COMMENTS VIOLATE THE JUDICIAL CODE OF CONDUCT.

It is difficult to consider Mr. Juneau's public comments apart from his disqualifying conflict of interest.  If the comments have often sounded adversarial, we now know that we should not be surprised, because the State retained him to be an adversary.  Even apart from his conflict of interest, however, his recent public statements warrant his removal as Claims Administrator.

Because Section 455(a) prohibits judges from serving when their partiality may reasonably be questioned , judges generally refrain from making public comments about the merits of a pending matter or the character of the parties.  This prudential rule is an ethical one as

well: the Judicial Code of Conduct prohibits a judge from "mak[ing] public comment on the merits of a matter pending or impending" and commands him to "require similar restraint by court personnel subject to the judge's direction and control."[77]  Mr. Juneau's recent public comments violate that injunction, and themselves create an appearance of partiality that necessitates his removal under section 455(a).[78]

The Claims Administrator's recent public commentary about BP is extraordinary.  He commented on BP's public disagreement with his now-invalidated matching policy and his interpretation of the Settlement Agreement's causal nexus requirement and is quoted as saying (seemingly inconsistently with the Fifth Circuit's October 2, 2013 opinion and this Court's December 24, 2013 order on matching):  "The federal courts have upheld the settlement process as valid, repeatedly."  He then allegedly accused BP's CEO of an "actionable" "lie" for criticizing the manner in which the Claims Administrator was interpreting tthe Settlement Agreement.[79]  Put aside his failure to acknowledge that, as part of the settlement process, he had adopted a policy that resulted in erroneous processing of thousands of claims and resulted in hundreds of millions of dollars in unjustified payments.  Even if his assertions were correct, it would be impossible for any judge to remain on a case after giving an interview to a newspaper in which he claims a right to initiate legal action against a litigant or comments on the merits in such a manner.  The appearance of partiality is obvious, and all the more so when Mr. Juneau publicly expresses personal offense based on out-of-court developments.  It is no answer that, in his second statement, the Claims Administrator sought to modify (or clarify) his prior comments

---

[77]   Judicial Code, Canon 3(A)(6).  Judicial employees also should "avoid making public comment on the merits of a pending or impending action and should require similar restraint by personnel subject to the judicial employee's direction and control."  Code of Conduct for Judicial Employees, Canon 3(D).

[78]   *See* Ex. 16, Ross Decl. ¶¶ 24–29.

[79]   Ex. 19, Lynda Edwards, "Lafayette lawyer takes heat handling oil spill claims," *The Advertiser* (July 5, 2014); *see also* Ex. 7, Lynda Edwards, "BP makes it personal," *The Shreveport Times* (July 6, 2014).

to say that he meant only that the conduct was "sanctionable,"—"I'm not talking about lawsuits here. . . ."[80]  His commentary, if anything, reinforces the appearance of partiality.  Under Section 455(a) and the Judicial Code, Mr. Juneau can no longer serve as Claims Administrator.[81]

## IV. THE COURT SHOULD REMOVE MR. JUNEAU AS CLAIMS ADMINISTRATOR BECAUSE HE HAS FAILED TO PREVENT MISCONDUCT

The problems the Claims Administrator has introduced into the Settlement Program are not confined to his own conflicts and bias.  He also failed, over a long period of time, to prevent basic exploitation of the program by those intent on misconduct.

### A. The Claims Administrator Has Failed to Prevent Misconduct by Senior CSSP Personnel.

Mr. Juneau is paid more than $3.4 million per year[82] to "faithfully implement and administer the Settlement," "oversee and supervise the Claims Administration Vendors . . . and staff," and "ensure the implementation and integrity of the overall Settlement Program."[83]  The Trust Agreement states he "shall act as the fiduciar[y] of the Settlement Trust."[84]  He owes fiduciary duties to the beneficiaries of the Trust, one of which (BP) pays the facility's

---

[80]   Ex. 20, Kyle Barnett, "Deepwater Horizon Claims Administrator Patrick Juneau defends negative statements," *Louisiana Record* (July 26, 2014).

