# Exhibit 7

# BP makes it personal

Written by Lynda Edwards Gannett Louisiana
Jul. 06

shreveporttimes.com

Lafayette attorney Patrick Juneau has administered some of the biggest claims settlements in U.S history. He handled Vioxx and Toyota settlements. And he is the administrator for BP settlements, paying claims to those who can prove their businesses were damaged by the impact of the catastrophic Deepwater Horizon oil spill.

The BP settlement is complex and mammoth — more than 1,000 pages — and Juneau had nothing to do with writing or approving it. He was appointed by a federal court to administer it, which includes filing and reviewing claims in a timely fashion and keeping track of the company's appeals.

Not once in his career, Juneau maintains, has a corporation attacked his integrity — until BP.

"BP's CEO Bob Dudley said I was willfully misinterpreting the settlement; that's a lie and, yes, it is actionable," Juneau said. "BP agreed to the settlement and its terms and it had the advice of some of the best attorneys in the world.

" The federal courts have upheld the settlement process as valid — repeatedly. And I don't understand the vitriol in attacking me. I am not anti-oil. I grew up in Lafayette, and I represented oil companies in court."

BP has filed numerous complaints with the 5th Circuit Court of Appeals, complaining the settlement process does not require rigorous enough proof that business losses were caused by the oil spill. BP paid for full-page ads in the New York Times attacking U.S. District Judge Carl Barbier.

Juneau said as of June, 292,800 claims had been received and 60,525 were denied. More than $5 billion has been paid, with Acadiana parishes reaping more than $239 million.

BP declined The Advertiser's request for an interview. Instead, Stephen Power, a media relations specialist for the company, provided an email response from BP Senior Vice President Geoff Morrell.

"BP has for some time expressed its concerns about what we believe to be the mismanagement of the claims facility and the misinterpretation of the settlement agreement," Morrell's email reads. "These problems affect not only BP, but all legitimate claimants who seek compensation from the Court-Supervised Settlement Program."

Loyola law professor Blaine LeCesne said the attacks on Juneau are unwarranted.

"The attacks on Mr. Juneau are beyond the pale and would not be considered good form by most oil companies," LeCesne said. "I can only guess this is part of BP's scorched earth legal strategy since Mr. Juneau has gone out of his way, too far out of his way in my opinion, to placate BP."

## Behind the scenes

When BP signed the 2012 settlement, it was facing the alternative of defending itself against hundreds of thousands of lawsuits swamping U.S. courts and making shareholders nervous.

LeCesne got a glimpse of how nervous major BP investors could be in a secret meeting right after the spill. He wrote a law review article after the 2010 spill speculating about whether BP could be convicted of gross negligence. His article caught the eyes of some powers behind BP.

"Some hedge fund managers who owned enormous quantities of BP stock, probably more than anyone else worldwide, called to ask me to meet with them privately," LeCesne said. "The article caught their eye. They flew me to Wall Street. They were young guys, smug, highly caffeinated and making millions annually. They never thought their BP shares would be a problem. Then I explained the cumulative impact of hundreds of thousands of negligence lawsuits against BP working their way through courts all over the country."

By the end of the meeting, the hedge fund managers seemed rattled by the prospect of BP stock nose-diving.

"They seemed eager to urge BP to reach a settlement," LeCesne remembered.

Settlement terms were negotiated by BP and a committee of plaintiffs' lawyers. Company officials and Judge Barbier approved the settlement in 2012.

Yet Juneau, recruited to be settlement administrator in spring 2012, remembers BP began challenging decisions made by him, the PricewaterhouseCoopers accountants he recruited and Barbier almost from the start. As the year elapsed, BP's attacks on Juneau became more personal.

"My wife and friends began asking me why I didn't just give this up and enjoy my fishing camp on the Atchafalaya Basin," said Juneau. "The attacks on my reputation are painful. I've had a long career that I'm proud of and never encountered anything like this. But I feel a duty to see this process out to its end."

He smiled ruefully. "If I'm alive to see the end."

**The process**

One of BP's ads complained that Emeril Lagasse, who owns 13 New Orleans restaurants and one Florida restaurant, lost money as the result of trademark licensing fees he chose to pay rather than a drop in customers after the spill. Lagasse's management company, Homebase, fired back last December saying the losses were proper, legitimate, met the settlement criteria — and Lagasse still hadn't collected a dime.

The settlement offers a mechanism for BP to appeal settlements to a judges' panel.

"BP wins those appeals a fair number of times," Juneau said. "But they fight their battle by taking out full-page ads in the New York Times attacking claimants."

LeCesne has collected many examples of plaintiffs whose claims seem legitimate yet they have waited two years without payment. He also observed that the whole point of a settlement is to avoid a costly court battle fighting over proof of cause and effect in court in favor of a simplified process based on certain criteria.

"In every settlement, there will be false positives, meaning some people who match the criteria may get more money than they should," LeCesne explained. "There will also be false negatives meaning some

people who deserve the money won't get it because the timing of their loss is a bit off or they didn't have all the records needed to submit. The parties accept that as the tradeoff instead of going to court. BP accepted that tradeoff."

**New rules**

In an effort to address BP complaints about proof of causality, Juneau replaced the simple pre- and post-spill comparison with a more detailed set of requirements for business owners claiming financial loss. LeCesne says the new rules will be especially difficult for farmers, agricultural workers and those in the construction industry.

Reuters legal blogger Alison Frankel, a founding editor of Litigation Daily, wrote a detailed analysis of the new rules in June.

The new rules establish "additional hurdles for farms, law firms, construction outfits and other businesses that use cash-based accounting," she wrote. "Farmers would have to submit claims based on expenses and revenues for particular plantings and harvests, not based on year-by-year accounting."

Judge Barbier has approved the new rules.

Barbier's decision is an additional concern for plaintiff attorneys who already see an adversary in Judge Edith Clement, one of three members of the panel that hears BP's appeals to various claims. Clement sits on the board of the Foundation for Research into Economics and the Environment, a controversial conservative think tank that argues for less federal regulation of environmental matters. The Judicial Conference of the United States ruled that it is an ethics violation for federal judges to join FREE's board.

Meanwhile, Juneau said he is trying to do his best for victims.

He says he is determined that, despite the mishaps and obstacles in the settlement process, every claimant will get justice, even those who had little to lose and have never learned to sign their names to paperwork.