# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to:<br>All Cases and No. 12-970 | * * * * * * | HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### DECLARATION OF MARK HOLSTEIN

I, Mark Holstein, do hereby declare that the following statements made by me are true and accurate to the best of my knowledge and belief:

### Introduction

**1.** I am Managing Counsel for BP America, and one of the in-house legal representatives overseeing implementation of the Economic Loss and Property Damages Settlement ("Settlement Agreement"), as amended on May 2, 2012. I make this Declaration based upon my own personal knowledge.

### Appointment of Patrick Juneau as Claims Administrator

**2.** The Economic and Property Damages Settlement was negotiated over many months in 2011-12. While the parties had discussed candidates a few weeks prior to the date of the announcement of the Agreement in Principle, we were unable to agree. Serious consideration of who would serve as Claims Administrator in the new claims

facility took place in the days just before the agreement was announced on March 2, 2012.

**3.** The Plaintiffs' Steering Committee proposed Patrick Juneau as a candidate for Claims Administrator. On February 26, 2012, after being contacted by counsel for BP and the PSC, Mr. Juneau traveled to New Orleans to meet with two outside attorneys for BP, Keith Moskowitz of the SNR Denton firm and Dan Cantor of Arnold & Porter LLP.

**4.** After the preliminary conversation with outside counsel, I interviewed Mr. Juneau for the first time on the evening of February 27, 2012. John Lynch, U.S. General Counsel BP America, Inc. and James Neath, Associate General Counsel for U.S. Litigation, were also present on behalf of BP as was Keith Moskowitz. Members of the Plaintiffs' Steering Committee were also present. Mr. Juneau said that he had been at his fishing camp when he was called "out of the blue" by Keith Moskowitz on BP's behalf. We discussed the prospect of Mr. Juneau serving as Claims Administrator and any issues it might present. Mr. Juneau said that he had been a neutral in large, complex civil disputes for many years, and had practiced for decades in Louisiana. As a result, he knew many members of the Plaintiffs' Steering Committee. He also had served as a neutral in matters in which PSC members had been counsel and had positive working relationships with them. However, he noted that no one could serve as a neutral in major cases over a long period of time without forming such relationships. He also noted that he had a reputation for fairness and that he had been a defense lawyer in private practice and had acted as counsel for both plaintiffs and defendants over a long career.

**5.** Either in this meeting, or one shortly after his appointment, Mr. Juneau further said he was still performing work in connection with the Toyota litigation, where he was

2

serving as a neutral, but that he expected such work to conclude by the end of the year. He said that if he were selected as Claims Administrator in this matter, other than that matter, he would devote his full-time energies to it.

6.     I asked him if he felt that he could faithfully comply with the terms of a settlement agreement as written, and he responded that he would.

7.     I have no recollection of Mr. Juneau saying at this meeting that he had represented the State of Louisiana as a lawyer in matters related to the Deepwater Horizon oil spill, or that he had done so for the purpose of advocating to the Gulf Coast Claims Facility as to how Louisiana resident claimants should be compensated. Nor do I recall him saying that at any time. Nor do I recall him saying he had previously considered the issue of how Deepwater Horizon oil spill claimants should be compensated (much less the specific details of that issue), what documentation claimants should have to provide to recover for claims, or the GCCF release.

8.     In July 2013, I was interviewed by the Freeh Group as part of the mandate given it by this Court to investigate misconduct in the CSSP. At that time, there was much public interest as to allegations of misconduct at the CSSP and whether senior staff had conflicts, apparent conflicts, or potential conflicts. I discussed with the Freeh Group some conflicts that alarmed BP. I did not discuss Mr. Juneau's prior representation of Louisiana and believe that I would have if I were aware of what I know today.

**Recent Developments**

9.     At the end of July 2014, I became aware of a contract between Louisiana and Mr. Juneau's firm originally executed in July 2010 and several amendments thereto. (Exs. 3, 4, and 12 of BP's Motion to Remove the Claims Administrator).

10. I asked in August 2014 that BP's files be reviewed for purposes of locating any waiver related to that issue or any communication from Mr. Juneau in February 2012 disclosing the representation or its scope.

