# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to: <br> All Cases and No. 12-970 | * * * * * * | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## **DECLARATION OF DANIEL A. CANTOR**

I, Daniel A. Cantor, do hereby declare that the following statements made by me are true and accurate to the best of my knowledge and belief:

### **Introduction**

1. I am a partner in the law firm of Arnold & Porter LLP, resident in the firm's Washington, D.C. office.  I am counsel for BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") in the above-captioned case.  I am over the age of 18 and, if called, competent to testify to the facts set forth herein.

2. In connection with my representation of BP, I have reviewed and become familiar with the Economic and Property Damages Settlement, as amended, in the above-captioned case. I have reviewed numerous claims awards made by the Court-Supervised Settlement Program ("CSSP" or "Settlement Program") pursuant to that Settlement, and the briefing of appeals of claims awards by BP and Claimants.

3. In the course of my representation of BP with regard to the Settlement Program, I have had numerous interactions with Claims Administrator Patrick Juneau and others affiliated with the CSSP.

4.      In 2010, Mr. Juneau made numerous submissions on behalf of the State of Louisiana to the Gulf Coast Claims Facility ("GCCF"). These submissions argued for the application of certain methodologies and approaches for calculating compensation for business and individual claimants alleging economic and property losses as a result of the Deepwater Horizon Spill.

5.      In his submissions to the GCCF, Mr. Juneau advocated on behalf of his client the State of Louisiana about many of the same subjects that Mr. Juneau is now called upon to adjudicate in a neutral manner as the Claims Administrator. In some instances, Mr. Juneau took positions on behalf of his client the State of Louisiana that differ from the rules prescribed by the Settlement Agreement.

<u>Mr. Juneau's Advocacy To The GCCF As Counsel For The State of Louisiana</u>

6.      As Counsel for the State of Louisiana, Mr. Juneau advocated for the GCCF to provide compensation to Louisiana businesses and individuals alleging impacts as a result of the Spill. Mr. Juneau submitted to the GCCF on behalf of the State of Louisiana numerous proposed methodologies for calculating compensation for shrimp captains and deckhands, crab captains and deckhands, fin fisher captains and deckhands, restaurants, and hotels.

7.      Mr. Juneau's prior advocacy on behalf of seafood industry claimants discussed what he described as the central role of the seafood industry in Louisiana, as well as his client the State of Louisiana's direct interest as a taxing authority in seafood industry revenues. For example, Mr. Juneau wrote to the GCCF:

- "Nearly 1/3 of the domestic seafood consumed in the contiguous United States comes from Louisiana. Louisiana is the largest producer of shrimp in the nation and this industry is a defining cultural identifier of our State and the Gulf of Mexico. Louisiana's shrimp industry is not only a multi-billion dollar economic driver to the State but a key contributor to our tourism and culinary industries as well. Shrimpers are vital to the State's economy providing millions of dollars in revenue to local,

- parish, and State governments. The industry as a result of landings by captains and deckhands employs thousands of persons throughout the seafood distribution system." Attachment to November 24, 2010 email from Patrick Juneau to Kenneth Feinberg titled "Shrimp Industry--Captain & Deckhand Baseline Compensation Models" at p.1 (hereinafter "Shrimp Methodology").

- "With a wide range of commercially viable finfish species to harvest, resulting from our marsh and wetland areas acting as nursery habitats, Louisiana's fin fishers are not only a key economic driver but a part of the State's cultural identity and key contributor to our international culinary legacy. Fin fishers are vital to the State's economy providing revenue to local, parish, and State governments and employment to low and moderate hourly wage earners." Attachment to Nov. 24, 2010 email from Patrick Juneau to Kenneth Feinberg titled "Fin Fishing-Captain & Deckhand Baseline Compensation Models" at p.1 (hereinafter "Fin Fish Methodology").

- "Louisiana is the number one provider of crabs in the United States supporting and augmenting other regions [sic] catches which are in decline due to environmental and biologic conditions. . . . Louisiana's crab industry is vital to not only the State's economy but [to] the nation [sic] economy, providing revenue to local, parish and state governments across the country. The crab industry provides significant blue collar employment in Louisiana primarily to low and moderate hourly wage earners and to persons in the restaurant industry across the United States." Attachment to Nov. 24, 2010 email from Patrick Juneau to Ken Feinberg titled "Crab Industry--Captain & Deckhand Baseline Compensation Models" at p.1 (hereinafter "Crab Methodology").

