# Exhibit 16

## AFFIDAVIT OF WILLIAM G. ROSS

WILLIAM G. ROSS, being duly sworn, deposes and says:

### I.    Summary of Statement of Opinions

1.    I am the Lucille Stewart Beeson Professor of Law at the Cumberland School of Law of Samford University in Birmingham, Alabama. I have been retained by Williams & Connolly LLP, attorneys for BP America Production Company and BP Exploration & Production Inc. ("BP") in the present action, to provide an independent opinion regarding BP's motion to remove Patrick A. Juneau from serving as claims administrator in this action. As is explained more fully herein, it is my opinion that Mr. Juneau should be disqualified.

### II.    Qualifications

2.    As is outlined more fully in the curriculum vitae attached to this Affidavit, my qualifications to render my expert opinion are based upon my experiences as a practicing attorney, law teacher, legal scholar, and consultant on ethical issues involving judges and lawyers.

3.    After graduation from Stanford in 1976 and Harvard Law School in 1979, I spent nine years as a litigator in private practice in law firms in New York City. In 1988, I became a member of the faculty of the Cumberland School of Law of Samford University, where I have been a full and tenured professor since 1993.

4.    I am the author of numerous articles about legal ethics, including judicial ethics. My articles regarding judicial ethics include "Extrajudicial Speech by Judges: Charting the Boundaries of Propriety," 2 *Georgetown Journal of Legal Ethics* 589-632 (1989); "Civility Among Judges: Charting the Bounds of Proper Criticism by Judges of Other Judges," 51 *Florida Law Review* 957-73 (1999); and "Extrajudicial Speech: Navigating the Perils and Avoiding the Pitfalls," 38 *Court Review: The Journal of the American Judges Association* 38-40 (2001). My Georgetown article on extra-judicial speech has been cited by the U.S. Court Appeals in *U. S. v. Microsoft*, 253 F.3d 34, 114 (D.C. Cir. 2001) and the Supreme Court of New Jersey in *In re Inquiry of Broadbelt*, 683 A.2d 543, 548 (N.J. 1996). I also have been quoted as a judicial ethics expert in various news articles, including Jess Bravin, "Opinion Slams Judge's Talk Out of Court," *Wall Street Journal*, June 29, 2001, at B1, B2, and a 2010 Associated Press article that was widely published; *see, e.g.,* Lisa Leff, "In wake of gay marriage decision, debate rages over judge's personal life, ability to rule," *Los Angeles Times*, Aug. 6, 2010. I am also the author of six articles about the appointment and confirmation of federal judges; and a law review article about the removal of federal judges. I have lectured on issues involving legal ethics, including judicial ethics, at various seminars. I have also served on several occasions as a consultant or expert witness on judicial ethics issues, including the recusal or disqualification of federal judges.

5.    I have taught a professional responsibilities course at Cumberland nearly every year since 2000, and I also taught professional responsibilities as a visiting professor at Notre Dame in 2001 and Florida State University in 2002.

6.      As an attorney in private practice in New York during the 1980s, I worked on a number of class action cases. I have included class actions as a subject in the civil procedure course that I have taught at Cumberland for twenty-two years, and I have served on several occasions as an expert witness on class action certification issues.

7.      More information about my qualifications as a judicial ethics expert is available on my personal website, williamgeorgeross.com.

## III.   Documents reviewed

8.      In preparation for making this Affidavit, I have reviewed the following documents: "Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement];" "*Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012;" "First Amended Order Creating Transition Process;" "Order and Reasons [Granting Final Approval of the Economic and Property Damages Settlement Agreement];" "Brief for Appellants," dated May 2, 2013; "Brief for Appellees," dated May 24, 2013; "Reply Brief for Appellants," dated May 31, 2013; "Transcript of the Motion Proceedings Heard Before the Honorable Carl J. Barbier" on April 5, 2013; "Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)," filed April 1, 2013; "BP's Memorandum of Law in Opposition to Settlement Program and Claims Administrator's Motion to Dismiss;" "First Amended Complaint," filed by the State of Louisiana on April 19, 2011; "Declaration of Mark Holstein"; contract between Juneau David and State of Louisiana, dated July 2, 2010; amendment to contract between Juneau David and State of Louisiana, effective March 3, 2011; amendment to contract between Juneau David and State of Louisiana, effective July 21, 2011; e-mail from Felicia A. Guidry on behalf of Patrick A. Juneau to Ken Feinberg, sent at 2:08 p.m. on November 24, 2010; memorandum from Felicia A. Guidry on behalf of Patrick A. Juneau to Ken Feinberg, sent at 2:25 p.m. on November 24, 2010, including "attached narratives in support of [valuation] templates"; email from Mary Anna Tabol to Thomas Milch, sent at 3:35 p.m. on November 30, 2010; letter from Kenneth R. Feinberg to James D. Caldwell, dated November 22, 2010; letter from James D. Caldwell to Kenneth R. Feinberg, November 17, 2010; Michael D. Bradford, "Far-flung claimants complicate BP oil spill fund," Business Insurance, Nov. 14, 2010;  David Segal, "Should BP's Money Go Where the Oil Didn't?," New York Times, Oct. 23, 2010; Sergiu Vidican, "Proximity Claims in BP Lawsuit," Metrolic.com; undated handwritten note of Keith Moskowitz, and the news articles cited below in paragraph 25.

