# Exhibit 30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | **MDL NO. 2179** |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | |
| | * | **SECTION J** |
| | * | |
| | * | |
| **This document relates to all actions.** | * | **HONORABLE CARL J. BARBIER** |
| | * | |
| | * | **MAGISTRATE JUDGE SHUSHAN** |
| | * | |

---

## <u>DECLARATION OF CHARLES CIPIONE</u>

I, Charles Cipione, am over the age of 18 and the opinions, statements and conclusions expressed in this declaration are my own.

### *Engagement*

1.      I was engaged by BP, through its counsel, to assess the appropriateness of the information technology system (the "IT System") implemented by the Court Supervised Settlement Program (the "CSSP") to carry out the terms of the settlement agreement in *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "Settlement Agreement").  In particular, I was asked to assess the appropriateness of the Claims Administrator's continuous reliance upon the CSSP's IT system and its adequacy for processing claims pursuant to the Settlement Agreement.

## *Qualifications*

2.      I am a Managing Director with AlixPartners, LLP ("AlixPartners"), a financial and operational consultancy.  I have more than 20 years of professional experience reviewing, deconstructing, designing, and implementing computer systems in the claims administration, litigation, and financial areas, and in handling associated operational issues.  I hold a B.S. in Chemistry, as well as an M.B.A., from Texas A&M University.  My curriculum vita is attached as Exhibit A.

### Bankruptcy Claims Administration Systems

3.      I have designed and implemented a variety of technology solutions related to the administration of bankruptcy claims.  To date, these systems have been accepted as the claims system of record in more than 50 bankruptcy filings in multiple Federal Bankruptcy Courts, and have processed in excess of $2 trillion of claims.  Some representative examples of claims cases include WorldCom, Kmart, and General Motors.  A complete listing of cases is included in Exhibit B.

4.      Specifically, I am the original architect/designer of AlixPartners' suite of claims administration applications.  These systems cover myriad issues encountered in Chapter 11 filings: bankruptcy schedules, statements of financial affairs, proofs of claim reconciliations, claim life cycles, reclamation claims, preference claims, intercompany claims, PACA/PASA claims, noticing, balloting, and distributions to name a few.  These systems also are responsible for a detailed tracking mechanism to ensure that claims processing is transparent and auditable. As an example, claims summary reports routinely track the entire universe of both debtors' scheduled claims and creditors' proofs of claims using easily recognizable claim categories, and current claims statuses.   These reports are critical to providing visibility of the claims

reconciliation process to all stakeholders so that the progression of the claims through the process is easily viewed, allowing for questions and issues to be identified and answered or resolved in a timely manner. I would expect that same visibility would be important in the Deepwater Horizon Economic Claims Center ("DHECC"). Scoped reports (subsets that are easily tied to the claims summary report) are also available for specific audiences. Claims life cycle tracking is also an important functionality of these systems. In order to arrive at final claims reconciliation and/or disposition, there is often a need to review the different actions performed on a particular claim. If claims life-cycle tracking is maintained in a complete manner, this review is possible. Consequently, it is critical that each of the events in a claim's life cycle is recorded in the system. These events drive the current status of each claim and can be reviewed for appropriateness at any time.

5.      As the architect of the bankruptcy claims systems I describe above, it is incumbent upon me to not only ensure that these systems include the core technical functionality to handle expected bankruptcy claim administration functionality, but also to recognize that each Chapter 11 filing is unique. Consequently, quality claims systems have been architected with the expectation that new functionality will need to be added and the new functionality will need to interact with the existing core functionality. My role as architect covers data structure design, interface design, and coding.

6.      Because of the variety of the types of claims present in bankruptcy proceedings (which can include any sort of claim), the systems we develop to handle such claims require broad-based expertise, which I believe is fully applicable to the present situation.

7.      I have testified on behalf of debtors in the United States Bankruptcy Court for the District of Delaware. I have been published in the American Bankruptcy Institutes Journal.

(CLAIMS CHAT: Data on Which to Stake Your Claim: A Guide to Information Management for Debtors, Restructuring Professionals (citation: ABI Journal, Vol. XXV, No. 10, p. 40, Dec/Jan 2007) - Charles A. Cipione and Michael C. Han)   I have conducted bankruptcy claim presentations to the American Bar Association Section of Business Law as well as the Dallas Bar Association.

**Litigation**

8.      I have also been retained to oversee the design, implementation, and management of multiple litigation support systems.  These systems contain functionality to reposit, organize, track, deliver, analyze, and report on large volumes of both unstructured (e.g., PDFs and MS Office files) and structured (i.e., databases) data supporting the various cases.  These systems support multiple related professional groups in their efforts to centrally access both the source documents and the resulting analytics of the entire set of professionals.

**Pre-AlixPartners**

9.      Immediately prior to joining AlixPartners, I owned and operated my own technology consulting firm.  I started my professional career at Arthur Andersen as an information systems auditor.  As an information systems auditor, I performed multiple general controls reviews and application reviews.

## *Summary of Conclusions*

10.      The operations of the CSSP are comparable to those of a Fortune 1000 business performing claims processing – and similar to a large insurance claims operation.  The CSSP employs over 2,000 individuals who process many different types of claims as defined in the Settlement Agreement.  (Independent Evaluation of Internal Control Environment - Process

Audit by CliftonLarsonAllen Report, dated May 17, 2013 ("CLA" or "CLA Audit") p.14, attached hereto as Exhibit D.)  The CSSP has spent tens of millions of dollars to develop and operate the information technology components of this claims program.

11.     Any claims program, and certainly one of this size and complexity, must utilize an information technology system that is capable of effectively and efficiently processing large numbers of claims in a well-documented, transparent way, subject to appropriate controls.

12.

# Redacted

13.     I was asked by BP, through its counsel, to review the Claims Administrator's IT System. To do so, I relied heavily on the IBM Report. It is reasonable to rely on the IBM Report for this opinion because of their reputation as a recognized technology firm, the scope of their work, their access to people with knowledge of the IT System and their direct access to the IT

System itself. My opinions are based primarily on the IBM Report. To the extent that modifications have been made to the IT system subsequent to that report, I am not privy to such modifications and do not offer an opinion with respect to them.

14.

# Redacted

15.    The CSSP's information technology system is fundamentally flawed and does not provide the proper control structures necessary to ensure that claims are processed completely and accurately. These design and control issues frustrate efforts to provide the visibility necessary for a comprehensive view of claims processing as well as to record and maintain detailed descriptions of each claim's progress through its life-cycle.

16.    The IT System was built within, and continues to be maintained within, an information technology management model that is severely lacking in design, development, and implementation control structures. The lack of information technology management rigor is not appropriate for a case of this size, a claims adjudication process this complex, and a population of claims containing personally identifiable information. The Claims Administrator should not have relied on the IT System for almost two full years, nor should the Claims Administrator continue to rely on the IT System (based on its current incarnation described in the IBM Report) as a vehicle to consistently apply the terms of the Settlement Agreement to adjudicate claims.

17.    I observed several critical flaws in the system:

   a.    The IT System does not provide functionality to process all stages of the claims process. In other words, the IT System does not have the capability within its design to track all aspects of the claim process from submission

of the claim by the claimant, to review and processing of the claim, to approval, payment, or other resolution of the claim.

    b.    The IT System relies upon processes external to its architecture to execute critical tasks.  These external processes are manual in nature and do not return any information to the IT System except for results upon completion.

    c.    The IT System does not anticipate exception processing, which requires behind-the-scenes interventions, sometimes including the alteration of claims data and the destruction of audit trails, to allow claims to continue through their life-cycles as contemplated by the designers of the IT System.  The Claims Administrator cannot expect to apply the terms of the Settlement Agreement consistently using this method of processing.

18.

# Redacted

19.    Continued use of the IT System will not "ensure the implementation and integrity of the overall settlement program." (Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 ("Settlement Agreement")  § 4.3.10, Rec. Doc. 6430-1))  The current IT System simply does not provide the basic functionality to allow the Claims Administrator to carry out this responsibility.  It is my opinion that the Claims

Administrator should have identified this situation within the initial months of overseeing the IT System.

## *Approach*

20.    The opinions presented in this report are based on my review and analysis of the information listed in Appendix C, incorporating my education and experience as a business technology professional with deep experience in claims administration technology solutions.

21.    These opinions were mainly based on an IBM report commissioned by the CAO, as described more fully above in the Summary of Conclusions.  My understanding of the IT System relied upon by the Claims Administrator is that it is a complex system that processes a high volume of claims information.  Further, it is my understanding that the business rules and requirements of this system are in a constant state of flux.

22.    This combination of complexity and changing environment mandates a flexible information system coupled with a strong control structure in order to operate efficiently while also preventing and/or detecting errors in a timely manner.  Both the efficiency and the control structure are ultimately the responsibility of the Claims Administrator, and should also be anticipated by the IT System's designers and operators.  My review of the supplied material focuses on assessing whether the IT System provides for the needs of the CSSP in a flexible and controlled manner.

23.    As a matter of course when reviewing any information technology that is relied upon to process financially significant information, I look for evidence of a strongly controlled information technology management model.  To provide management and oversight of a complex claims process, the IT System should have four attributes: transparency, auditability, completeness, and accuracy.

24.     In 2011, the American Institute of Certified Public Accountants (AICPA) developed Service Organization Controls 2 (SOC 2) to specifically address controls at service organizations covering security, availability, processing integrity, confidentiality, and privacy. SOC 2 is an evolution of older versions of general controls testing for information technology environments.    Although my report does not constitute a formal SOC 2 review, SOC 2 is informative in that it supplies widely accepted industry standards against which the IT System can be measured.

**Information Technology Management Model**

25.     Information technology systems that support mission critical tasks need to adhere to certain structures to ensure that they accomplish their tasks with integrity.   Two relevant structures are the Systems Development Life Cycle (SDLC) and the Segregation of Duties.

Systems Development Life Cycle (SDLC)

26.     While there are many different approaches to SDLC, all of the generally accepted approaches focus on five main elements: requirements gathering, design, development, testing, and implementation.   Often times, this cycle is revisited during the life of an IT system to enhance and update information technology systems as new functionality is needed.



27.    The "Requirements Gathering" phase is an important documentary process in which the business process owners describe the business needs to the information technology designers.  This process could be repeated frequently throughout the life of the information technology system as business needs evolve, but it is critical that requirements documents be created and that they continue to be used to ensure that the business owners and the information technology implementers understand and agree upon the functionalities that the system must have.  While the documentation does not have to be voluminous, it is the basis of all subsequent steps in the creation of the information technology system.  Errors made in the requirements gathering step manifest themselves in information technology systems that do not achieve business needs.

28.    The "Design" phase of the SDLC is the step where the business needs are architected into the information technology solution.  To the extent that business needs are evolving, the design should anticipate the need to make changes in the future.  The design phase should produce a set of documented specifications used during the development phase to ensure that the business needs are effectively translated to actionable information technology system construction steps for construction of the system during the Development phase.

29.    The "Development" phase of the SDLC implements the Design phase through the writing of computer code and the creation of database structures, among other things.

30.    The "Testing" phase of the SDLC ensures that the system performs as requested.  In order to accomplish this task, while maintaining the integrity of the processing being done in the actual live system (a "production environment"), a separate environment should be created solely for the purpose of testing changes.  This separate environment (a "test environment") should be similar to the production environment in structure and content.  The test environment

can then be used to simulate the production environment, with no risk to the integrity of the production environment. Changes are then evaluated in this test environment. If they pass the evaluation (based on the requirements), the changes can then be safely moved into the production environment. If the changes produce errors, or do not meet the business requirements, they are referred back to the design team for revisions, preventing the errors from occurring in the production environment.

31.    The "Implementation" phase of the SDLC starts when all testing has been completed with no errors identified. The implementation phase consists of migrating either new information technology or modified existing technology from the test environment to the production environment. This phase includes introduction of the screens that users will see when they use the IT system, the on-line instructions that help users use the system, and other computer code to facilitate users' navigation of the IT system.

Segregation of Duties

32.    In order to protect against errors, both inadvertent and malicious, it is important to segregate the people writing the code from the people using the system. Within the SDLC it is critical to separate staff who are charged with creating the solution from the staff who are charged with testing and implementing the solution. This segregation of duties introduces a set of checks and balances that are depicted in the graphic below. Checks are performed by the testing staff act to prevent the insertion of malicious or inadvertent errors in the information technology solution. Similarly, it is important that once an information technology system has been promoted to the production environment, only the users of the system, and the system itself, are allowed to create, modify, and delete information. An information management model that

ignores this segregation of duties exposes the production environment to malicious and inadvertent errors.

