# Exhibit 31

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | |
| This document relates to all actions. | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |

## DECLARATION OF TODD BRENTS

I, Todd Brents, am over the age of 18 and the opinions, statements and conclusions expressed in this declaration are my own.

### *Background*

1.      I am a Managing Director and a senior and founding member of AlixPartners, LLP Information Management Services ("IMS") practice, a business unit with 250 people globally, and have been employed there since 2001.  The IMS practice is a well-established information management consulting service for litigation, bankruptcy and corporate matters. Among other things, we provide services related to settlement administration, electronic discovery, mass transaction and complex data analytics, and bankruptcy claims.  I have more than 24 years of professional experience in finance and accounting management.  Prior to joining AlixPartners, I held various positions in treasury, operations analysis, and credit at Frito-Lay, Inc., and I was the Assistant Controller at Color Tile, Inc.  Prior to that, I was employed at Arthur Andersen, LLP in Dallas, TX.

82780163

2.      I received my Masters in Business Administration from Southern Methodist University and my Bachelors of Business Administration in accounting from the University of Texas at Arlington.  I am a Certified Public Accountant ("CPA") and a Certified Insolvency and Restructuring Advisor.

3.      My team and I have extensive claims management experience working on some of the most complex claims assignments in history.  I personally have worked as a claims administrator or manager in a number of instances, including:

a.  Bernard L Madoff Investor Securities — My team and I reconstructed information from electronic, paper and microfilm records spanning a 30-year time frame and implemented a customized online claims management system allowing numerous parties to quickly and efficiently review and determine claims.  We also served as the claims and noticing agent for the SIPA estate, which included facilitating claims filing, noticing and handling claimant communication through internal and public-facing websites.

b.   Genuity, Inc. — My team and I resolved telecommunications vendors' claims, including breaking down claims to a circuit-by-circuit basis, managed the sale of the business and post-sale transition to Level 3 Communications, and administered the distribution of over $700M to creditors during the wind-down.  I served as the CFO of the Liquidating Trust and was responsible for the management of the estate operations.

c.  Innkeepers USA Trust – I served as the Liquidating Trustee of this REIT and owner of 75 hotels, and was responsible for managing the operations, sale of remaining assets, post-transaction transition, claims and distributions during its wind-down.

4.      I also worked on the following claims administration or litigation matters: Rotech Healthcare, The Scooter Store, Inc., Borders, Inc., Fairpoint Communications, Inc., Freedom

2

Communications, The Readers Digest Association, New Century Financial Corporation, Refco, Inc., Exide Technologies, Motorola, and certain RMBS investor litigation, among others.

5.      As a result of these experiences, I have extensive proficiency in efficiently and effectively evaluating, managing and resolving complex claims.  In addition, I have provided testimony on numerous occasions, including in some of the matters above. A copy of my Curriculum Vitae is attached hereto as **Exhibit 1**.

<u>*Scope*</u>

6.      AlixPartners was retained on behalf of BP America, Inc. ("BP") in connection with litigation stemming from the *Deepwater Horizon* drilling rig in July 2012.  For the purposes of this declaration, I have been asked to provide my observations, findings and opinions regarding the Court Supervised Settlement Program's ("CSSP") and the Claims Administrator's management of the claims processing operation.

7.      All of the facts and opinions set forth in this declaration are based upon my personal experiences and knowledge, information supplied by the Claims Administrator's Office ("CAO"), and information and data provided to AlixPartners and BP from its access to data on the Settlement Program, my review of pleadings and other publicly available information, and my understanding of the Settlement Agreement.

8.      I have met with the Claims Administrator and representatives from the CAO on numerous occasions regarding the CSSP's claims processing operations, governance, vendor oversight, and budgeting and cost performance monitoring process.  Individuals I have met with include Mr. Patrick Juneau (Claims Administrator), Mr. David Odom (former CEO), Mr. Kirk Fisher (former COO), Mr. Randy Black, Mr. Mike Juneau, Mr. Jason Jordan, Mr. Scot Sherick, Mr. Philip Ollendike, Mr. Bob Levine, Mr. Patrick Hron, as well as the leadership from

BrownGreer PLC ("BG"), Garden City Group, Inc. ("GCG"), PricewaterhouseCoopers, LLP ("PwC"), and Postlethwaite & Netterville APAC ("P&N") (here to be known collectively as the "Claims Vendors").   Additionally, I have considered the documents and information listed in **Exhibit 2**.

<u>***Summary of Findings, Observations and Opinions***</u>

9.      It is my opinion that the CSSP exhibits poor quality in processing claims and experiences unreasonably high error rates in claim processing.  The quality of claims processing for Business Economic Loss ("BEL") claims is particularly problematic, with the results of testing and appeals indicating existing controls fail to catch significant numbers of errors.  A reasonable and prudent Claims Administrator would not accept such a high error rate and would be taking strident actions to address the shortcomings.

10.     Furthermore, I believe the CSSP is operating with high costs and low productivity.  Since the inception of the CSSP and through June 30, 2014, the program has spent in excess of $998M[1] on administrative costs.  I believe these costs are excessive based on my understanding of the productivity, budgeting and financial management of the CSSP.  Contributing to these excessive costs, the Claims Administrator has failed to properly oversee the CSSP's vendors, including by allowing vendors to charge excessive markups, and has failed to properly oversee the implementation of the CSSP's IT systems and Fraud, Waste and Abuse Program, which failings also contribute to the accuracy and error rate issues noted above.

11.     It is my further opinion that the Claims Administrator's inability to establish a proper budget and cost reporting framework until 2014 resulted in the inability to effectively manage the Claims Vendors and supervise the program.  Indeed, the CAO previously informed

---

[1] See **Exhibit 3**.

BP that "the CAO will identify the existence of a variance on a monthly basis if any variance exists, but, because of its sole role in an oversight capacity, the CAO will not take actions to cure the cause of the variance," See **Exhibit 4 (Located at Exhibit 3, page 6)**. Only after receiving critical feedback from BP and a direct order from the Court did the Claims Administrator begin to implement a reasonable budget and cost reporting framework.

12.     Additionally, the Claims Administrator fails to provide sufficiently detailed reports to allow the CSSP's stakeholders to understand, evaluate and monitor the CSSP's progress during the program.

13.     While I have observed recent improvement in the management of the CSSP, this improvement only occurred after BP provided detailed criticism of its failings and feedback about suggested improvements. A reasonable and prudent Claims Administrator would have independently recognized the shortcomings identified by BP in 2012 and 2013 and taken action on his own initiative.

14.     In my experience, this is a shocking observation to make in a program of this importance. I have not worked with another claims administrator that displays this lack of diligence around the accuracy of claims determinations, the productivity of claims processing, or financial management of the claims program, nor would I tolerate these issues in claims programs that I have administered.

### *Basis for Opinions*

### **A.   The Claims Processing Operations Result in Unreasonably High Error Rates**

15.     Given the resources available to the CSSP, there should be a very low tolerance for errors in the claims determination process. However, based on my review of available information, I have found that the CSSP appears to be resolving claims with an unreasonably

high error rate and that the Claims Administrator appears to find these high levels of error acceptable.

16.     This opinion is based on my review and analysis of the following: i) the Claims Administrator's file review reports, (attached as **Exhibit 5**), ii) the CliftonLarsonAllen ("CLA") Process Audit Report, (attached as **Exhibit 6**), and iii) results of claim determinations appealed by BP and claimants[2].  These represent discrete, separately derived sources of data visible to the Claims Administrator and other stakeholders, and provide evidence of problems with the quality of claims processing.  Each of these sources are addressed below.

17.

# Redacted

---

[2] Results of claims determinations appealed by BP and claimants are included in Table 16 of the Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review, Status Report No. 21, dated May 30, 2014.  **See Exhibit 7 at 21.**

[3] See **Exhibit 5**





18.                    Redacted

---

[4] For purposes of this report, Business Economic Loss Claims ("BEL") include the Business Economic Loss, Failed Business Economic Loss, and Start-up Economic Loss claim types.

[5] "Other" includes the following claim type categories: Wetlands Real Property, Real Property Sales, Vessels of Opportunity, Vessel Physical Damage, Subsistence, and Individual Periodic Vendor.

[6] See **Exhibit 8** for supporting calculations of the error rate.

[7] See **Exhibit 9**

82780163

19.

# Redacted

20.     There are two types of sample testing typically applied to a series of transactions – attribute sampling (used to evaluate internal controls) and substantive testing (used to identify material misstatements or errors).   These tests are sometimes combined into a single step, referred to as dual-use testing.  The testing methodology used to conduct the file reviews is not specified in the report, but it appears to be based on a dual-use or substantive testing methodology.

21.     In performing substantive testing, one must assess the effectiveness of the underlying controls, as it influences the conclusions drawn from the testing, and whether more robust substantive testing should be performed.  A control error may result in a minimal dollar impact on one claim, but that same control error may have a dramatic dollar impact on another claim.  Said differently, if the number of observed errors is high, it presents the risk that the same error, if repeated in another claim, would have a different dollar impact on the claims determination.  As a result, one cannot observe these significant numbers of attribute or control errors without questioning whether the appropriate controls are in place.

---

[8] Based on the absolute compensation variance percentage identified on page 1 in each of the Q1 2013, Q2 2013, and Q3 2013 Claims Administrator Interim File Review Reports.  See **Exhibit 5**

82780163

22.     In my opinion, a prudent and reasonable claims administrator would have interpreted these results as indications that existing controls were not operating effectively. Further, a prudent and reasonable claims administrator faced with such error rates would have immediately initiated a detailed quality control review with the Claims Vendors in order to identify corrective actions to prevent further errors from occurring.  Also, given the significant volume of claims being processed, a reasonable and prudent claims administrator would have implemented a re-verification process for all affected claims to ensure further claim determinations with errors were not repeated.  Re-verification processes generally require the cessation of processing claims with the affected attributes, the re-training of claims reviewers, and the implementation of other corrective actions as necessary.

23.     *Second*, the CLA process audit commissioned by the Claims Administrator also identified unreasonably high errors in claims processing of BEL claims[9].

| | Sample Size | Claims with Variances | Error Rate |
|---|---|---|---|
| BEL | 15 | 2 | 13.3% |
| CRP | 24 | 0 | 0.0% |
| IEL | 2 | 0 | 0.0% |
| Seafood | 33 | 2 | 6.1% |
| Vessel Physical Damage | 1 | 0 | 0.0% |
| VoO Charter Payment | 20 | 0 | 0.0% |
| Wetlands Real Property | 1 | 0 | 0.0% |
| **Total** | **96** | **4** | **4.2%** |

24.     While the CLA audit methodology was flawed given its intended purpose such that many of its findings cannot be conclusively relied upon (see June 21, 2013 letter from Mark Holstein attached as **Exhibit 10, page 2**), even CLA's methodology identifies potential problems

---

[9] See **Exhibit 6, page 29**

with BEL claims.   In their sample of 15 BEL claims, 2 of them, or 13.3%, were found to have "claim payment variances".   Using a substantive testing methodology, the CLA report extrapolates the dollar impact of the variances and estimates that BEL claims have a 0.008% error rate[10].   However, the report fails to address the 13.3% variance rate, or its suggestion that material numbers of errors are occurring.

25.     **Third**, results from the CSSP appeals process for which BP and claimants have appealed CSSP claim determinations indicate claims are erroneously deemed eligible for payment at a high rate.   Based on the Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review, Status Report No. 21, dated May 30, 2014; there have been 2,268 BEL claim determinations issued that have been appealed for which the appeals panel has reached an outcome (see attached at **Exhibit 7, page 21**).   Of those 2,268 claims, 463 claims were resolved by the appeals panel or resolved by the parties and resulted in a reduction to the Original Award amount.   *Id.* As a result, the error rate for the appealed BEL claims is at least 20.4%.   Stated differently, 20.4% of the appealed BEL claims were ultimately reduced in amount.   This error rate is not limited to BEL claims.   In reviewing all claim types, both BEL and non-BEL combined, the error rate is at least 17.2%.

26.     These percentages do not take into account the fact that a significant number of BP appeals were made based upon an incorrect application of the BEL matching policy.   Such appeals were denied based upon the then-current Claims Administrator policy on matching. Were those appeals removed from this analysis the error rates would be higher.

27.     These findings are summarized in the table below.

---

[10] Ibid

| | **All Appealed Claims** | **Claims Reduced**[11] | **Error Rate (Reduction in Amount)** |
|---|---|---|---|
| All Claim Types | 3,417 | 589 | 17.2% |
| BEL Only | 2,268 | 463 | 20.4% |

These findings are indicative of deficiencies in the claims process. While these instances were discovered and resolved through the appellate process, a reasonable and prudent Claims Administrator should be actively taking steps to identify the cause of the errors to improve the accuracy of claims determinations so that these errors do not reach the appeals process.

28.     Given the error rates in claims subject to appeal, noted above, it is reasonable to assume that similar errors are occurring in claims valued at less than $25,000 that are not subject to appeal.  There have been over 52,000 claims determined as eligible to date[12] below this level through June 30, 2014, representing 74% of eligible claims.

29.     These data points collectively demonstrate that the CSSP is operating with unreasonably high error rates for a facility with the size, scope, and resources such as the CSSP. Moreover, the Claims Administrator apparently finds this level of error acceptable, either because he does not recognize the actual level of error occurring, or because he improperly relies on the appellate process to cure the ills caused by the poor quality of the claims process. Contrary to the CSSP's experience under the Claims Administrator, it is my opinion that a

---

[11] Represents count of claims either decided by the appeals panel or resolved by the parties that resulted in a reduction to the award amount.  The reduction in the award amount was quantified by calculating the difference of the Original Award Amount and the Post Appeal Award Amount.
[12] Number of claims determined eligible to date was based on review of the claims register extract of determined claims less than $25,000, dated June 30, 2014.

prudent and reasonable claims administrator would find the above error rates to be unacceptable and take immediate action to address these shortcomings.

**B.** **The Claims Administrator has Failed to Properly Oversee CSSP Vendors and the CSSP's IT and Fraud, Waste, and Abuse Programs**

*i. The Claims Administrator Has Failed to Properly Oversee Vendor Staff Hiring, Allowing Vendors to Charge Excessive Markups on Independent Contractors Hired Specifically to Work on the CSSP*

30.      At the start of the CSSP's operations, CSSP vendors hired Gulf-based independent contractors with no previous direct experience to carry out tasks necessary for claims review and processing.  In particular, BG and GCG collectively hired more than two thousand independent contractors to work on claims review and apparently marked up the direct costs they paid to these workers at rates of multiple times.  On June 7, 2013, BP provided a letter to the Claims Administrator, at **Exhibit 11**, that presented a detailed analysis suggesting that the monthly markup of the vendors appears to approximate $14M per month that is pure profit for the CSSP vendors and provides no value to the CSSP.  This letter encouraged the Claims Administrator to avoid excessive markups and proposed converting what BP assumed were independent contractors to employees.  In a meeting shortly thereafter, BG informed BP that it had converted many of these workers to full-time employees, and GCG stated that they intended to immediately convert all of these contractors to full time employees, preventing the recommendation from being implemented.  The Claims Administrator was present at this meeting and appeared to have first learned of the proposed changes at this meeting.  Despite the substantial costs associated with these practices, he made no objection either to the initial practice of marking up contract staff, or to the vendors' proposed resolution, which effectively

internalized the markup by allowing the vendors to hire the former contract staff internally rather than through the CSSP.

31.     A prudent and reasonable claims administrator would have either hired such contract staff directly through the CSSP or required the vendors to provide contract staff without a markup as a direct pass-through cost.

        *ii. The Claims Administrator Has Failed to Properly Manage the Information Technology Systems*

32.     At the outset of the Program, the Information Technology system was built out by BG and GCG, with GCG providing and installing the hardware, and BG creating the software. In order to develop and maintain this system, BG has spent $40.9M through June 2014, and GCG has spent $16.9M[13]. In late 2013, at the insistence of BP, the CAO began to evaluate the security, stability, cost and effectiveness of the existing IT system.  This evaluation continued into 2014 and led to the recommendation by the Claims Administrator that a major overhaul of the system be implemented.  Current estimates indicate the new system (referred to as DWH 2.0) will cost approximately $19.6M[14] to design and implement, with a targeted implementation date of January 1, 2015.  The benefits of the new system are purported to be lower recurring costs to maintain the system, as well as productivity improvements in claims processing, particularly BEL claims.

33.     While the implementation of the new system and its purported benefits are notable undertakings, a prudent and reasonable Claims Administrator would have identified the deficiencies in the existing system at the inception of the Claims Program, and immediately taken action to address the shortcomings.  Yet the CSSP has operated for over 24 months with a

---

[13] See **Exhibit 12**
[14] See **Exhibit 13**

system containing notable deficiencies and inefficiencies, at substantial cost to BP.  In addition, the Claims Administrator must now incur significant additional costs to remedy the situation.

  *iii. The Claims Administrator Has Failed to Properly Provide for Integration of Accountant Workbooks Into the Claims System*

  34. A prudent and reasonable Claims Administrator would have understood the importance of including all information key to processing claims within a central repository, and required its vendors design systems to capture and analyze this information to assess trends across the entire claims population. Unlike other claim systems in which claims are processed, damage calculations performed, and results are documented completely within the claims system, much of the information used to calculate and document BEL claims is performed in Microsoft Excel workbooks.  These workbooks are maintained by PwC and P&N outside of the claims system, and only limited data from these workbooks is uploaded to the claims system upon completion of the claim review.  As a result, the Claims Administrator is not able to track issues or perform analytics across all BEL claims to identify potentially systemic errors or irregularities.  As these workbooks are used to process the largest risk area to the facility in terms of dollars and complexity, additional data capture and subsequent analysis within this area is needed to ensure claims processing is consistent and trends can be reviewed and researched at a detailed level to quickly identify errors or irregularities.

  35. After first discussing this limitation with BP in June 2013, the Claims Administrator did not take immediate action.  The most recently prepared Q4 2014 CAO budget continues to contain assumptions for costs based on these limitations.  A prudent and reasonable Claims Administrator would have recognized this issue and addressed it in a comprehensive fashion, including by demanding an end-to-end claims system capable of reporting detailed

metrics, at project inception, or immediately after this deficiency was first noted.

        *iv.*     *The Claims Administrator Has Failed to Properly Manage the Fraud, Waste and Abuse Environment*

36.     At the inception of the program, the Fraud, Waste and Abuse environment consisted of the head of the program, employed by the Claims Administrator, and the use of two vendors. BG provided the Special Investigations Team ("SIT"), which was charged with identifying potentially fraudulent claims during the claims review process. These claims were then subjected to internal evaluation by SIT. Where warranted, claims were referred to the second vendor – HUB Enterprises - for further investigation. During its interactions with the Claims Administrator, BP expressed is dissatisfaction with the lack of information provided by the Claims Administrator regarding the fraud program and its results, along with concerns that undetected fraud was occurring within the program.

37.     In the summer of 2013, allegations surfaced of several egregious instances of fraud and conflicts of interest violations. These allegations and the need for a transparent investigation led to the appointment of the Special Master. The Special Master's mandate further required the evaluation of the Claims Administrator's overall fraud program. As a result of the Special Master's findings of deficiencies and recommendations for improvements, in late 2013, David Welker (Director of Fraud Waste & Abuse) undertook a wholesale overhaul of the Fraud, Waste and Abuse program.

38.     This overhaul consists of moving the primary fraud monitoring and investigation tasks from the vendor-managed SIT process, to a newly established fraud team at the CAO, under the direction of the head of the program. In addition, the overhaul includes the development and implementation of a new information technology system to manage the claims

investigations (referred to as FWA 1.5/2.0). This new system is anticipated to cost approximately $6.4M[15].

39.     A reasonable and prudent Claims Administrator would have identified the failings and shortcomings in the Fraud, Waste and Abuse program at the outset, or at least in the early stages of the program, and would have undertaken timely and pro-active corrective measures to address them.

### C.  Budgeting and Cost and Performance Monitoring Processes

40.     A prudent and reasonable claims administrator would have developed comprehensive budgeting and cost and performance reporting processes at the outset of the program to provide oversight to the vendors through establishment of quantifiable and achievable performance targets.  Although improvements have been made, based on my experience as a claims administrator, the Claims Administrator has failed to carry out his responsibility to effectively and efficiently establish quantifiable and achievable performance targets and take corrective action through managing the CSSP vendors when targets are not achieved.  Because of this failure, the Claims Administrator has been unable to identify process and control issues through program and vendor performance monitoring which has resulted in the lack of incentive for the CSSP vendors to eliminate inefficiencies and increase productivity.

41.     The chart below demonstrates the level of costs and the resulting average cost per resolved claim[16].

---

[15] See **Exhibit 14**
[16] See detailed support for Q3 2012 – Q2 2014 administrative costs and resolved claims within **Exhibit 15**.



42.     Low productivity financially benefits the vendors because it increases the size of the teams each vendor employs as well as the length of the engagement.  Even the Claims Administrator's former COO conceded that there are "inefficiencies in the current operation of CSSP."  Aug. 7, 2013 Hr'g Tr. at 57:13–17.  And he agreed that "at this point in the program key performance indicators ("KPI" or "KPI's") would be beneficial to the program."  *Id*. at 59:17–60:2.  Through my experience in meetings with the Claims Administrator and the Claims Vendors and review of financial materials provided during course of my engagement, I have identified several issues with the budgeting and financial reporting processes.  These issues have been categorized into two groups: i) Insufficient Internal Controls:  Budgeting and Financial Reporting Processes; and ii) Budget Model Cost Calculation Methodology.  The failure to implement these processes has led to excessive costs.

i.  <u>Insufficient Internal Controls:  Budgeting and Financial Reporting Processes</u>

43.     The CSSP's annualized administrative spending based upon the 2014 budget is in excess of $463M[17] and it employs over 1,500 full time equivalent employees[18].  For the third and fourth quarters of 2014, the CSSP's monthly costs are projected to average over $42M[19].  To maintain the level of oversight needed to properly manage the cost and performance of a large operation of this nature, development of internal controls and processes to support a reporting framework along with continued monitoring of, and revisions to, this framework as the program matures is pivotal.

44.     The reporting framework should be used to identify and track the activities performed by each vendor in an effort to match productivity with costs billed to the program. Moreover, the reporting framework should define the information requirements to be captured within the claims system for performance metric reporting at the claim level, and should dictate the information each vendor should provide within its fee and expense invoices.   Upon establishment of the claims facility, the Claims Administrator failed to develop proper internal controls and processes for budget, cost and performance reporting, which in my opinion led to excessive costs.  Claim Vendors have been allowed to establish their own budgets and not until August 2013, and only upon BP's insistence and a Court order, did the Claims Administrator attempt to prepare a comprehensive budget.  In addition, the Claims Administrator only began recently to implement a reporting framework to assess vendor performance and develop cost oversight of its vendors in response to questions posed by BP through its assessment of the claims facility.

---

[17] See **Exhibit 16**
[18] See **Exhibit 17**
[19] See **Exhibit 18**

45.     The results of these ineffective controls are evident in the actions of the Claim Vendors.  As described in the Freeh Report, BG "…at times resisted CAO oversight efforts to control costs and to create efficiencies.  For example, BG relied upon Mr. Sutton and Ms. Reitano to advance BG's interests within the CAO in an effort to resist and to undermine the implementation of business practices to control its costs and to eliminate inefficiencies."  The report goes on to state "the CAO staff informed the Special Master that BG was not always receptive of their concerns and was generally unaccountable.  For example, Mr. Odom said that Orran Brown of BG made clear to him from the outset of Mr. Odom's tenure at the CAO that Mr. Brown reported only to Mr. Patrick Juneau…"  This behavior from a vendor receiving as much as $16M[20] per month is shocking, and such disregard to the Claims Administrator's authority and brazen behavior would not be tolerated by a reasonable and prudent Claims Administrator.

46.     The outputs of a proper budgeting and reporting framework are encapsulated in i) a "bottom up" budget reporting model to forecast costs and productivity measures; ii) reporting to track actual costs and productivity measures; iii) reporting of budget to actual variances, including explanations supported by detailed analysis for significant variances.  These reporting outputs should be used to manage vendor staffing levels and billings, and identify inconsistencies with program goals.

47.     The lack of a proper reporting framework and proper communication from the CSSP has left the vendors in a position where they manage themselves without satisfactory oversight of their activities, staffing and productivity levels.   Historically, the Claims

---

[20] See **Exhibit 19**

Administrator did not require the vendors to produce detailed invoices and therefore was not able to evaluate time spent by the vendors on specific tasks.

   *a.  Lack of use of a Comprehensive Budget Model prior to Q4 2013*

  48. As documented in **Exhibit 20**, August 5, 2013 Letter from Maria Travis to Bob Levine, BP requested a comprehensive budget model be provided for Q3 2013 to better understand the costs associated with the claims facility.  The Claims Administrator's Q3 budget request of $130.3M was in the form of an "…email contain(ing) only a simple, 13 line chart generally identifying dollar amounts by vendor" *Id.* page 1.  This budget request contained no additional support, detail or analysis, and was based solely upon estimates provided to the Claims Administrator by the Claims Vendors.  The Claims Administrator was not able to provide a "bottom-up" budget for the Q3 2013 budget, and has admitted that budgets submitted by the Claims Administrator prior to the Q4 2013 budget were not developed using a "bottom-up" approach, or any other reasonable budgeting methodology.  Since the fourth quarter of 2013, the CAO has made progress in developing an integrated budget model and conducting monthly cost reviews.  However, the Claims Administrator should have identified this as a critical activity at the outset of the Claims Program and insisted it be implemented sooner.

   *b. Inadequate and Inconsistent Vendor Invoices*

  49. The lack of a proper reporting framework and communication from the CSSP has also resulted in vendor invoice information which lacks sufficient detail necessary to assess productivity.  Further, there is no continuity across the program as vendors have been given autonomy to determine what information to provide.  As a result, the vendor invoices do not contain the information needed to adequately compare budget to actual results for cost and performance assessment.

82780163

50.     As part of the Q4 2013 budget review process, BP made requests for changes to the vendors' invoices to request the invoices include additional information in an effort to standardize the reporting across the facility and provide further insight into the costs and productivity at the claims level and was told changes are being made.  To date, no changes that substantively add to the ability to monitor vendors' activities at this level have occurred despite repeated follow up from BP.

   c. Budget v. Actual Variance Reporting

51.     As described in my previous declaration to the Court, **Exhibit 4**, September 11, 2013, Todd Brents Q4 2013 Budget Declaration, Section 13, an effective budgeting process requires a monthly review and investigation of, and accountability for, any variances between actual and budgeted amounts.  Budget to actual variance analysis is a basic principal of financial budgeted and a basic management tool.  This variance analysis enables a determination of the root causes for the variances, positive or negative, and an evaluation as to how to reduce or enhance the variances, as appropriate.  During my discussions with the CAO, they acknowledged that no such measurement process existed at the beginning of the third quarter of 2013.  Not until September 2013, and only at BP's insistence, did the Claims Administrator prepare budget to actual variance reporting as part of its monthly financial reporting processes.  In addition, this variance reporting was only performed at a summary level, and did not contain detailed analysis of the cost and performance variables that affect results and provide insight into the variances.

52.     A prudent and reasonable claims administrator would have identified and established procedures to manage the CSSP vendors by developing appropriate staffing and cost projections supported by target performance metrics; obtaining agreement on staffing and cost projections with its vendors; and finally, setting proper budget to actual variance reporting to

82780163

understand deviations from agreed upon estimates.   Explanations of variances should be accompanied with detailed supporting analyses so that they can be properly reviewed with the vendor and appropriate corrective measures taken.   Since early 2014, the Claims Administrator has made further improvements in its monthly variance reporting process, and established additional detailed reviews for some vendors.   However, the failure to establish such an analysis at the outset represents a severe shortcoming in the management of the CSSP by the Claims Administrator.

### d. Lack of Incorporation of KPI Measures into Quarterly Vendor Task Orders

53.     On its face, the CSSP exhibits low productivity.   Across all claims types, the CSSP's 1,750 claim reviewers and accountants resolved[22] approximately 8,000 to 11,000 claims per month prior to the issuance of the BEL injunction in October 2013.   This works out to approximately 1.1 to 1.6 resolved claims per reviewer per week[23].   For BEL claims, productivity has historically averaged 1.6 resolved claims per accountant reviewer per week but dipped to 0.2 resolved claims per accountant reviewer per week during the BEL injunction period from October 2013 through May 2014[24].   Despite this low productivity, the Claims Administrator does not enforce uniform performance or productivity goals for the CSSP Vendors.   For example, the Claims Administrator did not at the outset of the program institute KPI's - "specific and measurable vendor performance metrics that tie directly to their ongoing billing" – for the Claim Vendors.   Aug. 7, 2013 Hr'g Tr. At 54:23 – 55:8, 58:8-10.

54.     In contrast with best management practices, to date, the CSSP has neither tracked (nor required the CSSP vendors to track) sufficiently detailed information regarding productivity and costs at a claim and task level in order drive this type of model (e.g., the length of time that

---

[22] A resolved claim is one that is either deemed eligible for payment or denied.
[23] See **Exhibit 21**
[24] See **Exhibit 22**

82780163

should be required to complete a particular task of the accounting review).  The failure to gather this critical information renders it impossible for the Claims Administrator to evaluate vendor performance and leaves him reliant on the vendors to monitor their own performance.  The Claims Administrator on June 4, 2012 acknowledged the importance of these measures.  He stated "he has not yet established metrics to measure his vendors' performance.  I'll solve that problem.  That's my wagon to pull, and we are working to develop those metrics."[25]  Not until February 2014 did the Claims Administrator implement KPI measures in the Quarterly Task Orders.  However, the measures are not consistent across all vendors, and they don't address all comprehensive performance measures.  The CAO has acknowledged that more improvement is needed in the KPIs.

55.    The significance of this lack of tracking results in the inability to articulate an objective productivity target for claim reviews.  Based on my experience with other claims programs, the current results of 1.1 to 1.6 resolved claims per week is low[26].  A thorough analysis should be conducted to evaluate how long it should take to resolve a claim, and standards should be established by which to measure claims performance.  The CAO has taken the position that these measures are too difficult and uncertain to establish as a result of the BEL injunction that began in October 2013 and other ongoing changes in the program.  However, since that date, the Claims Vendors have continued to employ hundreds of claims reviewers processing BEL claims, with no method to measure the effectiveness of these activities as no final determinations were issued.  And, notwithstanding an injunction prohibiting the payment of claims, one vendor continued to bill overtime for its staff.   The lack of objective measures has

---

[25] David Hammer, "New Gulf Oil Spill Claims Administrator's Message: We Are Not BP. We Are Here To Help," Times-Picayune (June 4, 2012).
[26] See **Exhibit 21**

made it impossible to evaluate or justify such expenditures, or the overall $103M[27] spent by P&N and PwC between October 2013 and May 2014.   A reasonable and prudent Claims Administrator would have insisted on establishing measures to track productivity during this period.

*e. Budget Model Errors*

56.     In the review of the budget models provided on August 16 and August 28, 2013, we noted numerous calculation and formula errors.  These findings were communicated to the Claims Administrator.  A number of these items resulted in significant dollar restatements to the budget, while others only impacted statistical or tertiary calculations.   The complete, detailed lists of calculation and formula errors identified by BP to date are found in the August 23, 2013 Maria Travis Letter and BP's September 4, 2013 Letter regarding Proposed Revisions to the Q4 2013 Budget, attached as **Exhibits 24 and 25**, respectively.  BP should not be tasked with the identification of errors within the budget model as this responsibility should be captured within the Claims Administrator's internal controls and processes.  Additionally, discussions with the vendors should have uncovered material budget calculation errors; a finding that points to a lack of communication and vendor oversight.

ii.   <u>Budget Model Cost Calculation Methodology</u>

57.     As described in my declaration submitted to the Court, **Exhibit 4**, September 11, 2013, Todd Brents Q4 2013 Budget Declaration, Sections 30 and 31, in lieu of using actual historical data, the Q4 2013 Budget model used estimates and assumptions provided by the CSSP Vendors until more reliable data could be generated.  In contrast with best management practices, the CAO neither tracked (nor required the CSSP Vendors to track) sufficiently detailed

---

[27] See **Exhibit 23**

information regarding productivity (e.g. – output of a performance measure such as "documents categorized" per FTE) or process duration times, hours, and costs at a task level in order to support the requested funding captured in the summary level budget. These estimates have typically not been verified through additional analysis to their validity.  In addition, the Claims Administrator has indicated that it will take cost, process duration times, and productivity estimates from the Claims Vendors at face value.  As a result, the CAO does not set or evaluate their own standards, and use this information to challenge the vendors' estimates.  In support of the Q4 2013 Budget, the Claims Administrator has provided BP with data regarding the CSSP's productivity, including process duration measures and task utilization ratios.  But the CSSP also has acknowledged that it does not have data for all of these measures and that a reasonable budget process requires "a more in depth analysis than the Claims Administrator has been able to perform in this abbreviated budget revision process . . . ." See August 28, 2013 Letter from David Odom accompanying the Q4 Budget proposal, attached as **Exhibit 26, at 3**.

58.     As described in my previous declaration to the Court, **Exhibit 4,** September 11, 2013, Todd Brents Q4 2013 Budget Declaration, Sections 57 – 59, the CSSP was unable to provide explanation or support for BG's budgeted Q4 2013 IT costs, totaling $4.0M.  It was not until after BP made further challenges to these costs, that limitations were placed on new IT development spending in October 2013.   Similarly, the CSSP was unable to provide an explanation or support for BG's Q4 2013 administrative overhead costs of $8.4M through a task based "bottom-up" approach[28].  These practices by the Claims Administrator demonstrate the lack of proper budgeting techniques.

**D.  The Claims Administrators Status Reports are Deficient and Should be Improved.**

---

[28] See support for Q4 2013 BrownGreer budgeted IT and Administrative Overhead costs of $4.0M and $8.4M, respectively, within **Exhibit 27**.

59.     A further observation regarding the Claims Administrators' lack of diligence is the failure to issue appropriately detailed and informative status reports that enable stakeholders, including Class Members, the PSC, BP, and the Court, to understand, evaluate, and monitor the CSSP's progress during the program.   An effective status report should convey important activities regarding claims status, financial matters, governance, legal and other policy issues as well as substantial explanations of major operational changes such as the cost and implementation of new IT systems.  They should also include discussions of efforts the CSSP is making to combat fraud and reports of specific instances of fraud.  With such a report, stakeholders are able to efficiently remain informed as to the general activities of the Claims Administrator, and how those activities affect their particular interests.   Attached as **Exhibit 28** is a list of suggested enhancements to the CSSP's status reporting that I believe would provide more comprehensive and readily understandable reporting that would make the CSSP more transparent.

60.     As an example of more extensive and transparent reporting, I also note the reports of the SIPA Trustee Irving H. Picard in connection with the Madoff Recovery Initiative, available at http://www.madofftrustee.com/interim-reports-11.html.

### *Conclusion*

61.     Based upon my experience and observations of the CSSP, the Claims Administrator has not demonstrated the skills and capabilities necessary to effectively manage the CSSP.   The shortcomings in the quality of claims reviews, the management control

environment, and the financial management demonstrate the failings of the Claims Administrator's management.


I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.


Executed this ___ day of August, 2014.


Todd Brents
AlixPartners, LLP

82780163

**Exhibit Index**

| Exhibit | Exhibit Description |
|---|---|
| 1 | Todd Brents CV |
| 2 | List of Reviewed and Relied Upon Materials |
| 3 | CSSP Administrative Expenses |
| 4 | Todd Brents Declaration, dated September 11, 2013 |
| 5 | CA's Internal Quarterly Review Reports Q4 2012 to Q3 2013 |
| 6 | CLA Independent Evaluation of the Internal Control Environment (Process Audit) |
| 7 | Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review, Status Report No. 21, dated May 30, 2014 |
| 8 | Internal Quarterly File Review Reports Error Rate Calculations |
| 9 | Q4 2012 - Q3 2013 BEL Claim Determinations |
| 10 | Mark Holstein Deepwater Horizon Court Supervised Settlement Program -- Request for Examination, dated June 21, 2013 |
| 11 | Moskowitz letter to the Claims Administrator, dated June 7, 2013 |
| 12 | Brown Greer and Garden City Group IT Spend through June 2014 |
| 13 | DWH 2.0 Cost Projections |
| 14 | FWA 1.5/2.0 Cost Projections |
| 15 | CSSP Monthly Administrative Expenses, July 2012 - June 2014 and Monthly Resolved Claims, July 2012 - June 2014 |
| 16 | CSSP 2014 Administrative Expenses Summary |
| 17 | CSSP Full-time Equivalent Resources |
| 18 | Projected Q3 2014 and Q4 2014 Monthly Administrative Costs Summary |
| 19 | BrownGreer Administrative Cost Summary from Q1 2013 - Q2 2013 |
| 20 | Maria Travis Letter to Bob Levine for Model, dated August 5, 2013 |
| 21 | Resolved BEL Claims per Week Calculation |
| 22 | BEL Claims Resolved per Claim Reviewer per Week Statistics |
| 23 | CSSP Accountants Administrative Costs Summary during BEL Injunction (October 2013 - May 2014) |
| 24 | Maria Travis Letter to CAO, dated August 23, 2013 |
| 25 | BP Proposed Budget Revisions Letter Exhibit A, dated September 4, 2013 |
| 26 | David Odom Letter Accompanying Q4 2013 Budget Proposal, dated August 28, 2013 |
| 27 | BrownGreer Q4 2013 budgeted Administrative Overhead and IT costs |
| 28 | Report By The Claims Administrator Of The Deepwater Horizon Economic And Property Damages Settlement Agreement On The Status Of Claims Review |

# EXHIBIT 1

### Curriculum vitae of Todd B. Brents

Mr. Brents has extensive experience in the administration and resolution of claims.  He has managed numerous large, complex claims programs either as trustee, claims administrator, or as an advisor to trustees, claims administrators and companies.

His current project is serving as the Trustee of Innkeepers USA, Inc., a REIT and owner of 75 hotels, currently being liquidated in a chapter 11 proceeding.  He leads the Dallas-based Information Center practice at AlixPartners, a 30 person team focused on managing claims and noticing programs, call center operations, data analytics, document management and vendor sourcing, among other areas.  He has also worked in numerous litigation projects such as preference and avoidance actions, contract disputes, and has advised companies in numerous operational and project management roles.

Representative Claims Experience

- Rotech Healthcare
- The Scooter Store
- Innkeepers USA Trust
- Borders, Inc.
- Nebraska Book Company
- Fairpoint Communications
- Readers Digest Association
- Freedom Communications
- Bernard L. Madoff Investor Securities
- General Growth Properties
- Accredited Home Lenders
- Motor Coach Industries
- New Century Financial Corporation
- Refco Capital Markets
- Northwest Airlines
- Mirant Energy
- Genuity, Inc.
- Exide Technologies
- Avado Brands
- PhyAmerica Physicians Group
- Sunterra Resorts

Education and Certifications

- MBA, Southern Methodist University
- BBA, Accounting, University of Texas at Arlington
- Certified Public Accountant, Texas
- Certified Insolvency and Restructuring Advisor

Professional Experience

- AlixPartners, LLC, Managing Director (2001-Present)
- Frito-Lay, Inc., National Credit Manager (1996-2001)
- Color Tile, Inc., Assistant Controller (1994-1996)
- Arthur Andersen & Co., Audit (1990-1994)

Expert Testimony (past 4 years or more)

- SGSM Acquisition Co., L.L.C., R. Patrick Sharp, III v. Leidenheimer Baking Co., 01-1063, U.S. Bankruptcy Court for the Eastern District of Louisiana (2003)
- SGSM Acquisition Co., L.L.C., R. Patrick Sharp, III v. Patton Sausage Co., 01-1105, U.S. Bankruptcy Court for the Eastern District of Louisiana (2003)
- Oakridge Consulting, Inc. v. Gibson Greetings, Inc., 01-1454, U.S. Bankruptcy Court for the Eastern District of Louisiana (2003)
- Oakridge Consulting, Inc. v. Placid Oil Refining Company, LLC, 01-1453, U.S. Bankruptcy Court for the Eastern District of Louisiana (2004)
- Iridium Operating LLC et al v. Motorola, Inc., 99-45005, U.S. Bankruptcy Court for the Southern District of New York (2005)

Publications (past 10 years)

- Improving Sarbanes-Oxley Annual Assessments, *Directors and Boards*, Second Quarter 2006
- Expedited Chapter 11:  Case Administration Workplan and Key Considerations, *American Bankruptcy Institute Journal*, October 2010

Compensation

- Compensation for study and testimony in this case is $732/hour.

# EXHIBIT 2

| No. | List of Materials Considered |
|-----|------------------------------|
| 1 | Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 and related Exhibits |
| 2 | Pleadings for Case 2:2010-md-02179 |
| 3 | BrownGreer, Garden City Group, PricewaterhouseCoopers, and Postlethwaite & Netterville Invoices, March 2012 to May 2014 |
| 4 | BrownGreer, Garden City Group, PricewaterhouseCoopers, and Postlethwaite & Netterville Contracts |
| 5 | BrownGreer, Garden City Group, PricewaterhouseCoopers, and Postlethwaite & Netterville Task Orders |
| 6 | BrownGreer Organizational Chart, dated May 15, 2013 |
| 7 | BrownGreer Weekly Status Reports No. 1 - 40 |
| 8 | Garden City Group Procedural Protocols |
| 9 | Garden City Group Weekly Statistics Reports, dated: April 27, 2013, May 4, 2013, May 18, 2013, and June 9, 2013 |
| 10 | PricewaterhouseCoopers Response to May 23, 2013 Budget Requests, dated June 4, 2013 |
| 11 | PricewaterhouseCoopers BEL Claims Review Training Materials |
| 12 | PricewaterhouseCoopers BEL Reporting Package, dated June 6, 2013 |
| 13 | PricewaterhouseCoopers Organizational Chart, dated June 6, 2013 |
| 14 | Postlethwaite & Netterville Response to May 23, 2013 Budget Requests, dated June 4, 2013 |
| 15 | Postlethwaite & Netterville Training Materials |
| 16 | Postlethwaite & Netterville Process Guidelines |
| 17 | Postlethwaite & Netterville Organizational Chart, dated May 29, 2013 |
| 18 | DWHECC Organization Chart, dated October 15, 2012 |
| 19 | DWH Process Flow Diagrams, dated June 14, 2013 |
| 20 | DWH Operations Manual, dated June 6, 2013 |
| 21 | DWH Operations Manual Appendix, dated June 6, 2013 |
| 22 | DWH 8113 Reports: Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement, June 2013 to June 2014 |
| 23 | DWH 8115 Reports: End of Day Dashboard Report, July 2012 to June 2014 |
| 24 | DWH 8377 Appeals Filed to Date, through June 30, 2014 |
| 25 | Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review, No. 1 - 21 |
| 26 | CSSP Claims Database Issue Tracking Reports |
| 27 | CSSP Claims Register, Weekly Extract |
| 28 | CAO Program Metrics, dated June 14, 2013 |
| 29 | CAO Analysis of Settlement Projections - All Claim Types, dated June 14, 2013 |
| 30 | Hearing Transcripts - Morning & Afternoon Sessions, dated August 7, 2013 |
| 31 | Q4 2013 CSSP Budget Materials, dated August 16, 2013 |
| 32 | Q4 2013 CSSP Budget Materials, dated August 28, 2013 |
| 33 | Q4 2013 CSSP Budget Materials, dated September 5, 2013 |
| 34 | Q1 2014 CSSP Budget Materials, dated November 1, 2013 |
| 35 | Q1 2014 CSSP Budget Materials, dated November 13, 2013 |
| 36 | Q2 2014 CSSP Budget Materials, dated March 7, 2014 |
| 37 | Q3 2014 CSSP Budget Materials, dated May 2, 2014 |
| 38 | Q3 2014 CSSP Budget Materials, dated May 5, 2014 |
| 39 | Q3 2014 CSSP Budget Materials, dated June 20, 2014 |
| 40 | Q4 2014 CSSP Budget Materials, dated August 1, 2014 |
| 41 | February 2014 Monthly Budget Report, dated April 4, 2014 |
| 42 | March 2014 Monthly Budget Report, dated May 5, 2014 |
| 43 | April 2014 Monthly Budget Report, dated June 11, 2014 |
| 44 | May 2014 Monthly Budget Report, dated July 9, 2014 |
| 45 | June 2014 Monthly Budget Report, dated August 13, 2014 |
| 46 | Report of Special Master Louis J. Freeh, dated September 6, 2013 |
| 47 | Memorandum in Support of Motion of the Special Master for Return of Payments Made to Casey C. Thonn and Others (docket # 12107) |
| 48 | Resumes and LinkedIn profiles of select CAO professionals |
| 49 | CAO Policy 495: Business Economic Loss Claims: Matching of Revenue and Expenses |
| 50 | Declaration of Patrick Juneau Regarding Criteria for "Matching" for BEL Claims, dated October 25, 2013 |
| 51 | Public Company Accounting Oversight Board AU Section 350; Audit Sampling |

# EXHIBIT 3

**CSSP Administrative Expenses**

**Quarterly Vendor Summary[1]**

| | 2012 | Q1 2013 | Q2 2013 | Q3 2013 | Q4 2013 | Q1 2014 | Q2 2014[2] | Total |
|---|---|---|---|---|---|---|---|---|
| **Claims Admin & Processing** | | | | | | | | |
| CAO & Supporting Vendors | $11,577,918 | $4,968,381 | $4,607,244 | $4,353,607 | $5,582,971 | $6,179,946 | $7,573,899 | $44,843,966 |
| BrownGreer PLC | $123,669,466 | $47,374,851 | $47,026,561 | $41,457,116 | $24,642,685 | $22,482,994 | $21,795,404 | $328,449,077 |
| Garden City Group Inc. | $116,086,612 | $27,332,654 | $24,474,449 | $20,228,249 | $17,620,337 | $14,833,699 | $13,597,003 | $234,173,003 |
| PricewaterhouseCoopers LLP | $32,209,832 | $22,492,705 | $21,229,435 | $21,764,515 | $14,746,364 | $18,196,141 | $19,574,520 | $150,213,512 |
| Postlethwaite & Netterville APAC | $28,647,387 | $16,609,027 | $24,803,018 | $29,132,866 | $24,946,074 | $18,891,816 | $21,472,921 | $164,503,109 |
| HUB Enterprises Inc. | $3,962,990 | $1,370,195 | $1,556,959 | $1,822,123 | $2,354,220 | $3,075,104 | $4,009,048 | $18,150,639 |
| Other Vendors[3] | $346,368 | $505,093 | $1,656,200 | $1,925,383 | $1,041,129 | $921,573 | $1,121,189 | $7,516,935 |
| **Subtotal** | **$316,500,573** | **$120,652,906** | **$125,353,866** | **$120,683,859** | **$90,933,780** | **$84,581,273** | **$89,143,984** | **$947,850,241** |
| **Supplemental & New System Development** | | | | | | | | |
| Freeh Group Investigative Services | $0 | $0 | $801,716 | $3,895,569 | $6,422,273 | $8,488,397 | $9,732,836 | $29,340,791 |
| McGladrey LLP | $0 | $0 | $0 | $0 | $2,115,374 | $6,898,610 | $4,284,723 | $13,298,707 |
| IBM | $0 | $0 | $0 | $0 | $692,637 | $1,229,211 | $7,073 | $1,928,921 |
| DWH / FWA System Development | $0 | $0 | $0 | $0 | $0 | $424,297 | $5,698,787 | $6,123,084 |
| **Subtotal** | **$0** | **$0** | **$801,716** | **$3,895,569** | **$9,230,284** | **$17,040,515** | **$19,723,419** | **$50,691,503** |
| **Total** | **$316,500,573** | **$120,652,906** | **$126,155,582** | **$124,579,428** | **$100,164,064** | **$101,621,788** | **$108,867,403** | **$998,541,744** |

**Footnotes:**

[1] Obtained administrative expense amounts from supplemental schedule *IV Working Forecast Compared to Last Month.pdf* within CAO's May 2014 monthly budget materials.

[2] April and May amounts are for actual costs based on vendor invoices and placeholder amounts for vendors that had not submitted their invoices prior to the issuance of the May budget materials. June amounts represent the CAO's last forecast.

[3] Other Vendors include Appeals Panelists, Subsistence Specific Vendors, and the Wetlands Title Research Firm.

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | **MDL NO. 2179** |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | **SECTION: J** |
| | * | |
| | * | |
| This document relates to all actions. | * | **HONORABLE CARL J. BARBIER** |
| | * | |
| | * | **MAGISTRATE JUDGE SHUSHAN** |
| | * | |
| | * | |
| | * | |

## DECLARATION OF TODD BRENTS

I, Todd Brents, am over the age of 18 and the opinions, statements and conclusions expressed in this declaration are my own.

1.       I am a Managing Director and senior member of AlixPartners, LLP's Information Management Practice.  I have more than 23 years of professional experience in finance and accounting management.  Prior to joining AlixPartners, I held various positions in treasury, operations analysis, and credit at Frito-Lay, Inc. and was the Assistant Controller at Color Tile, Inc.  Before that, I was employed at Arthur Andersen, LLP in Dallas, TX.

2.       I received my Masters in Business Administration from Southern Methodist University and my Bachelors of Business Administration in accounting from the University of Texas at Arlington.  I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.

3.       I am a founding member of the Information Management Services practice of AlixPartners, a business unit with nearly 250 people globally, and have been employed there since 2001.  The Information Management Services practice is a well-established information

management consulting service for litigation, bankruptcy and corporate matters.  Among other things, we provide services related to settlement administration, electronic discovery, mass transaction and complex data analytics, and bankruptcy claims.

4.      My team and I have extensive claims management experience working on some of the most complex claims assignments in history.  I personally have worked as a claims administrator or manager in a number of instances, including:

  a.  Bernard L Madoff Investor Securities — My team and I reconstructed information from electronic, paper and microfilm records spanning a 30-year time frame and implemented a customized online claims management system allowing numerous parties to quickly and efficiently review and determine claims.  We also served as the claims and noticing agent for the Securities Investor Protection Act estate, facilitating claims filing, noticing and communication through internal and public-facing websites.

  b.  Genuity, Inc. — I resolved telecommunications vendors' claims on a circuit-by-circuit basis and managed the sale of the business to Level 3 Communications.  I also managed the distribution of over $700M to creditors during wind-down.

5.      I also worked on the following claims administration or litigation matters: Rotech Healthcare, The Scooter Store, Inc., Borders, Inc., Fairpoint Communications, Freedom Communications, The Readers Digest Association, New Century Financial Corporation, Refco, Inc., Exide Technologies, Motorola, and certain RMBS investor litigation.

6.      As a result, I have extensive experience managing and resolving complex claims efficiently.  In addition, I have provided testimony on numerous occasions, including in some of the matters above.

7.      Alix Partners was retained on behalf of BP America, Inc. ("BP") in connection with litigation stemming from the Deepwater Horizon drilling rig.  I have met with representatives from the Claims Administrator's Office ("CAO") on several occasions regarding the Court Supervised Settlement Program's ("CSSP") proposed fourth quarter 2013 budget ("Q4 budget") and I submit this declaration in connection with BP's opposition to that budget.

8.      Except as otherwise noted, I have personal knowledge as to all of the information set forth below.  All of the facts and opinions set forth in this declaration are based upon my personal experiences and knowledge, information supplied by the Claims Administrator, interviews of and information provided to AlixPartners by the CSSP Vendors, my review of other relevant information, and my knowledge of the Settlement Program and understanding of the Settlement Agreement.

**Development of the Q4 Budget**

9.      I have prepared numerous budgets for claims programs and organizations. Through this experience, I have gained a detailed understanding of what constitutes a reasonable budget.  My budgeting experience includes:

- Budget analysis and development of "bottom-up" budgeting and review methodology for the Deepwater Horizon Medical Settlement Program;

- Preparation of budgets for AlixPartners' clients regarding claims administration and wind-down costs for liquidating estates;

- Preparation of 13-week cash flow forecasts for numerous AlixPartners' clients;

- Preparation of projected accounts receivable cash collections for Frito-Lay, Inc.;

- Preparation of accounts receivable departmental budgets for Frito-Lay, Inc.; and

- Preparation of annual financial budgets for Color Tile, Inc.

10.    Systematically developing a reasonable financial budget is critical to understanding and managing the performance and costs of a large operation such as the CSSP. Budgets should be developed through a "bottom-up" approach by determining each component of the budget separately to derive the total projected budget.  In addition, the budget should tie projected production requirements to the labor and expenses that will be necessary to meet those requirements.

11.    A reasonable "bottom-up" budget includes four fundamental components: (i) projected work volume for each task and subtask; (ii) productivity rates across functional areas, per person and per vendor; (iii) the number of people required to meet the projected work volume, which requires a calculation that results from the first two requirements; and (iv) the costs of each person.

12.    As the CSSP has admitted during our budget meetings, the CSSP's Q3 Budget was not developed using a "bottom-up" approach. Contrary to basic budgeting principles and management practices, the Claims Administrator has not been using projected future workloads to develop the Q3 or any prior budgets.  Instead, the budget was developed by simply taking the amount CSSP Vendors had spent in a prior period, and projecting similar or higher spending levels going forward. The CAO also has not independently tracked detailed performance or productivity metrics regarding its accounting vendors.  As a result, the CAO cannot measure the accounting vendors' performance, except at the most generalized levels.  This means that with respect to accounting labor costs, which are the largest single category of costs incurred by the CSSP, the CAO could not track how long it was taking accountants to perform any particular task or how efficiently those accountants were operating.

13.    The CSSP's Q3 Budget also lacked a monthly performance measurement

4

methodology.  An effective budgeting process requires a monthly review and investigation of, and accountability for, any variances between actual and budgeted amounts.  This variance analysis enables a determination of the root causes for the variances, positive or negative, and an evaluation as to how to reduce or enhance the variances, as appropriate.  During my discussions with the CAO, they acknowledged that no such measurement process existed at the beginning of the third quarter.

14.     On August 9, 2013, I attended a meeting to discuss expectations and requirements for the Q4 Budget with representatives from BP, Class Counsel, and the CAO.  A copy of the minutes from that meeting are attached as **Exhibit 1**.

15.     On August 11, 2013, the CAO provided BP with a utilization model to be used in the formulation of the Q4 budget.  A copy of the August 11, 2013 utilization model is attached as **Exhibit 2.**

16.     On August 14, 2013, I attended a second meeting to discuss expectations and requirements for the Q4 Budget with representatives from BP, Class Counsel, and the CAO.  During that meeting I was told that the Claims Administrator "does not currently believe that addressing the cause of a variance [from the budgeted amount] falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role.  Rather, the cause of a particular variance would be left to the respective Vendor itself to address."  A copy of the minutes from that meeting are attached as **Exhibit 3.**

17.     On August 16, 2013, the CAO submitted its initial Q4 budget, which totalled over $119,000,000.  That budget is attached as **Exhibit 4** and the related August 16, 2013 CAO Narrative *Reviewer Cost Model and Budget Forecast Methodology* is attached as **Exhibit 5**.

18.     On August 21, 2013, I attended a meeting with representatives from BP, Class

Counsel, and the CAO to discuss the August 16 Q4 budget proposal. A copy of the minutes from that meeting are attached as **Exhibit 6**.

19.     On August 23, 2013, BP sent the CAO a letter containing detailed comments and proposed revisions to the initial Q4 budget, and indicated the initial Q4 budget was excessive. That letter is attached as **Exhibit 7**.

20.      On August 28, 2013, the CAO provided a revised Q4 Budget of more than $131,000,000. The August 28 Q4 Budget proposal is attached as **Exhibit 8** and the August 28, 2013 Letter from D. Odom to M. Travis is attached as **Exhibit 9**.

21.     The Q4 Budget submitted on August 28, 2013, relied on new, material assumptions, and contemplated adding 99 new accountants at a cost of $10 million per quarter. These new assumptions and 99 new accountants were not included in the proposal submitted less than two weeks earlier on August 16.

**Analysis of the Q4 Budget**

22.     I have reviewed and analyzed each of the CSSP's two formal 2013 Q4 Budget proposals and supporting documents provided by the CAO.

23.     As a result of the recent meetings and discussions between BP and the CAO regarding the Q4 Budget, the CAO conceded that it could eliminate the entire second shift of BrownGreer reviewers (*i.e.*, 240 full time equivalent ("FTE") employees), reduce monthly expenses by approximately $1.8 million and increase the efficiency of the overall process. Similarly, Garden City recently closed its Sarasota call center, saving millions. The CAO has also established an improved methodology for developing budgets. This methodology was used in the creation of the Q4 Budget. The Q4 Budget now attempts to estimate costs in four categories: (1) variable labor costs associated directly with claims processing (*e.g.*, accountant

and reviewer labor); (2) other variable, non-modeled costs associated indirectly with processing claims (*e.g.*, management costs and IT development); (3) fixed costs not associated with processing claims (*e.g.*, facility costs, CAO salaries); and (4) expenses.

24.     Despite the improved methodology used to create the Q4 Budget, the budget remains excessive and unreasonable, because, as described more fully below:

   a.   the Q4 Budget is largely based on untested assumptions (*e.g.*, assumptions related to variable labor costs) provided to the CAO by the CSSP Vendors; and

   b.   the Q4 Budget contains other excessive and unsupported costs related to overhead or unnecessary tasks.

25.     In my opinion, these remaining flaws in the Q4 Budget result from the CAO's failure to manage the CSSP Vendors or to use the budgeting process to drive efficiency results. August 14, 2013 Budget Meeting Minutes, Exhibit 3, at 6.

Variable Labor Costs

26.     The largest component of the proposed Q4 Budget (57%)[1] is variable cost related to claims processing.

27.     The Q4 Budget attempts to estimate future variable labor costs based on a predictive model (the "Labor Model") that incorporates past experience and purports to link the projected volume of each particular task with the amount of labor necessary to complete each task.

28.     Tasks required to process claims are broken down into 11 steps. The Budget includes an estimated time to complete each step (the "process duration") and the estimated portion of time reviewers spend on claims processing versus other tasks related to claims review

---

[1] This calculation is based upon the Q4 Budget received by BP on August 28, 2013.

(the "task utilization"). For each task, the variable labor costs are projected using the following equation: (hourly labor cost for the task * (projected hours to complete task one time/ task utilization rate)) * number of repetitions of the task based on projected claims volume.

29.    In support of the Q4 Budget, the CAO has provided BP with data regarding the CSSP's productivity, including process duration measures and task utilization ratios. But the CSSP also has acknowledged that it does not have data for all of these measures and that a reasonable budget process requires "a more in depth analysis than the CAO has been able to perform in this abbreviated budget revision process . . . ." August 28, 2013 Letter from D. Odom, Exhibit 9, at 3.

30.    In contrast with best management practices, to date, the CAO has neither tracked (nor required the CSSP Vendors to track) sufficiently detailed information regarding productivity and costs at a task level in order to drive this type of model (*e.g.*, the duration of time that should be required to complete a particular task of the accounting review).

31.    In lieu of using actual historical data, the Q4 Budget model uses estimates and assumptions provided by the CSSP Vendors until more reliable data can be generated. In addition, the CAO has indicated that it will take cost, process duration, and productivity estimates from the CSSP Vendors at face value. This allows the CSSP Vendors to effectively set their own budget because the assumptions materially drive the budget model.

32.    Despite not being able to meaningfully measure accountant productivity, the CSSP added approximately 100 accountants between April and June 2013. Collectively, those staffing increases add more than $36,000,000 to the yearly cost of the CSSP.

33.    Since the addition of these accountants, the productivity of BEL claims processing, which is the primary focus of these accountants, has declined. For example,

according to the Systems Performance – Claims Review report from August 28, 2013 (included in Exhibit 8), the CSSP reviewed 2.77 claims per reviewer per month in June 2013.  In comparison, the CSSP's Systems Performance – Claims Review report from June 14, 2013 (attached as **Exhibit 10**) reflected a rate of 3.83 claims per reviewer per month.  The CSSP's target as of June 14, 2013 was 5.39 claims per reviewer per month.  *Id.*

34.     Another example of declining productivity is the number of BEL determinations issued per accountant per week.  By comparing the total number of BEL determinations issued by the CSSP with the estimated BEL review hours billed by CSSP accountant vendors Postelthwaite & Netterville and PwC, I calculated rates of 2.0, 1.7, 1.7 and 1.9 claims per accountant per week for April, May, June and July 2013, respectively.  Using this same calculation, the Q4 Budget projects a decline in accountant productivity to 1.5 claims per accountant per week for the three months in Q4.

Key Performance Indicators

35.     Because the CAO has indicated that CSSP Vendors' Key Performance Indicators ("KPIs") will be developed from the efficiency targets established in the Q4 Budget, establishing these targets has implications, which extend beyond the Q4 Budget process.

36.     Depending on how the KPIs will be linked to financial rewards/penalties based upon performance, Vendor compensation in the fourth quarter could be affected.  As none of the previous task orders include KPI measures, it is not known how the CAO intends to link performance and compensation.  In addition, these KPIs will establish benchmarks upon which the Q1 2014 budget and future budgets will be compared.

Increasing Process Duration Times

37.     Based on information provided by its accounting vendors, the CAO has revised

upward the process duration times used in the Labor Model three times during the Q4 budgeting process: in the initial model provided on August 11, the formal model presented on August 16, and the revised model presented on August 28.  These changes are summarized in the following table:[2]

**BEL Process Duration Times (hours)**

|  | 8/11 Model | | 8/16 Model | | 8/28 Model | |
|---|---|---|---|---|---|---|
|  | Total | Accountant | Total | Accountant | Total | Accountant |
| BEL | 32.5 | 26.6 | 43.4 | 37.5 | 48.4 | 40.8 |
| Failed BEL | 30.8 | 26.6 | 43.5 | 37.5 | 55.2 | 44.7 |
| Start-Up BEL | 30.8 | 26.6 | 43.5 | 37.5 | 50.2 | 41.5 |

38.     During the budgeting process, the overall process duration for Business Economic Loss ("BEL") claims has increased by 15.9 hours per claim, and the time allocated for accountants' tasks has increased 14.2 hours per claim.

39.     Similarly, the process durations for individual steps in the BEL process have increased.  For example, the process duration for the "Claim Review/Preparation" step in the BEL process increased from 10 hours per claim in the August 16 budget to 17.41 hours per claim in the August 28 budget.

Decreasing Task Utilization Rates

40.     As explained in the CAO's August 16, 2013 narrative accompanying its initial Q4 Budget proposal, the task utilization rate is a factor used to account for inefficiency in the CSSP processes.  August 16, 2013 *Reviewer Cost Model and Budget Forecast Methodology*, Exhibit 5, at 7.  Task utilization is the estimated percentage of every hour billed that each person spends performing a specific claims task (as opposed to a task not directly related to processing a

---

[2] Business Economic Loss claims are segregated in the model between those of continuing businesses (including multi-facility), failed businesses (businesses that ceased operations or filed bankruptcy between May 1, 2010 and December 31, 2011) and start-up businesses (those with less than 18 months of operating history at the time of the DWH spill).

claim).   At a 75% utilization rate, the CAO estimates that each task will take 33% longer than it should due to task-related inefficiencies.

41.    The CAO has indicated that, with regards to the task utilization rate, it "is very important to note that this value does NOT attempt to capture the length of time a claim is in process." *Id.*   Instead, the task utilization rate purports to capture the amount of time that reviewers spend "off-task," *i.e.* not actively working on claims.   The CAO has described this time as downtime for "training, team meetings, travel, and waiting for screens to load in the claims system."   In the August 28 letter, CSSP CEO Mr. Odom expanded this description to include "…evaluating the claimant file; reviewing and validating previously entered values; and discussing work with previous reviewers."   August 28, 2013 Letter from D. Odom, Exhibit 9, at 5.

42.    These descriptions are not consistent, and are indicative of the fact that the CAO does not know with precision how the "off-task" time is spent or the actual task utilization rates, as this information is not tracked by the Claims Vendors.  I understand the CAO began requiring this information to be tracked beginning in August 2013.  Until such data exists, a budget based on these estimates should be subject to heightened scrutiny.

43.    In the three Labor Models presented with the three Q4 budget proposals, the CAO has used three different task utilization rates.  The chart below includes the varying rates used for the claim types.

### Task Utilization Rate (TUR)

| Claims Category | 8/11 Model | 8/16 Model | 8/28 Model |
|---|---|---|---|
| Business Economic Loss (including Multi-Facility) | 87.6% | 75.0% | 80.1% |
| Failed Business | 87.6% | 75.0% | 80.1% |
| Start-Up Business | 87.6% | 75.0% | 80.1% |
| Coastal Real Property Damage | 75.0% | 75.0% | 75.0% |
| Individual Economic Loss | 75.0% | 75.0% | 75.0% |
| Individual Periodic Vendor and Festival Vendor Economic Loss | 75.0% | 75.0% | 75.0% |
| Real Property Sales Damage | 75.0% | 75.0% | 75.0% |
| Subsistence Damage | 75.0% | 75.0% | 75.0% |
| Seafood Compensation Program (Non Accountant) | | | |
| Blue Crab / Other Seafood | 75.0% | 75.0% | 75.0% |
| Finfish | 75.0% | 75.0% | 75.0% |
| Oyster | 75.0% | 75.0% | 75.0% |
| Shrimp | 75.0% | 75.0% | 75.0% |
| Seafood Crew | 75.0% | 75.0% | 75.0% |
| Seafood Compensation Program (Accountant) | | | |
| Blue Crab / Other Seafood (A) | 87.6% | 87.6% | 75.0% |
| Finfish (A) | 87.6% | 87.6% | 75.0% |
| Oyster (A) | 87.6% | 87.6% | 75.0% |
| Shrimp (A) | 87.6% | 87.6% | 75.0% |
| Seafood Crew (A) | 87.6% | 87.6% | 75.0% |
| Vessel of Opportunity (VoO) | 75.0% | 75.0% | 75.0% |
| Vessel Physical Damage | 75.0% | 75.0% | 75.0% |
| Wetlands Real Property Damage | 75.0% | 75.0% | 75.0% |

44.     The CAO originally estimated the task utilization rate for BEL claims and Seafood (accountant) claims to be 87.6% and 75% for all other claim types in the August 11 version of its model.  Five days later, the CAO adopted a 75% utilization rate for all claims, except for Seafood claims.  Then, in the August 28 version, without providing any supporting analysis to justify the change, the task utilization rate changed again to 80.1% for BEL claims and 75% for all other claims, including Seafood.  Because adjusting the utilization rate impacts processing times of all tasks, this change materially impacts the budget.  By way of example, reducing the utilization rate by just 1% results in an overall increase of approximately $1.3 million to the proposed Q4 Budget.

45.     Utilization rates should be increasing, not decreasing, given that the CSSP has

been operating for more than 14 months and its work force has matured and should be well trained. The CAO cites "the complexity of the program" for the need to decrease the rates, but has not provided any analysis to support the changes to the existing levels.

<u>Decreasing Productivity Targets</u>

46.     Neither the downward revisions of task utilization rates nor the upward revisions of process task durations are supported by any empirical analysis. However, these changing assumptions have a significant impact on the productivity targets and the overall budget. In order to properly determine what the appropriate process duration times, task utilization rates, and productivity targets should be, and provide a sound basis for calculating future budgets, an operational review and examination should be conducted of the CSSP and its Vendors.

47.     In support of the Q4 Budget, the CAO has provided BP with data regarding the CSSP's productivity in meter charts. Meter charts present targeted and actual numbers of claims processed per person per month across the various claim types. The CSSP first provided meter charts in May 2013, and subsequently provided four revisions, most recently on August 28.[3]

48.     The CAO claims that the meter charts were developed to "evaluate the efficiency of the program" but has never used meter charts to establish performance goals or measure performance of the Vendors. As the model was adapted to be used in the Q4 budgeting process, the targeted amounts contained in the August 12, August 16 and August 28 charts are the targets for the months of October, November and December 2013, while the actual amounts reflect the June 2013 actual results.

49.     Based on the meter charts that were provided, the CSSP's BEL productivity targets for Q4 are lower than previous targets. A summary of the charts for overall claims and

---

[3] The CAO did not provide BP with supporting data for the first two meter charts, dated May 8 and June 14. But the CAO recently provided supporting data for the August 12, August 16, and August 28 meter charts.

BEL claims indicates that even by the CSSP's own measures, the facility is consistently missing

its own productivity targets.  Because the CAO's role appears to be strictly limited to oversight—

not management—the Vendors have consistently missed these review targets.

| Meter Chart Date | Monthly Amounts | | | |
|---|---|---|---|---|
| | Overall Review Target per FTE | Overall Actual Reviewed per FTE | BEL Review Target per FTE | BEL Actual Reviewed per FTE |
| May 8, 2013 | 10.75 | 5.00 | 7.80 | 1.80 |
| June 14, 2013 | 14.00 | 7.75 | 5.40 | 3.60 |
| August 12, 2013 | 13.00 | 7.77 | 5.39 | 3.83 |
| August 16, 2013 | 14.00 | 6.97 | 3.48 | 2.68 |
| August 28, 2013 | 14.00 | 7.65 | 4.59 | 2.77 |

Excessive and Unsupported Non-Modeled Variable Costs

Labor Rate Mark-ups

50.    At the start of the CSSP's operations, CSSP Vendors hired Gulf-based

independent contractors with no previous direct experience or specific skill sets to carry out tasks

necessary for claims review and processing for which the CAO could have hired at a fraction of

the cost.  In particular, BrownGreer and Garden City collectively hired more than two thousand

independent contractors to work on claims review and, I believe, marked up by several multiples

the direct costs they paid to these workers.  On June 7, 2013, BP provided a letter to the CAO

that presented a detailed analysis suggesting that the markup of the Vendors appears to

approximate $14 million per month that is largely profit for the CSSP Vendors, with no value to

the CSSP, the Class, or BP.  June 7, 2013 Letter from K. Moskowitz to P. Juneau, attached as

**Exhibit 11**.  This letter encouraged the Claims Administrator to convert what BP assumed were

independent contractors from contractors of the CSSP vendors at substantial markups to

contractors of the CSSP with no markups.  Shortly thereafter, BrownGreer informed BP that it already had converted many of these workers to full-time employees, and Garden City stated that they intended to immediately convert all of these contractors to full time employees.  P&N informed BP that it has not used independent contractors on this engagement.  Based on my meetings with the CAO, neither BrownGreer nor Garden City expressed any intention or willingness to convert these workers to CSSP staff, thereby securing the windfall profits they are making on these workers at BP's expense.

51.     In sum, both BrownGreer and Garden City hired hundreds of independent contractors in the Gulf Region and marked-up the labor costs in its invoices to the CSSP—likely by several multiples.  If the CAO had engaged in proper cost management, it would have insisted that these contractors be engaged by the CAO directly and avoided significant labor mark-ups or, at a minimum, insisted that the labor mark-ups were at a reasonable percentage.

52.     With respect to employee labor rates, the assumptions built into the Q4 budget related to rate and level changes of employees are not disclosed or explained, making it difficult to understand the driving factor behind these assumptions, other than that the assumptions are considered static based upon past performance.  Because BrownGreer and Garden City have refused to disclose their mark-ups, we have estimated them.  Based on our analysis of prevailing market rates and BrownGreer job postings, we believe that the mark-ups, on average, may be as high as 219% and that reducing these mark-ups to commercially reasonable rates could result in over $133 million in annual savings to the CSSP.

Call Center Staffing

53.     The proposed Q4 budget allocates approximately $1.9 million to the BrownGreer Claimant Communication Center ("CCC").

54.      According to the supporting documents submitted with the Q4 Budget, this amount is calculated based on an average call time of 30 minutes per call (Tab "BG CCC Budget").  However, according to the BrownGreer Weekly Status Report #40, August 12, 2013, Table 27B, the average call time for the CCC is 6.9 minutes.  In the August 28, 2013 D. Odom Letter, the CAO states "Since the submission of the initially proposed budget, the CAO has received updated information on the CCC [*i.e.* BrownGreer] average call time and the Call Center average time, both of which have been budgeted at 10 minutes each…"  Exhibit 9 at 9. However, no material revisions were made to the revised budget to reflect these reductions in time estimates.  The CAO has offered no credible justification to explain why the budget should include projected activity exceeding three times the current activity levels.

55.      Similarly, the proposed Q4 budget allocates approximately $1 million to the Garden City Group call center.  According to the supporting documents provided with the Q4 Budget, this amount is calculated based on an average call time of 30 minutes per call (Exhibit 8, GCG Outreach Model Assumptions.).   In its August 28 letter, the CAO stated "[s]ince the submission of the initially proposed budget, the CAO has received updated information on the CCC average call time and the Call Center average time, both of which have been budgeted at 10 minutes each…"  August 28, 2103 Letter from D. Odom, Exhibit 9, at 9.  However, no material revisions were made to the revised budget to reflect this reduction in time estimates.

56.      The proposed budget allocation for both the BrownGreer and Garden City call centers appear inflated by significantly overestimated activity levels and should be calculated based on the actual call times experienced at the CCC and Garden City Group call center.

Unnecessary, Unsupported and/or Excessive Fixed Costs

IT Design

16

57.     The Q4 Budget includes $3.9 million allocated to BrownGreer for IT costs.  The CAO has indicated that 48% of these budget dollars will be spent on system maintenance and 48% on further system development, with the remainder to smaller tasks.

58.     In response to requests for additional information regarding the IT development projects being funded, the CAO provided a summary of 9 development projects that make up the 17,743 hours planned for development, an average of almost 2,000 hours per project.  However, no detail has been provided about the level of effort required for each individual project in order to assess its reasonableness.  The projects mostly consist of modifications and enhancements to existing processes and systems, and do not appear to be for the construction of new modules or major modifications of existing modules.  This is to be expected given that the CSSP is a mature facility and the heavy costs related to IT development should already have been incurred.

59.     A similar amount is budgeted for maintenance activities for the quarter.  The CAO provided a cursory justification for these 17,743 hours, without providing a detailed explanation or breakdown of actual tasks performed.

60.     These estimates certainly appear to be excessive, particularly at this late stage in the program (*i.e.*, heavy development related IT costs should already have been incurred).  An operational review and examination, including an analysis of the continuing IT needs of the program for development and maintenance, is necessary to allow BP and the CAO some basis to evaluate the necessity of the IT projects BrownGreer is undertaking and the reasonableness of the associated budget.

File Audit

61.     The Q4 Budget includes a $1.3 million allocation for the Garden City Group's File Audit Process.

62.     The reported purpose of this process is to convert claim information submitted to the GCCF by Class Members into the CSSP for use in processing their CSSP claim.  However, these conversions are being performed on all GCCF claims, whether or not the claimant has filed a CSSP claim.  This step is inefficient, unnecessary, and has resulted in work being performed on over 600,000 GCCF claimants, when only approximately 10% of those claimants have filed claims in the CSSP to date.   Based on available data, it is estimated that currently less than 1,000 CSSP claims per month are being filed by previous GCCF claimants.  A reasonable practice would be to conduct the File Audit process only for newly filed CSSP claims.

Other Calculation Errors

63.     In the review of the budget models provided on August 16 and August 28, we noted numerous calculation and formula errors.  We have communicated these findings to the CAO.  A number of these resulted in a significant dollar impact on the budget, while others only impacted statistical or tertiary calculations.   The complete, detailed lists of calculation and formula errors identified by BP to date are found in the August 23 Letter from M. Travis (Exhibit 7) and BP's September 4, 2013 Proposed Budget Revisions, attached as **Exhibit 12**.

## IV.     Minimum Q4 Budget Reductions

64.     On September 4, 2013, a Panel Meeting was held regarding the Q4 Budget where BP provided the CAO and PSC with a document detailing minimum reductions to the Q4 Budget.  BP's September 4, 2013 Proposed Budget Revisions, Exhibit 12.  The revisions BP suggested would lead to a total Q4 Budget reduction of at least $45,600,000.  This would result in a Q4 budget of no more than $85,600,000.

65.     At the Panel Meeting, the CAO agreed to make the following revisions to the Q4 Budget:

18

| CAO Accepted Q4 Budget Revisions | CAO Estimated Cost Impact on Q4 Budget |
|---|---|
| *Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims* | ($11.16)M |
| *Reduce projected Q4 Seafood claim staffing  to reflect CAO's projected elimination of claim backlog* | ($5.47)M |
| *Reduce unallocated contingency fee from 5% to 2.5%, fix calculation errors and calculate off reduced proposed budget amounts* | ($3.44)M |

66.    The result of these CAO-accepted reductions is a Q4 Budget that totals approximately $111,600,000.  September 5, 2103 Letter from D. Odom, attached as **Exhibit 13**.

67.    However, even at $111,600,000, the Q4 Budget is still unreasonable and at least the following additional revisions should be made:

|    | Minimum Required Q4 Budget Revisions | Estimated Cost Impact on Q4 Budget |
|---|---|---|
| 1. | *Increase BEL accountant productivity* | ($13.0)M |
| 2 | *Further reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog* | ($3.4)M |
| 3. | *Adjust task utilization rate for non-BEL claim types to equal BEL claim utilization rate* | ($1.3)M |
| 4. | *Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims* | ($1.3)M |
| 5. | *Eliminate Brown Greer IT development spending until further requested information is provided* | ($2.0)M |
| 6. | *Adjust BG and GCG call center staffing levels based* | ($2.0)M |

19

| | | |
|---|---|---|
| | *on 10 minute call duration* | |
| 7. | *Reduce Q4 GCG administrative costs in line with budgeted Q4 labor costs* | ($1.3)M |
| 8. | *Reduce unallocated contingency fee from 2.5% to 1%, fix calculation errors and calculate based on reduced proposed budget amounts* | ($1.7)M |
| 9. | *Reduce labor rates to address the unknown and undisclosed mark-ups* | Currently unquantifiable because the Vendors refuse to disclose amount of mark-ups |
| 10. | *Reduce BG administrative budget* | Currently unquantifiable due to inability of CAO to provide sufficient detail |

68.     The rationale and calculation of the associated reduction for each of the proposed revisions listed in this chart are described above and in more detail below.

Increase BEL accountant productivity (1 above)

69.     A proposed adjustment has been made to increase BEL accountant productivity in the amount of $13.0 million. As discussed above, the Q4 accountant productivity levels that drive the budget are based on unsupported estimates and assumptions. The lack of empirical support for the key assumptions that impact the budget render it unreasonable. As a result, the proposed adjustment was calculated at a level designed to restore productivity measures back to previously attained levels.

Further reduce Q4 Seafood claims staffing levels (2 above)

70.     The Q4 budget includes 205 FTEs for Seafood determinations. While the CAO accepted reductions equivalent to the elimination of 100 BrownGreer FTEs, no justification has been provided for the remaining 105 FTEs included in the Q4 budget. Based on the projected

Seafood claim submittals and Q3 determinations, all Seafood claims are projected to be resolved prior to the start of Q4.  The estimated cost reduction leaves residual costs for estimated re-reviews, reconsiderations, and trailing incomplete responses. The tab [Measured Page] in the Q4 Budget erroneously projects determinations in excess of remaining Seafood claims throughout Q4, resulting in an overstatement of required claim reviewer hours.

<u>Adjust Task Utilization Rates for non-BEL claims (3 above)</u>

71.     The task utilization rate of 75% for non-BEL claim types is inconsistent with the BEL claim type utilization rate of 80.1%.  The proposed adjustment is supported by a best practice of maintaining consistency within the model unless specific data supports an alternative assumption. The estimated reduction represents the non-duplicative impact of the task utilization rate adjustment after the hours related to Seafood claim review are removed from the Q4 budget.

<u>Reduce GCCF file audit activity (4 above)</u>

72.     As discussed above, the practice of converting all GCCF claims, whether or not the claimant has filed a CSSP claim, is inefficient and unnecessary.  The proposed adjustment leaves costs for estimated conversions required based on historical activity of CSSP claims filed by GCCF claimants.

<u>Eliminate BrownGreer IT development spending (5 above)</u>

73.     As discussed above, an operational review and examination, including an analysis of the continuing IT needs of the program for development and maintenance, is necessary to allow BP and the CAO some basis to evaluate the necessity of the IT projects BrownGreer is undertaking and the reasonableness of the associated budget. The proposed adjustment eliminates Q4 budgeted IT development spending until this review and examination is complete.

<u>Adjust BrownGreer and GCG call center staffing levels (6 above)</u>

74.     The CAO's written response from 8/28 confirms that average call duration is 10 minutes as opposed to the previously assumed 30 minutes; however the Q4 budget fails to adjust the optimal staffing needs based on the new call duration assumptions.  Based on the inbound and outbound call volume at the BrownGreer call center in June, assuming a 30 minute call time, the utilization rate of the BrownGreer call center agents was 72%.  Adjusting for the more accurate average call duration of 10 minutes and assuming inbound and outbound call volume remains relatively constant through Q4, the BrownGreer call center staff should be reduced by at least 67% which translates to costs of approximately $1.34 million.  Based on the inbound call volume at the GCG call centers in July, assuming a 30 minute call time, the average daily utilization rate of the GCG call center agents was approximately 82%.  Adjusting for the more accurate average call duration of 10 minutes and using the daily call volumes projected by the CAO in the Q4 budget, no more than 7 full-time equivalent call center agents are required in order to meet the daily projected call volume and maintain a utilization rate of approximately 82%, as opposed to the 16 to 19 agents calculated in the Q4 budget.  The proposed adjustment accounts for this reduction in staffing and translates to approximately $670,000.

Reduce Q4 GCG administrative costs (7 above)

75.     The Q4 budget established that GCG administrative costs generally run between 15% and 18% of labor costs; however, the administrative cost projections are erroneously calculated off of Q2 actual labor costs as opposed to Q4 budgeted labor costs. The estimated reduction corrects for the calculation error and accounts for further reductions resulting from additional labor cost reductions related to Seafood claims review and call center staffing levels.

Reduce unallocated contingency fee from 2.5% to 1% (8 above)

76.     The CAO has agreed to reduce the contingency fee from 5% to 2.5%.  The CAO

claims that this contingency is needed because of the number of unverified assumptions driving the budget, the complexity of the claims process, and the pace at which the budget has been prepared.  In a well-functioning budget and performance review process, however, such large reserves are not needed, as any unexpected activities that cause budget overruns will be identified quickly, and can be addressed by evaluating the need for the activity, or requesting additional budget as needed.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 11th day of September, 2013.


_____

Todd Brents
AlixPartners, LLP

# Exhibit 1

# MEETING NOTES



**MEETING FOCUS:**    ADMINISTRATIVE BUDGET MEETING

**MEETING DATE:**    **AUGUST 9, 2013  9:30 AM CST**

**ATTENDEES:**

| Name | Company | DHECC |
|------|---------|-------|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Ramji Kaul | SNR Denton | |
| Steve Herman | Herman, Herman, & Katz | |
| John Creevy | Herman, Herman, & Katz | |
| Tommy Thomassie | Wright, Roy, & Edwards | |

**BP Presentation on Planned Budgeting Process**

- BP established a five part framework upon which its review of the Administrative Budget will be evaluated.
  - Determine Projected Work Volume by Claim Volume
    - This should include projections of new claims filed and should be projected down to the task level for each step in the claims process.
  - Productivity Rates for Each Task
    - These should be determined on a per FTE level to determine the hours required to complete each step in the claims process.
    - This should be calculated by the hours required to perform each task.
  - Staffing Levels
    - Projected staffing levels by function and location are determined using the two aforementioned parts of the framework.
  - Labor Costs
    - Developed by determining appropriate staffing levels and hourly rate for each necessary person for each function.  This figure is multiplied by the estimated number of individuals necessary from the previous step.
  - Expenses
    - Based on historical run rates with regular consideration of expenses that are no longer necessary.
      - (1)  Out of pocket expenses should be largely related to projected headcounts.
- Budget calculations should be made in an integrated model.
  - Connect the projected volumes to the cost and expense calculations.
- Actual results should be tracked against the budgeted volumes and hours with a variance analysis.



# MEETING NOTES *(CONTINUED)*

**Previous Requests for Information (RFIs) by BP**

- This section serves to establish the following: 1) the specific information previously requested by BP and 2) that the Claims Administrator's Office (CAO) has responded by providing to BP as requested all information currently tracked and maintained by the CAO.

  - The CAO has provided to BP all data that has been provided to it by the Vendors. Additionally, some information has not been provided to BP because it is not tracked at the certain micro-granular levels requested by BP. However, all information that is currently tracked by the CAO and was available to the CAO that has been requested by BP was subsequently provided to BP.

    - As to the information that needs to be requested from the Vendors and the information that needs to be tracked at a very granular level, BP and the CAO agreed on August 9 that it will take a reasonable amount of time for the CAO to acquire this information from the Vendors and develop this level of tracking before the CAO is able to provide it to BP.

    - Additionally, it was agreed to by BP and the CAO on August 9 that, given the time constraints of the budget development process, certain non-budgetary information requests will be given a lower priority than those information requests related to the budget development process. These instances are noted in the minutes.

  - A matrix of this information is attached in Exhibits A and B.

- May 1 Questions/RFIs for the CAO (Exhibit A)

  - Performance Metrics/Budgeting

    - Updated Organization Chart, including headcounts for each area

      (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on a high-level overview perspective.

        (a) It was acknowledged by BP and the CAO on August 9 that it is extremely onerous to provide this information on an "employee name" basis for the entire Program given the mere number of employees currently working for the Vendors.

      (2) In an effort to provide BP with employee information that can be correlated with the invoices, the CAO will provide more detailed organizational charts at the head count level for each Vendor employment position rather than at the individual employee name level.

    - Operations Manual and Process Flow Map for the claims process; correlate headcounts to the process flow map

      (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

        (a) However, it was acknowledged by BP and the CAO on August 9 that the CAO did not receive information correlating head count to the process flow map from the Vendors. Therefore, the CAO was unable to provide this information.

    - Management Reports and analysis performed to evaluate claims processing vs. costs/staffing

      (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP; however, the information provided correlated to volume.

        (a) It was acknowledged by BP and the CAO on August 9 that the CAO did not receive information evaluating claims on a cost/staffing basis from the Vendors. Therefore, the CAO was unable to provide this information.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

Case 2:10-md-02179-CJB-SS    Document 13347-36   Filed 09/12/14   Page 29 of 121



# MEETING NOTES *(CONTINUED)*

‣ Schedule of amounts that vendors pay to each contractor

  (1) It was acknowledged by BP and the CAO on August 9 the CAO does not have this information.

    (a) Based on discussions at the June 18 meetings, the CAO does not currently have authority to request this information from the Vendors as per the Vendor contracts.

    (b) The Vendors have provided which contractors are performing work on the Program and the rates that the Vendor is billing the Program for that labor.  However, as per Vendor Contracts, the Vendors are not obligated to provide the rates that they charge the contractors for this performed labor.

‣ Time in motion or velocity studies of the claims administration process

  (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on a macro level within the Utilization Modeling.

    (a) This topic is covered in greater detail with the discussion of the Utilization Modeling and the raw data that is incorporated into producing those reports.

    (b) In July 2012, when the CAO began creating these models, several assumptions were initially made.  These assumptions were gradually removed as the model matured and data became available.

‣ Analysis of administrative costs incurred or budgeted on an average claim basis across status types (eligible, incomplete, denial, withdrawn, closed) - if possible broken down by vendor by task

  (1) It was acknowledged by BP and the CAO on August 9 this is currently not tracked by the CAO.

    (a) The CAO currently measures the total system cost per damage category based on all notice types that are issued, but this is not tracked at the task sublevel.  This, along with information from the Utilization Modeling, can be married to the costs with accompanying reasonable assumptions to create the budget.

‣ Projections for the average administrative costs per claim type

  (1) It was acknowledged by BP and the CAO on August 9 that this data has been provided to BP.

‣ Projections of the time and costs to resolve the claims with no notice backlog, approx. 70,000 claims with no notices issued

  (1) It was acknowledged by BP and the CAO on August 9 that this data has been provided to BP.

‣ Projections of the time and costs to resolve the incomplete claims backlog, approx. 30,000 claims with incomplete notices

  (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Projections of the time and costs to process claims based upon the estimated number of new claims

  (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Key metrics to track each vendor. How are vendors being evaluated when contracts are not complete?

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999



# MEETING NOTES (CONTINUED)

(1) It was acknowledged by BP and the CAO on August 9 that the CAO does not have this information.

(2) The key metrics to track Vendors are Key Performance Indicators (KPIs), which can be implemented as per the Task Orders of the Vendor contracts.

    (a) When the claims processing began, the CAO wanted flexibility in establishing the expectations of the Vendors.

        (i) The CAO decided that KPIs should not be established as the Program was still evolving.

    (b) The CAO envisions that as the Program reaches a steady state, KPIs will be a valuable tool used to track and evaluate Vendors.

    (c) The Task Orders, however, do currently establish FTE Allocation.

(3) The next Task Order will be agreed upon in October 2013.

‣ Description of the steps taken to evaluate continual administrative process improvements, including efficiency improvements

(1) This RFI relates to system optimization and process optimization efforts.

(2) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

    (a) An example of this would be the IEL Process Improvement provided to BP in Exhibit E of the May 22 Letter to BP.

(3) BP and the CAO acknowledged on August 9 that, because of the complexity of the Program, the continual administrative process improvements can only reasonably be performed on a macro level.

    (a) Given the complexity of the Program, it is virtually impossible to isolate and measure specific variables to determine the effect one process change has on the whole Program.

    (b) To date, the CAO has focused on tracking global throughput rather than the system optimization effect of individual process changes.

        (i) Rather than measuring the system processes on a micro level, the CAO uses Daily Notice Reports per Claim Type to measure daily productivity against previously set benchmark goals.

(4) BP and the CAO acknowledged on August 9 that times could exist when it is possible to measure the effect a single change had on the whole Program; however, these occurrences would be rare.

    (a) One August 9, BP suggested including key highlights that illustrate instances in which system optimization efforts have a quantifiable effect in the periodic reports the CAO distributes to BP.

        (i) However, the difficulty in quantifying this data was acknowledged by both BP and the CAO.

‣ Support for the decision to not consolidate BEL processes

(1) This topic was acknowledged by BP and at CAO on August 9 as having been discussed and resolved by BP, the CAO, and the Vendors at the Vendor meetings in June.

‣ Cause(s) for the disparate trending of GCG administrative cost reduction and BrownGreer's administrative cost increase since the Program inception

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



    (1) It was acknowledged by BP and the CAO on August 9 that this issue had been resolved for the most part in June at the Vendor meetings and that anything currently unresolved will be resolved by the budgeting process itself.

‣ Document the underlying activities BrownGreer performs in the CSSP process vs. the GCCF process that gives rise to incremental CSSP costs for BrownGreer versus GCCF costs

    (1) It was acknowledged by BP and the CAO on August 9 that the CAO cannot comment as to the underlying activities performed by BrownGreer for the GCCF.

‣ Cost spent on training staff

    (1) It was acknowledged by BP and the CAO on August 9 that the CAO is not currently requiring this information from Vendors and therefore has not tracked this information to date as the CAO has focused more on trending.

       (a) Additionally, it is not likely that the CAO will be able to acquire this information from the Vendors on short notice.

       (b) BP requested on August 9, at a minimum, information concerning the out of pocket costs each Vendor incurs in hiring and training new employees.

          (i) The CAO acknowledged this request and will begin the process of acquiring the data from the Vendors.

‣ Turnover rate for project team members

    (1) This point is similar to the previous concerning "Cost spent on training staff."

       (a) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

          (i) However, BrownGreer's turnover statistics were uploaded to the CAO SharePoint site on June 14, 2013.

          (ii) Additionally, as requested by BP, the CAO will contact the other Vendors to acquire this information and provide it to BP as soon as is practicable.

       (b) It was agreed between BP and the CAO on August 9 that information related to turnover is mainly of a processing concern rather than a budgetary concern. Therefore, it was agreed that the acquisition and delivery of this information will be treated with a lower priority than information related strictly to the development of the budget.

‣ Costs of re-training due to turnover

    (1) This point is similar to the previous two points.

       (a) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

       (b) It was agreed between BP and the CAO on August 9 that information related to turnover is mainly of a processing concern rather than a budgetary concern. Therefore, it was agreed that the acquisition and delivery of this information will be treated with a lower priority than information related strictly to the development of the budget.

‣ Performance measures for project team members

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999



# MEETING NOTES (CONTINUED)

        (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP in a satisfactory manner.

   ‣ Results of actions taken based on project team members' performance metrics

        (1) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

  □ Internal Audit and Vendor Self-Review Process

   ‣ Copies of all reports issued from internal quality assurance and vendor self-reviews

        (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

   ‣ Copy of the quality assurance work plan

        (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

   ‣ Copies of vendor self-review plans

        (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

   ‣ Documented process for performing quality review of claims for each claim type

        (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

   ‣ In relation to the previous four topics, BP requested at the August 9 meeting a copy of the second quarter internal audit report.

        (1) The CAO will provide this report to BP.

  □ Fraud Detection Program

   ‣ Copies of any reports of the results of the fraud detection program

        (1) It was acknowledged by BP and the CAO on August 9 that all reports of results of fraud detection have been provided to BP.

   ‣ Current fraud detection program data

        (1) It was acknowledged by BP and the CAO on August 9 that the CAO provided all fraud data maintained by the CAO to BP. This data identified the number of claims identified as fraudulent.

           (a) The CAO does not track fraud detection from a volume throughput perspective.

              (i) The CAO's tracking of fraud is less about efficiency and more about fraud detection itself.

        (2) BP requested on August 9 more detail on the number of claims being reviewed by the Special Investigations Team.

           (a) BP and the CAO agreed that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget.

   ‣ Update on the final resolution of the claims summarized on Handout #3 of the January 16, 2013 Fraud Process Overview report

        (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on June 14 by BrownGreer.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- ‣ Analysis of the administrative cost impact of the presence of potential fraudulent claims in the system; percentage of administrative costs per claim and per claim type associated with fraud investigations
  - (1) It was acknowledged by BP and the CAO on August 9 that the CAO does not track the impact of potential fraudulent claims by administrative cost in this manner.
  - (2) It was acknowledged by BP and the CAO one August 9 that information contained in the Status Reports provided by BrownGreer have partially satisfied this request.
    - (a) BP requested on August 9 more detail on the number of claims being reviewed by the Special Investigations Team and, if permissible, the identity of the claims by Claim ID.
    - (b) The CAO is unsure at the moment whether the Settlement Agreement permits the disclosure of the identity of the claims that are under fraud review and will further research the topic.
- ‣ Results of the HUB investigations
  - (1) It was acknowledged by BP and the CAO on August 9 that it is unclear at the moment whether the Settlement Agreement permits the CAO to provide claimant specific information to BP.
- ‣ Analysis of fraudulent claim attributes and search of remaining claims for signs of those attributes
  - (1) It was acknowledged by BP and the CAO on August 9 that this is currently not tracked by the CAO.
- ‣ Correlation analysis of claims to identify repetitive patterns (i.e. amounts, class member, address/location, and attorney/representation)
  - (1) It was acknowledged by BP and the CAO on August 9 that this is currently not tracked by the CAO.
- ■ August 5, 2013, Letter from Maria Travis
  - ▫ Targeted claim determinations and payments by claim type and by person
    - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.
      - (1) It was acknowledged by BP and the CAO on August 9 that the Utilization Modeling included targeted claim determinations by claim type and by person but did not include targeted payments by claim type and by person.
  - ▫ Call center activity and targeted metrics
    - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - ‣ Given the familiarity the CAO has developed with this metric, it is likely the Erlang-C modeling will not be necessary in incorporating call center activity into the budget.
  - ▫ Targeted throughput analysis for each stage in the claim process
    - ‣ It was acknowledged by BP and the CAO on August 9 that this has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



- ▫ Estimated progress of incomplete claim analysis, broken down by type of incompleteness, aging of claim, and action items to be undertaken to resolve
  - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and Incompleteness Outreach Reports and would be explored further in the discussion of the Utilization Modeling.
  - ‣ BP has identified this as a "choke point."
- ▫ Levels of quality assurance in relation to reasonableness thresholds
  - ‣ Prior to this August 9 meeting, the meaning of this Request for Information was unclear to the CAO.  However, BP clarified its RFI on August 9 when it posed questions as to why varying claim types receive varying amounts of quality assurance.
    - (1) It was acknowledged by BP and the CAO on August 9 that the CAO has provided copies of its quarterly internal audit reports and data in relation to QA reviews.
  - ‣ It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.
- ▫ Projected fraud detection activity and bases for levels of efforts
  - ‣ As mentioned previously in relation to fraud detection, it was acknowledged by BP and the CAO on August 9 that the CAO has provided to BP all of the fraud data reports maintained by the CAO.
  - ‣ However, it was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget development date.
- ▫ FTE count by month, location, function, designation for employee vs. contractor, and claim type
  - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.
    - (1) It was acknowledged by BP and the CAO on August 9 that information related to designation of employee vs. contractor, claim type, and location of FTE for all Vendors is not currently available to the CAO.
- ▫ Fees and expenses broken down by month, Vendor, level, location, and expense type
  - ‣ It was acknowledged by BP and the CAO on August 9 that this information has been partially provided to BP within the monthly invoices.
    - (1) It was acknowledged by BP and the CAO that the CAO had not previously required this level of detail in the invoices of the Vendors.
    - (2) BP requests to see this level of detail within the budget.
- ▫ Turnover analysis: count of additions and subtractions of employees and contractors
  - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP, which consisted of turnover statistics as related to BrownGreer.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



    (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.

        (a) It was noted that Postlethwaite & Netterville's turnover rate is around 4% annually.

    (2) However, it was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

        (a) Additionally, BP proposed on August 9 including this in the previously mentioned periodic reporting that the CAO will provide to BP. Additionally, both BP and the CAO agreed that maintaining an open dialog about the issue of turnover rate would be beneficial to the productivity and efficiency of the Program.

- Turnover analysis: training requirements and costs given projected turnover
  - This point was encompassed in the discussion of the previous point.
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

- Turnover analysis: projected staffing level and hourly rate changes with justification/explanatory notes for any changes
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.
    - (2) No Vendor currently tracks or reports its projected staffing and hourly rate changes with explanatory notes.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

- Measure productivity in relation to costs using KPIs
  - Given that no KPIs exist within the current Task Orders, it was acknowledged by BP and the CAO on August 9 that this issue was not related to the immediate revision of this budget. However, BP and the CAO agreed to explore the use of KPIs to increase efficiency and productivity in the future.

- Data dictionary
  - It was acknowledged by BP and the CAO on August 9 that all information currently being tracked by the CAO has been provided to BP.
    - (1) However, BP requested on August 9 a data dictionary including every data field for the entire database currently maintained by the CAO in an effort to further determine any additional metrics that may be helpful.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



(a)  The CAO acknowledged this request and agreed to provide this information as soon as practicable.

(2)  It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

**Budget Process and the Utilization Modeling**

- The CAO will have a revised budget prepared within the time parameters set forth by the Court.
  - However, given the short time frame and the startup phase of this budgeting process, both BP and the CAO agreed that it is expected that certain reasonable assumptions will need to be established in order to provide the revised budget within the Court-established timeframe.
  - These assumptions will be modified over time in order to fine tune the projected budget to the level of granularity desired.
    - Assumptions such as these have been made in the CAO Utilization Modeling and were fine-tuned as the Program matured and grew towards steady state.
- The Utilization Modeling will be the main tool used to revise the CAO's budget.
  - The Utilization Model is updated on a monthly basis to provide a more or less real time forecasting tool.
    - This model was developed as a tool that the CAO uses to measure the efficiency and Claim throughout of the entire system.  It can now be modified and used to generate a budget.
  - This Model was initially developed in July 2012, as Claims began to be processed to determination notices, in an effort to measure the time spent in each of the various phases of the processing of a Claim.
    - The CAO has provided to BP a summation of all of this information in the Meter Charts.
      (1)  This provides monthly, backward-looking information on system capacity for a given month and actual final determinations as compared to that system capacity.
    - Initially, several assumptions were made with Vendor cooperation in building this model; however, over time, these assumptions have been replaced with data to increase the predictive accuracy of the Model.
    - Because this Model uses data collected from the BrownGreer system, it does not currently incorporate the offline aspects of review performed by P&N and PwC.
  - This Model does not granularly track time at the reviewer-specific level because of the complexity of the system, given that a reviewer may touch several different Claims in a single day because of incompleteness notices, pending policy, etc.
    - Not every hour of a FTE's workday is captured by the BrownGreer system because a small portion of that time is lost in offline, claim review related activities.
      (1)  This time is captured in a task utilization rate that measures off-task time that is inherent in the Claims processing system.
      (2)  The Utilization Modeling measures purely on-task touch time; however, it also backs into the information concerning the off-task time inherent in the system.
  - The Process Duration information on the Utilization Model will be used to revise the budget.
    - However, because this information was initially developed with a focus on projecting and measuring system efficiency, it will need to be adapted to be used to produce a budget.
      (1)  The challenge will be breaking down the information of the individual tasks.

# MEETING NOTES *(CONTINUED)*

- ▫ BP and the CAO agreed on August 9 that this would be the main tool that would be used in revising the budget.
    - ‣ BP requested on August 9 the raw data that the CAO had used to create the Utilization Models previously provided to BP.  This was a one-time educational request for this information that would only be used to better understand the raw data of the Utilization Model for the purposes of revising the budget.
        - (1) The CAO was unsure whether the Settlement Agreement provided the CAO with the right to provide this information to BP.
    - ‣ After brief discussion with the Plaintiffs' Steering Committee, it was determined that the CAO would provide to BP the raw data used in creating the Utilization Models as a one-time provision for educational purposes relating to the revision of the budget.
        - (1) The PSC noted that it had objected to the distribution of the material in the past; however, it did not object to this one time provision solely for educational purposes relating to the revision of the budget.
        - (2) All raw data contained within the Model is data to which BP has already been granted access.  The Model itself, however, is a work product developed by the CAO and is constantly modified and updated to better predict the processing of Claims.

**Communications over the Next Week**

- ▪ It is preferred by BP and the CAO that the communication process be open and informal so as to keep the revision of the budget as transparent and collaborative as possible.
    - ▫ This will allow BP to better understand the process of the CAO in revising the budget.
- ▪ The tentative plan calls for a face-to-face meeting in New Orleans at the Claims Administrator's Office on Wednesday, August 14, 2013, at 10:00 AM.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999



# MEETING NOTES *(CONTINUED)*

**ACTION ITEMS:**

| TASK | RESPONSIBLE PARTY | COMPLETION DATE |
|---|---|---|
| The CAO will provide BP with more detailed organizational charts on the head count level. | CAO | As soon as possible.  This information has not been previously required from the Vendors.  Therefore, it will take a reasonable amount of time for the CAO to acquire this information. |
| The CAO will provide BP with information on out-of-pocket training costs of new employees for each Vendor. | CAO | As soon as possible.  This information has not been previously required from the Vendors.  Therefore, it will take a reasonable amount of time for the CAO to acquire this information. |
| The CAO will provide BP with a copy of the second quarter internal audit report. | CAO | As soon as possible. |
| The CAO will provide BP with more detailed information on the number of claims being reviewed for fraud detection. | CAO | BP and the CAO agreed on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |
| The CAO will make a one-time provision to BP of the raw data drivers of the Utilization Model for the purpose of better understanding the mechanisms that the CAO will use to revise the budget. | CAO | As Soon As Possible.  As per objection by the PSC, BP and the CAO agreed on August 9 that this will be a one-time provision for the sole purpose of educating BP on the methods that will be used to revise the budget. |
| BP requested information concerning the turnover rates of the various Vendors. | CAO | BP and the CAO agreed that on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)

| | | |
|---|---|---|
| BP requested a data dictionary of all data fields currently captured in the CAO system. | CAO | BP and the CAO agreed on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |

*Please distribute internally as appropriate.*

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# Exhibit 2

## [Provided on Enclosed Disk]

## FILED UNDER SEAL

# Exhibit 3

# MEETING NOTES



**MEETING FOCUS:**    CSSP ADMINISTRATIVE BUDGET MEETING

**MEETING DATE:**    **AUGUST 14, 2013  10:00 AM CST**

**ATTENDEES:**

| Name | Company | DHECC |
|---|---|---|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Gary Jackson | BP | Philip Ollendike |
| Keith Moskowitz | SNR Denton | |
| Ramji Kaul | SNR Denton | |
| Tommy Thomassie | Domengeaux, Wright, Roy, & Edwards | |

**Utilization Model Changes**

- The Claims Administrator's Office (CAO) is attempting to break out certain functions to a granular level in order to achieve greater detail in the budget model.

- Model Changes in Progress
  - Revaluation of claim processing times to incorporate accurate weighted average review times for the following additional determination notices:
    - Eligible;
    - Incompleteness Denial;
    - Opt Out/Duplicate/Withdrawn;
    - Denied/Suspended/Closed/Closure.
  - Incorporation of analyzed trends to project the following costs:
    - Vendor expenses;
    - Appeals panelist fees;
    - Wetlands title firm fees;
    - Subsistence specific vendor costs.
  - The largest expense of the Program is the labor expense associated with claim reviewers.
    - Our current state model looks at the system from a wide overview.
      - (1) Expenses are currently a static function within the model because the CAO does not presently have access to all data necessary to project these costs.
      - (2) Management functions are being distributed on a pro rata basis because the vendors do not at the moment prepare invoices with highly detailed information regarding the specific task being worked on.



# MEETING NOTES *(CONTINUED)*

**Vendor Requests for Information**

- Given the time constraints on the budget model revision process set forth by the Court, BP and the CAO have agreed to focus efforts on current RFIs related to the budget. Non-budget related information will merely receive a lower priority until the revision of the budget model is complete.
- Budget Related RFIs
  - Detailed Organizational Charts
    - These will be provided broken down by function, task, and claim type for each of the Vendors. These charts will be coded by job performed so that they will tie to the invoices.
  - Out of Pocket Costs for Hiring and Training
    - The format of this report has not yet been determined.
    - This information will be a data driver in the future but will not be incorporated into the fourth quarter budget submitted on Friday, August 16, 2013, because Vendors will not be able to provide this information immediately.
  - Retraining Costs Due to Turnover
    - Similarly to the last point, the CAO is unable to attain this information from the Vendors immediately. For this reason, retraining costs due to turnover will not be incorporated into the Fourth Quarter Budget submitted on Friday, August 16. However, going forward, the CAO will be able to attain this information from the Vendors and incorporate it in the budget forecast model.
  - Modified Vendor Invoices
    - Similar to the Detailed Organizational Charts, these will be broken down by Vendor, location, and task.
    - Some concern was expressed about the Claimant Assistance Centers (CACs), specifically the cross training of reviewers.
      (1) Once the employee time card system and invoicing are adapted to include this level of detail, the increased level of detail on CAC task hours will be incorporated into the budget forecast model.
      (2) It is not anticipated that this level of detail will be achieved for the fourth quarter budget. The CAO will, however, be able to put the CAC employees in buckets for the purposes of creating the August budget.
- Process Related RFIs
  - It was again reiterated that these are indeed priority items for the CAO. However, given the time constraints surrounding the budget forecast model revisions, these will be given a lower priority than budget-related RFIs until the budget model revisions are complete.
  - Turnover Rates for DWH
    - As previously mentioned, the CAO is unable to attain information related to Turnover from the Vendors immediately. Further, since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
  - Volume of Claims Reviewed by SIT

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- ‣ This was recognized as an open-ended item.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
    - ▫ Detailed QA Thresholds
        - ‣ This was recognized as an open-ended item.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
    - ▫ Projected Staffing and Rate Changes
        - ‣ This is generally considered static because the rates charged by the Vendors are established in the Vendor contracts.
    - ▫ Data Dictionary
        - ‣ This request is being escalated through the Claims Administrator's Office.
        - ‣ It will initially only consist of a list of the data fields that the CAO tracks.  It will not initially include the actual data corresponding to those data fields.
        - ‣ According to BrownGreer, producing this data dictionary will take approximately three weeks.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.


**Budget Methodology**

- ■ Budget Forecast
    - ▫ The budget forecast model is based off the Utilization Modeling, developed to determine the system capacity necessary to prevent the backlog from growing any further.  System capacity required is based on the anticipated volume of claims filed for a particular month in addition to the backlog beginning that month.
    - ▫ The forecast model sums Modeled Reviewer Costs (which consist of static processes) and Expenses to reach a Forecast Cost for each Vendor.  A contingency cost is then added to this Forecast Cost figure to reach a Budget Forecast for each Vendor.
        - ‣ Reviewer costs are derived from the reviewer Utilization Model.
        - ‣ Costs for static Vendor processes are the previous month's actual costs.
        - ‣ Vendor expense cost is calculated as an average percentage of Vendor labor cost.
            - (1) Expenses are based on historic figures.
        - ‣ A five percent contingency is factored into the total forecast cost.
            - (1) The former budget did not contain a contingency.  However, the CAO wanted to make sure it modeled a sufficient budget given the assumptions required considering the time constraints and data limitations on this process.
- ■ Basic examples of the anticipated budget methodology for each Vendor were illustrated for BP.
    - ▫ BrownGreer
        - ‣ Reviewer costs have been smoothed with non-reviewer costs.
        - ‣ The static processes (CAC and Subsistence Interviewers) will be continually analyzed and eventually become more easily predictable with additional data.
        - ‣ Expenses for BrownGreer will be forecast based on historic averages.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- ◻ Garden City Group
    - ‣ The Sarasota call center has been closed, which has led to a significant decrease in costs.
    - ‣ Expenses for Garden City Group will be forecast based on historic averages.
        - (1) These figures seemed somewhat high to BP; however, these expenses were covered in more detail later in the meeting.
        - (2) Mention was made of the CliftonLarsenAllen audit recommendation of increased fire suppression at the Dublin Ohio Center. The pass through cost on these expenses will be investigated by the CAO to determine what percentage of these costs is directly attributable to the Settlement Program.
    - ‣ The contingency cost built in for Garden City Group is likely somewhat of an overestimation as Garden City Group arguably has less volatility.
- ◻ Postlethwaite & Netterville
    - ‣ The same methodology for the previous Vendor budgets was used for Postlethwaite & Netterville's budget forecast.
    - ‣ The budget forecasts of the Accounting Firms present interesting challenges because accounting review is an offline function not tracked by the BrownGreer timestamp system.
        - (1) We do not currently have the exact on-task time figures for accounting review. The CAO will make assumptions for this information. These assumptions will be fine-tuned until actual data is available.
- ◻ PricewaterhouseCoopers
    - ‣ The same methodology for the previous Vendor budgets was used for PwC's budget forecast. Additionally, the same offline task challenges experienced with P&N are present with PwC. The on-task time data is not currently available. Assumptions will be made until accurate actual data can be used in the forecast model.

**Agreement on Framework**

- ▪ The CAO established that the structure of this budget is merely anticipatory and not final. The CAO envisions a progressively expanding methodology based on a forecast of claims basis, an eligibility basis, etc.
    - ◻ The CAO believes that this structure is in alignment with what BP desires from the budget forecast. However, as the forecast model evolves and additional data becomes available, the model will become much more granular and detailed with respect to costs.
- ▪ BP agreed that this is in the vicinity of the framework BP had in mind.
    - ◻ BP agreed with the CAO that the use of a modeled number of determinations to create the budget was the best approach to forecast the budget.
        - ‣ This is why the task utilization rate and the system's capabilities are essential.
    - ◻ BP also expressed a desire that the CAO compare actual Program costs to the budget forecast costs to develop a variance analysis.
        - ‣ Further, the CAO wishes to maintain neutrality in this process, remaining focused on steady throughput of claims processing to prevent the increase of claim backlog. The CAO will put forth as accurate a budget as possible while remaining focused on combatting claim backlog.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999



# MEETING NOTES *(CONTINUED)*

- The CAO anticipates submitting to the Parties and the Court a budget package like the one discussed in this meeting. This budget package will include summary sheets that correlate costs based on projections over time. In addition to these summary sheets, the raw data used to produce these budget results will be provided. Further, an operational narrative will be provided. Lastly, information on assumptions made by the Program will be included in this package.
- The CAO would also be open to dialog with BP in the future to discuss one off expenses.

**Questions and Discussion**

- The CAO has attempted to measure the amount of determinations being produced.
- The CAO has normalized the task utilization rate, using the BEL specific rate, essentially lowering the task utilization rate from 87% to 75%. This task utilization rate is currently an assumption until the CAO has information on the true off-line rate.
  - A task utilization rate of 75% does not mean that 25% of the time no work is being done. It means that 25% of the time, there are other off-line activities associated with the processing of claims, such as waiting for screen loads, passing off a claim to another reviewer, downloading documents, etc.
  - The offline review tasks and the associated times used for purposes of the budget forecast model have been derived from detailed conversations with the Vendors.
  - BP and the CAO agreed that this task utilization rate is information that could be included in the quarterly budget reports.
- BP asked whether the CAC and CCC items for BG are included in the labor cost model.
  - These are included but they are static costs. As additional data is acquired on the function level for the CACs, the costs for the CACs will be parsed out on the functional level.
  - There was some discussion about extrapolating CAC costs based on total hours and number of CAC visits. The model basically already does this; however, the CAO expressed the desire to proceed cautiously with this tactic so as to not over-project by basing the extrapolation on a time period with an inordinate number of CAC visits.
  - The main issue is that the information is not currently broken down at the task level because the reviewers at the CACs are cross trained on various tasks. Once the CAO has this information, number of visits will be the best way to track it.
    - BP expressed a desire to see some sort of extrapolation supporting the labor hours of the CAC reviewers.
- For the subsistence budget forecast, the amount includes reviewers and interviewers; however, it does not include any field visits in this figure as field visits are handled by another Vendor.
  - The amount of time a subsistence review takes is based on data received from BrownGreer.
  - No information has been maintained on how long subsistence interviews take.
    - The CAO has information on how many notices are issued, but no information is available on the number of claims that will be processed on a per hour basis.
      (1) BP expressed an interest in attaining this level of detail in information. The CAO stated it does not currently have a time in motion study of this data, but will attempt to gather more information to evaluate the system input.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

Case 2:10-md-02179-CJB-SS Document 13347-26 Filed 09/11/13 Page 47 of 111



# MEETING NOTES *(CONTINUED)*

- ▫ Since no subsistence notices are being issued while policy is pending, the data used in this budget forecast is somewhat skewed currently. Once this hold is lifted, actual data will be available to be plugged into the budget forecast.
- ▪ BP desired to see a breakout of the IT costs incorporated into the model.
  - ▫ These costs are made up of system upkeep, development of new capabilities, and process enhancement; however, the breakout of the IT costs in terms of these sub functions is not data that the CAO currently maintains.
    - ‣ This is a reasonable way to incorporate this data and will be incorporated into the budget forecast as the information becomes available.
- ▪ BP asked about costs seemingly excluded from the GCG budget forecast model.
  - ▫ This is the result of similar cost groupings that were made. BP requested more detail on these cost groupings and the detailed data behind them, specifically regarding document intake, data entry, release processing, handling claimant correspondence, call volume, and file audit review.
- ▪ BP asked about the analysis that will be done to compare actual and modeled results for each month.
  - ▫ The actual hours will represent the amount of time it actually took to perform a particular task; the modeled hours will represent the time the CAO thinks the amount of work for that particular task should take based on the model's assumptions.
  - ▫ The CAO will identify the existence of a variance on a monthly basis if any variance exists, but, because of its sole role in an oversight capacity, the CAO will not take actions to cure the cause of a variance.
    - ‣ The CAO would be open to a monthly discussion with the Vendors as to the cause of a particular variance. However, the CAO does not currently believe that the addressing of the cause of a variance falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role. Rather, the cause of a particular variance would be left to the respective Vendor itself to address.
- ▪ BP questioned some high data capture hourly figures for IEL as compared to BEL. For IEL, these are attributable to the general tediousness of the job function, particularly entering hundreds of paystub figures from hundreds of individually different pay stubs. Additionally, the work associated with IEL is specific to BrownGreer, whereas the work associated with BEL is spread out over several different Vendors.
- ▪ Notice and Payment Data does not come from public reports. Duplicates are removed, so the figures in the Notice and Payment Data will not match public report figures exactly.
- ▪ BP expressed interest in acquiring the entire model in an unlocked version.
  - ▫ Neither BP nor the PSC expressed any real reason to object to providing the entire model.
  - ▫ Additionally, the CAO believes this would help streamline the efficiency of the budget revision process. The CAO will determine if the distribution of this information to the Parties is permitted by the Settlement Agreement.

**Communications over the Next Seventy-Two Hours**

- ▪ It is preferred by BP and the CAO that the communication process remains open and informal so as to keep the revision of the budget as transparent and collaborative as possible.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- □ This will allow BP to better understand the process of the CAO in revising the budget forecast model.

- □ All questions that the CAO has for BP or that BP has for the CAO will be routed through the Plaintiffs' Steering Committee and Keith Moskowitz.

- ▪ Items that Will Be Provided by Friday

  - □ As no objections were made to the framework of the modeled budget, the CAO will provide the forecasted budget on Friday, August 16 as presented to BP and the PSC at this meeting.

    - ‣ This will include supporting documentation with amended utilization modeling.

    - ‣ Additional information broken down at a more detailed level will be provided to the extent the information is currently available to the CAO. Any assumptions made in lieu of unavailable data will be noted.

      - (1) The main areas in which additional information was requested involve CAC staffing levels, costs of GCG job functions, and IT costs.

    - ‣ In preparing its fourth quarter budget, the CAO will be preparing a revised third quarter budget as well. BP noted its objection to the CAO's proposed third quarter budget but requested to see a revised third quarter budget if one is prepared by the CAO.

      - (1) The CAO will provide the six months covering quarters three and four of budget forecasts to BP.

    - ‣ Regarding turnover rates and the other process related information, the CAO is requesting this information from Vendors. However, it will receive a lower priority until the budget forecast model revisions are complete.

    - ‣ In requesting the data fields from the data dictionary, the CAO recommended to BP that it go through the proper channels to gain access to this. This will ensure that the PSC has no objections given the possible existence of Personally Identifiable Information in these data fields. Upon the completion of the process, the CAO will provide all information agreed to by BP and the PSC.

- ▪ It was decided that the continual and ongoing dialog between BP and the CAO has been very beneficial. Pursuant to this, a meeting has been scheduled for next Wednesday, August 21, 2013, at 10:00 AM, at the CSSP Office in New Orleans.

*Please distribute internally as appropriate.*

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# Exhibit 4

## [Provided on Enclosed Disk]

## FILED UNDER SEAL

# Exhibit 5



# Reviewer Cost Model and Budget Forecast Methodology

As will be evident from the budget summary sheets for each Vendor, one aspect of the budget forecasting process that generally pertains to all Vendors is the Reviewer Cost Model. Reviewer labor is present across all Vendors and represents the largest expense of the Program. This model captures the projected costs associated with that labor and is therefore the largest component of the Forecast Budget. For these reasons, the Reviewer Cost Model will be discussed in detail prior to the individual Vendor narratives.

The Reviewer Cost Model was developed to forecast aspects of the administration of the Program with a specific focus around claims review. The results of the initial model described three products: claims processing throughput, cost of the claims review system, and the anticipated duration of the Program. Over time, the model has been adapted to include additional forecasting functionality as the needs of the Program have evolved. It is also important to note that this modeling was developed specifically for and around the Deepwater Horizon Settlement Program and is not a modification to, an adaptation of, or evolution to existing modeling developed for another purpose.

The Reviewer Cost Model is built on a three step process: 1) Model Drivers, 2) Calculations, and 3) Results. The process behind each of these steps in relation to the Reviewer Cost Model is detailed below.

**Step 1 – Model Drivers**



Model drivers form the foundation of all modeling. Model drivers are the information that drives the calculations to generate results. When available, model drivers have been derived from actual historic Program statistics. When reliable or accurate historic information is not available, reasonable and educated assumptions are made. These assumptions have been created by the CAO through discussion with the Vendors. As the program matures and additional statistical information becomes available, these assumptions will be replaced with actual data. Whether actual statistics or assumptions are used as model drivers, the results are collectively vetted to test the validity of the data point and perceived accuracy to create reliable calculations and results.

The model drivers used in the development of the Reviewer Model and the current origin of the data included in these drivers is detailed below.

<u>Process Percentages</u>: The Process Percentage data describe how many claims will go through each step in the claims processing sequence. The majority of these drivers have been derived from actual historic Program statistics.

- *Review Factor*: This measures the percentage of claims submitted with complete information so that a review to determination can be completed.
  - No historic statistics for this step in the claims process are available. An assumption was made across all claim categories that ninety-five percent of submitted claims contain enough information to be document complete and legitimately warrant a claim review.
- *Review Iteration / Pass 1*: This measures the percentage of claims that will be deemed "Incomplete" upon completion of the first review cycle and will require a second review.



      □  The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Review Iteration / Pass 2*: This measures the percentage of claims that will be deemed incomplete upon completion of Review Iteration/Pass 1 and will receive a third review.

   - □ The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Secondary Handling / Re-Review*: This measures the percentage of claimants who will request a re-review of their claim after a determination is made as offered by the Settlement Agreement.

   - □ The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Secondary Handling / Reconsideration*: This measures the percentage of claimants who will request reconsideration of the determination of their claim as offered by the Settlement Agreement.

   - □ The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Secondary Handling / Appeals*: This measures the percentage of claimants who will request an appeal of the final determination of their claim as offered by the Settlement Agreement.

   - □ The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

Process Duration in Hours: The Process Duration in Hours data describes the length of time required, on average, to process a claim through each step in the claims processing sequence.



■ *Categorization*: This includes the process of identifying each piece of claimant provided documentation with its appropriate document category designation.

  □ The duration of this step in the claims processing sequence has been measured and reported through historic system statistics.

■ *Claim Preparation / Data Capture*: This includes the process of interpreting and entering data from claimant-provided documentation into the system.

  □ The duration of this step in the claims processing sequence has been measured and reported through historic system statistics.

■ *Claim Preparation / Causation*: This includes the process of testing claimant-provided data to ensure sufficient data has been provided to make a final determination regarding the claim.

  □ The duration of this step in the claims processing sequence has been measured and reported through historic system statistics.

■ *Claim Review / Preparation*: This includes the process of organizing and reviewing claim data to determine the final compensation outcome of the review.

  □ The duration of this step in the claims processing sequence has been measured and reported through historic system statistics for all claim categories except Business Economic Loss and those Seafood Claims requiring accountant review.

  □ No historic statistics are available for the Process Duration of the Claims Review/Preparation for Business Economic Loss or Seafood Claims.   An assumption on the Process Duration has been made in these instances.



- ■ *Claim Review / QC (Quality Control)*: This includes the process in which a senior reviewer, within the same functional group, audits the work of previous reviewers to ensure the accuracy of the final compensation outcome of the Claim Review/Preparation.
  - ▫ The duration of this step in the claims processing sequence has been measured and reported through historic system statistics for all claim categories except Business Economic Loss and those Seafood Claims requiring accountant review.
  - ▫ No historic statistics are available for the Process Duration of the Claims Review/Quality Control for Business Economic Loss or Seafood Claims. An assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

- ■ *Review Iterations / Pass 1*: This includes the process of evaluating a claim for a second time when the initial claim review results in a notice of incompleteness.
  - ▫ No historic statistics are available for the Process Duration of Review Iterations. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.
  - ▫ This assumption varies by claim type complexity but is typically fifty percent of the Process Duration for the initial Claim Review / Preparation.

- ■ *Review Iterations / Pass 2*: This includes the process of evaluating a claim a third time when the Review Iteration / Pass 1 results in a notice of incompleteness.
  - ▫ No historic statistics are available for the Process Duration of Review Iterations. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.



     □    This assumption varies by claim type complexity but is typically fifty percent of the Process Duration for the initial Review Iterations / Pass 1.[1]

- *Audit*: This includes providing a comprehensive evaluation of a claim, by an alternate vendor, to determine the accuracy of the previous reviewer's findings.

  - □ No historic statistics are available for the Process Duration of the Audits. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

- *Secondary Handling / Re-Review*: This includes the process of verifying the results of subsequent determinations to validate the findings at the request of the claimant.

  - □ No historic statistics are available for the Process Duration of the Secondary Handling / Re-Review. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

- *Secondary Handling / Reconsideration*: This includes the process of verifying the results of subsequent determinations, with new supporting documentation, to validate the findings at the request of the claimant.

  - □ No historic statistics are available for the Process Duration of the Secondary Handling / Reconsideration. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

---

[1] On rare occasions, a claim may require more than three reviews (Claim Review/Preparation, Review Iteration / Pass 1, and Review Iteration / Pass 2) to provide a final determination. Given the infrequency of these occurrences, however, this modeling does not contemplate time requirements for those additional reviews.



    ■   *Secondary Handling / Appeals*: This includes the process of verifying the results of subsequent determinations, in accordance with the appeals process prescribed by the Settlement Agreement, to validate the findings at the request of the claimant.

        ▫  No historic statistics are available for the Process Duration of the Secondary Handling / Appeals. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

<u>Task Utilization Rate</u>: The Task Utilization Rate is a factor of efficiency in excess of total Process Duration required to process a claim file. For example, a task that requires ten hours to process at a seventy percent Task Utilization Rate would, in reality, require around thirteen hours of dedicated interaction to complete. It is very important to note that this value does NOT attempt to capture the length of time a claim is in the process. Rather, Task Utilization Rate attempts to determine the actual amount of interaction time that is dedicated to processing a claim as opposed to the length of time a claim is checked out for processing. This figure has been assumed for both accounting and non-accounting steps in the claim processing sequence.

<u>Task Distribution</u>: The Task Distribution includes the amount, by percent, each Vendor has dedicated to each review function for each claim category or sub-category. Assumptions have been made for these drivers.

<u>Reviewer Shift Duration</u>: The Reviewer Shift Duration is the determination of how many effective working hours each Vendor's reviewers are on-task. This value is calculated by subtracting hours dedicated to non-productive hours from the overall paid shift length. Assumptions have been made for these drivers.



DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS Claims Data: Claims Data include historic claim submissions, processing rates, and resulting effective claims backlog. These data have been measured and reported through historic system statistics. Projected claims data have been developed by CAO.

Vendor Cost Data: Vendor Cost Data include historic invoicing information related to the processing and administration of the claims review process. These data have been measured and reported through historic system statistics.

**Step 2 – Calculations**

The next step in the modeling process is Calculations. During the calculation process, the Model Drivers are used in simple and straight-forward mathematical computations to determine a variety of useful program information. It is important to note that the modeling can be managed to derive various results as necessitated by the Program. The fixed and variable drivers that fuel the modeling are entered in different manners to achieve the desired management results.

In its most relevant form, this step is designed to determine the administration and support functions necessary to support the claims analysts and the reviewers required to process the modeled claims volume. The methodology used to forecast the administrative costs relies on historical invoice information. Historical invoices are analyzed to calculate the amount each administrative and support staff dedicates to the claims review process. These results are then multiplied by the modeled analysts and reviewers for the forecast four week period to determine the amount of hours required. The result of that calculation is then multiplied by the hourly billing rate of each function to determine the cost over the modeled period. These values are then summed to determine the total Vendor cost for the given time period.



**Step 3 – Results**

      In this step, the results of Step 2 – Calculations are presented in digestible graphic format. Reports vary depending on the approach employed to create the model.  The preferable format for a budget forecast is a Model Summary, which illustrates most relevantly the analyst and reviewer hours required and cost, all by Vendor.


**Conclusion**

      Because reviewer labor is present across all Vendors and represents the largest expense of the Program, the Reviewer Cost Model is an integral part of the methodology used by the CAO to forecast the budget.  Using this model, the CAO is able to accurately capture the projected costs of the reviewer labor of each Vendor.  This information can then be incorporated into the forecast to reach a total budget figure.

# Exhibit 6

# MEETING NOTES



| MEETING FOCUS: | CSSP ADMINISTRATIVE BUDGET MEETING |
| --- | --- |
| MEETING DATE: | AUGUST 21, 2013  10:00 AM CST |

ATTENDEES:

| Name | Company | DHECC |
| --- | --- | --- |
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Gary Jackson | BP | Philip Ollendike |
| Brad Spooner | Alix Partners | Henry Mitchell |
| Ramji Kaul | SNR Denton | Patrick Hron |
| John Creevy | Herman, Herman, & Katz | |
| Tommy Thomassie | Domengeaux, Wright, Roy, & Edwards | |

**Reviewer Model-Specific Questions**

- Meter Charts
  - The Meter Charts are real time measurements of system capacity over a period of time, usually a month.  The spread between system capacity and actual notifications produced is identified as an opportunity for improvement.
  - Questions raised by BP and its representatives related mostly to why BEL and IEL targeted and actual numbers have decreased as compared to the Meter Charts from the August 14 meeting.
  - BEL Specific Meter Chart Discussion
    - One of the main reasons for this change in the Meter Chart was that this Meter Chart incorporated the most recent month's Vendor data.
      - (1) The chart is dynamic and changes with each measured period.
    - Another reason was that the task utilization rate has been modified since the August 14 meeting.
      - (1) The Claims Administrator's Office (CAO) is attempting to define the accuracy of the task utilization rate today.  These figures must be derived from the data provided by the Vendors.
      - (2) Because this is extremely important and has such a significant impact, the CAO's goal is to use extremely detailed and accurate numbers provided by the Vendors.  The updated task utilization rate will depend on the Vendor provided information.  When the CAO is able to do finalize this, the confidence in the forecast model should be increased significantly.
    - Another reason was the changes made to task durations since the August 14 meeting.



# MEETING NOTES *(CONTINUED)*

(1) These task duration changes were made to increase the forecasting accuracy of the model. The CAO is continuing to tweak the task duration associated with individual claims per type per determination notice (Eligible Payable and Eligible No Payment, Denial and Closed, Duplicates and Opt Outs, and Incompleteness Denial) in order to increase the accuracy of the budget forecast model. The CAO will take a sample of 32 claims for each claim type for each determination notice type and calculate the task durations using a weighted average calculation. Currently, the CAO is actively working to update the task durations.

   (a) Two things have increased the claims processing the task durations – 1) the implementation of new, intricate policies and 2) the CAO is processing more complex claims.

      (i) As additional policies are agreed upon by the Parties and issued by the CAO, the processing of each claim becomes more complex.

      (ii) Further, whereas in the beginning of the Program claims deemed to be easier (Zone A claims, document complete claims, etc.) were processed first in an effort to get the Program running, the more complex and difficult claims are now being processed, which also increases task duration.

‣ The blue bar (actual performance) figures on the Meter Chart decreased as related to those of the August 14 meeting. This is due to the fact that the August 14 Meter Charts were comparing June labor to July production. Since July had more days of production than June, the determinations per reviewers were higher in the August 14 Meter Chart than the August 21 Meter Chart which compared June labor to June production.

‣ Red hash mark (targets per week) for BEL claims has decreased because it has begun to take a significantly longer time to process BEL claims for the reasons previously mentioned. We are currently meeting with BEL-processing Vendors to get the most accurate figures possible for the task durations associated with the processing of BEL Claims. Further, the larger 32 claims sample size for modeling task duration should produce more accurate results as well.

   (1) It is currently unclear how significant an effect these changes will have in the model.

   (2) It should also be noted that the same changes in task duration mentioned in reference to BEL Claims and the Accountants will apply to accounting-centric Seafood Claims and BrownGreer.

   ▫ IEL Specific Meter Chart Discussion

      ‣ Performance decreased while the target increased

▪ Task utilization Rate and Reviewer Shift Duration

   ▫ The task utilization rate of 75% and the FTE 35.5 hours per week are used in different places in the model and are calculated apart from each other.

▪ Differences between QC and Audit

   ▫ For BEL, five hours is allotted to each of these tasks on the task duration portion of the reviewer model.

   ▫ Some information in relation to Quality Control was provided prior to the June 18 meeting.

   ▫ The CAO will determine on a more detailed level exactly what function each of these tasks performs and any overlap between the two.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- Appeals as Related to the Review Process
  - Some concern was expressed over the five hours allotted to Appeals in the task duration section of the reviewer model.
    - The CAO will determine exactly what these five hours are spent on.
  - Questions were also raised as to the accuracy of the figure stating that 5.8% of claims go through the Appeals Process.
    - The CAO is working to update these figures, along with the First and Second Pass figures, by Friday, August 23.

**Questions Unrelated to the Reviewer Model**

- Subsistence
  - The model from the August 14 meeting had Subsistence costs layered on top of the model, whereas the model from the August 21 meeting had these costs, as well as those associated with GCG data entry, incorporated into the model.
    - Subsistence is an example of policy decisions affecting throughput, as all subsistence notices have been put on hold pending policy development.  Depending upon the outcome of the policy decision, the CAO may need to reevaluate its processing task durations.
      - (1) The Vendors are continuing to process subsistence claims even though no notices are being issued. Additionally, the CAO does not direct the Vendors on how to utilize their workforce.
        - (a) Some things clearly have to be halted if related to Court Orders, but the CAO does not interfere with the operational decisions of the Vendors as these are more business judgment decisions.

- BrownGreer IT Costs
  - Using estimations from BrownGreer, the CAO was able to break the IT costs out of the model to provide additional granularity as to the cost associated with the IT functions.
  - Some concern was expressed by BP and its representatives about the $700,000 budget for development activities.
    - The CAO does not have access to the development processes for BrownGreer, so the CAO relies on the data that BrownGreer provides.  However, because of the complexity of the system, adding to it requires significant time and manpower.  A single change in one line of code will require numerous additional changes in numerous other areas because it is all inter-related.
      - (1) The CAO will ask BrownGreer for more information on this in the future, but the CAO does not anticipate receiving more detailed information on this before August 28.

- GCG Overhead
  - IT Costs are labeled as Systems and Reporting.
    - GCG runs the servers for the database, network support, hardware support, fraud databases, internal IT processes, etc.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999



# MEETING NOTES (CONTINUED)

        (1) This does not include much development work but more database maintenance and analytics. GCG hosts the hardware infrastructure while BrownGreer runs the software system.

- BG Administrative Costs
  - It was noted that the BG Administrative Costs are decreasing. However, no breakout was provided as to which specific administrative labor category is decreasing.
    - The CAO does not believe that a straight line pro rata reduction across all Administrative Cost expenses is appropriate. As fewer claims come into the system, some expense categories will decrease while some will likely increase given the nature of those administrative functions.
    - The decision on staffing for each function performed by each Vendor is left to that Vendor itself. Some Vendors do reduce staffing levels based on the models. The CAO does not strong-arm the Vendors to staff at a level congruent with the model. However, the CAO does discuss the results of the model with the Vendors and allows the Vendor the opportunity to justify appropriate staffing levels. However, ultimately, the decisions on staffing is left to the Vendors.

- CLEAR
  - The CAO will determine exactly what this BG Overhead Cost represents.

- BG CCC vs. GCG Payment Outreach
  - Questions were raised as to the difference between the BG CCC and the GCG Outreach Program.
    - The BG CCC is in place to offer to claimants access to a representative specifically trained in each claim type, providing the claimant with an expert on each claim type, to handle issues specific to that particular claim type.
      - (1) This team handles the outreach related to curing claim incompleteness, specifically with IEL, which has been a significant portion of IEL processing. This team has a much higher level of expertise in this field than those performing Payment Outreach.
    - The GCG Payment Outreach is a team recently developed for the purpose of notifying claimants who have had eligibility notices issued that they need to submit a release in order to receive their compensation.
      - (1) This is a new group because it requires a different skillset, one different from the skillset devoted to knowledge of the document requirements for specific claim types required at the CCC.

- GCG Administrative Costs of Claim
  - These costs represent the management labor directly associated with the document categorization, data entry, and data capture/claims review. These costs variably related to the expected costs for Garden City Group claim review.

- GCG Call Center
  - The GCG Call Center is currently modeled at thirty minutes per call – twenty minutes of actual call time and ten minutes of wrap up time.
    - BP believes that when meeting with GCG, a figure closer to ten minutes per call was provided.
    - The CAO will follow up with GCG to determine the average time per call.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999



# MEETING NOTES (CONTINUED)

- ▫ It was noticed that GCG Call Center management costs were around 49% of GCG Call Center operator costs.
    - ‣ As the call volume decreases, the staff is eliminated; however, the permanent core and the individuals with subject matter expertise and institutional knowledge remain.  These individuals are generally in a managerial capacity, so this currently represents a high percentage of the costs as related to those of the operators.
- ■ File Audit
    - ▫ This function performs audits of GCCF claimant documents to be used in the CSSP Portal.
        - ‣ This includes removing PII and sensitive information unrelated to the claimant and the processing of the claim.
    - ▫ The CAO anticipates that the file audit will be complete by the end of the year.
    - ▫ BP questioned which files were being audited.  The CAO will follow up with GCG to determine if all GCCF files were being audited regardless of whether the claimant filed claim with the CSSP.
        - ‣ The CAO will confirm the exact scope of this audit.
- ■ Five Percent Contingency Fee
    - ▫ This contingency was implemented as a margin of error, given the timeframe set forth by Order of the Court in revising this budget.
        - ‣ The CAO anticipates that the process will be significantly refined and the budget will become more accurate over time.  Upon the first revision, however, the CAO did not want to put forth a budget forecast that was not worst case scenario.
            - (1) It should be noted that this worst case scenario budget is assuming no magnanimous events, such as a Fifth Circuit Ruling overturning previous Eastern District rulings.
- ■ Turnover and Staff Level Changes
    - ▫ The CAO has requested all information related to turnover and associated costs from the Vendors.
        - ‣ The CAO has not yet received anything other than a trending percentage which has been provided to BP through a previous data request.
        - ‣ This is still a priority to the CAO, but the CAO has not been able to acquire this information from the Vendors and incorporate it into the budget forecast model.
            - (1) Once the CAO has this information, it will be incorporated into the model.
- ■ PricewaterhouseCoopers Travel Expenses
    - ▫ The CAO has asked PwC to come up with a transition plan to allocate a portion of their travelling employees to work on the Program remotely.
        - ‣ Because of this, the CAO anticipates the budget forecast submitted next Wednesday will contain a significant downward trend from the 6.84% used in the current model.
- ■ The CAO does not currently model a high side, a low side, and a middle-of-the-road budget forecast.

## Current State of Affairs

- ■ BP acknowledged that the budget provided on August 16 contained the level of detail it desired in the budget forecast.

# MEETING NOTES *(CONTINUED)*



- BP expressed a desire to be able to make a variance comparison between the budget forecast and the actual costs of the Program for a particular month.
  - This would allow a comparison of actual costs to the budget and a comparison of the budget from one month to the budget of the next month to see where the forecast changed.
    - This can be done on a monthly basis.
- Data Dictionary
  - The CAO is compiling its data dictionary currently. However, BP will submit a written request to the CAO for the information it would like included in the data dictionary, as the PSC may object to the sharing of some information contained in it.
- The CAO will begin to maintain a change log for the budget forecast model in an effort to assist BP and its representatives in tracking the changes the CAO makes to the model to increase its accuracy.

*Please distribute internally as appropriate.*

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# Exhibit 7



23 August 2013

Mr. David Odom
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, LA 70130

Dear Mr. Odom,

Pursuant to the Court's August 7, 2013, Order (Dkt. No. 10955), BP is providing its comments to the Court Supervised Settlement Program's ("CSSP") 4th quarter 2013 ("Q4") proposed budget provided to BP on August 16, 2013.[1] Our response is organized into three parts: (1) comments regarding the framework of the proposed budget model; (2) comments regarding the proposed budget amounts; and (3) comments regarding the documentation and information provided in support of the proposed budget.

As described in detail below, notwithstanding the improvements in the framework of the proposed budget model, the overall proposed Q4 budget is still excessive. This appears, in large part, to be due to the willingness of the Claims Administrator's Office ("CAO") to take cost and productivity estimations from the CSSP Vendors, which drive the budget model projections, at face value without any managerial assessment or independent evaluation of the reasonableness of those assumptions and targets.

Since beginning our discussions on August 9, 2013, the CAO's uncritical acceptance of CSSP vendor estimates has led to a lowering of productivity goals. The proposed Q4 budget now targets, for example, that accountants complete only 1.0 Business Economic Loss ("BEL") claim per accountant, per week. As discussed below, these seem to be unreasonably low targets. The CAO has indicated that it does not view the budgeting process as a function to drive results and accordingly, it appears that the CSSP Vendors have provided assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

As a result, we believe an operational review and examination is required, including some analysis of the validity of the CSSP Vendors' assumptions, to allow BP and the CAO some basis to evaluate the reasonableness of the assumptions driving the budget. Without an operational review and examination and a critical evaluation of these assumptions, even a well-designed budget model does nothing more than replicate CSSP Vendors' own assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

## I. Comments Regarding the Framework of the Proposed Budget Model

The methodology used by the CAO to develop the budget process is improved from the Q3 budget and attempts to estimate future costs based on a predictive model incorporating past experience and purports to link projected levels of tasks with the amount of labor necessary to complete each task. However, to date, the CAO has neither tracked nor required the CSSP Vendors to track sufficiently detailed information regarding productivity and costs at a task level as needed to serve as the input to drive this type of model (e.g., the duration of time that should be required to complete a particular

---

[1] The CAO and BP met on August 21, 2013, to discuss BP's preliminary observations regarding the CAO's August 16 budget proposal. The CAO has subsequently provided additional information that may respond to some, but not all of the issues raised in this letter.

task of the accounting review). In lieu of using actual historical data, the CAO has indicated it will use estimates and assumptions until more reliable data can be generated. While using assumptions as a stop gap until actual data becomes available is not per se unreasonable, here the CAO has simply asked its vendors to provide those assumptions and has done nothing to test those assumptions or estimates or apply standards.

BP has asked for the CAO's supporting documentation for these various assumptions and estimates and understands that the CAO does not possess an analysis necessary to validate the assumptions and estimates being provided by the CSSP Vendors as to the standards. As indicated by the CAO, the Claims Administrator will not "pass judgment" on the data drivers provided by the CSSP Vendors. As a result, the predictive model is driven by, in large part, assumptions and estimates regarding productivity and costs provided to the CAO by the CSSP Vendors. This is particularly concerning given the productivity targets from the Q4 budget, which targets are derived from these assumptions, will set the CSSP Vendors' Key Performance Indicators in the upcoming Task Orders. Hence, an operational review and examination to test all of the assumptions and unsupported cost estimates provided by the CSSP Vendors is necessary to allow BP to fully evaluate the budget.

Additionally, with respect to the mechanical calculations of the budget model, since our last meeting we have confirmed several calculation errors that should be corrected:
      (i)    Using June cost vs. July determination numbers to calculate June productivity:
- Tab [Vendor Time & Cost June], cells P98 – U98

      (ii)    QA Audit Total Required Hours appear to be improperly calculated resulting in fewer hours allocated to the BEL, FBEL, and SUBEL claims than needed based on projected determinations and process duration hours:
- Tab [4wk Past Model], cells AT13:AT35
- Tab [4wk Fwd Model July 2013], cells AT13:AT35
- Tab [8wk Fwd Model Aug. 2013], cells AT13:AT35
- Tab [12wk Fwd Model Sept. 2013], cells AT13:AT35
- Tab [16wk Fwd Model], cells AT13:AT35
- Tab [20wk Fwd Model], cells AT13:AT35
- Tab [24wk Fwd Model], cells AT13:AT35

      Additionally, we encountered other formula errors within the model that did not impact the final budget calculation but had an impact on certain variables that were used to assess the budget calculation.
      (iii)    BrownGreer Employer Verification Review Team hours allocated among claim types do not agree to total Employer Verification Review Team hours:
- Tab [June 13 Costs], sum of cells K35:T35 do not foot to cell I35

      (iv)    Garden City Group Document Categorization hours allocated among claim types do not agree to total Document Categorization hours:
- Tab [June 13 Costs], sum of cells K88:T88 do not foot to cell I88

      (v)    Inconsistencies between claim type allocations within hard coded numbers in cell formulas as compared to other claim type allocations within the model:
- Tab [Model Inputs], cells D11:J13 include hard coded numbers, representing claim allocation percentages. The hard coded numbers are not consistent with other claim allocation percentages used within the [Data Request v5] tab, cells M57:O57 and within the [Model Inputs] tab, cells O48, R48, U48, AA48, AD48, AI48, AL48, AO48, AT48, AW48, AZ48, BC48, BF48, BK48, and BN48.

      (vi)    Summary admin costs in Claims Review – Modeling Summary are calculated inconsistently amongst the firms:
- Tab [Model Summary], cell D20 does not flow with the formulas surrounding it.

(vii)    Discrepancy between admin costs in two different cells:
- Tab [Vendor Time & Cost June], cells Q90, V90, and AA90 do not agree to the total costs for each vendor within AJ67, AJ82, and AJ92.

(viii)   Discrepancy between BrownGreer hours FTE Reviewers & Analysts in two different cells:
- Tab [Vendor Time & Cost June], cell O101 does not agree to cell K64.

(ix)    Allocation of BrownGreer FTE Reviewers & Analysts by Claim Category does not agree to Total FTE Reviewers & Analysts:
- Tab [Vendor Time & Cost June], cells P108:U108 do not agree to cell O108.

(x)    Certain costs appear to have been improperly classified as overhead rather than included within the Reviewer Model:
- Tab [June 13 Costs], cell B62 appears to have improperly classified this cost as an "O" instead of an "R".

(xi) Garden City Group total hours and total dollars exclude Hammond Center Administration and Management:
- Tab [June 13 Costs], cells F102 and I102 improperly exclude cell references F80 and I80, respectively.

(xii) BrownGreer total timekeepers is hard coded and does not equal sum of timekeepers:
- Tab [Vendor Time & Cost June], cell AG45 is hard coded with 1,187. The sum of timekeepers in cells AG9:AG44 equals 1,414.

Finally, as BP has previously noted, a critical component of evaluating a proposed budget is the ability to compare a projected quarterly budget against past actual performance in an "apples-to-apples" fashion. BP requested that the Q4 budget include a comparison against actual past performance broken out in detail on the same task based level used to generate the Q4 budget. The CAO has indicated that while it agrees that such a request is necessary and appropriate, it did not have time prior to the August 16, 2013 budget submission to perform this analysis. BP again reiterates the need for this critical comparative metric in order to fully review and evaluate the budget.

## II. Comments Regarding the Q4 Proposed Budget Amount

The proposed Q4 budget request of approximately $119,300,000 is excessive and unsupported by the documentation available and provided by the CAO. In particular, BP has the following detailed comments and proposed revisions to the Q4 budget.

### A.    The Line Item "Contingency Fee" Should be Eliminated
The Q4 budget includes a "contingency fee" of nearly $5.7 million. These are unallocated dollars which are not designated for any identifiable task or expense. This represents 5% of the total proposed budget and is, in essence, a projected cost overrun by the CSSP Vendors that the CAO apparently expects to occur, but cannot identify how it will occur. The CAO's explanation that the $5.7 million is needed because of the number of unverified assumptions driving the budget, the complexity of the claims process, and the pace at which the budget has been prepared is insufficient. The 5% fee is applied across the entire Q4 budget, not just the budget items based on assumptions, and includes fixed costs that do not have any unpredictability. Moreover, the assumptions regarding costs and productivity are being set by the CSSP Vendors themselves and likely already include a cushion for the same "uncertainty" the contingency is purportedly being included to cover. Finally, the 5% fee is static across all three months and does not reflect the CAO's stated view that the assumptions will be replaced with more reliable data over the course of the budget quarter.

### B.    The Task Utilization Rate is Too Low
The Q4 budget provides for a task utilization rate of 75%. As explained in the CAO's narrative accompanying its Q4 proposal, "a task that requires ten hours to process, at a seventy-five percent

3

task utilization rate would, in reality, require around thirteen hours* to complete. (Reviewer Cost Model and Budget Forecast Methodology). Here, the CAO is estimating that every task will take, in reality, 33% longer than it actually should. Moreover, the CAO originally estimated the task utilization rate to be 87.6% for BEL claims in the August 9 version of its model and now, without supporting analysis to justify the change, has reduced the task utilization rate to 75%. This downward revision has a significant impact on the productivity targets and the overall budget. For example, since August 9, the CAO has revised its BEL productivity targets from 5.39 down to 3.48 claims per employee per month. Similarly, productivity targets for accountants have decreased from 1.6 to 1.0 BEL claims per accountant per week, a 37.5% decrease.

BP recognizes that the task utilization rate, in reality, cannot be 100%, but has no ability at this time to assess or propose what a reasonable percentage should be under the circumstances. An operational review and examination, including some analysis of a reasonable utilization rate, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget. Without an operational review and examination, BP has no ability to assess whether the budgeted rate of program efficiency is reasonable under the circumstances.

### C.    There are Process Duration Changes for both BEL and IEL Claims Which are Unsupported

Since our budgeting process began on August 9, the CAO has increased the estimated duration of time to resolve a BEL claim from 32.5 hours to 43.4 hours, while the estimated time to process an IEL claim decreased from 25.1 hours to 13.6 hours. Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors, as the CAO does not possess sufficient historical information to create its own estimates or evaluate the assumptions given to it by its vendors. BP further understands that the CAO has not performed any analysis to assess the validity of the assumptions and estimates being provided by the accounting vendors as to the process duration standards. An operational review and examination including some analysis of the validity of the CSSP Vendors' assumptions regarding process duration is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

This budgeting issue is of particular concern given the Q4 budget takes into account costs resulting from the addition of 100 new accountants to the CSSP. As noted previously, this staffing proposal did not appear to be developed to meet any specific productivity goal and, as we have learned through this budgeting process, the CAO has limited visibility    into the process duration of the accounting function. In its justification for the addition of 100 accountants, P&N stated its productivity goal for the new accountants was 1.5 reviews per accountant per week, with new accountants achieving this level of productivity within 60 days. In the proposed Q4 budget, the targeted productivity for BEL accountant reviews has dropped to 1.0 review per accountant per week. Accordingly, it is of note that the addition of the 100 new accountants, which must be accounted for in the Q4 budget, corresponds with an estimated decrease in productivity levels for BEL claims which the accountants are responsible for handling.

### D.    Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

Brown Greer's proposed Q4 budget includes $3.9 million for IT costs. We have asked for a detailed breakdown of how the IT budget will be allocated and have only received a high level breakdown that 48% of the budget dollars will be spent on system maintenance and 48% on further system development, with the remainder to smaller tasks. We have requested, but have not received, any further breakdown of these costs including, for example, the list of IT development or maintenance tasks included in the estimate. Without these detailed breakdowns, these costs continue to appear excessive, particularly at this stage in the program (i.e., heavy development related IT costs should already have been incurred) and BP has no ability to evaluate their necessity. An operational review and examination, including some analysis of the continuing IT needs of the program, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

### E. Primary and Secondary Handling Rate Assumptions are Not Calculated at Current Rates

The Q4 budget uses February 2013 percentages for estimating the number of claims that will undergo claims processing for certain steps rather than current monthly percentages. BP recommends the most recent data be used in the budgeting process.

### F. The Budget Appears to Incorporate Excessive Labor Rates

BrownGreer and Garden City Group collectively hired more than one thousand independent contractor employees to work at the CSSP, marked-up these labor costs, and passed them through to the CSSP and Settlement Trust. BP has requested, but has not received, information regarding the markups actually being charged by BrownGreer and Garden City Group so that it can evaluate whether those markups are excessive. Based upon BP's review of independent contractor rates available in the market, the independent contractor rates appear excessive. As stated previously, BP does not believe it is appropriate to pass through unreasonable markups to the CSSP and Settlement Trust on dedicated labor acquired specifically to work on the program, and these costs should not be included in the Q4 budget. Both BrownGreer and Garden City Group have actively converted contractors to company employees preserving these apparently excessive markups for these converted employees.

With respect to employee labor rates, the assumptions built into the Q4 budget related to rate and level changes of employees are not disclosed or explained, making it difficult to understand the driving factor behind these assumptions.

### G. The Budget Incorporates Excessive Levels of Accountant Travel Expenses

The budget includes unreasonable and unnecessary travel fees related to having large numbers of accountants travel to New Orleans when there is no need for the vast majority of them to be physically present in New Orleans to accomplish their tasks. For example, PwC accountants perform the same work from other non-travel locations (e.g., San Francisco) without traveling to New Orleans. BP does not believe that it is appropriate to include these unreasonable and unnecessary travel fees in the budget.

### H. The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience.

The proposed Q4 budget allocates approximately $1.9 million to the BrownGreer Claimant Communication Center ("CCC"). According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (Tab "BG CCC Budget"). However, according to BG Weekly Status Report #40, August 12, 2013, Table 27B, the average call time for the CCC is 6.9 minutes. No justification has been provided to explain why the budget should include projected activity exceeding four times the current activity levels and the estimated call time should be reduced accordingly.

Similarly, the proposed Q4 budget allocates approximately $1 million to the GCG call center. According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (GCG Outreach Model Assumpt.). However, according to email correspondence from Kirk Fisher dated August 22, 2013, in response to BP's questions on the average call time, the average GCG call center call is 10 minutes. Again, no justification has been provided to explain the dramatic increase in estimate call times.

The proposed budget allocation for both the BrownGreer and Garden City call centers appear inflated by significantly overestimated activity and should be reduced accordingly.

The GCG budget also includes approximately $600,000 for Payment Outreach to class members who have received an Eligibility Notice but have yet to respond to the CSSP. Notwithstanding the issue of whether this process is required under the terms of the Settlement Agreement, this amount is based on an estimate provided by GCG, and no support has been provided as to the number of calls,

average time per call, or hours spent performing this task. This budget item requires additional detailed supporting documentation.

**I.**   **The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive.**

Of the total hours attributed to the BrownGreer CCC in the Q4 budget, no explanation is provided for approximately 33% of the total hours, which presumably are management-related hours. Similarly, the GCG call center budget assumes that 49% of the overall budget is attributable to management costs. For experienced call center teams, these percentages are excessive and the budget should be reduced accordingly.

**J.**   **The Proposed Budget Does Not Adequately Address Impact of Policy Holds**

The Q4 budget does not account for the policy hold on the subsistence review claims, nor is there any explanation of whether current reviews are placed on hold until policy hold issues are resolved. It was stated to us that the CAO relies on recommendations from vendors about whether current reviews should be suspended until policy hold issues are resolved. No review processes are planned to be suspended in the Q4 budget. At a minimum, the effect that a policy hold would have on actual and budgeted performance should be evaluated and disclosed. During a policy hold, vendors should not be left without direction to continue performing work that may need to be redone or revised as a result of the policy resolution. To the extent the subsistence policy has to be revised or replaced based on the current investigation of corruption at the CSSP, the CSSP may need to re-perform the subsistence reviews. Accordingly, the CSSP's hold should extend to the review of subsistence claims until the conclusion of the corruptions investigations. The Q4 budget should be revised to reflect such a broader hold.

**K.**   **The Budget Appears to Double Count Costs of Claim Review Time Spent By BrownGreer Employees Located at Client Assistance Centers ("CAC")**

The CAO has indicated that BrownGreer employees located at CACs are cross-trained to perform claims review tasks in addition to their CAC related tasks. The proposed Q4 budget includes $5.4 million for the costs of running the CACs and, while the supporting budget material indicates that the $5.4 million only includes cost for CAC related tasks, the actual data suggests the non-CAC related costs have not been backed out of the calculation.

The "CAC Modeling Assumptions Tab" calculates a cost per visit of $107.71 and explains in footnote 1 that CAC reviewer costs are not included in the calculation. However, the support provided for the $5.4 million budget shows that number is calculated using an average cost per visit of $295.02. (Tab "BG CAC Budget"). Presumably the difference between the two average costs per visit is due to the latter including both the costs of claims review tasks and CAC related tasks in developing the average.

Finally, with respect to fixed costs associated with CACs, it is not clear where the approximately $110,000 per month in rent is included in the proposed Q4 budget. Additionally, we would recommend that the final narratives supporting the Q4 budget include any relevant discussion regarding the analysis for closing any CACs during Q4. Such an analysis would include the number of visits at each center, the fixed costs of each center, the geographic proximity of visitors to the center, the proximity of adjacent centers, and the cost/benefit of early lease termination, among other things.

**L.**   **There are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis**

The Garden City Group File Audit Process, budgeted for $2.4 million in Q4, appears to be an unnecessary use of resources and adds great expense to the Q4 budget without reason. The impetus for this process is to convert claim information submitted to the GCCF by Class Members into the CSSP for use in processing their CSSP claim. However, these conversions are being performed on all GCCF claims, regardless of whether or not the claimant has filed a CSSP claim. This step is unnecessary, and results in work being performed on claims that will never be filed in the CSSP. In addition, it is believed that currently less than 1,000 CSSP claims per month are being filed

6

by previous GCCF claimants. As a result, the budget for this activity should be reduced to provide only for the conversion of newly filed CSSP claims.

The BrownGreer budget includes $6.4 million for administrative costs. The support for this cost is based on the amount spent in June, with an assumed reduction to the overall level occurring during Q4. As a result, no support can be provided for precisely where these budgeted amounts will be spent. For example, some of the tasks in June are based on claims volume and activity, while others are fixed in nature. The CAO stated that it is up to the vendors to determine where these costs will be allocated in Q4. However, no allocation has been provided, preventing an evaluation of this item in the budget.

## III. Comments Regarding the Documentation and Information Supporting the Proposed Budget

As previously mentioned, the budgeted amounts for many areas in the Q4 budget are not supported by anything other than an extrapolation of historical costs. Moreover, the historical costs of the facility have not been tracked in sufficient detail for all Vendors in order to support the budgeted amounts, as cost and productivity levels at each task level is not tracked. In order to support future budgeted amounts, the CAO should require vendors to provide this appropriate level of detail on a monthly basis.

On a quarterly basis, BP should be provided with the following documentation to support future budgets: (i) budgeted amounts by Vendor/CAO by month; (ii) supporting narratives; (iii) a utilization model for the three month period, without any locked cells; (iv) a supporting analysis of non-model driven variable costs; (v) a supporting analysis of fixed costs; (vi) a current BrownGreer/Garden City Group weekly reporting package; (vii) historical performance of utilization model/metrics; (viii) vendor KPI metrics and proposed vendor Task Orders for the quarter; (ix) a current organizational chart, showing headcounts at each level correlated to the vendor invoices and task level; (x) an analysis of projected turnover, hiring and training costs; (xi) current settlement projections showing projections of claims forecast and claims through the life of the program; (xii) analysis supporting the hours needed to perform each task by process by claim type for each vendor; and (xiii) a listing of service levels for each function within the Program by vendor (including administrative Program levels managed by the CAO).

In addition to the quarterly budget supporting documentation, BP should be provided with the following supporting documentation on a monthly basis: (i) current invoices from each vendor; (ii) BrownGreer/Garden City Group invoices broken down into the same categories shown on the organizational chart and task level, with time entries broken down by time spent on claim activity, travel, training and other "off-task" time; (iii) P&N/PWC invoices broken down into the same categories of organizational chart and task level with time entries separated between time spent on travel, claim resolution, training and other "off-task" time, and further separated for time spent on each individual claim, including an identification of the claim number worked; (iv) a comparison of actual costs to budget costs at the same level of detail provided in quarterly budget; (v) a supporting narrative with discussion of variances to budget and highlights of efficiency initiatives (both procedural and systems initiatives); (vi) a utilization model comparing actual to budgeted performance for the month, including a breakdown of performance for each vendor's portion of the model; (vii) supporting analysis of performance of non-model variable costs; (viii) current BrownGreer/Garden City Group weekly reports; (ix) an analysis of turnover, hiring and training costs for the month; (x) an analysis of changes to billing levels and rates of all employees of all vendors; (xi) additional data/analysis as may be determined once complete data dictionary is received and reviewed by BP; (xii) copies of any internal audit/quality assurance reports issued during the month; (xiii) copies of the invoice audit results performed by the CAO; and (xiv) any changes in existing service levels or service levels for new activities, agreed to by the CAO with the vendors.

For any identified variances, the variance analysis should include an analysis of the variances, the cause for the variance, action items to address the variance (if the variance is unfavorable), and any impact those results have on future budgets.

We are happy to discuss any of our comments and recommendations with the CAO in advance of its final proposed Q4 budget.

Sincerely,

Maria Travis
Director of Claims - GCRO

80683462

Cc:     Mark Holstein
        Keith Moskowitz
        Kirk Fisher
        Patrick Juneau
        Bob Levine

# Exhibit 8

## [Provided on Enclosed Disk]

# FILED UNDER SEAL

# Exhibit 9



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

August 28, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of your August 23rd letter responding to the CAO's initial Q4 2013 budget forecast submittal. In your letter, you list several concerns raised by BP regarding the budget process, some of which had already been addressed by the CAO at the time of your letter (BP's August 23rd Budget Response, 1 n.1). The CAO has since worked diligently to ensure that all of your comments in the August 23rd letter have been addressed in this final budget forecast and supporting documentation.

Before we address each of your comments from the August 23rd letter, I would like to restate the constraints on the development of our model. First, as per the directive of the Claims Administrator, we have developed our budget with the constraint that there will be no increase in the backlog of claims that will receive final determination notice. In other words, our staffing levels within the model are adequate to process to final notice all claims that the Program is projected to receive on a daily basis over the next quarter. With this assumption, you will note that our model indicates that we need an additional 99 accounting Full Time Equivalents (FTEs) to maintain the current claim volumes and to prevent backlog from increasing. Conversely, the

model shows that we are overstaffed in other areas, such as non-BEL analysts and reviewers, and therefore, we have a planned reduction in the budget forecast in these specific areas.

Secondly, as noted in your letter, the Claims Administrator's Office is largely dependent on Vendor-provided and historical data as inputs into the model, including task durations and other information. The CAO acknowledges that an increased level of effort is needed to complete the necessary studies and analyses, such as time and motion studies, as a next step to gathering additional data for the model. Within the time constraints of this budget request, there is simply not enough time to conduct the necessary studies and additional data collection. Therefore, Vendor-provided and historical data are necessary to complete the model. With this in mind, we see the budget process as a collaborative, continuously improving process whereby BP and the Plaintiffs' Steering Committee are able to work with the CAO to continue to develop an accurate, data driven budget forecast model incorporating new data as it becomes available.

Also note, in order to maintain full transparency, we have provided minutes for the August 9th, August 14th, and August 21st meetings conducted for the purpose of discussing our budget model and methodology. In our August 12th and August 15th letters, we asked that you provide any comments as to these minutes to ensure that we both have an accurate recollection of the meetings. Again, at our August 21st meeting, we asked that you review the minutes from those two meetings and provide feedback so that we could finalize those minutes. In that meeting, you stated that you would prefer to provide BP's comments the following day. As of this date, we have still not received any comments as to your understanding of the meetings in accordance with the minutes. We have attached the minutes for the August 9th, 14th, and 21st meetings as Exhibit A and ask that you provide BP's detailed comments as to your view of the accuracy of those minutes.

Our responses to each of your comments in the August 23rd letter are as follows:

## I. Comments Regarding the Framework of the Proposed Budget Model

As the CAO has stated and BP has reaffirmed in its response to the Q4 budget proposed on August 16th, certain assumptions were required in order to project future expenses. For some of these assumptions, it was necessary for the CAO to rely on data provided by the CSSP Vendors. BP has duly noted that the CAO does not currently possess the analysis necessary to validate the estimates provided by the CSSP Vendors. Nonetheless, the CAO has asked for additional information on the assumptions that were made. In response, Postlethwaite & Netterville has provided support for the claims review duration estimates; BrownGreer has provided support for the estimated decrease in Information Technology (IT) labor hours and for the elimination of the second reviewer shift; PricewaterhouseCoopers has provided support for its decrease in travel expense; and Garden City Group has provided support for the average call time and File Audit reduction. An example of this additional support is included as Exhibit B – Postlethwaite & Netterville Estimated Effort Memo.

With the understanding that future budget forecasts will require a more in depth analysis than the CAO has been able to perform in this abbreviated budget revision process, the CAO will be tracking the crucial data necessary to minimize the aforementioned assumptions. This data, in conjunction with time and motion studies, will provide the CAO with the resources necessary to validate, modify, or reduce the CSSP Vendor provided assumptions.

Additionally, as previously noted, the CAO adapted the pre-existing utilization model to be used as a budget forecast model. In performing this task on such a limited time frame, a small number of model miscodings occurred as disclosed in our August 21st meeting and as stated again in your August 23rd letter. These miscodings have been corrected by the CAO, and these

model changes are reflected in the change log attached as Exhibit C – Budget Forecast Model Change Log.

Lastly, BP's response notes that a critical component of the budget is a comparison of actual past performance to the proposed Q4 budget. In formulating this comparison, the CAO has compared July's actual hours and labor cost to the fourth quarter projected hours and labor cost. As previously mentioned, the primary foundation for the proposed budget is the reviewer utilization model, which has been developed to project staffing levels required to combat backlog growth. As such, the comparison of actual performance to budgeted performance results in variances for each of the four Vendors. This additional support is included as Exhibit D – Fourth Quarter Labor Modeling Summary.

## II. Comments Regarding the Q4 Proposed Budget Amount

### A. The Line Item "Contingency Fee" Should Be Eliminated

Over the past weeks, the CAO's confidence level pertaining to the accuracy of the budget model has vastly increased. For the Q4 budget, the 5% contingency fee will be applied to only variable costs within the Program and will not be applied to fixed costs. Due to the budget submission time constraints that do not provide sufficient time to gather all historical data and perform time and motion studies to review and examine the Vendor assumptions, the CAO maintains that a 5% contingency fee for variable components of the Program is appropriate. After applying all of the recent modifications and corrections to the budget model, the contingency fee for only variable costs results in a change in the contingency fee from $6,260,737 to $6,022,783, a reduction of $237,954. As more data is obtained and as time and motion studies are performed to review the Vendor-provided assumptions, the CAO's confidence

in the ability of the model to accurately forecast the budget will further increase, and the CAO
anticipates that, as a result, the contingency fee will decrease for the Q1 2014 budget.

Keep in mind that a contingency fee is just that—a contingency. It does not imply that
the actual fee will be expended. It merely provides a contingency in the case that an
unforeseeable event occurs, such as an unanticipated spike in claims, which, in conjunction with
our constraint to prevent an increase in the backlog of claims that will receive final determination
notice, would require additional labor hours (straight time overtime) to process the additional
claims.

## B. The Task Utilization Rate is Too Low

The CAO incorporated a Task Utilization Rate to accommodate the complicated nature of
reviewing claims that are, to a large extent, incomplete for several review iterations. Because of
the high level of incompleteness, claim reviewers must educate themselves on work that has
been performed to date by evaluating the claimant file; reviewing and validating previously
entered values; and discussing work with previous reviewers. All of this leads to time dedicated
to the review process that occurs outside the window of when a claim is checked out for review,
resulting in a lower Task Utilization Rate.

The CAO, however, takes note of BP's assertion that the 75 percent Task Utilization
Rate[1] is too low, particularly for some claim categories that experience fewer incomplete claims
and are less arduous to review. In the time between the Q4 budget submission and the Q1
budget submission, our team will perform an in depth operation review and examination; create a
more sophisticated measurement for current task utilization rates; work closely with the Vendors

---

[1] It should be noted that for Business Economic Loss claims, Start-Up Business Economic Loss claims, and Failed
Business Economic Loss claims, the CAO used a Task Utilization Rate of 80.12%. This figure is a blended rate
calculated using the task utilization information provided by Postlethwaite & Netterville and
PricewaterhouseCoopers.

to define target Task Utilization Rates for each claim category and design programs to achieve those rates; and develop scorecards to measure success against objectives.

## C. There Are Process Duration Changes for Both BEL and IEL Claims Which Are Unsupported

In the response to the Q4 2013 budget, BP states "Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors…" At the time of the initial budget submission on August 16th, the CAO did not possess the raw data necessary to perform such an analysis. Since the original submission, this data has been obtained, and a complete duration analysis has been performed on the average time required to generate each of the following notices for each of the 12 claim types: Eligible Claims, Closed/Denied, Incompleteness Denial, and Withdrawn/Opt Out.[2]

It is relevant to note that the Q4 budget forecast does not arbitrarily choose a number of FTEs with which to populate the model. The Q4 2013 budget model forecasts that, given the current rate of claims processing and the projected number of claims filed over the next quarter, 99 additional accountant FTEs will be necessary in order to combat increasing backlog, which has been the goal of the CAO from the beginning of the Program. As previously stated, the chief model constraint is to prevent the increase of the backlog of claims that go to final determination notice. As such, our staffing levels in the model are determined to meet this constraint and achieve a final budget forecast number.

BP also raises a concern as to an unexplained decrease in accountant reviews per week for BEL Claims. There is a valid reason for the decrease in reviews per week based on the way

---

[2] For a complete description of the Modeling Duration process and an analysis of the results, please reference the attached "Reviewer Costs Model" and "Reviewer Cost Model and Budget Forecast Methodology" narrative.

claims were selected earlier in the process in order to ramp up processing and demonstrate awards prior to the fairness hearing. In this early stage, claims that were complete, in Zone A, and were not subject to complex policy issues were selected. As the Program matured and claims were processed on a FIFO basis, a larger percentage of claims is subject to various issues which in turn slow down claim processing. With incomplete claims, the Program Accountants are now required to contact claimants in order to request additional information. Also, many claims are in Zones other than Zone A, which has presumed causation, and thus require significantly more time to process. Lastly, at the beginning of the Program, intricate and complex claims that were identified as having outstanding policy questions were placed on hold. As the Program has matured and hundreds of policies have been adopted to process these intricate and complex claims, the Program accountants must now not only process these complex claims, but also ensure that each claim review complies with the established Program policies. Program complexities such as these, rather than a decrease in reviewer productivity, are the reason that claim review times are increasing.

## D. Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

BrownGreer (BG) has provided a list of development and maintenance tasks for which the IT portion of the Q4 budget will be used. This list is attached as Exhibit E. However, the CAO notes that, given the time constraints of the budgeting process, an estimation of specific costs resulting from each programming task was not available from BrownGreer at the time of the Q4 budget submittal. The CAO has requested this information from the Vendor and, for future budget submittals, will include estimates of IT project costs that will tie to the IT budget. In the current budget forecast for the fourth quarter, the CAO utilized the labor assumptions provided by BG, resulting in a 24% reduction in IT costs.

## E. Primary and Secondary Handling Rate Assumptions Are Not Calculated at Current Rates

The CAO recognizes that, given the rapid pace with which the CAO was required to revise the budget forecast model, the initially proposed Q4 2013 budget secondary handling rate (i.e. re-reviews, reconsideration, and appeals) was based upon February statistics. Since the submission of the initially proposed budget, the CAO has updated all secondary review statistics as of August 21, 2013. These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

## F. The Budget Appears to Incorporate Excessive Labor Rates

As the CAO previously stated in its July 1st Letter to Judge Barbier, contracts have been established with the Vendors whereby the Vendors charge the regular bill rate for contract labor employees (also known as 1099 employees). Neither the CAO nor the Vendors were notified by BP prior to contract execution that BP would prefer for these contract labor costs to be passed through similar to Other Direct Costs (ODCs). With these Contracts already executed with each Vendor, the CAO simply cannot request these contract labor rates and that these costs be passed through as with other ODCs. BP was involved in every step of the Vendor contract negotiations, which included onsite meetings with the Vendors. In those meetings, which were the proper forums for such discussions, BP should have raised its concerns, which could have been part of the final negotiations prior to contract execution.

## G. The Budget Incorporates Excessive Levels of Accountant Travel Expenses

As a result of ongoing discussions with PricewaterhouseCoopers (PwC), the CAO and PwC have agreed that the number of accountants traveling to the New Orleans office will progressively decrease each month within the fourth quarter. The CAO has obtained monthly

estimated travel expenses from PwC, which it has incorporated into the Q4 budget forecast. PwC's plan for decreasing its travel expenses over the fourth quarter is included in Exhibit F.

## H. The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience

Because of the time constraints placed on the budget revision process set forth by the Court Order, call times presented in the initially proposed Q4 2013 budget were based on previously provided Vendor assumptions. Since the submission of the initially proposed budget, the CAO has received updated information on the CCC average call time and the Call Center average call time, both of which have been budgeted at 10 minutes each (8 minute call time and 2 minute wrap up time). These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

The CAO also disagrees with BP's assertion that the labor cost of the GCG Payment Outreach is an assumption provided by the Vendors. The July actual labor hours and costs were used as the basis for determining the Q4 budget. With only one full month of data available at the time of the budget creation, the CAO made the assumption that the labor hours and cost would remain constant throughout the fourth quarter.

## I. The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive

The Q4 2013 budget is, in the opinion of the CAO, not excessive and reflects BrownGreer's CCC management costs as 22% of total cost. BrownGreer includes one senior counsel and seven special counsel employees under its management umbrella. These managers are responsible for overseeing 65 callers, making the staff to management ratio approximately 8:1. Similarly, the current Garden City Group call center ratio of operators to floor supervisors is

10:1. However, the Garden City Group budgeted call center managerial cost figure includes crisis managers, quality assurance personnel, and telecom support which results in a higher managerial cost.

## J. The Proposed Budget Does Not Adequately Address Impact of Policy Holds

As the CAO has previously stated, it relies on Vendor recommendations to determine whether reviews should be suspended for claims on hold that currently have a pending policy decision. In regards to the current Subsistence hold, the Vendor recommended, and the CAO agreed that, by continuing to process claims, value is still being added to the Subsistence review process. While this value cannot currently be measured, claim reviewers are presently performing tasks that are essential to every Subsistence claim, regardless of pending policy outcome, which will ultimately assist in resolving the existing backlog of 23,000 claims. In regards to projecting the effect a policy hold has on actual and budgeted performance, the CAO does not possess the ability to identify newly proposed and amended policies or the number of claims that will fall within the policy hold parameters for the projected quarter when it is required to submit the budget sixty days in advance of the quarter's commencement. Furthermore, too many external variables exist (e.g. the number of claims that fall within the policy hold parameters, the policy decision date, and ultimately the policy decision) for the CAO to accurately project when the value added for processing policy hold claims will be observed.

## K. The Budget Appears to Double Count Costs of Claim Review Time Spent by BrownGreer Employees Located at Claimant Assistance Centers (CACs)

The CAO recognizes that, due to the limited time constraints of the Court Order budget process, the initially proposed Q4 2013 budget inadvertently included "costs of claim review time spent by BrownGreer Employees" located at Claimant Assistance Centers (CACs) in the

CAC Visitor-Specific Cost Model as well as in the Reviewer Cost Model, as indicated in BP's August 23rd letter. The CAC Visitor-Specific Model has since been revised to only include visitor-specific costs. The remaining portion of total CAC hours incurred that are not specific to claimant assistance are only included at the reviewer level in the Reviewer Cost Model. Removing the claim review task time from the Visitor-Specific Model reduced the 2013 CAC Visitor-Specific Q4 budget from $5,440,992 to $2,060,794.

In the proposed Q4 budget, the fixed monthly CAC lease payments are embedded in the expenses of BrownGreer. Due to the methodology used to calculate the proposed budget, breaking out the specific CAC lease payments and other fixed costs would have a limited benefit.

On December 1, 2013, the Apalachicola, Bay St. Louis, Biloxi, Cut Off, Lafitte, Clearwater, Fort Walton Beach, Mobile, Panama City Beach, Pensacola, and Orange Beach CAC leases expire and are up for renewal. No lump sum payments are required to renew the leases and only a portion of the CACs will see an increase in monthly lease payments. If all of the CACs were to renew their lease agreements, the monthly lease payments would increase from $75,709.77 to an estimated $76,480.58, a one percent increase in monthly costs. As such, it is still appropriate to consider the lease payments a fixed cost for each month in the fourth quarter.

Discussions between the CAO and the Vendors about closing CAC facilities have occurred; however, several reasons exist for why none of these facilities have been closed to date. First, these facilities have remained open because existing lease agreements remain in effect. The majority of CAC facility lease agreements are for a period of one year. Second, given BP and the PSC's desire that the Program maintain a presence in the Gulf Coast, the CAO has kept all CAC facilities open. It should be noted, however, that CAC staffing levels have decreased as CAC visitor traffic has decreased. This has had the effect of lowering labor costs

during the leasehold period while still maintaining a Gulf Coast presence. Further, CAC staff has been cross-trained on different Program-related tasks in order to remain efficient when traffic in the CACs is low. As the incoming claim volume and visitor traffic decrease at the CACs, the CAO is considering the closing and consolidation of some centers and/or the reduction of hours at centers. However, as of the forecasting of this budget, no plans have been developed to consolidate centers or reduce hours, and the CACs have been budgeted at status quo.

## L. There Are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis

Since the Program inception, the Garden City Group File Audit team has worked on performing audits on all GCCF files. Early in the Program, it was decided to audit all GCCF files so that when a claim was filed, these files would be immediately available to the reviewer and the claimant on the DWH portal, reducing delays in the system. The File Audit team reviews each file to identify and remove documents that contain Personally Identifiable Information that does not belong to the filing claimant.

The files currently being audited are taking longer to audit than the historical average time because these claims are more complex and document-intensive. File Audit priority is assigned using two criteria. First, priority is placed on reviewing files associated with claimants who have filed a claim with the DWH Program. Second, smaller files receive priority over larger files to ensure that as many claims as possible are reviewed as quickly as possible. Given the size of the files remaining, it is currently estimated that File Audit of all GCCF files will be complete in mid-November. This completion of File Audit is reflected in the Q4 budget forecast.

## III. Comments Regarding the Documentation and Information Supporting the Proposed

### Budget

In accordance with the Court's August 7th Order, enclosed in this budget package is the CAO's budget for the fourth quarter and the supporting documentation used to compute the forecast. In its response to the CAO's preliminary budget forecast, BP has requested additional documentation to support future quarterly budget forecasts. Some of this information, where available to the CAO, has already been incorporated into this budget forecast. Other information, such as training costs due to turnover, has yet to be provided to the CAO by the Vendors. Also, bear in mind that the CAO may not be permitted to distribute some information to BP under the Settlement Agreement and will need to work with both Parties to determine what data is allowed for distribution. Within this constraint, however, the CAO is committed to working with BP to provide as detailed a quarterly budget package as possible.

BP has also requested supporting information on a monthly basis. As discussed in prior meetings between BP and the CAO, given the time constraints of this budget revision process, much of this requested information has been unavailable to the CAO simply because it has never been tracked by Vendors at such a detailed level. Again, the CAO will also face many of the same issues regarding the information requested on a quarterly basis, namely that the CAO may not be permitted to distribute certain information to the Parties under the Settlement Agreement. This information will, if allowed by the Settlement Agreement, be incorporated into future monthly reports and quarterly budgets, producing a more accurate forecast provided to BP as it becomes available to the CAO.

The CAO reiterates that these requests have not been the focus throughout this process. Pursuant to the August 7th Court Order, the development of an accurate revised budget forecast

and its supporting documentation has been the CAO's primary priority. The CAO will work
with the Vendors in the coming months to provide BP with the supporting documentation as
requested.

Sincerely,

David Odom
CEO

Cc:    Magistrate Judge Shushan
       Stephen Herman
       James Roy
       Keith Moskowitz
       Patrick Juneau
       Bob Levine
       Kirk Fisher

# Exhibit 10

# System Performance - Claims Review

BrownGreer, Garden City Group, Postlethwaite & Netterville, PricewaterhouseCoopers

**Update as of June 14, 2013**





**Notes:**

1. Based on reviews per reviewer per month
2. Red bar target represents average reviews completed per month per reviewer based on modeled durations
3. Dark blue represents actual reviews per reviewer per month
4. Subsistence actual reviews per reviewer should improve as the system matures

# Exhibit 11

**DENTONS**

Keith Moskowitz
Partner

keith.moskowitz@dentons.com
D  +1 312 876 8220

Dentons US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306 USA

T  +1 312 876 8000
F  +1 312 876 7934

Salans FMC SNR Denton
dentons.com

June 7, 2013

**BY E-MAIL**

Mr. Patrick Juneau
Claims Administrator
935 Gravier Street
Suite 1905
New Orleans, LA 70112

Re:    Analysis of Immediate CSSP Cost Saving Opportunities

Dear Mr. Juneau:

Based on the information that BP has received from the Court Supervised Settlement Program ("CSSP") regarding the Court Supervised Vendors, it appears that BrownGreer PLC ("BG"), Garden City Group, Inc. ("GCG") and Postlethwaite & Netterville APAC ("P&N") (collectively the "CSSP vendors") rely on large numbers of independent contractors to staff their respective operations.[1]  Based on a review of billing records and other information, it also appears that the CSSP vendors are marking up the independent contractors' hourly rates and billing the Settlement Trust at two to three times the hourly rates that a local staffing agency would generally bill for those same independent contractors' services ("Vendor Markup"). While we do not know the exact amount of the Vendor Markups, as discussed below, based on available information and billing data, we estimate that the CSSP Vendor Markups may be accounting for as much as $14 million dollars per month in costs incurred by the Settlement Trust.  These Vendor Markups reflect pure profit for the CSSP vendors and provide no value to the CSSP, the Class or BP.

The Vendor Markups can be avoided by either requiring the CSSP vendors to pass through their direct costs of the independent contractors without any Vendor Markup or, as discussed below, by having the Settlement Trust contract directly with independent contractors (or respective staffing agencies) for the services the independent contractors are currently providing. Importantly, neither approach causes any impact on CSSP operations nor will it require you, in your capacity as Claims Administrator and Trustee of the Settlement Trust, to take on any additional responsibilities related to these independent contactors.

This letter summarizes our analysis of the Vendor Markups and also proposes a transition process, if necessary, to have the Settlement Trust contract directly with the independent contractors and/or staffing agencies.  As described below, under the proposed transition process, all human resource, administrative and other management responsibilities related to these independent contactors

---

[1] It appears that some of the independent contractors are being provided by staffing agencies, but the CSSP vendors are directly contracting with independent contractors as well. BP does not know the ratio of independent contractors that are being directly retained versus those being provided through staffing agency agreements.



Salans FMC SNR Denton
dentons.com

will remain with the CSSP vendors that currently retain these contractors and the CSSP vendors will be compensated at fair market rates for continuing to perform those responsibilities.

Consistent with your fiduciary obligations as Trustee of the Settlement Trust, we anticipate that you will review the information in this letter and take steps necessary to eliminate any unnecessary Vendor Markups.

## I.    CSSP Vendor Markups As Compared to Local Staffing Agency Rates

Based on the billing information you have provided us and our informed estimation of rates available in the market, BG, GCG and P&N appear to include average Vendor Markups of 200% to 231% on their independent contactor employees on top of the rates generally charged by local staffing agencies for those independent contractors.

The chart below summarizes the analysis:

| Vendor | Avg. Rate for Contractor As Billed by CSSP Vendor | Estimated Avg. Contractor Rate Charged by Local Staffing Agency[2] | Estimated CSSP Vendor Markup on top of Local Staffing Agency Rates ($) | Estimated CSSP Vendor Markup on top of Local Staffing Agency Rates (%) |
|---|---|---|---|---|
| BG | | | | 200% |
| GCG (excluding call center)[3] | | | | 219% |
| P&N | | | | 231% |

Based on our review of the billing information, the CSSP vendors do not appear to have any overhead related to these independent contractors and the Vendor Markups represent pure profit for the CSSP vendors (i.e., the Vendor Markup is not offsetting costs related to identifying potential contractors, screening applicants, administrating payroll, etc., which are being incurred by the staffing agencies). Absent some administrative function that CSSP vendors are performing warranting compensation for overhead that they are not already being compensated for, the markup of an independent contractor's rate solely to generate profit is wholly inappropriate under the circumstances.[4]

[2] Estimated actual average rates of independent contractors reflects the average rate of an independent contractor inclusive of the average markup percentages applied by local staffing agencies. The estimated average rates were determined by analyzing the types of positions for each CSSP vendor: low skill level, medium skill level, and high skill level. For each category, an analysis of rates paid to contractors and average markup percentages used by staffing agencies were used to calculate estimated rates.
[3] GCG has also subcontracted APAC Customer Services, Inc. ("APAC") to provide end-to-end resources for the CSSP call center operations (e.g., facility, technology infrastructure, call center staffing, management). GCG is billing the CSSP          per hour for APAC's call center representatives' time, regardless of the call volume. Because a market-based contract should charge $0.55 per minute of live call time, rather than an hourly rate, we address the call center contractors separately below.
[4] If for example, CSSP vendors are directly hiring independent contractors and are not otherwise billing for the administrative time necessary to identify and screen candidates, some Vendor Markup may be appropriate, but only

**DENTONS**

Mr. Patrick Juneau
June 7, 2013
Page 3

Salans FMC SNR Denton
dentons.com

## II.    Estimated Cost Savings Created By Avoiding the CSSP Vendor Markups

To quantify the estimated opportunity for cost savings, we identified independent contractors employed by the CSSP vendors, projected a future contractor headcount and workload based on current trends, and then calculated future labor costs based on an estimated labor rate stripped of the CSSP Vendor Markup.  Based on currently available information, the forecasted estimated cost savings are as follows:[5]

| Vendor | Forecasted Contractor Headcount | Forecasted Monthly Hours | Avg. Rate for Contractor As Billed by CSSP Vendor | Estimated Avg. Contractor Rate Charged by Local Staffing Agency | Monthly Potential Cost Savings[6] |
|---|---|---|---|---|---|
| BG | 1,320 | 180,000 | | | $7,400,000 |
| GCG (excluding call center) | 430 | 54,000 | | | $3,750,000 |
| P&N | 125 | 24,000 | | | $2,060,000 |

| | |
|---|---|
| Subtotal: | $13,210,000 |
| Estimated Call Center Saving[7]: | $760,000 |
| Total: | $13,970,000 |

The monthly potential cost savings above only reflect the elimination of the CSSP vendor markups and are not generated by comparing current costs against future projected costs.

## III.    Proposed Process to Eliminate CSSP Vendor Markups By Transitioning Independent Contractors to Contract Directly With The Settlement Trust

### 1.    Establish Team Workflow

The only change to the current organizational structure under this proposed process is that CSSP vendors will assign their respective independent contractor agreements and/or staffing agency agreements to the Settlement Trust.   To minimize any impact on the claims processing operation, the CSSP vendors should continue to be responsible for all of the managerial and administrative functions

---

at a commercially reasonable market rate and not the extraordinary Vendor Markups apparently being charged by the vendors today.

[5] BP has requested, but has yet to receive, amounts that vendors pay each contractor.  Projected savings could be significantly impacted if there are fewer independent contractors and more employees than estimated, or if the actual rates paid to contractors significantly differ than estimated amounts. Receiving this information will improve the accuracy of our analysis but we do not anticipate that the information will change our conclusions and recommendations.

[6] To be conservative, the Monthly Potential Cost Savings reflected in this column are reduced to account for any negative externalities associated with the transition process.

[7] The APAC contract provided to BP by GCG has redacted pricing information so it is unclear whether GCG is being billed by APAC on an hourly basis or on actual usage basis.  If GCG is arbitraging the two pricing structures (i.e., charging CSSP based on hourly rates and paying APAC pursuant to a market-based per-use rate), employing APAC directly would result in an additional $760,000 in monthly savings to the Settlement Trust.  In any event, transitioning to a market-based contract would yield significant savings.

**DENTONS**

Mr. Patrick Juneau
June 7, 2013
Page 4

Salans FMC SNR Denton
dentons.com

they currently perform. This includes, for example, interacting with contractors and/or staffing agencies, interviewing and hiring independent contractors, managing and overseeing contractor performance, managing administrative contracting issues, obtaining detailed timesheets from their respective contractors; preparing reports detailing time and contractor fees (without any Vendor Markup); submitting those reports to your Office for review and payment; maintaining payroll records as necessary, preparing and delivering payroll checks to their respective contractors and/or paying staffing agencies for independent contractors provided though those arrangements. Any new independent contractors hired by any CSSP vendor onto the project will, as a matter of legal technicality, contract with the Settlement Trust. Vendors will continue to be responsible for vetting potential new hires, making hiring decisions and facilitating the completion of all of the necessary paperwork that currently is required as part of the on-boarding process.

Because the CSSP vendors will be retaining all of the managerial and administrative burdens they currently are responsible for servicing, the CSSP vendors should continue to be allowed to bill the CSSP for time necessary to complete those tasks, as they are currently doing.[8] To the extent CSSP vendors have other administrative costs incurred not otherwise compensated through hourly fees (e.g., wire transfers, check stock, check printing and mailing; incremental fees associated with payroll systems, etc.), CSSP vendors should continue to receive reimbursement for those costs. However, we expect those costs to be very limited.

### 2. Confirm Banking Relationships

The Settlement Trust will be directly contracting with additional entities (i.e., APAC for call center services and possibly some staffing agencies), and those payees will need to be added to the Settlement Trust Administrative Expense Fund. These are relatively minimal adjustments to the current banking structure and should not impose any undue burden on the Settlement Trust or the CSSP vendors.

Because each CSSP vendor will receive funds for their own fees as well as any funds to cover the payroll of the independent contractors retained directly by the CSSP vendor, the Settlement Trust will need to confirm with the CSSP vendors that current banking relationships are sufficient to effectuate the process. By way of example, for ease of accounting, CSSP vendors may prefer separate accounts be established to receive wire transfers for independent contractor payroll. We are glad to assist you with respect to these issues.

### 3. Develop Communications Informing Independent Contractors and/or Staffing Agencies of the Transition

The Claims Administrator and Settlement Trust will need to inform the independent contractors and/or staffing agencies of the administrative change in the employment and/or retention agreements.

---

[8] For BrownGreer, we estimate total monthly administrative costs to be approximately $94,000. This is based on an estimated six full-time employees allocated to human resources administration                                    and invoice/ payroll administration                                    For Garden City Group, we estimate total monthly administrative costs to be approximately $45,000. This is based on an estimated three full-time employees allocated to human resources administration                                    and invoice/ payroll administration

For P&N, we estimate total monthly administrative costs to be approximately $29,000. This is based on an estimated two full-time employees allocated to human resources administration

and invoice/ payroll administration

**DENTONS**

Mr. Patrick Juneau
June 7, 2013
Page 5

Salans FMC SNR Denton
dentons.com

This communication should include a straightforward explanation that the independent contractors' employer will change as a matter of legal technicality, but all other aspects of the existing employment relationship will remain the same. The communication should clearly articulate that the contractors' current supervisors at the respective CSSP vendors shall retain all the same authority they currently possess. To the extent that the independent contractors' contracts or the agency staffing agreements are not assignable, the communication will also need to inform them of the need to terminate their existing agreements with the CSSP vendors and to sign a revised contract amending the name of their employer. We are glad to provide you a proposed template for this communication piece.

### 4.    Sign New Contracts / Assign Existing Contracts

We expect that the CSSP vendors will be able to assign contractor and/or agency staffing agreements to the Settlement Trust. If not, the Settlement Trust may need to enter into new agreements with such contractors and/or staffing agencies. Preparing new contracts will not impose an undue burden on the Settlement Trust, and we are glad to assist you in preparing the necessary contracts.

As stated above, this proposal eliminates the excessive Vendor Markups currently being incurred by the Settlement Trust, compensates existing vendors for the administrative and human resource related services they will continue to provide and does not impact the CSSP's operations in any material way. We believe that eliminating these Vender Markups in the manner described in this letter are consistent with the terms of the Settlement Agreement and your fiduciary obligations owed as the Trustee of the Settlement Trust.

If you have any questions regarding this letter or our analysis, we can provide additional details as necessary.

Sincerely,

Keith Moskowitz

# Exhibit 12

# EXHIBIT A

### BP's Minimum Proposed Revisions to 2013 Fourth Quarter Budget
### Submitted at September 4, 2013 Panel Meeting

On August 16, 2013, the Claims Administrator's Office ("CAO") submitted its initial 2013 fourth quarter ("Q4") budget, which totalled over $119,000,000. On August 23, BP sent the CAO a letter indicating that the initial Q4 budget was unreasonable and excessive under the circumstances and provided detailed comments and proposed revisions to the budget proposal.

The CAO submitted a revised Q4 budget on August 28 totalling over $131,000,000.

BP maintains the Q4 budget is excessive and unreasonable for all of the reasons identified in its August 23 letter.[1]  In particular, the budget relies on untested assumptions and contains unsubstantiated costs that BP cannot reasonably evaluate without a thorough operational review and examination (as BP is entitled to pursuant to the Settlement Agreement, the Settlement Trust, the CSSP contracts, and applicable law) including an analysis of the validity of the CSSP Vendors' assumptions.  Notwithstanding this lack of information, BP has identified specific revisions to the Q4 budget as detailed in the following table.

|   | Minimum Required Q4 Budget Revisions | Estimated Cost Impact on Q4 Budget |
|---|---|---|
| 1. | *Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims* | ($11.14)M |
| 2. | *Increase BEL accountant productivity [2]* | ($12.97)M |
| 3 | *Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog[3]* | ($8.55)M |
| 4. | *Adjust task utilization rate for non-BEL claim types to* | ($1.31)M |

---

[1] BP recognizes that the CAO appears to have corrected the double counting of claim review time spent by BrownGreer employees located at Client Assistance Centers, as well as other calculation errors BP had identified.

[2] Determining an appropriate productivity target requires an operational review and examination.  BP requests the budget be reduced immediately to reflect the only target that has been presented by the Vendor's themselves -- 1.5 BEL determinations per accountant per week.  (June 4, 2013 P&N Memorandum to P. Juneau regarding "BP Requested 'Performance Study -- BEL Claims/Accounting Costs'".)  BP maintains its position that the BEL claims determinations process is inefficient and does not make any representations that the target of 1.5 BEL claim determinations per accountant per week is a reasonable target.  This calculation was achieved by reducing the accountant hours in the process duration calculation to 28.3 for BEL claims, although other assumptions could be also be changed to achieve this productivity level.

[3] The current model projects 205 FTEs for Seafood determinations.  Based on the projected Seafood claim submittals and Q3 determinations, all Seafood claims are projected to be resolved prior to the start of Q4.  The estimated cost reduction leaves residual costs for estimated re-reviews, reconsiderations, and trailing incomplete responses.  The tab [Measured Page] erroneously projects determinations in excess of remaining seafood claims throughout Q4, resulting in an overstatement of required claim reviewer hours.

|    | *equal BEL claim utilization rate[4] (after the impact of revision 3)* |   |
|----|----|----|
| 5. | *Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims* | ($1.26)M |
| 6. | *Eliminate Brown Greer IT development spending until further requested information is provided[5]* | ($1.95)M |
| 7. | *Adjust BG and GCG call center staffing levels based on 10 minute call duration[6]* | ($2.01)M |
| 8. | *Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after the impact of revision 3 and 4)[7]* | ($1.25)M |
| 9. | *Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[8] and calculate off reduced proposed budget amounts* | ($5.23)M |
| 10 | *Reduce labor rates to address the unknown and undisclosed mark-ups[9]* | Unquantifiable because the Vendors refuse to disclose amount of mark-ups |
| 11 | *Reduce BG administrative budget[10]* | Unquantifiable |

---

[4] BP maintains its position that even an 80% task utilization rate is too low and an operational review and examination is required to determine an appropriate task utilization rate. The task utilization rate of 75% for non-BEL claim types is inconsistent with the BEL utilization rate of 80.1%. The proposed adjustment is supported by a best practice of maintaining consistency within the model unless specific data supports an alternative assumption. The estimated reduction represents the non-duplicative impact of the task utilization rate adjustment after the hours related to Seafood claim review are removed from the CAO's model.

[5] As explained in previous correspondence and meetings with the CSSP, BP does not have enough information to determine if these IT costs are necessary. BP will provide funding for BrownGreer IT development spending subject to (1) BrownGreer and/or the CSSP providing project-level budgets; (2) review and approval of those project-level budgets by Chris Reade of the CAO; and (3) BP's rights to review and consent to the project-level budgets under the Settlement Agreement.

[6] The CAO's written response from 8/28 confirms that average call duration is 10 minutes; however the model fails to adjust the optimal staffing needs based on the new call duration assumptions.

[7] The model establishes that GCG administrative costs generally run between 15% and 18% of labor costs; however, the administrative cost projections are calculated off of Q2 actual labor costs as opposed to projected Q4 labor costs. The estimated reduction corrects for the administrative cost error and accounts for further reductions resulting from additional labor cost reductions identified in proposals 3 and 4.

[8] The contingency fee calculation in the 8/28 Q4 budget contains a formula error in cells K42 and M42 of tab [Q4 CSSP], resulting in the inclusion of additional fixed costs in the calculation.

[9] See June 9, 2013Letter from K. Moskowitz to P. Juneau.

[10] The administrative budget is forecasted as a percentage of reviewer costs. As a result, a detailed description of these activities is not available. BP will provide funding BG Administrative costs subject to (1) BrownGreer and/or

These revisions amount to a total budget reduction of at least $45,600,000, resulting in a Q4 budget of no more than $85,600,000. BP believes that an operational review and examination will reveal further opportunities for budget reductions, while retaining or improving efficiency levels within the CSSP.

the CSSP providing task level budgets and (2) BP's rights to review and consent to the task-level budgets under the Settlement Agreement.

# Exhibit 13



September 5, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of BP's Proposed Revisions to the 2013 Fourth Quarter budget, a copy of which is attached as Exhibit "A," submitted at the September 4th, 2013, Panel Meeting which was assembled pursuant to Magistrate Judge Shushan's August 7th, 2013 Court Order "Regarding BP's Obligation to Fund Claims Administrator's Proposed 4th Quarter 2013 Budget". In its submission, BP lists several proposed revisions to the CAO's fourth quarter budget submittal. This letter will address the following: 1) the confirmation of the CAO's understanding of those proposed revisions, 2) the establishment of the CAO's position regarding each of those revisions, and, 3) where applicable, the documentation of the budgetary adjustments made by the CAO in the Panel Meeting pursuant to BP's recommendations along with the CAO's revised budget which is attached as Exhibit "B." Below are BP's Proposed Revisions to the Q4 2013 Budget and the CAO's response.

1. **Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims (Estimated Cost Impact of $11.14M)**

   The CAO agrees to remove funding for the 99 additional accountants from the Q4 2013 budget and will revisit this line item in the Q1 2014 budget pending additional analyses. As discussed in the Panel Meeting, the CAO stands ready to perform Time and Motion studies and will share the results of these studies as appropriate with BP to further validate data in

the budget forecast model and in any adjustments to the 99 accountant figure for the Q1 2014 budget submittal.

This concession results in an $11.16 million reduction to the Q4 2013 budget.[1]

## 2. Increase BEL accountant productivity (Estimated Cost Impact of $12.97M)

While increasing the productivity of BEL accountants would possibly result in a decrease in claim backlog, this would have no impact on the fourth quarter budget forecast as submitted by the CAO.

As discussed in the Panel meeting, while increasing the productivity of the Program accountants would result in an overall savings to the Program, there would be no impact to the Q4 2013 budget as there is a significant backlog of claims to be processed.  Savings will be achieved in future budgets as the backlog is decreased and an FTE reduction strategy is employed.[2]

The CAO will continue to gather detailed information and stands ready to perform Time and Motion studies on the accounting review process to validate the accuracy of current model drivers.  The CAO will also continue to work with the Program accountants and drive towards a more efficient operation for more expedient claims processing and for cost savings to the Program.

There is no cost savings to the Q4 2013 budget associated with this strategy.

## 3. Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog (Estimated Cost Impact of $8.55M)

The CAO agrees to reduce the number of FTEs performing Seafood reviews in the budget forecast from 205 FTEs to 100 FTEs.

---

[1] The figure presented by BP and presented as a concession in the Panel meeting was $11.14 million, but upon further analysis of the budget model, the number is actually $11.16 million.

[2] The CAO acknowledges that an increase in accountant reviewer productivity may help reduce the cost of the Program on a long term basis by lowering the claim backlog more rapidly and thus decreasing the overall duration of the Program.  However, for purposes of the Q4 2013 budget forecast, BEL accountant productivity is not relevant.

The budget model forecasted that 205 Seafood reviewers were required to achieve desired Seafood processing targets.  Rather than increasing Seafood review staff as dictated by the budget model to 205 total FTEs, the CAO determined that maintaining the current staffing level of 100 FTEs would be sufficient.

Given that the processing of Seafood claims is nearing an end, continuous evaluations of the FTE count dedicated to Seafood processing will be performed as more detailed studies are conducted by the CAO, and reductions will be employed in future quarters as reasonably appropriate.

This concession results in a $5.47 million reduction to the Q4 2013 budget.[3]

**4.  Adjust task utilization rate for non-BEL claim types to equal BEL claim utilization rate (after impact of revision 3) (Estimated Cost Impact of $1.31M)**

The CAO does not currently have adequate information to determine at exactly what level the task utilization rate for each claim type should be set.  Given the effect on staffing levels and claim backlog, the CAO cannot unilaterally adjust task utilization rates without additional information and further discussion.

The CAO stands ready to perform Time and Motion studies in its operational review to determine the appropriate task utilization rates.   Once these additional analyses are performed and accurate information is gathered, the CAO will address the task utilization rate of each claim type as reasonably appropriate in the Q1 2014 budget submittal.

**5.  Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims (Estimated Cost Impact of $1.26M)**

The decision to perform a file audit on all GCCF files was a decision made pursuant to Section 4.4.2 of the Settlement Agreement.

---

[3] The figure presented by BP and presented as a concession in the Panel meeting was $5.1 million, but upon further analysis of the budget model, the number is actually $5.47 million.

Case 2:10-md-02179-CJB-DPC   Document 13347-36   Filed 09/02/14   Page 144 of 310
Case 2:10-md-02179-CJB-SS   Document 11347-26   Filed 09/11/13   Page 134 of 212
August 28, 2013
Page 4

Per this Section, in November 2012, the CSSP sent each GCCF claimant a letter pursuant to Section 4.4.2 of the Settlement Agreement, discussing how the claimant could see all documents he or she had submitted previously in the GCCF and how to determine what additional documents the claimant needed to submit to the CSSP.  The letter explained that the claimant would have immediate access to all documents on file, as soon as he or she entered the GCCF claim number into the CSSP's online filing system.

The ability of the claimant to instantly access all previous GCCF information was viewed as preferable to other less favorable options.[4]

The CAO recommends continuing with the proactive conversion of these GCCF files, which will be complete in November of this year.

## 6.  Eliminate BrownGreer IT development spending until further requested information is provided (Estimated Cost Impact of $1.95M)

In reality, this proposed revision would downsize the BrownGreer IT development staff until a project-level budget has been produced by BrownGreer, submitted to the CAO, and finalized in discussions by BP at which point the BrownGreer IT staff would be required to "upsize" to perform the projects itemized in that budget.  This would have a largely adverse impact on the Program, as we have a continuing need to make modifications to the systems for policy and process changes, efficiency improvements, and IT security.

The CAO has requested information concerning the ongoing projects performed by the BrownGreer IT development department; however, given the time constraints of the budget revision process, BrownGreer has not been able to compile the detailed project-level budget forecasts at this point.

---

[4] The alternative to the approach adopted by the CAO included the examination of each GCCF claim and its associated files to determine what additional documentation that claimant was required to file in order to satisfy the requirements for each of the twelve claim types as dictated by the Settlement Agreement.  These additional documentation requirements would then be relayed to the claimant.  This alternative was viewed as inferior to the approach adopted by the CAO for two reasons: 1) it was significantly more labor-intensive and 2) it resulted in a delay between the time when the claimant filed with the CSSP and when that claimant could view his or her claim file online.

The CAO therefore recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast, at which point the required information will be available to the CAO and provided to BP as appropriate.

**7. Adjust BG and GCG call center staffing levels based on 10 minute call duration (Estimated Cost Impact of $2.01M)**

Garden City Group Call Center average call time is currently at ten minutes, as indicated in the budget forecast model. These calls include standard inbound and outbound calls that involve similar dialog and skillsets for each call.

BrownGreer's Claimant Communication Center (CCC) handles additional functions beyond inbound and outbound calls to include claim research, claim status updates and summaries, Portal navigation assistance, and resolution of escalated claimant concerns. The CCC also collaborates with the Claimant Assistance Centers (CACs) to schedule claimant visits, facilitate claim filing and document submission, and resolve additional questions related to the claims process.

Unlike the Garden City Group Call Center budget forecast, the BG ten minute call time does not directly affect the budget because the BrownGreer CCC call staff is carrying out additional functions; therefore, no direct correlation exists between this ten minute call time and the BrownGreer CCC budget forecast.

The CAO believes that the budget forecast model accurately reflects the appropriate call activity for the Garden City Group Call Center and the BrownGreer Claimant Communication Center.

**8. Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after impact of revision 3 and 4) (Estimated Cost Impact of $1.25M)**

Similar to previous Proposed Revisions related to these administrative costs, the CAO needs more information before it can reasonably make informed decisions related to the administrative costs of BrownGreer and Garden City Group.

While its operational review is performed and additional information is gathered, the CAO recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast at which time the results of the analysis will be available.

**9. Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[5], and calculate off reduced proposed budget amounts (Estimated Cost Impact of $5.23M)**

The CAO maintains that some contingency is essential given the possibility that unforeseeable incidences, such as the Freeh investigation, will undoubtedly arise. These are particularly time and cost intensive from a management perspective. For these reasons, some contingency is necessary.

Despite this, the CAO has conceded to lowering the contingency from 5% of variable costs to 2.5% of variable costs in a good faith effort to compromise with BP.

This concession results in a $3.44 million budget reduction to the Q4 2013 budget.[6]

**10. Reduce labor rates to address the unknown and undisclosed mark-ups (Estimated Cost Impact : Unquantifiable)**

As stated in our August 28, 2013 letter, Contracts have been executed with the Vendors including labor rates for Vendor employees and 1099 contract employees. BP was present at these negotiations, which were the appropriate for such discussions. Prior to Contract execution, BP could have requested lower rates for these 1099 employees or to treat them as Other Direct Costs, which are pass-through expenses. We now must honor those Contracts and pay the rates therein. Therefore, there is no possible concession in this area.

**11. Reduce BG administrative budget (Estimated Cost Impact:  Unquantifiable)**

---

[5] The formula oversights in cells K42 and M42 of tab [Q4 CSSP] have been corrected so as to not include any additional fixed costs in the calculation of the contingency. This resulted in approximately a $45,000 (0.035%) decrease in the total budget forecast.
[6] The figure presented to BP in the Panel meeting was $2.62 million, but upon further analysis of the budget model, due to reductions in variable costs in other concessions, the number is actually $3.44 million.

Similar to Proposed Revision number 8, the CAO needs to conduct additional studies before it can reasonably make an informed decision related to the administrative costs of BrownGreer.

Until its full operational review is performed and additional information is gathered, the CAO recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast.

In summary, and in response to BP's proposed revisions to the Q4 2013 budget, the CAO has made a total of $20.07 million in reductions to the Q4 2013 proposed budget, reducing the overall budget to $111.16 million.[7]  It should also be noted that this represents a reduction of $19.16 million from the Q3 2013 $130.32 million budget.  The remaining items with the exception of item 10, Labor Rate Reduction, will require further analysis, which could not be conducted in the timeframe allotted for the Q4 2013 budget revision process.

Indeed, the CAO has requested additional funding, as part of the Claims Administrator's line item in its Q4 2013 budget submittal (an increase of $1.44 million), to hire staff in order to conduct the Time and Motion studies referenced in this letter.  And as explained in the Panel Meeting, we anticipate that the first analysis will take 60 days to complete from the date we hire the additional staff.  In the Panel Meeting, Maria Travis stated that BP had no objection to this line item increase as part of our analysis.  While we understand that other items in the budget are still in dispute, we have sent an email yesterday asking BP to respond by email that BP does agree to this particular budget line item increase so that we may immediately add the necessary staff to meet the scope and schedule requirements of these studies.  We ask that BP respond quickly as the Q1 2014 budget submittal is in less than 60 days and delays in adding the required staffing will impact our ability to produce the studies needed for the Q1 2014 budget forecast.

Also, as discussed in the Panel meeting, the CAO continues to work with BP towards a more detailed budget process supported by further analysis including the Time and Motion studies as

---

[7] The reduction of $18.94 was presented at the Panel meeting but has increased to $20.07 million due to various factors as discussed in footnotes 1, 3 and 6.

Case 2:10-md-02179-CJB-DPC  Document 13347-36  Filed 09/02/14  Page 148 of 310
Case 2:10-md-02179-CJB-SS  Document 11347-2  Filed 09/04/13  Page 12 of 12
August 28, 2013
Page 8

part of the ongoing operational review of the Program. As part of this process, we will work with BP to identify additional studies and detailed data needed for future budget forecasts.

Sincerely,

David Odom
CEO

Cc:     Magistrate Judge Shushan
        Stephen Herman
        James Roy
        Keith Moskowitz
        Patrick Juneau
        Bob Levine
        Kirk Fisher

# EXHIBIT 5
## Filed Under Seal

# EXHIBIT 6



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

Dear Mr. Levine,

### Process Audit

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:
- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement). These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing. The procedures performed and related observations and recommendations are described in the Report attached. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and



An independent member of Nexia International

October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

CLA fully appreciates the complexity of claims operations DHECC faced. From the outset of the Process Audit, the CA stated clearly that DHECC's top priority was to compensate claimants that had been adversely affected by the Deepwater Horizon oil spill in a manner that was timely, accurate, and in accordance with the Settlement Agreement. Methodologies, processes, and controls evolved during the time period through March 31, 2013. DHECC made many adjustments and improvements as it gained a clearer understanding of the emerging challenges associated with its operations. The CA communicated to CLA that DHECC strives to consistently apply its policies, procedures, and methodologies in accordance with the Settlement Agreement and undoubtedly during this process exceptions would occur due to the volume of claims processed in a short period of time. Additionally the CA communicated that DHECC was committed to continue to enhance the internal control environment and to correct identified errors.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013. If subsequent events are brought to our attention we will evaluate those events during Project II and III.

Throughout Project I, CLA had full and timely access to the CAO and DHECC vendor personnel for on-site meetings, conference calls, additional requests, and clarification and questions identified in a timely and transparent manner. All personnel were collaborative and responsive throughout Project I.

CLA would like to thank the CAO and its vendors for their assistance, the education given on the complexities involved for our team, and efforts made during Project I. From the initial kick-off meeting the CA pledged DHECC's full cooperation and commitment and that is exactly what CLA received.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

Deepwater Horizon Economic Claims Center

Independent Evaluation of the Internal
Control Environment

(Process Audit)

May 17, 2013

Prepared By: CliftonLarsonAllen LLP





An independent member of Nexia International



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:

- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement).     These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing.     The procedures performed and related observations and recommendations are described in the Report. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

We performed this engagement, and formed our opinion for Project I, in accordance with the International Standards for the Professional Practice of Internal Auditing Standards (Standards). In addition, our procedures do not constitute an audit performed in accordance with auditing standards generally accepted in the United States of America; or an examination, review or agreed upon procedures performed under the attestation standards of the American Institute of Certified Public Accountants. As such, we do not express an opinion on any of the specified elements, accounts or items included in DHECC's financial statements or on the financial statements taken as a whole. If we had performed additional procedures, or if we had conducted an examination or review of the specified elements, accounts or items of the financial statements, or agreed upon procedures in accordance with professional standards, matters in addition to our observations may have come to our attention and been reported to you.

The sufficiency of the procedures and operations of internal controls is solely the responsibility of the CA and DHECC. Consequently, we make no representations regarding the adequacy of the procedures described in the attached document either for the purpose for which the Report has been requested or for any other purpose.

This report is intended solely for the use of the Claims Administrator and DHECC and is not intended to be used by anyone other than the specified parties.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013. If subsequent events are brought to our attention we will evaluate those events during Project II and III. In addition, CLA did not validate management's responses we will test changes and updates during Project II and Project III.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

# Table of Contents

1.0 Summary of Results .................................................................................................................... 8

   1.1 Key Strengths .......................................................................................................................... 8

   1.2 Key Opportunities for Improvement.................................................................................... 10

   1.3 Key Findings .......................................................................................................................... 11

2.0 Internal Audit Opinion ............................................................................................................ 12

3.0 Background .............................................................................................................................. 13

   3.1 DHECC Background ............................................................................................................... 13

   3.2 Named Vendors of Settlement Agreement .......................................................................... 13

   3.3 Engagement Background ....................................................................................................... 14

   3.3.1 Project 1 Background......................................................................................................... 15

4.0 Project Objectives and Scope.................................................................................................. 16

   4.1 Project Objectives ................................................................................................................. 16

   4.2 Project Scope ........................................................................................................................ 16

5.0 Project Work Performed........................................................................................................... 17

6.0 Detailed Observations and Recommendations ...................................................................... 20

   6.1 Review of DHECC Policies and Procedures .......................................................................... 20

   6.2 Claims Data Input.................................................................................................................. 21

   6.3 User Access Rights................................................................................................................. 22

   6.4 Change Management Audit Trail .......................................................................................... 23

   6.5 Claims Payment Disbursements............................................................................................ 24

   6.6 Claims Data Retention........................................................................................................... 24

   6.7 Claims Audited by CAO's Quality Control Department......................................................... 25

   6.8 Data Center ........................................................................................................................... 26

   6.9 Individual Claims Testing....................................................................................................... 27

   6.9.1 Seafood Compensation...................................................................................................... 30

   6.9.2 Individual Economic Damage ............................................................................................ 31

   6.9.3 Business Economic Loss ..................................................................................................... 31

   6.9.4 Vessel of Opportunity Charter Payment............................................................................ 32

   6.9.5 Vessel Physical Damage ..................................................................................................... 32

   6.9.6 Coastal Real Property Damage........................................................................................... 32

   6.9.7 Wetlands Real Property Damage ....................................................................................... 33

   6.9.8 Denied Claims Statistics ..................................................................................................... 34

## Table of Contents

6.9.9 Appealed Claims Statistics ......................................................................................................... 34

Appendix A - Individuals Interviewed ...................................................................................................... 35

Appendix B - Claim Categories Not Included In Project I Testing ........................................................... 37

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Summary of Results

## 1.0 Summary of Results

As of March 31, 2013, CLA identified the following key strengths and opportunities for improvement. It was communicated to CLA that DHECC had begun implementing changes during fieldwork to address the opportunities for improvement identified, and changes were implemented as early as March 6, 2013.

### 1.1 Key Strengths

#### *Claims Paid In Accordance With the Settlement Agreement*

DHECC disburses payments that are calculated in accordance with the Settlement Agreement. CLA's review of paid claims revealed exceptions of less than 2%. Based on the claims CLA reviewed, paid claims as a whole appear to be paid in accordance with the Settlement Agreement and the CAO is committed to correcting any errors identified.

#### *Open Communication between DHECC, the Court, the PSC, and BP*

The CAO manages all lines of communication between their vendors, the Court, PSC, BP, and themselves through weekly status meetings, ad hoc meetings to address emerging trends and issues, and weekly reports.

#### *Claims Processing with Transparency*

DHECC processes claims under the premise of complete transparency. This is accomplished by showing each claimant, PSC, and BP how each claim outcome is reached, and if a payment is calculated, how the calculation was performed in accordance with the Settlement Agreement.

#### *Claims Processing with Due Process*

DHECC implements the provisions of the Settlement Agreement providing each claimant the right to elect one of the following outcomes once the claimant receives a notice stating they are eligible for payment:
* Accept calculated offer
* Request a re-review of their claim if they are not satisfied with the initial outcome at no additional cost to claimant
* Request for a reconsideration it they are not satisfied with the re-review outcome at no additional cost to claimant
* Appeal the decision of the reconsideration at no additional cost to claimant

#### *Consistent Application of the Settlement Agreement*

DHECC applies the Settlement Agreement consistently based on the results of claims testing across the different claim categories. All claims categories revealed exceptions of less than 2% which indicates that DHECC correctly applied the Settlement Agreement.

## Summary of Results

### Number of Appeals

As of December 31, 2012, DHECC processed 68,954 claims and paid 15,894 claims, totaling $1,063,262,525. The difference between claims processed and claims paid is the result of claims processed being appealed, denied, or the need of additional information from the claimant to fully process the claim. See 6.9 Individual Claims Testing for breakdown of claims processed, paid, appealed, and denied. As of March 25, 2013, the total number of claims appealed by either BP or a claimant was 1,260, or 1.83% of total claims processed. Of the appeals, BP appealed 897 (71% of total appeals) and claimants appealed 363 (29% of total appeals) and the results of 67% of total appealed claims are still awaiting a decision.

### Ease of a Claimant Filing a Claim and Having Their Questions Answered

DHECC has made available three ways to file a claim. Claims can be filed on-line, at one of 18 DHECC established Claimant Assistance Centers (CAC), or through U.S. Postal Service mail. Additionally, DHECC has created a call center for claimants to call to get answers to claims filing questions.

### Quality Control

The CAO has a quality control function, responsible for quality control over claims processed, paid, and appealed. This allows the CAO to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses formal disciplines in accordance with the International Standards for the Professional Practice of Internal Auditing Standards to conduct their reviews. These protocols ensure a consistent application and allow for timely and accurate reporting of results. The work is retained and evidenced in workbooks to allow for review. In addition, the qualifications and experience of the CA QA/QC resources support a qualitative review. Having an in house quality control function given the complexities in the internal control environment is viewed as a leading practice.

### Claims Processing Volume

As of December 31, 2012, DHECC processed an average of 11,492 claims notices per month. As of March 31, 2013 DHECC's monthly average had risen by 89% to an average of 21,657 claims notices processed per month, demonstrating increasing efficiency in the processing of claims.

### Offsite Data Center Assessment

The CAO outsources its data center operations to GCG. The CAO and GCG regularly test and assess the physical controls of the data center to determine any control weaknesses.

### Document Retention

The CAO and GCG maintain paper documents in a secured storage area within the Mail Center, located in Hammond, LA. In addition, GCG maintains electronic documentation at the Data Center, located in Dublin, OH (Data Center). Both paper and electronic documentation are maintained in a secure area and can be located or recalled as needed.

# Summary of Results

## 1.2 Key Opportunities for Improvement

### *Change Management Audit Trail*

BG performs approximately 300 – 400 IT system changes daily such as updating claim or claimant specific information and claims processing portal system edits. While documentation is maintained to support the changes, a log of the changes is not maintained. As such, it is difficult for the CAO to monitor the nature and frequency of IT changes each day. Maintaining a daily log will also assist management is determining if changes made were authorized, reasonable and tested before implementation.

### *Excessive Remote User Access*

BG utilizes an IP address validation control to ensure access to the claims processing portal is restricted to users located at one of the DHECC approved locations. Remote access to the portal has been granted to 829 (28%) individuals out of approximately 3,000 individuals involved in the claims administration process. Such access is usually limited to a smaller percentage, 2-3% (i.e. 50 to 100 users). Additionally, criteria for allowing remote access has not been sufficiently reviewed and documented.

### *Periodic User Access Review*

DHECC's vendors have a number of individuals (443 out of approximately 3,000) who have multiple user accounts with different permission rights and capabilities. Users with multiple user accounts are not a control deficiency as long as monitoring over segregation of duties risks is performed. While management performs a 30 day review of static user accounts, user access is not periodically reviewed to determine if access level is appropriate and in alignment with job responsibilities.

### *Execute Vendor Contracts for All Vendors*

The CAO is required to work with the four DHECC vendors in the Settlement Agreement. Contracts have been executed and signed with two of the four vendors, P&N and GCG. While the remaining vendors, BG and PwC, have not completed contracts, they were named in the Settlement Agreement and are required to perform claims processing responsibilities for the CAO as part of DHECC. In the absence of signed contracts, it is difficult for the CA to establish service level agreements and performance metrics for the vendors.

### *Approval of Policies and Procedures*

DHECC appears to be operating in accordance with its policies and procedures. However, five of the seven policies reviewed during Project I were draft and had yet to be finalized and approved by DHECC management.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Summary of Results**

### *Enhance CA QA/QC's Coverage Over Claims Processing*

CA QA/QC currently adheres to a sampling methodology that is in accordance with the Standards by using a 95% confidence interval with a 10% margin of error. Enhancements to the sampling methodology through the use of data mining and trend analysis may increase the coverage of quality control reviews over DHECC's claims processing to identify anomalies and emerging trends.

### 1.3 Key Findings

The key finding noted during Project I is listed below. All other observations and recommendations relate to observations that are not considered high risk. Upon communication and validation of our observations and recommendation, DHECC commenced to implement and to address the control enhancements identified.

BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Summary of Results

## 2.0 Internal Audit Opinion

CLA conducted Project I of the Process Audit in accordance with International Standards for the Professional Practice of Internal Auditing Standards. The Standards require that we plan and perform the Process Audit to demonstrate a reasonable basis for our judgments and conclusions regarding DHECC's Internal Control Environment over claims processing.

Based on the work performed and the rating criteria established by DHECC, the internal control environment at DHECC merits a rating of "Minor Improvement Needed." This rating indicates that, overall internal controls are in place and are operating as intended to provide reasonable assurance that management's objectives are met.

**Rating Criteria Definition:**

- A "*Satisfactory*" rating indicates the evaluated in-scope processes are performing as designed to adequately, appropriately, and effectively mitigate risks in order for management objectives to be met.

- A "*Minor Improvements Needed*" rating indicates the evaluated in-scope processes are performing to mitigate the assessed risks, but minor deviations from the intended design were identified and should be corrected. The overall control framework in place is adequate and provides reasonable assurance that management objectives are met.

- An "*Improvements Required*" rating indicates the significant deviations from the control design were identified that open the applicable policies and procedures to an unacceptable level of risk. The process controls are unlikely to provide reasonable assurance that management objectives are met.

- An "*Unsatisfactory*" rating indicates the evaluated in-scope processes were not implemented as designed and/or are not mitigating the assessed risks. The controls in place are not adequate, appropriate, or effective to provide reasonable assurance that management objectives are met.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

## 3.0 Background

### 3.1 DHECC Background

In August 2010, lawsuits against BP and other defendants relating to the damages resulting from the spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, were consolidated before the Court. The Court serves as litigator of damages resulting from this oil spill. In advance of the trial, the parties to the litigation, namely, the PSC, and BP began settlement negotiations.

By Order dated May 2, 2012 the Court preliminarily approved the Settlement Agreement entered into by PSC and BP, dated April 18, 2012, as amended on May 1, 2012, for the purpose of settling all related claims against BP.

The Interim Class Counsel, the CA and J.P. Morgan Trust Company (the Directed Trustee), entered into the Deepwater Horizon Economic and Property Damages Trust Agreement (Trust Agreement) creating the Settlement Trust. The Settlement Trust's purpose is to establish a mechanism to disburse payments to claimants as defined in the Settlement Agreement.

A Claims Administrator was appointed by the Court to oversee the operations of the Deepwater Horizon Economic Claims Center (DHECC) as outlined in the Settlement Agreement. The Claims Administrator was also appointed as the Trustee of the Settlement Trust, which will disburse all administrative and claims funding for the Settlement Agreement.

The CA and DHECC's responsibilities, as set out in the Settlement Agreement include:
- Administering the Deepwater Horizon Economic Settlement in accordance with the Settlement Agreement and the Settlement Trust
- Resolving open issues with PSC and BP
- Reporting back to the Court on the Operations of DHECC
- Providing full transparency of DHECC's claims processing in accordance with the Settlement Agreement
- Overseeing execution of claims data inputting, processing, disbursing payments, and retaining data

### 3.2 Named Vendors of Settlement Agreement

The Settlement Agreement named four vendors who would have responsibility for the key processes of inputting claims data, processing claims data, disbursing payments, and retaining claims data. They are: BG, GCG, P&N, and PwC. Each vendor is under the oversight of the CAO as the vendors conduct the day to day aspects of managing DHECC's claims processing operations including inputting, processing, disbursing payments, and retaining data. Additionally, the CAO contracted with HUB to provide security at the CACs and aid in the investigation of claims or claimants suspected of committing fraud, waste, and abuse. The four named vendors and their Settlement Agreement responsibilities are tabled on the following page:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

### BrownGreer

- **Team Leader:** Orran Brown
- **Team Size:** 1,251 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
    - Specifically, constructing, maintaining, and supporting the claims processing portal; processing all claim categories with the exception of the business economic loss; monitoring claims processed and reporting to DHECC; staffing and maintaining 18 CACs

### Garden City Group

- **Team Leader:** Neil Zola
- **Team Size:** 1,503 as of December 31, 2012
- **Responsibilities:** Inputting Claims Data, Disbursing Payments, and Retaining Claims Data
    - Specifically, physical mail intake, including physical claim forms and supporting documentation; identifying supporting documentation, linking supporting documentation to the correct claimant, categorizing the supporting documentation, and capturing data electronically for the physical claims forms and supporting documentation; managing the stand alone call center; processing payment disbursements for the DHECC claims process; managing and maintaining the data center supporting DHECC; managing and maintaining all physical claim forms and supporting documentation received

### Postlethwaite & Netterville

- **Team Leader:** Mark Staley
- **Team Size:** 201 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
    - Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of seafood compensations claims over $250,000 prepared by BG

### PricewaterhouseCoopers

- **Team Leader:** Charles Hacker Jr.
- **Team Size:** 170 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
    - Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of business economic loss claims initially prepared by P&N

### 3.3 Engagement Background

CLA was selected to perform an Independent Evaluation of the Internal Control Environment in place for DHECC's claims processing for the periods of March 31, 2013, September 30, 2013, and December 31, 2013. Additionally, the scheduled fieldwork will cover claims paid as of December 31, 2012, May 31, 2013, and December 31, 2013. Throughout the course of our three projects, CLA will render an opinion over the internal control environment over claims processing using the International Standards for the Professional Practice of Internal Auditing. CLA will:

- Perform an onsite and remote comprehensive and objective review of the internal control environment over claims processing to evaluate if claims were properly valued according to the Settlement Agreement
    - Conduct an onsite and remote operational review of claims processing and review the payment system to verify compliance with the Settlement Agreement
    - Evaluate if the claims infrastructure achieves structured goals of DHECC

## Background

- o Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- o Conduct claims testing to evaluate whether claims are valued for all claims categories in accordance with the Settlement Agreement

- Perform a review of the internal control environment over claims processing in accordance with the Standards and evaluate the controls utilized by the DHECC to manage and control claims processing

- Perform a review of the internal control environment over claims processing with regard inputting data, processing data, disbursing payments, and retaining data in accordance with the Settlement Agreement

- Perform a review of the system's capacity and an evaluation of the Program's infrastructure for forecasted needs

Upon completion of the three scheduled projects CLA will have completed the services included in the Engagement Letter dated September 11, 2012 and amended March 5, 2013.

### 3.3.1 Project 1 Background

We have conducted the first of three 2013 scheduled projects. Project 1 covers the claims operation environment from June 4, 2012 to March 31, 2013, and includes claims paid as of December 31, 2012 as the population for testing adherence to management's expectations.

We anticipated changes would be made to DHECC's claims processes to improve the processing of claims on a go forward basis. The CAO and its vendors identified opportunities for improvement and implemented those opportunities throughout Project I of our Process Audit. Over 60 system enhancements were implemented from quality assurance reviews of the claims process, including but not limited to metrics for progress reporting, additional system prompts to confirm with vendor employees processing the claims are entering the correct information, and standardization of data capture analysis for the different claim categories.

As potential exceptions were identified by CLA, the following protocols were established and followed:
- Vetted the exceptions with DHECC to obtain confirmation
- Worked with DHECC to determine root causes
- Assisted DHECC to determine if exceptions had implications for the remaining claims paid population

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

## 4.0 Project Objectives and Scope

### 4.1 Project Objectives

The objectives of Project I were to evaluate the internal control environment over claims processing and processed claims. The key objectives are summarized below:

- Gain an understanding of the internal control environment over claims processing utilized by the CAO and its vendors to manage or oversee the claims process
- Perform review of claims processed and evaluate key internal controls over claims processed including inputting data, processing data, disbursing payments to evaluate if claims were valued and paid in accordance with the Settlement Agreement
- Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- Evaluate policy and procedures to determine if they are sufficient, adequate, and current

### 4.2 Project Scope

Fieldwork for Project I was conducted from November 26, 2012 through April 26, 2013. The period under review for Project I was the internal control environment over claims processing from June 4, 2012 through March 31, 2013 and claims paid through December 31, 2012. We evaluated the key processes covering the internal control environment over claims processing:

- Input
- Process
- Disbursement payments
- Data Retention

Further, Project I covered the following types of claims paid as of December 31, 2012.

- Paid Claims
    - o 10 of the 12 claim categories named in the Settlement Agreement were included in our testing population during Project I; however, not all 10 claim categories included in the population were selected through CLA's sampling methodology
    - o CLA did not include the two additional claim categories noted below due to the fact that they were not in production as of December 31, 2012
        - Individual Periodic Vendor or Festival Vendor Economic Loss
        - Subsistence Damage Claim
    - o CLA used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims
    - o CLA tested 96 paid claims across the claim categories
    - o CLA did not test claims that had a status of "in-process" as of December 31, 2012

- Appealed claims
    - o CLA performed trend analysis on appealed claims as of March 25, 2013
- Denied claims
    - o CLA performed trend analysis on denied claims as of December 31, 2012

## Background

Information technology (IT) systems used in processing claims, including:

- IT system Change management
- Logical access
- Physical security

Onsite visits to 8 DHECC and vendor locations.

CLA did not interview or meet with any claimants, their counsel, or their accountants to address specific claims. Nor did we assess or evaluate any operations pertaining to the Medical Benefits Class Action Settlement (Medical Settlement Trust) reached related to the Deepwater Horizon oil spill. The Medical Settlement Trust offers benefits to qualifying people who resided in the United States as of April 16, 2012.

## 5.0 Project Work Performed

The work performed is summarized below:

### Planning and High Level Risk Assessment

- CLA performed an initial kick-off meeting on November 13, 2012 to confirm the scope and objectives of Project I
- CLA performed a high level risk assessment of the internal control environment over claims processing to determine which cycles to evaluate first
- CLA developed a workplan, which was amended to increase the claims sampling and internal control environment testing

### Interviews

- Interviews on an as needed basis throughout Project I with 25 individuals, from the CAO, DHECC vendors in the Settlement Agreement, and HUB Enterprises. See **Appendix A** for listing of individuals interviewed

### Review of Documentation

- CLA reviewed the following 7 available DHECC policies and procedures to gain an understanding of the internal control environment over the key controls governing claims processing:
  - o Travel and entertainment
  - o Internal audit
  - o Internal audit of invoice review
  - o Internal audit of process review
  - o Internal audit of claims review
  - o Documentation retention policy
  - o Disaster recovery and continuity of operations

- CLA reviewed documentation provided by DHECC and its vendors, including but not limited to:
  - o Organizational charts
  - o Employee listings for user access
  - o Training materials and manuals
  - o Bank statements

17

## Background

- o Claims monitoring reports
- o Claims appealed reports
- o Claim forms
- o Eligibility notices
- o Claims processed documentation

### Walkthroughs

- • CLA conducted walkthroughs of the four key processes: inputting, processing, disbursing payments, and retention of data. During our walkthroughs we observed the process used to identify the key controls and any deviations from management objectives. We identified approximately 110 key controls governing the claims process, the responsible party for implementing the controls, and the CAO's role in oversight of the key controls.

### Evaluation of Internal Control Environment and Testing of Operational Effectiveness

- • CLA performed tests of internal controls governing claims processing, including evaluating:
  - o The determination of claim eligibility in accordance with the Settlement Agreement
  - o The calculation of claim payments in accordance with the Settlement Agreement
  - o Whether the claimant provided the appropriate documentation to receive the calculated payment, including a wet signature signed release
  - o Whether the disbursed payment was prepared and approved by employees with clearance to perform those responsibilities
  - o Whether the disbursed payment was recorded on the bank statement and in the general ledger
  - o Whether the employees performing the initial review and quality assurance review of claims paid had the appropriate training to perform those responsibilities
  - o Whether the claim had been flagged for potential fraudulent activity
  - o Whether the claim had been quality assurance reviewed by the CA QA/QC

- • CLA performed controls testing on 10 of the 12 claims categories as 2 of the claims categories had not been put into production, as of December 31, 2012
  - o CLA randomly tested 96 claims and performed procedures analyzing key controls governing claim preparation, determination of causation, payment calculation, quality assurance review, and payment disbursement
  - o CLA obtained a listing of all claims appealed either by BP or a claimant as of March 25, 2013 to analyze appealed claims trends by claim category
  - o CLA obtained a listing of all notices issued, extracted the denial notices issued to analyze denied claims trends by claim category to determine which claim categories had the highest percentage of denied claims
  - o CLA selected a random sample of claims that had been quality assurance reviewed by the CA QA/QC. We reviewed the workbooks and supporting documentation and reviewed any exceptions and gaps noted during IA's review. Additionally, we verified that exceptions and gaps noted were reported to The CAO to ensure remediation occurred on a timely basis
  - o CLA reviewed a random sample of documentation used to support disbursement amounts through approval of sign-off and date

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

18

## Background

- CLA evaluated certain aspects of the IT control environment and interviewed four key IT management personnel from the CAO, BG, and GCG and evaluated the following:
  - o CLA evaluated system access users with remote user access
  - o CLA tested the number of users with multiple user accounts and how those accounts are monitored
  - o CLA evaluated claims reporting and evaluated if the "all claims file" included all claims processed to a notice

- CLA conducted 8 onsite visits to :
  - o **DHECC Home Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
  - o **BG Claims Processing Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
  - o **Mail Center**, Hammond, LA – November 28, 2012
  - o **GCG Disbursement Center**, New York City, NY – December 17, 2012
  - o **Claim Call Center**, Sarasota Springs, FL – December 21, 2012
  - o **Claimant Assistant Center**, Clearwater, FL – December 21, 2012
  - o **GCG Data Center**, Dublin, OH – February 27, 2013

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Detailed Observations and Recommendations**

## 6.0 Detailed Observations and Recommendations

CLA conducted interviews with the CAO and the DHECC vendors of the Settlement Agreement (BG, GCG, P&N, and PwC), reviewed documents, tested claims processing, reviewed policies and procedures, compliance with protocols and methodology to enable us to gain an understanding of the operations and identified potential control weaknesses and opportunities for enhancement.

### 6.1 Review of DHECC Policies and Procedures

**Purpose:**
*The purpose of CLA's review of DHECC's policies and procedures was to evaluate them for sufficiency, consistency, adherence to the Settlement Agreement, and comprehension to support the internal controls that govern claims processing. We performed internal control evaluations to evaluate that the policies and procedures were being implemented as intended.*

**Results:**
*We reviewed The CAO's policies and procedures for adherence to the Settlement Agreement and performed internal control evaluations to verify the policies and procedures were being followed.*

*We noted five of the seven policies and procedures have not been finalized and approved, as of March 31, 2013.*

| Policy and Procedure | Dated |
|---|---|
| Travel and Entertainment | Approved July 17, 2012 |
| Internal Audit | Drafted October 17, 2012 |
| Internal Audit of Invoice Review | Drafted October 17, 2012 |
| Internal Audit of Process Review | Drafted October 25, 2012 |
| Internal Audit of Claims Review | Drafted October 25, 2012 |
| Document Retention Policy | Drafted September 12, 2012 |
| Disaster Recovery and Continuity of Operations | Approved October 10, 2012 |

Subsequent to the period of the fieldwork, the remaining policies and procedures were finalized and approved by the CA, so no further action is required.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.2 Claims Data Input

#### Purpose:
*The purpose of CLA's review of the input control environment was to perform controls testing to evaluate if controls are in place and operating as intended for claim input. A claim can be filed in one of three ways:*

- *Visiting a CAC in person*
- *Mailing in paper documents*
- *Filing a claim electronically on-line*

#### Results:
*We reviewed data inputs into the accountant's calculation spreadsheet and reviewed the accuracy of claimant data received for each claim category. We noted four data input exceptions pertaining to the accuracy of financial statement data input in the accountant's calculation spreadsheet used to calculate the claim payment see 6.9 Individual Claims Testing for a breakdown of variances and exceptions.*
*Errors in the data input process can result from individuals not receiving enough training and human error in the quality assurance process. Incomplete or inaccurate data captured may lead to errors in processing and calculating the claim in accordance with the Settlement Agreement.*

#### Recommendations:
*We recommend the CAO and BG refine its quality assurance review process over data input and data capture and continue to provide training to increase the effectiveness of the quality assurance process. This will assist individuals preparing and reviewing the claims data to meet the requirements of the Settlement Agreement more effectively and efficiently by reducing the potential for data input and data capture errors.*

#### Management Response:
*The vendors have discussed these findings with their staff. They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.3 User Access Rights

#### Purpose:
*The purpose of CLA's review of the user access rights control environment was to perform controls testing to evaluate if controls are in place and operating as intended for user access right over claim processing. BG is responsible for maintaining the claims processing portal and processing claims. All claims documentation is maintained on the claims processing portal, and with the exception of business economic loss (BEL) claims all claim categories are processed in the claims processing portal.*

#### Results:
*We noted that currently 829 out of the approximately 3,000 (28%) individuals that are part of the claims process have remote access. Remote access grants those individual the ability to sign into the BG claims processing portal from any location which presents them with the opportunity to misuse sensitive data.*

*In addition, 443 out of 2,439 (18%) individuals who have access to the BG claims processing portal have more than one user account. Monitoring exists to ensure that users can not process and approve a single claim all the way to payment; however, not monitoring the use of the user accounts on a periodic basis may result in unintended segregation of duties issues, including the ability to process and approve a single claim all the way to payment.*

*Though no instances of unauthorized access to the DHECC portal or instances of a user processing and approving a claim all the way to payment was detected, user accounts within the DHECC portal are not monitored to ensure only authorized individuals have access. Lack of monitoring user access accounts increases the risk of unauthorized access to the portal.*

#### Recommendations:
*We recommend access to the DHECC portal be periodically reviewed and corrective action taken to remove user access rights for personnel no longer employed and monitor users with multiple user accounts to identify any instances where a user processes and approves a claim all the way to payment.*

#### Management Response:
*Restricted IP Addresses: BG and the CAO have diligently reduced the number of DHECC personnel who can access the database by using an unrestricted IP address since February of 2013. Since the population of 829 unrestricted IP address users was identified, we have reduced that volume to 96 users as of 4/24/13 as follows: (a) 25 BG remote reviewers; (b) 25 CAO personnel (includes 10 CLA users); (c) 23 GCG intake personnel; (d) 17 P&N Accountants; and (e) four Louisiana property/title attorneys retained to assist on ownership issues for Wetlands claims. This reduced volume falls within the acceptable range of 2-3% as specified in Section 1.2 of the Report. BG and the CAO will continue to analyze whether this volume of users with access from an unrestricted IP address can be reduced further.*

*Monitoring of Roles and Access Rights for Claims Reviewers: The CAO will periodically test user access roles every 30 days by selecting a random sample of reviewers and analyzing their database access rights to the various review queues to ensure adherence to CAO policy and training certifications. The CAO will also run periodic audits to ensure that any personnel that disassociates from the DHECC program will have their login and passwords revoked.*

**Detailed Observations and Recommendations**

## 6.4 Change Management Audit Trail

### Purpose:
*The purpose of CLA's review of IT change management processes as part of the claims processing control environment was to perform controls testing to evaluate if controls are in place and operating as intended for changes made to the IT environment. BG is the vendor responsible for maintaining and implementing changes to the claims processing portal.*

### Results:
*BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.*

### Recommendation:
*We recommend BG maintain a daily log of IT changes made to claims in process and the claims processing portal to assist management in determining if changes made were properly authorized and vetted before implementation.*

### Management Response:
*Production Builds and System Enhancements: BG previously documented all new production builds for the DHECC database by archiving the existing production build before implementing the new system enhancements. To further document DHECC system enhancements, we created a Change Request Form template for the programmers and DBA personnel to complete when implementing new code. The Change Request Form indicates: (a) the date of the change, (b) a description of the change; (c) the affected tables; (d) the affected stored procedures; (e) who approved the changes; and (f) who implemented the changes to the DHECC system. BG has used the Change Request Form since 4/1/13.*

*Changes to Data Performed Outside of the Claims Review System: BG has recorded a daily log of data change requests to the DHECC database since 4/29/13. We track these data updates or manual movement of claims/claimants to various review queues when the database application cannot handle the request without direct intervention by a programmer. This daily log identifies: (a) the source and date of the request; (b) a description of the change or data updates; (c) the number of affected claimants/claims; (d) the Directly Responsible Individual who requested and authorized the data change; (e) the programmer who implemented the data change; and (f) the implementation date. We store this daily log in Excel format that tracks the changes by date and specific requests and upload a copy of this daily log to the CAO every week.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.5 Claims Payment Disbursements

### Purpose:
*The purpose of CLA's review of the payment disbursement control environment was to perform controls testing to evaluate if controls are in place and operating as intended for disbursements of claim payments. Disbursements are prepared at the GCG Disbursement Center located in New York City, NY by GCG.*

### Results:
*We noted payments disbursed to claimants were the same as the payments acknowledged as due to them and that segregation of duties were appropriate between check and wire preparation, approval, and disbursement. Additionally, we noted the individuals responsible for check and wire preparation, approval, and disbursement was documented and maintained without exception in accordance with the Standards.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

## 6.6 Claims Data Retention

### Purpose:
*The purpose of CLA's review of the retention control environment was to perform control testing to evaluate if controls are in place and operating as intended according to DHECC's policy for claim documentation retention. The preservation policy applied by DHECC to all emails and other electronic files or databases; paper documents; notes; calendars; logs; forms; drawing; diagrams; schedule; photograph; video and other recordings; worksheets; computations; data storage media including hard drive; external hard drive; CDs; USB Drives; and DVDs is to maintain all the previously listed electronic and paper documentation for three years after the expiration of the lifetime of the final DHECC claim.*

### Results:
*We noted that DHECC and GCG maintain paper documents in a secured storage area within the Mail Center located in Hammond, LA. In addition, GCG has planned for the volume of documents based on the size of the current storage area observed and the additional subcontract with a document storage vendor in the circumstance that the current area will not store all paper files.*

*We noted that all electronic documentation is stored at the Data Center. All documentation is available and can be recalled as necessary. We have performed a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center, see results at section 6.8.*

### Recommendations:
*We recommend that DHECC and GCG continue to monitor the capacity of the current paper document storage areas and determine when and if an expansion of the storage space is appropriate.*

**Detailed Observations and Recommendations**

**Management Response:**

*GCG will continue to monitor the capacity of the current paper document storage areas and recommend expansion to the CAO when and if expansion is appropriate.*

### 6.7 Claims Audited by CAO's Quality Control Department

**Purpose:**

*The purpose of CLA's review of the claims quality control reviewed by CA QA/QC was to evaluate if controls are in place and operating as intended for CA QA/QC quality assurance controls. CA QA/QC is responsible for quality control reviewing claims processed, paid, and appealed under DHECC. This function is in addition to the quality control measures instituted by the DHECC vendors. This allows DHECC to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses workbooks to quality control review claims processed as well as to document their quality control review. Each vendor identified in the Settlement Agreement is responsible for performing quality control reviews on their own work and the CA QA/QC is back-up in addition to the vendors' quality control measures.*

**Results:**

*We noted that two instances out of our sample selection of 25 where CA QA/QC did not evidence their review on all parts of the workbook through initials and date. Not fully documenting the CA QA/QC review of the workbook may indicate only a partial or inadequate review of the workbook, even if a full review was performed. In each instance we noted CA QA/QC had partially signed-off and dated the workbook review, we noted that all steps of the workbook had been properly completed.*

*Additionally, we noted that during the Fourth Quarter of 2012, CA QA/QC completed workbooks for 206 claims processed across 10 claim categories. CA QA/QC's sampling technique uses a 95% confidence level and 10% margin of error to calculate the sample size for paid claims by claim category which is a methodology that meets the Standards. All CA QA/QC quality control reviews and workbooks are completed either after a claim has been processed and is waiting for notice of payment to be disbursed or payments have been disbursed to claimants.*

*CA QA/QC communicates its quality control review results on a quarterly basis to the CAO and the DHECC vendors and identifies the root cause for all exceptions noted. Exception trends are analyzed to evaluate whether an exception's root cause is a one-time event or an event that could affect the entire claims population. In addition, once exception trends are evaluated, employees processing claims are educated and trained on why the exception occurred and how to properly process a claim to avoid recurring exceptions going forward. This allows CA QA/ QC to continuously monitor and implement improvements to the claims processing environment as exception trends are identified.*

*It is a leading practice to have an in-house quality control function; however, currently CA QA/QC may enhance its coverage of claims processing through data mining and trend analysis for DHECC's operations in addition to the quality control measures performed by the vendors.*

**Recommendations:**

*We recommend that CA QA/QC continue to perform quality control review of claims processed and document its entire review of the workbook.*

## Detailed Observations and Recommendations

*We also recommend CA QA/QC consider enhancing the coverage of quality control reviews over DHECC's claims processing through the use of data mining methodologies and trend analysis.*

### Management Response:

*To provide an independent assessment as to quality and consistency of claim reviews and payments, the CAO Quality Control Team has continued to randomly sample claims across all claim types. The random sample volume achieves a 95% confidence interval with a 10% margin of error. The scope of the Quality Control Team's reviews encompasses every aspect of a claim review from document categorization to payment distribution. Prior to publication of this report, the CAO Quality Control Team has begun testing live claims prior to distribution to notice, as well as performing data mining analysis on claim type databases. The CAO will continue to identify and report material and non-material exceptions (material exceptions affect causation or compensation) to the vendors on a weekly basis. The exceptions are reviewed with the vendors to allow them the opportunity to remediate incomplete and/or inaccurate claim determinations, identify processes that may benefit from additional training, identify opportunities to strengthen quality controls, and to identify trends and Program wide errors in need of attention.*

### 6.8 Data Center

#### Purpose:

*The purpose of CLA's review of the Data Center was to perform a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center.*

#### Results:

*We noted that environmental, physical security, and data backup and storage controls were in place. Such controls included fire detection and suppression systems, temperature monitoring, uninterruptible power supply, backup power source, key card access system, security cameras, security personnel, and tape backup system.*

*We noted one opportunity for improvement in the replacement of the dry pipe sprinkler system inside the computer room of the Data Center with a chemical-based fire suppression system. In the event of a data center fire, use of the dry pipe system could result in a significant amount of hardware loss due to water damage. Additionally in the event of significant hardware loss, the Data Center does have a redundant offsite facility to ensure that operations stay up and running during such an event.*

#### Recommendations:

*CLA recommends the CAO evaluate the existing functionality and off-site back-up data center and consider the potential benefits of a chemical-based fire suppression system to assist in the mitigation of risk of hardware loss in the event of a data center fire.*

#### Management Response:

*Prior to receiving the draft audit report, GCG's head of systems had been investigating whether a chemical-based fire suppression system was necessary for GCG as a whole. We determined that the cost, approximately $75,000 - $100,000, wasn't necessary since GCG carries insurance on all of our equipment and because, as mentioned in the Process Audit Report, GCG maintains a redundant offsite facility to ensure operations stay up and running in the event of a data center fire. However, if the CAO wants to authorize that expense, GCG will proceed to have the system installed.*

# Detailed Observations and Recommendations

## 6.9 Individual Claims Testing

Through December 31, 2012, DHECC had processed and issued 68,954 claim notices. A notice is the outcome of a particular claim being processed and each notice has one of four outcomes:

- Eligible – payment due
- Eligible – no payment due
- Incomplete
- Denial

As of December 31, 2012, 98,120 claims had been submitted and captured through the claims processing portal. Of those claims submitted, 68,954 (70%) had been processed and a notice issued. Additionally, as of December 31, 2012, notices of eligibility and payment had been processed for 15,894 claims, totalling $1,063,262,525. The table illustrates how DHECC has increased operations and the activity levels of the first full month of operations, the first six months of operations, and the first quarter of 2013.

| Metric | As of July 2012 | June 2012 – December 2012 | January 2013 – March 2013 |
|---|---|---|---|
| Total Number of Claims Processed* | 1,800 | 68,945 | 64,971 |
| Total Award Amounts Processed | $65,672,562 | $1,634,102,344 | $1,144,341,198 |
| Percentage of Total Awards Processed for Individuals | 43.42% | 32.61% | 25.58% |
| Percentage of Total Awards Processed for Individuals with Business | 0.00% | 9.91% | 13.91% |
| Percentage of Total Awards Process for Business | 56.58% | 57.48% | 60.52% |
| Average Number of Claims Processed Monthly | 1,800 | 11,492 | 21,657 |

*Each claim may have more than one notice generated for it throughout the process.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Detailed Observations and Recommendations**

The graph immediately below depicts the length of time (in days) on average to process the number of claims that had notices issued in a particular month. The points on the graph are based on issuance of the first notice that is generated for a claim. Claims may have additional notices or revised award amounts generated in a subsequent month based on the outcome of the first notice. The increase in average number of days to process a claim to first notice is due the increase in volume of claims received by DHECC. The second graph depicts the number of claims received on a monthly basis.



*Source: DHECC Notices File*



*Source: DHECC All Claims File*

28

**Detailed Observations and Recommendations**

10 claim categories were included in the population of our testing during Project I, but not all 10 claim categories were selected. We used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims. We tested 96 paid claims across the claim categories. We did not test claims that had a status of "in-process" as of December 31, 2012. The results of Project I are exhibited below.

| Program Review | # of Claims Sampled | Total $ of Sample | # of Claims with Variance | Total $ Of Over-payments | % of Over-payments | Total $ Of Under-payments | % of Under-payments |
|---|---|---|---|---|---|---|---|
| Seafood Compensation | 33 | $66,909,281 | 2 | $418 | 0.000% | $0 | 0.000% |
| Individual Economic Damage | 2 | $13,364 | 0 | $0 | 0.000% | $0 | 0.000% |
| Business Economic Loss | 15 | $26,737,487 | 2 | $2,494 | 0.008% | $0 | 0.000% |
| Vessel of Opportunity Charter Payment | 20 | $868,000 | 0 | $0 | 0.000% | $0 | 0.000% |
| Vessel Physical Damage | 1 | $12,778 | 0 | $0 | 0.000% | $0 | 0.000% |
| Coastal Real Property Damage | 24 | $141,352 | 0 | $0 | 0.000% | $0 | 0.000% |
| Wetlands Real Property | 1 | $15,750 | 0 | $0 | 0.000% | $0 | 0.000% |

*See Appendix B for breakdown and explanation of claim categories not tested during Project I.*

Instances were identified above where claimants were paid in excess of what they should have received as outlined in the Settlement Agreement. We were informed by the CAO throughout the course of our work, that any error identified resulting in a claimant being underpaid, would be corrected. Any instance identified resulting in a claimant being overpaid; DHECC would not request the claimant return the excess payment received. However, if a claimant received an overpayment for one claim category and was awarded an additional payment for another claim, the identified overpayment will be offset against any additional payments to that claimant.

In addition to our paid claims testing, we also performed trending on denied claims and appealed claims. A breakdown of the results by claim category is as follows:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.9.1 Seafood Compensation

**Purpose:**
*The Seafood Compensation Program covers damages suffered by Commercial Fishermen, Seafood Crew, or Seafood Vessel Owners that owned, operated, leased, or worked on a vessel that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012. In addition, it covers damages suffered by Oyster Leaseholders and Individual Fishing Quota (IFQ) Owners. The Seafood Compensation Program does not apply to claims relating to fishing, processing, selling, catching, or harvesting of menhaden (or pogy) fish. The Seafood Compensation Program is capped at $2.3 billion.*

**Results:**
*CLA identified two calculated claim payment variances totaling $418 out of the 33 Seafood Compensation Program claims for which we performed procedures, and the exceptions are broken down as follows:*

- *The two claims with a variance in payment calculated between DHECC and CLA, totaling $418 in overpayments was due to an incorrect calculation of the amount of allowable accountant reimbursement in accordance with the Settlement Agreement*

*While CLA did identify exceptions during our Seafood Compensation Program claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

**Recommendations:**
*CLA recommends that DHECC strengthens its quality control reviews of claims processed including allowable accountant reimbursement calculations and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

**Management Response:**
*BG agrees there is a discrepancy in the Claimant Accounting Support calculation for the claims noted by the auditors. Apart and independent of the external auditor findings, BG found and corrected the Notice mapping that caused the overpayments prior to receiving the audit report. BG recorded the overpaid amounts and will offset the overpaid amounts from payments to any future claims (Claim ID 37202: $1,123,35; Claim ID 4379: $361.25).*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Detailed Observations and Recommendations**

### 6.9.2 Individual Economic Damage

#### Purpose:
*Individual Economic Damage claims are claims submitted by Individuals, who shall be defined as (i) Natural Persons who (a) satisfy (or whose employers satisfy) the Class Definition and (b) whose losses are not excluded from the Class and (ii) who seek compensation for lost earnings from employment due to or resulting from the DWH Spill for claims that are not excluded from the Class.*

#### Results:
*We identified no exceptions for the two Individual Economic Damage claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

#### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

#### Management Response:
*No response necessary.*

### 6.9.3 Business Economic Loss

#### Purpose:
*The Business Economic Loss framework sets forth the standards for evaluating claims and determining compensation for Businesses that suffered an Economic Loss as a result of the spill.*

#### Results:
*We identified two calculated claim payment variances totaling $2,494 in overpayments out of the 15 Business Economic Loss claims for which we performed procedures and the exceptions are broken down as follows:*

- *The two claims for which CLA noted an exception in that the calculated claim payment had input errors and/or expenses were not categorized as fixed or variable expenses in accordance with the Settlement Agreement resulting in $2,494 in overpayments*

*While CLA did identify exceptions during our Business Economic Loss claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

#### Recommendations:
*CLA recommends that DHECC strengthens its quality control reviews of claims processed and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

#### Management Response:
*It appears that the overpayment of $2,494 resulted from data input errors and expense misclassifications. The vendors have discussed these findings with their staff. They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

## Detailed Observations and Recommendations

### 6.9.4 Vessel of Opportunity Charter Payment

#### Purpose:
*Vessel of Opportunity (VoO) damage claim category addresses damages suffered by Natural Persons or Entities who registered their vessels to participate in BP's Vessels of Opportunity program, executed a VoO Master Vessel Charter Agreement with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as Charterer, and completed the initial VoO training program. VoO participants can make VoO Charter Payment Claims regardless of whether they were dispatched or otherwise asked to perform work under the program.*

#### Results:
*We identified no exceptions for the 20 VoO claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

#### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

#### Management Response:
*No response necessary.*

### 6.9.5 Vessel Physical Damage

#### Purpose:
*A Vessel Physical Damage Claim is a claim for physical damage to a vessel resulting from the Deepwater Horizon Incident or certain response clean-up operations, including the cost of removal of equipment or rigging added to the vessel as part of the response activities.*

#### Results:
*We identified no exceptions for the Vessel Physical Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

#### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

#### Management Response:
*No response necessary.*

### 6.9.6 Coastal Real Property Damage

#### Purpose:
*Individuals and Entities who owned or leased coastal real property or boat slips located in the Coastal Real Property Claim Zone at any time from April 20, 2010 to December 31, 2010 can make Coastal Real Property Damage Claims for damage to that property.*

*In addition, owners of real or personal property located in the Coastal Real Property Claim Zone that was physically damaged in connection with the Deepwater Horizon Incident response cleanup operations can make claims for that physical damage to real or personal property.*

## Detailed Observations and Recommendations

### Results:
*We identified no exceptions for the 24 Coastal Real Property damage claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

### 6.9.7 Wetlands Real Property Damage

### Purpose:
*Individuals and Entities who owned wetlands real property located in certain geographic areas at any time between April 20, 2010 and April 16, 2012, can make claims for Wetlands Real Property Damage. If an individual or entity has property located in the Wetlands Real Property Compensation Zone, person or entity could receive a Settlement Payment depending on whether the property is considered oiled or non-oiled and what the acreage is.*

*In addition, owners of real or personal property located in the Wetlands Real Property Compensation Zone that was physically damaged in connection with the Deepwater Horizon Incident response clean-up operations can make claims for that physical damage to real or personal property.*

### Results:
*We identified no exceptions for the Wetlands Real Property Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.9.8 Denied Claims Statistics

### Purpose:
*Denied claims are claims submitted to DHECC for processing under the Settlement Agreement by a claimant that are determined to not meet causation as defined in the Settlement Agreement. Causation dictates a claim's eligibility and if the claim can be processed for potential payment.*

### Results:
*As of December 31, 2012 DHECC had processed and issued a notice of denial for 6,245 claims (9% of all notices issued).*

- *2,141 (34%) of the denial notices relate to the individual economic loss claim category.*

### Recommendations:
*Denied claims were trended with statistics noted above; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

## 6.9.9 Appealed Claims Statistics

### Purpose:
*Appealed claims are claims that are determined to be eligible for payment as processed by DHECC in accordance with the Settlement Agreement that are appealed by BP or the claimant. BP can appeal any claim with a calculated payment of $25,000 or more. The claimant can appeal the calculated award amount they receive and request that their claim be submitted for reconsideration.*

### Results:
*As of March 25, 2013 DHECC had processed and issued a notice for 68,954 claims, totaling $1,063,262,525. Of those claims processed, 1,260 had been appealed (1.83% of total notices issue), the breakdown between BP and Claimant appeals is as follows:*

- *BP appealed 897 (71%) claims, totaling $629,296,298*
- *Claimants appealed 363 (29%), totaling $3,699,307*

*As of our fieldwork date, March 31, 2013, there are currently 849 appealed claims with a status of pending with original calculated compensation amounts totaling $437,207,591.*

### Recommendations:
*Appealed claims were trended with statistics noted above; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Appendix A**

**Individuals Interviewed**

# Appendix A

## Individuals Interviewed During Project I Of The Process Audit

### The Claims Administrator's Office

| | |
|---|---|
| Patrick Juneau | Claims Administrator |
| Michael Juneau | Special Counsel |
| David Odom | Chief Executive Officer |
| Bob Levine | Chief Financial Officer |
| Kirk Fisher | Director of Business Processes & Reporting |
| Chris Reade | Chief Information Officer |
| David Welker | Director of Fraud, Waste, & Abuse |
| Philip Ollendike | Reporting & Audit |
| Henry Mitchell | Reporting & Audit |

### BrownGreer

| | |
|---|---|
| Orran Brown | Partner |
| Lynn Greer | Partner |
| Roma Petkauskas | Partner, New Orleans Claims Processing Center |
| Bob Staneart | Information Systems |

### Garden City Group

| | |
|---|---|
| Stephen Cirami | Project Manager |
| Jennifer Keough | Call Center Lead |
| Shandarese Garr | Mail Center Lead |
| Drew Sommer | Senior Vice President, Systems & Technology |

### HUB enterprises

| | |
|---|---|
| Chip Romero | President |
| Dwayne Regan | Vice President, Security |
| David Buchanan | Vice President, Fraud, Waste, & Abuse |

### Postlethwaite & Netterville

| | |
|---|---|
| Mark Staley | Director |
| Robin Pilcher | Director |
| Corey Jambon | Consulting Manager |

### PricewaterhouseCoopers LLP

| | |
|---|---|
| Charles Hacker Jr. | Partner |
| Theodore Martens | Partner |

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Appendix B**

**Appendix B**

**Claim Categories Not Included In Project I Testing**

## Appendix B

The Following claims categories were not selected for Project I testing based on low dollar and number of claims volume.

| Claims Category | # of Claims Paid as of December 31, 2012 | $ Paid as of December 31, 2012 | % of Total Paid Claims as of December 31, 2012 |
|---|---|---|---|
| Subsistence Damage | 0 | $0 | 0.000% |
| Individual Periodic Vendor or Festival Vendor Economic Loss | 0 | $0 | 0.000% |
| Real Property Sales Damage | 206 | $11,075,437 | 1.042% |
| Failed Business Economic Loss | 0 | $0 | 0.000% |
| Start-Up Business Economic Loss | 40 | $7,811,120 | 0.735% |

The purpose of each claim category not selected for Project I testing is listed below:

### Subsistence Damage

**Purpose:**
*Subsistence Damage is a loss of Subsistence use of natural resources arising from the Deepwater Horizon Incident. This includes damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume, or trade Gulf of Mexico natural resources (including Seafood and Game) in a traditional or customary manner, to sustain their basic personal or family dietary, economic security, shelter, tool, or clothing needs and who relied on Subsistence resources that were diminished or restricted due to the Deepwater Horizon Incident.*

### Individual Periodic Vendor or Festival Vendor Economic Loss

**Purpose:**
*Individual Periodic Vendor or Festival Vendor loss is for individuals who regularly provide the specific goods or services who meet the following criteria:*
1. *Regularly sold at retail during 2009 and 2010 any of the legal food, souvenir, art, tourist-related or water-related goods or services or substantially equivalent items ("Covered Sales") to CONSUMERS in Zones A,B or C during May through December 2009 and / or May through December 2010.*
2. *Made such Covered Sales, primarily to non-local CONSUMERS, except that water related Covered Sales, need not be primarily made to non-local CONSUMERS.*
3. *Did not maintain a permanent business location in a building at which the claimant made Covered Sales.*
4. *Held any licenses as required by law.*
5. *Was not employed by an employer in connection with such Covered Sales.*
6. *Does not have Tax Information Documents sufficient to support a claim under the Business Compensation Framework for this claimed loss.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

38

## Appendix B

### Real Property Sales Damage

**Purpose:**

*Real Property Sales Damage is economic loss suffered by sellers of residential property located in a specific geographic area, who sold their properties at a lower price because of the Deepwater Horizon Incident. In order to be eligible to file a Real Property Sales Damage claim, the claimant must have owned the property on April 20, 2010, and the sale of the property must have closed between April 21, 2010 and December 31, 2010. If the sales contract was executed prior to April 21, 2010, the property sales price must have been reduced because of the Deepwater Horizon Incident. Real Property Sales do not include transfers from borrowers to lenders as part of a foreclosure or a similar process.*

### Failed Business Economic Loss

**Purpose:**

*A Failed Business commenced operations prior to Nov. 1, 2008 and that on or after May 1, 2010 and prior to December 31, 2010 either, (i) Ceased operations and wound down, or (ii) Entered bankruptcy (through filing a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) Initiated or completed a liquidation of substantially all its assets. There are also guidelines for Failed Start-Up Businesses those commenced operations after Nov. 1, 2008. These claims have similar causation requirements as standard Failed Business Economic Loss Claims.*

### Start-Up Business Economic Loss

**Purpose:**

*A Business is considered a Start-Up Business if it began operations between November I, 2008 and April 20, 2010. The framework for Start-Up Businesses does not apply to (i) Failed Businesses, or (ii) claims covered under the Seafood Program.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# EXHIBIT 7



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig        MDL NO. 2179
     "Deepwater Horizon" in the Gulf
     of Mexico, on April 20, 2010       SECTION J

Applies to: *All Cases*          JUDGE BARBIER
                              MAGISTRATE JUDGE SHUSHAN

---

### REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW

| STATUS REPORT NO. | 21 | DATE | May 30, 2014 |
|---|---|---|---|

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re:  **Oil Spill by the Oil Rig**                                   **MDL NO. 2179**
　　　　**"Deepwater Horizon" in the Gulf**
　　　　**of Mexico, on April 20, 2012**                       **SECTION J**

**Applies to:** *All Cases*                                             **JUDGE BARBIER**
　　　　　　　　　　　　　　　　　　　　　　　　　**MAGISTRATE JUDGE SHUSHAN**

<u>**REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON**</u>
<u>**ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE**</u>
<u>**STATUS OF CLAIMS REVIEW**</u>

<u>**STATUS REPORT NO. 21, DATED MAY 30, 2014**</u>

The Claims Administrator of the Deepwater Horizon Economic and Property Settlement

Agreement (Settlement Agreement) submits this Report to inform the Court of the status of the

implementation of the Settlement Agreement as of April 30, 2014.  The Claims Administrator

will provide any other information in addition to this Report as requested by the Court.

**I.**　　　**S**TATUS OF THE **C**LAIMS **R**EVIEW **P**ROCESSES AND **C**LAIM **P**AYMENTS

**A.**　**<u>Claim Submissions</u>.**

**1.**　**Registration and Claim Forms.**

The Claims Administrator opened the Settlement Program with needed functions staffed

and operating on June 4, 2012, just over 30 days after the Claims Administrator's appointment.

The Claims Administrator's Office and Vendors (CAO)[1] have received 221,287 Registration

Forms and 275,443 Claim Forms since the Program opened, as shown in the Public Statistics for

the Deepwater Horizon Economic and Property Damages Settlement (Public Report) attached as

Exhibit A.  Additionally, claimants have begun, but not fully completed and submitted, 12,513

---

[1] "Claims Administrator's Office", as used within this report, refers to the Claims Administrator and, where
applicable, Court-Supervised Settlement Program vendors working with and under the Claims Administrator.

Claim Forms. The Forms are available online, in hard copy, or at Claimant Assistance Centers located throughout the Gulf.

Of the total Claim Forms submitted and the Claim Forms begun but not fully completed and submitted, 8.7% have been filed or are being filed within the Seafood Program, 17.0% have been filed or are being filed within the Individual Economic Loss (IEL) framework, and 38.8% have been filed or are being filed within the Business Economic Loss (BEL) framework (including Start-Up and Failed BEL Claims). *See* Ex. A, Table 2. Deepwater Horizon (DWH) staff at the Claimant Assistance Centers assisted in beginning and/or completing 37,102 of these Claim Forms. *See* Ex. A, Table 3.

### 2. Minors, Incompetents, and Deceased Claimants.

The table below describes the claims filed on behalf of minors, incompetents, and deceased claimants in the Settlement Program.

| | | Minor Claimants | | Incompetent Claimants | | Deceased Claimants | |
|---|---|---|---|---|---|---|---|
| | | Total | Change Since Last Report | Total | Change Since Last Report | Total | Change Since Last Report |
| | **Table 1. Minors, Incompetents, and Deceased Claimants.** | | | | | | |
| 1. | **Claims Filed** | 75 | +12 | 102 | +8 | 532 | +53 |
| 2. | **Claims Within GADL Review** | 1 | 0 | 1 | 0 | N/A | N/A |
| 3. | **Eligible for Payment** | 12 | 0 | 52 | +1 | 187 | +3 |
| 4. | **Approval Orders Filed** | 10 | +2 | 48 | 0 | 166 | +1 |

### 3. Third Party Claims.

The CAO receives, processes, and pays the claims and/or liens asserted by attorneys, creditors, governmental agencies, or other third parties (Third Party Claims) against the payments to be made by the CAO to eligible claimants under the Settlement Agreement in

accordance with Court Approved Procedure Order No. 1 (as entered September 9, 2012, and amended March 11, 2013).

The CAO requires a third party claimant to submit enforcement documentation soon after the initial Third Party Claim assertion, and the CAO notifies the claimant of an Enforced Third Party Claim against a potential Settlement Payment as soon as the CAO receives sufficient documentation of such an assertion, regardless of where the underlying Settlement Program Claim is in the review process. The claimant may, but is not required to, object to the Third Party Claim at this time. After the CAO sends an Eligibility Notice to the affected Settlement Program Claimant against whom an Enforced Third Party Claim has been asserted (meaning that both the underlying claim and the Third Party Claim are payable), the CAO sends the claimant/claimant's attorney and the third party claimant a Notice of Valid Third Party Claim, and the claimant has twenty (20) days to notify the CAO of any objection to the Third Party Claim. The CAO continues to process and pay Third Party Claims as reflected in Table 2 below.

| Table 2.  Third Party Claims. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Type of Third Party Claim ("TPC") | TPCs Asserted | TPCs Asserted Against Claimants With a DHECC ID | TPCs[2] Asserted Against Payable Claims | Valid TPCs Asserted Against Payable Claims | Claims with TPCs Paid/ Ready for Payment (TPClmt) | Claims with TPCs Paid/ Ready for Payment (Clmt) |
| 1. | Attorney's Fees | 2,462 | 2,263 | 427 | 272 | 298 | 574 |
| 2. | IRS Levies | 799 | 740 | 62 | 52 | 49 | 84 |
| 3. | Individual Domestic Support Obligations | 366 | 231 | 102 | 78 | 82 | 107 |
| 4. | Blanket State-Asserted Multiple Domestic Support Obligations | 4 states | N/A | N/A | N/A | 0 | 0 |
| 5. | 3rd Party Lien/Writ of Garnishment | 926 | 460 | 43 | 14 | 7 | 7 |

---

[2] Although the CAO will not know whether a Valid TPC has been asserted against a payable claim until the Eligibility Notice goes out, the streamlined enforcement requirements allow the CAO to assess validity earlier in the process.

| | Table 2. Third Party Claims. | | | | | | |
|---|---|---|---|---|---|---|---|
| | Type of Third Party Claim ("TPC") | TPCs Asserted | TPCs Asserted Against Claimants With a DHECC ID | TPCs[2] Asserted Against Payable Claims | Valid TPCs Asserted Against Payable Claims | Claims with TPCs Paid/ Ready for Payment (TPClmt) | Claims with TPCs Paid/ Ready for Payment (Clmt) |
| 6. | Claims Preparation/ Accounting | 4,508 | 4,315 | 126 | 88 | 34 | 43 |
| 7. | TOTAL | 9,061 | 8,009 | 760 | 504 | 470 | 815[3] |

The CAO sends a Notice of Third Party Claim Dispute to all parties involved in a disputed Valid Third Party Claim. If the claimant and third party claimant are unable to resolve their dispute by agreement and if the dispute is over a Third Party Claim for attorney's fees or fees associated with work performed in connection with a Settlement Program Claim, the claimant and third party claimant may participate in the Court-approved Third Party Claims Dispute Resolution Process and will receive a Request for Third Party Claim Dispute Resolution Form with the Notice of Third Party Claim Dispute. To date, the CAO has sent 106 Notices of Third Party Claim Dispute to notify parties with eligible disputes that they may submit a Request Form if they are unable to resolve their dispute by agreement. Table 3 provides additional information about participation in the Third Party Claims Dispute Resolution Process.

| Table 3. Third Party Claims Dispute Resolution Process. | | | |
|---|---|---|---|
| Request Forms Received for Eligible Disputes | Records Provided to Adjudicator | Disputes Withdrawn | Final Decisions[4] |
| 86 | 62 | 54 | 27 |

---

[3] A TPC can be asserted against one or more Settlement Program claims. Additionally, if the TPC amount is in dispute, the CAO pays the claimant the undisputed portion of the Settlement Payment. For these reasons, this total may not be equal to the total of the two preceding columns.

[4] Several factors impact when a Dispute is ripe for the Adjudicator to issue a Final Decision, including whether the Adjudicator has requested additional documentation or granted a Telephonic Hearing.

If the dispute is over a Third Party Claim asserted by a state or federal agency, the claimant must resolve the dispute in accordance with the applicable agency's procedures. If the dispute is over the amount of a Third Party Claim based on a final judgment of a state or federal court, the CAO must receive either a written agreement between the parties or a copy of a subsequent modifying court order in order to validate the claimant's objection; otherwise, the CAO will issue payment in satisfaction of the judgment to the third party claimant.[5]

To date, the CAO has removed 1,528 lien holds following parties' releasing their claims or resolving disputes.[6]

**B. Claims Review.**

The CAO completed its first claim reviews and issued its first outcome notices on July 15, 2012, and its first payments on July 31, 2012. There are many steps involved in reviewing a claim so that it is ready for a notice.

**1. Identity Verification.**

The Claimant Identity Verification review is the first step in the DWH claims review process. The Identity Verification team conducts searches based on the Taxpayer Identification Numbers (TIN) of claimants to confirm that both the claimant's name and TIN exist and correspond with each other. The Identity Verification team has initiated verifications for 195,651 claimants. Of those, the CAO has matched the TIN and claimant's name to public records databases and verified identity for 104,497 claimants from the initial query through LexisNexis and/or Dun & Bradstreet. The CAO has reviewed the remaining 91,154 claimants to determine whether claimant identity could be verified after searching for typographical errors

---

[5] For a claimant to object to a Third Party Claim based on a final judgment, additional evidence beyond a mere objection is required for the CAO to delay or deny payment of the court-ordered debt.
[6] This number may fluctuate due to reassertions of released or disallowed liens.

and name changes or after reviewing official documentation from the Internal Revenue Service or Social Security Administration.  Of the remaining 91,154 claimants, the CAO has verified the identity of 87,190.

If the CAO cannot verify a claimant's identity after review, but it appears that additional documentation may allow the CAO to verify the claimant's identity, the CAO issues a Verification Notice to the claimant requesting such documentation.  Verification Notice types include an SSN Notice, an ITIN Notice, and an EIN Notice.  The table below contains information on the number of claimants verified by the CAO during an initial Identity Verification review in addition to the type and number of TIN Verification Notices issued when the CAO could not verify identity after the initial review.

| Table 4.  Identity Verification Review Activity. | | | | | |
|---|---|---|---|---|---|
| | Outcome | Claimants Reviewed Since Last Report | Monthly Percentage | Total Claimants Reviewed | Total Percentage |
| 1. | Verified During Review | 2,179 | 61.07% | 67,691 | 76.51% |
| 2. | SSN Notice Issued | 212 | 5.94% | 2,923 | 3.30% |
| 3. | ITIN Notice Issued | 5 | 0.14% | 442 | 0.50% |
| 4. | EIN Notice Issued | 1,172 | 32.85% | 17,421 | 19.69% |
| 5. | Total Reviewed | 3,568 | 100% | 88,477 | 100% |

The CAO reviews the documentation that claimants submit in response to the Verification Notice to determine whether it is sufficient to verify identity.  The table below contains information on the number of Verification Notices issued, the number of claimants whose identities the CAO has verified after claimant response to the Notice, and the average time in days for claimants to provide documentation sufficient to verify the claimant's identity after the CAO issued the Notice.

| | Table 5. Identity Incompleteness Activity. | | | | |
|---|---|---|---|---|---|
| | **Notice Type** | **Notices Issued** | **Number Cured** | **Percentage Cured** | **Days to Cure** |
| 1. | **SSN Notice** | 2,923 | 2,162 | 73.97% | 52 |
| 2. | **ITIN Notice** | 442 | 376 | 85.07% | 31 |
| 3. | **EIN Notice** | 17,421 | 13,838 | 79.43% | 32 |
| 4. | **Total Issued** | **20,786** | **16,376** | **78.78%** | **38** |

When a claimant submits a Subsistence claim stating that he or she fished or hunted to sustain his or her basic personal and/or family's dietary needs, the CAO verifies the identities of the claimed family members. To do so, the CAO attempts to match each claimed family member's name and TIN to ensure that the family member exists and that the family member was not deceased prior to or at the time of the Spill or is not an overlapping dependent already identified. The CAO first attempts to match each family member's name and TIN to public records databases through LexisNexis. To date, the CAO has sent 49,896 family members' names and TINs, associated with 19,050 claims, to LexisNexis for verification. If a family member's identity cannot be verified through LexisNexis, the CAO reviews the claim file to determine whether the family member's identity can be verified using information contained within the file. After each family member's identity has been verified or reviewed, the Subsistence team reviews the claim to determine eligibility for payment.

| | Table 6. Subsistence Family Member Identity Verification Activity. | | | | |
|---|---|---|---|---|---|
| | | **Awaiting Review** | **Change from Last Report** | **Reviewed** | **Change from Last Report** |
| 1. | **Number of Claims** | 388 | 388 | 7,965 | 339 |
| 2. | **Number of Family Members** | 1,484 | 1,484 | 33,549 | 2,209 |

### 2. Employer Verification Review (EVR).

The EVR process ensures that all employees of the same business are treated uniformly and that each business is placed in the proper Zone. The review also walks through the analysis

necessary to assign the proper NAICS code to a business. The EVR team has completed the EVR analysis for 225,789 businesses and rental properties.

From April 1, 2014, through April 30, 2014, the team completed the EVR process for 4,497 businesses and rental properties. The CAO identified an average of 182 new businesses and rental properties to review per day and completed the EVR review for an average of 150 businesses and rental properties per day. The CAO continues to review new businesses and rental properties on a first-in, first-out basis.

**3. Exclusions.**

The Exclusions review process ensures that claims and claimants excluded under the Settlement Agreement are appropriately denied. The Exclusions team guides the reviewers and the EVR team when questions arise during the Exclusion review. Table 7 below shows the number of Denial Notices issued to date for each Exclusion Reason and the team responsible for making such a determination.

| Table 7. Exclusions. | | | | |
|---|---|---|---|---|
| | **Exclusion Reason** | **Team Responsible** | **Denial Notices Since Last Report** | **Total Denial Notices** |
| 1. | GCCF Release | Exclusions | 77 | 7,528 |
| 2. | BP/MDL 2179 Defendant | | 3 | 363 |
| 3. | US District Court for Eastern District of LA | | 0 | 22 |
| 4. | Not a Member of the Economic Class | Claims Reviewers | 0 | 230 |
| 5. | Bodily Injury | | 0 | 6 |
| 6. | BP Shareholder | | 0 | 8 |
| 7. | Transocean/Halliburton Claim | | 0 | 0 |
| 8. | Governmental Entity | Claims Reviewers/ EVR | 7 | 785 |
| 9. | Oil and Gas Industry | | 15 | 1,008 |
| 10. | BP-Branded Fuel Entity | | 0 | 42 |
| 11. | Menhaden Claim | EVR | 0 | 18 |
| 12. | Financial Institution | | 0 | 257 |

8

| Table 7. Exclusions. | | | | |
|---|---|---|---|---|
| | Exclusion Reason | Team Responsible | Denial Notices Since Last Report | Total Denial Notices |
| 13. | Gaming Industry | | 1 | 722 |
| 14. | Insurance Industry | | 2 | 186 |
| 15. | Defense Contractor | | 5 | 378 |
| 16. | Real Estate Developer | | 7 | 233 |
| 17. | Trust, Fund, Financial Vehicle | | 1 | 15 |
| 18. | **Total Denial Notices from Exclusions** | | **118** | **11,801** |

### 4. Claimant Accounting Support Reviews.

A special team handles Claimant Accounting Support (CAS) reviews. CAS reimbursement is available under the Settlement Agreement for IEL, BEL, and Seafood claims. After a claim has been determined to be payable and the Compensation Amount has been calculated, the CAS team reviews accounting invoices and CAS Sworn Written Statements submitted by the claimant. Table 8 includes information on the number of CAS reviews the CAO has completed to date, whether the Accounting Support documentation was complete, and the dollar amounts reimbursed for each Claim Type.

| Table 8. Claimant Accounting Support Reviews. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Claim Type | CAS Review Result | | | | Total CAS Reviews | | CAS $ Amount Reimbursed | |
| | | Complete | | Incomplete | | | | | |
| | | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date |
| 1. | BEL | 69 | 10,504 | 11 | 1,049 | 80 | 11,553 | $0.00 | $15,628,756.96 |
| 2. | IEL | 137 | 2,845 | 18 | 439 | 155 | 3,284 | $16,265.72 | $350,360.63 |
| 3. | Seafood | 9 | 3,877 | 2 | 779 | 11 | 4,656 | $6,627.17 | $1,570,646.16 |
| 4. | **TOTAL** | **215** | **17,226** | **31** | **2,267** | **246** | **19,493** | **$22,892.89** | **$17,549,763.75** |

## 5. Quality Assurance Review.

The Quality Assurance (QA) process addresses three fundamental needs of the Settlement Program: (a) it ensures that all claims reviewed within the system environment are reviewed in accordance with the provisions of the Settlement Agreement by targeting anomalous claim results through data metrics analysis; (b) it provides a mechanism to monitor reviewer performance and the tools necessary to efficiently and effectively provide feedback to reviewers; and (c) it identifies areas of review resulting in high discrepancy rates that require retraining or refined review procedures and data validations.

The CAO has implemented a reviewer follow-up process for all claim types reviewed within the system environment. The CAO provides daily follow-up to reviewers in the event a QA review of a particular claim produces a result different than that of the original review. The CAO also has a report that identifies specific reviewers who may require retraining and reveals whether there are issues that warrant refresher training for all reviewers. Table 9 shows, by Claim Type, the number of claims identified for QA review through the system of record database QA process, as well as the number of QA reviews that have been completed, the number in progress, and the number awaiting review.

| | Claim Type | Total Claims Needing QA To Date | QA Reviews Completed | % of QA Reviews Completed | QA Reviews in Progress | Claims Awaiting QA Review | QA Reviews Completed Since Last Report |
|---|---|---|---|---|---|---|---|
|  | **Table 9. Quality Assurance Reviews.**[7] |
| 1. | Seafood | 25,267 | 25,126 | 99% | 106 | 35 | 50 |
| 2. | IEL | 29,319 | 27,545 | 94% | 805 | 969 | 750 |

[7] Table 9 only includes system generated data that arise from quality assurance reviews of initial claim reviews that are performed within the confines of the system environment. Separate from the initial claim review, there are numerous ancillary steps within the overall claim review process in which quality assurance activities and measures are performed outside of the system environment.

10

| | Claim Type | Total Claims Needing QA To Date | QA Reviews Completed | % of QA Reviews Completed | QA Reviews in Progress | Claims Awaiting QA Review | QA Reviews Completed Since Last Report |
|---|---|---|---|---|---|---|---|
|  | **Table 9. Quality Assurance Reviews.**[7] |
| 3. | **BEL** | 26,206 | 24,910 | 95% | 205 | 1,091 | 389 |
| 4. | **Start-Up BEL** | 2,088 | 2,022 | 97% | 10 | 56 | 36 |
| 5. | **Failed BEL** | 2,117 | 2,066 | 98% | 8 | 43 | 22 |
| 6. | **Coastal RP** | 20,703 | 20,619 | 100% | 7 | 77 | 178 |
| 7. | **RPS** | 863 | 863 | 100% | 0 | 0 | 23 |
| 8. | **VoO** | 7,849 | 7,846 | 100% | 0 | 3 | 41 |
| 9. | **Subsistence** | 37,421 | 24,098 | 64% | 1,029 | 12,294 | 1,010 |
| 10. | **Wetlands RP** | 4,465 | 4,416 | 99% | 39 | 10 | 169 |
| 11. | **VPD** | 1,473 | 1,467 | 100% | 2 | 4 | 36 |
| 12. | **TOTAL** | **157,771** | **140,978** | **89%** | **2,211** | **14,582** | **2,704** |

### 6. Claim Type Review Details.

Table 10 provides information, by Claim Type, on the number of claims filed, the number of claims that have been reviewed to Notice, the number of claims remaining to be reviewed to Notice, and the number of claims reviewed to either a Notice or "Later Notice" to date. Table 10 divides the claims reviewed to a "Later Notice" into separate sections: (1) claims receiving a Notice based on CAO review following the submission of additional materials by a claimant in response to an Incompleteness Notice, and (2) claims receiving a Notice following a Reconsideration review conducted by the CAO.

| Table 10. Throughput Analysis of Claims Filed and Notices Issued. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **A. Claims Reviewed to First Notice** | | | | | | | | | |
| | Claim Type | **Status of All Claims Filed** | | | | **Productivity From 4/1/14 Through 4/30/14** | | | |
| | | Total Claims Filed To Date | Reviews Completed to Notice or Closed | | Claims Remaining to Review | | New Claims Filed | Avg. Daily Claims Filed | Reviews Completed to First Notice | Avg. Daily Reviews to First Notice |
| **1.** | **Seafood** | 24,681 | 24,336 | 99% | 345 | 1% | 48 | 2 | 37 | 1 |
| **2.** | **IEL** | 42,381 | 37,575 | 89% | 4,806 | 11% | 1,385 | 46 | 808 | 27 |
| **3.** | **IPV/FV** | 280 | 256 | 91% | 24 | 9% | 7 | <1 | 2 | <1 |
| **4.** | **BEL** | 99,449 | 52,039 | 52% | 47,410 | 48% | 4,243 | 141 | 2,260 | 75 |
| **5.** | **Start-Up BEL** | 5,416 | 3,854 | 71% | 1,562 | 29% | 150 | 5 | 81 | 3 |
| **6.** | **Failed BEL** | 3,670 | 2,812 | 77% | 858 | 23% | 119 | 4 | 37 | 1 |
| **7.** | **Coastal RP** | 35,367 | 34,231 | 97% | 1,136 | 3% | 853 | 28 | 582 | 19 |
| **8.** | **Wetlands RP** | 15,608 | 5,780 | 37% | 9,828 | 63% | 1,496 | 50 | 169 | 6 |
| **9.** | **RPS** | 1,604 | 1,559 | 97% | 45 | 3% | 56 | 2 | 62 | 2 |
| **10.** | **Subsistence** | 36,811 | 12,871 | 35% | 23,940 | 65% | 1,093 | 36 | 280 | 9 |
| **11.** | **VoO** | 8,744 | 8,671 | 99% | 73 | 1% | 35 | 1 | 26 | <1 |
| **12.** | **VPD** | 1,432 | 1,389 | 97% | 43 | 3% | 8 | <1 | 9 | <1 |
| **13.** | **TOTAL** | **275,443** | **185,373** | **67%** | **90,070** | **33%** | **9,493** | **316** | **4,353** | **145** |
| **B. Claims Reviewed to Later Notice** | | | | | | | | | |
| | Claim Type | **Initial or Preliminary Incompleteness Response** | | | **Follow-Up Incompleteness Responses** | | | **Requests for Reconsideration** | | |
| | | Total Responses | Claims with Later Notice | Remaining Claims | Total Responses | Claims with Later Notice | Remaining Claims | Total Requests | Claims with Later Notice | Remaining Claims |
| **1.** | **Seafood** | 5,911 | 5,407 | 504 | 2,819 | 2,562 | 257 | 3,668 | 3,361 | 307 |
| **2.** | **IEL** | 16,422 | 14,064 | 2,358 | 7,956 | 6,427 | 1,529 | 4,946 | 4,281 | 665 |
| **3.** | **IPV/FV** | 89 | 86 | 3 | 34 | 33 | 1 | 38 | 36 | 2 |
| **4.** | **BEL** | 28,224 | 16,690 | 11,534 | 10,993 | 4,752 | 6,241 | 3,914 | 2,663 | 1,251 |
| **5.** | **Start-Up BEL** | 2,227 | 1,637 | 590 | 1,320 | 638 | 682 | 423 | 265 | 158 |
| **6.** | **Failed BEL** | 965 | 753 | 212 | 602 | 303 | 299 | 436 | 314 | 122 |
| **7.** | **Coastal RP** | 5,246 | 5,092 | 154 | 1,484 | 1,416 | 68 | 1,790 | 1,734 | 56 |
| **8.** | **Wetlands RP** | 378 | 262 | 116 | 81 | 58 | 23 | 496 | 389 | 107 |
| **9.** | **RPS** | 283 | 272 | 11 | 95 | 74 | 21 | 187 | 186 | 1 |
| **10.** | **Subsistence** | 5,507 | 1,247 | 4,260 | 1,297 | 202 | 1,095 | 295 | 117 | 178 |

| | Claim Type | Total Responses | Claims with Later Notice | Remaining Claims | Total Responses | Claims with Later Notice | Remaining Claims | Total Requests | Claims with Late Notice | Remaining Claims |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Table 10. Throughput Analysis of Claims Filed and Notices Issued.** | | | | | | | | | |
| 11. | VoO | 925 | 912 | 13 | 389 | 374 | 15 | 622 | 614 | 8 |
| 12. | VPD | 778 | 739 | 39 | 352 | 333 | 19 | 244 | 230 | 14 |
| 13. | TOTAL | 66,955 | 47,161 | 19,794 | 27,422 | 17,172 | 10,250 | 17,059 | 14,190 | 2,869 |

C. **Claim Payments.**

1. **Notices and Payments.**

Tables 4 and 5 of the Public Report attached in Exhibit A provide detail on the notices and payments issued to date. As of April 30, 2014, the CAO has issued 65,728 Eligibility Notices to unique claims with Payment Offers totaling $5.01 billion. As of that date, the CAO has made over $3.87 billion in payments on 58,630 claims.[8]

2. **Claimants in Bankruptcy.**

The CAO reviews each claimant who indicates an open bankruptcy on the Registration Form (Debtor Claimant) to determine whether the claimant has submitted sufficient documentation from the applicable bankruptcy court to issue payment. If the CAO determines that the claimant is not a Debtor Claimant per the Procedure for Disposition of Claims by Claimants in Bankruptcy (Proc-445), or if the claimant submits sufficient documentation for the CAO to issue payment on all active claims, the CAO will remove the Bankruptcy Hold. Table 11 provides information about the status of claimants identified as Debtor Claimants, including information on notices issued to those claimants.

---

[8] The Court-ordered injunction addressing revenue and expense matching and causation issues has affected the number of Eligibility Notices with payment offers and payments issued. See section I.E for additional information on the injunction.

| Table 11.  Claimants in Bankruptcy. | | | |
|---|---|---|---|
| **1.** | **Identified Claimants in Bankruptcy** | **Total** | **Change Since Last Report** |
| (a) | Claimants with Active Bankruptcy Holds | 1,886 | +54 |
| (b) | Claimants with Removed Bankruptcy Holds | 947 | +27 |
| **2.** | **Bankruptcy Notices Issued** | **Total** | **Change Since Last Report** |
| (a) | Representative of Claimant in Bankruptcy Notices | 333 | +6 |
| (b) | Bankruptcy Trustee Communication Notices | 67 | +1 |
| (c) | Bankruptcy Trustee Informational Notices | 56 | +6 |

On March 25, 2014, the CAO re-issued the Procedure for Disposition of Claims by Claimants in Bankruptcy (Proc-445) to Class Counsel and BP for comment.  The revised version of the Procedure modifies the protocol for determining which claimants are subject to the Procedure and clarifies which documents a Debtor Claimant must submit for the CAO to issue payment.  The Procedure also contains a revised notice issued to Debtor Claimants, which explains why the claimant is subject to additional procedures and which documents the claimant must submit to receive payment.  On March 26, 2014, Class Counsel deferred to the CAO's decision on the Procedure.  BP proposed edits and offered comments, deferring to the CAO's decision as well, on April 6, 2014.[9]

**D. Re-Reviews, Reconsiderations, and Appeals.**

**1.  Re-Reviews and Outcomes.**

The CAO implemented a Re-Review process beginning on January 18, 2013, that provides claimants with the opportunity to request a Re-Review of their claim within 30 days of the issuance of an Eligibility or Denial Notice if the claimant has additional documentation not previously submitted to support its claim.  Following a Re-Review, claimants receive a Post Re-Review Notice, from which they may then request Reconsideration if they wish.  To date, there

---

[9] While as of April 30, 2014 the CAO was reviewing BP's proposed edits and comments, Proc-445 was approved as a Claims Administrator Decision on May 7, 2014.

have been 68,232 Eligibility, Denial, or Incompleteness Denial Notices issued from which claimants can or could seek Re-Review. Of those, 717 are still within the 30 day window to seek Re-Review and Re-Review has not yet been requested, leaving 67,515 claims for which the window to seek Re-Review has passed. Of those, claimants have requested Re-Review of 4,780 claims. Thus, the rate of Re-Review from all final determinations is 7.1%. The rate of Re-Review from Eligibility Notices is 4.3%, while the rate of Re-Review from Denial and Incompleteness Denial Notices is 13.8%.

Table 12 summarizes the Re-Reviews the CAO has completed, the number of Post Re-Review Notices the CAO has issued, and whether the outcome of the Re-Review resulted in an award that was higher than (↑), lower than (↓),or the same as (↔) the outcome previously issued. The table also includes information on whether an original Exclusion Denial was confirmed or overturned on Re-Review.

| Table 12. Re-Reviews. | | | | | |
|---|---|---|---|---|---|
| A. Re-Review Requests and Reviews | | | | | |
| | Claim Type | Requests Received To Date | Reviews Completed To Date | | |
| | | | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | Seafood | 817 | 791 | 0 | 12 |
| 2. | IEL | 725 | 679 | 31 | 11 |
| 3. | IPV/FV | 11 | 11 | 1 | <1 |
| 4. | BEL | 1,526 | 1,374 | 8 | 21 |
| 5. | Start-Up BEL | 116 | 102 | 0 | 2 |
| 6. | Failed BEL | 149 | 134 | 3 | 2 |
| 7. | Coastal RP | 855 | 852 | 18 | 13 |
| 8. | Wetlands RP | 289 | 280 | 10 | 4 |
| 9. | RPS | 81 | 81 | 0 | 1 |
| 10. | Subsistence | 106 | 80 | 9 | 1 |
| 11. | VoO | 57 | 57 | 0 | <1 |
| 12. | VPD | 48 | 45 | 3 | <1 |
| 13. | TOTAL | 4,780 | 4,486 | 83 | 70 |

| | | Notices Issued | | Outcome of Re-Review Notice | | | | |
|---|---|---|---|---|---|---|---|---|
| **Table 12. Re-Reviews.** | | | | | | | | |
| **B. Re-Review Notices Issued** | | | | | | | | |
| | **Claim Type** | **Total Issued to Date** | **Weekly Average** | **Compensation Amount for Eligible Claims** | | | **Exclusions/Denials** | |
| | | | | ↑ | ↓ | ↔ | **Confirmed** | **Overturned** |
| 1. | Seafood | 725 | 11 | 391 | 28 | 217 | 86 | 3 |
| 2. | IEL | 611 | 10 | 146 | 50 | 205 | 205 | 5 |
| 3. | IPV/FV | 11 | <1 | 0 | 0 | 0 | 11 | 0 |
| 4. | BEL | 1,038 | 16 | 253 | 46 | 83 | 647 | 9 |
| 5. | Start-Up BEL | 69 | 1 | 16 | 3 | 5 | 44 | 1 |
| 6. | Failed BEL | 101 | 2 | 1 | 2 | 0 | 98 | 0 |
| 7. | Coastal RP | 791 | 12 | 43 | 5 | 104 | 612 | 27 |
| 8. | Wetlands RP | 211 | 3 | 9 | 2 | 15 | 184 | 1 |
| 9. | RPS | 45 | <1 | 1 | 0 | 2 | 42 | 0 |
| 10. | Subsistence | 44 | <1 | 8 | 4 | 4 | 28 | 0 |
| 11. | VoO | 56 | <1 | 7 | 5 | 17 | 25 | 2 |
| 12 | VPD | 42 | <1 | 19 | 0 | 11 | 11 | 1 |
| 13. | TOTAL | 3,744[10] | 59 | 894 | 145 | 663 | 1,993 | 49 |

### 2. Reconsideration Reviews and Outcomes.

To date, there have been 130,976 Eligibility, Denial, or Incompleteness Denial Notices issued from which claimants can or could seek Reconsideration. Of those, 1,371 are still within the 30 day window to seek Reconsideration and Reconsideration has not yet been requested, leaving 129,605 claims for which the window to seek Reconsideration has passed. Of those, claimants have requested Reconsideration of 17,059 claims. Thus, the rate of Reconsideration from all final determinations is 13.2%. The rate of Reconsideration from Eligibility Notices is 5.5%, while the rate of Reconsideration from Denial and Incompleteness Denial Notices is 22.1%. Table 13 summarizes the Reconsiderations the CAO has completed, the number of Post-

---

[10] The number of Notices issued is fewer than the number of reviews completed because there is a 36-hour lag between the time when the review is completed and the time when the Notice is issued.

Reconsideration Notices the CAO has issued, and whether the outcome of the Reconsideration review resulted in an award that was higher than (↑), lower than (↓), or the same as (↔) the outcome previously issued. The table also includes information on whether an original Exclusion Denial was confirmed or overturned on Reconsideration.

| Table 13. Reconsideration. | | | | | |
|---|---|---|---|---|---|
| **A. Reconsideration Requests and Reviews** | | | | | |
| | **Claim Type** | **Requests Received To Date** | **Reviews Completed To Date** | | |
| | | | **Total** | **Completed Since Last Report**[11] | **Average Weekly Reviews** |
| 1. | Seafood | 3,668 | 3,480 | 28 | 41 |
| 2. | IEL | 4,946 | 4,630 | 206 | 55 |
| 3. | IPV/FV | 38 | 36 | 2 | <1 |
| 4. | BEL | 3,914 | 3,444 | 56 | 41 |
| 5. | Start-Up BEL | 423 | 367 | -1 | 4 |
| 6. | Failed BEL | 436 | 397 | 1 | 5 |
| 7. | Coastal RP | 1,790 | 1,755 | 28 | 21 |
| 8. | Wetlands RP | 496 | 455 | 4 | 5 |
| 9. | RPS | 187 | 186 | 2 | 2 |
| 10. | Subsistence | 295 | 169 | 14 | 2 |
| 11. | VoO | 622 | 619 | 3 | 7 |
| 12. | VPD | 244 | 239 | 2 | 3 |
| 13. | **TOTAL** | **17,059** | **15,777** | **345** | **187** |

---

[11] Instances in which negative values are reported arise when the number of claims re-entering the Reconsideration Review process following a quality assurance check is greater than the number of claims that complete the Reconsideration Review process within the reported month.

| | Table 13. Reconsideration. | | | | | | |
|---|---|---|---|---|---|---|---|
| | **B. Reconsideration Notices Issued** | | | | | | |
| | | **Notices Issued** | | **Outcome of Reconsideration Notice** | | | |
| | **Claim Type** | **Total Issued to Date** | **Weekly Average** | **Compensation Amount for Eligible Claims** | | | **Exclusions/Denials** | |
| | | | | ↑ | ↓ | ↔ | **Confirmed** | **Overturned** |
| 1. | **Seafood** | 3,361 | 38 | 785 | 103 | 474 | 1,686 | 313 |
| 2. | **IEL** | 4,281 | 48 | 416 | 35 | 108 | 2,723 | 999 |
| 3. | **IPV/FV** | 36 | <1 | 0 | 0 | 0 | 34 | 2 |
| 4. | **BEL** | 2,663 | 30 | 415 | 31 | 191 | 1,063 | 963 |
| 5. | **Start-Up BEL** | 265 | 3 | 19 | 2 | 12 | 80 | 152 |
| 6. | **Failed BEL** | 314 | 4 | 8 | 0 | 0 | 239 | 67 |
| 7. | **Coastal RP** | 1,734 | 19 | 103 | 17 | 379 | 1,028 | 207 |
| 8. | **Wetlands RP** | 389 | 4 | 21 | 1 | 31 | 314 | 22 |
| 9. | **RPS** | 186 | 2 | 1 | 0 | 3 | 168 | 14 |
| 10. | **Subsistence** | 117 | 1 | 2 | 0 | 1 | 104 | 10 |
| 11. | **VoO** | 614 | 7 | 59 | 4 | 122 | 373 | 56 |
| 12 | **VPD** | 230 | 3 | 50 | 2 | 17 | 95 | 66 |
| 13. | **TOTAL** | **14,190[12]** | **159** | **1,879** | **195** | **1,338** | **7,907** | **2,871** |

### 3. Appeals.

#### (a) BP Appeals.

To date, the CAO has issued 18,888 Eligibility Notices that meet or exceed the threshold amount rendering them eligible for appeal by BP. Of those, 26 Notices are still within the timeframe in which BP can file an appeal and BP has not yet done so, leaving 18,862 Notices that BP has either appealed or for which the deadline for BP to file an appeal has passed. Of those 18,862 Notices, BP has filed 3,940 appeals, a 20.9% appeal rate. However, out of the 3,940 Notices BP has appealed, BP has subsequently withdrawn 272 of those appeals, while another 1,332 have been resolved for a compensation amount the same as or greater than that in the pre-Appeal Eligibility Notice (excluding the 5% compensation increase that a claimant who

---

[12] The number of Notices issued is fewer than the number of reviews completed because there is a 36-hour lag between the time when the review is completed and the time when the Notice is issued.

prevails upon appeal receives). Thus, out of the 3,940 Notices BP has appealed, 1,604 have either been withdrawn or resolved for a compensation amount the same as or greater than that in the Eligibility Notice. Removing those 1,604 Notices from the 3,940 Notices BP has appealed provides a more representative and indicative "rate of disagreement" of 12.4%. Table 14 provides summary information on the status of BP appeals.

| Table 14. Status of BP Appeals. | | | |
|---|---|---|---|
| **A. Appeal Filing/Resolution** | | | |
| | Status | As of Last Report | Since Last Report[13] | Total |
| 1. | **BP Appeals Filed** | **3,928** | **12** | **3,940** |
| 2. | **Appeals Resolved** | **2,435** | **12** | **2,447** |
| (a). | Resolved by Panel decision | 1,513 | 12 | 1,525 |
| (b). | Resolved by parties | 387 | 1 | 388 |
| (c). | Remand to Claims Administrator | 120 | 1 | 121 |
| (d). | Administratively Closed | 8 | 0 | 8 |
| (e). | Withdrawn | 272 | 0 | 272 |
| (f). | Inactive Under Reconsideration/Re-Review | 135 | -2 | 133 |
| **B. Pending Appeals** | | | |
| 1. | **In Pre-Panel Baseball Process** | **1,269** | | |
| 2. | **Currently Before Panel** | **94** | | |
| 3. | **Under Discretionary Review** | **130** | | |
| 4. | **TOTAL PENDING[14]** | **1,493** | | |

### (b) Claimant Appeals.

Before a claimant may file an appeal, the claimant must request Reconsideration and receive a Post-Reconsideration Eligibility or Denial Notice. To date, the CAO has issued 7,377 Post-Reconsideration Eligibility and Denial Notices. Of those, 95 Notices are still within the timeframe in which the claimant can file an appeal and the claimant has not yet done so, leaving

---

[13] Negative values may occasionally appear in this table. These reflect instances such as when a claimant in the Reconsideration/Re-Review process withdraws his or her Reconsideration/Re-Review request, making the previously operative BP appeal active again.
[14] This includes 1,399 appeals that are on court-ordered hold for BEL matching. (See part E, infra.)

19

7,282 Notices that the claimant has either appealed or for which the deadline for the claimant to file an appeal has passed. Of those 7,282 Notices, claimants have filed 1,305 appeals, a 17.9% appeal rate. Of the 1,305 claimant appeals, 796 are appeals of Post-Reconsideration Denial Notices, while 509 are appeals of Post-Reconsideration Eligibility Notices. Table 15 provides summary information on the status of Claimant Appeals.

| Table 15. Status of Claimant Appeals. | | | | |
|---|---|---|---|---|
| **A. Appeal Filing/Resolution** | | | | |
| | **Status** | **As of Last Report** | **Since Last Report** | **Total** |
| **1.** | **Claimant Appeals Filed** | **1,284** | **21** | **1,305** |
| **2.** | **Appeals Resolved** | **893** | **77** | **970** |
| (a). | Resolved by Panel decision | 728 | 60 | 788 |
| (b). | Resolved by parties | 74 | 6 | 80 |
| (c). | Remand to Claims Administrator | 25 | 4 | 29 |
| (d). | Administratively Closed | 32 | 8 | 40 |
| (e). | Withdrawn | 34 | -1 | 33 |
| **A. Pending Appeals** | | | | |
| **1.** | **In Pre-Panel Baseball Process** | **70** | | |
| **2.** | **In Pre-Panel Non-Baseball Process** | **87** | | |
| **3.** | **Currently Before Panel** | **107** | | |
| **4.** | **Under Discretionary Review** | **71** | | |
| **5.** | **TOTAL PENDING**[15] | **335** | | |

### (c) Resolved Appeals.

As reported in the tables above, 3,417 appeals have been resolved. Table 16 provides a summary of these resolved appeals by Claim Type. The comparison between the Post-Appeal award amount and the award amount within the original notice does not take into consideration the 5% increase in compensation that a claimant who prevails upon appeal receives.

---

[15] This includes six appeals that are on court-ordered hold for BEL matching. (See part E, infra).

| Table 16.  Outcome After Appeal. | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Claim Type** | **Appeals Settled or Decided by Panel** | | | | | | **Withdrawn** | **Admin. Closed** | **Inactive Under Recon./ Re-Review** | **Total** |
| | **Compensation Amount Following Appeal Compared to That of Original Notice** | | | | | | | | | |
| | **Higher** | **Lower** | **Same** | **Denial Upheld** | **Denial Over-turned** | **Remand** | | | | |
| **1.** BEL | 56 | 463 | 1,148 | 159 | 48 | 81 | 201 | 7 | 105 | 2,268 |
| **2.** IEL | 20 | 43 | 68 | 54 | 9 | 32 | 10 | 17 | 4 | 257 |
| **3.** Seafood | 64 | 19 | 140 | 39 | 2 | 20 | 49 | 7 | 8 | 348 |
| **4.** Wetlands RP | 3 | 1 | 4 | 33 | 2 | 0 | 3 | 2 | 16 | 64 |
| **5.** Coastal RP | 35 | 1 | 20 | 67 | 5 | 1 | 6 | 6 | 0 | 141 |
| **6.** RPS | 0 | 4 | 7 | 34 | 0 | 0 | 2 | 1 | 0 | 48 |
| **7.** VoO | 16 | 31 | 44 | 50 | 18 | 5 | 26 | 4 | 0 | 194 |
| **8.** IPV | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 3 |
| **9.** VPD | 1 | 27 | 29 | 15 | 0 | 11 | 8 | 0 | 0 | 91 |
| **10.** Subsistence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 |
| **11.** Total | **195** | **589** | **1,460** | **452** | **85** | **150** | **305** | **48** | **133** | **3,417** |

**(d) Incompleteness Appeals.**

The Appeal for Insufficient Documentation (Incompleteness Appeal) allows Economic Class Members to have their claims reviewed by a separate Documentation Reviewer when the CAO denies their claims because of insufficient documentation.  The Documentation Reviewer reviews the claimant's documentation to determine whether the Program correctly denied the claim.

Before sending the claim to the Documentation Reviewer, the CAO reviews the appeal request along with any newly submitted documents.  If the claimant has submitted the requested documentation and cured the incompleteness, the CAO issues the appropriate Notice.  If the claimant still has not submitted the requested documentation, the CAO sends the claim to the Documentation Reviewer for review.

Before a claimant may file an appeal of an Incompleteness Denial, the claimant must request Reconsideration and receive a Post-Reconsideration Incompleteness Denial Notice. To date, the CAO has issued 3,923 Post-Reconsideration Incompleteness Denial Notices. Of those, 65 Notices are still within the timeframe in which the claimant can file an appeal, leaving 3,858 Notices for which the claimant's appeal deadline has passed. Of the 3,923 Notices eligible for appeal, 1,884 (48.0%) appeal requests have been filed. Table 17 provides summary information on the status of Incompleteness Appeals.

| Table 17. Incompleteness Appeals. | | | | |
|---|---|---|---|---|
| A. Incompleteness Appeal Filing/Resolution | | | | |
| | Status | As of Last Report | Since Last Report | Total |
| 1. | Incompleteness Appeals Filed | 1,822[16] | 62 | 1,884 |
| 2. | Appeals Resolved | 1,410 | 121 | 1,531 |
| (a). | Withdrawn/Closed Claims | 4 | 0 | 4 |
| (b). | Cured | 183 | 29 | 212 |
| (c). | Incompleteness Denial Affirmed | 1,190 | 89 | 1,279 |
| (d). | Incompleteness Denial Overturned | 33 | 3 | 36 |
| B. Pending Incompleteness Appeals | | | | |
| 3. | In Pre-Documentation Reviewer Process | 342 | | |
| 4. | Currently Before Documentation Reviewer | 11 | | |
| 5. | TOTAL PENDING | 353 | | |

As reported in Table 17 above, 1,531 Incompleteness Appeals have been resolved.

### E. Court-Ordered BEL Claim Suspension.

BP appealed the District Court's order, issued on March 5, 2013, that affirmed the Claims Administrator's interpretation of the Settlement Agreement that the BEL framework does not require the matching of revenues and expenses within claimant-submitted profit and loss

---

[16] The number of Incompleteness Appeals Filed As of Last Report is greater than the Total figure appearing in the April Report because of a lag between the time when a document containing an appeal request is received by the Program and the time when that document is reviewed by the Program to identify that appeal request.

statements.  On October 2, 2013, the Fifth Circuit Court of Appeals reversed the District Court's ruling and remanded the case to the District Court for further consideration.  The District Court immediately entered an order to suspend the issuance of any final determination notices or payments on all BEL claims, including Start-Up and Failed BEL claims, until the Court could create an appropriately narrowly-tailored preliminary injunction.  In the months following, the Court has reviewed the issue of matching revenues and expenses as well as issues concerning causation.

**1.  Preliminary Injunction Continuing BEL Claim Suspension.**

As required by the October 18, 2013 preliminary injunction, the Claims Administrator provided the District Court with a declaration outlining the criteria that the CAO would use to determine whether a BEL claim is supported by sufficiently-matched, accrual-basis accounting.  On November 12, 2013, the CAO resumed issuing Incompleteness Notices to BEL claims.  The CAO added language to all BEL Incompleteness Notices to inform claimants that additional information regarding the issue of matching revenues and expenses may be required at a later point in the review process.

After the District Court issued its preliminary injunction, BP filed an emergency motion objecting to the District Court's holding that causation was not an issue that the Court would address on remand.  On December 2, 2013, the Fifth Circuit remanded the issue of causation and ordered that the District Court must address causation in its preliminary injunction.  In response to the Fifth Circuit's ruling, the District Court issued an amended preliminary injunction on December 5, 2013, that ordered the CAO to temporarily suspend the issuance of final determination notices and payments to BEL claims until the Court resolves the BEL issues that are the subject of the pending remand.

On December 24, 2013, the District Court addressed the issues that the Fifth Circuit had placed on remand.  It reversed its previous holding that the Settlement Agreement does not require the matching of revenues and expenses, and remanded the matter to the CAO with instructions to adopt and implement an appropriate protocol or policy for handling BEL claims in which the claimant's financial records do not match revenues with corresponding variable expenses.  Further, the District Court found that whether a business economic loss is "as a result of" the Deepwater Horizon Incident for purposes of the Settlement is determined exclusively by Settlement Agreement Exhibit 4B.

BP appealed the District Court's holding, and, on March 5, 2014, the Fifth Circuit Court of Appeals affirmed the District Court's December 24th holding.  On March 17, 2014, BP filed a petition for rehearing en banc, requesting that the Fifth Circuit hold an en banc hearing to consider jointly both the causation issue at hand and BP's appeal of the approval of the Settlement Agreement and certification of the class (see Section III of this Report for additional information).[17]

During this time, the CAO continued to develop Policy 495 regarding the Matching of Revenue and Expenses for BEL claims, which Policy details the methodology that the CAO Accounting Vendors will use to handle BEL claims in which the claimant's financial records do not match revenues with corresponding variable expenses.  On February 12, 2014, the CAO announced Policy 495 to the Parties and provided the Parties with the opportunity to respond to the policy.

---

[17] While as of April 30, 2014 the Court had not yet issued its Order with regard to the petition for rehearing en banc, the Court dismissed the petition on May 19, 2014.  The time to seek relief from the United States Supreme Court, however, has not yet passed.

Following consideration of comments by the Parties, on March 12, 2014, the CAO held a Panel Hearing with the Parties at the request of BP to evaluate the Policy. The following day, the CAO re-announced Policy 495. BP responded with a memorandum detailing its comments on the policy and deferred to the decision of the Claims Administrator. Class Counsel also responded to the policy announcement with a memorandum detailing its comments, objections, and suggested edits and appealed the Policy to the Court in accordance with Section 4.3.4 of the Settlement Agreement.[18]

The CAO continues to adhere to the December 5, 2013 preliminary injunction not only by refraining from issuing any final determinations notices or payments for BEL claims but also by continuing to process BEL claims and to issue Incompleteness Notices for BEL claims until the CAO receives further guidance from the Court.

Additionally, the CAO is processing all IEL claims that do not qualify for eligibility solely on the basis of the employer's satisfaction of the BEL revenue-pattern causation requirements. The CAO has developed and applied measures within the system to stop all Notices and payments to IEL claimants specifically affected by the Court's injunction. These claims remain on hold until the CAO Accounting Vendors evaluate the associated BEL claim for matching issues.

### 2. Processing of Appealed Claims.

The December 5, 2013 amendment to the October 18, 2013 preliminary injunction applies to all claims currently in the claims appeal process. In response to this order, the CAO has temporarily suspended the Appeals Process for BEL claims in the "baseball" process, which includes BEL claims with Eligibility Notices. The CAO continues the Appeals Process as it

---

[18] While as of April 30, 2014 the Court had not yet issued its Order with regard to Policy 495, the Court approved Policy 495 on May 5, 2014. The time for which to appeal such approval, however, has not yet passed.

relates to the following claim groups: (1) non-BEL claims, and (2) BEL claims in the "non-baseball" process, including BEL claims issued Denial Notices for which the CAO has determined that neither revenue and expense matching nor causation, as addressed in the Fifth Circuit's ruling, are issues that have been raised as a basis for appeal.

## II.    CLAIMANT OUTREACH EFFORTS

The CAO has continued its claimant outreach efforts since the previous Court Status Report as detailed below.

### A.  Law Firm Contacts.

The Law Firm Contact team continued to service firms by providing statuses, answering questions about notices, and acting as a liaison between reviewers and firms to request additional documentation pertinent to claims review.  Firm Contacts continued to participate in outreach for various claim types and program processes, including Identity Verification and Payment.

### B.  Claimant Communications Center (CCC).

The CCC continued claimant outreach efforts across all claim types and review teams. The CCC continued to participate in established, on-going outreach efforts, including representation status updates, employer verification, deadline relief confirmation, payment incompleteness, and various claim-specific calls for individual damage categories.

### C.  Claimant Assistance Centers (CACs).

The CACs complete outreach assignments as a secondary task to meeting with claimants and answering DWH-related questions.  The CACs continued outreach to claimants who have incomplete claims and who have commenced but have not completed claim forms.  Additionally, the CACs continued outreach to claimants who are required to complete a new Form 4506-T.  To date, CACs have helped to complete over 102,000 calls for the Claimant Outreach Program.

D.  **Summary of Outreach Calls.**

The table below summarizes some of the Claimant Outreach Program efforts as of April 30, 2014.

| Table 18.  Outreach Call Volume. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Location** | **Calls Made** | **Incomplete Claims Affected** | **Claims With New Docs After Call** | **% of Claims With New Docs After Call** | **Claimants Visiting CAC After Call** | **% of Claimants Visiting CAC After Call** |
| **1.** | BrownGreer | 102,781 | 31,188 | 24,735 | 79% | 11,286 | 36% |
| **2.** | Garden City Group | 71,304 | 8,577 | 6,403 | 75% | 657 | 8% |
| **3.** | P&N | 38,973 | 9,408 | 8,351 | 89% | 208 | 2% |
| **4.** | PwC | 810 | 357 | 347 | 97% | 10 | 3% |
| **5.** | **TOTAL** | **213,868** | **49,530** | **39,836** | **80%** | **12,161** | **25%** |

III.    FIFTH CIRCUIT OPINION AFFIRMING DISTRICT COURT APPROVAL OF DWH ECONOMIC AND PROPERTY SETTLEMENT

The District Court issued an order on December 21, 2012, certifying the Economic and Property Settlement Class and granting final approval of the Settlement Agreement after addressing and rejecting each of the Objectors' arguments.  The Objectors appealed the District Court's order citing various provisions of Rule 23 and requested that the Fifth Circuit remand with instructions to withdraw approval of the Settlement Agreement and to decertify the class. Additionally, BP argued on appeal that two Policy Announcements issued by the Claims Administrator regarding the interpretation and application of the Settlement Agreement had subsequently brought the Settlement Agreement into violation of Rule 23, the Rules Enabling Act, and Article III of the U.S. Constitution.

A three judge panel for the Fifth Circuit Court of Appeals considered each of the arguments presented by the Objectors and BP.  On January 10, 2014, the Fifth Circuit affirmed

by a 2-1 majority the District Court's order approving the Settlement Agreement and certifying the class.  Based on the Court's previous decisions, the Fifth Circuit rejected the arguments presented by the Objectors and BP under Article III because "'it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered,' because we 'assume arguendo the merits' of their claims at the Rule 23 stage". (Court Op. at 48 (citations omitted).  Further, the Court also rejected the argument of the Objectors and BP under Rule 23, citing that "'[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct." *Id*.

On January 21, 2014, BP filed a petition for rehearing en banc of the Appeal Panel's decision.  Further, on March 17, 2014, BP filed another petition for rehearing en banc regarding the BEL Claim Causation issue (discussed in detail in Section I.E of this Report) and requested that the Fifth Circuit consider it jointly with BP's petition for rehearing en banc of the approval of the Settlement Agreement and certification of the class.[19]

## IV.  CONCLUSION

The Claims Administrator offers this Report to ensure that the Court is informed of the status of the Program to date.  If the Court would find additional information helpful, the Claims Administrator stands ready to provide it at the Court's convenience.

            /s/ Patrick Juneau
            PATRICK A. JUNEAU
            CLAIMS ADMINISTRATOR

---

[19] While as of April 30, 2014 the Court had not yet issued its Order with regard to the petition for rehearing en banc, the Court dismissed the petition on May 19, 2014.  The time to seek relief from the United States Supreme Court, however, has not yet passed.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/EDF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 30th day of May, 2014.


_____/s/ Patrick Juneau_____
PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

Case 2:10-md-02179-CJB-SS Document 13295-1 Filed 08/30/14 Page 1

Claims Administrator Patrick Juneau has announced that the Settlement Program began issuing payments on July 31, 2012, and has been issuing outcome Notices since July 15, 2012. The Program will issue Notices on a rolling basis as we complete reviews, and they will include Eligibility Notices, Incompleteness Notices, and Denial Notices. Each Notice will provide information explaining the outcome. We will post Notices on the secure DWH Portal for any law firm or unrepresented claimant who uses the DWH Portal. We will notify firms and unrepresented claimants by email at the end of each day if we have posted a Notice that day. Firms and unrepresented claimants may then log onto the DWH Portal to see a copy of the Notice(s). Law Firms or claimants who do not use the DWH Portal will receive Notices in the mail. Claimants who receive an Eligibility Notice and qualify for a payment will receive that payment after all appeal periods have passed, if applicable, and the claimant has submitted all necessary paperwork, including a fully executed Release and Covenant Not to Sue.

| Table 1 | Filings by State of Residence | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **State** | **Registration Forms** | | | | **Claims** | | | |
| | | **Form Begun** | **Form Submitted** | **Total** | **%** | **Form Begun** | **Form Submitted** | **Total** | **%** |
| **1.** | Alabama | 836 | 41,377 | 42,213 | 19% | 1,701 | 49,610 | 51,311 | 18% |
| **2.** | Florida | 2,104 | 75,039 | 77,143 | 34% | 5,407 | 82,089 | 87,496 | 30% |
| **3.** | Louisiana | 1,597 | 51,359 | 52,956 | 23% | 2,508 | 72,757 | 75,265 | 26% |
| **4.** | Mississippi | 543 | 29,171 | 29,714 | 13% | 1,026 | 33,007 | 34,033 | 12% |
| **5.** | Texas | 257 | 11,486 | 11,743 | 5% | 695 | 15,541 | 16,236 | 6% |
| **6.** | Other | 1,070 | 12,855 | 13,925 | 6% | 1,176 | 22,439 | 23,615 | 8% |
| **7.** | **Total** | **6,407** | **221,287** | **227,694** | **100%** | **12,513** | **275,443** | **287,956** | **100%** |



Chart 1: Filings by State of Residence



| Table 2 | Number of Claims by Claim Type | | | | | |
|---|---|---|---|---|---|---|
| | **Claim Type** | **Claims** | | | | **Unique Claimants with Form Submitted** |
| | | **Form Begun** | **Form Submitted** | **Total** | **%** | |
| **1.** | Seafood Compensation Program | 416 | 24,681 | 25,097 | 9% | 10,485 |
| **2.** | Individual Economic Loss | 6,639 | 42,381 | 49,020 | 17% | 41,464 |
| **3.** | Individual Periodic Vendor or Festival Vendor Economic Loss | 174 | 280 | 454 | <1% | 278 |
| **4.** | Business Economic Loss | 2,634 | 99,449 | 102,083 | 35% | 78,624 |
| **5.** | Start-Up Business Economic Loss | 295 | 5,416 | 5,711 | 2% | 4,633 |
| **6.** | Failed Business Economic Loss | 291 | 3,670 | 3,961 | 1% | 3,295 |
| **7.** | Coastal Real Property | 839 | 35,367 | 36,206 | 13% | 24,616 |
| **8.** | Wetlands Real Property | 236 | 15,608 | 15,844 | 6% | 3,419 |
| **9.** | Real Property Sales | 190 | 1,604 | 1,794 | 1% | 1,269 |
| **10.** | Subsistence | 650 | 36,811 | 37,461 | 13% | 36,743 |
| **11.** | VoO Charter Payment | 85 | 8,744 | 8,829 | 3% | 6,172 |
| **12.** | Vessel Physical Damage | 64 | 1,432 | 1,496 | 1% | 1,222 |
| **13.** | **Total** | **12,513** | **275,443** | **287,956** | **100%** | **195,005** |

Case 2:10-md-02179-CJB-SS Document 12957-1 Filed 05/30/14 Page 2 of 6

## Chart 2: Number of Claims by Claim Type



| | Filings by Claimant Assistance Center | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Table 3** | **Claimant Assistance Center** | **Registration Forms** | | | | **Claims** | | | |
| | | **Form Begun** | **Form Submitted** | **Total** | **%** | **Form Begun** | **Form Submitted** | **Total** | **%** |
| **1.** | Apalachicola, FL | 29 | 1,504 | 1,533 | 5% | 40 | 2,167 | 2,207 | 6% |
| **2.** | Bay St. Louis, MS | 9 | 608 | 617 | 2% | 29 | 753 | 782 | 2% |
| **3.** | Bayou La Batre, AL | 21 | 1,021 | 1,042 | 3% | 46 | 1,125 | 1,171 | 3% |
| **4.** | Biloxi, MS | 37 | 1,518 | 1,555 | 5% | 67 | 1,953 | 2,020 | 5% |
| **5.** | Bridge City, TX | 2 | 415 | 417 | 1% | 16 | 786 | 802 | 2% |
| **6.** | Clearwater, FL | 73 | 2,492 | 2,565 | 8% | 369 | 2,077 | 2,446 | 6% |
| **7.** | Cut Off, LA | 12 | 479 | 491 | 2% | 23 | 706 | 729 | 2% |
| **8.** | Fort Walton Beach, FL | 9 | 1,324 | 1,333 | 4% | 46 | 1,822 | 1,868 | 5% |
| **9.** | Grand Isle, LA | 4 | 144 | 148 | <1% | 5 | 227 | 232 | 1% |
| **10.** | Gretna/Harvey, LA | 41 | 2,137 | 2,178 | 7% | 49 | 2,176 | 2,225 | 6% |
| **11.** | Gulf Shores, AL | 18 | 2,149 | 2,167 | 7% | 70 | 2,828 | 2,898 | 8% |
| **12.** | Houma, LA | 22 | 804 | 826 | 3% | 42 | 1,045 | 1,087 | 3% |
| **13.** | Lafitte, LA | 6 | 342 | 348 | 1% | 12 | 475 | 487 | 1% |
| **14.** | Mobile, AL | 71 | 7,554 | 7,625 | 25% | 185 | 8,231 | 8,416 | 23% |
| **15.** | Naples, FL | 27 | 1,366 | 1,393 | 5% | 42 | 1,277 | 1,319 | 4% |
| **16.** | New Orleans – CBD BG, LA | 13 | 347 | 360 | 1% | 20 | 359 | 379 | 1% |
| **17.** | New Orleans East, LA | 43 | 2,076 | 2,119 | 7% | 99 | 2,450 | 2,549 | 7% |
| **18.** | Panama City Beach, FL | 21 | 2,331 | 2,352 | 8% | 100 | 3,581 | 3,681 | 10% |
| **19.** | Pensacola, FL | 28 | 1,392 | 1,420 | 5% | 71 | 1,733 | 1,804 | 5% |
| **20.** | **Total** | **486** | **30,003** | **30,489** | **100%** | **1,331** | **35,771** | **37,102** | **100%** |

**DEEPWATER HORIZON CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement**
Case 2:10-md-02179-CJB-SS Document 12953-1 Filed 05/30/14 Page 3 of 6
May 1, 2014

**Chart 3: Number of Claims by Claimant Assistance Center**



| Table 4 | Claim Type | Notices Issued | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Eligible - Payable | Eligible - No Payment | Incomplete | Denial | | | | | Opt-Outs | Withdrawn | Closed | Total Claims Issued Notice |
| | | | | | Exclusion Denials | Prior GCCF Release | Causation Denials | Other Denials | Incomplete Denials | | | | |
| **1.** | Seafood Compensation Program | 9,181 | 1,120 | 724 | 48 | 2,441 | 0 | 486 | 4,747 | 1,169 | 2,576 | 1,747 | **24,239** |
| **2.** | Individual Economic Loss | 5,118 | 1,287 | 7,042 | 3,080 | 1,950 | 80 | 944 | 14,499 | 702 | 1,127 | 2,903 | **38,732** |
| **3.** | Individual Periodic Vendor or Festival Vendor Economic Loss | 8 | 0 | 9 | 4 | 23 | 0 | 59 | 122 | 2 | 68 | 23 | **318** |
| **4.** | Business Economic Loss | 12,451 | 218 | 24,340 | 632 | 543 | 2,541 | 304 | 4,923 | 786 | 3,821 | 1,618 | **52,177** |
| **5.** | Start-Up Business Economic Loss | 520 | 18 | 1,843 | 49 | 41 | 96 | 30 | 815 | 90 | 129 | 241 | **3,872** |
| **6.** | Failed Business Economic Loss | 36 | 23 | 788 | 45 | 91 | 265 | 566 | 541 | 106 | 78 | 276 | **2,815** |
| **7.** | Coastal Real Property | 24,564 | 51 | 301 | 5 | 799 | 0 | 4,652 | 1,430 | 365 | 376 | 1,756 | **34,299** |
| **8.** | Wetlands Real Property | 2,935 | 1 | 148 | 10 | 66 | 0 | 1,399 | 55 | 57 | 158 | 923 | **5,752** |
| **9.** | Real Property Sales | 643 | 2 | 46 | 4 | 53 | 23 | 563 | 63 | 12 | 54 | 112 | **1,575** |
| **10.** | Subsistence | 2,479 | 39 | 6,034 | 16 | 1,279 | 0 | 31 | 2,023 | 193 | 255 | 447 | **12,796** |
| **11.** | VoO Charter Payment | 6,987 | 19 | 49 | 16 | 0 | 0 | 591 | 680 | 91 | 64 | 112 | **8,609** |
| **12.** | Vessel Physical Damage | 806 | 21 | 83 | 4 | 0 | 0 | 113 | 210 | 20 | 36 | 87 | **1,380** |
| **13.** | **Total** | **65,728** | **2,799** | **41,407** | **3,913** | **7,286** | **3,005** | **9,738** | **30,108** | **3,593** | **8,742** | **10,245** | **186,564** |

| Table 5 | Claim Type | Payment Information | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Eligibility Notices Issued with Payment Offer | | Accepted Offers | | Payments Made | | |
| | | Number | Amount | Number | Amount | Number | Amount | Unique Claimants Paid |
| 1. | Seafood Compensation Program | 9,181 | $1,118,390,002 | 8,099 | $1,098,768,117 | 7,734 | $1,078,116,053 | 4,551 |
| 2. | Individual Economic Loss | 5,118 | $66,134,340 | 4,692 | $61,871,693 | 4,379 | $52,952,387 | 4,379 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 8 | $77,085 | 8 | $77,085 | 8 | $77,085 | 8 |
| 4. | Business Economic Loss | 12,451 | $3,061,508,079 | 11,927 | $2,902,600,272 | 9,909 | $2,073,991,877 | 9,516 |
| 5. | Start-Up Business Economic Loss | 520 | $121,416,636 | 497 | $114,089,558 | 441 | $94,075,982 | 426 |
| 6. | Failed Business Economic Loss | 36 | $3,428,620 | 28 | $2,977,358 | 20 | $1,733,460 | 20 |
| 7. | Coastal Real Property | 24,564 | $136,639,375 | 23,772 | $132,818,596 | 23,138 | $128,297,942 | 18,165 |
| 8. | Wetlands Real Property | 2,935 | $155,334,242 | 2,760 | $109,733,847 | 2,650 | $108,221,806 | 1,102 |
| 9. | Real Property Sales | 643 | $31,967,039 | 627 | $31,351,523 | 615 | $30,746,273 | 571 |
| 10. | Subsistence | 2,479 | $18,198,003 | 2,272 | $16,985,175 | 2,080 | $15,256,023 | 2,080 |
| 11. | VoO Charter Payment | 6,987 | $279,444,695 | 6,961 | $277,304,204 | 6,896 | $275,377,552 | 5,254 |
| 12. | Vessel Physical Damage | 806 | $12,735,656 | 792 | $12,290,864 | 760 | $11,505,829 | 709 |
| 13. | **Total** | **65,728** | **$5,005,273,771** | **62,435** | **$4,760,868,291** | **58,630** | **$3,870,352,268** | **43,665** |

| Table 6 | Appeals Received | | | |
|---|---|---|---|---|
| | Resolved Appeals | | | |
| | Appeal Status | BP Appeals | Claimant Appeals | Total Appeals |
| 1. | Resolved by Panel decision | 1,525 | 788 | 2,313 |
| 2. | Resolved by parties | 388 | 80 | 468 |
| 3. | Withdrawn | 272 | 33 | 305 |
| 4. | Administratively Closed | 8 | 40 | 48 |
| 5. | Inactive Under Reconsideration/Re-Review | 133 | 0 | 133 |
| 6. | Remand to Claims Administrator | 121 | 29 | 150 |
| 7. | **Total** | **2,447** | **970** | **3,417** |
| | Pending Appeals | | | |
| 8. | In "Baseball" Process | 1,269 | 70 | 1,339 |
| 9. | In "Non-Baseball" Process | 0 | 87 | 87 |
| 10. | Submitted to Panel | 94 | 107 | 201 |
| 11. | Under Discretionary Court Review | 130 | 71 | 201 |
| 12. | **Total** | **1,493** | **335** | **1,828** |
| | Grand Total | | | |
| 13. | | **3,940** | **1,305** | **5,245** |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement
May 1, 2014
Case 2:10-md-02179-CJB-SS Document 12957-1 Filed 05/30/14 Page 5 of 6
Case 2:10-md-02179-CJB-SS Document 12957-1 Filed 05/30/14 Page 225 of 310



**Chart 4: Registration and Claim Forms Filed by Month**



**Chart 5: Notices Issued by Month**



**Chart 6: Payments Made by Month**



**Chart 7: Appeal Resolutions by Month**

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Legend:**

1. Form Begun - Includes electronically filed registration or claim forms for the period of time between the moment a claimant or his attorney has initiated the submission of a form and moment they complete that filing by submitting the electronic signature. This definition also includes hard copy registration or claim forms where the DWH Intake Team is in the process of linking the scanned images and has not yet completed the data entry on that form.

2. Form Submitted - Includes electronically filed registration or claim forms after the claimant or his attorney completes the electronic signature and clicks the submit button. This definition also includes hard copy registration or claim forms where the DWH Intake Team has completed both the linking of scanned images and the data entry on that form.

3. Unique Claimants with Form Submitted - Counts the unique number of claimants with at least one Claim Form Submitted for each Claim Type. Because claimants may file claims for more than one Claim Type, the sum of all Claim Types will not equal the count of total unique claimants.

4. Notices Issued - The count of Notices Issued in Table 4 counts each unique claim issued a Notice only once. For claims issued multiple Notices, this report uses the following hierarchy when counting the claim: (1) Eligibility Notice if the claim has been paid; (2) Most recent active Notice if the claim has not been paid; (3) If the claim has been closed it will not be counted as an Eligibility Notice unless the claim has been paid. The count of Notices Issued in Chart 5, counts all Notices Issued and reports claims with multiple Notices once for each Notice issued. Because of this, the totals reported in Table 4 do not match the totals reported in Chart 5.

5. Payment Information - The timing of payment can be affected by a number of factors. Even after the DHECC receives a Release, delay in receipt of a W-9, or in receipt of the Attorney Fee Acknowledgment Form can delay payment. In addition, any alterations or omissions on the Release Form, or an assertion of a third-party lien against an award amount, can delay payment. As a result, this report will show a higher number of Accepted Offers than Amounts Paid.

6. Appeals Received - Excludes Appeals closed pursuant to 4/24/2013 Court Order.

7. Note: The Claims Administrator continually monitors the status of all claim filings. Through this process, the Claims Administrator may find duplicate claims from the same claimant. In such cases, the Claims Administrator will close the duplicate claim and only process the remaining valid claim. This report excludes duplicate claims from all counts of claims filed.



# EXHIBIT 8
## Filed Under Seal

# EXHIBIT 9

# Q4 2012 - Q3 2013 BEL Claim Determinations

| Claim Type[1] | Q4 2012 | Q1 2013 | Q2 2013 | Q3 2013 | Total: Q4 2012 - Q3 2013 |
|---|---|---|---|---|---|
| BELClaims Determinations | 3,907 | 7,786 | 7,208 | 10,441 | 29,342 |
| Error Rate from File Audit Reviews | 15.7% | 15.7% | 15.7% | 15.7% | 15.7% |
| Extrapolated BEL Errors | 613 | 1,222 | 1,132 | 1,639 | 4,607 |

**Footnotes:**

[1] BEL includes Business Economic Loss, Failed Business Economic Loss, and Start-up Business Economic Loss claim types.

[2] BEL claims determination information was obtained from the following sources: 1) July 2012 - September 2013 from the [Updated Notice Payment Data] tab in the CAO's Q1 2014 budget model: *20131113 CSSP 1st Quarter Budget Revised.xlsx* ; 2) October 2013 from the 20131204 October 2013 Actual Inputs.xlsx received from the CAO's October 2013 materials, dated December 4, 2013, *20131204 October 2013 Actual Inputs.xlsx* ; 3) November 2013 - January 2014 from the supplemental schedule associated with the Q2 2014 budget materials; 4) February 2014 - May 2014 from the CAO's monthly budget materials; and 5) June 2014 from the CAO's Q3 2014 budget materials, dated May 2, 2014, *DHECC Q3 2014 Quarterly Budget Presentation.pdf* .

# EXHIBIT 10



**bp**

**Mark Holstein**

Managing Attorney
BP Legal – Litigation

BP America Inc.
P.O.Box 3092
Houston, Texas 77253

501 WestLake Park Blvd.
Houston, Texas 77079-2607
Mail Code 17.130

Direct: 281-366-8895
Fax:    281-366-3491
Mark.Holstein@bp.com

June 21, 2013

<u>**Via E-Mail**</u>

The Honorable Carl J. Barbier
United States District Judge
United States District Court, Eastern District of Louisiana
500 Poydras Street, Room C-256
New Orleans, LA  70130

Re:    *Deepwater Horizon Court Supervised Settlement Program -- Request for Examination*

Dear Judge Barbier:

BP has been evaluating the administrative activities, policies, procedures and controls of the Court Supervised Settlement Program (the "CSSP"), for which BP provides all funding under the Settlement Agreement.  This ongoing review has included consideration of documents, data, claims, claim appeals and other information provided by the CSSP, as well as recent meetings with the Claims Administrator's Office (the "CAO") and CSSP vendors BrownGreer PLC ("BrownGreer"), Garden City Group, Inc. ("GCG"), PricewaterhouseCoopers LLP ("PwC") and Postlethwaite & Netterville APAC ("P&N").  Based on those meetings and our analysis of the information provided to us by the CAO, we question whether the CAO is exercising appropriate professional oversight and supervision of the CSSP.  Specifically, we have significant concerns regarding what appear to be (1) inadequate operational controls; (2) significantly higher than expected administrative costs and expenses; (3) substantially lower than expected claim processing efficiencies and productivity; and (4) inadequately funded, insufficient processes to detect and prevent fraud, waste and abuse.

BP's concerns about these management issues have been heightened by the troubling allegations that have recently come to light regarding misconduct by a senior CAO employee that *may have* impacted significant CSSP policy decisions, improperly influenced claims outcomes and resulted in the payment of fraudulent, excessive or improper claims.  At minimum however, these issues have resulted in an extremely costly and underproductive program.  Simply by way of comparison, the per claim administrative costs incurred by the CSSP are significantly higher than the per claim costs incurred by the Gulf Coast Claim Facility ("GCCF").  Furthermore, the rate of productivity of the CSSP appears to be lower than the productivity of the GCCF.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 2 of 11

Given these serious concerns and in light of the overall administrative complexity of the program, BP respectfully requests that a full examination of the CSSP be undertaken promptly to assess the efficacy of the CAO's entire management operation, including but not limited to the CAO's internal operating procedures and vendor governance protocols.  The examination should identify any necessary recommendations for improvement as appropriate.  We believe that an appropriate examination will lead to significant opportunities for improving the quality, efficiency and integrity of CSSP operations, reduction of disruptive staff turnover, greater consistency in claims determination, better decision making and, potentially, more expedited claims processing.

This proposed examination is not duplicative of the recent audit completed by CliftonLarsonAllen ("CLA").[1]  Unlike the proposed examination, which would provide an opinion, *inter alia*, on the effectiveness of operational processes of the CAO and the efficiencies of the entire CSSP, the recently completed CLA audit was limited to essentially testing whether CSSP processes were resulting in accurate claims evaluations.  The CLA audit was not designed and  did not attempt to evaluate the CAO's operational protocols, particularly those of the type that relate to the current allegations against a senior CAO employee, the CAO's overall management of the CSSP vendors, or the processes to mitigate fraud, waste and abuse.  In short, the CLA audit does not address the issues raised by BP in this letter.

Notwithstanding its differing scope, the utility of the CLA audit is questionable, even as to its intended purpose.  Either because of an inadequate scope caused by cost constraints imposed by the CAO or simply a flawed design, the CLA audit was conducted with such a high margin of error and deficient sample selection methodology that meaningful conclusions cannot be drawn from it, even as to the factors it purports to measure.  Moreover, although the CLA report identifies a number of areas of potential concern, it does not perform any further investigation on those issues and presents an opinion of "minor improvements needed" that may be unfounded.

For all of the reasons set forth above and discussed in more detail herein, a complete examination (which may include as a component some level of accounting audit) of CAO management and its operational protocols, is necessary and should be initiated posthaste.  This examination should benefit the CAO, the CSSP as well as the Class and BP.

I.      **The CSSP Is Operating With Extremely High Costs and Low Productivity.**

In its April 25, 2013, budget presentation, the CAO provided information showing the average monthly administrative cost of the CSSP of $39.74 million as compared to the average monthly administrative costs of the GCCF of $47.94 million.  The statistic is somewhat misleading, however, because most of the difference between average program costs is simply attributable to the fact that the CSSP has virtually eliminated using a vendor dedicated to fraud analysis. When excluding the fraud costs from the GCCF figure, the average monthly CSSP costs are

---

[1] On May 17, 2013, CLA issued its report titled, *Deepwater Horizon Economic Claim Center Independent Evaluation of the Internal Control Environment*, describing the methodology and audit recently completed.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 3 of 11

running at 93% of GCCF costs.  In any event however, missing from the CAO presentation was any measure of productivity achieved by the program.

Based on our analysis of the information provided by the CSSP, on average, the CSSP has resolved 8,412 claims per month as compared to 22,325 claims per month by the GCCF.[2]  Since its inception, the CSSP's most productive month was March 2013, when it began issuing Business Economic Loss ("BEL") denials for incompleteness, where it achieved a total of 15,467 resolutions.  In contrast, the GCCF's most productive month resolved 62,071 claims, excluding emergency payments.  In total, the GCCF experienced seven months where (non-emergency) resolutions exceeded the CSSP's most productive month.   These results are summarized below:

| Measure | Weighted GCCF Average | Weighted CSSP Average |
|---|---|---|
| Costs Per Paid Claim[3] | $3,030 | $11,975 |
| Costs Per Resolved Claim[4] | $1,972 | $5,032 |
| Claim Resolutions Per Month | 22,325 | 8,024 |

Once these productivity measures are considered, the nearly equivalent average monthly costs of the two programs is not a positive observation of the CSSP and rather highlights that the CSSP is significantly more costly than the GCCF overall.


**II.     The CAO Does Not Appear to Employ An Expense Management Plan.**

As discussed in detail below, our overall observation after having reviewed CSSP's information and meeting with the CSSP vendors is that the CAO does not appear to have any effective strategy regarding expense management and the vendors appear to be operating without meaningful direction from the CAO as to the most efficient way to operate as an integrated system.  As a complex program with four vendors attempting to work in concert, the overall management of the system is critical.  Instead, the management teams for each vendor are being left almost entirely to set their own goals and performance measures and appear to make collective ad hoc adjustments to processes without any holistic or empirical consideration of costs or efficiencies.

In order to properly manage a claims program of this magnitude, detailed budgets for cost and performance measures should be established.   Actual results should be measured against those budgets.   Periodic (e.g., monthly) performance reviews of budgeted vs. actual results

---

[2] This analysis controls for the increased number of "claims" a single claimant may have had under the GCCF (i.e., a single claimant may have an EAP claim, an interim payment and a final payment) by excluding emergency payments and by counting a claimant who may have received interim and/or final payments as a single claim.
[3] Costs incurred prior to the first claims resolutions (i.e., startup costs) have been excluded from the calculation.
[4] Resolved claims are comprised of claims that are either approved for payment, denied or withdrawn. Costs incurred prior to the first claims resolutions (i.e., startup costs) have been excluded from the calculation.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 4 of 11

should occur.  These reviews identify problem areas and force an evaluation of how to address them.  Budgets and performance measures should be established at detailed levels.  High level or aggregate budgets and performance measures do not allow for the identification of specific, actionable items that can influence future performance.  As discussed below, through its observations and inquiries, BP has been unable to confirm whether this level of review is occurring.  As a result, it is necessary for an examination of the CSSP to occur in order to evaluate the program, identify and correct any shortcomings in its execution.

**A.    Vendors Do Not Appear To Be Managed To Meet Quantitative Performance Goals.**

Based on our discussions and review of the documents, other than tracking and monitoring costs and expenses, the CAO does not appear to make any effort to actively manage expenses to any financial plan.  The only comparative measure the CAO's office apparently uses to measure CSSP expenses is the GCCF experience, which as discussed above, does not provide a favorable assessment of CSSP expense management.  The CAO measurement is simply a comparison of total monthly costs, which fails to consider that, at meaningfully lower production rates, the CSSP is expending much more per claim to accomplish all of its required tasks than the GCCF incurred.

As the vendors explained during our recent series of meetings, although each individual vendor may have its own internal standards, there do not appear to be any quantitative performance measures imposed by the CAO on the CSSP vendors to measure productivity at either the vendor or staff level.  For example, the CAO has not set any production goals per full-time equivalent employee ("FTE") for any of the tasks or subtasks regularly performed by the vendors (e.g., each FTE accountant evaluating BEL claims is expected to process a specified number of  claims per week; each FTE accountant evaluating IEL claims is expected to process a specified number of   claims per week; each FTE performing document intake tasks is expected to process a specified number of documents per week; each accountant Q/A FTE is expected to process a specified number of  Q/A reviews per week).  Nor does it appear that the CAO has set any systematic performance expectations for the average time it should take to complete each stage of the claims evaluation process (e.g., claims should remain in a particular stage for less than a specified number of hours/days).  None of the vendors' contracts or task orders that we have seen contain Key Performance Indicators or Service Level Agreement metrics associated with performance; they merely establish maximum staffing levels.

Establishing performance measures for such a complex and variable operation obviously is not a simple task, but any purported difficulty in establishing these measures does not obviate the need for them.  Establishing performance goals is a best practice for any professionally run business or claims-processing operation, but they are particularly important given that the CSSP has four vendors that may each touch the same claim and may each be responsible for several stages of a multifaceted claims processing workflow.  Without measuring performance, the CAO cannot evaluate the CSSP vendors relative to their respective costs, make empirically based staffing decisions, or assess whether the entire system is running as efficiently as possible.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 5 of 11

     **B.**    **The CAO Appears To Allow Process Changes to Be Implemented On An Ad Hoc Basis And Without Any Consideration of Cost/ Benefit Analysis.**

CSSP Vendors also appear to be making ad hoc adjustments to processes without any empirical consideration of costs or impact on efficiency. One recent anecdotal example relayed by the vendors was that, as between PwC and P&N, the accounting firms decided it is better for each accounting firm to perform its own Quality Assurance ("Q/A") review of the claim files it is responsible for processing. Up until the recent change, PwC had been performing the Q/A of files processed by P&N. However, because taking on the Q/A process as to its own files created staffing pressures for P&N, it requested PwC to begin processing the Failed/Start-up Business claims that P&N was previously responsible for processing. PwC agreed and as a result, PwC now has 15 accountants working in some capacity to handle "Failed/ Start-up Business" claims.

We have no comment on whether these process changes are positive or negative with respect to overall costs or efficiencies. However, the "horse trading" approach giving rise to the process change highlights the lack of management scrutiny being applied by the CAO. Setting aside qualitative considerations, before authorizing such a change in process, we would have expected at least some level of analysis to have been completed by the CAO to determine whether P&N has the ability to meet or exceed the productivity of PwC accountants that had been previously performing Q/A review.

Another example demonstrating the lack of rigor in the management process is the recent proposal by the CAO to add 100 new accountants to the program. As confirmed by our discussions with PwC and P&N, the staffing proposal was not developed to meet any specific empirical goal. Instead, it was based on an untested hypothesis from the CAO that increasing the number of accountants was the most effective approach to reduce the backlog of outstanding BEL claims. Although the estimated cost to add these accountants is $39 million per year, no analysis appears to have been completed to determine, for example, the ability of additional accountants to actually impact the backlog (e.g., some unknown percentage of claims are simply waiting information from claimants); whether any part of that pending backlog could be reduced by using other, less costly staff; whether the beneficial impact of the accountants justifies the additional $39 million yearly cost (above and beyond the over $170 million already being spent on accounting services); or whether the same positive impact of adding accountants could be achieved by otherwise improving the efficiency of the current accounting workforce. Indeed, as the CAO presented during the vendor meetings, the CAO's only analysis appears to be a projection that adding the additional accountants will marginally reduce the length of the program, but at a dramatic increase in overall cost to the facility. Again, BP has not formed a judgment whether or not adding 100 accounts is reasonable or necessary. Our concern is that there seems to be little, if any, consideration being given to achieving CSSP objectives in a cost effective manner or to performing the analysis required to determine whether the additional accountants would achieve the intended goal cost-effectively.

Information technology costs are another area with minimal expense management. Currently, BrownGreer has approximately 90 individuals working on IT development at a cost of more than $1.7 million per month. As we understand it, with the exception of one or two modules, all of the programming necessary for the initial design build has been completed for each of the

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 6 of 11

twelve claim types.  The bulk of the expenses related to current IT services are for the day-to-day operations of the system and ad hoc improvements to the claim system that are requested or proposed by the CSSP vendors.  Our understanding is, with some exception, these are the "bells and whistles" being added to the claim system.  There does not appear to be any attempt to measure whether a particular system change actually improves the efficiency of the process or whether the cost and expense of developing the computer code and training the staff on the system change are justified by the actual measurable benefit to the process.

### C.     The CAO Does Not Appear To Proactively Manage Staffing Costs and Expenses.

It does not appear that the CAO makes meaningful efforts to match staffing levels to workloads in order to manage staffing costs and expenses.  Despite being a mature claims program, the total vendor headcount does not appear to be decreasing to reflect an improvement in efficiency as staff become more proficient completing their routine tasks.  And while, given our limited access to CSSP information, we are not in a position to comment on whether there are unique circumstances preventing the expected reduction in headcount, we do observe that the CAO is not even holding vendors to its own headcount projections.  For example, with respect to the Claim Assistance Centers and the call centers, information provided by the CAO shows that the office performs predictive modeling to forecast staffing levels needed to achieve desired service levels.  However, despite the CAO modeling results the actual staffing levels established are well in excess of the model, presumably resulting in significant amounts of non-productive time for staff.

As explained during our vendor meetings, Garden City Group currently operates two call centers — one located in Ohio and another located in Florida, both operating Monday through Saturday.  Despite dramatically reduced call volume, the CAO's own predictive modeling results and Garden City's stated view during the meeting that closing the redundant Florida facility and eliminating Saturday coverage is appropriate and would allow a further reduction in workforce, the CAO has not implemented these cost-saving staffing reductions at this time.

The CSSP is also incurring a significant expense and loss of efficiency from high monthly turnover.  Based on the series of vendor meetings, BrownGreer is experiencing monthly turnover as high as 4%, or 48% annually.  This has resulted in significant training costs and lost productivity as the facility has presumably had to replace over 700 staff per year at current turnover rates.  Based on our understanding, the CAO has never identified this as an issue or attempted to address it with the vendor.

Nor does the CAO appear to be proactive in managing independent contactor pass through costs.  BrownGreer and Garden City collectively hired more than a thousand independent contractor employees to work at the CSSP.  These vendors marked-up the labor costs of their respective independent contactors and passed those markups along to the CSSP and Settlement Trust.  The CAO appears to have given no consideration to the substantial cost savings the CSSP and Settlement Trust could have been achieved had the CAO identified this issue and explored opportunities to substantially reduce these markups.  We understand that BrownGreer has been routinely converting its independent contactors to at-will employees thereby potentially impairing the ability of the CSSP to address these contractor markups.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 7 of 11

Furthermore, when we presented this issue to Garden City, it told us that it will be immediately moving to convert its independent contractors to at-will employees.  Moreover, Garden City operates the Florida call center pursuant to a subcontract with a call center operator and, when asked about possible markups to its subcontractor rates, refused to disclose to us the amount they pay the subcontractor to run the facility.  It would be expected that the direct costs would be passed through to the CSSP with no markup by Garden City.  However, we have not been able to determine if a markup is being added.

With respect to expenses, there also seems to be minimal effort by the CAO to curb unnecessary expenditures.  The CSSP is currently incurring approximately $400,000 in monthly travel expenses as a result of having PwC accountants travel from New York, Washington D.C., Dallas, Houston, Atlanta and Chicago to work in the New Orleans area.  As explained by PwC, there is no substantive need from a qualitative standpoint for PwC accountants to be physically present in New Orleans, and indeed, accountants from four other PwC offices work on the project in the same capacity as their colleagues without ever traveling to New Orleans.  Again, the CAO does not even appear to have considered whether it is necessary for the program to continuously incur monthly hotel, lodging, and transportation costs that do not appear to provide any benefit to the performance of the program.

A properly managed claims process should balance the precision achieved by the evaluation process, the time to complete a review (throughput), and cost.  None of these attributes individually should determine how a particular process is established.  Goals for these three attributes should be established and clearly communicated so all team members understand the objectives.  This understanding of the intent of the project leader allows subordinate leaders to make decisions consistent with the objectives in the absence of specific guidance. An examination will identify areas to improve the balance between these considerations.

### III.    The Effectiveness, if Any, of CSSP's Procedures To Detect and Mitigate Fraud, Waste and Abuse Is Not Apparent.

As set forth by the CAO during the April 25, 2013, budget presentation, the CSSP has reduced its fraud vendor costs to approximately $200,000 per month—down from approximately $5.3 million per month during the GCCF.  This represents most of the difference in average monthly costs between the two programs.  Indeed, when excluding the fraud costs from the GCCF costs, the average monthly CSSP costs are running at 93% of GCCF costs.  While BrownGreer does perform some fraud investigations for the CSSP as it did with GCCF, even when considering only the CSSP costs, the CSSP still appears to be spending nearly 90% less on fraud detection than the GCCF.

Although the CAO and BrownGreer highlight this reduction in spending as evidence of cost savings, neither BrownGreer nor the CAO have provided any empirical support suggesting that the quality of the remaining CSSP fraud mitigation efforts are, in fact, as effective as the GCCF efforts.  The information BP has been provided suggests that the efforts taken by the CSSP to detect fraud are relatively nominal in relation to the actions taken by the GCCF, which yielded numerous fraudulent claims.  As described by the CAO, "BrownGreer relies on their claims evaluators to be sensitive to fraud and look for suspect documents . . . ."

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 8 of 11

The level of attempted fraud experienced by the GCCF was significant.  Indeed, the GCCF's fraud detection system is currently featured in a pending appeal before the United States Court of Appeals for the Fifth Circuit, *Johnson v. BP*, No. 12-20512.  In the Johnson case, the GCCF detected a fraudulent claim that otherwise would have been paid $2.7 million and denied it on that basis.  The GCCF fraud mitigation vendor identified 9,130 claims containing potential fraud, of which more than two-thirds were multiple claimant schemes.  Said differently, the GCCF was targeted by more sophisticated, institutional fraud rings.  Accordingly, the CSSP fraud mitigation efforts should be, at minimum, equally robust.  It is unclear at best whether BrownGreer's system of primarily relying on individual claims evaluators to detect fraud is the most cost effective method of identifying sophisticated fraud actors.  In light of the enormous reduction in overall spending on fraud detection from the GCCF, an examination of the overall fraud detection process is both necessary and warranted.

## IV.    The CSSP Appears To Lack Adequate Controls And Uniform Processes To Detect Errors In Claimant Submitted Profit and Loss Statements.

It does not appear that there are uniform processes in place to detect errors in claimant-submitted profit and loss statements, and there is significant risk of claims being paid based upon inaccurate or fraudulently submitted profit and loss statements.[5]  According to the CSSP, claimant-submitted profit and loss statements are not audited and, instead, the CSSP simply takes these statements as they are submitted.  PwC advises that the only scrutiny applied to claimant-submitted profit and loss statements is if a CSSP accountant identifies something that "looks unusual" or "inconsistent" or "wacky."  Unless one of these subjective criteria is observed, there is no inquiry.  PwC noted that errors in claimant-submitted profit and loss statements can be "hard to identify."  BrownGreer has further advised us that a profit and loss statement generated for the purpose of filing BEL claim, rather than contemporaneously in the ordinary course of business, "does not raise any red flags" for the Settlement Program's screens for fraudulent conduct (this raises a significant concern as to the adequacy of the CSSP's anti-fraud processes as discussed above).

A professionally run claims administration charged with implementing compensation frameworks should be making those determinations using accurate and non-fraudulent data, and should not simply accept data "as given" by the claimant without question.  Nor should there be what was described as an ad hoc system to question entries in profit and loss statements based on a "wacky" standard as opposed to a more appropriate, robust and uniform process.

In the context of BEL claims, there is significant opportunity for claimants to submit inaccurate or falsified profit and loss statements given the understanding that the Settlement Program takes this "hands off" approach with no audits of claimant-prepared financials.  For example, the BEL compensation framework Step One, allows claimants the optionality to select three or more consecutive months from May to December 2010 as the compensation period.  Absent any audit procedures or checks, it is possible for claimants to create financials in which revenue

---

[5] Given what we have observed with the BEL claims process, the other CSSP claims process should be similarly scrutinized in the examination.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 9 of 11

and expense entries are placed into months inaccurately yet tie with amounts reported on annual year-end profit and loss statements.  Likewise, it is possible for claimants to submit profit and loss statements in which errors and inaccuracies were not corrected which then may cause it to appear a claimant experienced a loss of variable profit when, in fact, there was no such loss.  Moreover, given that accountants in Louisiana and Alabama may pursue contingent fee arrangements with BEL claimants, there exists a financial incentive in which accountants may benefit from submission of inaccurate or invalid profit and loss statements.

For all of these reasons, an examination related to the processing of BEL claims is necessary to identify standardized processes and remedial steps related to the BEL claims process to insure that claims are considered using only accurate, non-fraudulent financial data.  This is essential to establish the integrity of the CSSP claims process.

## V.    The Proposed Examination of the CSSP Should Also Evaluate the Sufficiency of the CLA Audit To Determine Whether a Broader Audit Is Warranted.

As referenced above, the CLA audit was not designed to test the vendor governance measures, but rather only the internal controls of the CSSP, i.e., whether claims were being evaluated and calculated according to the terms of the settlement agreement.  However, as detailed below, because of significant questions raised primarily by the small random sample (which results in a high margin of error in the findings) and the simple sampling methodology (which did not take into consideration the material differences between claim types), the CLA audit scope does not look sufficient and the proposed examination of the CSSP should take that into consideration.

### A.    The Sample Size and Claims Selection Methodology Raise Significant Concerns Regarding the Validity of the Conclusions.

CLA indicates that its analysis of Paid Claims[6] is based on a test of 96 claims from 10 of the 12 claims categories and that the random sample was selected using a "sampling methodology [with] a confidence level of 95% with a 10% margin of error . . . ."  (Report, p. 16.)  Allowing for this margin of error in testing of a population of 15,894 paid claims (Report, p. 9.) means that up to 1,589 *paid* claims could have been calculated with errors and would not be identified by the CLA testing.  Given the importance of the CSSP operations and the aggregate monetary value of CSSP awards, it is unclear why CLA would select such a high margin of error and/or why only 96 claims were reviewed (i.e., approximately 0.6% of paid claims subject to the audit).  Materially improving the accuracy of the audit to a 3% margin of error would have only required a sample size of approximately 1,000 claims.  This would appear to be an area where the increased cost of an expanded review would be justified given the dollars flowing from the CSSP.

---

[6] Unless otherwise defined in this letter, capitalized terms are used as they are defined in the Report.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 10 of 11

Similarly, the use of a random sample methodology also appears to undercut the validity of the report's findings.  Rather than a simple random sample, which assumes that an exception (i.e., mistake) poses the same risk to the facility regardless of the claim type in which it occurs, we would have expected an experienced firm such as CLA to perform a more sophisticated dollar and risk weighted methodology (e.g., materiality based sampling).  As a result of not weighting the sample based on claim value, 50% of the claims tested represented 1% of the dollar amount tested.  A quarter of the entire sample was comprised of Coastal Real Property Claims which do not appear to present much risk to the program.  This significantly draws the overall observations contained in the report into question.

> **B.    The Report Does Not Drill Down Into Any Exceptions Revealed by the Audit and Tellingly, Does Not Actually State An Opinion as to the Effectiveness of the Internal Controls.**

Although the CLA report does not highlight this statistic, the audit found 13% of the BEL claims reviewed were overpaid.  This is a large percentage of overpaid claims, particularly in a claim type with one of the highest-dollar values.  Similarly, of the sample claims tested for QA/QC reviews, CLA identified 8% of the claims contained irregularities.  Notwithstanding these significant findings however, CLA made no recommendation to undertake further sampling or investigation to confirm whether or not these statistics are in fact actually reflective of the overall facility performance.

Similarly, the report contains only minimal analysis of appealed and denied claims except for some trending measures.  A properly scoped process audit of the CSSP must include a meaningful review of both appealed and denied claims because the substance and results of the appealed claims would likely provide insight into any infirmity in the claims process and a review of denied claims would provide useful information relating to the filing of fraudulent claims.

In short, the scope of CLA's audit, even given its stated purpose, appears as being too superficial to give a meaningful insight into whether the CSSP internal controls are efficacious.

**VI.    A Full Examination of the CSSP Is Warranted And Necessary.**

Pursuant to the terms of the Settlement Agreement[7] and the Settlement Trust Agreement[8], Mr. Juneau is obligated, *inter alia,* to act as a fiduciary of the Settlement Trust, to "oversee and supervise the Claims Administration Vendors" and to pay "reasonable and necessary expenses incurred in connection with the operation of the Settlement Program."[9]  As described in this letter, based on discussions with the CSSP vendors and materials provided by the CAO, the level of supervision and expense management applied to the vendors appears to be less than

---

[7] Originally filed in the United States District Court for the Eastern District of Louisiana on April 18, 2012, in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (Rec. Doc. 6726-1), as amended May 1, 2012.

[8] *Deepwater Horizon* Economic and Property Damages Trust Agreement, dated May 4, 2012.

[9] *See,* Settlement Agreement ¶¶ 4.3.2; 5.12.1.1.3; Settlement Trust Agreement ¶ 2.1.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 11 of 11

best practices. In addition, there are serious questions about the adequacy of control mechanisms as acutely demonstrated by the recent allegations against a senior CAO employee.

An examination, including improvement recommendations as appropriate, would aid the Claims Administrator in fulfilling his obligations under the Settlement Agreement and Settlement Trust Agreement and would further the CAO's fiduciary responsibility to operate an efficient and high quality claims facility.  Our expectation is that the examination will create opportunities for the CSSP to improve claims processing performance, drive more consistent and accurate claims results and, possibly, increase the pace of claim determinations.


Sincerely,


Mark Holstein
Managing Attorney


cc:     Magistrate Judge Sally Shushan
        Patrick A. Juneau
        Michael J. Juneau
        Steve Herman
        James Roy

# EXHIBIT 11

**DENTONS**

Keith Moskowitz
Partner

keith.moskowitz@dentons.com
D +1 312 876 8220

Salans FMC SNR Denton
dentons.com

Dentons US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306 USA

T +1 312 876 8000
F +1 312 876 7934

June 7, 2013

**BY E-MAIL**

Mr. Patrick Juneau
Claims Administrator
935 Gravier Street
Suite 1905
New Orleans, LA 70112

Re:  Analysis of Immediate CSSP Cost Saving Opportunities

Dear Mr. Juneau:

Based on the information that BP has received from the Court Supervised Settlement Program ("CSSP") regarding the Court Supervised Vendors, it appears that BrownGreer PLC ("BG"), Garden City Group, Inc. ("GCG") and Postlethwaite & Netterville APAC ("P&N") (collectively the "CSSP vendors") rely on large numbers of independent contractors to staff their respective operations.[1]  Based on a review of billing records and other information, it also appears that the CSSP vendors are marking up the independent contractors' hourly rates and billing the Settlement Trust at two to three times the hourly rates that a local staffing agency would generally bill for those same independent contractors' services ("Vendor Markup"). While we do not know the exact amount of the Vendor Markups, as discussed below, based on available information and billing data, we estimate that the CSSP Vendor Markups may be accounting for as much as $14 million dollars per month in costs incurred by the Settlement Trust.  These Vendor Markups reflect pure profit for the CSSP vendors and provide no value to the CSSP, the Class or BP.

The Vendor Markups can be avoided by either requiring the CSSP vendors to pass through their direct costs of the independent contractors without any Vendor Markup or, as discussed below, by having the Settlement Trust contract directly with independent contractors (or respective staffing agencies) for the services the independent contractors are currently providing. Importantly, neither approach causes any impact on CSSP operations nor will it require you, in your capacity as Claims Administrator and Trustee of the Settlement Trust, to take on any additional responsibilities related to these independent contactors.

This letter summarizes our analysis of the Vendor Markups and also proposes a transition process, if necessary, to have the Settlement Trust contract directly with the independent contractors and/or staffing agencies.  As described below, under the proposed transition process, all human resource, administrative and other management responsibilities related to these independent contactors

---

[1] It appears that some of the independent contractors are being provided by staffing agencies, but the CSSP vendors are directly contracting with independent contractors as well. BP does not know the ratio of independent contractors that are being directly retained versus those being provided through staffing agency agreements.



Mr. Patrick Juneau
June 7, 2013
Page 2

Salans FMC SNR Denton
dentons.com

will remain with the CSSP vendors that currently retain these contractors and the CSSP vendors will be compensated at fair market rates for continuing to perform those responsibilities.

Consistent with your fiduciary obligations as Trustee of the Settlement Trust, we anticipate that you will review the information in this letter and take steps necessary to eliminate any unnecessary Vendor Markups.

I.    CSSP Vendor Markups As Compared to Local Staffing Agency Rates

Based on the billing information you have provided us and our informed estimation of rates available in the market, BG, GCG and P&N appear to include average Vendor Markups of 200% to 231% on their independent contactor employees on top of the rates generally charged by local staffing agencies for those independent contractors.

The chart below summarizes the analysis:

| Vendor | Avg. Rate for Contractor As Billed by CSSP Vendor | Estimated Avg. Contractor Rate Charged by Local Staffing Agency[2] | Estimated CSSP Vendor Markup on top of Local Staffing Agency Rates ($) | Estimated CSSP Vendor Markup on top of Local Staffing Agency Rates (%) |
|---|---|---|---|---|
| BG | | | | 200% |
| GCG (excluding call center)[3] | | | | 219% |
| P&N | | | | 231% |

Based on our review of the billing information, the CSSP vendors do not appear to have any overhead related to these independent contractors and the Vendor Markups represent pure profit for the CSSP vendors (i.e., the Vendor Markup is not offsetting costs related to identifying potential contractors, screening applicants, administrating payroll, etc., which are being incurred by the staffing agencies). Absent some administrative function that CSSP vendors are performing warranting compensation for overhead that they are not already being compensated for, the markup of an independent contractor's rate solely to generate profit is wholly inappropriate under the circumstances.[4]

[2] Estimated actual average rates of independent contractors reflects the average rate of an independent contractor inclusive of the average markup percentages applied by local staffing agencies. The estimated average rates were determined by analyzing the types of positions for each CSSP vendor: low skill level, medium skill level, and high skill level. For each category, an analysis of rates paid to contractors and average markup percentages used by staffing agencies were used to calculate estimated rates.

[3] GCG has also subcontracted APAC Customer Services, Inc. ("APAC") to provide end-to-end resources for the CSSP call center operations (e.g., facility, technology infrastructure, call center staffing, management). GCG is billing the CSSP          per hour for APAC's call center representatives' time, regardless of the call volume. Because a market-based contract should charge $0.55 per minute of live call time, rather than an hourly rate, we address the call center contractors separately below.

[4] If for example, CSSP vendors are directly hiring independent contractors and are not otherwise billing for the administrative time necessary to identify and screen candidates, some Vendor Markup may be appropriate, but only

## II.    Estimated Cost Savings Created By Avoiding the CSSP Vendor Markups

To quantify the estimated opportunity for cost savings, we identified independent contractors employed by the CSSP vendors, projected a future contractor headcount and workload based on current trends, and then calculated future labor costs based on an estimated labor rate stripped of the CSSP Vendor Markup. Based on currently available information, the forecasted estimated cost savings are as follows:[5]

| Vendor | Forecasted Contractor Headcount | Forecasted Monthly Hours | Avg. Rate for Contractor As Billed by CSSP Vendor | Estimated Avg. Contractor Rate Charged by Local Staffing Agency | Monthly Potential Cost Savings[6] |
|---|---|---|---|---|---|
| BG | 1,320 | 180,000 | | | $7,400,000 |
| GCG (excluding call center) | 430 | 54,000 | | | $3,750,000 |
| P&N | 125 | 24,000 | | | $2,060,000 |

Subtotal:    $13,210,000
Estimated Call Center Saving[7]:    $760,000

Total:    $13,970,000

The monthly potential cost savings above only reflect the elimination of the CSSP vendor markups and are not generated by comparing current costs against future projected costs.

## III.    Proposed Process to Eliminate CSSP Vendor Markups By Transitioning Independent Contractors to Contract Directly With The Settlement Trust

### 1.    Establish Team Workflow

The only change to the current organizational structure under this proposed process is that CSSP vendors will assign their respective independent contractor agreements and/or staffing agency agreements to the Settlement Trust. To minimize any impact on the claims processing operation, the CSSP vendors should continue to be responsible for all of the managerial and administrative functions

---

at a commercially reasonable market rate and not the extraordinary Vendor Markups apparently being charged by the vendors today.

[5] BP has requested, but has yet to receive, amounts that vendors pay each contractor. Projected savings could be significantly impacted if there are fewer independent contractors and more employees than estimated, or if the actual rates paid to contractors significantly differ than estimated amounts. Receiving this information will improve the accuracy of our analysis but we do not anticipate that the information will change our conclusions and recommendations.

[6] To be conservative, the Monthly Potential Cost Savings reflected in this column are reduced to account for any negative externalities associated with the transition process.

[7] The APAC contract provided to BP by GCG has redacted pricing information so it is unclear whether GCG is being billed by APAC on an hourly basis or on actual usage basis. If GCG is arbitraging the two pricing structures (i.e., charging CSSP based on hourly rates and paying APAC pursuant to a market-based per-use rate), employing APAC directly would result in an additional $760,000 in monthly savings to the Settlement Trust. In any event, transitioning to a market-based contract would yield significant savings.

they currently perform. This includes, for example, interacting with contractors and/or staffing agencies, interviewing and hiring independent contractors, managing and overseeing contractor performance, managing administrative contracting issues, obtaining detailed timesheets from their respective contractors; preparing reports detailing time and contractor fees (without any Vendor Markup); submitting those reports to your Office for review and payment; maintaining payroll records as necessary, preparing and delivering payroll checks to their respective contractors and/or paying staffing agencies for independent contractors provided though those arrangements. Any new independent contractors hired by any CSSP vendor onto the project will, as a matter of legal technicality, contract with the Settlement Trust. Vendors will continue to be responsible for vetting potential new hires, making hiring decisions and facilitating the completion of all of the necessary paperwork that currently is required as part of the on-boarding process.

Because the CSSP vendors will be retaining all of the managerial and administrative burdens they currently are responsible for servicing, the CSSP vendors should continue to be allowed to bill the CSSP for time necessary to complete those tasks, as they are currently doing.[8] To the extent CSSP vendors have other administrative costs incurred not otherwise compensated through hourly fees (e.g., wire transfers, check stock, check printing and mailing; incremental fees associated with payroll systems, etc.), CSSP vendors should continue to receive reimbursement for those costs. However, we expect those costs to be very limited.

2.      **Confirm Banking Relationships**

The Settlement Trust will be directly contracting with additional entities (i.e., APAC for call center services and possibly some staffing agencies), and those payees will need to be added to the Settlement Trust Administrative Expense Fund. These are relatively minimal adjustments to the current banking structure and should not impose any undue burden on the Settlement Trust or the CSSP vendors.

Because each CSSP vendor will receive funds for their own fees as well as any funds to cover the payroll of the independent contractors retained directly by the CSSP vendor, the Settlement Trust will need to confirm with the CSSP vendors that current banking relationships are sufficient to effectuate the process. By way of example, for ease of accounting, CSSP vendors may prefer separate accounts be established to receive wire transfers for independent contractor payroll. We are glad to assist you with respect to these issues.

3.      **Develop Communications Informing Independent Contractors and/or Staffing Agencies of the Transition**

The Claims Administrator and Settlement Trust will need to inform the independent contractors and/or staffing agencies of the administrative change in the employment and/or retention agreements.

---

[8] For BrownGreer, we estimate total monthly administrative costs to be approximately $94,000. This is based on an estimated six full-time employees allocated to human resources administration                                           and invoice/ payroll administration                                           For Garden City Group, we estimate total monthly administrative costs to be approximately $45,000. This is based on an estimated three full-time employees allocated to human resources administration                                           and invoice/ payroll administration

          For P&N, we estimate total monthly administrative costs to be approximately $29,000. This is based on an estimated two full-time employees allocated to human resources administration
     and invoice/ payroll administration

**DENTONS**

Mr. Patrick Juneau
June 7, 2013
Page 5

Salans FMC SNR Denton
dentons.com

This communication should include a straightforward explanation that the independent contractors' employer will change as a matter of legal technicality, but all other aspects of the existing employment relationship will remain the same. The communication should clearly articulate that the contractors' current supervisors at the respective CSSP vendors shall retain all the same authority they currently possess. To the extent that the independent contractors' contracts or the agency staffing agreements are not assignable, the communication will also need to inform them of the need to terminate their existing agreements with the CSSP vendors and to sign a revised contract amending the name of their employer. We are glad to provide you a proposed template for this communication piece.

### 4. Sign New Contracts / Assign Existing Contracts

We expect that the CSSP vendors will be able to assign contractor and/or agency staffing agreements to the Settlement Trust. If not, the Settlement Trust may need to enter into new agreements with such contractors and/or staffing agencies. Preparing new contracts will not impose an undue burden on the Settlement Trust, and we are glad to assist you in preparing the necessary contracts.

As stated above, this proposal eliminates the excessive Vendor Markups currently being incurred by the Settlement Trust, compensates existing vendors for the administrative and human resource related services they will continue to provide and does not impact the CSSP's operations in any material way. We believe that eliminating these Vender Markups in the manner described in this letter are consistent with the terms of the Settlement Agreement and your fiduciary obligations owed as the Trustee of the Settlement Trust.

If you have any questions regarding this letter or our analysis, we can provide additional details as necessary.

Sincerely,

Keith Moskowitz

# EXHIBIT 12

# Brown Greer and Garden City Group IT Spend through June 2014

| Description | Prior | Q1 2013 | Q2 2013 | Actual Q3 2013 | Q4 2013 | Q1 2014 | Total | Projected Q2 2014 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fees: CSSP | $16,569,956 | $5,371,830 | $5,167,275 | $4,952,095 | $2,359,777 | $2,036,343 | $36,457,276 | $1,963,963 | $38,421,239 |
| Expenses: CSSP | $801,458 | $8,368 | $11,327 | $4,003 | $3,185 | $800 | $829,142 | $0 | $829,142 |
| Fees: GCCF | $1,377,782 | $0 | $0 | $0 | $0 | $0 | $1,377,782 | $0 | $1,377,782 |
| Expenses: GCCF | $250,453 | $0 | $0 | $0 | $0 | $0 | $250,453 | $0 | $250,453 |
| **Total BrownGreer[1]** | **$18,999,649** | **$5,380,198** | **$5,178,602** | **$4,956,098** | **$2,362,962** | **$2,037,143** | **$38,914,652** | **$1,963,963** | **$40,878,615** |
| GCG Fees | $5,769,892 | $1,469,592 | $1,407,583 | $1,098,924 | $1,063,736 | $1,140,322 | $11,950,050 | $1,820,753 | $13,770,803 |
| GCG Expenses | $1,032,389 | $265,684 | $243,631 | $205,839 | $241,693 | $845,456 | $2,834,692 | $260,844 | $3,095,536 |
| **Total GCG[2]** | **$6,802,281** | **$1,735,277** | **$1,651,214** | **$1,304,763** | **$1,305,429** | **$1,985,778** | **$14,784,742** | **$2,081,597** | **$16,866,339** |
| **Total** | **$25,801,930** | **$7,115,475** | **$6,829,817** | **$6,260,861** | **$3,668,391** | **$4,022,921** | **$53,699,394** | **$4,045,560** | **$57,744,954** |

**Footnote:**

[1] The $40.9M in BrownGreer's Information Technology costs were based on: 1) fees associated with information technology titles / tasks obtained from BrownGreer's March 2012 – March 2013 CSSP invoices; 2) fees associated with information technology tasks from April 2013 - May 2014 as obtained from supplemental schedule *V Working Forecast Compared to Last Month.pdf* in the May monthly budget materials; 3) projected June 2014 fees associated information technology tasks as obtained from supplemental schedule *V Working Forecast Compared to Last Month.pdf* in the May monthly budget materials; 4) information technology associated expenses identified in BrownGreer's March 2012 - May 2014 CSSP invoices; and  5) costs that were billed through the GCCF but related to standing up the CSSP facility as obtained from BrownGreer's January 2012 – March 2012 GCCF invoices.

[2] The $16.9M in Garden City Group's Information Technology costs were based on: 1) fees associated with information technology titles / tasks obtained from Garden City Group's April 2012 – May 2014 CSSP invoices; 2) projected June 2014 fees associated information technology tasks as obtained from supplemental schedule V Working Forecast Compared to Last Month.pdf in the May monthly budget materials; and 3) information technology associated expenses identified in Garden City Group's April 2012 - May 2014 CSSP invoices.

# EXHIBIT 13

# DWH 2.0 Project Spend

|  | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 | Total |
|---|---|---|---|---|---|---|
| DWH 2.0 | $424,296 | $5,190,526 | $8,099,479 | $4,468,452 | $1,446,397 | $19,629,149 |

**Footnote:**

[1] Cost information is based on actual and projected costs as obtained from the supplemental schedule *IV. DWH 2.0 ROI.pdf* from the Q4 2014 quarterly budget materials, dated August 1, 2014.

# EXHIBIT 14

# FWA 1.5 & 2.0 Costs

| | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Total |
|---|---|---|---|---|---|---|---|---|
| FWA 1.5 | $59,298 | $201,201 | $223,181 | $92,464 | $92,464 | $39,067 | $0 | $707,675 |
| FWA 2.0 | $0 | $36,376 | $3,633,357 | $561,635 | $574,370 | $495,830 | $362,620 | $5,664,188 |
| **Total FWA** | **$59,298** | **$237,577** | **$3,856,538** | **$654,099** | **$666,834** | **$534,897** | **$362,620** | **$6,371,863** |

**Footnote:**

[1] The FWA costs for June to December 2014 were summed from actual and projected cost information from the supplemental schedule *III. Working Forecast Compared to Last Month.pdf* from the Q4 2014 quarterly budget materials, dated August 1, 2014.

# EXHIBIT 15

## CSSP Administrative Budget

**Monthly Administrative Expenses**

| | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims Administrator's Office** | | | | | | | | | | | | | | | |
| Administrative | | | | | | | $956,622 | $736,143 | $793,301 | $842,896 | $1,817,710 | $710,578 | $701,445 | $728,019 | $778,953 |
| Legal Support | | | | | | | $1,247,708 | $38,234 | $99,137 | $94,445 | $98,108 | $75,843 | $708,719 | $140,051 | $183,380 |
| IT Support (Labor) | | | | | | | | | | | | | | | |
| Carrollton Group: non-2.0 (Labor) | | | | | | | $142,425 | $101,581 | $114,375 | $124,950 | $121,194 | $118,288 | $137,738 | $135,038 | $132,463 |
| BrownGreer - IT (Labor) | | | | | | | $1,891,002 | $1,743,614 | $1,737,215 | $1,853,214 | $1,754,229 | $1,559,832 | $1,715,661 | $1,795,658 | $1,469,520 |
| DWH 2.0 | | | | | | | | | | | | | | | |
| FWA 1.5 | | | | | | | | | | | | | | | |
| FWA 2.0 | | | | | | | | | | | | | | | |
| Audit Support | | | | | | | $197,004 | $187,955 | $353,896 | $247,208 | $189,111 | $166,913 | $259,212 | $210,475 | $217,106 |
| Fraud Support | | | | | | | | | | | | | | | $21,008 |
| **Claims Support - Intake** | | | | | | | | | | | | | | | |
| HUB Enterprises Inc. - Security | | | | | | | $221,443 | $233,856 | $229,847 | $265,115 | $250,092 | $206,247 | $186,261 | $253,232 | $201,403 |
| Garden City Group Inc. - Hammond | | | | | | | | | | | | | | | |
| Labor | | | | | | | $3,718,675 | $2,827,411 | $3,043,394 | $2,659,872 | $2,376,698 | $2,201,911 | $2,258,418 | $2,228,272 | $2,035,364 |
| Expense | | | | | | | $244,769 | $239,225 | $274,879 | $234,691 | $251,728 | $247,650 | $255,497 | $253,547 | $271,398 |
| BrownGreer - CAC (Labor) | | | | | | | $863,853 | $691,817 | $720,176 | $708,084 | $719,941 | $649,666 | $730,880 | $748,316 | $695,862 |
| **Claims Support - Review** | | | | | | | | | | | | | | | |
| Wetlands Title Research Firm (1x active firm) | | | | | | | $71,366 | $52,223 | $40,288 | $38,679 | $39,940 | $46,580 | $51,369 | $48,756 | $37,169 |
| Subsistence Specific Vendors (2x active firms) | | | | | | | $30,462 | $27,178 | $52,480 | $31,847 | $87,868 | $81,401 | $91,636 | $143,801 | $125,498 |
| HUB Enterprises Inc. - Fraud | | | | | | | $215,353 | $214,982 | $254,714 | $300,312 | $266,734 | $268,459 | $377,410 | $347,745 | $456,072 |
| Appeals Panel (x12 active firms) | | | | | | | $59,169 | $67,117 | $104,810 | $248,385 | $574,379 | $507,121 | $492,782 | $421,945 | $512,427 |
| BrownGreer PLC | | | | | | | | | | | | | | | |
| Labor | | | | | | | $13,577,358 | $12,409,938 | $12,657,153 | $13,304,676 | $13,323,367 | $12,028,023 | $12,365,979 | $11,646,203 | $9,285,957 |
| Expense | | | | | | | $373,439 | $343,185 | $366,105 | $373,345 | $401,991 | $350,193 | $350,374 | $341,467 | $311,239 |
| Garden City Group Inc. | | | | | | | | | | | | | | | |
| Labor | | | | | | | $6,353,886 | $4,879,711 | $5,357,735 | $5,527,454 | $5,592,027 | $5,007,045 | $4,789,856 | $4,393,031 | $3,850,578 |
| Expense | | | | | | | $166,765 | $130,345 | $95,859 | $167,142 | $130,379 | $77,852 | $92,491 | $67,276 | ($267,479) |
| PricewaterhouseCoopers LLP | | | | | | | | | | | | | | | |
| Labor | | | | | | | $7,172,155 | $6,998,808 | $6,991,738 | $6,970,744 | $6,802,005 | $6,312,343 | $6,842,234 | $6,943,959 | $7,238,396 |
| Expense | | | | | | | $481,002 | $478,577 | $370,426 | $381,088 | $372,139 | $391,116 | $228,728 | $325,071 | $186,127 |
| Postlethwaite & Netterville APAC | | | | | | | | | | | | | | | |
| Labor | | | | | | | $5,370,426 | $4,643,583 | $5,471,887 | $6,969,433 | $7,621,418 | $8,883,529 | $9,887,805 | $9,618,857 | $8,821,658 |
| Expense | | | | | | | $455,098 | $455,922 | $212,111 | $554,716 | $403,191 | $371,271 | $297,707 | $298,712 | $208,127 |
| **Subtotal** | | | | | | | **$43,809,976** | **$37,501,406** | **$39,341,524** | **$41,897,756** | **$43,194,249** | **$40,261,861** | **$42,822,202** | **$41,089,431** | **$36,772,226** |
| **Supplemental Support** | | | | | | | | | | | | | | | |
| Freeh Group Investigative Services | | | | | | | | | | | | $801,716 | $1,066,646 | $1,461,824 | $1,367,099 |
| McGladrey LLP | | | | | | | | | | | | | | $0 | $0 |
| IBM | | | | | | | | | | | | | | $0 | $0 |
| **Subtotal** | | | | | | | **$0** | **$0** | **$0** | **$0** | **$0** | **$801,716** | **$1,066,646** | **$1,461,824** | **$1,367,099** |
| **Total** | **$37,585,205** | **$37,628,200** | **$38,038,929** | **$51,191,495** | **$43,062,096** | **$38,038,929** | **$43,809,976** | **$37,501,406** | **$39,341,524** | **$41,897,756** | **$43,194,249** | **$41,063,577** | **$43,888,848** | **$42,551,255** | **$38,139,325** |

**Footnote:**
[1] Q3 2012 and Q4 2012 cost information is based on the Cost Detail file maintained by BP, which summarizes the vendor invoices received from the CAO for those periods. Q1 2013 – Q2 2014 cost information is on based actual and projected administrative costs as obtained from the supplemental schedule V Working Forecast Compared to Last Month.pdf from the Q3 2014 quarterly budget materials, dated June 20, 2014.

## CSSP Administrative Budget

**Monthly Administrative Expenses**

| | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Projected Jul-14 | Aug-14 | Sep-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims Administrator's Office** | | | | | | | | | | | | |
| Administrative | $818,100 | $787,986 | $974,429 | $766,900 | $740,586 | $807,266 | $788,252 | $1,846,794 | $793,651 | $781,393 | $792,282 | $802,838 |
| Legal Support | $871,590 | $242,344 | $191,231 | $879,427 | $223,642 | $226,416 | $829,075 | $288,459 | $288,219 | $293,549 | $288,459 | $288,459 |
| **IT Support (Labor)** | | | | | | | | | | | | |
| Carrollton Group: non-2.0 (Labor) | $175,369 | $264,131 | $319,800 | $364,706 | $322,119 | $398,519 | $380,924 | $383,204 | $352,340 | $368,780 | $352,340 | $352,340 |
| BrownGreer - IT (Labor) | $1,058,708 | $660,195 | $640,872 | $740,858 | $679,433 | $616,050 | $640,501 | $603,286 | $714,160 | $679,105 | $702,369 |
| DWH 2.0 | | | | | | $424,297 | $750,402 | $1,072,883 | $3,522,721 | $4,128,176 | $1,645,358 | $1,675,358 |
| FWA 1.5 | | | | | | | | $0 | $221,600 | $221,600 | $93,075 | $93,075 |
| FWA 2.0 | | | | | | | | $0 | $80,600 | $3,840,680 | $671,080 | $392,000 |
| Audit Support | $289,138 | $287,966 | $304,984 | $492,899 | $384,018 | $423,907 | $242,838 | $403,408 | $343,433 | $343,433 | $343,433 | $343,433 |
| Fraud Support | $24,063 | $17,776 | $14,064 | $55,494 | $48,398 | $45,849 | $113,890 | $393,980 | $484,115 | $499,340 | $507,678 | $516,015 |
| **Claims Support - Intake** | | | | | | | | | | | | |
| HUB Enterprises Inc. - Security | $191,235 | $109,051 | $109,142 | $124,058 | $119,935 | $109,258 | $95,820 | $95,252 | $95,736 | $99,623 | $95,465 | $95,465 |
| Garden City Group Inc. - Hammond | | | | | | | | | | | | |
| Labor | $2,356,519 | $2,232,897 | $2,336,877 | $2,076,348 | $2,095,818 | $1,981,334 | $2,084,588 | $2,071,065 | $1,996,065 | $2,058,611 | $1,999,225 | $2,004,660 |
| Expense | $366,255 | $252,777 | $271,964 | $262,335 | $251,434 | $261,459 | $231,564 | $228,596 | $228,656 | $241,072 | $241,132 | $241,192 |
| BrownGreer - CAC (Labor) | $746,441 | $573,648 | $577,277 | $623,655 | $612,831 | $571,502 | $496,451 | $469,551 | $470,198 | $494,569 | $470,132 | $477,096 |
| **Claims Support - Review** | | | | | | | | | | | | |
| Wetlands Title Research Firm (1x active firm) | $51,842 | $25,809 | $24,157 | $40,404 | $49,950 | $33,071 | $42,697 | $42,783 | $42,783 | $44,821 | $42,783 | $42,783 |
| Subsistence Specific Vendors (2x active firms) | $123,800 | $142,450 | $102,845 | $80,321 | $97,778 | $103,204 | $137,243 | $105,833 | $141,093 | $145,616 | $139,093 | $141,093 |
| HUB Enterprises Inc. - Fraud | $594,592 | $665,122 | $685,078 | $748,089 | $891,779 | $1,081,985 | $1,160,933 | $1,243,682 | $1,421,015 | $1,744,503 | $1,771,045 | $1,850,016 |
| Appeals Panel (x12 active firms) | $232,898 | $176,142 | $161,186 | $174,472 | $201,023 | $194,124 | $134,764 | $350,000 | $350,000 | $1,281,202 | $1,522,688 | $1,575,583 |
| BrownGreer PLC | | | | | | | | | | | | |
| Labor | $8,374,322 | $5,784,246 | $5,383,988 | $6,378,873 | $5,790,606 | $5,762,494 | $5,966,142 | $5,747,336 | $5,993,032 | $6,073,506 | $5,552,447 | $5,521,298 |
| Expense | $294,813 | $291,744 | $256,431 | $228,703 | $236,993 | $240,996 | $229,323 | $239,609 | $352,208 | $228,833 | $228,841 | $229,020 |
| Garden City Group Inc. | | | | | | | | | | | | |
| Labor | $4,290,687 | $2,785,349 | $2,473,228 | $2,587,179 | $2,105,100 | $2,397,755 | $2,191,112 | $2,461,239 | $2,509,302 | $2,639,928 | $2,600,447 | $2,616,753 |
| Expense | $64,303 | $114,373 | $75,108 | $72,629 | $112,211 | $630,096 | $30,886 | $64,703 | $59,703 | $57,849 | $71,759 | $63,100 |
| PricewaterhouseCoopers LLP | | | | | | | | | | | | |
| Labor | $6,580,099 | $4,180,971 | $3,651,045 | $5,942,340 | $5,936,974 | $5,713,555 | $5,670,317 | $6,919,920 | $6,919,920 | $7,492,780 | $10,284,952 | $11,564,678 |
| Expense | $216,039 | $68,717 | $49,493 | $183,544 | $286,172 | $133,556 | $317,152 | $375,000 | $375,000 | $400,114 | $544,410 | $613,816 |
| Postlethwaite & Netterville APAC | | | | | | | | | | | | |
| Labor | $9,615,656 | $7,717,197 | $7,162,022 | $6,540,596 | $6,111,533 | $5,786,218 | $6,983,864 | $7,243,985 | $7,231,812 | $8,629,211 | $9,421,850 | $9,488,630 |
| Expense | $140,985 | $147,807 | $162,407 | $157,360 | $126,170 | $169,939 | $134,524 | $166,784 | $161,784 | $179,784 | $179,784 | $179,784 |
| **Subtotal** | **$37,477,454** | **$27,528,698** | **$25,927,628** | **$29,521,190** | **$27,424,503** | **$28,112,850** | **$29,653,260** | **$32,817,352** | **$35,114,092** | **$43,003,133** | **$40,538,863** | **$41,870,854** |
| **Supplemental Support** | | | | | | | | | | | | |
| Freeh Group Investigative Services | $2,177,060 | $2,119,826 | $2,125,387 | $2,370,192 | $3,082,163 | $3,036,042 | $2,846,385 | $3,555,000 | $3,555,000 | $3,555,000 | $3,555,000 | $3,555,000 |
| McGladrey LLP | $196,604 | $888,953 | $1,029,817 | $2,079,699 | $2,476,324 | $2,342,587 | $1,923,429 | $1,009,242 | $262,261 | $867,041 | $1,446,338 | $164,829 |
| IBM | $0 | $224,598 | $468,039 | $487,711 | $553,829 | $187,671 | $4,313 | $50,000 | $0 | $0 | $0 | $0 |
| **Subtotal** | **$2,373,664** | **$3,233,377** | **$3,623,243** | **$4,937,602** | **$6,112,316** | **$5,566,300** | **$4,774,127** | **$4,614,242** | **$3,867,261** | **$4,422,041** | **$5,001,338** | **$3,719,829** |
| **Total** | **$39,851,118** | **$30,762,075** | **$29,550,871** | **$34,458,792** | **$33,536,819** | **$33,679,150** | **$34,427,387** | **$37,431,594** | **$38,981,353** | **$47,425,174** | **$45,540,201** | **$45,590,683** |

**CSSP**
**Monthly Resolved Claims**

| Claim Type[1] | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Economic Loss | 2 | 192 | 501 | 1,032 | 1,331 | 1,095 | 1,769 | 1,684 | 3,131 | 2,205 | 1,989 | 1,937 | 2,805 | 4,061 | 2,321 | 456 | 27 | 149 | 404 | 399 | 268 | 358 | 428 | 385 |
| Coastal Real Property | 109 | 565 | 985 | 2,006 | 2,864 | 1,773 | 2,397 | 2,830 | 2,498 | 2,704 | 2,728 | 2,129 | 1,583 | 1,493 | 1,502 | 1,031 | 863 | 986 | 913 | 1,017 | 718 | 631 | 872 | 1,083 |
| Failed Business Economic Loss | | 35 | 34 | 85 | 76 | 126 | 131 | 157 | 288 | 221 | 191 | 133 | 132 | 121 | 291 | 41 | 5 | 13 | 13 | 5 | 1 | 4 | 9 | 10 |
| Individual Economic Loss | | 555 | 747 | 516 | 775 | 446 | 1,499 | 2,560 | 2,873 | 1,706 | 2,388 | 2,766 | 3,599 | 2,927 | 2,192 | 1,852 | 1,301 | 1,244 | 1,844 | 1,144 | 1,915 | 2,430 | 2,260 | 1,656 |
| IPV or Festival Vendor Economic Loss | | 4 | 11 | | 6 | 3 | 14 | 28 | 63 | 28 | 39 | 22 | 27 | 24 | 3 | 12 | 4 | 1 | 4 | 3 | 0 | 6 | 6 | 0 |
| Real Property Sales | 31 | 64 | 112 | 110 | 138 | 152 | 62 | 60 | 73 | 52 | 65 | 145 | 77 | 65 | 69 | 47 | 27 | 42 | 34 | 38 | 29 | 46 | 48 | 31 |
| Seafood Compensation Program | 1 | 365 | 655 | 1,426 | 1,232 | 730 | 1,089 | 1,289 | 3,953 | 2,567 | 2,399 | 2,545 | 1,576 | 1,095 | 835 | 1,167 | 811 | 530 | 609 | 256 | 130 | 70 | 104 | 212 |
| Start-Up Business Economic Loss | | 10 | 11 | 34 | 69 | 59 | 114 | 177 | 335 | 197 | 162 | 173 | 221 | 245 | 244 | 52 | 1 | 17 | 20 | 45 | 39 | 42 | 32 | 25 |
| Subsistence | | 88 | 69 | 17 | 14 | 15 | 32 | 101 | 326 | 567 | 646 | 467 | 748 | 193 | 503 | 660 | 454 | 389 | 284 | 467 | 407 | 320 | 292 | 709 |
| Vessel Physical Damage | | 1 | 16 | 56 | 68 | 92 | 131 | 74 | 87 | 74 | 122 | 158 | 77 | 100 | 76 | 89 | 40 | 57 | 42 | 43 | 20 | 24 | 25 | 59 |
| VoO Charter Payment | 1,376 | 1,159 | 1,627 | 902 | 576 | 701 | 529 | 447 | 413 | 207 | 170 | 83 | 86 | 57 | 70 | 49 | 39 | 52 | 45 | 51 | 4 | 17 | 18 | 64 |
| Wetlands Real Property | | 14 | 80 | 168 | 292 | 266 | 541 | 338 | 436 | 328 | 366 | 185 | 488 | 179 | 241 | 249 | 107 | 141 | 191 | 237 | 244 | 188 | 503 | 374 |
| **Total** | **1,519** | **3,052** | **4,848** | **6,352** | **7,441** | **5,458** | **8,308** | **9,745** | **14,476** | **10,856** | **11,265** | **10,743** | **11,419** | **10,560** | **8,347** | **5,705** | **3,679** | **3,621** | **4,403** | **3,705** | **3,775** | **4,136** | **4,597** | **4,608** |

**Footnotes:**

[1] Resolved claims information was obtained from the following sources: 1) July 2012 - September 2013 from the [Updated Notice Payment Data] tab in the CAO's Q1 2014 budget model: *20131113 CSSP 1st Quarter Budget Revised.xlsx* ; 2) October 2013 from the *20131204 October 2013 Actual Inputs.xlsx* received from the CAO's October 2013 materials, dated December 4, 2013, *20131204 October 2013 Actual Inputs.xlsx* ; 3) November 2013 - January 2014 from the supplemental schedule associated with the Q2 2014 budget materials; 4) February 2014 - May 2014 from the CAO's monthly budget materials; and 5) June 2014 from the CAO's Q3 2014 budget materials, dated May 2, 2014, *DHECC Q3 2014 Quarterly Budget Presentation.pdf* .

[2] 5th Circuit Hold metrics for BEL claim types were not included as part of calculated determinations used for analyses.

# EXHIBIT 16

# CSSP 2014 Budget

|  | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Total |
|---|---|---|---|---|---|
| Admin Costs[1] | $101,621,888 | $109,555,361 | $127,522,621 | $124,670,090 | $463,369,960 |

**Footnote:**

[1] Cost information is based on actual and projected admin costs as obtained from the supplemental schedule *III. Working Forecast Compared to Last Month.pdf* from the Q4 2014 quarterly budget materials, dated August 1, 2014.

# EXHIBIT 17

## CSSP FTE as of June 2014

| | FTE |
|---|---|
| Claims Adminstrators Office | |
|     Administrative | |
|         CAO Management[1] | 7.0 |
|         CAO Finance[2] | 4.0 |
|         CAO Business Reporting[2] | 7.0 |
|         CAO Admin[2] | 4.0 |
|         The Gagliano Group[1] | 0.9 |
|     Legal Support | |
|         Ray Lamonica[1] | 0.2 |
|         Stanley, Reuter, Ross Thornton & Alford, LLC[1] | 0.5 |
|         Stone Pigman Walther Wittmann LLC[1] | 0.2 |
|         Sessions Fishman[1] | 2.7 |
|     IT Support | |
|         Carrollton Group (with 2.0)[2] | 21.4 |
|         DWH 2.0 - IBM[1] | 14.3 |
|     Audit Support | |
|         CAO Audit[2] | 19.0 |
|         CLA[2] | 0.6 |
|     Fraud Support | |
|         CAO Fraud[2] | 50.0 |
| Operational Support | |
|     Appeals Panel (x12 active firms) | 2.0 |
|     Wetland Title Research Firm (x1 active firm) | |
|         Lugenbuhl, Wheaton, Peck, Rankin & Hubbard[1] | 1.2 |
|     Subsistence Specific Vendors (x2 active firms) | |
|         AMT[2] | 4.2 |
|         Dr. Catherine Champagne[1] | 0.0 |
|         Dr. Peter Katzmarzyk[1] | 0.0 |
|     HUB Enterprises Inc. - Security[2] | 12.0 |
|     HUB Enterprises Inc. - Fraud[2] | 113.2 |
|     BrownGreer PLC[2] | 539.2 |
|     Garden City Group Inc.[2] | 222.0 |
|     PricewaterhouseCoopers LLP[2] | 163.6 |
|     Postlethwaite & Netterville APAC[2] | 259.2 |
| | |
| Supplemental Support | |
|     Freeh Group International Solutions[2] | 38.5 |
|     McGladrey LLP[2] | 23.1 |
|     IBM[2] | 0.1 |
| | |
| **Total** | **1,510.1** |

Footnotes:

[1] FTE information was not available for this vendor in the Q4 2014 budget materials.  As such, assumed FTE were consistent with April 2014 FTE schedule obtained from CAO.

[2] Obtained FTE information from the supplemental schedule III. Working Forecast Compared to Last Month.pdf from the Q4 2014 quarterly budget materials, dated August 1, 2014.

# EXHIBIT 18

# Projected Q3 & Q4 2014 Monthly Administrative Costs

| | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Average |
|---|---|---|---|---|---|---|---|
| Admin Costs[1] | $38,138,512 | $45,832,984 | $43,551,125 | $46,800,007 | $37,540,699 | $40,329,384 | $42,032,119 |

**Footnote:**

[1] The total monthly administrative costs for Q3 & Q4 2014 were summed from projected cost information from the supplemental schedule *III. Working Forecast Compared to Last Month.pdf* from the Q4 2014 quarterly budget materials, dated August 1, 2014.

# EXHIBIT 19

**BrownGreer Monthly Administrative Cost Summary**
**January 2013 - June 2013**

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Average |
|---|---|---|---|---|---|---|---|
| **BrownGreer PLC** | | | | | | | |
| Administrative Overhead & Claims Processing Labor | $13,577,358 | $12,409,938 | $12,657,153 | $13,304,676 | $13,323,367 | $12,028,023 | |
| IT Labor | $1,891,002 | $1,743,614 | $1,737,215 | $1,853,214 | $1,754,229 | $1,559,832 | |
| CAC Labor | $863,853 | $691,817 | $720,176 | $708,084 | $719,941 | $649,666 | |
| Expenses | $373,439 | $343,185 | $366,105 | $373,345 | $401,991 | $350,193 | |
| **Total BrownGreer Administrative Expenses** | **$16,705,650** | **$15,188,553** | **$15,480,648** | **$16,239,319** | **$16,199,528** | **$14,587,714** | **$15,733,569** |

**Footnote:**

[1] Q1 2013 – Q2 2013  BrownGreer cost information is on based actual costs as obtained from the supplemental schedule V Working Forecast Compared to Last Month.pdf from the Q3 2014 quarterly budget materials, dated June 20, 2014.

# EXHIBIT 20



05 August 2013

Mr.Bob Levine

Deepwater Horizon Settlement Program

935 Gravier St

New Orleans, LA 70130

Dear Bob,

We reviewed your July 17, 2013, email (a copy of which is attached) containing the Claims Administrator's proposed 3rd quarter 2013 budget summarily requesting over $130,300,000 to fund administration fees for that period. Given our recent meetings and discussions on claims activity and processes, and recent execution of vendor contracts, we would expect that you provide us with any supporting analysis, metrics or explanatory notes providing any transparency into the budgeting process or justification for the $130,300,000 request. Other than the total amount requested, the email contains only a simple, 13 line chart generally identifying dollar amounts by vendor. As your email recognizes, pursuant to the Settlement Agreement, the Claims Administrator's budget is subject to BP's reasonable approval. Given the absence of whatever supporting analysis, metrics or explanatory notes the Claims Administrator relied upon to create this budget, BP cannot determine if the budget request is reasonable under the circumstances. Furthermore, based upon our review of recent actual claims processing and administration results, which show even further declines in productivity and increases in costs, we continue to have significant concerns about CSSP's poor productivity and excessive costs. It would be unreasonable to approve a budget that validates and incentivizes the various claims administration vendors to perpetuate their track record of poor productivity and excessive costs. Accordingly, we request that the CSSP re-submit its 3rd quarter 2013 budget with appropriate documentation, analysis, metrics and explanatory notes to support each item in the budget request. Upon receipt and review of a re-submitted budget BP will respond with its position pursuant to the terms of the Settlement Agreement.

The CSSP is a multi-billion dollar program with cumulative administrative spend to date in excess of $500 million. The proposed budget does not evidence a systematic, disciplined budgeting process. As examples, BrownGreer is simply budgeted for exactly $15,000,000 each month and Garden City is budgeted for exactly $7,500,000 each month. Moreover, vendor fees have increased in April and May by 7%; vendor expenses have increased in April by 41%; and the proposed budget seeks vendor costs that are an additional 7% over April and May and 14% over March. We have also calculated variances of 2nd quarter actual results in comparison to the 2nd quarter budget provided by the CSSP, which further demonstrates that the CSSP budgeting process is inadequate. As examples, BrownGreer and P&N were collectively in excess of $2 million over budget for the 2nd quarter. There does not appear to be effective management of the vendors, including the apparent absence of repercussions or corrective actions taken to address vendors that fail to meet their respective budgets.

Consistent with what would be expected of a professionally run claims management process, the CSSP needs to implement a systematic and disciplined budgeting process so that the Claims Administrator is able to provide a budget proposal, including detailed buildups of how the

budget is developed in relationship to performance targets and past performance, that allows BP to meaningfully evaluate the proposed budget against actual past performance.[1]

 In order to appropriately budget administrative costs and to drive improved productivities and efficiencies, the CSSP should develop and track the following metrics:

➢ Targeted claim determinations and payments by claim type and by person (e.g. BEL claims per week, per accountant)

➢ Call Center activity and targeted metrics

➢ Targeted throughput analysis for each stage in the claims process, i.e. how long is a claim in each status, how many claims complete each stage per month

➢ Estimated progress of incomplete claims analysis, broken down by type of incomplete, aging of claim, and action items undertaken to resolve

➢ Levels of quality assurance in relation to reasonableness thresholds

➢ Projected fraud detection activity and bases for levels of effort

➢ FTE count by month, location, function (as used by vendor), designation for employee vs. contractor, and claims type

The CSSP should also develop and track the following cost-related metrics:

➢ Fees and expenses broken down by month, vendor, level, location and expense type

➢ Projected staff turnover analyzes including

 • Count of additions, subtractions of employees and contractors

 • Training requirements and costs given projected turnover

 • Projected staffing level and hourly rate changes with justifications/explanatory notes for any changes

The CSSP should further develop and measure productivity in relation to costs using key performance indicators and tie the two sections above (productivity and costs) together to determine overall targeted performance and costs metrics.

 These measures and an increased emphasis on budgeting are all necessary as there does not appear to be meaningful controls over what vendors are accomplishing and how much they are spending in order to accomplish those tasks. As referenced above, the CSSP April and May results show even further declines in productivity and increases in costs. Call center costs are now exceeding $1200 per hour per live calls. Excluding fraud detection, CSSP monthly costs now exceed GCCF monthly costs by approximately $1 million and the proposed budget pushes those CSSP costs even higher.

 Productivity not only remains low, but is further decreasing and the turnover rate appears to be increasing. The number of claims resolved in May fell and was 6% lower than the average of the three prior months; the turnover rate increased 29% in May over the average of the prior three months. The CSSP is now only resolving approximately one claim per week per full-time equivalent (10,000 claims resolved per month by 2200 FTEs).

 BP cannot approve a budget where the request does not transparently reflect the budgeting process, including performance targets that hold vendors accountable along with supporting analyses and metrics, particularly in light of the CSSP's historic performance in exceeding budgets and declining productivity as well as increasing costs that appear abnormally high. The CSSP needs to

---

[1] BP has on several occasions raised the need for the application of Key Performance Indicators ("KPIs") to the claims administration process. Such KPIs are essential to a well run claims operation, including the ability to appropriately budget claims administration costs and manage the claims administration. BP reiterates its request for KPIs.

immediately develop more effective budgeting and performance monitoring in order to run a well-managed operation and prepare credible budgets that hold vendors accountable.

To facilitate our review of future budgetary proposals, we further request a complete data dictionary for the CSSP claims system developed and managed by BrownGreer, including, but not limited to, the following information: (1) System / Database Name; (2) Table Name; (3) Field Name; (4) Field Description; (5) Data Type; (6) Data Length; and Nullable (Yes / No).

We look forward to receiving a new 3rd Quarter 2013 budget in line with our comments above.


Sincerely,

Maria T Travis
Director of Claims - GCRO


Cc:     Mark Holstein
        Dan Cantor
        James Roy
        Patrick Juneau
        David Odom

# EXHIBIT 21

# Resolved BEL Claims per Week Calculation

|  | Low | High |
|---|---|---|
| Resolved BEL Claims: Pre-BEL Injunction[1] | 8,000 | 11,000 |
| Claim Reviewers & Accountants[2] | 1,750 | 1,750 |
| Resolved BEL Claims per Week[3] | 1.1 | 1.6 |

**Footnotes:**

[1] Resolved BEL Claims are based on review of the low and high monthly BEL claims resolutions from January 2013 - September 2013, excluding the one-time spike in resolved claims experienced during March 2013, as obtained from the [Updated Notice Payment Data] tab in the CAO's Q1 2014 budget model: *20131113 CSSP 1st Quarter Budget Revised.xlsx* .

[2] Calculated the number of Claim Reviewers and Accountants based on vendor hours information obtained from the November 2013 vendor invoices.  Estimated full time equivalent employees.

[3] Resolved BEL Claims per Week calculated as follows: Resolved BEL Claims / Claim Reviewers & Accountants / 4 weeks.

# EXHIBIT 22

**BEL Claims Resolved per Claim Reviewer per Week Statistics**

| | Historical | BEL Injunction |
|---|---|---|
| Resolved BEL Claims[1][2] | 25,435 | 2,828 |
| Claim Reviewers & Accountants[3] | 455 | 385 |
| Resolved BEL Claims per Week[4] | 1.6 | 0.2 |

**Footnotes:**

[1] Obtained historical Resolved BEL Claims for the related to January 2013 - September from the [Updated Notice Payment Data] tab in the CAO's Q1 2014 budget model: *20131113 CSSP 1st Quarter Budget Revised.xlsx* .

[2] Obtained Resolved BEL Claims during the BEL Injunction for October 2013 - May 2014 as follows: 1) October 2013 from the *20131204 October 2013 Actual Inputs.xlsx* received from the CAO's October 2013 Actuals email correspondence, dated December 5 ; 2) November 2013 - January 2014 from Q2 2014 supplemental budget materials; and 3) February 2014 - May 2014 from the CAO's monthly budget materials.

[3] Calculated the number of accountant claim reviewers based on hours billed for relevant titles using information obtained from the January 2013 - September 2013 vendor invoices for the historical period and October 2013 - May 2014 for the BEL Injunction period.  Estimated full time equivalent employees.

[4] Resolved BEL Claims per Week calculated as follows: Resolved BEL Claims / Claim Reviewers & Accountants / 4 weeks.

# EXHIBIT 23

**CSSP Accountants Administrative Costs Summary**
**BEL Injunction Period (October 2013 - May 2014)**

| Vendor | Admin Cost Type | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| PWC | Fees | $6,580,099 | $4,180,971 | $3,651,045 | $5,942,340 | $5,936,974 | $5,713,555 | $5,670,317 | $5,753,681 | $43,428,982 |
| PWC | Expenses | $216,039 | $68,717 | $49,493 | $183,544 | $286,172 | $133,556 | $317,152 | $206,771 | $1,461,444 |
| P&N | Fees | $9,615,656 | $7,717,197 | $7,162,022 | $6,540,596 | $6,111,533 | $5,786,218 | $6,983,864 | $6,830,267 | $56,747,353 |
| P&N | Expenses | $140,985 | $147,807 | $162,407 | $157,360 | $126,170 | $169,939 | $134,524 | $130,670 | $1,169,862 |
| **Total[1]** | | **$16,552,779** | **$12,114,692** | **$11,024,967** | **$12,823,840** | **$12,460,849** | **$11,803,268** | **$13,105,855** | **$12,921,389** | **$102,807,639** |

**Footnote:**

[1] PWC and P&N admin costs incurred during the BEL injunction were based on fees and expenses from October 2013, the beginning of the BEL injunction, through May 2014, when the BEL injunction was lifted; as obtained from the supplemental schedule *V Working Forecast Compared to Last Month.pdf* , accompanying the May 2014 monthly budget materials.

# EXHIBIT 24



23 August 2013

Mr. David Odom
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, LA 70130

Dear Mr. Odom,

Pursuant to the Court's August 7, 2013, Order (Dkt. No. 10955), BP is providing its comments to the Court Supervised Settlement Program's ("CSSP") 4th quarter 2013 ("Q4") proposed budget provided to BP on August 16, 2013.[1]  Our response is organized into three parts:  (1) comments regarding the framework of the proposed budget model; (2) comments regarding the proposed budget amounts; and (3) comments regarding the documentation and information provided in support of the proposed budget.

As described in detail below, notwithstanding the improvements in the framework of the proposed budget model, the overall proposed Q4 budget is still excessive.  This appears, in large part, to be due to the willingness of the Claims Administrator's Office ("CAO") to take cost and productivity estimations from the CSSP Vendors, which drive the budget model projections, at face value without any managerial assessment or independent evaluation of the reasonableness of those assumptions and targets.

Since beginning our discussions on August 9, 2013, the CAO's uncritical acceptance of CSSP vendor estimates has led to a lowering of productivity goals.  The proposed Q4 budget now targets, for example, that accountants complete only 1.0 Business Economic Loss ("BEL") claim per accountant, per week.  As discussed below, these seem to be unreasonably low targets. The CAO has indicated that it does not view the budgeting process as a function to drive results  and accordingly, it appears that the CSSP Vendors have provided assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

As a result, we believe an operational review and examination is required, including some analysis of the validity of the CSSP Vendors' assumptions, to allow BP and the CAO some basis to evaluate the reasonableness of the assumptions driving the budget.  Without an operational review and examination and a critical evaluation of these assumptions, even a well-designed budget model does nothing more than replicate CSSP Vendors' own assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

## I. Comments Regarding the Framework of the Proposed Budget Model

The methodology used by the CAO to develop the budget process is improved from the Q3 budget and attempts to estimate future costs based on a predictive model incorporating past experience and purports to link projected levels of tasks with the amount of labor necessary to complete each task. However, to date, the CAO has neither tracked nor required the CSSP Vendors to track sufficiently detailed information regarding productivity and costs at a task level as needed to serve as the input to drive this type of model (e.g., the duration of time that should be required to complete a particular

---

[1] The CAO and BP met on August 21, 2013, to discuss BP's preliminary observations regarding the CAO's August 16 budget proposal. The CAO has subsequently provided additional information that may respond to some, but not all of the issues raised in this letter.

task of the accounting review). In lieu of using actual historical data, the CAO has indicated it will use estimates and assumptions until more reliable data can be generated. While using assumptions as a stop gap until actual data becomes available is not per se unreasonable, here the CAO has simply asked its vendors to provide those assumptions and has done nothing to test those assumptions or estimates or apply standards.

BP has asked for the CAO's supporting documentation for these various assumptions and estimates and understands that the CAO does not possess an analysis necessary to validate the assumptions and estimates being provided by the CSSP Vendors as to the standards. As indicated by the CAO, the Claims Administrator will not "pass judgment" on the data drivers provided by the CSSP Vendors. As a result, the predictive model is driven by, in large part, assumptions and estimates regarding productivity and costs provided to the CAO by the CSSP Vendors. This is particularly concerning given the productivity targets from the Q4 budget, which targets are derived from these assumptions, will set the CSSP Vendors' Key Performance Indicators in the upcoming Task Orders. Hence, an operational review and examination to test all of the assumptions and unsupported cost estimates provided by the CSSP Vendors is necessary to allow BP to fully evaluate the budget.

Additionally, with respect to the mechanical calculations of the budget model, since our last meeting we have confirmed several calculation errors that should be corrected:
    (i)    Using June cost vs. July determination numbers to calculate June productivity:
- Tab [Vendor Time & Cost June], cells P98 – U98

    (ii)    QA Audit Total Required Hours appear to be improperly calculated resulting in fewer hours allocated to the BEL, FBEL, and SUBEL claims than needed based on projected determinations and process duration hours:
- Tab [4wk Past Model], cells AT13:AT35
- Tab [4wk Fwd Model July 2013], cells AT13:AT35
- Tab [8wk Fwd Model Aug. 2013], cells AT13:AT35
- Tab [12wk Fwd Model Sept. 2013], cells AT13:AT35
- Tab [16wk Fwd Model], cells AT13:AT35
- Tab [20wk Fwd Model], cells AT13:AT35
- Tab [24wk Fwd Model], cells AT13:AT35

Additionally, we encountered other formula errors within the model that did not impact the final budget calculation but had an impact on certain variables that were used to assess the budget calculation.
    (iii)    BrownGreer Employer Verification Review Team hours allocated among claim types do not agree to total Employer Verification Review Team hours:
- Tab [June 13 Costs], sum of cells K35:T35 do not foot to cell I35

    (iv)    Garden City Group Document Categorization hours allocated among claim types do not agree to total Document Categorization hours:
- Tab [June 13 Costs], sum of cells K88:T88 do not foot to cell I88

    (v)    Inconsistencies between claim type allocations within hard coded numbers in cell formulas as compared to other claim type allocations within the model:
- Tab [Model Inputs], cells D11:J13 include hard coded numbers, representing claim allocation percentages. The hard coded numbers are not consistent with other claim allocation percentages used within the [Data Request v5] tab, cells M57:O57 and within the [Model Inputs] tab, cells O48, R48, U48, AA48, AD48, AI48, AL48, AO48, AT48, AW48, AZ48, BC48, BF48, BK48, and BN48.

    (vi)    Summary admin costs in Claims Review – Modeling Summary are calculated inconsistently amongst the firms:
- Tab [Model Summary], cell D20 does not flow with the formulas surrounding it.

    (vii)    Discrepancy between admin costs in two different cells:
*   Tab [Vendor Time & Cost June], cells Q90, V90, and AA90 do not agree to the total costs for each vendor within AJ67, AJ82, and AJ92.

    (viii)    Discrepancy between BrownGreer hours FTE Reviewers & Analysts in two different cells:
*   Tab [Vendor Time & Cost June], cell O101 does not agree to cell K64.

    (ix)    Allocation of BrownGreer FTE Reviewers & Analysts by Claim Category does not agree to Total FTE Reviewers & Analysts:
*   Tab [Vendor Time & Cost June], cells P108:U108 do not agree to cell O108.

    (x)    Certain costs appear to have been improperly classified as overhead rather than included within the Reviewer Model:
*   Tab [June 13 Costs], cell B62 appears to have improperly classified this cost as an "O" instead of an "R".

    (xi)  Garden City Group total hours and total dollars exclude Hammond Center Administration and Management:
*   Tab [June 13 Costs], cells F102 and I102 improperly exclude cell references F80 and I80, respectively.

    (xii)  BrownGreer total timekeepers is hard coded and does not equal sum of timekeepers:
*   Tab [Vendor Time & Cost June], cell AG45 is hard coded with 1,187. The sum of timekeepers in cells AG9:AG44 equals 1,414.

Finally, as BP has previously noted, a critical component of evaluating a proposed budget is the ability to compare a projected quarterly budget against past actual performance in an "apples-to-apples" fashion. BP requested that the Q4 budget include a comparison against actual past performance broken out in detail on the same task based level used to generate the Q4 budget. The CAO has indicated that while it agrees that such a request is necessary and appropriate, it did not have time prior to the August 16, 2013 budget submission to perform this analysis. BP again reiterates the need for this critical comparative metric in order to fully review and evaluate the budget.

## II. Comments Regarding the Q4 Proposed Budget Amount

The proposed Q4 budget request of approximately $119,300,000 is excessive and unsupported by the documentation available and provided by the CAO. In particular, BP has the following detailed comments and proposed revisions to the Q4 budget.

### A.   The Line Item "Contingency Fee" Should be Eliminated

The Q4 budget includes a "contingency fee" of nearly $5.7 million. These are unallocated dollars which are not designated for any identifiable task or expense. This represents 5% of the total proposed budget and is, in essence, a projected cost overrun by the CSSP Vendors that the CAO apparently expects to occur, but cannot identify how it will occur. The CAO's explanation that the $5.7 million is needed because of the number of unverified assumptions driving the budget, the complexity of the claims process, and the pace at which the budget has been prepared is insufficient. The 5% fee is applied across the entire Q4 budget, not just the budget items based on assumptions, and includes fixed costs that do not have any unpredictability. Moreover, the assumptions regarding costs and productivity are being set by the CSSP Vendors themselves and likely already include a cushion for the same "uncertainty" the contingency is purportedly being included to cover. Finally, the 5% fee is static across all three months and does not reflect the CAO's stated view that the assumptions will be replaced with more reliable data over the course of the budget quarter.

### B.   The Task Utilization Rate is Too Low

The Q4 budget provides for a task utilization rate of 75%. As explained in the CAO's narrative accompanying its Q4 proposal, "a task that requires ten hours to process, at a seventy-five percent

task utilization rate would, in reality, require around thirteen hours* to complete. (Reviewer Cost Model and Budget Forecast Methodology). Here, the CAO is estimating that every task will take, in reality, 33% longer than it actually should. Moreover, the CAO originally estimated the task utilization rate to be 87.6% for BEL claims in the August 9 version of its model and now, without supporting analysis to justify the change, has reduced the task utilization rate to 75%. This downward revision has a significant impact on the productivity targets and the overall budget. For example, since August 9, the CAO has revised its BEL productivity targets from 5.39 down to 3.48 claims per employee per month. Similarly, productivity targets for accountants have decreased from 1.6 to 1.0 BEL claims per accountant per week, a 37.5% decrease.

BP recognizes that the task utilization rate, in reality, cannot be 100%, but has no ability at this time to assess or propose what a reasonable percentage should be under the circumstances. An operational review and examination, including some analysis of a reasonable utilization rate, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget. Without an operational review and examination, BP has no ability to assess whether the budgeted rate of program efficiency is reasonable under the circumstances.

## C.    There are Process Duration Changes for both BEL and IEL Claims Which are Unsupported

Since our budgeting process began on August 9, the CAO has increased the estimated duration of time to resolve a BEL claim from 32.5 hours to 43.4 hours, while the estimated time to process an IEL claim decreased from 25.1 hours to 13.6 hours. Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors, as the CAO does not possess sufficient historical information to create its own estimates or evaluate the assumptions given to it by its vendors. BP further understands that the CAO has not performed any analysis to assess the validity of the assumptions and estimates being provided by the accounting vendors as to the process duration standards. An operational review and examination including some analysis of the validity of the CSSP Vendors' assumptions regarding process duration is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

This budgeting issue is of particular concern given the Q4 budget takes into account costs resulting from the addition of 100 new accountants to the CSSP. As noted previously, this staffing proposal did not appear to be developed to meet any specific productivity goal and, as we have learned through this budgeting process, the CAO has limited visibility    into the process duration of the accounting function.    In its justification for the addition of 100 accountants, P&N stated its productivity goal for the new accountants was 1.5 reviews per accountant per week, with new accountants achieving this level of productivity within 60 days. In the proposed Q4 budget, the targeted productivity for BEL accountant reviews has dropped to 1.0 review per accountant per week. Accordingly, it is of note that the addition of the 100 new accountants, which must be accounted for in the Q4 budget, corresponds with an estimated decrease in productivity levels for BEL claims which the accountants are responsible for handling.

## D.    Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

Brown Greer's proposed Q4 budget includes $3.9 million for IT costs. We have asked for a detailed breakdown of how the IT budget will be allocated and have only received a high level breakdown that 48% of the budget dollars will be spent on system maintenance and 48% on further system development, with the remainder to smaller tasks. We have requested, but have not received, any further breakdown of these costs including, for example, the list of IT development or maintenance tasks included in the estimate. Without these detailed breakdowns, these costs continue to appear excessive, particularly at this stage in the program (i.e., heavy development related IT costs should already have been incurred) and BP has no ability to evaluate their necessity. An operational review and examination, including some analysis of the continuing IT needs of the program, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

### E. Primary and Secondary Handling Rate Assumptions are Not Calculated at Current Rates

The Q4 budget uses February 2013 percentages for estimating the number of claims that will undergo claims processing for certain steps rather than current monthly percentages. BP recommends the most recent data be used in the budgeting process.

### F. The Budget Appears to Incorporate Excessive Labor Rates

BrownGreer and Garden City Group collectively hired more than one thousand independent contractor employees to work at the CSSP, marked-up these labor costs, and passed them through to the CSSP and Settlement Trust. BP has requested, but has not received, information regarding the markups actually being charged by BrownGreer and Garden City Group so that it can evaluate whether those markups are excessive. Based upon BP's review of independent contractor rates available in the market, the independent contractor rates appear excessive. As stated previously, BP does not believe it is appropriate to pass through unreasonable markups to the CSSP and Settlement Trust on dedicated labor acquired specifically to work on the program, and these costs should not be included in the Q4 budget. Both BrownGreer and Garden City Group have actively converted contractors to company employees preserving these apparently excessive markups for these converted employees.

With respect to employee labor rates, the assumptions built into the Q4 budget related to rate and level changes of employees are not disclosed or explained, making it difficult to understand the driving factor behind these assumptions.

### G. The Budget Incorporates Excessive Levels of Accountant Travel Expenses

The budget includes unreasonable and unnecessary travel fees related to having large numbers of accountants travel to New Orleans when there is no need for the vast majority of them to be physically present in New Orleans to accomplish their tasks. For example, PwC accountants perform the same work from other non-travel locations (e.g., San Francisco) without traveling to New Orleans. BP does not believe that it is appropriate to include these unreasonable and unnecessary travel fees in the budget.

### H. The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience.

The proposed Q4 budget allocates approximately $1.9 million to the BrownGreer Claimant Communication Center ("CCC"). According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (Tab "BG CCC Budget"). However, according to BG Weekly Status Report #40, August 12, 2013, Table 27B, the average call time for the CCC is 6.9 minutes. No justification has been provided to explain why the budget should include projected activity exceeding four times the current activity levels and the estimated call time should be reduced accordingly.

Similarly, the proposed Q4 budget allocates approximately $1 million to the GCG call center. According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (GCG Outreach Model Assumpt.). However, according to email correspondence from Kirk Fisher dated August 22, 2013, in response to BP's questions on the average call time, the average GCG call center call is 10 minutes. Again, no justification has been provided to explain the dramatic increase in estimate call times.

The proposed budget allocation for both the BrownGreer and Garden City call centers appear inflated by significantly overestimated activity and should be reduced accordingly.

The GCG budget also includes approximately $600,000 for Payment Outreach to class members who have received an Eligibility Notice but have yet to respond to the CSSP. Notwithstanding the issue of whether this process is required under the terms of the Settlement Agreement, this amount is based on an estimate provided by GCG, and no support has been provided as to the number of calls,

average time per call, or hours spent performing this task. This budget item requires additional detailed supporting documentation.

**I.     The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive.**

Of the total hours attributed to the BrownGreer CCC in the Q4 budget, no explanation is provided for approximately 33% of the total hours, which presumably are management-related hours. Similarly, the GCG call center budget assumes that 49% of the overall budget is attributable to management costs. For experienced call center teams, these percentages are excessive and the budget should be reduced accordingly.

**J.     The Proposed Budget Does Not Adequately Address Impact of Policy Holds**

The Q4 budget does not account for the policy hold on the subsistence review claims, nor is there any explanation of whether current reviews are placed on hold until policy hold issues are resolved. It was stated to us that the CAO relies on recommendations from vendors about whether current reviews should be suspended until policy hold issues are resolved. No review processes are planned to be suspended in the Q4 budget. At a minimum, the effect that a policy hold would have on actual and budgeted performance should be evaluated and disclosed. During a policy hold, vendors should not be left without direction to continue performing work that may need to be redone or revised as a result of the policy resolution. To the extent the subsistence policy has to be revised or replaced based on the current investigation of corruption at the CSSP, the CSSP may need to re-perform the subsistence reviews. Accordingly, the CSSP's hold should extend to the review of subsistence claims until the conclusion of the corruptions investigations. The Q4 budget should be revised to reflect such a broader hold.

**K.     The Budget Appears to Double Count Costs of Claim Review Time Spent By BrownGreer Employees Located at Client Assistance Centers ("CAC")**

The CAO has indicated that BrownGreer employees located at CACs are cross-trained to perform claims review tasks in addition to their CAC related tasks. The proposed Q4 budget includes $5.4 million for the costs of running the CACs and, while the supporting budget material indicates that the $5.4 million only includes cost for CAC related tasks, the actual data suggests the non-CAC related costs have not been backed out of the calculation.

The "CAC Modeling Assumptions Tab" calculates a cost per visit of $107.71 and explains in footnote 1 that CAC reviewer costs are not included in the calculation. However, the support provided for the $5.4 million budget shows that number is calculated using an average cost per visit of $295.02. (Tab "BG CAC Budget"). Presumably the difference between the two average costs per visit is due to the latter including both the costs of claims review tasks and CAC related tasks in developing the average.

Finally, with respect to fixed costs associated with CACs, it is not clear where the approximately $110,000 per month in rent is included in the proposed Q4 budget. Additionally, we would recommend that the final narratives supporting the Q4 budget include any relevant discussion regarding the analysis for closing any CACs during Q4. Such an analysis would include the number of visits at each center, the fixed costs of each center, the geographic proximity of visitors to the center, the proximity of adjacent centers, and the cost/benefit of early lease termination, among other things.

**L.     There are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis**

The Garden City Group File Audit Process, budgeted for $2.4 million in Q4, appears to be an unnecessary use of resources and adds great expense to the Q4 budget without reason. The impetus for this process is to convert claim information submitted to the GCCF by Class Members into the CSSP for use in processing their CSSP claim. However, these conversions are being performed on all GCCF claims, regardless of whether or not the claimant has filed a CSSP claim. This step is unnecessary, and results in work being performed on claims that will never be filed in the CSSP. In addition, it is believed that currently less than 1,000 CSSP claims per month are being filed

by previous GCCF claimants. As a result, the budget for this activity should be reduced to provide only for the conversion of newly filed CSSP claims.

The BrownGreer budget includes $6.4 million for administrative costs. The support for this cost is based on the amount spent in June, with an assumed reduction to the overall level occurring during Q4. As a result, no support can be provided for precisely where these budgeted amounts will be spent. For example, some of the tasks in June are based on claims volume and activity, while others are fixed in nature. The CAO stated that it is up to the vendors to determine where these costs will be allocated in Q4. However, no allocation has been provided, preventing an evaluation of this item in the budget.

## III. Comments Regarding the Documentation and Information Supporting the Proposed Budget

As previously mentioned, the budgeted amounts for many areas in the Q4 budget are not supported by anything other than an extrapolation of historical costs. Moreover, the historical costs of the facility have not been tracked in sufficient detail for all Vendors in order to support the budgeted amounts, as cost and productivity levels at each task level is not tracked. In order to support future budgeted amounts, the CAO should require vendors to provide this appropriate level of detail on a monthly basis.

On a quarterly basis, BP should be provided with the following documentation to support future budgets: (i) budgeted amounts by Vendor/CAO by month; (ii) supporting narratives; (iii) a utilization model for the three month period, without any locked cells; (iv) a supporting analysis of non-model driven variable costs; (v) a supporting analysis of fixed costs; (vi) a current BrownGreer/Garden City Group weekly reporting package; (vii) historical performance of utilization model/metrics; (viii) vendor KPI metrics and proposed vendor Task Orders for the quarter; (ix) a current organizational chart, showing headcounts at each level correlated to the vendor invoices and task level; (x) an analysis of projected turnover, hiring and training costs; (xi) current settlement projections showing projections of claims forecast and claims through the life of the program; (xii) analysis supporting the hours needed to perform each task by process by claim type for each vendor; and (xiii) a listing of service levels for each function within the Program by vendor (including administrative Program levels managed by the CAO).

In addition to the quarterly budget supporting documentation, BP should be provided with the following supporting documentation on a monthly basis: (i) current invoices from each vendor; (ii) BrownGreer/Garden City Group invoices broken down into the same categories shown on the organizational chart and task level, with time entries broken down by time spent on claim activity, travel, training and other "off-task" time; (iii) P&N/PWC invoices broken down into the same categories of organizational chart and task level with time entries separated between time spent on travel, claim resolution, training and other "off-task" time, and further separated for time spent on each individual claim, including an identification of the claim number worked; (iv) a comparison of actual costs to budget costs at the same level of detail provided in quarterly budget; (v) a supporting narrative with discussion of variances to budget and highlights of efficiency initiatives (both procedural and systems initiatives); (vi) a utilization model comparing actual to budgeted performance for the month, including a breakdown of performance for each vendor's portion of the model; (vii) supporting analysis of performance of non-model variable costs; (viii) current BrownGreer/Garden City Group weekly reports; (ix) an analysis of turnover, hiring and training costs for the month; (x) an analysis of changes to billing levels and rates of all employees of all vendors; (xi) additional data/analysis as may be determined once complete data dictionary is received and reviewed by BP; (xii) copies of any internal audit/quality assurance reports issued during the month; (xiii) copies of the invoice audit results performed by the CAO; and (xiv) any changes in existing service levels or service levels for new activities, agreed to by the CAO with the vendors.

For any identified variances, the variance analysis should include an analysis of the variances, the cause for the variance, action items to address the variance (if the variance is unfavorable), and any impact those results have on future budgets.

We are happy to discuss any of our comments and recommendations with the CAO in advance of its final proposed Q4 budget.

Sincerely,

Maria Travis
Director of Claims - GCRO

80083462

Cc:    Mark Holstein

        Keith Moskowitz

        Kirk Fisher

        Patrick Juneau

        Bob Levine

# EXHIBIT 25

# EXHIBIT A

## BP's Minimum Proposed Revisions to 2013 Fourth Quarter Budget
### Submitted at September 4, 2013 Panel Meeting

On August 16, 2013, the Claims Administrator's Office ("CAO") submitted its initial 2013 fourth quarter ("Q4") budget, which totalled over $119,000,000. On August 23, BP sent the CAO a letter indicating that the initial Q4 budget was unreasonable and excessive under the circumstances and provided detailed comments and proposed revisions to the budget proposal.

The CAO submitted a revised Q4 budget on August 28 totalling over $131,000,000.

BP maintains the Q4 budget is excessive and unreasonable for all of the reasons identified in its August 23 letter.[1] In particular, the budget relies on untested assumptions and contains unsubstantiated costs that BP cannot reasonably evaluate without a thorough operational review and examination (as BP is entitled to pursuant to the Settlement Agreement, the Settlement Trust, the CSSP contracts, and applicable law) including an analysis of the validity of the CSSP Vendors' assumptions. Notwithstanding this lack of information, BP has identified specific revisions to the Q4 budget as detailed in the following table.

|  | Minimum Required Q4 Budget Revisions | Estimated Cost Impact on Q4 Budget |
|---|---|---|
| 1. | *Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims* | ($11.14)M |
| 2. | *Increase BEL accountant productivity* [2] | ($12.97)M |
| 3 | *Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog* [3] | ($8.55)M |
| 4. | *Adjust task utilization rate for non-BEL claim types to* | ($1.31)M |

---

[1] BP recognizes that the CAO appears to have corrected the double counting of claim review time spent by BrownGreer employees located at Client Assistance Centers, as well as other calculation errors BP had identified.
[2] Determining an appropriate productivity target requires an operational review and examination. BP requests the budget be reduced immediately to reflect the only target that has been presented by the Vendor's themselves -- 1.5 BEL determinations per accountant per week. (June 4, 2013 P&N Memorandum to P. Juneau regarding "BP Requested 'Performance Study -- BEL Claims/Accounting Costs'".) BP maintains its position that the BEL claims determinations process is inefficient and does not make any representations that the target of 1.5 BEL claim determinations per accountant per week is a reasonable target. This calculation was achieved by reducing the accountant hours in the process duration calculation to 28.3 for BEL claims, although other assumptions could be also be changed to achieve this productivity level.
[3] The current model projects 205 FTEs for Seafood determinations. Based on the projected Seafood claim submittals and Q3 determinations, all Seafood claims are projected to be resolved prior to the start of Q4. The estimated cost reduction leaves residual costs for estimated re-reviews, reconsiderations, and trailing incomplete responses. The tab [Measured Page] erroneously projects determinations in excess of remaining seafood claims throughout Q4, resulting in an overstatement of required claim reviewer hours.

| | equal BEL claim utilization rate[4] (after the impact of revision 3) | |
|---|---|---|
| 5. | Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims | ($1.26)M |
| 6. | Eliminate Brown Greer IT development spending until further requested information is provided [5] | ($1.95)M |
| 7. | Adjust BG and GCG call center staffing levels based on 10 minute call duration[6] | ($2.01)M |
| 8. | Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after the impact of revision 3 and 4)[7] | ($1.25)M |
| 9. | Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[8] and calculate off reduced proposed budget amounts | ($5.23)M |
| 10 | Reduce labor rates to address the unknown and undisclosed mark-ups[9] | Unquantifiable because the Vendors refuse to disclose amount of mark-ups |
| 11 | Reduce BG administrative budget[10] | Unquantifiable |

---

[4] BP maintains its position that even an 80% task utilization rate is too low and an operational review and examination is required to determine an appropriate task utilization rate. The task utilization rate of 75% for non-BEL claim types is inconsistent with the BEL utilization rate of 80.1%. The proposed adjustment is supported by a best practice of maintaining consistency within the model unless specific data supports an alternative assumption. The estimated reduction represents the non-duplicative impact of the task utilization rate adjustment after the hours related to Seafood claim review are removed from the CAO's model.

[5] As explained in previous correspondence and meetings with the CSSP, BP does not have enough information to determine if these IT costs are necessary. BP will provide funding for BrownGreer IT development spending subject to (1) BrownGreer and/or the CSSP providing project-level budgets; (2) review and approval of those project-level budgets by Chris Reade of the CAO; and (3) BP's rights to review and consent to the project-level budgets under the Settlement Agreement.

[6] The CAO's written response from 8/28 confirms that average call duration is 10 minutes; however the model fails to adjust the optimal staffing needs based on the new call duration assumptions.

[7] The model establishes that GCG administrative costs generally run between 15% and 18% of labor costs; however, the administrative cost projections are calculated off of Q2 actual labor costs as opposed to projected Q4 labor costs. The estimated reduction corrects for the calculation error and accounts for further reductions resulting from additional labor cost reductions identified in proposals 3 and 4.

[8] The contingency fee calculation in the 8/28 Q4 budget contains a formula error in cells K42 and M42 of tab [Q4 CSSP], resulting in the inclusion of additional fixed costs in the calculation.

[9] See June 9, 2013Letter from K. Moskowitz to P. Juneau.

[10] The administrative budget is forecasted as a percentage of reviewer costs. As a result, a detailed description of these activities is not available. BP will provide funding BG Administrative costs subject to (1) BrownGreer and/or

These revisions amount to a total budget reduction of at least $45,600,000, resulting in a Q4 budget of no more than $85,600,000. BP believes that an operational review and examination will reveal further opportunities for budget reductions, while retaining or improving efficiency levels within the CSSP.

the CSSP providing task level budgets and (2) BP's rights to review and consent to the task-level budgets under the Settlement Agreement.

# EXHIBIT 26



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

August 28, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of your August 23rd letter responding to the CAO's initial Q4 2013 budget forecast submittal. In your letter, you list several concerns raised by BP regarding the budget process, some of which had already been addressed by the CAO at the time of your letter (BP's August 23rd Budget Response, 1 n.1). The CAO has since worked diligently to ensure that all of your comments in the August 23rd letter have been addressed in this final budget forecast and supporting documentation.

Before we address each of your comments from the August 23rd letter, I would like to restate the constraints on the development of our model. First, as per the directive of the Claims Administrator, we have developed our budget with the constraint that there will be no increase in the backlog of claims that will receive final determination notice. In other words, our staffing levels within the model are adequate to process to final notice all claims that the Program is projected to receive on a daily basis over the next quarter. With this assumption, you will note that our model indicates that we need an additional 99 accounting Full Time Equivalents (FTEs) to maintain the current claim volumes and to prevent backlog from increasing. Conversely, the

model shows that we are overstaffed in other areas, such as non-BEL analysts and reviewers, and therefore, we have a planned reduction in the budget forecast in these specific areas.

Secondly, as noted in your letter, the Claims Administrator's Office is largely dependent on Vendor-provided and historical data as inputs into the model, including task durations and other information. The CAO acknowledges that an increased level of effort is needed to complete the necessary studies and analyses, such as time and motion studies, as a next step to gathering additional data for the model. Within the time constraints of this budget request, there is simply not enough time to conduct the necessary studies and additional data collection. Therefore, Vendor-provided and historical data are necessary to complete the model. With this in mind, we see the budget process as a collaborative, continuously improving process whereby BP and the Plaintiffs' Steering Committee are able to work with the CAO to continue to develop an accurate, data driven budget forecast model incorporating new data as it becomes available.

Also note, in order to maintain full transparency, we have provided minutes for the August 9th, August 14th, and August 21st meetings conducted for the purpose of discussing our budget model and methodology. In our August 12th and August 15th letters, we asked that you provide any comments as to these minutes to ensure that we both have an accurate recollection of the meetings. Again, at our August 21st meeting, we asked that you review the minutes from those two meetings and provide feedback so that we could finalize those minutes. In that meeting, you stated that you would prefer to provide BP's comments the following day. As of this date, we have still not received any comments as to your understanding of the meetings in accordance with the minutes. We have attached the minutes for the August 9th, 14th, and 21st meetings as Exhibit A and ask that you provide BP's detailed comments as to your view of the accuracy of those minutes.

Our responses to each of your comments in the August 23rd letter are as follows:

## I. Comments Regarding the Framework of the Proposed Budget Model

As the CAO has stated and BP has reaffirmed in its response to the Q4 budget proposed on August 16th, certain assumptions were required in order to project future expenses. For some of these assumptions, it was necessary for the CAO to rely on data provided by the CSSP Vendors. BP has duly noted that the CAO does not currently possess the analysis necessary to validate the estimates provided by the CSSP Vendors. Nonetheless, the CAO has asked for additional information on the assumptions that were made. In response, Postlethwaite & Netterville has provided support for the claims review duration estimates; BrownGreer has provided support for the estimated decrease in Information Technology (IT) labor hours and for the elimination of the second reviewer shift; PricewaterhouseCoopers has provided support for its decrease in travel expense; and Garden City Group has provided support for the average call time and File Audit reduction. An example of this additional support is included as Exhibit B – Postlethwaite & Netterville Estimated Effort Memo.

With the understanding that future budget forecasts will require a more in depth analysis than the CAO has been able to perform in this abbreviated budget revision process, the CAO will be tracking the crucial data necessary to minimize the aforementioned assumptions. This data, in conjunction with time and motion studies, will provide the CAO with the resources necessary to validate, modify, or reduce the CSSP Vendor provided assumptions.

Additionally, as previously noted, the CAO adapted the pre-existing utilization model to be used as a budget forecast model. In performing this task on such a limited time frame, a small number of model miscodings occurred as disclosed in our August 21st meeting and as stated again in your August 23rd letter. These miscodings have been corrected by the CAO, and these

August 28, 2013
Page 4

model changes are reflected in the change log attached as Exhibit C – Budget Forecast Model Change Log.

Lastly, BP's response notes that a critical component of the budget is a comparison of actual past performance to the proposed Q4 budget. In formulating this comparison, the CAO has compared July's actual hours and labor cost to the fourth quarter projected hours and labor cost. As previously mentioned, the primary foundation for the proposed budget is the reviewer utilization model, which has been developed to project staffing levels required to combat backlog growth. As such, the comparison of actual performance to budgeted performance results in variances for each of the four Vendors. This additional support is included as Exhibit D – Fourth Quarter Labor Modeling Summary.

## II. Comments Regarding the Q4 Proposed Budget Amount

### A. The Line Item "Contingency Fee" Should Be Eliminated

Over the past weeks, the CAO's confidence level pertaining to the accuracy of the budget model has vastly increased. For the Q4 budget, the 5% contingency fee will be applied to only variable costs within the Program and will not be applied to fixed costs. Due to the budget submission time constraints that do not provide sufficient time to gather all historical data and perform time and motion studies to review and examine the Vendor assumptions, the CAO maintains that a 5% contingency fee for variable components of the Program is appropriate. After applying all of the recent modifications and corrections to the budget model, the contingency fee for only variable costs results in a change in the contingency fee from $6,260,737 to $6,022,783, a reduction of $237,954. As more data is obtained and as time and motion studies are performed to review the Vendor-provided assumptions, the CAO's confidence

in the ability of the model to accurately forecast the budget will further increase, and the CAO anticipates that, as a result, the contingency fee will decrease for the Q1 2014 budget.

Keep in mind that a contingency fee is just that—a contingency. It does not imply that the actual fee will be expended. It merely provides a contingency in the case that an unforeseeable event occurs, such as an unanticipated spike in claims, which, in conjunction with our constraint to prevent an increase in the backlog of claims that will receive final determination notice, would require additional labor hours (straight time overtime) to process the additional claims.

## B. The Task Utilization Rate is Too Low

The CAO incorporated a Task Utilization Rate to accommodate the complicated nature of reviewing claims that are, to a large extent, incomplete for several review iterations. Because of the high level of incompleteness, claim reviewers must educate themselves on work that has been performed to date by evaluating the claimant file; reviewing and validating previously entered values; and discussing work with previous reviewers. All of this leads to time dedicated to the review process that occurs outside the window of when a claim is checked out for review, resulting in a lower Task Utilization Rate.

The CAO, however, takes note of BP's assertion that the 75 percent Task Utilization Rate[1] is too low, particularly for some claim categories that experience fewer incomplete claims and are less arduous to review. In the time between the Q4 budget submission and the Q1 budget submission, our team will perform an in depth operation review and examination; create a more sophisticated measurement for current task utilization rates; work closely with the Vendors

---

[1] It should be noted that for Business Economic Loss claims, Start-Up Business Economic Loss claims, and Failed Business Economic Loss claims, the CAO used a Task Utilization Rate of 80.12%. This figure is a blended rate calculated using the task utilization information provided by Postlethwaite & Netterville and PricewaterhouseCoopers.

to define target Task Utilization Rates for each claim category and design programs to achieve those rates; and develop scorecards to measure success against objectives.

## C. There Are Process Duration Changes for Both BEL and IEL Claims Which Are Unsupported

In the response to the Q4 2013 budget, BP states "Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors…" At the time of the initial budget submission on August 16th, the CAO did not possess the raw data necessary to perform such an analysis. Since the original submission, this data has been obtained, and a complete duration analysis has been performed on the average time required to generate each of the following notices for each of the 12 claim types: Eligible Claims, Closed/Denied, Incompleteness Denial, and Withdrawn/Opt Out.[2]

It is relevant to note that the Q4 budget forecast does not arbitrarily choose a number of FTEs with which to populate the model. The Q4 2013 budget model forecasts that, given the current rate of claims processing and the projected number of claims filed over the next quarter, 99 additional accountant FTEs will be necessary in order to combat increasing backlog, which has been the goal of the CAO from the beginning of the Program. As previously stated, the chief model constraint is to prevent the increase of the backlog of claims that go to final determination notice. As such, our staffing levels in the model are determined to meet this constraint and achieve a final budget forecast number.

BP also raises a concern as to an unexplained decrease in accountant reviews per week for BEL Claims. There is a valid reason for the decrease in reviews per week based on the way

---

[2] For a complete description of the Modeling Duration process and an analysis of the results, please reference the attached "Reviewer Costs Model" and "Reviewer Cost Model and Budget Forecast Methodology" narrative.

claims were selected earlier in the process in order to ramp up processing and demonstrate awards prior to the fairness hearing. In this early stage, claims that were complete, in Zone A, and were not subject to complex policy issues were selected. As the Program matured and claims were processed on a FIFO basis, a larger percentage of claims is subject to various issues which in turn slow down claim processing. With incomplete claims, the Program Accountants are now required to contact claimants in order to request additional information. Also, many claims are in Zones other than Zone A, which has presumed causation, and thus require significantly more time to process. Lastly, at the beginning of the Program, intricate and complex claims that were identified as having outstanding policy questions were placed on hold. As the Program has matured and hundreds of policies have been adopted to process these intricate and complex claims, the Program accountants must now not only process these complex claims, but also ensure that each claim review complies with the established Program policies. Program complexities such as these, rather than a decrease in reviewer productivity, are the reason that claim review times are increasing.

## D. Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

BrownGreer (BG) has provided a list of development and maintenance tasks for which the IT portion of the Q4 budget will be used. This list is attached as Exhibit E. However, the CAO notes that, given the time constraints of the budgeting process, an estimation of specific costs resulting from each programming task was not available from BrownGreer at the time of the Q4 budget submittal. The CAO has requested this information from the Vendor and, for future budget submittals, will include estimates of IT project costs that will tie to the IT budget. In the current budget forecast for the fourth quarter, the CAO utilized the labor assumptions provided by BG, resulting in a 24% reduction in IT costs.

## E. Primary and Secondary Handling Rate Assumptions Are Not Calculated at Current Rates

The CAO recognizes that, given the rapid pace with which the CAO was required to revise the budget forecast model, the initially proposed Q4 2013 budget secondary handling rate (i.e. re-reviews, reconsideration, and appeals) was based upon February statistics. Since the submission of the initially proposed budget, the CAO has updated all secondary review statistics as of August 21, 2013. These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

## F. The Budget Appears to Incorporate Excessive Labor Rates

As the CAO previously stated in its July 1st Letter to Judge Barbier, contracts have been established with the Vendors whereby the Vendors charge the regular bill rate for contract labor employees (also known as 1099 employees). Neither the CAO nor the Vendors were notified by BP prior to contract execution that BP would prefer for these contract labor costs to be passed through similar to Other Direct Costs (ODCs). With these Contracts already executed with each Vendor, the CAO simply cannot request these contract labor rates and that these costs be passed through as with other ODCs. BP was involved in every step of the Vendor contract negotiations, which included onsite meetings with the Vendors. In those meetings, which were the proper forums for such discussions, BP should have raised its concerns, which could have been part of the final negotiations prior to contract execution.

## G. The Budget Incorporates Excessive Levels of Accountant Travel Expenses

As a result of ongoing discussions with PricewaterhouseCoopers (PwC), the CAO and PwC have agreed that the number of accountants traveling to the New Orleans office will progressively decrease each month within the fourth quarter. The CAO has obtained monthly

estimated travel expenses from PwC, which it has incorporated into the Q4 budget forecast.

PwC's plan for decreasing its travel expenses over the fourth quarter is included in Exhibit F.

## H. The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience

Because of the time constraints placed on the budget revision process set forth by the

Court Order, call times presented in the initially proposed Q4 2013 budget were based on

previously provided Vendor assumptions. Since the submission of the initially proposed budget,

the CAO has received updated information on the CCC average call time and the Call Center

average call time, both of which have been budgeted at 10 minutes each (8 minute call time and

2 minute wrap up time). These model changes are reflected in Exhibit C – Budget Forecast

Model Change Log.

The CAO also disagrees with BP's assertion that the labor cost of the GCG Payment

Outreach is an assumption provided by the Vendors. The July actual labor hours and costs were

used as the basis for determining the Q4 budget. With only one full month of data available at

the time of the budget creation, the CAO made the assumption that the labor hours and cost

would remain constant throughout the fourth quarter.

## I. The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive

The Q4 2013 budget is, in the opinion of the CAO, not excessive and reflects

BrownGreer's CCC management costs as 22% of total cost. BrownGreer includes one senior

counsel and seven special counsel employees under its management umbrella. These managers

are responsible for overseeing 65 callers, making the staff to management ratio approximately

8:1. Similarly, the current Garden City Group call center ratio of operators to floor supervisors is

10:1. However, the Garden City Group budgeted call center managerial cost figure includes crisis managers, quality assurance personnel, and telecom support which results in a higher managerial cost.

## J. The Proposed Budget Does Not Adequately Address Impact of Policy Holds

As the CAO has previously stated, it relies on Vendor recommendations to determine whether reviews should be suspended for claims on hold that currently have a pending policy decision. In regards to the current Subsistence hold, the Vendor recommended, and the CAO agreed that, by continuing to process claims, value is still being added to the Subsistence review process. While this value cannot currently be measured, claim reviewers are presently performing tasks that are essential to every Subsistence claim, regardless of pending policy outcome, which will ultimately assist in resolving the existing backlog of 23,000 claims. In regards to projecting the effect a policy hold has on actual and budgeted performance, the CAO does not possess the ability to identify newly proposed and amended policies or the number of claims that will fall within the policy hold parameters for the projected quarter when it is required to submit the budget sixty days in advance of the quarter's commencement. Furthermore, too many external variables exist (e.g. the number of claims that fall within the policy hold parameters, the policy decision date, and ultimately the policy decision) for the CAO to accurately project when the value added for processing policy hold claims will be observed.

## K. The Budget Appears to Double Count Costs of Claim Review Time Spent by BrownGreer Employees Located at Claimant Assistance Centers (CACs)

The CAO recognizes that, due to the limited time constraints of the Court Order budget process, the initially proposed Q4 2013 budget inadvertently included "costs of claim review time spent by BrownGreer Employees" located at Claimant Assistance Centers (CACs) in the

CAC Visitor-Specific Cost Model as well as in the Reviewer Cost Model, as indicated in BP's August 23rd letter. The CAC Visitor-Specific Model has since been revised to only include visitor-specific costs. The remaining portion of total CAC hours incurred that are not specific to claimant assistance are only included at the reviewer level in the Reviewer Cost Model. Removing the claim review task time from the Visitor-Specific Model reduced the 2013 CAC Visitor-Specific Q4 budget from $5,440,992 to $2,060,794.

In the proposed Q4 budget, the fixed monthly CAC lease payments are embedded in the expenses of BrownGreer. Due to the methodology used to calculate the proposed budget, breaking out the specific CAC lease payments and other fixed costs would have a limited benefit.

On December 1, 2013, the Apalachicola, Bay St. Louis, Biloxi, Cut Off, Lafitte, Clearwater, Fort Walton Beach, Mobile, Panama City Beach, Pensacola, and Orange Beach CAC leases expire and are up for renewal. No lump sum payments are required to renew the leases and only a portion of the CACs will see an increase in monthly lease payments. If all of the CACs were to renew their lease agreements, the monthly lease payments would increase from $75,709.77 to an estimated $76,480.58, a one percent increase in monthly costs. As such, it is still appropriate to consider the lease payments a fixed cost for each month in the fourth quarter.

Discussions between the CAO and the Vendors about closing CAC facilities have occurred; however, several reasons exist for why none of these facilities have been closed to date. First, these facilities have remained open because existing lease agreements remain in effect. The majority of CAC facility lease agreements are for a period of one year. Second, given BP and the PSC's desire that the Program maintain a presence in the Gulf Coast, the CAO has kept all CAC facilities open. It should be noted, however, that CAC staffing levels have decreased as CAC visitor traffic has decreased. This has had the effect of lowering labor costs

during the leasehold period while still maintaining a Gulf Coast presence. Further, CAC staff has been cross-trained on different Program-related tasks in order to remain efficient when traffic in the CACs is low. As the incoming claim volume and visitor traffic decrease at the CACs, the CAO is considering the closing and consolidation of some centers and/or the reduction of hours at centers. However, as of the forecasting of this budget, no plans have been developed to consolidate centers or reduce hours, and the CACs have been budgeted at status quo.

## L. There Are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis

Since the Program inception, the Garden City Group File Audit team has worked on performing audits on all GCCF files. Early in the Program, it was decided to audit all GCCF files so that when a claim was filed, these files would be immediately available to the reviewer and the claimant on the DWH portal, reducing delays in the system. The File Audit team reviews each file to identify and remove documents that contain Personally Identifiable Information that does not belong to the filing claimant.

The files currently being audited are taking longer to audit than the historical average time because these claims are more complex and document-intensive. File Audit priority is assigned using two criteria. First, priority is placed on reviewing files associated with claimants who have filed a claim with the DWH Program. Second, smaller files receive priority over larger files to ensure that as many claims as possible are reviewed as quickly as possible. Given the size of the files remaining, it is currently estimated that File Audit of all GCCF files will be complete in mid-November. This completion of File Audit is reflected in the Q4 budget forecast.

## III. Comments Regarding the Documentation and Information Supporting the Proposed

### Budget

In accordance with the Court's August 7th Order, enclosed in this budget package is the CAO's budget for the fourth quarter and the supporting documentation used to compute the forecast. In its response to the CAO's preliminary budget forecast, BP has requested additional documentation to support future quarterly budget forecasts. Some of this information, where available to the CAO, has already been incorporated into this budget forecast. Other information, such as training costs due to turnover, has yet to be provided to the CAO by the Vendors. Also, bear in mind that the CAO may not be permitted to distribute some information to BP under the Settlement Agreement and will need to work with both Parties to determine what data is allowed for distribution. Within this constraint, however, the CAO is committed to working with BP to provide as detailed a quarterly budget package as possible.

BP has also requested supporting information on a monthly basis. As discussed in prior meetings between BP and the CAO, given the time constraints of this budget revision process, much of this requested information has been unavailable to the CAO simply because it has never been tracked by Vendors at such a detailed level. Again, the CAO will also face many of the same issues regarding the information requested on a quarterly basis, namely that the CAO may not be permitted to distribute certain information to the Parties under the Settlement Agreement. This information will, if allowed by the Settlement Agreement, be incorporated into future monthly reports and quarterly budgets, producing a more accurate forecast provided to BP as it becomes available to the CAO.

The CAO reiterates that these requests have not been the focus throughout this process. Pursuant to the August 7th Court Order, the development of an accurate revised budget forecast

Case 2:10-md-02179-CJB-DPC Document 13347-36 Filed 09/02/14 Page 303 of 310
Case 2:10-md-02179-CJB-SS Document 13347-36 Filed 09/02/14 Page 303 of 310

August 28, 2013
Page 14

and its supporting documentation has been the CAO's primary priority. The CAO will work with the Vendors in the coming months to provide BP with the supporting documentation as requested.

Sincerely,

David Odom
CEO

Cc:   Magistrate Judge Shushan
      Stephen Herman
      James Roy
      Keith Moskowitz
      Patrick Juneau
      Bob Levine
      Kirk Fisher

# EXHIBIT 27

# BrownGreer PLC

Q4 2013 Administrative Budget

**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

Update as of August 28, 2013

**Administrative Budget**

| | October | November | December | Q4 Total | Calculation Category |
|---|---|---|---|---|---|
| Labor | | | | | |
| Administrative | $2,719,970 | $2,719,970 | $2,719,970 | $8,159,910 | A |
| Administrative Fixed | $67,848 | $67,848 | $67,848 | $203,544 | A |
| Claim Reviewers | $6,465,000 | $6,465,000 | $6,465,000 | $19,395,000 | |
| Claimant Assistance Centers | $727,408 | $657,360 | $676,025 | $2,060,794 | |
| Claimant Communications Center | $629,792 | $629,792 | $629,792 | $1,889,376 | |
| Information Technology | | | | | |
| Development | $693,137 | $632,421 | $577,229 | $1,902,787 | B |
| Maintenance | $693,137 | $632,421 | $577,229 | $1,902,787 | B |
| Help Desk | $43,321 | $39,526 | $36,077 | $118,924 | B |
| System Logic Testing & Implementation | $14,440 | $13,175 | $12,026 | $39,641 | B |
| **Total Labor** | **$12,054,054** | **$11,857,513** | **$11,761,196** | **$35,672,763** | |
| Expenses | | | | | |
| 2.64% of Historic Labor Cost | $318,227 | $313,038 | $310,496 | $941,761 | |
| **Total Expenses** | **$318,227** | **$313,038** | **$310,496** | **$941,761** | |
| Contingency | | | | | |
| Forecast Cost | $12,372,281 | $12,170,551 | $12,071,692 | $36,614,524 | |
| 5.0% Contingency on Variable Fees | $599,310 | $589,483 | $584,667 | $1,773,461 | |
| **Administrative Budget** | **$12,971,592** | **$12,760,034** | **$12,656,359** | **$38,387,985** | |

| | | |
|---|---|---|
| **Total Administrative (sum of A's)** | | **$8,363,454** |
| **Total Information Technology (sum of B's)** | | **$3,964,140** |

**Footnote:**

[1] Cost information is from the Q4 2013 CSSP Budget Materials, dated August 28, 2013

# EXHIBIT 28

REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND
PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW

| Outline of Status Report No. 21<br>May 30, 2014 (Doc. 12957) | Proposed Improvements<br>and Additional Sections to be Included |
|---|---|
| I.  Status of the Claims Review Process and Claim Payments | The report should begin with an executive summary of critical issues that have been raised or addressed since the last report.  This section should include, for example, key policies issued, summaries of significant Court rulings or orders, and progress reports for major work streams. |
| A. Claims Submissions | It is unnecessary to begin with a general recap of the CSSP operation since its inception in an iterative status report.<br><br>The report should open with an outline of the flow of the claims process accompanied by a narrative in each section assessing the performance of the specific component since the last report. |
| 1. Registration and Claim Forms | This section should specifically include:<br><br>• Statistics on the distribution by claim type and ageing of claim forms that have been submitted, but have not yet completed (e.g. of the 12,184 claim forms that have been submitted, but not yet completed ___ are BEL claims and of those claims ___% are 30 days of less; ___% are 30-60 days etc.);<br><br>• Same metrics as above for filed registration forms where no claim form has been submitted;<br><br>• Same metrics as above for registration form and claim form requested, but for which the claimants have not even filed the forms (meaning claimants have not even started the forms);<br><br>• Metrics on the number of forms provided through the CSSP versus the Claimant Assistance Center during the reporting period (to assess utility of Claimant Assistance Centers);<br><br>• Same metrics as above for Personal Representative Forms, Subsistence Interview Forms and Sworn Written Statements and Authorizations. |
| 2. Minors, Incompetents and Deceased Claimants | This discussion is less significant and should be |

| | |
|---|---|
| | moved to the end of the report or removed in its entirety. |
| 3. Third Party Claims | This discussion is less significant and should be moved to the end of the report or removed in its entirety. |
| | |
| B.  Claims Reviews | |
| | |
| 1. Identity Verification | Sections B(1) and B(2) should be expanded to include a complete discussion of the anti-fraud processes being employed by the CSSP and include metrics on measurements in addition to the two verification processes addressed here. |
| 2. Employer Verification Review | |
| 3. Exclusions | This section should include metrics on the number of claims denied on the grounds the claimants were excluded. |
| 4. Claimant Accounting Support Reviews | This section should include metrics on the number of claimant accounting support claims that have been denied and/or reduced. |
| 5. Quality Assurance Review | This section should include, at minimum, more robust metrics on claims where issues were identified in the QA process; supporting narratives describing the issues; quantification of settlement dollar impacts of errors; reports on the efficacy of error correction; and policy or process changes to address identify detected errors. |
| 6. Claim Type Review Details | This section should include the following additional metrics:<br>x   aging data on unresolved claims;<br>x   aging data on incomplete claims;<br>x   data on claims closed for incompleteness;<br>x   metrics identifying settlement dollar impacts of reconsideration decisions. |
| | |
| C.  Claim Payments | This section should also include detailed comparative trends in payment data since the last status report, reported by claim type, and supporting narratives discussing the observed trends. |
| 1. Notices and Payments | |
| 2. Claimants in Bankruptcy | |
| | |
| D.  Re-Reviews, Reconsiderations and Appeals | This section should provide additional information on the claims that were overturned, including whether any errors that might be systemic were identified and, if so, whether those errors were or are being investigation and the status or outcome |

| | |
|---|---|
| | of the investigation. |
| | Further, this section should report on whether a particular reviewer whose decision was overturned has a track record of getting decision incorrect and/or whether the error committed by the reviewer prompted a broader investigation/audit of the reviewer's other files. |
| 1. Re-Reviews and Outcomes | |
| 2. Reconsideration Reviews and Outcomes | |
| 3. Appeals | This section should provide additional discussion and analysis of whether appeals decisions have identified any potential systemic issues with claim determinations and/or claim reviewers and, if so, the status/outcome of investigations into such issues. |
|   (a)  BP Appeals | |
|   (b)  Claimant Appeals | |
|   (c)  Resolved Appeals | |
|   (d) Incompleteness Appeals | |
| | |
| E.  Court-Ordered BEL Claim Suspension | Relevant updates on major Court decisions and the impact on the claims process should be addressed at the beginning of the report. |
| | |
| 1.  Preliminary Injunction Continuing BEL Claim Suspension | |
| 2.  Processing of Appealed Claims | |
| | |
| II.  Claimant Outreach Efforts | |
| | |
| A.  Law Firm Contacts | |
| B.  Claimant Communications Center (CCC) | |
| C.  Claimant Assistance Centers (CACs) | |
| D.  Summary of Outreach Calls | |
| | |
| III.  Fifth Circuit Opinion Affirming District Court Approval of DWH Economic and Property Settlement | This section should continue to be updated to only include descriptions of issues or controversies taken to the Court during the reporting period. |
| | **New Sections Not Currently Included In the Claims Administrator's Status Report** |
| | **X.  Financial Report** <br><br> This section should include a status of the CSSP budget, funding, investments, cash walkforward, expenses, class member payments, etc., relevant for the reporting period. |
| | **X.  Governance Updates** <br><br> This section should include: (a) narrative summaries of major policies issued during the |

| | |
|---|---|
| | reporting period and the substance of the issue; (b) narrative summaries of any Panel Meetings occurring during the reporting period as well as the substance of the issues discussed and the resolutions; and (c) summary of activities and interaction with the Special Master. |
| | |
| | **X. Vendor Status Updates**<br><br>This section should be used to provide narrative updates on any important activities at the vendor level. For example, modifications made to the vendors' processing responsibilities, summary of headcounts and management challenges. |
| | |
| | **X. Major Reports Issued**<br><br>Although the opening executive summary should highlight audit reports or analyzes issued during the reporting period, this section should include more extensive discussion of the report, its findings, the Claims Administrator's reactions to the report and plans to address issues raised. |
| | |
| IV. Conclusion | |