# Exhibit 32
# Part A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | | MDL NO. 2179 |
|    "Deepwater Horizon" in the | * | |
|    Gulf of Mexico, on April 20, 2010 | * | |
| | * | SECTION  J |
| | * | |
| | * | |
| This document relates to all actions. | * | HONORABLE CARL J. BARBIER |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

---

<u>**DECLARATION OF MARK HUTCHINS**</u>

I, Mark Hutchins, am over the age of 18 and the opinions, statements, and conclusions expressed in this declaration are my own.

*Background*

1.     I am the Managing Partner of the Los Angeles office of KPMG LLP ("KPMG"), and I serve on KPMG's board of directors.  As an Audit Partner, I started the KPMG Internal Audit practice in the Western Region.  I was a Chartered Accountant and now a Certified Public Accountant in the State of California, and I have more than 30 years of experience providing risk management and advisory services to companies.  I hold a Bachelor's degree in Business and Economics from University College of Cardiff, Wales.  A copy of my current Curriculum Vitae is attached hereto as Exhibit A.

*Scope*

2.     I have been retained by BP America, Inc. ("BP") to provide my observations, findings, and opinions regarding the following: The Deepwater Horizon Claims Administrator Office ("CAO") governance structure and the overall Court Supervised Settlement Program ("CSSP"), which includes vendors, standard operating procedures generally performed by

management at the claims processing facility, and the expected duty of care for managing a facility of this size.

3.      In order to reach my opinions, I reviewed and considered materials including the following: the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement"); Independent External Investigation of the Deepwater Horizon Court Supervised Settlement Program, Report of Special Master Louis J. Freeh, September 6, 2013 (the "First Freeh Report"); the January 17, 2014 Report of Special Master Louis J. Freeh (the "Second Freeh Report;" collectively, the "Freeh Reports"); the CliftonLarsonAllen ("CLA") Financial Audit and Process Reports; Claims Administrator Interim File Review Quarterly Reports; Vendors' Service Agreements for the four court-appointed vendors (collectively, "Vendors"): BrownGreer ("BG"), Garden City Group, Postlewaite & Netterville ("P&N") and PriceWaterhouseCoopers LLP ("PwC"); IBM Claims Management System Assessment Report dated December 20, 2013 ("IBM Report"); Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties ("Reply of the Special Master") and the Deepwater Horizon Economic and Property Damages Trust Agreement (the "Trust Agreement").  A complete list of the documents reviewed and considered is set forth in Exhibit B.

4.      The CSSP was created pursuant to the Settlement Agreement and defines activities and obligations of the Claims Administrator, or those individuals under the Claims Administrator's supervision, necessary to implement and compensate claimants in accordance with the Settlement Agreement.  I understand the Trust Agreement was established pursuant to the Settlement Agreement to pay settlement payments and the costs of administering the CSSP. Patrick Juneau is the designated "Claims Administrator" and Trustee of the Settlement Trust.  The

Trustee shall act as the fiduciary of the Settlement Trust.   I also understand the Claims Administrator shall supervise and manage the court appointed Vendors.

*Summary of Findings, Observations and Opinions*

5.      The CSSP is a substantial entity with over 3,000 employees/contractors and administrative expenses totaling near $1 billion[1] since inception; as such, the CSSP resembles a major corporation for purposes of assessing internal control and governance.   Based on my 30 years of experience in reviewing countless major corporations and other entities, I believe that Patrick Juneau failed to act as a reasonable and prudent claims administrator by failing to have an adequate governance and control structure in place, particularly given an organization of this size and the financial resources available.   Based on my review and analysis of the referenced materials, I have formed the following opinions:

   a)   The Claims Administrator failed to establish an adequate internal control structure utilizing a widely accepted internal control framework.

   b)   The Claims Administrator failed to conduct even a basic risk assessment.   As a result of this failure, the Claims Administrator did not identify the high risk areas to address and monitor.

   c)   The Claims Administrator failed to implement an effective internal audit function, which includes an adequate process audit, and failed to obtain a form of systematic assurance that the Vendors' control environment met expectations.

   d)   The Claims Administrator failed to implement an information technology ("IT") system with appropriate or adequate security and controls.   The poor internal control environment surrounding the IT system results in a higher risk of fraudulent and inflated claim determinations as demonstrated in the IBM and Freeh Reports.

   e)   The Claims Administrator failed to require the Vendors to perform the tasks outlined by their respective service agreements.   No evidence indicates that control and performance indicator procedures were completed by the Vendors

---

[1]      Summary of CSSP Administrative Expenses prepared by Todd Brents, July 6, 2014 (attached hereto as Exhibit C); CLA Process Audit Report (Project 1) at 14 (attached hereto as Exhibit D).

and/or required by the Claims Administrator.   This precluded the Claims Administrator from determining whether the Vendors operated efficiently or in compliance with the terms of their agreements.

### *Basis for Findings and Opinions*

**I.   With respect to the CSSP's governance structure, control environment and vendor management, the Claims Administrator failed to meet the basic standard of due care for any prudent and reasonable claims administrator.**

6.      For an organization with the size and scope of the CSSP, particularly one with the resources available, a reasonable and prudent Claims Administrator would implement a proper control framework and structure. As discussed in paragraphs 14 to 45, the Claims Administrator failed to implement an internal control structure.   Had the Claims Administrator acted in a reasonable and prudent fashion, many of the identified issues could have been avoided, and the investigation by the Special Master Freeh may not have been required.   Consequently, the excessive costs associated with the investigation could have been avoided as well.

**A.   *The Claims Administrator failed to implement a recognized internal control framework.***

7.      Implementation of a recognized internal control structure and the corresponding controls are key to ensuring the integrity of the CSSP and that the objective of accurately processing claims is achieved.   Internal controls also enforce accountability and adherence to applicable policies and procedures and promote an ethical environment.

8.      The Committee of Sponsoring Organizations Framework ("COSO Framework") describes the requirements for an effective internal control structure and is the basic structure and the widely recognized internal control framework used by over 90% of all publicly owned companies.   The COSO Framework enables organizations to effectively and efficiently develop policies, procedures and controls that adapt to changing business and operation environments,

mitigate risks to acceptable levels, and support sound decision making and governance of the organization.

      9.      The COSO Framework describes five components to support the operational, reporting, and compliance objectives of an organization:

     a)  **Control Environment** – demonstrates commitment to integrity and ethical values; exercises oversight responsibility; establishes structure authority and responsibility; demonstrates commitment to competence; and enforces accountability.
     b)  **Risk Assessment** – specifies suitable objectives; identifies and analyzes risks; assess fraud risks; and identifies and analyzes significant change.
     c)  **Control Activities** – selects and develops control activities and general controls over technology, deployed through policies and procedures.
     d)  **Information and Communication** – uses relevant information that is communicated internally and externally.
     e)  **Monitoring Activities** – conducts ongoing and/or separate evaluations and communicates deficiencies.

      10.     All five COSO components are critical in achieving the organization's objectives and the underlying foundation of an effective internal control system.  I have not seen any evidence that the Claims Administrator has implemented an effective COSO Framework or any other similarly accepted framework for developing a system of internal controls.  A properly designed framework would have utilized the tools and mechanisms of such a framework to systematically identify and address the issues identified by the IBM Report[2] and the Freeh Reports,[3] such as the conflicts of interest and ethical issues related to Ms. Reitano and Messrs. Sutton, Odom, and Duval.  Indeed, Special Master Freeh confirmed that "the CSSP's control environment at the time of Sutton's employment contained vulnerabilities."[4]

---

[2]    IBM Claims Management System Assessment Report ("IBM Report") at 3-4 (attached hereto as Exhibit E).
[3]    Report of Special Master Louis J. Freeh at 8, Rec. Doc. 11287; January 17, 2014 Report of Special Master Louis J. Freeh at 6, Rec. Doc. 12174.
[4]    Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties at 12, Rec. Doc. 12393.

11.     The CAO's weak control environment was also affirmed by the recommendation in the Second Freeh Report that the CAO "should evaluate, audit and test its compliance efforts, including effective procedures to ensure that where misconduct may be discovered, reasonable steps will be taken to prevent further similar misconduct."[5]   The CAO's blatant failures in implementing and monitoring internal controls reflect senior leadership's poor tone regarding the control culture.   Without a proper control framework, the Claims Administrator is unable to provide reasonable assurance regarding the achievement of the CSSP objectives and whether the performance is within what is expected and acceptable.

12.     On January 27, 2014, BP presented the Claims Administrator with a summary of an internal controls framework which is consistent with the COSO Framework and would be effective in detecting and mitigating error and fraud risks.[6]   Had such internal controls been implemented by the Claims Administrator at the inception of the Settlement Program, many conflicts, fraud and ethical issues identified in the Freeh Reports could have been prevented.

13.     No reasonable and prudent claims administrator would operate an organization of this size without an adequate internal control framework.   However, Mr. Juneau did not adopt or implement an adequate internal control framework.

**B.   *The Claims Administrator failed to conduct even a basic risk assessment.***

14.     In order for management of any organization to appropriately develop processes and controls to manage and monitor potential risks or to adequately organize a proper governance structure, a risk assessment is a fundamental requirement.   A risk assessment is a systematic, formalized process of reviewing each aspect of the entity, including claims processing, to determine the objective, risks and therefore controls required.   A risk assessment

---

[5]     January 17, 2014 Report of Special Master Louis J. Freeh at 6, Rec. Doc. 12174.
[6]     Letter from G. Brown to D. Welker, January 27, 2014 (attached hereto as Exhibit F).

is a critical component of the COSO Framework and essentially forms the fundamental basis for determining how risks will be managed.

15.     A reasonable and prudent claims administrator would perform a proper risk assessment when managing a claims processing facility whose total dollar amount of claims paid and the number of employees is analogous to the revenue and operations of a Fortune 1000 company.   A proper risk assessment is critical for a claims processing facility of this magnitude dealing with hundreds of thousands of claims, many in high dollar amounts that are subject to fraud and manipulation.

16.     It does not appear that a proper risk assessment was performed.  Had a sufficient risk assessment been performed on the CSSP, it would have led to the development and implementation of proper controls.  Many of the issues identified in the Freeh Reports such as the conflicts of interest and weak controls could have been identified by a risk assessment and proper controls could have been implemented to mitigate the risk.   Similarly, a proper risk assessment could have identified that CSSP's major IT risks.   However, the Claims Administrator failed to conduct a risk assessment to analyze the CSSP's potential risks, and as a result, the Claims Administrator could not effectively manage these risks.

*C.  The Claims Administrator failed to secure adequate assurances that processes and controls were in place.*

17.     The CSSP is a complex operation with multiple vendors working in various systems.  It is imperative to evaluate vendors' processes and controls to verify that they are functioning as designed.  Both internal and process audits can be utilized to assess if the organization is operating effectively and adequately.  These audits are important elements of a strong control environment when the audits are performed in a satisfactory manner.  Under the direction of the Claims Administrator, both audit functions were insufficient to assess the entire

claims process and control environment.  The Claims Administrator also should have obtained systematic reports from the significant vendors to assure that proper procedures and adequate controls were in place, however, this too was not performed.

### *(1) The Claims Administrator failed to implement an effective internal audit function.*

18.     According to The Institute of Internal Auditors, an internal audit is defined as "an independent, objective assurance and consulting activity designed to add value and improve an organization's operations.  It helps an organization accomplish its objectives by bringing a systematic, disciplined approach to evaluate and improve the effectiveness of risk management, control, and governance processes."  Internal audits are important for reviewing the effectiveness of the design and execution of internal controls and risk management, and to meet the organization's objectives efficiently.

19.     The CSSP interim file review reports prepared by Claims Administrator's QA/QC Department failed to meet the standard of an adequate internal audit report because the "internal audit" review was not performed from a sufficiently independent and objective perspective.  The Claims Administrator's QA/QC Department is not an independent function of the Claims Administrator, and therefore is biased in its approach and scope.

20.

# Redacted

---

[7]     Claims Administrator Interim File Review Report, First Quarter 2013, at 1 (attached hereto as Exhibit G).

# Redacted

21.

22.     The Claims Administrator commissioned an exceptionally limited scope "internal audit" without adequately testing for fraud risks.  If an adequate internal audit was performed to review the entire claims process and the veracity of the claimant-provided information, then fraudulent attributes in the claim documentation could have been identified, such as those in the

---

[8]    General IT Controls include: a) Access to programs and data; b) Program change; c) Program development; and d) Computer operations.

[9]    See Exhibit E, IBM Report at 3-4.

Thonn and Burrle claims.[10]   Special Master Freeh recently affirmed that "[t]he Thonn claim itself had fundamental deficiencies that were not detected by several layers of CSSP review."[11]

23.     In October 2013, the Claims Administrator engaged McGladrey to perform an internal audit that is currently ongoing, which further supports that an internal audit function was not adequately established at the onset of the claims facility.[12]   The Settlement Agreement was approved by the court in May 2012; it was not until October 2013, a year and five months after the formation of the facility that the initial internal audit began.   According to the American Institute of CPAs ("AICPA"), a "key element in the corporate governance process of any organization is its audit committee."   The Claims Administrator failed to initially set up an internal audit function.

24.     The Claims Administrator did not act in a reasonable and prudent manner by failing to perform an adequate internal audit in the first year and a half of operations to assess the effectiveness and design of the internal controls at the CSSP and the Vendors.

## (2) The Claims Administrator failed to request systematic assurances from the Vendors.

25.     In my opinion, a reasonable and prudent Claims Administrator charged with managing an operation outsourcing more than 95% of its core business operation would require some form of systematic assurance (other than the vendors' own attestation) that the vendors' control environment meets expectations.   A Service Organization Control ("SOC") report is used to gain those assurances and is a typical requirement on due diligence, regulatory, external and

---

[10]   Report of Special Master Louis J. Freeh at 58, Rec. Doc. 11287; Motion of the Special Master for Return of Payments Made to Jarrod A. Burrle and Others at 3-4, 9-10, June 10, 2014, Rec. Doc. 13010.

[11]   Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties at 12, Rec. Doc. 12393.

[12]   Letter from Robert Levine (CSSP-CFO) to Maria Travis (BP-Director of Economic Restoration), January 30, 2014 (attached hereto as Exhibit H).

internal audit checklists. These reports are an industry standard for all public and private companies of any size that receive a financial statement audit and outsource a significant process or portion of their internal control environment to third parties. Above that, any outsourced service providers that provide services to government entities would also be required to provide SOC reports. A SOC report would help identify insufficient controls to ensure proper controls are implemented and the process can be relied on.

26.     Although the provision of a SOC report was discussed in the service agreement between the CSSP and PwC to assess PwC's information security requirements, it does not appear the report was prepared. The service agreement states:

> "*Upon written request, but no more than once per annum Vendor will supply to the Client (i) a security audit report (SSAEI6 SOC3 - SYSTRUST) issued to Vendor by a reputable independent auditor and (ii) a copy of Vendor's Information Security Requirements.*"[13]

27.     SOC reports for the Vendors would provide the Claims Administrator a roadmap of the deficiencies in the existing system. Moreover, it would have substantially identified the BG system issues that led to overlooking the fraudulent characteristics of the Thonn claims.[14] For example, if a SOC report had been obtained from BG, it could have identified significant data integrity and quality issues early on. The Claims Administrator did not measure the extent of the BG system's deficiencies or inefficiencies, and consequently, could not correct them.

### D. The Claims Administrator failed to design effective IT controls.

28.     A properly implemented and functioning IT system is absolutely critical for operating a claims processing facility such as the CSSP. As such, a certain level of control and review of the IT system would be expected of the Claims Administrator. Specifically, user

---

[13]     PwC Agreement to Provide Claims Administration Staffing Services, October 15, 2012 ("PwC Agreement") at 9, § 11.3 (attached hereto as Exhibit I).
[14]     Report of Special Master Louis J. Freeh at 74, Rec. Doc. 11287.

access should be appropriately assigned and monitored to ensure that only necessary personnel have access to the claims processing system.  Automated and manual controls must be tested to determine the reliability and accuracy of the information.  Automated controls may be programmed into software, databases and other system components that perform business logic on data – i.e., logic that governs the input, processing, integrity and output of data.  This business logic may include the segregation of duties (by blocking or allowing access to certain functions) or a configuration that prevents database administrators from accessing certain functions, etc.  In addition to implementing automated controls, the General IT Controls that support their consistent operation should also be tested to maintain the integrity of information and the security of data.  General IT Controls are policies and procedures that relate to many IT applications and support the effective functioning of automated controls by ensuring the operation of the IT systems.

29.     The initial CLA process audit reported issues in two IT control categories.  CLA concluded that hundreds of individuals in the CSSP had multiple user accounts with different types of access.  Furthermore, the accounts were not regularly reviewed to ensure that the granted access corresponded to the roles and responsibilities of the user.  The CLA report states:

> *"DHECC's vendors have a number of individuals (443 out of approximately 3,000) who have multiple user accounts with different permission rights and capabilities. Users with multiple user accounts are not a control deficiency as long as monitoring over segregation of duties risks is performed.  While management performs a 30 day review of static user accounts, user access is not periodically reviewed to determine if access level is appropriate and in alignment with job responsibilities."[15]*

30.     The second noted deficiency was in the area of change management and lack of documentation surrounding the numerous system modifications.  The CLA report states:

> *"While documentation is maintained to support the changes, a log of the changes is not maintained. As such, it is difficult for the CAO to monitor the nature and frequency of IT*

---

[15]     See Exhibit D, CLA Process Audit Report (Project 1) at 10.

*changes each day. Maintaining a daily log will also assist management is determining if changes made were authorized, reasonable and tested before implementation."[16]*

31.     Similar deficiencies were also discussed in the subsequent CLA process audit report, six months later.[17]   The Claims Administrator was informed and aware of the change management concern, yet they did not adequately act to resolve the issues.   Consequently, the Claims Administrator failed at supervising a sufficient process audit surrounding the IT system, and then repeated the mistake by failing to implement and monitor the remediation process.

32.

Redacted

33.

---

[16]   *Ibid.*
[17]   CLA Process Audit Report (Project 2) at 2 (attached hereto as Exhibit J).
[18]   See Exhibit E, IBM Report at 3.
[19]   *Id.* at 22.

34.

# Redacted

35.

36.     A reasonable and prudent claims administrator would not rely on an IT system, with the expectation that it would function as intended, when the IT controls' integrity is in question.  Based on my review of the myriad of system issues and many noted control issues, the Claims Administrator could not and should not have relied on the systems to ensure that the claims processing was properly performed.

