# Exhibit 32
# Part B

# Exhibit I

Filed Under Seal

Exhibit J

# MEMORANDUM

To:      Mr. Bob Levine, Chief Financial Officer
From:   Sue Ulrey, Principal, CliftonLarsonAllen LLP
Date:    December 27, 2013
Re:      Deepwater Horizon Project 2 Fieldwork Observations and Gathered Claims Statistics

## Background

This memorandum (Memo) is the second of two memoranda that CliftonLarsonAllen LLP (CLA) has prepared in response to the Claims Administrator's Office (CAO) request for Fieldwork Observations and Gathered Claims Statistics to reflect the results of work performed from August 20, 2013 to September 23, 2013.  CLA has not vetted its observations with the CAO, and CLA has not listed its observations as of September 23, 2013 in any particular order.

The request is now fulfilled by this Memo, dated December 27, 2013 and should be combined with the memo 1 dated December 27, 2013 and concludes our responsibilities under your request, dated October 24, 2013.

## Results

The results below are for work performed for the following:

- External economic, environmental, and regulatory risk
- Fraud, waste and abuse
- User support
- Claims processing in accordance with the settlement agreement
- IT change management

No results are reflected for the following as a result of Deepwater Horizon Economic Claims Center's (DHECC) request to cease work activity.

- Vendor oversight and monitoring
- Anti-virus and malware protection
- Network access and security
- IT user access and remote IP address

Indianapolis, Indiana
December 27, 2013



## Observations

## Information technology change management

| Control Domain | Information technology change management |
|---|---|
| **Control Segment** | Information technology change management logs |
| **Best Practice** | Change logs contain every detail regarding each change. The time, person, steps taken, actions performed, failures, and resolution are included on each change log to allow management to see the timeliness and accuracy of the change management function. |
| **Observation** | A weekly change log is produced that provides in-depth details about each change in the system. Management reviews this log to verify accuracy, completeness, and timeliness. The weekly change log lacks specific detail which would allow for monitoring and cannot be verified for completeness. |
| **Recommendation** | Update the weekly change log to include more detailed information to allow for management monitoring and oversight. |
| **Management Action Plan** | The CAO has taken three steps to address this issue. First, the CAO has changed the log period so that the CAO is now receiving change lists on a daily basis. Second, the CAO has implemented Idera compliance manager to log all changes in order to ensure that if any changes are missed by the manual log, they will be captured via Idera. Third, the CAO is in the process of changing the access level and segregation of duties such that changes are made by a promotions team unrelated to those requesting or planning the changes. |

| Control Domain | Information technology change management |
|---|---|
| **Control Segment** | Information technology change management structure |
| **Best Practice** | A Change Control Board and a Change Manager are present to administer and oversee the change management function including approving changes and testing them before making the change in the live environment. |
| **Observation** | Neither a Change Control Board nor a Change Manager is currently in place. |
| **Recommendation** | Create a Change Control Board and identify a Change Manager to oversee and manage the Change Management function. |
| **Management Action Plan** | The Change Control Board is fully functioning and is handling an average of 15 - 20 change requests per day. Brian Jones of the CAO is supervising the changes and process for IT while Scot Sherick is managing the same issues within the Business Process department. |

*\*\*\*The remainder of this page is intentionally left blank. \*\*\**



## Observations (continued)

### User support

| Control Domain | User support |
|---|---|
| **Control Segment** | User support documentation |
| **Best Practice** | User issues are documented when received and tracked throughout the process until resolution. |
| **Observation** | User support issues reported are not documented. |
| **Recommendation** | Implement help desk tickets tracking system to record all activity performed from request to final resolution, and develop sufficient reporting so that themes can be identified and addressed. |
| **Management Action Plan** | Remedy, an enterprise-level issue tracker, has already been installed, and a centralized help desk team for all DHECC Vendors has been put in place to begin operations in the first few weeks of January, 2014. |

| Control Domain | User support |
|---|---|
| **Control Segment** | Antivirus protection |
| **Best Practice** | All computer equipment is equipped with antivirus software and protection. |
| **Observation** | All computing equipment used by DHECC personnel are required to have antivirus software installed on them; however two machines did not have any antivirus software installed. |
| **Recommendation** | All computer equipment should be issued with antivirus software. |
| **Management Action Plan** | Only new machines that are in the process of being set up or those on the guest network belonging to outsiders do not have antivirus software. Kaspersky antivirus is centrally managing the systems and updates. |

*\*\*\*The remainder of this page is intentionally left blank. \*\*\**



## Observations (continued)

### User support

| Control Domain | User support |
|---|---|
| **Control Segment** | Network access/security |
| **Best Practice** | All snapshots and imaging of data and information from DHECC machines that occurs is recorded and monitored. |
| **Observation** | The VMware used in the system allows snapshots of data to be taken without a trace or record of it occurring, leaving management unable to identify and monitor the snapshots of data that occur. |
| **Recommendation** | VMware needs to have a recording function to ensure snapshots of data are not being performed without the knowledge of management. |
| **Management Action Plan** | There is no access to the VMWare server from outside of the network. Within the network, only the network administrators have access to the password for the console of the VM server to perform snapshots. If one of these users took a snapshot of the server, it would be logged, but as administrator level users, they also have the ability to erase the log. Access control should suffice to prevent any abuse of the VMWare server. |

### Fraud, waste and abuse

| Control Domain | Fraud, waste and abuse |
|---|---|
| **Control Segment** | Fraud Department |
| **Best Practice** | Fraud Departments are comprised of multiple employees with the proper level of experience and subject matter expertise. Fraud Departments have approved protocols, policies and procedures, performance metrics, and monitoring in place and are tested on a regularly basis. |
| **Observation** | The CAO is in the process of restructuring the Fraud Department to have more coverage and capabilities represented in the CAO's office. |
| **Recommendation** | Perform a pre and post implementation review of the Fraud Department restructuring to determine whether the Fraud Department is operating effectively, and as intended. |
| **Management Action Plan** | The Fraud Department is presently conducting a risk assessment of the current fraud detection structure. This analysis will serve as a pre-implementation review of the fraud detection structure. This assessment is further being utilized, in conjunction with recommendations from the Freeh Group, to develop the future fraud detection organization. Once this more robust configuration is implemented, a post-facto review will be conducted comparing the pre-implementation review to the restructured fraud department to ensure that it is operating effectively. |



## Observations (continued)

### External economic, environmental, and regulatory risk

| Control Domain | External economic, environmental, and regulatory risk |
|---|---|
| **Control Segment** | Internal conflict of interest |
| **Best Practice** | Organizations create and enforce codes of conduct and ethics by having employees annually read and sign all policies and procedures. Organizations also create and implement sound procedures and systems for reporting and monitoring of conflicts of interest. Additionally, an annual code of conduct training exists. |
| **Observation** | CAO staff attorney did not disclose conflicts of interest and receipt of referral fees in violation of DHECC's conflict of interest policy. |
| **Recommendation** | Any individuals employed by DHECC must be subject to background checks, ethics training, and disclose any conflicts of interest. Further, on an annual basis, code of conduct training should occur for all DHECC employees. |
| **Management Action Plan** | The CAO is currently working with the Freeh Group to ensure that all individuals employed by the DHECC are screened to confirm that potential conflicts of interests are disclosed. Further, any potential conflicts disclosed or identified are being cured in the appropriate manner, including recusal and letters of advisement instructing employees on how to avoid both impropriety and the appearance of impropriety. Additionally, the CAO and the Freeh Group are currently in the process of re-writing the DHECC Code of Conduct Policy in accordance with industry best practices. |

*\*\*\*The remainder of this page is intentionally left blank. \*\*\**



## Observations (continued)

### External economic, environmental, and regulatory risk (continued)

| Control Domain | External economic, environmental, and regulatory risk |
|---|---|
| **Control Segment** | Conflict of interest |
| **Best Practice** | Organizations create and enforce codes of conduct and ethics by having employees annually read and sign all policies and procedures. Organizations also create and implement sound procedures and systems for reporting and monitoring of conflicts of interest. Additionally, an annual code of conduct training exists. |
| **Observation** | Conflicts of interest were identified that had not been reported or captured by the Conflict of Interest practices. |
| **Recommendation** | DHECC personnel receive ethics training on annual basis, sign and read any ethics or code of conduct policies on an annual basis, and report any conflicts of interest immediately to the Claims Administrator.<br><br>Additionally, the CAO should implement periodic ad hoc reviews for conflicts of interest and address any exceptions noted during the reviews. |
| **Management Action Plan** | The CAO is currently working with the Freeh Group to ensure that all individuals employed by the DHECC are screened to confirm that potential conflicts of interests are disclosed. Further, any potential conflicts disclosed or identified are being cured in the appropriate manner, including recusal and letters of advisement instructing employees on how to avoid both impropriety and the appearance of impropriety. Additionally, the CAO and the Freeh Group are currently in the process of re-writing the DHECC Code of Conduct Policy in accordance with industry best practices. |

| Control Domain | External economic, environmental, and regulatory risk |
|---|---|
| **Control Segment** | Reputation risk – business economic loss claims |
| **Best Practice** | Process claims with transparency and in accordance with the governing instrument (i.e. Settlement Agreements, interpretations by the United States Courts, and regulations) while managing expectations and perceptions of the claims process. |
| **Observation** | Determining if a Business Economic Loss (BEL) claim meets causation could vary widely based on interpretation of the Settlement Agreement. |
| **Recommendation** | Establish agreed upon interpretation of the Settlement Agreement for BEL claims causation and processing between the CAO, Plaintiff Steering Committee, and BP. |
| **Management Action Plan** | The Claims Administrator has faithfully implemented and administered the Settlement Agreement, according to its terms and procedures, for the benefit of the Economic Class, as agreed to by the Parties and as ordered by the Court. In regard to the issues of Causation and the Matching of Revenues and Expenses, the Claims Administrator is currently awaiting additional guidance from the Court. |



## Observations (continued)

## Claims processing in accordance with settlement agreement

| Control Domain | Claims processing in accordance with settlement agreement |
|---|---|
| **Control Segment** | Paid claims data – zero payment |
| **Best Practice** | Data recorded in databases is reviewed for accuracy before use in reports and decision making processes. Information and data is reconciled on a regular basis to ensure all information is accurate and complete. |
| **Observation** | 2,629 claim IDs have a paid date but show a final compensation amount of zero in the claims database which may result in inaccurate paid claims reporting. |
| **Recommendation** | Perform a regular review of all paid claims to verify claims have both a paid date and paid amount. |
| **Management Action Plan** | This population consists of claims that were reviewed, determined to be eligible, and calculated to receive a positive final compensation.  However, due to Prior Payment Offset that exceeded total calculated compensation, this population of claims in actuality received a zero dollar compensation from the Program. |

| Control Domain | Claims processing in accordance with settlement agreement |
|---|---|
| **Control Segment** | Paid claims data – payment variances |
| **Best Practice** | Data recorded in databases is reviewed for accuracy before use in reports and decision making processes. Information and data is reconciled on a regular basis to ensure all information is accurate and complete. |
| **Observation** | A difference between the payment amounts on "the payment file" vs. "the claims database" exists for over 5,000 claim IDs. |
| **Recommendation** | Perform a weekly reconciliation of the payment files to the database noting exceptions and resolutions. |
| **Management Action Plan** | The CAO will institute a system-generated trial balance/transactional ledger that will be reconciled on a daily basis.  Further, this trial balance will be generated and reconciled back to the beginning of the Program. |

*\*\*\*The remainder of this page is intentionally left blank. \*\*\**



## Observations (continued)

## Claims processing in accordance with settlement agreement

| Control Domain | Claims processing in accordance with settlement agreement |
|---|---|
| **Control Segment** | Paid claims data – more than one payment amount |
| **Best Practice** | Data recorded in databases is reviewed for accuracy before use in reports and decision making processes. Information and data is reconciled on a regular basis to ensure all information is accurate and complete. |
| **Observation** | 4,663 claim IDs have more than one Final Compensation Award amount. |
| **Recommendation** | Claim IDs with Final Compensation Award amounts are reviewed on a weekly basis to verify there is only one compensation amount and that double payment did not occur. |
| **Management Action Plan** | The DWH 8428 Payment Report uses Event 79 (payment issued) to record the date a payment was issued to a claimant.  There are several reasons that multiple payments may be issued to a claim.  The reasons include, but are not limited to, reconciliations, payments in installments, payments to lien holders, and true-up payments (payments when the CSSP has discovered that an error was committed in the claims review and underpaid a claim).  When these multiple payments occur, each payment is tracked within the DWH 8428 Payment Report. |

*****The remainder of this page is intentionally left blank. *****



## Gathered Claims statistics



- A total of 223,230 unique claim IDs were found in the claims database.
- BEL claims comprise 31.2% of the total unique claim IDs submitted.



- 49,498 claim IDs had a date value in the "paid date" field, but only 46,896 claims had a dollar value in the "Final Compensation Award" field.
- 2,629 claim IDs had a zero value in the "Final Compensation Award" field.
- Of the 46,896 claim IDs with a dollar value paid, 38.5% of them were Coastal Real Property claims and 19.4% were BEL claims.



## Gathered Claims statistics (continued)



- $3,305,175,700 is the total dollar value of claims paid.
- These top 3 categories make up 91.0% of the total $3,305,175,700 paid.
- BEL claims make up 56.7% of the total dollar value paid.



- Of the 173,732 claims not paid, 45,237 were denials leaving 128,495 claims that have not been processed.
- 40.6% of the claims not processed are BEL claims.



## Gathered Claims statistics (continued)



- Of the 223,230 unique claim IDs, 45,237 or 20.3% were denied claims.
- Of the denied claims, Individual Economic Loss claims have the highest percentage at 36.2% of the denied claims.



- There were 2,478 appealed claims.
- 1,650 or 66.6% of the appealed claims were appeals by BP.
- 828 or 33.4% of the appealed claims were appeals by claimants.
- 79.9% of the appealed claims were BEL claims.
- 80.7% of the claims appealed by BP were BEL claims.

*** The remainder of this page is intentionally left blank. ***



## Gathered Claims statistics (continued)





*\*\*\*The remainder of this page is intentionally left blank.  \*\*\**



# Gathered Claims statistics (continued)



- Of the 223,230 claims submitted, 3.8% of the claims were submitted by The Diaz Law Firm.
- The 3 law firms represented on the above chart submitted 9.5% of the total claims.



- Faegre, Baker, Daniels, LLP had the most submitted claims paid.
- Of the 46,896 claims paid, Faegre, Baker, Daniels, LLP submitted 4.5% of them.
- The three law firms shown on the above represented 11.9% of paid claims.



## Gathered Claims statistics (continued)



- Faegre, Baker, Daniels, LLC represented 5.4% of the total dollar amounts paid.
- These 3 law firms shown above represented 13% of the total dollar amounts paid.

*\*\*\*The remainder of this page is intentionally left blank. \*\*\**



Exhibit K



**J. DAVID FORSYTH**
Partner
Direct Dial Number: (504) 582-1521
E-mail address: jdf@sessions-law.com
Respond to New Orleans Office

May 13, 2013

Orran L. Brown
BrownGreer PLC
250 Rocketts Way
Richmond, VA 23231

   Re: BrownGreer
      Our File No. (12) 10027-29278

Dear Orran:

   Enclosed you will find fully executed original counterparts of your services agreement and Task Order #1.

   Thanks very much.

       Very truly yours,

       J. David Forsyth

JDF/scp
Enclosure
cc(via email): Mr. Adam Gregory
      Ms. Lynn Greer
      Mr. David Odom
      Mr. Kirk Fisher
      Mr. Robert Levine
      Mr. Patrick A. Juneau
      Mr. Michael J. Juneau
      Mr. Michael Raschid

{00219726-1}

201 Saint Charles Avenue Suite 3815 New Orleans, LA 70170-1052
(504) 582-1500 (504) 582-1555 F www.sessions-law.com

CALIFORNIA ⊠ COLORADO ⊠ FLORIDA ⊠ GEORGIA ⊠ ILLINOIS ⊠ LOUISIANA ⊠ NEW JERSEY ⊠ NEW YORK ⊠ OHIO ⊠ TEXAS

## AGREEMENT TO PROVIDE CLAIMS ADMINISTRATION AND STAFFING SERVICES

This Agreement to Provide Claims Administration and Staffing Services, (this "Agreement"), is entered into by and between BrownGreer PLC, a Virginia professional limited liability company ("Vendor"), with offices at 115 South 15th Street, Suite 500, Richmond, VA 23219-4029; and Patrick Juneau, as Trustee (the "Trustee") of, and on behalf of, the Settlement Trust as further defined below (the "Settlement Trust"), and as Claims Administrator of the Court Supervised Claims Program (the "Claims Administrator").

## RECITALS

WHEREAS, BP Exploration & Production, Inc., a Delaware corporation and certain of its affiliates (collectively "BP") have been named as defendants in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179;

WHEREAS, BP and the Economic Class Representatives, individually and on behalf of the Economic and Property Damages Settlement Class, by and through (then) Interim Class Counsel (who are now Lead Class Counsel) entered into an Economic and Property Damages Settlement Agreement dated April 18, 2012, and amended May 2, 2012 ("Settlement Agreement"), for the purpose of settling all Released Claims against the Released Parties, including BP;

WHEREAS, the United States District Court for the Eastern District of Louisiana (the "Court"), after preliminary approval on May 12, 2012, has approved the Settlement Agreement by Order dated December 21, 2012 (the "Final Approval Order," as further defined below);

WHEREAS, on May 4, 2012, BP, Lead Class Counsel, the Claims Administrator and Trustee and J.P. Morgan Trust Company of Delaware (the "Directed Trustee") entered into the *Deepwater Horizon Economic and Property Damages Trust Agreement* (the "Trust Agreement") creating the Settlement Trust;

WHEREAS, the Settlement Trust fulfills the requirements for a qualified settlement fund under section 468B(d)(2) of the Internal Revenue Code of 1986, as amended from time to time, and section 1.468B-1 of the Treasury Regulations promulgated thereunder;

WHEREAS, the Settlement Trust's purpose is to establish a mechanism to pay Settlement Payments (as defined in the Settlement Agreement) and the costs of administering the Settlement Program (as defined in the Settlement Agreement) in accordance with the terms of the Settlement Agreement and the Trust Agreement;

WHEREAS, the Trustee has the power, pursuant and subject to the terms of the Settlement Agreement and the Trust Agreement, to appoint or hire officers, employees and other consultants necessary for the proper administration of the Settlement Trust; and

WHEREAS, Vendor provides certain services and staffing to assist with the administration of class action settlements;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms and conditions set forth herein.

1. Definitions.

The following words and phrases have the meanings indicated. Other words and phrases appearing in capital letters throughout this Agreement shall have the meanings they are given with their first operative use. Terms used in the singular shall be deemed to include the plural and vice versa. Terms not otherwise defined herein shall have the same meanings ascribed to them in the Settlement Agreement and/or the Trust Agreement, as applicable.

      1.1    Applicable Law:  means all applicable local, state and federal laws, rules and regulations, and orders of the Court.

      1.2    Claim:  has the meaning ascribed to it in the Settlement Agreement.

      1.3    Claimant:  has the meaning ascribed to it in the Settlement Agreement.

      1.4    Claims Administrator:  has the meaning ascribed to it in the Settlement Agreement.

      1.5    Claims File:  means any information, content or material regarding a Claim in electronic, paper or other form.

      1.6    Court Approved Procedures:  means any orders or decrees promulgated by the Court, from time to time, establishing, governing or relating to procedures or obligations applicable to Vendor with respect to the retention of documents and other materials used or generated in connection with the provision of the Claims Services.

      1.7    Deepwater Horizon Economic Claims Center:  means the operating arm of the qualified settlement trust fund established pursuant that certain Deepwater Horizon Economic and Property Damages Trust Agreement, dated May 4, 2012, among BP, (then) Interim Class Counsel, the Claims Administrator, and the Directed Trustee.

      1.8    Document Retention Policies:  means any written policies issued by the Claims Administrator, from time to time, establishing, governing or relating to procedures or obligations applicable to Vendor with respect to the retention of documents and other materials used or generated in connection with the provision of the Claims Services.

      1.9    Effective Date:  means March 8, 2012.

      1.10    Execution Date:  means the date that this Agreement has been executed by the last of the Parties to execute this Agreement.

      1.11    Final Approval Order:  means the Order entered by the Court on December 21, 2012 granting final approval of the Settlement Agreement.

      1.12    Individual:  means a natural person.

      1.13    Lead Class Counsel:  means the lawyers appointed by the Court to represent the Class of Claimants, who were formerly Interim Class Counsel.

1.14    Major Vendors:  means, collectively, HUB Enterprises, Inc.; Postlethwaite & Netterville, APAC; The Garden City Group, Inc.; BrownGreer PLC; and PricewaterhouseCoopers LLP.

1.15    Parties: means the Settlement Trust, the Trustee, the Claims Administrator and Vendor.

1.16    Program Management Office:  means the main office location of the Deepwater Horizon Claims Center, currently at 935 Gravier Street, New Orleans, Louisiana.

1.17    Settlement Trust: means the qualified settlement trust fund established pursuant that certain *Deepwater Horizon* Economic and Property Damages Trust Agreement, dated May 4, 2012, among BP, Lead Class Counsel, the Claims Administrator and Trustee, and the Directed Trustee.