[81]   *Cf. United States v. Microsoft Corp.*, 253 F.3d 34, 112, 115–16 (D.C. Cir. 2001) (*per curiam*) (disqualifying district judge for granting press interviews on the parties and the merits of the case);  *In re Boston's Children First*, 244 F.3d 164, 171 (1st Cir. 2001) (disqualifying judge for publicly commenting that the present case was more complex than a prior case, arguably implying that plaintiffs had a more valid claim); *In re IBM Corp.*, 45 F.3d 641, 642–44 (2d Cir. 1995) (disqualifying judge for, *inter alia*, criticizing the government's decision to stipulate to dismissal of a case and granting interviews to the *Wall Street Journal*); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (disqualifying judge for appearing on the television program *Nightline* and thereby "convey[ing] an uncommon interest and degree of personal involvement in the subject matter").

[82]   Undertaking of Patrick Juneau In Furtherance of Court Order Appointing Him Claims Administrator ("Undertaking") § 2(a), Rec. Doc. 10761-11; Ex. 21, Undertaking Supplement § I(4).

[83]   Settlement Agreement §§ 4.3.1, 4.3.2, 4.3.10.

[84]   Trust Agreement § 2.1, Rec. Doc. 10761-12.

administrative costs, whatever they may be.[85]  The Trust Agreement requires him to be
"independent," and charges him with responsibility to "establish procedures and controls" and
ensure that the Settlement Program's costs are "reasonable."[86]

In 2012 and 2013, misconduct ran rampant within the CSSP, and the Claims
Administrator, according to his own account, failed to prevent it, detect it, or take steps to stop it.
Instead, he allowed it to flourish, and it was only Special Master Freeh's appointment and
intervention that addressed these problems.

As detailed by Special Master Freeh, Mr. Juneau hired Mr. Sutton and Christine Reitano
as Claims Counsel, despite reservations expressed by the CSSP's former CEO about Mr.
Sutton's ethical reputation and "the fact that Mr. Sutton was married to Ms. Reitano."[87]  Mr.
Juneau did not apprise BP that he had a longstanding relationship with Mr. Sutton (according to
Mr. Sutton) or that Mr. Sutton had worked at his law firm and been the beneficiary of case
referrals from him.[88]  The resume for Mr. Sutton that Mr. Juneau gave BP omitted this
information and said only that Mr. Sutton worked at "an insurance defense firm."[89]

As Claims Counsel, Mr. Sutton and Ms. Reitano had uniquely important duties.  Indeed,
they were at the apex of the facility, acting as two of the three lawyers advising the CSSP.
Special Master Freeh concluded that Mr. Sutton and Ms. Reitano "may have violated the federal

---

[85]   *Id.* § 4.3; *see DuPont v. Del. Trust Co.*, 320 A.2d 694, 699 (Del. 1974) (finding trustees breached their fiduciary
duties to remaindermen by not properly funding the trust); *Law v. Law*, 753 A.2d 443, 445–46 (Del. 2000)
(holding trustee did not adequately protect the rights of the remaindermen); Restatement (Second) of Trusts
§ 232 (1959) ("If a trust is created for beneficiaries in succession, the trustee is under a duty to the successive
beneficiaries to act with due regard to their respective interests.").

[86]   Trust Agreement §§ 3.8, 4.3, 4.4, Rec. Doc. 10761-12.

[87]   First Freeh Report at 19–20, Rec. Doc. 11287.

[88]   *See* Ex. 22 & 23 (video), Jason B. Berry, DHECC – Lionel Sutton Interview Part II – How the "go-to guy"
became the fall guy ("How did Lionel and Christine get the job"), The American Zombie (May 27, 2014).

[89]   Ex. 24, Patrick Juneau Note to Keith Moskowitz, Oct. 9, 2012.

criminal statutes regarding fraud, money laundering, conspiracy or perjury"[90] and "caused tangible harm to the integrity of the [CSSP]."[91]

While serving as Claims Counsel, Ms. Reitano referred a former client and CSSP claimant, Casey Thonn, to AndryLerner, LLC.  In exchange, the law firm paid Mr. Sutton more than $40,000 in a "circuitous manner," funneled through a related law firm in Las Vegas, then through two separate Crown LLC accounts, "in effect 'laundering' these payments."[92]  The Court found the claim was fraudulent and ordered restitution.  In addition, Mr. Sutton received a $10,000 monthly salary for an ownership interest in Crown LLC, a company co-owned with Glen Lerner of AndryLerner, LLC.[93]  Mr. Sutton told Special Master Freeh that the Claims Administrator was aware of his interest in Crown.[94]  Special Master Freeh's investigation found that Mr. Sutton "act[ed] at the specific behest and to the special advantage of Mr. Jon Andry and Mr. Lerner, to determine the status of their DHECC claims, facilitate their processing, and expedite payment."[95]  Mr. Sutton also expedited payment of a $7,648,722 BEL award to The Andry Law Firm itself.[96]  Under pressure from BP, the Claims Administrator suspended Mr. Sutton and Ms. Reitano.[97]  Thereafter, Mr. Sutton resigned, and Ms. Reitano was terminated.[98]

---

[90]   First Freeh Report at 2, Rec. Doc. 11287.