11. BP has not as of this date located any waiver of a conflict of interests or any written disclosure from Mr. Juneau regarding the issue.

12. Over the next few weeks, BP located items in its files that appear to relate to Mr. Juneau's Louisiana representation, though none came from Mr. Juneau. First, BP located copies of three news articles in 2010 which describe Mr. Juneau as a "liaison" from Louisiana to the GCCF. (Exs. A to C).[1] Second, the State of Louisiana made a production to BP on a "thumb drive" on December 20, 2011, and February 24, 2012 to advance its claim for damages. This production included the contract and related amendments between Mr. Juneau and Louisiana and documents that appear to record some payments under the contract. (Ex. D). The State provided these as part of its claim for damages in connection with the spill, and, to my knowledge, these documents were not and have never been considered in connection with Mr. Juneau's appointment and service as Claims Administrator before the past several weeks. These documents are among tens of millions of pages of documents that have been produced for litigation and claims purposes in oil spill matters. Third, BP has located in its files three documents from November 2010 that contain references to Mr. Juneau and the Gulf Coast Claims Facility. The first two are letters between Louisiana Attorney General Buddy Caldwell

---

[1] These are an October 23, 2010 New York Times article entitled "Should the Money Go Where the Oil Didn't?," a November 14, 2010 Business Insurance article entitled "Far-flung Claimants Complicate BP Oil Spill Fund; Claims Asserting Loss Far Away from Gulf Tougher to Assess," and a Metrolic.com article entitled "Proximity Claims in BP Lawsuit."

and Ken Feinberg, then-head of the GCCF, which refer to Mr. Juneau. *See* (Exs. E & F). The third document, a November 30, 2010 email from Mary Anna Tabol of Mr. Feinberg's law firm, forwarded to BP counsel an exchange between Mr. Feinberg and Mr. Juneau. (Ex. G). To my knowledge, these documents—which were found in files predating by more than a year the February and March 2012 process of selecting the Claims Administrator—were not and have never been considered in connection with Mr. Juneau's appointment and service as Claims Administrator before the past several weeks.

**13.** Dentons, the successor to SNR Denton, located in its files an undated handwritten note of Keith Moskowitz under the heading "Pat Jenueu," (sic) which appears to read: "Consulted with La. (State) about the whole Feinberg process." (Ex. 18 of BP's Motion to Remove the Claims Administrator).

**14.** On August 14, 2014, I became aware of documents that reflect communications between Mr. Juneau and Ken Feinberg (or people working for him) related to the Gulf Coast Claims Facility's compensation protocols and other detailed communications and advocacy about how Louisiana claimants should be compensated. The documents of which I am aware are (Ex. H). These documents contain two pages previously located in BP's files, (Ex. G), but they also contain 49 pages of additional emails between Mr. Feinberg and Mr. Juneau that have not been found in BP's files, including attachments in which Mr. Juneau proposed to the GCCF compensation methodologies for claimants with "no or little documentation." (E.g., Ex. H, at 4). Given the language in some of the emails, it appears that there are several other communications between Mr. Juneau and representatives of the GCCF in which Mr. Juneau advocated on behalf of Louisiana businesses and residents and adverse to BP.

5

**15.** BP is filing this motion now because of the new information that it learned in recent weeks regarding Mr. Juneau's past advocacy of the interests of individual and business claimants seeking compensation from BP for spill-related injuries. It has never made any decision to defer raising this issue with the Court. Nor did it make any decision to await developments in the CSSP before raising the issue with the Court.

### Modification of Documentation Requirements

**16.** On August 16, 2012, I received an email from Claims Administrator Juneau containing a report, prepared by Orran Brown of BrownGreer, which recommended substantial modifications to the documentation requirements mandated by the Settlement Agreement. The recommendations included, among other things, eliminating the requirements imposed under the Settlement Agreement that BEL and IEL claimants provide copies of their business licenses. Mr. Juneau stated that his "initial view" was that the report's recommendations were "solid and if implemented, they would speed the process while still maintaining the intent of the agreement." (Ex. I).