8. The proposed methodologies that Mr. Juneau submitted to the GCCF advocated for the compensation of claimants who have little or no documentation. For example, Mr. Juneau explained to the GCCF:

- "The Crab Captain & Deckhand Compensation models was [sic] designed to assist with the calculations for payments of interim and final claims filed by claimants with little or no documentation." *Id.* "In the case of captains and deckhands with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits." *Id.*

- "The Fin Fishing Captain & Deckhand Compensation models was [sic] designed to assist with the calculations for payments of interim and final claims filed by claimants with little or no documentation." Fin Fish Methodology at 1. "In the case of captains and deckhands with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits." *Id.*

- "The Shrimp Captain & Deckhand Compensation models was [sic] designed to assist with the calculations for payments of interim and final claims filed by claimants with

3

little or no documentation." Shrimp Methodology at 1. "In the case of captains and deckhands with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits." *Id*. at 2.

- "The Restaurant Compensation model was designed to assist [the] GCCF and the State of Louisiana [sic] assist industry claimants with the calculation s [sic] for payments of interim and final claims, who have little or no documentation." Attachment to Nov. 24, 2010 email from Patrick Juneau to Ken Feinberg titled "Restaurant Baseline Compensation Model" at p.1 (hereinafter "Restaurant Methodology"). "In the case of restaurants with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits." *Id*.

- "The Hotel Compensation model was designed to assist [the] GCCF and the State of Louisiana assist industry claimant with the calculation s [sic] for payments of interim and final claims, who have little or no documentation." Attachment to Nov. 24, 2010 email from Patrick Juneau to Ken Feinberg titled "Hotel Baseline Compensation Model" at p.1 (hereinafter "Hotel Methodology"). "In the case of hotels with little or no documentation available, we utilized the following methodology to calculate lost earnings and profits." *Id*.

9. Mr. Juneau also argued to the GCCF that the GCCF should expand the compensable period of loss beyond 2010 and increase the risk multiplier used by the GCCF.

10. I was provided with a copy of the above-mentioned methodologies on or about August 15, 2014.

11. Under the Settlement Agreement, Mr. Juneau is charged with neutrally adjudicating claims by claimants in the industries for which he previously submitted proposed compensation methodologies and advocacy on behalf of the State of Louisiana. Thus, Mr. Juneau is now responsible for making claims determinations for many of the very same types of claimants on whose behalf he previously sought to increase compensation and lessen documentation requirements.

4

The Settlement Agreement's Documentation Requirements

12.     The Settlement Agreement's various frameworks contain numerous documentation requirements that must be complied with as a condition precedent to qualifying for compensation. Many of these requirements are described below. In numerous instances, the Claims Administrator has not enforced the Settlement Agreement's documentation requirements.

A.      Seafood Compensation Documentation Requirements

13.     As explained above, Mr. Juneau advocated extensively to the GCCF on behalf of participants in the seafood industry. A central feature of this advocacy was that documentation requirements should be minimized. As the Claims Administrator, Mr. Juneau has issued many awards under the Seafood Compensation Program that do not comply with the Settlement Agreement's documentation requirements. By way of example, the Seafood Compensation Plan's shrimp methodology contains several documentation requirements. Claimants may establish historical shrimping revenue for the vessel at issue through trip tickets. Alternatively, claimant may prove historical shrimping revenue for the vessel at issue by way of tax returns <u>and</u> other sufficient documentation. Where the Seafood Compensation Program permits the use of a tax return in lieu of trip tickets to establish benchmark seafood revenue, it requires additional documentation above and beyond the tax return itself. For example, the Seafood Program's Historical Revenue Methodology[1] for shrimp boat captains provides that where tax returns are used to establish Benchmark earnings, the Claimant "must provide:" "Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns with supporting documents for the Benchmark Period and *sufficient documentation to identify those components of earnings derived from commercial shrimp harvesting for the Benchmark Period for the*

---

[1] Similar provisions appear in the Settlement Agreement's sections dealing with other methodologies and species types.

5

*vessel(s) selected by the Claimant.  In addition, the Claimant <u>must provide</u> sufficient documentation for the Claims Administrator to be able to identify revenue from shrimp landings in the Gulf Coast Areas for each vessel while the Claimant was a Boat Captain.*" Settlement Agreement, Ex. 10 at 20 (emphasis added).