## IV.    "Assumed Facts" Provided to Expert by Counsel for BP

9.      In preparing my affidavit, attorneys for BP at Williams & Connolly have provided me with the following list of what those attorneys described as "Assumed Facts." I do not vouch for the accuracy of these "Assumed Facts," but I am assuming their accuracy for the purposes of forming my opinions for this Affidavit. The following is a verbatim list of the "Assumed Facts" provided to me by those attorneys:

   a.      "On June 16, 2010, pursuant to an agreement with the White House, BP established the Gulf Coast Claims Facility ("GCCF"), run by Kenneth

2

Feinberg, to process and pay economic damage claims associated with the
Deepwater Horizon Oil Spill.

b.     On July 2, 2010, the State of Louisiana engaged Mr. Juneau for a
maximum $175,000, three-year contract to provide advice and counsel on
matters "related to the claims process and allocation protocols utilized and
developed by the Responsible Parties associated with and/or arising from
the Deepwater Horizon Oil Spill."[1]

c.     Thereafter, Mr. Juneau sent extensive comments on various working drafts
of the GCCF's Protocol for Emergency Advance Payment and later its
Protocol for Interim and Final Claims.

d.     Mr. Juneau also sent the GCCF proposed valuation templates prepared by
the State of Louisiana designed to be used to assess claims by, *inter alia*,
claimants residing in Louisiana against BP.

e.     Mr. Juneau and/or his law firm had communications and correspondence
concerning both the GCCF's proposed protocols and the competing
templates proposed by Mr. Juneau on behalf of the State of Louisiana.

f.     Mr. Juneau provided the GCCF narratives in support of the templates he
and the State of Louisiana had proposed, and urged Mr. Feinberg to use
these templates in the evaluation of claims.

g.     Mr. Juneau also questioned the scope of the Release prepared by the
GCCF – arguing to the GCCF that the release improperly subrogated
claimants' claims against other Responsible Parties to BP.

h.     On December 21, 2010 the Plaintiffs Steering Committee filed a motion
requesting that the Court "supervise" the GCCF's communications with
claimants.

i.     On February 1, 2011, the State of Louisiana filed a joinder to the Motion
to Supervise, and argued both that the GCCF was implementing
inappropriate Protocols, and utilizing an inappropriate Release. Some of
these arguments appear to be similar to those advanced by Mr. Juneau in
his emails to the GCCF on the State's behalf and, in any event, touch on
similar subjects.

j.     On March 3, 2011, Mr. Juneau's contact with the State was amended to
increase his fees by $100,000 – for a total of $275,000 – "necessary to

---

[1]    Contract for Professional Legal Services between Louisiana Department of Public Safety,
Public Safety Services, Oil Spill Coordinator's Office (LOSCO) and Juneau David APLC at
1, July 2, 2010.

increase the number of hours required to provide legal services as described in the original scope of services."[2]

k.  On April 19, 2011, the State of Louisiana—Mr. Juneau's client—sued BP in the MDL 2179 proceeding, alleging among other things that "[a]s a result of the Gulf Oil Spill, the State of Louisiana has suffered, and will continue to suffer, extensive injury to its natural resources as well as damage to its real and personal property, loss of subsistence use of its natural resources, loss of taxes, rents, royalties and fees due to the injury to, loss or destruction of its real property, personal property and natural resources" and that the compensation BP has paid to these claimants through the GCCF did not provide "full restitution."[3]  Mr. Juneau did not sign the pleadings nor appear as counsel of record.

l.  Effective July 21, 2011, Mr. Juneau cancelled his contract with the State of Louisiana.

m.  On July 25, 2011, Plaintiffs moved this court to appoint a Special Master to oversee the GCCF.

n.  On March 8, 2012, the Court appointed Mr. Juneau pursuant to the recommendation of the parties as the Claims Administrator for the Transition Process provided for by the Deepwater Horizon Settlement.  He subsequently was appointed the Claims Administrator for the Court Supervised Settlement Program when the Deepwater Horizon Settlement was preliminarily approved in May 2012, and finally approved in November 2012.

o.  On July 2, 2013, the Court appointed former federal judge and FBI Director Louis Freeh as Special Master to investigate allegations of conflicts of interest among Mr. Juneau's staff.

p.  During the course of Mr. Freeh's investigation, on August 1, 2013, Mr. Juneau was interviewed under oath concerning his administration of the Claims Facility.

q.  During that interview, Mr. Juneau stated under oath: "I didn't have any involvement in anything in the spill. I didn't represent any claimants in the

---

[2]  Amendment to Agreement Between Louisiana Department of Public Safety, Public Safety Services, Oil Spill Coordinator's Office (LOSCO) and Juneau David, APLC at 1, *effective date* March 3, 2011.