## Segregation of Duties to Ensure Proper Checks and Balances

### Promotion to the next level upon completion



Requirements

Design & Development Environment

Test Environment

Production Environment

Business Needs: As determined by the business users of the information technology

Virtual Sandbox: All options can be explored

QA: Evaluating if the solution performs according to the business specifications

Deployed Solution: Only the solution and authorized business users have access

**Return if issues are encountered**

## IT System Attributes

### Transparency

33.    Transparency is concerned with the ability to easily view the processing that occurs within the claims system.   Transparency is most easily associated with clear and comprehensive reporting.   Transparent systems are able to report on the entire universe of data.

12

Transparent systems produce reports that are easily followed by the readers of the reports. As an example, a claims system should be able to report on all claims (regardless of their validity) among a small number of easily understood dimensions such as status (incomplete, to be reviewed, in review, approved, disapproved, paid) and category (business, individual). Since the universe of claims can only grow through the duration of the settlement, claims (and related amounts) should never leave the IT System, although they could change dimension values ("in review" to "approved").

Auditability

34.     Auditability is concerned with the ability to view the entire transactional history of each claim within one single system, without having to look to other locations outside the system. A complex claims system should maintain a complete transaction history for all actions and events related to the processing of a claim. At a minimum, the audit trail[1] should contain information related to each action performed upon a claim, the date of the event, and the responsible party. Only through this type of claims life-cycle history tracking can processing errors be identified and diagnosed so that corrective actions can be taken on not only the specific claim errors, but also on all other claims with similar life-cycle histories. Claims systems that do not contain this basic functionality inhibit the ability to determine the root cause of identified errors. Just as importantly, systems lacking claims life-cycle histories also impair the ability to categorically apply corrective actions across a population of similarly treated claims.

Completeness

35.     Completeness means the universal capture and retention of information. As a system "of record", claims systems need to maintain complete records, starting with originally

---

[1] An audit trail is a chronological set of documentary evidence records.

filed information. Original claim data should be retained throughout the entire case. All actions or edits should be recorded as a "transaction." For example, if any material change is made in the claim submitted or in any information about the claimant (such as address, company name or tax identification number), the claims system should contain a record of the date and time of the change, the nature of the change, and the person making the change. The record of such change should not be subject to alteration. Claims systems that allow the editing of original filed information, or the deletion of subsequent transactional information, cannot be relied upon to demonstrate accurate processing, or to diagnose errors. This is because future audits and research rely on the auditor's and/or researcher's ability to review the complete transactional history of a claim. If the original information has been altered, or if the complete transactional history of claims has been adulterated, it is impossible for the auditor or researcher to make a reliable assessment. The broader implication is that the proper treatment of a claimant's rights could be irreparably damaged due to the alteration of original data or the destruction of transactional information, such as claimants' requests to opt-out of the settlement. In each of these circumstances, the destruction of data (overwriting original information or the deletion of certain responses) would materially alter the downstream processing of the claim, to the claimants' detriment.

36.    In the absence of completeness and auditability, changes in dollar amounts, whether inadvertent or intentional, could be input into the system with respect to specific claims or on a bulk basis, resulting in increases (or decreases) in payments from the trust. No audit trail would exist to establish the reason for the change, which may go unnoticed. If discovered, the lack of audit trail would make it difficult or impossible to establish a cause and therefore limit the Claims Administrator's ability to prevent future changes of a similar sort, or to claw such

14

payments back.  In an extreme case, a bad actor could delete a BP objection from the system, which would allow the claim to be paid and leave no audit trail as to why it should not have been paid or who made the change.  Similarly, a claim, or evidence supporting a claim, could be deleted, resulting in an improper non-payment to the detriment of an otherwise legitimate claim.

Accuracy

37.    Accuracy is concerned with the claims system's proper application of business (settlement) rules.  The business rules, as described in the Settlement Agreement, should be correctly integrated into the claims system.  A claims system should consistently process claims correctly.  If not, then the claims system has failed its basic purpose.

## *Data Reviewed*

38.    A complete list of documents reviewed is included in Exhibit C.

39.    It should be noted that I did not have access to the IT System or facility personnel. However, IBM did have access to the IT System, the Claims Administrator and his staff, as well as the BP IT Group, the Plaintiffs Steering Committee (PSC) Information Technology, BrownGreer, the Garden City Group, PricewaterhouseCoopers, Postlewaite & Netterville, and the Freeh Group International Solutions.  (Ex. E, IBM p. 7)   I therefore used the IBM Report as a proxy to having access to these groups.

## *Observations, Findings and Opinions*

## According to the Settlement Agreement, the Claims Administrator has the responsibility to ensure that the IT System is consistently implementing the Settlement Agreement

40.    The Settlement Agreement states that the Claims Administrator shall "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class." (Settlement Agreement § 4.3.1)   The Claims Administrator shall

"oversee and supervise the **CLAIMS ADMINISTRATION VENDORS** (including any subcontractors) and staff in the processing and payment of Claims, report and provide information to the Court, BP, and/or **LEAD CLASS COUNSEL** (or their designee) as may be requested on an ongoing basis." (Settlement Agreement § 4.3.2)

**General IT Controls Are Not Employed in the Design, Development, and Implementation of the IT System**

41.

42.

Redacted

43.

44.     Special Master Judge Freeh also recently noted that due to "lapses in vendor oversight", issues concerning "workflow techniques, claim processing, and process integrity were unremediated." (Reply Of The Special Master To Responses, Objections, And Motions Filed By Show Cause Parties ("Reply") p. 29, Rec. Doc. 12393))

45.

# Redacted

46.

In a complex computer system like the IT System, changing any software code or aspect of the way the software works could cause unexpected errors in other parts of the system. This makes the modification of an IT system a matter of trial and error. The accepted method for conducting this trial and error process is in a separate test environment where the system changes will not affect actual claims that have been

or are being processed, until all of the bugs in the new code have been worked out.  In the specific context of the IT System, the lack of development and testing environments could result in claims being processed erroneously.

47.     The management controls surrounding the IT System are poor to non-existent. The level of risk to processing claims built in such an environment is extremely high and tantamount to an abdication of responsible management by the Claims Administrator.

48.     In my professional opinion, no reasonable, prudent, or competent administrator or court-appointed trustee with responsibility for implementing, administering, overseeing, and supervising a claims administration system would have allowed an IT system with such poor or non-existent management controls to operate and certainly would not have allowed it to continue to operate without correcting its flaws.

**The IT System Lacks the Flexibility Necessary to Fully Process Claims**

49.

# Redacted

---

[2] Happy Path is a term used to describe a claim processed without the need for any exceptional steps. (IBM p. 8)

# Redacted

50.    As a general controls rule, IT systems developers and operators should never directly interact with production data because they have the ability to change key information such as amounts and claims statuses.  Practices in the CSSP's IT System, however, regularly violate this rule.

51.    In the CLA Audit, CLA detailed several Key Opportunities for Improvement. These opportunities identify some of the same weaknesses later identified by IBM in the area of IT change management audit trails.  CLA stated that "BG performs approximately 300-400 IT system changes daily such as updating claim or claimant specific information and claims processing portal system, edits.  While documentation is maintained to support the changes, a log of the changes is not maintained."  (Ex. D, CLA 10)  This statement indicates two problems. First, it is evident the IT System was not designed to handle all of the necessary claims processing steps to properly process a claim from initial intake through determination.  Second, the IT System cannot provide complete information to the Claims Administrator regarding the daily changes.  The fact that the IT System is incapable of producing reliable daily change information was communicated to the Claims Administrator over six months prior to the IBM Report, in the CLA Audit, which described shortcomings of the system as well as fixes that threatened the IT System's ability to "faithfully implement and administer the Settlement." (Settlement Agreement § 4.3.1)  In my opinion, the failure to detect this set of flaws in a legal claims administration process is not consistent with reasonable, prudent, or competent claims administration.  Even after CLA's warning, the Claims Administrator continued to process claims through the IT System.

52.     In my professional opinion, no reasonable, prudent, or competent administrator or court-appointed trustee with responsibility for implementing, administering, overseeing, and supervising a claims administration system would have launched or continued to use a claims process in the face of this fundamental limitation in the IT system and certainly would have remediated this deficiency at the earliest possible time.  I do not understand how the Claims Administrator did not take immediate action to fix it, particularly because the Settlement Agreement imposes no restriction on his ability to do so.

53.     The proliferation of manual interventions by IT System personnel illustrates the inadequacy of the IT System to perform its basic and intended function.  Had the IT System been designed, developed, tested, and maintained using industry standard methods, the IT System would have included the capabilities that have been and currently are being performed by the off-system manual interventions.

54.

# Redacted

55.     The IT System is not flexible.  This lack of flexibility subjects the system to errors such as exposing data needing off-line processing to data entry errors, both malicious and inadvertent.  The lack of flexibility also increases the cost of the IT System in two respects.

First, it increases the cost of operating the existing system because the manual interventions are inefficient and make it more expensive to process claims.  Second, the lack of flexibility caused by original design flaws makes it much more expensive to fix the system now.

**The IT System Lacks Visibility as it Pertains to its Claims Processing**

 56.

# Redacted

 57. Claims summary reporting should categorize all claims in a straightforward manner that allows a complete accounting at any point in time.  Proper reporting allows the consumers of the reporting to clearly view the growth and evolution of the case.  To the extent that narrower reporting is required for specific purposes, these more focused reports should always be easily tied back to the summary reporting in order to maintain transparency in the process.

# Redacted

 58. The IT System does not provide the requisite level of record keeping and reporting to ensure the process is operating correctly.

 59. In my professional opinion, no reasonable, prudent, or competent administrator or court-appointed trustee with responsibility for implementing, administering, overseeing, and

supervising a claims administration system would allow the implementation and continued use of an IT system that lacks such internal visibility into the claims process.

**The IT System Does Not Maintain Proper Claims Life Cycle Information**

60.

61.

Redacted

Redacted

62.

63.     Auditability is essential for demonstrating the integrity of claims processing.  It creates an environment of transparency and allows actions to be defended or corrected, as necessary.

64.

Redacted

65.

# Redacted

66.     In my professional opinion, no reasonable, prudent, or competent administrator or court-appointed trustee with responsibility for implementing, administering, overseeing, and supervising a claims administration system would allow the implementation and continued use of an IT system that lacks the ability to record and report out claims information throughout the claims life cycle.

**The IT System Does Not Maintain Complete Claims Information**

67.

# Redacted

68.     In addition to the completeness issues discussed above, I have reviewed an exchange of correspondence relating to the IT System's failure to preserve and retain what are called "Global Notes." (Nov. 9, 2013 K. Moskowitz Ltr. to P. Juneau, attached hereto as Exhibit G; Nov. 21, 2013 P. Juneau Ltr. to K. Moskowitz, attached hereto as Exhibit H; Dec. 2, 2013 K. Moskowitz Ltr. to P. Juneau, attached hereto as Exhibit I)  In that correspondence, the Claims Administrator admits that the Global Notes associated with individual claims have been deleted or altered. (Ex. H, Nov. 21, 2013 P. Juneau Ltr. to K. Moskowitz)  These Global Notes are purposed to be viewed by the "Parties on the Portal". (*Id.*)  The deletion or alteration of these notes affects the appeals process and could prejudice claimants and/or BP in the process.  (Ex. I, Dec. 2, 2013 K. Moskowitz Ltr. to P. Juneau)

24

69.     Complete information retention is the bedrock of systems of record, such as the IT System.  The correspondence relating to the Global Notes shows that the IT System does not meet this standard.  The fact that this incompleteness persists throughout the IT System calls into question the integrity of the claims processing it performs.

70.     In my professional opinion, no reasonable, prudent, or competent administrator or court-appointed trustee with responsibility for implementing, administering, overseeing, and supervising a claims administration system would allow the implementation and continued use of an IT system that fails to maintain complete claims information.

**The IT System Does Not Accurately Process All Claims**

71.

# Redacted

72.     I reviewed calculated losses for two claims.  Due to confidentiality protections, I do not identify the specific claimants.  However, my review revealed that both claims, though of separate claimants, used the same profit and loss statements. (Ex. J, CAC000953; Ex. K, CAC000975)

73.     A well-controlled claims system should neither duplicate nor ignore supporting documentation used in the claims reconciliations and/or the compensation calculations across multiple claims.  A tracking mechanism to associate one or many input data sets to one or many claims is prudent, especially when multiple claims are filed by one claimant or multiple (apparently) related claimants.

74.     Based on this example, it does not appear that this type of mechanism was anticipated as a business requirement during the original design of the IT System, nor has it been incorporated in the interim.  Consequently, the IT System's design failings have not prevented these claims from being processed inaccurately.