### E.  The Claims Administrator failed to require the Vendors to perform the tasks outlined by their respective service agreement.

37.     Based on the CSSP Vendors' lack of compliance to the vendor service agreements, the Claims Administrator appears to have either intentionally disregarded his supervisory role, or lacked the ability to control the Vendors.  The Claims Administrator neither

---

[20]  *Id.* at 3.
[21]  Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties at 29, Rec. Doc. 12393.
[22]  See Exhibit E, IBM Report at 21.

required SOC reports nor audited the Vendors.  Many tools were available to adequately assess the performance of the Vendors and yet the Claims Administrator failed to properly utilize any of those tools.  The Claims Administrator did not properly manage the Vendors[23] or hold them accountable to terms defined in their vendor agreements.

38.    According to the BG vendor agreement, BG was to assist the Claims Administrator in implementing controls for the claims process, but there is no indication that such controls were developed or implemented.  The agreement states:

> "*Vendor shall assist the Claims Administrator with execution of the Settlement Program to include:*
>
>> *Implementing and maintaining the Settlement Program System of Record including databases, web interfaces, and source code to include regularly scheduled backups and system maintenance in accordance with industry accepted standards including change control procedures…*
>>
>> *Working with the Claim's Administrator's office for the development and implementation of fraud controls for the Settlement Program and forwarding identified fraudulent claims to the fraud investigation team.*" [24]

39.    The Claims Administrator and BG acknowledged the need to have controls in place, but it does not appear that the task was sufficiently performed or performed at all.  If proper controls had been implemented, the claims with fraudulent characteristics observed in the First Freeh Report[25] could have been identified and resolved.

40.    Key Performance Indicators ("KPIs") were also discussed in the BG vendor agreement to measure the vendor's performance; however there are no references to KPIs in the reports reviewed.  The BG vendor agreement states:

---

[23]    Report of Special Master Louis J. Freeh at 12, Rec. Doc. 11287.
[24]    BG Agreement to Provide Claims Administration and Staffing Services, May 13, 2013 ("BG Agreement"), Exhibit 1, at 3-4 (attached hereto as Exhibit K).
[25]    Report of Special Master Louis J. Freeh at 58, Rec. Doc. 11287.

> *"Vendor will implement and operate all measurement and monitoring tools and procedures and provide reports of Vendor's performance in connection with the KPIs."*[26]

A similar discussion of KPIs was also documented in the P&N and PwC agreements:

> *"Vendor shall be subject to the implementation of Key Performance Indicators (KPIs), to the extent negotiated and mutually agreed to in separately executed Task Orders. KPIs may include individual performance goals, measurement methodologies as agreed to by the Parties and penalty payments for missing performance goals as agreed to by the Parties. Vendor will implement and operate all measurement and monitoring tools and procedures and provide reports of Vendor's performance in connection with the KPIs in accordance with the terms of this Agreement."*[27]

41.     KPIs are an important indicator for meeting key objectives and measuring the success of a process.  KPIs are generally determined at the outset of the agreement, then actual performance is compared to the targets.  Kirk Fisher, the former CAO Director of Business Processes and Reporting acknowledges that KPIs are "valuable tool[s],"[28] yet the Claims Administrator did not require the vendors to implement them.  It is unclear how the Claims Administrator was able to determine the effectiveness of the services provided by Vendors without a comprehensive process audit, SOC report, or KPIs.

42.     The BG and PwC vendor agreements cite the use of forensic accountants for the purpose of reviewing and identifying fraudulent claims.  However, if forensic accountants were engaged to review and identify fraudulent claims, then claims exhibiting inconsistent documentation and other fraudulent characteristics described in the First Freeh Report[29] should have been identified and remediated.  It does not appear that any of the completed audits adequately tested for fraudulent claims due to the restricted review scope.

43.     The First Freeh Report also concluded that the CAO lacked oversight and management of Vendor(s):

---

[26]   See Exhibit K, BG Agreement at 4 § 2.3.
[27]   See Exhibit I, PwC Agreement at 3 § 2.3.
[28]   August 7, 2013 Hr'g Tr. at 55, Rec. Doc. 10975.
[29]   Report of Special Master Louis J. Freeh at 10, Rec. Doc. 11287.

> *"The Special Master has observed that BG, one of the primary DHECC (Deepwater Horizon Economic & Real Property Claims Center) vendors, earning millions of dollars per month, has at times resisted CAO oversight efforts to control costs and to create efficiencies."*[30]

The Reply of the Special Master further confirms the lack of vendor oversight and states, "[Christine] Reitano fought efforts to engage in vendor oversight, and serious vendor issues concerning workflow techniques, claim processing, and process integrity were unremediated."[31] Similarly, Kirk Fisher, the former CAO Director of Business Processes and Reporting, stated that BG rebuffed the CAO's attempt to manage the Vendors' costs.[32]  The Vendors' resistance to the CAO demonstrates that the Claims Administrator did not and presumably could not appropriately manage the Vendors.

44.    In a typical organization, an oversight role such as the Claims Administrator would include the responsibility of budget management.  And yet, during one budget meeting, the CAO avoiding its responsibility to control the Vendors when it stated that it "does not currently believe that the addressing of the cause of a variance [from budgeted amounts] falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role."[33]  The Claims Administrator advocates and justifies the budget to pay the Vendors, yet relinquishes all responsibility and control of how the budget is spent.

45.    The Claims Administrator has demonstrated in numerous situations that he apparently lacks the ability to appropriately control and manage the Vendors.  As a result, the governance is non-existent and the Vendors are largely self-regulated.  Not surprisingly, this has

---

[30]  *Id*. at 12.
[31]  Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties, at 29, Rec. Doc. 12393.
[32]  August 7, 2013 Hr'g Tr. at 61, Rec. Doc. 10975.
[33]  Claims Administrator Patrick Juneau and The Settlement Program's Response to BP's Objections to the Proposed 2013 Fourth Quarter Budget, Exhibit B-9 at 6, September 17, 2013, Rec. Doc. 11401.

lead to excessive cost, which is contrary to what would be expected of a prudent and reasonable claims administrator.

### Conclusion

46.      Based on my 30 years of experience in reviewing countless major corporations and other entities, I believe the Claims Administrator failed to meet the basic standard of reasonable due care.   Based on the issues identified in the Freeh Reports and numerous operational problems noted in the IBM Report and the CLA process audits, it is unreasonable to believe that the Claims Administrator was unaware of the CSSP's inadequacies.  Ultimately, the Claims Administrator, in the management oversight role, should have known of the claims processing issues.   It is apparent the Claims Administrator mismanaged the Vendors and fundamentally did not perform the expected duty of a reasonable and prudent Claims Administrator to adequately operate a facility of this magnitude.

I declare under penalties of perjury that the foregoing is a true and correct statement of my findings, observations and opinions.

By,

Mark Hutchins

As of August 27 2014

# Exhibit A



## MARK R. HUTCHINS
*Los Angeles Office Managing Partner*

KPMG LLP
355 South Grand Avenue, Suite 2000
Los Angeles, CA 90071-1568

Tel  213-955-8327
Fax 213-652-0874
Cell 323-449-4630
mhutchins@kpmg.com

### Function and Specialization
Mark is a member of the Internal Audit, Risk & Compliance Services practice (IARCS). He specializes in outsourcing and cosourcing, comprehensive business risk assessment, strategic performance review of the internal audit function, and corporate governance assessment services.

### Representative Clients
- Avery Dennison Corporation
- Cathay General Bancorp
- City National Corporation
- DreamWorks
- East West Bank
- Mattel
- MPG
- Nestle
- RAND Corporation
- Sony
- The Walt Disney Company
- Toyota
- Union Bank of California
- Warner Brothers
- WellPoint, Inc.
- Wells Fargo Bank

### Languages
- English

### Education, Licenses & Certifications
- Bachelor's degree in business and economics, University College of Cardiff, Wales
- Licensed CPA, California

### Background
Mark is the Los Angeles office managing partner and serves on KPMG's board of directors with more than 30 years of experience providing risk management and advisory services. Mark was an Audit partner and subsequently started KPMG's Risk Advisory Services practice in the Western region. He was the national lead partner for Enterprise Risk Management (ERM) services for the Banking and Finance practice and led Sarbanes-Oxley Section 404 efforts for major companies.

### Professional and Industry Experience
Mark has substantial experience leading and coordinating large client relationships and engagements. His extensive experience includes risk assessment, internal audit, best practice reviews, and process reengineering projects. Mark's experience also includes:
- Account executive/client service partner for a select group of prestigious clients based in Los Angeles and the Pacific Southwest
- Addressing all service issues or concerns as they may arise and facilitating communication between our respective organizations
- Experience in most industries with detailed focus on financial services, and media and entertainment

### Technical Skills
- Coordinating risk management, process, internal audit, and advisory services to audit committees
- Implementing the Committee of Sponsoring Organizations of the Treadway Commission (COSO) framework
- International Financial Reporting Standards (IFRS)
- U.S. GAAP Statutory Reporting

### Publications and Speaking Engagements
- Speaker and lecturer on ERM at various seminars
- Audit Committee Institute moderator
- Speaks on governance at various board programs

### Other Activities
- Board member and audit committee chair, KPMG's U.S. board of directors
- Board member and audit committee chair, Library Foundation of Los Angeles
- Board member, executive committee member, and audit committee chair, United Way of Greater Los Angeles
- Board member, California Chamber of Commerce
- Board treasurer and executive committee member, St. James' Episcopal School
- Member and honorary board member, British American Business Council – Los Angeles
- Member and former president, Los Angeles Tennis Club
- Member, Los Angeles Country Club
- Member and audit committee member, The California Club

- Audit committee member, Marlborough School Trustees
- Involved with the Los Angeles Orphans Home Society, Children's Hospital Los Angeles, and Marlborough Girls School.

## **RATE AND OTHER TESTIMONY**

My firm is being compensated for my time in this matter at an hourly rate of $409 for work I perform in the course of my analysis and $900 per hour for deposition and trial testimony.

Mark Hutchins has testified in the following matters during the last four years:

| Matter | Court | Case No | Testimony |
|---|---|---|---|
| B. Faigin and John J. Lannan, individually and as former institution-affiliated parties of First Bank of Beverly Hills, Calabasas, California | Federal Deposit Insurance Corporation, Washington, D.C. | FDIC-11-269c, FDIC-11-270k, FDIC-11-252e and FDIC-11-254k | Fact Witness |

# Exhibit B

## MATERIALS REVIEWED

1.  Deepwater Horizon Economic and Property Damages Settlement Agreement as amended on May 2, 2012

2.  Deepwater Horizon Economic and Property Damages Trust Agreement dated April 18, 2012 and amended on May 1, 2012

3.  Independent External Investigation of the Deepwater Horizon Court Supervised Settlement Program; Report of Special Master Louis J. Freeh, September 6, 2013

4.  January 17, 2014 Report of Special Master Louis J. Freeh

5.  Reply of the Special Master to Responses, Objections, and Motions Filed by the Show Cause Parties

6.  CliftonLarsonAllen Proposal to Provide Professional Services to DHECC, August 6, 2012

7.  CliftonLarsonAllen Financial Statements Audit Engagement Letter, executed on October 17, 2012

8.  CliftonLarsonAllen Financial Statements Audit Engagement Letter, amended on February 22, 2013

9.  CliftonLarsonAllen Financial Statements Audit Revised Scope

10. CliftonLarsonAllen Process Audit Engagement Letter, executed on September 11, 2012

11. CliftonLarsonAllen Process Audit Engagement Letter, amended on February 22, 2013

12. CliftonLarsonAllen Process Audit Revised Scope

13. 2012 CliftonLarsonAllen Financial Statements Audit

14. Annual Report of the Trustee December 31, 2012 based on the 2012 CliftonLarsonAllen Financial Statements Audit

15. CliftonLarsonAllen Process Audit Report, May 17, 2013

16. CliftonLarsonAllen Memorandum Re: Deepwater Horizon Project 2 Fieldwork Observations and Gathered Claims Statistics, December 27, 2013

17. BrownGreer Agreement to Provide Claims Administration and Staffing Services, executed on May 13, 2013

18. Garden City Group Agreement to Provide Claims Administration and Staffing Services

19. HUB Agreement to Provide Claims Administration and Staffing Services, executed on September 12, 2012

20. PwC Agreement to Provide Claims Administration Staffing Services, executed on October 15, 2012

21. IBM Claims Management System Assessment Report, prepared on December 20, 2013

22. Claims Administrator Interim File Review Report, First Quarter 2013

23. Claims Administrator's Office Interim File Review Report, Second Quarter 2013

24. Claims Administration Interim File Review Report, Fourth Quarter 2012

25. McGladrey Internal Audit Engagement Letter, executed on October 16, 2013

26. McGladrey Process Audit Interim Report, prepared on December 30, 2013

27. Court Transcript to Show Cause Proceedings Heard Before The Honorable Sally Shushan on August 7, 2013

28. CSSP Examination Objectives and Scope (Exhibit from budget hearing before The Honorable Sally Shushan heard on August 7, 2013)

29. Court Transcript Of Appeal Hearing Proceedings Heard Before The Honorable Carl J. Barbier on August 7, 2013

30. BP's Objections to the Claims Administrator's Proposed 2013 Fourth Quarter Budget and Request for Evidentiary Hearing, filed on September 11, 2013

31. Class Counsel's Response to BP's Opposition to the 4th Quarter Budget Submitted by the Claims Administrator for the Court-Supervised Settlement Program, filed on September 17, 2013

32. Claims Administrator Patrick Juneau and the Settlement Program's Response to BP's Objections to the Proposed 2013 Fourth Quarter Budget

33. CSSP Administrative Budget Q4 2013, September 5, 2013

34. CSSP Administrative Budget Q1 2014 Revised, November 13, 2013

35. Summary of CSSP Administrative Expenses prepared by Todd Brents, July 6, 2014

36. DHECC Audit Firm RFP to Provide Financial and Process Audit Services

37. DHWCC Financial External Audit Plan

38. Letter from Robert Levine (CSSP-CFO) to Maria Travis (BP-Director of Economic Restoration) dated January 30, 2014.

39.   Letter to David Welker (CSSP–CEO) from George Brown (Gibson Dunn) dated January 27, 2014

40.   Motion of the Special Master for Return of Payments Made to Jarrod A. Burrle and Others, June 10, 2014

# Exhibit C

## CSSP Administrative Expenses[1]

| | 2012 | Q1 2013 | Q2 2013 | Q3 2013 | Q4 2013 | Q1 2014 | Q2 2014[2] | Total |
|---|---|---|---|---|---|---|---|---|
| CAO & Supporting Vendors | $11,924,286 | $5,473,474 | $6,263,444 | $6,278,990 | $6,624,100 | $7,101,519 | $8,695,088 | $52,360,901 |
| BrownGreer PLC | $123,669,466 | $47,374,851 | $47,026,561 | $41,457,116 | $24,642,685 | $22,482,994 | $21,795,404 | $328,449,077 |
| Garden City Group Inc. | $116,086,612 | $27,332,654 | $24,474,449 | $20,228,249 | $17,620,337 | $14,833,699 | $13,597,003 | $234,173,003 |
| PricewaterhouseCoopers LLP | $32,209,832 | $22,492,705 | $21,229,435 | $21,764,515 | $14,746,364 | $18,196,141 | $19,574,520 | $150,213,512 |
| Postlethwaite & Netterville APAC | $28,647,387 | $16,609,027 | $24,803,018 | $29,132,866 | $24,946,074 | $18,891,816 | $21,472,921 | $164,503,109 |
| HUB Enterprises Inc. | $3,962,990 | $1,370,195 | $1,556,959 | $1,822,123 | $2,354,220 | $3,075,104 | $4,009,048 | $18,150,639 |
| **Subtotal** | **$316,500,573** | **$120,652,906** | **$125,353,866** | **$120,683,859** | **$90,933,780** | **$84,581,273** | **$89,143,984** | **$947,850,241** |
| **Supplemental & New System Development** | | | | | | | | |
| Freeh Group Investigative Services | $0 | $0 | $801,716 | $3,895,569 | $6,422,273 | $8,488,397 | $9,732,836 | $29,340,791 |
| McGladrey LLP | $0 | $0 | $0 | $0 | $2,115,374 | $6,898,610 | $4,284,888 | $13,298,872 |
| IBM | $0 | $0 | $0 | $0 | $692,637 | $1,229,211 | $7,073 | $1,928,921 |
| DWH / FWA System Development | $0 | $0 | $0 | $0 | $0 | $424,297 | $5,698,787 | $6,123,084 |
| **Subtotal** | **$0** | **$0** | **$801,716** | **$3,895,569** | **$9,230,284** | **$17,040,515** | **$19,723,584** | **$50,691,668** |
| **Total** | **$316,500,573** | **$120,652,906** | **$126,155,582** | **$124,579,428** | **$100,164,064** | **$101,621,788** | **$108,867,568** | **$998,541,909** |

1 Obtained administrative expense amounts from CAO's May 2014 monthly budget materials file: IV Working Forecast Compared to Last Month.pdf.
2 April and May amounts are for actual costs based on vendor invoices and placeholder amounts for vendors that had not submitted their invoices prior to the issuance
 of the May budget materials.  June amounts represent the CAO's last forecast.

# Exhibit D



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

Dear Mr. Levine,

## Process Audit

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:

- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement). These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing. The procedures performed and related observations and recommendations are described in the Report attached. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and



An independent member of Nexia International

October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

CLA fully appreciates the complexity of claims operations DHECC faced.   From the outset of the Process Audit, the CA stated clearly that DHECC's top priority was to compensate claimants that had been adversely affected by the Deepwater Horizon oil spill in a manner that was timely, accurate, and in accordance with the Settlement Agreement. Methodologies, processes, and controls evolved during the time period through March 31, 2013.  DHECC made many adjustments and improvements as it gained a clearer understanding of the emerging challenges associated with its operations. The CA communicated to CLA that DHECC strives to consistently apply its policies, procedures, and methodologies in accordance with the Settlement Agreement and undoubtedly during this process exceptions would occur due to the volume of claims processed in a short period of time.   Additionally the CA communicated that DHECC was committed to continue to enhance the internal control environment and to correct identified errors.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013.  If subsequent events are brought to our attention we will evaluate those events during Project II and III.