2.    Services Of Vendor Pursuant To Settlement Agreement and Final Approval Order.

2.1    Claims Services and Agency Designation.  Pursuant to the Settlement Agreement and the Final Approval Order, effective as of the Execution Date, Vendor shall provide staffing and services as further described in Exhibit 1 and separately executed Task Orders as defined in Section 2.2 to support the Claims Administrator, as well as such other additional services as are mutually agreed to in writing by the Parties from time to time or as otherwise reasonably requested by the Claims Administrator from time to time pursuant to the Settlement Agreement (collectively, the "Claims Services"). In order to implement and facilitate Vendor's performance of the Claims Services, the Claims Administrator hereby appoints and designates Vendor as its agent and attorney-in-fact to execute for and in the name of the Claims Administrator or in the names of the Deepwater Horizon Economic Claims Center, the Deepwater Horizon Economic Claims Center or any variations thereof, as the case may be, answers or other responses to garnishments, lien notices or other similar documents as Vendor may reasonably be required to execute and/or present during the course of its undertaking of the performance of the Claims Services. Any such documents that Vendor may execute as agent shall contain such terms as Vendor reasonably determines (but shall be consistent with and limited by the scope of the Claims Services) and shall be signed by an officer, employee or representative duly authorized by Vendor to execute such documents(s). Any documents so executed by Vendor as agent shall contain a signature block substantially as follows: "Deepwater Horizon Economic Claims Center [or other name of appearer], through BrownGreer PLC, Agent, by [name of signatory], its [title of signatory]. In the event that Vendor requires a separate agency agreement or power of attorney to establish to a court or other third party its agency, the Claims Administrator agrees to provide the same to Vendor upon reasonable notice. This designation of agency may be revoked by the Claims Administrator at any time for any reason or no reason, upon written notice to Vendor.  While the principals of Vendor and some of its employees are attorneys licensed to practice law in the Commonwealth of Virginia or elsewhere and Vendor has legal expertise and experience that improve its ability to provide the Claims Services, Vendor shall not have an attorney-client relationship with the Claims Administrator, the Settlement Trust, the Trustee or with any Claimants under the Settlement Agreement.

2.2    Task Ordering Procedures.  This Agreement establishes a process whereby the Parties will develop Task Orders for the Claims Services to be performed within the terms and conditions set forth herein. A "Task Order" is defined as a mechanism to authorize work within the scope of this Agreement.  The individual services to be performed on a Task Order basis shall be within the scope of the Claims Services and clearly defined in each Task Order. Each Task Order will provide for allowable staffing levels including the number of full time equivalents ("FTEs")

and classifications as defined in the Service Rate Schedule (Exhibit 2), allowable expense expenditures, Task Order term (typically quarterly), key performance indicators (KPIs) as defined in Section 2.3 and other requirements as may be provided by the Claims Administrator and agreed to by the Parties. Each Task Order and any subsequent changes shall be made in writing. Task Orders will require approval via signature of the Vendor and the Claims Administrator. Any modification in the defined Claims Services or Agreement term shall require a fully executed amendment to this Agreement.

      2.3    Key Performance Indicators (KPIs). Vendor shall be subject to the implementation of Key Performance Indicators ("KPIs"), which shall either be included in each separately executed Task Order as further defined in Section 2.2 or attached as separate KPI exhibits hereto. KPIs will include individual performance goals, measurement methodologies and penalty payments for missing performance goals as agreed to by the Parties in writing. Vendor will implement and operate all measurement and monitoring tools and procedures and provide reports of Vendor's performance in connection with the KPIs.

      2.4    Performance of Claims Services. The Claims Services shall be provided in strict accordance with the terms of the Settlement Agreement, the Final Approval Order, and in compliance with Applicable Law.

      2.5    Code of Conduct. In performing the Claims Services, Vendor shall comply with and be guided by the principles set forth in the Code of Conduct attached hereto as Exhibit 9.

3.    Leases. In connection with the Claims Services, Vendor has entered into, and may in the future enter into, leases (the "Leases") for offices or other real property related to the provision of such services (the "Leased Properties"). Vendor represents and warrants that the Leases in effect as of the Execution Date are set forth in Exhibit 7. Vendor agrees that all Leases (or renewals or extensions) entered into after the Execution Date (i) shall be consistent with the terms of Section 6.6 and Section 6.7 of this Agreement and the Claims Administrator's other reasonable requirements, (ii) shall be approved by the Claims Administrator in writing prior to Vendor's execution of such Lease, and (iii) shall, at the request of the Claims Administrator, be assigned and transferred to, the Claims Administrator or its designee upon termination or expiration of this Agreement (and contain provisions allowing such assignment and transfer). Vendor shall arrange for the provision of any environmental, safety and health or security services related to the Leased Properties and Vendor's own properties.

4.    Non-Exclusive Relationship; No Commitment. Notwithstanding anything to the contrary contained in this Agreement, Vendor acknowledges and agrees that this Agreement creates a non-exclusive relationship with respect to the provision of Claims Services, and the terms of this Agreement shall not be construed as limiting in any way the Settlement Trust's, the Trustee's or the Claims Administrator's right to contract for any services, including services similar to the Claims Services, with any other party. The terms of this Agreement shall also not be construed to commit to any minimum amount of business with Vendor, including any minimum volume of Claims. The Claims Administrator acknowledges and agrees that this Agreement creates a non-exclusive relationship and the terms of this Agreement shall not be construed as limiting in any way Vendor's right to provide services, including services similar to the Claims Services, to any other party on any other program.

5.    Reporting: Vendor shall provide to the Claims Administrator, and with the permission of the Claims Administrator, to Lead Class Counsel and BP, any reports requested by the Claims Administrator, including, without limitation, the reports specified in Exhibit 6 hereto.

6.      Fees and Expenses; Payment.

6.1      Fees.  After the Execution Date,Vendor will be compensated based on the hourly rates set forth in Exhibit 2 and consistent with the provisions of this Section 6.  The Settlement Trust shall be responsible for paying Vendor's validly incurred and invoiced fees ("Fees") under this Agreement.

6.2      Fee Increases.  Vendor shall not increase the rates set forth in Exhibit 2 at any time during the term of this Agreement unless agreed to in writing by the Parties.  Vendor shall only be entitled to an overtime increase for non-exempt employees who work more than 40 hours per week, as set forth in Exhibit 2.  Vendor shall not be entitled to any overtime increase or any other adjustment of the rates as set forth in Exhibit 2 for all other exempt Vendor employees, provided, however, that upon prior written notice to the Claims Administrator of the names of the employees, new job descriptions and new rates, Vendor may promote employees from one classification to another from time to time as determined in its sole discretion.

6.3      Reimbursement of Expenses.  In addition to the compensation described in paragraph 6.1 above and Exhibit 2, Vendor shall submit for reimbursement and be reimbursed on a semi-monthly basis for the reasonable expenses incurred by Vendor in order to perform the Claims Services, but not to exceed any limits contained in any applicable Task Orders ("Expenses").  Such reimbursable Expenses shall include without limitation lease rent and related expenses under the leases identified on attached Exhibit 7 and under such leases as may be later approved by the Claims Administrator, computer and other equipment costs, security services, travel and travel-related expenses (mileage, lodging, parking, meals, etc.) when such expenses are incurred in the course of performing the Claims Services.  All travel and travel-related expenses shall be in accordance with the *Deepwater Horizon* Economic Claims Center Travel Policy, copy attached as Exhibit 8. The Claims Administrator shall not be required to reimburse Vendor for any expenses not reasonably related to the Claims Services, or any insurance (not directly related to the provision of Claims Services), benefits, recruiting fees (except for job fair recruiting costs) or any Vendor overhead expenses (not directly related to the provision of Claims Services) from and after the Effective Date.

6.4      Invoices.  Effective as of the Execution Date, Vendor shall submit invoices for Fees to the Claims Administrator complete with supporting documentation as further described in Paragraph 6.5 on the fifteenth day of each month.  Vendor shall submit invoices for Expenses to the Claims Administrator complete with supporting documentation as further described in Paragraph 6.5 on the tenth and twenty-fifth days of each month.  The Claims Administrator shall review Vendor's invoices and if acceptable, authorize the payment of all reasonable Fees and Expenses subject to the terms of Paragraph 6.1 above within 30 days of submission of the invoice.  In the event that an invoice or charge(s) thereon is deemed not acceptable by the Claims Administrator or his designee due to insufficient documentation or other deficiencies, Vendor shall be notified in writing of such deficiencies, in sufficient detail for Vendor to be able to research and respond to such notice, within 15 days of submission of the invoice.  The Claims Administrator or his designee also has the right to dispute any invoice in good faith or to otherwise reject the payment of any compensation on the grounds that such amounts are not reasonable for Vendor to perform the Claims Services, in which event he will provide the grounds therefor in reasonable detail.  The Claims Administrator or his designee may at any time, including after payment, seek correction and adjustment of any charge, invoice or any portion thereof. Any corrections or adjustments shall be applied to the next charge or invoice to be paid.  If Vendor contests the Claims Administrator's rejection of any compensation, Vendor may present the dispute to the Court for resolution.  If any

dispute is presented to the Court, the non-prevailing party shall be responsible to pay the reasonable attorneys' fees incurred by the prevailing party.

6.5     Documentation. All invoices for Fees submitted after the Execution Date shall be provided digitally and shall contain a summary sheet showing all personnel names, classifications as identified in Exhibit 3 - Job Descriptions, rates as identified in Exhibit 2 - Service Rate Schedule, location and hours worked and all other information mutually agreed to by the Parties. All invoices for Expenses shall contain (i) individual timesheets or time records approved digitally by the personnel and designated managers; (ii) a detailed list of all Expenses including name of individual(s), expense type, purpose, vendor, description, amount and other supporting information, (iii) Expense backup to include receipts, route mileage (mapquest or equivalent), and other documentation and (iv) all other information mutually agreed to by the Parties in writing. Vendor shall provide such documentation in the digital format to be designated by the Claims Administrator upon execution of this Agreement. Vendor will provide any additional reasonably requested supporting documentation for such invoices within ten (10) days of such request by the Claims Administrator or any Party, which ten (10)-day period may be extended for up to an additional ten (10) days upon written request by Vendor.

6.6     Requirements for Approval of Certain Expenses. Effective as of the Execution Date, in providing the Claims Services, Vendor covenants and agrees that, without the Claims Administrator's prior written consent and the Claims Administrator's approval, it shall not enter into any agreement, contract or other binding commitment (excluding Subcontracts for Ancillary Services as defined in Section 15, provided that they are in compliance with the Service Rate Schedule and all applicable Task Orders) with a vendor, service provider or lessor, after the Execution Date, that (i) obligates Vendor, the Settlement Trust or the Trustee to pay more than ten thousand dollars ($10,000); (ii) does not allow termination by Vendor without cause on ninety (90) days or shorter notice and without any liability, obligation or payment of any kind to such vendor, service provider or lessor or (iii) does not allow assignment or transfer of such agreement to the Settlement Trust, the Trustee or its designee. All Expenses must be consistent with and in compliance with the Travel Policy and within the limits of the applicable Task Orders.

6.7     Reasonableness and Management of Expenses. In addition to other requirements set forth in this Agreement (including Section 6.6), Vendor shall only incur Expenses that are within the limits set in any applicable Task Orders and are reasonable to the performance of its obligations under this Agreement, and shall ensure that it, its employees, and its contractors and approved subcontractors use best efforts with respect to the efficient and cost-effective performance of the Claims Services.

6.8     Audit of Charges; Forecasts of Charges. Vendor shall be subject to an audit by an independent auditor selected by the Claims Administrator or his designee, six (6) months after Effective Date, to determine whether the Fees and Expenses (collectively, "Charges") are consistent with the terms set forth in this Agreement and whether any adjustments in staffing and other resource levels are necessary or appropriate in light of the findings of such audit. Vendor shall also submit to the Claims Administrator rolling forecasts of the estimated Charges for the next calendar quarter at least ten (10) days prior to the start of such quarter, and as requested by the Claims Administrator from time to time, but no more frequently than quarterly. Such estimated Charges shall be consistent with the Charges for prior periods, and, if there is a material deviation from such prior Charges, Vendor shall include with such forecasts an explanation and justification, in reasonable detail, of such deviation.

7.          <u>Term; Termination; Transition Services</u>.

      7.1     <u>Term</u>. Certain sections contained herein are applicable as of the Execution Date. Excluding such sections, this Agreement is effective as of 12:01 a.m. Eastern Standard Time March 8, 2012 (the "<u>Effective Date</u>") and shall continue in effect until 11:59 p.m. Eastern Standard Time on March 7, 2015 (the "<u>Initial Term</u>"), unless earlier terminated pursuant to the provisions of this Section 7. This Agreement may be renewed by the Claims Administrator upon written notice to Vendor prior to the date on which this Agreement would otherwise expire, for terms of one (1) year each commencing on the date on which this Agreement would otherwise expire if not renewed (each a "<u>Renewal Term</u>" and collectively with the Initial Term, the "<u>Term</u>"). For each of the first two (2) Renewal Terms (if renewed by the Claims Administrator), the rates charged by Vendor during such Renewal Term for the Claims Services shall be the same as the rates charged by the Vendor during the Initial Term, unless agreed otherwise by the Parties in writing.

      7.2     <u>Termination and Dispute Resolution</u>.

      (a)     <u>Termination</u>. Subject to the provisions of the Settlement Agreement governing replacement of a Claims Administration Vendor, this Agreement may be terminated by any of the Parties, for any reason or no reason, and without the need to establish cause, by providing at least ninety (90) days prior written notice to the other Parties and to BP and Lead Class Counsel. Subject to approval of the Court and the provisions of the Settlement Agreement governing termination, this Agreement may be terminated by any of the Parties for material breach by another of the Parties, if and only if the non-breaching party has provided the breaching party with a notice of the alleged material breach describing the alleged material breach in reasonable detail and the breaching party fails to cure the alleged breach within (i) fifteen (15) days in the case of a monetary beach or (ii) thirty (30) days in the case of a non-monetary breach, as the case may be, of receipt of such notice. In addition, this Agreement may be terminated if the Court determines that Vendor is not properly performing its duties pursuant to this Agreement. In the event this Agreement is terminated, if the Claims Administrator so requests and for the fees set forth in <u>Exhibit 2</u>, upon any termination or expiration of this Agreement, Vendor shall: (i) provide all the transition services reasonably requested by the Claims Administrator in order to assist the Claims Administrator in transitioning the Claims Services provided hereunder to a designated third party; and (ii) provide to the Claims Administrator for up to one hundred and eighty (180) days after the effective date of termination or expiration, any or all of the Claims Services being performed by Vendor prior to such date (or such other reasonable termination or transition services as the Claims Administrator may request, solely related to the transition of such Claims Services), consistent with the terms and conditions of this Agreement.

      (b)     <u>Dispute Resolution</u>. In the event that any Party asserts that any other Party is in breach of this Agreement, the Party asserting a breach shall give notice to all other Parties. The Party asserting the breach and the Party against whom the breach is asserted shall meet and confer within five (5) days of receipt of the asserting Party's notice. Any other Party to this Agreement may participate in such meetings. If the Party asserting the breach and the Party against whom the breach is asserted cannot resolve the dispute within ten (10) days of such meeting and conference, the matter shall be referred to the Court for resolution.

      7.3     <u>Effect of Termination</u>. When this Agreement expires or is terminated and except as expressly set forth in this Agreement (including Section 7.2(a)), Vendor shall: (i) cease providing the Claims Services; (ii) invoice the Claims Administrator for all Fees, Expenses and taxes payable to Vendor for services already performed prior to the effective date of expiration or termination; and (iii) deliver all Claims Files, Deliverables, Protected Information and Claimant Information as instructed by the Claims Administrator.

7.4     Survival. The provisions of Sections 2.5, 7.2, 7.3, 7.4, 8, 9, 10.1, 11, 13, 14 and 16 as well as any other terms and provisions that are required to survive by their nature, shall survive termination or expiration of the term of this Agreement.

8.     Confidentiality.

Vendor acknowledges and agrees that the Claims Files, Claimant Information and any other personally identifiable or otherwise protected information obtained by a Party (collectively, the "Protected Information") is confidential in nature and subject to protection under Applicable Law. Vendor shall use the Protected Information for the sole purpose of performance of its obligations under this Agreement and for no other purpose. Vendor agrees (i) to collect, store, process, use and disclose the Protected Information consistent with all Applicable Law and to establish all systems and processes necessary for such compliance, (ii) not to disclose the Protected Information except as permitted by the Settlement Agreement or as instructed by the Court, and (iii) to inform the other Parties and the Court in the event of any breach of its obligations under this Section or any suspected or actual unauthorized disclosure.

9.     Deliverables.

In connection with, or as an ancillary part of, the performance of the Claims Services, at the request of the Claims Administrator, Vendor may develop certain deliverables, including software, programs, applications or systems used to process Claims information, Claimant Information or Claims payments and any standalone customizations to the Vendor systems, improvements thereto, marks, logos, know-how, trade secrets, works of authorship, inventions, content, and other materials (collectively, "Deliverables"). Vendor shall promptly report to the Claims Administrator (and BP and Lead Class Counsel with permission of the Claims Administrator) in writing upon request regarding the progress, completion and status of the development of all such Deliverables. All Parties reserve, and do not waive, any or all rights and defenses they may have under Applicable Law with respect to Deliverables.

10.     Audit: Internal Controls: Insurance.

10.1     Audit. During the term of this Agreement and for a period of three (3) years after its termination or expiration, the Claims Administrator and his respective agents, designees, accountants, consultants and advisors, shall have the right to review and/or audit all pertinent books and records of Vendor, including the administrative procedures of Vendor, to substantiate the Charges invoiced under this Agreement and to otherwise confirm compliance by Vendor with its obligations under the Settlement Agreement and this Agreement. Such audit rights shall be in addition to any other rights of the Parties set forth in this Agreement. Vendor shall preserve all documents in accordance with the Court's orders governing document preservation. Vendor further agrees to cooperate fully with the Claims Administrator and with all reasonable requests of the Claims Administrator during such review(s) or audit(s). The Claims Administrator shall also have the right to independently audit the subcontractors of Vendor. Such audits shall be scheduled and conducted during normal business hours with reasonable advance notice to Vendor and shall not unreasonably interfere with Vendor's business activities. The Claims Administrator shall have the right to engage third party service providers to perform or participate in such audits. Prompt adjustment shall be made to compensate for any overpayment or underpayment by the Claims Administrator disclosed by such audit (including interest on such amounts equal to the prime rate set forth in the Wall Street Journal from the date such fees were incurred or overcharged until the date paid). Any audit by the Claims Administrator shall be paid for by the Settlement Trust, unless discrepancies are disclosed by the audit in excess of ten percent (10%) of the audited Charges, in which case Vendor shall pay the reasonable costs associated with such audit. In addition, with the approval of the Claims Administrator, BP and its agents, accountants, consultants and advisors,

shall have the right to review and/or audit Vendor in a manner consistent with the audit rights of the Claims Administrator set forth above.

10.2 <u>Insurance</u>. Commencing on the Execution Date and during the term of this Agreement thereafter, Vendor shall maintain insurance in the types and at least in the amounts set forth in <u>Exhibit 4</u>. Excluding the Professional Errors & Omissions, Ins. Co. Blanket Bond (Fidelity) and Third Party Commercial Crime policies, such insurance shall be primary, notwithstanding the existence of any other insurance policies which may be available to insure against any covered risks. All insurance policies shall be issued by reputable insurance companies rated "A" or better by A.M. Best. The General Liability, Automobile Liability and Umbrella Liability policies shall contain a separation of insureds provision and shall name the Settlement Trust, the Trustee and the Claims Administrator as additional insureds. Vendor shall require that all insurance policies, excluding the Professional Errors & Omissions, Ins. Co. Blanket Bond (Fidelity) and Third Party Commercial Crime policies, be endorsed so as to waive all rights of recovery under subrogation or otherwise against the Settlement Trust, the Trustee and the Claims Administrator. When requested, Vendor shall furnish copies of certificates of insurance evidencing coverage.

11.    <u>Information Security: Business Continuity</u>.

11.1 <u>Security Requirements</u>. Vendor shall comply, and shall cause all Vendor employees and approved subcontractors to comply, with the information security and data protection requirements set forth in <u>Exhibit 5</u> (the "<u>Security Requirements</u>") in providing the Claims Services. As periodically requested by the Claims Administrator or BP, Vendor shall promptly complete a third party service provider information security questionnaire and other reasonable documents or requests for information regarding Vendor's information security practices (*e.g.*, audits, summaries of test results, or other equivalent evaluations of Consultant's information security practices) ("<u>Security Questionnaire</u>").

11.2 <u>Claimant Information Handling Requirements</u>. Vendor shall comply with all reuse, redisclosure and other personal information handling, processing, security and protection requirements that are specifically required of a non-affiliated third-party processor or servicer (or subcontractor) under Applicable Law, including all laws related to personal information and data and privacy and protection thereof. Without limiting the foregoing, Vendor agrees that: (i) it is prohibited from disclosing or using any nonpublic personal information obtained by Vendor during the Claims process (the "<u>Claimant Information</u>"), except solely to carry out the purposes for which it was disclosed or as otherwise permitted by Applicable Law; and (ii) it has implemented and will maintain an information security program designed to meet Applicable Law (the "<u>Information Security Program Requirements</u>").