[91]   Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties ("Freeh Reply") at 1, Rec. Doc. 12393.

[92]   First Freeh Report at 5, 21–44, Rec. Doc. 11287.

[93]   *Id.* at 23–25.

[94]   *See id.* at 24.

[95]   First Freeh Report at 6, Rec. Doc. 11287.

[96]   *Id.* at 6, 25, 45–57 ("On numerous occasions, Mr. Sutton reached out to a claims analyst or accessed the database to check the status of the claim.  Accountants receiving these inquiries from Mr. Sutton, a senior lawyer at the CAO, acted promptly to expedite the claim.").

[97]   *Id.* at 42.

[98]   *Id.*; *see* Reitano's Third Suppl. Resp. to Freeh Rep. at 3, Rec. Doc. 11990.

Special Master Freeh's second report revealed additional serious misconduct by three more of Mr. Juneau's top deputies—David Duval, Appeals Coordinator; David Odom, CEO; and Kirk Fisher, Director of Business Processes and Reporting.[99] Where was the Claims Administrator?   In any event, he did nothing to prevent them from occurring.

> **B.      Mr. Sutton Has Accused the Claims Administrator Himself of Misconduct and this Court Should Address and Resolve that Question.**

As discussed in Special Master Freeh's first report, expediting claims for friends, family, business associates, or personal reward directly violates this Court's Order that claims are to be processed in the order in which they are received.[100]  Mr. Sutton recently alleged that in March 2013, the Claims Administrator asked Mr. Sutton to ensure that the son of one of the Claims Administrator's friends be paid expeditiously for his claim.  After Mr. Sutton told him it would be some time, the Claims Administrator responded: "[T]hat kid's been waiting long enough for his money, you call them and tell them to get it processed right away."[101]  Mr. Sutton states that he emailed program vendor BrownGreer and said "Pat wants this claim pushed through right away."[102]

In addition, reports allege that the Claims Administrator directed improper expedited processing of claims filed by clients of the Plaintiffs' Steering Committee.[103]  Those reports reference alleged emails by PSC members to the CSSP, stating "Per our meeting last week, Pat mentioned for members of the PSC to send along claim numbers for claims that have been filed

---

[99]    *See generally* Second Freeh Report, Rec. Doc. 12174.

[100]   First Amended Order Creating Transition Process at 2, Rec. Doc. 5995 ("New claims submitted shall be processed and evaluated in the order they are received.").

[101]   *See* Ex. 25 & 23 (video), Jason B. Berry, The American Zombie (May 19, 2014) ("Corps Constructors 1"), http://www.theamericanzombie.com/2014/05/dhecc-lionel-sutton-interview-part-1.html.

[102]   *See id.*

[103]   *See* Ex. 26, Jason B. Berry, The American Zombie (Mar. 11, 2014), http://www.theamericanzombie.com/2014/03/dhecc-proof-positive-of-claims-being.html.

and are [*sic*] larger claims that perhaps could be looked at more quickly.  To that end, [a PSC firm] respectfully submits DHE claim # [redacted] for your consideration."[104]  The Claims Administrator allegedly thereafter emailed Christine Reitano, instructing her to "Send to [BrownGreer] with request that they expedite."[105]

Although the Claims Administrator has disputed the allegation that he expedited numerous PSC claims for an improper purpose, explaining that it was important to have a representative sample of paid claims across all of the claim types,[106] Mr. Sutton states that he was unaware of the pre-fairness hearing "sampling program" until he saw the Claims Administrator's response.[107]  To be clear, BP was aware of a program to evaluate initial "test cases" in 2012 and expedite less complex claims that could be processed more quickly.  At no time, however, did BP agree that claimants represented by a particular lawyer—including PSC members—should be advantaged over *pro se* claimants or those represented by non-PSC lawyers.