**17.** On August 21, 2012, BP counsel Wendy Bloom provided BP's comments on these recommendations. Ms. Bloom noted that the CSSP was proposing "to disregard mandatory document and sworn statement requirements," which were "fundamental elements" of the compensation frameworks. For example, BP specifically stated that business licenses were a "mandatory" requirement under Exhibit 4A "that was negotiated and agreed to by the Parties," and that the requirement "cannot be disregarded." BP stated that the CSSP did not have the authority to disregard the requirements, and that BP would not agree to waive them. (Ex. J).

**18.** On August 28, 2012, I represented BP, along with Keith Moskowitz, at a meeting with Mr. Juneau and Class Counsel. Orran Brown of BrownGreer also attended the meeting. Mr. Juneau advocated that BP waive the requirements because BrownGreer believed they were not necessary to make eligibility and claim payment determinations.

**19.** Mr. Juneau stated that, unless BP agreed to do so, the CSSP would be forced to issue a substantial number of deficiency notices, which would damage the public image of the CSSP and could impact the number of opt-outs to the Settlement Agreement. Mr. Juneau characterized the upcoming sixty days as a crucial time for the CSSP, and suggested that BP's decision on this issue potentially could affect the Court's decision to grant final approval to the Settlement Agreement. Mr. Juneau stated that it was in the interest of all the Parties to remove these requirements.

**20.** However, when questioned at that meeting, Mr. Brown admitted that the CSSP had not contacted claimants found to have document deficiencies and had not worked with claimants to attempt to cure those deficiencies—for instance, by asking for a business license from a claimant who failed to provide one. I reiterated BP's position that the contested documentation requirements were specifically negotiated by the Parties, and that there was no justification for removing those requirements.

**21.** On September 4, 2012, I attended another meeting with Mr. Juneau regarding the document requirement issue.

**22.** BP attempted to work with the CSSP to develop a more efficient way for the claims vendors to either assist claimants in obtaining their own licenses or for the vendors to determine themselves whether claimants had professional licenses. To this end, on September 13, 2012, BP counsel Wendy Bloom sent Claims Administrator Juneau (as

well as Magistrate Judge Shushan) several spreadsheets listing the relevant licensing agencies for each state. BP representatives had contacted those licensing agencies and verified that the clear majority of them retained historical records of licenses, which would allow either the CSSP or claimants to obtain verification of past licenses.

23. Notwithstanding these efforts to assist claimants in providing the documents required under the Settlement Agreement, Claims Administrator Juneau and the CSSP adhered to their position that BP should waive the documentation requirements.

24. Class Counsel submitted a memorandum to Claims Administrator Juneau on September 16, 2012. Class Counsel argued that the documentation requirements, particularly the license requirements for business and individual economic loss claimants, were permissive rather than mandatory.

25. BP responded on September 17, 2012. BP maintained that "the license requirements in the Settlement Agreement are mandatory and must be met in order for a . . . claimant to be eligible for a settlement payment." BP also noted that the CSSP had "sought prematurely to seek exceptions from the Settlement Agreement's document requirements before undertaking its obligations under the Settlement Agreement to provide claimants with an opportunity to cure document deficiencies." Notwithstanding those observations, BP acquiesced to the Claims Administrator's insistence, but only because the Claims Administrator personally and others at the CSSP were emphasizing its importance:

> [G]iven *the importance the CSSP places* on eliminating the license requirement for Business Economic Loss and Individual Economic Loss claims, *and in a good faith effort* to facilitate the shared goal of efficiently processing claims under the terms of the Settlement Agreement with appropriate speed and diligence, BP agrees to modify the document requirements for [BEL] and [IEL] claims, including, but not limited to, license requirements for Seafood Compensation Program claims.

BP is agreeing to this modification based on representations by the CSSP that not requiring licenses will allow the CSSP to significantly increase the pace of claims processing and the payment of eligible claims.  (Ex. K) (Emphases added)

**26.** In addition, and again based on the Claims Administrator's insistence, BP also agreed to a number of other modifications to the documentation requirements mandated by the Settlement Agreement.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

Dated:  September 2, 2014

_____
Mark Holstein

9