14. The CSSP has allowed seafood claimants to substitute an unsubstantiated, Sworn Written Statement ("SWS") to establish historic shrimping revenue, even when that statement appears to contradict the existing documentation.  This practice has led to a number of questionable and inflated awards.  For example:

- Claim No. xxx39: Claimant, who alleged to be the owner and captain of a 45-74 foot ice boat, represented to the Settlement Program in its SWS that all $[redacted] in gross business receipts listed on Claimant's 2009 tax return constituted shrimping revenue.  Benchmark Period shrimping revenue of at least $90,000 is required to qualify for the Expedited Compensation Method.  However, Claimant's trip tickets showed only approximately $[redacted] in 2009 shrimping revenue.  A Form 1099 filed with the Claimant's tax materials confirmed that the trip tickets were accurate, and that more than $[redacted] of the $[redacted] of revenue reported on Claimant's tax return reflected the receipt of royalties from the State of Alabama and had nothing to do with commercial shrimping.  The Settlement Program did not address the material discrepancies in the Claimant's financial data, relied solely on Claimant's representations regarding the tax return, and issued an award of more than $160,000.  When confronted on appeal with the fact that the majority of the receipts reported on the tax return were not from shrimping, Claimant conceded the issue and agreed to an award of $20,805, a reduction of approximately $140,000.

- Claim No. xxx88: Claimant sought compensation as a 30-44 foot freezer boat owner (Benchmark Period shrimping revenue of at least $40,000 is required to qualify for the Expedited Compensation Method).  Claimant submitted an SWS alleging that all $[redacted] of the 2009 revenue reported on its tax return was from commercial shrimping.  The Settlement Program relied on the SWS and awarded Claimant approximately $135,000 before prior payment offsets under the Expedited Compensation Method.  However, a handwritten note in Claimant's file indicated that only $[redacted] of the $[redacted] was from shrimping, and that the remainder was from crab and fish.  On appeal, the Appeal Panel reduced the award to approximately $18,000 before prior payment offsets (a reduction of more than $100,000).

- Claim No. xxx27: Claimant sought compensation as a 45-74 foot ice boat owner (Benchmark Period shrimping revenue of at least $90,000 is required to qualify for the Expedited Compensation Method).  Claimant submitted an SWS indicating

6

shrimp sales of $[redacted], and Claimant's lawyer signed and filed under his own name an SWS representing that Claimant earned "at least $[redacted]" in Benchmark shrimping revenue –[redacted]. Claimant's trip tickets report $[redacted] in Benchmark shrimping revenue. The CSSP accepted these SWS and letter from Claimant's counsel and awarded the Claimant $270,563.

15. In addition to not consistently enforcing the Seafood Compensation Program's documentation requirements, the Claims Administrator has expanded compensation to certain seafood industry participants in ways not permitted by the Settlement Agreement. For example, the Seafood Compensation Program provides: "In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in shrimp harvesting due to circumstances beyond the Claimant's control (such as illness, disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period." Settlement Agreement, Ex. 10 at 7, 28, 43-44, and 55. However, the Claims Administrator has expanded this narrow provision to allow claimants to exclude 2009 revenue because of a strike by certain Louisiana shrimpers in 2009—a circumstance plainly within the claimants' control. This practice has led to a number of questionable and inflated awards:

- Claim No. xxx64: Claimant (shrimp boat captain) was awarded more than $144,000 before prior payment offsets under the Reduced Expedited Compensation Method. Had the 2009 harvest not been excluded, Claimant would not have qualified for the Reduced Expedited Compensation Method, and would have been awarded approximately $72,000 less in compensation.

- Claim No. xxx16: Claimant (shrimp boat owner) was awarded $270,000 under the Expedited Compensation Method. Had the 2009 harvest not been excluded, Claimant would not have qualified for the Expedited Compensation Method. Claimant would have been awarded approximately $124,000 less in compensation.

- Claim No. xxx19: Claimant (shrimp boat owner) was awarded more than $457,000 before prior payment offsets under the Reduced Expedited Compensation Method. Had the 2009 harvest not been excluded, Claimant would not have qualified for the

7

Reduced Expedited Compensation Method, and would have been awarded approximately $150,000 less in compensation.

- Claim No. xxx72:  Claimant (shrimp boat owner) was awarded more than $291,375 before prior payment offsets under the Reduced Expedited Compensation Method.  Had the 2009 harvest not been excluded, Claimant would not have qualified for the Reduced Expedited Compensation Method, and would have been awarded approximately $146,000 less in compensation.