[3]  State of Louisiana First Amended Complaint ¶ 131, Prayer for Relief (Apr. 19, 2011), Rec. Doc. 2031.

spill, wasn't representing any defendants in the spill, had really had no connection with the spill per se."[4]

r.    At no time in the August 1, 2013 transcript that is publicly available does Mr. Juneau reveal that he had represented the State of Louisiana, or describe the activities he undertook on behalf of the State with respect to the GCCF.

s.    BP has found no indication of an on the record disclosure of the conflict, nor assent to Mr. Juneau proceeding as Claims Administrator in the face of such a disclosure. None appears to have been made to the Court and the parties at the preliminary or final approval hearings in May 2012 and November 2012.

t.    While an advocate for the State of Louisiana, Mr. Juneau advocated about what documentation requirements should be imposed on claimants in the GCCF process. As Claims Administrator, he has made numerous decisions (and continues to make decisions) regarding documentation requirements. The Claims Administrator played a significant personal role in lobbying BP to waive documentation requirements explicitly required by the Settlement Agreement and presented himself as a neutral arbiter in his advocacy. For example, the Claims Administrator presented his view that not enforcing the Settlement Agreement's business license requirement would "speed the process while still maintaining the intent of the agreement."[5]

u.    While an advocate for the State of Louisiana, Mr. Juneau also advocated that BP should tender separate compensation to shrimpers, fin fishermen, and crabbers for property damage even if fully or partially redundant of the damages awarded for economic loss.

v.    Many of those same businesses and individuals are now claimants in the Seafood Compensation Fund. But the Settlement Program and the Claims Administrator have allowed Seafood Claimants to substitute a sworn written statement for documentation of loss, though whether that is sufficient under the Settlement Agreement is controversial.

w.    Mr. Juneau was part of an effort on behalf of Louisiana claimants to develop "industry benchmarks," setting forth detailed protocols as to precisely how claimants allegedly damaged should be compensated. He

---

[4]    Transcribed Sworn Statement of Patrick Juneau before Special Master Louis Freeh at 8, Aug. 1, 2013.

[5]    Declaration of Mark Holstein.

was exposed to, for example, Federal and State trip ticket data that is provided by crabbers individually per trip to the Louisiana Department of Wildlife and Fisheries. Access to this allowed him to advocate to the GCCF because it provided the means to properly reflect the financial baseline of the industry. He comes to his job with knowledge of extensive facts related to the claims he now decides.

x.      BP has located a note of a lawyer for BP which references that the Claims Administrator had "consulted" with Louisiana about the GCCF. In full, it appears to read: "Consulted with La.(State) about whole Feinberg process."[6]

y.      BP recently located items in its files that appear to relate to Mr. Juneau's Louisiana representation. First, BP located copies of three news articles in 2010 which describe Mr. Juneau as a "liaison" from Louisiana to the GCCF. Second, BP located a copy of the contract and related amendments between Mr. Juneau and Louisiana which was part of a larger production to BP on a "thumb drive" on December 20, 2011 and February 24, 2012 to advance the State's claims for damages. Third, BP located in its files two November 2010 letters between Mr. Feinberg (of the GCCF) and Attorney General Buddy Caldwell, which reference Mr. Juneau, and a November 2010 email in which the GCCF forwarded to BP counsel some of Mr. Juneau's correspondence with Mr. Feinberg. BP did not consider either the contract or the November 2010 correspondence at the time it considered Mr. Juneau's candidacy for Claims Administrator in February and March 2012.[7]

## V.    Mr. Juneau is a judicial official within the scope of 28 U.S.C. sec. 455

10.      As is explained more fully below, it is my opinion that the ethical and recusal standards announced in 28 U.S.C. sec. 455 apply to the issue of whether Mr. Juneau is able to serve as Claims Administrator. I am aware that BP previously has taken the position, without success, that Mr. Juneau is not a judicial officer, at least when it comes to the issue of whether Mr. Juneau possesses judicial immunity from a suit for injunctive relief. Regardless of the merits of BP's position on the question of judicial immunity, on which I express no opinion, I conclude that Mr. Juneau, who performs judicial functions in administering the Settlement Agreement, is subject the federal statute that governs judicial disqualification, 28 U.S.C. sec. 455, and that this Court therefore should adjudicate BP's motion for disqualification within the requirements of that statute.

---

[6]   Handwritten notes of Keith Moskowitz.

[7]   Declaration of Mark Holstein.

11.     Although section 455 applies on its face only to a "justice, judge, or magistrate judge," courts in various cases have held that the statute also embraces persons who perform quasi-judicial duties or at least that such persons should be held to the same standards of conduct in the adjudication of disqualification motions. *See Lister v. Commissioners Court, Navarro County*, 566 F.2d 490, 493 (5th Cir. 1978); *United States v. Werner*, 916 F.2d 175, 177-78 (4th Cir. 1990); *Jenkins v. Sterlacci*, 849 F.2d 627, 630-32 (D.C. Cir.), *rehearing denied,* 856 F.2d 274 (D.C. Cir. 1988); *In re Dirk Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2006). Accordingly, the courts in those cases disqualified various quasi-judicial officers whose impartiality was questionable.