75.     The poor control environment responsible for developing and implementing the IT System without the requisite completeness, transparency, and auditability highlights the possibility that routine calculations are in error and likely not detected, a statement repeated by Judge Freeh: "The assertion that 'mathematical' claims processes could not have produced a flawed result is wrong."  (Reply p. 12)

76.     In my professional opinion, no reasonable, prudent, or competent administrator or court-appointed trustee with responsibility for implementing, administering, overseeing, and supervising a claims administration system would allow claims to be processed incorrectly.  In my opinion, the Claims Administrator should consider halting the processing of claims until he has remediated known IT System errors and can also affirmatively assert that all classes of claims are being processed correctly by the IT System.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 3 1 , 2014.

**Exhibit B**

**Bankruptcy Administration Cases Utilizing Claims Systems Architected By Charles A. Cipione**

Accredited Home Lenders, Inc.
ASARCO LLC
Asyst Technologies, Inc
BearingPoint, Inc.
BI-LO, LLC
Borders, Inc.
Calpine Corporation
Centaur, LLC
Charter Communications, Inc.
CRC Parent Corporation f/k/a Chem Rx Corporation
Dana Corporation
Delta Financial Corporation
Dura Automotive Systems
DVI, Inc
Eastman Kodak Company
Energy Conversion Devices, Inc.
Exide Technologies
FairPoint Communications Inc
Fleming Companies, Inc.
General Growth Properties
Genuity Inc.
Global Power Equipment Group Inc.
Hayes Lemmerz International, Inc.
iGPS Company LLC
Innkeepers USA Limited Partnership
Kmart
Lyondell Chemical Company
Metaldyne Corporation
Metromedia Steakhouses Company
Mirant Corporation
Motors Liquidation Company (General Motors Corporation)
Movie Gallery, Inc.
Natural Products Group, LLC (Arbonne)
Nebraska Book Company, Inc.
Nellson Nutraceutical, Inc
New Century

Patriot Coal Corporation
Quality Stores, Inc.
R.E. Loans, LLC
Regal Cinemas
Rotech Healthcare Inc.
Sea Containers Caribbean Inc.
SemGroup, L.P.
Solyndra LLC
SP Newsprint Co., LLC
Sunterra Corp
Sydran Services LLC
Texas Rangers Baseball Partners
The Bombay Company, Inc.
The IT Group, Inc
think3 Inc
Tropicana Casinos and Resorts, Inc.
United Retail Incorporated
VeraSun Energy Corporation, et al.
Victor Valley Community Hospital
WHSU, Inc.
WorldCom, Inc.

## Exhibit A

### Charles A. Cipione Curriculum Vita

Mr. Cipione has over twenty years of experience in information technology. His experience has centered on the design and implementation of systems, the deconstruction and analysis of third party systems, and data modeling and reporting.

Mr. Cipione has designed and implemented a variety of technology solutions for a number of confidential clients involved in various bankruptcies, litigations and regulatory investigations. These solutions include custom designed complex data analytics and reporting as well as the development of web based program management offices and reporting systems used by the various professional constituencies requiring immediate access to pertinent information and analyses.

Mr. Cipione currently leads the AlixPartners Litigation Data Analytics team. This team is composed of personnel with a broad range of experience that includes computer programmers, database administrators, and business analysts. This team supports Mr. Cipione in his capacity as an expert witness in a variety of litigations.

Education

Mr. Cipione earned a B.S. in Chemistry and an M.B.A. from Texas A&M University.

Professional Experience

Managing Director, AlixPartners, L.L.P.

President, Cipione & Consultants

Senior Information Systems Auditor, Arthur Andersen

Claims System Administration Experience

Mr. Cipione is the original architect of multiple AlixPartners bankruptcy administration systems (e.g., Claims, Preferences, Schedules/SOFAs, and Reclamation). Mr. Cipione has significant experience in many industries, including insurance, financial services, oil & gas, healthcare, retail, manufacturing, distribution, and telecommunications. Mr. Cipione has a wealth of experience in managing, organizing, analyzing, and presenting a variety of information related to claims processing.

Expert Testimony

Fleming Companies, Inc., 03-10945-MFW, US Bankruptcy Court for the District of Delaware, 2003.

## Exhibit C

### Documents Referenced

Claims Management System Assessment Report for the Deepwater Horizon Claims Center Economic & Property Damage Claims prepared by IBM Global Business Services Business Analytics and Optimization, dated Dec. 20, 2013 ("IBM")

Deepwater Horizon Claims Center – Request for Quotation – Business Process Management (BPM) Solution, dated January 3, 2013 [sic] ("RFQ") Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties ("Reply"), Rec. Doc. 12393

Deepwater Horizon Economic Claims Center - Independent Evaluation of Internal Control Environment - Process Audit by CliftonLarsonAllen Report, dated May 17, 2013 ("CLA")

Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2, 2012, Rec. Doc. 6430-1

November 9, 2013 letter from K. Moskowitz to P. Juneau

November 21, 2013 letter from P. Juneau to K. MoskowitzDecember 2, 2013 letter from K. Moskowitz to P. Juneau

Documents numbered CAC000953, CAC000975 relate to claims information and contain confidential claimant information. These documents will be provided, upon request, to the parties, to the extent permitted by, and subject to the confidentiality and protective orders in this litigation.

# E X H I B I T   A

**Exhibit A**

**Charles A. Cipione Curriculum Vita**

Mr. Cipione has over twenty years of experience in information technology.  His experience has centered on the design and implementation of systems, the deconstruction and analysis of third party systems, and data modeling and reporting.

Mr. Cipione has designed and implemented a variety of technology solutions for a number of confidential clients involved in various bankruptcies, litigations and regulatory investigations. These solutions include custom designed complex data analytics and reporting as well as the development of web based program management offices and reporting systems used by the various professional constituencies requiring immediate access to pertinent information and analyses.

Mr. Cipione currently leads the AlixPartners Litigation Data Analytics team.  This team is composed of personnel with a broad range of experience that includes computer programmers, database administrators, and business analysts.  This team supports Mr. Cipione in his capacity as an expert witness in a variety of litigations.

<u>Education</u>

Mr. Cipione earned a B.S. in Chemistry and an M.B.A. from Texas A&M University.

<u>Professional Experience</u>

Managing Director, AlixPartners, L.L.P.

President, Cipione & Consultants

Senior Information Systems Auditor, Arthur Andersen

<u>Claims System Administration Experience</u>

Mr. Cipione is the original architect of multiple AlixPartners bankruptcy administration systems (e.g., Claims, Preferences, Schedules/SOFAs, and Reclamation).  Mr. Cipione has significant experience in many industries, including insurance, financial services, oil & gas, healthcare, retail, manufacturing, distribution, and telecommunications.  Mr. Cipione has a wealth of experience in managing, organizing, analyzing, and presenting a variety of information related to claims processing.

<u>Expert Testimony</u>

Fleming Companies, Inc., 03-10945-MFW, US Bankruptcy Court for the District of Delaware, 2003.

# E X H I B I T   B

**Exhibit B**

**Bankruptcy Administration Cases Utilizing Claims Systems Architected By Charles A. Cipione**

Accredited Home Lenders, Inc.
ASARCO LLC
Asyst Technologies, Inc
BearingPoint, Inc.
BI-LO, LLC
Borders, Inc.
Calpine Corporation
Centaur, LLC
Charter Communications, Inc.
CRC Parent Corporation f/k/a Chem Rx Corporation
Dana Corporation
Delta Financial Corporation
Dura Automotive Systems
DVI, Inc
Eastman Kodak Company
Energy Conversion Devices, Inc.
Exide Technologies
FairPoint Communications Inc
Fleming Companies, Inc.
General Growth Properties
Genuity Inc.
Global Power Equipment Group Inc.
Hayes Lemmerz International, Inc.
iGPS Company LLC
Innkeepers USA Limited Partnership
Kmart
Lyondell Chemical Company
Metaldyne Corporation
Metromedia Steakhouses Company
Mirant Corporation
Motors Liquidation Company (General Motors Corporation)
Movie Gallery, Inc.
Natural Products Group, LLC (Arbonne)
Nebraska Book Company, Inc.
Nellson Nutraceutical, Inc
New Century

Patriot Coal Corporation
Quality Stores, Inc.
R.E. Loans, LLC
Regal Cinemas
Rotech Healthcare Inc.
Sea Containers Caribbean Inc.
SemGroup, L.P.
Solyndra LLC
SP Newsprint Co., LLC
Sunterra Corp
Sydran Services LLC
Texas Rangers Baseball Partners
The Bombay Company, Inc.
The IT Group, Inc
think3 Inc
Tropicana Casinos and Resorts, Inc.
United Retail Incorporated
VeraSun Energy Corporation, et al.
Victor Valley Community Hospital
WHSU, Inc.
WorldCom, Inc.

# E X H I B I T   C

**Exhibit C**

**Documents Referenced**

Claims Management System Assessment Report for the Deepwater Horizon Claims Center Economic & Property Damage Claims prepared by IBM Global Business Services Business Analytics and Optimization, dated Dec. 20, 2013 ("IBM")

Deepwater Horizon Claims Center – Request for Quotation – Business Process Management (BPM) Solution, dated January 3, 2013 [sic] ("RFQ") Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties ("Reply"), Rec. Doc. 12393

Deepwater Horizon Economic Claims Center - Independent Evaluation of Internal Control Environment - Process Audit by CliftonLarsonAllen Report, dated May 17, 2013 ("CLA")

Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2, 2012, Rec. Doc. 6430-1

November 9, 2013 letter from K. Moskowitz to P. Juneau

November 21, 2013 letter from P. Juneau to K. MoskowitzDecember 2, 2013 letter from K. Moskowitz to P. Juneau

Documents numbered CAC000953, CAC000975 relate to claims information and contain confidential claimant information.  These documents will be provided, upon request, to the parties, to the extent permitted by, and subject to the confidentiality and protective orders in this litigation.

# E X H I B I T   D



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

Dear Mr. Levine,

## Process Audit

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:

- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement). These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing. The procedures performed and related observations and recommendations are described in the Report attached. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and



An independent member of Nexia International

October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

CLA fully appreciates the complexity of claims operations DHECC faced.  From the outset of the Process Audit, the CA stated clearly that DHECC's top priority was to compensate claimants that had been adversely affected by the Deepwater Horizon oil spill in a manner that was timely, accurate, and in accordance with the Settlement Agreement. Methodologies, processes, and controls evolved during the time period through March 31, 2013.  DHECC made many adjustments and improvements as it gained a clearer understanding of the emerging challenges associated with its operations. The CA communicated to CLA that DHECC strives to consistently apply its policies, procedures, and methodologies in accordance with the Settlement Agreement and undoubtedly during this process exceptions would occur due to the volume of claims processed in a short period of time.  Additionally the CA communicated that DHECC was committed to continue to enhance the internal control environment and to correct identified errors.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013. If subsequent events are brought to our attention we will evaluate those events during Project II and III.

Throughout Project I, CLA had full and timely access to the CAO and DHECC vendor personnel for on-site meetings, conference calls, additional requests, and clarification and questions identified in a timely and transparent manner.  All personnel were collaborative and responsive throughout Project I.

CLA would like to thank the CAO and its vendors for their assistance, the education given on the complexities involved for our team, and efforts made during Project I. From the initial kick-off meeting the CA pledged DHECC's full cooperation and commitment and that is exactly what CLA received.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

# Deepwater Horizon Economic Claims Center

## Independent Evaluation of the Internal Control Environment

## (Process Audit)

## May 17, 2013

Prepared By: CliftonLarsonAllen LLP





An independent member of Nexia International



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:
- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement). These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing. The procedures performed and related observations and recommendations are described in the Report. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

We performed this engagement, and formed our opinion for Project I, in accordance with the International Standards for the Professional Practice of Internal Auditing Standards (Standards). In addition, our procedures do not constitute an audit performed in accordance with auditing standards generally accepted in the United States of America; or an examination, review or agreed upon procedures performed under the attestation standards of the American Institute of Certified Public Accountants. As such, we do not express an opinion on any of the specified elements, accounts or items included in DHECC's financial statements or on the financial statements taken as a whole. If we had performed additional procedures, or if we had conducted an examination or review of the specified elements, accounts or items of the financial statements, or agreed upon procedures in accordance with professional standards, matters in addition to our observations may have come to our attention and been reported to you.

The sufficiency of the procedures and operations of internal controls is solely the responsibility of the CA and DHECC. Consequently, we make no representations regarding the adequacy of the procedures described in the attached document either for the purpose for which the Report has been requested or for any other purpose.