Throughout Project I, CLA had full and timely access to the CAO and DHECC vendor personnel for on-site meetings, conference calls, additional requests, and clarification and questions identified in a timely and transparent manner.  All personnel were collaborative and responsive throughout Project I.

CLA would like to thank the CAO and its vendors for their assistance, the education given on the complexities involved for our team, and efforts made during Project I.  From the initial kick-off meeting the CA pledged DHECC's full cooperation and commitment and that is exactly what CLA received.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

# Deepwater Horizon Economic Claims Center

## Independent Evaluation of the Internal Control Environment

### (Process Audit)

### May 17, 2013

Prepared By: CliftonLarsonAllen LLP



An independent member of Nexia International



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:

- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement).    These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing.    The procedures performed and related observations and recommendations are described in the Report. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

We performed this engagement, and formed our opinion for Project I, in accordance with the International Standards for the Professional Practice of Internal Auditing Standards (Standards). In addition, our procedures do not constitute an audit performed in accordance with auditing standards generally accepted in the United States of America; or an examination, review or agreed upon procedures performed under the attestation standards of the American Institute of Certified Public Accountants. As such, we do not express an opinion on any of the specified elements, accounts or items included in DHECC's financial statements or on the financial statements taken as a whole. If we had performed additional procedures, or if we had conducted an examination or review of the specified elements, accounts or items of the financial statements, or agreed upon procedures in accordance with professional standards, matters in addition to our observations may have come to our attention and been reported to you.

The sufficiency of the procedures and operations of internal controls is solely the responsibility of the CA and DHECC. Consequently, we make no representations regarding the adequacy of the procedures described in the attached document either for the purpose for which the Report has been requested or for any other purpose.

This report is intended solely for the use of the Claims Administrator and DHECC and is not intended to be used by anyone other than the specified parties.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013. If subsequent events are brought to our attention we will evaluate those events during Project II and III. In addition, CLA did not validate management's responses we will test changes and updates during Project II and Project III.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

# Table of Contents

1.0 Summary of Results ........................................................................................................................... 8

   1.1 Key Strengths ................................................................................................................................ 8

   1.2 Key Opportunities for Improvement........................................................................................... 10

   1.3 Key Findings ................................................................................................................................ 11

2.0 Internal Audit Opinion .................................................................................................................... 12

3.0 Background ...................................................................................................................................... 13

   3.1 DHECC Background ...................................................................................................................... 13

   3.2 Named Vendors of Settlement Agreement ................................................................................. 13

   3.3 Engagement Background .............................................................................................................. 14

   3.3.1 Project 1 Background ................................................................................................................. 15

4.0 Project Objectives and Scope........................................................................................................... 16

   4.1 Project Objectives ....................................................................................................................... 16

   4.2 Project Scope .............................................................................................................................. 16

5.0 Project Work Performed.................................................................................................................. 17

6.0 Detailed Observations and Recommendations ................................................................................ 20

   6.1 Review of DHECC Policies and Procedures ................................................................................. 20

   6.2 Claims Data Input........................................................................................................................ 21

   6.3 User Access Rights....................................................................................................................... 22

   6.4 Change Management Audit Trail ................................................................................................. 23

   6.5 Claims Payment Disbursements.................................................................................................. 24

   6.6 Claims Data Retention.................................................................................................................. 24

   6.7 Claims Audited by CAO's Quality Control Department................................................................. 25

   6.8 Data Center ................................................................................................................................. 26

   6.9 Individual Claims Testing............................................................................................................. 27

   6.9.1 Seafood Compensation............................................................................................................. 30

   6.9.2 Individual Economic Damage .................................................................................................... 31

   6.9.3 Business Economic Loss ............................................................................................................ 31

   6.9.4 Vessel of Opportunity Charter Payment................................................................................... 32

   6.9.5 Vessel Physical Damage ............................................................................................................ 32

   6.9.6 Coastal Real Property Damage.................................................................................................. 32

   6.9.7 Wetlands Real Property Damage............................................................................................... 33

   6.9.8 Denied Claims Statistics ............................................................................................................ 34

## Table of Contents

6.9.9 Appealed Claims Statistics ............................................................................................................... 34

Appendix A - Individuals Interviewed ...................................................................................................... 35

Appendix B - Claim Categories Not Included In Project I Testing ........................................................... 37

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Summary of Results

## 1.0 Summary of Results

As of March 31, 2013, CLA identified the following key strengths and opportunities for improvement. It was communicated to CLA that DHECC had begun implementing changes during fieldwork to address the opportunities for improvement identified, and changes were implemented as early as March 6, 2013.

### 1.1 Key Strengths

#### *Claims Paid In Accordance With the Settlement Agreement*

DHECC disburses payments that are calculated in accordance with the Settlement Agreement. CLA's review of paid claims revealed exceptions of less than 2%. Based on the claims CLA reviewed, paid claims as a whole appear to be paid in accordance with the Settlement Agreement and the CAO is committed to correcting any errors identified.

#### *Open Communication between DHECC, the Court, the PSC, and BP*

The CAO manages all lines of communication between their vendors, the Court, PSC, BP, and themselves through weekly status meetings, ad hoc meetings to address emerging trends and issues, and weekly reports.

#### *Claims Processing with Transparency*

DHECC processes claims under the premise of complete transparency. This is accomplished by showing each claimant, PSC, and BP how each claim outcome is reached, and if a payment is calculated, how the calculation was performed in accordance with the Settlement Agreement.

#### *Claims Processing with Due Process*

DHECC implements the provisions of the Settlement Agreement providing each claimant the right to elect one of the following outcomes once the claimant receives a notice stating they are eligible for payment:

- Accept calculated offer
- Request a re-review of their claim if they are not satisfied with the initial outcome at no additional cost to claimant
- Request for a reconsideration it they are not satisfied with the re-review outcome at no additional cost to claimant
- Appeal the decision of the reconsideration at no additional cost to claimant

#### *Consistent Application of the Settlement Agreement*

DHECC applies the Settlement Agreement consistently based on the results of claims testing across the different claim categories. All claims categories revealed exceptions of less than 2% which indicates that DHECC correctly applied the Settlement Agreement.

# Summary of Results

## Number of Appeals

As of December 31, 2012, DHECC processed 68,954 claims and paid 15,894 claims, totaling $1,063,262,525. The difference between claims processed and claims paid is the result of claims processed being appealed, denied, or the need of additional information from the claimant to fully process the claim. See 6.9 Individual Claims Testing for breakdown of claims processed, paid, appealed, and denied. As of March 25, 2013, the total number of claims appealed by either BP or a claimant was 1,260, or 1.83% of total claims processed. Of the appeals, BP appealed 897 (71% of total appeals) and claimants appealed 363 (29% of total appeals) and the results of 67% of total appealed claims are still awaiting a decision.

## Ease of a Claimant Filing a Claim and Having Their Questions Answered

DHECC has made available three ways to file a claim. Claims can be filed on-line, at one of 18 DHECC established Claimant Assistance Centers (CAC), or through U.S. Postal Service mail. Additionally, DHECC has created a call center for claimants to call to get answers to claims filing questions.

## Quality Control

The CAO has a quality control function, responsible for quality control over claims processed, paid, and appealed. This allows the CAO to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses formal disciplines in accordance with the International Standards for the Professional Practice of Internal Auditing Standards to conduct their reviews. These protocols ensure a consistent application and allow for timely and accurate reporting of results. The work is retained and evidenced in workbooks to allow for review. In addition, the qualifications and experience of the CA QA/QC resources support a qualitative review. Having an in house quality control function given the complexities in the internal control environment is viewed as a leading practice.

## Claims Processing Volume

As of December 31, 2012, DHECC processed an average of 11,492 claims notices per month. As of March 31, 2013 DHECC's monthly average had risen by 89% to an average of 21,657 claims notices processed per month, demonstrating increasing efficiency in the processing of claims.

## Offsite Data Center Assessment

The CAO outsources its data center operations to GCG. The CAO and GCG regularly test and assess the physical controls of the data center to determine any control weaknesses.

## Document Retention

The CAO and GCG maintain paper documents in a secured storage area within the Mail Center, located in Hammond, LA. In addition, GCG maintains electronic documentation at the Data Center, located in Dublin, OH (Data Center). Both paper and electronic documentation are maintained in a secure area and can be located or recalled as needed.

# Summary of Results

## 1.2 Key Opportunities for Improvement

### *Change Management Audit Trail*

BG performs approximately 300 – 400 IT system changes daily such as updating claim or claimant specific information and claims processing portal system edits. While documentation is maintained to support the changes, a log of the changes is not maintained. As such, it is difficult for the CAO to monitor the nature and frequency of IT changes each day. Maintaining a daily log will also assist management is determining if changes made were authorized, reasonable and tested before implementation.

### *Excessive Remote User Access*

BG utilizes an IP address validation control to ensure access to the claims processing portal is restricted to users located at one of the DHECC approved locations. Remote access to the portal has been granted to 829 (28%) individuals out of approximately 3,000 individuals involved in the claims administration process. Such access is usually limited to a smaller percentage, 2-3% (i.e. 50 to 100 users). Additionally, criteria for allowing remote access has not been sufficiently reviewed and documented.

### *Periodic User Access Review*

DHECC's vendors have a number of individuals (443 out of approximately 3,000) who have multiple user accounts with different permission rights and capabilities. Users with multiple user accounts are not a control deficiency as long as monitoring over segregation of duties risks is performed. While management performs a 30 day review of static user accounts, user access is not periodically reviewed to determine if access level is appropriate and in alignment with job responsibilities.

### *Execute Vendor Contracts for All Vendors*

The CAO is required to work with the four DHECC vendors in the Settlement Agreement. Contracts have been executed and signed with two of the four vendors, P&N and GCG. While the remaining vendors, BG and PwC, have not completed contracts, they were named in the Settlement Agreement and are required to perform claims processing responsibilities for the CAO as part of DHECC. In the absence of signed contracts, it is difficult for the CA to establish service level agreements and performance metrics for the vendors.

### *Approval of Policies and Procedures*

DHECC appears to be operating in accordance with its policies and procedures. However, five of the seven policies reviewed during Project I were draft and had yet to be finalized and approved by DHECC management.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

10

**Summary of Results**

### *Enhance CA QA/QC's Coverage Over Claims Processing*

CA QA/QC currently adheres to a sampling methodology that is in accordance with the Standards by using a 95% confidence interval with a 10% margin of error. Enhancements to the sampling methodology through the use of data mining and trend analysis may increase the coverage of quality control reviews over DHECC's claims processing to identify anomalies and emerging trends.

### 1.3 Key Findings

The key finding noted during Project I is listed below. All other observations and recommendations relate to observations that are not considered high risk. Upon communication and validation of our observations and recommendation, DHECC commenced to implement and to address the control enhancements identified.

BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Summary of Results

### 2.0 Internal Audit Opinion

CLA conducted Project I of the Process Audit in accordance with International Standards for the Professional Practice of Internal Auditing Standards. The Standards require that we plan and perform the Process Audit to demonstrate a reasonable basis for our judgments and conclusions regarding DHECC's Internal Control Environment over claims processing.

Based on the work performed and the rating criteria established by DHECC, the internal control environment at DHECC merits a rating of "Minor Improvement Needed." This rating indicates that, overall internal controls are in place and are operating as intended to provide reasonable assurance that management's objectives are met.

**Rating Criteria Definition:**

- A "*Satisfactory*" rating indicates the evaluated in-scope processes are performing as designed to adequately, appropriately, and effectively mitigate risks in order for management objectives to be met.

- A "*Minor Improvements Needed*" rating indicates the evaluated in-scope processes are performing to mitigate the assessed risks, but minor deviations from the intended design were identified and should be corrected. The overall control framework in place is adequate and provides reasonable assurance that management objectives are met.

- An "*Improvements Required*" rating indicates the significant deviations from the control design were identified that open the applicable policies and procedures to an unacceptable level of risk. The process controls are unlikely to provide reasonable assurance that management objectives are met.

- An "*Unsatisfactory*" rating indicates the evaluated in-scope processes were not implemented as designed and/or are not mitigating the assessed risks. The controls in place are not adequate, appropriate, or effective to provide reasonable assurance that management objectives are met.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Background

## 3.0 Background

### 3.1 DHECC Background

In August 2010, lawsuits against BP and other defendants relating to the damages resulting from the spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, were consolidated before the Court. The Court serves as litigator of damages resulting from this oil spill. In advance of the trial, the parties to the litigation, namely, the PSC, and BP began settlement negotiations.

By Order dated May 2, 2012 the Court preliminarily approved the Settlement Agreement entered into by PSC and BP, dated April 18, 2012, as amended on May 1, 2012, for the purpose of settling all related claims against BP.

The Interim Class Counsel, the CA and J.P. Morgan Trust Company (the Directed Trustee), entered into the Deepwater Horizon Economic and Property Damages Trust Agreement (Trust Agreement) creating the Settlement Trust. The Settlement Trust's purpose is to establish a mechanism to disburse payments to claimants as defined in the Settlement Agreement.

A Claims Administrator was appointed by the Court to oversee the operations of the Deepwater Horizon Economic Claims Center (DHECC) as outlined in the Settlement Agreement. The Claims Administrator was also appointed as the Trustee of the Settlement Trust, which will disburse all administrative and claims funding for the Settlement Agreement.

The CA and DHECC's responsibilities, as set out in the Settlement Agreement include:

- Administering the Deepwater Horizon Economic Settlement in accordance with the Settlement Agreement and the Settlement Trust
- Resolving open issues with PSC and BP
- Reporting back to the Court on the Operations of DHECC
- Providing full transparency of DHECC's claims processing in accordance with the Settlement Agreement
- Overseeing execution of claims data inputting, processing, disbursing payments, and retaining data

### 3.2 Named Vendors of Settlement Agreement

The Settlement Agreement named four vendors who would have responsibility for the key processes of inputting claims data, processing claims data, disbursing payments, and retaining claims data. They are: BG, GCG, P&N, and PwC. Each vendor is under the oversight of the CAO as the vendors conduct the day to day aspects of managing DHECC's claims processing operations including inputting, processing, disbursing payments, and retaining data. Additionally, the CAO contracted with HUB to provide security at the CACs and aid in the investigation of claims or claimants suspected of committing fraud, waste, and abuse. The four named vendors and their Settlement Agreement responsibilities are tabled on the following page:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Background

## BrownGreer

- **Team Leader:** Orran Brown
- **Team Size:** 1,251 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
  - Specifically, constructing, maintaining, and supporting the claims processing portal; processing all claim categories with the exception of the business economic loss; monitoring claims processed and reporting to DHECC; staffing and maintaining 18 CACs

## Garden City Group

- **Team Leader:** Neil Zola
- **Team Size:** 1,503 as of December 31, 2012
- **Responsibilities:** Inputting Claims Data, Disbursing Payments, and Retaining Claims Data
  - Specifically, physical mail intake, including physical claim forms and supporting documentation; identifying supporting documentation, linking supporting documentation to the correct claimant, categorizing the supporting documentation, and capturing data electronically for the physical claims forms and supporting documentation; managing the stand alone call center; processing payment disbursements for the DHECC claims process; managing and maintaining the data center supporting DHECC; managing and maintaining all physical claim forms and supporting documentation received

## Postlethwaite & Netterville

- **Team Leader:** Mark Staley
- **Team Size:** 201 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
  - Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of seafood compensations claims over $250,000 prepared by BG

## PricewaterhouseCoopers

- **Team Leader:** Charles Hacker Jr.
- **Team Size:** 170 as of December 31, 2012
- **Responsibilities:** Processing Claims Data
  - Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of business economic loss claims initially prepared by P&N

### 3.3 Engagement Background

CLA was selected to perform an Independent Evaluation of the Internal Control Environment in place for DHECC's claims processing for the periods of March 31, 2013, September 30, 2013, and December 31, 2013. Additionally, the scheduled fieldwork will cover claims paid as of December 31, 2012, May 31, 2013, and December 31, 2013. Throughout the course of our three projects, CLA will render an opinion over the internal control environment over claims processing using the International Standards for the Professional Practice of Internal Auditing. CLA will:

- Perform an onsite and remote comprehensive and objective review of the internal control environment over claims processing to evaluate if claims were properly valued according to the Settlement Agreement
  - Conduct an onsite and remote operational review of claims processing and review the payment system to verify compliance with the Settlement Agreement
  - Evaluate if the claims infrastructure achieves structured goals of DHECC

14

# Background

- o Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- o Conduct claims testing to evaluate whether claims are valued for all claims categories in accordance with the Settlement Agreement

- Perform a review of the internal control environment over claims processing in accordance with the Standards and evaluate the controls utilized by the DHECC to manage and control claims processing

- Perform a review of the internal control environment over claims processing with regard inputting data, processing data, disbursing payments, and retaining data in accordance with the Settlement Agreement

- Perform a review of the system's capacity and an evaluation of the Program's infrastructure for forecasted needs

Upon completion of the three scheduled projects CLA will have completed the services included in the Engagement Letter dated September 11, 2012 and amended March 5, 2013.

### 3.3.1 Project 1 Background

We have conducted the first of three 2013 scheduled projects. Project 1 covers the claims operation environment from June 4, 2012 to March 31, 2013, and includes claims paid as of December 31, 2012 as the population for testing adherence to management's expectations.

We anticipated changes would be made to DHECC's claims processes to improve the processing of claims on a go forward basis. The CAO and its vendors identified opportunities for improvement and implemented those opportunities throughout Project I of our Process Audit. Over 60 system enhancements were implemented from quality assurance reviews of the claims process, including but not limited to metrics for progress reporting, additional system prompts to confirm with vendor employees processing the claims are entering the correct information, and standardization of data capture analysis for the different claim categories.

As potential exceptions were identified by CLA, the following protocols were established and followed:
- Vetted the exceptions with DHECC to obtain confirmation
- Worked with DHECC to determine root causes
- Assisted DHECC to determine if exceptions had implications for the remaining claims paid population

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

## 4.0 Project Objectives and Scope

### 4.1 Project Objectives

The objectives of Project I were to evaluate the internal control environment over claims processing and processed claims. The key objectives are summarized below:

- Gain an understanding of the internal control environment over claims processing utilized by the CAO and its vendors to manage or oversee the claims process
- Perform review of claims processed and evaluate key internal controls over claims processed including inputting data, processing data, disbursing payments to evaluate if claims were valued and paid in accordance with the Settlement Agreement
- Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- Evaluate policy and procedures to determine if they are sufficient, adequate, and current

### 4.2 Project Scope

Fieldwork for Project I was conducted from November 26, 2012 through April 26, 2013. The period under review for Project I was the internal control environment over claims processing from June 4, 2012 through March 31, 2013 and claims paid through December 31, 2012. We evaluated the key processes covering the internal control environment over claims processing:

- Input
- Process
- Disbursement payments
- Data Retention

Further, Project I covered the following types of claims paid as of December 31, 2012.