11.3 <u>Security Audits</u>. During the term and thereafter for as long as Vendor retains Claimant Information, the Claims Administrator and his respective representatives, designees and agents shall be entitled to conduct audits of Vendor's relevant operations, facilities, systems, etc. to confirm that Vendor has complied with Security Requirements and the Information Security Program Requirements (the "<u>Security Audits</u>"). Any Security Audit shall be scheduled and conducted during normal business hours with reasonable advance notice to Vendor and shall not unreasonably interfere with Vendor's business activities. In the event that any Security Audit results in the discovery of material security risks to Claimant Information resulting from a failure to comply with the Security Requirements, after written notice and explanation to Vendor of such conditions and risks, Vendor shall (i) respond to the Claims Administrator in writing with Vendor's plan to promptly take measures and corrective actions necessary to restore compliance with the Security Requirements, at no cost to the Settlement Trust, the Trustee or the Claims Administrator,

and (ii) allow the Claims Administrator to review any system and transaction logs related thereto which pertain to information or data potentially compromised. Vendor shall have ten (10) business days to develop a remediation plan, unless the Parties mutually agree in writing to a longer period of time for such cure. In addition, with the prior written approval of the Claims Administrator, BP and its agents, accountants, consultants and advisors, shall have the right to perform Security Audits of Vendor consistent with the rights of the Claims Administrator set forth above. The Claims Administrator's and BP's right, and the right of their representatives and agents, to conduct Security Audits, and any exercise of such right, shall not in any way diminish or affect Vendor's duties and liabilities under this Agreement.

       11.4     <u>Disaster Recovery; Business Continuity</u>. Vendor shall implement and maintain disaster recovery and business continuity plans that are reasonable and appropriate to the Claims Services under this Agreement, all in accordance with generally accepted industry practices and procedures.

12.       <u>Vendor Personnel</u>. Vendor represents that it has or will secure, at its own expense, all personnel required in performing the services under this Agreement. Within ten (10) days after the Execution Date and at such times and intervals as the Claims Administrator may request, Vendor shall submit an organizational chart to the Claims Administrator detailing the identity of each person serving at the Manager or higher level (whether employed by Vendor or a subcontractor) who shall perform any services required under this Agreement or otherwise work on the Program pursuant to this Agreement. Each person will be assigned one of the classifications as identified in the Service Rate Schedule, <u>Exhibit 2</u> and as further defined in Job Descriptions, <u>Exhibit 3</u>. Vendor shall not allow any person who is not on the organizational chart to perform any services required under this Agreement or otherwise work on the Program; provided, however, that Vendor may fire, hire or change personnel if subject to the same rates as then in effect for persons performing the same services, but identify such new or replacement persons in the next organizational chart to be submitted to the Claims Administrator.

All the services required hereunder will be performed by the Vendor or under its supervision, and all personnel engaged in the work shall be fully qualified and shall be authorized or permitted under State and local law to perform such services.

No person who is serving sentence in a penal or correctional institution shall be employed on work under this Agreement.

       12.1     <u>Background Check</u>.    Commencing on the Execution Date, Vendor must, at its expense, arrange for a background check for each person who will be working on the Settlement Program through the Vendor identified as being on the organization chart submitted to the Claims Administrator for approval, and may include but is not necessarily limited to Vendor's employees or independent vendors, as well as the employees of any other company working through Vendor as a subcontractor or otherwise. The background check will include a check on certain aspects of an applicant's or employee's personal and professional background done by a third party vendor for the purpose of determining eligibility for employment. The background check shall include the following: social security number validation, name and address verification, county/state criminal history, sex offender registries, motor vehicle checks, employment verifications, credit reports, license certifications, education verification, military service verification, court record checks, and confirmation that the employee is not a denied person for purposes of export control. No person may be eligible to provide Claims Services if he has been convicted in any jurisdiction of any criminal offenses (exclusive of minor traffic violations and misdemeanors) within ten (10) years prior to the Effective Date or less than ten years has elapsed between the Effective Date and the successful completion or service of any sentence, deferred adjudication, or period of probation or parole for any such criminal offense.

12.2 [Intentionally Deleted]

13. Representations and Warranties.

Vendor represents, warrants and covenants that: (i) it has the power and authority to enter into this Agreement and to perform all of its obligations hereunder; (ii) the execution, delivery and performance of this Agreement does not violate or conflict with any other agreement to which Vendor is a party or by which it is bound; (iii) Vendor has not previously entered into any agreement that would restrict Vendor in the performance of the Claims Services; (iv) it shall comply with all Applicable Law in performing its obligations under this Agreement; (v) Vendor shall use commercially reasonable efforts to verify that each of Vendor's employees performing Claims Services is legally entitled to work in the United States and has all necessary visas and work permits; (vi) Vendor has the capacity and resources to perform the Claims Services; and (vii) all Claims Services shall be performed by qualified Vendor personnel and subcontractors in a timely, professional and workmanlike manner in accordance with generally accepted industry practices.

14. Indemnification and Exculpation.

14.1 Indemnification by Vendor. Vendor shall defend, indemnify, and hold harmless: (a) the Settlement Trust; (b) the Trustee; (c) the Claims Administrator; (d) the individual persons and the entities identified on the attached Exhibit 10 to the extent that they provide administrative and oversight services to the Claims Administrator in connection with the operation of the programs conducted through the Deepwater Horizon Claims Center or at or through the Program Management Office; (e) all additional persons who may be retained from time to time by any of the entities identified on attached Exhibit 10 to the extent that they provide administrative and oversight services to the Claims Administrator in connection with the operation of the programs conducted through the Deepwater Horizon Claims Center or at or through the Program Management Office, who will be identified to Vendor in amendments to Exhibit 10 or other notices to be submitted monthly to Vendor by the Claims Administrator; (f) all present and future employees and staff members of Juneau David, APLC (including but not limited to Michael J. Juneau, all associates, paralegal assistants, secretaries, and other employees); and (g) any future employees or staff members of the Claims Administrator who will be identified in amendments to Exhibit 10 or other notices to be submitted monthly to Vendor by the Claims Administrator, but excluding any of the other Major Vendors (each, but excluding the Major Vendors, an "Indemnitee", and collectively, the "Indemnitees") from and against any and all damages, losses or claims of any kind (including costs and reasonable attorney's fees) that are asserted, brought, commenced or sought against and incurred by any of the Indemnitees by any person or entity, including a governmental authority, relating to or arising from (i) Vendor's breach or alleged breach of this Agreement, including, without limitation, breach or alleged breach of any of its representations, warranties or covenants; (ii) Vendor's violation or alleged violation of any Applicable Law; or (iii) bodily injury, death or damage to tangible property resulting from Vendor's acts or omissions. No Major Vendor or any employee, agent, contractor or subcontractor of any Major Vendor shall be considered an Indemnitee at any time for any purpose.

14.2 Process for Indemnification Under Section 14.2. An Indemnitee shall give written notice to the indemnitor(s) of any claims that may be subject to indemnification, promptly after learning of such claim, and the indemnitor(s) shall, unless contesting the duty to indemnify, assume the defense of such claim with counsel chosen by the indemnitor(s). Each Indemnitee shall reasonably cooperate with the indemnitor(s) in such defense, at no cost to the indemnitor(s). Each Indemnitee may, at its option and sole expense, be represented by counsel of its choice in any

11

action or proceeding with respect to such claim. The indemnitor(s) shall not be liable for any litigation costs or expenses incurred by an Indemnitee's own counsel.

14.3 Exculpation. Anything in this Agreement to the contrary notwithstanding, Vendor shall have no responsibility or incur any liability for: (i) the acts or omissions of any other Major Vendor, other vendor, the Claims Administrator, any Indemnitee, BP or any other third parties, or any of their respective subcontractors or affiliates, or any officers, directors, employees, agents, or representatives of any of the foregoing, or (ii) any actions or omissions by Vendor, or any of its officers, employees or subcontractors, if such actions or omissions were taken or made in good faith reliance upon any Court Approved Procedure, Court Order, policies or procedures approved by the Claims Administrator, and/or instructions from the Claims Administrator and/or any Indemnitee.

15.     Subcontracting.

Notwithstanding any provision in this Agreement to the contrary, with the exception of subcontracts with (i) any software development staff and other providers of clerical, security, internal administrative or other services contracted by Vendor at a cost of no greater than $2,500.00 per month for each such provider, (ii) temporary and contract staffing agencies for personnel retained by Vendor to assist with the provision of Claims Services who are identified on attached Exhibit "11", and (iii) personnel retained by Vendor on a contract basis to assist with the provision of Claims Services who are identified on attached Exhibit "11" ((i) through (iii), collectively, "Subcontracts for Ancillary Services"), Vendor shall not subcontract any of its obligations to provide Claims Services under this Agreement to any third party, including any Affiliate of Vendor, without the Claims Administrator's prior written approval of the subcontractor. After the Execution Date, Vendor shall not enter into any subcontract without first giving an opportunity to the Claims Administrator and BP to review and comment on the proposed subcontract. Vendor shall require its approved subcontractors to enter into contracts that contain provisions that are consistent with (and as protective of the other Parties hereto as) the terms of this Agreement, including, without limitation, termination provisions and provisions relating to protection of Protected Information that are at least as protective as the provisions of this Agreement. Notwithstanding anything herein to the contrary, Vendor shall be liable for the acts and omissions of its subcontractors as if they were the acts and omissions of itself and its employees. With any proposed subcontract submitted for review by the Claims Administrator, Vendor shall provide the Claims Administrator with a list of all owners, shareholders, partners, members or other similar persons of any subcontractors providing services hereunder, unless such subcontractors are publicly held corporations listed on a major stock exchange. The Claims Administrator shall have the right to obtain any services directly from, or otherwise contract with, any subcontractors so retained by Vendor or any other third party at any time during or after the term of this Agreement, including, without limitation, for the provision of services similar to the Claims Services, provided, however, that Vendor shall have absolutely no liability whatsoever with respect to any services directly obtained by the Claims Administrator from any such subcontractors, any other provision in this Agreement to the contrary notwithstanding. In addition, Vendor shall include provisions in any approved subcontract that provide for the transfer back to Vendor or its designee of any services or work product thereunder upon written notice from Vendor to subcontractor, or upon any termination or expiration of such subcontract.

16.     Miscellaneous.

16.1 Third Party Beneficiaries. This Agreement is intended to be for the sole benefit of Vendor, the Settlement Trust the Trustee, and the Claims Administrator, and only to the extent applicable, BP and Lead Class Counsel, and the Parties do not intend, nor shall any clause be interpreted, to create under this Agreement any obligations of either Vendor, the Settlement Trust,

the Trustee, the Claims Administrator, BP or Lead Class Counsel in favor of, or benefits to, or rights in, any other party.

16.2    BP Right to Object. Vendor recognizes and acknowledges that BP shall have the right to lodge an objection with the Claims Administrator regarding Vendor's performance of its obligations under this Agreement, including, without limitation, with respect to its charges, costs and expenses, and the reasonableness thereof. In the event the objection is not resolved, BP may bring the objection to the Court's attention for resolution.

16.3    Successors and Assigns. The terms and conditions of this Agreement shall be binding upon the Parties and inure to the benefit of the Parties and their respective successors and permitted assigns; provided, however, that, unless otherwise provided in this Agreement, the obligations of the Parties under this Agreement may not be delegated nor shall any rights be assigned or transferred, including by merger, reorganization, change of control, acquisition or sale of all or substantially all of its assets or business or otherwise (including, without limitation, by operation of law) (collectively a "Sale Transaction"), by a Party without the other Parties' prior written consent. The Parties acknowledge and agree that the conversion of the entity form of the Vendor from a Professional Limited Liability Company to a Limited Liability Company or Corporation pursuant to the laws of the Commonwealth of Virginia shall not be deemed a Sale Transaction for the purposes of this Section 16.3 and that, in the event of such conversion, Vendor may delegate all or part of its obligations or assign or transfer all or a part of its rights to the new entity form, provided that the Vendor complies with the provisions of Section 15 hereof and that the Vendor shall remain liable for the acts and omissions of itself and the employees of that new entity.

16.4    Complete Agreement. This Agreement and its Exhibits, together with any addenda, set forth the entire agreement of the Parties with respect to Claims Services for the DWH Spill, and any prior or contemporaneous promises, conditions or understandings are superseded and/or replaced with this Agreement, with respect to Claims Services for the DWH Spill. The preceding sentence to the contrary notwithstanding, this Agreement does not supersede or otherwise affect the Indemnity Agreements between Vendor and BP, entered into with respect to the Leases of the Leased Properties.

16.5    Order of Precedence. In the event of any conflict between the terms set forth in the main body of this Agreement and any exhibit, schedule, annex, attachment or addendum hereto, the terms of the main body of this Agreement shall control and govern.

16.6    Modification. No provision of this Agreement may be changed unless the change is set forth in a written amendment to this Agreement signed by all of the Parties.

16.7    No Waiver. If a Party waives compliance with any term or condition of this Agreement, it shall be not deemed a waiver of any other right, nor to permit less than strict compliance with any term or condition on any future occasion.

16.8    Governing Law; Severability. This Agreement shall be governed by and construed in accordance with the law of the State of Louisiana without reference to its conflict of laws principles. To the extent that any provision is found to be unenforceable or invalid, then such provision shall be ineffective only to the extent of such unenforceability or invalidity, and shall not affect the enforceability or validity of any other provision of this Agreement. The Parties agree that any claim, action, proceeding or suit related to or arising from this Agreement shall be subject to the exclusive jurisdiction of the Court, to which the Parties irrevocably submit.

16.9    Notices. All notices and correspondence required to be given by this Agreement shall be delivered by hand or certified mail, return receipt requested and postage pre-paid, or by a nationally recognized courier service, or by facsimile transmission, and be addressed as follows:

If to Vendor:

> [Before 5/1/13]
> Orran L. Brown
> BrownGreer PLC
> 115 South 15th Street, Suite 500
> Richmond, VA  23219-4029
> Telephone: (804) 521-7201
> Fax No.: (804) 521-7299
> Email: obrown@browngreer.com

> [After 5/1/13]
> Orran L. Brown
> BrownGreer PLC
> 250 Rocketts Way
> Richmond, VA  23231
> Telephone: (804) 521-7201
> Fax No.: (804) 521-7299
> Email: obrown@browngreer.com

If to Claims Administrator, the Settlement Trust or the Trustee:

> Patrick Juneau
> The Deepwater Horizon Economic & Property Damages Trust
> 935 Gravier Street, Suite 1905
> New Orleans, LA  70112
> Phone: 504-264-9740
> Fax: 504-264-9746
> Email:  mjj@dheclaims.com

16.10   Public Announcements. Vendor shall not make any public announcements or press releases regarding this Agreement or the provisions of services hereunder.

16.11   Counterparts. This Agreement may be executed in one or more counterparts which taken together shall constitute one single agreement between the Parties.

16.12   Conflicts. Vendor represents that at as of the Effective Date there are no apparent or actual conflicts of interest between Vendor's services or obligations to the Settlement Trust, the Trustee, the Claims Administrator, Lead Class Counsel or BP hereunder, and Vendor's other business or financial interests (collectively, a "Conflict of Interest"). If any such Conflict of Interest should arise (or Vendor reasonably believes that a Conflict of Interest may arise), Vendor shall notify the Settlement Trust, the Claims Administrator, Lead Class Counsel and BP promptly to attempt to resolve the potential or actual Conflict of Interest to the Settlement Trust's, the Trustee's, the Claims Administrator's, Lead Class Counsel's and BP's satisfaction. Vendor shall ensure that, prior to engaging any subcontractor, such subcontractor is free from all Conflicts of

Interest with the Settlement Trust, the Trustee, the Claims Administrator, Lead Class Counsel and BP, and Vendor shall require that all subcontractors disclose any potential or actual Conflict of Interests while providing services for the benefit of the Settlement Trust, the Trustee, the Claims Administrator, Lead Class Counsel and BP. In the event that any Conflict of Interest cannot be resolved to the Settlement Trust's, the Trustee's, or the Claims Administrator's satisfaction, the Settlement Trust, the Trustee or the Claims Administrator with the approval of the Court, shall have the right to terminate this Agreement, in addition to any other remedies they may have at law or in equity.

16.13    Independent Contractors.    The Parties to this Agreement are independent contractors. No Party is an agent, representative, joint venturer, or partner of any other Party. No Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability of, or to otherwise bind, any other Party except as provided herein. Each Party shall bear its own costs and expenses in performing this Agreement, except as otherwise specifically provided in this Agreement. Vendor personnel shall at all times and for all purposes be deemed not to be employees of the Settlement Trust, the Trustee, the Claims Administrator, BP or Lead Class Counsel. Vendor shall be responsible for the payment of all fees, wages and/or salaries payable to Vendor personnel and for providing Vendor personnel with any fringe benefits to which they are entitled by reason of being an employee or contractor of Vendor. In no event shall Vendor personnel be eligible for any fringe benefits or insurance provided to employees of BP or Lead Class Counsel. Vendor shall also be responsible for withholding and payment of all payroll taxes with respect to Vendor's employees to governmental agencies. Vendor shall comply, at its expense, with all applicable provisions of workers' compensation laws, unemployment compensation laws, federal social security law, the Fair Labor Standards Act and all other Applicable Law relating to terms and conditions of employment required to be fulfilled by employers. Vendor shall comply with all applicable occupational health and safety laws, standards and requirements pertaining to the Claims Services, including, but not limited to, OSHA standards and analogous state standards for work performed under this Agreement.

16.14    Document Retention Policy.    Vendor shall comply, and shall cause all Vendor employees and any subcontractor and its employees, to comply, with all Document Retention Policies issued by the Claims Administrator and all Court Approved Procedures now or hereafter promulgated by the Court with respect to document retention.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on their behalf by the undersigned duly authorized individuals.

**The Settlement Trust**

By:

_____
Signature

Daniel A. Juneau
Printed Name

Trustee
Printed Title

5/13/13
Date

**BrownGreer PLC**

By:

_____
Signature

Orran L. Brown
Printed Name

Chairman
Printed Title

5/9/13
Date


**The Claims Administrator and Trustee**

_____
Signature

Patrick A. Juneau
Printed Name

5/13/13
Date

**Exhibit 1**

**Claims Services**

As requested by the Parties and appointed by Judge Carl J. Barbier of The United States District Court for the Eastern District of Louisiana in the Economic and Property Damages Settlement Agreement, Vendor will provide professional services to the Claims Administrator's office for the following scope of services, and additional services that may be requested during the life of the program:

Vendor hereby agrees to furnish services to the Claims Administrator's office as specified in the Amended Settlement Agreement: Court Document 6418, Section III, and Paragraph 23, filed 5/02/2012. All work performed under the Agreement must be authorized by an approved Task Order. A full description of the Scope of Services is contained below:

## 1.0 SCOPE OF SERVICES

### 1.1 Overview

Vendor will be responsible for the successful planning, executing, monitoring and control, and close out (in conjunction with the Claims Administrator's office and the Peer Contractors) in the role of "Process Leader" or "Process Support" as appropriate for the following processes pertaining to The Deepwater Horizon Court Supervised Settlement Program ("Settlement Program") , including but not limited to: Assisting with the Transition of claims from the Gulf Coast Claims Facility to the Settlement Program; Establishing Claimant Assistance Centers; Developing and Maintaining the Settlement System of Record, Database, and Interactive Web Portals; Reviewing, Evaluating and Processing Claims as well as the additional services described in more detail in the Task and Services Section below.

Tasks to be accomplished under this Agreement will be addressed in separate Task Orders that will include associated deliverables, service level agreements, performance measures, and timelines, among other requirements.

Vendor will be directly responsible for ensuring the accuracy, timeliness, and completion of all tasks assigned under this Agreement. The scope of services presented is based upon circumstances existing at the time the Settlement Agreement was prepared. The Claims Administrator reserves the right to modify or delete the scopes listed and, if appropriate, add additional scopes prior to and during the term of the Agreement, subject to the prior written approval of the United States District Court for the Eastern District State of Louisiana (the "Court") the Claims Administrator and the Parties.

In accordance with the Settlement Agreement, the Claims Administrator expects Vendor to provide competent and qualified staff to work on the scope of services under this Agreement. The Claims Administrator reserves the right to forbid unqualified or incompetent staff of Vendor to assist with the implementation and administration of the Deepwater Horizon Economic and Property Damage Settlement.

## 1.2 Tasks and Services

This Section provides a detailed list of tasks and services Vendor will be responsible for under the Agreement. Vendor will be responsible for entering information related to these tasks in the System of Record on a daily basis. Vendor will be required to coordinate with other Claims Administrator Program Manager(s) and Production Vendors as required.

## Task (1): Program Development

Vendor shall assist as requested by the Claims Administrator with the overall development of the Settlement Program to include:

- Developing procedures and processes associated with claims handling for timely and accurate claims review and award determinations.

- Developing the Settlement Program System of Record, for electronic storage of all claims-related documents and information submitted by Claimants or their representatives to the Settlement Program, and for Vendor and other authorized parties to access, review, evaluate and process claims through a system of categorized queues within the system.

- Designing claim forms and other form documents tailored to the 12 different categories of damage and loss covered by the Settlement Program (i.e., Individual Economic Loss, Individual Periodic Vendors and Festival Vendors, Business Economic Loss, Start-Up Business Economic Loss, Failed Business Economic Loss, Seafood Program, Coastal Real Property Damage, Real Property Sales Damage, Wetlands Real Property Damage, Subsistence Damage, VoO Charter Payment and Vessel Physical Damage), including establishment of business rules for system coding of the forms and programming of the respective system elements into the System of Record.