Mr. Sutton also discusses Special Master Freeh's finding on page 60 of his first report that "several claimants from AndryLerner and another law firm were submitting claims in which the claimants' tax returns were significantly more favorable than their trip tickets, as was the case with Mr. Thonn,"[108] as well as the Claims Administrator's initial reaction to this discovery.[109]  Mr. Sutton alleges the "page 60 law firm" is a PSC-member, and that the Claims

---

[104] *See* Ex. 27, Email between Calvin Fayard, Christine Reitano, and Patrick Juneau, Sept. 17, 2012, *available at* http://www.scribd.com/doc/211748455/DHECC-Master-Email-Exchange-regarding-expedited-claims-of-PSC.

[105] *See id.*

[106] *See* Ex. 28, Jason B. Berry, The American Zombie (Mar. 14, 2014).

[107] *See* Ex. 25 & 23 (video), Jason B. Berry, The American Zombie (May 19, 2014).

[108] First Freeh Report at 60, Rec. Doc. 11287.

[109] *See* Ex. 29 & 23 (video), Jason B. Berry, The American Zombie (June 4, 2014) ("Page 60 firm").

Administrator learned of the issue and did not report it to the Court or correct potentially improper claims that had been paid.[110]

Mr. Sutton's credibility is certainly questionable. But the Claims Administrator vouched for him until he was unavoidably discredited, at which point the Claims Administrator withdrew his support. As Special Master Freeh has said, expediting claims constitutes an abuse of a position of influence.[111]

There are ample reasons to remove the Claims Administrator whether or not these allegations are correct. But such allegations should not continue to go unresolved. If Mr. Sutton's allegations are substantially true, this issue alone would merit removal.

### C. The Failure to Prevent Misconduct Confirms the Necessity of the Claims Administrator's Removal.

The Settlement Agreement and Undertaking make clear that the Court may "remove" and "replace" Claims Administrator as part of its oversight of the Settlement Program.[112] Removal is appropriate where the trustee has "committed a breach of trust" or if there exists an "[u]nfitness, unwillingness or inability of the trustee to administer the trust properly,"[113] as well as where the trustee "fails to perform his duties through more than mere negligence."[114] Ultimately, "[t]he broad inquiry sparked by an application for removal of a trustee is whether the circumstances are

---

[110]   *Id.* ("This page sixty firm, this was no surprise. This happened a long time ago. . . . It was brought to Pat Juneau's attention. When we found out what was being done. . . . We explained it to Pat Juneau. . . . He contacted the firm in question and told them that they had to stop doing it. That was the end of it. . . . It's my understanding that they did not retract the ones that had already been paid. That's my understanding. But I don't know that. . . . As far as I know, Pat Juneau did not bring that to the attention of the Court.").

[111]   First Freeh Report at 81, Rec. Doc. 11287.

[112]   *See* Settlement Agreement §§ 4.3.3, 5.12.1; Undertaking §§ 2.a, 5, Rec. Doc. 10761-11. As his counsel has acknowledged, the Claims Administrator "is absolutely subject to [the Court's] authority at all times." Hr'g Tr. at 35:7-8, Apr. 5, 2013, Rec. Doc. 9836.

[113]   Del. Code tit. 12, § 3327(1), (3)(b).

[114]   *McNeil v. McNeil*, 798 A.2d 503, 513 (Del. 2002). *See also, e.g.*, Restatement (Third) of Trusts § 37 & cmt. e (2003) ("A trustee may be removed (a) in accordance with the terms of the trust; or (b) for cause by a proper court." "[P]ossible grounds for a court to remove a trustee" include "unfitness," "unwarranted preference to the interests of one or more beneficiaries," and "serious or repeated misconduct").

such that the continuance of the trustee in office would be detrimental to the trust and require the court to grant removal."[115]  "[P]ersistent failure of the trustee to administer the trust effectively" can "mak[e] removal in the best interests of the trust."[116]

That the Court found it necessary to appoint Special Master Freeh to conduct an investigation pointed to the possible "[u]nfitness, unwillingness or inability of the trustee to administer the trust properly."[117]  That investigation itself, although obviously necessary, imposes substantial additional cost on the facility's operations.  The reported outcomes of this investigation only heightened concerns.