- Claim No. xxx94:  Claimant (shrimp boat owner) was awarded more than $320,713 before prior payment offsets under the Historical Method.  Had the 2009 harvest not been excluded, Claimant would have been awarded approximately $32,000 less in compensation.

- Claim No. xxxx20:  Claimant (shrimp boat captain) was awarded more than $160,000 before prior payment offsets under the Expedited Compensation Method.  Had the 2009 harvest not been excluded, Claimant would not have qualified for the Expedited Compensation Method, and would have been awarded approximately $74,000 less in compensation.

- Claim No. xxxx89:  Claimant (shrimp boat captain) was awarded more than $107,250 before prior payment offsets under the Expedited Compensation Method.  Had the 2009 harvest not been excluded, Claimant would not have qualified for the Expedited Compensation Method, and would have been awarded approximately $57,000 less in compensation.

- Claim No. xxxx13:  Claimant (shrimp boat owner) was awarded $270,000 under the Expedited Compensation Method.  Had the 2009 harvest not been excluded, Claimant would not have qualified for the Expedited Compensation Method.  Claimant would have been awarded approximately $124,000 less in compensation.

- Claim No. xxx74:  Claimant (shrimp boat captain) was awarded more than $60,000 under the Expedited Compensation Method.  Had the 2009 harvest not been excluded, Claimant would not have qualified for the Expedited Compensation Method, and would have been awarded approximately $74,000 less in compensation.

- Claim No. xxxx28:  Claimant (shrimp boat owner) was awarded more than $315,000 before prior payment offsets under the Historical Method.  Had the 2009 harvest not been excluded, Claimant would have been awarded approximately $21,000 less in compensation.

- <u>Claim No. xxx24</u>:  Claimant (shrimp boat owner) was awarded more than $318,000 before prior payment offsets under the Historical Method.  Had the 2009 harvest not been excluded, Claimant would have been awarded approximately $80,000 less in compensation.

- <u>Claim No. xxx02</u>:  Claimant (shrimp boat owner) was awarded $145,688 under the Reduced Expedited Compensation Method.  Had the 2009 harvest not been excluded, Claimant would not have qualified for the Reduced Expedited Compensation Method.  Claimant would have been awarded approximately $77,000 less in compensation.

16.     Still further, for approximately a year, the CSSP improperly treated Continued Dumping and Subsidy Offset Act ("CDSOA") distributions to seafood dealers, fishermen, and others as revenue under the Settlement Agreement.  These distributions were derived from duties levied against foreign entities under U.S. Customs laws, which were then distributed to U.S. participants in the industry.  The CDSOA was repealed effective in 2007 for imports occurring on or after October 1, 2007, but the distributions of duties for pre-repeal violations took several years to complete.  CDSOA receipts do not constitute revenue under the Settlement Agreement and in any event relate to periods largely preceding 2007, meaning they are inappropriate for treatment as Benchmark revenue.  Notwithstanding these facts, on August 13, 2013, CSSP Special Counsel Michael Juneau announced to the parties that the Settlement Program had decided that "CDSOA payments should typically be treated as revenue for purposes of the Settlement Agreement."  Electronic Mail from Michael Juneau to Parties (Aug. 13, 2013) (attached hereto as Ex. 1).  Under this policy, the Settlement Program issued numerous inflated awards to seafood dealers and fishermen:

- <u>Claim No. xxx36</u>:  Claimant is a seafood wholesaler.  The CSSP included CDSOA receipts as revenue, which increased the BEL award by approximately $340,000 pre-RTP ($1.5 million post-RTP).

- <u>Claim No. xxx60</u>:  Claimant is a shrimper.  The CSSP included CDSOA receipts as revenue, which contributed to an increase in Claimant's award by approximately

9

      $145,000.

- <u>Claim No. xxx72</u>:  Claimant is a shrimper.  The CSSP included CDSOA receipts as revenue, which contributed to an increase in Claimant's award by approximately $74,000.

- <u>Claim No. xxx70</u>:  Claimant is a shrimper.  The CSSP included CDSOA receipts as revenue, which contributed to an increase in Claimant's award by approximately $125,000.

17.    Approximately a year after promulgating this improper policy, the Claims Administrator, in response to concerns voiced by the Seafood Neutral, rescinded the policy: "After consultation with the Seafood Neutral, and comments from the parties, the Claims Administrator will not consider revenue arising from CDSOA grants as revenue from commercial harvesting activities."  Reissued Policy Announcement 504.