12.     In *Lister*, the Fifth Circuit disqualified a special master who previously had testified in the case as a witness for the plaintiffs. 566 F.2d at 493. Explaining that a "special master has the duties and obligations of a judicial officer," the Fifth Circuit declared that a "special master 'should have no interest in or relationship to the parties....and (should be) fit to perform the duties incumbent on one sitting in the place of the court,'" *id.*, *citing* 5A Moore, Moore's Federal Practice, P 53.03, p. 2922. Although the court in *Lister* did not specifically invoke the federal judicial qualification statute, it appears to have applied the same standard for disqualification. Thus, even before an explicit rule was adopted, the Court recognized that the ethical standards for a judge should also apply to adjudicators acting in the Court's name. In 2003, an amendment to the Federal Rules of Civil Procedure essentially codified *Lister* by providing in Rule 53(a)(2) that "A master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. sec. 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification."

13.     In *Werner*, *Jenkins*, and *Kempthorne*, the courts specifically relied upon the statute in ordering disqualification of quasi-judicial officers. In *Jenkins* and *Kempthorne*, the District of Columbia Circuit held that section 455 applied to special masters. 849 F.2d at 630-32; 449 F.3d at 1269. In *Werner*, the Fourth Circuit held that the disqualification standards of 455 applied to a land commissioner who had been appointed by a district court to help determine the amount of just compensation paid for land condemned by the United States government. 916 F.2d at 178. The facts of *Werner* are particularly germane to the present case because the court explained that the "primary task" of the land commissioner in that case was "to determine the value of the land on the date of the taking." 916 F.2d at 178. This task appears to have been quite similar to Mr. Juneau's task of determining the value of losses claimed in the present action. The facts of Jenkins likewise are instructive because one of the duties of the special master in that case was the distribution of partnership assets. 849 F.2d at 631. *Kempthorne* likewise has analogous facts because the court found that a special master who was charged by the court "with finding the facts in the first instance and making a 'report and recommendation detailing his findings and conclusions'" was exercising an adjudicatory role. 449 F.3d at 1269. Accordingly, the court held that the disqualification provisions of Section 455 applied fully to the master in the conduct of his investigation. *Id.*

14.     Indeed, regardless of law, Mr. Juneau has effectively represented himself as bound by judicial standards. He has argued forcefully that his duties as class action administrator in this very case make him a quasi-judicial officer. In his motion to dismiss

BP's complaint against him for breach of the settlement agreement, Mr. Juneau argued in his trial brief that he was "entitled to absolute quasi-judicial immunity" from civil liability for his actions as claims administrator. His brief stated that "Mr. Juneau, in his capacity as Claims Administrator and Settlement Trustee, is performing acts that are judicial in nature and 'intimately associated' with the judicial function, including attempting to resolve disputes between the Parties to the Settlement Agreement and implementing its terms according to his best judgment." "Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)" at 7.

15.     Moreover, an attorney for Mr. Juneau and the Deepwater Horizon Court Supervised Settlement Program stated during oral argument on this motion in the trial court that "Mr. Juneau is engaged in quasi judicial functions trying to administer this settlement agreement" and declared that "the doctrine of judicial immunity which protects decision makers like Mr. Juneau…should apply in this case." "Transcript of Motion Proceedings," *supra*, at 33-34 (remarks of Richard C. Stanley).

16.     Similarly, the brief submitted by the attorneys for Mr. Juneau and the Deepwater Horizon Court Supervised Settlement Program on appeal explains in considerable detail why Mr. Juneau is a quasi-judicial officer. The brief emphasizes that the lawsuit arose out of a Policy Announcement by Mr. Juneau "whereby he exercised *his discretion* in *interpreting* the Settlement Agreement to determine the manner in which the BEL framework should be applied." Brief for Appellees, *supra*, at 43 (emphasis in original). The brief therefore contended that "Mr. Juneau's roles as Claims Administrator and Trustee are analogous to those of an appointed Rule 53 Master and other court-appointed positions to which judicial immunity has been extended." *Id.* at 42. The brief argued that Mr. Juneau is so "closely associated with the judicial process" and performs tasks that are so "intertwined with the judicial function" that he is entitled to judicial immunity. *Id.* at 40, quoting *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985); *Nystedt v. Nigro*, 700 F.3d 25, 30 (1st Cir. 2012)).