This report is intended solely for the use of the Claims Administrator and DHECC and is not intended to be used by anyone other than the specified parties.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013. If subsequent events are brought to our attention we will evaluate those events during Project II and III. In addition, CLA did not validate management's responses we will test changes and updates during Project II and Project III.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

# Table of Contents

1.0 Summary of Results ........................................................................................................................ 8

  1.1 Key Strengths ........................................................................................................................... 8

  1.2 Key Opportunities for Improvement..................................................................................... 10

  1.3 Key Findings ........................................................................................................................... 11

2.0 Internal Audit Opinion ................................................................................................................ 12

3.0 Background .................................................................................................................................. 13

  3.1 DHECC Background ................................................................................................................ 13

  3.2 Named Vendors of Settlement Agreement ........................................................................... 13

  3.3 Engagement Background ....................................................................................................... 14

  3.3.1 Project 1 Background .......................................................................................................... 15

4.0 Project Objectives and Scope...................................................................................................... 16

  4.1 Project Objectives ................................................................................................................. 16

  4.2 Project Scope ......................................................................................................................... 16

5.0 Project Work Performed.............................................................................................................. 17

6.0 Detailed Observations and Recommendations .......................................................................... 20

  6.1 Review of DHECC Policies and Procedures ........................................................................... 20

  6.2 Claims Data Input.................................................................................................................. 21

  6.3 User Access Rights................................................................................................................. 22

  6.4 Change Management Audit Trail ........................................................................................... 23

  6.5 Claims Payment Disbursements............................................................................................ 24

  6.6 Claims Data Retention........................................................................................................... 24

  6.7 Claims Audited by CAO's Quality Control Department.......................................................... 25

  6.8 Data Center ........................................................................................................................... 26

  6.9 Individual Claims Testing....................................................................................................... 27

  6.9.1 Seafood Compensation....................................................................................................... 30

  6.9.2 Individual Economic Damage.............................................................................................. 31

  6.9.3 Business Economic Loss ...................................................................................................... 31

  6.9.4 Vessel of Opportunity Charter Payment............................................................................. 32

  6.9.5 Vessel Physical Damage ...................................................................................................... 32

  6.9.6 Coastal Real Property Damage............................................................................................ 32

  6.9.7 Wetlands Real Property Damage......................................................................................... 33

  6.9.8 Denied Claims Statistics ...................................................................................................... 34

## Table of Contents

6.9.9 Appealed Claims Statistics ........................................................................................................ 34

Appendix A - Individuals Interviewed .................................................................................................. 35

Appendix B - Claim Categories Not Included In Project I Testing ........................................................ 37

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Summary of Results

## 1.0 Summary of Results

As of March 31, 2013, CLA identified the following key strengths and opportunities for improvement. It was communicated to CLA that DHECC had begun implementing changes during fieldwork to address the opportunities for improvement identified, and changes were implemented as early as March 6, 2013.

### 1.1 Key Strengths

#### *Claims Paid In Accordance With the Settlement Agreement*

DHECC disburses payments that are calculated in accordance with the Settlement Agreement. CLA's review of paid claims revealed exceptions of less than 2%. Based on the claims CLA reviewed, paid claims as a whole appear to be paid in accordance with the Settlement Agreement and the CAO is committed to correcting any errors identified.

#### *Open Communication between DHECC, the Court, the PSC, and BP*

The CAO manages all lines of communication between their vendors, the Court, PSC, BP, and themselves through weekly status meetings, ad hoc meetings to address emerging trends and issues, and weekly reports.

#### *Claims Processing with Transparency*

DHECC processes claims under the premise of complete transparency. This is accomplished by showing each claimant, PSC, and BP how each claim outcome is reached, and if a payment is calculated, how the calculation was performed in accordance with the Settlement Agreement.

#### *Claims Processing with Due Process*

DHECC implements the provisions of the Settlement Agreement providing each claimant the right to elect one of the following outcomes once the claimant receives a notice stating they are eligible for payment:

- Accept calculated offer
- Request a re-review of their claim if they are not satisfied with the initial outcome at no additional cost to claimant
- Request for a reconsideration it they are not satisfied with the re-review outcome at no additional cost to claimant
- Appeal the decision of the reconsideration at no additional cost to claimant

#### *Consistent Application of the Settlement Agreement*

DHECC applies the Settlement Agreement consistently based on the results of claims testing across the different claim categories. All claims categories revealed exceptions of less than 2% which indicates that DHECC correctly applied the Settlement Agreement.

## Summary of Results

### *Number of Appeals*

As of December 31, 2012, DHECC processed 68,954 claims and paid 15,894 claims, totaling $1,063,262,525. The difference between claims processed and claims paid is the result of claims processed being appealed, denied, or the need of additional information from the claimant to fully process the claim. See 6.9 Individual Claims Testing for breakdown of claims processed, paid, appealed, and denied. As of March 25, 2013, the total number of claims appealed by either BP or a claimant was 1,260, or 1.83% of total claims processed. Of the appeals, BP appealed 897 (71% of total appeals) and claimants appealed 363 (29% of total appeals) and the results of 67% of total appealed claims are still awaiting a decision.

### *Ease of a Claimant Filing a Claim and Having Their Questions Answered*

DHECC has made available three ways to file a claim. Claims can be filed on-line, at one of 18 DHECC established Claimant Assistance Centers (CAC), or through U.S. Postal Service mail. Additionally, DHECC has created a call center for claimants to call to get answers to claims filing questions.

### *Quality Control*

The CAO has a quality control function, responsible for quality control over claims processed, paid, and appealed. This allows the CAO to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses formal disciplines in accordance with the International Standards for the Professional Practice of Internal Auditing Standards to conduct their reviews. These protocols ensure a consistent application and allow for timely and accurate reporting of results. The work is retained and evidenced in workbooks to allow for review. In addition, the qualifications and experience of the CA QA/QC resources support a qualitative review. Having an in house quality control function given the complexities in the internal control environment is viewed as a leading practice.

### *Claims Processing Volume*

As of December 31, 2012, DHECC processed an average of 11,492 claims notices per month. As of March 31, 2013 DHECC's monthly average had risen by 89% to an average of 21,657 claims notices processed per month, demonstrating increasing efficiency in the processing of claims.

### *Offsite Data Center Assessment*

The CAO outsources its data center operations to GCG. The CAO and GCG regularly test and assess the physical controls of the data center to determine any control weaknesses.

### *Document Retention*

The CAO and GCG maintain paper documents in a secured storage area within the Mail Center, located in Hammond, LA. In addition, GCG maintains electronic documentation at the Data Center, located in Dublin, OH (Data Center). Both paper and electronic documentation are maintained in a secure area and can be located or recalled as needed.

# Summary of Results

## 1.2 Key Opportunities for Improvement

### *Change Management Audit Trail*

BG performs approximately 300 – 400 IT system changes daily such as updating claim or claimant specific information and claims processing portal system edits. While documentation is maintained to support the changes, a log of the changes is not maintained. As such, it is difficult for the CAO to monitor the nature and frequency of IT changes each day. Maintaining a daily log will also assist management is determining if changes made were authorized, reasonable and tested before implementation.

### *Excessive Remote User Access*

BG utilizes an IP address validation control to ensure access to the claims processing portal is restricted to users located at one of the DHECC approved locations. Remote access to the portal has been granted to 829 (28%) individuals out of approximately 3,000 individuals involved in the claims administration process. Such access is usually limited to a smaller percentage, 2-3% (i.e. 50 to 100 users). Additionally, criteria for allowing remote access has not been sufficiently reviewed and documented.

### *Periodic User Access Review*

DHECC's vendors have a number of individuals (443 out of approximately 3,000) who have multiple user accounts with different permission rights and capabilities. Users with multiple user accounts are not a control deficiency as long as monitoring over segregation of duties risks is performed. While management performs a 30 day review of static user accounts, user access is not periodically reviewed to determine if access level is appropriate and in alignment with job responsibilities.

### *Execute Vendor Contracts for All Vendors*

The CAO is required to work with the four DHECC vendors in the Settlement Agreement. Contracts have been executed and signed with two of the four vendors, P&N and GCG. While the remaining vendors, BG and PwC, have not completed contracts, they were named in the Settlement Agreement and are required to perform claims processing responsibilities for the CAO as part of DHECC. In the absence of signed contracts, it is difficult for the CA to establish service level agreements and performance metrics for the vendors.

### *Approval of Policies and Procedures*

DHECC appears to be operating in accordance with its policies and procedures. However, five of the seven policies reviewed during Project I were draft and had yet to be finalized and approved by DHECC management.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Summary of Results**

### Enhance CA QA/QC's Coverage Over Claims Processing

CA QA/QC currently adheres to a sampling methodology that is in accordance with the Standards by using a 95% confidence interval with a 10% margin of error. Enhancements to the sampling methodology through the use of data mining and trend analysis may increase the coverage of quality control reviews over DHECC's claims processing to identify anomalies and emerging trends.

### 1.3 Key Findings

The key finding noted during Project I is listed below. All other observations and recommendations relate to observations that are not considered high risk. Upon communication and validation of our observations and recommendation, DHECC commenced to implement and to address the control enhancements identified.

BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Summary of Results

## 2.0 Internal Audit Opinion

CLA conducted Project I of the Process Audit in accordance with International Standards for the Professional Practice of Internal Auditing Standards. The Standards require that we plan and perform the Process Audit to demonstrate a reasonable basis for our judgments and conclusions regarding DHECC's Internal Control Environment over claims processing.

Based on the work performed and the rating criteria established by DHECC, the internal control environment at DHECC merits a rating of "Minor Improvement Needed." This rating indicates that, overall internal controls are in place and are operating as intended to provide reasonable assurance that management's objectives are met.

**Rating Criteria Definition:**

- A "*Satisfactory*" rating indicates the evaluated in-scope processes are performing as designed to adequately, appropriately, and effectively mitigate risks in order for management objectives to be met.

- A "*Minor Improvements Needed*" rating indicates the evaluated in-scope processes are performing to mitigate the assessed risks, but minor deviations from the intended design were identified and should be corrected. The overall control framework in place is adequate and provides reasonable assurance that management objectives are met.

- An "*Improvements Required*" rating indicates the significant deviations from the control design were identified that open the applicable policies and procedures to an unacceptable level of risk. The process controls are unlikely to provide reasonable assurance that management objectives are met.

- An "*Unsatisfactory*" rating indicates the evaluated in-scope processes were not implemented as designed and/or are not mitigating the assessed risks. The controls in place are not adequate, appropriate, or effective to provide reasonable assurance that management objectives are met.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Background

## 3.0 Background

### 3.1 DHECC Background

In August 2010, lawsuits against BP and other defendants relating to the damages resulting from the spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, were consolidated before the Court. The Court serves as litigator of damages resulting from this oil spill. In advance of the trial, the parties to the litigation, namely, the PSC, and BP began settlement negotiations.

By Order dated May 2, 2012 the Court preliminarily approved the Settlement Agreement entered into by PSC and BP, dated April 18, 2012, as amended on May 1, 2012, for the purpose of settling all related claims against BP.

The Interim Class Counsel, the CA and J.P. Morgan Trust Company (the Directed Trustee), entered into the Deepwater Horizon Economic and Property Damages Trust Agreement (Trust Agreement) creating the Settlement Trust. The Settlement Trust's purpose is to establish a mechanism to disburse payments to claimants as defined in the Settlement Agreement.

A Claims Administrator was appointed by the Court to oversee the operations of the Deepwater Horizon Economic Claims Center (DHECC) as outlined in the Settlement Agreement. The Claims Administrator was also appointed as the Trustee of the Settlement Trust, which will disburse all administrative and claims funding for the Settlement Agreement.