- Paid Claims
    - o 10 of the 12 claim categories named in the Settlement Agreement were included in our testing population during Project I; however, not all 10 claim categories included in the population were selected through CLA's sampling methodology
    - o CLA did not include the two additional claim categories noted below due to the fact that they were not in production as of December 31, 2012
        - Individual Periodic Vendor or Festival Vendor Economic Loss
        - Subsistence Damage Claim
    - o CLA used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims
    - o CLA tested 96 paid claims across the claim categories
    - o CLA did not test claims that had a status of "in-process" as of December 31, 2012

- Appealed claims
    - o CLA performed trend analysis on appealed claims as of March 25, 2013
- Denied claims
    - o CLA performed trend analysis on denied claims as of December 31, 2012

## Background

Information technology (IT) systems used in processing claims, including:
- IT system Change management
- Logical access
- Physical security

Onsite visits to 8 DHECC and vendor locations.

CLA did not interview or meet with any claimants, their counsel, or their accountants to address specific claims. Nor did we assess or evaluate any operations pertaining to the Medical Benefits Class Action Settlement (Medical Settlement Trust) reached related to the Deepwater Horizon oil spill. The Medical Settlement Trust offers benefits to qualifying people who resided in the United States as of April 16, 2012.

## 5.0 Project Work Performed

The work performed is summarized below:

### Planning and High Level Risk Assessment
- CLA performed an initial kick-off meeting on November 13, 2012 to confirm the scope and objectives of Project I
- CLA performed a high level risk assessment of the internal control environment over claims processing to determine which cycles to evaluate first
- CLA developed a workplan, which was amended to increase the claims sampling and internal control environment testing

### Interviews
- Interviews on an as needed basis throughout Project I with 25 individuals, from the CAO, DHECC vendors in the Settlement Agreement, and HUB Enterprises. See **Appendix A** for listing of individuals interviewed

### Review of Documentation
- CLA reviewed the following 7 available DHECC policies and procedures to gain an understanding of the internal control environment over the key controls governing claims processing:
  - o Travel and entertainment
  - o Internal audit
  - o Internal audit of invoice review
  - o Internal audit of process review
  - o Internal audit of claims review
  - o Documentation retention policy
  - o Disaster recovery and continuity of operations
- CLA reviewed documentation provided by DHECC and its vendors, including but not limited to:
  - o Organizational charts
  - o Employee listings for user access
  - o Training materials and manuals
  - o Bank statements

## Background

- o Claims monitoring reports
- o Claims appealed reports
- o Claim forms
- o Eligibility notices
- o Claims processed documentation

**Walkthroughs**

- CLA conducted walkthroughs of the four key processes: inputting, processing, disbursing payments, and retention of data. During our walkthroughs we observed the process used to identify the key controls and any deviations from management objectives. We identified approximately 110 key controls governing the claims process, the responsible party for implementing the controls, and the CAO's role in oversight of the key controls.

**Evaluation of Internal Control Environment and Testing of Operational Effectiveness**

- CLA performed tests of internal controls governing claims processing, including evaluating:
  - o The determination of claim eligibility in accordance with the Settlement Agreement
  - o The calculation of claim payments in accordance with the Settlement Agreement
  - o Whether the claimant provided the appropriate documentation to receive the calculated payment, including a wet signature signed release
  - o Whether the disbursed payment was prepared and approved by employees with clearance to perform those responsibilities
  - o Whether the disbursed payment was recorded on the bank statement and in the general ledger
  - o Whether the employees performing the initial review and quality assurance review of claims paid had the appropriate training to perform those responsibilities
  - o Whether the claim had been flagged for potential fraudulent activity
  - o Whether the claim had been quality assurance reviewed by the CA QA/QC

- CLA performed controls testing on 10 of the 12 claims categories as 2 of the claims categories had not been put into production, as of December 31, 2012
  - o CLA randomly tested 96 claims and performed procedures analyzing key controls governing claim preparation, determination of causation, payment calculation, quality assurance review, and payment disbursement
  - o CLA obtained a listing of all claims appealed either by BP or a claimant as of March 25, 2013 to analyze appealed claims trends by claim category
  - o CLA obtained a listing of all notices issued, extracted the denial notices issued to analyze denied claims trends by claim category to determine which claim categories had the highest percentage of denied claims
  - o CLA selected a random sample of claims that had been quality assurance reviewed by the CA QA/QC. We reviewed the workbooks and supporting documentation and reviewed any exceptions and gaps noted during IA's review. Additionally, we verified that exceptions and gaps noted were reported to The CAO to ensure remediation occurred on a timely basis
  - o CLA reviewed a random sample of documentation used to support disbursement amounts through approval of sign-off and date

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

- CLA evaluated certain aspects of the IT control environment and interviewed four key IT management personnel from the CAO, BG, and GCG and evaluated the following:
    - o CLA evaluated system access users with remote user access
    - o CLA tested the number of users with multiple user accounts and how those accounts are monitored
    - o CLA evaluated claims reporting and evaluated if the "all claims file" included all claims processed to a notice

- CLA conducted 8 onsite visits to :
    - o **DHECC Home Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
    - o **BG Claims Processing Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
    - o **Mail Center**, Hammond, LA – November 28, 2012
    - o **GCG Disbursement Center**, New York City, NY – December 17, 2012
    - o **Claim Call Center**, Sarasota Springs, FL – December 21, 2012
    - o **Claimant Assistant Center**, Clearwater, FL – December 21, 2012
    - o **GCG Data Center**, Dublin, OH – February 27, 2013

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

19

**Detailed Observations and Recommendations**

## 6.0 Detailed Observations and Recommendations

CLA conducted interviews with the CAO and the DHECC vendors of the Settlement Agreement (BG, GCG, P&N, and PwC), reviewed documents, tested claims processing, reviewed policies and procedures, compliance with protocols and methodology to enable us to gain an understanding of the operations and identified potential control weaknesses and opportunities for enhancement.

### 6.1 Review of DHECC Policies and Procedures

**Purpose:**
*The purpose of CLA's review of DHECC's policies and procedures was to evaluate them for sufficiency, consistency, adherence to the Settlement Agreement, and comprehension to support the internal controls that govern claims processing. We performed internal control evaluations to evaluate that the policies and procedures were being implemented as intended.*

**Results:**
*We reviewed The CAO's policies and procedures for adherence to the Settlement Agreement and performed internal control evaluations to verify the policies and procedures were being followed.*

*We noted five of the seven policies and procedures have not been finalized and approved, as of March 31, 2013.*

| Policy and Procedure | Dated |
|---|---|
| Travel and Entertainment | Approved July 17, 2012 |
| Internal Audit | Drafted October 17, 2012 |
| Internal Audit of Invoice Review | Drafted October 17, 2012 |
| Internal Audit of Process Review | Drafted October 25, 2012 |
| Internal Audit of Claims Review | Drafted October 25, 2012 |
| Document Retention Policy | Drafted September 12, 2012 |
| Disaster Recovery and Continuity of Operations | Approved October 10, 2012 |

Subsequent to the period of the fieldwork, the remaining policies and procedures were finalized and approved by the CA, so no further action is required.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.2 Claims Data Input

### Purpose:

*The purpose of CLA's review of the input control environment was to perform controls testing to evaluate if controls are in place and operating as intended for claim input.  A claim can be filed in one of three ways:*

- *Visiting a CAC in person*
- *Mailing in paper documents*
- *Filing a claim electronically on-line*

### Results:

*We reviewed data inputs into the accountant's calculation spreadsheet and reviewed the accuracy of claimant data received for each claim category.  We noted four data input exceptions pertaining to the accuracy of financial statement data input in the accountant's calculation spreadsheet used to calculate the claim payment see **6.9 Individual Claims Testing** for a breakdown of variances and exceptions.*
*Errors in the data input process can result from individuals not receiving enough training and human error in the quality assurance process.   Incomplete or inaccurate data captured may lead to errors in processing and calculating the claim in accordance with the Settlement Agreement.*

### Recommendations:

*We recommend the CAO and BG refine its quality assurance review process over data input and data capture and continue to provide training to increase the effectiveness of the quality assurance process. This will assist individuals preparing and reviewing the claims data to meet the requirements of the Settlement Agreement more effectively and efficiently by reducing the potential for data input and data capture errors.*

### Management Response:

*The vendors have discussed these findings with their staff.  They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.3 User Access Rights

**Purpose:**
*The purpose of CLA's review of the user access rights control environment was to perform controls testing to evaluate if controls are in place and operating as intended for user access right over claim processing. BG is responsible for maintaining the claims processing portal and processing claims. All claims documentation is maintained on the claims processing portal, and with the exception of business economic loss (BEL) claims all claim categories are processed in the claims processing portal.*

**Results:**
*We noted that currently 829 out of the approximately 3,000 (28%) individuals that are part of the claims process have remote access. Remote access grants those individual the ability to sign into the BG claims processing portal from any location which presents them with the opportunity to misuse sensitive data.*

*In addition, 443 out of 2,439 (18%) individuals who have access to the BG claims processing portal have more than one user account. Monitoring exists to ensure that users can not process and approve a single claim all the way to payment; however, not monitoring the use of the user accounts on a periodic basis may result in unintended segregation of duties issues, including the ability to process and approve a single claim all the way to payment.*

*Though no instances of unauthorized access to the DHECC portal or instances of a user processing and approving a claim all the way to payment was detected, user accounts within the DHECC portal are not monitored to ensure only authorized individuals have access. Lack of monitoring user access accounts increases the risk of unauthorized access to the portal.*

**Recommendations:**
*We recommend access to the DHECC portal be periodically reviewed and corrective action taken to remove user access rights for personnel no longer employed and monitor users with multiple user accounts to identify any instances where a user processes and approves a claim all the way to payment.*

**Management Response:**
*Restricted IP Addresses: BG and the CAO have diligently reduced the number of DHECC personnel who can access the database by using an unrestricted IP address since February of 2013. Since the population of 829 unrestricted IP address users was identified, we have reduced that volume to 96 users as of 4/24/13 as follows: (a) 25 BG remote reviewers; (b) 25 CAO personnel (includes 10 CLA users); (c) 23 GCG intake personnel; (d) 17 P&N Accountants; and (e) four Louisiana property/title attorneys retained to assist on ownership issues for Wetlands claims. This reduced volume falls within the acceptable range of 2-3% as specified in Section 1.2 of the Report. BG and the CAO will continue to analyze whether this volume of users with access from an unrestricted IP address can be reduced further.*

*Monitoring of Roles and Access Rights for Claims Reviewers: The CAO will periodically test user access roles every 30 days by selecting a random sample of reviewers and analyzing their database access rights to the various review queues to ensure adherence to CAO policy and training certifications. The CAO will also run periodic audits to ensure that any personnel that disassociates from the DHECC program will have their login and passwords revoked.*

**Detailed Observations and Recommendations**

### 6.4 Change Management Audit Trail

#### Purpose:
*The purpose of CLA's review of IT change management processes as part of the claims processing control environment was to perform controls testing to evaluate if controls are in place and operating as intended for changes made to the IT environment. BG is the vendor responsible for maintaining and implementing changes to the claims processing portal.*

#### Results:
*BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.*

#### Recommendation:
*We recommend BG maintain a daily log of IT changes made to claims in process and the claims processing portal to assist management in determining if changes made were properly authorized and vetted before implementation.*

#### Management Response:
*Production Builds and System Enhancements: BG previously documented all new production builds for the DHECC database by archiving the existing production build before implementing the new system enhancements. To further document DHECC system enhancements, we created a Change Request Form template for the programmers and DBA personnel to complete when implementing new code. The Change Request Form indicates: (a) the date of the change, (b) a description of the change; (c) the affected tables; (d) the affected stored procedures; (e) who approved the changes; and (f) who implemented the changes to the DHECC system. BG has used the Change Request Form since 4/1/13.*

*Changes to Data Performed Outside of the Claims Review System: BG has recorded a daily log of data change requests to the DHECC database since 4/29/13. We track these data updates or manual movement of claims/claimants to various review queues when the database application cannot handle the request without direct intervention by a programmer. This daily log identifies: (a) the source and date of the request; (b) a description of the change or data updates; (c) the number of affected claimants/claims; (d) the Directly Responsible Individual who requested and authorized the data change; (e) the programmer who implemented the data change; and (f) the implementation date. We store this daily log in Excel format that tracks the changes by date and specific requests and upload a copy of this daily log to the CAO every week.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

23

## Detailed Observations and Recommendations

### 6.5 Claims Payment Disbursements

**Purpose:**
*The purpose of CLA's review of the payment disbursement control environment was to perform controls testing to evaluate if controls are in place and operating as intended for disbursements of claim payments. Disbursements are prepared at the GCG Disbursement Center located in New York City, NY by GCG.*

**Results:**
*We noted payments disbursed to claimants were the same as the payments acknowledged as due to them and that segregation of duties were appropriate between check and wire preparation, approval, and disbursement. Additionally, we noted the individuals responsible for check and wire preparation, approval, and disbursement was documented and maintained without exception in accordance with the Standards.*

**Recommendations:**
*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**
*No response necessary.*

### 6.6 Claims Data Retention

**Purpose:**
*The purpose of CLA's review of the retention control environment was to perform control testing to evaluate if controls are in place and operating as intended according to DHECC's policy for claim documentation retention. The preservation policy applied by DHECC to all emails and other electronic files or databases; paper documents; notes; calendars; logs; forms; drawing; diagrams; schedule; photograph; video and other recordings; worksheets; computations; data storage media including hard drive; external hard drive; CDs; USB Drives; and DVDs is to maintain all the previously listed electronic and paper documentation for three years after the expiration of the lifetime of the final DHECC claim.*

**Results:**
*We noted that DHECC and GCG maintain paper documents in a secured storage area within the Mail Center located in Hammond, LA. In addition, GCG has planned for the volume of documents based on the size of the current storage area observed and the additional subcontract with a document storage vendor in the circumstance that the current area will not store all paper files.*

*We noted that all electronic documentation is stored at the Data Center. All documentation is available and can be recalled as necessary. We have performed a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center, see results at section 6.8.*

**Recommendations:**
*We recommend that DHECC and GCG continue to monitor the capacity of the current paper document storage areas and determine when and if an expansion of the storage space is appropriate.*

## Detailed Observations and Recommendations

### Management Response:
*GCG will continue to monitor the capacity of the current paper document storage areas and recommend expansion to the CAO when and if expansion is appropriate.*

### 6.7 Claims Audited by CAO's Quality Control Department

### Purpose:
*The purpose of CLA's review of the claims quality control reviewed by CA QA/QC was to evaluate if controls are in place and operating as intended for CA QA/QC quality assurance controls. CA QA/QC is responsible for quality control reviewing claims processed, paid, and appealed under DHECC. This function is in addition to the quality control measures instituted by the DHECC vendors. This allows DHECC to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses workbooks to quality control review claims processed as well as to document their quality control review. Each vendor identified in the Settlement Agreement is responsible for performing quality control reviews on their own work and the CA QA/QC is back-up in addition to the vendors' quality control measures.*

### Results:
*We noted that two instances out of our sample selection of 25 where CA QA/QC did not evidence their review on all parts of the workbook through initials and date. Not fully documenting the CA QA/QC review of the workbook may indicate only a partial or inadequate review of the workbook, even if a full review was performed. In each instance we noted CA QA/QC had partially signed-off and dated the workbook review, we noted that all steps of the workbook had been properly completed.*

*Additionally, we noted that during the Fourth Quarter of 2012, CA QA/QC completed workbooks for 206 claims processed across 10 claim categories. CA QA/QC's sampling technique uses a 95% confidence level and 10% margin of error to calculate the sample size for paid claims by claim category which is a methodology that meets the Standards. All CA QA/QC quality control reviews and workbooks are completed either after a claim has been processed and is waiting for notice of payment to be disbursed or payments have been disbursed to claimants.*

*CA QA/QC communicates its quality control review results on a quarterly basis to the CAO and the DHECC vendors and identifies the root cause for all exceptions noted. Exception trends are analyzed to evaluate whether an exception's root cause is a one-time event or an event that could affect the entire claims population. In addition, once exception trends are evaluated, employees processing claims are educated and trained on why the exception occurred and how to properly process a claim to avoid recurring exceptions going forward. This allows CA QA/ QC to continuously monitor and implement improvements to the claims processing environment as exception trends are identified.*

*It is a leading practice to have an in-house quality control function; however, currently CA QA/QC may enhance its coverage of claims processing through data mining and trend analysis for DHECC's operations in addition to the quality control measures performed by the vendors.*

### Recommendations:
*We recommend that CA QA/QC continue to perform quality control review of claims processed and document its entire review of the workbook.*

## Detailed Observations and Recommendations

*We also recommend CA QA/QC consider enhancing the coverage of quality control reviews over DHECC's claims processing through the use of data mining methodologies and trend analysis.*

### Management Response:

*To provide an independent assessment as to quality and consistency of claim reviews and payments, the CAO Quality Control Team has continued to randomly sample claims across all claim types. The random sample volume achieves a 95% confidence interval with a 10% margin of error. The scope of the Quality Control Team's reviews encompasses every aspect of a claim review from document categorization to payment distribution. Prior to publication of this report, the CAO Quality Control Team has begun testing live claims prior to distribution to notice, as well as performing data mining analysis on claim type databases. The CAO will continue to identify and report material and non-material exceptions (material exceptions affect causation or compensation) to the vendors on a weekly basis. The exceptions are reviewed with the vendors to allow them the opportunity to remediate incomplete and/or inaccurate claim determinations, identify processes that may benefit from additional training, identify opportunities to strengthen quality controls, and to identify trends and Program wide errors in need of attention.*

### 6.8 Data Center

### Purpose:

*The purpose of CLA's review of the Data Center was to perform a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center.*

### Results:

*We noted that environmental, physical security, and data backup and storage controls were in place. Such controls included fire detection and suppression systems, temperature monitoring, uninterruptible power supply, backup power source, key card access system, security cameras, security personnel, and tape backup system.*