- Developing online Web Portals for the Settlement Program, permitting online submission of claims-related documents and information to the System of Record by Claimants and their representatives.

- Developing various notice letter templates to apprise Claimants of the status of their claims and establishing business rules for determining when a certain notice should issue to a Claimant and coding the System of Record to issue appropriate notice letters programmatically.

## Task (2): Program Execution Support

Vendor shall be responsible for program execution support to include:

- Working closely with the Claims Administrator and its designees in preparing projections, milestone schedules and reports in implementation of the Settlement Agreement.

- Running ongoing statistical and other programmatic reports as requested regarding Settlement Program activities and performance and providing findings to the Claims Administrator and other authorized parties on a recurring basis or as requested.

- Assisting the Claims Administrator with management of day-to-day tasks, process improvement, policy changes, and Settlement Program close out.

- Assisting the Claims Administrator, as requested, to provide the necessary data to ensure that the media and the general public remain informed through media messages, community outreach, public relations, and public education efforts.

- Coordinating with the Claims Administrator and its Information Technology Lead as required.

- Communicating potential risks, issues, and statuses with the Claims Administrator.

## Task (3): Program Execution

Vendor shall assist the Claims Administrator with execution of the Settlement Program to include:

- Leasing, furnishing, equipping and operating the headquarters office in New Orleans (The "New Orleans Office"), LA, for management and oversight of Settlement Program.

- Leasing, furnishing, equipping and operating 18 Claimant Assistance Centers for the Settlement Program, strategically located across the Gulf Coast region to provide convenient access to potential claimants requiring in person assistance with their claims.

- Providing third-party security services to be posted at the New Orleans Office.

- Recruiting hiring, training and managing personnel at the New Orleans Office, the Claimant Assistance Centers and Vendor's offices in Richmond, VA necessary for operation of the Settlement Program and related tasks described herein.

- Implementing and maintaining the Settlement Program System of Record including databases, web interfaces, and source code to include regularly scheduled backups and system maintenance in accordance with industry accepted standards including change control procedures.

- Developing and implementing processes for addressing claims transitioned from the Gulf Coast Claims Facility to the Settlement Program.

- Developing and implementing processes for document categorization and data capture of all claimant documents submitted in either paper or electronic format.

- Reviewing, evaluating and processing claims filed with the Settlement Program, through the System of Record, in accordance with the Settlement Agreement and relevant Court Orders and, where claims are ultimately determined to be payable, calculating payment amounts to be distributed to the claimants, as well as developing and implementing

protocols and data tables to assist other Settlement Program vendors with the disbursement of such payments to Claimants.

- Developing and implementing processes for Incomplete Claim Reviews, Employer Verification Reviews, Exclusions, Claimant Accounting Support Reviews, Identity Verification and Minors, Incompetents and Deceased Claimants.

- Working with the Claim's Administrator's office to develop and implement processes to address requests for reconsideration and claims appeals received from claimants.

- Developing and implementing processes for providing proper Settlement Program communications to pro se claimants and claimants represented by counsel.

- Working with the Claim's Administrator's office for the development and implementation of fraud controls for the Settlement Program and forwarding identified fraudulent claims to the fraud investigation team.

- Developing and implementing internal confidentiality and document preservation protocols required under the Settlement Agreement and related Court Orders.

- Developing and implementing protocols for the production of information and/or documents in response to subpoenas and requests from claimants or their counsel.

- Developing and implementing protocols for handling liens / garnishments and subsequent distributions to lien holders and claimants.

- All other activities and services necessary to perform the foregoing or hereafter agreed to in writing between the Vendor and the Claims Administrator.

**Task (4): Quality Assurance/Quality Control**

Vendor shall provide quality assurance and quality control to include:

- Performing routine quality checks of operational/functional areas as assigned to ensure that program performance standards are being met including continuous process improvement for efficiency and speed of processing claims.

- Periodically reviewing operational procedures to ensure that all procedures follow the Amended Settlement Agreement policy and comply with Court requirements and updating procedures as necessary.

- Performing a comprehensive final review for work performed on claimant files, as part of the Claims Administrator Program quality assurance process. The file for each claimant must be reviewed for accuracy and completeness prior to being archived.

- Reporting QA/QC results to Claims Administrator management on a routine basis.

**Task (5): Document Management and Records Retention**

Vendor shall retain all Claimant files and program materials in accordance with the Claims Administrator record retention policy. This includes the physical claimant file (if applicable) as well as an electronic version.

## Task (6): Accounting and Reporting

As required by the Claims Administrator's office, Vendor shall supply upon request:

- Data and reports related to labor and expense charges including a detailed organizational chart of individuals working on the project, hours worked by individual by title and location, expense detail, production metrics and other data as requested.

- A periodic report on the inventory, possession, and location of all items furnished by the Claims Administrator within an inventory system with appropriate chain of custody procedures, including items such as: equipment, furniture, computers, telephones, laptops, network printers, network equipment, etc.

## Task (7): Ramp-down and Program Close out

Vendor shall assist the Claims Administrator with program close out to include:

- Coordination of the ramp-down of services and support as claimants move through the Settlement Program, including scaling staff within functional areas to meet Settlement Program needs.

- Implementation of document retention procedures.

- Initiating program close out in accordance with the terms and conditions of the Agreement, the Amended Settlement Agreement, other program requirements and Applicable Law.

## Exhibit 2

### Service Rate Schedule
# RATE SCHEDULE

| | Position | Hourly Rate |
|---|---|---|
| 1. | ORRAN L. BROWN, PARTNER | $400 |
| 2. | LYNN C. GREER, PARTNER | $380 |
| 3. | PARTNER | $250 |
| 4. | SENIOR COUNSEL | $200 |
| 5. | COUNSEL | $175 |
| 6. | SPECIAL COUNSEL/PROJECT ATTORNEY | $95 |
| 7. | SENIOR ANALYST II | $125 |
| 8. | SENIOR ANALYST I | $95 |
| 9. | ANALYST | $85 |
| 10. | FORENSIC ACCOUNTANT | $85 |
| | **CLAIMS REVIEW AND CALL CENTER** | |
| 11. | LEGALLY TRAINED REVIEWER | $80 |
| 12. | CLAIMS REVIEWER | $50 |
| 13. | ADMINISTRATIVE ASSISTANT | $20 |
| | **CLAIMS ASSISTANCE CENTERS** | |
| 14. | CLAIMS ASSISTANCE CENTER MANAGER | $100 |
| 15. | CLAIMS ASSISTANCE CENTER ASSISTANT MANAGER | $85 |
| 16. | CLAIMS ASSISTANCE CENTER INTERVIEWER | $65 |
| 17. | CLAIMS ASSISTANCE CENTER ASSISTANT | $50 |
| 18. | CLAIMS ASSISTANCE CENTER COORDINATOR | $45 |
| | **DATABASE DEVELOPMENT AND MAINTENANCE** | |
| 19. | DIRECTOR OF INFORMATION MANAGEMENT | $160 |
| 20. | SENIOR PROJECT MANAGER | $145 |
| 21. | PROJECT MANAGER | $130 |
| 22. | SENIOR DATABASE ADMINISTRATOR | $120 |
| 23. | PROJECT TEAM LEAD | $120 |
| 24. | DATABASE ADMINISTRATOR | $110 |
| 25. | SENIOR PROGRAMMER ANALYST | $120 |
| 26. | PROGRAMMER ANALYST | $110 |
| 27. | IIS ADMINISTRATOR | $105 |
| 28. | PROJECT COORDINATOR | $85 |
| 29. | QUALITY ANALYST | $65 |
| 30. | IT MANAGER | $160 |
| 31. | INFRASTRUCTURE MANAGER | $75 |
| 32. | NETWORK ADMINISTRATOR | $75 |
| 33. | HELP DESK TECHNICIAN | $65 |
| 34. | FACILITIES MANAGER | $45 |
| 35. | TRAINING MANAGER | $85 |
| 36. | TRAINING ANALYST | $65 |

**Exhibit 3**

## Job Descriptions

### 1. Partner
Executive level management attorney. Responsibility includes overseeing the evaluation, management, and operations of claims submitted to the Claims Administrator to determine if specific elements have been met.

Juris Doctorate degree and active bar license is required. Minimum of eight years experience required.

### 2. Senior Counsel
Licensed attorney with more than three years experience. They are expected to manage the evaluation of claims submitted to the Claims Administrator to determine if specific elements have been met.

Juris Doctorate degree and Active bar license is required. Minimum of 3 years experience required.

### 3. Counsel
Licensed attorney working on this class action settlement. They are expected to manage the evaluation of claims submitted to the Claims Administrator to determine if specific elements have been met.

Juris Doctorate degree and active bar license is required. Minimum of two to three years experience required.

### 4. Special Counsel/Project Attorney
Entry level licensed attorney. Works on class action settlement and will be expected to evaluate claims submitted to the Claims Administrator to determine if specific elements have been met.

Juris Doctorate degree and active bar license is required.

### 5. Senior Analyst II
Manages and directs work flow of Claims Reviewers. Provide support and guidance to Analysts. Partner with attorneys and operate individually to coordinate with programming teams to maintain and improve existing databases, develop new functionalities, and develop concise reports.

Associate's Degree required or equivalent and/or related work experience with comparable responsibility. Bachelor's Degree preferred. Experience working in role and/or supervising staff that are subject to production requirements. Minimum of two years of relatable work experience desired and two years of internal experience desired. Prior legal experience a desired.

### 6. Senior Analyst I

Responsible for ensuring the integrity of claims data, providing work direction to Analysts and Claims Reviewers, examining complex data and making determinations and performing related tasks to ensure excellent client service. Relevant work time is considered billable and this position is responsible for billing target hours of 1,700 per year.

Bachelor's Degree required. Graduate level course work desired. Experience working in role and/or supervising staff that are subject to production requirements. Minimum of five years of relatable work experience required and five plus years of internal experience desired. Prior legal experience desired.

### 7. Analyst

Manages and directs work flow of Claims Reviewers and Site Office Assistants. Examines complex data and makes determinations. Ensures integrity of claims data. Performs related tasks to ensure excellent client service.

Associate's Degree required, or equivalent and/or related work experience with comparable responsibility; Bachelor's Degree preferred. Experience working in role and/or supervising staff that are subject to production requirements. Minimum of six months of internal experience desired. Prior legal experience desired.

### 8. Forensic Accountant

Review claims for quality assurance. Collaborate with attorneys and claims reviewers to identify fraudulent claims. Perform regular quality control of client databases through secondary review of claims information. Review claims in order to provide information to the client and other counsel outside the firm.

Bachelor's degree required, Master's degree preferred. Certified Fraud Examiner (CFE) or Certified Public Accountant (CPA) with Certification in Financial Forensics (CFF). Minimum of five year of relatable work experience desired.

<strong>CLAIMS REVIEW AND CALL CENTER</strong>

### 9. Legally Trained Reviewer

Claims Reviewers on this class action settlement that have obtained their JD but are not licensed to practice law. They are expected evaluate claims submitted to the Claims Administrator to determine if specific elements have been met. Determinations will be solely based on documentation submitted with the claim form. Juris Doctorate degree is required.

### 10. Claims Reviewer

Performs complex review of documents in order to evaluate and assign values to claims while maintaining the integrity of claims data with tasks including data entry and related duties to ensure excellent client service.

Bachelor s degree preferred. Minimum of one (1) year of relatable work or academic experience desired. Required degree and/or experience in: Accounting, Bookkeeping, Tax, Payroll and paycheck work; payroll services, Banking, Mortgage, Finance, Claims review on property loss or income loss claims, Economic modeling, Mathematics and statistics, Fraud detection and prevention; investigations; forensic analysis. Working knowledge or exposure to business software.

## 11. Administrative Assistant

Responsible for ensuring the integrity of claims data and/or lawsuit activity by updating and maintaining claims information with tasks to include data entry activity and the performance of related duties to ensure excellent client service.

Associate's Degree preferred, or equivalent and/or related work experience with comparable responsibility. One to three years of secretarial and administrative experience, or equivalent combination of experience and training. Notary Public a plus.

## CLAIMS ASSISTANCE CENTERS

## 12. Claims Assistance Center Manager

Manages and directs work flow of Claims Reviewers and Site Office Assistants. Examines complex data and makes determinations. Ensures integrity of claims data. Performs related tasks to ensure excellent client service.

Associate's Degree required, or equivalent and/or related work experience with comparable responsibility; Bachelor's Degree preferred. Experience working in role and/or supervising staff that are subject to production requirements.,

## 13. Claims Assistance Center Assistant Manager

Assists in managing and directing work flow of Claims Reviewers and Site Office Assistants. Examines complex data and makes determinations. Ensures integrity of claims data. Performs related tasks to ensure excellent client service.

Associate's Degree required, or equivalent and/or related work experience with comparable responsibility; Bachelor's Degree preferred. Experience working in role and/or supervising staff that are subject to production requirements.

## 14. Claims Assistance Center Interviewer

Performs complex review of documents in order to evaluate and assign values to claims. Conducts interviews with claimants in his or her native language to gather information related to filings. Understands and applies established criteria for submission of claims.

Bachelor's degree preferred. Minimum of one year relatable work or academic experience desired. Strong verbal and written communication skills. Cultural experiences and background in Native American, Vietnamese and/or Cambodian groups desired. Fluency in both verbal and written communication in one or more of the following languages: Vietnamese, Spanish, Khmer and other languages as identified. Ability to interview and gather information in languages other than English. Familiarity with financial documents preferred.

### 15. Claims Assistance Center Assistant

Meets with Claimants at Claims Assistance Centers to provide support related to initial claim filing. Receives documentation for processing, assists Claimants with general questions about the filing process and complete additional related duties as required to ensure excellent customer service.

Bachelor's degree preferred. Minimum of one year relatable work or academic experience desired. Strong verbal and written communication skills. Experience performing administrative duties that are subject to production requirements.

### 16. Claims Assistance Center Coordinator

Serves as point of first contact at claimant assistance centers for claimants and provides support to center personnel.

High school diploma or equivalency and Associates Degree preferred, or equivalent related work experience with comparable responsibility. Minimum of one to two years of related work experience required. Strong communication skills required.

## DATABASE DEVELOPMENT AND MAINTENANCE

### 17. Director of Information Management

Provides executive oversight and implements strategic direction of the Information Management Department in accordance with Firm policies and goals. Responsible for planning, developing, implementing, administering and evaluating cost-effective, state-of-the-art information management services and solutions.

Bachelors Degree in Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Fifteen years of relatable work experience. Ten years experience managing all levels of personnel. Five years experience in a senior IT management positions.

### 18. Senior Project Manager

Plans, executes, and finalizes high-level and/or enterprise-wide projects according to strict deadlines and within budget. This includes acquiring resources and coordinating the efforts of team members (attorneys, analysts, and IT staff), as well as third-party contractors or consultants in order to deliver projects according to plan. This position will also define the project's objectives and oversee quality control throughout its life cycle. In addition, the Senior Project Manager will work closely with the Project Managers to develop strategies and tactics, as well as provide leadership and direction.

Bachelors Degree in Business Administration, Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Masters degree preferred. At least ten years of relatable work experience
Significant project management experience (either dedicated or as part of larger job function)
Business acumen, superior critical thinking skills, and demonstrated experience in planning.

**19. Project Manager**

Plans, executes, and finalizes significant projects according to strict deadlines and within budget as assigned by the Senior Project Manager. This includes organizing resources and coordinating the efforts of team members (attorneys, analysts, and IT staff), as well as third-party contractors or consultants in order to deliver projects according to plan. The Project Manager will also define the project's objectives and oversee quality control throughout its life cycle.

Bachelors Degree in Business Administration, Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Seven to ten years of relatable work experience. Significant project management experience (either dedicated or as part of larger job function). Business acumen, superior critical thinking skills, and demonstrated experience in planning.

**20. Project Team Lead**

Responsible for leadership within a defined group of programmers or other IT professionals to design and develop proprietary software systems or their components. Implements the design by coding all or part of the system itself, as well as updating and repairing existing system as directed. Coordinates with Project Managers.

Bachelors Degree in Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Five to seven years of relatable work experience. Excellent knowledge of SQL, SQL Server, and/or .NET. Proficiency with MS-Office products (especially Word, PowerPoint and Excel. Bachelor's degree and/or post-graduate education preferred, or equivalent and/or related work experience with comparable responsibility. Experience in program/project management/oversight to include supervision of multiple staffing levels.

**21. Database Administrator**

The Database Administrator's role is to design, install, monitor, maintain, and performance tune production databases while ensuring high levels of data availability. This individual is also responsible for developing, implementing, and overseeing database policies and procedures to ensure the integrity and availability of databases and their accompanying software.

Associates Degree in Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. A minimum of five years of relatable work experience. Excellent knowledge of SQL and its implementation. Working knowledge of other database systems and IT functions.

**22. Senior Programmer Analyst**

Performs the highest level functions of both a systems analyst and a computer programmer. Design and develop proprietary software systems or their components. Implements critical design elements and directs the coding efforts of the Programmer Analysts on their team. This position is also responsible for overseeing the update and repair of existing system elements. The Senior Programmer Analyst will work

closely with the Programmer Analysts to ensure effective implementation, as well as provide leadership and direction.

Bachelors Degree in Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Masters degree preferred. Seven to ten years of relatable work experience. Excellent knowledge of SQL, SQL Server, and/or .NET.

### 23. Programmer Analyst

Performs the jobs of both a systems analyst and a computer programmer. Design and develop proprietary software systems or their components. Implements the design by coding all or part of the system itself, as well as updating and repairing existing system as directed. Coordinates with Project Managers.

Associates Degree in Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Bachelor's degree preferred. A minimum of five years of relatable work experience. Expert knowledge of SQL, SQL Server and/or .NET.

### 24. IIS Administrator

Administers and maintains Web Server Products and specifically Microsoft's Internet Information Services (IIS) 6.0 and 7.x. The IIS Administrator is engaged in providing 3rd level support, daily stewardship, troubleshooting, development, automation, and enhancement of web server products to meet the needs of the company; goal to provide the vision and direction for business partners running applications on client Internet and Intranet web servers. In addition, this position acts as a primary liaison between Web Technologies and business areas implementing solutions on the Windows Server and Microsoft .NET family of solutions.

Bachelors Degree in Business Information Systems, Computer Science, or related field required, or equivalent and/or related work experience with comparable responsibility. Seven to ten years of relatable work experience. Five years experience with Windows system administration. Three years experience with IIS administration and backup/disaster recovery.

### 25. Project Coordinator

Develops and maintains detailed project schedules, which include administrative tasks and all initiatives involved in the project. Coordinate meetings, maintain Project Manager calendars, prepare and/or edit meeting minutes, presentations and tables, develop and compile project documents, help track project changes, and assist Perform other administrative functions and duties as assigned.

Associate's Degree preferred, and/or related work experience with comparable responsibility. One to three years of secretarial and administrative experience, or equivalent combination of experience and training. Proficiency with MS-Office products.

### 26. Quality Analyst

The Quality Assurance Analyst's role is to develop and establish quality assurance standards and measures for the information technology services within the organization. This individual will also gather and analyze data in support of business cases, proposed projects, and systems requirements. This will include writing test plans and scripts for tracking defects and fixes in product development, software

application development, information systems, and operations systems. The QA Analyst will apply proven analytical and problem-solving skills to help validate IT processes through careful testing in order to maximize the benefit of business investments in IT initiatives.

Associates Degree in Business Information Systems, Computer Science, or related field required, the equivalent combination of education and/or experience with comparable responsibility. Bachelor's degree preferred. Three to five years of relatable work experience. Working knowledge of SQL, SQL Server and .NET.

### 27. IT Manager
Responsible for planning, developing, implementing, administering, and evaluating cost-effective, state-of-the-art information technology services and solutions. Helps business operations utilize information systems to improve efficiency.

Bachelors Degree in Information Technology or in related field or the equivalent combination of education and/or experience with comparable responsibility. Graduate degree a plus. Three to five years hands-on and supervisory experience in installing, securing and maintaining Microsoft Windows Operating Systems (Windows XP, SQL Server 2000, Windows Server 2000 and 2003), MS Exchange, MS Office, Active Directory and Email Systems in an enterprise environment. Experience in vendor negotiations of software licenses and hardware.

### 28. Infrastructure Manager
Manages the IT Help Desk and CAC Field IT Technicians. Tests and verifies hardware and software, and resolves employee and client issues as needed. Assists Network and Systems Administrators with projects.

Bachelors Degree in Information Technology or in related field or the equivalent combination of education and/or experience with comparable responsibility. Over 3 years working with VMWare Enterprise products and in installing, maintaining, configuring, and troubleshooting Microsoft Server, desktop operating systems, MS Exchange, Active Directory, backup systems, anti-virus applications, web servers, network security and remote access solutions in an enterprise environment.

### 29. Network Administrator
Administer and maintain networking equipment (Routers, Switches and Firewalls). Primary responsibilities include monitoring and maintaining the security and network resources. Assists in network design, modifications, and network equipment selections.

Bachelor's Degree in Information Technology or in related field or the equivalent combination of education and/or experience with comparable responsibility. Three years or more working with VMWare Enterprise products installing, maintaining, configuring, and troubleshooting Microsoft Server, desktop operating systems, MS Exchange, Active Directory, backup systems, anti-virus applications, web servers, network security and remote access solutions in an enterprise environment.