The Claims Administrator has failed to act with the care, skill, prudence and diligence of a fiduciary charged with leading one of the largest court-supervised settlement programs in history.[118]  He hired employees who had conflicts of interest to fill key positions, failed to supervise appointees, failed to discover self-dealing, and failed to implement policies and procedures that would forestall and root out misconduct.  The Settlement Agreement specifically provides that the Claims Administrator has the responsibility to "***oversee and supervise*** the Claims Administration Vendors . . . and staff."[119]  Delaware law is clear that a fiduciary is "liable for abusing its discretion in hiring [an] agent, for negligently hiring such agent, or for negligently continuing the agency relationship."[120]  And Louisiana law is even more explicit: "[T]he trustee has the duty to exercise reasonable care, skill, and caution in selecting the agent and establishing the scope and terms of the delegation consistent with the purposes and terms of

---

[115]   76 Am. Jur. 2d *Trusts* § 228; *see also, e.g.*, 90 C.J.S. *Trusts* § 313 ("A trustee may be removed under any conditions which render removal necessary for the best interests of the trust estate.").

[116]   76 Am. Jur. 2d *Trusts* § 230.

[117]   Del. Code tit. 12 § 3327.

[118]   *See* Del. Code tit. 12 § 3302.

[119]   Settlement Agreement § 4.3.2 (emphasis added).

[120]   Del. Code tit. 12 § 3322(a).

27

the trust instrument, to review periodically the actions of the agent, and, in the event of a breach of the agent's duties discovered by the trustee, to take such action to remedy the breach as is reasonable under the circumstances."[121]   This responsibility cannot be passed off to others. "[T]he trustee has a duty to monitor the performance of professionals hired by the trust."[122] Where a trustee fails to supervise, the law places the responsibility at the trustee's feet.[123]

In Special Master Freeh's telling, what occurred in the CSSP may have been criminal. Top members of the Claims Administrator's staff received payments from counsel representing claimants; his top appeals coordinator forwarded confidential information to a family member whose firm represented the claimant; one of his top lawyers was the "insider" for a law firm pursuing claims; several of his managers formed a company to market their services to a current CSSP vendor in a manner that was "riddled with potential conflicts of interest;" top managers spent significant amounts of money at a "bar" that was itself a CSSP claimant, epitomizing the complete failure to establish a "proper ethical tone" and leaving the program "susceptib[le] to bribery and other vulnerabilities"; and at least one of the most senior CSSP employees deleted a text message relevant to the Special Master's investigation while the investigation was

---

[121]   La. Rev. Stat. § 9:2087(D)(1); *see also* Restatement (Third) of Trusts § 80 ("In deciding whether, to whom, and in what manner to delegate fiduciary authority in the administration of a trust, and thereafter in supervising or monitoring agents, the trustee has a duty to exercise fiduciary discretion and to act as a prudent person of comparable skill would act in similar circumstances."); *Riggs Nat'l Bank v. Zimmer*, No. 3886, 1977 WL 5316, at *14–15 (Del. Ch. Nov. 30, 1977) ("If a power is delegable, the trustee owes to the beneficiary a duty to use reasonable care in selecting an honest and qualified person to whom to delegate the power.").

[122]   *Brady v. Capital Grp., Inc.*, No. 91-3873, 1992 WL 46337, at *2 (E.D. La. Mar. 4, 1992).

[123]   *See Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 351 (5th Cir. 2000) ("[F]ailure to exercise any appreciable oversight of the corporation's management was a breach of his fiduciary duty to preserve the trust assets."); *Mazur v. Gaudet*, 826 F. Supp. 188, 190–91 (E.D. La. 1992) ( "breach of duty by the defendants themselves which enabled the co-fiduciary to commit a breach" through embezzlement); *see also, e.g.*, *United States v. Michel*, 879 F. Supp. 2d 291, 304 (E.D.N.Y. 2012) (trustee who has delegated a duty "retain[s] an obligation to ascertain within a reasonable time whether an agent to whom he has delegated a trust power is properly carrying out his responsibilities" (internal quotation marks omitted)); *In re Nat'l Gypsum Co.*, 243 B.R. 676, 681 (Bankr. N.D. Tex. 1999) ("[W]here a trustee has properly delegated to agents or co-trustees or other persons, the trustee maintains a duty to exercise general supervision over their conduct.").

ongoing.[124]   Yet the Claims Administrator dismisses these as merely "incidents" that are

"isolated" and "unrelated."[125]

    Whether the Claims Administrator turned a blind eye or was so detached from day-to-day

activities as to be unaware of this conduct is irrelevant.  In either case, even in the absence of

other issues, his removal is justified.