      B.    <u>Vessel Damage Framework Documentation Requirements</u>

18.    In order to qualify for compensation under the Vessel Physical Damage Framework of the Settlement Agreement, a claimant must establish among other things that (i) "The Physical Damage was sustained due to or resulting from the DWH Spill or DWH Spill response cleanup operations" and (ii) the costs of repair or replacement were "reasonable and necessary."  Settlement Agreement, Ex. 14 at 2-3.  Like the other protocols, the Vessel Physical Damage Framework authorizes the Claims Administrator to investigate claims lacking sufficient documentation or containing questionable assertions:  "The Claims Administrator shall have the authority to verify any of the criteria contained in the Compensation Framework for [a] Vessel Physical Damage Claim."  *Id*. at 4.

19.    Mr. Juneau has awarded crabbers and fishermen compensation for alleged damage to crab traps and vessels.  These are the type of claimants, among others, on whose behalf Mr. Juneau previously advocated to the GCCF as counsel for the State of Louisiana.  That

10

prior advocacy had sought the minimization of documentation requirements. In a number of instances, the Appeal Panel established under the Settlement Agreement has found that in issuing crab trap and vessel damage awards Mr. Juneau did not enforce compliance with the Settlement Agreement's documentation requirements.[2] For example:

- Claim No. xxxx11: The CSSP awarded a crabber $28,000 for alleged lost crab traps. In reversing and remanding the award, the Appeal Panel held: "Of great[] concern is the dearth of evidence offered in support of this claim. The only evidence in the record to support it is an affidavit from the Claimant dated April 11, 2013, almost three years to the day after the spill, which merely states that the Claimant 'suffered damages' in the amount of $28,000, which 'represents 800 crab traps at a price of $35 per trap.' The record contains no estimate, invoice, or other document to verify that figure as reasonable. The affidavit notably does not indicate that the Claimant actually *replaced* 800 traps at that price. The Claimant certainly is capable of producing invoices as the record contains an affidavit from this Claimant in a different claim attaching 38 receipts for items down to nuts, bolts and washers."

- Claim No. xxxx95: The CSSP awarded another crabber $28,000. In overturning and remanding the award, the Appeal Panel held: "Claimant is another crab fisherman who filed his claim more than three years after the spill, claiming to have lost exactly 800 crab traps, the replacement costs of which were exactly $35.00 per trap. The only support for his claim in the record is a declaration signed by Claimant indicating 'the damages I suffered' were as reflected above. The record contains no estimate, invoice, evidence of payment, or proof that Claimant actually replaced that many traps at that amount. There have been numerous other crab trap claims in which the record showed that the cost of replacement traps was significantly less than $35 each."

- Claim No. xxxx10: In this case involving a $35,000 award to a crabber, the Appeal Panel once again reversed and remanded the award, holding: "This Panelist has searched the record in this matter for any other evidence establishing that Claimant spent $35,000.00 post-spill to purchase replacement traps. There is none. The issue becomes whether [or] not a sworn statement from the Claimant, by itself, is enough to prove a loss under the Vessel Physical Damage Claim provision of the Settlement Agreement. This Panelist has decided several crab trap claims and has reviewed many crab trap claims decided by other panelists. In those claims, the Panelist has not yet seen an invoice or receipt which could establish the claimed price for a crab trap and accessories at $35.00 per trap. Most seem to be in the range between $20.00

---

[2] All Appeal Panel decisions referenced herein are available on the CSSP Portal. If of assistance to the Court, copies of all such decisions can be submitted.

to $25.00 per trap. It is inconceivable to this Panelist that someone who spends $35,000.00 for equipment is unable to produce an invoice or sales receipt . . . ."

- Claim No. xxxx23: Claimant, a participant in the VoO Program and a shrimper, filed a claim for alleged vessel damage. After Claimant completed the VoO Program, the Coast Guard performed an inspection and found that there was no "damage as a result of oil spill response efforts or transit through effected [sic] waters" and the Claimant's vessel representative countersigned this finding. Claimant did not submit any evidence to the Settlement Program establishing vessel damage caused by the Spill. Yet the Settlement Program issued an award of $54,600 to replace the vessel's two engines. The Appeal Panel explained in reversing the award that not only did Claimant fail to provide "satisfactory proof" as required by the Settlement Agreement that the Spill caused the damage but "[i]n fact, there is satisfactory proof that there was *no* damage caused by the Spill." (emphasis added).