17.     Moreover, while some circuits declined to apply section 455 to Special Masters and the like prior to the 2003 Amendments, it is my opinion that the contrary view set forth in cases such as *Lister*, *Werner*, *Jenkins*, and *Kempthorne* is the right one because section 455 should be interpreted in conformity with the American Bar Association's *Model Code of Judicial Conduct*, which provides that "A judge, within the meaning of this Code, is anyone who is authorized to perform judicial functions, including an officer such as a justice of the peace, magistrate, court commissioner, special master, referee, or member of the administrative law judiciary." *Id., Application, I(B)*. *See H.R.Rep. No.* 1453, 93rd Cong., 2d Sess. 1, *reprinted in* 1974 *U.S. Code Cong. & Admin. News* 6351-63; *Werner, supra*, 916 F.2d at 178. This report stated that the purpose of an amendment to the statute was to make "the statutory grounds for disqualification of a judge in a particular case conform generally with the recently adopted canon of the Code of Judicial Conduct which relates to disqualification of judges for bias, prejudice or conflict of interest." H.R.Rep. at 6351. The report explained that the "existence of dual standards, statutory and ethical, couched in uncertain language has had the effect of forcing a judge to decide either the legal issue or the ethical issue at his peril." *Id.* at 6352. The Fourth Circuit has interpreted this report to mean that Section 455 embraces the Code's *Application* language. *Werner*, 916 F.2d at 178. Since, as is explained above, case law and Mr. Juneau's own

8

admissions demonstrate that he "is authorized to perform judicial functions," the incorporation of the "authorized to perform judicial functions" language of the *Application* into the statute means that he is subject to the statute's disqualification provisions.

18.     Mr. Juneau also appears to be subject to the ethical requirements of the *Code of Conduct for United States Judges* ("the Code"), which states in its Compliance section that "Anyone who is an officer of the federal judicial system authorized to perform judicial functions is a judge for the purpose of this Code." Since Mr. Juneau has been appointed as a claims administrator in a federal case and since for the reasons explained above and by his own admission he is performing judicial functions, he should be bound by the standards of the Code.

19.     Even if Mr. Juneau were not classified as a quasi-judicial officer upon whom the requirements of section 455 are binding, his prior representation of the state of Louisiana creates a conflict of interest that should disqualify him from service as claims administrator under generally recognized principles of class action practice. In a decision several months ago, for example, a federal court refused to approve a class action settlement because, *inter alia*, the proposed claims administrator had a conflict of interest because he was a defendant in the class action lawsuit. *Stewart v. USA Tank Sales and Erection Co., Inc.*, 2014 WL 836212 (W.D. Mo. 2014), at *9. Although the court acknowledged that the defendant's service as claims administrator might lower the costs of administering the settlement, the court explained that "[b]ecause the reversion clause provides that any remaining funds will be returned to Defendant, Defendant will have a financial incentive to deny class members' claims, which is a patent conflict of interest." *Id.*

## VI.     Mr. Juneau should be disqualified as claims administrator

20.     For the reasons explained more fully below, based again on the above "Assumed Facts," it is my opinion, that Mr. Juneau should be disqualified from service as claims administrator under section 455(a) and (b)(2).

### A.     Mr. Juneau's impartiality might reasonably be questioned

21.     It is my opinion that Mr. Juneau should be disqualified under section 455(a) because his "impartiality might reasonably be questioned within the meaning of that statute." Likewise, it is my opinion that Mr. Juneau should be disqualified because he has acted in ways that do not promote "public confidence in the integrity and impartiality of the judiciary," as required by Canon 2(A) of the Code. Indeed, Canon 2 of the Code announces an ethical precept broader in scope than the requirement of section 455(a), stating that a "Judge should avoid impropriety and the appearance of impropriety in all activities."

#### i.   Service as an attorney for Louisiana

22.     It is reasonable to question Mr. Juneau's impartiality because he served as a highly paid attorney for fourteen months for the state of Louisiana pursuant to a three-year contract to provide advice on matters "related to the claims process and the allocation protocols utilized and developed" by parties in connection with the oil spill that precipitated the class

action. As an attorney, Mr. Juneau therefore appears to have helped the state of Louisiana to try to obtain for its citizens maximum compensation from BP, the very party whose interests he is required as a claims administrator to treat fairly and objectively under the terms of the Settlement Agreement. In particular, Mr. Juneau's service as an attorney for Louisiana appears to have intimately involved him in the analysis and development of many of the same accounting practices that are at issue in the present litigation. Moreover, Mr. Juneau assisted the state of Louisiana in developing and advocating accounting and documentation standards that benefited some of the claimants whose claims he is adjudicating in his role as claims administrator. In particular, Mr. Juneau during his time as an advocate for Louisiana sought relaxed documentation requirements and advocated that BP should tender separate compensation for property damages even if fully or partially redundant of the damages awarded for economic loss. As counsel for Louisiana, Mr. Juneau also advocated that certain post-spill income to claimants should not be treated as an offset, an issue that has been controversial in the adjudication of claims under the settlement.