The CA and DHECC's responsibilities, as set out in the Settlement Agreement include:
- Administering the Deepwater Horizon Economic Settlement in accordance with the Settlement Agreement and the Settlement Trust
- Resolving open issues with PSC and BP
- Reporting back to the Court on the Operations of DHECC
- Providing full transparency of DHECC's claims processing in accordance with the Settlement Agreement
- Overseeing execution of claims data inputting, processing, disbursing payments, and retaining data

### 3.2 Named Vendors of Settlement Agreement

The Settlement Agreement named four vendors who would have responsibility for the key processes of inputting claims data, processing claims data, disbursing payments, and retaining claims data. They are: BG, GCG, P&N, and PwC. Each vendor is under the oversight of the CAO as the vendors conduct the day to day aspects of managing DHECC's claims processing operations including inputting, processing, disbursing payments, and retaining data. Additionally, the CAO contracted with HUB to provide security at the CACs and aid in the investigation of claims or claimants suspected of committing fraud, waste, and abuse. The four named vendors and their Settlement Agreement responsibilities are tabled on the following page:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Background

## BrownGreer

- **Team Leader:** Orran Brown
- **Team Size:** 1,251 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
    - Specifically, constructing, maintaining, and supporting the claims processing portal; processing all claim categories with the exception of the business economic loss; monitoring claims processed and reporting to DHECC; staffing and maintaining 18 CACs

## Garden City Group

- **Team Leader:** Neil Zola
- **Team Size:** 1,503 as of December 31, 2012
- **Responsibilities:** Inputting Claims Data, Disbursing Payments, and Retaining Claims Data
    - Specifically, physical mail intake, including physical claim forms and supporting documentation; identifying supporting documentation, linking supporting documentation to the correct claimant, categorizing the supporting documentation, and capturing data electronically for the physical claims forms and supporting documentation; managing the stand alone call center; processing payment disbursements for the DHECC claims process; managing and maintaining the data center supporting DHECC; managing and maintaining all physical claim forms and supporting documentation received

## Postlethwaite & Netterville

- **Team Leader:** Mark Staley
- **Team Size:** 201 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
    - Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of seafood compensations claims over $250,000 prepared by BG

## PricewaterhouseCoopers

- **Team Leader:** Charles Hacker Jr.
- **Team Size:** 170 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
    - Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of business economic loss claims initially prepared by P&N

### 3.3 Engagement Background

CLA was selected to perform an Independent Evaluation of the Internal Control Environment in place for DHECC's claims processing for the periods of March 31, 2013, September 30, 2013, and December 31, 2013. Additionally, the scheduled fieldwork will cover claims paid as of December 31, 2012, May 31, 2013, and December 31, 2013. Throughout the course of our three projects, CLA will render an opinion over the internal control environment over claims processing using the International Standards for the Professional Practice of Internal Auditing. CLA will:

- Perform an onsite and remote comprehensive and objective review of the internal control environment over claims processing to evaluate if claims were properly valued according to the Settlement Agreement
    - ○ Conduct an onsite and remote operational review of claims processing and review the payment system to verify compliance with the Settlement Agreement
    - ○ Evaluate if the claims infrastructure achieves structured goals of DHECC

14

## Background

- o Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- o Conduct claims testing to evaluate whether claims are valued for all claims categories in accordance with the Settlement Agreement

- Perform a review of the internal control environment over claims processing in accordance with the Standards and evaluate the controls utilized by the DHECC to manage and control claims processing

- Perform a review of the internal control environment over claims processing with regard inputting data, processing data, disbursing payments, and retaining data in accordance with the Settlement Agreement

- Perform a review of the system's capacity and an evaluation of the Program's infrastructure for forecasted needs

Upon completion of the three scheduled projects CLA will have completed the services included in the Engagement Letter dated September 11, 2012 and amended March 5, 2013.

### 3.3.1 Project 1 Background

We have conducted the first of three 2013 scheduled projects. Project 1 covers the claims operation environment from June 4, 2012 to March 31, 2013, and includes claims paid as of December 31, 2012 as the population for testing adherence to management's expectations.

We anticipated changes would be made to DHECC's claims processes to improve the processing of claims on a go forward basis. The CAO and its vendors identified opportunities for improvement and implemented those opportunities throughout Project I of our Process Audit. Over 60 system enhancements were implemented from quality assurance reviews of the claims process, including but not limited to metrics for progress reporting, additional system prompts to confirm with vendor employees processing the claims are entering the correct information, and standardization of data capture analysis for the different claim categories.

As potential exceptions were identified by CLA, the following protocols were established and followed:
- Vetted the exceptions with DHECC to obtain confirmation
- Worked with DHECC to determine root causes
- Assisted DHECC to determine if exceptions had implications for the remaining claims paid population

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

## 4.0 Project Objectives and Scope

### 4.1 Project Objectives

The objectives of Project I were to evaluate the internal control environment over claims processing and processed claims. The key objectives are summarized below:

- Gain an understanding of the internal control environment over claims processing utilized by the CAO and its vendors to manage or oversee the claims process
- Perform review of claims processed and evaluate key internal controls over claims processed including inputting data, processing data, disbursing payments to evaluate if claims were valued and paid in accordance with the Settlement Agreement
- Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- Evaluate policy and procedures to determine if they are sufficient, adequate, and current

### 4.2 Project Scope

Fieldwork for Project I was conducted from November 26, 2012 through April 26, 2013. The period under review for Project I was the internal control environment over claims processing from June 4, 2012 through March 31, 2013 and claims paid through December 31, 2012. We evaluated the key processes covering the internal control environment over claims processing:

- Input
- Process
- Disbursement payments
- Data Retention

Further, Project I covered the following types of claims paid as of December 31, 2012.

- Paid Claims
  - 10 of the 12 claim categories named in the Settlement Agreement were included in our testing population during Project I; however, not all 10 claim categories included in the population were selected through CLA's sampling methodology
  - CLA did not include the two additional claim categories noted below due to the fact that they were not in production as of December 31, 2012
    - Individual Periodic Vendor or Festival Vendor Economic Loss
    - Subsistence Damage Claim
  - CLA used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims
  - CLA tested 96 paid claims across the claim categories
  - CLA did not test claims that had a status of "in-process" as of December 31, 2012
- Appealed claims
  - CLA performed trend analysis on appealed claims as of March 25, 2013
- Denied claims
  - CLA performed trend analysis on denied claims as of December 31, 2012

16

## Background

Information technology (IT) systems used in processing claims, including:

- IT system Change management
- Logical access
- Physical security

Onsite visits to 8 DHECC and vendor locations.

CLA did not interview or meet with any claimants, their counsel, or their accountants to address specific claims. Nor did we assess or evaluate any operations pertaining to the Medical Benefits Class Action Settlement (Medical Settlement Trust) reached related to the Deepwater Horizon oil spill. The Medical Settlement Trust offers benefits to qualifying people who resided in the United States as of April 16, 2012.

## 5.0 Project Work Performed

The work performed is summarized below:

### Planning and High Level Risk Assessment
- CLA performed an initial kick-off meeting on November 13, 2012 to confirm the scope and objectives of Project I
- CLA performed a high level risk assessment of the internal control environment over claims processing to determine which cycles to evaluate first
- CLA developed a workplan, which was amended to increase the claims sampling and internal control environment testing

### Interviews
- Interviews on an as needed basis throughout Project I with 25 individuals, from the CAO, DHECC vendors in the Settlement Agreement, and HUB Enterprises. See **Appendix A** for listing of individuals interviewed

### Review of Documentation
- CLA reviewed the following 7 available DHECC policies and procedures to gain an understanding of the internal control environment over the key controls governing claims processing:
  - Travel and entertainment
  - Internal audit
  - Internal audit of invoice review
  - Internal audit of process review
  - Internal audit of claims review
  - Documentation retention policy
  - Disaster recovery and continuity of operations

- CLA reviewed documentation provided by DHECC and its vendors, including but not limited to:
  - Organizational charts
  - Employee listings for user access
  - Training materials and manuals
  - Bank statements

## Background

- o Claims monitoring reports
- o Claims appealed reports
- o Claim forms
- o Eligibility notices
- o Claims processed documentation

**Walkthroughs**

- CLA conducted walkthroughs of the four key processes: inputting, processing, disbursing payments, and retention of data. During our walkthroughs we observed the process used to identify the key controls and any deviations from management objectives. We identified approximately 110 key controls governing the claims process, the responsible party for implementing the controls, and the CAO's role in oversight of the key controls.

**Evaluation of Internal Control Environment and Testing of Operational Effectiveness**

- CLA performed tests of internal controls governing claims processing, including evaluating:
  - o The determination of claim eligibility in accordance with the Settlement Agreement
  - o The calculation of claim payments in accordance with the Settlement Agreement
  - o Whether the claimant provided the appropriate documentation to receive the calculated payment, including a wet signature signed release
  - o Whether the disbursed payment was prepared and approved by employees with clearance to perform those responsibilities
  - o Whether the disbursed payment was recorded on the bank statement and in the general ledger
  - o Whether the employees performing the initial review and quality assurance review of claims paid had the appropriate training to perform those responsibilities
  - o Whether the claim had been flagged for potential fraudulent activity
  - o Whether the claim had been quality assurance reviewed by the CA QA/QC

- CLA performed controls testing on 10 of the 12 claims categories as 2 of the claims categories had not been put into production, as of December 31, 2012
  - o CLA randomly tested 96 claims and performed procedures analyzing key controls governing claim preparation, determination of causation, payment calculation, quality assurance review, and payment disbursement
  - o CLA obtained a listing of all claims appealed either by BP or a claimant as of March 25, 2013 to analyze appealed claims trends by claim category
  - o CLA obtained a listing of all notices issued, extracted the denial notices issued to analyze denied claims trends by claim category to determine which claim categories had the highest percentage of denied claims
  - o CLA selected a random sample of claims that had been quality assurance reviewed by the CA QA/QC. We reviewed the workbooks and supporting documentation and reviewed any exceptions and gaps noted during IA's review. Additionally, we verified that exceptions and gaps noted were reported to The CAO to ensure remediation occurred on a timely basis
  - o CLA reviewed a random sample of documentation used to support disbursement amounts through approval of sign-off and date

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Background

- CLA evaluated certain aspects of the IT control environment and interviewed four key IT management personnel from the CAO, BG, and GCG and evaluated the following:
  - o CLA evaluated system access users with remote user access
  - o CLA tested the number of users with multiple user accounts and how those accounts are monitored
  - o CLA evaluated claims reporting and evaluated if the "all claims file" included all claims processed to a notice

- CLA conducted 8 onsite visits to :
  - o **DHECC Home Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
  - o **BG Claims Processing Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
  - o **Mail Center**, Hammond, LA – November 28, 2012
  - o **GCG Disbursement Center**, New York City, NY – December 17, 2012
  - o **Claim Call Center**, Sarasota Springs, FL – December 21, 2012
  - o **Claimant Assistant Center**, Clearwater, FL – December 21, 2012
  - o **GCG Data Center**, Dublin, OH – February 27, 2013

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## 6.0 Detailed Observations and Recommendations

CLA conducted interviews with the CAO and the DHECC vendors of the Settlement Agreement (BG, GCG, P&N, and PwC), reviewed documents, tested claims processing, reviewed policies and procedures, compliance with protocols and methodology to enable us to gain an understanding of the operations and identified potential control weaknesses and opportunities for enhancement.

### 6.1 Review of DHECC Policies and Procedures

#### Purpose:
*The purpose of CLA's review of DHECC's policies and procedures was to evaluate them for sufficiency, consistency, adherence to the Settlement Agreement, and comprehension to support the internal controls that govern claims processing. We performed internal control evaluations to evaluate that the policies and procedures were being implemented as intended.*

#### Results:
*We reviewed The CAO's policies and procedures for adherence to the Settlement Agreement and performed internal control evaluations to verify the policies and procedures were being followed.*

*We noted five of the seven policies and procedures have not been finalized and approved, as of March 31, 2013.*

| Policy and Procedure | Dated |
| --- | --- |
| Travel and Entertainment | Approved July 17, 2012 |
| Internal Audit | Drafted October 17, 2012 |
| Internal Audit of Invoice Review | Drafted October 17, 2012 |
| Internal Audit of Process Review | Drafted October 25, 2012 |
| Internal Audit of Claims Review | Drafted October 25, 2012 |
| Document Retention Policy | Drafted September 12, 2012 |
| Disaster Recovery and Continuity of Operations | Approved October 10, 2012 |

Subsequent to the period of the fieldwork, the remaining policies and procedures were finalized and approved by the CA, so no further action is required.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.2 Claims Data Input

**Purpose:**

*The purpose of CLA's review of the input control environment was to perform controls testing to evaluate if controls are in place and operating as intended for claim input. A claim can be filed in one of three ways:*

- *Visiting a CAC in person*
- *Mailing in paper documents*
- *Filing a claim electronically on-line*

**Results:**

*We reviewed data inputs into the accountant's calculation spreadsheet and reviewed the accuracy of claimant data received for each claim category. We noted four data input exceptions pertaining to the accuracy of financial statement data input in the accountant's calculation spreadsheet used to calculate the claim payment see **6.9 Individual Claims Testing** for a breakdown of variances and exceptions.*

*Errors in the data input process can result from individuals not receiving enough training and human error in the quality assurance process. Incomplete or inaccurate data captured may lead to errors in processing and calculating the claim in accordance with the Settlement Agreement.*

**Recommendations:**

*We recommend the CAO and BG refine its quality assurance review process over data input and data capture and continue to provide training to increase the effectiveness of the quality assurance process. This will assist individuals preparing and reviewing the claims data to meet the requirements of the Settlement Agreement more effectively and efficiently by reducing the potential for data input and data capture errors.*

**Management Response:**

*The vendors have discussed these findings with their staff. They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.3 User Access Rights

**Purpose:**
*The purpose of CLA's review of the user access rights control environment was to perform controls testing to evaluate if controls are in place and operating as intended for user access right over claim processing. BG is responsible for maintaining the claims processing portal and processing claims. All claims documentation is maintained on the claims processing portal, and with the exception of business economic loss (BEL) claims all claim categories are processed in the claims processing portal.*