*We noted one opportunity for improvement in the replacement of the dry pipe sprinkler system inside the computer room of the Data Center with a chemical-based fire suppression system. In the event of a data center fire, use of the dry pipe system could result in a significant amount of hardware loss due to water damage. Additionally in the event of significant hardware loss, the Data Center does have a redundant offsite facility to ensure that operations stay up and running during such an event.*

### Recommendations:

*CLA recommends the CAO evaluate the existing functionality and off-site back-up data center and consider the potential benefits of a chemical-based fire suppression system to assist in the mitigation of risk of hardware loss in the event of a data center fire.*

### Management Response:

*Prior to receiving the draft audit report, GCG's head of systems had been investigating whether a chemical-based fire suppression system was necessary for GCG as a whole. We determined that the cost, approximately $75,000 - $100,000, wasn't necessary since GCG carries insurance on all of our equipment and because, as mentioned in the Process Audit Report, GCG maintains a redundant offsite facility to ensure operations stay up and running in the event of a data center fire. However, if the CAO wants to authorize that expense, GCG will proceed to have the system installed.*

# Detailed Observations and Recommendations

## 6.9 Individual Claims Testing

Through December 31, 2012, DHECC had processed and issued 68,954 claim notices. A notice is the outcome of a particular claim being processed and each notice has one of four outcomes:

- Eligible – payment due
- Eligible – no payment due
- Incomplete
- Denial

As of December 31, 2012, 98,120 claims had been submitted and captured through the claims processing portal. Of those claims submitted, 68,954 (70%) had been processed and a notice issued. Additionally, as of December 31, 2012, notices of eligibility and payment had been processed for 15,894 claims, totalling $1,063,262,525. The table illustrates how DHECC has increased operations and the activity levels of the first full month of operations, the first six months of operations, and the first quarter of 2013.

| Metric | As of July 2012 | June 2012 – December 2012 | January 2013 – March 2013 |
|---|---|---|---|
| Total Number of Claims Processed* | 1,800 | 68,945 | 64,971 |
| Total Award Amounts Processed | $65,672,562 | $1,634,102,344 | $1,144,341,198 |
| Percentage of Total Awards Processed for Individuals | 43.42% | 32.61% | 25.58% |
| Percentage of Total Awards Processed for Individuals with Business | 0.00% | 9.91% | 13.91% |
| Percentage of Total Awards Process for Business | 56.58% | 57.48% | 60.52% |
| Average Number of Claims Processed Monthly | 1,800 | 11,492 | 21,657 |

*Each claim may have more than one notice generated for it throughout the process.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

The graph immediately below depicts the length of time (in days) on average to process the number of claims that had notices issued in a particular month. The points on the graph are based on issuance of the first notice that is generated for a claim. Claims may have additional notices or revised award amounts generated in a subsequent month based on the outcome of the first notice. The increase in average number of days to process a claim to first notice is due the increase in volume of claims received by DHECC. The second graph depicts the number of claims received on a monthly basis.



*Source: DHECC Notices File*



*Source: DHECC All Claims File*

**Detailed Observations and Recommendations**

10 claim categories were included in the population of our testing during Project I, but not all 10 claim categories were selected. We used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims. We tested 96 paid claims across the claim categories. We did not test claims that had a status of "in-process" as of December 31, 2012. The results of Project I are exhibited below.

| Program Review | # of Claims Sampled | Total $ of Sample | # of Claims with Variance | Total $ Of Over-payments | % of Over-payments | Total $ Of Under-payments | % of Under-payments |
|---|---|---|---|---|---|---|---|
| Seafood Compensation | 33 | $66,909,281 | 2 | $418 | 0.000% | $0 | 0.000% |
| Individual Economic Damage | 2 | $13,364 | 0 | $0 | 0.000% | $0 | 0.000% |
| Business Economic Loss | 15 | $26,737,487 | 2 | $2,494 | 0.008% | $0 | 0.000% |
| Vessel of Opportunity Charter Payment | 20 | $868,000 | 0 | $0 | 0.000% | $0 | 0.000% |
| Vessel Physical Damage | 1 | $12,778 | 0 | $0 | 0.000% | $0 | 0.000% |
| Coastal Real Property Damage | 24 | $141,352 | 0 | $0 | 0.000% | $0 | 0.000% |
| Wetlands Real Property | 1 | $15,750 | 0 | $0 | 0.000% | $0 | 0.000% |

*See Appendix B for breakdown and explanation of claim categories not tested during Project I.*

Instances were identified above where claimants were paid in excess of what they should have received as outlined in the Settlement Agreement. We were informed by the CAO throughout the course of our work, that any error identified resulting in a claimant being underpaid, would be corrected. Any instance identified resulting in a claimant being overpaid; DHECC would not request the claimant return the excess payment received. However, if a claimant received an overpayment for one claim category and was awarded an additional payment for another claim, the identified overpayment will be offset against any additional payments to that claimant.

In addition to our paid claims testing, we also performed trending on denied claims and appealed claims. A breakdown of the results by claim category is as follows:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.9.1 Seafood Compensation

**Purpose:**

*The Seafood Compensation Program covers damages suffered by Commercial Fishermen, Seafood Crew, or Seafood Vessel Owners that owned, operated, leased, or worked on a vessel that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012. In addition, it covers damages suffered by Oyster Leaseholders and Individual Fishing Quota (IFQ) Owners. The Seafood Compensation Program does not apply to claims relating to fishing, processing, selling, catching, or harvesting of menhaden (or pogy) fish. The Seafood Compensation Program is capped at $2.3 billion.*

**Results:**

*CLA identified two calculated claim payment variances totaling $418 out of the 33 Seafood Compensation Program claims for which we performed procedures, and the exceptions are broken down as follows:*

- *The two claims with a variance in payment calculated between DHECC and CLA, totaling $418 in overpayments was due to an incorrect calculation of the amount of allowable accountant reimbursement in accordance with the Settlement Agreement*

*While CLA did identify exceptions during our Seafood Compensation Program claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

**Recommendations:**

*CLA recommends that DHECC strengthens its quality control reviews of claims processed including allowable accountant reimbursement calculations and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

**Management Response:**

*BG agrees there is a discrepancy in the Claimant Accounting Support calculation for the claims noted by the auditors. Apart and independent of the external auditor findings, BG found and corrected the Notice mapping that caused the overpayments prior to receiving the audit report. BG recorded the overpaid amounts and will offset the overpaid amounts from payments to any future claims (Claim ID 37202: $1,123,35; Claim ID 4379: $361.25).*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.9.2 Individual Economic Damage

### Purpose:
*Individual Economic Damage claims are claims submitted by Individuals, who shall be defined as (i) Natural Persons who (a) satisfy (or whose employers satisfy) the Class Definition and (b) whose losses are not excluded from the Class and (ii) who seek compensation for lost earnings from employment due to or resulting from the DWH Spill for claims that are not excluded from the Class.*

### Results:
*We identified no exceptions for the two Individual Economic Damage claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

## 6.9.3 Business Economic Loss

### Purpose:
*The Business Economic Loss framework sets forth the standards for evaluating claims and determining compensation for Businesses that suffered an Economic Loss as a result of the spill.*

### Results:
*We identified two calculated claim payment variances totaling $2,494 in overpayments out of the 15 Business Economic Loss claims for which we performed procedures and the exceptions are broken down as follows:*

- *The two claims for which CLA noted an exception in that the calculated claim payment had input errors and/or expenses were not categorized as fixed or variable expenses in accordance with the Settlement Agreement resulting in $2,494 in overpayments*

*While CLA did identify exceptions during our Business Economic Loss claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

### Recommendations:
*CLA recommends that DHECC strengthens its quality control reviews of claims processed and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

### Management Response:
*It appears that the overpayment of $2,494 resulted from data input errors and expense misclassifications. The vendors have discussed these findings with their staff. They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

31

# Detailed Observations and Recommendations

## 6.9.4 Vessel of Opportunity Charter Payment

### Purpose:
*Vessel of Opportunity (VoO) damage claim category addresses damages suffered by Natural Persons or Entities who registered their vessels to participate in BP's Vessels of Opportunity program, executed a VoO Master Vessel Charter Agreement with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as Charterer, and completed the initial VoO training program. VoO participants can make VoO Charter Payment Claims regardless of whether they were dispatched or otherwise asked to perform work under the program.*

### Results:
*We identified no exceptions for the 20 VoO claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

## 6.9.5 Vessel Physical Damage

### Purpose:
*A Vessel Physical Damage Claim is a claim for physical damage to a vessel resulting from the Deepwater Horizon Incident or certain response clean-up operations, including the cost of removal of equipment or rigging added to the vessel as part of the response activities.*

### Results:
*We identified no exceptions for the Vessel Physical Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

### Recommendations:
*No exceptions were noted; therefore no management response is necessary.*

### Management Response:
*No response necessary.*

## 6.9.6 Coastal Real Property Damage

### Purpose:
*Individuals and Entities who owned or leased coastal real property or boat slips located in the Coastal Real Property Claim Zone at any time from April 20, 2010 to December 31, 2010 can make Coastal Real Property Damage Claims for damage to that property.*

*In addition, owners of real or personal property located in the Coastal Real Property Claim Zone that was physically damaged in connection with the Deepwater Horizon Incident response cleanup operations can make claims for that physical damage to real or personal property.*

# Detailed Observations and Recommendations

**Results:**
*We identified no exceptions for the 24 Coastal Real Property damage claims for which we performed procedures. The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**
*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**
*No response necessary.*

## 6.9.7 Wetlands Real Property Damage

**Purpose:**
*Individuals and Entities who owned wetlands real property located in certain geographic areas at any time between April 20, 2010 and April 16, 2012, can make claims for Wetlands Real Property Damage. If an individual or entity has property located in the Wetlands Real Property Compensation Zone, person or entity could receive a Settlement Payment depending on whether the property is considered oiled or non-oiled and what the acreage is.*

*In addition, owners of real or personal property located in the Wetlands Real Property Compensation Zone that was physically damaged in connection with the Deepwater Horizon Incident response clean-up operations can make claims for that physical damage to real or personal property.*

**Results:**
*We identified no exceptions for the Wetlands Real Property Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**
*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**
*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.9.8 Denied Claims Statistics

#### Purpose:
*Denied claims are claims submitted to DHECC for processing under the Settlement Agreement by a claimant that are determined to not meet causation as defined in the Settlement Agreement. Causation dictates a claim's eligibility and if the claim can be processed for potential payment.*

#### Results:
*As of December 31, 2012 DHECC had processed and issued a notice of denial for 6,245 claims (9% of all notices issued).*

- *2,141 (34%) of the denial notices relate to the individual economic loss claim category.*

#### Recommendations:
*Denied claims were trended with statistics noted above; therefore no management response is necessary.*

#### Management Response:
*No response necessary.*

### 6.9.9 Appealed Claims Statistics

#### Purpose:
*Appealed claims are claims that are determined to be eligible for payment as processed by DHECC in accordance with the Settlement Agreement that are appealed by BP or the claimant. BP can appeal any claim with a calculated payment of $25,000 or more. The claimant can appeal the calculated award amount they receive and request that their claim be submitted for reconsideration.*

#### Results:
*As of March 25, 2013 DHECC had processed and issued a notice for 68,954 claims, totaling $1,063,262,525. Of those claims processed, 1,260 had been appealed (1.83% of total notices issue), the breakdown between BP and Claimant appeals is as follows:*

- *BP appealed 897 (71%) claims, totaling $629,296,298*
- *Claimants appealed 363 (29%), totaling $3,699,307*

*As of our fieldwork date, March 31, 2013, there are currently 849 appealed claims with a status of pending with original calculated compensation amounts totaling $437,207,591.*

#### Recommendations:
*Appealed claims were trended with statistics noted above; therefore no management response is necessary.*

#### Management Response:
*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Appendix A**

**Individuals Interviewed**

# Appendix A

## Individuals Interviewed During Project I Of The Process Audit

### The Claims Administrator's Office

| | |
|---|---|
| Patrick Juneau | Claims Administrator |
| Michael Juneau | Special Counsel |
| David Odom | Chief Executive Officer |
| Bob Levine | Chief Financial Officer |
| Kirk Fisher | Director of Business Processes & Reporting |
| Chris Reade | Chief Information Officer |
| David Welker | Director of Fraud, Waste, & Abuse |
| Philip Ollendike | Reporting & Audit |
| Henry Mitchell | Reporting & Audit |

### BrownGreer

| | |
|---|---|
| Orran Brown | Partner |
| Lynn Greer | Partner |
| Roma Petkauskas | Partner, New Orleans Claims Processing Center |
| Bob Staneart | Information Systems |

### Garden City Group

| | |
|---|---|
| Stephen Cirami | Project Manager |
| Jennifer Keough | Call Center Lead |
| Shandarese Garr | Mail Center Lead |
| Drew Sommer | Senior Vice President, Systems & Technology |

### HUB enterprises

| | |
|---|---|
| Chip Romero | President |
| Dwayne Regan | Vice President, Security |
| David Buchanan | Vice President, Fraud, Waste, & Abuse |

### Postlethwaite & Netterville

| | |
|---|---|
| Mark Staley | Director |
| Robin Pilcher | Director |
| Corey Jambon | Consulting Manager |

### PricewaterhouseCoopers LLP

| | |
|---|---|
| Charles Hacker Jr. | Partner |
| Theodore Martens | Partner |

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

**Appendix B**

**Appendix B**

**Claim Categories Not Included In Project I Testing**

## Appendix B

The Following claims categories were not selected for Project I testing based on low dollar and number of claims volume.

| Claims Category | # of Claims Paid as of December 31, 2012 | $ Paid as of December 31, 2012 | % of Total Paid Claims as of December 31, 2012 |
|---|---|---|---|
| Subsistence Damage | 0 | $0 | 0.000% |
| Individual Periodic Vendor or Festival Vendor Economic Loss | 0 | $0 | 0.000% |
| Real Property Sales Damage | 206 | $11,075,437 | 1.042% |
| Failed Business Economic Loss | 0 | $0 | 0.000% |
| Start-Up Business Economic Loss | 40 | $7,811,120 | 0.735% |

The purpose of each claim category not selected for Project I testing is listed below:

### Subsistence Damage

**Purpose:**
*Subsistence Damage is a loss of Subsistence use of natural resources arising from the Deepwater Horizon Incident. This includes damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume, or trade Gulf of Mexico natural resources (including Seafood and Game) in a traditional or customary manner, to sustain their basic personal or family dietary, economic security, shelter, tool, or clothing needs and who relied on Subsistence resources that were diminished or restricted due to the Deepwater Horizon Incident.*

### Individual Periodic Vendor or Festival Vendor Economic Loss

**Purpose:**
*Individual Periodic Vendor or Festival Vendor loss is for individuals who regularly provide the specific goods or services who meet the following criteria:*

1. *Regularly sold at retail during 2009 and 2010 any of the legal food, souvenir, art, tourist-related or water-related goods or services or substantially equivalent items ("Covered Sales") to CONSUMERS in Zones A,B or C during May through December 2009 and / or May through December 2010.*
2. *Made such Covered Sales, primarily to non-local CONSUMERS, except that water related Covered Sales, need not be primarily made to non-local CONSUMERS.*
3. *Did not maintain a permanent business location in a building at which the claimant made Covered Sales.*
4. *Held any licenses as required by law.*
5. *Was not employed by an employer in connection with such Covered Sales.*
6. *Does not have Tax Information Documents sufficient to support a claim under the Business Compensation Framework for this claimed loss.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Appendix B

### Real Property Sales Damage

**Purpose:**

*Real Property Sales Damage is economic loss suffered by sellers of residential property located in a specific geographic area, who sold their properties at a lower price because of the Deepwater Horizon Incident. In order to be eligible to file a Real Property Sales Damage claim, the claimant must have owned the property on April 20, 2010, and the sale of the property must have closed between April 21, 2010 and December 31, 2010. If the sales contract was executed prior to April 21, 2010, the property sales price must have been reduced because of the Deepwater Horizon Incident. Real Property Sales do not include transfers from borrowers to lenders as part of a foreclosure or a similar process.*

### Failed Business Economic Loss

**Purpose:**

*A Failed Business commenced operations prior to Nov. 1, 2008 and that on or after May 1, 2010 and prior to December 31, 2010 either, (i) Ceased operations and wound down, or (ii) Entered bankruptcy (through filing a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) Initiated or completed a liquidation of substantially all its assets. There are also guidelines for Failed Start-Up Businesses those commenced operations after Nov. 1, 2008. These claims have similar causation requirements as standard Failed Business Economic Loss Claims.*

### Start-Up Business Economic Loss

**Purpose:**

*A Business is considered a Start-Up Business if it began operations between November 1, 2008 and April 20, 2010. The framework for Start-Up Businesses does not apply to (i) Failed Businesses, or (ii) claims covered under the Seafood Program.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Exhibit E
## Filed Under Seal

# Exhibit F

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel 650.849.5300
www.gibsondunn.com

George H. Brown
Direct: +1 650.849.5339
Fax: +1 650.849.5039
GBrown@gibsondunn.com

January 27, 2014

Mr. David Welker
CEO
Court Supervised Settlement Program
935 Gravier Street, Suite 1905
New Orleans, LA 70112

Re:     Error and Fraud Risk Detection and Mitigation in the Deepwater Horizon Court
        Supervised Settlement Program

Dear Mr. Welker:

        We have been told that the CSSP is now working to rebuild its internal control
policies and procedures with respect to detecting and preventing fraud and abuse in the
claims process – a process that is particularly important in light of the Fifth Circuit's recent
decisions and the District Court's orders on matching revenue and variable expenses under
the settlement agreement.  During our recent meeting with the CSSP Accounting Vendors,
BP was asked for additional input on rebuilding internal control procedures relating to fraud.
Towards that end, BP has prepared an outline of the key principles that should be included in
any redesigned overall error and fraud risk detection and mitigation program.  In addition, we
have prepared a "preliminary risk assessment" relating to BEL claims which we think may
be a useful starting point for the risk assessment activities that we expect the CSSP will
undertake as it rebuilds its BEL claims processing procedures.  We assume that the Claims
Administrator has considered and now put into place some aspects included in our summary
of key principles – as ample time has passed to do so during the life of the CSSP and since
the first Freeh report identified numerous weaknesses in the CSSP's controls – but the
second Freeh report makes plain that an unacceptable number of weaknesses remain.  We
have not tried to evaluate which of the principles the Claims Administrator may have
attempted to partially or fully implement.  I am including certain important proposals along
with this letter.