### 30. Helpdesk Technician

Works with end users to document and troubleshoot IT related issues with software, server, computer, storage, telecommunication, and network system.

Associate Degree in Information Technology or in related field or the equivalent combination of education and/or experience with comparable responsibility. One to two years experience in installing, configuring, and troubleshooting Microsoft Office products. One to two years experience with installing, troubleshooting, and maintaining Microsoft Windows Operating Systems (primarily Windows XP Pro). Exposure to Windows Server systems, MS Exchange, Active Directory and email systems. Exposure to backup systems, anti-virus applications, web servers, network security and remote access solutions in an enterprise environment. Exposure to network switches, routers and firewalls. Familiarity with virtual machines. Microsoft or Cisco certifications desired.

### 31. Facilities Manager

Provides leadership for all aspects of facility management. This includes office maintenance, environment and safety; purchasing and maintains office and break room supplies.

Bachelor's degree in Business Administration or relevant area, or the equivalent combination of education and/or experience. Minimum of five years progressive work related experience with three years in a supervisory/management position. Demonstrated knowledge of mechanical and electrical systems operation, space planning and office operations.

### 32. Training Manager

Responsible for BrownGreer's training and development program and for ensuring that this program fully supports and furthers the mission and goals of BrownGreer. Manage and enhance internal training needs through instructor led and self paced curriculums across all offices. Take a lead role in creating content and trainings for the firm. Manages and enhances internal training needs through instructor led and self paced curriculums across all offices.

Bachelors degree preferred; previous management experience in training in development required. Strong interpersonal, communication and leadership skills required.

### 33. Training Analyst

Responsible for creating and conducting company training programs. Monitors and reports the effectiveness of training on employees during the orientation period and for career development. Creates interactive, multimedia presentations to help employees improve upon or

enhance existing skills. Coordinates, plans, organizes implements a range of training activities for all employees.

Bachelor's Degree preferred, or equivalent work related experience with compatible responsibility. Demonstrated organizational ability and high degree of comfortable presenting to groups of people. Presentation of professional appearance, work standards, and demeanor that is reflective of a professional setting.

## Exhibit 4

## Insurance*

| Line of Coverage | Policy Limit |
|---|---|
| Workers Compensation / Employers Liability | All Statutory Requirements<br>$1,000,000 each accident<br>$1,000,000 each disease<br>$1,000,000 disease policy limit |
| General Liability | $1,000,000/occurrence $2,000,000/aggregate |
| Automobile Liability | $1,000,000/accident |
| Umbrella Liability | $10,000,000/occurrence and aggregate |
| Professional Errors & Omissions | $5,000,000 each claim/aggregate |
| Ins. Co. Blanket Bond (Fidelity) | $500,000 each claim/aggregate |
| Third Party Commercial Crime | $5,000,000 each claim/aggregate, subject to a $50,000 deductible. |

*All insurance coverages shall comply with the requirements prescribed by Section 10.2 of the Agreement.

## Exhibit 5

## Information Security Program Requirements

**Purpose:**

The purpose of this policy is to ensure that all information gathered in connection with the Claims Services is treated appropriately with regard for confidentiality and privacy and in compliance with all Applicable Law.

**Policy Statement:**

All persons who are entrusted with information gathered in connection with the Claims Services must treat the information with due regard for confidentiality and the privacy interests associated with the information in accordance with this policy and with all Applicable Law. All disclosures of information must be restricted to the minimum necessary required for the business needs of claims processing.

**Claims Professionals Procedure:**

All persons shall comply with all Applicable Law, and with the following standards, in collecting, using, maintaining and disclosing information:

- Information shall be obtained only by ethical and lawful means.

- Every reasonable effort shall be made to ensure that the information collected, maintained, and acted upon is accurate, complete, timely and relevant to the specific business purpose.

- Nonpublic personal financial and health information (NPI) may include an individual's name, address, age, telephone number, social security number, assets, income, beneficiaries, employment and other personally-identifying information.

- Any loss, misuse, unauthorized access to or unauthorized use of confidential information or other violation of this policy shall be reported immediately to the divisional information security officer (or equivalent personnel) and to corporate or divisional counsel.

- Failure to treat confidential information in accordance with these policies and procedures will result in appropriate disciplinary action, including loss of access privileges and possible termination of employment.

- The responsibility to maintain the confidential nature of confidential information_continues indefinitely after employment.

**Security, Integrity and Accessibility**

- Vendor shall comply with the Claims Administrator's Data Security Policy (provided to Vendor from the Claims Administrator from time to time) in order to protect the confidentiality, security, integrity and accessibility of NPI and other confidential data. Such Data Security Policy includes administrative, technical and physical policies, procedures and safeguards for the protection of all confidential information and shall be in addition to all other provisions, requirements and standards of this Exhibit.

- Logical access to the relevant networks and systems is limited to authorized persons. All users have unique login accounts; no shared accounts will be used. Authentication is handled over secure, encrypted connections using enforced password complexity.
- All Vendor offices providing Claims Services are secured areas.
- Internet usage is restricted to business purposes and controlled by Internet monitoring/blocking technology.
- Network firewalls and intrusion detection/prevention devices must be implemented and operational.
- All Claims Files and supporting documentation are stored in filing cabinets and the Claims centers are locked at the end of the business day.
- All Claims Files and supporting documentation are managed and maintained in accordance with any record and document retention policy required by the Court or the Claims Administrator.
- Any documentation that does not require retention is disposed of in a secure manner, such as shredding.
- Desktops and laptops must have: current and operational anti-virus/malware software; installation of personal firewalls where applicable; password-protected screen savers must have a wait period not to exceed thirty (30) minutes; critical security patches (*i.e.*, O/S and applications) must be reasonably current; and disposal of any desktop/laptop must ensure the complete destruction of all hard drive contents. Additionally, laptops must have full disk encryption.

## Digital Security

Vendor shall ensure that security management in connection with the Claims Services is implemented in accordance with the "Controls" and "Implementation Guidance" as defined and laid down in ISO 27002:2005. In performing its obligations under this Agreement, Vendor shall comply with the Digital Security Standards, the Digital Security Operating Practices and all other applicable policies related to security management and information management and protection provided by the Claims Administrator ("IT Policies"), copies of which shall be provided to Vendor from time to time. The Parties acknowledge that the Claims Administrator or his designees may undertake a security and information technology audit of Vendor's systems, networks and infrastructure to ensure that the Vendor is in compliance with the IT Policies. In the event that any deficiencies, gaps or other inconsistencies between the Vendor IT Security Policy and the IT Policies are identified by such audit, the Parties shall cooperate to take all reasonable actions necessary as soon as reasonably practicable (but in no event later than sixty (60) days) in order to remedy such deficiencies, gaps or inconsistencies and determine the appropriate actions and standards that need to be implemented, provided that such remediation shall not relieve Vendor of its obligations hereunder.

## Viruses Protection

Vendor shall ensure that no virus is knowingly or intentionally introduced into any Claims Administrator computer systems or networks and any systems used by Vendor to perform the Claims Services and shall take precautions to prevent any virus from being introduced including by ensuring that virus protection software is used and kept up to date. If a virus has been introduced into a party's computer systems or networks and any Vendor systems as a result of Vendor's act or omission, Vendor shall, at its own cost: (i) immediately notify such party; (ii) provide all necessary assistance to such party to minimize the effects of the virus; (iii) promptly take steps necessary to eliminate the virus from the affected system or network and prevent re-introduction of such virus; and (iv) if the presence of the virus results in a loss of

data or has a negative impact on the operation of the affected system, mitigate the loss, restore the data and ensure the operation of the affected system is remedied.

## Access by Vendor Personnel to Other Party's Systems

The Parties currently do not contemplate that Vendor will access any other party's systems or networks. In the event that access is required or contemplated, Vendor shall comply with such party's policies related thereto, including its Digital Systems Use Practice, a copy of which shall be provided to Vendor.

## Penetration Testing

1.  The Claims Administrator may, from time to time upon reasonable notice to Vendor, carry out security and penetration tests of the systems and infrastructure and any devices directly connected thereto that form part of the Claims Services provided by Vendor under this Agreement ("Target Systems"). All references in this clause to a "Tester" shall include either Party where it carries out the security assessment and test or a third party tester engaged to carry out security assessments and tests.

2.  Tests may be performed from time to time with the intent of evaluating and testing the measures that are in place to protect the Target Systems against unauthorized access, and to identify security weaknesses in the Target Systems (the "Tests"). Vendor consents, and shall obtain the consent of the security officer of the Claims Administrator (and, where relevant, any required third party consents), to the Tester performing the Tests, such consent not to be unreasonably withheld or delayed.

3.  The Tests shall be performed only during the times notified by the Claims Administrator at least seven days in advance, provided that this notice period shall not be applicable where the deployment of emergency changes to the Target Systems is required to remove security vulnerabilities.

4.  The Tester will use reasonable care to carry out the Tests in a manner which aims to identify security weaknesses but not to take undue advantage of found weaknesses to cause damage. Where the Tester is the Claims Administrator, the Tester shall inform the appropriate security contacts that there is a risk that some damage to the Target Systems may occur, especially if security weaknesses exist in the Target Systems. If the Tester is a third party, the relevant instructing party shall ensure that the Tester gives such a warning.

5.  Prior to the commencement of the Tests, the Parties shall agree to a list of authorized persons for the purpose of notices during the Tests and shall specify contact numbers for such authorized persons. The Tester will immediately stop the Tests upon notice from any one of the authorized persons of a Party. Notice to stop shall be given first by telephone and immediately confirmed by email to the relevant Party's authorized persons. The Tester will also stop the Tests if it has reason to believe that such Tests are causing damage or are about to cause damage to or access the Target Systems or any systems not part of the Target Systems.

6.  If, contrary to the provisions of paragraph 5 above of this Exhibit, the Tester continues to perform the Tests, the Tester or, where the Tester is a third party, the relevant instructing party (as the case may be), shall be responsible for damage caused to the Target Systems or third party property as a result of continuing the Tests. Vendor shall indemnify BP and the Claims Administrator against all losses, damages, liabilities, expenses and costs (including reasonable legal costs) which BP or the

Claims Administrator may incur or suffer as a direct result of any damage to its property or a third party's property caused by the gross negligence of Vendor in the carrying out of the Tests.

7. The Parties acknowledge that the Tests carried out in accordance with this Exhibit are authorized, provided that they are carried out strictly in accordance with the provisions of this Exhibit. The Parties shall put in place adequate measures internally to ensure that, in the event of activity under this Exhibit being detected by its personnel or contractors, they do not notify the police or other authorities, but report the matter internally in the first instance. In the event that the police or other authorities are advised of activities under this Exhibit, both Parties shall promptly advise them that such activities have been carried out with the other Party's full knowledge and permission. Where required, Vendor shall obtain the agreement of the owners of the systems it manages that such owners will comply with this clause.

8. The Parties agree that the work performed under this Exhibit and any results of the work will be treated as confidential information.

9. Vendor acknowledges that the Tester's work will be carried out, and the deliverables will be prepared, on the specific instructions of one of the Parties and for such Party's own use. Each Party shall provide the other with a report of the findings of the assessment to be used in the remedy of security weaknesses found. This report shall be treated as confidential information.

10. At no time, including during the period of Tests, is either Party relieved of its responsibilities under the Agreement in terms of security monitoring and incident reporting, save as explicitly set out in this Exhibit.

**Data Protection**

1. For the purposes of this Exhibit:

    1.1 "data controller": means the person which, alone or jointly with others, determines the purposes and means of the processing of personal data;

    1.2 "data processor": means the person which processes personal data on behalf of the data controller;

    1.3 "personal data": means any information relating to an identifiable individual that is processed by Vendor as a result of, or in connection with, the provision of the Claims Services; an identifiable individual is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity; and

    1.4 "processing": means any operation or set of operations which is performed upon personal data, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking erasure or destruction.

2. Vendor acknowledges that the Claims Administrator is the data controller in respect of any personal data that Vendor processes on the Claims Administrator's behalf in the course of providing the Claims Services and that Vendor is a data processor of such data.

3. Vendor agrees that it shall (and shall require that each of its subcontractors shall):

   3.1 only carry out processing of personal data in accordance with the Claims Administrator's instructions (which may be specific instructions or instructions of a general nature as set out in this Agreement or as otherwise provided by the Claims Administrator to Vendor during the term of this Agreement);

   3.2 implement appropriate technical and organizational measures to protect personal data against unauthorized or unlawful processing and accidental destruction or loss, including, but not limited to, the measures set out in Section 4 below and the standards set forth in the "Digital Security" section of this Exhibit 4;

   3.3 ensure that the technical and organizational measures shall be appropriate to the harm which might result from any unauthorized or unlawful processing and accidental loss, destruction or damage to the personal data and having regard to the nature of the personal data which is to be protected;

   3.4 ensure the reliability of any employees who have access to personal data and that all employees involved in the processing of personal data have undergone adequate training in the care, protection and handling of personal data;

   3.5 promptly handle any queries from individuals, as directed by the Claims Administrator, any data protection authority or any other law enforcement authority, for the Claims Administrator to resolve;

   3.6 at no additional cost beyond what is provided in any Task Orders, promptly provide such information to the Claims Administrator as the Claims Administrator may reasonably require to allow it to comply with the rights of individuals under applicable privacy laws, including subject access rights, or with information notices served by any data protection authority;

   3.7 at no additional cost, keep or cause to be kept full and accurate records relating to all processing of personal data on the Claims Administrator's behalf, and shall, upon reasonable notice, grant the Claims Administrator (and BP and Interim Class Counsel with permission of the Claims Administrator) and its auditors and agents, a right of access to and to take copies of such records in order to assess whether the Vendor has complied with the provisions of this Exhibit. Vendor shall, upon reasonable notice, allow the Claims Administrator (and BP and Interim Class Counsel with permission of the Claims Administrator) access to premises and other materials and to its personnel and shall provide all reasonable assistance in order to assist the Claims Administrator (and BP and Interim Class Counsel with permission of the Claims Administrator) in exercising its audit rights under this Exhibit. Vendor's obligations under this paragraph shall continue throughout the term of this Agreement and for a period of six (6) years thereafter unless Vendor returns (at the Claims Administrator's request) all personal data to the Claims Administrator upon or after any expiration or termination of the term of this Agreement and the Claims Administrator indicates in writing that Vendor is not required to retain all such personal data;

   3.8 notify Claims Administrator of any unauthorized or unlawful processing or any accidental loss, destruction, damage, alteration or disclosure of personal data as soon as it

becomes aware of any such event and keep the Claims Administrator informed of any related developments;

3.9    not process or permit the processing of personal data outside the country in which Vendor is established other than with the prior written consent of the Claims Administrator and, where such consent is granted, Vendor undertakes to enter into a suitable agreement with the Claims Administrator and/or any relevant parties and/or adopt any necessary measures in order to ensure an adequate level of protection with respect to the privacy rights of individuals;

3.10   upon reasonable request of the Claims Administrator, Vendor agrees to submit its data processing facilities, data files and documentation needed for processing personal data (and/or those of its agents, affiliates and sub-contractors) to review, audit and/or certification by the Claims Administrator (or any independent or impartial inspection agents, designees or auditors, selected by the Claims Administrator and not reasonably objected to by Vendor) to ascertain compliance with the warranties and undertakings in this Schedule, with reasonable notice and during regular business hours; and

3.11   If any part of personal data ceases to be required by Vendor for the performance of its obligations under this Agreement, or on termination or expiry of the Agreement (whichever is earlier), Vendor shall at the express choice of the Claims Administrator, either return to the Claims Administrator all personal data that has been obtained or collected in providing the Claims Services under this Agreement, or handle such personal data in accordance with any Document Retention Policies and Court Approved Procedures, as provided   in Section 16.14 of the Agreement, regarding document retention about which Vendor is informed from time to time, and certify to the Claims Administrator that it has done so. If legislation imposed upon Vendor prevents the return of all or part of the personal data, Vendor shall continue to ensure the confidentiality of personal data in its possession and will not actively process such data any further.

4.  To safeguard the security of information interests of employees, contractors and customers with respect to privacy and data protection, Vendor agrees that (in addition to its other obligations under this Agreement) adequate technical and organizational measures for the protection of the data must be in place:

4.1    to prevent unauthorized persons from gaining access to data processing systems with which the data are processed or used.

4.2    to prevent data processing systems from being used without authorization.

4.3    to ensure that persons entitled to use a data processing system have access only to the data to which they have a right of access, and that the data cannot be read, copied, modified or removed without authorization in the course of processing or use and after storage.

4.4    to ensure that the data cannot be read, copied, modified or removed without authorization during electronic transmission or transport, and that it is possible to check and establish to which bodies the transfer of data by means of data transmission facilities is envisaged.

4.5    to ensure that it is possible to check and establish whether and by whom the data have been input into data processing systems, modified or removed.

4.6     to ensure that the data are processed strictly in accordance with data controller's given instructions.

4.7     to ensure that the data are protected from accidental destruction or loss.

4.8     to ensure that data collected for different purposes can be processed separately.

## Exhibit 6

## Reports

In addition to any ad hoc and other reports requested by the Claims Administrator, Vendor shall provide the following reports:

- All Court Reports as required by the Amended Settlement Agreement.
- Reports located on the Public and CA Reporting Portals.
- Pipeline report with aging.
- Utilization reporting and projections.

## Exhibit 7

## Leases

1. Office Lease Agreement, dated March 6, 2012, by and between Kingfish Development, L.L.C., as Landlord, and BrownGreer PLC, as Tenant, for property located at 935 Gravier Street, Suite 1500, New Orleans, LA 70112, as amended by First Amendment to Office Lease (Suite 1905 Expansion Premises), dated as of March 21, 2012, and as further amended by Second Amendment to Office Lease (Suite 120 Expansion Premises), dated as of April 12, 2012.

2. Lease, dated as of May 30, 2012, by and between Plaza St. Martin, LLC, as Landlord, and BrownGreer PLC, as Tenant, for property located at 15812 Lemoyne Blvd., Building 2, Units A, B & C, Biloxi, MS 39532.

3. Shopping Center Lease Agreement, dated as of May 23, 2012, by and between Euro-American Investments of Pinellas LLC, as Landlord, and BrownGreer PLC, as Tenant, for property located at 2551 Drew Street, Suite 303, Clearwater, FL 33765.

4. Commercial Lease and Deposit Receipt, dated May 30, 2012, by and between Trustmark, as Lessor, and BrownGreer PLC, as Lessee, for property located at 348 S.W. Miracle Strip Pkwy., Suites 34 & 35, Fort Walton Beach, FL 32548.

5. Lease Agreement, dated as of May 9, 2012, by and between Palm South Development, L.L.C., as Lessor, and BrownGreer PLC, as Lessee, for property located at Palm South Plaza, 3501 Gulf Shores Pkwy, Suites 4-6, Gulf Shores, AL 36542.

6. Commercial Lease Agreement, dated as of May 25, 2012, by and between First Pacific Investments, LLC, as Lessor, and BrownGreer PLC, as Lessee, for property located at Plaza Caillou Shopping Center, 814 Grand Caillou Rd., Suite #2/3, Houma, Louisiana 70363.

7. Shopping Center Store Lease, dated as of June 28, 2012, by and between Catherine Associates, L.L.C., as Landlord, and BrownGreer PLC, as Tenant, for property located at 9671 Chef Menteur Hwy., New Orleans, LA 70127.

8. Lease Agreement, dated as of June 1, 2012, by and between City of Apalachicola, as Lessor, and BrownGreer PLC, as Lessee, for property located at 192 14th Street, Suites 104, 105 and 106, Apalachicola, FL 32320.

9. Lease Agreement, dated as of May 29, 2012, by and between Charles A. Cuevas and Edith Ann Cuevas, as Landlord, and BrownGreer PLC, as Tenant, for property located at 1171 Hwy 90, Bay St. Louis, MS 39520.

10. Lease Agreement, dated as of May 7, 2012, by and between Penny Orrell, as Landlord, and BrownGreer PLC, as Tenant, for property located at 13290 N. Wintzell Avenue, Bayou La Batre, AL 36509.

11. Shopping Center Lease Agreement, dated as of May 31, 2012, by and between Equity One (Louisiana Portfolio) LLC, as Landlord, and BrownGreer PLC, as Tenant, for property located at 16263 E. Main Street #2, Cut Off, LA 70345.

12. Agreement, dated as of June 1, 2012, by and between Town of Grand Isle, Louisiana and BrownGreer PLC, for property located at 3811 LA 1, Grand Isle, LA 70358.

13. Lease of Commercial Property, dated as of May 31, 2012, by and between Montagnino Properties, L.L.C., as Landlord, and BrownGreer PLC, as Tenant, for property located at 2701 Manhattan Blvd., Suites 11-13, Harvey, LA 70058, as amended by First Amendment to Lease of Commercial Property, dated as of June 14, 2012.

14. Office Lease, dated June 1, 2012, by and between Town of Jean Lafitte, as Landlord, and BrownGreer PLC, as Tenant, for property located at Lafitte Town Hall, 2654 Jean Lafitte, Lafitte, LA 70067.

15. Shopping Center Lease, dated as of May 29, 2012, by and between Ambelos LLC, as Lessor, and BrownGreer PLC, as Lessee, for property located at 3976 B. Government Blvd. Mobile, AL 36693.