### V.    THE COURT SHOULD REMOVE THE CLAIMS ADMINISTRATOR BECAUSE OF HIS WASTEFUL OVERSIGHT OF THE PROGRAM.

    The Settlement Program was designed to calculate awards using a transparent

framework.[126]   The Court cited transparency as one of the chief virtues of the CSSP, compared

with the GCCF.[127]   In their motions in support of final approval, Class Counsel and BP

expressed their intent that the Settlement Program operate transparently.[128]   Because it does not,

its wasteful practices are not evident.

### A.    The True Condition of the CSSP Is Alarming.

    The sad truth is that two years and $1 billion after the CSSP's establishment, its basic

claims processing functions are fundamentally flawed and have required extensive overhaul at

---

[124]  First Freeh Report at 54, 70, Rec. Doc. 11287; Second Freeh Report at 1–5 & n.1, Rec. Doc. 12174.

[125]  Letter from Phillip A. Wittmann at 1, Jan. 29, 2014, Rec. Doc. 12255-1.

[126]  Order Granting Final Approval at 110-11, Dec. 21, 2012, Rec. Doc. 8138 ("Settlement Agreement is designed to be transparent as a claimant or his or her counsel reviews the frameworks relevant to particular circumstances, but also sufficiently detailed to ensure that determinations made by the Settlement Program are objective, consistent, and predictable.").

[127]  *Id.* at 110 ("[T]he Settlement Program actually improves upon the GCCF in a number of important ways, including that (i) it pays claims that the GCCF would not; (ii) its decisions are made pursuant to transparent and objective frameworks; (iii) its administrator was appointed by this Court; and (iv) its operations are designed to be claimant-responsive and claimant-friendly, and they are subject to the active supervision of this Court.").

[128]  Pls.' Mem. in Support of Final Approval at 8, Aug, 13, 2012, Rec. Doc. 7104 (describing the Settlement Agreement's "animating principles" as "Court supervision, neutrality, transparency and effective communication with claimants"); BP Defs.' Mem. in Support of Mot. for Final Approval at 102, Aug. 13, 2012, Rec. Doc. 7114-1 ("[B]oth the claims administrator and the claims administration vendors will exercise their responsibilities pursuant to new, detailed, transparent, objective, and highly negotiated claims frameworks.").

extraordinary expense.  Many of the individuals involved in that overhaul are to be commended for their efforts.  But the underlying failure of the Claims Administrator is unmistakable.

A fundamental requirement of claims processing is a reliable IT system.[129]  An independent analysis, and BP's analysis, find that the CSSP's IT system was inadequate in every critical respect: transparency, auditability, completeness and accuracy.[130]  For most of the last two years, the system has been incapable of tracking a claim from beginning to end without manual input at various stages,[131] increasing the potential for error and the cost of processing claims,[132] and preventing the system from effectively being audited.[133]

As detailed in the Declarations of Charles Cipione and Todd Brents, the IT system is now being restructured with the guidance of additional vendors, a process that will take the better part of a year, at a cost of tens of millions of dollars.[134]  And, eight months later, the IT system experienced a failure that rendered it inaccessible to the parties for a period just ten days ago.

Mr. Juneau also did not implement at the outset the necessary systems to prevent and detect the payment of fraudulent and potentially fraudulent claims.  Recently, Special Master Freeh identified a $50,000 claim, approved by the CSSP, but which would have been caught by any rudimentary anti-fraud program.  The claimant had asserted that he caught more than 8.5

---

[129]   Ex. 30, Declaration of Charles Cipione ¶ 11, Aug. 31, 2014.

[130]   *See* Ex. 30, Cipione Decl. ¶¶ 33–37 (explaining that transparency means the ability to easily view the processing that occurs within the claims system, auditability means being able to view the entire transactional history of each claim, completeness means the universal capture and retention of information, and accuracy means properly applying the settlement rules) (citing Claims Management System Assessment Report, prepared by IBM Global Business Services Business Analytics and Optimization ("IBM Report"), Dec. 20, 2013).

[131]   *Id.* ¶¶ 49–54, 61.

[132]   *Id.* ¶¶ 46, 55.

[133]   *Id.* ¶¶ 63-66.