- Claim No. xxxx96: Claimant (a shrimper) submitted a conclusory sworn written statement alleging that his vessel was damaged during the Spill response cleanup operations. The Settlement Program awarded the Claimant $40,000. The Appeal Panel reversed, holding that "the Claimant just did not provide 'satisfactory proof' that the damage was caused by the spill instead of normal 'wear and tear, as required by the Settlement Agreement. In fact, the record reflects that the damage was not cause[d] by the Spill, was due to normal wear and tear, and the Claimant's position is, at best, contradictory, inconsistent and lacks substance." Upon deactivation from the VoO program, Claimant had admitted in writing that no damage had occurred due to the Spill, and this was verified by a decontamination inspector.

- Claim No. xxxx49: The Settlement Program awarded Claimant (a shrimper) $15,260 for alleged vessel damage that allegedly occurred while Claimant served in the VoO Program. The Appeal Panel reversed holding: "BP notes that the Off-Hire Deactivation Check Sheet, signed by the vessel's captain and an inspector, shows that the vessel suffered no damage during the VoO activation period. BP also notes that the invoice for the Claimant's generator expense is dated May 24, 2010, which predates the vessel's entry into the VoO program on June 5, 2010. Finally, BP contends that Claimant's invoice for a new propeller appears to have been altered. . . . A review of the record does not support the previous award and I find BP's unrebutted allegations to be supported by the record."

- Claim No. xxx03: The Settlement Program awarded Claimant (a fisherman) $49,680 for alleged vessel damage. The Appeal Panel reversed and remanded: "[T]his panelist, in a de novo review, was struck by a very significant discrepancy in the submission. In the Claims Form, Claimant avers that the damage occurred on Aug. 16, 2010 and involved loss of power to his engine caused by excessive towing of oil-skimming boom. . . . In his subsequent Sworn Statement executed on Form SWS 35, he claims that the damage was to the ribs of his wooden vessel caused by operation in high seas as a result of orders from the Operations Manager. His attached estimate for [alleged engine and hull] damages (on which this award was apparently based)

was dated Aug. 15, 2010--a day preceding the date of engine loss as stated in the Claims Form."

### C. IEL Framework Documentation Requirements

20. As with vessel damage claims, there have been numerous instances in which the Claims Administrator has not enforced the documentation requirements of the Individual Economic Loss ("IEL") framework.

21. Mr. Juneau previously advocated to the GCCF on behalf of the types of claimants who are now eligible to submit IEL claims under the Settlement Agreement. In that prior advocacy, Mr. Juneau argued for the minimization of documentation requirements. Under the Settlement Agreement, Claimants not otherwise entitled to a presumption of causation must either establish that they worked for an Eligible Employer, or submit an Employer Sworn Written Statement ("SWS") demonstrating that Claimant's loss of income resulted from the Spill. The Employer SWS must "articulate in detail how the claimant's losses . . . are causally related to the DWH Spill." Settlement Agreement, Ex. 8A at 14. The CSSP is required to "evaluate the credibility and reliability" of the Employer SWS as well as any other "information provided by the employer and the claimant" in determining whether claimant's loss is causally related to the Spill. *Id*.

22. The Appeal Panel has found that in numerous instances Mr. Juneau has not enforced the Settlement Agreement's documentation requirements when issuing IEL awards to claimants. Examples include:

- <u>Claim No. xxx64</u>: Claimant was a molding sales representative. The CSSP awarded Claimant more than $33,000. [redacted] The Appeal Panel reversed and held that Claimant was entitled to $0: "While Claimant apparently believes that his Employer Sworn Witness [sic] Statement ("SWS") provides evidence of a Spill-related loss, this Appeal Panel recognizes that an Employer SWS is insufficient to establish a Spill-related loss where, as here, it fails to address a claimant's pre-Spill decline in earnings. Here, that decline was precipitous. The SWS consisted of a brief

13

conclusionary [sic] statement, and was patently insufficient. It did not articulate in detail how Claimant's losses were related to the spill."

- Claim No. xxxx86: Claimant was an employee at a Zone D plumbing company. The CSSP awarded Claimant more than $91,000. [redacted] The Appeal Panel reversed and held that Claimant was entitled to $0: "This panelist agrees with BP that this Claimant has not established a colorable connection between the alleged injury and the spill as Claimant's earnings decline had started well before the spill."