23.    The Fifth Circuit has explained that the standard for recusal under section 455(a) is "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995) (holding that judge should have recused herself because the defendant had alleged criminal actions by an attorney with whom the judge had a friendship), *citing Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860-61 (1988). It is my opinion that Mr. Juneau's extensive assistance to the state of Louisiana with regard to many of the same issues that are in controversy in connection with his role as claims administrator would generate such doubts in the minds of a reasonable person.  Whether or not Mr. Juneau is actually biased is irrelevant since disqualification under the statute does not require that the judge be subjectively biased or prejudiced, so long as he appears to be partial. The Fifth Circuit has explained that "[s]ince the goal of section 455(a) is to avoid even the appearance of impropriety....recusal may well be required even where no actual partiality exists." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (requiring recusal of judge in a case in which an attorney who appeared on behalf of the defendant had testified against the judge before an investigatory committee). Similarly, the Fifth Circuit in another decision has declared, "[b]ecause 28 U.S.C. sec. 455(a) focuses on the appearance of impartiality, as opposed to the existence  in fact of any bias or prejudice, a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street." *Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1111 (5th Cir.), *cert. denied*, 449 U.S. 820 (1980) (disqualifying judge who had significant business dealings with one of the plaintiff's attorneys). As the Fifth Circuit has remarked, "[p]ut simply, avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself." *Jordan*, 49 F.3d at 155-56.

### ii.  **Extrajudicial comments**

24.    As is explained more fully below, it is also my opinion that comments that Mr. Juneau made to news reporters that were quoted in newspapers also could cause a reasonable person to question Mr. Juneau's impartiality.

25.     In an article by Lynda Edwards in the July 7, 2014 issue of *The Advertiser* of Lafayette, Louisiana, Mr. Juneau is reported as declaring that "BP's CEO Bob Dudley said I was willfully misrepresenting the settlement; that's a lie and, yes, it is actionable." It is my understanding that these remarks were made in response to Mr. Dudley's criticisms of Mr. Juneau's work as claims administrator during an appearance nearly a year earlier on a televised CNBC Program. *See* George Talbot, "BP chief executive:" Settlement deal 'hijacked' by claims administrator," July 18, 2013, AL.com. According to an article by Kyle Barnett in the August 25, 2014 issue of *The Louisiana Record: Louisiana's Legal Journal*, Mr. Juneau told the *Record* that he did not recall having used the word "liar" in his interview with the *Advertiser* but that he was "standing by the other statements that appear in the article." *The Record* quotes Mr. Juneau as saying, "I don't recall using the word, I did say there was no question that was not correct, not true, use whatever word you want to use." *The Record* article also stated that Mr. Juneau explained that his use of the word "actionable" did not refer to litigation, quoting him as saying, "For somebody to say something like that in that context is sanctionable. You can get sanctioned in Federal Court because you can't use those words. I'm not talking about lawsuits here. It is inappropriate, inaccurate and not correct."

26.     It is my opinion that Mr. Juneau's comments could cause a reasonable person to question his impartiality because they could be construed to suggest that he is antagonistic toward BP's chief executive officer, which could be construed to suggest that he is antagonistic toward BP and therefore might not perform his work as claims administrator in a manner that is fair and impartial to all parties. It is my opinion that such a hazard is present even though Mr. Juneau is quoted in the same article as providing assurances that Mr. Dudley's comments would not affect his service as claims administrator. As I explained in my *Georgetown Journal of Legal Ethics* article about extrajudicial speech, any public "comment concerning the parties or their attorneys would raise grave doubts about the judge's objectivity and his willingness to reserve judgment until the close of the proceeding." Ross, "Extrajudicial Speech by Judges," *supra*, at 598. Comments by judges to news reporters have provided the predicate for disqualification. *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 107-116 (D.C. Cir. 2001) (disqualifying judge whose published remarks to newspaper reporters included criticisms of the defendant's CEO, expressions of doubts about the credibility of the defendant's witnesses, and derogatory remarks about technological integration, which the court described as "one of the central issues in the case," 253 F.3d at 108); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (disqualifying judge who appeared on national television program to discuss interferences with abortion clinics, conduct that he had enjoined in a controversy that was ongoing); *Papa v. New Haven Federation of Teachers*, 444 A.2d 196, 207-10 (Conn. 1975) (holding that it was error for trial court judge to not recuse himself from a case involving a teacher's strike after he made derogatory remarks to news reporter about striking teachers).

27.     It is likewise my opinion that Mr. Juneau's remarks could create the appearance of partiality insofar as they contravene the admonition of the Academy of Court-Appointed Masters that "A judicial adjunct must be patient, dignified, respectful, and courteous; apply an even-handed and unbiased process; and treat all parties with respect." *Appointing Special Masters and Other Judicial Adjuncts: A Benchbook for Judges and Lawyers*, "Basic Rules for Judicial Adjuncts," Rule 2C, p. 25.

28. Even though it may be understandable that Mr. Juneau wanted to defend his work insofar as he is quoted as saying that he found Mr. Dudley's comments "personally offensive," that should not be a factor in the analysis. As I have written, a judge generally should not respond even to unfair criticisms of his or her opinions: "[I]f the criticism is factually inaccurate, there are persons other than the judge who might promulgate corrections. If the criticism is scurrilous, the criticism does not deserve the dignity of a judicial reply." Ross, "Extrajudicial Speech," *supra*, at 606; *see also Microsoft*, 253 F.3d at 112 ("It is no excuse that the Judge may have intended to 'educate' the public about the case or to rebut 'public misperceptions' purportedly caused by the parties."). As the Commentary to Canon 2(A) of the Code explains, a "judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen."