**Results:**
*We noted that currently 829 out of the approximately 3,000 (28%) individuals that are part of the claims process have remote access. Remote access grants those individual the ability to sign into the BG claims processing portal from any location which presents them with the opportunity to misuse sensitive data.*

*In addition, 443 out of 2,439 (18%) individuals who have access to the BG claims processing portal have more than one user account. Monitoring exists to ensure that users can not process and approve a single claim all the way to payment; however, not monitoring the use of the user accounts on a periodic basis may result in unintended segregation of duties issues, including the ability to process and approve a single claim all the way to payment.*

*Though no instances of unauthorized access to the DHECC portal or instances of a user processing and approving a claim all the way to payment was detected, user accounts within the DHECC portal are not monitored to ensure only authorized individuals have access. Lack of monitoring user access accounts increases the risk of unauthorized access to the portal.*

**Recommendations:**
*We recommend access to the DHECC portal be periodically reviewed and corrective action taken to remove user access rights for personnel no longer employed and monitor users with multiple user accounts to identify any instances where a user processes and approves a claim all the way to payment.*

**Management Response:**
*Restricted IP Addresses: BG and the CAO have diligently reduced the number of DHECC personnel who can access the database by using an unrestricted IP address since February of 2013. Since the population of 829 unrestricted IP address users was identified, we have reduced that volume to 96 users as of 4/24/13 as follows: (a) 25 BG remote reviewers; (b) 25 CAO personnel (includes 10 CLA users); (c) 23 GCG intake personnel; (d) 17 P&N Accountants; and (e) four Louisiana property/title attorneys retained to assist on ownership issues for Wetlands claims. This reduced volume falls within the acceptable range of 2-3% as specified in Section 1.2 of the Report. BG and the CAO will continue to analyze whether this volume of users with access from an unrestricted IP address can be reduced further.*

*Monitoring of Roles and Access Rights for Claims Reviewers: The CAO will periodically test user access roles every 30 days by selecting a random sample of reviewers and analyzing their database access rights to the various review queues to ensure adherence to CAO policy and training certifications. The CAO will also run periodic audits to ensure that any personnel that disassociates from the DHECC program will have their login and passwords revoked.*

**Detailed Observations and Recommendations**

**6.4 Change Management Audit Trail**

**Purpose:**
*The purpose of CLA's review of IT change management processes as part of the claims processing control environment was to perform controls testing to evaluate if controls are in place and operating as intended for changes made to the IT environment. BG is the vendor responsible for maintaining and implementing changes to the claims processing portal.*

**Results:**
*BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.*

**Recommendation:**
*We recommend BG maintain a daily log of IT changes made to claims in process and the claims processing portal to assist management in determining if changes made were properly authorized and vetted before implementation.*

**Management Response:**
*Production Builds and System Enhancements: BG previously documented all new production builds for the DHECC database by archiving the existing production build before implementing the new system enhancements. To further document DHECC system enhancements, we created a Change Request Form template for the programmers and DBA personnel to complete when implementing new code. The Change Request Form indicates: (a) the date of the change, (b) a description of the change; (c) the affected tables; (d) the affected stored procedures; (e) who approved the changes; and (f) who implemented the changes to the DHECC system. BG has used the Change Request Form since 4/1/13.*

*Changes to Data Performed Outside of the Claims Review System: BG has recorded a daily log of data change requests to the DHECC database since 4/29/13. We track these data updates or manual movement of claims/claimants to various review queues when the database application cannot handle the request without direct intervention by a programmer. This daily log identifies: (a) the source and date of the request; (b) a description of the change or data updates; (c) the number of affected claimants/claims; (d) the Directly Responsible Individual who requested and authorized the data change; (e) the programmer who implemented the data change; and (f) the implementation date. We store this daily log in Excel format that tracks the changes by date and specific requests and upload a copy of this daily log to the CAO every week.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

23

# Detailed Observations and Recommendations

## 6.5 Claims Payment Disbursements

### Purpose:
*The purpose of CLA's review of the payment disbursement control environment was to perform controls testing to evaluate if controls are in place and operating as intended for disbursements of claim payments. Disbursements are prepared at the GCG Disbursement Center located in New York City, NY by GCG.*

### Results:
*We noted payments disbursed to claimants were the same as the payments acknowledged as due to them and that segregation of duties were appropriate between check and wire preparation, approval, and disbursement. Additionally, we noted the individuals responsible for check and wire preparation, approval, and disbursement was documented and maintained without exception in accordance with the Standards.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

## 6.6 Claims Data Retention

### Purpose:
*The purpose of CLA's review of the retention control environment was to perform control testing to evaluate if controls are in place and operating as intended according to DHECC's policy for claim documentation retention. The preservation policy applied by DHECC to all emails and other electronic files or databases; paper documents; notes; calendars; logs; forms; drawing; diagrams; schedule; photograph; video and other recordings; worksheets; computations; data storage media including hard drive; external hard drive; CDs; USB Drives; and DVDs is to maintain all the previously listed electronic and paper documentation for three years after the expiration of the lifetime of the final DHECC claim.*

### Results:
*We noted that DHECC and GCG maintain paper documents in a secured storage area within the Mail Center located in Hammond, LA. In addition, GCG has planned for the volume of documents based on the size of the current storage area observed and the additional subcontract with a document storage vendor in the circumstance that the current area will not store all paper files.*

*We noted that all electronic documentation is stored at the Data Center. All documentation is available and can be recalled as necessary. We have performed a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center, see results at section 6.8.*

### Recommendations:
*We recommend that DHECC and GCG continue to monitor the capacity of the current paper document storage areas and determine when and if an expansion of the storage space is appropriate.*

**Management Response:**

GCG will continue to monitor the capacity of the current paper document storage areas and recommend expansion to the CAO when and if expansion is appropriate.

### 6.7 Claims Audited by CAO's Quality Control Department

**Purpose:**

The purpose of CLA's review of the claims quality control reviewed by CA QA/QC was to evaluate if controls are in place and operating as intended for CA QA/QC quality assurance controls. CA QA/QC is responsible for quality control reviewing claims processed, paid, and appealed under DHECC. This function is in addition to the quality control measures instituted by the DHECC vendors. This allows DHECC to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses workbooks to quality control review claims processed as well as to document their quality control review. Each vendor identified in the Settlement Agreement is responsible for performing quality control reviews on their own work and the CA QA/QC is back-up in addition to the vendors' quality control measures.

**Results:**

We noted that two instances out of our sample selection of 25 where CA QA/QC did not evidence their review on all parts of the workbook through initials and date. Not fully documenting the CA QA/QC review of the workbook may indicate only a partial or inadequate review of the workbook, even if a full review was performed. In each instance we noted CA QA/QC had partially signed-off and dated the workbook review, we noted that all steps of the workbook had been properly completed.

Additionally, we noted that during the Fourth Quarter of 2012, CA QA/QC completed workbooks for 206 claims processed across 10 claim categories. CA QA/QC's sampling technique uses a 95% confidence level and 10% margin of error to calculate the sample size for paid claims by claim category which is a methodology that meets the Standards. All CA QA/QC quality control reviews and workbooks are completed either after a claim has been processed and is waiting for notice of payment to be disbursed or payments have been disbursed to claimants.

CA QA/QC communicates its quality control review results on a quarterly basis to the CAO and the DHECC vendors and identifies the root cause for all exceptions noted. Exception trends are analyzed to evaluate whether an exception's root cause is a one-time event or an event that could affect the entire claims population. In addition, once exception trends are evaluated, employees processing claims are educated and trained on why the exception occurred and how to properly process a claim to avoid recurring exceptions going forward. This allows CA QA/ QC to continuously monitor and implement improvements to the claims processing environment as exception trends are identified.

It is a leading practice to have an in-house quality control function; however, currently CA QA/QC may enhance its coverage of claims processing through data mining and trend analysis for DHECC's operations in addition to the quality control measures performed by the vendors.

**Recommendations:**

We recommend that CA QA/QC continue to perform quality control review of claims processed and document its entire review of the workbook.

## Detailed Observations and Recommendations

*We also recommend CA QA/QC consider enhancing the coverage of quality control reviews over DHECC's claims processing through the use of data mining methodologies and trend analysis.*

**Management Response:**

*To provide an independent assessment as to quality and consistency of claim reviews and payments, the CAO Quality Control Team has continued to randomly sample claims across all claim types. The random sample volume achieves a 95% confidence interval with a 10% margin of error. The scope of the Quality Control Team's reviews encompasses every aspect of a claim review from document categorization to payment distribution. Prior to publication of this report, the CAO Quality Control Team has begun testing live claims prior to distribution to notice, as well as performing data mining analysis on claim type databases. The CAO will continue to identify and report material and non-material exceptions (material exceptions affect causation or compensation) to the vendors on a weekly basis. The exceptions are reviewed with the vendors to allow them the opportunity to remediate incomplete and/or inaccurate claim determinations, identify processes that may benefit from additional training, identify opportunities to strengthen quality controls, and to identify trends and Program wide errors in need of attention.*

### 6.8 Data Center

**Purpose:**

*The purpose of CLA's review of the Data Center was to perform a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center.*

**Results:**

*We noted that environmental, physical security, and data backup and storage controls were in place. Such controls included fire detection and suppression systems, temperature monitoring, uninterruptible power supply, backup power source, key card access system, security cameras, security personnel, and tape backup system.*

*We noted one opportunity for improvement in the replacement of the dry pipe sprinkler system inside the computer room of the Data Center with a chemical-based fire suppression system. In the event of a data center fire, use of the dry pipe system could result in a significant amount of hardware loss due to water damage. Additionally in the event of significant hardware loss, the Data Center does have a redundant offsite facility to ensure that operations stay up and running during such an event.*

**Recommendations:**

*CLA recommends the CAO evaluate the existing functionality and off-site back-up data center and consider the potential benefits of a chemical-based fire suppression system to assist in the mitigation of risk of hardware loss in the event of a data center fire.*

**Management Response:**

*Prior to receiving the draft audit report, GCG's head of systems had been investigating whether a chemical-based fire suppression system was necessary for GCG as a whole. We determined that the cost, approximately $75,000 - $100,000, wasn't necessary since GCG carries insurance on all of our equipment and because, as mentioned in the Process Audit Report, GCG maintains a redundant offsite facility to ensure operations stay up and running in the event of a data center fire. However, if the CAO wants to authorize that expense, GCG will proceed to have the system installed.*

## Detailed Observations and Recommendations

### 6.9 Individual Claims Testing

Through December 31, 2012, DHECC had processed and issued 68,954 claim notices. A notice is the outcome of a particular claim being processed and each notice has one of four outcomes:

- Eligible – payment due
- Eligible – no payment due
- Incomplete
- Denial

As of December 31, 2012, 98,120 claims had been submitted and captured through the claims processing portal. Of those claims submitted, 68,954 (70%) had been processed and a notice issued. Additionally, as of December 31, 2012, notices of eligibility and payment had been processed for 15,894 claims, totalling $1,063,262,525. The table illustrates how DHECC has increased operations and the activity levels of the first full month of operations, the first six months of operations, and the first quarter of 2013.

| Metric | As of July 2012 | June 2012 – December 2012 | January 2013 – March 2013 |
|---|---|---|---|
| Total Number of Claims Processed* | 1,800 | 68,945 | 64,971 |
| Total Award Amounts Processed | $65,672,562 | $1,634,102,344 | $1,144,341,198 |
| Percentage of Total Awards Processed for Individuals | 43.42% | 32.61% | 25.58% |
| Percentage of Total Awards Processed for Individuals with Business | 0.00% | 9.91% | 13.91% |
| Percentage of Total Awards Process for Business | 56.58% | 57.48% | 60.52% |
| Average Number of Claims Processed Monthly | 1,800 | 11,492 | 21,657 |

*Each claim may have more than one notice generated for it throughout the process.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Detailed Observations and Recommendations**

The graph immediately below depicts the length of time (in days) on average to process the number of claims that had notices issued in a particular month. The points on the graph are based on issuance of the first notice that is generated for a claim. Claims may have additional notices or revised award amounts generated in a subsequent month based on the outcome of the first notice. The increase in average number of days to process a claim to first notice is due the increase in volume of claims received by DHECC. The second graph depicts the number of claims received on a monthly basis.