        Of course, the effectiveness of any set of policies and procedures depends heavily on
the effectiveness of the organization's leadership.  Policies that protect against abuse of
facility resources, conflicts of interest, and fraud will only be effective if senior leadership
does not engage in such conduct – and will not be effective in an organization in which

**GIBSON DUNN**

Mr. David Welker
January 27, 2014
Page 2

senior leadership has failed to detect fraud and error and failed to respond to it aggressively
and timely on its own.

That said, effective management of the risk of material errors or fraud occurring and
remaining undetected should be based on a three-phased approach: prevention, detection,
and response. Policies and procedures designed to prevent errors and irregularities in the
administration of the CSSP should include a robust program of error and fraud awareness
training at all levels of the CSSP, periodic formal error and fraud risk assessments by both
the Claims Administrator and its outside auditors, implementation of appropriate controls
and procedures to reduce the identified risks to an acceptable level, implementation of an
effective internal audit program, creation of an effective information technology system, and
implementation of a rigorous program of due diligence with respect to CSSP employees and
vendors, including with respect to actual and potential conflicts of interest.

As you review the summary internal control framework we are providing with this
letter, we assume you will recognize that it is consistent with the Committee of Sponsoring
Organizations of the Treadway Commission's ("COSO") updated *Internal Control —
Integrated Framework* and covers all areas of the claims administration process, including
identification of and training for professionally qualified and technically competent
personnel and vendors, and claims verification, documentation and review. In addition, the
CSSP should use Service Organization Control ("SOC") reports in accordance with AICPA
standards, as a method of vendor management.

The CSSP should ensure that there is an independent person or group responsible for
oversight and management of fraud detection and mitigation procedures and to investigate or
review potential fraud or corruption as soon as possible after it has been identified in the
event that preventive processes and controls fail. As outlined in our summary of key
principles, the CSSP's fraud detection protocols should include routine post-claim reviews
based on identified risk criteria; clear internal and external reporting mechanisms for
employees, vendors and others to report instances of fraud and abuse; establishing effective
auditing and monitoring of the CSSP's internal controls program; and using proactive
forensic data analysis tools to identify potential fraud and other misconduct. We recognize
that the CSSP has only very recently adopted an internal fraud hotline, and, as noted, our
summary outline of key principles does not attempt to identify which aspects of internal
controls the Claims Administrator has attempted to implement or that he is in the process of
attempting to implement.

In our view, the adoption and implementation of a robust error and fraud risk
detection and mitigation program is essential to a properly functioning organization like the
CSSP. Moreover, the Claims Administrator failed to conduct a robust fraud risk assessment

**GIBSON DUNN**

Mr. David Welker
January 27, 2014
Page 3

and failed to implement appropriate internal controls from the inception of the settlement program through today, and that has contributed to the failure to prevent or detect the many conflicts, corrupt activity, and ethical lapses that have been reported to date. Therefore, before the CSSP resumes the processing and payment of BEL claims in any significant volume, the CSSP should ensure that a program based on the key principles outlined in our attached summary is fully implemented. Please confirm that you intend to do so.

In addition to the attached, we have been working on a detailed list of proposed controls that we expect to share with the CSSP soon. Those proposed controls are focused on entity level controls and BEL claims processing controls and are intended to be helpful suggestions (i.e., not mandates or demands) as you continue to work towards the implementation of an appropriate control environment for the operation of the CSSP and processing of BEL claims.

BP requests that the Claims Administrator review the accompanying materials and respond by indicating which internal control features are being implemented and what the Claims Administrator intends to do about the features that have not yet been adopted. We will follow up with you in our upcoming regular meetings.

Sincerely,

George Brown /NS

George H. Brown

GHB/knb

**January 24, 2014**

# SUMMARY OF KEY PRINCIPLES FOR CSSP INTERNAL CONTROLS FRAMEWORK

# TABLE OF CONTENTS

Page

I.      ERROR AND FRAUD RISK DETECTION AND MITIGATION .................................... 1

   A.      Error And Fraud Prevention Protocols ............................................. 1

       1.      Error and Fraud Awareness Training ........................................... 1

       2.      Error and Fraud Risk Assessment .............................................. 2

       3.      Internal Audit Program ........................................................... 3

       4.      Vendor Oversight .................................................................. 4

       5.      Employment and Third Party Due Diligence ................................. 4

       6.      Conflicts of Interest ............................................................. 5

   B.      Fraud Detection Protocols .......................................................... 6

       1.      Post-transaction review ......................................................... 6

       2.      Hotline and Whistleblower Mechanisms ...................................... 7

       3.      Auditing and Monitoring ......................................................... 7

       4.      Proactive Forensic Data Analysis .............................................. 7

   C.      Fraud Response Protocols .......................................................... 8

       1.      Internal Investigations Protocol ............................................... 8

       2.      Reporting Requirement .......................................................... 9

       3.      Remedial Action Protocols ...................................................... 9

           a)      Internal Control Review Following Discovery of Fraud .................. 10

           b)      Recovery of Proceeds of Fraudulent Conduct ........................... 10

II.     PRELIMINARY ERROR AND FRAUD RISK ASSESSMENT FOR CSSP BEL
        CLAIMS ................................................................................. 11

   A.      Financial Statement Fraud ......................................................... 11

   B.      CSSP Risk Factors .................................................................. 12

   C.      Potential Claims Process Fraud Scenarios ...................................... 13

   D.      All Industry Error And Fraud ...................................................... 14

   E.      Agriculture Error And Fraud ...................................................... 16

   F.      Construction Error And Fraud ..................................................... 16

   G.      Manufacturing Error And Fraud .................................................. 17

   H.      Professional Services Error And Fraud ........................................... 18

   I.       Real Estate Error And Fraud ..................................................... 18

   J.      Retail Error And Fraud ............................................................ 18

**TABLE OF CONTENTS**
(continued)

Page

K.  Wholesale/Distribution Error And Fraud ................................................................ 19

L.  Healthcare Error And Fraud ..................................................................................... 20

M.  Bar & Restaurant And Other Food Service Error And Fraud ............................... 20

N.  Tourism And Hospitality Error And Fraud ............................................................ 20

O.  Transportation & Warehousing Error And Fraud .................................................. 21

III.  ERROR AND FRAUD DETECTION, MITIGATION, AND REMEDIATION
PROCEDURES AND POLICIES ...................................................................................... 22

A.  Internal Control Environment ................................................................................. 22

B.  Control Activities ..................................................................................................... 22

C.  Internal Controls ...................................................................................................... 22

## I.      ERROR AND FRAUD RISK DETECTION AND MITIGATION

Among the risks faced by the CSSP are that material errors, irregularities or frauds will occur and remain undetected and thus will distort the claims determination process and lead to the payment of claims that are not based on actual economic loss, or losses traceable to the Deepwater Horizon accident.   The CSSP must be committed to minimizing such errors, irregularities and fraud through the development, implementation and regular review and enhancement of risk identification processes, and through well developed prevention, detection and response strategies.

The information below outlines the key principles that should be used for developing a program for achieving those goals.

Effective fraud risk management is based on a three-phased approach:

| Phase | Description |
|---|---|
| **Prevent** | Proactively implementing measures to prevent errors and fraud is the first component of an effective error and fraud risk management program.  Prevention measures include organization wide strategies such as regular external and internal communication of the anti-fraud program, fraud awareness training, pre-employment screening and business unit specific strategies such as fraud risk assessment. |
| **Detect** | Detection measures incorporate actions, programs, controls, and systems designed to discover circumstances indicative of errors or fraud and misconduct such as data mining.  Appropriate detection procedures are the second component in the management of fraud. |
| **Respond** | Response measures include controls designed to take corrective action to remedy the impact caused by fraud or misconduct. |

To achieve these goals, the following sections identify targeted and scalable error and fraud risk management procedures the CSSP should use to address potential error or fraud risk occurring in the BEL process.

### A.      Error And Fraud Prevention Protocols

### 1.      Error and Fraud Awareness Training

CSSP must raise the awareness of its directors, staff and third party vendors of error, fraud and corruption risks, including early warning signs and how to respond if fraud or corruption is suspected.  CSSP's commitment to fraud prevention and detection should be communicated both externally and internally on an ongoing, regular basis.

Below is a list of communication strategies and methods to raise awareness:

- ***Written anti-fraud and corruption policies (Code of Conduct).***  There exists a written anti-fraud and corruption policy and a code of conduct.  The Claims Administrator should take steps to ensure that all CSSP employees acknowledge in writing that they are aware of the CSSP's written anti-fraud and corruption policies and code of conduct and agree to abide by them.

- ***Regular formal awareness training.***  Face to face training facilitates increased learning of core concepts and is generally supplemented by appropriate e-learning modules and assessments to ensure and test employee's knowledge of the policies. Training sessions should also be embedded at the orientation training.

- ***Intranet communication/Instructional videos.***  CSSP should publish fraud control related policies, news and bulletins, instructional videos and other information regarding promoting fraud awareness on the Intranet site or common platform.

- ***Report investigations and take disciplinary action against perpetrators.***  To maximize deterrent value, instances of uncovered fraud should be publicized, emphasizing that all offenders will face disciplinary and other appropriate action. This discourages employee involvement in fraud and, conversely, encourages employee efforts to assure the integrity of CSSP operations.

## 2.    Error and Fraud Risk Assessment

The Claims Administrator and outside auditors should periodically perform an Error and Fraud and Compliance Risk Assessment to understand the risks that are unique to the CSSP claims process, and identify gaps or weaknesses in CSSP's controls to mitigate those risks.  The CSSP should also develop a practical plan for appropriately using sufficient resources to develop any additional policies, procedures and controls required to reduce the identified risks to an acceptable level.  The assessment should be conducted across the entire organization, taking into consideration CSSP's significant claim processes and identified errors and irregularities that have occurred during the life of the organization.

The objectives of the CSSP fraud risk assessment process are to:

- ***Identify and assess fraud risk factors through interviews and leveraging other pre-existing documentation.***  Fraud risk factors include past frauds and allegations of fraud, unusual trends or relationships identified through the performance of analytical procedures, and consideration of the potential role IT controls could play in early detection or prevention of fraud.

- ***Identify, to the extent possible, the specific fraud risks present in the current CSSP business practices, policies and claims processing and other procedures.***  Key components of this step include comprehensive discussions with individual with

relevant knowledge and information, including CSSP management and staff, the CSSP Accounting Vendors, BP's counsel and experts, industry specialists and others as appropriate, considering past frauds within the organization, and identifying possible fraud schemes, without consideration of the existence or effectiveness of internal controls.   This process must include evaluation of the pervasiveness, likelihood and the significance of any potential impact of the fraud risks and scenarios identified.

- ***Evaluate whether mitigating controls exist and are effective.***  Key components to this step include mapping existing controls to prioritized fraud risks, assessing the degree to which particular fraud risks are mitigated by existing controls, and identifying what potential remediating controls are necessary, if any.

- ***Develop fraud mitigation strategies to address risks with an unacceptable residual risk rating.***

If the existing CSSP policies and internal control framework are sufficient to mitigate effectively, at least partially, the fraud risks identified, steps should be taken to ensure that these fraud risks remain adequately controlled.  Accordingly, the CSSP should continue to actively monitor those key control mechanisms reported as effective during the fraud risk assessment process.  The Claims Administrator should undertake a series of reviews and periodic follow-up to ensure that the selection of controls remain operational and effective.

Based on the results of the risk assessment, the Claims Administrator should propose mitigation strategies to address the remaining fraud risk discovered during the assessment process for which the existing policies and internal control framework appear insufficient.  The mitigation strategy should clearly define the fraud risk and the personnel involved with implementing the strategies.

The Claims Administrator should immediately identify a person within the CSSP who will be responsible for monitoring the implementation of the fraud risk mitigation strategies arising from the fraud risk assessment and reporting progress to the Claims Administrator to ensure that all timetabled strategies are implemented accordingly.

## 3.    Internal Audit Program

The Internal Audit Program ("IAP") is an independent assurance and consulting activity designed to evaluate and improve the effectiveness of risk management, control and governance arrangements within the claims administrative process.  The IAP should use a systematic and disciplined approach to assist in:

- developing and maintaining a culture of accountability and integrity;

- facilitating the integration of risk management into day to day business activities and processes;

- promoting a culture of cost consciousness, self-assessment and adherence to the highest ethical standards;

- evaluating the potential for the occurrence of fraud and how the agency manages fraud risk; and

- assisting management to investigate fraud, identify the risks of fraud and develop fraud prevention and monitoring strategies.

## 4.      Vendor Oversight

The Claims Administrator should obtain assurances that the significant vendors are working in an adequate control environment and the processes are functioning as designed.  An assessment of the service providers can be accomplished through the utilization of the industry recognized Service Organization Control ("SOC") reports.  SOC reports are an industry standard for all companies of any size that receive a financial statement audit and outsource a significant process or portion of their internal control environment to third parties.  These reports are used to evaluate the controls of third party services and vendor operations to ensure that the results provided are valid and reliable.

There are three basic forms of the SOC report: SOC 1, SOC 2, and SOC3.  Reports are further described below:

- A SOC 1 is prepared in accordance with Statement on Standards for Attestation Engagements ("SSAE") No. 16, Reporting on Controls at a Service Organization to evaluate the effect of the internal controls over financial statement assertions and financial reporting.

- A SOC 2 is a Trust Services Report for service organizations which addresses the controls related to security, availability, processing integrity, confidentiality, and/or privacy of a service organization's system.

- A SOC 3 report is just the assertion and an opinion from the longer SOC 2 report.

The SOC reporting framework was developed by the American Institute of Certified Public Accountants ("AICPA").  All three SOC reports must be performed by an independent auditor and should be obtained annually from the vendor.

## 5.      Employment and Third Party Due Diligence

The Claims Administrator and its outside auditor should periodically perform CSSP employee and CSSP Claims Administration vendor assessments.  This includes performing due diligence in the hiring, retention and promotion of employees, agents, vendors, and other third parties.  The scope and depth of the due diligence process will vary based on the organization's identified risks, and the individual's job function and/or level or authority.

SUMMARY OF  INTERNAL CONTROLS PRINCIPLES FOR CSSP CONSIDERATION

Employee and third party due diligence is reduces an organization's potential exposure to internally based fraud and corruption.  Screening process reduces the risk of a potential security breach and helps assure the integrity, identity and credentials of personnel and third parties with whom the CSSP deals in the claims administration process.

Employment screening should be considered for all new employees joining the organization (including contractors) and all personnel being transferred to a senior executive position or to a position considered by the organization to be "high-risk" in terms of the potential exposure to fraud or corruption associated with those positions.

The employment screening process should include:

- verifying personal identity (using at least two forms of identity documentation such as passport, birth certificate or driver's license);

- verifying formal qualifications (sighting diplomas and contacting the relevant institution for confirmation);

- conducting a police criminal history search;

- conducting bankruptcy checks; and

- reviewing third party vendor business relationships and evaluating interests with related parties.

It is also important to consider and evaluate any gaps in the employment history of a potential candidate and the reasons for these gaps.

## 6.    Conflicts of Interest

A conflict of interest is a circumstance or situation that has, or may be perceived by a fully informed, reasonable observer to have an impact on the objective, unbiased performance of the CSSP or its personnel.  Proper due diligence procedures should be performed to deter the appearance of unfair or biased review by the CSSP.   Steps for deterrence include:

- conducting background checks of employees and third party vendors for pre-existing or ongoing business relationships with claimant attorneys or accounting professionals assisting claimants;

- implementing a policy to ensure all possible conflicts of interest are disclosed at the onset of employment or when a vendor is engaged, periodically confirming the absence of conflicts or potential conflicts, and terminating or dismissing those responsible for violations of the CSSP's conflicts policy; and

- ensuring claim processors and reviewers are randomly assigned claim files for which they are qualified to review.

### B.        Fraud Detection Protocols

The CSSP should identify an individual responsible for regular performance of fraud detection procedures to identify fraud and corruption to the extent it has occurred.

Fraud and corruption detection may be achieved through:

- enhancing fraud and corruption awareness and reporting responsibilities amongst employees working across all aspects of the claims processing;

- vigilance on the part of vendor management, who must be aware of their responsibility to identify and report any suspected or actual fraud or corruption activity;

- strategic use of the Internal Audit Program by building fraud detection procedures into the internal audit undertaken and to identify auditing priorities;

- development of automated Data Analytics routines, which should be run at regular intervals to identify unusual transactions, or other data anomalies indicative of potential fraud and corruption that should be investigated.  This can be done both as proactive and reactive measures;

- development of specific detection strategies for action by the CSSP and periodic management review as part of the day to day activities; and

- implementation of a hotline or other independent channel through which CSSP personnel, vendor personnel and others may report potential instances of fraud or other inappropriate conduct.

Responsibility for developing and maintaining systems and procedures to detect fraud and corruption (as specified above) rests with the Claims Administrator.  However, all employees and vendors must be alert to the potential for fraud and corruption and to take active steps to detect and report any suspected fraud and corruption.

### 1.        Post-transaction review

A targeted review of processed claims is an effective way to identify fraudulent or corrupt activity.  The population for review should be selected based upon risk criteria and selected in a systematic and documented manner.   Such a review may uncover instances of altered or missing documentation, falsified or altered authorization or inadequate documentary support.  In addition to the possibility of detecting fraudulent transactions, employing a post-transaction review process can also have a significant fraud prevention effect, as the threat of detection may be enough to deter some who would otherwise be tempted to engage in fraud.  The review may lead to the discovery of new methods or risk factors to be incorporated in future fraud detection procedures.

## 2.      Hotline and Whistleblower Mechanisms

A fraud and corruption control program should have clearly communicated internal and external reporting mechanisms for employees and others to report suspected fraud or corruption. Internal reporting channels may include reporting through line management or directly to a nominated individual who has responsibility for fraud and corruption control.  An effective fraud and corruption control program should also include an external anonymous reporting hotline.

"A Whistleblower Protection - Program for Entities" recommends the implementation of a whistleblower protection policy that encourages employees to report suspected fraud and corruption matters detected and provide for the protection of whistleblowers.  This policy should extend beyond staff to suppliers, contractors and clients.  It is important that the policy is well communicated and understood.   Organizations should consider providing external parties, including employees of vendors and claimants, with an avenue to report suspected fraud or corruption.   This can be achieved, for example, by extending the staff reporting hotline to external stakeholders.