16. Shopping Center Lease, dated as of May 23, 2012, by and between J. Franklin Dama, as Lessor, and BrownGreer PLC, as Lessee, for property located at 7938 Front Beach Road, Panama City Beach, FL 32408.

17. Lease Agreement, dated as of May 31, 2012, by and between Vivina, LLC, as Lessor, and BrownGreer PLC, as Lessee, for property located at 7555 Hwy 98 West, Suites 3 & 4, Pensacola, FL 32506.

18. Retail Lease, dated as of June 1, 2012, by and between Retail Investors of Texas, Ltd., as Landlord, and BrownGreer PLC, as Tenant, for property located at Cardinal Center, 2017 Texas Ave., Bridge City, TX 77611.

19. Standard Retail Lease Agreement, dated as of May 17, 2012, by and between CS Tamiami, LLC, as Landlord, and BrownGreer PLC, as Tenant, for property located at 14700 Tamiami Trail North, Unit 27, Naples, FL 34110.

20. Residential Lease, dated as of July 3, 2012, by and between Century 21 Island Realty, as Landlord, and six BrownGreer employees (Igor Vizelberg, Brenda Abud, Rolando Corzo, Alma J. Kusy, Max Marsh, and Jose F. Orrego), as Tenants, for property located at 238 Walnut Lane, Grand Isle, LA 70358.

21. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 203-C, located at 201 Magazine St., New Orleans, LA 70130-2422.

22. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 204-D, located at 201 Magazine St., New Orleans, LA 70130-2422.

23. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 206 -F, located at 201 Magazine St., New Orleans, LA 70130-2422.

24. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 303-C, located at 201 Magazine St., New Orleans, LA 70130-2422.

25. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 306-F, located at 201 Magazine St., New Orleans, LA 70130-2422.

26. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 406-F, located at 201 Magazine St., New Orleans, LA 70130-2422.

27. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 506-F, located at 201 Magazine St., New Orleans, LA 70130-2422.

28. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 507-G, located at 201 Magazine St., New Orleans, LA 70130-2422.

29. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 606-F, located at 201 Magazine St., New Orleans, LA 70130-2422.

30. Lease Agreement, dated as of December 31, 2012, by and between 201 Magazine St. LLC, as Landlord, and BrownGreer PLC, as Tenant, for apartment Unit 607-G, located at 201 Magazine St., New Orleans, LA 70130-2422.

31. Residential Lease, dated as of September 4, 2012, by and between Century 21 Island Realty, as Landlord, and Igor Vizelberg, Jose F. Orrego, Max Marsh, and Alma J. Kusy, as Tenants, for property located at 242 Walnut St., Grand Isle, LA 70358.

32. Residential Lease, dated as of April 5, 2012, by and between Dream Suites Corporate Solutions, LLC, as Landlord, and Joseph Jarvis, as Tenant, for property located at 925 Common St., Apt. 604, New Orleans, LA 70112.

33. Unwritten Residential Lease, dated as of September 3, 2012, with Dream Suites Corporate Solutions, LLC, as Landlord, for property located at 925 Common St., Apt. 716, New Orleans, LA 70112.

34. Residential Lease, dated as of April 8, 2012, by and between Dream Suites Corporate Solutions, LLC, as Landlord, and Oliver Doxtater, as Tenant, for property located at 925 Common St., Apt. 1504, New Orleans, LA 70112.

35. Residential Lease, dated as of April 19, 2012, by and between Dream Suites Corporate Solutions, LLC, as Landlord, and William Quirey, as Tenant, for property located at 925 Common St., Apt. 1505, New Orleans, LA 70112.

36. Residential Lease, dated as of April 26, 2012, by and between Dream Suites Corporate Solutions, LLC, as Landlord, and Molly Dickerson, as Tenant, for property located at 800 Common St., Apt. 412, New Orleans, LA 70112.

37. Residential Lease, dated as of April 5, 2012, by and between Dream Suites Corporate Solutions, LLC, as Landlord, and Jaclyn Sarshuri, as Tenant, for property located at 800 Common St., Apt. 602, New Orleans, LA 70112.

38. Unwritten Residential Lease, dated as of September 1, 2012, with Dream Suites Corporate Solutions, LLC, as Landlord, for property located at 800 Common St., Apt. 612, New Orleans, LA 70112.

39. Residential Lease, dated as of April 5, 2012, by and between Dream Suites Corporate Solutions, LLC, as Landlord, and Jennifer Dwyer, as Tenant, for property located at 800 Common St., Apt. 909, New Orleans, LA 70112.

40. Residential Lease, dated as of June 3, 2012, by and between Roma Petkauskas, as Tenant, and Dream Suites Corporate Solutions, LLC, as Landlord, for property located at 3700 Orleans Avenue Apt 5448, New Orleans, LA 70119.

**Exhibit 8**

**Travel Policy**

# DEEPWATER HORIZON ECONOMIC CLAIMS CENTER

## Policy

**TRAVEL AND ENTERTAINMENT**

Policy Number: CA-001
Version:        4.0
Applies to:     Claims Administrator's Office
                All Program Vendors, Contractors, Subcontractors and Consultants

**DHECC Approvals:**

_____          _____
**Patrick Juneau**                   **Date**
**Claims Administrator**

_____          _____
**David Odom**                       **Date**
**Chief Executive Officer**

### TABLE OF CONTENTS

1.0     General
2.0     Scope
3.0     Definitions
4.0     Responsibility Matrix
5.0     Travel Authorization
6.0     Air Travel
7.0     Rental Cars
8.0     Personal Car Use
9.0     Hotel Accommodations
10.0    Meal Expenses
11.0    Other Expenses

## 1.0  GENERAL

This policy defines policies and guidelines and establishes procedures for all Vendors incurring business travel and entertainment expenses on behalf of the Deepwater Horizon Economic Claims Center ("DHECC"), all of their respective Subcontractors, and all Consultants (all collectively, "Contractors").

Policy:

- Ensure all Contractors have a clear and consistent understanding of policies and procedures for business travel and entertainment.
- Provide business travelers with a reasonable level of service and comfort at the lowest possible cost.
- Maximize the project's ability to negotiate discounted rates with preferred suppliers and reduce travel expenses.
- Comply with IRS and related regulations.

This Policy is subject to modification or revision in part or in its entirety to reflect changes in conditions subsequent to the effective date of this Policy.

## 2.0  SCOPE

This Policy applies to business travel and entertainment incurred by all DHECC Contractors seeking reimbursement from the DHECC and takes precedence over all previously issued policies.

The allowable expenses identified in this Policy do NOT apply to assignments which are covered by a Contractor living allowance as approved by the Chief Financial Officer; or permanent relocation.   Long-Term field assignments and Relocation expenses are managed by the DHECC CFO.

## 3.0  DEFINITIONS

**CEO**.  The Chief Executive Officer of the DHECC.

**CFO.** The Chief Financial Officer of the DHECC.

**Claims Administrator.** The court appointed administrator of the Settlement Trust.

**Consultant.** A consultant hired to provide consulting advice to the Claims Administrator and the Program Management Office of the DHECC in providing Claims Administration Services.

**Contractor**. A Vendor, Subcontractor or Consultant.

**Deepwater Horizon Economic Claims Center ("DHECC").** The operating arm of the qualified settlement trust fund established pursuant that certain *Deepwater Horizon* Economic and Property Damages Trust Agreement, dated May 4, 2012, among BP, (then) Interim Class Counsel, the Claims Administrator, and the Directed Trustee (the "**Settlement Trust**").

**Expense Report**. The approval form for requesting reimbursement for business travel expenditures available from the DHECC Claims Administrator's Office.

**Non-Reimbursable Costs.** Any cost which is not considered to be business-related in accordance with the provisions of this procedure or any other DHECC policy or procedure will not be reimbursed to a Contractor.

**Subcontractor.** A contractor or vendor hired by a Vendor to support the Claims Administrator and the Program Management Office of the DHECC in providing Claims Administration Services.

**Vendor.** A contractor or vendor hired to support the Claims Administrator and the Program Management Office of the DHECC in providing Claims Administration Services.

## 4.0 RESPONSIBILITY MATRIX

Each Contractor is responsible for incurring only those expenses that are reasonable and necessary to conduct DHECC business and is responsible for complying with the requirements of this Policy.

Each contractor employee will submit an expense report approved by the employee's manager. The manager is responsible to ensure that all Contractor business travel and entertainment is approved prior to committing corporate or client funds. The manager reviews the Expense Report to ensure the expenses incurred were reasonable and in compliance with this policy and once satisfied, signs the expense report either in hard copy or electronic format.

The Claims Administrator and CEO are responsible for approving changes to this Policy.

The CFO is responsible for approving any expense deviations from this Policy.

**The DHECC assumes no obligation for expenses that are not in compliance with this Policy.**

## 5.0 TRAVEL AUTHORIZATION

### 5.1 Submitting Travel Authorizations

All Contractors must obtain approval from their appropriate managers prior to incurring travel expenses.

### 5.2 Travel Status

A Contractor is in "travel status" when he or she travels more than 50 miles, one way, from his or her home or office and is away more than 4 hours.

Travel status initiates when a Contractor leaves his or her home or office and travel status terminates when a Contractor returns to his or her home or office.

For purposes of this Policy, "office" means the Contractor's regular and continuous place of work. Overnight accommodations within 50 miles of the Contractor's place of work require special approval of the CFO.

### 5.3 Saturday Stays

Travelers may save the project significant expense in airfare by electing to stay over Saturday night at their business destination. In such cases, if the cost savings for staying over Saturday is greater than or equal to the added cost of meals and hotel accommodations for the extended stay, the traveler may elect to do so and remain within Policy.

The prior written approval of his/her immediate manager must be included with the Expense Report.

### 5.4 Necessity of Business Expenses

All travel, entertainment and miscellaneous expenses must be directly related to the conduct of DHECC business or the Contractor will not be reimbursed.

The Contractor should give strong consideration to alternatives to travel, e.g., conference call, video or audio conferencing. Wherever possible, particularly for staff meetings, these alternatives should be used.

Any off-site staff conferences involving travel or hotel costs must be approved in advance by the CFO.

## 6.0 AIR TRAVEL

## 6.1    Class of Air Travel

Contractors are required to book Air Travel as follows:

| Class/Fare | North American* Flights |
|---|---|
| First Class | Not allowed |
| Business Class | Not allowed |
| Coach/Economy | Standard Policy. Advance purchase where applicable. |

## 6.2    Upgrades for Air Travel

Contractors may upgrade at their own expense or by using frequent flyer miles, so long as there is no incremental cost to the DHECC.

## 6.3    Lowest Cost Routing/Booking

Contractors should use the most cost-effective routing when traveling by air.   This lowest logical airfare (LLA) is determined by the following:

- Plan trips and book travel in advance at least seven days (preferably twenty-one days) to take advantage of discounts for advance purchase.
- Be flexible in selecting departure times to use lower cost seats.
- Purchase non-refundable/penalty fares instead of fully-refundable fares.

## 6.4    Electronic Ticketing

Most major airlines are now encouraging the use of E-tickets (Ticketless Travel). This decreases the costs associated with issuing a paper ticket, negates the possibility of losing a ticket that could result in a charge for re-issuance and decreases issues that can result with other ticket delivery options.

The use of E-tickets is mandatory whenever available. Unused E-tickets must be reported to the Travel Agency; they are not automatically refunded if unused.

## 6.5    Unused/Lost/Refundable Tickets

Non-refundable tickets not used also need to be reported; however, these can be applied towards future travel with an exchange fee (normally expires one year from issue date).

## 6.6    Conversion

Contractors shall neither convert nor apply the value of any form of air transportation purchased, or otherwise acquired, for use by the DHECC to any other purpose than the

5

business related travel for which it was intended. Such conversion or application shall be grounds for disciplinary action up to and including termination.

6.7     Frequent Flyer Programs and Airline Clubs

Contractors may not expense and will not be reimbursed for the direct or indirect fees or costs for any club memberships/incentive programs offered by commercial air carriers.

6.8     Lost or Excess Baggage

The ultimate responsibility for retrieving and compensating lost baggage lies with the airlines. The DHECC will not reimburse travelers for personal items lost while traveling on business.

6.9     Overnight Delays

Should an airline delay necessitate an overnight stay, the traveler must first attempt to secure complimentary lodging from the airline. If the carrier will not absorb the hotel cost due to a forced layover, reasonable cost will be absorbed by the DHECC.

7.0   Rental Car Class and Basis for Payment

An intermediate (mid-size) class should be rented.   Use of a rental car one size larger is acceptable when:
- Three or more Contractors travel together and share rental;
- The upgrade is at no additional cost;
- The intermediate size is not available;
- If a larger vehicle is chosen, justification must be added to the expense description on the expense report.


Rentals should be paid by utilizing the traveler's designated corporate card and submitted on an Expense Report for reimbursement. For infrequent travelers without a corporate card, payment should be made by their personal charge card and submitted on an Expense Report for reimbursement.

7.1   Insurance

For domestic car rentals, Contractors must accept the Liability and Loss Damage Waiver (LDW) coverage as it is provided for in the rate agreement and will be reimbursed by the DHECC.

7.2   Fuel Charges

In order to minimize the large surcharges imposed by car rental companies for refueling charges on premise, Contractors are requested to return all rental vehicles with a full tank of gas or accept the prepay option at the time of the rental car pickup. Original gasoline receipts must be attached to the Expense Report for reimbursement.

7.3   Violations of Law

Parking tickets, fines, or other penalties imposed for improper operation of a rented car or violations of law are not reimbursable by the DHECC.

7.4   Use of Rental Vehicles in Lieu of Ground Transportation

Use of rental cars for ground transportation to or from the airport and your home is reimbursable only when no other means of transportation is available and/or where the cost of this service is less than commercial ground transportation.

**Note:** Rental cars may not be used if the cost of the rental, including gasoline and parking charges, exceeds the cost of a regular taxi or limousine service.

7.5   Other Transportation

In circumstances where a rental car is not used or is not practical, contractors will be reimbursed for reasonable cab/bus/train/subway fares incurred in traveling to and from the airport, hotels, temporary job sites, and eating establishments. The original receipt is required for any expense in excess of $15 USD.

8.0   PERSONAL CAR USE

Personal cars may be used under the following circumstances.


- Taxi/car services are more expensive or not available.
- Use of a rental car is more expensive.
- The driver has a valid driver's license.
- The driver has personal liability insurance coverage in compliance with applicable law.
- The personal car complies with the safety requirements of the governing state.

DHECC will reimburse expenses for business use of personal vehicles according to current IRS regulations. To be reimbursed for use of a personal vehicle for business, each Contractor must provide the following information on their Expense Report:

- Purpose of the trip
- Date and specific location (i.e. Baton Rouge Metropolitan Airport to Pine Grove, LA)
- Receipts for EZ passes and parking
- Miles driven

**Note:** Personal cars may not be used if the reimbursement cost of mileage will exceed the cost of a rental car. Reimbursement of personal car expenses claimed by a traveler will be limited to the cost of a rental car.

8.1    Use of Personal Car in Lieu of Commercial Air Travel

When a Contractor uses his/her personal car on a trip where a plane or train normally is the approved means of transportation, the DHECC will reimburse the Contractor for mileage at the allowable mileage rate, but not to exceed the equivalent economy class plane fare.

8.2    Violations of Law

DHECC will not reimburse for personal vehicle parking tickets, fines, traffic/violations, even if these costs result from business travel.

8.3    Unallowable Expenses

DHECC will not be responsible for any damage to a Contractor's personal vehicle while on DHECC business.

9.0  HOTEL ACCOMMODATIONS

No lodging expense is authorized for trips fewer than 50 miles unless there is a compelling business reason and the reason is fully documented and approved in the Expense Report. For purposes of this procedure, the 50 mile distance is defined as 50 miles in excess of the Contractor's normal commute.

Receipts are required for reimbursement of all lodging costs. Receipts for lodging should include the name of the establishment, the location, and the dates of stay. If lodging costs are not incurred (e.g., staying with relative or friends), the Contractor should provide a

written explanation on the Expense Report for the purpose of documenting the overnight stay for reimbursement of other travel expenses (e.g., meals and incidental expenses).

Any expenses (other than lodging) claimed for reimbursements which are included on the hotel bill (e.g., taxes on lodging, phone calls, and copies) must be separately identified in the appropriate sections of the Expense Report.

Reasonable lodging costs in New Orleans are reimbursed at actual cost incurred up to the limit established by the "New Orleans Exchange" guaranteed rate offered by the Waldorf Roosevelt.

| | |
|---|---|
| September 16 – June 3 | $170.00 plus applicable taxes |
| July 1 – September 15 | $135.00 plus applicable taxes |

In the event that the designated hotel is not available, Contractors are to stay at moderately priced hotels that offer a rate, excluding tax, comparable to the lodging allowance above.

For travel outside of New Orleans, the Contractor must book moderately priced hotels in the region. Contractor should not book suites and other more expensive options. Any deviation from this policy such as the non-availability of moderately priced rooms must be documented on the expense report and will be considered by the CFO.

In certain instances, when it is determined that lease of a corporate apartment by Contractor in lieu of hotel, mileage and other expense, is of benefit to the program in cost savings, reimbursement for the apartment will be allowed at the sole discretion and approval of the CFO.

## 10.0 M E A L  EXPENSES

### 10.1  Meal Policy

Traveling contractors will be reimbursed for meals and incidental expenses for overnight trips at the daily per diem total as calculated below:

| | **Gulf States** | **Other Travel** |
|---|---|---|
| Breakfast | 13.00 | 15.00 |
| Lunch | 20.00 | 25.00 |
| Dinner | 30.00 | 35.00 |
| Incidentals | 5.00 | 7.00 |
| Per Diem Total | 68.00 | 82.00 |

Note: The total Allowable Daily Per Diem should be calculated as follows:

- On days that are not departure or return days, the total per diem calculation will include breakfast,



lunch and dinner.
- Breakfast may only be included in the daily calculation on days of trip departure if travel commences before 10 am.
- Lunch may only be included in the daily calculation on days of trip departure if travel commences before 2 pm.
- Lunch may only be included in the daily calculation on days of trip return if travel ends after 10 am.
- Dinner may only be included in the daily calculation on days of trip return if travel ends after 4 pm

11.0 Other Expenses

Any other expenses that are necessary for travel or entertainment will be considered at the discretion of the CFO and are subject to the following considerations:
- Necessity of the expense as it relates to business travel or entertainment for the purposes of providing Claims Administration Services for the DHECC
- Reasonableness of the expense compared to lower priced alternatives
- The expense must not be in violation of any other provisions of this policy
- Any tips shall be reasonable under the circumstances, but shall not exceed (20) percent



<u>Code of Conduct</u>

# DEEPWATER HORIZON ECONOMIC CLAIMS CENTER

## Policy

### CODE OF CONDUCT

Policy Number: CA-003
Version:          3.0
Applies to:       All Program Vendors, Contractors, Subcontractors and Consultants

**DHECC Approvals:**

---

**Patrick Juneau**                                    **Date**
**Claims Administrator**

---

**David Odom**                                        **Date**
**Chief Executive Officer**

### Table of Contents

1.0 General
2.0 Scope
3.0 Definitions
4.0 Responsibility Matrix
5.0 Conflict of Interest and Recusal
6.0 Gifts, Entertainment and Gratuities

## 1.0 General

This Code of Conduct Policy defines the established standards and practices by which Contractors, Subcontractors and Vendors will conduct business while working on behalf of the Deepwater Horizon Economic Claims Center (DHECC) Administration in processing claims and making payment determinations for qualified Claimants.

Policy:

- Contractors, Subcontractors and Vendors will ensure that all Contractor, Subcontractor and Vendor Personnel have a clear and consistent understanding of the ethical standards that are expected and required while performing services on this program.
- Contractors, Subcontractors and Vendors shall constantly improve the quality of service, products and operations and create a reputation for honesty, fairness, respect, responsibility, integrity, trust and sound business judgment.
- No bribes, kickbacks or other similar remuneration or consideration shall be given to any person or organization in order to attract or influence business activity. All Contractor, Subcontractor and Vendor Personnel shall avoid gifts, gratuities, fees, bonuses or excessive entertainment, in order to attract or influence business activity.
- Contractor, Subcontractor and Vendor Personnel will often come into contact with, or have possession of, proprietary, confidential or business-sensitive information and must take appropriate steps to assure that such information is strictly safeguarded.
- Contractors, Subcontractors and Vendors are required to disclose unethical, dishonest, fraudulent and illegal behavior, or the violation of program policies and procedures by any Contractor, Subcontractor and Vendor Personnel, directly to the CEO David F. Odom or Special Counsel Michael J. Juneau.
- Contractors, Subcontractors and Vendors will obey all Equal Employment Opportunity laws and act with respect and responsibility towards others in all of their dealings.
- Contractors, Subcontractors and Vendors shall ensure that all Contractor, Subcontractor and Vendor Personnel are fully apprised and compliant with this Policy

This Policy is subject to modification or revision in part or in its entirety to reflect changes in conditions subsequent to the effective date of this Policy

## 2.0 Scope

This Policy applies to the ethical conduct required by all Contractors, Subcontractors and Vendors, and Contractor, Subcontractor and Vendor Personnel providing services to the Deepwater Horizon Economic Claims Center Administration.