[134]   *See generally* Cipione Decl. (citing IBM report); Ex. 31, Declaration of Todd Brents ¶ 32, Aug. 30, 2014.

tons of seafood a month in a 16-foot boat without the help of a single deckhand.[135]  Even more

incredibly, the claimant maintained, as part of his subsistence claim, that he retained 7,000

pounds of crab, 7,500 pounds of oysters, and 2,000 pounds of shrimp per month for personal and

family consumption.[136]  Only at year-end 2013 did David Welker receive authority to begin an

overhaul of the fraud-detection system.[137]  This overhaul will include a new IT infrastructure

expected to cost *$6.4 million*—in addition to the tens of millions of dollars it will cost to revamp

the IT system noted above.[138]

Mr. Juneau has further failed to monitor CSSP vendors.[139]  To begin with, the Claims

Administrator appears to have "intentionally disregarded [his] supervisory role, or lacked the

ability to control the Vendors."[140]  Todd Brents, Managing Director and a senior and founding

member of AlixPartners, LLP Information Management Services, which specializes in settlement

administration, found that Mr. Juneau permitted costs to balloon to "excessive" levels while

productivity and accuracy were unacceptably low.[141]  The Claims Administrator has permitted

vendors to establish their own budgets[142] and failed to insist on detailed invoices.[143]  Even after

promising in 2012 that he would establish metrics to evaluate vendors' performance—conceding

"[t]hat's my wagon to pull"—consistent, comprehensive performance and compliance metrics

---

[135]   Memorandum in Support of Motion of the Special Master for Return of Payments Made to Jarrod A. Burrle and Others at 10, June 10, 2014, Rec. Doc. 13010.

[136]   *Id.* at 3-4, 9.  This is several hundred times the CSSP's internal guidelines for maximum caloric consumption.

[137]   Ex. 31, Brents Decl. ¶ 37.

[138]   *Id.* ¶ 38.

[139]   Ex. 32, Declaration of Mark Hutchins ¶¶ 5, 25-27, 37–45, Aug. 29, 2014.

[140]   *Id.* at ¶ 37.

[141]   Ex. 31, Brents Decl. ¶¶ 10, 42–44.

[142]   *Id.* ¶ 44.

[143]   *Id.* ¶ 47.

still do not exist.[144]  As Mr. Brents concludes, the vendors are "in a position where they manage

themselves without satisfactory oversight of their activities, staffing and productivity levels."[145]

### B.      The Costs of this Poor Performance Are Alarming.

In reporting on the status of the CSSP, the Claims Administrator has not: (a) referenced

any of the major changes required, such as the new IT system, replacing the entire fraud

function, or the proposal to hire large numbers of accountants; (b) discussed the cost of the

facility, budget or productivity trends; (c) advised of the major changes to vendor assignments;

or (d) provided even basic information concerning fraudulent activity.  The Claims

Administrator's Reports fail to give the Court, the Class, BP, or the public a true picture of what

has actually been occurring at the CSSP.

Though budgets have ballooned, performance remains poor.  Based on the Claims

Administrator's own quarterly file reviews, BEL, Seafood, and Individual Economic Loss

("IEL") claims have error rates of 15.7%, 12.2%, and 13.8%, respectively.[146]  These findings

have been corroborated in part by the CliftonLarsonAllen LLP ("CLA") process audit,

commissioned by the Claims Administrator and conducted from June 4, 2012 through March 31,

2013, which found error rates exceeding 13% in BEL claims processing—and that does not

include the adoption of a fundamentally erroneous and now reversed BEL calculation formula.[147]

These error rates should be unacceptable to any reasonable and prudent claims administrator.[148]

These failings are not for want of money.  As Claims Administrator, Mr. Juneau has spent more

---

[144]   *Id.* ¶ 54–55 & n.25 (citing David Hammer, "New Gulf Oil Spill Claims Administrator's Message: We Are Not BP. We Are Here To Help," *The Times-Picayune* (June 4, 2012)).

[145]   *Id.* ¶ 47.

[146]   *Id.* ¶ 17.

[147]   *Id.* (citing CliftonLarsonAllen, Deepwater Horizon Economic Claims Center Independent Evaluation of the Internal Control Environment (May 17, 2013)).