- Claim No. xxxx54: Claimant was the owner and officer of a general contracting company. The CSSP awarded Claimant more than $48,000. The Appeal Panel reversed and remanded, finding multiple problems with the award. The Appeal Panel found the SWS upon which the CSSP relied to be "woefully inadequate. Comparing the Deepwater Horizon spill to the 2001 World Trade [C]enter bombings is . . . not only inappropriate but also fails to articulate in detail how the Claimant's losses were causally related to the spill." The Appeal Panel noted the inconsistency between the assertions in the SWS and extreme decline in Claimant's pre-Spill earnings.

- Claim No. xxxx06: Claimant was the owner and President of a painting company located in Zone D hundreds of miles from the Gulf of Mexico. The CSSP awarded Claimant more than $53,000. [redacted] The Appeal Panel reversed and held that Claimant was entitled to $0: "In contrast [to the allegations in the Employer SWS], the wage records submitted by the Claimant show that his salary was reduced by approximately $440 per week beginning a month before the oil spill and did not further diminish following the spill. . . . [H]e has failed to establish causation as required under the Settlement Agreement."

- Claim No. xxxx81: Claimant was a colorectal surgeon in Zone D, hundreds of miles from the Gulf. The CSSP awarded Claimant more than $48,000. The Appeal Panel reversed and remanded: "This panelist, in a de novo review, is struck by a single conclusory sentence in Claimant's [Employer SWS] concerning causation. This requires a remand . . . to better determine a factual basis for the causation argument."

- Claim No. xxxx56: Claimant was a real estate agent. The Settlement Program awarded Claimant more than $34,000. The Appeal Panel reversed: "The Settlement Agreement provides that the SWS must articulate in detail how the claimant's losses are casually [sic] related to the spill. Despite this requirement, the statement submitted by claimant was merely a conclusory statement which contends 'his wages decreased because the spill created uncertainty in the real estate market.' This assertion does not rise to the level of detail suggested by the Settlement Agreement. Moreover, this is especially inadequate where, as here, the claimant's over all post spill income appears to have increased in relation to the year before the spill."

- Claim No. xxxx39: Claimant was a design engineer for a company located hundreds of miles from where any Macondo oil came ashore. The CSSP awarded Claimant more than $53,000. Claimant was terminated only seven days after the DWH rig

14

explosion. The Appeal Panel reversed and remanded: "It would be hard to conceive, under the present record, how the employer's business could have taken such a relatively immediate downturn that could have resulted in mass layoffs in this short of a period of time."

- Claim No. xxxx07: Claimant was the CEO of a hospital. The CSSP awarded Claimant more than $43,000. The Appeal Panel reversed and remanded: "First, [Claimant's] employer is a rehabilitation hospital, which would not seem to be effected [sic] by a drop in tourism. Second, the Claimant is the CEO of his Employer. Hence, the SWS could be construed to be self-serving."

- Claim No. xxxx42: Claimant is a plumber located in Zone D. The CSSP awarded Claimant more than $43,000. The Appeal Panel remanded: "The type of conclusory statement provided here . . . is quite inadequate."

23. In addition to not consistently enforcing the IEL framework's documentation requirements with regard to causation, the Claims Administrator has not consistently enforced the IEL framework's documentation requirements with regard to the allocation of commissions and bonuses. Under the Settlement Agreement, the Claims Administrator is required to allocate claimants' commissions and /or bonuses across the period for which they were awarded. *See* Settlement Agreement, Ex. 8A at 10, 15 ("All bonuses and/or commissions shall be allocated pro rata across the period for which they were awarded . . . ."). However, in numerous cases, the Settlement Program has not required claimants to submit the information necessary to perform the required allocation and instead simply applied the commissions/bonuses to the date on which the payments were received or over the paycheck pay period. For example:

- Claim No. xxx81: Claimant is a commission-based real estate agent. The Settlement Program failed to properly allocate Claimant's commissions across the period for which they were earned. The Settlement Program instead allocated Claimant's commissions over the two-week paycheck period. As the Appeal Panel explained in reversing and remanding this claim: "[L]anguage in the Settlement Agreement requires allocation of commissions over the period for which they were earned. Claimant did not provide the required documentation to properly allocate Claimant's commissions, and the Settlement Program inappropriately allocated them over a two week period. This assumption did not square with the periods that expired between receipt of the checks, which were disbursed irregularly. The Claim is remanded in order for the Settlement Program to obtain the requisite documentation from Claimant

15

and to perform a proper lost earnings calculation."