29. Mr. Juneau's comments also appear at odds with Canon 3(A)(6) of the Code, which states that "A judge should not make public comment on the merits of a matter pending or impending in any court." Although Mr. Juneau's comments do not directly address the merits of particular claims, his general defense of his work as claims administrator and his criticism of Mr. Dudley refer to issues of judgment and discretion that are at the heart of the controversy over the adjudication of claims and distribution of assets under the terms of the class settlement.

### B. Mr. Juneau's service as an attorney for Louisiana disqualifies him

30. It is also my opinion that Mr. Juneau's service an attorney for the state of Louisiana in connection with the events that led to this class action disqualifies him under section 455(b)(2), which mandates disqualification "[w]here in private practice" a judge "served as lawyer in the matter in controversy…" Similarly, Canon 3(C)(1)(b) provides that "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:…the judge served as a lawyer in the matter in controversy." As is explained in the previous paragraph, Mr. Juneau served for more than a year as a highly compensated attorney for the state of Louisiana in connection with the present controversy. Mr. Juneau appears to have provided advice and counsel about the methods of calculating the value of at least many of the same claims that BP presently disputes.

31. Cases where a judge has previously served as an advocate are unusual, perhaps because few judges would be so brazen as to presume to adjudicate a case in which they had served as an advocate. In one decision, the Fifth Circuit required the disqualification of a magistrate who had reviewed a criminal defendant's motion to vacate his sentence because the magistrate previously had participated as an assistant district attorney in consideration of an earlier motion to reduce the sentence. *Mixon v. U.S.*, 608 F.2d 588, 591-92 (5th Cir. 1979), *rehearing granted*, 616 F.2d 23 (5th Cir. 1980), *on rehearing*, 620 F.2d 486 (5th Cir. 1980) (relying on the closely related section 455(b)(3), which covers government service "as counsel…concerning the proceeding"). In another case, a judge disqualified himself from hearing an antitrust case based on an "appearance of impropriety" under section 455(a) because he had limited involvement with the case while serving as a United States Attorney. *U.S. v. Pepper and Potter, Inc.*, 677 F.Supp. 123, 125-26 (E.D.N.Y. 1988). A judge also has disqualified himself under section 455 (a) in an action by tenants against a city and lead-based paint

manufacturer because the manufacturers intended to assert that the city had developed its lead-paint poisoning policy while the judge was deputy mayor. Even though the judge had little, if any, recollection of the issue and the tenants opposed disqualification, the judge found that a reasonable person might question his partiality. *German v. Home Loan Mortgage Corp.*, 943 F.Supp. 370, 373-75 (S.D.N.Y. 1996).

32.     Disqualification upon a finding of an appearance of partiality is necessary even if it causes delay or other inconvenience insofar as these concerns are "more than outweighed by the need to protect the dignity and integrity of the judicial process." *Potashnick v. Port City Construction Co.*, 609 F.2d at 1112.

33.     Judges similarly have been disqualified from adjudicating cases in which they have served as attorneys in state cases involving state disqualification statutes that closely resemble the federal statute. *See, e.g., Holmes v. State*, 966 So.2d 858, 860-61 (Miss. App. 2007) (judge who had actively participated as an assistant district attorney in a defendant's prosecution was disqualified from ruling on the defendant's motion for post-conviction relief in the same case); *In re Detention of Hargett*, 786 N.E.2d 557, 560-61 (Ill.App. 2003) (judge who had participated as state's attorney in prosecution of case that formed the basis for civil commitment proceeding was disqualified from participating in that proceeding).

## VII.   BP has not waived its objections to disqualification

34.     Under the circumstances as I understand them, BP cannot have waived any right to seek to disqualify Mr. Juneau for reasons of his prior employment by the state of Louisiana because the statute specifically provides in subsection (e) that "No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)." As a court has explained in a case involving a similar state statute, waiver of disqualification in a case in which a judge had served as counsel could not be permitted because "the law was not designed merely for the protection of the parties to the suit, but for the general interests of justice." *Harkness Apartment Owners Corp. v. Abdus-Salaam*, 232 A.D.2d 309, 309 (N.Y. App. Div. 1st Dep't 1996) (disqualifying judge who had reviewed documents crucial to the underlying complaint while serving as an attorney). In other words, if Mr. Juneau believed in March 2012 that (i) BP had consented to his service as Claims Administrator after full disclosure, and (ii) he had presented that consent or waiver to the Court, the Court could not have accepted that waiver as valid under section 455(e).