*Source: DHECC Notices File*



*Source: DHECC All Claims File*

28

# Detailed Observations and Recommendations

10 claim categories were included in the population of our testing during Project I, but not all 10 claim categories were selected. We used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims. We tested 96 paid claims across the claim categories. We did not test claims that had a status of "in-process" as of December 31, 2012. The results of Project I are exhibited below.

| Program Review | # of Claims Sampled | Total $ of Sample | # of Claims with Variance | Total $ Of Over-payments | % of Over-payments | Total $ Of Under-payments | % of Under-payments |
|---|---|---|---|---|---|---|---|
| Seafood Compensation | 33 | $66,909,281 | 2 | $418 | 0.000% | $0 | 0.000% |
| Individual Economic Damage | 2 | $13,364 | 0 | $0 | 0.000% | $0 | 0.000% |
| Business Economic Loss | 15 | $26,737,487 | 2 | $2,494 | 0.008% | $0 | 0.000% |
| Vessel of Opportunity Charter Payment | 20 | $868,000 | 0 | $0 | 0.000% | $0 | 0.000% |
| Vessel Physical Damage | 1 | $12,778 | 0 | $0 | 0.000% | $0 | 0.000% |
| Coastal Real Property Damage | 24 | $141,352 | 0 | $0 | 0.000% | $0 | 0.000% |
| Wetlands Real Property | 1 | $15,750 | 0 | $0 | 0.000% | $0 | 0.000% |

*See Appendix B for breakdown and explanation of claim categories not tested during Project I.*

Instances were identified above where claimants were paid in excess of what they should have received as outlined in the Settlement Agreement. We were informed by the CAO throughout the course of our work, that any error identified resulting in a claimant being underpaid, would be corrected. Any instance identified resulting in a claimant being overpaid; DHECC would not request the claimant return the excess payment received. However, if a claimant received an overpayment for one claim category and was awarded an additional payment for another claim, the identified overpayment will be offset against any additional payments to that claimant.

In addition to our paid claims testing, we also performed trending on denied claims and appealed claims. A breakdown of the results by claim category is as follows:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.9.1 Seafood Compensation

**Purpose:**

*The Seafood Compensation Program covers damages suffered by Commercial Fishermen, Seafood Crew, or Seafood Vessel Owners that owned, operated, leased, or worked on a vessel that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012. In addition, it covers damages suffered by Oyster Leaseholders and Individual Fishing Quota (IFQ) Owners. The Seafood Compensation Program does not apply to claims relating to fishing, processing, selling, catching, or harvesting of menhaden (or pogy) fish. The Seafood Compensation Program is capped at $2.3 billion.*

**Results:**

*CLA identified two calculated claim payment variances totaling $418 out of the 33 Seafood Compensation Program claims for which we performed procedures, and the exceptions are broken down as follows:*

- *The two claims with a variance in payment calculated between DHECC and CLA, totaling $418 in overpayments was due to an incorrect calculation of the amount of allowable accountant reimbursement in accordance with the Settlement Agreement*

*While CLA did identify exceptions during our Seafood Compensation Program claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

**Recommendations:**

*CLA recommends that DHECC strengthens its quality control reviews of claims processed including allowable accountant reimbursement calculations and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

**Management Response:**

*BG agrees there is a discrepancy in the Claimant Accounting Support calculation for the claims noted by the auditors. Apart and independent of the external auditor findings, BG found and corrected the Notice mapping that caused the overpayments prior to receiving the audit report. BG recorded the overpaid amounts and will offset the overpaid amounts from payments to any future claims (Claim ID 37202: $1,123,35; Claim ID 4379: $361.25).*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

### 6.9.2 Individual Economic Damage

#### Purpose:
Individual Economic Damage claims are claims submitted by Individuals, who shall be defined as (i) Natural Persons who (a) satisfy (or whose employers satisfy) the Class Definition and (b) whose losses are not excluded from the Class and (ii) who seek compensation for lost earnings from employment due to or resulting from the DWH Spill for claims that are not excluded from the Class.

#### Results:
We identified no exceptions for the two Individual Economic Damage claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.

#### Recommendations:
No exceptions were noted; therefore no management response is necessary.

#### Management Response:
No response necessary.

### 6.9.3 Business Economic Loss

#### Purpose:
The Business Economic Loss framework sets forth the standards for evaluating claims and determining compensation for Businesses that suffered an Economic Loss as a result of the spill.

#### Results:
We identified two calculated claim payment variances totaling $2,494 in overpayments out of the 15 Business Economic Loss claims for which we performed procedures and the exceptions are broken down as follows:

* The two claims for which CLA noted an exception in that the calculated claim payment had input errors and/or expenses were not categorized as fixed or variable expenses in accordance with the Settlement Agreement resulting in $2,494 in overpayments

While CLA did identify exceptions during our Business Economic Loss claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.

#### Recommendations:
CLA recommends that DHECC strengthens its quality control reviews of claims processed and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.

#### Management Response:
It appears that the overpayment of $2,494 resulted from data input errors and expense misclassifications. The vendors have discussed these findings with their staff. They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.

# Detailed Observations and Recommendations

## 6.9.4 Vessel of Opportunity Charter Payment

### Purpose:

*Vessel of Opportunity (VoO) damage claim category addresses damages suffered by Natural Persons or Entities who registered their vessels to participate in BP's Vessels of Opportunity program, executed a VoO Master Vessel Charter Agreement with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as Charterer, and completed the initial VoO training program. VoO participants can make VoO Charter Payment Claims regardless of whether they were dispatched or otherwise asked to perform work under the program.*

### Results:

*We identified no exceptions for the 20 VoO claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:

*No exceptions were noted; therefore no management response is necessary.*

### Management Response:

*No response necessary.*

## 6.9.5 Vessel Physical Damage

### Purpose:

*A Vessel Physical Damage Claim is a claim for physical damage to a vessel resulting from the Deepwater Horizon Incident or certain response clean-up operations, including the cost of removal of equipment or rigging added to the vessel as part of the response activities.*

### Results:

*We identified no exceptions for the Vessel Physical Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:

*No exceptions were noted; therefore no management response is necessary.*

### Management Response:

*No response necessary.*

## 6.9.6 Coastal Real Property Damage

### Purpose:

*Individuals and Entities who owned or leased coastal real property or boat slips located in the Coastal Real Property Claim Zone at any time from April 20, 2010 to December 31, 2010 can make Coastal Real Property Damage Claims for damage to that property.*

*In addition, owners of real or personal property located in the Coastal Real Property Claim Zone that was physically damaged in connection with the Deepwater Horizon Incident response cleanup operations can make claims for that physical damage to real or personal property.*

## Detailed Observations and Recommendations

**Results:**
*We identified no exceptions for the 24 Coastal Real Property damage claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**
*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**
*No response necessary.*

### 6.9.7 Wetlands Real Property Damage

**Purpose:**
*Individuals and Entities who owned wetlands real property located in certain geographic areas at any time between April 20, 2010 and April 16, 2012, can make claims for Wetlands Real Property Damage. If an individual or entity has property located in the Wetlands Real Property Compensation Zone, person or entity could receive a Settlement Payment depending on whether the property is considered oiled or non-oiled and what the acreage is.*

*In addition, owners of real or personal property located in the Wetlands Real Property Compensation Zone that was physically damaged in connection with the Deepwater Horizon Incident response clean-up operations can make claims for that physical damage to real or personal property.*

**Results:**
*We identified no exceptions for the Wetlands Real Property Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**
*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**
*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.9.8 Denied Claims Statistics

#### Purpose:

*Denied claims are claims submitted to DHECC for processing under the Settlement Agreement by a claimant that are determined to not meet causation as defined in the Settlement Agreement. Causation dictates a claim's eligibility and if the claim can be processed for potential payment.*

#### Results:

*As of December 31, 2012 DHECC had processed and issued a notice of denial for 6,245 claims (9% of all notices issued).*

- *2,141 (34%) of the denial notices relate to the individual economic loss claim category.*

#### Recommendations:

*Denied claims were trended with statistics noted above; therefore no management response is necessary.*

#### Management Response:

*No response necessary.*

### 6.9.9 Appealed Claims Statistics

#### Purpose:

*Appealed claims are claims that are determined to be eligible for payment as processed by DHECC in accordance with the Settlement Agreement that are appealed by BP or the claimant. BP can appeal any claim with a calculated payment of $25,000 or more. The claimant can appeal the calculated award amount they receive and request that their claim be submitted for reconsideration.*

#### Results:

*As of March 25, 2013 DHECC had processed and issued a notice for 68,954 claims, totaling $1,063,262,525. Of those claims processed, 1,260 had been appealed (1.83% of total notices issue), the breakdown between BP and Claimant appeals is as follows:*

- *BP appealed 897 (71%) claims, totaling $629,296,298*
- *Claimants appealed 363 (29%), totaling $3,699,307*

*As of our fieldwork date, March 31, 2013, there are currently 849 appealed claims with a status of pending with original calculated compensation amounts totaling $437,207,591.*

#### Recommendations:

*Appealed claims were trended with statistics noted above; therefore no management response is necessary.*

#### Management Response:

*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Appendix A**

**Individuals Interviewed**

## Appendix A

### Individuals Interviewed During Project I Of The Process Audit

#### The Claims Administrator's Office

| | |
|---|---|
| Patrick Juneau | Claims Administrator |
| Michael Juneau | Special Counsel |
| David Odom | Chief Executive Officer |
| Bob Levine | Chief Financial Officer |
| Kirk Fisher | Director of Business Processes & Reporting |
| Chris Reade | Chief Information Officer |
| David Welker | Director of Fraud, Waste, & Abuse |
| Philip Ollendike | Reporting & Audit |
| Henry Mitchell | Reporting & Audit |

#### BrownGreer

| | |
|---|---|
| Orran Brown | Partner |
| Lynn Greer | Partner |
| Roma Petkauskas | Partner, New Orleans Claims Processing Center |
| Bob Staneart | Information Systems |

#### Garden City Group

| | |
|---|---|
| Stephen Cirami | Project Manager |
| Jennifer Keough | Call Center Lead |
| Shandarese Garr | Mail Center Lead |
| Drew Sommer | Senior Vice President, Systems & Technology |

#### HUB enterprises

| | |
|---|---|
| Chip Romero | President |
| Dwayne Regan | Vice President, Security |
| David Buchanan | Vice President, Fraud, Waste, & Abuse |

#### Postlethwaite & Netterville

| | |
|---|---|
| Mark Staley | Director |
| Robin Pilcher | Director |
| Corey Jambon | Consulting Manager |

#### PricewaterhouseCoopers LLP

| | |
|---|---|
| Charles Hacker Jr. | Partner |
| Theodore Martens | Partner |

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Appendix B**

**Appendix B**

**Claim Categories Not Included In Project I Testing**

## Appendix B

The Following claims categories were not selected for Project I testing based on low dollar and number of claims volume.

| Claims Category | # of Claims Paid as of December 31, 2012 | $ Paid as of December 31, 2012 | % of Total Paid Claims as of December 31, 2012 |
|---|---|---|---|
| Subsistence Damage | 0 | $0 | 0.000% |
| Individual Periodic Vendor or Festival Vendor Economic Loss | 0 | $0 | 0.000% |
| Real Property Sales Damage | 206 | $11,075,437 | 1.042% |
| Failed Business Economic Loss | 0 | $0 | 0.000% |
| Start-Up Business Economic Loss | 40 | $7,811,120 | 0.735% |

The purpose of each claim category not selected for Project I testing is listed below:

### Subsistence Damage

**Purpose:**
*Subsistence Damage is a loss of Subsistence use of natural resources arising from the Deepwater Horizon Incident. This includes damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume, or trade Gulf of Mexico natural resources (including Seafood and Game) in a traditional or customary manner, to sustain their basic personal or family dietary, economic security, shelter, tool, or clothing needs and who relied on Subsistence resources that were diminished or restricted due to the Deepwater Horizon Incident.*

### Individual Periodic Vendor or Festival Vendor Economic Loss

**Purpose:**
*Individual Periodic Vendor or Festival Vendor loss is for individuals who regularly provide the specific goods or services who meet the following criteria:*
1. *Regularly sold at retail during 2009 and 2010 any of the legal food, souvenir, art, tourist-related or water-related goods or services or substantially equivalent items ("Covered Sales") to CONSUMERS in Zones A,B or C during May through December 2009 and / or May through December 2010.*
2. *Made such Covered Sales, primarily to non-local CONSUMERS, except that water related Covered Sales, need not be primarily made to non-local CONSUMERS.*
3. *Did not maintain a permanent business location in a building at which the claimant made Covered Sales.*
4. *Held any licenses as required by law.*
5. *Was not employed by an employer in connection with such Covered Sales.*
6. *Does not have Tax Information Documents sufficient to support a claim under the Business Compensation Framework for this claimed loss.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

38

## Appendix B

### Real Property Sales Damage

#### Purpose:

*Real Property Sales Damage is economic loss suffered by sellers of residential property located in a specific geographic area, who sold their properties at a lower price because of the Deepwater Horizon Incident. In order to be eligible to file a Real Property Sales Damage claim, the claimant must have owned the property on April 20, 2010, and the sale of the property must have closed between April 21, 2010 and December 31, 2010. If the sales contract was executed prior to April 21, 2010, the property sales price must have been reduced because of the Deepwater Horizon Incident. Real Property Sales do not include transfers from borrowers to lenders as part of a foreclosure or a similar process.*