## 3.      Auditing and Monitoring

Auditing and monitoring processes (separate from the Internal Audit Program) are effective in detecting transactions that are out of the ordinary.  Auditing and monitoring should be done by an employee who is independent of the employee processing the claims.   The continuous auditing and monitoring of the internal controls surrounding claims processing can be instrumental in detecting vulnerabilities in the existing policies and controls.  While audits are important for assessing internal controls, vendor audits are also necessary in preventing noncompliance or fraud by vendors.  In addition to the traditional tools of observation and monitoring, technology is becoming increasingly useful in this area with the potential to use software tools to quickly scan large quantities of disparate information for anomalous transactions and suspicious trends.   These types of processes can be integrated with or run alongside existing IT systems.

## 4.      Proactive Forensic Data Analysis

The Claims Administrator should perform proactive data analysis to help highlight potential fraud and misconduct by using sophisticated analytical tests, and non-obvious relationship identification.  Data resulting from the CSSP process is an important source of information to detect fraudulent and, to a lesser extent, corrupt conduct.  By using software applications and techniques early on in the CSSP intake process, suspect transactions can be identified and investigated to assist in the detection of anomalous transactions.  Transactions can be analyzed using repeatable monitoring routines which help identify potentially fraudulent transactions on an on-going basis, focusing on transactions or areas that pose particularly significant risk.

## C.     Fraud Response Protocols

An effective fraud response program should provide CSSP management with a comprehensive guideline of the steps to be undertaken should a fraud event be suspected to ensure that an appropriate set of procedures are consistently followed in order to limit the risk associated with the investigation of fraud.  The CSSP should adopt policies which establish the organization's internal investigation protocols, including requiring that an investigation or review be conducted whenever a potential significant impropriety is identified.  A well-designed investigative process typically includes the following types of elements:

- protocols for responding to initial allegations (*e.g.*, decisions on internal and external notifications, selecting an unbiased and qualified internal or external investigation team, etc.);

- standard investigative procedures exist for those conducting the investigation (*e.g.*, steps required to preserve attorney-client privilege, interviewing and other investigative techniques, documentation requirements, etc.); and

- protocols for reporting findings from the investigation.

### 1.     Internal Investigations Protocol

An investigation into actual or suspected fraud and corruption should be conducted by appropriately skilled and experienced personnel who are independent of the area in which the alleged fraudulent or corrupt conduct occurred.   To obtain reasonable assurance that investigations are properly performed and reported, experienced personnel who are sufficiently independent of the CSSP or the matter under investigation should conduct investigations.

Internal investigations into fraud or misconduct should be conducted based on the following internal control guidelines:

- When an allegation of fraud or misconduct is identified, a CSSP investigation team should be advised of the potentially fraudulent conduct immediately.

- Upon receipt of a suspected fraud incident report, the immediate concern of the investigative team should be the preservation of evidence and the containment of loss.

- The investigative team should conduct an internal investigation or coordinate the services of external consultants to assist in an investigation into the alleged fraudulent conduct.

- Parties to an investigation should be required to enter into a confidentiality agreement in relation to the information coming into their possession during the course of the investigation.

- Any investigation and resulting disciplinary proceedings should be conducted in an atmosphere of transparency, independence, fairness and objectivity at all times.

- An investigation should comply with all relevant legislation.

- Adequate records should be made and kept of all investigations, findings, and outcomes. The investigation team should keep a register of all frauds reported and maintain files of all reports and working papers relating to investigations of fraud.

An investigation should be subject to an appropriate level of supervision and review by an independent and responsible group or committee with regard to and in consideration of the seriousness of the matter under investigation. When the initial investigation identifies a situation beyond the scope of the investigation team's capability, external expertise should be sought to assist in performing the investigation. The decision to obtain such external expertise should be determined by CSSP management with notice to and input from the Court, BP, and Class Counsel.

## 2.    Reporting Requirement

The investigative team should submit a written report to CSSP management, BP, and Class Counsel detailing the circumstances and, when appropriate, recommending appropriate remedial or disciplinary action with respect to all investigations. The investigative report should provide the following information:

- details and circumstances of the allegations of fraud or misconduct reported;

- observations and findings from the investigation scope and procedures performed;

- disciplinary actions or administrative remedies (*i.e.*, dismissal, demotion or reprimand) recommended or taken with respect to identified CSSP employees or CSSP Claims Administration Vendors found culpable in the matter;

- recommendation concerning referral of investigative matters to authorities for further investigation and/or the results of any completed prosecuted action;

- any monies recovered, both by administrative action and the use of the judicial process; and

- recommendations concerning internal control modifications to enhance the system's ability to prevent or promptly detect similar fraud in the future.

## 3.    Remedial Action Protocols

Remediation protocols are designed to provide guidance on when and how to execute remediation steps in response to substantiated allegations of fraud or misconduct. A well-designed remediation protocol should:

- include a written guideline for anti-fraud control or program remediation that has been approved by the appropriate levels of management at the CSSP;

- identify the group or department at the CSSP that will have primary responsibility for monitoring remediation steps;

- include recommended remediation steps based upon the substantiated facts resulting from an internal or external investigation including among others (1) dollar impact, (2) the position and associated level of trust of the wrongdoer, or (3) compliance, legal, or reputation risk; and

- training and reinforcement protocols.

### a)    Internal Control Review Following Discovery of Fraud

In each instance in which fraud is detected, the adequacy of the internal control environment should be reassessed, particularly those controls directly impacting the fraudulent conduct. When improvements are required, these should be implemented as soon as practicable and additional testing to identify similar events should be conducted consistent with the enhanced risk profile relating to such events.

CSSP management is responsible for ensuring that the internal control environment is reassessed and the recommendations arising out of this assessment are implemented. Fraud control procedures must be subject to regular monitoring and revision to ensure such controls are being implemented effectively and achiving their intended outcomes. This will help to ensure internal controls weaknesses and gaps are addressed to prevent the fraud from reoccurring. A summary of recommendations or requirements for the modification of the internal control environment should be provided to CSSP management.

### b)    Recovery of Proceeds of Fraudulent Conduct

The CSSP should establish a policy requiring that recovery action be undertaken whenever: (1) evidence of fraud, corruption or material error is identified, and (2) the likely benefits of such recovery will exceed the funds and resources invested in the recovery action, including the consideration of the benefits of the deterrent effects of vigorous recovery efforts. The investigation team, in consultation with government authorities, including the Department of Justice (DOJ), should be responsible for recovering any funds as a result of court orders or negotiated settlements with organizations or persons found to have been involved in fraudulent or corrupt conduct. The investigation team should refer likely instances of fraud and corruption to the DOJ for further investigation or potential criminal prosecution. Prosecutions are important in deterring future instances of fraud and in educating the public generally about the seriousness of fraud.

Fraud investigation and response are key elements of the overall fraud control framework and provide reasonable assurance that fraudulent acts are identified, and appropriate remedies are consistently applied. The reporting of fraud control outcomes can provide a deterrent effect which will assist in minimising the impact of fraud on CSSP operations. The CSSP should adopt

fraud control protocols that are subject to regular monitoring and revision, to ensure fraud controls are implemented effectively and achieving their intended outcomes.

# II.   PRELIMINARY ERROR AND FRAUD RISK ASSESSMENT FOR CSSP BEL CLAIMS

An effective error and fraud prevention and detection program begins with a strong internal fraud risk assessment process.  When implemented properly, an error and fraud risk assessment will enable the CSSP to better understand and identify risk factors that are specific to the CSSP and BEL claims.  The knowledge gained by the CSSP in undertaking an error and fraud risk assessment should be utilized to evaluate existing processes and procedures and identify ways in which errors and fraud could occur within the BEL claims process.  The fraud risk assessment process should be conducted on a regular basis and provide the CSSP with insight as to how to strengthen its overall antifraud program through evaluation of the effectiveness of existing internal controls.

The following items represent risks of undetected errors and fraud occurring based on observations from BP's participation in the claims process as an external party.  In addition, the CSSP must engage in a comprehensive internal fraud risk assessment process to ensure that material risks have been identified and appropriate controls have been implemented.

## A.   Financial Statement Fraud

Financial statement fraud is the deliberate misrepresentation of the financial condition of an enterprise through the intentional misstatement or omission of amounts or disclosures in the financial statements to deceive financial statement users.[1]  Financial statement fraud can be as simple as double counting inventory or as complex as fabricating entire transactions, customers, or business operations.  Financial statement fraud typically begins with manipulating the timing of transactions.  It is common accounting practice to recognize revenue when it is earned (regardless of when cash is exchanged) and to recognize expenses when obligations occur.  Known as accrual accounting, this provides a good picture of the results of operations for a period by matching revenues earned with the expenses incurred to generate those revenues.  By intentionally manipulating the recorded timing of transactions, a company misrepresents its financial position or its results of operations.  Abnormal patterns may be an indication that improperly timed transactions have been recorded, for example, quarter-to-quarter revenue figures that do not appear consistent with economic events or industry averages.

Revenue is the most commonly relied-upon metric in evaluating a company's financial position, and therefore tends to be the most susceptible to manipulation.  Improper revenue recognition, either prematurely or fictitiously, is the most common form of financial statement fraud.  Another common area for financial statement fraud concerns expenses.  The simplest way to use expenses to manipulate profits is by understating or omitting expenses, specifically during

---

[1] *See, e.g.,* Association of Certified Fraud Examiners, Fraud Examiners Manual, §1.303, (2010).

the benchmark periods.  Deferring expenses has the same effect on profits as overstating revenues.  A common indicator that a company has concealed or deferred expenses is recurring negative cash flows from operations or an inability to generate cash flows from operations while reporting earnings.

## B.    CSSP Risk Factors

CSSP's attitudes and actions toward BEL claims, including disputes over application of accounting treatments (*e.g.*, whether accounting principles have been misapplied, important financial information not disclosed or records manipulated or falsified), are themselves a significant risk factor.

One of CSSP's apparent primary financial statement fraud deterrence/detection procedures appears to have been the reconciliation of book financial statements to tax returns. This has been insufficient and ineffective.  The difference in net income between monthly financial statements and tax returns is simply assessed as a percentage of revenue, often with no meaningful inquiry into differences evidenced.  Material differences between the monthly book financials and the tax returns have not been investigated by a professional accountant with sufficient training to understand the differences.

Claimants often provide insufficient explanations when inquiries related to sales differences are made.  For example, claimants often provide one-line "reconciliations" with the reconciling item described as "accrual to cash adjustments".  Variances identified in the data may not be further reviewed by a professional accountant with sufficient training to investigate and additional documentation is not requested as support.  Little to no verification of source documentation is performed in any meaningful fashion which would uncover or deter fraud, which is a reflection of CSSP's attitude toward data processing, accounting functions, and concern about the reliability of financial reporting.

Individuals hired specifically to perform claims review by PWC and Postlethwaite may not have received the same training as employees hired in the ordinary course of business.

Individuals hired specifically to perform claims review may not have gone through the same rigorous background checks, particularly with regards to prior actions or activities considered to be unacceptable to CSSP, as employees hired in the ordinary course of business.

Individuals hired specifically to perform claims review may not possess required technical competence or professional qualifications relative to the size of the CSSP, nature and complexity of activities and systems.

There is a lack of formal job descriptions or other means of defining tasks and responsibilities that comprise particular jobs.  Individuals may not be aware of their responsibilities and expectations of them.

## C.    Potential Claims Process Fraud Scenarios

Reviewer states that the book to tax reconciliation was performed when, in fact, it was not and, as a result, CSSP has paid for work that was never performed.  Based on the manner in which the reconciliation is performed and documented, a supervisor has no means to identify whether the work was performed, adequate inquiries were made and/or what, if any, responses were received.

Reviewer colludes with claimant to inflate a claim and mask the fraud by either not performing the limited "reconciliation" procedures or not investigating differences.

Reviewer inappropriately relies on claimant's consolidated financial statements, despite evidence indicating that the claimants maintain and operate out-of-zone facilities.  Thus, in certain instances claimants' financial statements have included operations throughout the United States, without excluding revenues generated from facilities located outside the compensable zones.

Reviewer incorrectly designates the compensable zones (*i.e.*, used Zone A location rather than relying on the claimant's headquarters in Zone D) and applies the incorrect RTP to increase the claim award.

Reviewer incorrectly and inconsistently includes expense reimbursements and non-recurring, non-operational income as revenue during the benchmark periods.

Reviewer incorrectly relies on multiple and inconsistent sets of P&Ls submitted by the claimant, all of which are inconsistent with the tax returns.  Without explanation, the reviewer uses the amounts listed in the set of P&Ls submitted by the claimant without resolving the discrepancies.

Claimant utilizes the book to tax reconciliation to mask an underlying financial statement fraud by submitting a spreadsheet reconciliation between accrual basis monthly financial statements and cash basis tax return with no source document such as bank statements to verify adjustments.

Claimant changes an expense account name from one falling into a variable category to one falling into a fixed category in the benchmark period, thereby overstating benchmark variable profit.

Claimant changes an expense account name from a fixed category to one falling into a variable category in the compensation period, thereby understating compensation period variable profit.

Claimant understates revenue by reclassifying the revenue as a loan in the compensation period, thereby understating compensation period variable profit.

Claimant submits fixed and variable costs in the benchmark period at a summary level categorized as fixed, thereby overstating benchmark variable profit.

Claimant submits fixed and variable costs in the compensation period at a summary level categorized as variable, thereby understating compensation period variable profit.

Claimant incorrectly and inappropriately breaks fixed expenses between fixed and variable during the compensation period, thereby reducing variable profit in the compensation period.

Claimant moves revenue out of compensation months in the Compensation Period into non-compensation months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant moves expenses into compensation months from non-compensation months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant moves revenue into benchmark months in the Benchmark Period from non-benchmark months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant moves expenses out of benchmark months from non-benchmark months leaving annual totals undisturbed to fabricate or overstate a claim.

Claimant submits a claim on the cash basis when books are kept on the accrual basis.

Sub-ledgers which differ from and are not reconciled to the general ledger or financial statements are never reconciled with the monthly financial statements.

Claimant submits unsigned tax returns and/or fails to provide periodic financial statements routinely prepared in the normal course of the claimant's business.

## D.    All Industry Error And Fraud

Illegitimate or false sales transactions have been recorded to overstate revenues during the benchmark periods.  For example, a claimant can create a fake customer, or use a legitimate customer and falsify invoices, without actually processing the invoices for product or service delivery.

Revenue recognition is delayed, specifically during the Compensation Period.  In such cases, a company may close the books early or not record current-period sales until the next period.

Expenses are understated or excluded during the Benchmark Periods by not paying or delaying the payment of invoices to future periods.

Fixed costs are categorized purely based on the description of the costs without considering the nature of the expenditure and substance of the transactions.

Due to the ambiguity of expenses incurred by certain industries claimant can change an expense from falling into a variable category to one falling into a fixed category, or vice versa, thereby impacting the Benchmark and Compensation Period variable profit.    Such

reclassifications that are made as a result of the claims submission process and not reflected in the contemporaneous records are indicia of potential errors or fraud.

Significant decrease in revenue results from discontinuation of business units / operations prior to or during the compensation period, but claimant falsely attributes the loss in revenue to the oil-spill.

Significant undisclosed related party (*i.e.*, controlled entity) transactions are executed to improperly inflate earnings by masking their economic substance or distorting reporting results.

Accounting estimates (approximations of financial statement elements, item or account) are manipulated.   Estimates are included in financial reports when particular amounts are uncertain as they are dependent upon the outcome of a future event or upon information related to events that have not yet occurred or cannot be gathered.  Common examples include obsolete inventory, warranty claims, and percentage of completion.  Claimant could take advantage of the uncertainties to create favorable financial results.

The financial data uses inconsistent accounting methods between the Benchmark Period and Compensation Period to achieve favorable financial results for the claimants.

Cumulative adjustments at year end to commissions that were earned throughout the year are recorded when made and are not tied to the months in which the commissions were earned, causing commissions to be overstated in the monthly financial statements throughout the year. Similarly, compensation expense is recorded in the period in which it is paid, not when it is earned.

Corrections of revenue from prior periods are recorded when the correction is made rather than matched with the period in which the revenue was earned, resulting in misstated records for two months.

Bad debt expense is recorded in the income statement when the accounts are written-off or deemed uncollectable, rather than when the related revenue was recorded.  Warranty expense is recorded in the income statement when warranty claims are received, rather than when the work was performed.

Sales tax is recorded in the income statement when sales tax is remitted, not when it was collected (*i.e.*, when the sale is made).  Similarly, payroll tax is recorded in the income statement when payroll tax is remitted, not when the corresponding payroll is earned.

Inventory cycle counts which differ from the monthly financial statements are not reconciled to the general ledger or financial statements.

Payroll tax payable is reconciled and corrections are made to payroll tax expense in the last segment of the period which leaves the Compensation and/or Benchmark Periods uncorrected.

SUMMARY OF  INTERNAL CONTROLS PRINCIPLES FOR CSSP CONSIDERATION

Cash basis claimants' bank reconciliation does not agree to cash basis financial statements.

Deposits are recorded as revenue in the Benchmark Period thereby overstating Benchmark revenue.

## E.    Agriculture Error And Fraud

Agriculture claimant manipulates the timing of the revenue recognition.  For example, a rice farmer may record harvest revenue in different months between the Benchmark and Compensation Periods, which can result in fictional losses in the Compensation Period (*i.e.*, records the bulk of 2009 revenue in November and records the bulk of the 2010 revenue in December).

Agriculture claimant stores certain crop harvests and does not sell or receive payment for these harvests until months later, potentially in the following calendar year.  The claimant stores the harvests on site or at a third-party warehouse.  In this scenario, it appears that claimant has zero revenues in the months the harvests are stored on-site and incurs storage costs, resulting in fictional losses in the Compensation Period.

## F.    Construction Error And Fraud

The percentage of completion is based on the claimant's estimates.   Accounting estimates, in nature, are subjective and vulnerable to manipulation because uncertainties exist in the underlying assumptions, and construction claimants could take advantage of the uncertainties.  Construction claimants may artificially overstate revenue by increasing the costs incurred toward completion, underestimating the costs of completion or overestimating the percentage completed.