## 3.0 Definitions

DEFINITIONS FOR CONTRACTOR, SUBCONTRACTOR AND VENDOR POLICIES

The following defined words and phrases apply to the Code of Conduct Policy. Terms used in the singular shall be deemed to include the plural and vice versa. Other words and phrases appearing in capital letters throughout the referenced documents shall have the meanings they are given with their first operative use.

**CEO:** The Chief Executive Office of the DHECC.

**CFO:** The Chief Financial Officer of the DHECC.

**Claim:** Any demand or request for compensation together with any accompanying documentation submitted by any Claimant in connection with the Deepwater Horizon Incident.

**Claimant:** Any natural person or entity that submits a Claim to the Deepwater Horizon Court Supervised Settlement Program seeking compensation in connection with the Deepwater Horizon Incident.

**Claims Administrator:** The person or entity selected or appointed or designated by the Court who shall administer economic and property damages settlements under the supervision of the Court.

**Claims Administration Services:** Services mutually agreed to in writing by any Contractor, Subcontractor or Vendor and Claims Administrator or as otherwise reasonably requested by the Claims Administrator from time to time pursuant to the Deepwater Horizon Economic and Property Damages Settlement Agreement and/or Transition Order (and any amendments or modifications thereof) and further orders of the Court. The Claims Administration Services shall be provided in strict accordance with the terms of the Deepwater Horizon Economic and Property Damages Settlement Agreement, the Court's Preliminary Approval Order, the Transition Order (and any amendments or modifications thereof) and in compliance with applicable law.

**Claims File:** Any information, content or material regarding a Claim in electronic, paper or other form.

**Confidential Information:** As ascribed in the Confidentiality/Non-Disclosure Agreement.

**Contractor:** An independent contractor, or employee or agent of an independent contractor, working at the request of the Claims Administrator engaged to assist with the Claims Administrator's responsibilities. Contractor is not to be considered an employee of the Claims Administrator for any purpose including, but not limited to, for purposes of the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding (federal, state and local), worker's compensation insurance premiums, and any and all state taxes. Contractor agrees to comply with all legal and ethical obligations related to assisting the Claims Administrator in his Court-appointed role as the Claims Administrator.

**Contractor Personnel:** Contractor officers, members, partners, directors, principals and employees.

**Court:** The United States District Court for the Eastern District of Louisiana, Judge Carl Barbier, presiding, in In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, MDL No. 2179.

**Court Supervised Claims Program:** All activities and obligations of the Claims Administrator or those under his supervision necessary to implement the Deepwater Horizon Economic and Property Damages Settlement Agreement.

**Deepwater Horizon Incident:** The events, actions, inactions and omissions leading up to and including (i) the blowout of the MC252 WELL; (ii) the explosions and fire on board the Deepwater Horizon on or about April 20, 2010; (iii) the sinking of the Deepwater Horizon on or about April 22, 2010; (iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the Deepwater Horizon and its appurtenances; (v) the efforts to contain the MC252 Well; (vi) Response Activities, including the Vessels of Opportunity (VoO) Program; (vii) the operation of the Gulf Coast Claims Facility (GCCF); and (viii) BP Exploration & Production Inc. (BP) public statements relating to all of the foregoing.

**Deepwater Horizon Economic and Property Damages Settlement Agreement:** The settlement agreement entered by the Court on April 18, 2012 and any amendments or modifications thereto.

**Special Counsel:** The Legal authority for policy determination for DHECC.

**Subcontractor:** An independent contractor, or employee or agent of an independent contractor, working at the request of any Contractor or Vendor engaged by the Contractor or Vendor to assist with the Claims Administrator's responsibilities. Subcontractor is not to be considered an employee of the Claims Administrator for any purpose including, but not limited to, for purposes of the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding (federal, state and local), worker's compensation insurance premiums, and any and all state taxes. Subcontractor agrees to comply with all legal and ethical obligations related to assisting the Claims Administrator in his Court-appointed role as the Claims Administrator.

**Subcontractor Personnel:** Subcontractor's officers, members, partners, directors, principals and employees.

**Transition Order:** The order entered by the Court on March 8, 2012 and any amendments or modifications thereto.

**Transition Process:** Has the meaning as ascribed in the Court's March 8, 2012 First Amended Order Creating Transition Process and any amendments or modifications thereto.

**Vendor:** A Contractor, but denominated as a vendor.

**Vendor Personnel:** Vendor's officers, members, partners, directors, principals and employees.

## 4.0 Responsibility Matrix

Contractors, Subcontractors and Vendors will seek to report all information accurately and honestly, and as otherwise required by applicable reporting requirements.

The Claims Administrator and the CEO are responsible for approving changes to this policy.

The CEO is responsible for approving any deviation from this policy.

## 5.0 CONFLICT OF INTEREST AND RECUSAL

Contractors, Subcontractors and Vendors will assist the Claims Administrator in carrying out their responsibilities for the Court Supervised Claims Program in a professional manner and will do so at all times free of any conflict of interest as independent contractors.

Contractors, Subcontractors and Vendors will ensure that Contractor, Subcontractor and Vendor Personnel will take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality with respect to the performance their official duties as part of the Court Supervised Claims Program. Contractors, Subcontractors and Vendors, and Contractor, Subcontractor and Vendor Personnel shall not participate, without prior written approval from the Claims Administrator, in any activity that presents or would appear to present to a reasonable person who is knowledgeable of the relevant facts, a conflict of interest with the Court Supervised Claims Program. However, merely being acquainted with an individual who, or entity that has made a claim with the Transition Process and/or the Court Supervised Claims Program does not by itself require Contractor personnel to be recused from official activities that relate to the Court Supervised Claims Program.

Contractor, Subcontractor and Vendor Personnel are not allowed to perform any official duties in the Court Supervised Claims Program that relate to any former employer, close family member or close personal friend with respect to the Court Supervised Claims Program, without the prior written approval of the Claims Administrator. Contractor, Subcontractor and Vendor must ensure that all Contractor, Subcontractor and Vendor Personnel affirm that neither they nor any immediate family members are an employee of BP or any affiliated entity of BP. Contractor, Subcontractor and Vendor must further ensure that all Contractor, Subcontractor and Vendor Personnel affirm that neither they nor any immediate family member have submitted a claim to the Court Supervised Claims Program, and if any such claim is intended to be filed or is actually filed, Contractor, Subcontractor and Vendor shall immediately notify the Claims Administrator in writing so that a determination may be made as to whether the Contractor, Subcontractor or Vendor Personnel in question may continue to provide service to the Court Supervised Claims Program under the circumstances.

Other than in the performance of their duties on behalf of Claims Administrator, Contractor, Subcontractor and Vendor must ensure that Contractor, Subcontractor and Vendor Personnel do not have and will not have any personal interest in the Transition Process, the Court Supervised Claims Program or the Claims Administration Services, nor will they take any action that will conflict with or contravene this Policy as it applies to the Transition Process, the Court Supervised Claims Program or the Claims Administration Services.

Contractor, Subcontractor and Vendor must further ensure that all Contractor, Subcontractor and Vendor Personnel acknowledge that, to the best of their knowledge, no close family member or close personal friend has or will have any interest in the Transition Process, the Court Supervised Claims Program or the Claims Administration Services, or will take any action that will contravene this Policy as it applies to the Claim Process, the Court Supervised Claims Program or the Claims Administration Services.

Contractor, Subcontractor and Vendor must report immediately to David F. Odom or Michael J. Juneau if they suspect that any Contractor, Subcontractor or Vendor Personnel may have violated of this Policy.

## 6.0 GIFTS, ENTERTAINMENT AND GRATUITIES

To avoid even the appearance of a conflict of interest or loss of impartiality with respect to the performance of their official duties as part of the Court Supervised Claims Program, Contractor, Subcontractor and Vendor Personnel are prohibited from soliciting or accepting any gifts or gratuities in excess of $100 from any person or entity that may be associated with the Court Supervised Claims Program or Claims Administration Services, including but not limited to any Claimant, party, attorney, vendor or other contractor or subcontractor.

Gifts and gratuities include but are not limited to: cash, gift certificates, tickets to events, liquor, food, vacations, entertainment, services, discounts, the use of property or facilities or other favors of value extended to Contractor, Subcontractor or Vendor Personnel or their families. Reasonable business meals may, on occasion, be necessary and appropriate. Such meals are acceptable, if they are not lavish or frequent.

Contractor, Subcontractor and Vendor must also report immediately to David F. Odom or Michael J. Juneau if they suspect that any Contractor, Subcontractor or Vendor Personnel may have violated this Policy.

**Exhibit 10**

## DHECC Organizational Chart

| | | |
|---|---|---|
| Juneau David, APLC | Patrick Juneau | Claims Administrator |
| Juneau David, APLC | Michael Juneau | Special Counsel |
| Plexos Group, LLC | David Odom | Chief Executive Officer |
| Vurbia Group, LLC | Bob Levine | Chief Financial Officer |
| Sutton and Reitano, LLC | Lionel Sutton | Special Counsel |
| Sutton and Reitano, LLC | Christine Reitano | Special Counsel |
| DHD Consulting Services LLC | David Duval | Appeals Coordinator |
| DW Welker Consulting, Inc. | David Welker | Director of Fraud, Waste & Abuse |
| Christina Hendrick, LLC | Christina Hendrick | Court Appointed Distribution Agent |
| The Gagliano Group | Nick Gagliano | Director of Communications |
| Carrollton Group LLC | Chris Reade | Chief Information Officer |
| Carrollton Group LLC | Orterio Villa | Senior IT Project Manager |
| Carrollton Group LLC | Ernie Megginson | IT Technician |
| Carrollton Group LLC | Brian Jones | IT Technician |
| Carrollton Group LLC | Brian Killian | IT Technician |
| Donovan Watkins | Tracy Steilberg | Office Manager |
| Alpha Consulting Group, L.L.C. | Kirk Fisher | Director of Business Processes and Reporting |
| Alpha Consulting Group, L.L.C. | Scot Sherick | Senior Manager |
| Alpha Consulting Group, L.L.C. | Rebecca Foreman | Executive Assistant |
| Alpha Consulting Group, L.L.C. | Kirston Pittman | Security Analyst |
| Alpha Consulting Group, L.L.C. | Henry Mitchell | Analyst |
| Alpha Consulting Group, L.L.C. | Philip Ollendike | Analyst |
| Alpha Consulting Group, L.L.C. | Mallary Morvant | Analyst |
| Alpha Consulting Group, L.L.C. | Katherine Nesser | Analyst |
| Alpha Consulting Group, L.L.C. | Mary Katherine Askew | Analyst |
| Alpha Consulting Group, L.L.C. | Kayla Frey | Analyst |
| Alpha Consulting Group, L.L.C. | Kyle Neathery | Analyst |
| Alpha Consulting Group, L.L.C. | Kyle Adolph | Analyst |
| Alpha Consulting Group, L.L.C. | Benjamin Arceneaux | Analyst |
| Alpha Consulting Group, L.L.C. | Zachary Schneider | Analyst |
| Alpha Consulting Group, L.L.C. | Patrick Hron | Analyst |