[148]   *Id.* ¶ 9 ("A reasonable and prudent Claims Administrator would not accept such a high error rate and would be taking strident actions to address the shortcomings.").

than $1 billion in the past two years, and the CSSP's annual administrative budget for 2014 will exceed another $463 million.[149]

### C. The Claims Administrator Should Be Removed Because He Failed to Control Costs.

This Court must hold the CSSP accountable for these expenses.  In two years, the CSSP has consumed approximately ***$1 billion***.[150]  That amount is for administrative expenses, not money paid out to claimants.  One billion dollars is a staggering number, equal to more than 7 percent of the annual budget of the entire federal judiciary during that timeframe.[151]

Since no expense was spared, the CSSP should be an efficient claims-processing operation.  In reality, however, the CSSP remains distressingly inefficient.  It has issued approximately 71,000 eligibility notices, with payment offers north of $5 billion, but still has approximately a hundred thousand claims in the queue.[152]  In other words, the CSSP has spent almost $10,000 per claim that has received an eligibility notice.  For every dollar consumed by the Settlement Program, approximately five dollars has been awarded to claimants.

Any reasonable claims administrator would have developed comprehensive budgeting and cost and performance reporting processes at the outset of the program to provide oversight to the vendors through establishment of quantifiable and achievable performance targets.[153] Without productivity management, low productivity benefits vendors by increasing the size of

---

[149]   *Id.* ¶ 43.

[150]   *Id.* ¶ 10.

[151]   *See* Administrative Office of the United States Courts, Annual Report 2012, *available at* http://www.uscourts.gov/FederalCourts/UnderstandingtheFederalCourts/AdministrativeOffice/DirectorAnnualR eport/annual-report-2012/fiscal-year-funding-cost-containment-initiatives.aspx#funding.

[152]   Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement, *available at* http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdf.

[153]   Ex. 31, Brents Decl. ¶ 40.

the teams each vendor employs as well as the length of the engagement.  Even the Claims

Administrator's former COO conceded the "inefficiencies in the current operation of CSSP."[154]

    At BP's urging, the Claims Administrator overhauled the budget process.  While the

process is improved, and good faith efforts have been made by some to cure these deficiencies,

the CSSP still lacks the ability to measure the performance of its key vendors, including

accountants.[155]  As a result, the CSSP cannot effectively manage its vendors.

### D.    The Claims Administrator Breached Contractual and Fiduciary Duties.

    The Claims Administrator failed in his duties to institute elemental good practices,

including the controls necessary to prevent waste by vendors and fraud by claimants.  The result

has been waste of trust assets and a lack of integrity in claims processing.  The Claims

Administrator was required to "establish procedures and controls" to manage the settlement

program and "oversee and supervise the Claims Administration Vendors."[156]  Basic principles of

fiduciary law required the same.[157]  But the failures in this regard are pervasive.

    Remedial efforts to undo the damage of the Claims Administrator's tenure are ongoing.

They rely primarily not on the Claims Administrator but on individuals or consultants brought in

from the outside.  Special Master Freeh has been given the task of advising on how the CSSP's

internal controls can be improved and is currently investigating fraudulent claims.  The

Settlement Program's IT system is being replaced at significant cost.  Mr. Welker is in the

---

[154]  Hr'g Tr. at 57:13–17, Aug. 7, 2013, Rec. Doc. 10975.

[155]  Ex. 31, Brents Decl. ¶¶ 53–55.

[156]  Trust Agreement § 4.4, Rec. Doc. 10761-12; Settlement Agreement § 4.3.2.

[157]  *E.g.*, *Mazur*, 826 F. Supp. at 190–91 (trustees breached their duties by failing to implement procedures to verify whether terms of the trust agreement were being followed); *see also Cobell v. Norton*, 240 F.3d 1081, 1104–05 (D.C. Cir. 2001) (trustee breached fiduciary duties where it failed to take measures necessary to provide beneficiaries with a complete historical accounting, including maintaining adequate records, implementing a computer system, and developing plans and procedures sufficient to ensure that all aspects of the accounting process were carried out).

process of overhauling the mechanisms for detecting and preventing fraudulent claims.  But the Claims Administrator should be held responsible for the failures that required these steps.

## CONCLUSION

To restore the CSSP to its intended goals, this Court must exercise its authority as the ultimate supervisor of this class-action settlement.  The Court should act now to remove the Claims Administrator and replace him.

September 2, 2014

Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200



Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999


Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

*OF COUNSEL*

Respectfully submitted,

  */s/ Kevin M. Downey*
Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029



  */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108


Richard C. Godfrey, P.C.
Wendy L. Bloom
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200


Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, on this 2nd day of September, 2014.

/s/ Don K. Haycraft
Don K. Haycraft