- Claim No. xxx57:  The Settlement Program awarded Claimant more than $91,000.  The Appeal Panel reversed and remanded, finding multiple errors, including a failure to allocate commissions:  "Language in the Settlement Agreement requires allocation of commissions over the period for which they were earned.  Claimant did not provide the required documentation to accomplish this, and the settlement program inappropriately allocated them over a two week pay stub period.  This did not comport with the actual period between receipt of the checks; and it was unrealistic to assume activity that yielded the sporadic commissions was limited to the pay periods. . . .  This matter is remanded in order for the Settlement Program to obtain the appropriate documentation necessary to perform a proper lost earnings calculation."

- Claim No. xxx11:  The Settlement Program awarded Claimant more than $48,000.  The Appeal Panel reversed and remanded, holding:  "Obviously, under the terms of the Settlement Agreement, bonuses must be allocated to the period or periods in which they are earned.  In this case it appears that the Claims Administrator's accountant did not correctly allocate the bonus over the period in which they were earned. . . .  This matter is remanded to the Claims Administrator to properly determine and allocate bonuses over the periods over which the bonuses were earned."

- Claim No. xxxx08:  The Settlement Program awarded Claimant more than $65,000.  The Appeal Panel reversed and remanded, finding multiple errors.  On the issue of bonus allocation, the Appeal Panel held:  "the Settlement Program failed to properly allocate Claimant's bonus payments as required by the Settlement Agreement and the Settlement Program should have requested additional documentation from Claimant and recalculated in order to properly allocate these bonuses. . . .  The claim is remanded in order for the Settlement Program to obtain the requisite documentation from Claimant and to perform a proper loss earnings calculation."

- Claim No. xxxx74:  The Settlement Program awarded Claimant more than $51,000.  The Appeal Panel reversed and remanded for failure to allocate commissions and bonuses:  "BP's first point of error is that the Program failed to establish whether Claimant's earnings included commissions and bonuses.  The letter provided by Claimant reporting his 'actual wages received' demonstrates BP's points.  There is no other explanation for the enormous disparity in the numbers reported except that Claimant received a bonus or a commission from time to time. . . .  The claim is remanded in its entirety to the Settlement Program."

- Claim No. xxxx03:  The Settlement program awarded Claimant more than $26,000.  The Appeal Panel reversed and remanded, finding that the Claims Administrator had failed to allocate commissions as required by the Settlement Agreement:  "The Settlement Agreement requires at Exhibit 8A that commissions be allocated over the period for which they were earned.  The Claims Administrator does not appear to

16

      have done so on this claim. . . .  The claim is therefore remanded to the Administrator for proper lost earnings calculation."

    I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

Dated:  September 2, 2014

                                                      _____/s/_____
                                                    Daniel A. Cantor

# Exhibit 1

**Moskowitz, Keith**

| | |
|---|---|
| **From:** | Michael Juneau <mjuneau@dheclaims.com> |
| **Sent:** | Tuesday, August 13, 2013 12:22 PM |
| **To:** | Steve Herman (SHERMAN@hhklawfirm.com); jimr@wrightroy.com; mark.holstein@bp.com; Moskowitz, Keith |
| **Cc:** | Patrick Juneau; obrown@browngreer.com; watkinson@browngreer.com; aoxenreiter@browngreer.com; charles.r.hacker@us.pwc.com; 'ted.martens@us.pwc.com'; emily.f.kent@us.pwc.com; rpilcher@pncpa.com; Mark Staley; Katherine Torres (ktorres@pncpa.com); tfriou@pncpa.com; Henry Mitchell |
| **Subject:** | CDSOA payments |

Counsel:

The question has arisen within the DwH Program as to how payments under the CDSOA program should be treated. This has been the subject of much discussion within our Program. The consensus within our Program is that CDSOA payments should typically be treated as revenue for purposes of the Settlement Agreement. It should also be noted that the CDSOA program requires accrual accounting; thus, any claim than includes CDSOA payments will presumably be presented with accrual basis monthly financials. The nature of the issue is such that the entire BEL team was in agreement that the Parties should be fully aware of how this issue is being accounted for in our Program. One side or the other may disagree with this approach and hence may wish to contest specific award(s) that may be reached using this methodology. But in any event, we wanted you to be fully aware of how we are dealing with this specific issue.

**Michael J. Juneau**
*Special Counsel*

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**504-934-4999**
**935 Gravier Street, Ste. 1905**
**New Orleans, LA 70112**
**mjuneau@dheclaims.com**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.