35.     Under these circumstances, BP likewise cannot have waived any right to seek to disqualify Mr. Juneau for the reason that his impartiality might be questioned under subsection (a) insofar as Mr. Juneau at the time of his appointment as claims administrator in 2012 failed to disclose on the record his prior employment by the state of Louisiana or his activities on behalf of the state with respect to the Gulf Coast Claims Facility. Section 455(e) states that where the disqualification arises under subsection (a), "waiver may be accepted *provided it is preceded by a full disclosure on the record of the basis for the disqualification*" (emphases added). The Fifth Circuit has applied this mandate in *Potashnick*, 609 F.2d at 1111, wherein the trial judge partially disclosed a conflict in a pretrial conference. The Fifth Circuit stated that "[u]nder the express language of section 455(e), the pretrial conference proceedings cannot constitute a valid waiver,"

13

and that, in any event, the disclosure was incomplete. *See id.* at 1114-15. *See also Hall v. Small Business Administration*, 695 F.2d 175, 180 (5th Cir. 1983) ("[C]ounsel may waive the right to recusal only after a full disclosure on the record of the basis for disqualification").

36.     Mr. Juneau's failure to disclose this conflict information on the record of this MDL proceeding negates any possibility of waiver. Indeed, even in his sworn testimony of August 1, 2013, Mr. Juneau stated that he did not have any involvement in or connection to the spill, and did not state, at least in the publicly available portion, that he had represented the state of Louisiana or describe the activities that he undertook on behalf of Louisiana with respect to the Gulf Coast Claims Facility.

37.     Based on the assumed facts as I understand them, BP's current objection to Mr. Juneau's continued service as Claims Administrator is also timely, an issue that is distinct from the question of waiver. *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989). As explained in *York*: "Timeliness is a different issue. A timeliness requirement forces the parties to raise the disqualification issue at a reasonable time in the litigation. It prohibits *knowing concealment* of an ethical issue *for strategic purposes*." *Id.* at 1055 (emphases added). My review of Fifth Circuit cases reveals that the Court has found untimeliness when there is evidence that a party had full knowledge of the grounds for disqualification, and yet waited to raise the issue until after an adverse ruling had resulted. *See, e.g., United States v. Sanford*, 157 F.3d 987, 989 (5th Cir. 1998) (recusal argument was untimely when raised for first time in appeal of sentence and defendant had "made no motion before the district court for a recusal in the two months before sentencing," despite being aware of grounds for disqualification); *York*, 888 F.2d at 1056 (defendant first sought to raise issue of judicial conflict on appeal despite having been aware of possible grounds for recusal before and during the trial); *Delesdernier v. Porterie*, 666 F.2d 116, 122-23 (5th Cir. 1982) (where judge himself had raised the possibility of disqualification at the very beginning, and gave a "full and fair disclosure" of his situation before trial, "[w]e think that the motion raised for the first time on appeal, and after two full trials on the merits, is too tardily made for us to consider it now."). Where, in contrast, it is clear that a party has not waited to see how things turn out before making his challenge, the Court has found the motion timely despite the passage of time. *See, e.g., United States v. Anderson*, 160 F.3d 231, 234 (5th Cir. 1998) ("It is clear that Anderson did not wait to see what sentence Judge McBryde would impose, and then, when that sentence was unfavorable, move for recusal. Rather, Anderson raised the ground for recusal before any sentence was imposed. There was no litigation concerning Anderson's guilt, all that remained to be determined was the duration of his sentence. Therefore, because Anderson filed his motion to recuse prior to sentencing, we find that the motion is timely in challenging his sentence.").

38.     Based on the information I have been provided, BP does not appear to be bringing its current motion for tactical reasons, *e.g.*, in the wake of a particular adverse decision by the Claims Administrator. Thus, this is not a case in which a litigant seeks "to utilize a disqualification issue as part of [its] trial strategy." *Potashnick*, 609 F.2d at 1115.

39.     I have assumed for purposes of this affidavit that BP was aware, as of February 2012 or earlier, that Mr. Juneau had been described as a "liaison" or consultant for the State of Louisiana with regard to the GCCF process. I have also assumed that BP has in its files a copy

of the contract and related amendments between Mr. Juneau and Louisiana which was part of a larger production to BP on a "thumb drive" on December 20, 2011 and February 24, 2012 to advance the State's claims for damages, and it has located two November 2010 letters between Mr. Feinberg (of the GCCF) and Attorney General Buddy Caldwell, which reference Mr. Juneau, and a November 2010 email in which the GCCF forwarded to BP counsel some of Mr. Juneau's correspondence with Mr. Feinberg.  It is my understanding, based upon the "Assumed Facts," that Mr. Juneau did not provide these documents or a summary of their import at the time of consideration of his appointment in February and March 2012 (or at any time), and that BP did not consider either the contract or the November 2010 correspondence at the time it considered Mr. Juneau's candidacy for Claims Administrator in February and March 2012.  Absent a full disclosure – or evidence that BP knew all the pertinent facts a full disclosure would provide – there can be no timeliness issue.  *See, e.g., Hall*, 695 F.2d at 179 (there can be no timeliness issue when there was no "full disclosure" of a conflict of interest).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:  September 2, 2014

William G. Ross