### Failed Business Economic Loss

#### Purpose:

*A Failed Business commenced operations prior to Nov. 1, 2008 and that on or after May 1, 2010 and prior to December 31, 2010 either, (i) Ceased operations and wound down, or (ii) Entered bankruptcy (through filing a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) Initiated or completed a liquidation of substantially all its assets. There are also guidelines for Failed Start-Up Businesses those commenced operations after Nov. 1, 2008. These claims have similar causation requirements as standard Failed Business Economic Loss Claims.*

### Start-Up Business Economic Loss

#### Purpose:

*A Business is considered a Start-Up Business if it began operations between November I, 2008 and April 20, 2010. The framework for Start-Up Businesses does not apply to (i) Failed Businesses, or (ii) claims covered under the Seafood Program.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Exhibit E

## Filed Under Seal

# Exhibit F

## Filed Under Seal

# E X H I B I T   G



| | Keith Moskowitz | keith.moskowitz@dentons.com | Salans FMC SNR Denton |
|---|---|---|---|
| | Partner | D +1 312 876 8220 | dentons.com |

Dentons US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6404 USA

T +1 312 876 8000
F +1 312 876 7934

November 9, 2013

**Via Electronic Mail**

Patrick Juneau
Court Supervised Settlement Program
935 Gravier Street
New Orleans, Louisiana, 70112

Re:    Accountant Note Screens

Dear Mr. Juneau:

It has come to BP's attention that notes recorded electronically by CSSP claims review staff in the notes field of BEL claim file records can, and apparently have, been deleted or overwritten and that there may be no record of deleted or overwritten notes. Although the specific instances we are aware of relate to P&N accountants, we do not know if this problem extends more broadly. The deletion or overwriting of claims review notes raises serious questions about the Settlement Program's compliance with its own Court-ordered document retention rules. It also calls into question the accuracy of BEL claim determinations, the integrity of the electronic claims system and its protections against unauthorized alteration, and it may have prejudiced both Claimants and BP in connection with BEL claim appeals. Finally, the deletion or overwriting of claim review notes undermines the transparency of the claims process -- transparency that was deemed paramount by both the PSC and BP in negotiating the Settlement Agreement, which policy was subsequently recognized by the CSSP.

Moreover, as you are aware, all documents or electronically stored information received or generated by the Deepwater Horizon Economic Claims Center ("DHECC"), including notes, must be preserved in accessible form during the administration of the Settlement Agreement and for three years after the date of final disposition of the last claim resolved by the DHECC. To the extent that claim review notes have been deleted and overwritten and no longer exist (or no longer exist in accessible form) it would appear that the Settlement Program has failed to comply with its own Court-ordered document retention rules.

Furthermore, the maintenance of complete, unadulterated claim file records is an essential element of the Settlement Program. In particular, the Appeals Process in Section 6 of the Settlement Agreement is dependent on the existence of complete claim file records "to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement." (Settlement Agreement at § 6.1) The Settlement Agreement specifically provides that Appeals Panelists can consider specific enumerated documentation in deciding appeals, including "the complete record of the Claimant in the Settlement Program." (emphasis added) (Settlement Agreement at §6.2) If BEL claim reviewer notes have been deleted or overwritten the Appeals Panelists may have been adjudicating appeals based on incomplete claim file records. This could have prejudiced Claimants and/or BP on BEL appeals.

Please advise the parties as to whether claim reviewer BEL notes can be, and in fact have been, deleted or overwritten and, if such notes have:



**Salans FMC SNR Denton**
**dentons.com**

November 9, 2013
Page 2

(1) what steps the Settlement Program will take to immediately cease this practice, including how the Settlement Program will ensure that claims reviewers will no longer delete or overwrite BEL notes;

(2) the identity of the BEL claims where claims reviewer notes have been deleted or overwritten;

(3) whether back-up copies of the deleted or overwritten notes were made and maintained by the Settlement Program and, if so, advise the parties as to the frequency and disposition of the individual system back-ups. Furthermore, please advise as to whether such system back-ups are complete or incremental.

Finally, we believe that it would be prudent, and ask through this letter, that you investigate whether notes or other claims-related entries or information for any claims types (e.g. IEL, subsistence etc) can be and/or have been deleted or overwritten. If there are other instances in which electronic records can and/or deleted, please respond to the questions above as to those claim types.

Sincerely,

Keith Moskowitz

cc:     Michael Juneau
        David Odom
        Frank Piantidosi
        Steve Herman
        Jim Roy
        Mark Holstein

# E X H I B I T   H



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

November 21, 2013

***By Electronic Transmission***

Keith Moskowitz
Dentons US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606

**Re:     Response to BP's November 9, 2013 letter re: claim reviewer notes**

Dear Mr. Moskowitz

We write in response to your November 9, 2013 letter regarding the retention of claim reviewer notes.

There are two primary types of notes made by claims reviewers – Global notes, which are seen by the Parties on the Portal, and Reviewer notes, which are internal work-progress notes of claims reviewers and which are not accessible by the Parties. The CSSP maintains an electronic history of all Reviewer notes created by claims reviewers. Thus, once a Reviewer note has been inputted into the system by a claims reviewer, the electronic history records that note such that previous notes cannot be deleted and/or over-written by a claims reviewer.

It has come to our attention that the electronic history of Global notes has not been maintained in a similar and readily-available format. However, the CSSP has maintained back-up copies of all Global notes since the inception of the Program. As such, we are reviewing all claims to identify any altered Global notes and are adding back any notes that could have been deleted or altered. We have made changes to the system to ensure that the electronic history of all Global notes will be maintained in a readily-available format going forward and we will refine this process to make it easier for users of the system to see the history of these notes. If there are any particular claims that BP has found to have altered notes, please let us know and we will target those claims first for reconstruction of the Global notes to include previous unaltered notes.

November 21, 2013
Moskowitz
Page 2

Moreover, as BP is aware, we are currently working with IBM to evaluate and improve the CSSP's electronic document retention protocols and to create a means through which the electronic history of Global notes will be available to the Parties. We will keep the Parties updated on the progress of pertinent changes to the system.

Sincerely,

Patrick A. Juneau

cc: Steve Herman
    Jim Roy

# E X H I B I T   I

**DENTONS**

| | | |
|---|---|---|
| **Keith Moskowitz**<br>Partner | keith.moskowitz@dentons.com<br>D  +1 312 876 8220 | Salans FMC SNR Denton<br>dentons.com |
| | Dentons US LLP<br>233 South Wacker Drive<br>Suite 7800<br>Chicago, IL 60606-6404 USA | |
| | T  +1 312 876 8000<br>F  +1 312 876 7934 | |

December 2, 2013

**Via Electronic Mail**

Patrick Juneau
Court Supervised Settlement Program
935 Gravier Street
New Orleans, Louisiana 70112

Re:    Deleted Claim Reviewer Notes

Dear Mr. Juneau:

        This letter responds to yours of November 21st regarding the deletion of claim reviewer notes in the Court Supervised Settlement Program's ("CSSP") claims processing system.  Your letter reports that claim reviewer notes in the CSSP's Global notes system have in fact been deleted.  Furthermore, while it was brought to our attention only that notes created by P&N accountants were overwritten or deleted, your letter indicates that claim reviewer notes for all claim types in the Global notes system may have been deleted.  You have generally advised that Global notes are backed-up and that the CSSP is in the process of attempting to restore deleted notes from the CSSP's back-up copies.  Furthermore, you indicate that the CSSP has already made changes to its system to ensure that claim reviewer notes are not deleted.

        The fact that claim reviewer notes have been deleted across all claim types in Global notes raises serious questions about the CSSP's claims processing systems, including whether claimants and/or BP have been prejudiced in connection with the decision to file appeals or the adjudication of appeals based on incomplete claimant records.  In addition, the deletion of notes calls into question the CSSP's IT change management and control practices as well as the CSSP's retention of claims information under the pertinent document retention order entered by the Court.  Your letter does not provide us with sufficient  detail to appropriately assess the sufficiency of the apparent changes to Global notes that the CSSP has put into effect to retain claim reviewer notes going forward, the process for restoring deleted claim reviewer notes or the potential scope and implication of this activity on the overall accuracy and integrity of the claims process (including the potential occurrence of similar or related claims processing issues pertaining to claims information and data).  Accordingly, we would greatly appreciate it if you

**DENTONS**

Patrick Juneau
December 2, 2013
Page 2

Salans FMC SNR Denton
dentons.com

or your colleagues within the CSSP could respond more specifically, including the provision of responses to the following questions:

1. Please explain exactly how individual claim reviewer notes in Global notes are <u>now</u> electronically retained without being deleted?

2. Are there any special tools, processes or software being utilized to now retain claim reviewer notes? If so, what are they and how do they work?

3. When did the CSSP effectuate the change in the Global notes system to retain claim reviewer notes?

4. If the Global notes are to be restored from back-ups, what was the timing of the backup cycles (*i.e.*, hourly, nightly, weekly, etc.) from which those notes will be extracted?

5. Were there multiple deletions to claim reviewer notes within Global notes that were made in between back-up cycles and, if so, would the only record be the most recent entry? If so, would any prior entries made between back-ups be lost?

6. Is there any way to recover those deleted notes that may have been changed between backup cycles?

7. Please explain what users have access to Global Notes and describe their level of access. How is the level of access determined?

8. Are you able to provide assurances that user access and data modification controls are secure and working properly?

9. Has a full audit-trail capability been enabled in the entire CSSP system (*e.g.,* all changes with appropriate identifying data are captured and retained and able to be reviewed)? Are any of these changes being stored in another program, outside of the CSSP claims processing system? If so, when did that capability become effective? Does it also include any changes to any data? If the audit-trail capability was enabled for the entire system, why were only the Reviewer notes and not the Global notes capable of being retained? Are claim reviewer notes recorded in any other locations aside from Global notes and Reviewer Notes? If so, where are such notes recorded, what are the rules for retention of such notes and what, if any, protocols exist surrounding a reviewer's discretion in whether or not to document communications as well as whether to include the documentation in Global Notes and/or Reviewer Notes (or any other location where notes are recorded)?

**DENTONS**

Patrick Juneau
December 2, 2013
Page 3

Salans FMC SNR Denton
dentons.com

10. Has the CSSP system experienced errors and crashes over the course of its operation to date? If such errors and crashes have occurred, please identify each such error and crash, as well as when and how it was addressed. Please further advise us as to whether any of these errors and/or crashes resulted in incorrect claims processing or the potential loss of claims information and/or data, including the loss of any type of claim reviewer notes. If errors and/or crashes resulted in incorrect claims processing or loss of claims information and/or data please provide detail on each specific instance and what was done by the CSSP to address the issue(s). Has the CSSP instituted a standard industry practice relevant to change management for the CSSP system? If it has, when did that occur?

11. For purposes of tracking system changes, including changes related to the maintenance and/or deletion of claim reviewer notes, can you identify each and every change to the system that was made by any/all such generic user accounts? If there is such a system, can you provide documentation of the reasons for and nature of all such changes?

12. Do the accountants also record claim reviewer notes in the accountant work books? If so, please explain whether such notes are maintained and, if they are overwritten of deleted. Further, please advise us as to whether they are backed-up and what steps the CSSP will take to address any such overwriting or deletion of these type of notes.

13. In addition to issues related to the preservation of claim reviewer notes in the Global notes, are there other changes that have occurred in the CSSP claims system, it's code, or its data that a full record for which has not been kept (e.g. what the change was, who made it, when it was made, why it was made, how it was checked for accuracy, etc.)?

To further address the risk presented by the deletion of claim reviewer notes from the Global notes system, BP also requests that the Claims Administrator take the following actions as soon as possible: (1) hold all pending appeals until such time as the Claims Administrator can demonstrate and certify that any deleted notes have been added back to an appealed claim file and/or that no claim reviewer notes in Global notes were deleted; and (2) stay the time for claimants or BP to appeal any claim determinations that have or will be issued, but for which the time to appeal has not run until the Claims Administrator can demonstrate and certify that any deleted notes have been added back to an appealed claim file and/or that no claim reviewer notes in Global notes were deleted.

Finally, in response to your question, BP cannot identify specific claim files where claim reviewer notes may have been deleted because, given the manner in which claim reviewer notes were apparently deleted (and BP's lack of visibility into the creation of notes in the Global



Patrick Juneau
December 2, 2013
Page 4

Salans FMC SNR Denton
dentons.com

notes system) it is impossible for BP to identify any such deleted notes. Accordingly, in our view all claim files should be reviewed.

Sincerely,

Keith Moskowitz

# Exhibit J

## Filed Under Seal

# Exhibit K

## Filed Under Seal