Construction claimant incorrectly and inappropriately adjusts percentage of completion accounting during the year in a way that cannot be substantiated to achieve favorable results.

Estimated contract revenue is overstated, *e.g.*, incentives which are unlikely to be achieved are included in estimated contract revenues, thereby overstating revenue and profit.

Construction claimant incorrectly and inappropriately treats unapproved change orders as earned revenue even though there is no basis to determine if the change order will be approved.  The contract value is not allowed to increase until the change order is actually approved by the customer.  Furthermore, billings on unapproved change orders will result in unearned revenue.

Assets are typically held on the balance sheet until consumed, at which time they are transferred to the income statement as expenses.  When assets or costs are held on the balance sheet, they are known as capitalized costs.  When an expense is not moved to the income statement but is held in the balance sheet, it gives the appearance of stronger profits.  Construction claimant expenses the cost of equipment when purchased rather than capitalizing it and subsequently allocating the expense to jobs according to its use.  Consequently, revenue

recognition is accelerated into non-compensation months and compensation month revenue is reduced.

Materials purchased by claimant in one period but put in place in a later period are expensed in the income statement in the period purchased rather than capitalized and expensed when put in place.  Consequently, revenue recognition is accelerated into non-compensation months and compensation month revenue is reduced.

Construction claimant incurring certain operating costs that should have been recorded as current-period expenses holds them in capital accounts on the balance sheet, thereby deferring recognition of current-period expenses during the Benchmark Periods to future periods.

Construction claimant shift costs from an unprofitable job in the Compensation Period to a profitable job with completion falling outside the Compensation Period.

Liabilities are not recorded, *e.g.*, payables, project claims against the contractor, backcharges/warranty expense, contract penalties.  Understating liabilities mirrors overstating income in that both artificially inflate earnings and/or the company's financial performance.

## G.      Manufacturing Error And Fraud

Long-term manufacturing claimant shifts costs from an unprofitable job in the Compensation Period to a profitable job with completion falling outside the Compensation Period.

Manufacturing claimant overstates revenues by manipulating consignment sales, which are sales contingent upon a third party that has a right to return the purchased merchandise.  For example, a manufacturer may sell a product to a retailer who can return the product if it is unable to sell it.  Revenue for the manufacturer typically is recognized when the item is ultimately sold by the retailer.  These types of selling arrangements are legitimate, but are vulnerable to abuse since such arrangements are susceptible to undisclosed sales conditions.   In this case, the manufacturer and retailer could negotiate the consignment sales with a side agreement that goes undocumented so that all deliveries to the retailer could be considered sales, but because of the undisclosed side agreement, the retailer can return any unsold items.  This would disallow the manufacturer from recognizing revenue.

Manufacturing claimant enters into arrangements whereby a third party would display the claimant's products without actually purchasing them.  Under this arrangement, the claimant ships products to dealers without releasing title and providing for no financial obligation unless the products are sold within 90 days.  If the products were not sold, the dealers could return the products.   However, as soon as the agreement was entered, the manufacturing claimant recognized revenue before the products were manufactured, shipped or sold.

Manufacturing claimant inflates revenues by recognizing 100 percent of the revenues on partial incomplete shipment of goods to customers or products that were not fully assembled or functional.

### H.    Professional Services Error And Fraud

Professional services firm often charges clients for external disbursements.  These costs are passed through to the client and do not constitute true expenses for the purposes of calculating variable profit.   The timing of disbursements may also differ from timing of repayment of the expenses by the client, affecting compensation calculation.

Professional services firm inappropriately classifies owner's compensation throughout the year as variable expense and then reclassifies it as fixed expense at year end, thereby understating variable profit throughout the year and artificially depressing the firm's performance.

Professional services firm (particularly law firms) records revenue from a contingent fee matter all in one month, when the matter has ended, rather than tying such revenue to the associated expenses incurred throughout the matter.

Professional services firm does not recognize certain types of fees (*e.g.*, contingent-fee matters, bankruptcy holdbacks, success fees) in the period the revenue is earned, instead delaying the recognition of revenue until the time payment is received.  This improper recognition of revenue impacts the proper calculation of Benchmark or Compensation Period Variable Profit.

Professional services firm claimant submits records recording revenue from services performed over a span of several months in one month, when the work has ended and payment has been received, rather than tying such revenue to the associated expenses incurred throughout the work period.

Professional services firm pays bonuses at year end to employees.  These bonuses are based on hours worked by the employees throughout the year, but the firm only records the expense in the month when the bonuses are paid, overstating expenses in one month and giving the appearance of low variable profit for that month and overinflated variable profit for the other months of the year.

### I.    Real Estate Error And Fraud

The principal source of revenue for real estate agents is commissions.  In some cases, real estate agents spend multiple months to complete the sale and commissions are paid upon sale of the property.  The agent incorrectly recognizes and records revenue in the period in which commission is received, not when it is earned.  In doing so, the agent recognizes no revenue in the periods prior to closing the sale, potentially resulting in fictional losses in the Compensation Period or inflated revenues in the Benchmark Period.

### J.    Retail Error And Fraud

A "bill-and-hold" transaction occurs where a company negotiates the sale of inventory but holds it at the company's facility or ships them to a different location such as a third party warehouse for storage until the customer is ready to accept shipment.  Revenue is typically

recognized once the risk of ownership is transferred to the buyer or upon shipment of goods. Under bill-and-hold transactions, a retailer can prematurely record revenues from invoiced purchases that would not be delivered until a future date.  In this case, sales made on bill-and-hold terms are included in revenue in a Benchmark Period when they should be recorded in a later period thereby overstating benchmark revenue.

Retailers delay the write-down of obsolete or slow-moving inventory, since a write-down would require a charge against earnings.  Retailer records obsolete or damaged inventory expense outside of a Benchmark Period at the time inventory is written-off, but the expense should have been recorded in a Benchmark Period when the inventory value was determined to be impaired due to reasons of obsolescence or damage.  Consequently, benchmark expense is understated and benchmark variable profit is overstated.

Retailers include vendor allowances in revenue when payment is received, not when the allowance is actually earned, thereby improperly shifting revenue recognition from a Benchmark Period to a later period outside of a benchmark.  Retailers receive allowances through a variety of different methods such as markdown allowances, advertising contributions, volume rebates, promotional discounts, and stocking and display allowances.  Allowances are earned over time when the specific activity associated with the allowance is performed, regardless of timing of receipts which can overlap across financial reporting periods.

Retailers issue coupons and rebates to promote customer sales.  Retailer improperly records coupons and rebates redeemed by customers as advertising expense, an expense line item accounted for below the variable profit line.  Coupons and rebates expense should be recorded in the financial statements as a direct reduction from top line revenue and recognized as an expense at the time of the sales transaction.  Recording coupons and rebates as advertising expense results in understating top line expenses and overstating variable profit.

## K.    Wholesale/Distribution Error And Fraud

Wholesale/Distribution claimant engages in pre-arranged sales transactions, often of the same product, to create an appearance of legitimate business activity and revenue.  For example, the company sells goods to another company with an undisclosed agreement to buy back the goods at a future time.  In essence, the transaction is without economic substance.

Wholesale/Distribution claimant pushes, often through its sales department, more products through its distribution channel than its customers have ordered or can sell during that period or in a reasonable time thereafter.  This behavior is conducted under the assumption that the customers will accept the goods in exchange for some future undisclosed benefit.  In some cases, there may be some collusion between the company selling the goods and the company purchasing the goods.

Wholesale/Distribution claimant fraudulently overstates inventory thereby understating expenses.  The claimant double counts the physical counts of the inventory on hand, or includes scrap, obsolete, damaged or even sold goods that are not yet shipped.

## L.      Healthcare Error And Fraud

Complex sales arrangement/contract typically provide opportunities for manipulating revenue.  The complexity of contracts between patients, employers who provide employment based health plans, insurance companies, health care providers and medical facilities present challenges in revenue recognition, thereby creating ample mechanisms to inflate or misrepresent revenues.  The most common methods healthcare providers use to falsely inflate revenues include: submitting claim forms to government healthcare plans and / or insurance companies for services and care that were not rendered; billing for non-covered services as a covered services; misrepresenting dates of service; misrepresenting the locations of services; misrepresenting the provider of service; waiving of deductibles and/or co-payments and then submitting another false claims to make up the dollar difference; billing and reporting false diagnoses or procedures performed; billing for services that are truly unnecessary; and issuing false or unnecessary prescription drugs.

Due to complexity of reimbursement arrangements and delays in reimbursement by insurers, there may be significant delays between the time services are rendered and cash is collected and thus revenues are incorrectly attributed to the months in which the service was provide and the efforts expended.

## M.      Bar & Restaurant And Other Food Service Error And Fraud

Bar and restaurant claimant shuts down one its restaurant locations prior to or during the compensation period, resulting in a significant decrease in revenue during 2010.  Nonetheless, claimant inappropriately attributes the reduction in revenue to the oil-spill in determining the variable profit in the compensation period, and fails to disclose such critical change in its business operations.

Bar and restaurant claimant's classification of fixed costs is based purely on the description of the costs without considering the fluctuating nature of the expenditure and the expenses unique to its industry.  For example, supplies such as straws, napkins, disposable utensils, cups and food containers are variable costs.  These expenses directly relate to the sales of restaurants, bars or other food service establishments.  Due to the ambiguity of certain expenses incurred in the bar and restaurant industry, claimant can reclassify an expense from a variable category to a fixed category, or vice versa, thereby misrepresenting the Benchmark and Compensation Period variable profit.

## N.      Tourism And Hospitality Error And Fraud

Tourism and hospitality claimant's classification of fixed costs is based purely on the description of the costs without considering the fluctuating nature of the expenditure.  For example, a hotel claimant incorrectly assigns housekeeping and laundry supplies and contract cleaning as fixed expense, thereby increasing the variable profit during the benchmark periods.  Such supplies are considered variable as these expenses directly relate to occupancy level, which is the single most important revenue driver and source of revenue for hotel/lodging units.  Due to the ambiguity of certain expenses incurred in the lodging industry (*i.e.*, housekeeping and

laundry supplies, etc.), claimant can reclassify an expense from a variable category to a fixed category, or vice versa, thereby misrepresenting the Benchmark and Compensation Period variable profit.

Tourism and hospitality claimants typically accept reservations, often requiring a deposit (refundable) in advance from customers.  As this refundable deposit has not yet been earned, the deposit should not be recognized as revenue until it is earned (*i.e.*, when the event has occurred).  However, claimants in the tourism and hospitality industry record the deposits as revenues upon receipt of payment without recognizing the corresponding expenses during the Benchmark Period, thereby overstating the variable profit.

Tourism and hospitality claimants often have operations that span countries. The claimant includes operations throughout the country without excluding revenues generated from facilities located outside the compensable zones.

## O.    Transportation & Warehousing Error And Fraud

Transportation and warehousing claimant's classification of fixed costs is based purely on the description of the costs without considering the fluctuating nature of the expenditure and the expenses unique to its industry.  For example, transportation and warehousing typically incur insurance costs specific to the goods in transit or stored in a warehouse.  Such insurance costs are variable as these expenses increase as more goods are stored at the warehouse and transported to the customers.  Due to the ambiguity of certain expenses incurred in the transportation and warehousing industry (*i.e.*, supplies, insurance, licenses, etc.), claimant changes an expense from falling into a variable category to one falling into a fixed category, or vice versa, thereby misrepresenting the Benchmark and Compensation Period variable profit.

Revenue from transportation services can be recognized based on the proportional performance method, which requires an estimate of the percentage complete when delivery is at the period end, factoring in transportation times and any specific costs of packaging, loading and unloading. Similar to the percentage-of-completion method used in the construction industry, proportional performance method is based on the claimant's estimates, which involves subjective judgments or uncertainties that can be difficult to corroborate which increase the likelihood of misstating or manipulating revenue.

The complexity of pricing in the transportation industry presents challenges in revenue recognition.  The processes for pricing, contracting and billing freight movements can be complex due to a number of factors, including: high variability of prices in fuel surcharge; wide range of load types and volumes; range of different customers; variable duration, routes and distances; customer changes to original requirements before or during shipments; and shipments where the operator has to sub-contract with another operator to complete the delivery due to their own capacity or route constraints.  As such, open bills can be amended a number of times prior to the finalization of the account with the customer.  An estimate is made to adjust revenue for the expected final amount of open billings at the period end.  Such an estimate involves subjective judgments or uncertainties that can be difficult to corroborate which increase the likelihood of misstating or manipulating revenue.

# III.   ERROR AND FRAUD DETECTION, MITIGATION, AND REMEDIATION PROCEDURES AND POLICIES

## A.   Internal Control Environment

The control environment is the foundation for all other components of internal control, providing discipline and structure for the "tone at the top." Control environment factors include the integrity, ethical values and competence of an organization's employees, management's philosophy and operating style, the way management assigns authority and responsibility and organizes and develops its people and the attention and direction provided by its governance body.[2]

The CSSP is expected to promote an internal control culture of integrity and ethical behavior through a process of:

- example setting by management for CSSP Claims Administration and CSSP Claims Administration Vendors;
- regular communication of the importance of ethical behavior and the adherence to internal controls to all CSSP employees and Claims Administration Vendors; and
- adherence to internal controls as part of performance development.

## B.   Control Activities

Control activities are the policies and procedures that help ensure management directives are carried out. They help ensure that necessary actions are taken to address risks to achieve the organization's objectives. Control activities occur throughout the organization, at all levels and in all functions. They include a range of activities as diverse as approvals, authorizations, verifications, reconciliations, reviews of operating performance, security of assets and segregation of duties.[3]

## C.   Internal Controls

Internal control is defined as a process, affected by those charged with governance and management designed to provide reasonable assurance about the achievement of the organization's mission, goals, and objectives with regard to:

- effectiveness and efficiency of operations;
- reliability of financial reporting; and
- compliance with applicable laws and regulations.

---

[2] Committee of Sponsoring Organizations of the Treadway Commission (COSO)

[3] *Id.*

Internal controls are the result of management planning, organizing and directing. They are an integrated collection of systems and processes used by all personnel designed to provide reasonable assurance that the organization's objectives are met, including:

- assets are safeguarded;

- resources are used efficiently and economically;

- the organization complies with all policies, procedures, laws, regulations and contracts;

- information is reliable and accurate; and

- organizational goals and objectives are successfully accomplished.

Internal controls are often the first line of defense against fraud. The CSSP should ensure the maintenance of a strong internal control system and the promotion and monitoring of a robust internal control culture to detect and mitigate error, fraud and corruption through implementation of an internal control policy framework.

To effectively and efficiently accomplish these objectives, the CSSP must develop policies, programs, systems, and controls that will balance providing appropriate relief with mitigating the risks of fraud, waste and abuse associated with the claims process. Fraud is only one aspect of these efforts. To have confidence in the program, similar attention must be paid to accurate reporting of claims statuses, reducing duplication of benefits and minimizing error rates, overpayments or underpayments.

The following are suggested areas for proposed internal control procedures, policies and practices which should be considered when designing and developing controls aimed at reducing the risk of possible material errors and or irregularities occurring in the BEL claims determination process and going undetected.

*Claims Administration.* For BEL claims, CSSP management personnel with primary responsibilities for administration and supervision of the CSSP should be professionally qualified and technically competent. Such personnel should have adequate training and credentials to make the judgments needed in connection with BEL claims. To mitigate the risk that CSSP personnel will not be qualified or competent to effectively perform their required duties, there should be internal controls in place to ensure that a thorough check into the background and qualifications of prospective candidates is conducted prior to any hiring decision being made. In addition, internal control procedures should be in place to ensure that assessment of employee performance is conducted through regular, periodic job performance evaluations.

*Claims Verification.* Claimants must be able to satisfy class member eligibility requirements based on their geographic Spill Zone location and the causal nexus requirement of the Settlement Agreement and to satisfy the causation proof requirements in Exhibit 4B to the Settlement Agreement. To mitigate the risk that claims verification has not been properly checked by the claims reviewer prior to the claim being submitted for evaluation and review,

there should be internal control procedures in place to ensure that claim eligibility has been properly assessed and determined in accordance with the Settlement Agreement.

*Claims Documentation.*  Claimants must submit all required information and necessary supporting documentation to the CSSP for the purpose of claims evaluation and processing.  A non-exhaustive list of required information and documentation is provided in Exhibit 4A to the Settlement Agreement.  To mitigate the risk that a claimant will submit incomplete information or insufficient documentation, and the deficiency is not identified or followed up by the CSSP claims reviewer, there should be internal control procedures to ensure the reviewer follows-up with the claimant for any missing documentation or key additional information required to properly evaluate the BEL claim.

*Claims Review*.  Claims reviewers should receive adequate training on CSSP BEL claim policies and procedures and claims review methodology to be properly educated and familiar with the methodology for reviewing and evaluating individual claims.  The processing of BEL claims can be affected by a variety of factors, such as completeness and quality of the information and documents submitted by the claimant, complexity of the claim, effectiveness of communications by the CSSP with the claimants, and revenue attribution and expense determination to the relevant periods of the Benchmark and Compensation periods.  Strong internal controls procedures should be in place to ensure BEL claims are effective and rigorously reviewed by claims reviews for compliance.

BP is working to complete a spreadsheet containing proposed internal control procedures relative to the BEL claims which are aimed at error and fraud risk management and control, and will share it with the CSSP soon.  BP strongly recommends that these controls be implemented to reduce the possible risk that material errors and irregularities occurring in the BEL claims determination process go undetected.

//

//

# Exhibit G

## Filed Under Seal

# Exhibit H

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

January 30, 2014

**VIA Electronic Mail**
Ms. Maria T. Travis
Director of Economic Restoration
BP - GCRO
501 Westlake Park Blvd.
Houston, Texas 77079

Re: McGladrey LLP ("McGladrey") Audit

Dear Ms. Travis,

We are in receipt of your correspondence dated January 29, 2014.

Mr. Juneau has asked the McGladrey firm to submit a proposal to continue performing the internal auditing functions. He has made arrangements for McGladrey to make a full presentation on this matter to the CAO's office, BP and the PSC at 10:00am on Wednesday, February 5, 2014 in the CAO Offices.

Mr. Juneau has further advised that the internal auditing would submit reports directly to him and he would provide copies of those reports to the Court.

Sincerely,

Robert P. Levine
Chief Financial Officer

Cc: James Roy
Steve Herman
Patrick Juneau
David Welker