Exhibit 11

## Parties to Approved Subcontracts for Ancillary Services

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|-----|--------------------|---------------|--------|----------|
| 1 | Abba Jr., Robert S. | 5231 | Brooke | New Orleans, LA |
| 2 | Abbas, Zaheer | 4951 | Lawyer Staffing | One Paragon Place |
| 3 | Akula, Mahender | 3260 | Modis | Canal Crossing |
| 4 | Allen Jr., Nathaniel | 5367 | Accountemps | New Orleans, LA |
| 5 | Ambati, Madhavi | 4460 | Modis | Canal Crossing |
| 6 | Anderson, Harold J. | 5345 | Accountemps | One Paragon Place |
| 7 | Ansbacher, Jacob M. | 5294 | Accountemps | New Orleans, LA |
| 8 | Arrants, Jeff | 4973 | TPX Consulting, LLC | Remote - VA |
| 9 | Bagley, Raleigh W. | 5253 | PartnerJD | One Paragon Place |
| 10 | Ballay, Ronald J. | 5232 | Brooke | New Orleans, LA |
| 11 | Banta, Robert W. | 4874 | PartnerJD | One Paragon Place |
| 12 | Batiste, Patricia S. | 5295 | Accountemps | New Orleans, LA |
| 13 | Bell, Latonya R. | 5319 | PartnerJD | Canal Crossing |
| 14 | Bennett, Marlene E. | 4674 | Special Counsel | Canal Crossing |
| 15 | Berry, Adrienne N. | 5263 | The Mergis Group | Canal Crossing |
| 16 | Bey, Rashaad T. | 4675 | Special Counsel | One Paragon Place |
| 17 | Bomidi, Sandhya Rani | 5252 | Onward Technologies, Inc. | Canal Crossing |
| 18 | Booker, Jammie L. | 5369 | Accountemps | New Orleans, LA |
| 19 | Brockenbrough, Monique C. | 4578 | Accountemps | One Paragon Place |
| 20 | Brooks, Im | 5370 | Accountemps | New Orleans, LA |
| 21 | Brown, Tempestt A. | 5371 | Accountemps | New Orleans, LA |
| 22 | Bruce, Mary F. | 5346 | The Mergis Group | One Paragon Place |
| 23 | Buchanan, Roshawnda T. | 5235 | Brooke | New Orleans, LA |
| 24 | Burl, Richard B. | 5236 | Brooke | New Orleans, LA |
| 25 | Burnley, Donna | 4496 | Synigent Technology | Canal Crossing |
| 26 | Butterly, Casey J. | 4863 | PartnerJD | One Paragon Place |
| 27 | Carter, Corey E. | 5372 | Accountemps | New Orleans, LA |
| 28 | Challagundla, Sindhura | 3255 | Modis | Canal Crossing |
| 29 | Champy, Gary J. | 5347 | Accountemps | One Paragon Place |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|---|---|---|---|---|
| 30 | Childress, Jeremie W. | 5398 | PartnerJD | Canal Crossing |
| 31 | Childs, Pamela J. | 5277 | Accountemps | Canal Crossing |
| 32 | Chimah, Bernadette U. | 5399 | PartnerJD | Canal Crossing |
| 33 | Chowdhury, Gazi | 3271 | Modis | Canal Crossing |
| 34 | Christopher-Dillon, Laura | 5374 | Accountemps | New Orleans, LA |
| 35 | Clark, Anita | 5368 | Accountemps | New Orleans, LA |
| 36 | Cook, IV, Thomas R. | 4550 | PartnerJD | Canal Crossing |
| 37 | Cosby, Carol L. | 5348 | Accountemps | One Paragon Place |
| 38 | Cosby, Matthew "Stuart" S. | 5340 | PartnerJD | Canal Crossing |
| 39 | Crowell, Lee M. | 1914 | Lawyer Staffing | Canal Crossing |
| 40 | Cruz, Lisbeth | 5375 | Accountemps | New Orleans, LA |
| 41 | Cullins, Med D. | 5296 | Accountemps | New Orleans, LA |
| 42 | Dagenhart, Toni R. | 5278 | Accountemps | Canal Crossing |
| 43 | Daggu, Venu | 4465 | SLAIT Consulting, LLC | Canal Crossing |
| 44 | Dandu, Prudhvi | 3151 | Modis | Canal Crossing |
| 45 | Davila, Keila | 5377 | Accountemps | New Orleans, LA |
| 46 | Dean, Timothy | 4331 | TA Dean | Canal Crossing |
| 47 | Dendhi, Yeshwanth | 1171 | Modis | Canal Crossing |
| 48 | Desrosier, Robin G. | 4946 | Special Counsel | One Paragon Place |
| 49 | Diaz, Michelle E. | 5237 | Brooke | New Orleans, LA |
| 50 | Dicken, Anthony "Tony" | 5012 | Apex | Canal Crossing |
| 51 | Domenech, Carla | 2130 | PartnerJD | One Paragon Place |
| 52 | Dorsey, Shannon M. | 5321 | Lawyer Staffing | Canal Crossing |
| 53 | Duffy, Ernest J. | 5238 | Brooke | New Orleans, LA |
| 54 | Duke, Alan | 4971 | TPX Consulting, LLC | Remote - VA |
| 55 | Durmo, Damir | 5239 | Brooke | New Orleans, LA |
| 56 | Eiwen, Charles B. | 5322 | The Mergis Group | Canal Crossing |
| 57 | Evans, William "Nick" N. | 3217 | Signature Consulting | Canal Crossing |
| 58 | Falzone, Fausto | 5400 | PartnerJD | Canal Crossing |
| 59 | Farley, Kevin J. | 5401 | PartnerJD | Canal Crossing |
| 60 | Fayman, Bryan | 1428 | PartnerJD | Canal Crossing |
| 61 | Fleming, Colin A. | 5379 | Accountemps | New Orleans, LA |
| 62 | Ford, Ryan M. | 5297 | Accountemps | New Orleans, LA |
| 63 | Freeman-Jackson, Lori | 5207 | Lawyer Staffing | One Paragon Place |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|---|---|---|---|---|
| 64 | Frey, Bruce E. | 5350 | Accountemps | One Paragon Place |
| 65 | Galle, Christy F. | 5380 | Accountemps | New Orleans, LA |
| 66 | Ganta, Sumathi | 4124 | Modis | Canal Crossing |
| 67 | Gardener, Linda J. | 5351 | The Mergis Group | One Paragon Place |
| 68 | Gaulding, Windley A. | 5352 | Accountemps | One Paragon Place |
| 69 | Geary, Patrick W. | 5402 | PartnerJD | Canal Crossing |
| 70 | George, Nicholas A. | 5382 | Accountemps | New Orleans, LA |
| 71 | Giles, Cutee | 3778 | SLAIT Consulting, LLC | Canal Crossing |
| 72 | Gnagno, Olie Cora Bibi | 4668 | PartnerJD | One Paragon Place |
| 73 | Gonzalez, Amanda B. | 5384 | Accountemps | New Orleans, LA |
| 74 | Gordon, Jonathan A. | 5265 | Lexolution | Canal Crossing |
| 75 | Gourley, Steven L. | 5266 | Lexolution | Canal Crossing |
| 76 | Graves, Phillip S. | 5353 | The Mergis Group | One Paragon Place |
| 77 | Grebe, Wayne | 3727 | Modis | Canal Crossing |
| 78 | Guillemet-Williams, Crystal | 5300 | Accountemps | New Orleans, LA |
| 79 | Gummula, Kranthi | 4843 | TPX Consulting, LLC | Canal Crossing |
| 80 | Harris, Amari S. | 5403 | PartnerJD | Canal Crossing |
| 81 | Harrison, Wanda M. | 5240 | Brooke | New Orleans, LA |
| 82 | Hassan, Nedal H. | 5241 | Brooke | New Orleans, LA |
| 83 | Hastings, Timothy A. | 4947 | Lawyer Staffing | One Paragon Place |
| 84 | Healy, Desiree D. | 5301 | Accountemps | New Orleans, LA |
| 85 | Henriksson, Pia | 4497 | Synigent Technology | Canal Crossing |
| 86 | Hershey, Ryan S. | 4846 | Lawyer Staffing | One Paragon Place |
| 87 | Hines, Charisse L. | 5404 | PartnerJD | Canal Crossing |
| 88 | Hogan, Mary | 5385 | Accountemps | New Orleans, LA |
| 89 | Holder, Sheldon A. | 5302 | Accountemps | New Orleans, LA |
| 90 | Horn, Lionel | 5227 | TPX Consulting, LLC | Remote |
| 91 | Howell, Clint | 5291 | TPX Consulting, LLC | Remote |
| 92 | Humbles, Takiyah M. | 5313 | Accountemps | New Orleans, LA |
| 93 | Ingram, Veronica | 5354 | The Mergis Group | One Paragon Place |
| 94 | Izzo, Keith A. | 5355 | The Mergis Group | One Paragon Place |
| 95 | Jammu, Harsha | 1734 | Modis | Canal Crossing |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|-----|-------------------|---------------|--------|----------|
| 96 | Jeanmarie, Cynthia M. | 5388 | Accountemps | New Orleans, LA |
| 97 | Jeter, Kenneth | 5394 | Data Concepts LLC | Canal Crossing |
| 98 | Johnson, Naisha | 2156 | Special Counsel | One Paragon Place |
| 99 | Jones, Christopher D. | 4553 | PartnerJD | One Paragon Place |
| 100 | Jordan, Seymour R. | 5405 | PartnerJD | Canal Crossing |
| 101 | Joshi, Siep | 3453 | SLAIT Consulting, LLC | Canal Crossing |
| 102 | Kalva, Lavanya | 4485 | SLAIT Consulting, LLC | Canal Crossing |
| 103 | Kancherla, Sindhura | 2640 | Modis | Canal Crossing |
| 104 | Kandula, Pradeep | 2915 | Modis | Canal Crossing |
| 105 | Kantam, Sneha | 2638 | Modis | Canal Crossing |
| 106 | Kastner, Sheri L. | 5303 | Accountemps | New Orleans, LA |
| 107 | Khandelwal, Gauri | 789 | Modis | Canal Crossing |
| 108 | Kiffin, Kemeisha A. | 5243 | Brooke | New Orleans, LA |
| 109 | Kolage, Trupti | 1443 | Special Counsel | One Paragon Place |
| 110 | Kolcum, Catherina A. | 5323 | Lawyer Staffing | Canal Crossing |
| 111 | Kondapu, Ram | 4438 | Modis | Canal Crossing |
| 112 | Kumar, Vinoth | 3258 | Modis | Canal Crossing |
| 113 | Kutumbaka, Mounika | 3216 | SLAIT Consulting, LLC | Canal Crossing |
| 114 | LaCava, Lukas J. | 5373 | Accountemps | New Orleans, LA |
| 115 | Lazard, Jeremy | 5244 | Brooke | New Orleans, LA |
| 116 | Lee, Seok "Eddy" M. | 5245 | Brooke | New Orleans, LA |
| 117 | Lewis, Brooke A. | 4556 | PartnerJD | One Paragon Place |
| 118 | Lewis, Richard T. | 5279 | Accountemps | Canal Crossing |
| 119 | Long, Marion G. | 5281 | Accountemps | Canal Crossing |
| 120 | Luan, Jia-Ping "Jessica" | 5324 | The Mergis Group | Canal Crossing |
| 121 | Madipadaga, Shashi | 829 | V-Soft Consulting | Canal Crossing |
| 122 | Maharjan, Sahana | 3274 | Modis | Canal Crossing |
| 123 | Maltseva, Anna | 5378 | Accountemps | New Orleans, LA |
| 124 | Malyala, Prashanth | 4443 | Modis | Canal Crossing |
| 125 | Malyala, Vamshi | 2636 | Modis | Canal Crossing |
| 126 | Maram, Ravi | 3455 | Signature Consulting | Canal Crossing |
| 127 | Matheny, Amina | 5325 | PartnerJD | Canal Crossing |
| 128 | Mayo, Johnita P. | 5326 | Lawyer Staffing | Canal Crossing |
| 129 | Mbugua, David H. | 5356 | Accountemps | One Paragon Place |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|---|---|---|---|---|
| 130 | McClure, Lyhana R. | 5406 | PartnerJD | Canal Crossing |
| 131 | McGill, Brenda K. | 5215 | Lawyer Staffing | One Paragon Place |
| 132 | McGregor, Glenn | 4972 | TPX Consulting, LLC | Remote - VA |
| 133 | McGurn, Daniel E. | 2115 | Lexolution | One Paragon Place |
| 134 | Meehan, Jessica | 5381 | Accountemps | New Orleans, LA |
| 135 | Megibow, Nicholas M. | 4557 | PartnerJD | One Paragon Place |
| 136 | Melton, Doug | 3799 | SLAIT Consulting, LLC | Canal Crossing |
| 137 | Mendu, Emmaneale | 1175 | Modis | Canal Crossing |
| 138 | Miller, Michelle A. | 5383 | Accountemps | New Orleans, LA |
| 139 | Miller, Thomas D. | 5357 | Accountemps | One Paragon Place |
| 140 | Mitchell, Mark G. | 5282 | Accountemps | Canal Crossing |
| 141 | Moats, Dawn | 5397 | Fahrenheit Technology | Canal Crossing |
| 142 | Moliva, Yves P. | 5358 | The Mergis Group | One Paragon Place |
| 143 | Morris, Wayne | 2456 | E W Morris Consulting | Canal Crossing |
| 144 | Muckelroy, Dennis S. | 5304 | Accountemps | New Orleans, LA |
| 145 | Mundy, Ethan P. | 2427 | PartnerJD | Canal Crossing |
| 146 | Nannuri, Aravind | 4544 | TPX Consulting, LLC | Canal Crossing |
| 147 | Newlun, Patrick R. | 5407 | PartnerJD | Canal Crossing |
| 148 | Nijhawan, Nikhil | 3539 | Modis | Canal Crossing |
| 149 | North, John R. | 5283 | Accountemps | Canal Crossing |
| 150 | Oates, Charles D. | 4866 | Lawyer Staffing | Canal Crossing |
| 151 | Oguntokun, Benga | 4466 | SMART Resources, Inc | Canal Crossing |
| 152 | Oliver, Angela D. | 5269 | The Mergis Group | Canal Crossing |
| 153 | Orubor, Stephen I. | 5408 | Lawyer Staffing | Canal Crossing |
| 154 | Ousley, Angela J. | 5284 | Accountemps | Canal Crossing |
| 155 | Oyotode, Renee M. | 5305 | Accountemps | New Orleans, LA |
| 156 | Palsa, Elisabeth S. | 5361 | Accountemps | One Paragon Place |
| 157 | Pamrag, Keerthi | 3273 | Modis | Canal Crossing |
| 158 | Panchagnula, Tejaswi | 4467 | SLAIT Consulting, LLC | Canal Crossing |
| 159 | Panyala, Sri | 675 | Prudent Technologies & Consulting | Canal Crossing |
| 160 | Parmar, Jignesh | 4458 | Modis | Canal Crossing |
| 161 | Patcha, Venkat Swetha | 2637 | Modis | Canal Crossing |
| 162 | Patel, Amita | 1756 | Data Concepts LLC | Canal Crossing |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|-----|-------------------|---------------|--------|----------|
| 163 | Patel, Dharti N. | 5362 | The Mergis Group | One Paragon Place |
| 164 | Patel, Mitesh | 2609 | Data Concepts LLC | Canal Crossing |
| 165 | Patel, Nitesh | 3379 | SLAIT Consulting, LLC | Canal Crossing |
| 166 | Pfister, Linda A. | 5246 | Brooke | New Orleans, LA |
| 167 | Pokala, Srujana | 5095 | TPX Consulting, LLC | Canal Crossing |
| 168 | Rajendran, Nithya | 5100 | Signature Consulting | Canal Crossing |
| 169 | Ramirez III, Alfred | 5386 | Accountemps | New Orleans, LA |
| 170 | Rao, Divya | 3277 | SLAIT Consulting, LLC | Canal Crossing |
| 171 | Rayburn, John H. | 5260 | Lawyer Staffing | One Paragon Place |
| 172 | Regula, Srikanth | 775 | Modis | Canal Crossing |
| 173 | Rhodd, Simone P. | 5363 | The Mergis Group | One Paragon Place |
| 174 | Riffe, Robert | 5251 | Fahrenheit Technology | Canal Crossing |
| 175 | Rispoli, Julia | 5411 | TPX Consulting, LLC | Remote - VA |
| 176 | Robert, Cassandra B. | 5387 | Accountemps | New Orleans, LA |
| 177 | Robertson, Scott | 3779 | Modis | Canal Crossing |
| 178 | Robinson, Ruth "Valerie" S. | 4949 | Special Counsel | One Paragon Place |
| 179 | Rodriguez, Miguel A. | 5247 | Brooke | New Orleans, LA |
| 180 | Romero, Yessica K. | 5272 | The Mergis Group | Canal Crossing |
| 181 | Ruddarraju, Suresh | 1173 | Modis | Canal Crossing |
| 182 | Russ, Louis | 5306 | Accountemps | New Orleans, LA |
| 183 | Saddy, Rocky L. | 5395 | Brooke | New Orleans, LA |
| 184 | Salisbury, Jessica R. | 5364 | The Mergis Group | One Paragon Place |
| 185 | Sammeta, Narendra | 1182 | Modis | Canal Crossing |
| 186 | Sandoval, Benjamin B. | 5389 | Accountemps | New Orleans, LA |
| 187 | Savage, Terri L. | 5307 | Accountemps | New Orleans, LA |
| 188 | Scott, Darlene H. | 5309 | Accountemps | New Orleans, LA |
| 189 | Scott, Dawn A. | 5220 | Lawyer Staffing | One Paragon Place |
| 190 | Settaluri, Sriranjita | 5276 | TPX Consulting, LLC | Canal Crossing |
| 191 | Shackelford, Taj Z. | 5308 | Accountemps | New Orleans, LA |
| 192 | Shetty, Rashmi | 796 | Modis | Canal Crossing |
| 193 | Shuler, Melodie V. | 4910 | PartnerJD | One Paragon Place |
| 194 | Smelley, Benjamin | 4546 | TPX Consulting, LLC | Remote - VA |
| 195 | Smith, Jerrod M. | 4911 | Special Counsel | One Paragon Place |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|-----|--------------------|---------------|--------|----------|
| 196 | Smith, Lynn M. | 5221 | Lawyer Staffing | One Paragon Place |
| 197 | Smith, Robert D. | 5365 | The Mergis Group | One Paragon Place |
| 198 | Snead, Judith H. | 5366 | The Mergis Group | One Paragon Place |
| 199 | Solomon, Kevin R. | 5329 | The Mergis Group | One Paragon Place |
| 200 | Somasundaram, Narmadha N. | 76 | Lawyer Staffing | One Paragon Place |
| 201 | Springer, Rebecca D. | 5206 | The Mergis Group | Canal Crossing |
| 202 | Srirangapurapu, Bhargavi | 3275 | Modis | Canal Crossing |
| 203 | Stanley, Raven A. | 5330 | PartnerJD | Canal Crossing |
| 204 | Sthanam, Archana | 3259 | Signature Consulting | Canal Crossing |
| 205 | Suri, Madhuri | 3263 | Synigent Technology | Canal Crossing |
| 206 | Sweet, Theodore "Ted" J. | 5332 | Lawyer Staffing | Canal Crossing |
| 207 | Tadishetty, Susmitha | 2075 | Modis | Canal Crossing |
| 208 | Tea, Michael | 5101 | SLAIT Consulting, LLC | Canal Crossing |
| 209 | Thalluri, Raveesh | 3381 | Synigent Technology | Canal Crossing |
| 210 | Thompson, Brittany M. | 5390 | Accountemps | New Orleans, LA |
| 211 | Thompson, Kymeiko T. | 5391 | Accountemps | New Orleans, LA |
| 212 | Timpano, Justin A. | 5333 | The Mergis Group | Canal Crossing |
| 213 | Tran, Christopher | 5214 | The Mergis Group | One Paragon Place |
| 214 | Tran, Richard | 5248 | Brooke | New Orleans, LA |
| 215 | Traver, Heather L. | 5334 | The Mergis Group | Canal Crossing |
| 216 | Udaipurwala, Juzer | 2611 | SLAIT Consulting, LLC | Canal Crossing |
| 217 | Valentine, Scott M. | 5249 | Brooke | New Orleans, LA |
| 218 | Valluru, Siva | 1733 | Modis | Canal Crossing |
| 219 | Vanathadupula, Bharath | 4464 | SLAIT Consulting, LLC | Canal Crossing |
| 220 | Veal, Nyesha N. | 5250 | Brooke | New Orleans, LA |
| 221 | Verma, Siddharth | 5226 | TPX Consulting, LLC | Canal Crossing |
| 222 | Villavasso, Stephen J. | 5310 | Accountemps | New Orleans, LA |
| 223 | Vuppu, Raidu | 5289 | TPX Consulting, LLC | Remote |
| 224 | Wallen, Adam | 3457 | SMART Resources, Inc | Canal Crossing |
| 225 | Wells, Shameika Z. | 5287 | Accountemps | One Paragon Place |
| 226 | Wessel, Samantha N. | 5409 | PartnerJD | Canal Crossing |
| 227 | White, Breionne M. | 5311 | Accountemps | New Orleans, LA |
| 228 | Whitehead, John | 1146 | The Ark Incorporated | Remote - VA |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|-----|--------------------|---------------|--------|----------|
| 229 | Whitlock, Tara | 5217 | The Mergis Group | One Paragon Place |
| 230 | Whitten, Lori M. | 5222 | Lexolution | One Paragon Place |
| 231 | Wiggam, Boyd O. | 4887 | PartnerJD | Canal Crossing |
| 232 | Williams, Stuart P. | 5312 | Accountemps | New Orleans, LA |
| 233 | Wilson, Charles F. | 5288 | Accountemps | Canal Crossing |
| 234 | Wilson, Quintin G. | 5392 | Accountemps | New Orleans, LA |
| 235 | Winstead, Domica M. | 4563 | PartnerJD | One Paragon Place |
| 236 | Yalamanchili, Kumar | 3284 | SLAIT Consulting, LLC | Canal Crossing |
| 237 | Yelchuri, Dinesh | 4127 | SLAIT Consulting, LLC | Canal Crossing |
| 238 | Young, David | 4614 | TPX Consulting, LLC | Remote - VA |
| 239 | Zavala, Fernando | 4745 | TPX Consulting, LLC | Remote |
| 240 | Zeng, Mei | 5336 | PartnerJD | Canal Crossing |
| 241 | Zeno, Natasha L. | 5393 | Accountemps | New Orleans, LA |
| 242 | Ziegler, Apryl T. | 5224 | Lawyer Staffing | Canal Crossing |
| 243 | Brownfield, Sr., Keljuane (Kel) | TBD | Accountemps | New Orleans, LA |
| 244 | Coleman, Candice J. | TBD | Accountemps | New Orleans, LA |
| 245 | Curley, Shondricka M. | TBD | Accountemps | New Orleans, LA |
| 246 | Ducros, Shantelle M. | TBD | Accountemps | New Orleans, LA |
| 247 | Ellzey, Josie L. | TBD | Accountemps | New Orleans, LA |
| 248 | Jackson, Troy D. | TBD | Accountemps | New Orleans, LA |
| 249 | Johnson, Courtney C. | TBD | Accountemps | New Orleans, LA |
| 250 | Joseph, Wanto | TBD | Accountemps | New Orleans, LA |
| 251 | Morris, Philip | TBD | Accountemps | New Orleans, LA |
| 252 | Mumphrey, Dana L. | TBD | Accountemps | New Orleans, LA |
| 253 | Patel, Vimesh C. | TBD | Accountemps | New Orleans, LA |
| 254 | Payton, Glinda | TBD | Accountemps | New Orleans, LA |
| 255 | Procido, Stephen M. | TBD | Accountemps | New Orleans, LA |
| 256 | Raspino, Lindsay N. | TBD | Accountemps | New Orleans, LA |
| 257 | Ruth, Trina N. | TBD | Accountemps | New Orleans, LA |
| 258 | Taylor, Wendi A. | TBD | Accountemps | New Orleans, LA |
| 259 | Huston, Mark A. | TBD | Accountemps | New Orleans, LA |
| 260 | Moore, Lakenya C. | TBD | Accountemps | New Orleans, LA |
| 261 | Ray, Russell J. | TBD | Accountemps | New Orleans, LA |
| 262 | Raya, Andrea D. | TBD | Accountemps | New Orleans, LA |
| 263 | Weathersby, Betty J. | TBD | Accountemps | New Orleans, LA |

| Row | Name of Contractor | Timekeeper ID | Agency | Location |
|-----|--------------------|--------------|--------|----------|
| 264 | Smith, Mary N. | TBD | Accountemps | New Orleans, LA |

## Task Order 1
## BrownGreer

1    This Task Order is issued by the Settlement Trust as further defined below (the "Settlement Trust") pursuant to Section 2.2 of the Agreement to Provide Claims Administration Staffing Services between BrownGreer, PLC ("Vendor") and the Settlement Trust dated May ___, 2013 (the "Agreement")

    1.1    <u>Definitions</u>: Terms capitalized but not defined herein shall have the meaning set forth in the Settlement Agreement thereto. Terms capitalized and defined herein shall have the meaning set forth herein.

    1.2    Settlement Trust means the qualified settlement trust fund established pursuant to that certain Deepwater Horizon Economic and Property Damages Trust Agreement, dated May 2, 2012, among BP, (then) Interim Class Counsel, the Claims Administrator, and the Directed Trustee.

2    <u>Scope of Services</u>:  Vendor will provide all labor and related expenses required to adjudicate economic loss claims as further defined in the Agreement, Section 2.1 for the following claim types:

- Business Economic Loss (BEL)
- Failed Business Economic Loss (F-BEL)
- Start-Up Business Economic Loss (S-BEL)
- Coastal Real Property (CRP)
- Individual Economic Loss (IEL)
- Individual Periodic and Festival Vendor (IPV)
- Real Property Sales (RPS)
- Seafood Compensation Program (SCP)
- Subsistence (SUB)
- Vessel of Opportunity (VoO)
- Vessel Physical Damage (VPD)
- Wetlands Real Property (WRP)

3    <u>Term of Task Order</u>: This Task Order is effective from April 1, 2013 through June 30, 2013. Measurements and KPI requirements will be re-evaluated with each subsequent Task Order.

4    <u>Cost Measurements</u>: The following costs are allowed under this task order.

    4.1    <u>Labor</u>: The following FTEs are allowed under this task order.

| Position | Maximum FTE |
|---|---|
| ORRAN L. BROWN, PARTNER | 1 |
| LYNN C. GREER, PARTNER | 1 |
| PARTNER | 6 |
| SENIOR COUNSEL | 10 |
| COUNSEL | 44 |
| SPECIAL COUNSEL/PROJECT ATTORNEY | 87 |
| SENIOR ANALYST I | 16 |

| | |
|---|---:|
| SENIOR ANALYST II | 6 |
| ANALYST | 54 |
| FORENSIC ACCOUNTANT | 2 |
| CLAIM REVIEW AND CALL CENTER | |
| LEGALLY TRAINED REVIEWER | 130 |
| CLAIMS REVIEWER | 700 |
| ADMINISTRATIVE ASSISTANT | 1 |
| CLAIMS ASSISTANCE CENTERS | |
| CLAIMS ASSISTANCE CENTER MANAGER | 22 |
| CLAIMS ASSISTANCE CENTER ASSISTANT MANAGER | 22 |
| CLAIMS ASSISTANCE CENTER INTERVIEWER | 70 |
| CLAIMS ASSISTANCE CENTER ASSISTANT | 220 |
| CLAIMS ASSISTANCE CENTER COORDINATOR | 17 |
| DATABASE DEVELOPMENT AND MAINTENANCE | |
| DIRECTOR OF INFORMATION MANAGEMENT | 2 |
| SENIOR PROJECT MANAGER | 5 |
| PROJECT MANAGER | 20 |
| PROJECT TEAM LEAD | 5 |
| DATABASE ADMINISTRATOR | 8 |
| SENIOR PROGRAMMER ANALYST | 16 |
| PROGRAMMER ANALYST | 55 |
| IIS ADMINISTRATOR | 3 |
| PROJECT COORDINATOR | 1 |
| QUALITY ANALYST | 1 |
| IT MANAGER | 1 |
| INFRASTRUCTURE MANAGER | 1 |
| NETWORK ADMINISTRATOR | 1 |
| HELP DESK TECHNICIAN | 12 |
| FACILITIES MANAGER | 1 |
| TRAINING MANAGER | 2 |
| TRAINING ANALYST | 16 |

Vendor may increase the staffing levels or add new positions to those set forth above in order to meet the needs of the program with thirty (30) days prior written notice to the Claims Administrator's office. All increases and any rate assignments for new positions added, are subject to Claims Administrator's approval.

4.2 <u>Other Direct Costs Expenses</u>: Vendor may charge other direct cost expenses ("ODCs") as required to perform the services as further specified in the Agreement, section 2.1. Only the following ODC's are allowed for reimbursement and shall not exceed $1,400,000 for this task order. Vendor must obtain approved in writing from the CFO for any ODCs not listed below.

| Expense Description | Items Covered | Purpose |
|---|---|---|

| | | |
|---|---|---|
| 1. Postage and Shipping | US Mail, FedEx, UPS, etc. | Mailings, notifications, etc. |
| 2. Applicant Production Cost | Stationary, Paper, Envelopes, Folders, CDs, etc. | Materials used to support Claim Processing |
| 3. Travel | Airfare, Lodging including Corporate Housing, Meals, Ground Transportation, Fuel, Baggage Fees, Rental Cars, Mileage, Parking, Tips | FTE Travel not associated with Unit Costs |
| 4. Security for on-site inspections | Security escort to be approved by CAO in advance | Security for on-site inspections |
| 5. Hardware, Software | Computers, Supplies, and other computer processing necessities including Computerized Docket Research. | Materials used to support Claim Processing |
| 6. Wireless Communication Devices | Cell phones, GPS, wireless cards, etc. | Program communications for key managers and field personnel |
| 7. Furniture | Desks, chairs, and other necessary materials | Materials used to support Claim Processing |
| 8. Leases, Rentals, and Utilities | Approved property and facilities usage costs including Janitorial Services and Insurance | Property exclusively used for the DWH settlement |
| 9. All other costs as approved | Must be approved in writing by the CEO | As needed |

5   Key Performance Indicators (KPIs):

5.1   Measuring Performance:  Vendor shall provide services subject to the following KPIs. The Claims Administrator will provide its final determination of performance within 30 days following the task order end date. Service Credits will be invoiced to the Vendor.

5.2   Changes and Additions to Service Levels: Upon at least thirty (30) days prior written notice to the Vendor, subject to mutual agreement of the Vendor and Settlement Trust, the Settlement Trust may (i) add or delete KPIs, and/or (ii) modify existing KPIs.

### Key Performance Indicators

| Task | Claim Categories | KPI | Measurement | KPI Credits |
|---|---|---|---|---|
| No KPIs will be assessed with this task order | | | | |

IN WITNESS WHEREOF, the Parties have caused this Task Order to be executed on their behalf by the undersigned duly authorized individuals.

**The Settlement Trust**

By:

_____
Signature

Patrick A. Juneau
Printed Name

Trustee
Printed Title

5/13/13
Date

**BrownGreer PLC**

By:

_____
Signature

Orran L. Brown, Sr.
Printed Name

Chairman
Printed Title

5/9/13
Date

**The Claims Administrator**

By:

_____
Signature

Patrick A. Juneau
Printed Name

Claims Administrator
Printed Title

5/13/13
Date

4